Highly Confidential - Subject to Further Confidentiality Review

1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
2                EASTERN DIVISION
3   IN RE: NATIONAL            )   MDL No. 2804
    PRESCRIPTION OPIATE        )
4   LITIGATION,                )   Case No.
                               )   1:17-MD-2804
5                              )
    THIS DOCUMENT RELATES TO   )   Hon. Dan A.
6   ALL CASES                  )   Polster
                               )
7

8                     __ __ __
9            Tuesday, January 22, 2019
                      __ __ __
10

11     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
               CONFIDENTIALITY REVIEW
                      __ __ __
12

13

14

15        Videotaped 30(b)(6) Deposition of
    Walmart, through the testimony of Susanne
16  Hiland, held at 4206 South J.B. Hunt Drive,
    Rogers, Arkansas, commencing at 8:22 a.m., on
17  the above date, before Debra A. Dibble,
    Certified Court Reporter, Registered
18  Diplomate Reporter, Certified Realtime
    Captioner, Certified Realtime Reporter and
19  Notary Public.
20

                      __ __ __
21

22

23       GOLKOW LITIGATION SERVICES
       877.370.3377 ph | fax 917.591.5672
24           deps@golkow.com
25

Page 2

```
 1        A P P E A R A N C E S :
 2   CARELLA, BYRNE, CECCHI, OLSTEIN,
     BRODY & AGNELLO, P.C.
 3   BY:  ZACHARY BOWER, ESQUIRE
          Zbower@Carellabyrne.Com
 4        MICHAEL INNES, ESQUIRE
          minnes@Carellabryne.Com
 5   5 Becker Farm Road
     Roseland, New Jersey 07068-1739
 6   (973) 994-1700
     Counsel For Plaintiffs
 7
 8   JONES DAY
     BY:  TARA FUMERTON, ESQUIRE
 9        tfumerton@Jonesday.Com
          TINA TABACCHI, ESQUIRE
10        ttabacchi@Jonesday.Com
          SCOTT ELMER, ESQUIRE
11        selmer@Jonesday.Com
          JASON ZHOU, ESQUIRE
12        jzhou@Jonesday.Com
          (Attending Telephonically)
13   77 West Wacker
     Chicago, Illinois 60601-1692
14   312-782-1692
     Counsel For Walmart
15
16   WRIGHT, LINDSEY & JENNINGS, LLP
     BY:  CALEY B. VO, ESQUIRE
17        cvo@Wlj.Com
18   3333 Pinnacle Hills Parkway
     Suite 510
19   Rogers, Arkansas 72758-8498
     (479) 986-0888
20   Counsel For McKesson
21   REED SMITH, LLP
     (Appearing Telephonically)
22   BY:  MARY BALASTER, ESQUIRE
          mbalaster@Reedsmith.Com
23   811 Main Street
     Suite 1700
24   Houston, Texas 77002-6110
     (713) 469-3800
25   Counsel For AmerisourceBergen
```

Page 3

```
 1   ARNOLD & PORTER KAYE SCHOLER, LLP
     (Appearing Telephonically)
 2   BY:  SETH WIENER, ESQUIRE
          seth.wiener@arnoldporter.com
 3   601 Massachusetts Avenue, NW
     Washington, DC 20001-3743
 4   (202) 942-5000
 5   Counsel For Endo Health Solutions
     Inc.; Endo Pharmaceuticals Inc.; Par
 6   Pharmaceuticals, Inc.; Par
     Pharmaceutical Companies, Inc.
 7   Formerly Known As Par Pharmaceutical
     Holdings, Inc.
 8
 9   BARBER LAW FIRM
     BY:  J. CARTER FAIRLEY, ESQUIRE
10        cfairley@Barberlawfirm.Com
     425 West Capitol Avenue
11   Suite 3400
     Little Rock, Arkansas 72201
12   (501) 707-6182
     Counsel For Cardinal Health, Inc.
13
14   BAILEY & WYANT, PLLC
     BY:  HARRISON M. CYRUS, ESQUIRE
15        hcyrus@Baileywyant.Com
     500 Virginia Street East
16   Suite 600
     P.O. Box 3710
17   Charleston, West Virginia 25301
     (304) 345-4222
18   Counsel For West Virginia Board of
     Pharmacy
19
20   ALSO PRESENT:
21   Jennifer B. Bechet
     Senior Associate Counsel
22   Walmart, Inc.
23   THE VIDEOGRAPHER:
24   Chris Ritona
     Golkow Litigation Services
25
```

Page 4

```
 1              INDEX
 2
     APPEARANCES              2
 3
     PROCEEDINGS              8
 4
 5
     WALMART 30(b)(6) EXAMINATION OF
 6   SUSANNE HILAND:
 7        DIRECT EXAMINATION      10
          BY MR. BOWER
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1        DEPOSITION EXHIBITS
          30(b)(6) Susanne Hiland
 2        January 22, 2019
 3   NUMBER     DESCRIPTION      PAGE
 4   Walmart-    First Notice of    24
     Hiland 1    Deposition Pursuant to
 5               Rule 30(b)(6) and
               Document Request
 6             Pursuant to Rule
               30(b)(6) and Rule 343
 7             to Wal-Mart
               Incorporation D/B/A
 8             Walmart and Sam's Club
     Walmart-   Second Notice of     25
 9   Hiland 2    Deposition Pursuant to
               Rule 30(b)(6) and
10             Document Request
               Pursuant to Rule
11             30(b)(6) and Rule 343
               to Wal-Mart
12             Incorporation D/B/A
               Walmart and Sam's Club
13   Walmart-   Administrative       74
14   Hiland 3    Memorandum of
               Agreement.
15             WMT_MDL_000043490-43496
16
17   Walmart-   3-11-10 email from    88
     Hiland 4    Edward Harris.  Subj:
18             Updated: Wal-mart
               Dendrite Conf.
19             Call-Mon. March 15 @
               11:00 Eastern/10:00
20             Central
               WMT_MDL_000011558-11565
21   Walmart-   Letters from the U.S.   93
     Hiland 5    Department of
22             Justice/Drug
               Enforcement
23             Administration.
               CAH_MDL2804_01564780-
24             1564773
```

Highly Confidential - Subject to Further Confidentiality Review

| | | |
|---|---|---|
| 1 | Walmart- 12-27-07 letter from | 128 |
| 2 | Hiland 6 U.S. Department of | |
| | Justice/Drug | |
| 3 | Enforcement | |
| | Administration. | |
| 4 | WMT_MDL_000043648-43649 | |
| 5 | Walmart- Tab 1 Walmart Responses | 165 |
| | Hiland 7 to Plaintiffs (First) | |
| 6 | Combined Discovery | |
| | Requests to National | |
| 7 | Retail Pharmacies | |
| | Defendants, Tab A | |
| 8 | WMT_MDL_000044441-44499 | |
| | Tab B | |
| 9 | WMT_MDL_000009423-9424, | |
| | Tab C | |
| 10 | WMT_MDL_000053813-53815 | |
| | Tab D | |
| 11 | WMT_MDL_0000 | |
| | 43316-43373, | |
| 12 | Tab 2 | |
| | WMT_MDL_000011106, | |
| 13 | Tab 3 | |
| | WMT_MDL_000011107-11109 | |
| 14 | Tab 4 | |
| | WMT_MDL_000000963-965, | |
| 15 | Tab 5 | |
| | WMT_MDL_000000966-968, | |
| 16 | Tab 6 | |
| | WMT_MDL_000000969-971, | |
| 17 | Tab 7 | |
| | WMT_MDL_000008377-8379, | |
| 18 | Tab 8 | |
| | WMT_MDL_000000004237-4239 | |
| 19 | Tab 9 | |
| | WMT_MDL_000004781-4783 | |
| 20 | Walmart- Excel threshold | 305 |
| 21 | Hiland 8 spreadsheet | |
| | WMT_MDL_000042877 | |
| 22 | Walmart- September 2015 email | 339 |
| 23 | Hiland 9 chain. Subj: Areas of | |
| | Focus - Week 35 | |
| 24 | WMT_MDL_000048214-48215 | |

| | | |
|---|---|---|
| 1 | Walmart- Masters decision | 346 |
| 2 | Hiland 10 September 2010 email | 393 |
| 3 | Hiland 11 chain. Subj: RE: DEA | |
| | Audit at DC 6013. | |
| 4 | WMT_MDL_000057259-57260 | |
| 5 | Walmart- February 2016 email | 419 |
| | Hiland 12 chain. Subj: FW: Areas | |
| 6 | of Focus - 2/16 - 2/19. | |
| | WMT_MDL_000003906-3907 | |
| 7 | Walmart- March 2010 email chain. | 430 |
| | Hiland 13 Subj: Updated: Wal-mart | |
| 8 | Dendrite Conf. | |
| | Call-Mon. March 15 @ | |
| 9 | 11:00 Eastern/10:00 | |
| | Central. | |
| 10 | WWMT_MDL_000011558- | |
| | 11575 | |
| 11 | Walmart- 11-30-17 email from | 437 |
| 12 | Hiland 14 Roxy Reed. Subj: DEA | |
| | SOM reports. | |
| 13 | WMT_MDL-000055271-55276 | |
| 14 | Walmart- 6-21-16 email from | 457 |
| | Hiland 15 Patsy Little. Subj: | |
| 15 | Oxycodone marketing | |
| | plan. | |
| 16 | MNK-T1_0004830712 | |
| 17 | Walmart- Chain Pharmacist | 460 |
| | Hiland 16 Practice Memo. Vol. | |
| 18 | 6/Number 9. | |
| | PKY181864224-PKY | |
| 19 | 181864229 | |
| 20 | Walmart- August 2014 email | 476 |
| | Hiland 17 chain. Subj: SOM Reqs. | |
| 21 | WMT-MDL_000028599 | |
| 22 | Walmart- Witness reference | |
| 23 | Hiland 18 binder | |
| | LATE-FILED EXHIBIT | |
| 24 | | |

1 PROCEEDINGS
2 (January 22, 2019 at 8:22 a.m.)
3 THE VIDEOGRAPHER: We are now
4 on the record. My name is Chris
5 Ritona. I am the videographer with
6 Golkow Litigation Services. Today's
7 date is January 22nd, 2019 and the
8 time is approximately 8:22 a.m.
9 This video deposition is being
10 held in Rogers, Arkansas, at Mitchell
11 Williams, 4206 South J.B. Hunt Drive,
12 Suite 200 in the Matter of National
13 Prescription Opioid Litigation MDL
14 No. 2804, Case No. 17-MD-2804 in the
15 United States District Court, Northern
16 District of Ohio, Eastern Division.
17 The deponent today is Susanne Hiland.
18 Will all counsel please identify
19 themselves for the record.
20 MR. BOWER: Good morning. Zach
21 Bower on behalf of MDL and the
22 plaintiffs.
23 MR. INNES: Good morning.
24 Michael Innes on behalf of the

1 plaintiffs and the MDL.
2 MR. FAIRLEY: Carter Fairley
3 for Cardinal.
4 MS. BECHET: Jennifer Bechet,
5 senior associate counsel, Walmart,
6 Incorporated.
7 MR. ELMER: Scott Elmer from
8 Jones Day on behalf of Walmart.
9 MS. FUMERTON: Tara Fumerton
10 from Jones Day on behalf of Walmart.
11 MR. TABACCHI: Tina Tabacchi,
12 Jones Day on behalf of Walmart.
13 THE VIDEOGRAPHER: Will all
14 counsel on the conference call please
15 also identify themselves.
16 MS. BALASTER: Mary Balaster,
17 Reed Smith, on behalf of
18 AmerisourceBergen Corporation.
19 MR. WIENER: Seth Wiener,
20 Arnold & Porter Kaye Scholer, on
21 behalf of the Endo Par defendants.
22 MR. ZHOU: Jason Zhou, Jones
23 Day, on behalf of Walmart.
24 THE VIDEOGRAPHER: The court

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 reporter today is Debbie Dibble. And
2 she will please now swear in the
3 witness.
4 SUSANNE HILAND,
5 having first been duly sworn, was examined
6 and testified as follows:
7 DIRECT EXAMINATION
8 BY MR. BOWER:
9 Q. Good morning, Ms. Hiland. How
10 are you today?
11 A. I'm fine, thank you.
12 Q. Have you ever provided sworn
13 testimony on behalf of Walmart in the past?
14 A. I have.
15 Q. Okay. And when was the first
16 time you provided such testimony?
17 A. It would have been sometime in
18 the late '90s.
19 Q. And what was that regarding?
20 A. A workmen's comp case.
21 Q. Was that a deposition?
22 A. Yes, it was.
23 Q. And where was that case
24 located, if you can recall?

Page 11

1 A. It would have been somewhere in
2 Central Florida, Lake County, Florida.
3 Q. Do you recall whether it was
4 state court or federal court?
5 A. I don't.
6 Q. Other than that time in the
7 late '90s, have you provided sworn testimony
8 on behalf of Walmart since then?
9 A. Yes.
10 Q. And what was the next time you
11 provided sworn testimony on behalf of
12 Walmart?
13 A. I don't recall the exact date.
14 Q. The approximate date?
15 A. Approximately 2011.
16 Q. And what was that regarding?
17 A. That was regarding a liability
18 case.
19 Q. Do you know what type of
20 liability it was regarding?
21 A. Prescription liability.
22 Q. And do you recall where that
23 case was located?
24 A. That was -- the deposition was

Page 12

1 taken in Tallahassee, Florida.
2 Q. Another Florida case?
3 A. Yes.
4 Q. Do you recall whether it was a
5 state or federal case?
6 A. I don't recall.
7 Q. Do you recall who defended
8 Walmart in that case? What law firm?
9 A. I don't recall.
10 Q. Do you recall anything else
11 about that case?
12 A. No.
13 Q. Do you recall were there any
14 prescription drugs at issue in that case?
15 A. Yes, it was a prescription
16 case.
17 Q. Do you know what type of drugs
18 were at issue?
19 A. It was fentanyl.
20 Q. Do you recall what the outcome
21 of the case was?
22 A. I don't recall the outcome.
23 Q. Do you recall what the
24 allegations were against Walmart?

Page 13

1 A. It was a failure to warn.
2 Q. Other than those two instances,
3 have you provided other sworn testimony on
4 behalf of Walmart?
5 A. Yes.
6 Q. When was the last time you
7 provided such testimony?
8 A. I've had several over --
9 probably following that case over the past --
10 well, since that time. I would say maybe
11 somewhere in the range of six to seven other
12 cases.
13 Q. Do you recall what those other
14 cases involved?
15 A. It was either one or two
16 employment cases, and the others were
17 liability cases.
18 Q. Do you recall whether there
19 were any other cases involving claims
20 regarding prescription opioid products?
21 A. None that I recall. I'm
22 certainly aware of no others.
23 Q. So that fentanyl one would be
24 the only one that falls under that category;

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 is that correct?
2     A.   Yes.
3     Q.   In any of those instances, were
4 you providing testimony on behalf of Walmart?
5     A.   Yes.
6     Q.   In other words, that was -- you
7 were providing testimony on behalf of the
8 corporation as you are today; is that
9 correct?
10     A.   Correct.
11     Q.   Do you recall in what cases you
12 provided that testimony?
13        MS. TABACCHI:  Objection, form.
14        THE WITNESS:  It would have
15    been all of them except the workmen's
16    comp case.
17     Q.   (BY MR. BOWER)  So prior to
18 today, you've provided testimony in behalf of
19 Walmart in approximately six to eight cases.
20 Would that be accurate?
21     A.   That's accurate, yes.
22     Q.   So it seems like you're fairly
23 familiar with the ground rules for a
24 deposition.  Would that be accurate?

Page 15

1     A.   Yes.
2     Q.   Okay.
3        And so just to make sure we're
4 all on the same page, I just want to go over
5 a couple of those rules, just so there's no
6 issues moving forward.  I think probably the
7 most important one is to make sure that you
8 understand my question.  So if at any point
9 you don't understand the question, please
10 just let me know and I'll try to rephrase it.
11 Okay?
12     A.   Okay.
13     Q.   If you don't ask me to rephrase
14 it, I'll assume that you understand the
15 question as I asked it.  Okay?
16     A.   Okay.
17     Q.   And you understand that your
18 answers today are on behalf of Walmart;
19 correct?
20     A.   Yes.
21     Q.   And that tomorrow you will be
22 providing your own fact testimony; is that
23 correct?
24     A.   Yes.

Page 16

1     Q.   And do you understand,
2 therefore, that the testimony you will give
3 today can be binding on the corporation?
4     A.   Yes.
5     Q.   Okay.  How long have you been
6 working at Walmart?
7     A.   29 years.
8     Q.   And I don't want to spend too
9 much time on your employment history, but can
10 you just -- let's start maybe in 2005, give
11 or take.  Going forward.  Okay?
12     A.   Yes.
13     Q.   What was your position in 2005?
14     A.   At the start of 2005, I was a
15 regional director for operations.  And then I
16 transitioned to a director of professional
17 services.
18     Q.   And when would that transition
19 occur?
20     A.   March of 2005.
21     Q.   Okay.
22        During that time period, did
23 you have oversight over Walmart pharmacies?
24        MS. TABACCHI:  Object to the

Page 17

1    form.
2        THE WITNESS:  In the regional
3    role I had oversight, yes.
4     Q.   (BY MR. BOWER) And what about
5 in the director role?
6     A.   In the director role, I had
7 responsibilities for Board of Pharmacy
8 issues.
9     Q.   What was your next position at
10 Walmart?
11     A.   The next position was a
12 promotion to senior director.  It was the
13 same department, but we -- the name of the
14 department changed to regulatory affairs.
15     Q.   And when did that occur?
16     A.   2009.
17     Q.   And just generally what were
18 your duties and responsibilities as the
19 senior director in regulatory affairs?  Is
20 that an accurate description of your title at
21 that time?
22     A.   That was my title.
23     Q.   Okay.
24        And what were your -- just a

Page 18

1 general description of your duties and
2 responsibilities in connection with that
3 title.
4      A.    I began to supervise the
5 directors that had responsibility for Board
6 of Pharmacy regulation.
7           I also had responsibility for
8 our licensing and registration function for
9 our facilities.  And I had federal regulatory
10 responsibility as it related to our licensed
11 pharmacies.
12          MS. TABACCHI:  Zach, of course,
13     you're welcome to inquire about the
14     witness's personal background, but
15     this is all beyond the scope of the
16     notice.
17          MR. BOWER:  I'm just trying to
18     get, like I said, a very high level.
19          MS. TABACCHI:  I just want to
20     make sure we're on the same page.  I'm
21     not going to object to every question
22     during this portion.
23          MR. BOWER:  No, I understand.
24     I'm just going to move quickly through

Page 19

1     this.
2      Q.    (BY MR. BOWER)  And what was
3 your next role at Walmart after senior
4 director of regulatory affairs?
5      A.    For a short period of time in
6 July 2011, I was senior director of
7 compliance and quality assurance.
8      Q.    So that was in 2011; is that
9 correct?
10     A.    Yes.
11     Q.    And then your next role after
12 that was?
13     A.    February 2012 of -- I'll likely
14 not get the title correct, but it was senior
15 director of clinical quality assurance.
16     Q.    Okay.
17     A.    And that was the general title.
18 I'd have to look back to get the title
19 exactly correct.
20     Q.    Approximately how many titles
21 would you say you've had at Walmart in your
22 29 years?
23     A.    One -- a different one every
24 three years approximately.

Page 20

1      Q.    What's your current title?
2      A.    My current title -- on paper my
3 title is Senior Director II, business
4 strategy.  That's an HR title.
5           In function, my title is senior
6 director of professional relations,
7 professional practice standards and clinical
8 services.
9      Q.    Do you believe you are the
10 person at Walmart with the most knowledge of
11 Walmart's maintenance and effective controls
12 against diversion?
13          MS. TABACCHI:  Object to the
14     form.
15          THE WITNESS:  I believe that
16     I'm prepared to speak to that topic on
17     behalf of Walmart.
18          MR. BOWER:  I move to strike
19     that answer.
20     Q.    (BY MR. BOWER)  I just would
21 ask you to please carefully listen to my
22 questions and answer the questions that I
23 ask.  Okay?
24     A.    Yes.

Page 21

1      Q.    The question is, do you believe
2 that you are the person at Walmart with the
3 most knowledge of Walmart's -- strike that.
4           Do you believe you are the
5 person at Walmart with the most knowledge on
6 Walmart's maintenance of effective controls
7 against diversion?
8          MS. TABACCHI:  Object to the
9     form, asked and answered.
10         THE WITNESS:  Yes.
11     Q.    (BY MR. BOWER)  How did you
12 prepare for today's deposition?
13     A.    I interviewed current and
14 former Walmart associates, I prepared with
15 counsel, and I reviewed documents.
16     Q.    Okay.  Let's take those one at
17 a time.  Get just a little more detail on
18 that.  Which former associates did you speak
19 with in preparation for today's deposition?
20     A.    I spoke to Scott Culver.
21     Q.    Are there any other former
22 employees you spoke with in connection with
23 preparation for today's deposition?
24     A.    No.

Page 22

1    Q.    What current associates did you
2  speak with in preparation for today's
3  deposition?
4    A.    I spoke to Jeff Abernathy,
5  Greg Beam, George Chapman, Dan Dyer, Chad
6  Ducote, Tim Harris, Debbie Hodges,
7  Miranda Johnson, Dena McClamroch, Mike
8  Mullins, Roxy Reed, and Ramona Sullins.
9    Q.    Did you speak with all of those
10 folks yourself?
11   A.    I spoke with them with counsel
12 present.
13   Q.    You were present for all of
14 those conversations?
15   A.    Yes.
16   Q.    Approximately how much time did
17 you spend speaking with current associates of
18 Walmart in preparation for today's
19 deposition?
20   A.    Can you clarify -- in total?
21   Q.    Yes, in total.
22   A.    Are you asking in total?
23   Q.    I'm just looking for a general
24 estimate.

Page 23

1    A.    Sure.  I would say between
2  eight and ten hours.
3    Q.    Approximately how many
4  documents did you review in preparation for
5  today's deposition?
6    A.    I reviewed hundreds.  I don't
7  know that I could -- the categories were
8  depositions, exhibits, policies, written
9  responses that we've provided in this case.
10   Q.    Okay.  Can you represent for us
11 that every document you've reviewed has been
12 produced in this case?
13       MS. TABACCHI:  I can make that
14 representation.
15   Q.    (BY MR. BOWER)  And
16 approximately how much time did you spend
17 meeting with counsel in preparation for
18 today's deposition?
19   A.    We met on -- by phone or in
20 person.  I didn't add up the -- it was on 13
21 different occasions that ranged from
22 90 minutes to 11 hours.
23   Q.    Do you recall approximately
24 when the first of those meetings occurred?

Page 24

1    A.    Yes.  June 28th.
2    Q.    Okay.  And I see that, as I'm
3  asking my questions, you're referring to some
4  documents in front of you; is that correct?
5    A.    Yes.
6    Q.    Are you using those documents
7  to refresh your recollection for today's
8  deposition?
9    A.    Yes.
10   Q.    Is there any objection to
11 including that as an exhibit to today's
12 deposition?
13       MS. TABACCHI:  After she's
14 finished using it.
15       MR. BOWER:  Yes, yes, after
16 she's done using it.  I just don't
17 know if there's going to be any
18 dispute as to what's in there.
19       MS. TABACCHI:  We're not going
20 to dispute that.
21       MR. BOWER:  Okay.  Thank you.
22       (Whereupon, Deposition Exhibit
23 Walmart 1, First Notice of Deposition
24 Pursuant to Rule 30(b)(6) and Document

Page 25

1  Request Pursuant to Rule 30(b)(6) and
2  Rule 343 to Wal-Mart Incorporation
3  D/B/A Walmart and Sam's Club, was
4  marked for identification.)
5       (Whereupon, Deposition Exhibit
6  Walmart 2, Second Notice of Deposition
7  Pursuant to Rule 30(b)(6) and Document
8  Request Pursuant to Rule 30(b)(6) and
9  Rule 343 to Wal-Mart Incorporation
10 D/B/A Walmart and Sam's Club, was
11 marked for identification.)
12   Q.    (BY MR. BOWER)  Handing you
13 what's been marked as Exhibits 1 and 2 for
14 today's deposition, which is just the
15 deposition notices that were issued prior to
16 your first meeting with counsel in June.
17       Do you recognize those
18 documents?
19   A.    I do.
20   Q.    You've reviewed those documents
21 prior to today?
22   A.    Yes.
23   Q.    Some of the folks you mentioned
24 speaking with, such as Mr. Abernathy, also

Page 26

1  provided depositions in this case.  Did you
2  review those depositions in preparation for
3  today's deposition?
4      A.   I reviewed depositions.
5      Q.   Did you --
6      A.   I --
7      Q.   I don't want to cut you off.
8  If not, please finish.
9      A.   I was finished.
10     Q.   Did you review Mr. Abernathy's
11  deposition?
12     A.   Yes.
13     Q.   Did you review Mr. Ducote's
14  deposition?
15     A.   Yes.
16     Q.   Did you review Ms. Hodges'
17  deposition?
18     A.   Yes.
19     Q.   Did you review Ms. Johnson's
20  deposition?
21     A.   Yes.
22     Q.   Did you review Ms. Reed's
23  deposition?
24     A.   Yes.

Page 27

1      Q.   When did you first review a
2  deposition transcript in this case in
3  preparation for today's deposition?
4      A.   It would have been -- if I
5  recall correctly, it would have been in -- it
6  was in December.
7      Q.   Were you reviewing the
8  deposition transcripts kind of after they
9  were happening or did you wait until a
10  certain time to prepare for today's
11  deposition?
12         MS. TABACCHI:  Object to the
13     form.
14         THE WITNESS:  I reviewed the
15     transcripts as they were made
16     available.
17     Q.   (BY MR. BOWER) Do you believe
18  you are the person at Walmart most
19  knowledgeable regarding Walmart's suspicious
20  order monitoring program for controlled
21  substances?
22     A.   Yes.
23         MS. TABACCHI:  Object to the
24     form.

Page 28

1      Q.   (BY MR. BOWER) Do you believe
2  you were the person at Walmart with the most
3  knowledge on Walmart's policies and
4  procedures related to due diligence following
5  the detection of a suspicious order?
6         MS. TABACCHI:  Object to the
7     form.
8         THE WITNESS:  Yes.
9      Q.   (BY MR. BOWER) Do you believe
10  you are the person at Walmart most
11  knowledgeable regarding the policies and
12  procedures and standards at Walmart used to
13  set and also thresholds for detecting orders
14  of interest?
15         MS. TABACCHI:  Object to the
16     form.
17         THE WITNESS:  Yes.
18         MS. TABACCHI:  I also object to
19     that as restating the topics.  So to
20     the extent that you're rephrasing the
21     topics that are either in the notice
22     or that we've agreed to, I will object
23     to those questions.
24     Q.   (BY MR. BOWER)  Are you

Page 29

1  familiar with the Controlled Substances Act?
2      A.   Yes.
3      Q.   And more specifically, are you
4  familiar with how the Controlled Substances
5  Act regulates distributors of controlled
6  substances?
7         MS. TABACCHI:  Object to the
8     form.  Calls for a legal conclusion,
9     beyond the scope of the notice.
10         THE WITNESS:  I'm aware that
11     there are obligations within the
12     Controlled Substances Act for
13     distributors.
14     Q.   (BY MR. BOWER)  Are you aware,
15  for example, that Walmart must be registered
16  in order to distribute controlled substances;
17  is that correct?
18     A.   Yes.  Walmart's DCs are
19  registered for the Controlled Substances Act.
20  We're registered.
21     Q.   Thank you for that
22  clarification.
23         And, in fact, Walmart DCs -- by
24  "DCs," you mean distribution centers;

Page 30

1 correct?
2    A.    Yes.
3    Q.    And in fact, Walmart
4 distribution centers were required to be
5 registered in order to distribute controlled
6 substances; is that an accurate statement?
7    A.    Yes. That's my understanding.
8    Q.    And in connection with that
9 requirement, those distribution centers were
10 obligated to institute suspicious order
11 monitoring programs for controlled
12 substances. Would you agree with that?
13        MS. TABACCHI: Object to the
14    form. Calls for a legal conclusion,
15    beyond the scope.
16        THE WITNESS: As a registrant,
17    we're required to implement systems to
18    detect orders and prevent diversion.
19        MS. TABACCHI: I'm sorry to
20    interrupt, but if someone has joined
21    the call, can we please get their
22    appearance for the record.
23        (Discussion off the record.)
24    Q.    (BY MR. BOWER) I'm just trying

Page 31

1 to get an understanding as to whether Walmart
2 acknowledges that, as a distributor of
3 controlled substances, it must be registered
4 with the DEA. Do you agree with that?
5        MS. TABACCHI: Object to the
6    form. Asked and answered. Calls for
7    a legal conclusion and beyond the
8    scope of the notice.
9        THE WITNESS: Yes.
10    Q.    (BY MR. BOWER) And would you
11 agree that, in order to maintain that
12 license, that registration, and in order to
13 maintain its ability to distribute controlled
14 substances, Walmart was obligated to
15 implement a program to monitor for the orders
16 of controlled substances.
17        Would you agree with that?
18        MS. TABACCHI: Object to the
19    form. Calls for a legal conclusion,
20    beyond the scope of the notice.
21        THE WITNESS: I'm aware that
22    there are requirements to implement
23    programs to alert us, the registrant,
24    of suspicious orders and investigate

Page 32

1 those orders.
2    Q.    (BY MR. BOWER) And when you
3 say "I'm aware," you're speaking on behalf of
4 Walmart; correct?
5    A.    Yes.
6    Q.    So every time today when you
7 say "I'm," you are referring to you, you're
8 speaking on behalf of Walmart. That's your
9 understanding; correct?
10        MS. TABACCHI: I object to that
11    question. The -- we will take those
12    questions as they come. And there
13    will be times when you ask a question
14    that is not calling for an answer that
15    is on behalf of the corporation, so
16    we're not going to agree to a blanket
17    assertion that every question is on
18    behalf of the corporation.
19    Q.    (BY MR. BOWER) Do you
20 understand that your answers today are on
21 behalf of the corporation?
22        MS. TABACCHI: To the extent
23    that they are within the scope of the
24    notice and our agreements.

Page 33

1        MR. BOWER: Look. I've let the
2    speaking objections go a little bit.
3    I would ask that you, so we don't take
4    time off the record the whole day,
5    just object to form and that way you
6    can sort it out later. But every
7    objection so far has been a lengthy
8    statement. I would ask if we could
9    save some time, just object to form so
10    we can move on.
11        MS. TABACCHI: I'll disagree.
12    I'll make my objections as
13    appropriate.
14    Q.    (BY MR. BOWER) Do you
15 understand that your testimony today is on
16 behalf of the corporation?
17    A.    Yes.
18    Q.    And in your previous answer,
19 you referred to "I." Were you speaking on
20 behalf of yourself or the corporation when
21 you provided that answer?
22        MS. TABACCHI: Can you please
23    restate the question that you're
24    asking about?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.    (BY MR. BOWER) Can you answer
2  that question?
3    A.    Can you restate the question?
4    Q.    I'll move on.
5         Do you agree that Walmart must
6  be proactive in designing a system to prevent
7  diversion?
8         MS. TABACCHI:  Object to the
9    form, beyond the scope.  Calls for a
10    legal conclusion.
11         THE WITNESS:  I believe that we
12    have policies in place to detect and
13    prevent diversion.  I believe that's
14    an obligation that we have.
15    Q.    (BY MR. BOWER) And do you agree
16  that Walmart must be proactive in preventing
17  diversion?
18         MS. TABACCHI:  Same objections.
19    Object to the form.
20         THE WITNESS:  Yes, I believe
21    our policies and procedures were in
22    place to be proactive and prevent
23    diversion.
24    Q.    (BY MR. BOWER)  Do you know how

Page 35

1  long the Controlled Substances Act has been
2  in place?
3         MS. TABACCHI:  Beyond the scope
4    of the notice.
5         THE WITNESS:  If I recall,
6    1970.
7    Q.    (BY MR. BOWER)  So Walmart is
8  aware that, going back to 1970, it had a --
9  to the extent it was distributing controlled
10  substances, it had an obligation to monitor
11  orders for those substances.
12         Would you agree with that?
13         MS. TABACCHI:  Object to the
14    form.  Beyond the scope of the notice.
15    Calls for a legal conclusion.
16         THE WITNESS:  The regulations
17    would apply during the time period
18    that we were distributing controlled
19    substances as a registrant.
20    Q.    (BY MR. BOWER)  Thank you
21         When did Walmart first begin
22  distributing controlled substances?
23    A.    Walmart pharmacies first
24  started in 1978.  We were not

Page 36

1  self-distributing at that time.
2    Q.    Okay.  When did Walmart first
3  become self-distributing?
4         MS. TABACCHI:  Beyond the
5    scope.
6         THE WITNESS:  Can you narrow
7    the -- are you asking about which
8    controlled substances?
9    Q.    (BY MR. BOWER)  Any controlled
10  substances?
11         MS. TABACCHI:  Beyond the
12    scope.
13         THE WITNESS:  To my knowledge,
14    it was in the mid-'80s.
15    Q.    (BY MR. BOWER)  Is it a true
16  statement that Walmart was distributing
17  controlled substances at least as of 1996?
18         MS. TABACCHI:  Object to the
19    form.  Beyond the scope.
20         THE WITNESS:  Yes.
21    Q.    (BY MR. BOWER)  And would you
22  agree that in 1996, Walmart had programs in
23  place to monitor for orders -- to monitor for
24  suspicious orders of controlled substances?

Page 37

1         MS. TABACCHI:  Object to the
2    form.  Beyond the scope.
3         THE WITNESS:  Can you restate
4    the question?
5    Q.    (BY MR. BOWER) Sure.  Did
6  Walmart have programs in place in 1996 to
7  monitor for orders of prescription -- of
8  controlled substances?
9         MS. TABACCHI:  Object to the
10    form.  Beyond the scope.
11         If you want to contain your
12    questions to the drugs that are at
13    issue in this case, I think we'll have
14    a better time of this.  There is an
15    agreed-upon list for Schedule II
16    opioids.
17    Q.    (BY MR. BOWER)  You can answer.
18    A.    We were not self-distributing
19  opioids in that time frame.
20    Q.    And so that wasn't my question.
21  I understand you listened to your counsel's
22  objection, and I would ask you not to do
23  that.  Just answer the question that I ask.
24         The question is, did Walmart

Page 38

1 have programs in place in 1996 to monitor for
2 orders of controlled substances?
3         MS. TABACCHI:  Object to the
4     form.  Beyond the scope of the notice.
5     Calls for a legal conclusion.
6         THE WITNESS:  Our distribution
7     centers would have had policies and
8     procedures in place.
9     Q.    (BY MR. BOWER)  Would they have
10 had written policies and procedures in place?
11        MS. TABACCHI:  Same objections.
12        THE WITNESS:  Not necessarily.
13    Q.    (BY MR. BOWER)  What's the
14 basis for your statement that policies and
15 procedures were in place at distribution
16 centers?
17        MS. TABACCHI:  Object to the
18    form.  What time period?
19        MR. BOWER:  1996.
20        MS. TABACCHI:  Beyond the
21    scope.
22        THE WITNESS:  The -- the
23    operation of the distribution centers
24    followed policies and procedures that

Page 39

1     the -- a -- the general operation had
2     policies and procedures in place.
3     Q.    (BY MR. BOWER)  What's the
4 basis for your statement that Walmart
5 distribution centers had policies and
6 procedures in place in 1996 to monitor for
7 orders of controlled substances?
8         MS. TABACCHI:  Same objections.
9         THE WITNESS:  I don't believe I
10    testified specifically to order
11    monitoring at that point in time.
12    Q.    (BY MR. BOWER)  Okay.  So let
13 me just ask it again, then.
14        Did Walmart have policies and
15 procedures in place in 1996 to monitor orders
16 for controlled substances?
17        MS. TABACCHI:  Object to the
18    form.  Beyond the scope of the notice.
19        THE WITNESS:  That time period
20    is not a time period that I prepared
21    for, and so I'm -- I don't have that
22    information today to share.
23    Q.    (BY MR. BOWER)  Okay.  Thank
24 you for that answer.

Page 40

1         What information -- what time
2 period did you prepare for to answer that
3 question?
4     A.    The time period that was within
5 the scope of the notice.
6     Q.    And do you recall what time
7 period it was?
8     A.    I believe it was in the 2006
9 range.  There were different time periods.
10    Q.    Well, if you'd turn to
11 Exhibit 1, for example, and you turn to
12 page 5, do you see the relevant time period
13 on the bottom of page 5?  As defined?
14    A.    I do.
15    Q.    Okay.  So when your answer
16 referred to the notice, do you see the notice
17 asked for testimony from 1995 to the present?
18    A.    I do.
19    Q.    And as you sit here today,
20 you're prepared to answer questions from 2006
21 to the present; is that correct?
22        MS. TABACCHI:  We have asserted
23    an objection to the relevant time
24    period, as you know.

Page 41

1         THE WITNESS:  Could you please
2     restate the question?
3     Q.    (BY MR. BOWER)  And as you sit
4 here today, you're only prepared to testify
5 and answer questions from the time period of
6 2006 to the present; is that correct?
7         MS. TABACCHI:  Per our
8     objection, and previous discussions.
9     Q.    (BY MR. BOWER)  Well, I
10 understand you've raised an objection, but
11 there was no previous discussions or
12 agreements to that time period.  So I'm just
13 trying to understand what you are prepared
14 today to testify to.  And the question is, am
15 I correct that you're only prepared to
16 testify today from the time period 2006 to
17 the present?
18        MS. FUMERTON:  I'd just like to
19    add that this did go before Special
20    Master Cohen, our letter dated
21    August 31st, stating what the relevant
22    time period would be, and the
23    plaintiffs at that point in time did
24    not raise any issue, and Special

Case: 1:17-md-02804-DAP  Doc #: 3026-12  Filed: 12/19/19  12 of 124.  PageID #: 463848.

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 Master Cohen did issue at that point
2 in time.
3        So I don't think it's accurate
4 for you to say that there has not been
5 a sort of agreement or decision
6 reached on this issue.
7        Moreover, Federal Rule 2 and 3
8 also talk about what the relevant time
9 period is in this case.
10       MR. BOWER:  Do you need the
11 question read back to you?
12       THE WITNESS:  Yes, please.
13       Q.   (BY MR. BOWER)  Okay.
14       And I'll just rephrase it.  I'm
15 just trying to understand what you prepared
16 for today.  Okay?
17       A.   Yes.
18       Q.   I don't think it's complicated.
19 I don't think we need all of those
20 objections.  I'm just trying to find out what
21 you have in fact prepared for today.
22       Is it a fair statement that
23 you've prepared to testify today with respect
24 to the time period 2006 to the present?

Page 43

1        A.   Yes.  However, I did speak to
2 Scott Culver who was in charge of our
3 distribution centers dating back into the
4 '90s.  And Scott represented to me that there
5 were policies and procedures in place around
6 the security and monitoring of orders --
7        Q.   Okay.
8        A.   -- at the distribution centers
9 that many years ago.
10       Q.   Okay.  And were those policies
11 he referred to written policies?
12       MS. TABACCHI:  Object to the
13 form.
14       THE WITNESS:  He described to
15 me the processes and the interactions
16 that they would have based on
17 reviewing orders.  But there were no
18 policies that we could locate.
19       Q.   (BY MR. BOWER)  Okay.  And how
20 did you get in touch with Mr. Culver?
21       A.   Through counsel.
22       Q.   Okay.  Did you call him or did
23 he call you?
24       MS. TABACCHI:  Object to the

Page 44

1 form.  Asked and answered.
2        THE WITNESS:  He came to the
3 office in person and met with me.
4        Q.   (BY MR. BOWER)  Oh, you visited
5 with him in person?
6        A.   Yes.
7        Q.   Do you know where Scott
8 currently resides?
9        A.   Somewhere in Northwest
10 Arkansas.
11       Q.   And Mr. Culver has knowledge on
12 Walmart's policies and procedures from
13 monitoring orders of controlled substances in
14 Walmart DCs prior to 2006; is that correct?
15       A.   If I can refer to his --
16       Q.   Sure.
17       A.   -- time period.
18       Yes.
19       Q.   And what were Walmart's
20 policies and procedures for monitoring orders
21 of controlled substances that Mr. Culver
22 conveyed to you?
23       A.   The information that he
24 provided to me related to the interactions

Page 45

1 that his associates would have with DEA
2 providing reporting, working collaboratively
3 with the DEA and the process that the
4 associates went through to understand orders
5 that were outlier orders as they processed
6 orders through the distribution center.
7        Q.   And what was the process that
8 the associates went through to understand the
9 orders that were outliers?
10       A.   Much of it was
11 experience-based.  There were very tenured
12 associates, and their jobs were
13 specifically -- they were specifically
14 assigned to the controlled substance
15 processing areas.  And so they were very
16 familiar with practices and what might be out
17 of the ordinary.
18       Q.   What specifically would they
19 look for?
20       A.   They would be looking for
21 orders that were of an unusual size.  They
22 would be monitoring for any type of an order
23 that was requested outside of a normal
24 ordering schedule that Walmart had

Page 46

1 established.  And those were the -- those
2 were the things that they were looking for.
3     Q.    What do you mean by "normal
4 ordering schedule that Walmart had
5 established"?
6     A.    So for Walmart, the way that
7 our distribution was set up, every pharmacy
8 only received an order once a week.  And so
9 that was the schedule.  It was -- it was a
10 certain set of stores that would order four
11 days out -- one day of the week, but we only
12 distributed four days out of the week.  And
13 so they could see also if there were manual
14 orders coming in or requests for some
15 different order schedule.
16     Q.    So they were, for example,
17 looking at as to whether a store ordered more
18 than once a week?  Is that correct?
19     A.    What they would look for is --
20 there was a process for a store to order
21 outside of their normal pattern, so they
22 would be looking for those.  And then
23 understanding why they needed it outside of
24 that normal day.

Page 47

1     Q.    And what would they look for
2 with respect to normal pattern?
3     A.    That -- so that would be one of
4 the patterns that they would look for, was
5 order pattern, was it outside of the cycle.
6 The other thing that they would do is reach
7 out to stores and have conversations about
8 the needs if they noticed there was something
9 out of the ordinary.
10     Q.    And this was occurring as of
11 1996.  Is that your understanding?
12     A.    My understanding was that there
13 were -- there were processes in place before
14 we distributed C-IIs, and that started in
15 2002.  So that when the DC was opened in
16 2002, there had been a lot of conversations
17 with the DEA prior to that, around current
18 processes, what needed to carry over and how
19 to open that building.
20     Q.    Is it your testimony that
21 Walmart did not distribute C-IIs prior to
22 2002?
23     A.    We did not self-distribute
24 C-IIs prior to that time.

Page 48

1     Q.    Okay.  And I just want to make
2 sure that the record is clear.  And my
3 question was limited to self-distribution.
4 And I understand there may be no difference,
5 but I just wanted to make sure that I'm
6 crystal clear as to whether that question was
7 provided an answer.  So let me ask it again.
8         Did Walmart distribute C-II
9 products prior to 2002?
10         MS. TABACCHI:  Beyond the
11 scope.
12         THE WITNESS:  No.
13     Q.    (BY MR. BOWER)  Did Walmart
14 distribute hydrocodone prior to 2002?
15         MS. TABACCHI:  Beyond the
16 scope.
17         THE WITNESS:  Yes.
18     Q.    (BY MR. BOWER)  Previously you
19 referenced interactions of associates with
20 the DEA.  Do you recall that testimony?
21     A.    Yes.
22     Q.    Okay.  Do you recall any more
23 specificity regarding which associates
24 interacted with the DEA?

Page 49

1         MS. TABACCHI:  Object to the
2 form.
3         THE WITNESS:  In -- can you
4 specify a time frame?
5     Q.    (BY MR. BOWER)  Sure.  Prior to
6 2006.
7     A.    Those interactions would be
8 with Scott Culver.  Scott relayed that he
9 interacted with the DEA prior to 2006 in his
10 role.
11     Q.    Did Mr. Culver convey to you
12 that he relied on those interactions with the
13 DEA in determining what policy would be used
14 to monitor for orders of controlled
15 substances?
16         MS. TABACCHI:  Object to the
17 form.  Beyond the scope.
18         You may answer.
19         THE WITNESS:  What he conveyed
20 to me was that he worked interactively
21 with the DEA around requirements and
22 understanding what their expectations
23 were that ranged from physical
24 security of the buildings, the

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  shipping mechanisms to ensure safe
2  transport, as well as any reporting or
3  processes that the associates were
4  conducting as they were order
5  monitoring.
6      Q.   (BY MR. BOWER)  And how many
7  associates during this time period that you
8  covered with Mr. Culver were -- had the
9  responsibility to review orders of controlled
10  substances?
11          MS. TABACCHI:  Object to the
12  form.  Beyond the scope.
13          THE WITNESS:  There would be a
14  number of associates in the
15  distribution center, depending on the
16  distribution center.  But it would be
17  limited to the management of those
18  distribution centers.
19      Q.   (BY MR. BOWER)  Well,
20  approximately how many associates in each
21  distribution center would have that
22  responsibility?
23          MS. TABACCHI:  Object to the
24  form.  Beyond the scope.

Page 51

1          THE WITNESS:  As the orders
2  were coming in to the -- so
3  specifically to the C-II facility, the
4  order team was reviewing the size of
5  those orders, and they would raise
6  those up if there was some --
7  something that they spotted.  So there
8  was a team of order reviewers, but
9  the -- the management that was in the
10  building would have been limited to a
11  handful of managers, possibly two or
12  three in any building.
13      Q.   (BY MR. BOWER)  I just want to
14  make sure that we're all on the same page.
15  What time period was that answer regarding?
16  Because you mentioned C-IIs.  Was that post
17  2002, your answer?
18      A.   That would be correct.
19      Q.   Okay.  So in your answer, you
20  stated reviewing the size of those orders,
21  and they would raise those up with some --
22  something that they spotted.  What does that
23  mean?
24      A.   That means they were looking

Page 52

1  for unusual orders of unusual size as the
2  orders were being processed.
3      Q.   And how would they determine
4  whether an order was of unusual size?
5      A.   These were --
6          MS. TABACCHI:  Beyond the
7  scope.
8          THE WITNESS:  These were
9  long-tenured associates that
10  understood the business and the fact
11  that we were self-distributing.  So
12  they saw the -- they saw the patterns.
13  They worked with it every single day.
14      Q.   (BY MR. BOWER)  They were using
15  their memory?  Is that correct?
16          MS. TABACCHI:  Object to the
17  form.
18          THE WITNESS:  They were using
19  their experience.
20      Q.   (BY MR. BOWER)  Were they using
21  any written information to make those
22  judgments?
23          MS. TABACCHI:  Object to the
24  form.  Beyond the scope.

Page 53

1          THE WITNESS:  Those were just
2  to alert -- to alert the management
3  that there might be something more
4  that needed to be looked into, which
5  would then be passed to the
6  management.
7      Q.   (BY MR. BOWER)  Okay.  Well, I
8  want to talk about passing to the management
9  in a moment, but I'm just trying to figure
10  out this alert step.  And to just go back to
11  my question, my prior question.
12          The associates were reviewing
13  orders in the 2002-2003 time period for
14  C-IIs.  Were they using any written
15  information in connection with those reviews?
16          MS. TABACCHI:  Beyond the
17  scope.
18          THE WITNESS:  They were looking
19  at orders that were coming in.
20  Those -- those orders were in a
21  system, and beyond -- they -- beyond
22  that, as they were reviewing the
23  orders, that was the process.
24      Q.   (BY MR. BOWER)  So other than

Page 54

1 reviewing the actual order itself, was there
2 any other information they would consider?
3      MS. TABACCHI: Beyond the
4 scope. Object to the form.
5      THE WITNESS: Not in that
6 specific step.
7      Q.    (BY MR. BOWER) And during this
8 time period, approximately how many
9 pharmacies did Walmart have?
10      MS. TABACCHI: Object to the
11 form, beyond the scope.
12      THE WITNESS: We have store
13 number counts. I don't have that
14 number in front of me today.
15      Q.    (BY MR. BOWER) Would you be
16 surprised at this time period there was 3- to
17 4,000 pharmacies in the U.S. for Walmart?
18      MS. TABACCHI: Object to the
19 form, beyond the scope.
20      THE WITNESS: No, that would
21 not surprise me.
22      Q.    (BY MR. BOWER) And it's your
23 testimony today that these associates at
24 DC 6045 would review orders for each of those

Page 55

1 pharmacies and use their memory to determine
2 whether an order was for unusual size?
3      MS. TABACCHI: Object to the
4 form, beyond the scope, misstates
5 testimony.
6      THE WITNESS: Not all stores
7 ordered every week. Not all stores
8 ordered every day. And that was not
9 the only step that was being
10 performed.
11      Q.    (BY MR. BOWER) Well, other than
12 their experience, which is -- is experience
13 in your testimony any different than their
14 memory?
15      MS. TABACCHI: Object to the
16 form.
17      THE WITNESS: Yes, I think so.
18      Q.    (BY MR. BOWER) And how is it
19 different?
20      MS. TABACCHI: Same objection.
21      THE WITNESS: In my personal
22 opinion?
23      Q.    (BY MR. BOWER) Yes.
24      A.    Is that what you're asking?

Page 56

1      Q.    Yes.
2      A.    I think experience takes in a
3 lot of different factors that includes
4 judgment.
5      Q.    And did these folks who were
6 reviewing orders for controlled substances
7 during the 2002-2003 time period receive
8 training in connection with what they were
9 looking for?
10      MS. TABACCHI: Object to the
11 form, beyond the scope.
12      THE WITNESS: The associates
13 were trained in their roles in the
14 distribution center.
15      Q.    (BY MR. BOWER) But did -- my
16 question is a little more focused than that.
17 I'm just trying to get at whether they
18 received any training specific to their roles
19 for monitoring orders of controlled
20 substances.
21      MS. TABACCHI: Same objections.
22      THE WITNESS: In my
23 conversations with Scott Culver, and
24 confirmed by Mike Mullins, the

Page 57

1 associates were trained in their
2 roles, and they understood the fact
3 that they were in a controlled
4 substances facility and the gravity of
5 the products that they were shipping.
6      Q.    (BY MR. BOWER) So even during
7 this time period, Walmart was aware of the
8 gravity of the products that were being
9 shipped; right?
10      MS. TABACCHI: Object to the
11 form. Beyond the scope.
12      THE WITNESS: Yes, we
13 understood that we were shipping
14 controlled substances that were
15 regulated.
16      Q.    (BY MR. BOWER) And those
17 controlled substances were regulated because
18 they were highly addictive. Would you agree
19 with that?
20      MS. TABACCHI: Object to the
21 form, beyond the scope.
22      THE WITNESS: They're scheduled
23 because they do have the potential for
24 addictive properties, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    Q.   (BY MR. BOWER) Well, other
2  than them being scheduled as controlled IIs,
3  did Walmart understand that these products
4  that it was distributing had the potential to
5  be deadly?
6         MS. TABACCHI: Object to the
7     form. This is beyond the scope of the
8     notice.
9         You may ask the witness in her
10    individual capacity. This is beyond
11    the scope of the notice.
12        MR. BOWER: You can answer.
13        THE WITNESS: We understand the
14    highly regulated nature of the C-IIs
15    and the addictive potential behind
16    those products.
17   Q.   (BY MR. BOWER) And earlier you
18 mentioned you testified in a case regarding
19 fentanyl; is that correct?
20   A.   Yes.
21   Q.   Was a person harmed as a result
22 of use of fentanyl?
23        MS. TABACCHI: Object to the
24    form. Beyond the scope.

Page 59

1         THE WITNESS: Yes.
2    Q.   (BY MR. BOWER) And that person
3  received the fentanyl from a Walmart
4  pharmacy?
5         MS. TABACCHI: Same objection.
6         THE WITNESS: Our pharmacy
7     filled the prescription according to
8     the -- there was no error on the part
9     of Walmart in the way that the
10    prescription was filled or dispensed.
11   Q.   (BY MR. BOWER) And I
12 understand that you're defending Walmart
13 here, and I'm not trying to phrase my answer
14 in any -- my question in any particular way.
15 I'm just trying to understand whether that
16 fentanyl was provided to the person who sued
17 Walmart by a Walmart pharmacy.
18        MS. TABACCHI: Object to the
19    form. Beyond the scope.
20        THE WITNESS: Yes.
21   Q.   (BY MR. BOWER) Do you know
22 what happened to that person who bought that
23 fentanyl?
24        MS. TABACCHI: Same objections.

Page 60

1         THE WITNESS: Yes, she died.
2    Q.   (BY MR. BOWER) And when was
3  that case, approximately?
4         MS. TABACCHI: Same objections.
5         THE WITNESS: The deposition
6     was approximately in 2011. So the
7     case would likely have been a couple
8     of years before that. I don't know
9     exactly.
10   Q.   (BY MR. BOWER) So Walmart
11 would have been on notice at least with
12 respect to when that case was filed that
13 fentanyl could be deadly; is that accurate?
14        MS. TABACCHI: Object to the
15    form, beyond the scope of the notice.
16        THE WITNESS: We understand the
17    nature and the potential of the drugs.
18    In this case the drug wasn't used as
19    it was prescribed.
20   Q.   (BY MR. BOWER) And what's your
21 basis for the statement "The drug wasn't used
22 as it was prescribed"?
23        MS. TABACCHI: Beyond the
24    scope.

Page 61

1         THE WITNESS: My recall of the
2     case was that the fentanyl was
3     dispensed and intended to be used
4     immediately, and the patient waited
5     and didn't use it. And then at some
6     point later was opioid naive and
7     decided to use the patch.
8    Q.   (BY MR. BOWER) And what do you
9  mean by "opioid naive"?
10        MS. TABACCHI: Beyond the
11    scope.
12        THE WITNESS: Didn't have a
13    previous history of taking opioids.
14   Q.   (BY MR. BOWER) Are patients
15 who don't have a previous history of taking
16 opioids all opioid naive?
17        MS. TABACCHI: Object to the
18    form, beyond the scope.
19        THE WITNESS: In -- the way
20    that I think about use of opioids is
21    based on prior use. And there's -- I
22    know that there's a formula that can
23    be used to determine whether or not a
24    patient, a person has taken enough

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  opioids and not be considered opioid
2  naive.
3      Q.   (BY MR. BOWER)  And what
4  formula are you referring to?
5          MS. TABACCHI:  Beyond the
6  scope.
7          THE WITNESS:  I've looked at
8  different resources to -- I don't
9  recall if it was CDC or another
10 resource that provided dosing around
11 opioid-naive patients.
12     Q.   (BY MR. BOWER) When did you
13 look at those different resources?  Do you
14 recall the first time you looked at them?
15         MS. TABACCHI:  Object to the
16 form.  Beyond the scope.
17         THE WITNESS:  As a pharmacist,
18 I've looked at them over the years.
19     Q.   (BY MR. BOWER)  Okay.  As a
20 pharmacist, have you kept up-to-date with the
21 CDC website regarding opioid use?
22         MS. TABACCHI:  Object to the
23 form.  Beyond the scope.
24         THE WITNESS:  I believe I have.

Page 63

1      Q.   (BY MR. BOWER) Has Walmart kept
2  up with the CDC website regarding opioid
3  abuse?
4          MS. TABACCHI:  Object to form.
5  This is beyond the scope of the
6  notice.
7          THE WITNESS:  I believe we
8  have.
9      Q.   (BY MR. BOWER) Did Walmart in
10 designing its suspicious order monitoring
11 policies for Controlled-II consider the
12 public harm that could arise from abuse of
13 opioids?
14         MS. TABACCHI:  Object to the
15 form.  Can you please repeat the
16 question.
17         (Whereupon, the following
18 testimony was read by the court
19 reporter.)
20         "QUESTION:  Did Walmart in
21 designing its suspicious order
22 monitoring policies for Controlled-II
23 consider the public harm that could
24 arise from abuse of opioids?"

Page 64

1      (End of readback.)
2          MS. TABACCHI:  Object to the
3  form.  Beyond the scope.
4          THE WITNESS:  Our order
5  monitoring policies are designed to
6  help detect and prevent diversion from
7  appropriate medical use.
8      Q.   (BY MR. BOWER)  And in adding
9  those order monitoring policies, did Walmart
10 consider the harm that would result from
11 potential diversion?
12         MS. TABACCHI:  Object to the
13 form.  Beyond the scope.
14         THE WITNESS:  I believe we take
15 our responsibilities seriously around
16 preventing diversion, and the reason
17 to prevent diversion would be so that
18 there isn't -- to prevent harm.
19     Q.   (BY MR. BOWER) Does Walmart
20 agree that an increase in diversion could
21 lead to an increase in harm to the public?
22         MS. TABACCHI:  Object to the
23 form.  And beyond the scope.
24         THE WITNESS:  Can you repeat

Page 65

1  the question?
2      Q.   (BY MR. BOWER)  And I should
3  have not paused.  It's my fault.
4          Does Walmart agree that an
5  increase in diversion could be -- strike
6  that.  I won't read it from that.  I'll read
7  it from here.
8          Does Walmart agree that an
9  increase in diversion could lead to an
10 increase in harm to the public?
11         MS. TABACCHI:  Object to the
12 form.  Beyond the scope.
13         THE WITNESS:  We -- I don't
14 think that we could know the purpose
15 for someone diverting.  If it's not
16 for appropriate use, it would result
17 in harm.
18     Q.   (BY MR. BOWER)  Do you
19 understand that the Controlled Substances Act
20 provides for a closed system of distribution
21 for controlled substances?
22         MS. TABACCHI:  Object to the
23 form.  Calls for a legal conclusion.
24 Beyond the scope.

Page 66

1    THE WITNESS: I don't think I
2  understand the question.
3    Q.   (BY MR. BOWER) Okay. I'm
4  going to rephrase.
5    Does Walmart acknowledge that
6  one of the goals of the Controlled Substances
7  Act is to provide for a closed system of
8  distribution for controlled substances?
9    MS. TABACCHI: Same objections.
10    THE WITNESS: I don't know that
11  I've -- I understand the closed
12  distribution system within the
13  Controlled Substances Act.
14    Walmart has a closed
15  distribution system.
16    Q.   (BY MR. BOWER) What do you
17  mean when you say "Walmart has a closed
18  distribution system"?
19    A.   We only self-distribute.
20    Q.   But do you understand that the
21  Controlled Substances Act provides that only
22  licensed entities are allowed to touch or
23  provide a controlled substance to anyone
24  else?

Page 67

1    MS. TABACCHI: Object to the
2  form. Beyond the scope. Calls for a
3  legal conclusion.
4    THE WITNESS: I understand that
5  one of the tenets of the Controlled
6  Substances Act is setting standards
7  for registration to distribute
8  controlled substances.
9    I don't think about that as a
10  closed system.
11    Q.   (BY MR. BOWER) And does
12  Walmart acknowledge that one important aspect
13  of the CSA is that everyone in the chain of
14  distribution, starting with the manufacturers
15  and going through to the distributors and
16  down to the pharmacies, must be registered
17  with the DEA?
18    MS. TABACCHI: Object to the
19  form. Calls for a legal conclusion.
20  This is beyond the scope of the
21  notice.
22    THE WITNESS: Can you repeat
23  the question?
24    Q.   (BY MR. BOWER) I'm just trying

Page 68

1  to understand Walmart's understanding of what
2  the CSA requires. Okay?
3    MS. TABACCHI: Which is not a
4  topic in the notice for the deposition
5  today.
6    MR. BOWER: Okay. Just so you
7  understand what I'm trying to ask.
8  Okay?
9    THE WITNESS: Yes.
10    Q.   (BY MR. BOWER) Okay. And I'm
11  just trying to understand whether Walmart
12  acknowledges that everyone in that system,
13  from the manufacturers to the distributors to
14  the pharmacies, must be registered with the
15  DEA.
16    MS. TABACCHI: Object to the
17  form. Beyond the scope of the notice.
18  Calls for a legal conclusion.
19    THE WITNESS: Yes.
20    Q.   (BY MR. BOWER) Walmart is
21  aware, for example, that its pharmacies are
22  registered with the DEA; correct?
23    A.   Correct.
24    Q.   And Walmart itself as a

Page 69

1  distributor was registered with the DEA at
2  the time it distributed controlled
3  substances; correct?
4    A.   Correct.
5    Q.   And Walmart is also familiar
6  with the manufacturers from which it acquires
7  controlled substances are also registered
8  with the DEA; is that correct?
9    MS. TABACCHI: Object to the
10  form. Beyond the scope.
11    THE WITNESS: Yes.
12    Q.   (BY MR. BOWER) Are you
13  familiar with Mr. Rannazzisi from the DEA?
14    MS. TABACCHI: Object to the
15  form.
16    THE WITNESS: I'm familiar with
17  his name.
18    Q.   (BY MR. BOWER) Is Walmart
19  familiar with Mr. Rannazzisi?
20    MS. TABACCHI: Object to the
21  form.
22    THE WITNESS: I know that we
23  have in our files a letter from
24  Mr. Rannazzisi.

Page 70

1  Q.   (BY MR. BOWER) You referenced
2  a letter.  How many letters does Walmart have
3  in its files from Mr. Rannazzisi?
4       MS. TABACCHI:  Object to the
5  form, beyond the scope.
6       THE WITNESS:  To my knowledge
7  in the search that was done, just one.
8  Q.   (BY MR. BOWER) And would you
9  dispute the fact that Walmart has received
10 four letters from Mr. Rannazzisi?
11      MS. TABACCHI:  Object to the
12 form.
13      MR. BOWER:  I'll strike that.
14 Q.   (BY MR. BOWER) Does Walmart
15 acknowledge that Mr. Rannazzisi sent Walmart
16 four letters regarding the distribution of
17 controlled substances?
18      MS. TABACCHI:  Object to the
19 form.
20      THE WITNESS:  I've seen one
21 letter that we have in our files.
22      So that's the only one that I'm
23 aware of.
24 Q.   (BY MR. BOWER) And I'm not

Page 71

1  asking you in your personal capacity, just to
2  be clear.  I'm asking you in your capacity as
3  Walmart here today.  Does Walmart acknowledge
4  that Mr. Rannazzisi provided Walmart at least
5  four letters regarding the distribution of
6  controlled substances?
7       MS. TABACCHI:  Object to the
8  form.  Asked and answered.
9       THE WITNESS:  I don't -- I
10 don't dispute it.  I don't have
11 evidence of a record that I've been
12 able to review.
13 Q.   (BY MR. BOWER) Would you agree
14 that if Walmart receives letters from the DEA
15 regarding the distribution of controlled
16 substances, that those letters are important?
17      MS. TABACCHI:  Object to the
18 form.
19      THE WITNESS:  We would hold
20 communication with the DEA important.
21 Q.   (BY MR. BOWER) Would you agree
22 that Walmart should keep those communications
23 in its files?
24      MS. TABACCHI:  Object to the

Page 72

1  form.  Beyond the scope.
2       THE WITNESS:  I think it
3  depends on what the -- what the nature
4  of the communication is as to whether
5  it should be filed and for how long it
6  should be filed.
7  Q.   (BY MR. BOWER) Is it Walmart's
8  position that at some point those
9  communications would be discarded?
10      MS. TABACCHI:  Object to the
11 form.  Beyond the scope of the notice.
12      If you're talking about a
13 particular communication, I'd ask that
14 you present it to the witness.
15      THE WITNESS:  I think that even
16 DEA guidance changes every time, so
17 there may be information that just
18 isn't relevant.  And I just don't know
19 without seeing additional information.
20 Q.   (BY MR. BOWER) Did Walmart
21 also enter a settlement agreement with
22 Mr. Rannazzisi?
23      MS. TABACCHI:  Object to the
24 form.  Beyond the scope of the notice.

Page 73

1       THE WITNESS:  Can you be more
2  specific about Mr. Rannazzisi
3  specifically?
4  Q.   (BY MR. BOWER) Sure.  Has
5  Walmart ever entered a settlement agreement
6  where Mr. Rannazzisi was a signatory on
7  behalf of the government?
8       MS. TABACCHI:  Object to the
9  form.  Beyond the scope of the notice.
10      If you have a particular agreement,
11 I'd ask that you present it to us.
12      THE WITNESS:  Can you be -- can
13 you be more specific from --
14      I'm not aware from a
15 distribution perspective that we've
16 had a settlement that Mr. Rannazzisi
17 signed.
18 Q.   (BY MR. BOWER) And my question
19 wasn't limited to distribution.  Are you
20 aware of any settlement agreement that
21 Walmart has entered into where Mr. Rannazzisi
22 was a signatory on behalf of the government?
23      MS. TABACCHI:  Object to form.
24 Asked and answered.  Beyond the scope.

Page 74

1    THE WITNESS: We've had a
2 settlement agreement with the DEA.
3    Q.   (BY MR. BOWER) And what was
4 that agreement regarding?
5    MS. TABACCHI: Beyond the
6 scope.
7    THE WITNESS: It was regarding
8 our pharmacies, our dispensing.
9    Q.   (BY MR. BOWER) Can you provide
10 any more specificity on that?
11    MS. TABACCHI: Beyond the
12 scope.
13    THE WITNESS: There was a
14 settlement agreement around a -- if I
15 recall correctly, the -- an effective
16 program around the dispensing of
17 controlled substances. And out of
18 that, the DEA asked us, or we were
19 required to begin documenting
20 refusal-to-fill activities by our
21 pharmacists.
22    (Whereupon, Deposition Exhibit
23    Walmart 3, Administrative
24 Memorandum of Agreement, WMT_MDL_

Page 75

1 000043490-43496, was marked for
2 identification.)
3    Q.   (BY MR. BOWER) Okay. You've
4 been handed what's been marked as Exhibit 3.
5 Is this the settlement agreement that you
6 were just testifying about?
7    A.   Yes.
8    Q.   Okay. So at least as of 2011,
9 Walmart was familiar with Mr. Rannazzisi.
10 Would you agree with that?
11    A.   May I review the document?
12    MS. TABACCHI: Object to the
13 form.
14    Q.   (BY MR. BOWER) I didn't ask
15 you a question about the document. Can you
16 see on page 7, Mr. Rannazzisi is a signatory?
17    Do you see that?
18    A.   Yes.
19    Q.   So would you agree that at
20 least as of this date, Walmart must have been
21 familiar with who Mr. Rannazzisi was. Right?
22    A.   Yes.
23    Q.   And if you could just turn to
24 page 2 of the document.

Page 76

1    Okay. I have a question. Just
2 one question on this one.
3    On paragraph 4(a), kind of the
4 end of paragraph 4(a).
5    MS. TABACCHI: Zach, could you
6 just give the witness a moment? I
7 think she asked to read it before you
8 told her just to look at the
9 signature. Just let her read it.
10    Q.   (BY MR. BOWER) Sure. I'll
11 read it for the record while you're doing
12 that. The question I have is -- the sentence
13 that says, "This compliance program shall
14 apply to all current and future Walmart
15 pharmacies registered with the DEA. Walmart
16 acknowledges and agrees that the obligations
17 undertaken in this subparagraph do not
18 fulfill the totality of its obligations under
19 the CSA and its implementing regulations."
20    Did I read that accurately?
21    MS. TABACCHI: Object to the
22 form.
23    I'd ask that you give the
24 witness an opportunity to read the

Page 77

1 document.
2    This is beyond the scope of the
3 notice, also.
4    THE WITNESS: Yes, that's what
5 that portion reads.
6    Q.   (BY MR. BOWER) So this
7 document is telling Walmart that, in addition
8 to their obligations here, it has other
9 obligations under the CSA?
10    Would you agree with that?
11    MS. TABACCHI: Object to the
12 form. Beyond the scope of the notice.
13    THE WITNESS: It's stating that
14 this does not fulfill all obligations
15 under the CSA.
16    Q.   (BY MR. BOWER) Okay. And if
17 you look at kind of the last sentence on the
18 first page that rolls over to the second page
19 starting with "Moreover"?
20    The last sentence there, it
21 says, "Moreover, the parties believe that the
22 continued cooperation between the parties to
23 reduce the potential for diversion is in the
24 public interest." Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    MS. TABACCHI: I'm sorry, Zach.
2  I don't see where you're reading from.
3    MR. BOWER: Page 1, the last
4  two words on page 1 that says
5  "Moreover."
6    MS. TABACCHI: Oh, you're on
7  the first page.
8    MR. BOWER: Yeah, first two
9  words on the first page and then it
10  bleeds over to the second page.
11    So I'll just read it again.
12    It says, "Moreover, parties
13  believe that the continued cooperation
14  between the parties to reduce the
15  potential for diversion is in the
16  public interest."
17    Do you see that?
18    THE WITNESS: I see that.
19    Q.   (BY MR. BOWER) So Walmart
20  acknowledged, in 2011, that reducing the
21  potential for diversion was in the public
22  interest. Would you agree with that?
23    MS. TABACCHI: This document is
24  beyond the scope.

Page 79

1    THE WITNESS: I see that, and I
2  also see in that sentence that -- the
3  point of working collaboratively with
4  the DEA, which I believe that we have
5  a history of doing.
6    Q.   (BY MR. BOWER) Did Walmart
7  rely on guidance from the DEA in implementing
8  or designing its suspicious order monitoring
9  programs?
10    A.   We didn't solely rely on
11  guidance, but we certainly had conversations
12  with the DEA regarding our plans, and took
13  into consideration any recommendations,
14  thoughts, suggestions that they had for how
15  we established our policies and practices.
16    Q.   And what conversations are you
17  referring to specifically?
18    A.   We have -- so in speaking with
19  Scott Culver, Scott relayed the conversations
20  that he had with the DEA in establishing the
21  C-II facility, our distribution facility,
22  even before any plans were built. Blueprints
23  were reviewed. Contractors were -- or at
24  least DEA-approved contractors to build the

Page 80

1  facility. Over multiple interactions with
2  the DEA, they've seen our processes. They've
3  reviewed our reports. They've asked for
4  additional information which we've provided.
5  And so we have a -- we have a long history of
6  interaction, positive interaction, and
7  collaborative interaction with the DEA.
8    Q.   (BY MR. BOWER) Okay. And now
9  I want to ask probably a better question than
10  the last one. So my question is more focused
11  than that. I want to ask specifically what
12  conversations has Walmart had with the DEA
13  regarding designing or implementing its
14  suspicious order monitoring program for
15  controlled substances?
16    MS. TABACCHI: Object to the
17  form.
18    THE WITNESS: The conversations
19  have occurred over time, again, as the
20  distribution center was established
21  and reporting was pulled and reviewed.
22  As a part, one part of our order
23  monitoring, the DEA reviewed those
24  reports, and at one point asked us to

Page 81

1  begin sending those to them on a
2  regular basis. I learned that through
3  a conversation with Scott Culver.
4    And then through the years, as
5  we've made certain changes, those
6  changes have been discussed through
7  audits that the DEA has conducted at
8  various of our facilities, where
9  they've -- they've actually asked to
10  review our order monitoring process.
11  It's a part of their audit on their
12  audit checklist, and we've -- we've
13  never had a reported deficiency in the
14  way that they've reviewed those
15  programs.
16    Q.   (BY MR. BOWER) When was the
17  first time a conversation occurred between
18  someone at Walmart and someone at the DEA
19  regarding Walmart's design or implementation
20  of a suspicious order monitoring program?
21    MS. TABACCHI: Object to the
22  form.
23    THE WITNESS: So from an
24  overall perspective?

Page 82

1     MS. TABACCHI:  Beyond the scope
2  of the notice from a time period
3  perspective.  I'm sorry.
4     THE WITNESS:  Before we
5  started -- before we stood up the
6  distribution center to distribute
7  opioids, C-IIs, Scott Culver reached
8  out to the DEA to understand, make
9  sure that all of the plans that we had
10  that are inclusive of our obligations
11  around preventing diversion were
12  discussed with the DEA, and then,
13  again, ongoing conversations have
14  occurred as our program has evolved.
15     Q.    (BY MR. BOWER)  Were those
16  initial discussions that Scott Culver had
17  with the DEA specific to order monitoring?
18     A.    There were -- there were
19  conversations around reporting and what
20  was -- what was expected.  And how they --
21  how the operation would -- would be
22  established.
23     Q.    And what did Walmart understand
24  that the DEA expected at that time?

Page 83

1     MS. TABACCHI:  Beyond the
2  scope.
3     THE WITNESS:  That our --
4     MS. TABACCHI:  You may answer.
5     THE WITNESS:  So the way that
6  our policies and procedures were set
7  up reflected our understanding of what
8  our obligations were at that time.
9     Q.    (BY MR. BOWER)  Well, I'm just
10  trying to get a little bit more information
11  as to what Walmart understood the DEA
12  expected.
13     So from those conversations,
14  what did Mr. Culver take away as to what the
15  DEA would require from a monitoring program?
16     MS. TABACCHI:  Object to the
17  form.  Beyond the scope.
18     THE WITNESS:  We didn't discuss
19  in very specific detail any specific
20  ask.
21     What I do know is that the
22  programming that was implemented was
23  the result of those conversations.
24     Q.    (BY MR. BOWER)  Okay.  Were the

Page 84

1  programs that were implemented or in place as
2  of 2006 also a result of those conversations?
3     MS. TABACCHI:  Object to the
4  form.
5     THE WITNESS:  Those were --
6  those were the results of ongoing
7  conversations and changes that we have
8  implemented over time.
9     Q.    (BY MR. BOWER)  And I just want
10  to focus now starting in the 2006 period.
11  Walmart had suspicious order monitoring
12  programs in place; correct?
13     A.    We had order monitoring in
14  place in our DC, yes.
15     Q.    Were those order monitoring
16  programs in any way designed or implemented
17  based on conversations with the DEA?
18     A.    They weren't solely designed or
19  approved -- the intent of the program wasn't
20  solely designed or approved by the DEA, but
21  we had conversations with the DEA to ensure
22  that we were meeting those expectations.
23     Q.    Okay.  And what information did
24  Walmart learn from the DEA that went into its

Page 85

1  design and implementation of those programs?
2     MS. TABACCHI:  Object to the
3  form.
4     THE WITNESS:  The program as
5  designed would reflect what it was
6  that the DEA expected of us at that
7  time, which included alerting them,
8  sending them information about the
9  reviews that we were doing as to
10  outlier orders.
11     Q.    (BY MR. BOWER)  Okay.  So
12  Walmart understood in 2006 that the DEA
13  expected that Walmart would alert them about
14  outlying orders; correct?
15     MS. TABACCHI:  Object to the
16  form, misstates testimony.
17     MR. BOWER:  I'm just reading
18  your testimony back.  You said the DEA
19  expected of us at that time, which
20  included alerting them.  Right?
21     So the DEA -- in 2006 Walmart
22  understood that the DEA expected that
23  Walmart would alert them of unusual
24  orders; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1   MS. TABACCHI: Object to the
2   form.
3   THE WITNESS: They were outlier
4   orders. I -- I wouldn't call them
5   unusual orders.
6   Q. (BY MR. BOWER) So in 2006, was
7   Walmart only alerting the DEA of outlier
8   orders?
9   MS. TABACCHI: Object to the
10  form.
11  THE WITNESS: Our process at
12  that time was to provide notice to the
13  DEA of those outlier reports.
14  Q. (BY MR. BOWER) Okay. And
15  we'll get into more of that in a bit. I just
16  want to go back to the conversations with the
17  DEA.
18  Other than Mr. Culver, did
19  anyone else at Walmart speak with the DEA
20  prior to 2006 that had any impact on the way
21  Walmart designed programs that were in place
22  in 2006?
23  MS. TABACCHI: Object to the
24  form. Beyond the scope of the notice

Page 87

1   as to time period.
2   THE WITNESS: We had associates
3   at the DC that were interacting with
4   the DEA, but my knowledge on this
5   subject and the program that was in
6   place is based on that conversation
7   with Scott Culver. And Scott was the
8   lead for the distribution system at
9   that time.
10  Q. (BY MR. BOWER) And do you know
11  whom Scott spoke with at the DEA?
12  A. I believe it was Carolyn Adams.
13  And before Carolyn Adams it
14  would have been Don Hickman. And he also
15  mentioned someone that he spoke with in the
16  DC office specific to the process that
17  Walmart was undertaking, not specific to
18  order monitoring. But he had conversations
19  with DEA agents in the DC office around
20  policy.
21  MR. BOWER: Do you guys want to
22  take a break? We've been going over
23  an hour. Just take a quick break?
24  MS. TABACCHI: Sure.

Page 88

1   THE VIDEOGRAPHER: 9:31. Going
2   off the video record.
3   (Recess taken, 9:31 a.m. to
4   9:43 a.m.)
5   THE VIDEOGRAPHER: 9:43. We
6   are on the video record.
7   Q. (BY MR. BOWER) All right.
8   We're back on the record, Ms. Hiland. I'm
9   going to hand you what's been marked as
10  Exhibit 4.
11  (Whereupon, Deposition Exhibit
12  Walmart 4, 3-11-10 email from Edward
13  Harris. Subj: Updated: Wal-mart
14  Dendrite Conf. Call-Mon. March 15 @
15  11:00 Eastern/ 10:00 Central,
16  WMT_MDL_000011558-11565, was marked
17  for identification.)
18  Q. (BY MR. BOWER) And so while
19  you're reviewing that, please take a moment
20  to review it. I will state for the record
21  that this is an email with several
22  attachments. I only included one attachment,
23  which is the document beginning with 11562.
24  Because all the questions will be focused on

Page 89

1   this.
2   Okay? And the first of those
3   will be whether this is the letter you
4   referred to earlier regarding Mr. Rannazzisi,
5   that you had reviewed in preparation for
6   today's deposition.
7   MS. TABACCHI: Object to the
8   form.
9   THE WITNESS: It's in a strange
10  format, so I'm not sure. May I review
11  it?
12  MR. BOWER: Sure.
13  And just for the record, while
14  the witness is reviewing it, the Bates
15  number on this document is 11558, and
16  the attachment -- as I noted, there
17  are several attachments. This
18  attachment, its Bates number is 11562
19  through 565.
20  MS. TABACCHI: Zach, can you
21  tell us what are the pages that are
22  missing from this document?
23  MR. BOWER: Do you mean the
24  Bates numbers?

Page 90

1 MS. TABACCHI: Yes. Well --
2 MR. BOWER: I'm not sure. The
3 documents are referenced in the email,
4 so I'm sure they will be reflective of
5 Walmart's production.
6 MS. TABACCHI: I know, but for
7 context, you've -- this is a partial
8 compilation.
9 MR. BOWER: Yes, I already
10 stated that for the record.
11 MS. TABACCHI: I know. What is
12 missing?
13 MR. BOWER: The other documents
14 reflected in the attachments here.
15 Do you see the cover email
16 references a bunch of attachments?
17 And because we only have a limited
18 time today, I didn't include all
19 those. I only included the document
20 that I have questions on.
21 And really my only question on
22 this document -- feel free to review
23 it -- is whether this is the letter
24 you referred to earlier from

Page 91

1 Mr. Rannazzisi that you saw in
2 preparation for today's deposition.
3 MS. TABACCHI: Well, before we
4 go back to that, I would just ask that
5 you provide a complete document to the
6 witness even if you're only going to
7 ask for a portion of it, rather than a
8 partial compilation. I don't know how
9 many other documents you have like
10 this, that you have partial
11 compilations.
12 Would you mind just restating
13 the question? Or reading back the
14 question so the witness knows what the
15 question is?
16 MS. FUMERTON: When she's
17 finished.
18 MS. TABACCHI: Oh, sorry, let
19 her read.
20 MR. BOWER: Ma'am, do you need
21 to read this entire letter in order to
22 answer my question? Is that correct.
23 MS. TABACCHI: Zach, I think
24 it's fair for her. You're asking her

Page 92

1 a question about it.
2 Q. (BY MR. BOWER) Well, in a
3 respect it's not fair because we only have a
4 certain time on the record. I've handed her
5 a letter, and the only question is whether
6 this letter is the letter that she referred
7 to earlier that she reviewed in preparation
8 for today's deposition.
9 MS. TABACCHI: It's fair that
10 she should be given the time to read
11 the letter.
12 MR. BOWER: Yes. It is. But
13 that's the only question.
14 MS. TABACCHI: Just allow her
15 to read it.
16 THE WITNESS: This is not the
17 letter that I was referring to.
18 Q. (BY MR. BOWER) Now, is the
19 letter you're referring to in the binder
20 that's in front of you?
21 A. Yes.
22 Q. Could you just for the record
23 state the date of the letter that you're
24 referring to and the Bates number?

Page 93

1 A. I'm not finding it in the --
2 Q. No problem.
3 Well, do you recall the
4 approximate date of the letter you have seen?
5 A. I believe it was December of
6 2007.
7 Q. Okay. And let me make it maybe
8 a little bit easier for you and show you --
9 A. Ah, here. Here it is.
10 Q. Okay. Great.
11 A. The Bates number is -- do you
12 just need the last five?
13 Q. Sure. That's fine.
14 A. 43648.
15 Q. And what's the date of the
16 letter?
17 A. December 27th, 2007.
18 Q. And that document is a part of
19 a binder you brought with you today; correct?
20 A. Yes.
21 Q. Okay. Okay. So let's -- why
22 don't we do this ...
23 (Whereupon, Deposition Exhibit
24 Walmart 5, Letters from the U.S.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 Department of Justice/Drug Enforcement
2 Administration, CAH_MDL2804_
3 01564780-1564773, was marked for
4 identification.)
5 Q. (BY MR. BOWER) You've been
6 handed what's been marked as Exhibit 5 to
7 today's deposition. And this is -- Exhibit 5
8 includes all four Rannazzisi letters. They
9 were produced by a different defendant in
10 this action. But I'm just using them for
11 sake of completeness.
12 I can try to focus most of my
13 questions on the letter that you have
14 specifically reviewed. Okay? Which is the
15 December 27, 2007 letter. But I do want to
16 know -- and you can flip through that
17 Exhibit 5 -- whether Walmart in fact received
18 all four letters from Mr. Rannazzisi. The
19 first is dated December 27, 2006. The next
20 is dated February 7, 2007, then we have the
21 December 2007 -- December 27, 2007 letter
22 which you referred to, and then we have
23 the June 12th, 2012 letter.
24 Do you see those?

Page 95

1 MS. TABACCHI: Object to the
2 form, and in particular to the
3 reference to like all four Rannazzisi
4 letters. As you noted, these are from
5 another defendant's production.
6 MR. BOWER: And I will note
7 that each of the letters notes that
8 they were being sent to every
9 commercial entity in the United States
10 who had registered with the DEA to
11 distribute controlled substances.
12 Q. (BY MR. BOWER) And would you
13 agree that Walmart was registered with the
14 DEA to distribute controlled substances from
15 2006 through 2014?
16 MS. TABACCHI: Zach, I'm sorry.
17 She's still trying to read.
18 MR. BOWER: I'm not asking her
19 a question about the document. She
20 can put that aside for the moment.
21 MS. TABACCHI: You're not
22 asking her a question from the
23 document.
24 MR. BOWER: Not at the moment,

Page 96

1 no. You can put that aside.
2 Q. (BY MR. BOWER) Would you agree
3 that Walmart was a commercial entity
4 registered with the Drug Enforcement
5 Administration to distribute controlled
6 substances from January 1st, 2006 through
7 2017?
8 MS. TABACCHI: Object to the
9 form.
10 THE WITNESS: We were
11 registrants.
12 Q. (BY MR. BOWER) So is your
13 answer yes to my question?
14 MS. TABACCHI: Object to the
15 form. Asked and answered.
16 THE WITNESS: Yes.
17 Q. (BY MR. BOWER) Now we'll ask
18 about the document. Do you see that
19 Exhibit 5 contains four letters from
20 Mr. Rannazzisi?
21 A. Yes. Yes.
22 Q. Does Walmart acknowledge
23 receiving these four letters from
24 Mr. Rannazzisi?

Page 97

1 MS. TABACCHI: Object to the
2 form. These are letters that are from
3 another defendant's production.
4 MR. BOWER: I agree they're
5 from another defendant's production.
6 The reason they're not from Walmart's
7 production is because Walmart hasn't
8 produced them. My question is whether
9 Walmart received them.
10 MS. TABACCHI: Object to the
11 form. Just for the record, Walmart
12 has produced the letter that was
13 directed to Walmart that was located
14 in its files. So you can't criticize
15 Walmart for not producing these
16 documents that are from a different
17 defendant's production.
18 Q. (BY MR. BOWER) Is it Walmart's
19 position today, as you sit here, that Walmart
20 did not receive the other three letters from
21 Mr. Rannazzisi?
22 MS. TABACCHI: Object to the
23 form.
24 THE WITNESS: The only letter

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  that we were able to locate was the
2  December 27th.  So I don't -- I don't
3  have evidence of having received the
4  other letters.
5       MR. BOWER:  Okay.  I move to
6  strike that answer as nonresponsive.
7       Q.   (BY MR. BOWER) My question is
8  just very simple.  Is it Walmart's position
9  today that it did not receive the other three
10 letters from Mr. Rannazzisi?
11      MS. TABACCHI:  Object to the
12 form.  Beyond the scope.  Asked and
13 answered.
14      THE WITNESS:  One of the
15 challenges that we noted with the
16 letter that we did receive is that
17 it's addressed to a pharmacy warehouse
18 at an address that is not a pharmacy
19 warehouse.  And so I don't know if
20 that played into the fact that we
21 don't have a copy of these letters on
22 file.  The only one that we were able
23 to find was the December 27th, 2007.
24      Q.   (BY MR. BOWER) And so my

Page 99

1  question is just very simple.  Did Walmart
2  receive the other letters from
3  Mr. Rannazzisi?
4       MS. TABACCHI:  Object to the
5  form.  Asked and answered.
6       THE WITNESS:  I can't confirm,
7  because I haven't seen those letters
8  in our files.
9       Q.   (BY MR. BOWER) So is Walmart's
10 answer today is I don't know?  Is that
11 accurate?
12      MS. TABACCHI:  Object to the
13 form.  Asked and answered.
14      The witness has already
15 provided an answer.
16      THE WITNESS:  The only letter
17 we were able to locate was the one
18 letter.
19      Q.   (BY MR. BOWER) And I
20 understand you were only able to locate one
21 letter.  But my question is different.  Okay?
22 My question is, for example, did Walmart
23 receive a letter dated September [sic] 27,
24 2006 from Mr. Rannazzisi?

Page 100

1       MS. TABACCHI:  Object to the
2  form.
3       THE WITNESS:  I cannot confirm
4  that based on the research I've done.
5       Q.   (BY MR. BOWER) Can you deny
6  that based on the research you've done?
7       MS. TABACCHI:  Object to the
8  form.
9       THE WITNESS:  I can't deny
10 that.
11      Q.   (BY MR. BOWER) So you just
12 don't know.  Is that correct?
13      MS. TABACCHI:  Object to the
14 form.
15      THE WITNESS:  I don't have
16 evidence to show that we have it in
17 our files.
18      Q.   (BY MR. BOWER) Do you have
19 evidence to show that it was never received?
20      MS. TABACCHI:  Object to the
21 form.  Proving a negative.
22      Q.   (BY MR. BOWER) Well, you
23 mentioned that the letter you do have was
24 addressed to somebody; correct?

Page 101

1       A.   Correct.
2       Q.   Who was it addressed to?
3       A.   It was addressed to Walmart
4  Pharmacy Warehouse at 702 Southwest 8th
5  Street in Bentonville, Arkansas.
6       Q.   And how did Walmart come to
7  find that letter in connection with this
8  case?
9       MS. TABACCHI:  Object to the
10 form.
11      THE WITNESS:  It was -- it was
12 in a file cabinet.
13      Q.   (BY MR. BOWER) And where was
14 that file cabinet located?
15      A.   In an archive room.
16      Q.   Did Walmart ever inquire as to
17 the person that received that letter, whether
18 they received other letters from
19 Mr. Rannazzisi?
20      MS. TABACCHI:  Object to the
21 form.  Lack of foundation.
22      THE WITNESS:  The archive was
23 for associates that were -- had left
24 Walmart.

Page 102

1  Q.  (BY MR. BOWER) And did Walmart
2  contact any of those associates to determine
3  whether they received other letters from
4  Mr. Rannazzisi?
5      MS. TABACCHI: Object to the
6  form. Beyond the scope of the notice.
7      THE WITNESS: Not being aware
8  of those letters, I -- we did not
9  contact anyone.
10     Q.  (BY MR. BOWER) So is it
11 Walmart's position that prior to sitting here
12 today, it is unaware of the other letters
13 that were sent to registrants by
14 Mr. Rannazzisi?
15     MS. TABACCHI: Object to the
16 form. Beyond the scope of the notice.
17     THE WITNESS: We have -- we
18 have the one letter that we have been
19 able to produce and review.
20     Q.  (BY MR. BOWER) Is Walmart
21 aware that Mr. Rannazzisi sent additional
22 letters?
23     MS. TABACCHI: Object to the
24 form. Are you asking us about our

Page 103

1  awareness today?
2      Q.  (BY MR. BOWER) I'm asking
3  whether Walmart is aware. This is a
4  question. Is it aware of whether
5  Mr. Rannazzisi sent additional letters other
6  than the one it received and is in the
7  notebook that they brought with them today?
8      MS. TABACCHI: Object to the
9  form.
10     Could you please read back the
11 question?
12     Q.  (BY MR. BOWER) I'll ask it
13 again.
14     Is Walmart aware, as it sits
15 here today, of whether Mr. Rannazzisi sent
16 other letters to registrants of controlled
17 substances in addition to the letter it
18 received in September -- or sorry -- in
19 December of 2007?
20     MS. TABACCHI: Object to the
21 form. Beyond the scope of the notice.
22     THE WITNESS: I see these
23 letters in Exhibit 5 before me.
24     MR. BOWER: Can you please read

Page 104

1  back the question?
2      (Whereupon, the following
3  testimony was read by the court
4  reporter.)
5      "QUESTION: Is Walmart aware,
6  as it sits here today, of whether
7  Mr. Rannazzisi sent other letters to
8  registrants of controlled substances
9  in addition to the letter it received
10 in December of 2007?"
11     (End of readback.)
12     MS. TABACCHI: Object to the
13 form. Beyond the scope of the notice.
14     THE WITNESS: I see these
15 letters today.
16     Q.  (BY MR. BOWER) If you hadn't
17 seen those letters today, would you have
18 known they exist?
19     MS. TABACCHI: Object to the
20 form.
21     THE WITNESS: I -- the only
22 letter that I'm aware of is the
23 December 2007.
24     Q.  (BY MR. BOWER) And that --

Page 105

1  your answer is on behalf of Walmart; correct?
2      MS. TABACCHI: Object to the
3  form, beyond the scope.
4      THE WITNESS: Yes.
5      Q.  (BY MR. BOWER) Is Walmart
6  aware of whether the letters from
7  Mr. Rannazzisi are available online?
8      MS. TABACCHI: Object to the
9  form. Beyond the scope of the notice.
10     THE WITNESS: I'm not aware.
11     Q.  (BY MR. BOWER) Has Walmart ever
12 been to any conferences or meetings where the
13 letters from Mr. Rannazzisi that it did not
14 receive in 2007 were discussed?
15     MS. TABACCHI: Object to the
16 form.
17     THE WITNESS: I don't have that
18 information.
19     Q.  (BY MR. BOWER) Did Walmart ever
20 look online to determine whether
21 Mr. Rannazzisi sent additional letters to his
22 December 2007 letter to Walmart?
23     MS. TABACCHI: Object to the
24 form. Beyond the scope of the notice.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    THE WITNESS: We would be
2  interested in making sure that we were
3  following the policies and procedures
4  to ensure that we were protected
5  against diversion of controlled
6  substances. And having conversations
7  with our local DEA agents that we
8  worked with on a regular basis.
9    So to reach out to see if there
10  was additional guidance, we -- we
11  wouldn't have the idea to -- that
12  there was information there that
13  wasn't being conveyed to us through
14  our interactions with other DEA
15  agents.
16    Q.   (BY MR. BOWER) Is it your
17  understanding, as you sit here today on
18  behalf of Walmart, that Walmart received the
19  December 27, 2007 letter on or about that
20  date?
21    MS. TABACCHI: Object to the
22  form.
23    THE WITNESS: That we -- can
24  you repeat the question?

Page 107

1    Q.   (BY MR. BOWER) Sure. Is it
2  your understanding, as you sit here today on
3  behalf of Walmart, that Walmart received the
4  December 27, 2007 letter on or about that
5  date?
6    MS. TABACCHI: Object to the
7  form.
8    THE WITNESS: Yes.
9    MR. BOWER: Okay.
10    Q.   (BY MR. BOWER) Did Walmart, in
11  connection with the agreement signed with
12  Mr. Rannazzisi in 2011, ever discuss with him
13  these "Dear Registrant" letters?
14    MS. TABACCHI: Object to the
15  form. Beyond the scope of the notice.
16    THE WITNESS: The MOU was
17  focused on our dispensing function.
18  And so I don't know that there was a
19  conversation that would have naturally
20  tied to our dispensing function.
21    Q.   (BY MR. BOWER) Well, as we
22  noticed --
23    A.   Our distribution function.
24    Q.   Sorry. I apologize. I thought

Page 108

1  you were finished.
2    Well, as we noted before on
3  Exhibit 3, the MOU also notes that Walmart
4  acknowledges and agrees that the obligation
5  undertaken in this subparagraph do not
6  fulfill the totality of its obligations under
7  the CSA in its implementing regulations.
8    Do you recall that testimony?
9    MS. TABACCHI: I appreciate
10  that you're short on time. Please
11  allow the witness time to reach for
12  what you're reading from so that she
13  can review it.
14    MR. BOWER: And feel free to
15  review it. I was just trying to
16  shortcut this, but you can review it
17  again. We already went over this.
18  It's 4(a), the last two sentences in
19  4(a) in Exhibit 3.
20    MS. TABACCHI: Would you mind
21  reading back Mr. Bower's question?
22    Q.   (BY MR. BOWER) I'll rephrase.
23    Do you recall we discussed
24  those last two sentences in paragraph 4(a) of

Page 109

1  Exhibit 3?
2    A.   Yes.
3    Q.   And do you recall that at this
4  time that Walmart acknowledged that this MOU
5  did not fulfill the totality of its
6  obligations under the CSA?
7    MS. TABACCHI: Object to form.
8  Beyond the scope.
9    THE WITNESS: Yes.
10    Q.   (BY MR. BOWER) And at that time
11  did anyone from Walmart ask Mr. Rannazzisi,
12  "Hey, what other obligations are you talking
13  about?"
14    MS. TABACCHI: Object to the
15  form. Beyond the scope of the notice.
16    THE WITNESS: The MOA [sic] was
17  focused on our dispensing
18  registrations. My understanding of
19  those obligations certainly extended
20  beyond the scope of this MOA, as it
21  related to our dispensing programming.
22  And, in fact, my understanding of this
23  MOA was that the compliance
24  programming that was outlined here was

Page 110

1  specific to dispensing.  So I separate
2  those two functions as -- because the
3  registrations were different.
4     Q.   (BY MR. BOWER)  All right.  So
5  let's go back, then, to the letter that --
6  the one letter that Walmart acknowledged it
7  received.  Okay?  The December 27, 2007
8  letter.
9        MR. BOWER:  Since we can't get
10  agreement on whether Walmart received
11  other letters today, I will limit my
12  questions to this letter, but I will
13  note that it's our position that
14  Walmart likely received the other
15  letters and just didn't produce them.
16  Okay.
17        MS. TABACCHI:  I believe we've
18  already addressed that, Zach.  That's
19  not an issue for this witness, the
20  document production.
21     Q.   (BY MR. BOWER)  So let's focus
22  on the December 2007 letter that you are
23  prepared for to testify today, okay?
24     A.   Yes.

Page 111

1     Q.   Did you review this letter in
2  preparation for your testimony today?
3        MS. FUMERTON:  Are we on a new
4  exhibit, then?
5        MR. BOWER:  We are on what's
6  part of the binder that you brought,
7  the example of the Rannazzisi letter
8  from December 28, 2007.
9        MS. FUMERTON:  So the short
10  time.
11        MR. BOWER:  Yes.
12        MS. TABACCHI:  Are you marking?
13  Do you have a copy of this?
14        MR. BOWER:  I have a copy
15  that's the same letter, which is
16  referenced in the composite Exhibit 5.
17        MS. TABACCHI:  It's not the
18  same letter because it's not addressed
19  to Walmart.
20     Q.   (BY MR. BOWER)  Okay.  But ...
21        If you could turn to the
22  December 27, 2007 letter.  Do you see that?
23        Or do you have it in front of
24  you?

Page 112

1     A.   Yes.
2     Q.   How many pages is your letter?
3     A.   It's two.
4        MR. BOWER:  I mean, if you want
5  to go off the record, we can print a
6  copy of that one out if you want.  I'm
7  just frankly surprised that Walmart
8  disavows receiving other letters, so
9  that's why I'm a little bit off
10  schedule here.  So if you want to go
11  off the record, we can use that -- we
12  can --
13        MS. TABACCHI:  You are
14  mischaracterizing the testimony.  As
15  we told you, this letter from December
16  2007 is the only letter that was found
17  in Walmart's files.
18     Q.   (BY MR. BOWER)  What is the
19  address reflected on that letter?
20     A.   It's Walmart Pharmacy
21  Warehouse, 702 Southwest 8th Street.
22     Q.   (BY MR. BOWER)  And what is
23  located at that address?
24     A.   That's the Walmart corporate

Page 113

1  office where the licenses are issued.
2     Q.   So it appears at least that
3  this December 27, 2007 letter was sent to the
4  Walmart corporate offices?  Is that correct?
5        MS. TABACCHI:  Object to the
6  form.
7        THE WITNESS:  It was sent to
8  the Walmart office address.
9     Q.   (BY MR. BOWER)  And that's the
10  Walmart corporate address; correct?
11     A.   Yes.
12     Q.   In preparation for today's
13  deposition, did you speak with anyone in that
14  office as to whether Walmart received any
15  other letters from Mr. Rannazzisi?
16        MS. TABACCHI:  Object to the
17  form.
18        THE WITNESS:  Specific to the
19  other letters?  I did not speak to
20  anyone.
21     Q.   (BY MR. BOWER)  Did you speak
22  to anyone from that office in any capacity in
23  preparation for today's deposition?
24        MS. TABACCHI:  Object to the

Page 114

1   form.
2       THE WITNESS:  Yes.  All of the
3   associates -- or several of the
4   associates that I spoke to are based
5   at the corporate office.
6       Q.   (BY MR. BOWER)  And by
7   "corporate office," is it the same or
8   synonymous to "home office"?
9       A.   Yes.
10      Q.   Okay.  And just to be clear,
11  you did review this letter in preparation for
12  your deposition today; correct?
13      A.   Yes.
14      Q.   Do you see the first letter --
15  I mean the first sentence of the letter notes
16  that it's being sent to every entity in the
17  United States who's registered with the DEA
18  to manufacture or distribute controlled
19  substances?
20      A.   Yes.
21      Q.   And that would include Walmart;
22  correct?
23      A.   At this -- yes, at this time it
24  did include Walmart.

Page 115

1       Q.   Okay.  And it included Walmart
2   up until it stopped distributing controlled
3   substances in 2018; correct?
4       MS. TABACCHI:  Object to the
5   form.
6       THE WITNESS:  Yes.
7       Q.   (BY MR. BOWER)  And do you
8   note, in the end of the first paragraph
9   there, beginning with the sentence
10  "Accordingly."  Do you see that?
11      A.   I'm sorry, where are you?
12      Q.   Sorry, the second -- I guess
13  it's the second full paragraph?
14      It says, "Accordingly, DEA does
15  not approve or otherwise endorse any specific
16  system for reporting suspicious orders?"
17      Do you see that?
18      A.   Yes.
19      Q.   So Walmart understood, at least
20  as of the end of 2007, that DEA would not
21  endorse any specific system; is that correct?
22      MS. TABACCHI:  Object to the
23  form.
24      THE WITNESS:  We had

Page 116

1   collaborative communications with the
2   DEA.  We didn't ask them -- we didn't
3   ask them to solely bless or deem that
4   a specific program was our only
5   responsibility.
6       Q.   (BY MR. BOWER)  Well, he
7   further explains, right, Mr. Rannazzisi goes
8   on to say, "Past communications with DEA,
9   whether implicit or explicit that could be
10  construed as approval of a particular system
11  for reporting suspicious orders should no
12  longer be taken to mean that the DEA approves
13  a specific system."
14      Do you see that?
15      A.   Yes.
16      Q.   Does Walmart disagree with that
17  statement?
18      MS. TABACCHI:  Object to the
19  form.  Beyond the scope of the notice.
20  We are not required to speak to
21  agreement or disagreement with this
22  letter.
23      THE WITNESS:  As it applies to
24  our process, there was -- there was no

Page 117

1   system that was approved or
2   disapproved.  We had policies and
3   procedures that were routinely
4   reviewed by the DEA in ongoing
5   conversations, even after the date of
6   this letter.
7       Q.   (BY MR. BOWER)  And is it
8   Walmart's position that whether the DEA
9   reviewed or approved of a process would
10  factor into whether Walmart met its
11  obligations under the CSA?
12      MS. TABACCHI:  Object to the
13  form.  Beyond the scope of the notice.
14      THE WITNESS:  The
15  communications and review advisement
16  of DEA was important to us throughout
17  the process.  We don't -- we did not
18  hold that the DEA approved a specific
19  system.  We had policies and practices
20  in place that we shared with them,
21  continually, throughout the time that
22  we were distributing controlled
23  substances.
24      Q.   (BY MR. BOWER)  And would you

Page 118

1  agree that it was Walmart's obligation to
2  develop policies and practices that met the
3  standard of the CSA and its regulations?
4      MS. TABACCHI:  Object to the
5  form.  Calls for a legal conclusion.
6  Beyond the scope.
7      THE WITNESS:  Our policies and
8  procedures were in place to ensure
9  that we had systems to prevent
10  diversion according to our obligations
11  under that registration.
12  Q.    (BY MR. BOWER)  And did Walmart
13  develop its policies and procedures for
14  monitoring of orders of controlled substances
15  to meet its obligations under the CSA and the
16  regulations promulgated thereunder?
17      MS. TABACCHI:  Object to the
18  form.
19      THE WITNESS:  We developed our
20  policies and procedures to show due
21  diligence in the way that we were
22  safeguarding and preventing diversion
23  of controlled substances.
24  Q.    (BY MR. BOWER)  And Walmart did

Page 119

1  so in order to meet its obligations under the
2  CSA; correct?
3      MS. TABACCHI:  Object to the
4  form.  It calls for a legal
5  conclusion.
6      THE WITNESS:  That's the
7  guiding regulation or law that the
8  registration is based on.
9  Q.    (BY MR. BOWER)  Well, as you
10  sit here today, do you dispute that Walmart's
11  programs for monitoring orders of
12  suspicious -- of -- strike that.
13      As you sit here today, does
14  Walmart dispute that the programs implemented
15  to monitor for orders of controlled
16  substances were designed to meet its
17  obligations under the CSA?
18      MS. TABACCHI:  Object to the
19  form.  Beyond the scope of the notice.
20      Would you mind reading back the
21  question.
22      (Whereupon, the following
23  testimony was read by the court
24  reporter.)

Page 120

1      "QUESTION:  As you sit here
2  today, does Walmart dispute that the
3  programs implemented to monitor for
4  orders of controlled substances were
5  designed to meet its obligations under
6  the CSA?"
7      (End of readback.)
8      MS. TABACCHI:  Object to the
9  form.  I think you actually read it
10  right.
11  Q.    (BY MR. BOWER)  To make it
12  easy, I'll rephrase.
13      Does Walmart today dispute that
14  the programs it designed to monitor orders of
15  controlled substances were intended to meet
16  its obligations under the CSA?
17      MS. TABACCHI:  Object to the
18  form.
19      THE WITNESS:  Our policies and
20  procedures were intended to meet our
21  obligations as a registrant under the
22  CSA.
23  Q.    (BY MR. BOWER)  And if Walmart
24  did not meet those obligations, it could

Page 121

1  potentially lose its license to distribute
2  controlled substances; isn't that correct?
3      MS. TABACCHI:  Object to the
4  form.  Beyond the scope of the notice.
5      THE WITNESS:  In a hypothetical
6  situation where we weren't meeting an
7  obligation, that would -- revocation
8  is an option.
9  Q.    (BY MR. BOWER)  Are you
10  familiar with examples of when that has
11  concurred; correct?
12      MS. TABACCHI:  Object to the
13  form.  Beyond the scope of the notice.
14  Examples.
15  Q.    (BY MR. BOWER)  Walmart's
16  familiar with, for example, the Masters case;
17  correct?
18      MS. TABACCHI:  Object to the
19  form.
20      THE WITNESS:  Yes.
21  Q.    (BY MR. BOWER)  And what
22  happened in that case?
23      MS. TABACCHI:  Object to the
24  form.  Beyond the scope of the notice.

Page 122

1 THE WITNESS: There was a
2 revocation.
3 Q. (BY MR. BOWER) And do you
4 recall why that revocation occurred?
5 MS. TABACCHI: Object to the
6 form. Beyond the scope of the notice.
7 THE WITNESS: My understanding
8 is that the -- that Masters was under
9 something of a -- of an MOA with the
10 DEA around corrections to programs
11 that they had in their order
12 monitoring program, and the DEA found
13 that later they were not following
14 those -- the tenets of that MOA was my
15 understanding.
16 Q. (BY MR. BOWER) Did you review
17 the Masters decision in preparation for
18 today's deposition?
19 A. I did.
20 Q. Was -- was that copy that you
21 reviewed in your binder as well?
22 A. Yes.
23 Q. And we can talk about that
24 maybe in a few minutes. I just wanted to

Page 123

1 clear that up.
2 So let's go back to this
3 December 27, 2007 letter.
4 When Walmart received this
5 letter in 2007, did it undertake any review
6 or audit of its suspicious order monitoring
7 procedures?
8 MS. TABACCHI: Object to the
9 form.
10 THE WITNESS: Can you be
11 specific about what you mean by
12 "review"?
13 Q. (BY MR. BOWER) Do you need
14 me -- do you not understand what the word
15 "review" means?
16 A. Specific at the time that the
17 letter was received?
18 Q. As a result of receiving this
19 letter -- let me put it that way -- did
20 Walmart undertake any review or audit of its
21 suspicious order monitoring procedures that
22 were in existence at that time?
23 MS. TABACCHI: Object to the
24 form.

Page 124

1 THE WITNESS: We continually
2 review and monitor our programs and
3 policies. And so in this time frame,
4 we -- that would have been part of how
5 we were approaching our programming in
6 general, in total as an approach to
7 how we looked at our obligations.
8 Q. (BY MR. BOWER) But did Walmart
9 do anything in specific response to this
10 letter in connection with its suspicious
11 order monitoring policies for controlled
12 substances?
13 MS. TABACCHI: Object to the
14 form.
15 THE WITNESS: Nothing that's
16 specifically tied to this -- this
17 letter.
18 Q. (BY MR. BOWER) Did this letter
19 lead to any changes in Walmart's policies and
20 procedures for monitoring of controlled
21 substances?
22 MS. TABACCHI: Object to the
23 form.
24 THE WITNESS: Specific --

Page 125

1 there's not a change that's
2 specifically tied to the letter.
3 Q. (BY MR. BOWER) No one at
4 Walmart was concerned that Walmart should no
5 longer rely on implicit or explicit guidance
6 from the DEA?
7 MS. TABACCHI: Object to the
8 form.
9 THE WITNESS: So we continued
10 our collaborative work with the DEA.
11 But we didn't rely on a yes-or-no
12 opinion from the DEA. We would put
13 policies, practices in place, and then
14 communicate with the DEA over time and
15 make changes if there were changes
16 that were suggested, and we
17 implemented changes to our policies
18 independently ahead of DEA approval or
19 blessing.
20 Q. (BY MR. BOWER) Is it Walmart's
21 testimony today that the DEA has ever
22 approved or blessed Walmart's policies for
23 monitoring orders of controlled substances?
24 MS. TABACCHI: Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  form.
2      THE WITNESS:  We've had
3  conversations with the DEA where they
4  agreed with the process that we
5  were -- that we had implemented versus
6  an outright approval.
7      Q.   (BY MR. BOWER)  And when did
8  those conversations occur, where the DEA
9  occurred with the process that was
10 implemented?
11     A.   So Scott Culver relayed to me
12 the conversations that I testified to
13 earlier, with the DEA, around our early
14 programs.  And then we have, through audits
15 that were conducted, different -- at the
16 different distribution centers we have
17 associates relaying information from the DEA,
18 with no audit finding any deficiency.  And I
19 spoke to Mike Mullins, and he relayed to me
20 that on the DEA audit form, order monitoring
21 was one of the areas that they checked.  So
22 from that, we found -- we have not been aware
23 that we've had a deficiency in our program.
24     Q.   Well, my question is a little

Page 127

1  bit different, though.  As you sit here
2  today, can you provide to us any specific
3  conversations where the DEA blessed or
4  otherwise endorsed Walmart's suspicious order
5  monitoring program?
6      MS. TABACCHI:  Object to the
7  form.  Asked and answered.
8      THE WITNESS:  No, I testified
9  that there was no specific deeming of
10 appropriateness.  There were reviews
11 of our processes over time and never a
12 deficiency noted.
13     Q.   (BY MR. BOWER)  Other than the
14 audits that you referenced, are there any
15 other specific instances where the DEA
16 reviewed Walmart's procedures for suspicious
17 order monitoring for controlled substances?
18     MS. TABACCHI:  Object to the
19 form.
20     THE WITNESS:  We've had
21 communication around specific tenets
22 of the order monitoring, but not a --
23 not a review.  So I think
24 communication, not necessarily a

Page 128

1  review.
2      Q.   (BY MR. BOWER)  Well, has the
3  DEA ever called into question Walmart's
4  process for order monitoring for controlled
5  substances?
6      MS. TABACCHI:  Object to the
7  form.
8      THE WITNESS:  No, there's no --
9  there's no evidence that we have that
10 says our order monitoring program
11 didn't meet an expectation.
12     MR. BOWER:  Just so the record
13 is clear, let's go ahead and mark a
14 copy.  I'll go ahead and do that -- of
15 the Walmart Rannazzisi letter.
16     (Whereupon, Deposition Exhibit
17 Walmart 6, 12-27-07 letter from U.S.
18 Department of Justice/Drug Enforcement
19 Administration, WMT_MDL_000043648-
20 43649, was marked for identification.)
21     MS. FUMERTON:  And this is
22 going to be marked as Exhibit 6?
23     MR. BOWER:  Yep.
24     Q.   (BY MR. BOWER)  So looking at

Page 129

1  Exhibit 6, do you know what the date on the
2  top refers to?  I note the date January 25th,
3  2008, 11:46 a.m.
4      A.   I do not.
5      Q.   Do you see that?  What about
6  the information to the right of the top?  It
7  says No. 4043.
8      Do you see that?
9      A.   I see that.
10     Q.   Do you know what that refers
11 to?
12     A.   No.
13     Q.   So let's continue talking about
14 the substance of the letter, then.
15     Let me ask you this:  If you
16 look at the last paragraph on the first page,
17 Mr. Rannazzisi is telling Walmart, "For
18 example, if an order deviates substantially
19 from a normal pattern, the size of the order
20 does not matter and the order should be
21 reported as suspicious."
22     Do you see that?
23     A.   Yes.
24     Q.   Did Walmart have policies and

Page 130

1 procedures in place as of January of 2008
2 that would allow it to report suspicious
3 orders that deviated substantially from a
4 normal pattern regardless of size?
5 　　　　MS. TABACCHI:  Object to the
6 form.
7 　　　　THE WITNESS:  Our programs --
8 again, because of the -- because of
9 the process of Walmart's
10 self-distribution, pattern was a -- a
11 component of the ordering process that
12 was a little bit different within
13 that -- within that system, because we
14 controlled the dates that the -- that
15 the pharmacies' orders were placed.
16 　　Q.　(BY MR. BOWER)  Is it Walmart's
17 position that because it was a
18 self-distributor of controlled substances,
19 that the CSA and the regulations applied to
20 it differently?
21 　　　　MS. TABACCHI:  Object to the
22 form.  Calls for a legal conclusion.
23 Beyond the scope of the notice.
24 　　　　THE WITNESS:  No, but what I'd

Page 131

1 believe is that the -- how we evaluate
2 "deviates substantially" was
3 different.  We -- how we evaluated
4 whether or not deviates substantially
5 applied to an order took into account
6 the fact that we had scheduled order
7 dates for each of the stores.
8 　　Q.　(BY MR. BOWER)  Well, do you
9 know whether other distributors had also
10 similar scheduled order dates from their
11 stores to which they distributed?
12 　　　　MS. TABACCHI:  Object to the
13 form.  Lack of foundation.  Beyond
14 the scope of the notice.
15 　　　　THE WITNESS:  I know what
16 Walmart's practices have been.
17 　　Q.　(BY MR. BOWER)  But your
18 suggestion was to me that Walmart's practices
19 because it's a self-distributor is somehow
20 different than practices of other
21 distributors.  Is that correct?
22 　　　　MS. TABACCHI:  Object to the
23 form.  Misstates the testimony.
24 　　　　THE WITNESS:  No.

Page 132

1 　　　　MS. TABACCHI:  Beyond the
2 scope.
3 　　　　THE WITNESS:  That's -- what I
4 was saying was the way that we would
5 look at deviate substantially from a
6 normal pattern took into account our
7 practices and policies.
8 　　Q.　(BY MR. BOWER)  Other than
9 limiting orders to once a week, are there any
10 other practices and policies that impacted
11 the way Walmart looked at whether an order
12 deviated from a normal pattern?
13 　　　　MS. TABACCHI:  I don't
14 remember.
15 　　　　THE WITNESS:  Can you restate?
16 Or read back?  Can you restate?
17 　　　　MR. BOWER:  Sure.  I'll read
18 back because I think that question is
19 pretty straightforward.
20 　　Q.　(BY MR. BOWER)  Other than
21 limiting orders to once a week, are there any
22 other practices or policies that impacted the
23 way Walmart determined whether an order
24 deviated from a normal pattern?

Page 133

1 　　　　MS. TABACCHI:  Object to the
2 form.
3 　　　　THE WITNESS:  We looked at
4 other information if an order was
5 flagged as an outlier or triggered as
6 an outlier.
7 　　Q.　(BY MR. BOWER)  And Walmart was
8 doing that in 2007?  Is that your testimony?
9 　　　　MS. TABACCHI:  Object to the
10 form.
11 　　　　THE WITNESS:  Yes.
12 　　Q.　(BY MR. BOWER)  Other than
13 whether an order was flagged as an outlier,
14 and Walmart practiced limiting orders for
15 controlled substances to once a week, are
16 there any other factors that Walmart
17 considered in determining whether an order
18 deviated from a normal pattern?
19 　　　　MS. TABACCHI:  Object to the
20 form.
21 　　　　THE WITNESS:  There may have
22 been others.  It would be
23 situation-specific for the store and
24 the order that was placed, including

Page 134

1  the drug that was included in that
2  order.
3      Q.   (BY MR. BOWER) Okay. And
4  Walmart doesn't dispute that it had that
5  obligation in 2007; correct?
6          MS. TABACCHI: Object to the
7      form. What obligation?
8      Q.   (BY MR. BOWER) The obligation
9  that we've been talking about. To --
10         MS. TABACCHI: You're
11     paraphrasing.
12     Q.   (BY MR. BOWER) -- report as
13  suspicious an order that deviates
14  substantially from a normal pattern.
15         MS. TABACCHI: Object to the
16     form.
17         THE WITNESS: Our programs were
18     in place to meet those obligations.
19     Q.   (BY MR. BOWER) Did Walmart --
20  in 2000 -- let me strike that.
21         In January 2008, was Walmart
22  reporting as suspicious orders that deviated
23  substantially from a normal pattern, "yes" or
24  "no"?

Page 135

1          MS. TABACCHI: Object to the
2      form.
3          THE WITNESS: If they were
4      determined to deviate from a pattern,
5      our program would have been to notify
6      the DEA.
7      Q.   (BY MR. BOWER) And that's true
8  in January of 2008; correct?
9      A.   Yes.
10     Q.   Okay. And in January 2008,
11  would Walmart have reported to the DEA an
12  order that deviated substantially from a
13  normal size?
14         MS. TABACCHI: Object to the
15     form.
16         MR. BOWER: I'll strike that.
17     Q.   (BY MR. BOWER) Does Walmart
18  agree that in January of 2008, it was
19  obligated to report to the DEA orders that
20  deviated from a normal size?
21         MS. TABACCHI: Object to the
22     form. Calls for a legal conclusion.
23         THE WITNESS: Yes. Orders
24     deviating from -- I'm sorry. I --

Page 136

1  "orders deviating from a normal size,"
2  are you reading that from the ...
3      Q.   (BY MR. BOWER) I'm not reading
4  that from anywhere. It's just a question.
5          MS. TABACCHI: That's the
6      problem.
7          MR. BOWER: I don't think I
8      have to read my questions from
9      somewhere unless I'm familiar with
10     some --
11         MS. TABACCHI: If you're going
12     to try to represent what the law is --
13         MR. BOWER: I'm asking the
14     question.
15     Q.   (BY MR. BOWER) Does Walmart
16  agree that in January of 2008, it had an
17  obligation to report orders that deviated
18  substantially from a normal size?
19         MS. TABACCHI: Object to the
20     form. Calls for a legal conclusion.
21         THE WITNESS: If we detected an
22     order that deviated from size and
23     could not -- and could not explain the
24     reason for that, therefore deeming

Page 137

1  that order suspicious, we would have
2  contacted the DEA, notified the DEA.
3      Q.   (BY MR. BOWER) So is it a true
4  statement that in January 2008, Walmart would
5  only contact the DEA for an order that it
6  determined was an unusual size if it could
7  not explain the reason for the size?
8          MS. TABACCHI: Object to the
9      form.
10         THE WITNESS: Our policies and
11     procedures incorporated an evaluation
12     of the order for many -- across the
13     circumstances of the order.
14         So there were several factors
15     that went into play.
16     Q.   (BY MR. BOWER) Okay. And
17  we'll get back to those specific programs in
18  a bit. Let's just finish with this letter
19  while we have it in front of us.
20         Can we look for a moment at
21  that last sentence on that first page?
22         And I'll just read it for the
23  record. "The determination of whether an
24  order is suspicious depends not only on the

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  ordering pattern of the particular customer,
2  but also on the patterns of the registrant's
3  customer base and the patterns throughout the
4  relevant segment of the regulated industry."
5      Do you see that?
6  A.  Yes, I see that.
7  Q.  Did Walmart's policies and
8  procedures as of January 2008 take into
9  account this criteria as defined here by
10 Mr. Rannazzisi that I just read?
11     MS. TABACCHI:  Object to the
12 form.
13     THE WITNESS:  So our policies
14 and procedures were developed with our
15 understanding of what we were required
16 to -- our -- the obligations that we
17 had under the Controlled Substances
18 Act, in conversation with DEA agents
19 throughout the entirety of our
20 distribution of controlled substances.
21 Q.  (BY MR. BOWER) Now, is it
22 Walmart's position that those conversations
23 somehow superseded this communication from
24 Mr. Rannazzisi?

Page 139

1      MS. TABACCHI:  Object to the
2  form.
3      THE WITNESS:  We were working
4  collaboratively with the DEA agents
5  that we had on the ground that were in
6  our buildings and saw our operations.
7  And so as time went on, and our
8  business evolved, our practices
9  evolved, we remained in communication
10 with those DEA agents that were
11 actually in our buildings.
12 Q.  (BY MR. BOWER) Okay.  But
13 Mr. Rannazzisi is telling you here, right,
14 that Walmart should not rely on
15 communications with the DEA; correct?
16     MS. TABACCHI:  Object to the
17 form.
18 Q.  (BY MR. BOWER) Do you agree
19 with that?
20     MS. TABACCHI:  Mischaracterizes
21 the exhibit.  Object to the form.
22     THE WITNESS:  We continued to
23 communicate with the DEA.  We had a
24 good collaborative relationship with

Page 140

1  the DEA.
2  Q.  (BY MR. BOWER) And who, during
3  December of 2007, were you communicating with
4  at the DEA?  Who specifically?
5  A.  In 2007?
6      MS. TABACCHI:  Object to the
7  form.
8  Q.  (BY MR. BOWER) Let me strike
9  that.  Let me ask a better question.
10     Who specifically in
11 December 2007 were you communicating with at
12 the DEA regarding your suspicious order
13 monitoring program?
14     MS. TABACCHI:  Object to the
15 form.
16     THE WITNESS:  In 2007, we met
17 with George Gadd and Carolyn Adams.
18 In December of 2007, we met with
19 George Gadd and Carolyn Adams, at our
20 distribution center in Bentonville,
21 Arkansas, and the entire operation
22 would have been open to their review
23 communication.  We were working with
24 our contacts in the Little Rock

Page 141

1  office.
2  Q.  (BY MR. BOWER) Did that
3  meeting occur on or before December 27, 2007?
4  A.  It was immediately before.
5  Q.  Okay.  So after that meeting,
6  Walmart received this letter; correct?
7      MS. TABACCHI:  Object to the
8  form.
9      THE WITNESS:  Yes, that date is
10 after.
11 Q.  (BY MR. BOWER) And this letter
12 says that "Past communications with DEA,
13 whether implicit or explicit, that could be
14 construed as approval of a particular system
15 for reporting suspicious orders should no
16 longer be taken to mean that the DEA approves
17 a specific system."
18     Do you see that?
19     MS. TABACCHI:  Object to the
20 form.
21     THE WITNESS:  I've seen that in
22 the letter.
23 Q.  (BY MR. BOWER) Okay.  So after
24 receiving this letter, did Walmart still rely

Highly Confidential - Subject to Further Confidentiality Review

---

Page 142

1  on communications that it had had with the
2  DEA prior to December 2007?
3        MS. TABACCHI: Object to the
4     form.
5        THE WITNESS: No. In fact, we
6     had other follow-up meetings with the
7     DEA after that, as a follow-up to that
8     December audit, that postdated the
9     date of this letter.
10       Q.   (BY MR. BOWER) Okay. And if
11  you look back to Exhibit 5, you will see that
12  Mr. Rannazzisi also sent a letter to all
13  registrants in June 2012.
14       Okay. If you could turn to the
15  second-to-the-last page of Exhibit 5.
16       Do you see that? Do you see
17  the date on there, June 12, 2012?
18       A.   Yes.
19       Q.   Did Walmart receive this
20  letter?
21       MS. TABACCHI: Object to the
22     form. Asked and answered.
23       THE WITNESS: I don't have
24     this -- we don't have this in our

---

Page 143

1     files.
2        MR. BOWER: Can you just read
3     back my question, please? I'd like to
4     ask that question again.
5        I'll just ask it again.
6        Q.   (BY MR. BOWER) Did Walmart
7  receive this June 12, 2012 letter?
8        MS. TABACCHI: Object to the
9     form. Asked and answered.
10       THE WITNESS: I don't -- I
11    don't have a copy of this. I haven't
12    seen this.
13       Q.   (BY MR. BOWER) Do you disagree
14  that the DEA sent this letter to every entity
15  in the United States who was registered with
16  the Drug Enforcement Administration to
17  manufacture or distribute controlled
18  substances?
19       MS. TABACCHI: Object to the
20    form. Beyond the scope of the notice.
21    Lack of foundation.
22       THE WITNESS: I see that in the
23    heading.
24       Q.   (BY MR. BOWER) And during this

---

Page 144

1  time period, Walmart fit that definition;
2  correct?
3        MS. TABACCHI: Object to the
4     form.
5        THE WITNESS: Correct.
6        Q.   (BY MR. BOWER) And do you see
7  here, again, if you look at the third
8  paragraph, in the last two sentences there,
9  Mr. Rannazzisi again is reemphasizing the
10 point about reliance of the DEA. He says,
11 "This regulation clearly places the
12 responsibility on the registrant to design
13 and operate such a system. Accordingly, DEA
14 does not approve or otherwise endorse any
15 specific system for reporting suspicious
16 orders."
17       Do you see that?
18       A.   I'm sorry, I don't -- I didn't
19  see where you were -- I didn't follow.
20       Q.   The first full paragraph there,
21  the paragraph starting "Under federal law"?
22       A.   I see that.
23       Q.   The last two sentences there.
24       I can read it again if that's

---

Page 145

1  helpful. It starts with "This regulation."
2  And it states, "This regulation clearly
3  places the responsibility on the registrant
4  to design and operate such a system.
5  Accordingly, DEA does not approve or
6  otherwise endorse any specific system for
7  reporting suspicious orders."
8        Do you see that?
9        MS. TABACCHI: Object to the
10    form. Lack of foundation. Beyond the
11    scope of the notice.
12       THE WITNESS: Yes, I see that.
13       Q.   (BY MR. BOWER) So if, in fact,
14  Walmart did receive this letter in 2012, then
15  it was again put on notice that it shouldn't
16  rely on its communications with the DEA for
17  approving its program for monitoring orders
18  of controlled substances. Correct?
19       MS. TABACCHI: Object to the
20    form. Calls for a legal conclusion.
21    Improper hypothetical. Beyond the
22    scope of the notice.
23       THE WITNESS: So -- so, again,
24    we weren't relying on them to endorse

---

Page 146

1  a specific system. I mean, I can't --
2  I can't read into what is intended by
3  this. We knew that our responsibility
4  was our own responsibility. And that
5  if there was a program in place, it
6  was ours to develop.
7       We did not rely on the DEA to
8  say, "This system is blessed, move
9  forward."
10      We implemented programs over
11 time, that we had communications with
12 the DEA, and had -- and did not have
13 an indication from them that there
14 were gaps.
15      Q.   (BY MR. BOWER) And during this
16 time period from 2006 through and after 2012,
17 Walmart was registered with the DEA to
18 manufacture or distribute controlled
19 substances; correct?
20      MS. TABACCHI: Object to the
21 form.
22      THE WITNESS: Can you state
23 your dates again? I missed the date.
24      Q.   (BY MR. BOWER) Sure.

Page 147

1  Beginning at least as early as January 1st,
2  2006, and through 2012, Walmart was
3  registered with the DEA to manufacture or
4  distribute controlled substances; correct?
5       MS. TABACCHI: Object to the
6  form. Misstates the witness's
7  testimony.
8       MR. BOWER: Well, let me ask
9  it, then.
10      Q.   (BY MR. BOWER) Was Walmart
11 registered to distribute controlled
12 substances with the DEA?
13      MS. TABACCHI: Object to the
14 form. Time period.
15      MR. BOWER: Ever.
16      THE WITNESS: Yes.
17      Q.   (BY MR. BOWER) During what
18 time period was Walmart registered?
19      A.   From the time period at least
20 from 2006 through the time that we ceased
21 distribution in 2018.
22      Q.   Okay. And would you expect
23 that -- let me strike that.
24      Does that registration require

Page 148

1  Walmart to include an address for the
2  registrant?
3       MS. TABACCHI: Object to the
4  form. Beyond the scope of the notice.
5  Calls for a legal conclusion.
6       THE WITNESS: My understanding
7  is that the registration is issued to
8  the address of business, where the
9  business occurs.
10      Q.   (BY MR. BOWER) And you would
11 expect that Walmart would always include the
12 proper address on its registration for
13 DC 6045, wouldn't you?
14      MS. TABACCHI: Object to the
15 form. Beyond the scope of the notice.
16 Calls for a legal conclusion.
17      THE WITNESS: Yes, we would --
18 yes.
19      Q.   (BY MR. BOWER) Is it your
20 testimony today that Walmart didn't receive
21 this June 12th, 2012 letter because it was
22 sent to the wrong address?
23      MS. TABACCHI: Object to the
24 form.

Page 149

1       The letter that was from a
2  different defendant's production?
3  That's what you're asking about?
4       MR. BOWER: No, I'm not. I'm
5  asking whether Walmart did not receive
6  a letter from Mr. Rannazzisi in June
7  of 2012 because it was sent to the
8  wrong address.
9       MS. TABACCHI: Object to the
10 form. Misstates the witness's prior
11 testimony. Beyond the scope of the
12 notice.
13      THE WITNESS: That's not my
14 testimony. I don't know.
15      Q.   (BY MR. BOWER) Do you have
16 any -- strike that.
17      What's your basis for saying
18 that Walmart may not have received the
19 June 12th, 2012 letter from Mr. Rannazzisi?
20      MS. TABACCHI: Object to the
21 form. Asked and answered.
22      THE WITNESS: I don't know
23 that.
24      Q.   (BY MR. BOWER) Did you ask

Page 150

1  anybody at Walmart whether Walmart received
2  the letter?
3        MS. TABACCHI:  Object to the
4     form.  Asked and answered.
5        THE WITNESS:  I wasn't aware of
6     the letter, so I didn't ask about it.
7        MR. BOWER:  Okay.
8     Q.    (BY MR. BOWER)  Did you ever
9  go -- did anyone at Walmart ever go look in
10 the files where the December 2007 letter was
11 found to see if there were other letters in
12 there?
13       MS. TABACCHI:  Object to the
14    form.
15       THE WITNESS:  Yes.
16    Q.    (BY MR. BOWER)  And no other
17 letters were found?
18    A.    There were no other letters
19 found.
20    Q.    Could Walmart have destroyed
21 the June 12, 2012 letter?
22       MS. TABACCHI:  Object to the
23    form.  Improper speculation.  Beyond
24    the scope of the notice.

Page 151

1        THE WITNESS:  I don't know
2     that.
3     Q.    (BY MR. BOWER)  Possible,
4  correct?
5        MS. TABACCHI:  Object to the
6     form.  Beyond the notice.
7     Q.    (BY MR. BOWER)  I'll rephrase.
8        Is it possible that Walmart
9  destroyed the June 12, 2012 letter from
10 Mr. Rannazzisi?
11       MS. TABACCHI:  Object to the
12    form.  This is an improper question.
13    Beyond the scope of the notice.
14       THE WITNESS:  I don't know that
15    we -- I don't know that we received
16    it, or who would have received it, so
17    I don't know what the disposition of
18    the letter might have been.
19    Q.    (BY MR. BOWER)  Well, if
20 Walmart did receive it, it's no longer in
21 Walmart's files; correct?
22       MS. TABACCHI:  Object to the
23    form.
24       THE WITNESS:  We didn't find it

Page 152

1  in our files.
2     Q.    (BY MR. BOWER)  And could one
3  of the reasons you didn't find it be because
4  it was destroyed?
5        MS. TABACCHI:  Object to the
6     form.
7        This is -- if this is how you
8     want to use your time, that's fine.
9     We have already made representations
10    to you about what was located in the
11    files.
12    Q.    (BY MR. BOWER)  And I'm just
13 trying to understand what happened to the
14 letter.  Either Walmart --
15       Look.  There's a couple of
16 options here.  Either Walmart received it and
17 lost it or it never received it.  What is
18 another option?  Can you tell us another
19 option?
20       MS. TABACCHI:  This is beyond
21    the scope of the notice.  I disagree
22    that those are the only possible
23    alternatives.
24       This --

Page 153

1     Q.    (BY MR. BOWER)  Do you have any
2  others?  Do you have any others that you can
3  provide for us today?
4        MS. TABACCHI:  This is beyond
5     the scope of the notice.
6     Q.    (BY MR. BOWER)  Let me ask you
7  this, then.  Let me go back to a question
8  that I think is more appropriate.
9        Does Walmart disagree that the
10 DEA purported to send this letter to every
11 entity in the United States who is registered
12 to distribute controlled substances?
13       MS. TABACCHI:  Object to the
14    form.
15       THE WITNESS:  I see that in
16    this letter.
17    Q.    (BY MR. BOWER)  And does
18 Walmart disagree with that statement?
19       MS. TABACCHI:  Object to the
20    form.  Beyond the scope of the notice.
21       THE WITNESS:  I don't disagree
22    with what's stated in the letter.
23    Q.    (BY MR. BOWER)  So based on
24 that statement, would you assume that Walmart

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1 would have received a copy of this letter?
2         MS. TABACCHI:  Object to the
3 form.  Beyond the scope.
4         THE WITNESS:  We would be
5 included as a registrant to distribute
6 substances during this time frame.
7         Q.    (BY MR. BOWER)  The answer is
8 yes, you would have assumed that Walmart
9 would receive this letter; correct?
10         MS. TABACCHI:  Object to the
11 form.  Beyond the scope.  Misstates
12 testimony.
13         THE WITNESS:  If indeed it was
14 sent to every registrant.  We were a
15 registrant during that time period.
16         Q.    (BY MR. BOWER) And Walmart
17 isn't today claiming that the letter wasn't
18 sent; isn't that correct?
19         MS. TABACCHI:  Object to the
20 form.  Asked and answered.  Misstates
21 testimony.
22         The testimony has been clear on
23 this issue.
24         MR. BOWER:  I don't think it's

Page 155

1 been clear at all.  Let me ask a
2 clearer -- a different question, then,
3 since you object to that one.
4         Q.    (BY MR. BOWER)  Does Walmart
5 contend that this letter was never sent to
6 Walmart?
7         MS. TABACCHI:  Object to form.
8 Beyond the scope of the notice.
9         Asked and answered.
10         THE WITNESS:  No.  I just don't
11 know.  I don't know where the -- I
12 just don't know.
13         Q.    (BY MR. BOWER) Okay.  So as you
14 sit here today, we don't know whether Walmart
15 ever received this letter, and we don't know
16 whether Walmart ever maintained this letter;
17 is that correct?
18         MS. TABACCHI:  Object to the
19 form.  Beyond the scope.
20         THE WITNESS:  If the letter was
21 received, we did not find it in our
22 files.
23         Q.    (BY MR. BOWER)  Does Walmart
24 have a policy to catalog DEA communications

Page 156

1 by registrant number?
2         MS. TABACCHI:  Object to the
3 form.
4         THE WITNESS:  No.
5         Q.    (BY MR. BOWER)  Would Walmart
6 want to have all communications from the DEA
7 regarding a specific registration?
8         MS. TABACCHI:  I'm sorry, did
9 you finish with the question?
10         MR. BOWER:  Yeah.
11         MS. TABACCHI:  Object to the
12 form.  Beyond the scope of the notice.
13         THE WITNESS:  Communication
14 that was appropriate and current to
15 the business would be important for us
16 to be aware of, yes.
17         Q.    (BY MR. BOWER)  Would you agree
18 that if Walmart had received this June 2012
19 letter, that it would be important to
20 Walmart's business for distributing
21 controlled substances?
22         MS. TABACCHI:  Object to the
23 form.  Beyond the scope.
24         THE WITNESS:  We would hold

Page 157

1 that any information from the DEA is
2 important.
3         Q.    (BY MR. BOWER)  Do you agree
4 that Walmart should maintain communications
5 from the DEA in its records?
6         MS. TABACCHI:  Object to the
7 form.
8         THE WITNESS:  Again, we -- I --
9 we have filing obligations around
10 records specific to our registration.
11 And so to the extent that it was
12 current and within the -- and required
13 for us to maintain, those would be
14 part of our policies for maintaining
15 records of information required by the
16 DEA.
17         Q.    (BY MR. BOWER)  Okay.  Let's
18 turn back.  Just a few more questions on the
19 December 27, 2007 letter, then.
20         If you could turn to the second
21 page, the top of page 2.
22         A.    I'm sorry, I've lost my copy.
23         Here.  I have it.
24         Q.    So I'm just looking at the top

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  of page 2.  Are you there?
2      A.    Yes.
3      Q.    It says, "Registrants that rely
4  on rigid formulas to define whether an order
5  is suspicious may be failing to detect
6  suspicious orders."
7          Do you see that?
8      A.    Yes.
9      Q.    Would you agree that if Walmart
10 did rely on a rigid formula, that it would be
11 a violation of the CSA?
12         MS. TABACCHI:  Object to the
13     form.  Calls for a legal conclusion.
14     Beyond the scope of the notice.
15         THE WITNESS:  So I see that
16 this says "may be failing to detect."
17 So again, I think it's circumstantial
18 as to if a rigid formula was your only
19 means, that you may fail to detect,
20 which is one of the responsibilities.
21 But I don't know that -- I think it's
22 circumstantial at this point.  There's
23 more information needed.
24         MS. TABACCHI:  Zach, whenever

Page 159

1  you're at a good point.
2          MR. BOWER:  Let's just finish
3      this.  A couple more questions and
4      then take a break.
5      Q.    (BY MR. BOWER) The next
6  sentence gives you an example, right, about a
7  rigid formula?  It says, "For example, a
8  system that identifies orders as suspicious
9  only if the total amount of a controlled
10 substance ordered during the one month
11 exceeds the amount ordered the previous month
12 by a certain percentage or more is
13 insufficient."
14         Do you see that?
15     A.    Yes.
16     Q.    Did Walmart's policies and
17 procedures during this time period, let's say
18 January 2008, take into consideration that
19 requirement by Mr. Rannazzisi?
20         MS. TABACCHI:  Object to the
21     form.  Calls for a legal conclusion.
22     Improper characterization.
23         THE WITNESS:  Our programs
24 included reporting as well as

Page 160

1  follow-up on different aspects of
2  the -- of the orders that we were
3  reviewing.
4          So I -- I see that this says --
5  is an example of what would be
6  considered insufficient, but that
7  wasn't the -- that wasn't our program.
8  And it wasn't -- the reports that we
9  were using were not our total program.
10     Q.    (BY MR. BOWER)  And would you
11 agree, though, that if Walmart was using
12 rigid formulas, that that program would
13 entail some risk?
14         MS. TABACCHI:  Object to the
15     form.
16         THE WITNESS:  So this says
17 "rigid formulas may fail to detect."
18 And so it would be incumbent upon us
19 to ensure that whatever formulas or
20 processes that we have in place were
21 effective in detecting any issues.
22     Q.    (BY MR. BOWER)  So is it
23 Walmart's position that a program that used a
24 rigid formula would also have to have other

Page 161

1  criteria with which to consider whether an
2  order was suspicious or not?
3          MS. TABACCHI:  Object to the
4      form.  Beyond the scope of the notice,
5      improper hypothetical and beyond --
6      and legal conclusion.
7          THE WITNESS:  Can you repeat
8      the question?
9          MR. BOWER:  Okay.  So we've
10 been going a long time.  Not today.
11 I've been pretty consistent allowing
12 those objections.  You've taken a lot
13 of time on the record.  I would ask
14 again just to please object to form.
15 When you do so, the witness then asks
16 me to rephrase the question and we
17 waste more time on the record.
18         So I'm just going to keep
19 making that request and you can ignore
20 it if you want.
21     Q.    (BY MR. BOWER)  So the question
22 is, going back to this time period,
23 January 2008, if Walmart had used rigid
24 formulas to detect orders that were

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 potentially suspicious, would you agree that
2 it would need other criteria with which to
3 also review those orders?
4          MS. TABACCHI:  Same objections.
5          THE WITNESS:  So to the extent
6     there was -- there was a rigid formula
7     in place, and according to this
8     letter, that may fail to detect.  It's
9     not an absolute.  Even according to
10    this letter.  So I'd have to have a
11    specific order to review to see if a
12    formula that was applied actually
13    needed something else behind it.
14    Q.    (BY MR. BOWER)  So in order to
15 answer that question, you'd want to review a
16 specific order from January 2008; is that
17 correct?
18         MS. TABACCHI:  Object to the
19    form.
20         THE WITNESS:  I'd want to
21    understand what is entailed in the
22    rigid formula.  It's hypothetical, so
23    I -- it's difficult for me to comment.
24         MR. BOWER:  Okay.  Why don't we

Page 163

1 take a break and then we'll do what
2 you just asked to do.  Okay?
3          THE VIDEOGRAPHER:  10:46.  We
4     are off the video record.
5          (Recess taken, 10:46 a.m. to
6     11:08 a.m.)
7          THE VIDEOGRAPHER:  11:09.  We
8     are on the video record.
9     Q.    (BY MR. BOWER)  Okay.
10 Ms. Hiland, we're back on the record.  I just
11 have a couple more, very quick questions on
12 Exhibit 6, which is the Walmart letter.
13         The address here, is that the
14 correct address?
15         MS. TABACCHI:  Object to the
16    form.
17         THE WITNESS:  There is -- so my
18    earlier comment was, this is the
19    correct address for the corporate
20    office.  We don't have a warehouse
21    there.  So it may have caused some
22    confusion when it arrived.  There was
23    just a -- it was just a statement.
24    But the physical address for the

Page 164

1 corporate office is correct.
2     Q.    (BY MR. BOWER)  Okay.  And do
3 you have any basis for that statement that it
4 may have caused confusion?
5          MS. TABACCHI:  Object to the
6     form.
7     Q.    (BY MR. BOWER)  For example,
8 did you talk to anybody that suggests in your
9 mind that it caused confusion or anything
10 like that?
11    A.    It confused me when I saw it.
12 That's the basis for that statement.
13    Q.    And why did it confuse you?
14    A.    Because we don't have a
15 warehouse at that address.  So there's no
16 registrant specifically at that address.
17    Q.    Do you know whether this is the
18 address that Walmart uses for its DC 6045
19 registration?
20         MS. TABACCHI:  Object to the
21    form.  Beyond the scope of the notice.
22         THE WITNESS:  I don't know
23    that.
24         MR. BOWER:  You can put that

Page 165

1 one aside for a moment, and we're
2 going to hand you a composite exhibit
3 which has been marked Exhibit 7.
4          (Whereupon, Deposition Exhibit
5     Walmart 7, Tab 1 Walmart Responses to
6     Plaintiffs' (First) Combined Discovery
7     Requests to National Retail Pharmacies
8     Defendants, Tab A
9     WMT_MDL_000044441-44499, Tab B
10    WMT_MDL_000009423-9424, Tab C
11    WMT_MDL_000053813-53815, Tab D
12    WMT_MDL_0000 43316-43373, Tab 2
13    WMT_MDL_000011106, Tab 3
14    WMT_MDL_000011107-11109, Tab 4
15    WMT_MDL_000000963-965, Tab 5
16    WMT_MDL_000000966-968, Tab 6
17    WMT_MDL_000000969-971, Tab 7
18    WMT_MDL_000008377-8379, Tab 8
19    WMT_MDL_0000004237-4239, Tab 9
20    WMT_MDL_000004781-4783, was marked for
21    identification.)
22    Q.    (BY MR. BOWER)  So please take
23 a moment and review Exhibit 7.  I imagine it
24 somewhat overlaps with the documents you have

Page 166

1 in your binder, but Exhibit 7 is Walmart's
2 responses to plaintiffs' combined discovery
3 requests.
4 A copy of that, and then the
5 exhibits, A, B, C, are just the documents
6 referenced therein.
7 So if you see -- just to orient
8 you, right? -- the Walmart -- the third page
9 of Walmart's responses provides examples of
10 additional policies and references document
11 numbers with Bates numbers.
12 A. Yes.
13 Q. Okay. So those -- so tabs A,
14 B, and C are just simply those Bates number
15 documents.
16 MS. TABACCHI: Wait. I'm
17 sorry.
18 Q. (BY MR. BOWER) So, sorry. So
19 if you look at --
20 MS. TABACCHI: What page are
21 you on?
22 MR. BOWER: So if you look at
23 the page -- the fourth page of
24 Walmart's responses which are the

Page 167

1 additional policies and practices in
2 bullet point form.
3 Okay.
4 MS. TABACCHI: Yes.
5 MR. BOWER: Are you with me?
6 MS. TABACCHI: Yes. And I'm
7 sorry. There's no page number.
8 Q. (BY MR. BOWER) You see it
9 references to -- second bullet point has a
10 document reference, fifth bullet point has a
11 document reference. And then the
12 second-to-the-last has a document reference.
13 Those are the Bates numbers of the documents
14 in tabs A, B, and C. Okay?
15 And then, tab D is just another
16 example, in case there was any confusion. I
17 just wanted to make sure we were all on the
18 same page regarding what these reports are.
19 So Exhibit D --
20 MS. TABACCHI: I'm sorry, what
21 are you saying tab D is?
22 MR. BOWER: Tab D is another --
23 I believe -- I'm going to ask her what
24 it is. But I believe it's another

Page 168

1 example of a controlled drug stock
2 exception report.
3 And then, the rest of the tabs
4 are simply the policies reflected on
5 the previous page.
6 Okay?
7 So take another moment,
8 familiarize yourself with that. And
9 then we can start. What I'm going to
10 do with this is I want to walk
11 through, year by year, what Walmart's
12 policies were starting in 2006. Okay?
13 And give you this to refer to. And
14 I'm sure you may also refer to your
15 binder as well.
16 MS. TABACCHI: Yes.
17 MR. BOWER: Okay?
18 So why don't we get started and
19 then you can refer to it as needed.
20 Does that make sense?
21 THE WITNESS: Yes.
22 MR. BOWER: Or do you want a
23 minute to review it?
24 THE WITNESS: No.

Page 169

1 MS. TABACCHI: So you're not
2 asking her questions about this. This
3 is just for her reference?
4 MR. BOWER: Yes. And I'm going
5 to have specific questions on it, I
6 believe. But yes, it's mostly for her
7 reference and to confirm what's
8 written here.
9 Q. (BY MR. BOWER) So the first
10 question would be what were Walmart's
11 policies and procedures in place in 2006, to
12 monitor for orders of controlled substances?
13 A. So the policies that we had in
14 2006 included work that the associates in the
15 distribution center themselves would do based
16 on monitoring orders.
17 We were running -- and so -- so
18 as to those orders, if an order was
19 identified, they would alert a manager, and a
20 manager would work with the operations
21 leadership to determine the reason for that.
22 Q. Now, if you look at Walmart's
23 responses to the combined discovery requests,
24 on page 4, the first bullet point, is that

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  the policy you're referring to?  Where it
2  says "From as early as 1994 until 2010,
3  employees in Walmart's pharmacy distribution
4  centers reviewed controlled drug stock
5  exception reports, followed up on orders by
6  speaking with pharmacists, and escalated
7  issues to market and/or regional leadership
8  as needed to investigate orders and to
9  resolve concerns."
10       Is that the policy you're
11  referring to?
12     A.    Yes.  As well as the bullet
13  that's at the very bottom of the page.  So
14  I'm on my document that, for the entire
15  relevant time period, our distribution
16  associates monitored orders.
17     Q.    Okay.  Now, let's go in 2006,
18  what specifically were the associates doing
19  to monitor orders?
20       MS. TABACCHI:  Object to the
21  form.
22       THE WITNESS:  They were
23  monitoring orders as they came into
24  the distribution center, and again

Page 171

1  based on their knowledge and
2  experience of the operations.  They
3  were looking for outliers.  Things
4  that were outliers for them -- for
5  their knowledge.
6     Q.    (BY MR. BOWER) Okay.  And
7  during this time period in 2006, Walmart had
8  approximately 4,000 pharmacies; is that
9  correct?
10       MS. TABACCHI:  Object to the
11  form.  Beyond the scope.
12       THE WITNESS:  That's
13  approximate.
14     Q.    (BY MR. BOWER)  Sounds about
15  right?
16     A.    Sounds good.
17     Q.    And those pharmacies would be
18  placing orders once a week; correct?
19     A.    They had the ability to place
20  orders once a week.  Not every pharmacy
21  ordered every week.
22     Q.    Okay.  And those orders that
23  came in could be for multiple products;
24  correct?

Page 172

1       MS. TABACCHI:  Object to the
2  form.
3       THE WITNESS:  Correct.
4     Q.    (BY MR. BOWER) Could be for
5  numerous products; correct?
6     A.    Correct.
7     Q.    And was -- these associates
8  were reviewing each one of those orders for
9  whether the order was unusual size; is that
10  correct?
11       MS. TABACCHI:  Object to the
12  form.
13       THE WITNESS:  What they were
14  doing was ordering -- monitoring the
15  orders as they came in, because they
16  were creating the 222 forms, as well
17  as other associates within the
18  building were filling those orders.
19  And so they had -- they had knowledge
20  of normal pattern as well.
21     Q.    (BY MR. BOWER) Okay.  But my
22  question is, were -- were the associates who
23  were in charge of this in 2006 reviewing each
24  order as it came in?

Page 173

1       MS. TABACCHI:  Object to the
2  form.
3     Q.    (BY MR. BOWER)  And let me make
4  it more specific.
5       At DC 6045 in 2006, were these
6  associates that you're referring to reviewing
7  each order as they came in?
8       MS. TABACCHI:  Object to the
9  form.
10       THE WITNESS:  They were working
11  with each order.  They certainly
12  touched each order as they came in.
13  And our policy was set up so that our
14  practices and policies would detect if
15  there was something outside of the
16  normal pattern.  So they -- they
17  were -- they were touching, handling
18  every order that came through.
19     Q.    (BY MR. BOWER)  And were they
20  reviewing each order that came through for
21  whether it was unusual size --
22       MS. TABACCHI:  Object to the
23  form.
24     Q.    (BY MR. BOWER)  -- in 2006 in

Page 174

1  DC 6045?
2      A.    Within the scope of their
3  normal work, they were looking at each order.
4      Q.    And approximately how many
5  items would have been ordered for each --
6  during this time period, each day?
7          MS. TABACCHI:  Object to the
8      form.  Beyond the scope of the notice.
9          THE WITNESS:  I don't have that
10     number.
11     Q.    (BY MR. BOWER)  Well, we have
12 approximately 4,000 pharmacies; right?
13     A.    Yes.
14     Q.    Potentially ten items for each
15 pharmacy?  Could have been more, right?
16         MS. TABACCHI:  Object to the
17     form.  Improper hypothetical.  Beyond
18     the scope.
19         THE WITNESS:  Could have been
20     less.  Could have been anything from
21     one to more.
22     Q.    (BY MR. BOWER)  Could have been
23 anything from one to more than 20; right?
24         MS. TABACCHI:  Object to the

Page 175

1      form.  Beyond the scope.
2          THE WITNESS:  It's a
3      hypothetical.
4      Q.    (BY MR. BOWER)  Well, how many
5  controlled substances was DC 6045
6  distributing in 2006?
7          MS. TABACCHI:  Object to the
8      form.  Beyond the scope.
9          THE WITNESS:  I don't have that
10     production number.
11     Q.    (BY MR. BOWER)  Well, in order
12 to tell me, right, whether -- the process for
13 order monitoring, wouldn't you have to know
14 how many orders were being monitored?
15         MS. TABACCHI:  Object to the
16     form.  Beyond the scope.
17         THE WITNESS:  Every order that
18     came in was subject to the practices
19     and policies of the distribution
20     center.  So whether it was one or it
21     was more, our obligation was the same.
22     Our policy applied exactly the same
23     across all of those orders, and those
24     associates took ownership and knew

Page 176

1  what their responsibilities were.
2      Q.    (BY MR. BOWER)  So we have
3  approximately 4,000 pharmacies with
4  potentially 20 items of controlled substances
5  for each pharmacy; right?
6          MS. TABACCHI:  Object to the
7      form.  Misstates the testimony.
8      Beyond the scope of the notice.
9          THE WITNESS:  That's a
10     hypothetical.
11     Q.    (BY MR. BOWER)  So would you
12 agree that the DC likely received more than
13 4,000 orders on an item basis each week?
14         MS. TABACCHI:  Object to the
15     form.  Beyond the scope.
16         THE WITNESS:  That -- it's
17     possible.  It's possible.
18     Q.    (BY MR. BOWER)  And how many
19 associates were reviewing the orders during
20 this time period in 2006?
21         MS. TABACCHI:  Same objections.
22         THE WITNESS:  We had a team of
23     order reviewers, and -- as well as a
24     team that was picking the number of

Page 177

1  associates.
2      Q.    (BY MR. BOWER)  What do you
3  mean by "picking the number of associates"?
4  What does that mean?
5      A.    Picking orders.  I didn't -- I
6  didn't complete my sentence.
7      Q.    Okay.  Sorry.
8      A.    Picking orders.
9      Q.    Okay.
10     A.    So I -- I believe we produced
11 org charts that show the number of associates
12 that were in -- within the distribution
13 center.
14     Q.    During -- in January 2006, how
15 many associates at DC 6045 were responsible
16 for reviewing orders to determine whether
17 they were for unusual size?
18         MS. TABACCHI:  Object to the
19     form.
20         THE WITNESS:  I don't have the
21     org charts.  That's not one of the
22     documents that I placed in my binder
23     to help me remember.  But I know I did
24     review that in one of the depositions.

Page 178

1     Q.    (BY MR. BOWER) Would you agree
2   that Walmart would have had to have numerous
3   associates reviewing each order in order to
4   ensure that a specific order didn't deviate
5   from an unusual pattern?
6          MS. TABACCHI:  Object to the
7          form.  Beyond the scope of the notice.
8          THE WITNESS:  I don't agree
9          with that.  There's no standard for
10         the number of people to review an
11         order.  We had policies and practices
12         in place so that we could -- we could
13         detect those orders and fulfill our
14         obligations.
15    Q.    (BY MR. BOWER) Okay.  So in
16  January 2006, okay --
17    A.    Yes.
18    Q.    -- we have associates at
19  DC 6045 reviewing orders for controlled
20  substances; correct?
21    A.    Correct.
22    Q.    And what specifically were they
23  looking for?
24    A.    They were looking for

Page 179

1   variations from their experience in that
2   facility that would indicate that there may
3   be something that needed to be reviewed about
4   that order.
5     Q.    So, for example, if they were
6   reviewing an order to determine whether it
7   represented unusual pattern, what would they
8   look at?
9     A.    So again, one of the -- one of
10  the practices, our policy at Walmart around
11  the ordering of medications through that
12  distribution center, was there were set days
13  that each pharmacy was assigned.
14         So if a manual order was
15  placed, which it would have had to have been
16  a manual order coming in, that type of order
17  outside of their normal ordering pattern
18  would have been reviewed by the management of
19  the distribution center.
20    Q.    So was it Walmart's policy,
21  procedure in January 2006 that only manual
22  orders were reviewed for whether they were an
23  unusual pattern?
24         MS. TABACCHI:  Object to the

Page 180

1          form.  Misstates testimony.
2          THE WITNESS:  No.
3     Q.    (BY MR. BOWER) Okay.  What is
4   incorrect about my statement?
5     A.    There were other reviews that
6   were conducted that included reaching out to
7   the pharmacy associates, reaching out to
8   field leadership.  There were -- there were
9   many reviews that were occurring
10  collaboratively between our logistics team,
11  our operations team.  Those reviews were all
12  part of how we were fulfilling our
13  obligations.
14    Q.    (BY MR. BOWER) Who on the
15  logistics team was responsible for reviewing
16  orders for unusual pattern in January 2006?
17         MS. TABACCHI:  Object to the
18         form.
19         THE WITNESS:  The associates in
20         the distribution center, as well as
21         the management of the distribution
22         center, were involved in those types
23         of reviews.
24    Q.    (BY MR. BOWER) And did you

Page 181

1   know their names?  Who were those people
2   doing it in 2000?
3     A.    I don't know all of their
4   names.  I know that they're listed on org
5   charts that have been produced.
6          The management in those
7   distribution centers, I do have, and I can
8   refer to.
9     Q.    Are you referring to
10  Mike Mullins?
11    A.    Mike Mullins was there.
12         In 2006?  I believe Jim Greer
13  was there for part of 2006.
14         And Jim Sherl was there as
15  well.  Those are some.  There may have been
16  others.
17    Q.    And those three individuals
18  were responsible for what in connection with
19  Walmart's suspicious order monitoring program
20  in 2006?
21    A.    They were the management team,
22  part of the management team at that
23  distribution center.  So as an order was
24  alerted, they were the ones that were working

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1 through whether or not there was anything to
2 be concerned with about that order, whether
3 or not they could deem it appropriate or
4 determine that it was suspicious and then
5 needed follow-up.
6     Q.    Okay.  So the management folks
7 would only review an order if it was alerted
8 to them; is that correct?
9         MS. TABACCHI:  Object to the
10     form.
11         THE WITNESS:  In the 2006 time
12     frame, our process was that our
13     associates were reviewing orders.
14     They were also reviewing reports that
15     were generated so they would become
16     familiar with patterns and stores in
17     that way as well.
18     Q.    (BY MR. BOWER) And we'll talk
19 about those reports in a moment, but I just
20 want to clarify a couple of things on what
21 the associates were doing.
22         Are these hourly associates
23 you're referring to?
24         MS. TABACCHI:  Objection, form.

Page 183

1         THE WITNESS:  Some of them were
2     hourly associates.
3     Q.    (BY MR. BOWER)  Were there
4 any -- strike that.
5         Were there some that were not
6 hourly associates?
7     A.    Yes.
8     Q.    In 2006?
9     A.    Yes.
10     Q.    Okay.  What positions were
11 those?
12     A.    Those would have been the
13 office management team, as well as the
14 managers that were within the building.
15     Q.    Well, I'm asking now
16 specifically about the first-level review.
17 Okay?  Before -- in 2006, before they're sent
18 to Mr. Mullins and Mr. Sherl.  Who was doing
19 the first-level review of orders other than
20 hourly associates?
21         MS. TABACCHI:  Object to the
22     form.
23         THE WITNESS:  So this was a --
24     it's a small distribution center.

Page 184

1 They all worked interactively.  Their
2 communication was across the
3 production day.  And so there were
4 managers that were involved as they
5 were generating.  There were managers
6 involved as the orders were picking.
7 There were managers involved with
8 security and access.
9         There were -- those managers
10 were involved in the total operation.
11         The first touch might have been
12 those hourly associates, but
13 management was involved as well in the
14 operation of -- of orders as they were
15 processed every day.
16     Q.    (BY MR. BOWER)  Under what
17 circumstances would one of the associates
18 bring in a manager to review an order in 2006
19 at DC 6045?
20     A.    One of the common issues that
21 was reported to me was pharmacists would
22 sometimes, if they were -- if they were
23 manually ordering, they would enter the wrong
24 quantity.  They were ordering tablets instead

Page 185

1 of bottles.
2         So 100 tablets might have
3 transposed to 100 bottles.  And that was one
4 that the associates knew was an error.
5         There were other times when
6 there might be some system issue, that the
7 associates would alert and say, you know,
8 this -- this order doesn't appear to be
9 right, and so they'd go back in and make sure
10 that there hadn't been some system issue that
11 generated a problem.
12         While they were -- other
13 times -- I think Jeff Abernathy testified to
14 these -- some of these processes.  Associates
15 on the line would be filling orders, and they
16 would notice that they were picking a certain
17 amount of orders consistently, and then the
18 next order that they were picking might be
19 something that was out of that pattern of how
20 they had been picking.  It might have been a
21 larger order.  And so they would alert at
22 that time as well.
23     Q.    Well, in that example you just
24 gave, when they would be filling orders and

Page 186

1 they would notice they were picking a certain
2 amount of orders consistently, and then the
3 next order they were picking might be
4 something that was out of the pattern -- what
5 do you mean by "pattern"? Pattern of
6 ordering from different stores or from the
7 same store?
8    A.   From different stores. They --
9 from different stores of what they had
10 previously picked.
11    Q.   Okay. During this time period,
12 were the Walmart associates who were
13 reviewing orders for controlled substances at
14 DC 6045 considering that order history from
15 the particular stores when reviewing that
16 store's order?
17    A.   That responsibility fell to the
18 management team that then went and
19 investigated and followed up when those types
20 of alerts were raised.
21    Q.   So the management team would
22 only follow up on those if the order had been
23 raised to them; is that correct? During this
24 time period?

Page 187

1       MS. TABACCHI: Object to the
2    form.
3       THE WITNESS: So the
4    circumstance of how the alert would be
5    raised to them would be what they
6    would follow up on. If there was
7    something that triggered in the
8    process that seemed to be an outlier
9    to the associates.
10    Q.   (BY MR. BOWER) Well, but my
11 question is a little different. My question
12 is, in reviewing these daily orders, were the
13 associates who were reviewing the orders
14 considering the past orders from those same
15 stores?
16    A.   Not at that time. That wasn't
17 part of their data set.
18    Q.   Okay. Do you know when Walmart
19 started reviewing that information in the
20 context of reviewing orders for controlled
21 substances?
22       MS. TABACCHI: Objection, form.
23       THE WITNESS: So there were a
24    variety of data that would be -- or

Page 188

1 information that would be reviewed
2    when an order was flagged, and then
3    reviewed -- flagged and then reviewed
4    by the team to determine whether or
5    not there was a concern.
6    Q.   (BY MR. BOWER) Well, let me
7 ask it a different way. Perhaps that was a
8 poor question.
9       When did Walmart start
10 considering a store's past orders when
11 reviewing its orders for controlled
12 substances?
13    A.   So in the -- in the pattern
14 of -- in reviewing how an order -- in the
15 process of reviewing an order, communications
16 with a market director, with the store
17 itself, and reports that were being pulled
18 and filed on a regular basis, those all
19 were -- those all were past history.
20    Q.   Well, let's go back to
21 January 2006. An order comes in from a store
22 in Ohio for ten orders of -- for ten orders
23 of oxy 5, ten bottles. Okay?
24       Are you with me?

Page 189

1       MS. TABACCHI: Hypothetical.
2       THE WITNESS: In this
3    hypothetical?
4       MR. BOWER: Yeah.
5       THE WITNESS: Ten orders of --
6    Q.   (BY MR. BOWER) Let's not make a
7 hypothetical. Let's turn to Exhibit A.
8 Okay?
9
10       MS. FUMERTON: This is
11    Exhibit A within 7.
12       MR. BOWER: Yes. Thank you.
13    Q.   (BY MR. BOWER) So Exhibit A
14 is -- do you see the first Bates number there
15 is ending in 4441?
16    A.   Yes.
17    Q.   And the last number, just for
18 the record -- it's a lengthy document -- the
19 last number is 44499. Okay?
20       And what's the name of the
21 document referenced on Exhibit A? If you
22 know.
23    A.   On Exhibit A, we referred to
24 this as the "405."

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1 Q. Okay. It's also -- is that
2 different than a controlled drug stock
3 exception report?
4 A. Yeah. That -- that is --
5 Q. Okay.
6 A. -- the same.
7 The title is "Controlled drug
8 stock exception report" and the report number
9 is 405.
10 Q. So in Walmart terminology,
11 though, is it the same thing? Is that
12 correct?
13 A. It is the same, yes.
14 Q. Okay. So let's look at some of
15 these orders, then. Would you agree that
16 this document reflects orders for particular
17 items from particular stores?
18 MS. TABACCHI: Object to the
19 form.
20 What portion of the document
21 are you --
22 MR. BOWER: Well, yeah. That's
23 a good point. Let's look at a
24 specific page. Okay?

Page 191

1 Let's -- let me find a good
2 example here. Let's turn to page
3 Bates ending in 44487.
4 Okay? Are you with me?
5 THE WITNESS: Yes.
6 Q. (BY MR. BOWER) Okay. And let's
7 look at -- just let's start with the bottom
8 drug there. It's item No. 003880917.
9 Do you see that?
10 A. Yes.
11 Q. And the drug is OxyContin? Do
12 you see that?
13 A. Oxycodone with acetaminophen.
14 Q. Oxycodone. Right?
15 A. Yes.
16 Q. 5 milligrams; right?
17 A. Yes.
18 Q. And the size of that product is
19 500 bottles? The unit size?
20 A. Yes.
21 Q. 500 units per bottle; correct?
22 MS. TABACCHI: Object to the
23 form.
24 THE WITNESS: Correct.

Page 192

1 Q. (BY MR. BOWER) And do you see
2 the number 1 there, in "Rank" -- under the
3 "Rank" column? Do you see that?
4 A. Yes.
5 Q. If you read -- if you go across
6 there, does that information reflect that
7 store's order for that product?
8 MS. TABACCHI: Object to the
9 form.
10 THE WITNESS: So this is the
11 aggregate purchase for this item for
12 the month of August of 2007.
13 Q. (BY MR. BOWER) For this store;
14 correct?
15 A. Yes.
16 Q. So this store in Garfield
17 Heights, Ohio, purchased 8,000 dosage units
18 of this product during that month; correct?
19 A. Correct.
20 Q. Okay. During this time period;
21 right? This is 2007; correct?
22 A. Yes.
23 Q. What would the Walmart
24 associates at DC 6045 have reviewed in

Page 193

1 connection with this order to determine
2 whether it was an unusual size?
3 MS. TABACCHI: Object to the
4 form. Misstates testimony.
5 THE WITNESS: If in the process
6 they had determined -- so again, this
7 is an aggregate. This is a month's
8 aggregate orders.
9 And so in the process of
10 filling those orders, if a flag had
11 been detected because of a pattern
12 size flag of concern to the
13 associates, it would have been passed
14 to management to follow up on with the
15 store or with their operations
16 leadership responsible for that
17 location.
18 Q. (BY MR. BOWER) Okay. And I'm
19 just trying to get a little more specificity.
20 So -- and I'm just giving you
21 one example of one store. And this is --
22 you're right, this is monthly. So this --
23 the average monthly dosage for the store
24 would have been approximately 2,000 dosages

Page 194

1 per week; right? Four weeks in a month? I
2 mean, right? One order per week?
3      MS. TABACCHI: Object to the
4 form.
5      THE WITNESS: That would be an
6 average, 2000.
7   Q. (BY MR. BOWER) Right.
8      So let me ask it again, then.
9 What -- who was reviewing these orders during
10 this time period?
11      MS. TABACCHI: Object to the
12 form.
13      THE WITNESS: So again, the --
14 can you clarify these orders as it
15 relates to this report? Or the order
16 itself.
17   Q. (BY MR. BOWER) The order
18 itself. So who is reviewing orders from
19 Store 3326, the weekly orders, during this
20 time period?
21      MS. TABACCHI: Object to the
22 form. Beyond the scope of the notice.
23      THE WITNESS: The distribution
24 center associates would be processing

Page 195

1 and reviewing these per the policies
2 and practices that we had in place.
3   Q. (BY MR. BOWER) Let me ask
4 perhaps a question in a little bit better way
5 because that was maybe a bad question.
6      In connection with Walmart's
7 suspicious order monitoring at DC 6045, who
8 was -- would have been responsible for
9 reviewing orders from Store 3326?
10      MS. TABACCHI: Object to the
11 form.
12      THE WITNESS: So the
13 responsibility for all stores was
14 within the policies and practices of
15 the distribution center.
16   Q. (BY MR. BOWER) And I
17 understand that, but I'm asking, what were
18 those policies and practices? Who had that
19 responsibility?
20      MS. TABACCHI: Object to the
21 form.
22      THE WITNESS: The DC associates
23 were reviewing orders as they were
24 processing. As flags were alerted,

Page 196

1 whether -- as issues were alerted or
2 raised to the management,
3 management -- and I think I named
4 Jim Sherl specifically for some
5 portion.
6      I didn't match these dates up,
7 but Jim Greer. Those were the
8 associates. I believe Jeff Abernathy
9 had testified to the fact that he
10 followed up on orders that were raised
11 that were -- that the associates had
12 questions on.
13   Q. (BY MR. BOWER) Let me just ask
14 a couple follow-up questions on that, then.
15      So the first question is, when
16 flags were alerted, did the folks who
17 received those alerts keep files on all of
18 those orders that were flagged during this
19 time period?
20      MS. TABACCHI: Object to the
21 form.
22      THE WITNESS: No. There was
23 not a process to keep track of all of
24 the flags.

Page 197

1   Q. (BY MR. BOWER) And then my
2 second question on that is, during this time
3 period when an order was flagged, would
4 Walmart hold that order prior to the review
5 by the -- Mike Mullins and Jimmie Sherl?
6      MS. TABACCHI: Object to the
7 form.
8      THE WITNESS: They would follow
9 up on that order before they would
10 be -- before they would proceed
11 through the picking process.
12   Q. (BY MR. BOWER) Let me just
13 make sure I understand your question [sic].
14 Let me ask it a different way.
15      During this time period -- and
16 this is September 2007; correct?
17      MS. TABACCHI: Object to the
18 form.
19      THE WITNESS: I'm sorry.
20   Q. (BY MR. BOWER) Let's just use
21 a time period. Okay? Let's use the date of
22 this document which is September 2007. Okay?
23 During that time period, if an order is
24 flagged by an associate at DC 6045, does

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  Walmart hold that order prior to shipping it?
2      A.    They would hold that order,
3  conduct outreach to understand the nature of
4  the order, and then at the -- at the point at
5  which they were able to clear that order,
6  they -- that's the point at which it would be
7  shipped.
8      Q.    And how -- how would Walmart go
9  about holding the order?
10     A.    It was a -- it was a procedure
11 within the -- within the distribution center
12 itself.  As -- as the orders were worked,
13 there was constant communication between the
14 associates and management.  And so they had
15 to pick up the phone and call the -- call a
16 store or market director at that moment.
17 That's the process that they went through.
18     Q.    Okay.  So let's just walk
19 through that process.  Okay?
20          We're in September 2007 in
21 DC 6045; okay?  An order comes in from Ohio
22 for ten bottles of Oxy 5s.
23          Okay?
24          100 dosages per bottle.  Okay?

Page 199

1          What happens to that order?
2          MS. TABACCHI:  Object to the
3  form.  Beyond the scope.
4          THE WITNESS:  The associates
5  would work through the process of
6  filling that order.  If a flag was
7  raised in the process of filling that
8  order, they would pass it to the
9  management that was on duty at that
10 time, and they would follow up to
11 determine -- to gather more
12 information about that order, the need
13 for that order.  And once they had
14 satisfied that, they would continue
15 the processing of that order.
16     Q.    (BY MR. BOWER) And how -- let's
17 break that down a little bit more.
18          How would they pass that order
19 to management?
20     A.    Again, this was a very small
21 facility.  And there was just constant
22 communication, constant dynamic communication
23 throughout the order-filling process,
24 tracking of orders.

Page 200

1      Q.    But let me just -- I mean, that
2  doesn't answer my question.  The question is
3  how would the associate pass that order to
4  management?
5      A.    They would communicate it to
6  them directly.
7      Q.    And how would they do so?
8      A.    Verbally.
9      Q.    Would they ever communicate it
10 in writing?
11         MS. TABACCHI:  Object to the
12 form.
13         THE WITNESS:  I don't believe
14 that that was the practice at the
15 time.  My understanding was that there
16 was communication directly between an
17 associate that flagged an item and a
18 manager.
19     Q.    (BY MR. BOWER)  And what
20 information specifically would they
21 communicate?
22         MS. TABACCHI:  Object to the
23 form.
24         THE WITNESS:  That they thought

Page 201

1  that there was something about this
2  order that needed to be reviewed.
3      Q.    (BY MR. BOWER)  Would they
4  communicate the store number?
5      A.    That would be -- that would be
6  tied to the order itself.
7      Q.    Would they communicate the item
8  number?
9          MS. TABACCHI:  Object to the
10 form.
11         THE WITNESS:  That would be
12 part of the order that they were
13 reviewing.
14     Q.    (BY MR. BOWER)  Would they
15 communicate the amount ordered?
16     A.    Yes.
17     Q.    Would they communicate the
18 reason that they had escalated the order?
19     A.    I believe that's inherent in
20 the conversation of why I'm raising my hand
21 about this order.
22     Q.    And then the managers of the DC
23 would memorize all of that information?  Is
24 that your testimony?

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    MS. TABACCHI: Object to the
2  form.
3    THE WITNESS: No. I -- that's
4  not my testimony. I -- from a moving
5  forward to communicating with the
6  store, I don't know if they jotted a
7  note. I -- I don't know that.
8    Q.   (BY MR. BOWER) Have you ever
9  received any note regarding an order that was
10 reviewed in 2007 at DC 6045?
11   MS. TABACCHI: Object to the
12 form. Beyond the scope. Are you
13 asking the witness herself?
14   MR. BOWER: Yes.
15   MS. TABACCHI: In her --
16   MR. BOWER: She just said they
17 may have jotted a note. I'm asking
18 her if she's ever seen one.
19   MS. TABACCHI: You're asking
20 her if she, Susanne Hiland, ever
21 received a note from 2007.
22   MR. BOWER: No, I'm asking if
23 she's ever seen one. Not received,
24 seen a note.

Page 203

1    THE WITNESS: I said it may
2  have happened. I'm -- I'm testifying
3  that the communication was largely
4  verbal.
5    Is it possible that there was a
6  note?
7    Q.   (BY MR. BOWER) Well, look.
8  We've got thousands of orders coming in every
9  day for DC 6045; right? And you're telling
10 me that these hourly associates are verbally
11 communicating orders that they flagged to the
12 managers so that they can go then review
13 them?
14   MS. TABACCHI: Object to the
15 form. Misstates testimony.
16   THE WITNESS: I think that
17 assumes that there were orders of --
18 outlier orders in huge numbers. This
19 was a -- this was a closed system
20 where we had policies and procedures
21 in place. That doesn't speak to the
22 number of orders that were raising
23 flags to the associates.
24   Q.   (BY MR. BOWER) My question

Page 204

1  is --
2    MR. BOWER: That wasn't my
3  question, so I move to strike.
4    Q.   (BY MR. BOWER) My question is,
5  would you agree that there were thousands of
6  orders per item coming into DC 6045 in 2007?
7    MS. TABACCHI: Object to the
8  form. Beyond the scope.
9    THE WITNESS: For what time --
10 for the entire 2007?
11   Q.   (BY MR. BOWER) 2007.
12   MS. TABACCHI: Object to the
13 form.
14   Q.   (BY MR. BOWER) Average day,
15 2007, what does it look like at 6045? How
16 many orders for specific items are coming in
17 for controlled substances?
18   MS. TABACCHI: Object to the
19 form. Beyond the scope.
20   Q.   (BY MR. BOWER) Let me break it
21 down a bit more, then, since we're getting
22 objections.
23   You said once a week. How many
24 actual days a week did DC 6045 fill orders?

Page 205

1  It was four days a week; right?
2    A.   It was four days a week.
3    Q.   So now we're averaging 1,000 --
4  if a -- let's assume all pharmacies' orders
5  are averaging 1,000 orders a day. Right?
6  4,000 pharmacies, four days a week. Okay?
7    MS. TABACCHI: Object to the
8  form. Beyond the scope.
9    MR. BOWER: Approximately;
10 right?
11   THE WITNESS: Approximately.
12 Again, not every pharmacy ordered
13 every week.
14   Q.   (BY MR. BOWER) Let's say half
15 of those pharmacies order. Right? Or 2,000
16 pharmacies. 500 orders per day. Right?
17   MS. TABACCHI: Object to the
18 form.
19   THE WITNESS: That would be
20 approximately that number.
21   Q.   (BY MR. BOWER) And those
22 pharmacies are ordering multiple products;
23 correct?
24   MS. TABACCHI: Same objections.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1  THE WITNESS:  They could order
2  multiple products.
3  Q.  (BY MR. BOWER)  They could
4  order more than ten products; correct?
5  MS. TABACCHI:  Same objections.
6  THE WITNESS:  They could order
7  more than ten.
8  Q.  (BY MR. BOWER)  So DC 6045
9  could have been getting more than 5,000 item
10  orders every day during this time period;
11  correct?
12  MS. TABACCHI:  Object to the
13  form.  Beyond the scope.
14  THE WITNESS:  It's possible
15  that they got multiple orders in the
16  thousands.  It's possible.
17  Q.  (BY MR. BOWER)  And Walmart's
18  policy was that its hourly associates would
19  review those orders to determine whether they
20  were potentially suspicious; is that correct?
21  MS. TABACCHI:  Object to the
22  form.
23  THE WITNESS:  Our policy and
24  practices were specific to the

Page 207

1  processing of orders and the knowledge
2  that these associates had, combined
3  with other interaction and ongoing
4  process with management.  We did not
5  rely on our hourly associates as the
6  only source of monitoring our controls
7  for opioids in this time period.
8  That's not true.
9  Q.  (BY MR. BOWER)  In 2007, who was
10  responsible for flagging a suspicious order
11  at DC 6045 for controlled substances?
12  MS. TABACCHI:  Object to the
13  form.
14  THE WITNESS:  Any associate
15  that had a concern and raised a
16  concern related to the orders that
17  they were filling.
18  Q.  (BY MR. BOWER)  Other than the
19  associates that we've discussed, is there
20  anyone else at DC 6045 who is responsible for
21  identifying suspicious orders?
22  MS. TABACCHI:  Object to the
23  form.
24  THE WITNESS:  It -- there

Page 208

1  may -- other than the ones that I
2  specifically named, or ...
3  Q.  (BY MR. BOWER)  Other than the
4  associates who were reviewing the orders as
5  they came in, is there anyone else who was
6  responsible for reviewing those orders to
7  determine whether they were potentially
8  suspicious?
9  MS. TABACCHI:  Object to the
10  form.
11  THE WITNESS:  So I think the
12  use of the word "responsible" is --
13  there -- they -- the entire team was
14  working on orders with products that
15  they knew were highly controlled.  The
16  entire distribution team was able and
17  engaged.  They knew their products.
18  They knew the process.  They were --
19  everyone in that building was engaged
20  in the controls that were in place
21  related to the distribution.
22  Q.  (BY MR. BOWER)  Okay.  Let me
23  see if I can get at it maybe a different way.
24  And I appreciate your explanation.  Let me

Page 209

1  ask you this.
2  If an associate who was
3  reviewing the orders as they came in did not
4  escalate or flag the order, would that order
5  be filled without further review?
6  MS. TABACCHI:  Object to the
7  form.
8  THE WITNESS:  That's a
9  hypothetical.  There were multiple
10  people touching orders.
11  Q.  (BY MR. BOWER)  Okay.  So -- so
12  let --
13  A.  It wasn't -- it wasn't just one
14  person deciding this passes through.  There
15  were multiple people in the building working
16  with those and -- that saw different pieces
17  of the process and had the ability to -- and
18  knowledge to raise their hand.
19  Q.  And what do you mean by
20  "knowledge"?
21  A.  Their experience.  They'd been
22  working with these products every single day.
23  They would see what was happening in that
24  day.  They would know from their experience

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 how those products flowed through the
2 distribution center. And they were all
3 committed to making sure that they were
4 following policies, procedures, and they
5 understood the products that they were
6 dispensing, and how -- how controlled they
7 were.
8     Q.    And what's the basis for your
9 statement that they were all committed to
10 making sure that they were following policies
11 and procedures?
12     A.    I spoke to Scott Culver and to
13 Mike Mullins about -- about the associates.
14 I was interested in tenure of the associates,
15 how we selected them, their training. I
16 would -- I asked them about the atmosphere
17 within the building, and how those -- how
18 they interacted together with the management
19 team to understand how these types of
20 processes worked at that time.
21     Q.    Okay. And what did they tell
22 you with respect to how they selected the
23 associates?
24     A.    They were highly tenured

Page 211

1 associates within the distribution system.
2         In fact, Mike specifically
3 commented -- and I believe I asked Jeff
4 Abernathy as well -- the average tenure of
5 the associates in that building was somewhere
6 between 17 and 18 years. And so if you look
7 back at our distribution history, these were
8 people that had been working in this
9 building, with these products, for more than
10 a decade.
11     Q.    And is it your -- so it's your
12 testimony that these people who were
13 reviewing the orders have been working at
14 DC 6045 reviewing orders for controlled
15 substances for more than a decade?
16     MS. TABACCHI: Object to the
17     form. Misstates testimony.
18     THE WITNESS: No. I believe I
19     said they were tenured within the
20     logistics.
21     Q.    (BY MR. BOWER) Okay. How long
22 had the folks who were reviewing orders in
23 2007 been reviewing orders for controlled
24 substances?

Page 212

1     MS. TABACCHI: Object to the
2     form.
3     THE WITNESS: It would be an
4     individual -- it would be an
5     individual tenured situation.
6         Some of them would -- would
7     have started with the building opening
8     in 2002. But they would be long-term
9     logistics associates.
10     Q.    (BY MR. BOWER) Would you agree
11 that in order for an associate to review an
12 order for substances, they would have to have
13 some experience with controlled substances
14 and filling orders in order to know whether
15 an order was unusual?
16     MS. TABACCHI: Object to the
17     form. Beyond the scope.
18     THE WITNESS: I think they
19     could be trained to understand what
20     the policies and procedures were.
21     Q.    (BY MR. BOWER) And did Walmart
22 provide training to its associates at --
23 during the 2007 time period?
24     MS. FUMERTON: Object to the

Page 213

1     form.
2     THE WITNESS: Yes.
3     Q.    (BY MR. BOWER) And what
4 specific training did it provide regarding
5 flagging orders for unusual size?
6     MS. TABACCHI: Object to the
7     form.
8     THE WITNESS: Again, it was an
9     understanding of the products that
10     they were using, and raising any
11     concerns that they had to management.
12     Q.    (BY MR. BOWER) And what did
13 Walmart train the associates with respect to
14 the understanding of the products they were
15 using?
16     MS. TABACCHI: Object to the
17     form. Beyond the scope.
18     THE WITNESS: So again, because
19     of the high security that was in the
20     building, they were aware of the
21     restrictions of those products.
22     Q.    (BY MR. BOWER) I've been
23 asking about the specific training, okay?
24 Did Walmart provide its associates who were

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 reviewing orders for controlled substances
2 any specific training with respect to those
3 substances?
4        MS. TABACCHI: Object to the
5    form. Beyond the scope.
6        THE WITNESS: There was
7    training as -- as the associates came
8    in around what their duties and
9    responsibilities were.
10   Q.   (BY MR. BOWER) And what
11 specific training was provided in connection
12 with monitoring for orders of controlled
13 substances?
14        MS. TABACCHI: Same objections.
15        THE WITNESS: I don't have
16    specific to that -- to that topic.
17    What they understood was their
18    responsibilities, how to perform their
19    duties in their area of
20    responsibility, and the nature of the
21    items that they were --
22   Q.   (BY MR. BOWER) Well, how do
23 you --
24   A.   -- handling.

Page 215

1        MS. TABACCHI: If you would
2    allow her to complete her answer.
3        MR. BOWER: Sorry, go ahead.
4        THE WITNESS: I'm done.
5    Q.   (BY MR. BOWER) Well, your
6 testimony is that they understood what their
7 responsibilities were and how to perform
8 their duties in the area. So my question is,
9 how did they understand what their
10 responsibilities were?
11   A.   I gained that knowledge from
12 speaking to the manager of the distribution
13 centers, Scott, who had responsibility.
14   Q.   And what did Scott tell you
15 with respect to how associates who were
16 reviewing orders of controlled substances --
17 strike that.
18        What did Scott tell you with
19 respect to the training for associates who
20 were reviewing orders of substances in 2007?
21   A.   What he told --
22        MS. TABACCHI: Object to the
23    form.
24        THE WITNESS: What he told me

Page 216

1 was that there were long-tenured
2 logistics associates that had -- many
3 of them had been in that building
4 since the day that it opened. They
5 understood their -- they understood
6 the products that they were
7 distributing. They understood their
8 role. And they were all engaged in
9 executing the policies and practices
10 at DC '45.
11   Q.   (BY MR. BOWER) So is it a fair
12 statement that it was more their experience
13 and specific training that he had relied on
14 in reviewing orders for controlled
15 substances?
16        MS. TABACCHI: Object to the
17    form.
18        THE WITNESS: Their -- learning
19    how to do their job would be part of
20    their training. And Walmart has other
21    training plans. So to -- but specific
22    to order monitoring, it was part of
23    the job that they were trained to do.
24   Q.   (BY MR. BOWER) But I just --

Page 217

1 look. The records would have been unclear,
2 so I want to make sure it's clear.
3        Did these associates who were
4 reviewing orders for controlled substances
5 receive any specific training with respect to
6 how to conduct those reviews?
7        MS. TABACCHI: Object to the
8    form.
9        THE WITNESS: What -- what they
10    understood about their responsibility
11    was that they had a role in raising
12    issues to their management, when those
13    issues were identified.
14   Q.   (BY MR. BOWER) Okay. And I
15 understand that your answer is that's what
16 they understood. But my question is a little
17 bit different. I'm just trying to understand
18 whether these associates who were responsible
19 for reviewing orders of controlled substances
20 at DC 6045 in 2007 received any specific
21 training in connection with those
22 responsibilities, specific to controlled
23 substances.
24        MS. TABACCHI: Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 form.
2       THE WITNESS:  They were
3 dispensing controlled substances, so
4 everything about their training for
5 their job was related to their
6 responsibilities within the building.
7       Q.    (BY MR. BOWER)  What do you
8 mean by "they were dispensing controlled
9 substances"?
10      A.    I misstated.  They were order
11 filling for controlled substances.
12      Q.    I think we can all recognize
13 they were order filling controlled
14 substances, but my question is different.
15 Okay?
16      There's an associate -- there's
17 associates in DC 6045 in 2007 that are
18 responsible for order monitoring for
19 controlled substances; correct?
20      A.    They're involved in order
21 monitoring within their job.
22      Q.    And indeed one of their
23 responsibilities is to monitor orders to
24 determine whether those orders might be

Page 219

1 unusual size; correct?
2       MS. TABACCHI:  Object to the
3 form.
4       THE WITNESS:  Their
5 responsibility was to raise any
6 concerns about outliers that they
7 identified within their area of
8 responsibility or through their daily
9 work.
10      Q.    (BY MR. BOWER)  And in
11 connection with those responsibilities to
12 identify outliers, did Walmart provide them
13 any specific training as to how they were to
14 go about identifying outliers?
15      MS. TABACCHI:  Object to the
16 form.
17      THE WITNESS:  There's --
18 there's not a specific training manual
19 that I can hand to you that details
20 the training that the associates were
21 given.
22      Through my conversations with
23 the -- with Scott Culver, he talked
24 about the awareness, the knowledge

Page 220

1 that the associates had, and the
2 familiarity that they had in their
3 jobs with their responsibilities, and
4 that there was constant communication
5 on a daily basis between all of the
6 associates, including managers, with
7 the policies and practices within that
8 building.
9       Q.    (BY MR. BOWER)  Okay.  Let's go
10 back to this controlled drug stock exception
11 report for a moment.  Were these reports used
12 to monitor orders for controlled substances?
13      MS. TABACCHI:  Are you looking
14 at Exhibit 7, tab A?
15      MR. BOWER:  Yes.
16      THE WITNESS:  These were not
17 suspicious order reports.
18      Q.    (BY MR. BOWER)  I just want
19 to -- I'm not sure if I understand your
20 answer.  What do you mean "These were not
21 suspicious order reports"?
22      A.    I believe that you asked me
23 whether these were used to monitor for
24 suspicious orders.  These were not reports of

Page 221

1 suspicious orders.
2       Q.    And I understand that they may
3 not be reports of suspicious orders, but did
4 Walmart use this information to monitor for
5 orders that were suspicious?
6       A.    We used these as a way to
7 communicate patterns to our partners in
8 operations, as well as to provide information
9 that was directly requested from
10 Carolyn Adams at the DEA.
11      Q.    But -- and I -- I understand
12 that's what they were used for.  I'm just
13 trying to confirm that these reports were not
14 used at the DC 6045 to orders -- to review
15 orders for controlled substances as they came
16 in.
17      MS. TABACCHI:  Object to the
18 form.
19      MR. BOWER:  And I'll strike
20 that.  I'll ask a better question.
21      Q.    (BY MR. BOWER)  Were these
22 controlled drug stock exception reports used
23 by the associates at DC 6045 to monitor
24 orders for controlled substances as they

Page 222

1  were -- came into the DC?
2       MS. TABACCHI: Object to the
3  form.
4       THE WITNESS: No. These were
5  monthly reports.
6       MR. BOWER: Thank you.
7       Q.  (BY MR. BOWER) If we can turn
8  to bullet point -- going back to a few pages
9  in Exhibit 1. Walmart's bullet points there.
10      For its additional policies.
11      Sorry, tab 1 of Exhibit 7.
12  My -- thank you.
13      Are you there, the first bullet
14  point there?
15      A.  Yes.
16      Q.  So when orders were followed up
17  by speaking with pharmacists, were those
18  orders that had been previously flagged as
19  suspicious?
20      MS. TABACCHI: Object to the
21  form. I'm sorry, Zach.
22      MR. BOWER: Sorry.
23      MS. TABACCHI: Where are you?
24      MR. BOWER: Bullet point 1

Page 223

1  where you said -- where we were
2  looking at, "Followed up on orders by
3  speaking with pharmacists."
4       Do you see that?
5       End of the second line.
6       "As early as 1994 until 2010,
7  employees in Walmart's pharmacy
8  distribution centers reviewed
9  controlled drug stock exception
10  reports, followed up on orders by
11  speaking with pharmacists."
12      Do you see that?
13      A.  Yes.
14      Q.  What orders does that refer to?
15      A.  Those are the orders that would
16  have been alerted, raised up to management.
17      Q.  Okay. So these are the orders
18  that have already been flagged as being
19  unusual for some reason; is that correct?
20      MS. TABACCHI: Object to the
21  form.
22      THE WITNESS: Those are the
23  orders that we've been talking about
24  that the associates would have said --

Page 224

1  would have raised a -- noticed that
2  there was something out of the
3  ordinary and raised up to management
4  with -- in the process of completing
5  those orders.
6       Q.  (BY MR. BOWER) Okay. These
7  orders are out of the ordinary. Can we agree
8  on that?
9       MS. TABACCHI: Object to the
10  form.
11      THE WITNESS: Those are --
12  those are the -- the follow-up that
13  was -- yes.
14      Q.  (BY MR. BOWER) And did Walmart
15  have a policy or procedure with respect to
16  documenting the conversation with pharmacists
17  during this time period? During 2007 time
18  period?
19      MS. TABACCHI: Object to the
20  form.
21      THE WITNESS: During 2007?
22      MR. BOWER: Yes.
23      THE WITNESS: Specifically, no.
24      Q.  (BY MR. BOWER) In the next,

Page 225

1  after that comment it says "and escalated
2  issues to market and/or region leadership."
3       Do you see that?
4       A.  Yes.
5       Q.  When would those escalations
6  occur?
7       A.  Those would -- if -- if an
8  order was flagged, and they were -- follow-up
9  was being conducted, and they spoke to the
10  pharmacist at the store and didn't get a
11  clear answer or had additional questions,
12  whatever it might be, that's when they would
13  escalate it to the market. Or region.
14  Generally the market director would be the
15  one.
16      Q.  Okay. And was there a specific
17  market director at Walmart in 2007 that was
18  responsible for reviewing these escalated
19  issues?
20      MS. TABACCHI: Object to the
21  form.
22      MR. BOWER: Or if you could
23  point to a title or something?
24      THE WITNESS: It would be -- in

Page 226

1  2007, they actually would have been
2  called -- I think market manager
3  was -- there was district manager.
4  There was market manager, and now
5  they're called something else.
6      Q.   (BY MR. BOWER)  Okay.  But in
7  2007, it would have been --
8      A.   I think market manager was
9  correct in 2007.
10      MR. BOWER:  And I assume if
11  it's not correct, we can get
12  clarification on that at some point.
13  Right?
14      MS. TABACCHI:  Yes.
15      Q.   (BY MR. BOWER)  Okay.  And you
16  said you believe it was primarily the market
17  manager and not the region leadership?  Is
18  that correct?
19      MS. TABACCHI:  Object to the
20  form.
21      Q.   (BY MR. BOWER)  Well, you --
22  explain what you mean -- or let me ask it
23  again, then.
24      And after we talked about

Page 227

1  pharmacists it says "and escalated issues to
2  market and/or region leadership."
3      Do you see that?
4      A.   Yes.
5      Q.   Does that accurately reflect
6  the policy and procedure in place in 2007?
7      A.   Yes.
8      Q.   Okay.  Under what circumstances
9  would region leadership become involved?
10      A.   Normally it would be if -- you
11  know, if the market manager couldn't be
12  reached -- because this was, again, a dynamic
13  production, and so these issues were working
14  to be resolved same day.  And so if the
15  market manager wasn't available for some
16  reason, the regional could be engaged.
17      Q.   And was the goal during the
18  2007 time period to resolve these issues the
19  same day?
20      MS. TABACCHI:  Object to the
21  form.
22      THE WITNESS:  The goal was to
23  provide answers to those orders so
24  that they could be resolved, yes.

Page 228

1      Q.   (BY MR. BOWER)  And if the --
2  well, strike that.
3      And then what would either the
4  market and/or region leadership do when they
5  received an order that needed investigation?
6      MS. TABACCHI:  Object to the
7  form.
8      Q.   (BY MR. BOWER)  Well, let me
9  just strike that, then.
10      We can read it; right?  It says
11  "and escalated issues to market and/or region
12  leadership as needed to investigate orders
13  and/or resolve concerns."  So what would the
14  market managers and/or region leadership do
15  to investigate orders during 2007 time
16  period?
17      MS. TABACCHI:  Object to the
18  form.
19      I think you need to read the
20  whole thing.
21      Q.   (BY MR. BOWER)  Do you
22  understand my question?
23      A.   So my experience, I was -- I
24  was a market -- I was a district manager in

Page 229

1  this broad time frame.  And my experience
2  with what I would look at, if I was
3  contacted, if I had a question about the
4  order, I would either follow up with my
5  pharmacy manager -- it would depend on the
6  information that I was getting from the DC,
7  if they had already spoken to them.
8      If there was something specific
9  that needed me to go look at prescription
10  information, I had that access.  I had a
11  limited number of pharmacies that I
12  supervised.  So it would depend on the
13  scenario, the circumstance.  But that's an
14  example of how I would go try to get
15  information to understand a specific order.
16      Q.   (BY MR. BOWER)  Well, you made
17  a good point, that you were in this role
18  during this time period.  So just let me ask
19  you this.
20      Did you ever -- did this ever
21  occur, based on the best of your
22  recollection?
23      MS. TABACCHI:  Object to the
24  form.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  THE WITNESS: I spoke to DC
2  associates -- I won't say on a regular
3  basis, but it wasn't completely
4  uncommon. Sometimes it could also be
5  if my pharmacy manager wasn't there
6  and the pharmacist that was in the
7  store didn't have the information that
8  they needed, they might call me.
9  And so it was -- it was not
10 frequent. It was -- but I did speak
11 to DC associates.
12 Q. (BY MR. BOWER) And just so I
13 get a general understanding, how many kind of
14 pharmacies were under your umbrella when you
15 had that role?
16 A. I had as many as 24. I had as
17 few as ten depending on the alignment.
18 MS. TABACCHI: Zach, our lunch
19 is here.
20 MR. BOWER: Let's go a few more
21 minutes. Get through at least this
22 bullet point and then we can take a
23 break.
24 MS. TABACCHI: Okay.

Page 231

1  Q. (BY MR. BOWER) So when folks
2  were contacted and issues were escalated, you
3  mentioned you would look at -- you said, "It
4  would depend on the information that I was
5  getting from the DC if I had already spoken
6  to them."
7  What does that mean?
8  A. So the --
9  MS. TABACCHI: Just beyond the
10 scope and notice in her personal
11 capacity. Go ahead.
12 MR. BOWER: Well, let me
13 rephrase, then.
14 Q. (BY MR. BOWER) During this
15 time period, were you carrying out Walmart's
16 policies and procedures for monitoring orders
17 of controlled substances?
18 MS. TABACCHI: Object to the
19 form.
20 THE WITNESS: I had
21 responsibilities that went into our
22 dispensing function related to --
23 ensuring that there was not diversion
24 occurring across my area of

Page 232

1  responsibility.
2  Q. (BY MR. BOWER) Okay. Well, now
3  I'm a bit confused because I thought you said
4  you had this role and you would have been one
5  of the folks where these issues were
6  escalated to. Is that not correct?
7  MS. TABACCHI: Object to the
8  form.
9  THE WITNESS: That is correct.
10 Q. (BY MR. BOWER) And these
11 issues that were escalated were in connection
12 with Walmart's suspicious order monitoring
13 program; is that not correct?
14 MS. TABACCHI: Object to the
15 form.
16 THE WITNESS: It was part of
17 the process that the distribution
18 centers conducted and part of the
19 information that they used in their
20 process was to reach out to operations
21 leadership. I was in an operations
22 leadership role at this time, so they
23 would reach out to me to gain more
24 information through their process.

Page 233

1  Q. (BY MR. BOWER) And what
2  information would they seek from folks like
3  you during the 2007 time period?
4  A. They would -- they would -- if
5  it was escalated to me, they would want to
6  know if I had information about a specific
7  order that they might be asking about.
8  Q. What type of information would
9  you have access to that they wouldn't during
10 this time period?
11 A. Well, I had supervision -- I
12 had responsibility for the pharmacies that
13 they were distributing to.
14 So could you -- I could go
15 physically stand in the pharmacy and
16 understand what the need for the order was
17 that was -- that they were questioning.
18 Q. Wait, your answer to my
19 previous question was, "If it was escalated
20 to me, they would want to know if I had
21 information about a specific order that they
22 might be asking about."
23 What specific information would
24 they be seeking from folks that were in your

Page 234

1  position?
2        MS. TABACCHI:  Object to the
3  form.
4        THE WITNESS:  The purpose of
5  the order from the pharmacy that I
6  supervised.
7     Q.   (BY MR. BOWER)  And how would
8  the folks in your position determine what the
9  purpose of that order was?
10    A.   I would --
11       MS. TABACCHI:  Object to the
12  form.
13       THE WITNESS:  -- do one of
14  several things that might include
15  talking to a pharmacist, talking to a
16  pharmacy manager.  I could go on-site.
17  I could look at their -- the specifics
18  around that drug.
19       There were -- there was a lot
20  of information that I had access to,
21  because I supervised those pharmacies.
22    Q.   (BY MR. BOWER)  Well, let's
23  break that down.  You give us some things you
24  would do.  Right?  So what would you talk to

Page 235

1  a pharmacist about?
2     A.   I would ask them why they
3  needed the order.
4     Q.   And would you rely on what they
5  told you?
6     A.   It would depend on the
7  circumstance --
8     Q.   Okay.
9     A.   -- of the response.
10    Q.   Can you recall any specific
11  time where you asked a pharmacist a question
12  and you needed more follow-up?
13       MS. TABACCHI:  Object to the
14  form.  Beyond the scope.
15       THE WITNESS:  I don't recall a
16  specific situation.
17    Q.   (BY MR. BOWER)  Not a single
18  time that you can recall specifically?
19       MS. TABACCHI:  Same objections.
20       THE WITNESS:  No, I --
21    Q.   (BY MR. BOWER)  Okay.  And the
22  second thing you mentioned was you could go
23  onsite.  What would you do when you went
24  onsite?

Page 236

1        MS. TABACCHI:  Object to the
2  form.  Beyond the scope.
3        THE WITNESS:  If I needed to go
4  onsite, I could, again, speak to the
5  pharmacist.  If I had questions about
6  the responses that they were giving
7  me, I could -- if there was a
8  prescription pending, I could look at
9  the prescription.  There may have
10  been -- I supervised those
11  pharmacists.  I supervised those
12  pharmacies, so I had pretty detailed
13  knowledge of the pharmacies that I was
14  responsible for.
15    Q.   (BY MR. BOWER)  And what kind
16  of knowledge are you referring to?  Give us
17  some examples of detailed knowledge.
18       MS. TABACCHI:  Object to the
19  form.  Beyond the scope.
20       MR. BOWER:  Well, let me strike
21  that.
22    Q.   (BY MR. BOWER)  Give us some
23  examples of detailed knowledge that would
24  have informed the folks who escalated these

Page 237

1  orders to you.
2        MS. TABACCHI:  Object to the
3  form.
4        THE WITNESS:  It would -- it
5  would be specific to the nature of the
6  order that was being placed.
7        I knew -- I knew my pharmacists
8  as part of Walmart's overall
9  organization.  The connection that we
10  had between logistics was -- was -- I
11  knew the logistics people.  They knew
12  who I was.  They knew they could reach
13  out to me.  George Chapman, in my
14  interview with him, recalled the same
15  thing in his time in role.
16       We -- the connection between
17  this distribution system was rather
18  seamless because logistics had the
19  ability to reach out to us, and --
20  throughout the entire distribution
21  channel, reach out and get any
22  information that they needed to
23  satisfy clearing that order.
24    Q.   (BY MR. BOWER)  Well, look.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1  I'm trying to understand what the policy was
2  as reflected in Walmart's responses to
3  discovery.  Okay?  And I'm trying to
4  understand, looking at bullet point 1, what
5  actually happened.
6      A.    Okay.
7      Q.    Okay?  Do you understand that?
8          And so I'm trying to
9  understand, when issue -- "escalated issues
10 to market and/or region leadership as needed
11 to investigate orders and resolve concerns,"
12 that's in connection with Walmart's SOM
13 program; correct?
14         MS. TABACCHI:  Object to the
15     form.  Asked and answered.
16         THE WITNESS:  It's a logistics
17     process that involved operations
18     leadership.
19     Q.    (BY MR. BOWER)  That's not my
20 question.  My question is, was the escalation
21 of issues to market and/or region leadership
22 as needed to investigate orders and to
23 resolve concerns part of Walmart's suspicious
24 order monitoring program?

Page 239

1          MS. TABACCHI:  Object to the
2      form.
3          THE WITNESS:  It was a part of
4      the process and due diligence that our
5      logistics teams engaged in to
6      understand the orders that they had
7      raised concerns about.
8      Q.    (BY MR. BOWER)  And they
9  engaged in that process in order to review
10 orders that had been flagged as unusual;
11 correct?
12         MS. TABACCHI:  Object to the
13     form.
14         THE WITNESS:  To flag an order
15     for whatever reason it was being
16     flagged.
17     Q.    (BY MR. BOWER)  And I'm trying
18 to understand from Walmart what these folks
19 did to investigate orders.  Okay?
20         What did they do to investigate
21 these orders that were escalated to them?
22         MS. TABACCHI:  Object to the
23     form.  Asked and answered.
24         THE WITNESS:  They would

Page 240

1  provide information about the pharmacy
2  that they knew, or they would go --
3  again, depending on the nature of the
4  order, it would direct what
5  information they needed to look for.
6      Q.    (BY MR. BOWER)  Okay.  In the
7  first part of your answer you said "They
8  would provide information about the pharmacy
9  they knew."  What information would they
10 provide about the pharmacy?
11         MS. TABACCHI:  Object to the
12     form.
13         THE WITNESS:  One of the things
14     that they could provide is my pharmacy
15     manager has been on vacation for two
16     weeks, and they -- they came back from
17     vacation and so you should, you
18     know -- this is part of the gap in why
19     there's no information coming from the
20     pharmacy manager about the -- about
21     the order.
22         If you call the pharmacy
23     manager and say, you know, "Why is
24     this order being placed?" and the

Page 241

1  pharmacy manager says at that time,
2  "I'm not sure," or they're busy, that
3  could come across as something that
4  they wanted to escalate to the market
5  director to understand if there was
6  something related to that order that
7  needed to -- needed further
8  information.
9          I mean, it could be anything
10 from a personnel issue to -- it
11 could -- it could be a wide range of
12 things that the market director,
13 district manager knew about the store
14 that logistics had access to.
15         MS. TABACCHI:  Zach, can we
16     take a break?
17         MR. BOWER:  Well, I'm just
18 trying to get through this, because I
19 need an answer to this and I don't
20 think I've gotten one yet.
21     Q.    (BY MR. BOWER)  I need to
22 understand what was done -- Walmart has
23 specifically told us, right, that these folks
24 are needed to investigate orders.

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1   Right?
2   Do you see that written there?
3   MS. TABACCHI: Object to the
4   form.
5   Q.   (BY MR. BOWER) "Escalated
6   issues to market and/or region leadership as
7   needed to investigate orders."  Right?
8   MS. TABACCHI: Zach, object to
9   the form.  You need to read the entire
10  bullet and we've been on this bullet
11  for a long time.
12  MR. BOWER: We have, but we
13  haven't got much answer on it, have
14  we?
15  MS. TABACCHI: You're just not
16  satisfied with the answer you have.
17  MR. BOWER: No, I am satisfied.
18  I just don't think the witness
19  understands what I'm asking, and I'm
20  trying to ask it in a way that she
21  maybe understands.
22  Q.   (BY MR. BOWER) So my question
23  is, when these orders are escalated to market
24  and/or region leadership as needed, what did

Page 243

1   those folks do?  I'm just trying -- what was
2   the policy as to what those folks were
3   supposed to do?
4   MS. TABACCHI: Asked and
5   answered.
6   THE WITNESS: They would have a
7   conversation with the logistics
8   associate that was reaching out to
9   them to understand what the question
10  was, and then they would go find
11  whatever information, validate what
12  they had already heard from the
13  pharmacist, or follow up specific to
14  whatever the point of escalation was.
15  It says "as needed."
16  Q.   (BY MR. BOWER) And were there
17  any written policies and procedures that
18  guided what the market managers or region
19  leadership was to do?
20  MS. TABACCHI: Object to the
21  form.
22  THE WITNESS: No.  This was a
23  practice of communication, and
24  exchange between logistics and the

Page 244

1   market leadership.  The operations
2   leadership.
3   MR. BOWER: All right.  We can
4   take a break.  Do you want to take a
5   lunch break now?
6   MS. TABACCHI: Yes.
7   THE VIDEOGRAPHER: 12:15.  We
8   are off the video record.
9   (Recess taken, 12:15 p.m. to
10  1:02 p.m.)
11  THE VIDEOGRAPHER: 1:02.  We
12  are on the video record.
13  Q.   (BY MR. BOWER) We're back from
14  lunch, Ms. Hiland.  Do you understand you're
15  still under oath?
16  A.   Yes.
17  Q.   So we spent some time this
18  morning going through bullet point 1, and I
19  just have a couple broad follow-up questions
20  and we can move on.  Okay?
21  A.   Okay.
22  Q.   The first thing I want to do is
23  I want to ask you whether the procedure we
24  discussed, whether that changed at any point

Page 245

1   between 2006 and 2010.
2   MS. TABACCHI: Object to the
3   form.
4   THE WITNESS: The procedure did
5   not change between that time period
6   2006 to 2010 for that specific
7   procedure.
8   Q.   (BY MR. BOWER) And was that
9   procedure also in place for other
10  distribution centers?  For example, the
11  centers that distributed hydrocodone?
12  MS. TABACCHI: Object to the
13  form.
14  THE WITNESS: Yes.  They had
15  the 405 report.
16  Q.   (BY MR. BOWER) Well, I'm
17  asking specifically about the review process
18  that was done by the associates for orders
19  that came in.  Was that also done at your
20  distribution centers?
21  A.   Yes.
22  Q.   Okay.  And what's your basis
23  for that statement?
24  A.   That was from speaking with

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1  Dena McClamroch, who was the DC manager for
2  our DC 6028 in Crawfordsville, Indiana.
3      Q.    Did Walmart distribute
4  hydrocodone in other DCs other than DC 6028
5  during this time period?
6      MS. TABACCHI:  Object to the
7  form.
8      THE WITNESS:  Yes.  We operated
9      other distribution centers, pharmacy
10     distribution centers, that distributed
11     hydrocodone.
12     Q.    (BY MR. BOWER) Did those
13 distribution centers also employ the policy,
14 practice, or procedure referenced in bullet
15 point 1?
16     MS. TABACCHI:  Object to the
17     form.  Beyond the scope.
18     THE WITNESS:  This was a
19     logistics procedure that applied to
20     all of those distribution centers.
21     Q.    (BY MR. BOWER)  And what's your
22 basis for that statement, that it applied in
23 DCs other than 6028 and 6045?
24     MS. TABACCHI:  Same objections.

Page 247

1      THE WITNESS:  For the reason
2      that Dena spoke about it in her
3      building.  And there was nothing
4      unique to Dena's building.  And so
5      I -- in speaking with her, she
6      articulated that that was the process.
7      So it was a process that the logistics
8      team was using for their orders.
9      Q.    (BY MR. BOWER)  Would you agree
10 that there's no written policy or procedure
11 that would require the practice reflected in
12 bullet point 1 to apply to hydrocodone?
13     MS. TABACCHI:  Object to the
14     form.
15     THE WITNESS:  We don't reflect
16     a written procedure for this.
17     Q.    (BY MR. BOWER) When you spoke
18 with Dena, did she have personal knowledge
19 that this procedure was implemented at the
20 DCs -- at all the DCs that distributed
21 hydrocodone?
22     MS. TABACCHI:  Object to the
23     form.  Can we focus on the geography
24     that's in this litigation, which is

Page 248

1  within the scope of the notice?
2      Q.    (BY MR. BOWER) I'm asking
3  about the policies and procedures.
4      A.    I'm sorry, can you restate the
5  question?
6      Q.    Sure.  When you spoke with
7  Dena, did she have personal knowledge that
8  this procedure that's reflected in bullet
9  point 1 was implemented at all of the DCs
10 that distributed hydrocodone?
11     MS. TABACCHI:  Object to the
12     form.
13     THE WITNESS:  I didn't ask her
14     that specific question, so I did not
15     get that response from her.
16     Q.    (BY MR. BOWER) Moving on to
17 bullet point 3 for a moment.
18     Can you see that?  The one that
19 starts "From approximately 2010"?
20     Do you see that one?
21     A.    Yes.
22     Q.    I just have a few questions on
23 this one.
24     Again, we see controlled drug

Page 249

1  stock exception reports; correct?
2      A.    Yes.
3      Q.    And we've already talked about
4  those reports; correct?
5      A.    Yes.
6      Q.    Okay.  And then it goes on --
7  after it references those reports and it says
8  "and internally circulated reports."
9      Do you see that?
10     A.    Yes.
11     Q.    Are those reports it's
12 referring to there that Walmart refers to,
13 are those reports controlled drug stock
14 exception reports or are those different
15 reports?
16     MS. TABACCHI:  Object to the
17     form.
18     THE WITNESS:  The 4 percent
19     report is a subset of information from
20     the controlled drug stock exception
21     report.
22     Q.    (BY MR. BOWER) Okay.  So from
23 2010 until 2015, the distribution centers
24 would create kind of subsets of the

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  controlled drug stock exception reports; is
2  that correct?
3      MS. TABACCHI:  Object to the
4  form.
5      THE WITNESS:  That is correct.
6      Q.   (BY MR. BOWER)  And those
7  reports would only include stores/items above
8  4 percent; is that correct?
9      A.   The 4 percent report, yes,
10 that's what was reflected on that report.
11     Q.   And then just a couple of
12 questions on that report.  What does the
13 4 percent reflect?
14     A.   That would be from the
15 exception report, the controlled drug stock
16 exception report.  That would show -- so
17 there were two different 405 reports
18 synonymous with that exception report.
19     One showed by drug; one showed
20 by store.  And so it would -- it would pull
21 together just those pharmacies that, for an
22 individual item, purchased more than
23 4 percent of an individual item for that time
24 period of the report.

Page 251

1      Q.   Okay.  That's helpful.
2      And then let me ask you this
3  question.  If you go one page earlier in
4  Exhibit 7 to the kind of chart there with the
5  documents?  The written documents and
6  policies?  Do you see the bottom of that?
7      A.   Yes.
8      Q.   And then the first one is
9  document No. 11106.  Right?  Which is
10 actually tab 2 in this exhibit.  Okay?
11     Tab 2.  It's after the A, B, C,
12 D.
13     A.   Oh.  Thank you.
14     Q.   Sorry about that.
15     So if you turn to tab 2, you'll
16 see there it's Document 11106.
17     Do you see that?
18     A.   Yes.
19     Q.   Okay.  Now, this references the
20 4051s and 4052s; correct?
21     A.   Yes.
22     Q.   And so my -- I just have a few
23 questions on this, then.  And one of those
24 questions is whether the procedure reflected

Page 252

1  in bullet point 3 is any different than this
2  written policy reflected on tab 2.
3      And I'll give you a second.
4      A.   I'm changing the exhibit.
5      Q.   Sure.  We'll put it back.
6      A.   So you're asking -- could you
7  ask your question again?
8      Q.   Sure.  So I'm just looking
9  at -- we're back to bullet point 3.  Right?
10 Okay?
11     A.   Correct.
12     Q.   And I'm just trying to
13 understand whether that procedure described
14 in bullet point 3 differs than the procedure
15 that would be required by this document in
16 tab 2 ending in 11106.
17     A.   So the bullet point includes
18 additional information and an additional
19 procedure above what's reflected in the
20 policy.
21     Q.   Okay.  So would it be a fair
22 statement that the policy reflected on tab 2
23 is a part of bullet point 3?
24     A.   That -- that is correct.

Page 253

1      Q.   Okay.
2      And so once we have -- let's go
3  back, then.  We'll talk about bullet point 3,
4  because I think I understand what you're
5  saying.
6      Once we have those reports,
7  what is the policy with respect to what the
8  folks at Walmart are doing with that?
9      MS. TABACCHI:  Object to the
10 form.
11     THE WITNESS:  So based on the
12 policy, the report was reviewed by the
13 senior AP manager in logistics.  And
14 that was forwarded over to the
15 diversion control coordinator for
16 review, per policy.
17     Q.   (BY MR. BOWER)  And these are
18 monthly reports; correct?
19     A.   These are monthly reports.
20     Q.   So during this time period,
21 from 2010 to 2015, was Walmart using these
22 monthly reports to monitor the daily orders
23 for controlled substances at 6045?
24     MS. TABACCHI:  Object to the

Page 254

1  form.
2      THE WITNESS:  No, this was
3  additional procedure that included
4  other things that were occurring at
5  the DC.
6      Q.   (BY MR. BOWER)  Okay.  And
7  then, if you go back to -- you mentioned that
8  bullet point 3 has some additional kind of
9  procedures that aren't reflected in tab 2;
10  correct?
11     A.   Correct.
12     Q.   And what did you mean by that?
13     A.   So in addition to the
14  distribution from logistics to the diversion
15  control coordinator, those 4 percent reports
16  were sent to operations leadership.
17     Q.   And what -- for what reason
18  were they sent to the operations leadership?
19     A.   It was information just to
20  share from an overall -- it was a data point
21  that we had so that they had more information
22  about their stores.
23     And if an order had never
24  arisen to be -- to their attention, they just

Page 255

1  had view to their stores and their purchases
2  if they appeared on that report.
3      Q.   Was that information used, for
4  example, to look for diversions at the
5  individual pharmacies?
6      MS. TABACCHI:  Object to the
7  form.
8      THE WITNESS:  It was not used
9  to look for a diversion.  It was a
10  data point if there was any
11  operational issues that arose.  And
12  the point of the diversion control
13  coordinator was to have a data point,
14  again, for their -- the work that they
15  are doing.
16     Q.   (BY MR. BOWER)  So it wasn't --
17  is it a -- strike that.
18     These reports weren't
19  necessarily used to look for diversion, but
20  it was a data point that was considered in
21  where to look for diversion at the individual
22  pharmacies?  Would that be accurate?
23     MS. TABACCHI:  Object to the
24  form.

Page 256

1      THE WITNESS:  The -- in trying
2  to explain how we used them, because I
3  saw these as well.
4      The -- the way that these would
5  be used is to look to see if
6  pharmacies were appearing on the
7  4 percent report.
8      So as you were doing an
9  operational review, it would be a data
10  point to say, I've seen this, you
11  know, let me check it out if there's
12  anything there of concern.  There may
13  not have been.  And not -- obviously
14  not every store ever hit a 4 percent
15  report.  So it was just a data point
16  for the market director to have more
17  visibility into the operation of their
18  pharmacy.
19     Q.   (BY MR. BOWER)  Okay.  Thank
20  you for that.
21     Now let's go to bullet point 4
22  for a minute.  Now we're in the time frame
23  2011 to 2015; correct?
24     A.   Correct.

Page 257

1      Q.   And this is when Walmart first
2  implemented order alerts in Reddwerks;
3  correct?
4      A.   Yes.
5      Q.   Do you know when in 2011
6  Walmart first implemented order alerts in
7  Reddwerks?
8      A.   I don't know the exact date.
9      Q.   Is that something you prepared
10  to testify on today?
11     MS. TABACCHI:  Object to the
12  form.
13     THE WITNESS:  I don't have an
14  exact date.
15     Q.   (BY MR. BOWER)  Do you know
16  whether it was -- could it have been 2012?
17     A.   No.  It was 2011.
18     Q.   And what makes you so certain
19  it was 2011?
20     A.   Because of the documentation
21  I've been given.
22     Q.   Can you refer to the specific
23  document that you're thinking of?
24     A.   Yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 258

1     Q.   Okay.
2     A.   Sorry, this is what I was
3 afraid of.
4     Q.   And just while you're looking
5 at it, I just want to confirm for the record
6 that you are looking in a binder you brought
7 with you today for a document that would
8 provide you a more precise date for when
9 Walmart first began implementing order alerts
10 in Reddwerks; is that correct?
11     A.   That is correct. And I had it
12 tabbed and I took my tab off, so I apologize
13 for the delay.
14     I have an SOP document that
15 talks about it.
16     It was an exhibit that was used
17 for a prior deposition.
18     Q.   Well, look. I don't think we
19 need to waste time on the record.
20     A.   I'm sorry.
21     Q.   I don't want to make this a
22 test for you either.
23     A.   I have it. I just took the tab
24 off.

Page 259

1     Q.   So maybe at a break or
2 something, I can look for it and you can
3 confirm that that's what you were looking
4 for.
5     So let's move on from that and
6 we'll come back to it later --
7     A.   Okay.
8     Q.   -- okay?
9     And at this point, when Walmart
10 first implemented order alerts in
11 Reddwerks --
12     A.   If I may, I just found it.
13     Q.   Oh, great. Okay.
14     So a document -- can you just
15 read the Bates number maybe into the record?
16     A.   It is Bates No. 9226. It's
17 multiple -- I'm sorry, it was Exhibit 8 in
18 Sullins.
19     Q.   Okay.
20     A.   And it starts 9224. And the
21 information -- and that document starts with
22 a date of 9-30-2013, but the attachment is
23 dated 2011. And that's the attachment that I
24 was looking for.

Page 260

1     Q.   And what -- what is the date on
2 the attachment specifically?
3     A.   12-20-2011.
4     Q.   So sometime around the end of
5 2011. Agreed?
6     A.   Yes. This is the SOP
7 enhancements.
8     Q.   And on what basis is it your
9 testimony that this in fact went into place
10 at that date?
11     A.   This is the document stating
12 the process that was in place.
13     Q.   So let me just ask it
14 differently, then. Other than the document,
15 is there anything else that's informing your
16 testimony today with respect to when Walmart
17 first implemented order alerts in Reddwerks?
18     A.   I spoke to Ramona Sullins about
19 the -- about the implementation of Reddwerks.
20 And there was no discrepancy in our
21 conversation about these documents and when
22 they were effective.
23     Q.   So did Ms. Sullins confirm for
24 you that this policy in fact went into place

Page 261

1 on 12-20-2011?
2     A.   We didn't talk about the exact
3 date. This is the order alert that's
4 reflected -- what we did talk about this is
5 this is the order alert and the documentation
6 that is reflected in the statement about the
7 Reddwerks alerting.
8     Q.   So just so I'm clear as to this
9 date, other than the date reference on the
10 document itself, is there any other basis
11 that you're relying on for the initial
12 implementation of the alerts in Reddwerks?
13     MS. TABACCHI: Object to the
14 form.
15     THE WITNESS: The conversations
16 with Ramona Sullins.
17     Q.   (BY MR. BOWER) And did
18 Ms. Sullins confirm to you that these
19 thresholds reflected in bullet point 4 in
20 fact began to be implemented on 12-20-2011?
21     A.   I didn't ask her that specific
22 question. I was asking about time frame. It
23 says "approximately 2011." And so as we
24 talked about the process, my understanding

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  was that is the correct time frame for these
2  alerts.
3      Q.    And other than your
4  understanding and the document itself, is
5  there any other basis for that testimony?
6          MS. TABACCHI:  Object to the
7      form.  Asked and answered.
8          THE WITNESS:  My interview and
9      the date on this document.
10     Q.    (BY MR. BOWER)  Did you, for
11 example, review any flagged orders during
12 this time period?
13     A.    I did not.
14     Q.    Okay.  And I just want to ask a
15 little bit more.  I understand -- strike
16 that.
17         Do you know whether during this
18 time period reflected in bullet point 4
19 there, whether Reddwerks was flagging orders
20 for non-controlleds of 50 bottles or more?
21     A.    Yes.
22         MS. TABACCHI:  Object to the
23     form.
24         THE WITNESS:  The Reddwerks

Page 263

1  system did flag non-controlled items
2  as well.
3      Q.    (BY MR. BOWER)  In fact, during
4  this time period, Reddwerks was flagging any
5  order of greater than 50; isn't that correct?
6          MS. TABACCHI:  Object to the
7      form.  Beyond the scope.
8          THE WITNESS:  That is part of
9      the SOP that was described in the
10     document.
11     Q.    (BY MR. BOWER)  And then, I
12 want to talk a little bit about this
13 30 percent.  And still on bullet point 4.
14     A.    Yes.
15     Q.    You're there?  Okay.
16         What does that 30 percent
17 reflect?  It says "higher than a rolling
18 four-week average for that item."
19         What does that mean?
20     A.    That means if the order
21 reflected higher than the average, that it
22 would flag.
23     Q.    And would it flag -- strike
24 that.

Page 264

1          Would that order flag
2  regardless of the amount ordered?
3          MS. TABACCHI:  Object to the
4      form.
5          THE WITNESS:  There were some
6      limits that were put in place specific
7      to that four-week average, but it was
8      at a later period.
9      Q.    (BY MR. BOWER)  Okay.  So
10 let's -- I'm -- and I think that's helpful.
11 I am a bit confused about those limits, so
12 I'd like to talk about those.  Do you know
13 when those limits were first put in place?
14     A.    The 2011 order limits?
15     Q.    So bullet point 4 states
16 that -- I'm going to skip the first part, but
17 it states that "Orders for amounts 30 percent
18 higher than a rolling four-week average for
19 that item were flagged from 2011 to 2014."
20         Do you agree with that?
21         MS. TABACCHI:  Object to the
22     form.
23         MR. BOWER:  I'll strike it,
24     then.

Page 265

1      Q.    (BY MR. BOWER)  When was
2  Walmart flagging orders for amounts
3  30 percent higher than a rolling four-week
4  average?
5      A.    That began in 2011.
6      Q.    And that again -- that began on
7  or about 12-20-2011; is that correct?
8      A.    That's correct.
9      Q.    And how long did that process
10 continue without any order alerts in place?
11         MS. TABACCHI:  Object to the
12     form.
13         THE WITNESS:  So I think I'm
14     confused about any order limits.
15     Q.    (BY MR. BOWER)  Okay.
16     A.    The alerts included order
17 limits.
18     Q.    Did the alerts include order
19 limits from their initial implementation?
20         MS. TABACCHI:  Object to the
21     form.
22         THE WITNESS:  The 50-bottle
23     alert was part of the initial
24     implementation.

Page 266

1    Q.   (BY MR. BOWER) But is it
2  correct that bullet point 4 describes two
3  different alerts?  Would you agree with that?
4    A.   It includes two different
5  calculations or two different numbers that
6  could result in an alert.
7    Q.   So an order alerts if it's
8  greater than 50 bottles for an individual
9  item; correct?
10   A.   Correct.
11   Q.   And that's per week; correct?
12   A.   Correct.
13   Q.   It's not reflected here, but
14  it's your understanding that 50 bottles
15  refers to per week; correct?
16   A.   Correct.
17   Q.   And would you agree that this
18  statement would be more accurate if it said
19  50 bottles per week?
20       MS. TABACCHI:  Object to the
21   form.
22   Q.   (BY MR. BOWER) Well, I think
23  we're entitled to know what the policy was.
24  And if the policy was 50 more bottles per

Page 267

1  week, then I think that's important
2  information for us to know.
3       So is it a true statement
4  that --
5    A.   I think we've reflected what's
6  in the SOP document which doesn't call out
7  the time period.
8    Q.   Okay.
9    A.   Any order that's over 50 is
10  flagged.  And some of these orders -- some
11  of these flags could be one or the other
12  prevailed, obviously.
13   Q.   So let's -- let me ask you
14  this, then.  From -- in 2012, if a store
15  ordered 60 bottles in a month, would those
16  orders be flagged?
17       MS. TABACCHI:  Object to the
18   form.
19       THE WITNESS:  The order -- if
20   it was at one time?
21       MR. BOWER:  Yes.
22       THE WITNESS:  It would flag.
23   If it was at one time, it would flag
24   on the 50.

Page 268

1    Q.   (BY MR. BOWER) What if it was
2  an order of 40 bottles one week and then an
3  order of 20 bottles the following week?
4  Would either of those orders be flagged under
5  the 50-bottle threshold?
6       MS. TABACCHI:  Object to the
7   form.
8       THE WITNESS:  In that scenario,
9   that threshold would not apply.
10   Q.   (BY MR. BOWER) So is it your
11  understanding that this 50 bottles or more
12  referred to 50 bottles or more per week?
13       MS. TABACCHI:  Object to the
14   form.
15       THE WITNESS:  Per -- based
16   on -- based on your process, yes.
17   Q.   (BY MR. BOWER) And that's
18  because the stores could only order
19  controlled substances once a week; is that
20  correct?
21   A.   That is correct.
22   Q.   And that was a threshold that
23  was implemented based on the item number;
24  correct?

Page 269

1    A.   In this order, it was item
2  number SKU, NDC.  That would be --
3    Q.   So that's one way an order
4  would be flagged.  Right?  50 bottles or more
5  by item number; right?  During this time
6  period, from end of 2011 to 2015; right?
7    A.   Correct.
8    Q.   And then the other way an order
9  is flagged is if it's 30 percent higher than
10  a rolling four-week average for that item;
11  correct?
12   A.   That is correct.
13   Q.   Okay.  For that second flag,
14  with 30 percent higher than a rolling
15  four-week average, were there any minimums
16  that would be required to meet for an order
17  to be flagged?
18   A.   Yes.
19   Q.   And what were those minimums?
20   A.   An order between 0 and 10 items
21  did not flag.
22   Q.   And what's the basis for that
23  statement?
24   A.   It's in the SOP of the document

Page 270

1  that I read.
2     Q.    And that document is not
3  referenced in this bullet point 4, is it?
4     A.    It is -- in bullet point 4 --
5     Q.    Yes.
6     A.    -- it is not.
7     Q.    Well, any order less than ten
8  items would not be flagged from 2011 to 2015;
9  is that correct?
10        MS. TABACCHI:  Object to the
11    form.
12        THE WITNESS:  That is correct.
13    Q.    (BY MR. BOWER)  And by -- when
14  you referred to "ten items," you meant --
15  what did you mean by "ten items"?
16    A.    Ten -- ten units of a single
17  item NDC.
18    Q.    And a single item could be a
19  bottle of 100 dosages; correct?
20    A.    Correct.
21    Q.    A single bottle could be a
22  bottle of 500 dosages; correct?
23        MS. TABACCHI:  Object to the
24    form.

Page 271

1        THE WITNESS:  In this setting,
2    correct.
3     Q.    (BY MR. BOWER)  So is it a true
4  statement that an order, for example, for
5  Oxy 5, that was nine bottles, or 900 dosages,
6  would never be flagged in 2011 to 2015?
7        MS. TABACCHI:  Object to the
8    form.  Misstates testimony.
9        THE WITNESS:  So the flags
10    were -- one piece of the program that
11    was running, according to these flags
12    in the settings in Reddwerks,
13    Reddwerks might not have flagged that,
14    but that was one piece of the program
15    that we were running.
16    Q.    (BY MR. BOWER)  And what is the
17  other piece of the program you're referring
18  to?
19    A.    Again, associates consistently
20  looking for any outliers that they had that
21  was in place throughout this time period.
22    Q.    Are you referring now to the
23  last bullet point there?
24    A.    Yes.

Page 272

1     Q.    Anything else that you were
2  thinking about when you provided that answer?
3     A.    We -- so you're in to -- in --
4  what time frame?
5     Q.    2012.
6     A.    Starting in 2012, we did
7  implement some order limits associated with
8  20 bottles specific to oxycodone 30, and we
9  started to look at all orders over 20 that
10  were processed about mid-2012.
11    Q.    But in my hypothetical, an
12  order of Oxy 5s, an order of nine bottles,
13  would never have been flagged pursuant to any
14  of these policies other than the last bullet
15  point; is that correct?
16        MS. TABACCHI:  Object to the
17    form.
18    Q.    (BY MR. BOWER)  And by "any of
19  these policies," I mean up until 2015, at
20  least.
21    A.    The flags would not have
22  alerted nine bottles.
23    Q.    Walmart would have relied on
24  the associates in the DC to review those

Page 273

1  orders; correct?
2        MS. TABACCHI:  Object to the
3    form.
4        THE WITNESS:  That was the
5    other piece of our program that was in
6    place.
7     Q.    (BY MR. BOWER)  So now we're in
8  the next bullet point.  2000 -- from
9  approximately July 2012.  Do you see that?
10    A.    Yes.
11    Q.    Okay.  What does it mean by
12  "DC 6045 implemented a hard limit of
13  20 bottles"?
14    A.    That means that they would --
15  they wouldn't ship anything more than
16  20 bottles of oxycodone 30.
17    Q.    And at that point in time, what
18  would Walmart do -- what was the policy and
19  procedure regarding an order that was over
20  20 bottles?
21    A.    They --
22        MS. TABACCHI:  Object to the
23    form.
24        THE WITNESS:  So --

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    MR. BOWER: I'll strike that.
2    I would like a clear question, so I'll
3    rephrase.
4    Q.    (BY MR. BOWER) From
5  approximately July 2012 until approximately
6  2015, what was the policy and procedure with
7  respect to orders of oxy 30 of over
8  20 bottles at DC 6045?
9    A.    So the policy was that if an
10 order came in for more than 20, the DC would
11 not ship more than 20, and those orders were
12 escalated for review.
13   Q.    During this time period, would
14 Walmart ever reduce the order to 20 and ship
15 the order without reviewing it?
16   MS. TABACCHI: Object to the
17   form.
18   THE WITNESS: We did reduce
19   those orders to 20 and ship.
20   Q.    (BY MR. BOWER) Did Walmart
21 review those orders before shipping them?
22   MS. TABACCHI: Object to the
23   form.
24   THE WITNESS: We reviewed those

Page 275

1    orders, every one of them that came
2    in. But the policy was we wouldn't
3    ship any more than 20, and so they'd
4    pass through and were processed.
5    Q.    (BY MR. BOWER) And then in
6  July of 2012, Walmart also starts beginning
7  to identify Schedule II substances -- strike
8  that.
9    In July 2012, Walmart also
10 begins to flag orders of more than 20 bottles
11 for Schedule II substances at DC 6045; is
12 that correct?
13   A.    Yes.
14   MS. TABACCHI: Object to --
15   Go ahead.
16   Q.    (BY MR. BOWER) And can you just
17 describe for us what that process was?
18   I know in here it says "for
19 further review and follow-up as needed."
20   Do you see that?
21   A.    Yes.
22   Q.    So let's say we're at the end
23 of 2012. An order for controlled substances
24 comes in for more than 20 bottles. What was

Page 276

1  the policy and procedure at Walmart DC 6045?
2    A.    So the report would be
3  circulated for review. A report would be
4  created and then circulated for review by the
5  DC associates. And it was forwarded on to
6  our asset protection team as well, to -- to
7  just take a review of that location.
8    Q.    And we've already seen
9  testimony by Mr. Abernathy on that procedure;
10 correct?
11   A.    Correct.
12   Q.    Okay. Is there anything about
13 the procedure described by Mr. Abernathy that
14 you would disagree with?
15   MS. TABACCHI: Object to the
16   form.
17   THE WITNESS: I'd have to
18   review. I did review his deposition,
19   but I don't review the exact
20   testimony, so I'd have to review it.
21   Q.    (BY MR. BOWER) Was there
22 anything as you sit here today testifying on
23 behalf of Walmart that you believe
24 Mr. Abernathy was incorrect about regarding

Page 277

1    that procedure?
2    MS. TABACCHI: Object to the
3    form.
4    THE WITNESS: Again, as I
5    reviewed it, I would have to look at
6    it again for these specifics.
7    Q.    (BY MR. BOWER) But nothing
8  that you're prepared to identify today; is
9  that correct?
10   MS. TABACCHI: Object to the
11   form.
12   THE WITNESS: I didn't -- I
13   didn't prepare to comment on his
14   testimony.
15   Q.    (BY MR. BOWER) Okay. And you
16 agree here that Walmart is relying on his
17 testimony?
18   MS. TABACCHI: Object to the
19   form.
20   THE WITNESS: In terms of?
21   Q.    (BY MR. BOWER) In terms of
22 support for this procedure.
23   A.    Yes, he testified to the
24 procedure.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    Q.   And during this time period
2  from approximately July 2012 until
3  approximately 2015, was Walmart holding and
4  not shipping an order of controlled -- of
5  Schedule II controlled substances until the
6  review was complete?
7        MS. TABACCHI:  Object to the
8     form.
9        THE WITNESS:  The orders were
10    reviewed.  Every order was reviewed,
11    and those reviews were completed.
12    Q.   (BY MR. BOWER)  In other words,
13  under bullet -- this bullet point, right,
14  that we're talking about, from approximately
15  July 2012 to approximately 2015?
16    A.   Yes.
17    Q.   Is it your -- is it Walmart's
18  testimony that any order of controlled
19  substances of greater than 20 bottles was
20  held for review prior to being shipped?
21        MS. TABACCHI:  Object to the
22    form.
23        THE WITNESS:  No.  At this time
24    they were not all held.

Page 279

1    Q.   (BY MR. BOWER)  Okay.  And how
2  did Walmart determine whether to hold an
3  order prior to shipment during this time
4  period?
5        MS. TABACCHI:  Object to the
6    form.
7        THE WITNESS:  So our order
8     would be flagged.  The associates
9     would review the orders and pass those
10    on to the asset protection team.  And
11    they would be cleared for shipment
12    once that review was completed.
13    Q.   (BY MR. BOWER)  And so going
14  back to my original question, then, would
15  Walmart hold those orders until they were
16  cleared?
17        MS. TABACCHI:  Object to the
18    form.
19        THE WITNESS:  I've confused
20    myself, because I'm trying to follow
21    your --
22    Q.   (BY MR. BOWER)  Okay.  So let
23  me take a step back and ask the question
24  again.

Page 280

1    A.   Okay.
2    Q.   From approximately July 2012
3  until approximately 2015, for orders for
4  Schedule II controlled substances of more
5  than 20 bottles, would Walmart hold those
6  orders for review prior to shipping those
7  orders?
8        MS. TABACCHI:  Object to the
9    form.
10        THE WITNESS:  Those orders were
11    held and reviewed.
12    Q.   (BY MR. BOWER)  And what was
13  the policy in place at the time with respect
14  to holding orders?
15    A.   This was a procedure that we
16  put in place specific to the -- to the
17  20-limit report.  We would hold orders until
18  they could be cleared as appropriate to ship.
19    Q.   So during this time period, any
20  order -- and we're talking about weekly
21  orders; correct?
22    A.   Yes.
23    Q.   Okay.  So any store that
24  ordered more than 20 bottles of a controlled

Page 281

1  substance during this time period, those
2  orders would be held prior to shipment; is
3  that correct?
4        MS. TABACCHI:  Object to the
5    form.
6        THE WITNESS:  Not all of those
7    orders were held.
8    Q.   (BY MR. BOWER)  And that's where
9  I thought we were.  I'm just trying to circle
10  back.
11        So how did Walmart during this
12  time period determine whether to hold an
13  order prior to shipment or whether to ship
14  the order before the review was completed?
15    A.   If they could not clear the
16  over 20 report, the information -- this was a
17  multi-stage process.  The distribution center
18  associates were involved.  If that could not
19  be cleared, the order -- the distribution
20  center associate could clear the order and
21  ship the order.  If that could not be
22  cleared, information was then passed on to
23  our asset protection team.
24        There may have been some

Page 282

1 involvement as well with the practice
2 compliance team, and those orders weren't
3 shipped until there were -- there was a
4 clearing of those orders.
5    Q.    (BY MR. BOWER)  Are there any
6 written policies or procedures that you could
7 point to to -- that would reflect what you
8 just described?
9    A.    Yes.  There was an exhibit used
10 in Abernathy that talked -- that has a
11 flowchart that speaks to that process.
12    Q.    So during this time period, is
13 it a true statement that the only order that
14 would be held would be an order that was
15 escalated by the DC?
16        MS. TABACCHI:  Object to the
17    form.
18        THE WITNESS:  If the DC could
19    clear it, they would ship it.
20    Q.    (BY MR. BOWER)  And what were
21 the policies and procedures regarding when
22 the DC could clear an order?
23        MS. TABACCHI:  Object to the
24    form.

Page 283

1    Q.    (BY MR. BOWER)  And now we're
2 still talking about the same time period.
3    A.    Same time period.  They would
4 have to be satisfied that their reason for
5 the order was -- that the explanation for it
6 made sense.
7    Q.    And are there any written
8 policies and procedures defining or
9 describing how the DC would go about
10 determining whether they were satisfied?
11    A.    There were no procedures, but
12 this was a similar process that they -- we
13 had had in place around alerts that were
14 raised to them.
15    Q.    During this time period, for
16 those orders that were flagged as being over
17 20, did Walmart keep a due diligence file for
18 those orders?
19    A.    We have some of those files.
20 The over-20 reports, I believe, have been
21 produced.
22    Q.    And I'm not talking about the
23 over-20 reports.  I'm talking about a
24 specific file related to a specific order.

Page 284

1 Okay?  So let's say an order is flagged as
2 being over 20.  Okay?
3    A.    Okay.
4    Q.    That order is reviewed;
5 correct?
6    A.    Correct.
7    Q.    Did Walmart keep a due
8 diligence file or any file in connection with
9 that review during this time period?
10        MS. TABACCHI:  Object to the
11    form.
12        THE WITNESS:  It would depend
13    on where the review was conducted.  If
14    asset protection completed a review,
15    they would have review -- they would
16    have notes related to their review.
17    Q.    (BY MR. BOWER)  By "asset
18 protection," what do you mean?
19        Where physically are those
20    folks during this time period?
21    A.    They would have been at the
22 corporate office.
23    Q.    Okay.  So during this time
24 period, there should be a file for any order

Page 285

1 that was escalated to the corporate office;
2 is that correct?
3        MS. TABACCHI:  Object to the
4    form.
5        THE WITNESS:  I don't know how
6    many there would be.  I don't know
7    how -- the retention on those files,
8    but they did take notes on the files.
9    Q.    (BY MR. BOWER)  Did Walmart
10 have a policy and procedure in place that
11 required those files to be kept?
12        MS. TABACCHI:  Object to the
13    form.
14        THE WITNESS:  Not specific --
15    not a specific retention policy to
16    those.
17    Q.    (BY MR. BOWER)  What about a
18 specific policy with respect to the creation
19 of the file?  A written record that due
20 diligence was done?
21    A.    In this time frame?
22    Q.    Yes.  We're talking 2012 to
23 2015.
24    A.    There were policies put in

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  place around documentation toward the end of
2  that time period.
3      Q.    And are you referring to a
4  specific policy or document that we could
5  read into the record?
6      A.    Yes.
7      Q.    Okay.
8      A.    There --
9      Q.    Go ahead.  I don't know if
10  you're looking for it or if you have it.
11      A.    There are documentation
12  requirements in the policy that is dated
13  August 2014, and the Bates number starts
14  8377.
15      Q.    And can you just -- since I
16  don't have access to that document at the
17  moment.  It's a document you brought with you
18  today; correct?
19      A.    It's part of the -- it is part
20  of the exhibit -- one of the exhibits.
21      Q.    Okay.
22      A.    It actually might be in this
23  book.  Oh, it is in this book.
24          It's behind tab 3.

Page 287

1      Q.    Okay.  So maybe this is a
2  different copy of the same policy?  It's a
3  different Bates number.  I just want to ...
4          Is that --
5      A.    Oh.  This was used in
6  Johnson 1.  Sorry.
7      Q.    Okay.  It's fine.  I just want
8  to make sure -- is it the same -- based on
9  what you're looking at, does it appear to be
10  the same policy?
11      A.    I put them in chronological
12  order.
13      Q.    Okay.
14      A.    It is 83- -- it's behind
15  tab 11.  Sorry.
16      Q.    Thank you for that.
17          Okay.  So the document we've
18  been talking about ending in 8377, this would
19  be the first time that Walmart had a written
20  policy that would require a written due
21  diligence file; is that correct?
22          MS. TABACCHI:  Object to the
23      form.
24          THE WITNESS:  This is the

Page 288

1  policy that reflected the
2  documentation of those files.
3      Q.    (BY MR. BOWER)  And according
4  to the responses here, this went into -- went
5  into practice in -- on or about August 2014;
6  is that correct?
7          MS. TABACCHI:  Object to the
8      form.
9          THE WITNESS:  Yes.  That is
10  correct.
11      Q.    (BY MR. BOWER)  And I will have
12  some questions on these policies, not too
13  many, but maybe we'll go through them after
14  we finish -- we're almost through the bullet
15  point, so let's finish there and then we'll
16  go through the policies.  Okay?
17      A.    Okay.
18      Q.    So I asked about due diligence
19  for the orders of oxy 20 for controlleds,
20  but I didn't ask about due diligence for
21  orders of oxy 30 over 20.  So let me ask
22  about that.
23          During this period of July 2012
24  to 2015, did Walmart keep a due diligence

Page 289

1  file for orders of oxy 30 that were over
2  20 bottles per week?
3      A.    There was a file kept of the
4  orders that were reviewed.  There's not a
5  policy that talks about the retention of
6  additional files.
7      Q.    I just want to clear up
8  something I don't think I asked, but I might
9  have.  So I -- there may be an objection to
10  this.  But going back to the prior bullet
11  point, the 30 percent?
12      A.    Yes.
13      Q.    I just want to confirm, that
14  30 percent, that average was based on that
15  store for that item; is that correct?
16      A.    That is correct.
17      Q.    Thank you.
18          Okay.  So now I want to go --
19  take a step back and go through these bullet
20  points again.  We've walked through most of
21  the process, but what I haven't asked is when
22  Walmart would report an order as suspicious.
23  So that's what I'm going to do now.  Okay?
24          And by "report," I mean report

Page 290

1 an order to the DEA that Walmart has
2 determined to be suspicious.  Okay?
3         I just want to give you kind of
4 where I'm going --
5     A.    Okay.
6     Q.    -- so you're not surprised.  So
7 let's go back to bullet point 1.  Okay?  And
8 under this policy, practice, or procedure,
9 described in bullet point 1, at what point
10 would Walmart report an order that was
11 suspicious to the DEA?
12     A.    At the point at which we
13 determined it was suspicious.
14     Q.    Okay.  And who would make that
15 determination during this time period?  And
16 now I'm talking about in connection with the
17 policy in bullet point 1.
18     A.    So in the process that was
19 being followed, that would be logistics.
20     Q.    And who -- what position or
21 what person at logistics would make that
22 determination?
23        MS. TABACCHI:  Object to the
24    form.

Page 291

1        THE WITNESS:  So those would be
2    the operations managers or the asset
3    protection manager that was onsite at
4    the distribution center.
5     Q.    (BY MR. BOWER)  Well, you
6 referenced an "or" in your answer.  I'm
7 just -- I just want to put a finer point on
8 it.
9        Under the procedure reflected
10 in bullet point 1, who at Walmart was
11 responsible for reporting a suspicious order
12 to the DEA?
13     A.    That would be the logistics
14 management at the point at which it was
15 determined to be suspicious.
16     Q.    What does that mean, the
17 logistics management at the point it would be
18 determined to be suspicious?  What does that
19 mean?
20     A.    So there were logistics
21 operations managers that were involved in
22 that process.  There was also an asset
23 protection manager onsite that -- that was
24 involved in much of the -- if there was

Page 292

1 day-to-day communication with DEA, that asset
2 protection manager was involved.  The
3 operations managers were the managers that
4 were -- that were looking at these orders
5 that had been raised and following up.
6     Q.    Let me try to get at that
7 question a different way.
8        Was there anyone at Walmart
9 that was responsible for reporting suspicious
10 orders to the DEA in connection with the
11 process, practice, or procedure outlined in
12 bullet point 1?
13     A.    That would be the logistics DC
14 management team.
15     Q.    So the team would be
16 responsible for the reporting; is that
17 correct?
18     A.    Well, the management team had
19 different shifts, and so the management that
20 was responsible at that time -- they might
21 not all have been there.  They weren't
22 collectively reporting those, but their
23 position -- they were in a position to have
24 that responsibility.

Page 293

1     Q.    (BY MR. BOWER)  And are you
2 referring now to like the Mike Mullins and
3 Jeff Abernathys?
4        MS. TABACCHI:  Object to the
5    form.
6        THE WITNESS:  Yes.
7     Q.    (BY MR. BOWER)  Okay.  Because
8 I think I understand what you're saying,
9 because Mr. Abernathy, for example, testified
10 that he would do some reports if he was the
11 first one in the office, for example.
12 Correct?
13     A.    Correct.  I read that in his
14 deposition.
15     Q.    So under that circumstance, he
16 would be the one responsible for reporting to
17 the DEA a suspicious order?
18        MS. TABACCHI:  Object to the
19    form.
20        THE WITNESS:  If there was an
21    order that was identified in his
22    shift, he would be responsible for
23    that.
24     Q.    (BY MR. BOWER)  During this

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  time period, up until 2010, have you seen any
2  order that Walmart had reported to the DEA
3  that has been determined to be suspicious?
4      MS. TABACCHI:  Object to the
5  form.  Beyond the scope of the notice
6  as to geography.
7      THE WITNESS:  No.
8      Q.    (BY MR. BOWER)  Not aware of
9  any; is that correct?
10     MS. TABACCHI:  Object to the
11 form.  Same objections.
12     THE WITNESS:  Not aware of any.
13     Q.    (BY MR. BOWER)  And let's go,
14 then, to bullet point 3.
15     Was there policy practice or
16 procedure in bullet point 3 meant to identify
17 suspicious orders that were to be reported to
18 the DEA?
19     A.    Bullet point 3 was part of the
20 process that we had in place to alert orders
21 that could be investigated to be determined
22 whether or not they were suspicious.
23     Q.    Well, bullet point 3 didn't in
24 and of itself provide a procedure where a

Page 295

1  specific order on a specific day would be
2  identified; is that correct?
3      MS. TABACCHI:  Object to the
4  form.
5      THE WITNESS:  I don't think
6  I -- I don't think I understand what
7  you're asking.
8      Q.    (BY MR. BOWER)  And I
9  appreciate that.  Bullet point 3 refers to
10 monthly reports; correct?
11     A.    Correct.
12     Q.    Okay.  So those reports
13 wouldn't have been used during this time
14 period, at least, to identify an order that
15 came in on a specific day --
16     A.    Now I understand the question.
17     Q.    -- for you; correct?
18     A.    Correct.
19     Q.    So let's go to the next bullet
20 point.  The 50-bottle.  The 2001-2015,
21 50 bottles and 30 percent higher.
22     Do you see that?
23     A.    Yes.
24     Q.    Under that policy, practice, or

Page 296

1  procedure, who was responsible at Walmart for
2  reporting any order that was determined to be
3  suspicious?
4      MS. TABACCHI:  Object to the
5  form.
6      THE WITNESS:  So there were
7  some changes in that time frame that
8  occurred, toward the end of that time
9  frame.  And so initially it would be
10 the same as I answered previously.
11     And then toward the end of that
12 time frame, there was a process that
13 was put in place that involved some
14 additional review by logistics at the
15 home office and practice compliance.
16     Q.    (BY MR. BOWER)  And then same
17 question for the next bullet point.
18     MS. TABACCHI:  I'm sorry, Zach,
19 what bullet point are you on?
20     MR. BOWER:  Sorry, we're on --
21 now we're at time period from
22 approximately 2012 to approximately
23 2015.  Do you see that?
24     THE WITNESS:  Yes.

Page 297

1      Q.    (BY MR. BOWER)  And now we're
2  looking at orders of oxy 30 more than 20 on a
3  weekly basis; correct?
4      A.    Correct.
5      Q.    And we were looking at orders
6  of Schedule II controlled substances in more
7  than 20 bottles on a weekly basis; correct?
8      A.    Correct.
9      Q.    During -- under this policy,
10 process, or procedure, was there anyone at
11 Walmart who had the specific responsibility
12 for reporting suspicious orders to the DEA?
13     MS. TABACCHI:  Object to the
14 form.  Asked and answered.
15     THE WITNESS:  So this would be
16 similar to -- up until -- in the early
17 part of this time frame, it would have
18 been logistic associates.  And then
19 toward the end of -- toward 2015 there
20 was -- August of 2014 was when the
21 policy was put in place for additional
22 review.
23     Q.    (BY MR. BOWER)  Okay.  And
24 that's that policy 8377, right?  That we

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  looked at?
2      A.    That started in August of 2018.
3      Q.    Okay.
4      A.    I'm -- let me correct.  2014.
5      Q.    2014.  I was with you.  Thank
6  you.
7          And then let me just close out
8  these bullet points and then we can take a
9  quick break.
10         Was the -- looking at --
11 starting with the 50 bottles and 30 percent
12 rolling week average bullet point?  Do you
13 see that?  Bullet point 4?
14     A.    Yes.
15     Q.    I'm now going to ask you
16 whether these policies and procedures applied
17 to orders for hydrocodone before hydrocodone
18 was rescheduled to a Schedule II.
19         Okay?
20     A.    Okay.
21     Q.    Was this bullet point
22 applicable to orders of hydrocodone prior to
23 its being reclassified as a Schedule II?
24     A.    Yes.

Page 299

1      Q.    Nothing different about that
2  policy that applied to hydrocodone; is that
3  correct?
4          MS. TABACCHI:  Object to the
5  form.
6          THE WITNESS:  That is correct.
7      Q.    (BY MR. BOWER) And then the
8  same question for the next bullet point.
9  Anything different about the -- I guess the
10 oxy 30 wouldn't apply, right?
11     A.    Yeah.
12     Q.    Okay.
13         MS. TABACCHI:  Right.
14         THE WITNESS:  This piece did
15 not apply.
16     Q.    (BY MR. BOWER) Right, but what
17 about the -- Schedule II wouldn't apply
18 either; right?  Because this wasn't a
19 Schedule II?
20     A.    Correct.
21         MR. BOWER:  All right.  Why
22 don't we take a quick break.
23         THE VIDEOGRAPHER:  1:55.  We
24 are off the video record.

Page 300

1          (Recess taken, 1:55 p.m. to
2  2:13 p.m.)
3          THE VIDEOGRAPHER:  2:13.  We
4  are on video record.
5      Q.    (BY MR. BOWER)  Okay.  We're
6  back on the record.  I want to continue going
7  down through these bullet points and just
8  kind of finish them off.
9          Are you still on that page in
10 front of you?
11     A.    Yes.
12     Q.    I want to talk for a minute ...
13         As I'm sure you've seen from
14 the transcripts, we've heard a lot about the
15 enhanced thresholds in Reddwerks.  Do you see
16 that in the third bullet point up from the
17 bottom there?
18     A.    Yes.
19     Q.    Can you describe for us what
20 that means?
21     A.    Those were thresholds -- those
22 were thresholds that were implemented in
23 around August 2015.  That made changes to the
24 alert system in Reddwerks.

Page 301

1      Q.    And were those changes the
2  changes -- so strike that.
3          Prior to those changes,
4  Reddwerks was only alerting for as reflected
5  in bullet point 4; is that correct?
6      A.    There were the alerts that were
7  reflected in bullet point 4, correct.
8      Q.    So those alerts were in place
9  until the enhanced Reddwerks -- enhanced
10 thresholds in Reddwerks were implemented;
11 correct?
12     A.    Correct.
13     Q.    And that would include the
14 minimum of ten bottles that we discussed
15 earlier; correct?
16         MS. TABACCHI:  Object to the
17 form.
18         THE WITNESS:  If I can correct
19 what I just testified to.
20         MR. BOWER:  Sure.
21         THE WITNESS:  At some point the
22 alert on the 20 bottles of oxy, that
23 20-bottle alert was added into
24 Reddwerks as well.

Page 302

1    Q.    (BY MR. BOWER) Do you recall
2  approximately when that was?
3    A.    It was -- it was after the time
4  frame that the change was implemented.  So it
5  was sometime in late 2012.
6    Q.    Okay.  With respect to the hard
7  limit for 20 bottles of oxy 30, did Walmart
8  ever implement any policy or procedure with
9  respect to whether stores could order more
10  than 20 bottles?
11        MS. TABACCHI:  Object to the
12     form.
13        THE WITNESS:  The order system
14     was based on a replenishment.  So the
15     order limit was applied at the
16     distribution center.
17    Q.    (BY MR. BOWER) So in other
18  words, a store was prevented from ordering
19  more than 20 bottles of oxy 30 at certain
20  time periods; is that correct?
21    A.    That is correct.  And we
22  implemented other policies on the dispensing
23  side of the business specific to oxy 30 to
24  help complement this distribution policy.

Page 303

1    Q.    And how would those dispensing
2  policies complement the distribution policy?
3    A.    We implemented a mandatory
4  prescription monitoring program check for all
5  oxycodone 30 prescriptions that our
6  pharmacists dispensed in states that allowed
7  for the pharmacist to have access to that
8  information.
9    Q.    What was the basis that Walmart
10  focused its efforts on oxy 30?
11    A.    We had a conversation with a
12  DEA agent that indicated that oxy 30 was
13  basically the drug that they were focusing
14  on.  That they had seen issues with oxy 30,
15  and during that same conversation they
16  indicated that Walmart was not part of their
17  focus.  But they were just sharing
18  information with us, and we reacted to that
19  information from the DEA.
20    Q.    Do you recall approximately
21  when that conversation with the DEA took
22  place?
23    A.    I believe it was in early 2012.
24    Q.    And do you know who had that

Page 304

1  conversation with the DEA?
2    A.    Tim Koch.
3    Q.    Do you know who he spoke with
4  at the DEA?
5    A.    I don't know the name of that
6  agent.
7    Q.    Did you speak with Mr. Koch in
8  preparation for today's deposition?
9    A.    I did not, but I had personal
10  knowledge of that conversation in 2012.
11    Q.    And how did you have personal
12  knowledge of that conversation in 2012?
13    A.    Because I was part of the group
14  that worked on the new policy related to
15  oxy 30.
16    Q.    Other than the information that
17  Mr. Koch acquired from the DEA, did Walmart
18  ever come to understand that other opioid
19  products were highly abused drugs?
20        MS. TABACCHI:  Object to the
21     form.  Beyond the scope.
22        THE WITNESS:  We were reacting
23     to that specific information that
24     seemed relevant.  To call out one

Page 305

1     single item was really what our focus
2     was at that time.
3    Q.    (BY MR. BOWER) And when
4  Walmart learned that this item was going to
5  be a focus, did it do any research or
6  investigation as to any other items that
7  should also be considered in its SOM program?
8        MS. TABACCHI:  Object to the
9     form.  Beyond the scope.
10        THE WITNESS:  Our program and
11     practices all applied across the
12     boards.  So to -- to the drugs that we
13     were dispensing.  So we put the oxy 30
14     limit in place, and then we began
15     looking at all of those orders that
16     were over 20 as a follow-up to that
17     policy change.
18        (Whereupon, Deposition Exhibit
19     Walmart 8, Excel threshold
20     spreadsheet, WMT_MDL_00042877, was
21     marked for identification.)
22    Q.    (BY MR. BOWER) So let me show
23  you what's been marked as Exhibit 8.
24        And just -- I'll make a

Page 306

1 statement for the record on Exhibit 8.
2 I believe this is the initial
3 Reddwerks enhancements. The Bates number as
4 reflected on the first page is 42877.
5 And what I did with this
6 document is we sorted by the stores that are
7 located in the CT-1 jurisdictions. Okay?
8 A. Okay.
9 Q. Are you following me?
10 A. Yes.
11 Q. Do you agree that document
12 No. 42877 would reflect the initial
13 thresholds that were implemented in
14 connection with the Reddwerks enhancement?
15 MS. TABACCHI: Objection, form.
16 Beyond the scope of the notice. The
17 witness was not prepared to testify
18 about any specific threshold. I
19 thought that there was an agreement
20 already.
21 MS. FUMERTON: Let's back up.
22 MR. BOWER: Let's stop for a
23 second. We're not having statements
24 on the record. If we want to go off

Page 307

1 the record, we can talk about it.
2 Okay? We're not doing this on the
3 record.
4 MS. FUMERTON: I need to
5 respond to your --
6 MR. BOWER: Not on the record.
7 MS. FUMERTON: -- to your
8 statement.
9 MR. BOWER: You don't need to
10 respond.
11 MS. FUMERTON: Well, this
12 doesn't have --
13 MR. BOWER: Okay. We're going
14 off the record.
15 MS. TABACCHI: We'd like to
16 have this on the record.
17 MR. BOWER: Okay. We can have
18 this on the record, but I will note
19 that this time is not counting against
20 my questioning. So you can make
21 statements on the record, but I can't
22 agree to allow you to make statements
23 on the record that counts against my
24 time.

Page 308

1 MS. FUMERTON: I made a
2 representation in an email, so that's
3 why I think that your statement or
4 question is different. And this is --
5 I mean, I don't know. Are you asking
6 her to verify what I said in my email
7 to you?
8 MR. BOWER: Yes. I'm just
9 asking whether these are the Reddwerks
10 thresholds that were in place when
11 Reddwerks was enhanced.
12 MS. FUMERTON: Nobody can
13 answer that based on this alone. In
14 other words, you can ask questions --
15 MR. BOWER: I'm not doing this
16 on the record. We're done on the
17 record. We can have a discussion off
18 the record.
19 MS. TABACCHI: Fine. We can go
20 off the record.
21 THE VIDEOGRAPHER: 2:21. We
22 are off the video record.
23 (Recess taken, 2:21 p.m. to
24 2:22 p.m.)

Page 309

1 THE VIDEOGRAPHER: 2:22. We
2 are on the video record.
3 Q. (BY MR. BOWER) We're back on
4 the record after a brief discussion off
5 record.
6 So you've been handed what's
7 been marked as Exhibit 8 for today's
8 deposition. Would you agree with me that
9 that document is 42877, as reflected on the
10 first page?
11 A. Yes.
12 Q. And that is a native Excel
13 document; is that correct? Or at least
14 appears to be?
15 A. Yes.
16 Q. Are you, as you sit here today,
17 familiar or able to testify that document
18 No. 42877 reflects the initial enhancements
19 in Reddwerks on or about August of 2015?
20 MS. TABACCHI: Object to the
21 question as beyond the scope of the
22 notice pursuant to the agreements that
23 have been reached previously with
24 counsel and the representations that

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1 were made by counsel to you with an
2 understanding that you were not going
3 to ask the witness about particular
4 thresholds, which is what you're
5 attempting to do now.
6 Q. (BY MR. BOWER) Can you -- do
7 you want me to read back that question?
8 A. Yes, please.
9 Q. Are you able to confirm for us
10 that Document 42877 reflects Walmart's
11 initial thresholds that were implemented into
12 Reddwerks in connection with the Reddwerks
13 enhancements?
14 MS. TABACCHI: Same objections.
15 THE WITNESS: I don't see a
16 date on this, so I -- so I don't know.
17 Q. (BY MR. BOWER) Okay. Well,
18 it's an Excel document, so it wouldn't be
19 dated; correct?
20 MS. TABACCHI: Object to the
21 form. Same objections.
22 THE WITNESS: There is no other
23 attachment for me to review from a
24 date perspective.

Page 311

1 Q. (BY MR. BOWER) Well, this is a
2 Walmart document. It was produced in
3 connection with this case.
4 Do you disagree with that?
5 MS. TABACCHI: Object to the
6 form. Beyond the scope of the notice.
7 THE WITNESS: I don't object to
8 the production. I just don't know
9 what context. Because this is an
10 Excel spreadsheet, I don't know what
11 context it was presented in.
12 Q. (BY MR. BOWER) Are you
13 prepared to testify as to how Walmart
14 determined what the thresholds would be in
15 connection with the Reddwerks enhancement?
16 A. Yes.
17 Q. And how did Walmart do that?
18 A. Can you give me time frame?
19 Q. The initial thresholds.
20 A. The initial thresholds?
21 Q. Yes.
22 A. The initial thresholds, and so
23 we're speaking about the time frame period
24 from -- starting in 2011?

Page 312

1 Q. No. My question is Reddwerks
2 enhancements.
3 A. The enhanced --
4 Q. Yes.
5 A. Okay. Thank you.
6 Q. Yeah. Sorry.
7 A. The enhanced thresholds were
8 calculated using a year's worth of shipment
9 data, and then applying a formula, which was
10 the average weekly order, plus three standard
11 deviations over that 52-week shipment date.
12 Q. And when that formula was used,
13 would that provide the enhancements for a
14 particular store?
15 MS. TABACCHI: Object to the
16 form.
17 THE WITNESS: It was store and
18 item specific. And there were
19 additional defaults that were applied
20 to those thresholds as they were
21 calculated.
22 Q. (BY MR. BOWER) And can you
23 describe for us how those defaults -- let me
24 break that down a little bit.

Page 313

1 How did Walmart go about
2 determining what the defaults would be?
3 A. So again, based on enhancing
4 what we had in place, we continued to use
5 that 50-unit limit. It was applied a little
6 bit differently in this context because we
7 took -- we took the dosage units and dropped
8 those down to item units to not exceed
9 5,000 units.
10 There was a default minimum
11 alert of 2,000 units applied, and then for
12 non-traited items for that location, there
13 was a limit set for a thousand dosage units.
14 Q. And I just have a couple of
15 questions to follow up on that. But let me
16 ask you this: What do you mean by
17 "non-traited items for that location"?
18 A. So the -- for certain items, we
19 might have had two supplier agreements in
20 place. And so stores would be traited for
21 one supplier's item. And that normally
22 happened when there could be supply
23 interruption.
24 And so if, for some reason, the

Page 314

1  traited item was unavailable and a store
2  attempted to order a non-traited item, that
3  non-trait -- that non-traited item could be
4  switched when there were supply issues, but
5  there were controls that were put in place to
6  make sure that the -- they stayed with that
7  traited item for their store.
8      Q.   And how would Walmart go about
9  determining what manufacturer would be a
10 traited item for a particular store?
11         MS. TABACCHI:  Objection,
12     beyond the scope.
13         THE WITNESS:  That was
14     something that the buyers would work
15     out with replenishment based on
16     contract and geography.
17     Q.   (BY MR. BOWER) And that
18 information was somewhere within the
19 documents that Walmart used to calculate the
20 Reddwerks enhancement; is that correct?
21         MS. TABACCHI:  Object to the
22     form.  Beyond the scope.
23         THE WITNESS:  May I clarify?
24     Q.   (BY MR. BOWER) Sure.

Page 315

1      A.   You're asking how we identified
2  non-traited items?
3      Q.   Yes.
4      A.   That would be in our
5  replenishment system and would have been
6  applied, because the NDC was --
7      Q.   Right.
8      A.   -- was specific.
9      Q.   In other words, the thresholds
10 that went into Reddwerks in connection with
11 the Reddwerks enhancement had different
12 thresholds that depended, at least in part,
13 on whether the item was traited for a store
14 or not traited for that store; is that
15 correct?
16     A.   That is correct.
17     Q.   And I think you mentioned, and
18 I just want to make sure that it's clear,
19 that if an item was not traited for that
20 store, the minimum threshold would be --
21 well, strike that.
22         If an item was not traited for
23 a store, was there a minimum threshold in
24 connection with the Reddwerks enhancements

Page 316

1  for Controlled-II substances?
2      A.   There was.
3      Q.   What was that minimum
4  threshold?
5      A.   The minimum threshold was
6  1,000 units.
7      Q.   And if an item was traited for
8  that store, what was the minimum threshold
9  for a Controlled-II substance?
10         MS. TABACCHI:  Object to the
11     form, asked and answered.
12         THE WITNESS:  2000 units.
13     Q.   (BY MR. BOWER) Okay.  And
14 again, we're talking about units on a weekly
15 basis; is that correct?
16     A.   Correct.
17     Q.   Did Walmart ever consider using
18 thresholds based on a monthly basis?
19         MS. TABACCHI:  Object to the
20     form.  Beyond the scope.
21         THE WITNESS:  Not to my
22     knowledge, in the information I've
23     reviewed about threshold development.
24     Q.   (BY MR. BOWER)  Why did

Page 317

1  Walmart, in designing its suspicious order
2  monitoring program, review orders on a weekly
3  basis as opposed to a monthly basis?
4          MS. TABACCHI:  Object to the
5      form.
6          THE WITNESS:  We looked at the
7      orders as they were being filled.  And
8      so each order that was placed or
9      filled was what we were reviewing, and
10     that was weekly within our system.
11     The order occurred weekly, as I
12     explained, on a single day of the
13     week.
14     Q.   (BY MR. BOWER)  Let me ask you
15 this.  When we're talking about a traited
16 product, can you describe what specifically
17 that means?
18         Is it specific to an NDC
19 number?
20         MS. TABACCHI:  Object to the
21     form.
22         THE WITNESS:  It would be -- a
23     traited item would be at the NDC
24     level.  It's -- another way to think

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  about it is the item that is
2  preferred.  It's a term that's used in
3  our replenishment system that just
4  shows which item for the system to
5  pick, because that's the trait or the
6  preferred item for that location,
7  based on the alignment in
8  replenishment.
9      Q.    (BY MR. BOWER)  Let me just ask
10 you a question, if you could turn back to
11 that exhibit, the Excel spreadsheet.
12      And I just want to -- I'm a
13 little bit confused, so if you compare -- do
14 you see the number all the way in the left
15 there?
16      The number column?
17     A.    Yes.
18     Q.    Okay.  I'm just looking at, for
19 example -- well, let me lay the foundation
20 for a moment.
21      Are you familiar with the
22 column headings on the top of this, what
23 those mean?
24     MS. TABACCHI:  I'm sorry,

Page 319

1  you're asking her now about Exhibit 8?
2     MR. BOWER:  Yeah.
3     THE WITNESS:  Yes, I understand
4  those.
5     Q.    (BY MR. BOWER)  And so if -- I
6  just want to now compare for a moment, in the
7  context of this discussion we're having on
8  traited items; okay?
9     A.    Yes.
10     Q.    If you compare, for example,
11 number -- row 29 with row 40.
12      Do you see those?
13     A.    Yes.
14     Q.    Those are both oxycodone
15 30 milligrams; correct?
16     MS. TABACCHI:  Object to the
17 form.
18     THE WITNESS:  Yes.
19     Q.    (BY MR. BOWER)  But one is --
20 one has HCL and one does not; right?
21     A.    Correct.
22     Q.    Okay.  So does it appear to
23 you, from looking at those items, that both
24 of those items were traited for Store

Page 320

1  No. 1857 based on the threshold numbers?
2     MS. TABACCHI:  Objection,
3  beyond the scope.
4     THE WITNESS:  Those are above
5  the threshold that was set for
6  non-traited, so it does appear that
7  they --
8      I think it -- I think it also
9  speaks to time frame, that these are
10 initial -- the minimum here would have
11 been 2,000 for a traited item, the
12 minimum threshold would have been.
13     Q.    (BY MR. BOWER)  And I'm just
14 trying to -- and maybe it's my
15 misunderstanding.  I'm just trying to
16 understand how the traited policy worked
17 again.
18      It's correct that even an
19 item -- if an item is identical, but is
20 manufactured by a different manufacturer, has
21 a different NDC number; correct?
22     A.    Correct.
23     Q.    And so, in that circumstance,
24 how, if at all, would the traited thresholds

Page 321

1  affect the threshold -- the threshold for
2  that item?
3     MS. TABACCHI:  Object to the
4  form.
5     MR. BOWER:  I'll strike that.
6     Q.    (BY MR. BOWER)  In that
7  circumstance, how would whether an item is
8  traited for that store affect the thresholds?
9     MS. TABACCHI:  Object to the
10 form.
11     THE WITNESS:  The non-traited
12 item would have a lower threshold.
13     Q.    (BY MR. BOWER)  So let's go
14 back, then, to Walmart's combined discovery
15 responses, the same bullet point.
16      Okay?  Three up from the
17 bottom.
18     A.    Yes.
19     Q.    Okay.  Now, we can look at what
20 the thresholds are when we look at the Excel
21 spreadsheets; correct?
22     MS. TABACCHI:  Object to the
23 form.  Beyond the scope of the notice.
24     THE WITNESS:  So this has been

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  represented that these are the --
2  Q.    (BY MR. BOWER) Yes.
3  A.    -- the thresholds.
4  Q.    I just want to confirm that the
5  thresholds would be reflected in the
6  spreadsheets that were provided to Reddwerks.
7  Correct?
8        MS. TABACCHI:  Object to the
9        form.
10       THE WITNESS:  The initial
11       thresholds in the enhanced model were
12       loaded by Reddwerks.
13  Q.    (BY MR. BOWER) And then Walmart
14  subsequently changed those thresholds over
15  time; correct?
16       MS. TABACCHI:  Object to the
17       form.
18       MR. BOWER:  I'll strike that.
19  Q.    (BY MR. BOWER) From time to
20  time, those thresholds would change for a
21  particular store or a particular item;
22  correct?
23  A.    After review, they could
24  change.

Page 323

1  Q.    Okay.  And then, what would
2  be -- from a general policy or procedure,
3  what would be the reasons that a threshold
4  would change?
5  A.    It could be for a change in
6  trait could possibly change the threshold.
7        It could be that a pharmacy's
8  orders had been reviewed over time.  They
9  were -- they would trigger a threshold.
10       They were reviewed and cleared
11  as appropriate, and so there was a period --
12  there were -- when there were repeat
13  instances of that, the threshold might be
14  raised.
15       Those were the types of
16  threshold changes that could occur.
17  Q.    And were there -- strike that.
18       Did Walmart have any written
19  policies or procedures with respect to when
20  it was appropriate to raise a threshold?
21       MS. TABACCHI:  Object to the
22       form.
23       MR. BOWER:  Just for the
24       record, while you're looking, you're

Page 324

1  referring to the binder that you
2  brought today?
3        THE WITNESS:  I am.  Because my
4  recollection is that there was a
5  process for reviewing thresholds and
6  making adjustments that was
7  documented, but it was upon decision
8  by practice compliance to understand
9  the nature of the needed request.
10  Q.    (BY MR. BOWER) Would you agree
11  that when Walmart made the decision to
12  increase a store's threshold, that the
13  reasons for the increase would have been
14  documented?
15       MS. TABACCHI:  Object to the
16       form.
17       THE WITNESS:  The evaluations
18       that occurred after the Reddwerks
19       enhancements, those evaluations were
20       documented.
21  Q.    (BY MR. BOWER) Okay.  Other
22  than the two examples you gave us, which
23  were, I believe, a change in whether the item
24  was traited for the store, and then some

Page 325

1  basis for an increase in threshold based on a
2  review of the store's order history, are
3  there any other circumstances that would lead
4  to a threshold being changed?
5        MS. TABACCHI:  Object to the
6        form.
7        THE WITNESS:  There may have
8        been others.  I don't recall
9        specifically.
10  Q.    (BY MR. BOWER) Are you
11  prepared to testify on that today?
12       MS. TABACCHI:  Object to the
13       form.
14       THE WITNESS:  Yes, I am.
15  Q.    (BY MR. BOWER) Okay.  So other
16  than the two examples you've given us, are
17  there any other reasons that Walmart would
18  adjust a store and item-specific threshold
19  after Reddwerks enhancements took effect?
20  A.    If a new store came onboard,
21  that was another reason that a threshold
22  might be adjusted.  Those are the -- those
23  are the circumstances that I'm aware of.
24  Q.    So let's go back, then, to the

Page 326

1 bullet point in the combined discovery
2 responses for a moment if we could. Same
3 bullet point referencing the enhanced
4 thresholds in Reddwerks.
5      So Walmart states that it
6 "implemented enhanced thresholds in Reddwerks
7 and the tiered review process."
8      Do you see that?
9   A.   Yes.
10   Q.   What is meant by a tiered
11 review process?
12   A.   The process began to move --
13 still the process at the distribution center
14 was in place. But those alerts were then
15 reviewed by the logistics compliance team.
16 And then the tiering was that practice
17 compliance also was involved. So there were
18 additional teams that were involved in the
19 review.
20   Q.   And is that tiered review
21 process reflected in any one of these written
22 policies and procedures on the previous page?
23   A.   Yes.
24   Q.   Okay.

Page 327

1   A.   And those would be -- and
2 again, I have these in date order.
3   Q.   Or if you give me the date, I
4 can point you to the tab. I have the dates
5 in front of me.
6   A.   Sure. That tiered review
7 process started in 2015, the Bates No. 963 --
8   Q.   Okay.
9   A.   -- on the distribution center
10 policy.
11   Q.   Okay. So that would be tab 4
12 of Exhibit 7. If you could just confirm.
13 Turn to tab 4.
14   A.   And actually, it's in effect in
15 September. So tab 3. It's also in effect in
16 this policy as well.
17   Q.   Okay. So the tiered review
18 process that is referenced in the bullet
19 point three up from the bottom on the
20 following page is reflected in both tabs in 3
21 and 4; is that correct?
22   A.   It is. That is correct. It's
23 reflected in the procedure.
24   Q.   Now, how did the Reddwerks

Page 328

1 enhancements review orders for whether they
2 deviated substantially from a normal pattern?
3      MS. TABACCHI: Object to the
4 form.
5      MR. BOWER: I'll strike that.
6   Q.   (BY MR. BOWER) Did the
7 Reddwerks enhancements review orders for
8 controlled substances for whether they
9 deviated substantially from a normal pattern?
10      MS. TABACCHI: Object to the
11 form.
12      THE WITNESS: The alerts that
13 were implemented were based on the
14 store's order average, and those were
15 alerted and further analysis was
16 completed.
17   Q.   (BY MR. BOWER) Well, let's
18 say, for example, a store orders under its
19 threshold of 20 bottles. Okay?
20   A.   Okay.
21   Q.   How would Reddwerks review
22 those orders for whether they were --
23 deviated substantially from a normal pattern?
24      MS. TABACCHI: Object to the

Page 329

1 form.
2      THE WITNESS: If it was under
3 the threshold, it would not alert.
4   Q.   (BY MR. BOWER) And that's true
5 even if an order deviated substantially from
6 a normal pattern; correct?
7      MS. TABACCHI: Object to the
8 form.
9      THE WITNESS: In this case, the
10 alert would be based on the store's
11 pattern, so it would not alert.
12   Q.   (BY MR. BOWER) And if an order
13 deviated -- strike that.
14      If an order was of unusual
15 frequency but it was less than 20, it would
16 not alert under the Reddwerks enhancements;
17 correct?
18      MS. TABACCHI: Object to the
19 form.
20      THE WITNESS: We still, from a
21 frequency perspective, had -- had
22 control from a manual perspective. So
23 there was -- there was a process that
24 was visible if a manual order was

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1   placed and there was a change in that
2   frequency from the established order
3   date.
4       Q.   (BY MR. BOWER) And that's the
5   process we described earlier where the
6   associates of the DC would review the orders;
7   correct?
8           MS. TABACCHI: Object to the
9       form.
10          THE WITNESS: This is in -- in
11      this time frame, that was part of the
12      review that was conducted, was what
13      the order pattern would have been.
14      Q.   (BY MR. BOWER) And that was
15  done by the associates at the DC; correct?
16          MS. TABACCHI: Object to the
17      form.
18          THE WITNESS: The associates in
19      the DC were completing their reviews,
20      and as well as reviews then through
21      the tiered process that included a
22      review of those patterns.
23      Q.   (BY MR. BOWER) But an order
24  during this time period wouldn't enter the

Page 331

1   tiered process of review unless it was
2   flagged at one of the associates; correct?
3           MS. TABACCHI: Object to the
4       form.
5           THE WITNESS: Flagged if there
6       was an indication of an issue.
7       Q.   (BY MR. BOWER) Are you
8   familiar with the term "SOM remediation"?
9       A.   I am, in our policy.
10      Q.   Okay. And what does that mean?
11      A.   That means that a pharmacy has
12  had an order alerted, and they -- and they
13  were put on a plan to address their ordering
14  pattern. So it's a -- it's a plan, and it's
15  in a policy. So let me just turn to the
16  policy.
17      Q.   Sure. Thank you.
18      A.   Which I also had tabbed. POM
19  remediation is in the policy -- at least
20  there's a reference -- and this may not be
21  the only reference, but the policy that is
22  the practice compliance policy, January 2015.
23      Q.   Okay. And the Bates number on
24  that, is that 4237?

Page 332

1       A.   It is 4237.
2       Q.   Thank you.
3       A.   And it appears on the second --
4   page 2 of 3.
5       Q.   Okay.
6           And I have seen it in the
7   documents. But can you provide any more
8   specificity as to what -- I'll strike that.
9           How would a SOM remediation
10  impact a store's threshold, if at all?
11          MS. TABACCHI: Object to the
12      form.
13          THE WITNESS: So this -- the
14      threshold would be applied through
15      monitoring of the store's orders,
16      because there was -- at least at the
17      time of this policy, there was not the
18      ability to quickly adjust the
19      replenishment system. And so the
20      process for a threshold adjustment did
21      include some cutting of orders to
22      impact that replenishment system that
23      we didn't have ready access to.
24      Q.   (BY MR. BOWER) When would a

Page 333

1   store be under SOM remediation?
2       A.   The -- if a store had a
3   suspicious order identified and reported to
4   the DEA, they would go into a remediation
5   plan.
6       Q.   And is that the only
7   circumstance under which your store would be
8   under SOM remediation?
9           MS. TABACCHI: Object to the
10      form.
11          THE WITNESS: Yes. That was
12      the policy.
13      Q.   (BY MR. BOWER) And so on that
14  policy, once a store has an order reported to
15  DEA, that store's thresholds are reduced; is
16  that correct?
17          MS. TABACCHI: Object to the
18      form.
19          THE WITNESS: Their orders
20      would be monitored so that any
21      system-generated order might be
22      reduced.
23          Again, it would depend on the
24      nature of the suspicious order that

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  was placed at review of the business.
2  And so because the replenishment
3  system was automated, they did adjust
4  orders for a period of time until the
5  replenishment system could catch up.
6      Q.    (BY MR. BOWER) And when you say
7  "reduced," do you mean cut to a certain
8  member?
9      MS. TABACCHI:  Object to the
10  form.
11      THE WITNESS:  Reduced.  Cut.
12  They were reduced, yes.
13      Q.    (BY MR. BOWER) Let me just take
14  a step back for a moment.  You've referenced
15  the replenishment system and the orders
16  therein a couple of times.
17      Can you just describe how that
18  works?
19      MS. TABACCHI:  Object to the
20  form.  Beyond the scope.
21      THE WITNESS:  The replenishment
22  system looks at the dispensing needs
23  of the pharmacy.
24      And this is across any product.

Page 335

1  This is not unique to controlled
2  substances.
3      And then based on the
4  dispensing data, based on on-hands
5  that are set in the pharmacy
6  dispensing system to show what is in
7  stock at that pharmacy, the
8  replenishment system would resupply
9  that pharmacy.
10      There were some -- there was
11  some trending that went on.  And that
12  was generally due to things like --
13  again, because we were doing this over
14  a period of time, what was the demand
15  that -- what day of the week was the
16  order placed.  I mean, there were --
17  there were multiple factors that went
18  into the replenishment system, but it
19  was -- it was an automated system that
20  looked back at -- at patterns of order
21  and then took into account the stock
22  that was available.
23      Q.    (BY MR. BOWER) And with
24  respect to Controlled-IIs, I'm just trying to

Page 336

1  get a sense of how many orders, what
2  percentage of orders came into the DC 65
3  [sic] that were a replenishment order, an
4  automated order.
5      MS. TABACCHI:  Object to the
6  form.
7      Q.    (BY MR. BOWER) Do you have any
8  knowledge on that?
9      MS. TABACCHI:  Object to the
10  form.  Beyond the scope.
11      THE WITNESS:  I don't know what
12  that number was.
13      Q.    (BY MR. BOWER) Do you have any
14  approximation as to how many -- for a typical
15  store, would their orders typically be
16  replenishment orders or manual orders?
17      MS. TABACCHI:  Same objections.
18      THE WITNESS:  The vast majority
19  of orders were replenishment orders.
20      Q.    (BY MR. BOWER) Other than
21  Walmart limiting the replenishment orders for
22  oxy 30, which we discussed, did Walmart ever
23  limit the replenishment orders of any other
24  products?

Page 337

1      MS. TABACCHI:  Object to the
2  form.  Beyond the scope.
3      Q.    (BY MR. BOWER) Well, strike
4  that.
5      Walmart limited replenishment
6  orders for oxy 30 in connection with its
7  suspicious order monitoring program, did it
8  not?
9      A.    We -- we set thresholds for
10  oxy 30 based on conversations with the DEA.
11  And so from a due diligence perspective, we
12  put those limits in place.
13      The other -- the other limits
14  that we have are the thresholds that we've
15  been discussing.
16      Q.    (BY MR. BOWER) So other than
17  oxy 30, Walmart never limited, from a
18  replenishment perspective, orders of other
19  Controlled-II substances; that is correct?
20      MS. TABACCHI:  Object to the
21  form.  Beyond the scope.
22      THE WITNESS:  No single item or
23  specific threshold set.
24      Q.    (BY MR. BOWER) Walmart is

Page 338

1 familiar with the Masters Pharmaceuticals
2 decision, is it not?
3    A.   Yes.
4    Q.   When did Walmart first become
5 aware of the Masters Pharmaceutical case?
6        MS. TABACCHI:  Objection,
7 beyond the scope.
8        THE WITNESS:  We were aware
9    after the decision in 2017.
10   Q.   (BY MR. BOWER) Was Walmart
11 aware before that decision came out?
12       MS. TABACCHI:  Object to the
13   form.  Beyond the scope.
14       Are you asking whether Walmart
15 was aware of a decision before it
16   issued?
17       MR. BOWER:  Yes.
18       THE WITNESS:  No.
19   Q.   (BY MR. BOWER) All right.  So
20 just to be clear, my question is whether
21 Walmart was aware of the Masters
22 Pharmaceutical case the DEA brought against
23 them.  Was Walmart aware of that?
24       MS. TABACCHI:  Object to the

Page 339

1    form.
2        THE WITNESS:  At the time the
3    decision was made, we were aware of
4    that decision.
5    Q.   (BY MR. BOWER)  What about
6 before that decision?  Was Walmart aware that
7 the DEA was prosecuting a case against
8 Masters Pharmaceuticals?
9        MS. TABACCHI:  Object to the
10   form.  Beyond the scope.
11       THE WITNESS:  Not to my
12   knowledge.
13       (Whereupon, Deposition Exhibit
14   Walmart 9, September 2015 email chain.
15   Subj: Areas of Focus - Week 35,
16   WMT_MDL_000048214-48215, was marked
17   for identification.)
18       MR. BOWER:  Can you just read
19   the Bates number for that into the
20   record?  Make sure I gave you the
21   right number.
22       THE WITNESS:  48214.
23       MR. BOWER:  All right.  Thank
24   you.

Page 340

1        Sorry about that.
2    Q.   (BY MR. BOWER) So you've been
3 handed what's been marked as Exhibit 9 to
4 today's deposition.
5        Just take a moment and look at
6 the document.
7        These are two folks I believe
8 you testified that you spoke with in
9 connection with today's deposition.
10   A.   I did not speak to Tim Koch.
11   Q.   Okay.
12   A.   In preparation.
13   Q.   Okay.  Thank you for that
14 clarification.
15       [Document review.]
16   Q.   (BY MR. BOWER) Have you had a
17 chance to review the document?
18   A.   Yes.
19   Q.   You did speak with
20 Miranda Johnson in preparation for today's
21 deposition; correct?
22   A.   Yes.
23   Q.   Did you speak with her
24 regarding the Masters Pharmaceutical case?

Page 341

1        MS. TABACCHI:  Object to the
2    form.
3        THE WITNESS:  I spoke to her in
4    relation to our response following the
5    decision.
6        MR. BOWER:  Okay.
7    Q.   (BY MR. BOWER)  What do you
8 mean by "our response following the
9 decision"?
10   A.   My changes that were made to
11 our order monitoring program after the
12 Masters -- that was impacted by the Masters
13 decision.
14   Q.   Did Walmart wait until the
15 decision came out to make those changes?
16       MS. TABACCHI:  Object to the
17   form.  Beyond the scope.
18   Q.   (BY MR. BOWER) Strike that.
19       Did Walmart make changes to its
20 suspicious order monitoring in connection
21 with Masters Pharmaceuticals?
22       MS. TABACCHI:  Object to the
23   form.  I would ask that you clarify.
24   The notice speaks of a December 2017

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 decision. If you're asking about
2 another Masters decision, please
3 clarify for the record so there's no
4 confusion.
5    Q.    (BY MR. BOWER) Do you agree
6 that Walmart was aware of the DEA case
7 against Masters prior to 2017?
8         MS. TABACCHI: This is beyond
9    the scope of the notice. The witness
10    can testify in her individual
11    capacity.
12         THE WITNESS: I see the
13    information in this email exchange.
14    Q.    (BY MR. BOWER) And are you
15 aware that -- strike that.
16         During this time period, was
17 Walmart a member of the NACDS?
18         MS. TABACCHI: Object to the
19    form.
20         THE WITNESS: Yes.
21    Q.    (BY MR. BOWER) Are you aware
22 that sometime in between September of 2015
23 and the time frame of the Masters decision,
24 NACDS submitted an amicus brief in the

Page 343

1 Masters case?
2         MS. TABACCHI: Object to the
3    form.
4         THE WITNESS: We weren't party
5    to the amicus brief.
6    Q.    (BY MR. BOWER) That wasn't my
7 question. Can you -- I'll read back my
8 question. Okay?
9         Are you aware that sometime
10 between September of 2015 and the time frame
11 of the Masters decision in 2017, that the
12 NACDS submitted an amicus brief in the
13 Masters case?
14         MS. TABACCHI: I'm just going
15    to caution the witness not to reveal
16    the substance of communications with
17    counsel. If you are aware of the
18    answer to Ms. Bower's question without
19    having discussed that with counsel,
20    you may answer.
21         THE WITNESS: I'm a member of
22    the NACDS Policy Council. And so
23    there may have been communication
24    about the Masters decision. I don't

Page 344

1 know the specifics around that
2 communication.
3    Q.    (BY MR. BOWER) As a member of
4 the policy -- when were you a member of the
5 policy council for NACDS?
6    A.    2007 to present.
7    Q.    As a member of the policy
8 counsel, would you not have reviewed amicus
9 briefs submitted in connection with
10 suspicious order monitoring?
11         MS. TABACCHI: Object to the
12    form.
13         THE WITNESS: No. That was --
14    there were other groups, and there was
15    a group -- a legal group that reviewed
16    and worked on amicus briefs, and I was
17    not a -- I was not a member of that.
18    Q.    (BY MR. BOWER) Was anyone from
19 Walmart aware that the NACDS would be
20 submitting an amicus brief in the Masters
21 case prior to its submission?
22         MS. TABACCHI: Object to the
23    form. Beyond the scope.
24         THE WITNESS: Through

Page 345

1 communication in policy council, it
2 may have -- it may have come up as a
3 topic. It likely did come up. I
4 don't have recollection of the timing
5 or the details of that information.
6    Q.    (BY MR. BOWER) Would you agree
7 that Walmart made changes to its suspicious
8 order monitoring program after the Masters
9 decision came out in 2017?
10         MS. TABACCHI: Object to the
11    form.
12         THE WITNESS: The changes that
13    we made were how we reported the
14    orders that we were reviewing.
15    Q.    (BY MR. BOWER) Would you agree
16 that Walmart began reporting more orders as a
17 result of Masters Pharmaceutical's decision?
18         MS. TABACCHI: Object to the
19    form.
20         THE WITNESS: We reported
21    orders of interest, and that was at a
22    rate that was higher than -- we had --
23    we had not previously been reporting
24    orders of interest before due

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1  diligence was applied to those orders.
2      MR. BOWER: Why don't we take a
3  quick break.
4      MS. TABACCHI: Sure.
5      MR. BOWER: We can be quick, if
6  you want. I don't know how long you
7  need.
8      THE VIDEOGRAPHER: 3:00 p.m.
9  We are off the video record.
10     (Recess taken, 3:00 p.m. to
11  3:22 p.m.)
12     THE VIDEOGRAPHER: 3:22. We
13  are on the video record.
14     Q.   (BY MR. BOWER) We are back on
15  the record. Let me hand you what is marked
16  as Exhibit 10, which is a copy of the Masters
17  decision. Take a moment to review it, but I
18  assume you're familiar with that decision;
19  correct?
20     MS. TABACCHI: Just have her
21  look at it, please.
22     (Whereupon, Deposition Exhibit
23  Walmart 10, Masters decision, was
24  marked for identification.)

Page 347

1      MS. TABACCHI: I did review the
2  decision in preparation.
3      Q.   (BY MR. BOWER) Do you have a
4  copy of the decision in the binder you
5  brought with you today?
6      A.   Yes.
7      Q.   Does the copy that you have in
8  the binder have a Bates number on it?
9      A.   It does not. It's one that I
10  printed.
11     Q.   So I know there was
12  representation made that --
13     MS. TABACCHI: That would be
14  the one exception, something from a
15  public record.
16     MR. BOWER: No, that's fine.
17     MS. TABACCHI: I thought of
18  that when she mentioned she had it.
19  Otherwise, I'm not aware of anything
20  else. It's either produced or in the
21  public record. There was nothing
22  else.
23     MR. BOWER: Thank you for that.
24     Q.   (BY MR. BOWER) So I want to

Page 348

1  have -- I have a few questions on the
2  decision. Feel free to review the one in the
3  binder or the one I've given you. They
4  should be identical.
5      A.   I believe they're identical.
6      Q.   Did you review this decision in
7  preparation for your testimony today?
8      A.   Yes.
9      Q.   And did the folks at Walmart
10  review the decision when it was issued?
11     MS. TABACCHI: Object to the
12  form. Beyond the scope.
13     THE WITNESS: Based on
14  communication and changes that were
15  applied to how we reported orders of
16  interest, the answer is yes.
17     Q.   (BY MR. BOWER) So if you just
18  turn -- look at the first page of the
19  Masters, right at the beginning there under
20  the opinion -- are you with me there?
21     The Court notes that -- about
22  two sentences down, that "Over the past two
23  decades, DEA has been battling a steep
24  increase in prescription opioid abuse, a

Page 349

1  problem DEA views as epidemic."
2      Do you see that?
3      MS. TABACCHI: I'm sorry, Zach.
4  I don't see where you are.
5      MR. BOWER: Sorry. Just on the
6  first page, bottom right-hand corner,
7  about the middle of that paragraph,
8  right under "Opinion."
9      MS. TABACCHI: The Court
10  notes -- oh, "The Court notes." Those
11  are your words.
12     MR. BOWER: Those are my words.
13     MS. TABACCHI: I'm trying to
14  find the Court notes.
15     MR. BOWER: Sorry about that.
16     MS. TABACCHI: Can you do that
17  again?
18     MR. BOWER: Sure.
19     Q.   (BY MR. BOWER) The language in
20  the opinion reads, "Over the past two
21  decades, DEA has been battling a steep
22  increase in prescription opioid abuse, a
23  problem that DEA views as an epidemic."
24     Do you see that?

Page 350

1    A.    Yes.
2    Q.    Does Walmart have a similar
3  feeling that there's been an opioid epidemic
4  for the past two decades?
5        MS. TABACCHI: Object to the
6    form.  Beyond the scope.
7        THE WITNESS:  We are aware of
8    the issues, the health issues related
9    to the opioid crisis, epidemic,
10    however it's referred to in ...
11    Q.    (BY MR. BOWER) And does Walmart
12  disagree that the crisis has been going on
13  for approximately two decades?
14        MS. TABACCHI: Object to the
15    form.  Beyond the scope of the notice.
16        The witness can testify in her
17    individual capacity, not on behalf of
18    Walmart, as to this particular
19    question.
20        THE WITNESS:  So I know that
21    there have been issues with controlled
22    substances, diversion, and misuse over
23    a period of -- a long period of time.
24    Q.    (BY MR. BOWER) And indeed,

Page 351

1  would you disagree that Walmart has been in
2  conferences and meetings where those issues
3  were discussed over a long period of time?
4        MS. TABACCHI:  Object to the
5    form.  Beyond the scope.
6        THE WITNESS:  The time period,
7    I don't know.  Certainly we've
8    attended meetings where opioid issues
9    have been discussed.
10    Q.    (BY MR. BOWER) And you've
11  attended meetings, for example, of the NACDS
12  where opioid issues were discussed; correct?
13    A.    Correct.
14    Q.    Have you attended other
15  meetings where opioid issues were discussed?
16        MS. TABACCHI:  Is the "you" now
17    Susanne Hiland?
18        MR. BOWER:  Yeah.
19        THE WITNESS:  Yes.
20    Q.    (BY MR. BOWER) And have folks
21  from Walmart in addition to yourself attended
22  meetings where opioids were discussed?
23        MS. TABACCHI:  Object to the
24    form.  Beyond the scope.

Page 352

1        THE WITNESS:  Yes.
2    Q.    (BY MR. BOWER) Do you know how
3  long Walmart has been a member of NACDS?
4    A.    My knowledge is that it has
5    been at least since the early 2000s.
6    Q.    Okay.  All right.  So I just
7    have a couple questions, then, on the
8    language of the opinion here.
9        If you could turn to page 2.
10    I'm looking at the right-hand column there.
11    The paragraph beginning "Whereas here."
12        Do you see that?
13    A.    I see that.
14    Q.    About halfway there, the Court
15    describes the reporting requirement.
16        Do you see that?
17    A.    Yes.
18    Q.    Okay.  At the time of this
19    opinion, was Walmart familiar with the
20    reporting requirement?
21        MS. TABACCHI: Object to the
22    form.  Beyond the scope.
23        THE WITNESS:  Our understanding
24    was that we would -- in our policy,

Page 353

1    was that we would report orders deemed
2    suspicious to the DEA.
3    Q.    (BY MR. BOWER) And at the time
4  of this opinion, did Walmart's policies
5  reflect that the reporting required was a
6  relatively modest one?
7        MS. TABACCHI:  Object to the
8    form.  Beyond the scope of the notice.
9        THE WITNESS:  I don't know that
10    we gauged the modesty of the
11    requirement.
12    Q.    (BY MR. BOWER) Well, do you
13  agree here that the Court is stating that the
14  reporting requirement is a relatively modest
15  one?
16        MS. TABACCHI:  Object to the
17    form.  Beyond the scope.
18        THE WITNESS:  I see that
19    represented here.
20    Q.    (BY MR. BOWER) And, in fact,
21  after Walmart saw this representation, it
22  changed the way it reported its orders; is
23  that correct?
24        MS. TABACCHI:  Object to the

Page 354

1  form.
2  THE WITNESS:  After the Masters
3  decision, we did begin reporting
4  orders of interest before we conducted
5  due diligence.
6  Q.  (BY MR. BOWER)  And Walmart
7  changed the way it reported its orders
8  because it hadn't been reflecting that the
9  reporting requirement was a relatively modest
10  one; isn't that correct?
11  MS. TABACCHI:  Oh, object to
12  the form.
13  Could you please read that
14  back?
15  MR. BOWER:  I'll rephrase.
16  Q.  (BY MR. BOWER)  After the
17  Masters decision came down, Walmart changed
18  the way it reported orders of controlled
19  substances because its prior program did not
20  reflect that the reporting requirement was a
21  modest one, did it?
22  MS. TABACCHI:  Object to the
23  form.  Beyond the scope.
24  THE WITNESS:  We reported

Page 355

1  orders that were deemed suspicious,
2  which was -- was the process that we
3  had in place pre-Masters.
4  Q.  (BY MR. BOWER)  And what do you
5  mean by "deemed suspicious"?
6  A.  After conducting due diligence
7  on an order of interest, if we could not
8  clear all red flags associated with that
9  order of interest, it was deemed suspicious
10  and then reported to the DEA and not shipped.
11  Q.  So prior to Masters, in order
12  for an order to be reported to the DEA,
13  Walmart would have not cleared all red flags
14  in connection with that order; is that
15  correct?
16  MS. TABACCHI:  Object to the
17  form.
18  THE WITNESS:  That's not
19  correct.  I think that's -- that's an
20  incorrect statement.
21  Q.  (BY MR. BOWER) Okay.  How would
22  you correct that statement?
23  A.  The accurate statement is that
24  prior to Masters, Walmart would report orders

Page 356

1  that were identified as suspicious orders to
2  the DEA.
3  Q.  And how would Walmart determine
4  whether an order was a suspicious order prior
5  to Masters?
6  MS. TABACCHI:  Object to the
7  form.  Asked and answered.
8  THE WITNESS:  We would review
9  the orders of interest, conduct due
10  diligence on those orders of interest,
11  identify -- having identified red
12  flags that caused it to be an order of
13  interest, and -- and then, if those
14  red flags could not be satisfied, it
15  would be considered a suspicious
16  order, not shipped, and reported to
17  the DEA.
18  Q.  (BY MR. BOWER)  And indeed
19  those orders of interest that you were
20  reviewing were flagged, or otherwise
21  identified, because they were, for example,
22  of unusual size; isn't that correct?
23  MS. TABACCHI:  Object to the
24  form.  Beyond the scope.

Page 357

1  THE WITNESS:  They may have
2  been flagged for the reason of size.
3  Q.  (BY MR. BOWER)  They were
4  flagged because they were unusual size.
5  Would you agree with that?
6  MS. TABACCHI:  Object to the
7  form.
8  THE WITNESS:  They may have
9  been flagged because they hit an
10  established threshold.  And, in fact,
11  that threshold, as I testified
12  earlier, sometimes was adjusted
13  because that threshold was not an
14  unusual size.  It was something that
15  was validated for that location, and
16  those -- and the threshold was then
17  adjusted because it was not unusual.
18  Q.  (BY MR. BOWER)  So is it your
19  testimony that if a threshold was not
20  adjusted and an order was flagged, that that
21  order would have been an unusual size?
22  MS. TABACCHI:  Object to the
23  form.
24  THE WITNESS:  No.  I was just

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  giving an example of the fact that the
2  threshold didn't -- didn't always
3  flag -- unusual size wasn't the reason
4  that the flag invoked in ...
5      MR. BOWER: Are you finished?
6      THE WITNESS: I am finished.
7      Q.   (BY MR. BOWER) Prior to
8  Masters, Walmart has the Reddwerks thresholds
9  in place; correct?
10     A.   Prior to Masters.  Yes.
11     Q.   Okay.  And those thresholds at
12 least attempt to identify what would be a
13 usual order; correct?
14     MS. TABACCHI: Object to the
15     form.
16     THE WITNESS: Those thresholds
17     were based on history.
18     Q.   (BY MR. BOWER) Right.  And
19 therefore, when an order exceeded those
20 thresholds, Walmart would determine that
21 would be an unusual order.  Agree or
22 disagree?
23     MS. TABACCHI: Object to the
24     form.

Page 359

1      THE WITNESS: It would flag an
2      alert, and we would then determine
3      whether or not that was unusual.
4      Q.   (BY MR. BOWER) And it would
5  flag an alert because that order was an
6  unusual size.  Agree or disagree?
7      MS. TABACCHI: Object to the
8      form.
9      THE WITNESS: It would flag the
10     alert so that we could determine if
11     the size was unusual.
12     Q.   (BY MR. BOWER) Well, wouldn't,
13 at that point, Walmart be looking to whether
14 that unusual size was a valid order or not,
15 and not whether the size itself was unusual?
16     MS. TABACCHI: Object to the
17     form.
18     THE WITNESS: If I'm
19     understanding correctly, I believe
20     that's what we did.
21     MR. BOWER: Okay.
22     Q.   (BY MR. BOWER) So let me just
23 clear that up a little bit, because I think
24 my question was a little bit kind of

Page 360

1  confusing.
2      At this point in time, let's
3  say prior to -- immediately prior to Masters.
4  Okay?
5      A.   Okay.
6      Q.   Walmart has thresholds in place
7  for controlled IIs at 6045; correct?
8      A.   Correct.
9      Q.   And those thresholds are
10 intended to reflect a usual order amount.
11 Would you agree with that?
12     MS. TABACCHI: Object to the
13     form.
14     THE WITNESS: Those thresholds
15     were based on a formulation that
16     was -- the basis for which was the
17     average order.  So it was an average
18     and some deviation from that average.
19     Q.   (BY MR. BOWER) Do you agree or
20 disagree that the thresholds that were in
21 place at this point were meant to reflect the
22 usual order amount?
23     MS. TABACCHI: Object to form.
24     Asked and answered.

Page 361

1      THE WITNESS: They were based
2      on order history and allowed for
3      variations within that order history.
4      Q.   (BY MR. BOWER) And if those
5  variations were too large, then the order
6  would flag; correct?
7      MS. TABACCHI: Object to the
8      form.
9      THE WITNESS: The challenge is
10     that we also adjusted that maximum
11     order limit down to 50, so there -- so
12     the deviation was not the same for
13     every store and for every item.  So
14     because we adjusted -- a deviation
15     based on that prior history might have
16     been above the 50 limit.  We adjusted
17     that down.
18     And so in that case, we flagged
19     it so that we could do further
20     evaluation, is the point of the
21     threshold.  It didn't always mean that
22     there was an unusual size.  It was the
23     threshold engaged so we could
24     evaluate.

Page 362

1    Q.    (BY MR. BOWER) So there's a lot
2  there in that answer, but I don't think it's
3  all in response to my question.
4        MR. BOWER:  So I'd move to
5  strike that answer.
6    Q.    (BY MR. BOWER) But I also am
7  now confused when you say you "order the
8  limit down to 50." What does that mean?
9    A.    So I testified earlier in
10 those -- the Reddwerks enhancement, as those
11 thresholds were established, if -- if the
12 weekly average plus three standard deviations
13 exceeded 50, we adjusted that threshold down
14 to 50.  And so the way that that order --
15 that subsequent order might flag could -- the
16 reasons it flagged were different for each
17 order, and for each store, and for each item.
18 That's why it flagged so that we could
19 evaluate whether or not it was an unusual
20 order.
21    Q.    So my question was, what does
22 an order limit of 50 mean?  Okay?  That's the
23 question.  Can you please answer that
24 question?

Page 363

1        MS. TABACCHI:  Asked and
2  answered.
3        THE WITNESS:  The order limit
4  of 50 was the threshold that was set
5  to alert in the enhanced Reddwerks
6  thresholds.
7    Q.    (BY MR. BOWER) So is it your
8  testimony now that the enhanced Reddwerks had
9  a threshold limit of 50?
10        MS. TABACCHI:  Object to the
11 form.  Misstates testimony.
12    Q.    (BY MR. BOWER) Well, your
13 testimony is the order limit of 50 was the
14 threshold that was set to alert in the
15 enhanced Reddwerks thresholds.  Is that an
16 accurate statement?
17        MS. TABACCHI:  Object to the
18 form.  Misstates testimony.
19        THE WITNESS:  So the testimony
20 that I gave -- and I'll clear up the
21 50 reference -- is that I previously
22 testified there was a maximum -- after
23 all of the calculations were
24 completed, there was a maximum

Page 364

1  threshold set.  It was 5,000 units.
2  So in this testimony, I extrapolated,
3  because most of our products are
4  100-count bottles.  So that's what I
5  was referring to in the maximum
6  threshold that was set for advanced
7  Reddwerks.
8    Q.    (BY MR. BOWER) So what happens
9  if a store orders during this time period of
10 the Reddwerks enhancements more than
11 5,000 units?
12    A.    The order would flag.  The
13 order would be pended.  We would evaluate
14 that as an order of interest.  It would start
15 with the logistics team.  If they could not
16 clear the flags, it would go in the tiered
17 process to the practice compliance team for
18 additional assessment.
19    Q.    Is it your testimony that under
20 the Reddwerks enhancements, an order would
21 flag if it was only over 5,000 units per
22 week?
23        MS. TABACCHI:  Object to the
24 form.  Misstates testimony.

Page 365

1        THE WITNESS:  I understood you
2  to ask what would happen if it hit the
3  50 -- the 50 or the 5,000 dosage unit
4  limit.
5    Q.    (BY MR. BOWER) What do you
6  mean by "unit limit"?  I don't understand
7  what that means, "unit limit."
8        MS. TABACCHI:  Object to the
9  form.  Asked and answered.
10        THE WITNESS:  So items were
11 available in different bottle sizes.
12 So 100-count bottle would be
13 100 units.  There were items that came
14 in 30-count bottles.  And so units
15 would be a function of how many dosage
16 units were in the bottles and how many
17 bottles were ordered.
18    Q.    (BY MR. BOWER) What was the
19 minimum threshold under the Reddwerks
20 enhancements for an item of controlled II
21 substances to flag?
22        MS. TABACCHI:  Object to the
23 form.
24        THE WITNESS:  For a traited

Page 366

1  item?
2        MR. BOWER:  Yes.
3        THE WITNESS:  The minimum --
4  this is confusing.
5        So the -- the highest threshold
6  that would be set -- the -- I'm going
7  to say highest and lowest.  The
8  standard deviation calculation was
9  applied.  The threshold that was set
10  would be 20 for a tailed item.
11        If that order fell between --
12  if that calculation fell between the
13  20 and 50, then it would flag for
14  whatever that calculation was.  If it
15  exceeded 50, it was lowered to 50.
16     Q.   (BY MR. BOWER)  Okay.
17     A.   If I'm clear.  I hope I'm
18  clear.  It's a bit confusing.
19     Q.   I understand now.  Thank you.
20        So just so the record is clear,
21  then, the calculations are performed, and if
22  the -- if the result of those calculations
23  would give a threshold of greater than 50,
24  then that threshold is then reduced to 50; is

Page 367

1  that correct?
2        THE WITNESS:  That is correct.
3        MR. BOWER:  Thank you for that
4  clarification.
5     Q.   (BY MR. BOWER)  And in
6  connection with those thresholds that were
7  part of the Reddwerks enhancements, did
8  Walmart use any third parties to perform
9  those calculations?
10        MS. TABACCHI:  Object to the
11  form.
12        THE WITNESS:  We used a company
13  called Mu Sigma to validate those
14  calculations.
15     Q.   (BY MR. BOWER)  And what do you
16  mean by "validate those calculations"?
17     A.   They're statisticians, so to
18  ensure that the thresholds and the
19  calculations, the data, that they were
20  applied correctly, that the calculation was
21  accurate and applied correctly.
22     Q.   Did Walmart provide -- is it
23  Mu Sigma?
24     A.   I think it's Mu Sigma.

Page 368

1     Q.   Okay.  Did Walmart provide
2  Mu Sigma instructions or anything similar to
3  that in connection with the Reddwerks
4  enhancements?
5        MS. TABACCHI:  Object to the
6  form.
7        THE WITNESS:  There were
8  communications about what we were
9  trying to accomplish in the request to
10  validate the data.
11     Q.   (BY MR. BOWER)  And did you
12  review those communications in preparation
13  for your deposition today?
14     A.   I reviewed the exhibits related
15  to those calculations, yes.
16     Q.   And are those in the binder you
17  brought with you today?
18     A.   I don't -- I don't think
19  they're in the binder, but I will check.
20     Q.   Okay.  If they're not in there,
21  then --
22     A.   Yeah.
23     Q.   The binder will reflect what's
24  in there, I guess.

Page 369

1     A.   I don't think they are.
2     Q.   Do you recall anything about
3  what you reviewed in connection with those
4  calculations?
5        MS. TABACCHI:  Object to the
6  form.
7        THE WITNESS:  I reviewed the
8  fact that Kristy Spruell, in her role
9  as logistics compliance, calculated --
10  was working to develop enhancements to
11  the Reddwerks system.  She relied on
12  the expertise of Roxy Reed.
13        And once the -- the formula or
14  concept was developed, it was
15  validated by Mu Sigma.
16     Q.   (BY MR. BOWER)  And what was
17  the concept that was developed that you're
18  referring to?
19     A.   The average -- the weekly
20  average order plus three standard deviations.
21     Q.   And how did Mu Sigma go about
22  validating that concept?
23        MS. TABACCHI:  Object to the
24  form.

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1    THE WITNESS:  They're data
2  experts.  So we relied upon them for
3  their expertise.
4    Q.    (BY MR. BOWER)  And what do you
5  mean by "validated"?  How would Walmart
6  consider that concept validated?
7    MS. TABACCHI:  Object to the
8  form.
9    THE WITNESS:  To take the data
10  and ensure that the assumptions that
11  we were making, based on the data, the
12  calculation was accurate.
13    Q.    (BY MR. BOWER)  And how did
14  Walmart determine that a minimum threshold of
15  20 would be appropriate for a traited item?
16    A.    We were looking at -- again, as
17  we progressed through the order monitoring
18  program, we had been using 20 as a flag
19  previously where we were reviewing all
20  orders.  And so these were progressions of
21  our process over time.
22    Q.    And how did Walmart determine
23  that a maximum -- minimum/maximum of 50 was
24  an appropriate kind of maximum threshold?

Page 371

1    MS. TABACCHI:  Object to the
2  form.
3    Q.    (BY MR. BOWER)  That's a poor
4  question.
5    How would you describe that 50
6  threshold?
7    A.    Again, because we had been
8  using 50 previously and were working through
9  those alerts, as the data came through and
10  there were thresholds over 50, we wanted to
11  make sure that we were still applying that
12  threshold that we had been working through.
13    Q.    Did Walmart ever do an analysis
14  as to what -- strike that.
15    Did Walmart ever do an analysis
16  as to how many orders it expected to flag if
17  a minimum threshold had been set at 20?
18    MS. TABACCHI:  Object to the
19  form.  Beyond scope.
20    THE WITNESS:  I'm sorry, I
21  think I missed the minimum
22  qualification.
23    Q.    (BY MR. BOWER) Has Walmart ever
24  done an analysis as to how many orders of

Page 372

1  controlled substances it expected to flag if
2  it set the minimum order to 20?
3    MS. TABACCHI:  Object to the
4  form.  Beyond the scope.
5    THE WITNESS:  I know in
6  reviewing the documents of the
7  analysis that there were conversations
8  with Mu Sigma, and in Kristy Spruell's
9  deposition, there were documents
10  related to different standard
11  deviations and how alerts would -- how
12  many alerts might fire based on that
13  sample set of data.
14    Q.    (BY MR. BOWER)  And that sample
15  set of data informed Walmart's decision to
16  set a minimum threshold of 20.
17    Would you agree with that?
18    MS. TABACCHI:  Object to the
19  form.
20    THE WITNESS:  It was one of the
21  data points that was considered as
22  this process was being developed.
23    Q.    (BY MR. BOWER)  And did Walmart
24  do a similar analysis for the threshold of

Page 373

1  50?
2    MS. TABACCHI:  Object to the
3  form.
4    THE WITNESS:  I think the
5  analysis was done across -- across the
6  deviations versus the alert, the exact
7  alert levels.
8    Q.    (BY MR. BOWER) So prior to
9  setting these kind of threshold sizes,
10  Walmart had at least some idea as to the
11  number of alerts that those sizes would
12  trigger.
13    Would you agree with that?
14    MS. TABACCHI:  Object to the
15  form.
16    THE WITNESS:  We had -- we had
17  experience with the 50 threshold and
18  the review of orders that we already
19  had in place.  And then we had -- we
20  had the over 20 report that had been
21  historically worked and had some view
22  of how many alerts were coming through
23  from that process.
24    Q.    (BY MR. BOWER)  Do you agree

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1  that Walmart asked Mu Sigma to determine how
2  many alerts would be expected if it set a
3  minimum threshold of 20?
4      MS. TABACCHI:  Object to the
5  form.  Beyond scope.
6      THE WITNESS:  I don't remember
7  that specific number in the documents
8  that I reviewed.  I did review an
9  analysis of how the alerts would work
10  with Mu Sigma.  I don't remember that
11  exact number.
12     Q.   (BY MR. BOWER) Sorry, we got
13  sidetracked for a minute.  Let's turn back to
14  Masters, if you would.  Going to that second
15  paragraph we were on in the second page of
16  Masters?
17     A.   Second page?
18     Q.   Yes.
19     A.   Okay.
20     Q.   So we've talked about the
21  reporting requirement.  I want to talk about
22  the next sentence where it states, "It
23  requires" -- now referring to the reporting
24  requirement -- "It requires only that a

Page 375

1  distributor provide basic information about
2  certain orders to the DEA so that DEA
3  investigators in the field can aggregate
4  reports for every point along the legally
5  regulated supply chain and use the
6  information to ferret out the potential
7  illegal activity."
8      Do you see that?
9      A.   Yes.
10     Q.   Did Walmart design its
11  suspicious order monitoring program to
12  provide this basic information to the DEA?
13     MS. TABACCHI:  Object to the
14  form.
15     THE WITNESS:  So after the
16  decision and we made changes to the
17  reporting of orders of interest, we
18  did -- we did report that information
19  before we conducted due diligence to
20  the DEA.
21     Q.   (BY MR. BOWER) Is it Walmart's
22  position that the Masters decision changed
23  its obligations under the Controlled
24  Substances Act?

Page 376

1      MS. TABACCHI:  Object to the
2  form.  Calls for a legal conclusion.
3  It's beyond the scope of the notice.
4  And we have an order from Special
5  Master Cohen.  We do not need to
6  answer that.
7      THE WITNESS:  We changed our --
8  we changed the way that we were
9  reporting orders of interest post the
10  Masters decision in 2017.
11     Q.   (BY MR. BOWER)  Thank you.
12     If you could turn to page 4 of
13  the Masters opinion.
14     I'm looking on kind of the
15  right-hand column there.  The paragraph
16  reading "In the record, evidence showed."
17     Do you see that?
18     A.   I do.
19     Q.   If you go kind of a little bit
20  down in that paragraph, the Court states that
21  "Masters' employees deleted held orders or
22  reduced their size so that they would no
23  longer trigger the hold."
24     Do you see that?

Page 377

1      A.   I see that.
2      Q.   Did Walmart's program, prior to
3  Masters, take into consideration that
4  reducing the size of an order in order to
5  ship the order and no longer trigger a hold
6  would be inappropriate?
7      MS. TABACCHI:  Object to the
8  form.  Beyond the scope of the notice.
9      I don't even understand what
10  you're asking.
11     Q.   (BY MR. BOWER)  Do you
12  understand what I'm asking?
13     A.   Can you repeat?
14     Q.   Sure.
15     Prior to Masters, did Walmart
16  have any policy and procedure in place that
17  would prevent an order from being reduced in
18  size and then shipped prior to due diligence
19  being performed?
20     MS. TABACCHI:  Object to the
21  form.
22     THE WITNESS:  I think there
23  were a couple of negatives in there.
24  So what -- our policies were designed

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1  to detect orders of interest.  We
2  conducted due diligence.  And if an
3  order was determined to be suspicious,
4  we did not ship and notified DEA.
5       Q.    (BY MR. BOWER) So let me just
6  revamp my question because I think you may
7  have misunderstood my question.
8       My question is this:  Prior to
9  Masters, did Walmart have any policy or
10  procedure in place that would prevent an
11  order from being reduced in size and then
12  shipped prior to due diligence being
13  performed?
14       MS. TABACCHI:  Object to the
15      form.
16       THE WITNESS:  That would
17      prevent an order from being ...
18       Our procedures in the
19      distribution center were specific to
20      oxycodone 30, and we did reduce
21      those -- we did reduce those orders.
22       Q.    (BY MR. BOWER)  Well, Walmart
23  didn't -- strike that.
24       Walmart's reduction of orders

Page 379

1  weren't limited to oxy 30, were they?
2       MS. TABACCHI:  Object to the
3      form.
4       THE WITNESS:  From a due
5      diligence perspective, we did perform
6      due diligence on other orders.
7       Q.    (BY MR. BOWER)  What about in
8  the circumstance where Walmart associated
9  with the DC calls up the pharmacist and the
10  pharmacist says they entered the order in
11  error?  Those were reduced, weren't they?
12       MS. TABACCHI:  Object to the
13      form.
14       THE WITNESS:  Those were orders
15      of interest that were cleared and not
16      deemed suspicious.
17       Q.    (BY MR. BOWER)  Those were
18  reduced, weren't they?
19       MS. TABACCHI:  Object to the
20      form.
21       THE WITNESS:  Those orders were
22      errors that were corrected.
23       Q.    (BY MR. BOWER)  And did Walmart
24  rely on the pharmacists to determine whether

Page 380

1  those orders were entered in error?
2       A.    Not every time.  It would
3  depend on the response.  And the associate
4  that was calling could escalate to
5  leadership, to asset protection.  And again,
6  depending on, you know, what time
7  pre-Masters, logistics compliance or practice
8  compliance might be involved.
9       Q.    In your preparation for today's
10  deposition, did you see any example of when a
11  Walmart associate called up a pharmacist and
12  then performed additional due diligence?
13       MS. TABACCHI:  Object to the
14      form.
15       THE WITNESS:  We have
16      documentation of phone conversations
17      with pharmacists and the due diligence
18      that occurred around orders that -- of
19      interest.
20       Q.    (BY MR. BOWER)  Okay.  But my
21  question is a little bit different than that.
22       So in your preparation for
23  today's deposition, did you see any evidence
24  that Walmart associates who called up the

Page 381

1  pharmacists would then conduct further due
2  diligence after speaking with the
3  pharmacists?
4       MS. TABACCHI:  Object to the
5      form.
6       THE WITNESS:  Yes.  We have
7      documentation of our process of
8      reviewing orders, conversations with
9      pharmacists, and additional due
10      diligence.
11       Q.    (BY MR. BOWER)  Okay.  What
12  documentation are you referring to?
13       A.    We have "know your customer"
14  and follow-up forms.
15       Q.    And when did Walmart first
16  implement its "know your customer" program?
17       MS. TABACCHI:  Object to the
18      form.
19       THE WITNESS:  It's a -- we've
20      known our customer.  We know who our
21      customer is because we own these
22      pharmacies.  And so over time as we've
23      developed our program, we did
24      formalize certain data points.  But

Page 382

1 from the period of time that we began
2 shipping, as I described, there were
3 collaborations between logistics and
4 other members of the corporate office
5 around knowing your customer.
6     Q.    (BY MR. BOWER) When did
7 Walmart formalize its "know your customer"
8 program?
9     A.    We began to formally document
10 with the Reddwerks enhancements.
11     Q.    Going back to Masters for a
12 second in that same paragraph?
13     A.    I'm sorry, I've already lost my
14 spot.
15     Q.    Oh, sorry about that.
16     A.    I'm here.
17     Q.    It's page 4.
18         So after that sentence, the
19 Court goes on to say, "Simply accepting
20 whatever the pharmacist told them without
21 taking requisite steps to determine whether
22 explanations were accurate or even
23 plausible."
24         Do you see that?

Page 383

1     A.    I see that.
2     Q.    Does Walmart agree that that
3 policy or procedure would be inappropriate?
4         MS. TABACCHI:  Object to the
5     form.  Beyond the scope.
6         MR. BOWER:  And I'll strike
7     that, because I understand the
8     objection.
9     Q.    (BY MR. BOWER) Did Walmart take
10 that requirement, that accepting what
11 pharmacies told them, did Walmart take that
12 basic principle and implement it into its
13 suspicious order monitoring program?
14         MS. TABACCHI:  Object to the
15     form.
16         THE WITNESS:  This would be
17     part of a data -- this wouldn't be the
18     only data set that we were looking at
19     in performing due diligence.  So -- so
20     a stand-alone word of the pharmacist
21     in that -- in the process of review of
22     orders of interest was -- did not
23     stand alone in this case.
24     Q.    (BY MR. BOWER) If you'd turn

Page 384

1 to page 6 in the Masters decision.
2         Again, the right-hand column,
3 looking at the paragraph starting with
4 "Those," towards the top there?  The first
5 full paragraph?
6     A.    (Witness nods.)
7     Q.    Do you see that?
8     A.    Yes.
9     Q.    Do you see the second sentence
10 in that paragraph, the Court states, "Most
11 strikingly, in lieu of reporting all held
12 orders, Masters employees deleted some and
13 edited others so that they appeared to be of
14 a normal size and pattern and then proceeded
15 to fill them."
16         Do you see that?
17     A.    Yes.
18     Q.    Did Walmart, at this point in
19 time, take that requirement in developing its
20 suspicious order monitoring programs?
21         MS. TABACCHI:  Object to the
22     form.
23         THE WITNESS:  I'm sorry, I was
24     reading the prior sentence.

Page 385

1         MR. BOWER:  Sure.
2         THE WITNESS:  Could you --
3         MR. BOWER:  I'll rephrase.
4         THE WITNESS:  Could I just for
5     one --
6         MR. BOWER:  Oh, yes.  Please.
7         THE WITNESS:  -- refresh my
8     memory?
9         Okay.  Thank you.
10     Q.    (BY MR. BOWER) So at this point
11 in time, we're talking 2017.  Right?
12     A.    Yes.
13     Q.    At this point in time, did
14 Walmart have any policies and procedures in
15 place that would prevent its own employees
16 from deleting orders or editing orders so
17 that they appeared to be of a normal size and
18 pattern and then filled them?
19         MS. TABACCHI:  Object to the
20     form.
21         THE WITNESS:  So in 2017, the
22     alerts that were coming through in the
23     enhanced Reddwerks were worked by the
24     logistics team and had to be cleared

Page 386

1    through that process.
2         And so the answer -- the answer
3    is we did not routinely cancel orders
4    in this -- in this manner that's
5    referred to in Masters.
6    Q.   (BY MR. BOWER) So my question
7    is a little bit different, though.  My
8    question is this:  At this point in time, did
9    Walmart have any policies and procedures in
10   place that would prevent its own employees
11   from deleting orders or editing orders so
12   that they appeared to be of a normal size and
13   pattern and then fill those orders?
14        MS. TABACCHI:  Object to the
15   form.
16        THE WITNESS:  The process in
17   this case was Reddwerks alerts, and
18   those Reddwerks alerts could not be
19   deleted.  The process was that that
20   alert had to be worked.  So the policy
21   in that case led to further due
22   diligence.
23   Q.   (BY MR. BOWER) And what
24   written policy are you referring to?

Page 387

1    A.   So in 2017, the Bates number I
2    have is 969.
3         I don't know that you have --
4    Q.   Is it tab 6 maybe?
5    A.   Oh, I'm sorry.  This
6    describes -- I've jumped ahead.  This
7    describes our Buzzeo.  But this was in place
8    in 2017.
9    Q.   Okay.
10   A.   I'm sorry, I just need to do a
11   fact check.
12   Q.   Sure.
13   A.   So in November of 2017,
14   actually this was in place.  This was Buzzeo.
15   And those alerts were coming through the
16   system pre anyone in the logistics system
17   seeing those orders.
18   Q.   Okay.  And did Walmart have a
19   similar policy in place in 2010?
20        MS. TABACCHI:  Object to the
21   form.
22        THE WITNESS:  In 2010, we --
23   our associates were reviewing orders
24   as they came in, correcting errors if

Page 388

1    they were identified.  If there was a
2    human error that was made, a mistake
3    that was made, that was in place in
4    2010.
5    Q.   (BY MR. BOWER) So let's say in
6    2010, if a human error is made, what would
7    happen?
8         MS. TABACCHI:  Object to the
9    form.
10        THE WITNESS:  If an order was
11   identified that needed clarification,
12   that raised concerns, the DC
13   associate, logistics associate would
14   reach out to the pharmacy, understand
15   the reason for the error.  If it was
16   reasonable, they would make a
17   correction and fill that order.  If
18   they felt it wasn't reasonable, they
19   would reach out for follow-up to the
20   leadership that had responsibility for
21   those -- for that specific pharmacy.
22   Q.   (BY MR. BOWER) So under this
23   policy, if the DC associates understood the
24   reason for the error, they would reduce the

Page 389

1    order and ship the order; is that correct?
2         MS. TABACCHI:  Object to the
3    form.
4         THE WITNESS:  If in their
5    assessment it was a reasonable order
6    and there was no other reason for
7    suspicion, yes.
8    Q.   (BY MR. BOWER) And those
9    orders would not be reported to the DEA; is
10   that correct?
11        MS. TABACCHI:  Object to the
12   form.
13        THE WITNESS:  Errors that were
14   corrected were not reported to the
15   DEA.
16   Q.   (BY MR. BOWER) Has Walmart
17   ever reported to the DEA prior to 2017 errors
18   that were corrected and then shipped?
19        MS. TABACCHI:  Object to the
20   form.
21        THE WITNESS:  To the extent it
22   was an order of interest that was
23   cleared and not deemed suspicious,
24   those were not reported before the

Page 390

1  Masters decision.
2  Q.  (BY MR. BOWER) Okay. But I'm
3  asking a little bit different question. I'm
4  not asking if orders ever cleared and then
5  shipped. I'm asking specifically about
6  orders that were corrected and then shipped.
7  A.  We would not have deemed those
8  as suspicious, and they would not have been
9  reported.
10  Q.  So prior to Masters, Walmart
11  had at no time reported orders to the DEA
12  that were corrected and shipped; is that
13  correct?
14  MS. TABACCHI: Object to the
15  form.
16  THE WITNESS: In that scenario,
17  I'm not aware of that scenario.
18  Q.  (BY MR. BOWER) If you'd turn
19  to page 9 of Masters.
20  Again, on the right-hand
21  column. Do you see the first -- I guess the
22  first full paragraph, the reference to the
23  shipping requirement?
24  A.  On page 9?

Page 391

1  Q.  Yeah, page 9, right-hand
2  column, first full paragraph starting in -- I
3  guess it's Pet'r Br. 46. That paragraph?
4  A.  I see the paragraph.
5  Q.  Do you see that?
6  So the second -- I think it's
7  the second full -- third full sentence.
8  States "As noted above, the shipping
9  requirement mandates that pharmaceutical
10  companies exercise due diligence before
11  shipping any suspicious order."
12  Do you see that?
13  A.  Yes.
14  Q.  Was that requirement reflected
15  in Walmart's suspicious order monitoring
16  policy at the time?
17  MS. TABACCHI: Object to the
18  form.
19  THE WITNESS: At the time of
20  the decision?
21  Q.  (BY MR. BOWER) Yes.
22  A.  Yes.
23  Q.  Okay. And what written policy
24  reflected that -- the shipping requirement

Page 392

1  mandate?
2  A.  The policy that -- let me get
3  the date correct.
4  The policy that was in place as
5  to December 2015, and, in fact, dating back
6  to January of 2015. It's in writing here,
7  as I go back and go through the various
8  policies.
9  Q.  Can you just refer to -- when
10  you say "January of 2015, it's in writing
11  there," what you're specifically referring
12  to?
13  A.  The policy -- the date of the
14  policy.
15  And so I'll refer you to the
16  earliest policy that references suspicious
17  order shipping is 8377, dated August 2014.
18  And that's on tab 7.
19  Q.  Does Walmart have any written
20  policies in place prior to that date that
21  would reflect the shipping requirement?
22  MS. TABACCHI: Object to the
23  form.
24  THE WITNESS: We don't have a

Page 393

1  policy in writing.
2  (Whereupon, Deposition Exhibit
3  Walmart 11, September 2010 email
4  chain. Subj: RE: DEA Audit at DC
5  6013, WMT_MDL_000057259-57260, was
6  marked for identification.)
7  Q.  (BY MR. BOWER) I've handed you
8  what's marked as Exhibit 11 to today's
9  deposition. The Bates number is 57259
10  through 60.
11  It's just a single email -- or
12  actually it's two emails. The rest is
13  redacted, and I'll note that those are
14  Walmart redactions. Just so you know. Okay?
15  A.  Okay.
16  Q.  Have you seen this document
17  before? Take a moment and review it and then
18  that will be my first question.
19  A.  I saw this document, I believe
20  in one of the depositions as an exhibit.
21  Q.  Okay.
22  You were also on this email;
23  correct?
24  A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1    Q.   Do you recall receiving this
2    email in 2010?
3    A.   I don't recall, but I don't
4    dispute it.
5    Q.   Okay.  This email reflects the
6    DEA audited a Walmart distribution center;
7    correct?
8    A.   This is a -- this is a
9    distribution center of Walmart's, yes.
10   Q.   In this email, Mr. Greer is
11   reporting on the DEA's expectations after an
12   audit at that distribution center.
13       Would you agree with that?
14   A.   Yes.
15   Q.   Okay.  And he states that the
16   DEA -- he's writing to you.  He writes,
17   Susanne.  Right?  That's you?
18   A.   Yes.
19   Q.   He writes, "The DEA expects the
20   DCs to have a more intimate relationship with
21   its customers."
22       Do you see that?
23   A.   Yes.
24   Q.   Okay.  And then he writes,

Page 395

1    "They are looking for our due diligence in
2    dealing with excessive or suspicious orders."
3        Do you see that?
4    A.   Yes.
5    Q.   Okay.  Previously when you
6    testified that the DEA had done audits at
7    Walmart's DCs and never raised a concern,
8    does this refresh your recollection that
9    concerns were in fact raised by the DEA?
10       MS. TABACCHI:  Object to the
11   form.
12       THE WITNESS:  I don't know that
13       it's in context.  I -- I don't know
14       the full context of this or the
15       outcome of that audit.  My
16       understanding has been that we've not
17       had an audit finding, and -- and so
18       this seems to be a conversation.  It
19       could have been a clarification.
20       We made numerous clarifications
21       about our programs and processes to
22       the DEA over time.  So I don't -- I
23       don't know what the context fully is
24       of this one excerpt.

Page 396

1    Q.   (BY MR. BOWER)  And I
2    understand your explanation but my question
3    was, again, a little bit different, going
4    back to your previous testimony where you
5    testified that the DEA had never raised
6    concerns about Walmart's suspicious order
7    monitoring policy at any of its audits.
8        Do you recall that testimony?
9        MS. TABACCHI:  Objection, form.
10       THE WITNESS:  I recall that
11       testimony.
12   Q.   (BY MR. BOWER)  would you agree
13   that this email, Exhibit 11, reflects DEA
14   raising at least some concerns regarding
15   Walmart's order monitoring policy for
16   controlled substances?
17       MS. TABACCHI:  Object to the
18       form.
19       THE WITNESS:  I agree that
20       they're talking about an improvement
21       that could be made to our program.
22   Q.   (BY MR. BOWER)  And as a result
23   of those conversations, folks at Walmart are
24   going to get together and figure out what a

Page 397

1    flag amount should be.
2        Do you agree with that?
3    A.   I see that listed.
4    Q.   And sometime thereafter,
5    Walmart then implements a flag amount.  Would
6    you agree with that?
7        MS. TABACCHI:  I'm going to ask
8        you to let the witness finish
9        answering.
10       MR. BOWER:  Sorry.  Sorry.
11       THE WITNESS:  If there's a
12       question, I did not hear it.
13   Q.   (BY MR. BOWER)  Okay.  And I
14   apologize if I cut you off.  I'll do a better
15   job of letting you finish.
16       Would you agree that after this
17   date, Walmart then began instituting a flag
18   amount?
19       MS. TABACCHI:  Object to the
20       form.
21       THE WITNESS:  We did implement
22       flags in our system.
23   Q.   (BY MR. BOWER)  Prior to this,
24   you had not had flags in your system.

Page 398

1    Would you agree with that?
2    MS. TABACCHI:  Object to the
3 form.
4    THE WITNESS:  We did not have
5 flags programmed into our system.
6    Q.    (BY MR. BOWER) The third
7 sentence of the email states that "Currently
8 we rely on the diversion team to run audits
9 and flag excessive purchases."
10    Do you see that?
11    A.    Yes.
12    Q.    During this time period, what
13 audits were being run by the diversion team
14 in connection with suspicious orders?
15    A.    This would have been part of
16 the follow-up if there was an order that was
17 flagged.  And the information -- this is the
18 process that passes the information to the
19 diversion control analyst, I believe was --
20    Q.    And those were referred to as
21 audits?
22    A.    It's reflected in our policy of
23 2010.
24    Q.    Okay.  Well that's not -- it

Page 399

1 doesn't seem to be consistent with what's
2 being written here because it says,
3 "Currently we rely on the diversion team to
4 run audits and flag excessive purchases."
5    Do you see that?
6    A.    I see the way that he's phrased
7 it here.
8    Q.    And it's your testimony that
9 that is inaccurate?
10    MS. TABACCHI:  Object to the
11 form.
12    THE WITNESS:  The process that
13 was in place, according to the policy,
14 was that we would send information for
15 flagged orders that could not be
16 resolved by the logistics team to the
17 diversion control coordinator, and
18 they would run an analysis.
19    Q.    (BY MR. BOWER) That was --
20 there was no written policy in place at this
21 time; correct?
22    MS. TABACCHI:  Object to the
23 form.
24    THE WITNESS:  In 2010?

Page 400

1    Q.    (BY MR. BOWER) Yes.
2    A.    At this time?
3    We were memorializing the
4 policy that's reflected in November 2010,
5 does postdate this.
6    Q.    So the answer to my question is
7 yes, there was no policy in place.
8    Would that be accurate?
9    A.    At the time of this email there
10 was no written policy in place.
11    Q.    Soon thereafter Walmart does
12 have a policy in place.
13    Would you agree with that?
14    MS. TABACCHI:  Object to the
15 form.
16    THE WITNESS:  Yes.
17    MS. TABACCHI:  Object to the
18 form.
19    THE WITNESS:  Yes.
20    Q.    (BY MR. BOWER) Towards the end
21 of the email, Mr. Greer -- what was
22 Mr. Greer's position at the time?
23    A.    He was asset protection manager
24 over the distribution centers.

Page 401

1    Q.    Okay.  So he would have been
2 one of the folks to flag those initial orders
3 as they're coming in; is that correct?
4    A.    At this time he supervised
5 those -- he was in a supervisory role of all
6 of the DCs.  Not -- at one point he was
7 physically in a DC in that role.  In this
8 role he supervised those DC asset protection
9 associates.
10    Q.    Okay.  So during this time, he
11 wouldn't have seen an order unless someone
12 had escalated it to him; is that correct?
13    MS. TABACCHI:  Object to the
14 form.
15    THE WITNESS:  Correct.
16    Q.    (BY MR. BOWER) And just a
17 couple more questions on this.  Going to the
18 end of the email, Mr. Greer writes to Greg,
19 now, he says -- or writing about Greg, he
20 says, "Greg and I spoke and are in agreement
21 that we do not want to make the flag so high
22 that it does not trigger, but we do not want
23 to make it so low that it is flagging all the
24 time."

Page 402

1    Do you see that?
2    A.   I see that.
3    Q.   And, in fact, that was
4  Walmart's concern even in implementing the
5  Reddwerks enhancements; right?  That they
6  didn't want the flag to be so low that it
7  would be flagging all the time?
8    MS. TABACCHI:  Object to the
9  form.
10    THE WITNESS:  I think this
11  reflects that we -- a desire to get
12  the flag right.  It's saying we don't
13  want -- we don't want it to be an
14  outlier on either side.  It's saying
15  we want it to be the right flag so
16  that we can detect orders and review
17  them appropriately.
18    Q.   (BY MR. BOWER) And in getting
19  it right, Walmart didn't want the flag to
20  identify too many orders for review; correct?
21    MS. TABACCHI:  Object to the
22  form.
23    THE WITNESS:  We also did not
24  want it to alert too few orders

Page 403

1  either.  It wouldn't have served its
2  purpose.
3    Q.   (BY MR. BOWER) Right.  Well,
4  did Walmart consider -- strike that.
5    Would you agree that, in
6  getting the amount of an order that would
7  flag right, as Mr. Greer writes, that Walmart
8  did not want to flag too many orders?
9    MS. TABACCHI:  Object to the
10  form.  Asked and answered.
11    THE WITNESS:  That's one of the
12  considerations.  It was not the only
13  consideration.
14    Q.   (BY MR. BOWER)  What were the
15  other considerations?
16    A.   Not flagging too few of times.
17    Q.   Okay.  And by -- can you put a
18  more precise number on it what you mean by
19  "not flagging too few of times"?  What would
20  be too few in your mind?
21    MS. TABACCHI:  Object to the
22  form.  Beyond scope.
23    MR. BOWER:  I'll strike that.
24    Q.   (BY MR. BOWER) What did Walmart

Page 404

1  consider to be too few?
2    MS. TABACCHI:  Same objections.
3    THE WITNESS:  It would be
4  something that didn't make sense for
5  the business.  That we were reviewing
6  orders appropriately.
7    Again, the purpose of the
8  program is to detect, and so the
9  purpose -- not having enough alerts
10  would potentially impact our ability
11  to detect.
12    Q.   (BY MR. BOWER) And I was with
13  you just to the end of that.  So I just -- I
14  didn't follow the end of your statement where
15  you said, "Not having enough alerts would
16  potentially impact our ability to detect."
17  What does that mean?
18    A.   If there was a suspicious
19  order.
20    Q.   So if there's a suspicious
21  order but you don't have enough alerts, it
22  would impact your ability to detect that
23  order; correct?
24    MS. TABACCHI:  Object to the

Page 405

1  form.
2    THE WITNESS:  I'm giving a
3  hypothetical to say that in trying to
4  set the alert levels, the
5  considerations were let's try to get
6  the number right.  If it alerts too
7  many, that's not ideal because you
8  would have false positives.
9    If it alerts too few, there may
10  be the opportunity for something to go
11  by unnoticed, and so we were -- the
12  intent of that comment is, let's get
13  it right.
14    Q.   (BY MR. BOWER) And do you agree
15  that in attempting to get it right, Walmart
16  should have erred on the side of caution?
17    MS. TABACCHI:  Object to the
18  form.
19    THE WITNESS:  Well, I think we
20  have evidence of how along the process
21  we have improved our program, and the
22  example that I've testified to is the
23  advanced Reddwerks alerts would have
24  allowed for thresholds over 50 in

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1  specific cases. We took a
2  conservative view in that case and set
3  that threshold at 5,000 dosage units,
4  or 50 bottles for 100 count.
5      Q.    (BY MR. BOWER) And would you
6  consider 50 to be a conservative threshold if
7  I told you that it wouldn't flag
8  99.99 percent of orders?
9          MS. TABACCHI: Object to the
10 form. Beyond the scope of the notice.
11         THE WITNESS: That wasn't the
12 only policy that we had in place. And
13 it was part of a broader program that
14 we had to be able to fulfill our
15 requirements.
16         MR. BOWER: I just-- I'll move
17 to strike that answer because I don't
18 think it was answering my question.
19 So I'll restate my question.
20     Q.    (BY MR. BOWER) Would you
21 consider 50 to be a conservative threshold if
22 I told you that it wouldn't flag
23 99.99 percent of all orders?
24         MS. TABACCHI: Object to the

Page 407

1  form. Asked and answered.
2          THE WITNESS: I think you have
3  to consider the other parameters that
4  were in place. That in and of itself,
5  the 50 alert did not -- there were
6  always other elements in place.
7      Q.    (BY MR. BOWER) Does Walmart
8  agree that it would be better to flag an
9  alert and review it as a potential false
10 positive than to ship an order that was
11 potentially suspicious?
12         MS. TABACCHI: Object to the
13 form.
14         THE WITNESS: Our intent was
15 never to ship an order that was deemed
16 suspicious.
17     Q.    (BY MR. BOWER) Well, let me
18 ask you this. What would be worse, flagging
19 an order as a false positive or shipping a
20 suspicious order?
21         MS. TABACCHI: Object to the
22 form.
23         THE WITNESS: I think you have
24 to look at the circumstances. Our

Page 408

1  intent was never to ship a suspicious
2  order. However, I think that if
3  there's too many false positives, it
4  could lead to missing --
5          I think one could lead to the
6  other from an unintended consequence
7  perspective. That's why we were
8  working to get it right knowing that
9  neither situation was the ideal. And
10 that's why we continued to adjust and
11 improve and make modifications to our
12 program over a continuum of time.
13         MS. TABACCHI: Can we just take
14 a break when you come to a right
15 moment?
16         MR. BOWER: Sure. Go ahead.
17         THE VIDEOGRAPHER: 4:20. We
18 are off the video record.
19         (Recess taken, 4:20 p.m. to
20 4:43 p.m.)
21         THE VIDEOGRAPHER: 4:43. We
22 are on the video record.
23     Q.    (BY MR. BOWER) All right.
24 We're back on the record. I just would ask

Page 409

1  you to pull out Exhibit 9 again, if you
2  would. I just have a couple of other
3  questions.
4          We looked at this earlier;
5  correct? In connection with Masters?
6      A.    Yes.
7      Q.    And I just have a couple of
8  additional questions on other topics on this
9  document. So if you'd look at the bottom
10 email, if you would, the email from
11 Ms. Johnson to Mr. -- how do you pronounce
12 his name? Tim --
13     A.    Koch.
14     Q.    Koch. Okay. The third bullet
15 point there under SOM. Do you see that? It
16 says, "Review past SOM evaluations that were
17 logistics team"?
18         Do you see that?
19     A.    Yes.
20     Q.    Did you talk with Ms. Johnson
21 about that work she performed in preparation
22 for today's deposition?
23         MS. TABACCHI: Object to the
24 form.

Page 410

1    THE WITNESS: Yes.
2    Q.   (BY MR. BOWER) Do you have any
3 understanding -- or strike that.
4    What concerns was Ms. Johnson
5 referring to in this document regarding her
6 reviewing of past SOM evaluations?
7    MS. TABACCHI: Object to the
8    form. Beyond the scope.
9    THE WITNESS: I don't know what
10    the concerns were specifically
11    detailed in this document, but my
12    conversation with her was around the
13    process of auditing the work that was
14    done in evaluating orders.
15    Q.   (BY MR. BOWER) And what did she
16 tell you about that process?
17    A.   That there was a process, and
18 that she would go back and look at the work
19 and just evaluate the process, what was being
20 looked at. Just a checkup of the process,
21 and the documentation that was occurring.
22    Q.   (BY MR. BOWER) And when did she
23 start that process?
24    MS. TABACCHI: Object to the

Page 411

1    form. Beyond the scope.
2    Q.   (BY MR. BOWER) Well, now we're
3 talking about evaluating the SOM process;
4 correct?
5    A.   This would be evaluating the
6 work that was done in evaluating orders.
7    Q.   In fact, I believe your words
8 were, "My conversation with her was around
9 the process of auditing the work that was
10 done in evaluating orders"; right?
11    A.   Yes.
12    Q.   So when did Miranda begin that
13 work?
14    A.   She -- from the -- from the
15 implementation of the multi-tiered approach,
16 she was looking at the work that was being
17 done to evaluate orders.
18    And so as this reflects,
19 September of 2015, that process had
20 transitioned from the logistics team -- was
21 in the process of transitioning into her
22 team. And so she was looking at the work
23 that was being done.
24    Q.   Okay. And for what purpose was

Page 412

1 she looking at the work that had been done?
2    A.   Just for consistency. There
3 were multiple people that were involved in
4 the process, and so she was looking for
5 consistency.
6    Q.   Was she looking for ways to
7 improve the process?
8    A.   I would say that's a -- as we
9 always have done. If she learned anything
10 that needed to be improved through that
11 review, that would be one of the outcomes.
12    Q.   Do you know whether she learned
13 anything that needed to be improved through
14 her auditing of the SOM process?
15    MS. TABACCHI: Object to the
16    form.
17    THE WITNESS: I know that the
18    process continued to evolve, and
19    information was added to the way the
20    orders were reviewed.
21    What I do not know, if it was
22    in direct response to what she's
23    referring to in this email in
24    September of 2015.

Page 413

1    Q.   (BY MR. BOWER) Okay. We're in
2 September of 2015. Right? This email?
3    A.   Yes.
4    Q.   When was the next point in time
5 that Walmart improved its review of orders of
6 interest?
7    MS. TABACCHI: Object to the
8    form.
9    MR. BOWER: I'll strike that.
10    Q.   (BY MR. BOWER) After
11 September 21st, 2015, when was the next time
12 Walmart improved its suspicious order
13 monitoring program?
14    MS. TABACCHI: Object to the
15    form.
16    THE WITNESS: So there were
17    ongoing processes that were being
18    worked on, the most significant of
19    which was the switch from the
20    Reddwerks program to the Buzzeo
21    program that occurred in 2017.
22    Q.   (BY MR. BOWER) Before we get
23 to the switch to Buzzeo in 2017, can you
24 provide any more specificity as to what you

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1  mean by "ongoing processes that were being
2  worked on"?
3      A.    So the reviews that were
4  occurring of alerts that were firing in the
5  Reddwerks system.  The documentation was
6  improved.  The amount of information that was
7  being reviewed was considered.  And so that
8  process was evolving as -- as Miranda was
9  standing up and developing that program.
10     Q.    Okay.  And let me just see if I
11 can put a finer point on a couple of those
12 things you mentioned.
13          When you say "the documentation
14 was improved," are you referring to
15 documentation in Archer?
16          MS. TABACCHI:  Object to the
17 form.
18          THE WITNESS:  Yes, we were
19 documenting the reviews in the Archer
20 system.
21     Q.    (BY MR. BOWER)  Sometime
22 after -- I lost my page.  Sometime after
23 September of 2015, Walmart began documenting
24 its due diligence in Archer; is that correct?

Page 415

1      A.    We were documenting before --
2  let me correct that.  We were documenting the
3  review of the orders of interest in Archer
4  with the Reddwerks enhancement.
5      Q.    So is it accurate, then, to say
6  that Walmart began documenting its review of
7  orders of interest in Archer on or about
8  August of 2015?
9      A.    We were documenting those
10 reviews with that Reddwerks enhancement.
11 That was part of the enhancement that was
12 implemented.
13     Q.    Let me try to get it a
14 different way.
15          When did Walmart first start
16 documenting its due diligence for orders of
17 interest in Archer?
18     A.    That was in -- that was in the
19 2015 time frame.
20     Q.    Can you put a finer point on
21 that than a 12-month period?
22          And again, just for the record,
23 you're referring to your binder that you
24 brought with you today?

Page 416

1      A.    Yes.
2          MR. BOWER:  And I will just
3  note that we were not provided a copy
4  of the binder.  I'm not sure what's in
5  the binder, but we haven't reviewed
6  it.  So we will keep the deposition
7  open pending any questions that are in
8  addition that we haven't asked and
9  that are included in the binder.
10         MS. TABACCHI:  We obviously
11 have a different view, but we can
12 discuss that later.
13         THE WITNESS:  Yes.  In policy,
14 we state that we are retaining
15 documentation in the August 2014 time
16 frame.
17     Q.    (BY MR. BOWER) Okay.  So let me
18 just see if I can get a clear record on this,
19 then.
20         Did Walmart begin documenting
21 its due diligence reviews in Archer in August
22 of 2014?
23     A.    There were -- the process that
24 was reviewed through the practice

Page 417

1  compliance -- this -- this documentation
2  evolved over time, and the documentation by
3  the practice compliance team was in the
4  Archer system.
5      Q.    So -- and there's been some
6  confusion in the past depositions on this
7  issue too, so I think I need a clear answer
8  on this one.
9          When did Walmart first begin
10 documenting all orders of interest in Archer?
11     A.    All -- if I can clarify.
12     Q.    Please.
13     A.    All of the information that was
14 associated with that order of interest, that
15 would be with the enhancement that occurred
16 in 2015.  There was some documentation prior
17 to that, but it wasn't -- it wasn't the full
18 record.
19     Q.    Okay.  What was being
20 documented in Archer prior to that Reddwerks
21 enhancement in 2015?
22     A.    The component that was
23 completed by the practice compliance team.
24     Q.    Okay.  So prior to the

Page 418

1 Reddwerks enhancement in 2015, an order of
2 interest would only be documented in Archer
3 if it was escalated to the practice
4 compliance team; is that correct?
5    A.    That component, correct.
6    Q.    And then after the Reddwerks
7 enhancements, is it true that Walmart began
8 documenting all reviews of flagged orders in
9 Archer?
10    A.    There was a period of time when
11 there was a form that was mentioned.  That
12 form was not used in those documents, were
13 placed into the Archer system.
14    Q.    Okay.  Can you just refer -- or
15 be more specific as to the form you're
16 referring to?
17    A.    There was an order of interest
18 investigation form mentioned that -- for
19 clarity, that form was not used.  That
20 information was documented in Archer.
21    Q.    And that form is referenced in
22 one or more of Walmart's written policies; is
23 that correct?
24        MS. TABACCHI:  Object to the

Page 419

1    form.
2        THE WITNESS:  It was referenced
3    in an exhibit that was used in
4    Spruell.  There was a link to a form
5    that's referenced there.
6    Q.    (BY MR. BOWER)  Okay.  And in
7 its continued desire to improve its
8 suspicious order monitoring program, did
9 Walmart have occasion to meet with
10 manufacturers in connection with that
11 program?
12        MS. TABACCHI:  Object to the
13    form.  Beyond the scope.
14        THE WITNESS:  I'm not aware of
15    a meeting with manufacturers specific
16    to our order monitoring program.
17    Q.    (BY MR. BOWER)  Okay.
18        (Whereupon, Deposition Exhibit
19    Walmart 12, February 2016 email chain.
20    Subj: FW: Areas of Focus - 2/16 -
21    2/19, WMT_MDL_ 000003906-3907, was
22    marked for identification.)
23    Q.    (BY MR. BOWER)  You've been
24 handed what's been marked as Exhibit 12 to

Page 420

1 today's deposition.
2        Take a moment and review that
3 document and let me know when you're
4 finished.
5        It's an email from Miranda
6 Johnson to George Chapman.  Actually, it's
7 two emails.  One's dated February 16, 2016,
8 and then a follow-up email dated February 19,
9 2016, providing updates.
10        Have you seen this document
11    before?
12    A.    I have not.
13    Q.    Have you had a chance to review
14 it?
15    A.    I did review it.
16    Q.    Is this something that you
17 talked with Ms. Johnson about in preparation
18 for today's deposition?
19    A.    I did not talk to her about a
20 meeting with a manufacturer.
21    Q.    Do you see her email to
22 Mr. Chapman there where she writes, "George,
23 here's my areas of focus this week"?
24        Do you see that?

Page 421

1    A.    Yes.
2    Q.    And she notes, "Meeting with
3 Purdue."  Purdue is a manufacturer; correct?
4    A.    Yes.
5    Q.    A manufacturer of opioid
6 products; correct?
7    A.    Yes.
8    Q.    She notes that she's "Meeting
9 with Purdue on SOM programs."
10        Do you see that?
11    A.    I see that.
12    Q.    Did you ever inquire as to
13 Ms. Johnson whether her meeting with Purdue
14 on SOM programs helped Walmart in its efforts
15 to continuously improve those programs?
16        MS. TABACCHI:  Object to the
17    form.  Beyond the scope.
18        THE WITNESS:  I did not speak
19    with her about a meeting with any
20    manufacturer.
21    Q.    (BY MR. BOWER)  Did you know
22 that Ms. Johnson notes that she had a great
23 meeting?
24        Do you see that?

Page 422

1    A.    I see that in the email.
2    Q.    And the meeting she's referring
3 to, it appears that she met with the director
4 of Purdue's SOM program.
5        Do you see that?
6        MR. TABACCHI:  Same objections.
7        THE WITNESS:  I see it in the
8 email.
9    Q.    (BY MR. BOWER)  And she notes
10 that she's -- that -- referring now to the
11 director of Purdue's SOM program, that "She
12 shared some interesting information with me
13 and prescribers."
14       Do you see that?
15    A.    Yes.
16    Q.    Do you know if Walmart ever
17 incorporated that research that it received
18 from Purdue into its own SOM program?
19       MR. TABACCHI:  Objection,
20 beyond the scope.
21       THE WITNESS:  Not that I'm
22 aware.
23    Q.    (BY MR. BOWER)  Do you know
24 whether it happened?

Page 423

1        MR. TABACCHI:  Same objections.
2        THE WITNESS:  So as -- as I
3 prepared for this deposition and
4 inquired as to who we partnered with,
5 we provided responses to -- to who we
6 were partnered with or who we relied
7 on -- the data that we used in our SOM
8 program.
9        MR. BOWER:  Okay.  So I move to
10 strike that answer as nonresponsive.
11 My question is very different than
12 that.
13    Q.    (BY MR. BOWER)  My question is
14 this.  Do you know whether Walmart ever
15 included the interesting research that she
16 learned about from Purdue on prescribers in
17 its own SOM program?
18       MR. TABACCHI:  Objection, form.
19 Beyond the scope.
20       THE WITNESS:  So in my
21 research, my understanding is we did
22 not include data that was from a
23 manufacturer in our SOM program.
24    Q.    (BY MR. BOWER)  And why --

Page 424

1 what's the basis for that statement?
2        MR. TABACCHI:  Same objections.
3        THE WITNESS:  I met with
4 Roxy Reed and with Miranda Burris, and
5 we talked about the data that we were
6 using in our SOM program.  And it --
7 there was no manufacturer mentioned as
8 we walked through the data that we
9 used in our program.
10    Q.    (BY MR. BOWER)  But you never
11 asked Ms. Johnson whether she included this
12 interesting research she got from Purdue on
13 prescribers in the SOM program; right?
14       MR. TABACCHI:  Same objections.
15       THE WITNESS:  I asked her what
16 data we were using and the source of
17 the data.  She did not mention Purdue
18 in that discussion.
19    Q.    (BY MR. BOWER)  Okay.  You
20 note -- she goes on to say, "We are going to
21 start a quarterly touch base to discuss ideas
22 on how to look at that."
23       Do you see that?
24    A.    Yes.

Page 425

1    Q.    Do you know whether Walmart
2 then continued to discuss ideas with Purdue
3 on how to look at data in connection with its
4 SOM program?
5        MR. TABACCHI:  Objection,
6 beyond the scope.
7        THE WITNESS:  I don't know
8 that.
9    Q.    (BY MR. BOWER)  Further down in
10 this email, Ms. Johnson notes that she
11 "reviewed reports from ABC McKesson that they
12 shared last week."
13       Do you see that?
14    A.    Yes.
15    Q.    And she notes that "Both
16 reports have some great information that I
17 think we can use."
18       Do you see that?
19    A.    Yes.
20    Q.    Did you talk with Ms. Johnson
21 about the use of reports from ABC and
22 McKesson in connection with Walmart's SOM
23 program?
24       MR. TABACCHI:  Objection, form.

Page 426

1    Scope.
2         THE WITNESS:  We talked about
3    the information that was available and
4    utilized from McKesson in our SOM
5    program.  We didn't -- we did not
6    include the ABC information.
7    Q.    (BY MR. BOWER)  You didn't talk
8    with Ms. Johnson about the ABC information;
9    is that correct?
10   A.    That is correct.
11   Q.    Okay.  And what information did
12   you talk about with respect to the
13   information that was available from McKesson?
14   A.    The information that's reviewed
15   as McKesson purchases via pharmacy that's
16   being reviewed for an order of interest.
17   Q.    And I'm just having a little
18   bit of trouble understanding that answer.
19   Your statement is that Walmart reviewed the
20   information that's reviewed as McKesson
21   purchases via pharmacy that's being reviewed
22   for an order of interest.  Can you explain
23   what that means?
24        Let's just start over because

Page 427

1    it's a little bit confusing.
2         So let's go back to my original
3    question.  What information did you talk
4    about with Miranda with respect to the
5    information that was available from McKesson?
6    A.    So our discussion was around
7    the McKesson purchase data that was used as
8    part of our order monitoring program.
9    Q.    And what is the McKesson
10   purchase data?
11   A.    That would be information
12   related to opioids, controlled substances
13   that our pharmacies' purchase from McKesson.
14   Q.    So that's information regarding
15   Walmart pharmacies purchases from McKesson;
16   is that correct?
17   A.    That is correct.
18   Q.    And prior to McKesson providing
19   that information, did Walmart consider its
20   own pharmacies' purchases from McKesson in
21   connection with its own SOM program?
22        MR. TABACCHI:  Object to the
23   form.
24        THE WITNESS:  Yes.  The

Page 428

1    information that we were using was
2    available and had been used over a
3    period of time.
4         I don't believe it was tied to
5    this report that's referenced in the
6    email.
7    Q.    (BY MR. BOWER)  Okay.  So when
8    did Walmart first consider information
9    regarding its pharmacies' purchases from
10   McKesson in connection with its own SOM
11   program?
12   A.    That purchase information has
13   been available to us from the time that we
14   started to self-distribute.
15   Q.    So is it a true statement that
16   Walmart always considered how much of a
17   product its pharmacies purchased from
18   McKesson in carrying out its own SOM program?
19        MR. TABACCHI:  Object to the
20   form.
21        THE WITNESS:  It wasn't always
22   a part of the review, but we --
23   that -- that data had been available
24   since the start of the program.  And

Page 429

1    it was used in various ways, depending
2    on the nature of the review that was
3    being conducted.
4    Q.    (BY MR. BOWER)  Okay.  So --
5    and I appreciate that clarification.  So when
6    did the data information become part of the
7    review?
8    A.    Some of the initial
9    incorporation would have been the process
10   that was implemented with the oxycodone 30
11   limits, as well as the over 20 report
12   reviews.
13   Q.    (BY MR. BOWER)  So, for
14   example, in those over 20 report reviews,
15   would Walmart include orders from McKesson in
16   reviewing those records?
17   A.    There's a step in that process
18   that review -- that refers to purchase and
19   dispensing information.  And that purchase
20   and dispensing information would be inclusive
21   of McKesson purchases.
22   Q.    And, for example, this example
23   we're talking about, these over-20 reports,
24   would the pharmacies' purchases from McKesson

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1  be included when considering whether an order
2  exceeded a threshold of 20?
3      MR. TABACCHI:  Objection, form.
4      THE WITNESS:  Those purchases
5  weren't incorporated into our
6  thresholds.
7  Q.   (BY MR. BOWER) But at some
8  point, Walmart decides to adopt the Buzzeo
9  system for its SOM program; correct?
10  A.   Correct.
11  Q.   And when did it first implement
12  Buzzeo at 6045?
13  A.   At 6045 it was in late 2017.
14      (Whereupon, Deposition Exhibit
15  Walmart 13, March 2010 email chain.
16  Subj: Updated: Wal-mart Dendrite Conf.
17  Call-Mon. March 15 @ 11:00
18  Eastern/10:00 Central, WWMT_MDL_
19  000011558-11575, was marked for
20  identification.)
21  Q.   (BY MR. BOWER) Okay. You've
22  been handed what's been marked Exhibit 13.
23      MR. BOWER:  I will represent
24      that we have already seen this email.

Page 431

1  There were some concerns that it
2  wasn't a complete set. So we've now
3  provided the witness with a complete
4  set to resolve those concerns, because
5  I do have some more questions on this
6  email.
7      MR. TABACCHI:  Is this a new
8      exhibit?
9      MR. BOWER:  New exhibit, yep.
10  Exhibit 13.
11      MR. TABACCHI:  Exhibit 13?
12      MR. BOWER:  Yep.
13  Q.   (BY MR. BOWER) Again, this is
14  the email from Dendrite, which later became
15  known as Buzzeo; correct?
16      MR. TABACCHI:  Object to the
17      form.
18      THE WITNESS:  That's my
19      understanding.
20      MR. TABACCHI:  Beyond the
21      scope.
22  Q.   (BY MR. BOWER) Take a moment,
23  review it. My first question is going to be,
24  you're the only one from Walmart on this

Page 432

1  email.
2      MR. TABACCHI:  Object to the
3      form.
4      THE WITNESS:  So Paula Barton
5  and Amanda Gorman are also from
6  Walmart.
7  Q.   (BY MR. BOWER) Okay. Thank
8  you for that. What were their roles?
9      Take a moment to review that
10  and then ...
11      [Document review.]
12  A.   I've reviewed.
13  Q.   Okay. I appreciate you taking
14  the time to review it.
15      Do you recall receiving this
16  email in 2010?
17  A.   I recall that we had
18  conversations with Cegedim.
19  Q.   And do you recall participating
20  in this conference call with them on
21  March 15, 2010?
22  A.   I'm sure I probably did. I
23  don't remember the specifics.
24  Q.   Okay.

Page 433

1      Does this refresh your
2  recollection potentially that maybe Cegedim
3  was presenting an option for Walmart's SOM
4  program?
5      MR. TABACCHI:  Objection,
6  beyond the scope.
7      THE WITNESS:  There were --
8  what I recall is there were several
9  items that we were discussing included
10  as the suspicious order monitoring
11  module that they had.
12  Q.   (BY MR. BOWER) Did Walmart
13  consider using that suspicious order
14  monitoring module in 2010?
15      MR. TABACCHI:  Objection,
16  beyond the scope.
17      THE WITNESS:  So we were
18  hearing the presentation, and so from
19  a consideration perspective, we were
20  looking at what they had to offer in
21  terms of this and other services that
22  they offered.
23  Q.   (BY MR. BOWER) And during this
24  time period, Walmart didn't have any written

Page 434

1 policies in place in connection with its own
2 program; correct?
3     A.   We did not have a written
4 policy at that time.
5     Q.   And Walmart declined to go with
6 Buzzeo in 2010; correct?
7     MR. TABACCHI:  Object to the
8     form.
9     THE WITNESS:  We did not
10     proceed -- I don't know if we
11     declined.  We did not proceed with, to
12     my knowledge, any of these services
13     that they discussed with us.
14     Q.   (BY MR. BOWER)  And then from
15 2010 up until 2017, Walmart took it upon
16 itself to enhance its SOM program; correct?
17     MR. TABACCHI:  Object to the
18     form.
19     THE WITNESS:  We made
20     enhancements to our program over time.
21     Q.   (BY MR. BOWER) And then
22 finally, at the end of 2017, Walmart decides
23 to go with Buzzeo; right?
24     MS. TABACCHI:  Object to the

Page 435

1     form.
2     THE WITNESS:  We did implement
3     Buzzeo at the end of 2017.
4     Q.   (BY MR. BOWER)  And was the
5 implementation of Buzzeo improvement of
6 Walmart's SOM program?
7     MR. TABACCHI:  Object to the
8     form.
9     THE WITNESS:  It was a
10     continuous evolution and improvement
11     in the automation of orders in how
12     they were flagged.
13     Q.   (BY MR. BOWER)  Okay.  And how,
14 if at all, did the change to Buzzeo impact
15 how orders of controlled substances were
16 flagged?
17     MR. TABACCHI:  Object to the
18     form.
19     THE WITNESS:  It specifically
20     sat ahead of the distribution system.
21     So an order was alerted -- an order
22     that was alerted came to the practice
23     compliance team before going to the
24     logistics team.  So that was an

Page 436

1     improvement.
2     Additionally, there was an
3     algorithm applied that Buzzeo
4     determined to set those thresholds.
5     So those were the largest changes
6     around how the program worked.
7     Q.   (BY MR. BOWER)  And up until
8 you changed to Buzzeo, did Walmart still have
9 in place its minimum thresholds of 20 for
10 titrated [sic] items of controlled
11 substances?
12     MR. TABACCHI:  Object to the
13     form.
14     THE WITNESS:  We had the
15     enhanced thresholds still in place.
16     Q.   (BY MR. BOWER)  And those
17 enhanced thresholds provided for a minimum
18 threshold of 20 per store per item for the
19 titrated items; correct?
20     MR. TABACCHI:  Object to the
21     form.
22     THE WITNESS:  Titrated?
23     Q.   (BY MR. BOWER) Traited.  Sorry.
24 Did I say "titrated"?

Page 437

1     MR. TABACCHI:  You did.
2     MR. BOWER:  I apologize.
3     Traited items.
4     THE WITNESS:  The -- for a
5     traited item, the threshold was 20 or
6     2,000 dosage units.
7     MR. BOWER:  Okay.
8     (Whereupon, Deposition Exhibit
9     Walmart 14, 11-30-17 email from Roxy
10     Reed. Subj: DEA SOM reports,
11     WMT_MDL-000055271-55276, was marked
12     for identification.)
13     Q.   (BY MR. BOWER)  Would you agree
14 with me that when the change to Buzzeo was
15 made, more orders were flagged at Walmart?
16     MR. TABACCHI:  Object to the
17     form.
18     THE WITNESS:  There were more
19     orders that were flagged as orders of
20     interest for review and due diligence.
21     MR. BOWER:  Okay.  You've been
22     handed what's been marked as
23     Exhibit 14.  Take a moment to review
24     it.  Let me know when you're finished.

Highly Confidential – Subject to Further Confidentiality Review

Page 438

1       [Document review.]
2       Q.    (BY MR. BOWER) Okay?
3       A.    Yes.
4       Q.    Have you seen this document in
5   preparation for your deposition today?
6       A.    Yes.
7       Q.    And this is the letter from
8   Walmart to the DEA reflecting the change in
9   its SOM reporting in the wake of Masters;
10  correct?
11      A.    Yes.
12      Q.    Okay.  And I think we've
13  already covered that, so I just want to ask a
14  little bit about the actual report itself.
15  Okay?
16          Would these orders on this
17  report have been flagged in the Buzzeo
18  system?
19          MR. TABACCHI:  Object to the
20  form.
21      Q.    (BY MR. BOWER) Well, I'll
22  strike that.  I'll take a step back in light
23  of the objection.
24          Do you see that the

Page 439

1   communication to the DEA attaches what
2   Walmart describes as its list of orders that
3   Walmart's SOM system has identified?
4           Do you see that?
5       A.    Yes.
6       Q.    Okay.  And that list is
7   attached; correct?
8       A.    Yes.
9       Q.    Are those -- were those orders
10  flagged by the Buzzeo algorithm?
11      A.    Yes.  Yes, I believe this is
12  the time.
13      Q.    So it appears, if you just look
14  at a couple of examples here, that orders are
15  being flagged, dosage units of 100; correct?
16      A.    Yes.
17      Q.    Those are one bottle; correct?
18      A.    Yes.
19      Q.    And those orders would have
20  never been flagged under the Reddwerks
21  system; correct?
22          MR. TABACCHI:  Object to the
23  form.
24          THE WITNESS:  Unless there was

Page 440

1   some other indicator, the threshold
2   in -- if there was some other
3   indicator of an issue, the Reddwerks
4   threshold was not set at this level.
5       Q.    (BY MR. BOWER) What do you mean
6   by "some other indicator of an issue"?
7       A.    If for some reason -- again, we
8   had associates who were monitoring orders.
9   If there was --
10      Q.    Let me just read back my
11  question so maybe we can move on.  Okay?  My
12  question is only this.
13          These orders reflected here
14  would not have been flagged under the
15  Reddwerks system.  Correct?
16          MS. TABACCHI:  Zach, I'd
17  appreciate it if you would not
18  interrupt the witness.
19          MR. BOWER:  We all know we have
20  limited time.  The question she was
21  answering was not the question that
22  was pending, and so we need to move
23  forward.
24          MR. TABACCHI:  It's

Page 441

1   disrespectful.
2           MR. BOWER:  I'm not trying to
3   be disrespectful.  I'm just trying to
4   focus --
5           MS. TABACCHI:  You are being
6   disrespectful.
7           MR. BOWER:  I'm just trying to
8   get her answers on the question that's
9   pending.
10          THE WITNESS:  Some of these
11  orders would not have flagged under
12  the advanced Reddwerks.  Some of them
13  would have --
14      Q.    (BY MR. BOWER) Can you identify
15  to us which --
16          MR. TABACCHI:  Again.
17          MR. BOWER:  I'm sorry.  I
18  thought you were finished.  All right.
19  Please finish.
20          THE WITNESS:  Some of them may
21  have flagged.
22      Q.    (BY MR. BOWER) Okay.  Can you
23  identify for us, please, which orders you
24  believe may have flagged under the Reddwerks

Page 442

1  system?
2      MR. TABACCHI:  Object to the
3  form.  Beyond the scope.
4      THE WITNESS:  I can't, because
5  I -- what I don't know is what the
6  deviation might have been from an
7  order that they had placed.
8      Q.    (BY MR. BOWER) Well, I thought
9  we spent a lot of time today discussing
10  that the Reddwerks had a minimum threshold of
11  20 bottles which would be 2,000 dosage units.
12  Is that not correct?
13      MS. TABACCHI:  Object to the
14  form.
15      THE WITNESS:  Yes.  As I was
16  looking through, I don't see anything
17  that's in a higher -- a 500-count
18  bottle.  I see the doses now.
19      Q.    (BY MR. BOWER) So would you
20  agree with me that none of the orders that
21  are reflected on Exhibit 14 would have been
22  flagged under the Reddwerks threshold system?
23      MR. TABACCHI:  Object to the
24  form.

Page 443

1      THE WITNESS:  That is correct.
2      Q.    (BY MR. BOWER) And this says
3  October of 2017; correct?
4      A.    Correct.
5      Q.    Buzzeo is implemented, more
6  orders are being flagged; correct?
7      A.    There are more orders of
8  interest being flagged for due diligence.
9      Q.    This is approximately seven
10  years after Buzzeo first approaches Walmart
11  to work on its SOM program; correct?
12      MR. TABACCHI:  Object to the
13  form.
14      THE WITNESS:  It's seven years
15  after the presentation was made in
16  2010.
17      Q.    (BY MR. BOWER) And a few
18  months later after this, Walmart decides to
19  stop distributing controlled substances;
20  correct?
21      MS. TABACCHI:  Object to the
22  form.  Beyond the scope.
23      THE WITNESS:  We did stop
24  distributing C-IIs in April of 2018.

Page 444

1      Q.    (BY MR. BOWER) Who made the
2  decision at Walmart to stop distributing
3  C-IIs?
4      MR. TABACCHI:  Objection,
5  beyond the scope of the notice.
6      THE WITNESS:  I don't know
7  exactly.  It would have been the
8  leadership of health and wellness --
9  the leadership of health and wellness
10  at the time.
11      Q.    (BY MR. BOWER)  Were any
12  members of Walmart's board or any committees
13  of the board participants in that decision?
14      MR. TABACCHI:  Object to the
15  form, beyond the scope of the notice.
16      THE WITNESS:  I don't know the
17  board's involvement in the decision to
18  discontinue distribution.
19      Q.    (BY MR. BOWER)  Is it a fair
20  statement that that's not something you
21  prepared for to testify on today?
22      MR. TABACCHI:  Object to the
23  form.
24      THE WITNESS:  Can you clarify?

Page 445

1      MR. BOWER:  Sure.
2      Q.    (BY MR. BOWER)  Do you know
3  whether anyone at the board level or any of
4  its committees was involved in the decision
5  to stop distributing controlled II
6  substances?
7      MR. TABACCHI:  Objection,
8  beyond the scope.
9      THE WITNESS:  I don't know the
10  extent that the board would have been
11  involved.
12      Q.    (BY MR. BOWER)  And --
13      A.    In that decision.
14      Q.    And just my -- I'm not trying
15  to be -- I'll strike that.
16      Is that something you prepared
17  to testify on today?
18      A.    I did not prepare on the
19  board's knowledge of our discontinuation of
20  controlled substances.
21      Q.    So as you sit here today, you
22  don't know one way or the other whether the
23  board had knowledge of that decision; is that
24  correct?

Page 446

1    A.   I don't know whether the board
2    was -- I don't know that --
3    Q.   Okay.
4    A.   -- information.
5    Q.   Are you familiar with anyone
6    who was involved in that decision?
7         MR. TABACCHI:  Objection,
8    beyond the scope.
9         THE WITNESS:  Yes.
10   Q.   (BY MR. BOWER)  Okay.  And who
11   were those folks?
12   A.   The person that I heard the
13   information from that was the head of Walmart
14   health and wellness was George Riedl.
15   Q.   And how did you hear that
16   information?
17   A.   It was in a meeting.
18   Q.   Okay.  Can we go back to
19   Exhibit 9 for a moment?
20        One -- I just want to clear up
21   one thing.
22        Do you have that in front of
23   you?
24   A.   Exhibit 9, yes.

Page 447

1    Q.   And I'm just using this to
2    maybe frame my questions regarding the
3    controlled substances advisory panel.
4         Do you see that reference in
5    the first email there from Miranda to
6    Tim Koch?  The last bullet point and on the
7    second clear bullet point, she says, "Working
8    on outline on what she needs to research and
9    who so we can add this data to present at the
10   next CS advisory panel."
11        Do you see that?
12   A.   Yes.
13        MR. TABACCHI:  Objection,
14   beyond the scope.
15   Q.   (BY MR. BOWER)  And "CS
16   advisory panel" refers to controlled
17   substances advisory panel?
18   A.   Yes.
19   Q.   Under certain circumstances was
20   that panel involved in reviewing orders that
21   had been flagged?
22        MR. TABACCHI:  Objection,
23   beyond the scope.  I'm also going to
24   instruct the witness not to answer

Page 448

1    with respect to any communications
2    within the context of the controlled
3    substances advisory panel as
4    privileged.
5         MR. BOWER:  Well, that -- that
6    panel made SOM decisions, so I think
7    I'm entitled to ask about it.  Are you
8    going to -- so let's try to cut
9    through this.
10   Q.   (BY MR. BOWER)  Are you going
11   to refuse to answer questions on the
12   controlled substances advisory panel today?
13   A.   To the extent that they're
14   privileged conversations, I could answer
15   general questions.
16   Q.   Okay.  Okay.  So my question
17   that's pending is, under certain
18   circumstances, was the controlled substance
19   advisory panel involved in making decisions
20   of whether to ship orders of interest?
21        MR. TABACCHI:  I'm just going
22   to caution the witness not to reveal
23   the substance of privileged
24   communications.  If you can answer

Page 449

1    that question without discussing
2    privileged communications, you may.
3         THE WITNESS:  So our policy
4    was -- and it's stated in policy,
5    that -- I'm trying to find it.
6         That the panel was involved in
7    oversight of the program.  And if a
8    decision could not be made as to
9    whether an order was suspicious
10   between consultation with the director
11   of compliance and the head of
12   logistics, that order -- the process
13   was to bring that order before the
14   panel.
15   Q.   (BY MR. BOWER)  Okay.  When was
16   the controlled substances advisory panel
17   first formed at Walmart?
18        MR. TABACCHI:  Objection,
19   beyond the scope.
20        THE WITNESS:  To the best of my
21   knowledge, it was sometime in 2014.
22   It may have been a little bit before
23   that.
24   Q.   (BY MR. BOWER)  And who -- who

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1 was on the panel when it was formed in 2014?
2     A.    So the -- it would have been
3 compliance -- practice compliance associates,
4 logistics, asset protection, quality
5 improvement, and operations representatives,
6 as well as legal.
7     Q.    And what was the purpose of the
8 panel?
9         MR. TABACCHI:  Objection.  To
10 the extent that the question calls for
11 you to reveal the substance of
12 attorney-client communications, I will
13 instruct you not to answer.
14     If you can answer without
15 revealing privileged communications,
16 you may.
17         THE WITNESS:  One --
18         MR. TABACCHI:  And if you are
19 unsure, we can -- we can discuss
20 whether there's a privilege issue.  I
21 just don't know what ...
22         MR. BOWER:  If you want to take
23 some time to discuss it, I'm happy to
24 give you that time.

Page 451

1         THE WITNESS:  Could --
2         MR. TABACCHI:  Do you want to
3 discuss it?  The privilege issue?
4         THE WITNESS:  Yes, please.
5         MR. TABACCHI:  Okay.
6         THE VIDEOGRAPHER:  5:24.  We
7 are off the video record.
8         (Recess taken, 5:24 p.m. to
9 5:34 p.m.)
10         THE VIDEOGRAPHER.  5:35.  We
11 are on the video record.
12     Q.    (BY MR. BOWER)  Okay.  We're
13 back on the record, Ms. Hiland.  I understand
14 you may be answering one of the questions I
15 asked earlier; is that correct?
16     A.    Yes.
17     Q.    Please go ahead.
18     A.    So you asked me that question
19 as to the involvement in the Controlled
20 Substances Advisory Panel in making a
21 determination about whether or not an order
22 was suspicious.  And I interviewed
23 Chad Ducote, Debbie Hodges, and
24 Miranda Burris, who all told me that, in

Page 452

1 following the policy and the stepped approach
2 of order review, none of the orders was ever
3 unresolved and therefore was not escalated to
4 the panel.
5     Q.    Okay.  Thank you for that.
6         What did the control
7 advisory -- Controlled Substance Advisory
8 Panel do?
9     A.    The panel was charged with
10 reviewing certain programs, policies, that
11 related to substances with the advice and
12 guidance of counsel present.
13     Q.    Did the panel review data
14 regarding controlled substances monitoring?
15         MR. TABACCHI:  I'm going to
16 instruct the witness not to answer
17 with respect to the inner workings of
18 the controlled substances advisory
19 panel.  Those communications are
20 privileged.
21     If you can answer the question
22 based on your interviews of Walmart
23 associates that were not privileged,
24 you may do that.

Page 453

1         THE WITNESS:  I don't have any
2 information outside of the panel
3 activities that were privileged.
4     Q.    (BY MR. BOWER)  So, in other
5 words, you can't answer my question without
6 divulging what your attorney has deemed to be
7 attorney-client privileged information;
8 correct?
9     A.    Yes.
10     Q.    Did the panel make any
11 recommendations with respect to changes to
12 Walmart's controlled substance monitoring
13 program?
14         MR. TABACCHI:  Object to the
15 form.  And instruct the witness not to
16 reveal the substance of any privileged
17 communications.  If you can answer
18 that with information that you have
19 that is not based on communications
20 with counsel, you may do that.
21         THE WITNESS:  I wouldn't be
22 able to answer that without revealing
23 attorney-client-privileged
24 information.

Highly Confidential - Subject to Further Confidentiality Review

Page 454

1    Q.    (BY MR. BOWER) Did the
2  Controlled Substance Advisory Panel make a
3  recommendation to Walmart's board of
4  directors that Walmart should exit the
5  business of distributing controlled
6  substances?
7        MR. TABACCHI: I'm going to
8    instruct the witness not to answer the
9    question. It's beyond the scope of
10   the notice.
11       THE WITNESS: I won't be able
12   to answer that question.
13   Q.    (BY MR. BOWER) Do you know
14  whether the controlled substances advisory
15  panel ever made an analysis of whether
16  Walmart should continue to distribute
17  controlled II substances?
18       MR. TABACCHI: I'm going to
19   instruct the witness not to answer the
20   question on the grounds that it's
21   protected by the attorney-client
22   privilege.
23       If you have information in
24   response to Mr. Bower's question based

Page 455

1  on your association with Walmart
2  associates that did not involve
3  communications with counsel, you may
4  answer.
5        THE WITNESS: I won't be able
6    to answer that question.
7        MR. BOWER: Why don't we take a
8    quick break. I don't have too much
9    time left on the record, so I can
10   prioritize the rest of my notes.
11   Okay?
12       THE VIDEOGRAPHER: 5:37. We
13   are off the video record.
14       (Recess taken, 5:37 p.m. to
15   5:57 p.m.)
16       THE VIDEOGRAPHER: 5:57. We
17   are on the video record.
18       THE WITNESS: If I could, could
19   I add some information to a prior
20   question that you asked me?
21   Q.    (BY MR. BOWER) Your counsel
22  will have time to ask you questions at the
23  end, so I would ask that you save any
24  statements for questions from your counsel.

Page 456

1  Okay?
2    A.    Okay.
3    Q.    Unless it's -- is it something
4  that your memory has been refreshed over the
5  break?
6    A.    It is information specific to
7  one of the exhibits.
8    Q.    Okay. Well, I guess it's a
9  little bit unusual, but let's hear it.
10   A.    So in -- as we were talking
11  about the exhibit that -- I'll have to find
12  it -- that showed our reporting post
13  Masters --
14   Q.    Mm-hmm.
15   A.    -- of orders of interest, where
16  we reported orders of interest prior to due
17  diligence to determine whether or not they
18  were suspicious?
19   Q.    Okay.
20   A.    We did report those to DEA.
21  And after that reporting, we had two
22  different DEA offices contact us and ask us
23  why we were reporting those and asked us to
24  stop reporting.

Page 457

1    Q.    Okay. Thank you for that.
2        (Whereupon, Deposition Exhibit
3    Walmart 15, 6-21-16 email from Patsy
4    Little. Subj: Oxycodone marketing
5    plan, MNK-T1_0004830712, was marked
6    for identification.)
7        MR. BOWER: You've been handed
8    what's been marked as Exhibit 15.
9        MS. TABACCHI: Do you have a
10   copy for me?
11       MR. BOWER: Oh, sorry.
12   Q.    (BY MR. BOWER) In preparation
13  for today's deposition, did you inquire
14  whether Walmart engaged in any marketing for
15  opioid products?
16       MS. TABACCHI: Objection,
17   beyond the scope.
18       THE WITNESS: I did read the
19   interrogatory and the response.
20   Q.    (BY MR. BOWER) Okay. Did you
21  talk to Ms. Little regarding monitoring for
22  oxycodone?
23       MS. TABACCHI: Same objection.
24       THE WITNESS: I did not

Highly Confidential – Subject to Further Confidentiality Review

Page 458

1    interview Patsy Little in my
2    preparation.
3        Q.    (BY MR. BOWER)  Okay.  Do you
4    see Exhibit 15 is an email from Ms. Little to
5    folks at Mallinckrodt?  Do you see that?
6        A.    Yes.
7        Q.    Mallinckrodt is a manufacturer
8    of oxycodone; correct?
9        MS. TABACCHI:  Beyond the
10   scope.
11       THE WITNESS:  Yes.
12       Q.    (BY MR. BOWER) And Ms. Little's
13   inquiring about the oxycodone marketing plan;
14   correct?
15       MS. TABACCHI:  Beyond the
16   scope.  Objection, lack of foundation.
17       THE WITNESS:  She's asking for
18   an outline.
19       Q.    (BY MR. BOWER) Are you prepared
20   to testify today regarding whether Walmart
21   considering -- considered the marketing of
22   opioid products to physicians prior to
23   purchasing those products?
24       MS. TABACCHI:  Objection,

Page 459

1    beyond the scope.  Object to the form.
2        THE WITNESS:  My preparation
3        indicates that we did not participate
4        in marketing of opioids.
5        Q.    (BY MR. BOWER)  But my question
6    is a little bit different.  Did Walmart
7    consider that, marketing plans that were
8    going to be implemented by manufacturers in
9    deciding whether to purchase opioid products?
10       MS. TABACCHI:  Objection.
11       Object to the form, beyond the scope.
12       THE WITNESS:  I don't have that
13       detail.
14       MR. BOWER:  Okay.
15       Q.    (BY MR. BOWER)  Would you agree
16   with me that Walmart -- sorry, just give me a
17   second.
18       Would you agree with me that
19   Walmart was involved in NACDS going back to
20   the early 2000s?
21       A.    Yes.
22       MS. TABACCHI:  Object to the
23       form.
24       (Whereupon, Deposition Exhibit

Page 460

1    Walmart 16, Chain Pharmacist Practice
2    Memo.  Vol. 6/Number 9,
3    PKY181864224-PKY181864229, was marked
4    for identification.)
5        Q.    (BY MR. BOWER)  You've been
6    handed what's been marked as Exhibit 16 to
7    today's deposition.
8        Just for the record, this is a
9    Purdue document that was produced as
10   non-confidential.  Bates number is
11   PKY181864224.  And it's a chain pharmacist
12   practice memo from September 2002.
13       Have you ever seen anything
14   like this before, ma'am?
15       MS. TABACCHI:  Object to the
16       form.  Beyond the scope.
17       THE WITNESS:  I've received
18       information -- I don't know if I've
19       received chain practice memo, but I
20       received communication from NACDS.
21       Q.    (BY MR. BOWER)  From time to
22   time, did NACDS provide chain pharmacist
23   practice memos to its members?
24       MS. TABACCHI:  Object to the

Page 461

1    form.
2        THE WITNESS:  It appears to.
3        Q.    (BY MR. BOWER)  And would you
4    agree with me that, if Walmart had been a
5    member in 2002, that it would have
6    received -- likely received this memo?
7        MS. TABACCHI:  Object to the
8        form.
9        THE WITNESS:  As a member we
10       would have had access to
11       communication.
12       Q.    (BY MR. BOWER)  And I just have
13   a couple of questions on this memo, then.
14       Do you see it says "Special
15   Issue:  Prescription Drug Misuse and Abuse."
16       Do you see that?
17       A.    Yes.
18       Q.    And do you see that it notes
19   that hydrocodone may be the most abused drug?
20       A.    I see that.
21       Q.    And then it goes on to mention
22   hydrocodone again kind of at the bottom,
23   right above the "Age and gender differences
24   in prescribing drug abuse trends."

Highly Confidential - Subject to Further Confidentiality Review

---

Page 462

1 Do you see right above that it
2 says, "Hydrocodone may be the most widely
3 misused opiate?"
4 Do you see that?
5 A. Yes.
6 Q. Okay. Would you agree with me
7 that if Walmart had received this document in
8 2002, it should have acted to do something
9 about hydrocodone abuse at that time?
10 MS. TABACCHI: Object to the
11 form. Beyond the scope. Lack of
12 foundation.
13 THE WITNESS: We had policies
14 in place related to the dispensing of
15 hydrocodone, and they were intended to
16 detect, prevent diversion across our
17 controlled substance obligations.
18 Q. (BY MR. BOWER) And what
19 policies did you have in place regarding the
20 dispensing of hydrocodone in 2002?
21 MS. TABACCHI: Objection,
22 beyond the scope.
23 THE WITNESS: The policies that
24 applied to our controlled substances

---

Page 463

1 would have applied -- would have been
2 inclusive of hydrocodone.
3 Q. (BY MR. BOWER) Do you see in
4 the next page it referenced opiophobia in the
5 bottom there? "Inappropriate pain management
6 and opiophobia"?
7 A. Yes, I see that.
8 Q. Have you ever heard that term
9 before?
10 MS. TABACCHI: Objection,
11 beyond the scope.
12 THE WITNESS: I don't believe I
13 have.
14 Q. (BY MR. BOWER) Do you
15 believe -- let me focus your attention on the
16 bottom of that box there. The last two
17 sentences say, "Most patients being
18 adequately treated for severe pain do not
19 abuse or become addicted to their
20 medications. One study found that only four
21 out of 12,000 patients given opioids for
22 acute pain become addicted."
23 Do you see that?
24 A. I see that here.

---

Page 464

1 Q. Do you believe that if Walmart
2 had distributed it to its pharmacists, that
3 it would have been accurate information?
4 MS. TABACCHI: Object to the
5 form. Beyond the scope of the notice.
6 Improper hypothetical. Lack of
7 foundation.
8 THE WITNESS: I don't see a
9 reference to the study, so I couldn't
10 verify the information.
11 Q. (BY MR. BOWER) As you sit here
12 today, do you believe that only four out of
13 12,000 patients given opioids for acute pain
14 management become addicted?
15 MS. TABACCHI: Object to the
16 form. Beyond the scope of the notice.
17 THE WITNESS: I don't know.
18 And I don't have a specific reference
19 to an addiction rate.
20 Q. (BY MR. BOWER) Well, it sounds
21 pretty low, doesn't it? Four out of 12,000?
22 Would you agree it sounds pretty low?
23 MS. TABACCHI: Object to the
24 form. Beyond the scope of the notice.

---

Page 465

1 THE WITNESS: That would be a
2 low number.
3 Q. (BY MR. BOWER) And would you
4 agree with me that, if this information had
5 been distributed to Walmart pharmacists, that
6 Walmart had an obligation to correct any
7 misleading information in this memo?
8 MS. TABACCHI: Object to the
9 form. Beyond the scope of the notice.
10 THE WITNESS: I don't know that
11 we would have correct -- to the extent
12 that it might have been counter to our
13 policy, we would restate policy. But
14 factual representations, I don't -- I
15 don't know that we would correct that
16 without having a reference to base any
17 correction on.
18 Q. (BY MR. BOWER) Did Walmart at
19 any point have any policies or procedures to
20 prevent opioid manufacturers from
21 communicating directly with its pharmacists?
22 MS. TABACCHI: Object to the
23 form. Beyond the scope of the notice.
24 THE WITNESS: The extent that I

---

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1  know about our relationship with drug
2  reps would be the way that I would
3  represent that.
4      Not specific to opioids.  More
5  related to other products such as
6  immunizations.  We have asked specific
7  manufacturers not to detail our
8  pharmacies and instead to work through
9  either someone at the home office or
10  even the regional manager so that
11  they're not actually out in the
12  stores.
13      Q.    (BY MR. BOWER)  Has Walmart
14  ever asked Purdue to stop communicating with
15  its pharmacists regarding opioid products?
16      MS. TABACCHI:  Object to form.
17  Beyond the scope of the notice.
18      THE WITNESS:  I don't know the
19  extent that that conversation would
20  have happened with Purdue.
21      Q.    (BY MR. BOWER)  Has Walmart
22  ever asked Mallinckrodt to stop communicating
23  with its pharmacists regarding opioid
24  products?

Page 467

1      MS. TABACCHI:  Object to the
2  form.  Beyond the scope of the notice.
3      THE WITNESS:  I don't have that
4  information.
5      Q.    (BY MR. BOWER)  Has Walmart
6  ever looked for any correlation in dispensing
7  between opioids and opioid rescue drugs?
8      MS. TABACCHI:  Object to the
9  form.  Beyond the scope of the notice.
10      THE WITNESS:  Not to my
11  knowledge.
12      Q.    (BY MR. BOWER)  Okay.  Do you
13  think such information could have been
14  informative to developing Walmart's SOM
15  program?
16      MS. TABACCHI:  Same objections.
17      THE WITNESS:  I don't know what
18  the comparison would be, so -- so I'm
19  not sure how it would apply to our
20  duty to have policies and procedures
21  in place to detect suspicious orders.
22      I don't know if I'm making the
23  connection.
24      Q.    (BY MR. BOWER)  Does NACDS

Page 468

1  include in its membership opioid
2  manufacturers?
3      MS. TABACCHI:  Object to the
4  form.
5      THE WITNESS:  I believe there
6  is a category of membership for
7  suppliers.  It's different than the
8  category of membership for pharmacy
9  members.
10      Q.    (BY MR. BOWER)  Okay.  And do
11  you know whether Walmart has ever allowed any
12  opioid manufacturer to provide CLE programs
13  to its pharmacists?
14      MS. TABACCHI:  Object to the
15  form, beyond the scope of the notice.
16      THE WITNESS:  I don't know that
17  specifically.
18      Q.    (BY MR. BOWER)  Do you --
19      A.    That there was a sponsored CE
20  program.
21      We use CE programs for our
22  pharmacists through pharmacist letter.
23  And -- and so generally that's what -- the
24  source of CE.  That's Walmart provided.  I

Page 469

1  don't have any information to anything other
2  than that.
3      Q.    Okay.  For example -- let me be
4  a little more specific.  Are you aware of
5  whether Purdue has ever provided educational
6  programs to Walmart pharmacists regarding
7  OxyContin?
8      MS. TABACCHI:  Object to the
9  form, beyond the scope of the notice.
10      THE WITNESS:  Not that I
11  recall.
12      Q.    (BY MR. BOWER)  Are you
13  familiar with whether Purdue has ever
14  provided information to Walmart pharmacists
15  regarding opioid abuse?
16      MS. TABACCHI:  Same objection.
17      THE WITNESS:  Not that I recall
18  specifically.
19      Q.    (BY MR. BOWER)  Did you inquire
20  anything about that in preparation for today?
21      MS. TABACCHI:  Objection,
22  beyond the scope.
23      THE WITNESS:  I did not.  I did
24  not.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 470

1    Q.   (BY MR. BOWER)  Okay.  You
2   didn't inquire whether any manufacturers ever
3   provided any marketing materials to
4   pharmacists; is that correct?
5        MS. TABACCHI:  Object to the
6    form.  Beyond the scope of the notice.
7        THE WITNESS:  No.
8    Q.   (BY MR. BOWER)  Okay.  Are you
9   familiar with a civil enforcement action
10  brought against -- strike that.
11       Are you familiar with a civil
12  enforcement action brought against Walmart
13  pharmacies in the District of Texas regarding
14  violations of the CSA?
15       MS. TABACCHI:  Object to the
16   form.  Beyond the scope of the notice.
17       THE WITNESS:  Could you -- I'm
18  sorry, I didn't mean --
19       MS. TABACCHI:  No, I'm sorry.
20  Is there a -- I apologize.  Is there a
21  plug?
22       MR. BOWER:  Why don't we go off
23  the record.
24       THE VIDEOGRAPHER:  6:10 p.m.

---

Page 471

1   We are off the video record.
2        (Recess taken, 6:11 p.m. to
3   6:11 p.m.)
4        THE VIDEOGRAPHER:  6:11.  We
5   are on the video record.
6    Q.   (BY MR. BOWER)  All right.
7   We're back on the record.  And let me just
8   re-ask you the last question that was pending
9   before we went off.
10       Are you familiar with a civil
11  enforcement action brought against Walmart
12  pharmacies in the District of Texas regarding
13  violations of the CSA?
14       MS. TABACCHI:  Object to the
15   form.
16       THE WITNESS:  I believe so.
17  Can you orient me to date?
18   Q.   (BY MR. BOWER)  On or about
19  2006 or '7?
20   A.   Yes.
21   Q.   And what do you know about that
22  action?
23       MS. TABACCHI:  Objection,
24  beyond the scope.

---

Page 472

1        THE WITNESS:  I know that it
2   was specific to follow-up
3   investigation of five of our
4   pharmacies, and the -- the result was
5   found to be a violation of
6   recordkeeping -- a recordkeeping
7   violation, and specifically that
8   related to our pharmacy not having
9   invoices onsite.  Walmart had the
10  invoices, but the receiving pharmacy
11  did not have invoices onsite.  That
12  was the majority of the violation.
13   Q.   (BY MR. BOWER)  And so you would
14  agree with me, would you not, that the
15  federal government found that "Accountability
16  audits did not match the drugs on hand
17  revealing major overages and shortages in
18  accounting of controlled substances, and that
19  there were missing invoices for controlled
20  substances"?
21       MS. TABACCHI:  Object to the
22   form.  It's beyond the scope of the
23   notice.  If you're going to read
24   something to the witness, please

---

Page 473

1   provide the document.
2    Q.   (BY MR. BOWER)  Would you agree
3   that the federal government made that finding
4   against Walmart?
5        MS. TABACCHI:  Object to the
6    form, beyond the scope of the notice.
7   Same objection.
8        THE WITNESS:  So I don't know
9   the language of the decision today.
10  But my understanding was -- and I was
11  involved in the audits.  We accounted
12  for every tablet that was -- that was
13  identified in the audit.  The DEA had
14  used a drug in the audit that was --
15  they were -- they were counting the
16  wrong drug and using the wrong audit
17  information.
18       And so I personally audited and
19  provided documents to the DEA,
20  balanced those accounts, and the
21  out -- the ultimate outcome was that
22  we had a pharmacy that was missing
23  multiple invoices.
24       That's my understanding.

---

Page 474

```
1    Without seeing the document, I -- my
2    understanding is different than the
3    detail that you've provided.
4       Q.   (BY MR. BOWER)  And your
5    understanding is that the DEA had essentially
6    had it wrong, and that you were able to
7    correct them.  Is that accurate?
8       MS. TABACCHI:  Object to the
9    form.  Misstates the testimony.
10      THE WITNESS:  I worked with the
11   DEA agent at the Houston field office
12   and provided them documentation.  They
13   didn't -- they didn't accept all of
14   the documentation, but the
15   documentation was there, and it is a
16   fact that they counted the wrong drug.
17      Q.   (BY MR. BOWER)  And it's also a
18   fact --
19      A.   In the audits.
20      Q.   Sorry, I didn't mean to cut you
21   off.  Do you want to finish?
22      A.   I am done.
23      Q.   Sorry about that.
24      It's also a fact, isn't it,
```

Page 475

```
1    that Walmart paid over $600,000 to the
2    federal government in connection with that
3    investigation?
4       MS. TABACCHI:  Object to the
5    form.  Beyond the scope of the notice.
6       THE WITNESS:  That's correct.
7    And it was -- it was a multiple of the
8    number of invoices that were missing.
9       Q.   (BY MR. BOWER)  How many
10   invoices were missing?
11      MS. TABACCHI:  Same objections.
12      THE WITNESS:  I'd have to go
13   back and count.  But we had them.  We
14   knew what -- what the finding entailed
15   specific to those invoices.  I just
16   don't recall today.
17      Q.   (BY MR. BOWER)  You haven't
18   seen those documents in connection with this
19   case, have you?
20      MS. TABACCHI:  Object to the
21   form.
22      THE WITNESS:  I -- not in
23   12 years.
24      Q.   (BY MR. BOWER)  Okay.  You
```

Page 476

```
1    didn't review them in preparing for your
2    deposition today; correct?
3       A.   I did not prepare.
4       MR. BOWER:  I know I'm running
5    short on time, but I want to try to
6    clear up one more thing on the record.
7    I'll note while you're reviewing this
8    document that I do have additional
9    questions on Walmart's SOM program and
10   other issues in addition to the issues
11   on the controlled substances advisory
12   panel.  So we will be seeking more
13   time for this witness.  I assume you
14   won't give us that time today; is that
15   correct?
16      MS. TABACCHI:  You are correct.
17      (Whereupon, Deposition Exhibit
18   Walmart 17, August 2014 email chain.
19   Subj: SOM Reqs, WMT-MDL_000028599, was
20   marked for identification.)
21      MR. BOWER:  I just thought we
22   might be able to cut it short and go
23   another hour.
24      MS. TABACCHI:  I don't believe
```

Page 477

```
1    you're entitled to more time.
2       Q.   (BY MR. BOWER)  So you've been
3    handed what's marked as Exhibit 17.  And we
4    spoke earlier about Walmart's ability to hold
5    an order while it was being evaluated.
6       Do you recall that?
7       A.   Yes.
8       Q.   Okay.  And this is an email
9    from Ms. Spruell to Miranda Gan and Miranda
10   Johnson in 2014.  Do you see that?
11      A.   Yes.
12      Q.   And Ms. Spruell writes that "It
13   is critical that we not ship any part of
14   suspicious orders so that the functionality
15   to hold an order pending evaluation is
16   absolutely required."
17      Do you see that?
18      A.   I see that.
19      Q.   Okay.  Do you recall when
20   Walmart obtained the ability to hold an order
21   pending evaluation?
22      MS. TABACCHI:  Object to the
23   form.
24      THE WITNESS:  My understanding
```

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1    is that it was with the -- with the
2    Reddwerks enhancement.
3        Q.    (BY MR. BOWER)  And that would
4    have been entered by August 2015; correct?
5        A.    That would be correct.
6        Q.    Okay.  So Kristy Spruell writes
7    this email to Miranda Gan and
8    Miranda Johnson, Ms. Sullins and Brian Wagner
9    in August of 2014; correct?
10            MS. TABACCHI:  Object to the
11       form.
12            THE WITNESS:  Yes, that's the
13       date on this.
14       Q.    (BY MR. BOWER) And she notes
15   that "This functionality is critical."
16   Right?
17            MS. TABACCHI:  Object to the
18       form.  This is beyond the scope of the
19       notice, this document.
20       Q.    (BY MR. BOWER)  This document
21   just for the record is specifically related
22   to the SOM.  Right?
23            MS. TABACCHI:  It's
24       specifically related to DC 6001.

Page 479

1        Q.    (BY MR. BOWER)  And so my
2    question is, right, you've already testified
3    as to when Walmart first had this capability;
4    right?  August 20th of '15.
5            MS. TABACCHI:  Same objections.
6            THE WITNESS:  This was a
7        systematic ability to hold the order.
8            MR. BOWER:  Right.
9            THE WITNESS:  The challenge
10       with the system has been how the
11       orders were pended and whether or not
12       the entire order had to be pended in
13       the previous Reddwerks system or
14       whether an individual order could be
15       broken out and pended.
16            And so that -- because
17       Miranda Gan was working on systems,
18       that's -- the questions are arising
19       out of how do we make that process.
20       How do we improve that process so that
21       the entire order doesn't have to be
22       pended.
23       Q.    (BY MR. BOWER)  Right.  And
24   your previous testimony regarding when

Page 480

1    Walmart first had that capability would have
2    applied to DC 6045; correct?
3            MS. TABACCHI:  Object to the
4        form.
5            THE WITNESS:  Yes.
6        Q.    (BY MR. BOWER)  What are Buzzeo
7    algorithms?
8        A.    It's a proprietary calculation
9    that Buzzeo provides in its service.
10       Q.    Was Walmart able to provide
11   Buzzeo the information it requested in
12   developing those algorithms for Walmart?
13            MS. TABACCHI:  Object to the
14       form.
15            THE WITNESS:  I know that there
16       was communication around our ability
17       to -- they requested order
18       information.  We didn't have the full
19       historical set of information.  And so
20       we did provide what we had available
21       and then provided shipping data for
22       the full time frame that they were --
23       that they were interested in.
24       Q.    (BY MR. BOWER)  And what are

Page 481

1    Buzzeo's stress bars?
2            MS. TABACCHI:  Object to the
3        form.
4            THE WITNESS:  Those were -- to
5        my understanding in my interviews with
6        Miranda Johnson and Roxy Reed, those
7        were indicators about the alert that
8        was coming through the Buzzeo system.
9        Q.    (BY MR. BOWER)  Okay.  And did
10       Buzzeo also have a numeric indicator for each
11   order that was communicated to Walmart?
12            MS. TABACCHI:  Object to the
13       form.
14            THE WITNESS:  There was a --
15       yes, there was a numeric indicator.
16       Q.    (BY MR. BOWER) Was Walmart
17   involved in developing any of those
18   algorithms or indicators or did it rely on
19   Buzzeo for their development?
20            MS. TABACCHI:  Object to the
21       form.
22            THE WITNESS:  The way that I
23       understand it is the indicators were
24       developed by Buzzeo, and then the way

Page 482

1  that we utilized and reviewed those as
2  we were performing due diligence was
3  part of the program that we applied.
4        MS. TABACCHI:  I would just
5  like to ask, are we out of time?
6        THE VIDEOGRAPHER:  About a
7  minute.
8        MR. BOWER:  We have a minute
9  left.
10       MS. TABACCHI:  One minute.  Go
11 ahead.
12       MR. BOWER:  Are you going to
13 cut me off right at seven hours even
14 though we've made several statements
15 on the record that I objected to?
16       I'm just asking so I know.
17       MS. TABACCHI:  We should
18 conclude the deposition when you're
19 out of time.
20       MR. BOWER:  So I have more
21 questions, so I'm going to keep asking
22 until your counsel cuts me off, okay?
23    Q.   (BY MR. BOWER)  Would you agree
24 that Buzzeo was the first dynamic formula

Page 483

1  that applied to Walmart's orders of
2  substances?
3        MS. TABACCHI:  Object to the
4  form.
5        THE WITNESS:  I know it's been
6  described that way.  The prior process
7  that looked at a 30 percent --
8  30 percent over the four-week average,
9  that changed -- those alerts in
10 Reddwerks changed.  And then of course
11 we were adjusting, improving, making
12 changes to the programs.
13       So I believe we had movement,
14 and change over time.  I think the
15 qualification of dynamic, it was a --
16 it was a robust system with the
17 algorithm that was applied.
18       MS. TABACCHI:  I do believe
19 that the deposition -- that we're past
20 seven hours now; is that correct?
21       THE VIDEOGRAPHER:  We are.
22       MR. BOWER:  So I think you just
23 cut it off.  She was finishing her
24 answer.

Page 484

1        MS. TABACCHI:  I'm sorry.  Were
2  you not finished?
3        THE WITNESS:  I think I was.
4        MR. BOWER:  Okay.
5        And I take it that you won't
6  let me ask any follow-up questions at
7  least on that question.  Is that
8  correct?
9        MS. TABACCHI:  I mean, I think
10 we're -- you know, you've chose to use
11 your time in the way that you've used
12 your time.  You know, I don't know
13 what additional questions you have,
14 but, you know, we've been here for all
15 day.  It's dark.  It's -- you know,
16 it's almost 6:30.
17       MR. BOWER:  This is a big
18 important case.  We want to get to --
19 we need to get all of the facts out.
20 So we have more questions.
21       MS. TABACCHI:  The witness has
22 been here all day for you, so I think
23 we'll take a break now and we'll be
24 back in a moment.

Page 485

1        MR. BOWER:  So -- do you mean
2  for your questions or do you mean to
3  give me more time?
4        MS. TABACCHI:  We're going to
5  go off the record and take a break and
6  we'll be back in a moment.
7        MR. BOWER:  Okay.  While we're
8  still on the record, do you have any
9  questions for this witness?
10       MS. TABACCHI:  We'd like to
11 take a break, and then we will come
12 back.
13       MR. BOWER:  So before you know
14 whether you're going to have
15 questions, you're going to take a
16 break; is that correct?
17       MS. TABACCHI:  Correct.
18       THE VIDEOGRAPHER:  6:23.  We
19 are off the video record.
20       (Recess taken, 6:22 p.m. to
21 6:25 p.m.)
22       MS. TABACCHI:  We don't have to
23 go back on the record, because we
24 don't have any questions.

Page 486

1    We have no questions for this
2  witness.  So we can conclude for
3  today.
4        THE VIDEOGRAPHER:  6:26.  We
5  are on the video record.
6        Any further questions?
7        MS. TABACCHI:  No.  Thank you.
8        THE VIDEOGRAPHER:  6:27.  We
9  are off the video record.  This
10  concludes the video deposition.
11        (Proceedings recessed at 6:27
12  p.m.)
13        --o0o--
14
15
16
17
18
19
20
21
22
23
24

Page 488

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8        After doing so, please sign the
9  errata sheet and date it.
10        You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14        It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of receipt
17  of the deposition transcript by you.  If you
18  fail to do so, the deposition transcript may
19  be deemed to be accurate and may be used in
20  court.
21
22
23
24

Page 487

1            CERTIFICATE
2        I, DEBRA A. DIBBLE, Registered
   Diplomate Reporter, Certified Realtime
3  Reporter, Certified Realtime Captioner,
   Certified Court Reporter and Notary Public,
4  do hereby certify that prior to the
   commencement of the examination, Walmart
5  30(b)(6), Witness Susanne Hiland, was duly
   sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7        I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
        I DO FURTHER CERTIFY that pursuant
11  to FRCP Rule 30, signature of the witness was
   not requested by the witness or other party
12  before the conclusion of the deposition.
13        I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
   action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
   that I am not financially interested in the
16  action.
17
18
19
   _____
20  DEBRA A. DIBBLE, RDR, CRR, CRC
   NCRA Registered Diplomate Reporter
21  NCRA Certified Realtime Reporter
   Certified Court Reporter
22
   Dated: 22 January 2019
23
24

Page 489

1            ERRATA
2  PAGE LINE CHANGE
3  ____ ____ _____
4     REASON: _____
5  ____ ____ _____
6     REASON: _____
7  ____ ____ _____
8     REASON: _____
9  ____ ____ _____
10     REASON: _____
11  ____ ____ _____
12     REASON: _____
13  ____ ____ _____
14     REASON: _____
15  ____ ____ _____
16     REASON: _____
17  ____ ____ _____
18     REASON: _____
19  ____ ____ _____
20     REASON: _____
21  ____ ____ _____
22     REASON: _____
23  ____ ____ _____
24     REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1     ACKNOWLEDGMENT OF DEPONENT
2
3
4      I, Walmart 30(b)(6) witness
      Susanne Hiland, do hereby certify that I have
5     read the foregoing pages and that the same is
      a correct transcription of the answers given
6     by me to the questions therein propounded,
      except for the corrections or changes in form
7     or substance, if any, noted in the attached
      Errata Sheet.
8
9
10
11
12     _____

      Susanne Hiland - Walmart 30(b)(6)     DATE
13
14
15

      Subscribed and sworn to before me this
16     _____ day of _____, 20 _____.
17    My commission expires: _____
18
19     _____
20    Notary Public
21
22
23
24

Page 491

1     LAWYER'S NOTES
2
3  PAGE   LINE
4   _____  _____   _____
5   _____  _____   _____
6   _____  _____   _____
7   _____  _____   _____
8   _____  _____   _____
9   _____  _____   _____
10  _____  _____   _____
11  _____  _____   _____
12  _____  _____   _____
13  _____  _____   _____
14  _____  _____   _____
15  _____  _____   _____
16  _____  _____   _____
17  _____  _____   _____
18  _____  _____   _____
19  _____  _____   _____
20  _____  _____   _____
21  _____  _____   _____
22  _____  _____   _____
23  _____  _____   _____
24  _____  _____   _____
25