```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5     ----------------------------x

 6     IN RE: NATIONAL PRESCRIPTION   ) Case No.

 7     OPIATE LITIGATION              ) 1:17-MD-2804

 8     APPLIES TO ALL CASES           ) Hon. Dan A. Polster

 9     ----------------------------x

10

11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12                 CONFIDENTIALITY REVIEW

          VIDEOTAPED DEPOSITION OF PAMELA HINKLE

13

                        WASHINGTON, D.C.

14

                   THURSDAY, JANUARY 24, 2019

15

                         9:06 A.M.

16

17

18

19

20

21

22

23

24     Reported by: Leslie A. Todd
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1  Deposition of PAMELA HINKLE, held at the law
2  offices of:
3
4
5       ZUCKERMAN SPAEDER, LLP
6       1800 M Street, N.W.
7       Suite 1000
8       Washington, D.C. 20036
9       (202) 778-1801
10
11
12
13  Pursuant to notice, before Leslie Anne Todd,
14  Court Reporter and Notary Public in and for the
15  District of Columbia, who officiated in
16  administering the oath to the witness.
17
18
19
20
21
22
23
24

Page 3

1          A P P E A R A N C E S
2
3  ON BEHALF OF PLAINTIFFS:
4       WILLIAM BAKER, ESQUIRE
5       BRIAN ROOF, ESQUIRE
6       WEISMAN, KENNEDY & BERRIS, LLP
7       101 West Prospect Avenue, Suite 1600
8       Cleveland, Ohio 44115
9       (216) 781-1111
10
11       JAMES A. DEROCHE, ESQUIRE
12       GARSON JOHNSON ATTORNEYS, LLC
13       101 W. Prospect Avenue
14       Midland Building, Suite 1610
15       Cleveland, Ohio 44115
16       (216) 696-9330
17
18  ON BEHALF OF CVS HEALTH AND THE WITNESS:
19       ALEXANDRA W. MILLER, ESQUIRE
20       KYLE A. CRAWFORD, ESQUIRE
21       ZUCKERMAN SPAEDER, LLP
22       1800 M Street NW, Suite 1000
23       Washington, D.C. 20036-5807
24       (202) 778-1801

Page 4

1  APPEARANCES (Continued):
2  ON BEHALF OF CARDINAL HEALTH:
3       JOSEPH S. BUSHUR, ESQUIRE
4       KATELYN ADAMS, ESQUIRE (Telephonically)
5       WILLIAMS & CONNOLLY LLP
6       725 Twelfth Street, N.W.
7       Washington, D.C. 20005
8       (202) 434-5107
9
10  ON BEHALF OF McKESSON CORPORATION:
11       MEGHAN MONAGHAN, ESQUIRE
12       COVINGTON & BURLING LLP
13       One City Center
14       850 Tenth Street, N.W.
15       Washington, D.C. 20001-4956
16       (202) 662-5261
17
18  ON BEHALF OF WALMART:
19       CHRISTINE D. PROROK, ESQUIRE (Telephonically)
20       PATRICK DuBOIS, ESQUIRE (Telephonically)
21       JONES DAY
22       77 West Wacker Drive
23       Chicago, Illinois 60601-1692
24       (312) 782-3939

Page 5

1  APPEARANCES (Continued):
2       JUSTIN C. TAYLOR, ESQUIRE (Telephonically)
3       BAILEY & WYANT, PLLC
4       Suite 600
5       500 Virginia Street East
6       Charleston, West Virginia 25301
7       (304) 345-4222
8
9  ON BEHALF OF HBC COMPANY:
10       ELLY HELLER-TOIG, ESQUIRE (Telephonically)
11       MARCUS & SHAPIRA LLP
12       One Oxford Centre, 35th Floor
13       Pittsburgh, Pennsylvania 15219
14       (412) 471-3490
15
16  ON BEHALF OF AMERISOURCEBERGEN:
17       M. JANE BRANNON, ESQUIRE (Telephonically)
18       JON L. ANDERSON, ESQUIRE (Telephonically)
19       JACKSON KELLY, PLLC
20       175 East Main Street
21       Lexington, Kentucky 40507
22       (859) 288-2805
23
24

Page 6

1  APPEARANCES (Continued):
2
3  ON BEHALF OF ENDO PHARMACEUTICALS AND PAR:
4     DAVID KOUBA, ESQUIRE (Telephonically)
5     ARNOLD & PORTER KAYE SCHOLER LLP
6     601 Massachusetts Avenue, N.W.
7     Washington, DC 20001-3743
8     (202) 942-5435
9
10 ALSO PRESENT:
11    PATTI CARDINAL (Telephonically)
12    AMY KENNEDY (Telephonically)
13    STEPHANIE HACKMAN (Paralegal)
14    ZACH HONE (Trial technician)
15    DANIEL HOLMSTOCK (Videographer)
16
17
18
19
20
21
22
23
24

Page 7

1         C O N T E N T S
2  EXAMINATION OF PAMELA HINKLE          PAGE
3     By Mr. Baker              12, 299
4     By Mr. DeRoche                238
5
6         E X H I B I T S
7       (Attached to transcript)
8  CVS-HINKLE DEPOSITION EXHIBITS        PAGE
9  No. 40  E-mail re FW: Top 10 Report Review,
10    Bates CVS-MDLT1-000019491        300
11 No. 41  E-mail string re FW: Attorney/Client
12    Privileged Information, Bates
13    CVS-MDLT1-000083855 to 000083856    48
14 No. 203  E-mail string The CVS Retunement,
15    Bates CVS-MDLT1-000022040 to
16    000022053                259
17 No. 207  Required Headcount to Complete
18    IRR SOM Process, Bates CVS-MDLT1-
19    000029884                263
20 No. 223  E-mail string re IRR Recap...
21    Privileged and Confidential/
22    Attorney Client Privilege, Bates
23    CVS-MDLT1-000110414 (with
24    attachment)              271

Page 8

1       E X H I B I T S (Continued)
2       (Attached to transcript)
3  CVS-HINKLE DEPOSITION EXHIBITS        PAGE
4  No. 228  IRR dated October 2nd, 2011,
5    Bates CVS-MDLT1-000056304 to
6    000056341                276
7  No. 229  Document titled "October 2011
8    Control IRR Recap"            286
9  No. 231  Document titled "November 2011
10    Control IRR Recap"           296
11 No. 232  IRR recap for November 29, 2011,
12    Bates CVS-MDLT1-000056888 to
13    000056908                287
14 No. 500  Dear Registrant letter from the
15    DEA to CVS TN Distribution, Inc.,
16    dated December 27, 2007, Bates
17    CVS-MDLT1-000115464 to 000115466   187
18 No. 508  Document titled "List I Chemicals
19    (PSE, EPH) and Control Drug Policy
20    & Procedure, Bates CVS-MDLT1-
21    000009812 to 000009814        206
22 No. 509  E-mail string re IRR Narratives,
23    Bates CVS-MDLT1-000109803 to
24    000109806                216

Page 9

1       E X H I B I T S (Continued)
2       (Attached to transcript)
3  CVS-HINKLE DEPOSITION EXHIBITS        PAGE
4  No. 511  E-mail string re IRR Narratives,
5    Bates CVS-MDLT1-000109843 to
6    000109859                220
7  No. 512  CVS Distribution Center, Controlled
8    Drug - DEA Standard Operating
9    Procedures Manual, Bates CVS-MDLT1-
10    000021018 to 000021083        201
11 No. 513  CVS Corporation, Item Review
12    Report, Control Drugs, Bates
13    CVS-MDLT1-000024496 to 000024497   194
14 No. 514  PSE IRR Report reports, Bates
15    CVS-MDLT1-000020397 to 000020412   102
16 No. 516  E-mail string re IRR/SOM
17    Retunement BSR_LOG_61148, Bates
18    CVS-MDLT1-000057759          26
19 No. 522  E-mail re Emailing: DEA Speaking
20    Points IRR.ppt, Bates CVS-MDLT1-
21    000088134 to 000088146        73
22 No. 523  E-mail re FW: [Blank], Bates
23    CVS-MDLT1-000020425 to 000020428
24    (with attachment)            150

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1      E X H I B I T S (Continued)

2      (Attached to transcript)

3   CVS-HINKLE DEPOSITION EXHIBITS     PAGE

4   No. 536 E-mail re Justication (2).docx,

5     Bates CVS-MDLT1-000033498 to

6     000033499        81

7   No. 538 E-mail string re FW: The CVS

8     Retunement Attorney Client

9     Privilege, Bates CVS-MDLT1-

10     000022040 to 000022053     59

11   No. 550 E-mail string re Attorney

12     Privileged and confidential,

13     Bates CVS-MDLT1-000100265 to

14     000100268        97

15   No. 554 E-mail re DEA Closing Remarks,

16     Bates CVS-MDLT1-000008385 to

17     000008386       179

18

19

20

21

22

23

24

Page 11

1      P R O C E E D I N G S

2      --------------------

3     THE VIDEOGRAPHER: We are now on the

4 record. My name is Daniel Holmstock. I am the

5 videographer for Golkow Litigation Services.

6     Today's date is January 24, 2019. The

7 time on the video screen is 9:06 a.m.

8     This deposition is being held at the law

9 offices of Zuckerman Spaeder, LLP, at 1800 M

10 Street, Northwest, Suite 1000, in Washington,

11 D.C., in the matter of In Re: National

12 Prescription Opiate Litigation, MDL No. 2804,

13 pending before the United States District Court

14 for the Northern District of Ohio, Eastern

15 Division.

16     The deponent today is Pam Hinkle.

17     Counsel will be noted for appearances on

18 the stenographic record.

19     The court reporter is Leslie Todd, who

20 will now administer the oath.

21      PAMELA HINKLE,

22    and having been first duly sworn,

23    was examined and testified as follows:

24      DIRECT EXAMINATION

Page 12

1 BY MR. BAKER:

2   Q   Your name is Pam Hinkle?

3   A   Yes, sir.

4   Q   And are you represented by Ms. Miller

5 sitting next to you?

6   A   Yes, sir.

7   Q   Okay. Ms. Miller also represents CVS?

8   A   Yes, sir.

9   Q   Okay. Where are you employed?

10   A   Where?

11   Q   Where are you employed?

12   A   CVS.

13   Q   There are certainly different names for

14 CVS entities. Which entity employs you?

15     MS. MILLER: Object to form.

16     THE WITNESS: CVS Logistics.

17 BY MR. BAKER:

18   Q   Okay. Throughout this deposition, there

19 will be many times that Ms. Miller says "Object"

20 or "Object to form." Just so you know, that --

21 she's probably told you, but I'm just going to

22 repeat it -- that that doesn't mean that you

23 should fail to answer the question. It's just

24 what lawyers do is they object, and then that just

Page 13

1 preserves the opportunity later to maybe go to a

2 judge to try to reformulate something referencing

3 the question or the answer.

4     So I don't want you to be thrown off,

5 and I don't want to stop and have a lot of pause

6 between my question and your answer simply because

7 the word "Object to form" or that phrase is said.

8 Okay?

9   A   Yes, sir.

10   Q   And if she tells you to not answer the

11 question, then that is her prerogative, and you

12 should obey whatever she tells you to do because

13 she is your lawyer. Okay?

14   A   Yes, sir.

15   Q   But the only time you wouldn't answer is

16 when she says, I'm instructing her not to answer.

17 Okay?

18     And also with my questions, I'm going to

19 try to be as direct as I can be. And I would

20 appreciate it in response if you could be as

21 direct in the response as you could be too. It

22 will help us move through this smoothly, and I

23 would appreciate it if you would do that. Okay?

24   A   Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q   All right.
2        MS. MILLER:  I'm going to just object to
3   the opening.
4   BY MR. BAKER:
5    Q   All right.  So CVS Logistics, that's the
6   department within which you work at CVS, correct?
7    A   Yes, sir.
8    Q   All right.  What is the name of the
9   company that you work for?
10   A   CVS.
11   Q   Okay.  All right.  So what is your job
12  title -- what -- tell me when you first -- strike
13  all that.
14       When did you first go to work for CVS?
15   A   1977.
16   Q   And what was your job at that time?
17   A   General warehouse.
18   Q   Which warehouse did you work at?
19   A   In the Knoxville distribution center.
20   Q   And what were your duties?
21   A   General warehouse.  Just different
22  things:  Picking, inventory control, just general
23  warehouse at that point.
24   Q   Did any of that have to do with

Page 15

1   controlled substances or not?
2    A   No, sir.
3        MS. MILLER:  Object to form.
4        Just give me a chance --
5   BY MR. BAKER:
6    Q   Ma'am --
7        MS. MILLER:  -- after he asks his
8   question to object.
9   BY MR. BAKER:
10   Q   -- did any of your duties have anything
11  to do with controlled substances in the warehouse
12  at that time?
13       MS. MILLER:  Object to form.
14       THE WITNESS:  No, sir.
15  BY MR. BAKER:
16   Q   Okay.  You continued in that position
17  until when?
18   A   Approximately 1980s, 1982, '83.
19   Q   Then what did your position and title
20  become?
21   A   I was a supervisor for our front store
22  products.
23   Q   Within the logistics department in
24  Knoxville?

Page 16

1    A   Yes, sir.
2    Q   What did that job title entail insofar
3   as daily duties?
4    A   I had oversight to the pickers and
5   stockers in the front store warehouse.
6    Q   All right.  Did those job duties have
7   any connection with any controlled substances or
8   not?
9    A   No, sir.
10   Q   All right.  How long did you remain in
11  that position?
12   A   Approximately 1990 -- '97, I went into
13  the pharmacy.
14   Q   Okay.  And was that in Knoxville?
15   A   Yes, sir.
16   Q   Okay.  Explain the pharmacy, because
17  most people would think of a pharmacy as something
18  in the nature of a store, and -- and you're
19  talking about a pharmacy inside of a distribution
20  center; is that right?
21       MS. MILLER:  Object to form.
22       THE WITNESS:  Yes, sir.
23  BY MR. BAKER:
24   Q   Okay.  Explain the nature of a pharmacy

Page 17

1   within a distribution center as opposed to how
2   somebody might envision it as a pharmacy in a
3   shopping center or a pharmacy in a standalone
4   store.
5        MS. MILLER:  Object to form.
6        THE WITNESS:  The pharmacy within a
7   distribution center is where you pick, pack and
8   ship.  And I oversaw that process in the pharmacy.
9   BY MR. BAKER:
10   Q   Okay.  So it's the pharmacy department
11  within the warehouse?
12   A   Yes, sir.
13   Q   Okay.  And the pharmacy department
14  within the warehouse, does that include controlled
15  substances?
16   A   Yes, sir.
17   Q   Were you having anything to do with
18  controlled substances at that point?
19   A   Yes, sir.
20   Q   And that would have been from 1997 until
21  when?
22   A   Approximately 2003 -- '02, '03.
23   Q   Okay.  What was your promotion in 2003?
24       MS. MILLER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

BY MR. BAKER:

1
2   Q   What did your job title become in 2002,
3   2003?
4   A   The loss prevention manager.
5   Q   Was that in the Knoxville distribution
6   center?
7   A   Yes, sir.
8   Q   What were the duties associated with
9   your job as loss prevention manager from 2000 --
10  2002, 2003 onward?
11  A   Oversight to the security of that
12  particular building.
13  Q   And did you continue in that position
14  for a period of years?
15  A   Yes, sir.
16  Q   How many years?
17  A   Approximately 2008, I became the
18  regional loss prevention manager.
19  Q   Okay.  When you were the loss prevention
20  manager in the Knoxville distribution center from
21  2003 to approximately 2008, did your job have any
22  connection with controlled substances?
23      MS. MILLER:  Object to form.
24  BY MR. BAKER:

Page 19

1   Q   Go ahead.
2   A   Security of the areas, yes, sir.
3   Q   What does that mean, the security of the
4   areas in connection with controlled substances?
5   A   Ensuring that they are following the
6   guidelines around the security of those areas.
7   Q   Such as the -- the vault and the fencing
8   and that sort of thing?
9       MS. MILLER:  Object to form.
10      THE WITNESS:  It was not a vault.  We
11  don't carry C-IIs.
12  BY MR. BAKER:
13  Q   Okay.
14  A   It would have been just the areas, the
15  secured areas, the caged areas, the DEA-approved
16  areas.
17  Q   Okay.  Did you have anything to do with
18  monitoring those controlled substances that were
19  within those caged areas?
20      MS. MILLER:  Object to form.
21      THE WITNESS:  Not in the security
22  capacity, no, sir.
23  BY MR. BAKER:
24  Q   Did you have anything to do during those

Page 20

1   years between 2003 and '08 with the suspicious
2   order monitoring system, if any, at CVS?
3       MS. MILLER:  Object to form.
4       THE WITNESS:  Not that I recall, sir.
5   BY MR. BAKER:
6   Q   All right.  What happened in 2008?
7   A   2000 --
8       MS. MILLER:  Object.
9   BY MR. BAKER:
10  Q   Go ahead.
11      MS. MILLER:  Pam, just give me a chance
12  after he asks his question to object.  Go ahead.
13  BY MR. BAKER:
14  Q   What did your position become in 2008?
15      MS. MILLER:  Object to form.
16  BY MR. BAKER:
17  Q   You just testified that you worked from
18  2003 to two -- approximately 2008 in the position
19  that you said, and then I asked you what did your
20  position become next in approximately 2008.
21      Is that question clear?
22      MS. MILLER:  Object to form.
23      THE WITNESS:  Yes, sir, it is clear.
24  BY MR. BAKER:

Page 21

1   Q   What's the answer to that question?
2   A   I was the liaison between the
3   distribution centers LP and the operations from a
4   compliance component.
5   Q   How long did you remain in that
6   position?
7   A   I'm still currently in that position.
8   Q   Okay.  So I wrote down you're the
9   liaison between the distribution centers loss
10  prevention and operations compliance; is that
11  right?
12      MS. MILLER:  Object to form.
13      THE WITNESS:  Yes, sir.
14  BY MR. BAKER:
15  Q   Okay.  So what is the name of your
16  position?
17  A   Senior manager.
18  Q   Senior manager of what?
19  A   Logistics, quality and compliance.
20  Q   Let me make sure I have this straight.
21  So from 2008 up to the present time, have you held
22  that position?
23  A   Yes, sir.
24  Q   And from 2008 to the present time, your

Page 22

1  position has been senior manager of logistics,
2  quality and compliance. Is that right?
3      A   Yes, sir.
4      Q   What are your duties in that position?
5      A   I support the distribution centers when
6  any of the government agencies visits that they
7  should have. I work with the distribution centers
8  around remodels. If they should be doing a
9  remodel in their pharmacies, what that would
10  involve. I meet with government agencies as
11  needed. Specific to new buildings, when we
12  construct new buildings and getting those
13  approvals, working with those government agencies.
14      Q   Since your promotion to senior manager
15  of logistics, quality and compliance in 2008, what
16  involvement have you had in that position with the
17  suspicious order monitoring program as it relates
18  to controlled substances distributed by CVS
19  distribution centers to CVS pharmacies?
20      A   I had oversight.
21      Q   What does that mean?
22      A   I had oversight to reviews for
23  suspicious order monitoring.
24      Q   Okay. Could you go into more detail

Page 23

1  about what that means so I could understand what
2  your job duties are in that respect.
3      MS. MILLER: Object to form.
4      THE WITNESS: I had oversight from
5  approximately '11 till roughly the end of '12.
6  BY MR. BAKER:
7      Q   Could you explain what the job duties
8  exactly meant on a daily basis when you said you
9  had oversight?
10      MS. MILLER: Object to form.
11      THE WITNESS: There were individuals
12  that actually worked for me.
13  BY MR. BAKER:
14      Q   And these were during what years?
15      A   2011 till approximately the end of '12,
16  maybe a little into '13.
17      Q   All right. Between 2008 and 2010, what
18  was your involvement, if any, with the suspicious
19  order monitoring program at CVS as it related to
20  distribution of Schedule III controlled substances
21  out of distribution centers to CVS pharmacies?
22      MS. MILLER: Object to form.
23      THE WITNESS: I had no day-to-day
24  responsibilities.

Page 24

1  BY MR. BAKER:
2      Q   Did the day-to-day responsibilities
3  start in 2011 as it related to suspicious order
4  monitoring of controlled substances out of the CVS
5  distribution centers to CVS pharmacies?
6      MS. MILLER: Object to form.
7      THE WITNESS: Yes, sir.
8  BY MR. BAKER:
9      Q   And what exactly were those duties from
10  2011 through 2012?
11      A   There were individuals that worked for
12  me that conducted the reviews of the daily
13  reports.
14      Q   And what did you do personally in your
15  position from 2011 through 2012 as it related to
16  the suspicious order monitoring program at CVS in
17  connection with the distribution of controlled
18  substances from CVS distribution centers to CVS
19  pharmacies?
20      MS. MILLER: Object to form.
21      THE WITNESS: I managed the individuals
22  that reviewed the reports, sir.
23  BY MR. BAKER:
24      Q   Explain how you managed them. What

Page 25

1  exactly did you do?
2      MS. MILLER: Object to form.
3      THE WITNESS: They would conduct their
4  reviews, and we would have discussions around
5  those particular reviews. Any orders of interest
6  that were identified, we would have further
7  discussions. They would conduct their due
8  diligence, and I would review the due diligence
9  with them. Any orders that we believed to be
10  potentially suspicious, we would then take to
11  several other folks for discussions.
12  BY MR. BAKER:
13      Q   Just so I'm clear, as I understand your
14  testimony -- and I want you to tell me if I'm
15  correct or incorrect in what I'm going to state --
16  it's my understanding that your involvement
17  directly with the suspicious order monitoring
18  program at CVS began in 2011. Is that correct or
19  incorrect?
20      MS. MILLER: Object to form.
21      THE WITNESS: That is correct, sir.
22  BY MR. BAKER:
23      Q   Okay. What month in 2011 did that
24  begin?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    MS. MILLER: Object to form.
2    THE WITNESS: Sir, I don't remember.
3 BY MR. BAKER:
4    Q   Okay. I want you to assume there was an
5 e-mail that indicated that in March of 2011 that
6 the program had been moved to Knoxville, and that
7 you were taking over the program at that point.
8    Does that sound consistent with the time
9 frame that you think the program moved to
10 Knoxville?
11    MS. MILLER: Object to form.
12    THE WITNESS: That would be approximate,
13 sir.
14    MR. BAKER: Could you pull up
15 number 516, please.
16    (Exhibit No. 516 was premarked for
17    identification.)
18 BY MR. BAKER:
19    Q   This is an e-mail that's dated 3/14/11
20 from John Mortelliti to Ellen Demetrius, with a
21 copy going to you. And it says: "The IRR process
22 has been shifted to our Knoxville DC with the LP
23 analyst position. I have forwarded the info to
24 Pam Hinkle, who will be overseeing the process

Page 27

1 going forward."
2    Do you see that?
3    A   I do see that, sir.
4    Q   Is that consistent with when you recall
5 the program moving to Knoxville?
6    MS. MILLER: Object to form.
7    THE WITNESS: That sounds roughly about
8 the time, sir.
9 BY MR. BAKER:
10    Q   Do you know where it had been -- been
11 moved from in order to move it to Knoxville?
12    MS. MILLER: Object to form.
13    THE WITNESS: It was located in our
14 Lumberton distribution center.
15 BY MR. BAKER:
16    Q   Okay. And that was with John
17 Mortelliti; is that right?
18    A   Yes, sir.
19    Q   All right. At any time are you aware of
20 the program being operated out of all of the
21 distribution centers as opposed to being operated
22 out of Lumberton, New Jersey's distribution
23 center?
24    MS. MILLER: Object to form.

Page 28

1    THE WITNESS: I don't recall, sir.
2 BY MR. BAKER:
3    Q   Okay. Fair enough.
4    Would it be fair to say that your
5 recall, to the best of your recollection at least,
6 is that the program -- the suspicious order
7 monitoring program moved directly from the
8 Lumberton, New Jersey distribution center to the
9 Knoxville distribution center in or about the time
10 that this e-mail was written in March of 2012?
11    MS. MILLER: Object to form.
12    THE WITNESS: That -- yes, sir, that's
13 approximately.
14 BY MR. BAKER:
15    Q   Okay. And it would be -- would it be
16 fair to say that, to the best of your knowledge,
17 the program in Lumberton, New Jersey, was being
18 run by John Mortelliti?
19    MS. MILLER: Object to form.
20    THE WITNESS: Yes, sir.
21 BY MR. BAKER:
22    Q   Okay. And it would -- would it be fair
23 to say that you did not have involvement in the
24 suspicious order monitoring program until

Page 29

1 Mr. Mortelliti relinquished that program to you
2 when it was moved to Knoxville in March of 2011?
3    MS. MILLER: Object to form.
4    THE WITNESS: Yes, sir.
5 BY MR. BAKER:
6    Q   Okay. When the program moved to
7 Knoxville in March of 2011, was your physical
8 office in the distribution center within
9 Knoxville?
10    A   Yes, sir.
11    Q   And was Knoxville one of the
12 distribution centers that was licensed to carry
13 and distribute narcotics?
14    MS. MILLER: Object to form.
15 BY MR. BAKER:
16    Q   Schedule III narcotics?
17    MS. MILLER: Object to form.
18    THE WITNESS: Yes, sir.
19 BY MR. BAKER:
20    Q   Okay. Did that include hydrocodone-
21 combination products?
22    MS. MILLER: Object to form.
23    THE WITNESS: Yes, sir.
24 BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    Q    Okay.  So, at that point you said that
2  you managed people who worked for you.
3  Specifically, I'm interested in the people that
4  you managed that worked for you in the suspicious
5  order monitoring program at the time it was moved
6  to and run out of Knoxville.  Who were those
7  people?
8         MS. MILLER:  Object to form.
9         THE WITNESS:  Shannon Miller.
10 BY MR. BAKER:
11   Q    Okay.  Who else?
12   A    Stephen Cain.
13   Q    Who else?
14   A    Paul Lawson.
15   Q    Who else?
16   A    Aaron Burtner.
17   Q    When you -- when the program first moved
18 to Knoxville in March of 2011, to the best of your
19 recollection at least, correct?
20   A    Yes, sir.
21         MS. MILLER:  Object to form.
22 BY MR. BAKER:
23   Q    And I'm going to say that because we're
24 talking about to the best of your recollection.

Page 31

1  You understand whether that's the actual date,
2  that's the best of your recollection, so that's
3  what I'm working on, okay?
4         MS. MILLER:  Object to form.
5  BY MR. BAKER:
6    Q    Fair enough?
7         MS. MILLER:  Object to form.
8  BY MR. BAKER:
9    Q    Ma'am?
10   A    Yes, sir.
11   Q    Okay.  So when the program first moved
12 to Knoxville in March of 2011, was Ms. Miller
13 working for you at that time or did you hire her
14 after the program moved there?
15        MS. MILLER:  Object to form.
16        THE WITNESS:  He was working for me at
17 the time, sir.
18 BY MR. BAKER:
19   Q    Okay.  I interpreted that to be a
20 female.  Shannon is a male?
21   A    Yes, sir.
22   Q    Okay.  So what was Mr. Miller's position
23 at that time?
24   A    He was the loss prevention supervisor.

Page 32

1    Q    And had Mr. Miller had any prior
2  experience working in the suspicious order
3  monitoring program before the program was moved to
4  Knoxville, to your knowledge?
5    A    No, sir.
6    Q    What was Mr. Miller's training and who
7  trained him to do any job within the suspicious
8  order monitoring system once it moved to
9  Knoxville?
10        MS. MILLER:  Object to form.
11        THE WITNESS:  John Mortelliti.
12 BY MR. BAKER:
13   Q    Okay.  Did John Mortelliti come from the
14 Lumberton distribution center down to Knoxville
15 physically to train Mr. Miller?
16   A    There was both the onsite and via phone
17 calls and conference calls.
18   Q    Okay.  How many times did Mr. Mortelliti
19 come to Knoxville in order to spend time with
20 Mr. Miller to train Mr. Miller to do his job in
21 the suspicious order monitoring program?
22        MS. MILLER:  Object to form.
23        THE WITNESS:  Sir, I don't recall the --
24 BY MR. BAKER:

Page 33

1    Q    All right.  When did Mr. Miller start
2  his job doing anything within the suspicious order
3  monitoring program at Knoxville?
4         MS. MILLER:  Object to form.
5         THE WITNESS:  Sir, I don't recall.
6  BY MR. BAKER:
7    Q    Was Mr. Miller one of the first
8  employees to go to work for you there within the
9  suspicious order monitoring program?
10   A    Yes, sir.
11   Q    Okay.  Do you know how long it was after
12 the program first moved to Knoxville before
13 Mr. Miller started doing any duty within the
14 suspicious order monitoring program?
15        MS. MILLER:  Object to form.
16        THE WITNESS:  I don't recall, sir.
17 BY MR. BAKER:
18   Q    Do you know how long Mr. Miller
19 performed duties within the suspicious order
20 monitoring program at Knoxville once he started
21 working there in that program?
22        MS. MILLER:  Object to form.
23        THE WITNESS:  I -- I don't recall, sir.
24 BY MR. BAKER:

Page 34

1    Q   Do you have any estimation of when that
2  would be?
3        MS. MILLER:  Object to form.
4  BY MR. BAKER:
5    Q   If you assume the program moved to
6  Knoxville in March of 2011, approximately how long
7  after that was it that Mr. Miller started working
8  within the program?
9        MS. MILLER:  Object to form.
10       THE WITNESS:  When it moved to
11 Knoxville, Shannon was -- would have been doing
12 the reviews.  I don't know the dates, sir.
13 BY MR. BAKER:
14   Q   Okay.  Would he have been one of the
15 first people to start doing the reviews once the
16 program moved there?
17   A   Yes, sir.
18       MS. MILLER:  Object to form.
19 BY MR. BAKER:
20   Q   And approximately how long did he
21 continue in that position doing the reviews?  When
22 you say "the reviews," I assume that means the
23 reviews of the IRRs; is that right?
24   A   Yes, sir.

Page 35

1    Q   Okay.  And could you explain to me, to
2  the best of your recollection, how long Mr. Miller
3  was in that position reviewing IRRs.
4    A   Sir, I don't know the length of time.
5  I'm sorry.
6    Q   Okay.  How about Mr. Cain, Stephen Cain,
7  what was his position when the program moved to
8  Knoxville?
9        MS. MILLER:  Object to form.
10       THE WITNESS:  He was hired to conduct
11 the reviews as an analyst, sir.
12 BY MR. BAKER:
13   Q   Okay.  What was Mr. Cain's position
14 relative -- what were his duties on a daily basis
15 relative to -- to the suspicious order monitoring
16 system in Knoxville?
17   A   To review the reports.
18   Q   The item review reports?
19   A   Yes, sir.
20   Q   The IRRs?
21   A   Yes, sir.
22   Q   So did Mr. Cain do anything different
23 than what Mr. Miller did or did they do the same
24 job?

Page 36

1        MS. MILLER:  Object to form.
2        THE WITNESS:  They were doing the same
3  job, sir.
4  BY MR. BAKER:
5    Q   Okay.  And were they both considered LP
6  analysts?
7        MS. MILLER:  Object to form.
8        THE WITNESS:  Yes, sir.
9  BY MR. BAKER:
10   Q   How long did Mr. Cain work in that
11 position at the Knoxville office?
12   A   Sir, I don't recall.
13   Q   I'm going to just ask if you would --
14 if -- if you have to reflect, that's fine, but I
15 have a limited amount of time, and if you take
16 that long to answer between questions -- I
17 understand you're reflecting and trying to
18 remember.  If you don't remember, then if that's
19 your answer, that's fine, you don't remember.  If
20 you do, that's good too.  I'd like to know.
21       But I have a limited amount of time
22 today, and if you take that length of time between
23 each question to answer it, I'm not going to be
24 able to get through my questions.  Okay.  And it's

Page 37

1  going to take a long time to get through them
2  otherwise.  So if you could try to get the flow
3  going a little quicker, I would appreciate it.
4  Okay?
5        All right.  So --
6        MS. MILLER:  Mr. Baker, the witness can
7  take the time she needs to answer your questions.
8        MR. BAKER:  I understand, but it's --
9  it's -- it's every single question is she's taking
10 a good 30 seconds to pause, and it's going to
11 cause me to lose the extent of time I have to go
12 through this deposition.
13 BY MR. BAKER:
14   Q   So if you know the answer, great.  If
15 you don't, just tell me you don't.  Okay?
16       So the next --
17       MS. MILLER:  Object to the colloquy.
18 BY MR. BAKER:
19   Q   All right.  The next question is --
20       MS. MILLER:  You can take the time you
21 need to answer the question.
22 BY MR. BAKER:
23   Q   Okay.  When -- what period of time was
24 Mr. Lawson employed in Knoxville?

Page 38

1      MS. MILLER: Object to form.
2      THE WITNESS: He replaced Stephen.
3  BY MR. BAKER:
4      Q   Paul Lawson replaced Stephen Cain?
5      A   Yes, sir.
6      Q   And what period of time did Aaron
7  Burtner work for you when you were in the
8  Knoxville office?
9      MS. MILLER: Object to form.
10     THE WITNESS: I don't recall, sir.
11 BY MR. BAKER:
12     Q   Okay. Did Mr. Burtner replace anybody?
13     A   Yes, sir. Shannon Miller.
14     Q   Okay. Let me just see if I have it
15 straight. The first two people that worked as LP
16 analysts for you when the SOM program moved to
17 Knoxville were Shannon Miller and Stephen Cain; is
18 that correct?
19     A   Yes, sir.
20     Q   Okay. And later Paul Lawson replaced
21 Stephen Cain; is that right?
22     A   Yes, sir.
23     Q   And later Aaron Miller replaced -- Aaron
24 Burtner replaced Shannon Miller; is that right?

Page 39

1      MS. MILLER: Object to form.
2      THE WITNESS: Yes, sir.
3  BY MR. BAKER:
4      Q   Okay. So when the program moved to
5  Knoxville, was there always two LP analysts or
6  were there at times just one LP analyst?
7      MS. MILLER: Object to form.
8  BY MR. BAKER:
9      Q   Working for you.
10     MS. MILLER: Object to form.
11     THE WITNESS: There was one when it
12 first moved to Knoxville.
13 BY MR. BAKER:
14     Q   Was that Mr. Miller?
15     A   Yes, sir.
16     Q   Okay. And when did it become two?
17     MS. MILLER: Object to form.
18     THE WITNESS: I don't remember the exact
19 date. It was shortly after it moved to Knoxville,
20 and I -- I don't remember the date, sir.
21 BY MR. BAKER:
22     Q   When Mr. Miller was working as the LP
23 analyst, was Mr. Miller reviewing all the IRRs on
24 a daily basis for all -- for the nationwide

Page 40

1  distribution of controlled substances --
2      MS. MILLER: Object to form.
3  BY MR. BAKER:
4      Q   -- out of CVS distribution centers to
5  CVS pharmacies?
6      MS. MILLER: Object to form.
7      THE WITNESS: John Mortelliti would have
8  been supporting Shannon at that time, sir.
9  BY MR. BAKER:
10     Q   In what respect?
11     A   With the reviews. I don't know the
12 exact capacity that they worked together
13 initially. It was when it was moved, though, they
14 had contact with the reviews.
15     Q   If Mr. Mortelliti's testimony is to the
16 effect that when the program moved out of
17 Lumberton, New Jersey, to Knoxville, Tennessee, he
18 no longer reviewed item review reports, would that
19 be inconsistent with your recollection?
20     MS. MILLER: Object to form.
21     THE WITNESS: I don't remember the
22 capacity of what John had with the reviews with
23 Shannon. I know that they worked closely together
24 in the very beginning.

Page 41

1  BY MR. BAKER:
2      Q   Okay. My question is, if
3  Mr. Mortelliti's testimony is to the effect -- I
4  want you to assume it's to the effect that he no
5  longer reviewed IRRs once the program moved from
6  Lumberton, New Jersey, to Knoxville, Tennessee, do
7  you have any reason to disagree with that?
8      MS. MILLER: Object to form.
9  BY MR. BAKER:
10     Q   If that's his testimony.
11     A   I have no reason to -- to disbelieve
12 that, no, sir.
13     Q   Okay. So Mr. Miller, how long did he
14 singularly review IRRs?
15     MS. MILLER: Object to form.
16     THE WITNESS: Sir, I don't remember the
17 specifics on when we hired Stephen Cain. So he
18 would have reviewed the reports working with John
19 Mortelliti at that time when we first moved it
20 until we received that hire, which was Stephen
21 Cain, and I don't remember the time frame of when
22 we hired Stephen Cain.
23 BY MR. BAKER:
24     Q   Okay. So did John Mortelliti actually

Page 42

1  review IRRs, to the best of your recollection,
2  when the program moved to Knoxville?
3      MS. MILLER:  Object to form.
4      THE WITNESS:  Sir, I just don't remember
5  the capacity.  I know that Shannon and John worked
6  together.  I just don't know the capacity of
7  what he actually was doing.  I can't say that he
8  did review, I can't say he didn't review.  I just
9  don't recall.
10 BY MR. BAKER:
11     Q   Okay.  John Mortelliti was physically
12 located in Lumberton the whole time that the
13 program was in Knoxville, right?
14     A   Yes, sir.
15     Q   Okay.  When you say John Mortelliti
16 worked with Shannon Miller, he wasn't physically
17 on site working with Mr. Miller, was he?
18     MS. MILLER:  Object to form.
19     THE WITNESS:  He wasn't physically
20 there, no, sir.
21 BY MR. BAKER:
22     Q   Okay.  You say he worked with
23 Mr. Miller.  Explain what you mean by that and how
24 often he worked with Mr. Miller, to your

Page 43

1  knowledge.
2      MS. MILLER:  Object to form.
3      THE WITNESS:  When it first moved to
4  Knoxville, with John having the oversight prior,
5  he worked with Shannon -- I can't tell you
6  daily -- I don't know if it was daily, but I know
7  that they worked together very closely at the very
8  beginning, sir.
9  BY MR. BAKER:
10     Q   Okay.  Did Mr. Mortelliti have anything
11 to do with training Stephen Cain, to your
12 knowledge?
13     MS. MILLER:  Object to form.
14     THE WITNESS:  I don't recall, sir.
15 BY MR. BAKER:
16     Q   Did Mr. Mortelliti have any -- any
17 duties associated with training Paul Lawson, to
18 the best of your knowledge?
19     MS. MILLER:  Object to form.
20     THE WITNESS:  I -- I don't recall, sir.
21 BY MR. BAKER:
22     Q   Did Mr. Mortelliti have any duties
23 associated with training Aaron Burtner, to the
24 best of your knowledge?

Page 44

1      MS. MILLER:  Object to form.
2      THE WITNESS:  I -- I don't recall.
3  BY MR. BAKER:
4      Q   If Mr. Mortelliti's testimony is to the
5  effect that he trained Mr. Burtner when
6  Mr. Burtner was going to take the position that
7  required him to review IRRs, would you have any
8  reason to disagree with that?
9      MS. MILLER:  Object to form.
10     THE WITNESS:  I have no reason to object
11 to that.
12 BY MR. BAKER:
13     Q   Where was Mr. Burtner physically located
14 when he worked under you at the Knoxville
15 distribution center?
16     MS. MILLER:  Object to form.
17     THE WITNESS:  In the Indianapolis
18 distribution center.
19 BY MR. BAKER:
20     Q   Okay.  Where was Mr. Cain located when
21 he worked for you?
22     A   In the Knoxville distribution center.
23     Q   Where was Mr. Lawson when he worked for
24 you?

Page 45

1      A   In the Knoxville distribution center.
2      Q   So the only one that physically worked
3  outside of the Knoxville distribution center under
4  you would have been Aaron Burtner?
5      MS. MILLER:  Object to form.
6      THE WITNESS:  Yes, sir.
7  BY MR. BAKER:
8      Q   Okay.  Prior to the time that Aaron
9  Burtner came on board to work for you, were all of
10 the IRRs, from the time the program first moved to
11 Knoxville until the time that Mr. Burtner came on
12 board to work under you, reviewed out of the
13 Knoxville distribution center?
14     MS. MILLER:  Object to the form.
15     THE WITNESS:  Yes, sir.
16 BY MR. BAKER:
17     Q   Once Mr. Burtner came on board, there
18 were some IRRs that were reviewed out of the
19 Indiana distribution centers and also some that
20 were reviewed out of the Knoxville distribution
21 center concurrently, correct?
22     A   Yes, sir.
23     Q   Okay.  The person that was reviewing out
24 of the Indiana distribution center was Aaron

Page 46

1 Burtner, correct?
2 　　　MS. MILLER: Object to form.
3 　　　THE WITNESS: Yes, sir.
4 BY MR. BAKER:
5 　　Q　The person reviewing out of the
6 Knoxville distribution center was Paul Lawson at
7 that time; is that correct?
8 　　　MS. MILLER: Object to form.
9 　　　THE WITNESS: Yes, sir.
10 BY MR. BAKER:
11 　　Q　Okay. And how was that split up? In
12 other words, what -- what distribution centers or
13 portion of the country was reviewed by Mr. Lawson
14 as opposed to what distribution centers and
15 portion of the country was reviewed by Aaron
16 Burtner?
17 　　　MS. MILLER: Object to form.
18 　　　THE WITNESS: I don't recall, sir.
19 BY MR. BAKER:
20 　　Q　Was there -- you were the manager to --
21 to make that determination, were you not?
22 　　　MS. MILLER: Object to form.
23 　　　THE WITNESS: I had decisions in that,
24 yes, sir.

Page 47

1 BY MR. BAKER:
2 　　Q　Okay. So what was your decision
3 concerning how things would be split up between
4 the duties that would be performed by Mr. Burtner
5 and the duties that would be performed by
6 Mr. Lawson?
7 　　　MS. MILLER: Object to form.
8 　　　THE WITNESS: Sir, I just don't -- I
9 don't remember. It was so long ago, I don't
10 remember how we -- what -- how we determined that,
11 sir.
12 BY MR. BAKER:
13 　　Q　Okay. How many distribution centers at
14 that time were licensed to carry and distribute
15 Schedule III controlled substances?
16 　　　MS. MILLER: Object to form.
17 　　　THE WITNESS: Sir, I believe there was
18 eight.
19 BY MR. BAKER:
20 　　Q　All right. And were they evenly split
21 such that each one of them had four distribution
22 centers to review the IRR for or -- or was one of
23 them reviewing more than the other?
24 　　　MS. MILLER: Object to form.

Page 48

1 　　　THE WITNESS: Sir, I don't remember -- I
2 just don't remember the split.
3 BY MR. BAKER:
4 　　Q　Okay. So, let's talk about --
5 　　　MR. BAKER: I'm going to take just a
6 five-minute break, okay?
7 　　　THE VIDEOGRAPHER: The time is 9:49 a.m.
8 Going off the record.
9 　　　(Recess.)
10 　　　THE VIDEOGRAPHER: The time is 9:59 a.m.
11 We're back on the record.
12 　　　(Exhibit No. 41 was premarked for
13 　　　identification.)
14 BY MR. BAKER:
15 　　Q　All right. You have in front of you
16 Exhibit 41. Could you turn to the second page,
17 please.
18 　　　And look up there on the screen, if you
19 would, both the first and the second page is right
20 up there on the screen.
21 　　　All right. Go back to the first page.
22 This is an e-mail that is dated July 10, 2012, and
23 it's to you, and it talks about the number of
24 distribution centers in existence at that time.

Page 49

1 It says there are 18 CVS distribution centers,
2 11 are DEA licensed to ship controlled III through
3 V -- controlled substances III through V.
4 　　　Is that consistent with your
5 recollection of the number of distribution centers
6 and the number that were DEA licensed as of that
7 time?
8 　　　MS. MILLER: Object to form.
9 　　　THE WITNESS: That -- yes, sir, that
10 would be.
11 BY MR. BAKER:
12 　　Q　Okay. It was on page 2 that the
13 order -- that the volume of orders -- do you see
14 the bullet where the cursor is right there? It
15 says: "Orders for 1,800 or 2,000 stores are
16 processed each night."
17 　　　Is that to the best of your recollection
18 how many stores' orders were processed each night?
19 　　　MS. MILLER: Pam, you can take a moment
20 to look at the document in front of you.
21 　　　Object to form.
22 BY MR. BAKER:
23 　　Q　I'll withdraw the question.
24 　　　Ma'am, does that document say "Volumes

Page 50

1  of orders, Rx controls, substances III through V
2  and PSE comprises 30,000 to 40,000 line items"?
3  Is that what that document say -- is that what it
4  says?
5      MS. MILLER:  Bill, if you can help
6  direct her, I think she's more comfortable with
7  the hard copy.
8      MR. BAKER:  Okay.
9      MS. MILLER:  Just help direct her where
10 in the e-mail.
11 BY MR. BAKER:
12     Q   Yeah.
13     MS. MILLER:  The one she's looking at.
14 BY MR. BAKER:
15     Q   Right here (indicating), does this say:
16 Volume of Orders, RX Controls (Substance III
17 through V) and PSE comprises 30,000 to 40,000 line
18 items?  Are those words on that e-mail?
19     MS. MILLER:  Object to form.
20 BY MR. BAKER:
21     Q   Are they?
22     A   Yes, sir, they are.
23     MR. BAKER:  Okay.  Did that pick up --
24     THE VIDEOGRAPHER:  Of course.

Page 51

1      MR. BAKER:  Okay.
2  BY MR. BAKER:
3      Q   All right.  Now, I'm going to ask -- as
4  I go through questions, I'm going to point to
5  certain sections of the e-mail and ask if that's
6  what it says, and then if it says that, I would
7  appreciate if you would just say "yes" if I'm
8  saying it accurately.  If I'm not, then tell me
9  I'm not.  Fair enough?
10     A   Yes, sir.
11     MR. BAKER:  Okay.  So let's pull 538.
12 BY MR. BAKER:
13     Q   When I hand you a document, it doesn't
14 mean that I'm going to refer to every single word
15 in the document because -- I'm handing you the
16 whole document so that I can go through certain
17 portions of the document with you, okay?
18     A   Yes, sir.
19     MS. MILLER:  Object to form.
20 BY MR. BAKER:
21     Q   All right.  So this is called a
22 "Retunement."
23     Go to the next page.  Go to the next
24 page.  Next page.

Page 52

1      Do you see at the top of this document
2  it says "Retunement" right here?
3      MS. MILLER:  Object to form.
4  BY MR. BAKER:
5      Q   Retunement.
6      MS. MILLER:  Yeah, I just would ask that
7  you would help direct her on the hard copy.  This
8  is --
9      MR. BAKER:  Oh, I am.
10     MS. MILLER:  -- comfortable for her, so
11 that when you're talking --
12     MR. BAKER:  I am.  Sure.
13     MS. MILLER:  -- she understands where
14 you're pointing to in the document.
15     MR. BAKER:  I got you.
16 BY MR. BAKER:
17     Q   I'm going to point to the hard copy and
18 the -- the highlighted will be up on the board for
19 you to look at, okay?
20     A   Yes, sir.
21     Q   So that way we can follow it.
22     Now, turn back to page 1 of the e-mails.
23 Do you see it says at the bottom:  "Attached is
24 the CVS Retunement document"?

Page 53

1      And this is February 9, 2011, from
2  RobertWilliamson@Cegedim.com.  Do you see that?
3      A   I do see that, sir.
4      Q   Okay.  And you see where this is called
5  "Retunement" right here?
6      MS. MILLER:  Object to form.
7      THE WITNESS:  I do, sir.
8  BY MR. BAKER:
9      Q   Okay.  Have you ever reviewed this
10 document before today other than outside of the
11 presence of your counsel?
12     MS. MILLER:  Yeah.  And just object,
13 work-product grounds.
14     Just to be clear, you may answer the
15 question to the extent it doesn't reveal
16 communications during meetings with counsel.
17 BY MR. BAKER:
18     Q   Have you seen this document before you
19 met with your counsel?
20     A   (Peruses document.)  Sir, I don't recall
21 seeing the document.  It vaguely looks familiar.
22 I just don't recall.
23     Q   Okay.  During the time that you worked
24 in your position within the suspicious order

Page 54

1 monitoring system at Knoxville, that would have
2 been from your testimony that you told me
3 approximately March of 2011 through some period in
4 2012; is that correct?
5      MS. MILLER: Object to form.
6      THE WITNESS: Yes, sir, that would be
7 correct.
8 BY MR. BAKER:
9    Q   And approximately what period in 2012
10 was that?
11      MS. MILLER: Object to form.
12      THE WITNESS: Sir, I can't remember.
13 I -- I just can't remember.
14 BY MR. BAKER:
15    Q   Okay. From March of 2011 to December of
16 2011 is approximately nine months, correct?
17    A   Yes, sir.
18    Q   Okay. And then from January of 2012
19 through December of 2012 is 12 months, right?
20    A   Yes, sir.
21    Q   Approximately how many months in 2012
22 did you work in the suspicious order monitoring
23 system at Knoxville?
24      MS. MILLER: Object to form.

Page 55

1      THE WITNESS: I -- I don't remember,
2 sir.
3 BY MR. BAKER:
4    Q   Who took over your position after you
5 stopped working in the suspicious order monitoring
6 system in 2012?
7      MS. MILLER: Object to form.
8      THE WITNESS: It was moved to the
9 Indianapolis distribution center.
10 BY MR. BAKER:
11    Q   Okay. So when it was moved from
12 Knoxville to Indiana, did you have anything at all
13 to do with managing or participating in the
14 suspicious order monitoring system?
15      MS. MILLER: Object to form.
16      THE WITNESS: No, sir.
17 BY MR. BAKER:
18    Q   Okay. And who took over the program
19 once it moved to Indiana, to the best of your
20 recollection?
21      MS. MILLER: Object to form.
22      THE WITNESS: It would have been Mark
23 Nicastro. He would have taken the program over.
24 BY MR. BAKER:

Page 56

1    Q   Okay. At the time the program was run
2 out of Knoxville, were you familiar with the
3 suspicious order monitoring computer software
4 system that had been provided by CCS, this company
5 Cegedim, to your company?
6      MS. MILLER: Object to form.
7      THE WITNESS: I was aware that -- that
8 they provided the program, sir. Yes, sir.
9 BY MR. BAKER:
10    Q   How do you pronounce the name of the
11 company and what do you call it?
12      The reason I'm asking is because I've
13 heard it called CCS, Cegedim. I've heard it
14 called the Buzzeo company. I've heard it called a
15 bunch of things. But I just want to know what you
16 call it so we can call it that throughout the
17 deposition. Okay?
18      MS. MILLER: Object to form.
19      THE WITNESS: Yes, sir. I reference it
20 as the Buzzeo system, sir.
21 BY MR. BAKER:
22    Q   Okay. All right. So you were aware
23 when you first assumed the position of
24 suspicious -- senior manager of logistics,

Page 57

1 quality and compliance -- or strike that.
2      What is the name of the position that
3 you assumed when you took over the SOM program at
4 the time it moved to Knoxville? What is the name
5 of that position?
6      MS. MILLER: Object to form.
7      THE WITNESS: It -- it was still
8 quality -- LP qual- -- I was the manager over the
9 LP quality compliance. I mean...
10 BY MR. BAKER:
11    Q   Okay. When you were the manager over LP
12 quality compliance in Knoxville, is that when you
13 were involved with the suspicious order monitoring
14 system?
15      MS. MILLER: Object to form.
16      THE WITNESS: Yes, sir.
17 BY MR. BAKER:
18    Q   Okay. So throughout my questioning, if
19 I say when you were the manager over LP quality
20 compliance, you understand that I'm associating
21 that with when you were in Knoxville and involved
22 with the SOM system. Is that fair?
23    A   Yes, sir.
24      MS. MILLER: Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1      Pam, just give me a chance after he asks
2  his question to object.
3  BY MR. BAKER:
4      Q   All right.  During that time, what
5  familiarity did you have with the inner workings
6  of the Buzzeo software program upon which this
7  system operated?
8          MS. MILLER:  Object to form.
9          THE WITNESS:  The system itself, I was
10 not familiar with.  The reports that were provided
11 is what I was familiar with.
12 BY MR. BAKER:
13     Q   Did you have any familiarity with the
14 algorithm?
15         MS. MILLER:  Object to form.
16         THE WITNESS:  No, sir, I --
17 BY MR. BAKER:
18     Q   Did you have any familiarity with the
19 term "coefficients" and what that meant in the
20 context of the algorithm?
21         MS. MILLER:  Object to form.
22         THE WITNESS:  I wasn't involved in that
23 piece, so, no, sir, I was not familiar with the
24 algorithm.

Page 59

1      (Exhibit No. 538 was premarked for
2       identification.)
3  BY MR. BAKER:
4      Q   Okay.  Could you pull up Exhibit 538,
5  please.  It's in front of you.
6          MS. MILLER:  Is that the last exhibit
7  used?
8          MR. BAKER:  Yes, this is Exhibit 538.
9  BY MR. BAKER:
10     Q   And if you would turn to page 3, where
11 at the bottom is called page 3, and it's Bates
12 No. 22045.  Do you see that?
13     A   I do, sir.
14     Q   Okay.  If you look on that page, it
15 says:  "The model has been designed so that any
16 order with a score of .15 or higher is identified
17 as suspicious pended and should be investigated
18 further."
19         Do you see that?
20     A   I do see that, sir.
21     Q   Do you know what that sentence means?
22         MS. MILLER:  Object to form.
23         THE WITNESS:  I -- I see the doc, sir,
24 but I don't -- no, sir, I don't know what that is

Page 60

1  indicating, sir.
2  BY MR. BAKER:
3      Q   Okay.  In the context of an IRR, what
4  does that sentence mean?
5          MS. MILLER:  Object to form.
6          THE WITNESS:  Are you asking what the
7  IRR indicates?  Is that what you're --
8  BY MR. BAKER:
9      Q   No, ma'am.  If I was to ask you what
10 this sentence means in the context of an IRR,
11 would you know?
12         Okay.  So here is the question -- here's
13 the sentence:  "The model has been designed so
14 that any order with a score of .15 or higher is
15 identified as suspicious pended and should be
16 investigated further."
17         Do you know what that means in the
18 context of an item review report?
19         MS. MILLER:  Object to form.
20         THE WITNESS:  Sir, I know what that's
21 stating.  I -- I wasn't involved in the actual
22 algorithm piece, so I don't know what the pieces
23 of the algorithm are.  And high level -- the
24 reports would come down, and we would review those

Page 61

1  reports, or I had folks at high level or I had
2  oversight to those that did review those reports,
3  sir.
4  BY MR. BAKER:
5      Q   Okay.  You had people at high levels
6  that reviewed that report.  Would those be one of
7  the four people that we discussed earlier in your
8  deposition that worked for you, those being
9  Shannon Miller, Stephen Cain, Paul Lawson and
10 Aaron Burtner?
11         MS. MILLER:  Object to form.
12 BY MR. BAKER:
13     Q   Is that who you're talking about?
14     A   Yes, sir.  I had oversight to their
15 reviews of the IRRs.  I had the high level
16 oversight, sir.
17     Q   Okay.  You were the high level oversight
18 over those four individuals to the extent that
19 they worked at certain times under you in that
20 department; is that right?
21     A   Yes, sir.
22         MS. MILLER:  Object to form.
23 BY MR. BAKER:
24     Q   And each one of those individuals at

Page 62

1  some point in time was assigned as an LP analyst,
2  a loss prevention analyst, to read IRRs on a daily
3  basis; is that right?
4        MS. MILLER:  Object to form.
5        THE WITNESS:  Yes, sir.
6  BY MR. BAKER:
7     Q    And that would include IRRs that -- that
8  showed items that were flagged within the Buzzeo
9  software system that was used within the
10 suspicious order monitoring system in Knoxville,
11 right?
12       MS. MILLER:  Object to form.
13       THE WITNESS:  Could you repeat that,
14 sir?
15 BY MR. BAKER:
16    Q    Were you -- were you of the
17 understanding that the Buzzeo software system was
18 used as a computer software program through which
19 nightly orders of controlled substances were
20 evaluated?
21       MS. MILLER:  Object to form.
22       THE WITNESS:  Yes, sir.
23 BY MR. BAKER:
24    Q    Okay.  And were you familiar with the --

Page 63

1  whether or not once those orders were run through
2  that system, if that's what caused the generation
3  of the item review report?
4        MS. MILLER:  Object to form.
5        THE WITNESS:  Yes, sir.
6  BY MR. BAKER:
7     Q    Okay.  And were you familiar with the
8  fact that -- if you'll turn back up to that
9  exhibit and go to page 3.
10       Were you familiar with the fact that the
11 model, that program model, has been designed so
12 that any order with a score of .15 or higher is
13 identified as suspicious, pended and should be
14 investigated further?
15       MS. MILLER:  Objection.  Asked and --
16 object to form, asked and answered.
17       THE WITNESS:  Sir, I know what that
18 states, but I -- I don't -- don't know or don't
19 recall, don't have any memory of how the actual
20 system was designed.
21 BY MR. BAKER:
22    Q    Okay.  Well, let's go back to page 2 of
23 that document.  Look at -- it says:  "Recap of
24 Model Design."  And I'd like to go through it with

Page 64

1  you, and then I'll ask you questions.  Fair
2  enough?
3        MS. MILLER:  Object to form.
4  BY MR. BAKER:
5     Q    Ma'am, fair enough?
6     A    Yes, sir.
7     Q    Okay.  All right.  So it says here:
8  "The SOM model that has been developed and
9  recommended by Cegedim Compliance Solutions has
10 been designed to pend an order which may be
11 classified as a suspicious order for DEA reporting
12 purposes.  As previously indicated, suspicious
13 orders are orders of unusual size, orders
14 deviating from a normal pattern, and orders of
15 unusual frequency.  The regulation does not
16 specifically define what these terms mean.  The
17 SOM model that has been developed and recommended
18 by Cegedim Compliance Solutions is thus designed
19 to evaluate orders and determine whether they are
20 more likely to fit the definition of 'a suspicious
21 order' or less likely to fit the DEA's definition
22 of 'a suspicious order.'"
23       So far have I quoted that document
24 correctly?

Page 65

1        MS. MILLER:  Object to form.
2        THE WITNESS:  Yes, that's what the
3  document states, sir.
4  BY MR. BAKER:
5     Q    It then goes on to state:  "In order to
6  do this, a score is given for each product line
7  item in an order.  The score is based on a number
8  of attributes or order quantities which are
9  independent variables that represent
10 characteristics of the item in the order.  The
11 attributes are based on markers or data calculated
12 from a 12-month historical database.  The model
13 also includes identifiers, binary variables that
14 must be either, yes, assigned a value of 1, or,
15 no, assigned a value of zero."
16       Have I correctly stated that document
17 and what it says?
18       MS. MILLER:  Object to form.
19       THE WITNESS:  Yes, sir, that's what the
20 document states.
21 BY MR. BAKER:
22    Q    It then goes on to say:  "For each order
23 an analysis is performed to determine whether or
24 not the order contains a number of factors

Page 66

1 (attributes) that would be associated with a
2 suspicious order. Each of these factors
3 (attributes) is assigned a numerical value. For
4 some factors, the factor is deemed to be more
5 important, significant, or indicative of a
6 potentially 'suspicious order,' and those factors
7 are assigned a higher value. These higher value
8 factors are referred to as having weighted values.
9 The weighted values are expressed in mathematical
10 terms referred to as coefficients. The various
11 numerical values associated with each factor for
12 each product line item are totaled, and the total
13 represents the 'scores.' If an order has a number
14 of factors (attributes) that have a high numerical
15 value (thus driving up the overall score), the
16 order likely would meet the DEA's definition of
17 what is considered potentially suspicious, and the
18 Cegedim Dendrite model would indicate the order
19 should be 'pended' to allow further investigation
20 to determine -- to determine whether the order is
21 in fact a 'suspicious order' for reporting
22 purposes."
23         Have I properly quoted that document?
24         MS. MILLER: Object to form.

Page 67

1         THE WITNESS: Yes, sir, that's what it
2 states in that document.
3 BY MR. BAKER:
4     Q    It goes on to the next page to say:
5 "The Cegedim Compliance Solutions model looks at
6 and utilizes attributes and identifiers (and their
7 assigned numerical values) that could be
8 considered suspicious and seeks to apply
9 statistical techniques to establish 'norms' and
10 'deviations' in order that the overall
11 'suspiciousness' of the order can be evaluated.
12 The Cegedim Compliance Solutions approach
13 considers both the types of order qualities
14 (attributes) that can make an order 'suspicious,'
15 and also establishes parameters related to
16 'normal' ordering patterns so that orders that
17 'deviate from a normal pattern' can be easily --
18 can be readily identified. At its core, the
19 system uses a heavily modified multiple logistic
20 regression model that returns a score or
21 'index' -- quite simply a number between zero and
22 one -- that is used to gauge the likelihood that
23 an item is either ordered in error or is
24 fraudulent (the model does not distinguish between

Page 68

1 the two). Items with low scores are allowed to
2 proceed for processing, and items with large
3 scores are pended for review. The model has been
4 designed so that any order with a score of 0.15 or
5 higher is identified as suspicious, pended, and
6 should be investigated further."
7         Have I properly quoted that document?
8         MS. MILLER: Object to form.
9         THE WITNESS: Yes, sir.
10 BY MR. BAKER:
11     Q    Do you understand what I just read to
12 you?
13         MS. MILLER: Object to form.
14         THE WITNESS: Yes, sir.
15 BY MR. BAKER:
16     Q    Did you understand this at the time that
17 you worked in the suspicious order monitoring
18 system for CVS in the Knoxville office between
19 2011 and 2012?
20         MS. MILLER: Object to form.
21         THE WITNESS: Sir, I understand what
22 this document states. I know how we conducted the
23 reviews. I don't -- did not know what the
24 algorithm was, nor do I know this information here

Page 69

1 to -- to tell you what exactly this is stating.
2 But I can tell you how we did our -- conducted the
3 reviews in Knoxville.
4 BY MR. BAKER:
5     Q    Okay. Well, the reviews came about as a
6 result of an IRR that was generated daily, right?
7     A    Yes, sir.
8         MS. MILLER: Object to form.
9 BY MR. BAKER:
10     Q    Okay. And the IRR was generated because
11 the orders were run through this computer system
12 to generate that IRR, right?
13         MS. MILLER: Object to form.
14         THE WITNESS: Yes, sir.
15 BY MR. BAKER:
16     Q    Okay. And the reason those items
17 appeared on the IRR is because they were flagged
18 as order -- orders of interest by this computer
19 system such that they appeared on the IRR,
20 correct?
21         MS. MILLER: Object to form.
22         THE WITNESS: They populated on the
23 report for -- to be reviewed, sir.
24 BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    Q    And they populated on the report as a
2  result of being run through this computer system,
3  correct?
4        MS. MILLER: Object to form.
5        THE WITNESS: Yes, sir. That's my
6  understanding of how it works.
7  BY MR. BAKER:
8    Q    Okay. And that computer system,
9  according to this document, it says: "The model
10  has been designed so that any order with a score
11  of .15 or higher is identified and is -- as
12  suspicious, and should" -- excuse me -- strike the
13  question.
14        Again from scratch. All right, here's
15  the question: This document says that that model
16  has been designed so that any order with a score
17  of .15 or higher is identified as suspicious,
18  pended, and should be investigated further.
19  Correct?
20        MS. MILLER: Object to form.
21  BY MR. BAKER:
22    Q    That's what the document says, correct?
23    A    Yes, sir, that --
24        MS. MILLER: Object to form.

Page 71

1        THE WITNESS: -- would be.
2  BY MR. BAKER:
3    Q    And is that what happened? Did you use
4  this model that had that scoring system to where
5  the model that was designed so that any order with
6  a score of .15 or higher is identified as
7  suspicious, pended, and should be investigated
8  further, is that the model that you used for the
9  IRRs that you reviewed?
10        MS. MILLER: Object to form.
11        THE WITNESS: Sir, I'm not familiar with
12  the document. I can't tell you about the
13  algorithm. I don't know how it worked.
14  BY MR. BAKER:
15    Q    Do you know what score, if any, appeared
16  on the IRR in reference to a score that would
17  cause an order to be pended and appear on that IRR
18  that you reviewed or that you managed the review
19  of?
20        MS. MILLER: Object to form.
21        THE WITNESS: I know there were data
22  elements on that report, sir. I don't remember
23  what the data elements actually were, but I do
24  remember the data elements there for them to do

Page 72

1  the initial review, sir.
2  BY MR. BAKER:
3    Q    Was the system that was adopted by CVS
4  from CCS, the Buzzeo related company, was it this
5  model that we're talking about, the model that has
6  been designed so that any order with a score of
7  .15 or higher is identified as suspicious, pended,
8  and should be investigated further?
9        MS. MILLER: Object to form, asked and
10  answered.
11        THE WITNESS: Sir, I -- I can't tell
12  you. I don't know what the algorithm was. I can
13  tell you that when the reports came down, the
14  reviews were conducted at that time.
15  BY MR. BAKER:
16    Q    Okay. Again, the document says -- the
17  CCS document, the Cegedim company, the Buzzeo
18  company document, that delivered that program,
19  according to this e-mail, and the attachment to
20  the e-mail that I just showed you says that: "The
21  model has been designed so that any order with a
22  score of .15 or higher is identified as
23  suspicious, pended, and should be investigated
24  further." True?

Page 73

1        MS. MILLER: Object to form. Asked and
2  answered.
3        THE WITNESS: That's what the document
4  states, yes, sir.
5  BY MR. BAKER:
6    Q    Okay. Insofar as the IRRs that you
7  reviewed or that you managed the review of during
8  2011 and 2012 out of the Knoxville distribution
9  center, were those IRRs produced as a result of
10  this program that we're talking about in this
11  retunement agreement that's been described by CCS,
12  the Buzzeo company?
13        MS. MILLER: Object to form.
14        THE WITNESS: Sir, I don't know what the
15  algo- -- I don't know what the algorithm was. I
16  don't know how it was designed.
17        (Exhibit No. 522 was premarked for
18        identification.)
19  BY MR. BAKER:
20    Q    Okay. We're going to go to Exhibit 522.
21  These are called "DEA Speaking Points," and this
22  is an e-mail from John Mortelliti to Aaron
23  Burtner, copy to you, 3/12 of 2012. Do you see
24  that?

Page 74

1    A   I do, sir.
2    Q   Okay.  Do you admit that you received
3 this e-mail?
4        MS. MILLER:  Object to form.
5        THE WITNESS:  I mean, I don't recall.
6 It's 2012, so I don't recall the e-mail, but I'm
7 not disputing that it indicates that I have, sir.
8 BY MR. BAKER:
9    Q   Okay.  So turn to the "DEA Speaking
10 Points," page 1.  Okay.  This is called
11 "Suspicious Order Monitoring for PSE/Control
12 Drugs, August 27, 2010."
13       Do you see that?
14   A   I do, sir.
15   Q   Okay.  Go to the next page.  It says:
16 "Purpose of Inventory Review Report."  Now, this
17 says "Inventory Review Report," and that may just
18 be a typo because it's been called "Item Review
19 Report" throughout the rest of everybody's
20 understanding in this case.
21       Is that what your understanding is, that
22 an IRR is an item review report?
23       MS. MILLER:  Object to form.
24 BY MR. BAKER:

Page 75

1    Q   Or do you know?
2    A   Item review report, sir.  That's what --
3    Q   Okay.  And so it says the purpose of
4 IRR, it says: "CVS has created a IRR to:  Detect
5 potential suspicious orders."  Correct?
6        MS. MILLER:  Object to form.
7 BY MR. BAKER:
8    Q   That's what it says, ma'am, right?
9        MS. MILLER:  Object to form.
10       THE WITNESS:  Yes, sir, it states it.
11 BY MR. BAKER:
12   Q   Okay.  And it says: "Prevent diversion
13 of PSE/EPH/Control Drug Products."  Correct?
14       MS. MILLER:  Object to form.
15       THE WITNESS:  That's what it states on
16 this, yes, sir.
17 BY MR. BAKER:
18   Q   And the control drug products that's
19 referenced in here would be the control drug
20 products, the Schedule III control drug products
21 that were carried within the distribution centers
22 that were owned by CVS and were distributed out of
23 those distribution centers to CVS pharmacies
24 nationwide, correct?

Page 76

1        MS. MILLER:  Object to form.
2        THE WITNESS:  Yes, sir.
3 BY MR. BAKER:
4    Q   Now, go to the fourth page.  It says:
5 "What is a Control Drug IRR?"
6        MR. BAKER:  Go ahead and highlight that
7 whole thing.
8 BY MR. BAKER:
9    Q   And it says: "What is a Control Drug
10 IRR? Report based on 6 formulas used to determine
11 potential suspicious orders:
12       "Current order deviation from 6 month
13 average.
14       "Current order deviation from projected
15 order based on historical average.
16       "Detects if GNC is subject to frequent
17 ordering.
18
19       "Detects an increasing trend in ordering
20 behavior.
21       "Detects if GNC has been ordered in past
22 2 months.
23       "Determines if GNC order is less than or
24 equal to 6 month maximum."

Page 77

1        Do you see that?
2    A   I do see that, sir.
3    Q   Do you know what all that means?
4        MS. MILLER:  Object to form.
5        THE WITNESS:  Sir, I see the doc, but I
6 don't recall now what that's indicating.  I mean,
7 I just don't recall now, sir.
8 BY MR. BAKER:
9    Q   Okay.  Go to page 6 of that document
10 talking about responsibilities.
11       MR. BAKER:  Highlight the first two.
12 BY MR. BAKER:
13   Q   It says:  The "DC RX Review Report (IRR)
14 Daily."  What is a DC RX, do you know?
15   A   I don't know what this document is
16 indicating, sir, as far as DC RX.  I don't know
17 what that's referencing, sir.
18   Q   Okay.  It says: "Communicate potential
19 suspicious orders to Viper Analyst."  Do you know
20 what that means?
21       MS. MILLER:  Object to form.
22       THE WITNESS:  I know what a Viper
23 analyst is, sir.
24 BY MR. BAKER:

Page 78

1    Q   Did you ever report or communicate any
2  potential suspicious orders to a Viper analyst?
3        MS. MILLER:  Object to form.
4        THE WITNESS:  No, sir.
5  BY MR. BAKER:
6    Q   Okay.  Go to page 8.
7        It says:  "What to consider when
8  determining if a Control Drug order is potentially
9  suspicious."  It says:  "Control Drugs are not
10 commonly 'Pushed' as a sale item.  Control Drugs
11 do not have a seasonal increase in most cases."
12       Is that what that document says?
13   A   That is, sir.
14   Q   Do you know what that means when it
15 says, "Control Drugs do not have a seasonal
16 increase in most cases"?
17       MS. MILLER:  Object to form.
18       THE WITNESS:  I -- I don't know how it's
19 used here, but I do know that control drugs do not
20 have a seasonal -- seasonality to them for the
21 most part because of, you know, conditions or
22 health or whatever.  So, yes, sir.
23 BY MR. BAKER:
24   Q   Okay.  So would that mean that you

Page 79

1  shouldn't expect for a controlled drug to be
2  ordered more so in one part of the season than in
3  another part of the season?
4        MS. MILLER:  Object to form.
5        THE WITNESS:  Traditionally, sir, yes,
6  that would -- that would be correct.
7  BY MR. BAKER:
8    Q   Okay.  Now, go to page 9.
9        It says:  "Why is the DC initiating the
10 research of the suspicious orders?"  It says:  "It
11 is the goal of CVS to prevent suspicious orders
12 from reaching their destination, therefore, the DC
13 must initiate the investigation because the DC is
14 the one who picks and distributes the product."
15       Is that what the document says?
16       MS. MILLER:  Object to form.
17       THE WITNESS:  Yes, sir, that's what the
18 document states.
19 BY MR. BAKER:
20   Q   Okay.  Now, you remember the document I
21 showed you previously that talked about 11 out of
22 the 18 distribution centers were Rx licensed or
23 controlled substance licensed?  Do you remember
24 that?

Page 80

1    A   Yes, sir.
2        MS. MILLER:  Object to form.
3  BY MR. BAKER:
4    Q   Okay.  Was this program, to your
5  knowledge, ever run out of all 11 of those DCs or
6  not?
7        MS. MILLER:  Object to form, asked and
8  answered.
9        THE WITNESS:  Sir, I just can't recall.
10 I'm sorry, I -- I don't know if it was or wasn't,
11 sir.
12 BY MR. BAKER:
13   Q   Okay.  These DEA Speaking Points, this
14 slide show that we just went through, had you ever
15 seen this during the period that you worked, 2011
16 to 2012, at the Knoxville distribution center in
17 the suspicious order monitoring program?
18       MS. MILLER:  Object to form.
19       THE WITNESS:  It does look familiar.  I
20 just don't -- can't tell you about it.  I just
21 know that it does look familiar, sir.
22 BY MR. BAKER:
23   Q   Okay.  All right.  So at some point did
24 you hire a manager to review the IRRs and to -- to

Page 81

1  take over the position of being the manager of the
2  IRRs?
3        MS. MILLER:  Object to form.
4        THE WITNESS:  Sir, I can't remember the
5  time frame, and I can't remember when there --
6        (Exhibit No. 536 was premarked for
7        identification.)
8  BY MR. BAKER:
9    Q   Okay.  Let me show you what's marked as
10 Exhibit 536.
11       All right.  This is an e-mail from you,
12 Pam Hinkle, to Frank Devlin, copy to Aaron
13 Burtner.  Do you see that?
14   A   I do see that, sir.
15   Q   All right.  And it's regarding an IRR
16 SOM justification letter that was drafted by Aaron
17 and myself, meaning you and Aaron, correct?
18       MS. MILLER:  Object to form.
19       THE WITNESS:  That's what it states,
20 sir, yes.
21 BY MR. BAKER:
22   Q   On the next page, it says:  "I am
23 recommending the promotion of Aaron Burtner to
24 manager overseeing the IRR SOM process."

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 Do you see that?

2 A I do see that, sir.

3 Q Is that when you believe that the

4 position was created for him?

5 MS. MILLER: Object to form.

6 THE WITNESS: I can't remember. I don't

7 know if -- if he was promoted after the move to

8 Indy -- the actual operation move to Indy, I can't

9 remember the time frame, sir.

10 BY MR. BAKER:

11 Q Okay. If Mr. Burtner said he was hired

12 into the position of IRR SOM manager, would -- in

13 December of 2012, would you have any disagreement

14 with that?

15 MS. MILLER: Object to form.

16 THE WITNESS: I would have -- no, I

17 would have no reason to object.

18 BY MR. BAKER:

19 Q Okay. Before Mr. Burtner was hired into

20 that position, was there an IRR SOM manager at

21 CVS?

22 A I was that manager, sir. I had the

23 oversight to the -- to the program.

24 Q Okay. Did you continue in that position

Page 83

1 after Mr. Burtner was hired into that position?

2 MS. MILLER: Object to form.

3 THE WITNESS: No, sir, I would not have.

4 BY MR. BAKER:

5 Q Did Mr. Burtner take your place in terms

6 of managing the IRR SOM program?

7 MS. MILLER: Object to form.

8 THE WITNESS: I don't recall the time

9 frame, sir. I --

10 BY MR. BAKER:

11 Q Okay. Does that sound consistent with

12 when you moved out of the program and he moved

13 into the program as the IRR SOM manager?

14 MS. MILLER: Object to form.

15 THE WITNESS: I just -- I don't recall,

16 sir.

17 BY MR. BAKER:

18 Q Okay. When you were in charge of

19 managing the SOM program in the Knoxville office,

20 what was it that you reviewed on the IRRs?

21 Specifically what were you looking at?

22 MS. MILLER: Object to form.

23 THE WITNESS: Sir, I didn't do the day

24 to day. I didn't actually review the IRR. There

Page 84

1 were individuals that reported to me that actually

2 conducted those reviews.

3 BY MR. BAKER:

4 Q Okay. And what did you tell the people

5 that worked under you that were conducting those

6 reviews that you expected them to do with respect

7 to reviewing the IRRs?

8 MS. MILLER: Object to form.

9 THE WITNESS: There were criterias in

10 place that they were to go by when they were

11 reviewing those reviews, sir. I don't remember

12 the -- the details behind -- you know, I know that

13 they looked at the reviews, each -- each customer

14 as it popped on -- that were populated, and if

15 there were reasons to believe that there were

16 additional reasons to do due diligence, then that

17 due diligence was conducted, sir.

18 BY MR. BAKER:

19 Q Now, Mr. Mortelliti was involved

20 with training the people that worked under you; is

21 that right?

22 A Yes, sir.

23 Q Okay. Did he train all four of those

24 people or had some involvement with training of

Page 85

1 all four of those people?

2 MS. MILLER: Object to form.

3 THE WITNESS: I don't recall, but I

4 will -- I don't recall if he --

5 BY MR. BAKER:

6 Q Okay. If Mr. Mortelliti testified that

7 he trained Mr. Burtner, you would have no reason

8 to disagree with that, correct?

9 MS. MILLER: Objection to form.

10 THE WITNESS: No, sir, I would have no

11 reason to --

12 BY MR. BAKER:

13 Q If Mr. Mortelliti testified -- I want

14 you to assume that Mr. Mortelliti has -- that his

15 testimony is to the effect that any time a

16 hydrocodone-combination product appeared on the

17 daily IRR report that that would cause him to

18 refer it for further investigation, every single

19 one of them, is that consistent with how you ran

20 your program in Knoxville?

21 MS. MILLER: Object to form.

22 THE WITNESS: Sir, I don't recall.

23 BY MR. BAKER:

24 Q Okay. You don't recall whether or not

Page 86

1  you ran your program in Knoxville such that every
2  single hydrocodone-combination product order that
3  appeared on the IRR was -- was subjected to
4  further due diligence?  You don't recall that one
5  way or the other?
6        MS. MILLER:  Object to form.
7        THE WITNESS:  I don't recall.  High
8  level, I know that we -- they looked at their --
9  each store order, and if there was -- whatever --
10  whatever it was, and if the criteria at that
11  time -- because I don't remember, sir.  If the
12  criteria was to look at the hydro, it would have
13  been looked at every time.  I just don't remember
14  the details around that time frame, and to say we
15  did or didn't, I just can't recall that, sir.
16  BY MR. BAKER:
17    Q   Okay.  So what --
18        MS. MILLER:  Bill, could we take a break
19  in a few minutes, please?
20        MR. BAKER:  I'm -- yeah, I'm -- I've
21  got -- can we get to 11:00?  We've already taken
22  two breaks and we haven't been three hours.
23        MS. MILLER:  Yeah, well, let's -- let's
24  see how -- Pam, are you ready for a break?

Page 87

1        MR. BAKER:  No, I'm ready to finish like
2  until 11:00, because I don't want -- I want to
3  finish this line of questioning, if I could.
4        MS. MILLER:  Well, let's see.  I mean
5  it's up to the witness.
6        If you -- if you need a break before
7  that --
8        MR. BAKER:  Actually not --
9        MS. MILLER:  -- say the word.
10        MR. BAKER:  -- because that was -- you
11  didn't ask me to take a break, but if you need a
12  bathroom break, we can do that, but I don't want
13  to take a break right in the middle of my line of
14  questioning, okay?
15        So do you need a bathroom break right
16  this minute?
17        MS. MILLER:  Are -- are you good for a
18  little bit longer, and then we can take a little
19  bit longer break?
20        MR. BAKER:  Yeah.
21        MS. MILLER:  We've been going for close
22  to 50 minutes.
23        MR. BAKER:  All right.  So let's go.
24        MS. MILLER:  Just so --

Page 88

1  BY MR. BAKER:
2    Q   So what was the criteria that you used
3  or that you instructed your analysts to use when
4  reviewing the IRRs such that they would know which
5  items that appeared on that report should be
6  subjected to further due diligence and
7  investigation?
8        MS. MILLER:  Object to form.
9        THE WITNESS:  Sir, at the time I knew.
10  Today sitting here, I cannot tell you what that
11  criteria was.  I just know that each order was
12  looked at on that IRR, and based on the criteria,
13  that's what we looked at.
14  BY MR. BAKER:
15    Q   See, you say "the criteria."  This is my
16  opportunity to ask you while you're under oath
17  what are those criteria and how they were
18  implemented.
19        So my question is, what are those
20  criteria that you're referring to and how were
21  they implemented?
22        MS. MILLER:  Object to form.  Asked and
23  answered.
24        THE WITNESS:  Sir, I don't remember.  I

Page 89

1  just don't remember the details, sir.
2  BY MR. BAKER:
3    Q   Was there any written policy in place
4  insofar as what should be looked at on an I- -- on
5  an IRR to make the determination as to whether an
6  item that -- that was flagged on that report
7  should be subjected to further due diligence
8  investigation?
9        MS. MILLER:  Object to form.
10        THE WITNESS:  I don't recall, sir.
11  BY MR. BAKER:
12    Q   And when you say that each item was
13  reviewed on the report, what, other than a person
14  putting their eyeballs on the report and looking
15  at it, are you talking about in terms of reviewing
16  an IRR report?
17        MS. MILLER:  Object to form.
18        THE WITNESS:  Sir, I don't -- I don't --
19  I just don't remember those criteria.  I just
20  don't remember.  I know that the criteria was
21  there, I know that they looked at every order, and
22  I know that if it warranted a second look, there
23  was further due diligence that would have been
24  conducted on that order.

Page 90

BY MR. BAKER:

Q   You just said "I know," and you went through three things.

A   Yes, sir.

Q   Okay.  One thing is that you said, I know that they reviewed the order, correct?

A   Yes, sir.

Q   Okay.  Did you personally watch your analysts all day to know what and when they reviewed on each order?

MS. MILLER:  Object to form.

THE WITNESS:  No, sir.

BY MR. BAKER:

Q   Okay.  So you don't personally know what the analysts reviewed, correct?

MS. MILLER:  Object to form.

BY MR. BAKER:

Q   You don't personally know because you didn't see them review it, correct?

MS. MILLER:  Object to form.

THE WITNESS:  That's incorrect, sir.

BY MR. BAKER:

Q   Well, if you're not there looking at them review it, how in the world are you going to

Page 91

know what they did to review?

MS. MILLER:  Object to form.

THE WITNESS:  Sir, we had conversations, daily conversations around the information and what was there, and -- and if there warranted anything additional and -- I mean, we -- we had conversations daily.  I mean...

BY MR. BAKER:

Q   Okay.  Mr. Burtner was in Indiana and you were in Knoxville, right?

MS. MILLER:  Object to form.

THE WITNESS:  Yes, sir.

BY MR. BAKER:

Q   Okay.  And Mr. Lawson was in Knoxville while you were in Knoxville, right?

A   Yes, sir.

Q   Where was Mr. Lawson's office in reference to where your office was located in the distribution center?

A   It was -- it wasn't -- it was away from mine.  It wasn't beside mine, if that's what you're asking.

Q   Was it on a different floor?

A   No, sir, it was on the same floor.

Page 92

Q   Was it -- give me an example, how many feet away was it?

MS. MILLER:  Object to form.

THE WITNESS:  Sir, I -- I don't know.

BY MR. BAKER:

Q   Oh, come on.  Was it right next to you in a cubicle or was he down the hall?  Was he on a different wing within the building?  Tell me.

MS. MILLER:  Object to form.

THE WITNESS:  I don't recall.  He wasn't side -- right side -- wasn't right beside me.  I -- I can't tell you feet-wise, though, sir.

BY MR. BAKER:

Q   Okay.  Is it your testimony that you don't know exactly what these people did to review these reports or is it your testimony that you do know exactly what they did to review these reports on a day-to-day basis?

MS. MILLER:  Object to form.

THE WITNESS:  My testimony is that I had oversight to the reports.  They reviewed them daily.  I don't remember the criteria.  I knew the criteria at that time, sir.  I just don't remember it today.

Page 93

BY MR. BAKER:

Q   Okay.  When these people reviewed these reports, were you present with them each day when they reviewed these reports, yes or no?

MS. MILLER:  Object to form.  Asked and answered.

And after this answer, we're going to take a break.

THE WITNESS:  Sir, I was not -- did not stand over them, no, sir.

MR. BAKER:  Okay.  Fair enough.  We'll take a five-minute break.

THE VIDEOGRAPHER:  The time is 10:49 a.m.  We're going off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is 11:05 a.m., and we're back on the record.

BY MR. BAKER:

Q   Ms. Hinkle, during the break that we just took, it was about 15 minutes; is that right?

MS. MILLER:  Object to form.

BY MR. BAKER:

Q   Is that right?

A   Sir, I didn't look at the time.

Page 94

1    Q   Give me your best estimate.
2         MS. MILLER:  Object to form.
3  BY MR. BAKER:
4    Q   Ms. Hinkle, that's a very simple
5  question.
6         I'm going to tell you that based upon
7  when we went off the record to the time we went
8  back on was about 15 minutes.
9         Do you have any reason to disagree with
10  that?
11    A   No, sir, I just don't -- I just don't --
12    Q   Did you talk to your attorney about your
13  testimony in this case during that break?
14         MS. MILLER:  I'm going to object based
15  on attorney-client privilege, and instruct the
16  witness not to answer.
17         MR. BAKER:  That is not accurate.
18  You're not supposed to talk to the witness during
19  the break.  It's just as if she's on a -- on a
20  witness stand in a federal court.  The federal
21  rules of procedure and the ethics rules permit me
22  to ask that question, and also -- also prohibit
23  you from coaching the witness or talking to the
24  witness during breaks.

Page 95

1  BY MR. BAKER:
2    Q   Now, did you talk to your attorney about
3  your testimony in this case during that break?
4  I'm allowed to ask that question if she did.
5         MS. MILLER:  Object.
6         Based on attorney-client privilege, I
7  instruct you not to answer.
8         MR. BAKER:  Okay.  I'm going to ask you
9  not to talk to her about her testimony during the
10  breaks, and we're not going to take an excessive
11  numbers of breaks at every 30 to 45 minutes.  If I
12  get to a middle of a line of questioning, we're
13  going to finish that line of questioning and not
14  take a break, and you're prohibited, I'm going t
15  tell you, from talking to her about her testimony
16  during breaks.
17         It's very obvious that's what you're
18  doing.  It's very obvious that the witness has
19  been coached.  And it's very obvious that she's
20  intentionally looking around and taking long
21  breaks between the questions and the time that she
22  gives the answers.  That's very obvious.
23  BY MR. BAKER:
24    Q   I've been doing this for 35 years.  I'm

Page 96

1  not -- this is not my first deposition.  This is
2  not my first rodeo, ma'am.  And let me explain,
3  I'm not going to put up with it from now to the
4  end of this deposition.  No more talking to your
5  attorney during the breaks.
6         If you do, I'm going to ask you, did you
7  talk to her, and if she instructs you not to
8  answer, it's because you did talk to her.  And if
9  that happens, I'm going to call up the judge and
10  I'm going to report this.
11         Do you understand that?
12         MS. MILLER:  Objection to the speech and
13  the lecture, and I instruct you to listen to the
14  questions as you were doing before.
15  BY MR. BAKER:
16    Q   Did you talk to your attorney about your
17  testimony during the break?
18         MS. MILLER:  Objection.  Attorney-client
19  privilege.  Instruct you not to answer.
20  BY MR. BAKER:
21    Q   I'm going to tell you, Don't do it.
22         MS. MILLER:  Objection.
23  BY MR. BAKER:
24    Q   All right.  Now, let's move forward.

Page 97

1         MS. MILLER:  Objection to the tone.
2  Objection to the treatment of the witness during
3  this deposition.
4         MR. BAKER:  Look, I know what's going on
5  here --
6         MS. MILLER:  You're out of line.
7         MR. BAKER:  -- Ms. Miller, and you can't
8  tell me that I'm not -- that it's not obvious
9  what's going on.  It's very obvious.  I'm just
10  asking you not to do it.
11         MS. MILLER:  Bill, I ask you to be
12  professional and courteous.
13         MR. BAKER:  I am professional and
14  courteous --
15         MS. MILLER:  And let's move on with the
16  deposition.
17         MR. BAKER:  -- but, look, don't -- don't
18  act like that's not what just happened.
19         MS. MILLER:  Let's move on.
20         MR. BAKER:  That's exactly what
21  happened.
22         (Exhibit No. 550 was marked for
23         identification.)
24  BY MR. BAKER:

Page 98

1    Q   Okay. I'm going to move to Exhibit 550.
2         MR. BAKER: I've got one. Where's the
3 other three? Exhibit 550.
4 BY MR. BAKER:
5    Q   All right. Ma'am, do you know who the
6 DEA is?
7    A   Yes, sir.
8    Q   Who is that?
9    A   Drug Enforcement Agency.
10   Q   And you realize the Drug Enforcement
11 Agency has jurisdiction over controlled substances
12 and the -- and you as a distributor of controlled
13 substances. You understand that?
14        MS. MILLER: Object to form.
15        THE WITNESS: I -- I understand, sir.
16 BY MR. BAKER:
17   Q   Okay. And this -- during the period of
18 time that you worked at CVS as a manager in the
19 department that monitored the distribution of
20 controlled substances from the distribution
21 centers to the pharmacies --
22        You understand that, correct?
23        MS. MILLER: Object to form.
24        THE WITNESS: Yes, sir.

Page 99

1 BY MR. BAKER:
2    Q   Okay. During the period of time that
3 you worked in that position and you were managing
4 employees who were reviewing IRRs, did each one of
5 those orders of interest that appeared on the IRR
6 in relation to hydrocodone-combination products
7 get referred out for further due diligence, yes or
8 no?
9         MS. MILLER: Object to form.
10        THE WITNESS: They would be reviewed,
11 sir, and based on the initial review and whatever
12 process of elimination of that due diligence would
13 have been done, and if there was no other reason
14 to believe an additional due diligence would have
15 been warranted, then it would have stopped there.
16 BY MR. BAKER:
17   Q   Okay. So the reasons to believe that an
18 order of interest that shows on the IRR report
19 should be subjected to further due diligence would
20 be what reasons?
21        MS. MILLER: Object to form.
22        THE WITNESS: Sir, without -- I can't
23 tell -- I don't know the exact steps, sir. I
24 mean, it was a long time ago. I don't remember

Page 100

1 what everything they looked at and what that
2 initial review looked like. I just can't remember
3 that, sir.
4 BY MR. BAKER:
5    Q   What are the inexact steps? You said
6 you don't remember the exact steps. What
7 inexactly do you remember?
8         MS. MILLER: Object to form.
9         THE WITNESS: Reviewing the order.
10 Contact with the customer. I just don't remember,
11 sir. I just don't remember.
12 BY MR. BAKER:
13   Q   On each one of the orders of interest
14 that -- that flagged on the IRR for hydrocodone-
15 combination products, was there contact by that
16 reviewer with the customer?
17        MS. MILLER: Object to form. Asked and
18 answered.
19 BY MR. BAKER:
20   Q   And in particular, was there contact by
21 the person reviewing the IRR, the LP analyst, with
22 the pharmacy that generated that order?
23        MS. MILLER: Object to form.
24        THE WITNESS: Sir, I don't -- I don't

Page 101

1 remember. I don't -- I just don't remember the
2 exact -- what they did. I just don't remember
3 that. I know that there -- there was a process,
4 sir, but I just don't remember the -- the details,
5 sir.
6 BY MR. BAKER:
7    Q   Can you say what percentage of orders of
8 interest that appeared on the IRR daily for
9 hydrocodone-combination products were subjected to
10 additional due diligence review?
11        MS. MILLER: Object to form.
12        THE WITNESS: Sir, I don't -- I don't
13 remember. I can't tell you that.
14 BY MR. BAKER:
15   Q   If I was to suggest to you that that
16 number was less than 2 percent, would you have any
17 reason to disagree with that?
18        MS. MILLER: Object to form.
19 BY MR. BAKER:
20   Q   Would you have any reason to disagree
21 with that?
22        MS. MILLER: Object to form.
23        THE WITNESS: Sir, I don't -- I don't
24 know what it was. I don't -- I can't agree or

Page 102

1  disagree. I just don't know.
2  BY MR. BAKER:
3      Q   Okay. If I was to tell you that the
4  number of hydrocodone-combination product orders
5  that appeared on the IRR daily often were not
6  subjected to any additional due diligence review,
7  meaning zero percent of them were subjected to
8  additional due diligence review, would you have
9  any reason to disagree with that?
10         MS. MILLER: Object to form.
11         THE WITNESS: I don't remember.
12  BY MR. BAKER:
13     Q   Okay. Do you know what an IRR recap is?
14     A   I do, sir. I vaguely remember, sir.
15     Q   Okay. Could -- could you hand me back
16  the exhibit that I handed you previously because
17  I'm not going to review that with you just this
18  second.
19         I'm going to review Exhibit No. 514.
20         (Exhibit No. 514 was premarked for
21         identification.)
22  BY MR. BAKER:
23     Q   I hand you Exhibit 514. Actually, this
24  is the one that's marked, so I need to give you

Page 103

1  that one, ma'am. Sorry. Could you hand me that
2  one back or give that one to your attorney.
3         Could you pull up Exhibit 514. Do you
4  know what an IRR recap is?
5         MS. MILLER: Object to form.
6  BY MR. BAKER:
7      Q   Ma'am, do you know what an IRR recap is?
8         MS. MILLER: Object to form, asked and
9  answered.
10         THE WITNESS: Yes, sir.
11  BY MR. BAKER:
12     Q   Okay. Tell me what an IRR recap is.
13     A   This -- the recaps would provide details
14  on what they were actually reviewing, sir.
15     Q   Okay. So when -- so, for instance, an
16  IRR, an item review report, is produced daily,
17  correct?
18         MS. MILLER: Object to form.
19  BY MR. BAKER:
20     Q   Yes?
21         THE WITNESS: Could you reask that?
22  BY MR. BAKER:
23     Q   An IRR is produced daily, an item review
24  report, correct?

Page 104

1         MS. MILLER: Object to form.
2         THE WITNESS: Yes, sir.
3  BY MR. BAKER:
4      Q   Okay. And an IRR has upon it items that
5  are populated into the IRR due to those items
6  being flagged by the suspicious order monitoring
7  computer system, the Buzzeo program. Is that
8  right?
9         MS. MILLER: Object to form.
10         THE WITNESS: The information populates
11  based on the criteria from the program, yes, sir.
12  BY MR. BAKER:
13     Q   And that would be the algorithm-based
14  program, correct?
15         MS. MILLER: Object to form.
16         THE WITNESS: Yes, sir, that's the way
17  my understanding it works.
18  BY MR. BAKER:
19     Q   Okay. And then once that IRR is put in
20  front of an LP analyst, at that point the LP
21  analyst has to make a decision as to which of
22  those items that appear on that IRR are subjected
23  to further due diligence review, correct?
24         MS. MILLER: Object to form.

Page 105

1         THE WITNESS: They -- they reviewed the
2  report and determined if whatever -- whatever that
3  review was, they determined if there was needed --
4  there needed to be separate due diligence
5  conducted.
6  BY MR. BAKER:
7      Q   Okay. And if there was -- if there was
8  additional due diligence conducted, then that
9  would appear on the IRR recap as an order flagged
10  further for additional due diligence that was
11  conducted; is that correct?
12         MS. MILLER: Object to form.
13  BY MR. BAKER:
14     Q   Is that right?
15         MS. MILLER: Object to form.
16         THE WITNESS: The -- that's my
17  understanding. If I -- I just don't recall a
18  hundred percent, but that's what we -- they put
19  that information on that report.
20  BY MR. BAKER:
21     Q   Okay. And the IRR recap was a monthly
22  report, whereas the IRR was a daily report,
23  correct?
24         MS. MILLER: Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    THE WITNESS:  The -- the IRR was a daily
2  report.
3  BY MR. BAKER:
4    Q   Correct.  And the IRR recap was a
5  monthly recap of what had occurred with reference
6  to those daily reports during each month of the
7  year; is that correct?
8    MS. MILLER:  Object to form.
9    THE WITNESS:  Sir, I don't remember the
10  cadence.  I believe it was monthly, but I -- I
11  can't remember the exact cadence, sir.
12  BY MR. BAKER:
13    Q   Okay.  But the recap would recap which
14  of those orders that appeared on the IRR were
15  subjected to further due diligence; is that
16  correct?
17    MS. MILLER:  Object to form.
18    THE WITNESS:  They would put -- they
19  would put that information on that additional
20  report after a review had been conducted.
21  That's -- that's what I do remember, sir.
22  BY MR. BAKER:
23    Q   Okay.  Please focus on my question and
24  see if you can just answer this question, okay?

Page 107

1    The IRR recap is a monthly report of
2  which orders were actually flagged by the LP
3  analysts off the IRR itself for further due
4  diligence to be conducted by that LP analyst; is
5  that correct?
6    MS. MILLER:  Object to form.
7    THE WITNESS:  They -- they did enter the
8  information on that report when they conducted a
9  review of that particular order, sir.
10  BY MR. BAKER:
11    Q   "That report" being the IR -- IRR recap?
12    A   Yes, sir.
13    Q   Okay.  Let me show you the IRR recaps
14  for the period between June of 2011 and December
15  of 2011, when the program had been moved to
16  Knoxville and was run out of Knoxville under your
17  management, okay?
18    A   Yes, sir.
19    Q   All right.  That is Exhibit No. 550.
20  And, actually, this is Exhibit No. -- what's that
21  exhibit number?
22    A   514.
23    Q   514.  And --
24    MS. MILLER:  Is that where you want her

Page 108

1  to be, Bill, is 514?
2    MR. BAKER:  Sure.  Sure.
3  BY MR. BAKER:
4    Q   514, right in front of you, okay?
5    A   Okay.
6    Q   So you can either choose to review the
7  paper in front of you or you can choose to look at
8  what's up on the screen.
9    Which do you prefer?
10    A   I can't hardly read this.
11    Q   Okay.  So let's look at what's up on the
12  screen, and it says:  "June 2011 PSE IRR recap."
13  That's for pseudoephedrine.  That's for chemicals.
14  That has nothing to do with hydrocodone, correct?
15    MS. MILLER:  Object to form.
16    THE WITNESS:  Yeah, PSE has nothing to
17  do with hydrocodone, yes, sir.
18  BY MR. BAKER:
19    Q   Okay.  All right.  So go to the next
20  page.
21    Okay.  We have the July 2011 control IRR
22  recap.  Do you see that?
23    Okay.  The control IRR recap is for the
24  controlled substances such as hydrocodone-

Page 109

1  combination products, correct?
2    A   The controlled substance recap would be
3  all -- any controlled substance, yes, sir.
4    Q   Okay.  So look on this controlled
5  substance IRR recap.
6    MR. BAKER:  And let's bring out that
7  first one, the Orlando, OR, bring that out,
8  please.
9  BY MR. BAKER:
10    Q   Okay.  This shows that the DC up at the
11  top was Orlando, OR, correct?
12    The DC, do you see it?
13    A   Yes, sir, I do see it.
14    Q   The store number next to it is 3670, so
15  that's Pharmacy No. 3670, or CVS Store No. 3670,
16  correct, that generated that order?  Right?
17    A   Yes, sir.
18    Q   Okay.  The IRR date was 7/1 of 2011,
19  correct?  That's when the IRR populated this order
20  that then made its way onto this IRR recap at the
21  end of the month, correct?
22    MS. MILLER:  Object to form.
23  BY MR. BAKER:
24    Q   Right?

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1      MS. MILLER:  Object to form.

2      THE WITNESS:  That's what it says on

3  there, yes, sir.

4  BY MR. BAKER:

5      Q    Okay.  The item in question was hydro,

6  do you see that?  Hydro -- it looks like,

7  ibuprohydro -- combination product hydrocodone

8  with ibuprofen; is that correct?

9      MS. MILLER:  Object to form.

10     THE WITNESS:  I see it says hydro, yes,

11  sir.  I can't --

12  BY MR. BAKER:

13     Q    Okay.

14     A    -- tell the rest of it, but I see --

15     Q    Okay.  And then item number 353756, do

16  you see that?

17     A    Yes, sir, I see where it states that.

18     Q    Okay.  Look over on the -- where it says

19  "Order mistake."  Do you see that?

20     That this was not a mistaken order,

21  correct?  That this was an order that was

22  intended, correct?

23     MS. MILLER:  Object to form.

24  BY MR. BAKER:

Page 111

1      Q    "Y" would mean, yes, it's a mistake.

2  "N" would be, no, it's not a mistake, correct?

3      MS. MILLER:  Object to form.

4      THE WITNESS:  That's what the -- the --

5  it's indicated on that -- it looks like on that

6  form, sir.

7  BY MR. BAKER:

8      Q    Okay.  The field LP analyst is Paul

9  Lawson, correct?

10     A    Yes, sir.

11     Q    Okay.  Actually, he's just an LP

12  analyst.  He's not in the field.  He's actually

13  working in an office in Knoxville, right?

14     MS. MILLER:  Object to form.

15  BY MR. BAKER:

16     Q    I mean you were there every day.  Was he

17  working in an office in the same distribution

18  center as you?

19     A    Yes, sir, he was.

20     Q    Okay.  So he's not in the field.  He's

21  not out in the field driving around in a car or

22  anything like that.  He is sitting in a chair at a

23  computer reviewing this IRR, correct?

24     MS. MILLER:  Object to form.

Page 112

1  BY MR. BAKER:

2      Q    Is that right?

3      MS. MILLER:  Object to form.

4      THE WITNESS:  Yes, he's in the

5  distribution center, sir.

6  BY MR. BAKER:

7      Q    Okay.  So he's not a field LP.  He's

8  just an LP, right?

9      MS. MILLER:  Object to form.

10     THE WITNESS:  He would -- yes, he's a DC

11  LP.

12  BY MR. BAKER:

13     Q    Okay.  All right.  And then it says:

14  "The date the file started, 7/1; the date the file

15  completed, 7/1; and file of case attached to IRR."

16  Do you see that?

17     Do you see that?

18     A    Yes, sir.

19     Q    What does that mean?  Do you know?

20     MS. MILLER:  Object to form.

21  BY MR. BAKER:

22     Q    Ma'am, do you know what that means?

23     MS. MILLER:  Object to form.

24  BY MR. BAKER:

Page 113

1      Q    Ms. Hinkle --

2      A    Sir, I'm trying to remember.

3      Q    If you don't know, then the answer is

4  you don't know.  If you know, the answer's you

5  know.  So it's one of those, yes or nos.

6      Do you know what that means?

7      MS. MILLER:  Object to form.

8      THE WITNESS:  I -- I don't recall, sir.

9  I'm sorry.

10  BY MR. BAKER:

11     Q    Okay.  Fair enough.

12     All right.  So you see that's one item

13  populated on the July 2011 control IRR.  Let's

14  look down.  There's another one here from Indiana.

15  Do you see that, the Indiana distribution center?

16     A    Yes, sir.

17     Q    Okay.  Keep going down, go down in July.

18  Do you see any more populated on that report for

19  July?

20     Ma'am?

21     A    No, sir.

22     Q    All right.  We see two controlled drug

23  hydro combination product orders -- hydrocodone-

24  combination orders that were flagged for further

Page 114

1 due diligence on this July 2011 control IRR recap;
2 is that correct?
3       MS. MILLER: Object to form. And I
4 would for the record state there's --
5       MR. BAKER: "Object to form" is all that
6 you can do.
7       MS. MILLER: Well, but there's other
8 pages of this document for July 2011, I believe,
9 in the hard copy, and I would --
10      MR. BAKER: Well, we'll go through
11 those. Okay?
12 BY MR. BAKER:
13      Q   Go to the second page of the copy.
14 That's blank, right?
15      MS. MILLER: Object to form.
16 BY MR. BAKER:
17      Q   That's a PSE IRR. That has nothing to
18 do with what my questioning is about. My
19 questioning is about the control drug IRR. So go
20 to the control drug IRR, the prior page.
21      All right. This is it. All right? So
22 the July control drug IRR, look at the bottom --
23 look at the bottom of the page.
24      MR. BAKER: Go out, just bring the whole

Page 115

1 page.
2 BY MR. BAKER:
3      Q   The Bates number is 20398. Do you see
4 that at the bottom, the Bates number?
5      A   Yes, sir.
6      Q   Okay. Go to the Bates number of the
7 next page, it's 20399. Do you see that?
8      Do you see that?
9      A   Yes, sir.
10      Q   Okay. So go back to 20398, that is the
11 complete July 2011 control IRR recap report, is it
12 not?
13      MS. MILLER: Object to form.
14      THE WITNESS: Sir, I -- I don't know if
15 it is or not. I mean --
16 BY MR. BAKER:
17      Q   According to the document that's put in
18 front of you, it is. Is it not?
19      MS. MILLER: Object to form.
20 BY MR. BAKER:
21      Q   Go back to the document that precedes
22 that, the Bates number, it's 20397. Do you see
23 that? The June 2011 PSE IRR recap, the bottom
24 right-hand corner, 20397, do you see that --

Page 116

1      A   I do --
2      Q   -- in bold?
3      A   I do, sir.
4      Q   Okay. Successive numbers -- go to the
5 next successive number. It's 20398, okay? That's
6 the next page and it's one page. Do you see it?
7      A   I do see it, sir.
8      Q   Okay. Go to the next page, 20399.
9 That's the next successive page, correct?
10      A   Yes, sir.
11      Q   Okay. Go back to 20398. All right.
12 That is the complete July 2011 control IRR recap
13 for all CVS pharmacy orders that came through the
14 CVS pharmacy suspicious order monitoring system
15 that were flagged on the IRR and that the LP
16 analysts flagged further for additional due
17 diligence review. Correct?
18      MS. MILLER: Object to form.
19      THE WITNESS: Sir, I don't know. I
20 mean, what is the black? What is --
21 BY MR. BAKER:
22      Q   The black is what the CVS attorneys have
23 blacked out because it -- it relates to items that
24 don't have anything to do with hydrocodone-

Page 117

1 combination product controlled substances. This
2 case is about hydrocodone-combination controlled
3 substances that were distributed out of the CVS
4 distribution centers to the CVS pharmacies.
5      Do you have that understanding?
6      MS. MILLER: Object to form.
7 BY MR. BAKER:
8      Q   Do you understand that?
9      MS. MILLER: Object to form.
10      THE WITNESS: Yes, sir.
11 BY MR. BAKER:
12      Q   Okay. I had nothing to do with blacking
13 that out. These are documents that are given to
14 me by CVS.
15      So I want you to assume that the
16 blacked-out items have -- are for items that have
17 nothing to do with the hydrocodone-combination
18 products, okay?
19      A   Yes, sir.
20      Q   All right.
21      MS. MILLER: Object to form.
22      MR. BAKER: Well, what's inaccurate
23 about that?
24      MS. MILLER: Well, no, you're --

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 you're --
2          MR. BAKER: I don't want to give her the
3 impression that I've done something with that
4 document.
5          MS. MILLER: Yes.
6          MR. BAKER: I've stated it correctly,
7 and if you would let her know that, I don't want
8 to make her feel like I'm misleading her.
9          MS. MILLER: No, these were produced --
10 these were produced by CVS and redacted in
11 connection with the production.
12          MR. BAKER: Okay.
13 BY MR. BAKER:
14     Q   So you understand that this July 2011
15 control IRR recap is the complete control IRR
16 recap as it relates to hydrocodone-combination
17 products. Do you understand that?
18          MS. MILLER: Object to form.
19          THE WITNESS: Sir, I see the document.
20 I don't know -- I don't know what it's -- if it is
21 or isn't. I mean, I see this document. I see
22 that there's information on here, but I -- I can't
23 tell you that. I can't --
24 BY MR. BAKER:

Page 119

1     Q   There's two items that appear on there,
2 right? Two hydrocodone-combination product items
3 that appear on there, and both are on July 1 of
4 2011, correct?
5          MS. MILLER: Object to form.
6          THE WITNESS: That's what it indicates
7 on the rec- -- on the --
8 BY MR. BAKER:
9     Q   So out of all the orders that came
10 through on the IRRs for July of 2011, for all of
11 the distribution centers that generated -- or
12 that -- that shipped orders or that reviewed
13 orders for July of 2011, this is representative of
14 how many orders were referred by the LP analysts
15 for further due diligence review off that IRR
16 form; is that correct?
17          MS. MILLER: Object to form.
18          THE WITNESS: Sir, I know they used the
19 form. I know they put the -- put information on
20 that -- this form for when they did reviews. I
21 don't recall the whole entirety of -- of -- of the
22 way it was used, but I do know they used it to put
23 information on here for reviews.
24 BY MR. BAKER:

Page 120

1     Q   And how many do we see on this form?
2 Hold up your fingers. How many?
3          MS. MILLER: Object to form.
4 BY MR. BAKER:
5     Q   Ma'am?
6          MS. MILLER: Object to form.
7          THE WITNESS: Sir?
8 BY MR. BAKER:
9     Q   Hold up the number of fingers that
10 appears on there how many orders.
11     A   There's two.
12     Q   Two.
13          Let's go to the next month control drug
14 IRR. This is August of 2011. Do you see the
15 Bates No. 20400? Go to the next Bates number,
16 20401. Go to the next Bates number, 20402. That
17 starts the PSE IRR recap.
18          So let's go back to 20400 and 20401.
19 Okay? 20400 and 20401, I want you to assume that
20 this was produced as the August 2011 control drug
21 IRR recap by CVS, okay? I want you to assume
22 that. Ma'am?
23          MS. MILLER: Object to form.
24 BY MR. BAKER:

Page 121

1     Q   All right. This document shows
2 absolutely no orders that were populated on the
3 control drug IRR as it relates to
4 hydrocodone-combination products, does it?
5          MS. MILLER: Object to form.
6          THE WITNESS: Sir, without the -- I -- I
7 can't tell you if -- if something populated or not
8 without the data. So I -- I don't know.
9 BY MR. BAKER:
10     Q   Do you see any hydrocodone-combination
11 products on there?
12          MS. MILLER: Object to form.
13 BY MR. BAKER:
14     Q   Are there any?
15     A   I do not see --
16          MS. MILLER: Object to form.
17 BY MR. BAKER:
18     Q   Okay. What's that mean?
19          MS. MILLER: Object to form.
20 BY MR. BAKER:
21     Q   The fact that there's none?
22          MS. MILLER: Object to form.
23          THE WITNESS: Sir, that there's --
24 there's -- it's -- there's nothing there, but I

Page 122

1 can't tell you without knowing -- seeing the
2 content for it to know -- I can't tell you that
3 there is or isn't. I just can't tell you that.
4 BY MR. BAKER:
5     Q   Okay. If you assume that the
6 blacked-out portion was blacked out by CVS before
7 it was presented to the plaintiffs' attorneys in
8 this case, and that the blacked-out portion is
9 because what was on that control IR re- -- IRR
10 recap was not the hydrocodone-combination products
11 but was related to other products that don't
12 relate to -- that are not hydrocodone-combination
13 products --
14     I want you to assume that, okay?
15     MS. MILLER:  Object to form.
16 BY MR. BAKER:
17     Q   So do you see any Schedule III narcotics
18 listed on that August 2011 control IRR recap, yes
19 or no?
20     MS. MILLER:  Object to form.
21 BY MR. BAKER:
22     Q   Do you see any?
23     MS. MILLER:  Object to form.
24     THE WITNESS:  No, sir, I don't see

Page 123

1 anything on -- on there.
2 BY MR. BAKER:
3     Q   Zero.  Let's go to the next document.
4     This is the August PSE IRR recap, but
5 that has nothing to do with this case.
6     Go to the next one, September control
7 IRR recap, 20403.
8     Go to the next one, September PSE IRR
9 recap.
10     So let's go back to the control IRR
11 recap.  Do you see any Schedule III narcotics on
12 that September 2011 control IRR recap?
13     MS. MILLER:  Object to form.
14 BY MR. BAKER:
15     Q   Do you?
16     MS. MILLER:  Object to form.
17     THE WITNESS:  Sir, I don't see --
18 there's nothing on that record that I'm looking
19 at.  But I can't tell you the content of what was
20 there.  I -- I don't have anything that would show
21 me anything that tells me what was there or not
22 there.  I see what this document is indicating.  I
23 see that.  But --
24 BY MR. BAKER:

Page 124

1     Q   This document indicates it's populated
2 with no hydrocodone-combination products, correct?
3     MS. MILLER:  Object to form.
4     THE WITNESS:  I don't see any --
5 anything populated, sir.
6 BY MR. BAKER:
7     Q   Okay.  Let's go two pages forward to the
8 October PSE report.  Do you see that?
9     Now, let's go to the October control
10 drug IRR recap.  Do you see that?
11     A   I do, sir.
12     Q   That's one item listed on that report,
13 on 10/25/2011.  Do you see that?
14     MS. MILLER:  Object to form.
15 BY MR. BAKER:
16     Q   One item.
17     MS. MILLER:  Object to form.
18 BY MR. BAKER:
19     Q   Do you see that, ma'am?
20     MS. MILLER:  Object to form.
21     THE WITNESS:  Yes, sir, I see it on the
22 report.
23 BY MR. BAKER:
24     Q   Are there any other items other than

Page 125

1 that one item populated on that report?
2     MS. MILLER:  Object to form.
3     THE WITNESS:  I don't -- there's nothing
4 else that's populating, sir, that's correct.
5 BY MR. BAKER:
6     Q   Okay.  It's true that if the LP analyst
7 reviewing the IRR subjected any of the
8 hydrocodone-combination product orders that
9 populated on that IRR for the month of October,
10 that it would appear on this control IRR recap.
11 Am I right?
12     MS. MILLER:  Object to form.
13     THE WITNESS:  I know that they would
14 complete this form on what they completed.  I
15 don't know -- I can't speak to what would populate
16 or not populate on this particular report because
17 I don't have anything -- any documentation that
18 shows me that.  I -- I know that they do -- that
19 that's what they did, that they put information
20 from what that reviews were onto this -- onto a
21 separate report, sir.
22 BY MR. BAKER:
23     Q   And that's the report you're looking at.
24 Right?

Page 126

1    MS. MILLER: Object to form.
2  BY MR. BAKER:
3    Q  This is the report that they would
4  report their reviews on, right?
5    MS. MILLER: Object to form.
6  BY MR. BAKER:
7    Q  Ma'am, isn't that correct?
8    MS. MILLER: Object to form.
9  BY MR. BAKER:
10    Q  Is that correct?
11    MS. MILLER: Object to form.
12  BY MR. BAKER:
13    Q  Ms. Hinkle?
14    A  Sir?
15    Q  You don't have to look at the form to
16  answer this question.  The form is simple to read.
17  Now, just, please, if you could direct your
18  attention to me so I can ask you a question.
19    MS. MILLER: Mr. Baker, she can look at
20  the document.  It's on the screen --
21  BY MR. BAKER:
22    Q  You can look at whatever you want, but
23  staring --
24    MS. MILLER: -- in connection with your

Page 127

1  questions.
2  BY MR. BAKER:
3    Q  -- staring at the screen isn't going to
4  make any easier for you.
5    MS. MILLER: You're being condescending
6  and rude to the witness, and I would ask you to
7  refrain.
8    MR. BAKER: Okay.  I'm not doing that.
9  The witness is staring at a screen for 30 seconds
10  to a minute to not answer a very simple question.
11    MS. MILLER: Objection.  That's a --
12  that's a mis --
13  BY MR. BAKER:
14    Q  Staring at the screen isn't going to
15  make you the ability to answer this question.
16    So look at the screen.  What you see on
17  that screen is the October 2011 control IRR recap,
18  correct?
19    MS. MILLER: Object to the form.  Object
20  to the speech.
21  BY MR. BAKER:
22    Q  Am I right?
23    MS. MILLER: Object.
24    MR. BAKER: Object all you want.

Page 128

1  BY MR. BAKER:
2    Q  Here's the question:  Look at the
3  screen.  Look at the document, October 2, 2011
4  control IRR recap is what you see up here, right?
5    MS. MILLER: Object to form.
6    THE WITNESS: Yes.
7  BY MR. BAKER:
8    Q  Okay.  And then you see that there's one
9  item populated on there for 10/25/11, one
10  hydrocodone product for that date, correct?
11    MS. MILLER: Object to form.
12    THE WITNESS: It indicates that's what
13  it appears, that it's an IRR recap, sir.
14  BY MR. BAKER:
15    Q  Okay.  And the IRR recap is generated as
16  a subset of what appears on the IRR daily report,
17  correct?
18    MS. MILLER: Object to form.
19    THE WITNESS: I know they used this form
20  to complete -- they would put information from
21  that report onto this report, sir.  I do know
22  that.
23  BY MR. BAKER:
24    Q  Okay.  And -- and the information off

Page 129

1  the IRR that they would put on this report -- the
2  LP analyst would put on this report is the due
3  diligence that they subjected those orders of
4  interest to that populated on the IRR, correct?
5    MS. MILLER: Object to form.  Asked and
6  answered.
7  BY MR. BAKER:
8    Q  Is that right, ma'am?
9    MS. MILLER: Object to form.
10  BY MR. BAKER:
11    Q  You understand staring at the screen
12  isn't going to make you answer that question.
13  So --
14    MS. MILLER: Okay, Bill -- Bill --
15  BY MR. BAKER:
16    Q  So just tell me, what's the answer to
17  the question?
18    MS. MILLER: Stop treating the witness
19  in that manner.  She is waiting and thinking to
20  answer your question.  Where she is looking is not
21  a matter for you to direct her to do or not do.
22    MR. BAKER: Okay.
23    MS. MILLER: Please treat her with
24  respect --

Page 130

1    MR. BAKER: Okay.
2    MS. MILLER: -- as she considers your
3  questions.
4  BY MR. BAKER:
5    Q   Okay. Respectfully, I'm going to ask
6  you this question. Respectfully, I request that
7  you answer it, okay?
8    The question is simply this: The IRR
9  recap report is a recap of which orders on the IRR
10  daily report for that month were subjected by the
11  LP analyst to further due diligence review,
12  correct?
13    MS. MILLER: Object to form. Asked and
14  answered.
15    THE WITNESS: The report was -- the
16  information was put on the report that -- of
17  information that they -- they would do reviews for
18  and put -- placed on that report, sir. That's
19  what I -- I know happened.
20  BY MR. BAKER:
21    Q   Do you know why something appears on
22  this report?
23    MS. MILLER: Object to form.
24    THE WITNESS: They were doing reviews on

Page 131

1  those -- on that information, sir.
2  BY MR. BAKER:
3    Q   So if there was not a review done on an
4  order of interest that appeared on the IRR, if
5  there's no review done, then it's not going to
6  appear on this report, correct?
7    MS. MILLER: Object to form.
8    THE WITNESS: Sir, I -- I can't answer
9  that. I don't know.
10  BY MR. BAKER:
11    Q   Ma'am, you were the manager. Are you
12  telling me you don't know why something would
13  populate on the control IRR recap report?
14    MS. MILLER: Object to form.
15    THE WITNESS: I know that they used this
16  form. I know that they put information from --
17  when they reviewed on this form, sir, but I can't
18  tell you anything other than that, that that's
19  what they did, that's what they used.
20  BY MR. BAKER:
21    Q   And this form was used for what?
22    MS. MILLER: Object to form, asked and
23  answered.
24  BY MR. BAKER:

Page 132

1    Q   Do you know what this form was used for?
2    MS. MILLER: She's already given her
3  testimony in response to this question repeatedly.
4    THE WITNESS: They took the information
5  and did reviews, and then they would place
6  information on this report, sir.
7  BY MR. BAKER:
8    Q   Okay. Let's go to the next month. This
9  is the November PSE IRR recap. This is the
10  November IRR recap. Do you see that?
11    And just to make sure I'm showing you
12  the complete document, go to the next page. All
13  right. That's the second page of that document.
14    Just to make sure I'm not leaving
15  something off, go to the next page.
16    All right. So go back to 20408.
17    So you understand this is a two-page
18  document for November of 2011, correct?
19    A   Yes, sir, that's what --
20    Q   Do you see one, one order of interest of
21  a Schedule III hydrocodone-combination product or
22  any Schedule III narcotic on that control IRR
23  recap?
24    MS. MILLER: Object to form. You've

Page 133

1  already stated that there are redactions. Your
2  question pertains to any controlled Schedule III
3  drug.
4    MR. BAKER: Fair enough. I'll restate
5  the question. Fair enough.
6  BY MR. BAKER:
7    Q   All right. Do you see any hydrocodone-
8  combination products populated on this
9  November 2011 control IRR recap?
10    MS. MILLER: Object to form.
11    THE WITNESS: I don't see anything on
12  this -- on this picture, sir, no.
13  BY MR. BAKER:
14    Q   Okay. Let's go to December of 2011.
15  Let's skip the PSE, go straight to the control.
16  That's the first page.
17    Go to the next page. Go to the next
18  page. That's it. So it's a two-page document.
19    So the December 2011 control IRR recap,
20  are there any hydrocodone-combination products
21  populated on that form?
22    MS. MILLER: Object to form.
23    THE WITNESS: There's nothing populated
24  on that that I see, sir.

Page 134

BY MR. BAKER:

2    Q   Okay.  Fair enough.

3        During this period of time, you were the

4    manager of the program in Knoxville, correct?

5        MS. MILLER:  Object to form.

6        THE WITNESS:  Yes, sir.

7    BY MR. BAKER:

8    Q   Okay.  And during this period of time,

9    you would have managed the people who would have

10   populated this report, correct?

11       MS. MILLER:  Object to form.

12       THE WITNESS:  Yes, sir.

13       (Counsel conferring.)

14   BY MR. BAKER:

15   Q   Okay.  Now, could you look at Exhibit

16   No. 550, please.  I believe I gave you a copy.

17       MS. MILLER:  What document is that,

18   please?

19       MR. BAKER:  It is an e-mail dated 11/19

20   from Pamela Hinkle to Amy Propatier.

21       MS. MILLER:  I think you took it back.

22       MR. BAKER:  Oh, here.  I'm sorry.

23   BY MR. BAKER:

24   Q   Before you look at No. 550, do you know

Page 135

1    a gentleman by the name of Mark Nicastro?

2    A   Yes, sir.

3    Q   Okay.  And he was the director of the

4    Indianapolis distribution center, correct?

5    A   Yes, sir.

6    Q   And the Indianapolis distribution center

7    was one of the distribution centers that was

8    licensed to carry hydrocodone-combination products

9    for distribution to the CVS pharmacies, correct?

10   A   Yes, sir.

11   Q   Okay.  It was actually the other half of

12   the program, meaning when you were managing the

13   program in Knoxville, Mr. Lawson's desk was at --

14   was in your office or in your building at least,

15   and the other office was in Indiana with

16   Mr. Burtner, correct?

17       MS. MILLER:  Object to form.

18       THE WITNESS:  Yes.  Paul was in

19   Knoxville, and Aaron was in Indy, sir.

20   BY MR. BAKER:

21   Q   All right.  And you're aware that in

22   August 2013, there was an inspection by the DEA to

23   the Indiana facility?

24       MS. MILLER:  Object to form.

Page 136

1    BY MR. BAKER:

2    Q   You're familiar with that, right?

3        MS. MILLER:  Object to form.

4        THE WITNESS:  What year, sir?

5    BY MR. BAKER:

6    Q   2013.

7    A   Yes, sir.

8    Q   Okay.  Were you present during that

9    inspection?

10   A   No, sir.

11   Q   Okay.  Look at the document in front of

12   you.  It's Pam Hinkle to Amy Propatier,

13   11/19/2013, regarding "DEA Letter, November 2013."

14   Do you see that?

15   A   Yes, sir.

16   Q   Okay.  And so turn to that next page.

17   And just to make sure we're looking at things in

18   sequence, we're looking at document number 10265,

19   and what's attached to it is 106 -- 266 and 267

20   and 268, correct?

21   A   Yes, sir.

22   Q   Those documents are in sequence,

23   correct?

24   A   Yes, sir.

Page 137

1    Q   Okay.  So if you would, this is -- you

2    understand this is a letter to Mr. Gillen at the

3    DEA from Mark Nicastro.  You know that, correct?

4        MS. MILLER:  Object to form.

5    BY MR. BAKER:

6    Q   Do you know who Dan Gillen is?

7    A   Yes, sir.

8    Q   Okay.  He's a DEA agent; is that

9    correct, an investigator?

10       MS. MILLER:  Object to form.

11       THE WITNESS:  Yeah -- yes, sir, he's the

12   DEA supervisor.

13   BY MR. BAKER:

14   Q   Correct.  And after the inspection was

15   done, there was a closing, correct?  You know what

16   a closing means, right?

17       MS. MILLER:  Object to form.

18       THE WITNESS:  Yes, sir.

19   BY MR. BAKER:

20   Q   Okay.  And a closing is when they make

21   their findings relative to the inspection

22   generally; is that right?

23       MS. MILLER:  Object to form.

24   BY MR. BAKER:

Page 138

1    Q   And report those findings to you,
2  correct?
3        MS. MILLER:  Object to form.
4        THE WITNESS:  It's a closing to cover
5  all the details --
6  BY MR. BAKER:
7    Q   Right.
8    A   -- of that inspection.
9    Q   And -- and oftentimes the DEA agent will
10  communicate to CVS preliminarily what those
11  findings might be, correct?
12        MS. MILLER:  Object to form.
13  BY MR. BAKER:
14    Q   Before the closing.
15        MS. MILLER:  Object to form.
16        THE WITNESS:  I'm sorry.  Ask that
17  again, please.
18  BY MR. BAKER:
19    Q   Oftentimes the DEA agent will
20  preliminarily communicate to CVS what their
21  findings are and what their concerns are relative
22  to that inspection before the closing actually
23  takes place, correct?
24        MS. MILLER:  Object to form.

Page 139

1        THE WITNESS:  There are times where
2  they -- if there's something ahead of time during
3  the walk-throughs, that there will be discussions.
4  BY MR. BAKER:
5    Q   Sure.  So I want to review this letter
6  with you, and this is a letter that starts with --
7  well, first of all, this letter is one that was
8  sent to you by -- that was authored by Mark
9  Nicastro, at least that's what it indicates on the
10  next page of the document, correct?
11        MS. MILLER:  Object to form.
12  BY MR. BAKER:
13    Q   You see it says, "Respectfully, Mark
14  Nicastro"?  Do you see that?
15        Ma'am?
16    A   Yes, sir, I see.
17    Q   Okay.  So let's go back to the front of
18  this letter.  It says:  "Dear Mr. Gillen:  I am
19  following up on our conversation the other day and
20  our e-mail exchange.  In August, you and your
21  staff conducted a compliance inspection of our
22  Indianapolis DC.  Since that time we have been
23  requesting a date for the closing conference to
24  receive formal comments and recommendations from

Page 140

1  the DEA, but no such date has been given.  At this
2  time I formally request that the DEA set a date
3  for the closing meeting for the audit conducted in
4  August 2013 at the Indianapolis DC."
5        Is that what that says in the first
6  paragraph?
7    A   Yes, sir, that's what that says.
8    Q   Okay.  And skip down where it says, "I
9  gave your investigators."  Okay.  Do you see
10  where, that paragraph?
11        "I gave your investigators a copy of our
12  standard operating procedure during the discussion
13  of our SOM, and I have attached a copy for your
14  review, but below are the highlights of our
15  process."
16        Do you see that?
17    A   Yes, sir, I do see that.
18    Q   A standard operating procedure is a
19  written document that sets forth what the policies
20  and procedures are of CVS and -- in reference to a
21  particular topic or a particular department at
22  CVS, correct?
23        MS. MILLER:  Object to form.
24        THE WITNESS:  An SOP is the standard

Page 141

1  operating procedures of what that particular topic
2  is, sir, yeah.
3  BY MR. BAKER:
4    Q   Okay.  And as of August 26 -- August 25,
5  2010, that was the first time that -- that your
6  company, CVS, had a suspicious order monitoring
7  SOP written into the SOP.  Is that right?
8        MS. MILLER:  Object to form.
9  BY MR. BAKER:
10    Q   Do you recall that?
11        MS. MILLER:  Object to form.
12        THE WITNESS:  Sir, I don't recall when
13  that --
14  BY MR. BAKER:
15    Q   That's fine.  I want you to assume
16  that -- that Amy Propatier uploaded into the
17  system and inserted the SOM, the suspicious order
18  monitoring paragraphs, into the CVS SOP on or
19  about August 26, 2010, and that she generated an
20  e-mail to that effect.
21        Do you have any reason to disagree with
22  that?
23        MS. MILLER:  Object to form.  If you
24  want to show her a document at this time.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    MR. BAKER: Not right now.
2  BY MR. BAKER:
3    Q   Just go ahead, do you have any reason to
4  disagree with that?
5      MS. MILLER: Object to form.
6      THE WITNESS: Sir, I don't -- don't -- I
7  don't -- I don't know when it happened. That's
8  the only thing. I can't --
9  BY MR. BAKER:
10   Q   Okay, that's fine.
11     All right. It says here: "... but
12 below are the highlights of our process." And the
13 first bullet says: "We have an algorithm through
14 which all controlled substance orders are run."
15     Do you see that?
16   A   I do see that, sir.
17   Q   Is that your recollection of how things
18 were run when you were the SOM manager in
19 Knoxville?
20     MS. MILLER: Object to form.
21 BY MR. BAKER:
22   Q   Ma'am? The title, I didn't -- I don't
23 have it in front of me. What do you call your
24 title that you were assuming when you were over

Page 143

1  the SOM program?
2    A   The manager.
3      MS. MILLER: Object to form.
4  BY MR. BAKER:
5    Q   The manager?
6    A   Yeah, the --
7    Q   Can we say SOM manager?
8    A   Yes. That's fine.
9    Q   All right. So if I say "SOM manager,"
10 you understand that I'm talking about the period
11 of time that you managed the SOM process between
12 2011 and 2012 in Knoxville, correct?
13     MS. MILLER: Object to form.
14     THE WITNESS: (The witness nods.)
15 BY MR. BAKER:
16   Q   Okay.
17   A   Yes, sir.
18   Q   Okay. So when you were the SOM manager
19 in Knoxville, was there an algorithm through which
20 all controlled substances orders were run? Was
21 there?
22     MS. MILLER: Object to form.
23     THE WITNESS: Was there an algorithm?
24 BY MR. BAKER:

Page 144

1    Q   Yes.
2    A   Yes, sir.
3    Q   Okay. And were all controlled substance
4  orders run through that algorithm?
5    A   Yes, sir.
6    Q   Okay. Was that done on a daily or
7  nightly basis --
8      MS. MILLER: Object to form.
9  BY MR. BAKER:
10   Q   -- for every order -- for every order of
11 a controlled substance by a pharmacy directed to a
12 CVS distribution center?
13     MS. MILLER: Object to form.
14     THE WITNESS: Sir, I don't -- I don't
15 know the process of how that actually worked. But
16 I do know that the -- that the system ran the
17 orders. I just don't know that process.
18 BY MR. BAKER:
19   Q   Okay. And it says: "It was developed
20 and implemented by Buzzeo in 2008 to identify
21 controlled substance orders of unusual size,
22 unusual frequencies, and orders that deviate from
23 a normal buying pattern."
24     Do you see that?

Page 145

1      MS. MILLER: Object to form.
2      THE WITNESS: Yes, sir, I see that.
3  BY MR. BAKER:
4    Q   Is that your understanding of the Buzzeo
5  program?
6      MS. MILLER: Object to form.
7      THE WITNESS: I -- I don't know what
8  that algorithm looked like. I just know that
9  there was an algorithm, you know, put in place,
10 and it ran -- that the orders ran through that
11 algorithm, sir. That's -- that's pretty much the
12 only thing I really understand or knew at that
13 time.
14 BY MR. BAKER:
15   Q   Okay.
16   A   And -- and I can't remember now, sir.
17   Q   Okay. And then it goes on to state
18 that: "Any order that is flagged by our SOM model
19 is identified as an order of interest."
20     Correct? That's what it says.
21     MS. MILLER: Object to form.
22 BY MR. BAKER:
23   Q   Is that right?
24   A   Yes, sir, that's what it states.

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    MS. MILLER: Object to form.
2  BY MR. BAKER:
3    Q   The SOM model refers to that algorithm
4  that we referred to in those first two paragraphs,
5  correct?
6    MS. MILLER: Object to form.
7  BY MR. BAKER:
8    Q   Ma'am?
9    MS. MILLER: Object to form.
10 BY MR. BAKER:
11   Q   You went like that (indicating). Does
12 that mean "yes"?
13   A   Sir, I --
14   Q   The SOM model, it says: "Any order that
15 is flagged by our SOM model is identified as an
16 order of interest." Correct?
17   MS. MILLER: Object to form. This
18 letter was sent on November --
19   MR. BAKER: Just object to form.
20   MS. MILLER: -- 2013. What time frame
21 are you talking about?
22   MR. BAKER: What I'm going to ask is
23 that you just object to form, and if you want
24 to -- to redirect or whatever you want to do later

Page 147

1  on, you can do that, but please don't do that.
2  BY MR. BAKER:
3    Q   All right. This letter says: "Any
4  order that is flagged by our SOM model is
5  identified as an order of interest."
6    Is that what the document says?
7    A   That is what the document says, sir.
8    Q   And is that your understanding of how
9  the Buzzeo software program worked is that it
10 would flag an order of interest and populate it on
11 the IRR?
12   MS. MILLER: Object to form.
13   THE WITNESS: The algorithm ran, and
14 then it would populate the information on the
15 report. I don't know how all that happened. It
16 was all done through a systematic way, sir, and I
17 don't know how that happened.
18 BY MR. BAKER:
19   Q   I understand.
20   But just in its most simplistic way, the
21 orders were run through that program nightly, and
22 they populated on the IRR as an order of interest;
23 is that right?
24   MS. MILLER: Object to form.

Page 148

1    THE WITNESS: It populated on the report
2  for review to determine if there was reason to
3  believe it was an order of interest. That's the
4  way it worked. It wasn't that it was
5  automatically an order of interest when it first
6  populates on that report, because there had to be
7  additional due diligence in -- you know, other
8  things -- you know, there were lots of different
9  things they looked at, and I don't have the
10 particulars around what that actually looked like,
11 sir.
12 BY MR. BAKER:
13   Q   Okay. You're telling me that if it
14 appeared on the IRR, that that doesn't make it an
15 order of interest?
16   MS. MILLER: Object to form.
17   THE WITNESS: It was an order that to --
18 for due diligence.
19 BY MR. BAKER:
20   Q   Okay.
21   A   That we had to do the due diligence.
22   Q   Okay. Fair enough.
23   A   So we had to -- we had to look at it.
24   Q   Right. So it wasn't a suspicious order.

Page 149

1  It was an order of interest that might be a
2  suspicious order. Is that correct?
3    MS. MILLER: Object to form.
4    THE WITNESS: It was an order to be
5  reviewed to determine if there was additional
6  review needed to be done --
7  BY MR. BAKER:
8    Q   Okay.
9    A   -- for an order of interest, and then
10 if -- based on if that due diligence warranted or
11 provided additional reasons that we believed it to
12 be suspicious.
13 BY MR. BAKER:
14   Q   Okay. Listen to my question.
15   If something populated on that report as
16 a result of being run through that algorithm, that
17 order that populated on the report is called an
18 order of interest, correct?
19   MS. MILLER: Object to form.
20   THE WITNESS: Sir, I can't remember if
21 we -- if it was deemed -- I can't remember that
22 piece. I know the -- the review -- the report
23 came down, and we reviewed the report. We would
24 determine if there was reason to look into that

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 order because it was deemed an order of interest.
2 And then once we did that, we did the due
3 diligence to determine if there was reason to
4 believe that it was suspicious.
5     MR. BAKER: I'm going to take just a
6 short break to confer with my co-counsel, okay?
7     THE VIDEOGRAPHER: The time is 11:58
8 a.m. We're going off the record.
9     (Recess.)
10     THE VIDEOGRAPHER: The time is
11 12:12 p.m., and we're back on the record.
12     (Exhibit No. 523 was premarked for
13     identification.)
14 BY MR. BAKER:
15   Q  I have in front of you Exhibit 523.
16     And we'll go back and ask you questions
17 about 550 in just a minute, but this is an e-mail
18 from Pam Hinkle, which is you, to Yvette Justice,
19 3/26/12. Do you see that?
20   A  Yes, sir.
21   Q  Okay. So this is the IRR SOM process
22 flow. Do you see that?
23   A  Yes, sir.
24   Q  Okay. Go to the next page. It is the

Page 151

1 Logistics Loss -- LP -- Work Instruction, Loss
2 Prevention Analyst, with a revision date of
3 2/29/12. Do you see that?
4   A  Yes, sir.
5   Q  Okay. So this is one of those work
6 instructions that is a written document that
7 describes the topic of work instruction for a loss
8 prevention analyst that was in effect on 2/28/12
9 while you were the SOM manager at CVS, correct?
10     MS. MILLER: Object to form.
11 BY MR. BAKER:
12   Q  Yes?
13   A  Yes, sir.
14   Q  Okay. All right. So let's go through
15 it.
16     The work instruction is a product
17 identifier: Primary: Review IRR SOM. And
18 secondary: Review high volume stores, high
19 dispensing doctors, high script filling patients,
20 et cetera.
21     The work instructions: "(a) Retrieve
22 the Inventory Review Report from the data room."
23     Is that what happened on a daily basis?
24   A  That's what I recall, sir. Yes,

Page 152

1 that's -- that would have been what occurred.
2   Q  All right. "Review entire RRR -- IRR to
3 identify irregular orders.
4     "Review the IRR regionally, beginning in
5 the East and then the West.
6     "Complete irregular orders -- Logistics
7 Communication form to identify which DCs have
8 stores with irregular orders.
9     "Via e-mail, send to all DCs the
10 completed irregular orders -- Logistics
11 Communication form to notify the DCs whether or
12 not they have stores with irregular orders."
13     Have I read that document so far word
14 for word?
15   A  Yes, sir, you have.
16   Q  Okay.
17     "Complete separate Irregular Orders --
18 DC Communication form for each DC with stores with
19 irregular orders.
20     "Via e-mail, send the Irregular Orders
21 -- DC Communication form to the appropriate DC,
22 instructing the DC to freeze the order.
23     "Prioritize each identified entry on the
24 IRR. Entries will be prioritized based on, but

Page 153

1 not limited to:
2     "Time zone;
3     "High theft items versus low theft
4 items;
5     "Items with a low 6 month/12 month
6 standard deviation."
7     Correct?
8     MS. MILLER: Object to form.
9 BY MR. BAKER:
10   Q  Is that what it says?
11     MS. MILLER: Object to form.
12     THE WITNESS: That's what it says in
13 this, yes, sir.
14 BY MR. BAKER:
15   Q  Okay. So at this point they reviewed
16 the entire IRR to identify irregular orders,
17 correct?
18     MS. MILLER: Object to form.
19 BY MR. BAKER:
20   Q  That's bullet (b). Ms. Hinkle?
21   A  Yes, sir.
22   Q  Bullet (b) says they review the entire
23 IRR to review -- to identify irregular orders,
24 correct?

Page 154

1    A   Yes, sir, that's what it states.

2    Q   All right.  Then it goes to (h).  It

3  says: "Using MicroStrategy, VIPER, InfoPak, etc.,

4  open an inquiry on each irregular order beginning

5  with the highest priority."  Correct?

6        MS. MILLER:  Object to form.

7        THE WITNESS:  That's what it states

8  here, sir.

9  BY MR. BAKER:

10   Q   Okay.  MicroStrategy was a tool

11 available for use by the loss prevention analysts

12 in 2012, correct?

13       MS. MILLER:  Object to form.

14       THE WITNESS:  I know that the VIPER was

15 available, but I'm not -- I'm not sure on the

16 times of when it -- I mean, I don't know when,

17 how.  I know that they did use VIPER.

18 BY MR. BAKER:

19   Q   Okay.  MicroStrategy, do you know what

20 that is?

21   A   Yes, sir, it was another system.

22   Q   Okay.  And what did that system do?

23   A   It was able to provide information

24 around particular, you know, items.

Page 155

1    Q   Do you know what information?

2    A   No, sir, I -- I don't remember what the

3  details were behind it, sir.

4    Q   All right.  Were the orders of interest

5  subjected to MicroStrategy?

6        MS. MILLER:  Object to form.

7        THE WITNESS:  They used -- there was

8  several different systems that they would use.

9  MicroStrategy would be one of them that they would

10 have used.

11 BY MR. BAKER:

12   Q   If Mr. Burtner, who worked for you,

13 testifies that he used MicroStrategy only for the

14 orders that he flagged off of the IRR report for

15 further due diligence, would you have any reason

16 to disagree with that testimony?

17       MS. MILLER:  Object to form.

18       THE WITNESS:  I have no reason to

19 disbelieve that -- if that's what he stated.  I

20 don't know.

21 BY MR. BAKER:

22   Q   All right.  And if Mr. Burtner said that

23 the -- his review under MicroStrategy and his

24 opinion suggested that there was no need to go

Page 156

1  further to continue any -- any further due

2  diligence on it, that he wouldn't do so based just

3  upon looking at the initial review on the IRR

4  report, and subjected it to MicroStrategy's

5  review, you would have no reason to disagree with

6  that, correct?

7        MS. MILLER:  Object to form.

8        THE WITNESS:  I have no reason to -- to

9  dispute if that's what he stated.  I have no --

10 BY MR. BAKER:

11   Q   In other words, that's where the -- the

12 review would stop according to him, if it passed

13 those levels of review in his opinion.  You have

14 no reason to disagree with that, would you?

15       MS. MILLER:  Object to form.

16 BY MR. BAKER:

17   Q   Go ahead.

18   A   I have no reason to dispute -- if that's

19 what he indicated, I have no reason to dispute

20 that.

21   Q   All right.  And then it says:  "If

22 initial inquiry justifies the irregular order,

23 contact the DC via e-mail and phone, and instruct

24 to release the order.

Page 157

1        "If the initial inquiry does not justify

2  the irregular order, contact the store PIC via

3  phone, and using the Store Environment Speaking

4  Points, ask the PIC questions to gather and

5  document the pertinent information."

6        Is that what it says?

7    A   Yes, sir, that is what it says.

8    Q   Okay.  Go to the next page.  It says:

9  "Log the review on recap spreadsheet."  Do you see

10 that?

11   A   Yes, sir, I do.

12   Q   Okay.  Do you remember those recaps that

13 we just went over?

14   A   Yes, sir, I do.

15   Q   Okay.  These are the recaps of what's

16 being reviewed when these IRRs have orders flagged

17 that are then subjected to further due diligence,

18 according to this document; is that correct?

19       MS. MILLER:  Object to form.

20 BY MR. BAKER:

21   Q   Is that right?

22       MS. MILLER:  Object to form.

23       THE WITNESS:  Based on this -- this

24 re- -- this, it indicates that that's what was

Page 158

1 done, sir.
2 BY MR. BAKER:
3     Q   Okay.  So go back to No. 550.  Do you
4 see that?  I asked you about the letter.
5     A   Oh.  Yes, sir.
6     Q   Okay.  And remember this is the letter
7 from Mr. Nicastro to Mr. Gillen.  Do you remember
8 that?
9     A   Yes, sir.
10     Q   Okay.  And it says here:  "Any order
11 that is flagged by our SOM model is identified as
12 an order of interest and has additional due
13 diligence conducted by the SOM team.  We have
14 reviewed and adjusted the model several times
15 since it was implemented.
16         "Due diligence on orders of interest may
17 include contacting the store and speaking to the
18 pharmacist, reviewing prior ordering data,
19 comparing ordering and dispensing data, comparing
20 the quantity of controlled substances to
21 non-controlled substances, determining if
22 prescriptions for cocktails are being presented to
23 the store, determining if one or more doctors make
24 up a disproportionate share of the dispensing,

Page 159

1 review of the store's ordering versus dispensing,
2 review of potential patients, prescribers of
3 concern such as common doctor, patient age,
4 dispensing quantity, payment method, distance
5 traveled."
6         That's what the letter says, right?
7         MS. MILLER:  Object to form.
8         THE WITNESS:  Yes, sir, that's what it
9 states.
10 BY MR. BAKER:
11     Q   Okay.  Isn't it true that the orders
12 that were flagged for additional review off of
13 that IRR were not subjected to that level of
14 scrutiny when you were the SOM manager?  Isn't
15 that true?
16         MS. MILLER:  Object to form.
17         THE WITNESS:  There was, well, a lot of
18 different checks and balances, sir, and there was
19 these -- some of these are very familiar.  Some I
20 just -- I just don't recall everything, but I know
21 that there was a lot of due diligence that was
22 conducted when they determined, you know, an order
23 of concern.
24 BY MR. BAKER:

Page 160

1     Q   Okay.  And do you remember that portion
2 of this document on No. 523, where it said, "Log
3 the review on recap spreadsheet"?  Do you remember
4 that?
5     A   I do, sir.
6     Q   Okay.  Did you see anything on the recap
7 spreadsheet for the second half of the year 2011,
8 that I went through with you on the control drug
9 IRR recap that indicated any of those things were
10 done?  Any of the due diligence that's described
11 by Mr. Nicastro in this letter to Mr. Gillen, did
12 you see any of that documented on the IRR recap?
13         MS. MILLER:  Object to form.
14         And if you'd like him to show the
15 document before you answer the question, you can
16 do that.
17 BY MR. BAKER:
18     Q   Do you remember the IRR recaps?
19     A   Yes, sir, I do.
20     Q   Did you see --
21         MS. MILLER:  Object to form.
22 BY MR. BAKER:
23     Q   Did you see any of that due diligence
24 reflected on that IRR recap?

Page 161

1         MS. MILLER:  Object to form.
2         THE WITNESS:  I didn't see any of this
3 information on there, sir, no.
4 BY MR. BAKER:
5     Q   Okay.  So if Mr. Nicastro said that --
6 that these -- this level of scrutiny was something
7 that the orders of interest were subjected to,
8 that's just plain and simply not true; is that
9 correct?
10         MS. MILLER:  Object to form.  Object to
11 the use of this document dated 2013, and your
12 reference to these IRR recaps from 2011.
13 Objection.
14 BY MR. BAKER:
15     Q   That's just not true, is it?
16         MS. MILLER:  Object to form.
17         THE WITNESS:  Sir --
18         MR. BAKER:  I understand your objection,
19 and you don't have to say it any more than just,
20 "Object to form."  If you say it with any more,
21 you know, vocalization, it doesn't make it any
22 more of an objection.  In fact, I will be happy to
23 give you a standing objection.
24         Can we just agree that I'll give you

Page 162

1 standing objection to every single question -- to
2 object to form on every single question?
3        MS. MILLER:  No, I think I'm going to
4 object to form.  It's my right.
5        MR. BAKER:  Okay.  But if you say it
6 just "object to form," without going, "Object to
7 form," and vehemently like that, that's not going
8 to make it any more of an objection than if you
9 just object.  So -- so --
10        MS. MILLER:  Well, then can I correct
11 you when you raise your voice?  Is that how this
12 is going to work?
13        MR. BAKER:  I -- I would prefer you not
14 do that.
15        MS. MILLER:  Well, I would prefer you
16 would not do that to me.  So let's -- why don't we
17 just agree that we each --
18        MR. BAKER:  But I just want to have the
19 ability to ask --
20        MS. MILLER:  -- each speak on the record
21 as we see fit.
22        MR. BAKER:  -- the question without
23 being interrupted every single time.
24        MS. MILLER:  You -- you're -- I'm

Page 163

1 allowing you to ask your question, and then I'm
2 objecting, as is my right.
3        MR. BAKER:  Right.  But if you say it
4 any louder than what you're -- if you say it just
5 in this tone, "Object to form," I get it.  You
6 don't have to say, "Object to form," and spread
7 that out with such volume.  It doesn't make it any
8 more of an objection.  So but just hold the
9 objection down so that the witness can answer, I'd
10 appreciate it.
11        MS. MILLER:  Okay.  Are you going to
12 hold your volume down as well?
13        MR. BAKER:  To the extent that I need to
14 communicate, I will use volume.  So --
15        MS. MILLER:  And I reserve the right to
16 do the same.
17        MR. BAKER:  Okay.  So let's move
18 forward.
19 BY MR. BAKER:
20    Q   So to the extent that -- that
21 Mr. Nicastro is reporting that all of these
22 things -- contacting the store and speaking to the
23 pharmacist, reviewing prior order data, comparing
24 order data and dispensing data, comparing the

Page 164

1 quantity of controlled substances to
2 non-controlled substances, determining if
3 prescriptions for cocktail are being -- cocktails
4 are being presented to the store, determining if
5 one or -- one or several doctors make up a
6 disproportionate share of the dispensing,
7 reviewing of the store's ordering and dispensing,
8 reviewing of potential patients, prescribers of
9 concern such as common doctor, patient age,
10 dispensing quantity, payment method, distance
11 traveled -- to the extent that Mr. Nicastro is
12 telling Mr. Gillen that all orders of interest are
13 subject to that level of scrutiny and review, that
14 is not what your experience was when you were the
15 SOM manager managing the people that did subject
16 orders of interest to review.  Am I correct?
17        MS. MILLER:  Object to form.
18        THE WITNESS:  What I recall is when
19 there was an order of interest, that it was deemed
20 we needed the order to -- it was deemed an order
21 of interest that we needed to do the due diligence
22 on, that these were the criteria of things that we
23 actually did look at.  Or not me personally, sir,
24 but it was things that they actually look --

Page 165

1 looked at.
2 BY MR. BAKER:
3    Q   On every single order of interest?
4        MS. MILLER:  Object to form.
5        THE WITNESS:  If they identified it as
6 being an order of interest, yes, sir.  That's what
7 I recall.
8 BY MR. BAKER:
9    Q   Okay.  And if --
10        MS. MILLER:  Object to form.
11 BY MR. BAKER:
12    Q   -- Mr. Burtner, who actually did the
13 reviews, testifies that he did not do all of these
14 things on every order of interest, you would have
15 no reason to disagree with that, would you?
16        MS. MILLER:  Object to form.
17        THE WITNESS:  Sir, I -- I don't know
18 what context, and I don't know if I'm mis- --
19 misinterpreting the -- the order of interest in
20 the way that works.  I don't know.  But I just
21 know that we did conduct this due diligence, and I
22 know that if it was flagged for additional due
23 diligence, that these were the things that were
24 looked at, sir.

Page 166

BY MR. BAKER:

Q   Okay.  Go back to subparagraph (o) on 523.

A   I'm sorry?

Q   On 523.  Go to subparagraph (o).  It says: "Log the review on recap spreadsheet." Remember that?

A   Yes, sir.

MS. MILLER:  Object to form.

BY MR. BAKER:

Q   Okay.  Now, on those spreadsheets that I showed you, did you see that list of items that Mr. Nicastro told Mr. Gillen that the orders of interest were subjected to, did you see any of that described on the recap sheet, yes or no?

MS. MILLER:  Object to form.

THE WITNESS:  Sir, I did not see any of this information on there, but I know that -- how it was done in Knoxville at that time.  I can't -- I don't -- don't know the -- the -- the -- what was -- the documentation on the records that I'm being shown, but I do know that -- that this type of due diligence was done when we did -- did the due diligence on a specific -- you know, specific

Page 167

customer, item, I know this is things that we looked at.

BY MR. BAKER:

Q   Okay.  Let me see if you can just answer this one yes or no.

Did you see any of that documented on the recap spreadsheet, yes or no?  Just plain yes, plain no.

MS. MILLER:  Object to form, asked and answered.

THE WITNESS:  No, sir, I did not see that on there.

BY MR. BAKER:

Q   Okay.  Let's go to Exhibit No. 523 and go to the flowchart.

Do you recognize this flowchart?

MS. MILLER:  Give her a chance to look at the flowchart, please.

BY MR. BAKER:

Q   And remember, this was the e-mail on the front of the page from Pamela Hinkle to Yvette Justice regarding the SOM process flow.

Do you see that?  And then also loss prevention analyst document.  Do you see that?

Page 168

MS. MILLER:  He's now at the front of the document.

BY MR. BAKER:

Q   Do you see that?

A   Yes, sir.

Q   Okay.  So if you go to Bates No. 20429, which is that flowchart, that's the flowchart that you attached to your e-mail, right?

MS. MILLER:  Object to form.

THE WITNESS:  That's what it indicates, sir, yes.

BY MR. BAKER:

Q   Okay.  So this describes the IRR SOM review process, correct?

MS. MILLER:  Object to form.

BY MR. BAKER:

Q   Right?

MS. MILLER:  Object to form.

THE WITNESS:  It is an I -- an IRR flowchart is what it appears to be, sir.

BY MR. BAKER:

Q   Okay.  So it starts with:  "Initiate IRR SOM review process.  Review entire RR -- IRR per time zone."  Correct?

Page 169

MS. MILLER:  Object to form.

BY MR. BAKER:

Q   Isn't that what it says?

A   Yes, sir, that is what it says.

Q   All right.  Then it says:  "While reviewing the IRR, identify all orders that appear irregular based on the previous 12 months LAG." Correct?

MS. MILLER:  Object to form.

THE WITNESS:  Yes, sir, that's what it says.

BY MR. BAKER:

Q   Okay.  And then it says -- it says: "Are any (more) orders identified as irregular?" Correct?

MS. MILLER:  Object to form.

THE WITNESS:  Yes, sir, that's what it states.

BY MR. BAKER:

Q   All right.  So if they're identified as irregular, if the answer is, no, they're not, then you complete the IRR irregular -- complete the I -- complete the irregular orders logistics communicating form indicating no irregular orders

Page 170

1 had been identified. Correct?
2         MS. MILLER: Object to form.
3 BY MR. BAKER:
4     Q   That's what it says if it's -- if there
5 are no irregular orders, right?
6     A   Yes, sir, that's what it states in
7 there.
8     Q   All right. And then if it says, yes,
9 there are irregular orders, "Complete the
10 Irregular Orders - Logistics Communication
11 indicating which Distribution Centers have orders
12 identified as irregular, correct?
13     A   That's what it states, sir.
14     Q   Then you send the communication to all
15 the DCs, correct?
16         MS. MILLER: Object to form.
17         THE WITNESS: Yes, sir, that's what it
18 states.
19 BY MR. BAKER:
20     Q   All right. Then you complete a separate
21 irregular order DC communication for each
22 distribution center with an order identified as
23 irregular, correct?
24         MS. MILLER: Object to form.

Page 171

1 BY MR. BAKER:
2     Q   Right?
3         MS. MILLER: Object to form.
4         THE WITNESS: That's what it states,
5 sir.
6 BY MR. BAKER:
7     Q   All right. Go to the next page.
8         All right. Then it says: "Do any
9 stores need to be reviewed?" Do you see that?
10         MS. MILLER: Objection. That's not what
11 it says.
12 BY MR. BAKER:
13     Q   "Do any high stores need to be
14 reviewed?" Is that what it says?
15     A   Yes, sir, that's what it states.
16     Q   A high store is what?
17         MS. MILLER: Object to form.
18 BY MR. BAKER:
19     Q   Do you know?
20     A   Sir, I don't know --
21         MS. MILLER: Object to form.
22         THE WITNESS: -- what it indicates here.
23 I'm sorry.
24 BY MR. BAKER:

Page 172

1     Q   Okay. Then it says: "Yes, using
2 MicroStrategy, run a report to retrieve all
3 necessary information to review all cash sales at
4 the store in the previous four weeks."
5         Do you see that?
6     A   I do see that, sir.
7     Q   All right. Then it says: "Review
8 MicroStrategy report, identifying cash orders with
9 common Doctor and/or common Patient." Correct?
10     A   Yes, sir, I see that.
11         MS. MILLER: Object to form.
12 BY MR. BAKER:
13     Q   Then it says: "Were any trends
14 identified?" Do you see that?
15         MS. MILLER: Object to form.
16 BY MR. BAKER:
17     Q   Do you see that?
18     A   Yes, sir, I do see that.
19     Q   It says: If no, then you go up. The
20 document -- "Document the review on the recap
21 spreadsheet." Do you see that?
22         MS. MILLER: Object to form.
23         THE WITNESS: Yes, sir, I do see that.
24 BY MR. BAKER:

Page 173

1     Q   Okay. And so, in any event, we know
2 that if there was a review done, that it should be
3 documented on the recap spreadsheet, correct?
4         MS. MILLER: Object to form.
5 BY MR. BAKER:
6     Q   Right?
7         MS. MILLER: Object to form.
8         THE WITNESS: I can't remember the
9 process, sir. I'm sorry. And I'm trying to
10 answer your question. I just need to look at this
11 flow for just a minute because I -- I just --
12 honestly, I don't remember the actual steps, sir.
13 It's been so long ago, I just don't remember.
14 BY MR. BAKER:
15     Q   I think we'll just do it this way.
16         Does the document say what I just said,
17 that you document the review on the recap
18 spreadsheet?
19         MS. MILLER: Object to form.
20 BY MR. BAKER:
21     Q   Did I read that correctly?
22     A   Yes, sir, you did.
23     Q   All right. And then go below that, it
24 says: "Were any trends identified? If the answer

Page 174

1  is yes, using MicroStrategy, run a report to
2  retrieve all information to perform an in-depth
3  review of doctor and patient."
4       Do you see that?
5       A  Yes, sir, I do.
6       Q  Okay.  So basically if -- if you look at
7  this flowchart, if you use MicroStrategy and run a
8  report to retrieve all necessary information to
9  review all cash sales of that store in the
10  previous four weeks, and use MicroStrategy to
11  identify cash orders with common doctor or common
12  patient, and there are no trends identified, then
13  at that point the investigation stops, and it's
14  documented on the recap spreadsheet, according to
15  this document.  Is that correct?
16      MS. MILLER:  Object to form.
17      THE WITNESS:  Based on this document,
18  that's what it indicates, sir.
19  BY MR. BAKER:
20      Q  Okay.  So if Mr. Nicastro said that
21  every order of interest is subjected to all those
22  things that are identified on page 2 of 550 -- go
23  back to 550 and go to page 2 -- that due diligence
24  on orders of interest may include contacting the

Page 175

1  store and speaking to the pharmacist, reviewing
2  prior ordering data, comparing ordering and
3  dispensing data, comparing the quantity of
4  controlled substances to non-controlled substance,
5  determining if prescriptions for cocktails are
6  being presented to the store, determining if one
7  or several doctors make up a disproportionate
8  share of the dispensing, review of the store's
9  ordering versus dispensing, review of potential
10  patients/prescribers of concern such as common
11  doctor, patient age, dispensing quantity, payment
12  method, distance traveled, that would be
13  inconsistent with the flowchart that I just showed
14  you -- if you pull that flowchart back up -- as to
15  at what point a review could stop if it was an
16  order of interest being reviewed.  Correct?
17      MS. MILLER:  Object to form.
18      You're misstating the content of this
19  document, Exhibit 550, dated November 19th, 2013,
20  as every order reviewed.  You've done it several
21  times.
22  BY MR. BAKER:
23      Q  Go ahead.
24      MS. MILLER:  The objection applies to

Page 176

1  the earlier --
2  BY MR. BAKER:
3      Q  Go ahead.
4      MS. MILLER:  -- misreading of the
5  document.  Mischaracterization.
6      THE WITNESS:  Could -- could you read --
7  BY MR. BAKER:
8      Q  Mr. Nicastro's letter says that the
9  orders of interest are subjected to that level of
10  investigation.  Let's just read the document.
11      "Any order that is flagged by our SOM
12  model is identified as an order of interest and
13  has additional due diligence conducted by the SOM
14  team.  We have reviewed and adjusted the model
15  several times since it was implemented.
16      "Due diligence on orders of interest may
17  include," and then he lists all those things, and
18  then you compare that to what's on your flowchart.
19  Go back to the flowchart, that flowchart does not
20  list all of those things that Mr. Gillen lists in
21  his letter to the DEA, does it?
22      MS. MILLER:  Object to form.
23      THE WITNESS:  Sir, all I can tell you is
24  what I know we did.  And I know that -- when I say

Page 177

1  "we," I mean the folks that actually did the
2  reviews.  And these were the elements that were
3  looked at when an order of interest required -- we
4  required to do additional due diligence, these
5  were the -- the elements of things that they did
6  look at.
7  BY MR. BAKER:
8      Q  Ma'am, when you were the suspicious
9  order monitoring manager in Knoxville, how many
10  irregular orders were -- were reported to the DEA?
11      MS. MILLER:  Object to form.
12  BY MR. BAKER:
13      Q  Irregular orders is what I said.
14      MS. MILLER:  Object to form.
15  BY MR. BAKER:
16      Q  Let me withdraw the question.
17      When you were the suspicious order
18  manager running the program in Knoxville in 2011
19  and 2012 for CVS, as it relates to Level III
20  controlled substances, including
21  hydrocodone-combination products, how many
22  suspicious orders were reported to the DEA as a
23  result of any investigation that took place by the
24  LP analysts under your supervision or you?

Page 178

1       MS. MILLER:  Object to form.
2   BY MR. BAKER:
3       Q   And if I told you the answer was zero,
4   would you have any reason to disagree with that?
5       MS. MILLER:  Object to form and to your
6   testimony.  You can ask her a question that she
7   will be prepared to answer, but don't testify on
8   the record and then ask her to agree.  Object to
9   form.
10  BY MR. BAKER:
11      Q   Let me ask you the question in a manner
12  that hopefully is -- is understandable to you.
13      Do you know what a suspicious order is?
14      MS. MILLER:  Object to form.
15      THE WITNESS:  I do, sir.
16  BY MR. BAKER:
17      Q   Do you know what the definition of "a
18  suspicious order" is?
19      A   I do, sir.
20      MS. MILLER:  Object to form.
21  BY MR. BAKER:
22      Q   What is it?
23      A   It is an order that appears to be --
24  reasons to question the -- whatever the

Page 179

1   characteristic is, whether it's the quantity,
2   whether it's a pattern, whatever the reason, then
3   that generates more due diligence, and when that
4   new due diligence occurs, and it's labeled as
5   suspicious, we have reason to believe that there's
6   concerns with the order, that we would then report
7   to the DEA.
8       Q   How many suspicious orders were reported
9   to the DEA as a result of any investigations that
10  took place for CVS out of the Knoxville facility
11  or the Indiana facility between 2011 and 2012 when
12  you were the SOM manager?
13      MS. MILLER:  Object to form.
14      THE WITNESS:  I don't recall, sir.
15      (Exhibit No. 554 was premarked for
16      identification.)
17  BY MR. BAKER:
18      Q   Let me ask you to look at Exhibit
19  No. 554.
20      And this is an e-mail from Andy Eck to
21  John Mortelliti.  Do you see that?
22      A   Yes, sir, I do.
23      Q   All right.  And it says -- and you're
24  included on that e-mail, Pam Hinkle.  Do you see

Page 180

1   that up at the top?
2       A   Yes, sir.
3       Q   Okay.  You don't disagree that you
4   received this e-mail, do you?
5       MS. MILLER:  Object to form.
6       THE WITNESS:  I have no reason to -- to
7   disagree.
8   BY MR. BAKER:
9       Q   Okay.  And it says:  "Brian and John, we
10  had a DEA visit back in August 2013."
11      Do you remember we discussed that?
12      A   Yes, sir.
13      Q   Okay.  And it says:  "Today, May 15,
14  2014, Dan Gillen, supervisor, and Andrew Ratcliff,
15  investigator, came in Indy to do their closing.
16  We had Pam Hinkle" -- that's you, right?
17      A   Yes, sir.
18      Q   -- "Gary Lamberth, Mark Nicastro, Betsy
19  Ferguson, and myself attending during this
20  closing."  Correct?
21      MS. MILLER:  Object to form.
22  BY MR. BAKER:
23      Q   That's what the document says, right?
24      A   Yes, sir, that's what the document

Page 181

1   states.
2       Q   Okay.  Betsy Ferguson, that's Elizabeth
3   Ferguson, who is the lawyer, the in-house counsel
4   for CVS; is that right?
5       MS. MILLER:  Object to form.
6       THE WITNESS:  That is correct, sir.
7   BY MR. BAKER:
8       Q   Okay.  And you, Pam Hinkle, at the time,
9   what was your position which caused you to be in
10  attendance during the closing?
11      MS. MILLER:  Object to form.
12      THE WITNESS:  I was the liaison.
13  BY MR. BAKER:
14      Q   Okay.  Look under bullet number 5 there.
15  Do you see paragraph 5?  It says:  "Suspicious
16  order monitoring:  The DEA thought this process
17  was not sufficient."
18      Do you see that?
19      MS. MILLER:  Object to form.
20  BY MR. BAKER:
21      Q   Do you see that?
22      A   I -- I do see that, sir.
23      Q   Okay.  And it says:  "Questions on the
24  number of inventory that leaves our facility."

Page 182

1    Do you see that?

2    MS. MILLER: Object to form.

3    THE WITNESS: I do see that, sir.

4  BY MR. BAKER:

5    Q   And then it says: "Concerned that their

6  office did not receive any communication of

7  suspicious ordering in the last three years."

8    Do you see that?

9    MS. MILLER: Object to form.

10    THE WITNESS: I do see that, sir.

11  BY MR. BAKER:

12    Q   Okay.  So is it true that while you were

13  the suspicious order monitoring manager in

14  Knoxville, that there were no suspicious orders

15  reported to the DEA by CVS?

16    MS. MILLER: Object to form.

17    THE WITNESS: Sir, I don't recall.  I

18  don't recall -- I know that there were reports --

19  contact reports submitted.  I just don't remember

20  the time frames, but I do know that there were

21  reports submitted.

22  BY MR. BAKER:

23    Q   Okay.  You have no reason to disagree

24  with what this document says, that their office,

Page 183

1  the DEA office did not receive any communication

2  of suspicious ordering in the last three years.

3  Is that right?

4    MS. MILLER: Object to form.

5    THE WITNESS: Sir, I -- I don't know --

6  I don't have any information either way.  I don't

7  know, sir.

8  BY MR. BAKER:

9    Q   Fair enough.  So you have no reason to

10  disagree with that, correct?

11    MS. MILLER: Object to form.

12  BY MR. BAKER:

13    Q   If you don't have any information either

14  way, then you can't disagree with it, right?

15    A   Nor agree, sir.  I just don't know.

16    Q   Okay.  How much time did you spend

17  preparing for your deposition?

18    A   Three days.

19    Q   Okay.  And was that -- any of those

20  three days outside the presence of counsel?

21    MS. MILLER: Object to form.

22    THE WITNESS: I'm -- I'm -- was -- was

23  the attorney -- was it with the attorneys?  This

24  is what you're -- I'm sorry.

Page 184

1  BY MR. BAKER:

2    Q   No.  Were any of those three days that

3  you reviewed, were those other than with the

4  lawyer?

5    MS. MILLER: Object to form.

6    THE WITNESS: No, I was with the

7  attorney.  Yes.

8  BY MR. BAKER:

9    Q   Okay.  So three days with the lawyer

10  reviewing for your deposition.  And you're telling

11  me that you weren't expecting to be asked the

12  question of whether or not CVS reported any

13  suspicious orders to the DEA?  Are you telling me

14  that?

15    MS. MILLER: Object to form.

16  Mischaracterizes the testimony.

17    THE WITNESS: Sir --

18    MS. MILLER: And I instruct you not to

19  answer to the extent it reveals any communications

20  that we had during our preparation on the grounds

21  of attorney-client privilege.

22    THE WITNESS: I know that I reported

23  suspicious orders to different local offices, sir.

24  I just don't know the time frames of when those

Page 185

1  occurred.

2  BY MR. BAKER:

3    Q   During the three years between August of

4  2010 and August 2013, did you report any

5  suspicious orders to the DEA?

6    MS. MILLER: Object to form.

7  BY MR. BAKER:

8    Q   That's the three years that's being

9  discussed in this report, because the

10  investigation took place in August of 2013.  You

11  understand that?

12    MS. MILLER: Object to form.

13    THE WITNESS: Yes, sir.  I mean, I just

14  don't remember or -- or remember the time frames

15  and which offices.  So I just -- I can't remember

16  that.  Sorry.

17  BY MR. BAKER:

18    Q   So many of my questions you've answered

19  with "I don't remember."  What would cause you to

20  remember your experience as the suspicious order

21  manager during the two years of 2011, 2012?  What

22  could I provide to you that would cause you to

23  remember, other than documents that clearly state

24  things that are on the documents that were

Page 186

1 generated by CVS? What would cause you to
2 remember stuff?
3       MS. MILLER: Object to form.
4 BY MR. BAKER:
5     Q   Anything?
6       MS. MILLER: Object to form.
7       THE WITNESS: I remember high level
8 information. And depending on what we look at, I
9 may or may not remember looking at something. But
10 you've got to understand, you've got a time span
11 of quite a few years, sir.
12 BY MR. BAKER:
13    Q   You remember high-level information. Do
14 you consider reporting a suspicious order to the
15 DEA during the period that you were the suspicious
16 order monitoring manager for CVS a high-level item
17 or not?
18      MS. MILLER: Object to form.
19      THE WITNESS: Any time you report
20 anything to the DEA, it's not considered high
21 level. I mean, it's -- it's something that I --
22 you know, I do.
23      MR. BAKER: We're going to take a break
24 for lunch.

Page 187

1       THE VIDEOGRAPHER: The time is
2 12:45 p.m. We're going off the record.
3       (Lunch recess.)
4       THE VIDEOGRAPHER: The time is 1:29
5 p.m., and we're back on the record.
6       (Exhibit No. 500 was premarked for
7       identification.)
8 BY MR. BAKER:
9     Q   I direct you to Exhibit 500.
10 Ms. Hinkle, this is a letter dated
11 September 27, 2007, from the DEA to CVS
12 Distribution, Inc., in Knoxville, Tennessee.
13      Have you ever reviewed this letter
14 before today?
15      MS. MILLER: Object to form. Objection
16 on attorney work product.
17      To the extent -- you can answer to the
18 extent you don't reveal any communications in prep
19 with your lawyers.
20      THE WITNESS: Yes, I have seen this
21 letter before.
22 BY MR. BAKER:
23    Q   Okay. In fact, the letter says: "Pam,
24 FYI, I think this should go to Frank and the group

Page 188

1 developing the news report. Jerry."
2       Is that what it says at the top?
3     A   It does say that, sir.
4     Q   Is that Pam being -- referring to you
5 that you know of?
6       MS. MILLER: Object to form.
7 BY MR. BAKER:
8     Q   Pam Hinkle?
9     A   Yes, sir, that would be.
10    Q   Who's Jerry?
11    A   Jerry Rose is the pharmacy -- was the
12 pharmacy manager at the time in the pharmacy
13 department.
14    Q   Who is "Frank and the group"?
15      MS. MILLER: Object to form.
16      THE WITNESS: Frank Devlin would be that
17 Frank.
18 BY MR. BAKER:
19    Q   Okay. And who was the group?
20    A   I'm sorry, I don't know who the group --
21 who he was referencing there.
22    Q   Okay. So you read this letter, and in
23 particular, you understood that, you know, what
24 21 CFR 1301.74 is in that second paragraph, right?

Page 189

1       MS. MILLER: Object to form.
2 BY MR. BAKER:
3     Q   Do you see it?
4       MR. BAKER: Let's highlight Title 21,
5 CFR 1301.74 in the second paragraph and go all the
6 way down.
7 BY MR. BAKER:
8     Q   Do you see where it says: Title 21 CFR
9 1301.74 specifically requires that a registrant
10 design and operate a system to disclose to the
11 registrant suspicious orders of controlled
12 substances"? Do you see that?
13    A   I do see that, sir.
14    Q   Okay. And you understand that the whole
15 reason for the suspicious order monitoring program
16 is to comply with that Code of Federal Regulation.
17 Do you understand that?
18      MS. MILLER: Object to form.
19      THE WITNESS: Yes, I -- I understand we
20 have to comply.
21 BY MR. BAKER:
22    Q   Okay. And so you understand also on
23 page 2 that this document says that: "Registrants
24 that rely on rigid formulas to define whether an

Page 190

1 order is suspicious may be failing to detect
2 suspicious orders." Right?
3          MS. MILLER: Object to form.
4          THE WITNESS: I do see where it states
5 that, sir.
6 BY MR. BAKER:
7     Q   Okay. Did you ever use any rigid
8 formulas to decide what a suspicious order would
9 be when you were the SOM manager at CVS?
10         MS. MILLER: Object to form.
11         THE WITNESS: I -- I don't know what
12 this statement is actually indicating, but I know
13 that we used a -- a system to -- to identify
14 orders.
15 BY MR. BAKER:
16    Q   Okay. That system being the algorithm-
17 based system. Is that what you're talking about?
18    A   Yes, sir.
19    Q   Okay. The algorithm system that we
20 talked about was the Buzzeo system that you and I
21 went over earlier today in your testimony,
22 correct?
23         MS. MILLER: Object to form.
24         THE WITNESS: Yes, sir.

Page 191

1 BY MR. BAKER:
2     Q   Okay. And could you pull up Exhibit 538
3 again, please.
4          If you go to the -- this is the
5 retunement document.
6          Okay. You remember me reviewing this
7 retunement document with you earlier today?
8          Go to page 3 -- let's see -- page 3 at
9 the bottom.
10         Do you remember where it says: "The
11 bottle has been designed so that any order with a
12 score of .15 or higher is identified as
13 suspicious, pended, and should be investigated
14 further"? Do you remember that?
15    A   I do remember that statement.
16    Q   And you remember on the front page of
17 this document, the e-mail on the very front page
18 of this document, it says, February 9, 2011, at
19 the bottom: "Attached is the retunement document.
20 It contains a revised algorithm and additional
21 required information for your Suspicious Order
22 Monitoring System."
23         Do you recall that?
24         MS. MILLER: Object to form.

Page 192

1          THE WITNESS: Do I recall the e-mail or
2 do I --
3 BY MR. BAKER:
4     Q   Do you recall reviewing this with me
5 earlier?
6     A   Oh, yes, sir, I do recall it.
7     Q   All right. So is that the system that
8 was used, the Buzzeo system as described in this,
9 the one that pended -- that was designed to -- so
10 that any order with a score of .15 or higher is
11 identified as suspicious, pended, and should be
12 investigated further?
13         MS. MILLER: Object to form.
14 BY MR. BAKER:
15    Q   Is that the system that CVS used?
16         MS. MILLER: Object to form.
17         THE WITNESS: Sir, I don't know the --
18 the particulars around it. I mean, I -- I just
19 don't know what was put into it, sir.
20 BY MR. BAKER:
21    Q   Okay. You were also a quality control
22 person at CVS, right? What was the title in
23 reference to quality control?
24    A   Yeah, quality -- logistics quality --

Page 193

1 compliance and quality.
2     Q   Okay. And what did you do to assure
3 quality in reference to that particular algorithm
4 that was being used in the suspicious order
5 monitoring system?
6          MS. MILLER: Object to form.
7 BY MR. BAKER:
8     Q   Specifically the question as it relates
9 to the algorithm, all I'm asking is about what did
10 you do with respect to the use of that algorithm?
11         MS. MILLER: Object to form.
12 BY MR. BAKER:
13    Q   And make sure that the quality was
14 controlled with respect to that algorithm.
15         MS. MILLER: Same objection.
16         THE WITNESS: Sir, that wasn't my area
17 of responsibility to review that information.
18 That was a separate -- separate individuals that
19 would have looked at the algorithm in-depth at
20 that time. I -- I did -- had no -- no
21 responsibility to that system.
22         MR. BAKER: Okay. Pull up Exhibit 513,
23 please.
24         MS. MILLER: Which document -- oh. It's

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 a new exhibit.
2     (Exhibit No. 513 was premarked for
3     identification.)
4     MS. MILLER:  It's a new exhibit.
5     THE WITNESS:  Oh, okay.
6 BY MR. BAKER:
7     Q   All right.  Do you recognize this -- at
8 the top it says:  "Item Review Report, Control
9 Drugs," and it's the first page of an item review
10 report, 3/25/2011, with the grid sheet.
11     Do you recognize this to be something
12 that you're familiar with?
13     A   Yes, sir.
14     MS. MILLER:  Object to form.  Object
15 to the --
16     THE WITNESS:  I've seen this.
17     MR. BAKER:  She said yes.
18     MS. MILLER:  -- incomplete exhibit.
19     MR. BAKER:  She said yes.
20 BY MR. BAKER:
21     Q   All right.  So this would appear on the
22 front of all the IRRs, right?
23     MS. MILLER:  Object to form.
24     THE WITNESS:  Yes.  This would be

Page 195

1 what -- would be familiar to me.
2 BY MR. BAKER:
3     Q   Okay.  Look at those attributes in the
4 left-hand column.  Do you see those attributes?
5     A   I do, sir.
6     Q   Okay.  Do you know what a PZ score range
7 is?
8     A   Today I do not.  At that time I don't --
9 I don't know -- I mean, I just don't know what it
10 is, sir.
11     Q   Okay.  Did you know at the time that you
12 were the suspicious order monitoring manager?
13     A   At the time I don't know.  I don't know
14 if I did or not, sir.
15     Q   All right.  And you see there at the
16 bottom where it says "Score."  Do you see that?
17     A   Yes, sir.
18     Q   All right.  And then just to the right,
19 "Description."  It says:  "Score decides if an
20 order is suspicious or not.  If it is greater than
21 a threshold value (currently .15), the order
22 is" -- and then go to the next page -- "flagged as
23 suspicious."
24     Is that what the document says?

Page 196

1     A   That is what the document says, sir.
2     MR. BAKER:  Okay.  Go back to the prior
3 page where it said "Score."  All right.  And go
4 all the way over to that -- yeah, go to the box
5 that says -- just flag it all the way across,
6 "Score decides," et cetera.  Okay.
7 BY MR. BAKER:
8     Q   It says:  "Score decides if an order is
9 suspicious or not.  If it is greater than a
10 threshold value (currently .15), the order is
11 flagged as suspicious."  Correct?
12     MS. MILLER:  Object to form.
13 BY MR. BAKER:
14     Q   Right?
15     A   That's what the --
16     MS. MILLER:  Object to form.
17 BY MR. BAKER:
18     Q   Okay.  And then the next --
19     MS. MILLER:  Can you let her finish.
20     What were you --
21 BY MR. BAKER:
22     Q   I'm sorry, were you finished?
23     A   That was just what the document states,
24 sir.

Page 197

1     Q   Right.  Okay.  I thought I did.  If I
2 don't let you finish, please tell me to -- please
3 hold your hand up and ask me to let you finish,
4 because I'll be glad to let you finish as long as
5 you're answering the question.  Okay?
6     A   Yes, sir.
7     Q   All right.  So the next one says,
8 "Possible Values."  It says:  "Score is a combined
9 result of all the above factors based on their
10 values and weights."  Correct?
11     MS. MILLER:  Object to form.
12 BY MR. BAKER:
13     Q   That's what it says, right?
14     A   That's what it says on the doc, yes.
15     Q   And all the above values -- if you -- if
16 you take all the above values on those attributes
17 that we're talking about, we're talking about the
18 PZ score, the PZ -- you understand all those
19 attributes on the left side are scored and that
20 the total score is at the bottom?  Do you
21 understand that?
22     MS. MILLER:  Object to form.
23     THE WITNESS:  Sir, I -- I'm -- I've seen
24 this doc.  I'm familiar with the doc, but I can't

Page 198

1 speak to all of the intricates. I mean, I see
2 what it's saying there, but I just can't speak to
3 all of it.
4 BY MR. BAKER:
5 Q Sure. All right. So it says in the
6 next column, "Interpretation." "Higher the score,
7 more suspicious is the order." Correct?
8 MS. MILLER: Object to form.
9 THE WITNESS: That's what it states in
10 the document.
11 BY MR. BAKER:
12 Q Okay. Even though over there in the
13 left-hand column where it says: "Score decides if
14 an order is suspicious or not. If it's -- if it
15 is a great -- if it is a -- if it is greater than
16 a threshold value (currently .15), the order
17 is" -- go to the next page -- "the order is
18 flagged as suspicious."
19 Do you see that?
20 A I do see it states that there.
21 Q All right. Go back to the previous
22 page. Even though it says that, if you go over to
23 the right, you see that .65 there?
24 A I do see that.

Page 199

1 Q Okay. All right.
2 MR. BAKER: Let's see the whole document
3 now.
4 BY MR. BAKER:
5 Q It says the "Model Weight" -- see up at
6 the top right, "Model Weight"?
7 The model weight, and then go down to
8 the bottom, ".65." Do you see that?
9 A I do see where it states that, sir.
10 Q Okay. Was this suspicious order
11 monitoring algorithm system that was delivered by
12 the Buzzeo company, was it somehow changed to
13 where the score would only flag an order at .65 as
14 opposed to .15?
15 MS. MILLER: Object to form.
16 THE WITNESS: Sir, I'm not aware of
17 that. I -- I'm not familiar with that at all,
18 sir. I can't tell you.
19 BY MR. BAKER:
20 Q If somebody had done that, and you're
21 the suspicious order monitoring manager, is that
22 something that you would want to know as a quality
23 control person in the suspicious order monitoring
24 department?

Page 200

1 MS. MILLER: Object to form.
2 THE WITNESS: There would have been --
3 there are experts with the data that was pulled
4 together on this. I would not be an expert on
5 this particular subject, sir.
6 BY MR. BAKER:
7 Q What I'm asking is, if somebody changed
8 the program to where it would only flag an order
9 to .65, and yet the program description said, "The
10 score decides if an order is suspicious or not.
11 If it is greater than threshold -- if it is
12 greater than a threshold value (currently .15),
13 the order is considered suspicious," and somebody
14 raised that score internally within the program
15 to .65, as a quality control person working for
16 CVS in the suspicious order monitoring program and
17 charged with reviewing the IRRs and managing the
18 people that review the IRRs, is this something
19 that you would have wanted to know?
20 MS. MILLER: Object to form.
21 THE WITNESS: Sir, the -- the program
22 itself is -- I would -- we would rely on the
23 experts to put that information together. I don't
24 know what all of these -- or remember all of these

Page 201

1 elements. I don't know what these are all
2 indicating. So I -- I -- there's experts that
3 would -- I would rely on to understand the things
4 that would go into that program for us to get
5 reports for us to review.
6 BY MR. BAKER:
7 Q Okay. Let's see if we can pull up the
8 SOP. Let's go to the Exhibit 512, please.
9 (Exhibit No. 512 was premarked for
10 identification.)
11 MS. MILLER: Is that a new exhibit or --
12 MR. BAKER: SOP. Hold on just one
13 second.
14 BY MR. BAKER:
15 Q Now, you took over the program, the
16 suspicious order monitoring program in Knoxville
17 on or around March of 2011, to the best of your
18 recollection; is that correct?
19 A Sometime in 2011, early 2011, yes, sir.
20 Q All right. And CVS had what's called
21 standard operating procedures that were in place
22 for the purpose of determining how things should
23 be run within CVS, correct?
24 MS. MILLER: Object to form.

Page 202

1    THE WITNESS:  There are standard
2  operating procedures, yes, sir, in place.
3  BY MR. BAKER:
4    Q   Okay.  And the standard operating
5  procedure we're looking at was revised on 3/11/11,
6  correct?
7    MS. MILLER:  Object to form.
8    THE WITNESS:  That's what this document
9  states, sir, yes.
10  BY MR. BAKER:
11    Q   So when you took over as a suspicious
12  order monitoring manager in Knoxville on or about
13  March of 2011, to the best of your recollection,
14  this would have been the SOP in place at that
15  time.  Is that right?
16    MS. MILLER:  Object to form.
17    You want to take a moment to look at it?
18    THE WITNESS:  (Peruses document.)
19    Based on the date, yes, sir, I would say
20  this is -- this is the --
21  BY MR. BAKER:
22    Q   All right.  So do you remember when I
23  showed you Exhibit No. 500, do you remember the
24  paragraph that says that:  "Title 21 CFR 1301.74

Page 203

1  specifically requires that a registrant design and
2  operate a system to disclose to the registrant
3  suspicious of controlled substances"?  Do you
4  remember that?
5    MS. MILLER:  You can look at the -- you
6  can look at the exhibit.  It's exhibit --
7    MR. BAKER:  It's Exhibit 500.
8    THE WITNESS:  Okay.  (Peruses document.)
9  BY MR. BAKER:
10    Q   Yes, ma'am.  Do you remember that?
11    MS. MILLER:  Object to form.
12    THE WITNESS:  I do remember you showing
13  me this, sir.
14  BY MR. BAKER:
15    Q   Okay.  And -- and you did get this
16  document back in 2008; is that right?
17    MS. MILLER:  Object to form.
18  BY MR. BAKER:
19    Q   To the best of your recollection?
20    A   Get the Exhibit --
21    Q   This document --
22    A   -- 500?
23    Q   -- Exhibit 500, yes, ma'am.
24    A   Yes, sir.

Page 204

1    Q   And to the best of your recollection,
2  you would have read it; is that right?
3    MS. MILLER:  Object to form.
4    THE WITNESS:  Yes, sir, I would have
5  read it.
6  BY MR. BAKER:
7    Q   Okay.  So now let's go back to Exhibit
8  No. 512, and let's go back where it's -- down
9  towards the second paragraph at the bottom, it
10  says "CVS is responsible..."
11    Do you see that?
12    MR. BAKER:  Okay.  Bold that first
13  sentence if you would.
14    MS. MILLER:  Pam, he --
15    THE WITNESS:  This one?
16    MS. MILLER:  -- is on Exhibit 512 now.
17    MR. BAKER:  Yes, this is the SOP.
18    MS. MILLER:  Can you direct her where on
19  the hard copy you're looking, Bill?
20    MR. BAKER:  Sure.
21  BY MR. BAKER:
22    Q   On the first page of the hard copy of
23  Standard Operating Procedures Manual, 3/11/11.  Do
24  you see that?

Page 205

1    A   Yes, sir.
2    Q   Okay.  Do you see where it says -- down
3  to the second or third to last paragraph, it says:
4  "CVS is responsible for ensuring compliance with
5  DEA regulatory requirements, and that
6  responsibility cannot be an abdicated or
7  transferred to anyone else."
8    Do you see that?
9    A   I do see where it states that, sir.
10    Q   What does the word "abdicated" mean to
11  you?
12    MS. MILLER:  Object to form.
13  BY MR. BAKER:
14    Q   Do you know?
15    A   No, sir, I don't.
16    Q   What does "transferred" mean?
17    A   Transferred to anyone else.
18    Q   Okay.  So CVS, according to CVS's own
19  policy, at least -- strike that question.
20    CVS, according to its own standard
21  operating procedures manual, is responsible for
22  ensuring compliance with DEA regulatory
23  requirements, and that responsibility cannot be
24  abdicated or transferred to anyone else, at least

Page 206

1 according to this document.

2     Is that correct?

3     MS. MILLER: Object to form.

4     THE WITNESS: That's what the document

5 states, yes.

6     MR. BAKER: Let's go to Exhibit 508,

7 please.

8     (Exhibit No. 508 was premarked for

9     identification.)

10 BY MR. BAKER:

11   Q  All right. Within the logistics

12 department, are there separate policies and

13 procedures that are published aside from the

14 master policy standard operating procedure manual

15 that is within CVS corporate?

16     MS. MILLER: Object to form.

17     THE WITNESS: The standard operating

18 procedures are for -- you know, each business

19 unit, separate SOPs, but they're all -- they start

20 at the corporate office.

21 BY MR. BAKER:

22   Q  Okay. The thick one that we just went

23 through that's dated 3/11/11 -- you know, that we

24 went through the first page that was about 60 or

Page 207

1 65 pages long?

2   A  Yes, sir.

3   Q  All right. Is that considered something

4 that's the overall corporate policy and procedure

5 or -- how does that work?

6     MS. MILLER: Object to form.

7 BY MR. BAKER:

8   Q  I know it has separate departments

9 identified within it, but -- do you know what I'm

10 asking?

11     MS. MILLER: Object to form.

12     THE WITNESS: Yes, I -- I believe so.

13 BY MR. BAKER:

14   Q  Okay. All right. So when we have a

15 separate type of policy and procedure, such as you

16 see in Exhibit 508 here -- look at the top, it

17 says "Logistics IRR Analyst." Do you see that?

18   A  I do see that.

19   Q  Okay. How does that get generated as a

20 separate document, separate and apart from the

21 document that I showed you that was dated 3/11/11?

22     MS. MILLER: Object to form.

23 BY MR. BAKER:

24   Q  Do you know?

Page 208

1     MS. MILLER: Object to form.

2     THE WITNESS: I don't know how they

3 differentiate between each of the policies.

4 BY MR. BAKER:

5   Q  Okay. Would this effective date of

6 June -- June 28, 2011, that would have been when

7 you were employed at CVS in the SOM department in

8 Nashville; is that correct?

9     MS. MILLER: Object to form.

10     THE WITNESS: I was employed in the

11 Knoxville distribution center, yes, sir.

12 BY MR. BAKER:

13   Q  Okay. And review date of March 28,

14 2012, you still would have been employed in

15 Knoxville in the suspicious order monitoring

16 department; is that correct?

17     MS. MILLER: Object to form.

18     THE WITNESS: Yes, sir, I believe I -- I

19 believe so.

20 BY MR. BAKER:

21   Q  Okay. And that department was

22 considered logistics; is that right?

23     MS. MILLER: Object to form.

24 BY MR. BAKER:

Page 209

1   Q  It was part of the logistics department?

2   A  Yes, sir, it was part of the logistics

3 department.

4   Q  And this title of this document is

5 "Logistics IRR Analyst, Suspicious Transactions."

6 Do you see that?

7     MS. MILLER: Object to form.

8 BY MR. BAKER:

9   Q  Do you see that?

10     MS. MILLER: I don't see that, Bill.

11     MR. BAKER: Up at the top. Okay. Maybe

12 this one is different -- yeah, this one looks

13 different.

14     MS. MILLER: Yeah.

15     MR. BAKER: I'm sorry.

16     MS. MILLER: Because that's not what --

17 that's not the document we're looking at.

18     MR. BAKER: Is this the 508 -- is that

19 the 508 that you have?

20     Okay, we'll put this under the ELMO

21 then. I'll do it this way.

22 BY MR. BAKER:

23   Q  Do you see this -- I have it here on the

24 screen under the ELMO. Do you see where it says

Page 210

1 "Logistics IRR Analyst - Suspicious Order
2 Monitoring (SOM) Program."  Do you see that?
3     A   I do see that.
4     Q   Okay.  And the effective date is
5 June 28, 2011, with last revision date March 28,
6 2012, correct?
7     A   I do see that, sir.
8     Q   Okay.  Do you see where the document is
9 highlighted where it says "Thresholds" right here
10 where I'm drawing that line?  Do you see that?
11     A   I do, sir.
12     Q   It says:  "CVS has established
13 thresholds that restrict the amount of Control
14 Drugs, PSE, and other List I chemicals that can be
15 ordered by each store within a specific time
16 frame.  These thresholds and subsequent analysis
17 of irregular activity are the primary tools to
18 stop suspicious orders of common drugs -- of
19 Control Drugs, PSE, and other List I chemicals.
20 These thresholds and in-depth order analysis are
21 based on historical trends of sales, individual
22 store ordering patterns, and other suspicious
23 order prevention methods."
24        Is that what the document says so far?

Page 211

1     A   It is what the document states.
2     Q   Then it goes on to state, and I would
3 like to bold this, it says:  "Stores may not order
4 more than the threshold amount, and the DC may not
5 ship amounts that exceed these thresholds."
6        Is that what the document says?
7        MS. MILLER:  Object to form.
8        THE WITNESS:  That's what the document
9 indicated, yes, sir.
10 BY MR. BAKER:
11     Q   Okay.  And would this document have
12 governed your department during the period of time
13 that this particular policy and procedure was in
14 effect at CVS in the logistics department as it
15 related to suspicious order monitoring and the SOM
16 program?
17        MS. MILLER:  Object to form.
18        THE WITNESS:  I don't recall the actual
19 document, but they -- we had procedures in place
20 that -- what we would follow.
21 BY MR. BAKER:
22     Q   And was this one of them?
23        MS. MILLER:  Object to form.
24        THE WITNESS:  I do believe that there

Page 212

1 are thresholds, sir.
2 BY MR. BAKER:
3     Q   Was this the policy in effect during
4 that time frame that was -- was for the purpose of
5 something that was to be followed in the
6 "Logistics IRR Analyst, Suspicious Order
7 Monitoring Program"?
8        MS. MILLER:  Object to form.
9        THE WITNESS:  Based on the dates, it --
10 of this document, I just don't recall this actual
11 document because of the years passed, but it
12 appears to be a document that we would have used.
13 BY MR. BAKER:
14     Q   Okay.  And again, when you were talking
15 about thresholds, the threshold that we were
16 talking about under the suspicious order
17 monitoring system that was developed by the Buzzeo
18 company, do you recall that to be .15 from the
19 document I showed you?
20        MS. MILLER:  Object to form.
21 BY MR. BAKER:
22     Q   Do you remember that, ma'am?
23        MS. MILLER:  Object to form.
24        THE WITNESS:  I don't -- I don't know

Page 213

1 what the algorithms were.  I don't remember that
2 piece.
3 BY MR. BAKER:
4     Q   Okay.  Let's see if I can refresh your
5 recollection.  Let's go back to that piece.  And
6 that piece is 513.
7        And down at the bottom where it says,
8 "Score" -- do you see the "Score"?  Where it says,
9 "Score decides if an order is suspicious or not"?
10        MS. MILLER:  Object to form.
11 BY MR. BAKER:
12     Q   Do you see that?
13        MS. MILLER:  Object to form.
14 BY MR. BAKER:
15     Q   Does this refresh your recollection,
16 this document, what I'm showing you?
17     A   This document --
18        MS. MILLER:  Object to form.
19        THE WITNESS:  -- I see what it states.
20 BY MR. BAKER:
21     Q   Does that refresh your recollection as
22 to what the document shows, having the document in
23 front of you?
24     A   Yes, that it states the .15.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1   Q  Right.  And it says: "If it's greater
2 than a threshold value (currently .15), the order
3 is," then go to the next page, "flagged as
4 suspicious."
5     Is that what the document says?
6    MS. MILLER:  Object to form.
7    THE WITNESS:  That's what the document
8 states, sir.
9 BY MR. BAKER:
10   Q  All right.  The purpose of thresholds is
11 so that there can be some sort of way to measure
12 whether or not an order is considered to be
13 suspicious, correct?
14    MS. MILLER:  Object to form.
15    THE WITNESS:  There's a -- CVS uses
16 thresholds as far as -- and this is, again, just
17 on what I know as a threshold and ways --
18 different ways as far as the thresholds for a
19 specific drug.  I do -- I mean, I remember the --
20 the threshold -- I mean, the -- the name
21 threshold.  I know that it was -- it's
22 something with -- in our -- the systems that they
23 use thresholds, but I don't know the exacts around
24 the thresholds and how they're all -- how it's

Page 215

1 actually all used.
2 BY MR. BAKER:
3   Q  Mm-hmm.  I see.  So even though I showed
4 you the document that described what the Buzzeo
5 system flagged as a suspicious order at the .15
6 score, you don't recall whether that was or was
7 not a threshold that was used at CVS, one way or
8 the other, when you were the suspicious order
9 monitoring manager in charge of that department in
10 2011 and 2012?
11    MS. MILLER:  Object to form.
12    THE WITNESS:  Sir, I don't remember what
13 those thresholds were, no, sir.
14 BY MR. BAKER:
15   Q  Okay.  So were there ever any shortcuts
16 used in terms of just mathematical formulas that
17 one could look at a particular order and say, Oh,
18 if it exceeds this particular amount, then that's
19 considered to be a suspicious order on its face?
20    Was there any sort of document created
21 within CVS to that effect that you recall when you
22 were involved with suspicious order monitoring in
23 2011 and 2012?
24    MS. MILLER:  Object to form.

Page 216

1    THE WITNESS:  No, sir, I don't recall.
2 BY MR. BAKER:
3   Q  Okay.  Let me see if I can direct your
4 attention to Exhibit 509.
5    (Exhibit No. 509 was premarked for
6    identification.)
7 BY MR. BAKER:
8   Q  All right.  Now, Exhibit 509 is a
9 document that's dated 1/28/2011.  Do you see that?
10   A  Yes, sir, I do.
11   Q  All right.  And it's Pam Hinkle to
12 Stephen Cain, 1/28/2011.  The subject "Forward:
13 IRR Narratives."  Do you see that?
14   A  I do see that, sir.
15   Q  Okay.  And before that there's an
16 e-mail, January 27, 2011, that says from Stephen
17 Cain to John Mortelliti and Pam Hinkle regarding
18 "IRR Narratives."  Do you see that?
19    Right below it, if you look up on the
20 board there.  Do you see that?
21   A  Yes, sir.
22   Q  Okay.  If you go to the next page, it
23 says: "Components of the Control IRR Report:  The
24 Control IRR Report is listed -- is a list of

Page 217

1 controlled substances which are labeled as being
2 suspicious."
3    Do you see that?
4   A  I do see where it says that, sir.
5   Q  The components of the report include the
6 store number, the item number, the description of
7 item in question, the UPC/NDC number, the bill
8 quantity, order quantity, unit of measure,
9 month-to-date order quantity, Lag 1, 2, 3.
10    Do you see that?
11   A  I do see where it states that, sir.
12   Q  Okay.  Now, go down to the bottom of
13 that first paragraph, and it says:  "The
14 month-to-date order quantity states the amount of
15 the item in question ordered during the month.
16 Lag 1 is the amount ordered the month before,
17 Lag 2 is the amount ordered two months before, and
18 Lag 3 is the amount ordered three months before."
19    Is that sentence clear to you?
20    MS. MILLER:  Object to form.
21    THE WITNESS:  I understand that's what
22 it states, sir.
23 BY MR. BAKER:
24   Q  Okay.  Then it goes on to state:

Page 218

1  "Process of Identifying Suspicious Orders.  In
2  order to determine which items on the Control IRR
3  Report are suspicious, the order quantity field is
4  observed by the DC IRR analyst for a quantity
5  ordered of ten or more.  The month-to-date field
6  is then observed and compared to Lags 1, 2 and 3.
7  If the month-to-date quantity is at least three
8  times greater than the quantities in Lags 1, 2
9  or 3, then that item is labeled as being
10  suspicious."
11       Is that what the document says?
12       MS. MILLER:  Object to form.
13       THE WITNESS:  That's what it states in
14  the document, sir.
15  BY MR. BAKER:
16   Q   Okay.  Now, your name is on the
17  communication in reference to this document,
18  correct?
19       MS. MILLER:  Object to form.
20  BY MR. BAKER:
21   Q   Right?  For the IRR narratives.  Do you
22  see that?
23   A   Yes, sir.  I -- this does appear to be
24  an e-mail that I -- that had my name on it.

Page 219

1   Q   Sure.  This is January of 2011, just
2  prior to the time that you recollect taking over
3  the suspicious order monitoring program in
4  Knoxville on or about March of 2011; is that
5  correct?
6       MS. MILLER:  Object to form.
7  BY MR. BAKER:
8   Q   Ma'am?
9   A   It -- this e-mail -- I don't remember
10  the e-mail, but it -- it's got my name on it.  So
11  I would have no reason to say it's not -- I didn't
12  receive it.
13   Q   Sure.  Understood.
14       All right.  So let's go to document
15  No. 510, please.
16       (Exhibit No. 510 was premarked for
17        identification and subsequently
18        withdrawn.)
19  BY MR. BAKER:
20   Q   This is another -- well, you know, this
21  one isn't -- let me see.  Yeah, 844.  Go to the
22  second page of this document.  Do you see 844,
23  blank?  845, there is none, and then we get to
24  846.  Do you see that?

Page 220

1   A   I do see that, sir.
2   Q   Okay.  Do you know where this document
3  came from?
4       MS. MILLER:  Object to form.
5       Bill, is there an 845?  This copy
6  doesn't have an 845.
7       MR. BAKER:  I don't see the 845, but we
8  can look it up.
9       MS. MILLER:  Pam, do you have --
10       THE WITNESS:  I don't have 845 either.
11       MR. BAKER:  Yeah.  Let me -- let me go
12  off the record for just one second.
13       THE VIDEOGRAPHER:  The time is 2:03 p.m.
14  We're going off the record.
15       (Pause.)
16       THE VIDEOGRAPHER:  The time is 2:04 p.m.
17  We're back on the record.
18       (Exhibit No. 511 was premarked for
19        identification.)
20  BY MR. BAKER:
21   Q   I'm will withdraw Exhibit 510.  I've now
22  showed you Exhibit 511.
23       Now, Exhibit 511 appears to be
24  sequentially numbered, and it's 109843, 109844 --

Page 221

1  I don't see 109845.
2       But in any event, I would like you to
3  look at 109846.  Do you see that?
4   A   I do see that.
5   Q   Okay.  It says:  "Components of the
6  Control IRR Report."  It again describes what the
7  Control IRR Report is in terms of store number,
8  item number, et cetera.  Do you see that?
9   A   I do see what that -- it states that.
10   Q   All right.  And if you skip over to the
11  next page, it talks about process of identifying
12  suspicious orders.  Do you see that?
13   A   I do see that, sir.
14   Q   All right.  It says:  "The DC IRR
15  analyst observes order quantity field for quantity
16  ordered of ten or more."  Then it says:  "The
17  month-to-date field is then observed and compared
18  to Lags 1-6.  If the month-to-date quantity is at
19  least three times greater than the quantities in
20  Lags 1-6, then that item is labeled as being
21  suspicious."
22       Is that what the document says?
23       MS. MILLER:  Object to form.
24       THE WITNESS:  That is what it -- what's

Page 222

1 written in the document.
2 BY MR. BAKER:
3    Q   Okay.  Now, you've seen this document
4 while you were employed at CVS as a suspicious
5 order monitoring manager outside the presence of
6 counsel.  Am I correct?
7        MS. MILLER:  Object to form.
8 BY MR. BAKER:
9    Q   Ma'am?
10    A   Yes, sir, I believe that I have --
11    Q   Okay.
12    A   -- seen this document -- something
13 similar to this.  I don't know if it was this
14 exact one, but, yes, I've seen something similar.
15    Q   Right.  And you understand that three
16 times greater -- if you look at that formula, when
17 it says "The month-to-date field is then observed
18 and compared to Lags 1-6."  If the month-to-date
19 quantity is at least three times greater than the
20 quantities in Lags 1 through 6, you would take the
21 quantity in Lag 1 through 6, and then have a
22 number that is three times even greater than that
23 number before the item is labeled as being
24 suspicious according to this document; is that

Page 223

1 right?
2        MS. MILLER:  Object to form.
3        THE WITNESS:  I understand what this
4 document is stating, but I don't -- I don't know
5 what we did or didn't do.  I -- I understand it's
6 stating this.
7 BY MR. BAKER:
8    Q   Sure.
9    A   But I don't know -- I just don't know --
10 I don't know how this is being used here, sir.
11 I'm sorry, I just don't.
12    Q   Now, you were the manager of the
13 suspicious order monitoring system in 2011, March
14 through sometime towards the end of December 2012,
15 correct?
16        MS. MILLER:  Object to form.
17 BY MR. BAKER:
18    Q   Ma'am?
19    A   Yes, I was the manager of the SOM.
20    Q   And you remember that formula set forth
21 in those documents that I showed you was to take
22 the prior Lag months, and then say if the -- if
23 the order -- if the current order is at least
24 three times greater than that Lag, it would be

Page 224

1 considered as suspicious under that definition in
2 those documents that I just showed you, correct?
3        MS. MILLER:  Object to form.
4 BY MR. BAKER:
5    Q   Ma'am?
6    A   I know that that's -- that's in that
7 document, sir, but I can't -- I can't tell you the
8 content of how that's written, what that means.
9 I'm sorry, I just don't remember.
10 BY MR. BAKER:
11    Q   Mm-hmm.  Alrighty.  So let's move on.
12        At what point after you finished your
13 stint as suspicious order monitoring manager in
14 2012 did you, if at all, stay involved -- or
15 strike that question.
16        When you finished your job as suspicious
17 order monitoring manager in the Knoxville
18 distribution center towards the end of 2012, was
19 Aaron Burtner the person who became the suspicious
20 order monitoring manager that succeeded you?
21        MS. MILLER:  Object to form.
22        THE WITNESS:  I know it was moved to
23 Indy, and Mark Nicastro took it over from me.
24 BY MR. BAKER:

Page 225

1    Q   Okay.  So Aaron Burtner, when he became
2 the IRR SOM manager --
3        The person that you recommended for the
4 position according to documents, right?
5    A   Yes, sir.
6    Q   All right.
7        -- was he working with you, was he
8 working under you, was he managing you?  Tell me
9 what his position was relative to you in the SOM
10 department.
11        MS. MILLER:  Object to form.
12        THE WITNESS:  When Aaron worked under
13 me, he worked -- he did the reviews of the IRRs
14 and reported to me.
15 BY MR. BAKER:
16    Q   Okay.  But his title was IRR SOM manager
17 according to the documents.  Remember?
18        MS. MILLER:  Object to form.
19        THE WITNESS:  At some point he was
20 promoted, and I don't know that time frame, sir.
21 BY MR. BAKER:
22    Q   Okay.  If he was the IRR SOM manager,
23 would that have put him in charge of managing
24 things relative to the IRR program?

Page 226

1     MS. MILLER: Object to form.
2     THE WITNESS: Yes, sir. He would have
3 been -- had the oversight of the individuals.
4 BY MR. BAKER:
5     Q   Would he have had more oversight than
6 you would have had -- even though he worked under
7 you, would he have had more oversight of the IRR
8 program than you would have had given that
9 title --
10     MS. MILLER: Object to form.
11 BY MR. BAKER:
12     Q   -- that he was granted?
13     A   Sir, I don't remember the time frame
14 that he was promoted. And I -- I don't remember
15 if it was during the time prior to it moving --
16 the reviews being moved to Indy.
17     Q   Okay. To what extent, if any, did you
18 remain involved in the CVS suspicious order
19 monitoring program when you finished your duties
20 in 2012 and went on to the next level within the
21 company?
22     MS. MILLER: Object to form.
23     THE WITNESS: When I no longer had
24 oversight, I was not involved in the SOM process.

Page 227

1 BY MR. BAKER:
2     Q   And that would have been approximately
3 when?
4     A   When it would have moved to Indy, and
5 I'm not sure of the time frame when that would
6 have been.
7     Q   Okay. And to the best of your
8 recollection, would that have been towards the end
9 of 2012?
10     A   I -- I don't remember. I mean, I just
11 don't remember the time if --
12     Q   Would it have been before 2014?
13     A   Yes, sir, it would have been before
14 2014.
15     Q   Okay. Could it have been -- could it
16 have been as late as early 2013?
17     A   I don't know. I --
18     Q   But -- okay. I'm sorry, I interrupted
19 you.
20     You say you don't know?
21     A   No, sir.
22     Q   All right. So in 2014, definitely you
23 were not involved in the suspicious order
24 monitoring program of controlled substances at

Page 228

1 CVS, according to your testimony; is that right?
2     A   That is --
3     MS. MILLER: Object to form.
4 BY MR. BAKER:
5     Q   Is that right?
6     MS. MILLER: Give me a chance to object
7 after he finishes his question.
8 BY MR. BAKER:
9     Q   Is that right, ma'am?
10     Let me repeat the question, and I accept
11 the objection in advance.
12     For certain, by the time the year 2014
13 rolled around, you were not in any way, shape or
14 form involved in the suspicious order monitoring
15 program at CVS as it related to controlled
16 substances; is that correct?
17     MS. MILLER: Object to form.
18     THE WITNESS: I did not have
19 oversight -- direct oversight to those individuals
20 reviewing IRRs. I don't know that -- or recall if
21 I had any conversations, any -- anything other
22 than I just did not have the oversight to those
23 individuals, sir.
24 BY MR. BAKER:

Page 229

1     Q   Okay. If you didn't have any oversight
2 of those individuals after you ceased being the
3 SOM manager, then what involvement, if anything,
4 would you have had with SOM after you ceased doing
5 that position?
6     MS. MILLER: Object to form.
7     THE WITNESS: I don't know. I just
8 don't remember if I did or didn't. I just don't
9 know if I did or I didn't have any conversations
10 around SOM or -- I just don't remember.
11 BY MR. BAKER:
12     Q   Did you have --
13     A   I --
14     Q   Go ahead.
15     A   I know that there, you know, may have
16 been conversations. I just don't remember them.
17 I'm not saying I did or didn't. I just don't
18 remember.
19     Q   I'm just trying to get a good gauge of
20 when to cut your participation off from the
21 standpoint of knowledge in the case, and if I was
22 to say that your participation was cut off from
23 the SOM program as of the time that you ceased
24 being the SOM manager, and that would have been at

Page 230

1  about the time -- at or about the time the program
2  moved out of Knoxville to Indianapolis, would that
3  be an accurate representation or not?
4      MS. MILLER:  Object to form.
5      THE WITNESS:  I would've not had the
6  oversight once it moved to Indy.
7  BY MR. BAKER:
8     Q   Okay.  And then beyond the point that
9  you ceased to have oversight, what was your
10 involvement, if any, in the SOM program at CVS?
11     MS. MILLER:  Object to form, asked and
12 answered.
13     THE WITNESS:  Sir, I just don't recall.
14 I don't know if I did or didn't.  I just don't
15 recall that interaction.
16     MR. BAKER:  All right.  Can we pull
17 up -- what number was the exhibit?  Yeah, pull
18 up --
19     MS. MILLER:  Bill, can we take a
20 five-minute break?  Would that be okay?
21     MR. BAKER:  Sure.  I just have one
22 document.  It's going to take me --
23     MS. MILLER:  Okay.  Just after that
24 document if we could break, please.

Page 231

1      MR. BAKER:  Yes.  Yes.
2      All right.  So could we pull up Exhibit
3  No. 9.  This one has not been paper copied out
4  because it's a recall of another deposition, but
5  we do have it on the screen, and we will have it
6  copied out.
7      MS. MILLER:  What do you mean by a
8  recall?
9      MR. BAKER:  Well, it's -- it's one that
10 was used in another deposition in this case.
11     MS. MILLER:  But you just don't have
12 hard copy?
13     MR. BAKER:  I don't have a paper --
14 paper copy with me, but we do have an electronic
15 copy on the screen.
16 BY MR. BAKER:
17     Q   This is an e-mail dated 6/12/2014, and
18 it's from William Goerhing to Jackie Powers, Dean
19 Moore, Sandro Sciarra, Cristie Ellis.
20     Do you recognize those people?
21     A   I do.
22     Q   Okay.  Who are they?
23     A   They are individuals that either
24 currently work in our Chemung distribution center

Page 232

1  or worked in our Chemung distribution center at
2  the time.
3     Q   Okay.  That's the New York distribution
4  center, Chemung?
5     A   Yes, sir.
6     Q   Okay.  And it says: "Steve, please make
7  sure your team is up to speed.  And the same with
8  you, June.  Especially if we get acetone/iodine
9  orders, and we all scratch our head on them.  In
10 the event of a DEA visit and SOM is being
11 questioned, make sure Dean V. and/or Pam Hinkle
12 and Susan Delmonico are contacted for assistance."
13     Do you see that?
14     A   I do see that it states that in the
15 e-mail.
16     Q   And the date on this document is
17 6/12/2014.  Do you see that?
18     A   I do see that, sir.
19     Q   Okay.  According to your testimony, you
20 ceased being a manager of the SOM department at or
21 around the end of 2012, to the best of your
22 recollection; is that right?
23     A   Yes, sir, that's true.
24     Q   All right.  And yet in this document, a

Page 233

1  year and a half later -- a year and a half or so
2  later, you're being -- I guess you're being
3  told -- yeah, not you're being told.
4      But in this document a year and a half
5  later, somebody is telling some other people
6  within CVS that in the event of a DEA visit and
7  SOM is being questioned, make sure that you are
8  one of the people that are contacted for
9  assistance.  Is that right?
10     MS. MILLER:  Object to form.
11     THE WITNESS:  I don't recall this
12 e-mail.  Based on -- you know, this e-mail is
13 indicating, you know, that I be contacted, I
14 just -- I don't remember the e-mail or remember,
15 you know, them stating that.
16 BY MR. BAKER:
17     Q   So were you contacted at all during this
18 time frame in reference to a DEA visit?
19     MS. MILLER:  Object to form.
20 BY MR. BAKER:
21     Q   Or not?
22     A   If there is a DEA visit, I'm
23 contacted -- regardless of the content, I'm
24 contacted as part of the --

Page 234

1    Q    But if you had been contacted in 2014,
2  given the fact that you had been out of the SOM
3  department for approximately a year and a half of
4  that time frame, according to the best of your
5  recollection, would you have been knowledgeable
6  about the SOM department to be able to explain it
7  to the DEA if you were called upon to do so?
8        MS. MILLER:  Object to form.
9        THE WITNESS:  I -- again, I don't know
10  the content of this e-mail.  I don't know -- the
11  only thing that I do know is that I would have
12  been part of those folks that would have been
13  contacted for -- because there was DEA.
14        Susan Delmonico, Dean Vanelli are --
15  Susan Delmonico, I had worked up under, and as
16  well as Dean Vanelli.  So therefore, I would have
17  been contacted because of the DEA inspection
18  itself.  And anything that I can't answer, I would
19  go to someone else that could answer.  So if there
20  were anything related I couldn't, I would talk to
21  someone else about it.
22  BY MR. BAKER:
23    Q    But by this time you had been out of
24  SOM, or suspicious order monitoring, for about a

Page 235

1  year and a half, right?
2        MS. MILLER:  Object to form.
3        THE WITNESS:  I don't know the exact
4  date, sir, but I would have been out of -- out of
5  it.
6  BY MR. BAKER:
7    Q    So your knowledge of SOM at that point
8  was basically not informed because you weren't
9  even involved in it for a year and a half.  Am I
10  right or wrong?
11        MS. MILLER:  Object to form.
12        THE WITNESS:  I don't know what my
13  knowledge base would have been at that time, but I
14  do know that I would have been contacted because
15  DEA -- if DEA did arrive, I do know that.  I don't
16  know what context or information that the DCs
17  would need.
18  BY MR. BAKER:
19    Q    I need to know when your involvement
20  stopped in SOM, and that's what I'm trying to get
21  at.  And it sounds to me like -- or at least from
22  your testimony, and you tell me if this is
23  accurate, that you ceased being involved as the
24  SOM manager at or around the end of 2012; is that

Page 236

1  right?
2        MS. MILLER:  Object to form.
3        THE WITNESS:  I -- around roughly that
4  time, sir.  I don't remember the exact time frame.
5  BY MR. BAKER:
6    Q    Insofar as what involvement you had with
7  SOM in 2013, you don't recall what it was; is that
8  right?
9        MS. MILLER:  Object to form.
10        THE WITNESS:  No, sir, I'm sorry, I
11  don't recall.
12  BY MR. BAKER:
13    Q    So you can't tell me that you were
14  involved in SOM in 2013, correct?
15        MS. MILLER:  Object to form.
16        THE WITNESS:  I can't tell you whether I
17  was or was not.  I just don't recall to what --
18  BY MR. BAKER:
19    Q    This is my time to ask and this is my
20  time to know before trial in this case, and that's
21  why I'm trying to get it straight as to what
22  involvement you had in 2013.
23        What I want to avoid is for you to all
24  of a sudden when you walk out of here today, and

Page 237

1  I've lost my chance to question you, all of a
2  sudden you remember something for some reason
3  about events that occurred in 2013 or 2014 or
4  thereafter that says, Oh, yeah, I was involved in
5  SOM, and here is what I did.
6        And yet today, it is January 24, 2018,
7  and I'm asking you and I need to know, were you or
8  were you not involved in the suspicious order
9  monitoring program at CVS in 2013 or 2014?
10        MS. MILLER:  Object to form, asked and
11  answered.
12        THE WITNESS:  Sir, I don't -- I don't
13  recall.  I don't -- I don't know.  I don't know if
14  I was or if I was not at that point.  I just don't
15  know.
16  BY MR. BAKER:
17    Q    What would refresh your recollection as
18  to whether you were or were not?
19        MS. MILLER:  Object to form.
20  BY MR. BAKER:
21    Q    Anything?
22        MS. MILLER:  Object to form.
23        THE WITNESS:  I would not have had
24  direct oversight because it moved.  I can tell you

Page 238

1 that.
2 BY MR. BAKER:
3     Q    Okay.  What indirect oversight, if any,
4 did you have in the suspicious order monitoring
5 program in 2013 or 2014?
6         MS. MILLER:  Object to form.  Asked and
7 answered.
8         THE WITNESS:  Sir, I don't know.  I
9 don't know that I did.  I don't know that I
10 didn't.
11        MR. BAKER:  Okay.  Fair enough.
12        I think I'm going to pass the mic over
13 to my co-counsel, and we can take a break.  Thank
14 you.
15        THE VIDEOGRAPHER:  The time is 2:23
16 p.m., and we're going off the record.
17        (Recess.)
18        THE VIDEOGRAPHER:  The time is 2:36
19 p.m., and we're back on the record.
20        FURTHER DIRECT EXAMINATION
21 BY MR. DE ROCHE:
22     Q    Good afternoon.  My name is Jim
23 De Roche, and I've got some -- a few follow-up
24 questions for you this afternoon.

Page 239

1         First of all, I want to learn more about
2 Pam Hinkle, because we didn't really get a lot of
3 background on you.
4         First of all, where -- did you go to
5 college?
6     A    I did not go to college.
7     Q    Okay.  You're a high school graduate?
8     A    I am.
9     Q    Okay.  Do you have any training at all
10 with respect to DEA regulations?
11        MS. MILLER:  Object to form.
12 BY MR. DE ROCHE:
13     Q    At any point in time.
14     A    Over my years, yes, sir, I've had
15 training.
16     Q    Okay.  Well, I want to know what that
17 training was, when you received it, who gave you
18 to you.  So lay it out for us.
19        MS. MILLER:  Object to form.
20        THE WITNESS:  Sir, I don't have -- I
21 don't have time frames.  I don't have specifics.
22 I don't have that information, sir.
23 BY MR. DE ROCHE:
24     Q    Okay.  So you can't tell us a single

Page 240

1 training session you went to where you were
2 trained with respect to DEA regulations or
3 anything having to do with the DEA's interaction
4 with CVS?
5         MS. MILLER:  Objection to form.
6         THE WITNESS:  Sir, I can't.  There's
7 different types of trainings where -- like with
8 our consultants, different consultants that I
9 would have partnered with and we did trainings.
10 We -- you know, separate on-site trainings.  I
11 just don't remember, sir, and I don't have the
12 details.
13 BY MR. DE ROCHE:
14     Q    What consultants provided training to
15 you?
16        MS. MILLER:  Object to form.
17        Instruct her not to answer to the extent
18 it reveals any attorney-client communications.
19        THE WITNESS:  Over the years we just
20 had -- we've had different train- -- you know,
21 consultants.  I don't know the names of those
22 different --
23 BY MR. DE ROCHE:
24     Q    Name me one.

Page 241

1     A    Buzzeo.  I worked with Buzzeo.
2     Q    Okay.  So Buzzeo came in and give you
3 some training?
4     A    We did training at our corporate office
5 at one point around -- I can't remember the
6 content.  I can't remember the content, sir.
7     Q    Can't remember a single thing about it?
8     A    No, I mean, the --
9         MS. MILLER:  Object to form.
10        THE WITNESS:  I think some of it had to
11 do with just reporting in and of itself, you know,
12 specific reporting, ARCOS reporting, that type of
13 stuff.  I just can't remember the exact contents,
14 sir.
15 BY MR. DE ROCHE:
16     Q    I don't want exact contents.  Give me
17 everything you can remember about any training you
18 received with respect to DEA compliance at any
19 point in time.  Let's start with the time period
20 before you became the SOM manager for CVS.
21     A    Sir, I can't give you any information.
22 I just -- I don't -- I don't have details.  I just
23 can't.  I worked with different people.
24     Q    Okay.  Tell me about any training you

Page 242

1  received while you were the SOM manager for CVS.
2          MS. MILLER:  Object to form to the --
3  and objection based on the attorney-client
4  privilege.
5  BY MR. DE ROCHE:
6      Q   Answer the question.
7          MS. MILLER:  To the extent -- to the
8  extent your answer will reveal any attorney-client
9  communications.
10         MR. DE ROCHE:  It's not implicating any
11 attorney-client anything.  So you can just take
12 that objection and save it.
13         MS. MILLER:  With due respect, do not
14 speak over me and try to tell the witness
15 something different than what I said --
16 BY MR. DE ROCHE:
17     Q   Ma'am, answer my question, please.
18         MS. MILLER:  -- on the record.  Okay?
19 BY MR. DE ROCHE:
20     Q   Answer the question.
21         Tell me any training you received with
22 respect to DEA compliance while you were the SOM
23 manager for CVS responsible for preventing
24 suspicious orders from going to their pharmacies.

Page 243

1  Go ahead, tell us.
2          MS. MILLER:  Same objection.
3          THE WITNESS:  I can't -- I can't, sir.
4  BY MR. DE ROCHE:
5      Q   Ma'am --
6      A   I can't recall the training, sir.  I'm
7  sorry.
8      Q   -- the jury wants to know why you were
9  SOM manager, what made you so important and so
10 well trained that you could be responsible for
11 preventing narcotics that were killing folks in
12 this country from going to those pharmacies.
13         Why -- why were you the SOM manager?
14         MS. MILLER:  Object to form.  I ask that
15 you treat the witness with respect.
16 BY MR. DE ROCHE:
17     Q   You can answer the question.
18     A   I -- I don't know or tell you why I was
19 selected.  I know that my history is compliance,
20 you know, working with the DEA, government
21 agencies for many, many years.
22     Q   What did that have to do with SOM?
23         MS. MILLER:  Object to form.
24 BY MR. DE ROCHE:

Page 244

1      Q   Suspicious order monitoring, what did
2  that have to do with suspicious order monitoring,
3  any of your past experience with the DEA?
4          MS. MILLER:  Object to form.
5          THE WITNESS:  Just from the compliance
6  component, sir.
7  BY MR. DE ROCHE:
8      Q   What kind of compliance?  What do you
9  mean by compliance?
10         MS. MILLER:  Object to form.
11         THE WITNESS:  Ensuring that we were
12 compliant in our, you know, day to day with our
13 controlled substances, you know, loss reporting,
14 those types of things.  You know, I had built a
15 reputation of understanding, knowing the regs,
16 having a good reputation with, you know, the
17 follow-throughs.  I just -- but I can't tell you
18 why I was selected.
19 BY MR. DE ROCHE:
20     Q   Well, when -- when -- who contacted you
21 and told you you were going to be responsible for
22 suspicious order monitoring for the network of CVS
23 pharmacies?  Who told you that?
24         MS. MILLER:  Object to form.

Page 245

1          THE WITNESS:  My boss at the time, Frank
2  Devlin.
3  BY MR. DE ROCHE:
4      Q   And was Frank Devlin your boss the
5  entire time you were the SOM manager for CVS?
6          MS. MILLER:  Object to form.
7          THE WITNESS:  He was, sir.
8  BY MR. DE ROCHE:
9      Q   Okay.  What did he tell you about why
10 you were the one who was being selected?
11     A   I don't recall, sir.
12     Q   Had you ever reviewed a item review
13 report prior to the time Mr. Devlin tapped you to
14 be the SOM manager?
15         MS. MILLER:  Object to form.
16         THE WITNESS:  I would have reviewed them
17 with John possibly, prior to me taking over, sir.
18 BY MR. DE ROCHE:
19     Q   You said "possibly."  You just don't
20 remember right now if you ever did actually see
21 one?
22         MS. MILLER:  Object to form.
23         THE WITNESS:  No, I would have seen
24 them.  I just don't know to what actual detail

Page 246

1 that we went to with them, but I did look -- see
2 them before we -- I took the program over.
3 BY MR. DE ROCHE:
4     Q    In what context did you see them?
5         MS. MILLER: Object to form.
6         THE WITNESS: I -- I don't -- I mean we
7 talked about them, we re -- looked at them, but I
8 can't give you -- sir, I can't give you details of
9 what we did at that time. I can't give you those
10 details.
11 BY MR. DE ROCHE:
12     Q    Well, I don't want -- I don't want
13 details.
14         Give me the best of your recollection of
15 when you looked at an IRR prior to being tapped as
16 the SOM manager for CVS's entire network of
17 pharmacies, what context were you looking at the
18 IRR in?
19         MS. MILLER: Object to form.
20 BY MR. DE ROCHE:
21     Q    Why were you looking at it?
22         MS. MILLER: Object to form.
23         THE WITNESS: We would have been talking
24 about the -- the reviews. I -- that would have

Page 247

1 been why we would have been looking at them.
2 BY MR. DE ROCHE:
3     Q    Talking about what reviews?
4     A    Whatever was on the actual report, sir,
5 at that time. I mean, John and I would have had
6 those conversations.
7     Q    How many conversations?
8     A    Sir, I can't tell you that. I don't
9 know.
10     Q    Where did they take place?
11         MS. MILLER: Object to form.
12         THE WITNESS: Some would have been in
13 Knoxville, some would have been over the phone.
14 I -- I don't know.
15 BY MR. DE ROCHE:
16     Q    Mr. Mortelliti came to Knoxville?
17         MS. MILLER: Object to form.
18         THE WITNESS: He's came to Knoxville
19 many times, sir.
20 BY MR. DE ROCHE:
21     Q    For what purpose?
22         MS. MILLER: Object to form.
23         THE WITNESS: He's been there for
24 multiple reasons, sir. There's not one specific

Page 248

1 reason, you know, he comes here for this reason,
2 purpose only. He's -- there's different reasons
3 that he would come to Knoxville.
4 BY MR. DE ROCHE:
5     Q    Did he come to Knoxville in reference to
6 suspicious order monitoring that you recall ever?
7     A    Yes, sir, he did.
8     Q    For what purpose was those -- was that
9 true?
10     A    For meetings around the IRR process,
11 sir.
12         MS. MILLER: And object to form. Object
13 on attorney-client privilege grounds.
14         To the extent any of those meetings
15 reflect discussions with attorneys or attorneys
16 were present, I instruct you not to answer.
17 BY MR. DE ROCHE:
18     Q    Did you have meetings with attorneys in
19 Knoxville concerning the suspicious order
20 monitoring process?
21     A    I did, sir.
22     Q    How many times?
23     A    I -- I don't know. I can't tell you
24 that, sir. I don't recall.

Page 249

1     Q    So meetings with the attorneys over
2 suspicious order monitoring is not something that
3 sticks out in your mind --
4         MS. MILLER: Object to form.
5 BY MR. DE ROCHE:
6     Q    -- that you can recall --
7         MS. MILLER: Object to form.
8 BY MR. DE ROCHE:
9     Q    -- how many times you actually did it?
10 Was it a frequent occurrence?
11         MS. MILLER: Object to form. I ask that
12 you show a little bit of respect for the witness.
13 BY MR. DE ROCHE:
14     Q    You can answer the question, ma'am. Was
15 it a frequent occurrence?
16         MS. MILLER: Object to form.
17         THE WITNESS: I don't know how many
18 times, sir.
19 BY MR. DE ROCHE:
20     Q    Was Mr. Mortelliti at any of those
21 meetings?
22         MS. MILLER: Object to form.
23         THE WITNESS: John would have been in
24 those meetings, yes, sir.

Page 250

BY MR. DE ROCHE:

1 Q   When did they take place?

2       MS. MILLER: Object to form.

3       THE WITNESS: I don't have the dates,

4 sir. I do not know.

5 BY MR. DE ROCHE:

6 Q   What year?

7       MS. MILLER: Object to form.

8       MR. DE ROCHE: What is the basis of the

9 objection, Counsel?

10       MS. MILLER: What year what?

11       MR. DE ROCHE: What year -- what year?

12 The context of the question was quite clear. What

13 was the basis for your objection?

14       MS. MILLER: Well, your question was

15 what year.

16       MR. DE ROCHE: Right. Why is that

17 objectionable? What's wrong with that form of

18 question?

19       MS. MILLER: There's no -- there's no

20 context to that.

21       MR. DE ROCHE: The context was the prior

22 answer she gave. That's pretty clear, isn't it?

23       MS. MILLER: Could you please --

Page 251

1       MR. DE ROCHE: No, I'm not going to

2 listen to objections that are baseless. You can

3 object to form if you have a basis for it. You

4 can't sit there and object to every question with

5 a completely baseless objection.

6       MS. MILLER: I can't object?

7       MR. DE ROCHE: That you can't do.

8       MS. MILLER: I'm objecting on the record

9 based on my right to do so.

10       MR. DE ROCHE: You're allowed to object

11 on the record when you have a basis for it.

12       MS. MILLER: Well, if your question --

13       MR. DE ROCHE: Not just when you're just

14 asking -- objecting to every question.

15       MS. MILLER: I can object --

16       MR. DE ROCHE: We've put up with that

17 all day today.

18       MS. MILLER: I can object based on

19 grounds that I see fit. You cannot tell me how --

20       MR. DE ROCHE: If you have grounds, you

21 can object. I agree, Counsel.

22       MS. MILLER: -- how to do my job. I'm

23 objecting to form.

24       MR. DE ROCHE: When it's baseless just

Page 252

1 to interfere, you can't.

2       MS. MILLER: I'm not interfering. I'm

3 stating it on the record. I have a right to

4 object to form on the record. I'm sorry if you

5 don't like the way this process works.

6       MR. DE ROCHE: Well, I don't like the

7 way the process has been perverted by objections

8 that are baseless. That's what I object to.

9       MS. MILLER: Oh, you're objecting to

10 the -- you're objecting to an attorney objecting

11 on the record.

12       MR. DE ROCHE: For baseless reasons,

13 yeah, I am.

14       MS. MILLER: It's not --

15       MR. DE ROCHE: You bet your -- you bet I

16 am.

17       MS. MILLER: It's not baseless reasons.

18 And I would just ask that you would refrain from

19 having this colloquy when I am simply doing

20 exactly what I'm entitled to do, which is object

21 to form on the record.

22 BY MR. DE ROCHE:

23 Q   Ma'am, what year did you meet with

24 Mr. Mortelliti in Knoxville concerning suspicious

Page 253

1 order monitoring where counsel was present?

2 A   I don't recall the date, sir.

3 Q   What year? I didn't ask you for a date.

4 A   I don't -- I don't know the dates -- I

5 don't know the year, sir. I'm sorry, I just don't

6 know.

7 Q   Was it before or after you were the SOM

8 manager?

9       MS. MILLER: Object to form.

10       THE WITNESS: There would have been

11 meetings before. There would have been meetings

12 after, sir. So...

13 BY MR. DE ROCHE:

14 Q   How many were there?

15       MS. MILLER: Object to form, asked and

16 answered.

17       THE WITNESS: Sir, I don't know how many

18 meetings we had.

19 BY MR. DE ROCHE:

20 Q   Did Mr. Devlin tell you why you were

21 tapped to be the SOM manager?

22       MS. MILLER: Object to form, asked and

23 answered.

24       THE WITNESS: I don't recall him giving

Page 254

1  me a reason.  I can't remember.
2  BY MR. DE ROCHE:
3      Q   Did you ever go to any DEA seminars?
4      A   Yes, sir, I did.
5      Q   Okay.  What years were those?
6      A   I don't know those years either, sir.  I
7  don't have the -- I don't remember.
8      Q   What was the subject matter of -- how
9  many did you go to?  Let's start with that.
10     A   I don't know, sir.  I don't know how
11 many I've been to.
12     Q   Where did they take place?
13     A   What I -- one I do remember was in Indy,
14 Indianapolis.
15     Q   Okay.  Any others?
16     A   Another was in Washington, the Virginia
17 area.  Maryland, Virginia bord- -- border.
18     Q   Is that it?
19     A   I don't remember, sir.  I don't remember
20 any -- I can't remember the other places, sir.
21 I'm sorry.
22     Q   What was the subject matter covered in
23 the Indianapolis DEA seminar?
24     A   There were different topics.  There was

Page 255

1  no one driven topic.  There were different topics.
2  Different speakers spoke during that time frame.
3      Q   How many days was it?
4      A   I believe it was a two-day seminar, but
5  I'm not -- I'm not a hundred percent sure of that.
6      Q   Why did you go to the seminar?
7      A   We routinely go to the DEA seminars.  If
8  you are a registrant, you have -- you can go to
9  the seminars.  Depending on if it's -- you know,
10 which -- which seminar they're doing, whether it's
11 a wholesaler seminar or whichever, you know, if
12 it's a pharmacy seminar.  There's different ones,
13 sir.
14     Q   Did you receive written materials at the
15 seminar?
16     A   I don't recall that, sir.
17     Q   Do you know if you have written
18 materials that you retained that are in your
19 office right now in Knoxville?
20     MS. MILLER:  Object to form.
21     THE WITNESS:  I don't know if I have
22 information there or not, sir.  I don't know what
23 I have in my office right now.
24 BY MR. DE ROCHE:

Page 256

1      Q   The Washington seminar, what was that
2  about?
3      A   Again, it was the same -- different
4  speakers spoke, sir.
5      Q   About what?
6      A   Different topics.  I don't remember the
7  actual details of what each one of those speakers
8  spoke on.
9      Q   Did you get written materials about that
10 one?
11     A   I don't recall, sir.
12     Q   Did you learn anything at either of
13 those two seminars about suspicious order
14 monitoring?
15     A   I don't remember.  I don't remember the
16 topics, sir.
17     Q   Did you hire Mr. Cain?
18     A   I did hire Mr. Cain.
19     Q   What about his background qualified him
20 to be an analyst?
21     MS. MILLER:  Object to form.
22     THE WITNESS:  I don't remember his
23 qualifications at that time, sir.  I -- I don't
24 remember what was looked at.  I don't remember the

Page 257

1  qualifications, sir, that --
2  BY MR. DE ROCHE:
3      Q   Did you hire Mr. Lawson?
4      A   Actually, I did not hire Mr. Lawson.
5      Q   Who hired them?
6      A   Shannon Miller hired him.
7      Q   Did you hire Mr. Miller?
8      A   No, sir, he was already employed with
9  CVS.  So I did not actually bring him on board
10 with CVS.
11     Q   What was his position before he was an
12 analyst for the -- in the SOM program?
13     A   He was an LP supervisor.
14     Q   What about his background qualified him
15 to be an analyst in the suspicious order
16 monitoring program?
17     A   He -- he had the investigation skills.
18 His investigation skills were, you know, very
19 good.  He had knowledge of being able to, you
20 know, dive into information, so it assisted with
21 him being able to assist, and we considered him,
22 you know, for the position.
23     Q   Did you have to approve the hiring of
24 Mr. Lawson?

Page 258

1    MS. MILLER: Object to form.
2    THE WITNESS: I did not have to approve
3 that, sir.
4 BY MR. DE ROCHE:
5    Q   Did you hire Mr. Burtner?
6    A   He was already employed with CVS, sir.
7    Q   How was it that he became an analyst in
8 the SOM program?
9    A   I don't recall, sir. John Mortelliti
10 was involved. I don't recall how -- how he was
11 selected, sir.
12    Q   When you ran the program, the SOM
13 program, was there any methodology for assessing
14 new pharmacies that joined the network?
15    MS. MILLER: Object to form.
16    THE WITNESS: I -- I don't recall what
17 we did, how we did that, sir.
18 BY MR. DE ROCHE:
19    Q   Do you recall anything that you did for
20 new pharmacies from day one when they joined the
21 network?
22    MS. MILLER: Object to form.
23    THE WITNESS: I don't recall, sir.
24 BY MR. DE ROCHE:

Page 259

1    Q   You would agree that a new pharmacy is
2 not going to have a purchasing history that's
3 going to allow them to be assessed under the
4 algorithm. You would agree with that, right?
5    MS. MILLER: Object to form.
6    THE WITNESS: I do understand that, sir.
7 BY MR. DE ROCHE:
8    Q   And you were responsible for the SOM
9 program for at least some period of time, and I'm
10 asking you what was done with respect to those
11 pharmacies in terms of suspicious order
12 monitoring.
13    A   I don't recall, sir.
14    MR. DE ROCHE: Let's bring up 203.
15    (Exhibit No. 203 was premarked for
16    identification.)
17 BY MR. DE ROCHE:
18    Q   Ma'am, I'm showing you what we marked as
19 Exhibit 203. Let's start with the e-mail that's
20 right in the middle of the page on the first page
21 of the exhibit.
22    Do you see that, ma'am?
23    Let me know when you're there.
24    A   In the middle of the page?

Page 260

1    Q   Right. Do you see that?
2    A   I see it, sir, yes.
3    Q   It's an e-mail from you, correct?
4    A   That's what it states, sir.
5    Q   November 2nd, 2012, correct?
6    A   Yes, sir.
7    Q   You're sending an attachment, the CVS
8 retunement document, to Judy Hughes and Chris
9 Tulley. Why did you do that?
10    MS. MILLER: Object to form.
11    Instruct you not to answer to the extent
12 it reveals attorney-client communications. If you
13 did that at -- if the attorneys were involved in
14 your doing that, then please do not answer.
15 Instruct you not to answer.
16    THE WITNESS: I don't remember the
17 e-mail, sir.
18 BY MR. DE ROCHE:
19    Q   Why did you have the retunement document
20 in your possession, ma'am?
21    MS. MILLER: Object to form.
22    THE WITNESS: (Peruses document.)
23    I don't know why I had the retunement
24 document, sir. It doesn't state it here, and I

Page 261

1 don't recall why I had it.
2 BY MR. DE ROCHE:
3    Q   Let's go to page 8 of the retunement
4 document. Let me know when you're there.
5    A   I'm there, sir.
6    Q   At the bottom of the page, it states:
7 "As previously noted, this statistical-based SOM
8 system can only identify a potentially suspicious
9 order if a customer has ordered the corresponding
10 active ingredient at least twice over the previous
11 one-year period, different months."
12    Do you see that, ma'am?
13    A   I do see that, sir.
14    Q   Did I read that correctly?
15    A   Yes, sir.
16    Q   You would agree that a new store is not
17 going to meet that criteria, are they?
18    MS. MILLER: Object to form.
19    THE WITNESS: There would be no history,
20 that's correct, sir.
21 BY MR. DE ROCHE:
22    Q   There would be no history.
23    A   Yes, sir.
24    Q   All right. It states: "When this is

---

Page 262

1 not satisfied, the order must be evaluated outside
2 this SOM system, most likely by an element of the
3 standard operating procedures, SOP."
4      What was the system that was in place to
5 deal with stores that didn't satisfy the criteria,
6 and therefore the algorithm wasn't going to work
7 on them?
8      MS. MILLER:  Object to form.
9 BY MR. DE ROCHE:
10     Q   What did you do when you ran the system?
11     MS. MILLER:  Object to form.
12     THE WITNESS:  Sir, I don't recall.  I
13 don't recall.
14     MR. DE ROCHE:  Fair enough.
15     Let's go to 207.
16     Hand it to me, please.  I'll take all.
17 BY MR. DE ROCHE:
18     Q   Did you think that suspicious order
19 monitoring was an important function at CVS?
20     MS. MILLER:  Object to form.
21     THE WITNESS:  Yes, it was a -- an
22 important function, sir.
23 BY MR. DE ROCHE:
24     Q   You would agree that appropriate

---

Page 263

1 staffing of a suspicious order monitoring system
2 is central to making sure that it operates
3 properly?
4      MS. MILLER:  Object to form.
5      THE WITNESS:  Yes.  We need staffing,
6 yes, sir.  Correct.
7      MR. DE ROCHE:  I'm handing you what will
8 be marked as Exhibit 207.
9      (Exhibit No. 207 was marked for
10     identification.)
11 BY MR. DE ROCHE:
12     Q   This is a memo that we marked as 207
13 dated 11/27/2012, correct?
14     A   Yes, sir.
15     Q   From Pam Hinkle and Aaron Burtner?
16     A   Yes, sir.
17     Q   And this is concerning the required head
18 count to complete the IRR SOM process, correct?
19     A   It states the document states, sir.
20     Q   It states after the first open bullet
21 point that the daily review of the controls --
22 that's -- that includes hydrocodone, correct?
23     A   It would include all controls, yes, sir.
24     Q   It states: "Orders populated based on

---

Page 264

1 algorithm" -- and that's the IRR that Mr. Baker
2 went over with you earlier, correct?
3      MS. MILLER:  Object to form.
4      THE WITNESS:  Yes, sir, that's the
5 Buzzeo algorithm.
6 BY MR. DE ROCHE:
7      Q   It states:  "Orders populated based on
8 maximum/minimum cutoffs that took effect during
9 week end 9/8/12."
10     Do you see that, ma'am?
11     A   I do see --
12     Q   What are those --
13     A   -- it states that.
14     Q   Sorry.  What are those referring to --
15 what does it refer to?
16     A   What I -- what I recall is this
17 maximum/minimum was a separate -- a separate
18 report that they did reviews.  I believe that
19 that's what this is.
20     Q   Well, it's on a separate report.  It
21 states that it adds the number to the number of
22 stores on to the IRR itself.  Isn't that what it
23 says?
24     MS. MILLER:  Object to form.

---

Page 265

1      THE WITNESS:  Sir, I -- I don't know.
2 I -- I don't know the context.  I don't know.
3 BY MR. DE ROCHE:
4      Q   Well, you wrote this, right?
5      MS. MILLER:  Object to form.
6      THE WITNESS:  It states I read -- I
7 wrote it in '12, but I don't recall this document,
8 nor do I recall writing the document, sir.  It was
9 2012.
10 BY MR. DE ROCHE:
11     Q   So that being the case, you can't
12 disagree with anything on here because you just --
13 you have nothing to add in terms of what this
14 covers other than what's on the documents.  You
15 can't refute it either, right?
16     MS. MILLER:  Object to form.
17     THE WITNESS:  Sir, what I can tell you
18 is that we had a program in place that we reviewed
19 orders on a daily basis, and we took it very
20 seriously.  I can tell you that.  We did do
21 diligence.  I can tell you that.
22 BY MR. DE ROCHE:
23     Q   Ma'am, did you realize that that was the
24 reason why you were coming in to testify today

Page 266

1 before you came here? That we --
2         MS. MILLER: Object to form.
3 BY MR. DE ROCHE:
4     Q   -- were going to ask you questions about
5 that subject matter?
6         MS. MILLER: Object to form.
7 BY MR. DE ROCHE:
8     Q   You were aware of that, right?
9         MS. MILLER: Object to form.
10        THE WITNESS: I was aware I was going to
11 be asked questions, yes, sir.
12 BY MR. DE ROCHE:
13    Q   Okay. And you had at least three days
14 with counsel and as many days as you wanted
15 without counsel to get ready so you could give
16 information to help the jury understand the
17 situation, right? You had all the time in the
18 world to get ready for this.
19        MS. MILLER: Object to form.
20 BY MR. DE ROCHE:
21    Q   Correct?
22        MS. MILLER: Object to form.
23        THE WITNESS: I can only recall what I
24 can recall, sir.

Page 267

1 BY MR. DE ROCHE:
2     Q   Do you recall the fact that adding the
3 maximum/minimum increased the numbers of stores on
4 the IRR per day by 105?
5     A   I don't recall, sir.
6     Q   At the time that you ran the SOM
7 program, for the entire time that you ran it, was
8 there any more -- was there ever more than two
9 analysts working on it?
10        MS. MILLER: Object to form.
11        THE WITNESS: There were two analysts.
12 BY MR. DE ROCHE:
13    Q   So for the entire time, from beginning
14 to end that you ran that program, you had two
15 analysts?
16        MS. MILLER: Object to form.
17        THE WITNESS: I had two analysts, yes,
18 sir.
19 BY MR. DE ROCHE:
20    Q   Did you ever jump in yourself when
21 things got hot and heavy at the end of the month
22 and act as an analyst yourself?
23        MS. MILLER: Object to form.
24        THE WITNESS: I did not review the

Page 268

1 reports. I reviewed the due diligence.
2 BY MR. DE ROCHE:
3     Q   Did you ever just look at an IRR -- in
4 other words, do what the analysts do -- and
5 determine which of the flagged orders appearing on
6 the IRR were going to be subject to due diligence?
7     A   I did not --
8         MS. MILLER: Object to form.
9         THE WITNESS: -- do the reviews, sir.
10 BY MR. DE ROCHE:
11    Q   Did you ever do any auditing of the work
12 that was performed by your analysts?
13        MS. MILLER: Object to form.
14        THE WITNESS: I don't remember actual
15 audits, sir. No, sir, I don't recall that.
16 BY MR. DE ROCHE:
17    Q   Do you know what the term "quality
18 control" means?
19        MS. MILLER: Object to form.
20        THE WITNESS: I do know what "quality
21 control" means, sir.
22 BY MR. DE ROCHE:
23    Q   Okay. Did you ever subject your
24 analysts' work to any kind of quality control

Page 269

1 procedure that you can tell us today?
2     A   There were daily conversations around
3 the reviews themself that I had with those that
4 were conducting the reviews. There were reviews
5 of the additional due diligence. There were
6 additional reports that were created outside of
7 the IRR where we would look at different things,
8 and that information, I would be part of that
9 review as well.
10    Q   Anything else?
11        MS. MILLER: Object to form.
12        THE WITNESS: Sir, I can't recall.
13 That's what I remember.
14 BY MR. DE ROCHE:
15    Q   Daily conversations in what respect?
16 Tell me what those -- those entailed.
17    A   It would be discussing the IRR, sir.
18    Q   In what respect?
19    A   What would be on the reports, what they
20 would be finding, what the information they had.
21 Just the daily conversations that you would have
22 with your -- your folks that are doing that job.
23    Q   I mean that's vague, so I want to get
24 specifics.

Page 270

```
1      Tell me, what -- what did those
2  conversations look like?
3      MS. MILLER:  Object to form.  Asked and
4  answered.
5      THE WITNESS:  Sir, I can't give you a
6  specific conversation.  That was very long ago.
7  BY MR. DE ROCHE:
8    Q    Give me an example of what exactly
9  you're talking about when you said daily
10 conversations.
11   A    We would talk about what was popped on
12 the report, what was the drugs that were popped.
13 Just the -- the normal things that you would be
14 looking at on an IRR and what that information
15 was.  Was there due diligence?  What did that --
16 you know, what was that due diligence?  Was there
17 reason to believe that there was a suspicious
18 order?
19      Just those normal conversations that you
20 would have when somebody is conducting a review.
21   Q    We're talking about -- you're talking
22 about orders that were on the IRR and selected to
23 receive some additional due diligence beyond the
24 IRR.  Is that what you're talking about?
```

Page 271

```
1    A    I'm talking --
2      MS. MILLER:  Object to form.
3      THE WITNESS:  I'm talking about the
4  IRRs, period.  What was popping, what was on
5  there, what was the due diligence.  That's what
6  I'm talking about.
7  BY MR. DE ROCHE:
8    Q    Other than daily conversations that you
9  mentioned, anything else that was -- in terms of
10 quality control?
11      MS. MILLER:  Object to form, asked and
12 answered.
13      THE WITNESS:  I would look at the due
14 diligence that they performed.  I would look at
15 the -- what they identified as detail around a due
16 diligence.
17      MR. DE ROCHE:  I need 223.  223.  It's
18 in there.
19      (Exhibit No. 223 was premarked for
20      identification.)
21 BY MR. DE ROCHE:
22   Q    I'm showing you what we marked as
23 Exhibit 223.
24      The first page is an e-mail from
```

Page 272

```
1  yourself to Frank Devlin, correct?
2    A    That's what it appears to be, sir.
3    Q    5/9/2012 is the date?
4    A    Yes, sir.
5    Q    A copy to Mr. Mortelliti?
6    A    Wait.  Confirm the date again, sir.
7    Q    5/9/2012.  I'm sorry.  Did I say that
8  wrong?  I apologize.
9    A    Yeah, I -- I think so.  Okay.
10   Q    A copy to Mr. Mortelliti?
11   A    Yes, sir.
12   Q    And you wrote:  "I finally received the
13 information."
14      Do you know what you're -- why you wrote
15 that?
16   A    I see the e-mail, sir.  I do not know
17 why I would have wrote that, no, sir.
18   Q    This is the time when you were the SOM
19 manager?
20   A    Yes, sir.
21   Q    And it appears that you are forwarding a
22 document, an Excel spreadsheet that refer -- that
23 is the IRR PSE control recaps.
24      Now, you looked at some of those earlier
```

Page 273

```
1  with Mr. Baker, correct?
2    A    Yes, sir.
3    Q    Okay.  And you produced this -- this was
4  produced by CVS in this case in native format;
5  produced the spreadsheet right behind the e-mail
6  that was produced.  The native is Bates No.
7  110415.  It's not written on there because it was
8  native, obviously.  I'm giving it to you so that
9  you can note it.
10      If you would go to the last recap.  So
11 it's the last two pages of the document.  Yeah,
12 last two pages.
13      Are you there?
14      MS. MILLER:  Jim, is this the same
15 document that Mr. Baker showed to her earlier?
16      MR. DE ROCHE:  I don't know.  He had --
17 he had a non-native.  This is native.
18 BY MR. DE ROCHE:
19   Q    This was printed off the native -- you
20 see the "August 2011 Control IRR Recap."  Do you
21 see that, ma'am?
22   A    I do see that, sir.
23   Q    And it appears that at least in August
24 2011 that there were no hydrocodone orders for the
```

Page 274

1 entire CVS network that were reviewed and
2 therefore placed on the recap.
3     MS. MILLER: Object to form.
4 BY MR. DE ROCHE:
5    Q   Do you agree with that, ma'am?
6     MS. MILLER: Object to form.
7     THE WITNESS: Sir, I can't say whether
8 something -- whether it was reviewed or not
9 reviewed without the content.
10 BY MR. DE ROCHE:
11    Q   What do you mean, "the content"?
12    A   Without the information from that time
13 frame, I can't tell you whether it was actually
14 reviewed or not reviewed.
15    Q   Isn't the recap the written record of
16 what was reviewed and not reviewed?
17     MS. MILLER: Objection to form.
18     THE WITNESS: It was a record they used,
19 sir.
20 BY MR. DE ROCHE:
21    Q   It was a record they were instructed to
22 use by your written work instructions that we
23 looked at earlier and the process flow that was
24 put together instructing them how to do the

Page 275

1 reviews. Isn't that correct?
2     MS. MILLER: Object to form.
3     THE WITNESS: Sir, I don't -- I -- I --
4 I don't know what -- I don't remember what the
5 document said. I don't remember what -- what this
6 actually all encompassed. It doesn't -- there's
7 not information for me to tell you whether
8 something was reviewed or not reviewed at that
9 time. I can't tell you that.
10 BY MR. DE ROCHE:
11    Q   Well, ma'am, did you supervise your
12 employees to make sure that they followed the work
13 instructions that they were given?
14    A   Yes, sir.
15    Q   Okay. And did you expect them to follow
16 the directions, and when they did a review of an
17 order, they noted it in the recap? You expected
18 them to follow those instructions, didn't you?
19     MS. MILLER: Object to form.
20     If you want to show her the work -- or
21 the document -- other documents --
22     MR. DE ROCHE: Your objection is noted,
23 Counsel.
24 BY MR. DE ROCHE:

Page 276

1    Q   Ma'am, did you expect them to follow the
2 directions and note the reviews in the recap?
3     MS. MILLER: Object to form.
4     THE WITNESS: They did note information
5 on the recaps for review, sir.
6     MS. MILLER: Jim, we've been going for a
7 while. Can we take a quick break?
8     MR. DE ROCHE: Sure.
9     THE VIDEOGRAPHER: The time is
10 3:22 p.m., and we're going off the record.
11     (Recess.)
12     THE VIDEOGRAPHER: The time is
13 3:33 p.m., and we're back on the record.
14     (Exhibit No. 228 was premarked for
15     identification.)
16 BY MR. DE ROCHE:
17    Q   Ms. Hinkle, I'm showing you what we
18 marked as Exhibit 228. This document is an IRR
19 dated October 2nd, 2011.
20     And you recognize this as an IRR,
21 correct?
22     MS. MILLER: Counsel, is that date
23 indicated anywhere on this document?
24     MR. DE ROCHE: Yes. Yes, it is.

Page 277

1 BY MR. DE ROCHE:
2    Q   If you go down to the first entry on the
3 page for the first order that's noted, you will
4 see that the DC is CR. What does CR stand for?
5    A   That would be Conroe.
6    Q   Excuse me, which one?
7    A   Conroe.
8    Q   And the date is 2011/10/2. Do you see
9 that on there, ma'am?
10     MS. MILLER: Where are you, right after
11 CR?
12     MR. DE ROCHE: Correct.
13     MS. MILLER: Is this the complete
14 document, Counsel, or was there --
15     MR. DE ROCHE: Yes, this is what you
16 guys produced to us.
17     MS. MILLER: I'm just asking --
18     MR. DE ROCHE: Yeah.
19     MS. MILLER: -- whether it was a
20 complete document.
21     MR. DE ROCHE: Yeah. Yes. Complete to
22 the extent that you guys blacked out what's
23 blacked out.
24     MS. MILLER: No, but I --

Page 278

1    MR. DE ROCHE: Okay, just so we're
2 clear.
3    MS. MILLER: No, but what I meant was
4 this wasn't an excerpt or there wasn't a cover
5 page that had been attached that you removed.
6    MR. DE ROCHE: No, this is -- this is
7 what was produced.
8 BY MR. DE ROCHE:
9    Q  Do you see that, ma'am, 2011/10/2?
10    A  Yes, sir.
11    Q  And it's a hydrocodone order.  It
12 appears for the Store No. 5972.  Correct?
13    MS. MILLER: Object to form.  Where --
14 BY MR. DE ROCHE:
15    Q  Is that correct, ma'am?
16    A  I'm looking for the store number.
17 Sorry, sir.
18    Q  Store No. 5792 -- 5972.  Excuse me.  Is
19 that correct?
20    A  5972, is that what you said, sir?
21    Q  5972, yes.
22    A  Yes, sir.
23    Q  Okay.  If you go -- this weighs out the
24 various coefficients and the scores associated

Page 279

1 with them for that particular order, and then it
2 provides Lags 1 through 12.  Correct?
3    MS. MILLER: Object to form.
4    THE WITNESS: That's what is indicated
5 on the document, sir.
6 BY MR. DE ROCHE:
7    Q  Okay.  And the score associated with
8 this order appears to be .74, correct?
9    MS. MILLER: How do you -- where is
10 that, Counsel, on the -- it's difficult to read.
11    MR. DE ROCHE: The witness will figure
12 it out, I know.  She'll get there eventually.
13    THE WITNESS: There is a .74 on this
14 document, sir.
15 BY MR. DE ROCHE:
16    Q  And next to that I believe is the
17 month-to-date for the particular drug -- excuse
18 me -- active ingredient, correct?
19    MS. MILLER: Object to form.
20    THE WITNESS: There is a -- that number
21 is populating on there, sir.
22 BY MR. DE ROCHE:
23    Q  Go to the next page, page number 56305,
24 Bates number at the bottom, correct?

Page 280

1    A  Yes, sir.
2    Q  Okay.  And again, you have an order,
3 same day, same IRR for hydrocodone for Store 7307,
4 correct?
5    MS. MILLER: Object to form.  The key is
6 on the first page.  So...
7    MR. DE ROCHE: So what?  She can read
8 this.  She was the manager.
9    MS. MILLER: Well, I'm just saying that
10 the key is not on the second page, and it's a
11 difficult document to read.
12    MR. DE ROCHE: Not unless you want to
13 make it difficult.
14 BY MR. DE ROCHE:
15    Q  Store 7307, correct?
16    MS. MILLER: Object to form.
17    THE WITNESS: 7307 is populating on
18 here, sir.
19 BY MR. DE ROCHE:
20    Q  Okay.  The score populated on this IRR
21 for this particular order is .97, correct?
22    MS. MILLER: Object to form.  I --
23 object to form.
24    THE WITNESS: .97 is populating on here,

Page 281

1 sir.
2 BY MR. DE ROCHE:
3    Q  That's the score given by the algorithm
4 for this order, correct?
5    MS. MILLER: Object to form.
6    THE WITNESS: That's what is indicated
7 populating on there, sir.
8 BY MR. DE ROCHE:
9    Q  As the -- as the score for this order,
10 that's what's populated on this report, correct?
11    A  Sir, I can't speak to what it actually
12 is populating for.  I can read the .97, and I can
13 read that, the -- the description.
14    Q  That's the score.
15    A  Yes, sir.
16    MS. MILLER: Object to form.
17 BY MR. DE ROCHE:
18    Q  Okay.  Again, the next page you have a
19 hydrocodone order on page 5630 -- 56306, correct?
20    A  Yes, sir.
21    Q  And the next page after that, a
22 hydrocodone order for Store 7664, correct?
23    A  For -- for 56306?
24    Q  No, for 56307.  Excuse me.  I went to

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1 the next page. Are you with me?

2     A  I am, sir.

3     Q  Store 7664 had a flagged order for

4 hydrocodone as well.

5     A  I show it says hydrocodone, and it

6 states so on this record 7664, sir.

7     Q  Different DC, I believe?

8     A  Yes, sir.

9     Q  What's -- what is EN?

10     A  Ennis.

11     Q  Ennis is --

12     A  Texas.

13     Q  -- Texas?

14     A  Mm-hmm.

15     Q  And again, this is 2011/10/2.

16 October 2nd, 2011, correct?

17     A  Yes, sir.

18     Q  Go to page 56309. Let me know when

19 you're there.

20     A  I'm there, sir.

21     Q  Okay. Hydrocodone order again flagged

22 by the algorithm for 5250, correct?

23     A  Yes, sir, that's what it states on the

24 document.

Page 283

1     Q  Okay. The score was -- SOM score was

2 .93 for this particular order, correct?

3     MS. MILLER: Object to form.

4     THE WITNESS: .93, yes, sir, it is on

5 there.

6 BY MR. DE ROCHE:

7     Q  Okay. The next page 56310, near the top

8 of the page, we have a hydrocodone order for Store

9 1599. Correct?

10     A  Yes, sir, that number is there.

11     Q  Then down below we have a hydrocodone

12 order for Store 3320, correct?

13     A  3320 is what's populating on here, sir.

14     Q  When Mr. Baker went through the

15 retunement document and read you a large portion

16 of it, you recall that the retunement indicated

17 that the scores were a number between zero and

18 1.0, correct?

19     MS. MILLER: Object to form.

20     THE WITNESS: Yes, I'm -- I remember

21 a --

22 BY MR. DE ROCHE:

23     Q  You recall that, right?

24     A  -- conversation around that, yes, sir.

Page 284

1     Q  The score for the hydrocodone order for

2 Store 3320 is .99, correct?

3     MS. MILLER: Object to form.

4     THE WITNESS: The .99 is stated on this

5 record.

6 BY MR. DE ROCHE:

7     Q  There's an order that is flagged for

8 hydrocodone on page 56312, correct?

9     A  Where -- where are you at, sir?

10     Q  56312. Let me know when you're there.

11     Page 56312, the number is on the bottom

12 right.

13     A  I'm there.

14     Q  Are you there?

15     A  Yes, sir.

16     Q  Okay. You see a hydrocodone order

17 flagged by the algorithm, correct?

18     A  I do see the hydro, yes, sir.

19     Q  Next page 56313, a hydrocodone order

20 flagged by the algorithm, correct?

21     A  Yes, sir, I see it.

22     Q  The score given to this one was .98,

23 correct?

24     MS. MILLER: Object to form.

Page 285

1     THE WITNESS: I see that number .98 on

2 there, yes, sir.

3 BY MR. DE ROCHE:

4     Q  Next page, two orders flagged for

5 hydrocodone on page 56314, correct?

6     A  There are two orders on here, sir.

7     Q  The page after that, 56315, again an

8 order flagged for hydrocodone, correct?

9     A  Yes, sir.

10     Q  The page after that, 56316, two orders

11 flagged for hydrocodone.

12     A  Yes, sir.

13     Q  The next page after that, 56317, we have

14 three orders flagged for hydrocodone, correct?

15     A  There's three orders on here, sir.

16     Q  56318, an order flagged for hydrocodone,

17 correct?

18     A  Yes, sir. That's -- it's populated

19 there.

20     Q  This is the IRR for one day in October

21 of 2011, correct?

22     MS. MILLER: Object to form.

23     THE WITNESS: Sir, I don't -- I don't

24 know that by looking at this document. I don't

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 know if it's for one day. I don't know --
2 BY MR. DE ROCHE:
3     Q   Well, let's look at the -- do you see
4 any date for any of these orders other than
5 10/2/2011?
6        Go through the document.  You can look
7 and see if there are any other dates on there.
8        MS. MILLER:  Take your time to look
9 through it.
10        THE WITNESS:  (Peruses document.)
11        It all has the same date, sir, that I
12 see.
13 BY MR. DE ROCHE:
14     Q   And it makes sense because the IRR was a
15 daily report, right?
16     A   It was a daily report, sir.
17     Q   All right.
18        (Exhibit No. 229 was premarked for
19        identification.)
20 BY MR. DE ROCHE:
21     Q   Now I'm going to show you what we marked
22 as Exhibit 229.
23        229 is a control drug IRR recap for
24 October of 2011, correct?

Page 287

1     A   That's what it states, sir.
2     Q   Okay.  And this control drug IRR
3 recap -- and this is the entire document produced
4 to us in this case by CVS -- has a single order
5 for hydrocodone on 10/25/2011.  Correct?
6        MS. MILLER:  Object to form.
7        THE WITNESS:  There is an order
8 populated for 10 -- 10/25/2011, sir.
9 BY MR. DE ROCHE:
10     Q   And there isn't a single order on this
11 IRR recap for October 2011 with the date
12 10/02/2011.
13        MS. MILLER:  Object to form.
14 BY MR. DE ROCHE:
15     Q   Correct?
16     A   There -- the only date I see is 10/25 of
17 '11.
18     Q   So none of the orders that were flagged
19 on Exhibit 228 appear on the recap that we've
20 marked as Exhibit 229, correct?
21     A   I do not see any of those stores on
22 this -- on this record, sir.
23        (Exhibit No. 232 was premarked for
24        identification.)

Page 288

1        MR. DE ROCHE:  Can you pull 232 up.
2 This is going to be 232.
3 BY MR. DE ROCHE:
4     Q   I'm showing you what we marked as
5 Exhibit 232.  The IRR recap for November 29, 2011,
6 correct?
7        MS. MILLER:  Do you mean -- this is --
8 this appears to be an IRR.
9        MR. DE ROCHE:  I don't care what it
10 appears to be.  It is what it is.  You guys
11 produced it.
12        MS. MILLER:  No, but I thought you just
13 said --
14        MR. DE ROCHE:  IRR?
15        MS. MILLER:  -- this is the IRR recap.
16        MR. DE ROCHE:  Did I say recap?
17        MS. MILLER:  Yes.
18        MR. DE ROCHE:  Excuse me.  I apologize.
19        MS. MILLER:  I was just trying to make
20 the record clear.
21        MR. DE ROCHE:  You're correct.  Thank
22 you, Counsel.  I appreciate it.
23 BY MR. DE ROCHE:
24     Q   And we'll get the date.  If you go to

Page 289

1 page 56890, there's a hydrocodone order for the
2 Indianapolis DC on there, correct?
3     A   It does indicate an Indy.
4     Q   And again, it's 2011/11/29, correct?
5     A   That is the date that's populating here,
6 sir.
7     Q   Okay.  And the hydrocodone order that's
8 populated on this IRR report for November 29 for
9 Indianapolis is Store 1502, correct?
10     A   That is the store number listed here,
11 sir.
12     Q   Okay.  The next page, also in
13 Indianapolis, order for hydrocodone?
14     A   Yes, sir, it does indicate hydrocodone.
15     Q   Store 3359.  Correct?
16     A   Yes, sir, that's the number on here.
17     Q   And the SOM score that was attributed to
18 this order by the algorithm was again .99,
19 correct?
20        MS. MILLER:  Object to form.
21        THE WITNESS:  That .99 is on here, sir.
22 BY MR. DE ROCHE:
23     Q   Okay.  Go to page 56893, please.  This
24 is an order again for the Indianapolis

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 distribution center, correct?
2    A   It does indicate Indianapolis, sir.
3    Q   For hydrocodone, correct?
4    A   That's what's populated, yes, sir.
5    Q   Store 7385, correct?
6        MS. MILLER:  Which -- are you on page
7 56893?
8        MR. DE ROCHE:  56893.
9        THE WITNESS:  There is a number 7385.
10 BY MR. DE ROCHE:
11   Q   And that's the store number, right?
12   A   Yes, sir.
13   Q   Okay.  Go to page 56898.
14       Hydrocodone order populated on the IRR
15 for that date, correct?
16   A   For 5698, sir?  Docket --
17   Q   Yes.
18   A   Yes, sir, there's a hydro.
19   Q   Okay.  And again, it's Store 1350,
20 correct?
21   A   That is the number on here, 1350, sir.
22   Q   SOM score attributed to this order is
23 .98, correct?
24   A   There is a .98 on there, sir.

Page 291

1    Q   And that's out of between zero and 1.0,
2 correct?
3        MS. MILLER:  Object to form.
4 BY MR. DE ROCHE:
5    Q   As we mentioned earlier.
6        MS. MILLER:  Object to form.
7 BY MR. DE ROCHE:
8    Q   The max you can have is 1.0.  This is
9 .98, correct?
10       MS. MILLER:  Object to form.
11       THE WITNESS:  Sir, I can't speak to this
12 document.  This number, I can't speak to that.
13 BY MR. DE ROCHE:
14   Q   Ma'am, you were in charge of the SOM
15 system where this IRR was used every single day
16 while you were managing the SOM system.  So you
17 are very familiar with what this report is and the
18 use of this report.  Correct?
19       You're not telling the jury as you sit
20 here you can't speak to the IRR that you were in
21 charge of the analysts who were reviewing every
22 day?
23       MS. MILLER:  Object to form.
24       THE WITNESS:  Sir, I -- I know what an

Page 292

1 IRR is.  I know what it looks like.  I can't speak
2 to the elements on there from 2000 -- whenever it
3 was, 2012.
4 BY MR. DE ROCHE:
5    Q   Did the document change between then and
6 now?
7        MS. MILLER:  Object to form.
8        THE WITNESS:  No, sir.  It --
9 BY MR. DE ROCHE:
10   Q   All right.
11   A   The document itself doesn't change, but
12 I don't know -- I can't speak to a score now
13 that -- that --
14   Q   Oh, really?
15   A   -- this document is indicating that it
16 happened in '12.  This is -- this is the first
17 time I've seen this document --
18   Q   Well, ma'am --
19   A   -- sir.
20   Q   -- I don't -- I don't want to quibble
21 with you, but the reality is that that's the
22 reason you have written records of things like
23 this so that you don't have to remember, and no
24 one else does.  You're supposed to have records of

Page 293

1 what went on when you were trying to comply with
2 the DEA regulation.
3        So let's stop playing games about what
4 you can or can't remember when we're talking about
5 a document that was used by folks you supervised
6 every single day for a year and a half.
7        MS. MILLER:  Object to form.
8 BY MR. DE ROCHE:
9    Q   Please.
10       MS. MILLER:  Object to the tone.
11 BY MR. DE ROCHE:
12   Q   You want to tell the jury why you can't
13 give testimony on simple questions involving
14 documents that you were in charge of running?
15       MS. MILLER:  Object to form.  Object to
16 the treatment and the tone --
17 BY MR. DE ROCHE:
18   Q   Do you really want to do that?
19       MS. MILLER:  -- towards the witness,
20 which is disrespectful.  And I respectfully ask
21 that you dial back the tone and treat this witness
22 with respect.  She is testifying to the best of
23 her recollection --
24       MR. DE ROCHE:  Your objection is noted,

Page 294

1 Counsel.
2       MS. MILLER: -- in response to your
3 questions.
4       MR. DE ROCHE: Your objection is noted.
5       MS. MILLER: And I ask that you treat
6 her respectfully.
7 BY MR. DE ROCHE:
8    Q   Ma'am, do you want to go on with this
9 document --
10       MS. MILLER: Object to form.
11 BY MR. DE ROCHE:
12    Q   -- and answer the questions about it
13 now?
14       MS. MILLER: Object to form.
15 BY MR. DE ROCHE:
16    Q   Would you like to proceed?
17       MS. MILLER: Object to form.
18       THE WITNESS: Yes, sir, I'll proceed.
19 BY MR. DE ROCHE:
20    Q   All right. Go to page 56899.
21       Are you there?
22    A   I am there.
23    Q   You see two hydrocodone orders that were
24 flagged by the algorithm on the IRR for that date,

Page 295

1 correct?
2    A   Yes, sir.
3    Q   Okay. One of them has a score of .95
4 out of 1.0, correct?
5       MS. MILLER: Object to form.
6       THE WITNESS: The number .95 is there,
7 sir.
8 BY MR. DE ROCHE:
9    Q   Go to page 56906.
10       Are you there?
11    A   I'm there, sir.
12    Q   Again, you see hydrocodone order flagged
13 by the algorithm on that date, correct?
14    A   I see that, sir.
15    Q   Okay. Again, the score is .99 out of
16 1.0, correct?
17       MS. MILLER: Object to form.
18       THE WITNESS: Sir, I see the .99.
19 BY MR. DE ROCHE:
20    Q   Next page 56907.
21       You see a hydrocodone order flagged by
22 the algorithm that day, correct?
23    A   Yes, sir, I see hydro there.
24    Q   Assigned a score by the algorithm of .96

Page 296

1 out of 1.0, correct?
2       MS. MILLER: Object to form.
3       THE WITNESS: I see the .96, sir.
4       MR. DE ROCHE: Let's go to 231.
5       (Exhibit No. 231 was premarked for
6       identification.)
7 BY MR. DE ROCHE:
8    Q   I'm handing you what we marked as
9 Exhibit 231, a document produced by CVS in this
10 case, November 2011 Control IRR Recap. And this
11 is the complete document.
12       Ma'am, do you see any hydrocodone orders
13 populated on the IRR recap for November 2011?
14       MS. MILLER: Object to form.
15       THE WITNESS: I do not see any hydro
16 populating on this record, sir.
17 BY MR. DE ROCHE:
18    Q   So the logical conclusion, the one that
19 we would reach, is none of the orders we just went
20 through on Exhibit 231 -- or 232, excuse me -- is
21 that right? -- 232 appear on 231, correct?
22       MS. MILLER: Object to form.
23       THE WITNESS: None of those do populate
24 on there, sir.

Page 297

1 BY MR. DE ROCHE:
2    Q   And the IRR recap, that was maintained
3 by folks that worked for you, right?
4       MS. MILLER: Object to form.
5 BY MR. DE ROCHE:
6    Q   Correct?
7    A   Yes, sir.
8       MS. MILLER: Object to form.
9 BY MR. DE ROCHE:
10    Q   Appear to show --
11       MS. MILLER: Please, after he finishes
12 his question, give me an opportunity to object.
13 BY MR. DE ROCHE:
14    Q   Appear to show that none of the orders
15 that were populated on 233, including orders with
16 a SOM score of .99, were noted on the recap.
17       MS. MILLER: Object to form.
18 BY MR. DE ROCHE:
19    Q   Correct?
20       MS. MILLER: Object to form.
21       THE WITNESS: I -- on this record, it
22 does not -- they're not populated, sir. I don't
23 know that -- I don't know if there was anything
24 where it -- that would have been reviewed but just

Page 298

1 not put on that record. I don't know that. I
2 can't speak to the data because I don't know.
3 This is just a document from -- from that time
4 frame, and I'm just -- I don't know -- I --
5 BY MR. DE ROCHE:
6    Q   Did you audit your employees that worked
7 for you to make sure that they were keeping the
8 records with respect to the suspicious order
9 monitoring program that they were required to keep
10 by the work instructions?
11       MS. MILLER: Object to form.
12       THE WITNESS: To the best of my
13 knowledge, the records were kept, sir.
14       MR. DE ROCHE: I have nothing further.
15       MS. MILLER: Do you have --
16       MR. DE ROCHE: We're done.
17       MS. MILLER: We're going to take -- I'd
18 ask to have a ten-minute break --
19       THE VIDEOGRAPHER: The time is --
20       MS. MILLER: -- to determine whether we
21 want to review, and we may come back and do a
22 redirect.
23       THE VIDEOGRAPHER: The time is 3:59 p.m.
24 We're going off the record.

Page 299

1       (Recess.)
2       THE VIDEOGRAPHER: The time is
3 4:16 p.m., and we're back on the record.
4          REDIRECT EXAMINATION
5 BY MR. BAKER:
6    Q   Ms. Hinkle, have you --
7       THE VIDEOGRAPHER: Hold on. Thank you.
8 BY MR. BAKER:
9    Q   Have you been employed for 41 straight
10 years with CVS?
11    A   Yes, sir, I have.
12    Q   Have you been employed anywhere else
13 during that 41 years?
14    A   No, sir, I have not.
15    Q   How old were you when you went to work
16 for them?
17    A   I was right out of high school. I was
18 18, I believe.
19    Q   Okay. So that would you make you how
20 old right now, 59?
21       MS. MILLER: Object to form.
22 BY MR. BAKER:
23    Q   Is that right?
24    A   60.

Page 300

1    Q   Okay. Do you plan to retire at CVS?
2       MS. MILLER: Object to form.
3       THE WITNESS: Yes, sir, I do plan to
4 retire at CVS.
5 BY MR. BAKER:
6    Q   Do you consider CVS part of your family?
7       MS. MILLER: Object to form.
8 BY MR. BAKER:
9    Q   If you've been with them 41 years?
10       MS. MILLER: Object to form.
11       THE WITNESS: I have a high respect for
12 my job and for my company --
13 BY MR. BAKER:
14    Q   Sure.
15    A   -- as I do anybody -- anything.
16    Q   I understand.
17       So let me show you Exhibit No. 40.
18       (Exhibit No. 40 was premarked for
19       identification.)
20 BY MR. BAKER:
21    Q   This is an e-mail from Ellen Demetrius
22 to Pam Hinkle, and it's dated June 8, 2012.
23       And it says: "Please review the
24 attached report for format only. I'm asking our

Page 301

1 offshore group to run data for the whole month of
2 May. Our plan is to implement this at the end of
3 June."
4       Do you recall receiving this e-mail?
5    A   No, sir, I don't.
6    Q   My question is what is the offshore
7 group?
8    A   I really don't know, but they're another
9 group that assists with IT requests.
10    Q   Okay. I didn't understand what you
11 said, and I apologize.
12    A   That's fine.
13    Q   I missed it. They're another group that
14 assists with?
15    A   With IT requests, like system updates or
16 things like that. That's what they do.
17    Q   Okay. Off what shore of where is that
18 group located?
19       MS. MILLER: Object to form.
20       THE WITNESS: Sir, I don't know.
21 BY MR. BAKER:
22    Q   When you say "offshore" in that context,
23 what does that mean? Where are they located if
24 they're off -- offshore? Offshore of where?

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1     MS. MILLER: Object to form.
2     THE WITNESS: Sir, I -- I don't know. I
3 don't know anything about them except that they --
4 they exist and they support IT. That's all I
5 really know.
6 BY MR. BAKER:
7    Q   Is this offshore group that is
8 unidentified, are they the ones -- and when I say
9 "unidentified," I mean unidentified by you, right?
10   A   Yes.
11   Q   Okay. Is this unidentified offshore
12 group, is that group involved in internet
13 technology? Is that what you're talking about,
14 IT?
15     MS. MILLER: Object to form.
16     THE WITNESS: Yeah, I don't know what
17 they do. I just know that they support the IT
18 group. I don't know in what capacity. I know
19 I've heard "offshore" before, but -- and that they
20 support the IT group, but I don't know how -- how
21 that -- how that works, sir.
22 BY MR. BAKER:
23   Q   When you say "IT" in that context, are
24 you talking about the computer systems within CVS?

Page 303

1    A   The -- yeah, the -- yes, sir, the --
2    Q   Would that be the same computer system
3 that runs the SOM program?
4     MS. MILLER: Object to form.
5 BY MR. BAKER:
6    Q   More likely than not?
7    A   I mean it could be.
8     MS. MILLER: Object to form.
9     THE WITNESS: I just don't know -- I
10 just don't know which businesses, what they
11 support. I just know that they do support. I
12 just don't know how and in what capacity.
13 BY MR. BAKER:
14   Q   All right. And this offshore group,
15 they're the ones that -- after that retunement was
16 delivered to CVS in 2011, that program, they're
17 the ones that raised the algorithm score from .15,
18 like the system was designed to operate at for
19 flagging, to .65, like CVS operated it from 2011
20 onward. Am I correct about that?
21     MS. MILLER: Object to form.
22     THE WITNESS: Sir, I don't recall that.
23     MR. BAKER: Thank you very much. No
24 further questions.

Page 304

1     MS. MILLER: No questions.
2     THE VIDEOGRAPHER: Okay. The time is
3 4:21 p.m., January 24, 2019. Going off the
4 record, concluding the videotaped deposition.
5         (Whereupon, the deposition of
6         PAMELA HINKLE was concluded
7         at 4:21 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 305

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2    The undersigned Certified Shorthand Reporter
3 does hereby certify:
4    That the foregoing proceeding was taken before
5 me at the time and place therein set forth, at which
6 time the witness was duly sworn; That the testimony
7 of the witness and all objections made at the time
8 of the examination were recorded stenographically by
9 me and were thereafter transcribed, said transcript
10 being a true and correct copy of my shorthand notes
11 thereof; That the dismantling of the original
12 transcript will void the reporter's certificate.
13    In witness thereof, I have subscribed my name
14 this date: January 28, 2019.
15
16
17    _____
18         LESLIE A. TODD, CSR, RPR
19         Certificate No. 5129
20 (The foregoing certification of
21 this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter.)

Page 306

1    INSTRUCTIONS TO WITNESS
2    Please read your deposition over carefully and
3  make any necessary corrections. You should state the
4  reason in the appropriate space on the errata sheet
5  for any corrections that are made.
6  After doing so, please sign the errata sheet
7  and date it.
8    You are signing same subject to the changes you
9  have noted on the errata sheet, which will be
10  attached to your deposition.  It is imperative that
11  you return the original errata sheet to the deposing
12  attorney within thirty (30) days of receipt of the
13  deposition transcript by you. If you fail to do so,
14  the deposition transcript may be deemed to be
15  accurate and may be used in court.
16
17
18
19
20
21
22
23
24

Page 308

1    ACKNOWLEDGMENT OF DEPONENT
2    I,_____, do hereby
3  certify that I have read the foregoing pages, and
4  that the same is a correct transcription of the
5  answers given by me to the questions therein
6  propounded, except for the corrections or changes in
7  form or substance, if any, noted in the attached
8  Errata Sheet.
9
10  _____
11  PAMELA HINKLE              DATE
12
13
14  Subscribed and sworn to
15  before me this
16  _____day of_____,20___.
17  My commission expires:_____
18  _____
19  Notary Public
20
21
22
23
24

Page 307

1        - - - - - -
2        E R R A T A
3        - - - - - -
4  PAGE LINE CHANGE
5  ____ ____ _____
6  REASON: _____
7  ____ ____ _____
8  REASON: _____
9  ____ ____ _____
10  REASON: _____
11  ____ ____ _____
12  REASON: _____
13  ____ ____ _____
14  REASON: _____
15  ____ ____ _____
16  REASON: _____
17  ____ ____ _____
18  REASON: _____
19  ____ ____ _____
20  REASON: _____
21  ____ ____ _____
22  REASON: _____
23  ____ ____ _____
24  REASON: _____