Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION,              )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES               )   Polster
                              )
 7
 8                  __ __ __
 9           Friday, January 11, 2019
                    __ __ __
10
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW
                    __ __ __
12
13
14
15   Videotaped Deposition of DEBBIE HODGES, held
     at 4206 South J.B. Hunt Drive, Rogers,
16   Arkansas, commencing at 8:15 a.m., on the
     above date, before Debra A. Dibble, Certified
17   Court Reporter, Registered Diplomate
     Reporter, Certified Realtime Captioner,
18   Certified Realtime Reporter and Notary
     Public.
19
20
21
                      __ __ __
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 | fax 917.591.5672
                deps@golkow.com
24
25
```

```
 1     A P P E A R A N C E S:
 2         CARELLA, BYRNE, CECCHI, OLSTEIN,
           BRODY & AGNELLO
 3         BY:  MICHAEL A. INNES, ESQUIRE
                minnes@carellabyrne.com
 4              ZACHARY S. BOWER, ESQUIRE
                zbower@carellabyrne.com
 5         5 Becker Farm Road
           Roseland, New Jersey 07068-1739
 6         (973) 994-1700
           Counsel for Plaintiffs
 7
 8         JONES DAY
           BY:  TINA M. TABACCHI, ESQUIRE
 9              tmtabacchi@jonesday.com
                PATRICK J. BEISELL, ESQUIRE
10              pbeisell@jonesday.com
           77 West Wacker
11         Chicago, Illinois 60601-1692
           312-782-1692
12         Counsel for Walmart
13
           MARCUS & SHAPIRA, LLP
14         (appearing telephonically)
           BY:  DARLENE NOWAK, ESQUIRE
15              dnowak@marcus-shapira.com
           301 Grant Street
16         35th Floor
           Pittsburgh, Pennsylvania 15219-6401
17         (412) 338-4690
           Counsel for HBC
18
19         WRIGHT, LINDSEY & JENNINGS, LLP
           BY:  CALEY B. VO, ESQUIRE
20              cvo@wlj.com
           3333 Pinnacle Hills Parkway
21         Suite 510
           Rogers, Arkansas 72758-8498
22         (479) 986-0888
           Counsel for McKesson
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          ARNOLD & PORTER KAYE SCHOLER, LLP
            (appearing telephonically)
 2          BY:  WREDE SMITH
                 wrede.smith@arnoldporter.com
 3          777 South Figueroa Street
            44th Floor
 4          Los Angeles, California 90017-5844
            (202) 942-5000
 5          Counsel for Endo Health Solutions
            Inc.; Endo Pharmaceuticals Inc.; Par
 6          Pharmaceuticals, Inc.; Par
            Pharmaceutical Companies, Inc.
 7          formerly known as Par Pharmaceutical
            Holdings, Inc.
 8
 9          BARBER LAW FIRM, LLP
            (appearing telephonically)
10          BY:  J. CARTER FAIRLEY
                 cfairley@barberlawfirm.com
11          425 West Capitol Avenue
            Suite 3400
12          Little Rock, Arkansas 72201
            (501) 707-6182
13          Counsel for Cardinal Health, Inc.
14
            REED SMITH, LLP
15          BY:  RYAN K. BLAKE, ESQUIRE
                 rblake@reedsmith.com
16          Three Logan Square, 1717
            Arch Street, Suite 3100
17          Philadelphia, PA, 19103
            (215) 851-8100
18          Counsel for AmerisourceBergen
19
            ALSO PRESENT:
20
            Jennifer B. Bechet
21          Senior Associate Counsel
            Walmart, Inc.
22
23          THE VIDEOGRAPHER:
24          Chris Ritona
            GOLKOW LITIGATION SERVICES
25
```

Highly Confidential - Subject to Further Confidentiality Review

1

                    I N D E X

2

    DEBBIE HODGES                                    PAGE

3

       DIRECT EXAMINATION BY MR. INNES                 7

4

5                      E X H I B I T S

6       No.                Description              Page

7    Walmart    10-13-17 email from Nick            286
     Hodges 1   Tallman to Debbie Hodges.

8               Subj: H&W Weekly Update
                Week 37.

9               WMT_MDL_000002636-2638.

10   Walmart    June 2017 email chain.              311
     Hodges 2   Subj: RE: Thursday, July 6.

11              WMT_MDL_000006197.

12   Walmart    October 2017 email chain.           326
     Hodges 3   Subj: Re: Buzzed.

13              WMT_MDL_000008328.

14

15

     CERTIFICATE                                    356

16

     ERRATA                                         358

17

     ACKNOWLEDGMENT OF DEPONENT                      359

18

     LAWYER'S NOTES                                 360

19

20

21

22

23

24

25

```
 1                PROCEEDINGS
 2          (January 11, 2019 at 8:05 a.m.)
 3              THE VIDEOGRAPHER:  We are now
 4       on the record.  My name is
 5       Chris Ritona.  I'm the videographer
 6       for Golkow Litigation Services.
 7       Today's date is January 11, 2019.  And
 8       the time is approximately 8:06 a.m.
 9       This video deposition is being held in
10       Rogers, Arkansas at Mitchell Williams,
11       4206 South J.B. Hunt Drive, Suite 200,
12       in the matter of National Prescription
13       Opioid Litigation, MDL No. 2804, Case
14       No. 17-MD-2804.  United States
15       District Court, Northern District of
16       Ohio, Eastern Division.  The deponent
17       today is Debbie Hodges.
18              Will all counsel please
19       identify themselves for the record.
20              MR. INNES:  Good morning.  My
21       name is Michael Innes with the law
22       firm of Carella Byrne on behalf of
23       plaintiffs in the MDL.
24              MR. BOWER:  Good morning.
25       Zach Bower, also Carella Byrne, on
```

1       behalf of plaintiffs in the MDL.

2               MR. VO:  Caley Vo, Wright

3       Lindsey & Jennings on behalf of

4       McKesson.

5               MR. FAIRLEY:  Carter Fairley

6       from the Barber Law Firm on behalf of

7       Cardinal Health.

8               MS. BECHET:  Jennifer Bechet,

9       senior associate counsel at Walmart,

10      Incorporated.

11              MR. BEISELL:  Patrick Beisell,

12      associate at Jones Day on behalf of

13      Walmart.

14              MS. TABACCHI:  Good morning.

15      Tina Tabacchi, Jones Day, on behalf of

16      defendant Walmart and the witness.

17              THE VIDEOGRAPHER:  Will all

18      counsel on the conference call please

19      identify themselves.

20              MR. SMITH:  This is Wrede Smith

21      from Arnold & Porter representing Endo

22      and Par.

23              MS. NOWAK: This is Darlene

24      Nowak, Marcus & Shapira, for

25      HBC Services.

1          MR. BLAKE:  This is Ryan Blake

2      with Reed Smith on behalf of

3      AmerisourceBergen.

4          THE VIDEOGRAPHER:  And the

5      court reporter today is Debbie Dibble,

6      and she will now please swear in the

7      witness.

8          DEBBIE HODGES,

9  having first been duly sworn, was examined

10   and testified as follows:

11          DIRECT EXAMINATION

12  BY MR. INNES:

13      Q.    Good morning, Ms. Hodges.  I

14   just introduced myself.  My name is

15   Michael Innes.  I'm with the law firm of

16   Carella Byrne in Roseland, New Jersey.  I

17   represent the plaintiffs in this case.

18          You understand you're under

19   oath, correct?

20      A.    Correct.

21      Q.    You may have to speak up so the

22   folks on the phone can hear you.

23          Have you ever testified under

24   oath before?

25      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      You understand that even though
2   you're in a law office today, that the
3   testimony you give under oath here is subject
4   to the same penalty of perjury as if you were
5   testifying in a court of law?
6      A.      Yes.
7      Q.      I'm going to assume you
8   understand the questions that I ask you
9   unless you tell me that I don't understand
10  them that.  Fair?
11     A.      Yes.  If I don't understand
12  them, I'll ask.
13     Q.      Thank you.  Is there anything
14  that would prevent you from thinking clearly
15  today?
16     A.      No.
17     Q.      Is there anything that would
18  prevent you from testifying truthfully today?
19     A.      No.
20     Q.      What, if anything, did you do
21  to prepare for this deposition today?
22     A.      So counsel -- counsel and I had
23  a session the day before yesterday, a brief
24  session, and then we prepared yesterday as
25  well.  And then sometime -- sometime before

1    the first of the year, we briefly met and

2    prepared.

3         Q.    Okay.  Let's take that in

4    reverse order.  The time before the first of

5    the year.  Was that an in-person meeting or

6    by telephone?

7         A.    There was an in-person meeting.

8         Q.    And was that at your offices?

9         A.    It was here in Bentonville.

10        Q.    And was that at a law office in

11   Bentonville?

12        A.    It was here in Bentonville.  I

13   don't recall where it was, the location.

14        Q.    You don't recall the address of

15   that meeting?

16        A.    No.  I don't recall the

17   location.

18        Q.    Okay.  Was it in a conference

19   room?

20        A.    I don't recall the location.

21        Q.    Do you remember who attended a

22   meeting?

23        A.    Sure.  It was Tina, myself,

24   Patrick.

25        Q.    What's Patrick's last name?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     I don't know.
 2            Q.     Is it the Patrick that's
 3     sitting at counsel table?
 4            A.     It is.  It is.
 5            Q.     Thank you.
 6                   Anyone else other than
 7     yourself, Tina, or Patrick attend that
 8     meeting?
 9            A.     There were a couple of Walmart
10     attorneys that came in and out, but ...
11                   And I couldn't tell you who
12     their names were.
13            Q.     How are you certain that they
14     were Walmart attorneys if you did not know
15     their names?
16            A.     They identified themselves, and
17     they gave their names.  I just can't -- I
18     don't recall their names.
19                   MS. TABACCHI:  I can represent
20            to you, Michael, that there's been
21            nobody other than counsel in any of
22            these meetings.
23                   MR. INNES:  Thank you, Tina.
24            Q.     (BY MR. INNES)  Approximately
25     how long was that first session?
```

```
 1              A.     It was a few hours.

 2              Q.     During that session did you

 3     review any documents?

 4              A.     No, I don't believe I did.

 5              Q.     Did you review any deposition

 6     testimony in this case?

 7              A.     No.

 8              Q.     Did you review any court

 9     documents?

10              A.     I don't -- no.

11              Q.     Do you not recall or do you

12     just not know?

13              A.     No, I said no.

14                     MS. TABACCHI:  I think that was

15          no.  N-O.

16                     THE WITNESS:  Right, it was.

17          It was no.

18              Q.     (BY MR. INNES)  When was the

19     date of the second session that you met with

20     counsel?

21              A.     It was Wednesday of this week.

22              Q.     Okay.  And who attended that

23     session?

24              A.     Tina, Patrick, Jennifer, and

25     there was another Walmart attorney that
```

Highly Confidential - Subject to Further Confidentiality Review

1    dropped in for a bit.

2         Q.    And do you know Jennifer's last

3    name?

4         A.    I don't.

5         Q.    Is Jennifer here today?

6         A.    Correct, she is.

7         Q.    And Jennifer is seated at the

8    end of the table?

9         A.    She is.

10        Q.    And you said there was one

11   other Walmart attorney that attended?

12        A.    Mm-hmm.  And I believe it was

13   Rob.  But I don't know Rob's last name.

14        Q.    I'll just take you to the third

15   and final session.

16              Well, strike that.

17              How long was the second

18   session?

19        A.    It was four hours,

20   approximately.

21        Q.    And where did that occur?

22        A.    It occurred in the -- a

23   conference room.

24        Q.    At Walmart?

25        A.    Correct.

```
 1           Q.     And what's -- which -- what's

 2    Walmart's address?

 3           A.     It's on Walton Boulevard.

 4           Q.     The location on Walton

 5    Boulevard?

 6           A.     Correct.

 7           Q.     And the final session, the one

 8    the day before yesterday?

 9           A.     Same location.

10           Q.     And what was the date of that

11    session?

12                  MS. TABACCHI:  I'm sorry, just

13           to clarify, the final session was

14           yesterday, not the day before

15           yesterday.

16                  MR. INNES:  I'm sorry.

17           Q.     (BY MR. INNES)  What was the

18    date of the final session?

19           A.     It was yesterday.

20           Q.     Yesterday?

21           A.     Yes.

22           Q.     And for how many hours did you

23    meet?

24           A.     Approximately six to seven.

25           Q.     And who was present at that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    meeting?
 2         A.    Tina, Patrick, Jennifer.
 3         Q.    The same Jennifer that's seated
 4    at the end of the table?
 5         A.    Yes.
 6         Q.    Anyone else?
 7         A.    No.
 8         Q.    In the second session, did you
 9    review any documents?
10         A.    Yes.
11         Q.    Did you review any deposition
12    testimony?
13         A.    No.
14         Q.    Did you review any court
15    documents?
16         A.    No.
17         Q.    In the third session, did you
18    review any documents?
19         A.    Yes.
20         Q.    Did you review any testimony?
21         A.    Did I what?
22         Q.    Did you review any deposition
23    testimony?
24         A.    No.
25         Q.    Did you review any court
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    documents?

 2         A.     No.

 3         Q.     Have you read the complaint

 4    that was filed in this case?

 5         A.     No.

 6         Q.     Are you familiar with the

 7    allegations in the complaint as they relate

 8    to Walmart?

 9                MS. TABACCHI:  Object to the

10         form.  I'm also going to caution the

11         witness not to reveal the substance of

12         any communications with counsel.

13                If you can answer the question

14         without revealing the substance of

15         communications with counsel, you may.

16         Otherwise, I will instruct you not to

17         answer the question if your

18         understanding comes from

19         communications with counsel, to the

20         extent you had one.

21                THE WITNESS:  Can you repeat

22         the question?

23         Q.     (BY MR. INNES)  Other than your

24    conversations with counsel, what is your

25    knowledge, if any, of the allegations in the
```

Highly Confidential - Subject to Further Confidentiality Review

1    complaint in this case?

2         A.    I don't have any knowledge,

3    other than communication with counsel.

4         Q.    Do you agree that the

5    United States is currently in an opioid

6    crisis?

7         A.    Yes.

8         Q.    What's the basis for your

9    agreement with that statement?

10        A.    I'm aware of the -- what media

11   publishes.

12        Q.    And what media sources

13   specifically?

14        A.    I read newspapers.

15        Q.    Which newspapers do you read?

16        A.    I read the Benton County

17   Gazette, or the Gazette. Democrat-Gazette, I

18   think it's called. Occasionally I read the

19   Wall Street Journal. I read an investment

20   newspaper.

21        Q.    What investment newspaper is

22   that?

23        A.    I think it's called IBD.

24        Q.    Are you aware that between 2000

25   and -- year 2000 and year 2014, unintentional

Highly Confidential - Subject to Further Confidentiality Review

```
 1    drug overdose deaths in the U.S. increased by

 2    137 percent?

 3         A.    No.

 4         Q.    Can you hear me?

 5              MS. TABACCHI:  I'm having a

 6         little trouble hearing you.

 7              MR. INNES:  I'll try to speak

 8         up.

 9              THE WITNESS:  When he bends his

10         head down.  So just -- I have a

11         hearing disability, and so I can watch

12         your lips, and I'll be able to pick up

13         on it.  I have hearing aids.  But when

14         you bend your head down, it's very

15         difficult for me to see your lips.

16              MR. INNES:  Sure.  Thank you

17         very much for pointing that out.  And

18         I'll do my best to speak with my face

19         up so you can see my lips moving.

20         Q.    (BY MR. INNES)  So maybe if I

21    can, just do a little rearranging here.

22              So I'll reread the --

23         A.    Sure.

24         Q.    -- re-ask the question.

25              Between the year 2000 and 2014,
```

1   are you aware that unintentional drug

2   overdose deaths in the U.S. increased

3   137 percent?

4        A.    I was not aware of that.

5        Q.    Between -- were you aware that

6   between the year 2000 and 2014, there were

7   500,000 deaths due to prescription overdoses?

8        A.    No, I was not aware of that.

9        Q.    Were you aware that in 2015,

10  over 47,000 drug-related -- there were over

11  47,000 drug-related deaths?

12       A.    No.  I was not aware.

13       Q.    Do you recall attending a DEA

14  Distributor Conference in Indianapolis,

15  Indiana on May 10th or 11th of 2016?

16       A.    No.  I did not attend that

17  conference.

18       Q.    Are you aware of anyone from

19  Walmart that attended that conference?

20       A.    I would not have that

21  knowledge.

22       Q.    In preparation for today's

23  testimony, have you looked in your own

24  personal paper files for documents that might

25  be relevant to your testimony today?

```
1           A.      I don't have any paper files.

2           Q.      Have you looked in any

3    electronic files prior to today to help

4    prepare for your testimony?

5                   MS. TABACCHI:  Object to the

6              form.

7                   THE WITNESS:  I have looked at

8              documents that we reviewed over the

9              past couple of days.

10          Q.      (BY MR. INNES)  The documents

11   that you reviewed in preparation for today,

12   the only documents you reviewed, were those

13   with counsel?

14          A.      Correct.

15          Q.      You did not review any

16   documents outside of the presence of counsel?

17          A.      Correct.

18          Q.      Did you endeavor to look in

19   your own electronic or paper files for

20   documents that may help refresh your

21   recollections of any events that might be

22   relevant for today?

23          A.      I did not look at any documents

24   in my files, either paper or electronic.

25          Q.      Thank you.
```

```
 1              My question is slightly
 2    different.
 3              I'm wondering if you attempted
 4    to find such documents.
 5         A.   No.
 6         Q.   Did you -- prior to today, in
 7    preparation for your testimony, did you speak
 8    with any colleagues about your testimony?
 9         A.   No.
10         Q.   Have you spoken with any family
11    members about the testimony you were about to
12    give?
13         A.   No.
14         Q.   Have you spoken with any
15    non-Walmart employees regarding the testimony
16    that you are about to give today?
17         A.   No.
18         Q.   Ms. Hodges, where did you
19    attend college?
20         A.   Southwest Missouri State
21    University.
22         Q.   And when did you graduate from
23    Southwest Missouri University?
24              MS. TABACCHI:  Object to the
25         form.
```

1       Q.      (BY MR. INNES)  Strike that.

2    When did you graduate from Southwest Missouri

3    State University?

4       A.      1985.

5       Q.      Okay.  Did you attend any

6    graduate programs after your graduation from

7    college?

8       A.      I did.

9       Q.      And what school was that?

10       A.      University of Missouri

11   Columbia.

12       Q.      And what degree did you obtain

13   from University of Missouri Columbia?

14       A.      A JD.

15       Q.      And what year was that?

16       A.      1988.

17       Q.      You graduated in 1988?

18       A.      Correct.

19       Q.      Did you sit for a bar exam

20   after your graduation?

21       A.      I did.

22       Q.      In what state did you sit for

23   the bar exam?

24       A.      Missouri.

25       Q.      And what year were you admitted

1    to -- strike that.

2              Were you ever admitted to the

3    state of Missouri?

4        A.    Yes.

5        Q.    And what year was that?

6        A.    I believe it was '90.  '90 or

7    '91.

8        Q.    So you sat for the bar exam

9    in --  Missouri State Bar exam in 1988?

10       A.    Correct.

11       Q.    And your date of admission to

12   the state of Missouri is 1990?

13       A.    '90 or '91.  Correct.

14       Q.    How many times did you sit for

15   the Missouri State Bar exam?

16       A.    Two or three.

17       Q.    Have you taken any other bar

18   exams?

19       A.    No.

20       Q.    Are you admitted in any other

21   states?

22       A.    No.

23       Q.    Upon your admission, did you

24   practice law?

25       A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.     Let's begin with -- well,
2       strike that.
3                     Do you hold any other advanced
4       degrees?
5              A.     No.
6              Q.     So this is a long period of
7       time that we're going to cover now.  I'd like
8       to cover your employment history.
9              A.     Okay.
10             Q.     And I think we can probably
11      move forward in time, but I'd like to get a
12      record of your employment from '91 to
13      present.
14                    We might stop along the way.  I
15      might want to investigate a little bit
16      further, based on what you tell me.  But we
17      might be able to keep this moving pretty
18      quickly.
19                    After you became admitted to
20      the bar, in 1990 or '91, were you employed?
21             A.     Yes.
22             Q.     And where were you employed?
23             A.     Walmart.
24             Q.     And what was your role at
25      Walmart in that time?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      I was a real estate manager.

 2              Q.      Do you recall your title?

 3              A.      Real estate manager.

 4              Q.      And what was your general job

 5      duties as a real estate manager?

 6              A.      It was a site selection job.

 7      And so we selected the sites for Walmart

 8      stores.

 9              Q.      And where were you based at

10      that time?

11              A.      Bentonville.  Bentonville,

12      Arkansas.

13              Q.      Thank you.  Did the site

14      selection process take into account the

15      siting of pharmacies?

16                   MS. TABACCHI:  Object to the

17              form.

18                   THE WITNESS:  It took into

19              account the selection of Walmart

20              buildings.  Walmart stores.

21              Q.      (BY MR. INNES)  Walmart retail

22      locations?

23              A.      Correct.

24              Q.      Did those retail locations

25      include pharmacies?
```

MS. TABACCHI: Object to the form.

THE WITNESS: I -- I don't know.

Q. (BY MR. INNES) Do you recall if Walmart had retail pharmacies in 1991?

A. I don't recall.

Q. How long did you hold the title of real estate manager?

A. From '88 to -- '88 to '91.

Q. So from 1988 to 1991, you were a real estate manager with Walmart here in Bentonville?

A. Correct.

Q. And during that same period of time, you were enrolled in a JD program; is that correct?

MS. TABACCHI: Object to the form.

THE WITNESS: Incorrect.

Q. (BY MR. INNES) I'm sorry, I just want to make sure I have the record clear.

My mistake. Let me clean that up so it's okay.

1       You graduated with a JD in

2   1988; is that correct?

3       A.      Correct.

4       Q.      And you passed -- you sat and

5   passed for the bar in '90 or '91.

6       A.      Correct.

7       Q.      And you were admitted in '90 or

8   '91?

9       A.      Correct.

10      Q.      And in 1988, you became a real

11  estate manager for Walmart?

12      A.      Correct.

13      Q.      And you held that title until

14  1991?

15      A.      Correct.

16      Q.      What was your next employment?

17      A.      I -- for approximate -- I went

18  out to the store -- and I think they called

19  me a trainee -- but long story short, it was

20  much like an assistant manager job in the

21  store for eight months or so.

22      Q.      And when you refer to "store,"

23  that's a Walmart retail location?

24      A.      Correct.

25      Q.      In your role, in that assistant

1    manager role, did you have any duties as it

2    related to -- strike that.

3                    In that location, was there a

4    pharmacy?

5         A.      There was.

6         Q.      And in your role as an

7    assistant manager, did you have any duties

8    relating to that pharmacy?

9         A.      So my role was not considered

10   an assistant manager.  My role was considered

11   a trainee.  I said it was like

12   responsibilities of an assistant manager.

13                   And then to answer your

14   question, no, I did not have any

15   responsibility as it relates to the pharmacy.

16        Q.      Thank you.

17                   And after eight months as a

18   trainee, what was your next employ?

19        A.      I was in merchandising as a

20   buyer.

21        Q.      And your role as a buyer in

22   merchandising, was that back at the home

23   office?

24        A.      Correct.

25        Q.      And how long did you hold that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    role?

 2         A.     I held various roles in

 3    merchandising.  So that first role was

 4    probably less than a year, probably less than

 5    six months, that first role.

 6         Q.     Okay.  In that first role, what

 7    were the products that you were -- strike

 8    that.

 9              What was your -- can you

10    describe your role?

11         A.     In the very first role in

12    merchandising, it was menswear.  And it was

13    ball caps that I bought.

14         Q.     All right.  We can talk about

15    that off-line.

16              Following your role as a -- in

17    merchandising as a buyer of ball caps, what

18    was your next role?

19         A.     It was a buyer in what we call

20    the infant department.

21         Q.     In that role in the infant

22    department, what, if any, medical products

23    did you purchase?

24         A.     None.

25         Q.     Were you primarily purchasing
```

```
 1     apparel for infants?
 2          A.     I purchased apparel.
 3          Q.     How long were you in that role?
 4          A.     Approximately three to four
 5     years.
 6          Q.     Okay.  After your role in
 7     merchandising as a buyer for infants, what
 8     was your next role?
 9          A.     It was a buyer in ladies' wear.
10          Q.     And how long were you in that
11     position?
12          A.     Approximately two, two and a
13     half years.
14          Q.     And what was your next role?
15          A.     It was a buyer in cosmetics and
16     skin care.
17          Q.     And what was your role after
18     that?
19          A.     I had a -- I was promoted to a
20     DMM in cosmetics and skin care.
21          Q.     Just for the record, what does
22     DMM stand for?
23          A.     Divisional merchandise manager.
24          Q.     So you're no longer a buyer,
25     but you're a divisional merchandise manager?
```

1          A.      Correct.

2          Q.      Did your responsibilities

3     change at that point?

4          A.      Yes, they did.

5          Q.      And what was your role or

6     function as a divisional merchandise manager?

7          A.      It was to oversee buyers that

8     bought product for the cosmetic and skin care

9     business.

10         Q.      And how -- approximately how

11    long did you hold that title?

12         A.      Approximately three and a half,

13    four years.

14         Q.      And what was your next

15    position?

16         A.      It was in supply chain, and it

17    was position of vice president over safety

18    and compliance of supply chain.

19         Q.      Approximately what year did you

20    begin in that role?

21         A.      I don't recall the year.  I'd

22    have to do a math problem and figure it out,

23    but I don't recall the year.

24         Q.      Maybe we can figure this one

25    out together.  So in '91, you're a real

Highly Confidential - Subject to Further Confidentiality Review

```
 1    estate manager.
 2         A.      From '88 to '91.
 3         Q.      Right.
 4         A.      Correct.
 5         Q.      And then from approximately '91
 6    to maybe '92, you're a trainee assistant?
 7         A.      So collectively in
 8    merchandising, I've spent about 15 years.
 9         Q.      Okay.  So does that help you?
10         A.      15 years, and if I started in
11    '88 -- '98 -- probably -- approximately 2004,
12    if my math is right.
13         Q.      So approximately 2004, you take
14    on the role of supply chain vice president,
15    safety and compliance.
16         A.      Correct.
17         Q.      And what were your
18    responsibilities in that role?
19         A.      It was a safety -- it was to
20    lead the asset protection team.
21         Q.      And what assets were you
22    protecting in that role?
23         A.      The -- I wasn't protecting, but
24    it was to lead the team that protected.  And
25    we called it asset protection, safety and
```

1    compliance.

2         Q.    Okay.  And what products was

3    that team responsible for, if any?

4         A.    Products in the general

5    distributions -- or grocery distribution

6    center and regional distribution center and

7    apparel distribution center.

8         Q.    Did you or your team have any

9    involvement in the distribution of opioids?

10        A.    No.

11        Q.    Did you or your team have any

12   responsibility over Distribution Center 6045?

13        A.    No.

14              Not at that time, no.

15        Q.    At any time did your team have

16   responsibility over DC 6045?

17              MS. TABACCHI:  Object to the

18        form.

19              THE WITNESS:  So let me ask for

20        clarification.  You said at any time,

21        did that safety and compliance --

22              Can you rephrase that question,

23        please?

24              MR. INNES:  Certainly.

25        Q.    (BY MR. INNES)  At any time

Highly Confidential - Subject to Further Confidentiality Review

1    during -- in your role as the asset -- as the

2    vice president of safety and compliance, did

3    you or your team have responsibility over

4    DC 6045?

5         A.    No.

6         Q.    Did you have any involvement in

7    DC 6045 while in that role of vice president?

8         A.    No.

9               MS. TABACCHI:  Object to the

10        form.

11        Q.    (BY MR. INNES)  And I'll just

12   say this now before we get too far.  We might

13   have sort of rapid-fire, faster exchanges.

14   If you can just pause, let your attorney

15   interpose an objection.

16        A.    Yes, I got in a little hurry,

17   didn't I?

18        Q.    Yeah.  I suffer from the same

19   thing as well.  So I will try to keep my pace

20   at a reasonable level so I don't egg you on.

21              The -- okay.  So for how long

22   did you hold the role of vice president,

23   safety and compliance in supply chain?

24        A.    Approximately three years.

25        Q.    So 2007 time period?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Correct.

2      Q.      What role did you take on after

3  vice president, safety and compliance?

4      A.      It was over operations, so vice

5  president of operations over the Great Lakes.

6      Q.      I'm sorry, let me cycle back to

7  your prior role as the vice president in

8  safety and compliance.

9              Who did you report to in 2004?

10     A.      Johnny Dobbs.

11     Q.      And for the record, do you --

12 can you spell Mr. Dobbs's last name?

13     A.      I think it's -- I think it's

14 D-O-B-B-S.

15     Q.      And during that timeframe, how

16 many people reported directly to you?

17             MS. TABACCHI:  Object to the

18         form.

19             Sorry, are you talking about

20         2004?

21             MR. INNES:  Yes.

22             THE WITNESS:  Approximately

23         six?

24     Q.      (BY MR. INNES)  And in 2005,

25 who did you report to?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     When I was over operations?  Is

2     that your question?

3          Q.     In 2005, you held the title

4     supply chain vice president, safety and

5     compliance; is that right?

6          A.     In 2000 --

7          Q.     '5?

8          A.     '5.  Correct.

9          Q.     Johnny Dobbs?

10         A.     Johnny Dobbs.

11         Q.     And was Mr. Dobbs also -- did

12    you report to Mr. Dobbs in 2006 as well?

13         A.     Yes.

14         Q.     And between 2004 and 2006, in

15    your role as a vice president, I think your

16    testimony is that for a portion of that time,

17    approximately six folks reported directly to

18    you.

19         A.     Correct.

20         Q.     Was that approximately the same

21    number of folks over the entire period of

22    time that you held that role?

23              MS. TABACCHI:  Object to form.

24              THE WITNESS:  Correct.

25         Q.     (BY MR. INNES)  So now let's

1    move forward to 2007.  You're the vice

2    president of -- well, I know I asked this

3    question again, but let's get it right for

4    the record.

5              In 2007, what was your title?

6        A.    After the position of safety

7    and compliance, I took the job of vice

8    president over operations of Great Lakes.

9        Q.    And I think I have an

10   understanding of what the Great Lakes region

11   might be, but could you explain to me in

12   Walmart's terms, what is the Great Lakes

13   region?

14       A.    Sure.  It consisted of the

15   states of Pennsylvania, Michigan, and Ohio,

16   the DC facilities there in those states.

17             And when I say "the DC

18   facilities," I was responsible for the

19   regional distribution centers as well as

20   the -- we refer to them as the GDCs, the

21   grocery distribution centers.

22             So those were my

23   responsibilities.

24       Q.    So the Great Lakes region was

25   limited to Pennsylvania, Michigan, and Ohio?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Correct.

2        Q.      There's some states that might

3   take issue with that.

4        A.      That's what we called it.

5        Q.      That's for another day.

6                The DC facilities, I'd like

7   to -- you testified there's two types of

8   distribution facilities; is that correct?

9        A.      I testified I was responsible

10  for two types in that scenario.  There are

11  several types of DC.

12       Q.      Thanks for that clarification.

13  Let's focus on the ones that you're

14  responsible for.  And I believe you said

15  regional?

16       A.      Right.

17       Q.      And what was the second one?

18       A.      Grocery.

19       Q.      And are those distribution

20  facilities, regional and grocery, are they

21  separate buildings?

22       A.      Correct.

23       Q.      Does a regional distribution

24  facility -- strike that.

25                In your role as a VP of

1    operations for the Great Lakes region, what,

2    if any, responsibility did you have for the

3    distribution of Schedule II substances?

4         A.    None.

5         Q.    During your time as a VP of

6    operations of the Great Lakes region, did

7    Walmart ever conduct training?

8              MS. TABACCHI:  Object to the

9         form.

10             THE WITNESS:  Can you be more

11        specific as it relates to training?

12        Q.    (BY MR. INNES)  Did you ever

13   attend any training as the vice president of

14   operations for Great Lakes related to your

15   role?

16        A.    So clarification.  Are you

17   talking internal training?  External

18   training?

19        Q.    Yeah, I think I'm going to

20   withdraw it.  That's a horrible question.

21        A.    What?

22        Q.    That's a horrible question.

23   I'm going to withdraw it.  We'll move on.

24        A.    Okay.

25        Q.    Where were you based as a vice

1    president of operations for Great Lakes?

2         A.    Detroit.  Livonia, to be

3    specific.

4         Q.    How do you spell that name?

5         A.    I don't know.  Livonia,

6    Michigan.

7         Q.    And Livonia is in proximity,

8    close proximity to Detroit?

9         A.    Correct.

10        Q.    Now, you said you were the vice

11   president of operations for the Great Lakes

12   region.  Were there other vice presidents

13   for -- I'm sorry, strike that.

14              What other regions are there

15   for Walmart?

16              MS. TABACCHI:  Object to the

17        form.

18              THE WITNESS:  There are other

19        regions.  I can't name them all, but

20        there are other regions.

21        Q.    (BY MR. INNES)  Did you ever

22   attend conferences with vice presidents of

23   operations for other regions?

24              MS. TABACCHI:  Object to the

25        form.

Highly Confidential - Subject to Further Confidentiality Review

1      THE WITNESS:  Can you clarify

2         what type of conferences?

3         Q.    (BY MR. INNES)  Did you ever

4    attend any conferences with Walmart employees

5    in charge of other regions, regions other

6    than the Great Lakes, for training purposes?

7         A.    Not that I recall.

8         Q.    Did you ever attend any

9    conferences with Walmart employees from other

10   regions?

11        MS. TABACCHI:  Object to the

12        form.

13        THE WITNESS:  I attended

14        meetings.  I don't know that I would

15        couch them as conferences.

16        Q.    (BY MR. INNES)  Okay.  How

17   often did you attend those meetings?

18        MS. TABACCHI:  Object to the

19        form.

20        THE WITNESS:  Annually.

21        Q.    (BY MR. INNES)  Was there an

22   annual gathering of employees from different

23   regions?

24        MS. TABACCHI:  Object to the

25        form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  The -- there
 2         were -- there were annual meetings.
 3         Q.    (BY MR. INNES)  What was
 4    discussed at those annual meetings?
 5                  MS. TABACCHI:  Object to the
 6         form.
 7                  THE WITNESS:  It was discussed
 8         overall -- overall business, Walmart
 9         business.
10         Q.    (BY MR. INNES)  Do you ever
11    recall discussing the distribution of
12    Schedule II opioids at any of those meetings?
13         A.    No, I don't recall that at all.
14         Q.    Were you provided -- were
15    presentations given during those meetings?
16         A.    Yes, presentations were given.
17         Q.    Were you provided any materials
18    in connection with those presentations?
19                  MS. TABACCHI:  Object to the
20         form.
21                  THE WITNESS:  Was -- no.
22         Q.    (BY MR. INNES)  Prior to
23    attending those meetings, was an agenda
24    circulated?
25         A.    I don't recall.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Is there anything that would

2    help refresh your recollection as to whether

3    or not an agenda was circulated prior to any

4    of those regional meetings?

5    A.    I didn't hear the first --

6           MS. TABACCHI:  Object to the

7    form --

8           THE WITNESS:  Oh, I'm sorry.

9           MS. TABACCHI:  Sorry.  Object

10   to the form.

11          Go ahead.

12          THE WITNESS:  I didn't hear the

13   first part of the question.

14   Q.    (BY MR. INNES)  So, yeah, I

15   think I was, again, looking down, so it's my

16   fault.

17          Is there anything that would

18   help refresh your recollection as to whether

19   or not there was an agenda -- you received an

20   agenda prior to attending any of those

21   meetings?

22   A.    I don't have any recollection

23   of it.

24   Q.    Slightly different question.

25   Is there anything that would refresh that

1    recollection?

2         A.    I -- I'm not sure.

3         Q.    Did you maintain a calendar

4    during 2007?

5         A.    No.

6         Q.    Did you use an electronic --

7    strike that.

8              2007, how did you know the date

9    that the meeting was going to occur?

10             MS. TABACCHI:  Object to the

11        form.

12             THE WITNESS:  How did I know

13        the date?  Well, I had an assistant,

14        and that assistant usually kept me on

15        track.

16        Q.    (BY MR. INNES)  Did your

17   assistant keep a calendar for you?

18        A.    My assistant had a calendar,

19   yes.

20        Q.    Who was your assistant during

21   that timeframe?

22        A.    I -- I don't remember who it

23   was.

24        Q.    Is there anything that could

25   help refresh your recollection as to who that

Highly Confidential - Subject to Further Confidentiality Review

1    person was?

2        A.    I'm not sure.

3        Q.    Can we speak with someone at

4    Walmart's HR department to figure out who

5    your assistant was at that time?

6        A.    Could I?

7        Q.    Yeah.

8        A.    No.  I -- there's not a record

9    as to who my assistant was in 2007.

10        Q.    It's your testimony that

11    Walmart does not maintain a record of who

12    your assistant was in 2007?

13            MS. TABACCHI:  Object to the

14        form.

15            THE WITNESS:  It's my -- I

16        don't -- I don't remember who my

17        assistant was, and I don't know of any

18        place that would have a record of who

19        my assistant was at that time.

20        Q.    (BY MR. INNES)  So did your

21    title change at any time after 2007?

22        A.    At any time after 2007.  From

23    now to present -- or from 2007 to present?

24        Q.    That's a fair point.  I

25    appreciate the clarification.

```
1              What role did you take on after
2    the vice president, if any?
3         A.    So I had a -- a took on --
4    after -- in the chronological that you're
5    talking.
6         Q.    Yes.
7         A.    After the vice president of the
8    Great Lakes, then I was the divisional vice
9    president of Central Plains.
10        Q.    And what year was that?
11        A.    Well, it was right after -- it
12   was two years after the Great Lakes.
13        Q.    So beginning sometime 2009?
14        A.    Correct.  '9 or '10.
15        Q.    And could you articulate the
16   Central -- the specific geographical metes
17   and bounds of the Central Plains region?
18        A.    Well, I had the responsibility
19   for the RDCs and the GDCs in Missouri, parts
20   of Oklahoma.  Let's see.  Predominantly
21   Missouri and Oklahoma.
22        Q.    Are there other states in
23   addition to Missouri and Oklahoma that you
24   cannot recall at this moment?
25              MS. TABACCHI:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

 1          form.

 2                    THE WITNESS:  No.  I think

 3          that's it.  I was just --

 4                    No.  It's Missouri and

 5          Oklahoma.

 6          Q.     (BY MR. INNES)  And the reason

 7     why I asked is you said predominantly

 8     Missouri and Oklahoma, which leads me to

 9     think that there's other states.

10          A.     Missouri and Oklahoma.

11          Q.     And in that role, did you have

12     any responsibilities regarding the

13     distribution of Schedule II drugs?

14          A.     No.

15          Q.     What position did you take on

16     immediately after the Central Plains role?

17          A.     It was the vice president of

18     supply chain services.

19          Q.     Is that sometime in 2000 --

20     well, you tell me.  What was the date that

21     you took the --

22          A.     A math problem.  I'm not good

23     at keeping track of that math problem.  So I

24     was four years in operations, and so it was

25     after that.

1    Q.    And by "operations," which role
2    are you referring to?
3    A.    I'm referring to the
4    Great Lakes and Central Plains jobs.
5    Q.    Okay.  I'm going to try to help
6    us through the math problem together.  The
7    operations position started in 2007.  You
8    think you were there for about four years
9    over those two roles.  So now we're --
10   A.    A little over, but yes.
11   Q.    So about 2011 --
12   A.    Correct.
13   Q.    -- you take on the vice
14   president of supply chain services?
15   A.    Yes.  Vice president of supply
16   chain services.
17   Q.    And can you describe your
18   responsibilities and duties in that role?
19   A.    It was a solution-based team.
20   And so I managed several solution-based teams
21   predominantly for the flow of merchandise
22   through the RDCs and GDCs.
23   Q.    Okay.  Let's break that down a
24   little bit.  What do you mean by
25   "solution-based team"?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      What I mean is if there were

 2    any issues of product coming through the RDC

 3    or GDC, I had teams that managed through

 4    those -- managed through those issues.

 5          Q.      And what do you mean by --

 6          A.      And --

 7          Q.      I'm sorry.

 8          A.      Go ahead.

 9          Q.      I try not to cut you off, so I

10    apologize if I did.

11                  If I do cut you off and you

12    want to continue speaking, please do.

13                  What do you mean by "issues"?

14          A.      So if a supplier were to ship

15    in product that was more product than the

16    PO -- the PO called for, then my team had to

17    help resolve that.

18          Q.      Does "PO" mean purchase order?

19          A.      Correct.

20          Q.      How long did you hold this role

21    of VP supply chain services?

22          A.      Approximately three and a half

23    years.

24          Q.      Sometime in the area of 2014,

25    2015 is when you ended that position?
```

```
 1              A.      No.  It would have to be -- I
 2    had to end that sometime in the neighborhood
 3    of '17, wasn't it?  '17, '18, '19 because
 4    I've been in this role a year and a half.  So
 5    it had to be sometime in that neighborhood of
 6    '17.
 7              Q.      Maybe I can help us out here.
 8              A.      Yeah.
 9              Q.      So what's the next role that
10    you took on?
11              A.      So then the next role is vice
12    president over pharmacy.  So I went from the
13    supply chain services to pharmacy.
14              Q.      Okay.
15              A.      Network pharmacy.  And it
16    wasn't just pharmacy, it's health and
17    wellness.  So health and wellness and print
18    solutions.
19              Q.      Okay.  Is that your current
20    title?
21              A.      Correct.
22              Q.      I have your current title as
23    vice president, health and wellness, PM DC
24    supply chain.
25              A.      Right.  So that's print
```

Highly Confidential - Subject to Further Confidentiality Review

1    solutions.

2             And I don't know what PM DC

3    stands for, but it's the old nomenclature for

4    print solutions.

5         Q.    So anytime I see PM DC --

6         A.    It's print solutions.

7         Q.    Okay.  They're synonymous?

8         A.    Correct.

9         Q.    Thank you.

10            That might help us out later.

11   I appreciate that.

12        A.    Okay.

13        Q.    So vice president, health and

14   wellness, PM DC supply chain.

15        A.    Correct.

16        Q.    Is it better for me to refer to

17   that as "vice president, health and wellness,

18   print solutions"?

19        A.    It's either one is fine.

20        Q.    Okay.

21            Did you take on that position

22   in June of 2017?  Is that correct?

23        A.    That is correct.

24        Q.    So now I just want to make sure

25   I have the timeline right.

1    So immediately prior to your

2    current title, you were the vice president of

3    supply chain services?

4         A.    Correct.

5         Q.    Okay.  And we believe that ran

6    from approximately 2011 until June of '17?

7         A.    There's something not right

8    with that math.  Because I -- it was only

9    about three and a half years.  So we'll have

10   to back up through there.

11        Q.    Well, maybe we're missing a

12   role.

13        A.    I don't think we're -- we

14   haven't missed any roles.

15        Q.    Okay.

16        A.    We might have -- I don't know

17   that we've added the math up correctly.  I

18   haven't been -- I don't have a tally sheet

19   here, but ...

20        Q.    Okay.  I'm relying on you for

21   that.  And I'm relying on the time frames

22   you're giving me.

23        A.    So to put an easy math problem,

24   I was in merchandising roughly 15 years.  So

25   I was in real estate roughly three and a

1   half, I was in merchandising roughly 15, and

2   I've been in distribution roughly 15.

3           So if you add -- or, let's see.

4   So that's not quite right.  So I was in

5   merchandising and real estate approximately

6   15, and then I've been in supply chain

7   approximately 13 to 15, I guess.

8        Q.    So all in, somewhere between 28

9   and 30 years as a Walmart employee?

10        A.    I just hit my 30-year, right.

11        Q.    All right.  Congratulations.

12        A.    So there's a math problem.

13        Q.    There's a math problem.  We're

14   doing algebra at this point.

15        A.    A little complicated.

16        Q.    All right.  So let's go back to

17   the title you had immediately before your

18   present title.

19        A.    Okay.

20        Q.    And that's the vice president

21   of supply chain services.

22        A.    Correct.

23        Q.    Were there any regional

24   limitations on that role or was that a

25   national role?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Were there any -- repeat the
 2    question?
 3            Q.      Was there --
 4                    Prior to your role, as you
 5    mentioned, you had responsibility over a
 6    particular region.
 7                    I'm wondering if, in the role
 8    of vice president of supply chain services,
 9    you were also limited to a particular region.
10            A.      No.  It covered all RDCs and
11    GDCs.
12            Q.      And by "all," you mean
13    nationally?
14            A.      Correct.
15            Q.      Were there any international
16    facilities you had --
17            A.      No.
18            Q.      So at that point, when you take
19    on a national responsibility, did you have
20    any responsibility for the distribution of
21    Schedule IIs?
22            A.      No.
23            Q.      Did your role in any way,
24    shape, or form touch on the distribution of
25    Schedule IIs?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      No.

2      Q.      Did your role have any

3  involvement in DC 6045?

4      A.      No.

5      Q.      In June of 2017, you take on

6  the role of vice president, health and

7  wellness, print solutions.

8      A.      Correct.

9      Q.      What were your job

10  responsibilities -- what are your job

11  responsibilities?

12      A.      It's to oversee the

13  distribution of -- the distribution of the

14  distribution centers.  And it's also to

15  oversee the operation of the optical

16  distribution center.

17      Q.      And are you describing your

18  role present day?

19      A.      Correct.

20      Q.      Okay.  So I want to maybe

21  refocus my question.

22      A.      Okay.

23      Q.      In June of '17, what were your

24  responsibilities?

25      A.      It was to oversee the operation

1    of the distribution center.  The

2    distribution -- the pharmacy distribution

3    centers.  And it was to oversee the operation

4    of the optical distribution centers.  And it

5    was to oversee the operation of print

6    solutions.

7          Q.    What is print solutions?

8          A.    It is a manufacturing operation

9    inside Walmart, a print manufacturing

10   operation.

11         Q.    What is Walmart printing?

12         A.    The -- what they do, they print

13   every --

14               So if you walk in our stores,

15   you see the signing in our stores.  And so

16   print solutions produces the signing for

17   everything, what we call 8-foot and down in

18   our stores.  They also print some 8-foot and

19   up, but predominantly it's 8-foot and down.

20   That's our main function.

21         Q.    What does "8-foot and down"

22   mean?

23         A.    8-foot in the store.  So 8-foot

24   and down.  So anything that is 8-foot and

25   below, print solutions has probably printed

Highly Confidential - Subject to Further Confidentiality Review

1    it.

2         Q.    Okay.

3         A.    It's a manufacturing operation.

4         Q.    In that role, do you have any

5    responsibility for the content of what -- of

6    what's on those items that are printed?

7         A.    No.  It's a manufacturing.

8    It's certainly -- no.

9         Q.    And "8-foot and up" means

10   anything above 8 feet in the store?

11        A.    Correct.

12              And that's not all inclusive.

13   They don't print everything 8-foot and down,

14   but they print a lot of the 8-foot and down.

15        Q.    Okay.  Thank you.

16              In response to one of my

17   earlier questions, I think you said the

18   "distribution of the distribution centers."

19        A.    Yes.  I misspoke.

20        Q.    Okay.  All right.

21        A.    I meant to say the "operation

22   of the distribution centers."

23        Q.    Okay.  Thank you.

24              Is it operation of the pharmacy

25   distribution centers?

1     A.     Correct.

2     Q.     How many pharmacy distribution

3  centers are there for Walmart in June of '17?

4     A.     Six.

5     Q.     And in June of '17, is

6  distribution -- do you have oversight over

7  Distribution Center 6045?

8     A.     Correct.

9     Q.     And 6045, as I understand it,

10  is the distribution center that handled

11  Schedule IIs for Walmart?

12         MS. TABACCHI:  Object to the

13     form.

14         THE WITNESS:  Had.  Did I hear

15     the word "had" or "has"?

16     Q.     (BY MR. INNES)  In that -- at

17  that time period, June of '17 --

18     A.     Repeat the whole question for

19  me.

20     Q.     In June of 2017, did DC 6045

21  handle Schedule IIs?

22     A.     Correct.

23     Q.     Correct?

24     A.     Yes.

25     Q.     When did DC 6045 stop handling

Highly Confidential - Subject to Further Confidentiality Review

1    Schedule IIs?

2          A.     Approximately April of -- April

3    to May of '18.

4          Q.     And from the time period

5    June 2017 through April or May of 2018, you

6    held the title vice president, health and

7    wellness, print solutions?

8          A.     Correct.

9          Q.     And I believe your testimony is

10   that you over -- during that time period, you

11   oversaw the operation of distribution

12   centers?

13         A.     Of the -- my testimony was of

14   the Rx distribution centers, and the optical

15   distribution center, and print solution.

16         Q.     And DC 6045 is one of those

17   centers?

18         A.     Is one of the Rx, correct.

19         Q.     And what do you mean by

20   "oversee operations"?  What does that entail?

21         A.     It entails that the general

22   managers report up to me.

23         Q.     In June of 2017, how many

24   general managers reported up to you?

25         A.     Clarification.  How many

Highly Confidential - Subject to Further Confidentiality Review

1    general managers in Rx?  Is that the

2    question?

3         Q.    No, it's how many general

4    managers --

5         A.    Reported up to me?

6         Q.    -- reported directly to you?

7               MS. TABACCHI:  Object to the

8         form.

9               THE WITNESS:  Seven.

10        Q.    (BY MR. INNES)  And by

11   "reported directly to you," do you understand

12   that to be you oversaw those seven general

13   managers?

14              MS. TABACCHI:  Object to the

15        form.

16              THE WITNESS:  They reported

17        directly to me.

18        Q.    (BY MR. INNES)  And how many

19   general managers are there of DC 6045 --

20              MS. TABACCHI:  Object to the

21        form.

22        Q.    (BY MR. INNES) -- in June of

23   2017?

24        A.    In June of?

25        Q.    2017.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      There were, at that point,
 2    none.  I mean, the -- 6045 ceased doing
 3    business in June -- or a little bit before,
 4    but prior to June of 2017.
 5                   Oh, sorry.  I got my dates
 6    wrong.  '18.  2017, you asked; correct?
 7         Q.      Yeah.  So --
 8         A.      So there was one general
 9    manager.
10         Q.      Yeah, so just so we're clear.
11         A.      Sorry on the dates here.
12         Q.      And we can -- the dates are
13    confusing.  I want to make sure we get them
14    right.
15         A.      Right.
16         Q.      And the timeline is important
17    to me, and to you, and to Walmart.
18                   I'm going to spend some time,
19    basically the remainder of the day, talking
20    about June '17 --
21         A.      Okay.
22         Q.      -- through May-April of 2018.
23         A.      Okay.
24         Q.      And I'm going to primarily do
25    this in a chronological order.  And I'll try
```

1    to be clear with my questions to make sure

2    we're focused on particular points in time

3    during that window.

4            A.      Okay.

5            Q.      So in June of 2017, how many

6    general managers were there of DC 6045?

7            A.      One.

8            Q.      And who is that person?

9            A.      Mike Mullins.

10           Q.      Was there ever more than one

11   general manager of DC 6045 between the time

12   period of June 2017 and May-April of 2018?

13           A.      No.

14           Q.      Was Mr. Mullins the only

15   general manager that held that position

16   during that time period?

17           A.      Correct.

18           Q.      And did Mr. Mullins report

19   directly to you?

20           A.      Yes.

21           Q.      Who reported -- strike that.

22                   How many folks, if any,

23   reported to Mr. Mullins?

24           A.      I couldn't tell you the number.

25           Q.      Can you give me an estimate?

1        A.    I can't tell you the number.  I

2   don't have that org chart in my mind.

3        Q.    But there is an org chart that

4   exists for that period of time?

5             MS. TABACCHI:  Object to the

6        form.

7             THE WITNESS:  I couldn't tell

8        you how many.

9        Q.    (BY MR. INNES)  Slightly

10  different question.

11             Is there an org chart,

12  organizational -- and by "org chart," do you

13  mean organizational chart?

14        A.    Yes.

15        Q.    Is there an organizational

16  chart or charts that covers the time period

17  between June 2017 and May or April of 2018?

18        A.    Yes.

19        Q.    Sitting here today, can you

20  recall anyone who has -- can you recall the

21  members -- strike that.

22             As you sit here today, can you

23  recall the names of the employees, Walmart

24  employees who reported to Mr. Mullins during

25  the time period of June '17 to May of 2018?

```
 1              A.      No.   I think I answered that
 2       earlier.   I can't recall who they were.
 3              Q.      You can't recall even one?
 4              A.      I can recall one.
 5              Q.      I'd like you --
 6              A.      But you asked me if I could
 7       recall all of them, I thought; right?
 8                      What was the question?
 9              Q.      I can rephrase the question.   I
10       believe I asked you if you recall anyone.
11              A.      So, I -- yes, I can recall
12       some.
13              Q.      Which ones can you recall?
14              A.      I can recall Jeff Abernathy.
15       Telinda Sabatini, I think is her last name.
16       David Bonds, Josh Jane.
17              Q.      Let's see if we can't help out
18       our court reporter here.   So you've listed
19       four names.   Jeff Abernathy is one.
20                      Tilinda Sabatini?
21              A.      I --
22              Q.      Is it --
23              A.      I'm not sure that that's her
24       last -- I know her -- "Talinda."   I think
25       it's Sabatini.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     So it's T-A-L-I-N-D-A?  Or is
2    it Linda, L-I-N-D-A?
3          A.     Telinda is T-E-L-I-N-D-A, I
4    believe.
5          Q.     And David, is it Bonds?
6          A.     B-O-N-D-S.
7          Q.     There's a good 007 joke in
8    there somewhere, I'm sure.
9                 And it's Josh Janes?
10         A.     Yes.  I don't know if it's Jane
11   or Janes.
12         Q.     Anyone else that you can recall
13   reporting directly to Mr. Mullins at that
14   time?
15         A.     Scott Easterling.  Easterly.
16         Q.     Anyone in addition to these
17   five names?
18         A.     That's all I recall.
19         Q.     Do you recall Mr. Abernathy's
20   title?
21         A.     I don't.
22         Q.     Do you recall Ms. Sabatini's
23   title?
24         A.     I don't.
25         Q.     Do you recall David Bonds'
```

1    title?

2          A.    I don't.

3          Q.    Mr. Janes's title?

4          A.    I don't.

5          Q.    Mr. Easterly's title?

6          A.    I don't recall the title.

7          Q.    Did anyone -- of these five

8    folks, is there anyone -- I'm going to ask

9    this question maybe to hopefully head it off,

10   but did anyone report up to these five

11   people?

12              MS. TABACCHI:  Object to the

13        form.

14              THE WITNESS:  Did anyone report

15        up to those five people?  They all

16        have reports.

17         Q.    (BY MR. INNES)  They all have

18   direct reports?  I can go --

19         A.    Every one of them has reports.

20         Q.    So now let's just continue to

21   build out this organizational chart.

22              Who reported to Jeff Abernathy?

23         A.    Sharon.

24         Q.    And what's Sharon's last name?

25         A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Anyone else other than Sharon

2    report to Mr. Abernathy?

3    A.    I don't recall.

4    Q.    And to be clear, this list of

5    five folks, Mr. Abernathy, Ms. Sabatini,

6    Mr. Bonds, Mr. Janes and Mr. Easterly, is

7    that an exhaustive list of --

8    A.    I don't recall if there are any

9    others.

10    Q.    I just wanted to make sure that

11    the record was clear on that.

12          Who, if anyone -- I'm sorry,

13    strike that.

14          Who reported to Ms. Sabatini?

15    A.    I don't recall.

16    Q.    And who reported to Mr. Bonds?

17    A.    I wouldn't -- I don't recall.

18    Q.    And who reported to Mr. Janes?

19    A.    I don't recall.

20    Q.    And who reported to Mr. --

21    Mr. Easterly?

22    A.    I don't recall.

23    Q.    But if you had an org chart for

24    that time period, we could obtain that

25    information; is that right?

1        MS. TABACCHI:  Object to the

2    form.

3        THE WITNESS:  I don't recall

4    who reports to them.

5        Q.    (BY MR. INNES)  Okay.  But do

6    you recall if an organizational chart exists

7    for this time period?  2000 --

8        A.    I don't know that there's an

9    organizational chart that will have everybody

10   that reports to them.  I don't know if that's

11   accurate or not.

12       Q.    So if we wanted to know who the

13   direct reports are to each one of these

14   individuals, we'd have to ask those

15   individuals; is that right?

16       MS. TABACCHI:  Object to the

17   form.

18       THE WITNESS:  I don't know,

19   because I -- I don't know.

20       Q.    (BY MR. INNES)  Do you have any

21   reason to believe that Mr. Abernathy wouldn't

22   know who his direct reports were?

23       A.    He would know.

24       Q.    And the same for the other

25   individuals?

1          A.      Absolutely.

2          Q.      So your testimony is you

3     believe that Walmart ceased the distribution

4     of Schedule IIs in or about April or May of

5     2018; is that right?

6          A.      Correct.

7          Q.      When did you first learn that

8     Walmart would cease the distribution of

9     Schedule IIs?

10              MS. TABACCHI:  I'm just going

11         to caution the witness not to reveal

12         the substance of any communications

13         with counsel.  If you have an

14         understanding that does not involve

15         counsel, you may answer.

16              THE WITNESS:  I don't recall

17         the -- I don't recall the date.  I

18         don't recall.

19         Q.      (BY MR. INNES)  Was it before

20    you took on the role of -- your present role?

21         A.      Rephrase the question for me?

22         Q.      Sure.  Did you become -- prior

23    to taking your current position --

24         A.      Right.

25         Q.      -- as vice president of health

1    and wellness, print solutions --

2         A.    Right.

3         Q.    -- were you aware that Walmart

4    intended to exit the distribution of

5    Schedule IIs?

6         A.    No.  I had no idea of the

7    pharmacy distribution centers before I took

8    on the role.

9         Q.    So to the best of your

10   recollection, any knowledge you had about

11   Walmart's intention to exit the distribution

12   of Schedule IIs occurred after June of 2017?

13        A.    Yes.

14        Q.    What training, if any, did you

15   receive from Walmart regarding its --

16   regarding the distribution of Schedule IIs?

17        A.    So when I took on the job, I

18   sat down with my predecessor, and we talked

19   through the different aspects of the

20   business.

21        Q.    And by "took on the job," do

22   you mean when you decided to accept the

23   position or when you formally were placed in

24   that position?

25        A.    There probably were some prior

1    conversations a couple of weeks before.  But

2    in that same timeframe; right?

3         Q.    Sure.

4         A.    I had a conversation with my

5    predecessor.

6         Q.    And your predecessor was

7    Chad Ducote?

8         A.    Correct.

9         Q.    So you had conversations in or

10   around your transition from your prior role

11   into your current role with Mr. Ducote?

12        A.    Correct.

13        Q.    Did any of those discussions

14   involve Walmart's distribution of opioids?

15        A.    The discussions were broad

16   discussions about, "Debbie, here are the DCs,

17   here's the managers, here's the operations."

18   And so that was the type of discussion it

19   was.

20        Q.    Okay.  So other than broad,

21   high-level discussions -- strike that.

22             MR. INNES:  We've been going

23        for maybe an hour now, right?

24             THE VIDEOGRAPHER:  Hour and 15.

25             MR. INNES:  I'm about to jump

Highly Confidential - Subject to Further Confidentiality Review

 1            into another long topic.  Maybe we

 2            take -- you know, take five, ten.

 3                    I mean, you guys --

 4                    We can go off the record.

 5                    THE VIDEOGRAPHER:  9:21.  We

 6            are off video record.

 7                    (Recess taken, 9:21 a.m. to

 8            9:38 a.m.)

 9                    THE VIDEOGRAPHER:  9:38.  We

10            are on the video record.

11            Q.    (BY MR. INNES)  Okay.

12     Ms. Hodges, we're back from our first morning

13     break.  I just wanted to take the opportunity

14     to go back and cover one area that I missed.

15            You -- I believe your prior

16     testimony is that you've given a deposition

17     before?

18            A.    Yes.

19            Q.    How many times have you sat for

20     a deposition?

21            A.    A couple.

22            Q.    Were those all in the same

23     case?

24            A.    No.

25            Q.    So two separate cases?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. TABACCHI:  Object to the

2         form.

3              THE WITNESS:  Yes.

4         Q.     (BY MR. INNES)  I can re-ask

5    the question.

6              By "couple" do you mean two?

7         A.     Yes.

8         Q.     Do you recall if you've given

9    more than two depositions?

10        A.     I don't recall.

11        Q.     And I know you have a JD, so

12   just so we're clear, when we're referring to

13   depositions, these are depositions where you

14   were being deposed?

15        A.     Correct.

16        Q.     Have you taken depositions

17   before?

18        A.     No.

19        Q.     The first case where you sat

20   for a deposition, when was that?  Approximate

21   year?

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

████  ███  ████████████  ███████

███  █████████

████  ███  ███████████████████

████  █████████████████████

5          I'll strike that.

6          The second case you sat for a

7   deposition, what was the nature of that case?

8          A.     There was a real estate case

9   with Walmart.

10         Q.     Okay.  And was Walmart the

11   plaintiff or the defendant in that case?

12         A.     Defendant.

13         Q.     And did this case take place

14   during the time period where you were in the

15   real estate division at Walmart?

16         A.     I don't -- don't know that the

17   case took place while I was in the real

18   estate.  It was about the real estate.

19         Q.     Okay.

20         A.     It was about a deal.

21         Q.     All right.  And what was the

22   exact -- strike that.

23         You were not a party to that

24   litigation, were you?

25         MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2          Q.     (BY MR. INNES)  You were not

3    named as a defendant in that case?

4          A.     No.

5          Q.     Okay.  Let's go back closer to

6    present day.

7                 June of 2017 is when you took

8    on the role of vice president, health and

9    wellness, printing solutions; is that right?

10         A.     Correct.

11         Q.     Prior to taking on that role,

12   what was your knowledge, if any, of Walmart's

13   obligations as a distributor of controlled

14   substances?

15         A.     I had no knowledge.

16         Q.     As you sit here today, do you

17   have any knowledge as to Walmart's

18   obligations as a distributor of controlled

19   substances between June of 2017 and May or

20   April of 2018?

21                MS. TABACCHI:  I'm just going

22         to caution the witness.  You may

23         answer that question "yes" or "no."

24         I'm just going to caution the witness

25         not to reveal the substance of any

Highly Confidential - Subject to Further Confidentiality Review

1    communications with counsel.

2         If you can answer without

3    revealing the substance of

4    communications with counsel, you may.

5    But it's a yes-or-no question.  I just

6    don't want you to expand about any

7    conversation with any counsel.

8         I'm sorry, do you want to

9    repeat your question for her so she

10   knows what your question was?

11        MR. INNES:  Sure.  I'll read

12   back the question.

13   Q.    (BY MR. INNES)  As you sit here

14   today, do you have any knowledge as to

15   Walmart's obligations as a distributor of

16   controlled substances between June 2017 and

17   May or April of 2018?

18   A.    No.

19   Q.    Were you aware that Walmart was

20   a registrant -- or was registered to

21   distribute Schedule II products between

22   June '17 and May of 2018?

23   A.    Yes.

24   Q.    And are you aware of any

25   obligations that Walmart may or may not have

1    had as a registrant?

2         A.    That's very broad.  Can you

3    repeat that question?

4              MR. INNES:  Can you read that

5         question back, please?

6              (The following portion of the

7         record was read.)

8              "QUESTION:  And are you aware

9         of any obligations that Walmart may or

10        may not have had as a registrant?"

11             (End of readback.)

12             MS. TABACCHI:  Object to the

13        form.

14             THE WITNESS:  If you could

15        clarify and ask me some specifics

16        rather than that real broad, I think

17        it would be better for me to answer --

18        a better approach.  I'm not sure where

19        you want to go with that.

20             I mean, I'm not sure what the

21        question is.

22        Q.    (BY MR. INNES)  Between June of

23   2017 and May of 2018, are you aware of any

24   obligations Walmart had vis-à-vis the

25   Controlled Substances Act?

```
 1              MS. TABACCHI:  Object to the
 2         form.
 3              THE WITNESS:  So you're asking
 4         if I have any obligation -- or if I
 5         know of any obligation as it relates
 6         to the Act.  Is that how you couched
 7         it?
 8              MR. INNES:  I'll try to
 9         rephrase the question.
10         Q.    (BY MR. INNES)  Between June of
11    2017 and May of 2018 --
12         A.    Right.
13         Q.    -- what was your understanding,
14    if any, of Walmart's obligations under the
15    Controlled Substances Act as it relates to
16    the distribution of Schedule II opioids?
17         A.    So when I took the position, I
18    think -- I'll back up.
19              I talked to -- had a
20    conversation with Chad, but then I also had
21    some conversation with -- with some of the --
22    what I call support team.  My support team.
23              And so in those conversations,
24    I learned what C-IIs were, and I learned -- I
25    learned what C-IIs were.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.     So the conversations that you
2     had, the only thing you learned in those
3     conversations was what a C-II is?
4                  MS. TABACCHI:  Object to the
5           form.
6                  THE WITNESS:  No, I learned
7           what C-IIs were, and I learned the
8           process.
9                  I was communicated to the -- I
10          call it the process of how we move
11          those goods.  That's what I learned.
12          Q.     (BY MR. INNES)  How was the
13    process of how you moved those goods -- and
14    by "those goods" you're referring to
15    Schedule IIs?
16          A.     Yes.  That was the question;
17    right?
18          Q.     How was the process of how
19    Walmart moves Schedule IIs communicated to
20    you?
21          A.     So they simply -- so I spoke
22    with Mike Mullins.  So he was general
23    manager.  And he walked me through, "Debbie,
24    here's how -- here's what they are, but
25    here's how they also move through the
```

1    facility.  Here's how we receive them.

2    Here's how we handle them.  Here's how we

3    outbound them."

4            So I learned all of that.

5        Q.    In layman's terms, "outbound"

6    means putting it from the DC onto a carrier

7    or a truck?

8        A.    Correct.  Correct.

9        Q.    So your conversations with

10   Mr. Mullins, did they expand beyond the

11   physical handling of Schedule IIs?

12           MS. TABACCHI:  Object to the

13      form.

14           THE WITNESS:  He -- he -- it

15      was tactical.  The conversation.  He

16      was walking me through the -- what I

17      call tactical process; right?

18        Q.    (BY MR. INNES)  Okay.  So can

19   you just explain to me what you mean by

20   "tactical process"?

21        A.    When you have a delivery, the

22   delivery, the processing, and the outbound.

23   That's what I mean by "tactical processing."

24   So Mike walked me through that.

25        Q.    So is it fair to say that the

1    tactical process is when an order comes to

2    you, DC 6045, in this instance, and that when

3    that -- the processing of that order, to move

4    a pill from order to carrier?

5         A.    When you say "move a pill,"

6    it's the inbound of the goods.  And so of

7    the -- it's the inbound of the boxes.  Right?

8    And it's the movement of those boxes through

9    the facilities and what measures we took for

10   the movement and for the security.  And then

11   it's the processing or the picking -- I call

12   that processing -- the picking of those pills

13   to fulfill the order.  And then the closure

14   of the boxes, and then the outbound.

15              And so when you -- and you

16   referred to it.  The outbound is when you put

17   it -- when it goes from the filling process

18   to the dock, to actually put it with a

19   carrier.

20        Q.    Okay.  And thank you for that

21   clarification, because I think I was focused

22   on a subset of that process.

23              You were responsible for taking

24   delivery of Schedule IIs from manufacturers?

25        A.    Correct.

1   Q.    Okay.  And then managing the

2   process of when that box comes into the DC,

3   and when the items in that box leave the DC.

4   A.    When that box comes into the

5   DC, when those boxes are actually -- I call

6   slotted -- in the picking area.  And then

7   when the boxes are closed, and then the boxes

8   are, as you've put it, out -- I call it

9   outbound, but when they actually outbound

10  to -- with -- on the carrier to the

11  facilities.

12  Q.    I will do my level best to

13  adopt your language and your jargon here.

14  A.    I'm just for -- I just don't

15  want there to be any confusion.

16  Q.    Absolutely.  That's one of our

17  shared goals today.

18        So when you took over in June

19  of 2017, in that role, did Walmart have an

20  obligation to monitor orders of controlled

21  substances?

22  A.    So when I took over, I also sat

23  down with -- I referred to the support team;

24  right?  And support team was my compliance

25  team.

Highly Confidential - Subject to Further Confidentiality Review

1          And so my compliance team

2    walked me through the process of what the

3    order monitoring was.

4          Q.    Okay.  So thank you for that.

5    My question is slightly different.  And it's

6    yes -- it can be a yes-or-no question.

7          When you took over in that role

8    in June of '17, did Walmart have an

9    obligation to monitor orders of controlled

10   substances?

11          MS. TABACCHI:  Object to the

12      form.

13          THE WITNESS:  Yes.

14          Q.    (BY MR. INNES)  And your

15   awareness of that obligation was based on

16   your discussions with your support team?

17          A.    Not only my support team, but

18   my direct.

19          So I had conversations as

20   probably most people do when they sit down

21   and they talk through their direct reports.

22   They talk through their support team, when

23   they take over new roles.  So it came from

24   directs as well as support.

25          I think you couched it just as

1    support, but it came from both.

2         Q.     I did.  And thank you for that

3    clarification.

4              So your directs -- when you say

5    "directs," you mean the folks that reported

6    up through the chain of command directly to

7    you?

8         A.     Correct.

9         Q.     And the support team, are

10   those -- those folks are different from your

11   direct reports?

12        A.     Correct.

13        Q.     Okay.  Who are the members of

14   your support team?

15        A.     So there's many members --

16             MS. TABACCHI:  Objection, form.

17             THE WITNESS:  So there's our

18        compliance team, our legal team, our

19        maintenance team, our reliable

20        operations team, our new ways of

21        working team.  I have a lot of

22        different support teams.

23             So those would be the support

24        functions and teams.

25             Is that -- was there two parts

1        to that question?

2        Q.      (BY MR. INNES)  Well, I

3    think -- maybe not two parts, but I can try

4    to focus us a little bit more.

5              I'm curious about who are the

6    support team members that educated you as to

7    Walmart's obligation to monitor controlled

8    substances.

9        A.      One of the support members was

10   Miranda Johnson.  And so she's on our

11   compliance team, the compliance support team.

12       Q.      Anyone else?

13       A.      She was the main source of

14   information from a support standpoint.

15       Q.      Right.  That's correct.  I'm

16   asking who are the members of the support

17   team.

18       A.      It was Miranda Johnson.

19       Q.      Okay.  Anyone else?

20       A.      Well, she would -- I think

21   George Chapman might have had some sit-ins

22   there with her.  She would -- they may have

23   been together.  But Miranda was the main

24   source.

25       Q.      Okay.  And when you refer to

1    "sit-ins," are those meetings with you and

2    Ms. Johnson and Mr. Chapman?

3         A.    The majority of -- I mean, what

4    I recollect is that Miranda had conversations

5    with me.  I remember George coming over once.

6         Q.    So to recap, in June of '17,

7    your knowledge of Walmart's obligations to

8    monitor controlled substances was based on

9    conversations with Miranda Johnson and maybe

10   Mr. Chapman?

11        A.    Predominantly Miranda Johnson,

12   yes.

13        Q.    Anyone else?

14        A.    Are you talking support?

15        Q.    Yes.  We're now -- we're

16   talking about --

17        A.    No.  That's -- that was my main

18   source of support.

19        Q.    And, again, I'm trying to drive

20   to the exact people.  And the responses

21   you're giving me have certain qualifiers on

22   them.  So I apologize if I keep asking the

23   same question.

24        A.    That's okay.

25        Q.    Ms. Johnson, Mr. Chapman.

1    Anyone else on the support team?

2         A.    No.  That's the support --

3         Q.    Okay.

4         A.    -- that gave me that

5    information.

6         Q.    Okay.  Thank you.  And who were

7    the folks on the -- who of your direct

8    reports gave you information regarding

9    Walmart's obligations to monitor C-IIs in

10   June of '17?

11        A.    So Ramona Sullins.  Direct

12   report.  She was the source of information

13   from the -- from my direct support.

14        Q.    Anyone else?

15        A.    I saw presentations but -- and

16   I say I saw presentations, but Ramona always

17   walked me through what those presentations.

18   Right?  So Ramona was a source.

19        Q.    And when you -- what do you

20   mean by "presentations"?

21        A.    I mean that Ramona would walk

22   me through -- she verbalized, "Debbie,

23   here's -- you know, "Here's what C-IIs are.

24   Here's the process and the obligations," as

25   you put it.  Here's what -- how we handle

1    things.  And we do it because we're re --

2              No, we do it -- well, and

3    "Here's how we handle things."  And then she

4    had Ray -- I recollect that -- she gave me --

5    she was educating me; right?  "Deb, here's

6    what C-IIs are."  And Deb -- so she had a

7    very simple, "Here's what C-IIs are."  And I

8    don't remember what it looked like, but I

9    remember she had a one-sheeter that said,

10   "Here's a C-II."  And I was like, okay, got

11   it.  It was an education piece.

12        Q.    Okay.  So you said

13   "presentations."  Were there multiple

14   presentations that were given?

15        A.    No.

16        Q.    And then you also --

17        A.    There were multiple

18   conversations.

19        Q.    Okay.

20        A.    I didn't get it the first time.

21   They had to talk to me several times.

22        Q.    Neither did I.  I'm in the same

23   boat.

24              The one-sheeter.

25        A.    I --

1    Q.    What's that?

2    A.    I -- I don't have -- there's

3    not a specific one-sheeter.  It was just a --

4    she was trying to explain to me what C-II is,

5    and I was like, "Okay, just tell me what a

6    C-II is."  Right?

7              I don't have a document that's

8    a one-sheeter.

9              She would -- she would refer --

10   she had a reference to something as to what

11   C-IIs were.

12   Q.    And a "reference to something,"

13   was it a document?

14   A.    It was -- it may have even just

15   been her notes.  But she referenced something

16   sitting in front of me.

17              She didn't just walk in and

18   say, "Here I am," right?

19              She had a pad and she

20   referenced something.  I don't recall seeing

21   a --

22              I called it a one-sheeter, but

23   the answer is, she referenced something when

24   she was talking to me.

25   Q.    Okay.  How many conversations

1    did you have with Ramona?

2         A.    Well, she's my direct report.

3    I have one-on-ones with her.

4               So -- and I have one-on-ones

5    with her, what, every other week?  So we

6    could do the math and figure that out,

7    but ...

8         Q.    We'll save that math problem.

9    I think we've done enough math today.

10        A.    Okay.

11        Q.    One thing is, sometimes I have

12   a slow cadence and I don't think I got my

13   question out fully before you started

14   answering.

15        A.    Okay.  Sorry.

16        Q.    It's absolutely fine.  But I'm

17   just going to ask you -- it's going to sound

18   similar, but it's now going to be a complete

19   question.

20               Just let me go back and see

21   where we are.

22               How many conversations did you

23   have with Ramona in June of '17 regarding to

24   educate you as to Walmart's obligations under

25   the CSA?

1          A.     I don't recall how many.

2          Q.     Did Ramona ever give you

3     documents to review?

4          A.     No.

5          Q.     So the document that -- the

6     one-sheeter that you just referred to, Ramona

7     never gave you a copy of that?

8          A.     No.

9          Q.     Okay.

10         A.     She never gave me a copy of her

11    notes.  If that's what -- or whatever it was

12    she had.  She was referring to something.  I

13    don't remember if it was a formal

14    presentation or her notes, but she -- she

15    taught me, for lack of a better word, off of

16    something; right?

17         Q.     And did she give you any

18    materials whatsoever in those conversations?

19              MS. TABACCHI:  Object to the

20         form.

21         Q.     (BY MR. INNES) Any documents in

22    that -- those conversations?

23         A.     Not that I recall.  Not that I

24    recall.

25         Q.     Did you take notes during those

1    conversations?

2         A.    No.

3         Q.    Your conversations with

4    Miranda Johnson regarding Walmart's

5    obligations to order -- to monitor orders of

6    controlled substances.  And I want to focus

7    you on conversations you had in June.  The

8    ones that --

9         A.    And I --

10             Okay.  I don't know that they

11   happened in June, but they happened.

12        Q.    Okay.

13        A.    I don't recollect the

14   timeframe.

15        Q.    So we started this colloquy

16   with the yes-or-no question when you took

17   over in June '17, did Walmart have an

18   obligation to monitor controlled substances.

19   I believe you agreed with that statement; is

20   that right?

21        A.    I did.  I did.

22        Q.    And I asked you what the basis

23   for your agreement was with that obligation?

24        A.    And I said I met with different

25   individuals.  And I met --

Highly Confidential - Subject to Further Confidentiality Review

 1              So when I met with individuals,

 2     I met with them for a couple of months,

 3     different -- you know, I had direct reports,

 4     I had indirect.  I was learning the business.

 5     And so if you're trying to say I met with

 6     them in June, I can't tell you when I met

 7     with them.  I do know, though, that in the

 8     process, I met with my support team and my

 9     directs.

10          Q.    But I want to make sure that

11     you understand the question and that the

12     record is clear.

13          A.    Okay.

14          Q.    You had an understanding in

15     June of 2017 of Walmart's obligation to

16     monitor orders of controlled substances; is

17     that right?

18          A.    I was beginning to learn the

19     understanding of C-IIs -- or learn what C-IIs

20     were.  I was being educated.  And I was

21     learning what those processes were.  I mean,

22     I've testified that I talked to Mike Mullins,

23     and -- because that -- that's my obligation,

24     to understand how to move goods.  Right?

25              And so -- and I also began to

1    understand what the processes were for the --

2    as you refer to them, as the obligations.  I

3    don't know by the end of June if I had it

4    conquered or even knew completely about it.

5    I knew that I started meeting, and I don't

6    have a recollection as to when those dates of

7    those meetings were.  That's what I know.

8         Q.    What was your understanding

9    of -- in June of '17, what did you understand

10   to be Walmart's obligations as related to the

11   monitoring of orders of controlled

12   substances?

13        A.    Over the course of time, I

14   learned that we -- that there were processes

15   that we had to -- had to ensure that we

16   adhered to; right?

17              And so that's what I learned.

18        Q.    I'm going to try to get at this

19   a slightly different way.  I'm not -- I'm

20   honestly not trying to be tricky or cagey

21   here.  I'm trying to understand how you --

22   what your understanding was of the

23   obligations.

24        A.    Okay.

25        Q.    The particular obligations

1    that --

2         A.    So I learned that -- the

3    obligations; right?

4         Q.    Right?

5         A.    You keep hounding on this June,

6    and I can't tell you if I knew it by June.

7    And so that -- that's why -- I'm not trying

8    to be cagey either, but I'm just telling you,

9    that's what you're nailing this question on,

10   and I can't tell you if I had a complete

11   understanding by June.

12        Q.    Right.  And the premise of this

13   line of questioning was in June, you said you

14   had an understanding of Walmart's obligations

15   to monitor orders of controlled substances.

16        A.    I was beginning to --

17              Let me course-correct.

18        Q.    Okay.

19        A.    I was beginning to learn what

20   the C-IIs were.  I was beginning to learn the

21   processes of moving the goods, and I was

22   beginning to learn, as I sat down with the

23   direct reports and indirect reports, what

24   those -- what that was and what that looked

25   like.

Highly Confidential - Subject to Further Confidentiality Review

1          But did I have a complete

2   understanding?  You know, I don't recollect

3   if I had a complete understanding by June.

4   In fact, I would tell you I probably didn't

5   have a complete understanding, because that

6   would be a very short timeframe for me to

7   understand all of that.

8          Q.     Certainly.  We're not

9   computers.  We can't plug in and download and

10  know everything we need to know.  So it's an

11  education over a continuum.

12          When -- at what point in time

13  did you have a full understanding of

14  Walmart's obligations to monitor orders of

15  controlled substances?

16          MS. TABACCHI:  Object to the

17          form.

18          THE WITNESS:  Yeah, and I

19          don't -- I don't have a date that I

20          had a full understanding.  It was an

21          evolution of education for me.

22          Q.     (BY MR. INNES)  Was there a

23  point in time when you became comfortable

24  that you had a grasp on Walmart's obligations

25  to monitor substances under the --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. TABACCHI:  Object to the
 2         form.
 3              THE WITNESS:  I would tell you,
 4         after the first couple of months,
 5         three months, I had an understanding
 6         of tactical.  I had an understanding
 7         of the processes, yes.
 8         Q.    (BY MR. INNES)  Okay.  So we're
 9    talking about September of '17, October of
10    '17 conservatively, about when --
11         A.    I don't know that I have -- I
12    mean, you're -- I'm sure there's stuff that I
13    don't know today about it.  I don't know
14    that --
15              You said "When did you have a
16    full understanding?"  I can't give you an
17    exact date.  But I -- I evolved as I got
18    educated; right?
19         Q.    Sure.
20              As you sit here today, what is
21    your understanding of Walmart's -- what was
22    your understanding of Walmart's obligation to
23    monitor the orders of controlled substances
24    during the time period of June '17 to May of
25    '18?
```

 1            MS. TABACCHI:  I'm just going

 2       to object to the form and again

 3       caution the witness not to reveal the

 4       substance of communications with

 5       counsel.

 6            You may answer the question if

 7       you can do that without revealing a

 8       privilege.

 9            MR. INNES:  Before you answer,

10       I just want to respond to the

11       privilege instruction.

12            I'm not sure that I understand

13       your privilege instruction.  She's

14       certainly -- do you want to articulate

15       that a little bit better?

16            MS. TABACCHI:  You're asking

17       the witness to share her

18       understanding -- you've been asking a

19       number of questions of an obligation

20       that you consider to be a legal

21       obligation.  You're asking the witness

22       about her understanding of a legal

23       obligation that the company had.  And

24       to the extent that she has an

25       understanding based on conversations

Highly Confidential - Subject to Further Confidentiality Review

1       with counsel, those communications

2       would be privileged.

3              So I just don't want her to

4       share information that she learned

5       from lawyers.

6              She can answer the question.

7       I'm just trying to protect the

8       privilege of the company.

9              MR. INNES:  But you understand

10      that in her role, she is responsible

11      for Walmart -- carrying out Walmart's

12      compliance with --

13             THE WITNESS:  No.

14             MR. INNES:  -- the Controlled

15      Substances Act.

16             MS. TABACCHI:  Okay.  Well,

17      there's not a question pending, but I

18      think that's part of the confusion is

19      that you're making some assumptions.

20             MR. INNES:  I don't think

21      there's any confusion here at all.

22      But we can take the answer to the

23      question.

24             MS. TABACCHI:  You're presuming

25      that she had a compliance obligation.

1          I think that's what you just said.

2               MR. INNES:  So we have an order

3          in this case from Judge Polster that

4          discusses the metes and bounds of

5          privilege as it relates to suspicious

6          order monitoring.  My questions are

7          directed at Walmart's suspicious order

8          monitoring program.

9               MS. TABACCHI:  You are free to

10         ask any question about what Walmart

11         did, what Walmart's program was, what

12         Walmart's policies were.  I'm just

13         asking that you not ask about

14         conversations between the witness and

15         the lawyers that are protected by the

16         attorney-client privilege.

17              If you want to ask about what

18         Walmart's suspicious order monitoring

19         policies were, process, program, yes.

20         Ask those questions.  We're not trying

21         to prevent you from getting that

22         information.  We're just not going to

23         have witnesses testify about the

24         conversation with a lawyer.

25              MR. INNES:  And I'm not asking

```
 1              about conversations with a lawyer.

 2                   MS. TABACCHI:  Okay.

 3                   MR. INNES:  I can preface each

 4              one of these questions that I'm not

 5              interested in conversations with a

 6              lawyer.  I'm only interested in her

 7              understanding of the obligations that

 8              she had to carry out.  That's the

 9              question.

10                   THE WITNESS:  So, the question?

11                   MS. TABACCHI:  Hold on.  Wait

12              until he asks you a question.

13                   Are you and I finished?

14                   MR. INNES:  I'm finished,

15              unless you --

16                   MS. TABACCHI:  No, no, that's

17              fine.

18                   MR. INNES:  Now I've had a long

19              colloquy.  I'm going to have trouble

20              finding this question.  Bear with me

21              for a second here.

22                   MS. TABACCHI:  It's okay.  Just

23              wait until he asks you a question,

24              then you can answer it.

25              Q.    (BY MR. INNES)  As you sit here
```

Highly Confidential - Subject to Further Confidentiality Review

1    today, what is your understanding of

2    Walmart's obligation to monitor the orders of

3    controlled substances during the time period

4    June '17 to May '18?

5         A.     So our obligation is to

6    understand what we have as inbound of

7    product.  And so what those C-IIs, how we

8    inbound them.  And our obligation is to make

9    sure that those are secure.

10              Our obligation is to ensure --

11   when we are picking the product, our

12   obligation is to ensure that we have an

13   accurate count of the product, and that we

14   pick that product that is what the PO tells

15   us to pick the product.

16              And then our obligation is to,

17   once again, ensure security of that product

18   on the outbound, and to ensure that we have

19   not only picked it, but that we ready it, for

20   lack of a better word, for the carrier to

21   pick it up.

22              So that is my obligation -- or

23   my understanding of our obligation.

24        Q.     And I just want to be clear.

25   Your testimony there is limited to the time

```
 1    period of June '17 to May '18; is that right?
 2         A.    Correct.
 3         Q.    And just -- this gets a little
 4    confusing because Walmart has decided to exit
 5    the business.
 6         A.    Correct.
 7         Q.    And you're speaking in the
 8    present tense and I'm trying to bring you
 9    back to the time period when Walmart's
10    distributing C-IIs.
11         A.    I just walked you through the
12    time period when we distributed.
13         Q.    It was just given in present
14    tense, so that's my problem.
15         A.    Oh, sorry.
16         Q.    Not a problem.  And it's
17    probably easier for you to give it in present
18    tense, and maybe I'll have to go back and
19    make a qualification.  But my questions are
20    limited to that time period.
21         A.    Okay.
22         Q.    I'm trying to make that clear.
23               So I'll move to strike that
24    answer starting with -- following
25    "obligation."
```

1                    The question is slightly

2     different.  The question is directed to your

3     obligation to monitor orders.

4          A.     Okay.

5          Q.     And perhaps my question wasn't

6     clear enough.  I'll ask it this way.

7                    As you sit here today, what is

8     your understanding of Walmart's obligation to

9     order -- to monitor orders from its

10    pharmacies of controlled substances during

11    the time period of June '17 to May '18?

12         A.     Hang on.  Back up.  Your voice

13    dropped when you said "pharmacies" or

14    something.  Just repeat it for me, please.

15         Q.     And I know I'm not looking at

16    you, and I'm very sorry about that.

17         A.     It's all right.  I can watch.

18         Q.     I'll try and be clear.

19                    As you sit here today, what is

20    your understanding of Walmart's obligation --

21    what is your understanding of Walmart's

22    obligation to monitor orders from its

23    pharmacies of controlled substances during

24    the time period June '17 to May of '18?

25                    MS. TABACCHI:  Did you hear

1          that?

2                    THE WITNESS:  Yes, I did.

3                    I have no knowledge of the

4          obligation to monitor from our

5          pharmacies.  Pharmacies.  I have no

6          knowledge of that.

7          Q.    (BY MR. INNES)  Okay.

8          A.    From our pharmacies.

9          Q.    I'm talking about -- I'm not

10   talking about pharmacies in the dispensing

11   context, if that's the confusion.  I'm

12   talking about --

13         A.    But that's how -- that's why we

14   need clarification; right?  Because you said

15   "pharmacies."  That's pharmacies.  And

16   "pharmacies," to me, means pharmacies in the

17   stores.

18         Q.    Okay.

19         A.    And I have no knowledge of

20   that.

21         Q.    We can do this a slightly

22   different way.

23                Orders for Schedule IIs between

24   June '17 and May '18.  The time period that

25   you held that position.

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Okay.

2      Q.      Orders were placed by

3  pharmacies for Schedule II --

4      A.      By who?

5      Q.      By pharmacies.  By Walmart's

6  pharmacies for Schedule II narcotics; isn't

7  that right?

8      A.      They were placed by pharmacists

9  and by the system.

10     Q.      Okay.  During your time in

11  June '17 to May '18, pharmacists --

12  pharmacies placed orders through the system,

13  and those orders were fulfilled by DC 6045;

14  is that right?

15     A.      That's correct.

16     Q.      What is your understanding of

17  Walmart's obligation to monitor those orders?

18     A.      Our obligation -- or my

19  understanding, once again, coming from our

20  compliance team, our -- my understanding is

21  that we had a process in place to monitor

22  those orders that came through, and to

23  monitor those orders that went on outbound.

24  We had an obligation.

25     Q.      Okay.  Let's break that down.

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.      Yeah.

2              Q.      Can you describe that process?

3              A.      Sure.

4                      MS. TABACCHI:  Object to the

5              form.

6                      THE WITNESS:  So that process

7              started with the inbound of the

8              orders.  And in that inbound of the

9              orders, they're downloaded.  Those

10             orders are downloaded to the DC.

11                     And are you talking 2017?

12             Q.      (BY MR. INNES)  I'm talking

13      June -- in June 2017.

14             A.      So then those were inbounded in

15      a system -- in a system.  And that system

16      then had thresholds.  And if those thresholds

17      were triggered, then the process was that

18      then those orders went into a pend status,

19      what we call pend, or pending, and went over

20      to a monitoring -- a SOM team, suspicious

21      order monitoring team.

22             Q.      Okay.  So you used a lot of

23      jargon there that I want to clean up.

24                     So they "inbound."  Is that the

25      order from the pharmacy to the DC?
```

```
 1              A.      Correct.

 2              Q.      And that --

 3              A.      It's a different inbound than

 4     I've been talking about than the drugs.

 5              Q.      Good.  That was the

 6     clarification I wanted to make.  Thank you.

 7                      When you say "downloaded to the

 8     DC," what does that mean?

 9              A.      The system pulled in those

10     orders.  And when I say "pulled in," it was

11     downloaded.

12              Q.      And --

13              A.      And I'm not a technical guru,

14     but they were downloaded.  So they were

15     received through the system to our DC.

16              Q.      What was the name of that

17     system?

18              A.      Reddwerks.

19              Q.      Was that a manual process?

20     Meaning did someone have to click a button to

21     make that download or was it an automated

22     system?

23                      MS. TABACCHI:  Object to the

24         form.

25                      THE WITNESS:  My understanding
```

Highly Confidential - Subject to Further Confidentiality Review

1      is it's an automated download.

2          Q.     (BY MR. INNES)  Then the next

3      step in the process as I have it, they were

4      downloaded to the DC and then inbounded to

5      the system?

6          A.     So it was downloaded to the DC,

7      which -- same verbiage, which was inbound to

8      the DC.  It just came inbound through that

9      download.

10         Q.     Okay.  That --

11         A.     I think that's all one step.

12         Q.     Okay.  Thank you.

13                And you mentioned that there

14     were thresholds.  What are thresholds?

15         A.     I can't give you the definition

16     of thresholds.  I was given from Miranda that

17     there were thresholds.

18         Q.     Okay.

19         A.     And so I don't know any detail

20     beyond that on the thresholds.  But there

21     were thresholds she communicated to me.

22         Q.     Which thresholds did she

23     communicate to you?

24         A.     I don't remember.

25                She communicated to me the word

1    "thresholds."  She didn't give me details

2    around thresholds.

3        Q.    Did you ask her what she meant

4    by the word "thresholds"?

5        A.    She -- I don't recall at the

6    time if she said, "Debbie, there are

7    thresholds."

8        Q.    So we're in the time period of

9    June 2017; correct?

10       A.    Pardon me?

11       Q.    Your testimony is June of '17;

12   Is that correct?

13       A.    Yes.

14       Q.    At any time after June of '17,

15   did you become aware of what these thresholds

16   were?

17       A.    No.

18       Q.    As you sit here today, you have

19   no recollection of what a threshold is?

20            MS. TABACCHI:  Object to the

21        form.

22            THE WITNESS:  I don't know what

23        the specific thresholds are.  I know

24        the terminology "threshold."

25       Q.    (BY MR. INNES)  How did

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Ms. Johnson communicate the word "threshold"

 2    to you?

 3         A.    She said, "Debbie, there are

 4    thresholds."

 5         Q.    Okay.

 6         A.    That's -- that's all she said.

 7         Q.    Some of these questions can be

 8    stilted.  It was an oral conversation?

 9         A.    Yes, it was.

10         Q.    It didn't come via email?

11         A.    Yes.

12               No, no, it didn't come by

13    email.  She said, "Debbie, there are

14    thresholds."

15         Q.    Okay.

16         A.    And I'm like, "Okay."

17         Q.    End of conversation?

18         A.    Mm-hmm.  (Witness nods.)

19               MS. TABACCHI:  Object to the

20         form.

21         Q.    (BY MR. INNES)  Was that the

22    end of the conversation?

23         A.    Well, no, she didn't get up and

24    walk out of my office after she said there

25    are thresholds and exit.  She went on to tell
```

1    me the other process.

2         Q.    Is all the information that you

3    relayed to me about this process that we're

4    discussing right now, did that come from that

5    conversation with Ms. Johnson?

6              MS. TABACCHI:  Object to the

7         form.

8              THE WITNESS:  Yes, it came from

9         several conversations.  But ...

10        Q.    (BY MR. INNES)  Several

11   conversations over the course of --

12        A.    A timeframe.

13        Q.    Okay.  And that timeframe

14   stretched from June of '17 to --

15        A.    I had several conversations --

16        Q.    Okay.

17        A.    -- in this whole learning

18   evolution.

19        Q.    You then said those thresholds

20   triggered and --

21        A.    So what it did, if there -- if

22   it -- if it triggered, then -- triggered

23   those thresholds, then it sent those orders

24   over to the SOM team.

25        Q.    Okay.  And this might be one

Highly Confidential - Subject to Further Confidentiality Review

1    step or it might be an intermediary step, but

2    I believe you testified earlier that it

3    triggered and then the order would pend?

4         A.    It pended -- what we call

5    pended.  It pends while it goes over to the

6    SOM team.

7              So what it does, it doesn't put

8    it in the queue for the pharmacy DC to

9    distribute it; right?

10             So when it's in pending status,

11   it means the pharmacy DC can't even --

12   doesn't have visibility to see that order.

13   They would not -- they would not have

14   visibility to ship it.

15        Q.    Does the pharmacy itself have

16   visibility if the order is pended?

17             MS. TABACCHI:  Object to the

18        form.

19             THE WITNESS:  I don't know.

20        You mean -- you're talking the

21        pharmacy back at the store?  Is that

22        the question?

23        Q.    (BY MR. INNES)  Yeah, a

24   pharmacy in Main Street, Cuyahoga County, can

25   they see that their order has not shipped?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      I don't know.

 2              Q.      Who would know the answer to

 3      that question?

 4                      MS. TABACCHI:  Object to the

 5              form.

 6                      MR. INNES:  I'll strike that.

 7              Q.      (BY MR. INNES)  If you wanted

 8      to determine that information, who would you

 9      ask?

10              A.      I would ask Ramona.

11              Q.      And that's Ramona Sullins?

12              A.      Yes, sir.

13              Q.      In June of --

14              A.      Or I might have Miranda either

15      too.  Either one.

16              Q.      Miranda Johnson?

17              A.      Yes, sir.

18              Q.      There's also a Miranda Gan, I

19      believe; right?

20              A.      I don't know.

21              Q.      In this process that you

22      described, the next step, I believe, was

23      after an order of threshold was triggered,

24      the order pended and then it was -- the SOM

25      team was notified?
```

1       A.      Correct.

2       Q.      Who are the members of the SOM

3    team?

4       A.      Shawn Robinson --

5               Who were the members?  Was that

6    the question?  Or who was?  Was that present

7    tense or past tense?

8       Q.      I'm always --

9       A.      As of 2017?

10      Q.      As of 2017.

11      A.      Shawn Robinson, Lisa Holland,

12   and Dena McClamroch.

13      Q.      And did you oversee the SOM

14   team?

15              MS. TABACCHI:  Object to the

16       form.

17              MR. INNES:  Strike that.

18      Q.      (BY MR. INNES)  Was the SOM

19   team -- did those members of the SOM team

20   report to you?

21      A.      Yes.

22      Q.      What were -- what was the

23   function of the SOM team?

24      A.      They --

25              MS. TABACCHI:  Object to the

1      form.

2              Go ahead.

3              THE WITNESS:  They ran an

4      analysis.

5      Q.    (BY MR. INNES)  Can you

6  describe what that analysis was?

7      A.     They ran a trend analysis, a

8  two-, I think a five-, and an eight-week

9  trained analysis.

10             They also ran analysis based on

11  criteria that had been vetted through

12  compliance.

13     Q.    Can you describe the trend

14  analysis?

15             MS. TABACCHI:  Object to the

16     form.

17             THE WITNESS:  It was a -- no.

18     Q.    (BY MR. INNES)  Did you ever

19  see the results of the trend analysis?

20     A.    No.

21     Q.    How do you know the trend

22  analysis was a five- and eight-week analysis?

23             MS. TABACCHI:  Object to the

24     form.

25             Go ahead.

Highly Confidential – Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Ramona told me.
 2         She said we do a two- and a five- and
 3         an eight-week analysis.
 4         Q.    (BY MR. INNES)  Those are three
 5    different analyses, two, five, and eight, is
 6    your understanding?
 7         A.    It was my understanding it was
 8    one analysis.  They just do those different
 9    weeks during that analysis.
10         Q.    Do you know what they were
11    looking at in those two-, five-, and
12    eight-week periods?
13         A.    They were looking at the trend
14    of that facility with that particular drug
15    that had been triggered.
16         Q.    And by "facility," do you mean
17    that pharmacy?
18         A.    I mean that particular order.
19    So when the order was triggered, right, the
20    order was triggered, and it was from a
21    specific pharmacy, with a specific drug.
22    They looked at that analysis for the two-,
23    the five-, and the eight-week for that
24    facility and that drug.
25         Q.    I just want to be clear for the
```

Highly Confidential - Subject to Further Confidentiality Review

1  record, because you've used two terms in that

2  sentence.  Is this "facility" synonymous with

3  "pharmacy" in your mind?

4      A.    So I used "facility," which

5  means pharmacy.  That order came from that

6  pharmacy with that particular drug.  And so

7  that's how I was using it.

8            And so that's -- so they took

9  that -- they looked at the trend of the

10  pharmacy it came from, and those drugs that

11  were -- that triggered.

12      Q.    And when you say "those drugs,"

13  what do you mean by that?

14      A.    Whatever drug triggered --

15  whatever the analysis was to be on.

16            Whatever the threshold sent to

17  them.

18      Q.    And was that -- were drugs

19  grouped by NDC code?

20      A.    You are beyond my level of

21  expertise.

22      Q.    Okay.  And we're going to test

23  the level of expertise in a little bit.  And

24  if you don't know, you don't know.  But I'll

25  just ask the question.

Highly Confidential - Subject to Further Confidentiality Review

1          Were the drugs grouped by base

2    code?

3          MS. TABACCHI:  Object to the

4       form.

5          THE WITNESS:  Once again, I

6       don't know.  You're beyond my

7       expertise.

8       Q.    (BY MR. INNES)  Were the drugs

9    based on dosage strength?

10          MS. TABACCHI:  Object to the

11       form.

12       Q.    (BY MR. INNES)  I'm sorry, I

13    botched that question.

14       A.    I don't recall.

15       Q.    Let me ask that again just so

16    we have it clear.

17          Were the drugs grouped by

18    dosage unit?

19          MS. TABACCHI:  Object to the

20       form.

21          THE WITNESS:  When they were

22       doing the analysis?  I don't recall.

23       Q.    (BY MR. INNES)  Do you believe

24    you had knowledge at some point?

25       A.    Do I believe what?

1    Q.    Do you believe you had

2  knowledge of that at some point?

3                MS. TABACCHI:  Object to the

4         form.

5                THE WITNESS:  Knowledge -- can

6         you clarify knowledge of what at some

7         point?

8                MR. INNES:  Sure.

9    Q.    (BY MR. INNES)  You testified

10  that you don't recall if the drugs in those

11  analyses were grouped by dosage.

12    A.    Correct.

13    Q.    I just want to know, back in

14  June of '17, do you believe you may have had

15  knowledge of that fact?

16    A.    So in that part of the process,

17  I don't know if I had knowledge.  I know at

18  another point in the process I recall there

19  being conversation around -- you said

20  "dosage"; right?

21    Q.    So the process that you

22  described -- I think we're at the terminus of

23  what you described, the SOM team.

24                Your knowledge that you just

25  described, did that come -- at what point in

1    this process was that knowledge?

2                    MS. TABACCHI:  Object to the

3            form.

4                    THE WITNESS:  So it was --

5                    MR. INNES:  That was a bad

6            question.

7                    THE WITNESS:  It was the

8            same --

9                    MR. INNES:  It was a bad

10           question.  Don't even try.

11                   I appreciate the effort.

12           Q.    (BY MR. INNES)  So you

13    testified that "I know at another point in

14    the process, I recall there being a

15    conversation around dosage"; is that right?

16           A.    Yes, I did.

17           Q.    All right.  At what point in

18    the process was that conversation?

19                   MS. TABACCHI:  Object to the

20           form.

21                   THE WITNESS:  If there was

22           conversation when Miranda, Roxy, and I

23           were looking at those -- because Roxy

24           would give the dosage.  She would --

25           part of the reading of the

 1                 information, and she would give

 2                 dosages.

 3           Q.     (BY MR. INNES)  Did that happen

 4     before or after the SOM team's trend

 5     analysis?

 6           A.     After.

 7           Q.     That's my -- I -- there's more

 8     to this process than what we've -- what you

 9     articulated earlier.

10                 What happens after the SOM team

11     performs their analysis?

12           A.     So then that analysis goes over

13     to Roxy and team -- or went over.  It doesn't

14     go.  It went over to Roxy and team.

15                 And then she performed further

16     analysis.

17           Q.     And is that Roxy Reed?

18           A.     Yes, sir.

19           Q.     Okay.  And is Roxy Reed a

20     direct report to you --

21           A.     No.

22           Q.     -- during that time period?

23           A.     No.

24           Q.     Who did Roxy Reed report to at

25     that time period?

```
 1            A.     I -- I'm not for sure.  I'm not

 2     for sure.

 3            Q.     Was Roxy Reed in your -- was

 4     she in a different division than you are?

 5            A.     She was in compliance.

 6            Q.     And you were in logistics?

 7            A.     Supply chain, yes, sir.

 8            Q.     Supply chain.

 9                   And at some point in time,

10     supply chain was referred to as logistics by

11     Walmart?

12            A.     You're correct.  You're

13     correct.

14            Q.     You said "Roxy and team."  Who

15     else was on Roxy's team?

16            A.     I'm not knowledgeable of that.

17            Q.     Are you knowledgeable about

18     what Roxy's team would do with respect to the

19     trend analyses that were performed by the SOM

20     team?

21                   MS. TABACCHI:  Object to the

22            form.

23                   THE WITNESS:  I'm not

24            knowledgeable about what she would do

25            with that trend analysis, no, I'm not.
```

1      Q.      (BY MR. INNES)  Do you have any

2   knowledge of the steps in the process

3   performed by Roxy's team?

4      A.      The -- I don't know what that

5   process looked like.

6      Q.      Okay.  What happened after --

7   what happened -- what, if anything, happened

8   after Roxy's team received the information?

9      A.      So then the -- that information

10  then was reviewed by Roxy, Miranda, and

11  myself and/or a representative of me.

12     Q.      And what did you, Roxy, and

13  Miranda, or your representative, what was

14  your task at that stage?

15     A.      So my task was to listen and

16  ask questions.  And so that's exactly what we

17  did.

18           So Roxy would go over a list of

19  analysis and information, and then

20  collectively the three of us would make a

21  decision as to if it was a suspicious order.

22     Q.      How would you make a

23  determination if the order you were reviewing

24  was suspicious or not suspicious?

25     A.      Well, I -- I think we use the

1    guidelines of our policy; right?  And I think

2    that the policy states -- has a couple three

3    things in it, but if the order was a large

4    size, or an unusual size, or something along

5    that line.  If it was -- if there was an

6    unusual pattern.  And so that coupled with

7    those -- that, coupled with the information

8    she had is how we made the decision.

9         Q.    And who -- you referred to

10   "she."  Who are you referring to there?

11        A.    How "we."  I think I said "we."

12             And so it was Roxy and

13   myself -- Miranda and Debbie Hodges.

14             MS. TABACCHI:  I'm happy to

15        help.

16             MR. INNES:  You seem like you

17        want to say something.

18             MS. TABACCHI:  No, no, no.  I

19        just want to make sure that you heard

20        the question.  I think --

21             THE WITNESS:  What was the

22        question?

23             MS. TABACCHI:  Do you mind if I

24        help you with this?  "The information

25        she had."  He asked the information

```
1            "she had."
2                 THE WITNESS:  That who had?
3                 MS. TABACCHI:  The "who" you
4        talked about when you said "the
5        information she had."  Who is the
6        "she"?
7                 THE WITNESS:  Oh, Roxy had.
8                 MR. INNES:  Thank you.
9                 THE WITNESS:  It was that Roxy
10       had.
11                MR. INNES:  Okay.  Thank you.
12                THE WITNESS:  Thank you.
13                MS. TABACCHI:  Let us know,
14       Mike, whenever it's a good time to
15       take another break.  If you're in the
16       middle of something, you know, go
17       ahead.
18                MR. INNES:  Let me just ask two
19       questions, see if we can't nail down
20       the rest of this process, and then we
21       can take a break.
22           Q.    (BY MR. INNES)  So the three of
23    you are meeting, or one of your designees.
24    Can Roxy or Miranda also appoint a designee
25    to sit in those meetings?
```

1          A.     I don't know.  I know about me.

2          Q.     Okay.

3          A.     But I would tell you that they

4     were -- they were in the meetings.  They were

5     involved, so ...

6          Q.     Okay.  So every -- each one of

7     these meetings that you were in, Miranda and

8     Roxy were always there?

9          A.     Miranda or Roxy sometimes, but

10     Miranda and Roxy most of the time.

11          Q.     Okay.  Did the policy call for

12     Miranda and Roxy to be there?  Or just one of

13     them?

14          A.     You know what?  I don't recall.

15          Q.     If you went to a meeting -- did

16     you ever attend a meeting where it was just

17     Miranda?

18               MS. TABACCHI:  Object to the

19          form.

20               THE WITNESS:  I don't know that

21          I recall if there was just Miranda.

22          Q.     (BY MR. INNES)  And just so

23     we're clear, did you ever attend one of the

24     meetings that you described in this process

25     where it was just you and Amanda [sic]?

```
 1                    MS. TABACCHI:  Object to the

 2         form.

 3         Q.    (BY MR. INNES)  Or you and

 4    Miranda?

 5         A.    Not that I recall.  Roxy always

 6    had the information.

 7         Q.    Did you ever attend one of

 8    these meetings at this stage of the process

 9    when it was just you and Roxy?

10         A.    Not that I recall.

11         Q.    Did you maintain records of

12    these meetings?

13         A.    No.

14         Q.    Why not?

15                    MS. TABACCHI:  Object to the

16         form.

17                    THE WITNESS:  I -- no reason

18         to.

19         Q.    (BY MR. INNES)  Why wasn't

20    there a reason to?

21         A.    I attend a lot of meetings.

22    And I don't keep records of meetings.  A lot

23    of meetings.

24         Q.    But this is a particular kind

25    of meeting; right?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I have a lot of particular

2    kinds of meetings.

3        Q.      And this particular meeting was

4    a decision as to whether or not Walmart was

5    going to ship an order that had been

6    identified as potentially a suspicious order?

7        A.      You're right.

8                I didn't say "you're right" as

9    in you're right that there --

10               So ask the question again.

11   Clarify, please.

12       Q.      What was the purpose of this

13   meeting that we described in the process?

14       A.      The purpose was to review the

15   potential suspicious orders and make a

16   decision if they were suspicious.

17       Q.      And those orders could involve

18   suspicious -- potential suspicious orders of

19   opioids; isn't that right?

20       A.      Correct.

21       Q.      And at this point in time,

22   you're aware that the United States is

23   undergoing an opioid crisis; is that right?

24       A.      Yeah.  I think we established

25   that in the very beginning of this

 1    conversation.

 2         Q.    Did you not think it important

 3    to document a decision to either withhold

 4    opioids from the market or to distribute

 5    opioids into the market?

 6              MS. TABACCHI:  Object to the

 7         form.

 8              THE WITNESS:  There was -- it

 9         wasn't my role to make a -- make a

10         record, if you will, of what the --

11         that meeting was.

12         Q.    (BY MR. INNES)  Did anyone make

13    a record of what that meeting was?

14         A.    You know what?  Roxy repeated

15    back what the -- verbally repeated back

16    during those at the end of the meeting.  I

17    don't know -- I think that --

18              Well, she repeated back what

19    that looked like, and she told me.  She told

20    in the meeting, "And I will ensure that that

21    is put in Archer," so ...

22              But ...

23         Q.    Okay.  What exactly did Roxy

24    repeat back to you?

25         A.    She repeated back the decisions

Highly Confidential - Subject to Further Confidentiality Review

1     that were made in that meeting.

2            Q.      Decisions to do what?

3            A.      Decisions whether it had been

4     decided it was a suspicious order or if it

5     was not a suspicious order.

6            Q.      And how did you go about

7     determining whether it was -- the order was a

8     suspicious order or not a suspicious order in

9     that meeting?

10           A.      So we would look at -- we

11    would -- back to my previous conversation, we

12    would look at all of the information she had.

13    We would look at the trending information

14    that she had gotten from the SOM team.  We

15    looked at the additional criteria she pulled

16    in.  Right?  We looked at whether there was

17    an unusual pattern.  We looked at the --

18    well, that -- that's the I -- kind of the

19    three buckets, unusual pattern, the

20    information that she provided, and the

21    information that she got from the SOM team.

22                  And then we -- collectively, we

23    looked at all of that information.  She -- we

24    talked through each one.  Because she would

25    say, "Here's the first order."  Right?  And

1    we would talk through a litany of all of that

2    information, and then we would make a

3    decision.

4         Q.     And when would you receive this

5    information?  Was it prior to the meeting?

6         A.     When would I receive?

7         Q.     The information you just

8    described that Roxy had.

9         A.     No, it was during the

10   information -- during the session.

11        Q.     So the first time that you saw

12   the information regarding that particular

13   order that was to be determined whether it

14   was suspicious or not was in that meeting?

15        A.     And I didn't see it.  I usually

16   heard it.  Right?  Because it was a verbal

17   presentation they would give to me.  I didn't

18   have any document.  Yes.

19        Q.     So did you read the -- did you

20   have a view of the document at the same time

21   that they were reading that document?

22        A.     No.

23               MS. TABACCHI:  Object to the

24        form.

25               Sorry.  Go ahead.

```
 1                    THE WITNESS:  No.  It was --
 2           they read me the -- they -- it was an
 3           oral presentation.
 4           Q.    (BY MR. INNES)  Do you know
 5    that they read every piece of information
 6    that was on those pieces of paper in those
 7    meetings?
 8                    MS. TABACCHI:  Object to the
 9           form, lack of foundation.
10                    THE WITNESS:  I don't know
11           that.
12           Q.    (BY MR. INNES)  You said your
13    role in those meetings was to listen and ask
14    questions.
15           A.    And -- and ensure that -- yeah,
16    and make a decision.
17           Q.    How did the group make a
18    decision?
19                    You said there's three of you
20    in there; right?
21           A.    Mm-hmm.
22           Q.    And that's it?
23           A.    Correct.
24           Q.    And how was a decision
25    ultimately reached?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      Well, she would go through the
2     information.  And Miranda would ask
3     questions.  I would ask questions.  Mine were
4     usually clarifying questions, as to what does
5     that drug do.  I had a lot of different
6     questions than what they had, since I was
7     not --
8               Well, I had a different line.
9     But --
10              And then we would make -- we
11    would make the decision.
12         Q.     You said that the information
13    was provided to you orally.  Did you ever ask
14    to see the documents from which they were
15    reading?
16              MS. TABACCHI:  Object to form.
17              THE WITNESS:  No.
18         Q.     (BY MR. INNES)  And by
19    "documents," I would -- did you ever ask to
20    view computer screens that they might be
21    reading from in that meeting?
22         A.      No.
23         Q.     Did you ever ask to review any
24    of the information that they were -- that
25    they brought to the meeting regarding these
```

1   particular orders?

2                    MS. TABACCHI:  Object to form.

3                    THE WITNESS:  The process that

4          had been used and was being used was

5          that it was an oral conversation, and

6          so that was the process that we used.

7          Q.   (BY MR. INNES)  Were these

8   meetings regularly occurring?

9                    MS. TABACCHI:  Object to the

10         form.

11                   MR. INNES:  I can withdraw the

12         question.

13         Q.   (BY MR. INNES)  Was this a

14  standing meeting?

15         A.   They were meetings that were

16  put on the calendar.  They had different

17  times, but ...

18         Q.   Did you --

19         A.   So it wasn't 2 o'clock every

20  Tuesday, no.

21         Q.   Did you meet weekly?

22         A.   Yes.

23         Q.   Did you meet more than one time

24  a week?

25         A.   Sometimes.  Most of the time.

1    Q.    Why would a meeting be

2    convened?

3    A.    The -- they would convene a

4    meeting whenever they had -- whenever there

5    were suspicious order -- or potential

6    suspicious orders.  When there were orders of

7    interest, suspicious orders, potential, then

8    there would be a meeting convened.

9    Q.    And typically how long did

10   these meetings last?

11   A.    I don't know that typical,

12   there's a typical because it depended on the

13   number; right?

14           And so it was different based

15   on the number and based on the complexity.

16   Q.    And by "number," you mean

17   number of orders to review?

18   A.    Yes, sir.

19   Q.    Why would it be complex to

20   review these orders?

21   A.    Based on the -- when I say

22   "complexity," it means based on the amount of

23   information.

24           So if there were 15 that we

25   were reviewing that period, that day, it

1   would take longer.  Because obviously, to go

2   through all of the information of 15 versus

3   3.

4        Q.    So the length of the meeting

5   was dictated by the number of orders --

6            MS. TABACCHI:  Object to the

7       form.

8        Q.    (BY MR. INNES)  -- that you

9   were reviewing in that meeting?

10       A.    It was related to how long it

11  took to get through the information.

12       Q.    What were the -- what was

13  Miranda Johnson's title at the time for those

14  meetings?

15       A.    I couldn't tell you what her

16  title was.

17       Q.    Okay.  And --

18       A.    She was in the compliance area.

19       Q.    And she reported to Mr. Chapman

20  at that time period?

21       A.    I'm not sure.

22            I'm not sure.

23       Q.    Did Roxy report to Miranda at

24  that time?

25       A.    Yes.

1    Q.    It's true that you were the

2    most senior person at Walmart in those

3    meetings at that time; is that right?

4    A.    That is true.

5    Q.    And even though you were the

6    most senior person in that meeting, you

7    didn't review the information prior to that

8    meeting; is that right?

9         MS. TABACCHI:  Object to the

10        form.

11        THE WITNESS:  The -- I was

12        given the -- I think we've established

13        that.  I was given the information in

14        the meeting.

15    Q.    (BY MR. INNES)  And did each of

16    you have an equal vote in whether or not an

17    order was suspicious or not?

18    A.    Yes.

19    Q.    Did you ever determine an order

20    to be suspicious in those orders?

21        MS. TABACCHI:  Object to the

22        form.

23        THE WITNESS:  The group

24        determines those orders to be

25        suspicious in those meetings, yes.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.     (BY MR. INNES)  Thank you for

2     that.  My question was slightly different.

3              Did you yourself determine an

4     order to be suspicious in those meetings?

5              MS. TABACCHI:  Object to the

6              form.

7              THE WITNESS:  It was a

8              collective decision.  And so if you're

9              asking if my part of it was that I,

10             based on the information that I took

11             in, that I felt that an order was

12             suspicious, the answer is yes.  My

13             vote was an order is suspicious.

14       Q.     (BY MR. INNES)  Okay.

15       A.     But the -- it was a collective

16     decision.

17       Q.     Sure.

18              At any point in time do you

19     recall you voting an order to be suspicious

20     that was ultimately deemed by that group to

21     be not suspicious?

22       A.     I don't.  I don't recall.

23              MS. TABACCHI:  Michael, we

24              asked for a break a few minutes ago.

25              Are you close?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. INNES:  I'm sorry.  We --

 2                    MS. TABACCHI:  You were on a

 3         roll?

 4                    MR. INNES:  Yeah, we can take

 5         one now.  Yeah, I just got on a roll.

 6                    THE VIDEOGRAPHER:  10:49.  We

 7         are off the video record.

 8                    (Recess taken, 10:49 a.m. to

 9         11:08 a.m.)

10                    THE VIDEOGRAPHER:  11:08.  We

11         are on the video record.

12            Q.     (BY MR. INNES)  Okay.

13    Ms. Hodges, we're back on the record.

14                    When we left off, we were

15    discussing the process for the review of

16    orders of interest in the time period of

17    June '17 to May of '18.

18                    Where we had left off, I

19    believe, was the last step of that process,

20    where yourself, Roxy, and Miranda were

21    reviewing orders of interest that had been

22    tagged as potentially suspicious orders to

23    determine whether or not they were suspicious

24    orders.

25                    Is that right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Correct.

 2              Q.      And in that meeting, the three

 3      of you had an equal vote; is that right?

 4              A.      We had discussion.  Yes, we all

 5      had input.

 6              Q.      Was there ever a time when --

 7      strike that.

 8                      As the senior-most person in

 9      that meeting, were you able -- for lack of a

10      better term, did you have the authority to

11      overrule the other two attendees' votes?

12              A.      It was a collective decision.

13      Every time, it was a collective decision.

14              Q.      Do you recall any time when

15      there was a dissenting party in that

16      decision?

17              A.      It was a collective decision.

18      We all came out of there with a unified

19      decision.  There were times when they asked

20      questions, but it was a unified decision.

21              Q.      You said there were times when

22      they asked questions.  Who are the "they"

23      you're referring to?

24              A.      There were times when all of us

25      asked questions.  And I said "they," but
```

Highly Confidential - Subject to Further Confidentiality Review

1    there were times when I asked questions,

2    there were times when Miranda asked

3    questions, and there were times when Roxy

4    asked questions.

5              But we always came out with a

6    unified decision.

7         Q.    What is your definition of the

8    word "unified"?

9         A.    Of what?

10        Q.    What's your definition of the

11   word "unified"?

12        A.    There was one decision.

13              That's my definition.  There

14   was one decision.

15        Q.    In your mind, are you familiar

16   with the word "unanimous"?

17        A.    Pardon me?

18        Q.    Are you familiar with the word

19   "unanimous"?

20        A.    Yes.

21        Q.    In your mind, is unified a

22   synonym for unanimous?

23        A.    There was a -- yes.  There --

24   there was a -- one decision coming out of

25   there.

1    Q.    If one of the members of that

2    group had reservations or otherwise disagreed

3    with the unified decision, would that

4    information be documented anywhere?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  The process is we

8         talked through with just different --

9         with different pieces of information.

10   Q.    (BY MR. INNES)  What pieces of

11   information?

12   A.    The information that Roxy would

13   provide.

14   Q.    And Roxy was --

15              Excuse me.

16   A.    That Roxy would provide.  I

17   was -- that was the end of my sentence.

18   Q.    And Roxy provided that

19   information to you at the meeting?

20   A.    To Miranda and I.

21   Q.    And she presented that

22   information to you based off of documents

23   that she brought to the meeting?

24              MS. TABACCHI:  Object to the

25         form.

```
 1                    THE WITNESS:  She not only
 2           brought to the meeting.  She had her
 3           computer.  There were some things she
 4           would pull up as we talked through.
 5           Q.    (BY MR. INNES)  And I believe
 6    your testimony earlier was that you were
 7    reviewing these orders that -- well, strike
 8    that.
 9                    In order for you to review an
10    order, in order to get to this -- strike
11    that.
12                    In order for an order of
13    interest to reach this level on the process,
14    it first had to be identified as an order of
15    interest; is that correct?
16           A.    Correct.
17           Q.    And it would be identified as
18    an order of interest because it was
19    potentially unusual size?  Is that right?
20           A.    That was one of the criteria,
21    but it was about thresholds.
22                    If I walk you back through the
23    process, it was about when they -- when
24    Reddwerks -- when the thresholds were
25    triggered.  And then that -- that's an order
```

1    of interest, and that order of interest would

2    go over to the SOM team.

3              And that order of interest --

4              So it carried that order of

5    interest.

6        Q.    How was an order -- how are you

7    defining "order"?

8              What is an order exactly?

9        A.    An order is when you get a --

10   through the system, there is -- the orders

11   are downloaded into the DC.  Those orders are

12   downloaded into the DC system.

13             Orders are downloaded.

14       Q.    And at the time, June '17

15   through May '18, you don't have an

16   understanding as to how exactly Reddwerks

17   flagged an order of interest?

18             MS. TABACCHI:  Object to the

19        form.

20             THE WITNESS:  Well, you said --

21        what are the dates you're quoting?

22             MR. INNES:  Let me clean that

23        up.

24       Q.    (BY MR. INNES)  What was the

25   time period -- what portion of the time

Highly Confidential - Subject to Further Confidentiality Review

1    period when you were in that -- of -- strike

2    that.

3              When did Walmart cease using

4    Reddwerks as part of its suspicious order

5    monitoring program?

6         A.    November of '17.

7         Q.    Okay.  So between June '17 and

8    November of '17, you're not aware of how

9    Reddwerks identified an order of interest; is

10   that correct?

11             MS. TABACCHI:  Object to the

12        form.

13             THE WITNESS:  I am aware that

14        there were thresholds, and I am aware

15        that Reddwerks -- those thresholds is

16        what triggered an order of interest.

17        Q.    (BY MR. INNES)  Okay.  And do

18   you have any idea if those thresholds

19   identified orders of unusual frequency?

20             MS. TABACCHI:  Object to the

21        form.

22             THE WITNESS:  It's my

23        understanding they identified -- they

24        just triggered -- they triggered with

25        unusual patterns.

1    Q.    (BY MR. INNES)  So it's your

2  understanding that the Reddwerks thresholds,

3  between June of '17 and November of '17

4  triggered orders of unusual patterns?

5    A.    Correct.

6    Q.    Did it trigger any other kind

7  of order?

8         Strike that.

9         Was Reddwerks triggered by any

10  other type of order?

11    A.    So I think I -- the threshold

12  piece, I don't have the -- the threshold

13  piece, it was triggered -- the system

14  triggered a threshold.  The threshold then

15  indicated whether it was an order of

16  interest.

17    Q.    Was that threshold based only

18  on unusual frequency?

19         MS. TABACCHI:  Object to the

20    form.  Lack of foundation.

21         THE WITNESS:  So I'm not the

22    expert on that threshold.  Those

23    thresholds were -- I'm not the expert.

24    Q.    (BY MR. INNES)  So what is

25  it -- what's your understanding of -- strike

1    that.

2              The SOM team that you described

3    as part of this process, the members of the

4    SOM team reported up through the chain of

5    command to you; is that right?

6         A.    Correct.

7         Q.    Did they report directly to

8    you?

9         A.    Correct.

10        Q.    There was no one between the

11   SOM team and you?

12        A.    Correct.

13        Q.    And the SOM team was, if I

14   understand the process correctly, in June of

15   '17 through November of '17, was tasked with

16   reviewing orders of interest that had been

17   flagged by Reddwerks; is that correct?

18        A.    That is correct.

19        Q.    And it is your testimony that

20   they performed trend analysis on those orders

21   of interest.

22        A.    They performed trend analysis,

23   the two-, the five-, and the eight-week.  And

24   they also performed analysis that was vetted

25   through compliance.  And so there was a list

1    of questions that they did the analysis as it

2    relates to that information.

3         Q.    Was the trend analysis -- was

4    the trend analysis able to identify orders of

5    unusual frequency?

6              MS. TABACCHI:  Object to the

7         form.

8              THE WITNESS:  The -- I'm not

9         sure.

10        Q.    (BY MR. INNES)  Did the trend

11   analysis identify orders of unusual size?

12             MS. TABACCHI:  Object to the

13        form.

14             THE WITNESS:  I'm not sure.

15        Q.    (BY MR. INNES)  Did the trend

16   analysis identify unusual patterns?

17        A.    I'm not the expert on the trend

18   analysis.

19        Q.    Did the criteria that you

20   described, was it provided by compliance?

21        A.    Yes.

22        Q.    Okay.  Was the criteria that

23   was provided by compliance to the folks in

24   the SOM team that you oversaw, were those

25   criteria aimed at identifying orders of

```
 1    unusual frequency?

 2               MS. TABACCHI:  Object to the

 3         form.

 4               THE WITNESS:  Yes.

 5         Q.    (BY MR. INNES)  They were.  And

 6    what's your basis for that statement?

 7         A.    Because the -- that's the --

 8    our policy.  So our policy is to identify --

 9    it's to identify patterns.  It's to identify

10    unusual orders.  And the criteria that

11    compliance set out was geared back towards

12    accomplishing that -- those policies, so ...

13         Q.    How do you know that that

14    was -- that the criteria that compliance set

15    out was geared back towards accomplishing

16    those policies?

17         A.    Because I was told.  Miranda

18    told me.  She said, "Debbie, we have -- we've

19    vetted out the questions and the analysis

20    that your team is running based on what we're

21    trying to -- the -- based on the policy."

22         Q.    Okay.  And at this point you're

23    aware that the country is in an opioid

24    crisis.  That is correct; right?

25         A.    Yes.
```

1      Q.     And at this time you're

2  overseeing a team that's implementing this

3  criteria; is that right?

4      A.     Yes.

5      Q.     And that team is, at that -- at

6  least at that point in the process, has an

7  ability to clear an order of interest and

8  ship it; is that right?

9      A.     Incorrect.

10     Q.     They can --

11     A.     They're the analysis piece of

12 the business.

13            So they would do the analysis.

14 The only time they had the ability to

15 override it was if there was a keying error,

16 a significant keying error.

17     Q.     What's a keying error?

18            I didn't mean to cut you off.

19     A.     No, I'm done.

20     Q.     What is a keying error?

21     A.     So, for example, if they called

22 the store -- if they saw an order that had

23 20,000 ordered in the order of a particular

24 item, and they called the store, of which is

25 in policy, that they're to call the techs

Highly Confidential - Subject to Further Confidentiality Review

1    and/or the pharmacist.  And so they would

2    make that phone call.

3              And they say, oh, that --

4    that -- that is clearly -- "We just had a

5    keying error."  And so they had the ability

6    to say -- based on the conversation and based

7    on the information given from the pharmacy at

8    store level, they had the ability to take it

9    to the -- to -- or whatever the pharmacist

10   said.

11        Q.     The information that you just

12   described there that goes into that

13   investigation, is that documented anywhere?

14        A.     In Archer.

15        Q.     Archer.

16              Does the logistics team

17   consider an order -- that was identified as

18   an order of interest, but was determined to

19   be a keying entry --

20        A.     A what?  Keying?

21        Q.     A keying error -- is that no

22   longer an order of interest?

23        A.     It means that there was a

24   keying error.  That's what it means.  And it

25   means that they -- when there's an obvious

1    keying error, they had the ability to go in

2    and make that adjustment based on the

3    information they were given.

4        Q.    What do you mean by "obvious

5    keying error"?

6        A.    Whenever -- it's the

7    information they get from the -- from the

8    store.  When the -- the -- when the -- when

9    the store says, "No, it wasn't 20 we

10   ordered" -- we -- or "We ordered 20, we meant

11   to order two," then -- then they -- the SOM

12   team had the ability to go in and put the two

13   in there, and they documented it every time

14   they did it.

15       Q.    So in that situation, the

16   pharmacist who's now -- who has keyed in, say

17   50,000.  I'll use this as an example.  Say

18   50,000.  Strike that.

19            2,000.  Pharmacist keyed in

20   2,000.  It's at the SOM team for review.

21   They've identified this as an order of

22   interest and they --

23       A.    Oh, they didn't identify it as

24   an order of interest.

25       Q.    Reddwerks identified it as --

1          A.      (Witness nods.)

2          Q.      Okay.  So it's reached their

3    desk as an order of interest that needs

4    further review; is that correct?

5          A.      Correct.

6          Q.      And in this example, an order

7    of 2000, they might give a call to the

8    pharmacist; is that right?

9          A.      There's a process to give a

10   call to.  They had to contact every store.

11   It's not that they might give a call.  There

12   was a process.

13         Q.      At what -- what level of --

14               For every order of interest,

15   they were required to contact the pharmacist?

16         A.      (Witness nods.)  They called.

17   They called the -- the pharmacy; right?

18         Q.      So for every order of interest

19   that made it -- that was identified by

20   Reddwerks in that time period, June to

21   November of '17, that landed with the SOM

22   team that you oversaw, each one of those

23   orders required -- was required -- the team

24   was required to make a call to the pharmacy

25   for each one of those orders?

```
 1              MS. TABACCHI:  Object to the

 2         form.

 3         Q.     (BY MR. INNES)  Is that

 4    correct?

 5         A.     Yes.

 6         Q.     And those telephone calls would

 7    be documented in Archer?

 8         A.     Those telephone calls where

 9    there were adjustments made.  If there -- if

10    there was that 2000 to 2, that would be

11    documented in Archer.  But the whole

12    telephone call would not be documented.

13         Q.     Okay.  Would -- were they --

14    were the SOM team members required to put in

15    notes of every single call that they placed

16    to a pharmacy?

17              MS. TABACCHI:  Object to the

18         form.

19              THE WITNESS:  I don't know --

20         I'm not aware that they were required

21         to put in notes of every single call.

22         Q.     (BY MR. INNES)  So a SOM team

23    member could have possibly called a pharmacy

24    and not recorded that in Archer?

25              MS. TABACCHI:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          form.
2                    THE WITNESS:  What was reported
3          in pharmacy was -- or in Archer was if
4          they had -- if there was an
5          adjustment.
6                    MR. INNES:  Okay.  Thanks for
7          that clarification.
8          Q.    (BY MR. INNES)  So the
9  information that is entered into Archer by
10 the SOM team member was that -- strike that.
11                   The SOM team members only made
12 an entry in Archer if they adjusted the
13 order; is that correct?
14                   MS. TABACCHI:  Object to the
15         form.
16                   THE WITNESS:  There could have
17         been other times they put additional
18         information that was from that
19         conversation.  It wasn't the -- there
20         were potentially times that they could
21         have put additional information in
22         Archer.
23         Q.    (BY MR. INNES)  Such as -- what
24 would -- what are examples of those types
25 of --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     I don't have an example.

 2              Q.     So this is the team that you

 3      oversaw regarding --

 4              A.     Correct.

 5              Q.     -- the evaluation at the

 6      logistics level on orders of interest; is

 7      that right?

 8              A.     Correct.

 9              Q.     And during this time period,

10      you're aware of the opioid crisis; is that

11      right?

12              A.     Correct.

13              Q.     And did you ever inquire --

14      strike that.

15                     Did you ever speak with members

16      of your team to make sure that they were

17      documenting information from phone

18      conversations with pharmacists?

19              A.     So our -- we had -- there

20      were -- I had various conversations with the

21      three members of that team to ensure that we

22      had the appropriate -- appropriate processes

23      in place, and that we were following those

24      processes.

25                     MR. INNES:  I'm going to move
```

1          to strike that answer.

2          Q.    (BY MR. INNES)  My question is

3     very specific.

4               Did you ever speak with members

5     of your team to make sure that they were

6     documenting their telephone calls with

7     pharmacists?

8          A.    I spoke to members of my team

9     in regards to ensuring that the proper

10    processes and the proper -- that we were

11    following the processes in place.

12              MR. INNES:  Move to strike that

13         as nonresponsive as well.

14         Q.    (BY MR. INNES)  The question

15    is -- it's "yes" or "no."  Did you ever speak

16    with your team members to ensure that they

17    were documenting their telephone

18    conversations with pharmacies in Archer?

19              MS. TABACCHI:  Objection, asked

20         and answered.

21              You may -- you may answer the

22         question.  I'm just asserting an

23         objection.

24              THE WITNESS:  The -- I spoke to

25         our team members about -- I don't

1    recollect if I spoke specifically

2    about whether they had the right

3    things in Archer.  I spoke to process.

4         MR. INNES:  Thank you.

5         Q.    (BY MR. INNES)  So at the SOM

6    team -- at the SOM team review level, could a

7    determination be made that an order of

8    interest was an appropriate order, other than

9    this keying information error that you

10   described?

11        A.    Not to my knowledge.

12        Q.    So at the SOM team level,

13   what's the purpose of a two-, five-, and

14   eight-week trend analysis if all you're

15   looking at is keying errors?

16        A.    That's information that is

17   ultimately passed on to Miranda/Roxy.

18             So their job was to do

19   analysis -- the SOM team was to do analysis.

20   And that was information passed along.

21        Q.    And at that level --

22             So they performed an analysis,

23   but no one at that level had decision-making

24   authority as to whether an order of interest

25   was appropriate or not?

1          MS. TABACCHI:  Object to the

2      form.

3          THE WITNESS:  So like we've

4      covered, they did have, if in fact

5      they -- when they called the

6      pharmacist and the pharmacist said,

7      "Oh, no, that's an incorrect order or

8      size," and they corrected it, made the

9      notation in Archer, then they had that

10     ability in that circumstance.

11     Q.    (BY MR. INNES)  Okay.  What did

12 you do, if anything, to ensure or verify that

13 your direct reports, the members of the SOM

14 team, were carrying out that policy

15 accurately?

16     A.    I had one-on-one conversations

17 with them on a regular basis.  And we covered

18 process, or -- you know, what -- what did --

19 what do the processes -- what are those

20 processes, and are we complying to the

21 process that relates back to the policy.

22 That's the conversation that I had.

23     Q.    Did you cover the processes in

24 the context of a specific order evaluation?

25          MS. TABACCHI:  Object to the

1         form.

2              THE WITNESS:  Repeat that

3         again, please?

4         Q.    (BY MR. INNES) These

5  conversations that you had with them on a

6  regular basis, were they in the context of

7  specific evaluations that they had done on

8  potential orders of interest?

9         A.    No.

10        Q.    Did you ever review orders that

11  were cleared for shipment because they were

12  identified as keying errors?

13        A.    No.

14        Q.    Is there a report of orders of

15  interest that were cleared for shipment

16  because they were keying errors?

17              MS. TABACCHI:  Object to the

18        form.

19              THE WITNESS:  You could find it

20        in Archer.

21        Q.    (BY MR. INNES)  Have you ever

22  reviewed Archer?

23        A.    No.

24        Q.    Have you ever asked for an

25  output of Archer?

1      A.      No.

2      Q.      Have you ever asked for access

3   to Archer?

4      A.      No.

5      Q.      How do you know what Archer is?

6      A.      Because when I sat down to talk

7   to the team, they communicated to me that

8   it's the document that they put the

9   information in.

10      Q.      Did you ever ask any of your

11   team members to show you a view of Archer?

12      A.      No.

13      Q.      In any of the -- I'm going to

14   skip forward in the process.

15              In your meeting with Roxy and

16   Miranda, did you ever view an Archer --

17   information that was in Archer as part of

18   that review process?

19      A.      I did.

20      Q.      Did you review that

21   information?

22      A.      Roxy reviewed it with me.  She

23   made the presentation, because she would say,

24   "And this is what is in Archer."

25      Q.      So I want to make sure your

Highly Confidential - Subject to Further Confidentiality Review

 1    testimony is clear on this point.

 2              Earlier I asked you, "Have you

 3    ever reviewed Archer?"  Your testimony was

 4    "No."  And now I've just asked you, "Did you

 5    review Archer in the meetings with Miranda

 6    and Roxy?"  You state that you did.

 7          A.    So let me clean that up.

 8              So the answer is that I didn't

 9    review Archer.  Roxy reviewed it with me.

10              And so when we were in our

11    meetings, she would say, "And here, Debbie,

12    is what is in Archer."  And that was part --

13    that was part of the conversation.

14          Q.    Sure.  So your knowledge and

15    access -- so your knowledge of what was

16    contained in Archer is based on what Roxy has

17    told you is in Archer?

18          A.    What she told and showed me.

19    Sometimes she would turn her computer around

20    and I would see a screen.  Say, "Here's what

21    it is, Deb."

22          Q.    What did you see?

23          A.    I don't recall.  But she would

24    explain, "This is in Archer."  She'd say,

25    "See here?"  And I'm like, "Okay."

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     Did you read it?

2     A.     Yes.

3     Q.     Did you study it?

4     A.     I read it.

5     Q.     Did you read every word on the

6     page?

7                    MS. TABACCHI:  Object to the

8            form.

9                    THE WITNESS:  I don't recall if

10           I read every word on a page.

11    Q.     (BY MR. INNES)  But you read

12    the information on the screen?

13    A.     I read what she turned around

14    to me and showed me, yes, I read it.

15    Q.     Okay.  So I believe your prior

16    testimony today was in these meetings you

17    only received information orally.  Do you

18    want to change that testimony now?

19    A.     So the answer is she gave it to

20    me orally.  So it is -- so my testimony is

21    that she gave it to me orally.  And there

22    were very few occasions that she'd turn the

23    computer around and say ...

24                    But I got that information

25    orally from her first.

```
1        Q.     So my question is, how did you
2    get the information from Roxy?
3        A.     Orally.
4        Q.     Any other way?
5        A.     Well, on very few occasions she
6    would turn the computer around and say, "Here
7    it is."
8        Q.     Okay.
9               On other occasions did she show
10   you any other information?
11       A.     No.
12              MS. TABACCHI:  Object to the
13       form.
14       Q.     (BY MR. INNES)  Even in
15   passing?
16              MS. TABACCHI:  If you could
17       just pause to allow me to -- to allow
18       Mr. Innes to complete his question and
19       for me to object before you begin.
20              I'm sorry.  Do you want to ask
21       what that was again?
22              MR. INNES:  That's also my
23       fault.  I was asking the questions too
24       quickly, I think.
25       Q.     (BY MR. INNES)  Any other
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    occasions in which Roxy showed you any other
 2    information other than Archer on her computer
 3    screen?
 4                    MS. TABACCHI:  Object to the
 5         form.
 6                    THE WITNESS:  No.
 7         Q.    (BY MR. INNES)  I think I asked
 8    you this, but pardon me.  What did Archer --
 9    what did you see on the screen when she
10    turned it around to you?
11         A.    I saw whatever she was
12    describing.  I mean, it wasn't --
13                    I don't recall right now, but
14    it was whatever she said verbally, and then
15    she said, "See, here it is."  Da, da, da.
16    That's all.
17                    And I don't recall specifics
18    right now.  It was on very few occasions.
19         Q.    Anything that would help you
20    recall those specifics?
21         A.    No.
22         Q.    Did it appear -- are you
23    familiar with Excel?
24         A.    With?
25         Q.    The computer program Excel?
```

1      A.      Yes.

2      Q.      Do you recall if the image she

3   showed you on the screen appeared to be an

4   Excel file?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  I don't recall.

8      Q.      (BY MR. INNES)  Did it look

9   like -- did it appear to be more of a web

10   page, for instance?

11      A.      I don't recall.

12      Q.      Do you recall seeing any

13   drop-down menus on it?

14      A.      No.

15      Q.      Do you recall seeing text with

16   words?

17      A.      I don't recall.

18      Q.      Do you recall seeing a chart?

19      A.      I don't recall.

20      Q.      So if an order wasn't cleared

21   by the SOM team to be an appropriate order

22   but was -- it was next brought to practice

23   compliance; is that correct?

24              MS. TABACCHI:  Object to the

25         form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  It was next
 2         brought to Roxy and team to do some
 3         analysis.
 4              MR. INNES:  Okay.
 5         Q.    (BY MR. INNES)  At that point
 6    did that team have the authority to determine
 7    an order to be appropriate and release it for
 8    shipment?
 9         A.    Not that I'm aware of.
10         Q.    But as the -- in your role at
11    that time, if an order was classified as an
12    order of interest, it would be pending and
13    held in the warehouse; is that right?
14         A.    It's pending, but it doesn't
15    mean it's held in the warehouse.  It --
16              The warehouse actually never
17    sees -- or never -- it's not -- it's not
18    where the warehouse can ship it or it's not
19    in what I call their queue.  So it's not in
20    their queue.
21         Q.    Is it within the walls of the
22    6045 facility at that point?
23              MS. TABACCHI:  Object to the
24         form.
25              THE WITNESS:  When an order is
```

1          pending, it goes over to the SOM team,

2          and so therefore, it is not available

3          to be distributed.

4                  MR. INNES:  I understand.

5          Q.    (BY MR. INNES)  Let me ask it a

6    slightly different way.  That order can't be

7    filled by the distribution center if it is

8    still -- if it's pended; is that right?

9          A.    It is not available to be

10   distributed.

11         Q.    When, in this process, can an

12   order of interest that's been -- be deemed

13   appropriate, other than by the SOM team in a

14   keying error?

15                 MS. TABACCHI:  I'm sorry, could

16         you say that -- could you just repeat

17         that?  I didn't --

18                 MR. INNES:  I can rephrase it,

19         if that's the objection.  Or if there

20         is an objection.

21                 MS. TABACCHI:  I couldn't hear

22         you.  I'm sorry, I just couldn't hear

23         you.

24         Q.    (BY MR. INNES)  In the process

25   that you've described in June of '17 to

1  November of '17, at what stage in that

2  process can an order of interest be cleared

3  for shipment?

4          MS. TABACCHI:  Object to the

5      form.

6          THE WITNESS:  So we've talked

7      through it can be cleared if, in fact,

8      they -- the SOM team had called the

9      pharmacist.  So we've walked through

10     that scenario.

11         MR. INNES:  Correct.

12         THE WITNESS:  And then it could

13     be cleared after the -- Miranda, Roxy,

14     Debbie, if, in fact, it was determined

15     not to be an order of interest or

16     suspicious order, not to be suspicious

17     order, and then that information would

18     be put back in Archer.  And then

19     that -- at that point then it can be

20     cleared.  It is cleared.

21     Q.   (BY MR. INNES)  And, again,

22  carving out the keying entry error, the only

23  time in this entire process, once an order of

24  interest has been flagged by Reddwerks, that

25  it can be released for shipment is after the

1    meeting with Roxy and Miranda and yourself

2    and you've determined it to be an appropriate

3    order.

4              MS. TABACCHI:  Object to the

5         form.  Lack of foundation.

6              Misstates testimony.

7              THE WITNESS:  So you said Roxy

8         and Miranda and Debbie.  I have a

9         representative that can also be there.

10        That's one scenario that I could see

11        wouldn't be true with the statement

12        you just made.

13             Would you like to repeat it so

14        I can --

15             MR. INNES:  Sure, I can

16        rephrase this question.

17        Q.    (BY MR. INNES)  So in this

18   process that you've described between June of

19   '17 and November of '17, the only time that

20   an order of interest can be cleared for

21   shipment, other than the SOM team's

22   evaluation of a keying error, determination

23   of a keying error, is after the meeting

24   between Roxy, Miranda, and yourself or the

25   appropriate designees?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. TABACCHI:  Object to the
2         form.
3              THE WITNESS:  To the best of my
4         knowledge.
5         Q.    (BY MR. INNES)  Can you think
6    of any other time in the process that an
7    order would ship from DC 6045 when it hadn't
8    been cleared through that meeting or by a
9    keying entry?
10        A.    To the -- to the best of my
11   knowledge, your statement was correct.
12             MS. TABACCHI:  Michael, let me
13        know whenever you're ready to break
14        for lunch.  I know our food is out
15        there.
16             MR. INNES:  Let me see if I
17        can't just close out this line.  It
18        might take 15 to 20.  Unless you guys
19        are hungry and you want to take a
20        break now, we can do that.  It's --
21             MS. TABACCHI:  Okay.
22             MR. INNES:  I'm leaving it in
23        your hands.  However you want to do
24        it.
25             MS. TABACCHI:  I mean, if you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              have 20 more minutes, I'd just as soon

 2              take a break.  But if you have a few

 3              more minutes --

 4                   MR. INNES:  That's okay.  No,

 5              we can take a break.

 6                   MS. TABACCHI:  Okay.

 7                   THE VIDEOGRAPHER:  11:46.  We

 8              are off the video record.

 9                   (Recess taken, 11:46 a.m. to

10              12:38 p.m.)

11                   THE VIDEOGRAPHER:  12:38.  We

12              are on the video record.

13         Q.    (BY MR. INNES)  Good afternoon,

14    Ms. Hodges.  We're back on the record.  You

15    understand you're still under oath?

16         A.    Correct.  Yes.

17         Q.    I want to bring you back to the

18    process we've been describing between the

19    time period of June '17 and November of '17,

20    for evaluation of orders of interest.

21                   Specifically I want to talk

22    about the SOM team.  And I'm curious if the

23    SOM team, if another name for that is the

24    pharmacy logistics order monitoring team?

25         A.    Yes.
```

1    Q.    And is it your understanding

2   that Walmart's policy that was in place at

3   the time required the Pharmacy Logistics

4   Order Monitoring Team to submit documentation

5   related to the outstanding order of interest

6   to the health and wellness director of

7   controlled substances?

8              MS. TABACCHI:  Object to the

9         form.

10             THE WITNESS:  It was my

11        understanding that the SOM team placed

12        information in Archer.

13             [Phone interruption.]

14             (Discussion off the record.)

15   Q.    (BY MR. INNES)  So is it your

16  understanding that the documentation that the

17  Pharmacy Logistics Order Monitoring Team

18  provided to the health and wellness director

19  of controlled substances was done by Archer?

20             MS. TABACCHI:  Object to the

21        form.

22             THE WITNESS:  It's my

23        understanding that they did put

24        information in Archer.  They also -- I

25        know there was other -- potentially

Highly Confidential - Subject to Further Confidentiality Review

1          other methods, perhaps, that they did,

2          but I know they put information in

3          Archer.

4          Q.    (BY MR. INNES)  What are those

5     potential other methods that they used to

6     provide information?

7          A.    I don't recall what the other

8     methods were, but I know Archer was one of

9     them.

10         Q.    Are you sure that there's

11    methods other than Archer that were used to

12    convey that information?

13         A.    I don't recall.  That's why I

14    said -- I know Archer was a method.  But

15    there possibly -- potentially could have been

16    other methods.

17         Q.    And why do you say there

18    "potentially could have been other methods"?

19         A.    I say that because there

20    potentially could have been other methods,

21    and Archer was one of them.

22         Q.    What gives you the basis for

23    that belief that there are potential other

24    methods?

25              MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  The basis that

3          there potentially have been other

4          methods.

5          Q.    (BY MR. INNES)  Such as?

6          A.    I don't know what those are.

7     But there potentially could have been other

8     methods that they would have communicated.

9          Q.    Could they have been provided

10    by email?

11                   MS. TABACCHI:  Object to the

12         form.

13                   THE WITNESS:  I don't know what

14         they could have been, but there could

15         have been others besides Archer.

16         Q.    (BY MR. INNES) Did you ever see

17    documentation provided to the health and

18    wellness director of controlled substances

19    from the SOM team that you monitored -- that

20    you were in charge of, provided, to that

21    director, in any other method than Archer?

22                   MS. TABACCHI:  Objection, form.

23                   THE WITNESS:  I don't recall.

24         Q.    (BY MR. INNES)  Is there

25    anything that could refresh your

1    recollection?

2         A.    I don't know of anything that

3    would refresh it.

4         Q.    Is it your understanding that

5    the policy in place between June '17 and

6    November of 17 was that the pharmacy

7    logistics order monitoring team was to submit

8    documentation relating to the outstanding

9    order of interest to the vice president of

10   pharmacy logistics?

11               MS. TABACCHI:  Object to the

12          form.

13               THE WITNESS:  So I'm not

14          sure -- I see you're referring to some

15          kind of paperwork.

16        Q.    (BY MR. INNES)  Would you like

17   me to read back the question?

18        A.    Please.

19        Q.    Is it your understanding that

20   the policy in place between June '17 and

21   November of '17 was that the pharmacy

22   logistics order monitoring team was to submit

23   documentation relating to the outstanding

24   order of interest to the vice president of

25   pharmacy logistics?

1      A.     I don't recall that being the

2  exact wording.

3      Q.     Who was the vice president of

4  pharmacy logistics between June '17 and

5  November of '17?

6      A.     I was.

7      Q.     And do you remember receiving

8  documentation of orders of interest from the

9  logistics order monitoring team?

10     A.     From the logistics -- I don't

11  recall.

12     Q.     Did you receive documentation

13  of orders of interest from the logistics

14  order monitoring team between June '17 and

15  November of '17?

16     A.     I don't recall.

17     Q.     Is there anything that could

18  refresh your recollection as to whether you

19  received such documentation during that time

20  period from the Logistics Order Monitoring

21  Team?

22     A.     I'm not aware of anything.

23     Q.     You're not aware of anything

24  that could refresh your recollection as to

25  that information?

```
 1              A.     Yes.  Correct.

 2              Q.     As you sit here today, is it

 3       your recollection that the only method by

 4       which you reviewed information regarding

 5       orders of interest compiled by the logistics

 6       order monitoring team was during your

 7       meetings with Miranda Johnson and Roxy Reed?

 8                     That's my question.

 9              A.     You're going to have to repeat

10       that question, because it was rather lengthy

11       there.

12              Q.     I had the wrong inflection on

13       the end as well, so ...

14                     As you sit here today, is it

15       your recollection that the only method by

16       which you reviewed information regarding

17       orders of interest compiled by the logistics

18       order monitoring team was during your

19       meetings with Miranda Johnson and Roxy Reed?

20              A.     There could have been.  My

21       recollection is those were the only ones that

22       I recall, but there could have been others.

23       There could have been other methods.

24              Q.     I think your prior testimony

25       was the only time that you saw information
```

Highly Confidential - Subject to Further Confidentiality Review

1    from this team was received orally from

2    Roxy Reed during those meetings, as well as

3    when Roxy showed you her computer screen on

4    several occasions.

5              Is that correct?

6    A.    The answer is the -- as I sit

7    here, that's what I recollect.

8              You know, it's been -- it's

9    been a year since I've had -- since this

10   event happened.  So with that year timeframe.

11   So that's what I recollect.

12             And also -- also -- well, it's

13   been a year.

14   Q.    It's been a year since what?

15   I'm unclear as to what --

16   A.    Since the June timeframe to

17   the -- since the June timeframe that you're

18   speaking about.

19   Q.    To be clear, I'm also asking

20   you the entire timeframe between June '17 and

21   November of '17.

22   A.    Okay.

23   Q.    Is that your understanding?  Do

24   you want to change any of your testimony in

25   light of that understanding?

1    A.    No.  I just said it's been a

2  timeframe.  So that's the best of my

3  recollection.  But it has been -- you know,

4  there's been some time lapse there.

5    Q.    During that time period,

6  Walmart was receiving orders for Schedule IIs

7  from pharmacies on a daily basis; is that

8  right?

9         MS. TABACCHI:  Object to the

10        form.

11        THE WITNESS:  We were -- the

12        system received in orders.

13        Not every day, but on a -- not

14        every day.

15    Q.    (BY MR. INNES)  How many orders

16  of interest, ballpark, do you think you

17  reviewed between June of '17 and November of

18  '17?

19    A.    I couldn't recall that.

20    Q.    Ten?

21    A.    I couldn't recall that.

22    Q.    More than a thousand?

23    A.    I couldn't recall that.

24    Q.    Do you recall how many

25  meetings -- strike that.

1          How many meetings did you have

2   with Roxy and Miranda regarding the

3   evaluation of orders of interest?

4              MS. TABACCHI:  Object to the

5         form.  Asked and answered.

6              THE WITNESS:  I don't recall

7         how many meetings there were.

8         Q.    (BY MR. INNES)  Did you have at

9   least one a month during that time period?

10        A.    Yes.

11        Q.    Did you have more than five on

12  an average month?

13        A.    Yes.

14        Q.    So from the time period between

15  June '17 and November '17, you had, on

16  average, one meeting a week to review orders

17  of interest with Miranda and Roxy, or their

18  designees; is that right?

19              MS. TABACCHI:  Object to the

20        form.  Misstates the prior testimony.

21              THE WITNESS:  It's not correct

22        as to what I've previously testified.

23        I previously testified there were

24        somewhere between one and two of those

25        meetings, but it depended on the

1    number of orders that we were to

2    review that came as potential orders

3    of interest.

4        Q.    (BY MR. INNES)  So I believe

5    your testimony is also that, in response to

6    my question did you have more than five on an

7    average month, you said yes.  Is that

8    correct?

9        A.    Correct.  That would be -- more

10   than five would be a difference between if

11   had you two to three -- or two -- one to two

12   a week.

13        MS. TABACCHI:  I'm happy to

14        clarify, but I'm sure you don't want

15        me to jump in.  Go ahead.

16        MR. INNES:  By all means.

17        MS. TABACCHI:  There was a --

18        you switched your question.

19        THE WITNESS:  So you asked if

20        there was more than five a month, and

21        I said yes.

22        MR. INNES:  Right.

23        Q.    (BY MR. INNES)  And how many

24   weeks are in a year -- or I mean a month,

25   rather?

1        A.      I didn't hear what you just

2    said.

3        Q.      How many weeks are in a month?

4        A.      Typically four.

5        Q.      And you had five meetings in a

6    month.

7        A.      No, you --

8                MS. TABACCHI:  Object to the

9        form.

10       Q.      (BY MR. INNES)  More than five?

11       A.      Correct.

12       Q.      So you had -- you would average

13   on a -- you would average at least one a

14   week; is that correct?

15       A.      My previous testimony said that

16   there were one to two a week.

17       Q.      Fair enough.  So you had one to

18   two a week between January -- or June of 2017

19   and November of 2017.

20       A.      Yes.

21       Q.      And you still can't recall if

22   you received documents ...

23               Strike that.

24               MS. TABACCHI:  I'm sorry, are

25       you finished?

1              MR. INNES:  Strike that.  I got

2        twisted there.

3        Q.    (BY MR. INNES)  At any point in

4    time, did you receive documentation regarding

5    any order of interest?

6        A.    I don't recall.

7              MS. TABACCHI:  Object to the

8        form.

9        Q.    (BY MR. INNES)  Do you mean

10    that you don't recall whether or not you

11    received the document?

12             MS. TABACCHI:  Object to the

13        form.

14        Q.    (BY MR. INNES)  I'm trying to

15    clear up --

16        A.    Would you like to restate the

17    question?  I'm sorry.  I thought you were --

18        Q.    Would you like me to restate

19    the question?

20        A.    Please.

21        Q.    Your testimony is that any --

22    you don't recall whether you received

23    documentation regarding any order of

24    interest; is that right?

25             MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

 1          form.  Misstates testimony.

 2          Q.    (BY MR. INNES)  There's a

 3   question pending.  If you don't understand

 4   it, you can let me know and I can --

 5          A.    I don't.

 6          Q.    What do you not recall?

 7          A.    I don't recall if I received

 8   any documentation.

 9          Q.    So you could have received that

10   documentation.  You just don't recall whether

11   or not you received the documentation?

12                MS. TABACCHI:  Object to the

13          form.

14                THE WITNESS:  Yes.

15          Q.    (BY MR. INNES)  And it could

16   also be the case that you never received that

17   documentation; is that correct?

18                MS. TABACCHI:  Object to the

19          form.

20                THE WITNESS:  I don't recall.

21          Q.    (BY MR. INNES)  That's not the

22   question.  The question is it could also be

23   the case that you did not receive that

24   documentation.

25                MS. TABACCHI:  Same objection.

1          Object to the form.

2                    THE WITNESS:  The -- and I

3          don't recall if I received any

4          documentation.

5          Q.    (BY MR. INNES)  Is it possible

6     that you could have received documentation?

7          A.    I don't recall if I received

8     any.  I don't recall.

9          Q.    Do you recall there being a

10    time when there was an order of evaluation

11    under the -- I'm sorry, there was an order of

12    interest evaluation, meaning that you and --

13    you were not available for?

14         A.    I remember giving a

15    designated -- having Ramona sit in for me as

16    a designated representative.

17         Q.    And was Ramona approved by the

18    controlled substance advisory panel to be

19    your delegate at that meeting?

20                    MS. TABACCHI:  Object to the

21          form.

22                    THE WITNESS:  Ramona was the

23          one that I asked to attend in my

24          place.

25         Q.    (BY MR. INNES)  Slightly

1   different question.  I understand that you

2   asked her to attend in your place.  My

3   question is whether or not she was approved

4   by the controlled substances advisory panel

5   as your designee.

6          A.     I don't recall.

7          Q.     Do you not recall or do you not

8   know?

9          A.     I don't recall.

10         Q.     Do you recall a process by

11  which you notified the controlled substance

12  advisory panel of intention to name

13  Ms. Sullins as your designee?

14         A.     Repeat the -- I didn't hear

15  that first part of that question.

16         Q.     Sure.  I'm sorry.  I think I

17  was looking down again.

18                Do you recall a point in time

19  by which you notified the controlled

20  substance advisory panel of intention to name

21  Ms. Sullins as your designee?

22         A.     No, I don't recall.

23         Q.     Is it your understanding of the

24  policies that were in place between June 2017

25  and November 2017 that your designee for

1    those meetings was to be approved by the

2    controlled substance advisory panel?

3         A.    I don't recall that.

4         Q.    Would there be something that

5    would help refresh your recollection as to

6    that requirement?

7         A.    I'm not aware of anything.

8         Q.    As the vice president of health

9    and wellness between June 2017 and

10   November '17, did you have familiarity with

11   the policies that were in place regarding

12   your roles and responsibilities?

13        A.    I certainly have familiarity.

14   But as you sit here today, you're not

15   familiar with the requirement that your

16   designee in the controlled -- in the order of

17   interest evaluation meetings be approved by

18   the controlled substance advisory panel?

19             MS. TABACCHI:  Object to the

20        form.

21             THE WITNESS:  I just don't

22        recall every bit of that memorized

23        policy.

24        Q.    (BY MR. INNES)  As you sit here

25   today, do you have any reason to believe that

1   Ms. Sullins was, in fact, approved by the

2   controlled substance advisory panel as your

3   delegate at the meetings to evaluate

4   potential orders of interest between June '17

5   and November of '17?

6           MS. TABACCHI:  Object to the

7       form, asked and answered.

8           THE WITNESS:  It was my

9       recollection and understanding that

10      she was a designated -- a designated

11      individual that could sit in my place

12      for those meetings.

13      Q.    (BY MR. INNES)  What was the

14  basis for the belief that she was a

15  designated individual that could sit in your

16  place for those meetings?

17      A.    Well, I'd -- I relied on my

18  compliance team.  And so when I was

19  unavailable, I had the conversation, you

20  know, "I'm going to be unavailable."  And

21  Miranda said, "No problem, you've got your

22  designated -- designated person is Ramona."

23          And I said, "Okay.  My

24  designated person is Ramona.  She can sit in

25  my place if she's available.  Let's

1  understand first if she's available."

2      Q.    Did Ms. Johnson designate

3  Ramona to sit in your place or did you

4  designate Ramona to sit in your place?

5      A.    I designated.  Miranda simply

6  communicated to me that that was appropriate

7  and had been done, practice.

8      Q.    Miranda communicated your

9  designation of Ms. Sullins back to you?

10          MS. TABACCHI:  Object to the

11      form.

12          THE WITNESS:  No, she did not.

13      I think we're confused here.

14          She -- I designated and

15      Miranda -- Miranda suggested to me

16      that -- that she could be.  And I

17      said, if I have that authority, then

18      she will be my designated.

19          So I designated.  But I was --

20      I was, again, back when we were pre --

21      in my previous testimony, that, you

22      know, this was a learning process and

23      so I was going through this.  And so I

24      relied upon any compliance team

25      members to give me -- to help me work

```
 1              through that.  And that's exactly --
 2              Miranda said, "The practice is she can
 3              be your designated," and I said,
 4              "Okay."  I will designate her then."
 5              That's how that worked.
 6          Q.     (BY MR. INNES)  Was
 7    Miranda Johnson part of the logistics team at
 8    that point in time?
 9          A.     No.  She was compliance.  And
10    so she's my compliance partner.  And that's
11    who I relied on, my compliance partners.
12          Q.     And was your -- is it your
13    understanding that your role as the health
14    and wellness vice president at that time was
15    governed by policies in the logistics side of
16    the business?
17              MS. TABACCHI:  Object to the
18              form.
19              THE WITNESS:  She -- so the
20              logistics and the compliance team
21              worked very closely together.  And so,
22              in fact, the -- even if it was a -- a
23              supply chain policy, the answer is
24              that compliance, it was -- it was
25              driven, for lack of a better word, --
```

1            Let me take that back.  It
2        was -- it was -- it was --
3            Compliance certainly helped --
4        it was guided by compliance.
5            Q.    (BY MR. INNES)  So that I
6        understand, the -- there is a logistics
7        division at Walmart; is that correct?
8            A.    Correct.  There was a supply
9        chain division at Walmart.
10           Q.    And there is a compliance
11       division at Walmart as well?
12           A.    There is a compliance.
13           Q.    And those are two separate
14       divisions at Walmart?
15               MS. TABACCHI:  Object to the
16           form.
17               THE WITNESS:  Those are two
18           separate forms that work very closely,
19           hand in hand.  And so when it is more
20           of a compliance conversation,
21           certainly the compliance partners
22           weigh in as to what that should be.
23           And weigh in with their suggestions.
24           And so that's what happened in this
25           case.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. INNES:  Okay.  Move to
 2          strike everything after the words
 3          "Separate forms."
 4          Q.    (BY MR. INNES)  Ms. Johnson --
 5    or Ms. Hodges, I'm sorry.  Ms. Johnson was
 6    not in your department; is that right?
 7          A.    Ms. Johnson was in compliance.
 8          Q.    And that was not your
 9    department at the time; correct?
10          A.    Correct.
11          Q.    And Ms. Johnson was, in fact,
12    junior to you at Walmart; is that correct?
13                    MS. TABACCHI:  Object to the
14          form.
15                    THE WITNESS:  Ms. Johnson was
16          in another department and she had a
17          different title.  I'm not even sure
18          what her title is.
19          Q.    (BY MR. INNES)  Well, your
20    prior testimony was -- when we discussed the
21    members and attendees at the order of
22    interest evaluations, your testimony was that
23    you were the senior-most person in that
24    group; is that correct?
25          A.    That is correct.
```

1        Q.      And Ms. Johnson attended

2    that -- those meetings?

3        A.      Correct.

4        Q.      And is Ms. Johnson -- is it

5    consistent to say that Ms. Johnson is junior

6    to you?

7        A.      It is consistent to say that

8    Ms. Johnson is in compliance and doesn't

9    report directly to me, and it is consistent

10   to say she's not at my level.

11       Q.      She's junior to you; correct?

12       A.      Correct.

13       Q.      Is it your common practice to

14   rely on employees at Walmart that are junior

15   to you, in other departments than you, for

16   interpretation of the policies that govern

17   your division?

18               MS. TABACCHI:  Object to the

19          form.

20               THE WITNESS:  So it's my

21          practice to rely on my resources.  And

22          my resources are compliance and legal

23          and -- I've got a lot of different

24          resources.  And those resources are my

25          support system.

Highly Confidential - Subject to Further Confidentiality Review

1           And so, yes, I rely on my

2      support system.

3           And I don't have officers

4      giving me advice on all of those

5      support systems.  I have the -- what

6      is a support system.  And Miranda was

7      clearly in the compliance end of my

8      support system.

9      Q.    (BY MR. INNES)  Who was your --

10  who did you report directly to in June of

11  2017 and November of 2017?

12     A.    Please state the question

13  again.

14           Please state that question

15  again.

16     Q.    Sorry, that was quick.  I'm

17  sorry.

18           Who did you report directly to

19  during the timeframe June of '17 and November

20  of '17?

21     A.    His name is Bryan Boudreaux.

22     Q.    Did you ever consult with

23  Mr. Boudreaux regarding who you should

24  delegate as -- to attend these meetings in

25  your absence?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No.

 2          Q.     Instead, you consulted with

 3   Ms. Johnson; is that right?

 4                 MS. TABACCHI:  Object to the

 5          form.

 6                 THE WITNESS:  I consulted with

 7          Ms. Johnson because she was my support

 8          system.

 9          Q.     (BY MR. INNES)  Are you

10   familiar with the suspicious order monitoring

11   incident form?

12          A.     I'm not sure what you're

13   referring to.

14          Q.     Have you ever heard the term

15   "suspicious order monitoring incident form"?

16          A.     No.

17                 I'm not sure what you're

18   referring to.

19          Q.     You're not sure what my

20   reference to suspicious order monitoring

21   incident form is?

22          A.     I'm not sure what an incident

23   form is.

24          Q.     Okay.

25          A.     What you're referring to.
```

1    Q.    Thank you.

2          Earlier today -- we've covered

3    this again, but I want to go back and ask you

4    some follow-up questions.

5          The SOM team that you -- that

6    you oversaw performed a trend analysis on

7    orders of interest.  And they also reviewed

8    these orders with criteria vetted through

9    compliance.  I believe your testimony on the

10   criteria vetted through compliance was phone

11   calls to the pharmacy regarding keying

12   errors; is that right?

13             MS. TABACCHI:  Object to the

14        form.

15             THE WITNESS:  If that's what I

16        said, I need to course-correct it.

17             But my understanding is that --

18        that that criteria that was -- those

19        questions were vetted through -- were

20        vetted through the compliance team.

21   Q.    (BY MR. INNES)  Okay.  And what

22   were those questions?

23   A.    I don't remember what those

24   questions are.

25   Q.    Okay.  Would you ever see -- do

1    you ever recall seeing a document that listed

2    those questions?

3         A.    I did at one time, but I

4    couldn't tell you what they are.

5         Q.    Okay.  If we had that document,

6    we'd be able to discuss what those criteria

7    were?

8         A.    I would be able to recognize if

9    it said questions vetted through compliance,

10   questions for, da da da, I would be able to

11   tell you that.

12        Q.    Do you ever remember seeing

13   such a document like that?

14        A.    I remember seeing a document of

15   questions.  That's what I remember seeing.

16        Q.    And who showed you that

17   document?

18        A.    I believe -- no.  I don't

19   recall.

20        Q.    Do you remember about the time

21   period that you did see that document?

22        A.    Sure.  It was early on into me

23   picking up the team.

24        Q.    Okay.  So sometime in or

25   about -- sometime after June '17?

1          A.     It would -- sometime in that

2     neighborhood, very -- yes.

3          Q.     It was also my understanding

4     based on your testimony prior to lunch that

5     members of the SOM team could clear an order

6     of interest if there is a keying entry that

7     was egregious and could be resolved; is that

8     right?

9               MS. TABACCHI:  Object to the

10          form.

11               THE WITNESS:  And I think I

12          testified that if there was -- to my

13          understanding and my recollection, if

14          there was an order that was miskeyed,

15          that, in fact, it could -- the team

16          could, with the conversation, go back

17          and adjust that.  Right?

18               But I think there potentially

19          could be other circumstances as well.

20          I'm just not aware of that.

21               MR. INNES:  Okay.

22               THE WITNESS:  I just don't

23          recall that.  I'm not aware.

24          Q.     (BY MR. INNES)  And again, you

25     never reviewed the disposition of the SOM

1    team's review of orders of interest at that

2    level; is that right?

3                    MS. TABACCHI:  Object to the

4         form.

5                    THE WITNESS:  Please ask --

6                    I'm not sure I understand that

7         question.

8         Q.    (BY MR. INNES)  Sure.  Let me

9    try to clear it up.

10                   So the SOM team evaluated

11   orders of interest; is that right?

12        A.    Correct.

13        Q.    Correct?

14                   And there's at least one way

15   that you recall that an order of interest can

16   be updated in Archer to be an appropriate

17   order; is that right?

18        A.    There was one way.  There may

19   have been others.  But I'm -- I can recall

20   one way.

21        Q.    Sure.  And did you ever review

22   those orders that were updated in Archer?

23                   MS. TABACCHI:  Object to the

24        form.

25                   THE WITNESS:  No.  I think I've

1    testified I wasn't in Archer.

2         Q.    (BY MR. INNES)   Okay.   Do you

3    know if we could -- if you were to look at

4    Archer, whether or not you could determine if

5    it was updated by the SOM team?

6         A.    I don't know that I could

7    determine that.

8         Q.    So at this point in time, in

9    June of '17 and November of '17, your team

10   members have the ability to investigate

11   orders of interest and update them as -- to

12   be appropriate orders; is that right?

13        A.    I gave you the one example

14   of -- that I know.   That they -- so they can

15   update and -- or they can -- I think you said

16   review or investigate.   And then they can

17   update in the instance that I recall and

18   know, that -- where, if there is a miskey,

19   that they can -- provided they have the

20   information from the pharmacists, that they

21   can go in and adjust that order.

22        Q.    And these folks report up to

23   you at this point in time, right?

24        A.    Absolutely.

25        Q.    And at this time period, you're

1    aware that the country is undergoing an

2    opioid crisis; is that right?

3           A.    I am.

4           Q.    And at that point, you didn't

5    feel the need to ensure that the folks that

6    you oversaw were releasing orders that had

7    already been identified as orders of interest

8    into the marketplace?

9                 MS. TABACCHI:  Object to the

10          form.

11                THE WITNESS:  The -- would you

12          like to restate that question for me?

13          Q.    (BY MR. INNES)  Do you not

14   understand the question?

15          A.    I didn't get it.  It was too

16   long for me.

17          Q.    From June of '17 until November

18   of '17, you did not feel the need to assure

19   that the folks that oversaw the orders

20   were -- folks you oversaw were releasing

21   orders that had been identified as orders of

22   interest into the marketplace.

23                MS. TABACCHI:  Object to the

24          form.

25                THE WITNESS:  I oversaw the

1      team as I saw appropriate.

2          Q.    (BY MR. INNES)  Did you feel it

3    appropriate not to review the orders that

4    they had released into the marketplace?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  I oversaw the

8         team as was appropriate.

9          Q.    (BY MR. INNES)  Was it

10   appropriate for you not to review those

11   orders that were cleared by your team

12   members?

13             MS. TABACCHI:  Object to the

14        form.

15             THE WITNESS:  I oversaw the --

16        I oversaw the process as I deemed

17        appropriate.

18         Q.    (BY MR. INNES)  Some of those

19   orders were for oxycodone?

20             MS. TABACCHI:  Object to the

21        form.

22             THE WITNESS:  I don't know.

23             MR. INNES:  Some of those

24        orders --

25             THE WITNESS:  Was that a

1      question?

2                  MR. INNES:  Were some of the

3          orders that the SOM team cleared for

4          release and shipment for oxycodone?

5                  MS. TABACCHI:  Object to the

6          form.

7                  Please just give me one second.

8                  THE WITNESS:  I'm not aware.

9      Q.    (BY MR. INNES)  How could you

10     become aware?

11                 MS. TABACCHI:  Object to the

12         form.

13     Q.    (BY MR. INNES)  Strike that.

14                 Did you have the ability at the

15     time to determine the product that your --

16     the SOM team was deemed to be appropriate?

17                 MS. TABACCHI:  Object to the

18         form.

19                 THE WITNESS:  So I oversaw what

20         I thought was appropriate.

21                 MR. INNES:  That wasn't

22         responsive to my question whatsoever.

23     Q.    (BY MR. INNES)  Did you have

24     the ability at the time to determine the

25     product that the SOM team deemed to be

Highly Confidential - Subject to Further Confidentiality Review

```
 1      appropriate?

 2           A.     I don't recall.

 3                  MS. TABACCHI:  Same objection.

 4                  Go ahead.

 5                  THE WITNESS:  I don't recall.

 6           Q.     (BY MR. INNES)  You don't

 7      recall if you had the ability to ask for a

 8      report if -- in Archer, as to what products

 9      the SOM team released?

10           A.     I don't recall.

11                  I don't recall if I asked for

12      a -- asked for ...

13           Q.     Do you recall if you had the

14      ability to ask for it?

15           A.     You certainly have the ability

16      to ask for anything, so ...

17           Q.     Okay.

18           A.     I would.

19           Q.     You would?

20           A.     I have the ability to ask for a

21      lot of things.  So to answer your question

22      would I have the ability, I potentially could

23      have the ability to ask for reports.

24           Q.     Is there anything preventing

25      you from asking for those reports?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. TABACCHI:  Object to the
2        form, asked and answered.
3              THE WITNESS:  I would have the
4        ability to ask for those reports.
5        Q.    (BY MR. INNES)  Is there
6   anything that would deny you that ability?
7        A.    I have the ability to ask for
8   those reports.
9        Q.    Is there anything that would
10  deny that -- your request from being
11  fulfilled?
12             MS. TABACCHI:  Object to the
13        form.
14             THE WITNESS:  I have the
15        ability to ask for the reports.
16        Q.    (BY MR. INNES)  And are you
17  aware of anything that would deny your
18  request for those reports?
19        A.    I have the ability to ask for
20  the reports.
21        Q.    Is that a "no"?
22        A.    I have the ability.
23        Q.    I'm -- we've established quite
24  clearly that you have the ability to ask for
25  it.
```

1     A.    Multiple times here.

2     Q.    And I'm asking whether or not

3  you're aware of anything that would prevent

4  that request from being fulfilled.

5     A.    I --

6           MS. TABACCHI:  Object to the

7        form.

8           THE WITNESS:  I have the

9        ability.

10    Q.    (BY MR. INNES)  You would agree

11  that you never -- even though you had the

12  ability, you never made the request?

13    A.    I don't recall making that

14  request, no.

15    Q.    Do you recall ever receiving a

16  communication saying that you could not have

17  that information?

18    A.    I don't recall seeing any

19  communication saying I did not.

20    Q.    What is an order of interest in

21  June of '17 --

22    A.    You just dropped the first two

23  words.  I apologize.

24    Q.    Sorry.  My fault.

25           In June of 2017 through

Highly Confidential - Subject to Further Confidentiality Review

1    November of 2017, what was an order of

2    interest?

3         A.    My understanding, an order of

4    interest was -- first of all, it was

5    triggered; right?  By the Reddwerks system.

6              Did you say June?  2017?

7         Q.    That's correct.

8         A.    Yeah.

9              So it was triggered in the

10   system, but it was triggered in the system on

11   thresholds.

12        Q.    And when you say "it," I want

13   to come to an understanding of what we're

14   talking about when we're talking about an

15   order.

16        A.    An order?

17        Q.    An order.  What is your

18   understanding of an order at Walmart for the

19   C-II?

20        A.    My understanding of an order is

21   when a -- an order is downloaded into the

22   system.  And so when the order comes from the

23   stores, that is an order, and it is

24   downloaded through the system to the DC.

25        Q.    And when a pharmacy places an

1    order in the system to the DC, it's ordering

2    multiple products at the same time.  Isn't

3    that correct?

4                    MS. TABACCHI:  Object to the

5            form.

6                    THE WITNESS:  An order does --

7            on an order -- you can get multiple

8            items on an order.

9            Q.    (BY MR. INNES)  Okay.  So when

10   you're reviewing orders of interest, are you

11   reviewing the order with multiple -- I just

12   want to make sure I use it right -- multiple

13   items, or are you reviewing a single item?

14                   MS. TABACCHI:  Object to the

15           form.

16                   THE WITNESS:  The order of

17           interest is the -- are the -- what is

18           being reviewed on the order of

19           interest is the item that is of

20           interest, that has triggered -- been

21           triggered into the Reddwerks system.

22           Q.    (BY MR. INNES)  Okay.  I think

23   I understand that.

24                   So it would be more accurate to

25   say we're looking at items of interest?

```
 1                    MS. TABACCHI:  Object to the
 2          form.
 3                    THE WITNESS:  We have called it
 4          orders of interest.
 5          Q.    (BY MR. INNES)  Well, when you
 6   look at an order of interest, are you
 7   considering -- so you're looking at the
 8   single item that's been flagged; is that
 9   right?
10                    MS. TABACCHI:  Object to the
11          form.
12                    THE WITNESS:  So --
13                    MR. INNES:  Strike that.  Let
14          me ask a better --
15                    When you're reviewing an order
16          of interest, you're reviewing the
17          items on that order -- item or items
18          on that order that have been
19          identified by Reddwerks; is that
20          correct?
21                    THE WITNESS:  That have been
22          identified as orders of interest.
23          Q.    (BY MR. INNES)  When you
24   yourself are -- were reviewing orders of
25   interest, did you consider the entire order,
```

1    or just the items that were flagged on that

2    order?

3         A.    So that's out of my area of

4    expertise, because I myself did not review

5    those orders.  You've just couched that --

6    you yourself have reviewed those orders.  I

7    myself did not review those orders when they

8    came in.  My team reviewed those orders.

9         Q.    Okay.  So maybe the confusion

10   is, you're at a different point in time than

11   I am.  You -- you reviewed orders of

12   interest; isn't that right?

13        A.    In the process, I reviewed

14   orders of interest.

15        Q.    At what point in the process

16   did you review orders of interest?

17        A.    We reviewed orders of interest

18   when it got down to Miranda, Roxy, and Debbie

19   reviewing orders of interest.

20        Q.    So let's go to the meeting.

21   When you were in that meeting, were you

22   reviewing the items on the order or were you

23   reviewing the order as a whole?

24        A.    The review was of the items on

25   the order.  The item that was in question on

1    the order.

2         Q.    As part of your consideration

3    of that order of interest, did you also --

4    did you consider the context of -- did you

5    consider the context in which that item was

6    ordered?

7              MS. TABACCHI:  Object to the

8         form.

9              THE WITNESS:  You'll have to

10         give me definition of -- clarify

11         context for me, please.

12         Q.    (BY MR. INNES)  I'm wondering

13    in that order of interest meeting, when you

14    were reviewing the order of interest, did you

15    consider the other items, if any, that were

16    on the order?  Or were you just looking

17    specifically at the flagged order?

18              MS. TABACCHI:  Object to the

19         form.

20              THE WITNESS:  So in that

21         meeting, Roxy would communicate to us

22         a lot of different information.  But

23         if it was one type of drug, she would

24         also communicate to us that same type

25         of drug, just in a different dosage.

```
 1          Q.      (BY MR. INNES)  Can you give me

 2    an example?

 3          A.      No.  I don't even -- I mean,

 4    different -- different pill dosages.

 5          Q.      So let's say -- let's take, for

 6    instance, an order that had -- was flagged

 7    and you're reviewing -- the flagged order is

 8    an Oxy 5.

 9              Would Roxy -- and that same

10    order contains an item for an Oxy 10.

11              In this example, the Oxy 10 has

12    not been flagged.  Was it your understanding

13    that Roxy would explain that the Oxy 5 had

14    been flagged, but that the order also

15    contained an order for Oxy 10?

16          A.      Roxy would provide information

17    on the same drug, but different dosages.

18    That's what she would provide.

19          Q.      I can make this -- maybe if I

20    make the example more generic.

21              Same hypothetical.  If you're

22    reviewing an order of interest, and that's

23    for an opioid A, for 5 milligrams, would Roxy

24    provide information about other opioids,

25    other opioid as on that same order form, for
```

1    different dosages?

2            MS. TABACCHI:  Object to the

3         form.

4            THE WITNESS:  She would provide

5         information -- I don't recollect if

6         she would provide what you've just

7         described, but she would provide

8         information on the same type of drug.

9         Different dosages.

10       Q.    (BY MR. INNES)  But you never

11   saw the actual order form in that review

12   process; is that right?

13           MS. TABACCHI:  Object to the

14        form.

15           THE WITNESS:  I've testified

16        that that communication was verbal.

17       Q.    (BY MR. INNES)  So you can't --

18   sitting here today, you can't say for certain

19   that Roxy accurately recited that order form

20   to you?

21           MS. TABACCHI:  Object to the

22        form.

23           THE WITNESS:  Well, I relied on

24        Roxy, or Miranda, or all of my support

25        staff.  I had no reason to believe

```
 1           that they weren't experts in their

 2           lanes.  No reason.

 3                And so that was my source of

 4           support.  And so there would be no

 5           reason to think that they were going

 6           to mislead me.

 7      Q.    (BY MR. INNES)  Did the trend

 8   analysis run by the SOM team include

 9   different dosages?

10      A.    I don't know that I -- I don't

11   recall.

12      Q.    Do you know -- what can you

13   tell me, if anything, about the trend

14   analysis -- the trend analyses that were run

15   by your SOM team?

16                MS. TABACCHI:  Object to the

17           form.  Asked and answered.

18                THE WITNESS:  I think I've

19           already answered that.  I don't recall

20           the details of that.

21      Q.    (BY MR. INNES)  You don't

22   recall any of the details of that?

23      A.    I didn't say any.  I said I

24   don't recall -- I didn't recall the details

25   of the --
```

1      Q.      (BY MR. INNES)  What details do

2   you recall?

3      A.      I recall that there were

4   analyses run, and I recall that that

5   information then was transferred over to Roxy

6   and team, and she took that information,

7   coupled with the information that she pulled

8   for the analysis, and then collectively, from

9   all of that information, we made the

10  decisions.  That's what I recall.

11     Q.      Where did your team pull the

12  data from to run their analyses?

13             MS. TABACCHI:  Object to the

14        form.

15             THE WITNESS:  My team pulled it

16        out of the system.

17     Q.      (BY MR. INNES)  What system is

18  that?

19     A.      They pulled it out of the

20  system.  And I have no other recollection

21  than that of the system.

22     Q.      Right.  My question is what's

23  the name of that system?  If you don't

24  recall, you don't recall.  I'm just asking

25  what the name of the system is.

1    A.    I don't know what the name of

2    the system is that they pulled it out of.

3    Q.    Do you know how often they

4    pulled the information out of the system?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  They pulled it

8         out of the system every time they had

9         an order of interest.  And so they

10        pulled the analysis out every time

11        they had an order of interest.

12   Q.    (BY MR. INNES)  So there was an

13   individual analysis done for each order of

14   interest?

15   A.    Yes.

16   Q.    And where is a record kept of

17   each of those analyses?

18             MS. TABACCHI:  Object to the

19        form.

20             THE WITNESS:  I don't

21        recollect.

22   Q.    (BY MR. INNES)  Did you ever

23   ask your team members if they ever saved them

24   in a central location?

25   A.    I know they passed them on to

```
1    Roxy.  We were an information gathering, and
2    then they passed them on to Roxy where the
3    decision -- where there was more information
4    coupled with that before it got to the
5    decision process.
6         Q.     How is that information passed
7    from your team to Roxy?
8         A.     I'm not for sure.
9         Q.     Were you ever copied on an
10   email that transmitted that information from
11   your team members to Roxy?
12        A.     Not that I remember.  Not that
13   I remember.
14        Q.     Does Walmart maintain any
15   central files where your team members are
16   told to save their analyses?
17             MS. TABACCHI:  Object to the
18        form.
19             THE WITNESS:  Can you narrow
20        that question any?
21        Q.     (BY MR. INNES)  The trend
22   analyses that your analysts performed on
23   Schedule II narcotics, did Walmart at any
24   time direct those files to be saved in a
25   central location?
```

```
 1              MS. TABACCHI:  Object to the

 2         form.

 3              THE WITNESS:  Not to my

 4         recollection.

 5              MS. TABACCHI:  Mike, whenever

 6         you're at a good point for a quick

 7         break, let me know.

 8              MR. INNES:  Do you want to take

 9         five right now?

10              MS. TABACCHI:  Sure.

11              MR. INNES:  Okay.

12              THE VIDEOGRAPHER:  1:31.  We

13         are off the video record.

14              (Recess taken, 1:31 p.m. to

15         1:36 p.m.)

16              THE VIDEOGRAPHER:  1:36.  We

17         are on the video record.

18         Q.   (BY MR. INNES)  Okay.  We're

19    back, Ms. Hodges, and I want to take you to

20    the -- there's one piece of the review

21    process that I think we may have -- may have

22    left out, at least my understanding, based on

23    the documents.

24              Following the meeting that you

25    had with Roxy and Miranda, or one of your
```

1    designees, did the controlled substances

2    panel play any role?

3         A.    Not during my tenure.  Not

4    during my time of reviewing.

5         Q.    Okay.  So you don't remember

6    ever -- the controlled substances panel

7    making a decision regarding order of

8    interest?

9         A.    Correct.  Not during my time.

10   Not during the -- the June-ish timeframe

11   through the November.

12        Q.    Okay.  And I want to ask my

13   question in a slightly different way.

14              Did the controlled substances

15   panel ever make a decision regarding an order

16   of interest during the June '17 to 11-17

17   timeframe?

18        A.    No.  Not to my recollection.

19        Q.    Is it possible that the

20   controlled substances panel made a decision

21   from the June '17 to the November '17

22   timeframe?

23        A.    Not to my recollection.  I

24   don't remember.  Not to my recollection.

25        Q.    Let's go back into the -- put

1    you in the chair in a meeting with Miranda

2    and Roxy or their designees where you're

3    evaluating orders of interest to determine

4    whether or not they're suspicious orders or

5    whether or not they're appropriate orders.

6    So in the June 2017 to November 2017

7    timeframe.

8           You've testified that Roxy

9    would make an oral presentation, at times

10   perhaps show you her computer screen

11   regarding the information on a particular

12   order that had been flagged as an order of

13   interest.  Is that right?

14        A.     I testified that she would make

15   oral presentations, and very seldom she would

16   turn her computer around.  But for the most

17   part, they were oral presentations, yes, sir.

18        Q.     So very seldomly would you get

19   a view of a primary document that Roxy was

20   relying on.  Is that right?

21        A.     Very seldom did I get any kind

22   of -- yeah, a view.  It was an oral

23   presentation.

24        Q.     So what did you -- what

25   criteria did you rely on personally to reach

1    a decision after receiving the information

2    from Roxy?

3         A.    So as the process went, first

4    of all, she would read through all of the

5    pertinent information.  And I would ask

6    additional question -- I would ask questions.

7    Miranda would ask questions.  Roxy would

8    sometimes -- she would sometimes look up

9    additional information right there, based

10   on -- based on some of the questions.  Right?

11             If she could not answer all of

12   those questions, then we -- she had to go

13   back and get additional information at times.

14             But the -- so I relied on the

15   information that she gave.  That's what I --

16   I relied upon.

17        Q.    And you say you relied upon the

18   pertinent information.  Or I'm -- strike

19   that.

20             You said that Roxy conveyed the

21   pertinent information.  Is that right?

22        A.    She relayed information.

23             I found it pertinent.  I found

24   it informative.

25             She relied on the information

Highly Confidential - Subject to Further Confidentiality Review

1    that they consistent -- they consistently

2    went through the same information on every

3    order.

4         Q.    Okay.  And what information was

5    that?

6         A.    I don't recall all of the

7    details, but some of that information was

8    obviously the name of the drug.  Some of the

9    information was the dosage of drug.  The

10   information was the frequency that that drug

11   had been delivered.  That information was

12   the -- part of it was the proximity of

13   that -- the proximity of the order to a pain

14   facility.  That type of information.

15             But she consistently went

16   through the same information every time.

17        Q.    Any other information sitting

18   here today that you can recall Roxy providing

19   on a consistent basis every time?

20        A.    There was more information than

21   I just went through.  I just walked you

22   through what I could remember.

23        Q.    And you have no notes from

24   those meetings?

25        A.    Correct, no notes.

1    Q.    You didn't send a follow-up

2  email to Roxy or Miranda following those

3  meetings?

4    A.    No.  No.  Not that I recall.

5    Q.    Did you send a follow-up email

6  to anyone following those meetings?

7    A.    Not that I recall.

8    Q.    Did you tell Bryan -- I'm

9  sorry, is it Mr. Boudreaux?

10    A.    (Witness nods.)

11    Q.    Did you tell Mr. Boudreaux

12  about any of the content of those meetings?

13    A.    Not that I recall.

14    Q.    Did Mr. Boudreaux ever ask you

15  about the content of those meetings?

16        MS. TABACCHI:  Object to the

17        form.

18        THE WITNESS:  Not that I

19        recall.

20    Q.    (BY MR. INNES)  Were you ever

21  asked to present to the controlled substances

22  panel regarding those meetings?

23        MS. TABACCHI:  Object to the

24        form.

25        THE WITNESS:  Not that I

Highly Confidential - Subject to Further Confidentiality Review

```
 1              recall.
 2              Q.    (BY MR. INNES)  Are you a
 3    member of the controlled substances panel?
 4                   MS. TABACCHI:  Object to the
 5         form.
 6                   MR. INNES:  I can strike that.
 7              Q.    (BY MR. INNES)  Are you
 8    familiar with the term "controlled substances
 9    panel"?
10                   MS. TABACCHI:  Object to the
11         form.
12                   THE WITNESS:  I'm familiar with
13         the term.
14              Q.    (BY MR. INNES)  Are you
15    familiar with the members of the controlled
16    substances panel?
17                   MS. TABACCHI:  Object to the
18         form.
19                   THE WITNESS:  I couldn't name
20         who's on that panel.
21              Q.    (BY MR. INNES)  So you're aware
22    of its existence?
23                   MS. TABACCHI:  Object to the
24         form.
25                   THE WITNESS:  I'm aware that
```

Highly Confidential - Subject to Further Confidentiality Review

1          there is a controlled -- I'm aware

2          that there is a panel.

3          Q.     (BY MR. INNES)  And are you

4     aware of the panel's function?

5                  MS. TABACCHI:  Object to the

6          form.

7                  THE WITNESS:  I'm aware of

8          the -- and I'm aware of what the panel

9          states in the policy, but I'm -- I've

10          never seen the panel operate.

11          Q.     (BY MR. INNES)  You've never

12     attended a panel meeting?

13                  MS. TABACCHI:  Object to the

14          form.

15                  THE WITNESS:  I have -- not to

16          my recollection.

17          Q.     (BY MR. INNES)  Did you ever

18     receive any communications from members --

19     from the panel?

20                  MS. TABACCHI:  Object to the

21          form.

22                  THE WITNESS:  Not to my

23          recollection.

24          Q.     (BY MR. INNES)  As an initial

25     matter, when you sat in the meetings with

1    Roxy, Miranda or their designees, in the

2    June '17-November '17 time period, when

3    looking at a particular order, did you have

4    an understanding whether it was flagged

5    because of a particular size?

6              MS. TABACCHI:  Object to the

7         form.

8              THE WITNESS:  So I didn't look

9         at the order, but when they

10        communicated it to me, they

11        communicated that it was an order of

12        interest.  And she just went down all

13        of the information.

14             I don't recall it being as of

15        size was -- she didn't state that.

16        She went through all of the

17        information.

18             She said, "This is an order of

19        interest," and then she started in

20        with the information.

21        Q.   (BY MR. INNES)  Would the size

22   of the order be part of that information?

23             MS. TABACCHI:  Object to the

24        form.

25             THE WITNESS:  Can you repeat

Highly Confidential - Subject to Further Confidentiality Review

1       that?  Would the --

2            Q.    (BY MR. INNES)  Would she

3    provide the size as part of that information?

4            A.    Yes.

5            Q.    Would she provide the pattern

6    of order history as part of that information?

7            A.    Yes.

8            Q.    Would she provide information

9    regarding the frequency of orders?

10           A.    Yes.

11           Q.    And she would provide -- would

12   she provide that same information for each

13   order?

14                 MS. TABACCHI:  Object to the

15           form.

16                 THE WITNESS:  She provided that

17           for each item that was being reviewed.

18           Q.    (BY MR. INNES)  So each item,

19   you were provided with metrics regarding the

20   size?

21           A.    Yes.

22           Q.    And for each --

23           A.    To my recollection.

24           Q.    And for each item flagged, you

25   were provided with information regarding

Highly Confidential - Subject to Further Confidentiality Review

1   pattern of that order?

2                  MS. TABACCHI:  Object to the

3          form.

4                  THE WITNESS:  To my

5          recollection.

6                  MS. TABACCHI:  I'm so sorry.

7          Go ahead.

8          Q.    (BY MR. INNES)  And for each

9   one of those orders, you were provided with

10  information regarding the frequency of the

11  order?

12                 MS. TABACCHI:  Object to the

13         form.

14                 THE WITNESS:  When you say

15         "each one."  To my recollection, she

16         went over -- I remember that -- all of

17         those being conveyed.  Whether in a

18         setting that she covered -- how -- how

19         deep --

20                 I mean, I remember all of those

21         being conveyed in the different

22         conversations.

23         Q.    (BY MR. INNES)  And you

24  remember all of those being conveyed with

25  respect to each particular order that was

 1    being reviewed?

 2                    MS. TABACCHI:  Object to the

 3            form.

 4                    THE WITNESS:  To the item.

 5            Q.    (BY MR. INNES)  The item that

 6    was being reviewed?

 7            A.    I remember that there was

 8    conversation around those.

 9            Q.    What would be an example of an

10    unusual pattern that was provided to you?

11                    MS. TABACCHI:  Object to the

12            form.

13                    THE WITNESS:  I've slept since

14            then.  I don't know that I could give

15            you an example of the pattern.  So ...

16            but I relied upon Roxy.  She is my

17            compliance partner, and she would --

18            she would walk me through -- walk

19            Miranda and I and herself through the

20            information.

21            Q.    (BY MR. INNES)  Either I

22    misheard it or we've got a strange transcript

23    or it's an idiom that I'm not familiar with.

24    You said "since I've slept"?

25            A.    I've slept since then.  I don't

1    remember everything that's happened since

2    back in April to November.  I have slept

3    since then.  Have you not heard that?

4              MR. INNES:  No, I haven't.

5              THE WITNESS:  That's a

6         Midwestern terminology.

7              MR. INNES:  I like it.  I'm

8         going to borrow it.

9              But we need to investigate it a

10        little bit further in the context of

11        this case.

12        Q.    (BY MR. INNES)  What would be

13   an example of an unusual pattern that Roxy

14   presented to you in the context of your

15   review of an order of interest in those

16   meetings?

17             MS. TABACCHI:  Object to the

18        form.

19             THE WITNESS:  I don't --

20             MS. TABACCHI:  Go ahead.

21             THE WITNESS:  I don't recall

22        specifics around what was an example

23        of the pattern.

24        Q.    (BY MR. INNES)  Well, what do

25   you recall?

1      A.     In regards to?  Can you clarify

2    what you want me to recall?

3      Q.     You just said you can't -- you

4    can't recall specifics.  And I'm asking you,

5    can you recall general things?

6      A.     I can recall that she walked

7    through the information that I walked you

8    through earlier, and I recall that we met two

9    times -- approximately two times a week,

10   depending on the number of orders.

11           I recall that depending on the

12   number of orders, the number of items being

13   reviewed, the length of the meetings being

14   different, there was no set.

15           We -- we reviewed those until

16   we completed them.

17           And until it was appropriate.

18   We had sufficient enough information in time

19   to complete.

20           I remember that there were

21   times that I asked questions and that Miranda

22   asked questions and that Roxy asked

23   questions.  I remember that she went back and

24   got information.  Sometimes while we were

25   sitting there, sometimes she went and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    retrieved additional information that we

 2    went, "hmm," and asked for.

 3              I remember -- I remember that

 4    we made a decision in each and every case

 5    that -- and if we didn't, we sent it back --

 6              We eventually made a decision

 7    on every one of those being reviewed.  That's

 8    what I remember.

 9              MR. INNES:  Okay.  I'll move to

10         strike that answer as non-responsive

11         to my very simple question which was,

12         what do you recall regarding -- what

13         do you recall regarding specific

14         examples that Roxy presented to you on

15         patterns of orders?

16              THE WITNESS:  I don't recall.

17         Q.    (BY MR. INNES)  Your previous

18    testimony was you don't recall specifics

19    around what was an example of a pattern.

20         A.    I don't recall specifics around

21    the pattern.

22         Q.    What do you recall in terms of

23    generalities?

24              MS. TABACCHI:  Object to the

25         form.  Asked and answered.
```

1          MR. INNES:  It was asked, but

2      it wasn't answered.

3          THE WITNESS:  I don't recall

4      specifics around.

5          MR. INNES:  That's not

6      responsive to my question.  You don't

7      recall specifics.  Do you recall

8      anything?

9          THE WITNESS:  I recall that she

10      covered information around patterns.

11      Q.    (BY MR. INNES)  And what

12  information did she cover around patterns?

13          MS. TABACCHI:  Object to the

14      form.  Asked and answered.

15          THE WITNESS:  I recall that

16      the -- she recall -- that -- the

17      ordering patterns.  That she walked

18      through ordering patterns.

19      Q.    (BY MR. INNES)  What are

20  ordering patterns?

21      A.    Ordering patterns that she

22  covered were the patterns of ordering from

23  that particular facility.

24      Q.    Tell me what your definition of

25  a pattern is.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. TABACCHI:  Object to the

 2         form.

 3              THE WITNESS:  A pattern is

 4         something that you see multiple times,

 5         in its very simplistic definition.

 6         Q.    (BY MR. INNES)  In the context

 7    of your review of orders of interest, and

 8    patterns presented to you by Roxy, is it fair

 9    to say that those patterns were simply the

10    orders that were placed by a particular

11    pharmacy?

12              MS. TABACCHI:  Object to the

13         form.

14              THE WITNESS:  The patterns that

15         she laid out were patterns of

16         frequency.  Patterns of -- that's the

17         type of patterns that we saw.  That we

18         were communicated to.  I didn't see

19         them.

20         Q.    (BY MR. INNES)  And as part of

21    this review process, it was -- you were to

22    look for unusual patterns; isn't that right?

23         A.    That is part of the policy and

24    process, correct.

25         Q.    And what do you determine to be
```

1    an unusual pattern?

2         A.    So the good news is, the good

3    news is I had -- I had her as my business

4    partner, right?  And so when she said,

5    "Debbie, Miranda, here's an unusual -- here's

6    an unusual pattern" and she would lay it out.

7    And she would say, "Here is a pattern that is

8    not consistent," and she would lay it out.

9              And so the good news is she was

10   teaching me in that process.  Right?  And so

11   she taught me.  And so I trusted her as a --

12   as a support, and so she gave me the --

13   here's -- "This is unusual.  And this is what

14   it looks like.  And let's have a discussion

15   around it."  So ...

16        Q.    You were one of three people in

17   this meeting; right?

18        A.    Absolutely.

19        Q.    And Walmart's policy set it up,

20   so there's always three people in this

21   meeting; isn't that right?

22        A.    Yes.

23        Q.    And the fact that there

24   couldn't be three people in the meeting, it

25   went to the controlled substances advisory

Highly Confidential - Subject to Further Confidentiality Review

1    panel; isn't that right?

2          A.    To my recollection, yes.

3          Q.    And you are one of -- again,

4    one of three people in the entire meeting;

5    isn't that right?

6          A.    That's correct.

7          Q.    And so what's the -- what is

8    the purpose of you being in that meeting if

9    you're just accepting the other members as

10   truth?

11               MS. TABACCHI:  Object to the

12          form.  Harassing the witness.

13               THE WITNESS:  So, you know, I

14          didn't accept -- you put words in my

15          mouth just then.  I didn't accept.

16               And so the answer is, she -- I

17          started in May, June -- actually, it

18          was June, let's course-correct that.

19          It was in June, and you have to be

20          given some education.  They gave me

21          education.  We worked through it.  It

22          was on a -- on an evolution process,

23          and so she continued to help walk

24          through.

25               I didn't walk into the job and

1           say, "Sam, this is what it is."  We

2           walked through that evolution of what

3           all of that looks like.  And we walked

4           through the evolution of here's the

5           information I'm going to supply you.

6           Q.    (BY MR. INNES)  Okay.  So after

7    you completed your education as to what an

8    unusual pattern was in the context of orders

9    of interest reviews, what is your

10   understanding today of what an unusual

11   pattern is?

12               MS. TABACCHI:  Object to the

13          form.

14               THE WITNESS:  When we were

15          going through the process, she would

16          help identify.  She would preface and

17          say, "This is an unusual pattern,

18          Debbie.  Let's just walk through it,"

19          what it looked like.  We walked

20          through it every time.

21          Q.    (BY MR. INNES)  And did you

22   ever challenge her on what an unusual pattern

23   was?

24          A.    I challenged her on a lot -- I

25   had a lot of different questions during the

Highly Confidential - Subject to Further Confidentiality Review

1    process, obviously, because I only started in

2    June; right?  And only did it until November.

3    So I had a lot of questions in this process.

4    And that was my job to question.

5         Q.    Did you ever disagree with

6    Roxy's characterization of a particular

7    pattern as unusual?

8         A.    I don't recall if I disagreed

9    with the pattern.

10        Q.    Did you ever find a pattern to

11   be usual that Roxy found to be unusual?

12        A.    I don't recall if I found a

13   pattern of usual that she thought was

14   unusual.

15        Q.    Would you recognize a usual

16   pattern if you saw it?

17             MS. TABACCHI:  Object to the

18        form.

19        Q.    (BY MR. INNES)  Should I --

20   would you like me to ask the question again?

21        A.    Yes, please.

22        Q.    Would you recognize a usual

23   pattern if you saw it?

24             MS. TABACCHI:  Object to the

25        form.

```
 1              THE WITNESS:  It's -- it's --
 2         perhaps.
 3         Q.    (BY MR. INNES)  Give me an
 4    example of a usual pattern.
 5              MS. TABACCHI:  Object to the
 6         form.
 7              THE WITNESS:  You have to -- to
 8         see an unusual pattern, you can't just
 9         go off of what is the unusual pattern?
10         What you have to do is you have to
11         look at a set of circumstances; right?
12         And so an unusual pattern is in all
13         different aspects of that information,
14         or can be gleaned from all different
15         aspects of that information.
16              And so you would have to
17         understand and know all of the
18         different pieces of information that
19         came with that one order.  And -- and
20         to be quite frank, that's why we did
21         individual orders.  And why we did
22         them and why we questioned -- had all
23         of the information.  Because every set
24         of circumstances was different.
25              And so that -- so to sit here
```

1          and say, "Give me what an unusual

2          pattern looks like," it's going to

3          look different in different drugs.

4          It's going to look different from

5          different areas of the country.  It's

6          going to look different from all of

7          those different situations.

8                    So that's why you review that

9          documentation.

10         Q.     (BY MR. INNES)  And you would

11    analyze all of the information that you just

12    listed to do it proper; right?

13                    MS. TABACCHI:  Object to the

14         form.

15                    THE WITNESS:  I would leave --

16         I would need the information that she

17         provided during those meetings.

18                    MR. INNES:  And you just lifted

19         off all of this information that you

20         yourself would have needed to evaluate

21         whether or not that order that was

22         presented to you by Roxy as unusual,

23         could be verified by you as unusual.

24         Isn't that right?

25                    MS. TABACCHI:  Object to the

```
 1              form.

 2                      THE WITNESS:  Maybe I misspoke.

 3              I don't verify any of that.

 4                      And what -- once again, I rely

 5              on them as a support team.  And so

 6              Roxy would provide that information.

 7              I would ask questions.  And based on

 8              those questions and based on all of

 9              this accept -- different facts, then

10              we would collectively -- we would

11              collectively make a decision.

12              Q.    (BY MR. INNES)  So you don't --

13       you don't verify the analysis that's been

14       given to you by Roxy?

15              A.    Well, she is my support, and

16       she is the one that I would rely on.

17                      And so the answer is, I don't

18       independently -- I did not independently

19       verify every piece of information she brought

20       to me.  If that is your question.

21              Q.    Did you accept every piece of

22       information that Roxy brought to you as

23       gospel?

24                      MS. TABACCHI:  Object to the

25              form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  That's why I ask
 2            questions.  That's -- that was why the
 3            form was there, and that's why we ask
 4            questions.
 5            Q.    (BY MR. INNES)  What form are
 6     you referring to?
 7            A.    Form as in that's why the --
 8     not a -- not a paper form.  That's why the --
 9     that's why we had the meeting.  So the form I
10     just referred to, that's why Miranda, Roxy,
11     and Debbie met.  Was so that we could -- in
12     that form, or in that meeting, that we could
13     cover all of that information.
14            Q.    And "Debbie," referring to
15     yourself; right?
16            A.    Correct.
17                    MS. TABACCHI:  I'm sorry, when
18            you said "form," do you mean "forum"?
19                    THE WITNESS:  Yes.
20                    MS. TABACCHI:  Forum.
21                    THE WITNESS:  Or consolidate.
22            F-O-R-U-M.
23            Q.    (BY MR. INNES)  That makes a
24     world of difference.  Thank you.
25            A.    Thank you.
```

1      Q.     What factors would you

2   personally look for to determine whether an

3   ordering pattern for a Schedule II was

4   unusual?

5             MS. TABACCHI:  Object to the

6        form.  Asked and answered.

7             THE WITNESS:  I would look to

8        the information that Roxy provided me.

9             And so depending on those

10       individual details, and that

11       individual -- to that individual item,

12       that's what I would look to.

13      Q.     (BY MR. INNES)  So Roxy

14   provided you with information; correct?

15      A.     Correct.

16      Q.     How did you evaluate the

17   information that Roxy gave you?

18      A.     Well, Roxy provided information

19   that she -- she also, along with information,

20   she would give some -- some insight as to,

21   this is what a pattern looks like.  Right?

22             This is -- this is, hmm.  This

23   is what a --

24             So she provided information and

25   she would say, "And this is ...  So she would

1    give guidance as well as information.

2            Once again, because she was my

3    support.  She was our -- she is the support.

4    She's not just my support.  She's the

5    compliance support that provided that

6    information, just as Miranda was as well.

7            Q.    Miranda was also your support?

8            A.    Sure.  She was my compliance

9    support.

10            Q.    So the members of this group,

11    you have three members; is that right?

12            A.    Of?  Apologize.

13            MS. TABACCHI:  Object to the

14            form.

15            Q.    (BY MR. INNES)  Of this review

16    meeting.  There's Debbie, Miranda, and Roxy,

17    or their designees; right?

18            A.    Correct.

19            Q.    And Debbie and -- I'm sorry,

20    Miranda and Roxy are supporting you in that

21    meeting.

22            A.    We collectively make decisions

23    together.

24            Q.    Of -- what -- what was

25    Miranda's role in these meetings?

1      A.      What was Miranda's role?  I

2    didn't hear the rest of it.

3      Q.      Correct.  What was her role in

4    these meetings?  We've talked a lot about

5    your role.  We've talked about Roxy's role.

6    But I've neglected Miranda's role.  What was

7    Miranda's role in the meeting?

8      A.      Miranda questioned.  She

9    added -- or asked questions around the

10   information that Roxy provided.  I mean, it

11   was very -- very similar.  She -- she did

12   give some thought processes around the

13   information that she saw, but it was a very

14   similar role.

15     Q.      What thought processes around

16   the information that you saw did you provide

17   to the group?

18            MS. TABACCHI:  Object to the

19        form.

20            THE WITNESS:  Are you asking

21        what questions I asked, or are you

22        asking -- is that what you're asking?

23     Q.      (BY MR. INNES)  Well, you've

24   dissembled questions and thought processes

25   when it comes to Miranda's function.  Right?

1    So I'm asking you -- you've asked questions.

2    I know that.  You've said that several times

3    now.

4           I'm asking you what the thought

5    processes you were -- that you had that you

6    shared with the group in this decision-making

7    process?

8                MS. TABACCHI:  Object to the

9           form.

10               THE WITNESS:  The thought

11          processes were very limited at first,

12          since I didn't have -- since I was in

13          the evolution of learning the

14          information.  Right?

15               But later on, as I understood

16          and as I had been in enough meetings,

17          I would have -- have observations

18          about the data.  Or questions.

19          Q.    (BY MR. INNES)  Ms. Hodges, you

20    have a JD; correct?

21    A.    Yes.

22    Q.    You went to law school?

23    A.    I did.

24    Q.    You passed the bar?

25    A.    I did.

1    Q.    You are now in a position that,

2    in at least some capacity, deals with

3    compliance with the federal regulations; is

4    that right?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  The role that I

8         have is not to interpret the law.  The

9         role that I have is to ensure that we

10        are about the distribution of the

11        goods and the appropriate

12        distribution.  So I'm not sure if you

13        want to recouch that question.  I lost

14        it when I was in the middle of that

15        conversation -- answer.

16    Q.    (BY MR. INNES)  That's okay.

17    Because I was going to move to strike it as

18    non-responsive anyway.

19    A.    Okay.

20    Q.    You're in a position now that,

21    at least in some capacity, deals with the

22    Controlled Substances Act; "yes" or "no"?

23              MS. TABACCHI:  Object to the

24         form.

25              THE WITNESS:  Are you talking

1          current or are you talking in --

2          Q.     (BY MR. INNES)  I'm sorry, I'm

3     talking about June '17 to 11-17.

4          A.     Yes.

5          Q.     Okay.

6                 And you've held positions your

7     entire professional career with Walmart; is

8     that right?

9                 MS. TABACCHI:  Object to the

10                form.

11                THE WITNESS:  I've held other

12                positions outside, a few, outside of

13                Walmart, but yes, I -- my career has

14                been mostly with Walmart.

15         Q.     (BY MR. INNES)  And you've been

16    successful in those positions at Walmart?

17         A.     That might be debatable.

18         Q.     Do you want to debate that one?

19         A.     No.  No.

20         Q.     All right.

21         A.     No.  I -- yes, I've had a

22    successful business career with Walmart.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Did you receive a -- are you

 2    eligible for a bonus at this year-end?

 3          A.     I'm eligible for a bonus

 4    provided the company performs.

 5          Q.     Have you received bonuses on an

 6    annual basis?

 7                 MS. TABACCHI:  Object to the

 8          form.

 9                 THE WITNESS:  I've received

10          bonuses in the past.
```

█        █        ████        ████

█    ██████████████

█        ████        ████

█        ███

█        █████        ███

█        █████████

█        █        ████        ████

█    ██████████        Have you received a

19    bonus in the past 12 months?

█        █        ███

█        █        █████████████

█    ██?

```
23          A.     I couldn't tell you.

24          Q.     You don't know how much you

25    were paid this year?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I couldn't tell you how much it

2     was.



20                    MS. TABACCHI:   Object to the

21     form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        ████    ████████████████    Do you receive
 2   stock options?
 3        A.    I do.
 4        Q.    What's the approximate value of
 5   the stock options you've received in the past
 6   year and a half?
 7        A.    I don't know.
 8        Q.    How much do you hold in Walmart
 9   stock?
10        A.    I don't know that either.
11        Q.    Do you hold more than one
12   share?
██   ████    ████    ████████████████████████
14        Q.    Do you hold more than 1,000
15   shares?
16        A.    I don't recall how much I hold.
17        Q.    Do you know the present value
18   of Walmart's stock?
19        A.    Nope, I don't.
20        Q.    Do you know what class of stock
21   you hold?
22        A.    Pardon me?
23        Q.    Do you know what class of stock
24   you hold?
25        A.    I don't know what class of
```

1    stock I hold.

2        Q.    Do you know the approximate

3    value of all stock held and all stock options

4    held?

5            MS. TABACCHI:  Object to the

6        form.

7            THE WITNESS:  I don't.

8        Q.    (BY MR. INNES)  So you've had a

9    successful career with Walmart.  You agreed

10   to that.

███                    ████████████████

███   ██████████  ███████████████████  And

13   you came into a role with a background in

14   law, with a successful background in

15   business.  Is it that complex to get up to

16   speed on the requirements of the CSA?

17           MS. TABACCHI:  Object to the

18       form.

19           THE WITNESS:  My responsibility

20       here is to -- is from a distribution

21       standpoint, not to insure that -- I

22       rely upon my compliance team members

23       to -- and my legal.  I've got a --

24       I've got legal members and compliance

25       members that that is their function.

Highly Confidential - Subject to Further Confidentiality Review

1    Their support function is to ensure

2    that we are following policy.

3        Q.    (BY MR. INNES)  And those

4    folks, under you, look to you to make sure

5    that you're following the -- that your

6    division is following the policies as set up

7    by Walmart; is that right?

8              MS. TABACCHI:  Object to the

9         form.

10             THE WITNESS:  Repeat that

11        question, because I think it was

12        inaccurate.

13       Q.    (BY MR. INNES)  And the folks

14   that report to you rely on you in some shape

15   or form to make sure that the department is

16   following the policies laid out in Walmart's

17   documents.  Isn't that right?

18             MS. TABACCHI:  Object to the

19        form.

20             THE WITNESS:  It's my job to

21        ensure that the team is following

22        processes and policies -- on my direct

23        reports.

24       Q.    (BY MR. INNES)  And what did

25   you do to ensure that your team was following

Highly Confidential - Subject to Further Confidentiality Review

```
 1    processes and policies?
 2                MS. TABACCHI:  Object to the
 3           form, asked and answered.
 4                THE WITNESS:  In this
 5           situation, it's a compliance and a
 6           supply chain, a combined function.
 7           And so that -- it's -- it's the
 8           compliance team, as well as the supply
 9           chain team, as well as a legal team to
10           ensure that we're complying with this.
11           Complying with policy.
12           Q.    (BY MR. INNES)  And in the
13    midst of the opioid crisis which you've
14    acknowledged you're aware of, you didn't
15    think at any point in time to inquire whether
16    or not your direct reports were properly or
17    improperly releasing orders of fentanyl, for
18    instance?
19                MS. TABACCHI:  Object to the
20           form.  Misstates testimony.
21                THE WITNESS:  I have no
22           knowledge of what you just spoke
23           about.
24           Q.    (BY MR. INNES)  Okay.  Let's
25    break it down, then.
```

1          Do you have knowledge of the

2  opioid crisis?

3          A.     Yes, I do.

4          Q.     Okay.  Do you have knowledge

5  that your direct reports were -- had the

6  capability to release orders that were

7  identified as orders of interest?

8          A.     We walked through that.  I have

9  knowledge that when they were -- when those

10  orders were miskeyed, that was one situation

11  or circumstances, and there could be others.

12          But that's the example that I

13  gave you, yes.

14          Q.     And you didn't inquire as to

15  whether or not your direct reports were

16  properly or improperly releasing orders of

17  fentanyl; is that right?

18          MS. TABACCHI:  Object to the

19      form.  Hypothetical.

20          THE WITNESS:  I didn't hear the

21      last word you said.

22          Q.     (BY MR. INNES)  Sure.

23          You didn't inquire whether or

24  not your direct reports were properly or

25  improperly releasing orders of fentanyl, for

Highly Confidential - Subject to Further Confidentiality Review

 1    instance.

 2                    MS. TABACCHI:  Same objections.

 3                    THE WITNESS:  I -- I didn't

 4          specifically ask if they were

 5          releasing or not releasing products of

 6          fentanyl.

 7          Q.    (BY MR. INNES)  Did you ask if

 8    they were specifically releasing or not

 9    releasing any products?

10                    MS. TABACCHI:  Object to the

11          form.

12                    THE WITNESS:  We -- so we have

13          policies and procedures.  And the team

14          members know those policies and

15          procedures as well.  And so the -- my

16          responsibility is to ensure that those

17          policies and procedures were met.

18          Q.    (BY MR. INNES)  And how did you

19    go about doing that?

20          A.    So I -- I had reliance upon

21    Miranda, and --

22                    I had conversations with the

23    team, but I also had reliance on the

24    compliance team that those orders were --

25    that we were following proper process.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     But you didn't make those

 2    inquiries yourself, did you?

 3               MS. TABACCHI:  Object to the

 4          form.

 5               THE WITNESS:  Well, certainly I

 6          asked questions in those meetings.

 7          Q.     (BY MR. INNES)  But you didn't

 8    make -- you didn't ask for -- you didn't ask

 9    for your own data to be pulled regarding your

10    team members, did you?

11               MS. TABACCHI:  Object to the

12          form.

13               THE WITNESS:  Some of the data

14          to be pulled had long been established

15          before I got there.  The data was the

16          data that had been agreed on and

17          vetted by compliance.

18               And so that was the data that

19          was being pulled.

20               And so -- and there's a reason

21          you have a support team, and it's to

22          rely upon the support team, because

23          you can't be an expert in every area,

24          and that's exactly what I was doing.

25               So they set out -- the
```

1          compliance team set out the analysis

2          to be pulled.

3          Q.    (BY MR. INNES)  Do you believe

4     it to be -- to require -- what do you

5     require -- what expertise do you require to

6     make the inquiry as to whether or not your

7     direct reports are properly releasing orders?

8               MS. TABACCHI:  Object to the

9          form.

10              THE WITNESS:  You're going to

11         have to repeat the question, please.

12              MR. INNES:  I'll withdraw the

13         question for now.

14         Q.    (BY MR. INNES) The policies and

15    procedures are designed, at least in part, to

16    prevent the shipment of suspicious orders;

17    right?

18         A.    They're in place to assure that

19    we are following them to ensure that we

20    have -- that we have proper processes and

21    that we're following processes.

22              Policies are there to ensure

23    that there are processes, and then we are

24    to -- and then we are to follow those

25    processes and procedures.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And why are those processes and

2    procedures set up in the first place?

3              MS. TABACCHI:  Object to the

4         form.

5              THE WITNESS:  To be followed.

6    Q.    (BY MR. INNES)  Is there any

7    reason that precipitated those policies and

8    procedures?

9              MS. TABACCHI:  Object to the

10        form.

11             THE WITNESS:  So they're the --

12        I did not draft the policies.  The

13        policies were drafted by the

14        compliance partners as well as the

15        legal partners.

16   Q.    (BY MR. INNES)  You understand

17   that the EA regulations require distributors

18   of controlled substances like Walmart to have

19   a system in place designed to identify

20   suspicious orders of controlled substances;

21   isn't that right?

22   A.    Yes.

23   Q.    Okay.  And the policies and

24   procedures that you were to carry out were at

25   least in part directed toward that goal; is

1    that correct?

2         A.    The policies and procedures

3    that we have that were established was for

4    the entire team to carry out to ensure that

5    we have -- that we meet that guideline.

6         Q.    And if you didn't meet that

7    guideline, those drugs could be diverted.

8    Isn't that right?

9              MS. TABACCHI:  Object to the

10        form.

11             MR. INNES:  I'll rephrase that

12        question.

13        Q.    (BY MR. INNES)  And if those

14    policies were not followed, it's more likely

15    that diversion would occur; right?

16             MS. TABACCHI:  Object to the

17        form.

18             THE WITNESS:  You've made an

19        assumption.  If those weren't

20        followed, there may be other things

21        that would happen but maybe not

22        diversion.

23             You went to diversion.  I'm not

24        sure I --

25             MR. INNES:  Do you understand

1      what diversion is in the context of

2      this case?

3                THE WITNESS:  Diversion -- yes.

4      Q.      (BY MR. INNES)  What is your

5  understanding of diversion?

6      A.      My understanding of diversion

7  is when drugs are not -- drugs are not

8  received in the hands that they are meant to

9  in the order process.  That's my

10 understanding of diversion.

11     Q.      What are some things that could

12 cause Walmart -- drugs distributed by Walmart

13 to not be received in the hands they were

14 meant to be received by?

15               MS. TABACCHI:  Object to the

16     form.

17               THE WITNESS:  I -- that --

18     you're asking for pure speculation.  I

19     don't know that I can give you that.

20     I would have to speculate.

21     Q.      (BY MR. INNES)  If Walmart

22 failed to flag an order of interest, could

23 that result in diversion?

24               MS. TABACCHI:  Object to the

25     form.

 1                    THE WITNESS:  That could also

 2          result in other things, not just

 3          diversion.

 4          Q.    (BY MR. INNES)  But it could

 5   result in diversion?

 6                    MS. TABACCHI:  Object to the

 7          form.  Calls for speculation.

 8          Q.    (BY MR. INNES)  What is your

 9   definition of "diversion"?

10          A.    It could lead to several

11   different things, to answer your question.

12          Q.    Now I'm curious about one thing

13   in particular.  It's more likely that

14   diversion could occur.

15          A.    I don't know that I can say

16   more likely.

17          Q.    Is it likely that diversion

18   could occur?

19                    MS. TABACCHI:  Object to the

20          form.

21                    THE WITNESS:  It would be one

22          of the options.

23          Q.    (BY MR. INNES)  And if

24   Walmart -- one of Walmart's SOM team members

25   failed to properly evaluate an order of

1    interest, and then caused it to be released,

2    that could likely result in diversion.  Isn't

3    that right?

4             MS. TABACCHI:  Object to the

5        form.

6             THE WITNESS:  I think I just

7        answered the question.  You said

8        "likely to divert," and I'm

9        disagreeing with that.  I'm not saying

10        that there is a likelihood of

11        diversion based on that.

12    Q.    (BY MR. INNES)  But you are

13    agreeing that diversion is one of the

14    potential consequences; is that right?

15    A.    Correct, but not likely.

16    Q.    And one of the potential -- and

17    diversion is one of the potential

18    consequences if -- if, in the meeting that

19    you have with Miranda, or Roxy, or one of

20    their designees, the incorrect determination

21    is made regarding a suspicious order, that

22    that could -- that that could result in

23    diversion?

24             MS. TABACCHI:  Object to the

25        form.

Highly Confidential – Subject to Further Confidentiality Review

```
 1              THE WITNESS:  You're assuming
 2         in there that there is an incorrect --
 3         incorrect -- I'm not sure what you
 4         said.  You said incorrect something.
 5         Q.    (BY MR. INNES)  If you -- if,
 6    in the meeting with Roxy and Miranda, and
 7    you, or your designees, in June '17 to
 8    November of '17, if in that meeting, you
 9    failed to identify an order of interest as a
10    suspicious order, and then released that
11    order, one of the options could have been
12    diversion.  Isn't that correct?
13              MS. TABACCHI:  Object to the
14         form.
15              THE WITNESS:  That would be an
16         option.
17         Q.    (BY MR. INNES)  In fact, if you
18    made the wrong determination that an order of
19    interest was an inappropriate order and
20    should have been classified as a suspicious
21    order, it's more likely that diversion could
22    occur; isn't that right?
23              MS. TABACCHI:  Object to the
24         form.
25              THE WITNESS:  It's likely.
```

1          It's an option.  Just like I

2          articulated before.

3          Q.     (BY MR. INNES)  Did you ever

4    consider -- well, strike that.

5                What did you consider to be an

6    order of normal size in the time period of

7    June 2017 to November 2017?

8                MS. TABACCHI:  Object to the

9          form.  Asked and answered.

10                THE WITNESS:  Once again, you

11          have to look at all of the facts of

12          this scenario to understand if it's a

13          normal size.  So to sit here and say

14          "Is that a normal size?" unless you

15          have all of the information as it

16          relates to that one particular order

17          or item, it's very difficult to say.

18          You have to have -- it has to be all

19          of that information.

20          Q.     (BY MR. INNES)  Okay.  And I'd

21    like you to tell me which -- what facts

22    exactly you would need to determine whether

23    or not an order was an order of unusual size.

24                MS. TABACCHI:  Object to the

25          form.  Asked and answered.

```
 1              THE WITNESS:  So once again,
 2         you have to have all of the
 3         information.  In particular, you have
 4         to know how --
 5              I mean, the -- the information
 6         that I've covered before, like the
 7         information of how many of this drug,
 8         particular drug and dosage does a
 9         store normally order.  You -- that
10         would be one point.  And there's many
11         others, but you have to have all of
12         the specifics in order to understand
13         if it's an -- of an abnormal size.
14         Q.    (BY MR. INNES)  I know this is
15    tedious, but I'm asking you in each one of
16    those facts that you would use in your
17    determination as to whether or not an order
18    of interest was a suspicious or not a
19    suspicious order.
20         A.    Right.
21         Q.    So could you --
22         A.    And I get that information from
23    Roxy.  She goes down with every piece of
24    information.  And unless you have all of that
25    information, and sometimes she -- she had --
```

1    didn't have the information to the level

2    that -- and I would say -- you know, I would

3    ask an additional question.

4        Q.    Can you tell me each piece of

5    information that Roxy provided to you for you

6    to be able to determine if an order was an

7    order of unusual size?

8        A.    I don't recall each piece of

9    information.

10       Q.    You sat in these meetings

11   multiple times in a month.  Isn't that right?

12       A.    I sat in them multiple times,

13   correct.

14       Q.    And you must have had hundreds

15   of orders at this point that you've reviewed.

16   Isn't that right?

17             MS. TABACCHI:  Object to the

18        form.

19             THE WITNESS:  No.

20       Q.    (BY MR. INNES)  No?

21             100 orders?

22       A.    I don't have -- I don't have a

23   recollection of the number.

24       Q.    You've done it more than 100

25   times?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. TABACCHI:  Object to the
 2        form.
 3              THE WITNESS:  100 times that I
 4        sat in the meeting or 100 times that
 5        the orders?
 6              I don't have a recollection as
 7        to the number.  I don't have a
 8        recollection.
 9        Q.    (BY MR. INNES)  Is there a
10   record anywhere of how many orders you
11   yourself reviewed?
12              MS. TABACCHI:  Object to the
13        form.
14              THE WITNESS:  I reviewed them
15        with the group, so ...
16        Q.    (BY MR. INNES)  Is there a
17   record of you being the one that reviewed it?
18              MS. TABACCHI:  Object to the
19        form.
20              THE WITNESS:  If I was in the
21        group?  Was there a record if I was in
22        the group?  Not to my knowledge.
23        Q.    (BY MR. INNES)  These meetings
24   were documented in some way, shape, or form
25   in Archer; isn't that right?
```

1        A.        I previously testified that

2   Roxy put the information back in Archer.

3        Q.        Okay.  Was the -- were the

4   names of the attendees one of the pieces of

5   information that Roxy put into Archer?

6        A.        I don't know.  I don't know.

7             MS. TABACCHI:  When you get a

8        chance, can we take a ...

9        Q.     (BY MR. INNES)  Is there any

10  written record anywhere of you having

11  attended these meetings?

12             MS. TABACCHI:  Object to the

13        form.

14             THE WITNESS:  Not that I'm

15        aware of, but there could possibly be

16        some kind of record.  But not that I'm

17        aware of.  Not that I know.

18        Q.     (BY MR. INNES)  And what type

19  of record would that be?

20        A.        I don't know.

21             MS. TABACCHI:  Object to the

22        form.

23             THE WITNESS:  If I don't know

24        and I don't recall, I don't know.

25        Q.     (BY MR. INNES)  Well, you said

1    that there possibly could be some kind of

2    record?

3           A.      Correct.

4           Q.      What --

5           A.      But I don't know what that

6    would be.

7                   To my knowledge, I don't know.

8           Q.      What's your basis for the

9    statement there could possibly be some kind

10   of record?

11          A.      There might be.  But not to my

12   knowledge.

13          Q.      Well, what's your basis for the

14   statement that there might be a record?

15          A.      Well.  There might be, but I

16   don't know.

17                  MS. TABACCHI:  When it's a good

18          time, could we take a break?

19                  MR. INNES:  Sure.

20          Q.      (BY MR. INNES)  What are

21   possibilities?

22                  MS. TABACCHI:  Object to the

23          form.

24                  THE WITNESS:  Can you give me

25          a -- repeat that question, other than

1      what are the possible -- I couldn't

2      even hear the --

3          Q.     (BY MR. INNES)  There possibly

4      could be some kind of record you stated.

5      Right?  And I'm wondering what those

6      possibilities might be.

7                  MS. TABACCHI:  Object to the

8          form.  Asked and answered.

9                  THE WITNESS:  And I don't know

10         what those possibilities -- I'm just

11         saying to my knowledge there's not,

12         but there could be.

13         Q.     (BY MR. INNES)  And we're

14     talking about written records; right?

15         A.     That's what I think you're

16     asking me about.  Correct.

17         Q.     That's what I'm asking.  I just

18     want to make sure we're on the same page with

19     that.

20         A.     Right.

21         Q.     And I'm talking about written

22     records in the form of hard paper document.

23     And I'm also talking about documents in the

24     form of an electronic record.

25         A.     And I'm saying there -- not to

Highly Confidential - Subject to Further Confidentiality Review

1    my knowledge, but I don't know.  There could

2    possibly be a record.

3              I don't know.

4         Q.    (BY MR. INNES)  Is it

5    possible --

6         A.    Not to my knowledge.

7         Q.    Is it possible that

8    Miranda Johnson took notes of those meetings?

9         A.    I don't know.  I don't --

10   I'm --

11             Not to my knowledge.

12             MR. INNES:  Did you need --

13             MS. TABACCHI:  Well --

14             THE WITNESS:  I need some

15       water.

16             MS. TABACCHI:  If we can take a

17       short break, when you're -- when you

18       have the right place.  I don't know

19       how much longer you have.  I don't

20       want to throw off your plans.

21             MR. INNES:  Sure.

22             MS. TABACCHI:  But ...

23        Q.    (BY MR. INNES)  What, if

24   anything, did you consider when determining

25   whether or not an order was an order of

```
 1    unusual frequency?
 2               MS. TABACCHI:  Object to the
 3          form.  Asked and answered.
 4               THE WITNESS:  Roxy would
 5          provide me with all of the information
 6          that was of the norm, that we
 7          consistently covered -- that was
 8          consistently covered before I got
 9          there, was consistently covered.  And
10          based on those pieces of information,
11          they -- collectively we would make the
12          decision.
13          Q.    (BY MR. INNES)  Okay.  What was
14    all of the information that was of the norm
15    that Roxy provided you when making a
16    determination as to whether an order was an
17    order of unusual frequency?
18               MS. TABACCHI:  Object to the
19          form.  Asked and answered.
20               THE WITNESS:  So once again,
21          you have to have a very specific set
22          of facts.  And she would go through
23          and cover all of the pieces of
24          information, and you would have to
25          know those in order to see if it was
```

Highly Confidential - Subject to Further Confidentiality Review

1          an -- you said an unusual frequency;

2          correct?

3          Q.     (BY MR. INNES)  That's correct.

4          A.     Right.

5          Q.     And you understand unusual

6     frequency to be one of the criteria that

7     would trigger an order of interest or also

8     qualify as a suspicious order; is that right?

9          A.     That's exactly correct.

10          Q.     Did you look at the same

11     information to determine order of unusual

12     size as well as -- the same information to

13     determine an order of unusual size that you

14     did to determine an order of unusual

15     frequency?

16               MS. TABACCHI:  Object to the

17          form.

18               THE WITNESS:  She had a lot of

19          different pieces of information that

20          applied to each different component of

21          that.

22               So the answer is, we looked at

23          the same litany, or the same list of

24          item -- or information that we did

25          each time, but pieces of that

```
 1              information applied to size.  Pieces

 2              of that information applied to

 3              frequency.  Pieces of that information

 4              applied to ...

 5                   So that's -- that's how we

 6              looked at it.

 7         Q.    (BY MR. INNES)  At the end of

 8    your evaluation, would you -- would anyone

 9    make a notation that this order was either --

10    was not an order of unusual size?

11                   MS. TABACCHI:  Object to the

12              form.

13                   THE WITNESS:  The notations

14              that were made were made in Archer by

15              either Roxy or Miranda, or that team,

16              the compliance team.

17         Q.    (BY MR. INNES)  I'll ask it

18    slightly different.  Did you all make an

19    affirmative determination that a particular

20    order either was or was not an order of

21    unusual size?

22                   MS. TABACCHI:  Object to the

23              form.

24                   THE WITNESS:  The

25              determination, did we -- are you --
```

```
 1              We made the determination

 2         whether it was a suspicious order or

 3         not.  It wasn't necessarily designated

 4         at the conclusion of it.

 5              But it was designated whether

 6         it was a -- whether that order of

 7         interest was suspicious or not.

 8         Q.    (BY MR. INNES)  Okay.  So as I

 9    understand your testimony, it was a generic

10    classification that it was either a

11    suspicious order or not a suspicious order.

12         A.    Well, it was an order of

13    interest until -- while we went through the

14    process, right.

15         Q.    Right.

16         A.    And so then after we reviewed

17    the information, we -- it was determined --

18    that was the reason for the meeting, it was

19    determined whether it was a suspicious order

20    or not.

21              And sometimes those suspicious

22    orders was -- it was just unusual.  It was an

23    unusual -- it was an unusual size.  It didn't

24    mean it was a -- it was suspicious.  You

25    didn't know why.  It just made you go "hmm."
```

Highly Confidential - Subject to Further Confidentiality Review

1    So yeah.

2              And so we reported it.

3         Q.    Okay.

4         A.    Absolutely.  We reported it.

5         Q.    So in order --

6         A.    So there were some of those

7    that were classified as suspicious, that were

8    just unusual.  Just unusual.  Unusual in

9    frequency.  Unusual in -- according to the

10   information.

11        Q.    And those would be designated

12   as --

13        A.    They would be designated as

14   suspicious order, and we would report them.

15        Q.    Okay.  Did you ever make a

16   determination that an order was an order of

17   unusual size, but could be cleared for other

18   reasons?

19             MS. TABACCHI:  Object to the

20        form.

21             THE WITNESS:  Not that I --

22             MS. TABACCHI:  Go ahead.

23             Object to the form.

24             You may --

25             THE WITNESS:  Not that I

1    recall.

2          Q.    (BY MR. INNES)  Well, could an

3    order, for instance, from a Walmart store,

4    that -- a Walmart pharmacy, that -- strike

5    that.

6                Could it be the case that, say,

7    an oncology clinic opened near a Walmart, and

8    that Walmart pharmacy saw an unusual uptick

9    in prescriptions for a particular opioid?

10               MS. TABACCHI:  Object to the

11          form.

12               MR. INNES:  That wasn't the end

13          of my question, so ...

14               MS. TABACCHI:  There was a

15          question mark, so ...

16         Q.    (BY MR. INNES)  All right.

17   I'll start again.

18               Was it ever the case that an

19   order that presented as an unusual size had a

20   justification for being an appropriate order?

21         A.    Not that I recall.

22         Q.    As part --

23         A.    And like I said, there were --

24   so if it was an unusual size, I mean, we

25   were -- there was -- we reported it.

1      Q.     Did --

2      A.     It --

3      Q.     Are you aware that Walmart

4   pharmacies could order directly from

5   McKesson?

6      A.     I am.

7      Q.     Okay.  Did you consider, as

8   part of your evaluation -- strike that.

9           Did Roxy present you with

10  information as part of your meetings

11  regarding opioids sent from McKesson directly

12  to a pharmacy?

13           MS. TABACCHI:  Object to the

14      form.

15           THE WITNESS:  I don't recall.

16           I don't -- I don't recall.

17      Q.     (BY MR. INNES)  Would that

18  information have been something that you

19  would have wanted when considering whether an

20  order of interest was a suspicious order or

21  an appropriate order?

22           MS. TABACCHI:  Object to the

23      form.

24           THE WITNESS:  All of those

25      orders came through our system, and

1          then were routed, I guess, to -- to --

2          you've referred to McKesson.  To

3          McKesson, if -- if it was for them to

4          send.  For them to distribute, right?

5          Q.     (BY MR. INNES)  Mm-hmm.  Okay.

6     So my question is slightly different.  We can

7     agree that that relationship existed.  That

8     pharmacies could order --

9          A.     I thought that's where you -- I

10    thought that was a question.

11         Q.     I'm sorry, maybe I -- maybe my

12    voice trailed off.

13              I'm interested in whether or

14    not you would like -- you would have wanted

15    to consider that information, shipments from

16    McKesson directly to a pharmacy, when

17    considering an order of interest.

18         A.     Well, if they went to McKesson,

19    it wouldn't have been -- it wouldn't have

20    triggered in our system as a suspicious order

21    because that would go through McKesson.

22         Q.     Right.  Right.  Exactly.

23              So when considering an order on

24    a particular pharmacy that was triggered by

25    Reddwerks.

1          A.     Correct.

2          Q.     When considering whether or not

3    that was an order of unusual size, unusual

4    pattern or unusual frequency, would you

5    consider the order -- the shipment

6    information from McKesson to the Walmart

7    pharmacy to be relevant to inquiry?

8                 MS. TABACCHI:  Object to the

9          form.

10                THE WITNESS:  Would I -- you're

11         going to have to ask the end of it.

12         I'm not sure I understand the

13         question.

14         Q.     (BY MR. INNES)  So I'm -- we've

15   been talking about the information that you

16   would consider when making a determination if

17   an order of interest was suspicious or not.

18   And then you made that determination based

19   off of information provided to you by Roxy;

20   correct?

21         A.     Correct.

22         Q.     And now I've also asked you

23   what criteria you personally used to evaluate

24   the information that was provided by Roxy.

25         A.     Correct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Right?

2              And now I'm wondering whether

3      or not one of those criteria for you would be

4      knowing the amount of opioids that the

5      pharmacy got directly from McKesson, as it

6      relates to the order that you're reviewing.

7      A.      The amount of opioids in total

8      are you asking?

9              I --

10     Q.      Would that be relevant to you?

11     A.      From McKesson?

12     Q.      From McKesson?

13             MS. TABACCHI:  Object to the

14     form.

15             THE WITNESS:  Possibly it could

16     be.

17     Q.      (BY MR. INNES)  Is it --

18     A.      But I don't recollect ever

19     getting any kind of information.  And the

20     reason I don't is probably because those

21     orders that come in for McKesson are routed

22     directly over to McKesson.

23     Q.      Okay.

24             MS. TABACCHI:  Mike, just

25     whenever you --

1           MR. INNES:  I'm sorry, I ran

2      over you.  You asked for a break.  We

3      can go --

4           MS. TABACCHI:  We'll be speedy.

5           THE VIDEOGRAPHER:  2:37.  We

6      are off the video record.

7           (Recess taken, 2:38 p.m. to

8      2:50 p.m.)

9           THE VIDEOGRAPHER:  2:50.  We

10      are on the video record.

11      Q.    (BY MR. INNES)  Okay,

12  Ms. Hodges.  We are back.  I think we'll make

13  one final push here.  Before I begin with

14  some documents I want to ask if -- first of

15  all, are you aware that the trials in this

16  case are scheduled to go forward in Ohio in

17  the first bellwether trials?

18      A.    I'm aware of that.

19      Q.    And would you be willing to

20  come and testify in that trial to tell your

21  story to the jury?

22           MS. TABACCHI:  You can consult

23      with us about the testimony of our

24      Walmart witnesses when there's a

25      pretrial order.  I'm not sure you need

1    to ask the witness that question

2    today.

3            MR. INNES:  I'm not asking

4    whether she will or will not come, I'm

5    asking if she's willing to come.

6            THE WITNESS:  It will be

7    determined by counsel whether I should

8    be there or not, I think.

9    Q.    (BY MR. INNES)  Thank you for

10   that.

11           Okay.  So let me hand you

12   what's been marked as Exhibit 1.

13           (Walmart-Hodges Deposition

14   Exhibit 1 was marked for

15   identification.)

16           MR. INNES:  I have copies here

17   for your counsel.

18           Tina, you'll notice that there

19   are hole punches in the side.  Those

20   are not part of the original.  Those

21   are part of the copy job.  You'll see

22   that on all three exhibits.  I

23   apologize for that.  I don't believe

24   that will impact any part of the

25   questions that I need to ask the

Highly Confidential - Subject to Further Confidentiality Review

```
1          witness or that the witness needs to

2          understand, but I'll let you be the

3          judge of that.

4              Ms. Hodges, when you've had a

5          chance to review the document, please

6          let me know and we can start some --

7          I'll ask my questions.

8              [Document review.]

9              MR. INNES:  If it helps, I can

10         direct your attention to --

11             THE WITNESS:  I was just

12         reading all of it.

13             MR. INNES:  You're more than

14         welcome to.  I'm going to represent to

15         you that I'm only going to ask you

16         questions about the one topic on the

17         page ending in Bates number -- that's

18         the number at the bottom right-hand

19         corner -- 263 --

20             THE WITNESS:  The top what?

21         Q.    (BY MR. INNES)  The bottom

22    right-hand corner.  2637.

23         A.    Okay.

24         Q.    You'll see a section there it's

25    called SOM update.  And while you're
```

1    reviewing that, I'm just going to, for the

2    record, say Document 1 is a Walmart document

3    beginning in Bates No. 2636 and ending in

4    2638.

5         A.    What is the date of this?

6               And did you say somewhere else?

7         Q.    Oh, yes.  So the middle of the

8    second page.  And if you had a chance to

9    review that, the SOM update section.

10        A.    I did.

11        Q.    So I just need -- well, first

12   let me say, this is an email from

13   Nick Tallman to you and several other people

14   on October 13th, 2017.  The subject is "H and

15   W weekly update, week 37."

16              Is this an email that you

17   would -- that you would get weekly?

18        A.    Correct.

19        Q.    What does "week 37" refer to?

20        A.    It's a Walmart week.  We have

21   our week's number.

22        Q.    Is that a fiscal year?

23        A.    It is our fiscal.  Our fiscal

24   starts in February 1st.

25        Q.    So that number tracks your

1    fiscal year, in weeks?

2          A.     Correct.

3          Q.     So that --

4          A.     But obviously it must be in

5    October.

6                 So week 37 is October 13th.

7    That week.

8          Q.     Right.  So --

9          A.     Or maybe not so obvious,

10   but ...

11         Q.     I'm just going to -- we're

12   going to turn to the second page, the section

13   I asked you to review, the SOM update.  I

14   just want a little help understanding exactly

15   what is being communicated in this section.

16                And it says, 142 alerts.

17                Now, like we just said, this

18   document is from October of '17.  So that's

19   when the Reddwerks section is in place;

20   correct?

21         A.     Correct.

22         Q.     And as 142 total alerts

23   indicate, that's the number of alerts that

24   were triggered for suspicious orders by

25   Reddwerks?

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      It's the number of orders of
2   interest.
3           Q.      Orders of interest.  Okay.
4   You'll see the subpoint there.  It says, "67
5   alerts were for controlleds which represents
6   48 percent of the alerts."
7                   Did Reddwerks flag orders that
8   were not controlled substances?
9           A.      Yes.
10          Q.      Okay.  So this -- so the
11  balance, 142, minus 67.  The balance would be
12  for non-controlleds; is that right?
13          A.      Correct.
14          Q.      Okay.  I'm going to continue
15  down to the next bullet.  25 alerts were sent
16  to practice compliance for further review.
17                  Do you see that?
18          A.      I do.
19          Q.      Now, I want to understand what
20  that means in the context of the process we
21  were discussing for the better part of today.
22                  Is this -- are these 25 alerts
23  sent from the SOM group that you oversaw to
24  the practice compliance group?
25          A.      67.  Number of total
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   represents --
 2                 (Sotto voce document review by
 3          the witness.)
 4                 So the practice -- so --
 5                 MS. TABACCHI:  I'm going to
 6          just object to the form.
 7                 THE WITNESS:  Yeah, I didn't --
 8                 So the practice and compliance,
 9          25 alerts.  The practice and
10          compliance team would be -- to my
11          recollection would be the -- well, do
12          you know what?  I'm just -- I'm not
13          sure, the practice and compliance,
14          what it means in this context.
15          Q.    (BY MR. INNES)  Okay.  So this
16   is a -- again, a weekly update.
17          A.    Yeah.  It is.
18          Q.    Yeah.
19                And so do you receive these on a
20   weekly basis?
21          A.    I did.  Yes, I did.
22          Q.    Okay.
23                And it comes from Nick Tallman.
24   Who is Nick Tallman?
25          A.    He's a direct report of mine.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So they typically come from

2  Nick?

3    A.    They do.  He drafted it.  I

4  didn't draft it, but he did.

5    Q.    Sure.  Because Nick drafts this

6  email and sends it to you; right?

7    A.    Correct.

8    Q.    At the top it says "Debbie"?

9    A.    Correct.

10    Q.    Did you review these on a

11  weekly basis?

12    A.    I read them on a weekly basis.

13    Q.    And did you understand what

14  they meant on a weekly basis?

15    A.    Well, I did at the time.  I'm

16  just saying I'm -- I'm not sure if it -- if

17  this 25 was to -- was to the SOM team or to

18  Roxy's team.

19    Q.    Well, isn't Roxy's team known

20  as practice compliance?

21    A.    The -- yes.

22    Q.    Okay.  So the SOM update is 25

23  alerts were sent to practice compliance.

24    A.    Mm-hmm.

25    Q.    Does that mean that 25 alerts

Highly Confidential - Subject to Further Confidentiality Review

1    were sent from logistics to practice

2    compliance for further review?

3         A.    It means that 25 of the total

4    alerts were sent to the practice and

5    compliance team.  To the -- to the Roxy team.

6         Q.    Okay.  So we see here that

7    there's 142 total alerts.

8         A.    Mm-hmm.

9         Q.    So does that mean that of the

10   142, all but 25 were cleared for shipment?

11             MS. TABACCHI:  Object to the

12        form.

13             THE WITNESS:  No.  It means

14        that there were just -- these were

15        just the -- these were just the

16        alert -- oops, sorry, I've got my cell

17        phone.

18             So it means that 25 were sent

19        to compliance.  So it may mean that --

20        I'm not going to speculate.

21             So it means that 25 were sent

22        to Roxy and team.

23        Q.    (BY MR. INNES)  Okay.  So what

24   happened to the balance of those?  The ones

25   that weren't sent to Roxy?

1          A.     You know --

2                 MS. TABACCHI:  Object to the

3          form.

4                 THE WITNESS:  In this

5          circumstance, I can't tell you what

6          happened to them.

7          Q.     (BY MR. INNES)  Why is that?

8          A.     Well, because I don't have the

9    context.  I would have asked the question at

10   the time, but I don't recollect.  That's why.

11                I don't recollect what happened

12   to them.

13         Q.     So you would have made an

14   inquiry at some point from one of your direct

15   reports regarding the disposition of alerts;

16   is that right?

17         A.     I would have made an inquiry to

18   a lot of things on this document.  We -- we

19   talked about a lot of different things.  I

20   don't know -- I don't even recall if I

21   specifically asked that, but the -- we -- I

22   talk about a lot of different things on this

23   document.

24         Q.     All right.  And, you know, your

25   prior testimony, I believe, was when we were

```
1    discussing alerts that were reviewed by your

2    team, that you didn't inquire as to the

3    disposition of those alerts following the

4    review.

5             MS. TABACCHI:  Object to the

6         form.

7             THE WITNESS:  Can you repeat

8         that, please?

9             MR. INNES:  Sure.

10        Q.    (BY MR. INNES)  I believe your

11   prior testimony was quite clear that you did

12   not inquire as to the disposition of orders

13   of interest that were reviewed by the SOM

14   team until the meeting you had with Roxy or

15   Miranda or their designees.

16            MS. TABACCHI:  Object to the

17        form.

18            THE WITNESS:  So I get -- I

19        do -- I did get this written update,

20        and if I had questions at the time, I

21        asked questions.

22            I can't tell you if I asked

23        questions here.  I can tell you that I

24        asked questions on -- about -- from

25        this page, because I asked the team in
```

1    their one-on-ones the different -- the

2    questions where I have questions, but

3    I can't tell you if I asked questions

4    on that.

5         Q.    (BY MR. INNES)  On this

6  particular --

7         A.    Correct.

8         Q.    -- particular --

9         A.    And I think that's what you

10  were asking; right?

11        Q.    That was what I was asking.

12             Now I'm going to ask you a

13  little more generally.  Was it your common

14  practice, after reviewing these SOM updates,

15  to inquire of your team members as to what

16  happened with the orders that were not

17  forwarded to practice compliance?

18        A.    The -- so -- so I did not -- I

19  can tell you I didn't recall here -- and you

20  asked me -- repeat it for me.

21        Q.    Sure.

22             MR. INNES:  Can you read back

23    my last question?

24

25             (Whereupon, the following

Highly Confidential - Subject to Further Confidentiality Review

1          testimony was read by the court

2          reporter.)

3               "QUESTION:  Now I'm going to

4          ask you a little more generally.  Was

5          it your common practice, after

6          reviewing these SOM updates, to

7          inquire of your team members as to

8          what happened with the orders that

9          were not forwarded to practice

10         compliance?"

11              (End of readback.)

12              THE WITNESS:  So I didn't --

13         after I reviewed this document, did I

14         inquire as to this?

15         Q.    (BY MR. INNES)  Well, again,

16    we've -- I think we've covered that you did

17    not do that with this particular -- you don't

18    recall doing that with this particular --

19         A.    I don't recall.  I may have, I

20    don't recall.

21         Q.    Sure.

22              Now I'm asking in a more

23    general sense.  Was it your practice when

24    receiving a weekly report to make an inquiry

25    of your team members regarding the orders

1    that were not forwarded to practice

2    compliance for further review?

3           A.    I may have asked questions as

4    to why, but I didn't in -- I did not ask -- I

5    didn't -- I think you said did you inquire

6    about the individual -- are you talking

7    individuals or ...

8           Q.    Did you make an inquiry of any

9    of your team members regarding the orders

10   that were not forwarded to practice

11   compliance?

12          A.    I possibly did.  I possibly

13   did.

14          Q.    And how would you have made

15   that inquiry?

16          A.    During their one-on-ones I

17   would have asked questions.

18          Q.    And what kind of questions

19   would you have asked?

20          A.    I don't recall.  Typically I

21   would have looked at the information at the

22   time, and I say, "Hmm, talk to me about

23   what's going on here."

24          Q.    So sitting here today, would

25   you have questions about the information you

Highly Confidential - Subject to Further Confidentiality Review

1    see here?

2              MS. TABACCHI:  Object to the

3         form.

4              THE WITNESS:  It's possible

5         that I would have -- that I could have

6         or would have or might have or --

7         it's asked, what's the difference.

8         But I don't recall doing that, and I

9         don't recall any answer because I

10        certainly don't recall doing it.

11        Q.    (BY MR. INNES)  And why would

12   you have had those questions?

13             MS. TABACCHI:  Object to the

14        form.

15             THE WITNESS:  I would have had

16        those -- just because I ask questions.

17        Because ...

18             That's a possible question.

19        Q.    (BY MR. INNES)  Is it possible

20   that the balance of alerts were all cleared

21   because of keying entries?

22             MS. TABACCHI:  Object to the

23        form.

24             THE WITNESS:  That's pure

25        speculation.  I wouldn't -- I wouldn't

1          be able to answer that.  I don't

2          recall even what these were, so ...

3               Or I don't even recall if I had

4          questions, rather, on them.  So I

5          certainly couldn't go the leap further

6          that you just asked.

7          Q.    (BY MR. INNES)  Were these

8     weekly reports sent to you in the same format

9     on a weekly basis?

10         A.    Sometimes.

11              So were they on a consistent?

12    Did you use the word "consistent"?

13         Q.    Were they sent to you in a

14    consistent format, that's correct.

15         A.    We've updated this format.

16    That's why I said "consistent."

17              So are you talking from date to

18    date was it the same format?

19         Q.    From week to week, yes.

20         A.    Now, what was the question?

21    Sorry.

22         Q.    Is, these were weekly updates

23    that were received every week; is that

24    correct?

25         A.    Right.

1      Q.     Did they come in the same

2   format each week?

3      A.     At some point we changed

4   formats.  I do recall that.

5           So I can't answer if they are

6   this way since I took over.

7      Q.     Okay.

8      A.     And so I don't know.

9      Q.     Did --

10     A.     Because I know they changed, so

11  I don't know what that timeframe was, even if

12  they were adjusted.

13     Q.     And did the format change

14  during your tenure in that position?

15     A.     Yes, it has.

16     Q.     And did it change at your

17  request?

18     A.     Actually, not at my request.

19           There was conversation around

20  what -- there was conversation around what

21  the strategy was and were we aligning our

22  report to our strategy.  Our supply chain

23  strategy.

24     Q.     And the information that was

25  contained in these weekly updates, was that

1    something that you found necessary to carry

2    out your duties in your role?

3              MS. TABACCHI:  Object to the

4         form.

5              THE WITNESS:  I found this

6         information helpful.

7         Q.    (BY MR. INNES)  Okay.  Did you

8    believe 142 total alerts to be an acceptable

9    number of alerts, given the volume of orders

10   that were coming in?

11             MS. TABACCHI:  Object to the

12        form.

13             THE WITNESS:  So I don't

14        know -- I can -- I don't know the

15        volume that was coming in this week to

16        answer if 142 was acceptable.

17        Q.    (BY MR. INNES)  Well, did you

18   ever ask the question or did you ever

19   research what the historical average number

20   of alerts were during the time period that

21   you were in your position?

22             MS. TABACCHI:  Object to the

23        form.

24             THE WITNESS:  We had

25        conversations around what was --

Highly Confidential - Subject to Further Confidentiality Review

```
 1            what -- how many alerts, but -- so I

 2            certainly had conversations around it.

 3            Q.    (BY MR. INNES)  Who did you

 4    have those conversations with?

 5            A.    Dena, Ramona, and probably a

 6    couple of others.

 7            Q.    And Dena and Ramona are copied

 8    on this email; is that right?

 9            A.    Let me see.  Yes.

10            Q.    Would you also have

11    conversations with any of the other folks

12    that were copied on this email?

13            A.    Potentially.

14            Q.    Okay.

15            And did you ever -- as part of

16    those conversations, did you ever discuss how

17    these reports related to opioids?

18            A.    What's your question?

19            Q.    Did you ever discuss these

20    reports in the context of opioids?

21            A.    I never use a -- or I seldom

22    used the terminology of "opioids" when I

23    asked Ramona or Dena.  I would just say,

24    "Talk to me about what this means."

25            I never said, "Tell me how many
```

Highly Confidential - Subject to Further Confidentiality Review

1   opioids," da da da.  I never said that.

2        Q.      Okay.  Did you ever focus on a

3   conversation on a particular opioid product

4   that Walmart distributed?

5                  MS. TABACCHI:  Object to the

6            form.

7                  THE WITNESS:  Not that I

8            recall.

9        Q.      (BY MR. INNES)  Well, I see

10  here on this SOM update, the last bullet, it

11  says "Top alerted drugs," and the final

12  subbullet says "CII, Hydro/APAP 10/325."  Do

13  you know what that means?

14       A.      Those are just the names of

15  drugs that have been top alerted.

16       Q.      Are you familiar with the name

17  of that drug?

18       A.      Which drug?

19       Q.      The one I just -- the one that

20  said the final bullet in the SOM update

21  section.

22       A.      Hydro, am I familiar with that

23  one?

24       Q.      Correct.

25       A.      I'm familiar with the name.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      And what's your understanding

2  of the name?

3      A.      That it is a C-II.

4      Q.      Do you know what class of drug

5  it is?

6      A.      A C-II.

7              MS. TABACCHI:  Object to the

8      form.

9      Q.      (BY MR. INNES)  Do you know

10  whether or not it's a derivative of opiate?

11  An opiate derivative?

12     A.      I don't know.

13     Q.      Do you know it to be an opioid?

14     A.      Hydro?  I know hydro to be an

15  opioid.  Hydrocodone.

16     Q.      Is that hydrocodone?

17     A.      I don't know.

18     Q.      Did you ever ask a question as

19  to whether -- as to -- after receiving a

20  report -- strike that.

21              If, after you received a

22  report, you did not recognize the name of a

23  drug, did you inquire as to what the name of

24  that drug was?

25              MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

```
1          form.

2                    THE WITNESS:  It's possible

3          that I did.

4          Q.    (BY MR. INNES)  Okay.  Was it

5     concerning to you that in October of 2017,

6     hydrocodone was a top alerted Schedule II

7     drug in Walmart's distribution?

8                    MS. TABACCHI:  Object to the

9          form.

10                    THE WITNESS:  So when you say

11          "top alerted," it still doesn't mean

12          that it's a suspicious order.  It just

13          means that it alerted.

14               So this --

15                    MR. INNES:  Right.

16                    THE WITNESS:  -- this doesn't

17          say that it turned out to be a

18          suspicious order.

19               It could be a lot of reasons

20          that it alerted.

21          Q.    (BY MR. INNES)  Well, why

22     would -- what is the same as the word "alert"

23     in the context of SOM at Walmart?

24                    MS. TABACCHI:  Object to the

25          form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  What was the

 2         what?

 3         Q.    (BY MR. INNES)  What's the --

 4   what does the term "alert" mean in the

 5   context of Walmart's SOM program?

 6                    MS. TABACCHI:  Object to the

 7         form.

 8                    THE WITNESS:  "Alert" means

 9         order of interest.  We've -- I thought

10         we've covered this before.  It's alert

11         the order of interest.  The orders of

12         interest.

13         Q.    (BY MR. INNES)  So when I'm

14   looking at this and I see "SOM update, top

15   alerted drug, C-II, hydro," is another way to

16   read that top alerted drug, top order of

17   interest, C-II hydro?

18         A.    So the top alerted -- the

19   terminology here means, they alerted, means

20   order of interest.

21         Q.    Okay.

22                So the top order of interest

23   drugs for C-IIs would be hydrocodone at that

24   point?

25         A.    It looks like -- well, I'm --
```

Highly Confidential - Subject to Further Confidentiality Review

1       It's written down here as a
2   bullet point.  Once again, I didn't prepare
3   the document, but it's written as a bullet
4   point to show that it was alerted this week.
5   In week 37, yes, it was.
6       Q.      And it's a subpoint of top
7   alerted drugs; is that right?
8       A.      Which means that it was an
9   order of interest.
10      Q.      Okay.
11              Let's turn to the first page of
12  the email.  In the first line it says "DEA
13  C-IIs update.  Recalls the schedule for
14  Tuesday of this coming week to recap the
15  FedEx visit with LR DEA office."
16              Is that the Little Rock DEA
17  office?
18      A.      Correct.  That's what the "LR"
19  stands for.
20      Q.      Okay.  Mike Stephenson,
21  Debbie Hodges, David Barlow, Robert Williams
22  and Nick Tallman will be on the call.
23              Do you remember that call
24  taking place?
25      A.      I remember the call taking

Highly Confidential - Subject to Further Confidentiality Review

1    place.

2         Q.    Okay.  Do you remember what was

3    said on that call?

4         A.    I don't remember what was said

5    on the call.

6         Q.    Were you on the call?

7         A.    I was on the call.

8         Q.    Okay.  And why was Walmart

9    speaking with the Little Rock DEA office

10   regarding FedEx?

11        A.    There had been a number of --

12   or, no.  There had been some losses from

13   FedEx facility.  And so DEA -- or DEA and

14   FedEx and Walmart were trying to collectively

15   work through some potential solutions.

16        Q.    Okay.  And where did those

17   losses occur?

18             MS. TABACCHI:  Object to the

19        form.

20             THE WITNESS:  Where did they

21        occur?  Can you clarify that?

22        Q.    (BY MR. INNES)  Sure.  Did the

23   losses occur at a FedEx warehouse?

24             MS. TABACCHI:  Object to the

25        form.

1          THE WITNESS:  I don't know.  It

2     occurred at the FedEx possession.

3          MR. INNES:  Okay.

4          THE WITNESS:  So I don't know

5     if it was at the warehouse or not.

6     Q.    (BY MR. INNES)  Or in transit?

7     A.    If they figured that out, we

8     would have figured the golden nugget out

9     there.

10    Q.    How did this -- if -- how, if

11    at all, was this in-transit loss with FedEx

12    resolved?

13          MS. TABACCHI:  Object to the

14     form.

15          THE WITNESS:  How was it

16     resolved?

17    Q.    (BY MR. INNES)  Strike that.

18          Following Walmart's

19    conversations with the DEA regarding these

20    losses, did Walmart adjust its business

21    practices at all?

22          MS. TABACCHI:  Object to the

23     form.

24          THE WITNESS:  As I discussed,

25     we were working with FedEx to come up

1    with some solutions.  And so there

2    were some solutions that collectively

3    we were working with them on.

4         Q.    (BY MR. INNES)  And were they

5    ultimately completed?

6         A.    There was some that were

7    tested, and -- yes.

8         Q.    Were there any that were tested

9    and then put into practice?

10        A.    Yes.

11        Q.    Okay.  And what were those?

12        A.    The one that I recall is a --

13   was in progress, but it was a

14   palletization -- palletization of the drugs.

15             So that they were palletized,

16   and so they weren't moving and in transit in

17   individual boxes, but that they were in a

18   pallet that was shrink-wrapped.

19             (Walmart-Hodges Deposition

20        Exhibit 2 was marked for

21        identification.)

22             MR. INNES:  Same

23   self-admonition on the hole punch.

24             This is a short email.  Let me

25   know when you have a chance to review

Highly Confidential - Subject to Further Confidentiality Review

1          it.

2                    THE WITNESS:  I'm completed.

3          Q.     (BY MR. INNES)  I'm sorry, I

4     didn't hear you say "I'm completed."  I'm

5     reading.  My fault.  I didn't mean to make

6     you sit there.

7                    So this is a one-page email.

8     It's a Walmart document with the Bates ending

9     6197.

10                    And it's an email from you,

11    Ms. Hodges, to a Lisa Holland on June 30th,

12    2017.

13                    The -- it's an email chain, I

14    should say.

15                    It begins with Lisa Holland

16    writing to you on June 30th -- on '17,

17    saying, "Debbie, would you have 30 minutes

18    available on 7-6 to meet with Dena, Shawn and

19    I to discuss the upcoming launch of the new

20    SOM system called Buzzeo?"

21                    So before we dive into that,

22    very short email.  I'm wondering if you could

23    tell me when Buzzeo became -- or what Buzzeo

24    is.

25          A.     So Buzzeo is the alert system

1    that we put in place -- and I say "we."  I'm

2    talking Walmart -- put in place in

3    replacement of Reddwerks.

4           Q.     Okay.  And when did Buzzeo

5    fully replace Reddwerks?

6           A.     Fully replaced for a day --

7    they fully replaced in August, a day and a

8    half, maybe.  July, August.

9                  And then fully replaced them

10   November-ish timeframe.

11          Q.     Okay.  And that's August of

12   2016?

13          A.     Well, it was --

14          Q.     2017.

15          A.     August of 2017.

16          Q.     Okay.

17          A.     And then August -- and then

18   November of '17.

19          Q.     Okay.  Before I forget, the

20   November of '17 date just triggered this in

21   my mind.

22          A.     What?

23          Q.     I'm just going to ask you a

24   quick question.

25                 The -- do you recall any

1    written policies that were in place in the

2    logistics side of the business post

3    November 2017?

4                    MS. TABACCHI:  Object to the

5            form.

6                    THE WITNESS:  Post?  Do I

7            recall any policies?

8            Q.    (BY MR. INNES)  I'm sorry,

9    strike that.

10                   Do you recall any policies

11   relating to the distribution of Schedule II

12   drugs that were in place in November of --

13   in -- I'm sorry, in December of '17?

14                   MS. TABACCHI:  Object to the

15           form.

16                   THE WITNESS:  I'm not sure what

17           you're after.  I don't recall any

18           specific policies.

19           Q.    (BY MR. INNES)  I'm sorry, I'm

20   not trying to play a game of gotcha.

21                   One thing that I'm trying to

22   clear up is we served on Walmart something

23   called a combined set of discovery that asked

24   for all policies regarding Walmart's

25   suspicious order monitoring systems from

1    January 2006 forward.

2            In response we received a

3    narrative of what those policies were, and

4    also certain documents -- citations to

5    documents.  I can represent to you that those

6    policies that were produced to us, none of

7    them has an effective date later than

8    November of 2017.  And I'm wondering if you,

9    sitting here today, have knowledge of any

10   policies regarding the SOM process that would

11   fall after November of 2017.

12           A.    I don't.

13                 MS. TABACCHI:  Object to the

14           form.

15                 THE WITNESS:  I don't.

16           Q.    (BY MR. INNES)  So in June of

17   2017, Ms. Holland wrote to you and others

18   asking for time to discuss the upcoming

19   launch of Buzzeo.  And she's asking for that

20   meeting to "review some of our concerns and

21   potential solutions."

22           Do you recall ever discussing

23   concerns or potential solutions with

24   Lisa Holland regarding Buzzeo?

25           A.    I don't recall the content.  I

```
1    don't -- I don't recall specific content.
2         Q.    But you recall the
3    conversation?
4         A.    I don't -- I don't recall the
5    conversation either, no.
6              I'll use my terminology, I've
7    slept since then.
8         Q.    Do you have any recollection
9    whatsoever as to what -- the concerns that
10   Ms. Holland had?
11        A.    I don't recall.
12        Q.    Did you speak with
13   Ms. McClamroch regarding any concerns she may
14   have had regarding the -- and potential
15   solutions regarding Buzzeo?
16        A.    I don't recall.
17        Q.    Okay.  Do you recall speaking
18   with Shawn Robinson regarding any concerns
19   and potential solutions regarding the launch
20   of Buzzeo?
21        A.    I don't recall.
22        Q.    It's possible, though, that she
23   did -- that these -- these folks did express
24   some concerns to you regarding the launch of
25   Buzzeo; is that correct?
```

1          A.     I just don't recall.

2          Q.     At this point in time, is

3    Mr. Boudreaux your -- do you report directly

4    to Mr. Boudreaux?

5          A.     No.

6          Q.     Who did you report to at this

7    time?

8          A.     I reported to Bryan Boudreaux

9    at that time.

10                Is that -- are you talking at

11   that time?

12         Q.     Yeah.  Yes.

13         A.     I thought you just asked

14   present tense, and I don't currently report

15   to Bryan.

16         Q.     I'm sorry.  I asked at this

17   time in the context of --

18         A.     Oh.

19         Q.     -- this document.  And that's

20   my -- thank you for making that clear.

21                In June of 2017, you're

22   reporting directly to Mr. Boudreaux; is that

23   correct?

24         A.     Correct.

25         Q.     And did you notify

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Mr. Boudreaux that other Walmart employees

 2      had concerns regarding the launch of Buzzeo?

 3                  MS. TABACCHI:  Object to the

 4            form.

 5                  THE WITNESS:  Not that I

 6            recall.

 7            Q.    (BY MR. INNES)  Is it possible

 8      that you raised it with Mr. Boudreaux?

 9            A.    I just don't recall.

10            Q.    Okay.

11                  Sitting here today, do you

12      think it would have been important to raise

13      your colleague's concerns regarding the

14      launch of Buzzeo with your superior?

15            A.    I just don't recall if it

16      happened.

17            Q.    In June of '17, you're aware

18      of -- again, you're aware of the opioid

19      crisis.  You're now being told of potential

20      flaws with Walmart's potential use system to

21      flag orders of interest; is that right?

22                  MS. TABACCHI:  Object to the

23            form.

24                  THE WITNESS:  I don't think

25            this says flaws to the system, does
```

Highly Confidential - Subject to Further Confidentiality Review

1    it?

2        Q.    (BY MR. INNES)  Well, we can

3    use the words here.  You're being notified of

4    concerns and potential solutions regarding

5    Buzzeo?

6        A.    That's -- I -- yes.  I don't

7    recall what those were.  Or I don't recall

8    that -- I don't recall what they were,

9    but ...

10       Q.    Sitting here -- if you were to

11   have received this email today, would you --

12   would this be something that was important to

13   you to forward on to your superiors?

14       A.    Absolutely not.  Because it's

15   compliance's responsibility, Buzzeo, at this

16   point.

17       Q.    Okay.  So it's your position

18   that it is your common practice at Walmart --

19   I think your -- to borrow a phrase -- to stay

20   in your lane and --

21       A.    What do you mean by that?

22       Q.    Well, is it your common

23   practice not to share information with other

24   divisions that might be helpful?

25       A.    Man, I --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. TABACCHI:  Object to the
 2         form.
 3              THE WITNESS:  I never said
 4         that.  I don't agree with that
 5         statement.
 6              "Not to share information."  I
 7         never -- I never stated that.
 8         Q.   (BY MR. INNES)  So if you don't
 9    agree with that statement, then maybe you
10    should have shared this information with
11    someone in compliance.
12              Would you agree with that?
13              MS. TABACCHI:  Object to the
14         form.
15              THE WITNESS:  I think you're
16         making assumptions here.
17              The -- our compliance team and
18         this team work very closely together.
19              So there were conversations in
20         the -- so long before I even got in
21         the chair, there were conversations
22         about the development of Buzzeo.  And
23         then about the -- about the, what I
24         call tactical piece of Buzzeo.
25              And so there were very close
```

1      conversations with compliance over

2      Buzzeo.

3          Q.     (BY MR. INNES)  So compliance

4    has ownership of Buzzeo; is that a fair

5    statement, at that point in time?

6          A.     At this point in time?

7          Q.     Yes.

8          A.     No, that's not accurate.

9          Q.     Logistics has possession of

10   Buzzeo?

11         A.     It's a combination.  Once

12   again, this was a support.  We're support

13   areas.  It wasn't just supply chain.  It was

14   supply chain and compliance and legal.

15         Q.     How do you square that with

16   your prior testimony that you -- that in

17   response to if you were sitting here, you had

18   received this email today, you would -- this

19   would be something that was important to you

20   to forward to your superiors.  Your answer,

21   "Absolutely not.  Because it's compliance's

22   responsibility, Buzzeo, at this point."

23         A.     Well, I made a mistake.  At

24   this point.  Because you asked me present

25   tense.  So maybe I'll just course-correct

1    myself on record.  So currently, after the

2    November timeframe, compliance had

3    responsibility for Buzzeo.  Currently, in

4    this situation, it's a compliance supply

5    chain.

6         Q.    Okay.  So sitting here today,

7    this wouldn't be something that would be

8    important for you to share, but back in 2016?

9         A.    I don't know that it won't be

10   important now.

11        Q.    Let me finish my question.

12             When you actually received this

13   email, it would have been important?

14             MS. TABACCHI:  Object to the

15        form.

16             THE WITNESS:  So, and what I'm

17        telling you is, this, the teams work

18        very closely, hand in hand.  So the

19        conversation about Buzzeo was

20        certainly happening with compliance,

21        with my team.

22        Q.    (BY MR. INNES)  And how do

23   you -- what makes you certain of that?

24        A.    Because we -- because we looked

25   to them for guidance for all of the

Highly Confidential - Subject to Further Confidentiality Review

1    compliance piece of this.

2         Q.    And what can you direct me to

3    that shows that you had communications with

4    them regarding Buzzeo?

5         A.    My --

6              MS. TABACCHI:  Object to the

7         form.

8              THE WITNESS:  I'm communicating

9         to you that there was very close

10        conversations with the two teams.

11        Q.    (BY MR. INNES)  So when you say

12   you looked to compliance for guidance, what

13   exactly were you looking to -- what guidance

14   were you seeking from compliance?

15             MS. TABACCHI:  Object to the

16        form.

17             THE WITNESS:  I didn't say I

18        sought guidance from them.  What I'm

19        saying is these two teams -- these two

20        teams work very closely together.  And

21        so with Buzzeo, they work very closely

22        together.  In fact, the compliance

23        team was the one that actually vetted

24        the system, to bring into Walmart.

25        And so this -- the compliance team and

Highly Confidential - Subject to Further Confidentiality Review

1            the supply team -- supply chain team

2            work very closely on Buzzeo.

3            Q.     (BY MR. INNES)   Okay.

4            A.     Just as they did on Reddwerks.

5            Q.     So there -- the compliance team

6       and your team work very closely on Buzzeo.

7       That's your testimony?

8            A.     Compliance -- my testimony is

9       that compliance actually did the vetting of

10      the system to bring Buzzeo in.

11           Q.     Who were the folks that were on

12      this email?  Are they compliance folks or are

13      they logistics folks?

14           A.     These happen to be my direct

15      reports.

16           Q.     Okay.  So your direct reports

17      have some --

18           A.     Which, for the record, are

19      supply chain team.

20           Q.     Okay.  Not compliance?

21           A.     You asked the question which

22      team are they on.  They're from supply chain.

23      These, on this -- on this one email.

24           Q.     Right.  And these folks,

25      Lisa Holland, Dena McClamroch and

Highly Confidential - Subject to Further Confidentiality Review

```
1    Shawn Robinson, members of your team, want to

2    discuss concerns they have with Buzzeo.  That

3    was vetted by another team.

4         A.    That's -- that's what the

5    document says.

6         Q.    Okay.  And you don't recall

7    ever having a discussion with your team

8    members regarding their concerns about the

9    other team with which you testified they work

10   very closely?

11             MS. TABACCHI:  Object to the

12        form.

13             THE WITNESS:  I don't recall

14        the conversations going on and I

15        certainly don't recall, obviously, the

16        detail of the conversations.

17        Q.    (BY MR. INNES)  Did you think

18   it was -- did you find it helpful that

19   Ms. Holland was raising these concerns with

20   you at that time?

21             MS. TABACCHI:  Object to the

22        form.

23             THE WITNESS:  I always

24        appreciate a conversation.

25             I don't know that I can speak
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              if I thought it was helpful because I

2              don't recall the conversation and I

3              don't recall the content.

4                   (Walmart-Hodges Deposition

5              Exhibit 3 was marked for

6              identification.)

7         Q.    (BY MR. INNES)  For the record,

8    Exhibit 3 is a one-page email, Walmart

9    document, ending in 8328.

10                  [Document review.]

11        Q.    (BY MR. INNES)  So you've had

12   an opportunity to review the document.

13                  Direct your attention to the

14   bottom of this email chain.  It's an email

15   from you, Ms. Hodges, to Nick Tallman,

16   Ramona Sullins, Dena McClamroch, Theresa

17   Alford, with a cc to Kelsey Marino.

18                  Who is Kelsey Marino?

19        A.    She is my assistant, but really

20   serves as the department assistant.

21        Q.    Okay.  Was Ms. Marino your

22   assistant in June of 2016?

23                  MS. TABACCHI:  Object to the

24              form.

25                  THE WITNESS:  Yes.
```

```
 1              MS. TABACCHI:  I'm sorry, did
 2         you say June of 2016?
 3              THE WITNESS:  No.  That's --
 4         June of '16.  I don't know.  She
 5         wasn't mine.  I had somebody else at
 6         the time.
 7         Q.    (BY MR. INNES)  When was
 8    Ms. Marino your assistant?
 9         A.    When I took the job in June of
10    '17.
11         Q.    June of '17.  Okay.
12              Does this refresh your
13    recollection from earlier today as to who
14    maintained your calendar during your time as
15    the vice president?
16         A.    During the time of what?  What
17    timeframe are we asking?
18         Q.    June '17 through present.
19         A.    You're looking at her.  She
20    maintained the calendar.
21         Q.    You maintained the calendar?
22         A.    Kelsey would do some things,
23    but I'd go in and adjust my calendar.
24         Q.    Okay.  So you --
25         A.    So I don't know that I maintain
```

1    it.  Let me course-correct.  I don't maintain

2    it, but I do put meetings on that calendar.

3         Q.    You do?

4         A.    Yes.

5         Q.    Do you want to correct any of

6    your prior testimony that you indicated you

7    did not put meetings on your calendar?

8         A.    I -- I do put some -- I -- very

9    few, but I do put some meetings on that

10   calendar.

11            So let me correct that.  If I

12   said I didn't put anything, I do put some

13   meetings on that calendar.

14        Q.    And if we wanted to refresh

15   your recollection as to what meetings you did

16   or did not attend, could we refer to your

17   calendar?

18        A.    Provided it's been updated.

19        Q.    And what do you mean by

20   "updated"?

21        A.    I mean if the meeting didn't

22   happen, did it get pulled off.  Sometimes

23   that doesn't happen.

24            Maintained, updated.

25        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Is what I mean.

 2          Q.      All right.

 3                  But in any event, it could be

 4     used to refresh your recollection as to those

 5     meetings?

 6          A.      If it -- if it, at the time,

 7     reflected what happened.

 8                  I don't know if it had been

 9     updated.  That's just what I said.

10          Q.      So getting to the substance of

11     this particular document.

12          A.      Yep.

13          Q.      The bottom it says, "Team, what

14     other retailers or shippers or wholesalers

15     use Buzzeo?  I'm in a meeting where the

16     question is asked.  Immediate response would

17     be appreciated, if you know."

18                  Do you recall that meeting?

19          A.      I don't.  I don't.

20          Q.      Do you recall discussing at any

21     point in time what retailers, shippers or

22     wholesalers used Buzzeo?

23          A.      The answer is I asked the

24     question.  I remember -- this refreshes my

25     memory that I was asked the question.

1      Q.      Okay.  And who asked you that

2   question?

3      A.      I don't know.

4      Q.      Do you recall meetings where

5   Buzzeo was discussed in October of 2017?

6      A.      Do I remember the meetings?  Is

7   that -- was that your question?

8      Q.      Yes.

9      A.      No.

10      Q.      Who do you think you likely had

11   a meeting with regarding Buzzeo?

12      A.      I don't know.  I don't know.

13           And -- I don't know.

14      Q.      Did you meet with members of

15   compliance regarding Buzzeo?

16      A.      I had conversations with

17   compliance in regards to Buzzeo.

18      Q.      Okay.  Do you recall those

19   conversations?

20      A.      I don't.

21      Q.      Who did you have conversations

22   with regarding Buzzeo?

23      A.      Miranda.

24      Q.      And what did you discuss?

25      A.      Miranda gave me some -- that's

1    why I know they actually vetted it.  She gave

2    me background as to Buzzeo.  That they

3    chose -- not necessarily why, but that

4    compliance chose Buzzeo.  And then she gave

5    me background as to the timing of

6    anticipation of rolling out Buzzeo.

7        Q.    Did you speak with anyone else

8    regarding those issues?

9        A.    Not that I recall.

10             Those weren't issues.  Those

11   were just a timeline and background.  History

12   background.

13       Q.    I can rephrase.  Did you speak

14   with anyone else regarding those topics?

15       A.    Not that I recall.  But I don't

16   know -- I don't know -- I don't recall.

17       Q.    Do you recall when Buzzeo was

18   first planned to roll out?

19             MS. TABACCHI:  Object to the

20        form.

21             THE WITNESS:  So you're going

22        to have to clarify the question.

23             I wasn't involved in the

24        beginning of the conversation around

25        Buzzeo.  Is that what you're speaking

1      about?

2          Q.    (BY MR. INNES)  I'm just

3      wondering if you can tell me if Walmart had a

4      plan to roll out Buzzeo prior to the date

5      that it actually was rolled out.

6                MS. TABACCHI:  Object to the

7          form.

8                THE WITNESS:  I don't remember.

9          Q.    (BY MR. INNES)  Do you remember

10     any -- well, strike that.

11               At some point in time the

12     decision was made to switch from Reddwerks to

13     Buzzeo; is that right?

14         A.    You're out of my scope.  I --

15     there was a decision.  I don't know when.

16         Q.    How did the decision impact

17     your team, if at all, to switch to Buzzeo?

18         A.    How did it -- how did it impact

19     my team?

20               When the plans to roll out to

21     Buzzeo, then, as I said earlier, the

22     responsibilities would shift to compliance.

23     So that would impact the team.

24         Q.    Were you aware of any estimates

25     that Buzzeo would identify more orders of

1    interest than Reddwerks had identified in the

2    past?

3         A.    I was -- I don't recall.

4         Q.    Is there anything that would

5    help refresh your recollection as to that

6    question?

7         A.    I don't know.

8         Q.    When Buzzeo did roll out, were

9    there a greater number of orders of interest

10   that were flagged than when -- as opposed to

11   when Reddwerks was in place?

12              MS. TABACCHI:  Object to the

13         form, lack of foundation.

14              THE WITNESS:  And so are you

15         talking about the first time or the

16         second time?

17         Q.    (BY MR. INNES)  Let's take them

18   in order, the first time.

19         A.    The first time, there were

20   systems issues, technical systems issues.  I

21   don't know that I would couch it as number

22   of -- what you just couched it as, number of

23   orders, but there were systems -- there were

24   some kind of systems issues.

25         Q.    What's -- what do you mean by

1    "systems issues"?

2        A.    I can't define what I mean by

3    systems issues, because I am not a technical

4    expert.

5             But certainly I have team

6    members that are.

7        Q.    Okay.  So where did you come to

8    know the term "systems issues"?

9        A.    I came to know systems issues

10   through Ramona Sullins.

11       Q.    Okay.  Ramona Sullins tell you

12   that Buzzeo was experiencing systems issues?

13            MS. TABACCHI:  Object to the

14       form.

15            THE WITNESS:  Ramona -- I

16       think -- I had conversation with

17       Ramona, and I think I had

18       conversation -- I had conversation

19       with Nick.

20       Q.    (BY MR. INNES)  Is this

21   Nick Tallman?

22       A.    Correct.

23       Q.    The second time that Buzzeo

24   rolled out.  And that was the final time that

25   Buzzeo rolled out; right?  The second time?

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.      Correct.

2         Q.      And what was the date of that

3    again?

4         A.      Sometime in November.

5         Q.      Okay.  And when it finally --

6    November of '17?

7         A.      Correct.

8         Q.      Okay.  And November of '17,

9    when Buzzeo finally rolled out, did Walmart

10   experience a greater number of orders of

11   interest being flagged by Buzzeo than by

12   Reddwerks?

13              MS. TABACCHI:  Object to the

14         form.  Lack of foundation.

15              THE WITNESS:  By that time, it

16         had transitioned over -- completely

17         over to compliance, so I don't -- I

18         don't recall.

19         Q.      (BY MR. INNES)  Okay.

20              When Buzzeo rolled out, did it

21   in fact flag orders of interest?

22         A.      Did what?

23         Q.      When Buzzeo rolled out in

24   November of '17, did it flag orders of

25   interest?
```

1          A.     Well, that was the objective

2     was for it to flag orders of interest.

3          Q.     I understand that was the

4     objective.  My question is, did it actually

5     fulfill that objective?  Were orders of

6     interest flagged by Buzzeo?

7                MS. TABACCHI:  Object to the

8          form.  Lack of foundation.

9                THE WITNESS:  Miranda would be

10          the one that would have to answer

11          that.  Or somebody on the compliance

12          side of the business.

13                Or -- because I -- at that

14          point it had transitioned -- they had

15          a team.

16          Q.     (BY MR. INNES)  In November of

17     '17, when Buzzeo rolled out, what, if -- what

18     was logistics' role, if any, with respect to

19     the evaluation of orders of interest?

20          A.     There was a transition and

21     Miranda had a team that did an evaluation

22     when that transitioned.

23                When Buzzeo, for the second

24     time, in that November timeframe, turned on,

25     Miranda had a team that did the evaluation of

1    the orders of interest.

2         Q.    Okay.  So in the process we

3    just spent hours discussing this afternoon,

4    your folks were the SOM -- was the SOM team;

5    right?

6         A.    My what?

7         Q.    The folks that you oversaw were

8    on the SOM team?

9              MS. TABACCHI:  Objection -- go

10        ahead.  Finish your question.

11        Q.    (BY MR. INNES)  Is that

12   correct?

13        A.    Yes.

14              MS. TABACCHI:  Object to the

15        form.

16        Q.    (BY MR. INNES)  When Buzzeo

17   rolled out, did that process that we

18   discussed under Reddwerks, did that change at

19   all?

20        A.    Did the -- I don't know.  It

21   transitioned over to the compliance team, so

22   I don't know what that process then looked

23   like.

24        Q.    Was your team involved in the

25   process?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      We were involved in the

2   transition of the process, but once it

3   transitioned, no, they were not involved in

4   it.

5      Q.      So after the transition of the

6   process, the transition from logistics to

7   compliance, did any folks in -- under your

8   command have responsibility for evaluations

9   of orders of interest?

10      A.      After the complete transition,

11   no.

12      Q.      Okay.

13      A.      And so it -- there was a

14   transition.  I don't recall the exact days of

15   that transition, but the -- after that

16   complete transition, no.  It was compliance.

17      Q.      After the complete transition,

18   did you still meet with Miranda Johnson and

19   Roxy Reed to evaluate orders of interest?

20      A.      No.

21      Q.      When was the last order of

22   interest meeting that you attended with --

23   well, order of interest meeting that you

24   attended?

25      A.      I don't recall.

1    Q.    Okay.  Did it happen before or

2  after the transition?

3            MS. TABACCHI:  Object to the

4        form.

5            THE WITNESS:  I don't recall.

6    Q.    (BY MR. INNES)  So that was

7  sort of an important meeting that you attend

8  on many times during the same month.  And

9  that came off the calendar.  I can imagine

10  that might be a --

11    A.    What did you say?  The first

12  part?

13    Q.    At some point did you stop

14  going to the order of interest meetings?

15            MS. TABACCHI:  Object to the

16        form.

17            THE WITNESS:  Correct.

18    Q.    (BY MR. INNES)  You did.  Okay.

19            Did that happen -- did you ever

20  attend an order of interest meeting to

21  examine orders of interest flagged by Buzzeo?

22    A.    Not that I recall.

23    Q.    Okay.

24    A.    There would have been no

25  reason.

1    Q.    And why would there have been

2  no reason for that?

3    A.    Because the SOM team wasn't --

4  in -- at that point, the SOM team wasn't

5  involved.  But I just didn't -- I --

6    Q.    Did you receive a communication

7  from anyone directing you to no longer attend

8  meetings to evaluate orders of interest?

9    A.    I had a conversation with

10  several people on the compliance --

11  several -- several of my support system on

12  the compliance side.

13    Q.    Okay.

14    A.    To -- that there was no longer

15  a need for it.  Because it did transition.

16  So that was Miranda, that was George Chapman,

17  that -- that --

18         So there was -- yeah, there

19  were several conversations.

20    Q.    So that -- the policy that was

21  in place that directed -- directed the orders

22  of interest to be evaluated and delivered to

23  you and others for examination, that policy

24  dissolved after the transition; is that

25  right?

1          MS. TABACCHI:  Object to the

2      form.

3          THE WITNESS:  I don't know that

4      it dissolved.  I know that I was asked

5      to no longer -- there was no need for

6      me to attend those meetings.  That's

7      what I know.

8      Q.    (BY MR. INNES)  When did

9  Walmart exit the distribution of Schedule II

10 drugs?

11     A.    It was in April-May timeframe.

12 April-May.

13     Q.    April-May of 2017?

14     A.    Correct.

15     Q.    And when did you first learn of

16 Walmart's decision to exit the business?

17     A.    I don't --

18         MS. TABACCHI:  You asked 2017.

19     I just want to make sure if you wanted

20     to ask 2017.

21     Q.    (BY MR. INNES)  I'm sorry,

22 2018.

23     A.    Correct.

24         Thank you.

25         MR. INNES:  Thank you for that,

1        Tina.

2        Q.    (BY MR. INNES)  So Walmart

3    exited the distribution of Schedule II drugs

4    in April or May of 2018?

5        A.    It was -- right.  It was a

6    transition of April-May timeframe.

7        Q.    And when did you first learn

8    that Walmart would no longer distribute

9    Schedule IIs?

10        A.    I don't recall the exact date.

11        Q.    Okay.  Do you recall the

12    approximate date?

13        A.    It was some time before that.

14        Q.    Did -- how did you learn that

15    Walmart was going to exit the distribution of

16    Schedule IIs?

17        A.    It was communicated in a

18    meeting.

19        Q.    And what meeting was that?

20        A.    It was a meeting that had -- it

21    was with operation, health and wellness, and

22    compliance.  And supply chain.

23        Q.    Those were three different

24    divisions?

25        A.    Yes.  But there were more in

Highly Confidential - Subject to Further Confidentiality Review

1    there.  There was other -- replenishment was

2    in there.  Legal was in there.  But I don't

3    recall the rest.

4                    MR. INNES:  I'm going to ask

5           another question.  Give your counsel

6           time to interpose an objection.

7           Q.    (BY MR. INNES)  Who attended --

8    do you recall who attended the meeting?

9           A.    I recall that I did.

10          Q.    Okay.  Do you recall who

11   from -- any other Walmart employees that

12   attended the meeting?

13          A.    I recall that George Riedl

14   attended.

15          Q.    Why do you recall Mr. Riedl

16   attending?

17          A.    Because he was the one that

18   made the announcement.

19          Q.    Okay.  Who is Mr. Riedl?

20          A.    Mr. Riedl was the SVP -- was

21   the SVP of pharm -- I don't know the title.

22   Pharmacy --

23          Q.    Okay.

24          A.    -- operation -- I don't know

25   his exact title.

 1        Q.      During that meeting, did

 2   Mr. Riedl give the reasons for Walmart's

 3   decision to exit the Schedule II distribution

 4   business?

 5             MS. TABACCHI:  Do you mind if I

 6        just -- I don't -- there were lawyers

 7        present at this meeting, and I would

 8        appreciate just an opportunity to talk

 9        to the client before we talk about the

10        substance of what was discussed in

11        this meeting to make sure that there

12        is no privilege issue.

13             MR. INNES:  We can do that.

14        I'm a little surprised that you

15        haven't talked to her about this

16        meeting yet, but if you'd like to take

17        a few minutes to do so, I'm happy to

18        do it.

19             THE WITNESS:  She hasn't.

20             MS. TABACCHI:  Thank you.

21        We'll be back.

22             THE VIDEOGRAPHER:  3:55.  We

23        are off the video record.

24             (Recess taken, 3:55 p.m. to

25        3:59 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  3:59.  We
 2         are on the video record.
 3              MR. INNES:  We're back on the
 4         record.  We took a break to allow
 5         counsel for Walmart to confer with
 6         Ms. Hodges regarding the pending
 7         question.  I'll just read back the
 8         pending question so you have it.
 9         Q.    (BY MR. INNES)  During that
10    meeting, did Mr. Riedl give the reasons for
11    Walmart's decision to exit the Schedule II
12    distribution business?
13         A.    No.  He did not.
14         Q.    When did this meeting take
15    place?
16         A.    I don't recall.
17         Q.    It was obviously some time
18    before Walmart exited the business.  Do you
19    recall if it was a short period of time?  A
20    long period of time?
21         A.    I don't recall.
22         Q.    Do you recall, it was April or
23    May, the exit?  Do you recall the weather on
24    that day?
25              MS. TABACCHI:  Object to the
```

1        form.

2                THE WITNESS:  I don't recall.

3        Q.     (BY MR. INNES)  Do you recall

4   whether it was warm out?

5                I'll withdraw that question.

6                Do you recall who attended the

7   meeting, other than the folks that you've

8   already listed?

9        A.     No.  I've listed those that --

10   those functional areas that I know that

11   attended.

12        Q.     Okay.  Do you know if

13   Roxy Reed -- know if Roxy Reed -- Roxanne

14   Reed attended that meeting?

15        A.     I don't know.

16        Q.     What is your understanding of

17   why Walmart decided to exit the Schedule II

18   business?

19        A.     My understanding is we were

20   told that we were exiting the business.

21   That's the extent that I know.

22        Q.     Okay.

23                Do you have any opinions

24   yourself as to why Walmart decided to exit

25   the business?

1       A.      I don't.

2       Q.      You didn't question why Walmart

3    had decided to exit the business?

4       A.      I didn't.

5       Q.      Were any of your direct reports

6    affected by the business decision to exit the

7    Schedule II business?

8       A.      Some of their jobs were

9    eventually impacted.

10       Q.      Okay.  And what do you mean by

11    "eventually impacted"?

12       A.      So we are -- ██████████████

13    made a decision to leave the company.

14                  ███████████████  made a decision

15    to go to another -- another business within

16    Walmart.

17       Q.      Do you know where

18    Lisa Holland -- strike that.

19                  Do you know if Lisa Holland

20    obtained employment elsewhere after Walmart?

21       A.      Yes.

22       Q.      Do you know where she's

23    employed?

24       A.      Arvest.

25       Q.      Arvest?  Arvest is a regional

Highly Confidential - Subject to Further Confidentiality Review

```
 1      bank; is that correct?
 2           A.     Correct.
 3           Q.     And it's owned by a member of
 4      the Walton family?  Is that --
 5           A.     You've got me.
 6                  I should have said "I don't
 7      know" rather than "You've got me."  I don't
 8      know.
 9           Q.     It's getting late in the day.
10                  Approximately how long did that
11      meeting last?
12                  MS. TABACCHI:  Object to the
13           form.
14                  THE WITNESS:  The -- yeah.
15           Clarify which meeting.
16           Q.     (BY MR. INNES)  Oh, I'm sorry.
17      The meeting where George Riedl announced that
18      Walmart would be exiting the Schedule II
19      business.
20           A.     It was a very short meeting.
21           Q.     Okay.
22           A.     So ...
23           Q.     Less than an hour?
24           A.     Very short meeting.
25           Q.     Five minutes?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.  Somewhere -- very
 2    short.  I don't know that it was five minutes
 3    exactly, but it was a very short meeting.
 4          Q.    Were folks surprised by the
 5    decision?
 6                MS. TABACCHI:  Object to the
 7          form.
 8                THE WITNESS:  I don't know that
 9          "surprised" was a word.  They -- I
10          don't know.  I -- we walked out of the
11          room.
12          Q.    (BY MR. INNES)  Were you
13    surprised by the decision to exit the
14    business?
15          A.    I was trying to figure out how
16    we planned to exit.  I wasn't surprised it --
17    I was trying to figure out how we transition,
18    right?
19          Q.    Why weren't you surprised?
20          A.    I just wasn't surprised.  I was
21    trying -- my mind was to, "Okay, now I've got
22    to figure out how to transition this."
23    That's just where my head was.
24          Q.    At any point in time prior to
25    that announcement, did you expect Walmart to
```

Highly Confidential - Subject to Further Confidentiality Review

1    exit the business?

2          A.    I was not -- I was not -- did I

3    expect?  I didn't expect, because I didn't

4    know.  I wasn't involved with any kind of

5    decision.  I didn't know.

6          Q.    Okay.  Were you required to

7    sign a nondisclosure agreement as part of

8    your -- after you were informed that Walmart

9    was going to exit the Schedule II business?

10         A.    Was I required?

11         Q.    Yes.

12         A.    No.

13         Q.    Did you sign a nondisclosure

14   agreement?

15         A.    No.

16         Q.    Were you asked to sign a

17   nondisclosure agreement?

18         A.    There was a nondisclosure

19   agreement that was -- that was put out there,

20   but to my recollection, I did not sign it.

21         Q.    What do you mean by "put out

22   there"?

23         A.    It was -- there was a

24   nondisclosure that was sent to individuals.

25   That's what I mean by "put out there."  Sent

Highly Confidential - Subject to Further Confidentiality Review

1    to individuals.

2         Q.    Was it sent to you?

3         A.    I don't even recall that.

4         Q.    If it was sent to you, would

5    it -- would it be -- would it have been sent

6    via email?

7         A.    Perhaps.

8         Q.    Would you have retained a copy

9    of that email?

10        A.    I -- I would not have.

11        Q.    You would -- would you have

12   deleted that email?

13             MS. TABACCHI:  Object to the

14        form.

15             THE WITNESS:  I would not -- it

16        still would be accessible in the email

17        system if it were sent to me.

18        Q.    (BY MR. INNES)  And why do you

19   say "it would still be accessible"?

20        A.    Because my emails are all

21   accessible.

22        Q.    It's not your -- do you ever

23   delete emails?

24        A.    I --

25             MS. TABACCHI:  Object to the

1    form.

2            THE WITNESS:  I have a lot of

3       emails in my email.

4            So the answer is sometimes I

5       delete emails, but it would still be

6       accessible.

7       Q.    (BY MR. INNES)  How do you know

8    this nondisclosure agreement was sent to

9    others?

10      A.    The -- there was -- because

11   there was conversation in a meeting that --

12   about sending it.

13           So I don't know that it was

14   sent.  Or I don't -- I can't tell you who it

15   was sent to.

16           But there was conversation

17   about a nondisclosure.

18      Q.    And was that conversation in a

19   meeting other than the one in which Mr. Riedl

20   announced Walmart's decision to exit the

21   business?

22      A.    I don't know when that

23   conversation happened.  I don't -- I don't

24   know if it happened in that meeting or in

25   another meeting.  I don't know.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Okay.

 2          A.      I don't recall.

 3          Q.      Do you recall if it happened,

 4    you know, in a meeting shortly after the

 5    meeting with Mr. Riedl?

 6          A.      I don't recall.  I just don't

 7    recall.

 8          Q.      Do you recall who attended that

 9    meeting?

10          A.      I don't.

11                  MS. TABACCHI:  Object to the

12          form.

13          Q.      (BY MR. INNES)  Did anyone

14    other than Mr. Riedl speak at the meeting

15    where he announced Walmart's decision to exit

16    the business?

17          A.      My recollection is just Mr. --

18    George Riedl speaking.

19                  MR. INNES:  Why don't you just

20          give me a couple minutes.

21                  We can go off the record.

22                  THE VIDEOGRAPHER:  4:07.  We

23          are off the video record.

24                  (Recess taken, 4:07 p.m.

25          4:11 p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE VIDEOGRAPHER:  4:11.  We
 2        are on the video record.
 3        Q.     (BY MR. INNES)  Ms. Hodges, we
 4   are back on the record.  Just a few more
 5   questions regarding the nondisclosure
 6   agreement.
 7              Do you recall any other time in
 8   your tenure at Walmart where employees were
 9   asked to sign a nondisclosure agreement?
10        A.     Yes.  In my merchandising days
11   I was asked.
12        Q.     Okay.  And did you sign those
13   nondisclosure agreements in your
14   merchandising days?
15        A.     When appropriate.  When there
16   were new launches of product that the
17   companies wanted to protect.  The companies
18   being suppliers wanted to protect, yes.
19        Q.     Did any of your immediate
20   reports -- were any of your immediate reports
21   asked to sign a nondisclosure agreement?
22              MS. TABACCHI:  Object to the
23        form.
24              THE WITNESS:  I don't recall --
25        I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      (BY MR. INNES)  Okay.

2                MR. INNES:  No further

3        questions.  Unless you've got

4        questions, I'm fine to end the

5        deposition.

6                MS. TABACCHI:  We have no

7        questions, no.

8                Thank you.

9                MR. INNES:  All right.  Thank

10       you.

11               MS. TABACCHI:  We'll reserve

12       signature.

13               THE VIDEOGRAPHER:  4:12 p.m.

14       We are off the record.  This concludes

15       the video deposition.

16               (Proceedings recessed at

17       4:12 p.m.)

18                       --o0o--

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CERTIFICATE
 2            I, DEBRA A. DIBBLE, Registered
      Diplomate Reporter, Certified Realtime
 3    Reporter, Certified Realtime Captioner,
      Certified Court Reporter and Notary Public,
 4    do hereby certify that prior to the
      commencement of the examination, DEBBIE
 5    HODGES was duly sworn by me to testify to the
      truth, the whole truth and nothing but the
 6    truth.
 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      not requested by the witness or other party
12    before the conclusion of the deposition.
13            I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17

      _____
20    DEBRA A. DIBBLE, RDR, CRR, CRC
      NCRA Registered Diplomate Reporter
21    NCRA Certified Realtime Reporter
      Certified Court Reporter
22
23    Dated: 15 January 2018
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

1          INSTRUCTIONS TO WITNESS

2

3          Please read your deposition over

4     carefully and make any necessary corrections.

5     You should state the reason in the

6     appropriate space on the errata sheet for any

7     corrections that are made.

8          After doing so, please sign the

9     errata sheet and date it.

10         You are signing same subject to

11    the changes you have noted on the errata

12    sheet, which will be attached to your

13    deposition.

14         It is imperative that you return

15    the original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        ERRATA

 2    PAGE   LINE   CHANGE

 3    _____  _____  _____

 4           REASON: _____

 5    _____  _____  _____

 6           REASON: _____

 7    _____  _____  _____

 8           REASON: _____

 9    _____  _____  _____

10           REASON: _____

11    _____  _____  _____

12           REASON: _____

13    _____  _____  _____

14           REASON: _____

15    _____  _____  _____

16           REASON: _____

17    _____  _____  _____

18           REASON: _____

19    _____  _____  _____

20           REASON: _____

21    _____  _____  _____

22           REASON: _____

23    _____  _____  _____

24           REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              ACKNOWLEDGMENT OF DEPONENT
2

3

4         I, DEBBIE HODGES, do hereby certify
          that I have read the foregoing pages and that
5         the same is a correct transcription of the
          answers given by me to the questions therein
6         propounded, except for the corrections or
          changes in form or substance, if any, noted
7         in the attached
          Errata Sheet.
8

9

10

11

12       _____
          DEBBIE HODGES                        DATE
13

14

15       Subscribed and sworn to before me this
16       _____ day of _____, 20 _____.
17       My commission expires: _____
18

19       _____
20        Notary Public
21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                        LAWYER'S NOTES

2

3       PAGE      LINE

4       _____    _____    _____

5       _____    _____    _____

6       _____    _____    _____

7       _____    _____    _____

8       _____    _____    _____

9       _____    _____    _____

10      _____    _____    _____

11      _____    _____    _____

12      _____    _____    _____

13      _____    _____    _____

14      _____    _____    _____

15      _____    _____    _____

16      _____    _____    _____

17      _____    _____    _____

18      _____    _____    _____

19      _____    _____    _____

20      _____    _____    _____

21      _____    _____    _____

22      _____    _____    _____

23      _____    _____    _____

24      _____    _____    _____

25