```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION,              )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES                )   Polster
                              )
 7
 8                    __ __ __
 9          Wednesday, December 12, 2018
                      __ __ __
10
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW
                      __ __ __
12
13
14
15        Videotaped Deposition of MIRANDA
     JOHNSON, held at 4206 South J.B. Hunt Drive,
16   Rogers, Arkansas, commencing at 8:51 a.m., on
     the above date, before Debra A. Dibble,
17   Certified Court Reporter, Registered
     Diplomate Reporter, Certified Realtime
18   Captioner, Certified Realtime Reporter and
     Notary Public.
19
                      __ __ __
20
            GOLKOW LITIGATION SERVICES
21      877.370.3377 ph | fax 917.591.5672
                deps@golkow.com
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
     A P P E A R A N C E S:
 2
        CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
 3      & AGNELLO, P.C.
        BY:  Donald Ecklund, ESQUIRE
 4           decklund@carellabyrne.com
             MICHAEL A. INNES, ESQUIRE
 5           minnes@carellabyrne.com
             ZACHARY S.  BOWER, ESQUIRE
 6            (attending telephonically)
             zbower@carellabyrne.com
 7           JOHN PETTROZZINO, ESQUIRE
              (attending telephonically)
 8           jpettrozzino@carellabyrne.com
        5 Becker Farm Road
 9      Roseland, New Jersey 07068-1739
        (973) 994-1700
10      Counsel for Plaintiffs
11      REED SMITH, LLP
         (appearing telephonically)
12      BY:  SAMANTHA ROCCHINO, ESQUIRE
             srocchino@reedsmith.com
13      Three Logan Square, 1717 Arch Street
        Suite 3100
14      Philadelphia, Pennsylvania 19103
        (215) 851-8100
15      Counsel for AmerisourceBergen
16
        JONES DAY
17      BY:  TINA M. TABACCHI, ESQUIRE
             tmtabacchi@jonesday.com
18           SCOTT B. ELMER, Esquire
             selmer@jonesday.com
19      77 West Wacker
        Chicago, Illinois 60601-1692
20      312-782-1692
        Counsel for Walmart
21
        WILLIAMS & CONNOLLY, LLP
22       (appearing telephonically)
        BY:  WILLIAM F. HAWKINS, ESQUIRE
23           whawkins@wc.com
        725 Twelfth Street, N.W.
24      Washington, DC 20005
        (202) 434-5331
25      Counsel for Cardinal Health, Inc.
```

```
 1    A P P E A R A N C E S:
 2        MORGAN, LEWIS & BOCKIUS, LLP
           (appearing telephonically)
 3        BY:  MATTHEW LADD, ESQUIRE
                matthew.ladd@morganlewis.com
 4             101 Park Avenue
                New York, New York 10178-0060
 5             (212) 309-6001
          Counsel for Teva Pharmaceuticals USA,
 6        Inc.; Cephalon, Inc.; Watson
          Laboratories, Inc.; Actavis, LLC;
 7        Actavis Pharma, Inc.; f/k/a Watson
          Pharma, Inc.
 8
          MARCUS & SHAPIRA, LLP
 9         (appearing telephonically)
          BY:  DARLENE NOWAK, ESQUIRE
10             dnowak@marcus-shapira.com
               301 Grant Street
11             35th Floor
               Pittsburgh, Pennsylvania 15219-6401
12             (412) 338-4690
          Counsel for HBC
13
          WRIGHT, LINDSEY & JENNINGS, LLP
14        BY:  CALEY B. VO, ESQUIRE
               cvo@wlj.com
15        3333 Pinnacle Hills Parkway
          Suite 510
16        Rogers, Arkansas 72758-8498
          (479) 986-0888
17        Counsel for McKesson
18
          ARNOLD & PORTER KAYE SCHOLER, LLP
19         (appearing telephonically)
          BY:  RYAN WATTS, ESQUIRE
20             ryan.watts@arnoldporter.com
               7601 Massachusetts Avenue, NW
21             Washington, DC 20001-3743
               (202) 942-5000
22
          Counsel for Endo Health Solutions Inc.;
23        Endo Pharmaceuticals Inc.; Par
          Pharmaceuticals, Inc.; Par
24        Pharmaceutical Companies, Inc. formerly
          known as Par Pharmaceutical Holdings,
25        Inc.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        ALSO PRESENT:
2        Jennifer B. Bechet
         Senior Associate Counsel
3        Commercial & Class Action
4
5    VIDEOGRAPHER:
6        James Arndt
         GOLKOW LITIGATION SERVICES
7
                    —  —  —
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1
                      I N D E X
2
     MIRANDA JOHNSON                            PAGE
3
       DIRECT EXAMINATION BY MR. INNES            10
4
5                       E X H I B I T S
6      No.              Description              Page
7    Walmart      Walmart Inc.'s Responses to     40
     Johnson      Plaintiffs' (First)
8    Exhibit 1    Combined Discovery Requests
                  to National Retail
9                 Pharmacies Defendants and
                  attached documents under
10                seven tabs to include Bates
                  WMT_MDL_000011106-109 and
11                WMT_MDL_000000963-971 and
                  WMT_MDL_000008377-8379 and
12                WMT_MDL_000004237-4239 and
                  WMT_MDL_000004781-4783.
13
     Walmart      FY15 Annual Performance        160
14   Johnson      Evaluation (50/40/10) for
     Exhibit 2    Miranda Johnson.
15                WMT_MDL_000055406-55410.
16   Walmart      2014 email chain.  Subj:       174
     Johnson      RE: SOM ISD Request Form
17   Exhibit 3    with native attachment.
                  WMT_MDL_000048098-101-3.
18
     Walmart      10-28-14 email from Miranda    211
19   Johnson      Johnson to George Chapman.
     Exhibit 4    Subj: SOM Strategy Deck -
20                Updated, with attached
                  PowerPoint deck.
21                WMT_MDL_000009385-9386 and
                  attachment.
22
     Walmart      May 2017 email chain.          228
23   Johnson      Subj: RE: Logistics Order
     Exhibit 5    Routing Project.
24                WMT_MDL_000041598-41599.
25
```

Highly Confidential - Subject to Further Confidentiality Review

| 1 | Walmart Johnson Exhibit 6 | January 2018 email chain. Subj: RE: Suspicious Order Monitoring. WMT_MDL_000021115-21117. | 255 |
|---|---|---|---|
| 4 | Walmart Johnson Exhibit 7 | 12-4-14 email from Roxy Reed. Subj: Step_2_Threshold_Calc.xlsx. WMT_MDL_000029318-29319 with attachment. | 265 |
| 7 | Walmart Johnson Exhibit 8 | 10-28-14 email from Kristy Spruell. WMT_MDL_000009819-9820, with attachment. | 276 |
| 9 | Walmart Johnson Exhibit 9 | 10-5-17 email from Miranda Johnson to David Barlow. Subj: Buzzed SOM Algorithm. WMT_MDL_000005896-5910. | 288 |
| 12 | Walmart Johnson Exhibit 10 | May 2016 email chain. Subj: RE: SOM Cloud Data Document - Current Version ver. 1.3. WMT_MDL_000004624-4626. | 293 |
| 15 | Walmart Johnson Exhibit 11 | April 2015 email chain. Subj: RE: Archer. WMT_MDL_000016206-16207. | 326 |
| 17 | Walmart Johnson Exhibit 12 | 4-27-15 email from Miranda Johnson to Tim Koch. Subj: Areas of Focus - Week 13. WMT_MDL_000027961-27962. | 330 |
| 19 | Walmart Johnson Exhibit 13 | 1-11-16 email chain. Subj: RE: SOMP. WMT_MDL_000003862-5883. | 333 |
| 21 | Walmart Johnson Exhibit 14 | 8-10-15 email from Miranda Johnson to Tim Koch. WMT_MDL_000020368. | 342 |

1    Walmart     February 2015 email chain.     349
     Johnson     Subj: Sr. Controlled
2  Exhibit 15    Substances Analyst - For
                 Review.
3                WMT_MDL_000016104-16105.

4

5

6  REPORTER'S CERTIFICATE                368

   ERRATA                                370

7  WITNESS SIGNATURE PAGE                371

   ATTORNEY NOTES                        372

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    PROCEEDINGS

 2           (December 12, 2018 at 8:51 a.m.)

 3           VIDEOGRAPHER:  We're now on the

 4     record.  My name is James Arndt.  I'm

 5     a videographer for Golkow Litigation

 6     Services.  Today's date is

 7     December 12, 2018, and the time is

 8     8:51 a.m.  This video deposition is

 9     being held in Rogers, Arkansas in the

10     matter of the National Prescription

11     Opiate Litigation for the

12     United States District Court for the

13     Northern District of Ohio, Eastern

14     Division.  The deponent is Miranda

15     Johnson.

16           Will counsel please identify

17     themselves?

18           MR. INNES:  Good morning.  This

19     is Michael Innes of Carella Byrne for

20     plaintiffs.

21           MR. ECKLUND:  Good morning.

22     Don Ecklund, also from Carella Byrne,

23     on behalf of plaintiffs and the MDL.

24           MS. TABACCHI:  Good morning.

25     Tina Tabacchi from Jones Day on behalf
```

Highly Confidential - Subject to Further Confidentiality Review

1          of defendant Walmart and the witness.

2                  MR. ELMER:  Scott Elmer also

3          from Jones Day on behalf of Walmart.

4                  MS. BECHET:  Good morning.

5          Jennifer Bechet, senior associate

6          counsel, Walmart, Incorporated.

7                  MR. VO:  Good morning.  Caley

8          Vo on behalf of defendant McKesson.

9                  VIDEOGRAPHER:  Will counsel on

10         the phone please identify themselves.

11                 MR. HAWKINS:  Will Hawkins from

12         Williams & Connolly on behalf of

13         Cardinal Health.

14                 MR. LADD:  Matthew Ladd of

15         Morgan Lewis on behalf of defendant

16         Rite Aid.

17                 MR. WATTS:  Ryan Watts from

18         Arnold and Porter, LLC, on behalf of

19         Endo Health Solutions Inc.; Endo

20         Pharmaceuticals Inc.; Par

21         Pharmaceuticals, Inc.; Par

22         Pharmaceutical Companies, Inc.

23         formerly known as Par Pharmaceutical

24         Holdings, Inc.

25                 MS. ROCCHINO:  Samantha

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Rocchino for Reed Smith, LLP, on

 2           behalf of AmerisourceBergen Drug

 3           Corporation.

 4               VIDEOGRAPHER:  The court

 5           reporter is Debbie Dibble, and she

 6           will now swear in the witness.

 7               MIRANDA JOHNSON,

 8    having first been duly sworn, was examined

 9    and testified as follows:

10               DIRECT EXAMINATION

11    BY MR. INNES:

12           Q.    Good morning, Ms. Johnson.  My

13    name is Michael Innes.  I'm with the law firm

14    Carella Byrne.  I represent the plaintiffs in

15    the matter.

16               Could you state your full name

17    for the record?

18           A.    Miranda Johnson.

19           Q.    And who is your current

20    employer?

21           A.    Walmart.

22           Q.    And what is your current title?

23           A.    Director on the controlled

24    substances compliance team.

25           Q.    And what's your business
```

1    address?

2        A.    702 Southwest 8th Street in

3    Bentonville, Arkansas.

4        Q.    You understand you are under

5    oath; is that correct?

6        A.    Yes.

7        Q.    And are you taking any

8    medication that would interfere with your

9    ability to answer my questions fully and

10   truthfully today?

11       A.    No.

12       Q.    Is there any reason why you

13   cannot answer my questions fully and

14   truthfully today?

15       A.    No.

16       Q.    If I ask you a question that

17   you don't understand -- and this is

18   important -- please let me know.

19             If you do understand -- I'm

20   sorry.  If I ask a question you don't

21   understand, let me know.  I'll rephrase it.

22             If you answer a question, I'm

23   going to assume that you understood the

24   question.

25       A.    Okay.

```
 1            Q.      Is that good?  Is that clear?

 2            A.      That's clear.

 3            Q.      Have you ever testified in a

 4    deposition or a trial before?

 5            A.      No.

 6            Q.      What did you do, if anything,

 7    to prepare for today's deposition?

 8            A.      I met with counsel.

 9            Q.      How many times did you meet

10    with counsel?

11            A.      Yesterday, a few hours on

12    Monday, and then a few hours before that.

13            Q.      And were those meetings in

14    person?

15            A.      Yesterday was in person.

16            Q.      And the others were over the

17    phone?

18            A.      Phone, mm-hmm.

19            Q.      Were any of them

20    videoconferenced, anything like that?

21            A.      No.

22            Q.      About how many hours do you

23    think each session was?

24            A.      Yesterday was probably about --

25    it was the day -- a full day.  The other was
```

1    a few hours.  I can't remember exactly how

2    many.  Maybe four.

3         Q.    So there was two sessions,

4    yesterday and then a day prior?

5         A.    Yesterday, with the full day,

6    Monday for a few hours, and then there was a

7    few hours before that.

8         Q.    Okay.

9              Who was present in those

10   meetings?  You can go through each one in the

11   sequence.

12        A.    It was counsel.  I'm trying to

13   remember who all was in there.

14             Tina, Scott, Jennifer,

15   Carl Sparks.

16             MS. TABACCHI:  Do you --

17             Do you want me to help you

18        streamline this, Michael?

19             THE WITNESS:  Sorry.

20             MS. TABACCHI:  Walmart's

21        in-house and outside counsel.

22             THE WITNESS:  Yeah.

23             MR. INNES:  No non-attorneys

24        were there?

25             MS. TABACCHI:  Correct.

1           THE WITNESS:  Correct.

2           MR. INNES:  Thank you.

3      Q.    (BY MR. INNES)  Did you review

4  any testimony in this case prior to today?

5      A.    No.

6      Q.    Did you speak with any

7  representative of any other defendant in the

8  case prior to today?  Regarding this case?

9      A.    No.

10      Q.    Did you speak with anyone else

11  other than counsel regarding the case or your

12  deposition today?

13      A.    No.

14      Q.    Have you discussed this case

15  with anyone other than counsel at any time?

16      A.    No.

17      Q.    You've never had any discussion

18  with Mr. Koch, C-O-C-H? [sic]  About the

19  case?

20      A.    About the case?

21           MS. TABACCHI:  Object to the

22      form.

23           MR. INNES:  Yes.

24           THE WITNESS:  Not that I

25      remember.

1    Q.    (BY MR. INNES)  Okay.  So you

2    graduated Louisiana Tech in 2002; is that

3    right?

4    A.    Yes.

5    Q.    Did you ever meet Tech the

6    bulldog?

7    A.    I don't know if I did.  I don't

8    remember.

9    Q.    Just kidding.

10    And then, you graduated from

11    the University of Arkansas School of Law in

12    2006; is that right?

13    A.    Yes.  I graduated from law

14    school in 2006, yes.

15    Q.    And that was a three-year

16    program?

17    A.    It was.

18    Q.    Okay.  And did you take a bar

19    exam after you completed your JD?

20    A.    Yes.

21    Q.    And where was that?

22    A.    Where was the bar exam?

23    Q.    What state were you in?

24    A.    Oh, Arkansas.

25    Q.    Arkansas.  Is that the only

1    state where you sat for the bar?

2        A.    Yes.

3        Q.    And did you pass the bar?

4        A.    Yes.

5        Q.    Are you admitted to the state

6    of Arkansas?

7        A.    Yes.

8        Q.    Any other states that you are

9    admitted in?

10       A.    No.

11       Q.    After you graduated with your

12   JD, you took a job at the Arkansas Department

13   of Health and Human Services; is that right?

14       A.    Yes.

15       Q.    And you were in the office of

16   chief counsel?

17       A.    Yes.

18       Q.    What role did you have in the

19   office of chief counsel?

20       A.    I was responsible for doing

21   child abuse and neglect cases.

22       Q.    Okay.  Was there -- do you have

23   any responsibilities as far as narcotics, for

24   instance?

25       A.    Can you --

Highly Confidential - Subject to Further Confidentiality Review

1              MS. TABACCHI:  Object to the

2         form.

3              THE WITNESS: -- clarify?

4              MR. INNES:  Sure.

5         Q.    (BY MR. INNES)  In your role as

6    counsel for the department of health and

7    human services, did you investigate

8    pharmaceutical companies?

9         A.    No.

10        Q.    Did you -- were you involved in

11   the prosecution of drug offenses?

12        A.    No.

13        Q.    When did you leave the office

14   of the department of human and health

15   services?

16        A.    I believe it was in January of

17   2007.

18        Q.    And that was to come to

19   Walmart?

20        A.    Yes.

21        Q.    Okay.

22        A.    It might have even been later

23   than January.  It was in 2007.

24        Q.    So about 2007 you left and --

25        A.    And came straight to Walmart.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How did you come to make that

2    career change?

3    A.    I interviewed for the position

4    and accepted the position.

5    Q.    And what was the first position

6    you held at Walmart?

7    A.    I was in the compliance

8    organization.

9    Q.    And what was your -- what was

10   your general day-to-day function in that

11   role?

12   A.    I did HIPAA compliance.

13   Billing compliance.  And also did some work

14   on licensing issues.

15   Q.    What type of licensing issues?

16   A.    We had opticians who, in some

17   states, are licensed, and I helped support

18   what they were able to do in certain states

19   based on their licensure.

20   Q.    Did you have anything to do

21   with registration with the Drug Enforcement

22   Agency?

23   A.    No.

24   Q.    You've held several positions

25   at Walmart.  And let's see if we can

1    streamline this instead of going through each

2    one of them.  I'll try and focus it.

3                 What was the first role in

4    which you had responsibility dealing with

5    Schedule II or Schedule III drugs?

6         A.    The role I'm currently in.

7         Q.    So to be clear, the senior

8    manager at compliance assessment, that -- you

9    did no responsibilities regarding Schedule II

10   or Schedule III drugs?

11        A.    Correct.  No responsibilities.

12        Q.    So you first entered -- well,

13   strike that.

14                When did you become the

15   director of controlled substances?

16        A.    It was in October of -- I

17   believe it was 2014.

18        Q.    Okay.  Maybe we can -- you're

19   aware that -- are you aware that Walmart

20   submitted responses to interrogatories in

21   this case?

22        A.    Yes.

23        Q.    Did you have a chance to review

24   those before they were submitted?

25        A.    I can't remember if I reviewed

1    them before.  I don't think I did.

2        Q.    I believe on that document it

3    says May of 2014 you took the role?

4        A.    (Witness nods.)

5        Q.    Do you think maybe it was May

6    or do you -- was it -- is it October?

7        A.    So I helped support as a -- on

8    a special assignment --

9        Q.    Okay.

10       A.    -- some projects starting in

11   May, but I didn't have the role until October

12   of 2014.

13       Q.    Okay.

14             So prior to May of 2014, did

15   you have any responsibilities regarding C-II

16   or C-III?

17       A.    No.

18       Q.    So your responsibilities and

19   interaction with C-II and C-III began day one

20   as director of controlled substances?

21       A.    Yes.

22       Q.    Can you describe your

23   responsibilities when you first took your

24   current position?

25       A.    So when I first took my current

Highly Confidential - Subject to Further Confidentiality Review

1    position, I was responsible for helping

2    support the enhancements and improvements we

3    were making to our order monitoring system.

4        Q.    And what do you mean by "order

5    monitoring system"?

6        A.    Our system to monitor

7    controlled substance orders.

8        Q.    Okay.

9              Was that your sole function, to

10   support the enhancements and improvements to

11   the suspicious order monitoring system?

12       A.    That was my main function.  I

13   can't remember exactly all that I was

14   involved in, but that was my key focus when I

15   first started.

16       Q.    And the suspicious order

17   monitoring program is directed towards C-II

18   and C-III products at that time?

19             MS. TABACCHI:  Object to the

20        form.

21             THE WITNESS:  Our order

22        monitoring system was for controlled

23        substances.

24             MR. INNES:  Controlled

25        substances.

```
 1          Q.     (BY MR. INNES)  Have those
 2    responsibilities -- well, strike that.
 3                 Has your focus in that role
 4    changed over time?
 5                 MS. TABACCHI:  Object to the
 6          form.
 7                 THE WITNESS:  Can you clarify
 8          what you mean by "focus"?
 9                 MR. INNES:  Sure.
10          Q.     (BY MR. INNES)  How, if at all,
11    have your responsibilities in your -- in your
12    role as director of controlled substances
13    changed from day one to present?
14          A.     In many ways.  Just like most
15    roles do, they change and expand depending on
16    what the need is.
17          Q.     Has your focus moved away from
18    suspicious order monitoring or is that still
19    your primary focus?
20                 MS. TABACCHI:  Object to the
21          form.
22                 THE WITNESS:  We no longer
23          distribute controlled substances as of
24          April 2018.
25          Q.     (BY MR. INNES)  And that's
```

1  probably one of the ground rules I skipped

2  over.  Your answers need to be audible.  No

3  nodding of the head.  And we try not to talk

4  over each other and help our colleague at the

5  end of the table out.

6        A.     Okay.

7        Q.     I'm usually the biggest

8  offender of talking over people, so know that

9  from the beginning.

10              Let's find our place here.

11              So when did Walmart exit the

12  distribution of the C-II/C-IIIs?

13       A.     C-IIs was in April of 2018.

14  And then IIIs through Vs, I believe that was

15  complete in May of 2018.

16              It was a transition, so ...

17       Q.     And so to be clear, Walmart no

18  longer distributes; is that correct?

19       A.     Correct.

20       Q.     But Walmart does dispense C-IIs

21  and C-IIIs?

22       A.     Correct.

23       Q.     Do you have any -- is any part

24  of your current role, since the exit from the

25  C-II/C-III market, directed towards

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring of those types of

2    products?

3              MS. TABACCHI:  Object to the

4         form.

5              THE WITNESS:  Can you clarify

6         that?  What you're asking?

7              MR. INNES:  Sure.

8         Q.    (BY MR. INNES)  So Walmart no

9    longer distributes C-IIs; correct?

10        A.    Correct.

11        Q.    Walmart no longer distributes

12   C-IIIs; correct?

13        A.    Correct.

14        Q.    You testified earlier that the

15   main focus when you first started in the job

16   was on suspicious order monitoring of C-IIs

17   and C-IIIs.

18        A.    (Witness nods.)

19        Q.    When Walmart exited that

20   market, did those responsibilities dissolve?

21        A.    Yes.

22        Q.    In your capacity, do you look

23   or -- I'm sorry, do you monitor the

24   suspicious order monitoring programs of the

25   companies from which Walmart purchases C-IIs

Highly Confidential - Subject to Further Confidentiality Review

```
 1     and C-IIIs?

 2                  MS. TABACCHI:  Object to the

 3             form.

 4                  THE WITNESS:  Can you clarify

 5             what you mean by that?

 6             Q.     (BY MR. INNES)  Sure.  I'll

 7     give you an example.

 8             A.     Okay.

 9             Q.     Hypothetically Walmart

10     purchases C-IIs and C-IIIs from, say,

11     McKesson.  In any part of your role currently

12     do you review McKesson's suspicious order

13     monitoring programs?

14                  MS. TABACCHI:  Object to the

15             form.

16                  THE WITNESS:  I'm not sure I

17             understand what you mean by "review."

18             We do have interactions with our

19             distributors where they provide us

20             information about orders they see from

21             our pharmacies.

22             Q.     (BY MR. INNES)  And what kind

23     of information are you receiving in that

24     context?

25             A.     They will contact us and ask us
```

 1    questions.

 2         Q.      And who exactly are they

 3    contacting at Walmart?

 4         A.      Oftentimes me.

 5         Q.      And if someone were to contact

 6    you -- well, strike that.

 7                 Has anyone contacted you about

 8    Walmart's ordering processes?

 9                 MS. TABACCHI:  Object to the

10         form.

11                 THE WITNESS:  I have had our

12         distributors contact me about a

13         specific order for a premise-specific

14         location.

15         Q.      (BY MR. INNES) Do you recall

16    what that specific order was?

17         A.      No.  I don't.

18         Q.      Do you recall a specific

19    location?

20         A.      No, I don't.

21         Q.      Would there be a way for you to

22    determine what that specific order was?

23                 MS. TABACCHI:  Object to the

24         form.

25                 THE WITNESS:  Maybe.  I'm not

1           sure.

2           Q.     (BY MR. INNES)  Do you keep

3      records of your communications with --

4      regarding those types of conversations?

5           A.     I probably have an email or I

6      might have an email.

7           Q.     Is there a formal process at

8      Walmart whereby you're required to record

9      such conversations?

10               MS. TABACCHI:  Object to the

11          form.

12               THE WITNESS:  If it was a phone

13          conversation, no.  If it was an email,

14          I do retain my emails.

15          Q.     (BY MR. INNES)  Okay.  But

16     there's no policy whereby you would draft a

17     memo, for instance, about that phone

18     conversation and save it?

19          A.     Not that I'm aware of.

20          Q.     So when you first entered the

21     role as controlled substances director, you

22     were aware that Walmart was registered with

23     the DEA, Drug Enforcement Administration, to

24     distribute controlled substances?

25          A.     Yes.

```
 1          Q.    And as a registrant, the DEA
 2    regulations require Walmart to report all
 3    suspicious orders of controlled substances?
 4          A.    That is my --
 5                MS. TABACCHI:  Object to the
 6          form.
 7                THE WITNESS:  That's my
 8          understanding.
 9          Q.    (BY MR. INNES)  And again, when
10    you first started in your role, those -- were
11    you aware those regulations stated that a
12    registrant was required to design, operate a
13    system to disclose suspicious orders of
14    controlled substances and shall inform the
15    field division office of the administration
16    in that area of suspicious orders when
17    discovered by Walmart?
18                MS. TABACCHI:  Object to the
19          form.
20                THE WITNESS:  Can you repeat
21          that question?
22                MR. INNES:  Sure.
23          Q.    (BY MR. INNES)  At the time
24    when you entered the role as a controlled
25    substance director, were you aware that
```

1    Walmart, as a registrant, was required to

2    design, operate a system to disclose

3    suspicious orders of controlled substances?

4                    MS. TABACCHI:  Same objection.

5                    THE WITNESS:  Yes, I believe

6            that was my understanding.

7            Q.    (BY MR. INNES)  And that also

8    at that time that the registrant had a duty

9    to inform the field office in the relevant

10   area of suspicious orders when discovered by

11   Walmart?

12                   MS. TABACCHI:  Object to the

13           form.

14                   THE WITNESS:  Yes, I believe

15           that was my understanding.

16           Q.    (BY MR. INNES)  And at the time

17   was it your understanding that suspicious

18   orders would include orders of unusual size?

19                   MS. TABACCHI:  Object to the

20           form.

21                   THE WITNESS:  My understanding

22           is that it could include orders of

23           unusual size.

24           Q.    (BY MR. INNES)  Do you agree

25   with this statement:  Suspicious orders

1    include orders of unusual size or as

2    deviating substantially from the normal

3    pattern and orders of unusual frequency?

4              MS. TABACCHI:  Object to the

5         form.

6              THE WITNESS:  My understanding

7         is that it could include those.

8         Q.    (BY MR. INNES)  And was it your

9    understanding at that time that Walmart had a

10   duty to maintain effective controls against

11   diversion?

12             MS. TABACCHI:  Object to the

13        form.

14             THE WITNESS:  That was my

15        understanding.

16        Q.    (BY MR. INNES)  And what at

17   that time was your understanding of the word

18   "diversion"?

19        A.    Diversion was focused on theft.

20        Q.    Theft from?

21        A.    Theft from internal employees,

22   typically.

23        Q.    So at the time when you became

24   the director of controlled substances, was it

25   your understanding that Walmart had a duty to

Highly Confidential - Subject to Further Confidentiality Review

1    maintain effective controls only against the

2    theft of Schedule II/Schedule IIIs via

3    employees?

4                    MS. TABACCHI:  Object to the

5            form.

6                    THE WITNESS:  That wasn't

7            something that I was responsible for,

8            but my understanding was that we were

9            expected to have controls to guard

10           against theft of controlled

11           substances.

12           Q.    (BY MR. INNES)  Did you -- were

13   you required to have controls to protect

14   against anything else?

15                   MS. TABACCHI:  Object to the

16           form.

17                   MR. INNES:  As it relates to

18           diversion?

19                   MS. TABACCHI:  Same objection.

20                   THE WITNESS:  I don't remember

21           what I was aware of at the time.

22           Q.    (BY MR. INNES)  At any time

23   during your role as director of controlled

24   substances did your understanding of the --

25   of diversion change?

1           MS. TABACCHI:  Object to the

2      form.

3           THE WITNESS:  So diversion

4      typically means theft, when we use it.

5           I have heard it also used to

6      just talk generally about controlled

7      substances being used for a

8      non-medical purpose.

9      Q.    (BY MR. INNES)  When you say

10   "we," who are you referring to there?

11     A.     In Walmart.  And honestly, in

12   conversations I've had with the DEA.

13     Q.     In any of those conversations

14   with the DEA, was the non-medical purpose

15   part of the definition of diversion?

16          MS. TABACCHI:  Object to the

17     form.

18          THE WITNESS:  I don't remember,

19     but I do remember the specific focus

20     being on theft or a filing of a 106.

21     Q.    (BY MR. INNES)  Was it your

22   understanding that to maintain effective

23   controls against diversion, Walmart needed to

24   exercise due care in confirming the

25   legitimacy of all orders prior to filling

Highly Confidential - Subject to Further Confidentiality Review

```
1      them?
2                   MS. TABACCHI:  Object to the
3           form.
4                   THE WITNESS:  Can you rephrase
5           that?
6                   MR. INNES:  Sure.
7                   THE WITNESS:  Or clarify that
8           one?
9                   MR. INNES:  Sure.
10      Q.     (BY MR. INNES)  Was it your
11  understanding that to guard against
12  diversion, Walmart had a duty to confirm the
13  legitimacy of an order prior to filling it?
14                  MS. TABACCHI:  Object to the
15          form.
16                  THE WITNESS:  My understanding
17          was that we had to monitor for
18          potentially suspicious orders, and
19          then suspicious orders needed to be
20          reported to the DEA.
21      Q.     (BY MR. INNES)  For instance,
22  if an order came in that was suspicious --
23  well, strike that.
24                  Did Walmart have to determine
25  if an order was legitimate before it shipped?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. TABACCHI:  Object to the
 2           form.
 3                    THE WITNESS:  We had to
 4           determine if it was suspicious, and
 5           then, like I said, report that to the
 6           DEA.
 7           Q.    (BY MR. INNES)  Could Walmart
 8      ship a suspicious order?
 9                    MS. TABACCHI:  Object to the
10           form.
11                    THE WITNESS:  Based on my
12           understanding, we did not ship
13           suspicious orders.
14           Q.    (BY MR. INNES)  Did Walmart at
15      any time ship orders that were under
16      investigation by Walmart?
17                    MS. TABACCHI:  Object to the
18           form.
19                    THE WITNESS:  Not that I'm
20           aware of.
21           Q.    (BY MR. INNES)  Were you aware
22      that Walmart was required to file reports of
23      distributions of controlled substances to the
24      DEA ARCOS unit?
25                    MS. TABACCHI:  Object to the
```

1          form.

2                    THE WITNESS:  Yes.

3          Q.    (BY MR. INNES)  And are you

4     aware that the failure to report them in a

5     timely manner could be grounds for revocation

6     of the registration?

7                    MS. TABACCHI:  Object to the

8          form.

9                    THE WITNESS:  I don't know if I

10         knew that much detail.

11         Q.    (BY MR. INNES)  And I

12    apologize.  I may have asked you this before.

13                   I'll be told if I did.

14                   The -- as a registrant, Walmart

15    was required to design and operate a system

16    to disclose suspicious orders of controlled

17    substances?

18                   MS. TABACCHI:  Object to the

19         form, asked and answered.

20                   THE WITNESS:  Can you repeat

21         what the question was?

22         Q.    (BY MR. INNES)  Sure.

23                   As a registrant, Walmart was

24    required to design and operate a system to

25    disclose suspicious orders of controlled

Highly Confidential - Subject to Further Confidentiality Review

 1    substances?

 2              MS. TABACCHI:  Same objections.

 3              THE WITNESS:  Are you asking if

 4         I agree with that or if I knew that?

 5         Q.    (BY MR. INNES)  If you knew

 6    that.  Sorry.

 7         A.    That was my understanding.

 8         Q.    And is it your understanding

 9    that your -- that Walmart was required to

10    inform the local DEA, division of suspicious

11    orders when they were discovered by the

12    registrant?

13              MS. TABACCHI:  Object to the

14         form.

15              THE WITNESS:  That was my

16         understanding.

17         Q.    (BY MR. INNES)  And is it your

18    understanding that Walmart could not rely on

19    a rigid formula to decide whether an order is

20    suspicious?

21              MS. TABACCHI:  Object to the

22         form.

23              THE WITNESS:  I don't know that

24         I had ever heard that language used.

25         Q.    (BY MR. INNES)  You'd never

1    heard the term "rigid formula"?

2              MS. TABACCHI:  Same objection.

3              THE WITNESS:  I'm sure I've

4         heard the term "rigid formula" but not

5         in this context.

6         Q.    (BY MR. INNES)  You've not

7    heard the term "rigid formula" in the context

8    of the DEA regulations as they applied to

9    Schedule II and Schedule IIIs?

10        A.    Correct.  Not that I recall.

11        Q.    Earlier we talked about

12   specific conversations that you had -- strike

13   that.

14              Are you aware of any specific

15   thefts of C-IIs or C-IIIs?

16              MS. TABACCHI:  Object to the

17        form.

18              THE WITNESS:  Not any specific

19        thefts.  That's not an area that I'm

20        responsible for.

21        Q.    (BY MR. INNES)  Okay.  So

22   earlier you testified that diversion could

23   encompass the theft of a C-II or C-III; is

24   that right?

25        A.    Yes, it could encompass the

1    theft of a controlled substance.

2        Q.    Okay.  As part of your role as

3    a director of controlled substances, was it

4    your responsibility to ensure that Walmart

5    was complying with DEA regulations?

6             MS. TABACCHI:  Object to the

7        form.

8             THE WITNESS:  Certain portions

9        of DEA regulations.

10       Q.    (BY MR. INNES)  To protect --

11   was protecting against a diversion of C-IIs

12   or C-IIIs part of that responsibility?

13            MS. TABACCHI:  Object to the

14       form.

15            THE WITNESS:  Protecting

16       against theft was not part of my

17       responsibilities.

18       Q.    (BY MR. INNES)  Who was in

19   charge of protecting against theft of C-IIs

20   and C-IIIs?

21            MS. TABACCHI:  Object to the

22       form.

23            THE WITNESS:  I don't know

24       exactly who was in charge.  We have

25       areas of the company that were

```
 1              involved in having policies and
 2              procedures and monitoring for theft.
 3                    MR. INNES:  Okay.
 4              Q.    (BY MR. INNES)  So I'm -- and
 5      I'm sort of dancing around.  I'm just
 6      trying -- really just trying to figure out
 7      sort of the metes and bounds of your
 8      responsibilities as they relate to C-IIs and
 9      C-IIIs.
10                    As a director of controlled
11      substances, your primary focus, you testified
12      earlier, was on suspicious order monitoring.
13              A.    Correct.
14              Q.    So that would be unusual size,
15      unusual frequency, deviating from a standard
16      patent.
17              A.    It was our order monitoring
18      program, yes.
19              Q.    Order monitoring.
20                    And it would -- your
21      responsibilities would stop there?
22                    MS. TABACCHI:  Object to the
23              form.
24                    THE WITNESS:  There were some
25              other things that I was responsible
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              for or would be involved in, but theft
2              of controlled substances was not one
3              that I would typically be involved in.
4         Q.    (BY MR. INNES)  And theft and
5    diversion are synonyms in your -- in
6    Walmart's mind?
7                   MS. TABACCHI:  Object to the
8              form.
9                   THE WITNESS:  I can't answer as
10             Walmart, but ...
11                  MR. INNES:  That was a horrible
12             question.  That was a horrible
13             question.  I'll rephrase.
14        Q.    (BY MR. INNES)  So -- actually,
15   I'll just move on from that one.  We'll come
16   back to that.
17                  I'm going to mark this as
18   plaintiffs' Exhibit 1.
19                  It is a composite exhibit.
20   Several documents here.
21        A.    Okay.
22                  (Walmart-Johnson Deposition
23             Exhibit 1 was marked for
24             identification.)
25        Q.    (BY MR. INNES)  Take your time
```

1    and review the document.  When you're done,

2    let me know and we'll start some questions.

3                    MR. INNES:  And I apologize.

4            We have four copies of every one other

5            than the first exhibit.

6                    MS. TABACCHI:  We will work it

7            out.

8                    MR. INNES:  I know that we're

9            trying to move this along, so I have

10           sort of shifted a little bit.  I can

11           maybe -- and you're poring over it.  I

12           can direct you to specific documents

13           and specific lines in the documents if

14           that's what you want to do.  I know

15           it's a pretty large document.  We

16           might be here for a pretty long time

17           if you need to review it word for

18           word, but again, it's entirely up to

19           you.

20                   MS. TABACCHI:  If you want to

21           direct the witness to a particular

22           tab.

23                   MR. INNES:  Sure.

24                   MS. TABACCHI:  And she may not

25           have reviewed that document, if you

1          want to ask her about that document.

2                    MR. INNES:  Sure.

3          Q.     (BY MR. INNES)  So this -- have

4    you seen this document before?

5                    MS. TABACCHI:  Object to the

6          form.

7                    MR. INNES:  I'm sorry.

8                    THE WITNESS:  Can you ask me

9          again.

10         Q.     (BY MR. INNES) Have you seen

11   the tab 1 before?

12         A.     I'm not sure if I've seen this

13   exact document.

14         Q.     I'll represent to you that

15   plaintiffs' Exhibit 1 is Walmart's responses

16   to plaintiffs' first set of combined

17   discovery requests to national retail

18   pharmacy defendants.

19                In this document, Walmart

20   referenced, are on -- references on page 2 of

21   tab -- sorry, page 3 of tab 1, there's a

22   small chart.

23                These are the policies and

24   procedures that Walmart has identified.

25                Tabs -- the remaining tabs that

1    you have in front of you are these documents.

2            So I would first like to turn

3    to tab 2, which, according to the chart, is

4    the policy in place between November 2010 and

5    December -- I'm sorry, and December of 2014.

6            Was this plan in place during

7    your --

8            MS. TABACCHI:  I'm sorry,

9        object to the form.

10           Q.    (BY MR. INNES)  Was this plan

11   in place during your time as director of

12   controlled substances?

13           MS. TABACCHI:  Object to the

14       form.

15           THE WITNESS:  Can I have a

16       minute to review it?

17           MR. INNES:  Sure.

18           MS. TABACCHI:  You're asking

19       about the policy behind tab 2,

20       Michael?

21           MR. INNES:  That's right.

22           MS. TABACCHI:  You just were

23       asking her about a plan.

24           MR. INNES:  Oh, I'm sorry.

25           THE WITNESS:  It may have been.

```
 1            I'm not very familiar with that
 2       specific policy.
 3            Q.    (BY MR. INNES)  Let's go -- I'm
 4       just going to ask you some questions.  So is
 5       it your testimony that you haven't seen this
 6       document before?
 7                 MS. TABACCHI:  Object to the
 8       form.
 9                 Would you mind identifying
10       the --
11                 MR. INNES:  You haven't seen
12       plaintiffs' Exhibit 1, tab 2, which is
13       Bates stamped ending in 11106?
14                 THE WITNESS:  I may have.
15                 MR. INNES:  You may.
16                 THE WITNESS: (Witness nods.)
17            Q.    (BY MR. INNES)  I'm going to
18       direct your attention to about a third of the
19       way down the page, "Pharmacy asset protection
20       AP managers"?
21                 Do you see that line?
22                 Under that it says, "By the
23       fifth day of each month, the pharmacy AP
24       manager retrieves the SD 405-1 and SD 405-2
25       from document direct."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that line?
 2        A.     Yes.
 3        Q.     Okay.  What is the SD 405-1?
 4   If you know.
 5                    MS. TABACCHI:  Object to the
 6        form.
 7                    THE WITNESS:  I don't know.
 8        Q.     (BY MR. INNES)  Okay.
 9                    Do you know what the SD 405-2
10   refers to?
11        A.     I don't.
12                    MS. TABACCHI:  Same objection.
13        Q.     (BY MR. INNES)  And do you know
14   what "document direct" refers to?
15        A.     I do not.
16        Q.     Do you know what -- well,
17   strike that.
18                    The purpose of this document
19   reads "To provide guidelines for monitoring
20   controlled substance purchases at the
21   pharmacy distribution center"; is that
22   correct?
23        A.     That's what the document says.
24        Q.     Are you aware of any other
25   policy that was in effect between
```

1    November 2010 and December of 2014 that held

2    that same purpose?

3                    MS. TABACCHI:  Object to the

4            form.

5                    Michael, just note that you've

6            misread the dates.  It's actually

7            October of 2014.

8                    MR. INNES:  Oh, I'm sorry.

9            Q.    (BY MR. INNES)  November 2010

10    through October of 2014.

11                   MR. INNES:  Thank you for that.

12                   THE WITNESS:  Can you repeat

13            the question?

14           Q.    (BY MR. INNES) Sure.

15           A.     Sorry.

16           Q.     Are you aware of any other

17    policy, Walmart policy, directed as providing

18    guidelines for monitoring controlled

19    substances -- substance purchases at the

20    pharmacy distribution centers in place

21    between November 2010 and October 2014?

22                   MS. TABACCHI:  Object to the

23            form.

24                   THE WITNESS:  Not that I'm

25            aware of.

```
1              Q.      (BY MR. INNES)  Can I ask you
2      to turn to tab 7?  Tab 7 to plaintiffs'
3      Exhibit 1 is -- ends in Bates No. 8377.
4                      [Document review.]
5              A.      Okay.
6              Q.      Okay.  Thank you.
7                      According to Walmart's response
8      to interrogatory, this was the plan that was
9      in place -- I'm sorry, this was the policy
10     that was in place between August of 2014 and
11     January of 2015.  Is that your understanding?
12                     MS. TABACCHI:  Object to the
13             form.
14                     THE WITNESS:  So this was a
15             proposed process as part of our
16             enhanced program that we were working
17             on.
18                     I don't remember the exact
19             dates that this went in place.
20             Q.      (BY MR. INNES)  So is it your
21     testimony that this is not a policy, but
22     rather a proposal?
23                     MS. TABACCHI:  Object to the
24             form.
25                     THE WITNESS:  It became a --
```

1          what we'd call like a process

2          document.  But I don't know if it was

3          in effect in August of 2014.

4          Q.     (BY MR. INNES)  Okay.

5          A.     That sounds early to me, but it

6     may have been.

7          Q.     When do you think it was in

8     place?

9               MS. TABACCHI:  Object to the

10          form.

11               THE WITNESS:  I think it may

12          have been a few months later, but I'm

13          not positive.

14          Q.     (BY MR. INNES)  In the calendar

15     year 2014?

16          A.     I believe so.

17          Q.     So the purpose of this policy,

18     or process document, as you referred to it,

19     was -- states, "DEA regulations require

20     distributors of controlled substances to have

21     a system in place designed to identify

22     suspicious orders of controlled substances.

23     This guidance document will outline the role

24     and practice -- of Practice Compliance in

25     evaluating orders of interest and reporting

1    suspicious orders to the appropriate federal

2    and state agencies."

3              Is that your understanding of

4    what the purpose of this document is?

5         A.    Yes.

6         Q.    How, at that time -- well,

7    strike that.

8              There's a definition section

9    below.  One that reads "Order of interest."

10   "An order that warrants follow-up evaluation

11   to determine whether it is suspicious."

12             How, at that time, in and

13   around end of 2014 to January of '15, did

14   Walmart identify orders of interest?

15             MS. TABACCHI:  Object to the

16        form.

17             THE WITNESS:  I believe that

18        there were thresholds in place in

19        Reddwerks that identified orders that

20        may be orders of interest.

21        Q.    (BY MR. INNES) And just to be

22   clear, my question is directed at C-IIs and

23   C-IIIs at this point.  Does that change your

24   answer at all?

25        A.    I don't believe so.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     So the Reddwerks system, what

2   is that exactly?

3      A.     Reddwerks is an order

4   fulfillment system for the pharmacy

5   distribution centers.

6      Q.     And what is an order

7   fulfillment system?

8      A.     I don't work in a distribution

9   center, so I will do my best to explain.  But

10  basically a system that's used to process

11  orders and let the DC know what the order is

12  so they can pick the order and ship the

13  order.

14     Q.     So its primary function is not

15  that of suspicious order monitoring?

16             MS. TABACCHI:  Object to the

17         form.

18             THE WITNESS:  There was a

19         suspicious order monitoring component

20         to Reddwerks.

21             MR. INNES:  Okay.  Thank you

22         for that.

23     Q.     (BY MR. INNES)  And that -- you

24  also referenced that -- thresholds?  What do

25  you mean by "thresholds"?

1          A.     There were quantity amounts set

2     in Reddwerks.  Orders over that would flag,

3     based on my understanding.

4          Q.     Would flag?

5          A.     Stop.  Flag.  Pinned.  There's

6     various terms for it, but ...

7          Q.     Would a flag -- in your mind, a

8     "flag" is -- is that another word for order

9     of interest?

10              MS. TABACCHI:  Object to the

11         form.

12              THE WITNESS:  I don't know how

13         "order of interest" was defined before

14         changes that we made to Reddwerks.

15         After we made enhancements to

16         Reddwerks, we did define any order

17         that flagged as an order of interest.

18         Q.     (BY MR. INNES)  Okay.  So I

19    just want to circle back, then.  So I believe

20    we've established this is -- we have

21    established this is the policy or process

22    document in place at the end of 2014 into the

23    beginning of 2015.

24         A.     I believe that was the

25    timeframe.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      Okay.

2          A.      I'm not positive.

3          Q.      And --

4                  MS. TABACCHI:  I'm so sorry.  I

5          have a problem with my throat.  That

6          wasn't a signal.

7          Q.      (BY MR. INNES)  So --

8                  MS. TABACCHI:  But do you mind

9          just asking your question so we can

10         start over with this question.

11                 MR. INNES:  I'm going to try

12         and figure out what my question was.

13         I don't think we have one pending.

14         Q.      (BY MR. INNES)  The -- so at

15  this time, Reddwerks -- strike that.

16                 At this time Walmart relied on

17  Reddwerks to identify orders of interest?

18                 MS. TABACCHI:  Object to the

19         form.

20                 THE WITNESS:  At what time?

21         Q.      (BY MR. INNES)  So the time

22  period that you believe this policy was in

23  place.

24                 MS. TABACCHI:  Object to the

25         form.  Mischaracterizes the witness's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              testimony.
 2                   THE WITNESS:  I -- I think I
 3              mentioned earlier, as -- I don't
 4              remember the exact timeframe of this.
 5              The -- there was a version of
 6              Reddwerks that was in place that I --
 7              when I started in the role.  I don't
 8              know how orders of interest were
 9              identified in that way.  I don't know
10              if everything that hit a threshold was
11              an order of interest.  I don't know
12              how that definition was applied prior
13              to being in role.  My focus was the
14              enhancement, and once the enhancement
15              was put in place, all orders that
16              pended were considered an order of
17              interest.
18         Q.    (BY MR. INNES)  So when you
19    first took the role as director of controlled
20    substances, how -- what's your understanding
21    of how an order of interest was identified?
22         A.    I knew that there were
23    thresholds in Reddwerks.  I don't know how an
24    order of interest was determined.
25         Q.    How do you -- I'm slightly
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    confused by this.  So how -- and I don't

 2    think it's you that's the problem.

 3              So he -- a threshold --

 4    Reddwerks uses thresholds to identify orders

 5    of interest; is that a fair statement?

 6              MS. TABACCHI:  Object to the

 7         form.

 8              THE WITNESS:  Reddwerks, before

 9         I started --

10    Q.    (BY MR. INNES)  Again, I --

11    A.    Yeah.  Sorry.

12    Q.    Yeah, I'm sorry.  And I think

13    that's important that we're always talking

14    about the same time period.  So if that's not

15    clear, please let me know.

16    A.    Okay.

17    Q.    Before you started, how was an

18    order of interest identified by Walmart?

19    A.    I don't --

20              MS. TABACCHI:  Objection, lack

21         of foundation.

22              THE WITNESS:  -- know.  I don't

23         know.

24    Q.    (BY MR. INNES)  Did Walmart

25    identify orders of interest prior to your
```

1    taking the role as director of controlled

2    substances?

3                    MS. TABACCHI:  Object to the

4          form, lack of foundation.

5                    THE WITNESS:  I don't know.

6          Q.    (BY MR. INNES)  Can I ask you

7    to turn to tab -- just a second.

8                    Could you turn to tab 3?

9                    That's Bates number -- begins

10   on Bates number 11107.

11                   And according to Walmart, this

12   is a plan in place, a policy in place between

13   October of 2014 and March of 2015.

14                   MS. TABACCHI:  Object to the

15         form.

16         Q.    (BY MR. INNES)  And my basic

17   question is if you agree with that statement.

18         A.    Can you restate that question?

19   The timeframe?

20         Q.    Sure.  Mm-hmm.

21                   As part of your

22   responsibilities as director of controlled

23   substances, what responsibilities, if any,

24   did you have with the pharmacy manual?

25                   MS. TABACCHI:  Object to the

1       form.

2               THE WITNESS:  The pharmacy

3       manual?  Or this policy?

4       Q.     (BY MR. INNES)  That's a good

5   clarification.

6               So this policy, which I'm

7   referring to, is the pharmacy manual.

8   Perhaps Walmart doesn't refer to it that way.

9               What responsibilities, if any,

10  did you have with respect to tab 3, which is

11  Walmart 11107?

12      A.     So this policy would have been

13  owned by the logistics compliance team.  I'm

14  sure that I had an opportunity to review it.

15      Q.     Does this document work

16  together with any other documents in

17  Walmart's policies?

18              MS. TABACCHI:  Object to the

19      form.

20              THE WITNESS:  I'm not sure I

21      understand.

22              Can you restate that question?

23              MR. INNES:  Sure.

24      Q.     (BY MR. INNES)  Let's do this.

25  I'm going to do it slightly different.

1       A.      Okay.

2       Q.      I'm going to ask you to turn

3    back to tab 7.

4       A.      Okay.

5       Q.      And on tab 7, which is --

6    begins 8377, in the middle of the page

7    there's a procedure section.

8               Do you see that?

9       A.      Yes.

10      Q.      And then there's the initial

11   evaluation right below that?

12      A.      Yes.

13      Q.      And the third line down refers

14   to "Pharmacy manual, XX-XXX (logistics)."

15              My question is, is that

16   referring to the document identified in

17   tab 3, which is -- ends in Bates No. 11107?

18              MS. TABACCHI:  Object to the

19        form.

20              THE WITNESS:  I believe so.

21              MR. INNES:  Okay.

22      Q.      (BY MR. INNES)  And here on

23   Document 11107, again, tab 3, the definition

24   section was Order of Interest.  As an order

25   that warrants follow-up evaluation or

1 evaluation to determine whether it is

2 suspicious.

3          Is that your understanding of

4 what an order of interest was between

5 October 14th and -- October of 2014 and March

6 of 2015?

7          A.    Yes.

8          Q.    Same question for suspicious

9 order definition.  Is that a -- is that your

10 understanding of what a suspicious order was

11 at the time?

12          MS. TABACCHI:  Object to the

13     form.

14          What document are you referring

15     to?

16          MR. INNES:  We're still on

17     Document 11107.

18          THE WITNESS:  Yes, that was my

19     understanding.

20          MR. INNES:  Okay.

21          Q.    (BY MR. INNES)  And is that --

22 I'll just continue down the page.  It says

23 "Appropriate order."  Is that an accurate

24 definition at the time?

25          MS. TABACCHI:  Object to the

1          form.

2                    THE WITNESS:  Yes, that was my

3          understanding.

4          Q.    (BY MR. INNES)  Can an

5     appropriate order -- is an appropriate order

6     always considered an order of interest?

7                    MS. TABACCHI:  Object to the

8          form.

9                    THE WITNESS:  Can you restate

10         that question?

11                   MR. INNES:  Sure.

12         Q.    (BY MR. INNES)  Is it -- if an

13    order is placed and shipped, and it hasn't

14    been identified as an order of interest, is

15    that an appropriate order?

16                   MS. TABACCHI:  Object to the

17         form.

18                   THE WITNESS:  Not as defined

19         here, but it doesn't mean it's not an

20         appropriate order and just a general

21         definition of "appropriate."

22         Q.    (BY MR. INNES)  I'm going to

23    take you back to tab -- the beginning of

24    tab 3.  It's 11107.

25                   Evaluating an order of

Highly Confidential - Subject to Further Confidentiality Review

 1    interest.
 2              The second line in that
 3    paragraph, first full sentence says, "All
 4    reported orders of interest will be
 5    evaluated."
 6              Are there orders of interest
 7    that are unreported?
 8              MS. TABACCHI:  Object to the
 9         form.
10              THE WITNESS:  I don't know what
11         was meant by "reported" in this
12         sentence.  So I don't know how an
13         order of interest could be reported or
14         unreported, because I don't know what
15         that means in that sentence.
16         Q.    (BY MR. INNES)  I want to turn
17    to page 3 of that same document.  It ends in
18    11109.  It's the last page of tab 3.
19              It discusses -- the middle of
20    the page says Role of Director of Controlled
21    Substances.
22              Were you the director of
23    controlled substances between -- strike that.
24              You were the director of
25    controlled substances between October 2014

1    and March 2015; is that right?

2         A.    Yes.

3         Q.    And what were your

4    responsibilities vis-à-vis this policy,

5    during that time period?

6              MS. TABACCHI:  Object to the

7         form.

8              THE WITNESS:  I was responsible

9         for reports of suspicious orders.  I

10        was responsible for the oversight of

11        the program or the evaluation process.

12             Sorry.  Things morphed so much,

13        I'm trying to think of timeframes.  I

14        believe those were my main

15        responsibilities during that

16        timeframe.

17        Q.    (BY MR. INNES)  One of those

18   responsibilities was, according to this

19   document, is a summary of all orders of

20   interest evaluations; is that right?

21        A.    Can you tell me where you're

22   looking?

23        Q.    So I'm looking at the first

24   full line on -- I can read it.  The middle of

25   the page begins, "The health and wellness

1    advisory panel will be responsible for

2    providing high-level oversight of the

3    evaluation process.  A summary of all order

4    of interest evaluations and all actions taken

5    by the health and wellness director,

6    including the reports submitted to the

7    federal and state agencies, will be presented

8    to the panel by the director on a routine

9    basis as established by the panel."

10            "Director" in that last clause

11   refers to you; is that correct?

12        A.    Yes, I believe so.

13        Q.    So you had the responsibilities

14   I just articulated there?

15        A.    Yes.

16        Q.    Sorry, that I just recited

17   there.

18            And did you maintain copies of

19   those documents and summaries?

20            MS. TABACCHI:  Object to the

21        form.

22            THE WITNESS:  Of which

23        documents?

24        Q.    (BY MR. INNES)  The summary of

25   all orders of interest evaluations.  Did you

1    document that as part of your summary?

2              I'm sorry, as part of your

3    report?

4              MS. TABACCHI:  Object to the

5         form.

6              THE WITNESS:  I don't remember

7         creating a specific summary document

8         of the order of interest evaluations.

9         But we did keep documentation if there

10        were order of interest evaluations.

11        Q.    (BY MR. INNES)  So how did you

12   present that information to the panel?

13             MS. TABACCHI:  Object to the

14        form.

15        Q.    (BY MR. INNES)  What was the

16   typical way that that was done?

17        A.    I don't remember the details.

18             I don't remember.

19        Q.    Do you remember ever making

20   such a presentation to the panel?

21        A.    A couple of times, mm-hmm.

22        Q.    How many?  How many times, do

23   you think?

24             MS. TABACCHI:  Object to the

25        form.

 1                      THE WITNESS:  I don't remember.

 2         Two or three.

 3         Q.     (BY MR. INNES)  So this wasn't

 4    a quarterly, standing meeting?  Is that --

 5                      MS. TABACCHI:  Object to the

 6         form.

 7                      THE WITNESS:  I don't remember

 8         how often the report was done.

 9         Q.     (BY MR. INNES)  If we could

10    flip back one page to Bates No. 11108.  It's

11    the second page of tab 3.

12                      How, during this timeframe,

13    which, again, has been identified by Walmart

14    as October 2014 to March 2015, was an order

15    of interest identified?

16                      MS. TABACCHI:  Object to the

17         form.

18                      THE WITNESS:  My understanding

19         during this time, if this was prior to

20         the Reddwerks enhancements we made,

21         said orders would be, as I mentioned,

22         flagged based on criteria.  And then

23         the logistics compliance team was

24         involved in determining the orders of

25         interest.

1       Q.      (BY MR. INNES)  Okay.  So let's

2   put a marker down.  When -- you said "prior

3   to Reddwerks."  When was it your

4   understanding that Reddwerks was put in

5   place?

6               MS. TABACCHI:  Object to the

7       form.

8               THE WITNESS:  Reddwerks was in

9       place when I started role.  We made

10      enhancements to Reddwerks.

11              MR. INNES:  Thank you for that.

12      When were the Reddwerks enhancements

13      made as related to C-IIs and C-IIIs?

14              MS. TABACCHI:  Object to the

15      form.

16              THE WITNESS:  There was a

17      phased rollout of the enhancements, so

18      I don't remember exactly when the

19      rollout went to which DC.  But it was

20      during the -- I believe it was during

21      the 2015 timeframe.

22      Q.      (BY MR. INNES)  Did -- during

23  the 2015 timeframe, did it roll out to

24  DC 6045?

25              MS. TABACCHI:  Object to the

```
 1              form.
 2                    THE WITNESS:  Yes, I believe
 3              so.
 4              Q.    (BY MR. INNES)  And how long
 5       was the -- strike that.
 6                    After the rollout, was it
 7       ever -- was it discontinued at any point in
 8       time?
 9                    MS. TABACCHI:  Object to the
10              form.
11                    THE WITNESS:  Can you clarify
12              that question?
13                    MR. INNES:  Sure.
14              Q.    (BY MR. INNES)  So you
15       testified that the Reddwerks system as it
16       relates to C-IIs and C-IIIs rolled out to
17       DC 6045 sometime in 2015.
18                    When did it become permanent?
19                    MS. TABACCHI:  Object to the
20              form.
21                    THE WITNESS:  The Reddwerks
22              enhancement rolled to DC 6045 for
23              C-IIs, and then the other DCs during
24              2015 and was in place after that.
25              Q.    (BY MR. INNES)  So it was
```

1  seamless.  From rollout until whenever

2  Reddwerks was ultimately discontinued, there

3  was no break in service, for instance?

4           MS. TABACCHI:  Object to the

5      form.

6           THE WITNESS:  We rolled out in

7      pilot to one DC.  And maybe two -- and

8      we may have had issues in two of them

9      during our pilot phase where we had to

10     pull it back out because things were

11     not working the way we expected.

12     Q.    (BY MR. INNES)  Was 6045 one of

13  those?

14     A.    I do think 6045 had some issues

15  when we first rolled out.  But if my memory

16  serves, by the end of 2015, we were back in

17  6045.

18     Q.    During that break, how were --

19  if they weren't identified -- if orders of

20  interest weren't identified by Reddwerks, how

21  were they identified?

22           MS. TABACCHI:  Object to the

23      form.

24           THE WITNESS:  Just as I

25      mentioned before, Reddwerks still had

1           criteria in place to identify orders,

2           and then logistics compliance was

3           involved -- I believe they were

4           involved in determining whether it was

5           an order of interest.

6           Q.     (BY MR. INNES)  Okay.  So

7      it's -- the break would have been only as to

8      the enhancements; right?

9           A.     Correct.

10          Q.     Okay.

11          A.     Correct.

12          Q.     But the prior configurations of

13     Reddwerks would have remained in place?

14          A.     Correct.

15          Q.     And the prior configuration of

16     Reddwerks as it relates to orders of

17     interest, what's your understanding of what

18     that configuration was?

19               MS. TABACCHI:  Object to the

20          form.

21               THE WITNESS:  My understanding

22          was there were criteria in the system

23          to flag orders that were over that

24          criteria.

25          Q.     (BY MR. INNES)  By "criteria,"

1    do you mean threshold?

2         A.     I believe some of the criteria

3    were what you would consider a threshold, but

4    I think there was another criteria that was a

5    difference from a typical average or

6    something like that.

7         Q.     Okay.  Do you know how the

8    thresholds were determined at that time?

9         A.     I don't.  That was before I was

10   in role.

11        Q.     So part of your

12   responsibilities and the focus as the

13   director of controlled substances was to save

14   a stalled program; is that right?

15              MS. TABACCHI:  Object to the

16        form.

17              THE WITNESS:  My

18        responsibilities were to move forward

19        with the enhancements that we had

20        planned.

21        Q.     (BY MR. INNES)  Okay.  And to

22   determine enhancements, did you have to do an

23   evaluation of what was happening -- oh, I'm

24   sorry -- of what the configuration was at the

25   time?

```
 1              MS. TABACCHI:  Object to the
 2         form.
 3              THE WITNESS:  I was not focused
 4         on the current configuration.  I was
 5         focused on what we wanted the
 6         enhancements to be.
 7              MS. TABACCHI:  Michael, when
 8         you get to a good point, can we take a
 9         quick break?
10              MR. INNES:  Sure.  Now is
11         totally fine.
12              VIDEOGRAPHER:  We are going off
13         the record at 10:03 a.m.
14              (Recess taken, 10:03 a.m. to
15         10:29 a.m.)
16              VIDEOGRAPHER:  We are back on
17         the record at 10:29 a.m.
18         Q.    (BY MR. INNES)  We're back, and
19    then I should state for the record, if you
20    need to take a break at any time, let us
21    know.
22         A.    Okay.  Thank you.
23         Q.    So during your tenure as
24    director of controlled substances, we agree
25    that Walmart had policies in place to prevent
```

Highly Confidential - Subject to Further Confidentiality Review

1    the diversion of Schedule II and Schedule III

2    drugs; is that right?

3         A.    Yes.  I'm aware of policies to

4    do that.

5         Q.    And in fact you were in charge

6    of those policies; is that right?

7              MS. TABACCHI:  Object to the

8         form.

9              THE WITNESS:  Not all of the

10        policies.

11        Q.    (BY MR. INNES)  Not all of the

12   policies.  What policies were you in charge

13   of?

14        A.    I was responsible for policies

15   related to the order monitoring program for a

16   period of time.  Also our policies related to

17   prescription monitoring programs and

18   corresponding responsibility.

19        Q.    Corresponding responsibility

20   to?  What is that in reference to?

21        A.    It's a requirement our

22   pharmacists have in evaluating controlled

23   substances prescriptions.

24        Q.    The order monitoring policies,

25   what were those policies?

```
 1              MS. TABACCHI:  Object to the

 2         form.

 3              THE WITNESS:  There was one

 4         policy that -- I can't remember the

 5         number off the top of my head.  It was

 6         one that we reviewed earlier.  But I

 7         wasn't responsible for it the entire

 8         time, but there was a portion of the

 9         time that it was -- I was responsible

10         for the policy.

11         Q.    (BY MR. INNES)  And what

12    portion of the time was that?

13         A.    I believe the transition

14    occurred sometime in 2015.

15         Q.    Okay.  And if you -- you said

16    we saw it earlier.  Do you want to take a

17    minute and flip through and see if we can

18    find it?

19         A.    Sure.

20              So it would be the 21.04.02

21    policy.

22         Q.    And which tab is that you're

23    referring to?

24         A.    Because I'm not sure of the

25    timeframe, I'm not sure if it's tab 4 or
```

Highly Confidential - Subject to Further Confidentiality Review

1    tab 5.

2         Q.     I can try to help you with

3    that.

4              Tab 4 is December 2015 to --

5    I'm sorry, tab 4 is March 15th to

6    December 15th.

7         A.     Because I'm not sure of the

8    timeframe of when the transition occurred for

9    me to be responsible for the policies, I'm

10   not sure which one was in effect at that

11   time.

12        Q.     Okay.  So you're aware that

13   during the time period -- well, you were

14   aware that for several decades now, the

15   country has been enduring an opioid epidemic;

16   is that right?

17             MS. TABACCHI:  Object to the

18        form.

19             THE WITNESS:  Can you clarify

20        that.

21        Q.     (BY MR. INNES)  During your

22   time as a controlled substance director, do

23   you agree that the country is enduring an

24   opioid epidemic?

25        A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And as part of your
 2    responsibilities as controlled substance
 3    director was to make sure that Walmart
 4    complied with the DEA's regulations; is that
 5    right?
 6                 MS. TABACCHI:  Object to the
 7          form.
 8                 THE WITNESS:  There are certain
 9          regulations that I was responsible for
10          supporting the compliance program, not
11          all of DEA's regulations.
12          Q.     (BY MR. INNES)  And those
13    regulations that you were responsible for,
14    those related to the distribution of C-IIs
15    and C-IIIs?
16                 MS. TABACCHI:  Object to the
17          form.
18                 THE WITNESS:  Some of them did,
19          yes.
20          Q.     (BY MR. INNES)  And as you sit
21    here today, you can't recall which policies
22    were in place during that time?
23                 MS. TABACCHI:  Object to the
24          form, misstates the testimony.
25                 THE WITNESS:  I recall which
```

```
 1              policies were in place at that time.
 2              I don't recall when I transitioned to
 3              be the one responsible for that
 4              policy, what time that occurred.
 5         Q.    (BY MR. INNES)  Okay.  I mean,
 6     that's a pretty big responsibility; right?
 7     When we're -- taking over the policies that
 8     are directly related to C-IIs and C-IIIs?
 9              MS. TABACCHI:  Object to the
10              form.
11              THE WITNESS:  There was a
12              logistics compliance and practice
13              compliance -- were both involved in
14              the order monitoring process.  At one
15              point in time, logistics compliance
16              was the lead responsible party, and
17              that transitioned to practice
18              compliance being the lead responsible
19              party.
20         Q.    (BY MR. INNES)  But you don't
21     recall when that transition occurred?
22         A.    I don't remember the exact
23     date.
24         Q.    Approximate date?
25         A.    It was generally in 2015
```

1    sometime.

2         Q.    So when you took that role on,

3    what did you do?

4              MS. TABACCHI:  Object to the

5         form.

6              THE WITNESS:  I don't remember

7         exactly.  I believe we were still

8         working on the enhancements to

9         Reddwerks, so it was continued work on

10        that.

11        Q.    (BY MR. INNES)  What did you do

12   to identify excessive quantities of

13   controlled substances that were ordered in a

14   given period of time?

15             MS. TABACCHI:  Object to the

16        form.

17             THE WITNESS:  So we put the

18        Reddwerks enhancements in place to

19        identify orders of interest.

20        Q.    (BY MR. INNES)  Okay.  What

21   were those enhancements?

22        A.    We made adjustments to

23   thresholds for pharmacies, and we allowed a

24   longer timeframe for orders to be evaluated.

25             We also brought the evaluation

1    process to the home office.

2         Q.    Okay.  So any other

3    enhancements that were made?

4                   MS. TABACCHI:  Object to the

5         form.

6                   THE WITNESS:  Nothing I can

7         think of right now.

8         Q.    (BY MR. INNES)  Is there

9    anything that would refresh your recollection

10   as to what enhancements were made?

11                  MS. TABACCHI:  Object to the

12        form.

13                  THE WITNESS:  I don't know.

14        Q.    (BY MR. INNES)  You stated one

15   of the enhancements was adjustments to the

16   thresholds.  When was that enhancement put in

17   place?

18                  MS. TABACCHI:  Object to the

19        form.

20                  THE WITNESS:  As we rolled out

21        the Reddwerks upgrade.

22        Q.    (BY MR. INNES)  And when was

23   that?

24        A.    It went into the DCs at various

25   times throughout 2015.

```
 1          Q.      When did it go to DC 6045?

 2          A.      I don't remember exactly.

 3          Q.      When you say "adjustments to

 4     thresholds," what exactly does that mean?

 5          A.      The thresholds were more

 6     tailored for specific locations and specific

 7     drugs.

 8          Q.      How did you tailor them to

 9     specific locations?

10               MS. TABACCHI:  Object to the

11          form.

12               THE WITNESS:  There was -- the

13          thresh -- the updated thresholds were

14          developed before I started in role,

15          but my understanding is there was a

16          third party with experience in

17          statistics that developed the process

18          for the thresholds.

19          Q.      (BY MR. INNES)  Okay.  I

20     thought we were -- your earlier testimony was

21     that you were focused on enhancements to

22     thresholds.  Right?

23          A.      (Witness nods.)

24          Q.      That --

25          A.      Yes.  Actually implementing
```

1    those into the system.

2         Q.     Okay.  So development of

3    thresholds occurred prior to you taking the

4    role?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  The -- yes.  The

8         concept for how thresholds would be

9         developed in the new version was done

10        before I was in role.

11        Q.    (BY MR. INNES)  And did you

12   have any -- after you came into the role, did

13   you have any input into the adjustment of

14   thresholds?

15             MS. TABACCHI:  Object to the

16        form.

17             THE WITNESS:  Yes.

18        Q.    (BY MR. INNES)  And what was

19   that?

20        A.     There were occasions where we

21   would adjust thresholds based on evaluation

22   of a specific pharmacy and their threshold

23   versus a big drug.

24        Q.     What was -- what went into that

25   evaluation?

1          MS. TABACCHI:  Object to the

2     form.

3          THE WITNESS:  After a review of

4     an order, a detailed review of an

5     order, if a threshold didn't seem to

6     be correct for that drug, myself and

7     the senior director of logistics could

8     decide that a threshold needed to be

9     modified.

10    Q.    (BY MR. INNES)  What went into

11  that review?

12         MS. TABACCHI:  Object to the

13    form.

14    Q.    (BY MR. INNES)  Exactly what

15  was the review that you did?

16         MS. TABACCHI:  Object to the

17    form.

18         THE WITNESS:  Oh, okay.  We

19    reviewed data from the pharmacy

20    location and then had a discussion to

21    understand whether or not we felt the

22    current threshold was appropriate

23    based on the data.  And if not, then

24    we would make a modification.

25    Q.    (BY MR. INNES)  Okay.  So what

1    data were you looking at?

2                    MS. TABACCHI:  Object to the

3            form.

4                    THE WITNESS:  We looked at

5            their dispensing data.

6            Q.    (BY MR. INNES)  Anything else?

7            A.    I mean, we -- typically we'd

8    have feedback from the pharmacy about, you

9    know, why they might need more, and then

10   dispensing data to see if that seemed

11   appropriate.

12           Q.    And "feedback from the

13   pharmacy," what do you mean by that?

14           A.    There were times when we would

15   call the pharmacy or also talk to their

16   market leader and ask questions about the

17   pharmacy and, you know, why there may be a

18   change in dispensing.

19           Q.    A couple of times you've said

20   "We" would call the pharmacy or "we" would do

21   something.  Who are you referring to when you

22   say "we"?

23           A.    There were -- logistics

24   compliance may have been involved and then

25   also our team in practice compliance.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.

2      A.      Our team in practice

3   compliance.

4      Q.      Who were those team members?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  They changed over

8         time, but Roxy Reed was on my team.

9              The logistics team included

10        Jeff Abernathy, Dena McClamroch.

11        Kristy Spruell.

12             There were a couple other folks

13        that kind of came -- you know, came in

14        and out.  I can't think of everyone's

15        name at this point in time.

16     Q.      (BY MR. INNES)  Okay.  This

17   review process for determining threshold

18   adjustments, was it documented?

19     A.      The process itself, or ...

20     Q.      Well, you've ticked off a few

21   things that you looked at and conversations

22   that you've had.  Did you memorialize those

23   data points and conversations in any way?

24             MS. TABACCHI:  Object to the

25        form.

1          THE WITNESS:  It would occur

2     after we were evaluating an order of

3     interest.  And so the notes from the

4     order of interest were documented.

5     Q.    (BY MR. INNES)  And where are

6  those documented?

7          MS. TABACCHI:  Object to the

8     form.

9          THE WITNESS:  They're

10    maintained in a system called Archer.

11    Q.    (BY MR. INNES)  What's Archer?

12    A.    It's a tool that the compliance

13 group uses to -- almost like an electronic

14 record-keeping tool, database.

15    Q.    And is that the only -- is that

16 the only place where these -- the

17 documentation of this process occurred?

18         MS. TABACCHI:  Object to the

19    form.

20         THE WITNESS:  Can you clarify

21    that?

22    Q.    (BY MR. INNES)  So you've said

23 that you used Archer to document the process.

24    A.    Mm-hmm.  (Witness nods.)

25    Q.    Were there any memos that were

Highly Confidential - Subject to Further Confidentiality Review

1    saved in a central file?

2         A.    Not that I'm aware of.  The

3    notes were to be taken in Archer.

4         Q.    How do you take -- describe to

5    me the process of taking notes in Archer.

6         A.     It's basically an electronic

7    form.  And there are spots to place certain

8    data elements and, you know, text fields

9    where you could type in notes.

10        Q.    Okay.

11        A.    And then that's saved

12   electronically.

13        Q.    So you have places where you

14   can put a narrative form of a statement, for

15   instance?

16        A.    There were places for narrative

17   forms.

18        Q.    Okay.

19        A.    There were drop-down menus.

20   There were a variety of options within the

21   form.

22        Q.    And who was in charge of -- I'm

23   sorry, strike that.

24              Who determined what information

25   would be in the drop-downs?

```
 1              MS. TABACCHI:  Object to the
 2         form.
 3              MR. INNES:  I'll withdraw the
 4         question.
 5              THE WITNESS:  Okay.
 6         Q.    (BY MR. INNES)  I want to talk
 7    about the configuration of Archer.
 8         A.    Okay.
 9         Q.    You just testified that Archer
10    had certain drop-downs.  What were in those
11    drop-downs?
12              MS. TABACCHI:  Object to the
13         form.
14              THE WITNESS:  I don't remember
15         all the things that were drop-downs,
16         but it was typically a decision or,
17         you know, something that could be
18         standardized.
19              So, for example, we would
20         document what type of order it was.
21         Was it something that the replenish
22         system ordered or manual?
23              Another example was what was
24         our final determination on the order?
25         Was it suspicious or was it
```

Highly Confidential - Subject to Further Confidentiality Review

1         appropriate?

2              So it was -- it was things that

3         were very cut and dry.

4         Q.    (BY MR. INNES)  Okay.

5         A.    Does that make sense?

6         Q.    Right.  And what went into the

7    narrative portions?

8              MS. TABACCHI:  Object to the

9         form.

10             THE WITNESS:  It would be notes

11        from the individual evaluating the

12        order.

13        Q.    (BY MR. INNES)  And is it just

14   one individual evaluating the order?

15             MS. TABACCHI:  Object to the

16        form.

17             THE WITNESS:  A specific --

18        evaluating a specific order?  Is that

19        what you're asking?

20        Q.    (BY MR. INNES)  Yes.

21        A.    It could have been.  It

22   depended on the order.  There could have been

23   more than one individual involved.

24        Q.    Would there be -- would there

25   always be someone from health and wellness

Highly Confidential - Subject to Further Confidentiality Review

1    logistics?

2                    MS. TABACCHI:  Object to the

3           form.

4                    THE WITNESS:  As far as I know,

5           yes.  There would have been someone --

6           yes.

7                    For -- for a period of time.

8           There was a period of time where it

9           was transitioned to solely compliance.

10          Q.    (BY MR. INNES)  What period of

11   time was that?

12          A.    That was in 2017, late 2017.

13          Q.    Okay.  And prior to 2017, were

14   folks other than those in logistics involved

15   in importing information into Archer?

16          A.    Logistics --

17                    MS. TABACCHI:  Object to the

18          form.

19                    THE WITNESS:  -- and practice

20          compliance.

21          Q.    (BY MR. INNES)  And practice

22   compliance would have been your group?

23          A.    Yes.

24          Q.    And who from your group would

25   have entered information into Archer relating

Highly Confidential - Subject to Further Confidentiality Review

```
1    to threshold adjustments?
2              MS. TABACCHI:  Object to the
3         form.
4              THE WITNESS:  It could have
5         been myself or Roxy Reed.
6         Q.    (BY MR. INNES)  Did you ever
7    have internal meetings regarding the
8    increasing a threshold of a particular
9    pharmacy?
10             MS. TABACCHI:  Object to the
11        form.
12             THE WITNESS:  Yes.
13        Q.    (BY MR. INNES)  Were notes
14   taken during those meetings?
15             MS. TABACCHI:  Object to the
16        form.
17             THE WITNESS:  Yes, they would
18        be documented in Archer.
19        Q.    (BY MR. INNES)  So the
20   policy -- sorry.  Was that a policy to
21   document notes in Archer?
22        A.    I don't remember if it was in
23   the policy itself.  It was our process.
24        Q.    So the normal course of
25   performing a threshold adjustment evaluation,
```

1    you would record your notes in Archer?

2              MS. TABACCHI:  Object to the

3         form.

4              THE WITNESS:  Yes.

5         Q.    (BY MR. INNES)  Anyone involved

6    in that particular threshold adjustment would

7    record their notes in Archer?

8              MS. TABACCHI:  Object to the

9         form.

10             THE WITNESS:  Yes, that was our

11        process.

12        Q.    (BY MR. INNES)  If there was

13   a -- the drop-down menu.  I want to go back

14   to that for a second.  It sounded like there

15   were -- could you select multiple -- make

16   multiple selections in that particular

17   drop-down?  Or was it more binary?

18             MS. TABACCHI:  Object to the

19        form.

20             THE WITNESS:  Which drop-down

21        are you referring to?

22             MR. INNES:  Good question.

23        Q.    (BY MR. INNES)  How many

24   drop-downs were there?

25        A.    I don't remember exactly.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  Was there a -- if there
 2    are two people involved, for instance,
 3    involved in entering information into Archer
 4    for purposes of threshold adjustments, were
 5    there ever conflicts between what people
 6    wanted to select in the drop-down menus?
 7               MS. TABACCHI:  Object to the
 8          form.
 9               THE WITNESS:  Not that I'm
10          aware of.
11          Q.     (BY MR. INNES)  Is it possible?
12               MS. TABACCHI:  Same objection.
13               THE WITNESS:  The different
14          individuals would have been
15          responsible for different portions of
16          the review.
17          Q.     (BY MR. INNES)  Okay.  So
18    during the time period when there was someone
19    from your team and someone from the logistics
20    team, there was a division of labor as to
21    what criteria folks would enter into Archer?
22          A.     Yes.  The logistics team was
23    responsible for an initial evaluation, and
24    then practice compliance would be involved in
25    the process if the order was not deemed
```

1    appropriate from the initial evaluation.

2         Q.    Okay.  So perhaps we slipped

3    into something else.

4              I'm talking about adjustments

5    for thresholds.  Are you now talking about

6    evaluations of orders of interest?

7         A.    It typically happened together.

8         Q.    Okay.  All right.

9              So if, for instance, a pharmacy

10   ordered something that was flagged as an

11   order of interest, was Walmart's policy then

12   to look at that order of interest to

13   determine whether it needed to have a

14   threshold change?

15             MS. TABACCHI:  Object to the

16        form.

17             THE WITNESS:  I don't remember

18        us having that in the policy.  What

19        would happen is if a pharmacy flagged

20        as an order of interest multiple

21        times, we may evaluate to see if the

22        threshold was appropriate.

23        Q.    (BY MR. INNES)  Okay.  What was

24   the criteria -- so what were the criteria

25   that went into deciding to do a threshold

1    evaluation?

2             MS. TABACCHI:  Object to the

3        form.

4             THE WITNESS:  There wasn't set

5        criteria.  As I mentioned, it was most

6        often if a pharmacy was flagging like

7        multiple times, we did not find

8        anything that would make those orders

9        suspicious or anything of concern, we

10       would then evaluate it -- consider if

11       a threshold increase was appropriate.

12       Q.    (BY MR. INNES)  This system at

13   the time, was it -- we're talking about the

14   Reddwerks system right now?

15       A.    Yes.

16       Q.    So the Reddwerks system, with

17   or without enhancements?

18       A.    With enhancements.

19       Q.    With enhancements?

20       A.    Mm-hmm.

21       Q.    So the Reddwerks system with

22   enhancements would flag an order of interest?

23       A.    Yes.

24       Q.    How would it go about flagging

25   that order of interest?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. TABACCHI:  Object to the
 2          form.
 3                    THE WITNESS:  There were
 4          thresholds set in Reddwerks.
 5                    MR. INNES:  Okay.
 6          Q.    (BY MR. INNES)  And those
 7     thresholds were set to identify an order that
 8     warrants follow-up evaluation to determine
 9     whether or not it is suspicious; is that
10     right?
11          A.    Yes.
12          Q.    Okay.  So if Walmart --
13     Walmart's practice was to consider whether or
14     not to increase a threshold for a particular
15     pharmacy, after it received multiple flags
16     for an order that was potentially suspicious?
17                    MS. TABACCHI:  Object to the
18          form.  Misstates testimony.
19                    THE WITNESS:  It was Walmart's
20          common practice that if an order was
21          flagged multiple times with no concern
22          that was deemed appropriate, we would
23          then evaluate whether or not the
24          threshold was appropriate for that
25          pharmacy and that drug.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. INNES)  You mentioned

2    that a -- I believe your testimony was that

3    the thresholds were originally set by a third

4    party?  Is that -- is that your testimony?

5    A.    We had a third party who

6    reviewed the data and made recommendations

7    for how to develop a threshold.

8    Q.    Do you recall the name of that

9    third party?

10    A.    Mu Sigma.

11    Q.    And do you recall what their

12    recommendation was?

13        MS. TABACCHI:  Object to the

14        form.

15        THE WITNESS:  Based on my

16        memory, it was -- I believe it was

17        three times a standard deviation or

18        something similar to that.

19    Q.    (BY MR. INNES)  Can you explain

20    what "three times a standard deviation" is?

21    A.    I can't.

22    Q.    Did Walmart ultimately accept

23    Mu Sigma's recommendation that a threshold

24    should be set by three times the standard

25    deviation?

```
 1                    MS. TABACCHI:  Object to the
 2          form.
 3                    THE WITNESS:  Yes, for most
 4          products.
 5          Q.    (BY MR. INNES)  For C-IIs and
 6     C-IIIs?
 7                    MS. TABACCHI:  Object to the
 8          form.
 9                    THE WITNESS:  We did modify
10          thresholds to be lower in some cases.
11          Q.    (BY MR. INNES)  So --
12          A.    So if a threshold on a product
13     was greater -- based on this calculation
14     would have been greater than 5,000 dosage
15     units, we would lower it down to that.
16                    So that we could monitor
17     closely.
18          Q.    When you say "on a product,"
19     what do you mean "on a product"?
20          A.    We also made some adjustments
21     on liquid products, because the calculations
22     would -- would typically make the threshold
23     too high.  It would be an amount that would
24     be unreasonable for a pharmacy to be able to
25     store from a liquid product standpoint, so we
```

Highly Confidential - Subject to Further Confidentiality Review

 1    artificially lowered those as well.

 2         Q.    Did you artificially lower any

 3    other thresholds for any other products?

 4         A.    Not that I can think of.

 5         Q.    Did you artificially raise a

 6    threshold for any other products that you can

 7    think of?

 8              MS. TABACCHI:  Object to the

 9         form.

10              THE WITNESS:  We did not

11         artificially raise a threshold for any

12         product.

13         Q.    (BY MR. INNES)  Did you raise a

14    threshold for any product?

15              MS. TABACCHI:  Object to the

16         form.

17              THE WITNESS:  We did raise

18         thresholds occasionally for a product

19         or a specific location and a specific

20         product.

21         Q.    (BY MR. INNES)  And that was

22    the process we just discussed?

23         A.    Yes.

24         Q.    So, I just want to make sure I

25    have this right.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    You accepted -- Walmart
 2      accepted Mu Sigma's threshold calculations
 3      three times the standard deviation, and
 4      Walmart -- but Walmart carved out of that
 5      liquid products?
 6                    MS. TABACCHI:  Object to the
 7              form.
 8                    THE WITNESS:  I didn't say we
 9              carved that out.  What we did on some
10              of the liquid products was lower the
11              threshold that would have been
12              calculated based on their
13              recommendation.
14      Q.    (BY MR. INNES)  But as far as
15      it goes for all other C-IIs or C-IIIs that
16      are not liquid products, Walmart went with
17      the three times the standard deviation as the
18      threshold?
19                    MS. TABACCHI:  Object to the
20              form.  Misstates testimony.
21                    THE WITNESS:  Generally, but if
22              it would have made a threshold above
23              5,000 dosage units, we would lower it
24              to 5,000 dosage units.
25      Q.    (BY MR. INNES)  And would you
```

1    be -- the further adjustments -- or the

2    further caveats that would be accepted the

3    three times the standard deviation unless it

4    went through an eval, threshold evaluation

5    and you increased it above the three times

6    the standard deviation?

7              MS. TABACCHI:  Object to the

8         form.

9              THE WITNESS:  I don't know that

10        we ever increased above the three

11        times the standard deviation.  Often

12        what we would see is we had lowered

13        the threshold to the 5,000 dosage

14        units, and we would adjust above that.

15        Q.    (BY MR. INNES)  If I gave you

16   the number of a hypothetical order, would you

17   know how to calculate the three times the

18   standard deviation?

19        A.    No.  That wasn't something that

20   I did.

21        Q.    I wouldn't know how to do that.

22              But are you aware that the

23   three times the standard deviation would

24   encompass 99.7 percent of all thresholds from

25   the mean average?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      MS. TABACCHI:  Object to the
 2           form.
 3                      THE WITNESS:  I -- no.
 4           Q.    (BY MR. INNES)  As a director
 5      of controlled substances and one that had a
 6      major role in threshold evaluation, do you
 7      think it's important to understand how the
 8      thresholds were set?
 9                      MS. TABACCHI:  Object to the
10           form.
11                      THE WITNESS:  Yes.
12           Q.    (BY MR. INNES)  Okay.  But you
13      don't know what three times the standard
14      deviation is?
15                      MS. TABACCHI:  Object to the
16           form.
17                      THE WITNESS:  I don't.
18           Q.    (BY MR. INNES)  You testified
19      earlier that when you looked -- that during
20      the threshold data -- threshold adjustment
21      evaluation, you looked at data; is that
22      right?
23           A.    Yes.
24           Q.    And the data that you looked at
25      was dispensing data?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     Any other data that you looked

3  at?

4             MS. TABACCHI:  Object to the

5        form.

6             THE WITNESS:  I don't remember

7        any other data.

8      Q.     (BY MR. INNES)  Do you not

9  remember any other data or there was no

10 other?

11     A.     I don't think there was other

12 data.

13     Q.     You didn't look at the

14 geographical location of a pharmacy, for

15 instance?

16            MS. TABACCHI:  Object to the

17        form.

18            THE WITNESS:  Yes, I would not

19        necessarily consider that data.

20     Q.     (BY MR. INNES)  Okay.  What do

21 you consider to be data?

22     A.     Numbers.

23     Q.     So what other information did

24 you consider when making a threshold

25 adjustment, other than dispensing data?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     As I mentioned earlier, if we

2    had feedback from the market director or our

3    pharmacist.  We also knew the geographic

4    location.  In addition, we knew information

5    about what else -- other aspects of the

6    pharmacy, so if it had any regulatory visits

7    or things like that.  We had access to that

8    information.

9        Q.     Okay.  What kind of feedback

10   would you receive from the market director,

11   generally speaking?

12       A.     It depended on the

13   conversation, but they could provide us with

14   information about the geographic location,

15   what -- is this a rural area?  Is it urban?

16            I remember several threshold

17   increases that were related to other

18   pharmacies -- local pharmacies closing in the

19   area, which would mean that patients had to

20   find a new pharmacy, and so they'll be able

21   to provide us with that type of information.

22       Q.     You relied on those individuals

23   to give you that information to the home

24   office?

25            MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  We would ask them

3          for information, yes.

4          Q.    (BY MR. INNES)  Did the home

5     office ever do its own independent

6     investigation about the data -- or the

7     information you just mentioned?

8                    MS. TABACCHI:  Object to the

9          form.

10                    THE WITNESS:  Yes, we would.

11          Q.    (BY MR. INNES)  And did you

12    document that?

13          A.     I believe so.  I believe it

14    would be documented in the notes in Archer.

15          Q.     Were you required to document

16    that in Archer?

17                    MS. TABACCHI:  Object to the

18          form.

19                    THE WITNESS:  As I mentioned,

20          it was a practice.  We didn't have

21          like a list of everything that had to

22          be documented.

23          Q.    (BY MR. INNES)  You said you

24    had like a list of everything that had to be

25    documented.

1       A.      I said we did not have a list.

2       Q.      So there is no standard

3    protocol for this piece of the investigation

4    for a threshold increase?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  There was -- we

8         required specific information in the

9         Archer form, but we did not go down to

10        every single item that had to be

11        documented.

12       Q.      (BY MR. INNES)  Can you explain

13   that?  So "We required specific information

14   in the Archer form, but we did not go down to

15   every single item that had to be documented."

16   What -- so was there information that wasn't

17   documented in Archer that you would consider?

18       A.      There was information that may

19   not be needed for a specific evaluation.

20       Q.      Who made that determination?

21              MS. TABACCHI:  Object to the

22        form.

23              THE WITNESS:  The individual

24        evaluating the order.

25       Q.      (BY MR. INNES)  Is it that the

1    individual evaluating the order stated their

2    reasons in Archer for making the

3    recommendation as to the threshold?

4            MS. TABACCHI:  Object to the

5        form.

6            THE WITNESS:  The person

7        evaluating the order didn't actually

8        make a recommendation.  That was a

9        decision that was made after the order

10       was determined to be appropriate.

11       Myself and the senior director of

12       logistics would discuss whether or not

13       a threshold adjustment was

14       appropriate.

15       Q.    (BY MR. INNES)  So when you

16   discussed with a senior director of logistics

17   whether or not a threshold adjustment was

18   appropriate, you were considering the notes

19   in Archer?

20       A.    Yes.

21       Q.    Is that right?

22            Your deliberations between the

23   director of logistics and you --

24       A.    (Witness nods.)

25       Q.    -- were those deliberations

1    memorialized in any way?

2         A.     We documented notes in Archer.

3         Q.     So you also put notes in

4    Archer?

5         A.     Mm-hmm.  (Witness nods.)

6              MS. TABACCHI:  I'm just going

7         to remind the witness to answer

8         audibly instead of an mm-hmm.

9              THE WITNESS:  Okay.  Sorry.

10             MR. INNES:  Thank you.

11        Q.     (BY MR. INNES)  Now I'm having

12   trouble with the glare.

13             Did you ever do any analysis of

14   what a -- strike that.

15             When considering a threshold

16   increase of a particular pharmacy, did you

17   ever look at other pharmacies in like

18   geographic regions or like situations or like

19   ordering patterns to determine whether or not

20   the threshold increase was justified?

21             MS. TABACCHI:  Object to the

22        form.

23             THE WITNESS:  We did not, that

24        I can recall.

25        Q.     (BY MR. INNES)  One of the

```
 1    enhancements you mentioned was more time.
 2              What do you mean -- what did
 3    you mean by "more time"?
 4        A.    It made it easier in the system
 5    to pull out those orders separately from
 6    other orders that hadn't pinned it.
 7        Q.    Okay.  So this is -- is this
 8    less an adjustment to -- strike that.
 9              More time for -- strike that.
10              So these enhancements, the
11    adjustments of threshold, more time, and
12    evaluation of home office, of those three,
13    the adjustments to threshold is really the
14    only one directed at flagging or of interest;
15    is that right?
16              MS. TABACCHI:  Object to the
17         form.
18              THE WITNESS:  Yes.
19        Q.    (BY MR. INNES)  And the "more
20    time" is for evaluation purposes?
21        A.    Yes.
22        Q.    Okay.
23              And the evaluation of the home
24    office, obviously that is for evaluation
25    purposes?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      Yes.
2            Q.      Where was that evaluation
3     occurring prior to the home office?
4                    MS. TABACCHI:  Object to the
5            form.
6            Q.      (BY MR. INNES)  If at all?
7            A.      Prior to my role, my
8     understanding is it occurred in the DCs.
9            Q.      Okay.
10                   And remind me again.  You
11    started in your role when?
12           A.      October 2014.
13           Q.      So prior to October 2014,
14    evaluations of orders of interest happened at
15    the DCs?
16           A.      That's my understanding.
17           Q.      And when did the enhancements
18    go into effect in 6045?
19                   MS. TABACCHI:  Object to the
20           form.
21                   THE WITNESS:  I think I
22           mentioned earlier, I'm not sure
23           exactly when, but it was in 2015.
24           Q.      (BY MR. INNES)  What did
25    Walmart do, if anything, to identify whether
```

1    controlled substances were being ordered in

2    quantities disproportionate to the quantity

3    of non-controlled medications?

4              MS. TABACCHI:  Object to the

5         form.

6              THE WITNESS:  Can you clarify

7         timeframe or --

8              MR. INNES:  Any timeframe.

9              THE WITNESS: -- just --

10             MS. TABACCHI:  Object to the

11        form, lack of foundation.

12             THE WITNESS:  So I'm only

13        familiar with what was done when I was

14        in role.  But as part of your

15        evaluation process, we did review the

16        percentage of controlled substances

17        versus non-controlled substances.

18        Q.    (BY MR. INNES)  And what

19   evaluation process are you referring to?

20        A.    Evaluation of an order of

21   interest.

22        Q.    When did you first start

23   considering that --

24             MS. TABACCHI:  Object to the

25        form.

```
1           Q.      (BY MR. INNES) -- in your

2    evaluations of orders of interest?

3                   MS. TABACCHI:  Same objection.

4                   THE WITNESS:  I don't remember

5           the exact date.

6           Q.      (BY MR. INNES)  Do you remember

7    an approximate date?

8           A.      They would have been sometime

9    in 2015, potentially end of 2014 that I know

10   of.  It could have happened earlier.

11          Q.      Do you have personal knowledge

12   of considering that information when

13   reviewing orders of interest?

14                  MS. TABACCHI:  Object to the

15          form.

16                  THE WITNESS:  Can you ask that

17          again?

18          Q.      (BY MR. INNES)  Can you point

19   to any instance where you know that that

20   information was considered when evaluating an

21   order of interest?

22                  MS. TABACCHI:  Object to the

23          form.

24                  THE WITNESS:  I reviewed it

25          when I evaluated orders of interest.
```

1    Q.    (BY MR. INNES)  Okay.  And you

2  believe that was beginning in 2014 or 2015?

3    A.    Yes.

4    Q.    And do you have any

5  documentation that that was considered as

6  part of your evaluation?

7    A.    It was part of the information

8  in Archer that we reviewed.

9    Q.    And how was it part of the

10  information in Archer?

11    A.    It was included in Archer, with

12  the store.

13    Q.    Was it information that you

14  inputted into Archer?

15    A.    Yes.

16    Q.    As part of your evaluation?

17    A.    It was done for all locations

18  so that it was available when the order of

19  interest was being evaluated.

20    Q.    Okay.  So you're looking at the

21  Archer interface, and there's a portion of

22  the Archer interface that gives you that data

23  point?

24    A.    Yes.

25    Q.    And what weight, if any, did

Highly Confidential - Subject to Further Confidentiality Review

1    you give to that data -- that data point when

2    considering an order of interest?

3                    MS. TABACCHI:  Object to the

4         form.

5                    THE WITNESS:  It was a relevant

6         point that was reviewed when we were

7         evaluating an order of interest.

8         Q.    (BY MR. INNES)  When

9    considering the information data in Archer as

10   part of the order of interest evaluation, you

11   considered multiple pieces of information; is

12   that correct?

13        A.    Correct.

14        Q.    And they were considered in

15   total; is that correct?

16        A.    Correct.

17        Q.    And were certain data points

18   more important to you than others?

19                    MS. TABACCHI:  Object to the

20        form.

21                    THE WITNESS:  I don't believe

22        there was specific data points that

23        were more important.  It was

24        evaluating the data and information

25        available as a whole.

```
 1          Q.     (BY MR. INNES)  And did you
 2   reach -- did that -- did all -- was all of
 3   that data ever distilled to one metric?
 4                  MS. TABACCHI:  Object to the
 5          form.
 6                  THE WITNESS:  Can you ask that
 7          again?
 8          Q.     (BY MR. INNES)  Yeah.  So when
 9   you're considering all these different data
10   points and information that is available to
11   you in Archer, but the information is
12   calculated for you and then your
13   consideration of notes with conversations
14   with market leaders, market directors, at
15   that point is it -- it's a -- sort of a gut
16   call of this seems suspicious, this does not
17   seem suspicious?
18                  MS. TABACCHI:  Object to the
19          form.
20                  THE WITNESS:  No, it's an
21          evaluation of all the information
22          available to determine whether or not
23          an order is suspicious.
24          Q.     (BY MR. INNES)  And what do you
25   benchmark those -- that data against to
```

1    determine whether or not it's a suspicious

2    order or not?

3              MS. TABACCHI:  Object to the

4         form.

5              THE WITNESS:  I -- I don't know

6         that I would call it "benchmarking,"

7         but when you review the information

8         available and the data, you're able to

9         either explain and understand why an

10        order was placed or you are not.  And

11        if you're not able to explain it or if

12        the explanation is not a -- is not an

13        appropriate explanation, then those

14        are the orders that we would report as

15        suspicious.

16        Q.    (BY MR. INNES)  Who determines

17   whether or not it's an appropriate

18   explanation?

19              MS. TABACCHI:  Object to the

20        form.

21              THE WITNESS:  There were

22        various individuals involved in the

23        process that could make that

24        determination.

25        Q.    (BY MR. INNES)  Can you tell me

Highly Confidential - Subject to Further Confidentiality Review

1    who those individuals were and the specific

2    time periods that they were involved in

3    making that determination?

4         A.    So the logistics compliance

5    team did an initial review.  And then if they

6    were not able to determine that the order was

7    appropriate, they would send it to the

8    practice compliance team for a more

9    comprehensive evaluation.  Then the final

10   decision was made by myself and the senior

11   director of logistics.

12        Q.    And what time period --

13        A.    That was until late 2017.

14        Q.    So from your -- that process

15   you just described was from the beginning --

16   your first day on the job until late 2017?

17        A.    No.  There was a period of time

18   at the beginning that the distribution center

19   was still responsible for the evaluation of

20   orders.

21        Q.    And what period of time was

22   that?

23        A.    That was until the Reddwerks

24   enhancements was rolled out.

25        Q.    Okay.  During the -- from when

1    Reddwerks was rolled out until late 2017,

2    that process that you've described, who was

3    in charge on the practice compliance side?

4          A.     Myself.

5          Q.     And who was in charge on the

6    logistics portion?

7                 MS. TABACCHI:  Object to the

8          form.

9                 THE WITNESS:  It was the senior

10         director of logistics.

11         Q.     (BY MR. INNES)  Was that

12   Chad Ducote?

13                MS. TABACCHI:  Object to the

14         form.

15                THE WITNESS:  I believe he was

16         enrolled the majority, if not all, of

17         that time.

18         Q.     (BY MR. INNES)  What did you

19   do -- strike that.

20                Were pharmacies permitted to

21   order C-IIs and C-IIIs from anyone other than

22   Walmart?

23         A.     Yes.

24         Q.     And when was that?

25         A.     During -- I know during the

Highly Confidential - Subject to Further Confidentiality Review

```
1     time period that I was in role.
2          Q.     So from when you started the
3     role until the present day?
4               MS. TABACCHI:  Object to the
5          form.
6               THE WITNESS:  Yes.  Present day
7          we do not self-distribute, so they
8          order from others.
9          Q.     (BY MR. INNES)  And from
10    whom -- or what entity did they order those
11    C-IIs and C-IIIs?
12              MS. TABACCHI:  Object to the
13         form.
14              THE WITNESS:  Walmart
15         pharmacies had the ability to order
16         from McKesson.
17         Q.     (BY MR. INNES)  Okay.  Did you
18    consider -- or did Walmart consider
19    pharmacies' purchases or orders from --
20    direct purchases from McKesson as part of
21    their threshold analysis?
22              MS. TABACCHI:  Object to the
23         form.
24              THE WITNESS:  Walmart had
25         visibility to all C-IIs orders being
```

1          placed to McKesson because those went

2          through a centralized CSOS process.

3          Q.    (BY MR. INNES)   Okay.  So I

4    think my question is slightly different.  Not

5    whether or not you had visibility, but

6    whether or not you actually considered those

7    orders as part of the threshold interest.

8               MS. TABACCHI:  Object to the

9          form.

10          Q.    (BY MR. INNES)  Or threshold

11    evaluation.

12               THE WITNESS:  The -- whether or

13          not we're going to increase a

14          threshold?  Is that what you're asking

15          about?

16          Q.    (BY MR. INNES)  Yeah.

17          A.    Yes, we did.

18          Q.    (BY MR. INNES)  And when did

19    you start doing that?

20          A.    I believe we were look --

21    considering those McKesson orders in our

22    order evaluations from when we started the

23    process with the new Reddwerks system, the

24    Reddwerks enhancements.

25          Q.    Reddwerks enhancements?

1      A.      Yes.

2      Q.      So prior to the Reddwerks

3  enhancements, to your knowledge did Walmart

4  consider McKesson orders as part of threshold

5  evaluations?

6              MS. TABACCHI:  Object to the

7         form.

8              THE WITNESS:  I don't believe

9         there were threshold adjustments prior

10        to the Reddwerks enhancements.

11             MR. INNES:  Okay.

12     Q.     (BY MR. INNES)  The -- were the

13 thresholds static prior to the Reddwerks

14 enhancements?

15             MS. TABACCHI:  Object to the

16        form.

17             THE WITNESS:  My understanding

18        prior to the Reddwerks enhancements

19        was there was -- there were specific

20        criteria built into Reddwerks, and

21        those weren't easily changed.

22             And I don't -- I don't believe

23        they were -- could be changed for a

24        specific location.

25     Q.     (BY MR. INNES)  And when the

Highly Confidential - Subject to Further Confidentiality Review

1   Reddwerks enhancements rolled out, did those

2   enhancements replace the thresholds that were

3   in Reddwerks prior to the enhancements?

4        A.     Yes.

5               MS. TABACCHI:  Object to the

6        form.

7               MR. INNES:  Sorry.  That was

8        bad.

9        Q.     (BY MR. INNES)  Another way of

10  asking that is, did -- the criteria that

11  Reddwerks applied prior to the enhancements

12  was not carried over with the enhancements?

13       A.     Correct.

14       Q.     Okay.  I'm going to ask the

15  same series of questions about McKesson

16  orders as they relate to suspicious order

17  evaluations.  We just talked about threshold

18  evaluations.

19               Were the McKesson orders

20  considered as part of an order of interest

21  evaluation?

22               MS. TABACCHI:  Object to the

23        form.

24               THE WITNESS:  Yes.

25        Q.     (BY MR. INNES)  And when did --

Highly Confidential - Subject to Further Confidentiality Review

1    when was that data considered as part of the

2    order evaluation?

3                    MS. TABACCHI:  Object to the

4             form.

5                    THE WITNESS:  I believe it was

6             the entire time after we had the

7             Reddwerks enhancements.

8         Q.    (BY MR. INNES)  Okay.  So prior

9    to the Reddwerks enhancements, just when

10   evaluating orders of interest, Walmart did

11   not consider direct orders to McKesson?

12                   MS. TABACCHI:  Object to the

13            form.

14                   THE WITNESS:  I'm not sure

15            because the evaluation occurred at the

16            DC.

17        Q.    (BY MR. INNES)  So after the

18   Reddwerks enhancements, what was considered

19   with respect to orders from other

20   distributors such as McKesson?

21                   MS. TABACCHI:  Object to the

22            form.

23                   THE WITNESS:  We would look at

24            what that pharmacy was ordering for

25            that drug from the other distributor.

```
 1              Q.     (BY MR. INNES)  And were

 2      they -- in looking at a particular pharmacy,

 3      did you take, for instance, Oxy 30s ordered

 4      from Walmart and added them to Oxy 30s

 5      ordered from McKesson?  Is that how that

 6      worked?

 7                      MS. TABACCHI:  Object to the

 8          form.

 9                      THE WITNESS:  We would

10          consider -- we would look at what they

11          had ordered from McKesson and consider

12          that as we were evaluating the order.

13              Q.     (BY MR. INNES)  And would that

14      be documented in Archer?

15              A.     I believe it would have been.

16                      MS. TABACCHI:  Object to the

17          form.

18              Q.     (BY MR. INNES)  As part of an

19      order of interest of a suspicious order

20      evaluation, did Walmart consider the

21      percentage of -- that a particular pharmacy's

22      business related to controlled substances?

23                      MS. TABACCHI:  Object to the

24          form.

25                      THE WITNESS:  Walmart would
```

1      consider the percentage of controlled

2      substances dispensed to non-controlled

3      substances dispensed in an order of

4      interest evaluation.

5          Q.     (BY MR. INNES)  And where was

6   that information obtained from?

7          A.     Our dispensing data.

8          Q.     And dispensing data was

9   available to you through Archer?

10             MS. TABACCHI:  Object to the

11          form.

12             THE WITNESS:  It was available

13          through -- we have databases where we

14          keep it, and it was input into Archer

15          for ease of access.

16          Q.     (BY MR. INNES)  So if you went

17   into Archer on any particular day and entered

18   in pharmacy Bentonville, you could see the

19   percentage of controls to non-controls?

20             MS. TABACCHI:  Object to the

21          form.

22             THE WITNESS:  Yes.  It was not

23          updated daily.  It was typically

24          updated quarterly.

25             MR. INNES:  Okay.

1    Q.    (BY MR. INNES)  So when doing

2    an evaluation, you were considering quarterly

3    eval?

4         MS. TABACCHI:  Object to the

5         form.

6         THE WITNESS:  Yes.

7    Q.    (BY MR. INNES)  And would you

8    consider that as part of every evaluation?

9    A.    Yes.  That was available to --

10   for review as part of the evaluation.

11   Q.    Slightly different question.

12   You say it was available for review.  I want

13   to know exactly what was reviewed.

14   A.    So I would consider it as every

15   part of my evaluation as -- in every

16   evaluation.  There were others that were

17   involved in evaluations.  I would assume they

18   would consider it as well because that was an

19   expectation.

20   Q.    And whose expectation was that?

21   A.    That was my expectation.

22   Q.    And you communicated that

23   expectation to those folks who were doing

24   evaluations in your stead?

25   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.       How did you do that?

2        A.       Through conversations.

3        Q.       Did you ever send a memo to

4    your team?

5                 MS. TABACCHI:  Object to the

6           form.

7                 THE WITNESS:  I don't remember

8           sending a memo.  We don't do memos

9           really at Walmart, but I may have sent

10          an email.  I don't remember.

11       Q.    (BY MR. INNES)  Again, you're

12   in charge of, during this time period, this

13   sort of monitoring program as it pertains to

14   the compliance side and you're doing reviews.

15   And sometimes there are people other than you

16   that are doing these reviews; is that right?

17       A.       From a compliance perspective?

18       Q.       Yeah.

19       A.       There were others that were

20   involved in pulling together the information,

21   but I was the decision-maker.

22       Q.    (BY MR. INNES)  Okay.  So you

23   had a -- you evaluated each and every order

24   of interest?

25                MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1       form.

2                   THE WITNESS:  No.

3           Q.      (BY MR. INNES)  Okay.

4           A.      I evaluated orders of interest

5       that were not already deemed appropriate by

6       the logistics compliance team.

7           Q.      So you're filtered down.

8       You're dealing with -- it's gone through a

9       layer of review and you're dealing with a

10      subset of orders that have been flagged by

11      Reddwerks?

12          A.      Correct.

13          Q.      And you looked at each and

14      every one of those?

15          A.      Yes.

16          Q.      And as part of your evaluation

17      of each and every one of those, you

18      considered what?

19                  What data did you consider?

20                  MS. TABACCHI:  Object to the

21              form.

22                  THE WITNESS:  All of the

23              information from the logistics

24              compliance that they had gathered.

25          Q.      (BY MR. INNES)  And what would

1    that be, typically?

2        A.    They would often have

3    conversations with a pharmacist.  They would

4    know what had been ordered previously.

5              They may have information about

6    a product that had been out of stock.  That

7    type of information.

8              And then we would pull

9    additional dispensing data.

10             We also, if we needed

11   additional clarification, would reach out to

12   a pharmacist or the market director.

13       Q.    (BY MR. INNES)  You said you

14   would pull dispensing data?

15       A.    Yes.

16       Q.    I thought earlier you said

17   that -- and this is -- I may have misheard

18   you -- that it was available to you through

19   Archer.

20       A.    We had certain things that were

21   available in Archer.

22       Q.    Okay.

23       A.    But it was not everything that

24   we would review if we were looking at an

25   order.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     Can you tell me everything that

2   was available to you in Archer?

3                MS. TABACCHI:  Object to the

4         form.

5                THE WITNESS:  I will try to

6         remember.

7                The controlled substance ratio

8         to non-controlled substances.  The --

9         I believe it was the overall average

10        controlled substances dispensed per

11        week.

12               And we also had overall data on

13        how patients typically paid for their

14        prescription.

15       Q.     (BY MR. INNES)  Anything else?

16       A.     Not that I can think of.

17       Q.     These pieces of information

18  that you just listed, were they at the

19  pharmacy level or were they at some other

20  level?

21               MS. TABACCHI:  Object to the

22        form.

23               THE WITNESS:  They -- the data

24        was specific to a pharmacy.

25       Q.     (BY MR. INNES)  And did you

Highly Confidential - Subject to Further Confidentiality Review

1  have a way of comparing that pharmacy data to

2  other pharmacies?

3       A.      Not within Archer.

4       Q.      Outside of Archer did you have

5  that ability?

6       A.      Possibly.

7       Q.      Do you remember ever doing

8  that?

9       A.      I don't remember ever doing

10 that.

11      Q.      As part of your order of

12 interest evaluation, did you ever look to see

13 if the script was written by a practitioner

14 from whom the buyer was not -- or did not

15 have a pre-existing relationship?

16              MS. TABACCHI:  Object to the

17        form.

18              THE WITNESS:  Can you restate

19        that?

20              MR. INNES:  Sure.

21      Q.      (BY MR. INNES)  So did you --

22 as part of your suspicious order monitoring

23 program, did you ever look to see if the

24 script was filled -- or the script was

25 written by a practitioner from whom the buyer

1    did not have a pre-existing relationship?

2                    MS. TABACCHI:  Object to the

3            form.

4                    THE WITNESS:  We looked at data

5            at a high level, not on an individual

6            prescription level.  The individual

7            evaluation of a prescription was done

8            by our pharmacist.

9            Q.    (BY MR. INNES)  Are the

10    pharmacists part of the suspicious order

11    monitoring program?

12                    MS. TABACCHI:  Object to the

13            form.

14                    THE WITNESS:  It was not part

15            of the suspicious order monitoring

16            program.  It was our original policies

17            and procedures.

18            Q.    (BY MR. INNES)  What's

19    Walmart's policy for filling prescriptions

20    issued by practitioners based solely on an

21    online evaluation?

22                    MS. TABACCHI:  Object to the

23            form.

24                    THE WITNESS:  It's not allowed.

25            Q.    (BY MR. INNES)  Is that a

1    written policy?

2                   MS. TABACCHI:  Object to the

3          form.

4                   THE WITNESS:  Yes.

5          Q.    (BY MR. INNES)  Where would I

6    find that?

7          A.    Which policy?

8          Q.    Yeah.

9          A.    That would be in what's called

10   POM 1311.

11         Q.    And when did POM 1311 go into

12   effect?

13                  MS. TABACCHI:  Object to the

14         form.

15                  THE WITNESS:  Prior to me

16         starting in role.  I don't remember

17         the date.

18         Q.    (BY MR. INNES)  Did Walmart

19   ever consider whether the prescribing

20   practitioner was licensed in the state where

21   the script was being filled?

22                  MS. TABACCHI:  Object to the

23         form.  Lack of foundation.

24                  THE WITNESS:  We had policies

25         in place for our pharmacist that would

1          include that as part of their

2          evaluation, of the appropriateness of

3          a controlled substance description.

4          Q.    (BY MR. INNES)  And where would

5     I find that policy?

6          A.    So that would also be in

7     POM 1311.  And it may be referenced -- we

8     have another policy that talks about

9     confirming appropriate licensure.  I can't

10    think of the number off the top of my head

11    for that one.

12         Q.    When do you think that took

13    effect?

14              MS. TABACCHI:  Object to the

15         form.  Lack of foundation.

16              THE WITNESS:  I don't know.

17         Both of those were in effect whenever

18         I started in role.

19         Q.    (BY MR. INNES)  When you

20    entered the role as controlled -- as director

21    of controlled substances, did you do any

22    research as to the history of Walmart's

23    policies as they relate to C-IIs and C-IIIs?

24              MS. TABACCHI:  Object to the

25         form.

```
 1                    THE WITNESS:  Not that I
 2          remember.
 3          Q.     (BY MR. INNES)  Did you look at
 4    any policies that -- old -- policies that
 5    were no longer in place?
 6                    MS. TABACCHI:  Object to the
 7          form.
 8                    THE WITNESS:  No.  Not that I
 9          remember.
10          Q.     (BY MR. INNES)  Did you
11    evaluate the policies that were in place when
12    you started in the role?
13                    MS. TABACCHI:  Object to the
14          form.
15                    THE WITNESS:  I did look at the
16          policies that applied to me when I was
17          in role.
18          Q.     (BY MR. INNES)  And did you
19    make any determinations about their
20    effectiveness?
21                    MS. TABACCHI:  Object to the
22          form.
23                    THE WITNESS:  When I was new to
24          role, I didn't know what was effective
25          at the time because I didn't have
```

1     experience with how it was working,

2     so ...

3          Q.     (BY MR. INNES)  Okay.  Did you

4     look -- look at them with an eye towards

5     whether or not they complied with the DEA's

6     regulations?

7                 MS. TABACCHI:  Object to the

8          form.  Lack of foundation.

9                 THE WITNESS:  I reviewed them

10         with -- based on what my understanding

11         of the DEA regulation was.  I was not

12         the only one that would be involved in

13         review and approval of language and

14         policy.

15         Q.     (BY MR. INNES)  And what was

16    your understanding -- at the time of that

17    review, what was your understanding of

18    those -- the regulations based on?

19                MS. TABACCHI:  Object to the

20         form.

21                THE WITNESS:  It would have

22         been --

23                MS. TABACCHI:  I'm going to

24         also caution the witness not to reveal

25         the substance of any attorney-client

Highly Confidential - Subject to Further Confidentiality Review

```
1              communication.
2                   If you can answer without
3              revealing a communication that you had
4              with a lawyer, you're free to do that.
5                   THE WITNESS:  I'm trying to
6              think if there was anything that
7              didn't involve communication with a
8              lawyer.
9                   I can't think of anything other
10             than it was a policy that was in
11             place, so ...
12             Q.    (BY MR. INNES)  In your
13        personal capacity, in your -- you hold a JD;
14        is that right?
15             A.    That's correct.
16             Q.    And you've passed the bar; is
17        that right?
18             A.    Correct.
19             Q.    And you were a practicing
20        lawyer at one point; is that right?
21                  MS. TABACCHI:  Object to the
22             form.
23                  THE WITNESS:  Correct.
24             Q.    (BY MR. INNES)  In your
25        personal capacity as a lawyer during that
```

Highly Confidential - Subject to Further Confidentiality Review

1    time period, did you look at Walmart's

2    policies to see whether or not they complied

3    with the DEA regulations as you understood

4    them at the time?

5            MS. TABACCHI:  Object to the

6        form, lack of foundation.

7            THE WITNESS:  When I first

8        started in role, what I was

9        responsible for was the suspicious

10       order monitoring, and so I became

11       familiar with that policy.

12       Q.    (BY MR. INNES)  You became

13   familiar with Walmart's policy?

14       A.    Yes.

15       Q.    And Walmart's policy, generally

16   speaking, each of these policies has a

17   preamble or a purpose that talks about what

18   DEA regulations require.

19            Did you investigate what those

20   DEA regulations were?

21            MS. TABACCHI:  Object to the

22       form.

23            THE WITNESS:  I did review.

24       Q.    (BY MR. INNES)  You did?

25       A.    Mm-hmm.  (Witness nods.)

 1      Q.    And after you reviewed them,

 2  did you then look at Walmart's policies?

 3              MS. TABACCHI:  Object to the

 4        form.

 5              THE WITNESS:  I don't remember

 6        if I reviewed them first and then

 7        looked at the policies or vice versa,

 8        but I did review the regulations

 9        requirements.

10      Q.    (BY MR. INNES)  And did you

11  make an analysis, after having looked at both

12  the regulations and the policies, to make a

13  determination as to whether or not the

14  policies were adequate?

15              MS. TABACCHI:  Object to the

16        form.  Lack of foundation.  Calls for

17        a legal conclusion.

18              THE WITNESS:  My role is

19        focused on compliance with our

20        policies.

21      Q.    (BY MR. INNES)  Your role as --

22  let's see.

23              So is it your testimony that as

24  a director of controlled substances, your

25  role, your job, is limited to whether or not

1    Walmart's policies are carried out?

2              MS. TABACCHI:  Object to the

3         form.

4              THE WITNESS:  That is my main

5         function.  I can make recommendations

6         to make sure policies are clear, but

7         my role is not interpreting legal

8         requirements.

9         Q.    (BY MR. INNES)  Did you ever

10   make recommendations regarding the clarity of

11   the policies you were charged with

12   implementing?

13        A.    Yes, I have made

14   recommendations for revisions of policies.

15        Q.    And what were those revisions?

16   Recommendations?

17             MS. TABACCHI:  Object to the

18        form.

19             THE WITNESS:  I don't remember

20        exactly.  Typically rewording language

21        so a pharmacist could understand it or

22        changing the order that things were

23        written.

24        Q.    (BY MR. INNES)  Do you have

25   any -- recall any specific examples of

1    policies that you recommended be changed?

2         A.    Yes.  We -- I made mod --

3    recommended modifications to many policies.

4    1311.  1316, which is related to our

5    prescription monitoring program for our

6    pharmacists.

7              Those are two that I can think

8    of off the top of my head.

9         Q.    Any recommendations to

10   evaluating orders of interest and suspicious

11   order reporting?

12             MS. TABACCHI:  Object to the

13        form.

14             THE WITNESS:  Yes.  At some

15        point I've been involved in making

16        recommendations for modifying the

17        policy.

18        Q.    (BY MR. INNES)  Do you recall

19   when you made recommendations to modify those

20   policies?

21        A.    I -- let's see.

22             The main one I remember is the

23   June 2017.

24        Q.    And you're referring to which

25   tab in Exhibit 1?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I apologize.  It's tab No. 6.

 2          Q.     So tab No. 6 in Exhibit 1

 3   ending in -- or beginning in Bates No. 969,

 4   that's the document?

 5          A.     Yes.

 6          Q.     Okay.

 7          A.     Yeah.

 8          Q.     What changes did you

 9   recommend -- I'm sorry, maybe -- you're

10   probably better off explaining this.

11                 All right.  Are you

12   recommending changes to this policy or

13   changes that you recommended and accepted in

14   this policy?

15                 MS. TABACCHI:  Object to the

16         form.

17                 THE WITNESS:  This policy

18         reflects some changes that I

19         recommended.

20                 MR. INNES:  Okay.

21          Q.     (BY MR. INNES)  And this policy

22   was in effect between June of '17 and

23   November of '17?  Is that correct?

24          A.     That -- possibly.  That sounds

25   accurate.
```

1    Q.    Okay.  And let's look at

2  what -- can you identify what changes you

3  made?

4    A.    So this was when we made a

5  transition to a -- using the QuintilesIMS

6  suspicious order monitoring application.

7        And so there are references to

8  using that system versus Reddwerks for

9  controlled substances.

10        And we split out non-controlled

11  substances and referenced that they would

12  still be processed through Reddwerks.

13        We also -- by this time, there

14  was a vice president of pharmacy logistics

15  instead of a senior director, and so we

16  changed that title throughout the policy.

17        I don't know if there was

18  anything else.  It's hard to tell because

19  this isn't a redline version, but ...

20    Q.    Do you know if a redline

21  version exists?

22        MS. TABACCHI:  Object to the

23        form.

24        THE WITNESS:  I don't know if

25        it does, because often those are all

Highly Confidential - Subject to Further Confidentiality Review

1          accepted and -- whenever the final

2          version is published.

3          Q.     (BY MR. INNES)  As a matter of

4    practice, does Walmart maintain redline

5    revisions to policies as they're going

6    through the deliberation process?

7                 MS. TABACCHI:  Object to the

8          form.

9                 THE WITNESS:  We do share

10         redlines as it's going through the

11         revision process.  But as I mentioned,

12         as people agree to the changes, they

13         will accept those, so the redlines go

14         away.

15         Q.     (BY MR. INNES)  All right.  So

16   the first change you mentioned was related to

17   this QuintilesIMS suspicious order

18   monitoring.

19         A.     Yeah.

20         Q.     Is that another name for

21   Buzzeo?  Or is Buzzeo -- does that --

22         A.     Yes.  The company was

23   originally called Buzzeo.  Then it was

24   purchased by QuintilesIMS.

25         Q.     Okay.  Is this the first

1    time -- the first version of this policy

2    where this QuintilesIMS suspicious order

3    monitoring application is referenced?

4                   MS. TABACCHI:  Object to the

5          form.

6                   THE WITNESS:  Yes.

7          Q.    (BY MR. INNES)  So this -- I

8    think we established that June 2017 is when

9    this policy went into effect.

10                  So is June 2017 the date that

11   QuintilesIMS suspicious order monitoring

12   application was live across all DCs?

13         A.    We did --

14                  MS. TABACCHI:  Object to the

15         form.

16                  THE WITNESS:  We did a pilot

17         around this timeframe.

18         Q.    (BY MR. INNES)  Okay.

19         A.    There were some issues with the

20   system, so we had to take it back out, revert

21   back to the Reddwerks system that we were

22   using until we were able to correct those

23   issues within the QuintilesIMS system.

24         Q.    Okay.  Did those issues within

25   the QuintilesIMS system -- that's a

1    mouthful -- those issues affect the 6045

2    distribution center?

3                 MS. TABACCHI:  Object to the

4         form.

5                 THE WITNESS:  Can you clarify

6         what you mean by "affect"?

7         Q.    (BY MR. INNES)  You testified

8    that at some point in time you had to revert

9    back to the Reddwerks system.

10        A.    (Witness nods.)

11        Q.    Did the 6045 facility revert

12   back to the Reddwerks?

13        A.    Yes.  All distribution centers

14   did.

15        Q.    This was a global reversion?

16        A.    The QuintilesIMS system was

17   rolled out to all DCs at once in the pilot

18   and then removed from all of the DCs.

19        Q.    Okay.  And how long was it

20   removed?

21        A.    Until November of 2018.

22        Q.    Okay.

23        A.    I mean 2017.  Sorry.

24        Q.    Okay.  I'm trying to line that

25   up with the date -- the effective date of

1    this policy.  So when -- do you know when the

2    reversion to Reddwerks occurred?

3         A.    It was sometime in the summer

4    of 2017.  I don't remember exactly when.

5         Q.    Okay.  When that reversion

6    happened sometime in the summer of 2017, what

7    policy was in effect at that point?

8         A.    I believe this policy was still

9    in effect.  We didn't, that I'm aware of,

10   pull down this policy and replace it with an

11   older version.

12        Q.    Was there an understanding

13   that we'll just -- we'll function under the

14   prior policy during this reversion period?

15              MS. TABACCHI:  Object to the

16        form.

17              THE WITNESS:  Yes.

18        Q.    (BY MR. INNES)  What were the

19   issues that required the reversion to

20   Reddwerks?

21        A.    If I remember correctly -- it

22   was a technical thing.  But there was issues

23   with the order files making it to the

24   QuintilesIMS system.

25              So orders that pharmacies were

Highly Confidential - Subject to Further Confidentiality Review

1  placing just kind of got lost, and so they

2  would never get the product.

3       Q.    Okay.  So it was -- were there

4  any issues related to -- strike that.

5            Tell me, if you can, what

6  Buzzeo is -- or strike that.

7            QuintilesIMS suspicious order

8  monitoring system is quite a mouthful.  Can

9  we refer to it as "Buzzeo," or do you want to

10 refer to it as "QuintilesIMS"?

11      A.    I'm okay referring to it as

12 "Buzzeo."

13      Q.    Can you explain to me what

14 Buzzeo is in a broad sense?

15      A.    It's an order monitoring system

16 that includes a statistical algorithm.

17 Orders are put into the system and then it

18 will pend to orders that are outside of this

19 algorithm -- or based on this algorithm.

20            MS. TABACCHI:  I'll just

21       show -- I don't know if you're now

22       switching to a new topic, but I'm

23       advised that lunch is here, whenever

24       you want to take a break for lunch.

25       Or if you're going to wrap this up in

1        a few minutes, that's fine too.  It's

2        up to you, Mike.

3                MR. INNES:  Let me ask -- just

4        give me 30 seconds.  I think I can

5        close out another chapter.

6                MS. TABACCHI:  Great.

7                MR. INNES:  We've sort of, as

8        things go, pulled into another area

9        that I want to go deeper into.

10               MS. TABACCHI:  A few minutes is

11       fine.  If this was going to be an hour

12       worth of questioning, I just wanted to

13       let you know.

14               MR. INNES:  No, no.  Give me

15       30 seconds to pull something together

16       here.

17               THE WITNESS:  Okay.

18               MS. TABACCHI:  Sure.

19               MR. INNES:  In the spirit of

20       efficiency, I'll try to reorder

21       things.

22       Q.    (BY MR. INNES)  At any point in

23  time did Walmart consider whether a

24  practitioner was writing a disproportionate

25  share of his or her prescriptions for

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances being filled at your

2    pharmacies?

3              MS. TABACCHI:  Object to the

4         form.  Lack of foundation.

5              THE WITNESS:  Can you repeat

6         that?

7              MR. INNES:  Sure.

8         Q.    (BY MR. INNES)  As part of its

9    order -- suspicious order monitoring program,

10   did Walmart ever consider if one or more

11   practitioners was writing a disproportionate

12   share of the prescriptions for a controlled

13   substance being filled by the pharmacy?

14             MS. TABACCHI:  Same objections.

15             THE WITNESS:  During the time

16        that I was in role and we had the

17        enhancements to Reddwerks, we did --

18        we were able to see which

19        practitioners prescribed the

20        controlled substances in our

21        dispensing data.

22        Q.    (BY MR. INNES)  Okay.  Again,

23   my question is slightly different.  So the

24   data was available to you.  Did you consider

25   that data as part of your evaluation?

1    A.    Yes.

2    Q.    And was that information found

3    within Archer?

4              MS. TABACCHI:  Object to the

5         form.

6              THE WITNESS:  It was not part

7         of the preloaded Archer data that we

8         talked about earlier.

9              MR. INNES:  Okay.

10   Q.    (BY MR. INNES)  So how would

11   you go about finding that data?

12   A.    We would run data on a specific

13   pharmacy that we were evaluating and the drug

14   we were evaluating, and it was available in

15   that data.

16   Q.    Who would actually run -- when

17   you say "run the data," who would do that?

18   A.    Roxy Reed.

19   Q.    And Roxy would -- would she do

20   that for all evaluations?

21             MS. TABACCHI:  Object to the

22        form, lack of foundation.

23             THE WITNESS:  My understanding

24        is Roxy would run the data for the

25        evaluations that practice compliance

1    was evaluating.

2         Q.    (BY MR. INNES)  So Roxy's on

3    your team?

4         A.    Yes.

5         Q.    So Roxy's reviewing that subset

6    that's been flagged by Reddwerks and hasn't

7    been cleared throughout the process and has

8    landed in your office?

9         A.    Yes.

10        Q.    And was Roxy's practice in each

11   one of those evaluations to run that

12   particular data set?

13             MS. TABACCHI:  Object to the

14        form.

15             THE WITNESS:  Yes.

16        Q.    (BY MR. INNES)  And where did

17   she record the results of that analysis?

18        A.    She made notes in Archer of the

19   analysis.

20        Q.    Okay.  And is it Roxanne Reed

21   that we're referring to?

22        A.    Yes.

23        Q.    And who does Ms. Reed report

24   to?

25        A.    Me.

1           MS. TABACCHI:  Object to the

2      form.

3           Q.    (BY MR. INNES)  And how long

4   was she in that role?

5           A.    She joined the team I believe

6   in 2015.  And she's still in -- on my team.

7           Q.    And she -- and still on your

8   team and maintain -- and up until Walmart's

9   exit of the market, she performed that

10  function for you?

11          MS. TABACCHI:  Object to the

12     form.

13          THE WITNESS:  She did.  We had

14     additional team members join in

15     October and November timeframe of 2017

16     that also did that function.

17          Q.    (BY MR. INNES)  Were those --

18  who were those employees that joined the

19  team?

20          A.    We had a large number of

21  analysts that joined.  I can't sit here and

22  name everyone's name.

23          Q.    So why the -- why the large

24  increase in analysts?

25          A.    When we made the transition to

```
 1    Buzzeo, and in November we brought the entire
 2    evaluation process into the compliance team
 3    instead of having logistics involved in the
 4    first part and then compliance in the second
 5    portion.
 6         Q.    Okay.
 7              In terms of staffing, was it a
 8    transition of bodies from logistics to
 9    compliance now?
10              MS. TABACCHI:  Object to the
11         form.
12              THE WITNESS:  We hired new
13         associates for the role in compliance.
14         Q.    (BY MR. INNES)  Because these
15    are brand-new, fresh hires?
16              MS. TABACCHI:  Object to the
17         form.
18              THE WITNESS:  Yes.
19         Q.    (BY MR. INNES)  Cycling back,
20    the data that Roxy pulled that we just
21    referenced, how is that considered as part of
22    the evaluation?
23              MS. TABACCHI:  Object to the
24         form.
25         Q.    (BY MR. INNES)  How is that
```

1    used?

2         A.    It was part of the overall

3    review of the order itself, and whether or

4    not it was appropriate.

5         Q.    And again, the determination as

6    to -- after all that data is collected --

7    well, strike that.

8               What other data -- what other

9    dispensing data did you look at as part of

10   the evaluation?

11              MS. TABACCHI:  Object to the

12        form.

13              THE WITNESS:  I don't know that

14        there was other dispensing data.

15        There's just one form of dispensing

16        data.

17        Q.    (BY MR. INNES)  Was any

18   analysis done on that dispensing data?

19              MS. TABACCHI:  Object to the

20        form.

21              THE WITNESS:  Yes, we did

22        analysis on the dispensing data.

23        Q.    (BY MR. INNES)  And what kinds

24   of analyses were done on the dispensing data?

25        A.    We looked for trends in

Highly Confidential - Subject to Further Confidentiality Review

1    dispensing.

2              I mentioned earlier we could

3    see who the prescribers of the product were.

4    We could see the distance patients were

5    traveling and the general quantities of the

6    prescriptions that were being dispensed.

7         Q.    When you say "we could" -- I'm

8    sorry, I don't want to cut you off.

9         A.    No.

10        Q.    Is there anything else?

11        A.    That's all I can think of right

12   now.

13        Q.    When you say "you could see,"

14   what do you mean by "you could see"?

15        A.    There was basically a -- you

16   know, charts and graphs created from the

17   dispensing data.

18        Q.    Okay.  And where were those

19   charts and graphs?  Were you looking at them

20   through Archer?

21        A.    No.  They were in Excel.

22        Q.    Any other programs used?

23        A.    Roxy used other programs.  She

24   used a tool called Alteryx.

25              I don't know what else she

Highly Confidential - Subject to Further Confidentiality Review

1    used.

2           Q.      Alteryx?  How do you -- do you

3    know how to spell that?

4           A.      I think it is A-L-T-E-R-Y-X.

5           Q.      Are you familiar with Tableau

6    by any chance?

7           A.      Yes.

8           Q.      Was that program used?

9                   MS. TABACCHI:  Object to the

10               form.

11                  THE WITNESS:  I don't believe

12               we ever used Tableau for this.

13          Q.      (BY MR. INNES)  Did you use

14    Tableau for other things?

15                  MS. TABACCHI:  Object to the

16               form.

17                  THE WITNESS:  Our compliance

18               organization broadly uses Tableau for

19               things, but ...

20          Q.      (BY MR. INNES)  Did you ever

21    see an analysis of -- or Tableau used in the

22    context of C-IIs or C-IIIs?

23                  MS. TABACCHI:  Object to the

24               form.

25                  THE WITNESS:  Not that I

1      remember.

2           Q.     (BY MR. INNES)  How would you

3      know if you saw something in Tableau?

4           A.     Can you ask that question

5      again?

6           Q.     When I look at Excel, I see

7      Excel, I know it's Excel.

8                  Is that the same for you?

9                  You can open up a computer

10     screen.  You would recognize an Excel file as

11     an Excel file?

12          A.     Yes.

13          Q.     Okay.  Do you have that same

14     level of familiarity with Tableau?

15          A.     I mean, I've seen things in

16     Tableau, yes.

17          Q.     Right.

18          A.     I don't know if there's other

19     forms Tableau could take that I wouldn't

20     recognize, but ...

21          Q.     What -- you mentioned earlier

22     that you were looking at trends.  What trends

23     specifically were you looking at?

24          A.     The dispensing trend.

25          Q.     Okay.  And again, I'm sorry.

```
 1    What time period are you -- are we dealing
 2    with right now?
 3         A.    This is from the time of the
 4    Reddwerks enhancements until -- we're talking
 5    about Roxy pulling the data?
 6         Q.    Yeah.
 7         A.    Is that what we're talking
 8    about?
 9         Q.    That's right.
10         A.    Until November -- the November
11    timeframe.  And then as I mentioned, we had
12    additional analysts that assisted with it as
13    well.
14         Q.    Okay.
15              So can we -- I'm trying to make
16    this as clean as possible.  Can we talk about
17    the Roxy era?  When she's doing it, and then
18    we talked about the Buzzeo era?
19         A.    Yeah, we can.
20         Q.    Okay.  So --
21              MS. TABACCHI:  I'm sorry, are
22         we defining this, what is the "Roxy
23         era"?
24              MR. INNES:  Yeah, we're
25         defining the Roxy era.
```

1      Q.      (BY MR. INNES)  So in the Roxy

2   era, you're looking at dispensing trends.

3   And what are those dispensing trends in

4   particular?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  Overall

8         dispensing, what is our pharmacy

9         dispensing for this product?  And what

10        does the trend line look like?

11     Q.      (BY MR. INNES)  On a

12   pharmacy-by-pharmacy basis?

13     A.      For the specific pharmacy that

14   was the subject of the order evaluation.

15     Q.      Did you ever look at that sort

16   of data on a more aggregated scale?  For

17   instance, pharmacies in a region?

18             MS. TABACCHI:  Object to the

19        form.

20             THE WITNESS:  I don't remember

21        if we looked at that specific data.

22        We did occasionally pull overall

23        reports, but I don't remember if it

24        was trends specifically.

25     Q.      (BY MR. INNES)  I guess other

1    than the trends you just described, anything

2    else in terms of trend analysis?

3           A.     In the order evaluations.  No,

4    that's what we were looking at is what

5    does -- what does their dispensing of this

6    product in question look like?

7           Q.     Okay.

8                  How were you able to determine

9    the distance traveled?

10          A.     We know the location of our

11   pharmacy, and we would use the address of the

12   patients based on how it was in our system.

13   So, you know, there are circumstances where

14   people don't update their address, but we

15   could get a general idea.

16          Q.     Did you ever seek to verify

17   addresses provided?

18                 MS. TABACCHI:  Object to the

19          form.

20                 THE WITNESS:  That would have

21          been the responsibility of our

22          pharmacist.

23          Q.     (BY MR. INNES)  So the -- who

24   maintains the dispensing data?

25                 MS. TABACCHI:  Object to the

1          form.

2                    THE WITNESS:  I don't know who

3          maintains the dispensing data.

4          Q.    (BY MR. INNES)  Is that at the

5     home office level?

6                    MS. TABACCHI:  Object to the

7          form.  Lack of foundation.

8                    THE WITNESS:  There is

9          dispensing data available to home

10          office-level associates.

11          Q.    (BY MR. INNES)  Is the

12     dispensing data -- is historical dispensing

13     data maintained at Walmart?

14                    MS. TABACCHI:  Object to the

15          form, lack of foundation.

16                    THE WITNESS:  I believe so.  I

17          don't know how far back it goes.

18                    MR. INNES:  I think we can take

19          a break now.

20                    THE WITNESS:  Okay.

21                    VIDEOGRAPHER:  We are going off

22          the record at 12:08 p.m.

23                    (Recess taken, 12:08 p.m. to

24          1:04 p.m.)

25                    VIDEOGRAPHER:  We are back on

1          the record at 1:04 p.m.

2                    MR. INNES:  Okay.  Welcome

3          back.

4                    THE WITNESS:  Thank you.

5                    (Walmart Johnson Deposition

6          Exhibit 2 was marked for

7          identification.

8          Q.     (BY MR. INNES)  Okay.

9     Ms. Johnson, once you've had a chance to

10    review it, let me know and we can start.

11         A.     Okay.

12                   [Document review.]

13                   Okay.

14         Q.     (BY MR. INNES)  Okay.  Do you

15    recognize this document?

16         A.     Yes, I do.

17         Q.     And can you tell me what it is

18    exactly?

19         A.     It's a performance evaluation.

20         Q.     And who fills out the

21    performance evaluation?

22                   MS. TABACCHI:  Object to the

23          form.

24                   THE WITNESS:  There are

25          portions of the evaluation that are

Highly Confidential - Subject to Further Confidentiality Review

1          done by the associate being evaluated,

2          so in this case me, and then there are

3          portions completed by the supervisor.

4          Q.      (BY MR. INNES)  And who is your

5     supervisor during this time period?

6          A.      Tim Koch.

7          Q.      We were wondering how to

8     pronounce his name.

9                  And this covers the time

10    period, physically, here, February 1st, 2014,

11    end date of January 31st, 2015; is that

12    correct?

13         A.      That's correct.

14         Q.      Direct your attention to the

15    second page of the exhibit, which is Walmart

16    Bates stamp 55407.

17                 In the manager's comments,

██    ████████████████████████████████████████

██    █████████████████████████████████████████████

██    ███████████████████████████████████████████████

██    ████████████████████████████

22                 Do you know what stalled

23    project he's referring to?

24                 MS. TABACCHI:  Object to the

25         form.

1              THE WITNESS:  I don't know

2         exactly, because he doesn't represent

3         the specific sentence.  But I believe

4         it's SOM.

5         Q.    (BY MR. INNES)  Let me direct

6    your attention to the second column, the

7    associate's comments.  Are those comments

8    that would have been made by you?

9         A.    Yes.

10        Q.    And you state, "Engaged

11   appropriate stakeholders to move forward

12   stalled systems projects.  The project is now

13   on track to pilot prior to end of FYE 2015."

14             What project -- what "stalled

15   systems project" are you referring to?

16        A.    I believe I was referring to

17   the Reddwerks enhancements.

18        Q.    Okay.  And was it your

19   understanding at that time that the project,

20   the Reddwerks enhancements were now on track

21   to pilot prior to the end of the fiscal year

22   '15?

23        A.    Yes.

24        Q.    You go on to say you "developed

25   strategy for a much more comprehensive

1    program than was initially developed."

2              What program are you referring

3    to there?

4         A.    I believe it's related to the

5    SOM project since it's under that section.

6         Q.    Okay.  "And Phase 1 is on

7    track, and progress has already been made

8    towards several Phase 2 goals scheduled for

9    next fiscal year."

10             What are you referring to there

11   as Phase 1?

12        A.    I believe, if I remember

13   correctly, Phase 1 were the Reddwerks system

14   enhancements.

15        Q.    And Phase 2, what is that?

16        A.    I don't remember exactly what

17   was included in Phase 2.

18             I don't remember what was in

19   Phase 2.

20        Q.    May it have included the

21   addition of what we've been referring to as

22   Buzzeo?  Is that --

23        A.    Possibly.

24        Q.    Okay.  Can we turn the page to

25   55408.  And I'll direct your attention to

1   your comments under "Judgment."

2            And specifically, the line

3   about halfway through that first full

4   paragraph.  "The SOM program was not as

5   mature or robust as it needed to be when I

6   came over."

7            Is the SOM program you're

8   referring to the Reddwerks system that was in

9   place at the time that you came over?

10       A.    I was -- I believe I was

11  referring to the enhancements that were

12  planned.

13       Q.    So "The SOM program was not as

14  mature or robust as it needed to be when I

15  came over."

16            What program was not as mature?

17            MS. TABACCHI:  Object to the

18       form, asked and answered.

19            THE WITNESS:  I believe it was

20       the planned enhancements for the

21       program.

22       Q.    (BY MR. INNES)  So the planned

23  enhancements were not as robust?

24            MS. TABACCHI:  Object to the

25       form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  That's what I
 2         remember, yes.
 3         Q.    (BY MR. INNES)  Or the planned
 4    enhancements were to make an existing program
 5    more robust?
 6                    MS. TABACCHI:  Object to the
 7         form.
 8                    THE WITNESS:  I'm not sure I
 9         understand that question.
10         Q.    (BY MR. INNES)  Let me take
11    your attention to the comment on the left for
12    manager's comments.
```

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬

```
16                    Is that the same SOM project as
17    the Reddwerks project?
18         A.    Yes.  I believe so.
```

■        ■   ▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

■ ▬▬▬▬▬▬▬▬▬▬▬

■         ▬▬▬▬▬▬▬▬▬▬▬▬▬

■   ▬▬▬▬▬▬

```
25         A.    I had experience in working
```

Highly Confidential - Subject to Further Confidentiality Review

1   with systems projects and how to work with

2   our systems group to move projects forward

3   and the processes you had to go through.  And

4   so I was able to come in and leverage those

5   relationships and that experience that I had

6   to ensure that the enhancements were moving

7   forward as quickly as they could.

8        Q.    Okay.  And the experience that

9   you just referenced, where was that gained?

10       A.    In my role as director of

11   systems and reporting, which was immediately

12   prior to the role I'm currently in.

13       Q.    So you were able to leverage

14   your relationships from your prior role and

15   your experience in your prior role to get

16   this stalled project back on track?  Is that

17   essentially what we're talking about here?

18           MS. TABACCHI:  Object to the

19       form.

20           THE WITNESS:  I was able to

21       move it through the process that it

22       had to go through from an IT

23       perspective.

24           MR. INNES:  Okay.

25        Q.    (BY MR. INNES)  The bottom of

Highly Confidential - Subject to Further Confidentiality Review

```
1    that same column it says "Presenting DEA at a
2    recent closure of investigation."
3              Do you recall that
4    presentation?
5              MS. TABACCHI:  Object to the
6         form.
7              THE WITNESS:  I believe this
8         was at an exit conference for an audit
9         of a distribution center.
10        Q.    (BY MR. INNES)  Do you recall
11   which distribution center?
12        A.    I believe it's the one in
13   Crawfordsville, Indiana.
14        Q.    Is that the 6045?
15        A.    No.  6028, I think is the
16   number.
17        Q.    Okay.
18              And what exactly was the audit
19   concerning?
20              MS. TABACCHI:  Object to the
21         form.  Lack of foundation.
22              THE WITNESS:  I was not
23         involved in the audit itself.  My
24         understanding is the DEA audits
25         facilities on a regular basis.  My
```

1          role was helping them understand

2          suspicious order monitoring and our

3          enhancements that we were working on.

4          Q.     (BY MR. INNES)  During this

5   presentation to the DEA?

6          A.     Yes.

7          Q.     Okay.  And do you re -- did you

8   make a PowerPoint presentation at that

9   meeting?

10         A.     I don't remember having a

11  PowerPoint presentation.

12         Q.     Okay.

13         A.     I believe it was just a

14  conversation.

15         Q.     A conversation?

16         A.     Yeah.  I don't remember any

17  kind of actual presentation.

18         Q.     What was the impetus for that

19  conversation?

20                MS. TABACCHI:  Object to the

21         form.

22                THE WITNESS:  It's the closing

23         audit for the conference.

24         Q.     (BY MR. INNES)  And did the --

25  how did the suspicious order monitoring

Highly Confidential - Subject to Further Confidentiality Review

1    program relate to 6028?

2                    MS. TABACCHI:  Object to the

3            form.

4                    THE WITNESS:  My understanding

5            is when DEA conducts audits of

6            distribution centers, that is one of

7            the things that they review, the order

8            monitoring program.

9            Q.    (BY MR. INNES)  And at the

10   time, 6028, were they Schedule IIs or

11   Schedule IIIs distributed by that facility?

12                   MS. TABACCHI:  Object to the

13           form.

14                   THE WITNESS:  6028 would have

15           distributed Schedule IIIs.

16           Q.    (BY MR. INNES)  That would have

17   been hydrocodone?

18           A.    I -- the timeframe would be

19   really -- I can't remember exactly when the

20   audit occurred, but hydrocodone switched to a

21   Schedule II in 2014.  So I believe this was

22   after the change to a Schedule II.

23           Q.    Do you recall what time period

24   the audit covered?

25                   MS. TABACCHI:  Object to the

1      form.

2              THE WITNESS:  I was not

3          involved in the audit itself.  It was

4          just the closing conference.

5          Q.    (BY MR. INNES)  The closing

6    conference?

7          A.    Yeah.

8          Q.    Is there any document that

9    Walmart submits as part of that closing

10   conference?

11             THE WITNESS:  Not that I'm

12         aware of.

13         Q.    (BY MR. INNES)  Were you asked

14   to provide any written comments in connection

15   with the investigation?

16             MS. TABACCHI:  Object to the

17         form, lack of foundation.

18             THE WITNESS:  Can you clarify

19         that question?

20             MR. INNES:  Sure.

21         Q.    (BY MR. INNES)  You testified

22   that as part of the closure of the audit --

23         A.    Mm-hmm.

24         Q.    -- you presented to the DEA?

25         A.    Mm-hmm.  (Witness nods.)

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     As part of that presentation,

2     did you submit any written documentation?

3          A.     After the fact, I did a

4     follow-up -- I can't remember if it was a

5     letter or an email -- just recapping what we

6     had discussed about our enhancements -- our

7     upcoming enhancements to our monitoring

8     program.

9          Q.     And what -- do you recall what

10    that summary was?  What those enhancements

11    were?

12         A.     It was the items we discussed

13    earlier.  So it was the adjustments to the

14    thresholds.

15              I can't remember exactly what

16    all we included in there.  Be it, you know,

17    additional time for the evaluation.

18              I can't remember what all was

19    in the actual letter, but ...

20         Q.     So we discussed before -- and

21    correct me if I'm wrong -- that the

22    adjustments to the thresholds, more time, I

23    think it's --

24         A.     And home office review.

25         Q.     And home office review.  And

1    the evaluations were conducted by home

2    office?

3                    MS. TABACCHI:  Object to the

4          form.

5                    THE WITNESS:  Yes, I believe I

6          would have referenced in that letter

7          that the evaluations were conducted at

8          the home office.

9          Q.    (BY MR. INNES)  Okay.

10         A.    Or would be in our

11   enhancements.

12         Q.    And there are no other

13   enhancements in that letter that you

14   recall --

15                    MS. TABACCHI:  Object to the

16         form.

17                    THE WITNESS:  Not that I

18         recall.

19         Q.    (BY MR. INNES)  In fact, those

20   were the only three enhancements to the

21   Reddwerks system that you're aware of?

22                    MS. TABACCHI:  Object to the

23         form.

24                    THE WITNESS:  That I remember,

25         yes.

```
 1          Q.    (BY MR. INNES)  So was the
 2     stall to getting the -- was the stall
 3     referring to finalizing the enhancements?
 4               MS. TABACCHI:  Object to the
 5          form.
 6               THE WITNESS:  I'm not sure what
 7          you mean by "finalizing the
 8          enhancements."
 9          Q.    (BY MR. INNES)  Was there --
10     was the project stalled in terms of
11     implementing the enhancements to the
12     Reddwerks system?
13               MS. TABACCHI:  Object to the
14          form.
15               THE WITNESS:  Where I assisted
16          was the systems portion of the project
17          which made adjustments to the
18          Reddwerks system to allow us to --
19          allowed for the enhancements.
20               I don't know if that made
21          sense.
22          Q.    (BY MR. INNES)  I'm going to
23     hand you what is being marked as
24     plaintiffs' 3.
25               (Walmart Johnson Deposition
```

Highly Confidential - Subject to Further Confidentiality Review

1          Exhibit 3 was marked for

2          identification.)

3               [Document review.]

4     A.     Okay.

5     Q.     (BY MR. INNES)  Okay.  So this

6  is -- appears to be -- well, it's an email

7  chain.  The first email in reverse

8  chronological order, you forwarded this to --

9  or sent this to Casey Campbell.  Who is

10  Ms. Campbell?

11     A.     Casey is a director on our

12  compliance team.  His team is responsible for

13  helping support systems initiatives, risk

14  assessments, that type of thing.

15     Q.     Okay.  And the subject is "SOM

16  ISD request form."  What does that mean?

17     A.     This was a request for an ISD

18  project.  "ISD" stands for information

19  systems division.  It's our IT department.

20     Q.     Okay.  Thank you.

21          And what project does this

22  request relate to?

23     A.     It appears that this is for the

24  Reddwerks enhancements.

25     Q.     Okay.  So does -- there's a

1    couple of attachments to the email.

2              MR. INNES:  Counsel, it appears

3         natively we put a slip sheet in and

4         this is the native document that we've

5         attached behind it.

6         Q.    (BY MR. INNES)  So can I direct

7    your attention to the document behind Bates

8    stamp 48100?  It's the first attachment.

9         A.    Okay.

10        Q.    Yeah, it's the next page.

11        A.    Okay.

12        Q.    So the goal -- it states, "The

13   goal of this project is modify the existing

14   Reddwerks logic to implement calculated store

15   item combination order thresholds.  Any order

16   above the new threshold will generate an

17   order alert.  The project also includes the

18   creation of historical order information

19   retention reporting.  This initiative will

20   allow program enhancements to help Walmart

21   avoid DEA enforcement as a result of

22   non-compliance with 21 CFR 1301.74(b)."

23             Is that a description of the

24   Reddwerks -- the enhancements that the

25   Reddwerks -- the problem that the Reddwerks

1    enhancements is meant to resolve?

2              MS. TABACCHI:  Object to the

3         form.

4              THE WITNESS:  Can you ask that

5         question again?

6         Q.    (BY MR. INNES)  Earlier you

7    testified you thought that this was a

8    document, an ISD request related to the

9    Reddwerks enhancements.

10        A.    Correct.

11        Q.    Is this document, Exhibit 1 --

12   or Attachment 1 to the exhibit, consistent

13   with that understanding?

14             MS. TABACCHI:  Object to the

15        form.

16             THE WITNESS:  Yes.  I believe

17        this was part of our request for

18        Reddwerks enhancements, yes.

19        Q.    (BY MR. INNES)  The second box

20   down on the left says, "The goal of this

21   project is design and operate a system to

22   identify 'Suspicious Orders' of controlled

23   substances.  All suspicious orders must be

24   reported to the DEA upon detection.  A

25   'Suspicious Order' could include an order of

Highly Confidential - Subject to Further Confidentiality Review

1  unusual quantity, orders which substantially

2  deviate from a normal pattern and orders of

3  unusual frequency."

4         Do you agree with those

5  statements?

6         MS. TABACCHI:  Object to the

7     form.

8         THE WITNESS:  Are you asking if

9     I agree with the goal of the project?

10         MR. INNES:  Yes.

11         THE WITNESS:  Yes.

12     Q.    (BY MR. INNES)  And in fact if

13  you did not do this -- if Walmart did not

14  implement this plan, the risks included

15  potential DEA enforcement which can include

16  fines, penalties, license forfeiture, as well

17  as failure to secure a VAWD accreditation; is

18  that right?

19         MS. TABACCHI:  Object to the

20     form.

21         THE WITNESS:  I don't

22     necessarily agree that not doing this

23     project specifically would result in

24     those issues.

25     Q.    (BY MR. INNES)  What was the

1     purpose behind the enhancements?

2          A.    We are always trying to improve

3     our processes, and so this was an enhancement

4     to continue to improve our program and our

5     process.

6          Q.    And is -- the only reason is

7     because you are continually improving?  Is

8     that what you're saying?

9               MS. TABACCHI:  Object to the

10          form.

11               THE WITNESS:  I mean, we are

12          always evaluating our compliance

13          programs and making enhancements where

14          we can.

15          Q.    (BY MR. INNES)  And what's the

16     purpose of an enhancement?

17               MS. TABACCHI:  Object to the

18          form.

19               THE WITNESS:  To improve

20          something with the program, either

21          build in an easier program to execute,

22          or to modify it in some way.

23          Q.    (BY MR. INNES)  Direct your

24     attention to the second attachment, which is

25     48101.

```
 1              The top of this document is
 2   called "Portfolio Scoring Sheet."
 3              On the left-hand column there
 4   is a series of -- they appear to be questions
 5   and values assigned to the -- numerical
 6   values assigned to the responses to those
 7   questions.  And on the right-hand side is the
 8   numerical response which appears to generate
 9   a score.  Is that accurate?
10        A.    Yes.  It looks accurate.
11              MS. TABACCHI:  It's a minor --
12         you say you printed these from a
13         booklet, but they look like they're
14         punched.  So I assume you're not
15         suggesting -- these must be copies of
16         something you --
17              MR. INNES:  They very well --
18              MS. TABACCHI:  -- punched holes
19         in?
20              MR. INNES:  It was a print of a
21         native that was copied and punched.
22              MS. TABACCHI:  So the holes
23         were not in the original native form?
24              MR. INNES:  No, those were not
25         in the original native version.
```

```
 1              MS. TABACCHI:  All right.

 2         Yeah, your version has holes.

 3              Okay.  I see where we're at.

 4         That's fine.

 5              MR. INNES:  We can take a break

 6         and get the original document.

 7              MS. TABACCHI:  It's not a

 8         problem.  I just wanted it to be clear

 9         that the original native is -- is not

10         exactly in this format.  Some of the

11         text is missing.

12              MR. INNES:  Okay.

13         Q.    (BY MR. INNES)  The first

14    section is "Improve program effectiveness."

15              Let me back up.  Do you know

16    who completed this form?

17         A.    I don't remember.

18         Q.    But you reviewed this form

19    prior to forwarding it, did you not?

20              MS. TABACCHI:  Object to the

21         form.

22              THE WITNESS:  I don't remember

23         specifically reviewing it, but I -- I

24         think that I did.

25         Q.    (BY MR. INNES)  Okay.  I'll
```

Highly Confidential - Subject to Further Confidentiality Review

1    have you flip back to the second page of this

2    exhibit.  At the bottom there is an email

3    from you, Miranda Johnson, dated Tuesday,

4    June 10, 2014 at 4:23 p.m. to Mr. George

5    Chapman.  Who is Mr. Chapman?

6         A.    He's in the practice compliance

7    division.

8         Q.    And do you report to him?

9         A.    At this time I did not.

10        Q.    Did he report to you?

11        A.    No.

12        Q.    Is the practice compliance

13   division a separate unit at Walmart from the

14   unit you worked in at the time?

15              MS. TABACCHI:  Object to the

16        form.

17              THE WITNESS:  Yes.  I was not

18        technically in practice compliance at

19        this time.

20        Q.    (BY MR. INNES)  Okay.  And you

21   made -- it says here you made the changes

22   that you discussed with George?

23              Is that correct?

24        A.    Yes, that's what it says.

25        Q.    And do you recall what changes

```
 1    those were?

 2         A.     I do not.

 3         Q.     You go on to state, "Once I

 4    receive approvals from you and Jim, I'll

 5    forward this to Kelly for sizing."

 6                Who is "Jim" you're referring

 7    to?

 8         A.     Jim was the vice president of

 9    health and wellness compliance.

10         Q.     What was Jim's last name?

11         A.     Langman.

12         Q.     L-A-N-G-M-A-N?

13         A.     Yes.

14         Q.     You go on to say, "I spoke with

15    Rick, and we are working to move forward with

16    funding the Reddwerks portion 130K through

17    state compliance."

18                Who is Rick?

19         A.     Rick was another senior

20    director on the practice compliance team.

21         Q.     And what's Rick's last name?

22         A.     Irby.

23         Q.     So is it a fair statement that

24    you've reviewed -- at this point in time

25    you'd reviewed it, you've made certain
```

1    changes, and you're seeking approval from

2    others to move the process forward?

3         A.    Yes.

4         Q.    Let me take you to -- back to

5    48101.

6               It's the first page of this

7    chart.

8               So is the purpose of this

9    chart -- what is the purpose of this chart?

10              MS. TABACCHI:  Object to the

11         form.

12              THE WITNESS:  Based on my

13         memory, there was a process where,

14         when you requested a systems project,

15         you outlined the need for the project

16         as part of a prioritization of systems

17         initiatives.

18              MR. INNES:  Okay.

19         Q.    (BY MR. INNES)  And this

20    project relates to the suspicious order

21    monitoring of Schedule II and Schedule IIIs?

22              MS. TABACCHI:  Object to the

23         form.

24              THE WITNESS:  I believe this

25         would have related to our suspicious

Highly Confidential - Subject to Further Confidentiality Review

1            order monitoring program for

2            controlled substances.

3            Q.      (BY MR. INNES)  So in the first

4    row, it says, "Improves governance program

5    maturity," and it offers a response of 'yes'

6    or 'no.'

7                    If yes, it's a 3.  And I see

8    the score marked in that column is a 3; is

9    that right?

10           A.      Yes.  It says 3.

11           Q.      The next column says "Improves

12   our business processes for governance."

13                   Again, a 3, which means yes?

14           A.      (Witness nods.)

15           Q.      "Improves our information usage

16   for governance."

17                   Again, a 3, which means yes.

18           A.      (Witness nods.)

19           Q.      Continuing down the page to the

20   section called "Risk reduction," the first

21   attachment describes risks including

22   potential DEA enforcement which includes

23   fines, penalties, license forfeiture and

24   failure to secure VAW [sic] accreditation.

25                   MS. TABACCHI:  Michael, I'm

1    sorry, but I'm not sure where you're

2    reading from or what page you have or

3    whether --

4            MR. INNES:  Fair enough.

5            MS. TABACCHI:  I'm just not

6    quite sure about this exhibit as a

7    whole.

8            MR. INNES:  It's a document

9    that you all produced.  It's got three

10   attachments or four attachments.  They

11   all work in concert.  It's going to

12   take some time flipping back and

13   forth.

14           MS. TABACCHI:  I just want to

15   make sure we have a clear record about

16   what you're looking at.

17           MR. INNES:  Sure.  Absolutely.

18   I'm not able to put page numbers on

19   these.  Obviously it's printed from

20   native.  I can't put page numbers on

21   it.  But I'll do my best to describe

22   for the record what we're doing now.

23           MS. TABACCHI:  So what page are

24   you on now?  Maybe you can just show

25   me.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. INNES:  This is the
 2     first -- what I believe is the first
 3     attachment.  It's 48100.  48100.
 4              Do you want to do that?  Do you
 5     want to number it now and then
 6     reference it as the exhibit?  Does
 7     that make it easier for you?
 8              MS. TABACCHI:  It might just
 9     make it easier because it's hard to
10     know what -- when you talk about this
11     chart, it's just hard to know what
12     you're looking at.
13              MR. INNES:  Understood.
14              What's the fastest way to do
15     it?  Do you want to --
16              I can take a clean copy, mark
17     it, copy it, or we can just --
18              MS. TABACCHI:  Just add like an
19     "A" or a "B."
20              MR. INNES:  I'm saying we do 1
21     through whatever it is.
22              MR. ECKLUND:  Start from after
23     native and then put a number on the
24     bottom corner.  And then everyone will
25     be using the same page after that.  So
```

```
1        start the page number after the native

2        insert.

3               So after the native and then 1.

4               MS. TABACCHI:  48100, and then

5        the next page is --

6               MR. INNES:  Correct.

7               MS. TABACCHI:  So 1.  The next

8        page is another native, so this is

9        101, and then the next page is 2?

10              MR. ECKLUND:  Whatever works

11       for everybody.

12              MR. INNES:  Can I make a

13       suggestion?

14              MS. TABACCHI:  Yes, sir.

15              MR. INNES:  Can we 101-1,

16       101-1, 101 and so on and so forth?

17              MS. TABACCHI:  Sure.

18              MR. INNES:  That way we don't

19       lose the attachments; right?

20              THE WITNESS:  So we're saying

21       100-1.

22              MS. TABACCHI:  So 100-1 is the

23       first one.

24              MR. INNES:  Correct.

25              MS. TABACCHI:  And then the
```

1    next one is 101-1.  Is that what --

2              MR. INNES:  Correct.  Yeah.

3              Arts and crafts.

4              101-3; right?

5              So now we're at 101-4?

6              MS. TABACCHI:  Do you mind if

7    Scott says something on the record

8    here?  And clarify the issue?

9              MR. ELMER:  While we're

10   clarifying things.  The first two

11   native attachments are attached to the

12   email that's ending in 098.  The first

13   email?

14             MR. INNES:  Yeah.

15             MR. ELMER:  But the subsequent

16   attachments ending 104 through 107

17   were attached to an email that is not

18   included in this set.

19             So I just want to be clear --

20             MS. TABACCHI:  They're not

21   actually attachments to this email.

22             MR. INNES:  So I think as

23   the -- I think what we tried to do is

24   the way that the email was produced to

25   us, was to say that this is all the

Highly Confidential - Subject to Further Confidentiality Review

1          same chain.  I'm using attachments

2          that are part of this chain.

3                  MR. ELMER:  But I would just

4          note that the email to which the

5          exhibits ending in 1 -- or the

6          documents ending in 104 through 107,

7          it's a different date.  It's a

8          different email.  I don't think it's

9          clear or accurate to those documents,

10         as attachments to the document ending

11         1098.  Because they're not.

12                 MS. TABACCHI:  They are not

13         attachments to this email.  So when

14         the email is referring to it as an

15         attachment, it's ...

16                 MR. INNES:  Do you want to go

17         off the record?

18                 MS. TABACCHI:  We can continue

19         numbering them, but --

20                 We can if you'd like.

21                 MR. INNES:  I just need to sort

22         this out for myself.

23                 MS. TABACCHI:  Sure.

24         Understood.  Happy to get it sorted

25         out.

1          VIDEOGRAPHER:  Do you want to

2     go off?

3          MR. INNES:  Yes.

4          VIDEOGRAPHER:  We're going off

5     the record at 1:42 p.m.

6          (Recess taken, 1:42 p.m. to

7     1:51 p.m.)

8          VIDEOGRAPHER:  We are back on

9     the record at 1:51 p.m.

10     Q.    (BY MR. INNES)  Okay.  So we're

11     back.  We took a little break to sort out an

12     issue with plaintiffs' Exhibit 2.

13          MS. TABACCHI:  3.

14          MR. INNES:  3, rather.  Off to

15     a really galloping start here.

16     Q.    (BY MR. INNES)  Plaintiffs'

17     Exhibit 3.  Mr. Elmer pointed out that

18     this -- the attachments that were included in

19     the original composite exhibit were, for lack

20     of a better term, incorrect.  So we've now

21     corrected that.  We've removed the last few

22     pages from the composite exhibit.  So it will

23     run now from 48098 through the native

24     attachment ending in 48104.

25          We've also, for purposes of --

1    no, that's wrong.

2              MS. TABACCHI:  So it's an email

3         that is 48098 --

4              MR. INNES:  Yes.

5              MS. TABACCHI:  -- that runs to

6         48099 with a native attachment, Bates

7         numbered 48100 that has been printed

8         but not numbered, although the parties

9         have numbered it 100-1.  And then

10        there is another native attachment

11        Bates numbered 48101 that the parties

12        have numbered 101-2, 101-2, 101-3, and

13        that's the sum and substance of this

14        exhibit.  So the prior questions about

15        the attached charts refer to these

16        numbered pages is that --

17             MR. INNES:  That's much better

18        than I would have articulated it.

19        Thank you, Tina.

20             MS. TABACCHI:  Is that where we

21        are?  Okay.

22             MR. INNES:  I will ask you to

23        turn to what we have marked 100-1.

24        Q.    (BY MR. INNES)  And halfway

25    down in, it says, "Risk reduction existing or

Highly Confidential - Subject to Further Confidentiality Review

```
 1    emerging.  Is this a new or emerging risk?"

 2              I'd ask you to turn back to

 3    what we have marked as 100-1.  And the risk

 4    that has an indirect -- I'm sorry, and direct

 5    you to the cell on the right-hand side of the

 6    page for -- it says "Risk of not doing

 7    project and dependencies."

 8              That states, "Risks include

 9    potential DEA enforcement which include

10    fines, penalties, license forfeiture as well

11    as failure to acquire VAWD accreditation."

12              Is that correct?

13      A.      That is what's listed on this

14    document.

15      Q.      And for the risk reduction --

16    let me ask you this:  Is it your

17    understanding that the 100-1 and 101-1 are a

18    pair, for lack of a better word?

19              MS. TABACCHI:  Object to the

20         form.

21              THE WITNESS:  I don't remember

22         if they were used for the same purpose

23         or by the same group.

24      Q.      (BY MR. INNES)  Okay.  So

25    for -- how is a typical ISD request made?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      That's changed many times.

2          Q.      Well, let me focus your

3    attention.

4                  In July of 2014, how was an ISD

5    application made?

6          A.      Based on my memory, you had to

7    request a project and you had to go through a

8    process for explaining why you needed the

9    project so it could be prioritized.

10         Q.      And as part of that process for

11   explaining, was it typical to fill out a form

12   as we see in 100-1?

13         A.      I believe so.

14         Q.      And was it also typical during

15   the process to fill out a form that we see

16   here at 101-1?

17         A.      I believe so.  This wasn't

18   created just for this project.

19         Q.      Is it your understanding that

20   the risk reduction referred to in 101-1 are

21   the same risks that are described in 100-1?

22                 MS. TABACCHI:  Object to the

23         form.  Lack of foundation.

24                 THE WITNESS:  I don't believe

25         the term "risk" in 101-1 directly is

1          related to the use of the term "risk"

2          in 100-1.

3              Q.      (BY MR. INNES)  What do you

4      believe the risk would refer to on 101-1?

5                  MS. TABACCHI:  Object to the

6          form.

7                  THE WITNESS:  Based on my

8          memory, the risk in 100-1 would be

9          related more broadly to a compliance

10          obligation.

11             Q.      (BY MR. INNES)  Okay.  And

12     compliance, what compliance obligation would

13     that be?

14             A.      This would be order monitoring.

15             Q.      So is it the risk of failure to

16     comply with a compliance obligation?

17                 MS. TABACCHI:  Object to the

18          form.

19                 THE WITNESS:  Can you ask that

20          again?

21             Q.      (BY MR. INNES)  The risk being

22     reduced is the failure to comply with a

23     compliance obligation?

24                 MS. TABACCHI:  Object to the

25          form.

1        Q.      (BY MR. INNES)  Is that

2   accurate?

3        A.      I would word it as a risk of

4   potential non-compliance.

5        Q.      Continuing down the page, the

6   first question is, "Is this a new or emerging

7   risk?"  Value given is 3 for existing.  Is

8   that correct?

9        A.      Yes, that's what it says.

10       Q.      So it was an existing risk for

11  potential non-compliance?

12               MS. TABACCHI:  Object to the

13          form.

14               THE WITNESS:  Order monitoring

15          was an existing obligation, compliance

16          obligation.

17       Q.      (BY MR. INNES)  Okay.  I

18  realize that one word is cut out of this next

19  cell.  That being said, "Risk being mitigated

20  today by manual, systematic or combination of

21  both today, regardless if optimal or not."

22               The numerical value assigned to

23  that is a 5, which means no.  An emerging

24  risk that has no process in place today.

25               So again, we're talking about

Highly Confidential - Subject to Further Confidentiality Review

```
1    the risk as failure to comply with an

2    existing obligation.

3              MS. TABACCHI:  Object to the

4         form.

5         Q.    (BY MR. INNES)  And is that new

6    process in place today to comply with that

7    existing obligation?

8              MS. TABACCHI:  Object to the

9         form.

10             THE WITNESS:  I'm not sure.

11             MS. TABACCHI:  Is there a

12        question, Mike, on the table?  What is

13        the question that's pending?

14             MR. INNES:  I'm not sure she's

15        done finishing the answer.

16             THE WITNESS:  No, I am.  I'm

17        not sure.

18             MS. TABACCHI:  Okay.

19        Q.    (BY MR. INNES)  You're not sure

20   what the emerging risk that has no process in

21   place today is?

22             MS. TABACCHI:  Object to the

23        form.  Lack of foundation.

24             THE WITNESS:  Yeah, I'm not

25        sure.  I remember that there were
```

1          several people involved in this

2          scoring, so I don't remember which

3          portions I was involved in and wasn't.

4               So I don't -- it's hard to

5          make -- for me to know what the

6          thought was --

7     Q.     (BY MR. INNES)  So --

8     A.     -- behind the rating.

9          MR. INNES:  Sorry.

10         THE WITNESS:  I'm done.

11    Q.     (BY MR. INNES)  So again, this

12    is -- at the time you're director of

13    controlled substances; right?

14    A.     No.

15    Q.     You were not?

16    A.     I was not.

17    Q.     What was your role?

18    A.     I had just come over to the

19    team to help on a temporary assignment.  So I

20    was director of systems and reporting.

21    Q.     And what was that temporary

22    assignment?

23    A.     To assist with some compliance

24    projects.  As I mentioned earlier, I had some

25    background in process related to systems

1    projects, and so order monitoring was one of

2    the projects that I assisted with.

3         Q.    Okay.  And this was -- this

4    project, your testimony was, related to the

5    enhancements to Reddwerks; is that right?

6         A.    Yes, I believe so.

7         Q.    Okay.  And could it be that

8    we're now in the stalled phase of the

9    Reddwerks enhancements?

10             MS. TABACCHI:  Object to the

11        form.

12             THE WITNESS:  I don't

13        remember -- this would have been very

14        early on in the process when we were

15        requesting systems support.

16             MR. INNES:  Okay.

17        Q.    (BY MR. INNES)  Were you

18   involved in requesting systems support?

19             MS. TABACCHI:  Object to the

20        form.

21        Q.    (BY MR. INNES)  For the

22   Reddwerks enhancements?

23        A.    Yes.  That's what this is.

24        Q.    (BY MR. INNES)  And you were

25   involved in that process?

```
1              MS. TABACCHI:  Object to the

2         form.

3              THE WITNESS:  Yes.

4         Q.    (BY MR. INNES)  Okay.  What was

5    your involvement in the process?

6         A.    I helped from a process

7    standpoint, understanding what things needed

8    to be completed, who they needed to go to,

9    and how to move it forward.

10        Q.    Okay.  From a -- what do you

11   mean exactly by "process standpoint"?  Is

12   that --

13        A.    So --

14        Q.    I'm sorry.

15        A.    At Walmart, you can't just go

16   say, "Hey, I need a project."  You have to

17   explain what you're asking for, and what you

18   need, and why.  And that's -- and get it to

19   the right people.  And that's what this email

20   is doing, is starting the process of asking

21   for systems enhancements.

22        Q.    And as part of that ask for

23   systems enhancements, it's an outlay of

24   capital from a certain division of Walmart;

25   is that right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. TABACCHI:  Object to the

 2         form.

 3              THE WITNESS:  I don't know if

 4         it's capital.  It's just, you know,

 5         people and money to do a systems

 6         project.  I don't know how it's

 7         classified.

 8         Q.    (BY MR. INNES)  So it costs

 9    time and people's -- money and people's time

10    to put a process in place there; right?

11         A.    Yes.

12         Q.    And Walmart requires folks to

13    go through an approval process to make sure

14    that it's actually necessary; is that right?

15              MS. TABACCHI:  Object to the

16         form.

17              THE WITNESS:  Yes.  I'm

18         assuming that's why they ask us to do

19         this.

20         Q.    (BY MR. INNES)  And I assume --

21    am I correct to assume that they ask you, the

22    folks applying -- making such applications to

23    be truthful in those applications?

24              MS. TABACCHI:  Object to the

25         form.
```

1          THE WITNESS:  Yes, I would

2     assume so.

3          Q.    (BY MR. INNES)  And the -- this

4     goes on to ask what -- the likelihood that

5     the events or conditions underlying the risk

6     will occur.  Assigned to that is a numerical

7     value of 4, which is likely.

8               In your role as -- what events

9     or conditions underlying a risk of

10    non-compliance are there?

11              MS. TABACCHI:  Object to the

12              form.

13              THE WITNESS:  So at this time,

14              in June of 2014, I had maybe been on

15              this special assignment for less than

16              two weeks.  So I don't believe I

17              answered these.  I don't know that I

18              would have even known enough about

19              what it was at that point in time to

20              have completed these answers.  So it's

21              hard for me to answer why or what was

22              meant by the responses.

23         Q.    (BY MR. INNES)  Fair point.

24    Maybe my question -- my question definitely

25    wasn't clear.  I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.      Okay.

2              Q.      So in your role today, what are

3      the risks that underlie -- or, I'm sorry,

4      what are the events or conditions that

5      underlie the risk of failure to comply with

6      DEA regulations?

7                      MS. TABACCHI:  Object to the

8              form.

9                      THE WITNESS:  Can you tell me

10             again where you're looking?  Or are

11             you looking at the document or --

12             Q.      (BY MR. INNES)  No.

13             A.      -- you're just asking

14     generally?

15             Q.      That's just a question.

16             A.      I'm sorry, I'm not sure I

17     understand what you're asking.

18                     Could you ask it one more time?

19             Q.      Sure.

20                     There's -- let me give you a

21     breakdown.

22                     In your role, is there a risk

23     of -- is there a potential risk of

24     non-compliance with DEA regulations?

25                     MS. TABACCHI:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

1                form.

2                        THE WITNESS:  Yes.

3            Q.     (BY MR. INNES)  And what events

4      or conditions underlie that risk occurring?

5                        MS. TABACCHI:  Object to the

6                form.

7                        THE WITNESS:  I mean, failure

8                to follow a policy could result in

9                non-compliance.

10                       MR. INNES:  Okay.

11           Q.     (BY MR. INNES)  Would a failure

12     to detect a suspicious order result in

13     non-compliance?

14                       MS. TABACCHI:  Object to the

15               form.

16                       THE WITNESS:  It would have

17               been a failure of our policy.

18           Q.     (BY MR. INNES)  If Walmart does

19     not detect an order that was otherwise

20     suspicious, is that a failure to comply with

21     the DEA regulations?

22                       MS. TABACCHI:  Object to the

23               form.  Calls for a legal conclusion.

24                       THE WITNESS:  I don't know.

25           Q.     (BY MR. INNES)  You're the

1    director of controlled substances.  If you

2    don't spot a suspicious order, that's a

3    problem; right?

4              MS. TABACCHI:  Object to the

5         form.

6              THE WITNESS:  We had policies

7         in place to identify and report

8         suspicious orders.

9         Q.    (BY MR. INNES)  And if there

10   was a suspicious order -- let's say

11   hypothetically a suspicious order that you

12   weren't -- that you didn't capture, you'd

13   want to improve the system to capture that,

14   wouldn't you?

15             MS. TABACCHI:  Object to the

16        form.  We're talking about

17        hypotheticals here.

18             THE WITNESS:  Yes.  I mean, the

19        purpose of the policy was to identify

20        and report suspicious orders.

21        Q.    (BY MR. INNES)  Right.  And

22   you're continually trying to improve that

23   process to make sure you're capturing the

24   right kinds of orders; is that right?

25             MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  Yes.

3          Q.     (BY MR. INNES)  At this point

4    in time, just so I'm clear, the -- you don't

5    know exactly what policies were in place for

6    suspicious order monitoring; is that right?

7    In July of 2014?

8          A.     Yes, I don't know if I knew at

9    the time.

10         Q.     But certainly the enhancements

11   weren't in place?

12                   MS. TABACCHI:  Object to the

13         form.

14                   THE WITNESS:  Did you say were

15         or were not?

16                   MR. INNES:  Were not.

17                   THE WITNESS:  No, the

18         enhancements were not in place.

19         Q.     (BY MR. INNES)  In fact, this

20   is an application by folks at Walmart to the

21   NSD, IT folks, to put enhancements in place

22   in the Reddwerks system; is that right?

23         A.     Yes.

24         Q.     And the -- what the folks that

25   filled out this form said was it was likely

Highly Confidential - Subject to Further Confidentiality Review

1    that the events or condition underlying the

2    risks will occur.  Isn't that right?

3                    MS. TABACCHI:  Object to the

4         form.

5                    THE WITNESS:  Can you tell me

6         where you're looking?

7                    MR. INNES:  I'm on 101-1,

8         middle of the page.

9                    THE WITNESS:  Yes, that's what

10        the score says.

11        Q.    (BY MR. INNES)  And the folks

12   that filled out this scoring metric said was,

13   "The potential or reputational impact to the

14   company if the events or conditions occur

15   would have been severe."  Isn't that correct?

16                    MS. TABACCHI:  Object to the

17        form.

18                    THE WITNESS:  That's what the

19        document says.

20        Q.    (BY MR. INNES)  Okay.

21                    In fact, they said, this

22   particular system that they're asking for

23   would not mitigate any other risk outside of

24   that -- outside of the area; isn't that

25   right?

```
 1              MS. TABACCHI:  Object to the
 2         form.
 3              THE WITNESS:  That's what it
 4         says.
 5         Q.    (BY MR. INNES)  So the only
 6    reason to fill out this application is to
 7    obtain approval for the Reddwerks
 8    enhancements so they comply with the DEA
 9    obligations at the time.
10              MS. TABACCHI:  Object to the
11         form.
12              THE WITNESS:  This was
13         requesting the Reddwerks enhancements,
14         and we anticipated that the
15         enhancements would also comply with
16         DEA regulations.
17         Q.    (BY MR. INNES)  I'm going to
18    bring you back in time to when the Reddwerks
19    enhancements were beginning to roll out -- or
20    sorry, beginning to be piloted.
21         A.    Okay.
22         Q.    Was there a schedule for
23    piloting the enhancements at the various DCs?
24         A.    I'm sure we had a schedule,
25    mm-hmm.
```

1    Q.    Was there a need to pilot the

2    6 -- to pilot the enhancements at 6045 by

3    November of 2014?

4              MS. TABACCHI:  Object to the

5         form.

6              THE WITNESS:  I can't remember

7         the exact date of the pilot schedule.

8    Q.    (BY MR. INNES)  Slightly

9    different question.  Was there a priority --

10   was priority given to certain DCs for

11   piloting?

12   A.    I do believe that we were going

13   to 6045 first with the pilot.  It was local,

14   so it was easier to pilot and have people

15   on-site.

16   Q.    Was that the only reason,

17   proximity to -- I guess to the home office.

18   Is that what you're saying?

19   A.    That's what I remember, mm-hmm.

20   Q.    It had nothing to do with the

21   fact that, at that time, 6045 was

22   distributing -- was the sole distributor of

23   C-IIs?

24   A.    I don't remember if that came

25   into play.  It may have.

1    Q.    As you sit here as a director

2  of controlled substances, would it make sense

3  to you that Walmart would want to make sure

4  it had the enhancements to Reddwerks in place

5  at the C-II facility as soon as possible?

6              MS. TABACCHI:  Object to the

7         form.

8              THE WITNESS:  We had a program

9         in place at the time, so I don't know

10        that it made a significant difference

11        which location we went to first.

12   Q.    (BY MR. INNES)  Well, if you're

13  confident that the enhancements are going to

14  have a more robust suspicious order

15  monitoring program, doesn't it make the most

16  sense to put that in the highest-risk

17  facility?

18              MS. TABACCHI:  Object to the

19         form.

20              THE WITNESS:  I don't remember

21         that we felt that we had a program

22         that wasn't sufficient at the time

23         anyway.

24    Q.    (BY MR. INNES)  But you've

25  never looked at the program that was in place

1    prior to the enhancements; isn't that right?

2                    MS. TABACCHI:  Object to the

3          form.

4                    THE WITNESS:  What do you mean

5          by that?

6          Q.    (BY MR. INNES) Have you

7    examined the processes in place prior to the

8    enhancements?

9                    MS. TABACCHI:  Same objection.

10                    THE WITNESS:  I was focused on

11          the enhancements themselves.

12          Q.    (BY MR. INNES)  That wasn't the

13    question.  Did you examine the policies that

14    were in place prior to the enhancements?

15          A.    I knew that there were policies

16    in place, and that there was a process.

17          Q.    Did you know any particulars

18    about that process?

19                    MS. TABACCHI:  Object to the

20          form.  Asked and answered.

21                    THE WITNESS:  I can't remember

22          what level of detail I knew at the

23          time.

24          Q.    (BY MR. INNES)  Did you have

25    any level of detail?

```
 1                    MS. TABACCHI:  Object to the

 2          form.

 3                    THE WITNESS:  I can't remember.

 4                    (Walmart Johnson Deposition

 5          Exhibit 4 was marked for

 6          identification.)

 7                    [Document review.]

 8                    THE WITNESS:  Okay.

 9          Q.     (BY MR. INNES)  Okay.  So,

10   Ms. Johnson, this is an email from you to

11   George Chapman, October 28th, 2014 at 3:19.

12   It attaches an SOMstrategy.pptx, which is a

13   PowerPoint presentation that we have printed

14   in native format and attached here.

15                    Do you recall this PowerPoint?

16          A.     Yes.  It looks familiar.

17          Q.     In your email you say you made

18   some adjustments to the deck based on your

19   conversation with Jim yesterday.  Is that

20   Jim Irby?

21          A.     I believe that would have been

22   Jim Langman.

23          Q.     Some were cosmetic, but I

24   changed the content of slides 2, 5, and 9.

25   So let's just go through them in that order,
```

Highly Confidential - Subject to Further Confidentiality Review

1    if you don't mind.

2              Slide 2 is the current SOM

3    program.  So that's the current SOM program

4    in October -- on October 28, 2014; is that

5    correct?

6         A.    Yes.  I believe so.

7         Q.    Okay.  And so that would be

8    pre-enhancements?

9         A.    Yes.

10        Q.    So it says here -- and this is

11   a slide that you made edits to -- that the

12   pre-enhanced Reddwerks system flagged orders,

13   over 20 bottles, in C-II DC, over 50 bottles

14   in all other DCs, and greater than 30 percent

15   increase over the rolling four-week average.

16             Do you understand that to be

17   correct?

18        A.    Yes.

19        Q.    So before when you testified

20   you didn't recall what the Reddwerks system

21   flagged prior to the enhancements --

22        A.    I didn't remember all of the

23   details.

24        Q.    But there is -- this refreshes

25   your recollection on that?

```
 1              A.      Yes.  This seems accurate.

 2              Q.      Okay.

 3                      I know it's -- it was a while

 4      ago.

 5              A.      Yeah.

 6              Q.      I'm not trying to play gotcha.

 7      Maybe I should have brought this document out

 8      earlier.

 9                      DC cuts orders over 50 bottles

10      down to 50 bottles.  Oxy down to 20 bottles.

11                      Can you translate that for me?

12      What are we talking about when you say "DC

13      cuts orders"?

14              A.      My understanding is if the

15      order was over 50 bottles or over 20 bottles

16      for Oxy 30, we would not ship more than 50 or

17      20 bottles for Oxy 30.

18              Q.      So giving you a hypothetical.

19      We have 60 bottles of Opana, and we cut it

20      down to -- we cut it down to 50 and you

21      shipped that; is that right?

22                      MS. TABACCHI:  Object to the

23              form.

24                      THE WITNESS:  Yes, that could

25              be an example.
```

1    Q.    (BY MR. INNES)  Would that be

2    considered a suspicious order at the time?

3              MS. TABACCHI:  Object to the

4         form.

5              THE WITNESS:  Not necessarily.

6    Q.    (BY MR. INNES)  Okay.  So when

7    we're talking about the current SOM program,

8    what are we talk -- what's the -- what does

9    "SOM" mean in that context?

10   A.    Suspicious order monitoring.

11   Q.    And are these first two bullets

12   the way that -- I'm sorry, and at the time

13   Reddwerks flagged suspicious orders; is that

14   right?

15             MS. TABACCHI:  Object to the

16        form.

17             THE WITNESS:  Reddwerks flagged

18        orders based on these criteria.

19   Q.    (BY MR. INNES)  So at the

20   time --

21   A.    The --

22   Q.    Go ahead.

23   A.    We did -- just because they met

24   these criteria did not mean they were

25   suspicious.

1      Q.     It meant they were flagged?

2      A.     Yes.

3      Q.     Or they were orders of

4   interest; right?

5      A.     Yes.

6             MS. TABACCHI:  Object to the

7        form.

8      Q.     (BY MR. INNES)  And what did

9   they -- they pended?  Is that another --

10            MS. TABACCHI:  Object to the

11       form.

12            THE WITNESS:  I think we called

13       it "flagged" at this time.

14            MR. INNES:  Okay.

15     Q.     (BY MR. INNES)  And who made

16   the decision at that time to cut?

17     A.     This would have occurred at the

18   DC.

19     Q.     And at that time, was there a

20   process in place where it was -- the DC

21   decided that the order needed to be escalated

22   for further review?

23            MS. TABACCHI:  Object to the

24       form.

25            THE WITNESS:  Can you clarify

1          timeframe?

2          Q.     (BY MR. INNES)  So I think

3     we're at -- yep, October of '14.

4          A.     Okay.  I think at this time the

5     DC -- if there was an order that there was a

6     concern, was something more than just, you

7     know, a -- an accidental order or something

8     like that, and they believed it needed a

9     further look, they could submit it to

10    logistics compliance.

11               It was around this timeframe

12    that they started doing that.  I don't

13    remember the exact date.

14         Q.     Okay.  Would any of the orders

15    that went to logistics, would you -- would

16    you, as director of controlled substances,

17    review any of those orders?

18               MS. TABACCHI:  Object to the

19          form.

20         Q.     (BY MR. INNES)  During this

21    time period?

22         A.     It would have been right around

23    this time period that I could have been

24    engaged if it was escalated past logistics

25    compliance.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.

2      A.      It's -- it was all very fluid,

3  and we were making changes along the way, so

4  it's kind of hard to -- the timeframe runs

5  together.

6      Q.      But certainly those changes

7  were reflected in Walmart's policies.

8              MS. TABACCHI:  Object to the

9        form.

10             THE WITNESS:  Yes, we did

11        reflect them in policies.  I just

12        don't remember the exact timeframes

13        and when things were actually

14        published, that kind of thing.

15     Q.      (BY MR. INNES)  Okay.  But

16  another way of asking, you wouldn't -- folks

17  who were involved in the SOM, when they're

18  looking at orders of interest or suspicious

19  orders, they wouldn't do anything other than

20  was written in the policies; is that right?

21             MS. TABACCHI:  Object to the

22        form.  Lack of foundation.

23             THE WITNESS:  I mean, we

24        followed our suspicious order

25        monitoring policies.

1      Q.      (BY MR. INNES)  If a DC cut an

2  order from 30 down to 20, that would have

3  been -- so, I'm sorry.  Strike that.

4              The Oxy 30, that would be an

5  order of interest; is that right?

6              MS. TABACCHI:  Object to the

7        form.

8              THE WITNESS:  Not necessarily.

9      Q.      (BY MR. INNES)  I'm sorry.  I

10  left out half the question.

11              So if an Oxy 30 over 20 -- an

12  order for Oxy 30 over 20 bottles was placed,

13  would that be considered an order of interest

14  at this time?

15              MS. TABACCHI:  Object to the

16        form.

17              THE WITNESS:  Not necessarily.

18      Q.      (BY MR. INNES)  Okay.  And --

19  but it could be?

20      A.      It could be.

21      Q.      And what would elevate it from

22  an appropriate order to an order of interest?

23              MS. TABACCHI:  Object to the

24        form.

25              THE WITNESS:  The circumstances

1    of the order.

2        Q.    (BY MR. INNES)  And who would

3    make that determination?

4        A.    That would have been made on

5    the logistics side.

6        Q.    So were there reports of Oxy 30

7    cuts that were made to logistics?

8            MS. TABACCHI:  Object to the

9        form.

10           THE WITNESS:  I don't know.

11       Q.    (BY MR. INNES)  So I guess my

12   question is how -- if the cut is made at the

13   DC level -- that's right; correct?

14       A.    Yes.

15       Q.    How does anyone outside the DC

16   know, if at all, that a cut was made?

17           MS. TABACCHI:  Object to the

18       form.

19           THE WITNESS:  I don't know,

20       because those wouldn't have come to

21       me.  They would have come to logistics

22       compliance.

23       Q.    (BY MR. INNES)  And logistics

24   compliance would have reviewed particular

25   Oxy 30 cut 20.  None of those ever made it

1    through -- past logistics and into your

2    domain?

3                    MS. TABACCHI:  Object to the

4          form.

5                    THE WITNESS:  I don't remember

6          if they did or not.

7          Q.    (BY MR. INNES)  Would there

8    be -- do you have records of what you've

9    reviewed during this timeframe for orders of

10   interest?

11         A.    I would have emails, that kind

12   of thing.

13         Q.    Would it have been documented

14   in Archer?

15         A.    I don't remember if Archer was

16   being used at this time.  I don't think it

17   was being used yet.

18         Q.    So if Archer wasn't -- strike

19   that.

20               Before recording -- before the

21   possible recording to Archer, what was done

22   for recording the reports?

23                    MS. TABACCHI:  Object to the

24          form.

25                    THE WITNESS:  I don't know what

1       was done prior to me being in role.

2       There was a period of time between

3       when I started my role and we

4       transitioned to Archer where there was

5       documentation from a web form that the

6       DCs could fill out and submit.  And

7       then logistics compliance, I believe

8       they documented their notes within

9       this web form mailbox that they used.

10          Q.     (BY MR. INNES)  If -- sitting

11  here today, if you wanted to go back and look

12  at an order from that time period, could you

13  do that?

14              MS. TABACCHI:  Object to the

15          form.

16              THE WITNESS:  An order or -- is

17          that what you're asking about?  If I

18          could look at an order?

19              MR. INNES:  That's a fair

20          question.

21          Q.     (BY MR. INNES)  If you wanted

22  to go back and look at your review of an

23  order of interest during that time period --

24  the time period we're talking about is

25  pre-Archer -- how would you do that?

1          If you -- if it's -- if it's

2     even possible.

3          A.    I don't know if it's -- I don't

4     know if it's possible.  I don't know.

5          Q.    You've never -- you've never

6     tried to do it?

7          A.    I've never tried to do it.

8          Q.    This third bullet here talks

9     about reports.  First says "Daily."  Orders

10    over 20 bottles of a C-II item.

11         What are those Daily Reports?

12         A.    I don't know.

13         Q.    Okay.

14         A.    I don't believe I received

15    those.

16         Q.    Do you know who received them?

17         A.    I don't.

18         Q.    Do you know if they've been

19    retained?

20         A.    I don't.

21         Q.    Same for the monthly.  Did you

22    receive those monthly reports that are

23    referenced at the bottom of the document?

24         A.    I may have received one or two.

25    I don't remember receiving them on a regular

Highly Confidential - Subject to Further Confidentiality Review

```
 1    basis.
 2         Q.    Okay.  And I know this is a
 3    very long time ago, but you do say in the
 4    email that you made changes to No. 2.  And
 5    honestly, I didn't think I was going to ask
 6    this question, but I'm assuming those changes
 7    were made to bullets 1 or -- 1 or 2?  Is that
 8    right?
 9              MS. TABACCHI:  Object to the
10         form.
11              THE WITNESS:  I don't know.  It
12         could have been any of those bullets
13         because George and Jim had been around
14         longer than I have, so they would have
15         had a better understanding of the
16         current SOM program.
17         Q.    (BY MR. INNES)  But you do say
18    you made content changes to slide 2; right?
19         A.    Yes.  But it was based on our
20    conversation.
21         Q.    Okay.  So you might have been
22    implementing changes in these --
23         A.    They're recommending, yes.
24         Q.    Turn to page 3 of the deck.
25    "Improvement opportunities in the current
```

1    program."  Again, the current program in

2    October of 2014 was Reddwerks

3    pre-enhancement; is that right?

4         A.    Yes.

5         Q.    And bullet 2 says, "Flags only

6    identify 'unusual size.'"  What does that

7    mean?

8              MS. TABACCHI:  Object to the

9         form.

10             THE WITNESS:  I don't know.

11             MR. INNES:  Okay.

12             THE WITNESS:  I don't know that

13        I agree with that.

14        Q.    (BY MR. INNES)  You don't know

15   that -- sorry?

16        A.    I don't necessarily agree with

17   that bullet.

18        Q.    Okay.  Why don't you agree with

19   that bullet?

20        A.    Because if you look at the

21   criteria that were reviewed --

22        Q.    And you're looking at --

23        A.    The slide 2.

24        Q.    Mm-hmm.

25        A.    That could have captured other

1    than just an unusual size.

2         Q.    What else other than unusual

3    size could the criteria on slide 2 have

4    captured?

5         A.    The frequency or pattern.

6         Q.    Which one would be frequency?

7         A.    The increase over four-week

8    average.

9         Q.    So what's your understanding of

10   what the 30 percent increase over a rolling

11   four-week average means?

12        A.    That the orders -- there was a

13   30 percent increase in the order over their

14   average over.

15        Q.    And that would be a 30 percent

16   increase in size over the four-week average?

17              MS. TABACCHI:  Object to the

18        form.

19              THE WITNESS:  I'm not sure.

20              MR. INNES:  Okay.

21        Q.    (BY MR. INNES)  Anything else

22   on there that would capture anything other

23   than unusual size?  You said trends?

24        A.    No, I think that's -- that

25   would be the one that would be most likely to

Highly Confidential - Subject to Further Confidentiality Review

1    capture the other -- the pattern of

2    frequency.

3          Q.      I'm sorry, which would capture

4    the pattern of frequency?

5          A.      Of the greater than 30 percent

6    increase.

7          Q.      How would you use greater than

8    30 percent increase to capture pattern of

9    frequency?

10          A.      Because it's looking at their

11    typical average.  And so that increase could

12    be caused by them ordering more frequently or

13    changing their pattern of ordering.

14          Q.      I think you said -- well, you

15    did say it's looking at their typical

16    average.  It's actually looking at their

17    rolling four-week average; right?

18          A.      Yes, rolling four-week average.

19          Q.      Which is different than typical

20    average?

21          A.      Yes.

22          Q.      I'm going to bring you back to

23    slide 3.  How -- well, again, we see flags

24    only -- it only -- flags only identify

25    unusual size.

1              It didn't identify

2    substantially from a normal pattern, did it?

3              MS. TABACCHI:  Object to the

4         form.

5              THE WITNESS:  I think it could

6         have.

7         Q.    (BY MR. INNES)  And what do you

8    base that on?

9         A.    Because if they're ordering in

10   a different pattern, a more frequent pattern,

11   it could cause a higher order volume.

12        Q.    And which one of the metrics

13   are you pointing to?

14        A.    The greater than 30 percent

15   increase.

16        Q.    Moving back to slide 3 again.

17   Bullet point 3, "McKesson orders are not

18   considered in evaluation."

19             I think earlier you testified

20   that McKesson orders were considered in the

21   eval -- in the evaluation.

22             MS. TABACCHI:  Object to the

23        form.

24             THE WITNESS:  I know for sure

25        that McKesson orders were considered

Highly Confidential - Subject to Further Confidentiality Review

1           post-enhancements.  I had believed

2           that they were considered in the

3           program prior to that.

4           Q.     (BY MR. INNES)

5       Post-enhancement.  When -- remind me again

6       the date of the enhancements?

7           A.     2015.

8                  MS. TABACCHI:  Mike, if you're

9           moving to another document?  Let us

10          know when is a good time for a break.

11          I have a technical issue.

12                 MR. INNES:  If I can just do

13          this exhibit quickly.  We're going to

14          keep going through this, so just keep

15          this handy.  I just want to bring out

16          this one.  This should be quick.

17                 THE WITNESS:  Okay.

18                 MR. INNES:  And then we can

19          take a technical break.

20                 (Walmart Johnson Deposition

21          Exhibit 5 was marked for

22          identification.)

23                 [Document review.]

24                 THE WITNESS:  Okay.

25          Q.     (BY MR. INNES)  So I'm just

Highly Confidential - Subject to Further Confidentiality Review

1    going to -- this is an email string from you

2    to -- in the middle of the page it's from

3    you, Miranda Johnson, on May 3rd, 2017 to a

4    Katrina Jamison.

5              Who is Katrina Jamison?

6        A.    She was a senior director in

7    our operations -- health and wellness

8    operations group.

9        Q.    And it looks like you're giving

10   her the heads-up that "Ramona Sullins is

11   going to be reaching out to you in the near

12   future to discuss what project for route

13   orders directed to McKesson when DC is out of

14   product."

15             What orders were being routed

16   directly to McKesson when a DC was out of

17   product?

18             MS. TABACCHI:  Object to the

19        form.

20             MR. INNES:  I can -- that's a

21        good objection.

22        Q.    (BY MR. INNES)  In the near

23   future -- at some point, you -- Walmart was

24   contemplating rolling out a project of

25   routing orders directly to McKesson when the

1    DC was out of product.

2              What -- what does that mean

3    exactly?  What orders are being direct -- or

4    routed directly to McKesson?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  So McKesson is a

8         supplemental distributor for us, and

9         so pharmacies would order from

10        McKesson if our DC did not carry that

11        product, or if our DC was out of stock

12        in that product.

13             So what this project would do

14        is when the DC received an order for a

15        product where they were out of stock,

16        instead of the pharmacy having to wait

17        to get notified that the DC was out of

18        stock and then the pharmacy having to

19        go to McKesson and place that order --

20             MR. INNES:  Okay.

21             THE WITNESS:  -- our DC would

22        basically send that order directly to

23        McKesson, as soon as the computer got

24        the order and said, "Hey, we're out of

25        stock" so that McKesson could

1    potentially fulfill that order.

2         Q.    (BY MR. INNES)  And when you

3    say "Those direct to McKesson orders limit

4    our ability to get full visibility to what

5    pharmacies order," what do you mean by that?

6         A.    When a pharmacy would order

7    directly from McKesson, we couldn't see that

8    order when it happened because it was going

9    directly to McKesson.  We would see it after

10   the fact.  And so there was benefit to it

11   coming directly through us versus going to

12   McKesson and then us seeing it after it had

13   already been placed.

14        Q.    Okay.  So what was the lag time

15   between when the order was placed and when

16   you had visibility on the order?

17             MS. TABACCHI:  Object to the

18        form.

19             THE WITNESS:  I'm not sure

20        exactly how all the timing works, but

21        maybe a day.

22        Q.    (BY MR. INNES)  And where does

23   that information come from?

24             MS. TABACCHI:  Object to the

25        form.

```
 1              THE WITNESS:  We have a --
 2        McKesson has a site where we could
 3        access the information.
 4        Q.    (BY MR. INNES)  Okay.  So it's
 5   McKesson providing the data back to Walmart?
 6        A.     We could log in and pull
 7   reports.
 8        Q.     And did you do that on
 9   schedule -- at scheduled times?
10              MS. TABACCHI:  Object to the
11        form.
12              THE WITNESS:  We did it as
13        needed, as we were evaluating orders.
14        Q.    (BY MR. INNES)  And what do you
15   mean by that?
16        A.     So when we were evaluating an
17   order of interest, we would go in and pull
18   our report for that drug and that location.
19        Q.     Okay.  And you did that every
20   order of interest?
21        A.     I know we did it from a
22   practice compliance standpoint.  I can't
23   remember if logistics did it at their
24   evaluation on every order.
25        Q.     Okay.  So during the timeframe
```

1    when an order is flagged by Reddwerks, it

2    goes through the DC.  It makes its way to

3    logistics.  Logistics could do an order of

4    interest evaluation absent -- without -- I'm

5    sorry, without any visibility to McKesson's

6    direct McKesson orders?  Is that possible?

7              MS. TABACCHI:  Object to the

8         form.

9              THE WITNESS:  Is it possible

10        that they didn't review it?

11             MR. INNES:  Correct.

12             THE WITNESS:  I believe it's

13        possible.

14             I think it's important to note,

15        though, that McKesson knew they were a

16        supplemental distributor, and so they

17        have their own suspicious order

18        monitoring program, and they set very

19        low thresholds for our pharmacies

20        because they knew that we use them on

21        a limited basis.

22        Q.    (BY MR. INNES)  Do you know if

23    McKesson -- did you -- strike that.

24             Did you share your distribution

25    data with McKesson?

1             MS. TABACCHI:  Object to the

2        form.

3             THE WITNESS:  The McKesson --

4        I'm not sure if we had, if it had been

5        done before I started.  McKesson also

6        had their own distribution data on

7        what they were distributing to us.

8        Q.    (BY MR. INNES)  Right.  Which

9   is the data that you -- that you pulled

10   during the order of interest evaluation in

11   the compliance portion of the review; is that

12   right?

13             MS. TABACCHI:  Object to the

14        form.

15             THE WITNESS:  Yes.  We could

16        review what our pharmacists had

17        ordered, yes.

18        Q.    (BY MR. INNES)  Right.  But --

19   and was that an auto-populated -- was that an

20   auto-populated screen in Archer?

21             MS. TABACCHI:  Object to the

22        form.

23             THE WITNESS:  No.

24        Q.    (BY MR. INNES)  No?  That was

25   something you had to go to McKesson, manually

Highly Confidential - Subject to Further Confidentiality Review

```
1    pull that data, then make that part of your
2    evaluation?
3         A.    Yes.
4         Q.    And if an order -- did you ever
5    see an order of interest evaluation that made
6    it to your desk, where a member of the
7    logistics team had documented that they had
8    done such a -- such a poll?
9              MS. TABACCHI:  Object to the
10        form.
11             THE WITNESS:  I don't remember.
12        Q.    (BY MR. INNES)  Was there ever
13   a written policy that said, you know, when
14   we're doing an order of interest evaluation,
15   let's make sure we look at the McKesson
16   direct orders?
17             MS. TABACCHI:  Object to the
18        form.
19             THE WITNESS:  I don't know if
20        we had a written policy on that
21        specifically.
22             MR. INNES:  I know you asked to
23        take a break, but just let me --
24             MS. TABACCHI:  When it works
25        for you, Mike.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. INNES:  Yeah, now's a good

 2         time to go off the record.

 3                    VIDEOGRAPHER:  We are going off

 4         the record at 2:46 p.m.

 5                    (Recess taken, 2:46 p.m. to

 6         3:02 p.m.)

 7                    VIDEOGRAPHER:  We are back on

 8         the record at 3:02 p.m.

 9         Q.    (BY MR. INNES)  Okay.

10    Ms. Johnson, we're back.

11         A.    Okay.

12         Q.    We're still looking at

13    plaintiffs' 4.

14         A.    Before we move on, can I

15    clarify something on Exhibit 5?

16         Q.    Sure.

17         A.    This -- the order routing

18    that's referenced in this email was only for

19    IIIs through Vs.

20                    We already did order routing

21    for C-IIs, because all C-IIs orders had to go

22    through our DC to actually be placed.

23         Q.    Okay.

24         A.    So this only applied to IIIs

25    through Vs.  I just wanted to clarify that.
```

1    Q.    And so let me just make sure I

2    understand.  So my question -- and the main

3    purpose is so I understand what visibility

4    you had into McKesson direct orders of C-IIs

5    and C-IIIs during your order of interest

6    reviews.  So did -- did you have visibility

7    on the McKesson direct orders during those

8    reviews?

9    A.    Yes.  We did.

10   Q.    And again, what time period did

11   you have that visibility?

12   A.    Can you clarify what you mean

13   by "time period"?

14   Q.    Sure.  When did you -- when was

15   the earliest point in time that Walmart

16   considered McKesson's orders, orders

17   direct -- direct McKesson orders during its

18   order of interest review?

19            MS. TABACCHI:  Object to the

20       form.

21            THE WITNESS:  I know for sure

22       that it occurred starting with the

23       enhancements.  I'm not sure how early

24       before then it may have started.

25            MR. INNES:  Okay.

1      Q.     (BY MR. INNES)  So going back

2    to page 3 -- page 3 of the slide deck where

3    it says "McKesson orders are not considered

4    in evaluation."  This is, again, in October

5    of 2014.

6            Is that an accurate -- is that

7    an accurate statement, "McKesson orders are

8    not considered in evaluation"?

9            MS. TABACCHI:  Object to the

10           form.

11           THE WITNESS:  So I'm not sure

12           if this is referencing the order

13           evaluation or the threshold

14           evaluation.

15     Q.     (BY MR. INNES)  So let's see if

16   we can't get to actualize this, then.

17           If you go back to slide 2.  It

18   says "Current SOM program."

19           And then these bullets that we

20   discussed below were directed at -- right

21   where it's flagged, orders; is that right?

22     A.     Yes.

23     Q.     Okay.  So we go to slide 3.

24   "Look at improvement opportunities in the

25   current program."

1              Is there anything in here

2    that -- strike that.

3              Let me do this a different way.

4              Do you know if McKesson orders

5    were considered in the order of interest

6    evaluation in October of 2014?

7              MS. TABACCHI:  Object to the

8         form.

9              THE WITNESS:  I don't know for

10        sure if they were included in the

11        evaluation of an order of interest to

12        determine if it's suspicious.

13        Q.    (BY MR. INNES)  Do you know if

14   McKesson orders were considered in the

15   threshold adjustment evaluation in October of

16   2014?

17             MS. TABACCHI:  Object to the

18        form.

19             THE WITNESS:  There were not

20        threshold adjustment evaluations in

21        October of 2014.

22             MR. INNES:  Okay.

23             THE WITNESS:  Those began after

24        the enhancement.

25        Q.    (BY MR. INNES)  So are there

1    any other evaluations that this line could be

2    referring to other than threshold and order

3    of interest?

4         A.    It could be referring to the

5    evaluation to determine if an order flags.

6         Q.    Okay.  And that would be a

7    determination of -- let me see.

8               An order would flag during this

9    time period if it was above a threshold?

10        A.    If it met one of these criteria

11   outlined at the top of slide 2.

12        Q.    Are any of these thresholds?

13        A.    I would consider the top two,

14   the over 20 bottles and the over 50 bottles

15   thresholds.

16        Q.    Okay.  So are the McKesson

17   orders considered in the over 20 or over

18   50-bottle evaluations?

19               MS. TABACCHI:  Object to the

20         form.

21               THE WITNESS:  I'm not positive

22         if they were considered to determine

23         if an order flagged for the over

24         20 bottles at the C-IIs, but it is

25         possible because all of the C-II

1          orders, even McKesson, had to go to

2          the C-II facility to be ordered.

3               And I'm -- I don't believe, I'm

4          not positive, that they would have

5          been included in the flag for the

6          over 50 at the other DCs.

7          Q.    (BY MR. INNES)  So you

8     testified that "I am not positive if they

9     were considered to determine if an order

10    flagged for the over 20 bottles at the C-IIs,

11    but it's possible because all of the C-II

12    orders, even the McKesson, had to go to the

13    C-IIs facilities to be ordered."  It's the

14    last part of that sentence that confuses me.

15         A.    Okay.

16         Q.    I thought we had been talking

17    about -- and I'm sorry if I confused you --

18    the orders that were placed from pharmacies

19    directly to McKesson.

20         A.    That's what I was -- sorry,

21    that's what I was trying to clarify on this

22    exhibit.  They were placed directly to

23    McKesson for only IIIs through Vs.  Our

24    pharmacies do not have the power of attorney

25    to place C-II orders directly to McKesson, so

Highly Confidential - Subject to Further Confidentiality Review

1    those orders have to be sent to our C-II

2    facility.

3         Q.     Okay.

4         A.     That is where the power of

5    attorney rests to place the C-II orders using

6    CSOS, the controlled substance ordering

7    system.  So C-II orders cannot be placed

8    directly to McKesson.

9         Q.     Okay.  So how would it work if

10   an order for a C-II was placed both by --

11   well, by the pharmacy, for, say -- we can do

12   Oxy 30s for 15.  And then another order

13   was -- well, how were orders placed?  Let's

14   start there.

15        A.     There are two ways that an

16   order can be placed for a pharmacy.  We have

17   a replenishment system that places orders.

18   We also -- the pharmacy itself can place an

19   order.  We would call that a manual order.

20        Q.     Okay.

21        A.     For a C-II, probably the best

22   way to think about it is they're actually

23   requesting an order be placed because they

24   don't have the authority to place a C-II

25   order.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      "They" being the pharmacy?
 2          A.      Yes.
 3          Q.      And they make the request of
 4    who?
 5          A.      It goes to the C-II facility or
 6    a power of attorney.
 7          Q.      Okay.
 8          A.      They have the power of attorney
 9    to place the C-II orders.
10          Q.      So in ultimately deciding
11    whether or not they're going to fulfill a
12    manual order, what does the DC -- what's the
13    DC's evaluation process?
14                  MS. TABACCHI:  Object to the
15          form.
16                  THE WITNESS:  Can you clarify
17          what you're --
18                  MR. INNES:  Sure.
19                  THE WITNESS:  What you're
20          asking.
21          Q.      (BY MR. INNES)  So a manual
22    order comes in to the pharmacy -- or comes in
23    from the pharmacy to DC 6045 for Oxy 30.
24    What happens next?
25          A.      It goes into the CSOS system.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     And if that one was for, say,
2    Oxy 30, 50 bottles, what happens?
3                    MS. TABACCHI:  Object to the
4          form.
5                    THE WITNESS:  If it was Oxy 30,
6          it would have flagged because it's
7          50 bottles.
8          Q.     (BY MR. INNES)  And it would
9    have been cut down to 20?
10         A.     That's my understanding.
11         Q.     Okay.  Would that order itself,
12   would that order be evaluated as an order of
13   interest?
14                   MS. TABACCHI:  Object to the
15         form.
16                   THE WITNESS:  It potentially
17         could be.
18         Q.     (BY MR. INNES)  And during this
19   time period, October of 2014, what -- what
20   would tip it towards being an order of
21   interest?
22                   MS. TABACCHI:  Object to the
23         form.
24                   THE WITNESS:  I wasn't the one
25         to decide whether or not it was an
```

1          order of interest.  It would have been

2          done with logistics compliance.  So

3          it's hard for me to say what they

4          would have used as criteria.

5          Q.     (BY MR. INNES)  Do you know the

6     policies that were in place at that time?

7               MS. TABACCHI:  Object to the

8          form.

9               THE WITNESS:  We reviewed them

10         earlier.

11         Q.     (BY MR. INNES)  You don't have

12    to --  you said there was a policy in place?

13         A.     During October of 2014?

14         Q.     Correct.

15         A.     Yes.

16         Q.     To address manual orders from

17    the pharmacy directly?

18         A.     I don't know if it specifically

19    outlined a manual order versus a system

20    order.

21         Q.     At that time, is an -- is an

22    order -- at that time is an order of Oxy 30

23    above 20 an order of interest?

24               MS. TABACCHI:  Object to the

25         form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I don't know.
 2          Q.    (BY MR. INNES)  So as a
 3    director of controlled substances, where
 4    exactly does your responsibility begin to
 5    know things along the order of interest
 6    chain?
 7                    MS. TABACCHI:  Object to the
 8            form.
 9                    THE WITNESS:  So if it was
10            elevated to me outside of -- logistics
11            compliance did the initial evaluation,
12            and then if it was elevated to me,
13            that would be where my role started
14            with evaluating an order of interest.
15          Q.    (BY MR. INNES)  And part of
16    your job as director of controlled substances
17    was to implement the Reddwerks enhancements;
18    is that right?
19          A.    To support the implementation
20    of the Reddwerks enhancements.
21          Q.    Okay.
22          A.    Yes.
23          Q.    And what was the -- what do you
24    mean by "support"?
25          A.    The logistics compliance team
```

Highly Confidential - Subject to Further Confidentiality Review

1   was the owner of that project.  I was

2   assisting them with it.

3          Q.     And how did you assist them?

4          A.     I believe we talked about it

5   before, with the process and how to get

6   things completed and requested from ISD, and

7   how to move system projects forward.

8          Q.     At any point in time as a

9   director of controlled substances, did you

10  have any interest in how the enhancements

11  were working to flag orders of interest?

12             MS. TABACCHI:  Object to the

13          form.

14             THE WITNESS:  Yes.  I mean,

15          whenever I would start to identify

16          things that we could maybe adjust as

17          we were building the system to make it

18          more efficient or make more sense or

19          work better from a process standpoint.

20          Q.   (BY MR. INNES)  And what were

21  those things?

22          A.     I don't remember specifically

23  what they were.

24          Q.     Were any enhancements beyond

25  the Reddwerks enhancements that we discussed

1    earlier, those -- the three -- are there any

2    others?

3                    MS. TABACCHI:  Object to the

4            form.

5                    THE WITNESS:  It would be

6            things to help make those Reddwerks

7            enhancements occur.

8            Q.    (BY MR. INNES)  What does that

9    mean?

10           A.    Let me see if I can think of an

11   example.

12                 Maybe changing the layout of a

13   screen that the evaluator reviewed so they

14   could better see information that they needed

15   would be an example.

16           Q.    Okay.  Anything else?

17           A.    I can't think of any other

18   examples right now.

19           Q.    So at no point were you engaged

20   in making sure that the Reddwerks

21   enhancements were capturing the proper

22   orders?

23                    MS. TABACCHI:  Object to the

24           form.

25           Q.    (BY MR. INNES)  Flagging the

Highly Confidential - Subject to Further Confidentiality Review

```
1      proper orders of interest?
2                MS. TABACCHI:  Same objections.
3                THE WITNESS:  The enhancements
4         were built to use the thresholds that
5         were developed.  The thresholds would
6         be what captured the orders that we
7         felt needed additional review.
8         Q.    (BY MR. INNES)  And those
9   thresholds were developed again by who?
10        A.    Mu Sigma.
11        Q.    And were those thresholds
12  ever -- aside from adjustments that you made
13  through the threshold adjustment process,
14  were those thresholds ever adjusted?
15                MS. TABACCHI:  Object to the
16        form.
17                THE WITNESS:  We did refresh
18        the data, the underlying data, but the
19        concept behind the thresholds, I don't
20        believe we modified it.
21                Aside from -- I think I
22        mentioned there was a couple of drugs
23        that we would adjust the specific
24        threshold to make it make more sense
25        in the 50 -- or the 5,000 dosage unit.
```

1    Q.    (BY MR. INNES)  And is that the

2    liquid --

3    A.    The liquid and then just the

4    overall 5,000 dosage unit cap.

5    Q.    So there was the two, there's

6    the 5,000 dosage cap and the liquid?

7    A.    Mm-hmm.  (Witness nods.)

8    Q.    And what do you mean by

9    "refresh the data"?

10   A.    So to calculate the thresholds,

11   to find the three times the standard

12   deviation, you have to put in historical

13   data, because you're finding what is -- what

14   are -- have they been ordering previously.

15   Q.    Right.

16   A.    So we did go through a process

17   and used the same -- three times the standard

18   deviation, but we used more updated data.

19   Q.    Did you increase the data set?

20   MS. TABACCHI:  Object to the

21   form.

22   THE WITNESS:  I don't remember

23   if we increased it.  We did newer

24   data.

25   Q.    (BY MR. INNES)  Did you remove

Highly Confidential - Subject to Further Confidentiality Review

```
 1      the old data?

 2                 MS. TABACCHI:  Object to the

 3           form.

 4                 THE WITNESS:  I can't remember

 5           exactly what we removed.

 6      Q.      (BY MR. INNES)  But you did

 7  remove something?

 8                 MS. TABACCHI:  Object to the

 9           form.

10                 THE WITNESS:  I'm not positive.

11           I think we just shifted the timeframe

12           to a newer timeframe.

13      Q.      (BY MR. INNES)  Who was

14  responsible for interfacing with Mu Sigma?

15      A.      That happened before I was in

16  role.

17      Q.      But do you know the person who

18  was responsible for Mu Sigma at Walmart?

19                 MS. TABACCHI:  Object to the

20           form.

21                 THE WITNESS:  I think the

22           logistics compliance team is the one

23           who engaged them.

24      Q.      (BY MR. INNES)  So aside from

25  knowing that the data was refreshed, the
```

Highly Confidential - Subject to Further Confidentiality Review

1    three -- the standard deviation equation was

2    used to develop the threshold, that's the

3    extent of your knowledge of the creation of

4    the Reddwerks threshold?

5              MS. TABACCHI:  Object to the

6         form.

7              THE WITNESS:  Can you state

8         that again?

9         Q.    (BY MR. INNES)  What else do

10   you know about the creation of the thresholds

11   in Reddwerks other than the use of Mu Sigma

12   and the resulting three standard deviations

13   calculation?

14             MS. TABACCHI:  Object to the

15        form.

16             THE WITNESS:  The other items

17        that I referenced about the liquids,

18        the 5,000 dosage unit cap.  You know,

19        those other adjustments that we made.

20        Q.    (BY MR. INNES)  Did you ever

21   do -- are you aware of or did the compliance

22   team ever do an audit of the threshold

23   evaluation?

24             MS. TABACCHI:  Object to the

25        form.

```
1                    THE WITNESS:  An audit of our

2         process?

3                    MR. INNES:  Yeah.  Yes.

4                    THE WITNESS:  I can't remember.

5         I can't remember one.

6         Q.    (BY MR. INNES)  Did you engage

7    in any audits of the SOM program?

8                    MS. TABACCHI:  Object to the

9         form.

10                   THE WITNESS:  I can't remember

11        an audit.

12        Q.    (BY MR. INNES)  Could we go

13   back to slide 3?

14        A.    Sure.

15        Q.    "All flags must be cleared

16   before production on any item can begin so

17   there's a limited time for evaluation."

18             What is "cleared before

19   production"?

20        A.    So an order that was flagged

21   had to be resolved before the DC could begin

22   their production on orders.

23        Q.    So what does the word

24   "production" mean in that sentence?

25        A.    Actually start picking orders
```

Highly Confidential - Subject to Further Confidentiality Review

 1    to be shipped.

 2         Q.    Okay.  So all flags must be

 3    cleared before an order can be shipped?  Is

 4    that a fair statement?

 5         A.    Yes.  Before it can move

 6    forward and be picked and shipped.

 7         Q.    And it says there's a limited

 8    time for evaluation.  Is that right?

 9         A.    Mm-hmm.  (Witness nods.)

10         Q.    So I think one of the

11    enhancements you described earlier was you

12    increased the time.

13         A.    Yes.

14         Q.    Is that a -- is this the

15    opportunity for improvement that was -- that

16    that increase was directed towards?

17                MS. TABACCHI:  Object to the

18         form.

19                THE WITNESS:  Yes.

20         Q.    (BY MR. INNES)  "No defined

21    process for tracking why DC cuts or clears

22    specific orders."  What does that mean?

23         A.    That's just referencing that we

24    didn't have a standard process for the

25    distribution center to take notes or document

1    a reason why they would cut an order or clear

2    an order.  We just didn't have a good process

3    for them to document the reasons why they

4    made their decisions.

5         Q.    Okay.

6               Were the -- did the Reddwerks

7    enhancements address the area of improvement

8    articulated in bullet point No. 1?

9         A.    The Reddwerks enhancements -- I

10   don't know if we ever looked at the number

11   before and after.  The Reddwerks

12   enhancements, because of the thresholds were

13   specifically tailored to individual

14   pharmacies, were intended to be more focused.

15   Because you could do a different threshold

16   for an individual pharmacy and an individual

17   drug.

18        Q.    Were the Reddwerks enhancements

19   a statistical methodology?

20        A.    Yes.

21        Q.    They were?

22        A.    Yes.

23              (Walmart Johnson Deposition

24        Exhibit 6 was marked for

25        identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    [Document review.]

 2                    THE WITNESS:  Okay.

 3          Q.     (BY MR. INNES)   Okay.  So this

 4     is an email from Miranda Johnson to

 5     Michael Fischer.

 6                    Ms. Johnson, who is

 7     Mr. Fischer?

 8          A.     He works in health and wellness

 9     operations.  He's an industrial engineer

10     lead.

11          Q.     Okay.  Halfway down the page

12     Mr. Fischer writes to you asking, "What was

13     the process for monitoring orders before this

14     project was implemented?"

15                    Based on this email chain, do

16     you know what project he's referring to?

17          A.     It would have been Buzzeo.

18          Q.     Okay.  And in response you

19     said, "We used a different tool that was

20     based on static thresholds."

21                    Which tool are you referring to

22     there?

23          A.     That would have been referring

24     to Reddwerks.

25          Q.     "This tool" -- again,
```

Highly Confidential - Subject to Further Confidentiality Review

1    Reddwerks -- "incorporated a statistical

2    model and grouped drug classes together so we

3    could better identify concerns."  Is that

4    right?

5         A.    Did you just say "This tool,

6    Reddwerks"?  Is that what you said?

7         Q.    I said, yeah.  Are you

8    referring to Reddwerks or are you referring

9    to Buzzeo there?

10        A.    I'm referring to Buzzeo there.

11        Q.    You're referring to Buzzeo

12   there.  Okay.  So Buzzeo included a

13   statistical model, but Reddwerks did not?

14             MS. TABACCHI:  Object to the

15             form.

16             THE WITNESS:  Reddwerks did not

17             have a built-in statistical model, but

18             the thresholds were developed based on

19             a statistical methodology, the three

20             times standard deviation that we've

21             already talked about.

22        Q.    (BY MR. INNES)  But once placed

23   into the Reddwerks platform, they're static;

24   is that right?

25             MS. TABACCHI:  Object to the

```
 1              form.

 2                   THE WITNESS:  It was a

 3              threshold that would only be changed

 4              if we went in and modified it for a

 5              reason.

 6         Q.    (BY MR. INNES)  And why the

 7    change to a tool that incorporated a

 8    statistical model?

 9                   MS. TABACCHI:  Object to the

10              form.

11                   THE WITNESS:  As I've

12              mentioned, we've been focused on

13              continuous improvement.  And so when

14              we learned about Buzzeo and the model

15              that was built in, we thought it was a

16              good tool to move to.

17         Q.    (BY MR. INNES)  And when did

18    you first learn about Buzzeo?

19         A.    I believe it was late 2014,

20    early 2015 maybe that I first heard of

21    Buzzeo.

22         Q.    Okay.  And if we can go back to

23    the PowerPoint.  And specifically slide 4 of

24    the deck.  It's called a strategy overview.

25                   There's a phrase "continuous
```

1    improvement."  Okay?

2              So Phase 1 is system

3    enhancements.  Are those Reddwerks

4    enhancements you're talking about?

5         A.    I believe that's what it's

6    referencing.

7         Q.    Okay.  "Process

8    implementation," do you know what that's

9    referring to?

10        A.    Implementing the new process

11   that connected to the Reddwerks enhancements.

12        Q.    "Data monitoring, manual."

13   What's that referring to?

14        A.    I'm not sure.

15        Q.    If you look directly across the

16   page, in Phase 2 it says, "Data monitoring

17   augmented."

18              Do you know what that refers

19   to?

20        A.    I don't.

21        Q.    Is -- do you know if the "data

22   monitoring, manual," that's a manual review

23   of data?  Is that your take on that?

24              MS. TABACCHI:  Object to the

25        form.

```
 1                    THE WITNESS:  I don't remember.
 2           Q.     (BY MR. INNES)  Was it part of
 3      your job as director of controlled substances
 4      to -- well, how, if at all, were you involved
 5      as director of controlled substances in this
 6      phased program for suspicious order
 7      monitoring?
 8                    MS. TABACCHI:  Object to the
 9           form.
10                    THE WITNESS:  I would have been
11           involved in the development of the
12           proposal, along with others.
13           Q.     (BY MR. INNES)  At any point in
14      time did you engage in any development of
15      automated data monitoring?
16                    MS. TABACCHI:  Object to the
17           form.
18                    THE WITNESS:  I don't remember
19           what this is referencing, so I can't
20           say.
21           Q.     (BY MR. INNES)  If I can direct
22      your attention to slide 6.
23                    Can you describe for me what's
24      going on in this graphic?
25           A.     I believe this is just a
```

```
 1    visualization of the process.

 2         Q.    What process is that?

 3         A.    The order monitoring process.

 4         Q.    Okay.  And is that the order

 5    monitoring process that exists in October of

 6    '14?

 7         A.    This says Phase 1, so it would

 8    have been the Phase 1 order monitoring

 9    process.

10         Q.    And has that been implemented

11    at this point, or is this being piloted and

12    rolled out?

13              MS. TABACCHI:  Object to the

14         form.

15              THE WITNESS:  On slide 4,

16         Phase 1 references the Reddwerks

17         enhancements, so this would have been

18         the process with the Reddwerks

19         enhancements.

20         Q.    (BY MR. INNES)  I want to

21    direct your attention to slide 8.  This is

22    Phase 2.

23              And what does this depict?

24         A.    The process for order

25    monitoring, and it looks like the change on
```

Highly Confidential - Subject to Further Confidentiality Review

1    this one is that Buzzeo was the filter.

2         Q.    Okay.  So was the plan in

3    October of 2014 to move from Reddwerks

4    enhancements in Phase 1 to Phase 2 with a

5    Buzzeo or Buzzeo-like system?

6         A.    That was the proposal.

7         Q.    Okay.  Was that proposal

8    ultimately implemented?

9              MS. TABACCHI:  Object to the

10         form.

11             THE WITNESS:  Yes.  Because we

12         did move to Buzzeo.

13        Q.    (BY MR. INNES)  I want you to

14   go all the way to the end to appendix

15   page 10, and 11 is the actual appendix.

16             What is -- what does this

17   represent, do you know?

18        A.    This graphic was to help

19   individuals who were maybe not familiar with

20   order monitoring understand the difference

21   between a threshold and a hard limit.

22        Q.    Could you educate me on the

23   difference between a threshold and a hard

24   limit?

25        A.    Yes.  So a threshold is an

1    amount that if an order exceeds the

2    threshold, additional evaluation would be

3    warranted to determine if it was suspicious.

4              A hard limit is just a limit

5    where, as a company, you would decide we are

6    not going to ship over X amount.

7         Q.    And did Walmart ever set a hard

8    limit for any Schedule II or Schedule IIIs?

9         A.    I believe you could consider

10   some of the 20 -- or Oxy 30, 20 bottles, a

11   hard limit.

12        Q.    Okay.  Anything other than

13   those?

14        A.    That's all that I recall.

15        Q.    Out of curiosity, how many --

16   are you aware how many different dosages of

17   Oxy Walmart dispensed or -- I'm sorry,

18   distributed?

19              MS. TABACCHI:  Object to the

20        form.

21              THE WITNESS:  What do you mean

22        by "different dosages"?

23        Q.    (BY MR. INNES)  An Oxy 5, an

24   Oxy 10.

25              MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1    form.

2              THE WITNESS:  I'm not familiar

3         with all the various variations we had

4         in our distribution centers.

5         Q.    (BY MR. INNES)  As the director

6    of controlled substances that controlled --

7    the controls you had that are distributed,

8    that wasn't something that you had ready --

9    readily available to you?

10             MS. TABACCHI:  Object to the

11        form.

12             THE WITNESS:  I would have had

13        it readily available to me to review

14        what drugs we distributed.  I just

15        can't list what all variations of all

16        of the drugs we did -- controlled

17        substances we distributed at this

18        time.

19        Q.    (BY MR. INNES)  Do you have any

20   idea why Walmart singled out that particular

21   Oxy 30 as one that it would limit to

22   20 bottles?

23        A.    I don't.  That occurred before

24   I was in role.

25        Q.    And did that continue -- how

Highly Confidential - Subject to Further Confidentiality Review

1  long did that continue for, that hard limit?

2       A.     That would have continued until

3  we implemented the Reddwerks enhancements.

4       Q.     So the Reddwerks enhancements

5  come online and the hard limits stop?

6            MS. TABACCHI:  Object to the

7       form.

8            THE WITNESS:  Yes.

9       Q.     (BY MR. INNES)  Does the same

10  apply for the 50 bottles?

11       A.     Yes.

12       Q.     And the same applies for the

13  greater than 30 percent increase over the

14  rolling four-week average?

15       A.     Yes.

16            (Walmart Johnson Deposition

17       Exhibit 7 was marked for

18       identification.)

19            [Document review.]

20            THE WITNESS:  Okay.

21       Q.     (BY MR. INNES)  What is the

22  attachment to this document?  To this email.

23  I'm sorry.

24       A.     It looks like a spreadsheet

25  with threshold calculations.

1      Q.     And again, this is an email

2   from Roxy Reed to you, Miranda Johnson, on

3   December 4, 2014.

4            Why is Roxy sending you the

5   threshold calculations?

6      A.     I don't know why she sent them

7   this particular time.

8      Q.     Was it common for Roxy to send

9   you threshold calculations?

10           MS. TABACCHI:  Object to the

11      form.

12           THE WITNESS:  It wasn't

13      uncommon because we had to upload

14      their thresholds into Reddwerks.

15      Q.     (BY MR. INNES)  And were you in

16   charge of uploading them to Reddwerks?

17           MS. TABACCHI:  Object to the

18      form.

19           THE WITNESS:  I uploaded them

20      into Reddwerks.  Roxy did it some.  I

21      believe there were members of the

22      logistics compliance team that may

23      have done it as well.

24      Q.     (BY MR. INNES)  And as I

25   understand it, Reddwerks is a third-party

```
 1    vendor; is that right?

 2                 MS. TABACCHI:  Object to the

 3           form.

 4                 THE WITNESS:  Yes.

 5                 MR. INNES:  Okay.

 6       Q.    (BY MR. INNES)  And Walmart

 7    supplied Reddwerks with the threshold

 8    calculations?

 9                 MS. TABACCHI:  Object to the

10           form.

11                 THE WITNESS:  Walmart did the

12           calculations.  We had a spreadsheet

13           with the threshold that we were able

14           to upload into the Reddwerks system.

15                 MR. INNES:  Okay.

16       Q.    (BY MR. INNES)  Who was

17    responsible at Walmart for actually

18    generating the threshold calculations?

19                 MS. TABACCHI:  Object to the

20           form.

21                 THE WITNESS:  Roxy.

22                 MR. INNES:  Roxy?

23                 THE WITNESS:  Reed.

24       Q.    (BY MR. INNES)  And did you

25    ever check Roxy's math?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I don't remember if I did or

2     not.

3          Q.     So you just accepted Roxy's

4     calculations as proper and uploaded them to

5     Reddwerks; is that right?

6          A.     I just said I don't remember if

7     I checked her math or not, so I --

8                 I mean, I understood how she

9     did it, and I may have checked the math.

10         Q.     Do you remember any case --

11    anytime when you did change her math?

12         A.     I don't remember.

13         Q.     Is it possible that you ever

14    changed her math?

15                MS. TABACCHI:  Object to the

16         form.

17                THE WITNESS:  It is possible.

18         Q.     (BY MR. INNES)  It's possible?

19         A.     Mm-hmm.  (Witness nods.)

20         Q.     Why do you say that?

21         A.     Because it's possible that I

22    reviewed it and something didn't make sense

23    to me, so I asked her about it and we made

24    modifications.

25         Q.     Okay.  I think you testified

Highly Confidential - Subject to Further Confidentiality Review

1    earlier that you didn't know how to calculate

2    the standard deviation; is that right?

3         A.    That's correct.

4         Q.    Okay.  So without knowing how

5    to calculate the standard deviation, how

6    would you go about making adjustments to this

7    threshold -- threshold calculation?

8              MS. TABACCHI:  Object to the

9         form.

10             THE WITNESS:  So even though I

11        can't calculate the standard

12        deviation, I can still review the

13        final thresholds and see if they make

14        sense.

15        Q.    (BY MR. INNES)  Okay.  So is

16   the -- is there one file that is uploaded to

17   Reddwerks for threshold calculations that

18   also includes those that have been manually

19   adjusted by your team?

20             MS. TABACCHI:  Object to the

21        form.

22             THE WITNESS:  I'm not sure I

23        understand what you're asking.

24        Q.    (BY MR. INNES)  You testified

25   earlier that you would manually adjust

Highly Confidential – Subject to Further Confidentiality Review

 1    thresholds.

 2         A.    After a threshold evaluation.

 3         Q.    After a threshold evaluation?

 4         A.    Yes.

 5         Q.    How are those thresholds

 6    uploaded to Reddwerks?

 7              MS. TABACCHI:  Object to the

 8         form.

 9              THE WITNESS:  They would be

10         updated in the threshold file, and

11         then the threshold file would be

12         re-uploaded into Reddwerks.

13         Q.    (BY MR. INNES)  Is that

14    threshold file different than the threshold

15    calculation file that you see here in

16    Exhibit 7?

17              MS. TABACCHI:  Object to the

18         form.

19              THE WITNESS:  Yes.  It would

20         not have included all of this detail.

21              MR. INNES:  Okay.

22         Q.    (BY MR. INNES)  So if -- when

23    Roxy would send you these threshold

24    calculations documents, like, for example,

25    Exhibit 7, you'd review them?  Is that right?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. TABACCHI:  Object to the

2         form.

3              THE WITNESS:  Yes.  I'm sure I

4         looked at the document.

5         Q.    (BY MR. INNES)  Okay.  And

6    sometimes you would make adjustments to them?

7    To the document?

8         A.    No.  I may ask her questions if

9    something that I saw didn't look right.

10        Q.    And how could you tell it

11   didn't look right?

12        A.    If a threshold looked off, I

13   could ask her a question and understand --

14   you know, have her go back and check that it

15   worked correctly.

16        Q.    And is it a note when you see

17   when it looks off?  Or are you looking for a

18   particular level or a particular number?

19             MS. TABACCHI:  Object to the

20        form.

21             THE WITNESS:  There was not a

22        particular number.  It was a, you

23        know, understanding what the drug is,

24        what does it look like.  You could see

25        if something was an anomaly or looked

```
 1           unusual.

 2           Q.     (BY MR. INNES)  Okay.  And are

 3      these -- these represent individual orders

 4      from individual pharmacies?  Is that what

 5      we're looking at?

 6                   MS. TABACCHI:  Object to the

 7           form.

 8                   THE WITNESS:  This does not

 9           represent orders.

10           Q.     (BY MR. INNES)  Okay.  What

11      does this represent?  This represents

12      thresholds?

13           A.     This represents a threshold

14      calculation.

15           Q.     And is it a threshold for a

16      particular pharmacy?

17                   MS. TABACCHI:  Object to the

18           form.

19                   THE WITNESS:  It looks like

20           thresholds for many different

21           pharmacies.

22           Q.     (BY MR. INNES)  And how many

23      pharmacies does Walmart have?

24                   MS. TABACCHI:  Object to the

25           form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Around 4,000.

 2          Q.    (BY MR. INNES)  So in, let's

 3   say, December of 2014, there's 4,000

 4   different pharmacies.  And each one of those

 5   pharmacies has a unique threshold; is that

 6   right?

 7                    MS. TABACCHI:  Object to the

 8          form.

 9                    THE WITNESS:  Yes, a threshold

10          is created for that specific pharmacy.

11          Q.    (BY MR. INNES)  And so when you

12   reviewed a calculation file such as this one,

13   you could expect to see how many rows of

14   data?

15                    MS. TABACCHI:  Object to the

16          form.

17                    THE WITNESS:  It depended on

18          what the calculation file encompassed.

19          Q.    (BY MR. INNES)  And on the low

20   end, how many would you see?

21                    MS. TABACCHI:  Object to the

22          form.

23                    THE WITNESS:  I guess it would

24          depend on what we were recalculating

25          thresholds for.
```

1    Q.    (BY MR. INNES)  So if you

2    recalculated the thresholds for -- strike

3    that.

4              How often did you recalculate

5         thresholds?

6         A.    Thresholds would be calculated

7    for a new pharmacy, or, as I mentioned, we

8    refreshed the thresholds with newer data.

9              Those are the times I can think

10   of that we would calculate thresholds.

11             MS. TABACCHI:  I'd just like to

12        note for the record that Exhibit 7 and

13        the attachment that was printed from

14        the native format is -- appears to be

15        just a portion, an excerpt.

16             MR. INNES:  Yeah, I'm sorry.  I

17        should have noted -- well, I can tell

18        you.  It was a really big document,

19        and I didn't have enough boxes for any

20        of this, so ...

21             MS. TABACCHI:  That's fine.  I

22        just wanted to get clear that this is

23        not the entire file.

24             MR. INNES:  This is not the

25        entire document.  This was printed as

1        a representative to show the columns

2        and the different data that we can

3        see.

4        Q.    (BY MR. INNES)  My last

5    question on this is, is this an Excel file

6    that I would expect to see equations in?

7            MS. TABACCHI:  Object to the

8        form.

9            THE WITNESS:  I don't believe

10        so, because I believe the calculations

11        were done by another tool that was

12        more advanced than Excel, and then the

13        result was, you know, put into Excel.

14        Q.    (BY MR. INNES)  So this file --

15    and I can represent to you we didn't find any

16    equations in it.

17        A.    Okay.

18        Q.    So to cut to the chase, this is

19    an export file from some other database that

20    does the calculation?

21        A.    Yes.

22        Q.    Do you know the name of that

23    database?

24        A.    It may have been Alteryx that

25    did this.

1    Q.    So Alteryx was used at some

2    point in time to do -- to do this.

3          Do you know what time -- what

4    period of time it was used for?

5    A.    I said it may have been.  I'm

6    not positive.

7          Yeah, I'm not positive.

8    Q.    Any other programs that may

9    have been used?

10         MS. TABACCHI:  Object to the

11         form.

12         THE WITNESS:  I know Roxy used

13         Access for some things, but I don't

14         know if Access could do this type of

15         calculation.

16    Q.    (BY MR. INNES)  And the person

17    to ask about how this calculation was done,

18    that would be Roxy?

19    A.    Yes.

20    Q.    Anyone else who would know

21    about how the calculation was done?

22    A.    Not that I can think of.

23         (Walmart Johnson Deposition

24         Exhibit 8 was marked for

25         identification.)

```
1                    [Document review.]

2                    MR. INNES:  While you're

3          reviewing that, I'll represent this is

4          a similar -- we pulled the native and

5          we only produced -- and I only printed

6          the -- a representative page.

7                    THE WITNESS:  Okay.

8          Q.    (BY MR. INNES)  Okay.  This is

9   an email from Kristy Spruell to -- I'll just

10  butcher this.  I'll spell it.  B-H-U-P-E-N

11  A-H-U-J-A.

12                   Copied on that email are Ramona

13  Sullins, Theresa Alford, Miranda Johnson, and

14  Miranda Gan.  It was sent at 4:29 on

15  October 28, 2014.  Subject matter is "SOM

16  threshold and order files," and there's an

17  attachment with an example SOM threshold

18  file-dummy data-CSV.

19                   Who -- who is Kristy Spruell?

20       A.    She worked in logistics.

21       Q.    And what was her role in

22  logistics?

23       A.    The senior manager of strategy,

24  compliance safety, and asset protection.

25       Q.    And I see that's her title.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    What did she -- what did she do in that --
2    what was it -- what were the responsibilities
3    of that title?
4              MS. TABACCHI:  Object to the
5         form, lack of foundation.
6              THE WITNESS:  Yeah, I don't
7         know all of her responsibilities.  My
8         interaction with her was related to
9         the order monitoring program.
10        Q.    (BY MR. INNES)  And can you
11   describe that interaction in some detail?
12             MS. TABACCHI:  Object to the
13        form.
14        Q.    (BY MR. INNES)  How did you
15   interact with her?
16             MS. TABACCHI:  Object to the
17        form.
18             THE WITNESS:  She was -- she
19        was the logistics compliance support
20        for the SOM program.
21        Q.    (BY MR. INNES)  She's in
22   logistics compliance, and her role in
23   logistics compliance as it related to you
24   was -- well, I'm sorry, your interaction was
25   limited to the SOM program with Kristy; is
```

Highly Confidential - Subject to Further Confidentiality Review

1    that right?

2          A.     Yes.   That's what I worked with

3    her on.

4          Q.     And do you have any idea who

5    she's referring to as her technical support

6    partner?

7          A.     I believe she may be

8    referencing Roxy.

9          Q.     Okay.  And Roxy's in your

10   department; is that right?

11         A.     Not at this time.

12         Q.     Not at this time.  Where is

13   Roxy at this time?

14         A.     She is on a health and wellness

15   compliance team that did analytics.

16         Q.     Okay.  Who else was on that

17   team during that time period?

18              MS. TABACCHI:  Object to the

19         form.

20              THE WITNESS:  I don't remember

21         who else was on the team.

22         Q.     (BY MR. INNES)  Did those folks

23   report to you?

24         A.     No.

25         Q.     No?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     They did not.

2          Q.     Do you know what sort of

3    analytics that team was engaged in?

4                 MS. TABACCHI:  Object to the

5          form.

6                 THE WITNESS:  They would have

7          supported the health and wellness

8          compliance organization, so I don't

9          know what all they would have done.

10         Q.     (BY MR. INNES)  Do you have any

11   idea what they would have done, if anything,

12   regarding Schedule IIs or Schedule IIIs?

13                MS. TABACCHI:  Object to the

14         form.  Lack of foundation.

15                THE WITNESS:  I'm not aware of

16         anything they did related to IIs or

17         IIIs other than I know she supported

18         the threshold calculations.

19         Q.     (BY MR. INNES)  And again, the

20   threshold calculations during this time

21   period were those that were developed by

22   Mu Sigma, three times the standard deviation?

23                MS. TABACCHI:  Object to the

24         form.

25                THE WITNESS:  Yes.  Yes.  The

1    formula was developed by Mu Sigma.

2            MR. INNES:  Why don't we take a

3        5-, 10-minute break and let me sort of

4        organize the last portion, see if we

5        can continue.

6            MS. TABACCHI:  I'm all for

7        that.  Sounds good.

8            VIDEOGRAPHER:  Going off the

9        record at 3:56 p.m.

10            (Recess taken, 3:57 p.m. to

11        4:11 p.m.)

12            VIDEOGRAPHER:  We are back on

13        the record at 4:11 p.m.

14        Q.    (BY MR. INNES)  Okay,

15    Ms. Johnson.  I want to -- let's shift gears

16    slightly --

17        A.    Okay.

18        Q.    -- and move forward in time.

19            At some point Walmart made the

20    decision to switch to -- from the Reddwerks

21    enhanced SOM model to the Buzzeo model; is

22    that correct?

23        A.    Yes.

24        Q.    And what was -- what was the

25    decision -- why was the decision made to make

Highly Confidential - Subject to Further Confidentiality Review

1    that change?

2              MS. TABACCHI:  Object to the

3         form.

4              THE WITNESS:  As I mentioned,

5         we were -- our group was wanting

6         continuous improvement, and so we felt

7         that Buzzeo could help continue to

8         improve our program.

9         Q.    (BY MR. INNES)  And what

10   improvements did Buzzeo offer?

11        A.    So it was earlier in our order

12   process, so we could review orders sooner.

13   It was -- I mentioned it had this built-in

14   statistical model, so there was not a need to

15   manage and update a threshold file.

16              It also just made it easier for

17   the individuals doing an evaluation to see

18   information about the stores' orders, because

19   it was all right there in front of them.

20        Q.    So let's unpack that a little

21   bit.  And I'll start at the top.

22              You could review orders sooner.

23        A.    Mm-hmm.  (Witness nods.)

24        Q.    How -- what do you mean by

25   that?

1         A.     So -- I'm going to have to

2    explain a little bit about how orders flow.

3         Q.     Sure.

4         A.     When a -- an order is placed,

5    it is -- orders from one day are kind of

6    pulled together and then submitted to the DC.

7                The Buzzeo tool in -- when we

8    were using Reddwerks, Reddwerks was at DC

9    level, and so those orders didn't get to the

10   Reddwerks tool to flag or preview until the

11   orders were sent to the DC.  The Buzzeo tool

12   was basically slotted in earlier in the

13   process, so any of the orders that got to the

14   DC had already gone through the Buzzeo tool.

15   So it just happened earlier in the process,

16   from an order-routing standpoint.

17        Q.     Okay.  So order goes through

18   the Buzzeo.  Is it an algorithm?

19                MS. TABACCHI:  Object to the

20         form.

21                THE WITNESS:  Yes.  There was

22         an algorithm inside Buzzeo that

23         reviewed the orders.

24                MR. INNES:  Okay.

25        Q.     (BY MR. INNES)  So an order

Highly Confidential - Subject to Further Confidentiality Review

1    goes to Buzzeo.  And then are orders -- it

2    only flags orders of interest; is that it?

3         A.    Yes.

4         Q.    And the orders that are not

5    deemed to be orders of interest, what happens

6    to them?

7         A.    They went ahead and went to the

8    distribution center for fulfillment.

9         Q.    And was there a secondary

10   review of those at all, after Buzzeo?

11               MS. TABACCHI:  Object to the

12          form.

13               THE WITNESS:  There wasn't

14          another order monitoring process.

15        Q.    (BY MR. INNES)  Were there any

16   periodic reviews to make sure that -- to make

17   sure that the Buzzeo algorithm was flagging

18   the proper orders?

19        A.    We did a lot of reviews of what

20   was -- we could see in there in the system

21   what was system cleared, which meant it went

22   through the algorithm without stopping, and

23   because the tool was new, we monitored that

24   fairly closely.

25        Q.    (BY MR. INNES)  And what do you

1    mean by "monitored very closely"?

2         A.    We would look at the orders

3    that were system cleared to make sure that

4    there wasn't anything we saw in there that we

5    thought was -- should not have been system

6    cleared.

7         Q.    And who is "We"?

8         A.    The individuals on the team

9    that were evaluating the orders.

10        Q.    And who were those individuals?

11        A.    I can't list them all, but it

12   was myself, Roxy Reed.  We had a number of

13   analysts and then some pharmacists that were

14   also helping with the evaluation process.

15        Q.    And how many folks total were

16   working on that team, do you think?

17        A.    I believe we had 20 -- 20-ish

18   individuals total.  Some of them were working

19   on order monitoring.  Some of them were

20   working on other things.  Some of them were

21   kind of working on both.  But in total, we

22   had about 20, between 20 and 25 individuals

23   on the team.

24        Q.    Did you ever look at how many

25   people hours were devoted to suspicious order

```
 1    monitoring on your team?

 2              MS. TABACCHI:  Object to the

 3         form.

 4              THE WITNESS:  I'm sure I did,

 5         because we were trying to determine

 6         how many people we needed to properly

 7         staff the team.

 8    Q.    (BY MR. INNES)  Do you have any

 9    communications or documents related to that

10    analysis?

11              MR. INNES:  I think the phone

12         was accidentally left on mute.  We've

13         been going for about -- what would you

14         say, four minutes now?

15              So we'll continue.

16    Q.    (BY MR. INNES)  I think we

17    still have a question open.

18    A.    Okay, sorry.  Can you repeat

19    that?

20    Q.    Do you have any communications

21    or documents related to that analysis?

22              MS. TABACCHI:  Object to the

23         form.

24              THE WITNESS:  I don't know.  I

25         may.
```

1       Q.      (BY MR. INNES)   Would anyone

2    else?

3       A.      Possibly.

4       Q.      Who would those people be?

5               MS. TABACCHI:  Object to the

6       form.

7               THE WITNESS:  I could have had

8       Roxy help with some numbers of, you

9       know, how long things were taking, did

10      we have the right number of people,

11      that kind of thing.

12      Q.      (BY MR. INNES)  Was there any

13   point in time when you didn't think you had

14   the right number of people?

15              MS. TABACCHI:  Object to the

16      form.

17              THE WITNESS:  No.  I mean, by

18      the time we rolled over the

19      enhancements, we had -- we were fully

20      staffed and had the support we needed.

21      Q.      (BY MR. INNES)  The Reddwerks

22   enhancements?

23      A.      The Buzzeo enhancements.

24      Q.      So over the course of your

25   tenure as the director of controlled

```
 1      substances, how -- what was the low watermark

 2      for people on your staff and the high

 3      watermark for folks on your staff?

 4                  MS. TABACCHI:  Object to the

 5            form.

 6                  THE WITNESS:  So directly

 7            reporting up to me.

 8            Q.    (BY MR. INNES)  Well, those

 9      that were directly reporting up to you who

10      were involved in the SOMs.

11                  MS. TABACCHI:  Object to the

12            form.

13                  THE WITNESS:  So initially in

14            my role it was myself, then Roxy

15            joined.

16                  And then we talked about where

17            we were towards the end.

18                  (Walmart Johnson Deposition

19            Exhibit 9 was marked for

20            identification.)

21                  [Document review.]

22                  MR. INNES:  You absolutely take

23            your time reviewing it.  I'm not going

24            to have any detailed questions about

25            it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Okay.
 2          Q.    (BY MR. INNES)   I just want to
 3    know if it's something that you recognize.
 4          A.    Yes, I do recognize it.
 5          Q.    And can you tell me what this
 6    is?
 7          A.    This is the document that
 8    QuintilesIMS/Buzzeo provided to us that
 9    explained the statistical model that was
10    developed for our use within Buzzeo.
11                    (Discussion off the record.)
12          Q.    (BY MR. INNES)  And is -- to
13    your understanding, is this the actual
14    algorithm that was used?
15                    MS. TABACCHI:  Object to the
16          form.
17                    THE WITNESS:  Yes.  It's my
18          understanding.
19          Q.    (BY MR. INNES)  Are you
20    familiar with the term "stress bars" as it
21    relates to Buzzeo?
22          A.    Yes.  I am.
23          Q.    Can you tell me what stress
24    bars are?
25          A.    They're -- basically when an
```

1    order was pended, you could look at the order

2    and the bars would show -- help you

3    understand why the order was pended.

4         Q.    And how would --

5         A.    This is the easiest way to

6    explain it, sorry.

7         Q.    And how would they help you

8    understand why it was pended?

9         A.    You could see -- I can't

10   remember all of their criteria, but you could

11   see that if it was an order that, for

12   example, was larger than the last 30 days,

13   the stress bar would show green, yellow, red,

14   how much larger it was.

15        Q.    Were you involved in any way in

16   the development of the algorithm that Buzzeo

17   ultimately offered?

18             MS. TABACCHI:  Object to the

19        form.

20             THE WITNESS:  We provided them

21        order data that they used to develop

22        the algorithm.

23        Q.    (BY MR. INNES)  Okay.  And what

24   sort of order data did you provide them?

25             MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

 1          form.

 2                    THE WITNESS:  Data on what our

 3          pharmacies had ordered historically.

 4          Q.    (BY MR. INNES)  Do you know

 5     the range of that historical data?  Date

 6     range of that historical data?

 7                    MS. TABACCHI:  Object to the

 8          form.

 9                    THE WITNESS:  I think it may

10          have been two years.  I'm not

11          positive.

12          Q.    (BY MR. INNES)  Is that all

13     that Buzzeo required was two years' worth of

14     what your pharmacies had ordered?

15          A.    I believe we provided what they

16     requested, so ...

17          Q.    Do you know what else they

18     requested, if anything?

19          A.    I don't remember anything other

20     than order data.

21          Q.    Who was involved in selecting

22     Buzzeo?

23          A.    There were many people

24     involved.

25                    We went through an RFP process.

Highly Confidential - Subject to Further Confidentiality Review

1    There were individuals from compliance,

2    individuals from logistics involved in making

3    the final decision.

4         Q.    Were you one of the people

5    involved in making the final decision?

6         A.    Making the recommendation, yes.

7         Q.    Making the recommendation.

8               And why did you ultimately --

9    well, did you recommend Buzzeo?

10        A.    Yes, I did.

11        Q.    And why did you recommend

12   Buzzeo?

13        A.    Of the vendors that we were

14   provided with through the RFP, they had the

15   most experience with order monitoring and the

16   one most able to support a business the size

17   of Walmart.

18        Q.    Who are the other vendors that

19   you considered?

20        A.    I can't remember their names.

21        Q.    How many others?

22        A.    I believe there were two or

23   three that -- that got to the point that I

24   was reviewing them.

25        Q.    Did you -- during that RFP

Highly Confidential - Subject to Further Confidentiality Review

1    process -- is that a request for proposal?

2         A.    Yes.

3         Q.    During that RFP process, did

4    you engage a third party to help with that

5    search?

6         A.    There's a group within our

7    information systems division that manages the

8    RFP process for systems projects.  I don't

9    know if they engaged a third party or not.

10        Q.    Do you know if they engaged

11   Deloitte?  A company named Deloitte?

12        A.    I don't know if they engaged

13   Deloitte.

14              (Walmart Johnson Deposition

15        Exhibit 10 was marked for

16        identification.)

17              [Document review.]

18              THE WITNESS:  Okay.

19        Q.    (BY MR. INNES)  So this is an

20   email string from sharty@us.imshealth.com to

21   Roxy Reed, Eric Welch and Miranda Johnson.

22   Copied on there is gglotz@us.imshealth.com.

23              In the middle of the page is --

24   it's the second-to-the-last email in the

25   chain dated May 26, 2016.  It's from

1    Roxy Reed to some other folks, Scott Hardy.

2    Do you know who Scott Hardy is?

3         A.    Yes.  He was our -- basically

4    our project manager on -- for Buzzeo.

5         Q.    And he's a Walmart employee?

6         A.    No.  He's on Buzzeo's side.

7         Q.    Did you have direct

8    interactions with Mr. Hardy regarding Buzzeo?

9         A.    Yes.

10        Q.    Okay.  And what do those

11   interactions consist of?

12             MS. TABACCHI:  Object to the

13        form.

14             THE WITNESS:  As I mentioned,

15        he's our project manager, so we had

16        regular interactions on the

17        implementation of Buzzeo.

18        Q.    (BY MR. INNES)  Did you discuss

19   your goals with -- goals for Buzzeo with

20   Mr. Hardy?

21             MS. TABACCHI:  Object to the

22        form.

23             THE WITNESS:  I don't know.

24        Q.    (BY MR. INNES)  What were your

25   goals with Buzzeo?

1           MS. TABACCHI:  Object to the

2      form.

3           THE WITNESS:  As I mentioned,

4      it was part of our continuous

5      improvement to roll out a system that

6      we thought could provide enhancements.

7      Q.   (BY MR. INNES)  So you wanted

8  to roll out a better system than what you had

9  in place?

10          MS. TABACCHI:  Object to the

11      form.

12          THE WITNESS:  Yes.  In some

13      aspects it was better.  I think we

14      talked about some of the enhancements

15      that it provided.

16     Q.   (BY MR. INNES)  Before Buzzeo,

17  was it your understanding that the

18  Reddwerks -- enhanced Reddwerks was --

19  functioned properly as an SOM?

20          MS. TABACCHI:  Object to the

21      form.

22          THE WITNESS:  Yes, I believe it

23      functioned properly.

24     Q.   (BY MR. INNES)  Did you ever do

25  an analysis comparing Buzzeo's performance to

1    Reddwerks' enhanced performance?

2              MS. TABACCHI:  Object to the

3         form.

4              THE WITNESS:  I don't remember

5         doing one.

6         Q.    (BY MR. INNES)  Did Buzzeo flag

7    more orders as orders of interest than

8    Reddwerks enhanced did?

9              MS. TABACCHI:  Object to the

10        form.

11             THE WITNESS:  I don't remember

12        exactly, but I believe that it did.

13        Q.    (BY MR. INNES)  Who would know

14   that information?

15        A.    I don't know of anybody who

16   would just know that.

17        Q.    Did you retain historical data

18   regarding orders of interest that were

19   flagged by Buzzeo -- or I'm sorry, by

20   Reddwerks enhanced?

21             MS. TABACCHI:  Object to the

22        form.

23             THE WITNESS:  Yes, we

24        documented the orders of interest in

25        Archer, as I mentioned before.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. INNES)  And do you

2  maintain records of orders of interest

3  flagged by Buzzeo?

4    A.    Yes, we have documentation of

5  those in Archer as well.

6    Q.    So it would be possible to

7  compare orders flagged by Reddwerks enhanced

8  with orders flagged by Buzzeo?

9         MS. TABACCHI:  Object to the

10        form.

11        THE WITNESS:  I believe so.

12    Q.    (BY MR. INNES)  But you've

13  never done that?

14    A.    Not that I recall.

15    Q.    Have you ever run orders --

16  historical orders that were placed prior to

17  Buzzeo being implemented through the Buzzeo

18  algorithm?

19        MS. TABACCHI:  Object to the

20        form.

21        THE WITNESS:  We may have.  I

22        don't know.  We may have done some

23        during testing, small data sets.  I

24        can't remember if we did -- we used

25        real orders or dummy data.

1        Q.     (BY MR. INNES)  Who would know

2    the answer to that question?

3        A.     It would probably be the people

4    on the IT side that were working on the

5    project.

6        Q.     Who were those people?

7        A.     Roxy may know.  So it's the

8    people referenced here.

9        Q.     Which people referenced here?

10       A.     The Scott Hardy, Eric Welch.

11   Like I say, Roxy may know.

12       Q.     Okay.  I'm sorry, is Eric Welch

13   a Walmart employee?

14       A.     Yes.

15       Q.     And what's his role?

16       A.     He was on the IT side,

17   supporting the implementation.

18       Q.     Was Buzzeo -- to your

19   knowledge, was Buzzeo available as a platform

20   when you rolled out Reddwerks enhanced?

21           MS. TABACCHI:  Object to the

22       form.

23           THE WITNESS:  Yes, to my

24       knowledge it was.

25       Q.     (BY MR. INNES)  Was there a

Highly Confidential - Subject to Further Confidentiality Review

1  reason why you didn't procure Buzzeo at that

2  time?

3           MS. TABACCHI:  Object to the

4           form.

5           THE WITNESS:  I don't know.  At

6           the time we were already moving

7           forward with the process for the

8           Reddwerks enhanced, and as I

9           mentioned -- and you can see in that

10          PowerPoint we were evaluating the

11          potential for using Buzzeo at some

12          point in the future.

13      Q.    (BY MR. INNES)  And were there

14  any efforts to speed up that evaluation?

15          MS. TABACCHI:  Object to the

16          form.

17          THE WITNESS:  In what

18          timeframe?

19      Q.    (BY MR. INNES)  Well, if

20  Walmart is continually -- working to

21  continually improve, and you're -- and

22  Walmart's aware of Buzzeo back in 2015, why

23  isn't Walmart driving hard to get Buzzeo at

24  that point?

25          MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  Like I said, at

3          that point we were moving forward with

4          the Reddwerks enhanced upgrades and

5          still evaluating Buzzeo or tools of

6          Buzzeo to see if it was something that

7          we wanted to move forward with.

8          Q.     (BY MR. INNES)  And at that

9     point resources have already been devoted to

10    Reddwerks enhancements?

11         A.     We were already moving forward

12    with that project.

13         Q.     Okay.  How long after Buzzeo

14    was implemented did Walmart exit -- or did

15    you become aware of Walmart's 's intention to

16    exit the C-II/C-III distribution business?

17                    MS. TABACCHI:  Object to the

18         form.

19                    THE WITNESS:  I believe it was

20         a couple of months.

21         Q.     (BY MR. INNES)  Do you know why

22    Walmart decided to cease distribution?

23         A.     I was not part of that

24    decision, so I don't.

25         Q.     Were folks in your department

1    laid off as a result of that transition?

2              MS. TABACCHI:  Object to the

3         form.

4              THE WITNESS:  There were

5         individuals that no longer had a role.

6         Most of them found other roles within

7         the company.

8         Q.    (BY MR. INNES)  So the data

9    that you provided to Buzzeo to support the

10   algorithm, did you provide shipped quantity?

11   Or ordered quantity?  Or both?  And I can

12   break that down if you want.

13        A.    Okay.

14             MS. TABACCHI:  Object to the

15        form.  Lack of foundation.

16             THE WITNESS:  So I do remember

17        that there were some challenges with

18        us getting -- finding the order

19        quantity because it wasn't something

20        that was maintained in the same way

21        shipped quantity was.

22             I know we went back and forth

23        trying to find it somewhere in a

24        database.  I can't remember if

25        ultimately we were able to find it.

Highly Confidential - Subject to Further Confidentiality Review

1             I know at a minimum we did

2        provide the shipped quantity.  I just

3        don't know if we were able to find a

4        way to get the ordered quantity.

5        Q.     (BY MR. INNES)  So you did

6   ultimately provide data to Buzzeo to support

7   their development of the algorithm?

8        A.     Yes, we did.

9        Q.     That -- did you provide shipped

10  quantity data?

11             MS. TABACCHI:  Object to the

12        form.  Asked and answered.

13             THE WITNESS:  Yeah, I think I

14        just mentioned, we did -- I know we

15        provided them quantity shipped.  We

16        also may have found the quantity

17        ordered.  I just don't remember.

18       Q.     (BY MR. INNES)  So you provided

19  shipped quantity.  For what period of time --

20  what duration of time shipped quantity were

21  you able to provide?

22       A.     I believe it was the 24 months

23  that they requested.

24       Q.     Okay.  Who would know

25  definitively how much -- what specific data

1    was provided to Buzzeo?

2         A.     Roxy probably would know.

3         Q.     Would Roxy also know whether or

4    not ordered quantity was provided to Buzzeo?

5         A.     She may remember, yes.  Because

6    she's the one working to pull the data

7    together to provide them.

8         Q.     Was there a reason why Walmart

9    didn't obtain ordered quantity in a readily

10   retrievable way?

11              MS. TABACCHI:  Object to the

12         form.  Lack of foundation.

13              THE WITNESS:  Yeah, I don't

14         know.

15        Q.     (BY MR. INNES)  Is historical

16   ordered quantity something you would be

17   interested in knowing when doing a threshold

18   evaluation?

19              MS. TABACCHI:  Object to the

20         form.

21              THE WITNESS:  We were able to

22         see it for a period of time, I

23         believe, and we also have shipped

24         quantity, so ...

25        Q.     (BY MR. INNES)  Well, for what

Highly Confidential - Subject to Further Confidentiality Review

1  period of time were you able to see ordered

2  quantity?

3      A.    I believe this references we

4  can see at least eight weeks.

5      Q.    Eight weeks from the date of

6  this email?

7          MS. TABACCHI:  Object to the

8      form.  Lack of foundation.

9          THE WITNESS:  My understanding

10     is it would be eight weeks from the

11     date of the time they were pulling the

12     information.

13     Q.    (BY MR. INNES)  So at this

14  point in time, Walmart maintained ordered

15  quantities for eight weeks?

16         MS. TABACCHI:  Same objections.

17         THE WITNESS:  I don't know

18     that.  I just mentioned that I

19     can't -- I don't know if we were ever

20     able to find it.  So we may have had

21     it maintained somewhere else.

22     Q.    (BY MR. INNES)  If you were to

23  do an order of interest evaluation, and

24  wanted to look at ordered quantity for a

25  specific pharmacy, how far back could you go?

1           MS. TABACCHI:  Object to the

2      form.

3           THE WITNESS:  As mentioned in

4      this email, it appears eight weeks.

5      Q.   (BY MR. INNES)  Was ordered

6  quantity something you considered in your

7  order of interest evaluation?

8           MS. TABACCHI:  Object to the

9      form.

10           THE WITNESS:  Not that I

11      recall.  We typically would not ship

12      something different than what was

13      ordered.  We're not going to ship more

14      product than what was ordered.

15      Q.   (BY MR. INNES)  But you might

16  ship less than what was ordered?

17      A.    Yes, if we were low stock or

18  something like that.

19      Q.   Or if it was an Oxy 30 above

20  20, you would cut to 20?

21           MS. TABACCHI:  Object --

22           THE WITNESS:  Not at this time.

23      Q.   (BY MR. INNES)  Not at this

24  time?

25           But you wouldn't have that

1    data --

2                    MS. TABACCHI:  Object to the

3           form.

4           Q.    (BY MR. INNES)  -- if you

5    wanted it right now; isn't that right?

6                    MS. TABACCHI:  Object to the

7           form.

8                    THE WITNESS:  I'm not sure what

9           you're asking.

10          Q.    (BY MR. INNES)  Can you tell

11   me, sitting here today, if you could -- you

12   could go back to the home office and ask for

13   a data pull of ordered -- of Oxy -- of

14   Oxy 30s that were ordered in, say, 2016?

15          A.    I don't know.

16          Q.    You don't know if you could do

17   that?

18          A.    I don't know if I could do

19   that.

20          Q.    Who would know if you could do

21   that?

22                    MS. TABACCHI:  Object to the

23          form.

24                    THE WITNESS:  I don't know.  As

25          I mentioned, Roxy may know.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     (BY MR. INNES)  Anyone other

2    than Roxy?

3      A.     Not that I know of.

4           I'm sure there are other people

5    in the company that would know, but I don't

6    know who it would be.

7      Q.     Can you describe in the process

8    flow, when Buzzeo -- the order -- the order

9    of interest process flow once Buzzeo was

10   installed?

11          MS. TABACCHI:  Object to the

12        form.

13          THE WITNESS:  What do you mean

14        by "order of interest process flow"?

15     Q.     (BY MR. INNES)  Okay.  Let me

16   just walk through it.

17          So order comes in, goes through

18   the Buzzeo algorithm.  It's either not

19   flagged, which means it starts the picking

20   process; is that right?

21     A.     Yes, it would be sent to the

22   DC.

23     Q.     Okay.

24          If it is flagged, then that

25   would be considered an order of interest; is

```
 1   that right?

 2       A.     Correct.

 3       Q.     Okay.  Who looks at the order

 4   of interest and what happens to that order of

 5   interest next?

 6       A.     We had analysts that would

 7   review the order of interest and start the

 8   evaluation process.

 9              So they would contact the

10   pharmacy, look at data, and pull together

11   notes on the order of interest.

12       Q.     And where are those notes

13   documented?

14       A.     Archer.

15              Then those would be sent to

16   either a senior manager or director on my

17   team to make a final determination on whether

18   or not the order was appropriate.

19       Q.     So is there ever a joint

20   meeting between logistics and -- that has

21   logistics and compliance or members --

22   designees of logistics and compliance to

23   deliberate over a specific order?

24              MS. TABACCHI:  Object to the

25       form.
```

1           THE WITNESS:  Yes.  Before we
2      would finalize a decision on a
3      suspicious order, we were still
4      meeting with the head of logistics.
5           Q.   (BY MR. INNES)  If your team
6  identified an order as a suspicious order,
7  you would then have a meeting with someone
8  from logistics to review that decision?
9           MS. TABACCHI:  Object to the
10      form.
11           THE WITNESS:  It would be a
12      potential decision at that time.
13           Q.   (BY MR. INNES)  Fair enough.
14           Review that recommendation?
15           MS. TABACCHI:  Object to the
16      form.
17           THE WITNESS:  Yes.
18           Q.   (BY MR. INNES)  And how often
19  were orders that you determined -- that your
20  team determined to be recommended as
21  suspicious orders ultimately, after that
22  meeting, the joint meeting, determined to
23  just be orders of interest?
24           MS. TABACCHI:  Object to the
25      form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 THE WITNESS:  I don't remember.
 2          Q.     (BY MR. INNES)  Would there be
 3   any way --
 4                 Well, strike that.
 5                 Did you document those joint
 6   meetings between logistics and compliance
 7   regarding potential suspicious orders?
 8          A.     I would have notes on our
 9   decisions in Archer.
10          Q.     Notes on decisions in Archer.
11   In Archer, are those notes entered by someone
12   specifically?
13                 MS. TABACCHI:  Object to the
14          form.
15                 THE WITNESS:  They could have
16          been entered by myself.  Roxy also was
17          involved in that process, so she may
18          have entered some notes.
19          Q.     (BY MR. INNES)  Was it only
20   folks from the compliance team that could
21   enter notes in Archer after that joint
22   meeting?
23                 MS. TABACCHI:  Object to the
24          form.
25                 THE WITNESS:  Yes.  In -- after
```

1        Buzzeo was live, yes.

2              Q.     (BY MR. INNES)  Before Buzzeo

3    was live, was there a difference?

4                    MS. TABACCHI:  Object to the

5              form.

6                    THE WITNESS:  Logistics

7              compliance had the ability to add

8              notes in Archer.  I believe the

9              fields -- there were certain fields

10             for practice compliance, and I don't

11             think that they had access to document

12             in those.

13             Q.     (BY MR. INNES)  Okay.  Can you

14   bring me into the room on a logistics meeting

15   and the joint meeting logistics and

16   compliance?  Is that happening over the

17   phone?

18                   MS. TABACCHI:  Object to the

19             form.

20                   THE WITNESS:  It would depend.

21             Sometimes it's over the phone.

22             Sometimes it was in person.

23                   MR. INNES:  Okay.

24             Q.     (BY MR. INNES)   Ever by a

25   video link?

1      A.      Yeah, it could have been.

2      Q.      Were any of those phone

3  conversations or video links recorded?

4      A.      No.

5      Q.      Were there any -- when you're

6  meeting in person, were you meeting in a

7  conference room like this?

8      A.      It was oftentime in an office.

9      Q.      Okay.  And while you're in the

10 office, is someone logged in to Archer

11 entering notes?

12     A.      Yes.  It was typically

13 reviewing the Archer information, discussing

14 what was found through the evaluation process

15 and then making a decision.

16     Q.      So you're all huddled around

17 the computer screen and someone is typing the

18 notes into Archer?

19     A.      Yeah.  We may not be huddled

20 but someone is reviewing what's in Archer,

21 discussing it.

22     Q.      It's getting late in the day.

23 I'm getting a little funny.

24     A.      Yes.

25     Q.      So would they typically be in

 1    your office?

 2                     MS. TABACCHI:  Object to the

 3            form.

 4                     THE WITNESS:  No.  Typically in

 5            the logistics leader's office.  I

 6            didn't have an office.

 7            Q.    (BY MR. INNES)  Did you each

 8    have a cubicle?

 9            A.    Yes.

10            Q.    So typically in the logistic

11    leader's office?

12            A.    (Witness nods.)

13            Q.    Is that Chad Ducote?

14                     MS. TABACCHI:  Object to the

15            form.

16                     THE WITNESS:  Chad Ducote and

17            then after he left the position,

18            Debbie Hodges.

19            Q.    (BY MR. INNES)  Because it's in

20    Chad Ducote's office or Debbie Hodges'

21    office, I assume that logistics leader would

22    be the one typing into Archer?

23                     MS. TABACCHI:  Object to the

24            form.

25                     THE WITNESS:  No, it would have

1    been myself or Roxy, if she was

2    sitting in.

3         Q.    (BY MR. INNES)  Okay.  So

4    you -- you went to Chad or Debbie's office,

5    sat in Chad or Debbie's chair, and typed in

6    the notes into Archer?

7              MS. TABACCHI:  Object to the

8         form.

9              THE WITNESS:  I have a

10        laptop --

11        Q.    (BY MR. INNES)  Okay.

12        A.    -- that I would bring with

13   me --

14        Q.    All right.

15        A.    -- and sit on the table.

16        Q.    All right.

17        A.    -- and have Archer up on my

18   laptop.

19        Q.    And you were the only one who

20   is allowed to type notes into Archer?

21             MS. TABACCHI:  Object to the

22        form.  Misstates the testimony.

23        Q.    (BY MR. INNES)  You and Roxy

24   were the only ones who were -- that typed

25   notes into Archer during this conference?

1        A.      Yes, I believe that we were the

2   only two that ever participated in those.

3        Q.      If, let's say, Roxy was typing

4   on her laptop, would you be taking notes

5   during that conference?

6        A.      Not usually.

7        Q.      Why not?

8        A.      Because Roxy was taking notes

9   for us.

10        Q.      All right.  Did you want to

11   make sure at any point in time that Roxy got

12   it right and have a record to go back and

13   check what Roxy put into the system?

14              MS. TABACCHI:  Object to the

15         form.

16              THE WITNESS:  I would remember

17         those conversations and could review

18         her notes.

19        Q.      (BY MR. INNES)  How many of

20   those conversations would you have in a given

21   week?

22              MS. TABACCHI:  Object to the

23         form.

24              THE WITNESS:  It depended on

25         the week.

1        Q.      (BY MR. INNES)  What's the most

2     you ever had in a given week?

3        A.      I don't remember.

4        Q.      100?

5              MS. TABACCHI:  Object to the

6        form.

7              THE WITNESS:  Oh, no.

8        Meetings?  100 meetings?

9        Q.      (BY MR. INNES)  Strike that.

10             How many orders of interest

11    would you -- how many recommended suspicious

12    orders would you review in those meetings at

13    one time?

14             MS. TABACCHI:  Object to the

15        form.

16             THE WITNESS:  So we would

17        review in those meetings orders of

18        interest that came to -- and I'm

19        talking about pre-Buzzeo -- the ones

20        that came to compliance for

21        evaluation.  So when we would review,

22        they wouldn't all be ones that we were

23        recommending as suspicious.

24        Q.      (BY MR. INNES)  Right.  I want

25    to get in sort of the same meeting.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    So after you've reviewed the

 2       compliance -- after you've had a chance --

 3       the compliance team has had a chance to

 4       review an order of interest that you are now

 5       choosing to recommend as suspicious order,

 6       right, there's a meeting between the

 7       compliance team and the logistics team; is

 8       that right?  Do I have that right?

 9                    MS. TABACCHI:  Object to the

10            form.

11                    THE WITNESS:  Can you restate

12            that?

13                    MR. INNES:  Sure.

14            Q.    (BY MR. INNES)  After the

15       compliance team has reviewed an order of

16       interest and determined that the

17       recommendation would be this is a suspicious

18       order, is there a meeting between compliance

19       and logistics regarding that specific order?

20                    MS. TABACCHI:  Object to the

21            form.

22                    THE WITNESS:  Yes, but we would

23            also review orders that we were not

24            recommending as suspicious.  Because

25            the -- it was not just our decision.
```

1      The decision was made between the lead

2      of logistics and myself.

3          Q.      (BY MR. INNES)  Okay.

4          A.      So they had the opportunity to

5      disagree with our recommendation if something

6      was appropriate or suspicious.

7          Q.      So if -- to make it to your

8      desk, to make it to your office, the order

9      had to have gone through logistics and be

10     flagged as -- continue to be flagged as an

11     order of interest.  They -- is that right?

12             MS. TABACCHI:  Object to the

13             form.

14         Q.      (BY MR. INNES)  Or could

15     they --

16         A.      Or could they what?  Sorry.

17             MS. TABACCHI:  Sorry, I don't

18             mean to interrupt your flow, but feel

19             free to rephrase that.

20         Q.      (BY MR. INNES)  We're talking

21     about the Reddwerks enhancements.

22         A.      Yes.

23         Q.      Order goes through Reddwerks

24     enhancement.  It's flagged as an order of

25     interest.  It's not cleared by the logistics

```
 1    team.  Right?

 2         A.    Correct.

 3         Q.    And now it's still an order of

 4    interest, and it's with your team.

 5         A.    Yes.

 6         Q.    And you determine that, yeah,

 7    that's still an order of interest.  What

 8    happens next?

 9         A.    We do additional evaluation on

10    the order.

11         Q.    Who is "we"?

12         A.    Roxy and I.

13         Q.    Just the compliance folks?

14         A.    Just the compliance folks.

15         Q.    Here's where I think we're

16    talking past each other.  After you've done

17    that review, the review the compliance team

18    would review on an order of interest, what

19    are the -- what outcomes can flow from that

20    meeting?

21         A.    So we would do an additional

22    review, so gather additional information on

23    the orders of interest.

24         Q.    Okay.

25         A.    That information would be taken
```

Highly Confidential - Subject to Further Confidentiality Review

1   to a meeting between myself and the leader of

2   logistics.

3           Q.      Okay.

4           A.      Sometimes Roxy would attend to

5   help take notes or provide information if we

6   had questions about the additional details of

7   an order.  We would discuss those orders and

8   all the information that had been gathered,

9   and decide together is this order appropriate

10  or is this suspicious?

11          Q.      Okay.  And then what would

12  happen?

13          A.      If --

14          Q.      Let's say you decide it was an

15  appropriate order.  What happens?

16          A.      If it was an appropriate order,

17  then we would what we call clear the order,

18  which would allow it to move forward and be

19  filled and shipped.

20          Q.      Okay.

21          A.      If it was suspicious, then we

22  would cancel the order and report it.

23          Q.      Report it to whom?

24          A.      The DEA and state board of

25  pharmacy if applicable in that state.

1    Q.    In the interest of brevity,

2    this was the Reddwerks enhanced system.

3    A.    Yes.

4    Q.    "Yes" or "no," it was a

5    different system after Buzzeo was

6    implemented?

7    A.    It was slightly different.

8    Q.    Okay.  Let's talk about those

9    slight differences.

10   A.    Okay.

11   Q.    We can just go through the

12   whole thing again.

13         So Buzzeo flags it:

14   A.    Flags an order of interest.

15   Q.    Okay.  What happens next?

16   A.    All of those orders of interest

17   are reported to the DEA and the state board

18   as applicable.

19         We conducted an evaluation of

20   the orders.  So we looked at the data,

21   contacted the pharmacies, gathered

22   information about the order, the analyst

23   would.

24         Then we had a group of senior

25   managers -- and I was involved in this as

Highly Confidential - Subject to Further Confidentiality Review

1    well -- who would review the information

2    pulled together by the analyst and make a

3    decision on if that order was going to be

4    shipped because it was an appropriate order

5    or cancelled.

6         Q.    Okay.  I want to clarify one

7    thing because maybe I misheard it.

8              I think you said -- "Buzzeo

9    flags it."

10             You said -- yes, "Flags an

11   order of interest."

12             "Okay.  What happens next?"

13             "All of those orders of

14   interest are reported to the DEA and the

15   state board as applicable."

16        A.    Mm-hmm.  (Witness nods.)

17        Q.    Is that accurate?

18        A.    Yes.

19        Q.    So when did Walmart start

20   reporting orders of interest to the DEA?

21        A.    We started reporting our orders

22   of interest in -- when we rolled out the

23   Buzzeo system, in -- I believe that was

24   November of 2017.

25        Q.    And why did you change your

Highly Confidential - Subject to Further Confidentiality Review

1    reporting operations at that point in time?

2              MS. TABACCHI:  Object to the

3         form.

4              THE WITNESS:  It was our

5         understanding that after the master's

6         decision, we needed to report orders

7         of interest.

8         Q.    (BY MR. INNES)  And when did

9    you make that -- make that change?

10             MS. TABACCHI:  Object to the

11        form.  Asked and answered.

12             THE WITNESS:  When we wrote out

13        the Buzzeo system, which I believe was

14        in November 2017.

15        Q.    (BY MR. INNES)  Are you aware

16   of any orders of interest that were reported

17   for the CT-1 jurisdictions?

18             MS. TABACCHI:  Object to the

19        form.

20             Do you want to let her know

21        what you mean by that?

22             THE WITNESS:  Can you tell me

23        what those are?

24             MR. INNES:  Let's just do Ohio.

25             THE WITNESS:  Okay.

1       Q.      (BY MR. INNES)  Are you aware

2    of any orders of interest that were reported

3    for Ohio?

4                    MS. TABACCHI:  Object to the

5           form.

6                    THE WITNESS:  Not any specific

7           ones.

8       Q.      (BY MR. INNES)  Do you recall

9    any orders of interest that were reported to

10   the DEA?

11                   MS. TABACCHI:  Object to the

12          form.

13                   THE WITNESS:  Not any specific

14          orders of interest.  We did report to

15          the DEA orders of interest.

16      Q.      (BY MR. INNES)  So yes, Walmart

17   reported orders of interest to the DEA?

18      A.      Yes.

19      Q.      Do you have records of those

20   orders of interest that were reported to the

21   DEA?

22      A.      Yes.

23      Q.      Do you know if those have been

24   produced in this case?

25      A.      I'm --

Highly Confidential - Subject to Further Confidentiality Review

1    MS. TABACCHI:  I'm not sure how

2   the witness would know that, but I can

3   represent to you that we produced

4   anything related to the CT-1

5   jurisdictions to you.

6   Q. (BY MR. INNES)  Do you know

7 whether or not the Buzzeo algorithm used an

8 active ingredient list as part of its

9 algorithm?

10   A. I don't know --

11    MS. TABACCHI:  Object to the

12   form.

13    THE WITNESS:  I don't know if

14   it was part of the algorithm

15   specifically, but it did group orders

16   by active ingredient.

17   Q. (BY MR. INNES)  Did you supply

18 that active ingredient list -- or did Walmart

19 supply their active ingredient list to

20 Buzzeo?

21    MS. TABACCHI:  Object to the

22   form.

23    THE WITNESS:  We did.  I think

24   they also reviewed it as well.

25   Q. (BY MR. INNES)  Do you know why

Highly Confidential - Subject to Further Confidentiality Review

1    the active ingredient list was used as part

2    of the Buzzeo platform?

3              MS. TABACCHI:  Object to the

4         form.

5              THE WITNESS:  The idea was that

6         the algorithm would look at all drugs

7         with the same active ingredient and

8         consider those orders together.

9              (Walmart Johnson Deposition

10        Exhibit 11 was marked for

11        identification.)

12             [Document review.]

13             THE WITNESS:  Okay.

14        Q.    (BY MR. INNES)  Okay.  So

15   Exhibit 11 is an email string between you and

16   Kristy Spruell.  It begins -- well, it begins

17   at the bottom of the page, Tuesday,

18   April 14th, 2015 from Kristy to you, Miranda,

19   and the body of that email is -- I'm sorry.

20   Second-to-the-last email states, "Sorry, I

21   meant to send you last week.  I haven't put

22   anything in there yet.  I haven't needed to

23   send any order on for further evaluation

24   since I got access to the system.  I haven't

25   had time to answer all the historic approved

1   order details yet.  I have all the

2   information.  It's still in my -- it's just

3   still in my notebook.  I plan to get all the

4   details in the system this week, and then

5   start entering the details as I go."

6             Is it your understanding that

7   the folks that were entering information into

8   Archer were transcribing it from one source

9   into Archer?  Because that's what it sounds

10  like was going on here.

11            MS. TABACCHI:  Object to the

12        form.

13            THE WITNESS:  This was, if I

14        recall correctly, when we very first

15        developed the Archer form, and I

16        believe Kristy was not as quick to

17        adopt it, and so she had some

18        historical notes before the form was

19        ready that she was -- did transcribe

20        into Archer.

21        Q.    (BY MR. INNES)  Do you know if

22  Kristy maintained those notes in any way,

23  shape or form?

24        A.    I don't know.

25        Q.    Who would I have to ask to

1    figure that out?

2                    MS. TABACCHI:  Object to the

3          form.

4                    THE WITNESS:  I don't know.

5          Q.    (BY MR. INNES)  Do you think

6    Kristy would know?

7                    MS. TABACCHI:  Object to the

8          form.

9                    THE WITNESS:  I don't know.

10         Q.    (BY MR. INNES)  And when you

11   say she wasn't -- she didn't adopt it early

12   on, was there a lag period between the time

13   when she could have started using it and when

14   she did use it?

15                   MS. TABACCHI:  Object to the

16         form.

17                   THE WITNESS:  Yes, it appears

18         so.

19         Q.    (BY MR. INNES)  So are we

20   talking about -- is Kristy also entering

21   information into Archer, sort of like

22   backdating it?  So let's say, for instance,

23   it went live on January 1st.  Was Kristy told

24   to -- January 1st, 2015.

25                   Was Kristy told to start

1    entering orders from, you know, 2013, 2014,

2    into the database?

3              MS. TABACCHI:  Object to the

4         form.

5              THE WITNESS:  I -- I don't

6         believe this was referencing anything

7         that old.  It was -- Kristy -- I don't

8         know that Kristy was even involved in

9         SOM evaluations back then.  This was

10        from the time that Kristy was

11        involved, is my understanding.

12             Q.    (BY MR. INNES)  So it was a

13   very bad hypothetical.

14             So if the date on which Archer

15   went live -- in the Archer system, would you

16   find information from the live date forward

17   or would there also be information that was

18   from someone else, prior to Archer, but

19   otherwise transcribed into Archer?

20             MS. TABACCHI:  Object to the

21        form.

22             THE WITNESS:  I believe that we

23        asked Kristy to take some of the older

24        information.  And when I say "older,"

25        I don't think it would have been more

than, you know, a few weeks or a month or so, and put it into Archer.

Q. (BY MR. INNES) And where was it housed before Archer again?

MS. TABACCHI: Object to the form.

THE WITNESS: Based on this email, she had it in a notebook.

Q. (BY MR. INNES) Okay. So the evaluation notes that would typically go into Archer or do go into Archer, some were housed only in Kristy's notes?

MS. TABACCHI: Object --

MR. INNES: Prior to being transcribed into Archer?

MS. TABACCHI: Object to the form.

THE WITNESS: It appears that she took notes in a notebook, and then we asked for her to transcribe those into Archer.

MR. INNES: Okay.

(Walmart Johnson Deposition Exhibit 12 was marked for identification.)

```
 1                    [Document review.]

 2                    MR. INNES:  I can direct you to

 3            the exact line that I'm interested in

 4            or you can read the whole email.

 5            That's entirely up to you.

 6                    THE WITNESS:  Go ahead.

 7            Q.    (BY MR. INNES)  This is an

 8      email from Miranda Johnson to -- and I've

 9      already forgotten how to pronounce it --

10      Tim Koch?

11            A.    Tim Koch.

12            Q.    Sent on April 27, 2015.

13                    So the prior email, Exhibit 11,

14      was on April 14th, 2015, so this is a fairly

15      contemporaneous email; is that right?

16            A.    Yes.  They were close together.

17            Q.    Okay.

18                    So the line I'm interested in

19      is at the bottom of 27961.  It says, "I have

20      concerns about the lack of Archer

21      documentation."

22                    What are you referring to there

23      exactly?

24            A.    I don't remember exactly.  But

25      it's likely in reference to this email where
```

1    we had asked Kristy to transcribe her notes,

2    and it was taking time to do that.

3         Q.    So I think you testified

4    earlier that if you were to do either a -- an

5    order of interest evaluation or a threshold

6    adjustment, you would look to the information

7    that was in Archer as part of that

8    investigation; is that right?

9         A.    Yes.

10        Q.    And to be able to do a full

11   investigation -- full and accurate

12   investigation, you would need full and

13   accurate information in Archer; isn't that

14   right?

15             MS. TABACCHI:  Object to the

16        form.

17             THE WITNESS:  Yes.

18        Q.    (BY MR. INNES)  But you had

19   concerns about the information that was in

20   Archer; is that right?

21             MS. TABACCHI:  Object to the

22        form.

23             THE WITNESS:  At this specific

24        time I did.

25             MR. INNES:  Thank you.

1          THE WITNESS:  Just to clarify,

2     threshold evaluations were not being

3     conducted at this time.

4          Q.    (BY MR. INNES)  I thought you

5     said at that period of time, you were only

6     using Archer for order of interest

7     evaluations.

8          A.    Yes.

9          Q.    Okay.  Thank you.

10          (Walmart Johnson Deposition

11     Exhibit 13 was marked for

12     identification.)

13          [Document review.]

14          Q.    (BY MR. INNES)  I'm sorry,

15     Miranda -- Ms. Johnson, are you done?

16          MS. TABACCHI:  So what that

17     means is that this is not all one

18     email.  This is a combination of

19     multiple documents.

20          THE WITNESS:  Okay.

21          Can you tell me what is all an

22     email or what is connected to each

23     other?

24          Q.    (BY MR. INNES)  Sure.  So we

25     have a series of emails that I believe are

1    related.

2           A.    Okay.

3           Q.    They are -- first it's 3862.

4    And then there's another document here.  It's

5    another email, 5876.  And then a third email

6    that is 5882 through 5883.

7                 And I'm wondering if you can

8    tell me whether or not you reviewed -- well,

9    whether or not Sharla ever completed any

10   trend analysis regarding suspicious order

11   reports.

12          A.    I don't know.

13          Q.    Okay.

14                Do you know if she -- did you

15   ever send Sharla raw data regarding

16   suspicious order reports?

17          A.    What I provided Sharla was when

18   we made a determination that an order was

19   suspicious, there was a notification that

20   went out to various individuals in the

21   company and I added her to that distribution

22   list.

23          Q.    So the information you provided

24   Sharla was forward-looking from the date of

25   this email?

```
 1              MS. TABACCHI:  Object to the

 2         form.

 3         Q.    (BY MR. INNES)  I'm sorry, the

 4    one ending in 3862?  It's the first page.

 5         A.    Yes, if I remember correctly,

 6    we just added her to the distribution list,

 7    so she received notifications.

 8         Q.    So did she do any trend

 9    analysis that you're aware of following your

10    provision -- your adding her to that

11    notification?

12         A.    I never saw anything.

13         Q.    Did you ever ask her if she'd

14    done it?

15         A.    I don't remember if I did or

16    not.

17         Q.    Do you know who would ask if

18    Sharla completed that work?

19              MS. TABACCHI:  Object to the

20         form.

21              THE WITNESS:  Can you restate

22         that?

23         Q.    (BY MR. INNES)  Who would know

24    if Sharla completed that work?

25         A.    I don't know.
```

1    Q.    Turn your attention to the

2    second-to-the-last page, 5882.

3           Do you know why Mr. Chapman

4    granted Sharla access to Tableau?

5    A.    I don't.

6    Q.    So this email from Mr. Chapman

7    on January 11th to you and Sharla says, "I

8    think if we add Sharla to the distribution of

9    the determination of controlled substance

10   suspicious order reports along with the

11   access I just granted to Tableau, she'll have

12   everything she needs to identify trends."

13          Do you agree with that

14   statement?  That she had everything she

15   needed to identify trends with those two

16   pieces of information?

17          MS. TABACCHI:  Object to the

18       form.

19          THE WITNESS:  I don't know what

20       all types of trends she was

21       identifying.  The only ones I was

22       aware of is she wanted to look at

23       trends for suspicious order

24       monitoring.

25   Q.    (BY MR. INNES)  Okay.  Would

Highly Confidential - Subject to Further Confidentiality Review

1    this information, the access to Tableau and

2    the addition to the distribution list, give

3    her enough information to identify trends?

4              MS. TABACCHI:  Object to the

5         form.  Lack of foundation.

6              THE WITNESS:  We didn't house

7         suspicious order monitoring in

8         Tableau, so I don't know what other

9         trends she was trying to develop with

10        information from Tableau.

11        Q.    (BY MR. INNES)  What did you

12   have in Tableau?

13             MS. TABACCHI:  Object to the

14        form.  Asked and answered.

15             THE WITNESS:  My team did not

16        house specific information in Tableau.

17        I don't know if George's -- someone

18        else in George's organization did.

19        Q.    (BY MR. INNES)  So we have to

20   ask George that question?

21        A.    Yes.  He would know better than

22   I would.

23        Q.    Did you ever receive any DEA

24   reports from Sharla ever?

25             MS. TABACCHI:  Object to the

1      form.

2                    THE WITNESS:  What do you mean

3          by "DEA reports"?

4          Q.    (BY MR. INNES) Did Sharla ever

5      generate any reports related to the DEA that

6      you reviewed?

7                    MS. TABACCHI:  Object to the

8          form.

9                    THE WITNESS:  I don't believe

10         I've received any reports from Sharla.

11         Q.    (BY MR. INNES)  Did anyone on

12     your team receive reports from Sharla?

13                   MS. TABACCHI:  Object to the

14         form.

15                   THE WITNESS:  Not that I'm

16         aware of.

17         Q.    (BY MR. INNES)  Was there

18     anyone else that held Sharla's role during

19     your time as the controlled -- director of --

20                   MS. TABACCHI:  I'm sorry, did

21         you finish your -- can we have that

22         question again?

23                   MR. INNES:  Sure.

24         Q.    (BY MR. INNES)  Was there

25     anyone else that held Sharla's role during

1    that time?

2                    MS. TABACCHI:  Object to the

3            form.

4                    THE WITNESS:  During what time?

5            Q.    (BY MR. INNES)  During January

6    of 2016 and later.

7                    MS. TABACCHI:  Object to the

8            form.

9                    THE WITNESS:  After Sharla

10           left, Marcus Mabry joined.  But I

11           don't know if it was the same role

12           exactly.  I don't know if he did the

13           same thing as Sharla did.

14           Q.    (BY MR. INNES)  Could you spell

15   Marcus's last name?

16           A.    I think it's M-A-B-R-Y.

17           Q.    And did Marcus perform any

18   analysis related to Schedule II or

19   Schedule IIIs that you're aware of?

20           A.    Not that I'm aware of.

21           Q.    Do you think that would be

22   something that was in Marcus's purview?

23   Analysis of Schedule II?

24                    MS. TABACCHI:  Object to the

25           form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Not based on my
 2         understanding of his role.
 3         Q.     (BY MR. INNES)  Any other
 4    analysts that you can think of at any time
 5    that performed analysis related to
 6    Schedule IIs or Schedule IIIs?
 7                MS. TABACCHI:  Object to the
 8         form.
 9                THE WITNESS:  What kind of
10         analysis?
11         Q.     (BY MR. INNES)  Trend analysis.
12                MS. TABACCHI:  Object to the
13         form.
14                THE WITNESS:  Not that I'm
15         aware of or that I can think of.
16         Q.     (BY MR. INNES)  When
17    reviewing -- did you ever review the relative
18    success or failure of Buzzeo as a SOM
19    platform?
20                MS. TABACCHI:  Object to the
21         form.
22                THE WITNESS:  I don't know how
23         I would quantify it as a success or a
24         failure.
25         Q.     (BY MR. INNES)  Were any -- the
```

1    DEA serve any subpoenas on Walmart following

2    Buzzeo's implementation regarding C-IIs or

3    C-IIIs?

4                    MS. TABACCHI:  Object to the

5            form.  I'm also not quite sure what

6            you're asking the witness, but I'm

7            going to caution the witness not to

8            reveal the substance of any

9            communications with counsel.

10                   If you had communications -- if

11           you personally had communications with

12           the DEA after Buzzeo -- the

13           implementation of the Buzzeo system,

14           you can answer that question, but ...

15                   THE WITNESS:  The DEA did reach

16           out after our Buzzeo implementation

17           and asked why we were reporting so

18           many orders.

19           Q.    (BY MR. INNES)  I'll ask the

20    question again.

21                   Did Walmart receive any

22    subpoenas from DEA following the

23    implementation of Buzzeo?

24                   MS. TABACCHI:  I'm going to

25           caution the witness not to reveal the

1    substance of any communications with

2    counsel.

3         If you can answer -- if you are

4    aware of information or can answer

5    that question without revealing

6    communications with counsel, you may.

7    If you know.

8         THE WITNESS:  Subpoenas don't

9    come to me, so ...

10        MS. TABACCHI:  Okay.  That's

11   easy enough.

12   Q.    (BY MR. INNES)  Who do

13   subpoenas go to?

14        MS. TABACCHI:  Object to the

15   form.  Lack of foundation.

16        THE WITNESS:  I believe the

17   legal department.

18        (Walmart Johnson Deposition

19   Exhibit 14 was marked for

20   identification.)

21        [Document review.]

22   Q.    (BY MR. INNES) Okay, Miranda,

23   Ms. Johnson, this is an email that you sent

24   to Koch, and it says in the middle "DEA

25   subpoenas.  We have several to review this

Highly Confidential - Subject to Further Confidentiality Review

```
 1     week.  Also going to schedule a meeting with
 2     the appropriate groups to address data errors
 3     and ways we can improve the process and limit
 4     our review time."
 5               Are you aware of any DEA
 6     subpoenas served on Walmart?
 7               MS. TABACCHI:  I'm going to
 8          caution the witness in the same way,
 9          not to reveal the substance of any
10          communications with counsel.  If
11          you --
12               MR. INNES:  That's a yes-or-no
13          question, Tina.
14               MS. TABACCHI:  You can answer
15          if you can answer this.
16               If you understand what this
17          refers to without revealing privileged
18          communications, you may answer.
19               THE WITNESS:  I do.  I think I
20          can clarify what I meant by "DEA
21          subpoenas."
22               The DEA will subpoena records
23          from Walmart when they're
24          investigating a prescriber or a
25          patient.  And after those went to --
```

1       would go to legal and they would pull

2       the information on that prescriber or

3       patient that was under investigation,

4       we would review that for accuracy.

5       Q.    (BY MR. INNES)  So these are

6    subpoenas for information that Walmart might

7    have as part of another investigation by the

8    DEA?

9             MS. TABACCHI:  Object to the

10       form.

11            THE WITNESS:  As I mentioned,

12       it was the DEA asking for information

13       about a prescriber or a patient.

14       Q.    (BY MR. INNES)  Did you comply

15    with those subpoenas?

16            MS. TABACCHI:  Object to the

17       form.

18            THE WITNESS:  I was not the one

19       responsible for responding to the

20       subpoenas.  We would just review the

21       data that was going to be sent for

22       accuracy.

23       Q.    (BY MR. INNES)  Do you ever

24    recall finding data that was inaccurate?

25            MS. TABACCHI:  Object to the

```
 1           form.

 2                   THE WITNESS:  We did have

 3           situations where the way the data was

 4           pulled was not -- was not correct.

 5           And so we would let them know that

 6           this -- this doesn't work correct.  It

 7           was pulled incorrectly.

 8           Q.     (BY MR. INNES)  Do you recall

 9      the names of those prescribers?

10           A.     I don't.

11           Q.     Was the -- when Walmart

12      received such a subpoena, was that entered

13      into Archer?

14           A.     We did enter some of these into

15      Archer, yes.

16           Q.     Why only some?

17           A.     It was the ones that we had

18      visibility to, we'd enter into Archer.

19           Q.     What do you mean by

20      "visibility"?

21                   MS. TABACCHI:  Object to the

22           form.  Again, I'd caution the witness

23           not to reveal the substance of any

24           communications with counsel.  If you

25           can answer without doing so, you may.
```

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  We did not always

2      review -- we were not always involved

3      in this process.  So those would not

4      have been entered into Archer when we

5      were not involved.

6      Q.     (BY MR. INNES)  If -- by you,

7  do you mean the compliance team?

8      A.     Yes.

9      Q.     If the compliance team was

10 involved in the review, would you necessarily

11 enter it into Archer?

12          MS. TABACCHI:  Object to the

13      form.

14          THE WITNESS:  I believe we

15      would.  I don't remember if we started

16      doing that initially.

17      Q.     (BY MR. INNES)  When do you

18 believe you started doing that?

19      A.     I don't remember.

20      Q.     Would there be a record readily

21 identifiable in Archer -- strike that.

22          Could you query Archer for DEA

23 subpoenas?

24      A.     Possibly.

25      Q.     Who would know?

```
 1          A.      Roxy might know.

 2          Q.      Roxy knows a lot.

 3          A.      She does know a lot.

 4          Q.      And Roxy reported to you?

 5          A.      Yes.

 6                  MS. TABACCHI:  How are we doing

 7          on time?  As you know, we were hoping

 8          to start at 8:00 a.m. for travel

 9          purposes.  And we were here and

10          prepared to start at 8:00, so --

11                  I know you're doing the best

12          you can.  How are we doing on time?

13                  MR. INNES:  We're doing -- I

14          can take a hard five-minute break --

15          and I'll be honest on the five-minute

16          break -- and organize my notes and we

17          can come back in.

18                  Are you going to have much

19          redirect, do you think?

20                  MS. TABACCHI:  Well, that

21          depends on your last five minutes.

22                  MR. INNES:  Okay.  See, neither

23          of us are certain as to what's

24          happening.

25                  I mean, for the record, we saw
```

```
1          that the notice was for 9 o'clock a

2          while back.  We contacted Golkow.

3          Golkow -- I'll have to talk to my

4          paralegal, but Golkow was on notice to

5          correct it.  We were under the

6          assumption it was corrected.  So I

7          don't know what the snafu happened

8          there.

9               But, yeah, we were ready to go

10         at 7:45.

11              MS. TABACCHI:  Understood.  We

12         were all here at 8 o'clock.

13              Understood.

14              MR. INNES:  Right.

15              MS. TABACCHI:  Thank you.

16              MR. INNES:  We're on the same

17         page.

18              MS. TABACCHI:  All right.

19              VIDEOGRAPHER:  We're going off

20         the record at 5:27 p.m.

21              (Recess taken, 5:27 p.m. to

22         5:35 p.m.)

23              VIDEOGRAPHER:  We are back on

24         the record at 5:36 p.m.

25              (Walmart Johnson Deposition
```

1          Exhibit 15 was marked for

2          identification.)

3                  [Document review.]

4          Q.    (BY MR. INNES)  I can get you

5   right where we want to be.

6          A.     Okay.  Sounds good.

7          Q.     So this is an email from you to

8   George Chapman on Wednesday, February 18,

9   2015.

10                 You're discussing a senior

11  controlled substance analyst.

12                 Is this a position you're --

13  you'd like to fill?  Or is it a position that

14  exists?

15         A.     It's a position that I would

16  like to fill.

17         Q.     So is this a position that's

18  being created and needs to be filled, or is

19  it --

20         A.     I'm asking for it to be

21  created.

22         Q.     Okay.  And why are you asking

23  for it to be created?

24         A.     To help support the work that I

25  was doing.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And what work was that?

2    A.    The work related to our

3    suspicious order monitoring program.

4    Q.    And what support was this

5    particular role going to provide?

6    A.    It was mainly the data

7    elements, the analytics-type pieces that we

8    talked about.  Because I don't have

9    experience in pulling from databases and

10   things like that, so ...

11   Q.    Sure.

12         So was this position ultimately

13   created?

14   A.    Yes.

15   Q.    Okay.  And who filled that

16   position?

17   A.    Roxy Reed.

18   Q.    You're kidding.

19   A.    No.

20   Q.    And did all -- did Roxy take on

21   all of the reactive analytics that you

22   describe here?

23         MS. TABACCHI:  Object to the

24   form.

25         THE WITNESS:  In some form.

Highly Confidential - Subject to Further Confidentiality Review

1          This was very early, and so I think

2          this was just my brainstorming of

3          things that an analyst could

4          potentially do.

5          Q.     (BY MR. INNES)  Okay.  Did Roxy

6   develop reactive analytics directed toward

7   SOM threshold development and periodic

8   updates?

9               MS. TABACCHI:  Object to the

10          form.

11              THE WITNESS:  Roxy, as we

12          mentioned earlier, calculated the SOM

13          thresholds and then would do -- did

14          the periodic update to the SOM

15          threshold that we discussed.

16         Q.     (BY MR. INNES)  And the SOM

17   threshold that -- the calculations for that

18   were based on the equation provided by

19   Mu Sigma?

20         A.     Yes.

21         Q.     Were there any other threshold

22   calculations other than Mu Sigma that Roxy or

23   anyone else in your department performed?

24              MS. TABACCHI:  Object to the

25          form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  As I mentioned,
 2        we also had the adjustments that we
 3        made for the liquids and the lowering
 4        of thresholds that were above 5,000
 5        dosage units per week to -- down to
 6        5,000 dosage units a week.  And then
 7        new -- she would calculate the
 8        thresholds, as I mentioned, for new
 9        pharmacies.
10        Q.    (BY MR. INNES)  Did Roxy
11   perform an analysis of data to support SOM
12   remediation plan development?
13        A.    So what this became was the
14   dispensing data that we pulled to review
15   during an order of interest evaluation.
16        Q.    Okay.  And -- so was that --
17   that dispensing data analysis, that --
18   when -- at what point in time did that come
19   to fruition?
20              MS. TABACCHI:  Object to the
21        form.
22              THE WITNESS:  It was around the
23        time that Roxy started.  We did it in
24        a -- in a lesser form, not as -- not
25        as -- I'm trying to think of the term
```

1              to use.  The more rudimentary form,

2              based on data that I could pull

3              without the extensive database skills

4              that Roxy had initially, and then when

5              Roxy joined the team, she improved our

6              ability to pull together data.

7         Q.    (BY MR. INNES)  What kind of

8    data did you pull before Roxy began helping

9    you?

10        A.    I was able to pull some basic

11   dispensing data.

12        Q.    Such as?

13        A.    What we had dispensed for that

14   drug and that location over a time period.

15        Q.    And was that the extent of your

16   ability?

17              MS. TABACCHI:  Object to the

18        form.

19              THE WITNESS:  There was also

20        some information available in Archer

21        that I was able to review.  I don't

22        remember if there was anything else

23        that I pulled.

24        Q.    (BY MR. INNES)  You don't

25   remember if there was anything else you

Highly Confidential - Subject to Further Confidentiality Review

1    pulled from Archer?

2          A.     Or pulled from data generally.

3          Q.     Okay.  And what was Roxy able

4    to do that you were not able to do?

5          A.     She has skills in analytics and

6    using analytics tools.  So she was able to

7    pull data that I didn't have access to in

8    databases and then do analytics on those to

9    show things like trends that we discussed

10   earlier, patient distances that we discussed

11   earlier.

12         Q.     Why didn't you have access to

13   certain databases that Roxy did?

14              MS. TABACCHI:  Object to the

15         form.

16              THE WITNESS:  Because I don't

17         have the background in using the

18         analytics tools that Roxy does to

19         query those databases.

20         Q.     (BY MR. INNES) What analytics

21   tools does Roxy use to query those databases?

22              MS. TABACCHI:  Object to the

23         form.

24              THE WITNESS:  Alteryx, which we

25         discussed earlier.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      (BY MR. INNES)  Anything else?

2          A.      SQL.

3          Q.      Anything else?

4          A.      That's all that I'm aware of.

5          Q.      Okay.  And you reviewed reports

6     generated from Alteryx?

7                  MS. TABACCHI:  Object to the

8          form.

9          Q.      (BY MR. INNES)  By Roxy?

10                 MS. TABACCHI:  Same objection.

11                 THE WITNESS:  Reports

12         related -- I did review

13         reports-related order evaluations from

14         Alteryx, yes.

15                 MR. INNES:  I don't know if

16         those have been produced in the case.

17         We ask if they are.  I'll send you a

18         letter.

19                 MS. TABACCHI:  I will pass that

20         on to Tara.

21                 MR. INNES:  Fantastic.

22         Q.      (BY MR. INNES)  Below the

23    reactive analytics there is a proactive

24    analytics.  Development and management data

25    models to identify hot spots that can be used

Highly Confidential - Subject to Further Confidentiality Review

1    for proactive remediation.

2              What did you mean by the term

3    "hot spots"?

4         A.    I believe it was just are there

5    areas or certain pharmacies that we might

6    want to take a closer look at from a training

7    perspective?

8         Q.    Okay.

9              And you said, "This would

10   include development of models for like store

11   comparisons."

12             Were models for like store

13   comparisons ever developed?

14             MS. TABACCHI:  Object to the

15        form.

16             THE WITNESS:  We started to try

17        to develop them.  It's very

18        complicated to determine if a store is

19        a like store.  We did -- we would look

20        at stores, eventually group them

21        together based on their overall

22        volume.

23        Q.    (BY MR. INNES)  How did you go

24   about doing that?

25        A.    We were able to see how much

1    they dispensed overall, and we would group

2    those stores within, you know, the same --

3    like, similar volume together.

4         Q.     And those reports were created

5    by Roxy?

6              MS. TABACCHI:  Object to the

7         form.

8              THE WITNESS:  Yes.

9         Q.     (BY MR. INNES)   Do you recall

10   the location of the stores that you compared?

11             MS. TABACCHI:  Object to the

12        form.

13        Q.     (BY MR. INNES)  As you sit here

14   today?

15        A.     I mean, we basically looked at

16   all of our pharmacies and then put them into

17   groups.

18        Q.     Okay.  So you looked at all

19   4,000-odd pharmacies and put them in like

20   buckets?

21        A.     Yes.

22        Q.     Okay.

23        A.     Based on their overall

24   dispensing volume.

25        Q.     When was that analysis

1    performed?

2         A.    It was pretty close to the time

3    we implemented Buzzeo because we included

4    that information with Buzzeo.

5         Q.    Oh, did you provide that

6    information to Buzzeo to develop the

7    algorithm?

8         A.    I don't know that they used

9    that to develop the algorithm.

10        Q.    Did they request it from you?

11        A.    There was a -- I believe there

12   was a stress bar that would compare the

13   pharmacies' orders to orders within that same

14   grouping.  But I don't think it was used to

15   actually create the algorithm.

16        Q.    Okay.

17        A.    I'm not sure, honestly --

18        Q.    Do you know --

19        A.    -- if it was used.

20        Q.    Do you know if that analysis

21   was ever updated after it was provided to

22   Buzzeo?

23             MS. TABACCHI:  Object to the

24        form.

25             THE WITNESS:  I don't know.  We

1           used Buzzeo for a very short period of

2           time, though, as we discussed.

3           Q.    (BY MR. INNES)  Did you retain

4     a copy of that analysis in your own files?

5           A.    I don't know if I would have a

6     copy in my files.

7                 MR. INNES:  You are going to

8           direct me to Tara again, but we'd just

9           request that that analysis be produced

10          if it hasn't already been.

11          Q.    (BY MR. INNES)  Do you know if

12    the proactive -- under the proactive

13    analytics, it lists "Review and follow-up

14    analysis from various reports related to

15    controlled substance ordering and

16    dispensing."

17                Do you know if that review and

18    follow-up analysis was ever performed?

19          A.    We did review reports that we

20    had received from McKesson.  The over

21    4 percent report, we did not review that.

22    There was another team that was responsible

23    for reviewing that, and then I think that

24    report went away.

25          Q.    (BY MR. INNES)  Do you recall

1    if an analysis of refusal to fill data was

2    ever performed?

3                    MS. TABACCHI:  Object to the

4           form.

5                    THE WITNESS:  Yes.

6           Q.    (BY MR. INNES)  And when was

7    that?

8           A.    I don't remember when exactly.

9           Q.    Who performed it?

10          A.    Roxy would have.

11                  MR. INNES:  I'd ask that Roxy's

12          analysis of the refusal to fill data

13          be produced if it hasn't already been.

14          Q.    (BY MR. INNES)  The analysis of

15   IMS data -- I'm sorry, was there an analysis

16   of IMS data that was performed?

17                  MS. TABACCHI:  Object to the

18          form.

19                  THE WITNESS:  Not that I

20          remember.

21                  MR. INNES:  Okay.

22          Q.    (BY MR. INNES)  Why were you

23   suggesting that it should be done?

24                  MS. TABACCHI:  Object to the

25          form.

```
 1                    THE WITNESS:  I think at the
 2            time I was just learning about IMS,
 3            and thought it may be something that
 4            was useful to us, but it -- what I
 5            thought it was, it wasn't.
 6        Q.    (BY MR. INNES)  What did you
 7    think it was?
 8        A.    We weren't able to look at just
 9    controlled substances in IMS data and
10    separate them out.
11        Q.    Did you -- it says in the
12    parenthetical "Our dispensing patterns versus
13    industry dispensing."
14                 Did you -- was there ever an
15    analysis done of that comparison, dispensing
16    patterns versus industry patterns?
17                    MS. TABACCHI:  Object to the
18            form.
19                    Asked and answered.
20                    THE WITNESS:  Yeah.  Not that
21            I'm aware of.
22        Q.    (BY MR. INNES)  And I'm asking
23    that outside of IMS data.  I'm just wondering
24    if there's any data that was used to perform
25    that analysis.
```

1      A.     Not that I'm aware of.

2      Q.     Why was it important to you

3    that that analysis might be done?

4             MS. TABACCHI:  Object to the

5         form.

6             THE WITNESS:  I thought it

7         could be interesting.

8      Q.     (BY MR. INNES)  Interesting

9    why?

10      A.     To see what our dispensing

11   looked like versus others in the industry.

12      Q.     What do you think that might

13   have told you?

14             MS. TABACCHI:  Object to the

15         form.

16             THE WITNESS:  I don't know,

17         because we weren't able to do the

18         analysis.

19      Q.     (BY MR. INNES)  Was there --

20   what was the reason why you thought you might

21   want to see that relationship?

22             MS. TABACCHI:  Object to the

23         form.  Asked and answered.

24             THE WITNESS:  Yeah, I'm -- I

25         think it's not unusual to want to

1        benchmark against others doing the

2        same thing you do.

3            Q.     (BY MR. INNES)  Are we talking

4    from a sales perspective?

5                MS. TABACCHI:  Object to the

6        form.

7                THE WITNESS:  No.  I don't even

8        know that I have access to sales data.

9            Q.     (BY MR. INNES)  So you were

10   interested in doing this comparison because

11   you thought it would be interesting as it

12   related to your SOM work?

13           A.     Just generally related to our

14   dispensing.

15           Q.     What is your purview as it

16   relates to dispensing?

17               MS. TABACCHI:  Object to the

18       form.

19               THE WITNESS:  During what

20       timeframe?

21           Q.     (BY MR. INNES)  Well, you're

22   asking for this analysis in February 2015, so

23   we can start there.

24           A.     At the time I don't believe I

25   was really involved in dispensing, but I did

Highly Confidential - Subject to Further Confidentiality Review

1    want to transition the role to be more

2    involved in some of the other aspects other

3    than the order monitoring program or in

4    addition to it.

5         Q.    So you didn't have any

6    responsibilities related to dispensing at the

7    time, but you thought it would be interesting

8    to do the comparison; is that right?

9         A.    Yes.

10        Q.    How does dispensing relate to

11   suspicious order monitoring?

12              MS. TABACCHI:  Object to the

13         form.

14              THE WITNESS:  I'm not sure I

15         understand the question.

16        Q.    (BY MR. INNES)  How does

17   dispensing relate to suspicious order

18   monitoring?

19              MS. TABACCHI:  Object to the

20         form.

21              THE WITNESS:  I mean, you order

22         products that you dispense, so it

23         would relate to your orders.

24        Q.    (BY MR. INNES)  How does

25   dispensing relate to distribution within the

```
 1      suspicious order monitoring context?

 2                  MS. TABACCHI:  Object to the

 3           form.

 4                  THE WITNESS:  We distribute

 5           products that our pharmacies dispense.

 6           Q.    (BY MR. INNES)  Are you

 7      familiar with the "know your customer

 8      requirements"?

 9           A.    Yes.

10           Q.    And what's your understanding

11      of the "know your customer requirements"?

12                  MS. TABACCHI:  Object to the

13           form.

14                  THE WITNESS:  It's a

15           distributor is expected to understand

16           who their customer is and who they're

17           distributing products to.

18           Q.    (BY MR. INNES)  And does

19      Walmart seek to understand who their customer

20      is and who they're distributing products to?

21                  MS. TABACCHI:  Object to the

22           form.

23                  THE WITNESS:  Yes.

24           Q.    (BY MR. INNES)  And who is

25      that?
```

1          A.     Our customer, our own

2    pharmacies.

3          Q.     Does that put you in a unique

4    position as it relates to the DEA?

5               MS. TABACCHI:  Object to the

6          form.

7               THE WITNESS:  I believe that

8          puts us in a different position than

9          other distributors because we are

10         distributing to our own customers.

11              So -- to our own pharmacies.

12         So we have easier access to know who

13         our customers are.

14         Q.     (BY MR. INNES)  How do you

15   fulfill your obligation -- your "know your

16   customer" obligation?

17              MS. TABACCHI:  Object to the

18         form.

19              THE WITNESS:  As I mentioned,

20         they're our own pharmacies, so we have

21         access to who they are, what their

22         policies and procedures are, what

23         their dispensing data is.

24         Q.     (BY MR. INNES)  And why you

25   have access to who they are, what do you mean

```
 1     by "who they are"?

 2           A.     Who our pharmacists are.

 3           Q.     The actual white-coat staff in

 4     the pharmacy?

 5           A.     Mm-hmm.  (Witness nods.)

 6                  MR. INNES:  Okay.  We can break

 7          now.

 8                  THE WITNESS:  Okay.

 9                  MS. TABACCHI:  We're finished?

10                  MR. INNES:  We're finished.  Do

11          you want to get on camera?

12                  MS. TABACCHI:  No.  I have no

13          questions.

14                  Thank you.

15                  VIDEOGRAPHER:  Are you going to

16          read and sign or anything?

17                  MS. TABACCHI:  Yes.  Yes.

18                  Does anybody on the phone have

19          questions?

20                  VIDEOGRAPHER:  We are going off

21          the record at 4:54 p.m.

22                  (Proceedings recessed at 4:54

23          p.m.)

24                       --o0o--

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                    CERTIFICATE

 3

 4

 5         I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.

 7

           It was requested before
 8   completion of the deposition that the
     witness, MIRANDA JOHNSON, have the
 9   opportunity to read and sign the
     deposition transcript.

10

11
         _____
12       Debra A. Dibble; RDR, CRR, CRC
         Certified Reporter
13       Notary Public
         Dated:  December 17, 2018

14

15

16
              (The foregoing certification
17   of this transcript does not apply to any

18   reproduction of the same by any means,

19   unless under the direct control and/or

20   supervision of the certifying reporter.)

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4     carefully and make any necessary corrections.

 5     You should state the reason in the

 6     appropriate space on the errata sheet for any

 7     corrections that are made.

 8              After doing so, please sign the

 9     errata sheet and date it.

10              You are signing same subject to

11     the changes you have noted on the errata

12     sheet, which will be attached to your

13     deposition.

14              It is imperative that you return

15     the original errata sheet to the deposing

16     attorney within thirty (30) days of receipt

17     of the deposition transcript by you.  If you

18     fail to do so, the deposition transcript may

19     be deemed to be accurate and may be used in

20     court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                              ERRATA

2      Page    LINE    CHANGE

3      _____   _____   _____

4              REASON: _____

5      _____   _____   _____

6              REASON: _____

7      _____   _____   _____

8              REASON: _____

9      _____   _____   _____

10             REASON: _____

11     _____   _____   _____

12             REASON: _____

13     _____   _____   _____

14             REASON: _____

15     _____   _____   _____

16             REASON: _____

17     _____   _____   _____

18             REASON: _____

19     _____   _____   _____

20             REASON: _____

21     _____   _____   _____

22             REASON: _____

23     _____   _____   _____

24             REASON: _____

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I, MIRANDA JOHNSON, do hereby
      certify that I have read the foregoing pages
 5    and that the same is a correct transcription
      of the answers given by me to the questions
 6    therein propounded, except for the
      corrections or changes in form or substance,
 7    if any, noted in the attached
      Errata Sheet.

 8

 9

10

11

12    _____

       MIRANDA JOHNSON                       DATE
13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    _____

20    Notary Public

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1

                              LAWYER'S NOTES

2

3      page       LINE

4      _____      _____      _____

5      _____      _____      _____

6      _____      _____      _____

7      _____      _____      _____

8      _____      _____      _____

9      _____      _____      _____

10     _____      _____      _____

11     _____      _____      _____

12     _____      _____      _____

13     _____      _____      _____

14     _____      _____      _____

15     _____      _____      _____

16     _____      _____      _____

17     _____      _____      _____

18     _____      _____      _____

19     _____      _____      _____

20     _____      _____      _____

21     _____      _____      _____

22     _____      _____      _____

23     _____      _____      _____

24     _____      _____      _____

25