Highly Confidential - Subject to Further Confidentiality Review

1           UNITED STATES DISTRICT COURT

         FOR THE NORTHERN DISTRICT OF OHIO

2                  EASTERN DIVISION

3

    IN RE: NATIONAL          )

4    PRESCRIPTION            )  MDL No. 2804

    OPIATE LITIGATION        )

5    _____ )  Case No.

                             )  1:17-MD-2804

6                            )

    THIS DOCUMENT RELATES  )  Hon. Dan A.

7    TO ALL CASES           )  Polster

8

                FRIDAY, JULY 13, 2018

9

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

10               CONFIDENTIALITY REVIEW

11                    - - -

12          Videotaped deposition of Shirlene

13   Justus, held at the offices of BakerHostetler

14   LLP, 200 South Civic Center Drive, Columbus,

15   Ohio, commencing at 9:05 a.m., on the above

16   date, before Carrie A. Campbell, Registered

17   Diplomate Reporter and Certified Realtime

18   Reporter.

19

20

21                    - - -

22

            GOLKOW LITIGATION SERVICES

23       877.370.3377 ph | 917.591.5672 fax

                 deps@golkow.com

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S :
 2
 3      MCHUGH FULLER LAW GROUP
        BY:  MICHAEL J. FULLER, JR., ESQUIRE
 4           mike@mchughfuller.com
             AMY J. QUEZON, ESQUIRE
 5           amy@mchughfuller.com
        97 Elias Whiddon Road
 6      Hattiesburg, Mississippi 39402
        (601) 261-2220
 7
 8      NAPOLI SHKOLNIK, PLLC
        BY:  HUNTER J. SHKOLNIK, ESQUIRE
 9           hunter@napolilaw.com
             SHAYNA E. SACKS, ESQUIRE
10           SSacks@NapoliLaw.com
             (VIA TELECONFERENCE)
11      360 Lexington Avenue, 11th Floor
        New York, New York 10017
12      (212) 397-1000
13
14      GREENE KETCHUM BAILEY WALKER FARRELL & TWEEL, LLP
        BY:  PAUL T. FARRELL, JR., ESQUIRE
15           paul@greeneketchum.com
        419 Eleventh Street
16      Huntington, West Virginia 25701
        (314) 525-9115
17      Counsel for Plaintiffs
18
        WILLIAMS & CONNOLLY LLP
19      BY:  JENNIFER G. WICHT, ESQUIRE
             jwicht@wc.com
20           STEVEN M. PYSER, ESQUIRE
             spyser@wc.com
21           MIRANDA PETERSEN, ESQUIRE
             mpetersen@wc.com
22      725 Twelfth Street, N.W.
        Washington, DC 20005
23      (202) 434-5331
        Counsel for Cardinal Health, Inc.
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        REED SMITH LLP
          BY:  LOUIS W. SCHACK, ESQUIRE
 2             lschack@reedsmith.com
          Three Logan Square
 3        1717 Arch Street, Suite 3100
          Philadelphia, Pennsylvania 19103
 4        (215) 851-8100
          Counsel for AmerisourceBergen
 5
 6        BARTLIT BECK HERMAN PALENCHAR &
          SCOTT LLP
 7        BY:  ALEX J. HARRIS, ESQUIRE
               alex.harris@bartlit-beck.com
 8        1801 Wewatta Street, Suite 1200
          Denver, Colorado 80202
 9        (303) 592-3100
          Counsel for Walgreens
10
11        JONES DAY
          BY:  EDWARD M. CARTER, ESQUIRE
12             emcarter@jonesday.com
          325 John H. McConnell Boulevard
13        Suite 600
          Columbus, Ohio 43125-2673
14        (614) 469-3939
          Counsel for Walmart
15
16        PELINI, CAMPBELL & WILLIAMS LLC
          BY:  PAUL B. RICARD, ESQUIRE
17             pbricard@pelini-law.com
          8040 Cleveland Avenue NW, Suite 400
18        North Canton, Ohio 44720
          (330) 305-6400
19        Counsel for Prescription Supply,
          Inc.
20
21        JACKSON KELLY PLLC
          BY:  WILLIAM J. AUBEL, ESQUIRE
22             william.j.aubel@jacksonkelly.com
          500 Lee Street East, Suite 1600
23        Charleston, West Virginia 25301
          (304) 340-1146
24        Counsel for Miami-Luken
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        ZUCKERMAN SPAEDER LLP
          BY:  R. MILES CLARK, ESQUIRE
 2            mclark@zuckerman.com
          1800 M Street NW, Suite 1000
 3        Washington, DC  20036-5807
          (202) 778-1800
 4        Counsel for CVS Indiana, LLC, and
          CVS RX Services, Inc.
 5
 6        ARNOLD & PORTER KAYE SCHOLER, LLP
          BY:  ALLISON GARDNER, ESQUIRE
 7            Allison.Gardner@arnoldporter.com
              (VIA TELECONFERENCE)
 8        601 Massachusetts Avenue, NW
          Washington, DC 20001-3743
 9        (202) 942-5000
          Counsel for Endo Pharmaceuticals
10        Inc., and Endo Health Solutions Inc.
11
          MORGAN, LEWIS & BOCKIUS LLP
12        BY:  PAMELA C. HOLLY, ESQUIRE
              pamela.holly@morganlewis.com
13            (VIA TELECONFERENCE)
          101 Park Avenue
14        New York, New York 10178
          (212) 309-6000
15        Counsel for Teva Pharmaceuticals
          USA, Inc., Cephalon, Inc., Watson
16        Laboratories, Inc., Actavis LLC,
          Actavis Pharma, Inc., f/k/a Watson
17        Pharma, Inc.
18
          MORGAN, LEWIS & BOCKIUS LLP
19        BY:  JOHN P. LAVELLE, JR., ESQUIRE
              john.lavelle@morganlewis.com
20            (VIA TELECONFERENCE)
          1701 Market Street
21        Philadelphia, Pennsylvania 19103-2921
          (215) 963-5000
22        Counsel for Rite Aid
23
24
25
```

```
 1       LOCKE LORD LLP
         BY:  BRANDAN MONTMINY, ESQUIRE
 2            brandan.montminy@lockelord.com
              (VIA TELECONFERENCE)
 3       2200 Ross Avenue, Suite 2800
         Dallas, Texas 75201
 4       (214) 740-8445
         Counsel for Henry Schein, Inc., and
 5       Henry Schein Medical Systems, Inc.
 6
 7   ALSO PRESENT:
 8       CARDINAL HEALTH
         BY:  CAITLIN E. ANDERSON, ESQUIRE
 9            caitlin.anderson@cardinalhealth.com
         7000 Cardinal Place
10       Dublin, Ohio 43017
         (614) 757-5382
11       In-house Counsel for Cardinal Health
12       AJ ELKINS, McHugh Fuller
13
     VIDEOGRAPHER:
14       DAN LAWLOR,
         Golkow Litigation Services
15
16   TRIAL TECHNICIAN:
         EVAN WOLFE,
17       Golkow Litigation Services
18                    - - -
19
20
21
22
23
24
25
```

```
 1                      INDEX
 2                                       PAGE
 3    APPEARANCES...............................   2
 4    EXAMINATIONS
 5      BY MR. FULLER...........................  12
 6      BY MS. WICHT........................... 327
 7      BY MR. FULLER.......................... 333
 8
 9                    EXHIBITS
10       No.        Description              Page
11    Cardinal Justus  21 USCA Section 801,     78
      Exhibit 1        Congressional findings
12                     and declarations:
                       Controlled substances
13
      Cardinal Justus  US Department of Justice,  80
14    Exhibit 2        Drug Enforcement
                       Administration, Diversion
15                     Control Division, Title
                       21 Code of Federal
16                     Regulations, Part 1301 -
                       Registration of
17                     Manufacturers,
                       Distributors, and
18                     Dispensers of Controlled
                       Substances
19
      Cardinal Justus  Cardinal Health Standard  113
20    Exhibit 3        Operating Procedure,
                       Detecting and Reporting
21                     Suspicious Orders and
                       Responding to Threshold
22                     Events,
                       CAH_MDL_PRIORPROD_AG_
23                     0000154 -
                       CAH_MDL_PRIORPROD_AG_
24                     0000160
25
```

Highly Confidential - Subject to Further Confidentiality Review

| 1 | Cardinal Justus Exhibit 4 | Cardinal Health Sales - Anti-Diversion Alert Signals, CAH_MDL_PRIORPROD_AG_ 0000323 - CAH_MDL_PRIORPROD_AG_ 0000325 | 132 |
| 5 | Cardinal Justus Exhibit 5 | Cardinal Health, Inc., Outline of Key Actions on Anti-Diversion, January 11, 2007, CAH_MDL_PRIORPROD_DEA07_ 00968292 - CAH_MDL_PRIORPROD_DEA07_ 00968297 | 158 |
| 10 | Cardinal Justus Exhibit 6 | Cardinal Health Corporate Compliance Policy, Anti-Diversion Compliance Policy, CAH_MDL_PRIORPROD_DEA07_ 008719842 - CAH_MDL_PRIORPROD_DEA07_ 008719843 | 169 |
| 14 | Cardinal Justus Exhibit 7 | Cardinal Health Anti-Diversion Compliance Policy, Overview, Eric Brantley, Anti-Diversion Compliance Coordinator, April 2006, CAH_MDL_PRIORPROD_DEA07_ 00792061 - CAH_MDL_PRIORPROD_DEA07_ 00792084 | 176 |
| 20 | Cardinal Justus Exhibit 8 | Assurance of Discontinuance Pursuant to Executive Law Section 63(15), CAH_MDL_PRIORPROD_DEA07_ 00833777 - CAH_MDL_PRIORPROD_DEA07_ 00833804 | 178 |

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Cardinal Justus Exhibit 9 | Cardinal Health, Inc. V. Holder, Attachment 9 to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction | 189 |
| 4 | Cardinal Justus Exhibit 10 | Declaration of Ruth A. Carter in Cardinal Health, Inc. Vs. Eric Holder, Jr., Attorney General, et al. | 212 |
| 7 | Cardinal Justus Exhibit 11 | Administrative Memorandum of Agreement, CAH_MDL_PRIORPROD_BOP_ 0000042 - CAH_MDL_PRIORPROD_BOP_ 0000049 | 223 |
| 10 | Cardinal Justus Exhibit 12 | Investigation Report of the Special Demand Committee, Board of Directors of Cardinal Health, Inc., April 12, 2013, CAH_MDL_PRIORPROD_HOUSE_ 0003331 - CAH_MDL_PRIORPROD_HOUSE_ 0003372 | 248 |
| 16 | Cardinal Justus Exhibit 13 | USB drive with Excel spreadsheets | 307 |
| 18 | Cardinal Justus Exhibit 14 | Anti-Diversion Customer Profile, Gulf Coast Pharmacy, Inc. | 336 |

(Exhibits attached to the deposition.)

20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                VIDEOGRAPHER:  We are now on
 2         the record.
 3                My name is Dan Lawlor.  I'm a
 4         videographer with Golkow Litigation
 5         Services.
 6                Today's date is July 13, 2018,
 7         and the time is 9:05 a.m.
 8                This video deposition is being
 9         held in Columbus, Ohio, in the matter
10         of National Prescription Opiate
11         Litigation MDL Number 2804.  The
12         deponent is Shirlene Justus.
13                Counsel, please identify
14         yourselves beginning with the
15         plaintiffs.
16                MR. FULLER:  Mike Fuller on
17         behalf of the plaintiff.
18                MS. QUEZON:  Amy Quezon on
19         behalf of plaintiff.
20                MR. WOLFE:  Evan Wolfe,
21         plaintiffs.
22                MR. SHKOLNIK:  Hunter Shkolnik
23         on behalf of plaintiffs.
24                MR. ELKINS:  AJ Elkins on
25         behalf of plaintiffs.
```

```
 1              MR. SCHACK:  Lou Schack from

 2        Reed Smith on behalf of

 3        AmerisourceBergen Drug Corporation.

 4              MR. HARRIS:  Alex Harris,

 5        Bartlit Beck, on behalf of Walgreens.

 6              MR. FARRELL:  Paul Farrell,

 7        Junior, on behalf of plaintiffs.

 8              MR. CLARK:  Miles Clark of

 9        Zuckerman Spaeder on behalf of CVS

10        Indiana, LLC, and CVS RX Services,

11        Inc.

12              MR. AUBEL:  Bill Aubel from

13        Jackson Kelly on behalf of

14        Miami-Luken.

15              MR. RICARD:  Paul Ricard,

16        Prescription Supply, Inc.

17              MR. CARTER:  Ed Carter from

18        Jones Day for Walmart.

19              MR. PYSER:  Steven Pyser,

20        Williams & Connolly, on behalf of

21        Cardinal Health, Inc.

22              MS. ANDERSON:  Caitlin

23        Anderson, in-house counsel at Cardinal

24        Health.

25              MS. PETERSEN:  Miranda
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Petersen, Williams Connolly, on behalf

 2        of Cardinal Health, Inc.

 3              MS. WICHT:  Jennifer Wicht from

 4        Williams & Connolly on behalf of

 5        Cardinal Health.

 6              VIDEOGRAPHER:  And counsel on

 7        the phone?

 8              MR. LAVELLE:  John Lavelle from

 9        Morgan Lewis on behalf of Rite Aid.

10              MS. GARDNER:  Allison Gardner

11        from Arnold & Porter, counsel for

12        Endo.

13              MR. MONTMINY:  Brandan

14        Montminy, Locke Lord, counsel for the

15        Henry Schein defendants.

16              MS. HOLLY:  Pam Holly, Morgan

17        Lewis, counsel for Teva

18        Pharmaceuticals, Cephalon and various

19        pharmacies.

20              VIDEOGRAPHER:  The court

21        reporter today is Carrie Campbell, and

22        she will now swear in the witness.

23

24              SHIRLENE JUSTUS,

25   of lawful age, having been first duly sworn
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to tell the truth, the whole truth and

 2    nothing but the truth, deposes and says on

 3    behalf of the Plaintiffs, as follows:

 4

 5              DIRECT EXAMINATION

 6    QUESTIONS BY MR. FULLER:

 7         Q.    Ma'am, please introduce

 8    yourself to the jury.

 9         A.    I'm Shirlene Justus.

10         Q.    Ms. Justus, where do you

11    currently work?

12         A.    I work for Cardinal Health.

13         Q.    How long have you worked for

14    Cardinal Health?

15         A.    15 years.

16         Q.    And what is your current

17    position at Cardinal Health?

18         A.    I am a senior consultant for

19    strategic planning and execution.

20         Q.    And how long have you been in

21    that role?

22         A.    Almost four years.

23         Q.    And what did you do prior to

24    being a senior consultant for strategic

25    planning and execution?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Prior to that I was in -- a

 2    member of the anti-diversion department.

 3              Q.     And is that what you guys call

 4    it, the anti-diversion department?

 5              A.     Yes.

 6              Q.     Okay.  And did you have a

 7    specific title?

 8              A.     Yes.  Prior to that, I was a

 9    senior analyst for quality and regulatory.

10              Q.     And how long did you hold that

11    position?

12              A.     Approximately two years.

13              Q.     So if we're going back four

14    years from now we're in, what, 2014?  So '12

15    to '14 time frame?

16              A.     Uh-huh, that's correct.

17              Q.     And how about prior to that?

18              A.     I was also a member of the

19    anti-diversion department, but I was in new

20    account setup.

21              Q.     And how long were you a member

22    or in the position of new account setup?

23              A.     18 months to two years, so it

24    was 2010.

25              Q.     How about prior to becoming a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   new -- well, what was the title?  New account

 2   setup --

 3        A.    It was a specialist.

 4        Q.    -- person?

 5        A.    Account specialist, uh-huh.

 6        Q.    How about prior to that?

 7        A.    I was in admin.

 8        Q.    And that was your title?

 9        A.    Senior administrative

10   assistant.

11        Q.    How long did you hold that

12   spot?

13        A.    Almost seven years.

14        Q.    And does that take us back to

15   the time when you started with Cardinal?

16        A.    Yes.

17        Q.    Okay.  So let's go through

18   these just real briefly.  Let's start with

19   your senior admin assistant.

20              What is a senior admin

21   assistant?

22        A.    It's an administrative

23   assistant for...

24        Q.    Let me ask it differently.

25              What were your duties?  What
```

Highly Confidential - Subject to Further Confidentiality Review

1  did you do on a daily basis?

2      A.    On a daily basis I could make

3  travel arrangements, audit expense reports,

4  handle any kind of training arrangements to

5  be made for teams, for the training teams

6  from the different departments that I worked

7  in.

8      Q.    And how about new account

9  setup?  What would that -- what did you do

10  there?

11          Now, let me stop you for a

12  second.  From the time you began up until

13  2010, you were not a member of the

14  anti-diversion department, were you?

15      A.    Not for that entire time, no.

16      Q.    For any of that time?

17      A.    Some, yes.

18      Q.    Okay.  Where do we fit in the

19  timeline when you became a member of that

20  department?

21      A.    I was an administrative

22  assistant starting in -- at the end of 2007.

23      Q.    For that department?

24      A.    Yes.

25      Q.    Now, other than being in a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    different department, did your duties and

 2    responsibilities change or were they

 3    basically the same?

 4         A.     They were basically the same.

 5         Q.     Now tell me, what does a new

 6    account specialist do?

 7         A.     We collected data, any kind of

 8    due diligence, an account that was brought to

 9    us to see if they could open an account to --

10    at Cardinal Health to purchase controlled

11    substances.

12         Q.     So as a new account specialist,

13    you would work with pharmacies and drugstores

14    who wanted to open an account with Cardinal?

15         A.     We did not direct line to any

16    of the pharmacies or customers.

17         Q.     Let me ask it differently.

18         A.     Uh-huh.

19         Q.     As a new account specialist,

20    you would review drugstores and pharmacies to

21    determine whether they'd be approved to do

22    business with Cardinal?

23         A.     Yes, that's correct.

24         Q.     Okay.  And how about as a

25    senior administrative assistant?  What was
```

```
 1    your job role there?  I'm sorry, not senior

 2    admin -- senior analyst for quality and

 3    regulatory.

 4         A.     So the difference is is that we

 5    would actually review the analytic side, the

 6    history purchase data and the accounts and

 7    the way they purchased and their patterns.

 8         Q.     We got a lot to talk about

 9    today then.

10                And that was for about two

11    years; is that right?

12         A.     That's correct.

13         Q.     And was that considered a

14    promotion, from new account specialist, or a

15    lateral move?

16         A.     It's a promotion.

17         Q.     Okay.

18         A.     Uh-huh.

19         Q.     So tell me a little bit more.

20    You reviewed analytics or reviewed

21    information on the analytic side.  I'm

22    assuming these are for already -- customers

23    already pharmacies and drugstores that

24    you're -- that Cardinal is delivering to; is

25    that right?
```

```
 1            A.      That would be correct.

 2            Q.      And what was your particular

 3    role in that system?  What type of analytics

 4    did you review, or did you assist others in

 5    reviewing?  Did you make final determinations

 6    as to whether something was going to be

 7    delivered or not?

 8                    Tell us what you did on a

 9    regular basis.

10                    MS. WICHT:  Object to the form

11            of the question.

12                    You can still go ahead and

13            answer when I object to the form.

14            It's generally for the record.  You

15            can go ahead and answer if you

16            understand.

17                    MR. FULLER:  She means I asked

18            a bad question.

19                    MS. WICHT:  Exactly.

20                    MR. FULLER:  And I'm from

21            Mississippi, so there's going to be a

22            lot of them.  But I do have all my

23            teeth.

24                    THE WITNESS:  So on a daily

25            basis it would be more of if there was
```

Highly Confidential - Subject to Further Confidentiality Review

1         a threshold event, we have a case

2         management system that we would have

3         tools that were provided for us so

4         that we could watch the different

5         patterns of their purchase history.

6    QUESTIONS BY MR. FULLER:

7         Q.    Now, you say "a case management

8    system."

9         A.    Uh-huh, that's correct.

10        Q.    What is that?

11        A.    Well, it's not the ordering

12   platform.  So any customer can place an

13   order.

14        Q.    Okay.

15        A.    Okay?  So once that comes into

16   the system, if it was over threshold, right,

17   then there would be a case created.  And it

18   would be sent to a system so that -- it's

19   case management work -- so that we would be

20   identified that there was a case that had

21   gone over threshold, and then we could

22   actually analyze if that was -- what that was

23   or why.

24        Q.    And is that whole process

25   automated?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.

 2          Q.      Okay.

 3          A.      It's systematic.

 4          Q.      Systematic sounds better than

 5     automated.

 6                  MS. WICHT:  Just to be clear,

 7          Mike, you're asking in the '12 to '14

 8          when she was in the department, right?

 9          All of these are directed at that?

10                  MR. FULLER:  Yes, ma'am.

11                  MS. WICHT:  Okay.  Thank you.

12     QUESTIONS BY MR. FULLER:

13          Q.      Now, so you would get this --

14     you mentioned threshold event.  Somehow,

15     computer-wise, this information comes to you,

16     you and others in your department, I guess;

17     is that right?

18          A.      That's correct.

19          Q.      And what is it that you do with

20     this information?

21          A.      Multiple things.  So, first of

22     all, you look at it to see, you know, what

23     drug family, what threshold event happened.

24     We have many tools that we use, or that we

25     used at the time, and those tools are created
```

```
 1    from statisticians on the team that would

 2    create dashboards for us so that we could

 3    actually look at and evaluate what was

 4    happening for which customer.

 5         Q.    Now, you mentioned drug

 6    families.

 7               What are drug families?

 8         A.    Drug families are the way

 9    controlled substances are categorized --

10         Q.    Yes, ma'am.

11         A.    -- by the DEA, by the active

12    ingredient in the drug.

13         Q.    So give us some examples of

14    drug families that you would be looking at.

15         A.    Actually, there's 116 of them.

16         Q.    Well, just give us two or

17    three.

18         A.    So the example would be I could

19    say alprazolam.  Okay.  So that would be any

20    and all strengths of what that drug family

21    would have.  So all the different products

22    that Cardinal Health carries, it would have

23    the same exact active ingredient that

24    alprazolam carries that would be in a

25    specific drug family.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.      So would OxyContin be in its

 2  own drug family?

 3           A.      It does have its own, uh-huh.

 4           Q.      And how about like hydrocodone?

 5           A.      Yes.

 6           Q.      Okay.  Then in '14 you moved on

 7  over to being a senior consultant for

 8  strategic planning and execution?

 9           A.      That's correct.

10           Q.      Now, does that take you out of

11  the anti-diversion department?

12           A.      Yes.  Yes.

13           Q.      Okay.  So, and correct me if

14  I'm wrong, you joined this anti-diversion

15  department in approximately '07?

16           A.      Correct.

17           Q.      You were there through sometime

18  in 2014?

19           A.      Correct.

20           Q.      We talked about your role as

21  the new account specialist, and then as a

22  senior analyst for quality and regulatory you

23  were involved in analyzing threshold events

24  to determine whether shipments would be made

25  or not, and then also report it to the DEA,
```

Highly Confidential - Subject to Further Confidentiality Review

1  I'd assume?

2        A.     Well, I want to clarify that

3  the only analytics or that anything that we

4  would look at were only the ones that

5  actually had a threshold event, not all.

6        Q.     Okay.  So as a senior analyst

7  for quality and regulatory, you would analyze

8  threshold events, correct?

9        A.     Yes.

10       Q.     To determine whether they --

11 there was some legitimate explanation, do the

12 due diligence, or whether they needed to be

13 halted or suspicious and need to be reported,

14 correct?

15       A.     Correct.

16              MS. WICHT:  Object to the form

17       of the question.

18              THE WITNESS:  That's correct.

19 QUESTIONS BY MR. FULLER:

20       Q.     And then in 2014 you come out

21 of that department?

22       A.     Yes.

23       Q.     Was that considered a promotion

24 or a lateral move?

25       A.     It was a promotion.

```
 1          Q.     Okay.  And you're now a senior

 2   consultant for strategic planning and

 3   execution?

 4          A.     That's correct.

 5          Q.     Can you tell us what that --

 6   what you do now?

 7          A.     Yes, I can.

 8                 I am actually on a software --

 9   Cardinal Health is going through a software

10   change with their ordering platforms, so in

11   instead of having different ordering

12   platforms and systems that are different

13   across different business units, we are all

14   coming onto one platform.

15                 So in this role, gathering

16   business requirements for what that software

17   will need to do, how it will need to react,

18   what it -- how it needs to handle orders for

19   the future, basically, is what it's for.

20          Q.     So basically you -- and correct

21   me if I'm wrong, so you have a bunch of

22   different departments within Cardinal, or

23   segments, and you're trying to put everybody

24   on the same page as far as an ordering

25   platform goes?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Correct.

 2          Q.      Okay.

 3          A.      Correct.

 4          Q.      Everybody may have little bit

 5    of different needs, and you're trying to

 6    design or facilitate a platform that

 7    satisfies everybody's needs?

 8          A.      That's correct.

 9          Q.      Got it.

10                  Now, you've been in that role

11    four years?

12          A.      Yes.

13          Q.      Has it taken that long to

14    create this platform, or is there other stuff

15    that you've been doing?

16          A.      No, it has taken that long, and

17    it's -- will continue.

18          Q.      Really?

19          A.      Yes, it will.  It's at least a

20    seven-year project.

21          Q.      Wow.

22          A.      Uh-huh.

23          Q.      So as part of the diversion

24    department, you've already told us that you

25    guys receive the threshold events, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.      It's the anti-diversion.

 2         Q.      Anti-diversion.  What did I

 3    say?  Diversion department.

 4         A.      Sorry.

 5         Q.      I'm going to hold my tongue on

 6    that one.

 7         A.      Yeah.

 8         Q.      As part of the anti-diversion

 9    department, you guys receive the threshold

10    events when they occur, correct?

11         A.      That's correct.

12         Q.      Now, is that for -- and you're

13    based here in Dublin?

14         A.      Correct.

15         Q.      Okay.  So is that for the

16    entire company?

17         A.      Yes.

18         Q.      Okay.  So all -- I don't know.

19    There's 20-some-odd different distribution

20    centers; is that right?

21         A.      That's correct.

22         Q.      And each of them have their own

23    DEA registrant number; is that right?

24         A.      That's correct.

25         Q.      And you would receive all
```

```
 1    threshold events for all of those facilities,

 2    whether it's 27 or whatever number it is?

 3         A.    That's correct.

 4         Q.    Okay.  So they're all centrally

 5    processed within this anti-diversion

 6    department?

 7         A.    Yes.

 8         Q.    Now, when you joined the

 9    anti-diversion department, had it just been

10    created or was it in existence prior to?

11         A.    The actual system for the case

12    management?

13         Q.    No, the department, the

14    anti-diversion department, that you became a

15    part of in 2007.

16         A.    I honestly -- I don't know.  I

17    wasn't part of that.  I wasn't -- it was -- I

18    hadn't worked in any of that.

19         Q.    They were on the other side of

20    the building?

21         A.    Yes, I was, so I don't know

22    what was there.

23         Q.    So you don't know when this

24    anti-diversion department was actually set up

25    or created?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      No.

 2        Q.      Let me ask this.  A little bit

 3   of an odd question.  But how did you go from

 4   where you -- what department were you in, let

 5   me ask it that way, before anti-diversion?

 6        A.      So I was in a department that

 7   was for --

 8        Q.      You were in the diversion

 9   department, right?  I'm kidding.

10        A.      No, I was not.

11                I was in the business

12   transformation office, is what it was

13   considered.  So there again, it was where

14   Cardinal was trying to bring all of their

15   different business units together to make it

16   kind of a one Cardinal Health so that it

17   would be more uniform and consistent across

18   all areas of business.

19        Q.      So more of a corporate

20   application across all units?

21        A.      Correct.

22        Q.      Got it.

23                And how did you -- did you get

24   recruited to go to this anti-diversion

25   department?  Did somebody post it?  How did
```

1    that happen?

2         A.    The senior vice president was

3    who I had reported to before, and when he was

4    assigned or asked or recruited or whatever

5    term that was to build, you know, a process,

6    or a different process, that Cardinal needed,

7    he asked at that point in time that I would

8    follow and join him as the admin for that

9    role.

10        Q.    And who was that senior vice

11   president?

12        A.    Mark Hartman.

13        Q.    Is Mr. Hartman still there?

14        A.    At Cardinal Health?  No.

15        Q.    Do you know when he left,

16   approximately?

17        A.    2010.

18        Q.    And do you know where he is

19   now?

20        A.    Yes, I do.  He's actually

21   consulting for himself.  He has his own

22   company.

23        Q.    Oh, just outside consulting?

24        A.    Yes.

25        Q.    Do you-all still keep in touch?

1          A.      We do.

2          Q.      I mean, he must have thought

3    pretty highly of you to ask you to come with

4    him to help him.

5          A.      Yes.

6          Q.      So what is your role in setting

7    thresholds, if any?

8          A.      Currently, none.

9                  Are you asking at the time

10   frame?

11         Q.      Sorry, back when you worked in

12   the anti-diversion department.

13         A.      So there again, that was very

14   specific.  So setting the thresholds are

15   different for the different roles, so what

16   time are you actually --

17         Q.      Was there anytime that you were

18   assisting in setting thresholds?

19         A.      Well, definitely.

20         Q.      Okay.

21         A.      So that's why I'm trying to

22   tell you -- ask which time frame that you're

23   questioning and how those are handled.

24         Q.      Sure.  Sure.

25                 When was it that you were

```
 1    involved in any way in setting thresholds?

 2          A.      In both roles.

 3          Q.      In any role?

 4          A.      Both roles.  That's my answer.

 5          Q.      Oh, yeah, sure.

 6          A.      So as a new account

 7    specialist --

 8          Q.      Sooner or later you and I are

 9    going to get on the same page, I promise.

10          A.      I'm trying.

11          Q.      No, listen, I appreciate it.

12          A.      So, definitely.  So a new

13    account specialist, if an account has been

14    approved for the sale of controlled

15    substances, they're the ones that actually

16    use the system to apply those thresholds to

17    each individual customer.  Okay?  Those are

18    preset.  Those are -- it's just a matter of

19    being systematic so that each customer has a

20    base threshold for each drug family.  So

21    that's kind of the responsibility in the new

22    accounts.

23          Q.      And you say it's preset.

24                  Explain what you mean to us.

25          A.      So as a new account specialist
```

```
 1   there's, you know, ways of approving, right,

 2   to make sure that the customer is valid and

 3   legitimate and should be purchasing

 4   controlled substances.  But the pharmacists

 5   had already, you know, stated, depending upon

 6   the size of a pharmacy, what those types of

 7   thresholds should be.

 8               So it wasn't necessarily

 9   individually to say that -- a new account

10   specialist would say, oh, this is the number

11   or the value that this pharmacy should have.

12   That was all done by, you know, some form of

13   statistics, analytics, handled by a

14   pharmacist, all preset prior to that

15   happening.

16       Q.    So to make it simple for

17   someone like me, there is a -- correct me if

18   I'm wrong -- there is a predetermined matrix

19   of some sort, grid, that depending on what

20   type of pharmacy or drugstore you are and

21   what size you are, you get plugged into this

22   grid, and that tells you what the thresholds

23   will be for the different drug families?

24       A.    That's correct, yes.  They're

25   all preset on a conservative level of what it
```

```
 1    should be, so then we can begin to see a

 2    pattern and how they order.

 3              MS. WICHT:  Again, at that time

 4         that she was serving --

 5              THE WITNESS:  That's correct.

 6              MS. WICHT:  -- in the account

 7         setup role.

 8    QUESTIONS BY MR. FULLER:

 9         Q.    Now, did you have any input

10    into what this matrix was --

11         A.    No.

12         Q.    -- at any point in time?

13         A.    No.

14         Q.    Did you have any ability to

15    vary from what this matrix was for a new

16    client?

17         A.    Absolutely.  I mean, if we felt

18    that once they were put in place, if they

19    were -- if we used the small category and we

20    decided or thought that they didn't even need

21    those, we would ratchet that down.  So, you

22    know, we would have explanation of what was

23    needed for that.

24         Q.    In that example that you just

25    gave us, is that still as part of the new
```

```
 1    account setup, or is that after we deal with

 2    them for a little bit?

 3         A.     Both.

 4         Q.     Okay.  But in your role as new

 5    account setup, could you still go in and

 6    change their threshold after they've been

 7    approved, or does that go to someone else?

 8    I'm trying to distinguish roles because from

 9    the title, new account setup seems like

10    you're just doing the new account setup.

11         A.     And at the time, yes, I mean,

12    we would -- if we had a recommendation to the

13    pharmacist that said, for example, on a new

14    account setup, right, it would have a

15    questionnaire, and if they did not sell --

16    there are many pharmacies that decide that

17    they don't want to sell any C-IIs, okay?

18              So in that case, we would then

19    say, "Hey, this is their answer.  These

20    aren't the drugs that they want to purchase.

21    We would like to take that down to a zero,"

22    so that they couldn't get any.

23         Q.     Sure.  Sure.

24         A.     Okay.  So those were the types

25    of decisions or callouts that we would make
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as a new account setup team at that time.

 2         Q.    Now, if it's a pharmacy that

 3    says, "Hey, no, no, I want more than that,"

 4    did you have the ability to increase the

 5    threshold as a new account setup person?

 6         A.    At that time, no, not at all.

 7    We would have to get an approval for that.

 8         Q.    And that approval would have to

 9    come from who?

10         A.    From leadership or a

11    pharmacist.

12         Q.    And when you say "leadership,"

13    help me out.

14         A.    I mean -- I apologize.

15    Leadership in that type of role was anybody

16    that was manager, director, in the

17    department.

18         Q.    Someone like Mr. Hartman could

19    certainly give that approval?

20         A.    Mr. Hartman would not.

21         Q.    Okay.  And why not?

22         A.    Because that was not his

23    specialty.  He relied on his pharmacist for

24    that.

25         Q.    Okay.
```

1      A.      Uh-huh.

2      Q.      So you mentioned that, for

3   example, if we were zeroing them out because

4   they didn't want to sell C-IIs, that we would

5   have to document that, correct?

6      A.      That's correct.

7      Q.      Okay.  With all of the stuff

8   that you're doing, with all the due

9   diligence, with all the analysis of new

10  accounts, is all that documented somewhere?

11     A.      To the best of my knowledge at

12  that time, yes, it would have been

13  documented.

14     Q.      Okay.  And what type of

15  documentation did you keep?  Were there new

16  account files?  Were there diligence files?

17     A.      Yes.  Yes.

18     Q.      Which one?  Both?

19     A.      Well, both, right.

20     Q.      Okay.

21     A.      I mean, due diligence is an

22  entire packet.  We would gather the

23  information, put it together, and then it

24  would be kept electronically in a file.

25     Q.      So that at any point in time if

Highly Confidential - Subject to Further Confidentiality Review

```
1    you needed to go back and look, you could
2    always that access that file?
3         A.    Absolutely.
4         Q.    If anybody questioned why you
5    approved them, you have that information
6    there?
7         A.    That's correct.
8         Q.    Okay.  When you joined the
9    anti-diversion department in 2007 --
10        A.    Yes.
11        Q.    -- how many people were in that
12   department?
13        A.    Oh, goodness.  I don't have an
14   exact number.  I believe there was seven or
15   eight, uh-huh.
16        Q.    Okay.  Safe to say less than
17   ten?
18        A.    Yes, when I joined, uh-huh.
19        Q.    Okay.
20        A.    For that department, uh-huh.
21        Q.    Now, did that department grow
22   over the time and by the time you left in, I
23   think, '14?
24        A.    Yes.
25        Q.    So say in '14, how large or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   small was that department?

 2         A.     I believe there were 14, but

 3   again, I don't have an exact amount.

 4         Q.     No, that's fair.

 5         A.     Now that's just that

 6   anti-diversion department, though.

 7         Q.     Right.

 8         A.     Okay.

 9         Q.     Now, at that point in time did

10   the anti-diversion department have people out

11   in the field, too, at the -- or distribution

12   centers?

13         A.     So...

14         Q.     Go ahead.

15         A.     So the field, we did have field

16   representation.

17         Q.     Okay.  Now, would that be a

18   person at each distribution center or would

19   it be people that covered certain

20   geographical areas?  How did that work?

21         A.     I wasn't on staff to even bring

22   that up to speed.  Like I was not a hiring

23   manager for that.  I don't know.

24         Q.     Not something you knew?

25         A.     No.  No.
```

 1          Q.     But you knew there were people

 2   out in the field?

 3          A.     There were, yes.

 4          Q.     Do you know what they did?

 5          A.     No, I don't.

 6          Q.     Hopefully something with

 7   anti-diversion, right?

 8          A.     Hopefully something in the

 9   distribution center for that reason, yes, or

10   in their regions or areas.

11          Q.     All right.  So let's talk a

12   little bit more about how your role changed

13   when you became the analyst, senior analyst,

14   for quality and regulatory.

15                 Tell us in a little more detail

16   what you did there.

17          A.     Well, again, it was case

18   management.  So if a case had -- if an order

19   had surpassed their threshold --

20          Q.     Yes, ma'am.

21          A.     -- case would come into our

22   system.  And we would take a look at, you

23   know, again, the drug family, the threshold,

24   what had already been shipped, if anything,

25   and make decisions using the tools that we

1    had in front of us to make a decision on

2    whether we would release the order or cut the

3    line.

4            Q.      Now, so an order is placed by a

5    pharmacy or a drugstore?

6            A.      That's correct.

7            Q.      That comes into this automated

8    system, right?

9            A.      If it's over threshold, yes.

10           Q.      Well, and I'm sorry.  There's

11   an automated system for ordering altogether;

12   is that correct?

13           A.      Yes.

14           Q.      Okay.  So someone places an

15   order, and it does just what you said, exceed

16   a threshold, does it get taken out of the

17   system that's going to the distribution

18   center?

19           A.      Yes.

20           Q.      Okay.  So they won't even know

21   about it?

22           A.      That's correct, they have no

23   idea.

24           Q.      Do they get any notice that,

25   "Hey, we have a hold on this order from this

```
1    pharmacy or this drugstore"?

2         A.     At the distribution center?

3         Q.     Yes, ma'am.

4         A.     I don't know that.

5         Q.     Okay.

6         A.     I don't know.

7         Q.     But it was your belief that

8    this order, when it exceeds this threshold,

9    gets pulled out of the regular system and

10   diverted to the anti-diversion department?

11        A.     That's correct.

12        Q.     And who does it come to, or

13   does it come to all of you in the

14   anti-diversion department?

15        A.     Depending upon the assignment,

16   I mean, it's kind of -- it's case management,

17   so it's assigned by region or area, you know,

18   that -- so depending upon the distribution

19   center, it would depend upon who it was

20   actually assigned to.

21        Q.     So, for example, during the

22   time that you were acting as -- in the

23   analyst role, what was your region, or did it

24   change over time?

25        A.     I had multiple regions.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.     Which would include what?

 2        A.     I had the Aurora distribution

 3   center.  I had Lakeland distribution center.

 4   I had Swedesboro distribution center.  I had

 5   Wheeling distribution center.  And I had

 6   Knoxville distribution center.

 7        Q.     Now, was that -- did you have

 8   all of those facilities or distribution

 9   centers for the two years you were filling

10   that role?

11        A.     I believe so.

12        Q.     Okay.

13        A.     I do.  I believe so.

14        Q.     And I apologize.  Let me back

15   up a little bit.

16               When you came into the

17   anti-diversion department as administrative

18   assistant, did you receive any specialized

19   training related to anti-diversion?

20        A.     As an administrative assistant?

21        Q.     Yes, ma'am.

22        A.     Hands-on training, you begin to

23   hear and begin to learn.  I did not have to

24   go through any type of formal training to be

25   an administrative assistant, no.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.     And how about when you moved or
 2    got the promotion to become the new class
 3    specialist, did you receive any training for
 4    that job?
 5           A.     Yes, absolutely.
 6           Q.     And tell us what kind of
 7    training you received and from who.
 8           A.     It was internal training.  It
 9    was a lot of hands-on.  As an administrative
10    assistant, I had already seen the documents
11    that we were gathering for the
12    questionnaires.  So definitely, you know,
13    looked through those and see there were --
14    there were key questions that the pharmacist
15    had wanted answers to or would be, you know,
16    notified if there were certain answers on
17    them.  So, you know, all of the key questions
18    were something that I already kind of knew.
19           Q.     Right.
20           A.     So going through those and then
21    deciphering the training was really what
22    those answers meant, you know.  But other
23    additional information would be needed if
24    they were different answers or certain
25    answers that, you know, once raised to the
```

1    pharmacist level of, you know, approval-type

2    thing, then what would we need to gather for

3    the due diligence.

4         Q.    Now, how about for the analyst

5    position?  You've been in new clients for a

6    couple of years; now you're moving on to

7    analyst.

8              Did you receive any training in

9    that regard?

10        A.    Yes.

11        Q.    Now, was this some of the stuff

12   that you had already seen, though, being in

13   new clients?

14        A.    I had not worked in any of the

15   case management, so that part was new.  So

16   there was, you know, formal training as far

17   as it was internal, but it was formal

18   training that was set up so that we would

19   know what, you know, we were looking at at

20   that point in time.

21        Q.    When you say "looking at," what

22   do you mean?

23        A.    Well, in the case management,

24   so that you would see and you would

25   understand exactly what was provided in that

Highly Confidential - Subject to Further Confidentiality Review

1    case.

2         Q.    So let's talk about the

3    threshold setting and the -- the new client

4    analysis, not threshold setting.  I'm sorry.

5               New client analysis.  What type

6    of information would you gather on a new

7    drugstore or a new pharmacy?  Say, whether it

8    be -- and if it does, differentiate for me if

9    it differs from, say, between, you know,

10   Joe's Pharmacy versus a CVS.

11              Okay?

12        A.    Uh-huh.

13        Q.    Well, let me ask:  Does the

14   process differ depending on who the potential

15   drugstore or pharmacy is?

16        A.    Only if there's a prime vendor

17   agreement.  So, you know, as far as all

18   licenses or due diligence, no, it does not

19   change.

20        Q.    Well, now I've got to ask what

21   a prime vendor agreement is.

22        A.    To be perfectly honest, I do

23   not know all the details in it.

24        Q.    No.  No.  I'm kidding.

25        A.    But it's an agreement from

1   contracts that are set up from the sales

2   department, I would assume.

3           Q.      And do you know what the gist

4   of the agreement does?  What the purpose of

5   this prime vendor agreement is?

6                   Does it give them special

7   ordering rights or quicker delivery?

8           A.      Not to my knowledge, no.

9           Q.      What does it --

10          A.      No quicker deliveries.

11          Q.      What does it do for them?

12                  Does it set any certain amount

13  that they have to order?

14          A.      I don't have the details.  I

15  don't know what's in those contracts at all.

16          Q.      So whether a drugstore or

17  pharmacy has a prime vendor agreement, does

18  it affect your due diligence as they're

19  coming in as a new customer then?

20          A.      No.

21          Q.      Okay.  Again, take us through

22  the process.  New client.  I'm, you know,

23  Mike's Pharmacy, and I want to become a

24  customer of Cardinal's and receive deliveries

25  of controlled substances.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Okay.

 2          Q.      What are you going to do?

 3          A.      So when I was in that

 4   department --

 5          Q.      Yes.

 6          A.      -- what we did at that point in

 7   time --

 8          Q.      Just so we're clear, this is

 9   during, say, 2010 to 2012, correct?

10          A.      Yes.

11          Q.      Okay.

12          A.      So we would gather -- the sales

13   representatives would have to submit for

14   that, right, they're the front line to the

15   customer.  So they would have to submit

16   licenses, requests that they wanted to

17   purchase controls.  There is a questionnaire

18   that would have to be filled out.  There

19   would be photos gathered.  There could be

20   dispense data and usage.

21                  I think that -- that -- those

22   pieces would at least get it started where we

23   could at least begin to work on gathering due

24   diligence on that -- on that account.

25          Q.      And you say salespeople.
```

```
 1   What's the title of the salespeople; do you

 2   know?

 3        A.     Sales managers?  I'm not

 4   100 percent certain on their titles.

 5        Q.     No, that's all right.

 6        A.     I don't know.

 7        Q.     But these are the people that

 8   have the face-to-face contact with the

 9   customers?

10        A.     That's correct.

11        Q.     These are the ones that try to

12   make sales and do sales with the drugstores

13   and pharmacies on a regular basis?

14        A.     Yes.

15        Q.     Okay.  Do you know if they're

16   based out of Dublin or they're scattered all

17   over the place?

18        A.     Cardinal Health sales force is

19   across the country.

20        Q.     Okay.  Now, let's go through

21   this initial setup.  Well, let's actually

22   keep going.  You said this is the initial

23   setup information.

24               What do you do with it when you

25   get it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Well, we validate and we
 2   verify.  So we would start with licenses --
 3          Q.      Okay.
 4          A.      -- for example, if it was a
 5   valid license, if there's any action held
 6   against it, if -- which would be the stores,
 7   right, the ship-to locations' DEA license.
 8   It would be the state license of the
 9   pharmacy.  It would be the state license of
10   the pharmacist, the pharmacist in charge, a
11   pharmacy tech.  If there was any individual
12   in the pharmacy, that was working in that
13   pharmacy, we would require their license.
14          Q.      Okay.
15          A.      Validate, make sure that
16   there's no action held against them, and then
17   from there kind of move down through, you
18   know, Internet research for where the store
19   is located, the surrounding area.
20          Q.      What are you looking for?
21          A.      Validation in some cases that
22   what their questionnaire states is truthful
23   and matches for validity purposes.  Some of
24   it, if it's a brand new store, we would have
25   photos for -- you know, to make certain that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they had vault purposes, right?

 2             So just various reasons to have

 3    photos or do Internet research on the

 4    location of what -- where it was.

 5        Q.    And then you mentioned

 6    dispensing data.  What's that?

 7        A.    It's a report that can be run

 8    from a pharmacy's ordering systems that will

 9    give the information on what -- what they

10    have dispensed for a period of time that they

11    so choose to run that report.

12        Q.    Now, Mr. Baranski was here

13    yesterday, and I think he referred to

14    something like that as a usage file.

15             Does that sound familiar?

16        A.    Yes, usage.  That's the same,

17    yeah.

18        Q.    And I've seen it -- something

19    referred to as a drug utilization report?

20        A.    That's the same as well.

21        Q.    Okay.  So it's all this

22    dispensing data?

23        A.    Right.  Correct.

24        Q.    And what type of information

25    can you get from the pharmacies in this
```

 1    dispensing data?  Why do you ask for it?

 2         A.    If they're an existing, right,

 3    so they have to be an existing customer or an

 4    existing store, right?  So if it's a brand

 5    new store, which is different, they would not

 6    have it.

 7         Q.    That means because they weren't

 8    open --

 9         A.    They haven't been open.  They

10    have no -- they haven't dispensed anything --

11         Q.    They have no history?

12         A.    -- so you can't obtain such a

13    thing.

14         Q.    Sure.

15         A.    If they have some kind of

16    history and they're just new to Cardinal,

17    then it gives an idea of what it is that they

18    have actually dispensed for the past month,

19    two months, you know.  Some of them will only

20    provide, you know, a month's worth of data.

21         Q.    Now, you say it gives an idea.

22               Does it give you an idea, or

23    does it give you actual numbers?

24         A.    Depending upon -- so when they

25    run it, right, so if they run it mid-month to

Highly Confidential - Subject to Further Confidentiality Review

1   mid-month, then you can only assume, right,

2   which is not always great, that it's a 30-day

3   period.  You have to have at least a 30-day

4   period, and then it would at least give the

5   information that they had dispensed.

6          Q.      And when you say "information

7   they dispensed" --

8          A.      By drug family is what we

9   request.

10         Q.      Okay.  So you can actually get

11  it just by drug family for -- sorry.

12                 So actually give you the number

13  of pills per drug family, right?

14         A.      That's correct.

15         Q.      Now, can you also get -- we're

16  talking, I think, controls, controlled

17  substances; is that --

18         A.      That's correct.

19         Q.      Can you also get noncontrolled

20  substances?

21         A.      That we can actually get

22  from -- yes, if they will provide it.  That's

23  kind of the question.  But, yes, you could.

24  You could actually obtain that.

25         Q.      And certainly you guys could

```
 1    demand it, right?

 2         A.     We could.

 3         Q.     I mean, you could say, "Look,

 4    give us the information" --

 5         A.     Uh-huh.

 6         Q.     -- "or we're not going to sign

 7    you up."

 8         A.     That's correct.

 9         Q.     Did you ever have problems

10    getting this dispensing data or usage files?

11         A.     Not on a normal basis.  The

12    issue is that it has HIPAA information.  So

13    when that report gets run, if they don't

14    cleanse it, they're still complying and

15    sending it, and then we would have to either

16    cleanse it or send it back.  So it can take

17    some time, but they would send it, yes.

18         Q.     Okay.  So the only issue being

19    potential HIPAA, which you've seen those

20    reports run in the past without HIPAA

21    information as well?

22         A.     Correct.

23         Q.     Okay.

24         A.     So we would push for the issue

25    to make sure that we would get cleansed data,
```

1    yes.

2         Q.      And assuming the store has been

3    open, you can ask for more than just a month?

4         A.      That's correct.

5         Q.      Do your people ask for that?

6    If you know back then during 2010 to 2012.

7         A.      I don't know if there was a

8    ruling on what the sales representatives were

9    to ask for on that.

10        Q.      Now, you, as the new client

11   specialist, can say to your salesperson,

12   "Hey, I want to see more data.  Go back and

13   ask for the last six months," right?

14        A.      I could.

15        Q.      Okay.  Now, is there any other

16   source that you could get this information

17   from other than asking the pharmacy?

18             MS. WICHT:  Objection.

19             THE WITNESS:  Asking the

20        pharmacy directly?

21             MS. WICHT:  Calls for

22        speculation.

23   QUESTIONS BY MR. FULLER:

24        Q.      Was there any other source that

25   you could go to get this information?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.      No, the pharmacy has to provide

 2    it.

 3         Q.      Okay.

 4         A.      At that time, that's what we

 5    utilized.

 6         Q.      So you're not aware of any

 7    other source where you could get the same

 8    dispensing data?

 9         A.      To that degree?  No.  There's a

10    data feed that we could use.

11         Q.      What's a data feed?

12         A.      You know, I'm not 100 percent

13    certain how it actually works through our

14    sales team, through our sales -- that's not

15    correct.  It's through the sales purchase

16    history, but there again, they have to be a

17    Cardinal Health, already, customer.  So

18    during, you know, the new account setup, that

19    was not anything that was able to be

20    utilized.

21         Q.      So that data field that you're

22    referencing, that's something that's only for

23    Cardinal -- customers that are already with

24    Cardinal?

25         A.      That would have not been
```

 1    anything that the new account team -- at the

 2    time that I was involved with the new account

 3    team could have possibly ever utilized, no.

 4         Q.    Okay.  So to your knowledge,

 5    there's no other source to gain that

 6    dispensing data, other than from getting it

 7    from the pharmacies themselves?

 8         A.    That's correct.

 9         Q.    Okay.  And do you know whether

10    you could actually request to have the

11    information ran different ways from the

12    pharmacies, this dispensing data?

13         A.    I'm not sure I understand your

14    question.

15         Q.    Sure.

16               You said they broke it out by

17    drug family.

18               Could they break it out by

19    actually pills, the actual -- the dosage

20    units as well, or the dosages?

21         A.    I would suppose they could.

22         Q.    Now, Mr. Baranski was telling

23    us yesterday that the usage file, dose

24    dispensing data, that they use it to make

25    sure that they can meet client needs.  If

Highly Confidential - Subject to Further Confidentiality Review

```
 1   they got to increase volume, they need to

 2   know what kind of increased volume they're

 3   going to have.

 4             Does that make sense?

 5        A.    Sure.

 6        Q.    Okay.  You guys use it in the

 7   threshold process to look back historically

 8   at what that client or what that potential

 9   client may be ordering in the past or

10   dispensing in the past; is that right?

11             MS. WICHT:  Object to the form.

12             MR. FULLER:  Yeah, strike that.

13        That was bad.

14   QUESTIONS BY MR. FULLER:

15        Q.    Whether the client -- excuse

16   me.  Whether the pharmacy or drugstore is

17   ordering from one distributor or multiple

18   distributors, the dispensing data is going to

19   show how many pills are going out,

20   irrespective of where they come from,

21   correct?

22        A.    It should, yes.

23        Q.    You say "it should."

24        A.    I don't know how they can run

25   it.  I'm not on their systems.
```

```
 1          Q.     Okay.

 2          A.     Right?  I mean, that's only

 3   fair.  I don't know -- when we request

 4   something, that has to be in the trust that

 5   they're giving us what we have requested.

 6          Q.     That they're running it the way

 7   you've asked it be run?

 8          A.     That's correct.

 9          Q.     Okay.  And assuming they run it

10   the way you ask them to run it, when you

11   request a dispensing data or a drug

12   utilization report, you're going to know how

13   many pills are leaving that pharmacy for

14   whatever period it is ran for?

15          A.     That's correct.

16          Q.     So now take us from that point

17   forward.  You have all this information.  You

18   went through it.

19                 What's your next step in the

20   process?

21          A.     Well, there's also a question

22   that shows or -- that can counteract that on

23   the questionnaire.  We also ask them how many

24   prescriptions they fill in a month's time.

25                 So by knowing that, even if
```

Highly Confidential - Subject to Further Confidentiality Review

1    they only provided controlled substances on

2    the data usage, there should also be a

3    balance on the noncontrols because of the

4    prescription count, not just the usage.

5              Those all come into play.  I

6    mean, there's not one specific response that

7    causes whether or not you approve.  So you

8    have to go through all of it.

9         Q.    Right.

10        A.    You have to figure out all of

11   the information that is provided, all the

12   information that you gather, and then if it

13   makes sense that, you know, you don't find

14   anything as far as any kind of a licensure

15   issue, if it makes sense that the size that

16   they are stating that they are matches to the

17   prescription count and it matches to the

18   controls to noncontrols, then we could

19   approve an account for purchase or we could

20   deny the account, depending upon our

21   findings.

22        Q.    And we talked about you sort of

23   plug the potential new drugstore, new

24   pharmacy, in this matrix.

25              What goes into calculating

 1    where they fall onto this matrix?  Is it size

 2    and what else?

 3         A.    It would be size of how many

 4    prescriptions per month.  It would be the

 5    amount of controls or -- and noncontrols that

 6    they use.

 7         Q.    So is it the percentage of

 8    each?

 9         A.    It's not a percentage.  It's

10    not to the exact count.  It's a variation

11    of -- from small, medium, large.  Those were

12    already preset by the pharmacist that would

13    make sense.

14              On a small or medium-sized

15    pharmacy, that could be set with a boundary

16    of thresholds, right?  I mean, so it's kind

17    of -- if they're new to Cardinal and we, you

18    know, didn't know exactly what it was that

19    they would be purchasing from Cardinal, they

20    have to, you know, tell you if they're

21    primary or secondary.

22              There's all of the different

23    pieces to the matrix that kind of represents

24    how we would actually establish what size

25    they would fall into, which would then

1  categorize where and which threshold settings

2  we would use.

3       Q.    And so the record's clear, you

4  mentioned primary and secondary.  I think I

5  may know what that means, but can you explain

6  that to us?

7       A.    Well, if a pharmacy says

8  they're going to purchase everything or the

9  mass majority of all of their products

10  through one distributor versus having

11  multiple, that goes into play.

12       Q.    So that would be a scenario

13  where --

14       A.    So if they're going to -- yeah.

15  So if they're going to use just Cardinal,

16  then that would be considered a primary.  If

17  they were going to use two, then that would

18  be -- we would set that for a secondary.

19       Q.    Okay.  So -- all right.  So I

20  just drew this while we were sitting here

21  chatting.

22            So -- and this is just a really

23  bad sketch.  So if this is a new drugstore

24  threshold grid and we consider such things as

25  you mentioned, number of scripts, number of

1    controlled versus noncontrolled, primary,

2    secondary, the computer system is going to

3    give us somewhere in here on this grid where

4    the new customer is going to fall, right?

5        A.    The computer is not going to

6    give that.

7        Q.    So you're just going to plug it

8    in?

9        A.    We're going to make the

10   decision to begin with if they are considered

11   a small, medium or large --

12       Q.    Okay.

13       A.    -- and then we're going to go

14   from there, right?  So that's a decision that

15   is made; that's not a calculation from the

16   computer.

17       Q.    Okay.  So you're going to

18   decide if it's small, medium, large, and it's

19   going to take to us a certain spot on this

20   grid; is that correct?

21       A.    Yes.

22             MS. WICHT:  Object to the form.

23   QUESTIONS BY MR. FULLER:

24       Q.    And then wherever they fall on

25   this matrix, or this grid, that's going to

```
 1   tell us what their threshold numbers are

 2   going to be; is that right?

 3              MS. WICHT:  Object to the form.

 4        Foundation.

 5              THE WITNESS:  Sir, I don't

 6        think that you're understanding what

 7        I'm categorizing.  I think you have

 8        more of a grid.  This is actually

 9        what -- the grid, or the matrix, is

10        actually the numbers behind, right?

11              So if there are -- I feel like

12        you're trying to make me pinpoint

13        exactly what a threshold would be for

14        this specific customer.  There are

15        little -- it's more small, medium,

16        large --

17   QUESTIONS BY MR. FULLER:

18        Q.    Okay.

19        A.    -- and then you customize from

20   there.

21              So it's not necessarily that I

22   would pick that box to say what that's going

23   to be.  You've got way too many options on

24   this as far as we would calculate from using

25   this information, I personally would.  It
```

Highly Confidential - Subject to Further Confidentiality Review

1    would be no computerized piece that gives me

2    the calculation to that.

3              At that point we would then go

4    to the computer and apply the thresholds

5    based on what we found or what we decided to

6    say is a small, medium or large category, and

7    then it would also depend upon the class of

8    trade.  So those are -- that's where you're

9    kind of getting into that grid and box.

10        Q.    Okay.  So we have -- so tell me

11   again what we do have.

12             We have small, medium and large

13   that are taken into consideration?

14        A.    That's correct.

15        Q.    We have class or category?

16        A.    Class of trade, yes.

17        Q.    Class of trade.

18             And are those mainly the two

19   factors that go into it?

20        A.    Yes.

21        Q.    Okay.  And how many classes of

22   trade do we have, best you can recollect?

23        A.    A handful maybe.

24        Q.    Okay.  And what are classes of

25   trade?

1      A.    The type of pharmacy.  It could

2   be a retail independent.  It could be a

3   hospital.  It could be a long-term care.  It

4   could be a 340B account.  There could be all

5   kinds of different classes of trades in

6   there.

7      Q.    Okay.

8      A.    Uh-huh.

9      Q.    I mean, it --

10     A.    So those -- but those

11  thresholds vary.  So when you're pinpointing

12  something on that box, that's not quite

13  appropriate.

14     Q.    So let me make sure I

15  understand, though.

16          If we have a medium facility,

17  medium drugstore, and it's independent, it's

18  going to have a certain threshold set?

19     A.    That would be correct.

20     Q.    If we have another medium

21  that's a hospital, we go to its threshold,

22  its threshold may be different than the

23  independents?

24     A.    That's correct.

25     Q.    If we have a large that's an

Highly Confidential - Subject to Further Confidentiality Review

```
 1    independent, his threshold is going to be

 2    different than the medium independent?

 3         A.    That's correct.

 4         Q.    So it -- okay.  So it's

 5    probably -- you're right, it's probably a

 6    much smaller grid if we line up small,

 7    medium, large and all --

 8         A.    And worked with just that type

 9    of class of trade for that response or that

10    need, and then you would work --

11         Q.    So the class of trades may go

12    up this side and -- you're right, I mean --

13         A.    Correct.

14         Q.    I'm not going to ask you to

15    name them all, but there's multiples?

16         A.    No, please don't.  At the

17    moment, I mean, just having to -- I might

18    miss one.

19         Q.    Yeah.  No.  No.  That's fine.

20               So the matrix is set by

21    determination of class of trade and whether

22    it's a small, medium, large within that

23    class, correct?

24         A.    That's correct.

25         Q.    And that will tell us what the
```

Highly Confidential - Subject to Further Confidentiality Review

1   threshold is for that respective drugstore,

2   pharmacy, hospital, long-term care facility,

3   whatever it is?

4        A.     That's correct.

5              MR. FULLER:  Okay.  So we've

6         been going just about an hour, a

7         little over an hour, so I usually try

8         to stop every hour for a bathroom

9         break, stretch your legs.  So if

10        that's okay with you, that's what

11        we'll do.

12             THE WITNESS:  That's fine.

13             VIDEOGRAPHER:  Going off the

14        record.  The time is 10:09.

15         (Off the record at 10:09 a.m.)

16             VIDEOGRAPHER:  We're going back

17        on the record.  Beginning of Media

18        File Number 2.  The time is 10:27.

19   QUESTIONS BY MR. FULLER:

20        Q.     Let me ask, Ms. Justus, talking

21   about the dispensing data just a little bit

22   more, did you guys ever utilize any outside,

23   third parties to help with the investigations

24   of these new customers, these new drugstores,

25   these new pharmacies?

```
 1                    MS. WICHT:  Object to the form.
 2                    THE WITNESS:  During that time
 3           frame of new account setup?
 4      QUESTIONS BY MR. FULLER:
 5           Q.    Well, let's start with that
 6      time frame, yes, ma'am.
 7           A.    No.
 8           Q.    So it would just be --
 9           A.    Not that I can remember that we
10      had third-party data.
11                    Is that what you asked?
12           Q.    Well, no, ma'am.  I asked if
13      you used any third-party sources to help
14      collect information or anything like that as
15      far as the new client setup process.
16           A.    We had an investigative team.
17      I mean, if we wanted an investigator to go,
18      that would have been an outside source, I
19      guess, other than what was in front of us,
20      yes.
21           Q.    So when you -- and you say
22      investigative team.
23                    Would the investigators work
24      for Cardinal or is it some contract help or
25      assistance?
```

1      A.      Both.

2      Q.      Okay.  Any other third parties

3   that assisted with that process?  And again,

4   limiting it to the new client process.

5      A.      Not that I can think of at this

6   time.

7      Q.      And how about your threshold

8   analysis, which we'll get into here in a

9   minute, but any third parties that you had

10   assist you in that part of the job?

11              MS. WICHT:  Object to the form.

12              THE WITNESS:  I don't know how

13         those thresholds were actually set.

14         The pharmacist -- these were preset

15         for the new account specialists.  That

16         wasn't anything that the new account

17         specialists did.

18   QUESTIONS BY MR. FULLER:

19      Q.      Right.  I'm referring more to

20   the diligence that you do when you get a

21   threshold event.

22              Would you utilize any third

23   parties to help with that investigation or

24   that due diligence?

25      A.      That's not in the new account

1  setup process.

2      Q.     No, ma'am.  I said, is it when

3  we go into the analysis part of your job

4  duties.

5      A.     Yes.

6      Q.     When you changed jobs --

7      A.     Yes.

8      Q.     -- did you use any third

9  parties for that section?

10     A.     We had what was considered a

11  data feed.  I don't know exactly where all of

12  that came from.  That was from a system

13  ordering.

14     Q.     And what is a data feed?  Help

15  me understand what it is.

16     A.     So it shows -- it takes

17  historical purchases.  It has all of the

18  Cardinal purchase data in it.  And if a

19  pharmacy has signed up for or paid for the

20  subscription, it would then give all of their

21  data and dispense data.

22     Q.     When you say "signed up for" a

23  subscription, help me understand.  I --

24     A.     I don't know the exact details

25  of how it all works or what they have to

1    subscribe to or the details behind it.

2         Q.    Yes, ma'am.

3         A.    So I really can't help you

4    understand that, other than that was a tool

5    that we used through historical purchases.

6         Q.    Who would know more information

7    about that?

8         A.    I guess the decisionmakers that

9    actually have the means to access.  I'm

10   not even sure who in Cardinal would say -- or

11   how to or otherwise get that information.  I

12   don't know.

13        Q.    But it's something that you had

14   access for if they had a sub -- well, you had

15   access -- strike that.

16             So you had access for a data

17   feed for at a minimum Cardinal's past history

18   with that particular drugstore or pharmacy,

19   right?

20        A.    Sure.  I mean, we had our --

21   the historical data of our sales, yes.

22        Q.    Because it's your sales?

23        A.    Exactly, and that's what we

24   would use in that.

25        Q.    And if they had a subscription

1    for this data feed process, you would have

2    additional information; is that correct?

3         A.     I don't know how that worked.

4         Q.     I understand you don't know how

5    it worked --

6         A.     Okay.

7         Q.     -- but you had additional sales

8    data other than just Cardinal sales data?

9         A.     I do not know that that is

10   actually what came in there.  I know that we

11   would have more than what was controlled

12   substances.  We would be able to tell how

13   many prescriptions, but then that

14   validated -- that would validate everything

15   that we would see as all of Cardinal Health's

16   purchases.

17        Q.     And you mentioned -- you

18   mentioned that if they signed up for the

19   subscription, which is something -- let's

20   back up.

21             They don't have to sign up for

22   a subscription for you to have all of

23   Cardinal's sales data, right?

24        A.     That's correct.

25        Q.     So when they sign up for the

 1    subscription, whatever it may be, there's

 2    additional information that comes along with

 3    that?

 4         A.    I believe so, yes.

 5         Q.    And I think you testified a

 6    moment ago that it includes all their

 7    dispensing data?

 8         A.    You are correct.  I did say

 9    that.  I am not certain that that is a

10    correct statement.  I do not know exactly

11    what comes into that data feed.

12         Q.    But clearly when they sign up

13    with a subscription, it's more than just

14    Cardinal's sales data?

15         A.    I would assume so, and that's

16    unfair.  I do not know that to be exact.

17         Q.    Do you know who would sell

18    these subscriptions to the pharmacies?  Would

19    it be the sales reps?

20         A.    To the best of my knowledge,

21    yes.

22         Q.    Okay.  Now, were there ever

23    files that you got -- strike that.

24               So now let's go forward into

25    that where we just dove a little bit, into

1    the analysis side of your job when you became

2    the senior analyst for quality and

3    regulatory.

4              We talked a little bit about

5    setting thresholds.  Now your job is dealing

6    with existing drugstores and pharmacies and

7    threshold events; is that correct?

8         A.    That's correct.

9         Q.    Okay.  And what is a -- do you

10   have an understanding of why we set -- or why

11   you guys are required to set thresholds?

12             MS. WICHT:  Object to the form.

13             THE WITNESS:  To the best of my

14        understanding, so that we would know

15        and have a baseline of -- that we

16        wouldn't ship over that amount to any

17        extent, to watch for orders.  I mean,

18        there's only so much that Cardinal

19        would want to ship.

20   QUESTIONS BY MR. FULLER:

21        Q.    And the reason for these

22   thresholds is to monitor and try to -- well,

23   it's part of a system we have in place that's

24   required to monitor for suspicious orders.

25             Would you agree with that?

Highly Confidential - Subject to Further Confidentiality Review

```
1                MS. WICHT:  Object to the form.

2                THE WITNESS:  It's to monitor

3         for anything that would go over

4         threshold.

5                MR. FULLER:  All right.  AJ,

6         pull me 243, 496 and 47.  2043 and 47.

7   QUESTIONS BY MR. FULLER:

8         Q.    And, Ms. Justus, at Cardinal

9   you're dealing with controlled substances; is

10  that correct?

11        A.    During that time frame, yes.

12        Q.    And the dispersing of

13  controlled substances across the country; is

14  that right?

15               MS. WICHT:  Object to the form.

16               THE WITNESS:  The ordering,

17        yes, that's correct, was on controlled

18        substance orders.

19  QUESTIONS BY MR. FULLER:

20        Q.    And there are certain

21  regulations that you're aware that pertain to

22  controlled substances and how they have to be

23  handled and how they have to be dealt with;

24  is that fair?

25        A.    Yes.
```

```
 1                 MR. FULLER:  Evan, if you'll

 2          bring up the DEA website from

 3          yesterday.

 4    QUESTIONS BY MR. FULLER:

 5          Q.     And at Cardinal, you ship and

 6    distribute not just Schedule V, IVs, IIIs,

 7    but also Schedule II substances; is that

 8    correct?

 9          A.     That's correct.

10          Q.     And are you aware of what a

11    Schedule II substance is?

12          A.     Yes, I am.

13          Q.     And here you're looking at what

14    is off the DEA's website.  For the record,

15    it's www.DEA.gov\druginfo\ds.shtml, the best

16    I can read it.

17                 And it gives us a definition of

18    Schedule II drugs, correct?

19          A.     That is correct.

20          Q.     And it says, "Schedule II drugs

21    are substances or chemicals are defined as

22    drugs with high potential for abuse, with use

23    potentially leading to severe psychological

24    and physical dependencies and that these

25    drugs are also considered dangerous."
```

1          Do you agree with that?

2      A.      I agree if they are used for

3  inappropriate ways, yes.

4      Q.      And that they're dangerous if

5  they're used in inappropriate ways, right?

6      A.      Inappropriate, yes.

7      Q.      And you're aware that our

8  country is in the middle of an opioid

9  epidemic?

10      A.      I have --

11          MS. WICHT:  Object to the form.

12          THE WITNESS:  I have read that,

13      yes, heard that.

14  QUESTIONS BY MR. FULLER:

15      Q.      Do you agree with that or

16  disagree?

17      A.      I don't have any -- I would --

18  I agree that it's an epidemic, yes.

19      Q.      And you're aware that over 100

20  people are dying every day because of opioid

21  overdoses?

22      A.      That's correct.

23          MS. WICHT:  Object to the form.

24          MR. FULLER:  And, Evan, if you

25      go to 2043, and we'll mark this as

```
 1              Plaintiff's 1 for this deposition.
 2                   (Cardinal-Justus Exhibit 1
 3         marked for identification.)
 4   QUESTIONS BY MR. FULLER:
 5         Q.    So now we're looking at part of
 6   what is the Controlled Substance Act.
 7                   You're aware that there is a
 8   Controlled Substance Act out there that deals
 9   with scheduled drugs; is that right?
10         A.    I'm aware there's an act out
11   there, yes.
12         Q.    Have you ever read it?
13         A.    No.
14         Q.    Have you ever looked at any
15   portion of it?
16         A.    No.
17                   MR. FULLER:  Let's go to Sub 2,
18         Evan.
19   QUESTIONS BY MR. FULLER:
20         Q.    This is the Congressional
21   findings and declaration related to
22   controlled substances.
23                   Do you see that there,
24   Section 801?
25         A.    Number 2, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Number 2 reads, "The illegal
 2    importation, manufacture, distribution and
 3    possession and improper use of controlled
 4    substances have a substantial and detrimental
 5    effect on the health and general welfare of
 6    the American people."
 7               You would agree with that,
 8    wouldn't you?
 9          A.     I --
10               MS. WICHT:  Object to the form.
11          Foundation.
12               THE WITNESS:  Yeah, I have
13          never read this before.  This is not
14          something that -- I would not say that
15          I'm even qualified to understand
16          everything on here.  This would be
17          something that I would definitely
18          leave to my legal department to
19          decipher what all of this means.
20    QUESTIONS BY MR. FULLER:
21          Q.     Sure.
22               But you would agree, would you
23    not, based on the dangerous propensity of
24    Schedule IIs, that the illegal or improper
25    use of those substances could lead to harm to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the general public?

 2         A.      They could.

 3               MS. WICHT:  Object to the form.

 4    QUESTIONS BY MR. FULLER:

 5         Q.      And that's basically what it's

 6    saying, right?  "Illegal or -- illegal

 7    importation, manufacture and distribution and

 8    possession and improper use of a controlled

 9    substance have a substantial detrimental

10    effect on the health and general welfare of

11    the American people."

12               It's saying the same thing,

13    right?

14               MS. WICHT:  Object to the form.

15               THE WITNESS:  I'm not going

16         to -- my legal department would have

17         to take a complete look at that and

18         decipher what that actually says.

19               MR. FULLER:  Fair enough.

20               Now, Evan, if you'll go to 47.

21               (Cardinal-Justus Exhibit 2

22         marked for identification.)

23    QUESTIONS BY MR. FULLER:

24         Q.      This has been marked as

25    Plaintiff's Exhibit Number 2.  If you go down
```

1  to B, it talks about registrant obligations.

2           Have you ever seen this in the

3  past?

4      A.    Yes.

5      Q.    Have you had any training on

6  this regulation?

7      A.    Training as in?  I'm sorry, can

8  you --

9      Q.    How it applies to you, what you

10  need to do to make sure Cardinal is complying

11  with this regulatory obligation that they

12  have?

13     A.    Yes, Cardinal takes their

14  regulatory application very seriously.

15     Q.    What kind of training have you

16  had related to these what's called suspicious

17  orders?

18     A.    I've had internal training to

19  decipher what it is, what drug families.

20     Q.    When you say "what it is," are

21  you referring to what a suspicious order may

22  be?

23     A.    No, sorry.  More so that the

24  registrant has their licenses, that we have

25  our licenses, that -- you know, at the time,

1    the training was stated that once a case came

2    into the case management system, that it had

3    breached a threshold, uh-huh.

4        Q.    And is that all the training?

5              Did they teach you about

6    suspicious orders and what suspicious orders

7    meant?

8              MS. WICHT:  Object to the form.

9              THE WITNESS:  Yes.  I mean, a

10        suspicious order, yes.

11   QUESTIONS BY MR. FULLER:

12        Q.    And what is your understanding

13   of a suspicious order?

14        A.    It's an order that would

15   deviate from size, frequency and pattern.

16        Q.    And I think that's what the

17   regulation reads here.  It says, "The

18   registrant shall design and operate a system

19   to disclose to the registrant suspicious

20   orders of controlled substances.  The

21   registrant shall inform the field officer of

22   the DEA administration in his area of

23   suspicious orders when discovered by the

24   registrant.  Suspicious orders include," what

25   you mentioned, "orders of unusual size,

Highly Confidential - Subject to Further Confidentiality Review

1    orders deviating substantially from a normal

2    pattern, and orders of unusual frequency."

3              Is that your recollection?

4        A.    During the time that I was in

5    that department, yes, we used the definition

6    of -- suspicious orders included orders of --

7    deviating from normal patterns of size --

8    size, pattern and frequency.

9        Q.    Okay.

10       A.    That's exactly right.

11       Q.    Now, when you're dealing with

12   threshold events, is that normally dealing

13   with just size?

14       A.    No.

15       Q.    Okay.  How does a threshold

16   event take into any consideration any pattern

17   or frequency?

18       A.    The actual threshold event

19   would not.  That's what the process is about.

20   The threshold event is systematic, so it

21   would state that it was over threshold.

22       Q.    Which is a number, right?

23       A.    That is just a number, that's

24   right.

25       Q.    So when we say we have a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    threshold event, we're talking about events

 2    that are triggered just because of the size

 3    or the number of pills being ordered; is that

 4    fair?

 5         A.    That is not fair.

 6         Q.    Okay.

 7         A.    A threshold, it does not have

 8    to be -- it is a -- the threshold is on a

 9    monthly purchase.  It is not -- at that time,

10    it was all on a monthly basis.  It was not

11    specific to a given order; it was an order

12    that had breached threshold.

13         Q.    Right.

14               And a breach of a threshold is

15    based on a number of pills?

16         A.    But not in one order.

17         Q.    Absolutely.

18               During the month?

19         A.    That's right.

20         Q.    So it, again, is based on a

21    number?

22         A.    A threshold is a number.

23         Q.    Okay.

24         A.    That's correct.

25         Q.    Did you have a system to
```

1    monitor for unusual frequency or deviation

2    from a pattern or normal pattern?

3         A.    We utilized tools to do that,

4    yes.

5         Q.    What tools would those have

6    been?

7         A.    We used a Tableau file,

8    actually.  Statisticians would create the

9    dashboard for us.  That information came in

10   from the purchase patterns that our customers

11   had.

12        Q.    And it's called a Tableau?

13        A.    Tableau.  It's a software, yes.

14        Q.    Spelled T-a-b-l-o-w?

15        A.    L-e-a-u.

16        Q.    That's a new one.

17              And that looked at patterns --

18        A.    It's a visual tool that gives

19   visual graphs, gives visual information so

20   that it can be identified in patterns, yes.

21        Q.    Now -- okay.  So have you

22   received any training on orders of interest?

23        A.    No.

24        Q.    Do you know what a order of

25   interest is?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Not by -- not by definition as

 2   any kind of qualifications or what they are,

 3   no.

 4          Q.      You haven't seen any

 5   regulations related to orders of interest,

 6   have you?

 7          A.      No.

 8          Q.      Okay.

 9          A.      That was not in my role, no.

10          Q.      So when you receive a threshold

11   event, as the analyst -- so we're talking

12   about the time frame of 2012 to 2014.

13          A.      Okay.

14          Q.      You receive a threshold event.

15          A.      Yes.

16          Q.      Does that stop shipments of

17   that drug family or of all controlled

18   substances to that doctor, pharmacy or

19   drugstore?

20                  MS. WICHT:  Object to form.

21                  THE WITNESS:  Can you clarify

22          that a little further, please?

23   QUESTIONS BY MR. FULLER:

24          Q.      Yes, ma'am.

25          A.      Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Once you have a threshold event

 2   related to a controlled substance from a

 3   drugstore or pharmacy --

 4          A.     Uh-huh.

 5          Q.     -- you have an obligation to

 6   hold it, correct?

 7          A.     That's correct.

 8          Q.     You also have an obligation to

 9   hold all other controlled substances going to

10   that drugstore or pharmacy as well, correct?

11                 MS. WICHT:  Object to the form

12          and the foundation.

13                 THE WITNESS:  That is not

14          necessarily -- that was not -- I can't

15          answer that.  That's not anywhere

16          stated that I'm aware of.

17   QUESTIONS BY MR. FULLER:

18          Q.     So would you continue to ship

19   controlled substances to that drugstore or

20   pharmacy?

21                 MS. WICHT:  Object to the form.

22                 THE WITNESS:  If you want to be

23          a little more clear on that, a

24          threshold event on a drug family, not

25          all controlled substances.
```

```
 1    QUESTIONS BY MR. FULLER:

 2         Q.    So would you hold all future

 3    shipments and orders related to a drug

 4    family?

 5         A.    Anything subsequent in that

 6    drug family, yes, was held.

 7              MS. WICHT:  Object to the form

 8         of that question.

 9    QUESTIONS BY MR. FULLER:

10         Q.    And for how long would you hold

11    this drug family?

12         A.    Depended upon the decision that

13    was made.

14         Q.    Okay.  And can you give me any

15    idea on how quickly you would turn around as

16    an analyst this analysis of a threshold

17    event?

18         A.    It could take from a couple of

19    hours to a couple of days, depending upon

20    what kind of information we needed for it and

21    how fast that could get returned.

22         Q.    Okay.  And tell us -- you get

23    this threshold event.  What's the first step

24    in your process?

25         A.    Okay.  Well, let's see.  That
```

 1    is a long time ago.  Actually, I've done a

 2    lot of things since then.

 3         Q.    I understand.

 4         A.    So my first step would have

 5    been -- would have been to pull the Tableau

 6    file.  You look at the threshold.  You look

 7    at the amount that we have shipped.  You look

 8    at the order itself.

 9         Q.    What else?  Anything else that

10    you pull initially?

11         A.    Initially, probably not.  From

12    what I can remember, that's -- that's kind of

13    my very first go-tos that I would pull.

14         Q.    So Tableau is this graph that

15    you mentioned earlier, right?

16         A.    That's correct.

17         Q.    Okay.  And then you review the

18    threshold.  You have the threshold

19    information internally, so you just pull that

20    information for that particular client, that

21    pharmacy or drugstore?

22         A.    That's in the case management

23    case.

24         Q.    Okay.  What's a case management

25    case?

```
 1          A.      The actual threshold event --

 2          Q.      Uh-huh.

 3          A.      -- when it comes into the case

 4   management system --

 5          Q.      Yes, ma'am.

 6          A.      -- it is -- it's pulled from

 7   the system so that it's right in front of

 8   you.  It's data that comes into the case.

 9          Q.      And this is all done

10   automatically?

11          A.      Yes.

12          Q.      Then you mentioned you look at

13   the amount shipped.  Are you talking about

14   earlier that month, prior months?

15          A.      The data that comes into --

16   with -- along with the case that's

17   automatically pulled is the amount for that

18   month.

19          Q.      Okay.  And these threshold

20   amounts, are they done on a month-by-month

21   basis?

22          A.      Thresholds, yes, are on accrual

23   cycles, yes.

24          Q.      So all of January would be one

25   cycle, February another, March another?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.   There are staggered
 2    accrual cycles, but, yes, it's -- the month,
 3    it's a 30-day, 31-day allotment, yes.
 4          Q.     And when you say "staggered
 5    accrual cycles," what does that mean?
 6          A.      There are -- systematically,
 7    you can have reset-type accrual cycles start
 8    on the first of the month.  There are those
 9    that are set on -- to begin on the 8th of the
10    month, the 15th, the 22nd.  It's a way so
11    that not all customers -- the threshold
12    events don't happen all across the country
13    all at the same time of the month.  It's a
14    way to kind of balance out that because it
15    makes it a little easier to go through a day
16    when you don't have --
17          Q.     Sure.
18          A.      -- lulls in your day.  So it's
19    more -- more for workload balance, but
20    that's -- depending upon the date that your
21    pharmacy would be on that accrual cycle,
22    that's the date, and that's a staggered
23    start.
24          Q.     Got it.
25          A.     Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      And then you mentioned the
 2   order itself.
 3          A.      Yes.
 4          Q.      Is that also automatically
 5   pulled for you?
 6          A.      Yes.
 7          Q.      And I'm assuming that all the
 8   orders that come in are electronically sent
 9   in anyway?
10          A.      Yes.
11          Q.      They're not handwritten or
12   anything like that?
13          A.      No.
14          Q.      Okay.
15          A.      Everything is electronic.
16          Q.      And then what's your next step
17   in the process?
18          A.      Well, from memory, that would
19   be kind of evaluating what the drug family
20   is, the patterns in which they have ordered,
21   the way they've placed their order, what
22   the past few months would be in that drug
23   family and how they've ordered that.  It's
24   just the validation of whatever is utilizing
25   the tools in front of us.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     So at this point you're only

 2     looking at that initial information, correct?

 3          A.     Yes.

 4          Q.     Okay.  And what do you -- how

 5     do you determine whether to release a

 6     threshold at that point, or release an order,

 7     I guess?

 8                  MS. WICHT:  Object to the form.

 9                  THE WITNESS:  Well, that's --

10          comes after the determination.  It can

11          have various reasons that one would

12          release an order, and then there would

13          be various reasons that you would cut

14          an order.

15                  So if you were going to release

16          an order, it has to have very strict

17          parameters.  It has to be within

18          reason, and it has a percentage within

19          the threshold, depending upon how far

20          that is and what that is, of whether

21          or not you actually release an order.

22                  Typically you make the cut on

23          the -- that's what it's called.  It's

24          kind of a cancellation of the line or

25          a rejection.  You would just cut that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        order.

 2   QUESTIONS BY MR. FULLER:

 3        Q.     And you say it's generally what

 4   you do?

 5        A.     There are more -- yes, there

 6   are more cuts than there are any kind of a

 7   release, yes.

 8        Q.     Okay.  And when you say "cut

 9   the order," that's a cancellation of the

10   entire order?

11        A.     It's a cancellation of that

12   line.

13        Q.     What does that mean?

14        A.     Of that order line, of that

15   item.

16        Q.     So help me understand.

17        A.     If they have any other product

18   on that order, right, it's a standard order

19   form.  They can have a controlled substance

20   on the standard order.  It could be cotton

21   balls or Q-tips.  We're not going to hold

22   that.

23        Q.     Sure.

24        A.     Right?

25               So that's part of the order.
```

 1    That part of the order would continue.  It's

 2    only that line item that would be held for

 3    regulatory review, would be the controlled

 4    substance lines.  So then we would cancel or

 5    cut the controlled substance line.

 6         Q.     Okay.  And maybe you lost me.

 7                Is that the end of the process?

 8    If you cut it, it's done and gone?

 9         A.     That's correct.

10         Q.     And who notifies the customer?

11    Because I'm assuming the customer may be

12    expecting --

13         A.     It's systematic.

14         Q.     So there's some automated way

15    that the customer is told, "Hey, this order

16    isn't going to be filled"?

17         A.     That's correct, the sales

18    representative gets an e-mail once it has

19    already been decided.

20         Q.     And you mentioned a certain

21    percentage within threshold.

22                Is there some sort of

23    percentage standard deviation that you guys

24    allow for?

25         A.     There is -- if it makes sense,

```
 1   if you've done all of the due diligence that

 2   you need to do, if it has been decided that

 3   you're going to release it, it still has to

 4   be only the first event of the month, and it

 5   would have to be within a percentage of what

 6   that threshold would be.  The analysts do not

 7   have rights to just allow any order to go

 8   through.

 9        Q.     Right.

10               And do you know what the

11   percentages were?

12        A.     It varied.

13        Q.     Like if how it calculated --

14        A.     For a C-II, was no more than a

15   █ percent or a █ percent of what the

16   threshold could possibly be.

17        Q.     Okay.

18        A.     Uh-huh.

19        Q.     And is there a different

20   percentage for, say, C-IIIs?

21        A.     It could be.  There was

22   never -- there was no percentage that was

23   over -- I don't remember -- █ percent.  There

24   were -- different drug families had different

25   reasons or different percentages, yes.
```

```
 1          Q.      Sure.

 2                  So if a threshold order is cut,

 3      that customer would not -- that drugstore or

 4      pharmacy could not purchase anything else in

 5      that drug family for the rest of that monthly

 6      cycle?

 7          A.      That's correct.

 8          Q.      But they could purchase other

 9      controlled substances during that monthly

10      cycle?

11          A.      They could.

12          Q.      Now, are you determining

13      that -- when that order reaches that

14      threshold and it's cut, are you determining

15      that that's a suspicious order?

16          A.      Not necessarily.

17          Q.      Is there some additional

18      evaluation it goes through to determine

19      whether it's a suspicious order and should be

20      reported to the DEA?

21                  MS. WICHT:  Object to the form.

22                  THE WITNESS:  Our policy was

23          that if you cut the line, you reported

24          it to the DEA.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FULLER:

 2        Q.    So and what you're supposed to

 3   do is report suspicious orders to the DEA,

 4   correct?

 5              MS. WICHT:  Object to the form.

 6              THE WITNESS:  That, I don't

 7        have a supposed to do.

 8   QUESTIONS BY MR. FULLER:

 9        Q.    Well, the regulation that we

10   just looked at --

11        A.    Says that we have an obligation

12   to report suspicious orders.

13        Q.    Okay.

14        A.    And, yes.

15        Q.    And when you cut it, you report

16   it to the DEA?

17        A.    That's correct.

18        Q.    Now, say the client, say

19   it's -- we'll make it easy.  It's January,

20   and their cycle starts at January 1, so it

21   ends at the end of the month, right?

22        A.    Great.  Yes.

23        Q.    So say we're at the 20th of the

24   month --

25        A.    That's correct.
```

```
 1          Q.      -- and they exceed their

 2   threshold.  They have a, quote/unquote,

 3   threshold event.  That gets pulled from the

 4   system and sent to you, correct?

 5          A.      That's correct.

 6          Q.      You do an analysis; you cut

 7   that order.  That means you cancel it?

 8          A.      Yes.

 9          Q.      Once you've canceled the order,

10   somebody sends notice to the DEA of this

11   order; is that right?

12          A.      Yes.

13          Q.      Or this event?

14          A.      Yes.

15          Q.      When we hit January -- or

16   excuse me, February 1, can they now order

17   from that drug family again?

18          A.      Yes.

19          Q.      Even though they may be

20   conducting suspicious activity, which we had

21   to report to the DEA, we're going to start

22   shipping again that same drug family to them?

23              MS. WICHT:  Objection to the

24       form and foundation.

25
```

```
 1   QUESTIONS BY MR. FULLER:

 2        Q.      Right?

 3        A.      That's correct.

 4        Q.      Okay.

 5        A.      Not all orders are suspicious

 6   orders if they breach threshold.

 7        Q.      And you're not sure how the

 8   threshold is actually calculated, right?

 9        A.      No, I'm not.

10        Q.      Are you aware that it's

11   determined to what average is within a

12   certain class of trade than for such things

13   as OxyContin or hydromorphone?  They multiply

14   that by three?

15             MS. WICHT:  Object to the form

16        and lack of foundation.

17             THE WITNESS:  No, I'm not aware

18        of any of that.

19   QUESTIONS BY MR. FULLER:

20        Q.      Would you agree with me if a

21   threshold event is set, such that it's three

22   times the normal average, that's quite a

23   large number above and beyond what would be

24   average, right?

25             MS. WICHT:  Object to the form
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          and foundation.  Asked and answered.
2               THE WITNESS:  I don't know what
3          average is, and I do not know how
4          those thresholds are calculated.
5     QUESTIONS BY MR. FULLER:
6          Q.    Do you know if you guys have
7     a -- strike that.
8               Do you know if Cardinal has a
9     standard operating procedure on calculating
10    thresholds, or did during this time?
11         A.    No, I don't.
12         Q.    Do you know -- I'm sorry, go
13    ahead.
14         A.    Thresholds were preset.  I
15    don't have -- I did not create those, so that
16    standard operating procedure on how those
17    thresholds were actually created to begin
18    with, no, I have no idea.
19         Q.    Do you know if Cardinal had a
20    standard operating procedure on dealing with
21    threshold events?
22         A.    Yes.
23         Q.    Do you know if they had a
24    standard operating procedure on onsite
25    investigations?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I can't honestly answer that.

2      I was not ever in that department.

3          Q.      Okay.  In the anti-diversion

4      department, did you deal with anything other

5      than threshold breaches?

6              MS. WICHT:  Object to the form.

7              THE WITNESS:  Can you ask that

8          question again, please?

9      QUESTIONS BY MR. FULLER:

10         Q.      Yes, ma'am.

11             As part of the anti-diversion

12     department, did the department deal with

13     other issues other than threshold breaches?

14             MS. WICHT:  Object to the form.

15             THE WITNESS:  The department in

16         itself, yes.

17     QUESTIONS BY MR. FULLER:

18         Q.      What other issues would the

19     department deal with, if you know?

20         A.      New account setup.

21         Q.      All right.

22         A.      Right?  I mean, those were --

23     that was part of the department and

24     investigations were part of the department.

25         Q.      When you say "investigations,"

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what types of other --

 2          A.      Site investigations.

 3          Q.      Now, what would cause a site

 4    investigation?

 5          A.      If an analyst or -- during my

 6    time when I was there, if I decided that I

 7    needed more information to make a decision or

 8    there was any kind of question in my mind of

 9    what the pharmacy was ordering or why, I

10    could at any point in time ask for a site

11    investigation so that one of our

12    investigators from that team would go to the

13    pharmacy and request their drug usage, see

14    what was going on, actually put eyes inside

15    that pharmacy so that we would know what was

16    happening in there.

17          Q.      So other than the information

18    you told us that you would initially pull,

19    which a lot of it was automatic --

20          A.      Uh-huh.

21          Q.      -- there was additional steps

22    that you could take if you chose to as a

23    diversion analyst or an anti-diversion

24    analyst?

25          A.      Yes, there's documentation.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Yes.

2         Q.    Okay.  And one of those things

3    would be asking for a site investigation?

4         A.    You could do that, yes.

5         Q.    What else could you do?

6         A.    Oh, as an analyst you could

7    change a threshold to zero so that they

8    couldn't get any more, if that's what you

9    deemed to be what was necessary.  Could hold

10   the order and actually do nothing with it

11   until you got back the investigation.  You

12   could just cut all orders and allow that

13   to -- until you got further information.  You

14   could stop the sale of controlled substances

15   across the board if that's what it took to

16   get -- for the pharmacy to agree to having a

17   site inspection.

18        Q.    Do the pharmacies actually have

19   to agree?  Do you guys let them know?

20        A.    Normally, yes.

21        Q.    Okay.

22        A.    Yes.

23        Q.    So they'll know if someone is

24   going to come out and conduct an

25   investigation and assist in the process?

```
 1                    MS. WICHT:  Object to the form.

 2                    THE WITNESS:  I do not know if

 3         that's always the way that happened.

 4         I know that when I requested one,

 5         there was somebody that went -- would

 6         get that information, yes.

 7   QUESTIONS BY MR. FULLER:

 8         Q.     And they -- you mentioned again

 9   dispensing data.  You could get another input

10   of dispensing data from the pharmacy?

11         A.     That's correct.

12         Q.     And could you also check the

13   data feeds?

14         A.     That was part of the initial

15   information that was -- that's all in --

16   excuse me.  That would be part of the Tableau

17   file.

18         Q.     Okay.  That initial file that's

19   automatically --

20         A.     Yes.

21         Q.     -- downloaded to you?

22         A.     Yes.

23         Q.     Got it.

24                    Now, you mentioned you could

25   reduce thresholds to zero.  Could you reduce
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    them to a certain number?

 2         A.     You could.

 3         Q.     Could you increase them?

 4         A.     You could.  If it deemed

 5    necessary or if you had the documentation

 6    that made it -- that it would be appropriate

 7    to do so.

 8         Q.     Now, you mentioned the

 9    documentation several times.

10         A.     Uh-huh.

11         Q.     It sounds like the

12    documentation is a significant part of

13    explaining or showing what you're doing or

14    why you're doing it; is that fair?

15         A.     That's correct, yes.

16         Q.     So if we have a threshold

17    event, we should see documentation in that

18    client's diligence file as to the result of

19    that event, correct?

20              MS. WICHT:  Object to the form.

21              THE WITNESS:  To the result of

22         that threshold event?  Yes.

23    QUESTIONS BY MR. FULLER:

24         Q.     Or maybe the better term is the

25    result of the investigation:  your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    explanation as to what you did and why you

 2    did it?

 3         A.     Yes, there would be information

 4    that would state why or what made you do

 5    exactly what you did, yes.

 6         Q.     Whether you cut it, whether you

 7    increased the threshold, whether you

 8    decreased the threshold, whether you

 9    requested an onsite investigation, and I

10    guess potentially what the result of that

11    investigation was, so forth and so on; is

12    that fair?

13         A.     That's fair.

14              MS. WICHT:  Are you asking is

15         that -- all that information in one

16         particular place, Mike?

17              MR. FULLER:  No, ma'am.  I'm

18         asking the witness the questions.

19         Thank you.

20              MS. WICHT:  Okay.

21    QUESTIONS BY MR. FULLER:

22         Q.     You mentioned most of the time

23    the threshold order -- I shouldn't say

24    "most."

25              What is your recollection on
```

1    how often orders would simply be cut versus

2    released?

3         A.    I don't have a percentage.  The

4    recollection was more -- definitely more cuts

5    than releases, yes.

6         Q.    Okay.  And there would be a

7    record of a particular pharmacy's history

8    with threshold events and cuts and releases;

9    would that be right?

10        A.    I would -- you could probably

11   ask for a report to be run, yes.

12        Q.    Well, and let me ask it

13   differently.

14             So if you have a threshold

15   event, you would want to know the history on

16   that particular pharmacy or drugstore,

17   correct?

18        A.    That's correct.

19        Q.    Because one of the things I

20   think you mentioned when you had the ability

21   to increase to a certain percentage is

22   whether it was the first threshold event or

23   not?

24        A.    Correct.

25        Q.    Okay.  So in this automated

```
 1   file, would it give you any history as far as

 2   recent increases or decreases of thresholds?

 3       A.    Yes, you could look in the

 4   system to find those -- that information.

 5       Q.    Well, and I want to make sure

 6   I'm clear.

 7             Would it be in the automated

 8   file that was sent to you when that threshold

 9   event occurred, or would that be something

10   you would have to go looking for somewhere

11   else?

12       A.    It would be in the case

13   management system.

14       Q.    And is the case management

15   system different than that file that was

16   automatically sent to you?

17             MS. WICHT:  Object to the form.

18             THE WITNESS:  That question is

19       not necessarily a valid question.  The

20       ordering system --

21   QUESTIONS BY MR. FULLER:

22       Q.    Okay.

23       A.    Let me help you with that one,

24   okay?

25       Q.    I don't even know how to
```

Highly Confidential - Subject to Further Confidentiality Review

1    respond to that.

2         A.    I'm not quite sure how to

3    respond to your question is what I'm saying,

4    so --

5         Q.    Yeah, I know.  My terminology

6    may be off, so help me understand.

7         A.    Okay.  So in the case

8    management system -- so there's -- when the

9    automated system from the ordering platform

10   sends a case to -- a threshold event to the

11   case management system, there is a historical

12   run in the case management system.

13        Q.    Say that one more time, I'm

14   sorry.

15        A.    If you have -- so if you have a

16   threshold event that is going to be sent in,

17   all of that information into the case is what

18   it's called, okay?

19        Q.    Okay.

20        A.    If that case comes into the

21   automated system --

22        Q.    Yes, ma'am.

23        A.    -- okay, that's a case

24   management system.

25        Q.    Okay.

```
 1          A.     In that case management system,

 2     it would have a running toll of all of the

 3     different cases for that customer.

 4          Q.     So you would see all the prior

 5     history --

 6          A.     That's correct.

 7          Q.     -- when you open it up?

 8          A.     That's correct.

 9          Q.     So you could know whether they

10     had a threshold event last month, the last

11     six months, whatever the case may be?

12          A.     That's correct.

13          Q.     Then you would be able to

14     determine whether the threshold, you know --

15     wow, you know, we just recently bumped their

16     threshold down.  Maybe that's why they're

17     having a threshold event.

18          A.     Well, you could, yes.

19          Q.     Or we've continuously upped

20     them, there may be something going on here?

21          A.     Well, we didn't continuously up

22     thresholds.

23               MS. WICHT:  Object to the form.

24     QUESTIONS BY MR. FULLER:

25          Q.     Never?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.      There would be reason for such.

2         Q.      And that reason would be

3    documented in the diligence file for that

4    client?

5         A.      That's correct.  To my

6    knowledge, yes.

7         Q.      Did you ever receive any

8    training as far as threshold events or

9    suspicious orders or anti-diversion from the

10   DEA?

11        A.      No.

12        Q.      What about the organization,

13   what was it, the HDMA?

14        A.      No, I did not.

15        Q.      Do you know what the HDMA is?

16        A.      I've heard the term.  To be

17   honest, I don't even know what the call

18   letters stand for.

19        Q.      So the only training you

20   received related to this anti-diversion

21   department position was internal training; is

22   that correct?

23        A.      That's correct.  I would

24   have -- I entrusted that those that were my

25   direct reports and leaders in our department
```

1    would have received that information.

2              I was not at a level to attend

3    DEA meetings or HDMA meetings or any other of

4    the governing bodies' meetings, so that would

5    have definitely come from our leadership down

6    to us, yes.

7         Q.    Sorry about that.

8              Let me ask:  Have you ever

9    heard of highlight reports?

10        A.    Not that I recall.

11             MR. FULLER:  All right.  Evan,

12        2685.

13             (Cardinal-Justus Exhibit 3

14        marked for identification.)

15             MR. FULLER:  Yeah, I'm sorry,

16        that's Exhibit Number 3 for the

17        record.

18   QUESTIONS BY MR. FULLER:

19        Q.    And, Ms. Justus, have you ever

20   seen this document before?

21        A.    Yes.

22        Q.    And what is it, or what is your

23   understanding of what it is?

24        A.    It's an SOP detecting or

25   reporting suspicious orders in responding to

```
 1    the threshold events.

 2         Q.      And by SOP --

 3         A.      Standard operating procedure.

 4         Q.      All right.  And if it's okay

 5    with you, when either one of us use it, we'll

 6    know what the other one's talking about,

 7    right?

 8         A.      Sounds great.

 9         Q.      Okay.  And it's talking about

10    not just suspicious orders, but also

11    detecting and reporting -- can you read the

12    purpose?

13              MR. FULLER:  If you can

14         highlight that section for me, Evan.

15         Go ahead and highlight the section for

16         me, the whole thing.

17              And then if you underline...

18    QUESTIONS BY MR. FULLER:

19         Q.      It talks about the quality and

20    regulatory affairs.  That would be your

21    department; is that right?

22         A.      Yes.

23         Q.      Okay.  Section on responding,

24    detecting and reporting suspicious orders,

25    and processing and documenting and making
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    judgments about threshold events.

 2               Is that what your department

 3    did?

 4        A.     Yes.

 5        Q.     Okay.  Now, you and I talked a

 6    little bit about suspicious orders and what

 7    they were.

 8               One thing that you indicated to

 9    us was orders of unusual size; is that right?

10        A.     That's correct.  That's one

11    factor.

12        Q.     Well, is it one factor?

13    Explain what you mean by that.

14        A.     It is one factor.

15        Q.     Can you have a suspicious order

16    that the only thing suspicious about it is

17    unusual size?

18        A.     I would -- not under normal

19    circumstances.  I would take everything into

20    consideration.

21        Q.     What about abnormal pattern?

22    Could you have a suspicious event that was

23    just based off abnormal pattern?

24        A.     I would take --

25               MS. WICHT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I would take all

 2          into consideration.

 3   QUESTIONS BY MR. FULLER:

 4          Q.     So you wouldn't necessarily

 5   report something that was just abnormal based

 6   on the size of the order?

 7          A.     If I cut the order, I would.

 8          Q.     Okay.  So you might report

 9   something if it's just based on pure size,

10   pure number of pills, volume?

11                    MS. WICHT:  Object to the form.

12                    THE WITNESS:  If I deemed that

13          it was something that should be cut

14          from a threshold event, then I would

15          report it.  That not necessarily is

16          just on size alone.

17   QUESTIONS BY MR. FULLER:

18          Q.     And there's where we're having

19   a disconnect.  I'm not saying it's

20   necessarily.

21          A.     You asked me if it was just on

22   the size; is that correct?

23          Q.     I said can there be a reporting

24   of a -- can a suspicious order be based just

25   on size?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     It could.

 2        Q.     So if I'm, you know, Larry's

 3  Drive-Thru pharmacy, I've only been ordering

 4  10,000 oxy 30s a month for the past year and

 5  all the sudden I order 100,000, everything

 6  else looks fine, but I order 100,000 oxy 30s,

 7  that's going to throw up some red flags,

 8  right?

 9        A.     Yes.

10               MS. WICHT:  Object to the form.

11  QUESTIONS BY MR. FULLER:

12        Q.     You're probably going to report

13  me, aren't you?

14               MS. WICHT:  Object to the form.

15               THE WITNESS:  I would cut that

16        order.

17  QUESTIONS BY MR. FULLER:

18        Q.     So you would have to report me?

19        A.     Therefore, I would report,

20  that's correct.

21        Q.     Okay.  So if you go to -- make

22  sure I've got the right page here -- page 4,

23  the one that has orders of unusual size up at

24  the top of it.

25               Do you see that, 6.1.5?
```

```
 1          A.      I see that.

 2          Q.      Tell us, what does Cardinal say

 3    orders of unusual size are?

 4                  MS. WICHT:  Object to the form.

 5    QUESTIONS BY MR. FULLER:

 6          Q.      Read that for us, Ms. Justus.

 7          A.      Actually, kind of revamping on

 8    the entire SOP.  If you -- it's been a while

 9    since I've had to read this.

10          Q.      Sure.

11          A.      Okay.  I've read this section

12    completely, so, I'm sorry, could you please

13    repeat your question?

14          Q.      Yes, ma'am.

15          A.      Okay.

16          Q.      Cardinal has determined at

17    least during this time frame that orders of

18    unusual size are significantly larger than

19    the orders normally placed by the customer or

20    by customers that have a size and type of

21    business that is similar to the ordering

22    customer's business; is that right?

23          A.      That is what this says, yes.

24          Q.      And when we're talking about

25    ordering customers, generally speaking, we're
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   talking about drugstores and pharmacies,

 2   correct?

 3        A.    We do have other customers, but

 4   in this case I would agree that, yeah, it's

 5   going to be a pharmacy.

 6        Q.    And when we're -- based on this

 7   policy, when we're comparing orders of

 8   unusual size, we need to be able to compare

 9   our pharmacy, our drugstore, to like-size

10   pharmacy and drugstores elsewhere, correct?

11        A.    That's correct, which is how

12   the original thresholds would have been set.

13        Q.    Is based on an average, right?

14             MS. WICHT:  Object to the form.

15             THE WITNESS:  I don't know --

16             MS. WICHT:  Foundation and

17        mischaracterizes her testimony.

18   QUESTIONS BY MR. FULLER:

19        Q.    All right.  So -- okay.  Well,

20   then explain to me what you -- what you meant

21   when you just said that that's how our

22   thresholds are set.

23        A.    At this point in time -- or at

24   that point in time, I'm sorry -- I don't know

25   what they do today, but in that point in
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    time, those thresholds would have already

2    been in place.  That would have been

3    through -- you have to realize and remember

4    that the new account setup, right, that's

5    where the actual original thresholds were

6    set.  That categorizes in that matrix that

7    you were trying to tell me -- the matrix that

8    you drew out.  That's what I'm saying, you

9    can't specifically say which ones or how

10   those thresholds were actually calculated.  I

11   don't have that information.  I don't know if

12   an average was used.  I don't know if it was

13   a percentage.  I don't know how the

14   pharmacist calculated or came up with those

15   thresholds.

16        Q.    Okay.  Well, we'll look at that

17   in a second.

18        A.    Okay.

19        Q.    So my question to you is:

20   Based on this policy and procedure, we have

21   to be able to compare like-pharmacies --

22        A.    And we would have, yes.

23        Q.    -- and -- well, let me

24   finish -- and like-drugstores to determine

25   what's an unusual size, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      It would be the purchasing

 2    pattern as well of that specific pharmacy.

 3          Q.      So under this unusual -- orders

 4    of unusual size definition, where does it say

 5    purchasing pattern?

 6          A.      The orders normally placed is

 7    how they purchase --

 8          Q.      Or --

 9          A.      -- by the customer --

10          Q.      Or?  Keep reading.

11          A.      "Or" -- it's an "or" -- "by

12    customers that have a size and type of

13    business that is similar to the ordering

14    customer's business."

15                  It's "or."  It's not specific

16    to --

17          Q.      Right.

18                  And so what I want to make sure

19    of is if we have a customer that's already

20    out of whack, meaning ordering significant

21    amounts above what other normal pharmacies,

22    size and type, are ordering, that that's

23    going to get flagged, right?

24                  MS. WICHT:  Object to the form.

25                  You can answer if you
```

```
 1              understand the question.

 2                   THE WITNESS:  I would like you

 3              to clarify what you just said is out

 4              of whack.

 5    QUESTIONS BY MR. FULLER:

 6         Q.      Ordering too many pills.

 7         A.      They would be having threshold

 8    events.

 9         Q.      We assume they'd be having

10    threshold events.

11                   This policy says that you need

12    to compare them to their own ordering

13    patterns in the past, right?

14         A.      Correct.

15                   MS. WICHT:  Object to the form.

16    QUESTIONS BY MR. FULLER:

17         Q.      And others -- other customers,

18    other drugstores and pharmacies, that have a

19    size and type of business that is similar to

20    that customer's.

21                   Isn't that what the policy

22    says?

23                   MS. WICHT:  Object to the form.

24                   THE WITNESS:  It does.

25
```

```
 1    QUESTIONS BY MR. FULLER:

 2         Q.      Okay.  Do you believe you did

 3    this at Cardinal during your time there?

 4         A.      I don't believe that I -- that

 5    I would have used anybody else's purchasing

 6    patterns to decide whether or not it was for

 7    one.

 8         Q.      So you wouldn't have pulled

 9    other like-sized pharmacies?

10         A.      That was not -- no.  So

11    that's where I -- to pull all of that data, I

12    am not qualified to pull all of that data.

13    That data would be pulled from the

14    statisticians on the team that would be able

15    to give more information on that.

16         Q.      So --

17         A.      That's not something that -- we

18    could ask to have that done, but that's not

19    something that we utilized.

20              We utilized by customer the

21    information that was in front of us until we

22    needed to go further, yes.

23         Q.      Do you ever recall asking the

24    statisticians to pull like-customers'

25    ordering patterns to be able to compare when
```

1   you were evaluating a threshold event?

2       A.    I don't remember if I did.

3       Q.    Okay.

4       A.    I don't.

5       Q.    You believe that's something

6   that you could have done?

7       A.    Yes.

8       Q.    And if you did it, we would see

9   that documented as part of your investigative

10  process, right?

11      A.    I could have documented that

12  reports were used.

13      Q.    I mean, if you went to the

14  trouble of having the statisticians pull a

15  bunch of other like-pharmacy information, you

16  would probably make a note of that, wouldn't

17  you?

18          MS. WICHT:  Object to the form.

19          THE WITNESS:  I may or may not

20      have.

21  QUESTIONS BY MR. FULLER:

22      Q.    When you send out investigators

23  to the pharmacy to do an onsite inspection,

24  would you have made a note of that?

25      A.    There would have had to be a

1    request made, yes.

2          Q.     There would also have to be a

3    request made to have the statistical

4    information pulled for other like-sized

5    customers?

6          A.     No.  No, there wouldn't have to

7    be.

8          Q.     So how would you do it?  Just

9    go down the hall and say, "Hey" --

10         A.     Absolutely.

11         Q.     -- "pull this information for

12   me"?

13         A.     Sure, you can do that.  If I

14   wanted to put it in an e-mail or if they

15   weren't at their desk or needed something, of

16   course, then it would be that way.  That's

17   what I'm saying:  It could be documented; it

18   may not be actually documented.

19         Q.     Let's go down to orders of

20   unusual frequency.

21                Now, Ms. Justus, this

22   requirement, at least according to the

23   policy, has the same requirement that we

24   analyze it with:  that customer's prior

25   orders as well as other drugstores and

Highly Confidential - Subject to Further Confidentiality Review

 1   pharmacies that have the same size and

 2   business type.

 3              Would that normally be done at

 4   Cardinal?

 5        A.    Again, that's a poor

 6   statement --

 7              MS. WICHT:  Object to the form.

 8              THE WITNESS:  That is not

 9         something that -- that -- if we saw a

10         trend, possibly.  There's no --

11         there's no reason to have to pull that

12         data on every threshold event.  As

13         long as we were doing the one or the

14         other, we were following our

15         procedures.

16   QUESTIONS BY MR. FULLER:

17        Q.    Okay.  And if you're only

18   looking at that one customer, you're not

19   going to be able to tell if they are

20   significantly different from others of that

21   same size and type of business, are you?

22              MS. WICHT:  Object to the form.

23         Foundation.  Mischaracterizes her

24         prior testimony.

25              THE WITNESS:  Size would have

Highly Confidential - Subject to Further Confidentiality Review

```
 1         been established when the original

 2         thresholds had been set.

 3    QUESTIONS BY MR. FULLER:

 4         Q.    But, ma'am, you haven't

 5    answered my question.

 6         A.    I'm sorry, can you please

 7    repeat the question?

 8         Q.    Yes, ma'am.

 9               My question is:  If we're only

10    looking at the history with CVS 1515, we're

11    not going to know if their ordering patterns

12    or their size of orders are out of place for

13    other customers, other drugstores, that are

14    of the same size and type, are we?

15         MS. WICHT:  Objection.  Asked

16         and answered.

17         THE WITNESS:  Again, it's an

18         "or" statement.  It doesn't have to be

19         done on every threshold event.

20    QUESTIONS BY MR. FULLER:

21         Q.    Ma'am, I'm not asking you if

22    it's an and/or an or, or that you have to do

23    both or not.  I'm simply asking you:  We're

24    not going to know how they compare with the

25    others unless we pull them?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. WICHT:  Objection to the

 2           form.

 3                    THE WITNESS:  So pulling the

 4           data is not done; we would have to

 5           have it requested to be done.  And,

 6           yes, there are times that that could

 7           have been done.  There are times that

 8           it is not necessarily needed.

 9  QUESTIONS BY MR. FULLER:

10           Q.    I understand that, ma'am.

11                    My simple question is:  If we

12  don't pull it, we can't make -- or if we

13  don't request it to be pulled, we can't make

14  that comparison with other like-businesses,

15  correct?

16                    MS. WICHT:  Object to the form.

17                    THE WITNESS:  I guess I do not

18           see where the question is.  The

19           likeness of --

20  QUESTIONS BY MR. FULLER:

21           Q.    So hold on.

22           A.     -- the types of pharmacies

23  would have already been concluded, and we

24  would have already had that information.

25           Q.    Hold on.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Okay.

 2          Q.      If I'm in an apple orchard and

 3    I'm picking apples, okay?

 4          A.      Uh-huh.

 5          Q.      And I'm only picking apples

 6    from one tree, and all I have in my bushel is

 7    apples from one tree, I can't say those

 8    apples are average compared to all the other

 9    apples in the orchard, can I, because I

10    haven't picked any other apples from the

11    other orchard trees?

12                  Would you agree with that?

13                  MS. WICHT:  Object to the

14          incomplete hypothetical.

15                  THE WITNESS:  On a hypothetical

16          question, I would -- I'll agree with

17          that.

18    QUESTIONS BY MR. FULLER:

19          Q.      Okay.  Now, let's just take

20    that to what we're doing as an analyst.

21          A.      Uh-huh.

22          Q.      If I'm looking at a pharmacy,

23    Mike's Pharmacy, and I'm just analyzing the

24    size of orders related to my prior purchases,

25    the frequency and pattern related to my prior
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    purchases -- we're not comparing it to

2    others.  I'm not saying that you had to every

3    time.  I'm just saying we can't make that

4    comparison unless we have that information

5    pulled.

6              Would you agree with that?

7              MS. WICHT:  Object to the form.

8         Mischaracterizes her prior testimony.

9              THE WITNESS:  I will say that

10        it could.

11   QUESTIONS BY MR. FULLER:

12        Q.    Could what?

13        A.    It could make a difference.  Or

14   you can't -- you not necessarily could

15   compare what your question is as far as

16   different pharmacies.

17        Q.    Ma'am, I'm not even asking if

18   it could make a difference.  Okay?

19              I'm just asking:  You can't

20   compare it if you don't have the information

21   next to you or you don't have somebody to

22   pull it, right?

23              MS. WICHT:  Object to the form.

24        Foundation.

25              THE WITNESS:  There are other
```

```
 1          tools that you use --
 2   QUESTIONS BY MR. FULLER:
 3          Q.     I'm not saying --
 4          A.     I mean, I'm not saying that you
 5   don't compare, that we didn't compare.
 6          Q.     And I'm not saying there aren't
 7   other tools.  You've told us about all the
 8   other tools.
 9          A.     I know.
10          Q.     I'm just asking you:  You can't
11   compare it unless you have it pulled to
12   compare it, correct?
13              MS. WICHT:  Object to the form.
14              THE WITNESS:  Correct.
15   QUESTIONS BY MR. FULLER:
16          Q.     Okay.  This policy and
17   procedure doesn't say it, but would this be a
18   policy and procedure that was applicable to
19   the anti-diversion department?
20          A.     This -- to the entire
21   department?
22          Q.     No, ma'am, just to the
23   department in general.
24          A.     This would be a standard
25   operating procedure for the analysts in the
```

```
 1   anti-diversion department.

 2              MR. FULLER:  And for the

 3         record, I've just marked and provided

 4         the witness Exhibit Number 4.  And

 5         it's 2008.

 6              (Cardinal-Justus Exhibit 4

 7         marked for identification.)

 8   QUESTIONS BY MR. FULLER:

 9         Q.    Ma'am, have you ever seen this

10   document?

11         A.    No.

12         Q.    Okay.  And it appears, if you

13   look at the top, it was a policy and

14   procedure that was entered in December 22nd

15   of '08; is that right?

16         A.    That's what I see, yes.

17         Q.    And it has a previous issue, it

18   says "new."

19              Do you know what that means?

20         A.    No.

21         Q.    Okay.  Can you tell by looking

22   at this policy and procedure who it pertains

23   to?

24         A.    No.

25         Q.    Okay.  Well, let's start with
```

1    the title.  It says, "Sales," right?

2         A.      It does.

3         Q.      And you guys did have a sales

4    department or sales team?

5         A.      That's correct.

6         Q.      Okay.  It says, "Anti-diversion

7    alert signals."

8                 Do you see that there?

9         A.      I do.

10        Q.      And if you look at the purpose,

11   it says, "The Federal Controlled Substances

12   Act requires pharmaceutical wholesalers to

13   maintain effective controls to guard against

14   the diversion of controlled substances."

15                You don't disagree to that, do

16   you?

17        A.      No, I do not disagree with

18   that.

19        Q.      Then it says, "This" -- excuse

20   me.  "As part of this requirement, Cardinal

21   has developed a suspicious order monitoring

22   program to identify orders of unusual size,

23   pattern and frequency."

24                Based on your knowledge, that

25   would be accurate, too, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.

 2          Q.      Now, you don't know when they

 3   first created that suspicious order and

 4   monitoring program, or do you?

 5          A.      No, I don't.

 6          Q.      Okay.  It says, "This policy

 7   provides process requirements for the

 8   continuous monitoring and reporting of

 9   customer order activities by sales during the

10   execution of the SOM program."

11                  And it says "by sales."  So can

12   we agree that this policy and procedure would

13   apply to the sales team or the sales

14   personnel?

15          A.      Yes.

16          Q.      Okay.  Now, I want to go to the

17   third page.

18          A.      Wait a minute.  I don't know

19   who this does -- as I look at this document,

20   this came from transportation and warehouse

21   operations.  That does not say sales at all.

22          Q.      It says, "health care supply

23   chain services."

24          A.      It says, "transportation and

25   warehouse operations."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.     And then it also says,

 2   "Reporting customer activities by sales

 3   during the execution of the SOM program."

 4         A.     It does -- I see that, yes.

 5         Q.     If you read the scope, what

 6   does it tell us it applies to?

 7               It says, "This policy applies

 8   to quality and regulatory affairs."  That

 9   would have been you during this time frame,

10   right?

11         A.     Not during this time frame.  I

12   mean, I was an admin.

13         Q.     But you were in the department?

14         A.     Yes.

15         Q.     Okay.  Supply chain integrity,

16   was that a different department?

17         A.     No.  I mean, that was -- it was

18   kind of all encompassed.

19         Q.     Okay.  And then Cardinal sales,

20   which would be the sales force, right?

21         A.     Correct.

22         Q.     Okay.  Now, of interest, do you

23   know a Tom -- is it DeGemmis?  DeGemmis?

24               MS. WICHT:  Are you reading

25         that name somewhere?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. FULLER:  Well, I'm trying.
 2           Not doing a very good job.
 3                    MS. WICHT:  No.  Can you just
 4           point us to where it is?  Maybe we can
 5           see how it's spelled.
 6                    MR. FULLER:  The last page.
 7                    MS. WICHT:  Okay.
 8                    MR. FULLER:  There's an e-mail,
 9           and put it into this policy and
10           procedure as an attachment.
11                    And, Evan, if you could blow up
12           the -- there you go.
13      QUESTIONS BY MR. FULLER:
14           Q.    Who is Tom?
15           A.    Tom DeGemmis.
16           Q.    DeGemmis?
17           A.    Uh-huh.
18           Q.    Wow, I butchered that.
19           A.    Uh-huh.
20           Q.    You didn't have to agree with
21      me on that.
22           A.    I apologize.
23                    Well, I couldn't find it,
24      sorry.
25                    MS. WICHT:  So what's the
```

```
 1         question?

 2                THE WITNESS:  Who was he?  Was

 3         that the question?

 4    QUESTIONS BY MR. FULLER:

 5         Q.    Yes, ma'am.

 6               I mean, it says senior VP, but

 7    I don't know for what.

 8         A.    Correct.  I would know not his

 9    full title.  I don't know.

10         Q.    Okay.  And that's fair.

11         A.    I don't.

12         Q.    It says here that -- and this

13    is an e-mail, at least it indicates, from

14    Tom, right?

15         A.    It does.

16         Q.    And it indicates it's going to

17    who?  Retail independent sales --

18         A.    Sales professionals.

19         Q.    -- professionals?

20         A.    Yes.

21         Q.    Who would that encompass, if

22    you know?

23         A.    I wouldn't know specifically.

24         Q.    Well, we know retail

25    independents are non-chains, correct?
```

1        A.      Correct.

2        Q.      And we know sales professionals

3    are our salespeople?

4        A.      Correct.

5        Q.      Okay.  So it's probably the

6    salespeople for the retail independents,

7    fair?

8        A.      Fair.

9        Q.      And it says, "We have heard

10   consistent feedback that more tools are

11   needed to perform regular customer data

12   checks.  In response to this feedback, a new

13   report has been created, which we have

14   unofficially been calling the highlight

15   report."

16              Now, ma'am, have you ever heard

17   of the highlight report?

18       A.      No.

19       Q.      Okay.  It says, "The highlight

20   report has been designed to give sales a

21   monthly snapshot of each customer's monthly

22   total pharmaceutical sales, six-month

23   purchase history and the percentage of

24   controlled sales to total RX sales."

25              And when it says "RX sales," do

Highly Confidential - Subject to Further Confidentiality Review

```
1    you know what that means?

2         A.    Prescription.

3         Q.    Okay.  But potentially

4    noncontrolled as well?

5         A.    Correct.

6         Q.    Okay.  Now, let me ask you:

7    Was that also something that you would look

8    at when you were doing your due diligence on

9    certain threshold events, comparing

10   controlled substance sales versus

11   noncontrolled sales?

12        A.    Yes.

13        Q.    Why is that?

14        A.    Because Cardinal takes this

15   very seriously, and, therefore, we would not

16   just have a customer that was just purchasing

17   controlled substances.  We would need to

18   ensure that it was -- that they were ordering

19   all of their products from Cardinal, not just

20   controls.

21        Q.    Now, let's talk about that for

22   a second, because we would also want to make

23   sure they're not double-dipping on

24   distributors as well, right?

25              MS. WICHT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Yes.  I mean,

 2          there is -- there is cause to want to

 3          be a primary.

 4   QUESTIONS BY MR. FULLER:

 5          Q.    Well, one, because --

 6          A.    Right.

 7          Q.    -- as you're running a

 8   business, you want to be the one providing

 9   your product to them --

10          A.    Absolutely.

11          Q.    -- your service to them?

12          A.    Yes.

13          Q.    No question.

14          A.    Right.

15          Q.    Additionally, we would want

16   know, would we not, as the anti-diversion

17   group, if they're buying controlled

18   substances from somebody else as well,

19   correct?

20          A.    Correct.

21          Q.    Do we, when we're doing our

22   analysis, have that information?

23          A.    We have information, because on

24   the new account setup questionnaire there is

25   a question that was asked at that time
```

```
 1   whether or not that they were planning on

 2   being -- purchasing from multiple

 3   distributors or not, yes.

 4        Q.    And there we're trusting them

 5   to provide the right answer --

 6        A.    That's correct.

 7        Q.    -- the honest answer, I guess?

 8        A.    That's correct.

 9        Q.    Do we have that information any

10   other way?

11             MS. WICHT:  Object to the form.

12             THE WITNESS:  I mean, if

13        sales -- our sales reps are our front

14        line.

15   QUESTIONS BY MR. FULLER:

16        Q.    Yes, ma'am.

17        A.    So we would rely upon sales to

18   give us that information.

19        Q.    So our salespeople should know

20   if they're ordering from other distributors

21   as well?

22        A.    That's correct.

23             MS. WICHT:  Object to the form.

24   QUESTIONS BY MR. FULLER:

25        Q.    Okay.  And how about our
```

1    pharmacy data reports?  Can that help us

2    determine if they're ordering from other

3    distributors?

4        A.    It can if you have the number

5    of scripts that they fill on a monthly basis

6    and compare to what they have purchased from

7    Cardinal Health.  That can identify if

8    they're purchasing all products from Cardinal

9    Health.

10       Q.    And we can tell by number of

11   scripts or the number of pills going out as

12   well, correct?

13             Because if you're only shipping

14   them 5,000 oxy 30s and they've got 20,000

15   going out the door, there's a good chance

16   they're getting the other 15 from someone

17   else.  You would agree with me, right?

18             MS. WICHT:  Objection to the

19        form.

20             THE WITNESS:  That should

21        definitely be what was happening, yes.

22   QUESTIONS BY MR. FULLER:

23       Q.    Okay.  Because the only places

24   they can get these, these controlled

25   substances, is from other wholesale

Highly Confidential - Subject to Further Confidentiality Review

```
 1   distributors, correct?

 2        A.     To my knowledge, yes.

 3        Q.     Okay.  Well, I mean, at least

 4   that's the way the law is set up; you would

 5   agree with that?

 6        A.     I agree with that.

 7        Q.     Now, whether they're going out

 8   on the street and buying them from somebody

 9   else, that's a whole 'nother story, correct?

10        A.     That would be correct.

11        Q.     Okay.  So Mr. -- and help me

12   pronounce his name again.

13        A.     DeGemmis.

14        Q.     DeGemmis.

15               -- sets out this watch list and

16   these flags.

17               Do you see that below?

18        A.     I do see it.

19        Q.     So there's a watch list for

20   5 percent increase of controlled substances,

21   List I chemicals.  There's a yellow flag for

22   a 10 percent increase of controlled

23   substances, List I chemicals.  There's a red

24   flag for 15 percent increase in controlled

25   substances, List I chemicals.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Did you know about this process
 2    when you were in the anti-diversion
 3    department?
 4         A.    No, sir, I did not.
 5         Q.    So you would have never been
 6    provided with any of these yellow, red or
 7    watch list flags?
 8         A.    Sales --
 9              MS. WICHT:  Object to the form.
10              THE WITNESS:  No, we did not.
11         No.  In the anti-diversion department,
12         we did not cross with sales to that
13         kind of a degree.  We would ask them
14         certain questions.
15    QUESTIONS BY MR. FULLER:
16         Q.    Yes, ma'am.
17         A.    We would receive certain
18    answers.  We were not provided with any of
19    this type of detail as to what the sales
20    department was doing.  There's -- no, I've
21    never seen this.
22         Q.    Well, and I'm not asking
23    necessarily whether you were provided with
24    the detail.
25         A.    Right, but I have no idea --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   no, I did not know that they had this, no.

 2        Q.      But yet you guys are included

 3   as to the potential scope of this policy and

 4   procedure, aren't you?

 5             It says, "Quality and

 6   regulatory affairs as well as supply chain

 7   integrity."

 8             That was your department,

 9   correct?

10        A.     This -- again, I don't know

11   where this came from.  This --

12        Q.      Well, it came from Cardinal.

13        A.      This is -- we both agree this

14   is a sales standard operating procedure.

15   This is not a standard operating procedure

16   that I am familiar with.  I did not read

17   this.  I did not follow this.  So, no, I

18   don't know what this is.

19        Q.      And let me help you here.  If

20   somebody in your department had this

21   information, certainly it wasn't given to

22   you?

23        A.     That's correct.

24             MR. FULLER:  Okay.  All right.

25        We've been going over an hour now, so
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          I think I made up for a little bit of

 2          lost time, but why don't we take a

 3          break.  And being that it's noon, why

 4          don't we take our lunch, if that's

 5          okay with you.

 6              THE WITNESS:  That's fine.

 7              VIDEOGRAPHER:  We're going off

 8          the record.  The time is 11:56.

 9       (Off the record at 11:56 a.m.)

10              VIDEOGRAPHER:  We're going back

11          on the record.  Beginning of Media

12          File Number 3.  The time is 1:04.

13  QUESTIONS BY MR. FULLER:

14      Q.    Ms. Justus, you've currently

15  been working for Cardinal approximately

16  15 years, correct?

17      A.    That's correct.

18      Q.    And in 2007, thereabouts, you

19  were transferred into the anti-diversion

20  department; is that fair?

21      A.    That's fair.

22      Q.    Initially as an administrative

23  assistant and then as the new client

24  specialist?

25      A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.     You held that position as new

 2   client specialist, reviewing accounts for

 3   potential pharmacies and drugstores as well

 4   as others wanting to do business with

 5   Cardinal?

 6         A.     Yes.

 7         Q.     And then approximately in 2012,

 8   you switched over to a senior analyst for

 9   quality and regulatory, which involved

10   reviewing thresholds that were hit by some of

11   these customers, these drugstores and

12   pharmacies; is that right?

13         A.     Yes.

14                MS. WICHT:  Objection to the

15         form.

16   QUESTIONS BY MR. FULLER:

17         Q.     And then in 2014 you were

18   promoted to senior consultant for strategic

19   planning and execution.

20                Did I get that term right?

21         A.     Yes, you did.

22         Q.     And what you've been working on

23   the past four years, with three years to go,

24   is a software platform to integrate the

25   purchasing process across all of Cardinal's
```

Highly Confidential - Subject to Further Confidentiality Review

1    different departments, if you will?

2         A.    That's correct.

3         Q.    Okay.  Now, we talked a lot

4    about these controlled substances, and you've

5    told us what specific areas you were over.

6    And those included the Aurora, Lakeland,

7    Swedesboro, Wheeling and Knoxville

8    distribution centers during that time frame

9    of 2012 to 2014; is that accurate?

10        A.    That's correct.

11        Q.    Okay.  If I wanted to chat with

12   the person most knowledgeable as to the

13   distribution of controlled substances and

14   suspicious orders related to Cuyahoga County,

15   who would I need to speak with?

16             MS. WICHT:  Objection to the

17        form.

18             THE WITNESS:  As an overall

19        measuring what -- -- I mean, depending

20        upon --

21   QUESTIONS BY MR. FULLER:

22        Q.    Focusing on suspicious orders.

23        A.    Threshold events?  It would be

24   myself, would be one, I guess.

25        Q.    Now, are you going to limit

Highly Confidential - Subject to Further Confidentiality Review

```
1    yourself to the time of 2010 to 2014?

2    Because that's the only time you were over

3    that issue there, correct?

4         A.    That's correct.

5         Q.    Okay.  What about the city

6    of -- strike that.

7               Who else would have knowledge

8    about the threshold events -- or excuse me,

9    the suspicious orders into Cuyahoga County?

10              MS. WICHT:  Object to the form.

11              THE WITNESS:  I guess any of my

12         direct reports all the way -- it

13         wasn't hidden.  It was -- if there was

14         anything, it would have been my direct

15         report was -- during new account setup

16         would have been Nick Rausch.  He

17         reported to Michael Moné.

18   QUESTIONS BY MR. FULLER:

19        Q.    Nick Rausch?

20        A.    That's correct.

21        Q.    He reported to Mr. Moné?

22        A.    Yes.

23        Q.    Do you know who Mr. Moné'

24   reported to?

25        A.    Let's see.  In -- it would have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    been Gilberto Quintero.

 2         Q.    Quintero?  Help me out with the

 3    last name.

 4         A.    Q-u-i-n-t-e-r-o.

 5         Q.    Now let me ask:  What was

 6    Mr. Moné's position?

 7         A.    Vice president of supply chain

 8    integrity or anti-diversion.

 9         Q.    How about Mr. Gilberto?  Sorry,

10    I'm not going to try the last name.  It will

11    end badly.

12         A.    It's okay.

13               He was the SVP.  So he was a

14    senior vice president of -- I don't remember

15    his actual title, but he was over that

16    department, yes.

17         Q.    Okay.  And he was above

18    Mr. Moné?

19         A.    Yes.

20         Q.    Now, if we asked to speak with

21    the person most knowledgeable related to

22    these same issues -- well, strike that.

23               If I asked you to speak with

24    the person from Cardinal most knowledgeable

25    on suspicious orders for the City of
```

```
 1    Cleveland, who would I need to speak with?

 2              MS. WICHT:  Object to the form.

 3              THE WITNESS:  It would be the

 4       same.

 5    QUESTIONS BY MR. FULLER:

 6       Q.     So it would be Mr. Rausch,

 7    Mr. Moné and then Mr. --

 8       A.     Quintero, yes.

 9       Q.     Mr. Quintero?

10       A.     Uh-huh.

11       Q.     Ms. Justus, if I wanted to

12    speak with the person with Cardinal most

13    knowledgeable to suspicious orders for the

14    City of Akron, Ohio, who would I need to

15    speak with?

16              MS. WICHT:  Same objection.

17              THE WITNESS:  Again, it's going

18       to be the same.

19    QUESTIONS BY MR. FULLER:

20       Q.     Again, that would be

21    Mr. Rausch, Mr. Moné and Mr. Quintero?

22       A.     Yes.

23       Q.     Did I get that name right?

24       A.     Uh-huh, you did.

25       Q.     If I wanted to speak with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   person most knowledgeable as to the

 2   suspicious orders in Summit County, would I

 3   seek to speak with Mr. Moné, Mr. Rausch and

 4   Mr. Quintero?

 5        A.    Yes.

 6              MS. WICHT:  Same objection.

 7   QUESTIONS BY MR. FULLER:

 8        Q.    When you were transferred into

 9   the anti-diversion group, wasn't the group

10   being restructured or rebuilt at that time?

11        A.    It was.  I don't know what it

12   was before.

13        Q.    Do you know if the

14   anti-diversion group existed before?

15        A.    I don't.  I don't know what it

16   was called, who was in it, no.

17        Q.    Or whether they even had one?

18        A.    I don't have any idea.

19        Q.    You and -- and I apologize.

20   Who was the gentleman that brought you with

21   him?

22        A.    Mark Hartman.

23        Q.    Hartman?

24        A.    Yes.

25        Q.    Mr. Hartman.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  You and Mr. Hartman went over

 2   there and sort of revamped or developed the

 3   anti-diversion department as you went to know

 4   it, correct?

 5                  MS. WICHT:  Object to the form.

 6           Foundation.  It mischaracterizes.

 7                  THE WITNESS:  It wouldn't have

 8           been we.  It would have been

 9           Mr. Hartman.  I was an admin.

10   QUESTIONS BY MR. FULLER:

11           Q.    You were helping him?

12           A.    Well, I was an admin.

13           Q.    Right?

14           A.    There's not a whole lot of

15   decision-making when you're an admin.

16           Q.    Yeah, but you're the support

17   behind the man, right?  No.

18           A.    No.  Mr. Hartman can do -- I

19   was an admin assistant.  That's it.

20           Q.    So when Mr. Hartman went over

21   there, he went over there to build this

22   anti-diversion department, correct?

23                  MS. WICHT:  Object to the form.

24                  THE WITNESS:  I don't know --

25                  MS. WICHT:  Mischaracterizes
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          prior testimony.

 2                    THE WITNESS:  -- why he was

 3          hired.

 4   QUESTIONS BY MR. FULLER:

 5          Q.    Well, you, I think, agreed with

 6   me that you went over to revamp, redo,

 7   build --

 8                    MS. WICHT:  Object to the form.

 9                    MR. FULLER:  You going to let

10          me finish my question?

11                    MS. WICHT:  Sure.

12                    MR. FULLER:  Thank you.

13   QUESTIONS BY MR. FULLER:

14          Q.    Isn't that what you testified

15   to?

16                    MS. WICHT:  Object to the form.

17          Mischaracterizes.

18                    THE WITNESS:  I was asked to

19          come with Mark on his new role in the

20          department of anti-diversion, yes.

21   QUESTIONS BY MR. FULLER:

22          Q.    Okay.  And do you know whether

23   there was a new client specialist in that

24   department when you arrived?

25          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Was there a senior analyst in

 2    that department when you --

 3          A.      I don't know that.

 4          Q.      You also mentioned earlier that

 5    there were people that were running these

 6    thresholds, running these numbers, creating

 7    these -- the matrix that we talked about

 8    earlier, right?

 9                  Are there people that don't do

10    that?

11          A.      There are pharmacists that do

12    that, yes.

13          Q.      Okay.  Who are the pharmacists

14    that were doing that when you were there in

15    the anti-diversion department?

16          A.      At the time that I was there,

17    it was Michael Moné.  It was Christopher

18    Forst.

19          Q.      You say Forst or Horst?

20          A.      Forst, F-o-r-s-t.

21          Q.      That's Christopher?

22          A.      Yes.

23          Q.      And I'm sorry, Michael Moné

24    again, right?

25          A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Okay.  Who else?

 2          A.      There are additionals.  There

 3   were Doug Emma, Janet Ng.

 4          Q.      I'm sorry, what's her last

 5   name?

 6          A.      Ng.  It's N-g.

 7                  Kimberly Anna-Soisson.

 8          Q.      I'm sorry, I didn't get the

 9   last name again.

10          A.      It's Anna-Soisson.  So it's

11   S-o-i-s-s-o-n.  It's Anna hyphenated Soisson.

12          Q.      Okay.

13          A.      And Bill, and I can't think of

14   his last name.  Bill Brady.

15          Q.      And these were all pharmacists,

16   to your knowledge?

17          A.      Yes.

18          Q.      Okay.  How many other senior

19   analysts were there, other than yourself,

20   when you took over that role in 2012?

21          A.      Three or four.  I'm not sure.

22   I don't know.  I don't remember exactly.

23          Q.      And I think you told us earlier

24   you split it up, or divided up, the company

25   geographically, is that right, by
```

1    distribution center?

2         A.    Yes.

3         Q.    When you first started in the

4    anti-diversion department, what type of stuff

5    were you and Mr. Hartman doing?

6         A.    Well, I don't know what

7    Mr. Hartman would have been doing as far as

8    the role goes.  I can give you what I would

9    do.  It would be the typical administrative

10   scheduling meetings, travel arrangements,

11   auditing any kind of expense reports.  For

12   the most part, most of the day.

13        Q.    And this would have been

14   sometime in early 2007; is that right?

15        A.    Late 2007.  I was an admin

16   prior to that, so...

17        Q.    I'm sorry, you lost me there.

18   Say that again?

19        A.    I had been an admin since 2003.

20        Q.    Right.

21        A.    And late 2007 is when I was the

22   admin for the anti-diversion team.

23        Q.    Okay.  And you believe you did

24   more secretarial tasks?

25        A.    For the most part, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Until 2010?

 2          A.      Yes.

 3                  (Cardinal-Justus Exhibit 5

 4          marked for identification.)

 5   QUESTIONS BY MR. FULLER:

 6          Q.      Okay.  Let's go to 2020.  This

 7   is going to be Plaintiff's Exhibit Number 5.

 8                  Have you seen this document in

 9   the past?

10          A.      Yes.

11          Q.      And what is it?

12          A.      It's an outline of tasks that

13   Mr. Hartman was in charge of to -- per his

14   roles and responsibilities.

15          Q.      And this is some of the action

16   he was taking when he first came to the

17   anti-diversion department to restructure or

18   recreate it or whatever you want to call it,

19   right?

20          A.      Correct.

21          Q.      Okay.  And it starts off by

22   saying, "Establish new, elevated,

23   organizational unit responsible for the

24   supply chain integrity and anti-diversion;

25   direct dual reporting to the interim chief
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    executive officer, HSCS, and the EVP QRA,

 2    Cardinal Health."

 3              Right?

 4    A.    Yes.

 5    Q.    And tell us, who is the HSCS,

 6    if you know.

 7    A.    I don't know.  I don't

 8    remember.

 9    Q.    Who is the EVP?

10    A.    Well, the EVP of QRA Cardinal

11    Health would have been Dolch.

12    Q.    And EVP is what?

13    A.    Executive vice president.

14    Q.    Got it.

15              And you believe that would have

16    been who?

17    A.    Gary Dolch.

18    Q.    Help me out with the last name.

19    I'm sorry.

20    A.    Dolch.  It's D-o-l-c-h.

21    Q.    And this outline, this outline

22    of key anti-diversion actions, was issued, at

23    least according to the document, in January

24    of 2007; is that right?

25    A.    That's what it says here, yes.
```

1    Q.    Okay.  Do you have any reason

2  to dispute that?

3    A.    No.

4    Q.    And this document goes through

5  six pages of different changes and

6  implementations that Mr. Hartman was doing

7  during this time frame, correct?

8    A.    Well, I would state that that's

9  more than likely a typo because he wasn't put

10  into the position until December of 2007.

11    Q.    I --

12    A.    I have no idea, yeah.

13    Q.    Only going by the document,

14  right?

15    A.    Going by the document.

16    Q.    And that's what it says?

17    A.    It does.

18    Q.    Any idea who would have

19  prepared this document?

20    A.    More than likely myself.

21    Q.    And let's talk about some of

22  the things that are being done.  And actually

23  I didn't pick up on this, and I apologize.

24  Gary Dolch's name is printed right on the

25  form, isn't it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      It is.

 2        Q.      At least you didn't have to

 3   point it out to me.

 4        A.      I didn't.

 5        Q.      I called myself out.

 6                So if you go down to D on that

 7   first page, "Change reporting of VP" --

 8                I'm assuming that means vice

 9   president, right?

10        A.      Uh-huh.

11        Q.      Is that a yes?

12        A.      I would agree.

13        Q.      Okay.

14                -- "of HSCS, QRA, to direct

15   reporting to the senior VP, supply chain

16   integrity and anti-diversion."

17                And then it says the owner is

18   Mr. Dolch?

19        A.      That's correct.

20        Q.      Do you know, when we say

21   "owner," is that sort of like the person

22   responsible?

23        A.      Yes.

24        Q.      Whoever owned that task?

25        A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Okay.  So if you go to, on

 2    page 3 of the document, number 5, it talks

 3    about, "At this point we're going to make

 4    anti-diversion compliance a component of

 5    annual performance reviews and incentive

 6    compensation for field sales and

 7    operational -- excuse me, operations

 8    personnel."

 9              Do you see that there?

10       A.      I do.

11       Q.      And who is Scott Storrer?

12       A.      Scott Storrer?

13       Q.      Yes.

14       A.      I don't remember what or who

15    his title was.  He was in the area leadership

16    group.

17       Q.      How about Mike Duffy?

18       A.      Again, he was senior light

19    leadership.  I don't -- I don't know exactly

20    his title or what -- I believe was

21    operations, but I do not know that.

22       Q.      And then we have Mr. Hartman,

23    who we know who he is, right?

24       A.      Correct.

25       Q.      So now if you can continue to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the -- it's the fifth page.  You have a

 2    section called "Systems."

 3              Do you see that down at the

 4    bottom?

 5         A.    Yes.

 6         Q.    And do you know who Steve

 7    Reardon is?

 8         A.    Yes.

 9         Q.    Who is Steve Reardon?

10         A.    Steve is the -- at that time

11    was the vice president of quality and

12    regulatory affairs and ops, and operations.

13         Q.    Okay.  And I'm assuming by

14    systems -- and you may be able to help us

15    here.  By "systems," you're talking about

16    systems that we're going to address, do

17    something to, systems within the company; is

18    that right?

19              MS. WICHT:  Object to the form.

20              THE WITNESS:  I don't know

21         that.  I would --

22    QUESTIONS BY MR. FULLER:

23         Q.    Okay.

24         A.    Yeah.

25         Q.    You don't know one way or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    another?

 2         A.     No, I do not.

 3         Q.     Number one is the

 4    implementation -- or excuse me, "Implement

 5    individual SKU daily order limiter for

 6    hydrocodone, oxycodone, alprazolam and" --

 7                 Help me out with that one.

 8         A.     Phentermine.

 9         Q.     -- "phentermine until the

10    suspicious order monitoring system is

11    operational."

12                 Do you see that?

13         A.     I see that, yes.

14         Q.     And we're going to put daily

15    order limits according to this, or

16    Mr. Reardon is, until we get our suspicious

17    order monitoring system operational, right?

18         A.     I'm not going to take that out

19    of context.  I don't know exactly what that

20    means.  That is the way it reads, yes.

21         Q.     Well, do you disagree that it

22    says we're going to put daily order limits --

23         A.     No, I just said that's exactly

24    what it says --

25         Q.     Okay.
```

```
 1        A.     -- and that's what it reads.
    The context behind it, I don't know.
 3        Q.     What it actually means, you
 4   don't have any idea?
 5        A.     That's correct.
 6        Q.     It would be a better question
 7   for someone else?
 8        A.     That would be a better question
 9   for someone else, what they meant, yes.
10        Q.     And then number 2.  The second
11   system that we're going to deal is we're
12   going to "develop and implement a
13   computerized system to identify, block and
14   report suspicious orders."
15               Is that what that says?
16        A.     That is what that says.
17        Q.     And the subcategories there in
18   A and B are also assigned to Mr. Reardon.
19               Now, is it your understanding
20   that in '12 and -- through '14, that was a
21   system you were working with, a system
22   designed to block -- and what did it say? --
23   "identify, block and report suspicious
24   orders."  Would that be part of the threshold
25   system?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Again, and the reason that I

2    don't know what all of this is is because

3    Steve was in quality and regulatory affairs

4    and operations.  That's not necessarily

5    anti-diversion department.  So, yes, between

6    '12 -- 2012 and 2014, we worked in a system

7    that was all automated for that.

8            I don't know what these systems

9    are that are listed here for Mr. Reardon.

10     Q.      Okay.  But in any case, at

11   least according to this document, he's going

12   to develop and implement that system.  And he

13   has to have it done, a network-wide rollout,

14   by December 23rd of 2007; is that right?

15     A.      Yes.

16            MS. WICHT:  Object to the form.

17     Calls for speculation.

18            THE WITNESS:  It's what it

19     says, yes.

20   QUESTIONS BY MR. FULLER:

21     Q.      Do you have any reason to doubt

22   that the document isn't accurate?

23     A.      No.  I mean, I --

24     Q.      I mean --

25     A.      Actually, I've caught two typos

Highly Confidential - Subject to Further Confidentiality Review

```
 1   on myself, but...

 2        Q.      We won't talk about those.

 3        A.      So as far as accuracy, yes,

 4   this is what I would have been given to put

 5   on this document, yes.

 6        Q.      And probably by Mr. Hartman?

 7        A.      More than likely, yes.

 8        Q.      Okay.  And then number 4,

 9   "Ensure appropriate communication to field on

10   order blocking that will occur with IT

11   solution so that field is equipped to deal

12   with customers."

13              And I'll tell you right off the

14   bat that that whole grammatical thing could

15   have been better.

16        A.      It most certainly could have.

17        Q.      But we'll blame that on

18   Mr. Hartman.

19        A.      Yes, we will.

20        Q.      You only type what you're

21   given, right?

22        A.      That's right.

23        Q.      All right.  So again, number 4

24   is "ensure appropriate communication to

25   field," and by that we would think we're
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    talking about people out in the field?

 2         A.    I don't know what that means.

 3         Q.    Okay.  "Communication to field

 4    on order blocking that will occur with IT

 5    solution so that field is equipped to deal

 6    with customers."

 7               And that was to be implemented

 8    by January 18 of 2000 -- or excuse me,

 9    January 18 of 2008; is that right?

10         A.    That's what this says, yes.

11         Q.    Okay.  All right.  So in your

12    job as the administrative assistant, as you

13    testified earlier, you would have prepared

14    this document; is that right?

15         A.    Yes, more than likely, uh-huh.

16         Q.    And you believe it would have

17    been at the direction of whom?

18         A.    Mr. Hartman.

19         Q.    Because he was your supervisor?

20         A.    He was my direct report, yes.

21         Q.    Okay.  And you would have

22    prepared this document in the normal course

23    of business following his direction, correct?

24         A.    Yes.

25         Q.    He would have provided you all
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the information contained in the document?

 2         A.     Yes.

 3                MS. WICHT:  Object to the form.

 4    QUESTIONS BY MR. FULLER:

 5         Q.     And it's your understanding

 6    that it would have been for whatever task he

 7    was doing in his position of -- what was his

 8    title again?

 9         A.     Senior vice president of supply

10    chain integrity or anti-diversion and --

11         Q.     Whatever it was --

12         A.     Right.

13         Q.     -- he was doing it?

14         A.     Right.  I mean, that was his

15    role, yes.

16         Q.     In the execution of his job

17    duties and responsibilities, correct?

18         A.     To my knowledge, yes.

19         Q.     Okay.  Now, are you aware of

20    prior to this point in time, 2007, and during

21    2007 that Cardinal was having some issues?

22         A.     I was not aware.

23                MS. WICHT:  Object to the form.

24                (Cardinal-Justus Exhibit 6

25           marked for identification.)
```

```
 1   QUESTIONS BY MR. FULLER:

 2         Q.    I'm going to hand you

 3   Plaintiff's Exhibit Number 6.

 4               Now, Ms. Justus, what you have

 5   is what appears to be a standard operating

 6   procedure for Cardinal Health; is that

 7   correct?

 8         A.    That's correct.

 9         Q.    And it says -- the title is,

10   "Anti-diversion and compliance."  And I've

11   got one on the overhead.

12         A.    Uh-huh.

13         Q.    That is highlighted because I

14   highlighted it yesterday when we were using

15   it.

16               Right?  At the top it says

17   "Anti-diversion and compliance"?

18         A.    Yes.

19         Q.    Compliance and policy?

20         A.    Yes.

21         Q.    And it indicates it was issued

22   in February of 2006; is that right?

23         A.    Yes.

24         Q.    It indicates also that it's a

25   new policy and procedure?
```

```
 1        A.     Yes.

 2        Q.     And tell the jury what the

 3   purpose of this policy and procedure is

 4   according to the document.

 5        A.     I would have to absolutely read

 6   this and try to figure that out.  I've not

 7   seen this before.

 8        Q.     Ma'am, I'm just asking you to

 9   read the purpose on the document.

10        A.     Oh.  "The purpose of the policy

11   is to establish a process and procedure to

12   detect and prevent the diversion of products

13   that Cardinal Health sells to closed-door

14   pharmacy customers at contract pricing."

15        Q.     And do you know who the -- what

16   it means by closed-door pharmacy?  Do you

17   know what those are?

18        A.     Yes.

19        Q.     Explain to the jury what that

20   is.

21        A.     It would be any pharmacy

22   without any walk-ins.

23        Q.     So it means something with no

24   retail, correct?

25        A.     Normally, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And if you look down at the

2  definition section of this document it

3  actually says, "Closed-door pharmacy means

4  any non-retail pharmacy."  Is that right?

5      A.     Yes, it does.

6      Q.     And that's consistent with your

7  definition?

8      A.     Yes.

9      Q.     Okay.

10      A.     Yes.

11      Q.     Would you suspect that there

12  would be other policies and procedures

13  related to the anti-diversion during this

14  time?

15      A.     I don't have any idea.

16      Q.     We know that when you got into

17  that department you had them, right?  We

18  looked at some of them?

19      A.     Yes.

20      Q.     The threshold, high tail -- or

21  highlight report, so forth and so on,

22  correct?

23      A.     Yes.

24      Q.     If this is the only one that

25  existed back in 2006, would that cause you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    any concern?

 2              MS. WICHT:  Object to form.

 3         Foundation.  Calls for speculation.

 4              THE WITNESS:  That's a

 5         hypothetical.  I don't know if there's

 6         others.  I don't know what the

 7         policies were.  I was not in the

 8         department.

 9              I don't have any opinion on

10         that.  I don't know what that would

11         be.

12    QUESTIONS BY MR. FULLER:

13         Q.    Sure.

14              And at Cardinal, Cardinal takes

15    a position that all of its employees are

16    responsible for preventing diversion, right?

17         A.    That is correct.

18         Q.    Whether you're an

19    administrative assistant in some other

20    far-off department or whether you're in the

21    anti-diversion department, correct?

22         A.    That would be correct.

23         Q.    In order to do that, to try to

24    prevent diversion --

25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.     -- we need to have some

 2   mechanism to assist for that; would you

 3   agree?

 4              MS. WICHT:  Object to the form.

 5   QUESTIONS BY MR. FULLER:

 6        Q.     Policy, procedure, practice,

 7   something?

 8        A.     Something.

 9        Q.     Okay.  This policy and

10   procedure only focuses on one of those

11   segments of who we deliver to as Cardinal; is

12   that right?

13        A.     That's correct.

14        Q.     You would suspect to see a

15   policy and procedure for retail pharmacies,

16   right?

17              MS. WICHT:  Object to the form.

18              THE WITNESS:  I would not

19        expect any -- to be able to see

20        anything.  I mean, this is the first

21        I've seen this one.

22   QUESTIONS BY MR. FULLER:

23        Q.     Right.

24        A.     So I can't make an expectation

25   of anybody having anything more written.
```

1          Q.      I'm not asking you to make an

2     expectation.  I've asking you based on

3     15 years of experience with Cardinal.

4          A.      Uh-huh.  No, I -- I not

5     necessarily would have any expectation.  It

6     could have a departmental process.

7          Q.      Fair enough.  Fair enough.

8                  Do you know who Eric Brantley

9     is?

10         A.      I do know Eric Brantley.

11         Q.      And who is Eric Brantley?

12         A.      Well, from -- gosh.  I remember

13    that Eric was -- I don't know his title.  I

14    don't know much about Eric.  I know that Eric

15    ended up moving to Atlanta area at one point.

16                 The reason I would know Eric is

17    because he sat near me in cubicles.  I didn't

18    really know what he did or what his role was.

19         Q.      When you say you sat next to

20    him or near him --

21         A.      Near him in the area in -- on

22    the fourth floor in the 4C wing of our

23    corporate building.  He was just an

24    individual that sat in the area.

25         Q.      And when was that?  What time

Highly Confidential - Subject to Further Confidentiality Review

```
 1   frame are you talking?

 2        A.     Oh, gosh.  That would have

 3   been, I don't know, 2005 maybe.

 4               (Cardinal-Justus Exhibit 7

 5        marked for identification.)

 6   QUESTIONS BY MR. FULLER:

 7        Q.     Next document you have is a

 8   policy and procedure -- actually it's an

 9   anti-diversion compliance policy overview.

10        A.     Uh-huh.

11        Q.     Do you see that?

12               And it looks like it was -- at

13   least Eric Brantley's name is at the bottom?

14        A.     That's correct.

15        Q.     Okay.  And what's the date

16   there at the bottom?

17        A.     April of 2006.

18        Q.     And it gives a title.

19        A.     It does.

20        Q.     What's the title of

21   Mr. Brantley there?

22        A.     Anti-diversion compliance

23   coordinator.

24        Q.     Okay.  Did you ever know him to

25   be working with anti-diversion at all?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      No, I didn't know that at the
 2   time.  No.
 3          Q.      If you turn to the first page,
 4   it talks about, "The anti-diversion
 5   conversion compliance policy sets forth
 6   guidelines and procedures Cardinal Health has
 7   adopted to detect and prevent the diversion
 8   of drugs it sells to closed-door pharmacy
 9   customers at contracting prices."
10               You would agree with me that
11   the anti-diversion practice that was there in
12   2010 through 2014 was much broader than that,
13   correct?
14          A.      I would not speculate that.  I
15   don't know what they had beforehand.
16          Q.      Well --
17          A.      For this, this is one document
18   that he would have created.
19          Q.      Yes.
20          A.      Yes.
21          Q.      And in this document he says,
22   "The anti-diversion compliance policy sets
23   forth guidelines and procedures for Cardinal
24   related to closed-door pharmacy customers."
25               I'm not asking you to read
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    anything into it.  I'm just asking you if

 2    what you did when you were in the diversion

 3    department was broader than just closed-door

 4    customers.

 5         A.    Yes.

 6         Q.    Okay.  And it says, "The policy

 7    applies to all officers and employees of

 8    Cardinal and its subsidiaries."

 9              As you stated earlier, you

10    agree with that, that we all have an

11    obligation when it relates to diversion and

12    controlled substances, correct?

13         A.    Yes.

14         Q.    If you go to the next page,

15    second bullet point there talks about

16    "preventing diversion has also been a recent

17    focus of a number of governmental efforts."

18    And the first one it talks about is the

19    New York Attorney General inquiries.

20              Do you know anything about

21    those?

22         A.    No.

23         Q.    Or what they encompassed?

24         A.    No, I don't.

25              (Cardinal-Justus Exhibit 8
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              marked for identification.)
 2   QUESTIONS BY MR. FULLER:
 3       Q.    All right.  Plaintiff's Exhibit
 4   Number 8.  Pass to counsel two copies.
 5              I'm just assuming that you've
 6   never seen this document before, right?
 7       A.    No.
 8       Q.    Now, when you came into the
 9   anti-diversion department, did they share any
10   history of diversion issues with you?
11       A.    No.
12       Q.    That Cardinal may have had?
13       A.    No.
14       Q.    Would you have wanted to know
15   of any issues so you could be on the lookout
16   for similar things, or didn't matter?
17              MS. WICHT:  Object to the form.
18              THE WITNESS:  At that point in
19          time, no, I was not aware of what
20          things were.  I had not held
21          positions --
22   QUESTIONS BY MR. FULLER:
23       Q.    And when you first came in, you
24   were administrative assistant still?
25       A.    Right.  So, no.
```

1    Q.    So when you get promoted in

2    2010 into a position where you're actually

3    evaluating clients, drugstores and

4    pharmacies, to decide whether we're going to

5    accept them, at that point did they give you

6    any insight into the history of compliance

7    issues that Cardinal has had?

8              MS. WICHT:  Object to the form.

9              THE WITNESS:  That Cardinal had

10        had?

11   QUESTIONS BY MR. FULLER:

12        Q.    Yes, ma'am.

13        A.    No, it was more of the training

14   of what to look for.  That would have all

15   been discussed in litigation or in legal

16   meetings or in senior management meetings.

17   That wasn't -- it wasn't as a historical-type

18   training.  It was on what we were looking for

19   and what our daily duties were.

20        Q.    So then in 2012 when you got

21   promoted again to senior analyst, they still

22   didn't provide you any training or any

23   understanding of what had been going on with

24   Cardinal as far as regulatory issues, did

25   they?

```
 1              MS. WICHT:  Object to the form.
 2              THE WITNESS:  No.  I mean, what
 3         we knew from being in the department
 4         at that point in time, sure, we
 5         could -- but there was no training,
 6         there was no --
 7    QUESTIONS BY MR. FULLER:
 8         Q.     What did you --
 9         A.     -- reading of these documents.
10         Q.     What did you know of what was
11    going on from being in the department?
12         A.     Well, in -- that we had lost
13    licensure, right?  I mean, that was pretty
14    common knowledge that we had lost licensure
15    from the DEA, making notice that, you know,
16    for whatever reason, that they had their
17    findings on our sales, which is why we had
18    the processes in place.
19         Q.     You say "for whatever reason."
20              Do you know what the reasons
21    were?
22         A.     You know what?  Sure.  They
23    stated that we had shipped too many
24    prescription drugs to pharmacies is what they
25    had stated, yes.
```

Highly Confidential – Subject to Further Confidentiality Review

1      Q.     And do you believe you did?

2      A.     I did not see any order ever go

3   out of Cardinal Health that was ever thought

4   to be for diversion, no.  I don't know.

5      Q.     So the best you understand and

6   what you've seen and what you've worked on

7   over the time that you were in the

8   anti-diversion department, you've never seen

9   any order go out that you thought was

10  suspicious of diversion?

11     A.     That is correct.

12     Q.     And let's talk about -- when we

13  talk about suspicious orders, we're talking

14  about orders that we believe could be or

15  might be diverted, correct?

16     A.     That is a could be, yes.

17     Q.     Okay.  It's not that we have to

18  know for sure 100 percent that they're going

19  to be diverted; we just have to have a

20  suspicion that they may be?

21     A.     Correct.

22     Q.     Okay.  And why do we want to

23  prevent diversion?

24            MS. WICHT:  Object to the form.

25            THE WITNESS:  So that

1          prescription drugs do not get into the

2          wrong hands or are used in any way

3          other than medical purposes.

4    QUESTIONS BY MR. FULLER:

5          Q.    Because if they are, it can be

6    what?

7               MS. WICHT:  Object to the form.

8               THE WITNESS:  Per all of the

9          documents, it can be -- what were some

10         of the words here? -- damaging,

11         harmful.

12   QUESTIONS BY MR. FULLER:

13         Q.    To the general public, right?

14         A.    Absolutely.

15              MS. WICHT:  Object to the form.

16              THE WITNESS:  It could be.

17   QUESTIONS BY MR. FULLER:

18         Q.    And you mentioned you want to

19   prevent the diversion into other than the

20   legitimate use.

21              When we're talking about

22   diversion, that's actually talking about

23   criminal activity.  We want to prevent

24   criminal activity, correct?

25              MS. WICHT:  Object to the form

Highly Confidential - Subject to Further Confidentiality Review

```
1          to the extent it calls for a legal

2          conclusion.

3                THE WITNESS:  I can't say

4          what's criminal and isn't criminal.

5   QUESTIONS BY MR. FULLER:

6          Q.    Do you know whether or not the

7   diversion of controlled substances is a

8   crime?

9          A.    Yes.

10         Q.    Okay.  So by blocking

11  suspicious orders, we're trying to prevent

12  diversion, correct?

13         A.    Correct.

14         Q.    Therefore, we're trying to stop

15  crimes from happening at Cardinal; isn't that

16  what we're really doing?

17               MS. WICHT:  Object to the form.

18               THE WITNESS:  Well, I think

19         stopping crime -- we are trying to --

20         Cardinal Health is a distribution

21         company.  We are trying to get

22         products to legitimate uses in the

23         pharmacies.

24               It is not Cardinal Health's

25         responsibility to police officer that
```

1           criminal activity to the degree of

2           where -- where I would know what

3           criminal activity was happening.

4           That's above my role and

5           responsibility there.

6     QUESTIONS BY MR. FULLER:

7           Q.     Right.

8           A.     Right.

9           Q.     But you've already testified

10    that we're --

11          A.     Yes.

12          Q.     Under suspicious orders, we're

13    trying to prevent suspicious orders because

14    of potential for diversion.

15          A.     That's correct.

16          Q.     Which is a crime.

17                 MS. WICHT:  Object to the form.

18    QUESTIONS BY MR. FULLER:

19          Q.     Correct?

20          A.     Correct.

21          Q.     Okay.  2434 has been marked as

22    Exhibit 8.

23                 Do you see that?  Do you have

24    that document, "Assurance" --

25          A.     I do have this document.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      "Assurance of discontinuance

 2    pursuant to Executive Law Section 63(15)."

 3          A.      Yes.

 4          Q.      And you don't have any idea

 5    what type of conduct was going on here,

 6    correct?

 7          A.      No.

 8          Q.      You haven't seen this before?

 9          A.      No, I have not.

10          Q.      And you're free to read the

11    document.  The document deals with two

12    issues:  purchases from other than reliable

13    sources, as well as diversion.

14                  And for the purposes of our

15    conversation, I will focus on the diversion

16    piece.  And if you go to page 4, starts at

17    the bottom, paragraph 12.

18                  Do you see that there, ma'am?

19          A.      Yes.

20          Q.      Actually, let's go to

21    paragraph 11 first.

22                  MR. FULLER:  Can you zoom in on

23          11 for me?

24    QUESTIONS BY MR. FULLER:

25          Q.      It says, "Cardinal repeatedly
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sold pharmaceuticals to customers that it

 2    knew or should have known were diverting

 3    pharmaceuticals."

 4              Isn't that what it reads?

 5         A.    That's what it reads.

 6         Q.    And that "Cardinal made

 7    numerous sales to pharmaceuticals" -- excuse

 8    me -- "of pharmaceuticals to a Nevada company

 9    which purported to be a, quote/unquote,

10    closed-door pharmacy that serviced only

11    nursing homes."

12              Is it surprising to you that

13    shortly after this document is entered into

14    in December of 2006 -- not shortly after it

15    was entered into -- after the investigation

16    began, that Cardinal put out a policy related

17    to closed-door pharmacies?

18              MS. WICHT:  Object to form.

19         Calls for speculation.

20              THE WITNESS:  Sir, I don't know

21         why or when any of these documents

22         were created.  This is -- this would

23         definitely be handled by the legal

24         department, right?

25              I don't know why any documents
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          would have been created after, before

 2          or --

 3     QUESTIONS BY MR. FULLER:

 4          Q.     Sure.  I mean, all of this is

 5     being handled by the legal department.

 6          A.     That's correct.

 7          Q.     That's why we have legal

 8     counsel here.

 9          A.     Well, I mean, yes, but I don't

10     know why these things would have been in the

11     dates that they're in.

12          Q.     Okay.  And then you do know

13     that in 2007 there were immediate suspension

14     orders issued to Cardinal, correct?

15          A.     That's correct.

16          Q.     Okay.  And that's the same year

17     you got transferred to this anti-diversion

18     department; is that right?

19          A.     That's correct.

20          Q.     Do you know if those immediate

21     suspension orders were entered prior to your

22     transfer?

23          A.     Yes, they were.

24          Q.     Okay.  And do you know what

25     facilities those ISOs, or immediate
```

```
 1    suspension orders, pertained to?

 2        A.    It would have been Lakeland.

 3    It would have been Swedesboro.  I believe our

 4    Seattle location.

 5        Q.    Now, before we look at anything

 6    related to that, let me ask you:  Do you have

 7    any knowledge of the Rannazzisi letters that

 8    were issued in 2006?

 9        A.    No.

10        Q.    What about the ones issued in

11    2007?

12        A.    No.

13        Q.    Have you ever seen those

14    letters?

15        A.    No.

16        Q.    At least that you're aware of?

17        A.    That's correct, not that I am

18    aware of.

19        Q.    I'm sorry?

20        A.    Not that I'm aware of, no.

21              MR. FULLER:  Okay.  So we'll go

22        to 2024.  This will be Plaintiff's

23        Exhibit 9.  If you go to the second

24        page, Evan.

25              (Cardinal-Justus Exhibit 9
```

```
 1          marked for identification.)

 2   QUESTIONS BY MR. FULLER:

 3          Q.     Have you ever seen this

 4   document before?

 5          A.     No, sir.

 6          Q.     It appears to be the order to

 7   show cause and immediate suspension of

 8   registration for Cardinal Health, correct?

 9          A.     It appears to be that, yes.

10          Q.     Okay.  If you'll turn -- and it

11   says, "Cardinal Health, 2045 Interstate

12   Drive, Lakeland, Florida."

13                 That's in Polk County, right?

14          A.     I have no idea.

15          Q.     Okay.  I do know that because I

16   grew up there.

17          A.     Okay.

18          Q.     Lakeland, Florida, that is the

19   address of that distribution center, or do

20   you know that?

21          A.     I don't have that address

22   memorized.  I would -- I don't.

23          Q.     Okay.  So if we go to the third

24   page, you blow up that graph, this was the

25   basis of the immediate suspension order.  And
```

1    on the left it appears that we have the

2    pharmacies that were being delivered to; is

3    that right?

4              MS. WICHT:  Object to the form.

5              THE WITNESS:  It looks --

6              MS. WICHT:  She said she's

7         never seen this before.  I don't know

8         how she's supposed to tell you that.

9    QUESTIONS BY MR. FULLER:

10        Q.    I'm sorry, I thought that --

11   well, let me back up.

12             Ms. Justus, you can certainly

13   read the document, correct?

14        A.    I can read the document.

15        Q.    And my question was:  The

16   column on the left says it includes the

17   pharmacies.

18             I don't think you've had to see

19   this document before to know the column on

20   the left lists the pharmacies, right?

21        A.    Correct.

22        Q.    Okay.  And then the next column

23   lists the dosage units or total dosage units;

24   is that right?

25        A.    That's correct, that's what it

Highly Confidential - Subject to Further Confidentiality Review

1    says.

2         Q.     In your industry, is there a

3    special meaning that you guys give to dosage

4    units?

5                What is a dosage unit, if you

6    know?

7         A.     Dosage unit is exactly what it

8    states, that is, a least unit of measure, or

9    the smallest unit of measure, that can be --

10   it's kind of hard to actually explain what a

11   dosage unit is.

12        Q.     Can you give me --

13        A.     Sorry.

14        Q.     So --

15        A.     Yes.

16        Q.     So if we're dealing with oxys,

17   can you give me an example of what a

18   dosage -- what is the dosage unit measure for

19   oxys?

20        A.     I can give you what it is or

21   what we knew it to be, so -- while I was in

22   that department.

23        Q.     Fair enough.

24        A.     Okay.  Because a clinical dose

25   could be completely different to the degree

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of -- I don't know how it's prescribed.

 2         Q.     Fair enough.

 3         A.     Okay.  A dosage unit could

 4    be -- if a bottle size is a 100-count bottle

 5    and a dose is one, right?  So it's the least

 6    amount of units.

 7         Q.     Okay.  So it's basically -- if

 8    we're talking about pills, it's going to be

 9    the number of pills?

10         A.     Not always.

11         Q.     Are there some outlier

12    exceptions to that?

13         A.     I believe there could be, yes,

14    depending upon how that prescription is

15    written and the strength of the tablet, yes.

16         Q.     If we're dealing with, say,

17    generally oxys and here we're dealing with

18    hydrocodone, we're going to be talking about

19    number of pills?

20         A.     Yes.

21         Q.     Okay.  So if you look at this

22    graph, the first pharmacy received a total

23    dosage units of 620,000 and some change over

24    four months.

25                That's what the graph
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   indicates, right?

 2       A.    Yes.

 3       Q.    An average of 155,000 dosage

 4   units for those four months.

 5             Does that -- based on your

 6   experience, does that seem significantly

 7   large?

 8       A.    That's a number --

 9             MS. WICHT:  Objection.  Calls

10        for speculation.

11             THE WITNESS:  First of all, I

12        mean, that's just one number.

13   QUESTIONS BY MR. FULLER:

14       Q.    Well, I mean --

15       A.    That not necessarily has --

16       Q.    It's the number averaged over

17   four months.

18       A.    What's the question?

19             Go ahead.  What was your

20   question, please?  Because...

21       Q.    Again, so based on your

22   experience --

23       A.    I agree that's that exactly

24   what it says, over four months, yes.

25       Q.    Is that a large delivery to a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmacy for hydrocodone?

 2              MS. WICHT:  Objection.  Calls

 3         for speculation.

 4              THE WITNESS:  There is no way I

 5         can make that decision.  I couldn't

 6         even speculate that.  There is -- that

 7         one number has absolutely -- there's

 8         way too much that would go behind

 9         making a conclusion on whether that is

10         a large number.

11    QUESTIONS BY MR. FULLER:

12         Q.    So one of the things we want to

13    know is what we talked about earlier, right,

14    the history of the pharmacy, correct?

15         A.    We would.

16         Q.    One of the things we would also

17    look at is thresholds.  It's based on some

18    sort of number of what's normal for

19    everybody, correct?

20         A.    What would be normal for that

21    pharmacy would be how that progressed, and

22    under the time frame that I was in the

23    department, we were looking much more at the

24    individual pharmacy.

25         Q.    Now, a policy says that we can
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    compare to other pharmacies.

 2         A.     We could.

 3         Q.     Okay.

 4         A.     Yes.

 5         Q.     And the DEA indicated, if we go

 6    to the paragraph above this graph, indicates

 7    that the retail pharmacies in Florida order

 8    an average of less than 8,400 dosage units of

 9    hydrocodone per month.

10              You would agree with me that

11    155 is well over ten times the average, isn't

12    it?

13              MS. WICHT:  Just asking her

14         about the math?  Is that the question?

15              MR. FULLER:  Counsel, if you

16         want to object to form, you can object

17         to form.

18              MS. WICHT:  I object to the

19         form.

20              MR. FULLER:  If you don't

21         understand my question, I really don't

22         care.

23              If the witness has a question

24         about understanding my question, which

25         I'm sure she is going to ask now about
```

Highly Confidential - Subject to Further Confidentiality Review

1          the math, then she can ask me.

2               THE WITNESS:  Just repeat your

3          question, please.

4     QUESTIONS BY MR. FULLER:

5          Q.    Yes, ma'am.

6               So 8,400 average in Florida at

7     this time is -- well, 155,000 is more than

8     ten times what the average was during this

9     time, correct?

10              MS. WICHT:  Object to the form

11         of the question.

12              THE WITNESS:  Per that math

13         calculation only, yes.  That doesn't

14         state anything about what type of

15         pharmacy, what -- again, it's a

16         number.  It's a number.

17    QUESTIONS BY MR. FULLER:

18         Q.    It is.

19         A.    That's right.

20         Q.    And that's one of the things we

21    have to look at, isn't it?

22              MS. WICHT:  Object to the form.

23              THE WITNESS:  It is one, and

24         only one, of the factors.

25

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. FULLER:

2         Q.    Now, we talked earlier about --

3         A.    We did.

4         Q.    -- the fact that you can have a

5    suspicious order based on numbers alone.

6               MS. WICHT:  Object to the form.

7    QUESTIONS BY MR. FULLER:

8         Q.    Didn't we?

9         A.    We stated -- I stated that you

10   could.

11        Q.    Okay.  Let's go down to Q-R-G,

12   Inc.  Over a five-month period, 1.2 million

13   pills delivered to that pharmacy.

14              Would that cause you any

15   concern as a senior analyst?

16              MS. WICHT:  Object to the form

17        of the question.

18              THE WITNESS:  Not to look at

19        that number.

20   QUESTIONS BY MR. FULLER:

21        Q.    None at all?

22        A.    No.

23        Q.    And that's because Cardinal was

24   regularly dumping millions of pills into

25   pharmacies on a regular basis, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. WICHT:  Object to the

 2          form of the question.

 3                    THE WITNESS:  Sir, I have no

 4          idea of that.

 5    QUESTIONS BY MR. FULLER:

 6          Q.    Do you not know how many --

 7          A.    I did not ever see -- I did not

 8    ever see any kind of an order that went out

 9    and was shipped from Cardinal that was known

10    for diversion to be happening.  There was --

11    no.

12          Q.    Is that the -- is that the

13    burden, that diversion has to be known to be

14    happening?

15                    MS. WICHT:  Objection to the

16          form of the question.

17                    THE WITNESS:  I think that

18          would be kind of speculation.  I have

19          no idea --

20    QUESTIONS BY MR. FULLER:

21          Q.    That's what you just stated:

22    We didn't ship an order where diversion was

23    known to be happening.

24          A.    That's correct.

25          Q.    That's not the burden, is it?
```

Highly Confidential - Subject to Further Confidentiality Review

 1    You have to stop an order if it might be

 2    diverted.

 3              MS. WICHT:  Object to the form

 4         of the question to the extent it calls

 5         for a legal conclusion.

 6              THE WITNESS:  There's no way

 7         that I can give you any more

 8         information on this being one number

 9         in --

10    QUESTIONS BY MR. FULLER:

11         Q.    Let's back up.

12              Is the obligation of Cardinal

13    to stop an order that might be diverted, or

14    that it has to know it's going to be

15    diverted?

16              MS. WICHT:  Object to the form

17         of the question.

18              THE WITNESS:  That is not my

19         decision.  That's not my definition.

20         That's not --

21    QUESTIONS BY MR. FULLER:

22         Q.    Well, hold on.  You were the

23    one sitting at the -- in the corporate

24    headquarters making the call as to whether to

25    clear or cancel an order, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.      That's correct.

 2           Q.      So that was your decision.  You

 3   had the ability to clear an order and let it

 4   go through or cancel it and stop it --

 5           A.      That's correct.

 6           Q.      -- based on your investigation.

 7                   So that determination of what

 8   you needed to stop and what you needed to let

 9   through, you have to understand what you're

10   supposed to be stopping to be able to do

11   that?

12           A.      Correct.

13                   And one number is not

14   necessarily the only answer.  And this is

15   nothing more than giving me a pharmacy name.

16   I don't know the type.  I don't know what

17   they did.  I don't know any history on it.  I

18   don't know why there would have been shipped

19   this, and I can't give that to you from the

20   questions that you're asking me.

21           Q.      And, ma'am, we've stepped away

22   from this graph for a second.  I'm asking now

23   what the standard is as far as shipping a

24   suspicious order.

25                   You only halt it if you know
```

Highly Confidential - Subject to Further Confidentiality Review

 1    it's going to be diverted, or do you halt it

 2    if it might be diverted?

 3         A.     Personally, I would cut an

 4    order if I thought that there was any chance

 5    of it.

 6              MR. FULLER:  Fair enough.

 7         We'll take a break.

 8              VIDEOGRAPHER:  We're going off

 9         record.  The time is 2:03.

10         (Off the record at 2:03 p.m.)

11              VIDEOGRAPHER:  We're going back

12         on the record.  Beginning of Media

13         File Number 4.  The time is 2:21.

14    QUESTIONS BY MR. FULLER:

15         Q.     And, Ms. Justus, we were just

16    discussing the immediate suspension order and

17    some of the shipments that made up that

18    suspension, correct?

19         A.     That's correct.

20         Q.     And again, you've been -- or

21    were in the anti-diversion department

22    yourself from 2007 to 2014, right?

23         A.     That's correct.

24         Q.     You've been with Cardinal

25    approximately 15 years.  And as I think

Highly Confidential - Subject to Further Confidentiality Review

```
1    you've agreed and multiple people previously

2    have stated, everybody at Cardinal is

3    responsible for diversion and making sure we

4    prevent as much diversion as possible; is

5    that correct?

6         A.    That's correct.

7         Q.    Okay.  And part of the time you

8    were the diversion person.  You were the one

9    analyzing orders and determining, as you just

10   testified, whether they either went out or

11   whether they were cut, correct?

12        A.    That's correct.

13        Q.    Now, being that you're that

14   person, you have to know what type of orders

15   need to be cut, what type of orders need to

16   be let through, correct, whatever the -- what

17   your threshold is?  And by "threshold" I

18   don't mean your number.  I mean are we

19   stopping suspicious orders that may be

20   diverted, could be diverted; do we have to

21   know diversion is going on?

22              You have to know what that

23   baseline is, correct?

24              MS. WICHT:  Objection to the

25        form of the question.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  The baseline
 2          would be, from sitting where we sat in
 3          the department, baseline would be that
 4          threshold.
 5   QUESTIONS BY MR. FULLER:
 6          Q.    Let me ask it differently.
 7          A.    Okay.
 8          Q.    You need to know what your duty
 9   is as it relates to suspicious orders,
10   correct?
11          A.    That's correct.
12          Q.    And your duty was that we are
13   to stop a whole shipment of anything that
14   might be diverted; is that right?
15                    MS. WICHT:  Objection.
16   QUESTIONS BY MR. FULLER:
17          Q.    Anything that you suspected
18   could be a subject of diversion?
19                    MS. WICHT:  Object to the form
20          of the question.
21                    THE WITNESS:  Yes.
22   QUESTIONS BY MR. FULLER:
23          Q.    Or were you required before you
24   cut an order, required to go out in the field
25   and confirm that diversion was actually going
```

```
 1   on?

 2        A.     No, I could cut an order

 3   without going to the field.

 4        Q.     And that's what your duty was.

 5   You were to cut anything that was,

 6   quote/unquote, suspicious, correct?

 7             MS. WICHT:  Object --

 8             THE WITNESS:  Sorry.

 9             MS. WICHT:  Object to the form

10        of the question.

11             THE WITNESS:  The possibility

12        of -- it could be suspicious, yes.

13   QUESTIONS BY MR. FULLER:

14        Q.     Okay.  And you believe in your

15   role as the senior analyst that you erred on

16   the side of caution when you cut more than

17   just what would be, quote/unquote,

18   suspicious; is that right?

19        A.     Yes.

20        Q.     You cut more than you let

21   through?

22        A.     Yes.

23        Q.     Okay.  And we were just talking

24   about the ISO, and you're aware that the

25   memorandum of understanding between Cardinal
```

1    and the DEA came out in 2008 during the time

2    you were actually in the diversion

3    department; is that right?

4         A.     Yes.  I was an admin, yeah.

5         Q.     And you're aware that there

6    were multiple suspensions because of

7    violations of this suspicious order

8    requirement, correct?

9              MS. WICHT:  Object to the form

10        of the question.

11             THE WITNESS:  That was the

12        understanding, yes.

13   QUESTIONS BY MR. FULLER:

14        Q.     You knew that.  Somebody told

15   you that.  Like you said, it was common

16   knowledge.

17        A.     Correct.

18        Q.     And when you say "common

19   knowledge," common knowledge throughout the

20   company?

21        A.     I don't know who knew.  It was

22   not a hidden factor, so anybody was allowed

23   to know, but I don't know who.  But, yes,

24   it's common knowledge.

25        Q.     Was it common knowledge within

Highly Confidential - Subject to Further Confidentiality Review

1    the diversion department that this issue had

2    arose, needed to be addressed?

3         A.    Yes.

4         Q.    What changes were made to the

5    diversion department because of this, this

6    2008 memorandum of understanding and the

7    immediate suspension orders; do you know?

8         A.    Not that I was working on.  I

9    was still an admin when all of that took

10   place.

11        Q.    Right.

12        A.    Right.

13              So as far as putting the

14   procedures into place, I don't know what was

15   all changed.

16        Q.    And then moving forward, you

17   take on this role as analyst, correct?

18        A.    That's correct.

19        Q.    Beginning in 2010?

20        A.    Yes.

21        Q.    And then there's another --

22        A.    Oh, it wasn't necessarily

23   beginning of 2010.  It was --

24        Q.    You became the new --

25        A.    -- in 2010, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Right.

 2                  Then in '12 you became the

 3   senior analyst?

 4          A.      Yes.

 5          Q.      Okay.  And then later in 2012,

 6   some of the facilities, some of the

 7   distribution centers, particularly Lakeland,

 8   that you oversaw has another run-in with the

 9   DEA; is that right?

10          A.      That is correct.

11          Q.      And being that you were in that

12   role, do you have any -- did anybody talk to

13   you about what was going on in those

14   facilities?

15          A.      No.

16          Q.      No one came to you?

17          A.      No.  It was common knowledge

18   that we had issues again and what their

19   findings would be, that they were under

20   investigation.

21          Q.      And you say "issues again."

22   Issues related to, again, sending out

23   suspicious orders; is that right?

24                  MS. WICHT:  And, Ms. Justus, I

25          just could caution you, and I don't --
```

```
 1          if there were conversations that you

 2          had with attorneys for Cardinal Health

 3          at that time, those are privileged and

 4          you shouldn't reveal those.  But to

 5          the extent there were any

 6          conversations that were not with

 7          attorneys, you are free to testify

 8          about those.  Okay.

 9              THE WITNESS:  Yeah, there's --

10          there is nothing that would have

11          stated, or they didn't come to me or

12          anything of the sort.

13     QUESTIONS BY MR. FULLER:

14          Q.    So your boss never said, "Hey,

15     we just have another issue in Lakeland.  How

16     is Lakeland going?  What's going on in

17     Lakeland?  Tell me, since you're the senior

18     analyst looking at Lakeland suspicious

19     orders, threshold events, what do you see?"

20              MS. WICHT:  Object to the form

21          of the question.

22              THE WITNESS:  No, they didn't

23          do that.  They would have run reports

24          or asked reports to be run or whatever

25          they were looking for.  That was not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          something that they would have come to

 2          me directly and said, "What's the

 3          lowdown," or whatever you stated.  No,

 4          that's not the way that was -- no.

 5   QUESTIONS BY MR. FULLER:

 6          Q.     Not what's the lowdown.

 7          A.     Well, you're asking what was

 8   going on, was the question.  So they would

 9   not have asked me how Lakeland was going.

10   They would not have asked me that.

11          Q.     Why not?

12          A.     I don't know.

13          Q.     You're the person reviewing all

14   of the Lakeland suspicious orders thresholds

15   in 2012, right?

16          A.     For retail independent, yes.

17          Q.     Okay.  And you don't believe

18   there was any suspicious orders that went out

19   of Cardinal?

20          A.     I don't.

21          Q.     Do you know what pharmacies

22   were related to the 2012 investigation?

23          A.     At that moment, at that time,

24   no, I didn't.

25          Q.     How about now?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.     I do now.

2         Q.     Were there any retail

3   independents involved?

4         A.     There were.

5         Q.     Were any suspicious orders

6   shipped to them?

7         A.     Not to my knowledge, no.

8         Q.     Do you know whether or not

9   Cardinal investigators asked to call the DEA

10  related to what they suspected as subject,

11  potentially criminal activity?

12        A.     No, I don't know that.

13               MS. WICHT:  Object to the form

14        of the question.  Foundation.

15  QUESTIONS BY MR. FULLER:

16        Q.     Do you know a gentleman by the

17  name of Mr. Moellering?

18        A.     Yes, I do.

19        Q.     Who is Mr. Moellering?  Tell it

20  to the jury.

21        A.     He was an investigator for

22  Cardinal Health.

23        Q.     And what was his job as an

24  investigator for Cardinal Health?

25        A.     I don't have all the duties.
```

1    He would be one that we would have -- he

2    would have done a site visit to a pharmacy.

3          Q.     And a site visit related to

4    potentially suspicious orders or

5    diversion-type of activity?

6          A.     That's correct.

7          Q.     And he was trained in this

8    area, correct?

9          A.     I don't know that, yes.

10         Q.     Would you suspect --

11         A.     I would suspect that he did --

12   was.

13         Q.     I mean, there's no reason to

14   send someone out to do an investigation

15   unless they're trained in investigating what

16   they're supposed to be there to investigate,

17   right?

18                MS. WICHT:  Object to the form

19         of the question.

20                THE WITNESS:  I would agree

21         with that.

22                (Cardinal-Justus Exhibit 10

23         marked for identification.)

24   QUESTIONS BY MR. FULLER:

25         Q.     Okay.  Now we're going to go to

1    2025.

2              And this is one of the

3    affidavits, declarations, done by the DEA

4    related to that 2012 memorandum of

5    understanding in the Cardinal versus Holder

6    or Holder versus Cardinal matter.

7              Have you ever seen this

8    document before, ma'am?

9        A.    No, sir.

10       Q.    It's the declaration of a

11   Ruth A. Carter.

12             Do you see that?

13       A.    I do.

14       Q.    And for the record, we're now

15   looking -- I think the exhibit sticker I gave

16   you, Ms. Justus, is Number 10; is that right?

17       A.    That's correct.

18             MR. FULLER:  Did you give her

19        the right one?

20             MS. WICHT:  I did, sorry, yep.

21        I have the wrong one myself, but she

22        has the right document.

23             MR. FULLER:  All right.  All

24        right.

25             MS. WICHT:  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. FULLER:  Sure.  I just

 2          wanted to make sure the record was

 3          clear.

 4   QUESTIONS BY MR. FULLER:

 5          Q.     And in her declaration,

 6   Ms. Carter states that she's a group

 7   supervisor assigned to the Drug Enforcement

 8   Administration, Seattle Division, in Seattle,

 9   Washington; is that correct?

10          A.     That's what this states, yes.

11          Q.     Okay.  And if you'll turn to

12   page 13, the bottom paragraph D, this is part

13   of her investigative declaration.  She says,

14   "October 5 of 2010, Mr. Moellering and

15   Mr." --

16                  Is it Moro?  Do you know

17   Mr. Moro?

18          A.     No, sir, I don't.

19          Q.     -- "Mr. Moro conduct a site

20   visit and notes from this particular site

21   visit reflect the following:  CAH, PBC, Lenny

22   Moro, has observed -- has observed groups of

23   white males and females coming into the

24   pharmacy during his late afternoon visit to

25   have their scripts filled.  They leave in
```

1    small groups."

2              The report further stated:

3    "Owner requested increase in oxycodone

4    threshold.  Even higher dispensing data

5    revealed that 462,766 {sic} units of

6    hydrocodone dispensed within two months."

7              This is what apparently

8    Mr. Moellering tells the agent -- or excuse

9    me, is written in Mr. Moellering's report.

10             "I am not convinced that the

11   owner is being forthright pertaining to his

12   customers' origin or residence.  I have

13   requested permission to contact the DEA to

14   resolve this issue.  High risk of diversion."

15             If you get this type of report,

16   you're going to allow Mr. Moellering to

17   contact the DEA, and you're actually going to

18   encourage it, aren't you?

19             MS. WICHT:  Objection.

20        Foundation.  Calls for speculation.

21             THE WITNESS:  I'm not going to

22        allow anything when it comes to

23        contacting the DEA.  That would have

24        to go through his -- that would have

25        to go through his direct reports.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FULLER:

 2        Q.    Well, let me ask:  If you were

 3    one of his -- if you were his direct report,

 4    and based on the information that he's laid

 5    out so far, would you allow him to contact

 6    the DEA?

 7             MS. WICHT:  Objection to the

 8        form of the question.

 9             THE WITNESS:  I'm not going to

10        hypothetically say anything.  This

11        sounds like to me that this would be

12        legal.  There would be all kinds of

13        information -- or people involved.

14    QUESTIONS BY MR. FULLER:

15        Q.    Okay.  But so far -- you mean

16    the legal department?

17        A.    Yes.

18        Q.    Or you mean this activity's

19    certainly legal?

20        A.    No, this would be a legal

21    department matter that -- that's where I

22    would have raised it to, so...

23        Q.    If there was a threshold hit --

24    therefore, this would be for your review --

25    you send out a site investigator, which
```

Highly Confidential - Subject to Further Confidentiality Review

1    you've told us you had the ability to do, and

2    this is the type of report that comes back,

3    do you clear that order or do you cut it?

4              MS. WICHT:  Objection to the

5         form of the question on the

6         hypothetical.

7              THE WITNESS:  I would have cut

8         the order.

9    QUESTIONS BY MR. FULLER:

10        Q.    If you go to the next

11   paragraph.

12        A.    Uh-huh.

13        Q.    "Despite Mr. Moellering's

14   findings and recommendations, Cardinal

15   Lakeland did not contact the DEA.  Cardinal

16   not only continued to ship oxy 30-milligram

17   tablets to Gulf Coast, but substantially

18   increased shipments to Gulf Coast shortly

19   afterwards.  On November 24, 2010, Cardinal

20   adjusted the monthly volumes of oxycodone to

21   Gulf Coast from 140,000 to 207 -- 207,200.

22   Attachment 29."

23              As the person that at least for

24   a period of time reviewed suspicious orders,

25   you certainly had the training to do that,

```
 1   would this be something that you would allow?

 2        A.    No.

 3              MS. WICHT:  Objection to the

 4        form of the question.

 5   QUESTIONS BY MR. FULLER:

 6        Q.    Why not?

 7              MS. WICHT:  And calls for

 8        speculation.

 9              THE WITNESS:  Personally, I

10        wouldn't have done that.

11              Secondly, that's -- those

12        limits are over any analyst limits.

13   QUESTIONS BY MR. FULLER:

14        Q.    Because they're so high, right?

15        A.    No, I think that it's because

16   of the reasoning behind it.  It would be --

17   need to have additional information that not

18   necessarily an analyst would have the

19   judgment call on.

20        Q.    Again, because the limits are

21   so high, it's beyond the analyst's ability to

22   do it, correct?

23              Which means it had to go up

24   above the analyst level to get the approval

25   to do something like this, correct?
```

```
 1                    MS. WICHT:  Object to the form

 2          of the question.

 3                    THE WITNESS:  There would be

 4          additional levels of approval, yes.

 5   QUESTIONS BY MR. FULLER:

 6          Q.     And you would hope that those

 7   same people who have those additional levels

 8   of approval would have also seen

 9   Mr. Moellering's report, right?

10                    MS. WICHT:  Object to the form

11          of the question.

12   QUESTIONS BY MR. FULLER:

13          Q.     Well, let me ask again.

14          A.     I would hope -- go ahead.

15          Q.     Strike the question.

16                    If someone is going to request

17   a site visit, you get a site visit report,

18   you would certainly hope they would use that

19   site visit report if they're going to change

20   the threshold for that pharmacy or drugstore,

21   right?

22                    MS. WICHT:  Object to the form

23          of the question.

24                    THE WITNESS:  I don't know what

25          they would use.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. FULLER:

2         Q.    Would you?  As one of the

3    senior analysts, would you use the

4    investigative report?

5         A.    I would, yes.

6         Q.    And you would cut this order,

7    right?

8              MS. WICHT:  Object to the form

9         of the question.

10             THE WITNESS:  It would depend

11        upon what was in there, what it

12        stated, if it's this report.  Then,

13        yes, I would have cut the order.

14   QUESTIONS BY MR. FULLER:

15        Q.    Because you would have been

16   fearful of diversion; is that right?

17             MS. WICHT:  Object to the form

18        of the question.

19             THE WITNESS:  I wasn't fearful

20        in my job.  I would have accepted the

21        comments that were in there from the

22        investigator, so I would have cut the

23        order.

24   QUESTIONS BY MR. FULLER:

25        Q.    And certainly after the 2012
```

Highly Confidential - Subject to Further Confidentiality Review

1    MOU came out, I would assume, and correct me

2    if I'm wrong, that you guys made changes in

3    the system to prevent this type of conduct

4    from happening again, correct?

5                MS. WICHT:  Object to the form

6         of the question.

7                THE WITNESS:  2012?  I don't

8         remember when exact changes were made.

9    QUESTIONS BY MR. FULLER:

10        Q.     Do you know if any changes were

11   made in response to this?

12               MS. WICHT:  Object to the form

13        of the question.

14               THE WITNESS:  I don't know if

15        there were anything in response to

16        this.

17   QUESTIONS BY MR. FULLER:

18        Q.     Who would know?

19        A.     I guess it would be the

20   decisionmakers or the people that had the

21   methodology that had put together the entire

22   program.

23        Q.     And who were they?  Who were

24   the decisionmakers?  Tell us.

25        A.     At that time it would have been

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Michael Moné.

 2             See, this is in 2010; is that

 3   correct?

 4        Q.    That was when the orders were

 5   talked about; the MOU came out in 2012.  So

 6   if we're talking about in response to this

 7   memorandum of understanding, we're talking

 8   about 2012.

 9        A.    In 2012 it would have been -- I

10   don't know the exact time and date of who

11   changed, but it would have been either

12   Mr. Moné or it would have been Mr. Cameron.

13             The next level would have been

14   Gilberto Quintero in either situation.  They

15   both ended up reporting to him.

16        Q.    And so was Cameron before or

17   after Moné?  I'm just trying to pick up when

18   the change occurred between the two.

19        A.    It was after Moné.

20        Q.    Okay.  Is that because Mr. Moné

21   got demoted or moved after the 2012 MOU came

22   out?

23        A.    I don't know what the

24   reasonings were.

25        Q.    Well, he got moved after the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   2012 MOU came out, right?

 2        A.    He did.

 3        Q.    What kind of position did he

 4   get; do you know?

 5        A.    I believe his current role

 6   now -- I don't know if he's changed roles

 7   again.  He's in the regulatory legal area.

 8        Q.    Let's go to 222.  Actually,

 9   let's not do that.  Let's look at 2967.

10             (Cardinal-Justus Exhibit 11

11         marked for identification.)

12   QUESTIONS BY MR. FULLER:

13        Q.    This will be Exhibit Number 11.

14             Have you seen this document

15   before?

16        A.    No, sir.

17        Q.    It's entitled "Administrative

18   Memorandum of Agreement," right?

19        A.    Yes.

20        Q.    And it's the administrative

21   memorandum of agreement that is based on the

22   2012 investigation by the DEA, I'll represent

23   to you.

24             And if you look under the

25   background section, it talks that -- and the
```

Highly Confidential - Subject to Further Confidentiality Review

1    only reason I'm going here is for the number

2    of facilities.  Cardinal is registered with

3    28 facilities as distributors of Schedules II

4    through IV controlled substances.

5             Is that right?  Is that what it

6    says?

7        A.    It's says Schedule II

8    through V, but, yes.

9        Q.    II through V, I'm sorry.

10       A.    Yes.

11       Q.    And then if you go down --

12   actually, let's go to the second page.

13   Halfway through that first paragraph,

14   "Cardinal admits."

15            MR. FULLER:  Can you zoom in on

16       that?  Thank you.

17   QUESTIONS BY MR. FULLER:

18       Q.    Here's a stipulation and

19   agreement.  It's a section of the document,

20   correct?

21       A.    That's correct.

22       Q.    All right.  And it says,

23   "Cardinal admits its due diligence efforts

24   for some pharmacy customers and its

25   compliance with the 2008 MOA, in certain

Highly Confidential - Subject to Further Confidentiality Review

1    respects, were inadequate."

2              Do you see that there?

3       A.    I see that it states that.

4       Q.    Did anybody talk with you and

5    determine to assist you in making sure that

6    going forward that whatever areas were

7    inadequate were fixed?

8              MS. WICHT:  Object to the form

9         of the question.

10             THE WITNESS:  Specifically, it

11        was a program-wide; it wasn't

12        specifically just this.  We would have

13        been trained across the board for all.

14   QUESTIONS BY MR. FULLER:

15      Q.    So -- and you're correct.

16             So the anti-diversion program,

17   the department, was companywide, coast to

18   coast, right?

19      A.    Correct.

20      Q.    So whatever policies and

21   systems were in place, good, bad or

22   indifferent, they applied to everybody?

23      A.    That's correct.

24      Q.    Okay.  And you go down to the

25   general section, "Covered Conduct."

Highly Confidential - Subject to Further Confidentiality Review

1                    Do you see that section there?

2         A.     I do see it.

3         Q.     And it says, "For purposes of

4    this agreement, covered conduct shall mean

5    the following:  A, conduct alleged in the

6    February 2, 2012, order to show cause."  And

7    we'll skip the rest of that one.

8                    "B, Failure to maintain

9    effective controls against the diversion of

10   controlled substances, including failing to

11   conduct meaningful due diligence to ensure

12   that controlled substances were not diverted

13   into other than legitimate channels,

14   including failing to conduct site visits of

15   its retail pharmacy chain customers on or

16   before May 14, 2012."

17                   Do you see that section?

18        A.     I do.

19        Q.     Did you know that Cardinal was

20   failing to conduct site visits of its chain

21   pharmacies?

22        A.     No, I did not.

23                   MS. WICHT:  Object to the form.

24        Mischaracterizes the document.

25

Highly Confidential – Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FULLER:

 2         Q.    Would it surprise you if they

 3    were?

 4              MS. WICHT:  Object to the form.

 5         Calls for speculation.

 6              THE WITNESS:  Yes, it would

 7         have.

 8    QUESTIONS BY MR. FULLER:

 9         Q.    Because --

10         A.    That was --

11         Q.    I'm sorry, go ahead.

12         A.    If that was the policy, then we

13    would have followed the policy.  But this

14    is -- I mean, I -- I don't know why or what

15    didn't happen.

16         Q.    And as we discussed earlier,

17    all pharmacies are to be treated the same,

18    correct?

19              MS. WICHT:  Object to the form

20         of the question.

21              THE WITNESS:  Yes.

22    QUESTIONS BY MR. FULLER:

23         Q.    Okay.  If you go to C, "Failure

24    to detect and report suspicious orders of

25    controlled substances as required by 21 CFR
```

Highly Confidential - Subject to Further Confidentiality Review

 1    Section 1301.74(B) on or before May 14th of

 2    2012."

 3              Did I read that correctly,

 4    ma'am?

 5        A.    You did.

 6        Q.    By this agreement, Cardinal

 7    has -- covered conduct includes failing to

 8    report suspicious orders.

 9              Do you know what any of those

10    orders were or where they were?

11        A.    No, I do not.

12              MS. WICHT:  Object to the form

13        of the question.

14    QUESTIONS BY MR. FULLER:

15        Q.    Now, you and I talked a little

16    bit about one of them, correct, dealing with

17    Mr. Moellering and the investigation?  That

18    was one of the basis for this complaint.

19              Were you aware of that?

20              MS. WICHT:  Object to the form

21        of the question.

22              THE WITNESS:  Order or the

23        investigation that he did?

24    QUESTIONS BY MR. FULLER:

25        Q.    His investigation was part of

```
 1    the suspicious order that led to this

 2    memorandum of understanding or memorandum of

 3    agreement?

 4              MS. WICHT:  Object to the form

 5         of the question.

 6              If you have -- I have no idea

 7         what's being asked.  If you do, you

 8         can --

 9              MR. FULLER:  Counsel, if you

10         could stop the side commentary.  I

11         mean, under the rules you're allow to

12         object to form and preserve that,

13         absolutely, but we all know here any

14         additional commentary is only to coach

15         the witness.

16              If the witness doesn't

17         understand my question, as she's done

18         throughout the day, she can clarify.

19         She's competent of doing that.

20              MS. WICHT:  I'm not coaching

21         the witness.  I'm going to -- I was

22         not going to put this on the record,

23         especially in the presence of the

24         witness, but I think the questioning

25         that you're doing on this document,
```

```
 1          Mike, is very misleading.  You're

 2          reading Covered Conduct.  Those are

 3          not admissions by the company.  Those

 4          are not things that were acknowledged

 5          to have happened.

 6               This witness is not a lawyer.

 7          Putting this document in front of her

 8          that she has never seen before and

 9          asking her to comment on these things,

10          I think, is improper use of this

11          document.

12               MR. FULLER:  And there you go

13          again.  I'm going to ask you to stop.

14          You'll have an opportunity to cross.

15          You can point out anything you want on

16          cross.  You're entitled to do that.

17          But commentary during my direct is

18          absolutely inappropriate.

19     QUESTIONS BY MR. FULLER:

20          Q.    Ma'am, part of the covered

21     conduct includes failing to report suspicious

22     orders of controlled substances; is that

23     right?

24          A.    That's what it says here, yes.

25          Q.    And that was what the
```

```
 1   anti-diversion department was supposed to

 2   stop, correct?

 3              MS. WICHT:  Object to the form

 4        of the question.

 5              THE WITNESS:  With our

 6        processes, yes.

 7   QUESTIONS BY MR. FULLER:

 8        Q.     Your processes went in place,

 9   at least started going in place, back 2007

10   when you and Mr. Hartman came over to the

11   division.

12              And we saw that long list of

13   things that he was going to implement; is

14   that right?

15              MS. WICHT:  Object to the form

16        of the question.

17              THE WITNESS:  Sir, I stated

18        then I do not know what all of those

19        were, and I don't know what was in

20        systems and processes and

21        departmental.  I was not in that

22        department to be in the anti-diversion

23        actual department with that type of a

24        role.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. FULLER:

 2         Q.     And your role involved and your

 3    job grew in that department, correct?

 4         A.     It did.

 5         Q.     And you gained knowledge being

 6    in that department, as particularly the

 7    senior analyst in that department; is that

 8    right?

 9         A.     I did, yes.

10         Q.     Now, we went through the list

11    of things he was going to implement.  We were

12    able to read them and understand them.

13              You don't disagree with that,

14    correct?

15              MS. WICHT:  Object to the form

16         of the question.

17              THE WITNESS:  I was able to

18         read those, and that's exactly what I

19         stated then.

20    QUESTIONS BY MR. FULLER:

21         Q.     Okay.  So assuming that those

22    things that he had set out were implemented,

23    we can agree, at least by this agreement,

24    they didn't do the job they were intended to

25    do, because they were intended to prevent
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    diversion into -- or excuse me.  They were

 2    designed to prevent the delivery of

 3    suspicious orders, correct?

 4         A.    That would be an assumption --

 5               MS. WICHT:  Object to the form

 6         of the question.

 7               THE WITNESS:  -- I wouldn't

 8         make.

 9               MR. FULLER:  All right.  Bring

10         up Exhibit Number 5, Plaintiff's

11         Exhibit Number 5, please.

12               Go to page 6.  There we go.

13    QUESTIONS BY MR. FULLER:

14         Q.    So you go to page 6 of Exhibit

15    Number 5, it says, "Number 2, develop and

16    implement a computerized system to identify

17    and block and report suspicious orders."

18               Correct?

19         A.    That's what that says, yes.

20         Q.    That's a system to put in place

21    to identify and block suspicious orders.  Do

22    you disagree with that?

23               MS. WICHT:  Object to the form

24         of the question.

25               THE WITNESS:  That's exactly
```

```
 1          what it says.  And as I said then, I

 2          don't have any idea of what these all

 3          determined or what they were supposed

 4          to do.  I put the document together.

 5    QUESTIONS BY MR. FULLER:

 6          Q.    Ma'am, it says it was going to

 7    be designed -- to design and implement a

 8    system to identify, block and report

 9    suspicious orders.

10                What do you mean you don't know

11    what the system was going to do?  It was

12    designed -- doesn't it say it's designed to

13    identify, block and report suspicious orders?

14          A.    And that's --

15                MS. WICHT:  Object to the form

16          of the question.

17                THE WITNESS:  Yes, I agree,

18          that's what that says.

19    QUESTIONS BY MR. FULLER:

20          Q.    Have you heard the adage "spot,

21    stop and report"?

22          A.    Yes.

23          Q.    What's that?  What's that mean

24    to you?

25          A.    Spot, stop and report.  It
```

1    means exactly what the words mean.

2         Q.    Well, I don't -- where have you

3    heard it before?

4         A.    It's kind of like stop, drop

5    and roll.  It's common knowledge.  This is

6    a --

7         Q.    Ma'am, I'm --

8         A.    -- block report, right?  It's

9    to stop, block and report.

10        Q.    I'm asking you:  Where have you

11   heard that?

12              Stop, drop and roll I heard in

13   elementary school.

14        A.    Correct.

15        Q.    I didn't hear spot, stop and

16   report in elementary school.

17        A.    Well, stop, spot and report, I

18   would not -- I would understand that that's

19   what that meant.  We always identified it to

20   identify, block and report.

21        Q.    Okay.

22        A.    So stop -- what is it, stop --

23        Q.    Spot, stop and report.

24        A.    That's not -- I mean, yes, I

25   understand where you're going with that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    That's not the terms that we would have used

 2    in the department when I was there at all.

 3              MR. FULLER:  Play video clip

 4         number 4 for her.

 5              (Video played.)

 6    QUESTIONS BY MR. FULLER:

 7         Q.    Ma'am, who was that gentleman

 8    that was just speaking?

 9         A.    That's George Barrett.

10         Q.    Okay.  What was his position at

11    Cardinal?

12         A.    He's CEO.

13         Q.    Those apparently are the terms

14    he uses, correct?

15         A.    That's correct.

16         Q.    And he talked about the

17    anti-diversion program, and that is what it

18    was designed to do:  Spot, stop and report.

19              Isn't that what he just said?

20         A.    That is what he said, yes.

21         Q.    Isn't that consistent with what

22    we read here at number 2?

23         A.    Yes.  Identify, block and

24    report, yes.

25         Q.    Well, it says, "Develop and
```

```
 1    implement a computerized system to assist

 2    us" -- or basically, I guess, to assist us --

 3    "to identify, block and report suspicious

 4    orders," correct?

 5          A.    That's correct.

 6          Q.    Okay.  And my concern is is

 7    that you're telling me you don't know what

 8    was going on in the early part of 2007 when

 9    this document was created because you were

10    just an administrative assistant.

11                You know by reading that,

12    number 2, that they were trying to implement

13    an electronic system to spot, stop and

14    report, correct?

15                MS. WICHT:  Object to the form

16          of the question.

17                THE WITNESS:  That's what this

18          says.

19    QUESTIONS BY MR. FULLER:

20          Q.    Do you have any reason to

21    believe that they just created this document

22    to put it in a file to make it look like --

23          A.    No.

24          Q.    -- they were going to create a

25    system to spot, stop and report, just to give
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    lip service to that idea?

 2         A.    No.

 3               MS. WICHT:  Object to the form

 4         of the question.

 5    QUESTIONS BY MR. FULLER:

 6         Q.    So would you believe in the

 7    normal course of business, in the way that

 8    the anti-diversion department was operated,

 9    that if they said they were going to develop

10    and implement a computerized system to

11    identify, block and report suspicious orders

12    and implement it by December of '07, that

13    they would have done that?

14               MS. WICHT:  Object to the form

15         of the question.

16               THE WITNESS:  Yes.

17    QUESTIONS BY MR. FULLER:

18         Q.    Okay.

19         A.    I would have no reason to not

20    believe that.

21         Q.    Okay.  And that was the normal

22    business.  If you guys set out an objective

23    in that anti-diversion department, you're

24    going to try to get it done; isn't that

25    right?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      That's correct.

2          Q.      And part of the objective was,

3    as Mr. Barrett said, spot, stop and report,

4    correct?

5          A.      Yes.

6          Q.      Okay.  So if we are still

7    sending out suspicious orders in 2010, 2011

8    and 2012, we know we need to do something to

9    the system; would you agree to that?

10               MS. WICHT:  Object to the form

11          of the question.

12               THE WITNESS:  I'm certain that

13          there was decisions made, yes.

14   QUESTIONS BY MR. FULLER:

15         Q.      And decisions to improve the

16   system, right?

17         A.      Yes.

18         Q.      Now, but let's talk a second.

19   We've had this same obligation to spot, stop

20   and report all the way back to the time when

21   you came to the company, correct?

22         A.      Correct.

23         Q.      So it's not something that's

24   new to us.  It's that we're trying to improve

25   the systems that we got in place; is that

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2         A.     There is continuous

3    improvement, continuously always looking at

4    anything that we can do to improve, yes.

5         Q.     Absolutely.

6                How many suspicious orders have

7    you reported?

8         A.     I have no idea if those -- if

9    they were truly going out as suspicious

10   orders.  Do you mean threshold events?

11        Q.     Well, the DEA wants you to

12   report to them suspicious orders based on the

13   regulation, right?

14        A.     Yes.

15        Q.     Okay.  Whether you call it a

16   threshold event or whatever --

17        A.     Okay.

18        Q.     -- how many suspicious orders,

19   threshold events, whatever you want to call

20   it, how many have you reported?

21        A.     I don't have a number that I

22   could give you.

23        Q.     Did you report any?

24        A.     Yes.

25        Q.     How many did you report for

1    Cuyahoga County?

2         A.      I don't have any idea.

3         Q.      How many did you report for the

4    City of Cleveland?

5         A.      Again, I would not have that

6    information as to how many divided up amongst

7    any -- I don't have the total amount.  I

8    don't have the individual amounts.

9         Q.      How many suspicious orders did

10   you report to Summit County, or related to

11   Summit County?

12        A.      I don't know.

13        Q.      How many suspicious orders did

14   you report to the City of Akron?

15        A.      I do not know.

16        Q.      And I'll tell you, because the

17   plaintiffs are all sort of joined here,

18   that's why I'm asking separately for each

19   one.

20        A.      Absolutely.

21        Q.      If your answer is the same,

22   just answer the same way --

23        A.      Yes.

24        Q.      -- and that will roll us

25   through.  I apologize for dragging it out.

1      A.      That's okay.

2      Q.      Now, you mentioned earlier that

3   you have staggered monthly time frames for

4   the differing pharmacies and drugstores to

5   prevent threshold events from all coming in

6   at the same time, correct?

7      A.      Correct.

8      Q.      That's one of the reasons, I

9   guess?

10     A.      That's correct.

11     Q.      And that's for workflow

12  purposes so you're not getting flooded with

13  too many threshold events all at once.

14  You're spreading them out over the month; is

15  that fair?

16     A.      That's fair.

17     Q.      Okay.  And that's possible

18  because you have this electronic system in

19  place, correct?

20     A.      Correct.

21     Q.      Is there any way that you could

22  imagine, with the size diversion department

23  that you had, trying to do this threshold

24  reporting or spotting manually for all the

25  orders that are shipped by Cardinal across

Highly Confidential - Subject to Further Confidentiality Review

1    the country?

2                    MS. WICHT:  Object to the form

3            of the question.

4                    THE WITNESS:  I can.

5    QUESTIONS BY MR. FULLER:

6            Q.      So with the seven or eight

7    people that were the anti-diversion

8    department, with the millions and millions of

9    orders that are shipped every month, you

10   think there was a way to add those all up

11   manually to determine when thresholds are

12   breached?

13           A.      It's very time consuming.  It

14   would be very difficult to do.

15           Q.      So Mr. Baranski testified

16   yesterday that in one month, one month, he

17   sends out about 1.5 million shipments.

18   That's one distribution center, correct?

19           A.      Uh-huh, that's correct.

20           Q.      How many do you have currently;

21   do you know?

22           A.      No, I don't.

23           Q.      We saw in 2012 --

24           A.      26, I think, but it's --

25           Q.      Okay.  We'll go with 25.

```
 1          A.      Okay.

 2          Q.      That would be somewhere in the

 3   neighborhood of 37 and a half million sales a

 4   month.

 5                  You think six or seven people

 6   could go through 37 and a half million sales

 7   a month?

 8                  MS. WICHT:  Object to the form

 9          of the question.

10   QUESTIONS BY MR. FULLER:

11          Q.      Manually?

12                  MS. WICHT:  Foundation.

13                  THE WITNESS:  Sir, I don't have

14          any idea.

15   QUESTIONS BY MR. FULLER:

16          Q.      Okay.  Fair enough.

17          A.      I don't.

18          Q.      Electronic system makes it much

19   easier, doesn't it?

20          A.      It does.

21          Q.      And since you've been doing the

22   job, it's been in an electronic format,

23   correct?

24          A.      Yes, when I was in that role,

25   it was all electronic.
```

 1        Q.      And do you know, going back

 2   even earlier to the time when you started

 3   with Cardinal, were there a lot of the

 4   systems that they had in place were

 5   automated?

 6        A.      I'm sorry, I -- can you

 7   elaborate on that?

 8        Q.      Sure.

 9        A.      I don't mean you mean there.

10        Q.      I mean, you guys are in the

11   business of distributing pills, medications,

12   controlled substances, right?

13        A.      That's correct.

14        Q.      Even back then when you

15   started, do you know whether or not there was

16   an automated system for tracking the number

17   of pills in all the different warehouses and

18   all the ordering systems and purchasing

19   systems and that kind of thing?

20        A.      I don't know what they had in

21   the distribution centers even back then.  The

22   ordering platform, I would assume, would

23   be -- one way was definitely electronic.  I

24   don't know if there were other ways.

25        Q.      All right.  You would agree

```
 1    with me, would you not, based on your

 2    knowledge now, that the 2008 issues with the

 3    immediate suspension orders and memorandums

 4    of understanding, as well as the 2012 issues

 5    we were just looking at, both dealt with

 6    shipping of suspicious orders and potential

 7    diversion, correct?

 8                 MS. WICHT:  Object to the form

 9         of the question.

10                 THE WITNESS:  I don't know that

11         they were suspicious orders.

12    QUESTIONS BY MR. FULLER:

13         Q.    Not that they were suspicious

14    orders, but that's what the issues dealt

15    with.  It was all related to suspicious order

16    obligations, correct?

17         A.    It was in regards to the

18    regulatory obligations for Cardinal, yes.

19         Q.    As it relates to reporting

20    suspicious orders?

21         A.    Yes.

22         Q.    Okay.  Have you ever

23    participated with any updates with the audit

24    committee?

25         A.    Updates with the audit
```

1    committee such as?

2         Q.      Related -- and this would

3    obviously be during the time that you were

4    with the anti-diversion department.  Related

5    to diversion issues or anti-diversion issues.

6         A.      The internal audit team?  Is

7    that what you're talking about?

8         Q.      Yes, ma'am.  There's an

9    internal audit team.

10        A.      That's right, there's always an

11   internal audit.

12               As far as what came from that,

13   there could have been absolute changes or

14   updates or whatever term that you wanted to

15   call that.  They were not necessarily called

16   out specifically because of the audit.

17        Q.      And maybe we're talking about

18   something different.  You tell me.

19               So the board of directors has

20   an audit committee that reports to them.

21        A.      Okay.

22        Q.      Do you know anything about

23   that?

24        A.      No.

25        Q.      Have you ever consulted with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    them?  Have they ever talked to you, to your

 2    knowledge?

 3         A.    No.

 4         Q.    Okay.  If we can go to Bates

 5    number -- well, Document 2222.

 6               (Cardinal-Justus Exhibit 12

 7         marked for identification.)

 8    QUESTIONS BY MR. FULLER:

 9         Q.    Did I already give it to you

10    guys?

11         A.    What is it?

12         Q.    2222.  All right.  All right.

13               Ms. Justus, this is an

14    investigation report of the Special Demand

15    Committee, board of directors of Cardinal

16    Health, Inc., April 12, 2013.

17               Do you see that?

18         A.    I do.

19         Q.    Have you ever seen this

20    document before?

21         A.    No, sir.

22         Q.    Do you know anything about this

23    document?

24         A.    No, sir.

25         Q.    All right.  I want to ask you
```

1    to turn to page -- and if you're looking at

2    the Bates numbers in the upper right, it's

3    going to be .14.

4              It starts off, "Monitoring

5    existing customers.  Electronic sales

6    monitoring."

7         A.    Okay.

8         Q.    Did you find that?

9         A.    I have the page.

10        Q.    Okay.  Now, I'll tell you --

11   explain to you a little background.  So this

12   is an investigation that was conducted based

13   on a request by certain shareholders to sue

14   the executives of the company based on the

15   2012 memorandum of understanding and the

16   issues that arose there.

17             Okay?

18        A.    Okay.

19        Q.    And they did an investigation

20   of -- actually, hold on.  Let's back up.

21             Weren't you interviewed related

22   to this?

23        A.    I don't remember any of that,

24   no.

25        Q.    Do you remember a Milbank, a

```
 1    team of Milbank attorneys?

 2        A.    No.

 3        Q.    If you'll go to page 9, the

 4    interviews.

 5              MS. WICHT:  Using the numbers

 6        in the --

 7              MR. FULLER:  Upper right.

 8              MS. WICHT:  -- upper right, not

 9        the page numbers?

10              MR. FULLER:  Yeah, because it

11        screws up that guy.

12              MS. WICHT:  Okay.

13    QUESTIONS BY MR. FULLER:

14        Q.    Do you see the interview

15    section there?

16        A.    I do.

17        Q.    It says, "Milbank conducted

18    interviews of 20 company employees and two

19    audit committee members."

20              And then if you go on down it

21    says, "One analyst in quality and regulatory

22    affairs, Shirlene Justus."

23        A.    It does.

24        Q.    Do you remember that?

25        A.    No, I do not.
```

```
 1          Q.     Well, I'm starting to wonder

 2   what you remember and what you don't.

 3          A.     Nope.

 4          Q.     No recollection of that at all?

 5          A.     No.

 6          Q.     So if I asked you what they

 7   asked you, you're going to say "I don't

 8   remember"?

 9          A.     I don't remember.  No.

10          Q.     All right.  So at least

11   apparently you were part of this

12   investigation, even though you may not

13   recall.

14          A.     What is this?

15          Q.     Take a moment and look at it if

16   you think it'll help you.

17          A.     No, I would --

18          Q.     You have no independent

19   recollection?

20          A.     I really don't.

21          Q.     Okay.

22          A.     I don't remember ever being

23   interviewed with a team of lawyers for any of

24   this, no.

25          Q.     And it may have just been one
```

Highly Confidential - Subject to Further Confidentiality Review

1    person that came with your supervisor or

2    somebody else to chat with you and really

3    didn't, you know, sit down in a formal

4    setting or anything.  I don't know.

5         A.    Yeah, I have no idea.  The

6    Milbank name does not --

7         Q.    Doesn't ring a bell?

8         A.    -- ring any bells, no.  No.

9         Q.    All right.  Now, if you go back

10   to page 14, apparently you were part of this

11   investigation.

12        A.    Apparently I was.

13        Q.    What they say here under

14   electronic sales monitoring is, "In 2007, the

15   company began to build out the technology and

16   infrastructure for an electronic system that

17   would store data about customers and monitor

18   orders."

19              Do you see that?

20        A.    I do.

21        Q.    Is that consistent with the

22   other document that we looked at, Exhibit

23   Number 5, that talked about in 2007 --

24        A.    It is.

25        Q.    -- that they were going to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   start building this system?

 2        A.    It is.  That's correct.

 3             MS. WICHT:  You got to let him

 4        finish the question so I have an

 5        opportunity to object, and then you

 6        can answer.  Okay?

 7             THE WITNESS:  Okay.

 8             MS. WICHT:  Object to the form

 9        of the question.

10   QUESTIONS BY MR. FULLER:

11        Q.    And then it says, "At that

12   time, the company's data on the customers was

13   located in various places and largely on

14   paper."

15             Do you see that?

16        A.    I do see that.

17        Q.    It's the next sentence.

18        A.    Uh-huh.

19        Q.    And that would tend to indicate

20   that they didn't have an electronic system

21   before that, wouldn't it?

22             MS. WICHT:  Object to the form

23        of the question.

24   QUESTIONS BY MR. FULLER:

25        Q.    And if we did, why would we
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    just have began building one in 2007?

 2              MS. WICHT:  Same objection.

 3              THE WITNESS:  I don't know how

 4         to decipher this.  Like I said, I

 5         don't know what they had before, so --

 6    QUESTIONS BY MR. FULLER:

 7         Q.    No, but this investigation

 8    indicates they just began building it in 2007

 9    as far as this electronic system, correct?

10         A.    Correct.  We're beginning to

11    build a new system as well.  That doesn't

12    mean that we don't have one now or any kind

13    of a process.

14         Q.    And you said you're beginning

15    to build a new system now.

16              A new suspicious order system?

17         A.    I don't know what it will end

18    up being.  We're taking everything from what

19    we have, futuristic.  We don't know what that

20    looks like just yet.  That doesn't mean we

21    don't have a system now, is all I'm saying.

22         Q.    Well --

23         A.    So the terminology, there's no

24    way I can decipher all of that.

25         Q.    Sure.
```

1    A.    Okay.

2    Q.    I mean, it does help us a

3    little bit, would you agree, in the next

4    sentence that says, "At that time, the

5    company's data on customers was located in

6    various places and largely on paper"?

7         Being on paper isn't

8    electronic; you would agree with me, right?

9    A.    I would agree with that.

10   Q.    Okay.

11   A.    Do you know what the various

12   places are?

13   Q.    There were a few stones down in

14   Cincinnati that they stuck things under.

15   There was a lake north of Cleveland -- no,

16   I'm kidding.

17   A.    That's what I'm saying, I don't

18   know what they had prior.

19   Q.    And then let's go to the next

20   sentence.  "Further, there was no analytical

21   capability or realtime data for reviewing

22   orders."

23        That would tend to indicate

24   there wasn't an electronic system already in

25   place, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. WICHT:  Object to the form
2         of the question.
3              THE WITNESS:  Sir, I'm not
4         going to define this.  I don't know
5         what they had.
6   QUESTIONS BY MR. FULLER:
7         Q.    Okay.
8         A.    I mean --
9         Q.    It says what it says.
10        A.    -- it says realtime data.
11  That's right, it says exactly what it says.
12        Q.    And then the next sentence
13  talks about Moné, who you mentioned, and
14  Rausch, who you mentioned, right?
15        A.    Yes.
16        Q.    And that they were working with
17  the company's IT group to build an electronic
18  monitoring system; is that correct?
19        A.    Yes, that's what that says.
20        Q.    If you look at the next
21  paragraph, it says, "The company engaged
22  Deloitte" -- Deloitte?  All right.  I'll take
23  your word for it.  I told you I'm from
24  Mississippi.
25              Ma'am, do you know in the next
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sentence who Deloitte is?

 2         A.    Deloitte is a consulting firm.

 3         Q.    Do you recall that Cardinal

 4    consulted with them?

 5         A.    No.

 6         Q.    Okay.  And who is Mr. Morse?

 7    Was there a Morse?

 8         A.    There was.

 9         Q.    I don't remember his first

10    name.

11         A.    If you're referring to Steve

12    Morse.

13               Do you know what page or the

14    spelling of his last name?

15         Q.    M-o-r-s-e.

16         A.    Okay.

17         Q.    Oh, it's on a later page.  I

18    was just looking to see -- yeah, Steve Morse.

19               What was Mr. Morse's position;

20    do you know?

21         A.    He was the director of

22    investigations or investigators.

23         Q.    Okay.  Was he in the

24    anti-diversion department?

25         A.    Yes.
```

```
 1              Q.      Okay.   Now, if you turn to

 2     page 37, it says, "In the months

 3     following" -- at the bottom, I'm sorry.   It

 4     talks about personnel.

 5                      "In the months following the

 6     2012 ISO, Moné was moved from his position as

 7     vice president of anti-diversion into a

 8     position as an attorney in the regulatory

 9     group, focusing on such things as training,

10     policy development and the company's outreach

11     efforts with Boards of Pharmacy."

12                      Do you see that section?

13              A.      I do.

14              Q.      And then it goes on just a

15     little further down, "However, under Moné,

16     the evaluation of customers and orders had

17     been heavily focused on clinical expertise

18     and subjective judgment of the pharmacists in

19     the anti-diversion group.   The goal after the

20     2012 ISO was to move toward assessing

21     customers based on more objective criteria

22     and their practical knowledge about the

23     business."

24                      Do you see that?

25              A.      I do.
```

```
 1          Q.     And so we can see that after

 2    2012, Mr. Moné was moved.

 3                 And if we go on, "Morse was

 4    moved from his position as the director of

 5    investigation to a position in regulatory

 6    management outside the area of control drug

 7    anti-diversion."

 8                 Is that consistent with your

 9    recollection as to what happened to Mr. Morse

10    as well, is that he was moved?

11          A.     Yeah.  He took a different

12    role.

13          Q.     And it says, "The view was that

14    Morse was not as strategic as his former

15    position required, and there were questions

16    about his judgment."

17                 Do you see that?

18          A.     I do.

19          Q.     Okay.  Now, you worked with

20    Mr. Morse for a period of time there,

21    correct?

22          A.     Yes.

23          Q.     Did you see any of that

24    yourself, concerns about his judgment and the

25    way he conducted himself in that position?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      No, but I didn't directly

2    report to him.

3          Q.      Okay.  Have you ever heard of a

4    program called WinWatcher?

5          A.      Yes.

6          Q.      And what is that, if you know?

7          A.      It's a sales team tool.

8          Q.      Does it deal with notifying

9    them of where their customers sit, where the

10   drugstore or the pharmacy sits related to its

11   thresholds?

12         A.      It has that information in it.

13   I don't know that it actually notifies.

14   That's not a system that I've ever really

15   worked with.  I know that it exists, and I

16   know that that information was in it, yes.

17         Q.      Now, let me ask you:  We've

18   talked a lot today about suspicious orders,

19   and the registrant or Cardinal's obligation

20   to report suspicious orders.

21                 That has nothing to do with

22   reporting suspicious customers, correct?

23                 MS. WICHT:  Object to the form

24        of the question.

25                 THE WITNESS:  I don't know

```
 1          that -- I don't know what you mean by

 2          that.

 3   QUESTIONS BY MR. FULLER:

 4          Q.     Sure.

 5                 Your obligation in reporting

 6   suspicious orders is to focus on the orders

 7   being placed; is that right?

 8          A.     Yes.

 9          Q.     Okay.  Whether a customer looks

10   suspicious -- you're not going to wait until

11   you determine a customer is suspicious before

12   you report a suspicious order.  If you get a

13   threshold event and you decide to cut it, you

14   got to cut it and report it no matter

15   whatever else is going on in the customer's

16   building, correct?

17                 MS. WICHT:  Object to the form

18          of the question.

19                 THE WITNESS:  Our policy was

20          to -- if we cut an order, we did

21          report it, yes.

22   QUESTIONS BY MR. FULLER:

23          Q.     Who took over when Mr. Morse

24   moved as the director of investigations; do

25   you know?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      I'm not 100 percent certain.

2          Q.      Who do you think it may be?

3          A.      I think it was Kimberly

4    Anna-Soisson.

5          Q.      Okay.  And we talked about her

6    earlier.  She's a pharmacist, correct?

7          A.      Right.  Right.

8          Q.      Okay.  And that would have been

9    a move within the anti-diversion department;

10   is that correct?

11         A.      That's correct.

12         Q.      Is she still there today?

13         A.      Yes, she is.

14         Q.      And what role does she fill

15   today?

16         A.      She is now over new accounts,

17   and she's -- I don't know all of her duties

18   and details.

19         Q.      Is she like the new account

20   specialist that you were when you moved to

21   that --

22         A.      No, she would have been a

23   director over --

24         Q.      She's higher up?

25         A.      Yes, and she would have been
```

Highly Confidential - Subject to Further Confidentiality Review

1    over the investigators as well, just like

2    Mr. Morse.

3         Q.    Now, is that still currently

4    the case, that she's over the investigators?

5         A.    No, I don't believe so.

6         Q.    Okay.  She's just over new

7    clients?

8         A.    I believe so, yes.

9         Q.    And that process?

10        A.    Yes.  I don't know her full

11   duties and details, but I believe so, yes.

12        Q.    And if you go to page 39, this

13   relates to onsite investigations.

14        A.    Okay.

15        Q.    If you take a look at that

16   second paragraph there:  "Moreover, the

17   current director of investigations now

18   reviews each site visit report and makes a

19   concerted effort to provide timely feedback

20   and guidance.  Despite this requirement in

21   the SOPs issued in 2008 the director of

22   investigations review each site visit report,

23   Morse did not do that."

24             Would that cause you any

25   concern to know that the director who is

 1    responsible for reviewing all these site

 2    visit reports wasn't even doing what the

 3    policies and procedures, SOPs, said he was

 4    supposed to do?

 5                    MS. WICHT:  Object to the form

 6         of the question.

 7                    THE WITNESS:  Personally?  Yes.

 8    QUESTIONS BY MR. FULLER:

 9         Q.    And it's the reason you

10    have those -- we talked about it earlier.

11    The reason we have the procedures, the SOPs,

12    in place is because we want to put a system

13    in place to operate around the country, but

14    we're going to have to rely on everybody to

15    comply with that SOP, correct?

16                    MS. WICHT:  Object to the form

17         of the question.

18                    THE WITNESS:  Yes.

19    QUESTIONS BY MR. FULLER:

20         Q.    Otherwise it may not work,

21    right?

22         A.    It may not.

23         Q.    And we would agree, would we

24    not, that in 2012 when Cardinal got hit for

25    the shipping of suspicious orders, it wasn't

Highly Confidential - Subject to Further Confidentiality Review

```
 1    working?

 2              MS. WICHT:  Object to the form

 3         of the question.

 4              THE WITNESS:  I -- from what I

 5         saw, what I did, the process was

 6         working.

 7    QUESTIONS BY MR. FULLER:

 8         Q.    So --

 9         A.    So I don't know what these

10    individuals did in their roles or how they

11    did.  I mean, it's stated here.

12         Q.    So during this time you were in

13    this department, the DEA comes in and

14    investigates, finds multiple violations, ends

15    up reaching a deal where Cardinal pays a

16    significant amount of money and agrees to

17    make significant changes and revamp its

18    system in 2012, and you think the system was

19    working the right way?

20              MS. WICHT:  Object to the form

21         of the question.

22              THE WITNESS:  I think these are

23         all legal documents.  I think that

24         some of this -- I, not necessarily,

25         understand all of this.  There are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          things that -- the process that I was

 2          in charge of and what we did, yes,

 3          that process was working.  And again,

 4          I do not know of, I didn't see

 5          anything as far as any orders that

 6          were -- that were ever shipped that

 7          would have ever been thought to say

 8          that the process was not working.

 9          That's all I know from the time that I

10          was in the department.

11   QUESTIONS BY MR. FULLER:

12          Q.    Now, can you and I agree that

13   with the distribution of controlled

14   substances -- we know they're highly

15   addictive and we know they're dangerous, at

16   least according to the scheduling of them,

17   correct?

18          A.    That is correct.

19          Q.    Okay.  With the more controlled

20   substances that we distribute, there's more

21   of a chance for diversion; would you agree?

22              MS. WICHT:  Object to the form

23          of the question.

24              THE WITNESS:  I think that's

25          speculation.  I don't know that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FULLER:

 2         Q.    Okay.  Well, if I'm the

 3   distributor and I only distribute you one

 4   pill, there's only a chance of one pill being

 5   diverted, right?

 6         A.    That's correct.

 7         Q.    If I distribute to you five

 8   pills --

 9         A.    Uh-huh.

10         Q.    -- there is now a chance of

11   five different pills being diverted, isn't

12   there?

13         A.    It would depend upon what I did

14   with those.

15         Q.    Right.

16               MS. WICHT:  Object to the form

17         of the question.

18   QUESTIONS BY MR. FULLER:

19         Q.    There's an opportunity to

20   divert five different pills now, correct?

21               MS. WICHT:  Object to the form

22         of the question.

23               THE WITNESS:  I -- I -- there's

24         a chance.  It could.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FULLER:
 2        Q.    So, I mean, it's pure
 3   probability.  If there's more pills out
 4   there, there's more of a chance the pills
 5   could be diverted; you would agree?
 6             MS. WICHT:  Object to the form
 7        of the question.
 8             THE WITNESS:  They could.
 9   QUESTIONS BY MR. FULLER:
10        Q.    And the system, this closed
11   system that Congress designed for us, is to
12   try to keep the pills in the legitimate
13   channel and out of the illegitimate channel;
14   would you agree with that?
15        A.    I agree with that.
16        Q.    And if we're putting more pills
17   in the legitimate channel, there's more of an
18   opportunity for the legitimate channel to
19   overflow into the illegitimate channel,
20   right?
21             MS. WICHT:  Object to the --
22        I'm sorry.  Object to the form of the
23        question.
24             THE WITNESS:  If it's in the
25        legitimate channel, I would not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          suspect it to be going to the

 2          illegitimate channel.

 3    QUESTIONS BY MR. FULLER:

 4          Q.    So as long as you distribute to

 5    a registered pharmacy, then we don't expect

 6    anything to go into the illegitimate channel,

 7    right?

 8          A.    If it's --

 9                MS. WICHT:  Object to the form

10          of the question.

11                THE WITNESS:  If it's

12          legitimate use, then that would be

13          correct, it would not be being

14          diverted.

15    QUESTIONS BY MR. FULLER:

16          Q.    But we now find ourselves in an

17    opioid epidemic with over a hundred people

18    dying in our country every day from

19    opioid-related overdoses, right?

20          A.    That's correct.

21          Q.    So something went wrong

22    somewhere; can we agree on that?

23                MS. WICHT:  Object to the form

24          of the question.

25                THE WITNESS:  Sure.  We can
```

```
 1          agree to that.

 2     QUESTIONS BY MR. FULLER:

 3          Q.     Maybe not.  Maybe it was the

 4     whole design that we're going to flood the

 5     market with so many pills that a hundred-plus

 6     people are going to die every day.

 7               MS. WICHT:  Object to the form

 8          of the question, if that's a question,

 9          which I don't see how it is.

10     QUESTIONS BY MR. FULLER:

11          Q.     Was that the design?

12          A.     It was not the Cardinal Health

13     design.

14          Q.     Okay.

15          A.     Nothing that I'm aware of would

16     ever state that that was the design.

17          Q.     Okay.  So we now find our place

18     in an epidemic, where people are dying every

19     day.  It wasn't how the system was designed,

20     but we know we've had multiple failures in

21     the system, don't we?

22               MS. WICHT:  Object to the form

23          of the question.

24               THE WITNESS:  If that's the way

25          you want to conclude that, then, yes.
```

```
 1   QUESTIONS BY MR. FULLER:

 2        Q.      Not just on behalf of Cardinal,

 3   but we're looking at all the distributors,

 4   right?  Because everybody's -- well, I

 5   shouldn't say everybody.  There are multiple

 6   distributors for controlled substances, and

 7   particularly Control IIs, correct?

 8                Cardinal isn't the only game in

 9   town.  There's others out there doing what

10   Cardinal does.

11        A.      There's an entire supply chain.

12        Q.      Right.

13                And there's a whole set of

14   different wholesale distributors in the

15   supply chain, right?

16        A.      That's correct.

17        Q.      Okay.  And as wholesale

18   distributors, we have an obligation to help

19   prevent diversion by reporting suspicious

20   orders; you would agree with that?

21        A.      Correct.

22                MR. FULLER:  Okay.  Let's take

23         another quick break.

24                VIDEOGRAPHER:  We're going off

25         record.  The time is 3:31.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Off the record at 3:31 p.m.)

 2              VIDEOGRAPHER:  We're going back

 3         on the record.  Beginning of Media

 4         File 5.  The time is 3:56.

 5    QUESTIONS BY MR. FULLER:

 6         Q.    Ms. Justus, we talked a moment

 7    ago about you being interviewed as it relates

 8    to Exhibit 12, right?

 9         A.    Yes.

10         Q.    And you have no recollection of

11    that?

12         A.    I do not.

13         Q.    Now, that would have been

14    during your time as a senior analyst for the

15    quality and regulatory group?

16         A.    That could depend upon when

17    that interview was done in 2012.  I could

18    have been in the new accounts area.

19         Q.    The report is actually from

20    April of '13?

21         A.    The report, but when was the

22    interview --

23         Q.    Right.

24         A.    -- done is all I'm saying.

25         Q.    Correct.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1          A.     Yeah.  I don't -- I didn't look

 2     to see what...

 3          Q.     Well, the board didn't request

 4     a Special Demand Committee until November 2nd

 5     of 2012.

 6          A.     November 2nd.

 7          Q.     So it had to have been way --

 8     some time after that, but before April of

 9     '13.

10          A.     Correct.  So, yes, then I would

11     more likely have been in the analyst role,

12     yeah.

13          Q.     So assuming we have our dates

14     right, Ms. Justus, at the time of your

15     interview, you are a senior analyst for

16     quality and regulatory issues within the

17     anti-diversion department, correct?

18          A.     I was an analyst in the

19     department, yes.

20          Q.     And do you have any idea why

21     this investigative committee would want to

22     have interviewed you?

23          A.     No.

24          Q.     During your time in that

25     position as senior analyst, did you have a
```

Highly Confidential - Subject to Further Confidentiality Review

1    job title that set out exactly what your

2    duties and responsibilities were?

3         A.    A job title?  No.

4         Q.    Or excuse me, a job

5    description.

6         A.    I'm sure there was.

7         Q.    Do you ever recall seeing it?

8         A.    I don't recall.

9         Q.    You've described to us your job

10   as dealing with and reviewing what you've

11   termed as threshold events; is that correct?

12        A.    That's correct.

13        Q.    Would those also be considered

14   suspicious orders?

15             MS. WICHT:  Object to the form

16        of the question.

17             THE WITNESS:  Not necessarily.

18   QUESTIONS BY MR. FULLER:

19        Q.    Okay.  You also have an

20   understanding that a registrant has to have a

21   suspicious order monitoring program, correct?

22        A.    That is correct.

23        Q.    Who was running the suspicious

24   order monitoring program during that time?

25             If I want to find the person

```
 1    who can tell me what a suspicious order is,

 2    what it isn't, would that be you?

 3          A.    If you're wanting --

 4                MS. WICHT:  Object to the form

 5          of the question.

 6                THE WITNESS:  -- I mean, the

 7          lead in the department would have

 8          been -- in 2012 would have been

 9          Gilberto.

10    QUESTIONS BY MR. FULLER:

11          Q.    Okay.  Who we've talked about

12    earlier and what his role and position was,

13    correct?

14          A.    Correct.

15          Q.    Okay.  Were you also the one

16    dealt that with or had responsibilities and

17    duties for identifying and reporting

18    suspicious orders?

19          A.    If the order was deemed a

20    suspicious, yes, I would have reported it.

21    Yes.

22          Q.    But was that part of your job

23    is to deal with suspicious order issues?

24          A.    The job details -- the job

25    details were for threshold events that I
```

Highly Confidential - Subject to Further Confidentiality Review

1    would recall.  A threshold event could

2    possibly be a suspicious order, so -- but not

3    all threshold events are suspicious orders,

4    so --

5         Q.    And you were the person to

6    decide whether the threshold event was a

7    suspicious order and report it and cut it or

8    clear it and let it go, right?

9              MS. WICHT:  Object to the form

10        of the question.

11             THE WITNESS:  I would have been

12        the one that made that decision.  I

13        could have definitely had others'

14        opinions, but, yes, I would have been

15        the one to do a cut, a report -- cut

16        or release in the system.

17   QUESTIONS BY MR. FULLER:

18        Q.    Which means that -- again, when

19   we say cut, we're cutting it because we

20   believe it to be suspicious, we're not going

21   to ship it and we're going to report it?

22             MS. WICHT:  Object to the form

23        of the question.

24             THE WITNESS:  Again, I'm going

25        to say that it was over threshold.  It

```
 1          not necessarily -- it could have been

 2          suspicious and, therefore, we would

 3          cut or release.

 4    QUESTIONS BY MR. FULLER:

 5          Q.     Sure.

 6          A.     Okay.

 7          Q.     But if you're reporting it --

 8    you're only supposed to report suspicious

 9    orders.  That's what the DEA wants to know

10    about, right?

11                MS. WICHT:  Object to the form

12          of the question.

13                THE WITNESS:  I don't know

14          that.

15    QUESTIONS BY MR. FULLER:

16          Q.     We saw the regulation.

17          A.     Our process and our policy, our

18    departmental process, was that if we cut an

19    order, we reported that order.

20          Q.     So do you do -- do you ever

21    label an order as suspicious or not?

22                Here's what I'm trying to

23    understand.

24          A.     Okay.

25          Q.     You keep using thresholds.
```

```
 1        A.      Correct.

 2        Q.      I don't care about thresholds.

 3   Thresholds isn't the regulatory obligation.

 4   The regulatory obligation that I showed you

 5   earlier is to report suspicious orders,

 6   right?  We saw it.

 7        A.      That's what it states, yes.

 8        Q.      It's the Code of Federal

 9   Regulations from 1971 --

10        A.      Okay.

11        Q.      -- that has been in place since

12   then --

13        A.      Yes.

14        Q.      -- has been binding on Cardinal

15   ever since they've been a registrant, right?

16        A.      That's correct.

17        Q.      So I want to know who's

18   responsible for reporting suspicious orders.

19   And you keep taking me to thresholds.  We've

20   talked about thresholds, and now I want to

21   know about suspicious orders.

22                Do you know or do I need to

23   talk to somebody else?

24        A.      I would -- at this point in

25   time in the department I would talk to --
```

Highly Confidential - Subject to Further Confidentiality Review

1   Todd Cameron would be the one to give you

2   those answers.

3          Q.     And he's the one that took

4   Mr. Morse's spot in 2012; is that right?

5          A.     No, that's not correct.

6          Q.     Who did he replace?  Moné?

7          A.     He is in -- yes, he's the --

8   actually he's now a senior vice president, I

9   believe, of the supply chain department,

10  anti-diversion, yes.

11         Q.     And Mr. Moné was in that

12  position prior to Mr. Cameron?

13         A.     That's correct.

14         Q.     And do you know who held that

15  before Mr. Moné?

16         A.     I do not.

17         Q.     Okay.  So suspicious orders I

18  need to go to Mr. Cameron or Moné, depending

19  on the time frame?

20         A.     Correct.

21         Q.     But yet it was your job to

22  either click and clear these threshold events

23  or cut and report them, right?

24         A.     That is correct.

25         Q.     We talked a little bit about

Highly Confidential - Subject to Further Confidentiality Review

1   your training, education and experience, but

2   let me ask:  What is your educational

3   background say after high school?

4        A.     I have -- I attended the

5   University of Toledo, and then I finished my

6   schooling at Davis College, also in Toledo.

7        Q.     Also in what?

8        A.     Toledo, Ohio.

9        Q.     And what was your degree in?

10        A.     My degree is in travel and

11   airline office management.

12        Q.     I'm guessing that doesn't help

13   with suspicious order reporting, does it?

14        A.     I would say that is not the

15   priority of that degree.

16        Q.     So prior to -- let's take it

17   all the way up to '07.  Let's take it all the

18   way up to 2010 when you got the promotion to

19   new client specialist.

20        A.     Okay.

21        Q.     Prior to that, did you have any

22   experience or training or knowledge related

23   to suspicious orders and anti-diversion?

24        A.     No.

25        Q.     Okay.  When you go into new

Highly Confidential - Subject to Further Confidentiality Review

```
1    client specialist role, I'm assuming you also

2    had a job description there; is that right?

3          A.     That's correct.

4          Q.     And again, like we talked

5    about, this deals with permitting drugstores

6    or pharmacies as well as others to become

7    customers of Cardinal?

8          A.     Yes.

9          Q.     Okay.  Tell me what training

10   specifically did you receive related to that

11   role.

12         A.     It was internal training.

13         Q.     So training provided by

14   Cardinal only?

15         A.     It was on-hand training, yes.

16         Q.     You say "on-hand" --

17         A.     On-the-job training.  It was

18   internal per Cardinal.  There were parameters

19   and guidelines.

20         Q.     You say "parameters and

21   guidelines," related to the training or

22   relating to how to approve a new client?

23         A.     On the training of how to go

24   about approving and looking at and doing the

25   due diligence on a new client, on a new
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    customer.

 2         Q.     And is that the extent of your

 3    training before you took on that job?

 4         A.     Other than the administrative,

 5    what I had done myself, yes, that was the

 6    first part of the training.

 7         Q.     Was there a second part of the

 8    training with that role?

 9         A.     No.  I'm just saying that was

10    the first time, right?  Like prior -- your

11    question was prior.  No, there was no prior

12    set training.

13         Q.     So now you get promoted to

14    senior analyst, and there were several of you

15    in this position, correct?

16         A.     Yes.

17         Q.     What training did you receive

18    as a senior analyst?

19                And understanding this role,

20    you're actually basically clicking whether to

21    let an order go through or cut it, right?

22         A.     That's correct.

23         Q.     So what training did you

24    receive in that regard?

25         A.     Again, it was internal
```

```
 1   training.

 2        Q.     On-the-job training?

 3        A.     It was documented.  We were

 4   trained before we even, per se, started

 5   looking at anything in the case management

 6   system.  So we had all of our tools.  We

 7   learned everything that we needed to for that

 8   specific job role.

 9        Q.     And when you say "that specific

10   job role," that is senior analyst reviewing

11   threshold events?

12        A.     That's correct.

13        Q.     All right.  Let's go to

14   Exhibit 4, the previously highlighted version

15   on page 3.  This deals with the flagging

16   system that we saw earlier.

17               Do you remember talking about

18   that, Ms. Justus?

19        A.     Yes.

20        Q.     So in the anti-diversion

21   department, you had no knowledge of this

22   process or any of these flags; is that right?

23               MS. WICHT:  Object to the form

24        of the question.

25               THE WITNESS:  Which process --
```

Highly Confidential - Subject to Further Confidentiality Review

1       so where on this document are you

2       looking?

3   QUESTIONS BY MR. FULLER:

4       Q.      I'm on the last page related to

5   the flags.

6       A.      Oh.

7       Q.      Suspicious order monitoring

8   update, e-mail.

9       A.      No, this was the sales reps.

10  This was not what we did.  This is not

11  anything in the actual anti-diversion

12  threshold monitoring department at all.  This

13  was to the sales.

14      Q.      Well, and I understand it was

15  to sales.  The title of the e-mail is

16  "Suspicious Order Monitoring."

17      A.      Correct.

18      Q.      Right?

19              And anti-diversion -- that's

20  part of anti-diversion's job is suspicious

21  order monitoring, right?

22      A.      It's everybody's

23  responsibility.

24      Q.      Sure.

25      A.      Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So this is a sales -- way that

 2   the sales team could help to identify

 3   anything.  This is not what we did in the

 4   actual department.

 5        Q.    Well, it may not have been what

 6   you did, but the scope of the policy

 7   indicates that it applies to quality and

 8   regulatory affairs and supply chain

 9   integrity, which was the anti-diversion

10   department, right?

11              MS. WICHT:  Object to the form

12        of the question.

13              THE WITNESS:  That's what the

14        scope says, yes.

15   QUESTIONS BY MR. FULLER:

16        Q.    And those QRA and supply chain

17   integrity fell into the anti-diversion

18   department; would you agree?

19        A.    I would agree.

20        Q.    Okay.  So sales has some sort

21   of system where they're red-flagging things,

22   and as far as you're aware, it's not even

23   brought to the attention --

24        A.    It is not to my --

25              MS. WICHT:  Object to the form
```

```
 1        of the question.

 2   QUESTIONS BY MR. FULLER:

 3        Q.     Hold on.

 4        A.     Okay.

 5        Q.     It's not even brought to the

 6   attention -- let's do this.  Let me finish,

 7   let counsel object, then you can yell at me.

 8               Okay?

 9        A.     Okay.

10        Q.     All right.

11               MS. WICHT:  I just -- I think

12        that was a joke.  I just --

13               MR. FULLER:  Yes.  Yes.

14               MS. WICHT:  -- for purposes of

15        the record, the witness is not yelling

16        at Mr. Fuller.

17               MR. FULLER:  Well, we got

18        video, so we're safe.

19               MS. WICHT:  Yes, exactly.

20               MR. FULLER:  We're safe.

21   QUESTIONS BY MR. FULLER:

22        Q.     So we have a system in place

23   that is red-flagging orders based on

24   substantial increases in controlled

25   substances, List Is, that the salespeople are
```

1    getting, but we're not even giving it to our

2    anti-diversion team as far as you're aware,

3    correct?

4              MS. WICHT:  Objection to the

5         form of the question and foundation.

6              THE WITNESS:  I believe that's

7         taking this out of context.  Because

8         what this is saying is if there are

9         purchases -- it's not a specific

10        order.  They would not be bringing an

11        order to our attention; it is to their

12        own attention.  That -- if they had

13        noticed any of their customers in

14        their purchasings, because they would

15        be in charge of looking at their

16        volume of sales as a whole, that if

17        they noticed any kind of a difference

18        within these percentages, then that

19        should be a notice to them to take a

20        look at what their customers are doing

21        or why.  That's what this says to me.

22              So that's my definition of this

23        document.  That's why this would be

24        from Tom DeGemmis that was the senior

25        vice president.  It would be in

```
 1          regards to any kind of process or

 2          program that the company was

 3          implementing, would be my guess.

 4                  I was not on this e-mail.  This

 5          is something -- you're asking me a

 6          question that I don't know what all of

 7          this actually represents.  That could

 8          only be a guess as to why this went

 9          out.

10   QUESTIONS BY MR. FULLER:

11          Q.      Okay.  The scope indicates it

12   applies to your department, fair?

13          A.      And again, yes, that is fair.

14          Q.      Okay.

15          A.      That the anti-diversion or the

16   quality and regulatory affairs.  But this is

17   an attachment to this document.  The document

18   is actually created for the scope.

19                  I have no idea who, why or

20   otherwise that this attachment was put on

21   this -- this document.  I don't know.

22          Q.      Well, somebody who created the

23   standard operating procedure clearly put it

24   into the document?

25          A.      Correct.  I didn't create this.
```

```
1          Q.      Okay.  So --

2          A.      I don't know.

3          Q.      -- it doesn't make it any less

4    valid because they inputted an e-mail into

5    it, does it?

6                  MS. WICHT:  Object to the form

7          of the question.

8                  THE WITNESS:  It does not.

9    QUESTIONS BY MR. FULLER:

10         Q.      Okay.  So let's go to the red

11   flag for a second.  The red flag says that

12   it's a 15 percent increase of controlled

13   substance or List I chemical orders, right?

14         A.      That's what the document says,

15   yes.

16         Q.      Okay.  And it says, "Customers

17   in the red flag category should be visited

18   ASAP by the PBC and/or QRA."

19                 Who is PBC?

20         A.      That would be a sales rep.

21         Q.      Or the QRA.  Who's QRA?

22         A.      QRA is a vast group.

23         Q.      It's quality/regulatory

24   assurance, right?

25         A.      Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1         Q.      Okay.

2         A.      Or affairs.

3         Q.      "The PBC should contact

4    corporate QRA as well as the field compliance

5    officer to work with this account."

6                 Who is the corporate QRA?

7                 MS. WICHT:  Object to the form

8         of the question.

9                 THE WITNESS:  There are two

10        areas.

11   QUESTIONS BY MR. FULLER:

12        Q.      There's what?

13        A.      There's two areas.

14        Q.      Two corporate QRA areas?

15        A.      Well, sir, I think I identified

16   that there was the anti-diversion department

17   and the quality and regulatory affairs and

18   ops, which are in the distribution centers.

19        Q.      So who are the two QRAs?  The

20   corporate QRAs, I'm sorry.

21        A.      Quality and regulatory affairs.

22   Quality and regulatory affairs and ops.

23        Q.      And who heads up each of those;

24   do you know?

25        A.      So currently, no, I don't know

Highly Confidential - Subject to Further Confidentiality Review

```
 1    who handles the quality and regulatory

 2    affairs and ops.  I don't know.

 3              The quality and regulatory

 4    would be led by -- I don't know if Gilberto

 5    still has all of quality and regulatory, but

 6    then each of the different departments that

 7    reside in there, right?  So you're looking at

 8    Todd Cameron currently, today, is over

 9    anti-diversion.

10         Q.    Okay.

11         A.    Yes.

12         Q.    So we can ask Mr. Cameron or

13    Mr. Gilberto, correct?

14         A.    You could.

15         Q.    Okay.  They would probably be a

16    better one to answer that question?

17         A.    That's correct.

18         Q.    Got it.

19              Now, during 2012 to 2014, you

20    were providing the oversight of the threshold

21    breaches that came out of a number of

22    different facilities, including the

23    Williams -- excuse me, Wheeling distribution

24    center; is that right?

25         A.    That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Okay.  And Wheeling

 2    distribution center, do you know whether or

 3    not it would have delivered to Cuyahoga

 4    County?

 5          A.      I don't.

 6          Q.      Do you know whether or not the

 7    Wheeling distribution center would have

 8    delivered to Summit County or the cities

 9    therein?

10          A.      I don't.

11          Q.      Okay.  And I'm assuming you

12    don't know whether it delivered to the City

13    of Cleveland?

14          A.      I don't.

15          Q.      And do you know whether the

16    Wheeling distribution center delivered to the

17    City of Akron?

18          A.      I don't.

19          Q.      Okay.  I'm going to represent

20    to you that Mr. Baranski, who is the director

21    of operations for that distribution center,

22    the Wheeling distribution center --

23          A.      Yes.

24          Q.      -- who has been there since

25    2004, 2005 --
```

```
 1        A.      Uh-huh.

 2        Q.      -- has indicated that he has

 3   delivered to Summit County and the cities

 4   therein, and that Mr. Baranski has delivered

 5   to Summit -- what did I say Summit? --

 6   Cuyahoga and the cities therein.

 7        A.      Uh-huh.

 8        Q.      So that would have been an area

 9   under your purview during the time that you

10   were the senior analyst; is that correct?

11        A.      That's correct.

12        Q.      So any threshold events that

13   come out of there would come to you; is that

14   right?

15        A.      They should.

16        Q.      And because of the electronic

17   system, do you usually get them immediately?

18                Meaning that if someone places

19   an order, say, today, Friday the 13th, is

20   what it happens to be, at noon, how long will

21   it take for that order to make it to your

22   computer?  Any idea?

23        A.      Without any kind of system

24   failure at all, it would be maximum 10

25   minutes, maximum 15 --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.      Okay.

 2        A.      -- minutes, yes.  It would be

 3   put --

 4        Q.      Very quick?

 5        A.      Yes.

 6        Q.      Is that an automated process

 7   that it goes through to get to you, or is

 8   there some manual mechanism?

 9        A.      It's automatic.

10        Q.      Okay.

11        A.      It's all automated.

12        Q.      And when it gets to you, it has

13   that case file that we were talking about

14   earlier, all the initial information that

15   you'll need to review; is that correct?

16        A.      It has --

17        Q.      And my terminology may be off.

18        A.      Yeah.  So it would have with it

19   the threshold value, the accrual value or

20   what we had shipped, yes, the drug family.

21   Those pieces of information would come

22   directly in that case.

23        Q.      So can we call that information

24   the initial information?

25        A.      Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     So if a threshold event happens

 2  in anywhere that the Wheeling distribution

 3  center is distributing, that threshold event

 4  is going to come to you within a matter of 10

 5  to 15 minutes and come to you with the

 6  initial information; is that right?

 7          A.     That's correct.

 8                 MR. FULLER:  Okay.  Evan, if

 9          you can bring up the Excel spreadsheet

10          for me.

11                 Counsel, what this is, is this

12          is the Excel spreadsheet, Bates

13          number 13, which that probably doesn't

14          mean much, but it is the suspicious

15          order reports that were previously

16          produced.  It's Bates number 13

17          related to the respective Track 1

18          plaintiffs from 1/1/13 through

19          approximately May of '18.

20  QUESTIONS BY MR. FULLER:

21          Q.     So, Ms. Justus, if these are

22  suspicious order reports beginning on

23  January 1st of '13, this would have been part

24  of your time frame.  Because, as I indicated,

25  it goes all the way up to '18, and you're no
```

Highly Confidential - Subject to Further Confidentiality Review

1    longer in this senior analyst role; is that

2    right?

3         A.    That's correct.

4         Q.    Okay.  And do you get the

5    information like we're seeing it here on the

6    spreadsheet where it has customer name,

7    customer address, city, county, drug

8    family -- if you'll move to the right,

9    please -- the drug family name, so forth and

10   so on?

11        A.    What we see is not this.  This

12   information is included, yes.

13        Q.    Okay.

14        A.    Yes.

15        Q.    May be in a different format?

16        A.    Correct.  That's all I'm

17   saying.  It would not look like this, but

18   that would be the data that we would be

19   provided.

20        Q.    At least some of it?

21        A.    Correct.

22        Q.    Okay.  So if you'll go over to

23   the left, please.

24              So the registrant DEA column,

25   that appears to be the DEA number for

```
 1    whatever pharmacy or drugstore we're looking

 2    at; is that right?

 3         A.     No.

 4         Q.     Okay.  What is the registrant

 5    DEA then?

 6         A.     In this case, it would be for

 7    whichever distribution center that you're

 8    looking at.

 9         Q.     Okay.  So this is all for the

10    Wheeling distribution center?

11         A.     It's all the same.

12         Q.     Okay.

13         A.     The column G would be the

14    customer DEA number.

15         Q.     Got it.

16                MR. FULLER:  Expand column B

17         for me a little bit for me.

18    QUESTIONS BY MR. FULLER:

19         Q.     Transaction code.  What does a

20    transaction code mean; do you know?

21         A.     I don't not in this, huh-uh.

22         Q.     Action indicator, those are

23    blank.  Let's go to the NDNC -- or NDC.

24                What's an NDC number; do you

25    know?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      It's an industry standard for

 2    product.

 3          Q.      And from that, you can tell

 4    what the drug is, who made it, the size of

 5    it, how it's packaged, that kind of thing,

 6    right, or do you know?

 7          A.      You can, with a description.

 8          Q.      Yeah, I mean, looking at it --

 9          A.      Yeah, like I don't know those

10    numbers.

11          Q.      Got it.

12          A.      Okay.  Okay.  Yes, but -- yes,

13    that's the information that comes with the

14    NDC.  That's how it's industry standard, yes.

15          Q.      Okay.  So next we have the

16    customer DEA number, and as you've pointed

17    out to me, that is the DEA number for the --

18    whoever is doing the ordering?

19          A.      Correct.

20          Q.      And then we have order form

21    number.  What is that; do you know?

22          A.      Looking at it, it looks like it

23    would be a DEA 222 number.

24          Q.      Okay.

25          A.      It's a form number.
```

```
 1              Q.      And DEA 222, that's a form

 2      that's used to order, place orders with as

 3      far as a customer is concerned, or drugstore

 4      or pharmacy, right?

 5              A.      Yes.

 6              Q.      Okay.  And then we have overage

 7      date.  Now, that would be the date that they

 8      exceed the threshold; is that correct?

 9              A.      It should be, yes.

10              Q.      Okay.  And then correction

11      number, I don't know what that is.

12              A.      I don't either.

13              Q.      Okay.  We're in the same boat.

14                      Transaction identifier, do you

15      know what that is?

16              A.      No, I don't.

17              Q.      Okay.  Then we have the

18      customer name.  That's pretty

19      self-explanatory, right?

20              A.      Correct.

21              Q.      Customer address, we know who

22      that is or what that's for, city, state, ZIP

23      code.

24                      Now, drug family.  Explain to

25      us what the drug family is.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     A drug family is identified or

 2     is provided by the DEA all -- all drugs

 3     within the drug family, it has the same

 4     active ingredient.

 5          Q.     And, therefore, they have all

 6     the same drug numbers, the drug family

 7     numbers, right?

 8          A.     If it's in the -- if it has the

 9     same active ingredient, yes.

10          Q.     Okay.  Then we have the drug

11     family name, which I'm assuming corresponds

12     with the drug family number; is that fair?

13          A.     Yes.

14          Q.     And then I think the last two

15     columns, one says, "reported to state by

16     e-mail," the other "reported to state by

17     fax."

18                 And I'm assuming that's just

19     self-explanatory as to how it was reported?

20          A.     Yes.

21          Q.     Okay.  So if -- if what I'm

22     telling you is accurate -- and being produced

23     by the defendants, I'm sure it is -- that

24     these are the suspicious orders -- if you'll

25     go up to the top, please.  I want to see the
```

Highly Confidential - Subject to Further Confidentiality Review

1    top of the date.  There you go -- these start

2    in, appears to be, February of '13.

3            Do you see that there?

4        A.    Yes.

5        Q.    And that would be a time frame

6    in which you were in this role as the senior

7    analyst; is that right?

8        A.    That would be correct.

9        Q.    And then these would be orders

10   that would be coming to you as threshold

11   breaches or overages?

12       A.    Correct.

13       Q.    And at that point you would go

14   through the process that we discussed

15   earlier, and on these you would have cut the

16   number or cut the order and would have

17   reported this to the DEA; is that right?

18       A.    If I --

19            MS. WICHT:  Object to the form

20       of the question.  Sorry.

21            THE WITNESS:  That's okay.

22            If it was a cut order, then,

23       yes, it would have been reported.

24   QUESTIONS BY MR. FULLER:

25       Q.    So what I've been told is these

```
 1    are the suspicious orders that were reported.

 2    So that would mean they would have had to

 3    have been cut, because you can't ship them if

 4    you're going to report them, right?

 5              MS. WICHT:  Object to the form

 6         of the question.

 7              THE WITNESS:  That would be

 8         correct, but there's nothing on here

 9         that tells me what decision was made

10         or how that decision was made.

11    QUESTIONS BY MR. FULLER:

12         Q.    Well --

13         A.    So and I don't know where that

14    report came from if I'm looking --

15         Q.    Let me -- let me --

16         A.    Go ahead.

17         Q.    -- see if I can clarify.

18         A.    Uh-huh.

19         Q.    I've been told that these are

20    threshold -- well, they appear to have

21    overage dates, which means they're threshold

22    events, right?

23         A.    Uh-huh.

24         Q.    Is that a yes?

25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      The threshold events, I was

2    also told that these have been the ones that

3    were reported to the DEA, which based on the

4    system that you explained to us earlier,

5    would mean these were cut and reported,

6    correct?

7               Did you report threshold events

8    to the DEA that you still shipped?

9       A.      I don't know where this report

10   even came from.  That's what I'm saying.

11      Q.      Your counsel.

12      A.      Okay.

13      Q.      That --

14      A.      So this came from the case

15   management system is where they ran these

16   reports.

17      Q.      I have no idea where they ran

18   these reports.  They may have retyped this

19   information.  I -- that's not anything I'm

20   entitled or that I know at this point, at

21   least.

22      A.      Okay.

23      Q.      They have produced this

24   document --

25      A.      Uh-huh.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      -- and said, "Plaintiffs, these

 2     are the suspicious order reports that we

 3     provided to the DEA and the State of Ohio

 4     from 1/1/13 until" -- the last one is about

 5     May of '18 --

 6          A.      Okay.

 7          Q.      -- "for Cuyahoga and Summit

 8     Counties."

 9                  Okay?

10          A.      Uh-huh.

11          Q.      So what I want to make sure of

12     is that because these were reported to the

13     DEA, that these must have been threshold

14     events that were cut, not shipped?

15          A.      I -- again, I haven't seen

16     anything in the case management system.  I

17     would not -- I'm not going to validate a

18     report that I have no idea -- granted, if it

19     came from counsel, then they should probably

20     answer that because I do not know where this

21     came from.

22                  The ruling, the process --

23          Q.      Yes, ma'am --

24          A.      -- is a cut order gets

25     reported.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.      Did you report threshold events
 2    that you still shipped?
 3           A.      To my knowledge, no.
 4           Q.      Okay.  So if we have a
 5    threshold event that was shipped, it's not
 6    going to show up as being reported to the
 7    DEA, assuming that system is the way you just
 8    said it is?
 9           A.      Correct.
10           Q.      Okay.  And if we have a
11    threshold event that we cut, we're no longer
12    going to -- from what you've told me already
13    or testified to, we're no longer going to
14    distribute that drug family to that customer,
15    that drugstore or pharmacy, at least until
16    the new cycle begins?
17           A.      That should be correct.
18           Q.      Okay.  After the new cycle
19    begins, they're now on a new threshold, so
20    we'll ship to them?  Their threshold is
21    reset?
22           A.      Their threshold is reset.
23    Thank you.
24           Q.      So we'll ship to them?
25           A.      Correct.
```

```
 1        Q.      Got it.  All right.

 2        A.      So if there was a change in

 3   threshold, then --

 4        Q.      Then we wouldn't -- so --

 5        A.      We would not have reported,

 6   right.

 7                So -- okay.

 8        Q.      You got it.

 9        A.      All right.

10        Q.      You and I.

11        A.      All right.

12        Q.      All right.  So what Cardinal

13   also produced to the plaintiffs --

14        A.      Yes.

15        Q.      -- is the transactional data

16   for Summit County.  They've also produced the

17   transactional data for Cuyahoga County for

18   the same time frame.

19                And what I've done is if you go

20   to the merged data is I've overlaid the two

21   of them.  Okay?

22                So what I have done --

23                MR. FULLER:  And I have a thumb

24        drive I'll give the court reporter

25        with this, as well as counsel.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Actually can I have those now?  Thumb

 2          drives.

 3                  (Cardinal-Justus Exhibit 13

 4          marked for identification.)

 5                  MR. FULLER:  All right.  And

 6          we're attaching the thumb drive for

 7          this Excel spreadsheet as Plaintiff's

 8          Exhibit 13.

 9                  So, Evan, if you'll go back to

10          the macro.

11  QUESTIONS BY MR. FULLER:

12          Q.    And let me ask before we start

13  going through this:  When in 2014, the best

14  you can recall, did you move out of senior

15  analyst position to your new spot?

16          A.    August.

17          Q.    Sometime around about August of

18  '14?

19          A.    That's correct.

20          Q.    And that would have cut off

21  your responsibilities related to senior

22  analyst work; is that right?

23          A.    That's correct.

24                  MR. FULLER:  Okay.  So, Evan,

25          if you'll put in row number 3,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          suspicious order number 3 for me.
 2                  And, Counsel, the way this
 3          works, what you're looking at now, is
 4          the macro.  Whatever number you plug
 5          in will be the corresponding line on
 6          the Bates number 13, the list of
 7          suspicious orders.
 8                  And when you click the purple
 9          language there -- go ahead -- it will
10          bring up that suspicious order and
11          then the subsequent orders provided to
12          that particular customer or pharmacy
13          from the same drug family.
14   QUESTIONS BY MR. FULLER:
15          Q.    And, Ms. Justus, correct me if
16   I'm wrong, but that's what we would want to
17   look at to make sure our system was working,
18   is if we have a suspicious order we reported,
19   we would want to look at subsequent orders to
20   that pharmacy for the same drug family and
21   when they were filled, correct?
22                  MS. WICHT:  Object to the form
23          of the question and foundation.
24                  THE WITNESS:  That's what I
25          just understood, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. FULLER:

2         Q.    Okay.  So what we have there in

3    blue is the suspicious order report that was

4    held for Ohio CVS store -- expand that a

5    little bit for me -- LLC, which is at 2007

6    Brookpark Road in Cleveland -- hold on.

7    Department, same information.

8              MR. FULLER:  If you go across,

9         go ahead and go across to the date, it

10        says suspicious orders are going to be

11        in blue.  The shipped orders are going

12        to be in white.  And what we see is

13        the buprenorphine.

14   QUESTIONS BY MR. FULLER:

15        Q.    There was an order quantity of

16   39, right?

17              Is that what it indicates,

18   Ms. Justus?

19        A.    Yes.

20        Q.    On February of '13 -- excuse

21   me, February 14 of '13, that was reported.

22   And then it also indicates on the 14th there

23   was an order shipped for that buprenorphine

24   of 20 units, and 20 units were shipped on the

25   14th.
```

Highly Confidential - Subject to Further Confidentiality Review

1              Do you see that as well?

2      A.     I do.

3      Q.     Now, do you have an

4   understanding of how your distribution

5   centers work?

6      A.     I do not.

7              MS. WICHT:  Object to the form

8       of the question.

9   QUESTIONS BY MR. FULLER:

10     Q.     According to Mr. Baranski,

11  they'll take orders up till sometime in the

12  evening, and it's the night shift that

13  actually loads the trucks and the trucks will

14  leave that evening.

15              So if this order on the 14th

16  didn't come to you until sometime during the

17  day on the 14th, it would be very possible

18  that the order was actually on -- that was

19  delivered on the 14th of the same substance

20  was actually placed the day before and being

21  delivered earlier before you would have

22  received what you flagged as a threshold

23  event, correct?

24              MS. WICHT:  Object to the form

25       of the question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  You're going to
 2        have to repeat that.
 3   QUESTIONS BY MR. FULLER:
 4        Q.     Sure.  Sure.
 5        A.     Check on that timing there
 6   because --
 7        Q.     So Mr. Baranski -- well, the
 8   testimony has been --
 9        A.     Uh-huh.
10        Q.     -- that Cardinal's trucks leave
11   very, very early in the morning or in the
12   middle of the night depending on where
13   they're going to deliver products.
14        A.     Okay.
15        Q.     Okay?
16        A.     Uh-huh.
17        Q.     So a truck may have been sent
18   out on the 14th, very early morning hours,
19   before you, during daytime hours, received a
20   suspicious order or a threshold event,
21   correct?
22                  MS. WICHT:  Object to the form
23        of the question.
24   QUESTIONS BY MR. FULLER:
25        Q.     All right.  Let's not even
```

```
 1    worry about it.
 2         A.     Yeah.
 3         Q.     You held a suspicious order,
 4    and a suspicious order was reported to the
 5    DEA --
 6         A.     Okay.
 7         Q.     -- with an overage date of
 8    2/14/13.
 9         A.     Okay.
10         Q.     There are 20 units of that same
11    drug family shipped on that same day.
12                Based on what you've told us,
13    that should not happen; would you agree?
14                MS. WICHT:  Object to the form
15         of the question.
16                THE WITNESS:  Could you move
17         that screen to the left, please?
18                Now, that line number that's in
19         blue, that does not have -- can you
20         scroll back to the right?
21                Why does that line not have the
22         item description like the other lines
23         and the strengths?  Is that --
24    QUESTIONS BY MR. FULLER:
25         Q.     That would be a question for
```

```
 1    your counsel.

 2         A.     Okay.

 3         Q.     Let me ask you:  Does it matter

 4    if you're holding a drug family --

 5              MR. FULLER:  Whoever is, like,

 6         jumping around on their phone or

 7         cooking, according to Cardinal's

 8         counsel, please stop or else mute your

 9         phone.

10              Thank you.

11    QUESTIONS BY MR. FULLER:

12         Q.     I don't know why that dosage

13    information is not filled in.

14         A.     I don't either.

15              And with what's in front of me,

16    the policy is to not ship subsequent orders,

17    so...

18         Q.     And so then the order that was

19    shipped on the 18th and then the 20th, 21st,

20    22nd, 27th, may also violate that policy; is

21    that correct?

22              MS. WICHT:  Object to the form

23         of the question and no foundation.

24              THE WITNESS:  There's no way to

25         tell from this report.
```

```
 1   QUESTIONS BY MR. FULLER:

 2        Q.    And why is that?

 3        A.    Because -- do you have the

 4   threshold value on there?

 5              Because even if we cut that and

 6   we decided that that was a -- that we were

 7   not going to ship that, if there was any kind

 8   of research done or needed to be done,

 9   anything that we had a reason for it, we

10   could have changed a threshold on that, and

11   then that would have allowed the next order

12   to go through because it would have been

13   under threshold.

14        Q.    And we should see that document

15   in the diligence file, right?

16        A.    In the which file?

17        Q.    Diligence file, the one that

18   you've talked about earlier.

19        A.    It should be in that -- it

20   should be, yes.

21        Q.    And if it's not, then we have

22   an issue?

23              MS. WICHT:  Object to the form

24        of the question.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FULLER:

 2        Q.     Would you agree with me?

 3               MS. WICHT:  I'm sorry.  Object

 4        to the form of the question.

 5               THE WITNESS:  I don't know if

 6        there's an issue there or not.

 7   QUESTIONS BY MR. FULLER:

 8        Q.     Well, if that's not the case,

 9   if we are shipping orders for a drug family

10   which has been cut on previous orders --

11        A.     Uh-huh.

12        Q.     -- that's not right.  You would

13   agree with that?

14               MS. WICHT:  Object to the form

15        of the question.  No foundation and it

16        mischaracterizes her prior testimony.

17               THE WITNESS:  If there is a

18        reason for it, it should be

19        documented.

20   QUESTIONS BY MR. FULLER:

21        Q.     And if there is no reason for

22   it, it shouldn't happen, right?

23               MS. WICHT:  Object to the form

24        of the question.

25               THE WITNESS:  I would agree
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          that it should not happen.
 2                MR. FULLER:  Evan, let's go to
 3          macro number 2.
 4   QUESTIONS BY MR. FULLER:
 5          Q.    This is the suspicious order
 6   reporting but this time for a Skilled Cared
 7   Pharmacy.
 8                Do you see that?
 9          A.    I do.
10          Q.    And then the order is for the
11   Skilled Care Pharmacy, same address, same
12   customer DEA number, right?
13          A.    Yes, I agree.  Yes.
14                MR. FULLER:  If you move to the
15          right for me.
16   QUESTIONS BY MR. FULLER:
17          Q.    And the date of the suspicious
18   order report or overage is February 14th, and
19   then product from the same drug family was
20   shipped on the 18th and 22nd.
21                Do you see that?
22          A.    I do.
23          Q.    Now, you would expect to see
24   some sort of explanation again in the
25   diligence file; is that right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               MS. WICHT:  Object to the form

 2       of the question and no foundation.

 3               THE WITNESS:  It should be

 4       there.

 5  QUESTIONS BY MR. FULLER:

 6       Q.    Okay.  And was that your

 7  standard practice?

 8               If you were going to change a

 9  threshold or if you were going to clear

10  something or allow future shipments to go

11  through, you would have documented your

12  reasoning behind that, why you were doing

13  that?

14               MS. WICHT:  Object to the form

15       of the question.

16  QUESTIONS BY MR. FULLER:

17       Q.    Correct?

18       A.    I should have, yes.

19       Q.    That was your normal procedure?

20       A.    Yes, that would have been what

21  I should have done, yes.

22       Q.    Okay.  And you -- sitting here

23  today, you don't know whether you did or

24  didn't?

25       A.    I have no idea whether I did or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   not.

 2        Q.      All right.  I know we're

 3   talking about things about five years ago.

 4        A.      Exactly.  Right.

 5        Q.      Got it.

 6        A.      Absolutely.

 7        Q.      Just want to know what your

 8   normal course was.

 9        A.      Yes, that is normal course.

10        Q.      What would also be helpful to

11   know in looking at this is what monthly cycle

12   you had these different pharmacies on, right?

13        A.      That is correct.

14        Q.      So, for example, if you were on

15   a -- I'm going to make up a date --

16   January 15th to February 15th cycle, you

17   could have a threshold event or overage and a

18   hold on the 14th, and then the 18th when the

19   threshold resets, you could ship again,

20   right?

21        A.      That is correct.

22        Q.      Okay.  So that might be what

23   explains what happened here?

24        A.      Could.

25        Q.      We don't know until we get
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ahold of that information?

 2         A.      That's correct.

 3         Q.      Okay.  Let's go to number 30,

 4    macro 30, please.

 5                 Same thing here.  Here we're

 6    looking at a Walgreens, which is a chain

 7    pharmacy, you can agree, right?

 8         A.      That's correct.

 9         Q.      Okay.  And there are multiple

10    suspicious orders before -- and let's just

11    confirm.

12                 The customer DEA number is the

13    same all the way down; is that right?

14         A.      That's correct.

15         Q.      Let's move to the right.  And

16    the family we're looking at here is

17    hydrocodone; is that correct?

18         A.      That's correct.

19         Q.      And let's look, for example, on

20    the 20th there's three threshold events.

21                 Could that have been three

22    separate orders for different dosages?

23         A.      It could have been, yes.

24                 MS. WICHT:  Object to the form

25         of the question.
```

```
 1    QUESTIONS BY MR. FULLER:

 2         Q.    Okay.  And then on the 21st,

 3    23rd, 23rd, 27th and 27th, there were

 4    hydrocodone products, at least according to

 5    this document, this spreadsheet, shipped to

 6    that Walgreens pharmacy; is that right?

 7         A.    That's what this looks like,

 8    yes.

 9         Q.    And again, the way the system

10    was set up and the procedures in place, you

11    would expect to see some documentation for

12    these events in the diligence file for

13    this particular Walgreens pharmacy; is that

14    right?

15              MS. WICHT:  Object to the form

16         of the question and foundation.

17              THE WITNESS:  I -- there should

18         be some kind of documentation.

19    QUESTIONS BY MR. FULLER:

20         Q.    And we would also want to know,

21    again, what cycle this particular pharmacy is

22    on?

23         A.    That's correct.

24         Q.    Where would we find that

25    information as far as the cycle?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      It would have to be from a
 2  report that -- the case management system
 3  should be able to show that or the customer
 4  file that's within Cardinal's systems would
 5  have that as well.
 6          Q.      All right.  Ma'am, I have
 7  additional examples that I could show you of
 8  the same thing, but if I asked you similar
 9  questions, would your answers be the same?
10          A.      Yes, sir.
11               MS. WICHT:  Object to the form
12          of the question.
13               MR. FULLER:  Let's take a quick
14          break, let me look at my notes, see if
15          I've got anything else, and then maybe
16          we can get you on your way, assuming
17          she doesn't have hours and hours of
18          questions.
19               VIDEOGRAPHER:  Going off the
20          record.  The time is 4:49.
21           (Off the record at 4:49 p.m.)
22               VIDEOGRAPHER:  We are going
23          back on the record.  Beginning of
24          Media File Number 6.  The time is
25          5:05.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FULLER:
 2        Q.    Ms. Justus, we were looking at
 3   Exhibit 13, that spreadsheet -- well, not
 4   Exhibit 13.  It was actually Exhibit 13.
 5             The Bates number 13, which
 6   included the -- what I've been told are the
 7   suspicious order reports, that's not actually
 8   how a suspicious order gets reported, is it,
 9   that line that we saw on that Excel
10   spreadsheet you were looking at?
11        A.    From that report -- it's
12   systematic, so I don't know what it would
13   look like.
14             MR. FULLER:  Tab 13.  Or the
15        Bates number.  No.  No.  No.  No.
16        There you go.
17   QUESTIONS BY MR. FULLER:
18        Q.    Okay.  So the suspicious order
19   report that you would file is automated?
20        A.    Yes.  I mean -- yes, we
21   would -- our responsibility was just to note
22   that that order would be reported to the DEA,
23   and then --
24        Q.    You say "our responsibility."
25             Are you talking about --
```

1          A.      The analyst.

2          Q.      Okay.

3          A.      During that frame between 2010

4    and 2012, the responsibility of the analyst,

5    if they were going to cut an order, they

6    would report it to the DEA.  So it is flagged

7    to mark as report to the DEA.

8          Q.      So what about 2012 to 2014?

9          A.      My apologies.  2012 to 2014, it

10   was the years that I was as an analyst, yes.

11         Q.      So you didn't actually do the

12   reporting yourself?

13         A.      No.

14         Q.      Do you actually know if

15   anything that you cut was actually reported?

16         A.      I would have no reason to

17   believe otherwise.

18         Q.      That's the process that was in

19   place?

20         A.      That's correct.

21         Q.      And you expected others who got

22   notified of your cutting to follow the

23   process?

24         A.      That's correct.

25         Q.      You don't know one way or

Highly Confidential - Subject to Further Confidentiality Review

```
1    another as you sit here today?
2         A.      That would be correct as well.
3         Q.      And during the time frame you
4    were not notified whether one was actually
5    reported or not?
6         A.      No, I was not.
7         Q.      You wouldn't get any sort of
8    automated e-mail or anything that says it was
9    reported?
10        A.      No.
11        Q.      Do you know where it was
12   reported?  Local DEA?  Headquarters?  Any
13   idea?
14        A.      To my knowledge, it would have
15   been to local and to federal.  I don't know
16   that.  I mean, that was --
17        Q.      That's just your understanding?
18        A.      That is my understanding.
19        Q.      From working in the department?
20        A.      Correct.
21        Q.      Okay.  Do you know what
22   additional information would have been
23   included in those suspicious order reports?
24        A.      I don't.
25        Q.      And while I have information
```

1    that's been provided only from 2012 -- or

2    excuse me, 1/1/2013 forward, you were in this

3    role going backwards to sometime back in

4    2012; is that right?

5         A.    That's correct.

6         Q.    And do you know when the actual

7    change from new client analyst to senior

8    analyst happened?

9         A.    I don't exactly know.

10        Q.    Okay.  So there may be

11   additional information, additional suspicious

12   orders, that you spotted for Cuyahoga,

13   correct?

14             MS. WICHT:  Object to the form

15        of the question.

16   QUESTIONS BY MR. FULLER:

17        Q.    There may have been additional

18   orders you cut that got reported as

19   suspicious prior to 1/1/13, from the

20   information we have here, going back to when

21   you began as an analyst; is that right?

22        A.    It could be, depending upon

23   that date, sure.

24        Q.    And here's where I'm going to

25   go through my four different entities, okay,

Highly Confidential - Subject to Further Confidentiality Review

```
1   so bear with me.

2          A.      Uh-huh.

3          Q.      So there could be additional

4   suspicious orders that you yourself -- or

5   orders that you cut and were reported to DEA

6   for Summit County prior to 1/1/13?

7          A.      There could be.

8          Q.      There could be additional

9   orders that you cut and reported to the DEA

10  for the City of Cleveland prior to 1/1/13,

11  correct?

12         A.      There could be.

13         Q.      And there could be prior orders

14  that you cut and reported to the DEA for

15  Akron, Ohio, prior to 1/1/13 which we have

16  here?

17         A.      There could be, yes.

18                MR. FULLER:   Okay.   And with

19         that limited qualifier, I'll reserve

20         to ask to come back and chat with you

21         again.   I don't know that it's going

22         to be necessary, but my understanding

23         is they're working on getting us the

24         additional information going back

25         further.   If there's any questions I
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          have, I may touch base with your

2          counsel on that issue.

3                    Okay?

4                    THE WITNESS:  Yes, that's fine.

5                    MR. FULLER:  I don't have any

6          further questions.

7                    MS. WICHT:  Okay.  I have

8          probably five minutes or less, I would

9          say.

10                   MR. FULLER:  Never make that

11         kind of guarantee.  Are you kidding

12         me?

13                   MS. WICHT:  Do you have a

14         preference?  Can I just do it from

15         here?  Is that okay?

16                   CROSS-EXAMINATION

17   QUESTIONS BY MS. WICHT:

18         Q.    Okay.  Good afternoon,

19   Ms. Justus.  I know it's been a long day, so

20   I don't have very much for you.

21         A.    Okay.

22         Q.    Do you recall earlier today

23   Mr. Fuller was asking you some questions

24   about the 2012 immediate suspension order of

25   the Lakeland distribution center?
```

Highly Confidential - Subject to Further Confidentiality Review

1           Do you recall that?

2      A.     Yes.

3      Q.     Okay.  And I'm going to go back

4   to just a couple of the documents that

5   Mr. Fuller showed you on that subject.

6           So if you would take a look,

7   please, at what was marked as Exhibit 10,

8   please, which is the declaration of Ruth

9   Carter from the DEA.

10     A.     Yes.

11     Q.     And if you want to turn to

12  page 13 of the document, please.

13     A.     Yes.

14     Q.     So let me first ask you:  I

15  think you said that you came into the analyst

16  role sometime in 2012, correct?

17     A.     Yes, that would be correct.

18     Q.     So prior to whenever in 2012

19  that was that you came into that role, you

20  were not responsible for reviewing any

21  threshold events out of the Lakeland

22  distribution center; is that right?

23     A.     That is correct.

24     Q.     Okay.  So Mr. Fuller asked you

25  a series of questions about the paragraphs

1    that are on page 13 and 14, about Gulf Coast

2    Pharmacy.

3              Could you please take a look

4    and just let us know what the years are of

5    the issues that are raised about Gulf Coast

6    Pharmacy in those paragraphs A through H,

7    please.

8         A.    Yes, I can.

9              It would be through from -- it

10   states August 12th of 2008 --

11        Q.    Just so -- you don't have to

12   read all the specifics dates, if you just

13   want to --

14        A.    I won't.  It just goes through

15   from 2008 through 2011.

16        Q.    Okay.  And were you -- so that

17   was all prior to your time as an analyst; is

18   that correct?

19        A.    That is correct.

20        Q.    So you would not have been the

21   analyst responsible for reviewing any of

22   these orders?

23        A.    No, ma'am.

24        Q.    Do you have any knowledge as to

25   whether -- what the analyst who -- do you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have any knowledge of whether there were
 2    threshold events with respect to Gulf Coast
 3    Pharmacy?
 4         A.    I have no idea.
 5         Q.    Do you have any knowledge if
 6    there were threshold events, what the analyst
 7    considered in evaluating those orders?
 8         A.    No, ma'am, I don't.
 9         Q.    And what does paragraph 31
10    reflect about Cardinal services to Gulf Coast
11    Pharmacy?
12         A.    It states that on October 5th
13    of 2011, Cardinal suspended its distributions
14    to Gulf Coast.
15         Q.    And that's prior to you coming
16    into any role where you were overseeing the
17    Lakeland distribution center, correct?
18         A.    That is correct.
19         Q.    Okay.  So you don't have any
20    actual information about the Gulf Coast
21    orders in particular or what was done to
22    analyze them or why any actions were taken or
23    not taken on it; is that right?
24         A.    That is correct.
25         Q.    Would it be the role of an
```

Highly Confidential - Subject to Further Confidentiality Review

1   analyst to decide whether or not a contact

2   should be made with the DEA about a

3   particular pharmacy?

4        A.      No.

5        Q.      Or would that be elevated up

6   the chain from the analyst?

7        A.      That would be elevated.

8        Q.      Okay.  And do you have any

9   knowledge of whether that happened with

10  respect to Gulf Coast Pharmacy?

11       A.      I do not.

12       Q.      Or any information that would

13  have been considered by those above the

14  analyst in the chain with respect to this

15  pharmacy?

16       A.      I have no idea.

17       Q.      Okay.  And we've been talking

18  about Gulf Coast Pharmacy, but I take it that

19  it's correct that any orders coming out of

20  the Lakeland distribution center, you would

21  not have been reviewing those prior to

22  sometime in 2012 when you came into that

23  analyst role; is that correct?

24       A.      That's correct.

25       Q.      Okay.  And if you look at

Highly Confidential - Subject to Further Confidentiality Review

```
 1    exhibit -- what was marked as Exhibit 9,

 2    which is the order to show cause regarding

 3    the Lakeland distribution center in 2007.

 4          A.     Yes.

 5          Q.     And Mr. Fuller directed you to

 6    a chart that appears on page 3 of the

 7    document.

 8          A.     That's correct.

 9          Q.     If you just take a look at the

10    dates of the distributions reflected in that

11    chart.

12          A.     Yes, it's from 2005 through

13    2007.

14          Q.     Would you have had any

15    responsibilities with respect to reviewing

16    orders placed by those pharmacies through

17    Lakeland distribution center in that time

18    frame?

19          A.     No, ma'am, I was not even in

20    the department.

21          Q.     Do you have any knowledge or

22    information about what -- what information,

23    if any, was considered about those particular

24    orders?

25          A.     No, I do not.
```

```
 1          Q.    Okay.  Do you have any

 2   knowledge or information around what, if any,

 3   information was collected in the on-boarding

 4   of the customers who are listed in this

 5   chart?

 6          A.    No, I do not.

 7                MS. WICHT:  Okay.  That's all I

 8          have.  Thank you.

 9                REDIRECT EXAMINATION

10   QUESTIONS BY MR. FULLER:

11          Q.    Ms. Justus, counsel asked you

12   about time frames and going back to, you

13   know, 2008, 2009, and some of the

14   investigations.

15                You would agree with me that

16   the obligations set forth in the regulations

17   that we looked at -- actually the statutes

18   that were enacted in 1970 and then the

19   regulations enacted in '71 -- would apply for

20   that entire time frame; would you not?

21                MS. WICHT:  Object to the form.

22                THE WITNESS:  I don't know what

23          the policy was at that time.

24   QUESTIONS BY MR. FULLER:

25          Q.    I'm not asking the policy.  I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    asking the regulations that you saw that were

 2    enacted in 1971.

 3              They would still be applicable

 4    in the '07 and '08 and '09 and 2010, right?

 5              MS. WICHT:  Object to the form.

 6              THE WITNESS:  As far as I would

 7         know, yes.

 8    QUESTIONS BY MR. FULLER:

 9         Q.    Okay.  You also testified

10    earlier that the diversion issue is

11    everybody's business at Cardinal, right?

12    Everybody has an obligation to help prevent

13    diversion, I think is what you testified to,

14    correct?

15         A.    That is correct.

16         Q.    And Mr. Barrett's even said

17    that publicly.  It's everybody's job.

18         A.    That's correct.

19         Q.    Not just if you're in this

20    position or if you're in that position.

21              But you have specialized

22    training now, right?

23              MS. WICHT:  Object to the form

24         of the question.

25              THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. FULLER:

 2        Q.     You have senior analyst

 3   training?

 4        A.     Yes.

 5        Q.     Okay.  Now, as it relates to --

 6   whether it would be an analyst's job to

 7   approve someone calling the DEA, I think you

 8   testified that that would be above your pay

 9   grade or up the chain?

10        A.     That is correct.

11        Q.     Whose job would that be?

12        A.     During the time frame that I

13   was in the department, it would have been at

14   least at the senior vice president level, so

15   that would have been -- or at the VP level.

16   It would have been Michael Moné.  It would

17   have been Mark Hartman.  It could have been

18   Gilberto.

19        Q.     And the senior vice president

20   level would have been who?

21        A.     Would have been Mark Hartman or

22   Gilberto.  The vice president role would have

23   been Michael Moné.

24        Q.     Okay.  And counsel asked you a

25   little bit about Gulf Coast.
```

```
 1                    I want to look at one more

 2    thing from Gulf Coast.  2034.  It will be

 3    Plaintiff's 14.

 4                    (Cardinal-Justus Exhibit 14

 5         marked for identification.)

 6    QUESTIONS BY MR. FULLER:

 7         Q.     If you'll recall when we were

 8    reading that declaration, there was reference

 9    to an attachment or an exhibit.  This is one

10    of those exhibits.

11                    Have you ever seen this type

12    of -- not this particular form, but this type

13    of form before?

14         A.     Yes.

15         Q.     What is this?

16         A.     This was -- I believe this to

17    be one of the forms that the pharmacist or

18    whoever was taking care of the threshold

19    events at that point in time would have used

20    as part of their decision.

21         Q.     In analyzing a threshold event

22    or a suspicious order?

23         A.     I believe that's what this was

24    used for in assisting that, yes.

25         Q.     And this pertains to what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    counsel was questioning you about, Gulf Coast

 2    Pharmacy, correct?

 3         A.    This does, yes.

 4         Q.    Okay.

 5               MR. FULLER:  And for the

 6         record, it's going to be attached as

 7         Plaintiff's Number 14.

 8    QUESTIONS BY MR. FULLER:

 9         Q.    And it includes information as

10    to total prescription sales, total controlled

11    substance sales, the percentages of each as

12    well as the distribution numbers, is that

13    right, historical purchase data?

14         A.    It does have historical

15    purchase data, uh-huh.

16         Q.    This says it was reviewed by,

17    in the upper right-hand corner, Christopher

18    J. Forst?

19         A.    That's correct.

20         Q.    I know his name came up

21    earlier.  Help me out with who he was.

22         A.    He was a pharmacist.

23         Q.    Okay.  He's one of that group

24    of pharmacists that would do the statistical

25    stuff?
```

```
 1              MS. WICHT:  Object to the form
 2        of the question.
 3              THE WITNESS:  There's
 4        statisticians for the statistical.
 5        This would be -- he would have been
 6        with the pharmacists that looked at
 7        this from a pharmacist's background.
 8        Would have been -- I don't know what
 9        other duties they did at this point in
10        time.
11   QUESTIONS BY MR. FULLER:
12        Q.     Okay.  No, fair enough.
13        A.     Yeah.
14        Q.     Fair enough.
15              And this was -- if you review
16   this, this was October 29, 2010, right?
17        A.     That's correct.
18        Q.     And if you look at the
19   historical purchase data, this pharmacy in
20   April of '10, when it was only ordering
21   31,000 pills, in a, what, six-month time
22   frame it went up to 162,000 pills?
23              That's a pretty big increase;
24   can we agree on that?
25              MS. WICHT:  Object to the form
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          of the question.

 2                  THE WITNESS:  It's an increase.

 3     QUESTIONS BY MR. FULLER:

 4          Q.     And what is the conclusion, or

 5     the QRA decision, at least, according to this

 6     form?

 7          A.     According to this form, it was

 8     a release.

 9          Q.     Meaning that the pills were

10     shipped, right?

11          A.     I don't have that detail.

12          Q.     What does released --

13          A.     This is not anything that would

14     have been in the system in which I worked.

15          Q.     Sure.

16                  What does "release order" mean?

17                  MS. WICHT:  Object to the form

18          of the question.

19                  THE WITNESS:  It means to

20          release the order.

21     QUESTIONS BY MR. FULLER:

22          Q.     Which means to ship the order,

23     correct?

24                  MS. WICHT:  Object to the form

25          of the question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  It could, yes.

 2        It could.

 3   QUESTIONS BY MR. FULLER:

 4        Q.     I mean, it doesn't mean cancel

 5   the order, does it?

 6        A.     It does not.

 7                MR. FULLER:  Okay.  I don't

 8        have anything further.

 9                MS. WICHT:  Nothing for me.

10                VIDEOGRAPHER:  All right.  This

11        concludes today's deposition.  We're

12        going off record.  The time is 5:24.

13        (Deposition concluded at 5:24 p.m.)

14                   - - - - - - -

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE

 2

 3           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Shirlene Justus was duly
     sworn by me to testify to the truth, the
 6   whole truth and nothing but the truth.

 7           I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.

10

             I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.

14

15

16

             _____
17           CARRIE A. CAMPBELL,
             NCRA Registered Diplomate Reporter
18           Certified Realtime Reporter
             California Certified Shorthand
19           Reporter #13921
             Missouri Certified Court Reporter #859
20           Illinois Certified Shorthand Reporter
             #084-004229
21           Texas Certified Shorthand Reporter #9328
             Kansas Certified Court Reporter #1715
22           Notary Public
23           Dated:  July 18, 2018

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3            Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8            After doing so, please sign the

 9   errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13            It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I,_____, do

    hereby certify that I have read the foregoing

 5  pages and that the same is a correct

    transcription of the answers given by me to

 6  the questions therein propounded, except for

    the corrections or changes in form or

 7  substance, if any, noted in the attached

    Errata Sheet.

 8

 9

10

11

12  _____

    Shirlene Justus          DATE

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                         ERRATA

 2                    - - - - - - -

 3     PAGE    LINE    CHANGE/REASON

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                   LAWYER'S NOTES

 2                    - - - - - - -

 3     PAGE    LINE

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```