```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3

     ------------------------    )
 4   IN RE: NATIONAL             ) MDL No. 2804
     PRESCRIPTION OPIATE         )
 5   LITIGATION                  ) Case No.
     ------------------------    ) 1:17-MD-2804
 6                               )
     THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster
 7   ALL CASES                   )
     ------------------------    )

 8

 9                 HIGHLY CONFIDENTIAL

10      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12            VIDEOTAPED FACT DEPOSITION

13                       and

14               30(B)(6) DEPOSITION

15                        OF

16   WALGREENS BOOTS ALLIANCE, INC. a/k/a WALGREEN CO.

17                        BY

18                  EDWARD KALETA

19

20              December 18, 2018

21               Chicago, Illinois

22

23            GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

7     The videotaped Fact and 30(b)(6) deposition
8 of EDWARD KALETA, called by the Plaintiffs for
9 examination, taken pursuant to the Federal Rules of
10 Civil Procedure of the United States District
11 Courts pertaining to the taking of depositions,
12 taken before CORINNE T. MARUT, C.S.R. No. 84-1968,
13 Registered Professional Reporter and a Certified
14 Shorthand Reporter of the State of Illinois, at the
15 offices of Bartlit Beck Herman Palenchar & Scott,
16 Suite 700, 54 West Hubbard Street, Chicago,
17 Illinois, on December 18, 2018, commencing at 8:09
18 a.m.

## Page 3

1 APPEARANCES:
2   ON BEHALF OF THE PLAINTIFFS:
3     LEVIN PAPANTONIO THOMAS MITCHELL
    RAFFERTY & PROCTOR P.A.
4     316 South Baylen Street, Suite 600
    Pensacola, Florida 32502
5     205-396-3982
    BY: JEFF GADDY, ESQ.
6       jgaddy@levinlaw.com
    LAURA DUNNING, ESQ.
7       ldunning@levinlaw.com
      (via livestream)
8
9
10     NAPOLI SHKOLNIK, PLLC
    360 Lexington Avenue, 11th Floor
    New York, New York 10017
11     212-397-1000
    BY: HUNTER J. SHKOLNIK, ESQ.
12       hunter@napolilaw.com
      (via telephone)
13
14
    ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
15   aka WALGREEN CO.:
16     BARTLIT BECK LLP
    54 West Hubbard Street, Suite 300
17     Chicago, Illinois 60654
    312-494-4475
18     BY: BRIAN C. SWANSON, ESQ.
      Brian.Swanson@BartlitBeck.com
19     SHARON DESH, ESQ.
      Sharon.Desh@BartlitBeck
20
21
22
23
24

## Page 4

1 APPEARANCES (Continued):
2   ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
    ENDO PHARMACEUTICALS, INC.,
3   PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
    COMPANIES, INC. (f/k/a Par Pharmaceutical
4   Holdings, Inc.):
5     ARNOLD & PORTER KAYE SCHOLER, LLP
    777 South Figueroa Street, 44th Floor
6     Los Angeles, California 90017-5844
    213-243-4000
7     BY: ERIC SHAPLAND, ESQ.
      eric.shapland@arnoldporter.com
8       (via telephone and livestream)
9
10   ON BEHALF OF McKESSON CORPORATION:
11     COVINGTON & BURLING LLP
    850 Tenth Street, NW
12     Washington, DC 20001-4956
    202-662-6000
13     BY: GABRIEL FULMER, ESQ.
      gfulmer@cov.com
14       (via telephone)
15
16   ON BEHALF OF CARDINAL HEALTH, INC.:
17     ARMSTRONG TEASDALE LLP
    7700 Forsyth Boulevard, Suite 1800
18     St. Louis, Missouri 63105
    314-621-5070
19     BY: JULIE FIX MEYER, ESQ.
      jfixmeyer@ArmstrongTeasdale.com
20
21
22
23
24

## Page 5

1 APPEARANCES (Continued):
2   ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
    AMERISOURCEBERGEN CORPORATION:
3
    REED SMITH LLP
4     10 South Wacker Drive, 40th Floor
    Chicago, Illinois 60606-7507
5     312-207-2834
    BY: M. PATRICK YINGLING, ESQ.
6       MPYingling@reedsmith.com
7
8   ON BEHALF OF WALMART:
9     JONES DAY
    77 West Wacker Drive
10     Chicago, Illinois 60601-1692
    312-782-3939
11     BY: PATRICK J. BEISELL, ESQ.
      pbeisell@jonesday.com
12
13
14   ON BEHALF OF RITE AID:
15     MORGAN LEWIS & BOCKIUS LLP
    1000 Louisiana Street, Suite 4000
16     Houston, Texas 77002-5006
    1-713-890-5472
17     BY: JAMES ALPHONSE NORTEY, ESQ.
      james.nortey@morganlewis.com
18       (via telephone and livestream)
19
20   ON BEHALF OF HBC COMPANY:
21     MARCUS & SHAPIRA LLP
    One Oxford Centre, 35th Floor
22     Pittsburgh, Pennsylvania 15219
    412-338-4383
23     BY: ERIN GIBSON ALLEN, ESQ.
      allen@marcus-shapira.com
24       (via telephone and livestream)

| | Page 6 |
|---|---|
| 1 | ALSO PRESENT: |
| 2 | KATIE MAYO, Legal Assistant |
| | kmayo@levinlaw.com |
| 3 | SARAH MERCED, Legal Assistant |
| | smerced@levinlaw.com |
| 4 | MADISON SHELQUIST, Legal Assistant, |
| | mshelquist@levinlaw.com |
| 5 | (via livestream) |
| | MARK FREDO, |
| 6 | mfredo@levinlaw.com |
| | (via livestream) |
| 7 | |
| 8 | COREY SMITH, Trial Technician |
| 9 | |
| 10 | |
| 11 | VIDEOTAPED BY: BEN STANSON |
| 12 | |
| 13 | REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968 |
| 14 | |

**Page 7**

```
                I N D E X
EDWARD KALETA              EXAMINATION
   BY MR. GADDY.................  14
   BY MR. SWANSON...............  358
   BY MR. GADDY.................  372

EDWARD KALETA - 30(b)(6)
   BY MR. GADDY.................  383

              E X H I B I T S
WALGREENS-KALETA EXHIBIT         MARKED FOR ID
  No. 1    GAO Report to Congressional        29
           Requesters, Prescription
           Drugs, OxyContin Abuse and
           Diversion and Efforts to
           Address the Problem;
           P-GEN-0007

  No. 2    Congressional Report,              47
           "OxyContin: Its use and
           abuse," etc., August 28, 2001;
           P-GEN-0047
  No. 3    6/7/17 e-mail string;             53
           WAGMDL00038786 - 00038791

  No. 4    11/2/16 e-mail with               62
           attachment;
           WAGMDL00375070 - 00375071

  No. 5    3/30/16 e-mail string;            70
           WAGMDL00377962 - 00377967
```

**Page 8**

```
              E X H I B I T S
WALGREENS-KALETA EXHIBIT         MARKED FOR ID
  No. 6    6/1918 e-mail with            83
           attachments;
           WAGMDL00376065 - 00376072
  No. 7    4/23/18 e-mail string with    88
           attachment;
           WAGMDL00035669 - 00035683
  No. 8    10/31/17 e-mail string with   95
           attachment;
           WAGMDL00385788 - 00385791
  No. 9    Binder containing Settlement  105
           and Memorandum of Agreement
           between DOJ, DEA and Walgreens
           and other documents;
           WAGMDL00490963 - 00490978
  No. 10   5/9/18 e-mail string;         150
           WAGMDL00383697 - 00383700

  No. 11   12/15/15 e-mail string with   157
           attachment;
           WAGMDL00042452 - 00042464

  No. 12   5/6/16 e-mail;                169
           WAGMDL00615477
  No. 13   5/3/16 e-mail string with     175
           attachment;
           WAGMDL00615504 - 00615509
  No. 14   6/13/16 e-mail string with    181
           attachments;
           WAGMDL00378634 - 00378639
  No. 15   7/17/17 e-mail string with    190
           attachment;
           WAGMDL00374710 - 00374719
```

**Page 9**

```
              E X H I B I T S
WALGREENS-KALETA EXHIBIT         MARKED FOR ID
  No. 16   4/9/18 e-mail string with     202
           attachment;
           WAGMDL00315889 - 00315903
  No. 17   6/19/17 e-mail string;        204
           WAGMDL00612155 - 00612157

  No. 18   9/6/17 e-mail string;         207
           WAGMDL00595580 - 00595586
  No. 19   1/17/18 e-mail string with    210
           attachment;
           WAGMDL00591948 - 00591951
  No. 20   9/20/17 e-mail string;        225
           WAGMDL00385105 - 00385110

  No. 21   5/21/18 e-mail string with    237
           attachment;
           WAGMDL00384341 - 00384357

  No. 22   5/24/18 e-mail string;        254
           WAGMDL00616784 - 00616787
  No. 23   3/1/17 e-mail with attachment; 262
           WAGMDL00611377 - 00611384

  No. 24   5/19/16 e-mail string;        272
           WAGMDL00600854 - 00600860
  No. 25   10/22/15 e-mail string;       279
           WAGMDL00383497 - 00383499

  No. 26   8/12/16 e-mail string;        290
           WAGMDL0044770 - 00044773
  No. 27   4/27/16 e-mail string and     291
           attachments;
           WAGMDL00603118 - 00603128
```

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 10 |
|---|---|
| 1 | E X H I B I T S |
| 2 | WALGREENS-KALETA EXHIBIT        MARKED FOR ID |
| 3 | No. 28   8/14/17 e-mail string;        300 |
|  | WAGMDL00385259 - 00385260 |
| 4 |  |
|  | No. 29   10/23/17 e-mail with        307 |
| 5 | attachment; |
|  | WAGMDL00385895 - 00385897 |
| 6 |  |
|  | No. 30   Lobbying Report;        313 |
| 7 | P-WAG-00040 |
| 8 | No. 31   3/2/12 e-mail string;        318 |
|  | WAGMDL00642592 - 00642594 |
| 9 |  |
|  | No. 32   1/29/16 e-mail string with        322 |
| 10 | attachment; |
|  | WAGMDL0000613455 - 00613467 |
| 11 |  |
|  | No. 33   10/27/17 e-mail string;        327 |
| 12 | WAGMDL00386743 - 00386745 |
| 13 | No. 34   3/2/18 e-mail string with        334 |
|  | attachment; |
| 14 | WAGMDL0000644179 - 00644182 |
| 15 | No. 35   1999 - 2016 maps, National        342 |
|  | Center for Health Statistics, |
| 16 | National Vital Statistics |
|  | System, mortality data |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 11 |
|---|---|
| 1 | E X H I B I T S |
| 2 | WALGREENS-KALETA 30(b)(6) EXHIBIT    MARKED FOR ID |
| 3 | No. 1    Second Notice of Deposition to        384 |
|  | Deft. Walgreens Boots |
| 4 | Alliance, Inc. a/k/a Walgreen |
|  | Co. |
| 5 | No. 2    DEA Compliance Working Group        404 |
|  | 1/10/13 Meeting Summary; |
| 6 | CAH_MDL2804_02933683 - 02933700 |
| 7 | No. 3    Document, "Payments, Payments        417 |
|  | for the 1 selected |
| 8 | Organization, 12 September 2018"; |
|  | WAGMDL00286426 - 00286428 |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 12 |
|---|---|
| 1 | THE VIDEOGRAPHER:  We are now on the record. |
| 2 | My name is Ben Stanson.  I'm a videographer for |
| 3 | Golkow Litigation Services. |
| 4 | Today's date is December 18, 2018, and |
| 5 | the time is 8:09 a.m. |
| 6 | This video deposition is being held in |
| 7 | Chicago, Illinois in the matter of the National |
| 8 | Prescription Opiate Litigation, pending in the U.S. |
| 9 | District Court, Northern District of Ohio, Eastern |
| 10 | Division. |
| 11 | The deponent is Ed Kaleta. |
| 12 | Counsel will be noted on the |
| 13 | stenographic record. |
| 14 | Our Court Reporter is Corinne Marut. |
| 15 | Will you please swear in the witness. |
| 16 | (WHEREUPON, the witness was duly |
| 17 | sworn.) |
| 18 | MR. GADDY:  Corinne, did you get everybody |
| 19 | that's in attendance? |
| 20 | (Clarification by the reporter.) |
| 21 | MR. SHAPLAND:  Eric Shapland, Arnold & Porter, |
| 22 | on behalf of Endo and Par. |
| 23 | MS. ALLEN:  Erin Gibson Allen from Marcus & |
| 24 | Shapira on behalf of Defendant HBC. |

|  | Page 13 |
|---|---|
| 1 | MR. FULMER:  Gabriel Fulmer from Covington & |
| 2 | Burling on behalf of McKesson. |
| 3 | MR. GADDY:  And I'm Jeff Gaddy on behalf of |
| 4 | the Plaintiffs. |
| 5 | MR. NORTEY:  This is James Nortey with Morgan, |
| 6 | Lewis on behalf of Rite Aid. |
| 7 | MR. SWANSON:  Do you want to keep going? |
| 8 | MS. MAYO:  Katie Mayo on behalf of the |
| 9 | Plaintiff with Levin Papantonio. |
| 10 | MS. MEYER:  Julie Fix Meyer, Armstrong |
| 11 | Teasdale, on behalf of Cardinal Health. |
| 12 | MR. YINGLING:  Patrick Yingling with Reed |
| 13 | Smith on behalf of AmerisourceBergen Drug |
| 14 | Corporation. |
| 15 | MR. BEISELL:  Patrick Beisell, Jones Day, on |
| 16 | behalf of Defendant Walmart. |
| 17 | MS. DESH:  Sharon Desh from Bartlit Beck on |
| 18 | behalf of Walgreens. |
| 19 | MR. SWANSON:  Brian Swanson from Bartlit Beck |
| 20 | on behalf of Walgreens. |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

Page 14

1    EDWARD KALETA,
2 called as a witness herein, having been first duly
3 sworn, was examined and testified as follows:
4    EXAMINATION
5 BY MR. GADDY:
6    Q.   Good morning, Mr. Kaleta.  Is it Kaleta
7 or Kaleta?
8    A.   Yes, Kaleta.
9    Q.   Kaleta.  My name is Jeff Gaddy.  I
10 represent the Plaintiffs in this matter, and I'm
11 going to ask you some questions this morning.
12    As your attorney referenced just before
13 we started today, not only are you being deposed as
14 a fact witness, but also you're designated on a
15 30(b)(6) topic, correct?
16    A.   Yes.
17    Q.   Okay.  So, what I expect or what I plan
18 to do today is to take your fact testimony first
19 and before I start asking you questions as in your
20 capacity as the corporate designee, I'll make that
21 clear to you.  Okay?
22    A.   Okay.
23    Q.   Where do you work?
24    A.   I work at Walgreens.

Page 15

1    Q.   What's your title?
2    A.   My current title is vice president of
3 federal government relations and U.S. public
4 policy.
5    Q.   And how long have you held that
6 position?
7    A.   About three years.
8    Q.   What was your position before that?
9    A.   Before that I was the senior director of
10 federal government relations.
11    Q.   And was that your position going back to
12 2011?
13    A.   Yes.
14    Q.   Has all of your duties at Walgreens
15 since you began in 2011 involved federal government
16 relations?
17    A.   Going back to 2011, some of my duties
18 have involved federal government relations.
19    Q.   To perform your duties in that position,
20 are you registered as a lobbyist?
21    A.   That's correct.  I'm a registered
22 lobbyist.
23    Q.   How long have you been a registered
24 lobbyist for Walgreens?

Page 16

1    A.   I've been a registered lobbyist for
2 Walgreens dating back to 2011.
3    Q.   And do you have other individuals within
4 your department or division who are also lobbyists?
5    A.   Yes.  There are other individuals on the
6 team that are registered lobbyists.
7    Q.   Okay.  In your position as vice
8 president of federal government affairs, do you
9 have a team that reports to you?
10    A.   Yes.  I have individuals that report to
11 me as part of the federal government relations
12 portion of my position.
13    Q.   Okay.  How many people?
14    A.   There are -- can you be a little more
15 specific on the team or?
16    Q.   Sure.  How many lobbyists work
17 underneath you and report to you?
18    A.   So, as part of the federal government
19 relations team, there are two other registered
20 lobbyists.
21    Q.   Who do you report to?
22    A.   I report to Chuck Greener.
23    Q.   What's his position?
24    A.   Chuck Greener is the senior vice

Page 17

1 president for global public affairs,
2 communications, government relations.
3    Q.   Does your division have the sole
4 responsibility for federal lobbying within
5 Walgreens?
6    A.   There are other individuals who at
7 different times, other individuals, other
8 departments throughout the company that may
9 contribute on a limited basis.
10    But as far as having the main
11 responsibility on behalf of the company for
12 lobbying, I think the answer to your question would
13 be yes.
14    Q.   Okay.  Who are the other two folks that
15 are lobbyists who report to you?
16    A.   Alethia Jackson and Katie Bond Troller.
17    Q.   Would it be fair to say that you,
18 Ms. Jackson and Ms. Troller are the primary
19 individuals who conduct federal lobbying on behalf
20 of Walgreens?
21    A.   Yes.  That's fair to say.
22    Q.   Does -- I'm sorry, but I think you said
23 you report to Charles -- is it Greenbriar?
24    A.   Chuck Greener.

Page 18

1    Q.    Chuck Greener.  Thanks.
2         Is he registered as a lobbyist also?
3    A.    He is not.
4    Q.    Does your division have a budget for
5    federal lobbying activities?
6    A.    The government relations team overall
7    has a budget, yes.
8    Q.    Does that budget cover things like
9    political contributions by Walgreens?
10   A.    No.  Those are separate.
11   Q.    Okay.  Does the federal government
12   relations team's budget, does that include dues or
13   contributions to trade associations?
14   A.    That is a portion of the government
15   relations budget, yes, dues for trade associations.
16   Q.    Does that also include any payments to
17   consulting groups?  Does that come out of that
18   budget?
19   A.    Yes.  As part of the overall government
20   relations budget, there is also money allocated for
21   outside consultants.
22   Q.    Okay.  Does Walgreens utilize outside
23   consultants to assist with its lobbying efforts?
24   A.    We have utilized outside consultants to

Page 19

1    assist with lobbying, yes.
2    Q.    And do those outside consultants, do
3    they perform lobbying on behalf of Walgreens?
4    MR. SWANSON:  Object to form.
5    BY THE WITNESS:
6    A.    Our outside consultants perform
7    different responsibilities on our behalf.  Some of
8    them do include direct lobbying, yes.
9    BY MR. GADDY:
10   Q.    So, in addition to you and the other two
11   members of your team who are registered as
12   lobbyists to advocate on behalf of Walgreens,
13   Walgreens also employs or hires outside consultants
14   who also will do direct lobbying on behalf of
15   Walgreens, is that correct?
16   MR. SWANSON:  Object to form.
17   BY THE WITNESS:
18   A.    Yes, that is correct.
19   BY MR. GADDY:
20   Q.    And as a lobbyist your goal is to
21   influence federal legislation on behalf of
22   Walgreens?
23   A.    No.  No.  I wouldn't characterize it
24   that way.

Page 20

1    Q.    Will you agree that as a lobbyist your
2    goal is to promote Walgreens' positions or agendas
3    at the Federal Government level?
4    A.    No.  I believe that the job of the team
5    as it relates to federal government relations is to
6    share relevant information with elected officials
7    and their staff on issues of importance to
8    Walgreens.
9    Q.    You're not trying to influence
10   politicians with the information that you provide
11   them?
12   MR. SWANSON:  Object to form, vague.
13   BY THE WITNESS:
14   A.    No.  We're trying to share relevant
15   information on issues of importance to the company.
16   BY MR. GADDY:
17   Q.    Why do you want to share information
18   with them?
19   A.    Each year and each session of Congress
20   there is hundreds, if not thousands, of bills that
21   are introduced, some of which have an impact on
22   Walgreens, others that do not.
23        I believe that our role in the federal
24   government relations team is to try to share

Page 21

1    relevant information on behalf of Walgreens on
2    issues of importance to the company.
3    Q.    The purpose of sharing the information
4    is so they can know how that particular piece of
5    legislation will impact Walgreens?
6    A.    I think in some cases the goal is to
7    share that information in order to have them better
8    understand how different pieces of legislation may
9    impact the company.
10   Q.    And you want them to see how the
11   legislation will impact Walgreens from Walgreens'
12   perspective, correct?
13   A.    I think it depends.  I think there is
14   different issues and there is different outcomes.
15   There is also different impacts relative to our
16   patients, relative to our employees or relative to
17   the company overall.
18   Q.    Is there an aspect of your position that
19   is related to public relations?
20   A.    I think -- it's kind of a vague
21   question.  It depends on the definition of public
22   relations.
23   Q.    Would you consider your primary
24   responsibility or primary job duty to revolve

Page 22

1 around the lobbying functions that you perform?

2 A. Primary? No. I wouldn't say it's

3 necessarily primary. I think it depends on what is

4 going on with Congress, what's going on with the

5 administration, which issues may be brought up for

6 discussion.

7 But I wouldn't say that my primary focus

8 on any given day is lobbying. Some days it is.

9 Other days it may revolve more around policy

10 development. Other days it may revolve around

11 other issues of importance to the company that may

12 not have anything to do with lobbying per se.

13 Q. But it's fair to say that some aspect of

14 your -- of your job or at least on some days

15 involves public relations, press events,

16 coordinating those types of functions?

17 A. We have a -- so, the short answer to

18 that question is probably no. We have a

19 communications team that handles media inquiries,

20 press events, press releases. That's separate and

21 distinct from what we do in federal government

22 relations.

23 Q. The budget for you and your team as it

24 relates to -- to the lobbying activities that you

Page 23

1 do, what is that budget?

2 MR. SWANSON: Object to form.

3 BY THE WITNESS:

4 A. Can you repeat the question.

5 BY MR. GADDY:

6 Q. Sure. Let me ask it this way. Does

7 your group, federal government affairs, does it

8 have a budget?

9 A. So, the larger government relations

10 team, which includes federal, state, local policy

11 and other couple functions, has an overall budget.

12 Q. What is that budget?

13 A. It varies from year to year depending.

14 Q. What is it this year?

15 A. I don't know if I can say with certainty

16 what it is for 2018. I could probably guesstimate

17 that that budget is somewhere around 8 to

18 $10 million.

19 Q. And is that -- would that be a fair

20 guesstimate, going back to when you started with

21 the company in 2011, for what it was on a yearly

22 basis?

23 A. I don't know. I didn't have exposure or

24 access to that type of information back when I

Page 24

1 started in 2011.

2 Q. Okay. Going back for I guess the last

3 three years when you did have access to that

4 information, would that be a fair guesstimate for

5 the last couple of years?

6 A. It's probably a little bit -- may have

7 been a little bit less one or two of those years,

8 but it's probably a fair estimate, yes.

9 Q. Okay. You told me that contributions to

10 trade associations would come out of that budget,

11 payments to consulting groups would come out of

12 that budget.

13 What else would come out of that 8 to

14 $10 million that Walgreens budgets for federal

15 government affairs on an annual basis?

16 A. Office supplies, travel back to Chicago

17 to headquarters of Walgreens, computers,

18 publications, online publications, salaries, of

19 course, for team members.

20 Q. As we sit here today, do you acknowledge

21 that the United States is in the midst of an opiate

22 crisis?

23 MR. SWANSON: Object to form.

24 BY THE WITNESS:

Page 25

1 A. I'm not sure that I can say relative to

2 that term. Can you be -- can you provide a little

3 bit more information?

4 BY MR. GADDY:

5 Q. Would you in your personal capacity

6 consider the United States to be in the midst of an

7 opioid crisis?

8 MR. SWANSON: Object to form.

9 BY THE WITNESS:

10 A. I think that there are a number of

11 challenges related to the opioid epidemic that have

12 been going on for some period of time with more or

13 less exposure put on certain issues over the last

14 several years. It's probably how I'd look at it.

15 BY MR. GADDY:

16 Q. You don't think we are in the middle of

17 an opioid epidemic?

18 MR. SWANSON: Object to form, asked and

19 answered.

20 BY THE WITNESS:

21 A. I think that there is a lot of

22 challenges related to the opioid epidemic, some of

23 which have been more highlighted recently than in

24 other times.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

BY MR. GADDY:

Q. Yes or no. Are we in the middle of an opioid epidemic?

MR. SWANSON: Object to form, asked and answered.

BY THE WITNESS:

A. Again, I'm not familiar with -- I don't know if I would characterize what's going on in the company -- what's going on in the country with that terminology. I think there is a lot of different ways to look at what's going on with the opioid crisis and its impact on communities as well as patients.

BY MR. GADDY:

Q. Okay. When you started at Walgreens in 2011, did anybody at Walgreens tell you that the U.S. was in the midst of an opioid crisis?

A. I'm not sure I can recall seven years ago if anybody used that language. But if I had to hazard a guess, I'd say no, I don't recall anybody coming up to me when I started with the company and using that terminology.

Q. When you started with Walgreens in 2011, did anybody at Walgreens provide you with any

Page 27

education or training on the scope of the opioid epidemic in the U.S.?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. When I joined the company, I was trained about things related to my particular position, which largely consisted of issues that had been of importance to the company prior to me joining as well as other aspects of the government relations team.

BY MR. GADDY:

Q. You don't remember anything specific about the opioid crisis or drug abuse as it relates to opioids, do you?

A. I do not.

Q. Okay. Anybody give you any training or education when you started at Walgreens in a -- as a federal lobbyist for Walgreens on the scope of opioid-related overdoses in the country?

A. I don't recall seven years ago having that type of information shared with me.

Q. Did anybody at Walgreens when you started as a federal lobbyist for the company have on your agenda any activities in federal government

Page 28

relations related to combating the opioid crisis back in 2011?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. Can you tell me what you mean by "activities"?

BY MR. GADDY:

Q. Sure. When you started with Walgreens back in 2011 as a lobbyist for Walgreens, did anybody ask you to go to D.C. and make combating the opioid crisis a part of your -- your agenda and therefore Walgreens' agenda back in 2011?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. So, I'm based in Washington, D.C., so I didn't have to go there. But in terms of was one of the key issues presented to me early on when I got there in 2011 revolving around the opioid crisis, I would recall that, no.

BY MR. GADDY:

Q. Okay. I'm going to show you what I'm going to mark as Kaleta 1.

(WHEREUPON, a certain document was marked as Walgreens-Kaleta Exhibit

Page 29

No. 1: GAO Report to Congressional Requesters, Prescription Drugs, OxyContin Abuse and Diversion and Efforts to Address the Problem; P-GEN-0007.)

BY MR. GADDY:

Q. Ask you to take a look at this document. Do you know if you've ever seen this before?

MR. SWANSON: Counsel, mine is marked as a different exhibit. Was this used in a different deposition?

MR. GADDY: It looks like it was used in a Cardinal Health deposition.

MR. SWANSON: So you are re-marking it as Kaleta 1 in this deposition.

MR. GADDY: Right.

MR. SHAPLAND: And for those on the phone, if the document has a Bates number, could you read the Bates number into the record, please.

MR. GADDY: We could do that at the end of the deposition if you want that to be done.

MR. SHAPLAND: Oh, no. During the deposition I'd like the Bates number for an exhibit read into

Page 30

1  the exhibit so that I can pull it up and look at
2  it. Thank you.
3      MR. GADDY: We're not going to do that during
4  the course of the deposition.
5  BY MR. GADDY:
6      Q. Have you seen this document before?
7      MR. SWANSON: Why are you unwilling to read
8  the Bates number on the record? I don't
9  understand.
10     MR. GADDY: This document doesn't have a Bates
11  number.
12     MR. SWANSON: So why don't you tell him there
13  is no Bates number on it?
14     MR. SHAPLAND: Yeah, that would be a fair --
15     MR. SWANSON: There is no Bates number on the
16  document.
17     MR. SHAPLAND: Thank you.
18  BY MR. GADDY:
19     Q. Have you seen this document before?
20     A. I don't believe so, no.
21     Q. You recognize this to be a report from
22  the United States General Accounting Office?
23     A. I mean, it says "United States General
24  Accounting Office" at the top, so...

Page 31

1      But I have no idea what's in the report.
2  It's obviously several, several pages with a lot of
3  small print. So...
4      Q. Are you familiar with the GAO?
5      A. Yes, I'm familiar with the General
6  Accounting Office.
7      Q. What do you understand it to be?
8      A. There is a myriad of functions. I know
9  that they -- one of the functions is that they
10  produce reports at Congress' request.
11     Q. And do you see under where it says the
12  "United States General Accounting Office," this
13  indicates it's a report to Congressional
14  Requesters?
15     A. I do see.
16     Q. And do you see in the left-hand side of
17  the page this is a report from back in December of
18  2003?
19     A. I see that it says that, yes.
20     Q. And the title of the report is
21  "OxyContin Abuse and Diversion and Efforts to
22  Address the Problem."
23      Do you see that?
24     A. I do.

Page 32

1      Q. Do you recall when you started back in
2  2011 at Walgreens whether or not anybody at the
3  company made you aware of this report from 2003?
4      A. I don't recall that.
5      Q. If you'd flip for me to -- up in the top
6  right-hand corner, as you turn the pages, there
7  will be dots kind of indicating the page number.
8  Turn to .2. Do you see that?
9      A. No, I don't. Oh, yeah. Up here?
10     Q. Yes.
11     A. Okay.
12     Q. Do you see here there is the section
13  that says "What GAO Found"?
14     A. No. I see it says "What GAO
15  Recommends," and then there is a section that says
16  "What GAO Found."
17     Q. Right. That's where I am.
18      First of all, you understand that back
19  in 2011 Walgreens, in addition to being a
20  pharmaceutical dispenser at their pharmacies, also
21  were a pharmaceutical distributor of these drugs to
22  themselves, correct?
23     A. No. I don't have any knowledge of that
24  role or responsibility for Walgreens in 2011. I

Page 33

1  was hired in the federal government relations team
2  and did not have exposure to that.
3      Q. Okay. You understand that OxyContin,
4  which we saw is the subject of this report, is a
5  drug that Walgreens dispenses at its pharmacies?
6      A. So, I've never seen this report before.
7  I have no idea what it says. So, I can't answer
8  that question.
9      Q. Well, it says "OxyContin" on the
10  first -- in the title of the report, correct?
11     A. Yeah, I see that part.
12     Q. Okay. My question is whether or not you
13  have an understanding that OxyContin is a drug that
14  Walgreens has dispensed from their pharmacies?
15     MR. SWANSON: Object to form.
16  BY THE WITNESS:
17     A. Ever?
18  BY MR. GADDY:
19     Q. Yeah.
20     A. I'm assuming that Walgreens -- I'm not a
21  pharmacist, right. I'm a lobbyist and I do policy
22  work. So, I'm not super-familiar with dispensing
23  requirements and which drugs are for what.
24      But I think if the -- if you're asking

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 whether or not Walgreens at some point dispensed
2 OxyContin, I believe the answer to that question is
3 probably yes.
4     Q.   You say the answer to that question is
5 probably yes. You are telling me as you sit here
6 today you don't know whether or not Walgreens
7 dispensed OxyContin?
8     A.   Well, your question is super-vague.
9 Ever, yesterday, 6 years ago, 10, 15 years ago?
10 I'm not familiar with the company's operations.
11     Q.   You asked "Ever" and I said sure, ever.
12     A.   So, the answer to the question would be
13 yes.
14     Q.   Walgreens dispenses OxyContin currently,
15 correct?
16     A.   I believe that's correct, yes.
17     Q.   Walgreens didn't decide to stop
18 dispensing OxyContin because of anything going on
19 with the opioid epidemic, did they?
20     MR. SWANSON:  Object to form.
21 BY THE WITNESS:
22     A.   Yeah, so, I'm not a pharmacist.  I work
23 in the government relations area and we also do
24 policy support.

Page 35

1     What I do know is in my experience on
2 the government relations side of things, we are
3 constantly trying to assess the balance between
4 patients' needs as well as challenges that exist
5 with different drugs and issues related to them.
6     Q.   Okay.  I understand that.  What I'm
7 asking is whether or not Walgreens has made a
8 decision to stop dispensing OxyContin.  Do you know
9 the answer to that?
10     A.   I don't know the answer to that.  I
11 don't believe we have made a decision to stop.  I
12 believe we've done a number of things related to
13 good faith dispensing, patient awareness, a whole
14 bunch of other things that we're doing in the
15 pharmacy side that I -- would be better answered by
16 folks on the operations team.
17     Q.   In the second paragraph that starts
18 "Several factors."  Do you see where I am?
19     A.   I do.
20     Q.   It says, "Several factors may have
21 contributed to the abuse and diversion of
22 OxyContin.  The active ingredient in OxyContin is
23 twice as potent as morphine, which may have made it
24 an attractive target for misuse."

Page 36

1     Do you see that?
2     A.   I see the sentence you just referenced,
3 yes.
4     Q.   Were you aware of that?
5     A.   No.
6     Q.   "Further," it says, "the original
7 label's safety warning advising patients not to
8 crush the tablets because of the possible rapid
9 release of a potentially toxic amount of oxycodone
10 may have inadvertently alerted abusers to methods
11 for abuse." It says, "Moreover, the significant
12 increase in OxyContin's availability in the
13 marketplace may have increased opportunities to
14 obtain the drug illicitly in some states."
15     Did I read that correctly?
16     A.   That's what is on this page, yes.
17     Q.   Was this information that you were aware
18 of prior to reading it just now?
19     A.   There's a lot of information here.  Most
20 of this information is not something that I have
21 been exposed to based on my role at Walgreens.
22     Q.   If you don't mind, turn for me to
23 page 7.  It will be .7 at the top.
24     A.   Okay.  .7.

Page 37

1     Q.   Yeah.  Do you see the paragraph in the
2 middle of the page that starts, "In early 2000"?
3     A.   I do.
4     Q.   It says, "In early 2000, media reports
5 began to surface in several states that OxyContin
6 was being abused - that is, used for
7 non-therapeutic purposes or for purposes other than
8 those for which it was prescribed - and illegally
9 diverted."
10     Do you see that?
11     A.   I see what you just read, yes.
12     Q.   When you started at Walgreens as a
13 federal lobbyist, did anybody make you available
14 that going back to early 2000 media reports had
15 began to surface that OxyContin was being abused?
16     MR. SWANSON:  Object to form; compound.
17 BY THE WITNESS:
18     A.   I don't recall information like this
19 being shared with me when I started at Walgreens.
20 BY MR. GADDY:
21     Q.   It uses a term there "diverted," the
22 last sentence of that sentence that we just read.
23 Does that mean anything to you?
24     A.   Does what mean anything to me?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.   The term "diverted."  Does that have any
2  particular meaning to you?
3    A.   As a general word or in this sentence?
4    Q.   In the context of prescription drugs,
5  specifically opioids?
6    A.   I don't know if I understand your
7  question.
8    Q.   Are you aware of the concept of
9  diversion?
10   A.   I have read about and am familiar with
11 the -- a concept of diversion, yes.
12   Q.   As it relates to prescription narcotics?
13   A.   As it relates to I would say drugs.
14 More generally.
15   Q.   What does it mean to you?
16   A.   I'd have to think about that.  So,
17 diversion to me I assume, I would -- I would say
18 means that something ended up in the wrong place.
19 It was diverted.
20      So, going -- I would go to the actual
21 definition of the word.  Diversion means to not be
22 delivered to the place it was intended to,
23 something to that effect.
24   Q.   And when we're talking about

Page 39

1  prescription opioids, that can happen through
2  concepts such as doctor shopping, correct?
3    MR. SWANSON:  Object to form.
4  BY THE WITNESS:
5    A.   I'm not familiar with doctor shopping
6  per se.  Can you be -- I don't know if I understand
7  your question.
8  BY MR. GADDY:
9    Q.   You have never heard of the concept of
10 doctor shopping?
11   A.   I've heard of the concept of doctor
12 shopping, but I'm not sure what the question is.
13   Q.   I'm asking whether or not doctor
14 shopping can lead to diversion of prescription
15 opioids?
16   MR. SWANSON:  Object to form.
17 BY THE WITNESS:
18   A.   So, I'm on the government relations
19 team, and we also perform policy support on behalf
20 of the company.
21      I don't have expertise in that area of
22 whether doctor shopping can lead to diversion.
23 BY MR. GADDY:
24   Q.   Okay.  So, in your role as the vice

Page 40

1  president of government affairs for Walgreens, the
2  person who goes to D.C. and speaks with -- with
3  politicians or regulators on behalf of the company,
4  you don't have a concept of how doctor shopping
5  leads to diversion?
6    MR. SWANSON:  Object to form.
7  BY THE WITNESS:
8    A.   So, my title is actually vice president
9  of federal government relations and U.S. public
10 policy.  I don't have responsibility for the whole
11 team.
12      And your question beyond that was?  Was
13 what?
14 BY MR. GADDY:
15   Q.   Was in that role you don't have an
16 understanding of how doctor shopping can lead to
17 diversion.  Is that true or false?
18   A.   I'm not familiar with the legal
19 ramifications of doctor shopping and how and why it
20 occurs and how diversion plays a role in that with
21 specifics, no.  I'm not intimately familiar with
22 that.
23   Q.   Okay.  Let's keep reading.  It says,
24 "According to FDA and the DEA, the abuse of

Page 41

1  OxyContin is associated with serious consequences,
2  including addiction, overdose and death."
3      Do you see that?
4    A.   I do.
5    Q.   It says, "When OxyContin was approved,
6  the Federal Government classified it as a
7  Schedule II controlled substance under the CSA
8  because it has a high potential for abuse and may
9  lead to severe psychological or physical
10 dependence."
11      Do you see that?
12   A.   I do.
13   Q.   When you started with Walgreens in 2011,
14 did anybody at the company make you aware that
15 OxyContin abuse is associated with addiction,
16 overdose and death?
17   A.   I don't recall when I came to the
18 company in 2011 whether that information was shared
19 with me or not.
20   Q.   At any point in time during your time
21 with Walgreens has anyone ever shared with you that
22 information about OxyContin?
23   A.   I can't recall if anybody has ever
24 shared it with me.  I can state that I've read that

Page 42

1 before.
2 Q. Okay. Is that something that you set
3 out on your own and were able to do some
4 independent research on and determine for yourself?
5 A. It's something that I can recall reading
6 either in a newspaper publication, a report, some
7 type of analysis that's been done on different
8 issues before, but I can't say specifically where I
9 read it.
10 Q. Okay. And approximately when did you
11 gain that knowledge?
12 A. At some point over probably the last few
13 years, several years. I don't know if I can -- I
14 can't say for sure.
15 Q. It's not information that was given to
16 you or provided to you by Walgreens?
17 A. I don't --
18 MR. SWANSON: Object to form.
19 BY THE WITNESS:
20 A. I don't believe so.
21 BY MR. GADDY:
22 Q. It goes on to say, "DEA has
23 characterized the pharmacological effects of
24 OxyContin and its active ingredient oxycodone as

Page 43

1 similar to those of heroin."
2 Do you see that?
3 A. I do.
4 Q. Same question I've been asking.
5 Did Walgreens when you started back in
6 2011 make you aware that they were dispensing, that
7 Walgreens was dispensing a drug in OxyContin that
8 had effects similar to those of heroin?
9 A. I don't recall anybody with Walgreens
10 sharing that information when I joined the company
11 in 2011.
12 Q. Okay. Do you recall anybody at
13 Walgreens ever sharing that information with you?
14 A. I don't recall.
15 Q. Turn, please, to page 14. Do you see
16 the paragraph at the bottom of this page that
17 starts "Media reports"?
18 A. I do.
19 Q. It says, "Media reports of OxyContin
20 abuse and diversion began to surface in 2000.
21 These reports first appeared in rural areas of some
22 states, generally in the Appalachian region, and
23 continued to spread to other rural areas and larger
24 cities in several states."

Page 44

1 Do you see that?
2 A. I see the sentence you just read, yes.
3 Q. It goes on to say, "Rural communities in
4 Maine, Kentucky, Ohio, Pennsylvania, Virginia and
5 West Virginia were reportedly being devastated by
6 the abuse and diversion of OxyContin."
7 Did I read that correctly?
8 A. Yes.
9 Q. When you started with Walgreens in 2011,
10 did anybody with the company tell you that going
11 back to the early 2000s, that there were reports
12 that these rural communities in places like Ohio
13 and West Virginia were being devastated by abuse
14 and diversion of OxyContin?
15 MR. SWANSON: Object to form.
16 BY THE WITNESS:
17 A. I don't recall anyone with Walgreens
18 sharing this information with me when I started in
19 2011. They may have. I don't recall.
20 BY MR. GADDY:
21 Q. Has anybody -- do you recall anybody at
22 Walgreens ever sharing with you that information
23 that we just read right there, that rural
24 communities in Ohio, West Virginia, Kentucky are

Page 45

1 being devastated by the abuse and diversion of
2 OxyContin?
3 MR. SWANSON: Object to form.
4 BY THE WITNESS:
5 A. I don't recall specifically anyone with
6 Walgreens sharing that information, but it could
7 have been shared with me on a different capacity or
8 a different type of summary or in a different way.
9 BY MR. GADDY:
10 Q. And your job as a federal lobbyist is to
11 share, I think what you said earlier, is to share
12 information with -- with the men and women of
13 Congress about issues that are important to
14 Walgreens, correct?
15 A. And their staffs, that's correct.
16 Q. And their staffs. Okay.
17 And throughout your time at Walgreens,
18 nobody at the company has shared with you this
19 information for you to pass on to the men and women
20 of Congress and their staffs as it relates to your
21 lobbying efforts on behalf of Walgreens, correct?
22 MR. SWANSON: Object to form; mischaracterize.
23 BY THE WITNESS:
24 A. So, there is a lot of information here.

Page 46

1 This talks about OxyContin abuse. And, again, I've
2 never seen this before so I'm just reading it for
3 the first time.
4      This provides information dating back to
5 2000, and I'm not familiar with this information,
6 as I mentioned.
7      So, if your question is whether anybody
8 at Walgreens has shared information with me related
9 to some of these topics, the answer is yes. But I
10 can't say that anybody has specifically talked to
11 me about the information as it's presented in this
12 report.
13     Q.    Okay. When was the first time that you
14 recall somebody at Walgreens talking to you about
15 the opioid epidemic and the impact that it's having
16 on communities in the United States?
17     A.    I can recall having information shared
18 with me by folks at Walgreens over the last few
19 years.
20     Q.    Okay. Few meaning two, three?
21     A.    Three, five. Somewhere in there. I
22 don't know that I can say specifically. I would
23 say somewhere maybe in the three to four to five
24 range.

Page 47

1     Q.    I show you what I will mark as Kaleta 2.
2          (WHEREUPON, a certain document was
3          marked as Walgreens-Kaleta Exhibit
4          No. 2: Congressional Report,
5          "OxyContin: Its use and abuse,"
6          etc., August 28, 2001; P-GEN-0047.)
7 BY MR. GADDY:
8     Q.    Do you recognize this document?
9          You still got the first one in front of
10 you.
11     A.    It looks to be -- the front page --
12     MR. SWANSON: It's the one you just gave him.
13 BY THE WITNESS:
14     A.    It looks to be the same.
15 BY MR. GADDY:
16     Q.    My fault. Sorry about that.
17     A.    That's all right.
18     Q.    All right. Let's try again.
19          Do you recognize this document?
20     A.    I do not.
21     Q.    And do you see the title there on the
22 first page says, "OxyContin: its abuse and abuse:
23 hearing before the Subcommittee on Oversight and
24 Investigations of the Committee on Energy and

Page 48

1 Commerce, House of Representatives, 107th Congress,
2 first session, August 28, 2001."
3      Do you see that?
4     A.    I do.
5     Q.    And from your experience as a federal
6 lobbyist for Walgreens, you're familiar with the
7 concept that Congress has committees and
8 subcommittees and that sometimes those committees
9 and subcommittees hold hearings and take testimony
10 from folks on certain issues?
11     A.    Yes. I'm familiar with that concept.
12     Q.    And do you see below the title there we
13 see that this is, and we saw it actually in the
14 title, but also see below there that the date of
15 this, of this document is 2001?
16     A.    Yes. I see that.
17     Q.    Do you recall when you started with
18 Walgreens in 2011 as a federal lobbyist whether or
19 not anybody at Walgreens directed you to this
20 testimony that was provided to Congress on the --
21 on "OxyContin: its use and abuse"?
22     A.    I don't recall if that happened, no.
23     Q.    At any time since you've been at
24 Walgreens, even over the past few years when you

Page 49

1 say that you have received some information about
2 the opioids and the impacts that they're having on
3 communities, did anybody direct you back to this
4 Congressional testimony from 2001?
5     A.    I don't believe so.
6     Q.    Did you have the opportunity to find it
7 on your own through independent research or
8 articles or whatnot?
9     A.    So, I don't know what's in here. I may
10 have read summaries of what's in here. But I don't
11 recall receiving this or seeking it on my own.
12     Q.    Okay. If you would, turn to page 6 for
13 me, please. Upper right-hand corner there should
14 be some dash.
15     A.    Uh-huh.
16     Q.    And see that the top of the page says
17 "OxyContin: its use and abuse," and then has the
18 date, Tuesday, August 28, 2001.
19      Do you see that?
20     A.    I do.
21     MR. SWANSON: Hang on.
22     THE WITNESS: Tuesday, August 28, 2001.
23     MR. GADDY: Upper right-hand corner, Brian,
24 there should be like a dash and then a number.

Highly Confidential – Subject to Further Confidentiality Review

Page 50

1    MR. SWANSON: Oh, okay. Thank you.
2   BY MR. GADDY:
3    Q.   Do you see about halfway down the
4   page there is a paragraph that starts "The use and
5   abuse of OxyContin"?
6    A.   Yes, I see where that is.
7    Q.   And it says, "The use and abuse of
8   OxyContin provides quite a dilemma for us in
9   Congress and for the American public.  For some,
10  OxyContin is the angel of mercy; for others, it is
11  the angel of death."
12       Do you see that?
13   A.   I do.  I see that sentence.
14   Q.   It says, "To those who suffer severe
15  chronic pain, it brings welcome relief.  But for
16  those who abuse this highly addictive drug, it can
17  bring even greater suffering."
18       Do you see that?
19   A.   I do see that sentence, yes.
20   Q.   Goes on to say that "Today we will hear
21  from law enforcement officials who argue that
22  OxyContin is quickly becoming the abuser's drug of
23  choice, surpassing heroin and cocaine in some
24  jurisdictions."

Page 51

1        Do you see that?
2    A.   I do see that sentence, yes.
3    Q.   Prior to coming here to testify today,
4   did you have an understanding that going all the
5   way back to 2001 that the use and abuse of opioids
6   such as OxyContin were surpassing heroin and
7   cocaine as drugs of choice among folks in this
8   country?
9    MR. SWANSON: Object to form.
10  BY THE WITNESS:
11   A.   I can't recall that I knew that going
12  back to 2001.  I'm obviously aware that OxyContin
13  is a -- is an addictive substance.
14  BY MR. GADDY:
15   Q.   And this is a full decade before you
16  started with Walgreens, correct?
17   A.   This document you mean?
18   Q.   Correct.
19   A.   Yes.  This would have been roughly ten
20  years before I started at Walgreens, that's
21  correct.
22   Q.   And when you started at Walgreens ten
23  years after this testimony is being provided to
24  Congress about OxyContin being the abuser's drug of

Page 52

1   choice, do you recall anybody at Walgreens making
2   you aware of that so that you could have that
3   information when you went to Capitol Hill and
4   talked to Congressmen and women on behalf of issues
5   that were important to Walgreens?
6    MR. SWANSON: Object to form.
7   BY THE WITNESS:
8    A.   So, is your question whether they shared
9   this document with me?
10  BY MR. GADDY:
11   Q.   Whether they shared this information
12  with you in 2011 that OxyContin had been being used
13  and abused going all the way back for ten years
14  prior to you starting with the company?
15   MR. SWANSON: Object to form.
16  BY THE WITNESS:
17   A.   I don't recall when I started in 2011
18  this specific information being shared with me; but
19  as I've said in my testimony, I've had information
20  shared with me over the last seven years, some of
21  which is related to OxyContin.
22  BY MR. GADDY:
23   Q.   I show you what I'll mark as Kaleta 3.
24  P-WAG-1845.

Page 53

1        (WHEREUPON, a certain document was
2        marked as Walgreens-Kaleta Exhibit
3        No. 3:  6/7/17 e-mail string;
4        WAGMDL00038786 - 00038791.)
5   BY MR. GADDY:
6    Q.   I will represent to you this is an
7   e-mail chain.  If you would, turn for me to page --
8   if you look down at the -- at the bottom of the
9   page, the Bates number for where I'm going to start
10  is 38790.
11   MR. SHAPLAND:  Could you read the full Bates
12  number, please.
13   MR. GADDY:  That's it 39790.
14   MR. SHAPLAND:  There is no prefix?
15   MR. GADDY:  These are all going to be
16  Walgreens MDL documents.
17   MR. SHAPLAND:  That's helpful to let me know
18  that.  Thank you.
19       (Clarification requested by the
20        reporter.)
21   MR. SHAPLAND:  This is Eric Shapland.
22  BY MR. GADDY:
23   Q.   Are you with me?
24   A.   Yeah, I'm on page 38790.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    Q.    And do you see it starts out with the
2   e-mail from Lauren Stone to you at the bottom of
3   the page?
4    A.   Yes.
5    Q.    And the subject of this e-mail is
6   "Opioid addiction ages."
7        Do you see that?
8    A.   I do see that.
9    Q.    This is an e-mail from it looks like
10  about a year and a half ago, June of last year,
11  correct?
12   A.   That's correct.
13   Q.    And she says, "Hi Ed, I am hoping you
14  can provide me with some information on what age
15  people are likely to start abusing prescription
16  drugs.  We are now looking at how our partnership
17  with WE develops over this next year and we are
18  moving in the direction of opioid abuse prevention
19  and education.  The audience for the WE activities
20  is about 11 to 16 years old."
21       Do you see that?
22   A.   I do.
23   MR. SWANSON:  Objection.  You just misread it.
24  That's on you.

Page 55

1    MR. GADDY:  What did I miss?
2    MR. SWANSON:  You missed "considering," among
3   other things.
4    MR. GADDY:  Okay.
5   BY MR. GADDY:
6    Q.   Do you see the words written there?
7    A.   Which ones?
8    Q.   The words that we just -- that we just
9   went over.
10   A.   I mean, you've just read portions of the
11  first three sentences, yes.
12   Q.   Okay.  And is this something that would
13  happen from time to time in your role, that you
14  would get requests for information from other folks
15  within the company?
16   A.   Yes.  That's something that happens in
17  my role.  I get requests from others in my company
18  for information.
19   Q.   And if you turn back two pages, Bates
20  No. is 38788, do you see you get a response to this
21  request ultimately comes from Steven Gregory.
22       Do you see that?
23   A.   Yes.  I see Steven Gregory's response to
24  Linn here.

Page 56

1    Q.    Okay.  And you're copied on this e-mail
2   as well, correct?
3    A.   Yes.
4    Q.    He says, "Hi Linn, below are stats on
5   adolescents aged 12 through 7."
6        This is in response to her question
7   about adolescents misusing opioids, correct?
8    A.   It says 12 to 17.
9    Q.   17.  Thank you.
10       This is in response to her request about
11  adolescents misusing opioids?
12   A.    This was in response to her request on
13  opioid addiction ages.
14   Q.   Okay.  Who is Steven Gregory?
15   A.   Steven Gregory is the senior director of
16  the -- and head of public policy.
17   Q.   Is he somebody that you work with to
18  help you do your job as a federal lobbyist for
19  Walgreens?
20   A.   So, I have two roles.  I'm the head of
21  federal government relations and I'm the head of
22  U.S. public policy.  Steven reports to me as head
23  of public policy.
24   Q.    And the stats that Steven provided here

Page 57

1   is that "In 2015, 276,000 adolescents were current
2   non-medical users of pain reliever with 122,000
3   having an addiction to prescription pain
4   relievers."
5        Do you see that?
6    A.   Yes, I see that sentence.
7    Q.    Second -- second bullet point states
8   that "In 2015, an estimated 21,000 adolescents had
9   used heroin in the past year, and an estimated
10  5,000 were current heroin users."
11       Do you see that?
12   A.   I see that sentence.
13   Q.   It goes on to say, "Additionally, an
14  estimated 6,000 adolescents had" -- I think what he
15  is trying to say "had a heroin use disorder in
16  2014."
17       Do you see that?
18   A.   I do.
19   Q.   Goes on to say that "People often share
20  their unused pain relievers, unaware of the dangers
21  of non-medical opioid use.  Most adolescents who
22  misuse prescription pain relievers are given them
23  for free by a friend or relative."
24       Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 　A.　I do.

2 　Q.　Final bullet point indicates, "The

3 prescribing rates for prescription opioids among

4 adolescents and young adults nearly doubled from

5 1994 to 2007."

6 　　　Do you see that?

7 　A.　I do.

8 　Q.　That last bullet point about the

9 prescription rates for adolescents doubling, that

10 happened before you even started with the company,

11 correct?

12 　A.　Yes.  I believe that's right, according

13 to -- assuming that that bullet point is accurate,

14 yes.

15 　Q.　Do you have any reason to believe that

16 it's not?

17 　A.　So, I didn't do this research obviously.

18 Steven on my team did.  I don't have any reason to

19 believe it's not accurate.

20 　Q.　I think he says right there below it,

21 "This information is sourced from the American

22 Society of Addiction Medicine 2016 Facts and

23 Figures."

24 　　　Do you see that?

Page 59

1 　A.　I do.

2 　Q.　And, again, you have no reason to doubt

3 the information?

4 　A.　I don't, but I've not read the American

5 Society of Addiction Medicine 2016 Facts and

6 Figures.

7 　Q.　When you started with Walgreens in 2011,

8 do you recall anybody at the company coming to you

9 and telling you that one issue that was important

10 to them was the fact that adolescents had had the

11 prescribing rate for opioids double from '94 to

12 2007?

13 　　MR. SWANSON:  Object to form.

14 BY THE WITNESS:

15 　A.　I don't recall that.  I do recall a

16 great deal of discussion around doctors

17 overprescribing.

18 BY MR. GADDY:

19 　Q.　Okay.  My question was whether or not

20 when you started in 2011, did anybody at Walgreens

21 come to you and tell you that an issue that would

22 be important to Walgreens and therefore one that

23 they want you to inform individuals about in D.C.

24 was that prescription rates for adolescents had

Page 60

1 doubled from '94 to 2007?

2 　　MR. SWANSON:  Object to form.

3 BY THE WITNESS:

4 　A.　When I started in 2011, I don't recall

5 anybody sharing that specific information.  What I

6 do recall as it relates to prescribing rates is

7 information that was shared to me about how doctors

8 prescription or prescribing rates had increased

9 significantly.  So, I recall that information being

10 shared.

11 BY MR. GADDY:

12 　Q.　You recall somebody back in 2011 sitting

13 down and talking to you about doctor prescribing

14 rates when you started with Walgreens?

15 　A.　No, not -- I can't pinpoint in 2011.

16 But I can say probably similar to the timeline I

17 referenced before, three, four, five years, I can

18 recall people sharing information with me around

19 that.

20 　Q.　Are you familiar with the fact that --

21 let me ask you this way.

22 　　　Do you agree or disagree that Walgreens

23 itself would have had its own information about the

24 number of opioids that they had prescribed or

Page 61

1 dispensed I should say to adolescents during that

2 time frame?

3 　　MR. SWANSON:  Object to form.

4 BY THE WITNESS:

5 　A.　So, as I mentioned before, I'm on the

6 government relations team.  I'm not familiar with

7 what type of information we have specific.  I would

8 assume we have prescribing rates, but I can't speak

9 to how that's broken out or anything related to it.

10 BY MR. GADDY:

11 　Q.　Would you expect that Walgreens would

12 have the information about the rates of Walgreens

13 dispensing opioids to adolescents over time?

14 　A.　I don't know the answer to that

15 question.

16 　Q.　Would you expect a company like

17 Walgreens to have that type of information about

18 their patients?

19 　　MR. SWANSON:  Object to form, calls for

20 speculation.

21 BY THE WITNESS:

22 　A.　Yes, I -- I don't know what the HIPAA

23 rules are around adolescents and prescription

24 rates.  I just don't -- I don't have that, that

Page 62

1 expertise.
2 BY MR. GADDY:
3    Q.   Would it be fair to say that over the
4 last year or two that a lot of your -- that some of
5 your time and attention has been focused on issues
6 related to the opioid crisis?
7    A.   I've spent a lot of time in my capacity
8 both as a lobbyist as well as with the public
9 policy team on a host of issues, some of them
10 relate to our Safe Medication Disposal Program,
11 some of them related to the Electronic Prescribing
12 Act that was part of the CARA bill.
13       That's how I have spent -- that's --
14 those are examples of how I spent my time.
15    Q.   Okay.  And we are going to talk about
16 the -- the drug take-back program a little bit.
17 That started rolling out in 2016, correct?
18    A.   Yes, I believe that's correct.
19    Q.   I'm going to show you what I'm going to
20 mark as Kaleta 4.
21       (WHEREUPON, a certain document was
22       marked as Walgreens-Kaleta Exhibit
23       No. 4:  11/2/16 e-mail with
24       attachment; WAGMDL00375070 -

Page 63

1       00375071.)
2 BY MR. GADDY:
3    Q.   And this document I'll represent to you
4 is a one-page document with an attachment on it,
5 and do you see this is an e-mail from November of
6 2016?
7    A.   11/2/16, yes.
8    Q.   Okay.  And the subject of the e-mail is
9 "Drug Take-Back Program"?
10    A.   Yes.  That's correct.
11    Q.   And it looks like you as well as several
12 other folks were copied on this e-mail.
13       Do you see that?
14    A.   Yes, I'm copied on this e-mail.  I'm
15 not -- I don't recall this e-mail and I don't
16 recall who Matt Pike is and I don't know who Marc
17 Falkin is.
18    Q.   Okay.
19    A.   But I do see that my name -- that I'm
20 copied on this e-mail.
21    Q.   Okay.  Well, you could see from Marc
22 Falkin, you can see from his e-mail address, he is
23 not with Walgreens.  He is actually from Actavis,
24 correct?

Page 64

1    A.   It appears so, yes.
2    Q.   Okay.  And so you could see this is an
3 e-mail from a Walgreens employee to an Actavis
4 employee?
5    A.   It appears this is from Matt Pike at
6 Walgreens to Marc Falkin at Actavis, yes.
7    Q.   And what Matt says here is "Marc, as you
8 may know, Walgreens is leading the fight against
9 prescription drug abuse with new programs to help
10 curb misuse of medications and the rise in overdose
11 deaths and it says see the attached pdf and link."
12       It goes on to say, "To that end, our
13 government relations group is asking my team's
14 assistance in connecting them with the government
15 relations groups from the largest manufacturers to
16 engage them in this effort."
17       Do you see that?
18    A.   I do.
19    Q.   And even though --
20    MR. YINGLING:  I'm sorry.  For the people on
21 the phone can you give the Bates number.
22    MR. GADDY:  375070.
23 BY MR. GADDY:
24    Q.   Even though you may not remember this

Page 65

1 specific e-mail, this concept of reaching out to
2 government relations groups with other -- whether
3 it's manufacturers or PBMs or distributors, is not
4 foreign to you, is it?
5    A.   As part of our Safe Medication Disposal
6 effort that I was involved with, we did reach out
7 to other entities in the supply chain, yes.
8    Q.   Okay.  And we saw there in the body it
9 referenced an attachment.  If you turn to the next
10 page for me, please.
11    A.   Yes.
12    Q.   And do you recognize this document?
13    A.   I do.
14    Q.   And is this document here -- it's got --
15 it says "Walgreens" up in the top left-hand portion
16 of the page.  This is a Walgreens document?
17    A.   Yes.
18    Q.   And the title is "Leading the Fight to
19 Prevent Drug Diversion and Drug Abuse."
20       Do you see that?
21    A.   I do.
22    Q.   And this was a document that Walgreens
23 would disseminate to other -- either to the public
24 or to other entities that stated Walgreens'

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 position as it relates to these issues, correct?
2     A.   Can you repeat the question.
3     Q.   Sure.  This is a document that Walgreens
4 would distribute to the public or to other
5 stakeholders, manufacturers, PBMs, distributors,
6 stating Walgreens' position and informing them of
7 Walgreens' efforts in this area, correct?
8     A.   I would say informing them of Walgreens'
9 efforts in this area.  I'm not sure that this gets
10 to positions per se.
11     Q.   Okay.  Let's see in the first -- in the
12 body there right under the title it says, "Drug
13 abuse continues to be a public health and safety
14 risk."
15         Do you see that?
16     A.   I do.
17     Q.   It says, "The National Survey on Drug
18 Use and Health estimate 6.5 million Americans
19 misused a prescription drug in 2014, while the
20 Centers for Disease Control and prevention reported
21 nearly 50,000 prescription and illicit drug
22 overdose deaths in the same year - a 140% increase
23 since 2000."
24         Do you see that?

Page 67

1     A.   I do.
2     Q.   It goes on to say, "Most people who
3 misuse prescription drugs first obtain them from a
4 family member or friend, often from a home medicine
5 cabinet, and can eventually graduate to using
6 illicit drugs such as heroin."
7         Do you see that?
8     A.   I do.
9     Q.   And that was not a surprise or that was
10 not new information to Walgreens, was it, that
11 people will commonly migrate from using and abusing
12 prescription drugs to using and abusing heroin?
13     MR. SWANSON:  Object to form, vague.
14 BY THE WITNESS:
15     A.   I don't understand your question.
16 BY MR. GADDY:
17     Q.   From your work at Walgreens, you
18 understand that to be something that Walgreens and
19 the people of Walgreens were aware of?
20     A.   This sentence says, "Most people who
21 misuse prescription drugs first obtain them from a
22 family member or friend, often from a home medicine
23 cabinet and can eventually graduate to using
24 illicit drugs such as heroin."

Page 68

1         I believe that is factual information.
2 It probably was provided to us from the CDC, as
3 referenced in the sentence before that.
4     Q.   Okay.  That wasn't a secret to people at
5 Walgreens, that individuals go from using and
6 abusing prescription drugs such as opioids to using
7 and abusing illicit drugs like heroin?
8     MR. SWANSON:  Object to form, vague as to
9 time.
10 BY THE WITNESS:
11     A.   There are people at Walgreens that are
12 familiar with that information.  Some.  Not all.
13 You're saying was it a secret to people at
14 Walgreens?  I would answer by saying there are
15 people at Walgreens that are aware of this
16 information as presented in this fact sheet.
17 BY MR. GADDY:
18     Q.   You're aware of that information,
19 correct, that people --
20     A.   Yes.  This was created by my team.
21     Q.   Okay.  And so you, Ed Kaleta, head of --
22 VP of governmental affairs and public policy,
23 you're aware of the fact that individuals who use
24 and misuse prescription opioids will often graduate

Page 69

1 to using and misusing heroin?
2     A.   You keep trying to promote me, which I
3 appreciate.  But I am only the VP of federal
4 government relations and U.S. public policy, so I
5 don't have responsibility for the whole team.
6         But, yes, per this document I'm familiar
7 with this fact, that's correct.
8     Q.   The document goes on to say, "Our
9 Commitment."  And then you highlight two programs
10 that we'll talk about in a little bit more detail
11 moving forward.
12         First you talk about the "Safe Drug
13 Disposal."  That's the drug take-back program that
14 you worked on?
15     A.   Safe Medication Disposal, yes.
16     Q.   And the second one says, "Increasing
17 Access to Naloxone."  That's what's commonly
18 referred to as Narcan?
19     A.   This is another program that the company
20 overall spent time on.  I spent more time on safe
21 medication drug disposal than I did on increasing
22 access to Naloxone.  Increasing access to Naloxone
23 is largely a state issue.
24     Q.   Who would be the head of your -- of the

Page 70

1    state lobbying program?

2        A.    Casey Cesnovar is the vice president of

3    state and local government relations.

4        MR. SWANSON:  Counsel, if you are finishing

5    this document, we have been going about an hour.

6        MR. GADDY:  Sure.

7        MR. SWANSON:  The witness has a cold.  Can we

8    take a short break?

9        MR. GADDY:  Absolutely.  Whenever you want to.

10       THE WITNESS:  Great.  Thanks.

11       THE VIDEOGRAPHER:  We are off the record at

12   9:13 a.m.

13           (WHEREUPON, a recess was had

14           from 9:13 to 9:28 a.m.)

15       THE VIDEOGRAPHER:  We are back on the record

16   at 9:29 a.m.

17   BY MR. GADDY:

18       Q.    Mr. Kaleta, I'm going to hand you what

19   I've marked as Kaleta 5.

20           (WHEREUPON, a certain document was

21           marked as Walgreens-Kaleta Exhibit

22           No. 5:  3/30/16 e-mail string;

23           WAGMDL00377962 - 00377967.)

24   BY MR. GADDY:

Page 71

1        Q.    It's P-WAG-1822, Bates No. 377962.

2            Do you recognize this as an e-mail, just

3    on the first page, from Michael Polzin to a number

4    of people including you and Mr. Cesnovar?

5        A.    Okay.  I'm sorry.  What was your

6    question?

7        Q.    Do you see this is an e-mail from a

8    Michael Polzin to a number of people including you?

9        A.    Yes.

10       Q.    And the subject of the e-mail was "Safe

11   disposal joint op-ed"?

12       A.    Yes.

13       Q.    In your public policy role, is putting

14   together op-eds that you would seek to have

15   published or Walgreens would seek to have

16   published, would that be something that you would

17   do from time to time?

18       A.    We would work with our media relations

19   and communications team.  The -- those types of

20   pieces would generally generate through that side

21   of the company.  But obviously since it was a

22   program that we were involved with, then we would

23   have opportunities to edit and look over materials

24   before they were final.

Page 72

1        Q.    And some of the other folks that

2    received this e-mail, there is a David Seldin from

3    the Brunswick Group.

4            Do you see that?

5        A.    I do.

6        Q.    Is that an individual with one of these

7    outside consulting agencies that you all bring on

8    to help you with lobbying or public policy type

9    issues?

10       A.    No.

11       Q.    Who is he and what does he do?

12       A.    So, Walgreens I believe retained the

13   Brunswick Group.  That's not -- that was not part

14   of my budget area.

15       Q.    Okay.  Also Phil Caruso is on the "To"

16   line here.  Who is that?

17       A.    He is in the media -- he is part of

18   Walgreens media relations team.

19       Q.    The body of the e-mail says, "I think

20   this is in good shape.  I just made a few small

21   edits in the attached version.  Ed and Casey, let

22   me know if you're okay with it and then I can

23   circulate it internally for approvals."

24           Do you see that?

Page 73

1        A.    Yes.

2        Q.    If you turn the few pages towards the

3    back of the document, you actually see the draft

4    op-ed that looks like it was drafted by Brunswick?

5        A.    Yes.

6        THE VIDEOGRAPHER:  Mr. Kaleta, your mike

7    slipped down a bit.

8    BY THE WITNESS:

9        A.    Okay.

10   BY MR. GADDY:

11       Q.    Do you see the second paragraph that

12   starts "Prescription drug"?

13       A.    Yes.

14       Q.    It says, "Prescription drug abuse is a

15   public health epidemic."

16           Do you see that?

17       A.    I do.

18       Q.    When we started this deposition, I asked

19   you the question and you did not -- you would not

20   call it a public health epidemic.  Do you see here

21   that Walgreens in this joint op-ed is calling

22   prescription drug abuse a public health epidemic?

23       MR. SWANSON:  Object to form, mischaracterizes

24   testimony.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

BY THE WITNESS:

1  A.   You referred to the opioid epidemic, and
2  this says prescription drug abuse is a public
3  health epidemic.  Those are two different.
4  BY MR. GADDY:
5      Q.   Okay.  So, you would agree there is a
6  prescription drug abuse epidemic but not an opioid
7  epidemic within the country.  Is that your
8  position?
9      A.   No.  I'm not familiar with the vague
10  term of the "opioid epidemic."  I am familiar with
11  the term of "prescription drug abuse," and that's
12  something that I've spent time on at Walgreens
13  trying to address.
14      Q.   And you agree that a significant portion
15  of the prescription drugs that are abused are
16  opioids?
17      A.   I don't know what the numbers are, but I
18  don't believe that -- I don't know what the --
19  "significant portion" is a very vague
20  generalization.  I don't know if that means a half,
21  more than half.
22      Q.   Would you characterize opioid abuse as a
23  significant portion of prescription drug abuse?

Page 75

1      A.   I'm not familiar with percentages of
2  which drugs are prescribed how often.  So I can't
3  answer your question.
4      Q.   So, you don't know whether or not
5  opioid -- opioids are a significant portion of the
6  prescription drugs that are abused in the country?
7      MR. SWANSON:  Object to form, vague.
8  BY THE WITNESS:
9      A.   Again, you're using -- you're using
10  pretty vague terms.  So, I can't answer a question
11  about whether it's a significant.  I don't know
12  what the term "significant" is supposed to
13  connote.
14  BY MR. GADDY:
15      Q.   It goes on to say, "More than half of
16  the approximately 46,000 drug-related deaths in the
17  United States each year are from heroin and
18  prescription opioids."
19      Do you see that?
20      A.   I do.
21      Q.   Does that sound like a significant
22  portion of the drug-related deaths coming from
23  heroin and prescription opioids?
24      MR. SWANSON:  Object to form.

Page 76

1  BY THE WITNESS:
2      A.   What it sounds like is more than half of
3  the approximately 46,000.  It doesn't use the term
4  "significant," which is why I still don't
5  understand why you're using that word.  I'm not
6  familiar -- there is no number attached to
7  "significant."
8      This does say that more than half of the
9  approximately 46,000 drug-related deaths each year
10  are from heroin and prescription opioids, and it
11  references the DEA.  So, I'm assuming that the DEA
12  numbers are correct on that.
13  BY MR. GADDY:
14      Q.   The DEA is what you would consider a
15  trustworthy source when it comes to information
16  about controlled substances?
17      MR. SWANSON:  Object to form.
18  BY THE WITNESS:
19      A.   Yeah, so, I'm not -- I think there is
20  certain things that the DEA is considered an
21  authority on and an expert and other things not.
22  But I don't have -- I can't say definitively that
23  everything that they put out is 100 percent
24  accurate.  As a matter of fact, I'm familiar with

Page 77

1  things that the DEA has put out and put on their
2  web site that's not accurate.  So...
3  BY MR. GADDY:
4      Q.   My question was whether or not you
5  consider the DEA a trustworthy source as it relates
6  to information about controlled substances?
7      A.   I think it depends on the information.
8      Q.   It goes on to say, "The prescription and
9  illicit drugs now kill 40% more people than car
10  crashes.  In fact, deaths from heroin and opioids
11  have doubled and tripled, respectively, since
12  1999."
13      Do you see that?
14      A.   I do.
15      Q.   If you go down to the next paragraph, it
16  says, "A crucial element in combating this
17  epidemic, and drug abuse generally, is curbing
18  'drug diversion,' or in other words, the transfer
19  of a controlled substance from the prescription
20  holder to another individual for illicit use.
21  Diversion can take many forms.  It often results
22  from the seemingly benign habit of leaving old
23  prescriptions in the medicine cabinet too long."
24      Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    A.    I do see that sentence, yes.

2    Q.    And is that consistent with your

3 understanding in your role with Walgreens of some

4 of the ways that drug diversion can happen?

5    A.    In other words -- so, the last sentence

6 says, "It often results from the seemingly benign

7 habit of leaving old prescriptions in the medicine

8 cabinet too long."

9        Yes, I am familiar that that is a form

10 of diversion and that that is in fact a big problem

11 that the country has been facing, which is part of

12 the reason that we took up the Safe Medication

13 Disposal Program.

14    Q.    Goes on to say in the next paragraph,

15 "Consider that four out of five new heroin users

16 began abusing substances with prescription

17 medications."

18        Do you see that?

19    A.    I do.

20    Q.    Is that consistent with your

21 understanding that four out of five new heroin

22 users began using prescription medications?

23    A.    I read the sentence.  This is -- this

24 paragraph cites a number of different statistics

Page 79

1 and they're apparently referencing more DEA

2 numbers.  So, I'm not familiar with this particular

3 data.

4    Q.    Is that sentence, though, consistent

5 with your understanding?

6    A.    I'm not an expert on that level of

7 specificity on different types of drugs.

8    Q.    Regardless of your understanding, this

9 is a sentence that Walgreens was inputting into a

10 joint op-ed that they were going to seek have

11 published it looks like with the DEA?

12    MR. SWANSON:  Object to form.

13 BY THE WITNESS:

14    A.    So, this is a sentence that is in this

15 draft op-ed, that is correct.

16 BY MR. GADDY:

17    Q.    Goes on to say that "According to the

18 2014 National Survey on Drug Use and Health, an

19 estimated 6-1/2 million Americans misused a

20 prescription drug in 2014, and the CDC and

21 Prevention reported a total of 47,055 drug overdose

22 deaths."

23        Do you see that?

24    A.    I do.

Page 80

1    Q.    Would you agree that that number of

2 individuals misusing prescription drugs and that

3 number of people dying from overdose of drugs is

4 crisis level?

5    A.    I don't know what your measure is of

6 crisis.  I would say that any number --

7    Q.    I'm asking for your definition.

8    A.    My definition is any overdose deaths are

9 too many.  That would be my definition.

10    Q.    So, you would agree this would be crisis

11 level?

12    A.    I -- again, you're picking out vague

13 terms like "crisis" and the one you were using

14 earlier.  Any number of drug overdose deaths are

15 too many.

16    Q.    Would you call it a crisis?

17    A.    Would I call what a crisis?

18    Q.    This number of people overdosing and

19 dying from prescription drugs.

20    A.    I would call this too many.  That's what

21 I would call it.

22    Q.    You wouldn't call it a crisis?

23    A.    I think there is all kinds of different

24 crises.  Any drug overdose deaths are too many.

Page 81

1    Q.    How many deaths would there have to be

2 for you to call it a crisis?

3    MR. SWANSON:  Object to form.

4 BY THE WITNESS:

5    A.    I'm not an expert in statistics, and I'm

6 not an expert in most of the numbers mentioned in

7 this paragraph.  So, I could speak to my personal

8 knowledge, which is --

9 BY MR. GADDY:

10    Q.    And that's all I'm asking for is

11 Ed Kaleta's personal opinion.  How many people

12 have to die --

13    A.    My personal opinion --

14    Q.    -- before you would call it a crisis?

15    MR. SWANSON:  Object.

16        (Clarification requested by the

17        reporter.)

18    MR. SWANSON:  Stop interrupting the witness.

19 Ask your question.  And you can answer it again if

20 you feel it appropriate to change your answer.

21 BY MR. GADDY:

22    Q.    Go ahead.

23    A.    The question.

24    Q.    How many people have to die from

Page 82

1 prescription drug overdoses before Ed Kaleta calls
2 it a crisis?
3    A.  So, Ed Kaleta is not an expert on what
4 defines a crisis related to this or any number of
5 other things.
6      Ed Kaleta does believe that one drug
7 overdose death is too many, which is why I've spent
8 a lot of time at Walgreens working on our Safe
9 Medication Disposal.
10    Q.  Do you not want to use the word "crisis"
11 or "epidemic"?  Is there a reason you don't want to
12 answer that question?
13    A.  No.
14    MR. SWANSON:  Object to form.  It's a
15 different question.
16 BY MR. GADDY:
17    Q.  How many people have to die from drug
18 overdoses, prescription drug overdoses before
19 Ed Kaleta would call it an epidemic?
20    MR. SWANSON:  Object to form.
21 BY THE WITNESS:
22    A.  Again, I -- I have a political science
23 degree.  I didn't do well in statistics when I took
24 poli sci in college, so I don't know what the

Page 83

1 thresholds are associated with the term "crisis" or
2 "epidemic."  I would repeat that I think one drug
3 overdose death is too many.
4    Q.  I will show you what I'll mark as Kaleta
5 6.
6      (WHEREUPON, a certain document was
7      marked as Walgreens-Kaleta Exhibit
8      No. 6:  6/1918 e-mail with
9      attachments; WAGMDL00376065 -
10      00376072.)
11 BY MR. GADDY:
12    Q.  This is P-WAG-1872, Bates No. 376065.
13      Do you recognize the top page as being
14 an e-mail from you?
15    A.  Your question was whether this e-mail at
16 the top is from -- is from me, and the answer is
17 yes.
18    Q.  Okay.  And if you turn to the second
19 page, about halfway down the page do you see the
20 first e-mail in the chain from it looks like Nimesh
21 Jhaveri?
22      Do you see that?
23    A.  I do.
24    Q.  It says, "Hi Ed, hope you are well.  I

Page 84

1 was wondering if you have anything that recaps our
2 current positions for pharmacy and retail.  In
3 addition, anything specific by state would be
4 helpful."
5      Do you see that?
6    A.  I do.
7    Q.  And if we get back up to the first page,
8 the very first chain, while there is some traffic
9 in the middle, we see your ultimate response,
10 correct?
11    A.  Yes.
12    Q.  You have a bullet list of what you have
13 attached, and then it says, "The attached
14 one-pagers and miscellaneous sheet do offer our
15 public positions/talking points on the key issues."
16      Do you see that?
17    A.  I do.
18    Q.  Do you recall a few minutes ago, I think
19 it was before we took a break, I had showed you a
20 document and asked you if these were Walgreens'
21 positions and you said that you didn't know if you
22 would characterize those statements as Walgreens'
23 positions.
24      But this -- what you've attached here

Page 85

1 are Walgreens' public positions on certain issues,
2 correct?
3    MR. SWANSON:  Object to form.
4 BY THE WITNESS:
5    A.  So, it's a pretty open-ended question.
6 There is some information here that is regarding
7 programs that Walgreens is involved with.  Some of
8 these describe certain public policy issues, and in
9 some cases we're specific about what Walgreens is
10 in support of.
11 BY MR. GADDY:
12    Q.  But what you tell Nimesh is that these,
13 what you're providing him, offers Walgreens' public
14 position and key talking points, correct?
15    A.  Yes.
16    Q.  If you turn the couple pages in, the
17 Bates number at the bottom is the one going to be
18 ending in 069.
19    A.  Okay.
20    Q.  Do you see at the top of the page it
21 says, "Miscellaneous Issue Positions"?
22    A.  Yes.
23    Q.  And then it separates them out by
24 different topics?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    A.   Yes.

2    Q.   At the bottom of the page we see

3 Walgreens public position and talking points as it

4 relates to drug diversion and abuse.

5    Do you see that?

6    A.   I wouldn't call this talking points.  I

7 would say that this is a summary of some of our key

8 initiatives.

9    Q.   Okay.  And it goes on to say there under

10 "Drug Diversion and Abuse," "The U.S. opioid

11 epidemic continues to grow."

12    Is that what it says?

13    A.   Yes.  The first line says, "The U.S.

14 opioid epidemic continues to grow."

15    Q.   So, that's a phrase that Walgreens, at

16 least in this document, is comfortable using?

17    A.   Yes.  That's correct.

18    Q.   Goes on to say, "More than 63,600 lives

19 were lost to drug overdose in 2016, the most lethal

20 year yet of the drug abuse epidemic according to a

21 recent report from the CDC.  The majority of these

22 deaths (more than 42,000) involved opioids."

23    Do you see that?

24    A.   I do.

Page 87

1    Q.   It says, "Most people who misuse

2 prescription drugs first obtain them from a family

3 member or friend, often from a home medicine

4 cabinet, and can eventually graduate to using

5 illicit drugs such as heroin."

6    Do you see that?

7    A.   I do.

8    Q.   According to this document, the public

9 position or the talking points as it relates to

10 Walgreens around drug diversion and abuse was that

11 the U.S. opioid epidemic continues to grow,

12 correct?

13    MR. SWANSON:  Object to form.

14 BY THE WITNESS:

15    A.   So, the first sentence reads, "The U.S.

16 opioid epidemic continues to grow."  I'm not sure I

17 understand your question.

18 BY MR. GADDY:

19    Q.   I'm just asking whether or not that was

20 Walgreens' position as it relates to drug diversion

21 and abuse.

22    MR. SWANSON:  Object to form.

23 BY THE WITNESS:

24    A.   Yeah, so, this is -- this is stating

Page 88

1 information.  This is a -- not a talking points

2 document, as I mentioned.  This is an issue

3 position paper that talks through different issues,

4 the background, and then in some cases lists either

5 programs that we're involved with to help with

6 these particular efforts or in other cases

7 different policy positions that we might be taking.

8 BY MR. GADDY:

9    Q.   And in listing out the background of

10 Walgreens' position, in addition to talking about

11 the opioid epidemic continuing to grow, it also

12 contains the information about how individuals who

13 misuse and abuse opioids eventually can graduate to

14 illicit drugs such as heroin, correct?

15    A.   Yes.  That is reflected in the third

16 sentence.

17    Q.   I show you what I'll mark as Kaleta 7.

18    (WHEREUPON, a certain document was

19    marked as Walgreens-Kaleta Exhibit

20    No. 7: 4/23/18 e-mail string with

21    attachment; WAGMDL00035669 -

22    00035683.)

23 BY MR. GADDY:

24    Q.   This is P-WAG-1172, Bates No. 35669.

Page 89

1    And do you see this as being, it looks

2 like, a one -- two-page e-mail with a PowerPoint

3 attached to it?

4    A.   I've never seen this document before.

5    Q.   Okay.  That was going to be one of my

6 questions.  I don't think you're copied on the

7 e-mail chain here.  Do you see that?  I didn't see

8 your name.

9    A.   Correct.  I am not on this e-mail chain.

10    Q.   Okay.  But you know who Patty Daugherty

11 is?

12    A.   I don't.

13    Q.   Okay.  Do you know who Eric Stahmann is?

14    A.   I do.

15    Q.   What do you understand Eric Stahmann's

16 role to be?

17    A.   Eric is in our pharmacovigilance and

18 diversion area.

19    Q.   Some of the other folks on this e-mail

20 chain are Ed Bratton, Natasha Polster.  Do you

21 understand them to work in similar roles to Eric on

22 the same team?

23    A.   I don't know Ed Bratton.  I do know

24 Tasha Polster.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  Q.  What do you understand her role to be?
2  A.  She is also involved in
3  pharmacovigilance as well as diversion and a
4  handful of other issues as well.
5  Q.  If you look at the first page of the
6  PowerPoint presentation, it says, "Silence the
7  Stigma.  Opioid Use Disorder and Addressing
8  Stigma."
9      Do you see that?
10  A.  That's what it says on the first slide,
11  that's correct.
12  Q.  As far as you know, you haven't seen
13  this before, is that correct?
14  A.  Nope.
15  Q.  You don't know that Tasha or anybody
16  else at Walgreens ever made this information
17  available to you or this PowerPoint available to
18  you I should say?
19  A.  I've never seen this document.
20  Q.  Okay.  You recognize it's a Walgreens
21  document?
22  A.  I do.
23  Q.  Okay.  And it references, in the
24  heading, it references Walgreens Company/Purdue

Page 91

1  University College of Pharmacy.
2      Do you see that?
3  A.  Yes.  But I don't know what that means.
4  Q.  Okay.  That doesn't mean anything to
5  you?
6  A.  Nope.
7  Q.  It looks like the slides are numbered on
8  the bottom right-hand corner.  If you'd turn to
9  slide 6 for me, please.
10      Are you with me?
11  A.  I'm on slide 6.
12  Q.  Do you see in the bottom right-hand
13  corner it's still got the Walgreens logo there?
14  A.  It does.
15  Q.  Okay.  And the title of the slide is
16  "Opioid Statistics."  Correct?
17  A.  That's what it says.
18  Q.  And the first bullet point is
19  "Prescription Opioids and Heroin," and it says,
20  "Nearly 80% of Americans using heroin reported
21  misusing opioids first."
22      Do you see that?
23  A.  That's what the first bullet reads.
24  Q.  Were you aware of that information?

Page 92

1  A.  I've never seen this document before.
2  Q.  Different question.  Were you aware of
3  that information?
4  MR. SWANSON:  Object to form, foundation.
5  BY THE WITNESS:
6  A.  Just the first bullet?
7  BY MR. GADDY:
8  Q.  Correct.
9  A.  No, I'm not familiar with that.  It may
10  be accurate.  It may not be.  I'm not familiar with
11  that particular fact.
12  Q.  Has anybody at Walgreens ever made that
13  representation to you that nearly 80% of Americans
14  using heroin reported misusing opioids first?
15  A.  They may have.  They may not have.  I
16  don't know.
17  Q.  Nothing that stuck in your mind as far
18  as if it was mentioned to you?
19  A.  We on any given day are working on a
20  multitude of issues.  So, processing a lot of
21  information.  That particular statistic, I'm not
22  familiar with it.
23  Q.  I understand.  The second bullet point
24  says, "Individuals who misuse prescription opioid

Page 93

1  pain pills are 40 times more likely to abuse
2  heroin."
3      Do you see that?
4  A.  I do.
5  Q.  Is that information that you were aware
6  of before reading it just now?
7  MR. SWANSON:  Object to form, foundation.
8  BY THE WITNESS:
9  A.  Again, I've never seen this document
10  before.  I can't say for sure that that's a
11  statistic that I am familiar with.  But I, you
12  know, I may have seen it before.
13  BY MR. GADDY:
14  Q.  Were you aware that this was information
15  that Walgreens was including within PowerPoints
16  under the heading of "Opioid Statistics" and
17  circulating to other members of Walgreens' team
18  including members of their pharmacovigilance team?
19  A.  So, by the fact that I've never seen
20  this document, the answer to your question is no.
21  Q.  Okay.  It goes on in the next heading to
22  say, "Prescription Opioid Misuse," and then it has
23  some statistics about costs.
24      Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    A.   I do.
2    Q.   It says, "55.7 billion nationally,
3  25 billion in healthcare costs, 25.6 billion in
4  lost workplace productivity, 5.1 billion in
5  criminal justice costs."
6         Do you see that?
7    A.   I do.
8    Q.   Is that information that you have become
9  aware of through your employment at Walgreens?
10       MR. SWANSON:  Object to form.
11  BY THE WITNESS:
12   A.   I'm not familiar with those statistics.
13  BY MR. GADDY:
14   Q.   And in your role as being a lobbyist
15  representing Walgreens' interest in Washington,
16  D.C., had Walgreens made you aware of the tens of
17  billions of dollars that prescription opioid misuse
18  is costing?
19       MR. SWANSON:  Object to form.
20  BY THE WITNESS:
21   A.   I'm not familiar with these statistics.
22  BY MR. GADDY:
23   Q.   Walgreens hadn't -- didn't make you
24  familiar with those statistics through based on

Page 95

1  your role as a lobbyist?
2    A.   They may have.  Again, I process and
3  have access to a fair amount of information on any
4  given topic on any given day.  I may have had
5  exposure to these particular numbers, but I can't
6  say.
7    Q.   I show you what I'll mark as Kaleta 8.
8  This is P-WAG-1859, Bates No. 385788.
9         (WHEREUPON, a certain document was
10            marked as Walgreens-Kaleta Exhibit
11            No. 8:  10/31/17 e-mail string with
12            attachment; WAGMDL00385788 -
13            00385791.)
14  BY MR. GADDY:
15   Q.   Do you see this, the top, top of this
16  e-mail chain is an e-mail from Charles Greener to
17  you.
18        Do you see that?
19   A.   Yes.
20   Q.   I think you told us earlier that Charles
21  Greener is who you report to, correct?
22   A.   That's correct.
23   Q.   Okay.  And, so, if you're looking at the
24  e-mail that he forwarded to you, if we go down to

Page 96

1  the next one, there is an e-mail from Charles
2  Greener to Stefano Pessina.
3         Do you see that?
4    A.   Yes.
5    Q.   Who is Stefano Pessina?
6    A.   Stefano is our executive vice chairman
7  and CEO of Walgreens Boots Alliance.
8    Q.   And Walgreens is a part of Walgreens
9  Boots Alliance?
10   A.   That's correct.
11   Q.   So, Stefano Pessina would be the CEO of
12  the company?
13   A.   That's correct.  Just to be clear,
14  Stefano Pessina is CEO of Walgreens Boots Alliance.
15   Q.   Of which Walgreens is a part of?
16   A.   Of which Walgreens is a part of, that's
17  correct.
18   Q.   The e-mail from Chuck says, "Dear
19  Stefano, attached is a joint industry letter
20  addressing opioid crisis in America."
21        Do you see that?
22   A.   I do.
23   Q.   It says, "We have been working with CVS
24  on the letter, and Alex, Richard and their teams

Page 97

1  have reviewed the letter and are comfortable
2  signing it."
3         Do you see that?
4    A.   Yes.
5    Q.   Who is Alex that's referenced there?
6    A.   Alex Gourlay is the co-Chief Operating
7  Officer of Walgreens Boots Alliance.
8    Q.   Also what Walgreens is a part of?
9    A.   That's correct.
10   Q.   It goes on to say, if you skip a
11  sentence, "I wanted to see if you would like to
12  sign on behalf of WBA."  That is Walgreens Boots
13  Alliance?
14   A.   Yes.
15   Q.   "I believe the letter is very good in
16  demonstrating the industry working together on the
17  opioid crisis and will be viewed very favorably by
18  the Administration and Congress."
19        Do you see that?
20   A.   Yes.
21   Q.   And if you turn to the attachment that
22  Chuck sent you, do you see that he sent you this
23  joint letter that he was asking the CEO of
24  Walgreens Boots Alliance to review and encouraging

Page 98

1 him to sign?
2     Do you see that?
3     A.  I do.
4     Q.  Do you see in the first paragraph it
5 says, "By any measure, opioid use in the
6 United States has reached crisis proportions."
7     Do you see that?
8     A.  I do.
9     Q.  "The number of opioid prescriptions has
10 nearly tripled from 76 million in 1991 to
11 approximately 207 million in 2013.  The U.S.
12 accounts for 80% of the world's consumption of
13 opioid painkillers and 99% of the hydrocodone."
14     Do you see that?
15     A.  I do.
16     Q.  "This remarkable volume is severely
17 harming consumer health, costing the country more
18 than $78 billion annually in associated costs and
19 taking a tragic toll on countless individuals and
20 society as a whole."
21     Do you see that?
22     A.  I do.
23     Q.  Is there anything in that paragraph that
24 you disagree with?

Page 99

1     A.  I wouldn't say there is anything I
2 disagree with.  But I'm also not familiar with
3 where the sourcing is for those particular numbers.
4 I didn't write the letter.
5     Q.  This is a letter that the COO, Alex
6 Gourlay, of Walgreens Boots Alliance reviewed and
7 was passing on to Stefano Pessina, the CEO of
8 Walgreens Boots Alliance, and was encouraging him
9 to sign the letter?
10     A.  No.
11     MR. SWANSON:  Object to form.
12 BY THE WITNESS:
13     A.  Actually, Chuck is passing it along to
14 Stefano.
15 BY MR. GADDY:
16     Q.  Okay.  After Alex has reviewed it,
17 correct?
18     MR. SWANSON:  Object to form.
19 BY THE WITNESS:
20     A.  I mean, I'm not familiar with the
21 cadence.  But in the e-mail that you read, Chuck
22 references that Alex has reviewed the letter.
23 BY MR. GADDY:
24     Q.  You're not disagreeing that this is a

Page 100

1 letter that was sent to the CEO of Walgreens Boots
2 Alliance and that he was being encouraged to sign
3 the letter?
4     A.  I would agree with that.
5     Q.  And you see this is e-mail traffic
6 that's occurring in October of 2017.
7     Do you see that?
8     A.  That's the date of the e-mail, correct.
9     Q.  Are you aware of any other letter such
10 as this prior to 2017 that the CEO of Walgreens
11 Boots Alliance or prior to Walgreens going into
12 Walgreens Boots Alliance, just Walgreen Company,
13 are you aware of any letter prior to this that the
14 CEO of the company was ever encouraged to sign?
15     A.  Yes.
16     Q.  Okay.  When?
17     A.  I'm sure there is a handful of examples
18 of different industry letters or other letters that
19 potentially went to Capitol Hill supporting or
20 outlining various positions on legislation that
21 dealt with some of these issues in here.
22     Q.  Are you aware of any letter from
23 Walgreens, whether it's Walgreens Company or
24 Walgreens Boots Alliance, prior to October 30 of

Page 101

1 2017 that stated the opioid abuse in the
2 United States had reached crisis proportions?
3     A.  Am I aware of any letters that use that
4 exact language, is that your question?
5     Q.  Or comparable.
6     MR. SWANSON:  Object to form.
7 BY THE WITNESS:
8     A.  So, again, I'm familiar with Walgreens
9 and Walgreens Boots Alliance communicating with
10 members of Congress on the Hill, either alone or
11 with other entities prior to 2017.
12 BY MR. GADDY:
13     Q.  Do you remember the first one?
14     A.  I don't.  I don't have -- I don't recall
15 the date.
16     Q.  Okay.  If you were to take a stab at it,
17 would you be able to do that?
18     A.  My --
19     MR. SWANSON:  Object to form.
20 BY THE WITNESS:
21     A.  Yeah, no, my stab would probably be
22 somewhere in the similar three-to-five-year range
23 going back from today.
24     But I should also say that prior to my

Page 102

1  new role, there were multiple communications that I
2  know occurred, but I'm not familiar with what
3  that -- with what the subject matter was.
4       So, I can only speak to what I was aware
5  of from 2011 moving forward, and I can speak to
6  what I'm more aware of since being in this
7  different role over the last three years.
8    Q.   Do you agree that Walgreens has a
9  responsibility to combat opioid abuse?
10   A.   I believe that each entity in the drug
11 supply chain has a responsibility to help with
12 prescription drug abuse.
13   Q.   Does that include Walgreens?
14   A.   Yes.
15   Q.   Does that include other pharmaceutical
16 distributors?
17   A.   I believe that all the entities in the
18 drug supply chain have a responsibility to try to
19 address the prescription drug abuse challenges
20 facing our country.
21   Q.   So, yes, that includes pharmaceutical
22 distributors?
23   A.   They are part of the drug supply chain,
24 yes.

Page 103

1    Q.   Does that also include the
2  pharmaceutical manufacturers of opioids?
3    A.   I believe everybody in the drug supply
4  chain has a responsibility to try to do their part
5  to address prescription drug abuse.
6    Q.   That would include the retail
7  distributors or retail pharmacies, correct?
8    A.   If they are in the drug supply chain,
9  which some but not all are, then, yes, I believe
10 they have a responsibility to try to do something
11 to address prescription drug abuse.
12   Q.   Are you aware that in 2013 Walgreens
13 entered into a settlement with the DEA related to
14 alleged violations of the Controlled Substance Act?
15   A.   I am not aware of the specifics of what
16 you just mentioned.  I was aware back in somewhere
17 around 2013 reading a press release about a
18 settlement with the DEA.
19   Q.   Okay.  Would it be fair to say that the
20 first time you learned about a settlement between
21 Walgreens and the DEA, and specifically I'm talking
22 about the one that came out of the investigation
23 into the Jupiter distribution center, would it be
24 fair to say the first time you became aware of that

Page 104

1  investigation or settlement was when you read a
2  press release about the settlement?
3    A.   I believe that's correct, yes.  But --
4  yes.  So...
5    Q.   Would that have been the first time that
6  you even knew that Walgreens was under
7  investigation by the DEA?
8    A.   I don't know any of the specifics.  I
9  don't know if or when they were under
10 investigation.
11      Again, I'm aware of a settlement that
12 Walgreens entered into in 2013 as a result of
13 reading the press release.
14   Q.   Were you involved in any meetings or
15 conversations with anybody from DEA or DOJ,
16 Department of Justice, regarding that investigation
17 or settlement?
18   A.   Back in 2013?
19   Q.   Correct.
20   A.   No.
21   Q.   Did you have any meetings or
22 conversations with any Congressmen or women or
23 their staffs regarding that investigation and/or
24 the settlement?

Page 105

1    A.   I don't believe so.
2    Q.   I show you what I'll mark as Kaleta 9.
3         (WHEREUPON, a certain document was
4          marked as Walgreens-Kaleta Exhibit
5          No. 9:  Binder containing
6          Settlement and Memorandum of
7          Agreement between DOJ, DEA and
8          Walgreens and other documents;
9          WAGMDL00490963 - 00490978.)
10 BY MR. GADDY:
11   Q.   If you flip to the -- this is P-WAG-1.
12      If you'll flip to the first page, do you
13 see it says Settlement and Memorandum of Agreement?
14   A.   Yes.  It says that at the top.
15   Q.   Do you know if you've ever seen this
16 before?
17   A.   I don't believe I've ever seen this
18 before, no.
19   Q.   As you sit here today and before we get
20 into this document, what is your understanding
21 of -- or let me ask you this first.
22      Do you have an understanding of the
23 allegations that the DEA made against Walgreens in
24 starting in 2012 that results in the 2013

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 settlement?

2    A. I'm in the government relations area,
3 was back then as well with a much more narrow
4 focus. So, the answer to your question is no. All
5 I can recall is reading a press release sometime in
6 2013 about the settlement.

7    Q. Okay. Since then have you gained an
8 understanding of any of the allegations that were
9 made against Walgreens by the DEA?

10    MR. SWANSON: Let me just caution you not to
11 disclose anything you may have learned from your
12 legal counsel either in litigation or before.
13 Separate from that, if you can answer the question,
14 go ahead.

15 BY THE WITNESS:

16    A. I'm not aware of anything related to the
17 settlement beyond the press release that I read in
18 2013.

19 BY MR. GADDY:

20    Q. And your job in Washington as it relates
21 to government relations and public policy, do you,
22 have you ever had occasion to have any meetings or
23 communications with individuals from DEA or DOJ?

24    A. Since I've been employed by Walgreens?

Page 107

1    Q. Yes.

2    A. On any issue?

3    Q. Yes.

4    A. The answer is yes.

5    Q. Okay. Do you recall when you first
6 having or when you first would have had a meeting
7 with DEA or DOJ?

8    A. I believe my first communication with
9 the DEA was back in 2015, 2016, end of 2015,
10 beginning of 2016 in reference to our Safe
11 Medication Disposal Program and seeing if we were
12 understanding the regulations associated with that
13 drug disposal correctly.

14    Q. Okay. And that was related to the
15 regulations that they finalized sometime in 2014
16 range?

17    A. That's correct.

18    Q. Okay. Have you had interactions with
19 DEA or -- let me back up.

20    Have you ever had any conversations or
21 interactions with the Department of Justice that
22 you're aware of outside of the DEA?

23    A. On any issue?

24    Q. Correct.

Page 108

1    A. Yes.

2    Q. Okay. Do you recall when your first
3 interaction with DOJ would have been?

4    A. I don't.

5    Q. Okay. Would it have been before or
6 after your first conversation with DEA on the drug
7 take-back program?

8    A. It's possible that I had a communication
9 of some sort with the DOJ on an issue prior to
10 2016. I can't say. Again, we are involved in a
11 multitude of issues, so I can't say for sure.

12    Q. Are there any topics that you've had
13 interactions with DEA -- sorry. Let me finish the
14 first thing first.

15    Your conversations with DOJ, did that
16 also relate to the drug take-back program or was it
17 other issues?

18    A. Other issues.

19    Q. What were the other issues?

20    A. Any number of different issues in the
21 last seven years. I mean, do you want an
22 exhaustive list?

23    Q. Give me a taste of the most predominant
24 issues that you would interact with DOJ about?

Page 109

1    A. Most recently antitrust issues.

2    Q. Okay. Anything relating to drug --
3 prescription drug distribution or prescription drug
4 dispensing with DOJ specifically?

5    A. With the Department of Justice, I don't
6 believe so, no, not that I can recall.

7    Q. Have there been any issues that you've
8 interacted with the DEA about other than the
9 medication take-back kiosks?

10    A. My interaction with the DEA has been
11 largely, if not completely, in some form or fashion
12 relates back to our Safe Medication Disposal
13 Program.

14    Q. Have you ever done anything to educate
15 yourself or become educated in any other way about
16 the settlement that Walgreens entered with the DEA
17 or any of the allegations therein outside of a
18 press release that you believe you reviewed back in
19 2013?

20    A. Not to my -- not to my recollection, no.

21    Q. Do you recall whether -- who issued that
22 press release?

23    A. I don't. I -- I don't.

24    Q. This document has got page numbers in

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 the bottom right-hand corner.
2    A.    Okay.
3    Q.    If you would flip for me, please, to
4 page 23.
5    A.    Page 23 of 343?
6    Q.    Yes, please.
7    A.    23 of 343.  Okay.
8    Q.    Are you there?
9    A.    I am.
10    Q.    Okay.  And you see up at the top right
11 of the page it says, "U.S. Department of Justice,
12 Drug Enforcement Administration."
13       Do you see that?
14    A.    I do.
15    Q.    Then below that there is the date,
16 September 13, 2012.
17       Do you see that?
18    A.    I do.
19    Q.    And it says the style of the case over
20 on the left, it says, "In the matter of Walgreen
21 Company," and it has a Jupiter, Florida address.
22       Do you see that?
23    A.    I do.
24    Q.    Are you aware that Walgreens has a

Page 111

1 distribution center in Jupiter, Florida?
2    A.    I am aware that we did.  I can't say for
3 certain if we still do or not.
4    Q.    The title of the document is "Order to
5 Show Cause and Immediate Suspension of
6 Registration."
7       Do you see that?
8    A.    Yes.  I do.
9    Q.    And I'll skip down to where it says
10 "Notice."  It says, "Notice is hereby given to
11 inform Walgreen Corporation of the immediate
12 suspension of Drug Enforcement Administration
13 Certificate of Registration RW0277752 pursuant to
14 21 USC Section 824(d) because such registration
15 constitutes an imminent danger to the public health
16 and safety."
17       Do you see that?
18    A.    I see what you've highlighted, yes.
19    Q.    Okay.
20    A.    And read.
21    Q.    Were you aware that it was the position
22 of the DEA that allowing the Walgreens distribution
23 center in Jupiter, Florida to continue to operate
24 constituted an imminent danger to the public health

Page 112

1 and safety?
2    A.    I was not.
3    Q.    Was that not included in the press
4 release that you reviewed?
5    MR. SWANSON:  Object to form.
6 BY THE WITNESS:
7    A.    I don't remember.
8 BY MR. GADDY:
9    Q.    What does that phrase mean to you,
10 imminent danger to the public health and safety?
11    MR. SWANSON:  Object to form.
12 BY THE WITNESS:
13    A.    So, in addition to not understanding a
14 lot of the operations of our company, I'm also not
15 a lawyer, so I don't understand most of that
16 sentence.
17       I'm not familiar with what the
18 Certificate of Registration is.  I'm definitely not
19 familiar with the -- that section of the U.S. Code.
20 So, I don't think I can speak to any part of that
21 sentence.
22 BY MR. GADDY:
23    Q.    Would you agree that it would not be a
24 good thing for the DEA to be saying that Walgreens

Page 113

1 constitutes an imminent danger to the public health
2 and safety?
3    MR. SWANSON:  Object to form.
4 BY THE WITNESS:
5    A.    So, I don't know what that says.  But to
6 answer your question, would it generally be not
7 good for the DEA to say something regarding
8 imminent danger?  Yeah, that's probably not
9 something that's good.
10 BY MR. GADDY:
11    Q.    Before we get into some of the
12 allegations, you told us that you reviewed a press
13 release back in 2013.
14       As you sit here today what is your
15 understanding of the settlement that Walgreens
16 entered into with the DEA and the basis for the
17 settlement as far as what was alleged against
18 Walgreens?
19    A.    Extremely limited.
20    Q.    Okay.  Can you tell us?
21    A.    I remember that we entered into a
22 settlement with the DEA regarding the Jupiter
23 distribution center, and I honestly can't recall
24 any details.  That was now, what, five years ago?

Page 114

1 This is '13. No, six years ago.
2 So, this was less than a -- a little bit
3 more than a year after I joined the company, and I
4 don't recall any details beyond the fact that we
5 entered into a settlement with the DEA and it had
6 something to do with our distribution center in
7 Jupiter, Florida.
8 Q. Okay. Did you have an understanding
9 that back leading up to 2013 that Walgreens was a
10 distributor of controlled substances in addition to
11 being a dispenser from their pharmacies?
12 A. Back in 2000 -- prior to 2013 I probably
13 did not have a good understanding of what
14 Walgreens' role was beyond dispensing
15 prescriptions.
16 Q. As you sit here today do you have an
17 understanding that for a significant period of time
18 Walgreens was a distributor in addition to being a
19 dispenser?
20 A. As I sit here today --
21 MR. SWANSON: Object to form.
22 BY THE WITNESS:
23 A. -- I am aware that we have an ownership
24 stake in AmerisourceBergen and as a result of that,

Page 115

1 they are our wholesaler. That's what I'm familiar
2 with.
3 BY MR. GADDY:
4 Q. Do you have any -- any understanding
5 that Walgreens at one point in time acted as
6 essentially as its own wholesaler? Do you have
7 that understanding?
8 A. I don't. We may have, but I don't
9 have -- I don't have -- I have very little
10 knowledge about it.
11 Q. Okay. When you read this press release
12 that Walgreens had entered into a settlement with
13 the DEA, do you remember the amount of the
14 settlement?
15 A. I don't.
16 Q. Did you have any conversations with
17 anybody at Walgreens about the company entering
18 into a settlement with the DEA?
19 A. I probably did have watercooler-type
20 conversations once the press release came out.
21 Q. Did you learn any information from
22 those?
23 A. Not that I recall.
24 Q. Did anybody from the company ever come

Page 116

1 and talk to you about any of the details of the
2 settlement?
3 MR. SWANSON: Other than any lawyers.
4 BY THE WITNESS:
5 A. I can vaguely recall my boss at the
6 time, Debbie Garza, mentioning in a meeting the
7 press release and saying that there is nothing to
8 discuss beyond the press release.
9 BY MR. GADDY:
10 Q. There was no other information
11 disseminated from Walgreens corporate to you to
12 help you with your job liaisoning with Congressmen
13 and women and their staffs in Washington?
14 MR. SWANSON: Object to form, assumes facts.
15 BY THE WITNESS:
16 A. Not that I recall.
17 BY MR. GADDY:
18 Q. There was nothing provided by Walgreens
19 corporate to assist you in any public policy
20 portion of your job either then or further down the
21 road?
22 MR. SWANSON: Same objection.
23 BY THE WITNESS:
24 A. Not that I recall. On most legal

Page 117

1 matters, generally we are told to stick to the
2 press release and share the press release, if
3 asked, and quote the press release verbatim and not
4 veer from it.
5 And so, I can't say for sure that
6 happened with this settlement back in 2012, but it
7 may have.
8 Q. You told us earlier that it was your
9 belief that everybody in the supply chain had a
10 responsibility to combat opioid abuse, is that
11 right?
12 A. Yes, doctors, pharmaceuticals,
13 wholesalers, pharmacists, PBMs, health insurers.
14 Everybody in the supply chain has a responsibility.
15 Q. You agree that if Walgreens is engaging
16 in activity around opioids that constitutes an
17 imminent danger to the public health and safety,
18 that that would be inconsistent with that
19 responsibility?
20 MR. SWANSON: Object to form.
21 BY THE WITNESS:
22 A. I'm not familiar -- I can't speak to
23 you -- what you're referencing. I'm not sure I
24 understand the question.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

BY MR. GADDY:

Q. Well, I think it's a pretty simple question.

If Walgreens is engaging in activity that's imminent danger to the public health and safety as it relates to opioids, you would agree that's inconsistent with their responsibility to help address or solve opioid abuse in the country?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. I'm not aware that Walgreens is or has done the words that you mention. Again, I'm not a lawyer. So, I can't agree or disagree with that whole statement because I'm just not familiar enough with the facts surrounding that and whether that's true or was true or could be true.

BY MR. GADDY:

Q. Well, I'm not trying to use any legal terminology. I'm asking you that if Walgreens engaged in behavior that constituted an imminent danger to the public health and safety as it relates to their activities around opioids, that would be inconsistent with what you've said is their responsibility to actively address and help

Page 119

to solve opioid abuse?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. So, you're asking me to answer a hypothetical question. What I can say is in the time that I've been head of federal government relations and U.S. public policy, what we have done with safe medication disposal has resulted in us collecting 500 tons of unused medications.

I have spent a lot of time on the program. I'm super-proud of it and I know for a fact that we've probably prevented some folks from overdosing as a result of it.

Q. Okay. I'll object to the answer to the extent it's not responsive.

I think the question is simple. If Walgreens, as it relates to their behavior with opioids, is acting in a way that they constitute an imminent danger to the public health and safety, that would be inapposite to their responsibility to help address and solve the opioid crisis, correct?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. I can't -- again, I'm not a lawyer. I'm

Page 120

not familiar with some of the terms that you used.

What I can say is we've done a great deal in working with other folks in the supply chain and working with the DEA and have now been able to install 1,100 kiosks around the country and we've collected over 500 tons of unused medications.

And I've been very involved on that effort, and it's something that I feel very strongly about in terms of the impact that we've had.

Q. Again, I'll object to the portion of the answer that's not responsive to the question.

Turn the -- to page 24 for me, please.

Sorry. Go back to 23. Let's start there.

See the paragraph numbered 1 at the bottom of the page?

A. Um-hmm.

Q. It says, "Walgreens' Jupiter, Florida distribution center is registered with DEA as a distributor in Schedules II to V pursuant to DEA Certificate of Registration," gives a number, and then it gives an address.

Page 121

Do you see that?

A. I see that sentence, yes.

Q. Skip a sentence. It goes on to say, "The Jupiter distribution center is one of 12 distribution centers owned and operated by Walgreens Corporation, headquartered in Deerfield, Illinois. Walgreens also operates more than 7,800 Walgreens retail pharmacies in the United States."

Do you see that?

A. I do.

Q. Is that 7,800 number still accurate or has it gone up since then?

A. I believe it's higher.

Q. Do you have an estimate for where it is now?

A. Somewhere around 9,000.

Q. Is that paragraph consistent with your understanding that Walgreens, at least at one time, had a distribution center in Jupiter, Florida?

A. I have no idea what "Schedules II-V pursuant to DEA Certificate of Registration" means. So, I can't -- I can't answer your question. I don't know what this means.

Q. Okay. Let's go to paragraph 2. It

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  says, "Since at least 2009, the State of Florida
2  has been the epicenter of a notorious,
3  well-documented epidemic of prescription drug
4  abuse."
5       Do you see that?
6     A.  I do.
7     Q.  Were you aware of that when you started
8  with Walgreens in 2011?
9     A.  I was not.
10    Q.  Did anybody at Walgreens make you aware
11 of that when you began with Walgreens in 2011?
12    A.  Make me aware of that first sentence?
13    Q.  Correct.
14    A.  I can't recall that anybody specifically
15 told me that information.
16    Q.  It says, "In July 2011, the Florida
17 Surgeon General declared a public health emergency
18 based on the prescription pill epidemic which
19 results in an average of seven overdose deaths per
20 day in Florida."
21      It says, "The drugs most commonly
22 associated with this epidemic are typically
23 prescribed at unscrupulous pain clinics by
24 physicians acting outside the usual course of

Page 123

1  professional practice and include Schedule II pain
2  relieves such as oxycodone, Schedule IV
3  benzodiazepines such as alprazolam and Schedule IV
4  muscle relaxers such as carisoprodol."
5       Do you see that?
6     A.  I see that sentence, yes.
7     Q.  Were you aware of that information prior
8  to me reading it just now?
9     A.  I am aware of the "unscrupulous pain
10 clinics by physicians acting outside of the usual
11 course of practice."
12    Q.  Did you have an understanding that those
13 drugs that we mentioned there were some of the most
14 used and abused opioids?
15    A.  No.  I can't say for sure that I was
16 aware that they were the most -- what was the term
17 you used?
18    Q.  Used and abused opioids.
19    A.  No, I don't know that I would be able to
20 say that they were the most used and abused, but I
21 was -- I am familiar with the fact that -- have
22 been exposed to the information about the
23 "unscrupulous pain clinics by physicians acting
24 outside the usual course of professional practice."

Page 124

1     Q.  See in paragraph 3 it says, "Oxycodone
2  is a dangerously addictive Schedule II controlled
3  substance which is known to be highly abused and
4  diverted in the State of Florida."
5       Do you see that?
6     A.  I see that sentence, yes.
7     Q.  Do you recall that we or first thing
8  this morning read some documents about oxycodone
9  and specifically OxyContin going back to 2001-2003?
10 Do you recall that from earlier today?
11    A.  Do I recall a conversation or you
12 reading about oxycodone earlier today, is that your
13 question?
14    Q.  Correct.
15    A.  Yes, I'm aware that you read some
16 information related to oxycodone earlier today.
17    Q.  Did you have an understanding prior to
18 us reading that just now that oxycodone is a
19 dangerously addictive Schedule II controlled
20 substance?
21    A.  I'm aware that oxycodone is an addictive
22 substance.
23    Q.  When did you gain that knowledge?
24    A.  Probably sometime in the last three to

Page 125

1  five years.
2     Q.  If you go to paragraph 4, it says,
3  "Since 2009, Walgreens Jupiter, Florida
4  distribution center has been the single largest
5  distributor of oxycodone products in Florida."
6       Do you see that?
7     A.  I see that sentence, yes.
8     Q.  You've mentioned or wanted to mention
9  and have mentioned doctors or physicians several
10 times.  But do you see here that it was Walgreens
11 who was the single largest distributor of oxycodone
12 products in Florida?
13    MR. SWANSON:  Object to form.
14 BY THE WITNESS:
15    A.  So, I mentioned doctors twice, once
16 about 30 minutes ago and again because it's
17 actually in this sentence.  But it also goes back
18 to what I've said now a few times, which is that
19 everybody in the supply chain has a responsibility
20 to try to help with prescription drug abuse.
21 BY MR. GADDY:
22    Q.  My question was did you know that since
23 2009, and, again, this document came out in
24 September of '12, that since 2009, over that

Page 126

1  three-year period, Walgreens was the single largest
2  distributor of oxycodone products in Florida?  Did
3  you know that?
4      A.   I did not know that.
5      Q.   Prior to us reading it just now, did you
6  have any idea of that?
7      A.   I did not.
8      Q.   It goes on to say, "At the same time as
9  the abuse of prescription drugs became an epidemic
10 in Florida, Walgreens Florida retail pharmacies,
11 supplied by Respondent, commanded an increasingly
12 large percentage of the state's growing oxycodone
13 business.  In 2010, only 3 Walgreens retail
14 pharmacies were in the top 100 purchasers of
15 oxycodone within Florida.  In 2011, 38 Walgreens
16 pharmacies made the top 100 and 6 were in the top
17 10."
18       Do you see that?
19     A.   I see those sentences, yes.
20     Q.   Was that information that you were aware
21 of or that anybody at Walgreens ever made you aware
22 of?
23     A.   No.
24     Q.   "Through May of 2012, 44 Walgreens

Page 127

1  pharmacies are in the top 100 oxycodone purchasers,
2  all of them supplied by Respondent," which I'll
3  represent to you means Walgreens.
4       Do you see that?
5      A.   I do see that, yes.
6      Q.   Would you agree with me that having
7  Walgreens be 44 of the top 100 oxycodone --
8  Walgreens stores being 44 of the top 100 oxycodone
9  purchasers within the State of Florida would be
10 inconsistent with what you said is their
11 responsibility to try to combat opioid abuse?
12     MR. SWANSON:  Object to form.
13 BY THE WITNESS:
14     A.   So, this is the first time I've seen
15 this document.  It's the first time I've seen this
16 paragraph in this section, so I can't speak to the
17 context of how it applies to any number of
18 different metrics related to other pharmacies,
19 other distributors, other things going on in the
20 State of Florida.  I just don't have that knowledge
21 or background or expertise.
22 BY MR. GADDY:
23     Q.   But would you agree that having some of
24 the highest dispensing pharmacies of oxycodone in

Page 128

1  the State of Florida is inconsistent with what you
2  said is Walgreens' responsibility to combat or try
3  to solve or help opioid abuse across the country?
4      MR. SWANSON:  Object to form.
5  BY THE WITNESS:
6      A.   So, again, this is the first time I have
7  seen this information.  I can't respond one way or
8  the other about how it ranks, impacts or anything
9  else related to the supply chain.
10 BY MR. GADDY:
11     Q.   If we turn to the or go to the next
12 page, page 25, do you see the chart at the top of
13 the page?
14     A.   Uh-huh.
15     Q.   And do you see the chart in the
16 left-hand column lists several store locations?
17     A.   Yes.
18     Q.   And then over to the right there is a
19 heading that says "Oxycodone Purchases by Dosage
20 Unit."
21     A.   Yes.
22     Q.   And then it has three, three years, '09,
23 '10 and '11.
24      Do you see that?

Page 129

1      A.   I do.
2      Q.   And if you look at the first store
3  that's listed there, the Hudson, Florida store, you
4  see that it goes from 388,000 dosage units in 2009
5  to 900,000 the following year and 2.2 million in
6  2011.
7       Do you see that?
8      A.   I do.  I see those numbers, yes.
9      Q.   Do you agree with me that that's a
10 significant increase in the number of oxycodone
11 dosage units going to that particular pharmacy?
12     MR. SWANSON:  Object to form, foundation.
13 BY THE WITNESS:
14     A.   So I'm not familiar with this chart.
15 I've not seen it before.  I can't speak to it.  I
16 would agree with the terminology that there was an
17 increase from '09 to '10 to '11 based on reading
18 what's on the paper, but that's all I can speak to.
19 BY MR. GADDY:
20     Q.   Okay.  It was about a five times
21 increase, right?
22     A.   I'll trust.  I don't know.  I have not
23 done the math.  There is an increase based on those
24 numbers.  But, again, I'm not familiar with this

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 chart, so I don't know what the context is.
2 Q. Okay. If you look in the next store in
3 the Fort Myers location, it indicates in 2009 there
4 were 95,000 dosages of oxycodone that went to that
5 pharmacy, correct?
6 A. That's what that says. Assuming that --
7 I mean, again, I'm not familiar with this chart. I
8 don't know what "dosage unit" means per se.
9 Q. Okay. Assume it means pill.
10 A. Okay.
11 Q. So, in 2009 --
12 A. But I don't know that it means pill.
13 Q. Okay.
14 A. Does it mean pill? I don't know.
15 Q. For the purposes of our conversation
16 let's assume it means pill.
17 MR. SWANSON: Are you making a representation
18 to him or not? That's what he wants to know.
19 MR. GADDY: Sure.
20 BY THE WITNESS:
21 A. Does it mean bottle?
22 BY MR. GADDY:
23 Q. I am representing to you that it means
24 pill. Okay?

Page 131

1 A. Okay.
2 Q. 95,800 pills to Fort Myers, Florida
3 location.
4 Do you see that?
5 A. I do.
6 MR. SWANSON: Object to form.
7 BY MR. GADDY:
8 Q. And what does it go to two years later?
9 MR. SWANSON: Object to form.
10 BY THE WITNESS:
11 A. So, you just asked me to read the
12 numbers on the page?
13 BY MR. GADDY:
14 Q. Yeah, I'm asking what the chart
15 indicates the number of pills given to that
16 particular Walgreens pharmacy two years after it
17 was given 95,800 pills.
18 A. So, I've never seen this chart before.
19 I don't necessarily know what it's saying or what
20 the numbers mean.
21 What I can obviously agree to is that
22 under the 2009, if you go down, it says 95,800; and
23 then if you go to 2010, it shows a bigger number,
24 496,100.

Page 132

1 Q. What does it go to in 2011?
2 A. Well, if you go down again from 2011, it
3 says 2,165,900.
4 Q. Would you agree that there is a
5 significant increase in the number of pills that
6 went to that particular pharmacy and specifically
7 oxycodone pills between 2009 and 2011?
8 MR. SWANSON: Object to form, foundation.
9 BY THE WITNESS:
10 A. So, I'm not in the operations business.
11 I'm not in the dispensing business. I'm not a
12 pharmacist and I have not seen this chart before,
13 so I can't speak to whether it's significant or not
14 significant or anything else.
15 BY MR. GADDY:
16 Q. Well, you agree it's an over a 20 times
17 increase?
18 A. Again, that's your math. I've not done
19 the math. I probably need a calculator.
20 Q. You would or would not call a 20 times
21 increase in the number of oxycodone pills going to
22 one particular pharmacy a significant increase?
23 MR. SWANSON: Object to form, foundation.
24 BY THE WITNESS:

Page 133

1 A. So, I'm on the government relations
2 team. I don't have background related to
3 dispensing rates. I just can't speak to that.
4 BY MR. GADDY:
5 Q. You don't have an opinion on whether or
6 not that's a significant increase?
7 MR. SWANSON: Object to form.
8 BY THE WITNESS:
9 A. On the -- as part of the government
10 relations, I have opinions about different policy
11 issues, different political issues. I have
12 opinions on our Safe Medication Disposal Program.
13 Strong opinions on it.
14 I don't have an opinion because I don't
15 have the background or the training or the
16 education to comment on that being significant, not
17 significant or anything else.
18 BY MR. GADDY:
19 Q. Okay. Let's turn the page, to paragraph
20 8. I think it's on the next page. It says,
21 "Notwithstanding the ample guidance available,
22 Walgreens has failed to maintain an adequate
23 suspicious order reporting system."
24 Does that phrase mean anything to you?

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    A.   It does not.
2    Q.   It says, "And as a result, Walgreens has
3  ignored readily identifiable orders and ordering
4  patterns that, based on the information available
5  throughout the Walgreens Corporation, should have
6  been obvious signs of diversion occurring at,"
7  again, "Respondent's customer pharmacies."
8        Do you see that?
9    A.   I see that sentence, yes.
10    Q.   Would you agree that if there was
11  obvious signs of diversion occurring at Walgreens
12  pharmacies and that Walgreens wasn't doing anything
13  about it, that would be inconsistent with the
14  responsibility that you've testified that Walgreens
15  has to alleviate opioid abuse, correct?
16    MR. SWANSON:  Object to form.
17  BY THE WITNESS:
18    A.   So, I've never seen this document before
19  and I've not seen this paragraph before, so I can't
20  speak to it.  I don't know what 21 CFR of the
21  Federal Code is.  So, I can't offer an opinion on
22  that one way or the other.
23  BY MR. GADDY:
24    Q.   Pretend the document is not here.  Okay.

Page 135

1    A.   But you just wanted -- you just read it.
2    Q.   Okay.  Well, we're going to do it again.
3        Pretend the document is not here.  I'm
4  just going to ask you a question.  All right.
5    A.   Okay.
6    Q.   If Walgreens Corporation had obvious
7  signs of diversion of oxycodone pills at its
8  pharmacies and it didn't do anything about it, that
9  would be inconsistent with what you testified to as
10  the responsibility of Walgreens in trying to
11  alleviate opioid abuse in the country?
12    MR. SWANSON:  Object to form, incomplete
13  hypothetical, vague, calls for speculation.
14  BY THE WITNESS:
15    A.   So, I would say that it's another
16  hypothetical question that I, you know, I don't
17  know that I can offer an opinion on one way or the
18  other.
19        What I can tell you is what I've done
20  since coming to Walgreens, how that's changed over
21  the last seven years, and how I've been spending my
22  time over the last three years in particular as it
23  relates to safe medication disposal.
24  BY MR. GADDY:

Page 136

1    Q.   Okay.  Well, and I promise we're going
2  to talk about that for a little bit in a little bit
3  down the road here.
4        But safe medication disposal, you've
5  been working on that since 2015, 2016ish?
6    A.   Yes.
7    Q.   Okay.  Would it be fair to say that that
8  was the first large-scale project that you were
9  involved with that would be directly applicable to
10  the opioid crisis, if someone was to call it that?
11    MR. SWANSON:  Object to form.
12  BY THE WITNESS:
13    A.   It's -- I know that we had been involved
14  and weighed in on other public policy issues
15  related to prescription drug abuse prior to 2015
16  and '16.
17  BY MR. GADDY:
18    Q.   My question was was that the first
19  large-scale project that you were involved in
20  related to prescription drug abuse?
21    MR. SWANSON:  Him personally?
22    MR. GADDY:  That's what I asked.
23    MR. SWANSON:  I just want to make sure by
24  "you" you mean him personally.

Page 137

1    MR. GADDY:  Yes.
2  BY THE WITNESS:
3    A.   For me personally?  That was the first
4  project that I was in charge of on behalf of
5  Walgreens or had joint responsibility for related
6  to prescription drug abuse, yes.
7  BY MR. GADDY:
8    Q.   Prior to that rollout in 2016, there
9  weren't any projects that you were in charge of or
10  had joint responsibility for that were directed to
11  helping the opioid abuse, prescription drug abuse
12  in the U.S.?
13    A.   No, I wouldn't agree with that.  I was
14  involved in efforts, legislative as well as
15  probably regulatory, related to prescription drug
16  abuse prior to that.
17        But your question was is this the first
18  large-scale project, and I responded that it's the
19  first one I was in charge of or had joint
20  responsibility for.  But it's not the first one I
21  was involved with it.
22    Q.   What's the earlier one that you would
23  point to?
24    A.   I can't recall, although I'm fairly

Highly Confidential – Subject to Further Confidentiality Review

Page 138

1 confident that there was different pieces of
2 legislation at the federal level that we weighed in
3 on that related to prescription drug abuse.
4    Q.   But nothing that's memorable as you sit
5 here today?
6    A.   The only thing that jumps out relates to
7 good faith dispensing and some of the local, state
8 and federal laws around dispensing and the role of
9 the pharmacist in that regard.
10   Q.   When did the -- when did Walgreens good
11 faith dispensing program roll out?
12   A.   I want to say sometime in the last four
13 or five, six years.
14   Q.   You will agree it was after this
15 settlement with the DEA in 2013?
16   MR. SWANSON:  Object to form.
17 BY THE WITNESS:
18   A.   I don't know that for certain.
19 BY MR. GADDY:
20   Q.   Let's go to page 27 of this document,
21 paragraph 12.
22        Do you see that?
23   A.   Yes, I see paragraph 12.
24   Q.   I want to ask you about several of the

Page 139

1 specific allegations that kind of made the basis
2 for the charges against Walgreens and see whether
3 or not any of those were made -- whether or not you
4 were made aware of any of those.
5        It says, "Respondent's employee with
6 overall responsibility for Schedule II drug
7 operations."
8        Do you know what Schedule II means?
9    A.   I don't.  I get mixed up between
10 Schedule I and Schedule II.
11   Q.   Okay.  Okay.  You do have an
12 understanding that those are classifications for
13 drugs by the DEA?
14   A.   Something to do with that, yes.
15   Q.   And that different drugs are scheduled
16 either I through V depending on different
17 properties about them?
18   A.   I'm not as familiar with the -- I just
19 actually thought there was two.  You have now
20 pointed out there is five.  So, you have now
21 exceeded my knowledge on the topic.
22   Q.   It says, "Respondent's employee with
23 overall responsibility for Schedule II drug
24 operations, the C-II function manager, raised

Page 140

1 questions within the corporation about what she
2 correctly identified as unusually large orders for
3 Schedule II narcotics placed regularly by several
4 customer pharmacies.  Based on the evidence
5 available to DEA, none of these orders were
6 reported to the DEA as suspicious and all appear to
7 have been shipped without any further due diligence
8 to verify their legitimacy."
9        Do you see that?
10   A.   I do see that sentence.
11   Q.   Do you have any understanding or
12 appreciation whatsoever for laws or regulations
13 regarding suspicious order reporting or due
14 diligence requirements?
15   A.   None.
16   Q.   If you look at paragraph A, it says,
17 "In January 2011, Jupiter's C-II function manager
18 expressed concern about the enormous volume of
19 30 milligram oxycodone being ordered by three
20 stores," and it lists the stores, it says,
21 "Concluding in an e-mail to the manager of Rx
22 inventory drugstores at Walgreens corporate
23 headquarters in Deerfield, Illinois, that she felt
24 the stores needed 'to justify the large quantity.'"

Page 141

1        Do you see that?
2    A.   I see that in the sentence, yes.
3    Q.   "With regard to Store No. 3836 in
4 Port Richey, Florida she noted that Respondent had
5 shipped this 3,271 bottles of 100 count
6 30 milligram oxycodone, which is 327,100 dosage
7 units, in a 40-day period from 12/1/10 to 1/10/10"
8 (sic).
9        Do you see that?
10   A.   I do.
11   Q.   Do you have an appreciation for that
12 being a significant number of oxycodone pills?
13   MR. SWANSON:  Object to form, foundation.
14 BY THE WITNESS:
15   A.   I don't have an appreciation.
16 BY MR. GADDY:
17   Q.   It goes on to say this caused "her to
18 question 'how can they even house this many
19 bottles.'  She then inquired of the same corporate
20 manager, 'How do we go about checking the validity
21 of these orders?'"
22        Do you see that?
23   A.   I do see that written, yes.
24   Q.   It goes on to say in the next paragraph,

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  "Despite having raised these concerns from the
2  distributor to a supervisor at corporate
3  headquarters, none of these orders were reported as
4  suspicious and there appears to have been no other
5  inquiry conducted into the circumstances of the
6  enormous amount of narcotics being shipped to Store
7  No. 3836 in Port Richey, a town of less than 3,000
8  people in a county with a population of only
9  approximately 475,000."
10     Do you see that?
11     A.  I do see that written, yes.
12     Q.  If -- and, again, don't focus on the
13 document.  But if Walgreens had information that
14 there were that many pills being shipped to a
15 single store in that size of a community over such
16 a short period of time, do you agree that that
17 would be inconsistent with what you've said is
18 Walgreens' responsibility to alleviate opioid abuse
19 in the U.S.?
20     MR. SWANSON:  Object to form, foundation,
21 calls for speculation.
22 BY THE WITNESS:
23     A.  I don't have enough knowledge of most of
24 what you just read here, and I have now read as

Page 143

1  well, to have an opinion one way or the other.
2     Q.  You have no opinion one way or the other
3  whether that number of dosage units is cause for
4  concern?
5     MR. SWANSON:  Object to form, foundation.
6  BY THE WITNESS:
7     A.  So, I'm on the government relations
8  team, and we have responsibility to talk about
9  issues of importance to the company with members of
10 Congress and their staff as well as now also our
11 policy development process.
12     I'm not a pharmacist, and I've not been
13 on the operations side of the business.  So, I
14 don't have any experience one way or the other on a
15 lot of these terms let alone quantities.
16 BY MR. GADDY:
17     Q.  Do you have an opinion one way or the
18 other of whether or not the -- a manager expressing
19 concern over how a store can hold that many bottles
20 of opioids is a concern that should be taken
21 seriously?
22     MR. SWANSON:  Object to form, foundation.
23 BY THE WITNESS:
24     A.  So, this is the first time I've seen

Page 144

1  this document.  You know, I'm the GR guy.  Not
2  operations, not pharmacy.
3  BY MR. GADDY:
4     Q.  I'm just asking whether or not you have
5  an opinion on whether or not a concern raised by a
6  manager about whether or not a store can actually
7  hold 3,271 bottles of 100 count oxycodone should be
8  taken seriously?
9     MR. SWANSON:  Object to form.
10 BY MR. GADDY:
11     Q.  If you don't have an opinion, that's
12 fine.
13     A.  Yeah, I don't have an opinion one way or
14 the other.
15     Q.  Okay.  Was this information that was
16 ever provided to you either in that press release
17 that you reviewed back in 2013 or by Walgreens in
18 any form or fashion?
19     A.  No.  I don't believe so.
20     Q.  Turn to page 34.  And if you actually
21 look over to the right side of the page, on
22 page 35, do you see that ultimately this document
23 that we have been reading from was signed by
24 Michele Leonhart?

Page 145

1     A.  Okay.
2     Q.  The administrator of the Drug
3  Enforcement Administration.
4     Do you see that?
5     A.  I do.
6     Q.  Do you have -- did you know who that was
7  prior to just looking at this?
8     A.  I did not.
9     Q.  Go back to the -- to page 34 and top of
10 the page is a paragraph that starts, "In view of
11 the foregoing."
12     A.  Okay.
13     Q.  It says, "In view of the foregoing and
14 based on information before the agency as of the
15 issuance of this notice, it is my preliminary
16 finding pursuant to 21 USC 823(f) and 824(a)(4)
17 that Walgreens' continued registration is
18 inconsistent with the public interest."
19     Do you see that?
20     A.  I do.
21     Q.  It goes on to say that "Under the
22 summarized facts and circumstances described
23 herein, it is my preliminary finding, significantly
24 in light of the rampant and deadly problem of

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 prescription controlled substance abuse in Florida,
2 that Respondent's continued registration while
3 these proceedings are pending constitutes an
4 imminent danger to the public health and safety."
5      Do you see that?
6      A.   I do.
7      Q.   If you go down to the next paragraph, do
8 you see where it says, "Pursuant to certain
9 statutes and regulations, the special agents and
10 diversion investigators of the DEA who serve this
11 order to show cause and immediate suspension
12 registration are authorized to place under seal or
13 to remove for safekeeping all controlled substances
14 that Walgreens possesses pursuant to the
15 registration which I have herein suspended."
16      Do you see that?
17      A.   I do.
18      Q.   Okay.  Do you have an understanding that
19 the DEA actually put a padlock and locked up the
20 controlled substances that Walgreens had in their
21 warehouse in Jupiter, Florida?
22      MR. SWANSON:  Object to form.
23 BY THE WITNESS:
24      A.   I do not.

Page 147

1 BY MR. GADDY:
2      Q.   In the press release or in any
3 information given to you by Walgreens back in 2013,
4 did they communicate to you that the DEA had
5 determined that Walgreens being registered to
6 distribute controlled substances was inconsistent
7 with the public interest?
8      MR. SWANSON:  Object to form.
9 BY THE WITNESS:
10      A.   I don't believe so.
11 BY MR. GADDY:
12      Q.   Turn backwards to page 7.
13      A.   Okay.
14      Q.   Do you see under paragraph 3 it says
15 "Walgreens General Obligations"?  Do you see that?
16      A.   Yes.
17      Q.   And --
18      MR. SWANSON:  Sorry.  I'm on the wrong 7.
19      MR. GADDY:  Page 7.  7 of 343.
20 BY MR. GADDY:
21      Q.   Do you see here it's listing Walgreens'
22 general obligations under the settlement agreement;
23 you see there is paragraphs A, B and C?
24      A.   I do.

Page 148

1      Q.   Under C, it says, "Walgreens agrees to
2 pay the United States $80 million, ('the Settlement
3 Amount).'"
4      Do you see that?
5      A.   I do.
6      Q.   Were you aware that as a result of the
7 allegations that some of which we just went through
8 that Walgreens made this payment to the DEA?
9      MR. SWANSON:  Object to form.
10 BY THE WITNESS:
11      A.   I can recall vaguely based on the press
12 release that there was a settlement that involved
13 payment to the DEA, but I don't recall the number.
14 BY MR. GADDY:
15      Q.   Do you agree that $80 million is a
16 substantial settlement amount that Walgreens paid?
17      MR. SWANSON:  Object to form.
18 BY THE WITNESS:
19      A.   So, again, I'm not sure in the context
20 whether substantial.
21 BY MR. GADDY:
22      Q.   In any context.
23      A.   In any context?
24      Q.   Don't you think that $80 million is a

Page 149

1 substantial sum of money for a company to pay?
2      MR. SWANSON:  Object to form.
3 BY THE WITNESS:
4      A.   Can you be more specific?
5 BY MR. GADDY:
6      Q.   I don't think so.
7      A.   So, you said is 80 million a lot of just
8 money in general?
9      Q.   I'm asking whether or not you believe
10 that $80 million is a significant civil settlement
11 for Walgreens to pay.
12      MR. SWANSON:  Object to form.
13 BY THE WITNESS:
14      A.   So, I can't speak to civil -- what was
15 the term you used?
16 BY MR. GADDY:
17      Q.   Settlement.
18      A.   Civil settlement.  Is that -- I don't
19 know what if that's different than --
20      Q.   Doesn't mean --
21      A.   -- other settlements.
22      $80 million as a stand-alone number is a
23 lot of money, yes.  I can't speak to whether it's a
24 lot in the context of a civil settlement.  I don't

Page 150

1 know if that's more or less than has occurred in
2 the past or present. But is $80 million a lot of
3 money? I think $80 million generally is a lot of
4 money.
5    Q. Would it surprise you to know that it
6 was the biggest ever paid at the time?
7    MR. SWANSON: Object to form.
8 BY THE WITNESS:
9    A. I wasn't aware of the number at the
10 time. I don't know circumstances.
11    MR. SWANSON: Jeff, if you're swapping
12 documents, can we take another break, please.
13    MR. GADDY: Sure.
14    MR. SWANSON: Thank you.
15    THE WITNESS: Great.
16    THE VIDEOGRAPHER: We are off the record at
17 10:50 a.m.
18      (WHEREUPON, a recess was had
19      from 10:50 to 11:05 a.m.)
20      (WHEREUPON, a certain document was
21      marked as Walgreens-Kaleta Exhibit
22      No. 10: 5/9/18 e-mail string;
23      WAGMDL00383697 - 00383700.)
24    THE VIDEOGRAPHER: We are back on the record

Page 151

1 at 11:06 a.m.
2 BY MR. GADDY:
3    Q. Mr. Kaleta, I've already put in front of
4 you what I've marked as Kaleta 10, which is
5 P-WAG-1937, Bates No. 383697.
6    You can look at the e-mail if you want,
7 but I'll represent to you I'm just giving it to you
8 because it's got your resume attached on the back.
9    A. Okay.
10    Q. And I was going to ask you a couple
11 questions about that.
12    A. Okay.
13    Q. Do you recognize this as being your
14 resume that you generated?
15    A. Yes.
16    Q. And you indicate at the top of the
17 page you have been with Walgreens since May of
18 2011?
19    A. Yes.
20    Q. And that position listed there, VP of
21 federal government relations and U.S. public
22 policy, is that -- that's the accurate position as
23 of right now?
24    A. So, I started as a senior director. So,

Page 152

1 this doesn't reflect my old role that I had from
2 2011 until 2015.
3    Q. Okay. In 2015, this title became
4 accurate?
5    A. That's correct.
6    Q. Under the "Responsibilities" the first
7 bullet point indicates that you "serve as the chief
8 lobbyist for federal legislative and regulatory
9 issues," correct?
10    A. Yes.
11    Q. And to be fair, that involves more than
12 just issues related to opioids?
13    A. Yes, that's correct.
14    Q. The third bullet point in the case, you
15 "develop and execute U.S. public policy strategy at
16 the federal, state and local levels."
17    Is that still correct?
18    A. Yes.
19    Q. And the last bullet point in that
20 section indicates that you "manage ten full-time
21 employees, nine outside consultants and an annual
22 budget of more than $11 million."
23    Do you see that?
24    A. Yes.

Page 153

1    Q. You told us earlier you would have
2 guessed 8 to 10. Do you agree that 11 is a more
3 accurate number?
4    A. So, there's different portions of the
5 budget. Included in that $11 million is also PAC
6 dollars, political action committee. And so that
7 is not Walgreens funds. Those are
8 employee-collected funds to be used for political
9 action purposes. So, I think that's probably where
10 the delta would come in.
11    Q. Okay. So, if you're estimating 8 to
12 $10 million in Walgreens money, there is another
13 1 to $3 million in Walgreens PAC money that goes
14 into your budget?
15    A. So, it's -- no. It's a couple hundred
16 thousand dollars. In addition, we have at
17 different points over the last couple of years, the
18 budget will increase depending on what's going on
19 with the company.
20    My guess and the reason that this
21 reflected this higher number was because it
22 probably included spending for the national
23 political campaigns during the 2016 calendar year.
24    Q. Okay. So, that's why when you gave me

Page 154

1 the budget range, you gave me a range because from
2 year to year it may fluctuate?
3     A.   That's correct.
4     Q.   Okay.  So, would it be fair to say that
5 8 to 11 million is a fairly accurate range for
6 your department's budget?
7     A.   Yes.  But just to put a finer point on
8 it.  The 8 to 10 or 8 to 11 million also includes
9 state spending.  So, that's not just federal and
10 public policy.  That also includes state.
11    Q.   The Walgreens PAC, is that money that
12 Walgreens solicits and collects from Walgreens
13 employees?
14    A.   That's correct.
15    Q.   And that -- does that money go anywhere
16 other than into the government relations budget?
17    A.   So, that money doesn't even pass through
18 our budget.  That money goes directly to candidates
19 running for office or those that are running for
20 reelection.
21    Q.   Correct me if I'm wrong, but I thought
22 you told me this morning that this budget, this
23 $11 million, does not include political
24 contributions?

Page 155

1     A.   Right.  So, there is two different types
2 of political contributions.  There is corporate
3 contributions, which are made through Walgreens,
4 and those are for state candidates.  I don't manage
5 the state political contribution fund.  That's not
6 included in this 8 to $11 million number.
7         For the purposes of my resume, I may
8 have included the PAC number, which is roughly
9 $250,000 a year.  And then, again, as I mentioned,
10 it likely includes the uptick in spend, which is
11 probably somewhere around a million dollars for the
12 2016 Presidential political conventions.
13    Q.   And without going into any -- into too
14 terribly much detail, your previous positions were
15 with companies such as Humana, Caterpillar, U.S.
16 Chamber of Commerce and ChamberBiz.
17         Did all those positions involve lobbying
18 activities or government relations activities?
19    A.   No, I didn't lobby at all at ChamberBiz
20 from 2000 to 2001, and I served as a lobbyist at
21 various points during the chamber from '95 to 2001
22 but not consistently throughout.
23    Q.   Okay.  But beginning with your time at
24 Caterpillar, which started it looks like in

Page 156

1 October of 2001, through your time at Humana from
2 '05 to '11, you were constantly in or consistently
3 I should say in government relations or lobbying
4 type positions?
5     A.   That's correct.
6     Q.   I presume that during your time at
7 Caterpillar you didn't have any involvement in any
8 opioid-related issues?
9     A.   I believe that's true, yes.
10    Q.   Okay.  During your time at Humana from
11 '05 to '11, did you have any -- any items on your
12 legislative agenda or your lobbying agenda that
13 would have been specific to opioids?
14    A.   Probably, on a limited basis in that
15 Humana was one of the largest prescription drug
16 plans in the country.
17         When I joined in '05, 2006 was the first
18 year of the Medicare Modernization Act which kicked
19 off the Part D program, so they ended up getting
20 a million plus members after that year.  So, it's
21 possible that I was lobbying on some type of opioid
22 issues relating to the Part D benefit and how some
23 of those rules were structured.
24    Q.   Is there anything that is memorable to

Page 157

1 you as you sit here today?
2     A.   No.
3     Q.   I show you what I'll mark as Kaleta 11.
4         (WHEREUPON, a certain document was
5          marked as Walgreens-Kaleta Exhibit
6          No. 11:  12/15/15 e-mail string
7          with attachment; WAGMDL00042452 -
8          00042464.)
9 BY MR. GADDY:
10    Q.   One of the items that you listed on
11 your resume as being involved in or maybe you
12 listed it as an accomplishment was you talked about
13 your medication kiosks, correct?
14    A.   That's correct.
15    Q.   So, I want to talk about that a little
16 bit.
17    A.   Okay.
18    Q.   And this is a program that I think you
19 told us earlier you started working on maybe late
20 2015 and began rolling out in 2016?
21    A.   Yes.
22    Q.   And would it be accurate to describe the
23 general idea of the program that you were involved
24 with is Walgreens would install a kiosk inside one

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  of the Walgreens pharmacy stores or Walgreens
2  stores where individuals at the store could drop
3  off any unwanted medication into the kiosk to
4  dispose of it?
5      A.   Yes.  That's -- that's a fair
6  assessment.
7      Q.   And there is no limitation on the type
8  of drug that could be put in there or is there?
9      A.   So, for pills there are no limitations.
10  The boxes cannot handle sharps, needles, as well as
11  most lotions are not allowed.
12      Q.   So, any pills, whether it's an oxycodone
13  pill that you have been talking about a lot today
14  or a Fred Flintstone vitamin, all of that could go
15  into these things?
16      A.   That's correct.
17      Q.   If we look at this document here, this
18  is P-WAG-1818, which is Bates No. 42452.
19          If you turn to page -- the first
20  page attached, the first page of the attachment is
21  a PowerPoint presentation.  It looks like it's from
22  October 2015 presented by Tasha Polster and Brian
23  Arnold.
24          Do you see that?

Page 159

1      A.   I do.
2      Q.   And do you know whether or not you're
3  familiar with this PowerPoint?
4      A.   I didn't create it.  I believe I may
5  have seen it before, but I can't say for sure.
6      Q.   Okay.  If you turn to the second page,
7  the heading is the "Drug Take-Back National Plan."
8          Do you see that?
9      A.   Yes.
10      Q.   It says, "The ask is to get a decision
11  on which direction to go for a national drug
12  take-back plan.  The costs are primarily due to the
13  service fee to have a hazardous waste company haul
14  the discarded medications away each month or any
15  time the kiosk is full."
16          Do you see that?
17      A.   I do.
18      Q.   And is that consistent with your
19  understanding?
20      A.   Yes.
21      Q.   And if you flip a couple pages, you get
22  to a slide that says -- flip two pages, you get to
23  a slide that says "Walgreens Solution Today."
24          Do you see that?

Page 160

1      A.   Yes.
2      Q.   This would have been any -- this would
3  have been the options that Walgreens had in place
4  in October of '15, which would have been prior to
5  these drug kiosks going into place, correct?
6      A.   Correct.
7      Q.   And what it says here is that Walgreens
8  had a Medsaway pouch located in the diagnostic
9  aisle.
10          Do you see that?
11      A.   I do.
12      Q.   And it indicates that that pouch could
13  be used for anything, such as narcotics, liquid
14  medications, patches or even controlled substances,
15  correct?
16      A.   Correct.
17      Q.   And if you go down, you see that
18  Walgreens was selling these Medsaway pouches where
19  patients could dispose of --
20      A.   Excuse me.
21      Q.   -- could dispose of their unwanted drugs
22  for $4, correct?
23      A.   Yes.
24      Q.   And it indicates there that the cost to

Page 161

1  Walgreens was $2.25?
2      A.   That's what it says, yes.
3      Q.   So, in October of 2015 Walgreens was
4  selling a solution to get rid of old drugs,
5  including controlled substances, for a profit?
6      A.   So, I'm not familiar with whether that
7  2.25 includes labor costs or not or if that's just
8  actually how much we have to pay for the actual
9  item itself.
10          But I know that typically there is the
11  cost of -- the ingredient cost of a drug, there is
12  the actual cost of an item and then there is the
13  additional cost on top of that for employees, the
14  stores, lights, electricity, security, all that
15  other kind of stuff.  What I don't know is whether
16  that is part of that 2.25 or 3.99.
17      Q.   What the PowerPoint indicated is that
18  you're selling it for $4 and it cost you 2.25,
19  correct?
20      MR. SWANSON:  Object to form, foundation.
21  BY THE WITNESS:
22      A.   So, that's what it -- but, again, I
23  don't know what's included in the 2.25.
24  BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    Q.   Okay. I'm just asking you if that's
2  what's represented in the PowerPoint?
3    A.   It says, "Cost."
4    MR. SWANSON:  Same objections.
5  BY THE WITNESS:
6    A.   Yeah, I'm not sure what's included in
7  the 2.25. My guess is that does not include other
8  associated costs. That's just the actual purchase,
9  transaction price to get this from whoever
10  manufactures it and doesn't include other costs
11  associated with it.
12  BY MR. GADDY:
13    Q.   Do you think if you factor in the labor
14  costs that it comes to exactly $3.99?
15    MR. SWANSON:  Object to form.
16  BY THE WITNESS:
17    A.   So, I'm in the government relations
18  business. I'm not in the sales pricing team. So I
19  have no idea.
20  BY MR. GADDY:
21    Q.   You're not claiming that Walgreens was
22  giving these medication disposal pouches away for
23  free, are you?
24    A.   I would not claim that.

Page 163

1    Q.   If you turn three pages, you get to a
2  slide that says "Costs of the Kiosk."
3      Do you see that?
4    A.   I'm sorry. Which slide are you on?
5    Q.   Slide 7.
6    A.   Okay.
7    Q.   It says, "Costs of the Kiosk." Are you
8  with me?
9    A.   "Costs of the Kiosk," yes.
10    Q.   And first bullet point says a one-time
11  cost for the unit is just about $500, right?
12    A.   That's what that says.
13    Q.   And then in the bottom bullet point it
14  indicates that the estimated service per year per
15  location is approximately $2,600, correct?
16    A.   That's what it says.
17    Q.   And if you go to the very next page, it
18  lays out three different options of deploying this
19  program, correct?
20    A.   Yes. That's what it looks like.
21    Q.   And the different options involve the
22  number of stores that the kiosk would be placed in
23  and the estimated cost to Walgreens for each of
24  those, correct?

Page 164

1    A.   At this moment in time in 2015, that's
2  correct.
3    Q.   Okay. If you go back to the e-mail and
4  if you go to the second page and start at the top,
5  do you see the e-mail goes to Brad and Richard?
6      Do you see that?
7    A.   I do.
8    Q.   It says, "With the cancellation of
9  yesterday's" -- do you know what RxIC means?
10    A.   I do. I'm not familiar with what the
11  acronym actually stands for, but I'm familiar with
12  that particular entity within Walgreens.
13    Q.   How would you describe it?
14    A.   It's a review process for any number of
15  different pharmacy operation-related programs to
16  have discussion around priorities, what gets
17  implemented and executed when, the associated costs
18  with that, et cetera.
19    Q.   Is that the organization that would
20  approve spending money for a program such as this?
21    A.   Yes.
22    Q.   It says, "Attached are two
23  time-sensitive requests we'd like to present for
24  your approval via e-mail."

Page 165

1      And the second one is related to the
2  drug take-back program, correct?
3    A.   Correct.
4    Q.   And the -- under the third bullet point
5  it says, "Option 1 would create the biggest splash
6  in the media and would be the best way to manage
7  the program."
8      Do you see that?
9    A.   I do.
10    Q.   Were you involved in the program at this
11  point in time as it related to pitching it to the
12  folks with RxIC who would be making these
13  decisions?
14    A.   We had input around the regulatory
15  challenges associated with installing safe
16  medication disposal kiosks in the stores as well as
17  discussion around how scaleable we wanted and were
18  able to have this program, in large part because
19  there is a number of different criteria that go
20  into -- did go into and continue to go into whether
21  we have where we put the boxes.
22    Q.   My question was whether or not you had
23  any involvement in pitching the program to the
24  folks that would make the decision about whether or

Page 166

1 not to fund it?

2     A.   I was not part of the Rx -- the RxIC

3 meeting, according to this e-mail, was canceled. I

4 didn't draft this e-mail. I don't know that I

5 provided input on these different options. I don't

6 believe I did.

7     Q.   Okay. It said, "Option 1 would create

8 the biggest splash in the media and would be the

9 best way to manage the program. Pharmacy must be

10 open in order to have the kiosk available for drop

11 off. Otherwise we have to lock it so no intake can

12 happen while the pharmacy is closed."

13      Do you see that?

14     A.   Yes.

15     Q.   And the first option was to put a kiosk

16 in each of Walgreens 24-hour stores, correct?

17     A.   Yes. That's what it says.

18     Q.   And that would have -- would have

19 resulted in approximately 1,500 Walgreens stores

20 getting one of these drug take-back kiosks,

21 correct?

22     A.   At that moment at that snapshot in 2015,

23 based on estimates of the program, that is correct.

24 Those numbers have since been adjusted

Page 167

1 significantly.

2     Q.   Sure. But the proposal that was in

3 place at the time for Option 1 was 1,500 stores for

4 $3.8 million?

5     A.   Based on the limited knowledge we had of

6 how much the program was going to cost. These were

7 estimates. This had never been done before within

8 our company and had only been tried on a very

9 limited basis with other -- a handful of smaller

10 pharmacies around the country.

11     Q.   That was the proposal that was -- that

12 was made for as far as the first option that

13 presented to this -- this group that would make the

14 decisions about funding, correct?

15     A.   That's what it says. There is Option 1.

16     Q.   And Option 2 was one kiosk per district.

17 So, 600 stores for $1.6 million, correct?

18     A.   That's what it says, that's correct.

19     Q.   Then there was a third option for one

20 store per area, 120ish stores, for about $300,000,

21 correct?

22     A.   That's what it says, correct.

23     Q.   If you turn back to the first page of

24 the e-mail, you see that ultimately in that second

Page 168

1 e-mail there from Brian Arnold to Natasha Polster

2 and Jay Jorbin that Option 2 is what was selected

3 there, correct?

4     A.   That's what it says, yes.

5     Q.   The option of 1,500 stores and

6 $3.8 million in costs was rejected and Option 2 of

7 600 stores, 620 stores and $1.6 million is what was

8 selected to go with by this group, correct?

9     A.   Well, I don't know if I would so far as

10 to say that Option 1 was rejected. What that

11 e-mail shows is that Option 2 was what was

12 approved.

13      So, I am aware that there was

14 conversations around an initial take-back 1.0 as we

15 referred to it internally with the expectation of

16 potentially expanding on it, which in fact we have.

17      So, I wouldn't agree with the

18 classification that Option 1 was denied. Option 1

19 was considered and the initial option was to go

20 with 2 with an idea of likely expansion.

21     Q.   Okay. They chose Option 2?

22     A.   That's what the e-mail says, yes.

23     Q.   Okay. Would it be accurate to say that

24 around the same time that you were working on this

Page 169

1 project within Walgreens that there were some push

2 by some folks in Congress to make these types of

3 drug take-back programs mandatory in every

4 pharmacy?

5     A.   It would be accurate to say that there

6 was pushes in different parts of the country, at

7 the local level, at the state level and on a very

8 limited basis at the federal level, yes.

9     Q.   And Walgreens opposed those efforts,

10 correct?

11     A.   Inaccurate. Walgreens was working with

12 and had multiple discussions going on about

13 different safe medication or -- excuse me -- about

14 different types of take-back programs that were

15 considered by legislatures, municipalities as well

16 as the Federal Government. Some of them we weighed

17 in on opposition to, others we were in support of,

18 and others we were just trying to provide feedback.

19     Q.   I show you what I'm going to mark as

20 Kaleta 12.

21      (WHEREUPON, a certain document was

22      marked as Walgreens-Kaleta Exhibit

23      No. 12: 5/6/16 e-mail;

24      WAGMDL00615477.)

Page 170

1    MR. GADDY:  This is P-WAG-1895, Bates
2  No. 615477.
3  BY MR. GADDY:
4    Q.  Do you see this is a one-page e-mail
5  from you to your boss, Chuck Greener, as well as
6  the other two lobbyists who you said underneath
7  you, Alethia Jackson and Katie Troller.
8      Do you see that?
9    A.  I do.
10   Q.  The subject of the e-mail is "Mandatory
11  Take-Back Amendment."
12     Do you see that?
13   A.  Yes, I do.
14   Q.  You say, "Chuck, we can discuss more on
15  Monday but below is an update on the potential
16  Slaughter amendment to the opioid abuse bills
17  coming to the House floor this week.  Slaughter's
18  two-page bill mandates take-back in all pharmacies,
19  but paid for by pharmaceutical companies."
20     It says, "We are strongly opposed but
21  are trying to prevent her amendment from being
22  included."
23     Do you see that?
24   A.  I do.

Page 171

1    Q.  I asked you a minute ago if you opposed
2  mandatory take-backs, and I think your words were
3  "Absolutely not."
4      You agree that here in this e-mail you
5  said you were strongly opposed to her suggestion of
6  mandatory take-back programs?
7    MR. SWANSON:  Object to form.
8  BY THE WITNESS:
9    A.  No.  So, what you said was, "You opposed
10  all efforts at mandatory take-back," and I
11  responded by saying, "That's inaccurate."  I didn't
12  say strongly opposed.  I said inaccurate.  Can we
13  read it back?
14  BY MR. GADDY:
15   Q.  You opposed or Walgreens -- let me ask
16  it this way.
17     Walgreens opposed or Walgreens was in
18  favor of mandatory drug take-back programs?
19   A.  So, that's a vague question.  Are you
20  talking about in California in different
21  municipalities around the state, are you talking
22  about in the State of Illinois, or are you talking
23  about the federal level?
24   Q.  I am talking about was Walgreens in

Page 172

1  favor of or opposed to mandatory drug take-back
2  programs at every pharmacy across the country?
3    MR. SWANSON:  Object to form.
4  BY THE WITNESS:
5    A.  So, again, you need to be more specific.
6  There is multiple bills that have been introduced,
7  debated across the country, in cities and
8  municipalities and states as well as the Federal
9  Government.  So, I can't answer your question
10  unless you're more specific.
11  BY MR. GADDY:
12   Q.  I'm pretty sure I said across the
13  country.
14   A.  Pardon?
15   Q.  I'm pretty sure I said across the
16  country.
17   MR. SWANSON:  Object to form.
18  BY THE WITNESS:
19   A.  Yeah, I'm not in a position and I
20  wouldn't be really good at my job if I just blanket
21  statement said we are for or against one phrase or
22  another.
23     Obviously the details are significant
24  and important, and it depends upon which part of

Page 173

1  the country.  It depends upon what the legislation
2  does, how it's implemented, who pays for it,
3  whether it's voluntary in nature, whether subsidies
4  are provided.  So, if you want to get into the
5  specifics, we can go down that road.
6    Q.  Let's get into this e-mail that you
7  wrote.
8      You say here that you are "strongly
9  opposed but are trying to prevent her amendment
10  from being included during Rules Committee next
11  Tuesday night."  Correct?
12   A.  That's what the sentence says, that's
13  correct.
14   Q.  Then it says, "Hence the meetings with
15  Representative Pete Sessions (Republican from
16  Texas) and Stefano on Tuesday at noon."
17     Do you see that?
18   A.  I do.
19   Q.  Who is Stefano?
20   A.  That's a reference to Stefano Pessina,
21  our executive vice chairman and Chief Operating
22  Officer.
23   Q.  So, this issue and your strong
24  opposition to Representative Slaughter's take-back

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  amendment was to the extent that you were having
2  the CEO of Walgreens Boots Alliance go and have a
3  meeting with a Representative on the issue?
4      MR. SWANSON:  Object to form.
5  BY MR. GADDY:
6      Q.   True or not?
7      MR. SWANSON:  Sorry.  Object to form.
8  BY THE WITNESS:
9      A.   Can you repeat the question.
10 BY MR. GADDY:
11     Q.   Sure.  Your opposition to this bill
12 being -- this amendment I should say being offered
13 by Congresswoman Louise Slaughter was to the extent
14 that you were having the CEO of Walgreens Boots
15 Alliance have a meeting with the Congressional -- a
16 member of Congress?
17     A.   We opposed the Slaughter amendment.
18     Q.   There is no doubt about that, is there?
19     A.   No.  There is no doubt about that.
20     Q.   In fact, you said you strongly opposed
21 the amendment to make drug take-back, her amendment
22 that would make drug take-backs mandatory?
23     A.   That's correct.  We strongly opposed the
24 amendment for a host of reasons, mostly relating to

Page 175

1  safety since we had already now installed roughly a
2  couple of hundred take-back boxes at this
3  particular time and it was clear based on our
4  experience, which is why we were ultimately
5  successful, that if you put a box in every single
6  store, it would actually create more challenges,
7  legal issues and safety concerns than it would
8  solve.  So, that's why we opposed the Slaughter
9  amendment.
10     Q.   Well, it wasn't just limited to the
11 Slaughter amendment.  You were opposed to most all
12 of the bills that came out that were suggesting the
13 drug take-back program should be mandatory?
14     MR. SWANSON:  Object to form.
15 BY THE WITNESS:
16     A.   That's false.
17 BY MR. GADDY:
18     Q.   I show you what I will mark as Kaleta
19 13.
20          (WHEREUPON, a certain document was
21           marked as Walgreens-Kaleta Exhibit
22           No. 13:  5/3/16 e-mail string with
23           attachment; WAGMDL00615504 -
24           00615509.)

Page 176

1  BY MR. GADDY:
2      Q.   What's the NACDS?
3      A.   NACDS is the National Association of
4  Chain Drug Stores.
5      Q.   Is that a trade association that
6  Walgreens belongs to?
7      A.   That is correct.
8      Q.   Does Walgreens have employees that serve
9  on the Policy Council of that trade association?
10     A.   Yes.
11     Q.   Does Walgreens have input into policy
12 decisions and policy positions of the NACDS?
13     A.   Yes.
14     Q.   Do you recognize this as being a -- this
15 is P-WAG-1893, Bates No. 615504.
16          Do you recognize this being another
17 e-mail from you?
18     A.   I do.
19     Q.   And it has an attachment and the
20 attachment is an NACDS document that says,
21 "Programs for Take-Back and Disposal of Consumers'
22 Used Medications must be Voluntary."
23          Do you see that?
24     A.   No, I'm sorry.  Where are you?

Page 177

1      Q.   I'm on the title of the attachment.
2      A.   The title of the attachment is "Drug
3  Take-Back Programs for Take-Back and Disposal.
4  Unused Medications Voluntary."  You added a word
5  there.
6      Q.   I'm on page, Bates No. at the bottom
7  506.
8      A.   506.  Oh, you're on the NACDS document.
9  "Programs for Take-Back and Disposal of Consumers'
10 Used Medications must be Voluntary."
11          Yes, that's what that says.
12     Q.   And that was the position of the NACDS,
13 correct?
14     A.   That was the position of the NACDS.
15     Q.   And that was a position that Walgreens
16 encouraged NACDS to have, correct?
17     A.   We had input on different policy issues
18 that NACDS debates.  I can remember and recall
19 actually that we weren't quite as strident in our
20 language about saying "must be voluntary."
21          At this point Walgreens was already
22 being recognized as a leader in take-back and
23 actually was viewed as more progressive on the
24 take-back program and the different options

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  available because of what we had already been up
2  and running with.
3      So, I would agree with the notion that
4  we weighed in with NACDS, but I recall us not being
5  in complete opposition and that everything had to
6  be voluntary.
7      But as trade associations work, they
8  have to try to get consensus among their members,
9  and so I think in the end we agreed to this
10 consensus position.
11     Q.   Go back to the first page, please, the
12 e-mail.
13     A.   Um-hmm.
14     Q.   You say there, "This one pager is
15 interesting, think we should all take a look and
16 give feedback."  Correct?
17         You then say, "I pushed NACDS yesterday
18 to contemplate being more aggressive on some of the
19 mandatory take-back bills/regs that are popping."
20         Do you see that?
21     A.   I do.
22     Q.   In fact, you were encouraging NACDS to
23 be more opposed and more vocal in their opposition
24 against mandatory take-back bills, correct?

Page 179

1      MR. SWANSON:  Object to form.
2  BY THE WITNESS:
3      A.   Incorrect.  It actually doesn't say
4  "more aggressive in opposition."  It says, "more
5  aggressive."  It doesn't say "in opposition."  So,
6  there is a significant difference there.
7          The art of lobbying is one that nuance
8  is important and words matter, and so that actually
9  says, "more aggressive."  It doesn't say, "more
10 aggressive in opposition to."
11         So, as I mentioned previously, at this
12 point Walgreens had already been recognized as a
13 national leader in the take-back program.  So, we
14 had a pretty significant voice in how a lot of the
15 bills were being constructed around the country and
16 so we used that leadership position to try to
17 have -- share our insight and the lessons learned
18 from the different programs.
19     Q.   Are you saying that Walgreens was in
20 favor of mandatory drug take-back programs?
21     A.   What I said before was that there was
22 any number of different bills that were being
23 debated at the local, the state and the federal
24 level; and we looked at each one of them

Page 180

1  individually, some that we supported, some that we
2  opposed, and some that we just provided counsel on.
3      Q.   Did you often -- did Walgreens often
4  utilize NACDS to take public positions on issues
5  that Walgreens may not want to take public
6  positions on?
7      MR. SWANSON:  Object to form.
8  BY THE WITNESS:
9      A.   I'm not sure that -- I'd probably answer
10 the question by saying we work with NACDS on a host
11 of issues, and part of the goal of the trade
12 association is try to gain consensus among its
13 members.  There are some issues that we felt more
14 strongly about than other members and vice versa.
15 BY MR. GADDY:
16     Q.   When you were saying that you pushed
17 NACDS to be more aggressive on some of the
18 mandatory take-back bills, were you encouraging
19 them to support these mandatory take-back bills?
20     A.   As I mentioned, it depended.  Depended
21 which bills you're talking about.  So, you can't
22 paint with a broad brush support or opposition to
23 all bills at the local, state and federal level.
24     Q.   I'm asking about the sentence that you

Page 181

1  typed in this e-mail where you said, "I pushed the
2  NACDS yesterday to contemplate being more
3  aggressive on some of the mandatory take-back bills
4  or regs that are popping."
5          What did you mean by that?
6      A.   What I meant was we need to be more
7  involved and we need to make sure that we're part
8  of those discussions and conversations, whether
9  it's the local level, the state level or the
10 federal level, because the repercussions of how
11 those bills are structured have an impact to
12 patients, have an impact to take-back, have an
13 impact to the company, have an impact to the safety
14 of our employees.
15     Q.   Let me show you what I have marked as
16 Kaleta 15.
17     MR. SWANSON:  I missed 14.
18     MR. GADDY:  I'm sorry.  14, which is
19 P-WAG-1833, Bates No. 378634.
20         (WHEREUPON, a certain document was
21          marked as Walgreens-Kaleta Exhibit
22          No. 14:  6/13/16 e-mail string with
23          attachments; WAGMDL00378634 -
24          00378639.)

Highly Confidential - Subject to Further Confidentiality Review

Page 182

BY MR. GADDY:

Q. Do you see this is an e-mail from Steven Gregory, who I think you already told us reports to you, correct?

A. This is an e-mail that looks like it's from Steven to a handful of folks.

Q. And the subject is "NACDS Take-Back Policy Strategy - Thoughts?"

Do you see that?

A. I do.

Q. And attached to it, if you turn the page, is a confidential NACDS document.

Do you see that?

A. I do.

Q. And it talks about an "Overview of Prescription Drug Take-Back and Disposal," correct?

A. That's the title of the document, yes.

Q. And if you go down, you see the bullets in the middle of the page and just above that it says, "NACDS present policy positions are as follows."

Do you see that?

A. I do.

Q. And the first policy position is "NACDS

Page 183

opposes mandatory take-back programs and supports voluntary programs."

Do you see that?

A. I do.

Q. The next sentence indicates that "NACDS supports manufacturer-funded patient education programs on in-home drug disposal where the educational materials are distributed by the pharmacies."

Do you see that?

A. Yes.

Q. So the position of NACDS there was that the manufacturers should pay for and generate the documents but that the pharmacies could hand them out?

A. I believe that's correct, yes.

Q. And the last bullet point, "NACDS supports collaborating with law enforcement for periodic regional take-back events to be held off site from pharmacies with joint funding from manufacturers and pharmacies."

Do you see that?

A. Yes.

Q. And that would be consistent with things

Page 184

like the DEA Drug Take-Back Days that they do from time to time?

A. Yes.

Q. If you go to the first page of the document, the second paragraph says -- this is Steven writing. He says, "There isn't anything particularly ground-breaking with these policy options, nor do we really disagree with any of the options."

Do you see that?

A. I do.

Q. He goes on to state, "For us, the question is really about whether we, as a company, become more public in our opposition to mandatory take-back programs."

Do you see that?

A. I do.

Q. Do you agree with what Steven has written there that Walgreens as a company was opposed to these mandatory drug take-back programs?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. No. I didn't write the e-mail. Steven did. And I'm fairly certain I actually responded

Page 185

back to this in that I didn't wholly agree with that second sentence.

BY MR. GADDY:

Q. But, nevertheless, that's what the member of your team wrote in this e-mail when he forwarded this policy statement from NACDS, correct?

A. Is that a question? Are you asking me if that's what it says here?

Q. I'm asking if that's what your team member wrote when he forwarded this document?

A. We have robust discussions and arguments day in and day out on various policy issues. Sometimes we're aligned when we're reporting back up through headquarters and sometimes we're not. This may be a situation where Steven was a little over his skis.

Q. Does he represent in this e-mail that it's his personal position or that it's the company's position?

MR. SWANSON: Object to form, foundation.

BY THE WITNESS:

A. So, this is Steven's e-mail. I didn't write it and so...

Highly Confidential - Subject to Further Confidentiality Review

Page 186

BY MR. GADDY:

Q.   The sentence says, "For us, the question is whether we, as a company, became more public in our opposition to mandatory take-back programs."

Is that what he wrote?

A.   That's what this says in the second sentence, correct.

Q.   We saw in that earlier document that the plan for the drug kiosk rollout was about 620 pharmacies were -- according to the prognostication back in October of 2015, about 620 pharmacies were supposed to get a kiosk in the first phase, correct?

A.   That was according to Option 1.

Q.   I think Option 1 was about 1,500 kiosks. Option 2 was 620 kiosks.

A.   Yes, yes. I'm sorry. You're right. Option 1 was the 1,500 and Option 2 was 600.

Q.   It was Option 2 that was chosen, right?

A.   Option 2 was chosen, that's correct.

Q.   Do you -- do you have a -- do you know as you sit here today how many Walgreens stores actually got kiosks in the first phase of the project?

Page 187

A.   We currently have 1,107 boxes in the ground. We've collected over 500 tons of unused medications. We have tripled more than any other pharmacy in the country. We have won awards nationally from consumer groups, from prescription drug monitoring groups. We have been honored in states and localities around the country. We will be at 1,500 boxes by the end of 2019.

Q.   Okay. I will object to the portion of the response that's not responsive to the question.

What I asked was how many stores got boxes in phase 1?

A.   So, it depends what you mean by phase 1.

Q.   Okay.

A.   This timeline, this program was very -- had to be very flexible based on the DEA, based on regulations, based on costs, based on safety. After we had installed a handful of boxes, we realized there was some safety concerns that we hadn't considered prior to that.

The street value of one of these boxes and its contents could easily exceed $100,000. There is extensive regulations with our subcontractor Stericycle over who has access to the

Page 188

box, who unlocks it, how many keys, when it goes on the truck, how it gets destroyed.

So, I can't answer your question about the number in phase 1 because phase 1 was something that transpired over a number of months, which ended up turning quickly into phase 2, which was actually referred to as Take-Back 2.0.

So, what I can tell you is we have 1,107 boxes in the ground right now, which is far more than any other pharmacy in the country, and we're going to have 1,500 around the country by the end of 2019.

Q.   Same objection to the portion of the response that's non-responsive to the question and I will ask again.

Prior to -- I guess if there is a phase 2 or a Take-Back 2.0, up until that point, how many boxes went in the ground? If you don't know, you don't know.

A.   So, are you asking as a matter of something being bucketed as phase 1 or phase 2 or are you asking as a matter of a particular date and time?

Q.   I thought I heard you tell me that there

Page 189

was a Take-Back 2.0 program. So, I'm asking up until that started what would we call -- how many boxes went into the ground during the first phase of the rollout until you started Take-Back 2.0.

A.   I want to say --

Q.   I am not trying to ask a trick question I promise.

A.   Somewhere around 600 is probably what I recall.

Q.   Were all of those 600 funded by Walgreens?

A.   Yes. In the initial phase they were all funded by Walgreens.

Q.   When you -- when Walgreens started to implement the Take-Back 2.0 or the second phase of the rollout, Walgreens looked to bring on partners to share the financial obligation, correct?

A.   That's correct. In addition to sharing the financial obligation, the goal was also to try to have a broader voice in making folks, patients aware of the kiosks, because at the end of the day the only way the kiosks work is if people know where they are and then have the ability to dispose of their unused medications.

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    Q.   I am showing you what I've marked as
2  Kaleta 15, which is P-WAG-1847, Bates No. 374710.
3         (WHEREUPON, a certain document was
4         marked as Walgreens-Kaleta Exhibit
5         No. 15: 7/17/17 e-mail string with
6         attachment; WAGMDL00374710 -
7         00374719.)
8  BY MR. GADDY:
9    Q.   Do you recognize this as being an e-mail
10 that you're on the recipient line and there is also
11 a PowerPoint attached?  Do you see that?
12   A.   I do, yes.
13   Q.   And your name is actually on the
14 PowerPoint.  Did you have any role in putting this
15 together?
16   A.   I had a limited role in putting it
17 together.  This is actually a Blue Cross Blue
18 Shield document.
19   Q.   And Blue Cross Blue Shield is one of the
20 entities that Walgreens partnered with in this
21 second round or what you call here the phase 2
22 rollout of medication disposal sites, correct?
23   A.   They are one of the partners that we
24 approached, that's correct.

Page 191

1    Q.   And who was the audience for this
2  particular PowerPoint?
3    A.   Blues plans around the country.
4    Q.   That would be state insurance plans?
5    A.   Yes, state Blue Cross Blue Shield
6  insurance plans around the country that were
7  members of the Blue Cross Blue Shield Association.
8    Q.   So, to help me understand it, there is a
9  national like a parent Blue Cross Blue Shield
10 Association and then each state has their own
11 individual plan?
12   A.   Yes.
13   Q.   If you turn to the second page of the
14 PowerPoint, the slide is entitled "Opioid Deaths in
15 2015."
16   A.   Yes.
17   Q.   Do you see that?
18   A.   I do.
19   Q.   It says on the right-hand side of the
20 page, "In 2015, there was one overdose death every
21 ten minutes in America, two-thirds of which were
22 from opioids including prescription painkillers and
23 heroin."
24        Correct?

Page 192

1    A.   That's what it says, correct.
2    Q.   Goes on to say that "The epidemic is
3  most concentrated in rural Appalachia, New England
4  and the Midwest."
5         Do you see that?
6    A.   I do.
7    Q.   And it also includes a -- it looks like
8  a map from the CDC over on the left-hand side of
9  the page that has kind of a color-coded indication
10 of where overdose deaths are most concentrated,
11 correct?
12   A.   Yes.
13   Q.   And the area that's indicated on that
14 map that was included in this PowerPoint that you
15 were listed on includes Ohio, West Virginia and
16 Kentucky as some of the hardest hit areas by opioid
17 overdose deaths, correct?
18   A.   So, yeah, I'll just reiterate, I didn't
19 put the deck together.
20        But to answer your question, it appears
21 that, yes, this CDC-referenced chart is showing
22 higher adjusted death rates in the four or five
23 states you just mentioned.
24   Q.   And if we turn about three pages to

Page 193

1  Bates number that ends 715 we get to a slide that
2  says, "BCBS Walgreens - Safe Medication Disposal."
3  This is going to be slide 5.
4         Do you see that?
5    A.   Yes.
6    Q.   Okay.  And underneath there it says,
7  "BCBSA and participating BCBS plans shall partner
8  with Walgreens on the second phase rollout of the
9  Safe Medication Disposal Program."
10        Do you see that?
11   A.   Yes.
12   Q.   And there you say that you have
13 collected over 72 tons of medication in 600 stores
14 from these disposal kiosks, correct?
15   A.   Correct.
16   Q.   That 72 tons, you're not telling us that
17 that's all opioids, are you?
18   A.   Well, no, it doesn't say that.  It says
19 72 tons of medications.
20   Q.   So, that includes any and all types of
21 medications?
22   A.   It may.  It's actually against -- it's
23 against the law by DEA regs to open up a bag of
24 unused medications in a box.  So, we don't know the

Page 194

1 answer.

2 Q. At the bottom there is it looks like
3 there is two columns, one is "National PR
4 Partnership" and the one on the right is the "Local
5 Kiosk Sponsorship."

6 Do you see that?

7 A. I do.

8 Q. On the left-hand side for the "National
9 PR Partnership" it says there will be a sponsor --
10 excuse me -- "Partnership between BCBSA and
11 Walgreens to fund national co-branded awareness
12 campaigns."

13 Do you see that?

14 A. I do.

15 Q. Is that what you were referencing
16 earlier as far as you got to tell people about the
17 boxes if you want people to use the boxes?

18 A. That's correct.

19 Q. If you look on the right-hand side of
20 the page with the "Local Kiosk Sponsorships," this
21 says that "BCBS plans have the opportunity to
22 participate in the program by sponsoring new and/or
23 existing kiosks."

24 Do you see that?

Page 195

1 A. I do.

2 Q. Is that talking about the local
3 state-based plans?

4 A. Yes. So, the individual state plans
5 could sponsor new or existing kiosks separate and
6 distinct from our partnership with the Blue Cross
7 Blue Shield trade association.

8 Q. If we turn to slide 8, the title is
9 "BCBS Walgreens - Safe Medication Disposal."

10 Do you see that?

11 A. I do.

12 MR. GADDY: I'm actually on the next page,
13 Corey. There we go.

14 BY MR. GADDY:

15 Q. Do you see there in the top box it
16 indicates that Blue Cross Blue Shield America will
17 contribute $200,000 towards the national public
18 relations partnership.

19 Do you see that?

20 A. I do.

21 Q. And then at the bottom sentence of that
22 first paragraph, it says, "Prime Therapeutics has
23 also agreed to contribute $100,000 as the national
24 PBM sponsor of the program."

Page 196

1 Correct?

2 A. Yes.

3 Q. If you go down to the bottom of the
4 page, you see the amounts that the local plans can
5 spend to sponsor their kiosk in their local areas,
6 correct?

7 A. Yes, and this is an interesting slide
8 because it actually shows the adjusted cost of each
9 kiosk per year compared to when we were still in
10 the planning stages back in 2015.

11 Q. Is it -- let's explore that a little
12 bit.

13 Is it your testimony that a -- that
14 these figures here indicate the actual costs of the
15 boxes?

16 A. That -- yes. Well, so, this is two
17 things. This is the cost of the box in order for a
18 Blue's plan to sponsor it per year.

19 Q. Okay. So, what it indicates here is
20 that if one of the local Blues plans wants to
21 sponsor a kiosk, that it would cost them $6,000 per
22 kiosk per year, correct?

23 A. For a new kiosk that just had the Blue
24 Cross Blue Shield sticker, for lack of a better way

Page 197

1 of saying it, and not to have it be both Walgreens
2 and Blue Cross Blue Shield.

3 Q. These boxes are in Walgreens stores,
4 correct?

5 A. That's correct.

6 Q. Okay. But for the box that's in the
7 Walgreens store to only have a Blue Cross Blue
8 Shield on it, it would cost the plan $6,000 per
9 year?

10 A. Correct.

11 Q. Okay. And we saw in that earlier
12 document that the estimated cost of the boxes per
13 year was $2,600, right?

14 A. "Estimated" being the operative word.
15 So, what ended up finding is we had incredible
16 success with the kiosks and in a number of
17 locations the pickup had to be increased from once
18 a month to in some cases twice a month and in some
19 cases per week.

20 So, in addition to the actual price of
21 the kiosks, what's also baked into that number is
22 the Stericycle contract monthly number to pick them
23 up.

24 So, what we ended up finding out is

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 while there was a static cost associated with the
2 box, based on the pickup rates, that's where the
3 annual number got a lot higher than we had
4 anticipated.
5    Q.   500 bucks for the box didn't change?
6    A.   More or less that sounds right.
7    Q.   Okay.  Well, what changed was whether it
8 was --
9    A.   Frequency.
10   Q.   -- $2,100 a year or more --
11   A.   That's correct.
12   Q.   -- to have the hazardous waste come and
13 be picked up, correct?
14   A.   Yes.
15   Q.   Obviously that varied on location,
16 population that the Walgreens store served?
17   A.   Yes.  I mean, yeah, it varied -- I think
18 the answer to your question is yes.
19   Q.   Is it your testimony that the costs per
20 store for a kiosk was $6,000 per year?
21   A.   Actual cost?
22   Q.   Correct.
23   A.   It's my testimony that actual cost, that
24 was probably on the low side.  But I -- yes.  It's

Page 199

1 probably on the low side.
2    Q.   $6,000 is on the low side?
3    A.   I'm not sure that it was all-inclusive.
4 Again, what this number doesn't take into
5 account -- it does take into account the cost of
6 the box.  It does take into account the Stericycle
7 contract.  What it doesn't take into account is the
8 labor costs for Walgreens store manager and
9 pharmacy manager to be maintaining the box,
10 unloading it and helping Stericycle put it on the
11 truck.
12        So, there is unassociated costs, and
13 this goes back to what we discussed earlier, that
14 just weren't considered at the time when we
15 initially threw out the $2,500 number.  I think
16 that's what you had mentioned on the previous
17 documents that we had reviewed.
18   Q.   My question is whether or not you're
19 testifying that these kiosks cost $6,000 per store
20 to maintain?
21   MR. SWANSON:  Object to form.
22 BY MR. GADDY:
23   Q.   And if you don't know, you don't know,
24 but...

Page 200

1    A.   I don't know that I can say
2 definitively.
3    Q.   Okay.  But, regardless, that was the
4 amount that Walgreens was charging individual plans
5 if they wanted to exclusively sponsor a kiosk?
6    A.   That's correct.
7    Q.   If they agreed to have a Walgreens
8 sticker on the box with their Blue Cross sticker,
9 they only paid $3,000, correct?
10   A.   That's correct.
11   Q.   If the price had stayed in the area of
12 $2,600, you agree there would be a significant
13 profit margin that Walgreens would be making on the
14 $6,000 per year sponsorship plan, correct?
15   A.   No.
16   Q.   6,000 is a lot more than 2,600, right?
17   A.   Your math is good, but the answer is no
18 because, as I just mentioned, there is a whole
19 number of different variable costs that were not
20 considered as part of the initial phase 1
21 consideration on the 2,500.
22        This is a money-losing operation.  I
23 have made myself infamous inside Walgreens for
24 coming up, helping to promote a program that is

Page 201

1 costing us millions of dollars a year, far more
2 than we had ever anticipated.
3        But I think there is also complete
4 acknowledgment that this is the right thing for us
5 to do to help combat what's going on with unused
6 medications.
7        But to suggest that there is a profit in
8 here is not accurate at all.  As a matter of fact,
9 the White House drug czar Michael Botticelli when
10 we dropped our first box in Washington D.C. on
11 March 16, he said to Richard Ashworth, who was our
12 president at the time, "This is probably great for
13 foot traffic and would help increase your profit."
14        And Richard chuckled and said, "I can
15 guarantee you that the last thing these boxes are
16 going to do is help us make more money, but we
17 believe this is the right thing for pharmacy to do
18 to help with getting unused medications out of the
19 hands of any number of different individuals."
20   Q.   Is that it?
21   A.   That's it.
22   Q.   Again, I'll object to the extent that
23 the response to the question was not responsive to
24 what was asked.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 Whether or not these kiosks drove
2 business was actually something you looked at and
3 looked into, isn't it?
4 A. No. I didn't.
5 Q. Would it surprise you if somebody at
6 Walgreens did?
7 A. I'm not sure I have an opinion on that
8 one way or the other. I'm not familiar with that.
9 Q. I'm going to show you what I will mark
10 as Kaleta 16, which is P-WAG-1865.
11 (WHEREUPON, a certain document was
12 marked as Walgreens-Kaleta Exhibit
13 No. 16: 4/9/18 e-mail string with
14 attachment; WAGMDL00315889 -
15 00315903).
16 BY MR. GADDY:
17 Q. Do you see at the top this is an e-mail
18 from Eric Stahmann to Natasha Polster and the
19 subject is "Kiosk Questions."
20 Do you see that?
21 A. Eric Stahmann, yes.
22 Q. Sorry. Eric Stahmann. The subject is
23 "Kiosk Questions."
24 Do you see that?

Page 203

1 A. I do.
2 Q. And down in the e-mail before that you
3 see it's an e-mail from Natasha Polster to Eric and
4 she asks, "Also, there was an ask to have insights
5 to do something around whether or not the
6 medication kiosk is a driver to get patients in the
7 store. We need to discuss how to do that. Let's
8 connect today if possible."
9 Do you see that?
10 A. I do.
11 Q. Did anybody from Tasha's group or Eric's
12 group or anybody else ever tell you that they were
13 talking about using the medication kiosk as a
14 driver to get patients into the store?
15 A. No.
16 Q. The sponsorships that you obtained to
17 help fund this program from Blue Cross Blue Shield
18 and Prime Therapeutics were not the only
19 sponsorships that you obtained or helped Walgreens
20 obtain to pay for this program, correct?
21 A. Correct.
22 Q. I will show you what I will mark as
23 Kaleta 17, which is P-WAG-1906.
24 (WHEREUPON, a certain document was

Page 204

1 marked as Walgreens-Kaleta Exhibit
2 No. 17: 6/19/17 e-mail string;
3 WAGMDL00612155 - 00612157.)
4 BY MR. GADDY:
5 Q. Bates No. 612155. Do you recognize this
6 as being an e-mail from you with the subject line
7 "Walgreens-BCBSA Strategic Partnership Agreement"?
8 A. I do.
9 Q. And what I'm going to specifically ask
10 you about are the bullet points under the heading
11 "Update" in your e-mail there.
12 Do you see that?
13 A. I do.
14 Q. And this was an e-mail that you sent to
15 Alex Gourlay, the Chief Operating Officer at
16 Walgreens?
17 A. Along with a number of others, yes.
18 Q. And you copied your boss Chuck Greener
19 on there?
20 A. I did.
21 Q. And also Casey Cesnovar, who is in
22 charge of the state government relations?
23 A. Yes.
24 Q. You wrote, "Attached is a Strategic

Page 205

1 Partnership Agreement with Blue Cross Blue Shield
2 and Walgreens." It says, "Highlights will include:
3 BCBSA will pay Walgreens $200,000 as a national
4 partner in our Take-Back 2 program."
5 Do you see that?
6 A. Yes.
7 Q. And that's what we looked at in that
8 PowerPoint just a minute ago, correct?
9 A. Yes.
10 Q. It goes on to say in the next bullet
11 point that Prime Therapeutics will pay $100,000,
12 correct?
13 A. Yes, it does.
14 Q. And then "BCBSA will continue to work
15 with" I assume you meant Blue Cross Blue Shield
16 "state plans for them to brand or co-brand
17 take-back boxes at specific" -- "at a specific cost
18 for a two-year commitment."
19 Correct?
20 A. Yes.
21 Q. Goes on to say in the next bullet point
22 that "Funding from the state plans," you're talking
23 about the Blue Cross plans, correct?
24 A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    Q.   -- "will likely exceed $700,000,
2  bringing the total commitment of Blue Cross, Prime
3  and State plans to over a million dollars."
4  Correct?
5    A.   Correct.
6    Q.   Goes on to say, "This is in addition to
7  the $1 million commitment by AmerisourceBergen."
8  Correct?
9    A.   Yes.
10   Q.   Finally you say, "We are talking to
11 Purdue Pharmaceuticals to serve" -- I think you are
12 saying for them "to serve as the pharma partner."
13      MR. SWANSON:  Don't write on the exhibits.
14      THE WITNESS:  Oops.
15      MR. GADDY:  Forgiven.
16      THE WITNESS:  Can I have paper to write on?
17      MR. GADDY:  I got a sticky note if you want
18 that.
19      THE WITNESS:  Yeah, that's cool.  Thanks.
20 Okay.
21 BY MR. GADDY:
22   Q.   Did those talks with Purdue
23 Pharmaceutical ever pan out?
24   A.   No.

Page 207

1    Q.   Did Purdue ever give you any money for
2  the drug take-back program?
3    A.   No.
4    Q.   So, at this point in time you're at
5  approximately $2 million that you've managed to
6  bring in from other entities to help fund this drug
7  take-back program, correct?
8    A.   That's roughly accurate, yes.
9    Q.   Okay.  I will show you what I'll mark as
10 Kaleta 18, which is going to be P-WAG-1983, Bates
11 No. 595580.
12      (WHEREUPON, a certain document was
13       marked as Walgreens-Kaleta Exhibit
14       No. 18:  9/6/17 e-mail string;
15       WAGMDL00595580 - 00595586.)
16 BY MR. GADDY:
17   Q.   Do you recognize this as being another
18 e-mail from you, the subject line being "Walgreens
19 Partnership Agreement"?
20   A.   Yes.
21   Q.   And below that it looks like you
22 forwarded this e-mail on to several folks, Ron
23 Lundeen and Kristina Raymond.
24      Do you see that?

Page 208

1    A.   Yes.
2    Q.   Who are they?
3    A.   They're in our legal division.
4    Q.   And we see below the e-mail that you
5  forwarded to them, correct?
6    A.   Yes.
7    Q.   And it was an e-mail between you and an
8  individual Ken Cole who is with Pfizer, correct?
9    A.   Yes.
10   Q.   And you had mentioned in that last
11 document that you were talking to Purdue Pharma
12 about them being the pharma partner as far as the
13 take-back program was concerned.
14      Did you end up striking a deal with
15 Pfizer?
16   A.   We did end up striking a deal with
17 Pfizer.
18   Q.   And if you turn to the second page of
19 this document, look under paragraph B at the top of
20 the page.
21   A.   Yes.
22   Q.   Does this contract, which admittedly is
23 still in draft form here, indicate that Pfizer was
24 going to provide Walgreens with $1 million?

Page 209

1    A.   Yes.  This is not the executed contract,
2  but that is what we -- what we agreed to.
3    Q.   And that's the ultimate amount that
4  Pfizer ended up supplying to Walgreens?
5    A.   That's correct.
6    Q.   So, we're now roughly at $3 million that
7  you've been able to bring in of outside funds to
8  support the effort of Walgreens to put these kiosks
9  in stores, correct?
10   A.   That's correct.
11   Q.   Tell me if I'm wrong, but I believe I
12 saw in your resume a reference to the fact that you
13 had secured $3-1/2 million for this effort, is that
14 correct?
15   A.   That is correct.
16   Q.   So, over and above what we've already
17 talked about, the 200,000 from Blue Cross, the
18 100,000 from Prime, the 700,000 from the local Blue
19 Cross plans, the million from AmerisourceBergen and
20 the million from Pfizer, there was another 500,000
21 out there that you were able to bring in to use to
22 pay for these drug take-back kiosks, correct?
23   A.   Yes.
24   Q.   Do you remember who that came from?

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    A.   Where did the additional money come
2  from?  State Blues plans I believe.
3    Q.   The state Blues plans ended up giving
4  you about $1.2 million, roughly?
5    A.   That sounds about right.
6    Q.   Okay.  Let me show you what I'm going to
7  mark as Kaleta 19.  It's P-WAG-1984, Bates
8  No. 591948.
9         (WHEREUPON, a certain document was
10             marked as Walgreens-Kaleta Exhibit
11             No. 19:  1/17/18 e-mail string with
12             attachment; WAGMDL00591948 -
13             00591951.)
14  BY MR. GADDY:
15    Q.   Do you recognize this as being an e-mail
16  from Eric Stahmann to you and Casey with the
17  subject line being "Rx Kiosk Take-Back Program RFQ
18  results"?
19    A.   Yes.
20    Q.   Earlier today you had referenced
21  Stericycle.  That's the vendor that you used to
22  empty out your drug kiosks, correct?
23    A.   Yes.  In addition to emptying it, they
24  also dispose of it.

Page 211

1    Q.   Correct.  Thank you.
2         Do you see in the e-mail from Eric, he
3  says, writing to you and Casey, "Hello.  Just an
4  update.  Stericycle submitted their one-year term
5  bid for the expansion last night.  Svetlana will be
6  presenting this to Jim today at 3:15 for approval."
7         Do you see that?
8    A.   Yes.
9    Q.   And is this similar to the process we
10  looked at earlier, similar to where you were trying
11  to get initial -- not you, but where Tasha was
12  trying to get initial approval for this program and
13  she had to go in front of the RxIC board?
14    A.   I don't know the answer to that.
15  This -- I'm on this e-mail.  I'm not -- I don't
16  remember reading this.  But obviously I'm cc'd on
17  it.
18    Q.   I think it's to you, right?
19    A.   It's to me, Casey, Phil and Anita.  But
20  I don't see any reference to RxIC.
21    Q.   Okay.  That's fair.
22         When she says -- I'm sorry.  When Eric
23  says that "Svetlana will be presenting this to Jim
24  today," do you know who Jim is?

Page 212

1    A.   I don't.
2    Q.   Okay.  Do you know who Svetlana is?
3    A.   I'm aware of her name.  I think I've
4  been on a call or two with her.
5    Q.   Did you know that there was a time
6  wherein Stericycle was having to rebid to continue
7  to be the vendor that would provide the services
8  you just indicated they provide?
9    A.   I was aware of that, yes.
10    Q.   Turn to the attachment which is going to
11  be -- the Bates number at the bottom is going to be
12  950.  "Group Procurement Commercial Approval
13  Document" is what it says at the top of the page.
14         Do you see that?
15    A.   I do.
16    Q.   And it says the project description in
17  the top left is "Retail pharmacy USA - Rx kiosk
18  Take-back 2.0 rollout."
19         Do you see that?
20    A.   Yes, I do.
21    Q.   And this is consistent with the
22  Take-back 2.0 rollout we've been talking about
23  where you were going around and collecting
24  contributions from different entities, different

Page 213

1  pharmaceutical entities, correct?
2    A.   Yes.
3    Q.   And it goes on to say in the right side
4  of the page it says the recommended supplier is
5  Stericycle.  The contract value is $1.7 million to
6  pay them to serve as the vendor for a year,
7  correct?
8    MR. SWANSON:  Object to form.
9  BY THE WITNESS:
10    A.   You've lost me now.
11  BY MR. GADDY:
12    Q.   Sorry.  Right-hand column.  Top, still
13  top of the page.  It's highlighted up on the screen
14  if you want to look over there, too.
15    A.   So, again, I'll just reiterate that I
16  was on this e-mail.  I've never read this
17  particular contract.  I probably glanced at the
18  e-mail and realized it was something that I didn't
19  have a ton of expertise in.
20         So, with that in mind, you're asking me
21  if it says recommended supplier and it says a total
22  contract value and it says 1.7, is that the
23  question?
24    Q.   Correct.

Page 214

1    A.    Yeah, the answer to that is that is what
2 it says up there, correct.
3    Q.    And maybe I should have made this clear
4 earlier because I was asking you questions about
5 sponsorship amounts and the cost of the kiosk.
6        The negotiating the contract with
7 Stericycle and in looking into the costs that were
8 associated with the kiosk, was that something that
9 you were specializing in or something that other
10 folks at Walgreens had the nitty-gritty details on?
11    A.    Can you repeat the question?
12    Q.    Sure.  You indicated that you got this
13 e-mail, but I think you said you probably didn't
14 read it or if you did, you didn't spend too much
15 time on it because it wasn't really in your
16 expertise, right?
17    A.    Correct.
18    Q.    And earlier we were looking at your
19 PowerPoint presentation that talked about the
20 different amounts that local plans could pay to
21 sponsor or co-sponsor a kiosk, right?
22    A.    We were looking at a Blue Cross Blue
23 Shield PowerPoint that they put together that my
24 name appeared on.

Page 215

1    Q.    Okay.  Your name was on the first slide?
2    A.    It was.
3    Q.    Okay.  You recall we looked at that, and
4 that had some sponsorship amounts to either sponsor
5 or co-sponsor a kiosk, correct?
6    A.    Correct.
7    Q.    And I was asking you some questions
8 about the costs to maintain a kiosk, the cost to
9 put it in a store, and costs related to Stericycle.
10 And do you recall that general conversation?
11    A.    I do.
12    Q.    Okay.  Would you agree that or -- not
13 would you agree.  Strike that.
14        Were you the person that would have been
15 in charge and had the most knowledge on the costs
16 of the kiosk and maintaining the kiosk and the
17 contractual relationships with vendors such as
18 Stericycle or were there other folks at Walgreens
19 who were more in charge of that aspect?
20    A.    The latter.
21    Q.    Okay.  So, would you defer on issues
22 related to costs of the kiosk and values of
23 contracts with vendors and the ultimate cost to
24 Walgreens, would you defer on that to folks that

Page 216

1 were more in charge of that area?
2    MR. SWANSON:  Object to form.
3 BY THE WITNESS:
4    A.    It depends.
5 BY MR. GADDY:
6    Q.    On what?
7    A.    Well, it depends on a number of factors.
8 So, early on, at the outset of this program, as I
9 mentioned, there was variable costs that were tied
10 to what it would -- how it would impact financially
11 in terms of obtaining a box, dropping the box.
12        So, to be clear, the 495 was to buy the
13 box.  There was then installation costs.  There is
14 then the Stericycle cost.  There is then the labor
15 cost for our employees.
16        And then part of the other reason that
17 we wanted to raise additional money was to in fact
18 then talk about the program.  So, part of the
19 moneys that were raised as part of that 3.5 million
20 were actually spent as part of the national
21 release, which we did back in October of 2017.
22        So, I think that's why I am trying to
23 kind of break down your question a little bit more.
24 There is a lot of different costs associated with

Page 217

1 this program, some of which I've been very familiar
2 with over the course of the last two and a half
3 years and have tracked closely, others that other
4 people are more involved in.  But it really varies.
5    Q.    As far as the overall cost picture and
6 having expertise in all of the costs associated
7 with the program, would you agree that it's
8 somebody else who has that expertise?
9    A.    I would -- I would say that this is a --
10 this is a complicated program that required and
11 continues to require the coordination of many
12 different business units at Walgreens, which is
13 part of the reason that we're so proud of its
14 success.
15        I don't know that there is any one
16 individual that would be an expert on all costs
17 associated with the program.  Eric Stahmann and
18 other folks would not be familiar with costs
19 related to getting the program off the ground,
20 efforts around highlighting the expansion of the
21 program to additional 750.  They wouldn't be
22 familiar with a lot of the travel costs associated
23 with all of the events we've done around the
24 country.

Page 218

1    Similarly, I don't know the ins and outs
2  of how the Stericycle contract actually works in
3  terms of pickups and all that other kind of stuff.
4  I'm just the GR guy.
5    Q.  Sure.  So, let me ask you.  Did you know
6  the value of the Stericycle contract until we just
7  looked at it right here?
8    A.  I did not.
9    Q.  So, you have an understanding of some of
10  the costs, but you certainly don't have an
11  understanding of all of the costs associated with
12  the project?
13    MR. SWANSON:  Object to form.
14  BY THE WITNESS:
15    A.  I think that I have an understanding of
16  some of the costs involved with this program and
17  have had exposure to most of the costs at some
18  point over the last couple of years.
19  BY MR. GADDY:
20    Q.  Under the "Background and Context"
21  section it says, "To help combat opioid epidemic,
22  Walgreens partnered with our incumbent service
23  provider Stericycle to install 604 safe medication
24  kiosks in 45 states including Washington, D.C.

Page 219

1  beginning in May of 2016."
2    Do you see that?
3    A.  I do.
4    Q.  And I think I had asked you how many do
5  you think you had gotten into the first phase.  I
6  think you said about 600.  Is that consistent with
7  your memory, 604?
8    A.  Yes.
9    Q.  It goes on to say, "In the first 18
10  months the program customers visited these
11  locations depositing 155 tons of unwanted
12  medications."
13    Correct?
14    A.  Yes, that's what it says.
15    Q.  Next paragraph, it says, "Going forward,
16  Walgreens is partnering with leading peer health
17  organizations, AmerisourceBergen, Blue Cross Blue
18  Shield Association, Pfizer and Prime Therapeutics
19  to help fund an expansion of program titled
20  Takeback 2 to an additional 900 Walgreens stores."
21    Do you see that?
22    A.  Yes.
23    Q.  Skip a few sentences, you see there is a
24  sentence that begins "Cost impact."  Do you see

Page 220

1  that?
2    A.  I do.
3    Q.  It says, "Cost impact of this expansion
4  will be net neutral to the fiscal year 18 P & L and
5  ongoing costs for fiscal year 19 as the
6  organizations committed $3 million to support
7  Takeback 2.0."
8    Do you see that?
9    A.  Yes.
10    Q.  As far as Walgreens was concerned, when
11  they were getting the approval of this contract,
12  the renewal of Stericycle, they were expecting the
13  cost impact of this program to be neutral, correct?
14    MR. SWANSON:  Object to form.
15  BY THE WITNESS:
16    A.  So, again, I have never seen this
17  document before.  I am not familiar with any of
18  this language.
19  BY MR. GADDY:
20    Q.  Well, you don't disagree that that's
21  what's being represented is the program is going to
22  be cost neutral because of the $3 million, and I
23  guess it's over $3 million, that you were able to
24  bring in from Blue Cross, Pfizer, AmerisourceBergen

Page 221

1  and Prime Therapeutics, correct?
2    A.  No.  There are a number of pieces, as
3  I'm now looking at this document for the first time
4  today, as I mentioned, that are not accurate.
5    Underneath "Qualitative" it says,
6  "Expand the Rx Kiosk Takeback program with
7  Stericycle by adding 471 new locations to their
8  existing footprint of existing 604."
9    The proposal was for a total of 1,500.
10  So, a lot of these numbers are, frankly, not
11  accurate according to where we were and where we
12  are and where we're going.  So, as a result, I also
13  can't speak to the validity of that one sentence
14  that you've just mentioned.
15    Q.  Well, what I think we can agree on is
16  that sentence that was included in this document
17  when it was recommended that Walgreens contract
18  with Stericycle to perform this service to help
19  with the Take-Back 2 rollout, correct?
20    MR. SWANSON:  Object to form.
21  BY THE WITNESS:
22    A.  Is your question whether or not this
23  sentence actual exists in this document?
24  BY MR. GADDY:

Page 222

1    Q.   Correct.  If that sentence is what was
2  written in this document when it was proposed to
3  bring Stericycle back on board to continue with
4  this program?
5    A.   I can't say one way or the other
6  because, obviously, I'm not the author of this.  My
7  name is not anywhere on it and I've never seen it
8  before.  So, I honestly don't have any idea what
9  this as a whole is trying to represent.
10    Q.   Okay.  I'll take that.
11        And you mentioned that another aspect of
12  this program was public awareness or the PR aspect
13  of it, correct?
14    A.   That's correct.
15    Q.   And you certainly made an effort or
16  Walgreens certainly made an effort to talk about
17  this program and use it to gain some publicity?
18    A.   I wouldn't -- I wouldn't -- I would
19  disagree with the word "publicity."
20        What I can tell you is I have personally
21  flown to California, Illinois, states all over the
22  country, and have appeared with elected members of
23  Congress, which has resulted in extensive news
24  coverage, including on the morning drive time, to

Page 223

1  the point where we then have patients interrupting
2  the press conferences that we're holding to dispose
3  of their medications in the box because it was the
4  first time they were aware the box existed.
5    MR. SWANSON:  Jeff, before you go on to your
6  next document, we have been going about another
7  hour ten.  We started at 8:00.  It's 12:20.  I
8  don't know about others.  I'm ready for lunch.
9    MR. GADDY:  Sure.
10    MR. SWANSON:  Is it a good time to do it now?
11    MR. GADDY:  Whenever you are ready.
12  Absolutely.
13    MR. SWANSON:  Thanks, sir.
14    THE VIDEOGRAPHER:  We are off the record at
15  12:20 p.m.
16        (WHEREUPON, a recess was had
17          from 12:20 to 1:07 p.m.)
18    THE VIDEOGRAPHER:  We are back on the record
19  at 1:07 p.m.
20  BY MR. GADDY:
21    Q.   Mr. Kaleta, before we broke for lunch we
22  were talking about some of the public awareness
23  type campaigns that you would assist Walgreens in
24  in talking about or spreading the news on the drug

Page 224

1  take-back kiosk, correct?
2    A.   Yes.
3    Q.   And you mentioned I think that you had
4  flown across the country doing press events with
5  different folks talking about the programs, right?
6    A.   Yes.
7    Q.   You did a program with Congressman Paul
8  Ryan talking about the take-back kiosk in
9  Janesville, Wisconsin?
10    A.   Yes.
11    Q.   Did a program with I think Kevin
12  McCarthy out in California, same type of deal?
13    A.   Um-hmm.
14    Q.   Those type of programs typically involve
15  a brief press conference where you have the elected
16  official give a statement that sometimes you can
17  help him or your office will help them draft
18  talking about the program?
19    A.   We will provide background information
20  to assist if folks are interested in putting
21  something into their remarks or a press release in
22  terms of typically get a lot of questions on how
23  long a program has been around, how many boxes do
24  we have on the ground, how much have we collected,

Page 225

1  those type of things.
2    Q.   I want to show you what I've marked as
3  Kaleta 20.
4        (WHEREUPON, a certain document was
5          marked as Walgreens-Kaleta Exhibit
6          No. 20:  9/20/17 e-mail string;
7          WAGMDL00385105 - 00385110.)
8  BY MR. GADDY:
9    Q.   And this is an e-mail chain.  This is
10  P-WAG-1851, Bates 385105.  And you see the front
11  page, and we will flip to the back and go through
12  this chronologically, but you see that this is an
13  e-mail exchange between you and a Paige Smith with
14  the Washington Speakers Bureau?
15    A.   Okay.
16    Q.   And if we would turn to, it's going to
17  be Bates number at the bottom ending 108.
18    A.   Uh-huh.
19    Q.   And at the bottom of the page we see an
20  e-mail from you to Paige Smith and the subject is
21  "WSB," which I am going to presume stands for
22  Washington Speakers Bureau, "Following up."
23        Do you see that?
24    A.   Yes.

Page 226

1    Q.   And you write here, "Paige or Kristin,
2  as a follow-up to our conversation on Friday, here
3  is a letter of invitation for General Powell to
4  join us for our announcement on Safe Medication
5  Disposal on Friday September 29, here in
6  Washington, D.C."
7        Do you see that?
8    A.   Yes.
9    Q.   And a couple things to note, you write,
10  "This event is being made by four companies and a
11  major trade association to highlight their
12  commitment to the opioid epidemic and help
13  Americans have a place to dispose of unused
14  medications."
15        Do you see that?
16    A.   Yes.
17    Q.   And did this relate to an event that you
18  were intending to have to open in the drug kiosk in
19  Washington, D.C.?
20    A.   That's correct.
21    Q.   This was by no means the first one of
22  these programs that you would have done to raise
23  awareness, correct?
24    A.   Correct.  So, this one was actually

Page 227

1  again to highlight kind of phase 2 Take-Back 2.0
2  with the other companies and trade.
3    Q.   But you had been doing press releases
4  and public awareness rollouts for the last year as
5  you rolled out the first phase, correct?
6    A.   That's correct.
7    Q.   If you flip up a page, flip up a page,
8  at the bottom you see Paige's response and she
9  says, "Dear Ed.  Thank you for the" -- "so much for
10  the clarification, we reconfirmed with General
11  Powell's office and although he greatly appreciates
12  the opportunity to participate, he's unavailable to
13  do so."
14        Do you see that?
15    A.   Yes.
16    Q.   And the person we are talking about
17  there is General Colin Powell, correct?
18    A.   Yes.
19    Q.   And what was your interest in having
20  General Colin Powell come and attend this press
21  event?
22    A.   He's a nationally recognized figure,
23  somebody that has a stellar reputation.  We also
24  had initially as part of Take-Back 2.0, we were

Page 228

1  trying to focus a little bit on the challenges
2  faced by our armed service men and women, both
3  active and retired duty, with having unused
4  medications and some of the challenges faced there.
5        So, we thought that Colin Powell would
6  be an excellent person to help talk about what we
7  were doing to get those out of communities.
8    Q.   Okay.  Paige then asked if you'd be
9  interested in then putting together some
10  alternative recommendations, and then the next
11  e-mail up you say that you would be interested in
12  that, correct?
13    A.   Yes.
14    Q.   And if you turn the page one more time,
15  do you see the list of opportunities that she was
16  able to put together for you for people who could
17  come and speak at this press event?
18    A.   Yes.
19    Q.   Okay.  And the first individual that she
20  listed who was available to come and speak was
21  former Mary Rudy Giuliani.
22        Do you see that?
23    A.   I do.
24    Q.   And underneath his name it indicates

Page 229

1  what his fee would be and he wanted $60,500 plus
2  expenses to come and participate in the event,
3  correct?
4    A.   Yes.
5    Q.   The next individual listed is Bob Gates
6  who is the former Secretary of Defense, correct?
7    A.   Yes.
8    Q.   And it indicates that he would -- he was
9  potentially available to come and speak at a cost
10  of $10,500, correct?  I'm sorry.  $100,500.
11    A.   That's what's written there, yes.
12    Q.   It said he also would require either two
13  first class airplane tickets or expenses for two in
14  a private plane Lear 60 or larger.  Correct?
15    A.   Yes.
16    MR. SWANSON:  Object to form,
17  mischaracterizes.
18  BY MR. GADDY:
19    Q.   Sorry.  I didn't hear your answer.
20    A.   I mean, that's what it's -- what's
21  written here.  Yeah, those aren't my words
22  obviously.  That's from Paige.
23    Q.   Sure.  These were the options that were
24  being presented to you, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    A.   These were options that she offered,
2  correct.
3    Q.   Okay.  Also listed there is David
4  Petraeus, Chuck Hagel and another former General or
5  another General Peter Pace, former Joints Chief of
6  Staff.
7        Do you see that?
8    A.  I do.
9    Q.   If you flip to the first page of that
10  e-mail, you see your response in the middle of the
11  page to Paige.  Do you see that there?
12    A.  I do.
13    Q.   You say, "Yes, can you begin the
14  conversations to see if Robert Gates might be
15  available for our event next Friday, September 29."
16        Do you see that?
17    A.  I do.
18    Q.   The fee for Bob Gates was $100,500,
19  correct?
20    A.   Yes, that's what was on the other page.
21    Q.   But in order to secure publicity for
22  your event, that was a reasonable option for
23  Walgreens to secure the attendance of Mr. Gates at
24  this event, correct?

Page 231

1    A.   We were pursuing a number of different
2  folks, some of which were requiring an appearance
3  fee, others that were not.
4    Q.   Mr. Gates was somebody that you were
5  pursuing at least at this time?
6    A.   That's correct.
7    Q.   From the numbers that we looked at
8  earlier at $500 a kiosk to purchase them, this --
9  over 200 kiosks could have been purchased with the
10  speaking fee that Walgreens was prepared to pay
11  Bob Gates.  Am I doing that math right?
12    MR. SWANSON:  Object to form.
13  BY THE WITNESS:
14    A.   Yeah, no, I think I'd need to think that
15  through a little bit.  How many boxes did you say?
16  BY MR. GADDY:
17    Q.   I think I -- I think it would be 201.
18    A.   No.  Because they're roughly 6,000 a
19  box.  So, 6,000 goes into 100,000.  I don't know
20  what the math is on that.  But 15, 20.
21    Q.   Okay.  Well, I was just talking about
22  the boxes.  I think we -- you told me earlier it
23  was $495 for a box?
24    A.   No.  No, it's $6,000 all in.  You can't

Page 232

1  just -- it's disingenuous to say each box costs
2  $500 when the actual cost is somewhere around
3  $6,000.
4    Q.   Well, there is one cost for the box and
5  another cost to put a box in a store, correct?
6    A.   And another cost to maintain the box by
7  Stericycle and another cost of labor and man-hours
8  to do so.  So, there is four costs associated with
9  the box.
10    Q.   Would you agree that $100,500 is a
11  significant sum of money to secure a speaker at an
12  event such as this?
13    A.   I would agree that our ability to
14  collect 500 tons of unused medications is
15  phenomenal and clearly suggests that we've -- are
16  answering a need out there in communities across
17  the country.  So, our ability to do that with
18  elected officials or with potentially a paid
19  representative would only increase the exposure of
20  the boxes and make them more available to more
21  patients.
22    Q.   I didn't ask you how much you collected.
23  I didn't ask you whether or not you thought it was
24  phenomenal or not phenomenal.  If your attorney

Page 233

1  wants to come back at the end of the day and ask
2  you questions about what you think is fantastic or
3  how much you've done, he is more than welcome to do
4  so.
5        My question to you is whether or not
6  you think $100,500 is a significant sum to pay for
7  an appearance fee for somebody to come and appear
8  at a press event?
9    A.   If a tree --
10    MR. SWANSON:  Object to the form.
11  BY THE WITNESS:
12    A.   If a tree falls in the forest and nobody
13  knows or hears about it, then it didn't occur.  If
14  you don't highlight efforts like this, then people
15  won't understand what options are available to them
16  with safe medication disposal.
17  BY MR. GADDY:
18    Q.   So, your answer is that it's reasonable
19  to pay $100,500 to a person like Bob Gates and fly
20  him on a private jet to attend your press event?
21    MR. SWANSON:  Object to form.
22  BY MR. GADDY:
23    Q.   That's a reasonable expenditure of the
24  money that you've collected from partners to fund

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 this effort?

2    A.   I think if we could have had an

3 opportunity to have somebody of his stature talking

4 about the importance of safe medication disposal,

5 it would have had -- allowed access to probably

6 tens of thousands, if not hundreds of thousands of

7 Americans about where our boxes are located, which

8 means we would have collected even more.

9    Q.   So, you think it's reasonable?

10    A.   Again, I think the opportunity to have

11 somebody of former Secretary Robert Gates' stature

12 or former Joint Chiefs of Staff Colin Powell talk

13 about the importance of unused medications, then

14 having that message be cascaded to tens of

15 thousands, if not hundreds of thousands of

16 Americans is worth it in trying to help with this

17 important issue.

18    Q.   So, yes, it's reasonable?

19    MR. SWANSON:  Asked and answered three times.

20 BY THE WITNESS:

21    A.   I think the opportunity to have somebody

22 of former Secretary Robert Gates' stature or Robert

23 Joint Chiefs of Staff Colin Powell be able to share

24 this message with tens of thousands, if not

Page 235

1 hundreds of thousands of Americans would just go a

2 long way towards collecting even more unused

3 medications.

4 BY MR. GADDY:

5    Q.   Does that mean yes or no?

6    MR. SWANSON:  Objection.

7 BY THE WITNESS:

8    A.   I think the opportunity to have somebody

9 of that stature be able to help broadcast that

10 message is just another key step in trying to

11 combat a challenging issue.

12 BY MR. GADDY:

13    Q.   Is there a reason that you don't want to

14 say yes or no that that's a reasonable amount of

15 money?

16    MR. SWANSON:  Object to form, argumentative.

17 BY THE WITNESS:

18    A.   You want me to answer that last

19 question?  Is there a reason that I'm not willing

20 to say whether or not it's reasonable.  I think

21 if --

22 BY MR. GADDY:

23    Q.   I'm asking is there a reason you don't

24 want to say yes or no.  You're giving me your

Page 236

1 lobbying speech on your talking points; but you

2 won't say yes, it's reasonable or no, it's not.

3    Is there a reason you can't give an

4 answer to that?

5    A.   I think --

6    MR. SWANSON:  Objection to the preface.

7 BY THE WITNESS:

8    A.   I think "reasonable" is a subjective

9 term.  I think obviously if you see in the e-mail

10 that I was in fact inquiring about him appearing,

11 then that is something that we were interested in

12 doing.

13 BY MR. GADDY:

14    Q.   You agree that there is folks within the

15 industry that questioned whether or not drug

16 take-back kiosks or programs do any good at all

17 when it comes to combating the opioid crisis?

18    A.   I think that there is some -- I mean,

19 everybody has an opinion.  Do I think there is

20 legitimate folks that are questioning whether

21 take-back is a good method?  I think -- I don't --

22 I'm not aware of anybody that has a reasonable,

23 legitimate, unbiased, objective viewpoint on that,

24 no.

Page 237

1    Q.   I show you what we are going to mark as

2 Exhibit No. 21.

3    (WHEREUPON, a certain document was

4    marked as Walgreens-Kaleta Exhibit

5    No. 21: 5/21/18 e-mail string with

6    attachment; WAGMDL00384341 -

7    00384357.)

8 BY MR. GADDY:

9    Q.   It's P-WAG-1924, Bates No. 384341.

10    Do you recognize this as an e-mail

11 chain -- it looks like it's just a one-page e-mail,

12 and the e-mail is sent to you from Michele

13 Davidson.

14    Do you see that?

15    A.   I do.

16    Q.   Who is Michele?

17    A.   She's on our policy team.

18    Q.   And if you'd turn, up at the top

19 right-hand corner, it's going to say .002.  It's

20 the second page of the attachment.

21    A.   Okay.

22    Q.   And do you recall, and I want to start

23 on the first page, which is .002 at the top right.

24    A.   Um-hmm.

Page 238

1    Q.   Sorry.  It's 344 at the bottom right.
2  We'll start there.
3    A.   So, I'm sorry.  Where are we going?
4    Q.   Flip to the one up top.  344, the first
5  page.  It's the one up on the screen.
6    A.   Okay.
7    Q.   Do you recall this document?
8    A.   I recall reading a news report of a John
9  Holaday who has a financial interest in selling
10 DisposeRx packets, which is why he shared
11 information about what he believed to be the
12 efficacy of take-back programs.
13   Q.   So, is the answer that yes, you recall
14 this document?
15   A.   No.  I don't recall this specific
16 document.  I recall that John Holaday testified
17 before folks on the Hill with a financial interest
18 to sell more of his packets.
19   Q.   Okay.
20   A.   At the expense of take-back boxes.
21   Q.   Okay.  So, you know who John Holaday is?
22   A.   I do.
23   Q.   And you recall that he provided some
24 testimony to Congress and he promoted the option

Page 239

1  that he's actually in the business of?
2    A.   That's correct.
3    Q.   Okay.  Turn to the next page, which is
4  345 at the bottom right, and in the middle of the
5  page there is a paragraph that says, "Twice
6  yearly."
7        Do you see that?
8    A.   Actually look up here.  "Twice yearly,"
9  okay.
10   Q.   It says, "Twice yearly, on April 28 and
11 October 28, the DEA sponsors take-back programs at
12 various locations around the U.S."
13       Do you see that?
14   A.   I do.
15   Q.   Does Walgreens support those efforts of
16 the DEA?
17   A.   We have participated in those efforts
18 that the DEA has done, yes.
19   Q.   It says, "These programs often collect
20 several tons of drugs during the day-long event.
21 The cost per pound of managing the collected drugs
22 is estimated to be up to $62."
23       It goes on to say, "Although the tons of
24 drugs removed from circulation is certainly

Page 240

1  impressive, collected drugs include such
2  over-the-counter drugs as Flintstone vitamins and
3  the tonnage was largely due to the drug containers,
4  not the drugs themselves."
5        Do you see that?
6    A.   I see what's written there.
7    Q.   Okay.  When you keep quoting --
8    A.   500 tons.
9    Q.   Are you talking about pills only?
10   A.   That includes pills as well as other --
11 as well as the container in some cases.
12   Q.   Okay.  So, when you keep telling me how
13 many tons that Walgreens has collected, you're
14 aware that that weight includes the tonnage of the
15 drug container kiosks?
16   A.   It may.
17   Q.   And when you tell me how many -- the
18 weight of what was collected, you're not
19 representing that those -- that all that was
20 collected was opioids, correct?
21   A.   That's correct.
22   Q.   In fact, you have no idea how many
23 opioids are actually collected?
24   A.   I think that there is different studies

Page 241

1  that have been done about how many, what percentage
2  of opioids are prescribed, and so different
3  researchers and professors have gone down the road
4  of saying if X percent of all prescriptions are
5  opioids, then it's fairly logical to assume that
6  X percent of what's in the take-back box is
7  opioids.
8    Q.   And we will look at some of that in a
9  little bit.  But I think you told us earlier that
10 it's against regulations for you to -- for you or
11 anybody with Walgreens to open the box and look in
12 there, right?
13   A.   That's correct.
14   Q.   So, you don't know, you can't sit here
15 and tell me today how many tons of opioids, if any,
16 they have actually collected in this program?
17   A.   I know for a fact that there's opioids
18 inside the take-back boxes.
19   Q.   Okay.  Have you opened some of them?
20   A.   No.  I have put them in myself, and I
21 have done it on behalf of family members.
22   Q.   Okay.
23   A.   So...
24   Q.   But you don't know how much opioids have

Page 242

1  been collected in these programs?
2      A.   I think we have established that on a
3  percentage basis, one could discern relative to how
4  many prescriptions are opioids that that
5  calculation can be made.  But no, I cannot.
6      Q.   It goes on to say in the next paragraph,
7  second sentence or let's just start with the first
8  sentence.
9          It says, "A study in five counties in
10 Kentucky conducted by Egan, et al. evaluated all
11 the drugs dispensed and then collected at take-back
12 programs and kiosks.  They found that the vast
13 numbers of drugs that are dispensed by pharmacists,
14 very few were subsequently collected."  It says,
15 "Annually controlled medications disposed were
16 estimated to account for less than 1%," to be
17 exact, ".3% of those that were dispensed."
18         Do you see that?
19     A.   I do see that.
20     Q.   And then in the last sentence of that
21 paragraph they say, "Another report on drug
22 take-back by Carnevale noted 'we found no evidence
23 that take-back programs affect prescription drug
24 abuse.'"

Page 243

1          Do you see that?
2      A.   I do.
3      Q.   You obviously disagree.  I'm not asking
4  if you agree with those characterizations.  But you
5  see that that's represented there?
6      A.   So, I've never -- I've heard of people
7  allude to this study.  What year is the study from?
8      Q.   We will look at it in just a minute
9  but...
10     A.   Okay.
11     Q.   You've heard those comments before?
12     A.   I have heard that a study has been done
13 in certain parts of the country relative to.  But,
14 again, I have no -- no basis for that being
15 accurate or factual or relevant.
16         And, again, I would ask what the date of
17 the study was and which boxes they were reviewing
18 and how frequently and what parts of the country
19 and 100 other questions.
20     Q.   Sure.  Turn to Page No. 349 for me,
21 please, at the bottom right.  You see here one of
22 these particular articles?
23     A.   Do I see what?
24     Q.   That this here is one of these

Page 244

1  particular articles?
2      A.   I don't.  I see a whole bunch of words
3  on the screen that I've never read before.
4      Q.   Okay.  Start up in the -- well, if you
5  go back to the first page of this e-mail, this is
6  an e-mail that was sent to you, right?
7      A.   Yeah.  I get a lot of e-mails with big
8  large attachments.
9      Q.   Okay.
10     A.   Some of which I read, some of which I
11 don't.
12     Q.   Did you read this one?
13     A.   Nope.
14     Q.   Okay.  Let's go back to that 349 on the
15 bottom right-hand corner.
16     A.   Um-hmm.
17     Q.   Do you see in the top left-hand corner
18 it says it's the American Journal of Drug and
19 Alcohol Abuse?
20     A.   From 2016.
21     Q.   I think it says 2017 right below.
22     A.   No.  It says article history, received,
23 revised, accepted on the right.  So, I don't know
24 what the 2017 is, but...

Page 245

1      Q.   Okay.  I was just going with the date it
2  was published, but whatever.
3      A.   I think you'd have to go with your
4  article history.
5          It's pretty important since we started
6  dropping boxes in 2016.  That means that this study
7  100 percent didn't include anything that Walgreens
8  was doing.
9          So, we now have 1,100 boxes in the
10 ground collecting, and this article has nothing to
11 do with any of them.  So, I think actually this is
12 helpful to point out I probably should have read it
13 so I could push back a little stronger on the folks
14 that have tried to make this claim.
15     Q.   But you haven't read it?
16     A.   No, I have not.
17     Q.   Okay.
18     A.   But it's not timely and it's not
19 relevant because it's from 2016.  We didn't have
20 any boxes in the ground until 2016.  Clearly, they
21 couldn't have performed, done the study and written
22 the article all in the same period of time when we
23 were still putting our first boxes in the ground.
24     Q.   And I will object to the extent that

Page 246

1 that was non-responsive to any question. Okay.

2      Do you see the title of the article,

3 "From dispensed to disposed: evaluating the

4 effectiveness of disposal programs through a

5 comparison with prescription drug monitoring

6 program data"?

7      Do you see that?

8    A.  I see that title, yes.

9    Q.  Okay. And do you see there in the

10 middle of the page there there is an abstract?

11    A.  I do.

12    Q.  It gives a summary of the article.

13      Do you see that?

14      Are you familiar with the concept of an

15 abstract?

16    A.  I'm familiar with the concept of an

17 abstract, but an abstract varies by publication.

18 So, as I said, I've never read this article before.

19    Q.  Okay. It says under "Background:

20 Organized disposal of controlled medications, such

21 as take-back events and permanent drug donation

22 boxes, is a prevention strategy that has been

23 widely used to reduce availability of controlled

24 medications for drug diversion or abuse. However,

Page 247

1 little is known as to whether this strategy

2 actually reduces the overall availability of these

3 medications for the purposes of diversion or

4 abuse."

5      Do you see that?

6    A.  I do. I see what you're highlighting.

7    Q.  Okay. And if you go down to the bottom

8 of that section, you come to the conclusion and it

9 reads, "Controlled medications collected by

10 take-back events and permanent drug donation boxes

11 constituted a minuscule proportion of the drugs

12 dispensed. Our findings suggest that organized

13 drug disposal efforts may have had a minimal impact

14 on reducing the availability of unused controlled

15 medications at a community level."

16      Do you see that?

17    A.  I see what you've highlighted.

18    Q.  Okay.

19    A.  What you didn't highlight, though, is in

20 the middle of the abstract that you referred to it

21 says "Results."

22    Q.  Mr. Kaleta, I don't think I've asked a

23 question.

24    A.  In 2013. So, actually I want to revise

Page 248

1 what I said before. This actually may have been

2 printed initially in 2016. The study may have been

3 results are from 2013. So, this is five years old.

4    Q.  Are you done?

5    A.  I just don't think it's relevant.

6    Q.  If your attorney wants to ask you

7 questions about it, he can point out everything

8 that --

9    A.  I think we should. Yeah, we should go

10 to this later. That's a great opportunity.

11    Q.  Well, next time we take a break, you

12 should tell him that and come back to this at the

13 end of the day.

14    A.  That sounds good.

15    Q.  Can you turn with me please to 354.

16    A.  354. Okay.

17    Q.  Do you see there is a pie chart at the

18 bottom of the page?

19    A.  I see a pie chart, yes.

20    Q.  You see it's labeled Figure 1?

21    A.  I see where it says Figure 1. I have no

22 idea what this is about. I mean, I haven't read

23 this, any of this study. So...

24    Q.  If you go back up to the "Discussion"

Page 249

1 portion, I'll try to explain it to you.

2      There is a sentence about halfway

3 through that first paragraph on the left that

4 starts "We found that."

5    A.  I'd like time to read this.

6    MR. SWANSON: Go ahead. Take your time to

7 read it if you want to.

8    THE WITNESS: Yeah.

9 BY THE WITNESS:

10    A.  I mean, this is a long study and you

11 want me to refer to a pie chart at the bottom.

12 BY MR. GADDY:

13    Q.  Do you see where I am on the left-hand

14 side of the page, "We found"?

15    A.  No, I need more time.

16      All right. I've had a chance to do a

17 cursory glance.

18    Q.  Okay. Do you see where I am talking

19 about, "We found that"?

20    A.  We found what?

21    Q.  I am starting in the sentence there, "We

22 found that biannual."

23    A.  Okay.

24    Q.  "We found that biannual take-back events

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  and annual permanent drug donation boxes were
2  estimated to account for .3% of the prescription
3  medications dispensed in the participating counties
4  within a single year."
5      Do you see that?
6      A.  Yeah, but it doesn't list the year.  Do
7  you know what year they're referring to there?
8      Q.  I'm just asking if you see what's
9  written there.
10     A.  I do.
11     Q.  It says, "These findings in conjunction
12 with previous research reporting that approximately
13 30% of controlled medications are used suggest that
14 69% of controlled medications are unused and
15 unaccounted for in communities."
16     Do you see that?
17     A.  I do.  It also says on the first
18 sentence, "This is the first study to compare the
19 number of controlled medications."  Yet then in the
20 second sentence you highlighted it talks about
21 other studies.  So, I'm confused by those two
22 sentences.
23     Q.  Okay.  Now that we have read that, do
24 you see the pie chart on the bottom of the page?

Page 251

1      A.  Yes.  I see a pie chart.
2      Q.  And do you see that the white section,
3  the 30%, represents the amount of drugs, the amount
4  of controlled substances that were dispensed to the
5  patient and used by the patient.
6      Do you see that?
7      A.  Yeah, but I don't --
8      MR. SWANSON:  Object to foundation.
9  BY THE WITNESS:
10     A.  I don't understand what the 30% is
11 referring to.
12 BY MR. GADDY:
13     Q.  Okay.  Do you see the gray-shaded area
14 that I think -- I believe it says 69.7% that it
15 indicates is unknown?
16     A.  I don't have any idea what those numbers
17 mean.
18     MR. SWANSON:  Object to form, foundation.
19 BY THE WITNESS:
20     A.  Yeah, I mean, what's the 30%?  Of what?
21 What year?  With which box?  And which medications?
22 In which part of the country?
23     You're just pointing to numbers on a pie
24 chart.  I can't possibly respond to that.

Page 252

1  BY MR. GADDY:
2      Q.  I'm just asking if you see what the
3  results of the study are indicating in that chart.
4      MR. SWANSON:  Object to form.
5  BY MR. GADDY:
6      Q.  I'm not asking you to conduct an
7  analysis.  I'm not asking you whether you agree or
8  disagree with the study.  I'm just asking if you
9  see what it says.
10     A.  I don't understand --
11     MR. SWANSON:  Let me get a --
12     THE WITNESS:  Yeah, please.
13     MR. SWANSON:  -- foundation objection in.  He
14 is asking for information.  I understand you don't
15 want to give it to him.  I'm objecting on
16 foundation.
17     If you can answer the question, go
18 ahead.  If you can't answer the question, you can
19 say so.
20 BY THE WITNESS:
21     A.  I can't answer that question.
22 BY MR. GADDY:
23     Q.  Okay.  Do you remember what you did when
24 you received this study?

Page 253

1      A.  I do not.
2      Q.  You agree that this study gave a
3  negative assessment or a negative view of drug
4  take-back programs?
5      A.  I agree that the gentleman that
6  testified on Capitol Hill with this study has a
7  financial interest in pushing his paid envelopes
8  and not take-back boxes.  I would agree with that.
9      Q.  Okay.  I'll reask my question.
10     You agree that this study gave a
11 negative assessment of drug take-back programs?
12     MR. SWANSON:  Object to form.
13 BY THE WITNESS:
14     A.  I won't agree with that.  I'll agree
15 that the individual that trumpeted this study had a
16 financial interest in sharing it with folks on
17 Capitol Hill.
18 BY MR. GADDY:
19     Q.  Do you think the study gave a positive
20 review of take-back programs?
21     MR. SWANSON:  Object to form, foundation.  I
22 thought he said he hadn't read it.
23 BY THE WITNESS:
24     A.  I have no idea what the -- aside from

Page 254

1 you cherry-picking a couple of lines from the
2 study, I have no idea what it says positively or
3 negatively as it relates to take-back.
4 BY MR. GADDY:
5    Q.   The conclusion that we read that said
6 drug take-backs have no impact on opioid abuse, do
7 you think that's positive or negative?
8    A.   The conclusion that was part of the
9 abstract saying the study from 2013?
10    Q.   The conclusion that we just read.
11    A.   I don't agree with any of this since I
12 haven't had a chance to read the study.
13    Q.   I'll show you what I will mark as
14 Exhibit 22.
15      (WHEREUPON, a certain document was
16      marked as Walgreens-Kaleta Exhibit
17      No. 22:  5/24/18 e-mail string;
18      WAGMDL00616784 - 00616787.)
19 BY MR. GADDY:
20    Q.   If you flip for me, please, to page 786
21 looking at the bottom right-hand corner.
22    MR. SWANSON:  786?
23    MR. GADDY:  Correct.
24 BY MR. GADDY:

Page 255

1    Q.   Do you see on the bottom of that
2 page it's an e-mail from you to John, Charley;
3 Katherine Troller; Steve Gregory; and Alethia
4 Jackson and subject "Holaday testimony"?
5    A.   Yes, I see that.
6    Q.   That's the individual that we were just
7 talking about, correct?
8    A.   Yes.  That's correct.
9    Q.   You say, "Charley."  And who is Charley?
10    A.   Charley is a member of the public policy
11 team.
12    Q.   You say, "Charley, can you look into the
13 Journal of Drug Abuse article referenced here?
14 When is it from?  Who conducted it?  Who paid for
15 it?  Thanks, Ed."
16      Do you see that?
17    A.   Yes.
18    Q.   So, you didn't read the article; you
19 sent it to Charley and asked him to look into it,
20 correct?
21    A.   That is correct.
22    Q.   Okay.  If you flip back to page 785,
23 bottom right, up at the top of the page you see an
24 e-mail from you to the same group of people,

Page 256

1 correct?
2    A.   I'm sorry.  What page are you on?
3    Q.   785 at the bottom right.
4    A.   785 bottom right.
5    Q.   785 is the Bates number in the bottom
6 right-hand corner of the document.
7    A.   Yes.  So, which e-mail are you referring
8 to?
9    Q.   Top of the page, do you see an e-mail
10 from you to those same individuals?
11    A.   Yes, I see that.
12    Q.   Okay.  You write back to Charley, say,
13 "Hey, this is super helpful.  I have a call with
14 Walmart tomorrow on this topic.  They have already
15 said they did not participate in the drafting of
16 the testimony, but I'm going to ask that they ask
17 Holaday to refrain from using inaccurate
18 cherry-picked and clearly out of date data."
19      Do you see that?
20    A.   I do.
21    Q.   And those are some of the concerns that
22 you've raised here today, correct?
23    A.   That's correct.
24    Q.   You go on to say, "Further, as we

Page 257

1 discussed, Charley, let's get a few proposals ASAP
2 on conducting a study of safe medication disposal."
3      Do you see that?
4    A.   I do.
5    Q.   You were interested in putting a study
6 together that would look at Walgreens' take-back
7 program, correct?
8    A.   I floated an idea of potentially doing a
9 study looking at take-back programs, that's
10 correct.  I didn't necessarily say Walgreens.  I
11 just said safe medication disposal.
12    Q.   Go to the first page of the document.
13 Do you see the e-mail in the middle of the
14 page from Steven?
15    A.   I do.
16    Q.   And he says, "Perhaps NACDS could help
17 with the study?"
18      Do you see that?
19    A.   I do.
20    Q.   And at the top of the page there is
21 actually a response to that e-mail from Charley,
22 correct?
23    A.   Yes.
24    Q.   Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  A.  I do.
2  Q.  And is Charley somebody that reports to
3  you?
4  A.  He is not.  He reports to Steven
5  Gregory, head of policy.
6  Q.  And Steven reports to you?
7  A.  That's correct.
8  Q.  And Charley writes, "Would you worry
9  about what an NACDS or any other product for that
10  matter would show?"
11  Do you see that sentence?
12  A.  I do.
13  Q.  Do you understand him to be talking
14  about the results of any study that would be done?
15  A.  So, Charley wrote the e-mail.  I didn't.
16  I'm not exactly certain what he means because there
17  is a little bit of confusion when he talks about
18  product.
19  Q.  Okay.
20  A.  I don't know if that's a take-back
21  product.  I don't know if that's referring to a
22  study.  So, I'm not clear.
23  Q.  Okay.  Let's keep reading.  It says,
24  "Us," meaning Walgreens, "and CVS are pretty well

Page 259

1  entrenched in our method."
2  Do you see that?
3  A.  I see that sentence.
4  Q.  Okay.  At this point in time Walgreens
5  also had a drug take-back program, correct?  I'm
6  sorry.  CVS.
7  A.  CVS has a form of a drug take-back
8  program.
9  Q.  Goes on to say, "Walmart and Rite Aid
10  are now entrenched in theirs."
11  Those two entities also have drug
12  take-back programs, correct?
13  A.  They both have different things that
14  they do to try to address unused medications.
15  Q.  Charley then writes or then asks, "So
16  what happens when this preference study shows one
17  over the other?"  It says, "If their method doesn't
18  work, it will just fade.  And one advantage that
19  we'll always have over it is they won't be able to
20  do press releases with impressive tonnage of
21  collection."
22  Do you see that?
23  A.  I do.
24  Q.  He goes on to say, "But if a survey

Page 260

1  comes out in their favor, that will be a hard
2  perception to change."
3  Do you see that?
4  A.  I do.
5  Q.  And do you understand Charley to be
6  questioning whether or not Walgreens should
7  actually do a study because you don't know what the
8  results of the study would be beforehand?
9  MR. SWANSON:  Object to form, foundation.
10  BY THE WITNESS:
11  A.  I can't speak to Charley's intent.  He
12  wrote the e-mail.  I didn't.
13  BY MR. GADDY:
14  Q.  Do you not recognize that to be a
15  concern that he's raising?
16  A.  I recognize that on any given day, as
17  I've mentioned before, there is debates that go on
18  amongst my colleagues and I about pros and cons of
19  any different number of policy proposals, research
20  associated with them, et cetera.
21  Q.  So, yes, he is raising a concern that
22  the study might show that people like other
23  people's programs better than Walgreens?
24  MR. SWANSON:  Object to form.

Page 261

1  BY THE WITNESS:
2  A.  Yeah, again, Charley wrote the e-mail.
3  I didn't.  I think he is trying to point out pros
4  and cons is probably how I would characterize what
5  I'm trying to interpret that he's saying.
6  BY MR. GADDY:
7  Q.  But one of the pros that he points out
8  is that Walgreens always has the ability to point
9  to the tonnage of medication it's collected,
10  correct?
11  A.  That sentence does in fact say, yes, one
12  advantage is that we have an impressive tonnage
13  collection, something that, as I have mentioned
14  before, we have won awards for, received numerous
15  commendations from a bunch of groups around the
16  country for all of our work.  So, yeah, I think
17  we're pretty proud of the tonnage collection
18  number.
19  Q.  I will object to the extent that was
20  non-responsive to the question.
21  That's something that Walgreens does
22  quite a lot is mention or reference the number of
23  tons of medication and I guess, frankly, medication
24  plus containers that is collected, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    MR. SWANSON:  Object to form.
2    BY THE WITNESS:
3        A.    The goal of the Safe Medication Disposal
4    Program is to try to get unused medication out of
5    medicine cabinets, out of homes, away from
6    children, adolescents, et cetera.  So, to the
7    extent that we talk about it, that is the goal.
8    BY MR. GADDY:
9        Q.    I will show you what I'll mark as Kaleta
10   23, P-WAG-1903, Bates No. 611377.
11            (WHEREUPON, a certain document was
12            marked as Walgreens-Kaleta Exhibit
13            No. 23:  3/1/17 e-mail with
14            attachment; WAGMDL00611377 -
15            00611384.)
16   BY MR. GADDY:
17       Q.    Do you recognize this as an e-mail that
18   was sent by Charley to you, Steven and your boss
19   Chuck Greener?
20       A.    I recognize that it's an e-mail from
21   Charley to Steven, myself and Chuck, yes.
22       Q.    And the subject of this e-mail is opioid
23   study?
24       A.    That's correct.

Page 263

1        Q.    Okay.  And earlier you had suggested, I
2    think in this last e-mail we just looked at, you
3    suggested the option of conducting a study to look
4    at drug take-backs, correct?
5        A.    That's correct.
6        Q.    And I don't know if this is the study
7    you were referencing, but actually such a study was
8    done, correct?
9        A.    This is from 2017.  The e-mail exchange
10   that we just went through is 2018.
11       Q.    Sure.  I think I just said I don't know
12   that this is the study that was being referenced
13   there.  But this is such a study that was done?
14       A.    I've never -- I've never read this
15   study.  I'm not familiar with it.
16       Q.    And this one was e-mailed to you also,
17   correct?
18       A.    Yeah, I'm on the e-mail.
19       Q.    Okay.  But you didn't read this --
20       A.    You picked two documents, one from 2017
21   and one from 2018, and you're trying to suggest
22   that the 2018 e-mail is referring to something else
23   and I'm just having trouble following you.
24       Q.    Specifically said this isn't the study

Page 264

1    that's being referenced in the other e-mail.  I'm
2    just asking if this is a study that was sent to
3    you.
4        A.    Yes.  This was in fact a study that was
5    sent to me by e-mail.
6        Q.    Did you read this study?
7        A.    I did not.
8        Q.    Do you read any of the studies that are
9    sent to you by e-mail?
10       A.    Some.  I get a lot of information.
11       Q.    Okay.  How do you pick what you read and
12   what you don't read?
13       A.    I'm going to assume that in this
14   situation I probably asked Charley for a summary.
15   That's one of the main objectives of the policy
16   team is to summarize information in a more concise
17   way.
18       Q.    Well, let's look at the study.
19       A.    Okay.
20       Q.    If you look at the first page, you see
21   this is in the Journal of the American Pharmacists
22   Association?
23       A.    Okay.
24       Q.    Do you see that at the top of the page?

Page 265

1        Do you see that the title is
2    "A nationwide pharmacy chain responds to the opioid
3    epidemic"?
4        Do you see that?
5        A.    I see that that's the title, yes.
6        Q.    And do you know, before we get into
7    this, that they are talking about Walgreens here?
8        A.    No.
9        Q.    Okay.
10       A.    I don't know who they are talking about.
11       Q.    Okay.  Go under the "Abstract" again.
12   Under "Objectives" do you see it says describe --
13   "The objective of the study is to describe the
14   three-pronged approach taken by a large national
15   retail pharmacy chain to address the opioid
16   epidemic and associated overdoses."
17       Do you see that?
18       A.    I do.
19       Q.    And if you go to "Practice Innovation,"
20   it says, "Initiated 3 programs to respond to the
21   opioid crisis, provide safe medication disposal
22   kiosks, expand national access to Naloxone and
23   provide education on the risk and avoidance of
24   opioid overdose."

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    Do you see that?
2    A.   Yes.
3    Q.   And is that consistent with your
4  understanding of some of the programs that
5  Walgreens has engaged in in the last two or three
6  years?
7    A.   We have engaged in programs that are
8  highlighted in those three bullets, yes.
9    Q.   And if you go down to the conclusion, do
10  you see that it indicates, "The availability of the
11  safe drug disposal kiosks, the naloxone dispensing
12  at pharmacies and patient education are key
13  prevention initiatives to address the opioid
14  epidemic and reduce the increasing national burden
15  of opioid overdose. Early results are
16  quantitatively and qualitatively promising."
17    Do you see that?
18    A.   I see that.
19    Q.   You weren't aware of this study?
20    A.   It rings a bell, but I can't say I've
21  read it. I also notice that the date on this is
22  2016 as well.
23    Q.   Okay.
24    A.   So, it's interesting that assuming that

Page 267

1  this was Walgreens, which I don't know one way or
2  the other whether it was or not, that we were
3  studied. They did so when some of these programs
4  were only just in their infant stages, but I'm not
5  familiar with this study. So...
6    Q.   Turns --
7    A.   Just guessing.
8    Q.   Let's turn to the page, the Bates No. is
9  379 in the bottom right. It's the very next page.
10    And do you see right-hand column it says
11  "Practice site." It indicates they are talking
12  about Walgreens.
13    Do you see that?
14    A.   I do.
15    Q.   Okay. And if you go down to the next
16  heading, which is "Practice innovation," you see
17  they talk about those three programs and, again,
18  they are talking about Walgreens?
19    A.   I do.
20    Q.   Okay. Do you accept that they were
21  looking at Walgreens when they did this study?
22    MR. SWANSON:  Object to form, foundation.
23  BY THE WITNESS:
24    A.   Again, I haven't read the study, but it

Page 268

1  appears that they are talking about Walgreens.
2    Q.   Okay. Go back to the first page of the
3  e-mail from Charley, please.
4    A.   Okay.
5    Q.   It says, "Here is our study on the early
6  impact of our programs within drug diversion and
7  abuse. It is not a landmark result yet. That
8  would be when we can tie the programs to decrease
9  in mortality or morbidity. But a statement that
10  our programs are a key prevention initiative to
11  address the opioid epidemic can be a powerful early
12  message."
13    Do you see that?
14    A.   I do.
15    Q.   Do you know who performed the study?
16    A.   I don't.
17    Q.   If you look at the authors on the first
18  page underneath the title, Emily Shafer, Nyahne
19  Bergeron, Renae Smith-Ray. Do you know any of
20  those individuals?
21    A.   I know Chester Robson.
22    Q.   And how do you know Chester Robson?
23    A.   He works at Walgreens.
24    Q.   Do you know that all these people work

Page 269

1  at Walgreens?
2    A.   No. I did not know that.
3    Q.   Go to the last page of the document, if
4  you don't mind. On the right-hand corner.
5    A.   Okay.
6    Q.   Do you see the --
7    A.   The last page of the document?
8    Q.   Correct.
9    A.   What's the page number?
10    Q.   384 is the last.
11    A.   Okay.
12    Q.   Do you see the authors listed there?
13    A.   I do.
14    Q.   Do you see that all of them work at
15  Walgreens?
16    A.   According to this, they're all listed as
17  being with Walgreens.
18    Q.   So, the individuals that wrote the
19  article that concluded that the early results of
20  Walgreens programs are promising were all folks who
21  work for Walgreens, correct?
22    MR. SWANSON:  Object to form.
23  BY THE WITNESS:
24    A.   Again, I have not read the study. So...

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 BY MR. GADDY:
2    Q.   Would you agree that if the study was
3 written by five individuals who worked for
4 Walgreens about a Walgreens study, that that would
5 not be an independent study?
6    MR. SWANSON:  Object to form.
7 BY THE WITNESS:
8    A.   I haven't read the study.
9 BY MR. GADDY:
10   Q.   I'm not asking if you read the study.
11   A.   I understand.
12   Q.   Forget the study exists.  Let's pretend
13 it's a study about cheeseburgers.  If five people
14 that worked for McDonald's wrote a study about
15 McDonald's cheeseburgers, do you think that would
16 be an independent study?
17   MR. SWANSON:  Object to form.
18 BY THE WITNESS:
19   A.   I am not a hamburger expert.
20 BY MR. GADDY:
21   Q.   I'm not asking you to be.  I am asking
22 whether or not you think that would be an
23 independent study.
24   MR. SWANSON:  Object to form.

Page 271

1 BY THE WITNESS:
2    A.   Yeah, I can't.  I'm not a statistics
3 guy.  I'm not a study guy.  So, I don't know what
4 type of methodology can, should be used to evaluate
5 different programs and I have not read this, so I
6 can't comment on whether it was objective or not.
7 BY MR. GADDY:
8    Q.   You have no opinion on whether or not an
9 article written by five individuals with the
10 company about a company program is an independent
11 study or not?
12   MR. SWANSON:  Object to form.
13 BY THE WITNESS:
14   A.   I am familiar with the American
15 Pharmacists Association.  I don't know that I have
16 read any of their articles before.  But I don't
17 know what the criteria are from the Journal of the
18 American Pharmacists Association.  I don't know
19 what their editorial requirements are.  I don't
20 know what their rationale is and who gets to do
21 studies and who doesn't.
22 BY MR. GADDY:
23   Q.   In your mind, your personal opinion, not
24 your opinion as a statistician or an expert on

Page 272

1 anything, would you consider this to be an
2 independent study?
3    MR. SWANSON:  Object to form.
4 BY THE WITNESS:
5    A.   Again, I can't answer that question.
6 I've never read the study, so it's impossible for
7 me to say whether it's independent or not.
8 BY MR. GADDY:
9    Q.   All these people, if they work for
10 Walgreens, are paid by Walgreens, right?
11   A.   I don't know the answer to that.  I know
12 Chester is paid by Walgreens.  As I mentioned to
13 you, I don't know the other four individuals.  I
14 assume that they, but I have no reason to -- some
15 of them may be part time, some of them may be
16 fellows.  I have no idea.
17   Q.   I show you what I will mark as Kaleta
18 24.
19      (WHEREUPON, a certain document was
20       marked as Walgreens-Kaleta Exhibit
21       No. 24:  5/19/16 e-mail string;
22       WAGMDL00600854 - 00600860.)
23 BY MR. GADDY:
24   Q.   You see that this is an e-mail at the

Page 273

1 top of the page, it looks like it's a e-mail
2 between Casey Cesnovar and Sally West.  Do you know
3 who that is?
4    A.   Yes.  I know who Casey Cesnovar and
5 Sally West are.
6    Q.   Who is Sally?
7    A.   Sally is a member of the Walgreens
8 government relations state team.
9    Q.   If you go to the second page.  855 is
10 the Bates stamp.  See at the bottom or about
11 halfway down the page, there is an e-mail from
12 Casey to the government relations team.
13      Do you see that?
14   A.   I do.
15   Q.   Okay.  Is government relations, is that
16 a list-serve that all of you all are on?
17   A.   Yes.
18   Q.   So, you would have received this e-mail?
19   A.   In theory, yes.
20   Q.   It says, "All, I wanted to make sure you
21 saw the final tally on our take-back efforts with
22 law enforcement around national drug take-back
23 back.  At the 50 plus locations Walgreens collected
24 roughly 8,815 pounds of unused medications.  A nice

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1 talking point to supplement our continued efforts
2 aimed at reducing prescription drug abuse."
3         Do you see that?
4     A.    I do.
5     Q.    Then in the response to that is an
6 e-mail from Sally to Casey.
7         Do you see that?
8         Are you with me?
9     A.    Yeah, I have not read it.
10     Q.    Okay.
11     A.    Can I read it?
12     Q.    Sure, sure.  Take your time.
13     A.    Okay.
14     Q.    And you see in the second paragraph it's
15 talking about the possibility of doing a study with
16 an entity that could come in and look at what
17 actually gets picked up on the program.
18         Do you see that?
19     MR. SWANSON:  Object on foundation grounds.
20 BY THE WITNESS:
21     A.    So, this is the first time I have seen
22 this e-mail obviously since I'm not on it.  There
23 is -- yeah, there is discussion about some type of
24 study with different entities.

Page 275

1 BY MR. GADDY:
2     Q.    Okay.  And at the bottom of that
3 paragraph it says, "The goal is to find out if this
4 is really a productive use of resources or will
5 people just throw old Tylenol in there?  Will be
6 interesting to see if we move forward on this."
7         Do you see that?
8     A.    I do see that.
9     Q.    Do you recall at all whether or not
10 there was any proposal within Walgreens to actually
11 do such a study and determine whether or not you
12 all are actually collecting a significant amount of
13 opioids?
14     A.    I don't recall this e-mail.  We've
15 obviously looked at other e-mails where I myself
16 suggested potentially a study.  So...
17         I think the answer to your question is
18 yes, I am aware of different conversations around
19 different studies.
20     Q.    Did Walgreens ever decide to participate
21 in any type of study, not just a general study, but
22 specifically to determine what you're actually
23 collecting in these take-back boxes?
24     A.    Not to my knowledge.

Page 276

1     Q.    If you turn the page and actually go
2 back to the first page and at the bottom of the
3 page, you see in response to that e-mail from
4 Cesnovar, correct?
5     A.    Yeah.
6     Q.    And in the bottom section of that e-mail
7 he writes, "Another option would be for us to hook
8 them," meaning Purdue, "in with our local partners
9 here in Lake County, Illinois.  They have been
10 collecting and sorting the meds for some time and
11 anecdotally I have heard that it is about 5%
12 controls."
13         Do you see that?
14     A.    I do.
15     Q.    Is this the first time that you're
16 seeing or hearing that according to Casey, the
17 Walgreens individual in charge of state government
18 relations, is indicating that he's heard that it's
19 about 5% of the drugs collected in these programs
20 are controlled substances?
21     MR. SWANSON:  Object to form, foundation.
22 BY THE WITNESS:
23     A.    Yeah, I have no idea what this is
24 referring to.  Is it the first time I've seen this

Page 277

1 e-mail?  Yes.
2 BY MR. GADDY:
3     Q.    Have you ever heard that 5% number
4 before?
5     MR. SWANSON:  Object to form, foundation.
6 BY THE WITNESS:
7     A.    Again, I don't know what the 5% is
8 referring to.
9 BY MR. GADDY:
10     Q.    Okay.  When he says that these folks
11 have been collecting and sorting the meds for some
12 time and anecdotally he's heard it's about 5%
13 controls, do you have any reason to agree or
14 disagree with that?
15     MR. SWANSON:  Object to form, foundation,
16 vague.
17 BY THE WITNESS:
18     A.    I have no idea who he is referring to,
19 who is collecting, who is sorting.  And any time I
20 see the word "anecdotal," from a government
21 relations standpoint we tend to stay away from
22 things that are associated with anecdotes.
23 BY MR. GADDY:
24     Q.    Any reason to agree or disagree with

Page 278

1 that percentage of controlled substances that's
2 collected in your program?
3 MR. SWANSON: Objection; vague, foundation.
4 BY THE WITNESS:
5 A. I have no reason to agree or disagree
6 with that.
7 BY MR. GADDY:
8 Q. Prior to you becoming involved with the
9 drug take-back program in 2016, would you agree
10 that Walgreens was not doing anything as it related
11 to combating the opioid crisis?
12 MR. SWANSON: Object to form.
13 BY THE WITNESS:
14 A. No, I would not agree with that
15 statement.
16 BY MR. GADDY:
17 Q. We looked at some folks outside of
18 Walgreens who were negative about drug take-back
19 programs. Would you agree that you also got
20 pushback from within Walgreens about the prospects
21 of success of using drug take-back programs?
22 A. No, I wouldn't agree with that
23 statement.
24 Q. I'll show you what I will mark as

Page 279

1 Exhibit 25. This is P-WAG-1817, Bates No. 383497.
2 (WHEREUPON, a certain document was
3 marked as Walgreens-Kaleta Exhibit
4 No. 25: 10/22/15 e-mail string;
5 WAGMDL00383497 - 00383499.)
6 BY MR. GADDY:
7 Q. And if you would, turn to the second
8 page of that document, and about halfway down the
9 page you will see an e-mail from Rex Swords to
10 Richard Ashworth and Roxanne Flanagan.
11 Do you see that?
12 A. What page are you on?
13 Q. Second page.
14 A. 498?
15 Q. Correct.
16 A. Yes, I see an e-mail from Rex to
17 Richard, Roxanne and Rick Gates.
18 Q. Who is Rex Swords?
19 A. He works for Walgreens.
20 Q. What does he do for Walgreens?
21 A. I don't know what his title is right
22 now.
23 Q. Okay. He's on the operations side,
24 correct?

Page 280

1 A. Again, I don't know his exact
2 responsibility right now.
3 Q. You don't know what his -- what his
4 general duties are?
5 A. I believe Rex has been with the company
6 for a number of years and he continues to change
7 responsibilities. So, no, I can't speak to what
8 his responsibilities are right now.
9 Q. Outside of a professional relationship,
10 do you have a personal relationship with Rex?
11 A. I'm not sure I follow.
12 Q. A friendship?
13 A. Well, without being flip here, under our
14 HR empowerment surveys, typically are friends with
15 most of your colleagues.
16 Do we socialize together, is that your
17 question.
18 Q. Sure.
19 A. We've not socialized together.
20 Q. The subject of the e-mail is "Obama
21 announces massive push to curb opioid abuse, heroin
22 use."
23 Do you see that?
24 A. I do.

Page 281

1 Q. And Rex writes there, "FYI, I have the
2 team working on a nationwide drug take-back program
3 which we will bring through RxIC and we will
4 continue to partner with Rick's team to develop a
5 Naloxone program."
6 Do you see that?
7 A. Yes.
8 Q. Who is Richard Ashworth?
9 A. I believe Richard's title currently is
10 president of pharmacy and retail operations for
11 Walgreens.
12 Q. You believe that was his title at the
13 time, 2015, when this e-mail was sent?
14 A. I don't.
15 Q. What was he doing then?
16 A. I don't know what his title was. He was
17 in a somewhat similar capacity. He was probably a
18 senior vice president of at that time of pharmacy
19 and retail operations is my guess.
20 Q. It looks like he forwards this e-mail to
21 you and asks you for your thoughts, correct?
22 A. Yes.
23 Q. And if you flip back to the first page,
24 you respond with your thoughts, correct? Do you

Page 282

1 see that?

2 A. Yes. But if I could just have a second

3 to read this. It's been a while.

4 Okay.

5 Q. The second paragraph there starts, "Rick

6 Gates and I."

7 Do you see that?

8 A. I do.

9 Q. You say, "Rick Gates and I (and our

10 teams) have been working on a comprehensive plan

11 for the last few weeks on drug

12 take-back/prescription abuse, including a meeting

13 yesterday afternoon which also included Tasha."

14 You go on to say, "I'm pleased to see

15 Rex is on board as we have consistently had

16 pushback from his folks on his team (as recently as

17 yesterday), it costs too much, it won't make a

18 difference and what CVS and others announced is all

19 fluff."

20 Do you see that?

21 A. I do.

22 Q. I asked you a few minutes ago whether or

23 not you got any pushback from folks within

24 Walgreens about the prospects of success of using a

Page 283

1 program, and you told me you would not agree with

2 that statement. You agree you got pushback from

3 Rex on this program?

4 A. So, I stand by my statement. I got

5 pushback for real operational challenges on the

6 program. So, that's how -- that's the reason I

7 responded to your question in the manner I did.

8 Q. Regardless, you got pushback from Rex on

9 doing a drug take-back program, correct?

10 A. We received feedback from Rex, from

11 Tasha and others regarding some of our initial

12 thoughts around the drug disposal program.

13 Q. At the top of the page you forward this

14 e-mail to Rick Gates. You say, "Wanted to make

15 sure we were aware of this. That's really rich

16 below on Rex's part, assume Tasha got to him? In

17 any event, maybe now they'll be helpful moving

18 forward."

19 Do you see that?

20 A. I do.

21 Q. What did you mean when you said "That's

22 really rich below on Rex's part"?

23 A. We had been working with Rex and Tasha

24 and their teams for -- I don't know what period of

Page 284

1 time -- weeks, months, probably months for sure, on

2 exploring different solutions related to drug

3 disposal and they had raised a handful of different

4 challenges, operational, cost, effectiveness; and

5 then essentially out of the blue after an article

6 was forwarded by Richard to Rex, he then jumped in

7 to say that he was in the finishing stages of

8 having the contours of a drug take-back program.

9 So, my reference to "this is really

10 rich" was that clearly Rex had come around to what

11 we had been laying out encouraging him and his team

12 to do.

13 Q. So, he went from giving you pushback to

14 an article coming out to him writing an e-mail to

15 Richard saying that he was putting it together?

16 A. I'm a really good lobbyist.

17 Q. What do you mean by that?

18 A. I mean obviously we had been working

19 this issue internally. This was super-important to

20 helping our patients. And change is hard. Change

21 is hard in big companies. Different people in

22 different companies have responsibilities to

23 protect the bottom line, focus on patient safety,

24 any number of different things.

Page 285

1 A program that was essentially the first

2 of its kind like this one obviously and not

3 surprisingly had pushback initially.

4 Q. Okay. And some of that pushback came

5 from Rex?

6 A. Yes. Rex raised different types of

7 objections along with others early on about how the

8 program would work, how it would be funded, what

9 the costs involved would be, et cetera.

10 Q. If you go back down to your e-mail at

11 the bottom of the page, in the paragraph that

12 starts "Bottom line," you say, "Bottom line, we

13 need to have a plan and obviously need to be

14 cognizant of the cost and impact on operations, but

15 we can no longer do nothing."

16 Do you see that?

17 A. I do see that line.

18 Q. I asked you a minute ago if you would

19 agree that Walgreens was not doing anything before

20 you started the take-back program. You told me you

21 did not agree with that, but here in this e-mail

22 you say that "We can no longer do nothing,"

23 correct?

24 MR. SWANSON: Object to form,

Highly Confidential – Subject to Further Confidentiality Review

Page 286

1 mischaracterizes.
2 BY THE WITNESS:
3    A.   Agree.  This is do nothing on take-back.
4 BY MR. GADDY:
5    Q.   Okay.
6    A.   We had not been doing anything
7 significant on take-back.  We had been doing good
8 faith dispensing.  We had been doing education.  We
9 had been pushing for different bills at the state
10 and federal level to make electronic prescribing
11 more available in government programs.
12       There is a host of things we had been
13 doing to try to combat some of the challenges with
14 medications.  What I'm referring to here is on
15 take-back.
16    Q.   You were already selling meds pouches in
17 the stores for $4 a pop, correct?
18    A.   Right.
19    Q.   So you were doing something?
20    A.   Correct.  But what I would say is that
21 the Medsaway pouches were -- were not being bought
22 that much.  We would typically find them on the
23 shelves.
24    Q.   Another issue that we have seen

Page 287

1 mentioned and I think Walgreens has touted as their
2 response to the opioid crisis is the fact that they
3 dispense Narcan without a prescription, correct?
4    A.   Yes.  It's something that we have pushed
5 hard to increase the accessibility and availability
6 of Narcan.
7    Q.   Earlier today I asked you about the
8 topics and I believe, tell me if I am wrong, but I
9 believe you told me that you had a lot of
10 involvement with take-backs but not as much
11 involvement with the Narcan?
12    A.   Yes.  Narcan typically is an issue that
13 is handled on a state-by-state basis as well as
14 with boards of pharmacy.
15    Q.   The dispensing Narcan without a
16 prescription, that's not something that's unique to
17 Walgreens, correct?
18    A.   Can you expand on your question?
19    Q.   Sure.  At CVS you can get Narcan without
20 a prescription, right?
21    A.   Other pharmacies have done things to try
22 to make Narcan more accessible as well.
23    Q.   Walmart, Rite Aid, you can get Narcan
24 without a prescription there also, correct?

Page 288

1    A.   I can't say for certain at those
2 locations you can, but I believe that's correct.
3    Q.   We also talked about the fact that those
4 other pharmacies also have their own type of drug
5 take-back programs, correct?
6    A.   Some of them do.
7    Q.   I think we looked at the document that
8 talked about how CVS had one that they were
9 entrenched in and Walmart and Rite Aid also had
10 their own programs that they did drug take-back
11 for, correct?
12    MR. SWANSON:  Object to form.
13 BY THE WITNESS:
14    A.   Different pharmacies have different drug
15 take-back programs.
16 BY MR. GADDY:
17    Q.   That's not something that's unique to
18 Walgreens.
19    A.   So, actually, Rite Aid and CVS now have
20 essentially adopted our exact box with
21 specifications.  Neither entity was really able to
22 figure out how to do it on any broad basis.  So, is
23 it unique to Walgreens?  The answer is yes.
24       We are still the leader by far, and both

Page 289

1 Rite Aid as well as CVS actually used our
2 specifications.  At the request of our CEO, we
3 worked with both of their teams to help make it
4 more available to both of those pharmacies.
5    MR. SWANSON:  He was just suggesting a break,
6 either now or after this.
7    MR. GADDY:  Now is fine.  Sorry.  I got
8 confused, but we are good now.
9    THE VIDEOGRAPHER:  We are off the record at
10 2:13 p.m.
11       (WHEREUPON, a recess was had
12        from 2:13 to 2:28 p.m.)
13    THE VIDEOGRAPHER:  We are back on the record
14 at 2:28 p.m.
15 BY MR. GADDY:
16    Q.   Mr. Kaleta, as it relates to the Narcan
17 program, Walgreens is not giving away Narcan for
18 free, are they?
19    A.   I don't believe so, no.
20    Q.   Do you have any understanding about what
21 the cash price is for Narcan?
22    A.   Limited.
23    Q.   Okay.  About $130 sound right?
24    A.   Don't know.

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1   Q.   I will show you what we will mark as
2   Kaleta 26.
3       MR. GADDY:  Counsel, I only have two copies of
4   that.  I'm missing one.
5       (WHEREUPON, a certain document was
6           marked as Walgreens-Kaleta Exhibit
7           No. 26:  8/12/16 e-mail string;
8           WAGMDL0044770 -- 00044773).
9   BY MR. GADDY:
10      Q.   It's P-WAG-1839, Bates No. 44770.
11          And if you would, turn for me to the
12  third page of that e-mail, and about halfway down
13  this page you'll see an e-mail to that -- goes to
14  you and Casey.
15          Do you see that?
16      A.   Yes.
17      Q.   It says, "Hi Ed and Casey, hope you're
18  having a good week.  I'm covering Naloxone/SafeMed
19  while Phil is out of the office."  It says, "We
20  received a media inquiry from Bakersfield,
21  California regarding the Naloxone rollout in
22  central California.  The reporter is looking to
23  confirm if Naloxone is still on track to be
24  available without a prescription in California by

Page 291

1   end of year."
2           Do you see that?
3       A.   I do.
4       Q.   And if you flip back one page, do you
5   see up in the middle of the page, Natasha Polster
6   responds and she indicates, "For the Naloxone
7   without a patient specific prescription, our
8   program is the nasal formulation.  I will defer to
9   Patty on the ETA for the California rollout.  I
10  think we are still working through the funding for
11  the training of the pharmacists."
12          Do you see that?
13      A.   I see that.
14      Q.   Do you know what the cost was of the
15  training to train the pharmacists for this?
16      A.   I do not.
17      Q.   I'm going to show you Kaleta 27.
18      (WHEREUPON, a certain document was
19          marked as Walgreens-Kaleta Exhibit
20          No. 27:  4/27/16 e-mail string and
21          attachments; WAGMDL00603118 -
22          00603128.)
23  BY MR. GADDY:
24      Q.   This is P-WAG-1973, Bates No. 603118.

Page 292

1           Do you recognize this document as being
2   an e-mail on which you and Casey are copied?  Do
3   you see that?
4       A.   I do.
5       Q.   And the subject of this e-mail is
6   "Funding for Naloxone training."  Do you see that?
7       A.   I do.
8       Q.   And if you flip one page, you see a
9   PowerPoint presentation that is a Walgreens
10  presentation by Tasha Polster, "Naloxone Training
11  Funding Request."
12          Do you see that?
13      A.   I do.
14      Q.   If you flip the page one more time, do
15  you see a slide that says "Funding Needed to
16  Complete State Specific Training."
17          Do you see that?
18      A.   I do.
19      Q.   And the first one listed there is
20  California, which is where they got the request in
21  on that last e-mail we were looking at, correct?
22      A.   I don't know.
23      Q.   Well, we'll go back to it in a minute.
24  I'll represent to you that it was California.

Page 293

1       A.   Okay.
2       Q.   And if I'm wrong, then we'll fix it in a
3   minute.
4       A.   Okay.
5       Q.   See the top row there is for California,
6   correct?
7       A.   That's what it looks like.
8       Q.   And it indicates the number of
9   pharmacists that Walgreens has in California?  Do
10  you see that?  Under "RPH Count"?
11      A.   Yes.
12      Q.   If you don't know, you don't know.
13  That's fine.
14      A.   I don't.  I know I was copied on the
15  e-mail, but this is the first time I've seen this
16  chart.
17      Q.   Okay.  You didn't have the opportunity
18  to open and review this presentation?
19      A.   I don't recall doing so, no.
20      Q.   Okay.  If you go a couple columns over,
21  you see that there is a column titled "Number of
22  Stores."
23          Do you see that?
24      A.   Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    Q.   And that the cost of training, which we
2 looked at in the last e-mail where Natasha was
3 working through some training issues, the cost of
4 training for California stores was $25 per store
5 for training.
6         Do you see that?
7    A.   I see that figure, yes.
8    Q.   And do you accept my representation that
9 if you multiply the 674 stores times $25 per store,
10 that you get a training cost of $16,850.
11        Do you see that?
12   A.   Okay.  If you say that that's true.
13   Q.   Okay.  Would you agree that in the
14 scheme of things as it relates to Walgreens as a
15 company and the sales and revenue and profit that
16 Walgreens makes, $16,850 is not a lot of money?
17       MR. SWANSON:  Object to form.
18 BY THE WITNESS:
19   A.   I would probably not be able to answer
20 that question.  $16,000 in the context of what?  I
21 see a lot of numbers on this sheet.  I see a
22 $647,000 number.  That's a big number as well.  So,
23 there is -- there is a lot of big numbers on here.
24 BY MR. GADDY:

Page 295

1    Q.   Do you see the cost of training for the
2 Walgreens store is $25 a store, right?
3    A.   For California.
4    Q.   Right.  And they even indicate in there
5 not per pharmacist, but just per store, correct?
6       MR. SWANSON:  Object to form.
7 BY THE WITNESS:
8    A.   Yeah, again, I've never read this chart.
9 So, I don't really know what it means.  I've not
10 seen it before.
11 BY MR. GADDY:
12   Q.   You don't have problem seeing or reading
13 or understanding the $25 per store, do you?
14   A.   It says $25 per store for training, but
15 I don't know what "Not per" -- "Not per registered
16 pharmacist."  I don't know what that nomenclature
17 means.
18   Q.   Okay.  Do you see that it says it's $25
19 per store for training, not per pharmacist, right?
20   A.   Again, I've never seen this chart
21 before.  But okay.  I'll believe that that's the
22 case.
23   Q.   Okay.  And then a little bit farther to
24 the left they also -- Natasha also indicated a

Page 296

1 labor cost, correct?
2    A.   It looks like it says, "Labor dollar by
3 state."
4    Q.   Okay.  And do you accept my
5 representation that that would be the $69 per hour
6 multiplied by the 1,534 pharmacists that Walgreens
7 has in California coming to $106,000?
8    A.   If you say so.
9       MR. SWANSON:  Object to form.
10 BY MR. GADDY:
11   Q.   And labor means the cost that Walgreens
12 has to actually pay the pharmacist, correct?
13      MR. SWANSON:  Foundation objection.
14 BY THE WITNESS:
15   A.   Yeah, I have no idea.
16 BY MR. GADDY:
17   Q.   But regardless, the total cost for
18 Walgreens to do the training, taking into account
19 not only the time they have to have pay the
20 pharmacist to be on the clock to undergo the
21 training but also the $25 per store, comes to
22 $123,000 on the right side of the page, correct?
23   A.   In the box all the way on the right, it
24 says training plus labor is $123,324.94.

Page 297

1    Q.   And did you note on the first page of
2 that PowerPoint that this is a presentation from
3 April 23, 2016?
4    A.   I did not.
5    Q.   You can look at that one more time.
6    A.   Okay.  Yes, that's what it looks like it
7 says.
8    Q.   And let's go back to that last e-mail
9 that we were on.  I think it was No. 26.
10   A.   Um-hmm.
11   Q.   It's the previous document.  Sorry.
12 It's the previous document.  Exhibit No. 26.
13   A.   Oh.
14   Q.   I think you have 27 in front of you.
15   A.   Okay.
16   Q.   You see that the timing of this
17 e-mail -- and let me just take you to a specific
18 place.  See down in the bottom of the first page we
19 get another response saying, "Hey, sorry y'all.
20 Sorry to send another note on this but the deadline
21 for this is in 15 minutes.  Are we comfortable
22 confirming publicly that our program for Naloxone
23 without a patient specific prescription is a nasal
24 formulation?  Is that something we've already

Page 298

1  shared?  Are you able to let me know what the
2  expected rollout is for California?  Are we on
3  track to have full rollout by end of year?"
4       Do you see that?
5  A.  Yes.
6  Q.  And this is an August 2016 e-mail,
7  correct?
8  A.  That's what it says, yes.
9  Q.  This is about four months after we saw
10 that proposal to get the $123,000 training for the
11 California funded?
12 A.  I guess, yes.
13 Q.  If you go back up, the very next e-mail
14 up is the response from Tasha Polster.
15      Do you see that?
16 A.  Yes.
17 Q.  It says, "Yes, I am comfortable for with
18 the nasal formulation."  It says, "Our goal is to
19 have it rolled out in California by the end of the
20 year, but the high cost of training is a barrier
21 that we are working through.  I'm not sure how you
22 want to put that so we are highlighting our concern
23 without looking like the bad guy for not doing the
24 expensive training required by the state."

Page 299

1       Do you see that?
2  A.  I do.
3  Q.  Okay.  Would you consider $25 per store
4  to be expensive?
5  MR. SWANSON:  Object to form, foundation,
6  mischaracterizes.
7  BY THE WITNESS:
8  A.  Yeah, I'm not sure what you're referring
9  to.
10 BY MR. GADDY:
11 Q.  Okay.  We just looked at a slide that
12 said it cost $25 per store plus an hour of the
13 pharmacist time to do the training.  Do you recall
14 that?
15 A.  I recall a chart that said $647,000 for
16 a bunch of training in a handful of different
17 states.
18 Q.  Right.  We're talking about California.
19 A.  Okay.
20 Q.  The question is do you think $25 a store
21 is expensive?
22 MR. SWANSON:  Object to form, foundation.
23 BY THE WITNESS:
24 A.  So, not an operations person.  But

Page 300

1  you're just reading one number off the chart.
2  BY MR. GADDY:
3  Q.  I'm just asking if you think $25 a store
4  is expensive or not.
5  MR. SWANSON:  Foundation.
6  BY MR. GADDY:
7  Q.  If you do, you do.  If you don't, you
8  don't.
9  A.  I don't have an opinion.  I'm the
10 government relations person.  So I don't have an
11 opinion on pharmacist training, education, anything
12 associated with that.
13 Q.  I'll show you what I will mark as Kaleta
14 28.
15      (WHEREUPON, a certain document was
16       marked as Walgreens-Kaleta Exhibit
17       No. 28:  8/14/17 e-mail string;
18       WAGMDL00385259 - 00385260.)
19 BY MR. GADDY:
20 Q.  P-WAG-1850, Bates No. 385259.
21      Do you recognize this as being an e-mail
22 chain with you, Steve Gregory and Rick Gates on it?
23 A.  Yes.
24 Q.  Okay.  And I'm going to start with your

Page 301

1  e-mail which is in the middle of the page to Rick
2  and Steven.  And before I ask you about your
3  e-mail, I'm going to be candid with you, let you
4  know I don't know if this is all your e-mail or not
5  because you can see up at the very top Rick writes,
6  "Steven, some thoughts below."
7  A.  Yeah.
8  Q.  So, he might have gone and supplemented
9  your e-mail.  Does that make sense?
10 A.  It does make sense.
11 Q.  Okay.  So, do you remember this e-mail
12 chain at all?
13 A.  A little bit.
14 Q.  Okay.  Are you able to tell me whether
15 or not the entire text under your e-mail is your
16 writing or if Steve -- excuse me -- if Rick made
17 some notes there?
18 A.  I can tell you that it is not all my
19 writing.
20 Q.  Okay.  So, Rick made some notes to some
21 of the questions that you posed, correct?
22 A.  That's what it appears, yes.
23 Q.  Okay.  So, you ask the question, and
24 this was for a 5 p.m. call.  Do you know who this

Page 302

1 call was with?

2    A.  I don't.

3    Q.  Okay.

4    A.  I don't.

5    Q.  For the 5 p.m. call, the first question

6 was, "Do we think the price of Naloxone is too

7 high?"

8       The second question was, "Should HHS try

9 to negotiate a lower price?"

10       Do you see that?

11    A.  I do.

12    Q.  And HHS is what?

13    A.  Department of Health and Human Services.

14    Q.  The third question you posed is "Now

15 that Trump has declared a national emergency, does

16 that change any of our ideas?"

17       Do you see that?

18    A.  I do.

19    Q.  Okay. And it looks like Rick -- and

20 remind me where again, please, where Rick is on the

21 hierarchy as far as the different departments.

22    A.  So, during this time I believe he was

23 senior vice president of pharmacy operations.

24    Q.  And in response to your first question,

Page 303

1 Rick writes, "I would say that the best product

2 lines" -- and, again, he is talking about Naloxone

3 here, correct?

4    A.  It appears so, yes.

5    Q.  He says, "I would say the best product

6 lines are relatively high."

7       Do you see that?

8    A.  It says, yes, "I would say the best

9 product lines are relatively high priced."

10    Q.  Thank you. High priced.

11       He goes on to say that the Narcan nasal

12 spray is covered on 96% of formularies.

13       Do you see that?

14    A.  Yes.

15    Q.  Does that mean anything to you?

16    A.  It does. I mean, formularies are what

17 the PBMs and health plans put together to decide

18 which drugs get accepted. What I don't know, is he

19 referring to Medicare, is he referring to Medicaid

20 or commercial.

21    Q.  Regardless, he says the best product

22 lines are relatively high priced when it comes to

23 Naloxone, correct?

24    A.  If we assume that that was his bullet

Page 304

1 points underneath my questions, then the answer is

2 yes. But I don't know that for sure.

3    Q.  They weren't your bullet points?

4    A.  I don't think so. They could also have

5 been Steven's.

6    Q.  Okay. The next question that you posed

7 is, "Should Health and Human Services try to

8 negotiate lower price?"

9       Do you see that?

10    A.  Yes.

11    Q.  And the response there is, "We are not

12 at a price advantage currently."

13       Do you see that?

14    A.  I do.

15    Q.  And does that indicate that you're right

16 now not able to price these drugs lower than any of

17 Walgreens' competitors?

18    A.  I don't know the answer to that.

19    Q.  Goes on to say, "That being said, under

20 U & C would limit how low we could go contractually

21 as there is a blend." (As read.)

22       Do you see that?

23    A.  I do.

24    Q.  You also mentioned when you talked about

Page 305

1 the programs that Walgreens has instituted in the

2 last two or three years revolving around opioid

3 abuse, you mentioned, and we talked a lot about

4 drug take-back, and you've also mentioned we talked

5 a little bit now about Naloxone being available

6 without a prescription.

7       You've also mentioned educational

8 handouts or something to that effect. Is that

9 right?

10    A.  I think it was referenced in one of the

11 e-mails.

12    Q.  Is that something you're familiar with?

13    A.  Not as much. We've had different

14 programs around educational efforts, some that have

15 had to do with the WE organization that were also

16 referenced in some e-mails from much earlier today.

17 But I'm not as familiar with some of those

18 educational efforts.

19    Q.  I know we looked at a document today

20 from the NACDS that laid out their positions, and

21 one of their positions was that there should be

22 educational packets funded by the pharmaceutical

23 manufacturers and distributed at the time the drugs

24 are dispensed.

Page 306

1    Do you know if that program ever went
2 into place?
3    A.   In terms of ever went into place?
4    Q.   Is it in effect?  Is that happening?
5 Are there educational materials being paid for by
6 the pharmaceutical manufacturers that relate to
7 opioids that are being distributed to patients at
8 Walgreens pharmacies?
9    A.   I don't know.
10   Q.   Do you know whether or not Walgreens
11 pharmacies are distributing any educational
12 information to patients who are being prescribed
13 opioids?
14   A.   I do.  I know that there is printed
15 information on the prescription pack that every
16 patient that gets an opioid receives as well as the
17 pharmacist has a consultation with the patient
18 about the potential dangers of opioids.
19   Q.   Is that a governmental regulation thing?
20 Is that a Walgreens thing?  Is that an
21 industry-wide thing?
22   A.   I can't speak to the other pharmacies,
23 but it's a Walgreens program or programs I guess.
24   Q.   Do you know an individual named Jeffrey

Page 307

1 Denny?
2    A.   Yes.
3    Q.   Who is that?
4    A.   Jeff Denny is an outside consultant for
5 Chuck Greener that helps with communications.
6    Q.   And communications could be anything as
7 far as written statements, announcements, op-eds,
8 position papers, those types of things?
9    A.   Et cetera, et cetera, et cetera, yes.
10 Wide scope.
11   Q.   I show you what I'll mark as Kaleta 29.
12       (WHEREUPON, a certain document was
13        marked as Walgreens-Kaleta Exhibit
14        No. 29:  10/23/17 e-mail with
15        attachment; WAGMDL00385895 -
16        00385897.)
17 BY MR. GADDY:
18   Q.   P-WAG-1856, Bates No. 385895.
19       Again, do you recognize this to be an
20 e-mail chain with you, Chuck Greener and Jeff Denny
21 on it?
22   A.   Yes.
23   Q.   And do you see the attached -- or excuse
24 me.  The subject is, "Draft SP statement for White

Page 308

1 House event."
2       Do you see that?
3    A.   Yes.
4    Q.   Is this the type of statement, a
5 statement that a Walgreens executive would be
6 making at the White House, the type of thing that
7 you would bring Jeff Denny to help him draft those
8 remarks?
9    A.   We have on occasion.
10   Q.   And if you go down to the bottom of the
11 first page, you see his original e-mail and the
12 subject is "Opioid piece."
13       Do you see that?
14   A.   I do.
15   Q.   And he says, "Hey, I did my thing and
16 tried to work what Walgreens is doing into a
17 coherent narrative and include the most meaningful
18 stuff for the piece that you sent me."
19       Do you see that?
20   A.   Yes.
21   Q.   This is an October 2017 e-mail, correct?
22   A.   Yes.
23   Q.   So, at this point in time, over the last
24 year or so, you had been instituting the take-back

Page 309

1 program and also doing the Narcan dispensing,
2 correct?
3    A.   That's correct.
4    Q.   It says, "Notes.  I aimed to fit or
5 bucket the welter of initiatives into a coherent
6 plan and strategies with three goals, ordered by
7 what we've done:  deter, treat and prevent."
8       Do you see that?
9    A.   I do.
10   Q.   He goes on to say in the second bullet
11 point, it says, "As you indicated, a lot of stuff
12 in the piece you sent is national, in process, in
13 the weeds" -- excuse me -- "is notional, in
14 process, in the weeds or hard to explain as
15 meaningful."  It says, "All in all, the substance
16 beyond kiosks and Naloxone is relatively weak."
17       Do you see that?
18   A.   I do see that.
19   Q.   Do you agree with that statement that
20 Jeff Denny makes about the programs that Walgreens
21 was involved in?
22   A.   I do not.
23   MR. SWANSON:  Object to form.
24 BY THE WITNESS:

Page 310

1  A. He is not -- he is making a comment
2  about a piece of paper that had information on it
3  about some of our programs, and he's commenting on
4  that particular piece of paper, not on our
5  programs.
6  Q. If you go to the next page, do you see
7  the attachment and the draft statement that he was
8  putting together?
9  Do you see that?
10  A. Yeah.
11  Q. Again, this looks like this was a
12  statement that Walgreens Boots Alliance CEO was
13  going to be giving at the White House?
14  A. Uh-huh. Can you scroll up, please?
15  MR. SWANSON: You have it here.
16  BY MR. GADDY:
17  Q. Did this -- did Stefano Pessina actually
18  give a statement at the White House on this?
19  A. I don't remember. I don't think so. I
20  think it's possible we shared this with the White
21  House as part of their announcement on the
22  declaration of the national emergency.
23  Q. Do you see in the second paragraph there
24  it says, "Serving millions of customers and

Page 311

1  patients every day in communities across America,
2  the people of Walgreens understand the devastating
3  impact and tragedy of the opioid epidemic."
4  Do you see that?
5  A. I do.
6  Q. He goes on to say, "We embrace our
7  ability - and critical responsibility - as a
8  leading retail pharmacy provider on the front lines
9  of healthcare to marshal our resources and take
10  bold and aggressive action to address the opioid
11  crisis."
12  Do you see that?
13  A. I do.
14  Q. And you agree with that statement, don't
15  you, that Walgreens has a critical responsibility
16  to take bold and aggressive action to address the
17  opioid crisis?
18  MR. SWANSON: Object to form and foundation.
19  BY THE WITNESS:
20  A. I agree with that statement.
21  BY MR. GADDY:
22  Q. Another issue that you have addressed
23  that relates to opioids in your time as a lobbyist
24  for Walgreens is the scheduling of hydrocodone

Page 312

1  combination products. Is that correct?
2  A. I may have to have my memory refreshed.
3  Q. Do you know what I'm talking about?
4  A. Vaguely.
5  Q. Okay. You remember we looked earlier at
6  some documents that were talking about different
7  schedules of drugs and whether they were II or III
8  and so and so forth?
9  A. I do.
10  Q. Do you recall generally that at one time
11  hydrocodone combination products were scheduled as
12  Schedule III?
13  A. I don't.
14  Q. Do you know what a hydrocodone
15  combination product is?
16  A. I don't.
17  Q. Do you know what types of drugs are in
18  Lortab?
19  A. I do not.
20  Q. Do you know what types of drugs are in
21  Vicodin?
22  A. I don't.
23  Q. Are those types of drugs that you've
24  heard of before, Lortab and Vicodin?

Page 313

1  A. I've heard of Vicodin.
2  Q. I will show you what I'll mark as Kaleta
3  30.
4  (WHEREUPON, a certain document was
5  marked as Walgreens-Kaleta Exhibit
6  No. 30: Lobbying Report;
7  P-WAG-00040.)
8  BY MR. GADDY:
9  Q. Do you recognize this document?
10  A. I don't.
11  Q. Do you know what a Lobbying Report is?
12  A. I do.
13  Q. Do you have to fill out the Lobbying
14  Reports?
15  A. Can you be more specific?
16  Q. Do you complete and generate these forms
17  yourself or does somebody do that for you?
18  A. Somebody does it for --
19  Q. Okay.
20  A. Has done it for me. This one is from
21  2013.
22  Q. Correct. You understand that as a
23  lobbyist, you have to report in a public nature or
24  generate for a public report the issues on which

Page 314

1 you lobby and the bills on which you lobby? Do you
2 understand that?
3    A.   I do.
4    Q.   Okay.  And if we look at the first
5 page of this report, at the top box there is a
6 registrant name and it says Walgreens Company?
7    A.   Correct.
8    Q.   If we go down to the type of report, we
9 see that it's the year 2013, I think this is the
10 first quarter, correct?
11    A.   Correct.
12    Q.   And you have to report this information
13 quarterly?
14    A.   Correct.
15    Q.   And in the box below that, on the
16 right-hand column, you have to indicate how much
17 money was spent lobbying in the first quarter.
18        Do you see that?
19    A.   Yes.
20    Q.   And it was indicated here that Walgreens
21 spent $590,000 lobbying in the first quarter of
22 2013, correct?
23    A.   Yes.
24    Q.   If you turn the page, you see at the top

Page 315

1 it says "Lobbying Activity"?
2    A.   Yes.
3    Q.   And then under No. 16 you have to list
4 the specific lobbying issue that you were lobbying
5 on, correct?
6    A.   Yes.
7    Q.   And the issue that was being lobbied on
8 here by Walgreens was the Safe Prescribing Act of
9 2013 and it says, "All provisions regarding
10 amendment of the Controlled Substance Act to make
11 any substance containing hydrocodone a Schedule II
12 drug."
13        Do you see that?
14    A.   I do.
15    Q.   And below there you have to indicate who
16 you were lobbying, and you indicate that you were
17 lobbying the U.S. House of Representatives and the
18 U.S. Senate, correct?
19    A.   Yes.
20    Q.   And then even below that you have to
21 indicate the names of the individuals who are
22 actually doing the lobbying.  Do you see that?
23    A.   I do.
24    Q.   And your name is listed there, correct?

Page 316

1    A.   It is.
2    Q.   You understand that -- do you dispute
3 that you were lobbying on a bill that was -- that
4 was looking to reschedule hydrocodone products to
5 Schedule II?
6    A.   I think if you look at this LD-2 report,
7 all three, Debbie Garza, Ed Kaleta and Alethia
8 Jackson, are listed under all the issues.  We had a
9 general practice in our office that we would list
10 all individuals on all the issues, but that doesn't
11 mean that all of us were spending more of our time
12 on all of the issues.  So, we did segment issues
13 out.
14        I personally did not spend a lot of time
15 on the Safe Prescribing Act of 2013.  I spent a lot
16 more time on medication therapy management and the
17 Marketplace Fairness Act.
18    Q.   Okay.  Do you know whether or not you
19 did any lobbying whatsoever on this particular bill
20 that was seeking to reschedule hydrocodone products
21 as Schedule II?
22    A.   I don't recall.  I may have.
23    Q.   Was Walgreens in favor of or against the
24 rescheduling of hydrocodone from III to II?

Page 317

1        MR. SWANSON:  Object to form.
2 BY THE WITNESS:
3    A.   I don't -- I don't remember.
4 BY MR. GADDY:
5    Q.   Excuse me for a minute.  I'm not wanting
6 to ask you questions about something you don't know
7 about.  So, I'm trying to get through this.
8    A.   Okay.
9    Q.   Who would be the best person for us to
10 ask about Walgreens' position on the rescheduling
11 of hydrocodone?
12    A.   Back in 2013?  Debbie Garza.
13    Q.   Is she still with the company?
14    A.   She is not.
15    Q.   Do you know where she is now?
16    A.   I think she's somewhere in Texas.
17    Q.   I was asking you earlier today about
18 some of the interactions that you have with -- with
19 DEA, and I think you told me that the first time
20 you really had much interaction with DEA was back
21 in late '15 or early '16 as you were starting to
22 work through some of the drug take-back programs.
23 Is that right?
24    A.   Correct.

Page 318

1     Q.   I show you what I'll mark as Exhibit 31.
2         (WHEREUPON, a certain document was
3         marked as Walgreens-Kaleta Exhibit
4         No. 31: 3/2/12 e-mail string;
5         WAGMDL00642592 - 00642594.)
6 BY MR. GADDY:
7     Q.   And you were just mentioning Debbie
8 Garza. It looks like this is an e-mail that was
9 sent from her to several folks and you were copied
10 on the e-mail?
11     A.   Yes. It looks like I was.
12     Q.   And it looks like down at the bottom,
13 there is an e-mail and it's from March of 2012 and
14 it was a recap of the drug diversion hearing.
15         Do you see that?
16     A.   I see the header, yes.
17     Q.   And back in March of 2012, obviously
18 you're getting this e-mail, but did you have any
19 involvement with the DEA back then?
20     A.   I did not.
21     Q.   Do you recall receiving this e-mail
22 about this hearing that happened in front of the
23 DEA back in 2012?
24     A.   I don't.

Page 319

1     Q.   Okay. It indicates that "The House
2 Energy and Commerce Subcommittee on Commerce,
3 Manufacturing and Trade held a hearing this
4 Thursday, March 1, 2012 titled 'Prescription Drug
5 Diversion: Combating the Scourge.'"
6         Do you see that?
7     A.   Yes.
8     Q.   At this time frame, in March of 2012,
9 you were lobbying for Walgreens, correct?
10     A.   Yes.
11     Q.   Would you agree that none of your
12 lobbying activities at this time had to do with the
13 opioid crisis?
14     A.   Not that I can recall. In 2012, no.
15     Q.   And you see in the next paragraph that
16 there was three panels of witnesses that testified.
17 The first panel included one individual, the second
18 panel included several State Attorney Generals as
19 well as Joe Rannazzisi with the DEA.
20         Do you see that?
21     A.   Yes, I do see that now that it's
22 highlighted.
23     Q.   And then it goes on to say the third
24 panel contained the president of the HDMA and some

Page 320

1 other trade organizations including the NACDS.
2         Do you see that?
3     A.   I do.
4     Q.   Do you -- do you know Joe Rannazzisi?
5     A.   I do not.
6     Q.   Have you had any --
7     A.   I know who he is, but I don't know him
8 personally or professionally.
9     Q.   In what context do you know who he is?
10     A.   He was the guy that was on the
11 60 Minutes story a couple, several months ago.
12     Q.   Okay. Prior to seeing him on the
13 60 Minutes story, did you know who he was?
14     A.   No.
15     Q.   Had you ever heard of him before that?
16     A.   I don't recall. I mean, obviously, I
17 got this e-mail with him in it. But no, I don't
18 remember his name.
19     Q.   You never had any interactions with him?
20     A.   No.
21     Q.   Did you know whether or not he was
22 involved at all in the DEA action against the
23 Walgreens distribution center in Jupiter, Florida
24 that contained a lot of the allegations that we

Page 321

1 went through this morning?
2     A.   I did not know one way or the other.
3     Q.   If you go to the next page, in the
4 middle of the page there is a paragraph that says,
5 "During the second panel."
6         Do you see that?
7     A.   Okay.
8     Q.   It says, "During the second panel, the
9 DEA witness, Rannazzisi, emphasized in his
10 testimony that diversion from the pharmaceutical
11 supply chain is the primary source for drugs that
12 are abused, and called upon distributors,
13 physicians and pharmacies to meet their obligations
14 under the Controlled Substance Act."
15         Do you see that?
16     A.   I do.
17     Q.   "He was asked what he saw as a big
18 problem, and he stated the pharmacists had not been
19 doing their due diligence with regards to the
20 public. He stated that they were not checking the
21 validity of the prescriptions and they simply chose
22 not to get involved and have failed to do their
23 jobs."
24         Do you see that?

Page 322

1    A.  I do.

2    Q.  In response to receiving this e-mail,
3 this summary of this hearing, do you recall whether
4 or not you or anybody else in your department were
5 asked to take any action or do anything as it
6 relates to the DEA or these allegations about
7 distributors and pharmacies?

8    MR. SWANSON:  Object to form.

9 BY THE WITNESS:

10    A.  I can't speak to anybody else.  I don't
11 believe I was asked to do anything that I recall.

12 BY MR. GADDY:

13    Q.  I show you what I will mark as
14 Exhibit 32.

15       (WHEREUPON, a certain document was
16       marked as Walgreens-Kaleta Exhibit
17       No. 32:  1/29/16 e-mail string with
18       attachment; WAGMDL0000613455 -
19       00613467.)

20 BY MR. GADDY:

21    Q.  Do you see this document?

22    A.  Yes.  I see this document.

23    Q.  And if you see down at the bottom of the
24 page, the subject of an e-mail from you to Carol

Page 323

1 Kelly and Kevin Nicholson is "DEA meeting."

2    Do you see that?

3    A.  Yes.

4    Q.  And you say, "Can you shed a little
5 light on why the DEA meeting is now NACDS only?
6 After a lot of happy talk from them, this does not
7 send a signal that they are serious about working
8 more collaboratively with pharmacy chains."

9    Do you see that?

10    A.  I see that.

11    Q.  What are you referring to there?

12    A.  I don't know.  I'd have to take a moment
13 to read this.

14    So, I'd have to read the testimony.  I
15 assume he's just that somehow -- again, I don't
16 know what's in his testimony.  I don't remember.
17 But so I can't say for certain.

18    Q.  Okay.  That's fair.  But per your e-mail
19 here, DEA was meeting with NACDS but not meeting
20 individually with Walgreens, correct?

21    A.  That's what the e-mail says.

22    Q.  And she responds there, "Ed, good
23 question.  I think they are working their way
24 through how to best interact with industry as they

Page 324

1 restart the clock with us."

2    Do you see that?

3    A.  I do.

4    Q.  And she then goes on to say, "A couple
5 months ago when they began outreach, the DEA said
6 we could bring five people and did not stipulate
7 this was an association representative only
8 meeting.  A couple weeks ago they told Kevin that."

9    Do you see that?

10    A.  I do.

11    Q.  And this process of meeting or
12 interacting Walgreens and the DEA, was that
13 something that had been a frustration of yours or
14 other folks at Walgreens for some time?

15    MR. SWANSON:  Object to form.

16 BY THE WITNESS:

17    A.  I just don't know that I can recall.
18 What I can recall is that different folks inside
19 the company felt that the DEA was always very
20 difficult to work with.  So, I think that was the
21 context for my e-mail.

22 BY MR. GADDY:

23    Q.  Okay.  And that was an attitude -- first
24 off, when we are talking about the DEA folks, we

Page 325

1 are talking about people whose -- whose primary job
2 as it relates to these opioids is to prevent these
3 drugs from getting into the hands of people that
4 aren't supposed to have them.  Correct?

5    MR. SWANSON:  Object to form.

6 BY THE WITNESS:

7    A.  I think the DEA has a whole lot of
8 responsibilities, some of -- a small portion of
9 which I'm familiar with, but I don't know their
10 full scope.

11 BY MR. GADDY:

12    Q.  You would agree that one of the roles
13 that the DEA plays is trying to prevent drugs from
14 getting into the hands of people that aren't
15 supposed to have them?

16    A.  I believe that one of their goals is to
17 help with drug diversion.

18    Q.  You agree that some of the -- some of
19 the DEA agents who do their job spend their careers
20 fighting drug abuse or diversion or harm that comes
21 from drug abuse.  Do you agree with that?

22    MR. SWANSON:  Object to form.

23 BY THE WITNESS:

24    A.  I can't speak to what DEA agents do or

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1  don't do over the course of their career and
2  anything related to that.
3  BY MR. GADDY:
4  Q. Would you agree that their job and their
5  task of preventing diversion is important?
6  A. Yes.
7  Q. Would you agree that it's something that
8  they should take seriously?
9  A. I would hope so.
10  Q. I think we've looked at some documents
11  as a part of this that indicate that they've for a
12  period of time been involved in their own take-back
13  program, correct?
14  A. Yes.
15  Q. And that's something that Walgreens
16  would support, correct?
17  A. We support most programs revolving
18  around take-back. I think one of the challenges we
19  have with the DEA take-back programs is that
20  they're typically at police stations and there is a
21  lot of folks, a lot of patients of ours that have
22  given feedback that that's not the place that they
23  are necessarily interested in visiting with
24  opioids.

Page 327

1  Q. The fact that they collect unwanted
2  medications generally you would take the position
3  is a good thing?
4  A. Yes. It is a good thing. We wish their
5  hours were broader. We wish it occurred more often
6  and we wish there were permanent solutions, similar
7  to what we ended up doing with our take-back
8  program.
9  Q. I'm going to show you what I'm going to
10  mark as Kaleta 33.
11  (WHEREUPON, a certain document was
12  marked as Walgreens-Kaleta Exhibit
13  No. 33: 10/27/17 e-mail string;
14  WAGMDL00386743 - 00386745.)
15  BY MR. GADDY:
16  Q. P-WAG-1858, Bates No. 386743.
17  Do you see this is an e-mail that was
18  forwarded to you regarding a DEA drug take-back
19  day?
20  A. Yes.
21  Q. And do you see, if we start halfway down
22  the page, the title of the article that was
23  forwarded to you was "DEA will hold Drug Take-Back
24  Day to snag unused opioids."

Page 328

1  Q. Do you see that?
2  A. I do.
3  Q. This is the program that we were just
4  talking about that they hold on occasion to try to
5  take back unwanted medications, correct?
6  A. Yes.
7  Q. Okay. And they say the first thing
8  there is, "One of the few ways to discard addictive
9  painkillers and other pills so they won't be stolen
10  or abused is through temporary disposal sites
11  people can use free and anonymously."
12  Do you see that?
13  A. I see that sentence, yes.
14  Q. And then it goes on to say, "The DEA
15  will again provide a nationwide outlet on Saturday
16  when it holds its 14th National Prescription Drug
17  Take-Back Day."
18  Do you see that?
19  A. I do.
20  Q. And if you go down to the bottom of the
21  page, it says, "Disposing of leftover painkillers
22  or other addictive medicines in the house is one of
23  the best ways to prevent a member of your family
24  from becoming a victim of opioid epidemic. More

Page 329

1  people start down the path of addiction through the
2  misuse of opioid prescription drugs than any other
3  substance."
4  Do you see that?
5  A. I do see that.
6  Q. Do you agree with that statement?
7  A. "More people start down the path of
8  addiction through the misuse of opioid prescription
9  drugs than any other substance." I would say in my
10  personal capacity I would generally -- I'm not -- I
11  don't have extensive knowledge to back up what the
12  DEA acting administrator is saying, but I generally
13  agree with both of those sentences.
14  Q. It says, "The abuse of these
15  prescription drugs has fueled the nation's opioid
16  epidemic which has led to the largest rate of
17  overdose deaths this country has ever seen."
18  Do you see that?
19  A. I do.
20  Q. And do you recall that earlier today we
21  looked at the settlement agreement and the order to
22  show cause between Walgreens and the DEA. Do you
23  recall that?
24  A. I do.

Page 330

1    Q.    And do you recall that we read some
2    examples through there of opioids being shipped in
3    high volumes to Walgreens stores in Florida?
4        MR. SWANSON:  Object to form.
5    BY THE WITNESS:
6        A.    Yeah, again, I hadn't seen the
7    settlement until this morning.  So I'm not familiar
8    with what's in it, facts, et cetera.
9    BY MR. GADDY:
10       Q.    You don't recall that we looked at that
11   this morning?
12       A.    We looked at a bunch of numbers dealing
13   with pharmacies in Florida.  That was -- that's
14   about all I can speak to.
15       Q.    You recall that or do you recall I
16   should say that the order to show cause that we
17   looked at indicated that Walgreens was the number
18   one distributor of oxycodone to Florida for the
19   three years leading up to the settlement?
20       A.    I don't recall that, actually.  It may
21   be true, but I don't recall that.
22       Q.    But you do recall that the DEA initiated
23   an investigation and that ultimately Walgreens paid
24   $80 million to settle that?

Page 331

1        A.    I'm not familiar with the first portion
2    about -- I mean, I don't know the facts, but I do
3    recall from this morning from what you showed me
4    that Walgreens had an $80 million settlement.
5        Q.    And it looks like this e-mail was
6    forwarded to you by your wife, correct?
7        A.    It appears so, yes.
8        Q.    And what was your response to her when
9    she sent you this e-mail?
10       A.    So, I've put a lot of blood, sweat and
11   tears into Walgreens safe medication disposal
12   project, I think as we have discussed over the last
13   several hours.
14            One of the drawbacks with the DEA
15   take-back days, which are held now twice a year, is
16   they only list DEA-approved locations on their
17   website.
18       Q.    Mr. Kaleta, I just asked what your
19   response was.
20       A.    So, I'm getting to it.
21            So, as a result, on the national
22   take-back day back in 2017, if you went to their
23   website, you wouldn't come up with all of the
24   boxes, roughly 5 to 600, that had been installed by

Page 332

1    Walgreens at that time.
2            The only thing you can find is the
3    temporary locations that the DEA mans once or twice
4    a year, which, as I pointed out, a lot of our
5    patients are not comfortable going to a police
6    station to return their drugs.
7            In addition, a lot of our patients made
8    it very clear it's hard to go at 10 a.m. on a
9    Saturday morning once a year.
10           What disappointed me with the DEA is
11   that they were not willing to show the Walgreens
12   take-back boxes that were permanent and that folks
13   could go to year round.  So, rather tongue in
14   cheek, I responded to my wife that I was displeased
15   with the DEA.
16       Q.    Well, you didn't say that you were
17   displeased with the DEA, did you?
18       A.    Sure I did.
19       Q.    What did you say?
20       A.    I said the "DEA can suck it."
21       Q.    And that's the attitude within Walgreens
22   as it relates to the DEA, isn't it?
23       MR. SWANSON:  Object to form.
24   BY THE WITNESS:

Page 333

1        A.    Absolutely not.
2    BY MR. GADDY:
3        Q.    That's the attitude --
4        A.    If anything, this demonstrates my
5    passion for the take-back program and, again,
6    questions why a government agency wouldn't be more
7    willing to have permanent take-back boxes
8    highlighted as part of their once or twice-a-year
9    effort.
10       Q.    You testified just a minute ago that the
11   attitude within Walgreens was frustration with the
12   DEA.  Is that fair?
13       MR. SWANSON:  Object to form.
14   BY THE WITNESS:
15       A.    No.
16       MR. SWANSON:  Mischaracterizes testimony.
17   BY THE WITNESS:
18       A.    Yeah, that's not fair.  There is
19   frustrations within Walgreens employees.  There is
20   frustration with Walgreens and outside folks.  But
21   you are referring very vaguely to a question you
22   asked me that was very specific.
23   BY MR. GADDY:
24       Q.    Anyway, this is how you decided to

Page 334

1 express your frustration towards the DEA as it
2 relates to this particular issue, correct?
3     A.   That is correct.
4     Q.   Another issue that you looked at was the
5 potential for Walgreens pharmacists to be
6 designated as non-physician providers under
7 Medicare.
8         Do you know what I am speaking of there?
9     A.   Can you give me a little more detail.
10     Q.   Well, I'm asking you because I don't
11 have a lot of detail, but I could show you a
12 document if that might help.
13     MR. GADDY:  This is going to be Kaleta 34.
14         (WHEREUPON, a certain document was
15         marked as Walgreens-Kaleta Exhibit
16         No. 34:  3/2/18 e-mail string with
17         attachment; WAGMDL0000644179 -
18         00644182.)
19 BY MR. GADDY:
20     Q.   And do you see at the bottom of the
21 page there is an e-mail from you.  The subject is
22 "Language on pharmacist interventions to prevent
23 prescription drug abuse."
24         Do you see that?

Page 335

1     A.   I do.
2     Q.   And this is actually -- this actually is
3 an e-mail from you, correct?
4     A.   That's correct.
5     Q.   And you say in the first paragraph, "We
6 wanted to share the attached language we have been
7 working on."
8         And then in the next paragraph you say,
9 "We believe this is a great opportunity to
10 demonstrate why now is the time for pharmacists to
11 be in the game and help with the opioid crisis,
12 while granting them status as non-physician
13 providers."
14         Do you see that?
15     A.   I do.
16     Q.   Does that ring a bell as to what I was
17 asking about a minute ago?
18     A.    So, the reason I was asking for
19 clarification is because I've been working on
20 trying to have pharmacists become non-physician
21 providers for the better part of five years, and
22 unfortunately we have been unsuccessful to date.
23         There has been different iterations of
24 that -- those efforts, different bills, different

Page 336

1 bill numbers.  This is one of the more late, later
2 efforts that we then focused on.
3     Q.   Can you explain to me what that means
4 for a pharmacist to be a non-physician provider?
5     A.   So, right now under the Medicare program
6 pharmacists are not recognized as non-physician
7 providers, similar to a nurse, a nurse anesthetist,
8 a podiatrist.  As a result, pharmacists are not
9 able to be paid for any services that could help
10 Medicare or Medicaid patients.
11         So, we have been trying to change the
12 law to allow for pharmacists to do more than put
13 pills in a bottle and do medication adherence
14 counseling and help with some of the things that
15 we're able to do with opioids.  We want to go
16 deeper on all of those areas, and so the different
17 iterations of the bill would have tackled that in
18 different ways.
19     Q.   Okay.  There is no dispute that right
20 now, I mean, a pharmacist can talk to a physician
21 about the medication that they're dispensing to
22 them, correct?
23     A.   Correct.
24     Q.   And if a pharmacist is dispensing

Page 337

1 opioids, they can certainly talk to the patient
2 about the risk and the potential for addiction or
3 abuse or misuse related to that prescription,
4 correct?
5     A.   Yes.
6     Q.   And it would be appropriate for a
7 pharmacist to talk to that patient about drugs such
8 as Narcan which could be available to reverse any
9 type of overdose that somebody was experiencing,
10 correct?
11     A.   Can you repeat the question.
12     Q.   Sure.  It would also be appropriate for
13 a pharmacist to talk to a patient about the
14 availability of a drug such as Narcan, which could
15 potentially reverse the effects of any overdose
16 that was related to any opioid prescription that
17 was dispensed by the pharmacist?
18     MR. SWANSON:  Object to the form on that.
19 BY THE WITNESS:
20     A.   It -- I don't know if I'd agree with
21 your use of the term "appropriate."
22         There is a great deal that goes on at
23 the pharmacy counter.  There is in some situations
24 not always an opportunity to have a confidential

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1  conversation with a patient. There is a number of
2  different responsibilities that a pharmacist has to
3  perform at the pharmacy counter.
4      And I think we have argued to
5  policymakers that pharmacists need to be given the
6  opportunity to be more engaged in medication
7  adherence, which includes in some cases adherence
8  to opioids.
9      Q.  But no doubt that as the law is right
10  now, pharmacists are permitted to talk to patients
11  about their opioid prescriptions that they're
12  dispensing to them, correct?
13      A.  Are pharmacists permitted to talk to
14  patients about -- yes, they are permitted. But
15  they're also permitted to do a whole bunch of other
16  things under state scope of practice laws and
17  they're not able to do those.
18      Q.  If you flip through the document, you
19  attached it looks like some language that Walgreens
20  was proposing, correct?
21      A.  Yes.
22      Q.  On this issue. And the language that
23  you're adding is what's underlined there, correct?
24      A.  That's correct.

Page 339

1      Q.  And it starts on the first page, and it
2  is lettered there A through D; and if you go to the
3  next page, you see subsection E, and then it goes
4  on to the next section, correct?
5      A.  Yeah, I think I follow.
6      Q.  I'm on the back page. I'm sorry.
7      A.  Okay.
8      Q.  It wasn't the smoothest way to do that.
9      The last section that's been added is
10  section (b) for payment, correct?
11      A.  The last section (b) says "Payment,"
12  that's correct.
13      Q.  And under subsection 2, it indicates
14  that, "With respect to pharmacist services, the
15  amounts paid shall be equal to 80% of the lesser of
16  the actual charge or 85% of the fee schedule amount
17  provided under Section 1848 if such services had
18  been furnished by a physician."
19      Do you see that?
20      A.  I do.
21      Q.  Did I read that correctly?
22      A.  Yes.
23      Q.  If this bill that Walgreens was pushing
24  would have passed, pharmacists would have been

Page 340

1  eligible to be paid for this counseling that they
2  would have been doing with patients, correct?
3      A.  Pharmacists would have been paid for
4  more extensive counseling as well as actually
5  training around Naloxone.
6      Q.  And that was payment that would have
7  gone to Walgreens for the benefit of Walgreens
8  programs and Walgreens pharmacists, correct?
9      MR. SWANSON: Object to form.
10  BY THE WITNESS:
11      A.  The payment would go to the pharmacy I
12  believe.
13  BY MR. GADDY:
14      Q.  Pharmacy is Walgreens?
15      A.  That's correct.
16      MR. GADDY: Brian, if we can take a break. I
17  might be about done with the fact portion of this
18  deposition.
19      MR. SWANSON: He was just asking for a break,
20  so good timing.
21      THE VIDEOGRAPHER: We are off the record at
22  3:24 p.m.
23      (WHEREUPON, a recess was had
24      from 3:24 to 3:44 p.m.)

Page 341

1      THE VIDEOGRAPHER: We are back on the record
2  at 3:44 p.m.
3  BY MR. GADDY:
4      Q.  Mr. Kaleta, I'm just going to go over
5  one more document, and then I'll be done with the
6  fact portion of your deposition.
7      We've talked earlier today about the
8  significance of the statistics related to opioid
9  overdose, opioid deaths. Do you remember those
10  types of things?
11      A.  I do.
12      Q.  Have you had the opportunity to review
13  any of the CDC data on the prevalence of opioid
14  overdoses or opioid deaths over time?
15      A.  Have I had the chance to review any of
16  the CDC data? Is that your question?
17      Q.  Correct.
18      A.  I have definitely seen CDC data over
19  time.
20      Q.  I think we have seen it from time to
21  time Walgreens would quote CDC data in some of its
22  one-pagers or things like that, correct?
23      A.  Yes.
24      Q.  I'm going to show you what I'm going to

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 mark as Kaleta 35.
2          (WHEREUPON, a certain document was
3          marked as Walgreens-Kaleta Exhibit
4          No. 35:  1999 - 2016 maps, National
5          Center for Health Statistics,
6          National Vita Statistics System,
7          mortality data.)
8 BY MR. GADDY:
9    Q.   And this is P-GEN-61, Kaleta 35.  I'm
10 going to represent to you that this -- you can see
11 down at the bottom of the page it says, "Source:
12 National Center for Health Statistics, National
13 Vital Statistics System, mortality data."
14      Do you see that?
15    A.   Yes.
16    Q.   And do you see in the address next to
17 that they get this information from CDC?
18    A.   Yes.
19    Q.   Do you understand what mortality means?
20    A.   I believe it means like the death rate.
21    Q.   Okay.  So, you understand that this
22 deals with the rate of deaths, and I will represent
23 to you that these maps are showing the rates of
24 death related to drug overdoses.

Page 343

1      Do you see that?
2    A.   Yes.
3    Q.   And do you see if we look at the map, on
4 the right-hand side of the page, there's a key, if
5 you will, up at the top with the dark -- dark
6 color, the dark blue indicates that per 100 people,
7 less than 2 individuals died of a drug-related
8 overdose death.
9      As you get on down to the bottom and the
10 color lightens and turns a darker red, it means
11 more people have died from drug-related overdoses.
12      Do you see that?
13    A.   Yes.
14    Q.   And do you see that in 1999 on this
15 first slide here, with a few rare examples, most of
16 the country is pretty blue?
17    A.   Yes.
18    Q.   And that would indicate that, with the
19 few rare examples, there are not a lot of drug
20 overdoses happening across the country here in
21 1999.
22      Do you see that?
23    A.   That seems to be what the data
24 represents.

Page 344

1    Q.   Okay.  You weren't with Walgreens in
2 1999, correct?
3    A.   I was not.
4    Q.   As we flip through these slides, do you
5 see the next page indicates the death rate for
6 2000?
7    A.   Yes.
8    Q.   And then if we flip it again, do you see
9 it goes to 2001?
10    A.   Yes.
11    Q.   And again, you see it goes to 2002?
12    A.   Yes.
13    Q.   Flip again, it goes to 2003.
14      Do you see that?
15    A.   Yes.
16    Q.   Are you noticing the maps start to
17 change as we go through time?
18    A.   Yes.
19    Q.   What is happening?
20    A.   You mean what's happening on the map?
21    Q.   Correct.
22    A.   Well, it appears that the certain parts
23 of the country, the estimated age-adjusted death
24 rate is going up.

Page 345

1    Q.   That means more people are dying from
2 drug-related overdose deaths, correct?
3    A.   I believe so, yes.
4    Q.   If you turn, you see that that trend
5 continues in 2004?
6    A.   Yes.
7    Q.   It appears to continue in 2005?
8    MR. SWANSON:  Object to form.
9 BY MR. GADDY:
10    Q.   Do you see that?
11    A.   It appears at very quick glance that
12 that's what the chart is trying to show, yes.
13    Q.   As you get to 2006, do you begin to see
14 a circle of red forming in what I think we have
15 seen referred to before as the Appalachia region?
16    A.   I believe so.
17    Q.   And that would be the areas that we
18 looked at in some earlier Walgreens documents where
19 you -- some of the Walgreens documents had the
20 states of Ohio, Kentucky and West Virginia as -- as
21 indicated of locations of larger amounts of
22 overdose deaths.
23    MR. SWANSON:  Object to form.
24 BY MR. GADDY:

Page 346

1    Q.   Correct?
2    MR. SWANSON:  Sorry.  Object to form.
3    BY THE WITNESS:
4    A.   I do recall earlier documents singling
5    out a handful of states.  West Virginia was one of
6    them.
7    BY MR. GADDY:
8    Q.   As we go to 2007 and then again in 2008,
9    do you see that that trend of an increase in
10   overdose-related deaths continues?
11   MR. SWANSON:  Object to form.
12   BY THE WITNESS:
13   A.   It appears that the numbers continue to
14   increase.
15   BY MR. GADDY:
16   Q.   Do you see as we go to 2009 and then to
17   2010 that that red blotch in the Appalachian region
18   of Ohio, West Virginia and Kentucky has become
19   larger and darker over the last few years?
20   A.   Yeah, I mean, I can't speak to the scale
21   or how much larger, but it looks to be larger from
22   '08 to 2010, 2011.
23   Q.   And if you go to the next slide, in
24   2011, that was the data when you first started at

Page 347

1    Walgreens, correct?
2    A.   I started at Walgreens in 2011, that's
3    correct.
4    Q.   And if you'll -- just quickly, just grab
5    the whole packet and look at the very first slide,
6    1999.
7    A.   Okay.
8    Q.   And then look at the 2011 slide that we
9    were just on.
10   A.   Okay.
11   Q.   How would you characterize the
12   difference from 1999 to 2011?
13   MR. SWANSON:  Object to form.
14   BY THE WITNESS:
15   A.   It looks different.
16   BY MR. GADDY:
17   Q.   How does it look different?
18   A.   Well, obviously the colors have changed.
19   Q.   Okay.  What do the change of colors
20   indicate?
21   A.   Estimated --
22   MR. SWANSON:  Object to form.
23   BY THE WITNESS:
24   A.   Yeah, I mean, estimated -- I can read.

Page 348

1    Estimated age-adjusted death rate per 100,000.
2    BY MR. GADDY:
3    Q.   You agree that from the -- from the
4    information that you're seeing in this map here
5    that the -- the number of people who were dying
6    from drug overdoses in 2011 has increased from the
7    number of people that were dying in 1999?
8    A.   That appears to be the case.
9    Q.   And you agree that in 2011 you continue
10   to see the red, the dark red blotch in the
11   Appalachian area of Ohio, West Virginia and
12   Kentucky?
13   A.   Yes.
14   Q.   And I think I asked you about this
15   earlier.  But when you started with Walgreens in
16   2011, did anybody with Walgreens sit down with you
17   and have a talk with you about the rate of overdose
18   deaths, drug-related overdose deaths happening in
19   our country?
20   A.   In 2011?
21   Q.   Correct, when you started with the
22   company.
23   A.   I don't recall specific conversations
24   about the drug overdose rate, no.

Page 349

1    Q.   In -- again, I think I asked you this
2    earlier, but you don't recall in 2011 that any
3    particular portion of your lobbying agenda related
4    to opioid abuse?
5    A.   Me personally, no.  I had a very fairly
6    narrow set of issues that I was at that point
7    advocating on behalf of.
8    Q.   In fact, I think you told us -- well,
9    strike that.
10   If we flip through to the next year,
11   2012, do you see the map continues to change?
12   A.   Yes.
13   Q.   And the rate of drug overdose deaths
14   continues to increase in the country, correct?
15   A.   That's what it appears from the chart.
16   Q.   And if you flip one more time to 2013,
17   do you see that it appears that the number of drug
18   overdose deaths in the country continues to
19   increase, correct?
20   MR. SWANSON:  Object to form.
21   BY THE WITNESS:
22   A.   It's hard to tell to flip so quickly,
23   but it appears that, yes, some of the numbers are
24   getting darker.

Page 350

BY MR. GADDY:

Q. And, in fact, 2013 is the year that we talked about earlier when Walgreens paid an $80 million fine to the DEA relating to allegations that it had violated the Controlled Substance Act. Do you recall that?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. I don't recall if it was 2012 or 2013.

BY MR. GADDY:

Q. Okay. Well, you recall that we saw that order to show cause that was served in September of 2012 that indicated that Walgreens continuing to operate a drug distribution system in the State of Florida was an imminent threat to the public health and safety. Do you recall that?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. I don't. I recall a document that was put before me this morning that I had not seen before, most of which I was not familiar with.

BY MR. GADDY:

Q. Okay. Well, let's talk about that for a second.

Page 351

So, you right now are championing some of Walgreens' efforts to fight back against the opioid crisis, correct?

A. I think that's a fair characterization, yes.

Q. Okay. But you don't know really anything about the settlement between Walgreens and the DEA in 2013, do you?

A. Not very much, no.

Q. Okay. We were talking just before the break about Walgreens' efforts to increase the abilities of its pharmacists to do certain tasks. Do you recall that?

A. I do.

Q. And we read through some of the statistics from Florida in this 2013 settlement about some of the actions at some of the pharmacies down in Florida.

Do you recall that from this morning?

MR. SWANSON: Object to form.

BY THE WITNESS:

A. I recall references to pharmacies down in Florida. That's about it.

BY MR. GADDY:

Page 352

Q. Okay. You don't -- you're not familiar with any of those allegations from down in Florida in 2009, 2010, 2011, 2012 that led to that $80 million settlement, are you?

A. I'm not.

MR. SWANSON: Object to form.

BY MR. GADDY:

Q. You don't even have an understanding of the rules and regulations that relate to Walgreens acting as a distributor up until 2013 about suspicious order monitoring programs or due diligence requirements. You don't have an understanding of that, do you?

A. I don't have knowledge of that.

Q. In fact, you don't even have an understanding of what a hydrocodone combination product is. Is that fair?

A. Yes. That's fair.

Q. And that's true even though you're listed on a lobbying disclosure where Walgreens spent $590,000 lobbying against the change of hydrocodone combination products from being changed from III to II, correct?

MR. SWANSON: Object to form, foundation.

Page 353

BY THE WITNESS:

A. No, that form showed that we had spent $590,000 in I believe it was the first quarter of 2012 on a host of different issues. It wasn't just one. Medication therapy management was included, a retail issue on the free and fair markets initiative, which dealt with online sales tax. That was part of what we were lobbying on as well.

BY MR. GADDY:

Q. Regardless, you were on that form and you don't know what a hydrocodone combination product is, correct?

A. As I mentioned before, we typically try to be as --

Q. Mr. Kaleta, I asked if you were on the form or not.

A. So, I am going to explain.

We try to be overly compliant with the LD-2 forms, and it's better to overreport than to underreport. So, as I mentioned, different colleagues worked on different issues, but we typically listed all of us on the LD-2 reports.

Q. Were you listed on the form?

A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1    Q.   Do you know what a hydrocodone
2 combination product is?
3    A.   I do not.  But I may have at one point.
4 That was six years ago.
5    Q.   You don't know about the Walgreens
6 settlement with the DEA.  You don't know about the
7 rules and requirements for a distributor.  You
8 don't know about what a hydrocodone combination
9 product is.
10       Do you feel that Walgreens has given you
11 the adequate information and tools that you need to
12 do your job to be an authority figure on talking
13 about Walgreens' response to the opioid crisis?
14    MR. SWANSON:  Object to form.
15 BY THE WITNESS:
16    A.   Can you repeat the question?
17 BY MR. GADDY:
18    Q.   No.  I'll move on.
19       As you flip through this document, you
20 see in 2014 the rate of overdose deaths increase
21 yet again?
22    A.   It appears so.
23    Q.   Again, if you flip into 2015, it appears
24 that they continue to increase?

Page 355

1    MR. SWANSON:  Object to form.
2 BY THE WITNESS:
3    A.   Again, flipping quickly and not having
4 seen these charts before, it does appear that
5 colors are getting darker in a handful -- a number
6 of parts of the country.
7 BY MR. GADDY:
8    Q.   And that means that more people are
9 dying, right?
10    A.   That's what this chart indicates, yes.
11    Q.   And in 2016 is the last chart we have
12 and you see that, once again, it appears that the
13 rate of overdose deaths continue to rise across the
14 country.
15       Do you see that?
16    MR. SWANSON:  Object to form.
17 BY THE WITNESS:
18    A.   It does appear that, yes, that's
19 correct.
20 BY MR. GADDY:
21    Q.   And in 2016 is when for the first time
22 Walgreens rolls out their drug take-back program
23 that you were in charge of.  That happened in 2016?
24    A.   I had responsibility for a portion of

Page 356

1 the drug take-back program in 2016, that's correct.
2    Q.   As we look at this map here in 2016 and
3 we see the rates of death across the country, are
4 you ready to say that this is a crisis or an
5 epidemic?
6    MR. SWANSON:  Object to form.
7 BY THE WITNESS:
8    A.   I think that we've seen different
9 documents that we've used and shared with members
10 of Congress and staff on the Hill that have
11 referenced an opioid crisis.
12 BY MR. GADDY:
13    Q.   We have, Mr. Kaleta, but I've asked you
14 several times throughout the course of the
15 deposition today if you would call this an opioid
16 crisis or an opioid epidemic, and you've
17 consistently neglected to do so.
18       I'm asking you here, looking at this map
19 for the 2016 drug overdose rate across the country,
20 would you call this a crisis or an epidemic?
21    MR. SWANSON:  Object to form.
22 BY THE WITNESS:
23    A.   I would repeat what I just shared with
24 you, which is that in a number of documents that

Page 357

1 we've seen today we used the term "opioid crisis."
2 Your definition of epidemic may be different than
3 mine.  My definition of crisis may be different.
4 But we've used the term "opioid" trying to combat
5 the opioid crisis.
6    Q.   Let me be a little bit more clear.  I'm
7 not asking Walgreens.  I'm asking Ed Kaleta.
8       Looking at this map in 2016 and the drug
9 overdose rate across the country, is this a crisis
10 or an epidemic?
11    MR. SWANSON:  Object to form.
12 BY THE WITNESS:
13    A.   Yeah, I don't know what the distinction
14 is.  So, I don't want to -- I can't agree with a
15 term that I don't know how it's defined.
16       What I can tell you is we've used the
17 term "opioid crisis" in documents to help explain
18 what it is we're trying to accomplish.
19    MR. GADDY:  Mr. Kaleta, I don't have any more
20 questions as it relates to your fact deposition.
21    THE WITNESS:  Okay.
22    MR. SWANSON:  We can stay on the record.  This
23 is Brian Swanson for Walgreens, as you know,
24 Mr. Kaleta.  I just have a few questions to sort of

Page 358

1 tie up some loose ends, and I hope I won't take
2 long.
3             EXAMINATION
4 BY MR. SWANSON:
5     Q.   If I can, if you can just leave the map
6 that you were looking at from Kaleta Exhibit 35 in
7 front of you.
8         You were looking at the 2016 map, and
9 Mr. Gaddy asked you repeatedly today whether you
10 would consider this an epidemic or a crisis.
11        Whatever term you want to use, is the
12 number of estimated age-related deaths per 100,000
13 people that's shown in this map something that
14 troubles you?
15    A.   Yes.
16    Q.   Is it something that in your career and
17 your time at Walgreens you have taken efforts to
18 try to combat?
19    A.   Yes.
20    MR. GADDY:  Objection; form.
21 BY THE WITNESS:
22    A.   Yes.
23 BY MR. SWANSON:
24    Q.   And I want to return to just a few of

Page 359

1 those efforts that you or Walgreens have undertaken
2 momentarily, but first I want to just set the time
3 parameters a bit.
4         You joined Walgreens in what year?
5     A.   May of 2011.
6     Q.   And we didn't spend a lot of time
7 talking about it, but can you tell us what position
8 you held when you first joined Walgreens in May of
9 2011?
10    A.   So, my title was senior director of
11 federal government relations and I lobbied on at
12 that point a fairly limited scope of issues.
13    Q.   And what does that mean, you lobbied on
14 a fairly limited scope of issues?
15    A.   We had different responsibilities when
16 the -- within the office.  So, my boss, the vice
17 president, Debbie Garza, lobbied on a handful of
18 issues that we were not aware of.  A lot of
19 information wasn't shared with us.
20        Typically we were lobbying in 2011 for
21 medication therapy management as well as a handful
22 of retail issues that affect our business.
23    Q.   And I think you said, but I'll ask you
24 again.  Did you, when you joined Walgreens in

Page 360

1 May of 2011, were you doing, to your recollection,
2 any lobbying or policy work on opioids?
3     A.   Not to my recollection, no.
4     Q.   At some point in your career at
5 Walgreens did you become involved in lobbying for
6 or discussing policy relating to opioids?
7     A.   Yes.
8     Q.   Mr. Gaddy had asked you several
9 questions about when you joined Walgreens whether
10 you were provided with certain documents, including
11 a GAO report and some other reports from the early
12 2000s relating to opioids.
13        Do you recall those questions?
14    A.   I do.
15    Q.   Whether you saw the specific documents
16 that Mr. Gaddy showed you, over your time at
17 Walgreens were you provided with information that
18 you felt allowed you to lobby on behalf of
19 Walgreens and its patients regarding opioids?
20    MR. GADDY:  Objection; form.
21 BY THE WITNESS:
22    A.   As my responsibilities increased and the
23 issue portfolio increased, I was definitely able to
24 have access to and be proactively provided with

Page 361

1 information related to opioid abuse as well as a
2 number of other issues.
3 BY MR. SWANSON:
4     Q.   Now, if you can, and maybe I can help
5 you out a little bit here, this stack of documents,
6 I just want to ask you about a couple of documents
7 that were referenced earlier today.
8         The first is Kaleta Exhibit 3.  So, I'll
9 give everybody a moment to pull that out.
10    A.   Kaleta Exhibit 3.  Okay.
11    Q.   And Mr. Gaddy referenced certain
12 snippets from the document; and I just want to, for
13 the sake of completeness, look at a few other
14 sections in the e-mail chain.  Is that fair?
15    A.   Sure.
16    Q.   If you look at the e-mail on the
17 page that ends in 790 in the bottom right.
18    A.   Yes.
19    Q.   And if you'll recall, this was the
20 e-mail where Ms. Stone was reaching out to you to
21 try to get some data on abuse, prescription drug
22 abuse statistics for 11-to-16-year-olds.  Do you
23 recall that?
24    A.   Yes.

Page 362

1    Q.   And can you read for us on Friday,
2  June 2, 2017 what your response was to Ms. Stone's
3  request?
4    A.   "Lauren, good question.  I've copied
5  Steven Gregory who heads up our policy group to
6  help find the answer to your question and sharing
7  resources for more information.  I strongly support
8  the idea of opioid abuse prevention and education
9  for CSR/WE in light of all we are doing on our
10 take-back program, et cetera.  Thanks, Ed."
11   Q.   Was that your view at the time, that you
12 personally strongly supported the idea of opioid
13 abuse prevention and education?
14   MR. GADDY:  Objection to form.
15 BY THE WITNESS:
16   A.   Yes.
17 BY MR. SWANSON:
18   Q.   Has that been your view throughout your
19 time at Walgreens?
20   MR. GADDY:  Objection to form.
21 BY THE WITNESS:
22   A.   I don't know that I could say I've
23 always strongly supported the idea of opioid abuse
24 prevention because I didn't work on those issues

Page 363

1  initially; but when I was exposed to the larger
2  issue set and then realized increased
3  responsibility, it was -- basically became one of
4  the top priorities that I would spend a great deal
5  of time on.
6    Q.   What is CSR/WE?
7    A.   CSR is corporate social responsibility
8  and WE is a partnership that we were pursuing with
9  a group that focused on opioid education for
10 teenage adolescents.
11   Q.   And did you have any personal
12 involvement in either of those endeavors?
13   A.   I didn't do much as it related to the WE
14 project, but all of our work on opioid abuse and
15 take-back was part of -- is part of our corporate
16 social responsibility pillars, of which we have
17 four.
18   Q.   And can you tell us what those are?
19   A.   So, they focus on four different aspects
20 of our business, community, marketplace, the
21 patient as well as our employees.
22   Q.   If you can pull out, please, for me,
23 sir, Kaleta Exhibit 6, and I think this is the last
24 document I wanted to ask you about.

Page 364

1    A.   Okay.
2    Q.   Kaleta Exhibit 6 is at the beginning an
3  e-mail from you to Nimesh Jhaveri dated June 19,
4  2018.
5         Do you see that?
6    A.   Yes.
7    Q.   And as Mr. Gaddy went through with you,
8  the e-mail includes attachments of public positions
9  and talking points on key issues.  Right?
10   A.   Yes.
11   Q.   Let me ask you.  Do you know in June of
12 2018 whether Walgreens, the company, was a
13 distributor of Class II drugs?
14   A.   In June of 2018, I don't believe
15 Walgreens was a distributor of Class II drugs, no.
16   Q.   If you can turn, please, to the
17 page that ends with the No. 069.
18   A.   Yes.
19   Q.   And I want to turn to this again just
20 for the sake of completeness.
21        If you recall, Mr. Gaddy earlier in the
22 deposition read to you some statistics from the CDC
23 regarding drug overdoses in 2016.
24        Do you see that?

Page 365

1    A.   Yes.
2    Q.   And do you recall that he went through
3  the first three sentences of the -- of that
4  paragraph with you?
5    A.   I believe that's right.
6    Q.   And that's a section entitled "Drug
7  Diversion and Abuse"?
8    A.   Yes.
9    Q.   Do you see the sentence that begins
10 "Policymakers"?
11   A.   Yes.
12   Q.   Can you read that sentence for me,
13 please.
14   A.   "Policymakers are seeking solutions to
15 aid their efforts to combat drug abuse and overdose
16 deaths in communities across America, and Walgreens
17 stands ready to help."
18   Q.   Do you believe that was true at the time
19 that Walgreens stands ready to help policymakers
20 seeking solutions to aid their efforts to combat
21 drug abuse?
22   MR. GADDY:  Objection; form.
23 BY THE WITNESS:
24   A.   Absolutely.

Page 366

BY MR. SWANSON:

1 Q. It continues, "Our pharmacists play a
2 significant role in counseling patients on the safe
3 use of medications, and we understand the
4 challenges our communities face in the fight
5 against drug abuse."
6 You believe that was a true statement
7 when you wrote it or when it was written in the
8 e-mail here?
9 A. Absolutely.
10 Q. Now, there is a reference after that to
11 other Walgreens' initiatives and it looks like it
12 lists four of them.
13 Do you see that?
14 A. Yes.
15 Q. The first one is, "Safe medication
16 disposal receptacles in more than 600 pharmacies in
17 45 states and Washington, D.C. with plans to add an
18 additional 900 stores in the near future."
19 Right?
20 A. Yes.
21 Q. Now, I don't want to dwell on this.
22 Well, let me ask you. Is this the
23 take-back program that you spent quite a bit of

Page 367

1 time today responding to questions from Mr. Gaddy
2 about?
3 A. Yes.
4 Q. And I just want to make sure that
5 your -- that some of your testimony might have been
6 cut off or objected to, so I want to ask you.
7 Is the take-back program that Walgreens
8 has implemented, is that something, sir, that
9 you're personally proud of?
10 MR. GADDY: Objection; form.
11 BY THE WITNESS:
12 A. Extremely proud of what we've done with
13 combating opioid abuse, including our Safe
14 Medication Disposal Program, as well as pushing for
15 legislation which was included in the Comprehensive
16 Addiction Recovery Act that was passed this past
17 year.
18 That included electronic prescribing
19 provision which mandates that all electronic -- all
20 controlled substances within the Medicare D program
21 have to be electronically prescribed, which cuts
22 down on not only errors, but a great deal of
23 diversion, phony scripts, a whole bunch of other
24 issues.

Page 368

1 So, we advocated very hard on that and
2 we are very pleased to see it included in the CARA
3 bill.
4 Q. All right. And I'll ask you about that
5 in a moment. Right now I just want to focus on the
6 take-back program at Walgreens.
7 I think you mentioned that Walgreens had
8 won some awards for that program. Is that fair?
9 A. Yes. We have been recognized by the
10 California stewardship program for our efforts on
11 the take-back program. We've also been recognized
12 by the Partnership for Drug-Free Kids for our
13 leadership with the take-back program. And we've
14 been honored by a number of municipalities around
15 the country for what we've done on take-back.
16 Q. All right. The --
17 MR. GADDY: Objection. Excuse me. Sorry.
18 Objection to the portion that was
19 non-responsive. Go ahead.
20 BY MR. SWANSON:
21 Q. The second initiative that's listed
22 there is the "Naloxone available without a
23 prescription in 45 states and Washington, D.C."
24 Again, not something that I want to

Page 369

1 belabor because I think that's something you've
2 already discussed today?
3 A. Yes.
4 Q. No. 3 is "Member of the Opioid Safety
5 Alliance, a broad-based coalition of patient
6 groups, provider organizations, employers and
7 payers dedicated to advancing technology-enabled
8 solutions to combat the scourge of opioid misuse."
9 Do you know what that's a reference to?
10 A. Yes. It's a coalition that has banded
11 together to -- in support of solutions around the
12 opioid crisis, including the electronic prescribing
13 act that I mentioned just a little bit ago.
14 Q. And the final is the "Recent launch of
15 the 'Combat Opioid Abuse' site on Walgreens.com for
16 patients seeking information and resources about
17 opioid abuse."
18 Do you know what that is?
19 A. Yes. As we've built out a whole bunch
20 of different programs and responses to the opioid
21 crisis, we now have a place on our Walgreens
22 website where patients can go and seek out a number
23 of different solutions for their medications, for
24 Naloxone, counseling, education and a number of

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1 other efforts.
2    Q.   You mentioned in an earlier answer a
3 reference to electronic prescribing, and I lost the
4 answer a little bit because I was referring to
5 take-back and not electronic prescribing.  So, I
6 want to ask you since you mentioned it.
7       What is the electronic prescribing that
8 you were referring to?
9    A.   We supported legislation that was
10 introduced in the House and the Senate which would
11 mandate electronic prescribing of controlled
12 substances within the Medicare program with the
13 goal of cutting down on errors as well as diversion
14 with different scripts.
15       It's something we have been pushing for
16 over a few years, and we're fortunate to have that
17 provision included in the CARA bill, which is the
18 Comprehensive Addiction and Recovery Act of
19 20, I believe, 17.
20    Q.   You said that electronic prescribing you
21 believe cuts down on diversion.  Can you tell us
22 how that works or why you think that's the case?
23    A.   Sure.
24    MR. GADDY:  Objection to form.

Page 371

1 BY THE WITNESS:
2    A.   So, paper prescriptions are easy to
3 duplicate, copy or do any number of different
4 nefarious things in order to try to have folks fill
5 more than one script with one different
6 prescription.
7       So, basically the doctor is then writing
8 it electronically and it's being sent directly to
9 the pharmacy, and then that patient who saw that
10 doctor is the only one that's able to pick it up as
11 well as it's not then changing hands with a whole
12 bunch of people once that patient leaves the
13 doctor's office.
14    Q.   So, you spoke earlier in the deposition
15 about your personal view that Walgreens has
16 responsibility to help with prescription drug
17 abuse.  The initiatives that you've just described,
18 are those some of the ways in your view that
19 Walgreens was attempting to fulfill that
20 responsibility?
21    A.   Absolutely.  Those are some, but not all
22 of the different pursuits and programs,
23 legislation, initiatives that we've tried to push
24 forward to help our patients and communities across

Page 372

1 the country deal with opioid abuse.
2    MR. GADDY:  Mr. Kaleta, thank you.  I don't
3 have any further questions for you.
4       FURTHER EXAMINATION
5 BY MR. GADDY:
6    Q.   Mr. Kaleta, you referenced a couple of
7 different programs that you indicated Walgreens has
8 supported, several that we've talked about today
9 and one in particular that we haven't talked about
10 about e-prescribing just now?
11    A.   Yes.
12    Q.   When did that go into effect?
13    A.   But it's been a long day, but I want to
14 say 2017.
15    Q.   Okay.  2017 for e-prescribing.
16       The program that you just referenced
17 regarding opioids as it relates to combat, do you
18 know what I'm referring to?  Sorry.
19    A.   I don't know if I do.
20    Q.   Sorry.  The recent launch of the Combat
21 Opioid Abuse site.
22    A.   Oh.  Yes.
23    Q.   When did that go into effect?
24    A.   Sometime in the last couple of years

Page 373

1 because this document is from 2017 I believe.
2    Q.   Okay.  And in 2017 the language used was
3 "The recent launch of the Combat Opioid Abuse site
4 on Walgreens.com," correct?
5    A.   Yes.
6    Q.   So, do you agree '17, '16ish?
7    A.   So, we have been lobbying on electronic
8 prescribing for the better part of a decade.
9    Q.   I am asking about the Combat Opioid
10 Abuse.
11    A.   Right.  I thought you were lumping the
12 two together.
13    Q.   No.
14    A.   I believe the Combat Opioid Abuse is
15 actually a built-out formal section.  We have had
16 able to find safe medication kiosks on our site for
17 almost three years now as well as other tools.
18 This is just a more formal and easier place to find
19 information on our site that we moved to sometime
20 in the last year and a half.
21    Q.   The Combat Opioid Abuse site is within
22 the last year and a half.
23    MR. GADDY:  Corey, if you don't mind, please,
24 putting back up P-GEN-61 and then going to --

Page 374

1      MR. SWANSON:  Putting up what?
2      MR. GADDY:  I'm sorry.  It would be No. 35.
3  The maps.
4  BY MR. GADDY:
5      Q.   And in going to I guess the '16 or it's
6  going to be the 2016 slide.
7          We looked at this earlier, Mr. Kaleta,
8  but this was the rate of overdose deaths in the
9  country in 2016.  You recall that?
10     A.   Yes.
11     Q.   And in 2016 is when Walgreens first
12  rolled out these medication disposal sites at the
13  stores, correct?
14     A.   In response --
15     MR. SWANSON:  Objection; asked and answered.
16  BY THE WITNESS:
17     A.   Yeah, in response to new DEA regulations
18  that were issued shortly before that.
19  BY MR. GADDY:
20     Q.   Okay.
21     A.   We didn't have the legal ability to do
22  safe medication disposal boxes before that.
23     Q.   Well, the regulations were finalized in
24  2014, correct?

Page 375

1      A.   That's correct.
2      Q.   Okay.
3      A.   With questions that took us a good bit
4  of time to work through.
5      Q.   If you'd grab -- I'm sorry.  I don't
6  know the number, but it's the big thick one in a
7  binder.
8      A.   Okay.
9      Q.   And I think it's Exhibit 9.  Is that
10  what you got on the front of it there?
11     A.   Yes.
12     Q.   And you talked a little bit about these
13  programs that have been implemented in the last
14  year or two as far as the take-back, the
15  e-prescribing, the website, the Narcan dispensing.
16         As far as you're concerned, that's
17  appropriate because of the responsibility that
18  Walgreens has to address the opioid crisis,
19  correct?
20     MR. SWANSON:  Object to form.
21  BY THE WITNESS:
22     A.   Can you repeat the question?
23  BY MR. GADDY:
24     Q.   Sure.  The actions that Walgreens has

Page 376

1  taken in the last year or two, the e-prescribing,
2  the drug take-back started in '16, the Narcan
3  prescription, the website that you said came out in
4  the last 18 months or so, you believe that those
5  are appropriate actions for Walgreens to take
6  partly because of the, I think you've said,
7  critical responsibility that companies like
8  Walgreens have in addressing the opioid crisis,
9  correct?
10     MR. SWANSON:  Object to form.
11  BY THE WITNESS:
12     A.   I would agree with most of the statement
13  except that I would say three years plus for some
14  of the programs you had mentioned.
15  BY MR. GADDY:
16     Q.   Okay.  If you'd turn in that document to
17  page 28 of 343 if you're looking at the bottom of
18  the page.
19     A.   28 of 343.  Okay.  Yes.
20     Q.   Would you agree that one of the reasons
21  that Walgreens has a critical responsibility to
22  address the opioid crisis is because Walgreens
23  played a role in causing the opioid crisis?
24     MR. SWANSON:  Object to form and beyond the

Page 377

1  scope of my cross.
2  BY THE WITNESS:
3      A.   No.
4  BY MR. GADDY:
5      Q.   Go to the next page, page 29, and there
6  is paragraph D in the middle of the page.
7          Do you see that?
8      A.   Yes.
9      Q.   It says, "Oviedo is a town of about
10  34,000 people and is home to two Walgreens retail
11  pharmacies.  Beginning in late 2010, these two
12  pharmacies became the site of multiple arrests by
13  the local police for drug offenses.  The local
14  Chief of Police began writing letters to the
15  pharmacies after each arrest stemming from the
16  prescriptions they filled.  These letters informed
17  the pharmacy of the circumstances of the arrest and
18  that the dispensed drugs were not being used for
19  treatment."
20         Do you see that?
21     A.   I do.
22     Q.   Were you aware of this information?
23     A.   I was not.
24     MR. SWANSON:  Object to form and beyond the

Page 378

1 scope of my cross.
2 BY MR. GADDY:
3 Q. You see it continues to say, "They
4 further provided the pharmacy with the name and
5 date of birth not only of the person whose
6 prescription they filled, but also of others
7 associated with the illegal distribution of the
8 dispensed drugs. These letters then concluded with
9 a request for the pharmacy's help in 'dealing with
10 the prescription medication epidemic' by soliciting
11 a commitment to stop further incidents."
12     Do you see that?
13 A. I see that sentence, yes.
14 Q. Would you agree that Walgreens, as I
15 think you testified to already, would have a
16 responsibility to deal with the prescription
17 medication epidemic by stopping -- by committing to
18 stop further incidents such as these?
19 MR. SWANSON: Object to form, asked and
20 answered, beyond the scope of cross.
21 BY THE WITNESS:
22 A. So, I'm not familiar with this binder.
23 Earlier today is the first time I have seen it and
24 I have not seen this section D, so I don't know

Page 379

1 what it refers to. I'm not familiar with it.
2 BY MR. GADDY:
3 Q. Okay. If you go down to section F,
4 about halfway through the paragraph it starts,
5 "On March 15, 2011."
6     Do you see that?
7 A. I do.
8 Q. It says, "He sent identical letters to
9 both the chairman and CEO of Walgreens asking them
10 for their support and assistance in combating the
11 prescription drug epidemic, informing them that
12 Oviedo 'has seen the parking lots of your stores
13 become a bastion of illegal drug sales and drug
14 use' where once the prescriptions are filled, 'the
15 drugs are sold, distributed as payment, crushed and
16 snorted, liquefied and injected, or multiple pills
17 swallowed while in the parking lot of your
18 pharmacies.'"
19     Do you see that?
20 MR. SWANSON: Object to form.
21 BY THE WITNESS:
22 A. I see what's highlighted, yes.
23 BY MR. GADDY:
24 Q. Would you agree that activity such as

Page 380

1 that contributes to the opioid crisis as opposed to
2 help address it?
3 MR. SWANSON: Object to form, beyond the
4 scope.
5 BY THE WITNESS:
6 A. I've not seen this document before and
7 I've not seen this section, so I don't have a basis
8 for an opinion.
9 BY MR. GADDY:
10 Q. Pretend the document is not there.
11 Okay?
12 A. Okay.
13 Q. If I was to tell you that in March of
14 2011 that a local sheriff thought that the
15 Walgreens stores in his jurisdiction had become
16 bastions of illegal drug sales and drug use, you
17 would agree that that is contributing to the opioid
18 crisis as opposed to helping to solve it, correct?
19 MR. SWANSON: Object to form, incomplete
20 hypothetical, calls for speculation and beyond the
21 scope of the cross. Could have done this all
22 before and you did.
23 BY THE WITNESS:
24 A. Yeah, that's another hypothetical, could

Page 381

1 have, would have, should have. Whatever happened
2 around the country ten years ago, I can't speak to
3 that.
4 BY MR. GADDY:
5 Q. Okay. You don't know whether or not
6 that type of activity would make the opioid crisis
7 worse or better?
8 A. I think you're --
9 MR. SWANSON: Same objections.
10 BY THE WITNESS:
11 A. Yeah, I think your summary of that
12 activity is real vague. So, I'm not sure exactly
13 what you're referring to.
14 BY MR. GADDY:
15 Q. You would agree it's not a good thing
16 for Walgreens stores to be called a bastion of
17 illegal drug sales. You would agree with that,
18 right?
19 MR. SWANSON: Object to form.
20 BY THE WITNESS:
21 A. Can you repeat your question?
22 BY MR. GADDY:
23 Q. Would you agree that it's not a good
24 thing to be told that Walgreens stores and their

Page 382

1 parking lots in particular have become a bastion of
2 illegal drug sales and drug use?
3     MR. SWANSON:  Object to form, scope.
4 BY THE WITNESS:
5     A.   So, if you're asking in a vacuum if that
6 particular sentence and just that sentence or
7 statement is something that would be -- what was
8 the word you used?
9 BY MR. GADDY:
10     Q.   Bastion of illegal drug sales.
11     A.   No, would that be bad for Walgreens, is
12 that what --
13     Q.   Would it be bad, period?
14     A.   I would agree with that, yes.
15     MR. SWANSON:  Objection.
16     MR. GADDY:  That's all the questions I have,
17 Mr. Kaleta.
18     MR. SWANSON:  All right.
19     MR. GADDY:  You ready to go right in?
20     THE WITNESS:  I think I need to go to the --
21     MR. GADDY:  No problem.
22     THE WITNESS:  -- bathroom real quick.
23     THE VIDEOGRAPHER:  We are off the record at
24 4:26 p.m.

Page 383

1         (WHEREUPON, a recess was had
2             from 4:26 to 4:31 p.m.)
3     THE VIDEOGRAPHER:  We are now on the record.
4 The time is 4:31 p.m. on December 18, 2018.  This
5 is the 30(b)(6) testimony of Mr. Ed Kaleta.
6         Counsel will be noted on the
7 stenographic record.
8         Will the Court Reporter please swear in
9 the witness.
10         (WHEREUPON, the witness was duly
11             sworn.)
12         EDWARD KALETA,
13 called as a 30(b)(6) witness herein, having been
14 first duly sworn, was examined and testified as
15 follows:
16         EXAMINATION
17 BY MR. GADDY:
18     Q.   State your name, please.
19     A.   Edward Kaleta.
20     Q.   And if you don't mind saying your title
21 for me one more time.
22     A.   Vice president of federal government
23 relations and U.S. public policy.
24     Q.   And do you understand that you've been

Page 384

1 designated by Walgreens to provide testimony today
2 on a single topic pursuant to a Deposition Notice
3 under Rule 30(b)(6)?
4     A.   I do.
5     Q.   Okay.  I've handed you a document which
6 we're going to call Kaleta No. 1 as it relates to
7 the 30(b)(6) deposition.
8         (WHEREUPON, a certain document was
9             marked Walgreens-Kaleta 30(b)(6)
10             Exhibit No. 1:  Second Notice of
11             Deposition to Deft. Walgreens Boots
12             Alliance, Inc. a/k/a Walgreen Co.)
13 BY MR. GADDY:
14     Q.   Have you seen this before?
15     A.   Yes, I saw this.  My counsel provided it
16 to me.
17     Q.   Okay.  Prior to seeing this -- let me
18 ask you this first.
19         When did you first find out you were
20 going to be a 30(b)(6) designee for this case?
21     A.   About a month ago probably.
22     Q.   Okay.  When you were first told that,
23 did you know what it meant?
24     A.   I did not.

Page 385

1     Q.   If you turn to page 8 of that Notice, do
2 you see topic 12 in the middle of the page?
3     A.   Yes.
4     Q.   Is it your understanding that this is
5 the topic you have been designated on?
6     A.   That's correct.
7     Q.   It says, "Your participation,
8 relationship or association with any trade
9 organization, including, but not limited to, the
10 HDA, the NACDS, PhRMA, including the submission of
11 amicus briefs."
12         Do you see that?
13     A.   I do.
14     MR. SWANSON:  I'll just note that he is being
15 produced subject to objections that were made to
16 that topic in an August 31, 2018 letter from my
17 colleague Ms. Swift.
18     MR. GADDY:  Let me ask you.  Is there any --
19 certainly aware there were objections made.  I know
20 there has been some rulings made on other, as it
21 relates to other Defendants.  I don't believe there
22 was any rulings made as it relates to that topic.
23     MR. SWANSON:  I think that's correct.
24     MR. GADDY:  Are you limiting his testimony in

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1 any way, shape or form based merely on the raising
2 of an objection?
3     MR. SWANSON: Well, let's go through the
4 questions and we'll find out.
5     MR. GADDY: You can tell me if you have
6 instructed him not to answer a question or not to
7 prepare for a topic as we get there?
8     MR. SWANSON: I'll object as beyond the scope,
9 and then I think we can sort that out later if we
10 need to and if the testimony is within.
11 BY MR. GADDY:
12     Q. Mr. Kaleta, if you'd turn to page 2 for
13 me. Do you see at the bottom of page 2 there is a
14 section called "Duty to Prepare"?
15     A. Yes.
16     Q. It says, "The testimony elicited in the
17 deposition represents Walgreens' knowledge, not the
18 individual deponent's knowledge."
19         Do you understand that?
20     A. I do.
21     Q. Obviously we've spent several hours
22 today taking your individual fact deposition but
23 you understand this is different, right?
24     A. Yes.

Page 387

1     Q. When you answer questions, you're
2 answering as Mr. Walgreens as opposed to
3 Mr. Kaleta. You understand that distinction?
4     A. I do.
5     Q. It goes on to say, it says, "Therefore,
6 if Walgreens' designee is not knowledgeable about
7 the matters specified in the Deposition Notice, it
8 must nonetheless prepare such designee to give
9 knowledgeable, binding answers."
10         Do you see that?
11     A. I do.
12     Q. Have you done anything to prepare to be
13 Walgreens' designee on this topic today?
14     A. I have.
15     Q. Okay. About how much time did you spend
16 preparing to testify on this topic today?
17     A. About three hours.
18     Q. Okay.
19     A. Maybe two.
20     Q. Okay. If you would, describe for me
21 what you did to prepare.
22     A. So, there was a couple components to it.
23 One was obviously seeing this notice, having my
24 counsel explain what the 30(b)(4).

Page 388

1     MR. SWANSON: 6.
2     THE WITNESS: 6, close.
3 BY THE WITNESS:
4     A. 30(b)(6) designation meant. Spent a
5 fair amount of time on that and explaining, as you
6 just outlined, the difference between that and my
7 personal testimony.
8         We did a little -- I -- I had a couple
9 conversations with colleagues to confirm
10 information related to our membership in some of
11 these trade associations, including information
12 when it was available, in which case -- in some
13 cases in which it wasn't, about our participation
14 in trade associations prior to 2011 when I was at
15 the company.
16 BY MR. GADDY:
17     Q. Okay. How many people -- you said
18 colleagues. How many colleagues did you talk to?
19     A. Three maybe.
20     Q. Who did you talk to?
21     A. Casey Cesnovar. There was a gentleman
22 that was on the phone and he was referenced in one
23 these other documents that I had mentioned I had
24 heard his name before. Excuse me. I mentioned

Page 389

1 earlier in my personal testimony that I had heard
2 his name and talked with him.
3     THE WITNESS: I don't know if you can help me.
4     MR. SWANSON: I can't help you. It's your
5 testimony.
6     THE WITNESS: Okay.
7 BY THE WITNESS:
8     A. Do you want me to go through the
9 documents?
10 BY MR. GADDY:
11     Q. No.
12     A. Okay.
13     Q. Who is the third person?
14     A. It's going to take me a while. Forgive
15 me. The head cold is definitely in full force
16 after eight hours. So, I'm trying to pull the
17 other person that we had a conversation with.
18         I did talk to Pete Wilson in our legal
19 department. So, Casey, Pete and then the other
20 gentleman.
21     Q. Okay.
22     A. I believe that's the list.
23     Q. Okay. Any one of those folks more
24 important than the other as far as kind of the

Highly Confidential - Subject to Further Confidentiality Review

**Page 390**

1  primary source that you got information from?

2   A.   Not necessarily, no.

3   Q.   Let me start with what I think will be

4  some easy ones.

5        Has Walgreens ever been a member of HDA

6  or the HDMA?

7   A.   I don't believe that Walgreens has ever

8  been a member of HDA or HDMA, but my understanding

9  is that I can go back to 2004 is about when I can

10  go back to.  But I don't believe so.  I can say

11  with fair amount of certainty we have not.

12   Q.   Okay.  Has Walgreens ever been a member

13  of PhRMA?

14   A.   No.

15   Q.   Again, is that a definitive no or no

16  back to '04?

17   A.   That was a definitive no.

18   Q.   Has Walgreens ever been a member or is

19  Walgreens a member of NACDS?

20   A.   National Association of Chain Drug

21  Stores, yes.

22   Q.   How long has Walgreens been a member of

23  that trade association?

24   A.   I was able to determine that we have

**Page 391**

1  been a member since, I want to say, going into the

2  early '90s.

3   Q.   Has Walgreens ever been a member of the

4  NABP?

5   A.   The National Association of Boards of

6  Pharmacy?

7   Q.   Correct.

8   A.   I believe we have, but I can't say for

9  certain.

10   Q.   Is that one that you inquired about or

11  asked about?

12   A.   It wasn't.  I don't believe it was on

13  this document.

14   Q.   Okay.

15   A.   We work with the National Association of

16  Boards of Pharmacy; but as to whether we are a

17  member, I don't know the answer to that.

18        What I can also add is that my area is

19  responsible for paying all trade association dues,

20  and so with the exception of individuals in our

21  company that have gone out of the process and are

22  paying for trade association dues out of their own

23  budget without our knowledge, I'm not aware that we

24  have been a member of NABP.

**Page 392**

1   Q.   Of any?  I'm sorry?

2   A.   Of NABP.

3   Q.   Oh.  Gotcha.  Turn to page 8 for me, if

4  you don't mind, back where it lists your topic.

5        You see there it says, "Your

6  participation, relationship or association in any

7  trade association."

8        Do you see that?

9   A.   I do.

10   Q.   Did you limit your inquiry only to the

11  three that are listed there?

12   A.   I did not.

13   Q.   Okay.  So, of the four that I've asked

14  you about, let me summarize it and you can tell me

15  if I got it right or not.

16        You don't believe you've ever been a

17  member of had but can only say so with certainty

18  back to '04.  You've never been a member of PhRMA.

19  You've been a member of NACDS going back to the

20  early '90s, and you're not sure about NABP?

21   A.   Correct.

22   Q.   What other trade associations is

23  Walgreens a member of?

24   A.   You want the whole list?

**Page 393**

1   Q.   Yes.

2   A.   How much time do you have?

3   Q.   How many?

4   A.   Do you want federal?  Do you want state?

5   Q.   Start with federal.

6   A.   You want with local chambers of

7  commerce?  Those are technically trade

8  associations.

9   Q.   Start with federal.

10   A.   So, at the federal level we are members

11  of the Business Round Table.  We're members of the

12  Retail Industry Leaders Association.  The acronym

13  is RELA.  We're members of the American Benefits

14  Council.  We're members of the National Business

15  Group on Health.

16        I believe that's currently where we are

17  at the federal level.

18   Q.   Okay.  Any of those four trade

19  organizations deal with opioids?

20   A.   I would say yes, that Business Round

21  Table and the Retail Industry Leaders Association

22  have had conversations related to the opioid

23  epidemic and its potential impact on very -- the

24  members organizations and workforce.  They have

Page 394

1  not, that I'm aware of, lobbied on behalf of the
2  opioid epidemic.
3      Q.  Okay.  Have they lobbied on behalf of
4  member businesses such as Walgreens?
5      A.  On other issues?
6      Q.  Sure.
7      A.  Yes.
8      Q.  Do all of these trade associations that
9  you just mentioned, these four, conduct lobbying
10 activity?
11     A.  Yes.
12     Q.  Okay.  And all of them lobby on behalf
13 of the interest of their members, just maybe not on
14 opioids, correct?
15     A.  I'm sorry.  What was the last part of
16 your question?
17     Q.  They all lobby on behalf of the interest
18 of their members, just maybe not on opioids?
19     A.  That's correct.
20     MR. SWANSON:  Object to form.
21 BY MR. GADDY:
22     Q.  So, are you aware of any of those four
23 lobbying on any opioid-related issues?
24     A.  I'm not aware.

Page 395

1      Q.  Are there any state trade associations
2  that Walgreens is a member of that conducts
3  lobbying activity on behalf of its members related
4  to opioids?
5      A.  I believe there are.  There are pharmacy
6  trade associations in various states that we are
7  members of.  There are pharmacy and retail
8  associations in various states that we are members
9  of.  I would point to Illinois.  I would point to
10 Florida.  And there's a handful of others that have
11 lobbied at various times on opioid-related matters.
12     Q.  Do you know the name of the association
13 in Florida?
14     A.  I believe there's the Florida Retail
15 Association and I believe they also have a Florida
16 Pharmacy Association.  In some states it's combined
17 and in some states it's two different distinct
18 organizations.
19     Q.  Were you saying something?
20     A.  Uh-uh.
21     Q.  Would those be the only two state trade
22 associations within Florida?
23     A.  I believe so.  But, again, the lion's
24 share of my responsibility is at the federal level

Page 396

1  and so I have more intimate knowledge around that
2  area.
3      Q.  Who did you talk to to get information
4  about HDA or HDMA?
5      A.  So, I had knowledge myself and I also
6  talked to Casey and I talked to Pete and I talked
7  to the third gentleman whose name I can't recall at
8  this point.
9      Q.  Through your association and membership
10 in NACDS, do you ever interact with HDA and HDMA as
11 it comes to common interest in lobbying?
12     MR. SWANSON:  Object to form and scope.
13 BY THE WITNESS:
14     A.  So, Walgreens interacts, has
15 historically, with HDA on different issues, yes.
16 BY MR. GADDY:
17     Q.  Has Walgreens interacted with HDA on
18 issues related to opioids?
19     A.  I would say the answer is yes in that we
20 have spent extensive time working with HDA on the
21 Drug Supply Chain Security Act that passed in 2014
22 that was dealing with trying to update the
23 technology in the supply chain and, so, on a
24 de facto basis that impacts opioids.  So, yes.

Page 397

1      Q.  Any other issues other than that one?
2      A.  With HDA?
3      Q.  Correct.
4      A.  I believe that an amicus brief was filed
5  with NACDS and HDA, but that was another area where
6  I had to be prepared for that one during my
7  preparation.  I wasn't familiar with it prior to
8  that.
9      Q.  Okay.  Who did you speak with about the
10 amicus brief?
11     A.  Within Walgreens?
12     Q.  Correct.
13     A.  I spoke to I believe only Pete Wilson
14 about the amicus brief.
15     Q.  Okay.  What was the issue on which the
16 amicus brief was submitted?
17     A.  It had to do with -- oh, God, I need to
18 remember the name.  It had to do with distribution
19 of opioids, and Walgreens I know through NACDS was
20 in support of the amicus brief.  But I'm not aware
21 and I didn't hear from anybody that we actually
22 provided legal input or writings as it related to
23 the amicus brief.  The Masters case.  That's what
24 it was called.

Page 398

1    Q.    Did Walgreens support the amicus brief
2  that was submitted in that case?
3    MR. SWANSON:  Object to form, beyond the
4  scope.
5  BY THE WITNESS:
6    A.    So, we supported it through NACDS.
7  BY MR. GADDY:
8    Q.    What do you mean by that?
9    A.    On any number of different issues, NACDS
10  reaches out to its membership and asks for input on
11  an issue.  That was an example.
12    Q.    That would have been an issue on which
13  Walgreens would have issued and responded
14  affirmatively that they support that amicus brief
15  being submitted?
16    A.    That's correct.
17    MR. SWANSON:  Object to form.
18  BY MR. GADDY:
19    Q.    Did Walgreens have an opportunity to
20  review that brief before they gave their
21  affirmative support that it should be submitted?
22    A.    I believe we did, yes.
23    Q.    And after reviewing that amicus brief,
24  Walgreens gave their affirmative support to NACDS

Page 399

1  to support or in favor of that amicus brief being
2  filed in the Masters Pharmaceutical case, correct?
3    A.    Yes.
4    MR. SWANSON:  Object to form.
5  BY MR. GADDY:
6    Q.    Did Walgreens propose any edits or
7  changes or amendments to the brief prior to it
8  being filed?
9    A.    I don't believe so.
10    Q.    Did Walgreens voice any objections to
11  any aspects of the brief that was filed?
12    A.    I don't believe so.
13    Q.    When I asked you about state trade
14  associations, you singled out Florida and Illinois.
15  Any particular reason for those two states?
16    A.    Yes.  They're our first and third
17  largest states in terms of number of stores.  So,
18  I'm more familiar with them than I am with other
19  states.
20    Q.    The lobbying or the trade associations
21  in Illinois, would they be similar to the ones that
22  you mentioned from Florida?
23    A.    They are joint in Illinois.  IRMA is the
24  Illinois Retail Manufacturers Association, and they

Page 400

1  handle both retail as well as pharmacy issues for
2  Walgreens.
3    Q.    And these state trade associations that
4  you're referencing in Illinois and Florida, do they
5  restrict their lobbying to state legislatures as
6  opposed to federal?
7    MR. SWANSON:  Object to form.
8  BY THE WITNESS:
9    A.    The short answer is no.  There are
10  instances where federal legislation has an impact
11  on states and different state trade associations,
12  retail associations will weigh in.  It's not
13  common, but it happens.
14  BY MR. GADDY:
15    Q.    Are there any federal trade
16  organizations you can think of that Walgreens is a
17  member of or associated with other than NACDS and
18  the four that you mentioned, the Business Round
19  Table, the retailers.  Can't read my own writing.
20  Those four.  Are there any others that you can
21  recall?
22    A.    The National Association of Specialty
23  Pharmacy, which I'm on the Executive Committee on,
24  so I clearly should have remembered that one.

Page 401

1  Again, I blame the head cold.
2    Q.    Does "specialty pharmacy," do those two
3  words have anything to do with opioids?
4    A.    No.
5    Q.    Does that trade association have
6  anything to do with opioids?
7    A.    No.
8    Q.    I'll ask you about NACDS in a minute.
9    But any of the other federal trade
10  organizations that Walgreens is a member of, do any
11  of them do any lobbying regarding the laws, rules
12  and regulations surrounding drug distribution or
13  drug dispensing?
14    A.    That we're members of?
15    Q.    Correct.
16    A.    I don't believe so, no.
17    Q.    Are there any significant or well-known
18  federal trade organizations that do represent
19  retail pharmacies that Walgreens is not a member of
20  that you're aware of?
21    A.    Yes.
22    Q.    What would that be?
23    MR. SWANSON:  Object to the form and scope.
24  BY THE WITNESS:

Page 402

1    A.   National Retail Federation.
2  BY MR. GADDY:
3    Q.   National Retail Federation?
4    A.   That's correct.
5         And technically you're -- can you repeat
6  the words you use to describe.  Just retail
7  pharmacies, is that all you said?
8    Q.   Correct.
9    A.   The National Community Pharmacy
10 Association also technically represents retail
11 although there is usually one or two or three.  So,
12 they're not described as a chain.  NCPA also would
13 lobby on opioid-related matters.  We are not a
14 member of either NRF or NCPA.
15   Q.   Let's talk about NACDS for a minute.
16        Within that trade organization, are
17 there different committees or councils or
18 leadership groups that have been formed?
19   A.   Yes.
20   Q.   Are there any that you're aware of that
21 any Walgreens employees serve on?
22   A.   Yes.
23   Q.   Can you name one of them, one of the
24 leadership committees.  Sorry.

Page 403

1    A.   So, Richard Ashworth and Alex Gourlay
2  are members of the Board of Directors of the NACDS
3  board.
4    Q.   And how long has Mr. Gourlay been a
5  member of the Board of Directors?
6    A.   About four years.
7    Q.   What about for Mr. Ashworth?
8    A.   About three.
9    Q.   And what does that position entail?
10   MR. SWANSON:  Object to form, scope.
11 BY THE WITNESS:
12   A.   I mean, typical to a Board of Directors
13 for a company or a trade association, the goal is
14 to try to set the strategic vision of the trade
15 association.
16 BY MR. GADDY:
17   Q.   Okay.  Are there other councils or
18 committees that Walgreens has employees on?
19   A.   Yes.
20   Q.   What would be the next one?
21   A.   Policy Council.
22   Q.   What is the Policy Council?
23   A.   Policy Council is the entity that helps
24 establish policy positions and makes

Page 404

1  recommendations to the Board of Directors.
2    Q.   I will show you what I will mark as
3  Kaleta 2.
4         (WHEREUPON, a certain document was
5          marked as Walgreens-Kaleta 30(b)(6)
6          Exhibit No. 2:  DEA Compliance
7          Working Group 1/10/13 Meeting
8          Summary; CAH_MDL2804_02933683 -
9          02933700.)
10 BY MR. GADDY:
11   Q.   And there is an e-mail up front.  But,
12 frankly, what I am getting at is the attachment.
13   A.   Okay.
14   Q.   If you want to flip to that.
15        Do you recognize this attachment?  It's
16 going to be --
17   A.   Excuse me.  I don't believe I've seen
18 this document before.
19   Q.   The -- do you recognize this is a
20 National Chain of -- National Association of Chain
21 Drug Stores document, correct?
22   A.   I do.
23   MS. DESH:  I don't believe you can show this
24 document to the witness.  It was produced by

Page 405

1  Cardinal.  I don't know if he's on it.
2    MR. GADDY:  He's the 30(b)(6) capacity and
3  he's testifying on behalf of Walgreens.  Walgreens
4  employees present.
5    MS. DESH:  That's correct, but this is a
6  document that was produced by Cardinal.
7    MR. GADDY:  Sure.  And he's testifying on
8  behalf of Walgreens and Walgreens is on this
9  document.
10   MS. DESH:  Is the witness on this document?
11   MR. GADDY:  The witness is Walgreens, and
12 Walgreens is on the document.
13   MS. DESH:  Do we have anyone from Cardinal?
14   MS. MEYER:  Yes, I just got this.  So, can you
15 give me a minute to look at it and see what it is.
16   MR. GADDY:  Sure.
17   MS. MEYER:  Can we take a moment to look at
18 this because I have literally not seen this.
19   MR. GADDY:  If it will help, I am happy to rip
20 off the first page that has any Cardinal
21 correspondence on it.  I think that's even NACDS
22 correspondence as well.  I am looking at the
23 document that's an NACDS document, not a Cardinal.
24   MS. MEYER:  Which one are you looking at?

Highly Confidential – Subject to Further Confidentiality Review

| Page 406 |
| --- |

1  MR. GADDY: The attachment. Page 683 at the
2  bottom right-hand corner. It's on National
3  Association of Chain Drug Stores letterhead.
4  MS. DESH: But that is also a Cardinal
5  document which the witness is not on.
6  MS. MEYER: Right.
7  MR. GADDY: The witness is Walgreens and
8  Walgreens is on the document. So...
9  MS. MEYER: You want to take off the cover
10 document?
11 MR. GADDY: That's fine with me. The cover
12 document is also an NACDS document. It's not
13 Walgreens internal e-mails. It's NACDS e-mails --
14 or excuse me. It's not Cardinal Health e-mails.
15 MS. MEYER: Do we mind if we take a break? I
16 need to make a quick phone call.
17 MR. GADDY: Sure.
18 MS. MEYER: Thanks.
19 THE VIDEOGRAPHER: We are off the record at
20 4:58 p.m.
21    (WHEREUPON, a recess was had
22     from 4:58 to 5:03 p.m.)
23 THE VIDEOGRAPHER: We are back on the record
24 at 5:03 p.m.

| Page 407 |
| --- |

1  BY MR. GADDY:
2  Q.  You got No. 2 in front of you,
3  Mr. Kaleta?
4  A.  I do.
5  Q.  And I'm on Bates No. that ends in 683 of
6  P-WAG-42.001.
7  A.  Is that the first page?
8  Q.  That is.
9  A.  Okay.
10 Q.  That was for Corey.
11    You see this is an NACDS document?
12 A.  Yes.
13 Q.  And up at the top of the page it
14 indicates it's a DEA Compliance Working Group
15 meeting summary.
16    Do you see that?
17 A.  I do.
18 Q.  Okay. Let's put that aside for just a
19 minute.
20    So, you had told me that about
21 Mr. Gourlay and Mr. Ashworth who were on the Board
22 of Directors, correct?
23 A.  Yes.
24 Q.  You also said there is a Policy Council?

| Page 408 |
| --- |

1  A.  Yes.
2  Q.  Who is on the Policy Council at
3  Walgreens?
4  A.  Ed Kaleta, Rick Gates.
5  Q.  And what are your functions on the
6  Policy Council?
7  A.  We help determine policy priorities and
8  policy positions for NACDS and make recommendations
9  to the board. The board then decides whether to
10 approve or decline those --
11 Q.  Okay.
12 A.  -- recommendations.
13 Q.  How many people are on the Policy
14 Council?
15 A.  Say probably about 25ish.
16 Q.  Are there individuals from CVS on the
17 Policy Council?
18 A.  Yes.
19 Q.  Individuals from Walmart?
20 A.  Yes.
21 Q.  Individuals from Rite Aid?
22 A.  Yes.
23 Q.  Individuals from Henry Schein?
24 A.  I don't know about Henry Schein.

| Page 409 |
| --- |

1  Q.  What about Discount Drug Mart?
2  A.  I don't know.
3  Q.  What about HBC?
4  A.  HBC? No.
5  Q.  Giant Eagle?
6  A.  Yes.
7  Q.  How long have you been on the Policy
8  Council, Ed Kaleta?
9  A.  Three years.
10 Q.  What about Rick?
11 A.  Probably about five.
12 Q.  Was there somebody on that Policy
13 Council before you from Walgreens?
14 A.  Yes.
15 Q.  Who was that?
16 A.  Debbie Garza.
17 Q.  How long was she on it?
18 A.  I don't know the answer to that.
19 Q.  You indicated earlier that you think she
20 is in Texas. Do you know if she is employed or not
21 or retired?
22 A.  I think she may be -- the last I heard
23 was that she may be working with the Texas
24 Pharmacists Association.

Page 410

1    Q.   The Texas Pharmacists Association?
2    A.   That's correct.
3    Q.   When did she leave Walgreens?
4    MR. SWANSON:  Scope objection.
5 BY THE WITNESS:
6    A.   July, August of 2015.
7 BY MR. GADDY:
8    Q.   And when she left, is that when -- did
9 you take her position?
10   A.   No.  Her position was essentially split
11 up.  I took a portion and Casey Cesnovar took a
12 portion.
13   Q.   Anybody else -- or sorry.
14        Any other Walgreens employees that
15 you're aware of that have previously been members
16 of the Policy Council?
17   A.   I can't recall for sure.  I think
18 Richard probably has been at some point.
19   Q.   If you go back to Kaleta 30(b)(6) 2, you
20 see this is a document referencing a meeting of a
21 DEA Compliance Working Group.
22        Do you see that?
23   A.   I do.
24   Q.   Is that another committee within NACDS?

Page 411

1    A.   It is.
2    Q.   How long has that committee been in
3 place?
4    A.   I have no idea.  There are dozens of
5 different working groups within NACDS.
6    Q.   Is this the only one that you're aware
7 of that's related to DEA compliance?
8    MR. SWANSON:  Object to form.
9 BY THE WITNESS:
10   A.   There are other working groups that I
11 believe have weighed in on matters related to the
12 DEA.
13 BY MR. GADDY:
14   Q.   This indicates that in January of 2013
15 Rex Swords was a co-chair of the committee,
16 correct?
17   A.   It does indicate that.
18   Q.   Is he still?
19   A.   I don't believe so.
20   Q.   Does Walgreens currently -- strike that.
21        Does NACDS still have a DEA Compliance
22 Working Group?
23   A.   I believe they do.
24   Q.   Are there any Walgreens employees that

Page 412

1 are currently on it?
2    A.   I believe Tasha Polster is on it.
3    Q.   How often does the DEA Compliance
4 Working Group meet?
5    A.   I don't know if it has a regular cadence
6 or if it's just more a couple times a year.  I know
7 they typically meet in conjunction with the summer
8 meeting of what's referred to as Total Store Expo,
9 which focuses -- used to be called Pharmacy and
10 Technology Conference and, again, it's typically in
11 August.  So, I know they meet there and then I
12 assume they meet a handful of times otherwise
13 during the year.
14   Q.   Was there a particular committee or
15 division within NACDS through which the amicus
16 brief on the Masters Pharmaceutical case that we
17 were discussing earlier would have been funneled
18 through?
19   A.   Yes.
20   Q.   Which one is that?
21   A.   The legal working group.
22   Q.   Is Pete Wilson on the legal working
23 group?
24   A.   I believe he is.

Page 413

1    Q.   Any other members or any other employees
2 of Walgreens that are on that group?
3    A.   I believe Michael Freeman is as well.
4    Q.   Would the participation in the legal
5 working group be similar to what you described as
6 the Policy Council and have representatives or
7 individuals who work for other retail pharmacies
8 such as CVS, Walmart, Rite Aid, Giant Eagle and the
9 like?
10   MR. SWANSON:  Object to form, vague.
11 BY THE WITNESS:
12   A.   Yeah, is it similar in terms of
13 structure or processes?
14 BY MR. GADDY:
15   Q.   In terms of members of the committee
16 coming from a wide cross section of the
17 pharmaceutical industry as far as different retail
18 pharmacies.
19   A.   Yes.
20   MR. SWANSON:  Same objections.
21 BY MR. GADDY:
22   Q.   And that would be the same for most all
23 of the different committees or divisions or working
24 groups within NACDS, correct?

Page 414

1    MR. SWANSON: Object to form.
2  BY THE WITNESS:
3    A.  No.  There are some that actually don't
4  include certain members based on issue subject.
5  BY MR. GADDY:
6    Q.  Any that relate to opioids?
7    A.  I don't believe so.
8    Q.  This particular meeting, in the first
9  paragraph there, it says, "Co-chairs Jason Ausili
10  and Rex Swords started the meeting with a
11  description of the working group's charge from the
12  NACDS Board of Directors."
13    That would have been the Board of
14  Directors that Alex Gourlay and Rick Ashworth are
15  on now, correct?
16    A.  That they are on now, correct.  They
17  were not back in 2013.
18    Q.  Okay.  Anybody from Walgreens on the
19  Board of Directors in 2013?
20    A.  Yes.
21    Q.  Who?
22    A.  Greg Wasson.
23    Q.  He was the CEO of Walgreens?
24    A.  Correct.  And I believe Kermit Crawford

Page 415

1  was also on the board.
2    Q.  So, talking about the working group's
3  charge from the NACDS Board of Directors, it says,
4  "In particular, the work group is tasked with
5  helping to curb prescription drug abuse through the
6  development of an industry-wide code for controlled
7  substance dispensing.  The co-chairs emphasized the
8  need to be forward thinking with the code, and go
9  beyond simply codifying known red flags for abuse."
10    Do you see that?
11    A.  I do.
12    Q.  Is this typical of the type of topic
13  that would be discussed at a DEA Compliance Working
14  Group meeting?
15    MR. SWANSON: Object to form, scope.
16  BY THE WITNESS:
17    A.  I'm not as -- I'm not intimately
18  familiar.  I've never served on the DEA Compliance
19  Working Group.  I've never attended a meeting.  I
20  don't know that I've seen more than a handful of
21  documents over the course of my seven years.
22  BY MR. GADDY:
23    Q.  In the scope of the Policy Council that
24  you serve on, what would you say are the -- are

Page 416

1  kind of the top three hot button items right now
2  for that committee?
3    A.  Drug pricing.  This is not in rank
4  order.  Drug pricing, pharmacist scope/provider
5  status, and opioid abuse.
6    Q.  Are there other committees that you're
7  aware of that within NACDS that Walgreens employees
8  serve on?
9    A.  Yes.
10    Q.  What's the next one?
11    A.  The direct and indirect remuneration
12  proposed rule, Part D, just formed.  I'm the new
13  co-chair.
14    Q.  That deals with Medicare Part D?
15    A.  It deals with a proposed Medicare rule
16  that was recently released.
17    Q.  Any other committees or councils or
18  divisions?
19    A.  NACDS has a foundation within its
20  organization.  It's a separate legal structure, but
21  there are members of NACDS that serve on that.
22    There is a federal working group.  I
23  don't really know what they do.  There is a state
24  working group.  I've not participated in any of

Page 417

1  those meetings.
2    Those are kind of the ones off the top
3  of my head.
4    Q.  What's the difference in the federal
5  working group and the Policy Council?
6    A.  The federal working group is meant to
7  keep member organizations, companies, apprised of
8  federal issues that are occurring.
9    The Policy Council is tasked with
10  actually coming up with and figuring out policy
11  recommendations to the Board of Directors.
12    Q.  I will show you what I will mark as
13  Kaleta 3.
14    (WHEREUPON, a certain document was
15    marked as Walgreens-Kaleta 30(b)(6)
16    Exhibit No. 3:  Document,
17    "Payments, Payments for the 1
18    selected Organization, 12 September
19    2018"; WAGMDL00286426 - 00286428.)
20  BY MR. GADDY:
21    Q.  In preparing for this, did you do any --
22  any work or any research to -- into the amount of
23  dues that Walgreens pays to these trade
24  associations?

Highly Confidential – Subject to Further Confidentiality Review

Page 418

1     A.   I did although I'm pretty familiar with
2  the federal organizations.
3     Q.   Okay.  And what we're looking at here,
4  P-WAG-1948 or Bates No. 286426, do you recognize
5  this to be an itemization of payments made by
6  Walgreens to the NACDS, National Association of
7  Chain Drug Stores, going back to, it looks like,
8  2009?
9     A.   Yes.
10    Q.   Now, it seems like every year there are
11  annual dues, correct?
12    A.   Correct.
13    Q.   Are those annual dues a set amount?  Are
14  they a -- or are they a percentage of revenue,
15  market share?  How are they calculated?
16    A.   It's a formula that deals with revenue
17  percentages, percentages based on revenue
18  increments.  So, from X hundred thousand up to a
19  couple million up to the billions, et cetera.
20    MR. SWANSON:  Let me just get an objection to
21  scope on this.  You can ask the questions, but this
22  seems to be venturing into Item No. 13.  So, I will
23  have a scope objection, but go ahead and ask.
24  BY MR. GADDY:

Page 419

1     Q.   And in this year, 2018, it looks like
2  your -- Walgreens' annual dues were in the area of
3  $1-1/2 million, correct?
4     MR. SWANSON:  Same objection.
5  BY THE WITNESS:
6     A.   So, we paid our dues in December of
7  2017.
8  BY MR. GADDY:
9     Q.   Thank you.  I had my line wrong.
10         December of 2017 you paid the annual
11  dues of about $1-1/2 million?
12    A.   Yes.
13    Q.   And if you go -- you also see in here
14  there are several, it looks like about annually,
15  there is a fairly large annual due that Walgreens
16  pays but there are also several smaller amounts in
17  here.
18         Do you see that?
19    A.   Yes.
20    Q.   What do these -- first of all, let me
21  ask you this way.
22         Is it your understanding that this
23  represents every payment made from Walgreens to
24  NACDS going back to December of 2009?

Page 420

1     MR. SWANSON:  Objection to scope.
2  BY THE WITNESS:
3     A.   I don't know that I can say it's every
4  payment.  Different employees can join NACDS,
5  attend their conferences, attend their education
6  seminars.  Some of those are picked up by this, but
7  some of those are probably paid by either
8  individual departments, by folks personally.  So, I
9  can't say that it's every single charge.
10  BY MR. GADDY:
11    Q.   And to be clear, I'm not asking about
12  individual employees.  But as far as Walgreens
13  corporate, are you able to say that these are all
14  moneys paid on behalf of Walgreens to NACDS?
15    MR. SWANSON:  Same objection.
16  BY THE WITNESS:
17    A.   I believe that's correct.
18  BY MR. GADDY:
19    Q.   And if you look at the last page, you
20  see the grand total is -- looks to be about
21  $10.2 million over the last decade that's been paid
22  by Walgreens to NACDS?
23    A.   Yeah.  That looks right.  I see the
24  number.

Page 421

1     Q.   Is there any trade association that
2  Walgreens pays more to be a member of than NACDS?
3     A.   No.
4     Q.   Would it be fair to say that Walgreens
5  has been an active member in NACDS dating back to
6  the early '90s?
7     MR. SWANSON:  Object to form, scope.
8  BY THE WITNESS:
9     A.   Yes.
10  BY MR. GADDY:
11    Q.   Walgreens made a -- had a constant
12  presence within NACDS and on different councils or
13  committees or working groups going back to the
14  early '90s?
15    MR. SWANSON:  Same objections.
16  BY THE WITNESS:
17    A.   I don't have personal knowledge of how
18  many folks were involved during that 20-year
19  period, but I would agree with your assessment if
20  you want to say we have been an active member.
21  BY MR. GADDY:
22    Q.   Do you by chance remember the third guy
23  you talked to yet?
24    A.   I don't.

Page 422

1    MR. SWANSON:  If it would help, I can suggest
2  somebody to him but I don't want to coach the
3  witness.
4    MR. GADDY:  Go ahead.
5    MR. SWANSON:  And I'm not sure I know who it
6  is.
7    MR. GADDY:  Go ahead.
8    MR. SWANSON:  Would you like me to do that?
9    MR. GADDY:  Sure.
10 BY THE WITNESS:
11   A.   Ed Bratton.
12 BY MR. GADDY:
13   Q.   What topic in particular did or what
14 area I guess I should say did Mr. Bratton help you
15 with?
16   A.   We had a high-level conversation about
17 interaction with NACDS and whether between him and
18 Casey and I, our knowledge of how far back our
19 membership went.
20   Q.   You mentioned Tasha Polster being on
21 some committee or working group within NACDS at
22 some point in time.  Mr. Bratton ever been on any
23 committees or working groups that you're aware of?
24   A.   I don't know.  He may.

Page 423

1    Q.   Anybody else from the pharmacovigilance
2  team that you've referenced before that had Eric
3  Stahmann, some other folks, any of them that are on
4  working group committees that you're aware of?
5    A.   I'm not aware.  There is just too many
6  working groups to keep track of.
7    MR. GADDY:  Mr. Kaleta, that's all I got for
8  you.
9    THE WITNESS:  Okay.
10   MR. SWANSON:  Nothing from me.  Thank you.
11   THE VIDEOGRAPHER:  We are off the record at
12 5:21 p.m.
13      (Time Noted:  5:21 p.m.)
14      FURTHER DEPONENT SAITH NAUGHT.
15
16
17
18
19
20
21
22
23
24

Page 424

1
2    I, CORINNE T. MARUT, C.S.R. No. 84-1968,
   Registered Professional Reporter and Certified
   Shorthand Reporter, do hereby certify:
3    That previous to the commencement of the
   examination of the witness, the witness was duly
4  sworn to testify the whole truth concerning the
   matters herein;
5    That the foregoing deposition transcript
   was reported stenographically by me, was thereafter
6  reduced to typewriting under my personal direction
   and constitutes a true record of the testimony
7  given and the proceedings had;
     That the said deposition was taken
8  before me at the time and place specified;
     That the reading and signing by the
9  witness of the deposition transcript was agreed
   upon as stated herein;
10     That I am not a relative or employee or
   attorney or counsel, nor a relative or employee of
11 such attorney or counsel for any of the parties
   hereto, nor interested directly or indirectly in
12 the outcome of this action.
13
14     CORINNE T. MARUT, Certified Reporter
15
     (The foregoing certification of this
16 transcript does not apply to any
   reproduction of the same by any means, unless under
17 the direct control and/or supervision of the
   certifying reporter.)
18
19
20
21
22
23
24

Page 425

1    INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.  You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7      After doing so, please sign the errata
8  sheet and date it.
9      You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12      It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the
15 deposition transcript by you.  If you fail to do
16 so, the deposition transcript may be deemed to be
17 accurate and may be used in court.
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1      - - - - - -
          E R R A T A
2      - - - - - -

3

4   PAGE  LINE  CHANGE

5   ____  ____  _____

6         REASON: _____

7   ____  ____  _____

8         REASON: _____

9   ____  ____  _____

10        REASON: _____

11  ____  ____  _____

12        REASON: _____

13  ____  ____  _____

14        REASON: _____

15  ____  ____  _____

16        REASON: _____

17  ____  ____  _____

18        REASON: _____

19  ____  ____  _____

20        REASON: _____

21  ____  ____  _____

22        REASON: _____

23  ____  ____  _____

24        REASON: _____

Page 428

1      LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Page 427

1

2       ACKNOWLEDGMENT OF DEPONENT

3

4       I, EDWARD KALETA, do hereby certify

5   under oath that I have read the foregoing pages,

6   and that the same is a correct transcription of the

7   answers given by me to the questions therein

8   propounded, except for the corrections or changes

9   in form or substance, if any, noted in the attached

10  Errata Sheet.

11

12

13  _____

14  EDWARD KALETA          DATE

15

16

17  Subscribed and sworn
    to before me this

18  _____ day of _____, 20____.

19  My commission expires:_____

20

    _____ Notary Public

21

22

23

24