0   01


2       `       IN THE UNITED STATES DISTRICT COURT

3           FOR THE NORTHERN DISTRICT OF OHIO

4                   EASTERN DIVISION

5       -----------------------------X

        IN RE: NATIONAL PRESCRIPTION   MDL No. 2804

6       OPIATE LITIGATION,

                                Case No. 17-MD-2804

7       This document relates to:

8       All Cases                Hon. Dan A. Polster

9       -----------------------------X

10              * HIGHLY CONFIDENTIAL *

11      * SUBJECT TO FURTHER CONFIDENTIALITY REVIEW  *

12              VIDEOTAPED DEPOSITION

13                      OF

14              LACEY R. KELLER

15              New York, New York

16          Thursday, June 13, 2019

17

18

19

20

21

22

23

        Reported by:

24      ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

25

**Page 2**

```
 1
 2
 3
 4
 5                    June 13, 2019
 6                     9:10 a.m.
 7
 8          HIGHLY CONFIDENTIAL - SUBJECT TO
 9      FURTHER CONFIDENTIALITY REVIEW
10      videotaped deposition of LACEY R.
11      KELLER, held at the offices of
12      KIRKLAND & ELLIS LLP, 601 Lexington
13      Avenue, New York, New York, pursuant to
14      Notice, before Annette Arlequin, a
15      Certified Court Reporter, a Registered
16      Professional Reporter, a Realtime
17      Systems Administrator, a Certified
18      Realtime Reporter, and a Notary Public
19      of the State of New York and New
20      Jersey.
21
22
23
24
25
```

**Page 3**

```
 1
 2      A P P E A R A N C E S:
 3
 4      SIMMONS HANLY CONROY LLC
 5      Counsel for Plaintiffs
 6          112 Madison Avenue, 7th floor
 7          New York, New York  10016-7416
 8      BY: JAYNE CONROY, ESQ.
 9          JConroy@simmonsfirm.com
10      BY: LAURA L. FITZPATRICK, ESQ.
11          Lfitzpatrick@simmonsfirm.com
12              - and -
13      MOTLEY RICE LLC
14      Counsel for Plaintiffs
15          28 Bridgeside Boulevard
16          Mt. Pleasant, South Carolina  29464
17      BY: JAMES W. LEDLIE, ESQ.
18          Jledlie@motleyrice.com
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2      A P P E A R A N C E S(Cont'd.):
 3
 4      KIRKLAND & ELLIS LLP
 5      Counsel for Allergan Finance
 6          1301 Pennsylvania Avenue, N.W.
 7          Washington, D.C. 20004
 8      BY: JENNIFER LEVY, ESQ.
 9          Jennifer.levy@kirkland.com
10      BY: CATIE VENTURA, ESQ.
11          Catie.ventura@kirkland.com
12
13      O'MELVENY & MYERS LLP
14      Counsel for Janssen Pharmaceutical and
15          Johnson & Johnson
16          1999 Avenue of the Stars - 8th Floor
17          Los Angeles, California  90067-6035
18      BY: AMY R. LUCAS, ESQ.
19          Alucas@omm.com
20      BY: J. KEITH KOBYLKA, ESQ.
21          (Telephonically/realtime stream)
22
23
24
25
```

**Page 5**

```
 1
 2      A P P E A R A N C E S(Cont'd.):
 3
 4      MORGAN LEWIS & BOCKIUS LLP
 5      Counsel for Teva, Cephalon and Actavis
 6          1701 Market Street
 7          Philadelphia, Pennsylvania  19103-2921
 8      BY: ADAM HAMMOUD, ESQ.
 9          Adam.hammoud@morganlewis.com
10
11      ARNOLD & PORTER KAYE SCHOLER LLP
12      Counsel for Endo Health Solutions Endo
13          Pharmaceuticals, Inc.; Par Pharmaceutical
14          Companies, Inc. f/k/a Par Pharmaceutical
15          Holdings, Inc.
16          601 Massachusetts Avenue N.W.
17          Washington, D.C.  20001-3743
18      BY: JOANNA PERSIO, ESQ.
19          Joanna.persio@arnoldporter.com
20
21
22
23
24
25
```

Page 6

A P P E A R A N C E S(Cont'd.):
DECHERT LLP
Counsel for Purdue Pharmaceuticals
   Three Bryant Park
   1095 Avenue of the Americas
   New York, New York  10036-6797
BY: DEBRA D. O'GORMAN, ESQ.
   Debra.ogorman@dechert.com

ZUCKERMAN SPAEDER LLP
Counsel for CVS Indiana, LLC and CVS RX
Services, Inc.
   1800 M Street N.W. - Suite 1000
   Washington, D.C.  20036-5807
BY: PAUL B. HYNES, JR., ESQ.
   Phynes@zuckerman.com

MORGAN LEWIS & BOCKIUS LLP
Counsel for Rite Aid of Maryland
   1701 Market Street
   Philadelphia, Pennsylvania  19103-2921
BY: JOHN P. LAVELLE, JR., Partner
   John.lavelle@morganlewis.com

Page 7

A P P E A R A N C E S(Cont'd.):
ROPES & GRAY LLP
Counsel for Mallinckrodt
   Prudential Tower
   800 Boylston Street
   Boston, Massachusetts  02199
BY: JOSH GOLDSTEIN, ESQ.
   Joshua.goldstein@ropesgray.com
BY: FEIFEI (ANDREA) REN, ESQ.
   Andrea.Ren@ropesgray.com

COVINGTON & BURLING LLP
Counsel for McKesson
   One CityCenter
   850 Tenth Street, N.W.
   Washington D.C. 20001-4956
BY: CLAIRE CATALANO DEAN, ESQ.
   ccdean@cov.com

Page 8

A P P E A R A N C E S(Cont'd.):
BARTLIT BECK LLP
Counsel for Walgreens
   54 West Hubbard Street - Suite 300
   Chicago, IL 60654
BY: PETER B. BENSINGER, JR., ESQ.
   Peter.bensinger@bartlit-beck.com
   (Telephonically/realtime stream.)

FOLEY LARDNER LLP
Counsel for Anda, Inc.
   111 Huntington Avenue - Suite 2500
   Boston, MA 02199-7610
BY: GRAHAM D. WELCH, ESQ.
   Gwelch@foley.com
   (Telephonically/realtime stream.)

BARNES & THORNBURG LLP
Counsel for H.D. Smith
   11 South Meridian Street
   Indianapolis Indiana  46204-3535
BY: KATHLEEN L. MATSOUKAS, ESQ.
   Kathleen.matsoukas@btlaw.com
   (Telephonically/realtime stream.)

Page 9

A P P E A R A N C E S(Cont'd.):

LOCKE LORD LLP
Counsel for Henry Schein, Inc. and
  Henry Schein Medical Systems, Inc.
  2200 Ross Avenue - Suite 2800
  Dallas, Texas  75201
BY: BRANDAN MONTMINY, ESQ.
  Brandan.montminy@lockelord.com
  (Telephonically/realtime stream.)

ALSO PRESENT:

VINCE ROSICA, Golkow, Legal Video Specialist
DAN LAWLOR, Golkow, Legal Video Specialist

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1
2        IT IS HEREBY STIPULATED AND
3   AGREED by and between the attorneys for
4   the respective parties herein, that
5   filing and sealing be and the same are
6   hereby waived;
7        IT IS FURTHER STIPULATED AND
8   AGREED that all objections, except as
9   to the form of the question, shall be
10  reserved to the time of the trial;
11       IT IS FURTHER STIPULATED AND
12  AGREED that the within deposition may
13  be sworn to and signed before any
14  officer authorized to administer an
15  oath, with the same force and effect as
16  if signed and sworn to before the
17  Court.
18
19               - o0o -
20
21
22
23
24
25

Page 11

1
2        THE VIDEOGRAPHER:  We are now on
3   the record.  My name is Vince Rosica.
4   I'm a videographer for Golkow
5   Litigation Services.
6        Today's date is June 13, 2019,
7   and the time is 9:10 a.m.
8        This video deposition is being
9   held in New York, New York, in the
10  matter of National Prescription Opiate
11  Litigation, MDL No. 2804, for the
12  United States District Court for the
13  Northern District of Ohio, Eastern
14  Division.
15       The deponent is Lacey Keller.
16       Counsel will be noted on the
17  stenographic record.
18       The court reporter is Annette
19  Arlequin and will now swear in the
20  witness.
21          *        *        *
22  L A C E Y  R. K E L L E R,  called as a
23     witness, having been duly sworn by a
24     Notary Public, was examined and
25     testified as follows:

Page 12

1
2        THE WITNESS:  I do.
3        Lacey Rae Keller.
4   EXAMINATION BY
5   MS. LEVY:
6        Q.  Good morning, Ms. Keller.  My
7   name is Jenny Levy, and I'm an attorney
8   here at Kirkland & Ellis.  I represent the
9   Allergan defendants in this case.
10       Thank you for being here today.
11  Apologies in advance for my scratchy voice
12  and sniffles.  I'm feeling very under the
13  weather, so I will do my best to keep my
14  germs away from you.
15       Have you ever had your deposition
16  before?
17       A.  Good morning, Jenny.  Thanks for
18  having me.  And no.
19       Q.  This is the first deposition
20  experience you've ever had?
21       A.  Correct.
22       Q.  In the course of your work either
23  at the New York Attorney General's Office
24  or previously with SEIU, did you sit in on
25  any depositions or is this the first time

Page 13

1
2   you've had this experience?
3        A.  This is the first time I've had
4   this experience.
5        Q.  You've never been to a deposition
6   before?
7        A.  That is correct.
8        Q.  Okay.  Let me tell you, just so
9   you're comfortable, how this is going to
10  go.
11       We have a court reporter to my
12  right, your left, who is typing out every
13  word that I'm saying and every word that
14  you will say, in addition to our
15  videographer.
16       Because she is typing all of our
17  words, it's important that instead of the
18  way we would normally communicate, maybe
19  nodding our your head or saying "uh-huh,"
20  that you do your best to speak in words
21  when you answer my question.
22       Does that make sense?
23       A.  That makes sense.
24       Q.  Okay.  Thanks.
25       And if you don't understand the

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1
2  question I'm asking you, please absolutely
3  feel free to tell me that, and I will do my
4  very best to rephrase it.  I don't want the
5  questions to be tricky.  They're not
6  intended to confuse you.  I would like to
7  make sure that you understand them before
8  you answer them.
9        Can we agree that if you don't,
10  you'll ask me to rephrase?
11     A.  Thanks.  I will.
12     Q.  Is there any reason that you
13  can't give truthful, honest testimony
14  today?
15     A.  No.
16     Q.  Okay.  I'm going to ask you
17  questions.  The attorneys that came with
18  you today may object to questions that I
19  ask.  Unless they instruct you not to
20  answer, I would ask that you please answer
21  the questions.
22        If they instruct you not to
23  answer, we'll probably quibble about that,
24  but you'll get to follow your counsel's
25  advice on that; otherwise, we can take

Page 15

1
2  breaks?
3        If you need a break at any time,
4  I would ask that you just answer any
5  pending question I have before we take a
6  break.
7        So if you need to use the
8  restroom or check your email or are hungry
9  or any of that, feel free to just tell me
10  and we can take a break when we get to an
11  appropriate stopping point.
12     MS. LEVY:  Okay.  I would like to
13  mark as Exhibit 1, the deposition
14  notice that was issued in this case.
15     (Keller Exhibit 1, Track 1
16  Defendants' Second Amended Notice of
17  Oral Videotaped Deposition of Lacey R.
18  Keller, marked for identification, as
19  of this date.)
20     MS. LEVY:  Do you folks want
21  copies, physical copies of the
22  exhibits?  If you do, just raise your
23  hand.  I'm going to pass them down
24  through Catie.  And share them among
25  yourselves.

Page 16

1
2        If there are any exhibits that
3  folks would like me to put on the ELMO,
4  please just say so.
5  BY MS. LEVY:
6     Q.  Ms. Keller, have you seen this
7  deposition notice before?
8     A.  No.
9     Q.  This is the first time you've
10  taken a look at it?
11     A.  Yes.
12     Q.  Okay.  If you don't mind, please
13  turn to the back page that says Exhibit A.
14        Exhibit A is a request for three
15  categories of documents.
16        Do you see that?
17     A.  I do.
18     Q.  Okay.  Let's start with No. 1,
19  "All documents or other materials you
20  reviewed since the date of your report that
21  have not specifically been identified in
22  your report in preparation for your
23  expected testimony."
24        Do you see that?
25     A.  I do.

Page 17

1
2     Q.  Have you prepared a list of
3  documents that would respond to No. 1?
4     A.  I believe I have.
5     Q.  Okay.  I'm going to mark what
6  is -- I'm going to hand you what we're
7  going to mark as Exhibit 2.
8        (Keller Exhibit 2, List of
9  documents that respond to request 1 in
10  Exhibit A on Exhibit 1, marked for
11  identification, as of this date.)
12  BY MS. LEVY:
13     Q.  Do you see Exhibit 2?
14     A.  I do.
15     Q.  Take a look at that.  Is
16  Exhibit 2 a list of documents that respond
17  to request 1 in Exhibit A on Exhibit 1?
18     A.  It's my intention that it does.
19     Q.  Okay.  That's what I figured.
20        How did -- who prepared
21  Exhibit 2?
22     A.  Exhibit 2, I'm sorry, yes.  I
23  did.
24     Q.  And how did you prepare
25  Exhibit 2?  What did you do to come up with

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1
2  that list?
3      A.   Specifically to make the list or
4  for the items?
5      Q.   To make the list.
6      A.   To make the list?  To be honest,
7  we wrote a Python script to go through all
8  the documents that I used to rely on, and
9  then I compiled the actual Excel
10  spreadsheet or list that you guys received.
11      Q.   You used data science to make a
12  list.  I'm impressed.
13          And so am I correct that
14  Exhibit 2 reflects all the materials that
15  were not cited in your report but that you
16  have reviewed and relied on to form your
17  opinions since your report?  Is that
18  correct?
19      A.   Yes.  There may be some overlap.
20  There might be some citations here that
21  were in the original covered items, but I
22  just didn't want to exclude anything, so to
23  be thorough, I put them all here.
24      Q.   Got it.
25          And other than the materials

Page 19

1
2  cited in your report and the materials
3  listed in Exhibit 2 as additional reliance
4  materials, are there any other materials
5  that you relied on in forming your opinions
6  in this case?
7      A.   No.
8      Q.   If we look back at Exhibit 1,
9  Item No. 2 in Exhibit A in Exhibit 1 asked
10  for an "itemization of the hours spent, the
11  compensation paid or to be paid for your
12  work in this matter and your staff's work
13  in this matter, including all invoices you
14  have submitted to counsel."
15          Do you see that?
16      A.   Yes, I do.
17      Q.   Did you prepare and give to
18  counsel a list of your invoices that
19  reflect all of the work you've done in this
20  case?
21      A.   Yes, I have.
22      Q.   Okay.
23          (Keller Exhibit 3, Gryphon
24      Strategies Invoice dated 5/30/19,
25      Bates-stamped OPIOIDMDL_KELLER_000036

Page 20

1
2  through 35, marked for identification,
3  as of this date.)
4      MS. LEVY:  Let's go off the
5  record for just a minute.
6      THE VIDEOGRAPHER:  The time is
7  9:18 a.m.  We are now off the record.
8      (Off the record.)
9      THE VIDEOGRAPHER:  The time is
10  9:20 a.m. We are back on the record.
11  BY MS. LEVY:
12      Q.   Ms. Keller, take a look at
13  Exhibit 3 that we've put in front of you.
14      A.   I have it.
15      Q.   What is Exhibit 3?
16      A.   These are our invoices.
17      Q.   And is Exhibit 3 a comprehensive
18  list of all invoices that Gryphon
19  Strategies has submitted in this case?
20      MS. CONROY:  Objection.
21      You can go ahead and answer.
22      THE WITNESS:  Okay.
23      A.   To the best of my knowledge, yes.
24      Q.   Okay.
25      A.   And it's Gryphon.

Page 21

1
2      Q.   Sorry.  Thank you.
3      A.   Everyone says Gryphon so...
4      Q.   The dragon makes it look like it
5  should be a more dramatic name.  Gryphon.
6  Okay.  Thank you for correcting me.
7          What is Gryphon Strategies?
8      A.   Gryphon Strategies is a private
9  investigation consulting firm.
10      Q.   And you went to work at Gryphon
11  Strategies in 2017?
12      A.   Yes.
13      Q.   From the New York Attorney
14  General's Office?
15      A.   Correct.
16      Q.   You weren't the founder.  It
17  existed before you got there, correct?
18      A.   Correct.
19      Q.   How many individuals, roughly,
20  work at Gryphon Strategies?
21      A.   When I started, it was probably
22  around 50.  My guess is that number is much
23  larger now.  Probably around 70.
24      Q.   Does Gryphon have, like, multiple
25  places of business or is it all located in

Page 22

White Plains?

A. There are multiple offices. So the headquarters is in White Plains. We have a satellite office in the city here. And I believe they're in process of opening a few offices around the rest of the world.

Q. And where do you work?

A. I work in New York City.

Q. How many folks work with you in New York City?

A. Around seven to nine, depending on our intern flux.

Q. Okay. And how many individuals have worked with you on this case?

A. Sorry, let me just do the math.

Q. Sure.

A. Around six.

Q. Got it.

Is there anybody above you or that you report to within Gryphon on this case or are you the boss?

A. I'm the boss of our division, yes.

Q. And the other individuals that

Page 23

have worked on this matter are reporting to you or work for you; is that fair?

A. Correct. They report directly to me.

Q. Gotcha.

Does Exhibit 3 and the work that is covered by the invoices in Exhibit 3 cover all of the work that Gryphon Strategies has done on this matter?

A. For data mining and analytics. Correct.

Q. Is there other work besides data mining and analytics that Gryphon Strategies has done on this matter?

MS. CONROY: Objection. You can answer.

A. Yes.

Q. And what category of other work?

MS. CONROY: Just before you answer, I don't want -- this is an area where there is some attorney work product. If you inquire a little bit more, it has nothing to do -- Lacey is not involved in that.

Page 24

MS. LEVY: Okay.

BY MS. LEVY:

Q. For the questions that I ask you about this other work, I do not want you to answer any specifics of that. We are very worried about attorney-client privilege, so we don't want, we don't want anything confidential that attorneys have said to you or you have said to attorneys or that you know of that attorneys have said to Gryphon or Gryphon has said to be revealed in my questions.

But, generally, is it true to say in addition to data mining and analytics, Gryphon Strategies has performed other services related to the opioid matter?

A. That is correct to say.

Q. And have you been involved in any work other than data mining and analytics for this matter?

A. No. I have only done data mining and analytics for this matter.

Q. Have you participated in meetings related to the other work that Gryphon

Page 25

Strategies is doing or has done for the opioid matter?

A. No.

Q. Has there been any overlap between your work and the other work that Gryphon Strategies is doing?

A. How would you define overlap?

Q. So is there a wall between you and your team that Gryphon has put in place and others at Gryphon who are doing different work?

A. No. We share an office. So like we're all in the same work space. Even physically, there is not a wall. But even metaphorically, no.

Q. I guess I should be more clear about that.

Has Gryphon Strategies put in place what lawyers would call a Chinese wall?

Are you familiar with the term "Chinese wall"?

A. Yeah, sort of.

Q. Has Gryphon Strategies put in

Page 26

1
2 place a procedure by which your team is
3 walled off from other teams at Gryphon
4 doing work on the opioid litigation?
5     A.  Not explicitly, no.
6     Q.  Have you had communications, you
7 personally, with others at Gryphon who are
8 doing other types of work other than data
9 mining and analytics about the opioid
10 litigation or the work that's being done in
11 the opioid litigation?
12     A.  Yes.
13     Q.  Who, just names of individuals,
14 who specifically have you communicated with
15 at Gryphon that's not on your team
16 regarding your work in this case?
17     A.  So in not great detail, my boss,
18 Jay Dawdy.  He is the president of the
19 firm.  Mostly just to update him on what
20 we're doing with all of our time.  And Eric
21 Nawrocki.  I can provide a spelling on that
22 one if that's difficult.
23     Q.  Who is Eric Nawrocki?
24     A.  Eric Nawrocki is another managing
25 director.

Page 27

1
2     Q.   And what is your title at Gryphon
3 Strategies?  You're a managing director as
4 well, right?
5     A.  Correct.
6     Q.  How many managing directors are
7 there?
8     A.  I think there's around four or
9 five.  I'd have to check the website to be
10 certain.
11     Q.  Have you done any work relating
12 in any way to the opioid litigation or your
13 retention in this case with individuals
14 outside of the New York City office?
15        MS. CONROY:  You mean Gryphon?
16        MS. LEVY:  Yes.
17     A.  So Jay Dawdy is primarily based
18 in the White Plains office.  Eric is based
19 primarily in the New York City office, if
20 that helps answer the question.
21     Q.  And how has the work that you
22 have done on data and analytics overlapped
23 with the work that -- with what you've
24 communicated with others in the firm?  What
25 is the overlap?

Page 28

1
2     A.  There's very little.  Their work
3 is primarily concerned with people and
4 we're more with the numbers, to the extent
5 that the people have numbers.  For example,
6 like numbers of prescriptions in the IQVIA
7 data, that would be one place where you
8 could imagine some overlap.
9     Q.  Have you shared data sets with
10 other teams in Gryphon working on opioid
11 matters?
12     A.  Data sets?
13     Q.  Yes.
14     A.  No.
15     Q.  Have you shared ARCOS data with
16 other teams in Gryphon?
17     A.  No.
18     Q.  Have you shared chargeback data
19 with other teams in Gryphon?
20     A.  No.
21     Q.  Have you shared any of the data
22 provided to you by the attorneys in this
23 case with others at Gryphon?
24     A.  Not in its raw form, no.
25     Q.  Have you shared in any form?

Page 29

1
2     A.  I have provided some aggregated
3 statistics.
4     Q.  What aggregated statistics have
5 you provided to others in your firm?
6     A.  One -- an example would be like
7 the prescriptions of a physician over time.
8 Just like in the report, we talk about
9 Adolf Harper, so the number of
10 prescriptions that Adolf Harper wrote over
11 time.
12     Q.  I think I understand.
13        So aggregated statistics relating
14 to individuals, is that the category of
15 data that you shared?
16     A.  Yes, individuals --
17     Q.  Individual prescribers?
18     A.  Yeah.  Maybe a pharmacy.
19     Q.  Is there any other category of
20 data that you can think of that you shared
21 with others that are not on your data and
22 analytics team?
23     A.  Not at this time, no.
24     Q.  Okay.
25        MS. LEVY:  I think we're up to

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1
2    Exhibit 4.
3        (Keller Exhibit 4, Resume of
4    Lacey R. Keller, not Bates-stamped,
5    marked for identification, as of this
6    date.)
7    BY MS. LEVY:
8        Q.  What is Exhibit 4?
9        A.  That's a question for me?  Sorry.
10       Q.  Yes.
11       A.  Okay.
12       Q.  It should be an easy one.
13       A.  Boy, I hope so.  That's my CV or
14   my resumé.
15       Q.  Okay.  And going back to
16   Exhibit 1, Exhibit 1, the last page of
17   Exhibit 1 on Exhibit A, No. 3 asked for a
18   "copy of the most current and accurate
19   curriculum vitae, CV, as of the date of
20   your deposition."
21       Is the document that we've
22   labeled Exhibit 4 a copy of your most
23   recent CV?
24       A.  Yes.
25       Q.  And when was this created?

Page 31

1
2        A.  Just before we filed the report.
3        Q.  And you haven't added anything to
4    your resumé since then?
5        A.  No.
6        Q.  Taking a look at Exhibit 4, and
7    starting at the top left, you are currently
8    a managing director at Gryphon where you've
9    worked from November 2017 to the present,
10   about a year-and-a-half, correct?
11       A.  That is correct.
12       Q.  Did you start at Gryphon as a
13   managing director or did you start with a
14   different title?
15       A.  I started as a managing director.
16       Q.  How did you get the job at
17   Gryphon?  Who hired you?  How did that come
18   about?
19       A.  Yeah, so at the time, I was
20   working at the Attorney General's Office
21   and Jay Dawdy had approached me about
22   coming to the firm to start their data
23   mining and analytics practice.  He thought
24   the work that we were doing at the AG's
25   office was super innovative and wanted to

Page 32

1
2    see if I'd be interested in doing that with
3    him.
4        Q.  Did you know Jay Dawdy before
5    that?
6        A.  No, I didn't.
7        Q.  How do you spell Dawdy?
8        A.  D-a-w-d-y.
9        Q.  Dawdy.  I'm from the south.  We
10   say "Dowdy."
11       A.  Yes.
12       Q.  And so how did he know about you?
13       A.  Boy, I have to remember.  I
14   believe we had an intern in common.  And so
15   I had an intern and then that intern went
16   to be his intern or staff.  And the intern
17   had said, boy, there's this lady, you need
18   to speak with her.  And so I think that's
19   how we got to know each other.
20       Q.  Have your job response -- what,
21   in general, are your job responsibilities
22   as a managing director at Gryphon?
23       A.  So generally that means running
24   the data team and building out that
25   practice.

Page 33

1
2        Q.  Do you have clients right now
3    other than clients related to this
4    litigation?  Not tell me what they are,
5    just a "yes" or "no" question.
6        A.  Yes.
7        Q.  What percentage of your work is
8    related to this litigation as opposed to
9    other clients not related to this
10   litigation?
11       A.  I don't have an exact number, but
12   the vast majority is this litigation.
13       Q.  Would you say like 75, 80
14   percentish?  I know you're estimating.
15       A.  Yeah, the data part of me doesn't
16   want to do that, but, yeah --
17       Q.  Okay.
18       A.  -- or more.
19       Q.  And not naming other clients,
20   particularly if they're confidential, but
21   other than this litigation, what types of
22   other clients and work are you doing in
23   addition to this?
24       A.  So we have governmental clients.
25       Q.  And your governmental clients, is

Highly Confidential - Subject to Further Confidentiality Review

Page 34

2 that related to pharmaceuticals or other
3 issues?
4      A.   Completely separate issues.
5      Q.   Okay.  Do you have any other
6 clients that relate in any way to
7 pharmaceuticals or opioids?
8      A.   No.
9      Q.   Okay.  Now turning to your work
10 at the New York Attorney General's Office,
11 how did you get that job?
12      A.   So I was at the union at the time
13 and was looking for the next step.  A
14 friend of mine had said that they were
15 looking for a researcher at the AG's
16 office, and I thought that would be at
17 first a pretty boring job and that I would
18 just be reading documents all day in a
19 taupe office.  But after meeting with them,
20 I realized it would be a pretty exciting
21 job because they wanted to build out a data
22 mining practice there and make leads out of
23 big data.
24      Q.   I'm smiling because I actually
25 did some research on you and I watched your

Page 35

2 YouTube video on this, and I've seen how
3 excitedly you describe particularly how you
4 thought it was going to be boring.
5          Is the work that you did -- you
6 were at the New York Attorney's General
7 Office from October 2013 through
8 November 2017, just over four years,
9 correct?
10      A.   That is correct.
11      Q.   Is the work that you did or the
12 categories or types of matters you worked
13 on all summarized on Exhibit 4 in the
14 section under New York State Attorney
15 General's Office?
16      A.   I am sure there's much more that
17 I worked on or supervised.
18      Q.   Okay.  Fair enough.
19          From your, from the YouTube
20 video -- you know what YouTube video I'm
21 referring to?  It was a Washburn alumni
22 thing?
23      A.   Yeah.
24      Q.   From the YouTube video, I -- you
25 made some comment about why you thought it

Page 36

2 wasn't boring, which is you realized that
3 you could take data and learn how to chase
4 leads.
5          Do you remember saying that?
6      A.   Yes.
7      Q.   Is that a good description of
8 what you were doing at the U.S. Attorney
9 General's Office?
10      A.   It's New York Attorney General's
11 Office and -- for the record.
12          Yeah.
13      Q.   I'm sorry.  I thought -- I didn't
14 mean to say U.S. Attorney General, I meant
15 to say New York.
16          So on your CV, you list several
17 areas in which you used data and data
18 mining techniques in order to generate
19 leads on cases.  And one is in the gun and
20 firearms space.
21          And a second one is using data
22 analytics to figure out leads on, I guess,
23 vendors with respect to Internet speed?
24      A.   Oh, yes.
25      Q.   I also see here, I'm combining

Page 37

2 your CV and your report, but experience
3 that you have with using data to generate
4 leads in the Airbnb rental space.
5          Is that also part of your work?
6      A.   Those all three are part of my
7 work, yes.
8      Q.   And you also used data analytics
9 to do modeling of landlord complaints?
10 Specifically, generate leads with, like,
11 landlords who are out of compliance with
12 tax laws?
13      A.   Oh, yes, that would be the
14 421(a).
15      Q.   I see that you, in your
16 experience, have used data to generate
17 leads on fake trades in foreign currency?
18      A.   Yes, I supervised that work, but,
19 yes.
20      Q.   In your, in the combination of
21 your report and other information I could
22 find about you and your CV, I see one area
23 where you have, where your work in data
24 analytics has overlapped with the
25 pharmaceutical industry, and that is when

Highly Confidential – Subject to Further Confidentiality Review

Page 38

1
2  you were modeling data that could help with
3  the deployment of Naloxone?
4      A.  Sure.
5      Q.  Am I correct about that?
6      A.  Yes, you're correct about that.
7      Q.  So up until your work on this
8  case, have you done any other work with
9  data and analytics related to the
10  pharmaceutical industry?
11      A.  Yes.
12      Q.  What was that?
13      A.  At a high level, it would have
14  been pulling publicly available data on
15  opioids, hospitalizations, opioid
16  prescribing, so that would be like the
17  public ARCOS reports.  And, I'm sorry,
18  those aren't prescribed, those are
19  shipments.  So the public ARCOS reports and
20  New York State hospitalization data, is one
21  example.
22      Q.  Okay.  So I want to make sure my
23  record is clear.
24          Prior to your work on this case
25  that you're doing through Gryphon, you had

Page 39

1
2  prior experience with a project at the New
3  York Attorney General's Office that related
4  to, I'm going to say, Naloxone deployment.
5          Is that a fair way to categorize
6  it?
7      A.  So the Naloxone deployment, yes,
8  that was the Community Overdose and
9  Prevention program is what we called it,
10  the COP program.  And so that was the
11  deployment of Naloxone around the state and
12  to police officers.  So we equipped every
13  police officer with the life-saving Narcan.
14  And so I managed that program.
15      Q.  And the way you did that,
16  describe what data you looked at generally.
17  We don't need to educate ourselves fully
18  about the project, but, generally, what was
19  the data, what did you look at, and what
20  was your methodology for working on the COP
21  project?
22      A.  So, I remember it was the fall
23  that Philip Seymour Hoffman died that that
24  was when the office took an interest in
25  opioids generally.  And so I was tasked

Page 40

1
2  with finding something that was of
3  importance to do in the area.
4          And so I wouldn't say that it was
5  really data driven.  I didn't deploy based
6  off of, you know, this is where the most
7  overdoses were occurring, because at that
8  time, that data set really didn't exist in
9  a robust fashion.
10          So it was just a "raise your
11  hand" program, if you will.  So if a police
12  department came to us and said, look, we
13  could use some money to buy this Narcan,
14  then we would give them that, that funds.
15      Q.  And so you analyzed a segment of
16  ARCOS data in your in your work in figuring
17  out how to best deploy Naloxone.
18          Is that true or false?
19      A.  That's not -- that would be
20  false.
21      Q.  Okay.  Did you not -- you did not
22  use ARCOS data?
23      A.  No.
24      Q.  Okay.
25      A.  Not for the -- I used ARCOS data

Page 41

1
2  for other things, but not for that, no.
3      Q.  Okay.  What in the past have you
4  used ARCOS data for?
5      A.  So I've only used the public
6  ARCOS data in the past, and that was mostly
7  to get a general sense of where the
8  shipments were going into New York.
9      Q.  And was that in conjunction with
10  the Naloxone project or was that for
11  something else?
12      A.  I can't be -- I can't really
13  recall the timing, but it was either around
14  that time or shortly -- or probably
15  subsequent.  I'm trying to think of where I
16  was, but, yeah.
17      Q.  And what did you do with the
18  results of your analysis?  What was the
19  results and what did you do with it?
20      A.  I wrote a pretty high level memo
21  about, like, the state of opioids in New
22  York as much as I could from public data.
23      Q.  And what did you -- what did it
24  say?
25      A.  I mean, I wrote it years ago, so

Highly Confidential - Subject to Further Confidentiality Review

Page 42

I can't remember exactly. But at a high
level, it would have the number of
shipments into the state. I think we were
able to get it by ZIP three. I think we
ended up mapping it to counties because
people have counties here, not ZIP codes.
        The number of deaths over time,
the number of hospitalizations over time,
specifically opioid-related deaths and
opioid-related hospitalizations.
        My guess is it would have also
included some open payments data as well
from Center for Medicaid Studies. And it
would have just summarized all of those at
a fairly high level.
    Q.  And do you know what it would
used for? Who it was submitted to?
    A.  I'm not sure exactly who it was
submitted to.
    Q.  Or what happened with it?
    A.  I don't know exactly what
happened with it. It's hard to tell.
    Q.  And what year were you conducting
this analysis and drafting this memo?

Page 43

    A.  I'm sorry, I have to think a
little bit. I want to say around
2015-2016.
        Things get picked up and put down
quite a bit in government, especially as
more pressing matters come to light so...
    Q.  On your -- so other than the work
you've just described in analyzing -- what
do you call that project that you just
talked about? It's different from the
Naloxone COP project. What do you call
that segment of work?
    A.  So that segment of work is a
pretty typical request of my team at the
AG's offices. Like, we were the -- we were
a data-driven research team, but
fundamentally we are a research team. So
give us the facts about whatever. So, you
know, you could call it briefings or
whatnot, but they were, you know, fact,
factual-driven documents so...
    Q.  Opioid research?
    A.  Yes. It was one example, but
I've written them on, you know, payroll

Page 44

cards and other unrelated things as well.
That's pretty much what we did at that
office, in addition to data support.
    Q.  So if I want to hone in on your
opioid and pharmaceutical experience, I --
you've told me about the Naloxone
deployment COP project. You've told me
about opioid research and data that you did
with the New York Attorney General's
Office.
        Aside from those two things, do
you have any other experience looking at
pharmaceutical data prior to this case?
    A.  Not prior to this case, that I
recall.
    Q.  Since you have begun your work on
this case, do you have any additional work
in the pharmaceutical space? Without
revealing any confidences.
    A.  Not that I am currently
contracted for or being paid to do work on.
    Q.  Like potential leads or potential
clients you're thinking about, but nothing
that you've actually done yet; is that

Page 45

correct?
    A.  Correct, nothing that I've
submitted an invoice to or could bill hours
to.
    Q.  Is the education in the top
right-hand corner that is reflected in
Exhibit 4, does this continue to be
accurate today?
    A.  Yes.
    Q.  Do you have a Master's of Arts
from the New School in 2010; is that
correct?
    A.  That is correct.
    Q.  Bachelor of Business
Administration in Economics from Washburn
University, 2008?
    A.  That is correct.
    Q.  And a certificate in data
science, it says General Assembly, 2015.
        What does that mean?
    A.  General Assembly, I'm not sure if
it's still around, was like an evening boot
camp for-profit -- I think it's a
for-profit institution to learn data

Page 46

1
2  science.
3      So I took a semester-long evening
4  class while I was at the AG's office to
5  kind of brush up on my skills because I
6  wanted to know a little bit more about the
7  field and where we were headed.
8      Q.  When you describe your profession
9  to people at the dinner table, are you a
10 data scientist?
11     A.  So that term gets thrown around a
12 lot.  I would say -- pure data scientist,
13 would say no.  I use that title because
14 it's a known quantity.  I would not call
15 myself a data scientist.  I'm a manager of
16 data scientists, is a much better
17 reflection of my --
18     Q.  Okay.  And what is the difference
19 between those two things in your mind?
20 I've never heard the distinction.  I'm
21 asking very genuinely.
22     A.  So a data scientist, in my
23 opinion, are going to be fluent in several
24 different languages.  And not like French
25 or Arabic like as you and I would think of

Page 47

1
2  them, but more like SQL, Python, whatever
3  programming languages you fancy, and be
4  able to work in multiple platforms easily.
5      I have those skills as well, but
6  I don't use them every single day like they
7  do.  And so I'm much more in the managing
8  and prioritizing of the workflow,
9  fact-checking, confirming that the process
10 is right, the assumptions are correct.
11     Q.  Got it.
12     And so if I ask you, what is your
13 expertise, how do you describe it to me?  I
14 am an expert in?
15     A.  I'm an expert in seeing the big
16 picture, the data sources that are
17 available to me, combining them, whether
18 they be public, private, confidential, and
19 using them for results.
20     Q.  I think I know the answer to
21 these, but I have to ask them anyway.
22     You don't have a law degree,
23 correct?
24     A.  That is correct.
25     Q.  And you are not an expert in the

Page 48

1
2  law, right?
3      A.  I am not an expert in the law.
4      Q.  And you don't intend to offer any
5  legal opinions in this case?
6      A.  I do not.
7      Q.  You have not ever worked in drug
8  enforcement, have you?
9      A.  No, I have never worked in drug
10 enforcement.
11     Q.  You are not an expert on the
12 Controlled Substances Act, are you?
13     A.  That is correct, I am not an
14 expert in the Controlled Substance Act.
15     Q.  You have not ever worked with the
16 DEA, have you?
17     A.  I have not.  I have not worked
18 with the DEA.
19     Q.  And you are not an expert in DEA
20 requirements and regulations, correct?
21     A.  That is correct.
22     Q.  You are not an expert or don't
23 intend to offer yourself as an expert in
24 what the DEA regulations actually mean,
25 correct?

Page 49

1
2      A.  That is correct.
3      Q.  You do not intend to offer
4  yourself as an expert in what DEA
5  registrants should or are supposed to do in
6  accordance with those guidance and
7  regulations, correct?
8      A.  That is correct.
9      Q.  And from a big picture level, if
10 I understand your report correctly, what
11 you have done is offer -- is do analyses
12 offering 16 different metrics and
13 illustrate what the results of those
14 metrics would show at a high level.
15     Do you agree with me that that's
16 what your report does?
17     A.  Yes.  I didn't actually count how
18 many metrics, so I'm taking your word that
19 there are 16.
20     Q.  I will represent to you that I
21 count 16.  But what I'm trying to parse
22 out, I don't mean to be mysterious, is I
23 want to make sure that I understand the
24 expertise you do intend to offer and the
25 expertise you don't intend to offer.

Page 50

2 So as I understand your opinions,
3 they are opinions from a data science point
4 of view that say if you ran these metrics,
5 here's what the results would look like.
6 Is that a fair assessment at a
7 very, very high level?
8 MS. CONROY: Objection.
9 You can answer.
10 A. I would say that's a fair
11 assessment. I was asked to apply the
12 compliance metrics to the labeler's data,
13 including chargebacks and IMS, IQ, yeah.
14 Q. And you don't intend to offer any
15 opinions about which one of those metrics
16 is the right one, do you?
17 A. That is correct. I don't endorse
18 any of the metrics or not endorse.
19 Agnostic would be the correct term, yeah.
20 Q. Okay. And you're not going to
21 offer any opinions that a particular
22 registrant should have or is required to
23 employ which ones of the metrics? That is
24 not what you were retained to do, correct?
25 A. That is correct.

Page 51

2 Q. And that is beyond your expertise
3 to do.
4 Do you agree with that?
5 A. That is correct.
6 Q. And I think, if I'm reading your
7 report correctly, you don't take any
8 opinion as to what the DEA or the
9 Controlled Substances Act means when it
10 talks about suspicious orders.
11 You are not taking a position as
12 to what specifically the DEA means, right?
13 A. Yes, I believe that's right.
14 Q. And I think it can make our day
15 easier if I understand the scope of this.
16 What you have done is you've used
17 a number of different metrics to show that
18 if a particular defendant had looked at the
19 data this way, this is what that defendant
20 would have seen.
21 Is that fair?
22 A. Yes.
23 Q. And when you use the term
24 "suspicious," which you do quite a number
25 of times in your report, what you mean by

Page 52

2 that is the result of your own metrics,
3 right?
4 A. Yes, you can characterize it that
5 way.
6 Q. You don't mean to use
7 "suspicious" as a technical term meaning
8 suspicious under the Controlled Substances
9 Act, right?
10 MR. LEDLIE: Object to the form.
11 You can answer.
12 A. Yes, when I say "suspicious," I
13 mean that they have either triggered one of
14 the metrics, which are -- I'll leave it at
15 that.
16 Q. Okay. And you haven't, you
17 haven't gone -- have you ever met with
18 anyone from DEA about this case and your
19 report?
20 A. I have not met with anyone about
21 this case or my report from the DEA.
22 Q. Okay. Why do you hesitate?
23 A. I have spoken to DEA officials
24 about the ARCOS data and how to process it,
25 but clarifying questions of what does an S

Page 53

2 mean and what does this correction number
3 mean like...
4 Q. Okay. When you have spoken to
5 the DEA, it has been entirely in the
6 context of the data itself, correct?
7 A. Absolutely.
8 Q. You've never asked anyone from
9 DEA, "Do these various metrics make sense
10 to you"? You've never asked that question?
11 A. Never.
12 Q. And you've never asked anybody
13 from DEA, "Are these metrics in line with
14 what DEA expects or requires"? That's
15 nothing you've ever asked the DEA, correct?
16 A. That is correct.
17 Q. And that wasn't -- the point of
18 your report is not to say what the DEA
19 requires, but rather to say what the data
20 had available for people to look at.
21 Is that a proper simplification?
22 MS. CONROY: Objection.
23 You can answer.
24 A. I would say, yes, it was what
25 data was available to apply the -- what

Page 54

1
2  data was available to apply the compliance
3  metrics and what those metrics would have
4  revealed.
5      Q.  And, again, I think you've
6  answered this, but I want to be sure.
7          You do not offer the opinion that
8  any defendant had an obligation to apply
9  any of the particular compliance metrics,
10 right?
11     A.  That is correct.
12     Q.  And it is also beyond your
13 expertise to opine on what would have
14 happened in the real world if someone had
15 applied the metrics?  That is beyond what
16 you are an expert in, correct?
17         MS. CONROY:  Objection.
18         You can answer.
19     A.  Yes.  There is a section in the
20 report, the small labeler impact section,
21 that, depending on how this question is
22 worded, might come in conflict with that,
23 but that's not the intention.
24     Q.  We'll get to that.
25         But just generally, in the small

Page 55

1
2  labeler impact, in your own words, you
3  phrase it as a hypothetical, right?
4      A.  Correct.
5      Q.  You aren't suggesting -- the
6  defendant that's subject to the small
7  labeler impact is Janssen, correct?
8      A.  Yes, I believe so.
9      Q.  And what you do in that section
10 is you model, hypothetically, if Janssen
11 had looked at the data this way, then
12 hypothetically, orders could have been
13 stopped, right?
14     A.  That is correct.
15     Q.  But you do not go further in this
16 report to opine that Janssen had an
17 obligation to do that or should have done
18 that or that the DEA expected Janssen to do
19 that.
20         That's beyond your expertise,
21 right?
22     A.  That is beyond, yes.
23     Q.  Okay.  And, also, you don't know
24 or you don't have the expertise to know --
25 you don't consider yourself an expert in

Page 56

1
2  DEA reporting requirements, do you?
3      A.  No.
4      Q.  And you don't know what triggers
5  a reporting requirement for a manufacturer?
6      A.  No.
7      Q.  You don't know what triggers a
8  reporting requirement for a distributor, do
9  you?
10     A.  No.
11     Q.  And you don't know what triggers
12 reporting requirements for pharmacies?
13     A.  No.
14     Q.  It is beyond the scope of your
15 expertise to opine on what triggers a
16 reporting responsibility specifically?
17 That's beyond what you have been asked to
18 do here, correct?
19     A.  Correct.
20     Q.  And also just to make sure we
21 narrow in on what your opinions are, you
22 are not an expert in what DEA does with
23 suspicious reports?  That is beyond your
24 expertise as well, right?
25     A.  That is correct.

Page 57

1
2      Q.  And I think there are places in
3  your report where you talk about orders
4  that could have been stopped.  And I just
5  want to make sure that I understand the
6  parameters of what you intend to say about
7  that.
8          When you talk about orders that
9  could have been stopped, you mean from a
10 data perspective hypothetically, correct?
11     A.  Yes.  I mean that the compliance
12 metrics showed that order or that triggered
13 that order and so, yes, it could have been
14 stopped.
15     Q.  So someone, somewhere could have
16 stopped those orders?
17     A.  Yes, they could have seen it or
18 stopped it.
19     Q.  But beyond what the data shows,
20 do you have any opinions whatsoever on how
21 that would work in the real world?
22         MS. CONROY:  Objection.
23         You can answer.
24     A.  No, I have no opinions on the
25 real world.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

2  Q. So going back to what we were
3 talking about, Section 9, in the small
4 manufacturer impact -- I think I've gotten
5 it wrong. It's called...
6  (Document review.)
7  Q. Small labeler impact.
8  You use the term "labeler" and
9 "manufacturer" interchangeably, correct?
10  A. I do.
11  Q. Actually, you just use the term
12 "labeler"?
13  A. I think I use the term "labeler."
14 I think at the beginning of the report, in
15 the event that we do say "manufacturer," I
16 always mean labeler because I...
17  Q. Why do you do that, just out of
18 curiosity? Most of the time I hear people
19 talk about manufacturers. Why do you make
20 that distinction?
21  A. So as I understand it from when
22 we process the data from the FDA, they call
23 it the labeler. So when they say that the
24 NDC was labeled by that entity, that was
25 the -- I understand that to be like the

Page 59

2 last person that put that, if you will, a
3 box together.
4  So I don't know how often that
5 box was created by somebody else and
6 labeled by someone else. They might always
7 be the same. But to be most correct, I
8 wanted to use the DEA's and the FDA's
9 terminology. I'm not sure which one, where
10 that term came from, but I saw that as part
11 of the data set.
12  Q. And so going back to the small
13 labeler impact, when you talk about orders
14 that could have been stopped, you did not
15 analyze how that would have happened, who
16 would have stopped the orders, who had a
17 duty to stop the orders, what would have
18 had to happen to stop the orders? You
19 didn't do any of that work, did you?
20  A. Correct.
21  Q. And you certainly don't intend to
22 opine that Janssen, in particular, should
23 have stopped those transactions. That is
24 beyond what you're saying. You're simply
25 saying it could have happened, correct?

Page 60

2  A. That is correct.
3  Q. And really, as you sit here, you
4 don't even know how Janssen or any other
5 registrant would actually stop those orders
6 in practice in the real world? That is not
7 something that you have ever studied or
8 know if it would even be possible, right?
9  A. That's correct.
10  Q. Okay. So let's go to the
11 summary. Let me mark your report as
12 Exhibit 5.
13  (Keller Exhibit 5, Expert
14  Analysis of Lacey R. Keller, not
15  Bates-stamped, marked for
16  identification, as of this date.)
17 BY MS. LEVY:
18  Q. Do you recognize what we've
19 handed you as Exhibit 5?
20  A. I do.
21  Q. What is that?
22  A. That is my report.
23  Q. How did this document spring
24 forth into the world? What -- who typed
25 it? Whose computer was it on? How did it

Page 61

2 get created?
3  A. So it was a collective effort by
4 my team. So we have folks working on some
5 of the coding, some of the data loading,
6 some of the writing. It sits on my
7 computer, their computers. But all of it
8 is in my team.
9  Q. And you said there were roughly
10 six people working under you on your team
11 to create Exhibit 5?
12  A. Yes.
13  Q. Nobody working above you to
14 create Exhibit 5?
15  A. Correct.
16  Q. And you communicated with the
17 lawyers in this case to prepare Exhibit 5,
18 correct?
19  A. Correct.
20  Q. And what lawyers specifically did
21 you communicate with in your work in this
22 case?
23  A. I'd have to think, but primarily
24 Linda Singer.
25  Q. Can you think of any other

Highly Confidential - Subject to Further Confidentiality Review

Page 62

2 attorneys that you worked with other than
3 Linda Singer?
4     A.   Jayne Conroy.
5     Q.   Anybody else?  Any man attorneys
6 or just -- did you have an all-women team?
7     A.   We're a strong team.
8          Not that I can think of at this
9 time.
10    Q.   And who typed the report?
11    A.   The report was primarily typed by
12 one of my staffers and then myself as well.
13    Q.   Just very generally, like what
14 was the process in writing it?  Who did
15 what in the process?
16    A.   Sure.
17         So there's a pipeline.  So we --
18 you know, someone is usually in charge of
19 loading the data, so bringing it in.
20 Another person is in charge of the metrics
21 and applying them.  Another person is in
22 charge of pulling charts, tables and
23 graphs.  And another person is in charge of
24 making everything look pretty, write the
25 words.  And then it goes and flows up to

Page 63

2 me.
3          And then to the extent that I
4 interject myself, either willingly or
5 unwillingly from my staff, along each
6 different places is how that usually looks.
7     Q.   And then did you ever -- strike
8 that.
9          For the 16 different analyses or
10 the 16 different metrics, those metrics,
11 you were asked to run by the attorneys in
12 the case?  They were not metrics that you
13 yourself thought of, correct?
14    A.   I would say that is correct.  We
15 didn't create a metric to the extent that
16 multiple distributor was kind of like --
17 there was no, "here's how to apply a
18 multiple distributor metric."  You are just
19 looking for whether or not they exist or
20 not.  Everything else was either created by
21 another entity or found by us, if that
22 makes sense.
23    Q.   So I guess that's what I'm trying
24 to figure out.
25         If we look at the index of your

Page 64

2 report, so Exhibit 5, page 2 is the index.
3 And particularly in J, Compliance Metric
4 Application.
5          Do you see -- are you with me?
6     A.   I'm with you.
7     Q.   The twice trailing 12-month
8 average, which you referred to as the
9 double national average metric, that's a
10 metric that the lawyers in the case asked
11 you to run, correct?  You didn't develop
12 that?  You didn't think of that yourself,
13 right?
14    A.   I would say that's a fair
15 representation.
16    Q.   Same is true for the triple
17 national average right below, right?  The
18 lawyers asked you to do that analysis; you
19 didn't generate that?
20    A.   I would say that's a fair --
21    Q.   Same with the McKesson 8,000 rule
22 metric, the lawyers in the case asked you
23 to run that metric; that's not something
24 you thought of on your own, right?
25    A.   Correct.

Page 65

2     Q.   The same with the trailing
3 six-month threshold, which you referred to
4 as "common sense," that's something that
5 the lawyers asked you to run.
6          You didn't come up with that
7 yourself, right?
8     A.   Correct.
9     Q.   You who came up with the term
10 "common sense"?
11    A.   I've always heard of that metric
12 being called that.
13    Q.   That's not your term?  Somebody
14 else told that to you?
15    A.   That's correct.
16    Q.   And you certainly don't use that
17 term to mean that it's your opinion that
18 this is the common sense answer.
19         That is not how you use that
20 term, correct?
21    A.   Correct.  It's any one of these
22 that has quotes in it is -- well, really,
23 that is the only one that does after the
24 correction sheet, so, yes.
25    Q.   And is it your opinion that J4,

Highly Confidential - Subject to Further Confidentiality Review

Page 66

the maximum monthly trailing six-month threshold, is the most common sense in the ordinary use of that term? That is not your opinion, is it?

A. That is not my opinion.

Q. Okay. And then No. 5, the Qualitest, Endo, 25/50 percent national average, the lawyers in the case asked you to run that.

That was not a metric you came up with, right?

A. Correct, with a clarification.

So on some of the labeler metrics, some of them were found by attorneys and some we found on our own by reading documents.

Q. So that's exactly what I want to find out.

Which ones did you find all on your own that lawyers didn't ask you to do?

A. I don't know specifically. I actually didn't keep track. It was kind of a --

Q. All of the documents that you

Page 67

were provided in this case were provided to you by the lawyers in the case, right?

A. No. We had access to anything that we had asked for, and I also could search for documents.

Q. So what documents -- did you get any documents that did not come to you through the lawyers in the case?

A. Yes.

MS. CONROY: Objection.

BY MS. LEVY:

Q. And what types of documents were those?

A. There were a few compliance documents --

Q. Let me -- I think we might be talking -- I might be asking the question in a confusing way.

Internal company documents that you reviewed, those you were given access to by the lawyers in the case, right?

A. That is correct. True. Let's say relativity.

Q. Okay. And how did that process

Page 68

work? Did you say, I'd like to see documents of X category, provide them to me? Or did you search the whole relativity database and found them on your own? Just generally, how did that process go?

A. A little bit of both. So to the extent that lawyers had already identified documents of categories, so we said give me compliance documents, those would be already provided to us.

To the extent we felt like we wanted to find more, we'd go looking.

Q. Going back to the index of Exhibit 5, No. J5, this Qualitest, Endo metric, that was a metric that the attorneys asked you to run, correct?

A. Correct, or that we found.

Q. You don't know which?

A. I don't. I'm sorry, I don't know which.

Q. And what about No. 6, J6, the Qualitest, Endo 30,000 rule, that's a metric that the attorneys asked you to run? That was their idea, correct?

Page 69

A. Or that we found.

Q. You just don't know?

A. I just don't know. I didn't keep track.

Q. Same with 7, 8, 9, 10, 11, 12, whose idea was it to run those metrics? Are these things that you thought of out of the blue or metrics that the attorneys asked you to run?

MS. CONROY: Objection.

A. They're metrics that either the attorneys asked us to run or that we found in the compliance documents.

Q. And you don't know which?

A. I don't know. I mean, I do remember Mallinckrodt was known at the beginning, but I don't remember at what point these we found and others were given.

Q. And then for part 1, the manufacturer prescriber analysis, was the methodology to look at IQVIA data and come up with this analysis, was that your idea or was that something that the lawyers asked you to do?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

2     A.   That was what lawyers had asked
3  me to do.  They had asked me to apply the
4  known compliance metrics to labelers' data
5  which would have included chargebacks and
6  IQVIA.
7     Q.   And then for part 2, the
8  manufacturer to pharmacy analysis, that
9  also was something that the lawyers asked
10  you to do; they asked you to apply these
11  various metrics to chargeback data,
12  correct?
13     A.   To chargeback data, correct, or
14  867 data.
15     Q.   What is 867 data?
16     A.   So I want to make sure I get the
17  definition right because -- so let me flip
18  to my report.
19          (Document review.)
20     A.   Sorry, I wish you could do a
21  control F while you're in the room.  It
22  would make things is so much easier.
23     Q.   Can you do that?  I'll see if I
24  can get Catie to narrow it quickly.
25          (Document review.)

Page 71

2     A.   No, I can't find the definition.
3  But I understand it to be -- go ahead -- to
4  be data that the labelers have at their
5  hands of where their opioids are going down
6  to the pharmacy level.
7     Q.   Do you know anything else about
8  867 data or does that reflect your entire
9  understanding?
10     A.   I mean, I have some backup with
11  me that I can pull up if you'd like.  But I
12  don't have a deep, deep knowledge of it.  I
13  understand just generally definitionally
14  what it was and then what was provided to
15  me.
16     Q.   And your understanding of what
17  867 data is comes from what the attorneys
18  told you in this case, correct?
19          MS. CONROY:  Objection.
20     A.   I also have a few documents that
21  are in this list and reading through
22  depositions of, like, understanding what it
23  was.
24     Q.   How comprehensive is 867 data?
25  Who has it and to what extent do they have

Page 72

2  it?  Do you know that?
3     A.   I only know what 867 data I
4  received.  And I believe I only received it
5  from Purdue, but that -- that at least is
6  all I've seen.
7     Q.   Okay.  And you didn't do any
8  analysis on anybody else's 867 data other
9  than Purdue?
10     A.   That I was aware of, yes.
11     Q.   Okay.  What is 852 data?
12     A.   It's just another type of data
13  that labelers have to them.
14     Q.   Can you be more specific than
15  that?
16     A.   I don't -- I have never seen it,
17  so I don't know that much about it.  But I
18  understand it to be more of a labeler to
19  manufacturer.
20     Q.   What it is, who has it, how
21  comprehensive it is, all of that is beyond
22  the scope of your expertise, correct?
23     A.   For 852 data, yes.
24     Q.   And 867 data, too?
25     A.   Correct.  I would say I only use

Page 73

2  the data as I saw it and know of that exact
3  data set and those Bates numbers.
4     Q.   When you used the term -- strike
5  that.
6          Chargeback data, you are familiar
7  with and did a number of analyses on
8  chargeback data, correct?
9     A.   That is correct.
10     Q.   I am not an expert in data
11  science, so I'm going to try to get this
12  right.
13          But in your backup files, you
14  have an enormous file with all of the
15  chargeback data that you were given in this
16  case, correct?
17     A.   Yes.  I think you're referring to
18  the aggregated, we call it the chargeback
19  summary table.
20     Q.   And the title of that file is
21  called chargeback_flagging, correct?
22     A.   So I think there are two tables.
23  There's one, the base chargebacks table,
24  and then that table is used to run
25  flagging.  And when I say "flagging," I

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1
2  mean the compliance metrics.
3      Q.  The metrics that are reflected in
4  your report.  I tried to print it.  It was
5  so --
6      A.  Oh, no.
7      Q.  It was very hard.
8          But if I understand -- I've done
9  some digging in your backup files.
10         You were provided nationwide
11 chargeback data, correct?
12     A.  I think so, yes.
13     Q.  And one of the columns in the
14 enormous amount of data is Buyer County,
15 correct?
16     A.  Correct.
17     Q.  And that allowed you to look at
18 chargeback data by county?
19     A.  Yes.
20     Q.  So you can isolate a chargeback
21 in Cuyahoga County or in Summit County,
22 right?
23     A.  Yes, to the best that we could
24 identify the county, because not all
25 chargeback data had a county.

Page 75

1
2      Q.  Okay.
3          MS. LEVY:  Can we take a break?
4  Thanks.  Let's go off the record.
5          THE VIDEOGRAPHER:  The time is
6  10:19 a.m.  We are now off the record.
7          (Recess is taken.)
8          THE VIDEOGRAPHER:  The time is
9  10:37 a.m.  We are now back on the
10 record.
11 BY MS. LEVY:
12     Q.  Ms. Keller, before the break, we
13 talked about several data sets, including
14 ARCOS, A-r-c-o-s, data.
15         To what extent did you use ARCOS
16 data for your report in this case?
17     A.  I believe there is one metric
18 that required the use of ARCOS data.  And
19 that would be the Qualitest 25, 50.
20     Q.  On page 18 of your report?
21     A.  18 to 19, yes.
22     Q.  Can you turn with me to page 85
23 of your report?
24         (Witness complies.)
25     Q.  Specifically, paragraph 159.  In

Page 76

1
2  159(b) -- well, let me back up.
3          Page 85 of your report describes
4  the methodology you followed in this case,
5  correct?
6      A.  To the best that we could, yes.
7      Q.  And Section 1 in paragraph 159 on
8  page 85 describes how you treated six of
9  the labeler defendants.
10         Do you see that in paragraph
11 159(b)?
12     A.  Yes, table 75.
13     Q.  Okay.  Table 75 on page 85 shows
14 how you have grouped particular labels into
15 combined labeler names.
16         Is that what that table reflects?
17     A.  Yes.
18     Q.  So how did you come up with these
19 groupings?  What methodology did you use to
20 come up with these groupings?
21     A.  I understood them to be the
22 subsidiaries or part of the grouped
23 labeler.
24     Q.  And how did you arrive at that
25 understanding?

Page 77

1
2          Is that something that the
3  lawyers told you?
4      A.  Yes, through our own research,
5  through what the lawyers told us, through
6  corporate filing documents that we had
7  access to, yes.
8      Q.  Did you review corporate filing
9  documents in order to come up with these
10 groupings in table 75?
11     A.  It was a summary of corporate
12 filing documents.  So it was like, you
13 know, for example, this entity and this
14 entity cite this filing document.
15     Q.  So you had access to a summary of
16 the corporate groupings in order to come up
17 with table 75?
18     A.  I think that would be correct.
19     Q.  I don't see that cited anywhere
20 in your report.
21         Where is the cite to whatever it
22 was that you used to come up with these
23 groupings?  Where is that summary?  Where
24 would I go to find it?
25     A.  We could provide that, I guess,

Page 78

if it wasn't part of the documents.

Q. Who prepared the summary of the documents that you used to do these groupings?

The lawyers prepared that, right?

A. Yes.

Q. Basically they told you who to use and what groupings, right?

A. That would be correct, yes.

Q. And table 75, it looks like for purposes of your report, you have assumed that the labelers in the right-hand column are subsidiaries of the parents in the left-hand column; is that correct?

MS. CONROY: Objection.

A. Yes, I think that's accurate.

Q. And so you're assuming that Allergan, Inc. is a subsidiary of Teva; is that right?

A. Yes.

Q. And looking also on table 7 of your report, which is on, I believe --

MR. LEDLIE: 29, I believe.

BY MS. LEVY:

Page 79

Q. -- page 29.

I'm sorry, that is the wrong one. Page 28 of your report, table 6.

(Document review.)

Q. Are you with me?

A. Yes.

Q. Okay. In the left-hand column, it says Parent Company. In the right-hand column, it has different label names.

Do you see that?

A. In the right-hand column, it has different label -- help me out here. Different than table 77?

Q. I'm sorry. Let me reask that in a less confusing way.

Right now I am looking at page 28 of your report in table 6.

A. I'm there.

Q. Okay. The left-hand column in table 6 is labeled Parent Company.

What does that mean?

A. It's like the parent company of the labelers to the right or how we, I would say, collectively referred to those,

Page 80

that company and its subsidiaries throughout the report or through -- it's a way to show who's part of -- when I say, let's say in table 8, when I say Endo, who is part of that Endo number.

Q. So in other words, taking the Endo example, when you refer to Endo, you are assuming that Endo, Par and Qualitest are all subsidiaries of Endo, correct?

A. Correct.

Q. And these were assumptions you were asked to make based on the summary you were provided? These are not independent conclusions of your own, correct?

A. Yes. To some extent. I mean, I've done some research on my own to make sure that we're getting the odd subsidiary names, to make sure that those are correct.

And I want to point out that table 77 is an ARCOS table. The groupings for the chargeback -- or, I'm sorry, for the IQVIA table -- I'm sorry. Let me make sure I'm saying this right.

Table 75, which is where we

Page 81

started, that's an ARCOS table.

Table 6 is an IQVIA table.

Q. In both sets of analyses, you were asked to use the same assumptions as to whose parent companies go with which subsidiaries, correct?

A. That's correct.

Q. And those were assumptions that the lawyers asked you to make, correct?

A. Yeah, or that we knew ourselves, yes.

Q. Okay. So looking specifically on page 28, we've talked about Endo. I want to look down at the Teva parent company.

And here, you have listed as Teva as the parent company and then you have Actavis, Allergan and Teva as the labelers that belong with that parent.

Do you see that?

A. I do see that.

Q. Did you do independent analysis to arrive at that specific grouping or is that one that the lawyers asked you to make?

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1
2     A.  A little bit of both.
3     Q.  Okay.  What specific independent
4  analysis did you do to determine that
5  Allergan is a subsidiary of Teva?
6     A.  We read online documents, some
7  corporate history of the companies on their
8  websites.
9     Q.  And who did that work?
10     A.  I reviewed it, as well as another
11  staff of mine.
12     Q.  And tell me what you know about
13  the relationship between Allergan and Teva.
14        What did your research on that
15  show?
16     A.  I'd have to recall exactly, but I
17  recall a long history of one -- the company
18  begetting another and those -- the
19  corporate history, I would say, is maybe
20  complicated.
21     Q.  You are not being offered as an
22  expert in corporate history, I assume?
23     A.  No.
24     Q.  And that is beyond your expertise
25  or anything that you would be comfortable

Page 83

1
2  opining on, correct?
3     A.  Yes, that would be correct.
4     Q.  You don't know, as you sit here
5  today, if Allergan is a subsidiary of Teva?
6  That is not something that you have
7  knowledge of?
8     A.  Not that is different than what's
9  purported in this report, then no.
10     Q.  So I think I need to get more
11  clarity on that.
12        You have treated Allergan as a
13  subsidiary of Teva for purposes of some of
14  your analyses in this report, right?
15     A.  That's correct.
16     Q.  But as you sit here today, you
17  don't know if, in actuality, Allergan
18  really is a subsidiary of Teva?  That's not
19  something that you know, is it?
20     A.  I think that's correct.
21     Q.  And in the ARCOS data and in the
22  IQVIA data, you recognize from your data
23  work that Allergan is, in fact, separate
24  from Teva?
25        They have different NDC labeler

Page 84

1
2  codes, correct?
3     A.  In ARCOS, they have different NDC
4  codes.  In IQVIA, IQVIA has its own IQVIA
5  code in there, and so that's assigned by
6  IQVIA.
7     Q.  In the IQVIA data, Allergan is
8  also different from Teva, isn't it?
9     A.  It appears so, yes.
10     Q.  All right.  So going back to your
11  report overview on page 16 where you begin
12  to describe in table 1, the labeler market
13  shares in Summit County and in table 2, the
14  labeler market shares in Cuyahoga County.
15        Do you see that?
16     A.  I do.
17     Q.  And what is the source of the
18  data that you drew from to create these
19  market shares?  The sources is IQVIA data,
20  correct?
21     A.  That is correct.
22     Q.  In this IQVIA data, you could
23  have separated out the entities that you
24  believe are subsidiaries of Teva, but you
25  did not do that, right?

Page 85

1
2     A.  I believe I could.
3     Q.  And same for Endo, you could have
4  separated out the entities that were
5  subsidiaries of Endo in your view, but you
6  did not do that, correct?
7     A.  Yes.  I could break Endo into
8  Endo generic, Endo labs and Par.
9     Q.  And you could break Teva into --
10  you could break Allergan out from Teva as
11  well?  That's something else you could have
12  done?
13     A.  I could break Allergan, Teva -- I
14  could break Allergan and Teva out from
15  Teva.
16     Q.  And what would, for example,
17  Allergan's market share have been if you
18  had broken it out in table 1 in Cuyahoga
19  and Summit?
20     A.  I'd have to run that number.
21     Q.  You've never run that?
22     A.  I don't think so, no.
23     Q.  Okay.  And the same is the true
24  for the other subsidiaries that you've
25  wrapped into the parents, you've never run

Highly Confidential - Subject to Further Confidentiality Review

Page 86

them separately, correct?

A. That is correct.

Q. And the reason you didn't is because you were asked to assume these groupings and to present the data this way; is that right?

MS. CONROY: Objection.

A. Yes or from our own understanding. Yes.

Q. Well, that's what I want to know. Which one was it?

With Allergan specifically, because that's my client, were you asked to group it with Teva or did you independently decide to do it that way?

A. I would say it would be most correct to say that we had grouped them from doing this for a long time and that it was agreed upon that that was okay.

Q. Okay.

A. So the data doesn't come that way. I have to process it and do the groupings. We presented the groupings. We continued with those groupings as agreed

Page 87

upon.

Does that help?

Q. And so when you talk in table 7, for example, about Allergan and you do break it out for table 7, what is the difference there in Allergan and Teva? What Allergan products?

A. I'm sorry, table 7?

Q. I'm sorry, my fault. Let me reask the question.

Table 6. I keep saying 7, but it's table 6.

In table 6 on page 28, what I really would like to understand is what you understand the difference between Allergan and Teva in that table?

A. So for that table, I think there were -- the purpose of this table is to show compliance metrics over time, and so there were differences over time.

And so to the extent that we could help show that granularity, that was the purpose of breaking them apart.

Q. But you didn't ask -- you

Page 88

didn't -- you were not asked to and you didn't look specifically at Allergan?

MS. CONROY: Objection.

A. As far as we were presenting results, let's say, ala, table 1 and 2, correct.

Q. Now beginning on page 16 in Section J, you describe your compliance metric application.

Are you with me?

A. Yes.

Q. And you state in paragraph 51, "I was instructed by counsel to apply metrics derived and used by any manufacturer or distributor and also to apply metrics applied in enforcement actions, McKesson and Masters, to all data sets to detect prescribing and purchasing patterns of unusual size, frequency and pattern."

Do you see that?

A. I do.

Q. When you say "I was instructed by counsel," who does that refer to? What counsel?

Page 89

A. That would refer to Linda Singer.

Q. And so when we talk about counsel, it's Linda Singer who asked you to do these various metrics that we are going to talk about in a minute?

A. Linda Singer provided us with the assignment, yes.

Q. In No. 1 -- well, this term that is used in the end of paragraph 51, "patterns of unusual size, frequency and pattern" and there is a cite there, what is that cite? Do you know?

A. I understand that to be the Code of Federal Regulations when it comes to diversion, but I'd have to have the actual language in front of me to know.

Q. I don't mean to give you a memory quiz on the cites. That is not the purpose of the question.

There are no specific requirements for how a registrant is supposed to calculate patterns of unusual size, frequency, and purchasing patterns of a -- sorry, let me ask the question again.

Page 90

2 You are not aware of any specific
3 rules or regulations for a registrant on
4 how to calculate patterns of unusual size
5 or frequency, correct?
6 A. So I think, as I stated earlier,
7 that's not my area of expertise.
8 Q. And you're not aware of any?
9 A. I wouldn't be able to say, but...
10 Q. Okay. The first metric that you
11 employ is double the national average. And
12 I'm looking now on page 17.
13 A. Correct.
14 Q. Are you with me?
15 And that metric, again, was one
16 that Linda Singer asked you to do, correct?
17 A. Correct.
18 Q. And you didn't find it in any DEA
19 regulations?
20 A. Correct.
21 Q. You are not aware of any place in
22 the real world where this metric is used,
23 correct?
24 MS. CONROY: Objection.
25 A. I wouldn't know for sure.

Page 91

2 Q. Do you have a guess?
3 MS. CONROY: Objection.
4 A. No.
5 Q. Okay. And you are -- I think you
6 already answered this earlier, but you are
7 not offering any opinion that this metric
8 is somehow a requirement on registrants,
9 right? That is not your opinion?
10 A. Correct. That's not my area of
11 expertise.
12 Q. And you are not offering an
13 opinion that failure to employ this metric
14 is somehow unlawful or misconduct?
15 That is beyond your expertise,
16 correct?
17 A. Correct.
18 Q. Going to the second metric that
19 you applied, triple national average,
20 again, that metric you were asked to run by
21 Linda Singer, correct?
22 A. Correct.
23 Q. That did not come from any DEA
24 guidance or any DEA regulations, correct?
25 A. Correct.

Page 92

2 Q. You do not know of any place in
3 the real world that applies that average,
4 correct?
5 MS. CONROY: Objection.
6 A. I wouldn't know.
7 Q. And it is not your opinion that
8 any registrant should have or had any
9 requirement to employ that metric in the
10 real world? That is not the opinion you're
11 offering in this case, correct?
12 A. Correct, that's not my area of
13 expertise.
14 Q. Looking at No. 3, the McKesson
15 8,000 rule, again -- I apologize if this is
16 getting tedious. The McKesson 8,000 rule
17 is a metric that you are asked to apply by
18 Linda Singer, correct?
19 A. Correct.
20 Q. And you were asked to look at
21 what would the data show if you used this
22 set of assumptions, right?
23 MS. CONROY: Objection.
24 A. Yes.
25 Q. Like No. 1 and 2, the McKesson

Page 93

2 8,000 rule is not a metric that you have
3 ever seen in any DEA guidance or
4 regulation, correct?
5 A. I think that's correct.
6 Q. Are you aware of any limitation
7 anywhere in the DEA regulations or in the
8 Controlled Substances Act or any guidance
9 interpreting them that puts a specific
10 limitation on dosage units?
11 MS. CONROY: Objection.
12 A. I would say that's outside of my
13 expertise.
14 Q. And it is not your opinion in
15 this case that any particular defendant was
16 required or obligated to employ this metric
17 in running its business, correct?
18 A. That's correct. That's outside
19 of my expertise.
20 Q. Even with respect to McKesson, it
21 is outside your area of expertise to say
22 that anybody, McKesson or anybody else, had
23 a duty to run a metric in the way that you
24 have, right?
25 A. Yes, I believe that is correct.

Page 94

1
2    Q.  Going down to No. 4, Maximum
3  Monthly Trailing Six-Month Threshold, which
4  in parentheses says, quote, "common sense."
5    I think you told me this before
6  the break, common sense is not a term that
7  you came up with, right?
8    A.  Correct.  I've heard this rule
9  referred to colloquially as the common
10  sense rule.
11    Q.  Who have you heard that
12  colloquially?  Who has referred to this
13  rule as the common sense rule?
14    A.  I honestly couldn't remember.
15  It's been -- I've heard it so many times
16  that I --
17    Q.  Had you heard it from lawyers in
18  the case?
19    A.  Sure.
20    Q.  Have you ever heard it from DEA?
21    A.  No.  Like I said, I only spoke to
22  the DEA about the ARCOS data.
23    Q.  Okay.  And it is not your opinion
24  in this case that this metric is the most
25  sensible metric?  Even though the term

Page 95

1
2  might suggest that, that's actually not
3  your opinion in this case.  Am I right
4  about that?
5    A.  That's correct.
6    Q.  Okay.  Have you read the Masters
7  Pharmaceutical opinion from the D.C.
8  circuit in 2017?
9    A.  I think I skimmed it a while ago.
10    Q.  You don't intend to offer any
11  opinions about what the law is as a result
12  of that opinion, correct?
13    A.  That's correct.
14    Q.  And you don't intend to offer any
15  opinions as to what the law might require
16  as a result of that opinion, do you?
17    A.  That's correct.
18    Q.  Okay.  Sorry, back to the common
19  sense threshold.  That is not a threshold
20  that came from -- where did that threshold
21  come from?
22    A.  Do you mean where was the metric
23  derived or?
24    Q.  Yes.  Where was metric derived?
25    A.  So I have it -- whatever citation

Page 96

1
2  I have there, that's where it would have
3  been derived from.
4    Q.  And beyond that, you don't know
5  anything other than what you were asked to run
6  it, correct?
7    A.  Yeah, I was asked to review the
8  metric and implement it on the data.
9    Q.  With respect to the Qualitest
10  Endo 25/50 percent national average, that
11  metric also came -- that metric was
12  presented to you by the attorneys as
13  something that you should run based on
14  documents that you were provided, correct?
15    A.  It was either a metric that we
16  found or the attorneys provided.  I
17  honestly can't remember.
18    Q.  And for this metric, which was
19  it?  Did you stumble across a document and
20  say, hey, we should run this?  Or did the
21  attorneys provide you documents and say
22  based on these documents, we'd like for you
23  to run it as if this were the law of the
24  land?
25    MS. CONROY:  Objection.

Page 97

1
2    A.  I'd really have to review my
3  notes to know for sure.  I don't remember.
4    Q.  Okay.  And you don't recall
5  seeing this metric in any directive from
6  DEA or any guidance from DEA?  That's not
7  your opinion in this case?
8    A.  That's correct.  I don't recall
9  seeing it in any guidance, nor is it my
10  opinion to offer.
11    Q.  And I think, to short-circuit
12  this, if we look at page 19, 20, 21, and 22
13  of your report, those list other metrics
14  that you were asked to run, correct?
15    A.  Yes.  I would say I was asked to
16  review the documents, interpret the metrics
17  and run them on the data.
18    Q.  You will not offer any opinion in
19  this case as to whether these metrics are
20  appropriate for a registrant to do in real
21  life, whether a registrant should have done
22  them or had any requirement to do them in
23  real life?  That is outside of the scope of
24  the opinions you intend to offer in this
25  case, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1
2     A.  Correct.
3     Q.  With respect to every one of the
4  metrics that are listed in 19 through 21 of
5  your report, you have no opinion as to
6  whether there was a duty to do them,
7  whether it was feasible in the real world
8  to do them, or what the result would have
9  been had a registrant attempted to
10 implement these metrics?
11        All of that is beyond the scope
12 of what you have been asked to opine on,
13 correct.
14        MS. CONROY:  Objection.
15    A.  So I would say all the metrics in
16 17 through 22, so all of them that we've
17 covered today and that are in the report, I
18 would not be offering that opinion,
19 correct.
20    Q.  Okay.  Let's go to page 23,
21 Manufacturer to Prescriber Analysis.
22        Table 4 reflects your work with
23 IQVIA -- is that how you pronounce it?  How
24 do you say it?
25    A.  I say IQVIA.

Page 99

1
2     Q.  IQVIA.
3     A.  I've heard it IQVIA.  I've heard
4  it all.  I'm from Kansas.  I'm not super
5  good at pronouncing words.
6     Q.  Me either.
7     A.  We said Par-mee-zian cheese for a
8  long time --
9     Q.  Really?
10    A.  -- instead of Parmesan.
11    Q.  Parmesan.
12        IQVIA, I say it both ways.
13        You looked at that set of data
14 and based on your data analytics, you
15 grouped prescribers by specialty and the
16 results of that work is reflected in table
17 4; is that right?
18    A.  Yes.  And the groupings are in
19 the methodology.
20    Q.  Now your report suggests that you
21 were missing data for 2017, right?
22    A.  For 2007.
23    Q.  I'm sorry, for 2007.
24        So your analyses skipped 2007; is
25 that right?

Page 100

1
2     A.  Yes, it does not include 2007,
3  which would only increase any of the
4  numbers or -- depending on the metrics,
5  either increased the number of transactions
6  or might impact this.
7     Q.  Do you know whether the 2007 data
8  is actually missing or whether it's
9  actually in your reliance materials but
10 just in a different format than the rest of
11 the years?  Have you looked at that issue?
12    A.  So I actually just -- we just
13 found this out this week that the 2007 data
14 is in the production and the reliance
15 materials that we listed.  It was in such a
16 different format in function, and we were
17 provided no data dictionary on how to
18 process it, that we didn't feel comfortable
19 with including it because it didn't look
20 like any of the other years.
21        We weren't quite sure if it was a
22 secondary file because we just had the
23 Bates number and nothing, like, else to
24 process it.  So we felt that it was most
25 conservative to leave it out as opposed to

Page 101

1
2  maybe including some data erroneously.
3     Q.  Okay.  That's what I thought you
4  would say.
5        Does anything that you have
6  subsequently seen in the 2007 data change
7  your report or your opinions in any way?
8     A.  So to be honest, we're still
9  loading that data.  But I would say that it
10 wouldn't because all it would do is just
11 create a bigger base on which to run
12 that --
13    Q.  And just really fill in the gap
14 of that one year in a 20-year period that
15 you didn't have hard data and had to
16 extrapolate, right?
17    A.  Correct.  And I would say there's
18 some metrics that have a lookback period
19 that are somewhat impacted by that lack of
20 data because you can't employ those when
21 you're missing a year of data, so those
22 would be impacted.
23    Q.  Do you have any present intention
24 to create a supplemental report in this
25 case?

Highly Confidential - Subject to Further Confidentiality Review

Page 102

2    A.  I don't know.
3    Q.  Do you have a supplemental report
4  in process?
5    A.  No.
6    Q.  Okay.  And if your opinions
7  change in any way as a result of additional
8  analysis of the 2000 [sic] data or for any
9  other reason, we would ask that you bring
10  that to the attention of counsel.
11    A.  Of course.
12    Q.  Okay.  Page 27 of the report,
13  paragraph 76, heading No. 1 at the top of
14  page 27.
15      Are you with me?
16    A.  I am.
17    Q.  It says, "Defendant access to
18  IQVIA data."
19      And then down in paragraph 78 you
20  make the statement that "Each of the
21  defendant labelers had access to IQVIA
22  XPONENT data."
23      Do you see that?
24    A.  I do.
25    Q.  That is an assumption that you

Page 103

2  were asked to make.  You did not look at
3  each labeler and do an analysis of what
4  data each labeler had during what time
5  periods in the real world?  You did not do
6  that, did you?
7    A.  I would say it's a mix.
8    Q.  Okay.
9    A.  It was an assumption that we made
10  at the beginning of the report.  But we
11  also, in part of the reliance materials
12  that are provided to you today, also
13  include dates in which we identified
14  defendant access to -- defendant labeler
15  access, I should be more specific, to the
16  IQVIA XPONENT data or purchase.  I should
17  say purchase, not access.
18    Q.  So let's go through on page 28 in
19  table 6.
20      For Endo, did you an analysis of
21  what IQVIA data Endo had in its files, what
22  type of IQVIA data Endo actually had, and
23  for what years in the 20-year time period
24  that you looked at?  Is that something that
25  you did?

Page 104

2    A.  I would say yes.
3    Q.  Okay.  And what is the answer for
4  Endo?
5    A.  I'd have to pull up my files to
6  look specifically.
7    Q.  You don't know?
8    A.  I don't remember, no.
9    Q.  Okay.  Do you know -- can you
10  say, as you sit here, are you going to give
11  the opinion that Endo actually had the full
12  set of IQVIA data in its files for the
13  whole 20-year period?  Is that an opinion
14  you intend to offer in this case?
15    A.  So I would say it's an assumption
16  of the report but not an opinion, yes.
17    Q.  Okay.  And so I just want to --
18  I'm not trying to be tricky.  I'm looking
19  at the first statement in 78.  You say,
20  "Each of the defendant labelers had access
21  to IQVIA XPONENT data."
22      What you mean by that is they
23  could have purchased that data, right?
24    A.  I would say that's correct, if
25  they didn't already purchase some form of

Page 105

2  it, yes.
3    Q.  And in -- some of the labelers or
4  some of the defendants in this case might
5  have purchased some data for some time
6  periods.  And you do not know and did not
7  do a deep analysis of every single labeler,
8  every single time period?  You didn't do a
9  look at what each labeler had in the real
10  world, right?
11    A.  We had a -- we had a high level
12  review, but I couldn't write a report on
13  each labeler's access on every year, no.
14    Q.  And the metrics that you run that
15  flow from the IQVIA data are based on the
16  assumption that any of these labelers could
17  have had it all, but not assuming that they
18  actually did have it all in the real world?
19    A.  Yes.
20    Q.  And --
21    A.  When you say "it all," I would
22  say -- I want to clarify that, if you're
23  saying that the Allergan data is it all.  I
24  don't know what the "all" could be from
25  IQVIA.  You know, I know only what Allergan

Highly Confidential - Subject to Further Confidentiality Review

Page 106

had produced. So to that extent.

Q. And so when you're talking about what Allergan produced, let's look at -- I think I know what you're referring to, but I want to make sure we're clear. It's footnote --

A. Actually I think it's in that --

Q. I think it's on page 28 and footnote 81 in your report.

When you talk about the data that Allergan produced, is that what you're referring to?

A. Yes. When I talk about the IQVIA data that we're using throughout the report, that was the Bates number given to me for that production.

Q. And you have no idea whether Allergan had that data in its possession during the time period you're analyzing between 2000 and -- or 1997 and 2017?

You don't know whether Allergan had that body of data then or purchased it later like for litigation? You don't know that, do you?

Page 107

A. I would not know that, no.

Q. Okay. And so you're not assuming -- let me phrase it differently. Strike that.

When you say in paragraph 78 that each of the defendant labelers had access to IQVIA data, you mean had access to the data that is referred to in 81, the footnote?

MS. CONROY: Objection.

A. I would say they could have had access to the data referred to in footnote 81.

Q. And you've drawn the exact distinction that I'm trying to hone in on.

They could have had access. You don't know and you did not analyze on a labeler-by-labeler basis who did have access to it and specifically when they had access to it and specifically which piece of footnote 81 that each labeler had access to? You did not drill down and look at the minutia of that, did you?

A. I would say some of the reliance

Page 108

that I've read today does look at that, but not every year for every labeler. It goes -- it reviews -- I don't even want to the say what percentage, but we did look at a high level to make sure. Or I would say the materials that we've provided to date will reflect, let's say, purchase orders from Purdue for several years of Xponent data and reveal -- and show what data or what baskets of data, I think is what they referred to them, might have been included as part of that purchase.

Q. I think I understand.

You have seen documents that reflect some purchases in some time periods of some Xponent IQVIA data, right?

A. Correct.

Q. You cannot say for Allergan what data Allergan had in what time period. That's not something you can do, right?

A. If it's in the reliance, then I could. But other than that, no.

Q. Gotcha.

All you know about who had what,

Page 109

when is what is in your reliance materials?

A. Correct.

Q. And for the Allergan data that you referred to in footnote 81, you do not know when that data was acquired or what portion of that data was received during the 20-year time period by Allergan or any other defendant in this case?

You only know snippets from other documents; is that right?

MS. CONROY: Objection.

A. Yes, I have documents that show purchases. Again, I don't have that data from that time provided to me.

Q. Okay. I think I understand.

And the thing I'm getting at, to demystify it, is you are not offering any opinions that the defendants in this case actually had all this data in their hands.

Your opinion is, if they had it and if they looked at it in the way I did, here's what the metrics would have shown.

Do you see the distinction I'm drawing?

Highly Confidential - Subject to Further Confidentiality Review

Page 110

2    A.  I think I see the distinction.
If we're talking about IQVIA, chargebacks,
they of course had.
5    Q.  Okay.  And you agree with me if
we are talking about IQVIA?  We'll talk
about chargebacks in a minute.  Am I right?
8    A.  I think so.
9    Q.  Okay.  Let's look at page 30 of
your report.
11   (Witness complies.)
12   Q.  Page 30 in table 9.  In table 9,
you take four of the metrics and show a
summary of what it would look like if these
metrics would have been run, correct?
16   A.  Yes.  We show what number of
prescriptions would have been flagged by
the compliance metrics if they were run,
yes.
20   Q.  And when you say in the
right-hand column any flag, again, this is
depending on the metrics, you get different
numbers.
24   If you use double national
average, you get a different number from

Page 111

2    triple national average, from McKesson
8,000, and from common sense.
4    Each of these metrics generates a
different number of flags, right?
6    A.  Correct.
7    Q.  You do not intend to offer any
opinion in this case as to which one of
these is right.  I think you've told us
that, correct?
11   A.  Right.
12   Q.  And relatedly, you don't intend
to offer any opinion that any particular
set of these prescriptions are suspicious
prescribing as the DEA would define it?
That is not what you're here to do,
correct?
18   A.  Correct.  Whenever we use the
word "suspicious," we mean that it tripped
one of the metrics.
21   Q.  When you use the term
"suspicious," you mean flagged by your
metrics?
24   A.  That's precisely what we mean.
25   Q.  And that is all that you mean by

Page 112

2    that?
3    A.  Correct.
4    Q.  And so under your metrics, in
table 10, we can see the number of
physicians in Summit and Cuyahoga County
who would have been flagged by the
compliance metrics that you use, right?
9    A.  Correct.
10   Q.  And depending on which metric you
use, your metrics would generate thousands
and thousands of physicians in these two
counties who get flags, right?
14   A.  I would say they're not my
metrics, but by applying these metrics,
yes, you would have.
17   Q.  And I think I know the answer
now, but you are not suggesting that there
are actually, looking at the first row,
4,207 family or general physicians in
Summit and Cuyahoga County that are
actually prescribing suspiciously?  That is
not what you mean to suggest here, correct?
24   A.  Correct.  What I mean to say is
that they were -- they tripped one of the

Page 113

2    compliance metrics.
3    Q.  Okay.  And in figure 2, figure 2
reflects what the dosage unit numbers look
like between some really tiny colorful
chart on the bottom left-hand side.
7    I think the orange chart at the
top is the dosage units reflected by any
flagged prescription of any of your
compliance metrics.
11   You see the orange one on top?
12   A.  It's black and white, but...
13   Q.  Oh, I'm sorry about that.  You
see the line at the top?
15   A.  I think it is orange.  The top
one mathematically should be any metric.
17   Q.  Okay.  And, again, when we're
looking at these, this is not information
that you are suggesting that the labelers
actually had, correct?
21   A.  Yes.  I'm saying that they could
have had.
23   Q.  Could have had.
24   And this is not -- you're not
opining on anything that the labelers could

Highly Confidential - Subject to Further Confidentiality Review

Page 114

have or should have done with this data? That is not what you're offering here?

A. It's a little confusing. The whole analysis is if they had applied, this would be the results.

But I am not saying that they should have. That would not be my expert opinion.

Q. Okay. And you say in paragraph 82 that you've done a diligent search and you haven't seen any labelers reporting any of these physicians to law enforcement.

Do you see where it says that in 82?

A. Correct. I do see that.

Q. My question is: What was the diligent search that you describe there?

A. So we were reviewing -- specifically, especially for the examples in the report, searching for their names, for documents within the production for those names would be one example of how we did that search.

Q. Flip with me to page 32 of your

Page 115

report, table 11.

A. Yup.

Q. In your prior answer when you say "those names," you're referring to the physicians that are listed in table 11, right?

A. The physicians in table 11, as well as any exemplar physicians in the report. I think Yang is the only one that's not part of table 11.

Q. Why is he not in table 11?

A. So from what I -- so table -- this is very confusing for people and I apologize.

These -- the intention of table 11 was to identify the physicians that labelers had documented somewhere that were suspicious. They said either for Purdue, for example, that would be your do-not-call list regency rule. I could not find Yang on those documents.

Q. But you don't know, as you sit here today, whether these doctors were actually reported to authorities? You

Page 116

don't know that one way or the other?

A. I would say I don't know that one way or the other.

Q. Okay. And you don't know if authorities actually investigated these guys? That is beyond what you would know, correct?

MS. CONROY: Objection.

A. To the extent that there isn't news articles. I mean, I think I do cite some news articles about some of these doctors, so I would assume an arrest -- or there was an investigation leading to an arrest.

Q. Other than the public information, you don't have any knowledge about investigations that might or might not have gone on about these physicians, correct?

A. Correct.

Q. And you did not take a look at what proportion of these doctors' prescriptions were lawful versus unlawful? That is not something that you were asked

Page 117

to do here?

A. Correct. I would not know what was lawful versus unlawful.

Q. Okay. And did you talk to anybody at DEA and ask if these doctors ever were on DEA's radar screen or what they knew about these doctors and when?

A. No. Like I said earlier, the only contact I've had with the DEA is just to talk about our ARCOS data process.

Q. And turning to page 33 of your report, figure 3, for one of those prescribers, this is an illustration of Dr. Sinoff's dosage units compared to other physicians in his specialty between '97 and 2017.

Is that what this chart reflects?

A. Yes.

Q. The limit of your opinion is: If the metrics I employed had been used, this is what they would show, correct?

A. I would say that there were -- to make this graph "no metrics needed to be applied," I just graphed the IQVIA data for

Highly Confidential - Subject to Further Confidentiality Review

Page 118

this prescriber.

Q. Well, you had to figure out a national average, you had to figure out what specialty, isolate the specialty, create an average, and then run the metric, right?

A. Yes, I did have to calculate an average for that specialty for that year. But then as far as flagging, that would be recorded in a separate table.

Q. Looking at figure 3, you're not going to offer any opinions as to, you know, whether a labeler should have sliced the data or looked at the data this way?

The "should have done" or "required to do" is beyond your opinion, correct?

A. Correct.

Q. You are not intending to offer any opinions as to what point in the timeline reflected in figure 3 a labeler might have a reporting duty with respect to this doctor, correct?

That's beyond the scope of what

Page 119

you have expertise to do?

A. Correct.

Q. You don't intend to offer any opinions as to what might have happened if someone reported Dr. Sinoff to someone else, what might have happened in the real world if that had happened? That is beyond what you will offer in this case, correct?

A. Correct.

Q. Somewhere in the report you conclude by using a phrase "that orders might have been stopped."

You haven't looked at and you don't know the process by which orders get stopped, do you?

A. Not thoroughly, no.

Q. Okay. And you don't have the expertise to offer opinions about how a distributor or a manufacturer or a pharmacy would stop an order? That is not -- that is beyond the limits of your expertise, correct?

A. Correct.

Q. Okay. And for each of the

Page 120

doctors that are analyzed in pages 32 through 52 of your report, again, your opinions offered at trial will be limited to this is what the data could have shown, but you do not intend to offer any opinions as to what should have been done, what was required to be done, or what would have happened in the real world had an action been taken, correct?

A. That's correct.

Q. Okay. Page 54 of your report in paragraph 115 -- sorry. Let me back up.

Page 53 gives us the heading "Small Labeler Impact."

We talked a little bit about this analysis before the break, correct?

A. Correct.

Q. I believe you agreed with me that the small labeler impact analysis is hypothetical only, correct?

A. Yes, hypothetical only.

Q. You do not intend to offer any opinions that this analysis should have been done by Janssen or anyone else,

Page 121

correct?

A. Correct.

Q. You have no idea how many opioids went into Cuyahoga and Summit County, how many of those opioids were excessive versus medically necessary? You have no idea of that, do you?

A. That's outside of my expertise, correct.

Q. Okay. And you do not intend to offer any opinions in this case that the actions of any manufacturer would have or could have prevented excess orders into Cuyahoga and Summit County? That is beyond your expertise?

MS. CONROY: Objection.

A. Sorry, I think so, yes. I would say throughout the report, we say if they had used the compliance metrics, they could have been identified, but nothing about should.

Q. And when you say "could have had a curtailing affect on the excess of opioids prescribed in the counties," do you

Page 122

1
2  see where it says that in 115?
3      A.  Yes, I'm there.
4      Q.  That is hypothetical only.  You
5  do not know whether there was, in fact, an
6  excess of opioids or to what extent the
7  opioids in Cuyahoga or Summit County were
8  excessive?  That is not something you know,
9  correct?
10          MS. CONROY:  Objection.
11      A.  Correct.
12      Q.  And you don't know and it would
13  be outside of your expertise to know how or
14  whether Janssen's actions could have
15  curtailed that and to what extent excessive
16  prescribing could have been curtailed?
17  That is outside of what you've been asked
18  to do here, correct?
19          MS. CONROY:  Objection.
20      A.  Outside of what we've offered
21  here of the hypothetical situation of what
22  the impact on the prescriptions would have
23  been, then no.
24      Q.  Okay.  Page 56 and 57 talk about
25  a baseline year analysis.

Page 123

1
2          Are you with me?
3      A.  Yes.
4      Q.  I am not data scientist, so let
5  me say that.  I'm just a lawyer.  But I
6  understand this analysis to be a
7  supplemental analysis that looks at what
8  would have been the change to certain of
9  your metrics if you had used 1997 as a
10  baseline year as opposed to using the
11  year-over-year actual averages.
12          Is that a fair simplification?
13      A.  That is a fair simplification.
14      Q.  Okay.  And what you conclude
15  about that is reflected in tables 30
16  through 32 on page 57, correct?
17      A.  Yes.
18      Q.  You do not have any opinion as to
19  whether it's more appropriate to use '97 at
20  a baseline year or to use the
21  year-over-year averages that are reflected
22  elsewhere in your report.
23          You are not taking a position on
24  that, correct?
25      A.  Correct.  It's another

Page 124

1
2  hypothetical situation.
3      Q.  It's just another option to show
4  the data, correct?
5      A.  That's a great way to say it.
6      Q.  And then in table 30, table 30
7  shows the additional physicians that would
8  have been flagged if you used '97 as the
9  baseline; is that right?
10      A.  Correct.
11      Q.  And under the, air quote, "common
12  sense" metric, if you used the '97
13  baseline, you would have gotten 8,736 more
14  physicians flagged than if you used the
15  year-over-year metrics, right?
16      A.  Yes.
17      Q.  You have no opinion on whether
18  there were really 8,700 suspicious
19  prescribers in Cuyahoga and Summit County?
20  You have no opinion whatsoever on that, do
21  you?
22      A.  Correct.
23      Q.  Okay.  Part 2 of your report is
24  Manufacturer to Pharmacy Analysis.
25          And this analysis uses chargeback

Page 125

1
2  data as opposed to IQVIA data, correct?
3      A.  Correct.
4      Q.  We talked about this before the
5  break, but you were provided a gigantic
6  chargeback data file, correct?
7      A.  That is not a full
8  representation.
9      Q.  Okay.  Sorry.  Let me get in your
10  words.
11          What did you have with respect to
12  chargeback data?
13      A.  I have thousands of chargeback
14  files that were produced by defendants.  So
15  those are, the Bates for those are in my
16  report somewhere.  And so to create the
17  massive chargeback file that you're looking
18  at that you tried to print out, which
19  probably broke your whole computer, was an
20  amalgamation of those data sets to make
21  them processable.
22      Q.  And, again, this data science is
23  too hard for me, but to the extent that my
24  lawyer brain can understand it, what I
25  believe you did was you put all of those

Highly Confidential - Subject to Further Confidentiality Review

Page 126

different kinds of files that you received from different productions of labelers into a chargeback file, and then you ran the metrics in various ways and created a file that's called chargeback_flagging that's giant in itself and shows you the times that the flags hit based on each of the metrics you ran.

Is that essentially what you did in your analysis?

A. Yes. So the process -- and I actually wrote the chargebacks scripts, so I can talk a lot about it. And so what it does, for some labelers, we had like two files. Mallinckrodt produced two. Those were just stacked on top of one another and put into the table.

Some had literally thousands of files that had to be appended onto one another because they were chunked in such a way to make them smaller, maybe more manageable for processing. I don't know the reasons behind that production. So those, again, were stacked on top of one

Page 127

another.

And then relevant fields moved over into the main chargeback table. So relevant fields would be date, who they went to, DEA numbers if they were there, so on and so forth.

Q. And you had the buyer county, so you could look at it -- you could look at the flags and your metrics specific to Cuyahoga and Summit County, correct?

A. Yes. So if the county wasn't provided in the data, some had it, some did not, we would find that county, either using ZIP code, buyer DEA, registrant information. From the ARCOS data, that would be another touch point for the ARCOS data. Or through just geolocation, which would be like a lat/long, latitude and longitudinal.

Q. Part of what a data scientist does and part of what's reflected in your invoices is, as I understand it, actually making the data usable so you can analyze it, right?

Page 128

A. That's the part they don't ever tell anybody. That is kind of the un-sexy part of the job is cleaning the data and putting it together.

Q. Okay. Looking at page 58 of your report, part L is where you describe the results of the analysis that you ran, right?

And if I understand the process, you made the data, and it seems like it wasn't easy, but you made the data usable and then you ran your metrics over it. And what is presented in the analysis, similar to what we talked about earlier, is what the results would be if these metrics were run, what your metric show.

Do I have that right?

A. Yes, I would say the data wasn't unusable, so I don't want to characterize it that way, but we made it that an easy-to-flag format. And, yes, we applied the metrics and here's what the results were.

Q. And, again, like the other

Page 129

analyses we've talked about, you do not intend to offer any opinions that any labeler should have done this; is that right?

A. Correct. It's a --

Q. You have no opinions as to whether there was any requirement by any defendant in this case to do analyses like you have done here, correct?

A. Correct.

Q. Okay. What your part L of your report shows us is merely if the data is looked at in this way, here's what it would show.

Do I have that right?

A. I think that is a nice representation.

Q. Okay. Paragraph 125 refers to chargebacks as a -- let me strike that.

Do you see paragraph 125 of your report on page 58?

A. I am there.

Q. Okay. In the third sentence there, you say, "For Mallinckrodt, between

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1
2   2009 and 2012, 96 percent of oxycodone
3   orders and 98 percent of oxycodone 30
4   orders were subject to chargeback request
5   and hence would be in the chargeback data."
6          And then you have a footnote
7   there.
8          Do you see that?
9          A.  Yes.
10          Q.  And then you go on to say, "In
11   2017, Teva stated that about 51 percent of
12   controlled substance transactions resulted
13   in a chargeback."
14          And then you have a cite there.
15          Is that correct?
16          A.  Yes.
17          Q.  Do you see that?
18          Okay.  The only information that
19   you rely upon to know the percentages of
20   how many of Mallinckrodt and Teva's sales
21   were subject to chargebacks is reflected in
22   those two footnotes in the reliance
23   materials you looked at that's cited there,
24   right?
25          A.  Yes.

Page 131

1
2          Q.  And you don't know more broadly
3   if those percentages could be expanded over
4   different years for different products?
5          That's beyond what you looked at?
6          A.  That's correct.
7          Q.  Okay.  And just in general, from
8   a data perspective, using like the higher
9   percentage of orders that are subject
10   to a chargeback, the more useful that tool
11   would be, correct?
12          MS. CONROY:  Objection.
13          A.  I wouldn't say useful.  It would
14   just provide more data on which to flag.
15          Q.  And that's what I wanted to
16   check.  Because in that next sentence in
17   paragraph 125, you say, "Even with only
18   partial coverage of downstream customer
19   purchases, chargebacks were a useful tool
20   in monitoring suspicious transactions at
21   the pharmacy level from a manufacturer's
22   perspective."
23          Do you see where I read that?
24          A.  I do.
25          Q.  Okay.  And the extent to which

Page 132

1
2   monitoring chargebacks could be a useful
3   tool varies depending on how many
4   chargebacks there are, right?
5          A.  I don't want to speak to its
6   usefulness, but I would say the more data
7   you have, the more of a complete picture
8   you have.
9          Q.  If you have one order, two
10   orders, you can't use that to analyze
11   chargebacks, correct?
12          A.  Of course --
13          MS. CONROY:  Objection.
14          A.  -- in this hypothetical, yes, if
15   you had two, that's a pretty difficult --
16          Q.  Too small to analyze?
17          A.  Yeah.
18          Q.  So when you say here -- is there
19   a threshold number beyond which I would not
20   consider that data really useful to me?
21          A.  No.  I don't have a hard
22   threshold that I would set, no.
23          Q.  In looking at table 34 on page
24   59, in the left-hand column we have the
25   parent companies.

Page 133

1
2          Are you with me?
3          A.  Yup.  Sorry.
4          Q.  The next column says Labeler
5   Names, and that shows what companies you
6   aggregated into the parent company.
7          Am I right about that?
8          A.  Yes.
9          And I think throughout this
10   section we keep things -- keep companies
11   generally separated based off the
12   productions.
13          Q.  Exactly where I was going.
14          So here, I represent Allergan,
15   and so I'll just look at Allergan, for
16   example.
17          Here, you break out Allergan from
18   Teva in the chargeback analysis, right?
19          A.  Correct.  Because of the
20   different productions.
21          Q.  The data that is reflected in
22   table 34, this shows nationwide data.  This
23   is not limited to Cuyahoga and Summit
24   County, right?
25          A.  I honestly don't remember.  I'd

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1
2 have to consult the code that pulled that
3 table to be for certain.
4     Q.  Okay.  You don't know one way or
5 the other as you sit here whether this
6 is -- the number of chargebacks in the
7 right-hand column, so the 7,519,723 for
8 Endo, is that total number of chargebacks
9 or is that in Cuyahoga and Summit County or
10 you don't know?
11     A.  I'd have to check the code.  I'm
12 really sorry.  Usually I put in the paren
13 what it is, and this one slipped by me.
14     Q.  So I'll represent to you -- I
15 don't mean this to be a trick.  I will
16 represent to you that from our analysis of
17 your data, this appears to be the
18 nationwide chargeback data.
19     A.  Okay.
20     Q.  And so for Cuyahoga -- do you
21 know how many counties are in the United
22 States, roughly?
23     A.  Well, over 3,000.
24     Q.  And so for each county, for
25 example Allergan, do you see there that it

Page 135

1
2 says 13,986 total chargebacks in the data?
3     That do you understand that to be
4 the total number of chargebacks that you
5 found in the Allergan data?
6     A.  Yes, after processing, yes.
7     Q.  And then -- and that's 16 years
8 of data, right?
9     A.  Yes.
10     Q.  And if you divide that by 3,000
11 counties, you only have a, on average,
12 couple chargebacks per county, right?
13     A.  Sure.  I don't want to do mental
14 math on camera, but sure.
15     Q.  I won't make you, I won't make
16 you commit to actual numbers, but I think
17 you get my point.
18     For -- I assume you're not going
19 to offer the opinion that analyzing a
20 handful of chargebacks less than a dozen
21 over a 20-year time period would be a
22 useful tool for suspicious order
23 monitoring.
24     You would agree with me that it
25 would not in fact be a useful tool for that

Page 136

1
2 based on a matter of data, correct?
3     MS. CONROY:  Objection.
4     A.  Let me think about this a little
5 bit.  I think it really depends on the data
6 and...
7     Q.  So I'm going to mark as
8 Exhibit 6, a very, very long piece of
9 paper.
10     (Keller Exhibit 6, Spreadsheet,
11     not Bates-stamped, marked for
12     identification, as of this date.)
13 BY MS. LEVY:
14     Q.  I'm going to tell you what this
15 is in a minute.  But take a look at it and
16 see if you recognize what this data is
17 before I describe it to you.
18     (Document review.)
19     A.  I do recognize it.
20     Q.  You do or don't?
21     A.  I do.
22     Q.  Okay.  This is what we were
23 talking about earlier, like, the ginormous
24 amount of information in the file that you
25 have.

Page 137

1
2     If you look at the top left-hand
3 corner, that says "chargeback_flagging."
4     Do you see that?
5     A.  Um-hmm.
6     Q.  Okay.
7     MS. LEVY:  [Directed to court
8 reporter] What exhibit are we on, 6?
9     THE REPORTER:  (Nodding
10 affirmatively.)
11 BY MS. LEVY:
12     Q.  So the chargeback_flagging file
13 has a very long number of columns that go
14 from left to right.
15     Do you see that?
16     A.  Um-hmm.
17     Q.  And reflected in each of the
18 columns are the metrics that you ran across
19 the chargeback data and the flags that came
20 up as a result; is that right?
21     A.  I think that's correct.
22     Q.  And so in other words, when I
23 looked across all of this data, the only
24 values in each of these columns are zero or
25 1.

Page 138

1
2    That's like a data science thing,
3  yes?
4    A.  Yeah, flagged or not flagged,
5  yeah.  It's not meant to be a joke or
6  anything.
7    Q.  We don't talk like that as
8  lawyers, but I think how I interpret this
9  data is, if there is a zero in the column,
10  that means it did not trigger a flag under
11  that particular metric.  And if there is a
12  1, this metric did trigger a flag.
13    Is that correct?
14    A.  That's great.
15    Q.  Okay.  And so if you look at, up
16  here in the top left, "query," it says
17  "from chargeback_flagging."
18    That is, you understand, to be
19  your chargeback flagging reliance file,
20  correct?
21    A.  Yeah, the table name is familiar
22  to me.
23    Q.  And where it says "Where labeler
24  name equals Allergan and buyer_state equals
25  Ohio and_county in Cuyahoga and Summit,"

Page 139

1
2  what does all that mean in data-speak?
3    A.  So this looks like a SQL query to
4  me that's pulling from a schema name DBO to
5  a chargeback flagging table, which is
6  probably your renaming of our table, which
7  is totally fine.  And it's pulling data
8  where it is Allergan as the labeler, where
9  the state is Ohio, and Cuyahoga and Summit
10  are the counties.  So good job at SQL.
11    Q.  And is this the way you would
12  query it if you want to see how many
13  Allergan chargebacks got a flag in Cuyahoga
14  and Summit County?  Is that the methodology
15  you'd use?
16    A.  I would take it one step further.
17  If I wanted to look at those that were
18  flagged for Allergan and Summit or
19  Cuyahoga, I would say where one of these
20  would be equal to 1.
21    Q.  So you would have to add up
22  everything in this table that got a 1 and
23  that's how you would know how many flags it
24  got?
25    A.  Or a really massive "or" clause

Page 140

1
2  where you would say where two times the
3  national average is equal to one or three
4  times the national average is equal to one
5  or so on and so forth.
6    Q.  But in Exhibit 6, each one of
7  those queries appears separately from right
8  to left.
9    Do you see that?
10    A.  They're columns, not queries,
11  but, sure.
12    Q.  Okay.  So what this shows us is,
13  there were a total of 15 chargebacks over
14  this 20-year period for Allergan drugs,
15  right?
16    A.  I'm not sure that that is correct
17  because this appears to be an aggregation.
18  Like I said, the chargeback flagging table
19  is an aggregation of chargebacks, and I
20  would have to look at this myself.  A
21  couple of them have 2s next to them so like
22  at line 7, there is a value of 2.  So this
23  could be 15, 16, 17, 18.
24    Q.  So I apologize.  And you have --
25  I accept your correction.

Page 141

1
2    So in the first column to the
3  right of the row number, we see total
4  number of chargebacks, and there is a value
5  of 1 listed for all of them except for row
6  7, 13 and 15, and that has two chargebacks
7  in each of those, correct?
8    A.  7, 13 and 15, correct, have two
9  chargebacks.
10    Q.  And so what that tells us is
11  there were 18 chargebacks, not 15, but 18
12  chargebacks over this 20-year time period
13  for the Allergan labeler code, correct?
14    A.  That were submitted to us or that
15  I had in the data set, yes.
16    Q.  Okay.  And I'm going to pass over
17  to you, just to make this easier and
18  faster, my version of this.
19    (Handing.)
20    A.  Do we need to mark this?
21    Q.  And I will represent to you that
22  I have highlighted the three transactions
23  or the three rows that reflect any flag
24  from your metrics.  So take a look at that
25  and -- is yours highlighted too?

Highly Confidential - Subject to Further Confidentiality Review

Page 142

2    A.  Yes.  Would you like this back?
3    Q.  Yes.
4        (Handing.)
5    Q.  Thank you.  This would make it
6  easier.
7        So what I've done in the
8  highlighted -- we highlighted everything
9  that had a flag.
10       Do you see that?
11   A.  Yes, sorry.  Yes.
12   Q.  And so what this shows us is that
13  in the 20-year time period, you came up
14  with or your data would reflect four
15  chargebacks that would get a flag if you
16  applied all of your metrics in total for
17  Allergan.
18       Do you see that?
19   A.  I'm trying to look at this
20  without grids, but I'm going to take your
21  word for it.
22       (Document review.)
23   A.  But I see where you're flagging
24  the 1s.  And there are a line, and so that
25  reflects that group of chargebacks to that

Page 143

2  buyer ID.
3    Q.  And then if you just look at row
4  11, for example, the total doses, what does
5  total doses mean?
6    A.  So one could think of that as the
7  number of pills it's like the dosage units.
8  And so generally, that's a field in the
9  data.
10   Q.  And if you look at the doses in
11  row 11, that's 200 doses.  And then right
12  beside it, it says total MMEs is 2,000.
13       Do you see that?
14   A.  Correct.
15   Q.  So it means 200 pills at 10
16  milligrams a pill in that order, correct?
17   A.  Because it is hydrocodone, yes,
18  you can do that math.
19   Q.  And so that reflects -- if you go
20  over to data date, that reflects 9/1/2005,
21  an order of 200 pills of 10-milligram
22  hydrocodone for a chain pharmacy in Summit
23  County, correct?
24   A.  Yes, it's a chargeback request
25  for that.  I wouldn't say it's an order.

Page 144

2    Q.  And my point from this data is --
3  did you look at what product this is?  You
4  didn't go behind any of the flags and look
5  for what product this is or how many
6  prescriptions this would fill?  That's not
7  something you did, is it?
8    A.  So to the extent that we needed
9  the product to get the MME conversion
10  factor, I would have looked at that on the
11  aggregate.
12       To the extent that the product
13  mattered for a particular flag, because I
14  think some flags go to the NDC, I would
15  have looked at that.
16       For this specific order on this
17  specific date to this specific buyer, I did
18  not look at that particular NDC code.
19       And to your second question, I
20  did not, across the board, analyze how many
21  prescriptions that would or should or could
22  have filled.
23   Q.  Okay.  And so I think just taking
24  a step back, there comes a point when you
25  have so little data that it is not useful

Page 145

2  for using as an order for suspicion.
3        Would you agree that that is true
4  in the abstract?
5        MS. CONROY:  Objection.
6    A.  As like the example that you
7  pointed out earlier, one or two, yes,
8  unusable.
9    Q.  Okay.  And in here, you do not
10  intend to offer any opinions that a flag
11  for a single order should have been labeled
12  by Allergan as suspicious?  That is beyond
13  what your offering in this case, correct?
14       MS. CONROY:  Objection.
15   A.  Yes, because you used the word
16  "should."  No, I'm not.
17   Q.  Okay.  Which of the orders that
18  were subject to the chargebacks in
19  Exhibit 6 are suspicious in your analysis?
20   A.  So I think that's what we were
21  covering earlier.  And for one, when I
22  answer this question, when I say
23  suspicious, they triggered the compliance
24  metrics.
25       So those would be this order here

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1
2 on row 15. I'm taking your math for it,
3 but it looks to be generally right. Row 11
4 and row No. 4.
5     Q. And you don't intend to offer any
6 opinion that actually in the real world,
7 these were suspicious orders or DEA would
8 consider these suspicious orders, correct?
9     A. Correct.
10     Q. Okay. And the same analysis,
11 this one in Exhibit 6 is unique to
12 Allergan.
13         Did you isolate for any other
14 labeler the exact number of chargebacks in
15 Cuyahoga and Summit County?
16     A. Where we would, like, create a
17 table like 34 for Summit and Cuyahoga, no.
18     Q. Okay. Why didn't do you that?
19 There are many other places in your report
20 that you looked specifically at Cuyahoga
21 and Summit County. Why did you not do that
22 for purposes of table 34?
23     A. Honestly, I have no idea, but
24 it's easy to run and could be done no
25 problem, and I'd be happy to do that for

Page 147

1
2 you guys.
3     Q. If you look at table 38 on page
4 61, this gives you -- the table is called
5 "Number of flagged buyers attributed to
6 each labeler."
7         Again this is on a national
8 level, not Cuyahoga and Summit, right?
9     A. I would think this would be
10 Cuyahoga and Summit.
11     Q. Do you know one way or the other?
12 (Document review.)
13     A. It should be Cuyahoga and Summit.
14     Q. Okay. And the numbers for
15 flagged buyers varied depending on which
16 one of the metrics or matrices you run
17 across table 38, right?
18     A. Correct.
19     Q. So if you run -- for Allergan, if
20 you ran the double national metric, you
21 would find one flagged buyer in Cuyahoga
22 and Summit County? Is that what that
23 means?
24     A. Correct.
25     Q. And you would find zero for some

Page 148

1
2 of these and two they hit on any flag.
3         Is that a correct reading of this
4 table?
5     A. Correct.
6     Q. And again, I think you've now
7 said this many, many times, but it's not --
8 you do not intend to offer any opinion that
9 these are, in fact, suspicious orders or
10 suspicious purchases by buyers. That is
11 beyond what you are able to do and beyond
12 your expertise, correct?
13         MS. CONROY: Objection.
14     A. Correct.
15     Q. And that's true for Allergan, but
16 also all of the other labelers on the
17 left-hand column?
18     A. I would say so, yes.
19     Q. Okay. And the same with table 39
20 and the dosage units, I think generally the
21 same thing applies.
22         The number of flagged dosage unit
23 changes, depending on which one of your
24 metrics are applied, correct?
25     A. Correct.

Page 149

1
2     Q. And for Allergan specifically,
3 where there's no value in a column, that
4 means there's no flagged dosage units under
5 that metric, right?
6     A. Correct.
7     Q. And then where there is a value
8 for Allergan under these columns, that is
9 the total amount of dosage units
10 attributable to Allergan in this 20-year
11 period that got a flag; is that right?
12     A. Based on the data that we had
13 available, yes.
14     Q. And the dosage units are pills
15 basically, correct?
16     A. Correct.
17     Q. So 200 pills in 20 years for
18 Allergan under the "common sense, masters"
19 column.
20         Do you see that?
21     A. Correct. I do see it. That
22 should be the right answer, sorry.
23     Q. Okay. And 200 pills, you don't
24 have any idea how many prescriptions that
25 would fill, right?

Page 150

1
2  A.  No.
3  Q.  It could be just one prescription
4  or two prescriptions, right?
5  MS. CONROY:  Objection.
6  A.  I would have no idea.
7  Q.  Okay.  And the same is true for
8  all of the labelers listed in table 39, you
9  don't have any opinion on whether the
10  dosage units listed in these tables were
11  actually suspicious or improper or not?
12  You don't have any opinion on that, do you?
13  A.  That's correct.
14  Q.  Okay.
15  MS. LEVY:  Let's take a -- would
16  you rather take a short break or break
17  for lunch?
18  MS. CONROY:  Do you think the --
19  well, isn't food there?  Do you know?
20  MS. VENTURA:  Yes.
21  MS. LEVY:  There is.  Are you
22  hungry yet?
23  THE WITNESS:  Yes, always.
24  MS. LEVY:  Let's go off the
25  record.

Page 151

1
2  THE VIDEOGRAPHER:  The time is
3  12:05 p.m.  We are now going off the
4  record.
5  (Recess is taken.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1
2
3  A F T E R N O O N   S E S S I O N
4  (Time noted:  1:06 p.m.)
5  THE VIDEOGRAPHER:  The time is
6  1:06 p.m.  We are back on the record.
7  *     *     *
8  L A C E Y  R.  K E L L E R,   resumed
9  and testified as follows:
10  EXAMINATION BY (Cont'd.)
11  MS. LEVY:
12  Q.  Ms. Keller, I have a few more
13  questions to ask you based on my review of
14  the material at lunch and then I will pass
15  you off to some of the other defendants'
16  counsel in this room to ask questions.  But
17  I do have a few more things that I wanted
18  to follow up on based on our conversation
19  this morning and some other things that I
20  had flagged in your report that I meant to
21  ask you about --
22  A.  Sure.
23  Q.  -- and I have not yet done so.
24  If we look at, back to your
25  report marked I think as Exhibit 2 and we

Page 153

1
2  look at paragraph 2 on page 9.  I'm sorry,
3  Exhibit 5.
4  A.  I'm sorry, we're at the report?
5  Q.  Yeah, your report on page 9,
6  paragraph 22, that is under the heading
7  "Scope of report."
8  A.  Sure.
9  Q.  You mention in the first sentence
10  in paragraph 22 that your report "focuses
11  specifically and exclusively on
12  manufacturers' anti-diversion and
13  suspicious order monitoring programs."
14  Do you see that?
15  A.  Correct, I do see that.
16  Q.  Okay.  I want to make sure that I
17  understand the limitations of what you mean
18  by that.
19  When you talk about in that
20  sentence in 22, focusing on manufacturers'
21  suspicious order monitoring programs,
22  you're referring to what we've already been
23  talking about all day today, which is what
24  might have been or could have been in a
25  hypothetical world had your metrics been

Page 154

employed, right?

MS. CONROY: Objection.

A. Yes, I think that's a correct characterization.

Q. And your analysis does not include, for example, an analysis of Allergan and a look at every single order that it did investigate.

You didn't conduct such an analysis for Allergan or any other labeler, correct?

A. Let me think about that for a second just to make sure I'm clear.

I was... I think that is correct. I didn't look at the practices, I didn't evaluate the practices of Allergan. I didn't look at how each process was -- how each order was processed, monitored, flagged, unflagged or released, et cetera.

Q. And to be clear, you had some information about suspicious order monitoring programs for the various labelers. You had some information, but you didn't do an analysis of which ones of

Page 155

the orders were investigated versus weren't investigated.

That was beyond what you did, right?

A. I think -- I think that's correct.

Q. Yeah, I'm not trying to be tricky. I just want to make sure.

You never looked at for any of the flags that came up for any of your metrics in the real world whether a labeler actually did investigate those particular transactions? That, you never looked at, right?

MS. CONROY: Objection.

A. I think that's correct. I did have access to the Mallinckrodt peculiar orders data, but I didn't go as far as beyond looking at that data set.

Q. And so for the set of transactions that are flagged under different matrices, you can't say which ones of those actually got investigated, which ones didn't, which ones were

Page 156

legitimate, which ones weren't legitimate? That is not something that you did in connection with your work in this case, right?

A. Yes, I would not be able to state which ones were legitimate or not.

Q. Okay. And the extension of that is, you have no opinion, you cannot opine on what the impact would have been if a labeler had investigated because you don't know what those investigations would have found, what would have happened after that, correct?

A. Yes, I think we've covered this one earlier, but with the exception of the hypothetical Janssen analysis, that is a correct statement.

Q. Okay. I forgot to talk to you about your addendum. You provided an addendum to your expert report.

Do you know what I'm talking about when I say the addendum?

A. Yes, I do.

Q. So how did this addendum come

Page 157

about? Tell me the story of the addendum.

A. Yes. So --

MS. CONROY: Is it marked?

THE WITNESS: I don't know that --

MS. CONROY: Can we just mark it?

MS. VENTURA: Just a second.

MS. LEVY: It's Tab 3 in my binder.

Mark this as Exhibit 7.

(Keller Exhibit 7, Expert Analysis - Addendum: Lacey R. Keller, marked for identification, as of this date.)

BY MS. LEVY:

Q. Exhibit 7 is your addendum, correct?

A. Correct.

Q. Okay. So what's the story as to how this came about?

A. So one is a -- let me make sure I've got this all here.

So one is the persistent flagging as I would say is similar to the

Page 158

1
2  methodology that was contained in McCann's
3  report, so I wanted to enact this here just
4  to see what would be the results of the
5  data after reviewing his report, also a
6  similar 12-month trailing average.  And
7  then the final metrics are the Purdue
8  metrics that we became aware of at the last
9  moment, right before filing, and did not
10  have time to enact.  So I wanted to have a
11  chance to adopt it or implement the Purdue
12  metrics because I thought it was important
13  to do so.
14      Q.  Your original report was dated
15  April 15th, correct?
16      A.  Correct.
17      Q.  This addendum, do you remember
18  the date of it?  I don't see it on here.
19      A.  I do not.
20      Q.  I'll represent to you that the
21  addendum was submitted on May 11th.
22          Does that sound about right to
23  you?
24      A.  That seems generally correct.
25      Q.  Was there any reason that you

Page 159

1
2  could not have done your persistent
3  flagging analysis in advance of your
4  April 15th report?
5      A.  Mostly just time.
6      Q.  What do you mean by that?
7      A.  Just ran out of time already
8  preparing we had there, so it was a very
9  natural place to just let's do what we have
10  here and then we'll do that as a separate
11  addendum.
12      Q.  And you didn't get any additional
13  information between April 15th and May 11th
14  that would have created that analysis?
15      A.  Correct.
16      Q.  You had the information all
17  along, correct?
18      A.  Correct.
19      Q.  You just ran out of time to do it
20  before April 15th?
21      A.  Correct.  Because I believe the
22  first McCann report uses the persistent
23  flagging methodology that he had filed.  So
24  yes, we could have filed this with the
25  April 15th.  I just ran out of time.

Page 160

1
2      And the Purdue metrics that we
3  found, like I said, we literally found them
4  days before, and I just didn't feel that it
5  was prudent to implement something that I
6  found doing a document review.
7      Q.  You do not take an opinion in the
8  addendum as to whether the persistent
9  flagging approach makes any sense or not?
10  That's outside the scope of your opinion,
11  right?
12      MS. CONROY:  Objection.
13      A.  Yes, as with all the other
14  metrics or approaches, I'm agnostic.
15      Q.  And did you ever ask DEA, does
16  this make any sense to you, DEA to put a
17  flag on and keep it for perpetuity?  Did
18  you ever ask that question of DEA?
19      A.  No.  Like I said earlier, my only
20  correspondence with the DEA has been over
21  basic ARCOS processing.
22      Q.  Okay.  And you don't intend to
23  offer any position at trial as to whether
24  it makes more sense to employ the
25  persistent flagging approach or the

Page 161

1
2  continuous evaluation approach?
3      A.  Sure.
4          If you want to -- what I think
5  you're saying is one where we reset the
6  flags every month or every X time period
7  versus leaving the flag on once it's
8  flagged?  Yes, I have no opinion on
9  whether -- on either -- sorry, I'm getting
10  hung up on my words -- on whether each one
11  is correct or not correct.  We just
12  implement them.
13      Q.  If we look at your addendum on
14  page 9, table 1, and if we compare that
15  side by side with, I think it's table 36 at
16  page 34 in your report.
17          (Document review.)
18      A.  I'm going to bet that you may
19  want table 7.
20      Q.  Table 7 on page 29.  These two
21  reports or these two tables represent the
22  results -- the composite results of this
23  analysis under the two different
24  approaches, correct?
25      A.  Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

2 Q. And if you look at -- for these
3 two analyses, you just picked four of the
4 metrics. You didn't do them all.
5 Do you see that?
6 A. So it wasn't happenstance like
7 cherry-picking or not. No, that wasn't the
8 case.
9 So with some of the metrics where
10 they could have applied to IQVIA, I did.
11 Where it came to the labeler's own metrics,
12 it felt most appropriate to apply those
13 only to the chargeback, their own data
14 so...
15 Q. And that was most appropriate
16 because that's the data set that those
17 metrics were designed to look at, right?
18 A. Correct. In reading the metrics
19 and the documentation behind them, it
20 looked as if they were designed to apply to
21 pharmacies or to sales data or to some sort
22 of internally housed data set, so that was
23 my intention, yes.
24 Q. I was going to ask you about
25 that. That's important to keep straight

Page 163

2 because if you apply a metric that is
3 designed to look at distributor orders, if
4 you apply it to pharmacies, the results are
5 going to be in some ways skewed, right,
6 because the metric is not designed to apply
7 to that kind of data? Is that what you're
8 getting at?
9 A. I would say it's more that I felt
10 like it was most honest or most like in the
11 truest sense of the metric to apply it to
12 the data set that it was intended for. Not
13 to mix distributor versus manufacturer
14 metrics, but just to the data set that it
15 was designed for.
16 The larger ones, the double
17 national, triple national, common sense,
18 and McKesson, were kind of at a -- I viewed
19 them as a different level as the
20 manufacturer's own metrics. Because I
21 don't know that, let's say, Purdue would
22 know Mallinckrodt's metric. But these
23 other metrics are like in a different
24 realm, if you will, is because they were
25 the result of an enforcement action or --

Page 164

2 so to me, they got a different treatment
3 among the data sets.
4 Any metric could have been ran
5 against all the data, and I could do that
6 very easily for you and would be happy to,
7 but it was my intention to try to keep
8 things to their truest sense.
9 Q. I think I understand what you're
10 saying.
11 You tried to apply the metric
12 designed for that type of data to that type
13 of data?
14 A. That's a very nice way of saying
15 it much more succinctly than I did.
16 Q. And so for these four metrics,
17 common sense, I'm using that term in air
18 quotes for the video, air quote words for
19 the transcript, the metric that is referred
20 to, air quote, common sense, double
21 national average, triple national average,
22 and McKesson 8,000, those were the ones you
23 picked to run over the IQVIA data for the
24 tables that we see in table 1 of the
25 addendum and table 7 of your original

Page 165

2 report, right?
3 A. Yes, those four metrics we ran on
4 the IQVIA data, correct.
5 Q. The results of the metrics change
6 a little bit depending on whether you do
7 the resetting flags or the persistent
8 flagging, correct?
9 A. Correct. As --
10 Q. Go ahead. I didn't mean to cut
11 you off. Go ahead and finish your answer.
12 A. I was going to say, yes, it
13 depends on what metric you're looking at
14 there.
15 Q. But if you look at column 1,
16 "Defendant labeler flagged physicians,"
17 that number actually doesn't change between
18 the two analyses, right?
19 A. Right. Because that one makes
20 sense, right? Because once a foot position
21 is flagged, at some point that is a 1 or a
22 zero, so it doesn't really, it won't -- it
23 doesn't change whether you leave that flag
24 on or not.
25 Q. A number of physicians get

Page 166

1
2  flagged in these counties varies wildly
3  depending on which metrics you use, right?
4      A.  Yes.  Like you can see here
5  anywhere between 1 and 75 percent.
6      Q.  And you take no position as to
7  which one is right or which one is closest
8  to right, do you?
9      A.  That would be correct.
10     Q.  But it doesn't make much sense as
11 a matter of common sense that 8 out of 10
12 physicians in these counties are
13 prescribing suspiciously.
14         That is not what you mean to
15 suggest with this analysis, correct?
16     MS. CONROY:  Objection.
17     A.  So I'm going to break that into
18 two pieces.
19         One, I'm making no assessment of
20 the real world of who is suspicious or not.
21 I will say with physicians, with that count
22 of physicians specifically, if you get
23 flagged once, and I think we say this in
24 the report, if you get flagged once or you
25 get flagged hundreds of times for every

Page 167

1
2  month that you've ever prescribed, you're
3  still counted the same.
4          So that's why that number looks
5  as it does compared to the prescriptions.
6      Q.  The number is -- the percentage
7  of physicians is grossly larger than the
8  percentage of physicians in the real world
9  that actually prescribe suspiciously.  It's
10 not meant to represent that, right?
11     MS. CONROY:  Objection.
12     A.  I wouldn't know.
13     Q.  Okay.  I mean, you could design a
14 metric that uses a parameter that all
15 opioids are suspicious and 100 percent of
16 prescribers who prescribe them should be
17 suspicious.  You can define it that way and
18 get 100 percent suspicious under some
19 metric, right?  That's something you could
20 do if you used the right definition?
21     A.  I would say that would be
22 something that someone could do.  I don't
23 know that I would do it, but that could be
24 done if asked of someone.
25     Q.  It would not be useful to

Page 168

1
2  describe a metric so comprehensive that it
3  captured 100 percent of the prescribers in
4  a jurisdiction?  That would not be a useful
5  thing to do, would it?
6      A.  I would say, you know, I'm not --
7  I don't want to weed into or wade into
8  evaluating metrics, so I'm not really going
9  to pontificate on that.
10     Q.  Well, if we take a step back to
11 what you do as a data scientist to generate
12 leads, if you create a metric that captures
13 everybody who is doing something, that
14 doesn't generate any leads for you, does
15 it?
16     A.  Or it generates all the leads
17 but --
18     Q.  It generates the lead of
19 everybody in the whole --
20     A.  -- it doesn't prioritize them.
21     Q.  Right.
22         So when you're looking to create
23 sensible useful metrics, the ideal way to
24 do so is to create metrics that come up
25 with, as close as you can, to the actual

Page 169

1
2  behavior you're trying to analyze, correct?
3      MS. CONROY:  Objection.
4      A.  I'm not really in a position to
5  evaluate metrics.  I think we've talked
6  about that earlier.  So I don't really want
7  to wade into that.
8      Q.  Well, I understand that you're
9  not offering any opinions about
10 specifically in this case what the metrics
11 should be or shouldn't be.  I understand
12 that and you've testified a great deal
13 about that.
14         But stepping back, like for
15 example, your other work in the New York
16 Attorney General's Office, when you
17 designed metrics to analyze data and target
18 gun traffickers -- that was something that
19 you did, right?  When you're doing that,
20 you're trying to design metrics that
21 isolate the bad guys, right?
22     MS. CONROY:  Objection.
23     A.  Correct.
24     Q.  And the most -- you know, in the
25 ideal world, what someone should do to try

Highly Confidential - Subject to Further Confidentiality Review

Page 170

```
1
2   to look for aberrant behavior is to create
3   sets of metrics that get as close to as you
4   can isolating the behavior that you're
5   targeting?  I mean, that's the goal in
6   doing all this, yes?
7       A.  I would think from a logical
8   perspective, that makes sense.
9       Q.  And metrics that are overly
10  comprehensive that capture everybody or the
11  vast majority of people doing something as
12  opposed to just the bad guys, those are
13  less helpful than more targeted metrics
14  designed more closely to target bad
15  behavior, as a conceptual matter that would
16  be true, right?
17      MS. CONROY:  Objection.
18      A.  Yeah, I guess I don't -- I don't
19  really...
20      I think when you're looking for
21  bad -- I think when's designing metrics,
22  you have different goals in mind for
23  whatever you're doing, right?
24      For gun trafficking, for example,
25  maybe I'm only looking for straw purchasers
```

Page 171

```
1
2   or whatnot.  That is a very unique fact
3   pattern.
4       I think by looping things into
5   bad guys or good guys or suspicious
6   activity or not, there is a lot that's
7   packed into that that I don't really want
8   to blanket state like a metric that should
9   or shouldn't do anything when it comes to
10  that.
11      Q.  I mean, if I'm a labeler and I
12  design a metric that captures 80 percent of
13  prescribers, that's not going to be very
14  helpful to me, is it?
15      MS. CONROY:  Objection.
16      A.  I wouldn't know.
17      Q.  Page 13 of your original report,
18  if you can flip with me to that.
19      (Witness complies.)
20      Q.  I'm confused on where I want to
21  look at.  Just a minute.
22      What is LRX data?
23      A.  So I haven't seen it, so I can't
24  speak definitively.  But what I have read,
25  as I understand it to be longitudinal -- I
```

Page 172

```
1
2   think that's what it stands for like
3   longitudinal data from IQVIA that allows
4   you to see a little bit more granular, a
5   little bit more granularity about the -- I
6   think it has patient, prescriber, pharmacy,
7   like all of that in the data.
8       And again, this is a little bit
9   hearsay because I have never seen the data,
10  so I can't speak to that definitively.
11      Q.  Okay.  You don't know really know
12  what it looks like because you've never
13  seen it?
14      A.  Correct.  I've seen references to
15  it.
16      Q.  Looking at page 13 of your
17  report, in paragraph 40, this is under
18  limitations of your analyses, I assume,
19  from what you just told me, that you did
20  not do any analysis on LRX data if you
21  haven't ever seen it?
22      A.  Correct, I did not do any
23  analysis on LRX data.  The only reason why
24  I know it exists, I think, is from that --
25  if that cite doesn't capture it, somewhere
```

Page 173

```
1
2   I have a cite that would -- that -- where
3   we know it exists.
4       Q.  And when you make the blanket
5   statement in paragraph 40 about LRX data
6   being used in investigations of suspicious
7   prescribers and downstream customers, the
8   only information you have about that is
9   what is cited in footnote 10, correct?
10      MS. CONROY:  Objection.
11      A.  I'm sure there's more, but I
12  believe so.  And I can't recall which of
13  those many cites for that paragraph are
14  there, which has the reference to the LRX
15  data, but...
16      Q.  You don't know which
17  manufacturers had or didn't have it?
18      A.  I don't -- so I would know from
19  the cite here who references that, but I
20  did not, as we were discussing earlier, do
21  a comprehensive review of who purchased or
22  didn't purchase.
23      Q.  Or what time periods it might
24  have been purchased or what portion of it
25  might have been purchased, that's not an
```

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1
2  analysis that you did?
3      A.   Correct.  I did not look at who
4  purchased, when, where, why or how LRX
5  data.
6      Q.   And both with respect to LRX
7  data, but also more broadly with respect to
8  Xponent data and IQVIA data in general,
9  there is no requirement that a manufacturer
10  buy that data, right?
11      A.   I wouldn't be able to say that.
12      Q.   You don't know one way or the
13  other?
14      A.   It's outside of my expertise.
15      Q.   Okay.  IQVIA data, you're aware
16  that the IQVIA data for a particular drug
17  reflects the labeler that holds that drug
18  today for the entirety of the IQVIA
19  database?  You're aware of that, right?
20      A.   So I would say what we understood
21  based off the files that we received, we
22  were given, maybe you can call it a control
23  file, that had the keys to the codes of
24  which labeler were what.  We had asked
25  repeatedly for historical versions of this

Page 175

1
2  file so that we could identify the labeler
3  historically.  But, yes, I think that file
4  was dated fairly recently.
5      Q.   You just said it a thousand times
6  better than I could.
7           You were unable to tell from the
8  code that IQVIA provides how long a
9  particular labeler had held that product?
10  In other words, you couldn't tell who had
11  the product historically, right?
12      A.   Correct, even though we had asked
13  for historical versions of that file.
14      Q.   And so the limitations of that
15  data would not allow you to separate out
16  for Allergan a time period that it didn't
17  have one of the products, that's not
18  something you could do with the IQVIA data
19  that you were given?
20      A.   Correct.  If they were assigned
21  whatever code they were in the control file
22  that we were given as part of the Allergan
23  production, then that's what was applied
24  for the entire data set.
25      Q.   And so for Allergan and its

Page 176

1
2  product, Kadian, for example, if IQVIA has
3  Kadian under the Allergan labeler code
4  today, your analysis would have Kadian as
5  an Allergan product for the whole 20-year
6  time period because you had no way to
7  understand or take out any other time
8  periods?  Am I right about that?
9      A.   That's correct.  We had asked for
10  that file.  It wasn't either available or
11  producible, so, yes.
12      Q.   And if you came to understand
13  that Allergan did not own Kadian for a
14  portion of that time period, that would
15  change your analysis, correct?
16      A.   Someone else would have been
17  attributed that Kadian product in the data
18  set.  It's not to say that that point of
19  data would drop out completely or anything
20  like that.  And it wouldn't change my
21  fundamental findings of applying the
22  compliance metrics.  It might change a few
23  numbers in the tables, what's attributed to
24  Allergan or not, but I wouldn't say -- I
25  wouldn't characterize that as changing my

Page 177

1
2  analysis.
3      Q.   The flags would still be there,
4  they would just be somebody's else's flags,
5  not Allergan's, right?
6      A.   Depending on the purchasing
7  history, but, yes.
8      Q.   Got it.
9           And the same would be true for
10  any other labeler who had historically
11  changed possession of products over time,
12  right?
13      A.   Correct, which is why we asked
14  very hard to obtain that file.
15      Q.   And IQVIA could not provide it,
16  could they?
17           MS. CONROY:  Objection.
18      A.   I don't know who it was asked of
19  or where.  I know I had requested it and
20  was very firm in those requests.  I don't
21  know if it was requested of defense or by
22  IQVIA directly.  That's beyond me.
23      Q.   Because that was data that you
24  really wanted to see and it would have been
25  important for you to know, right?

Page 178

1
2    MS. CONROY:  Objection.
3    A.   Yes, it would -- you know, I want
4    things to be most accurate and so I want --
5    if I had historical knowledge I would have
6    liked to have applied that, yes.  But I
7    don't -- I don't know that it -- like I
8    said earlier, I don't know -- it doesn't
9    fundamentally change the results.
10   Q.   It doesn't change the number of
11   flags?
12   A.   I mean each flag depends on the
13   purchasing history of a particular
14   prescribing history, so it's a little bit
15   more complicated than that, but the flags
16   would still exist, but --
17   Q.   They'd be attributed to different
18   defendants?
19   A.   Correct, with a big asterisk
20   there.
21       MS. LEVY:  Okay.  Let's mark this
22   document as Exhibit 8.
23       Do you have more copies of this,
24   Jayne?  These are the corrections you
25   brought today.

Page 179

1
2       MS. CONROY:  We have a copy over
3    here.  I think I gave everybody --
4       MS. LEVY:  We passed them out.
5    Okay.  Let's mark this as Exhibit 8.
6    I've got another one that I can ask
7    about.
8       (Keller Exhibit 8, "Corrections
9    to Expert Analysis," prepared by Lacey
10   R. Keller, not Bates-stamped, marked
11   for identification, as of this date.)
12   BY MS. LEVY:
13   Q.   Who created Exhibit 8?
14   A.   I did.
15   Q.   Did you use fancy data science or
16   is it a plain old Excel or Word document?
17   A.   That is a plain old Word document
18   that actually started with old chicken
19   scratch of my reports.  For nicety for you
20   guys, I didn't hand you the chicken
21   scratch.
22   Q.   How did Exhibit 8 come about?
23   Like how, when, and why was it created?
24   A.   So I would say I compiled it, we
25   compiled it last night to send to you just

Page 180

1
2    to make sure that everything was nice and
3    neat as opposed to, you know, all over my
4    report here.
5       I would say it's the culmination
6    of, since I filed it, a review of the
7    report trying to make things correct.  I'm
8    sure there is some typos and such, but
9    these were substantive changes that I
10   wanted to point out.
11   Q.   And are these changes that are
12   reflected in the right-hand column, are
13   these things that others pointed out to you
14   or that you just discovered on your own the
15   more you read it after the fact?
16   A.   Every single one of them, I
17   discovered.
18   Q.   Okay.  This is a classic woman
19   second-guessing and second-guessing and
20   second-guessing her own work.
21       Okay.  And so none of these were
22   like the lawyers telling you to change it
23   from something to another?  These are just,
24   these are just corrections you discovered
25   you want to make on your own?

Page 181

1
2    A.   Correct.
3    Q.   And you said this was prepared
4    last night.
5    A.   For production to you guys I
6    think just to make today easier.  I had
7    them for quite some time and was putting
8    them, but, yes, the document here.
9    Q.   I just want to run through this
10   quickly.
11       In paragraph 33, you say that
12   "would" should be "could."  And that
13   relates to what we've already talked about
14   today, is that you are not saying what
15   would have happened, you're saying
16   hypothetically what could happen, correct?
17   A.   Correct.  You've made a lot of
18   these quite easy to explain now.
19   Q.   In paragraph 86, the 7,000 to
20   5,000, how did you discover that
21   discrepancy?
22   A.   I went through after filing the
23   report and, like you said, we always check
24   and recheck our work, and I just -- I
25   wanted to make sure that every number was

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1
2  as right as I could make it.  So that one,
3  I just reran it and realized that there was
4  a discrepancy there.
5      Q.  Okay.  And the change in
6  paragraph 125 for table 35, last column, it
7  says the second, third and fourth "no"
8  should be a "yes."
9          So where you say "no, Endo did
10  not use chargeback in SOM program," you
11  mean -- so let me speak in a way that our
12  court reporter can transcribe.
13          Turning to table 35, on page 59
14  of your report and looking at that in
15  conjunction with Exhibit 8, your
16  corrections, you note that in table 35, in
17  the last column of that table, the second
18  "no" should be a "yes"; is that right?
19      A.  Yes.  So Endo's "no" in the "used
20  chargeback in SOMS program" should be
21  "yes," followed by "Par and Qualitest."
22          And that's to jive with the
23  language below.
24      Q.  Okay.  The metrics that you've
25  used, I'm getting to the end of my

Page 183

1
2  questioning, the metrics that you've used
3  in your report in its addendum, these
4  metrics could have been used by others
5  other than the defendants in this case,
6  right?
7          MS. CONROY:  Objection.
8      A.  Because you used the word
9  "could," I would say yes.
10      Q.  The DEA could have run these
11  metrics had it chosen to do that, right?
12      A.  I would think so, yes.
13      Q.  Law enforcement of other types,
14  other than DEA, could have run these
15  metrics if they had chosen to do that?
16      A.  I would think so, yes.
17      Q.  Cuyahoga, Summit County could
18  have run these metrics if their law
19  enforcement wanted to run them?  They could
20  have done that?
21      A.  Correct.  Anyone who had access
22  to the data or had access to the metrics
23  could run them.
24          MS. LEVY:  I'm going to mark the
25  invoices.

Page 184

1
2      A.  Do me a favor and get your
3  invoices, which I believe we marked
4  previously as Exhibit 3.
5          MS. LEVY:  Did we mark the
6  invoices?
7          MS. CONROY:  Yes.
8      A.  We did.
9          MS. LEVY:  Okay.  We already have
10  them marked as Exhibit 3.
11          (Keller Exhibit 9, Word document
12  prepared by Keller, not Bates-stamped,
13  marked for identification, as of this
14  date.)
15  BY MS. LEVY:
16      Q.  I'm going to hand you Exhibit 9,
17  and I will represent to you that Exhibit 9
18  was created by asking data entry folks to
19  put into a table the information that came
20  from your invoices in Exhibit 3.
21          You've never seen Exhibit 9
22  before, correct?
23      A.  That is correct.
24      Q.  And this is something that we
25  created, not something that came from you.

Page 185

1
2  But do you recognize the content of the
3  information generally?  I'm not asking you
4  to tell me whether it's correct or not, but
5  do you recognize what the types of
6  information in here are?
7      A.  Yes.  The case names look similar
8  to ones that are in the invoices.
9      Q.  Okay.  And for purposes of these
10  questions, I will ask you to accept that
11  this is an accurate extraction from the
12  invoices here, but I recognize that you
13  just have to accept my assumption on that.
14  I'm not asking you to compare thing by
15  thing.  But if you accept that assumption,
16  then I'd like to go through and ask, just,
17  you know, what do these descriptions mean.
18          What does opioid DMA mean in the
19  Project column on the first page of
20  Exhibit 9?
21      A.  It means -- I mean, there's a
22  number in front of it, which is some
23  computer-generated case number by the
24  OpenAir system.
25          Opioid DMA is data mining

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1
2  analytics.
3      Q.  Data mining?
4      A.  Analytics.
5      Q.  Analytics.
6      A.  So anywhere you see DMA, that's
7  data mining analytics.
8      Q.  Got it.
9          And there are four invoices that
10 are dated May 31st, 2018.
11         Do you see that --
12     A.  I think --
13     Q.  -- far left column.
14     A.  Yeah.  It looks like the line
15 items are entered, so just give me a
16 second.
17     Q.  Oh, right.
18         And these line items are all
19 related to travel, correct?
20     A.  Can I move this?  Sorry.
21         (Document review.)
22     A.  So the first four appear to be
23 line items for travel, yes.
24     Q.  And they reflect that there was a
25 meeting on May 24th in D.C.?

Page 187

1
2      A.  Correct.
3      Q.  Who was that meeting with?
4      A.  I don't recall specifically who
5  was in the room.  I remember it was at -- I
6  remember meeting like Paul Farrell and some
7  attorneys.  Linda Singer of course was
8  there.  And then there is a lot of faces I
9  don't remember or know.
10     Q.  A lot of other people, but you
11 don't know who?
12     A.  Correct.  It was --
13     Q.  How many people were there for
14 that meeting?
15     A.  Oh, I couldn't guess.  It was a
16 room smaller than this for sure.
17     Q.  Less people than in this room
18 today?
19     A.  Maybe the same but in a much
20 tighter quarters.
21     Q.  Was anyone from DEA at that
22 meeting?
23     A.  Like I said, I don't know who was
24 exactly in that meeting.  I didn't -- we
25 didn't do like a check-in, but I don't

Page 188

1
2  recall somebody being introduced as, hi,
3  I'm so-and-so from the DEA.
4      Q.  Did you understand that meeting
5  to be -- were there any other experts in
6  the meeting aside from you?
7      A.  At that time, I wasn't even an
8  expert, so I wouldn't have even known then
9  who would have been an expert or was an
10 expert.
11     Q.  What did you do at the meeting?
12     A.  So that was... if I recall, I
13 think it was a preliminary meeting about
14 the ARCOS data.  I think we had just gotten
15 maybe the first or second production about
16 it and everyone kind of putting their heads
17 together of what the heck is this and how
18 do we use it.
19     Q.  I don't see a hotel, so I would
20 assume that was just a single
21 there-and-back meeting?
22     A.  Yeah, I specialize in those.
23     Q.  So do I.
24         Okay.  And then we see another
25 set of line items underneath the travel

Page 189

1
2  ones that are the next four entries in gray
3  that are charges for data mining and
4  analytics.
5          Do you see that?
6      A.  Correct.
7      Q.  But the one right before we get
8  to data mining and analytics says "air gap
9  server for ARCOS."
10         What is air gap server?
11     A.  So you'll see a couple charges
12 throughout here that are just to charge for
13 our server space.
14     Q.  Like the hosting fee?
15     A.  Exactly.
16     Q.  Because it's a ginormous amount
17 of data?
18     A.  Yes.  It doesn't just sit
19 somewhere for free if you want it to be
20 super secure.
21     Q.  And then data mining and
22 analytics reflect various numbers of hours
23 and various billing rates.  One is $250 an
24 hour, one is 475 and one is 275.
25         Do you see that?

Page 190

1
2    A.  Yes.
3    Q.  475 is you, correct?
4    A.  That is me.
5    Q.  You're the only person that bills
6  at the 475 rate on these, on this matter?
7    A.  I believe so, yes.
8    Q.  Okay.  So anywhere we see a 475,
9  I can know that's work you did personally?
10    A.  Correct.
11    Q.  And those are your hours.
12        And then what is the difference
13  between the 250 and the 275, just out of
14  curiosity?
15    A.  Our analysts are generally paid
16  on the lower end of the scale.  I don't
17  know exactly the structure.  The data
18  scientists and the more senior staff, more
19  senior than analysts, I should say, get
20  paid at that 275.
21    Q.  It's like a sliding scale of
22  seniority?
23    A.  Exactly.
24    Q.  What are "investigative services"
25  that are reflected on 6/22/2018 invoice?

Page 191

1
2    A.  Yeah.  So some of the earlier
3  invoices when we were first setting up the
4  firm, they just -- so the firm would bill
5  everything as investigative services
6  because it's all that they had and never
7  bothered to change it to data mining and
8  analytics.  And you'll notice that that
9  disappears after some point in time,
10  probably in the fall where we open up the
11  "own data mining" categories, because I
12  wanted to have my own for tracking so...
13    Q.  So here, it looks like the
14  opposite to me, because it starts out being
15  described as "data mining and analytics" in
16  5/31/2018, but then it changes to
17  "investigative services" from their amount
18  if you look down that.  And sometimes it's
19  called "U.S. jurisdiction."
20        But I think the 5/31/18 is the
21  last time we see "data mining and
22  analytics."  Am I right about that?
23    A.  I'd have to put them in order to
24  look, but that's how the -- when I asked
25  the billing team to put this together for

Page 192

1
2  me, that's how it was described to me is at
3  some point, the case was opened and called
4  data -- investigative services and then at
5  some point, it was data mining analytics.
6        I recognize that there's these
7  three here that say "data mining and
8  analytics" instead of "investigative
9  services," but, again, this is from the DMA
10  side of things, not from the investigation
11  side of things.
12    Q.  And is there any substantive
13  difference in what the people are doing
14  when it's described as data mining and
15  analytics versus investigative services?
16    A.  When it's on this paper, no.
17    Q.  Okay.  As opposed to what?
18    A.  If there were -- as we talked
19  earlier, Gryphon has two lines of -- or
20  multiple lines of business, and we
21  discussed the investigative side and not if
22  the -- I can't speak to what their stuff is
23  billed as, for example.
24    Q.  Okay.  And so all the entries
25  that have the description "investigative

Page 193

1
2  services," those are people that are doing
3  work with the data sets that are described
4  in your report?
5    A.  Correct, you could understand
6  them to be that.
7    Q.  What is DMA methodology and data
8  overlays, what does that mean?  DMA
9  methodology and data overlays at the bottom
10  of the first page of this exhibit, what
11  does that mean?
12    A.  So that's the case where we -- if
13  there is not a specific jurisdiction to
14  bill that case towards -- so you'll notice
15  some of these are for Summit County,
16  Cuyahoga.  At some point, those become
17  Bellwether, et cetera.  Methodology and
18  data overlays are the analysis and work
19  that we do that could touch multiple
20  jurisdictions, right?  So like a great
21  example is the ARCOS data.  There's a good
22  chunk of time that goes into understanding
23  it, processing it, filtering it, making
24  sure that you're looking at the right
25  thing, because it's not an easy thing to

Page 194

1
2  just ingest.
3      Q.  So this, in the fourth column
4  where we're talking about in reference to,
5  that is how you know internally who pays
6  which part of the bills?  That's what that
7  column is designed to help be used for?
8  Whether it should be allocated to Cuyahoga,
9  to Summit or is relevant to multiple
10  analyses?
11      A.  Yeah, I guess the invoice is
12  reflected as that.  We actually view that
13  as the case title when we're billing
14  against it.
15      Q.  On the second page of Exhibit 9,
16  at the top, there is an entry in the
17  reference to column that says, "DMA Ohio
18  5."
19      What's that mean?
20      A.  So there were five counties in
21  Ohio.  Some of these are just shorthand,
22  you know, we just call them internally, not
23  thinking that they would ever been produced
24  as exhibits.  There were five counties that
25  we were producing analysis on in Ohio, so

Page 195

1
2  those were part of this.
3      Q.  And so those hours would be
4  relevant to all five counties?
5      A.  Correct.
6      Q.  And I think I can guess what you
7  would say if I looked down to "DMA
8  Cleveland," that's relevant to work about,
9  specific to Cleveland?
10      A.  Precisely.
11      Q.  And in the fifth column, which
12  the heading in the column indicates that it
13  came from the description part of your
14  actual invoices, under "Description," on
15  the top of page 2 where it says "United
16  States," what does that mean?
17      A.  I have no idea.  I asked our
18  billing team why it says United States.
19  Sometimes it says U.S.  I don't know if
20  it's to delineate whether or not it's a
21  U.S. versus international investigation
22  because they are an international firm.
23  But as far as I'm concerned, it doesn't
24  reflect anything for us.
25      Q.  Have you done any international

Page 196

1
2  analysis in conjunction with this case?
3      A.  No.
4      Q.  Have you done any work for the
5  United States of America as opposed to the
6  Ohio counties in conjunction with this
7  matter?
8      A.  No.
9      Q.  Under the project name, which is
10  the third column, flipping through this
11  document to page 4 of Exhibit 9, at the
12  top, the first set of white ones, November
13  of 2018, they say "labeler flagging."
14      What's labeler flagging?
15      A.  That's the -- that's an analysis
16  of flagging metrics similar to what's in
17  the report here to labelers' data.
18      Q.  Same question with "Bellwether
19  follow-up" at the bottom of the page, what
20  does that mean?
21      A.  So, one, I've been informed that
22  it's Bellwether without the A, so
23  apologies.  And then, two, at some point in
24  time -- so we had been billing Summit and
25  Cuyahoga separately, and the request to us

Page 197

1
2  for analysis started grouping them more
3  frequently, so we just pushed them into one
4  case.
5      Q.  These invoices that you provided
6  us in Exhibit 3 and that have been
7  summarized in Exhibit 9, they cover a time
8  period from May 31st, 2018, to May 30th,
9  2019.
10      Is that correct -- is that the
11  correct time period for which Gryphon
12  Strategies has actually billed for work on
13  this matter?
14      A.  Correct.  You know, we invoice
15  monthly, so I don't know exactly at what
16  point in May that I would have started on a
17  case, but, yes.
18      Q.  And obviously you've done work in
19  June, this month?
20      A.  Correct, yes.  Those have not
21  been --
22      Q.  Those have not been billed yet?
23      A.  Yes.
24      Q.  Do you know, as you sit here
25  today, the amount of hours that you've put

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1
2 in, in June?
3     A.   No, I don't, but I'm sure they're
4 somewhere similar as to what we've done in
5 the past or so.
6     Q.   Did the information contained in
7 Exhibit 3 and summarized in Exhibit 9
8 reflect the entirety of the work that
9 you've don't in this case?
10    A.   On this case, yes.
11    Q.   Is there any work related to
12 opioids for this litigation that you've
13 done that's not reflected in these
14 exhibits?
15    A.   For this litigation, this is
16 complete.
17    Q.   What is the distinction you're
18 drawing there?  What would be incomplete?
19 What other work that you've done that is
20 not for this litigation?
21       MS. CONROY:  Objection.  That's
22       actually beyond the scope, if that's
23       what your question means.
24 BY MS. LEVY:
25    Q.   I'm asking you, personally, what

Page 199

1
2 work have you done that is not reflected in
3 this litigation that relates to opioids?
4     A.   So there are other cases around
5 the country that I've done work on.
6     Q.   Okay.  Understood.
7       Have you done any work for free,
8 pro bono?
9     A.   Yes, but not on opioids.
10    Q.   I meant with respect to this
11 litigation.
12       Have you done any work with
13 respect to opioids or this litigation under
14 any organization other than Gryphon?
15    A.   For this litigation, no.
16    Q.   For other litigations, have you?
17 For other cases in this litigation, have
18 you billed through somewhere else other
19 than Gryphon?
20    A.   No.
21    Q.   All of your work on opioids has
22 gone through Gryphon Strategies?
23    A.   I want to make sure I'm super
24 clear.  Because like we discussed earlier,
25 I did work at the AG's office.  Of course I

Page 200

1
2 didn't bill for that.  They're not part of
3 this litigation.  So that's what I'm
4 struggling with, making sure that I say the
5 right thing.
6     Q.   You haven't received any payment
7 for your work on the opioid litigation that
8 we don't see in these exhibits, correct?
9     A.   That's correct.
10    Q.   What is your compensation
11 structure at Gryphon?
12    A.   We're all salaried.
13    Q.   What is your salary annually?
14    A.   180.
15    Q.   And is that -- the salary is the
16 same regardless of what you bill?
17    A.   There is a salary and then there
18 is a bonus at the end of the year.
19    Q.   How is the bonus calculated?
20    A.   I would love to know.  But my
21 boss decides what it is at the end of the
22 year.
23    Q.   Did you get a bonus at the end of
24 2018?
25    A.   I did.

Page 201

1
2     Q.   What was your bonus?
3     A.   It was either 20 or 25,000 I
4 actually can't remember.
5     Q.   And you don't know how it was
6 calculated?
7     A.   No.
8     Q.   Is it based on the amount that
9 you bill or the amount you bring in?
10    A.   Yes and no.  I don't really know
11 exactly.  I've asked my boss for more
12 complete metrics.  I am metric person.
13 Some of it is time with the firm, some of
14 it is billable, some of it is just a factor
15 X, I think.
16    Q.   But you, Lacey Keller, are
17 getting paid 180,000 a year regardless of
18 what Gryphon is billing, correct?
19    A.   Correct.
20    Q.   Plus whatever bonus you get?
21    A.   Correct.
22    Q.   Got it.
23       And have you calculated how much
24 money Gryphon has brought in as a result of
25 the opioid litigation?

Highly Confidential - Subject to Further Confidentiality Review

Page 202

2 A. No.
3 Q. If I represent to you that your
4 own hours total 470 hours over the course
5 of the last year, does that sound about
6 right to you?
7 A. 470 hours?
8 Q. I'm sorry, 870 hours.
9 A. That probably feels about right.
10 Q. And are you aware that Gryphon
11 Strategies has invoiced over a
12 million-and-a-half dollars for work that
13 you and your team have done on the opioid
14 litigation for these particular matters?
15 A. That probably makes sense.
16 MS. LEVY: Okay. I do not have
17 any further questions for this witness.
18 I will pass you along to the next
19 co-defendant who wishes to be in this
20 seat.
21 Let's go off the record for a
22 minute so we can change questioners.
23 THE VIDEOGRAPHER: The time is
24 2:04 p.m. We are now off the record.
25 (Recess is taken.)

Page 203

2 THE VIDEOGRAPHER: The time is
3 2:18 p.m. We are now back on the
4 record.
5 EXAMINATION BY
6 MS. LUCAS:
7 Q. Good afternoon, Ms. Keller. I'm
8 Amy Lucas. I represent Janssen and J&J.
9 Can you turn to Exhibit 5, which
10 is your report, at page 6 and look at
11 paragraph 4, please?
12 A. Sure.
13 Q. It says, "The work I've done
14 throughout my career relates directly to
15 analysis undertaken in this report."
16 Is that accurate?
17 A. Correct.
18 Q. And you believe that, correct?
19 A. Correct.
20 Q. So if you take a look at
21 paragraph 6 down at the bottom, the second
22 sentence -- or the first about when you
23 were the at New York AG's office, the
24 second sentence says, "Frequently I was
25 given a subject area to investigate without

Page 204

2 having any prior expertise in the area. I
3 would then educate myself through research
4 and talking with subject matter experts to
5 allow me to help them identify new areas of
6 investigation."
7 Is that accurate?
8 A. That is.
9 Q. In circumstances where are you
10 were given an area to investigate without
11 having prior expertise in the area, why
12 would you educate yourself through research
13 and talking with subject matter experts?
14 A. So that I can best do my job.
15 Q. It's important to you to
16 understand the subject area that you're
17 working in, right?
18 A. Of course.
19 Q. And you wouldn't want to offer
20 opinions in a subject area without doing
21 the work to understand that subject area,
22 right?
23 A. Yes.
24 Q. I think you said earlier that you
25 did not consider yourself to have expertise

Page 205

2 in the area of manufacturers'
3 anti-diversion and suspicious order
4 monitoring programs before you were
5 retained in this matter; is that correct?
6 A. That is correct.
7 Q. And you also said earlier that
8 you never worked at the DEA, correct?
9 A. That is correct, I never worked
10 at the DEA.
11 Q. And other than speaking to
12 someone at DEA regarding the ARCOS data,
13 you hadn't spoken to anyone else at the
14 DEA, correct?
15 A. That is correct.
16 Q. You've also never worked as a
17 detective on a DEA task force, right?
18 A. That is correct.
19 Q. You've never investigated any
20 doctor who was suspected of overprescribing
21 opioids for purposes of bringing charges
22 against that doctor, correct?
23 A. That is correct.
24 Q. You've never spoken to anyone who
25 has investigated a doctor suspected of

Page 206

1
2  overprescribing, correct, for purposes of
3  bringing charges?
4      A.  Not that I can recall right now.
5      Q.  You have never worked on any
6  investigation by any doctor by any state
7  medical board related to suspected
8  overprescribing, correct?
9      A.  Correct.
10     Q.  You've never spoken to anybody
11  who does such investigations, correct?
12     A.  I don't think I have, no.
13     Q.  You have never managed a
14  registrant's suspicious order monitoring
15  program, correct?
16     A.  That is correct.
17     Q.  What did you do to educate
18  yourself on manufacturers' anti-diversion
19  and suspicious order monitoring programs in
20  connection with your work in this matter?
21     A.  I read documents through
22  discovery, so their own protocols, all of
23  which are in my reliance materials.
24     Q.  And those are the documents cited
25  in your report in your reliance materials,

Page 207

1
2  correct?
3      A.  Correct.
4      Q.  Other than reading those
5  documents, what else did you do to educate
6  yourself on manufacturers' anti-diversion
7  and suspicious order monitoring programs?
8      A.  I reviewed some depositions.
9      Q.  Which depositions did you review?
10     A.  I wouldn't be able to recall from
11  memory right now, but those are definitely
12  in my reliance materials.
13     Q.  Anything else?
14     A.  I believe I already cited the
15  Masters decision and things like that.  So
16  I believe that's all.
17     Q.  Did you talk to any subject
18  matter experts other than the one DEA
19  employee regarding ARCOS data?
20     A.  We might have random -- like
21  there might have been one phone call, but I
22  don't know that they would be subject
23  matter experts in the area.
24     Q.  Who was the phone call with that
25  you have in mind?

Page 208

1
2      A.  I remember having a call on a
3  Saturday morning with someone who might
4  have worked at the DEA, but I actually
5  can't remember.  It was like, you need to
6  talk to this person, and we briefly
7  discussed compliance metrics.
8          And I don't remember a ton of the
9  details from the conversation other than I
10  was particularly interested in grouping or
11  not grouping by drug code.  That's --
12     Q.  What do you mean by that?
13     A.  So when you're applying
14  compliance metrics, you can choose -- some
15  of them call for applying certain drug
16  codes.  So a great example is the 8,000
17  rule, right?  It says it should only apply
18  to hydrocodone and a few other ones.  And
19  so that hydrocodone would be considered its
20  own drug code or drug grouping.
21          And so when applying other
22  compliance metrics, did it make sense or
23  not make sense, depending on the metric, to
24  group by a drug code if there is any
25  ambiguity in the documentation.

Page 209

1
2      Q.  And what did -- this person was a
3  current DEA employee?
4      A.  I believe a former.
5      Q.  And what did this person say?
6      A.  I don't really recall because it
7  didn't really change how we were going to
8  do it.  I think, if I recall, there was
9  some hedging of, well, it could be this or
10  it could be that, so we just continued with
11  exactly how we had planned.
12     Q.  Other than asking a former DEA
13  employee about grouping by drug code for
14  compliance metrics, have you had any other
15  conversations with any subject matter
16  experts regarding your work in this matter?
17     A.  Not that I can recall at this
18  time.
19     Q.  How long did that call last?
20     A.  Oh, less than an hour for sure.
21     Q.  And when was that call?
22     A.  I don't recall the exact date.
23  Like I said, I remember it being a Saturday
24  morning because I remember walking my dog
25  while I was on the call.

Page 210

2      Q.   Do you know what makes an order
3   reportable to the DEA as a suspicious
4   order?
5      A.   No, I do not.  As we discussed
6   earlier, outside of my expertise.
7      Q.   Do you know whether DEA expects
8   registrants to conduct due diligence into
9   flagging orders -- into flagged orders to
10  determine whether they're actually
11  suspicious before reporting it?
12     A.   Again, as discussed earlier,
13  outside of my expertise.
14     Q.   Did you ever discuss whether
15  to -- strike that.
16         Did you ever discuss whether to
17  consider due diligence in running the
18  metrics that you ran?
19     A.   So --
20     Q.   Let me start over.
21         You said earlier that in your
22  report, if something is suspicious, you
23  mean it just was tripped by one of the
24  metrics, right?
25     A.   That is correct.

Page 211

2      Q.   And just because you used the
3   word "suspicious" in your report, that
4   doesn't mean it's suspicious as the DEA
5   defines under the Controlled Substances
6   Act, correct?
7      A.   That's accurate.
8      Q.   So did you ever consider whether
9   you should take due diligence into account
10  in creating your definition of suspicious?
11     A.   So I'm pausing for this because
12  there's the addendum that does the
13  persistent flagging which assumes no due
14  diligence because once the flag is
15  triggered, it stays on for the perpetuity
16  of the data set.
17         So in the sphere that is around
18  that, then, yes.  And if we're talking
19  about anything outside of that, then no.
20     Q.   Are you aware whether -- strike
21  that.
22         Did you look at any documents or
23  deposition testimony regarding Janssen's
24  due diligence of flagged orders?
25     A.   I might have read a document or

Page 212

2   two.  But, again, evaluating due diligence
3   or any of that is outside of the scope of
4   my expertise.
5      Q.   So even if you evaluated it, you
6   would not have incorporated any documents
7   related to Janssen's due diligence of its
8   flagged orders into your opinions?
9      A.   I think the answer to that would
10  be yes.  If I read a document, it doesn't
11  impact the findings of the report.  The
12  report was to apply the known compliance
13  metrics to labelers on data.
14     Q.   I want to ask you about the known
15  compliance metrics.
16         Do you know what -- strike that.
17         A compliance metric is the same
18  way of saying an algorithm, right?
19     A.   Sure.
20     Q.   Okay.  The SOMS algorithm, do you
21  know what Janssen used for its suspicious
22  order monitoring algorithm?
23     A.   If it's not in my report, then
24  no.  Or if it's in my report, then, yes.
25  But if it's not in my report, then, no.

Page 213

2   But I don't believe that we had a Janssen
3   algorithm.
4      Q.   I'll represent to you we haven't
5   found one.
6         Why is it that you didn't use
7   Janssen's suspicious order monitoring
8   algorithm or compliance metric in your
9   report?
10     A.   If it's not here, then, which I
11  don't think it is, I didn't know of it.  So
12  if there was one, I'd be happy to implement
13  it.
14     Q.   How did you choose the compliance
15  metrics that got included in the report?
16     A.   As we were stating earlier, some
17  were provided by counsel, others we found.
18     Q.   So there was no instruction by
19  anyone to make sure you included all of the
20  defendants' algorithms in your report?
21     A.   Well, I would say that's correct,
22  there was no explicit instruction to
23  include all or exclude all, include what
24  you could find and go from there.
25     Q.   Is it your understanding that

Highly Confidential - Subject to Further Confidentiality Review

Page 214

2 nobody could find Janssen's suspicious
3 order monitoring algorithm?
4     A.  I just wanted to look at one
5 thing really quick.
6         (Document review.)
7     Q.  What page are you on?
8     A.  I'm trying to find it.  I'm
9 sorry.
10     Q.  Are you looking for the metrics?
11    A.  Yeah.  I'm looking actually for
12 the footnote about Janssen that describes
13 the SOMS program.
14        (Document review.)
15    A.  Because as I understood it, there
16 wasn't one to implement.  But I just...
17 that's what I wanted to review.
18        (Document review.)
19    A.  So, yes, it was my understanding
20 that there wasn't a metric.
21    Q.  It was your understanding?
22    A.  Correct.
23    Q.  Did you ask anybody to confirm
24 that?
25    A.  I did.

Page 215

2     Q.  Who did you ask?
3     A.  Evan Janush, I think is his last
4 name.  J-a-n-u s-h.
5     Q.  And your understanding is that
6 Mr. Janush told you that Janssen did not
7 have a suspicious order monitoring
8 compliance metric or algorithm?
9     A.  Correct, that we could implement,
10 yes.
11    Q.  Did you find that footnote?
12    A.  Yes.  I was on page 28 here.
13 Footnote 83 is what I was looking for just
14 to make sure.
15    Q.  And footnote 83 says, "Janssen
16 used chargeback and value track data on
17 occasion for size only."
18        Is that what you were thinking
19 of?
20    A.  That is exactly what I was
21 thinking of.
22    Q.  And what makes you think that
23 that supports the notion that Janssen did
24 not have a suspicious order monitoring
25 algorithm?

Page 216

2     A.  So in some of these footnotes, we
3 cite when SOMS programs were developed and
4 what Bates numbers support those
5 development.  And I wanted to make sure
6 that Janssen didn't have one.
7     Q.  Are you aware that -- have you
8 ever spoken to James Rafalski?
9     A.  I might have, but I'm not sure.
10    Q.  Have you read his report?
11    A.  Yes.
12    Q.  You're aware that he's a
13 plaintiff's expert in this case?
14    A.  Yes.
15    Q.  And are you aware that he
16 evaluated Janssen's suspicious order
17 monitoring program and, in particular, the
18 algorithm that Janssen used?
19    A.  If it was part of his report,
20 then it would have been, yes.
21    Q.  And so if you read his report and
22 you understood that, then why is Janssen's
23 suspicious order monitoring algorithm not
24 part of your report?
25        MS. CONROY:  Objection.

Page 217

2     A.  I believe his report was filed at
3 the same time ours was.
4     Q.  And so you learned that Janssen
5 had a suspicious order monitoring algorithm
6 after your report was already in?
7     A.  Do you have Rafalski's report?
8 I'd like to review it just to make sure
9 that I know --
10    Q.  I don't.
11    A.  So I don't know what algorithm
12 was discussed.  I mean, his report was
13 quite lengthy, if I recall.  And so I'd
14 have to look at it to know exactly what the
15 algorithm was.
16    Q.  But if you would have had the
17 algorithm, you would have incorporated it
18 into your report; is that correct?
19    A.  Absolutely.
20        MS. CONROY:  Objection.
21 BY MS. LUCAS:
22    Q.  What are the Janssen products at
23 issue in this litigation?
24    A.  I don't know that I can name them
25 by name.  It would be anything that

Page 218

1
2  appeared in the IQVIA data or your own
3  chargeback data.
4      Q.  If you can take a look at page
5  14, paragraph 44.
6      (Witness complies.)
7      Q.  "I implemented the manufacturer
8  and distributor-developed compliance
9  metrics as documented without endorsement."
10      What does that mean to you?
11      A.  That means what we were stating
12  earlier on the record about I'm not
13  endorsing saying one metric is better than
14  another.
15      Q.  "I implemented the metrics using
16  a close reading of the best information
17  available for produced documents and
18  instruction by counsel, providing the most
19  accurate reflection of labeler defendants'
20  monitoring programs as they were
21  represented in their own operating
22  procedures and documentation."
23      What does that mean?
24      A.  Sure.
25      So when you're reading a metric,

Page 219

1
2  sometimes people explain -- you know, it
3  may say take the 30 day average.  Well,
4  what does that mean?  Does that mean a
5  rolling 30 day or calendar 30 day?
6      So, you know, what I'm trying to
7  encapsulate there is there might be -- you
8  know, we're trying to do the best that we
9  can, given the documents, to implement them
10  to their truest meaning based off of
11  testimony, depositions, the documents
12  themselves.  That's what I'm trying to
13  represent there.
14      Q.  So what you did, though, here was
15  you implemented metrics that Janssen didn't
16  use, correct?
17      A.  I couldn't speak to whether
18  Janssen did or did not use a metric.
19      Q.  Do you have any reason to believe
20  that Janssen used any of the metrics listed
21  in your report?
22      A.  I wouldn't know.
23      Q.  Let me ask it again.
24      Do you have any reason to believe
25  that Janssen used any of those metrics

Page 220

1
2  listed in your report, yes or no?
3      MS. CONROY:  Objection.
4      A.  It's really outside the scope of
5  my expertise.
6      Q.  You haven't seen any information
7  to suggest that Janssen used any of those
8  metrics, correct?
9      A.  I have not read a document that
10  led me to believe that, correct.
11      Q.  Therefore, since you didn't use
12  Janssen's algorithm in your report, you
13  don't have any opinion on what Janssen's
14  algorithm would or would not have flagged,
15  correct?
16      A.  That is correct.  And I would
17  like to know, just so if we're going to
18  continue to talk about an algorithm, maybe
19  what it was, so I can be a little bit more
20  informed.
21      Q.  One of the great things about
22  deposing people is I get to ask the
23  questions.  Your counsel can provide that
24  to you afterwards.
25      MS. CONROY:  Objection.  Assumes

Page 221

1
2  that it exists.
3      MS. LUCAS:  I think Mr. Janush
4  knows about our -- Janssen's algorithm.
5  BY MS. LUCAS:
6      Q.  So I wanted to talk about your
7  small labeler opinion.
8      And that applies only to Janssen,
9  correct?
10      A.  That is correct.
11      Q.  And why is that?
12      A.  So small labeler, I don't mean
13  any offense to that because I understand
14  Johnson & Johnson is a very large company,
15  but when it comes to opioids, you have very
16  few as it pertains to the market share,
17  right?  You're a much lower market share.
18      Q.  Actually, if you want to turn
19  really quickly to page --
20      A.  16 you're probably looking for.
21      Q.  I am.
22      Page 16, table 1 and table 2.
23  That reflects Janssen's market share in
24  Summit County and Cuyahoga County, correct?
25      A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

2  Q.   And the largest percentage on
3 that table is 0.9 percent, and the smallest
4 one is 0.1 percent, correct?
5  A.   That appears to be correct.
6  Q.   Did you calculate those numbers?
7  A.   I didn't do it by hand, but an
8 algorithm did.
9  Q.   How did you do that?
10  A.   SQL query.
11  Q.   And you concluded that Janssen
12 had between 0.1 percent and 0.9 percent
13 market share in Summit and Cuyahoga,
14 correct?
15  A.   Yes, depending on the metric and
16 depending on the county.
17  Q.   And other manufacturers, either
18 defendants or otherwise not named in the
19 complaints, had between 99.1 and 99.9
20 percent of the market share, correct?
21  A.   Yes.  I'm assuming you're taking
22 the hundred minus yourselves and that's
23 everybody else, yes.
24  Q.   So then back to your small
25 labeler opinion, why then did you conduct

Page 223

2 the small labeler impact analysis as to
3 Janssen?
4  A.   It was asked of me to see what
5 would happen if -- again, this is a
6 hypothetical scenario.  And let me just
7 flip to there just so I'm on the right
8 page.
9       Do you have it.
10  Q.   Small labelers starts on page 53.
11  A.   Thank you so much.
12       (Document review.)
13  A.   So it would be if a labeler, like
14 yourselves, had identified a suspicious
15 physician -- and when I say identified
16 suspicious, I mean using the metrics -- and
17 then flagged them and reported them and
18 they were taken off-line completely, what
19 would be the downstream impact of that.
20  Q.   And why did you conduct that
21 analysis?
22  A.   It was requested.
23  Q.   Who requested it?
24  A.   Linda Singer.
25  Q.   When did she request that you do

Page 224

2 the small labeler analysis?
3  A.   At some point in March or April.
4  Q.   Did you have any input into the
5 methodology of the small labeler impact
6 analysis?
7  A.   Of course.
8       MS. CONROY:  Objection.
9 BY MS. LUCAS:
10  Q.   What exactly were your
11 instructions from Ms. Singer, to the best
12 of your recollection?
13  A.   I would say pretty much as
14 written was it's a hypothetical scenario,
15 assuming that, let's say, a physician is
16 flagged, he then or she was reported and
17 taken off-line for the duration of his or
18 her prescribing habits or prescribing
19 history, I should say.  How we went about
20 doing that was on our own.
21       And even --
22  Q.   So let me just make sure I
23 understand.  You were instructed to work
24 backwards from a hypothetical scenario
25 where a physician is flagged and reported

Page 225

2 and taken off-line and then figure out how
3 to create that methodology?
4       MS. CONROY:  Objection.
5  A.   I'm not sure I would characterize
6 it that way.  We were given an assignment
7 of someone is -- a physician is flagged and
8 then there is, you know, a lot of things
9 that have to come after that, but assuming
10 once they've been flagged, they're taken
11 off-line, what is the impact on the rest of
12 the county.
13  Q.   You said a lot of things have to
14 happen after the flagging.
15       What are those things that have
16 to happen after a physician is flagged?
17  A.   So like I said earlier, I'm not
18 an expert in due diligence or reporting
19 requirements to the DEA.
20       So with that in mind, to make
21 this work, I had to make the assumption
22 that once flagged, they stopped
23 prescribing.
24  Q.   At the moment the flagging
25 happened; is that correct?

Highly Confidential – Subject to Further Confidentiality Review

Page 226

2    A.  I believe so, yes.  I'd have to
3  look at the code to be for certain.
4    Q.  So in order for this analysis to
5  work, you had to assume that the prescriber
6  was taken off-line the moment the metrics
7  used were tripped and there was a flag,
8  correct?
9        MS. CONROY:  Objection.
10    A.  I would say for this hypothetical
11  situation to present itself, yes, once
12  someone was flagged and they were taken
13  off-line, what their, what amount of
14  prescriptions were then taken off-line.
15        I'm trying to say it the best way
16  I can.  I'm sorry if I'm not being clear.
17    Q.  Do you believe that your small
18  labeler impact opinion is an accurate
19  representation of what happens in the real
20  world?
21    A.  I'm not really an expert to say
22  that.
23    Q.  Do you have any beliefs on
24  whether it's an accurate representation of
25  what would happen in the real world?

Page 227

2    A.  Any beliefs?  Outside of my
3  expertise here.
4    Q.  You haven't considered it at all?
5    A.  Not as an expert.
6    Q.  As a non-expert?
7    A.  I mean, of course you think about
8  things, but I'm not here to talk about
9  those.
10    Q.  What do you think about it?
11    A.  I mean, I think it's a -- I
12  guess, I mean it's like you give it
13  fleeting thoughts of like -- I don't even
14  really know how to talk about like random
15  thoughts that you have like while riding a
16  bicycle on the way to work about things.
17  Like, you know, I'm thinking about my small
18  labeler impact; I don't really carry it
19  down the logical path of, well, does due
20  diligence actually happen or does this
21  actually happen.  I don't go into that
22  great detail.  So maybe it was a
23  mischaracterization to say do I think about
24  it.  I don't know.  I've kind of walked
25  myself into --

Page 228

2    Q.  Well, if you want to go back to
3  page 11, paragraph 34:  "I was asked by
4  plaintiff's counsel to include additional
5  analysis that examined what would have
6  happened if a labeler with a comparatively
7  small market share had reported and stopped
8  supplies to suspicious prescribers.
9        "I demonstrated that if Janssen,
10  the defendant labeler with the second
11  smallest market share in Summit and
12  Cuyahoga Counties, had reported suspicious
13  activity, prescriptions for millions of
14  dosage units could have been stopped in
15  Summit and Cuyahoga Counties."
16        That's very definitive.  Do you
17  believe that is an accurate statement?
18    A.  It's a hypothetical situation.
19  As we discussed in that section, it's a
20  hypothetical analysis.
21    Q.  Right, but paragraph 34 says you
22  were asked to examine what would have
23  happened.
24        Are you saying now that your
25  small labeler opinion is not a statement of

Page 229

2  your opinion of what would happen?
3    A.  So I would say that the change
4  that we made earlier in the corrections
5  where we went from "would" to "could,"
6  those should have been throughout.  I
7  didn't really get to talk about every
8  single change here.  But, again, these are
9  "could" statements, and I think we stated
10  that pretty definitively in the first part
11  of this deposition.
12    Q.  Right.  I asked because I noticed
13  that the corrections didn't apply to this
14  paragraph.  And so you are now saying that
15  you meant to say "could" have happened?
16    A.  I would be most comfortable with
17  saying "could."
18    Q.  And "could" means that it's
19  feasible, correct?
20    A.  I think that's what that word
21  means, yes.
22    Q.  Do you believe that your small
23  labeler impact opinion is feasible in the
24  real world?
25    A.  I'm not here -- I won't talk

Page 230

1
2  about real world. It's outside of my
3  expertise.
4      Q. So you're not offering any
5  opinion about whether your small labeler
6  impact opinion could happen in the real
7  world, right?
8      MS. CONROY: Objection.
9      A. So I think we've said here that
10  this was what could happen. I'm not
11  offering an opinion about what would happen
12  or should happen.
13      Q. Right.
14      But you're also not offering an
15  opinion about what could happen as applied
16  in the real world, right?
17      A. I guess I'm not really
18  understanding the difference between that
19  question and the one that I just answered.
20      Q. Well, because you said this is
21  all hypothetical.
22      A. Sure, but it relies on real-world
23  data.
24      Q. Which data?
25      A. The IQVIA data.

Page 231

1
2      Q. It is then your opinion that this
3  could happen in the real world, correct?
4      A. It seems a little... it's a lot
5  of time to spend on a hypothetical, but,
6  yes, if all of the assumptions that were
7  outlined in the report that the labeler was
8  -- or that the labeler identified the
9  prescriber and that all the different steps
10  were taken to take them off-line, then,
11  yes, it could happen in the real world.
12      Q. Well, the only two assumptions I
13  think I heard were that one of the metrics
14  was tripped and a flag went up, correct?
15      A. That is one part of the
16  hypothetical.
17      Q. And Janssen would report that
18  prescriber to law enforcement as
19  suspicious, right?
20      A. So as part of the hypothetical,
21  they would be tripped, Janssen could report
22  them. That prescriber, through whatever --
23  or they could be reported, or they could
24  stop prescribing, whatever the means are to
25  get them to stop prescribing.

Page 232

1
2      But the whole point of the
3  analysis is that that prescriber who was
4  flagged then stops prescribing. I don't
5  really claim or really fill out the blanks
6  between what gets from A to B.
7      Q. You said that your assumption is
8  that the prescriber would stop prescribing
9  immediately upon the metric being tripped,
10  right?
11      A. Correct.
12      Q. Do you have any basis to believe
13  that those assumptions would happen in the
14  real world?
15      A. It's really outside of my
16  expertise.
17      Q. You don't know?
18      A. I don't know.
19      Q. Have you ever thought when you
20  were thinking about this analysis whether
21  it was flawed?
22      MS. CONROY: Objection.
23      A. I think --
24      MS. CONROY: Which analysis? The
25  hypothetical you're talking about or --

Page 233

1
2      MS. LUCAS: Her small labeler
3  analysis.
4      MS. LEVY: Okay. I just want --
5  it's a pretty broad question.
6      MS. LUCAS: The report, no.
7  We've been talking about the small
8  labeler. Let me ask it again.
9  BY MS. LUCAS:
10      Q. You said earlier that, you know,
11  sometimes you thought about the analysis
12  and the small labeler impact.
13      Did you ever think that it was
14  flawed?
15      A. No. But I will say I always
16  think about where things could go wrong.
17  That's the point of being a good analyst
18  and data scientist. It's always are we
19  looking for the right things, have we
20  applied things correctly, are we making
21  conservative assumptions.
22      Q. Where do you think things could
23  have gone wrong in the small labeler
24  analysis?
25      A. So the whole hypothetical I think

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1
2  is maybe what's at issue here.  That's the
3  hypothetical situation that I was asked to
4  enact, so that is what it is.
5      Q.  Do you think there is anything
6  that could have gone wrong in the small
7  labeler analysis in the assumptions that
8  you were making?
9      You just said "I want things to
10  be accurate."
11      Do you think this is accurate?
12      A.  I think it is an accurate
13  implementation of the hypothetical
14  situation that we were asked to enact.
15      Q.  We'll come back to this one in a
16  minute.
17      I want to talk about chargeback
18  analysis for a moment.
19      Can you take a look at page 59
20  and table 35.
21      (Witness complies.)
22      Q.  And I think we said -- you said
23  earlier that you changed -- table 35 is the
24  use of chargeback data for compliance,
25  right?

Page 235

1
2      A.  Correct.
3      Q.  And you changed in your
4  corrections the Endo, Par and Qualitest nos
5  in that far right column of whether they
6  used chargeback in suspicious order
7  monitoring program from "no" to "yes."  But
8  Johnson & Johnson and Janssen is listed as
9  no without any citation.
10      Why is that?
11      A.  So it's hard to cite to a
12  document that I don't have.  If there was a
13  "yes," then there would be a document to
14  cite to.
15      Q.  And did somebody tell you to
16  assume "no" for these purposes?
17      A.  I was told, and I think reflects
18  similarly in the footnote earlier that we
19  discussed, maybe it was 83.
20      Give me one second.
21      (Document review.)
22      Q.  Well, let me ask you a different
23  way.
24      When you say "suspicious order
25  monitoring program," are you talking about

Page 236

1
2  only the algorithm?
3      A.  Yes, I think that would be a
4  better characterization.
5      Q.  So you're excluding from
6  suspicious order monitoring program, any
7  follow-up due diligence that the suspicious
8  order monitoring department did when an
9  order was flagged, right?
10      MS. CONROY:  Objection.
11      A.  Yeah, I would say that's outside
12  of the scope.  So to the extent that there
13  was an algorithm that we could implement
14  and chargebacks were used as part of that
15  algorithm, then they get the "yes" here.
16      Q.  Got it.
17      And so...
18      (Document review.)
19      Q.  All right.  Take a look at page 4
20  of the --
21      MS. LUCAS:  Do we have the errata
22  sheet marked?
23      MS. CONROY:  Yes.
24      MS. LUCAS:  From 5/11?
25      Has this been marked?

Page 237

1
2      MS. VENTURA:  No.
3      (Keller Exhibit 10, Expert
4  Analysis - Errata Sheet: Lacey R.
5  Keller, not Bates-stamped, marked for
6  identification, as of this date.)
7  BY MS. LUCAS:
8      Q.  If you look at page 4, table 4.
9      MS. CONROY:  Do you have another
10  copy?
11      MS. LUCAS:  Sure.  I'm sorry,
12  Jayne.
13  BY MS. LUCAS:
14      Q.  This identifies a number of
15  pharmacies flagged by running your
16  compliance metrics over each labeler's
17  chargeback data, correct?
18      A.  Sorry.  Give me one second.
19      (Document review.)
20      A.  Yes.
21      Q.  And for Janssen, it says total
22  buyers 12.
23      Does that mean total buyers in
24  all or total buyers in the chargeback data?
25      A.  That would be total buyers that

Highly Confidential - Subject to Further Confidentiality Review

Page 238

2 appeared in the chargeback data.
3 Q. And for seven of them, you say
4 that seven were flagged by any metric,
5 correct?
6 A. Sorry, just a second. I just
7 want to make sure.
8 So your question earlier, it says
9 total buyers, 12. Yes, total buyers in the
10 chargeback data. And then seven of which
11 were flagged by any metric.
12 Q. Did you do any research yourself
13 to determine whether any of those buyers
14 were actually suspicious?
15 MS. CONROY: Objection.
16 A. That would be outside of the
17 scope of my expertise.
18 Q. And if you take a look back at
19 your report in Exhibit 5 at page 28, table
20 6, this is about IQVIA data.
21 I want to confirm what I think is
22 going to be the case based on what you just
23 told me.
24 In paragraph 80, it says,
25 "Janssen discusses using IQVIA data for

Page 239

2 one-off investigations of suspicious
3 activity."
4 There's no citation there. What
5 is the basis for that statement?
6 (Document review.)
7 A. If it's not in my reliance, then
8 it would have been from an attorney.
9 Q. And the reason that you have "no"
10 listed in the table, whether Janssen used
11 IQVIA data for compliance, is because you
12 were considering only the algorithm,
13 correct?
14 A. Yes. And now that I'm thinking
15 about this, this citation here, chargeback
16 and value track should really -- that
17 citation makes more sense on the table
18 later in the document.
19 But again, yes, if there is an
20 algorithm that would have referenced using
21 IQVIA data in some way, that's the
22 intention of giving a "yes" there.
23 Q. Do you believe the IQVIA data
24 that forms the basis of part one of your
25 report, the prescriber opinions, is

Page 240

2 accurate?
3 A. I have to assume that it is.
4 Q. Is it important that that data be
5 accurate?
6 A. Yes.
7 Q. If the IQVIA data turned out to
8 not be accurate, would that potentially
9 affect your opinions?
10 MS. CONROY: Objection.
11 A. It really would depend on the
12 error or what might be considered accurate.
13 As we were talking earlier, the data was
14 thought to be missing 2007. The inclusion
15 of that would lead to a potentially
16 additional flagging.
17 So depending on characterization,
18 that could be accurate/inaccurate. You
19 know, that's a term of art, so it really
20 depends.
21 MS. LUCAS: I'm going to mark
22 this Exhibit 11 an FDA report stating,
23 "FDA reports quality problems for data
24 provided by the firm IQVIA that were
25 used to inform estimates for some

Page 241

2 controlled substances."
3 (Keller Exhibit 11, Press release
4 entitled "FDA reports quality problems
5 for data provided by the firm IQVIA
6 that were used to inform estimates for
7 some controlled substances", marked for
8 identification, as of this date.)
9 BY MS. LUCAS:
10 Q. Have you seen this document
11 before?
12 A. This document, no, but I do
13 remember reading the press release when it
14 came out.
15 Q. And when did you review the press
16 release? In May of 2008?
17 A. 2018, I believe.
18 Q. I'm sorry, 2018.
19 And did you have any concerns
20 when you read this report about IQVIA data
21 inaccuracies when you read it in 2018?
22 A. I mean, it really depends on
23 which data set. IQVIA offers many.
24 Q. Did you ever ask anyone whether
25 the data set that you had might be subject

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1
2  to the inaccuracies that are reported in
3  this press release?
4      A.  I mean, the data set was provided
5  by Allergan.  We did not purchase it.
6      Q.  Do you know where Allergan got
7  the data set?
8      A.  I do not.  But I assume that it's
9  IQVIA.
10     Q.  Did you ever ask anyone, though,
11 whether anybody had checked to see whether
12 the data set suffered from the same
13 inaccuracies that are in this report in
14 Exhibit 11?
15     A.  I need to review the inaccuracies
16 here before I answer that.
17     (Document review.)
18     Q.  Well, it says, "While conducting
19 analyses," this is fourth paragraph, "While
20 conducting analyses to estimate the amount
21 of prescription opioids sold in the U.S.,
22 FDA found a discrepancy in the IQVIA data
23 that showed a more than 20 percent drop in
24 the reported amount expressed in kilograms
25 of Fentanyl sold for a minimum of the past

Page 243

1
2  five years compared to what IQVIA's
3  database had previously reported."
4      Is that something that would have
5  been relevant to your analysis?
6      A.  It really depends on what data
7  set's impacted, whether or not the data set
8  was purchased prior to or after this.
9  There's lots of factors that could go into
10 that.
11     Q.  And did you ask anyone whether
12 the data set you had might be affected by
13 this inaccuracy?
14     A.  I really just needed to take the
15 data set as it was presented.
16     Q.  Is that a no?
17     A.  Yes.  Yes, that is a no, to make
18 that clear.
19     Q.  And then if you look at the
20 second to last paragraph of the document,
21 third to last says, "Since the FDA
22 identified these issues, our scientists
23 have being looking methodically at the
24 IQVIA data for similar errors relating to
25 other opioids and non-opioid controlled

Page 244

1
2  substances."
3      And then the next paragraph says,
4  "As a result of this work, we identified
5  additional data quality issues related to
6  several other controlled substances with
7  similar weight-based conversion factors
8  including oxymorphone and hydrocodone.
9  These additional errors raised serious
10 concerns about systemic issues with IQVIA's
11 data and quality control procedures."
12     Is that something that you would
13 want to know, whether these errors affected
14 the data set you were working on?
15     A.  I would definitely like to know
16 the extent of the errors, what particular
17 NDC codes they affected and whether this
18 data set would be affected.  But, again,
19 there's lots of unknowns here, which data
20 set.  Is at the IQVIA XPO or other data
21 sets.
22     Q.  So it would be important to know
23 if the data set you were working with was
24 affected by these errors, correct?
25     MS. CONROY:  Objection.

Page 245

1
2      A.  Yes.
3      Q.  I want to go back through --
4      MS. CONROY:  Is this a good time
5  for a break?  We've been going for
6  about an hour.  Is this a good time for
7  a break if we finished with this
8  document?
9      MS. LUCAS:  Yeah, we can take a
10 short break.
11     THE VIDEOGRAPHER:  The time is
12 3:05 p.m.  We are now off the record.
13     (Recess is taken.)
14     THE VIDEOGRAPHER:  The time is
15 3:23 p.m.  We are back on the record.
16 BY MS. LUCAS:
17     Q.  Ms. Keller, can you take a look
18 at page 30 of the report at Exhibit 5 and
19 look at table 9?
20     (Witness complies.)
21     Q.  It's the total prescriptions
22 flagged by compliance metrics by labeler.
23     A.  Yup.
24     Q.  Then it lists the manufacturers
25 and the number of prescriptions that were

Page 246

2 flagged by the different standards and then
3 any flag.
4     Do you see that?
5     A.  Yes.
6     Q.  Did you ever consider what
7 percentage of prescriptions were being
8 flagged by these metrics in relation to the
9 total number of prescriptions for each
10 manufacturer?
11     A.  It doesn't appear to be one of
12 these tables, but it would be possible to
13 pull.
14     Q.  Did you consider it?
15     A.  I don't remember if I pulled that
16 exact breakdown, but it's definitely a way
17 that you can pull the data.
18     Q.  Do you know about what percentage
19 of the prescriptions were flagged?
20     A.  By each metric?  Yes.  That's on
21 table 7.
22     Q.  No, by prescriber.
23     A.  By each prescriber?
24     Q.  Right.
25     A.  So we do that --

Page 247

2     Q.  Or, sorry, by labeler.  Strike
3 that.
4     Do you know each labeler, what
5 percentage of their prescriptions were
6 being flagged?
7     A.  Not with me, no.
8     Q.  Do you have any opinions on what
9 percentage of doctors in the Cuyahoga and
10 Summit County areas were prescribing
11 irresponsibly?
12     A.  No.  I stated earlier in
13 testimony today, that's outside of my
14 expertise.
15     Q.  I have a few more questions about
16 your small labeler impact opinions, if you
17 want to go back to page 53.
18     A.  Thank you.
19     (Document review.)
20     Q.  I wanted to confirm, in your
21 small labeler analysis, were doctors
22 flagged for their prescriptions of Janssen
23 products only or did you flag a doctor
24 based on number of non-Janssen
25 prescriptions so long as that doctor

Page 248

2 prescribed any Janssen product?
3     A.  Give me one moment to re-review
4 the methodology here.
5     (Document review.)
6     A.  So I'd have to look at the code
7 to make sure I'm saying this most
8 accurately, and I would be happy to do
9 that, but I think what we did was you had
10 to have six months of consecutive
11 prescribing Janssen products first.  And
12 then once you reached that threshold, you
13 were then flagged.  And I think we say
14 here, in paragraph 114, that we used
15 Janssen drugs as well as everybody else's.
16     Q.  Where do you see that?
17     A.  The very last statement.  Oh,
18 hang on, actually.  Maybe I am misstating
19 that.  Give me one second.
20     Q.  Okay.
21     (Document review.)
22     A.  I don't know that we actually
23 specifically addressed whether we flagged
24 them based off of all drugs or just Janssen
25 products.  I'd have to consult the code to

Page 249

2 be for certain.
3     Q.  Let's quickly run through the
4 code.  Exhibit 12.
5     (Keller Exhibit 12, Report on
6     Script.SQL, not Bates-stamped, marked
7     for identification, as of this date.)
8 BY MS. LUCAS:
9     Q.  If you can take a look at page 7
10 through 12.  Pages 7 -- starting at the
11 middle where it says "drop table" through
12 page 12 that ends kind of towards the
13 middle-ish where it says "B, year" and then
14 the next word is "select," that's our
15 understanding of the small labeler
16 analysis.
17     Could you confirm that, please?
18     (Document review.)
19     A.  Sorry, dense code.
20     (Document review.)
21     A.  Yes, this appears to be the small
22 labeler analysis.
23     Q.  And by looking at this analysis,
24 does that tell you whether or not doctors
25 were flagged based on Janssen prescriptions

Page 250

1
2    or all labelers' prescriptions?
3        A.   It will, but I have to find it.
4    Sorry.
5        (Document review.)
6        A.   So what this appears to me is
7    that Janssen -- so you first have to
8    prescribe a Janssen product for six months.
9    And after that point, the first flag that
10   you're flagged on is the flag no matter
11   what the labeler is.
12       Q.   Where do you see that in the
13   code?
14       A.   It's through a series of steps.
15   So first there is a chunk of code that
16   identifies the first date of flagging.  And
17   there is a chunk of code with a bunch of
18   nested queries.
19       Q.   What page are you on, 7?
20       A.   I start on 7.
21            It's actually really hard to read
22   formatted this way, so I'm sorry.  It's
23   really hard to follow.  But the gist of it
24   is, yes, you first have a date you're
25   flagged, your earliest flag date.  And then

Page 251

1
2    there is a date in which you are -- your
3    first date of -- your sixth month of
4    prescribing a Janssen product.  And
5    whatever flag date that occurs after that
6    six month of prescribing Janssen, then you
7    would be...
8        Q.   So let me make sure I understand
9    this correctly.
10            This small labeler analysis
11   requires, in order for someone to be
12   flagged, first requires prescribing a
13   Janssen product for six months, correct?
14       A.   Correct, for six -- I believe
15   it's even more stringent.  It's six months
16   within a year.
17            Because I think we partitioned it
18   by data date, which would give it a year.
19   But, again, it's definitely six months of
20   Janssen prescribing.  And then after which,
21   that point in time, then the first date of
22   flagging.
23       Q.   Okay.  So in order for a
24   prescriber to be flagged, it would have to
25   be six months of Janssen prescribing and

Page 252

1
2    then one of these three metrics being
3    tripped, not just for a Janssen product but
4    it could be for any opioid product,
5    correct?
6        A.   Correct.  For the three products
7    that -- so we exclude one because -- and I
8    believe that's the McKesson 8,000 because
9    Janssen doesn't have those drugs, and so it
10   wouldn't really be paying attention to that
11   line of business.
12            And so our assumption would be,
13   yes, any of the other three metrics could
14   have been applied.
15       Q.   But let me just say, does the --
16   strike that.
17            Does the small prescriber
18   analysis include flags that Janssen should
19   have seen for Endo's medications?
20       A.   I'm not going to talk about what
21   should have been seen.
22       Q.   I'm meaning that like in could it
23   be tripped.
24       A.   Yes, because the assumption with
25   IQVIA, just like Allergan has access to

Page 253

1
2    data on Purdue, is that, yes, Janssen could
3    see prescriptions being written about other
4    labelers.  So in addition to the assumptions
5    that we talked about before that Janssen --
6    that one of the flags was tripped and then
7    Janssen reported and then immediately the
8    prescriber stopped prescribing after being
9    reported to law enforcement authorities,
10   the other assumption that's baked into here
11   is that Janssen was monitoring other
12   manufacturer's medications being
13   prescribed, correct?
14       MS. CONROY:  Objection.
15       A.   I wouldn't say that they are
16   monitoring, but --
17       Q.   Under this hypothetical.
18       A.   -- that they were looking at the
19   prescribing history that would have
20   included those labelers.
21            So it depends on the metric.
22   Some metrics look at -- some of the
23   metric -- or, I'm sorry.  Some of the
24   metrics, so if it's "common sense" or

Page 254

2 whatnot, they look at all of them together.
3 They're not really labeler by labeler
4 because it's the whole prescribing history
5 that matters.
6 Q. Do you have any basis in the
7 evidence to say that Janssen was ever
8 monitoring for reporting purposes other
9 labelers' medications?
10 A. That would be outside of my
11 expertise.
12 Q. Is that a "no"?
13 A. Again, it's just outside of my
14 expertise.
15 Q. Well, my question is a little
16 different.
17 Do you have any basis in the
18 evidence to say that you know Janssen was
19 ever monitoring for reporting to law
20 enforcement purposes other labeler's
21 medications?
22 A. So it's not as easy as a "yes" or
23 "no" because you're asking me to review
24 evidence that I wasn't asked to review. So
25 I can't really make a statement here.

Page 255

2 Q. So you have not seen any evidence
3 that Janssen was reviewing for law
4 enforcement reporting purposes other
5 labeler's medications, correct?
6 A. Again, I have not reviewed that.
7 That was not my expertise.
8 Q. Do you have any basis to believe
9 that there is a duty under the Controlled
10 Substances Act for any manufacturer to
11 monitor other manufacturer's medications
12 for purposes of reporting to law
13 enforcement authorities?
14 MS. CONROY: Objection.
15 A. Again, that's outside of my
16 expertise.
17 Q. And you've never seen any
18 evidence of that, right?
19 A. Again, it's outside of my
20 expertise, so I wouldn't be looking at that
21 type of evidence.
22 Q. But you haven't seen any of that
23 evidence, correct?
24 MS. CONROY: Objection.
25 A. Again, I wouldn't have been

Page 256

2 looking for it.
3 Q. Well, I guess I'm trying to
4 understand why this opinion exists if you
5 can't tell me that there is any evidence in
6 the record that it reflects things that
7 actually happened.
8 A. I mean, it was a hypothetical
9 request by -- to me, and so that's what I
10 enacted. I was asked to enact that.
11 Q. Quickly, you said that your
12 opinion assumes that the doctor would stop
13 prescribing immediately upon being reported
14 to law enforcement, correct?
15 MS. CONROY: Objection.
16 A. I would say the assumption is
17 that they do not have any more
18 prescriptions. However that comes to be
19 is...
20 Q. But do you know how long
21 investigations into prescribers take?
22 A. Outside of my expertise.
23 Q. Well, if you look at page 40 of
24 your report, on paragraph 96, it's talking
25 about a prescriber named Ronald Celeste.

Page 257

2 And there was an "...uptick in
3 prescriptions caught the attention of the
4 authorities, who launched a two-year
5 investigation into his practice in 2014."
6 So you know here, in your report,
7 is that the investigation into Mr. Celeste
8 lasted two years, correct?
9 A. That was what was reported in the
10 news.
11 Q. And that's in your report, right?
12 A. It is, but it's one
13 investigation. I can't say what's typical
14 length of time for an investigation. It's
15 outside of my expertise.
16 Q. Yes or no, are you aware of any
17 instance ever in the real world where a
18 prescriber stopped prescribing the moment
19 that an investigation was opened into him
20 or her?
21 MS. CONROY: Objection.
22 A. I'm not really here to talk about
23 the real world. It's outside of my
24 expertise, so I can't answer a "yes" or
25 "no" to that.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

2    Q.   Well, that's not my question.
I'm asking you if are aware of any instance
in the real world where a prescriber ever
stopped prescribing the moment an
investigation was opened.
7    A.   Again outside of my expertise, so
I can't speak to something that I know or
don't know.
10    Q.   You don't know what you don't
know?
12    A.   Actually, I don't know what I
don't know.
14    Q.   I mean, I'm -- you're avoiding my
question because my question is pretty
simple.
17         It's are you aware of any
instance where a prescriber stopped
prescribing the minute that an
investigation was opened into his or her
prescribing practices?
22         MS. CONROY:  Objection.
23   BY MS. LUCAS:
24    Q.   Do you know of that, yes or no?
25    A.   I just am not going to answer a

Page 259

2   question about something that's not my area
of expertise.
4    Q.   Well, refusing to answer
something and not knowing are different
things.
7         Is it then correct that you don't
know of any instance where a prescriber
stopped prescribing the minute that an
investigation was opened into his or her
prescribing practices?
12    A.   Look, I haven't looked at that.
It's not part of my expertise.  I would not
know because it's not part of my expertise.
15    Q.   But you're offering an expert
opinion on this fact that assumes this.
And in order to offer this opinion, you
have to have some factual basis for it.
19         So do you have a factual basis
for this opinion or not?
21         MS. CONROY:  Objection.
22    A.   So what I'm offering is a
hypothetical scenario using the data that's
been provided to me.  I have no expertise
in the real world, due diligence, et

Page 260

2   cetera, that goes beyond that.  So there's
a set of assumptions that go into this and
that is all.
5    Q.   So in order for you to get on the
stand and testify about this opinion at
trial, you must identify a factual basis.
8         Can you do that today?
9         MS. CONROY:  Objection.
10    A.   I really don't know what will go
into that and so I can't answer that.
12    Q.   Is one of the other assumptions
in your small labeler impact analysis that
the patient who would have gotten the
prescription of the flagged doctor does not
go to another doctor and get that same
prescription?
18    A.   I wouldn't say that we talk about
anything about patients in this report.
20    Q.   You didn't consider that?
21    A.   That was not something I would
consider as part of this set of
assumptions.  The patients are not
considered in really anywhere in this
report.

Page 261

2    Q.   And you didn't consider also
whether or not whether the medical board
would revoke prescribing privileges
immediately, correct?
6    A.   Again, it was not part of the
assumptions yes or no.  It's just we had
too make the assumption -- to do the
analysis, you make the assumption that the
prescriber stopped prescribing.  The steps
between medical board, due diligence, et
cetera...
13    Q.   Right.  Because it doesn't work
unless you assume that the prescriber
stopped prescribing immediately, correct?
16    A.   I wouldn't characterize it as it
doesn't work.  It's just part of the
exercise.
19    Q.   Well, does it work if the
prescriber didn't stop prescribing
immediately?  Does the result stay the
same?
23    A.   So you could create a period of
which time -- you know, you could say give
them six months after which they were first

Highly Confidential - Subject to Further Confidentiality Review

Page 262

2 flagged and implement that. It's an
3 analysis. How I complete the analysis can
4 work -- you can bake in any amount of time
5 you'd like, after which time they're first
6 flagged if that's --
7 Q. But for this --
8 A. -- part of this.
9 Q. Sorry.
10 A. Yes, but for this, that was not
11 part assumption.
12 MS. LUCAS: I will reserve my
13 rights given the time constraints and
14 that I have a few more questions or
15 many more questions. If I were given
16 the time, we could spend much more time
17 together, but subject to that
18 Reservation of Rights, we are done and
19 I will pass the witness.
20 Can we go off the record for just
21 a moment?
22 THE VIDEOGRAPHER: The time is
23 3:42 p.m. We are now off the record.
24 (Recess is taken.)
25 THE VIDEOGRAPHER: The time is

Page 263

2 3:45 p.m. We are back on the record.
3 EXAMINATION BY
4 MS. DEAN:
5 Q. Ms. Keller, my name is Claire
6 Dean. I'm with Covington & Burling, and
7 I'm here on behalf of McKesson.
8 Your time with me will be very
9 brief.
10 So if we could turn to page 9 of
11 your report and to paragraph 22. And just
12 let me know once you're there.
13 (Witness complies.)
14 A. Sorry.
15 Q. No problem.
16 A. Here we are.
17 Q. Okay. So paragraph 22, first
18 sentence, "This report focuses specifically
19 and exclusively on manufacturers
20 anti-diversion and suspicious order
21 monitoring programs."
22 Did I read that correctly?
23 A. You did.
24 Q. And just to make sure I
25 understand what that means, to confirm, you

Page 264

2 are not offering any opinions about the
3 suspicious order monitoring programs of any
4 wholesale distributors, correct?
5 A. Correct.
6 Q. You also did not review or
7 analyze the suspicious order monitoring
8 programs of the wholesale distributors,
9 right?
10 A. Correct.
11 Q. And you're not offering any
12 opinions here today or in the future about
13 the anti-diversion efforts of any of the
14 wholesale distributors; is that right?
15 A. Not to my knowledge.
16 Q. And you also didn't undertake a
17 review or an analysis of the anti-diversion
18 efforts undertaken by any wholesale
19 distributor; is that right?
20 A. Correct.
21 Q. Now you offer no opinions about
22 whether or how the distributors may have
23 applied any of the compliance metrics
24 discussed in your report; is that right?
25 A. That's correct.

Page 265

2 Q. And you offer no opinions on what
3 categories of data any of the wholesale
4 distributors may have had access to between
5 1997 and 2017; is that right?
6 A. That is correct.
7 Q. You haven't reviewed any
8 communications between DEA and
9 distributors, right?
10 A. That is correct.
11 Q. And you offer no opinions about
12 whether the distributors could have even
13 applied any of the compliance metrics
14 outlined in your report; is that correct?
15 A. That is correct.
16 Q. And with respect to opinions on
17 suspicious order monitoring programs and
18 the anti-diversion efforts, you also offer
19 no opinions as to McKesson specifically; is
20 that correct?
21 A. That is correct.
22 Q. Now I'd like to turn to page 18
23 of your report, paragraph 57.
24 Now this is where you introduce
25 the McKesson 8,000 rule.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

2    Now you cite a single McKesson
3 document here.
4    You are not offering any opinions
5 about how McKesson may have applied its
6 lifestyle drug monitoring program; is that
7 right?
8    A.  Correct.
9    Q.  You're not offering any opinions
10 about how McKesson's lifestyle drug
11 management program was operated at
12 McKesson?
13    A.  That is correct.
14    Q.  You're not offering any opinions
15 about whether the lifestyle drug monitoring
16 program complied or did not comply with the
17 Controlled Substances Act; is that correct?
18    A.  That's correct.  Outside of my
19 expertise.
20    Q.  You're not offering any opinions
21 about what due diligence steps may have
22 been taken by McKesson personnel during the
23 lifestyle drug monitoring program, right?
24    A.  That is correct.  Outside of my
25 expertise.

Page 267

2    Q.  And you didn't undertake any
3 review or analysis to determine due
4 diligence steps that may have been taken by
5 McKesson under the lifestyle drug
6 monitoring program, right?
7    A.  That is correct.  Outside of my
8 expertise.
9    Q.  Now last couple of questions from
10 me and then we will move on to somebody
11 else.
12    I'd like to turn to page 79 of
13 your report, please.
14    A.  Sure.
15    Q.  And actually if you could turn
16 over to page 80, paragraph 151.
17    (Witness complies.)
18    Q.  In paragraph 151, you referenced
19 McKesson.  So I wanted to confirm that you
20 are not offering any opinions about
21 McKesson as it relates to the Rite Aid
22 pharmacy you're discussing in paragraph
23 151, correct?
24    A.  Correct.  I think all we're doing
25 is just citing that document there and the

Page 268

2 facts behind it.
3    Q.  But you're not offering any
4 opinions about McKesson's involvement with
5 that pharmacy or with Dr. Adolf Harper; is
6 that correct?
7    A.  Correct.  I would -- that's
8 outside of my expertise.
9    Q.  Okay.  And that's outside of the
10 scope of the opinion in the report and the
11 opinion you may intend to offer at trial;
12 is that right?
13    A.  I think that's a correct
14 characterization.
15    Q.  Okay.  And, sorry, I just want to
16 make sure I'm clear because I'm not
17 positive that he was included in this.
18    The same is true for Dr. Adolf
19 Harper, you're not offering any opinions
20 about McKesson as it relates to Dr. Adolf
21 Harper; is that right?
22    A.  Correct.
23    Q.  Now last questions.
24    Sitting here today, are you aware
25 of any future opinions you may be offering

Page 269

2 against McKesson?
3    A.  I mean, anything is possible, but
4 not right this second.
5    Q.  So as it stands today and as
6 outlined in your report, your opinions are
7 being offered exclusively against the
8 labeler defendants and no opinions
9 currently being offered against
10 distributors including McKesson; is that
11 right?
12    A.  Yes.  The report focuses solely
13 on labelers.
14    MS. DEAN:  Okay.  I don't have
15 any further questions, and I will pass
16 my time to someone else.
17    Thank you, Ms. Keller.
18    THE WITNESS:  Thanks, Ms. Dean.
19    THE VIDEOGRAPHER:  The time is
20 3:52 p.m.  We are now off the record.
21    (Recess is taken.)
22    THE VIDEOGRAPHER:  The time is
23 3:54 p.m.  We are now on the record.
24
25 EXAMINATION BY

Page 270

MR. LAVELLE:

Q.  Good afternoon, Ms. Keller.  My name is John Lavelle.  I'm an attorney at Morgan Lewis, and I am representing defendant Rite Aid of Maryland.

I'd like to ask you to turn to your report, page 63.

(Witness complies.)

A.  I'm there.  Sorry.

Q.  Thank you.  That's fine.

So beginning in paragraph 127 of your report, you start a discussion of what you refer to as "suspicious pharmacies"; is that right?

A.  Correct, we use that term.

Q.  Where does that term come from?  What do you mean by "suspicious pharmacies"?

A.  So as we stated earlier on the record today, it's those pharmacies that triggered our metrics or the metrics that we employed, I should be more correct to say.

Q.  And you discuss in your report

Page 271

six different pharmacies that you label as suspicious pharmacies, right?

A.  They were six pharmacies that at some point triggered one of the compliance metrics.

Q.  How are these six pharmacies selected?

A.  Some were selected because of their size in the county.  Some were selected because of the number of -- like I think their prescriptions, so if they were particularly high dose or not.  Others were because they were known to the court.  And others -- and I believe the Rite Aid, for example, was because it was mentioned in conjunction with Adolf Harper.

Q.  So I think you referred to three different reasons there, if I got what you just testified correctly.

You referred to some as being selected because of their size in the county, some because they were known to the court, and then the Rite Aid because it was mentioned in conjunction with Adolf Harper?

Page 272

A.  And then probably a fourth, I would add, of just unusual prescribing -- or, I'm sorry, we've been talking about physicians all day.  Chargebacks or purchases.  So if it's particularly high dose or -- I don't really recall exactly what reason went into each one, but that's generally how examples come to me.

Q.  Who selected them?

A.  I did.

Q.  Anybody else involved in your selection process?

A.  I think there was... I think the New Choice Pharmacy was one that was either known to the court or was requested of me.

Q.  When you say "known to the court," can you tell us what you mean by that?

A.  Yeah.  From what I understand or what I recall is like there's documents about Adolf Harper or some of the other physicians in the report.  And so with the pharmacies, I understood there to be documentation about them as well.

Page 273

Q.  So anyone else at Gryphon involved in the selection of these six pharmacies other than yourself?

A.  My staff.

Q.  Anyone in particular assigned with that task?

A.  I would say a group of them worked on it just to determine, you know, what would be a short list of good examples to show in the report.

Q.  Were you asked by counsel to identify any particular pharmacies?

A.  As a said earlier, I think New Choice would have been one.

Q.  Were you -- how did you learn about Dr. Harper?

A.  That's a good question.

Q.  I thought so.

(Laughter.)

A.  I honestly don't know if it was from reading court documents or being in the same office as some of the -- and I don't want to get into privilege here, but working in the same office as our

Page 274

investigative team.

Q. Did you look at any other pharmacies other than the six that you discussed in this report?

A. Definitely.

Q. Were there any others that you are prepared to offer opinions about if you're called to testify at trial other than these six pharmacies?

A. So to be clear, I don't mean to offer opinions about these pharmacies, just how they appear in the data.

And, two, not at this time.

Q. You're not a pharmacist, right?

A. That is correct.

Q. You have no expertise in operations of pharmacies, right?

A. That is correct.

Q. As you sit here today, do you have any plans to work on developing opinions about pharmacies in the future?

A. Not at this moment, no.

Q. All right. Let's turn to the section of your report that discusses the

Page 275

Rite Aid store, which I believe you referred to as flag pharmacy 6. That begins on page 79 of your report.

A. I'm there.

Q. All right. This is a Rite Aid store that is located at 1047 Kenmore Boulevard in Akron, Ohio, right?

A. I believe so.

Q. Was there any reason other than the fact that it was associated with Dr. Harper, in your view, that it was flagged for discussion in your report?

A. I'd have to look at my notes to be for certain. There might be other reasons, but I don't -- I can't recall them right now. But, again, it could have been because of the number of prescriptions that it was -- I'm sorry, the number of shipments that it had at its -- I'm not saying that correctly. I'm sorry. I've been talking about prescriptions all day. The number of chargebacks that it had or the total number of shipments if we had looked at, like, the ARCOS data, for

Page 276

example.

Q. All right. In paragraph 150, which begins on page 79 and goes on to page 80, can you read the last sentence that actually appears on page 80? It starts with the word "Mallinckrodt."

A. "Mallinckrodt was the only defendant labeler to identify the pharmacy as suspicious, placing them on a 2016 cutoff pharmacy list."

Q. What is your basis for saying that?

A. I believe there is a citation there.

Q. All right. You have a citation and a footnote to a particular document; is that right?

A. That's what I understand that to be.

Q. Do you remember what that document is?

A. It's characterized in the paragraph as a "cutoff pharmacy list."

Q. Do you know whose term "cutoff

Page 277

pharmacy" is? Is that a Mallinckrodt term?

A. If we're putting it in quotes, it would be Mallinckrodt's, but I'd like to review the document if we want to be precise.

Q. All right. I think I have the document and I can show it to you.

Generally speaking, do you recall what that document was?

A. I'd have to look at it to be certain.

MR. LAVELLE: All right. Let me mark this as an exhibit.

(Keller Exhibit 13, Document produced in native format beginning with Bates-stamp MNK-T1_0001315847, marked for identification, as of this date.)

BY MR. LAVELLE:

Q. Ms. Keller, I've put in front of you what we marked for Identification as Exhibit 11.

I'll represent to you this is a printout from a document that was produced

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1
2  in native format.  And the original, as I
3  understand it, is a spreadsheet.
4      A.  Okay.
5      Q.  I will also tell you that it is a
6  spreadsheet that has two tabs.  And I only
7  printed out one of the two tabs.
8      A.  Okay.
9      Q.  And the reason for that, I will
10 tell you, is the second tab has 160,000
11 fields on it and it would fill up hundreds
12 and hundreds of pages.
13     So looking at this tab, do you
14 recognize this document?
15     A.  Yes.  I mean, I don't remember it
16 exactly.  I looked at a lot of data sets
17 through this whole thing, so I can't really
18 recall exactly which ones look familiar and
19 which ones don't.
20     Q.  Do you know how a decision would
21 have been made by your team as to which of
22 the two tabs in a spreadsheet should be
23 used as the tab on which to run analysis?
24         MS. CONROY:  Objection.
25     A.  What's on the other tab?

Page 279

1
2      Q.  All right.  So that's the tab
3  that is a giant spreadsheet.  And although
4  I ask the questions here, I will tell you
5  that there were over 135,000 rows on that
6  tab.
7      As you are sitting here,
8  Ms. Keller, do you believe there was over
9  135,000 pharmacies on the Mallinckrodt list
10 of cutoff pharmacies?
11     A.  I wouldn't know.
12     Q.  You wouldn't know?
13     A.  I wouldn't know what they put
14 on -- let me say that a little bit -- I
15 wouldn't know exactly how -- to the extent
16 of how many pharmacies Mallinckrodt would
17 cut off or were put on a cutoff list.
18     Q.  Do you see the Rite Aid pharmacy
19 located at 1047 Kenmore Boulevard in Akron,
20 Ohio, on this list that I've put in front
21 of you that we marked as Exhibit 11?
22         MS. CONROY:  13.
23         MR. LAVELLE:  I'm sorry, 13.  My
24 apologies.
25         (Document review.)

Page 280

1
2      A.  I don't see that pharmacy in
3  Exhibit 13, but I don't know what's on the
4  other tab or what the whole entire document
5  is.
6      Q.  So would you agree with me that
7  if this particular tab that we marked as
8  Exhibit 13 is in fact the cutoff pharmacy
9  list, that that Rite Aid pharmacy is not in
10 it?
11     A.  I would agree that -- and let me
12 do one more run-through to be sure.
13     Q.  Sure.
14         (Document review.)
15     A.  I would say that I do not see
16 Rite Aid in this Exhibit 13.
17     Q.  Have you ever heard of something
18 called a chargeback restriction
19 reinstatement list?
20     A.  No, I have not.
21     Q.  Have you ever seen the email to
22 which this document that we marked as
23 Exhibit 13, the spreadsheet, was attached?
24     A.  Not that I can recall sitting
25 here.

Page 281

1
2      Q.  All right.  Well, let's mark it
3  as an exhibit, and I'll show it to you and
4  you can tell us whether you've seen it
5  before or not.  Thank you.
6         (Keller Exhibit 14, Email chain
7      beginning with email dated 9/23/16 from
8      K. Harper to McKenzie, Bates-stamped
9      MNK-T1_0001315844 through 5846, marked
10     for identification, as of this date.)
11 BY MR. LAVELLE:
12     Q.  Ms. Keller, we've marked as
13 Exhibit 14, a document that's Bates-stamped
14 MNK-T1_0001315844 through 46.  It's an
15 email chain.  And I'll just note for the
16 record that it immediately precedes the
17 Bates number of the document we were
18 looking at just a moment ago which was
19 Exhibit 13.
20     So my question is:  Have you ever
21 seen this document, the one we marked as
22 Exhibit 14, before?
23     A.  This does not look familiar to
24 me.
25     Q.  All right.  Can we just look at

Highly Confidential - Subject to Further Confidentiality Review

Page 282

the second page of this document? There is
an email there from a Karen Harper of
Mallinckrodt to Patrick Dudley of Cardinal
Health dated Wednesday, March 30, 2016, at
2:06 p.m.
        Do you see that?
    A.  I'm there, yes.
    Q.  And the second paragraph,
Ms. Harper writes to Mr. Dudley, "For your
convenience, I have attached the current
spreadsheet of pharmacy chargeback
restrictions and reinstatements.
(Reinstatements highlighted in green.)"
        Do you remember ever seeing that
before?
    A.  I do not.
    Q.  Do you know whether the pharmacy
chargeback restrictions and reinstatements
list is the list that you intended to refer
to as the pharmacy cutoff list in your
report?
    A.  I really couldn't be sure without
consulting what we had.
    Q.  What would you need to look at in

Page 283

order to be able to answer that question?
    A.  I would need to look at the
document as it was produced to us and how
it appeared.
    Q.  And do you have notes as well
that you would be able to look at?
    A.  I might.
    Q.  What kind of notes might you
have?
    A.  They might be notes to myself or
notes by my staff.
    Q.  Now you make this same statement
about Mallinckrodt being the only defendant
labeler to identify a pharmacy as
suspicious putting them on the cutoff
pharmacy list with respect to each and
every one of these six pharmacies, don't
you?
    A.  I'd have to look.
    Q.  Well, let's start by looking at
paragraph 128 on page 63 of your report.
That's the section that refers to the
Marc's 23PU pharmacy.
        (Document review.)

Page 284

    A.  Okay.
    Q.  Do you have that in front of you?
    A.  I do.  Thank you.
        (Document review.)
    A.  Yes, I see that.  Same citation.
    Q.  And you cite the same document
again, right?
    A.  Yes.
    Q.  The Marc's 23PU pharmacy isn't in
that spreadsheet either, is it?
    A.  It's not in an exhibit -- I have
to look, but it's not in Exhibit 13.
    Q.  Right.
    A.  Again, there is a second tab, and
I'd have to look at the entire document to
be certain.
    Q.  Turn to paragraph 120 -- I'm
sorry, page -- the CVS section here.
Paragraph 133 on page 67.
    A.  Okay.
    Q.  Again you have that same
sentence, do you not, "Mallinckrodt was the
only defendant labeler to identify the
pharmacy as suspicious, placing them on a

Page 285

2016 cutoff pharmacy list," right?
    A.  Again, the same citation.
    Q.  And the same citation and the
same document?
    A.  Correct.
    Q.  All right.  We can go through
this process for each of them, but suffice
it to say that none of these six pharmacies
appear on what we marked as Exhibit 13.
        So does that suggest to you that
you relied on the second tab of whatever
that document is?
    A.  If Exhibit 13 is the first tab
and the pharmacies are in the second tab,
then logic would be yes.
    Q.  All right.  And if it turned out
that tab 2 was not the cutoff pharmacy list
but in fact was a listing of every pharmacy
in the United States, that would have been
a mistake, right?
    A.  I'd have the review that to be
sure.
    Q.  You don't have a view as we sit
here today as whether or not a tab that had

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1
2  over 135,000 rows in a spreadsheet could
3  possibly be a cutoff pharmacy list?
4       MS. CONROY:  Objection.
5       A.  Again, I'm not here to talk about
6  what actually was suspicious or not
7  suspicious from the labelers' perspective.
8  So that's outside of my expertise.  I
9  wouldn't have known what would have been a
10  reasonable amount.
11      Q.  All right.  Coming back to the
12  discussion of that Rite Aid pharmacy on
13  page 80, paragraph 151, and I think you
14  said this earlier, that you viewed this as
15  connected to Dr. Harper, this Rite Aid,
16  correct?
17      A.  Yes, I believe there was some
18  documents there that discussed that
19  Rite Aid in connection with Dr. Harper.
20      Q.  Yes.
21          Do you remember what those
22  documents were?  You cite two documents in
23  your footnote there at the bottom of page
24  80.
25      A.  I don't recall them off the top

Page 287

1
2  of my head.
3       Q.  Do you have any recollection of
4  what they were at all?  Were they emails?
5  Were they spreadsheets?  What were they?
6       A.  I'd have to look to be certain.
7       Q.  All right.  You don't have any
8  recollection at all even if --
9       A.  I'm sorry, there's like hundreds
10  of cites and hundreds of thousands of rows
11  of data.
12      Q.  All right.  Well, let me mark
13  that as the next exhibit, next two
14  exhibits, and we can look at them together?
15          (Keller Exhibit 15, Email chain
16      beginning with email dated 10/31/11
17      from Oriente to Nichols, Bates-stamped
18      MCKMMDL006332908 through 2910, marked
19      for identification, as of this date.)
20  BY MR. LAVELLE:
21      Q.  And so Ms. Keller, we marked as
22  Exhibit 15 the document that's
23  Bates-stamped MCKMDL00632908 through 10,
24  which I think is the first document you
25  reference in this footnote; is that right?

Page 288

1
2       A.  That looks correct.
3       Q.  Do you recognize this document?
4       A.  Yes.
5       Q.  How did you find this document?
6       A.  I don't recall.
7       Q.  Did someone give it to you?
8       A.  I don't recall.  I really don't.
9       Q.  Did you do searches for records
10  through documents in the process of
11  preparing your report?
12      A.  We did.
13      Q.  You say in this report that this
14  Rite Aid "...requested that McKesson
15  increase its threshold on oxycodone because
16  of increased activity from Dr. Harper,
17  though one request was denied."
18          Do you remember saying that in
19  your report?
20      A.  I'm looking at that statement
21  here.
22      Q.  Right.
23          Who denied that request?
24      A.  Based off the statement, I would
25  assume McKesson, but I'd have to look at

Page 289

1
2  the document.
3       Q.  All right.  Well, let's take a
4  look at this document that we have in front
5  of you.
6          You see at the top first page,
7  Mr. Oriente from McKesson is the author of
8  an email?
9          Let's start by looking -- this is
10  one of the email chains that goes from
11  bottom to top.
12          You see on the second page, the
13  one that is Bates-stamped No. 9, there is
14  an email from Sophia Lai at Rite Aid.
15          Do you see that?
16      A.  Sorry, at the --
17          MS. CONROY:  Here, turn it.
18          (Document review.)
19      A.  It copied Sophia Lai.
20      Q.  Right.
21          So the first email is from Dave
22  Gustin at McKesson.  And he says, "Let me
23  know if this is truly needed," right?
24      A.  That looks --
25          MS. CONROY:  Okay.

Page 290

1
2     A.  It's hard to follow, but it looks
3  like the first one is from Jenna Nichols
4  and the second one is from Dave.
5     Q.  Right.
6        Let's go to the second page of
7  this document, the email from Sophia Lai.
8        And she is at Rite Aid, correct?
9     A.  Correct.
10    Q.  What does Ms. Lai say?  She says,
11 "Please hold off," right?
12    A.  She says those words, correct.
13    Q.  Direct quote, "Please hold off.
14 We have certain procedures we need the PDM
15 to verify prior to a second increase.  I
16 will follow up and let you know if we need
17 to increase the threshold."
18       Right?
19    A.  She does say those words.
20    Q.  Okay.  And then on the top of
21 this document, Mr. Oriente from McKesson
22 says that "The doctor is an OB/GYN, not a
23 pain management specialist.  I'm going to
24 deny this additional increase," right?
25    A.  That's where things get hard to

Page 291

1
2  read.
3     Q.  It's at the top of the first page
4  here.
5     A.  Okay.  So I assume all the rest
6  of this is copy-and-paste or what --
7     Q.  Well, just can you agree with me
8  that Mr. Oriente says at the top of this
9  email, "The doctor listed for the threshold
10 review may be an issue that you want to do
11 additional due diligence on.  He is an
12 OB/GYN not a pain management specialist.
13 I'm going to deny this additional
14 increase"?
15    A.  He does say those words.
16    Q.  Right.
17       All right.  Now does looking at
18 this help you remember what the other
19 document was?  I'm trying to speed this
20 along, but I can --
21       MS. CONROY:  The other document
22    referenced in footnote 155?
23       MR. LAVELLE:  Yes.
24    A.  No, we'd have to go through those
25 as well.  I'm sorry.

Page 292

1
2     Q.  Okay.  That's okay.  I have it
3  here.  I will show it to you now.
4        (Keller Exhibit 16, Email chain
5     beginning with email dated 10/31/11
6     from Lai to Oriente and others,
7     Bates-stamped MCKMDL00626683 through
8     6685, marked for identification, as of
9     this date.)
10 BY MR. LAVELLE:
11    Q.  Ms. Keller, we marked as
12 Exhibit 16, a document Bates-stamped
13 MCKMDL00626683 through 5.
14    A.  Okay.
15    Q.  Would you agree with me that's
16 the second document that's referenced in
17 that footnote of yours?
18    A.  That is what we cite, yes.
19    Q.  All right.  You can look through
20 the whole email.  I believe it is actually
21 pretty much a copy of a large part of the
22 same chain we were looking at before except
23 there is a new email at the top from Sophia
24 Lai to a group of people at McKesson,
25 October 31, 2011.

Page 293

1
2        Do you see that?
3     A.  I see that.
4     Q.  And can you read for us what
5  Ms. Lai says in her email to the
6  individuals at McKesson?
7     A.  She says, "I agree.  We ran a
8  report and checked his DEA number and saw
9  the same thing.  We have the PDM reviewing
10 a checklist to visit the clinic.  No
11 increase at this time.  Thanks."
12    Q.  All right.  So having looked at
13 both of these documents, does that help
14 refresh your recollection as to who denied
15 the request for an increase?
16    A.  Yes.
17    Q.  Who was it?
18    A.  Well, it appears that McKesson
19 denies the increase.
20    Q.  And Rite Aid did too, didn't
21 they?
22       MS. CONROY:  Objection.
23    A.  I can read the words that
24 Rite Aid said here when they say "please
25 hold off," but I don't know how -- if I

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1
2  would characterize it as a denial.  I'm not
3  really an expert in that.
4      Q.  Okay.  You reference also the
5  deposition of Sophia Lai Novack in that
6  same footnote, right?
7      A.  I do.
8      Q.  Did you read that?
9      A.  You'd have to refresh my memory.
10  I read or skimmed a lot of depositions.
11      Q.  Do you remember as you sit here
12  today whether Ms. Novack was actually shown
13  a copy of either of those documents?
14      A.  That, I don't know.
15      Q.  How did you pick Ms. Novak's
16  deposition to cite here?
17      A.  I don't recall specifically, but
18  I -- it might have been suggested to me.
19      Q.  By whom?
20      A.  An attorney.
21      Q.  Ms. Singer, perhaps?
22      A.  That, I don't recall.
23      Q.  If it wasn't Ms. Singer, who else
24  could it have been?
25      A.  I don't remember all the

Page 295

1
2  attorneys.  I worked with several, so I
3  don't recall the names, but I could look.
4      Q.  Were you given access to a
5  database of depositions?
6      A.  If they were in Relativity, then
7  yes.
8      Q.  Do you remember as you sit here
9  whether you were given access to
10  depositions as part of that Relativity
11  database or not?
12      A.  I definitely know I searched for
13  some of the depositions somewhere that were
14  in here.
15      Q.  With respect to Dr. Harper, you
16  described that he surrendered his license
17  in May of 2012, right?  I think you say
18  that in paragraph 104 of this report on
19  page 46.
20      A.  Sorry, say again.  What
21  paragraph?
22      Q.  Paragraph 104, which is on page
23  46.
24      A.  Thank you.
25      (Document review.)

Page 296

1
2      A.  Correct.
3      Q.  And you also say that he pled
4  guilty to drug-trafficking charges in 2014.
5  You say that in paragraph 105.
6      A.  That appears to be so.
7      Q.  Where did you get that
8  information?
9      A.  That must be from the press
10  release that we read online.
11      Q.  Are you aware that the
12  deposition's been taken in this place of
13  the detective who was the lead investigator
14  on Dr. Harper's investigation?
15      A.  Am I aware that there have been
16  depositions taken?  No.
17      Q.  Have you ever heard of the name
18  Detective Patrick Leonard?
19      A.  No.
20      Q.  Are you aware that he was the
21  lead detective on the Harper investigation?
22      A.  No.
23      Q.  Are you aware that his deposition
24  was taken in this case?
25      A.  No.

Page 297

1
2      Q.  Are you aware that he testified
3  that he was given a tip by a pharmacist
4  working at the Rite Aid pharmacy on Kenmore
5  Avenue in Akron over a year before
6  Dr. Harper had to surrender his license?
7  Were you aware of that?
8      A.  As I said, I didn't read the
9  deposition, so I wouldn't be aware of
10  anything that was in it.
11      Q.  Were you aware that tips were
12  provided to law enforcement officials by
13  other pharmacies in addition to that
14  Rite Aid pharmacy that you flagged in this
15  report?
16      A.  No, that would be outside of my
17  expertise.  And, again, I didn't read his
18  deposition, so I wouldn't know.
19      Q.  So no one told you, for example,
20  that CVS also flagged Dr. Harper over a
21  year before his license was revoked?
22      A.  I was not told that, no.
23      Q.  Did anyone tell you that
24  Walgreens also flagged Dr. Harper and
25  complained about him to law enforcement

Page 298

2  over a year before his license was revoked?
3      A.  No, again outside of what I would
4  have been told or looked at in this report.
5      Q.  Did anyone tell you that Giant
6  Eagle, a supermarket chain which operates
7  pharmacies, also complained about
8  Dr. Harper to local law enforcement
9  officials over a year before his license
10 was revoked?
11     A.  No, as it was outside of the
12 scope of this report.
13     Q.  And I suppose no one told you
14 that another local pharmacy, Ritzman
15 Pharmacy, also complained about Dr. Harper
16 to local law enforcement officials over a
17 year before his license was revoked?
18     A.  Same answer.  Again, it would be
19 outside of the scope, so I was not told
20 that, no.
21     Q.  So when you say in your report
22 that this Rite Aid pharmacy was associated
23 with Dr. Harper, you're not referring to
24 the fact that this Rite Aid pharmacy
25 provided a tip to local law enforcement

Page 299

2  officials that were actually important in
3  starting the investigation against him; is
4  that right?
5      MS. CONROY:  Objection.
6      A.  So when I say this Rite Aid was
7  associated, you know, it's the documents
8  that we cite there.  Again, as far as what
9  was actually done by labelers or pharmacies
10 in the course of actual due diligence or on
11 the ground, as we were saying earlier in
12 the day, enforcement actions, that would be
13 outside of the scope of my expertise or
14 report.
15     Q.  It's outside of your expertise.
16 It's also outside of your knowledge, right?
17     A.  I think that would be correct to
18 say, that I... I think that would be
19 correct to say.
20     Q.  Thank you, Ms. Keller.  That is
21 all I have.
22     A.  Thank you.
23     THE VIDEOGRAPHER:  The time is
24 4:27 p.m.  We are off the record.
25     (Recess is taken.)

Page 300

2      THE VIDEOGRAPHER:  The time is
3  4:42 p.m.  We are back on the record.
4  EXAMINATION BY
5  MS. O'GORMAN:
6      Q.  Good afternoon, Ms. Keller.  My
7  name is Debra O'Gorman.  I represent Purdue
8  defendants, and I have just a few questions
9  for you this afternoon.
10     If you could take a look at
11 Exhibit 5, your expert report, page 89.
12 And I'll refer you to the references to 867
13 data.
14     A.  I'm there.
15     Q.  And you said you had 867 data
16 only for Purdue; is that correct?
17     A.  Correct.
18     Q.  And what is 867 data?
19     A.  I think we addressed this earlier
20 today, and it's my intention to state the
21 same answer.  But I understand it to be
22 data that labelers have that tracks the,
23 their products.
24     Q.  Do you recall the time period
25 covered by Purdue's 867 data?

Page 301

2      A.  Yes.  I would have that here.
3      On page 59, table 34, after
4  processing, that would be from 2009 to
5  2018.  That was the data that was provided
6  to me.
7      Q.  And you mentioned in your report
8  that you had 3,572 files of 867 data.
9      Do you recall that?
10     A.  Yes.  I'd have to go back to the
11 methodology, but I believe it was produced
12 in more than 3,000 files.
13     Q.  And what did you do, if anything,
14 to combine those files?
15     A.  Sure.
16     So you can see on page 90,
17 paragraph Z, we had 3,572 files of five
18 different schemas.  So they were all
19 without column headers, from what I
20 understand, but I could be wrong in stating
21 that because it doesn't -- I'm sorry, one
22 of them did not have a schema, but they had
23 different schema lengths, and so those were
24 then appended to one another based off of
25 the columns in common.

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1
2   Q.  So you combined those files and
3   then used that to run your analysis?
4   A.  That's correct.
5   Q.  Okay.  If I can refer you to page
6   20 of your expert report, you reference
7   there certain Purdue algorithms.
8   A.  Correct.
9   Q.  And what is algorithm?
10  A.  It can mean anything to anybody,
11  to be honest.  The term has been somewhat
12  polluted recently to mean anything.  A lot
13  of companies like to say they have this
14  fancy algorithm to predict X, Y and Z, but
15  as far as this, we interpreted an algorithm
16  to mean an operating procedure or something
17  that was documented as to be done by the
18  labeler.
19  Q.  And what, if anything, did you do
20  to try to replicate Purdue's algorithms for
21  your report?
22  A.  Those would be in the addendum.
23  Q.  So for your initial report, you
24  didn't do anything to replicate Purdue's
25  algorithms?

Page 303

1
2   A.  Correct.  I think the one that we
3   mention here, there was not enough
4   information to be able to implement it
5   accurately, but we do in the addendum.
6   Q.  Okay.  And in the addendum, you
7   add five metrics that you obtained from
8   Purdue documents; is that correct?
9   A.  Without counting them, but, yes,
10  we implement a number of --
11  Q.  And those are on pages 26 and 30
12  of your supplemental report, correct?
13  A.  Yes.  I see one, two that were
14  manufactured to prescriber.  And then one,
15  two, three that were manufactured to
16  pharmacy metrics.
17  Q.  Do you recall if these metrics
18  were identified by you or somebody on your
19  team?
20  A.  They were identified by me or
21  somebody on my team.
22  Q.  And do you know how they were
23  identified?
24  A.  I believe one I found out after
25  filing the report because I was reading a

Page 304

1
2   different deposition that -- or document
3   that referenced a set of the metrics.
4   And then in looking for a
5   definition of chargeback, we found the
6   other metrics.
7   Q.  Okay.
8   MS. O'GORMAN:  Can you mark this
9   as the next exhibit.
10  (Keller Exhibit 17, Purdue Pharma
11  L.P. document Bates-stamped
12  PDD1503450011 through 0024, marked for
13  identification, as of this date.)
14  BY MS. O'GORMAN:
15  Q.  We marked as Exhibit 17 a
16  document Bates-stamped PDD1503450011.
17  Is this one of the documents that
18  you used to identify Purdue metrics?
19  A.  Let me be for certain.
20  Q.  I believe it's referenced on page
21  26 of your expert report in one of the
22  footnotes, although you use the Bates
23  number ending in 12, which is the second
24  page of the document.
25  A.  Yes.

Page 305

1
2   Q.  Was this document available to
3   you at the time you prepared your initial
4   report?
5   A.  If it was cited in the report,
6   then it was.  But as I said earlier in my
7   testimony, that I believe we received the
8   document a little bit too soon to filing to
9   be able to implement these metrics.
10  Q.  And it looks like numbers 2 and 4
11  on page that ends in 12 of this report were
12  implemented by you in your addendum as
13  Purdue metrics; is that right?
14  A.  Correct.
15  Q.  And you did not apply the other
16  criteria identified in this document,
17  correct?
18  MS. CONROY:  Objection.
19  A.  So, for example, the cash
20  prescriptions, I don't --
21  (Interruption.)
22  THE VIDEOGRAPHER:  The time is
23  4:48 p.m.  We are now off the record.
24  (Recess is taken.)
25  THE VIDEOGRAPHER:  The time is

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1
2     4:50 p.m.  We are back on the record.
3   BY MS. O'GORMAN:
4     Q.  So before we had an unintended
5   break, you were telling me about or I asked
6   you about the application of other criteria
7   in this Purdue document.
8     A.  Yes.
9         So as far as implementing other
10  or speaking about other SOMS programs, no,
11  that would be outside of expertise.
12        But as you can see on the
13  document, there could be considered a
14  metric on point 3 where it talks about cash
15  prescriptions as an example.
16        I was not provided with data
17  about the number of cash prescriptions as
18  part of total prescriptions.  I didn't have
19  that type of data.  And I think I even note
20  that in my limitations.
21    Q.  Okay.  And you see that the
22  numbers 3, 4, 5, and 6 on this document are
23  various steps that would be taken.
24        Do you see those there?
25    A.  Sure.  I see those steps.  Sorry.

Page 307

1
2   I didn't mean to be flippant.
3     Q.  And do you know whether any
4   action was taken in conforming with those
5   steps in connection with any orders that
6   you flagged under this metric?
7     A.  That would be outside of the, my
8   expertise.
9         (Keller Exhibit 18, Document
10        produced natively, Bates-stamped
11        PPLP004449246, marked for
12        identification, as of this date.)
13  BY MS. O'GORMAN:
14    Q.  We marked as Exhibit 18 a
15  document numbered PPLP004449246.
16        Do you recognize this document as
17  one from which you obtained Purdue metrics?
18    A.  I do.  I found it.
19    Q.  And on the fifth page of that
20  document, there is a list of additional
21  metrics to identify pharmacies for review.
22        Do you see that there on the
23  bottom page?
24    A.  Yes.
25    Q.  And is this where you obtained

Page 308

1
2   the Purdue metrics that you've included in
3   your supplemental addendum?
4     A.  Yes.  I think the ones that we
5   implement are from that 2010 to 2012 period
6   because those are the ones that we felt
7   that we could, we had enough information
8   to -- hang on to make sure.
9         (Document review.)
10    Q.  I believe it's in the 2012 to
11  2015 -- ^ ck speaker
12    A.  That's --
13    Q.  -- time period?
14    A.  I misspoke when I said 2010 to
15  2012.  Her correction of 2012 to 2015.
16    Q.  And how did you come to select
17  these metrics?
18    A.  So as we went through, if there
19  was something that we felt that could
20  create a flag or a metric, then we could.
21  And so these specifically say metric No. 1,
22  metric No. 2 and metric No. 3, so that is
23  why we chose those.
24    Q.  And these are listed here as
25  additional metrics.

Page 309

1
2         Do you see that in the title?
3     A.  Yes.
4     Q.  Does that suggest to you that
5   these are in addition to other metrics that
6   were being applied?
7     A.  I don't really know what else --
8   I don't really understand or really weighed
9   the considerations of the other documents.
10  I just saw some metrics that I attempted to
11  implement here.
12    Q.  And do you see that these metrics
13  require or contemplate that there will be a
14  review when metrics might be triggered, the
15  last two bullet points under that same
16  section?
17    A.  I do see those statements on this
18  document.
19    Q.  And you have no knowledge of any
20  review that would have been done by Purdue
21  in connection with any orders that might
22  have been flagged under your application of
23  the metrics; is that correct?
24    A.  Correct.  I would not speak to
25  the actual on-the-ground due diligence or

Page 310

1  what was done in real life.
2      Q.   And am I also correct that you're
3  not suggesting that the DEA required any of
4  these metrics that you've identified?
5          MS. CONROY:  Objection.
6      A.   Correct.  That would be outside
7  of my expertise.
8      Q.   And you're not offering an
9  opinion on the real-world results or the
10 application of any of these metrics; is
11 that correct?
12     A.   That would be correct.
13     Q.   Now we've talked earlier at your
14 deposition about the IQVIA data set that
15 you utilized for your review.
16         Do you recall that testimony?
17     A.   Yes, I remember speaking about
18 IQVIA.
19     Q.   And that was the Allergan data
20 set that you reviewed, correct?
21     A.   Correct.
22     Q.   Do you have any familiarity with
23 what information Purdue received from IQVIA
24 or IMS at any point in time?

Page 311

1      A.   I did review some documents.
2      Q.   And what do you recall about
3  those documents?
4      A.   So I have, in my other reliance
5  materials that I brought with me this
6  morning, documents that cite Purdue's
7  purchases of IQVIA data from several years
8  over the past, at least into the '90s.  I
9  don't remember at what point those start.
10     Q.   Do you know what data
11 specifically Purdue purchased from IQVIA
12 for particular years?
13     A.   Xponent.
14     Q.   Do you know whether Purdue
15 received information related to all opioids
16 or only its own products at any given point
17 in time?
18     A.   I'd have to consult the document
19 to be certain.
20     Q.   Do you have any expertise in
21 pharmaceutical marketing?
22     A.   I do not.
23     Q.   Have you ever worked for a
24 pharmaceutical company?

Page 312

1      A.   I have not.
2      Q.   Have you ever been present for a
3  sales call by a pharmaceutical
4  representative?
5      A.   No.
6      Q.   Do you have any expertise in the
7  purpose for which sales calls are made?
8      A.   I do not.
9      Q.   Is it correct, then, that you
10 have no familiarity with the educational
11 component of sales calls by pharmaceutical
12 representatives?
13     A.   That would be outside of my
14 expertise.
15     Q.   Have you ever reviewed call notes
16 for a pharmaceutical company?
17     A.   I have.
18         MS. CONROY:  In any --
19         THE WITNESS:  Oh, sorry.
20         MS. CONROY:  In any litigation?
21         MS. O'GORMAN:  Ever.
22         MS. CONROY:  Yeah, okay.
23 BY MS. O'GORMAN:
24     Q.   In what situation have you

Page 313

1  reviewed call notes?
2      A.   So I think we cite to a few call
3  notes in this document.
4      Q.   And do you consider yourself to
5  have any expertise in the interpretation of
6  call notes?
7      A.   No.
8      Q.   Have you reviewed any of the
9  other expert -- any of the defense expert
10 reports that have been submitted in this
11 matter?
12     A.   Yes.
13     Q.   Do you know which ones you
14 reviewed?
15     A.   Bell, Buthusiem, I might be
16 saying it wrong, to be honest with you.  We
17 already talked about that.
18     Q.   Any others?
19     A.   That is all.
20     Q.   Do you recall reading a report by
21 Iain Cockburn?
22     A.   No.
23     Q.   If you can take a look at your
24 initial expert report, page 16, tables 1

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1
2  and 2.
3      A.  Sure.  I am there.
4      Q.  And what was Purdue's market
5  share in the relevant counties by
6  prescription as listed in tables 1 and 2?
7      A.  3.3 in table 1 in terms of total
8  county percentage and 3.7 -- for Summit
9  County, I should say.  And 3.7 for
10  prescriptions in Cuyahoga County.
11      Q.  Is that information that you
12  calculated?
13      A.  That would be through a SQL
14  script, yes.
15      MS. O'GORMAN:  I have no further
16  questions.  Thank you.
17      THE VIDEOGRAPHER:  The time is
18  4:59 p.m.  We are now off the record.
19      (Recess is taken.)
20      THE VIDEOGRAPHER:  The time is
21  5:00 p.m.  We are now back on the
22  record.
23  FURTHER EXAMINATION BY
24  MS. LEVY:
25      Q.  Ms. Keller, I am Jenny Levy

Page 315

1
2  again.  I have what I think should be a
3  really quick follow-up question based on
4  your responses to the questioning by the
5  last three lawyers who have been
6  questioning you.
7      A couple times in your answer you
8  keep referring to the Allergan data.
9      Do you remember the answers that
10  I'm referring to?
11      A.  Yes, I think so.
12      Q.  And when you refer to the
13  Allergan data, you're referring to the body
14  of data from IQVIA XPONENT database,
15  correct?
16      A.  That's correct.  It's actually
17  cited in this exhibit that you just handed
18  me, I believe.
19      Q.  A couple of your answers make it
20  seem to me as if you are under the
21  impression that Allergan, the business, has
22  always had that data.
23      Is that the impression that
24  you're under?
25      A.  That, I wouldn't know for

Page 316

1
2  certain, but they did produce data for the
3  entire time period '97 and 2017.
4      (Keller Exhibit 19, Letter on
5  Kirkland & Ellis letterhead dated
6  8/31/18 from Welch to Donna Welch to
7  the Plaintiffs' Executive Committee,
8  not Bates-stamped, marked for
9  identification, as of this date.)
10  BY MS. LEVY:
11      Q.  Okay.  I'm going to show you what
12  has been marked as Exhibit 19.  We just put
13  that in front of you.
14      A.  Thank you.
15      Q.  I assume that you have not seen
16  this document before right now.
17      Am I right about that?
18      A.  That is correct.
19      Q.  Okay.  This is a document from --
20  on Kirkland & Ellis letterhead.  That is --
21  I'll represent to you that is the law firm
22  we're in right now.  It's my law firm.  And
23  this is a letter from my partner Donna
24  Welch to the Plaintiffs' Executive
25  Committee.

Page 317

1
2      Do you see that?
3      A.  I do see that.
4      Q.  And do you know what the
5  Plaintiff's Executive Committee is?
6      A.  I do not know what that is.
7      Q.  Okay.  And you look at the second
8  page of Exhibit 19 on the back, when you
9  see the list of the cc's on this
10  document --
11      (Document review.)
12      Q.  -- and you see in that list of
13  cc's you see among other lawyers, Linda
14  Singer's name, second to the last?
15      A.  I do.
16      Q.  Do you recognize any of the other
17  lawyers on that cc list?
18      A.  Tom Egler.
19      Q.  Is he one of the lawyers that you
20  interacted with in preparation with your
21  opinions in this case?
22      A.  Not particularly, no.
23      Q.  How do you recognize that name
24  then?
25      A.  He was the one that I remembered

Page 318

1
2 knowing to ask -- or his name came up, I
3 guess is more correct to say, in getting
4 the IQVIA data.
5    Q.   So if you turn back over to the
6 front page of Exhibit 19, in the second
7 bolded section that's labeled "IQVIA Data,"
8 are you with me?
9    A.   I'm there.
10    Q.   In that paragraph it says, "On
11 August 10th, 2018, Allergan Finance
12 produced data from IQVIA's XPONENT and
13 XPONENT PLANTRAK products related to
14 prescriptions of opioids from 1997 to the
15 present."
16       And there is a cite there that
17 says, "See Allergan MDL02485011."
18       Do you see that?
19    A.   I do.
20    Q.   If you turn in your report to
21 page 28 and you look at footnote 81, that's
22 the same data set that you cite in your
23 report as the Allergan data, correct?
24    A.   Give me one second.  Sorry.
25       (Document review.)

Page 319

1
2    A.   That is correct.
3    Q.   Okay.  And then this letter goes
4 on to say, "As stated in the statement of
5 work we are producing today, this data was
6 purchased by Allergan for the first time on
7 May 15th, 2018.  Allergan Finance and its
8 predecessor companies did not have this
9 data prior to the purchase."
10       Do you see that?
11    A.   I do.
12    Q.   Did any of the lawyers that you
13 worked with in this case tell you that
14 Allergan did not in fact have this data
15 prior to the purchase?
16    A.   It was not made aware to me that
17 they had purchased the data for this, as
18 it's stated here.
19    Q.   And my question is slightly
20 different.
21       Did any of the lawyers in this
22 case tell you that Allergan did not have it
23 prior to the purchase?
24    A.   No, that was not told to me that
25 Allergan did not have access to the data

Page 320

1
2 prior to the purchase.
3       MS. LEVY:  I'm going to pass you
4 along to someone else.  Thank you.
5       THE WITNESS:  Thank you.
6       THE VIDEOGRAPHER:  The time is
7 5:05 p.m.  We are going off the record.
8       (Recess is taken.)
9       THE VIDEOGRAPHER:  The time is
10 5:07 p.m.  We are on the record.
11 EXAMINATION BY
12 MR. HAMMOUD:
13    Q.   Good afternoon, Ms. Keller.  My
14 name is Adam Hammoud.  I'm an attorney from
15 Morgan Lewis, and I represent Teva
16 Pharmaceuticals USA Inc., Cephalon, Inc.
17 and Actavis, LLC, which I will collectively
18 refer to as the Teva defendants, if that's
19 all right.
20    A.   Great to meet you.
21    Q.   Good to meet you.
22       Could you explain what national
23 drug codes are?
24    A.   Sure.
25       A National Drug Code is an NDC.

Page 321

1
2 I think somewhere in one of my reliance
3 materials, it breaks down what the
4 components of an NDC are, the first few
5 being an identifier for the labeler and the
6 rest about the package.
7    Q.   Okay.  And you talked about this
8 a little bit earlier, but can you explain
9 the process that you followed for assigning
10 national drug codes to specific labelers?
11    A.   Sure.
12       So the first few digits, I can't
13 remember if it's four or five, I would have
14 to look at the breakdown of it, is for the
15 labeler itself.
16       And I don't recall for this
17 particular litigation -- or for this
18 particular assignment needing to assign
19 labelers to NDC codes, because they either
20 came to me through the ARCOS data or they
21 were through the IQVIA processing file.
22    Q.   And so your testimony is you
23 either retrieved the national drug codes
24 and assigned them to labelers based on what
25 was available to you in the ARCOS data or

Page 322

1
2   the IQVIA data; is that correct?
3       A.   Sorry.  Let me state that more
4   clearly.
5           The ARCOS data as it came to me
6   for this report was processed by McCann.
7   And McCann, I believe, already had taken
8   those steps.  So to the extent that he had
9   done that, that was done.
10      Q.   And so you're relying on some of
11  the work that McCann performed on the ARCOS
12  data, correct?
13      A.   That would be correct.
14      Q.   Okay.  And how did you account
15  for any changes in the NDC or the National
16  Drug Code ownership by the labelers that
17  resulted from, for example, acquisitions
18  among the labelers?
19      A.   Sure.  I think we discussed this
20  a little bit earlier.
21          So, for example, the ARCOS file,
22  I think the -- and I'm guessing at how
23  McCann processed it, so you would have to
24  take his testimony and his methodology as
25  how he actually did it.  But if I were him,

Page 323

1
2   what you would do is take the NDC labeler
3   file from the FDA and then match it based
4   off of the first four.  And so that data
5   set is available at a snapshot in time.
6           And then for the IQVIA data, that
7   came with a processing file, so it has
8   nothing to do with NDCs, but the IQVIA
9   unique identifier for each drug and then
10  match those across.
11      Q.   Okay.  And if you turn to page 85
12  of your report.
13      (Witness complies.)
14      Q.   You can turn to page 87.  And
15  look at table 77 for me.
16          In table 77, you identify Actavis
17  Pharma, Inc., Allergan, Inc., Cephalon,
18  Inc. and Watson Pharma, Inc. as part of the
19  labeler named group under Teva; is that
20  correct?
21      A.   Are we looking at table 77?
22      Q.   Yes.
23      A.   So I see Allergan, Teva, and Teva
24  and another Teva.
25      Q.   So you see Allergan, Teva CNS,

Page 324

1
2   Teva Parenteral and Med and Teva
3   Pharmaceuticals assigned to Teva, correct?
4       A.   I do see that.
5       Q.   And then if you turn back to page
6   85 briefly, here is where you see Teva as
7   the labeler named group for Teva
8   Pharmaceuticals USA, Actavis Pharma, Inc.,
9   Allergan, Inc., Cephalon, Inc. and Watson
10  Pharma, Inc.; is that correct?
11      A.   That is correct.
12      Q.   Does that mean that all the NDCs,
13  the national drug codes assigned to Teva
14  Pharmaceuticals USA, Inc., Actavis Pharma,
15  Inc., Allergan, Inc., Cephalon, Inc.,
16  Watson Pharma, Inc. in that table and in
17  your analysis were included in the
18  transactions that were flagged for Teva's
19  products?
20      A.   Correct.  All of the products
21  underneath each one of these, so Teva,
22  Actavis, Allergan, Cephalon, and Watson
23  were all grouped under Teva.
24      Q.   And was that for all points in
25  time?

Page 325

1
2       A.   Yes.
3       Q.   All right.  And if you turn
4   briefly to page 28, footnote 79, here in
5   this footnote, it says, "Teva acquired the
6   Actavis/Watson generic pharmaceutical
7   business from Allergan in 2016, and those
8   entities are currently operating under the
9   Teva SOMS system.  Prior to 2016, the
10  Actavis/Watson operated under Allergan's
11  SOMS system."
12          Did I read that correctly?
13      A.   You did.
14      Q.   And is that your testimony today,
15  do you believe that to be truthful that,
16  excuse me, that Teva acquired the Actavis
17  and Watson generic pharmaceutical business
18  from Allergan in 2016?
19      A.   As it states in my report, yes.
20      Q.   What I'm trying to understand is
21  where you got the -- what support you have
22  that Teva acquired Allergan, Inc.
23      A.   What support I have that Teva
24  acquired Allergan?
25          I think as we were stating

Highly Confidential - Subject to Further Confidentiality Review

Page 326

2 earlier, that there is a document, and I
3 would be happy to provide it if it's not
4 part of our reliance materials.
5 Q. Okay. But you're not sure one
6 way or the other if Teva, in fact, acquired
7 Allergan, right?
8 A. I'm not an expert in corporate
9 acquisition, no.
10 Q. No worries.
11 Back to national drug codes.
12 Did you distinguish any of the
13 national drug codes for generic
14 opioid-containing products various national
15 drug codes for branded opioid-containing
16 products? Did you make any -- did you
17 distinguish between generic and branded
18 products in any way?
19 A. Not for this, no.
20 Q. Okay. And were the national drug
21 codes pulled from the IQVIA data that you
22 received, I guess, that was produced by
23 Allergan but that you received through
24 plaintiff's counsel?
25 A. So just to clarify. ARCOS have

Page 327

2 NDCs. Chargebacks generally have NDCs.
3 But the IQVIA data does not contain a NDC.
4 It has its own unique identifier, and it's
5 impossible to know what that NDC --
6 Q. Okay.
7 A. -- what corresponding NDC is
8 there. They have their own little number.
9 Q. Understood.
10 So you obtained that NDC from
11 chargebacks in ARCOS data; is that correct?
12 A. Yes, there were NDCs and
13 chargebacks in ARCOS.
14 Q. Did you remove any national drug
15 codes during your analysis?
16 A. Sure.
17 Q. And I guess you can -- if you
18 need to refer to it, in page 94 of your
19 report, paragraph 170, you start to talk
20 about that a little bit.
21 Do you recall the process you
22 followed for removing those national drug
23 codes?
24 A. So there's a few things I think
25 that are being conflated here.

Page 328

2 So this section here is talking
3 about chargebacks, and it's cleaning
4 steps that were taken -- so paragraph 170
5 is talking about the steps to process the
6 chargeback data. If you want to ask me
7 about the NDC codes and specifically which
8 ones weren't included or included in the
9 analysis, I think I talk about that earlier
10 in a different paragraph of the report.
11 Q. Okay. Even with respect to the
12 chargeback data, you said there were
13 invalid NDCs. That NDC values were
14 identified that could not be validated by
15 DEA, FDA or CMBS data sources; is that
16 correct?
17 A. That is correct. I looked to see
18 if I could match -- so when we received the
19 data, some of the NDCs were just either cut
20 off, incomplete, mispadded. So NDCs need
21 to be padded to a 9, 10 or 11-digit format
22 following a certain formatting structure.
23 And if any one of those combinations of
24 formatting didn't match what would have
25 been a valid NDC in any of the files that I

Page 329

2 searched, and I tried very hard to try to
3 find a match for these files because I
4 didn't want to exclude data, then they
5 would have been excluded.
6 So, you know, an example, and I
7 remember seeing it, would be an NDC code of
8 just straight zeroes. Zero, zero, zero,
9 zero, zero. That would not have been
10 included.
11 Q. Okay. Thank you.
12 Turning now to suspicious order
13 monitoring analytics and programs, are you
14 familiar with Cephalon, Inc.?
15 A. To the extent that its name
16 appears in the data, but not much beyond
17 that.
18 Q. Did you review any documents
19 regarding Cephalon's suspicious order
20 monitoring program?
21 A. I don't believe that we have a
22 Cephalon flag. And I don't remember,
23 sitting here right now, reviewing any
24 documents about their program.
25 Q. So you did not review any

Page 330

2 documents regarding Cephalon's
3 investigation of any transactions or orders
4 that it may have flagged, correct?
5     MS. CONROY:  Objection.
6     A.  Correct.  That would be outside
7 of my scope, too.
8     Q.  Turn to paragraph 69.
9     A.  I'm sorry, paragraph 69, not
10 page?
11     Q.  Yes.  It's on page 21.  Sorry.
12     A.  I am there.
13     Q.  Okay.  Did you review any
14 documents regarding Teva's SORDS of one
15 system?
16     A.  Yes.
17     Q.  So I see here --
18     A.  I'm sorry, SORDS I?
19     Q.  Yes.  Here in paragraph 69 you
20 say, "Teva's SOMS system (referred to as
21 SORDS II) was in effect from approximately
22 2012 to 2015, when it was replaced by a
23 system called DefOps," D-e-f, O-p-s.
24     A.  So SORDS I, I recall maybe
25 briefly seeing some documentation on it,

Page 331

2 but I think mostly -- I'm thinking most
3 clearly about the ones that are referenced
4 here.
5     Q.  Okay.  And so you did not attempt
6 to apply any algorithms from Teva's SORDS I
7 program to any of the data, correct?
8     A.  Correct.  If they're not here,
9 then we didn't apply them.  But we could if
10 asked.
11     Q.  And did you review any documents
12 regarding Teva's DefOps system?
13     A.  Yes.
14     Q.  And I think you referenced them
15 in paragraph 70 if you want to look at
16 that.
17     A.  Thank you.
18         (Document review.)
19     Q.  You did not apply the algorithm
20 used by Teva's DefOps system to any of the
21 data discussed in your report, correct?
22     A.  I'd have to look at the document,
23 I'm sorry, I'm getting a little fuzzy
24 today.  But it appears, yes, we did not
25 implement it because it was not -- we

Page 332

2 weren't able to programmatically implement
3 it.
4     Q.  Okay.  And you're aware that the
5 DefOps program, as you state here, went
6 into effect in 2015; is that right?
7     A.  That is what it states here.  And
8 I believe there's transcripts that state
9 that.
10     Q.  But you did -- but you did apply
11 the algorithm used by Teva's SORDS II
12 system, that right, correct?
13     A.  That appears to be correct.
14     Q.  Okay.  And you gathered
15 information about that algorithm through a
16 review of something called the Buzzeo -- or
17 what you referred to as the Buzzeo/Cegedim
18 compliance report in paragraph 69; is that
19 correct?
20     A.  That is what we cite, yes.
21     Q.  Okay.  Did you review any
22 documents besides the Buzzeo/Cegedim
23 compliance report to gather information
24 about Teva's SORDS II system?
25     A.  If they're cited here, I'd have

Page 333

2 to look at which Bates numbers applies to
3 which document.
4     Q.  But you don't recall reviewing
5 any other documents besides the Cegedim,
6 the Buzzeo/Cegedim compliance report?
7     A.  If I did, they're in my reliance,
8 but not that I can recall sitting here and
9 talking to you.
10     Q.  In paragraph 69, you state that
11 your report or your report states that
12 "Under the SORDS II program, orders by NDC
13 that were more than three standard
14 deviations above the customer's consents
15 monthly mean were flagged by Teva."
16     Do you see that?
17     A.  I do.
18     Q.  About halfway down that
19 paragraph, you note that "Any order that is
20 in excess of the three standard deviations
21 above the mean is pended for further
22 investigation."
23     Do you see that?
24     A.  Yes, I see that quote.  It's in
25 quotes.

Highly Confidential - Subject to Further Confidentiality Review

Page 334

2  Q. "And that the monthly mean was
3 refreshed periodically."
4  Do you see that as well?
5  A. I do see that.
6  Q. Which you understood to mean that
7 "The mean and standard deviation were
8 calculated approximately twice per year
9 using the most recent six months of data."
10  Do you see that?
11  A. I do see that.
12  Q. When you say "six months of
13 data," what data are you referring to?
14  A. So that would be the chargeback
15 data that it would be applied to.
16  Q. And so your understanding is that
17 the system, excuse me, that the monthly
18 mean was refreshed periodically and that
19 the mean and standard deviation were
20 calculated approximately twice per year
21 using the most recent six months of
22 chargeback data?
23  A. So we applied it to the
24 chargeback data. And so when we're making
25 this assumption, we're assuming that the

Page 335

2 most recent six months, so let's say we're
3 doing the report on -- let's make it easy
4 on myself -- on February would be like
5 January and then the preceding six months
6 to that. And then that block would be
7 refreshed to include the next six months.
8  Q. Okay. Did you review any orders
9 that Teva had received?
10  A. Any orders that Teva had
11 received...
12  Not unless they appeared in the
13 chargeback data.
14  Q. And did you review any data that
15 Teva had about its orders that was
16 available to Teva at the time the orders
17 were made?
18  A. No. That would be outside of
19 this report.
20  Q. Did you determine whether the
21 Teva transactions flagged by your various
22 metrics, by various metrics in your report
23 were also flagged by the Teva defendants'
24 SOM systems?
25  MS. CONROY: Objection.

Page 336

2  A. I would not know.
3  Q. Did you look to see if those
4 transactions were flagged by those systems?
5  MS. CONROY: Objection.
6  A. Again, I wouldn't know. It was
7 not asked of me.
8  Q. And so you did not review any
9 documents regarding investigations of
10 pended orders in those systems; is that
11 accurate?
12  A. Not that I can recall. That
13 would have been outside of my expertise to
14 review those.
15  Q. I know we discussed this a little
16 bit before, but I want to make it clear for
17 the record.
18  On page 9 of your report, in
19 paragraph 22, you say that "The report
20 focuses specifically and exclusively on
21 manufacturers' anti-diversion and
22 suspicious order monitoring programs,"
23 correct?
24  A. Correct, it does state those
25 words.

Page 337

2  Q. And is that what you were
3 endeavoring to offer an opinion on, the
4 suspicious order monitoring programs?
5  MS. CONROY: Objection.
6  A. No. I think as we stated
7 earlier, and it's my intention to answer
8 this the same as I have before, but I was
9 asked to apply the known compliance metrics
10 to labelers' data including chargebacks and
11 IQVIA data.
12  Q. Okay. So you're not offering any
13 opinions today that the Teva defendants
14 failed to flag a potentially suspicious
15 order, correct?
16  A. Correct.
17  MS. CONROY: Objection.
18  A. Outside of my scope.
19  Q. Similarly, you're not offering
20 any opinions today or in your report that
21 the Teva defendants failed to detect and
22 report a suspicious order, correct?
23  A. Correct. That would be outside
24 of my expertise.
25  MR. HAMMOUD: All right. That's

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1
2     all the questions I have. Thank you
3 very much for your time.
4     THE WITNESS: Thank you.
5     THE VIDEOGRAPHER: The time is
6 5:25 p.m. We are now off the record.
7     (Recess is taken.)
8     (Keller Exhibit 20, Report of
9     Edward J. Buthusiem of Berkeley
10     Research Group, not Bates-stamped,
11     marked for identification, as of this
12     date.)
13     THE VIDEOGRAPHER: The time is
14 5:27 p.m. We are back on the record.
15 EXAMINATION BY
16 MR. GOLDSTEIN:
17     Q. Good afternoon, Ms. Keller. My
18 name is Josh Goldstein with the law firm of
19 Ropes & Gray. I represent Mallinckrodt,
20 LLC.
21     I've placed in front of you
22 what's been marked as Exhibit 20.
23     Do you recognize that document?
24     A. I do.
25     Q. Have you reviewed that document?

Page 339

1
2     A. I have.
3     Q. And for the record, what is that
4 document?
5     A. It is a report by Edward
6 Buthusiem, I'm not sure if I'm saying that
7 correctly.
8     Q. We can go with your pronunciation
9 for the first -- for today's deposition.
10     And when did you first review it?
11     A. I would say either in late May or
12 early June.
13     Q. Do you recall for how long you
14 reviewed it?
15     A. How long did it take me to read
16 it?
17     Q. Sure.
18     A. For as long as it takes to read.
19 I don't know, maybe an hour it takes to
20 read.
21     Q. Were you asked to offer any
22 opinions based on Mr. Buthusiem's report?
23     A. No.
24     Q. Do you intend to offer an opinion
25 at trial regarding his report?

Page 340

1
2     A. I'm not certain.
3     Q. Have you conducted any additional
4 analysis as a result of your review of
5 Mr. Buthusiem's report?
6     A. Yes.
7     Q. Could you describe that, please?
8     A. I reviewed his work and our work
9 as well.
10     Q. And when you say his work and
11 your work, could you elaborate?
12     A. The examples that he cites in his
13 report.
14     Q. Did you review the materials --
15 strike that.
16     Did you just review the report
17 that's been placed in front of you or did
18 you review materials he relied on?
19     A. I also reviewed his reliance.
20     Q. I think this is probably
21 encompassed in what I've already asked, but
22 if I'm understanding you correctly, you
23 don't intend to supplement your report as a
24 result of your review of his report?
25     A. Not that I'm aware of at this

Page 341

1
2 time.
3     Q. Okay. Did you form a general
4 impression of his report?
5     A. No.
6     Q. Do you recall generally the main
7 points that Mr. Buthusiem makes in his
8 report?
9     A. I do.
10     Q. What are they?
11     A. He discusses chargebacks to a
12 great degree and then discusses some of our
13 processing of the data. I would say not
14 even processing, more our analysis of the
15 data. And then I would say a third piece
16 would be to describe how Mallinckrodt's --
17 I don't know how to word this
18 appropriately, forgive me, it's getting
19 late in the day -- to describe how
20 Mallinckrodt views using its different data
21 sets available to them, to the labeler.
22 I'm sorry if that's not clear.
23     Q. I think I understand you.
24     Which data sets are you referring
25 to in particular?

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1
2    A.   Specifically he brings up a sales
3  data set that I thought was interesting to
4  review.
5    Q.   Sorry to go back to this, but
6  when you -- have you reviewed his report
7  since the initial time that you reviewed it
8  in late May or early June?
9    A.   Yes.
10    Q.   Did you review it in preparation
11  for the deposition today?
12    A.   Yes.
13    Q.   Do you remember the last time you
14  reviewed it?
15    A.   Last night.
16    Q.   Now of the three key points that
17  you just identified, or I don't think you
18  used the word "key," but the three main
19  points, I believe is what my question asked
20  for, do you disagree with any of the points
21  that Mr. Buthusiem made?
22    A.   I do.  I think that -- I do.
23  I'll just leave it at that.
24    Q.   Okay.  Could can you elaborate?
25    A.   I think he misunderstood our

Page 343

1
2  report and what we were trying to do.
3    Q.   And what do you mean by that?
4  What makes you think he misunderstood the
5  report?
6    A.   So he takes to task that we
7  incorrectly include some orders in our
8  analysis.
9      What I stated and intended to do
10  was to provide examples of chargeback
11  requests that included NDCs that were part
12  of peculiar orders.
13    Q.   I think maybe -- strike that.
14      So I'd like to kind of walk
15  through some of the statements in his
16  report and maybe sort of hone in on where
17  the disagreements might be.
18    A.   Sure.
19    Q.   So just generally speaking, what
20  is your understanding of the purpose of
21  chargeback data?
22    A.   As I think I state in the report,
23  it helps protect the labeler from -- well,
24  actually, let me make sure I state it
25  right.  I got it right here.

Page 344

1
2      (Document review.)
3    A.   "Submitted by the distributors to
4  labelers to protect distributors from
5  profit loss when drugs are sold at" -- "to
6  a buyer at less than the distributor paid
7  for them."
8    Q.   Did you understand it to be a
9  type of financial reconciliation mechanism?
10    A.   If you want to call it that.
11    Q.   You wouldn't take issue with that
12  characterization?
13    A.   Yeah, I understand it to be like
14  maybe like in an colloquial term, a rebate
15  or something like that.  Maybe that --
16  that's probably not the right word to use,
17  especially in pharmaceuticals because I
18  think that means something different there,
19  but it's helped kind of make somebody
20  whole.  I think I've heard that phrase
21  used.
22    Q.   Understood.
23      So let me frame it this way and
24  see if you agree or disagree?
25      Is it fair to say that

Page 345

1
2  distributors provide chargeback data to
3  manufacturers in order to be compensated
4  for the difference between the price a
5  distributor sells the product to a pharmacy
6  and the price that the distributor paid the
7  manufacturer for that product?
8      MS. CONROY:  Objection.
9    A.   I think that's in the same realm
10  of what I mean to say in 33 but, sure, the
11  definition is what it is.
12    Q.   So just to be clear, you don't
13  take issue with the definition I just
14  provided?
15      MS. CONROY:  Objection.
16    A.   I wouldn't know exactly the
17  correct definition of a chargeback.  That's
18  not my area of expertise.  But it sounds
19  good to me sitting here.
20    Q.   Do you have an understanding of
21  whether manufacturers purchase chargeback
22  data from distributors or whether that data
23  is provided to manufacturers by
24  distributors?
25    A.   I mean, it depends on how you

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1
2 define the word "purchase," but I don't
3 really know how they come to get, but I
4 know that they have that data.
5     Q.  So you're not aware one way or
6 the other whether manufacturers purchase
7 chargeback data from distributors?
8        MS. CONROY:  Objection.
9     A.  Yes, that would be outside of my
10 expertise of how they came to get the data.
11 I just know what I was given.
12     Q.  Now a chargeback request is
13 submitted by the distributor to a
14 manufacturer after the distributor has
15 already shipped the order to the pharmacy
16 or whatever the downstream customer is; is
17 that right?
18     A.  I don't know for certain because
19 I'm not an expert in chargebacks.
20     Q.  Is that consistent with your
21 understanding of how chargebacks work?
22     A.  I would think so, yes.
23     Q.  And a chargeback request is only
24 submitted by a distributor to a
25 manufacturer for sales that a distributor

Page 347

1
2 made to a distributor's customer; is that
3 fair to say?
4     A.  I think that's fair to say.
5     Q.  And of sales that a distributor
6 makes to a distributor's customer, not
7 every sale is eligible for a chargeback
8 with respect to the manufacturer; is that
9 right?
10     A.  Yes, I think we state that in our
11 report that some percentage, depending on
12 the labeler, are submitted for chargebacks
13 and some are not.
14     Q.  Apologies.  I think you might
15 have testified to this already, but a
16 manufacturer only has chargeback data for
17 sales to a distributor of the
18 manufacturer's own product.  Is that your
19 understanding?
20     A.  Generally, that's my
21 understanding.  I do remember seeing, and
22 it may have been an invalid NDC code issue,
23 some crossover between labelers where NDCs
24 of one labeler were in another labeler's
25 chargeback request.  But they were very,

Page 348

1
2 very tiny, and I assumed that it was just
3 an error in the data.
4     Q.  Okay.  Understood.
5        And that is true regardless of --
6 strike that.
7        That's true even in situations
8 where a company is selling its own generic
9 product of another manufacturer's branded
10 products?  Is that your understanding?
11     A.  Help me get a better question.
12     Q.  Sure.
13        Do you have an understanding of
14 the difference between a generic
15 manufacturer and a branded manufacturer?
16     A.  I understand that some drugs are
17 generic and some drugs are brand name, yes.
18     Q.  And what is your -- can you
19 describe that understanding?
20     A.  I mean, I don't really -- I don't
21 have expertise or deep knowledge in what
22 goes in behind that, but I understand that
23 when I match it to an FDA file, some have a
24 brand name B next to them and some drugs,
25 NDCs, have a G for generic.  I don't know

Page 349

1
2 if that's actually how it shows up in the
3 data, but in simplest terms, that's -- I do
4 understand that there's be a distinction
5 between the two.
6     Q.  Okay.  And so as far as you know,
7 the manufacturer of a generic product only
8 gets chargeback data for that product;
9 doesn't get chargeback data from any other
10 manufacturer?
11        MS. CONROY:  Objection.
12     A.  I would say in the data that I
13 saw and used, I only saw manufacturer's own
14 data.  And it generally reflected the NDC
15 codes that I understood them to label based
16 off of the labeler mappings from FDA and
17 DEA.
18     Q.  Okay.  I'd like to ask you to
19 turn to paragraph 13 of Mr. Buthusiem's
20 report.  It's on page 5.
21        (Witness complies.)
22     Q.  And what I'd like to do is walk
23 through some of the statements in this
24 report.
25        So the first sentence,

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1
2 Mr. Buthusiem writes, "Across the
3 pharmaceutical industry, chargeback
4 requests from distributors to manufacturers
5 do not indicate what specific product
6 inventory, i.e. which particular bottles or
7 packages, the distributor used to fulfill
8 the sale to the downstream registrant."
9 Do you see that?
10 A. I do.
11 Q. Do you agree with that statement?
12 A. I really wouldn't know. It's
13 outside of my expertise.
14 Q. So you have no reason to disagree
15 with that statement?
16 A. I wouldn't have the expertise to
17 agree or disagree.
18 Q. Okay. Skipping down to the
19 sentence in the middle of the paragraph
20 that starts "As such," do you see that?
21 A. I do.
22 Q. And the underlying portion reads.
23 "The manufacturer cannot use chargeback
24 data to trace a downstream sale back to the
25 specific original direct manufacturer to

Page 351

1
2 distributor sale or sales."
3 Do you see that?
4 A. I do see that.
5 Q. And do you agree with that
6 statement?
7 A. I do not.
8 Q. Which part do you disagree with?
9 A. Which part? I'm sorry. Ask me a
10 different question or --
11 Q. Sure.
12 What do you disagree with about
13 that statement?
14 A. So I believe in my report we do
15 trace the chargeback data back to the --
16 for a second.
17 So he refers to sales data. I
18 didn't review sales data. So I actually
19 couldn't be certain if you could trace a
20 chargeback back to sales data.
21 What I had available to me was
22 chargeback data and peculiar order data.
23 Q. Just so the record is clear, what
24 sales data are you referring to that
25 Mr. Buthusiem reviewed that you said you

Page 352

1
2 didn't review?
3 A. There is a cite here. The direct
4 sales transaction, 1998 to -- that's in
5 footnote 9, MNKT1_0007897646.
6 Q. Okay. And that's data that you
7 did not review in connection with your
8 report?
9 A. That is correct.
10 Q. And have you reviewed it since --
11 have you ever reviewed that data?
12 A. I have.
13 Q. You reviewed it after you
14 prepared your report?
15 A. I did.
16 Q. So now that that data has been
17 made available to you, does it change your
18 opinions at all that you offer in your
19 expert report?
20 A. I'm really not sure at this time.
21 I haven't fully completed my analysis.
22 Q. Is it fair to say you're in the
23 process of making that determination?
24 A. I don't know if I will or will
25 not. I just don't know.

Page 353

1
2 Q. But have you begun that analysis?
3 A. I would say I've reviewed the
4 data sources that he has used and used his
5 report, and that's where we are right now.
6 Q. At this time, do you have any
7 reason to disagree with -- strike that.
8 At this time, are there any
9 opinions that you intend to offer based on
10 your review of the direct sales data?
11 A. I do not plan to offer opinions
12 today on the direct sales data or -- and I
13 don't know if I will.
14 MR. GOLDSTEIN: I'm just going to
15 note for the record that defendants
16 will reserve all rights in connection
17 with any late-disclosed opinions,
18 particularly those opinions that
19 respond to Mr. Buthusiem's report.
20 BY MR. GOLDSTEIN:
21 Q. Bear with me one second.
22 A. Take your time.
23 Q. So you testified just now that
24 you couldn't be certain if it's possible to
25 trace a chargeback to the -- trace a

Page 354

2 chargeback from the sale from the
3 manufacturer to a distributor and then from
4 a distributor to the distributor's
5 downstream customer.
6         Do you recall that?
7     A.  So I think what I was saying is
8 because I haven't fully reviewed the sales
9 data, I don't know what would be possible.
10 So that was -- I think I started making a
11 statement but needed to clarify that.
12 Because I haven't used this direct sales
13 data and done this analysis, I don't know
14 the answer.
15     Q.  Okay.  At this point, you're not
16 aware of any information in the direct
17 sales data that would enable you to trace a
18 manufacturer's sale to a distributor, to
19 then a distributor's sale to a downstream
20 customer?
21     A.  I'm really not prepared to answer
22 that either way right now.
23     Q.  So I was just asking if you're
24 aware of any information at this point.
25     A.  I just -- I've reviewed the file

Page 355

2 fairly quickly.  I'm just really not
3 prepared to say what's in the file or what
4 data points are there or what would be
5 possible to review.  So I just am not
6 comfortable with saying one way or the
7 other what is possible or not possible.
8     Q.  Oh, I understand.  I think my
9 question is a little different.
10         It's simply, at this point in
11 time sitting here today, if you are aware
12 of any information that would enable you to
13 trace manufacture's sale to a distributor,
14 trace that order from the manufacturer to
15 the distributor to the downstream customer?
16     A.  So, again, the data that I used
17 in my report was peculiar orders and
18 chargebacks.  The data that's mentioned
19 here that I've only briefly reviewed is
20 sales.  So I can't offer an opinion or a
21 statement at this time about sales.
22     Q.  So what I'm trying to understand
23 is that based on your review thus far,
24 understanding that it's incomplete review
25 of the Mallinckrodt direct sales data, if

Page 356

2 there's any information that you've come
3 across to date that would enable you to
4 trace the manufacturer's sale to a
5 distributor, to then the sale by the
6 distributor to a downstream customer?
7         MS. CONROY:  Objection.  Apart
8     from her report?
9         MR. GOLDSTEIN:  Based on her
10     review of the Mallinckrodt direct sales
11     data, which is --
12         MS. CONROY:  That's what you're
13     your question is about, the
14     Mallinckrodt direct --
15         MR. GOLDSTEIN:  Correct.
16         MS. CONROY:  Okay.  Why don't you
17     ask it again, then.
18         MR. GOLDSTEIN:  Correct.
19         MS. CONROY:  That's what's
20     confusing.
21         MR. GOLDSTEIN:  Right.  So I
22     understand the testimony to be that
23     Ms. Keller can't say whether the direct
24     sales data that Mr. Buthusiem reviewed
25     would enable or would not enable

Page 357

2 someone to trace the order all the way
3 from the manufacturer to the downstream
4 customer.  And so that's where I'm
5 going with that.
6         MS. CONROY:  Okay.
7 BY MR. GOLDSTEIN:
8     Q.  So would you like me to repeat
9 the question?
10     A.  Yes, please.
11     Q.  So based on your review thus far
12 of the Mallinckrodt direct sales data that
13 Mr. Buthusiem cites in his report, do you
14 have any -- are you aware of any
15 information in that data that would enable
16 you to trace a sale from a manufacturer, to
17 a distributor, to then the downstream
18 customer?
19     A.  I mean, again, that is a very
20 long chain that you've outlined here.  I
21 would need to fully review it to make -- to
22 make an actual assertion.
23         I mean, if there's NDC codes in
24 there, that's where we would start.  But
25 beyond that, I don't -- I'm not prepared to

Highly Confidential - Subject to Further Confidentiality Review

Page 358

talk about that right now.

Q. So I think I've asked this question about five times.

All I'm asking is what you're aware of today, not what you could ever possibly be aware of at some future point down the road.

So as far as, as you sit here today what you're aware of and not aware of, it sounds like you're not aware of any information that would enable you to trace an order from a manufacturer, to a distributor, to the downstream customer?

MS. CONROY: Objection.

A. I'm not going to say aware or not aware because I haven't fully reviewed the data set. If you want to pull it out, I'd be happy to look at it right now, but I don't remember what column headers are in there. I don't know what fields are in there. I just -- those are things that I would need to know to be aware or not aware and I just -- I would be happy to look at it right now if you want to pull it up on a

Page 359

computer, but...

Q. Sitting here today, you don't recall if you're aware or not of whether there is any information in that direct sales data that would change your analysis?

A. So sitting here, I do not have the familiarity with the data set that would allow me to answer the question either way, that I am aware or unaware, because I would just have to look at the data set more closely to be able to answer the full question of being able to trace from here to here to here.

Q. Okay. Well, let me move on and ask a slightly different question. I think everyone is growing weary of that one.

If you turn to your report, paragraph 158. It's on page 84.

A. Yes.

Q. And there, you reference roughly 2,900, I think if you look at table 74, it's 2,860 peculiar orders, or to be clear, orders that Mallinckrodt had deemed peculiar based on its own monitoring system

Page 360

that involved distributors that shipped the same opioid product purchased in a peculiar transaction to buyers in either Summit County or Cuyahoga County within 30 days.

Do you see that reflected in your report?

A. I do.

Q. Okay. And so my question is, sitting here today, based on whatever you've reviewed to date, can you state with 100 percent certainty that any of those 2,860 orders that are referenced in table 74 were shipped themselves into Cuyahoga or Summit County?

A. So the question is -- can you state it a little bit more succinctly for me?

Q. Sure. Let me try again.

Can you state with 100 percent certainty that any of the 2,860 orders that are identified in table 74 -- you see those orders that I'm talking about?

A. I do.

Q. Okay. If any of those orders

Page 361

were definitively shipped into Cuyahoga or Summit County as opposed to shipped somewhere else?

A. So those orders contained an NDC product that was deemed peculiar at some point by Mallinckrodt in the previous 30 days that went to a Summit or Cuyahoga County buyer.

Q. So your testimony sitting here today is that you can definitively trace the orders that were placed by a distributor to Mallinckrodt, these 2,860 orders, that Mallinckrodt -- let me back up.

Mallinckrodt, your understanding is that Mallinckrodt shipped those orders to various distributors, correct?

A. So you've got two points in there. That Mallinckrodt shipped to those distributors or -- I'm sorry, I just don't really follow your question.

Q. I'll start over. That's fine.

So the 2,860 peculiar orders that are identified in table 74, your

Page 362

1
2 understanding is that those orders were
3 placed by a distributor to Mallinckrodt,
4 correct?
5     A.  Yes.
6     Q.  And as far as you know,
7 Mallinckrodt shipped those orders to
8 various distributors, correct?
9     A.  I would -- yes, I think because
10 these are peculiar orders.  So at some
11 point, yes, I would assume that that --
12 they were deemed peculiar so -- I don't --
13 let me state this more completely.  And I'm
14 sorry, my brain is getting fuzzy.
15         They appear in the peculiar order
16 data for Mallinckrodt, and these are the
17 distributors that are in that data.
18         Whether or not those were
19 actually shipped or unshipped, I couldn't
20 answer as to whether, whether that
21 happened.
22     Q.  So I guess now I'm a little
23 confused.  I thought that your report is --
24 in your report, I thought you're saying
25 that these are orders that were shipped

Page 363

1
2 into Cuyahoga or Summit County; is that
3 right?
4     A.  So that's the chargeback
5 component.  We looked at chargeback data
6 and peculiar order data.
7     Q.  Okay.
8     A.  So to the extent that a
9 chargeback existed, one has to make the
10 assumption that it made it there, that the
11 product made it there.
12     Q.  Well, let me follow up with
13 something you said.
14         Are you aware of any
15 identification code or any data contained
16 within chargeback data, the peculiar order
17 data, or any other data that links a
18 peculiar order and a chargeback?
19     A.  Well, yes.
20     Q.  What data is that?
21     A.  So I mean, we'd have to consult
22 how we did this in the code, but there's --
23 you would need the NDC code of the
24 products, as well as the distributor that
25 that product went through.

Page 364

1
2     Q.  Okay.  So let me go back to my --
3 go back a couple of questions which is, as
4 far as you know, the way the supply chain
5 works is, distributor places an order with
6 a manufacturer, we established that.  The
7 manufacturer ships the order to the
8 distributor?
9     A.  Yes.
10     Q.  Okay.  So once the distributor
11 has obtained the order, the distributor has
12 inventory of that product, whatever product
13 was contained in that order.
14         Is that your understanding?
15     A.  I think I've seen data that
16 reflects what you're trying to say, yeah.
17     Q.  Do you have an understanding
18 of -- I guess I should put it this way:  Do
19 you have an understanding of how an order
20 placed by a distributor to a manufacturer
21 ends up -- well, strike that.
22         Do you have an understanding of
23 how the 2,860 orders that you identify in
24 table 74 were shipped into Cuyahoga or
25 Summit County as you have opined?

Page 365

1
2         MS. CONROY:  Objection.
3     A.  How they were shipped, like what
4 was the method that they arrived in Summit
5 County?
6     Q.  Yes.  They were shipped there by
7 a distributor into Summit or Cuyahoga
8 County.
9         Is that your opinion?
10     A.  I guess I don't really understand
11 the question.  I'm sorry if I'm -- I'm not
12 trying to be obstinate.  I just don't
13 understand.  Are you asking me -- I just
14 don't understand quite what you're asking
15 me.
16     Q.  What I'm getting at is that, once
17 a, once product is shipped -- I'll start
18 over.
19         Do you have an understanding of
20 whether distributors that receive products
21 from manufacturers typically hold inventory
22 of the product that they are purchasing
23 beyond the single order that was purchased?
24     A.  I have no expertise in what the
25 inventory practices are of distributors.

Highly Confidential - Subject to Further Confidentiality Review

Page 366

Q.  So you don't know if, for example, if a distributor purchases -- places an order with Mallinckrodt for one of its products, you don't know if -- and Mallinckrodt ships it to that distributor, the product that was purchased, you don't know if the distributor would have other of Mallinckrodt's products already in its inventory at the time it places that order?

A.  Correct.  I'm not an expert in supply chain, nor am I an expert in distributor LIFO or any of their practices there, nor do I -- you had another point in there, but, no, that would be outside of my expertise.  Actually, nor was I given data on those practices.

Q.  Okay.  And if a distributor at the time it placed an order that the distributor deemed -- that that -- strike that.

If a distributor in its inventory had product from Mallinckrodt that was purchased via multiple orders --

Are you with me so far?

Page 367

A.  Yeah.

Q.  Okay.  If that was the case, do you have an understanding of whether it would be possible for Mallinckrodt to determine whether any -- or whether chargeback data provided to Mallinckrodt would reflect whether any product that's ultimately shipped into Cuyahoga or Summit County is from a particular order that was placed to Mallinckrodt?

A.  I'm sorry, I'm rereading your question here to make sure I understand.

Q.  Take your time.

MS. CONROY:  Object to the question.

A.  I just don't... I don't really know how to answer this question because I've got chargeback data, correct, but as we've discussed, I haven't reviewed the sales data, and I have peculiar orders data.

But I think all of that is a little bit mixed together in this question, so I'm not quite sure what you're trying to

Page 368

ask me.  And I'm sorry, it might be that it's late in the day.

Q.  Well, let's say a distributor has two orders in its inventory worth of the same -- the same Mallinckrodt products, okay?

A.  Okay.  Let's go with that.  This is good.

Q.  One order has been deemed by Mallinckrodt to be peculiar.

A.  Okay.

Q.  The other has not.

A.  Okay.

Q.  The distributor then ships some portion of its inventory of that Mallinckrodt product into -- to a pharmacy located in Cuyahoga or Summit County, okay?

A.  Okay.

Q.  Are you aware of any way to determine, for Mallinckrodt to determine through the use of chargeback data whether any of the product that was shipped into Cuyahoga or Summit County was part of what had been flagged as peculiar?

Page 369

A.  Well, yes.  I think that's what we do in our analysis where that -- some of the -- so an order of an NDC product that was ultimately shipped to Summit or Cuyahoga County resulted in a chargeback request within the next 30 days.

Q.  But you, sitting here today, can't say with certainty whether the chargeback request that was sent was for product that was flagged as peculiar or it was from other product that was in the distributor's inventory that was not flagged as peculiar?

MS. CONROY:  Objection.

A.  So because there was many products shipped after which it was being deemed peculiar to a distributor, you're saying because you continued shipments after they were deemed peculiar, that that -- you're trying to ask me if that deems it impossible to trace a chargeback?

Q.  No.  I'm asking if the distributor requests a chargeback from Mallinckrodt -- strike that.  Let me move

Highly Confidential - Subject to Further Confidentiality Review

Page 370

2 on.
3      You selected a 30-day cutoff as
4 part of your analysis of Mallinckrodt's
5 peculiar orders?
6      A.  Sure.
7      Q.  How did you determine that as the
8 window of time?
9      A.  So in reviewing the SOMS
10 documentation, many algorithms reflected a
11 30-day lookback.  It seemed an appropriate
12 lookback period.  And also looking at
13 chargeback requests, some companies, I'm
14 sorry, some distributors submitted them,
15 what appeared to be maybe on weekly basis,
16 some on a daily basis, some on monthly
17 basis.  It was all over the place.  So the
18 30 days was chosen based off of those
19 factors.
20      Q.  Okay.  And without consideration
21 of any distributors's inventory management
22 practices, correct?
23      A.  As I stated earlier, I'm not an
24 expert in inventory management, nor did I
25 review those types of documents.

Page 371

2      Q.  Okay.  So the answer is, yes,
3 that is correct, that you did not consider
4 distributors's inventory management
5 practices when setting the 30-day cutoff?
6      A.  I would consider inventory
7 management practices to be out of my
8 expertise.  And so the 30-day cutoff was
9 based off of our review of other documents.
10      Q.  Okay.  Now if you turn to page 8
11 of Mr. Buthusiem report.  You recall that
12 Mr. Buthusiem states that some of the --
13 you made some errors with respect to the
14 code in your report.
15      Do you recall that?
16      A.  I do recall reading that.
17      Q.  And have you gone back and looked
18 at whether those errors in fact occurred?
19      A.  I think he's just
20 misunderstanding what we tried to do in the
21 report.
22      Q.  And how so?
23      A.  We show orders that contained NDC
24 products that were deemed in a peculiar
25 report -- that were deemed peculiar.

Page 372

2      Q.  And is that true even if --
3 strike that.
4      Is it your testimony that all of
5 the 2,860 peculiar orders had involved
6 situations where the distributor who made
7 the chargeback request was the same as the
8 distributor who placed the peculiar order?
9      A.  I think the 2,860 peculiar orders
10 that we identified involved different
11 distributors, not just one.
12      Q.  Right.
13      What I'm saying is, for any --
14 let's just pick one of those 2,860 peculiar
15 orders.
16      For that order, are you aware of
17 situations in which of those 2,860 orders,
18 any one of them individually, the
19 distributor who placed -- who made the
20 chargeback request was different from the
21 distributor who was identified as having
22 placed a peculiar order?
23      A.  So for us -- to appear in this
24 list, they had to have of shipped -- this
25 list contains orders that were traced to

Page 373

2 Summit and Cuyahoga after which an NDC
3 product within that order was deemed
4 peculiar.
5      Q.  Would you have included in your
6 list of 2,860 orders any order in which the
7 distributor who placed the chargeback
8 request to Mallinckrodt was different from
9 the distributor who was identified as
10 having placed a peculiar order initially
11 from Mallinckrodt?
12      A.  I mean, there's lots going into
13 that calculation, whether or not it was in
14 the 30 days of the same order, if it was on
15 the same day, if it was the same
16 distributor, if it was the same NDC code.
17 There is a lot that goes into that
18 analysis.
19      Q.  But your analysis attempts to
20 link peculiar order placed by distributor
21 to Mallinckrodt with a chargeback request
22 that was provided by a distributor to
23 Mallinckrodt reflecting an order that was
24 shipped into Summit or Cuyahoga; is that
25 right?

Highly Confidential - Subject to Further Confidentiality Review

---

Page 374

1
2    A.  So, yes, to the extent that the
3  chargeback reflects the shipment and the
4  peculiar order is the other half of the
5  equation, yes.  I'm not trying to state
6  that the peculiar orders were shipped.
7    Q.  Let me ask it this way:
8  Paragraph 158 of your report, you say, "I
9  identified around 2,900 peculiar orders
10  that involved distributors that shipped the
11  same opioid product purchased in the
12  peculiar transaction to buyers in either
13  Summit or Cuyahoga County within 30 days."
14    Okay?
15    A.  I state that.
16    Q.  Okay.  And the next sentence
17  says, "With chargeback data, Mallinckrodt
18  was able to see where a peculiar orders
19  went."
20    Do you see that?
21    A.  I state that as well, yes.
22    Q.  Okay.  So in order for -- in
23  order to be included in one of these 2,860
24  peculiar orders, it would, by definition,
25  need to be an order that was placed by a

---

Page 375

1
2  distributor to manufacturer or that was
3  deemed peculiar by Mallinckrodt and then
4  the same distributor submitted a chargeback
5  request to Mallinckrodt for what you're
6  saying reflects that same order, right?
7    A.  It's just it's complicated,
8  right, because we're looking at the time
9  periods and NDC codes.
10    Q.  I really don't think it's that
11  complicated.  I think it's a simple
12  question that you have a distributor where
13  you're saying the distributor, the same
14  distributor placed an order from
15  Mallinckrodt, shipped it into Cuyahoga or
16  Summit County and then submitted a
17  chargeback request to Mallinckrodt.
18    So all I'm asking is, is it, by
19  definition, the same distributor that
20  placed the order and submitted the
21  chargeback request?
22    That's a simple "yes" or "no"
23  question.
24    A.  Yes.  I think our code would
25  reflect that.

---

Page 376

1
2    Q.  Okay.  And so if your code
3  reflected -- in there was an error in your
4  code whereby you had a distributor, whereby
5  you had different distributors, that would
6  be an error in your code?
7    If there was a different
8  distributor who placed the order and
9  submitted the chargeback request, that
10  could not be for the same order?
11    A.  I think the code shows that it
12  has a 30-day window, an order that contains
13  the NDC product through that distributor.
14    Q.  The same distributor?
15    A.  I would think so, yes.
16    Q.  Okay.  And if there was an order
17  where it wasn't the same distributor, that
18  would reflect an error in your code?
19    MS. CONROY:  Objection.
20    A.  I would have to look at the full
21  facts behind that before I'd say whether or
22  not it would.
23    Q.  It should not have been included
24  in the 2,860 peculiar orders in table 74?
25    MS. CONROY:  Objection.

---

Page 377

1
2    A.  I would like to look at the order
3  before making an assertion as to whether
4  or not it would be an error or not.
5    Q.  It's possible that an order
6  placed by a distributor and then a
7  chargeback request submitted by a different
8  distributor could be the same order
9  reflected in these 2,860 in table 74?
10    A.  I mean, I'm not going to talk
11  about what's possible and not possible
12  without looking at the data.
13    MR. GOLDSTEIN:  I'll pass the
14  witness.  I'll reserve my rights.  I
15  don't think I've gotten responsive
16  answers to my questions.
17    THE VIDEOGRAPHER:  The time is
18  6:12 p.m.  We are now off the record.
19    (Recess is taken.)
20    THE VIDEOGRAPHER:  The time is
21  6:17 p.m.  We are back on the record.
22  EXAMINATION BY
23  MR. HYNES:
24    Q.  Good evening, Ms. Keller.  My
25  name is Paul Hynes.  I represent CVS

---

Highly Confidential - Subject to Further Confidentiality Review

Page 378

2 Indiana, LLC and CVS RX Services, Inc.
3     I just have a few questions about
4 Section L of your report where you address
5 certain pharmacies.
6     So if you want to turn to those
7 pages, that would be helpful?
8     A. Sure.
9     Q. I want to first turn your
10 attention to paragraph 127 on page 63.
11     A. I am there.
12     Q. In the first sentence, you say
13 "The section that follows analyzes
14 suspicious pharmacies about which labelers
15 could have known and reported."
16     Do you see that?
17     A. I do.
18     Q. Okay. What do you mean by
19 "suspicious pharmacies"?
20     A. So I think I had been asked this
21 question before, and I intend to answer it
22 the same way as before, but when I say
23 "suspicious," I mean they've triggered the
24 compliance metrics that we applied to the
25 data.

Page 379

2     Q. Okay. So you're not saying that
3 any labeler had an obligation to report
4 those pharmacies to the DEA?
5     A. That would be outside of my
6 expertise.
7     Q. Okay. Do you intend to offer an
8 opinion at trial that these pharmacies were
9 suspicious?
10     A. Not beyond how I've defined
11 "suspicious" here today.
12     Q. Okay. So your opinion about
13 these pharmacies at trial would be limited
14 to the fact that they had orders that hit
15 on one of the compliance metrics that you
16 were asked to use?
17     A. That would be a correct
18 characterization.
19     Q. Okay. Thank you.
20     In reviewing the orders placed by
21 these pharmacies or the shipments made to
22 them, did you consider whether there were
23 any legitimate reasons to explain their
24 purchasing or ordering habits?
25     A. That would be outside of my

Page 380

2 expertise.
3     Q. Okay. So you didn't consider the
4 location of the pharmacies?
5     A. That would be outside of what I
6 was asked to do.
7     Q. Okay. Did you consider whether
8 they're located near any medical
9 facilities?
10     A. I think there is one pharmacy
11 where we show -- I think for -- in the New
12 Choice one, we show another pharmacy,
13 Cleveland Clinic, to demonstrate those that
14 are near medical facilities. But beyond
15 that example, I don't have any others.
16 That would be outside of my --
17     Q. Did you consider whether the CVS
18 pharmacy at 8000 Euclid Avenue is located
19 near the Cleveland Clinic's main campus?
20     A. Yeah, that would be outside of my
21 expertise.
22     Q. Okay. So beyond I think it was
23 the Church's pharmacy you mentioned, you
24 didn't consider whether any of the other
25 pharmacies in Section L of your report were

Page 381

2 located near any medical facilities; is
3 that correct?
4     A. So I think you said Church's.
5     Q. I may have gotten it wrong?
6     A. It's in the New Choice section --
7     Q. New Choice.
8     A. -- on 74 and 75.
9     Q. Okay. So besides the New Choice
10 Pharmacy, you didn't consider whether any
11 of the other pharmacies were located near a
12 medical facility?
13     A. Correct. That was not part of
14 the assignment.
15     Q. And you didn't consider the
16 population density of the area surrounding
17 the pharmacies?
18     A. Correct. That was not part of
19 the assignment.
20     Q. So none of the pharmacies you
21 considered that?
22     A. Correct. That was not part
23 assignment.
24     Q. And just to confirm, you didn't
25 visit any of the pharmacies, did you?

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1
2    A.   That's correct, I did not visit.
3  That was not asked of me.
4    Q.   And you've testified today that
5  you considered manufacturer chargeback data
6  related to these pharmacies, correct?
7    A.   That is correct.
8    Q.   Okay.  And you've also testified
9  that that data is incomplete.
10       Is that also correct?
11   A.   I don't recall saying
12 "incomplete."
13   Q.   Okay.
14   A.   I would say that it -- because
15 the data that I had was a full data set, so
16 it's not to say that it's incomplete.
17       I think if -- maybe what you're
18 referencing is the testimony that it
19 reflects only a certain percentage of the
20 total shipments or the total, yeah, the
21 total shipments or sales made to a county.
22   Q.   It doesn't cover all shipments
23 made to each of these pharmacies?
24   A.   Correct.  I think I characterized
25 that in my report.

Page 383

1
2    Q.   And did you also consider the
3  ARCOS data that showed shipments to these
4  stores?
5    A.   I want to make sure that -- yes,
6  we did.  I think it's shown throughout the
7  report.
8    Q.   And just to confirm, that data,
9  though, only covers shipments of certain
10 prescription opioids?
11   A.   Correct.  That data produced to
12 us had 14 drug codes.  I believe only 12
13 were included.
14   Q.   So it didn't have all controlled
15 substances?
16   A.   Correct.  It had 12 drug codes.
17 The two that weren't included were
18 methadone and buprenorphine.
19   Q.   In paragraph 42 on page 14 of
20 your report, if you want to turn to that
21 real quick.
22   A.   Sorry.
23   Q.   Take your time.
24   A.   I'm getting cold fingers.  All
25 right.  Here we are.

Page 384

1
2    Q.   The last sentence of paragraph 42
3  states, "Several monitoring programs
4  developed by manufacturers and distributors
5  relied on the percentage of controlled
6  substances to non-controlled substances as
7  a metric."
8        Do you see that?
9    A.   I do.
10   Q.   Okay.  Did you consider that
11 metric in analyzing any shipments made to
12 the pharmacies in Section L of your report?
13   A.   I would not have been able to.
14   Q.   Why not?
15   A.   Because I was not given access to
16 the full sales data for a pharmacy.
17   Q.   Did you ask for access to the
18 full sales data?
19   A.   I've asked for it and I don't
20 believe that it exists or -- I've asked for
21 it, I should say.
22   Q.   Okay.  And what was the response?
23   A.   And I was told that we didn't
24 have that.
25   Q.   Okay.  So you're not aware that

Page 385

1
2  CVS and Cardinal have produced complete
3  shipment data for the CVS pharmacy at 8000
4  Euclid Avenue?
5    A.   I was not provided with that
6  data.
7    Q.   Okay.  And did you consider the
8  expert report of Sonya Kwon where she
9  quantified the percentage of controlled and
10 non-controlled substances that were shipped
11 to the CVS at 8000 Euclid Avenue?
12   A.   I have not read that report or am
13 I familiar with it.
14   Q.   Okay.  In analyzing these
15 pharmacies, did you consider whether there
16 was any regulatory or law enforcement
17 action taken against any of the?
18   A.   That would be outside of the
19 scope of the report.
20   Q.   And did you consider whether
21 there was any regulatory, law enforcement
22 or disciplinary action taken against any
23 pharmacists who worked on those stores?
24   A.   Again, that would be outside of
25 the scope of the report.

Highly Confidential - Subject to Further Confidentiality Review

Page 386

2    Q. Okay. And did you determine
3 whether any prescription opioids shipped to
4 these pharmacies were diverted?
5    A. Again, that would be outside of
6 the scope of this report.
7    Q. Okay. So just so we can button
8 this all up, you considered chargeback data
9 and ARCOS data related to these stores and
10 that's it?
11    A. And also Purdue's 867.
12    Q. Okay. And Purdue's 867, and that
13 is the extent of the data that you
14 considered related to these stores?
15    A. With the exception of helper
16 files to help clean them up, whether it's
17 an NDC code or MMEs. But as far as data
18 concerning those stores and the
19 transactions about them, then, yes.
20    Q. But that's helper files to help
21 clean up that data, right?
22    A. Correct.
23    Q. And you didn't look at any due
24 diligence files that Cardinal or McKesson
25 or CVS produced related to these stores?

Page 387

2    A. Correct. That would be outside
3 of the scope here.
4    Q. Okay.
5    MR. HYNES: I have no further
6 questions. Thank you very much.
7    THE WITNESS: Thank you.
8    THE VIDEOGRAPHER: The time is
9 6:26 p.m. We are now off the record.
10    (Recess is taken.)
11    THE VIDEOGRAPHER: The time is
12 6:27 p.m. We are back on the record.
13 EXAMINATION BY
14 MS. PERSIO:
15    Q. Hi, Ms. Keller. Thank you for
16 being here today.
17    A. Thanks for having me.
18    Q. My name is Joanna Persio. I
19 represent the Endo and the Par defendants
20 in this litigation. I have just a few
21 questions for you.
22    I think I know the answers to
23 these, so hopefully I will be brief. I
24 know it's been a long day so far.
25    Is it correct that you haven't

Page 388

2 done any analysis as to whether any of the
3 Endo orders identified in your report as
4 being flagged by the various compliance
5 metrics that you have applied were or were
6 not actually investigated or reviewed by
7 Endo?
8    A. That is correct. That would be
9 outside of the scope of the report.
10    Q. And you also didn't do that
11 analysis for any of the Par orders that are
12 identified in your report; is that correct?
13    A. That is correct. I didn't review
14 due diligence records or anything like
15 that. That would be outside of the scope
16 of the report.
17    Q. And the answer would be the same
18 for the entity that you referred to as
19 Qualitest; in your report, you didn't do
20 any review or identification of whether or
21 not those orders that you flagged for
22 Qualitest were actually investigated by the
23 entity you referred to as Qualitest?
24    A. Correct.
25    Q. So you have no basis to say

Page 389

2 whether or not Endo or Par or Qualitest in
3 fact flagged or investigated any of the
4 orders that you flag for those entities in
5 your report; is that right?
6    MS. CONROY: Objection.
7    A. Yes. That would be outside of my
8 expertise. I didn't review that.
9    Q. And you also couldn't say whether
10 any of the orders for Endo or Par or
11 Qualitest were or were not legitimate
12 orders that should have been shipped after
13 an investigation?
14    MS. CONROY: Objection.
15    A. Correct. That would be outside
16 of the scope.
17    Q. And you can't say if there are
18 any specific prescriptions for an Endo, Par
19 or Qualitest opioid medication that were or
20 were not legitimate?
21    MS. CONROY: Objection.
22    A. Correct. That would not be my
23 area of expertise.
24    Q. And you're not offering in your
25 report or planning to offer any opinion as

Highly Confidential - Subject to Further Confidentiality Review

Page 390

2 to whether or not Endo's investigations of
3 any orders or any prescribers who are
4 flagged in your report were or were not
5 sufficient; is that right?
6      A.   Correct.  I am not an expert in
7 that.
8      Q.   And you're also not offering or
9 planning to offer an opinion as to whether
10 or not any Par's investigations of the
11 orders or prescribers flagged in your
12 report were sufficient?
13      A.   Correct.
14      Q.   I assume the answer is the same
15 for the entity you referred to as
16 Qualitest?
17      A.   Correct.
18      Q.   And you also can't offer any
19 opinion as to whether or not Endo could
20 have in fact stopped any of the orders
21 flagged by the application of your
22 compliance metrics or stopped any
23 particular prescriptions in the real world;
24 is that right?
25          MS. CONROY:  Objection.

Page 391

2      A.   Correct.  That is outside of my
3 expertise and scope.
4      Q.   And you can't offer an opinion as
5 to whether or not Endo should have stopped
6 any of those orders or prescriptions; is
7 that right?
8          MS. CONROY:  Objection.
9      A.   Correct.
10      Q.   And you also can't comment on
11 those things for Par or Qualitest, correct?
12          MS. CONROY:  Objection.
13      A.   Correct.  All that I can talk to
14 about what could have been done using the
15 known compliance metrics by -- applied to
16 the labeler's own data.
17      Q.   But you're not offering any
18 opinion as to whether or not what was
19 actually done was adequate or appropriate;
20 is that right?
21      A.   Correct.
22          MS. PERSIO:  I have no further
23 questions.  Thank you.
24          THE WITNESS:  Thank you.
25          THE VIDEOGRAPHER:  The time is

Page 392

2      6:31 p.m.  We are now off the record.
3          (Discussion off the record.)
4          THE VIDEOGRAPHER:  Time is
5 6:32 p.m.  We are back on the record.
6 FURTHER EXAMINATION BY
7 MR. GOLDSTEIN:
8      Q.   Hi, again, Ms. Keller.  I'm back
9 for the remaining five minutes of the
10 deposition today.
11          Can you turn back to Exhibit 20,
12 please.  And specifically that's
13 Mr. Buthusiem's report, and specifically
14 paragraph 13.
15      A.   Sure.
16      Q.   If you look at the second
17 sentence of that paragraph, it says, "The
18 distributor's inventory is comprised of
19 product purchased over the course of
20 multiple orders placed with the
21 manufacturer."
22          Do you have any reason to
23 disagree with that statement?
24      A.   I don't have any reason to
25 disagree with what he has stated, but

Page 393

2 that's what's stated here.
3      Q.   Okay.  The next sentence says,
4 "The chargeback data submitted with respect
5 to any eligible distributor to downstream
6 registrant sale does not delineate which
7 specific distributor to manufacturer order
8 relates to the chargeback."
9          Do you have any reason to
10 disagree with that statement?
11          (Document review.)
12      A.   I don't understand what the word
13 "eligible" means, so I don't really know if
14 I can agree or disagree with this.
15          And it's also referencing sales
16 data that, again, we've discussed earlier
17 that I haven't reviewed fully.
18      Q.   So let me break that up.  I'll
19 represent to you that eligible distributor
20 to downstream registrant sale simply means
21 a sale for which a chargeback was issued.
22      A.   Sure.
23      Q.   A chargeback eligible sale.
24          Okay.  Does that make sense?
25      A.   Sure.

Page 394

1
2     Q.   Okay.  Now based on the data that
3 you've reviewed to date and as you sit here
4 today, do you have any reason to disagree
5 with the sentence that I just read?
6     A.   And I just assume that there is
7 an order number, an order ID in both data
8 sets, is there?
9     Q.   You assume that there is an order
10 ID in both sets of what?
11     A.   Of both the chargeback data and
12 the sales data.
13     Q.   That is the same order ID, is
14 that what you're saying?
15     A.   I would think that that exists.
16     Q.   Okay.  And so if that is the
17 case -- sorry.  If that is not the case,
18 then you would not be able to delineate
19 which specific distributor to manufacturer
20 order relates to the chargeback?
21     A.   I mean, I'd have to look at the
22 data sets again to see whether or not I
23 could trace it or not.  Again, you're
24 asking me look at data I haven't fully
25 reviewed.

Page 395

1
2     Q.   I'm only asking you about
3 chargeback -- so let me only ask you about
4 chargeback data for the moment.
5     A.   Okay.
6     Q.   Do you know if chargeback data
7 anywhere reflects which product in
8 circumstances where, as discussed in the
9 sentence immediately prior, where
10 distributor's inventory is comprised of
11 product purchased over the course of
12 multiple orders, okay?
13     A.   Okay.  I don't know that there is
14 a question there, though.
15     Q.   Are you with me so far?
16     A.   Yes.
17     Q.   You understand the situation I'm
18 talking about is a situation where a
19 distributor's inventory includes product --
20 is comprised of product purchased over the
21 course of multiple orders placed with the
22 same manufacturer?
23     A.   Yes.  I think maybe let's go back
24 to our example from earlier where you had
25 the two orders.

Page 396

1
2     Q.   Sure?
3     A.   Okay.
4     Q.   Chargeback data is submitted for
5 one of those orders.
6     A.   Sure.
7     Q.   Are you aware of any information
8 in the chargeback data that identifies
9 which order of the two orders in the
10 distributor's inventory that chargeback
11 data pertains to?
12     A.   So the -- I will say what I know
13 that exits in the chargeback data.  I can't
14 talk about the inventory system of the
15 distributor.
16         The chargeback has an NDC number,
17 the distributor that shipped it or that
18 submitted it, I should say, to be most
19 correct, as well as an order number and a
20 date.
21     Q.   And is it your understanding that
22 the NDC code that's included pertains to
23 the product that's being shipped?
24     A.   I would understand the NDC to be
25 the product, yes.

Page 397

1
2     Q.   And not a particular order that's
3 being shipped?
4     A.   I think you could characterize
5 the NDC is part of a larger order.
6     Q.   I'm not sure I follow.
7         The NDC relates to the type of
8 product that's being shipped?
9     A.   So I have seen the data, have an
10 order number, let's say one, two, three,
11 four, five, have as part of it, and this is
12 a hypothetical, but I've seen real examples
13 of the data, an order for -- the same order
14 number also have oxycodone, morphine and a
15 hydrocodone product as part of that whole
16 order.
17     Q.   And that's all under the same NDC
18 code?
19     A.   No, different NDC codes folded
20 underneath one order.
21     Q.   Okay.  But understood the NDC
22 order only pertains to the product that's
23 being shipped?
24     A.   Yes.  I think we've talked about
25 that.

Page 398

1
2      Q.  Okay.
3           MR. GOLDSTEIN:  Can I ask one
4      more question?  Thank you.
5           MR. LEDLIE:  Sure.
6  BY MR. GOLDSTEIN:
7      Q.  So if you turn to figure 1 in
8  Mr. Buthusiem's report, it's right under
9  paragraph 24.
10     A.  Yup.
11     Q.  Have you reviewed this figure
12 before?
13     A.  I've seen it before.
14     Q.  Sorry.  That wasn't my one final
15 question.
16          (Laughter.)
17     Q.  Do you see it reflected in that
18 table that there is a Mallinckrodt peculiar
19 order and a Mallinckrodt chargeback record?
20          Do you see that?
21     A.  I see those two records on this
22 document, yes.
23     Q.  And do you see that the order
24 numbers are different?
25     A.  I do see that.

Page 399

1
2      Q.  And what do you take that to
3  mean?
4      A.  I mean what I assume, there are
5  two different systems that have two
6  different numbering.
7      Q.  And so this is my last question.
8          Assuming that there are two
9  different systems with two different
10 numbering, it would not be possible to
11 trace a peculiar order to -- that is to
12 product that is shipped into Cuyahoga or
13 Summit County and is subsequently the
14 source of a chargeback request?
15          MS. CONROY:  Objection.
16     A.  I don't agree with that.
17     Q.  Why not?
18     A.  Because our report traces
19 peculiar orders and chargebacks.
20     Q.  So based on the substance of
21 what's in your report today, you disagree
22 with that statement?
23     A.  Yes, I disagree with that
24 statement based off of my findings in my
25 report.

Page 400

1
2           MR. GOLDSTEIN:  Okay.  Thank you.
3           THE WITNESS:  Thanks.
4           THE VIDEOGRAPHER:  The time is
5  6:41 p.m.
6           (Time noted:  6:41 p.m.)
7
8
9
10          _____.
11          LACEY R. KELLER
12
13
14 Subscribed and sworn to before me
15 this    day of        2019.
16
17 _____
18
19
20
21
22
23
24
25

Page 401

1
2      C E R T I F I C A T E
3
4  STATE OF NEW YORK      )
5                        :  ss.
6  COUNTY OF WESTCHESTER  )
7
8      I, ANNETTE ARLEQUIN, a Notary
9  Public within and for the State of New
10 York, do hereby certify:
11     That LACEY R. KELLER, whose
12 deposition is hereinbefore set forth,
13 was duly sworn by me, and that the
14 transcript of such depositions is a
15 true record of the testimony given by
16 such witness.
17     I further certify that I am not
18 related to any of the parties to this
19 action by blood or marriage; and that I
20 am in no way interested in the outcome
21 of this matter.
22     IN WITNESS WHEREOF, I have hereunto
23 set my hand this 14th day of June, 2019.
24 _____
25 ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

Highly Confidential - Subject to Further Confidentiality Review

Page 402

I N D E X

WITNESS                          PAGE

LACEY R. KELLER

MS. LEVY                         12, 314
MS. LUCAS                        203
MS. DEAN                         263
MR. LAVELLE                      270
MS. O'GORMAN                     300
MR. HAMMOUD                      320
MR. GOLDSTEIN                    338, 392
MR. HYNES                        377
MS. PERSIO                       387

I N D E X   O F   E X H I B I T S
DESCRIPTION                      PAGE

Keller Exhibit 1, Track 1            15
Defendants' Second Amended Notice
of Oral Videotaped Deposition of
Lacey R. Keller

Keller Exhibit 2, List of            17
documents that respond to request
1 in Exhibit A on Exhibit 1

Page 403

I N D E X   O F   E X H I B I T S (Cont'd.)
DESCRIPTION                      PAGE

Keller Exhibit 3, Gryphon            19
Strategies Invoice dated 5/30/19,
Bates-stamped
OPIOIDMDL_KELLER_000036 through
35

Keller Exhibit 4, Resume of Lacey    30
R. Keller, not Bates-stamped

Keller Exhibit 5, Expert Analysis    60
of Lacey R. Keller, not
Bates-stamped

Keller Exhibit 6, Spreadsheet,       136
not Bates-stamped

Keller Exhibit 7, Expert Analysis    157
- Addendum: Lacey R. Keller

Keller Exhibit 8, "Corrections to    179
Expert Analysis," prepared by
Lacey R. Keller, not
Bates-stamped,

Keller Exhibit 9, Word document      184
prepared by Keller, not
Bates-stamped,

Keller Exhibit 10, Expert            237
Analysis - Errata Sheet: Lacey R.
Keller, not Bates-stamped,

Page 404

I N D E X   O F   E X H I B I T S (Cont'd.)
DESCRIPTION                      PAGE

Keller Exhibit 11, Press release     241
entitled "FDA reports quality
problems for data provided by the
firm IQVIA that were used to
inform estimates for some
controlled substances"

Keller Exhibit 12, Report on         249
Script.SQL, not Bates-stamped

Keller Exhibit 13, Document          277
produced in native format
beginning with Bates-stamp
MNK-T1_0001315847

Keller Exhibit 14, Email chain       281
beginning with email dated
9/23/16 from K. Harper to
McKenzie, Bates-stamped
MNK-T1_0001315844 through 5846

Keller Exhibit 15, Email chain       287
beginning with email dated
10/31/11 from Oriente to Nichols,
Bates-stamped MCKMMDL006332908
through 2910

Keller Exhibit 16, Email chain       292
beginning with email dated
10/31/11 from Lai to Oriente and
others, Bates-stamped
MCKMDL00626683 through 6685

Keller Exhibit 17, Purdue Pharma     304
L.P. document Bates-stamped
PDD1503450011 through 0024

Page 405

I N D E X   O F   E X H I B I T S (Cont'd.)
DESCRIPTION                      PAGE

Keller Exhibit 18, Document          307
produced natively, Bates-stamped
PPLP004449246

Keller Exhibit 19, Letter on         316
Kirkland & Ellis letterhead dated
8/31/18 from Welch to Donna Welch
to the Plaintiffs' Executive
Committee, not Bates-stamped

Keller Exhibit 20, Report of         338
Edward J. Buthusiem of Berkeley
Research Group, not Bates-stamped

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1
2          ERRATA SHEET FOR THE TRANSCRIPT OF:
3    CASE NAME:  OPIOID LITIGATION
4    DATE:        JUNE 13, 2019
5    DEPONENT:  LACEY R. KELLER - CONFIDENTIAL
6    Pg.  Ln.  Now Reads  Should Read  Reason
7    __  __  _____  _____  _____
8    __  __  _____  _____  _____
9    __  __  _____  _____  _____
10   __  __  _____  _____  _____
11   __  __  _____  _____  _____
12   __  __  _____  _____  _____
13   __  __  _____  _____  _____
14   __  __  _____  _____  _____
15   __  __  _____  _____  _____
16   __  __  _____  _____  _____
17
18             _____
19             LACEY R. KELLER
20   SUBSCRIBED AND SWORN BEFORE ME
21   THIS____DAY OF_____  2019.
22
23   _____
24   (Notary Public)
25   MY COMMISSION EXPIRES:_____