1                    IN THE UNITED STATES DISTRICT COURT

                     FOR THE NORTHERN DISTRICT OF OHIO

2                              EASTERN DIVISION

3

      IN RE:  NATIONAL PRESCRIPTION      ) No. 17-md-2804

4     OPIATE LITIGATION                  )

                                         )

5     APPLIES TO ALL CASES               ) Hon. Dan A. Polster

                                         )

6

7

8

9

10

                      VIDEO DEPOSITION OF SANDRA KINSEY

11

                              June 7, 2019

12                             9:05 a.m.

13

           *HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14                    CONFIDENTIAL REVIEW*

15

16

17

18           Reporter:  John Arndt, CSR, CCR, RDR, CRR

                     CSR No. 084-004605

19                     CCR No. 1186

20

21

22

23

24

**Page 2**

1  DEPOSITION OF SANDRA KINSEY produced, sworn, and examined on June 7, 2019, at Marcus &
2  Shapira LLP, One Oxford Centre, 35th Floor, in the City of Pittsburgh, State of Pennsylvania, before John
3  Arndt, a Certified Shorthand Reporter and Certified Court Reporter.
4
5  APPEARANCES OF COUNSEL
6
7  On Behalf of Plaintiffs:
  Levin, Papantonio, Thomas, Mitchell, Rafferty &
8  Proctor, P.A.
  316 South Baylen Street, Suite 600
9  Pensacola, FL 32502
  (850) 435-7043
10  BY: MR. BRANDON L. BOGLE
  bbogle@levinlaw.com
11  On Behalf of HBC Services and the witness:
  Marcus & Shapira LLP
12  301 Grant Street
  Pittsburgh, PA 15219
13  (412) 471-3490
  BY: MR. ROBERT M. BARNES
14  rbarnes@marcus-shapira.com
  MR. JOSHUA A. KOBRIN
15  kobrin@marcus-shapira.com
16  On Behalf of Walmart:
  Jones Day
17  77 West Wacker Drive
  Chicago, IL 60601
18  (312) 269-4335
  BY: MS. TARA A. FUMERTON
19  tfumerton@jonesday.com
20  On Behalf of Johnson & Johnson and Janssen:
  O'Melveny & Myers LLP
21  Two Embarcadero Center, 28th Floor
  San Francisco, CA 94111
22  (415) 984-8700
  BY: MR. DANIEL H. LEIGH
23  dleigh@omm.com
  (present via videoconference)
24

**Page 3**

1  APPEARANCES OF COUNSEL (CONTINUED)
2
  On Behalf of Purdue Pharma:
3  Dechert LLP
  1095 Avenue of the Americas
4  New York, NY 10036
  (212) 698-3599
5  BY: MS. SHARON TURRET
  sharon.turret@dechert.com
6  (present via videoconference)
7  On Behalf of AmerisourceBergen:
  Reed Smith LLP
8  1301 K Street, Suite 1000
  Washington, DC 20005
9  (202) 414-9286
  BY: MS. LINDSAY A. DeFRANCESCO
10  ldefrancesco@reedsmith.com
  (present via videoconference)
11
  On Behalf of Allergan Finance, LLC:
12  Kirkland & Ellis LLP
  300 North LaSalle
13  Chicago, IL 60654
  (312) 862-2000
14  BY: MR. ZACHARY A. CIULLO
  zac.ciullo@kirkland.com
15  (present via videoconference)
16
  On Behalf of Discount Drug Mart:
17  Cavitch, Familo & Durkin Co. LPA
  1300 East 9th Street
18  Cleveland, OH 44114
  (216) 621-7860
19  BY: MR. ERIC J. WEISS
  (present via videoconference)
20
  On Behalf of Walgreens:
21  Bartlit Beck LLP
  54 West Hubbard Street
22  Chicago, IL 60654
  (312) 494-4410
23  BY: MR. BRIAN C. SWANSON
  brian.swanson@bartlitbeck.com
24  (present via videoconference)

**Page 4**

1  APPEARANCES OF COUNSEL (CONTINUED)
2
  Bailey & Wyant, PLLC
3  500 Virginia Street East, Suite 600
  Charleston, WV 25301
4  (304) 345-4222
  BY: MR. MICHAEL W. TAYLOR
5  mtaylor@baileywyant.com
  (present via videoconference)
6
7  Also present: Jacob Arndt, videographer
  Ian Eberle
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 5**

1  INDEX OF INTERROGATION

2  Examination by Mr. Bogle          Page 8
  Examination by Mr. Barnes         Page 205
3  Examination by Mr. Bogle          Page 244
  Examination by Mr. Barnes         Page 255
4
5  INDEX OF EXHIBITS
6
  Exhibit Kinsey-001                Page 12
7  (Expert report)
  Exhibit Kinsey-002                Page 12
8  (Amended expert report)
9
  Exhibit Kinsey-003                Page 13
10  (Errata to expert report)
11  Exhibit Kinsey-004                Page 20
  (Notice of deposition)
12
  Exhibit Kinsey-005                Page 21
13  (Additional documents reviewed)
14  Exhibit Kinsey-006                Page 23
  (Invoices)
15
  (Exhibits are attached.)
16
17
18
19
20
21
22
23
24

Page 6

1     THE VIDEOGRAPHER: We are now on the
2  record. My name is Jacob Arndt. I'm a videographer
3  representing Golkow Litigation Services. Today's date
4  is June 7th, 2019, and the time is 9:05 AM.
5     This video deposition is being held in
6  Pittsburgh, Pennsylvania, in re National Prescription
7  Opiate Litigation for the United States District Court
8  for the Northern District of Ohio, Eastern Division.
9  The deponent is Sandra Kinsey.
10     Counsel, please identify yourselves.
11     MR. BOGLE: Brandon Bogle on behalf of the
12  plaintiffs.
13     MR. BARNES: Robert Barnes, Marcus &
14  Shapira, for HBC Service Company and the witness,
15  Sandra Kinsey.
16     MR. KOBRIN: Joshua Kobrin of Marcus &
17  Shapira. I'm also representing HBC Service Company and
18  the witness.
19     MS. FUMERTON: Tara Fumerton from Jones
20  Day representing Walmart.
21     MR. BARNES: Ian, you want to --
22     MR. EBERLE: Ian Eberle at Marcus &
23  Shapira.
24     MR. BARNES: Ian is a first-year law

Page 7

1  student.
2     MR. BOGLE: Hey, Ian. Nice to meet you,
3  man.
4     MR. BARNES: He wants to see how these
5  things happen, and if he sticks in law school after
6  this deposition, that will be a plus.
7     THE VIDEOGRAPHER: Anybody on the phone?
8     MR. BOGLE: You want the phone stuff?
9     THE REPORTER: Would you like to announce
10  your appearances on the record on the phone?
11     MR. LEIGH: Daniel Leigh from O'Melveny &
12  Myers on behalf of Janssen defendants.
13     MS. TURRET: Sharon Turret from Dechert on
14  behalf of Purdue.
15     MS. DeFRANCESCO: Lindsay DeFrancesco from
16  Reed Smith on behalf of AmerisourceBergen Drug
17  Corporation.
18     MR. CIULLO: Zac Ciullo from Kirkland &
19  Ellis on behalf of Allergan Finance LLC.
20     MR. WEISS: Eric Weiss from Cavitch,
21  Familo & Durkin on behalf of defendant Discount Drug
22  Mart.
23     THE VIDEOGRAPHER: The court reporter is
24  John Arndt and will now swear in the witness.

Page 8

1
2     The witness, SANDRA KINSEY, first having been
3  duly sworn, testified as follows:
4     EXAMINATION
5  BY MR. BOGLE:
6     Q.  Good morning.
7     A.  Good morning.
8     Q.  My name is Brandon Bogle. I'm going to be
9  asking you some questions today regarding your report
10  that you submitted in the opioid litigation. Can I get
11  your full name first, please?
12     A.  Sandra Kinsey.
13     Q.  And I understand you've had your
14  deposition taken before, but I just want to go through
15  an abbreviated sort of set of rules here, hopefully
16  make things go a little smoother today.
17     So I'm going to ask you questions. I'd
18  ask that before you start your answer you wait till I
19  finish my question, even if you think you might know
20  where I'm going with the question. That will make the
21  transcript a little clearer and help ensure that you're
22  answering the right question. Is that fair?
23     A.  Sure.
24     Q.  And I'll try to do the same for you. I

Page 9

1  will try not to ask any questions until you're done
2  with your answer. I'm sure I'll mess that up a few
3  times, but that's certainly my ambition.
4     The only other thing that I wanted to
5  mention, if you don't hear or understand a question
6  that I ask, feel free to ask me to repeat or rephrase.
7  Otherwise I'm going to assume that -- if you answer the
8  question that you understood it. Is that fair?
9     A.  Yes.
10     Q.  Where are you currently employed?
11     A.  I work for Kinsey Partners.
12     Q.  And do you own that business?
13     A.  I do that business.
14     Q.  And you opened that business in 2014; is
15  that right?
16     A.  I did, and if I may, I also work for
17  Highlands Oncology. I do have an employment with them.
18     Q.  What do you do with Highlands Oncology?
19     A.  I'm a clinical pharmacist.
20     Q.  Do you see patients?
21     A.  I do.
22     Q.  How many days a week do you work with
23  Highlands Oncology?
24     A.  It's roughly one day a week. I strictly

Page 10

1 do relief work.

2     Q.   When you say relief work, what does that

3 mean?

4     A.   I help fill in when people have a day off,

5 when they need assistance by another pharmacist to fill

6 in a shift. So I roughly on average -- I've been

7 working a little bit more lately because they've lost a

8 pharmacist, but roughly it's about one day a week.

9     Q.   And when you work one day a week, are they

10 usually full sort of eight-to-10-hour days, or are they

11 half days, or what are they --

12     A.   They're full eight-to-10-hour days.

13     Q.   When did you start working for Highlands

14 Oncology?

15     A.   March.

16     Q.   Of this year?

17     A.   Yes.

18     Q.   What made you decide to start working for

19 them?

20     A.   Well, I've been working as a relief

21 pharmacist for several years since I left Walmart, and

22 Highlands needed a relief pharmacist. My other relief

23 work, I bill through my company as a 1099, as a

24 contractor, and Highlands preferred to hire me as an

Page 11

1 employee instead.

2     Q.   Where is Highlands located?

3     A.   Rogers, Arkansas.

4     Q.   And sort of as the name implies, I

5 understand they would treat predominantly cancer

6 patients?

7     A.   Predominantly, yes.

8     Q.   Where have you done relief work for other

9 than Highlands Oncology?

10     A.   I've worked for Talley Pharmacy in

11 Centerton, Arkansas, Teasley Drug in Gravette,

12 Arkansas, Smith Drug in Gentry, Arkansas, Jepson Drug

13 in Siloam Springs. I do relief work. I know these

14 independent pharmacists, and so when they need a day

15 off, I'm happy to go help.

16     Q.   And for these four other pharmacies you've

17 listed, have you seen patients in that context as well?

18     A.   Yes.

19     Q.   Are there any sort of specialties for any

20 of those four pharmacies as far as patients they serve?

21     A.   Not really. Talley Pharmacy did have a

22 compounding business, so I saw a lot of females for

23 hormones, but they have since -- the owner has since

24 sold that pharmacy to a small chain.

Page 12

1     Q.   Any of the other of the three you've

2 listed have any sort of specialty as far as patients

3 they see?

4     A.   No, they're just general retail.

5     Q.   Okay. I'm going to hand you what I'm

6 marking here as Kinsey Exhibit 1, which is the expert

7 report that you served initially in this case.

8     [Exhibit Kinsey-001 marked for

9     identification.]

10     Q.   And as Exhibit 2, I'm going to mark your

11 amended expert report. Here you go.

12     [Exhibit Kinsey-002 marked for

13     identification.]

14     A.   Thank you.

15     Q.   And the amended expert report that I

16 handed you here was served this Monday. Does that

17 sound accurate to you?

18     A.   Yes.

19     Q.   And what prompted you to do an amended

20 report?

21     A.   Further review. After I submitted the

22 report, I went back through and -- like you do with

23 normal edits and continued to find things that I felt

24 needed further clarification for the record. I found

Page 13

1 some typos, that kind of stuff.

2     Q.   I'm going to hand you now what I'm marking

3 as Exhibit 3 to your deposition.

4     [Exhibit Kinsey-003 marked for

5     identification.]

6     Q.   And Exhibit 3 is entitled errata to May

7 10, 2019, expert report of Sandy K.B. Kinsey, R.Ph,

8 MBA. Do you see that?

9     A.   Yes. Sorry.

10     Q.   And what is the purpose of this errata?

11     A.   It was to document the changes between the

12 initial report and the amended report.

13     Q.   So all of the changes on the amended

14 report -- would those be captured on this errata?

15     A.   I believe they're all on here, yes.

16     Q.   Is there anything as you sit here today

17 that you're aware of that -- as far as changes go from

18 the initial report to the amended report that are not

19 captured on this errata?

20     A.   No, I believe they're all in here.

21     Q.   So between the initial expert report and

22 the amended report, which are Exhibits 1 and 2, do

23 those reports include all the opinions you intend to

24 offer in this case?

Page 14

1  A.   They include the opinions that I have
2  concluded to date and that I felt were most applicable
3  to this particular case.
4  Q.   So are there any additional opinions you
5  intend to offer that are not captured in those reports?
6  A.   I mean, I'm not going to limit my
7  opinions, but the ones that I feel are most important
8  are included in my report.
9  Q.   Well, I'm entitled to know what opinions
10 you're going to offer.  That's one of the purposes of
11 the deposition today.  So I'm trying to get a sense of
12 what that is and whether I can find those in the four
13 corners of those reports.
14 A.   So for that purpose, then yes, these are
15 the opinions that I intend to offer up to today.
16 Q.   Are you currently working on anything
17 related to this case that you intend to supplement your
18 reports with?
19 A.   I don't believe so.  Not at this time.
20     MR. BARNES:  And for the record, we do
21 reserve -- as plaintiffs have done, we reserve the
22 right to supplement her report for information learned
23 after the dates of her report.
24 BY MR. BOGLE:

Page 15

1  Q.   I want to go on Exhibit 3 to the third
2  page.  So for Exhibits H and I on this page, you
3  deleted references to those documents which had a stamp
4  that said Analysis Group, Inc.; correct?
5  A.   Yes.
6  Q.   Why did you remove those references?
7  A.   Just formatting.
8  Q.   Were those exhibits created by Analysis
9  Group, Inc.?
10 A.   They were.  Under my direction.
11 Q.   Who did you work with at Analysis Group to
12 create those exhibits?
13 A.   There were three people, and I apologize;
14 I only know their first names.  David, David, and
15 Vandella (ph).
16 Q.   Had you worked with these individuals
17 before working on this case?
18 A.   I have not.
19 Q.   How did you come to work with them here?
20 A.   They are a consulting group that was hired
21 by Marcus & Shapira to help crunch some of the data
22 involved in this case so that I could better draw my
23 opinions.
24 Q.   Did you specifically ask for another group

Page 16

1  to be brought in to assist you in crunching these
2  numbers, as you say?
3  A.   I did ask for some help, but Marcus &
4  Shapira were the ones that actually brought them in as
5  consultants.
6  Q.   Could you have done the data analysis in
7  this case without assistance from a third party?
8  A.   No, probably not.  Given the time, maybe,
9  but I would have preferred to rely on a consulting
10 group.
11 Q.   Are you relying on the Analysis Group or
12 any work that they've done for any opinions you're
13 reaching here today?
14 A.   When you say rely -- I mean, all of the
15 opinions are mine.  The information that they provided
16 just substantiate my opinions.
17 Q.   Are there any opinions you could not have
18 reached on your own without the assistance of Analysis
19 Group, Inc.?
20 A.   No.
21 Q.   So the references to Analysis Group, Inc.,
22 were removed on Exhibits H and I.  Did they assist you
23 in creating any other exhibits in your report?
24 A.   Yes.

Page 17

1  Q.   Which ones?
2  A.   The majority of the charts associated with
3  anything that had to do with the data crunching and
4  looking at Dr. McCann's data and Giant Eagle data they
5  helped with.
6  Q.   Can you give me a list of the exhibits
7  that they assisted you on?
8  A.   Sure.  It would be Exhibit D, E, F, G, H,
9  I, J, M, N, O, P, and Q.
10 Q.   Do you have a background in statistics?
11 A.   No.
12 Q.   Do you hold yourself out as an expert in
13 statistics?
14 A.   I'm not an expert in statistics, but I've
15 evaluated plenty of datasets.
16 Q.   Have you ever testified as an expert on a
17 matter related to statistical analyses?
18 A.   No.
19 Q.   What specifically did you ask the
20 individuals at AGI to do to assist you here?  What were
21 your directions to them?
22 A.   You know, it was really around as I was
23 drawing my opinions and thinking about the data.  I
24 mean, it was -- it's brought up in my report as I was

Page 18

1  drawing my conclusions I wanted to look at the data to
2  ensure that it substantiated the conclusions that I was
3  coming to, and I wanted help with graphs and charts and
4  illustrations.
5      Q.   Did you reach the conclusions outlined in
6  your report before AGI was brought in to assist in
7  running data?
8      A.   Some of them, yes.
9      Q.   Which ones had you not -- which opinions
10 had you not concluded in your mind prior to AGI being
11 consulted?
12     A.   Well, I mean, that's a broad question.  I
13 can give -- I certainly can give you an example.  So
14 one of the conclusions that I talk about in McCann's
15 data is some of the duplicate transactions that he had
16 in his dataset.  I didn't see those based off of a
17 broad scan of his report.  That information was
18 discovered as AGI began digging into his dataset.
19     Q.   Anything else that comes to mind as far as
20 things that you had not reached a conclusion on or you
21 had not noticed in reviewing the reports that AGI
22 brought to your attention?
23     A.   There are such things as we go through the
24 exhibits with dates and times in which he is flagging

Page 19

1  orders in which HBC was not distributing, so some of
2  the errors in his data AGI discovered and pointed out
3  to me.
4      Q.   The he -- you're referring to Dr. McCann?
5      A.   I'm sorry.  Yes.
6      Q.   So if, for example, AGI created Exhibits H
7  and I, why remove the reference to them in the actual
8  documents?
9      A.   Personal preference.
10     Q.   Why was that your preference?
11     A.   Because I wanted them to look like all the
12 other reports.
13     Q.   When you say all the other reports, what
14 are you referring to?
15     A.   The other exhibits.
16     Q.   The other exhibits in your report?
17     A.   The other exhibits in my report didn't
18 have their stamp on it, so I was just from a formatting
19 perspective wanting it to look nice.
20     MR. KOBRIN:  This is Joshua Kobrin.
21 Counsel also wanted to put the same confidential
22 subject to protective order stamp on it.  I think it
23 might have been slightly different in the initial
24 report.  I think it only said confidential.

Page 20

1  BY MR. BOGLE:
2      Q.   Are there any corrections to your current
3  amended report that was served on Monday that you'd
4  like to make at this time?
5      A.   No.
6      Q.   All right.  I'm going to hand you Exhibit
7  4, which is your deposition notice.
8           [Exhibit Kinsey-004 marked for
9           identification.]
10          MR. BARNES:  Thanks.
11 BY MR. BOGLE:
12     Q.   Have you seen this notice prior to today?
13     A.   I don't think so.
14     Q.   If we can go to the third page of the
15 document, Exhibit A.  You see there there are three
16 things that we've requested be produced prior to or at
17 the deposition.  I want to kind of go through these
18 with you.
19          Number 1 says all documents or other
20 materials you reviewed since the date of your report
21 that you have not specifically identified in your
22 report in preparation for your expected testimony.  You
23 see that?
24     A.   Yes.

Page 21

1      Q.   And yesterday I did receive what I'm going
2  to mark as Exhibit 5 to your deposition.  There you go.
3           [Exhibit Kinsey-005 marked for
4           identification.]
5      Q.   If you see, Exhibit 5 is titled additional
6  documents reviewed by Sandra Kinsey.  Do you see that?
7      A.   Yes.
8      Q.   Was Exhibit 5 created in response to the
9  Document Request Number 1 in Exhibit A of the
10 deposition notice that I just reviewed with you?
11     A.   Yes.
12     Q.   And the documents listed in Exhibit 5 --
13 when did you review these?
14     A.   This week.
15     Q.   What days this week?
16     A.   Tuesday and Wednesday.
17     Q.   For what purpose did you review these
18 documents?
19     A.   Further education and preparation for this
20 deposition.
21     Q.   Did you ask for these specific materials,
22 or were they provided to you by counsel at their
23 request?
24     A.   They were provided by counsel.

Page 22

1  Q.  Do you intend to offer any new opinions
2  based on the documents listed in Exhibit 5?
3  A.  No.
4  Q.  How do these documents impact your
5  existing opinions?
6  A.  They don't.  Other than to reinforce my
7  current opinions.
8  Q.  Which current opinions do they reinforce?
9  A.  Most of them.
10  Q.  Any specific opinions you could tell me?
11  A.  No.
12  Q.  Had you asked AGI to run any additional
13  calculations based on the second supplemental expert
14  report of Craig McCann?
15  A.  I think we did one, yes.
16  Q.  You did one based on the second
17  supplemental report?
18  A.  I'm confused.  Ask your question again.
19  Q.  Yeah.  So Exhibit 5 --
20  A.  Okay.
21  Q.  -- one of the documents you list --
22  A.  Uh-huh.
23  Q.  -- is the second supplemental expert
24  report of Craig McCann.

Page 23

1  A.  Oh.
2  Q.  And my question was did you ask AGI to run
3  any additional calculations based on anything contained
4  in that report?
5  A.  No, I did not.  I'm sorry.  I
6  misunderstood you.
7  Q.  That's all right.  All right.  Let's go
8  back to the deposition notice, Exhibit 4.  The second
9  request there is for an itemization of hours spent and
10  compensation paid or to be paid for your work in this
11  matter and your staff's work in this matter, including
12  all invoices you have submitted to counsel.
13  Do you see that?
14  A.  Yes.
15  Q.  And I'm going to hand you what I'm marking
16  as Exhibit 6 to your deposition, which are a copy of
17  the invoices that I received yesterday.
18  [Exhibit Kinsey-006 marked for
19  identification.]
20  Q.  Are the invoices I provided to you as
21  Exhibit 6 intended to be responsive to our Request
22  Number 2 here on the deposition notice?
23  A.  Yes.
24  Q.  Request Number 3 in Exhibit A asks for a

Page 24

1  copy of your most current and accurate CV as of the
2  date of your deposition.  Do you see that?
3  A.  Yes.
4  Q.  I know you provided a CV in your initial
5  report and in your amended report.  Is that CV current
6  and up-to-date and accurate?
7  A.  Yes.
8  Q.  What did you do to prepare for your
9  deposition today?
10  MR. BARNES:  Objection to the extent it
11  seeks to invade privileged communications.  So you can
12  answer generally without getting into discussions with
13  counsel.
14  A.  Preparing for the deposition was rereading
15  my expert report, getting comfortable speaking with
16  counsel, the general things you do to get ready for a
17  deposition.
18  BY MR. BOGLE:
19  Q.  How much time did you spend preparing for
20  your deposition?
21  A.  A couple of days.
22  Q.  How many hours?
23  A.  Roughly 20.
24  Q.  Over which days?

Page 25

1  A.  So let me change that.  I did a little bit
2  of work last week, so roughly 30 hours, maybe, a day or
3  so last week, and then two days this week.
4  Q.  Did you meet with any attorneys for this
5  preparation?
6  A.  I did.
7  Q.  Which ones?
8  A.  Bob Barnes and Josh Kobrin.
9  Q.  Did you meet with any counsel --
10  A.  And Scott Livings -- that was Scott
11  Livingston; right?  Yeah, Scott Livingston, I believe.
12  Sorry.  You can ask him.
13  MR. BARNES:  He's a partner of mine.
14  BY MR. BOGLE:
15  Q.  Okay.  Anybody else that you met with for
16  these preparation sessions?
17  A.  Not attorneys, no.
18  Q.  Any non-attorneys that you met with during
19  these preparation sessions?
20  A.  I had conference calls with the folks at
21  AGI.
22  Q.  The same three folks you gave me earlier?
23  A.  Yes.
24  Q.  What did you discuss with the AGI folks?

Page 26

1    MR. BARNES: Excuse me. I'm going to
2 object and instruct the witness not to answer to the
3 extent it has anything to do with the preparation of
4 any draft report.
5    A.   We --
6    MR. BOGLE: But AGI is not an expert in
7 this case. They're not -- they haven't offered any
8 expert reports. It's like any other third party.
9    MR. BARNES: I'm talking about her expert
10 report.
11    MR. BOGLE: She's speaking to a third
12 party, not her counsel. I don't think this is
13 protected.
14    MR. BARNES: She's speaking to a
15 consulting expert who are data analysis experts. To
16 the extent she had any discussions about the
17 preparation of any draft report, it's not permissible.
18 BY MR. BOGLE:
19    Q.   So the discussions for deposition
20 preparation were after your report was submitted;
21 correct?
22    A.   Yes.
23    Q.   So what did you discuss?
24    A.   Well, we did some --

Page 27

1    MR. BARNES: Hold on.
2    MR. KOBRIN: Some of it is before the
3 amended report was submitted, just to clarify.
4    MR. BARNES: Be clear -- first give him
5 the dates of the conversations and then secondly, to
6 the extent it related to the preparation of any draft
7 report, including any amended report, do not divulge
8 that information.
9    A.   Fair enough. So we discussed the
10 conversations that I had that were related to preparing
11 for the deposition. They helped me with just mock
12 questions for the deposition and helping me to prepare.
13 BY MR. BOGLE:
14    Q.   Did they provide those mock questions to
15 you orally or in writing?
16    A.   It was just -- they were just asking
17 questions via conference call.
18    Q.   What sort of questions did they ask you?
19    A.   They were just prepping me, helping to
20 prep me for the deposition.
21    Q.   Do you recall anything they asked you?
22    A.   They were asking questions about the
23 report. We were role-playing.
24    Q.   What specifically did they ask you?

Page 28

1    A.   Again, just questions about the depo --
2 about the report and certain things that potentially
3 you would ask.
4    Q.   Did they question you on any of the
5 exhibits that they helped you create?
6    A.   They did.
7    Q.   Which ones?
8    A.   We dis -- well, they had questions about
9 several of them. At this point I can't recall
10 specifically.
11    Q.   Which individual was asking you questions?
12 Or was it all three?
13    A.   I believe it was just one. It's hard to
14 tell. It was via conference call.
15    Q.   Do you know which person was asking you
16 questions?
17    A.   It was one of the males, so it was either
18 David or David.
19    Q.   Was anybody else on these calls with you
20 other than you and the folks at AGI?
21    A.   Counsel, Josh, was on the phone.
22    MR. BARNES: And for that reason, I'm
23 instructing you not to answer any further questions
24 with respect to these phone calls.

Page 29

1 BY MR. BOGLE:
2    Q.   Was counsel asking you questions as
3 well -- mock questions? I'm not asking you what the
4 questions are. I'm just asking if he asked you
5 questions -- mock questions.
6    MR. BARNES: I really think this is
7 invading privilege, so I'm going to instruct the
8 witness not to answer.
9 BY MR. BOGLE:
10    Q.   Have you met with any counsel other than
11 those representing HBC related to your work in this
12 case?
13    A.   No.
14    Q.   Did you create any outlines or notes to
15 assist you in the deposition today?
16    A.   No.
17    Q.   Did you bring anything with you to the
18 deposition today?
19    A.   No.
20    Q.   And we don't need to hash all this out
21 now, but we're going to likely be requesting a
22 deposition for the individuals at AGI related to their
23 work with Ms. Kinsey. So we could talk about that
24 later, but -- and I also think that we're entitled to

Page 30

1  ask a lot of these questions that you're instructing
2  her not to answer related to their work.
3      MR. KOBRIN: On what basis --
4      MR. BOGLE: So we'll reserve on that -- I
5  don't think it's privileged.
6      MR. KOBRIN: On what basis would you be
7  seeking a deposition?
8      MR. BOGLE: For their work in creating
9  this report.
10     MR. BARNES: You believe you have a right
11 to depose consulting experts who assisted testifying
12 experts? Is that what you're saying?
13     MR. BOGLE: Yeah, that actually created
14 exhibits that she's relying on for her opinions?
15 Absolutely.
16     MR. BARNES: We disagree.
17     MR. BOGLE: Okay.
18 BY MR. BOGLE:
19     Q.  Prior to your work in --
20     MR. BARNES: You're going to have a lot of
21 depositions if you go down that road.
22 BY MR. BOGLE:
23     Q.  Prior to your work in this case, have you
24 ever done any consulting or litigation work for HBC?

Page 31

1      A.  No.
2      Q.  Had you ever heard of HBC prior to your
3  work in this case?
4      A.  No.
5      Q.  Prior to your work in this case, had you
6  ever done any consulting or litigation work related to
7  any opioid product?
8      A.  No. Oh. Yes.
9      Q.  What did you do?
10     A.  I provided some subject matter expertise
11 to Amneal Pharmaceuticals on Suboxone.
12     Q.  What was the nature of the expertise you
13 provided them?
14     A.  Retail pharmacy practice.
15     Q.  What specifically did you tell them?
16     A.  I mean, that's a long conversation with
17 them, and it's also under protective order, but in
18 general it was about the drug and how pharmacy practice
19 works with respect to drug substitution between brands
20 and generics.
21     Q.  Did you advise them in any way regarding
22 suspicious order monitoring?
23     A.  No.
24     Q.  Did you advise them in any way related to

Page 32

1  anti-diversion efforts?
2      A.  No.
3      Q.  Is this related to an ongoing litigation?
4      A.  No.
5      Q.  Was it in a consulting capacity?
6      A.  Yes.
7      Q.  Have you ever published anything related
8  to opioids?
9      A.  No.
10     Q.  Have you ever conducted a risk-benefit
11 analysis for a patient contemplating taking opioids?
12     MR. BARNES: Objection to the form.
13 Vague.
14     A.  I mean, when you -- so what do you mean by
15 risk-benefit analysis?
16 BY MR. BOGLE:
17     Q.  Meaning did you ever discuss with a
18 patient the risks and benefits of opioids for a patient
19 who was contemplating taking --
20     A.  Yes.
21     Q.  How many times?
22     A.  Several.
23     Q.  How recently?
24     A.  Tuesday.

Page 33

1      Q.  And what did you tell the patient?
2      A.  A lot of what is in the patient
3  information sheets that are included in my exhibit --
4  or included in my report.
5      Q.  How long was your conversation with that
6  patient?
7      A.  Roughly five minutes.
8      Q.  And did you ultimately offer an opinion as
9  to whether that patient should or should not take the
10 opioid product?
11     MR. BARNES: I'm going to object. We're
12 here for her expert opinion in this case, not with
13 respect to what she may have advised the patient.
14     MR. BOGLE: I'm entitled to know about her
15 knowledge related to opioids. This is clearly
16 relevant.
17     MR. BARNES: And now you're asking her
18 about an opinion given to a patient?
19     MR. BOGLE: Yeah.
20     MR. BARNES: That's totally unrelated to
21 the case.
22     MR. BOGLE: It's not totally unrelated.
23 It goes to her knowledge of opioids.
24     MR. BARNES: It's totally unrelated.

Page 34

BY MR. BOGLE:

Q. It's about opioids. You can answer.

A. Will you ask the question again, please?

Q. Sure. Did you ultimately offer an opinion as to whether or not that patient should or should not take the opioid product?

MR. BARNES: Same objection.

MS. FUMERTON: This is Tara Fumerton. I'm just going to add in an objection that I disagree that you can ask any question that relates to an opioid, so again, to the scope of the question, I join in counsel's objection.

BY MR. BOGLE:

Q. Okay. You can answer.

A. Will you ask the question again, please?

Q. Sure. Did you offer an opinion to that patient as to whether or not they should take the opioid product?

A. No.

Q. Did they ask for your opinion in that regard?

A. No.

Q. Do you recall telling them anything about opioids other than what's contained in the medical

Page 35

information sheet?

A. No.

Q. Have you ever offered a recommendation to a patient to take or not take an opioid product?

A. Yes.

Q. In what capacity?

A. As a pharmacist.

Q. And what was your recommendation?

A. I mean, I make multiple recommendations to support a physician's diagnosis and treatment plan.

Q. So did you recommend they take the product or not?

A. I recommend they follow the prescriber's treatment plan.

Q. Have you ever personally made the decision to refuse to fill an opioid prescription?

A. Yes.

Q. How many times?

A. Several.

Q. Under what circumstances?

A. What do you mean by under what circumstances?

Q. Why did you refuse?

A. I was uncomfortable with the prescription.

Page 36

The physician asked me to tear the prescription up. There's a num -- that's a couple of reasons why I would not fill a prescription.

Q. When you say you were uncomfortable with a prescription, what made you uncomfortable?

A. Sometimes when you can't get a hold of the physician and you're looking at the prescription itself and you disagree with the quantity or the directions or the frequency in which a patient is being prescribed or receiving the medication, I would make the judgment decision not to fill it.

Q. And can you tell me -- you said several times that you made a recommendation or that you decided not to fill an opioid prescription. Can you give me more detail on how many times that's occurred?

A. No.

Q. You don't have any more detail other than several?

A. It happens quite frequently. Patients don't realize the last time they picked up their prescription and so they come back in to pick up their next prescription, and you just tell them I can't fill it today but I can fill it in three days or I can fill it in four days. Working for an oncology clinic, I

Page 37

have that conversation frequently.

Q. Specific to opioids?

A. Specific to opioids. But it also happens with other drugs. It's not limited to opioids.

Q. Have you ever designed a suspicious order monitoring program for controlled substances?

A. What do you mean by suspicious order monitoring program?

Q. Are you unclear on what that term means as it relates to controlled substances?

A. No, I'm trying to understand what elements of that that you're getting at.

Q. I'm just asking generally whether you've designed a suspicious order monitoring program for controlled substances.

MR. BARNES: And she's asked you to explain what you mean by that term.

BY MR. BOGLE:

Q. What do you mean by that term?

A. I'm not asking the question.

Q. I get to ask the questions.

A. I understand --

Q. So --

A. -- but I'm seeking clarity.

Page 38

1    Q.   How do you define a suspicious order
2  monitoring program as it relates to controlled
3  substances?
4    A.   I mean, it's a multifaceted system that is
5  defined by the Controlled Substances Act.
6    Q.   What are the facets of that system -- of
7  those systems?
8    A.   I mean, reading the Controlled Substances
9  Act, it is -- it has a number of security requirements,
10 storage requirements, all aimed to protect against
11 theft and diversion, of which a suspicious order
12 monitoring system is a small part.
13   Q.   Have you ever designed any component of a
14 suspicious order monitoring system for controlled
15 substances?
16      MR. BARNES:  You mean as she has defined
17 it?
18      MR. BOGLE:  Sure.
19   A.   I have assisted in developing operational
20 policies and procedures to protect against theft and
21 diversion, yes.
22 BY MR. BOGLE:
23   Q.   What types of operational procedures?
24   A.   Everything from inventory management,

Page 39

1  counting and back-counting procedures, location and
2  safety parameters for opioids -- those kinds of things.
3    Q.   When you say safety parameters for
4  opioids, what do you mean?
5    A.   Where to store them in the pharmacy, what
6  types of cabinets, vaults, safes that are used.
7    Q.   Have you ever designed a system to flag
8  suspicious orders of controlled substances?
9    A.   Flag electronically?
10   Q.   Sure.
11   A.   No.
12   Q.   How about manually?
13   A.   That's a hard question to answer, because
14 as a pharmacist, part of our pharmacy practice is to
15 scrutinize every controlled substance prescription,
16 particularly around opioids, so teaching and training
17 is part of my job and part of my experience, and
18 teaching pharmacists how to identify questions within a
19 prescription was part of my job and continues to be
20 part of my practice.
21   Q.   Have you ever drafted written procedures
22 for how to detect suspicious controlled substances
23 orders?
24   A.   I don't recall.

Page 40

1    Q.   Have you ever designed a suspicious order
2  monitoring program for a pharmaceutical distributor?
3    A.   No.
4    Q.   Have you ever designed a suspicious order
5  monitoring program for a pharmaceutical manufacturer?
6    A.   No.
7       MR. BARNES:  Just for clarity, I'm not
8  sure you both are on the same page in terms of
9  suspicious order monitoring.  You gave a definition and
10 he won't give you his definition, so I'd want to make
11 sure that you're not adopting some definition that has
12 been unexplained to you.
13   A.   So I will amend the -- or I will change my
14 answer about the distributor.  I have been involved,
15 again, with a suspicious order monitoring program as
16 it's defined very broadly, including the security
17 requirements and all of the things that an organization
18 will do regarding theft and diversion prevention.
19 BY MR. BOGLE:
20   Q.   For what distributor?
21   A.   I've worked on things for Walmart, for --
22 for Walmart.
23   Q.   What components of Walmart's suspicious
24 order monitoring program for controlled substances did

Page 41

1  you design?
2       MS. FUMERTON:  I object to the form of the
3  question and the specifics of going to a fact
4  deposition effectively of her time at Walmart.
5  BY MR. BOGLE:
6    Q.   You can answer.
7       MS. FUMERTON:  I think in broad strokes
8  she can talk about her experience, but beyond that,
9  it's inappropriate.
10      MR. BOGLE:  Okay.  So you guys aren't
11 allowed to make speaking objections.  So I hear you,
12 but you're not allowed to make speaking objections.
13 BY MR. BOGLE:
14   Q.   So you can answer the question.
15   A.   Part of my job at Walmart was to work on
16 operations.  I was a pharmacist there.  Part of the
17 operations, part of the distribution, everything from
18 being a pharmacist to an executive.  I worked on a
19 number of different facets at Walmart over my 17-year
20 career that worked on different programs, policies, and
21 procedures to prevent theft and diversion.
22   Q.   What components of Walmart's suspicious
23 order monitoring program for controlled substances did
24 you design?

Page 42

1     MS. FUMERTON: Objection to form.

2     MR. BARNES: Now, hold on. Yeah. I'm
3  going to instruct the witness you can testify generally
4  about your experience and background, but you're not
5  going to convert this into a fact deposition of
6  Walmart.

7     MR. BOGLE: I'm entitled to know about her
8  expertise in this area.

9     MR. BARNES: And that's all you're
10 entitled to, and I'm instructing her do not get into
11 details about Walmart's policies, Walmart's
12 decision-making, anything like that. What your
13 experience and duties were generally is fine.

14 BY MR. BOGLE:

15    Q.  What components of Walmart's suspicious
16 order monitoring program did you design?

17    MR. BARNES: Same instruction.

18    MS. FUMERTON: Object to form. Outside
19 the scope.

20    A.  Again, in general, I was responsible as
21 part of the operational leadership team for general
22 policies and procedures regarding prevention of theft
23 and diversion.

24 BY MR. BOGLE:

Page 43

1     Q.  Did you design any of those policies or
2  procedures? Did you write any of them?

3     A.  I don't recall.

4     Q.  Were you responsible at Walmart for
5  creating a manual or automated system to flag
6  suspicious orders of controlled substances?

7     A.  An elec -- are you asking me about an
8  electronic system?

9     Q.  I believe my question was manual or
10 automated.

11    A.  As part of standard operating procedures,
12 every pharmacist is involved in prevention of theft and
13 diversion, so manual procedures in my opinion include
14 every time a pharmacist scrutinizes a prescription,
15 it's part of a suspicious order monitoring program.

16    Q.  My question is whether you created any
17 such system, not whether you operated under one.

18    A.  To me the system includes all the policies
19 and procedures that begin at store level and flow all
20 the way through to the distribution, so so far as I
21 have created manuals or operational procedures that
22 begin at the pharmacy level, that's what I'm referring
23 to.

24    Q.  But have you created any manual or

Page 44

1  automated system to flag suspicious orders of
2  controlled substances while at Walmart?

3     MS. FUMERTON: Objection. Form. And I
4  think needs clarification at the distribution or the
5  pharmacy level.

6     MR. BOGLE: Either. I'm asking either
7  right now.

8     MR. BARNES: And what do you mean by
9  create?

10    MR. BOGLE: Design. And you don't get to
11 ask questions either, so --

12    A.  So --

13    MR. BARNES: I don't take instructions
14 from you, by the way, and won't, so you can end that
15 little practice.

16    A.  So I will answer again. My opinion is
17 that a suspicious order monitoring program to prevent
18 theft and diversion is multifaceted and begins as a
19 pharmacist scrutinizes the prescription all the way
20 through the operational process until the order is then
21 fulfilled by the distribution centers.

22 BY MR. BOGLE:

23    Q.  Did you ever create an automated system to
24 flag suspicious orders of controlled substances while

Page 45

1  at Walmart?

2     A.  No.

3     Q.  And did you ever draft any written
4  policies while at Walmart that were specifically aimed
5  at detecting suspicious orders at the distribution
6  level?

7     MS. FUMERTON: Objection. Form. Outside
8  the scope.

9     A.  Will you ask that question again, please?

10 BY MR. BOGLE:

11    Q.  Did you ever draft any written policies
12 while at Walmart that were specifically aimed at
13 detecting suspicious orders of controlled substances at
14 the distribution center level?

15    A.  No.

16    Q.  Have you ever designed a program that was
17 designed to block suspicious orders of controlled
18 substances?

19    A.  No.

20    MR. BARNES: Same objection. Make sure
21 you're on the same -- you're using the same terms.

22 BY MR. BOGLE:

23    Q.  Outside the context of this litigation,
24 has HBC ever retained you to evaluate its suspicious

Page 46

1 order monitoring program for controlled substances?

2     A.  No.

3     Q.  Have you ever been retained as an expert

4 or a consultant to evaluate a suspicious order

5 monitoring program for controlled substances for a

6 company?

7     A.  No.

8     Q.  From 1992 to present, has all of your

9 financial compensation from an employment perspective

10 come from companies that sell pharmaceutical products?

11     MS. FUMERTON:  Objection.  Form.

12     A.  No.

13 BY MR. BOGLE:

14     Q.  What aspect of your compensation during

15 that time period has not come from those companies?

16     A.  Well, I've worked for companies that

17 aren't involved in pharmaceuticals.

18     Q.  Which ones?

19     A.  Well, I worked for RediClinic, which is

20 in -- which is a medical clinic.  And I have some

21 consulting contracts that do not involve

22 pharmaceuticals.

23     Q.  And what companies are those for?

24     A.  I don't have a complete list of all of my

Page 47

1 clients as an executive consultant.

2     Q.  From 1992 to present, what percentage of

3 your income related to employment has come from

4 companies selling pharmaceutical products?

5     MR. BARNES:  I'm going to object to form.

6 And where is this 1992 date coming from?  Is that just

7 a random date you selected?

8     MR. BOGLE:  Why does it matter where it

9 came from?

10     MR. BARNES:  It matters because there's a

11 thing called relevance, so --

12 BY MR. BOGLE:

13     Q.  You can answer my question.

14     MR. BARNES:  No.  Don't answer the

15 question beyond the last 10 years.  I don't see where

16 you get this relevance with 1992.

17     MR. BOGLE:  You're instructing her not to

18 answer beyond the last 10 years?

19     MR. BARNES:  Yes.  Yes.  Yes.

20     MR. BOGLE:  Based on what?

21     MR. BARNES:  Based upon the same

22 randomness that you picked 1992 out of the air.

23     MR. BOGLE:  So you -- based on relevance

24 you're telling her not to answer a question?

Page 48

1     MR. BARNES:  I'm telling you where -- I

2 asked you where 1992 came from and you wouldn't tell

3 me, so --

4     MR. BOGLE:  I just want to make sure I

5 understand the basis for your instruction.  It's based

6 on your view that it's not relevant?

7     MR. BARNES:  Do you even remember 26 years

8 ago?

9     MR. BOGLE:  No, no, no, no, no, no, no.

10 You don't get to ask her questions.  No, no, no, no,

11 no.  That's now how this works.

12     MR. BARNES:  Actually, I do.

13     MR. BOGLE:  No, no, no.

14     MR. BARNES:  When you're done I will ask

15 her questions.

16     MR. BOGLE:  That's fine.  I'm not done.

17 BY MR. BOGLE:

18     Q.  From 1992 to present, what percentage of

19 your income has come from companies selling

20 pharmaceutical products?

21     MR. BARNES:  Object to form.  Lack of

22 relevance.

23     A.  I can't recall.

24 BY MR. BOGLE:

Page 49

1     Q.  Any approximation whatsoever?

2     A.  I would have to spend some time looking at

3 it.

4     Q.  Okay.  Well, how about -- let's take your

5 counsel's date, for example, then.  Over the last 10

6 years, what percentage of your income has come from

7 companies selling pharmaceutical products?

8     A.  I don't know.  I'd have to look at it.  I

9 don't keep those percentages in my head.

10     Q.  What about the last five years?

11     A.  Again, same answer.  I don't know unless I

12 look.

13     Q.  How about the last two years?

14     A.  I would have to look.  Otherwise I'm

15 speculating as a percent and I'm not going to

16 speculate.

17     Q.  Within the last 12 months?

18     A.  I'm not going to speculate what percentage

19 of my income.

20     Q.  Over the last 12 months you don't know

21 what percentage of your income has come from --

22     A.  Off the top of my head, no.  I haven't

23 done the math.

24     Q.  You have no idea what that number is?

Page 50

1    A.   I'm not going to speculate.
2    Q.   That wasn't my question.  You have no idea
3  what that number is; is that true?
4    A.   I'm not going to guess.
5    Q.   That's not an answer to my question.
6         MR. BARNES:  All right.  I think this is
7  enough.  Let's move on.
8  BY MR. BOGLE:
9    Q.   My question was do you have no idea what
10  that number is over the last 12 months?
11        MR. BARNES:  And she's asked and answered
12  it three times.
13        MR. BOGLE:  No, she hasn't.
14        MR. BARNES:  Let's move on.
15    A.   I'm not going to guess.
16  BY MR. BOGLE:
17    Q.   So it would be a guess in your regard in
18  the last 12 months?
19    A.   Yes, if you're looking for a percentage
20  number, I would have to guess.
21    Q.   When were you first contacted to conduct
22  work in this case?
23    A.   I believe it was December, January time
24  frame.

Page 51

1    Q.   December 2018, January 2019?
2    A.   Yes, it was in January of 2019.
3    Q.   Who contacted you?
4    A.   Bob Barnes with Marcus & Shapira.
5    Q.   Were you advertising for your expert
6  services at that point in time?
7    A.   Define advertising for me.
8    Q.   Yeah.  Were you using any sort of
9  third-party service to put out in the public sphere
10  that you were an expert witness?
11    A.   I am listed on a website, but it's a we --
12  but it's a -- I don't know what you call it.  It's --
13  I'm listed on a website, but it's something -- but just
14  as -- and it has my résumé out there.
15    Q.   What's the website?
16    A.   Well, it's like LinkedIn but for pharmacy
17  law.
18    Q.   What's the name of the website?
19    A.   I believe it's American Society of
20  Pharmacy Law, and it's a membership-based service that
21  I pay for.
22    Q.   How much do you pay for that?
23    A.   I don't know.
24    Q.   Do you advertise your expert services in

Page 52

1  any other fashion presently?
2    A.   Not that I can recall.
3    Q.   Have you ever advertised for your expert
4  services in any fashion other than the website you've
5  given me?
6    A.   No, not that I recall.
7    Q.   When did you start looking at documents in
8  this case?
9    A.   In January of 2019.
10    Q.   If we go to Exhibit 6, which is your
11  invoices.  You have those?
12    A.   Yes.
13    Q.   The first date listed for document review
14  is February 7th, 2019.  Is that accurate, or should it
15  be January?
16    A.   That's accurate for my invoice, yes.
17    Q.   Is that not accurate as to the actual work
18  you did?
19    A.   There were -- to prepare for my meeting
20  with Bob in January when I came in for my initial
21  discussions, he did give me some initial documents to
22  review and to make sure that I had no conflicts.
23    Q.   What documents did you get before you were
24  retained?

Page 53

1    A.   I don't know exactly.  He gave me the
2  initial complaint, I believe, to review to familiarize
3  myself with the companies and the people involved in
4  the case to make sure that I was qualified to render an
5  opinion and that I didn't have any conflicts.
6    Q.   Anything else beyond that before you were
7  retained?
8    A.   I don't re -- I don't recall.
9    Q.   What were you asked to do in this case?
10    A.   I was asked to explain and talk about
11  typical pharmacy practices regarding prescriptions,
12  supply chain and distribution involving
13  self-distributors and the relationship between the
14  pharmacy, the corporate office, and the distributors
15  themselves, and then to take a look at Giant Eagle's
16  controls and render an opinion whether or not they were
17  in compliance with the Controlled Substances Act.
18    Q.   Have you ever been retained as an expert
19  in a case and reviewed the materials and ultimately
20  concluded that you couldn't offer the opinions you were
21  being asked to offer?
22    A.   No.  But I don't get involved in a case if
23  I can't stand by my opinions.
24    Q.   Yeah, so what I asked you was have you

Page 54

1  ever been retained as an expert in a case, ultimately
2  reviewed the materials, and concluded that you couldn't
3  offer the opinions you were being asked to offer?
4     A.  No.
5     Q.  Your work in the opioid litigation -- is
6  it specific to the trial case involving Summit and
7  Cuyahoga Counties, or is it broader than that?
8     A.  Right now it's just Summit and Cuyahoga
9  County.
10    Q.  Have you been retained for any other
11  opioid cases beyond those involving Summit and
12  Cuyahoga?
13    A.  No.
14    Q.  Have you ever practiced as a pharmacist in
15  either Summit or Cuyahoga County, Ohio?
16    A.  No.
17    Q.  Now, the hours that you've listed on the
18  invoices marked as Exhibit 6 -- are those hours
19  complete and accurate from the time you started working
20  on the case through May 31st, 2019?
21    A.  Yes.
22    Q.  And how many hours have you worked from
23  June 1st to the present on this case?
24    A.  Roughly 40.

Page 55

1     Q.  And those 40 hours would be paid at the
2  rate of $500 an hour; is that right?
3     A.  Yes.
4     Q.  So once you are paid for those hours, you
5  will have been paid approximately $154,000 in this
6  case?  Does that sound right to you?
7     A.  Yes.
8     Q.  And per your invoices, Exhibit 6, it notes
9  you started writing the expert report on April 29th.
10  That's on the fourth page of the invoices.  Do you see
11  that?
12    A.  I do.
13    Q.  Is that accurate?
14    A.  Well, I began drafting the outline earlier
15  than that.
16    Q.  But actually drafting the report itself
17  began April 29th, 2019; is that true?
18    A.  I mean, to me it all runs together between
19  the outline and the report, but yes, the actual
20  verbiage for the report began that last week in April.
21    Q.  And there's an entry here on April 15th --
22  April 15th to 19th, 2019, again on that same page, the
23  last entry there says review and respond to Pharmacy
24  Times article, one hour.  Do you see that?

Page 56

1     A.  Yes.
2     Q.  What does that relate to?
3     A.  Counsel sent me an article in Pharmacy
4  Times that dealt with -- I believe it was shortages of
5  opioids in the market.
6     Q.  And when you say respond to, what sort of
7  response did you provide to that article?
8     A.  Oh, it was around DEA -- I'm trying to
9  remember what that article was about, but it was just
10  convers -- it was just a response back to counsel
11  agreeing with the article and adding additional
12  commentary.
13    Q.  Did you provide any sort of published
14  response to that article?
15    A.  What do you -- no.
16    Q.  Are you currently conducting any work on
17  this case that's not referenced in your initial or
18  amended reports?
19    A.  No.
20    Q.  Did you draft your expert reports
21  yourself?
22    A.  Yes.
23    Q.  Are there any portions of your reports
24  that you did not personally draft?

Page 57

1     A.  There were some paragraphs that were added
2  or were offered by the Analysis Group, but all of it
3  was reviewed, edited, and amended by me to reflect my
4  opinions.
5     Q.  What paragraphs came from Analysis Group?
6  Can you point me to where those are in your report?
7     A.  The paragraphs would be the ones around
8  some of the exhibits.
9     Q.  And take whatever time you need.  Just let
10  me know.
11    A.  Okay.
12       MR. BARNES:  Brandon, we've been going
13  about an hour, and whenever you're at a good breaking
14  point, I think we'll --
15       MR. BOGLE:  As soon as she answers this
16  question, I'm fine to stop for a break.
17    A.  So the first one would be F.1.
18    Q.  Can you give me a Page Number for your
19  report?
20    A.  Page 26.  Actually, probably Page 27.
21       MR. BARNES:  You're looking at Exhibit 2,
22  the amended report?
23    A.  I am.  I'm sorry.  Yes.  So -- and when I
24  say they offered information, it's because of the data

Page 58

1  that they came out, they would give me a paragraph and
2  I would take that paragraph and edit it and make sure
3  that it flowed within the report and reflected my
4  opinions. So they provided the substantiation for the
5  opinions that I was drawing.
6  BY MR. BOGLE:
7    Q.   Which paragraphs are you referring to on
8  Page 27?
9    A.   72. 74. 76. 78. Paragraph 144, Page
10 50. Paragraph 145, Page 51. Paragraph 147. 148.
11       So for clarity, because I'm struggling
12 with this -- so that I can answer your question
13 correctly -- having discussions with them based on the
14 information that I wanted to put in my report, they
15 transcribed or they may have written some paragraphs,
16 but it was all based on my language or my ideas, so I'm
17 struggling answering what exactly it is that you want.
18    Q.   That's what I'm asking you.
19    A.   And I'm asking you for clarity.
20    Q.   I'm asking you if they wrote any
21 paragraphs or provided any paragraphs to you that are
22 reflected in any way, shape, or form in your report.
23    A.   Okay. And again, all of this is --
24 they're all my ideas and I edited and reviewed

Page 59

1  everything, so it's hard for me -- it's not their idea,
2  it's my idea, and they may have typed it as we were
3  talking on the phone, so that's why it's hard for me to
4  answer this question, because they're my ideas and they
5  just happened to transcribe them and then forward them
6  to me.
7        So if I didn't say it, it would be 149,
8  150, 151, and this would continue through -- it's --
9  163. Continue through 163. I'm sorry.
10    Q.   151 through 163?
11    A.   Yes. And then there are parts of 164 to
12 167.
13    Q.   What parts?
14    A.   I can't recall at this time. Again, it
15 was a -- because I edited. They would have sent a
16 statement or two, and then I put other language in
17 there to make up the entire paragraph.
18       As I said, I'm struggling to answer your
19 question because I don't feel as though they wrote the
20 report. I wrote the report. They just gave me some
21 sentences here and there.
22    Q.   Anything after Paragraph 167?
23    A.   No.
24       MR. BOGLE: Okay. We can take a break.

Page 60

1        THE VIDEOGRAPHER: We are going off the
2  record at 10:15 AM.
3        [A brief recess was taken.]
4        THE VIDEOGRAPHER: We are back on the
5  record at 10:36 AM.
6  BY MR. BOGLE:
7    Q.   Ms. Kinsey, to follow up on where we left
8  off, do you have an understanding as to the process
9  that AGI followed to create any of the exhibits they
10 were responsible for creating in your report?
11    A.   I don't understand your question.
12    Q.   You want me to repeat or rephrase?
13    A.   Rephrase.
14    Q.   Okay. Do you have an understanding as to
15 the methodology that AGI employed to create any of the
16 exhibits that they created in your report?
17    A.   So I'm con -- I don't understand your
18 question as far as methodology. They -- I mean, they
19 crunched the data for me.
20    Q.   Okay. Do you know what process they
21 followed to do so, sort of walking me through the
22 process of what data they used, how they utilized it,
23 how they crunched the numbers? That's what I'm asking.
24    A.   Yes. That should all be in my papers that

Page 61

1  were sent over.
2    Q.   Okay. So for example, if we go to Exhibit
3  G in your amended report. I believe this is one of the
4  exhibits that you said that AGI was responsible for
5  creating; right?
6    A.   Yes.
7    Q.   Can you walk me through the process of how
8  they created this exhibit?
9    A.   I don't understand the process you're
10 talking about. They crunched the data, and then they
11 took the data and they created a chart.
12    Q.   What data did they crunch for this
13 exhibit?
14    A.   It's listed under the sources.
15    Q.   So what data is that, though?
16    A.   It's the data that was supplied in the
17 case as part of discovery.
18    Q.   So under Sources A, for example, what data
19 is that?
20    A.   I would have to pull that exact -- so it's
21 going to be the DEA quota information as well as the
22 HCP distribution information.
23    Q.   And for sources under B, for example, it
24 talks about the quota history for selected substances

Page 62

1  from the DEA.  Do you see that?
2      A.   Yes.
3      Q.   Is it your understanding that the quotas
4  that are created by the DEA are for distributors to
5  track their distribution of opioids?
6      A.   No.  Quotas are created by the DEA for
7  manufacturers.
8      Q.   So has there ever been a quota created for
9  HBC, for example, for any opioid product by the DEA?
10     A.   No.
11     Q.   Going back to your invoices, Exhibit 6.
12  You have that?
13     A.   I do.
14     Q.   On the first page for February 12th and
15  13th, one of the things you have listed is an interview
16  with Rick Shaheen, security manager at Giant Eagle.  Do
17  you see that?
18     A.   Yes.
19     Q.   So he is a -- based on this, a current
20  employee of Giant Eagle; is that right?
21     A.   Yes.
22     Q.   And what did you discuss with him?
23     A.   It was really a conversation -- I was on
24  the phone, so it was a conversation between Bob and

Page 63

1  Rick, and we were just discussing the --
2          MR. BARNES:  Hold on.  If it involved
3  counsel, I'm instructing you not to answer.
4  BY MR. BOGLE:
5      Q.   Is Mr. Shaheen a lawyer, to your
6  understanding?
7      A.   No.
8      Q.   Did your discussion with Mr. Shaheen
9  impact in any way the opinions you're offering in this
10  case?
11     A.   No.
12     Q.   So you didn't utilize anything that he
13  told you in reaching any of your opinions?  Is that
14  your testimony?
15     A.   Correct.
16     Q.   Did you talk to anybody else at Giant
17  Eagle about your work in this case?
18     A.   I spoke a little bit with Jim Tsipakis.
19     Q.   Say that name again.
20     A.   Jim Tsipakis.
21     Q.   And what did you talk to him about?
22     A.   He was in my initial meeting when I came
23  in and we were discussing pieces of the case to
24  determine whether or not I was qualified to be their

Page 64

1  expert witness.
2      Q.   Did he provide you any information about
3  HBC's suspicious order monitoring program over time?
4          MR. BARNES:  Anything related to that
5  meeting is privileged, but you can answer anything
6  outside that meeting.
7      A.   Not -- most of what I got from Jim came
8  from his deposition.
9  BY MR. BOGLE:
10     Q.   Anybody from Giant Eagle ever given you
11  information about Giant Eagle or HBC's suspicious order
12  monitoring programs?
13     A.   Not outside the depositions that I've
14  read.
15     Q.   Have you talked to anybody else at Giant
16  Eagle or HBC other than the two we've talked about?
17     A.   I can't recall.  I don't know if -- there
18  may have been -- their internal counsel may have been
19  there that same day.  I can't recall.
20     Q.   Is your understanding that Jim Tsipakis is
21  an attorney?
22     A.   No, he's not.
23     Q.   Was the conversation involving him prior
24  to you being retained as an expert in this case?

Page 65

1      A.   Yes.
2      Q.   And since you had not been retained at
3  that point, that's before you had started writing your
4  report; right?
5      A.   Correct.
6      Q.   So I'll ask again.  What did you talk
7  about with Mr. Tsipakis?
8          MR. BARNES:  If it was in the presence of
9  counsel for HBC, I instruct you not to answer.
10         MR. BOGLE:  Despite the fact that she's
11  not operating as an ex -- in an expert capacity and she
12  wasn't writing a report?
13         MR. BARNES:  We're entitled to meet with
14  experts.
15         MR. BOGLE:  Okay.  I'm just making sure I
16  understand your objections when we raise it later.
17  Okay, so you're instructing her not to answer, though?
18         MR. BARNES:  Did you get that?  Is that
19  already on the record?  Okay.
20         THE REPORTER:  I mean, it's right there --
21  whatever you said.
22         MR. BARNES:  Okay.
23         MR. BOGLE:  I'm just making sure you are.
24         MR. BARNES:  Yes.  Yes.

Page 66

1        MR. BOGLE:  Okay.
2   BY MR. BOGLE:
3        Q.   Have you spoken to anyone employed by
4   GERx?
5        A.   No.
6        Q.   Have you ever been retained by Marcus &
7   Shapira other than in this case?
8        A.   No.
9        Q.   And your rate for expert work in this case
10  is $500 per hour; is that right?
11       A.   Correct.
12       Q.   Is that for all work, or does that differ
13  depending on what type of work you're doing in the
14  case?
15       A.   It's for all work.
16       Q.   For example, to make it clear, if you
17  testify in trial, is it $500 an hour for that too?
18       A.   Yes, it's a standard rate.
19       Q.   Is $500 the same -- $500 an hour the same
20  rate you've used for all expert work since 2014?
21       A.   Yes.  May -- possibly.  I may have made a
22  change a couple of -- about a year-and-a-half ago.  I
23  can't recall.
24       Q.   So prior to a year-and-a-half ago, do you

Page 67

1   think you were charging more or less than $500 an hour?
2        A.   It's the standard rate.  It's what I've
3   been using, yes.
4        Q.   So just to make sure I understand.  Prior
5   to a year-and-a-half ago, you did not change your rate?
6        A.   I have not changed my -- I don't believe I
7   have changed my rate.
8        Q.   The invoices we looked at as Exhibit 6 --
9   did you create these?
10       A.   Yes.
11       Q.   Do you have anybody else that works for
12  you at Kinsey Partners?
13       A.   I have two people, yes.
14       Q.   What do they do?
15       A.   They are just administrative.  They help
16  run errands, clean my office, those things.
17       Q.   Anybody that would assist you doing any
18  substantive expert work?
19       A.   No.
20       Q.   Since you formed Kinsey Partners in 2014,
21  what percentage of your income has come from work for
22  pharmaceutical manufacturers, distributors, or
23  pharmacies?
24       A.   Will you just -- will you read that

Page 68

1   question again, please?
2        Q.   Sure.  Since you formed Kinsey Partners in
3   2014, what percentage of your income has come from work
4   for pharmaceutical manufacturers, distributors, or
5   pharmacies?
6        A.   Or pharm -- I would say almost 100
7   percent.
8        Q.   Of that almost 100 percent, how much is
9   related to expert litigation work like this?
10       A.   Maybe 30 to 40 percent.
11       Q.   And the remainder would be consulting; is
12  that right?
13       A.   Well, consulting and working as a
14  pharmacist, yes.
15       Q.   What percentage of your income since 2014
16  has come from working as a pharmacist?
17       A.   I don't know.  I haven't done the math.
18       Q.   Well, for example, in 2018, approximately
19  how much did you make dollar-wise working as a
20  pharmacist?
21       A.   I don't know.  I'd have to look.  In 2018?
22       Q.   Yeah.
23       A.   Maybe $50,000.
24       Q.   Dollar-wise, how much have you made since

Page 69

1   2014 from your work with pharmaceutical manufacturers,
2   distributors, or pharmacies, total?
3        A.   Oh.  Since when?
4        Q.   Since you formed Kinsey Partners in 2014.
5        MS. FUMERTON:  Objection.  Form.
6        A.   I don't know.  This is a math test.  I
7   would have to speculate --
8        MR. BARNES:  Don't speculate.
9        A.   -- and I know you don't want me to do
10  that.
11       MR. BARNES:  Don't speculate.
12  BY MR. BOGLE:
13       Q.   You don't know?
14       A.   I don't know.
15       Q.   How about in 2018?  Same question.
16       A.   Again, almost 100 percent.
17       Q.   I'm asking dollar figure, not percentage.
18       A.   Oh, dollar figure.  Roughly,
19  approximately, just last year, 350, maybe.
20       Q.   And in 2018, how much did you make dollar
21  figure-wise for work not done for a pharmaceutical
22  manufacturer, distributor, or pharmacy?
23       A.   I'm sorry.  Which date?  Twenty nine --
24       Q.   2018.  I'm just sticking with 2018.

Page 70

1    A.   Oh, 2018?
2    Q.   Right.  That's what I asked you in the
3  prior question, so --
4    A.   I'm sorry.  It would all have been for a
5  pharmacy or pharmacy manufacturer -- or pharmaceutical
6  manufacturer or another manufacturer.
7    Q.   Do you have any stock ownership in a
8  pharmaceutical manufacturer presently?
9    A.   Not directly.  I don't know what it's in
10  my mutual funds, but direct stock ownership, no.
11    Q.   Do you have any stock ownership presently
12  in any pharmaceutical distributor?
13    A.   Not a specific pharmaceutical distributor,
14  no.  I have stock in Walmart, and so much as they are a
15  pharmaceutical distributor, then I will disclose that.
16    Q.   What's the current value of your stock in
17  Walmart?
18    A.   I don't know.
19    Q.   Do you have any stocks in any other
20  pharmacies that are publicly traded other than Walmart?
21    A.   Not directly, no.
22    Q.   When you say not directly, I want to make
23  sure I know what that means.
24    A.   Well, if they're in mutual funds.  I'm not

Page 71

1  a finance guy, so I don't know what's in the mutual
2  funds.
3    Q.   Since you opened Kinsey Partners in 2014,
4  have you served as a paid consultant for any
5  pharmaceutical distributor outside of your work in this
6  case?
7    A.   Yes.
8    Q.   Which one?
9    A.   Anda and AmerisourceBergen.
10    Q.   What was the nature of your work with
11  Anda?
12    A.   It was responding to RFPs for retailers,
13  so working on contracts.
14    Q.   What was the nature of your work with ABC?
15    A.   ABC has -- gosh, we've done a couple of
16  different things, from inventory management to OTC,
17  over-the-counter sets within their Good Neighbor
18  Pharmacy division.
19    Q.   Have you done any work related to
20  suspicious order monitoring for controlled substances
21  for ABC?
22    A.   No.
23    Q.   Since you opened Kinsey Partners in 2014,
24  have you assisted any pharmaceutical manufacturer in

Page 72

1  patenting any products?
2    A.   No.
3    Q.   Have you served as a key opinion leader
4  for any pharmaceutical manufacturer or distributor or
5  pharmacy since 2014?
6        MR. BARNES:  Object to form.  Do you know
7  what key opinion leader means?
8    A.   I mean, there's a number of -- I would ask
9  you to clarify what you mean by key opinion leader.
10  BY MR. BOGLE:
11    Q.   Have you been retained to sit on any
12  boards or any meeting groups for any pharmacy,
13  distributor, or manufacturer to provide your opinions?
14    A.   No.
15    Q.   I want to go to your testimony list in
16  your report -- the amended report, which I think is --
17  let's see what the exhibit is on that.  Exhibit B, it
18  appears.  Are you there?
19    A.   Yes.
20    Q.   Exhibit B is titled litigation support for
21  Sandra K.B. Kinsey.  Do you see that?
22    A.   Yes.
23    Q.   Do you view yourself as providing
24  litigation support in this case?

Page 73

1    A.   Yes.
2    Q.   And you give a description of each case
3  starting on this page and carrying over for the next
4  two-and-a-half pages for each case you've worked on
5  during this time frame; right?
6    A.   Yes.
7    Q.   Now, for the -- each case you provide a
8  description of the nature of cases except for -- strike
9  that.  You see there's a section that says nature of
10  cases for each litigation?
11    A.   Yes.
12    Q.   And there's a description after nature of
13  cases that provides the type of case and then a
14  description of the case.
15        For example, if you look at the J & J
16  talcum powder litigation, you say plaintiff alleges
17  progressive lung disease, cancer, and other serious
18  diseases are caused by inhalation of asbestos fibers
19  from exposure to defendants' products.  Do you see
20  that?
21    A.   Yes.
22    Q.   You don't provide that kind of description
23  for the opioid litigation, though, do you?
24    A.   No.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Q.  Is there a reason why that's the only case
2 you don't provide that kind of narrative description
3 for?
4    A.  No.
5    Q.  If you were to write one, what would it
6 be?
7    A.  I don't know. I'd have to think about it.
8    Q.  And the cases on this list for these three
9 pages go back to 2016; right?
10    A.  Yes.
11    Q.  Prior to 2016, had you served in an expert
12 capacity in any case?
13    A.  Not as an expert, no.
14    Q.  So in what capacity did you work in a
15 litigation setting prior to 2016, if not as an expert?
16    A.  I --
17      MR. BARNES: Object to form. She didn't
18 say that.
19    A.  I worked as a 30(b)6 for Walmart back in
20 my Walmart days.
21 BY MR. BOGLE:
22    Q.  Okay. Any other sworn testimony that you
23 provided prior to 2016?
24    A.  No.

Page 75

1    Q.  And from 2016 to present, is this a
2 complete list of cases in which you provided litigation
3 support or expert witness work?
4    A.  Yes.
5    Q.  How many times have you testified in a
6 deposition?
7    A.  I believe it's eight. I think that's what
8 I put in my -- eight.
9    Q.  What page are you on?
10    A.  Four.
11    Q.  You note here eight depositions and
12 testimony in four trials; right?
13    A.  Correct.
14    Q.  And for -- let's start with the
15 depositions. Each of the depositions -- were those --
16 was that testimony offered on behalf of a corporation?
17    A.  Yes.
18    Q.  For each of the trials, was that testimony
19 offered on behalf of a corporation?
20    A.  Yes.
21    Q.  So what we found on Pages 4 and 5 --
22 that's a complete list of your deposition and trial
23 testimony; is that true?
24    A.  Yes.

Page 76

1    Q.  Other than the 30(b)6? I'm sorry.
2    A.  Yes.
3    Q.  I'll grant you that. Which four trials
4 did you testify in?
5    A.  Concordia versus Winder, GlaxoSmithKline
6 versus Glenmark. Testify or deposition?
7    Q.  I'm asking about trial. You list --
8    A.  Okay. I --
9    Q.  You say you testified in four trials.
10 That's what I'm asking you -- which four?
11    A.  Right. That's what I'm trying to recall.
12 So Valeant and ECI, Winder, Glaxo, and Teva. I can't
13 remember the fourth one. Oh, the Concordia case was
14 two trials. We had a PI hearing and then an actual
15 trial.
16    Q.  Any others?
17    A.  No.
18    Q.  Are there any other cases where you
19 submitted an expert report but did not actually end up
20 testifying in any capacity?
21    A.  Yes.
22    Q.  What case is that, or cases?
23    A.  So some of these cases are still pending.
24 I lost my CV. So I submitted an expert report in

Page 77

1 GlaxoSmithKline versus Glenmark.
2    Q.  Can you tell me where you're at?
3    A.  I'm in my CV. When you look at my
4 complete listing.
5    Q.  So in your CV --
6    A.  Page 2.
7      MR. BARNES: Of Exhibit B? Is that what
8 you're referring to?
9    A.  Oh, I'm sorry. Yes. Exhibit B, Page 2.
10 BY MR. BOGLE:
11    Q.  Oh, so not your C -- the litigation
12 support exhibit?
13    A.  The litigation support. I'm sorry.
14    Q.  Can you start over then, because I lost
15 where you were at?
16    A.  No problem. So if you want to start on --
17 let's start on Page --
18    Q.  Let's do this. Stop there.
19    A.  Okay.
20    Q.  Let me repeat the question and we'll start
21 over with the question.
22    A.  Okay. All right.
23    Q.  That's probably the best way to do this.
24 My question was are there any other cases where you

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  submitted an expert report but have not actually
2  offered any sort of testimony?
3      A.  And testimony, do you mean by being
4  deposed?  I'm not an attorney, so --
5      Q.  Any sworn testimony where you were put
6  under oath.
7      A.  Okay.  Fair enough.  So starting on Page
8  1, Concordia versus Lazarus.  James Jah versus
9  Glenmark.  GlaxoSmithKline versus Glenmark.  And I
10  believe that's it.
11     Q.  So going then back to the listing in
12  Exhibit B of cases there, the J & J talcum powder
13  litigation -- what are the nature of the opinions
14  you're offering in that case?
15     A.  It's around a retailer's standard
16  processes regarding testing of branded OTC products.
17     Q.  And what company are you testifying on
18  behalf of?
19     A.  It is in gen -- it will be different
20  companies, but it will generally be retailers and
21  distributors of the OTC products.
22     Q.  And it looks like Barnes & Thornburg is
23  the firm that retained you there?
24     A.  Correct.

Page 79

1      Q.  Are you offering any opinions in that case
2  that the retailers acted inappropriately in any
3  fashion?
4      A.  No.
5      Q.  And how much approximately have you been
6  paid for your work in that case?
7      A.  Well, it's a number of different cases,
8  and --
9      Q.  That litigation, then.  Let me rephrase
10  it.
11     A.  I --
12     Q.  How much have you been paid to date for
13  your work in that litigation -- the J & J talcum powder
14  litigation?
15     A.  Roughly $7,000 or $8,000.
16     Q.  That case is still pending; right?
17     A.  Oh, it's multiple cases.
18     Q.  Those cases are still pending; right?
19     A.  Some of them I believe have been settled
20  or canceled or -- some of them are pending.
21     Q.  Going then to the Heartland Medical LLC
22  versus Express Scripts case -- what are the nature of
23  the opinions you're offering in that case?
24     A.  It was around diabetic testing supplies

Page 80

1  and whether or not a pharmacy can adequately track all
2  the way through the supply chain where the product came
3  from.
4      Q.  And who were you testifying for in that
5  case?
6      A.  On behalf of Heartland Medical.
7      Q.  And are you offering any opinions that
8  Heartland Medical acted inappropriately in any way in
9  that case?
10     A.  No.
11     Q.  And how much have you been paid for that
12  case so far?
13     A.  I don't know.  Sitting here today, I don't
14  know.
15     Q.  More than $50,000?
16     A.  No.
17     Q.  More than $20,000?
18     A.  No.
19     Q.  You have no approximation other than not
20  more than $20,000?
21     A.  It's -- it was a small engagement.  That's
22  what I can tell you.  I would have to go back and look
23  at the invoices to understand.
24     Q.  The Concordia Pharmaceuticals, Inc.,

Page 81

1  versus Lazarus case -- what are the nature of the
2  opinions you're offering there?
3      A.  It's around pharmacy practice regarding
4  DESI drugs, the buying practices -- the general buying
5  practices of retailers and drug substitution.
6      Q.  Which company are you testifying for
7  there?
8      A.  On behalf of Lazarus.
9      Q.  Are you testifying in that case that
10  Lazarus acted inappropriately in any way?
11     A.  No.
12     Q.  And how much have you been paid for your
13  work in that case?
14     A.  Again, I'd have to go back and pull the
15  invoices.  Less than 20.
16     Q.  The Valeant versus ECI and Virtus
17  Pharmaceuticals case -- what are the nature of the
18  opinions you're offering there?
19     A.  It will be pharmacy practice, buying --
20  the buying practices, procurement and supply chain and
21  drug substitution regarding DESI drugs.
22     Q.  When you say DESI drugs, what does that
23  mean?
24     A.  It's a different kind of drug that doesn't

Page 82

1 necessarily have an NDA, and so when the generic comes
2 to market, the ability for a pharmacist to substitute
3 isn't -- doesn't follow the normal pathway.
4      Q.   And in that case, the Valeant
5 Pharmaceuticals versus ECI and Virtus case, who are you
6 testifying on behalf of?
7      A.   On behalf of ECI Pharmaceuticals and
8 Virtus Pharmaceuticals.
9      Q.   Are you testifying in that case that
10 either of those companies acted inappropriately in any
11 way?
12      A.   No.
13      Q.   And how much have you been paid for your
14 work in that case?
15      A.   This one I don't recall.
16      Q.   At all?
17      A.   I am -- I would be uncomfortable giving
18 you a number.
19      Q.   The James Jah versus Glenmark Generics and
20 others case there -- what are the nature of the
21 opinions you're offering there?
22      A.   This was around the requirement of a
23 pharmacist to counsel or warn a patient about a side
24 effect.

Page 83

1      Q.   What was the side effect?
2      A.   This particular individual had a severe
3 allergic reaction to a drug.
4      Q.   And who are you testifying for in that
5 case?
6      A.   It was AmerisourceBergen.
7      Q.   And are you testifying in that case that
8 AmerisourceBergen did anything inappropriately?
9      A.   No.
10      Q.   How much have you been paid for your work
11 in that case?
12      A.   Less than $10,000.
13      Q.   Takeda Pharmaceuticals versus West-Ward
14 and Hikma -- what are the nature of the opinions you're
15 offering there?
16      A.   It's all around pharmacy practice, drug
17 substitution, and the typical buying practices of
18 retail pharmacies.
19      Q.   Who were you testifying for there?
20      A.   On behalf of West-Ward and Hikma.
21      Q.   Are you testifying or have you testified
22 that either of those companies acted inappropriately in
23 any way?
24      A.   No.

Page 84

1      Q.   And how much have you been paid for your
2 work in that case?
3      A.   I don't know.  I didn't review those
4 invoices.
5      Q.   Do you have any approximation at all?
6      A.   I don't.
7      Q.   Concordia Pharmaceuticals versus Winder
8 Labs and Steve Pressman.  What are the nature of the
9 opinions you're offering there?
10      A.   It's around pharmacy practices, typical
11 buying and supply chain distribution, and drug
12 substitution.
13      Q.   Who are you testifying for?
14      A.   On behalf of Winder Labs and Steven
15 Pressman.
16      Q.   Have you offered any opinions that either
17 of those -- or that company or individual acted
18 inappropriately in any way?
19      A.   No.
20      Q.   How much have you been paid for your work
21 in that case?
22      A.   I don't recall.
23      Q.   GlaxoSmithKline versus Teva.  What are the
24 name of the opinions you were offering in that case?

Page 85

1      A.   Pharmacy practice, drug substitution, and
2 typical buying and purchasing patterns of pharmacy and
3 drug supply chain.
4      Q.   Who were you testifying for there?
5      A.   On behalf of Teva Pharmaceuticals.
6      Q.   Have you testified or will you testify
7 that Teva acted inappropriately in any way?
8      A.   No.
9      Q.   How much have you paid -- how much have
10 you been paid for your work on that case?
11      A.   I don't recall.
12      Q.   Any approximation?
13      A.   No.
14      Q.   GlaxoSmithKline versus Glenmark.  What are
15 the nature of the opinions in that case?
16      A.   Pharmacy practice, drug substitution,
17 supply chain management, typical buying practices.
18      Q.   Who were you testifying for there?
19      A.   Glenmark Pharmaceuticals.
20      Q.   Are you testifying or have you testified
21 that Glenmark has acted inappropriately in any way?
22      A.   No.
23      Q.   How much have you been paid for your work
24 in that case?

Page 86

1    A.  I don't recall.

2    Q.  Amneal Pharmaceuticals versus

3  Reckitt Benckiser Pharmaceuticals and Idivior --

4  Idivior.  I probably said that wrong.  What are the

5  nature of the opinions you're offering there?

6    A.  Was around drug substitution and typical

7  buying practices, supply chain and distribution.

8    Q.  Who were you testifying for in that case?

9    A.  Amneal.

10    Q.  And did you testify or have you testified

11  that Amneal acted inappropriately in any way?

12    A.  No.

13    Q.  How much have you been paid for your work

14  in that case?

15    A.  I don't recall, but it was less -- it was

16  minimal.

17    Q.  And what do you mean by minimal?

18    A.  I don't recall.

19    Q.  And then there's another entry for

20  Concordia Pharmaceuticals versus Winder Labs and Steven

21  Pressman.  Is that a different case than -- it looks

22  like the same case number as the one we just looked at

23  a few cases ago.

24    A.  It's the same case, but there's a

Page 87

1  counterclaim.

2    Q.  Did you provide more than one report in

3  that case?

4    A.  I have, yes.

5    Q.  So as to this report for the 2016 injury

6  you've got here, what are the nature of the opinions

7  you're offering there?

8    A.  Pharmacy practice, drug substitution, and

9  the typical ordering practices for a supply chain and

10  distribution.

11    Q.  And I assume, but I want to be sure --

12  you're working for Winder Labs and Steven Pressman

13  there again?

14    A.  Yes.

15    Q.  And have you testified or will you testify

16  they acted inappropriately in any way?

17    A.  No.

18    Q.  And the last one you have listed here is

19  on the next page, URL Pharma, Inc., versus Reckitt

20  Benckiser, Inc.  What are the nature of the opinions

21  you're offering there?

22    A.  I did some analysis.  It wasn't -- I did

23  some analysis for them regarding typical substitution

24  when a new generic comes to market.

Page 88

1    Q.  And who were you working for there?

2    A.  Reckitt Benckiser.

3    Q.  And what do they do?

4    A.  They're a manufacturer.

5    Q.  And did you testify that Reckitt Benckiser

6  did anything inappropriate?

7    A.  Again, I did an analysis, so it wasn't --

8  I wasn't really rendering an opinion other than to give

9  them an analysis.

10    Q.  Did your analysis reach any conclusions

11  that they had acted inappropriately in any way?

12    A.  No.

13    Q.  How much were you paid for your work in

14  that case?

15    A.  I don't recall.

16    Q.  Have you ever testified before Congress?

17    A.  No.

18    Q.  Have you ever testified before a grand

19  jury?

20    A.  No.

21    Q.  Have you ever given a sworn statement or

22  sworn testimony to the FDA?

23    A.  No.

24    Q.  Have you ever given a sworn statement or

Page 89

1  sworn testimony to the DEA?

2    A.  No.

3    Q.  Have you ever given a sworn statement or

4  sworn testimony to the CDC?

5    A.  No.

6    Q.  Have you ever given a sworn statement or

7  sworn testimony to any regulatory body?

8    A.  Not that I can recall.

9    Q.  And I understand from your report that you

10  reviewed the Controlled Substances Act as part of your

11  work in this case; is that right?

12    A.  Yes.

13    Q.  Had you reviewed that act in its entirety

14  prior to your work in this litigation?

15    A.  At some point in time in my training and

16  education, I believe I have.

17    Q.  Where at?  Training and education for what

18  company?

19    A.  Well, no, I would say training and

20  education as a pharmacist, that we would have studied

21  the Controlled Substances Act -- definitely pieces of

22  it -- in pharmacy school, and then I'm sure I reviewed

23  it at some point in time during my time at Walmart in

24  the various positions that I held.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    Q.   Do you recall how long it had been since
2  you had reviewed it prior to your work in this case?
3    A.   No.
4    Q.   Can you go to Page 47 of your expert
5  report, the amended version?
6       You say there in Paragraph 137 the DEA is
7  overly ambiguous on what a suspicious order monitoring,
8  SOM, system entails and does not approve or otherwise
9  endorse any specific system for reporting suspicious
10  orders, accepting both manual and technology enabled
11  programs for the safety of controlled substances as
12  long as the policies and procedures meet the
13  regulations.
14       Do you see that?
15    A.   Yes.
16    Q.   What did you mean here by overly ambiguous
17  in this regard?
18    A.   Well, in my opinion, the DEA does not
19  specify specifically what a distributor needs to do as
20  part of the suspicious order monitoring system.  They
21  specifically are purposely ambiguous, saying that each
22  organization needs to design and develop a system that
23  is consistent with and specific to their type of
24  business.

Page 91

1    Q.   Do you intend to testify the DEA has a
2  duty to be more specific in this regard?
3    A.   No.
4    Q.   Do you think the DEA has acted
5  inappropriately in not providing more detail in this
6  regard?
7    A.   No.  No.
8    Q.   And would you agree that as to the
9  construct of a suspicious order monitoring program for
10  each individual company, that that company is in a
11  better position to determine what type of program works
12  for them than the DEA is?
13       MS. FUMERTON:  Objection.  Form.
14    A.   I don't know -- I think it is smart of the
15  DEA to understand that everybody's business is
16  different, and that it's also smart of the DEA to be --
17  not specifically clarify, because technology changes,
18  business policies and programs change.
19       And so I respect the fact that they're not
20  specific, they are overly ambiguous, so that companies
21  can design programs that specifically match their type
22  of business, size, market.
23  BY MR. BOGLE:
24    Q.   Okay.  Are you done?

Page 92

1    A.   Yes.  Thank you.
2    Q.   Yeah.  Looked like you were still
3  thinking; I just wanted to be sure.
4       So the next paragraph, Paragraph 138, you
5  say Giant Eagle complies with all regulations and
6  actively maintains a complex SOM system of integrated
7  controls that has been part of their standard operating
8  procedures for decades.
9       Do you see that?
10    A.   Yes.
11    Q.   So when you reference, just so I'm clear,
12  Giant Eagle here, are you talking about them as one and
13  the same with HBC or different in this paragraph?
14    A.   I'm representing Giant Eagle as an entity
15  when I speak to their SOM system.
16    Q.   Okay.  Let me ask it a little different
17  way to make sure we're clear.  The statement I just
18  read from Paragraph 138, are you meaning that to
19  include the SOM systems over time for HBC?
20    A.   Yes, I'm including those systems as well.
21    Q.   So when you referenced standard operating
22  procedures here, which standard operating procedures
23  are you referring to?  Is there somewhere you could
24  point me to what you looked at?

Page 93

1    A.   Well, within Giant Eagle again.  Their SOM
2  system as they define it is integrated controls that
3  includes the pharmacy, the distributor, as well as
4  their corporate office.
5       So their policies and procedures to
6  prevent theft and diversion are all of the operational
7  activities that occur within those three entities, or I
8  should say within the one entity but within those three
9  distinct groups.
10    Q.   So in formulating the statement you wrote
11  in Paragraph 138 here, did you review any specific
12  standard operating procedures?
13    A.   I reviewed sworn testimony and I looked at
14  exhibits -- and along with that and my knowledge of
15  pharmacy practice and the laws that govern pharmacy and
16  pharmacists and state boards of pharmacy.  So it's all
17  included.
18    Q.   Yeah, so I'm just trying to figure out
19  what specific procedures you looked at.  So am I safe
20  to take from that answer that any specific standard
21  operating procedures that you reviewed -- when I mean
22  specific, specific to Giant Eagle or HBC -- would be
23  located in the deposition transcripts in your reliance
24  materials or the exhibits thereto?

Page 94

1    A.    The things specifics to Giant Eagle, yes.

2    Q.    Are any of the standard operating

3 procedures you reviewed for Giant Eagle or HBC specific

4 to compliance with the Controlled Substances Act?

5    A.    There is information in the depositions,

6 yes.

7    Q.    When you say information, are you

8 referring to specific standard operating procedures?

9    A.    I mean, I get -- there's -- and I

10 apologize if I'm confused, but as people are speaking

11 to the different policies and procedures, some of them

12 are written, some of them are unwritten.  It just goes

13 towards their general practices that all combine to

14 make up their suspicious order monitoring system.

15    Q.    At what point in time did HBC first have a

16 written policy concerning compliance with the

17 Controlled Substances Act?

18    A.    I don't recall.  I don't know.  I know

19 there is a date -- I believe -- there's a date that's

20 been thrown out there, the first piece of paper that

21 they were able to find with regards to discovery, but

22 that these operational procedures existed long before

23 then.

24    Q.    In written form?

Page 95

1    A.    We don't know.  I know that as part of

2 discovery, which was what came out in the testimony,

3 that as part of discovery they were only able to find

4 beginning on a certain date, but that people have

5 testified that these operational procedures existed

6 long before then.

7    Q.    Have you been able to find any written

8 standard operating procedures related to Controlled

9 Substances Act compliance other than what was discussed

10 in the depositions?

11    A.    I only reviewed what was in the

12 depositions.

13    Q.    Do you agree there's an ongoing opioid

14 epidemic in this country?

15    A.    I would agree that, yes.

16    Q.    And do you agree that opioid diversion is

17 a cause of that epidemic?

18    A.    The opioid epidemic is -- it has a number

19 of components associated with it.  I don't believe that

20 it stems from the closed-loop controlled system of

21 legitimate prescriptions.

22    Q.    Do you think that opioid diversion is a

23 cause of the epidemic?

24    MS. FUMERTON:  Object to form.

Page 96

1    MR. BARNES:  Asked and answered also.

2    A.    Again, I don't believe that when there's

3 sworn testimony that 99.9 percent of prescriptions are

4 written legit -- for legitimate reasons and dispensed

5 appropriately, I don't believe the remaining has

6 contributed to the opioid crisis.

7 BY MR. BOGLE:

8    Q.    You referenced 99.9 percent of

9 prescriptions being legitimate.  Have you seen any sort

10 of underlying data or statistical analysis to support

11 that finding?

12    A.    No, it was as part of the sworn testimony

13 of high-ranking individuals within the U.S.

14    Q.    Okay, but have you seen any actual data to

15 support that?

16    A.    Not directly, no.

17    Q.    Are you aware of any data indirectly to

18 support that?

19    A.    Well, I'm sure he has some information.  I

20 mean, if they're saying it, I'm certain he has some

21 information to back it up.

22    Q.    Have you seen anything in the public

23 sphere or any private documents that you reviewed that

24 show that that data is accurate?

Page 97

1    A.    Again, I'm relying on other people within

2 the industry, other respectable and credible

3 individuals within the industry, to relay that

4 information accurately.

5    Q.    Okay, but you're not aware of any data

6 that supports that yourself?

7    A.    Again, I believe that these individuals

8 that are speaking and testifying in court and using

9 this information have data to back up their statements.

10    Q.    Okay, but I don't think that's what I

11 asked you.  I'm asking if you're aware of any data that

12 supports the statement.

13    A.    I myself have not seen any data.  I rely

14 on the fact that they are using data to support their

15 statements.

16    Q.    Let's take a look at your CV real quick,

17 in the amended report, which I think is Exhibit A to

18 the report.

19    Is this a CV that you prepared yourself?

20    A.    Yes.

21    Q.    When did you prepare it or last update it?

22    A.    Probably, well, March.  March or April of

23 this year.

24    Q.    Is this the same CV that you use for

Page 98

1  non-litigation work?
2      A.  Yes.
3      Q.  Has the DEA ever retained you to assist it
4  in evaluating any issue?
5      A.  No.
6      Q.  Has the FDA ever retained you to assist it
7  in evaluating any issue?
8      A.  No.
9      Q.  Has any other regulatory body hired you to
10 evaluate it in assisting (sic) any issue?
11     A.  No.
12     Q.  Are you a member of any professional
13 organizations currently?
14     A.  Yes.
15     Q.  Which ones?
16     A.  The American Society of Pharmacy Law, the
17 American Pharmacists Association, the Arkansas Pharmacy
18 Association, and the American Society of Healthcare
19 Professionals, I believe it is, and the Healthcare
20 Businesswomen's Association.
21     Q.  Are there any other professional
22 organizations you've been a member of in the last five
23 years that you're not presently a member of?
24     A.  I don't believe so.

Page 99

1      Q.  Are all of the materials that you relied
2  on to form your opinions in this case found in your
3  materials considered list and your additional materials
4  considered list?
5      A.  Yes.
6      Q.  Were you granted access to any document
7  databases to do any searches on production documents in
8  this case?
9      A.  No.
10     Q.  Let's go to Exhibit C of your amended
11 report, which is the list of materials reviewed or
12 considered.  The first section you have there are
13 pleadings and materials related to pleadings.
14         Do you see that?
15     A.  Yes.
16     Q.  And did you specifically select these
17 pleadings to review?
18     A.  No.
19     Q.  Did you ask for any specific pleadings?
20     A.  No.
21     Q.  How did you come about getting these
22 pleadings, then?
23     A.  They were e-mailed to me by counsel.
24     Q.  The next section is expert reports,

Page 100

1  including exhibits therein.
2          Do you see that?
3      A.  Yes.
4      Q.  And did you specifically select these
5  experts to review -- expert reports to review?
6      A.  No.
7      Q.  How did you come to get these specific
8  list of reports?
9      A.  They were e-mailed to me by counsel.
10     Q.  So that selection was made by them as far
11 as what to send you?
12     A.  Yes.
13     Q.  Is the same true for the expert reports
14 and depositions that you list in your additional
15 documents reviewed, which is Exhibit 5?
16     A.  Yes.
17     Q.  And going back to the list in your amended
18 exhibit -- or amended expert report, you have
19 depositions, including exhibits therein, as well.
20         Did you specifically select those
21 depositions to review?
22     A.  No.
23     Q.  Were those given to you by counsel at
24 their choosing?

Page 101

1      A.  Yes.
2      Q.  And for the expert reports and
3  depositions, the reference to exhibits -- did you look
4  at all the exhibits to both the reports and depositions
5  that are cited here?
6      A.  The ones that -- I would have scanned them
7  or looked at them as part of my reading of these
8  documents.
9      Q.  Now, the expert reports, for example,
10 listed in your amended report and the additional
11 documents considered -- did you review those reports in
12 their entirety?
13     A.  For the most part I did, yes.
14     Q.  Are there any that stand out to you that
15 you did not review in their entirety?
16     A.  There were times that I just skipped to
17 certain sections that I felt were most applicable to
18 HBC.
19     Q.  What sections would you have focused on?
20     A.  Well, I would have scanned over things
21 that related to manufacturers, potentially other
22 distributors in the case.  So I would skip certain
23 sections that didn't necessarily pertain to Giant Eagle
24 and HBC.

Page 102

1    Q.   The depositions that you reviewed in this
2    case -- did you review the depositions in their
3    entirety?
4    A.   I scanned them, yes.
5    Q.   When you say scanned them, what do you
6    mean?
7    A.   Well, for the most part I read them.  Did
8    I read them word-for-word?  No.  Would I skip certain
9    sections?  Yes.
10    Q.   Now, on the expert reports that you list
11    here in your amended expert report -- strike that.
12         For the expert reports that you reviewed
13    as part of your amended expert report listing here, do
14    you intend to offer any specific criticisms of those
15    experts outside of what's listed in your report
16    currently?
17    A.   As of today's date, no, I don't intend
18    outside of what I've already done, but it doesn't mean
19    that I won't later on.
20    Q.   Do you have any present intention of doing
21    so?
22    A.   Not at this time.
23    Q.   And from my review of your report and
24    amended report, the only expert listed here that you

Page 103

1    provide criticisms of is Craig McCann; is that right?
2    A.   Yes.
3    Q.   Going back to the materials considered
4    list, you've got websites, articles, and other online
5    materials.  Do you see that?
6    A.   Yes.
7    Q.   Are these materials that you specifically
8    reviewed for your work in this litigation?
9    A.   Yes.
10    Q.   Are there any of these materials -- these
11    list of 39 here -- that you had reviewed prior to your
12    work in this case?
13    A.   Yes.
14    Q.   Which ones?
15    A.   I don't know.
16    Q.   Do you know of any of these in this list
17    of 39 that you definitely had not reviewed prior to
18    your work in this case?
19    A.   So for -- and I don't know that I can give
20    you a complete list without spending time scanning.
21    For example, Number 30 -- I have seen that prior to
22    writing this expert report.
23    Q.   You said you had seen that?
24    A.   I have seen it, yes, because I've used

Page 104

2    that before.
3    Q.   30, you said?
4    A.   Uh-huh.  But there aren't many of them
5    that are like that.  I would have to -- that's the
6    first one that comes to mind.
7    Q.   Were these 39 documents here on this
8    list -- were these pulled through your independent
9    research?
10    A.   Yes.
11    Q.   We'll just look at a couple of these for
12    example.  The Number 4 on your list, article lead
13    author Rosenblum.
14    A.   Uh-huh.
15    Q.   Had you read that article prior to your
16    work in this case?
17    A.   No.
18    Q.   Did you pull that article yourself, or was
19    it provided to you?
20    A.   No, I pulled that.
21    Q.   Number 2, the article lead author Bondell.
22    Had you reviewed that article prior to your work in
23    this case?
24    A.   No.
25    Q.   Did you pull that, or was it provided to

Page 105

1    you?
2    A.   I pulled it.
3    Q.   What process did you use to search for
4    these medical journal articles, like Number 2 and
5    Number 4?
6    A.   Google.
7    Q.   Are there any medical journal articles
8    that you reviewed for your work in this case but didn't
9    include on this list?
10    A.   Yes.
11    Q.   Is there a reason why you didn't include
12    those on your list?
13    A.   Because they didn't help in forming my
14    opinions.
15    Q.   Have you created any demonstrative
16    exhibits that you plan to use at trial, outside of
17    what's contained in your report?
18    A.   No.  Doesn't mean that I won't, but I
19    don't have -- I haven't done it yet.
20         MR. BOGLE:  Let's take a five-minute
21    restroom break real quick.  I'm going to reset, move on
22    to a different subject.
23         MR. BARNES:  Okay.
24         THE VIDEOGRAPHER:  We are going off the

Page 106

1  record at 11:35 AM.
2       [A brief recess was taken.]
3       THE VIDEOGRAPHER:  We are back on the
4  record at 11:58 AM.
5  BY MR. BOGLE:
6       Q.  Before we broke, I asked you if you had
7  created any demonstrative exhibits for trial, and I
8  believe you said not at this time.  Is that right?
9       A.  Yes.
10      Q.  Are there any that you plan to create but
11  have not started working on yet?
12      A.  I don't know.  I mean, until it gets down
13  when we get to trial and we determine what my testimony
14  is going to be and whether or not other demonstratives
15  are needed, I don't know how to -- I just don't know
16  right now.
17      Q.  Do you intend to testify as to what
18  patient populations should appropriately take opioids?
19      A.  No.
20      Q.  Let's go back to your amended expert
21  report.  And I'm on Page 6, please.  So I'm under
22  summary of expert opinions there.
23      And for A, you say as a board licensed
24  pharmacist with over 25 years of experience, I find

Page 107

1  that opioids are effective and essential drugs for pain
2  management when used appropriately.
3      Do you see that?
4      A.  Yes.
5      Q.  What are you relying on to support that
6  conclusion as to the efficacy of opioids?
7      A.  Well -- first of all, they're safe and
8  effective because they were approved by the FDA and
9  granted both NDAs and ANDAs.  So we know they're safe,
10  we know they're effective.
11      And given my 25 years of experience as a
12  pharmacist, I can vouch for the fact that there are
13  thousands and thousands of patients that have taken
14  them and they work for them.
15      Q.  Have you conducted any sort of systematic
16  analysis of those patients as to the efficacy they
17  received?
18      A.  No, I don't need to.  Again, the drug was
19  proven safe and effective by the FDA.
20      Q.  So as to this opinion here as to opioids
21  being effective and essential drugs, outside of your
22  experience as a pharmacist that you've just referenced
23  and it being approved by the FDA, is there anything
24  else you intend to rely on for that statement?

Page 108

1      A.  Well, it's my years of experience.  It's
2  the data that shows that it's constantly being
3  prescribed.  It is the materials that I have reviewed
4  and it's referenced to them being in evidence-based
5  protocols.  I mean, it's a multitude of information
6  that points to the fact that these drugs are effective.
7      Q.  What as far as stuff that you've cited to
8  are you talking about that you're referring to on this
9  point?
10      A.  Well, when you think about the World
11  Health Organization and their analgesic ladder, when
12  you read about the information from other key opinions
13  leaders and the testimony in this case speaks to the
14  efficacy of these drugs to treat pain.
15      Q.  The testimony from who?
16      A.  There are other experts in this case that
17  have testified to the effectiveness of these drugs.
18      Q.  Which ones have you reviewed on that
19  point?
20      A.  I just recently re -- read it on the
21  additional documents reviewed.  It was either Hughes or
22  Dombrowski, and I apologize, I can't recall which
23  one.
24      Q.  So you're relying on either one of those

Page 109

1  two individuals considering the efficacy of the drug as
2  well?
3      A.  It just goes to further supporting my
4  opinion.  There was lots of information that I reviewed
5  that I looked at on the internet that is going to
6  support this.
7      Q.  Like what?
8      A.  Other articles, things that other
9  physicians and key opinion leaders have brought forth.
10      Q.  Anything outside of what's in your
11  materials considered list as far as articles go?
12      A.  I mean, I looked at -- as I said before, I
13  looked at a lot of articles, but they didn't
14  necessarily add to or change my opinion.
15      Q.  But are there any medical journal articles
16  you intend to rely on for this point outside of what's
17  listed in your materials considered?
18      A.  Not at this point, no.
19      Q.  And the WHO analgesic ladder you're
20  referring to related to treatment of cancer patients;
21  right?
22      A.  It was originally developed to treat
23  cancer patients and then has been supplemented to
24  actually work outside work on noncancer pain, and

Page 110

1 they've even supplemented it to look at acute pain.
2     Q. The WHO has supplemented it?
3     A. The other -- no, key opinion leaders have
4 supplemented it.
5     Q. So the next sentence under A in your
6 summary of expert opinions says the vast majority of
7 opioid prescriptions are written for legitimate reasons
8 and consumed by patients according to prescribers'
9 directions without undue or long-lasting harm to the
10 patient.
11     Do you see that?
12     A. Yes.
13     Q. What are you specifically relying on to
14 support that statement?
15     A. Again, it's 25 years of experience, my
16 training as a pharmacist, the fact that the products
17 are approved by the FDA and continue to remain in
18 market, opinions of physicians and other key opinion
19 leaders in the market, as well as the information
20 provided in testimony.
21     I believe -- and I don't want to mess up
22 his name -- Rannazzisi speaks to the legitimacy of the
23 prescriptions and how many prescriptions are actually
24 written for legitimate reasons.

Page 111

1     Q. So you're citing to the Rannazzisi -- is
2 that the Deposition Exhibit 8 you're talking about
3 here?
4     A. Yes, his information in general. That's
5 Exhibit 8. There are other things that I have
6 reviewed, but you're asking me -- I've read so much
7 material, it's hard for me to specifically point to the
8 exact place that I got the information, outside of what
9 I've already cited.
10     Q. Have you undertaken any quantitative
11 analysis as to how many patients legitimately use
12 opioids?
13     A. I have not, no.
14     Q. Have you done any quantitative analysis as
15 to how many patients consume opioids according to their
16 prescriber's directions?
17     A. No.
18     Q. Have you done any quantitative analysis as
19 to how many patients consume opioids without undue or
20 long-lasting harm to themselves?
21     A. I haven't done any specific analysis
22 because my experience tells me and the number of
23 patients that I have treated tells me that these are
24 safe, they're effective products, and when they're used

Page 112

1 appropriately they will not cause long-lasting harm to
2 the patient.
3     Q. So for that point you're relying on your
4 experience; is that true?
5     A. My experience, working as a pharmacist,
6 working with physicians, the articles that I have read,
7 my training, and the endorsements by the FDA.
8     Q. Have you seen any FDA endorsements to the
9 point of majority of patients taking opioids do so
10 without undue or long-lasting harm?
11     A. Well, just the fact that the FDA has
12 granted them a new drug application or an abbreviated
13 new drug application -- the FDA controls what drugs are
14 available in market for sale, and the fact that the FDA
15 leaves these products in market signals to all health
16 care providers that these products have been proven
17 both safe and effective.
18     Q. So you're relying on FDA approval for the
19 point of the vast majority of patients taking the drugs
20 without undue or long-lasting harm? Am I understanding
21 you right?
22     A. What I'm saying is the fact that the FDA
23 approves these products for safety and efficacy means
24 that when taken appropriately they are safe. That is

Page 113

1 what the FDA is telling the health care community.
2     Q. What are the appropriate ways to take
3 opioids?
4     A. Per your physician's instructions.
5     Q. Any other?
6     A. Well, I am not a physician, so it is -- as
7 a prescriber, you have the relationship with the
8 patient to determine their level of pain, their
9 tolerance, any side effects, any systemic issues with
10 their kidneys and liver.
11     So it is the -- the relationship exists
12 between the prescriber and the patient to determine
13 what is appropriate for them and the amount of pain
14 that they are experiencing.
15     Q. Under B there, you say patients are
16 increasingly aware of the benefits and risks of pain
17 medications, including opioids.
18     Do you see that?
19     A. Yes.
20     Q. What are you relying on for that
21 statement?
22     A. Just general information as a pharmacist,
23 the things that you read in the media. There is a lot
24 of information now bubbling up about opioids and the

Page 114

1  terms that have been used between opioid crisis and
2  opioid epidemic.
3      People have -- they're increasingly aware,
4  they're extremely sensitive to these types of drugs,
5  and when they're prescribed they have lots of
6  questions, and we supply them with information.
7      Q.   Have you undertaken any formal analysis as
8  to patient awareness on the risks or benefits of
9  opioids?
10     A.   No formal analysis, no.
11     Q.   Under C there, the second sentence, you
12  say if pain is not resolved or is expected to be
13  moderate to severe intensity, evidence-based treatment
14  protocols recommend opioid/acetaminophen combination
15  products.
16      Do you see that?
17     A.   Yes.
18     Q.   And you cite to an article by Bondell.  Do
19  you see that there?
20     A.   Yes.
21     Q.   Any other articles you intend to rely on
22  for that point?
23     A.   Well, this is also where the World Health
24  Organization's analgesic ladder comes in.

Page 115

1      Q.   As to cancer patients?
2      A.   Again, it -- yes, it was originally
3  created for cancer patients, but then has been amended
4  or has been widely accepted to be amended to include
5  noncancer patients.
6      Q.   What do you rely on to say it's been
7  widely accepted in that regard?
8      A.   The fact that it's been published in
9  several different countries that -- and it's part of
10  the article, the review articles that these doctors are
11  referring back to.
12     Q.   Do you consider the fact that the WHO
13  hasn't modified the analgesic ladder as being important
14  at all to that opinion?
15     A.   I just think that -- can you -- will you
16  ask that question again, please?
17     Q.   Sure.  Do you consider the fact that the
18  WHO has not modified their own analgesic ladder in the
19  way you're describing as being important or not to that
20  opinion?
21     A.   I don't think so.  I think a lot of times
22  a protocol is adopted for a particular situation, and
23  then that adoption gets expanded and applied to other
24  situations where -- and it becomes widely acceptable.

Page 116

1      Q.   So is there anything else you intend to
2  rely on for the statement I just read here, that if
3  pain is not resolved or is expected to be moderate to
4  severe intensity, evidence-based treatment protocols
5  recommend opioid/acetaminophen combination products?
6      A.   Not at this time.
7      Q.   If you can go to the next page, Page 7 of
8  your report.  Are you there?
9      A.   Uh-huh.
10     Q.   Oh, okay.  You're already -- I'm looking
11  at F.  You say there as part of the prescription
12  filling process, a pharmacist often communicates with
13  prescribers regarding an opioid prescription to discuss
14  the drug, strength, dose, or frequency of utilization
15  for a specific patient.
16      Do you see that?
17     A.   Yes.
18     Q.   Do you intend to specify -- or strike
19  that.
20      Do you intend to testify specifically
21  about any interaction between anyone at Giant Eagle and
22  any specific patient in this regard?
23     A.   No.  Wait, let me ask the question again.
24  I mean, I have read testimony that says that they have

Page 117

1  also done this.  So besides me doing it as a pharmacist
2  and recognizing the fact that it is part of our
3  standard practice as a pharmacist, there is testimony
4  from Giant Eagle employees that they also engage in
5  this behavior.
6      Q.   Okay.  I think my question was specific to
7  whether you intend to testify about any specific
8  interaction between a Giant Eagle pharmacist or other
9  employee and a patient in this regard.
10     A.   Not a specific employee or a specific
11  patient, no.
12     Q.   If you go to Page 8 of your report.  And
13  under G about two-thirds of the way down through G
14  where it says the DEA has left it.
15     A.   Uh-huh.
16     Q.   Do you see that sentence?
17     A.   Yes.
18     Q.   It says the DEA has left it substantially
19  to the discretion of each registrant to design and
20  operate its system to comply with the security
21  requirement, and such system must be able to disclose
22  suspicious orders when discovered, and then you cite to
23  the regulation.
24      Do you see that?

Page 118

1    A.   Yes.

2    Q.   What is your understanding of how long a
3 registrant has to report a suspicious order after it's
4 discovered?

5    A.   So the registrant needs to report it
6 immediately after it has determined that it is
7 suspicious.

8    Q.   The -- strike that.

9         Are you aware of any substantive changes
10 to the Controlled Substances Act since 1970?

11   A.   Not that I can recall, no.

12   Q.   If you go to H on that same page, you say
13 captive self-distributors for prescription products
14 fulfill orders that will replenish shelf stock for
15 items that have already been dispensed.

16        You see that sentence?

17   A.   Yes.

18   Q.   What is your understanding of Giant
19 Eagle's policy as to when they order opioid products in
20 relationship to how much they have left on their shelf?

21   A.   Ask that question again.

22   Q.   Yeah.  What is your understanding of Giant
23 Eagle's policy as to when they order opioid products in
24 relationship to how much of that product they have left

Page 119

1 on their shelf?

2    A.   Well, the way the system works, if that's
3 what you're asking me, is -- the process is that when a
4 prescription is dispensed, the inventory is
5 automatically decremented from their prescription
6 management system, and then at the end of the day all
7 of the orders are aggregated and that ends up what gets
8 ordered then from the distributor.

9    Q.   And you're talking about Giant Eagle
10 specifically?

11   A.   I'm talking about Giant Eagle
12 specifically.

13   Q.   So for example, if there are 10 bottles of
14 opioid acetaminophen combination products that they
15 have, they sell one bottle, the next day they would
16 replenish with another bottle?  Is that what you're
17 saying?

18   A.   More than likely, yes, because it's
19 done -- it's an automated process, and they
20 determine -- they can do min/max shelf quantities.
21 There are different things that they can do within the
22 inventory system to hold a certain amount of product on
23 the shelf in order to accommodate the fluctuations in
24 volume, but in general what happens is you sell a

Page 120

1 bottle, you order a bottle.

2    Q.   And how long has that specific process
3 been in place at Giant Eagle?

4    A.   For years.

5    Q.   Do you have any more specific --

6    A.   Several years.  Decades.

7    Q.   Decades?  Okay.

8         The next sentence, you say therefore
9 artificially limiting order quantities, preventing
10 shipments, and delaying orders unnecessarily can
11 interrupt patient care and cause further harm.

12        Do you see that?

13   A.   Yes.

14   Q.   You would agree that any necessary
15 interruption, though, would be appropriate; right?

16        MR. BARNES:  Objection to form.  Vague.

17   A.   I'm struggling to answer that question
18 because a necessary interruption -- could it cause
19 patient harm?  If you interrupt an order, could it
20 cause patient harm?  Yes.

21 BY MR. BOGLE:

22   Q.   But would it be necessary to do so if that
23 order was suspicious?

24        MR. BARNES:  Object to form.  Vague again.

Page 121

1    A.   If the order is suspicious, one needs to
2 determine why it's suspicious and we're going to --
3 this definition of suspicious.  The -- it needs -- what
4 needs to be determined is whether or not if the product
5 is released -- anyway, if it's determined that it is
6 suspicious, then the order will be stopped.

7 BY MR. BOGLE:

8    Q.   And it necessarily should be; right?

9    A.   If it is determined to be suspicious, it
10 will be stopped.

11   Q.   And my question was a little different.
12 It should be under the Controlled Substances Act;
13 right?

14   A.   Well --

15        MS. FUMERTON:  Objection.  Form.  Calls
16 for a legal conclusion.

17   A.   If it's a suspicious order it will be
18 stopped.  I mean, one -- is it necessary to be stopped?
19 Again, as a patient responsibility what I'm going to
20 tell you is that if it's suspicious it will be stopped.

21 BY MR. BOGLE:

22   Q.   And just to address the objection and make
23 sure I understand it, are you not testifying about what
24 the Controlled Substances Act requires as it pertains

Page 122

1 to suspicious order monitoring? Is that not part of
2 your testimony?
3     A.   No, I'm speaking -- I am testifying to the
4 suspicious order monitoring system at Giant Eagle.
5     Q.   And whether or not that complies with the
6 Controlled Substances Act; right?
7     A.   Correct.
8     Q.   On the next page -- I'm looking at I --
9 the second sentence there says recognizing the complex
10 differences to the core organization, Giant Eagle built
11 a pharmacy infrastructure that is separate from its
12 main grocery business in order to focus on patient
13 care, prescription delivery and cost, supply chain,
14 regulatory compliance, training, and other
15 health-related business services.
16         Do you see that?
17     A.   Yes.
18     Q.   This separate infrastructure -- what are
19 you relying on to say that that separate pharmacy
20 infrastructure was created for the purpose of -- one of
21 its purposes being regulatory compliance?
22     A.   Well, based on the testimony that I read
23 and looking at the org charts that I saw, you can
24 determine that they have a separate legal

Page 123

1 infrastructure -- or not separate legal -- separate
2 pharmacy infrastructure that is different from their
3 broader business, and they created this infrastructure
4 in order to concentrate on the areas that are
5 different -- that are unique to pharmacy that are
6 different from the rest of their grocery business.
7     Q.   What documentary evidence do you intend to
8 rely on to support that this infrastructure was created
9 and one of its purposes for -- is for regulatory
10 compliance.  You mentioned org charts.  Anything else?
11     A.   It's what's in the testimony that I read.
12     Q.   So testimony, org charts.  Anything else?
13     A.   No.
14     Q.   Anybody's testimony in specific you're
15 relying on for that point?
16     A.   I can't recall at this time.  It was
17 mentioned several times.
18     Q.   Going down to J, the second sentence
19 there, you say because of the heightened sensitivity
20 concerning controlled substances and opioids in
21 particular, additional parameters are engaged that
22 exceed regulatory minimums.
23         Do you see that?
24     A.   Yes.

Page 124

1     Q.   And you're talking about Giant Eagle or
2 HBC specifically here; right?
3     A.   Yes.
4     Q.   And what specific parameters are you
5 referring to here that exceed regulatory minimums?
6     A.   There are different operating policies and
7 procedures that are not required -- they're not
8 required legally.  For example, the quantity and the
9 number of times that they do an inventory count, within
10 HBC itself they're actually doing inventory counts five
11 times a day.  They do them at the beginning of a shift;
12 they do it at break; they do it at lunch; they do it in
13 the afternoon break, and they do it before they leave.
14 That far exceeds any regulatory parameters.
15         The store level, same thing.  They do
16 controlled substance inventory counts specific around
17 opioids doing back counts, monthly narcotic orders,
18 those -- where they're actively looking at the accuracy
19 of their inventory on a much more consistent and
20 constant basis than what the law requires.
21     Q.   Any other parameters that you intend to
22 testify about other than what you mentioned here as far
23 as inventory counts?
24     A.   Those are the ones that come to mind right

Page 125

1 now.
2         Well, I mean, and I can mention -- I mean,
3 as we sit here, I can mention things.  Security
4 controls with cameras and guards.  They have redundant
5 security between what belongs in the pharmacy,
6 including the box that Giant Eagle sits in.
7         So I mean, it's a repeat -- I mean, it goes
8 on and on.  It's not just the inventory counts, but as
9 I sit here today, those are the two that come to mind
10 easiest.
11     Q.   And these security controls you're
12 referencing -- that's an attempt to prevent theft from
13 the distribution center or the pharmacy itself; right?
14     A.   It's both.  Theft and diversion, yes.
15     Q.   Right.  So from people, either the
16 employees or somebody coming into a pharmacy taking the
17 medications; right?
18     A.   That -- yes.
19     Q.   Stealing them?
20     A.   But it's also to ensure that operational
21 procedures are being followed.  They're not
22 specifically to look at theft.  They're to monitor the
23 entire operations and ensure that they have a closed
24 supply chain and a closed loop of distribution.

Page 126

1  Q.  What security controls do you intend to
2  testify are specifically aimed at ensuring that
3  suspicious orders are properly flagged and blocked?
4       MR. BARNES:  Just so we're clear, are you
5  asking her other than what's in her report, or --
6       MR. BOGLE:  No, I'm asking generally.
7       MR. BARNES:  So if you need to refer to
8  your report to answer the question, feel free.
9  A.  Right.  So ask your question again.
10 BY MR. BOGLE:
11 Q.  What security controls do you intend to
12 testify are specifically aimed at ensuring that
13 suspicious orders for opioids are flagged and blocked?
14 A.  Everything that I've put in here.
15 When you look at GE's different security and the
16 different pieces that they have in place when it comes
17 to security and the systems that they use, the
18 operational procedures they employ, the people that
19 they have hired and they employ, it all works together
20 as part of their process for suspicious order
21 monitoring.
22 Q.  Is there a specific written policy or
23 procedure that you intend to rely on to support the
24 notion that -- strike that.

Page 127

1       Is there a specific policy or procedure
2  that you intend to rely on, written policy or procedure
3  you intend to rely on, to support the notion that Giant
4  Eagle or HBC exceeds regulatory minimums as it pertains
5  to detecting suspicious opioid orders?
6       MR. BARNES:  Objection.  Asked and
7  answered several times now.
8  A.  Again, I don't believe that a single
9  policy or a single procedure can adequately describe
10 the suspicious order monitoring system that exists at
11 Giant Eagle.
12 BY MR. BOGLE:
13 Q.  Is there a set of policies or procedures
14 you're relying on in that regard?
15 A.  It is a -- it's part of the general
16 business practices as a pharmacy, as a pharmacist.
17 It's -- as I've said in my report, it's a complex
18 integrated system that involves the stores, the
19 distribution center, and the corporate office.
20 Q.  Right, and I'm focusing on a specific area
21 of that, which is -- are written policies and
22 procedures.  I'm just trying to ascertain in this
23 deposition what written policies or procedures you
24 intend to rely on to say that Giant Eagle or HBC has

Page 128

1  exceeded regulatory minimums as it applies to
2  suspicious order monitoring for controlled substances.
3  A.  And I understand you're trying to --
4  you're asking me about specific written documentation.
5  Q.  Right.
6  A.  And I can't -- I'm not going to rely on
7  specific written documentation when I have reviewed all
8  of this information and I understand how the process
9  works.  I'm not going to rely on -- on a vast complex
10 program, to rely on a document or a set of documents.
11 Q.  Is it important to you from your
12 perspective for there to be written policies and
13 procedures documenting what should be done to detect
14 suspicious orders of controlled substances?
15 A.  So there are certain things that need to
16 be put in writing, and as systems have evolved and the
17 business acumen has evolved, things that -- policies,
18 procedures, typical pharmacy practices have more and
19 more been written down.
20      Does it all have to be in writing?  No, it
21 doesn't.  It comes from years of training, schooling,
22 expertise, and years in the industry to know that these
23 policies and procedures and the things that you follow
24 all contribute to the prevention of theft and diversion

Page 129

1  of opioids.
2  Q.  What aspects of suspicious order
3  monitoring programs should be put in writing?
4  A.  That's up to the organization.  I'm not
5  going to make that determination of what needs to be in
6  writing or not in writing.  I'm also not an attorney.
7  Q.  Has anyone ever asked you or consulted
8  with you as to what sort of policies and procedures
9  should be put in writing for their company as it
10 pertains to suspicious order monitoring?
11 A.  No.
12 Q.  You say under K on Page 9, the first
13 sentence, Giant Eagle is and always has been compliant
14 with the Controlled Substances Act.
15      Do you see that?
16 A.  Yes.
17 Q.  First of all, you say has always been.
18 What was your review period for this case?  How far
19 back did you go to make this assessment?
20 A.  I have been relying on the testimony of
21 the other Giant Eagle employees in this particular
22 case, reading their sworn statements and testimony.
23 Q.  So -- but do you have any time parameters
24 in mind based on that?  You're saying has always been

Page 130

1  compliant. Are you saying since 1970, when the
2  Controlled Substances Act was implemented, or some
3  other time? I'm just trying to get a sense of what
4  that means.
5       A.   Right. So I'm relying on the sworn
6  testimony of other Giant Eagle employees that have said
7  that they are in compliance.
8       Q.   Did you undertake your own assessment
9  outside of the review of their testimony on that point?
10      A.   My review would be current and existing,
11 so based on their testimony and what I understand in
12 the industry and through my experience, I have
13 determined that yes, they are currently -- they are in
14 compliance.
15      Q.   So outside of your review of the
16 deposition testimony and your general experience as a
17 pharmacist, what else are you relying on specifically
18 as to HBC to say that they have always been compliant
19 with the Controlled Substances Act?
20      A.   Well, you also have to look at the fact
21 that they've been licensed; they are licensed and
22 inspected by the DEA, they are licensed and inspected
23 by the state boards of pharmacies, and by having those
24 licenses, each of those governing boards are consenting

Page 131

1  to the fact that they are in compliance and they can
2  continue to dispense such products and they have never
3  been -- they're not -- so they've never been cited by
4  the DEA with any type of deficiency.
5           So given the governing boards that govern
6  our practice of pharmacy and the distributors, one can
7  rely on the fact that these government agencies, the
8  licensing boards, are giving them the license to
9  continue practicing and to continue distributing in
10 every store and from the distribution centers.
11      Q.   So is it your testimony that our jury in
12 this case can rely on the fact that HBC and Giant Eagle
13 have been licensed, and that's enough for them to
14 support a conclusion that they haven't been involved in
15 any diversionary activities?
16      A.   I believe it's a combination of
17 information, but yes, licensing speaks a lot. We are
18 licensed. They have come in. They have licensed the
19 facility, HBC in specifics. They came in and they do a
20 preinspection, making sure that all the security
21 requirements are being met. They come back in before
22 they even allow them to start distributing. They come
23 back in again after six months.
24           These are accredited -- these are state --

Page 132

1  I don't even know the word for it, but these are
2  licensing bodies that come in and are telling everybody
3  that these facilities, these pharmacies, the
4  professionals that are working in the pharmacies, are
5  all licensed and have the credibility, the education,
6  the authority. They're meeting all of the licensing
7  requirements, they're following the state laws, they
8  can continue -- they can begin and continue
9  distributing and dispensing these particular products.
10      Q.   Have you reviewed any audits or
11 inspections by any licensing authority as to HBC?
12      A.   Personally I have not reviewed, but based
13 on the testimony that I read, I understand that the DEA
14 has not sanctioned HBC for any reason.
15      Q.   But I just want to make sure I'm
16 understanding. You have not reviewed any actual
17 licensing audits or inspections yourself; true?
18      A.   That is correct.
19      Q.   Have you reviewed any internal audits or
20 inspections done by ABC on itself as to its suspicious
21 order monitoring practices?
22      A.   Done by ABC?
23      Q.   I should have said HBC. Sorry.
24      A.   Oh. And I have not --

Page 133

1       Q.   -- I may have said ABC. I meant HBC.
2       A.   That's all right. I did not -- I have not
3  reviewed any audits. I am going strictly off of the
4  testimony that says that they have had no deficits.
5       Q.   So outside of what we've just discussed
6  here, anything else you're relying on for the
7  conclusion that Giant Eagle is and has always been
8  compliant with the Controlled Substances Act?
9       A.   For now -- that's the answer to my
10 question, or to your question for now, that those are
11 the things that I'm going to be relying on.
12      Q.   If you can go to Page 10 of your report.
13 I'm looking at Paragraph 18. You say opioids have been
14 regarded for millennia as among the most effective
15 drugs for the treatment of pain.
16           Do you see that?
17      A.   Yes.
18      Q.   And then you cite to an article by
19 Rosenblum; right?
20      A.   Yes.
21      Q.   Any other articles or documentation you
22 intend to rely on for this point?
23      A.   No. Other than -- and if I -- I'm going
24 to add to that. Other than the fact, again, that these

Page 134

1  are FDA-approved products.
2      Q.  So the fact that they're FDA-approved and
3  the article you've cited to here.  Anything else?
4      A.  For this particular -- no, that is what I
5  relied upon.  And my experience and my training and all
6  of the other things that we've already spoken of.
7      Q.  From a documentation perspective, though,
8  anything else?
9      A.  From a documentation perspective, that is
10 it.
11     Q.  If you can go to Page 14 of your report.
12 I'm looking at Paragraph 30 that starts on that page.
13 It says -- let's see.  One, two, three -- I think four
14 sentences in there where it says although the increase.
15         Do you see that?
16 A.  Uh-huh.
17 Q.  Is that a yes?
18 A.  Yes.  I'm sorry.
19     Q.  Although the increase in prescription drug
20 abuse is likely to be multifactorial, it is likely to
21 reflect in part changes in available drug formulations
22 and prescribing practices of opioid medication.
23         Do you see that?
24 A.  Yes.

Page 135

1      Q.  What are you specifically relying on from
2  a documentation perspective to support that statement?
3      A.  The -- it's my general knowledge of the
4  industry being a pharmacist, my years of training.  I
5  mean, I work with this all the time.  Being in the --
6  working at the oncology clinic and really looking at
7  opioids and understanding the changes in the
8  prescriptions that are being filled -- being written,
9  being filled, and how the prescriptions are changing
10 due to the different formulations and restrictions by
11 the insurers and what they're requiring.
12     Q.  Anything from a documentation perspective
13 you're relying on for this?
14         MR. BARNES:  Object to form.  When you say
15 documentation, are you talking about her whole body of
16 knowledge and experience, or documentation in this
17 case?
18         MR. BOGLE:  Well, knowledge and experience
19 are not documents.
20         MR. BARNES:  Well they can be.  You go to
21 a professional education seminar, you read an outline.
22 BY MR. BOGLE:
23     Q.  Okay.  You got any outlines that you're
24 relying on from a seminar?

Page 136

1      MR. BARNES:  That you can remember.
2      A.  I mean, not that I can remember, but
3  again, this is -- I didn't cite everything.  To me
4  things that are common knowledge or are consistent in
5  the industry, I didn't feel it necessary to completely
6  cite every statement in my report, so maybe that's an
7  error based on an author, but I didn't feel like I
8  needed to cite every statement I made in my report.
9  BY MR. BOGLE:
10     Q.  I'm not calling you out.  I just have a
11 right to ask you --
12     A.  Sure.
13     Q.  -- what you're relying on to support
14 anything that you're saying.
15     A.  And again, I have read and reviewed a
16 number of articles through all of my training.  To me
17 this is common knowledge that virtually any pharmacist
18 could tell you, any physician could tell you, that the
19 prescribing habits of opioids are changing drastically.
20     Q.  Have you seen the rate of addiction to
21 opioids being one factor in the changing of prescribing
22 practices?
23     A.  I --
24         MR. BARNES:  Object to form.  I don't --

Page 137

1  if you know what he means by addiction.
2      A.  And again, there's a lot of discussion
3  between addiction versus physical dependence.  What I
4  will tell you is that everybody is concerned.
5  Pharmacists are concerned.  Doctors are concerned.
6  They're changing their prescribing patterns because of
7  the concern of addiction, of physical dependence, but
8  also because of diversion and what's happening to these
9  products once they leave the closed distribution loop
10 and what happens to the products afterwards.
11 BY MR. BOGLE:
12     Q.  As a practicing pharmacist, do you
13 specifically have concerns about the rate of addiction
14 with opioids as being a reason that they should be
15 prescribed less?
16         MR. BARNES:  Same objection.
17     A.  And I don't -- I have not seen any
18 evidence that talks about the quantity or the number of
19 prescriptions related -- and how that can cause
20 addiction.  It's not necessarily quantified.  Yes,
21 what's quantified is the number of people that have
22 died, have moved into heroin, have done other things
23 with the illicit opioids that are on the market.
24         But in general, the information that I

Page 138

1  have seen and the data that I have reviewed and seen
2  talks about the fact that the deaths and the opioid
3  epidemic aren't necessarily caused by prescription
4  opioids that are taken according to prescriber
5  direction.
6  BY MR. BOGLE:
7      Q.   Do you intend to testify that opioids do
8  not pose the risk of addiction?
9      A.   No.  The FDA, by classifying most opioids
10  as either a III or a II, as a controlled substance III
11  or II, have blatantly come out and said that there is a
12  risk of abuse and addiction.
13      Q.   Do you believe at all times that opioids
14  have been on the market and available for public
15  consumption, that patients should be aware that opioids
16  pose a risk of addiction?
17      MR. BARNES:  Objection.  Way beyond the
18  scope of her report.  What time period are you talking
19  about?
20      MR. BOGLE:  I think I said at all times
21  opioids have been on the market.
22      MR. BARNES:  At all times opioids have
23  been on the market.  Do you know what time period he's
24  referring to?

Page 139

1      A.   I don't.  What I will tell you that as a
2  pharmacist, from 1990 until present we have had an
3  obligation to consult with patients and to speak to
4  them about their medication and to ensure that they're
5  knowledgeable and aware of what the products are and
6  what risks they pose.
7  BY MR. BOGLE:
8      Q.   My question was, do you believe at all
9  times that opioids have been on the market and
10  available for public consumption, that patients should
11  be made aware that opioids pose a risk of addiction?
12      MS. FUMERTON:  Object to form.
13      MR. BARNES:  Yeah, same objection to form.
14  Also, it sounds like you're asking for a legal
15  analysis.
16      MR. BOGLE:  I'm not.
17  BY MR. BOGLE:
18      Q.   Go ahead.
19      A.   Well, and I can speak to as long as I've
20  been in practice, and the fact that the FDA has come
21  out and said that these are controlled substances and
22  by the nature of them being controlled substances they
23  have potential for abuse is the information that is
24  readily available to anybody.

Page 140

1      Q.   So do you intend to testify that the
2  average patient just by way of the fact that it's a
3  controlled substance should know that it's addictive?
4      MR. BARNES:  Object to form.  Vague.  I
5  don't know what you mean by average, but --
6      A.   And I don't know if they should know.
7  There is a growing -- they will know, and they're going
8  to -- as they take it, they're going to be made aware
9  of it.
10  BY MR. BOGLE:
11      Q.   Should they know that before they become
12  addicted to them?
13      MR. BARNES:  Same objection.
14      A.   Again, it's not a matter of addiction.
15  You asked me whether or not the patient should know --
16  would they know that they're taking it, not necessarily
17  are they addicted to it.
18  BY MR. BOGLE:
19      Q.   No, I asked you whether they should know
20  that it poses a risk of addiction.
21      MR. BARNES:  Same objection.  Beyond the
22  scope of her report.
23      A.   Again, it's not my -- I'm not here to talk
24  about addiction and physical dependence.

Page 141

1  BY MR. BOGLE:
2      Q.   If you go to Page 21 of your report.  On
3  Paragraph 53, you say Giant Eagle Pharmacy experienced
4  rapid growth beginning in 2008 and peaking in 2012
5  after new store growth slowed.
6      Do you see that?
7      A.   Yes.
8      Q.   What prompted the rapid growth beginning
9  in 2008 for Giant Eagle?
10      A.   It was -- they were building new stores.
11      Q.   What -- or if you know, what prompted the
12  need for these new stores?
13      A.   Well, it's just growth of the general
14  business, so they're growing their business, they're
15  growing the company in total.  So when you build a new
16  store typically there's a pharmacy that's going to be
17  located within that particular store.  So as they had
18  growth.  There was also an extreme amount of growth in
19  overall prescriptions within the entire industry during
20  that time period.
21      Q.   But companies grow for a reason, and I'm
22  asking you do you know why Giant Eagle Pharmacies grew
23  beginning in 2008?  I understand that they did grow.  I
24  got that from your report.  I'm asking you why.  Do you

Page 142

1 know why?
2 　　　　MR. BARNES:  Asked and answered.
3 　　A.　Because they had more customers coming to
4 them.
5 BY MR. BOGLE:
6 　　Q.　Do you know if the growth was specific to
7 any drug or class of drugs?
8 　　A.　I know that they grew more rapidly in
9 their non-controlled substances than they did in their
10 controlled substances.
11 　　Q.　Based on what?  What did you look at to
12 determine that?
13 　　A.　When we looked at the data, and I actually
14 have some reports that speak to that.
15 　　Q.　Specific to Summit and Cuyahoga County?
16 　　A.　Specific to Summit and Cuyahoga County.
17 　　Q.　Can you point me to which ones show the
18 growth -- the disproportionate growth for Summit and
19 Cuyahoga County, non-controlled versus controlled?
20 　　A.　Well, you can look at over those years.
21 So for example -- where's the spot?  So just as an
22 example, if you look at Exhibit M.
23 　　Q.　Okay.
24 　　A.　You'll see four stores that experienced

Page 143

1 prescription growth ranging from 21 to 34 percent for
2 overall prescriptions and yet their controlled
3 substances only increased somewhere in the neighborhood
4 of seven to 12, or didn't -- I'm sorry.  Not between
5 seven and 12, but that their relationship of controlled
6 substances to regular controlled substances stayed
7 fairly flat.
8 　　Q.　Did you run any assessment like this for
9 opioids specifically?
10 　　A.　I did not for opioids specifically.  This
11 is strictly on controlled substances.
12 　　Q.　Any other exhibits that you intend to rely
13 on here for the point specific to Summit and Cuyahoga
14 County -- there was disproportionate growth of controls
15 versus non-controls?
16 　　A.　Well, I mean, there's -- I've got
17 another -- there's another exhibit here on Barberton,
18 and when you look at, say, Exhibit Q, and you can see
19 Barberton in general, you can see growth in their total
20 prescriptions, whereas their non -- or their controlled
21 prescriptions actually are flat to declining.
22 　　Q.　Okay.  Any others?
23 　　A.　I mean, there are other conclusions that I
24 can draw based on these exhibits, but that's how I

Page 144

1 rely -- that's how I got to that conclusion.  Those are
2 two examples.
3 　　Q.　Have you done any specific assessment for
4 any Summit or Cuyahoga County pharmacies as to the rate
5 of growth of non-controlled substances versus the rate
6 of growth for opioid sales?
7 　　A.　If you look at Exhibit -- I think it's I.
8 　　　　MR. BARNES:  I have it in color if you
9 want.
10 　　A.　Oh, that wasn't the one I was thinking of.
11 I was thinking of the ones that are specific to the
12 opioids and the at-issue drugs.
13 　　　　So specifically, yeah, if you look at
14 Exhibit J, this is a specific comparison of all of the
15 opioids -- the three opioids that appear in Giant
16 Eagle's top 100 drugs as determined by IMS, and you can
17 see -- now, this is a market share comparison, but you
18 can see their comparison, that they under-index -- when
19 you look at their non-controlled substances they
20 actually under-index in these at-issue substances.
21 BY MR. BOGLE:
22 　　Q.　And this is looking at Giant Eagle stores
23 across the board, right, not for any specific county or
24 city or geographic region?

Page 145

1 　　A.　That is correct.  This is much -- this is
2 broader, yes.
3 　　Q.　And the top 100 prescription drugs listed
4 here -- who came up with that list?
5 　　A.　IMS.
6 　　Q.　Where'd you get the IMS data?
7 　　A.　This particular data came as part of the
8 discovery.  It just came up as part of the discovery.
9 IMS data what I'm used to using for evaluation of
10 market share, so this is the drug data -- or not the
11 drug.  This is the database that I'm used to using and
12 so this is the information that was brought up as part
13 of discovery.
14 　　Q.　So under Note 2 here in Exhibit J you list
15 four specific opioid products that were assessed;
16 right?
17 　　A.　It's three.
18 　　Q.　Yeah, I'm sorry.  I'm sorry, no, it's --
19 okay.  Am I reading this wrong?  You say HYCD/APAP.
20 That's one?
21 　　A.　One.
22 　　Q.　Oxycodone/APAP.  That's two; right?
23 　　A.　Correct.
24 　　Q.　Oxycodone/HCL.  That's three; right?

Page 146

1    A.  Correct.
2    Q.  Four is APAP/CD; right?
3    A.  Oh, you have the ol -- you don't have the
4 amended.
5    Q.  Oh, I do. I'm sorry. I'm looking at the
6 wrong one.
7    A.  That's okay.
8    Q.  All right. Let me start that over then.
9    A.  Okay.
10    Q.  Thank you for telling me that.
11    A.  You're welcome.
12    Q.  Okay. I stand corrected. And in Note 3
13 you do have three drugs listed here. Why did you
14 remove the fourth one?
15    A.  So we debated, because one, it's not -- it
16 is an opioid but it is not a drug that is at issue in
17 this particular case, so we didn't want to confuse the
18 only way -- then we would include all opioids, and then
19 you're involving some C-IIIs, some C-IVs, so we felt it
20 better to actually look at and limit the drugs that we
21 analyze to the ones that are involved in this case.
22    Q.  So you removed APAP/CD; right?
23    A.  Correct.
24    Q.  What does that stand for?

Page 147

1    A.  It's Tylenol with codeine.
2    Q.  And what was the basis for saying that's
3 not at issue here?
4    A.  It is -- it's not a C-II product, and it's
5 not part of the hydrocodone family that started as a
6 C-III and was moved to a C-II.
7    Q.  So the three drugs you looked at here that
8 appear on the top 100 list -- do you know what numbers
9 they appeared on the top 100?
10    A.  I don't recall. I'd have -- you'd have to
11 look at the reliance materials.
12    Q.  I didn't see that they were numerically
13 broken out. I see them listed here and but I don't see
14 them numerically broken out as to where they fit on the
15 top 100.
16    A.  Right. They would be in the sources.
17 They would have them in the sources if you look at the
18 reliance materials and the sources themselves.
19    Q.  So you're saying in the materials you
20 produced I can glean what numbers these -- meaning was
21 HYCD/APAP Number 2 on the list?
22    A.  That is correct.
23    Q.  I can determine that?
24    A.  Off the Excel spreadsheet, yeah.

Page 148

1    Q.  Let's go back to Page 24 of your report.
2 In Number 63, Paragraph 63, you talk about various
3 types of training that was conducted; right?
4    A.  Yes.
5    Q.  Did you review any specific training
6 materials that were provided to HBC employees?
7    A.  I did not.
8    Q.  Did you assess what percentage of
9 employees actually received training related to
10 controlled substance diversion at HBC?
11    A.  I did not.
12    Q.  On Page 25 of your report -- I'll get
13 there.
14    A.  Can I ask that we go maybe 10, 15 more
15 minutes? I'm going to need a break.
16    MR. BARNES: Okay. It's 12:53.
17    MR. KOBRIN: Should we break for lunch?
18    MR. BARNES: Yeah, let's see what --
19    A.  Before you start that question, I'm just
20 letting you know.
21    MR. BOGLE: Yeah, I understand. If you
22 want to break for lunch that's your prerogative.
23 That's your --
24    MR. BARNES: Yeah, we've gone over an

Page 149

1 hour -- well, almost an hour. How about we break
2 around 1:00?
3    MR. BOGLE: That's fine. Whatever you all
4 want to do.
5 BY MR. BOGLE:
6    Q.  Okay, so I think I was at Page 25.
7    A.  Yes.
8    Q.  You make a reference in Paragraph 67. The
9 first sentence actually says like most pharmacies with
10 self-distribution capabilities, the drug warehouse and
11 its distribution capabilities are a strategic asset and
12 advantage for the organization that improves,
13 visibility, tracking, and overall management of drug
14 inventory. Do you see that?
15    A.  Yes.
16    Q.  What do you mean by improves visibility?
17    A.  The organization, because they are
18 purchasing product, they can see the product as it
19 enters the warehouse, as it flows through the supply
20 chain, and as it resides on the pharmacy shelf.
21    Q.  And from a visibility perspective,
22 wouldn't it also be true that they can see, for
23 example, which doctors are writing the prescriptions
24 that are being filled?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    A.   Oh.

2         MS. FUMERTON:  Objection to form.

3    A.   It's -- so I don't know whether or not

4 Giant Eagle has that capability or not.

5 BY MR. BOGLE:

6    Q.   Is that something -- it's not something

7 you looked at?

8    A.   By doctor?  No.

9    Q.   Right.  Do you know whether that's

10 something that HBC ever assessed as part of its

11 suspicious order monitoring program -- an assessment

12 of, for example, what percentages of prescriptions came

13 from specific doctors?

14    A.   I don't know that HBC specifically would

15 have seen those things, no.  It may have been reports

16 or part of investigations that were conducted through

17 the stores, the PDLs, and the home office.

18    Q.   Did you see any sort of investigations or

19 reports like that, though, at any level?

20    A.   There was -- there were some testimony and

21 some exhibits to the fact that they did look at certain

22 prescribers, yes.

23    Q.   Was there any sort of specified report

24 that was run at any regular interval along those lines?

Page 151

1    A.   Based on prescribers and based on the

2 testimony that I read I don't know that there was any

3 concentration itself on regular reports based on

4 prescribers.

5         MR. BARNES:  If this is a good break

6 point -- you seem to be pausing -- we don't need to

7 wait two more minutes to 1:00, but --

8         MR. BOGLE:  That's fine.  I don't care.

9 That's fine.

10         THE VIDEOGRAPHER:  Okay.  We are going off

11 the record at 12:56 PM.

12         [A recess was taken.]

13         THE VIDEOGRAPHER:  We are back on the

14 record at 2:01 PM.

15 BY MR. BOGLE:

16    Q.   Okay.  I want to go back to something I

17 unfortunately skipped over when I was going through

18 this.  If we could go back to your amended report, and

19 specifically want to look at the materials considered

20 list, which is Exhibit C.  And I want to go to the last

21 page of that list.

22         On that page you've got a list of 16

23 internal production documents.  Do you see that?

24    A.   Yes.

Page 152

1    Q.   Did you specifically select those

2 documents?

3    A.   Yes, I believe so.

4    Q.   How did you select them?

5    A.   I used them in -- I mean, by reading the

6 testimony and going through the depositions.  I used

7 that -- I found them that way.

8    Q.   So you pulled these documents from

9 deposition exhibits?

10    A.   Yes.

11    Q.   All 16 of them?

12    A.   I believe so.

13    Q.   Is there a reason why you only pulled

14 these 16 exhibits from the depositions and not other

15 exhibits?

16    A.   What other exhibits?

17    Q.   Is it your understanding that there are

18 only 16 exhibits used in all the depositions you

19 reviewed?

20    A.   Oh, no.  I just used those because those

21 were the ones that I used to help form my opinions.

22    Q.   So these are the 16 documents from the

23 depositions that you've relied on to form your

24 opinions?  Am I understanding you right?

Page 153

1    A.   Well, I used all of them -- I used all the

2 testimony, all the documents.  They all helped me form

3 my opinion.  But these are the ones that I used for a

4 specific purpose.

5    Q.   What purpose was that?

6    A.   To further document my citations.

7    Q.   Okay.  I guess I'm just still a little

8 confused as to why these 16 were selected above the

9 other deposition exhibits.  Can you help explain that

10 for me?

11    A.   Just what I felt needed to be highlighted

12 because I used them specifically in my report.

13    Q.   So would it be fair to say you viewed

14 these as the 16 most important documents -- internal

15 documents to your opinions?

16    A.   No, they're just the ones that I happened

17 to use that I felt like I needed to highlight so I

18 could cite and document.

19    Q.   So you're saying all of these are actual

20 cited in the report itself?

21    A.   I don't know if all of them are.  I mean,

22 it was just a way for -- right or wrong, it was a way

23 for me as I wrote my report, those were the ones that I

24 felt like I needed to include.

Page 154

1     MR. BARNES: Do you want to show her any
2 of these document to refresh her memory?
3     MR. BOGLE: I'm just asking. I don't
4 think --
5     A.   And I'm trying to give you a good answer.
6 BY MR. BOGLE:
7     Q.   Okay. Were any documents -- internal
8 documents provided to you by counsel that were not
9 specifically requested by you?
10     A.   I mean, they gave me -- I didn't
11 request -- I guess I don't understand your question. I
12 didn't really -- they provided me documents, yes,
13 and -- but -- and these documents were contained in
14 those documents. I don't understand your question.
15     Q.   In the documents that were provided to you
16 by counsel?
17     A.   Yes.
18     Q.   Let's go back to Page 27 of your report.
19 You say in Paragraph 74 the volume of HCPs distributed
20 by HBC/GERx generally track below quotas set by the
21 DEA, and you say see Exhibit G; right?
22     A.   Yes.
23     Q.   Then you say the data shows that
24 distribution of hydrocodone combination products from

Page 155

1 HBC was below the expected amount on an MME basis
2 between 2012 and 2017 when indexed to the DEA quota for
3 hydrocodone products starting in 2010.
4     Do you see that?
5     A.   Yes.
6     Q.   What was the process you used here to
7 determine the expected amount of HCPs that HBC should
8 be distributing over this time frame?
9     A.   Well, the report doesn't have anything to
10 do with an expected amount. It is strictly a
11 comparison between the DEA quotas and what was actually
12 shipped.
13     Q.   Well, you say this was below the expected
14 amount on an MME basis. Do you see that?
15     A.   I understand. So to clarify my answer,
16 the idea in this particular exhibit is to show that the
17 DEA -- even though the DEA was increasing quotas, an
18 expectation would be for HBC to also increase their
19 shipments.
20     The DEA is increasing the quotas in
21 response to an increase in prescriptions in the
22 marketplace, so an expected outcome would be for HBC
23 then in turn to have an increase in shipments of HCPs
24 to coincide with the quota, but in reality what we

Page 156

1 actually found was that HBC had a reduction in the HCP
2 shipments.
3     Q.   Would you expect there to be an increase
4 in all Giant Eagle Pharmacies based on increases in DEA
5 quotas?
6     A.   It's really looking at an average overall,
7 that if the DEA nationwide is -- if the DEA nationwide
8 is raising their quotas as a result of an increase in
9 prescriptions and an increase in demand for the
10 product, that a reasonable expectation is that in
11 general every pharmacy could also have that same type
12 of increase.
13     So it's very much a generalization when
14 you talk about what could be expected. In general you
15 would expect if the DEA says there's a higher demand
16 for product and there's more prescriptions, then in
17 general the pharmacies are going to rise at that same
18 rate, which is why the DEA increased their quota to
19 begin with, but what we actually found with Giant Eagle
20 is that the amount of HCP shipments declined.
21     Q.   The DEA quotas are done on a nationwide
22 basis; right?
23     A.   That is correct.
24     Q.   So you've compared the nationwide

Page 157

1 increases to the HCP distribution just in Cuyahoga and
2 Summit Counties; right?
3     A.   Correct. But the distribution in those --
4 the number of prescriptions involved in Cuyahoga and
5 Summit Counties is included in the DEA's quotas.
6     Q.   Well, so is every other county in the
7 country; right?
8     A.   Sure.
9     Q.   And so what basis do you have to say that
10 the Summit and Cuyahoga County prescriptions
11 necessarily should increase at the same level as a
12 national quota?
13     A.   I didn't. I made a generalization that
14 said one could expect that nationwide if the DEA says
15 look, we're increasing the quota overall nationwide
16 because in general the amount of prescriptions is
17 increasing and it's increasing overall nationwide -- so
18 if you were at parity -- if you're a pharmacy and
19 you're at parity, you would expect then that if the DEA
20 is saying that nationwide the number of prescriptions
21 is going up, that you as a pharmacy chain would also
22 have your prescriptions go up as well, but what we
23 actually found when we looked at the data is that Giant
24 Eagle's prescriptions went down be -- and therefore the

Page 158

1 shipments out of HBC went down as well.
2    Q.   Why was this indexed to MME?
3    A.   That's the way the data was -- because
4 that's how the FDA does it.  They do it based off of an
5 MME basis because it's done through API or active
6 pharmaceutical ingredient.
7    Q.   Is this one of the exhibits, Exhibit G,
8 that AGI created?
9    A.   They designed this particular chart, yes,
10 on my direction.
11    Q.   Do you understand that DEA quotas are
12 meant to indicate how much should actually be
13 distributed of a specific product?
14    A.   DEA quotas are actually for manufacturers.
15 They're not meant for distributors; they're meant for
16 manufacturers.  But DEA quotas, the rise of quotas, is
17 in response to an increase in the demand for these
18 particular products.  And the amount of API that the
19 DEA allows to be distributed to manufacturers or given
20 to manufacturers for their manufacturing capabilities
21 is in response to the demand by patients.
22    Q.   But DEA quotas are not specific to any
23 specific distributor as far as how much the DEA saying
24 distributor HBC, this is how much we think you should

Page 159

1 be able to legitimately distribute as far as a specific
2 product; right?
3    A.   That is correct.  The DEA determines how
4 much API should be given to the manufacturers and to
5 research facilities.
6    Q.   And further down on Page 27, Paragraph 76,
7 the second sentence you say the ratio of controlled
8 substance prescriptions to total prescriptions
9 dispensed for all Giant Eagle Pharmacies in Summit and
10 Cuyahoga Counties during the relevant time period was
11 less than 10 percent, and then you cite to Exhibit H.
12       You see that?
13    A.   Yes.
14    Q.   Do you have the complete list of
15 controlled substances that went into this calculation?
16    A.   It is in the Excel spreadsheet.  Let me
17 think.  I believe that particular spreadsheet -- I'd
18 have to go back and look, but I believe Giant Eagle
19 actually named the controlled substances -- not named,
20 but indicated which were controls and non-controls.
21    Q.   In the source data you provided?
22    A.   In the source data.
23    Q.   Did you crosscheck the controlled
24 substance list from the source data against any list

Page 160

1 you might have?
2    A.   No, I did not.
3    Q.   On Page 28 of your report -- I'm looking
4 at the last sentence on Paragraph 79.  You say during
5 the relevant time period, the share of prescriptions
6 for controlled substances dispensed by Giant Eagle
7 Pharmacies declined steadily, indicating that the
8 pharmacies were exercising effective controls to
9 prevent diversion of prescription opioids.
10       Do you see that?
11    A.   Yes.
12    Q.   What's the relevant time period you're
13 talking about here?
14    A.   From 2009 through 2018.
15    Q.   Did you run any specific assessment for
16 opioids along these lines?
17    A.   So the -- what do you -- for all opioids,
18 or the at-issue?  I mean, you can see from the exhibits
19 which analyses were done and which drugs were
20 contained.
21    Q.   Yeah, I'm asking for 2009 to 2018, did you
22 look at -- did you assess whether the opioid
23 dispensation by Giant Eagle Pharmacies declined
24 steadily?

Page 161

1    A.   And I'd have to recall.  I think most of
2 it was done -- other than that one report that I did
3 with at-issue drugs, most of the other ones are based
4 off of controls in general, or specific only to
5 hydrocodone.
6    Q.   So over this time frame of 2009 to 2018,
7 do you know whether HCP sales at Giant Eagle Pharmacies
8 steadily declined?
9    A.   Can you ask that question again?
10    Q.   Sure.  Over the time frame you've listed
11 here, 2009 to 2018, do you know whether HCP sales at
12 Giant Eagle Pharmacies steadily declined?
13    A.   I don't think I know specific to HCP, no.
14 For the -- give me just a second.
15       No, not specific to HCP.
16    Q.   What are you relying on specifically to
17 conclude that the decline of controlled substances
18 sales over this time period or dispensation over this
19 time period necessarily means effective controls
20 against diversion for being exercised?
21    A.   Well, because the pharmacies were growing,
22 they were not filling -- as the growth of the pharmacy
23 occurred or as the total prescriptions occurred, the
24 amount of controlled substances were going down,

Page 162

1 therefore indicating a couple of different things.
2          One is that they weren't just
3 inadvertently filling controlled substances. Their
4 controls were in place; they were following their
5 controlled substance manual, so they were only filling
6 prescriptions by legitimate prescribers. They weren't
7 targeting or being attracted by drug-seekers because
8 that type of patient wasn't the kind of patient that
9 was seeking Giant Eagle or using Giant Eagle to fill
10 their prescriptions.
11     Q.   Which you're basing those conclusions just
12 based on the fact that the numbers went down; right?
13 Is there any other data you're considering to reach
14 that conclusion?
15     A.   Well, I mean, all of the review. When you
16 think of all of the testimony that has been given in
17 this case, when you think about the controls, my review
18 of that testimony in comparison to my experience and
19 the industry standards as I know them, continuing
20 education and other industry-type meetings -- I mean,
21 it's a whole wealth of information that I take into
22 account when I draw these conclusions.
23     Q.   But a decline in controlled substances
24 sales by itself does not necessarily mean that

Page 163

1 effective controls against diversion are being
2 exercised, does it?
3     A.   It means that some of them are, yes,
4 because they're not -- one, you don't have the
5 drug-seekers. It will go through -- if people know
6 that you're willy-nilly filling prescriptions and
7 you're not scrutinizing prescriptions, that information
8 will get out and people will come pouring in.
9     Q.   So you're saying -- but -- so you're
10 saying that you can look just at the decline in
11 controlled substance sales and necessarily conclude
12 that effective controls against diversions related
13 specifically to opioids exist?
14     A.   Yes, I can make that conclusion.
15     Q.   And you're basing that on the fact that
16 you think that drug seekers would know if it was easy
17 to get opioids from these pharmacies and the numbers
18 would go up?
19          MR. BARNES: Objection. That misstates
20 her former testimony.
21     A.   And like I've said before, it's a
22 combination of products. The reason -- or a
23 combination of information. The reason that it's going
24 down is because they are following effective controls

Page 164

1 and therefore the amount of prescriptions are not going
2 up.
3 BY MR. BOGLE:
4     Q.   So in your mind, is it inconceivable for
5 there to be any reason why controlled substances sales
6 would go down in a situation where effective controls
7 do not exist?
8     A.   I don't understand your question.
9     Q.   Can you conceive of any situation where
10 controlled substances sales would go down in a
11 situation where effective controls do not exist?
12          MR. BARNES: Objection. Calls for
13 speculation.
14     A.   Yeah, I mean, I could dream something up,
15 but I'm not here to -- I mean, that's not something I'm
16 here to think about. I didn't actually think about it.
17 BY MR. BOGLE:
18     Q.   And you also did not look at whether the
19 opioid prescriptions actually declined during this time
20 period either; right?
21     A.   I did not specifically look at opioids,
22 no, in totality.
23     Q.   Or HCP specifically; right?
24     A.   Correct.

Page 165

1     Q.   We can go to Page 34 of your report.
2     A.   I'm sorry. 34?
3     Q.   34. Yes, ma'am.
4          You say -- it's a carryover paragraph,
5 Paragraph 96. You say however, a pharmacist may at any
6 time exercise their professional judgment and refuse to
7 fill a prescription that appears fraudulent, outside
8 the scope of practice, or not in accordance with
9 standard treatment guidelines.
10          Do you see that?
11     A.   Yes.
12     Q.   Did you assess in this case whether any
13 Giant Eagle pharmacist refused to fill any opioid
14 prescriptions in Summit or Cuyahoga County?
15     A.   I did read about that in the depositions,
16 yes.
17     Q.   Which deposition?
18     A.   I'm not going to -- I can't recall whose
19 deposition it was, but I know it was -- there were a
20 couple of them, and I can't recall the gentleman's
21 name.
22     Q.   So outside of reading depositions, did you
23 do any analysis of your own on this issue?
24     A.   Well, my analysis overall is I know that

Page 166

1  it happens.  It's happened -- I mean, I'm a practicing
2  pharmacist of over 25 years, so I know that it occurs;
3  I know that it happens.  I didn't necessarily need to
4  do an analysis.  It's part of the daily
5  responsibilities of a pharmacist to scrutinize every
6  controlled substance prescription, and they're given
7  the authority then to refuse to fill it if need be.
8      Q.  No, I understand that.  I'm just asking
9  whether you specifically analyzed whether any Giant
10 Eagle pharmacies in Summit or Cuyahoga refused to fill
11 opioid prescriptions.
12     A.  My analysis came from the materials that I
13 read.
14     Q.  The depositions?
15     A.  The depositions that said that they had
16 the authority to do so and in fact exercised that
17 judgment.
18     Q.  Are you aware of any specific numbers as
19 to how many times that occurred from 2009 to 2018?
20     A.  No, I am not.  I believe the statement on
21 the record says frequently or many or it happens.
22     Q.  If we can go to Page 42 of your report.
23        [Discussion off the record.]
24        MR. BARNES:  What paragraph are you going

Page 167

1  to?
2        MR. BOGLE:  123.
3  BY MR. BOGLE:
4      Q.  If you look on Paragraph 123, the third
5  sentence says Giant Eagle is highly focused on
6  preventing theft and diversion by in many cases
7  exceeding expectations related to federal and state
8  guidelines.
9        Do you see that?
10     A.  Yes.
11     Q.  When it comes to suspicious order
12 monitoring for controlled substances, would this go
13 back to your testimony earlier about you relying on
14 inventory counts and security controls to support this
15 statement?
16        MR. BARNES:  Objection.  Misstates her
17 prior testimony, but --
18     A.  So I'm confused by your question.  Can
19 you --
20 BY MR. BOGLE:
21     Q.  Sure.  I'll reask -- I'll ask it a
22 different way.
23     A.  Okay.
24     Q.  What are you specifically from a document

Page 168

1  perspective relying on to say that Giant Eagle is
2  highly focused on preventing theft and diversion by in
3  many cases exceeding expectations related to federal
4  and state guidelines?  What documents are you going to
5  rely on for that?
6      A.  So the -- I'm relying on, gosh, all of the
7  documents that I've read.  And I mean, there's a number
8  of documents where they are talking about the different
9  things that they did to exceed expectations.  Just like
10 I have prior talked about with the inventory counts,
11 with the security controls.  I mean, there are a number
12 of different areas where that occurred specific to
13 Giant Eagle.
14     Q.  Okay.  So what else?  You've talked about
15 inventory counts and security controls.  I mean, this
16 is pretty central to the case.  I'd like to know what
17 else you're going to come in and say.
18     A.  Well, all of their controls.  Some of them
19 are in accordance with state guidelines and some of
20 them exceed those state guidelines.
21     Q.  What controls specific to preventing
22 diversion of controlled substances are you referring
23 to?
24     A.  All of them.

Page 169

1      Q.  You say all of them.  What -- can you give
2  me some sort of explanation of what that means?
3      A.  Well, all of Giant Eagle's controls when
4  it comes to -- I mean, they write a controlled
5  substance manual for the pharmacist.  That was not
6  required by state law.  There are a number of different
7  things that Giant Eagle did both at the store level
8  within their warehouses using automation for picking of
9  their products within the warehouse.  Exercising the
10 different security controls with guards and breaks and
11 counts.
12        I mean, there's a number of different
13 things.  As I sit here today I can't give you an
14 exhaustive list.
15     Q.  The CSA manual that you referenced -- when
16 was that first created?
17     A.  Oh, I don't remember.  The -- you mean the
18 controlled substance manual that Giant Eagle authored?
19     Q.  Yeah.
20     A.  At this time I can't recall.
21     Q.  The automation you mentioned -- is that at
22 the distribution center level?  Is that what you're
23 talking about?
24     A.  Yes.

Page 170

1  Q. When did that begin -- automation for
2  their drugs?
3  A. I don't have their dates. I don't have
4  the dates memorized.
5  Q. Let's go to Page 44 of your report.
6  You've got some bullet points on this page referring to
7  physical security controls. Do you see those?
8  A. I do.
9  MR. BARNES: Those begin on Page 43, by
10 the way.
11 MR. BOGLE: Okay.
12 MR. BARNES: Just -- he's looking at a
13 one-page --
14 BY MR. BOGLE:
15 Q. You see there the next-to-last bullet
16 point says order specialists to monitor store orders
17 for accuracy and appropriateness and any deviations
18 from typical ordering patterns?
19 Do you see that?
20 A. I do.
21 Q. When did that process go into effect?
22 A. I'm not sure. I don't know that the dates
23 were specified in the deposition.
24 Q. Are you aware of what procedure that these

Page 171

1  order specialists would follow to determine if orders
2  were accurate and appropriate?
3  A. So order specialists are -- they refer to
4  a number of different people. Again, this information
5  came from this deposition, from Mr. Durr's deposition,
6  who is keenly aware of the different controls,
7  policies, and procedures that they have in place at the
8  distribution center.
9  Q. Okay. I'm just asking if you know. I'm
10 asking if you know what procedure was followed by the
11 order specialists?
12 A. Well, the order specialists are -- I
13 believe -- at some point in time he refers to them as
14 pickers, so these order specialists are limited.
15 There's only a few of them, and they are aware of the
16 general picking practices for each and every store,
17 that they would readily recognize and be able to see if
18 a store was requesting a quantity outside what was
19 normal for their particular stores.
20 Q. Are you aware of any specific written
21 procedure these order specialists follow to do their
22 job?
23 A. I'm not aware of anything written, no.
24 Q. Are you aware of any specific training

Page 172

1  these people would have undertaken to do their job?
2  A. Well, I mean, their training and their --
3  would be documented in their job descriptions. So when
4  you look at their job descriptions, when you look --
5  that will include the different training, the different
6  education, how they were taught to do their job, is
7  specific to what they are doing and the things that --
8  and how it plays into the prevention of theft and
9  diversion.
10 Q. Did you look at any of the job
11 descriptions for order specialists?
12 A. No, I didn't need to, because I understand
13 what that role is and essentially what they do.
14 Q. Do you have a sense then as to what
15 specific training they received?
16 A. Well, they've -- they're part of the job
17 that allows them to be a picker, and as they pick with
18 time they understand what the patterns and the
19 frequency and the quantities are for standard orders
20 for standard stores.
21 Q. Do you know what a new picker -- what they
22 would be trained on before they would start doing their
23 job?
24 A. They would be trained according to Giant

Page 173

1  Eagle's -- whatever their training protocol is.
2  Q. And what is that? Have you seen that?
3  A. I have not specifically seen their
4  training protocol, no.
5  Q. You reference Giant Eagle's controlled
6  substance dispensing guidelines. Do you recall
7  discussing that in your report?
8  A. Yes.
9  Q. When did those first go into use?
10 A. I don't know. I can't recall.
11 Q. Do you know who they were distributed
12 to -- what class of employees?
13 A. I believe it was distributed to the
14 stores.
15 Q. To the pharmacies?
16 A. I believe so.
17 Q. Have you reviewed those guidelines?
18 A. I have not reviewed the guidelines, no,
19 but based on my experience and based on the information
20 that I have read, it's a guideline that helps the
21 pharmacists and pharmacy technicians develop red flags
22 and to be able to detect certain prescriptions that
23 potentially could be illegitimate.
24 Q. And you're basing that on what people in

Page 174

1 depositions have said about the guidelines? Is that
2 true?
3     A.  It's what's said about the guidelines and
4 what -- an assumption that I'm making of what's in
5 those guidelines, because they're standard pharmacy
6 practice guidelines that most pharmacists are going to
7 follow, and Giant Eagle chose to ensure that they were
8 more specific about the guidelines that they wanted
9 their pharmacists and their pharmacy technicians to
10 follow concerning controlled substances.
11     Q.  Go to Page 46 of your report, please, on
12 Paragraph 130.  The second sentence, you say if issues
13 are detected or questions raised the order will be
14 suspended until management finds a resolution.
15         Do you see that?
16     A.  Correct.
17     Q.  Did you assess whether HBC suspended any
18 opioid orders for Summit or Cuyahoga County pharmacies
19 at any point in time?
20     A.  For Summit and Cuyahoga?
21     Q.  Right.
22     A.  I know that there were some that were
23 suspended.  As far as I know they weren't in those two
24 counties.

Page 175

1     Q.  Have you seen any written guidelines for
2 warehouse employees to follow to determine whether they
3 should suspend a controlled substance order?
4     A.  There is some information in the
5 depositions that talks about the different triggers and
6 the different guidelines for when to suspend an order,
7 so yes, there is information in the testimony.
8     Q.  Have you actually read the guidelines
9 themselves, or just the testimony talking about the
10 guidelines?
11     A.  I've read most of the exhibits that refer
12 to -- as best as I can recall that refer to those
13 guidelines throughout the years.  There have been --
14 there's multiple exhibits in different depositions and
15 at different periods of time.
16     Q.  Just so I understand, you're saying if
17 they were marked as an exhibit to a deposition in your
18 reliance materials you would have reviewed it?
19     A.  Yeah, for the most part I reviewed all of
20 them, yes.
21     Q.  And you have a specific recollection of
22 reviewing these warehouse guidelines in one of the
23 exhibits to the deposition?
24     A.  I have specific recollection of reviewing

Page 176

1 how orders -- yes, how orders would be reviewed and
2 suspended.
3     Q.  Do you have a recollection of how that
4 process worked under the guidelines?
5     A.  Well, it's based on certain triggers of --
6 Giant Eagle today -- the trigger that they're currently
7 using at the warehouse is based off of an electronic
8 system.  Prior to that you would have orders that would
9 be suspended.  The order specialist may find an error
10 based off of unusual-sized frequency or pattern in
11 which they would hold an order until they could get a
12 hold of somebody that would further clarify and then
13 they would either fix the order or they would let it go
14 through based on the information they would get after
15 that.
16     Q.  Have you reviewed any specific algorithm
17 that's been used to flag suspicious orders?
18     A.  I've reviewed several of them.
19     Q.  For HBC specifically?
20     A.  Well, we've looked at all of McCann's
21 methodologies and how those have applied, and then I
22 also have a general understanding of the thresholds
23 that Giant Eagle uses.
24     Q.  When did Giant Eagle start utilizing

Page 177

1 thresholds for suspicious order monitoring?
2     A.  I believe the date was -- I can't
3 remember.  I'd have to look it up.  And what I'm
4 referring to, just to be clear, is their electronic
5 system of thresholds; right?  That's what you asked me
6 for?  I'm sorry.
7     Q.  I did, yeah.
8     A.  Yeah.
9     Q.  Was there a manual threshold system at
10 some time before that?
11     A.  I don't -- no, there wasn't a manual.
12 They've had -- they have had different reports that
13 have been running for years, and those reports have
14 evolved in order to flag and define different
15 thresholds.  There isn't a single threshold system that
16 can be deployed that effectively -- that can
17 effectively identify a true suspicious order.  So using
18 a threshold-type system is -- it's one of the tools
19 that Giant Eagle employs, and they've been using a
20 threshold system for several years, and it has evolved
21 as their technology has evolved.
22     Q.  So if you go to Page 49 of your report.
23 In Paragraph 141 you reference a monthly threshold
24 system starting in 2013.

Page 178

1    A.    There you go.

2    Q.    Is that what you're referring to?

3    A.    Yeah.  Told you I had to look it up.

4    Q.    So that's what you're referring to when
5    you talk about the automated thresholds; right?

6    A.    These are the automated reporting.

7    Q.    Right.  So beginning in 2013, when an
8    order was flagged using this system, would that order
9    be blocked?

10    A.    This one in 2013, the order itself, it was
11    only flagged for needing further investigation.  It
12    doesn't mean that the order was actually suspicious; it
13    just is a trigger that is flipped so that somebody can
14    do further investigation.

15    Q.    Right.  So while that investigation was
16    ongoing using the system -- starting with the one in
17    2013 that -- this monthly system that you're talking
18    about here -- first of all, what sort of employee would
19    be tasked to do that investigation?

20    A.    Well, the employee -- the employee that
21    was tasked sort of -- the information would be brought
22    to the attention of the pharmacy district leader, which
23    by the way I believe in most cases is also a
24    pharmacist, and they're the ones that are the

Page 179

1    operational supervisor for the store level.

2    Q.    Do you know if the pharmacy district
3    leader covering Summit and Cuyahoga Counties was a
4    pharmacist?

5    A.    Yes.

6    Q.    And who was that?

7    A.    I've read so many reports.  I cannot
8    recall his name.

9    Q.    So while that investigation was ongoing by
10    the pharmacy district leader, what would happen to the
11    order using -- under the 2013 system?

12    A.    Well, in 2013, again, it was a flag, but
13    in 2013, that order would continue to go through.
14    However, because Giant Eagle is a captive
15    self-distributor, at any time if they had a concern
16    about an order they could certainly stop it and/or
17    quarantine the product.

18    Q.    Did you assess whether that was actually
19    done in any situation, where an order was flagged under
20    the system from 2013, it went on through, and it was
21    pulled back later, quarantined or stopped?

22    A.    I believe there was an order or two.  I
23    may have my time frames -- but I believe there were a
24    couple of orders.  However, it was not -- it may even

Page 180

1    have been outside these two counties, but there are --
2    these are some of the questions that I asked as I was
3    looking at their controls.

4    Q.    So are you aware of any orders under this
5    monthly ordering threshold system in 2013 from Summit
6    and Cuyahoga Counties that you can cite to or you
7    intend to cite to that were held or stopped after they
8    were flagged?

9    A.    I don't intend to call anything out as a
10    specific example in the 2013 time frame.

11    Q.    In the -- you reference in Paragraph 141
12    the threshold system advanced to daily thresholds based
13    on independent store dynamics, but that part you don't
14    have a date.  Do you know when that occurred?

15    A.    I believe that was after they opened GERx
16    because that was the advancement in technology.

17    Q.    Do you intend to testify that the
18    technology employed by GERx was not available in 2013?

19    A.    It wasn't available to Giant Eagle, no.

20    Q.    How do you know that?

21    A.    Because it was under development.

22    Q.    Have you assessed whether similar
23    technological systems were already being used by other
24    distributors in 2013?

Page 181

1    A.    No, I have not.

2    Q.    You can go to Page 50 of your report.  In
3    Paragraph 144, a few sentences from the bottom, there's
4    a sentence that says furthermore, such threshold-based.

5    A.    Uh-huh.

6    Q.    Do you see that sentence?

7    A.    Yes.

8    Q.    You say furthermore, such threshold-based
9    methods are neither an effective nor a rational means
10    to detect diversion of controlled substances for
11    shipments between divisions of the same company.

12         Do you see that?

13    A.    Yes.

14    Q.    So do you intend to testify that the
15    thresholds are not effective method to detect
16    suspicious orders?

17    A.    Yes, thre -- so threshold meth --
18    thresholds and establishing a threshold system is only
19    a tool.  It cannot be used in isolation to determine
20    whether an order is suspicious or not.

21    Q.    But once an order is flagged using a
22    threshold, what you should go next is doing due
23    diligence to confirm or refute whether it's actually
24    suspicious; true?

Page 182

1  A.  Again, the threshold is a tool and how you
2  design the tool.  Every threshold system that you use
3  has fatal flaws, and you need to understand those
4  flaws, and by understanding those flaws based on the
5  nature of your business you can determine then whether
6  or not an order that is flagged needs further
7  investigation or not.
8  Q.  So it's your opinion then that just
9  because an order is flagged it doesn't necessarily
10  require further due diligence?
11  A.  I'm not saying it doesn't require further
12  due diligence.  What I'm saying is somebody makes --
13  needs to then make a determination whether or not it
14  requires further due diligence.
15  Q.  So it needs to be looked at at the very
16  least; right?
17  A.  That is correct.
18  Q.  What are the fatal flaws with HBC's
19  threshold system that they employed in 2013?
20  A.  Oh.  Well, the threshold system that they
21  had in 2013 -- it flagged orders.  It was an average --
22  they used an average.  They used a nation -- not
23  nationwide, but their company average, and it was
24  aggregated through the entire month.

Page 183

1  So what you got is as you were reaching
2  your threshold potentially -- as you were reaching your
3  threshold you didn't hit those thresholds ever until
4  the end of the month, so it was more of a look back and
5  be able to see stores that were constantly -- or not
6  constantly, but if they were exceeding certain
7  thresholds, that somebody could keep an eye on them.
8  Q.  We can go to Page 64 of your report.  You
9  say in the bullet point there starting with despite
10  implementing -- do you see that?
11  A.  Uh-huh.
12  Q.  It says despite implementing a threshold
13  system to monitor for suspicious orders there was no
14  change in the number of suspicious orders validating
15  that existing policies and procedures were sufficient
16  to prevent theft and diversion.
17  Do you see that?
18  A.  Yes.
19  Q.  You agree this conclusion assumes that the
20  threshold system that was implemented was adequate;
21  right?
22  A.  No, what I'm assuming what is adequate and
23  even more than adequate are Giant Eagle's policies,
24  procedures, and controls regarding theft and diversion,

Page 184

1  and that the threshold system was -- it was a redundant
2  tool that they added because that seemed to be where
3  the industry going -- where the industry was going and
4  what the expectations were in the industry, and all it
5  proved is that Giant Eagle had sufficient controls to
6  prevent theft and diversion.
7  Q.  But in order for the threshold system to
8  prove that, you would have to assume that it in and of
9  itself was an adequate system; right?  Otherwise it
10  can't validate anything.
11  A.  Right, and -- well, but based on -- but
12  even as technology advanced and their systems became
13  more sophisticated, nothing changed.  They didn't
14  identify even -- they didn't identify more.  So yes,
15  they may have used a rudimentary threshold system in
16  2013 that was the best thing available to them at the
17  time, but even as technology advanced and they took
18  advantage of more advanced software and more
19  complicated algorithms, the outcome was the same, which
20  is that no suspi -- or limited suspicious orders, very
21  little suspicious orders were identified, and therefore
22  you can conclude and I have concluded that their
23  controls are sufficient.
24  Q.  I didn't see an analysis in your report as

Page 185

1  to the number of suspicious orders flagged over time
2  using these different systems.  Have you conducted such
3  an analysis?
4  A.  Based on all of the information that I
5  have read, there haven't been any.  There's been a
6  couple and they have been outside these two counties.
7  Q.  Have you independently verified that
8  outside of review of the depositions?
9  A.  I haven't needed to do that because --
10  Q.  I'm just asking if you have.
11  A.  I have not.  I have not because I didn't
12  feel like I needed to.  There are people that -- within
13  the organization that have validated all of this
14  information.
15  Q.  But you didn't undertake any assessment of
16  that on your own outside of reviewing the transcripts;
17  right?
18  A.  I didn't feel like I needed to.
19  Q.  So that's a no; right?
20  A.  I didn't feel like I needed to.
21  Q.  I'm just asking if you did or you didn't.
22  A.  I didn't feel like I needed to.
23  MR. BARNES:  Okay.
24  BY MR. BOGLE:

Page 186

1    Q.   But you didn't; right?
2         MR. BARNES:  Objection.  Asked and
3  answered.  Let's move on.
4         MR. BOGLE:  She hasn't come close to
5  answering the question and you know that.
6         MR. BARNES:  Let's move on.
7  BY MR. BOGLE:
8    Q.   You didn't do it, did you?
9    A.   I didn't have to.
10   Q.   You didn't feel like you had to?
11   A.   I didn't have to.
12        MR. BARNES:  This is five times now.
13  Let's move on.
14  BY MR. BOGLE:
15   Q.   On the last bullet point here on Page 64
16  you say in the second sentence the DEA believes that
17  Giant Eagle provides effective controls and procedures
18  by inspecting their stores and distribution center
19  regularly and issuing licenses to operate.
20        You see that?
21   A.   Yes.
22   Q.   Do you intend to testify on behalf of the
23  DEA as to what they specifically believe?
24   A.   No.

Page 187

1    Q.   And you say a similar thing about the
2  state board of pharmacy for Ohio and other state boards
3  of pharmacy.  I mean, do you intend to come and testify
4  that you know what individuals at these regulatory
5  bodies think?
6    A.   What I'm testifying to is the fact that
7  these regulatory bodies are issuing licenses to
8  operate.  Before they can issue those licenses to
9  operate, they have rules and regulations that need to
10  be followed that need to be proven to be followed, and
11  these regulatory agencies, they do unannounced audits
12  and visits and checks to continually make sure that
13  Giant Eagle is in compliance with rules and
14  regulations.  If Giant Eagle was outside compliance or
15  had failures in their controls, they no longer would
16  issue these licenses.
17   Q.   So outside of the granting of the
18  licenses, do you intend to testify as to what any
19  people in these regulatory bodies think or what the
20  regulatory bodies think of them collectively?
21        MR. BARNES:  Asked and answered, but go
22  ahead.
23   A.   Again, I don't work for these regulatory
24  bodies, but the fact that they are issuing these

Page 188

1  licenses means that they believe that effective
2  controls would take place -- effective controls were in
3  place or they wouldn't continue to give them licenses
4  to operate.
5  BY MR. BOGLE:
6    Q.   Are you basing that on any discussion with
7  anybody at these regulatory bodies?
8    A.   No.
9    Q.   Are you basing that on anything outside of
10  the fact that they have continued to license them?
11   A.   I mean, when you look and you understand
12  what the licenses mean and you understand that they
13  audit and they check and they go through and inspect
14  what they expect, one can draw a logical conclusion
15  that they approve their policies, procedures, and
16  controls.
17   Q.   I'm just asking if you're relying on
18  anything outside of the fact that they've continued to
19  license them to support the opinion you're offering in
20  this bullet point.
21   A.   Yeah, they --
22   Q.   It's a simple question.
23   A.   Right, but they license and they inspect
24  them.  It's a simple answer.

Page 189

1    Q.   Have you reviewed any of the inspections?
2    A.   I have not personally reviewed the
3  inspections.  I have reviewed the testimony of the
4  people that have reviewed the inspections.
5    Q.   So you've talked about licensing and
6  inspections.  Anything else you're relying on for this
7  conclusion about these people's internal beliefs?
8    A.   With regard to the DEA and the state
9  board --
10        MR. BARNES:  Object to the form of the
11  question.  Sorry.
12   A.   With regard to the DEA and the state
13  board?  Is that -- what's your question?
14  BY MR. BOGLE:
15   Q.   Uh-huh.  Yeah.
16   A.   What's your question?
17   Q.   You mentioned inspections and licensing.
18  Is there anything else that you intend to rely on to
19  support the conclusion in this bullet point as to the
20  beliefs of these state or federal regulatory bodies?
21   A.   Just those two points, that they license
22  and they inspect them.
23   Q.   Thank you.
24        If you can go to Page 58 of your report.

Page 190

1    You see there's a footnote there at the bottom of the
2    page that says my review of Dr. McCann's -- of
3    extensive reliance materials is ongoing and I may
4    supplement my opinions as a result.
5        Do you see that?
6    A.   Yes.
7    Q.   Have you at this point completed your
8    review of Dr. McCann's reliance materials?
9    A.   For the particular conclusions that I have
10   drawn, yes.
11   Q.   Is there anything else in his reliance
12   materials that you think you need to see to draw any
13   additional conclusions?
14   A.   Not at this time, no.
15   Q.   On Page 59, Paragraph 159, the second
16   sentence, you say although as of today I have not been
17   able to evaluate the basis for the thresholds Dr.
18   McCann uses in his maximum daily dosage units approach,
19   I note that the results of this approach are absurd.
20       Do you see that?
21   A.   Yes.
22   Q.   Have you been able to evaluate the basis
23   for those thresholds as of today?
24   A.   No, I have not.

Page 191

1    Q.   Are you actively trying to do so?
2    A.   Not at this time.
3    Q.   If we go to Page 52 of your report. I'm
4    on Paragraph 147. The third sentence you say yet
5    another fatal flaw that spans his transactions analyses
6    is that Dr. McCann is using unproven, nonstandard,
7    unprincipled methodologies that are void of research
8    and application of widely-accepted professional
9    principles.
10       Do you see that?
11   A.   Yes.
12   Q.   Is that a sentence that you drafted or one
13   that came initially from AGI?
14   A.   Well, I mean, it's information that was
15   part of our discussions. I mean, we talked about each
16   one of these. So did they transcribe my language?
17   Possibly, yes.
18   Q.   And what is your basis to say that his
19   transactions analyses are unproven, nonstandard,
20   unprincipled methodologies? What are you relying on to
21   support that?
22   A.   Well, one, so he doesn't cite anything.
23   He doesn't cite why he chose those methodologies. The
24   methodologies aren't proven. There is no proof in the

Page 192

1    industry. There is no industry standard. Everybody is
2    still playing with threshold and threshold systems and
3    how best to identify and flag.
4        So they're not proven. They're not
5    standard. He doesn't describe any principals that he
6    follows with regard to these methodologies and he
7    doesn't point out any of his own flaws. He just says
8    here it is.
9    Q.   What sort of transaction analysis would
10   you conduct to do the review that he did?
11   A.   And as I've stated earlier, a
12   threshold-type system has flaws. It doesn't matter
13   which one you pick. You're going to have flaws.
14   The --
15   Q.   So even using a non-threshold-based
16   analysis, how would you do it?
17   A.   I don't --
18   Q.   To do the kind of analysis he did as far
19   as the number of suspicious orders?
20       MR. BARNES: Objection. Outside the scope
21   of the report. She provides criticisms of Dr. McCann's
22   approaches. She's not here to tell him how he should
23   have done his job.
24       MR. BOGLE: Well, she can say that.

Page 193

1    A.   Right. So I'm not here to tell Dr. McCann
2    how to do his report, and I'm not -- yeah, I'm not here
3    to do that. What I can tell you is the methodologies
4    that he chose have flaws.
5    BY MR. BOGLE:
6    Q.   Okay, so my question is if you were doing
7    this sort of analysis, what methodology would you
8    choose?
9    A.   But I'm not here to provide that analysis.
10   That's beyond the scope of what I was asked to do.
11   Q.   Do you think you're qualified to do that?
12   A.   To come up with a methodology?
13   Q.   Correct.
14   A.   It's not something I would engage in, no.
15   Q.   And if we can look at -- further down on
16   Page 52. The last two sentences say -- on Paragraph
17   147. I'm sorry.
18       Finally, in all five of Dr. McCann's
19   approaches, Dr. McCann flags all transactions
20   subsequent to the first flagged transaction. This
21   means that he automatically impugns all subsequent
22   transactions without an analysis of the fundamental
23   properties of the transaction -- transactions, thereby
24   abandoning whatever modicum of professional principle

Page 194

1  might have supported his approach.
2      Do you see that?
3      A.  I do.
4      Q.  Did this language here come from AGI?
5      A.  Oh, no.  It was mine.
6      Q.  And then let me ask you.  As far as this
7  specific component that you're criticizing, what
8  methodology or principles are you relying on to say
9  that subsequent transactions should not be flagged if a
10  suspicious order is not investigated?
11     A.  So understanding that when a pharmacy
12  places an order, it's for replenishment of a product,
13  and you cannot then say that every order from that
14  point forward should be considered suspicious, because
15  they're placing orders based on prescriptions that have
16  been filled, that have been filled and have gone out
17  the door.
18     So to take an analysis threshold, what
19  have you, and say just because the very first order
20  needs to be flagged and everything after that should be
21  flagged as well is absurd.
22     Q.  What process would you undertake if a
23  suspicious order was flagged but not investigated as to
24  the subsequent orders?

Page 195

1      MR. BARNES:  Same --
2  BY MR. BOGLE:
3      Q.  That same product.
4      MR. BARNES:  Same objection as prior.
5  Outside the scope of her report.
6      A.  Exactly.  I'm not here to determine the
7  best way to do it.  I was here and I was asked to
8  determine whether or not Giant Eagle was in compliance.
9  BY MR. BOGLE:
10     Q.  But I'm just talking about a specific
11  component of what you're talking about in your report,
12  and I'm asking if you -- strike that.
13     What process would you undertake or would
14  you think is a reasonable process to undertake to
15  assess whether subsequent orders are suspicious of the
16  same product if a prior order has been flagged and not
17  investigated?
18     MR. BARNES:  Objection.  Same objection --
19  BY MR. BOGLE:
20     Q.  If you don't know, that's fine.
21     A.  It's not that I don't know or I don't have
22  or cannot form opinions.  What I'm saying in my report
23  is that the way Dr. McCann approached it is
24  inappropriate.

Page 196

1      Q.  Any order that is flagged by a threshold
2  system as suspicious should be investigated; right?
3      A.  No.
4      Q.  No?
5      A.  Which we've already talked about before.
6  Just because a threshold system may highlight an order
7  that somebody needs to look at doesn't -- the threshold
8  system is not saying this order is suspicious.  A
9  threshold system only flags an order for somebody to
10  look at.
11     Q.  How do you distinguish between looking at
12  an order and investigating an order?  I guess I'm not
13  following the distinction.
14     A.  Well, to me an investigation is something
15  that is more formalized.  When you look at an order and
16  you understand the flaws of the tool that you're using
17  and you understand the normal pattern, frequency, and
18  order size of the store in which that order belongs to,
19  somebody makes a decision whether or not that order can
20  continue.  The threshold system is only a tool.
21     Q.  So if an order is flagged using a threshold
22  system, what should a person do in looking at that
23  order to determine whether it's suspicious or not?
24     A.  So that particular person would look at

Page 197

1  the -- like I said, would look at the information, just
2  like what Giant Eagle said.  They look at the
3  information, they understand their stores -- they know
4  their customers, they understand their stores, and they
5  make the determination whether or not that is a false
6  positive.
7      Q.  Well, what specifically would you look at?
8      A.  Just like the DEA has given guidance.
9  You're looking at the unusual size, frequency, and
10  pattern for that particular product for that store.
11     Q.  But how would you make that assessment?
12     A.  Through knowledge and experience and
13  knowing your customer.  The DEA says you have to know
14  your customer, and Giant Eagle knows their customers
15  better than most because they're their pharmacies.
16  They're owned by their own company.
17     Q.  Have you seen any written investigations
18  done by anyone at HBC or Giant Eagle as to flagged
19  suspicious opioid orders?
20     A.  I recall testimony that investigations
21  have been done, but I just -- I recall written
22  testimony that the process has worked and
23  investigations have been completed.
24     Q.  But have you reviewed any of the written

Page 198

1 investigations that have been done, if they've been
2 done at all?
3      A.   Well, I know that there have been
4 investigations done because it's in the sworn
5 testimony, and so insofar as they provided the
6 information in the sworn testimony, that would have
7 been what I reviewed.
8      Q.   So did you go back behind that then and
9 look at the actual investigation that was conducted to
10 assess whether you thought it was an appropriate
11 investigation?
12      MR. BARNES:  You mean in addition to the
13 depositions?
14      MR. BOGLE:  Yeah.
15      MR. BARNES:  Like the exhibits?
16 BY MR. BOGLE:
17      Q.   Did you look at anything to say -- did you
18 look at any specific investigation to say I think this
19 is a good investigation or a bad investigation as to a
20 specific order?
21      A.   No, my job was to evaluate their controls,
22 not to follow up on whether or not there was an
23 investigation or not.  I needed to look at their
24 controls, their policies and their procedures, and to

Page 199

1 assess whether or not they were in compliance with the
2 Controlled Substances Act.  That's what I was tasked
3 with.
4      Q.   Well, isn't part of the process of having
5 controls doing investigations on orders that may be
6 suspicious?
7      A.   That would be part of their controls, yes,
8 but it doesn't mean that I necessarily had to go in and
9 look specifically at an investigation.  I just had to
10 make sure that their controls were in place and that
11 they were in compliance.
12      Q.   But you made that compliance determination
13 without looking at what they actually did to
14 investigate; right?
15      MR. BARNES:  Objection.  That misstates
16 her testimony.
17 BY MR. BOGLE:
18      Q.   If it misstates it, let me know.
19      A.   I made the compliance -- the opinion based
20 on their compliance, based on the stated testimony of
21 the Giant Eagle employees.
22      Q.   If you can go to Page 62 of your report.
23 And I'm on Paragraph 164 where you say plaintiffs
24 identified 30 HBC orders that they claim are

Page 200

1 suspicious.  I understand from counsel for HBC that
2 Giant Eagle determined that none of these orders were
3 suspicious based on a thorough investigation of the
4 associated prescriptions.  My review of these orders,
5 including the size and frequency of other orders during
6 the relevant periods, did not identify a suspicious
7 pattern.
8      Do you see that?
9      A.   I do.
10      Q.   Walk me through the process that you went
11 through here to determine that these orders were not
12 suspicious.
13      A.   Well, all of these orders came out of the
14 Barberton store, so we did a full analysis of the
15 Barberton store on my direction so that I could go in
16 and look.  So although I didn't necessarily look at
17 these 30 orders, I did a full analysis on the Barberton
18 store to understand their ordering, frequency,
19 quantity, and pattern.
20      Q.   And what did you look at in that regard?
21      A.   The -- I looked at the orders shipped from
22 HBC to the Barberton store, as well as the number of
23 controlled prescriptions filled by the Barberton store.
24      Q.   Did you run any calculations as far as

Page 201

1 percentages, controlled versus non-controlled or opioid
2 versus non-controlled?
3      A.   We looked at -- I created the three
4 exhibits specific to Barberton that would look at
5 quantity -- oh, and the Barberton -- that stuff is in
6 the other -- my other exhibit.
7      So yes, if we look at where we
8 specifically call -- give me just a second.  So
9 specifically from -- on Exhibit H, if you look at the
10 time period from November 9th to May of 2018, the
11 Barberton store -- their controlled prescriptions
12 versus total prescriptions were 13.9 percent.
13      Q.   And how long did it take you, by the way,
14 to do your investigation of these 30 orders?
15      A.   Again, I --
16      Q.   How much time did you spend?
17      A.   And again, like I said, I didn't
18 personally review all of those 30 orders.  I reviewed
19 all of the shipments.  So I didn't look at those 30
20 orders in Barberton.  I reviewed all of the shipments
21 from HBC to Barberton.
22      Q.   How long did that process take you?
23      A.   Well, it was a matter of crunching the
24 data.  I asked Giant Eagle for the data.  They provided

Page 202

1 the data. I had the assistance of the Analysis Group
2 to crunch the data.
3     Q.    That we see in Exhibit H?
4     A.    That you see in -- well, you see in
5 Exhibit H, but then specifically to the Barberton store
6 you see in O, P, and Q.
7     Q.    So beyond having the AGI folks crunch
8 these numbers, is there anything else that you did to
9 look at this store?
10     A.    To get to what conclusion? My conclusion
11 is that there's nothing --
12     Q.    The conclusions in here?
13     A.    Yeah, my conclusion is that there was
14 nothing suspicious as defined by the Controlled
15 Substances Act that happened at the Barberton store.
16     Q.    Right. I'm asking what you specifically
17 looked at to reach that conclusion. You've told me
18 that AGI ran some numbers for you. I'm asking if
19 anything else was done by you.
20     A.    I crunched -- we just looked at the data
21 to determine whether or not there were orders of
22 unusual size, frequency, or pattern.
23     Q.    Do you know how much time AGI spent
24 creating the numbers specifically for Barberton?

Page 203

1     A.    I don't.
2     Q.    Did you review the numbers with them to
3 assist you in reaching your conclusions as to
4 Barberton?
5     A.    Well, I asked for the numbers. These are
6 the things that I wanted to see as my -- because of my
7 analysis on this store because it was showing up in all
8 of -- in a lot of the depositions.
9     Q.    Yeah, I'm just asking if you reviewed the
10 numbers with them --
11     A.    Yeah.
12     Q.    -- to assist you in reaching your
13 conclusions.
14     A.    Yes, I did.
15     Q.    You reference in Paragraph 165 that
16 Barberton pharmacy is across the street from Akron's
17 Children Hospital and within one mile of Summa Health
18 System Barberton campus.
19       Do you see that?
20     A.    I do.
21     Q.    Did you specifically assess how many of
22 the orders for the numbers that were crunched came from
23 either of those two facilities?
24     A.    Well, HBC doesn't send orders based on

Page 204

1 prescriptions. I don't -- I guess I don't understand
2 your question.
3     Q.    Right, but Giant Eagle, when they fill a
4 prescription, they know what doctor it comes from;
5 right?
6     A.    Yes.
7     Q.    That's all in the prescription; right?
8     A.    Yes.
9     Q.    So I'm asking you did you utilize any of
10 Giant Eagle's data to determine how many prescriptions
11 that fall within the data that you crunched came from
12 doctors at either of these two facilities?
13     A.    No, I didn't -- no, I didn't.
14     Q.    Do you have any present plans to attend
15 trial in October in this case?
16     A.    I guess that's up to counsel.
17     Q.    I'm going to ask -- I'm just asking if you
18 personally made any plans.
19     A.    Not at this time, no.
20     Q.    Do you know when the trial is set for?
21     A.    No.
22       MR. BOGLE: Let's take five minutes. I
23 want to look at my notes real quick. I may be done.
24       THE VIDEOGRAPHER: We are going off the

Page 205

1 record at 3:10 PM.
2       [A brief recess was taken.]
3       THE VIDEOGRAPHER: We are back on the
4 record at 3:30 PM.
5       MR. BOGLE: Thank you for your time. I
6 have no further questions at this point. Okay?
7         EXAMINATION
8 BY MR. BARNES:
9     Q.    Good afternoon, Ms. Kinsey.
10       You were asked a lot of questions today
11 about various aspects of your report, various
12 footnotes, various exhibits, et cetera, and documents
13 and things you may have relied upon.
14       I just want to ask you generally with
15 respect to the -- all of the opinions that you're
16 providing as stated in your report, what are they
17 generally based upon.
18       MR. BOGLE: Object to form.
19     A.    So my entire report is based off of my
20 over 25 years of experience, 30 years of experience in
21 pharmacy, 25 practicing as a pharmacist, my years as an
22 executive in different companies all related to health
23 care and pharmaceuticals, continuing education,
24 training, conferences where I meet with colleagues,

Page 206

1  conversations with manufacturers learning and teaching
2  me about the industry, as well as specifically for
3  Giant Eagle the things that I read in this report. All
4  of the testimony, testimony from former DEA agents,
5  testimony from Giant Eagle employees. So it's an
6  abundance of information and training, experience, and
7  materials.
8  BY MR. BARNES:
9      Q.  You were asked a lot of questions about
10 Exhibit B to your report, which is your chronology of
11 your litigation support engagements going back to 2016.
12     A.  Yes.
13     Q.  Do you recall those questions?
14     A.  Yes.
15     Q.  Now, have you been approved as an expert
16 witness in multiple cases?
17     A.  Yes, I --
18         MR. BOGLE:  Object to form.
19     A.  Yes, I have.
20 BY MR. BARNES:
21     Q.  Have you been disapproved or excluded as
22 an expert witness because you weren't qualified?
23         MR. BOGLE:  Object to form.
24     A.  No.

Page 207

1  BY MR. BARNES:
2      Q.  The consulting engagements that counsel
3  discussed with you -- he was asked -- he asked
4  questions about who you represented in that case or who
5  you were an expert for. Do you remember those
6  questions?
7      A.  Yes.
8      Q.  Did you -- have you been an expert
9  testifying against pharmaceutical companies?
10     A.  Yes.
11     Q.  How many times?
12     A.  In all of these cases. I have worked for
13 a pharmaceutical company. I shouldn't say all, but
14 all -- there's a couple of them that I haven't. But in
15 the majority of my case I have testified -- I have been
16 an expert witness for a pharmaceutical company in a
17 case that is against another pharmaceutical company.
18     Q.  I see.
19         Exhibit C to your report is a list of
20 materials reviewed or considered. Did you intend this
21 to be the only documents that you rely upon to form
22 your opinions, or is it some other -- what is this
23 listing?
24     A.  Exhibit C is not exhaustive. Exhibit C

Page 208

1  is -- it's a list of documents that I used to form my
2  opinions that I cited as part of my opinions, but I
3  reviewed much more information that is on here, not to
4  mention the information that comes from all of my
5  training and conferences that I have attended.
6          So that list is not an exhaustive list of
7  everything that I depended upon to form my opinions.
8  It's just a limited amount of documents that I used to
9  cite and to draw some major points of my conclusions.
10     Q.  With respect to the concept of theft and
11 diversion which is touched upon in your report at
12 multiple points, have you had industry experience and
13 pharmacy experience -- as a pharmacist and as an
14 executive in the industry have you dealt with theft and
15 diversion throughout all of that experience?
16         MR. BOGLE:  Object to form.
17     A.  Yes, I have dealt with theft and diversion
18 since pharmacy school.
19 BY MR. BARNES:
20     Q.  And do you feel that your education,
21 training, and experience is sufficient for the opinions
22 that you have advanced in this case?
23         MR. BOGLE:  Object to form.
24     A.  Absolutely.

Page 209

1  BY MR. BARNES:
2      Q.  And does that include your conclusions in
3  this case that Giant Eagle and its warehouse HBC and
4  GERx complied with the Controlled Substances Act,
5  including the security requirement which requires
6  effective controls against theft and diversion?
7      A.  That is correct.
8      Q.  You at one point in questioning by
9  counsel -- you've testified several times about AGI's
10 role in this case, and I just want the record to be
11 clear. The opinions that you're advancing -- are they
12 your opinions or are they opinions suggested by AGI in
13 any way?
14         MR. BOGLE:  Object to form.
15     A.  I wrote the report. This is my report.
16 They're my opinions. I wrote the report. AGI was only
17 there to crunch the data at my direction to make sure
18 that I could further substantiate and illustrate some
19 of my opinions and to provide actual numbers to the
20 opinions that I was drawing.
21 BY MR. BARNES:
22     Q.  You at one point indicated that AGI
23 provided the substantiation for your opinions. What
24 did you mean by that?

Page 210

1   A.   Well, they did the data-crunching for me
2   so that I could be more specific in giving my opinion
3   so that I had numbers that could back up the general
4   opinions that I was drawing and concluding from my
5   analysis of Giant Eagle's operations.
6       Q.   Did you feel -- sitting here today, do you
7   feel like you were not given any information or
8   documents or testimony that you needed to form your
9   opinions?
10      MR. BOGLE:  Object to form.
11      A.   I was given plenty of information that
12  educated me about the case that helped me derive my
13  opinions, so I believe I was given everything that I
14  needed, and there wasn't anything that I needed to see
15  further.
16  BY MR. BARNES:
17      Q.   You were asked a lot of questions about
18  your compensation.  You remember that?
19      A.   I do.
20      Q.   Do you derive some of your compensation
21  from working actively as a pharmacist?
22      A.   I do.
23      Q.   Do you derive other compensation outside
24  of consulting -- or legal -- from consulting

Page 211

1   engagements that are listed in your report or
2   otherwise?
3       A.   I do.
4       Q.   There was some testimony about this ratio,
5   I'll call it, of controlled substances versus
6   non-controlled substances.  Do you recall that
7   testimony?
8       A.   Yes.
9       Q.   And in fact, your report contained some
10  exhibits that you went through that analyzed HBC's --
11  I'll call it the controlled substance ratio.  What is
12  the significance of that ratio, and is it something
13  that you came up with?
14      MR. BOGLE:  Object to form.
15      A.   So there has been DEA testimony in this
16  case that the DEA has come out and said that a normal
17  or an average ratio for controlled prescriptions to
18  non -- to total prescriptions is about an 80-20 mix, so
19  about 20 percent would be considered average or normal.
20      So I wanted to make sure that where Giant
21  Eagle was in that particular ratio, where the DEA agent
22  talks about whether or not there's a red flag, and what
23  I found is that Giant Eagle is well below where the DEA
24  would place any flag as far as the number of controlled

Page 212

1   prescriptions being dispensed by the organization.
2   BY MR. BARNES:
3       Q.   And is that why you asked AGI to help you
4   crunch data, to make that analysis?
5       MR. BOGLE:  Object to form.
6       A.   That is correct, because I wanted to see
7   the information and in fact see it by store within some
8   in Cuyahoga County.
9   BY MR. BARNES:
10      Q.   And using the DEA's own 80-20 test, you
11  said that HBC never approached the 20 percent amount
12  that the DEA said you should look at?
13      MR. BOGLE:  Object to the exhibit --
14      A.   That is correct.  Based on the exhibit --
15  I would have to go back, but I believe it's about 9.8
16  percent.  So as an organization, where the DEA said
17  they wouldn't even consider a red flag until it was
18  around -- until it was over 20-ish percent, Giant Eagle
19  is well below that.
20  BY MR. BARNES:
21      Q.   For the time period at issue?
22      A.   For the time period at issue from November
23  2009 to 2018 in the Summit and Cuyahoga Counties.
24      Q.   What exhibit are you looking at?

Page 213

1       A.   I'm sorry.  I'm looking at Exhibit H.
2       Q.   You found it faster than I did.  And these
3   are for so -- specific stores, all of the stores in
4   Summit and Cuyahoga Counties?
5       A.   That is correct.
6       Q.   From November of 2009 to May of 2018?
7       A.   That is correct.
8       Q.   And is that time period related to when
9   HBC and/or GERx distributed controlled substances?
10      A.   Yes.
11      Q.   And overall it's about less than half of
12  what the DEA said would be a problematic ratio?
13      MR. BOGLE:  Object to form.
14      A.   Yes.
15  BY MR. BARNES:
16      Q.   There were a few exhibits in your report
17  that were not gone over, and I would like to draw your
18  attention, for example, to Exhibit D as in dog.
19  What -- can you tell us what that exhibit shows?
20      A.   This was a review of -- using McCann's
21  dataset where I wanted to go back and see.  We talked a
22  lot about MMEs as well as dosage units, and this in
23  particular looked at HBC, and what it showed is based
24  McCann's dataset that HBC's share of the market with

Page 214

1  respect to MMEs -- and now this is the first part from
2  January 1996 to 2018 -- that HBC only had about .1 --
3  .81 percent.
4      Q.   0.81?
5      A.   0.81 percent market share.
6      Q.   Why did you want to know that?
7      A.   Because it's tiny.  It's minuscule.  So
8  when you think of the entire market that is involved in
9  Summit and Cuyahoga Counties, the amount of MMEs that
10 HBC is responsible for is minuscule.
11     Q.   Is that also shown in Exhibit E?  The
12 other way.
13     A.   Yes.  Then when you break it out, both
14 Exhibit E and Exhibit F, you can see the same thing.
15 It's broken out per capita and broken out into the
16 individual counties, so you can actually see the flow
17 of shipments -- you can actually see the market share
18 per capita in E and F, and then down in the lower
19 right-hand corner you can see the minuscule amount that
20 is actually distributed by HBC and GERx, including the
21 time frame from 2014 to 2016 where they distributed
22 zero.
23     Q.   And why was that?  Why did they distribute
24 zero in that time frame?

Page 215

1      A.   Because they closed the HBC facility and
2  then opened GERx, and so it was during that time frame
3  that you're not going to see any shipments based from
4  Giant Eagle organization.
5      Q.   Thank you.  You were asked some questions
6  about the DEA, and there was something in your report
7  about their overly ambiguous guidance.  Do you recall
8  that testimony?
9      A.   It was -- yes, I do.  With regards to the
10 Controlled Substances Act and the direction that they
11 were given or lack of specifics that they were
12 providing as it relates to the suspicious order
13 monitoring system.
14     Q.   As part of your testimony and your
15 report -- is it based upon your experience in that time
16 frame -- and by time frame I'm talking about roughly
17 2000 to 2009.  Were you practicing in the industry or
18 practicing as a pharmacist during that period of time?
19     A.   Yes, I was.
20     Q.   And were you familiar with industry's
21 attempts to get guidance from the DEA?
22          MR. BOGLE:  Object to form.
23     A.   That is correct, yes.
24 BY MR. BARNES:

Page 216

1      Q.   And are you familiar with whether or not
2  the DEA would provide such guidance?
3          MR. BOGLE:  Object to form.
4      A.   The DEA would talk around the subject but
5  would never necessarily put in specifics.  They would
6  never endorse a specific system or a specific
7  methodology.
8  BY MR. BARNES:
9      Q.   And so was industry required to just come
10 up with whatever they thought was appropriate?
11         MR. BOGLE:  Object to form.
12     A.   Industry was directed to design and
13 develop a system that is unique and specific to their
14 business, so something that Giant Eagle would develop
15 should look and would look completely different than
16 something that CVS would develop because they're
17 different organizations, they're a captive
18 self-distributor.  They have different businesses,
19 different areas of operation.
20         And so the DEA being overly ambiguous
21 required these organizations to cater and to uniquely
22 design something specific for their business.
23 BY MR. BARNES:
24     Q.   In that same testimony you were asked if

Page 217

1  companies were in a better position to determine what
2  systems they were going to use.  Do you recall that
3  testimony?
4      A.   I do.  The most important thing here --
5  because the other thing the DEA came out and said is --
6  they actually termed something called know your
7  customer.  In fact, there are experts that talk about
8  knowing your customers being extremely important in
9  your suspicious order monitoring program, and the
10 unique advantage that Giant Eagle has is they know
11 their customer because their customer is their own
12 organization.
13         Their stores are following all of Giant
14 Eagle's controls.  They are Giant Eagle's employees.
15 So having this captive self-distribution and this
16 closed loop of supply chain makes them unique in being
17 able to design a program that is specific to their
18 business.
19     Q.   But in terms of who's in a better position
20 to design systems -- are you familiar with the ARCOS
21 database?
22     A.   I am familiar with ARCOS.
23     Q.   And who maintains and manages that
24 database?

Page 218

1    A.  Well, the DEA does.

2    Q.  And what are the inputs into that

3 database, based upon your experience?

4    A.  Well, the DEA gets to see the -- the

5 interesting part is Giant Eagle can see the flow of

6 merchandise that is specific to Giant Eagle. The DEA

7 can see the flow of merchandise nationwide that

8 every -- so the only thing Giant Eagle can see is what

9 is within Giant Eagle's control.

10      The DEA can see everything. So through

11 the ARCOS database they get to see every shipment to

12 through wholesaler from every manufacturer. It's a

13 huge database that the DEA can look and examine and see

14 what is actually going on nationwide, or it can be

15 completely narrowed down to a specific pharmacy.

16    Q.  So in terms of access to data to analyze

17 what's going on in the country regarding controlled

18 substances as between the DEA and manufacturers or

19 distributors or pharmacies, who has the better

20 information?

21      MR. BOGLE: Object to form.

22    A.  Well, the DEA's information is more

23 comprehensive. They have entirely more information and

24 it is extremely more comprehensive for them to be in a

Page 219

1 better position to see the actual flow if they want to

2 see what's happening nationwide.

3 BY MR. BARNES:

4    Q.  And would that include specific product

5 flow, or say opioid flows to specific pharmacies

6 anywhere in the country?

7    A.  Yes.

8    Q.  And who was responsible for enforcing the

9 Controlled Substances Act?

10      MR. BOGLE: Object to form.

11 BY MR. BARNES:

12    Q.  And who has the enforcement powers of

13 arrest and criminal investigations and civil

14 enforcement, things of that nature?

15      MR. BOGLE: I'll just object as it exceeds

16 the scope of the report and my exam.

17    A.  The DEA.

18 BY MR. BARNES:

19    Q.  There were some questioning concerning --

20 I think the number was 99 percent of the prescriptions

21 written in the country being legitimate, if I -- I was

22 writing as fast as I could while you were testifying.

23      Do you recall that testimony?

24    A.  I do.

Page 220

1    Q.  Is that something that you made up, or is

2 that coming from somebody with knowledge?

3      MR. BOGLE: Object to form.

4    A.  It actually came from multiple people I

5 believe I cited in two different places, and the number

6 that's been thrown around or has been testified to is

7 between 99.9 percent and 99.5 percent.

8      I believe I pulled it out of Prevoznik's

9 report, but it was said by multiple people, and it

10 indicates -- and what the conclusion that is being

11 drawn from the documents is that there's a very, very

12 small fraction of prescribers and prescriptions that

13 are being written for illegitimate reasons.

14 BY MR. BARNES:

15    Q.  I'm going to show you what was marked as

16 Rannazzisi Exhibit 8.

17    A.  Does this have to be marked?

18    Q.  I want to direct your attention to Page 76

19 and specifically down near the bottom, the last piece

20 of testimony of Mr. Rannazzisi, who I believe was the

21 head of the DEA diversion division when he gave this

22 testimony in 2014. If he wasn't actively at the

23 time, he had very recently been.

24      Do you recognize him, for example, as the

Page 221

1 author of the dear registrant letters from 2007 -- 2006

2 and 2007?

3    A.  I do yes.

4      MR. BOGLE: Object to form.

5 BY MR. BARNES:

6    Q.  Would you read into the record Mr.

7 Rannazzisi's two sentences here in his Congressional

8 testimony on April 29th of 2014?

9    A.  Mr. Rannazzisi says, quote, I think that

10 if you were talking about 99.5 percent of the

11 prescribers, no, they are not overprescribing, but our

12 focus is in rogue pain clinics and rogue doctors who

13 are overprescribing. Actually, they are prescribing

14 illegally. They are not overprescribing. They are

15 illegally prescribing.

16    Q.  So does that comport with your 25 years'

17 experience in the industry and more particularly your

18 experience as a pharmacist, that the vast majority,

19 upwards of 99.5 percent of doctors, were legitimately

20 prescribing opioids for legitimate patients with

21 legitimate needs?

22      MR. BOGLE: Object to form.

23    A.  Yes, that is correct. It is consistent

24 with my practice as a pharmacist, as an executive, and

Page 222

1 my 25 years in the industry.
2 BY MR. BARNES:
3      Q.   There was also -- and I think you also
4 cited to this.  I want to direct your attention to the
5 DEA witness Prevoznik, Exhibit 15.  And this was used
6 in the Prevoznik deposition on Page 32.  Mr. Patterson,
7 who was the acting administrator of the DEA, May 8th of
8 2018, in testimony before Congress.  Would you read in
9 the last two sentences of his testimony at the top of
10 Page 32?
11      A.   Mr. Patterson says, quote, I look at the
12 vast majority of doctors.  99.99 percent are all trying
13 to do right by their patients, so I think the key is to
14 again keep working on it -- educational process.
15      Q.   Again, is that consistent with your
16 industry experience, including as a practicing
17 pharmacist for the last two-and-a-half decades?
18          MR. BOGLE:  Object to form.
19      A.   Yes, it is consistent with my practice and
20 my experience.
21 BY MR. BARNES:
22      Q.   And would you expect DEA officials who
23 have access to the ARCOS database and who have vast law
24 enforcement powers across the entire country would know

Page 223

1 these statistics and not be speaking of these
2 statistics without having an adequate basis for them?
3          MR. BOGLE:  Object to form.
4      A.   Yes.
5 BY MR. BARNES:
6      Q.   Have you ever turned down an engagement
7 asked of you because you couldn't provide the opinion
8 that was being requested?
9      A.   Yes.
10      Q.   You were asked a bunch of questions about
11 opioids being an effective pain management drug.  Do
12 you recall that?
13      A.   Yes.
14      Q.   Have you actually -- and you testified
15 generally about the FDA and NDAs and ANDAs and -- et
16 cetera.  Have you actually seen this in practice as a
17 pharmacist?
18          MR. BOGLE:  Object to form.
19 BY MR. BARNES:
20      Q.   Opioids being an effective pain management
21 tool for doctors?
22      A.   Yes.
23          MR. BOGLE:  Object to form.
24 BY MR. BARNES:

Page 224

1      Q.   Have you seen any trends in the
2 availability of opioids and the effects it has on
3 patients?
4          MR. BOGLE:  Object to form.  Exceeds the
5 scope of my exam or her report.
6      A.   Yes, I have seen prescribing patterns
7 change.  I've also seen what happens when certain
8 opioids, certain strengths are no longer available in
9 market and how those shortages affect patient care, as
10 well as the ordering patterns of stores.
11 BY MR. BARNES:
12      Q.   And how do they affect patient care?
13      A.   Well, it --
14          MR. BOGLE:  Object to form.
15      A.   It sends the patient scrambling.  If -- I
16 can tell you specific -- just as a specific example
17 earlier this year, morphine 15 milligram was
18 unavailable, and if that was what the patient needed,
19 your choice was either to change the drug, or
20 unfortunately we were forced to give the patient and
21 the doctor had to write for a stronger amount and ask
22 the patient to cut it in half because the product
23 was -- the product that they needed was no longer
24 available.

Page 225

1          So it sends the different trends, it sends
2 the prescribing habits, and it sends the ordering
3 process out of balance.  When certain products are no
4 longer available, then you can see some blips or
5 disparities.
6 BY MR. BARNES:
7      Q.   Is there a patient care aspect to
8 suspicious order monitoring?
9          MR. BOGLE:  Object to form.
10      A.   There is.  The pharmacy organization --
11 the pharmacy itself.  Let's start there.
12          Pharmacists are trained to take care of
13 their patients, and you can't take care of your
14 patients if you don't have product on the shelf.  So
15 you have an obligation as a pharmacist to carry the
16 products that your patient base needs, and when you
17 can't get those products from your wholesaler, it's
18 devastating, and you can no longer take care of your
19 patient, and therefore you have to tell your patient to
20 go somewhere else.
21          So it's important that whatever suspicious
22 order monitoring threshold, program, and all of the
23 different tools that you use -- the things that you put
24 together need to follow the law, and you need to be

Page 226

1  compliant, but you also have to remember patient care
2  so that you don't unnecessarily slow things down or
3  disrupt access that can cause further ramifications
4  down the line, which includes further harm to the
5  patient.
6  BY MR. BARNES:
7      Q.   So if I'm interesting you correctly, that
8  part of this analysis about suspicious orders is -- is
9  your testimony that you have to take into account the
10 legitimate needs of patients?
11         MR. BOGLE:  Object to form.
12     A.   Yes.  You can't just stop an order because
13 it's flagged by a system, because by stopping that
14 order that drug is not getting to the store and
15 therefore the store then can't fill prescriptions.
16 BY MR. BARNES:
17     Q.   You know Dr. McCann -- he had like five
18 different ways of playing with the numbers in terms of
19 how many suspicious orders, and do you recall five of
20 his methodologies would have identified upwards of 80
21 to 90 percent of every order ever input by everybody as
22 suspicious?  Does that make any sense to you
23 whatsoever?
24         MR. BOGLE:  Object to form.

Page 227

1      A.   No, it makes absolutely no sense.  His
2  methodologies were full of flaws.
3  BY MR. BARNES:
4      Q.   Are you aware of the DEA being required to
5  consider patient needs and making sure there was an
6  adequate supply getting to the patients as part of
7  their regulatory obligations?
8          MR. BOGLE:  Object to form.
9      A.   The DEA's regular -- and where I would
10 apply this is in their quotas, as the DEA is
11 determining how quotas are formed and what they should
12 be used for.  The DEA's obligation is to make sure that
13 there is enough product in market to meet the needs and
14 the demand of the patients.
15 BY MR. BARNES:
16     Q.   You provided a lot of testimony and your
17 report specifically addresses HBC and the GERx
18 warehouse at Giant Eagle?
19     A.   Yes.
20     Q.   And you've -- I don't want to go over
21 everything, but you've opined that Giant Eagle has met
22 the Controlled Substances Act in many different ways
23 and in some ways exceeded the requirements of that act?
24     A.   Yes.

Page 228

1      Q.   And does that cover the time period in
2  which HBC and GERx were actually distributing
3  controlled substances?
4      A.   Yes.
5      Q.   And that began when; do you know?
6      A.   In 2009.
7      Q.   When you talked about the suspicious order
8  monitoring, were you limiting your testimony in any way
9  to so-called threshold systems that use formulas or
10 algorithms?
11         MR. BOGLE:  Object to form.
12     A.   No, as I've stated before, threshold
13 systems are only a tool to be used as potentially --
14 you don't even have to use it.  It's not even required
15 by law, but you can use a threshold-type system as a
16 tool in your toolbox as it relates to a suspicious
17 order monitoring program.
18 BY MR. BARNES:
19     Q.   You were asked some questions about being
20 licensed and what that means.  I just want to follow up
21 with a few questions.  Were you testifying that simply
22 having a license meant you were in compliance, or
23 something else?
24         MR. BOGLE:  Object to form.

Page 229

1      A.   By having a license, the regulatory
2  authority has said that you have controls, policies,
3  and procedures in place they find legally relevant to
4  rules and regulations that they have created and
5  they're enforcing.
6  BY MR. BARNES:
7      Q.   And you talked a little bit about
8  preinspection -- preinspections by the DEA.  And by
9  pre, I mean before you start distributing, another
10 inspection right after you start distributing, and then
11 periodic inspections throughout the time you are
12 distributing -- is that -- am I summarizing your
13 testimony correctly?
14         MR. BOGLE:  Object to form.
15     A.   Yes.
16 BY MR. BARNES:
17     Q.   Now are those inspections rigorous or are
18 they flimsy or somewhere in between?
19         MR. BOGLE:  Object to form.
20     A.   No, those inspections are extremely
21 rigorous, and they give full feedback whether or not
22 you're meeting their expectations of what needs to
23 occur.
24 BY MR. BARNES:

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    Q.   Does it include a review of suspicious
2  order monitoring systems?
3        A.   It does.
4        MR. BOGLE:  Object to form.
5  BY MR. BARNES:
6        Q.   Does it include a review of inventory
7  management systems?
8        A.   It does.
9        Q.   Does it include a detailed review of
10  transactions within your systems to make sure controls
11  are in place and working?
12        MR. BOGLE:  Object to form.
13        A.   Yes.
14  BY MR. BARNES:
15        Q.   And did you see testimony in the record
16  for the Giant Eagle depositions that HBC and GERx were
17  subjected to pre-inspections, post-inspections, and
18  audits -- periodic audits?
19        A.   Yes, I did see that testimony.
20        Q.   And did you also see the testimony that
21  the DEA never once suggested that Giant Eagle was not
22  in compliance?
23        MR. BOGLE:  Object to form.
24        A.   The DEA did not find any deficiencies.

Page 231

1  BY MR. BARNES:
2        Q.   And is that an important factor for you
3  when you made the evaluations you did in this case and
4  came to the conclusions that you did?
5        A.   Absolutely, yes.
6        Q.   You were asked some questions about
7  training -- training at Giant Eagle.  Do you recall any
8  deposition testimony about so-called CBT,
9  computer-based training?
10        A.   I do, yes.
11        Q.   And do you recall specifically the Walt
12  Durr and Greg Carlson depositions talking about
13  training?
14        MR. BOGLE:  Object to form.
15        A.   Yes, they went -- they spoke of the
16  different training modalities from computer-based
17  training to even having trainers.  Their PDLs often
18  gave little mini training seminars or on-the-job
19  training, so it was constant education on the policies,
20  procedures, and controls that Giant Eagle wanted them
21  to follow.
22  BY MR. BARNES:
23        Q.   Is that pretty standard in the industry in
24  your experience -- that type of training?

Page 232

1        A.   The training using computer-based
2  learning, yes, and also using field management.  That's
3  pretty standard, yes.
4        Q.   You were asked some questions about
5  whether you particularly focused upon opioids or
6  hydrocodone-containing products and compared them to
7  other information.  Do you remember those questionings
8  or those questions?
9        A.   Maybe.
10        Q.   I could be a little bit --
11        A.   Which one are you going to?
12        Q.   Well, I'm just trying to see if you can
13  generally recall analyses in the McCann report where he
14  compared hydrocodone shipments by HBC over time.  Do
15  you recall that?
16        A.   Yes, I do.
17        Q.   And what do you recall he was doing with
18  that information?
19        A.   Well, he was comparing it -- in some cases
20  he was comparing it to DEA quotas.  In other cases he
21  was just showing the hydrocodone shipments, all of
22  which were -- again, based on my report, were -- they
23  don't track the way the quotas track and they continue
24  to show that the shipments out of HBC continue to

Page 233

1  decline.
2        Q.   What did you take from that?  What does
3  that mean to you?
4        A.   It means that the -- those type of
5  patients, although their prescription volume was steady
6  or slightly declined from 2012 forward, you actually
7  saw a further decline in their controlled substances,
8  which tells you a lot about the patient that is coming
9  to Giant Eagle.
10        This is not the drug-seeking patient.
11  This isn't the patient that comes in and only gets a
12  prescription for hydrocodone.  These are the patients
13  that are coming in for diabetes, for their blood
14  pressure, for their stomach issues, and they're not
15  over-indexing or they're not attracting the patient
16  strictly seeking hydrocodone.
17        Q.   You were asked some questions about -- I
18  can't even read my own writing here.
19        Are you aware of any requirements by the
20  DEA to keep records of due diligence on flagged orders?
21        MR. BOGLE:  Objection.
22  BY MR. BARNES:
23        Q.   Or suspicious orders?
24        MR. BOGLE:  Exceeds the scope of her

Page 234

1 report and my exam.
2      A.   No, there's nothing in the Controlled
3 Substances Act that say that any type of written or
4 investigations -- that any type of written reports need
5 to be kept for any type of time period.
6 BY MR. BARNES:
7      Q.   I just deciphered my handwriting, and I
8 realized what it said.
9          You were asked some questions about
10 pharmacists refusing prescriptions.  Do you recall
11 those questions?
12      A.   Yes.
13      Q.   Now, when a pharmacist refuses to fill a
14 prescription, is there a record of that in some way in
15 your experience?
16      A.   No, there's not.  There's really no way --
17 if it's a new patient to the pharmacy, there is no
18 record created unless we even fill a prescription.  So
19 there's no way to electronically create a record or
20 document that type of interaction because no
21 prescription has been filled.
22          If it's a prescription of an existing
23 client or an existing patient, those types of notes and
24 documentation doubtfully are put in the record.  More

Page 235

1 often than not -- it usually depends on what happens
2 with the prescription.  If the prescriber says hold it
3 for a couple of days and you can fill it in two days,
4 then that's what we do.  If the prescriber says throw
5 it away then we rip it up and we throw it away.
6      Q.   Okay.  You were asked some questions about
7 what specific controls; in fact, the questioning was --
8 you said several times all the controls and you were
9 asked, well, give me an example, and you referred to
10 the controlled substance manual and various controls at
11 the store and warehouse.
12          Would you look at Pages 43 and 44 of your
13 report?  And specifically Paragraph 125.
14          These bullet points that are highlighted
15 here -- what are they?
16      A.   These are physical -- they're security
17 controls to prevent theft and diversion at Giant Eagle.
18      Q.   And they continue onto the middle of Page
19 44 -- they include things like limited personnel access
20 to controlled substances, Vocollect software
21 application and hardware, Manhattan software
22 application, order specialist, threshold reports,
23 inventory counting at point of receipt and reserve
24 slots for outbound product counting before the business

Page 236

1 day starts, when it ends, during breaks, security
2 cameras, video surveillance, guards.
3          Are those the types of controls, when you
4 said all controls, that you had in mind?
5          MR. BOGLE:  Object to form.
6      A.   Yes, this is an illustrative list of some
7 of the things that Giant Eagle that is not necessarily
8 required by law, but Giant Eagle chooses to engage in
9 these activities in order to protect their business and
10 to prevent against theft and diversion.
11 BY MR. BARNES:
12      Q.   You reference a couple of times in your
13 testimony the Durr deposition.  Do you remember Walt
14 Durr being deposed and being specifically asked a lot
15 of questions about controls and policies and procedures
16 at the HBC warehouse?
17      A.   Yes.
18      Q.   And do you recall the exhibits to that
19 deposition included numerous policies and procedures?
20 He also testified to oral policies and procedures.  Do
21 you recall that testimony?
22          MR. BOGLE:  Object to form.
23      A.   Yes.
24 BY MR. BARNES:

Page 237

1      Q.   Is that part of the information you relied
2 upon in your report when talking about written policies
3 and procedures and controls followed by Giant Eagle?
4          MR. BOGLE:  Object to form.
5 BY MR. BARNES:
6      Q.   And specifically the HBC warehouse?
7          MR. BOGLE:  Object to form.
8      A.   Yes.
9 BY MR. BARNES:
10      Q.   You were asked a question about a
11 so-called fatal flaw you said is inherent in every
12 threshold system?
13      A.   Yes.
14      Q.   And you specifically were asked if there
15 were -- was it -- fatal flaw in HBC's system and you
16 provided an answer that related to the -- they use an
17 average company-wide aggregate per month?
18      A.   Yes.
19      Q.   Despite that flaw, does that change
20 your -- or even in light of that flaw, does that change
21 your opinion in any way, that Giant Eagle's controls
22 met and exceeded the Controlled Substances Act
23 requirement?
24          MR. BOGLE:  Object to form.

Page 238

1    A.   Well, what it led me to believe is even
2  though Giant Eagle established that tool and began
3  using that tool, because it didn't identify any
4  suspicious orders, that the current controls, policies,
5  and procedures that Giant Eagle had in place were more
6  than adequate; that they were preventing theft and
7  diversion.
8  BY MR. BARNES:
9    Q.   Did you identify any fatal flaws in the
10 McCann methodology?
11   A.   Several.
12   Q.   What were the biggest ones?
13     MR. BOGLE:  Object to form.
14   A.   Well, and it depends on which one you're
15 looking at.  His first methodology, he was using a
16 six-month average, and although it was store-specific,
17 the six-month average took into account -- failed to
18 take into account any growth of a particular store, so
19 inevitably what you found out is that your largest
20 stores that had any type of growth within the period
21 were always showing up and every order was then showing
22 up on his report.  Other times he was using averages.
23     Again, the biggest thing I had a problem
24 with was the fact that even when he flagged an order he

Page 239

1  would then flag every subsequent order, which just
2  basically blew up his entire report to where it was no
3  longer usable.
4  BY MR. BARNES:
5    Q.   In your experience in the industry and
6  your experience as a pharmacist, does that have any
7  semblance of reality, that if an order is suspicious
8  that every subsequent order is also suspicious?
9      MR. BOGLE:  Object to form.
10   A.   No, because what we've already discussed
11 is a tool like a threshold monitoring -- like a
12 threshold report -- that type of tool cannot determine
13 whether an order is suspicious.  It can't.
14     It is just a report.  It's a report that
15 has flaws in it.  It can -- red flag.  It can create
16 triggers for somebody to go look.  But a report cannot
17 determine whether or not an order is suspicious.
18 BY MR. BARNES:
19   Q.   Did any of the McCann methodologies
20 attempt to tailor any of the methods to a specific
21 organization or defendant?
22     MR. BOGLE:  Object to form.
23   A.   No, he used all five methodologies across
24 a number of different defendants, not taking into

Page 240

1  account their specific business models.
2  BY MR. BARNES:
3    Q.   And you may have testified to this
4  already, but the DEA regulations and guidance that
5  you've seen -- are you supposed to tailor it to each
6  organization?
7    A.   Yes, the DEA has encouraged the design and
8  the development of systems specific to a -- specific to
9  an organization.  It's the reason that they were overly
10 ambiguous about the direction that they created, is
11 because they wanted to put the onus back on the
12 organizations to tailor a suspicious order-monitoring
13 program that was unique to their business.
14   Q.   You used the term captive self-distributor
15 in your report and in your testimony today?
16   A.   I did, yes.
17   Q.   Is that -- in terms of Giant Eagle, is
18 that a significant factor for you that they were only
19 distributing to themselves?
20     MR. BOGLE:  Object to form.
21   A.   Yes.  So it's important -- and the DEA has
22 come out and said that knowing your customer is vitally
23 important to the prevention of theft and diversion, and
24 the fact that Giant Eagle is a captive self-distributor

Page 241

1  means it's a completely tight and controlled
2  distribution loop because they know their customer.
3  Their customer is their own pharmacy.
4      Giant Eagle is a relatively small
5  organization with 227 pharmacies.  Therefore they
6  should design a program that is unique to them and
7  unique to their circumstances and take into account the
8  fact that they are their own self-distributor and they
9  own the merchandise from the time in which the
10 manufacturer delivers it to the time in which they
11 dispense it to the patient.
12 BY MR. BARNES:
13   Q.   You were asked some questions about HBC's
14 investigations of flagged orders.  Do you recall that?
15   A.   Yes.
16   Q.   Do you recall in the deposition
17 testimony the Giant Eagle witnesses being questioned
18 about specific investigations that were conducted?
19     MR. BOGLE:  Object to form.
20   A.   Yes, I remember the testimony that there
21 were orders that were flagged as part of their
22 threshold systems and that these conversations and
23 these investigations took place.
24 BY MR. BARNES:

Page 242

1    Q.   You were asked some questions about the
2  Barberton store being close to the Akron hospital and
3  other facilities.  This was in connection with
4  Paragraph 165 of your report.
5        At the end of Paragraph 165, you state
6  that the Barberton pharmacy is across -- is across the
7  street from the Akron Children's Hospital and within
8  one mile of the Summa Health System Barberton campus.
9        Is that last entity -- is that a hospital?
10   A.   Yes.
11   Q.   And what is the significance of a pharmacy
12  being very close to two hospitals?
13       MR. BOGLE:  Object to form.
14   A.   Well, it goes to the size of the pharmacy.
15  Again, I chose to highlight, I chose to dig in deep on
16  the Barberton store because plaintiffs often pointed
17  out in their discovery that the Barberton store was one
18  that Giant Eagle needed to pay attention to.
19       So I wanted to do a deep dive into
20  Barberton, and what you come to find out -- Barberton
21  is one of their -- is one of Giant Eagle's busiest
22  stores and part of the reason why it's one of the
23  busiest stores is because it is located very close to
24  large hospital systems.

Page 243

1        It will also -- it would signify to me
2  that not only would their prescription volume be
3  higher, but potentially they would have a higher
4  percentage of controlled substances because patients
5  are fulfilling their discharge meds at these local
6  stores.
7        And so being around a hospital, you would
8  essentially see a higher percentage of controlled
9  substances in order to take care of these patients
10  right after they have had some sort of surgical
11  procedure.
12 BY MR. BARNES:
13   Q.   Did the McCann analysis in any of his
14  methodologies attempt to take into account
15  store-specific facts like this, like where the store
16  was located and whether or not it was next to one or
17  two hospitals or pain clinics or things of that nature?
18       MR. BOGLE:  Object to form.
19   A.   No, the McCann report didn't take into
20  account any specifics about any store, which like I
21  said is a flaw with most threshold systems.
22 BY MR. BARNES:
23   Q.   In your experience as a pharmacist and in
24  the industry, have you seen that effect, that

Page 244

1  pharmacies right across the street from hospitals or
2  down the block from another hospital will see these
3  types of prescriptions on a more frequent basis?
4        MR. BOGLE:  Object to form.
5    A.   Absolutely, which is why the DEA comes
6  through and says that you need to know your customer.
7        MR. BARNES:  I've got nothing further.
8             EXAMINATION
9  BY MR. BOGLE:
10   Q.   Yeah, so a few follow-up questions.
11       Exhibit C to your report, your materials
12  considered, I think you said was not exhaustive.  Is
13  that right?
14   A.   Correct.
15   Q.   What are you missing?  Because we're
16  entitled to know what you're relying on.
17   A.   Well, again, a lot of the materials that I
18  looked at and considered were just Google searches
19  where I would pop into a document, I would read a
20  little bit, and I would pop out.  I have materials
21  from -- and remembrance of materials from conferences
22  and different training and continuing education.
23   Q.   And you're relying on those materials to
24  form your opinions?

Page 245

1    A.   It's part of my experience, so as part of
2  my experience and my expertise, to the extent that I
3  understand those documents and I've been exposed to
4  them, they would help in forming my opinions.
5    Q.   So Exhibit C asks for a list of materials
6  reviewed or considered -- materials.  I'm asking do you
7  have any other materials.  I'm not asking about your
8  experience; I'm asking about materials.  Do you have
9  any other materials that you intend to rely upon or
10  have considered that you have not listed here?  I'm
11  allowed to know that.
12   A.   So by materials do you mean pieces of
13  paper?  I mean, I've described to you what I consider
14  to be the information that I relied upon in forming my
15  opinions.
16   Q.   So the federal rules require you to list
17  out this information.  I'm asking to know what it is.
18  And I'm not asking about your experience.  I'm asking
19  about yes, documentary information.
20   A.   I understand, but what -- and my answer to
21  you is that my opinions are based off my knowledge of
22  the industry and my experience and that when I formed
23  these opinion it is based on all of those materials,
24  all of that information that I understand and that I

Page 246

1 have been exposed to.
2      Q.   So do you intend to provide additional
3 materials considered after this deposition?
4           MR. BARNES:  I'm going to object.  She's
5 not required to produce every document she's ever seen
6 as a professional since pharmacy school.
7           MR. BOGLE:  That's not what I -- that's
8 not the question I'm asking her and you know that.
9           MR. BARNES:  No, and what I --
10          MR. BOGLE:  That's silly.  That's not what
11 I'm asking her.
12          MR. BARNES:  Why don't you ask her -- why
13 don't you get to the point?
14          MR. BOGLE:  I already have five times.
15 She didn't answer my question.
16          MR. BARNES:  No, you're asking in a way
17 that's confusing her.  Why don't you ask her -- I'm not
18 even going to suggest a question.
19          MR. BOGLE:  Yeah, seriously.  I've asked
20 her a very straightforward question.
21 BY MR. BOGLE:
22      Q.   Are there any additional materials that
23 you have reviewed for this case or have considered that
24 are not included in Exhibit C?  It's a very

Page 247

1 straightforward question?
2      A.   It's not, because you asked me about
3 materials and there are several things that -- there
4 are several things that I've looked at that's been part
5 of my experience and my years in the industry.
6      Q.   So you're not willing to provide us a
7 complete list of the materials you've considered?  Is
8 that what I should take away from this?
9      A.   I don't know how to.
10          MR. BARNES:  You mean for purposes of --
11          MR. BOGLE:  Okay.  She doesn't know how
12 to.  All right.  No, I'm moving on.  She doesn't know
13 how to.  She's answered the question.
14          MR. BARNES:  No.  I'll ask --
15      A.   Okay.
16 BY MR. BOGLE:
17      Q.   Can diversion occur when controlled
18 substances purchases are less than 20 percent of
19 overall purchases?
20          MR. BARNES:  Objection.  Calls for
21 speculation.
22      A.   Yeah, I'm not going to speculate.
23 BY MR. BOGLE:
24      Q.   You don't know?

Page 248

1      A.   No, I'm not going to speculate.
2      Q.   I'm not asking you to speculate.  I'm
3 asking you do you know if diversion can occur when
4 controlled substances are less than 20 percent of
5 overall purchases?  Do you know or do you not know?
6          MR. BARNES:  Same objection.
7      A.   And I will draw a conclusion that says
8 that when you've got 99.9 of prescription for
9 legitimate use and none of those prescriptions --
10 there's been no evidence that shows that those
11 prescriptions lead to diversion.
12          MR. BOGLE:  Move to strike as
13 nonresponsive.
14 BY MR. BOGLE:
15      Q.   That's not even close to my question.  I'm
16 asking you whether diversion can occur if controlled
17 substances purchases are less than 20 percent of the
18 overall purchases.
19          MR. BARNES:  Object to form.  It's vague.
20 Diversion where?  In the closed system or outside the
21 closed system?
22 BY MR. BOGLE:
23      Q.   You can answer my question.
24      A.   Well, and I'm trying to -- I'm not -- I'm

Page 249

1 trying to answer your question.
2      Q.   You just answered a bunch of questions
3 from your counsel on this in a very straightforward
4 manner.  I'm asking you one follow-up question and you
5 can't answer it.  Is that right?
6      A.   No, that's incorrect.  I'm not -- I'm
7 trying to answer your question as best as I understand
8 it.
9      Q.   I'll ask it again.
10          Is it possible for diversion to occur --
11 I'll even add with opioids -- if controlled substances
12 purchases are less than 20 percent of overall
13 purchases?
14          MR. BARNES:  Object to form.
15 BY MR. BOGLE:
16      Q.   Is that possible?
17      A.   Diversion can occur at any time, yes.
18      Q.   Now, the Rannazzisi testimony that you
19 were shown here today -- did you review any other parts
20 of his deposition, or did you just review this Exhibit
21 8?
22      A.   No, I was -- I'm trying to remember.  I
23 think the Exhibit 8 -- I may have seen other --
24          MR. KOBRIN:  You can check your documents

Page 250

1  if you want.
2      A.   Oh, that's right.
3          Yeah, it would have been -- so that
4  particular one, it was strictly that exhibit.
5  BY MR. BOGLE:
6      Q.   So this testimony from Exhibit 8 to his
7  deposition -- your counsel spent a fair amount of time
8  going over this with you.  Were you shown any
9  underlying data supporting this 99.5 percent number by
10  your counsel?
11      A.   I didn't ask for any data.  The fact that
12  you had the head of the DEA giving this information and
13  testifying in front of Congress leads me to believe --
14  or you would assume that the information was
15  trustworthy and backed up by data.
16          MR. BOGLE:  Move to strike as
17  nonresponsive.
18  BY MR. BOGLE:
19      Q.   Were you shown any data by your counsel?
20      A.   No.
21      Q.   Yes or no?  And did you read this
22  testimony in your preparation of your report to be a
23  mathematical fact that 99.5 percent of prescribers are
24  not overprescribing?  Did you read that and take away

Page 251

1  that that's a mathematical fact?
2          MR. BARNES:  Object to form.
3      A.   I read it that it was a relied-upon fact,
4  yes.
5  BY MR. BOGLE:
6      Q.   A mathematically-confirmed fact?
7      A.   If he said it.  He testified to it.  So
8  yes, he should have backup to say that that is -- if
9  he's going to give those kinds of numbers, then he
10  should have backup, and he would be in the best
11  position to know.
12      Q.   Not you; right?
13      A.   Not me.  That is correct.
14      Q.   And the 99.9 percent number from Mr.
15  Patterson -- same thing.  Were you shown any underlying
16  data even when your counsel went through this to
17  support that?
18      A.   No.
19      Q.   And are you relying on that testimony to
20  be a mathematically-proven fact?
21      A.   I'm relying on that testimony to be true
22  based on the people that are revealing the information.
23      Q.   Did you review the remainder of the
24  testimony to get the surrounding context for what was

Page 252

1  being discussed here with Mr. Patterson?
2      A.   I did look at some of the beginning and
3  the end, yes.
4      Q.   Did you review all this testimony?
5      A.   I did not.
6      Q.   You said that you previously turned down
7  engagements to be an expert.  Do you recall that?
8      A.   Yes.
9      Q.   How many times?
10      A.   Handful.
11      Q.   Do you have any better information than
12  that?
13      A.   Less than maybe five.  I mean, I talked to
14  attorneys -- I mean, you're asking.  It's a crazy
15  question.  They call, they say do you know anything
16  about this we say yes, you get a little more
17  information, you say yeah, I'm not ready to go there
18  yet.
19      Q.   You say it's a crazy question.  It's a
20  question you were just asked by your counsel.
21      A.   Right.  And my answer -- he asked if I've
22  ever turned any down and I said yes and you want to
23  know how many.
24      Q.   Right.

Page 253

1      A.   And my question -- my response to you is
2  it's hard for me to quantify because sometimes it's
3  just a question.  They will call, they say can you help
4  us do X, Y, and Z, and I evaluate the position that
5  they want to take and I decide yes or no, I want to be
6  involved.
7      Q.   Has a company ever given you their
8  internal data and documents and then you ultimately
9  conclude that you can't help them?
10      A.   No, I've never got even that close.
11      Q.   Right.  So you're talking about turning
12  down an engagement sort of with the first phone call
13  and they say can you help us with X, Y, and Z and you
14  say no; right?
15      A.   There have been some that have been after
16  panel interviews and -- where we're getting deeper into
17  the substance of the case.
18      Q.   During those panel interviews, were you
19  ever shown any deposition testimony or internal
20  documents?
21      A.   No.
22      Q.   You talked about DEA inspections.  Have
23  you ever participated in a DEA inspection?
24      A.   No.

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| Page 254 | Page 256 |

Page 254

1 Q. Ever been present for a DEA inspection?

2 A. No.

3 Q. And as to the Barberton pharmacy, you

4 talked about that quite a bit. Did you analyze what

5 percentage of prescriptions came from the two medical

6 facilities you listed there in your report?

7 A. No, that information is hard to get to.

8 Q. Did you try to get it?

9 A. We -- I think we discussed it at one

10 point, but it's too hard to get to.

11 Q. Did you determine it was too hard to get

12 to?

13 A. No, it just -- it was based on my

14 knowledge of the industry and how the reporting of

15 these -- of prescription information is we determined

16 that we didn't -- we weren't going to need that

17 information and it wasn't necessarily going to bolster

18 my opinion anyway.

19 Q. But your opinion is that being close in

20 proximity to these facilities matters; right?

21 A. That's correct.

22 Q. It only matters if there's actually a

23 significant number of prescriptions coming from the

24 facilities; right?

Page 255

1 A. Yeah, but based on my experience and my

2 work both as a pharmacist and as an executive, I can

3 make the conclusion because that is normal trends that

4 would also occur at this particular location.

5 Q. But you're assuming that to be true in

6 this case as to Barberton; right?

7 A. I am making that assumption, yes.

8 MR. BOGLE: Okay. I don't have anything

9 further.

10 EXAMINATION

11 BY MR. BARNES:

12 Q. Just one follow-up. This Exhibit C.

13 Have you listed in this Exhibit C all of

14 the documents that are specific to this engagement that

15 you are relying upon to form your opinions?

16 THE WITNESS: Yes.

17 MR. BARNES: Nothing further.

18 THE VIDEOGRAPHER: Okay. We are going off

19 the record at 4:29 PM.

20

21 [SIGNATURE RESERVED.]

22

23

24

Page 256

1 C E R T I F I C A T E

2

3 I, JOHN ARNDT, a Certified Shorthand

4 Reporter and Certified Court Reporter, do hereby

5 certify that prior to the commencement of the

6 examination, SANDRA KINSEY was sworn by me to testify

7 the truth, the whole truth and nothing but the truth.

8 I DO FURTHER CERTIFY that the foregoing is a

9 true and accurate transcript of the proceedings as

10 taken stenographically by and before me at the time,

11 place and on the date hereinbefore set forth.

12 I DO FURTHER CERTIFY that I am neither a

13 relative nor employee nor attorney nor counsel of any

14 of the parties to this action, and that I am neither a

15 relative nor employee of such attorney or counsel, and

16 that I am not financially interested in this action.

17

18

19 _____

20 JOHN ARNDT, CSR, CCR, RDR, CRR

21 CSR No. 084-004605

22 CCR No. 1186

23

24

Page 257

1

2 I, SANDRA KINSEY, the witness herein,

3 having read the foregoing testimony of the pages of

4 this deposition, do hereby certify it to be a true and

5 correct transcript, subject to the corrections, if any,

6 shown on the attached page.

7

8

9

10 _____

11 SANDRA KINSEY

12

13

14 Sworn and subscribed to before me,

15 This _____ day of _____, 201_.

16

17

18 _____

19 Notary Public

20

21

22

23

24

Page 258

1          DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21

22   SIGNATURE:_____DATE:_____

23          SANDRA KINSEY

24