```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                   -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                   -  -  -
            Tuesday, January 15, 2019
11                   -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                     -  -  -
14
             Videotaped deposition of
15   LINDA KITLINSKI, taken pursuant to
     notice, was held at Golkow Litigation
16   Services, One Liberty Place, 1650 Market
     Street, Suite 5150, Philadelphia,
17   Pennsylvania 19103, beginning at 9:05
     a.m., on the above date, before Amanda
18   Dee Maslynsky-Miller, a Certified
     Realtime Reporter.
19
                     -  -  -
20
21
22
23        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com
```

Page 2

```
 1  APPEARANCES:
 2
 3      SEEGER WEISS, LLP
        BY:  PARVIN K. AMINOLROAYA, ESQUIRE
 4      BY:  DAVID R BUCHANAN, ESQUIRE
          CHARLES BACHMANN, PARALEGAL
 5      77 Water Street
        8th Floor
 6      New York, New York 10005
        (212) 584-0700
 7      Paminolroaya@seegerweiss.com
        Dbuchanan@seegerweiss.com
 8      CBachmann@seegerweiss.com
        Representing the Plaintiffs
 9
10
11
        BRANSTETTER, STRANCH & JENNINGS, PLLC
12      BY:  JOE P. LENISKI JR., ESQUIRE
        223 Rosa L. Parks Avenue
13      Suite 200
        Nashville, Tennessee 37203
14      (877) 369-0267
        Joeyl@bsjfirm.com
15      Representing the Staubus Plaintiffs
16
17
18      ARNOLD & PORTER KAYE SCHOLER LLP
        BY:  JOSHUA M. DAVIS, ESQUIRE
19      BY:  JOHN CELLA, ESQUIRE
        601 Massachusetts Ave, NW
20      Washington, DC 20001
        (202) 942-5000
21      Joshua.davis@arnoldporter.com
        John.cella@arnoldporter.com
22      Representing the Defendant,
        Endo Pharmaceuticals, Endo Health,
23      and Par Pharmaceuticals
24
```

Page 3

```
 1  APPEARANCES:  (Continued)
 2
 3      PIETRAGALLO GORDON ALFANO BOSICK &
        RASPANTI, LLP
 4      BY:  ASHLEY KENNY, ESQUIRE
        1818 Market Street
 5      Suite 3402
        Philadelphia, Pennsylvania 19103
 6      (215) 320-6200
        Representing the Defendant,
 7      Cardinal Health, Inc.
 8
 9
10      JONES DAY
        BY:  TAYLOR A. GOODSPEED, ESQUIRE
11      555 California Street
        26th Floor
12      San Francisco, California 94104
        (415) 626-3939
13      Tgoodspeed@jonesday.com
        Representing the Defendant,
14      Walmart
15
16  VIA TELEPHONE/LIVESTREAM:
17
18      REED SMITH, LLP
        BY:  MOLLY Q. CAMPBELL, ESQUIRE
19      1301 K Street, N.W.
        Suite 1000 - East Tower
20      Washington, D.C., 20005
        (202) 414-9200
21      Mqcampbell@reedsmith.com
        Representing the Defendant,
22      AmerisourceBergen Drug Corporation
23
24
```

Page 4

```
 1  APPEARANCES:  (Continued)
 2
    VIA TELEPHONE/LIVESTREAM:
 3
 4
 5      FOX ROTHSCHILD, LLP
        BY:  ADAM BUSLER, ESQUIRE
 6      1301 Atlantic Avenue
        Midtown Building, Suite 400
 7      Atlantic City New Jersey 08401
        (609) 348-4515
 8      Abusler@foxrothschild.com
        Representing the Defendant,
 9      Validus Pharmaceuticals LLC
10
11
    ALSO PRESENT:
12  David Lane, Videographer
    Mike Kunys, Trial Technician
13  Jobina Jones-McDonnell, Endo Pharmaceuticals
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1              - - -
 2          I N D E X
 3              - - -
 4
    Testimony of: LINDA KITLINSKI
 5
 6  By Ms. Aminolroaya
    By Mr. Buchanan
 7  By Mr. Davis
 8
 9          - - -
10      E X H I B I T S
11
    NO.       DESCRIPTION          PAGE
12
13  Endo-Kitlinski
    Exhibit-1   ENDO-OPIOID_MDL-05967764-
14  774                56
15  Endo-Kitlinski
    Exhibit-2   ENDO-OPIOID_MDL-03258200-
16  202                68
17  Endo-Kitlinski
    Exhibit-3   ENDO-OPIOID_MDL-02344002,
18      With attachment        73
19  Endo-Kitlinski
    Exhibit-4   ENDO-OPIOID_MDL-06234663   77
20  Endo-Kitlinski
    Exhibit-5   ENDO-OPIOID_MDL-01139611,
21      With attachment        80
22  Endo-Kitlinski
    Exhibit-6   ENDO-OPIOID_MDL-04869680-
23  682                98
24
```

Page 6

E X H I B I T S

NO.        DESCRIPTION                    PAGE

Endo-Kitlinski
Exhibit-7   ENDO-OPIOID_MDL-02002513-
514, with attachment        104

Endo-Kitlinski
Exhibit-8   END00000923-989             114

Endo-Kitlinski
Exhibit-9   ENDO-CHI_LIT-00543668-673   125

Endo-Kitlinski
Exhibit-10   ENDO-OPIOID_MDL-03388209-
210, with attachment        133

Endo-Kitlinski
Exhibit-11   ENDO-OPIOID_MDL-02261843-
845                 147

Endo-Kitlinski
Exhibit-12   KP360-OHIOMDL-000605-626   160

Endo-Kitlinski
Exhibit-13   ENDO-OPIOID_MDL-02206602-
606                 162

Endo-Kitlinski
Exhibit-14   ARGOFF006513-515           170

Endo-Kitlinski
Exhibit-15   KP360-OHIOMDL_000050938-
1097                175

Endo-Kitlinski
Exhibit-16   ENDO-OPIOID_MDL-06233891-
909                 595

Endo-Kitlinski
Exhibit-17   MDL_KP360_000000002,
With attachment        184

Page 7

E X H I B I T S

NO.        DESCRIPTION                    PAGE

Endo-Kitlinski
Exhibit-18   END00152457-473            188

Endo-Kitlinski
Exhibit-19   No Bates
Endo Payment to NIPC.
2003-2012               192

Endo-Kitlinski
Exhibit-20   KP360_OHIOMDL_000003707   199

Endo-Kitlinski
Exhibit-21   No Bates
Demonstrative          199

Endo-Kitlinski
Exhibit-22   KP360_OHIOMDL_000003328-
329                 200

Endo-Kitlinski
Exhibit-23   KP360_OHIOMDL_00009569    210

Endo-Kitlinski
Exhibit-24   No Bates
The Effectiveness and Risks
Of Long-Term Opioid Treatment
Of Chronic Pain; Agency for
Healthcare Research and
Quality               223

Endo-Kitlinski
Exhibit-25   ENDO-OPIOID_MDL-01605952-
958                 235

Endo-Kitlinski
Exhibit-26   ENDO-OPIOID_MDL-02002702-
703, with attachment        238

Page 8

E X H I B I T S

NO.        DESCRIPTION                    PAGE

Endo-Kitlinski
Exhibit-27   KP360-OHIOMDL-000241-
244                 241

Endo-Kitlinski
Exhibit-28   ENDO-OPIOID_MDL-01928285-
286                 244

Endo-Kitlinski
Exhibit-29   ENDO-OPIOID_MDL-01656768-
777                 250

Endo-Kitlinski
Exhibit-30   END00154834-856            256

Endo-Kitlinski
Exhibit-31   No Bates
Maps; National Center for
Health Statistics        263

Endo-Kitlinski
Exhibit-32   END00661357-359            271

Endo-Kitlinski
Exhibit-33   ENDO-OR-CID-00754369
(Starting Bates, Compilation
Exhibit)              279

Endo-Kitlinski
Exhibit-34   END00735362
Clawed Back            284

Endo-Kitlinski
Exhibit-35   ENDO-OPIOID_MDL-06234029-
037                 301

Endo-Kitlinski
Exhibit-36   CHI_000435580-597         304

Page 9

E X H I B I T S

NO.        DESCRIPTION                    PAGE

Endo-Kitlinski
Exhibit-37   ENDO-OPIOID_MDL-
01652584-58628251-254      307

Endo-Kitlinski
Exhibit-38   JAN-MS-00925641-643
With attachment        316

Endo-Kitlinski
Exhibit-39   ENDO-OPIOID_MDL-01928251   324

Endo-Kitlinski
Exhibit-40   ENDO-OPIOID_MDL-05968029-
075                 332

Endo-Kitlinski
Exhibit-41   No Bates
American Pain Society;
2017 Elizabeth Narcessian
Award for Outstanding
Educational Achievements in
The Field of Pain        339

Endo-Kitlinski
Exhibit-42   PKY181215547-749           342

Endo-Kitlinski
Exhibit-43   END00051370-443            349

Endo-Kitlinski
Exhibit-44   No Bates
Demonstrative          359

Endo-Kitlinski
Exhibit-45   ENDO-CHI_LIT-00241435-436,
With attachment        366

Page 10

- - -

E X H I B I T S

- - -

NO.        DESCRIPTION              PAGE

Endo-Kitlinski
Exhibit-46  ENDO-OPIOID_MDL_DEPONENT-
          000015904-16398        379

Endo-Kitlinski
Exhibit-47  Hard drive              421

Endo-Kitlinski
Exhibit-48  ENDO-OPIOID_MDL-04908487-
          488, with attachment    426

Endo-Kitlinski
Exhibit-49  No Bates
          Amended Subpoena to Testify
          At a Deposition in a
          Civil Action            432

Endo-Kitlinski
Exhibit-50  ENDO-OPIOID_MDL-01769386-
          592                495

Endo-Kitlinski
Exhibit-51  ENDO-OPIOID_MDL-02343835,
          With attachment        594

Endo-Kitlinski
Exhibit-52  ENDO-OPIOID_MDL_DEPONENT
          000000184-189          617

Page 11

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
Page Line   Page Line   Page Line
284   11

Request for Production of Documents
Page Line   Page Line   Page Line
None

Stipulations
Page Line   Page Line   Page Line
12    1

Question Marked
Page Line   Page Line   Page Line
None

Page 12

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:  We're now on the record.  My name is David Lane, the videographer for Golkow Litigation Services.  Today's date is January 15th, 2019.  Our time is 9:05 a.m.

This deposition is taking place in Philadelphia, Pennsylvania, in the matter of National Prescription Opiate Litigation, MDL.  The deponent today is Linda Kitlinski.  Our counsel will be noted on the stenographic record.  Our court reporter today is Amanda Miller

Page 13

and will now swear in the witness.

- - -

LINDA KITLINSKI, after having been duly sworn, was examined and testified as follows:

- - -

VIDEO TECHNICIAN:  Please begin.

- - -

EXAMINATION

- - -

BY MS. AMINOLROAYA:

Q.   Good morning, Ms. Kitlinski.  We met a few moments ago off the record.  My name is Parvin Aminolroaya, and I represent some of the plaintiffs in the opioid litigation.

Would you please state your name for the record?

A.   Linda Ann Kitlinski.

Q.   And have you ever been deposed before, Ms. Kitlinski?

A.   No, I have not.

Q.   So I'm just going to go over

Page 14

1 a few ground rules. Your counsel may
2 have gone over them, but I want to make
3 sure we're on the same page.
4        If you don't understand a
5 question, please tell me. And I will be
6 asking a lot of questions throughout the
7 day, there may be times when I don't
8 succeed in asking a question that you
9 understand. Just let me know.
10 Otherwise, the record will reflect that
11 the question was understood.
12        I'll ask you to answer with
13 a verbal yes or no. Please don't nod or
14 shake your head. The court reporter
15 should be able to take down what we're
16 saying.
17        And in the course of normal
18 conversation, sometimes you can
19 anticipate what I'm saying so you may
20 know the answer before I even finish the
21 question. But for purposes of having a
22 clean record, please wait until I finish
23 my question before giving your answer.
24 And I'll remind you of that if it seems

Page 15

1 like we're talking over each other during
2 the deposition.
3        We can take a break whenever
4 you need, just let me know. The only
5 thing I would ask is that if there's a
6 question pending, you answer the
7 question.
8        Do you understand these
9 instructions?
10    A.   Yes, I do.
11    Q.   And do you understand that
12 you're under oath as if you were in a
13 court of law before Judge Polster in
14 Ohio?
15    A.   Yes, I do.
16    Q.   And if you don't know an
17 answer to a question or can't recall,
18 just let me know. But please don't
19 guess. However, we are entitled to your
20 best recollection.
21        Is there anything we should
22 know that would prevent you from
23 testifying truthfully and to the best of
24 your ability today?

Page 16

1    A.   No.
2        VIDEO TECHNICIAN: Going off
3 the record. 9:08 a.m.
4        - - -
5        (Whereupon, a brief recess
6 was taken.)
7        - - -
8        VIDEO TECHNICIAN: We're
9 back on record at 9:10 a.m.
10 BY MS. AMINOLROAYA:
11    Q.   We just took a short break
12 to handle a small technical issue. We're
13 back on the record.
14        Ms. Kitlinski, what did you
15 do to prepare for your testimony today?
16    A.   I read the subpoena
17 documents thoroughly. I went through my
18 files, gathered up the requisite
19 materials that were referenced in there,
20 provided those to counsel. Met with
21 counsel on three occasions for a few
22 hours. And I'm here today.
23    Q.   And when did you first
24 receive a subpoena?

Page 17

1    A.   I'm going to say it was in
2 October. That's a guess. It was prior
3 to the first week of November, I know
4 that, but I don't know the exact date.
5    Q.   And what did you do to
6 undertake the thorough search you just
7 described in response to the subpoena?
8    A.   Well, I went through my
9 personal -- first of all, the documents
10 that I had in my possession were
11 subsequent to my employment from Endo. I
12 had turned everything in, you know, when
13 I retired, or during subsequent -- I
14 mean, during the orders that they had in
15 place prior to that time.
16        So I went through my
17 materials. And I extracted anything that
18 had anything to do with opioids or the
19 other criteria that were listed in the
20 subpoena.
21        I did a key word search, and
22 I have on my -- on my computer the -- any
23 of the documents that -- as well as on my
24 laptop, on my thumb drive, I have one

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 thumb drive that I have used since
2 leaving Endo, and that's where I have
3 looked for those documents.
4     Q.    What search terms did you
5 use?
6     A.    Anything related to opioids,
7 you know -- they were listed in your
8 document there, opioids, oxymorphone,
9 Opana, REMS.
10     Q.    And where on your computer
11 did you search?
12     A.    I searched my desktop, and I
13 searched in my -- in my folders.  And I
14 searched the thumb drive that I use.  I
15 also searched in through my e-mails.  The
16 majority of my e-mails were, shall I say,
17 a combination of junk mail that you get
18 from, you know, people soliciting your
19 participation in things not related to
20 this case, you know, just regular,
21 everyday coupons and that type of thing.
22         The other e-mails in my
23 files were copied to the folks at the
24 REMS, now Syneos, previously Campbell

Page 19

1 Alliance/inVentiv.  And the conjoint
2 committee members who participate in the
3 REMS, again, they are also copied on the
4 Syneos/inVentiv documents since they're
5 in attendance at that meeting and take
6 minutes.
7     Q.    And when did you run the
8 search in your e-mail?
9     A.    Between the time I received
10 the subpoena and the time that I
11 prepared -- presented the documents to
12 counsel this past week.

24         So I pulled off anything

Page 20

1 that was not related to the subpoena and
2 this case, retained those family
3 documents.
4     Q.    So just to clarify, you
5 searched the thumb drive?
6     A.    Yes.
7     Q.    And you applied the search
8 terms that were identified in plaintiffs'
9 subpoena?
10     A.    Yes.
11     Q.    And you turned those
12 documents over to your counsel?
13     A.    Yes.
14     Q.    And turning to your
15 e-mails --
16     A.    Excuse me, just to clarify.
17     Q.    Thank you.
18     A.    I turned some paper
19 documents, which came from my files, over
20 to counsel.  And I turned the thumb drive
21 that did not have my family information
22 but had the information related to the --
23 to this case.
24     Q.    And what kinds of documents

Page 21

1 were on the thumb drive?
2     A.    Oh, they were things like
3 the minutes from the -- from the REMS
4 meetings, the agenda, the participants.
5 They would circulate the minutes for
6 comments to make sure that they reflected
7 accurately what people who participated
8 heard.
9         It contained the -- I
10 believe there was a copy of the
11 MedBiquitous REMS specs on there, which
12 was another element of the REMs.
13     Q.    I'm sorry, I think I missed
14 the word you said before "REMS."
15     A.    MedBiquitous.  It's the
16 Johns Hopkins organization that does the
17 metrics for the REMS.
18     Q.    Any other categories of
19 documents on the thumb drive?
20     A.    Those are -- that's the
21 majority of them.
22         And there may have been, for
23 example, like, if I was going to a
24 conference and, for REMS or the FDA,

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 let's say the FDA public meeting, I would
2 have printed out a copy at that -- you
3 know, at that time, of the agenda and any
4 attachments, and afterwards I might have
5 had a copy of it retained on the thumb
6 drive or the directions to the, you know,
7 meeting and things like that.
8    Q.   And you talked about running
9 the search on the thumb drive.
10       Can you give us a better
11 sense of when you ran the search?  You
12 said it was between October and this
13 week, and January, correct?
14       MR. DAVIS:  Objection to
15    form.
16       MS. AMINOLROAYA:  You can
17    answer.
18       MR. DAVIS:  You can go
19    ahead.
20 BY MS. AMINOLROAYA:
21    Q.   Unless your counsel
22 instructs you not to answer a question,
23 and that shouldn't occur very
24 frequently --

Page 23

1    A.   Sure.
2    Q.   -- you can answer the
3 questions.
4    A.   Sure.
5       Again, I focused on -- well,
6 I initially started with the paper files,
7 and I did that in the end of October and
8 finished it up this month.  Originally,
9 the subpoena said that the deposition
10 would be held in November, but because of
11 my dad's medical situation, I appreciated
12 the flexibility in being able to do it
13 this month instead.  So I had begun some
14 things and finished them up this month.
15       And the computer, you know,
16 looking through the documents on my -- in
17 my files on the thumb drive, that was in
18 January.
19    Q.   And did you provide any
20 documents to your counsel before January?
21    A.   No, I did not.
22    Q.   Documents that were on the
23 thumb drive or on your computer, were
24 those provided to counsel before January?

Page 24

1    A.   I provided all of the
2 documents to counsel in January.
3       I also provided the one
4 notebook that I had during that time
5 period after, you know, 2016 until the
6 present, until the end of this past year.
7 And I provided that notebook to counsel.
8    Q.   And -- thank you.
9       You mentioned your e-mails,
10 that you searched your e-mails as well
11 and you applied the search terms in
12 plaintiffs' subpoena to your e-mails.
13       What's your e-mail address?
14    ██  ██  ████████████████
15    ████████████████████████████
16    ██████
17    Q.   And how long have you
18 maintained this e-mail address?
19    A.   That's been my e-mail
20 address since I retired from Endo, so the
21 middle of May 2014.
22    ████  ██  ████████████████
23    ████████████████████████████████████
24 of 2014; is that right?

Page 25

1    ██  ██████████████████████
2    ██████████████████████████
3    ██  ████████████████████████
4    ██  ██████████████████████████████
5    ██  ██████████████████████████████
6    ██  ████████████████████████████████
7    ██  ████████████████████████
8    ██
9    Q.   Understood.  That happens.
10       And were there any other
11 ██████████████████████████████
12 ██████████████████████
13    A.   Not since leaving Endo.
14 Endo had my, you know, Endo e-mail
15 address.  But since leaving the company,
16 no.
17    Q.   And while you were at Endo,
18 were there any other personal e-mail
19 addresses you maintained?
20    A.   No.  I had just one e-mail
21 address, and that was my Endo address.
22    Q.   And you used that for all
23 communications?
24    A.   Yes, I did.

Page 26

1    Q.   Including personal
2  communications?
3    A.   I did.  I know it was
4  perhaps not the best practice, but it was
5  just a reality that our lives were so
6  inextricably linked with work, and I had
7  little personal e-mail communications.
8    Q.   And when did you start
9  consulting for Syneos?
10       MR. DAVIS:  Objection to
11       form.
12  BY MS. AMINOLROAYA:
13    Q.   I'm sorry.  Did you ever
14  start consulting for Syneos?
15       MR. DAVIS:  Objection to
16       form.
17       THE WITNESS:  When I retired
18       from Endo in 2014, it was put in
19       place a consulting agreement with,
20       at that time it was Campbell
21       Alliance, which was the project
22       management organization that now
23       is Syneos.  And they were the PMO
24       for the REMS program companies.

Page 27

1       I consulted with them on the
2       REMS beginning in, I believe it
3       was, the middle of 2016.
4  BY MS. AMINOLROAYA:
5    Q.   For the jury's benefit --
6    A.   I'm sorry, I just misspoke.
7       I left Endo in the middle of
8  2014.  And in October of that year, in
9  the fall, is when I began consulting.  It
10  took a few months to get a consulting
11  agreement in place.
12    Q.   And do you continue to
13  consult for Campbell Alliance?
14    A.   No.  I consulted with them
15  from -- like I said, from the fall of
16  that year through -- of 2014, that was
17  through the fall of 2016.



Page 28

1       Since that time, however, I
2  have continued to voluntarily consult
3  with the REMS working group for the
4  Conjoint Committee on Continuing
5  Education.  So I've participated in the
6  REMS meetings, whether they be the
7  conjoint committee meetings, the FDA
8  public meetings.
9    Q.   You mentioned earlier that
10  Campbell Alliance was the PMO for REMS.
11       What is PMO?
12    A.   Project management office.
13    Q.   What do they do for REMS?
14    A.   They execute all of the
15  project -- and I should -- I should state
16  that this is my understanding as of 2016
17  when I last worked with them in that
18  formal capacity.
19       They were responsible for
20  conducting the meetings, scheduling the
21  subteam meetings, taking minutes of the
22  meetings, retaining the records for
23  the -- for the REMS.  Any number of
24  operational aspects of the REMS itself,

Page 29

1  since there were a group of, you know,
2  25-plus companies at that time.
3       So they served as the
4  logistical and operational arm of the
5  RPC, the REMS program companies.
6    Q.   And during your consultancy
7  with Campbell Alliance, did you use your
8  ██████████████████████  for
9  communications related to this work?
10    A.   Yes.  Again, I used my Endo
11  address for communications with Campbell
12  Alliance, because they were -- I don't
13  recall when they came on board exactly,
14  it was early on in the REMS, so I was
15  communicating with them via my Endo
16  e-mail address until I retired from Endo.
17  And then during the consulting period, I
18  worked with the Gmail address.
19    Q.   And what types of
20  communications would be -- would you
21  typically send from your Gmail address
22  related to your consultancy for Campbell
23  Alliance?
24    A.   So, again, it was what we've

Page 30

1  talked about before. The fact that, you
2  know, we had a weekly -- for example, a
3  weekly CE -- CE is continuing
4  education -- subteam meeting, there would
5  be an agenda for that.
6          I had a co-chair at times,
7  and so we would put together an agenda,
8  send it out to Campbell. They would
9  distribute it to the other members of the
10 team. They would take notes on the --
11 during the call.
12         We were -- frequently
13 prepared, I'll call them PowerPoint
14 presentations so that the folks on the
15 phone, since we were all, you know,
16 meeting remotely, could follow along on
17 documents. Those -- those PowerPoint
18 slides were retained by Campbell. They
19 retained copies.
20         Once a year, we would have a
21 call for grant proposals for education
22 related to the REMS, and the documents
23 that were utilized during that grant
24 application process, the call for

Page 31

1  proposals, the scoring cards that were
2  used to make sure that the applications
3  met the CE criteria and the FDA REMS
4  criteria. The results of the grant
5  review, you know, which applications were
6  of the best quality. Campbell would put
7  those on to an Excel spreadsheet so that,
8  you know, we could look at them across
9  the total of what was -- what was
10 received.
11         They would -- when we would
12 get invited, for example, to speak at the
13 FDA public meeting on REMS, we would put
14 together a slide deck that had to be
15 approved, because it was for external
16 use, by the members of the RPC.
17         Campbell would share those
18 slides during the Wednesday weekly
19 conference call that all the companies
20 participated in and -- so that they would
21 be aware of what was being said and could
22 approve what was being said outside of
23 the organization.
24         And that's the -- I mean,

Page 32

1  that's the type of documents that -- and
2  that's the focus of those documents.
3      Q.   Did you ever communicate
4  with individuals outside of Campbell,
5  during this time, through your e-mail?
6      A.   Yes. The continuing
7  education subteam members. So, for
8  example, at times Marcia Stanton or Bob
9  Kristofko were my co-chairs, and we
10 would, you know, put together an agenda
11 or suggest items for the agenda. Or if
12 there was an issue that was brought to
13 our attention from the CE community that
14 we had to put on the larger agenda for
15 RPC, we would, you know, communicate that
16 amongst ourselves so that it could get on
17 to the agenda.
18     Q.   What is Marcia's last name?
19     A.   Stanton, S-T-A-N-T-O-N.
20     Q.   And where is Ms. Stanton?
21 What company did she work with?
22     A.   I believe she's retired now
23 herself. She was last at Pernix
24 Pharmaceuticals.

Page 33

1      Q.   While you were working at
2  Campbell, or while you were consulting
3  for Campbell, where did Ms. Stanton work?
4      A.   She was one of the first
5  folks involved with the REMS, so going
6  back to, let's say, 2009. And I don't
7  know the dates here, but she did work for
8  Pfizer at one point in time. She worked
9  for Purdue. She worked for Pernix. And
10 there was one other small company,
11 Horizon Pharmaceuticals, which was not an
12 opioid company.
13     Q.   Did you ever communicate
14 with individuals at ACCME?
15     A.   Yes. That was a large part
16 of -- I mentioned to you the Conjoint
17 Committee on Continuing Education, that
18 working group. I perhaps should have
19 explained what that was.
20         That is an organization of
21 approximately 25 to 26 national
22 accrediting bodies, including the ACCME,
23 and including the national professional
24 organizations that accredit education for

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 nurses, pharmacists, physicians,
2 dentists, et cetera.
3       So ACCME was one of the
4 accreditors with whom, you know, the CE
5 subteam at RPC communicated regularly.
6    Q.   And if you were
7 communicating with an individual at
8 ACCME, that would be -- you would send an
9 e-mail from ███████ to that individual
10 at ACCME?
11    A.   I would bet that there were
12 maybe one or two e-mails, again, from my
██ ██████████. Because all of our
14 communications with the ACCME, the vast
15 majority occurred during the context of
16 when we were developing the REMS or in a
17 meeting that Syneos and the RPC would
18 have been involved with.
19       So the -- to my knowledge,
20 there were two direct e-mails to ACCME,
21 and they were regarding participation in
22 a meeting that was coming up that we were
23 both supposed to be speaking at.  So it
24 was not -- and/or, you know, coordinating

Page 35

1 participation in a conference, like at
2 the FDA public meeting type things.
3    Q.   Did you ever communicate
4 with individuals from the Council of
5 Medical Specialty Societies?
6    A.   Yes.  Dr. Kahn, Norm Kahn
7 and Heidi Lapka are the -- Dr. Kahn is
8 the head of the Council of Medical
9 Professional Societies.  Heidi Lapka is
10 the executive director.  And they were
11 the organization that was the convener
12 for the Conjoint Committee on Continuing
13 Education that I referred to a little
14 while ago.
15       And to just put that in
16 perspective, the CMSS, the Council of
17 Medical Specialty Societies, represents
18 650, 750 clinicians from across the U.S.
19 in all medical specialties.
20    Q.   And when you would
21 communicate with individuals from CMSS,
22 you would do this using your █████
23 account?
24    A.   If it was --

Page 36

1       MR. DAVIS:  Object to form.
2       Go ahead.
3       THE WITNESS:  If it was
4 after 2016, yes.  I'm sorry, if
5 was -- yes, if it was after 2016.
6 And also on occasion, in between
7 that period of time when I was
8 retired from Endo but not yet a
9 consultant for Campbell.
10       Because I left Endo in the
11 middle of May of 2014, and then my
12 consulting agreement started in,
13 like, October or so of that year.
14 BY MS. AMINOLROAYA:
15    Q.   And after your -- the
16 conclusion of your consultancy with
17 Campbell Alliance in the fall of 2016,
18 you began to work for the REMS Working
19 Group?
20       MR. DAVIS:  Objection to
21 form.
22       THE WITNESS:  The REMS
23 Working Group was the -- was in
24 place the whole time.  So, in

Page 37

1 other words, I believe it was
2 maybe 2010, the conjoint committee
3 on CE, Dr. Kahn, the Council of
4 Medical Specialty Societies, they
5 began working -- they set up, you
6 know, a working group within the
7 CE community.  They were important
8 stakeholders to the REMS, so they
9 participated in all of the early,
10 you know, discussions with the
11 FDA, in terms of, you know, what
12 the REMS would look like, what the
13 blueprint should look like.
14       So that's what I'm referring
15 to when I say the working group,
16 not to be confused with the IWG,
17 which was the Industry Working
18 Group, you know, the name for the
19 pharma companies that preceded
20 them being called the RPC.
21 BY MS. AMINOLROAYA:
22    Q.   Thank you for that
23 clarification.
24    A.   Sure.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.   And since when have you
2  worked for the REMS Working Group?
3         MR. DAVIS:  Objection to
4  form.
5         THE WITNESS:  And just to be
6  clear, when you say "worked for,"
7  I receive no compensation for
8  them.  It's a voluntary project.
9  I'm very committed to making sure
10 the REMS is successful, and I feel
11 that, you know, I have a lot of
12 institutional knowledge to share
13 with the folks that are involved.
14        I've worked with the folks
15 at the FDA since the inception of
16 it, and the accreditation
17 community.  And so I like -- I
18 would like to see it through to
19 fruition and success.
20        So I do not receive any
21 compensation for that.  But, to
22 answer your question, I have been
23 working with them since they were
24 established.  Part of the time

Page 39

1    while I was with RPC at Endo, part
2    of the time while I was consulting
3    for Campbell Alliance.  And then
4    after my formal consulting for
5    Campbell Alliance ended, I
6    remained a voluntary -- a
7    voluntary member of the working
8    group.
9  BY MS. AMINOLROAYA:
10    Q.   Thank you.
11        And do you continue to do
12 that work today?
13    A.   Yes.
14    Q.   Did you review any
15 deposition transcripts in preparation for
16 your testimony today?
17    A.   I did not.
18    Q.   I believe you answered this
19 earlier, have you ever been deposed
20 before?
21    A.   No, I have not.
22    Q.   Tell us about your
23 education, Ms. Kitlinski.
24    A.   I grew up in ████

Page 40

1  Pennsylvania, a small town in
2  Northeastern PA, and graduated from Penn
3  State University in 1977, with a degree
4  in business administration.
5         I'm proud to say I
6  maintained my dean's list average that
7  whole time and attended there on a
8  scholarship.
9         I stayed in the local area
10 subsequent to my graduation for about
11 three years, due to family medical
12 situations.
13    Q.   And what did you do after
14 you graduated from Penn State?
15    A.   I worked, as I said, in the
16 local area there.  ████ was ill, so I
17 worked as a manager for a local retail
18 department store.
19    Q.   And how long did you do
20 that?
21    A.   For three years.
22    Q.   And what did you do after
23 that?
24    A.   I relocated to Harrisburg in

Page 41

1  1980.
2         During the time of helping
3  my mom to navigate through her condition,
4  I became really interested in
5  pharmaceuticals, and education in
6  particular.  My ████ was a
7  pharmacist, training at Duquesne.  She
8  stayed with us during the summers, and
9  she had a very positive influence on me.
10        And then again, seeing the
11 turnaround in my mom, once she was able
12 to be treated adequately, I was really --
13 my interest was piqued by
14 pharmaceuticals.
15        So where I lived, there were
16 no pharmaceutical companies nor
17 opportunities for really advancing in
18 that area.  So I relocated to Harrisburg,
19 which was close enough to be available
20 for ████ but yet a
21 little bit of an area for better
22 opportunities.
23        I worked first for Marriott
24 and then Kaiser Roth as I was

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 identifying, through an employment
2 agency, an opportunity to get into
3 pharmaceuticals.
4        I joined Schering
5 Pharmaceuticals ophthalmic division, and
6 that was in 1984.  And I stayed with
7 Schering until 1986, when I joined DuPont
8 Pharmaceuticals, which was the parent
9 company for Endo.
10       Q.   And what did you do at
11 Schering?
12       A.   At Schering, I was the
13 regional representative for their contact
14 lenses and ophthalmic solutions.
15       Q.   Is that a sales -- a sales
16 position?
17       A.   It was sales related, yes.
18       Q.   And what did you do as a
19 regional representative for Schering?
20       A.   I would be in touch with the
21 ophthalmologists and the optometrists in
22 the area.  Wesley-Jessen was the research
23 arm of the company that had developed the
24 first soft contact lenses.  And so my job

Page 43

1 was to explain the different types of
2 contact lenses and ophthalmic solutions
3 that were available to optometrists and
4 ophthalmologists.
5        Q.   And was your compensation
6 related -- did you receive --
7        A.   A salary.  It was a salaried
8 position.
9        Q.   Thank you.
10       Did you receive any
11 incentive compensation?
12       A.   You know, it was a really
13 long time ago, and I don't recall.
14       Q.   And then in 1986 you went to
15 DuPont; is that correct?
16       A.   Let's see.
17       Yes, 1986, I went to DuPont.
18 And the -- as I said, that was the parent
19 company for Endo.
20       While I was at DuPont, I
21 served in various capacities.  I was
22 there from '86 until '97.  And so I
23 served in the capacity as a regional
24 trainer.  I served in the capacity as a

Page 44

1 clinical liaison.  Over the course of the
2 years they called them different things,
3 clinical liaisons, medical science
4 liaisons, basically, field-based medical
5 people.
6        I served as a senior
7 clinical liaison and then manager of the
8 clinical liaisons during my time there at
9 DuPont.
10       In 1980, DuPont entered into
11 a joint venture with Merck
12 Pharmaceuticals.  And so the company name
13 changed from DuPont Pharma to DuPont
14 Merck Pharmaceuticals.
15       And at DuPont Merck, my
16 responsibilities were an associate
17 director -- in an associate director
18 capacity there.
19       Q.   And going back to your role
20 as a regional trainer at DuPont, what
21 were your responsibilities there?
22       A.   We did the disease state
23 training for the sales representatives.
24       So when DuPont hired

Page 45

1 representatives, they would be -- you
2 know, you would go through an orientation
3 period when they needed to get up to
4 speed on the therapeutic area that they
5 would be working in.  And they always
6 tried to use medical folks from clinical
7 affairs to assist the sales training
8 folks.
9        Q.   And what type of disease
10 training were you teaching the sales
11 reps?
12       A.   It was -- I'm trying to
13 think of that period of time.
14       It was primarily pain
15 management, to the best of my
16 recollection.
17       Q.   And after you moved on to be
18 a clinical liaison field-based person,
19 what were your responsibilities in that
20 position?
21       A.   Sure.  And, again, for
22 clinical liaison, senior clinical liaison
23 and manager of the liaisons, it was a
24 progression through the department there.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  So we were responsible for
2  being the R&D side of the business's
3  contact with, for example, the national
4  professional organizations, with the
5  national patient advocacy organizations,
6  the therapeutic experts in that -- the
7  disease state, you know, pain management,
8  and interacting with those folks on a
9  day-to-day basis.
10  Q.  And which national
11  professional organizations did you
12  interact with during your time at DuPont?
13  A.  Well, of course, over the
14  years again, all of the pain
15  organizations, you know, the national
16  ones, the American Pain Society; the
17  American Academy of Pain Management; the
18  American Academy of Pain Medicine; the
19  Oncology Nursing Society; the American
20  College of Physicians, which is the
21  internal medicine group; the American
22  Academy of Family Physicians.
23  All of the -- pain is
24  ubiquitous to all of the professions and

Page 47

1  so, you know, all of the professional
2  organizations were involved in that area.
3  Q.  And which national patient
4  advocacy organizations did you interact
5  with during your time at DuPont?
6  A.  And I'm trying to think.
7  So, let's see.  DuPont was
8  through 19 -- I want to say -- I
9  shouldn't speculate.  But I believe the
10  national organizations at that time
11  included folks like the American Cancer
12  Society, the American Chronic Pain
13  Association, ACPA.  I believe that the
14  American Pain Foundation was established,
15  you know, some time between DuPont, my
16  DuPont responsibilities and Endo, and I
17  just don't recall the exact timing of
18  that, I'm sorry.
19  Q.  Did you begin to interact
20  with the American Pain Foundation when it
21  started as an organization?
22  MR. DAVIS:  Objection to
23  form.
24  THE WITNESS:  I

Page 48

1  interacted -- again, I'm going to,
2  you know, not state the year, just
3  because I really am not clear on
4  that.
5  But during the time between
6  DuPont and Endo, when the American
7  Pain Foundation -- and there was
8  actually another one, it was the
9  National Pain Foundation as well.
10  And so during that period of
11  time, I was one of the company's
12  R&D points of contact with those
13  organizations.  So I did interact
14  with them on a regular basis.
15  I just -- I'm sorry that I
16  can't be more clear on what exact
17  year that was.
18  BY MS. AMINOLROAYA:
19  Q.  Thank you.
20  A.  And so in -- you were asking
21  me about my time at DuPont, and I cut off
22  my -- my explanation there a little
23  prematurely.
24  So I was -- I was in my role

Page 49

1  at DuPont in the clinical liaison
2  capacity, in the senior clinical liaison
3  capacity until -- until I became the
4  associate director under the DuPont
5  Merck, when that became a joint venture.
6  At that point in time, they
7  expanded into some other therapeutic
8  areas; there was an HIV therapeutic area,
9  that was a major area of emphasis because
10  it was a pressing public health issue at
11  that time.  So I worked in that
12  therapeutic area and began to work with
13  those organizations.
14  And that -- I stayed in that
15  capacity until 1997, when a group of
16  senior management from DuPont Merck did a
17  managed buyout and formed Endo
18  Pharmaceuticals.
19  So those leaders, including
20  Carol Ammon, were the genesis of the
21  current-day Endo.  And their interest and
22  their commitment to pain management, a
23  lot of that stemmed back to Carol's
24  personal experience, which was as a

Page 50

1 scientist, a research scientist for
2 DuPont, and then having witnessed her mom
3 suffering prior to her death.
4          And so that was sort of the
5 basis of Endo's commitment to pain
6 management, going back to 1997.
7     Q.   You also mentioned that you
8 worked with therapeutic experts during
9 your time at DuPont.
10          Who are some of those
11 experts?
12     A.   They would be the same folks
13 who are the therapeutic experts in the
14 acute and chronic pain world at that
15 time.  So people like Kathy Foley,
16 Richard Payne, Russ Portnoy, Mack
17 Gallagher, Bob Jamison up at Brigham.
18 Scott Fishman in California.  Howard
19 Fields and Michael Robothom.
20     Q.   How about Dr. Fine?
21     A.   Perry Fine, yes.
22     Q.   Dr. Argoff?
23     A.   Charles Argoff, yes.
24          Again, there's a nice number

Page 51

1 of national therapeutic experts there.
2 So I was doing my best to recall them
3 offhand.
4     Q.   And during this time, did
5 you obtain any additional degrees?
6     A.   No, I did not.  I took
7 additional coursework, but I have -- I
8 still have my goal of, when I really
9 retire, of getting an advanced degree.
10 But right now, family situations are
11 dominating, so --
12     Q.   Thank you.
13          Now, you started at Endo in
14 1997; is that right?
15     A.   I -- actually, the -- Endo,
16 the company, was formed in 1997, right
17 around Thanksgiving.  And I started
18 January of 1998.  So about two months
19 after the company's inception.
20          And it was a very -- a very
21 small organization at that time.  I
22 think -- I forget, I was employee number
23 40, or something like that.
24          And my role there at that

Page 52

1 time was twofold.  One, to establish Endo
2 in the pain management field, because
3 prior to that time, again, everyone knew
4 Dupont or DuPont Merck.  And so Endo was
5 now a freestanding entity.
6          And then also to develop and
7 support education and resources in the
8 pain management area.
9     Q.   And what was your role when
10 you started at Endo?
11     A.   I was -- I can't recall if I
12 still had my associate director title,
13 because I had just left DuPont, or if I
14 got a director's position, you know, in
15 taking the new responsibilities.
16     Q.   Fair.
17     A.   And then over the duration
18 of my time at Endo, from 1998 until
19 retirement in 2014, I served in the, I'll
20 call it the medical affairs/clinical
21 affairs/clinical development and
22 education department, because the name,
23 you know, changed as different vice
24 presidents came in to the organization

Page 53

1 and as the organization realigned a bit.
2          But I was a -- first a
3 director, and then a senior director for
4 them.  And my responsibilities there
5 were, at that time, threefold.
6          First of all, I was
7 responsible for building and managing a
8 team of medical science liaisons.  We
9 call them clinical liaisons, but
10 nonetheless, MSLs, basically.  That was
11 one responsibility.
12          Secondly, I, again, had the
13 responsibilities as the R&D primary point
14 of contact with the national professional
15 organizations and the national patient
16 advocacy groups.
17          And then, thirdly, I oversaw
18 the independent continuing education for
19 the company.  So by that point in time,
20 my emphasis was not just education, per
21 se, you know, broadly, but independent
22 education and assuring that all of the
23 education that we did was compliant with
24 the regulatory guidelines that FDA and

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  the CE community and OIG had established.
2  And part of that -- part of
3  that independent CE was the educational
4  work that I oversaw for the Endo RiskMAP,
5  which was the predecessor for the REMS.
6  And then once the ERLA
7  opioid REMS was issued, I was -- oversaw
8  the educational aspects, the independent
9  educational aspects of the REMS for Endo.
10  Q.    And were you responsible for
11  any particular drugs during your time at
12  Endo?
13  A.    Across the board; whatever
14  our therapeutic areas were, the -- so if
15  it was, for example, neuropathic pain, if
16  it was extended-release opioids,
17  immediate-release opioids that would be
18  used more for acute pain or breakthrough
19  pain, topical analgesics that were used
20  for osteoarthritis or for neuropathic
21  pain.
22  So the full scope of our
23  therapeutic areas.  Although, in reality,
24  because of the REMS responsibilities, the

Page 55

1  last few years prior to leaving, the
2  emphasis was on the, you know,
3  appropriate pain management and
4  mitigation of risks associated with
5  opioid analgesics.
6  Q.    And which extended-release
7  opioids were you responsible for during
8  your time at Endo?
9  MR. DAVIS:  Objection to
10  form.
11  THE WITNESS:  Could you
12  clarify what you mean "responsible
13  for"?  Because, again, I just
14  mentioned that all of the whole
15  area of opioid analgesics, you
16  know, that therapeutic area was my
17  responsibility for independent
18  education.
19  So I know that Endo had a
20  number of -- you know, they had
21  branded opioid analgesics, such as
22  Opana and Opana ER.  They also had
23  a generic product line.
24  And to be honest, that

Page 56

1  changed quite a number of times.
2  So, you know, they might have had
3  extended-release morphine or they
4  might have had a hydrocodone
5  compound, et cetera.
6  But, basically speaking, I
7  was responsible for the
8  therapeutic -- education in that
9  therapeutic area.
10  - - -
11  (Whereupon, Endo-Kitlinski
12  Exhibit-1,
13  ENDO-OPIOID_MDL-05967764-774, was
14  marked for identification.)
15  - - -
16  BY MS. AMINOLROAYA:
17  Q.    I'm handing you what's been
18  marked as Exhibit-1.  This is a 1998
19  mid-year update on goals and objectives,
20  Linda A. Kitlinski.
21  Was it typical for you to
22  compose a mid-year update on goals and
23  objectives while you were at Endo?
24  MR. DAVIS:  Objection to

Page 57

1  form.
2  Parvin, can we just get the
3  Bates number on the record here,
4  please?
5  MS. AMINOLROAYA:  Yes, I'm
6  sorry.  This is Exhibit-1.  It's
7  E1250.  Bates Number
8  ENDO-OPIOID_MDL-05967764.
9  THE WITNESS:  If I can just
10  have a minute to take a look
11  through this?
12  MS. AMINOLROAYA:  Sure.
13  THE WITNESS:  Thank you.
14  BY MS. AMINOLROAYA:
15  Q.    Ms. Kitlinski, you're
16  welcome to review the document, but I can
17  tell you I'm only going to ask about a
18  few lines on the page.
19  A.    Okay.  I'm sorry.  Thank
20  you.  I just want to be thoroughly
21  prepared.  I didn't mean to take that
22  long.  If you could repeat your question,
23  please.
24  Q.    Sure.  And you're welcome to

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 look at any part of the document.
2 I'd like to turn your
3 attention to the top of Page 1, which
4 under, Financial performance, says,
5 Achieve or exceed the company's financial
6 goals for 1998 with regards to revenue,
7 variable contribution and cash EBITDA of
8 $43 million.
9 And then the first bullet --
10 I believe there's a bullet, yes -- that
11 says, Partner with sales and marketing to
12 identify, prioritize and capitalize on
13 educational opportunities which drive
14 attainment of sales quotas, while
15 optimizing resource utilization.
16 Did I read that correctly?
17 A. You did, yes.
18 Q. And does this refresh your
19 recollection as to your responsibilities
20 at the company in 1998?
21 A. It does.
22 And, again, as I mentioned
23 early on when I was just talking about
24 the history, the company was -- in its

Page 59

1 early days, there was a very lean
2 organization. The -- as I was reading
3 through here, you can see that there were
4 only two or three people who were active
5 in that -- at that time, besides myself
6 in education.
7 And I want to be very clear
8 about differentiating -- this is not
9 independent education, like CE, for
10 example, which is what my focus became as
11 the company evolved. This was, you know,
12 more an education about appropriate
13 assessment of pain, using a pain rating
14 scale, talking to your physician about
15 pain, providing some resources to -- you
16 know, as educational resources, that type
17 of thing.
18 Q. Let's look at Page 2, Roman
19 Numeral II. It states, Worked with sales
20 and marketing teams to successfully
21 execute the launch/relaunch of Percolone
22 symmetrical tablets, Hycocets and the
23 Perco variants.
24 Did I read that correctly?

Page 60

1 A. Yes.
2 Q. And what is Percolone?
3 A. Percolone is single-entity
4 Oxycodone. So Percocet was a combination
5 of Oxycodone and acetaminophen. And this
6 was the single entity.
7 At that time, there was a
8 lot of concern in the medical community
9 about the potential toxic effects of
10 acetaminophen, particularly because it
11 was contained not only in prescription
12 medications but in a lot of
13 over-the-counter drugs, that patients
14 inadvertently could take, you know,
15 Tylenol and/or cough/cold preparation
16 that had acetaminophen in it, and,
17 without being aware of it, get to doses
18 that could convey liver toxicity.
19 So the company developed a
20 single-entity product that had the opioid
21 for pain relief without the risk of the
22 liver toxicity.
23 Q. What are Perco variants?
24 A. You know, Perco was

Page 61

1 Percocet. Variants, I don't honestly
2 recall, and I don't want to guess.
3 Q. Is this a reference to the
4 different tablet strengths of Percocet
5 that Endo launched shortly after --
6 MR. DAVIS: Objection.
7 BY MS. AMINOLROAYA:
8 Q. -- you came to the company?
9 MR. DAVIS: Objection to the
10 form.
11 THE WITNESS: It may well
12 be. I truly -- I know what Perco
13 is. But that term "variants" is
14 just not sticking with me, I'm
15 sorry. That was, you know, 21
16 years ago.
17 BY MS. AMINOLROAYA:
18 Q. Did the company launch
19 additional Percocet strengths after the
20 commencement of this new Endo company?
21 MR. DAVIS: Objection to
22 form.
23 THE WITNESS: I know that
24 over the course of the years there

Page 62

1 were different strengths of
2 Percocet. But I don't recall the
3 details of when they were launched
4 or, you know, what was -- whether
5 that occurred while they were Endo
6 or while they were still, you
7 know, part of DuPont.
8 BY MS. AMINOLROAYA:
9     Q.   The first bullet here
10 states, Drive Percolone's market share
11 among single-entity Oxycodones through
12 contacts with the pain community and
13 discussions at national/regional
14 conventions.
15         In parenthesis it says,
16 Second quarter 1998.
17         Does this refresh your
18 recollection as to your responsibilities
19 at the company in 1998?
20     A.   At that time, yes.
21         And as I -- you know, as I
22 said earlier, part of my
23 responsibility -- well, part of -- to be
24 frank, part of everyone's responsibility

Page 63

1 at a startup company like that is to
2 drive revenues so that the company exists
3 and can grow.
4         And so part of my
5 responsibility, until the R&D
6 organization was formed, because, at that
7 time, there was no R&D organization, was
8 to generate awareness of Endo in the pain
9 therapeutic area and to make clinicians
10 aware of the line of pain products that
11 Endo manufactured.
12         And I'll just say that I
13 look at this language now about driving
14 sales and market share, and it sort of --
15 it is absolutely not consistent with
16 what, you know, my role evolved to over
17 the course of the years with the company.
18         But at the time I wrote
19 these objectives, I had just joined the
20 organization. And I was mirroring the
21 language of the people in the -- you
22 know, I was only sort of R&D -- soon to
23 be R&D person in this group, so I was
24 modeling my objectives, you know, as a

Page 64

1 newcomer, after what the organization's
2 objectives were at that time.
3         MS. AMINOLROAYA:  Move to
4     strike.
5 BY MS. AMINOLROAYA:
6     Q.   Turn to Page 3, please.
7         Roman Numeral III states,
8 Maximize return on current product lines
9 and prepare for future products.
10         The first bullet there
11 states, Accelerate the expansion of
12 Endo's branded pain management market
13 through focused educational and Phase IV
14 initiatives. Assure integrated
15 strategy/programs (second through fourth
16 quarter 1998).
17         Did I read that correctly?
18     A.   Yes.
19     Q.   Does this refresh your
20 recollection as to your responsibility
21 for accelerating the expansion of Endo's
22 branded pain management products?
23         MR. DAVIS:  Objection to
24     form.

Page 65

1         THE WITNESS:  Yes.  And,
2     again, as I said, part of my
3     responsibilities at that time was
4     to make the clinicians aware of
5     what Endo's analgesic offerings
6     were and to, you know, support
7     education relevant to that.
8 BY MS. AMINOLROAYA:
9     Q.   And under the first hyphen
10 under the bullet, it says, Have secured
11 placement of strategically focused
12 educational programs at the following
13 national/regional conferences:  American
14 Pain Society.
15         Is that one of the ways that
16 you accelerated the expansion of Endo's
17 branded pain management?
18         MR. DAVIS:  Objection to
19     form.
20         THE WITNESS:  One of the
21     ways that we familiarized the pain
22     community with Endo as a -- again,
23     a newcomer to this therapeutic
24     area, was to assure that there was

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  education that was appropriate for
2  these national meetings.
3       Some of them were product
4  theater-type things.  Some of them
5  might have been just supporting --
6  you know, a sponsorship for the
7  conference in general.  And just,
8  basically, making sure that folks
9  had pain as a therapeutic area on
10  their radar screen for education
11  and identifying what the unmet
12  needs were there.
13  BY MS. AMINOLROAYA:
14       Q.   To be clear, the bullet here
15  states, Accelerate expansion of Endo's
16  branded pain management market, correct?
17       A.   Uh-huh.
18       Q.   And what is branded pain
19  management?
20       A.   At the time, it was
21  Percocet, Percolone.  There was something
22  else on that previous page we just looked
23  at.  Oh, and Hycocet, which was a
24  hydrocodone/acetaminophen variation.

Page 67

1       MR. DAVIS:  Parvin, it's
2  been about an hour.  I don't know
3  if you want to go into that one or
4  take a break now.  I don't know
5  how much you have.
6       MS. AMINOLROAYA:  No, that's
7  fine.  Let's take a break.
8       VIDEO TECHNICIAN:  Going off
9  the record.  The time is 10:07
10  a.m.
11       - - -
12       (Whereupon, a brief recess
13  was taken.)
14       - - -
15       VIDEO TECHNICIAN:  We are
16  back on the record.  The time is
17  10:20 a.m.
18  BY MS. AMINOLROAYA:
19       Q.   Welcome back, Ms. Kitlinski.
20  We just took a short break.  We're back
21  on the record.
22       I'm going to hand you what's
23  being marked as Exhibit-2.
24       - - -

Page 68

1       (Whereupon, Endo-Kitlinski
2  Exhibit-2,
3  ENDO-OPIOID_MDL-03258200-202, was
4  marked for identification.)
5       - - -
6       MS. AMINOLROAYA:  Bates
7  number ENDO-OPIOID_MDL-03258200.
8  And E1251.
9       THE WITNESS:  Thank you.
10  BY MS. AMINOLROAYA:
11       Q.   This is your clinical
12  development and education, 1999
13  objectives, correct?
14       A.   Yes.
15       Q.   And if you take a look at
16  the document, I'm only going to ask you
17  about two sections.
18       Ms. Kitlinski, on Page 1 of
19  the document, under financial --
20       MR. DAVIS:  Are you through
21  looking at it, Linda?
22       THE WITNESS:  May I have
23  just one more second?  I have one
24  more section to take.

Page 69

1       MS. AMINOLROAYA:  Sure.  I
2  can tell you I'm not going to ask
3  you about Section 6, if that's
4  what you're looking at.
5       THE WITNESS:  That's what I
6  was looking at.
7  BY MS. AMINOLROAYA:
8       Q.   Under, Financial
9  performance, Roman Numeral I, it's the
10  second bullet there under your 1999
11  objectives, Partner with sales and
12  marketing to identify, prioritize and
13  capitalize on educational opportunities
14  which drive attainment of sales quotas
15  while optimizing source utilization.
16       A.   Yes.
17       Q.   Is that the second bullet in
18  your 1999 objectives?
19       A.   Yes, it is.
20       Q.   And moving on to Roman
21  Numeral II.
22       Is Roman Numeral II in your
23  1999 objectives for clinical development
24  and education, Work with sales and

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 marketing teams to successfully launch
2 Zydone, Percocet 2.5 milligrams, Percocet
3 5 milligram blue, Percocet 7.5 milligram,
4 Percocet 10 milligram, and the Lidocaine
5 patch?
6      A.   Yes.
7           And then you can see under
8 that the types of initiatives that
9 supported that overall objective.
10     Q.   Is one of those initiatives
11 supporting launches of Endo's new
12 products through a combination of
13 premarketing initiatives, educational
14 programs and Phase IV study placement
15 during the first or fourth quarters of
16 1999?
17     A.   Yes.
18     Q.   And is another initiative,
19 it's Bullet Number 6, under the first
20 bullet, Develop and/or expand
21 relationships with national professional
22 organizations related to newly launched
23 products, e.g., VZV, APS, IASP, et
24 cetera?

Page 71

1      A.   Yes.
2      Q.   And is APS a reference to
3 the American Pain Society?
4      A.   That's correct.
5      Q.   And is the next initiative,
6 Utilize strategic educational program
7 placement and one-on-one discussions with
8 the pain community at national/regional
9 conferences to increase awareness of
10 Endo's newly launched products?
11     A.   Yes.
12     Q.   Turn with me to Page 2,
13 please.
14          And Roman Numeral III of
15 your 1999 objectives at Endo, is it,
16 Maximize corporate return on corporate
17 product lines -- excuse me -- on current
18 product lines and seek/support new
19 product initiatives?
20     A.   Yes.
21     Q.   And was one of the
22 initiatives to support this objective,
23 Continue to expand the pain community's
24 familiarity with Endo's commitment to

Page 72

1 pain management market through focused
2 educational initiatives and support of
3 strategic professional organizations?
4      A.   Yes.
5      Q.   Moving to Page 3, under
6 Roman Numeral V.
7           Is Roman Numeral V of your
8 1999 objectives at Endo, Enhance Endo's
9 image by emphasizing our commitment to
10 pain management with the pain community,
11 professional organizations, physicians
12 and pharmacists?
13     A.   Yes.
14     Q.   And is Number 3 under that
15 objective -- or is the third initiative
16 under that objective, Working with
17 marketing team, marketing/PR agencies and
18 professional organizations to promote our
19 corporate pain leadership role?
20     A.   Yes.
21     Q.   And is the fourth initiative
22 in support of this objective, Collaborate
23 with sales and marketing to increase
24 visibility and sponsored events at

Page 73

1 appropriate conventions and conferences?
2      A.   Yes.
3      Q.   You can set this document
4 aside.
5           Ms. Kitlinski, I'm handing
6 you what's been marked as Exhibit-3.
7 ENDO-Opioid_MDL 02344002 and E256.
8           - - -
9           (Whereupon, Endo-Kitlinski
10          Exhibit-3,
11          ENDO-OPIOID_MDL-02344002, with
12          attachment, was marked for
13          identification.)
14          - - -
15 BY MS. AMINOLROAYA:
16     Q.   And this document was
17 produced in native format, so that's the
18 cover sheet you're seeing.
19          This is the CD&E, that's
20 clinical development and education -- the
21 department you were director of in 2000?
22     A.   Yes.
23     Q.   -- CD&E:  The critical
24 connection for success in 2000 and

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 beyond.
2          Page 6 states, 2000:  CD&E
3 objectives, correct?
4      A.   May I just have a few
5 moments to look through this, please?
6      Q.   Yes.
7      A.   Thank you.
8      Q.   Ms. Kitlinski, just to help
9 us move along, I can tell you the pages
10 we're going to look at together --
11      A.   All right.  Thank you.
12      Q.   -- if that's helpful.
13          We're going to look at Pages
14 6, 11 and 13.
15      A.   All right.
16          When you say "6," you're
17 referencing this number right up here?
18      Q.   Yes, the E number.
19      A.   Okay.  6, 11 and 13.
20          Okay.
21      Q.   Turning to Page 6, was one
22 of the 2000 objectives for CD&E to,
23 Attain and exceed financial objectives
24 for promoted products?

Page 75

1      A.   Yes.  It was everyone's in
2 the company's objective.
3      Q.   And your promoted products
4 in 2000 included Percocet?
5      A.   All of the company's
6 products were -- branded products were
7 promoted at that time.
8      Q.   And was another objective in
9 2000 of CD&E to, Expand usage of current
10 products by developing and leveraging
11 current strategic relationships -- excuse
12 me -- expand usage of current products by
13 developing and leveraging strategic
14 relationships and alliances?
15      A.   Yes.
16      Q.   Turning to Page 13, were
17 strategies of clinical development and
18 education, Leveraging strategic alliances
19 and relationships to expand utilization
20 of current product line?
21      A.   Yes.
22      Q.   Expand awareness and usage
23 of Percos and Zydone through acute pain
24 initiatives?

Page 76

1          MR. DAVIS:  Objection to
2      form.
3          THE WITNESS:  Yes.
4 BY MS. AMINOLROAYA:
5      Q.   And was another strategy of
6 CD&E, in the year 2000, to, Utilize new
7 JCAHO standards as impetus to establish
8 pain management as a priority with PCPs,
9 RPHs and neuros?
10      A.   Yes.
11      Q.   And what are PCPs?  What
12 does that stand for?
13      A.   Primary care providers,
14 physicians generally, sometimes nurse
15 practitioners and PAs.
16      Q.   You can set that aside.
17          Actually, I'm sorry, if you
18 pull that back out again, E256.
19          MR. DAVIS:  Exhibit-3?
20          MS. AMINOLROAYA:  Exhibit-3,
21      yes.
22 BY MS. AMINOLROAYA:
23      Q.   And turn to Page 15.
24          Were other tactics of CD&E,

Page 77

1 in 2000, to, Establish Endo as a leader
2 in the field of pain management?
3          MR. DAVIS:  Objection to
4      form.
5          THE WITNESS:  Yes.
6 BY MS. AMINOLROAYA:
7      Q.   And are initiatives for this
8 objective listed beneath that?
9      A.   Yes.
10      Q.   And is APS guideline project
11 and implementation committee one of the
12 initiatives listed here as a way to
13 fulfill this objective?
14          MR. DAVIS:  Objection to
15      form.
16          THE WITNESS:  Yes.
17 BY MS. AMINOLROAYA:
18      Q.   And APS is a reference to
19 the American Pain Society?
20      A.   Correct.
21          - - -
22          (Whereupon, Endo-Kitlinski
23      Exhibit-4,
24      ENDO-OPIOID_MDL-06234663, was

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 marked for identification.)

2   - - -

3 BY MS. AMINOLROAYA:

4  Q. I'm handing you what's been

5 marked as Exhibit-4. It's

6 ENDO-OPOID_MDL_06234663. And it's E1265.

7  A. Excuse me, can we put this

8 one on the side?

9  Q. You can put it on the side

10 for now, yes. But keep it close by, we

11 may come back to it.

12  A. Sure.

13  Q. Is this a note from the

14 clinical development and education

15 department at Endo regarding PER Number

16 11018-American Pain Society?

17  A. Yes.

18  Q. And what is a PER?

19  A. A PER stands for

20 professional education request. It's

21 sort of the forum on which organizations

22 and institutions submit grants.

23  Q. And so is this related to

24 the submission -- or the -- was this a

Page 79

1 response to a grant request from the

2 American Pain Society?

3  A. Yes.

4  Q. And was Endo's response --

5 or, strike that.

6   Was the agreement that Endo

7 provided to APS here under the third

8 bullet, CD&E will sit on the founding

9 members' guideline committee and provide

10 input into topics for guideline

11 development, as well as suggestions of

12 clinicians for participation in the

13 guideline development process, methods of

14 dissemination/adoption, et cetera?

15  MR. DAVIS: Objection to

16 form.

17  THE WITNESS: Yes.

18 BY MS. AMINOLROAYA:

19  Q. You can answer.

20  And as a founding member of

21 the guideline committee, would Endo be

22 entitled to access/distribute copies of

23 the guidelines through CD&E?

24  MR. DAVIS: Objection to the

Page 80

1 form.

2  THE WITNESS: Yes.

3 BY MS. AMINOLROAYA:

4  Q. And in response to the

5 American Pain Society's proposal, did

6 Endo commit to provide $25,000 to the

7 guideline development process?

8  A. I don't recall that myself

9 at this moment, but that's what the memo

10 states. So that would be reflected.

11  Q. Thank you. You can set this

12 aside.

13  MS. AMINOLROAYA: I'm

14 handing you what's been marked as

15 ENDO-OPIOID_MDL -- I'm handing you

16 Exhibit-5, which has been marked

17 as ENDO-OPIOID_MDL-01139611 and

18 E244.

19   - - -

20  (Whereupon, Endo-Kitlinski

21 Exhibit-5,

22 ENDO-OPIOID_MDL-01139611, with

23 attachment, was marked for

24 identification.)

Page 81

1   - - -

2  THE WITNESS: Excuse me, is

3 there a date on this, to your

4 knowledge?

5 BY MS. AMINOLROAYA:

6  Q. There isn't a date on the

7 document, but I'll represent to you that

8 the document is from October of 2005.

9 The metadata for this document identifies

10 that -- the date as October 2005.

11  MR. DAVIS: Which date from

12 metadata? Date created? Last

13 edited?

14  MS. AMINOLROAYA: The doc

15 date field of the document

16 reflects that the date is October

17 2005.

18  MR. DAVIS: Thank you.

19  THE WITNESS: Excuse me, is

20 there a box of tissues nearby

21 anywhere?

22   - - -

23  (Whereupon, a discussion off

24 the record occurred.)

Page 82

1          - - -
2   BY MS. AMINOLROAYA:
3       Q.   And, Ms. Kitlinski, I know
4   there are a lot of pages in this
5   document.
6       A.   Sure.
7       Q.   To help us out here and to
8   help us move along, I can tell you I'm
9   only going to ask you questions about one
10  page, and that's Page 15, that's E244.15
11      And this is a 2005 document.
12  Again, you would agree with me, Ms.
13  Kitlinski, that by 2005, the CD&E
14  strategy to drive sales for Percocet had
15  worked?
16      MR. DAVIS:  Objection to
17      form.
18      THE WITNESS:  I'm sorry, I'm
19      not sure what you're referring to
20      here.
21  BY MS. AMINOLROAYA:
22      Q.   Sure.
23      You would agree with me that
24  by 2005, Endo acknowledged that the CD&E

Page 83

1   strategy to drive sales of Percocet had
2   worked?
3       MR. DAVIS:  Objection to
4       form.
5       THE WITNESS:  The Endo
6       strategy, by 2005, they had a
7       sales force.  And it was the
8       responsibility of the sales and
9       marketing organization to drive
10      the sales of Percocet.
11      I'm not -- I'm not sure
12      where the -- what the source of
13      this data is.  But I suspect --
14      well, I'm not sure the source of
15      this data.
16      But by 2005, it was the
17      sales representatives and the, you
18      know, commercial organization that
19      was driving the sales of Percocet.
20  BY MS. AMINOLROAYA:
21      Q.   Is this data --
22      MS. AMINOLROAYA:  Move to
23      strike.
24  BY MS. AMINOLROAYA:

Page 84

1       Q.   Is Endo describing its work
2   with -- or its sales of Percocet here
3   as -- or its role in the sale of Percocet
4   as the company that built Percocet, here
5   on Page 15?
6       MR. DAVIS:  Objection to
7       form.
8       THE WITNESS:  You know, I
9       don't -- this presentation looks
10      like it's from --
11  BY MS. AMINOLROAYA:
12      Q.   I'm asking about Page 15.
13      A.   No, I know that.  But it's
14  relevant as to whose presentation this
15  is.
16      Jeremy Goldberg was the
17  corporate development person up front,
18  but then I had seen someone else's name
19  prior to Page 15, and it was not CD&E or
20  me.
21      Q.   Ms. Kitlinski, my question
22  is, in 2005, did Endo describe itself as
23  the company that built Percocet?
24      MR. DAVIS:  Objection to

Page 85

1       form.
2       THE WITNESS:  I have no
3       recollection of having seen that
4       verbiage before.  It's here in
5       this slide from Mark Gossett, who
6       was the senior vice president of
7       the commercial business, but I
8       haven't seen that before.
9   BY MS. AMINOLROAYA:
10      Q.   And if you look at Page 15
11  with me, have Percocet prescriptions
12  increased between 1999 and 2001?
13      MR. DAVIS:  Objection to
14      form.
15      THE WITNESS:  Again, I'm not
16      familiar with the source of this
17      data.
18      And, you know, by that point
19      in time -- well, first of all,
20      even though our generic objective
21      as a company was to drive revenues
22      and sales of our product lines,
23      and each department within the
24      organization contributed to that

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 in an appropriate manner, we had a
2 firewall between --
3        MS. AMINOLROAYA: Move to
4 strike. You can do this with your
5 counsel, Ms. Kitlinski, on direct
6 examination.
7 BY MS. AMINOLROAYA:
8    Q.   My question is, in this 2005
9 document, did Endo describe itself as the
10 company that built Percocet?
11        MR. DAVIS: Objection to
12 form.
13        And I would appreciate it if
14 you let Ms. Kitlinski finish her
15 answers.
16        MS. AMINOLROAYA: I would
17 appreciate it if Ms. Kitlinski
18 would answer my questions. The
19 question is yes or no.
20        THE WITNESS: I'm sorry, I
21 was trying to -- but I'm not
22 familiar with this language or
23 this data. And I have never seen
24 this presentation before, so I

Page 87

1 don't know.
2 BY MS. AMINOLROAYA:
3    Q.   A few moments ago we looked
4 at documents that stated that the CD&E --
5 your objective as director of CD&E was to
6 drive sales of Percocet, correct?
7        MR. DAVIS: Objection to
8 form.
9        THE WITNESS: One of the
10 objectives of the CD&E department
11 at that time, which was in 1997
12 and 1998, was to contribute to
13 those aspects that we read off the
14 bullet points.
15        And this is -- this is a
16 document from 2005. So there were
17 other individuals who had the
18 primary responsibility, on the
19 commercial side of the business,
20 for doing so.
21 BY MS. AMINOLROAYA:
22    Q.   And if we look at the
23 document we were just looking at, 256,
24 Page 13, you would agree that a CD&E

Page 88

1 strategy, in the year 2000, was to expand
2 awareness and usage of Percos?
3        MR. DAVIS: I'm sorry, which
4 exhibit?
5        MS. AMINOLROAYA: 256.
6        MR. DAVIS: Is that
7 Exhibit-3?
8        MS. AMINOLROAYA: Exhibit-3.
9        MR. DAVIS: Which page?
10        MS. AMINOLROAYA: Page 13.
11 It's on the screen.
12        MR. DAVIS: Here you go.
13        THE WITNESS: Thank you.
14        Yes, that was a 2000
15 strategy, to expand awareness and
16 usage of the branded analgesic
17 products through acute pain
18 initiatives.
19 BY MS. AMINOLROAYA:
20    Q.   And in the year -- in 2001,
21 were prescriptions of Percocet, according
22 to Exhibit -- or E244.15, in 2001, had
23 prescriptions -- in February of 2001, for
24 example, had prescriptions of Percocet

Page 89

1 increased over November 2000?
2        MR. DAVIS: Objection to
3 form.
4        THE WITNESS: Again, I don't
5 know the source of this data. I
6 presume it's from the sales force
7 and IMS or whoever they were
8 purchasing data from.
9        So I'm not familiar with it.
10 And it wouldn't be appropriate for
11 me to speculate on that, because
12 that was not my primary
13 responsibility.
14 BY MS. AMINOLROAYA:
15    Q.   Setting that aside, does
16 this document reflect that there are more
17 prescriptions of Percocet in February
18 2001 than there were in November of 2001?
19        MR. DAVIS: Objection to
20 form.
21        THE WITNESS: In February of
22 2001 compared to November of 2000,
23 is that what you just said?
24 BY MS. AMINOLROAYA:

Highly Confidential - Subject to Further Confidentiality Review

1  Q.   Yes.
2  A.   Again, I --
3  Q.   Yes or no?
4      MR. DAVIS:  Objection to
5  form.  Please don't interrupt her
6  answers.
7      THE WITNESS:  I mean, the
8  bars -- I don't know what
9  specifically the source of the
10  data is or what it's referring to.
11  The two bars that you're talking
12  about, November 2000 and February
13  2001, look very comparable.  And I
14  don't know what the standard
15  deviations or the confidence
16  intervals are.
17      So I am trying to answer it,
18  but I just am not familiar with
19  this data.  I'm sorry.
20  BY MS. AMINOLROAYA:
21  Q.   So you're telling us that
22  you cannot, looking at this data, for
23  example, looking at August 2001, you
24  cannot tell us whether there are more

1  prescriptions for Percocet in August 2001
2  than there were in May of 2000?
3      MR. DAVIS:  Objection to
4  form.
5      THE WITNESS:  Well, the
6  legend is off the axis here.  What
7  is this on the sidebar?  Can you
8  read that?
9  BY MS. AMINOLROAYA:
10  Q.   This is how the document was
11  produced to us by your former employer.
12  A.   I'm sorry.  I don't know
13  what that refers to, then.
14  Q.   I can suggest it likely
15  refers to TRx.
16      Are you familiar with the
17  concept of TRx?
18      MR. DAVIS:  Objection to
19  form.
20      THE WITNESS:  TRx?  No.
21  BY MS. AMINOLROAYA:
22  Q.   I'll represent to you that
23  this refers to prescriptions of Percocet.
24      MR. DAVIS:  Objection to

1  form.
2  BY MS. AMINOLROAYA:
3  Q.   You're telling the jury that
4  looking at this document you can't tell
5  us whether there were more prescriptions
6  of Percocet in August 2001 than there
7  were in May of 2000, Ms. Kitlinski?
8      MR. DAVIS:  Objection to
9  form.
10      THE WITNESS:  I'm just
11  saying that I don't -- I'm not
12  familiar with this data.  I didn't
13  have access to sales data.  And
14  I'm not an expert on sales or
15  interpreting data.
16      And so, you know, it would
17  not be my place to speculate on
18  what this data says or doesn't
19  say.
20      I'm not trying to be
21  difficult.  I'm just identifying
22  the limitations of what I'm
23  looking at and the fact that I
24  have not seen it before and I

1  don't know the source of it.
2  BY MS. AMINOLROAYA:
3  Q.   Ms. Kitlinski, you've worked
4  in sales since 1986 when you were at
5  Schering, correct?
6      MR. DAVIS:  Objection to
7  form.
8      THE WITNESS:  I haven't
9  worked in sales since 1986 when I
10  have been at Schering.
11      I spent a limited period of
12  time as a sales trainer there,
13  yes.  And I assisted our, you
14  know, sales training at Endo and
15  DuPont.
16      I never worked -- I have
17  no -- I have no relevant
18  experience that helps me in
19  interpreting this.
20  BY MS. AMINOLROAYA:
21  Q.   All right.  Turning back to
22  256.
23      MR. DAVIS:  Just so the
24  record is clear, we're talking

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  about Exhibit-3; is that right?
2      MS. AMINOLROAYA: Exhibit-3,
3  yes. Exhibit E256.
4  BY MS. AMINOLROAYA:
5      Q.  Is another initiative under
6  CD&E's 2000 strategies, Support/develop
7  initiatives that combat opiophobia?
8      A.  What page are you on,
9  please?
10     Q.  Page 13.
11     A.  13. Thank you.
12         MR. DAVIS: Here, look at
13  this one, this is the actual
14  marked exhibit.
15         THE WITNESS: Thank you.
16  Okay.
17  BY MS. AMINOLROAYA:
18     Q.  Was another strategy that
19  CD&E listed in their 2000 strategies,
20  Support/develop initiatives that combat
21  opiophobia?
22         MR. DAVIS: Objection to
23  form.
24         THE WITNESS: Yes.

Page 95

1  BY MS. AMINOLROAYA:
2      Q.  And what is opiophobia?
3      A.  Opiophobia is the ungrounded
4  fear of using opioids in any way, shape
5  or form, as opposed to the appropriate
6  use of opioid analgesics, which requires
7  that a clinician would balance the risks
8  associated with opioids and the
9  anticipated clinical benefits in a given
10  patient and make an appropriate decision
11  as to whether or not that patient is an
12  appropriate candidate for opioids.
13     Q.  And you would agree that
14  fear of opioids is bad for Endo sales?
15         MR. DAVIS: Objection to
16  form.
17         THE WITNESS: I would --
18  fear of opioids is not bad for
19  Endo sales. If people didn't have
20  an appropriate and justified
21  concern about the real risks that
22  are associated with all opioid
23  analgesics and that are spelled
24  out in the package insert,

Page 96

1  including the black box warnings,
2  if people did not have a very
3  appropriate concern and fear of
4  those potential risks, then they
5  could be used inappropriately;
6  abuse, misuse, addiction, overdose
7  would be rampant more so than it
8  might otherwise be. And that
9  would be bad for Endo.
10         We were -- we are committed
11  to having opioids used
12  appropriately, and that means in
13  those instances where the risk
14  outweighs the benefits in the
15  clinician's mind.
16         MS. AMINOLROAYA: Move to
17  strike.
18  BY MS. AMINOLROAYA:
19     Q.  You would agree that on Page
20  13, another initiative -- another
21  strategy of CD&E, in the year 2000, was
22  to use the JCAHO as an impetus to
23  establish pain management as a priority
24  with primary care physicians?

Page 97

1      A.  Absolutely. Pain management
2  is -- pain is ubiquitous to virtually
3  every disease and health condition across
4  the, you know, extent of a person's
5  lifetime.
6         And so making sure that
7  there were appropriate standards for
8  assessing pain objectively and making an
9  appropriate risk analysis as well,
10  whether you are using opioids or whether
11  you are choosing nonpharmacologic
12  options, whether you are choosing
13  nonopioid pharmacology, whether you were
14  using multimodal techniques.
15         So, absolutely, the joint
16  commission standards, which advocated for
17  making sure that pain was measured in
18  patients, was important.
19         MS. AMINOLROAYA: Move to
20  strike everything after the word
21  "absolutely."
22         - - -
23         (Whereupon, Endo-Kitlinski
24  Exhibit-6,

Page 98

1 ENDO-OPIOID_MDL-04869680-682, was
2 marked for identification.)
3 - - -
4 MS. AMINOLROAYA: You can
5 put that aside.
6 THE WITNESS: Thank you.
7 MS. AMINOLROAYA: I'm
8 handing you what's been marked as
9 Exhibit-6. This is
10 ENDO-OPIOID_MDL-04869680. E1262.
11 THE WITNESS: Thank you.
12 BY MS. AMINOLROAYA:
13 Q. I just have a few questions
14 about this page.
15 A. Sure. If you'll just give
16 me a moment to read it, I appreciate it.
17 Thank you for the time to
18 read that.
19 Q. On December 12th, 2001, did
20 Ms. Travers send you and some of your
21 colleagues at Endo articles regarding
22 reports of OxyContin abuse?
23 MR. DAVIS: Objection to
24 form.

Page 99

1 THE WITNESS: Yes. This is
2 a memo from Deb Travers regarding
3 those subjects.
4 BY MS. AMINOLROAYA:
5 Q. And, in particular, do the
6 articles -- was she sending you articles
7 regarding the recent congressional
8 hearings with Purdue and their marketing
9 of OxyContin?
10 A. I'm sorry, I mean, it's
11 mentioned in here.
12 When you say is she
13 particularly sending that?
14 Q. Was she forwarding you
15 articles regarding the congressional
16 hearings that had just taken place
17 regarding the abuse of OxyContin,
18 Purdue's OxyContin?
19 A. I see that the House
20 Appropriation Subcommittee is mentioned
21 in here. So that's one of the -- one of
22 the subjects, yes.
23 Q. And who is Ms. Travers?
24 A. What's the time on this?

Page 100

1 2001.
2 Deb Travers was in our
3 commercial organization. I'm not sure
4 what her title was at that particular
5 point in time, but she was in our
6 commercial organization at Endo.
7 Q. And did you have occasion to
8 work with Ms. Travers?
9 A. Yes.
10 Q. Was this a regular
11 occurrence, that you worked with Ms.
12 Travers?
13 MR. DAVIS: Objection to
14 form.
15 THE WITNESS: I sat on the
16 risk management subcommittee at
17 Endo, and as did Deb Travers. And
18 the committee met on a regular
19 basis, so all of the departments,
20 all of the relevant departments,
21 had representatives at that
22 committee.
23 So I worked with her in that
24 capacity.

Page 101

1 BY MS. AMINOLROAYA:
2 Q. Did you work with her in any
3 other capacity?
4 A. When they were developing
5 the -- you know, prior to the launch of
6 new products, there would be a
7 multidisciplinary team from the company
8 that would work together to identify any
9 potential issues and, you know, bring
10 their relative expertise to the table.
11 Q. And Ms. Travers is
12 forwarding you these articles regarding
13 the congressional hearings on Purdue's
14 abuse of -- abuse of Purdue's OxyContin,
15 along with other individuals as well,
16 correct?
17 A. Yes.
18 Q. Including Scott Shively.
19 Who is Scott Shively?
20 A. Scott Shively was -- again,
21 I don't recall his exact title, but he
22 was one of the senior leaders in the
23 commercial organization.
24 Q. He was in marketing?

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    A.   Yes.
2    Q.   And Peter Lankau, who was
3  he?
4    A.   Peter was -- again, at the
5  time, he was either the CEO or the
6  president of the company.  I don't recall
7  which position.
8    Q.   So these were reports of
9  congressional hearings about OxyContin
10  abuse.  Ms. Travers thought it was of
11  concern or something that the CEO,
12  marketing and David Lee -- who is David
13  Lee?
14    A.   David Lee was the vice
15  president of R&D, research and
16  development, at Endo.
17    Q.   Ms. Travers was forwarding
18  these articles to the CEO of marketing
19  and yourself?
20    A.   It looks as if she copied --
21  it looks as if she -- well, first of all,
22  Peter Lankau copied the commercial
23  organization, the R&D organization, and
24  others in -- other departments at Endo.

Page 103

1      So it looks like he was
2  trying to broadly make sure that relevant
3  departments were aware of the situation
4  here that is discussed in this memo, both
5  about Chester County and about the Purdue
6  situation.
7    Q.   And you would say -- it's
8  fair to say that you were following
9  reports of these congressional hearings
10  and the attention on Purdue's OxyContin
11  pretty closely?
12    MR. DAVIS:  Objection to
13  form.
14    THE WITNESS:  Again, that
15  was not my area of responsibility.
16  So I wasn't the individual who
17  would have been following it
18  closely as, for example, another
19  colleague in Endo might have been.
20  I certainly was aware of it.
21    MS. AMINOLROAYA:  I'm
22  marking -- I'm handing you what's
23  been marked as Exhibit-7.  It's
24  ENDO-OPIOID_MDL-02002513, and

Page 104

1  E270.
2      This is an e-mail from you
3  to Carey Aron and Vin Tormo, dated
4  December 6th, 2001, subject:  3202
5  draft plans for 2002.
6      - - -
7      (Whereupon, Endo-Kitlinski
8  Exhibit-7,
9  ENDO-OPIOID_MDL-02002513-514, with
10  attachment, was marked for
11  identification.)
12      - - -
13  BY MS. AMINOLROAYA:
14    Q.   And I know it's a large
15  document, I'm only going to ask you about
16  the cover and two pages in the document.
17    A.   Okay.  I'll just read the
18  cover here, and then you can direct me to
19  the two pages.
20    Q.   Sounds good.  Thank you.
21    A.   And the pages you were
22  referencing?
23    Q.   I'll direct your attention
24  to -- well, before we go to the page that

Page 105

1  I'm referencing.
2      3202, is that the number
3  that was used for Opana ER internally at
4  the company?
5    A.   Yes.
6    Q.   So this is -- you're sending
7  draft plans for Opana ER, in late 2001,
8  to Carey Aron and Vin Tormo?
9    A.   Yes.
10    Q.   And who are Carey Aron and
11  Vin Tormo?
12    A.   They were the regional
13  liaisons, one on the West Coast and one
14  in the Midwest, who later became the
15  clinical liaison directors.
16    Q.   Were these direct reports of
17  yours?
18    A.   Yes.
19    Q.   And you write -- you were
20  sending them, here, a brief presentation
21  you made to the Opana ER team on your
22  proposed strategy for 2002?
23    A.   That's what the cover memo
24  says.  I didn't look at the presentation

Page 106

1 yet, though.
2      Q.   Okay.  We'll look at that in
3 just a second.
4           And "our proposed strategy,"
5 that's a strategy from CD&E, correct?
6      A.   Yes.
7      Q.   And December 2001, that's
8 around the time period of the
9 congressional hearings and investigations
10 into OxyContin's abuse, correct?
11           MR. DAVIS:  Objection to
12      form.
13           THE WITNESS:  That's
14      certainly what that previous
15      document had in it as the date.  I
16      don't -- again, that was 18 years
17      ago, and I don't remember the
18      exact timing of it.
19           But I -- that's what the
20      document says.  So I'm certain
21      that's right.
22 BY MS. AMINOLROAYA:
23      Q.   And that's an issue that was
24 definitely on the mind or the focus of

Page 107

1 CD&E in late 2001, correct?
2           MR. DAVIS:  Objection to
3      form.
4           THE WITNESS:  The entire
5      company, as a company that focused
6      on responsible pain management and
7      appropriate mitigation of risks
8      that were associated with opioid
9      analgesics, whether they were ours
10      or others, we all were aware of
11      the situation.
12           And so my comment to you
13      before was that I was not
14      particularly aware, at this point
15      sitting here, to remembering that
16      particular hearing date.
17           But I do know that we were
18      all aware of the situation, and
19      why we had, obviously, put
20      substantial risk mitigation plans
21      in place ourselves, even before
22      there was an opioid REMS.
23 BY MS. AMINOLROAYA:
24      Q.   Go to Page 62 of the

Page 108

1 document, please.
2           This is dated December 1,
3 2001.  It's CD&E 2002, clinical
4 development and education, your
5 department.
6           And this is the proposed
7 strategy that you attached to an e-mail
8 to your direct reports for Opana ER.
9           MR. DAVIS:  Objection to
10      form.
11 BY MS. AMINOLROAYA:
12      Q.   Is this an integrated
13 strategy for advocacy and development for
14 Opana ER and IR?
15      A.   That's what the document is
16 entitled, yes.
17           I'll just need a few moments
18 to -- is this the section of the document
19 you would like --
20      Q.   Page 63, yes, and 64.
21      A.   Okay.
22           All right.
23      Q.   And is the very first bullet
24 on Page 63, under, Environmental

Page 109

1 overview, is the overview you were
2 providing to the Opana ER team regarding
3 the negative OxyContin publicity
4 increasing opiophobia among PCPs,
5 pharmacists and patients?
6      A.   Yes.  That was certainly a
7 correct statement of the environment at
8 that time.
9      Q.   And on Page 64, are you
10 setting out a strategy for Opana ER?
11           MR. DAVIS:  Objection to
12      form.
13 BY MS. AMINOLROAYA:
14      Q.   Or strike that.
15           Is one of the strategies for
16 Opana ER that you proposed here to
17 refocus attention from abuse potential?
18           MR. DAVIS:  Objection to
19      form.
20           THE WITNESS:  The bullet
21      point here says, Refocus attention
22      from abuse potential to
23      appropriate clinical use of opioid
24      analgesics, which is consistent

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  with the DEA joint statement on
2  the previous page, which urges a
3  balanced strategy.
4       So to, you know -- at the
5  time, they recognized the fact
6  that, yes, there were abuse
7  potential and problems.  But there
8  was also the balanced need for
9  appropriate access and pain
10  medication access to and
11  prescription of pain medication.
12  BY MS. AMINOLROAYA:
13     Q.   And was the objective, in
14  refocussing attention away from the abuse
15  potential of opioids, to increase PCP
16  comfort level?
17     A.   With using opioids
18  appropriately.
19       Again, helping them to
20  understand, as we said a little while
21  ago, about the need to assess patients
22  appropriately and have an objective and,
23  where possible, psychometrically
24  determine evaluation of their risk.

Page 111

1     Q.   Where does it say
2  psychometrically evaluate?
3     A.   It doesn't say anything
4  about it on the slide.  This is a
5  slide -- as you know, when you're putting
6  slides together, you just use brief
7  bullet points.
8     Q.   So you do have a good
9  recollection of this document?
10     A.   No, I'm --
11       MR. DAVIS:  Objection to the
12  form.
13       THE WITNESS:  I don't have a
14  recollection of this document.
15       I'm just saying, reading my
16  words here, appropriate clinical
17  use of opioid analgesics, that's
18  what that means to me and to the
19  company.
20  BY MS. AMINOLROAYA:
21     Q.   Okay.  We'll take a look at
22  what that means in a little bit.
23     A.   Okay.
24     Q.   Was another objective, in

Page 112

1  refocusing attention from abuse
2  potential, to increase patient
3  receptivity to opioids?
4       MR. DAVIS:  Objection to
5  form.
6       THE WITNESS:  To increase
7  patient receptivity to considering
8  the therapeutic options that are
9  appropriate for them, again,
10  including opioids, if that's what
11  they and their clinician determine
12  is appropriate for them.
13  BY MS. AMINOLROAYA:
14     Q.   And this is what you were
15  suggesting, this was your strategy, to
16  prepare the market for Opana ER, correct?
17       MR. DAVIS:  Objection to
18  form.
19       THE WITNESS:  Again, the
20  meeting we were at was the, you
21  know, the Opana ER launch team
22  meeting.  And so our bullet point
23  here, we're talking about what we
24  were going to do in conjunction

Page 113

1  with that; and including, you
2  know, advancing Endo's leadership
3  that we've discussed before and
4  our position and presence.
5       So you have to take it in
6  its entirety.
7  BY MS. AMINOLROAYA:
8     Q.   Was your strategy to prepare
9  the market for Opana ER in 2002 to
10  refocus attention away from abuse
11  potential in order to increase patient
12  receptivity?
13       MR. DAVIS:  Objection to
14  form.
15       THE WITNESS:  It was to
16  refocus the attention to the
17  appropriate clinical use of opioid
18  analgesics, yes.
19       MR. DAVIS:  Can we go off
20  for just one second, Parvin?
21       VIDEO TECHNICIAN:  Going off
22  the record.  11:20 a.m.
23            - - -
24       (Whereupon, a brief recess

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  was taken.)
2          - - -
3          VIDEO TECHNICIAN:  We're
4  back on the record at 11:38 a.m.
5  BY MS. AMINOLROAYA:
6      Q.   Welcome back, Ms. Kitlinski.
7      A.   Thank you.
8      Q.   We just took a short break.
9          MS. AMINOLROAYA:  I'm
10  handing you what's been marked as
11  Exhibit-8.  This is END0000 --
12  there's too many zeros here.
13  END00000923.  It's E329.1.  The
14  Endo Pharmaceuticals Opana
15  business plan for December --
16  dated December 12th, 2005.
17          - - -
18          (Whereupon, Endo-Kitlinski
19  Exhibit-8, END00000923-989, was
20  marked for identification.)
21          - - -
22          THE WITNESS:  Thank you.
23  BY MS. AMINOLROAYA:
24      Q.   I'll direct your attention

Page 115

1  to Page 59 of the document.
2          You see about the middle of
3  the page, a little bit further than the
4  middle, you were a member of the Opana
5  core launch team, correct?
6      A.   Yes.  That's what I referred
7  to before, when you asked if I worked
8  with Debbie Travers.
9      Q.   And December 12th, 2005,
10  that's a little bit before Opana ER was
11  launched, correct?
12      A.   Correct.
13      Q.   And if you'll turn to Page 2
14  of the document with me.
15      A.   I'm sorry, 2 did you say?
16      Q.   Page 2, yes.
17      A.   Thank you.
18      Q.   It has an executive summary.
19  And it states, Opana will be the first
20  new oral opioid molecule in 25 years and
21  the preferred option for patients with
22  moderate to severe pain if Endo can, one,
23  focus on launch success by supporting
24  prelaunch activities which strengthen the

Page 116

1  label and elevate awareness with key
2  audiences.
3          Did I read that correctly?
4      A.   Yes, that's what the
5  statement says.
6      Q.   And, two, Establish value
7  for Opana's points of differentiation,
8  correct?
9      A.   Yes, that's what the
10  statement says.
11      Q.   And if you'd turn to Page 15
12  of the document with me, please.
13          Actually, Page 14, please.
14          Page 14 lists major tactical
15  plan initiatives for Opana ER, correct?
16      A.   Yes, that's what the slide
17  heading is.
18      Q.   And is one of the
19  initiatives awareness crescendo?
20      A.   That's one of the
21  initiatives that are -- that this slide
22  states.
23          I'm not familiar with these
24  slides myself.  Are these -- what is the

Page 117

1  source of them?
2      Q.   The source is your
3  employer -- your former employer, Endo.
4      A.   No, I meant they weren't my
5  slides.  So I wasn't trying to be trite,
6  I was just saying that's what the bullet
7  point says, but I don't know what the
8  awareness crescendo is, because I don't
9  know whose slides these are and I haven't
10  seen them before, except, perhaps, it
11  looks like they were presented at a
12  meeting back in 2005.
13      Q.   You were a member of the
14  core launch team for Opana, correct?
15      A.   Yes.  But we each had our
16  respective responsibilities.  And so
17  looking at this in terms of, you know --
18  this is not a CD&E tactic plan
19  initiative, so this is someone else on
20  the team.
21          So I was just trying to
22  identify the source of the slides.
23      Q.   On Page 59 of the document,
24  though, it lists, CD&E, that department,

Page 118

1 as represented by you on the Opana core
2 launch team, correct?
3     A.   Yes, that is correct.
4     Q.   So CD&E was a member -- or
5 was part of the team that was working on
6 launching Opana ER just a few months
7 before the launch, correct?
8         MR. DAVIS:  Objection to
9     form.
10        THE WITNESS:  Yes.  All --
11    any time the company had a new
12    addition, a new product that was
13    being approved by the FDA, they
14    would put together a multi -- I'll
15    call it multidisciplinary, but
16    multidepartmental team.
17        So you can see here all of
18    the -- all of the departments from
19    marketing to medical affairs,
20    operations, regulatory, sales,
21    CD&E, you know, business
22    information, contracting, you
23    know, project management, managed
24    markets.  They all have a seat at

Page 119

1    the table.
2        But not everyone is
3    responsible for all aspects of the
4    plan.  That's why it's, you know,
5    divvied up by who the
6    representatives are from those
7    departments.
8        MS. AMINOLROAYA:  Move to
9    strike everything after the word
10    "yes."
11 BY MS. AMINOLROAYA:
12    Q.   Turn to Page 15.
13        And this is describing the
14 awareness crescendo that we saw was one
15 of the tactical initiatives for the
16 launch of Opana ER.
17    A.   Yes.
18    Q.   And is part of the awareness
19 crescendo developing awareness?
20    A.   Yes, that's what this slide
21 communicates.
22    Q.   And is one of the components
23 of developing awareness congresses?
24    A.   Yes.

Page 120

1     Q.   And is another component of
2 developing awareness for Opana ER
3 national thought leaders?
4         MR. DAVIS:  Objection to
5     form.
6         THE WITNESS:  Again, whoever
7     put this slide together listed on
8     here that for -- components of
9     developing awareness included
10    publications, congresses, national
11    thought leaders and CME.
12 BY MS. AMINOLROAYA:
13    Q.   Thank you.
14    A.   I did not write that,
15 however, just to be clear.
16    Q.   Thank you.
17        And is another component of
18 the -- of developing awareness for Opana
19 noise?
20    A.   That's what the --
21        MR. DAVIS:  Objection to the
22    form.
23        THE WITNESS:  That's what
24    this slide conveys, yes.

Page 121

1 BY MS. AMINOLROAYA:
2    Q.   And is noise developed
3 here -- is one of the components of the
4 noise CME?
5         MR. DAVIS:  Objection to
6     form.
7         THE WITNESS:  Again, this
8     slide, which was not produced by
9     me, lists CME, publications,
10    congresses, regional advocacy,
11    payor education, public relations,
12    and distribution channel prep of
13    elements of noise.
14 BY MS. AMINOLROAYA:
15    Q.   Thank you.
16        And these are part of the
17 prelaunch activities for Opana ER,
18 correct?
19        MR. DAVIS:  Objection to the
20    form.
21        THE WITNESS:  That appears
22    to be where the slide has
23    positioned them.
24 BY MS. AMINOLROAYA:

Page 122

1    Q.   And moving over to demand,
2  demand is another way that -- is another
3  part of developing awareness for Opana
4  ER?
5          MR. DAVIS:  Objection to
6    form.
7          THE WITNESS:  Again, the
8    slide, whoever produced this
9    slide, has listed, as part of this
10   awareness crescendo, demand, which
11   includes direct promotion, journal
12   ads, direct mail, E-detailing,
13   publications, congresses,
14   promotional education, disease
15   management, public relations,
16   website, sales training and launch
17   meeting.
18 BY MS. AMINOLROAYA:
19   Q.   And congresses were part of
20 the launch strategy for Opana ER,
21 correct?
22         MR. DAVIS:  Objection to
23   form.
24         THE WITNESS:  That -- again,

Page 123

1    that's what this slide points out
2    on here, yes.
3  BY MS. AMINOLROAYA:
4    Q.   Did you ever tell anyone
5  that you had -- anything in this document
6  was not correct?
7          MR. DAVIS:  Objection to
8    form.
9          THE WITNESS:  To be honest,
10   I don't remember this document.
11   I'm not saying I didn't see it.
12   I've seen a lot of documents over
13   the years, and, you know, this is
14   2005, so 14 years ago.
15         But I'm just saying that I
16   didn't write it.  And I haven't
17   seen it; I don't recollect having
18   seen it before.
19         So I'm just -- I'm just
20   trying to be clear, when you say,
21   is that what this slide says,
22   that's what the words say.  I
23   don't know what the exact intent
24   or meaning was, since I did not

Page 124

1    write it.
2  BY MS. AMINOLROAYA:
3    Q.   Stay with my question, Ms.
4  Kitlinski.
5    A.   I'm sorry.
6    Q.   Did you ever tell anyone
7  that you had -- that anything in this
8  document was not correct?
9          MR. DAVIS:  Objection to
10   form.
11         THE WITNESS:  I don't recall
12   the document, so I don't --
13 BY MS. AMINOLROAYA:
14   Q.   Thank you.
15   A.   -- I don't know.
16   Q.   You can set that aside.
17         MS. AMINOLROAYA:  I'm
18   handing you what's been marked as
19   Exhibit-9.  Endo_CHI_LIT-00543668.
20   E1277.  And we'll start with the
21   cover page.
22         - - -
23         (Whereupon, Endo-Kitlinski
24   Exhibit-9,

Page 125

1    ENDO-CHI_LIT-00543668-673, was
2    marked for identification.)
3          - - -
4  BY MS. AMINOLROAYA:
5    Q.   This is a document dated May
6  18th, 2006.  It's a fax cover page from
7  you, Linda Kitlinski, to Heather Mullen,
8  regarding key stakeholder outreach info.
9          Who is Heather Mullen, Ms.
10 Kitlinski?
11   A.   I'm looking on here to see
12 if there's some indication of that.
13         I don't see any indication
14 on here of who Heather Mullen is.
15   Q.   Was she someone that Endo
16 hired to assist them with the launch of
17 Opana ER?
18   A.   Again, I don't want to
19 speculate, because I don't remember her.
20         I obviously wrote this memo
21 to her, but I can't place her.
22   Q.   Thank you.
23         And the fax cc's David Kerr.
24   Who is David Kerr, or Dave

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 Kerr?
2     A.   Dave Kerr was on the
3 commercial side of the team.  I'm trying
4 to think of what his -- he had several
5 positions at the time.
6         I can't, in my mind, place
7 in '06 exactly where he was.  But he was
8 a senior leader on the commercial side of
9 the organization.
10    Q.   Mr. Kerr was in sales,
11 correct?
12        MR. DAVIS:  Objection to
13    form.
14        THE WITNESS:  I don't know.
15    He was on the commercial side of
16    the organization.  I don't recall
17    if he was in sales or marketing or
18    business development.
19        You know, a part of the
20    commercial organization, that much
21    I did know.
22 BY MS. AMINOLROAYA:
23    Q.   And the fax is dated May 18,
24 2006.

Page 127

1         So this was just before the
2 launch of Opana ER, correct?
3     A.   Correct.
4     Q.   And you're writing to
5 Heather, to Ms. Mullen, As per your
6 request, I have marked up a list of third
7 parties to indicate which organizations
8 might be most appropriate for:  Prelaunch
9 meeting, at-launch meeting, post-launch
10 meeting.
11        Did I read that correctly?
12    A.   Yes, you did.
13    Q.   And then you add, two
14 paragraphs later, I've also circled the
15 CD&E team members who would be involved
16 in each meeting and, in some cases, have
17 handwritten in additional members of the
18 CD&E team.
19        Did I read that correctly?
20    A.   Yes.
21    Q.   Let's turn to Page 2 of the
22 document.
23        Was one of the
24 indications -- or, I'm sorry, was one of

Page 128

1 the organizations that might be most
2 appropriate for a pre-approval meeting
3 the American Academy of Pain Medicine?
4         Do you see that on the last
5 row on Page 2?
6     A.   Yes, I see that.
7         I was just looking for --
8 you said something about approval for
9 pre-meeting, and I was just looking to
10 see where that notation came from.
11    Q.   Do you see the handwritten
12 note that states pre-approval?
13    A.   Oh, yes.  Thank you so much.
14    Q.   Thank you.
15        And, again, this document is
16 about a month or so before the launch of
17 Opana ER, correct?
18    A.   Approximately, yes.
19    Q.   So we're talking about
20 pre-approval of Opana ER?
21    A.   Yes.
22    Q.   And you've circled the CD&E
23 team members who would be involved in
24 each meeting.

Page 129

1         Were you among those CD&E
2 representatives?
3     A.   Yes.
4     Q.   Along with Vin Tormo?
5     A.   Yes.
6     Q.   And Debbie Travers?
7     A.   I did not circle Debbie
8 Travers.  That -- if you look at the
9 header for that --
10    Q.   Thank you.  Yes.
11    A.   -- column, it's contacts,
12 Key Endo contacts.
13        And so Debbie is a contact
14 on the commercial side of the business.
15 So she might have had dealings with them
16 for a booth or something like that.
17    Q.   And turning to Page 4 of the
18 document -- Page 4 of the document,
19 another organization that you identified
20 as most appropriate for a pre-approval
21 meeting was the American Pain Foundation?
22    A.   Yes.
23        MR. DAVIS:  Objection to
24    form.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 BY MS. AMINOLROAYA:
2      Q.   And did you identify
3 yourself as the most appropriate
4 individual to be involved with the
5 meeting?
6           MR. DAVIS:  Objection to
7      form.
8           THE WITNESS:  I -- again,
9      the CD&E contacts that I
10     identified were Marcia Speiller,
11     who was one of our medical science
12     liaisons, myself.
13          We were the two CD&E people.
14     Both of us were from CD&E.
15 BY MS. AMINOLROAYA:
16     Q.   And Ms. Romero, Amy Romero?
17     A.   Yes, she was doing patient
18 education on the promotional side, or the
19 non-CE side of things.
20     Q.   Ms. Romero was in marketing?
21          MR. DAVIS:  Objection to
22     form.
23          THE WITNESS:  Ms. Romero was
24     on the commercial side of the

Page 131

1      business.  Again, who was in sales
2      and who was in marketing, I
3      don't -- I do recall where Deb
4      Travers was, because she headed
5      the launch team.  But I don't
6      recall Amy.
7 BY MS. AMINOLROAYA:
8      Q.   Ms. Romero was in sales or
9 marketing, though?
10          MR. DAVIS:  Objection to
11     form.
12          THE WITNESS:  Yeah, sales or
13     marketing, the commercial side of
14     the business, correct.
15 BY MS. AMINOLROAYA:
16     Q.   Thank you.
17          Is another organization that
18 you identified for a pre-approval meeting
19 the American Pain Society?
20     A.   Yes.
21     Q.   And did you identify
22 yourself as the best individual to attend
23 that meeting?
24          MR. DAVIS:  Objection to

Page 132

1      form.
2           THE WITNESS:  I have, again,
3      two individuals here from our
4      team, myself and Vin Tormo.
5 BY MS. AMINOLROAYA:
6      Q.   And did you identify Ms.
7 Romero as well?
8      A.   Again, Ms. Romero would have
9 been speaking -- the contacts, that
10 category, indicate people who would have
11 differing reasons to talk with those
12 organizations.
13          So Ms. Romero would have
14 been talking to them about some aspect of
15 whatever department, if she was in sales
16 or marketing; so having a booth at the
17 meeting, for example, or -- and for Vin
18 and myself, it would have been a
19 corporate membership, for example.
20     Q.   Yes or no, did you identify
21 Ms. Romero as an appropriate individual
22 to be at the American Pain Society for a
23 pre-approval meeting?
24          MR. DAVIS:  Objection to

Page 133

1      form.
2           THE WITNESS:  No.  What I
3      identified her as was an
4      appropriate contact to reach out
5      to the American Pain Society to
6      discuss what would be appropriate
7      in a pre-approval meeting.
8           It would not be product
9      specific, obviously, for someone
10     in the commercial side of the
11     business, but more about logistics
12     of post-approval.
13          MS. AMINOLROAYA:  I'm
14     handing you what's been marked as
15     Exhibit-10.  This is
16     ENDO-OPIOID_MDL-03388209, E1260.
17          - - -
18          (Whereupon, Endo-Kitlinski
19     Exhibit-10,
20     ENDO-OPIOID_MDL-03388209-210, with
21     attachment was marked for
22     identification.)
23          - - -
24 BY MS. AMINOLROAYA:

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1   Q.   This is an e-mail dated
2   August 24th, 2001, from you to Carey Aron
3   and Vin Tormo, regarding a 2002 strategy
4   review.  And the attachment here is a
5   2002 strategy review.
6        If you turn to Page 5 of the
7   document, it's, Percocet business plan
8   and marketing strategy, correct?
9   A.   Yes.
10       And just to be clear on the
11  document and the attachments, this was --
12  these were slides that were prepared by
13  Eric Vandel, and I don't recall what FCB
14  stands for.  It was one of the
15  organizations that the marketing team
16  worked with.
17       So these are, again, not --
18  just to be clear, these are not my
19  slides, these are Eric Vandel's slides
20  that he plans to use in Monday's Percocet
21  planning session.
22  Q.   Where does it say it's Eric
23  Vandel's slides?
24  A.   The e-mail says, FYI, the

Page 135

1   slides Eric V -- his name is Vandel, and
2   FCB -- again, I know that was an agency,
3   I don't know what it stands for -- plan
4   to use for next Monday's Percocet
5   strategy session.
6   Q.   And Mr. Vandel was sending
7   you the Percocet business plan for 2002,
8   correct?
9   A.   He was sending me the slides
10  that were going to be used on the -- at
11  the presentation the following Monday,
12  yes.
13  Q.   He was sending you slides
14  that would be used at a strategy session
15  for Percocet, correct?
16       MR. DAVIS:  Objection to the
17       form.
18       THE WITNESS:  Again, I don't
19       recall the session, sitting here
20       today, but that's what this
21       document states.
22  BY MS. AMINOLROAYA:
23  Q.   And we know, from looking at
24  your 1999 objectives -- excuse me -- that

Page 136

1   the second objective you listed there was
2   working with sales and marketing teams to
3   successfully launch Percocet, different
4   strengths, including the 7.5- and
5   10-milligram strengths, correct?
6       MR. DAVIS:  Objection to
7       form.
8       THE WITNESS:  Yes.  And
9       you'll recall we discussed the
10      type of support that I provided
11      versus the type of support that
12      the marketing organization
13      provided.
14          So I just -- again, I just
15      want to make sure I'm
16      differentiating those two.
17          MS. AMINOLROAYA:  Move to
18      strike everything after the word
19      "yes."
20  BY MS. AMINOLROAYA:
21  Q.   Page 7, please.
22       You would agree that the
23  strategy for Percocet -- strike that.
24       Page 7 is entitled, Percocet

Page 137

1   Key Targets.  And were the key targets
2   for the Percocet business plan, in 2002,
3   current high 7.5- and 10-milligram
4   writers?
5   A.   Again, this is the
6   commercial side of the business's targets
7   and their strategy.
8       And so I -- while I
9   generally -- while our team generally
10  supported, in the way that I explained
11  previously, I have no way of knowing --
12  first of all, it was 2001 and this is
13  2019, so I don't recall.
14      But, secondly, I don't know
15  if this was their key target or not.
16  That's what the document states, but I
17  don't know that of my own knowledge.
18  Q.   Do you have a reason to
19  believe there was another key target?
20      MR. DAVIS:  Objection to
21      form.
22      THE WITNESS:  No.  My point
23  is I can't confirm this was a key
24  target or not, because it was not

Page 138

1 my area of responsibility. That
2 would have been the commercial
3 organization that would have been
4 developing these.
5 BY MS. AMINOLROAYA:
6 Q. But you wrote in your 1999
7 objective that your objectives were to
8 support the launch of new products,
9 including Percocet, correct?
10 A. Yes.
11 MR. DAVIS: Objection to
12 form.
13 BY MS. AMINOLROAYA:
14 Q. Thank you.
15 A. And you'll recall, just to
16 complete my statement, if you don't mind,
17 what I said at the time was, my role at
18 that was increasing the awareness of Endo
19 in the pain management therapeutic area
20 and helping to support and/or develop
21 educational materials or resources. So
22 those, in that way, did support the
23 Percocet launches.
24 This is a totally different

Page 139

1 tactic and target that this slide is
2 talking about.
3 Q. And why were you sending
4 these slides to your direct reports?
5 A. Because we always copied
6 members -- we were, again, a small
7 department at that time; it was Carey,
8 Vin and myself. Carey was responsible
9 for the Western part of the country, Vin
10 was responsible for the Central part of
11 the country, and I was responsible for
12 the Eastern part of the country.
13 So it was just having
14 transparent communication of what was
15 being shared with me.
16 Q. And what was being shared
17 with you, in 2002, was the Percocet
18 business strategy, correct?
19 MR. DAVIS: Objection to
20 form.
21 BY MS. AMINOLROAYA:
22 Q. Or, rather, in late 2001.
23 In August of 2001.
24 MR. DAVIS: Objection to

Page 140

1 form.
2 THE WITNESS: Again, I
3 didn't finish looking through the
4 rest of these slides. I just
5 looked at the one that you
6 mentioned, which was the Percocet
7 business plan and market strategy.
8 So that's what Eric Vandel
9 apparently was presenting.
10 BY MS. AMINOLROAYA:
11 Q. And was one of the things
12 that Mr. Vandel was sharing with you, in
13 your capacity as someone who supported
14 the Percocet marketing activities, the
15 message for Percocet on Page 7?
16 MR. DAVIS: Objection to
17 form.
18 THE WITNESS: Well, again,
19 these slides, which were going to
20 be presented at the session, were
21 shared with everyone.
22 So it's not like it was
23 directed, oh, CD&E, here is our
24 target message for Percocet. He's

Page 141

1 telling -- he's telling the
2 participants at the meeting. And
3 since I would be there and Carey
4 and Vin were not, I was sharing
5 the slides with them, this is our
6 marketing -- what does he call it
7 here? This is our customer
8 segmentation analysis and our
9 marketing strategy.
10 BY MS. AMINOLROAYA:
11 Q. And was one of the messages
12 that Mr. Vandel included in the Percocet
13 business plan, Push dose higher, use
14 longer?
15 MR. DAVIS: Objection to
16 form.
17 THE WITNESS: That's what
18 this slide states on here. I have
19 no knowledge of what he -- what he
20 meant to use that for.
21 But I am sure there are
22 folks from, you know, Endo's
23 marketing team that could provide
24 light on that for you.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    MS. AMINOLROAYA: I'm
2  switching gears here, Ms.
3  Kitlinski.
4  BY MS. AMINOLROAYA:
5    Q.   Earlier we looked at a
6  document that stated that the focus --
7  the strategy of CD&E in 2002 was going to
8  be refocus attention away from abuse,
9  correct?
10    MR. DAVIS:  Objection to
11  form.
12    THE WITNESS:  No, I don't
13  recall saying that at all.
14  BY MS. AMINOLROAYA:
15    Q.   You don't recall that we
16  looked at a document that --
17    A.   No.  I recall we looked at a
18  document.  I don't recall that it said
19  refocussing away from abuse.
20    What I recall is we said we
21  were refocussing on the appropriate use
22  of opioid analgesics.  Unless I'm talking
23  about a different document.
24    Q.   We'll look at the document

Page 143

1  again.
2    A.   Okay.
3    Q.   Let's turn to Exhibit-7,
4  Page 64.
5    Just to refresh your memory
6  of the cover page here, it has an e-mail
7  from you to Carey and -- to Mr. Aron and
8  Mr. Tormo, dated December 6th, 2001, and
9  you're attaching a presentation you made
10  to the Opana ER team, correct?
11    A.   Yes.  As well as a
12  presentation that Debbie Travers made.
13    And you said it's Page --
14    Q.   Let's turn to Page 62.
15    A.   62.
16    Q.   So this is, CD&E:  2002.
17  Integrated strategy for advocacy
18  development.
19    Let's go to Page 64.  One of
20  the strategies for Opana ER, in 2002, was
21  to refocus attention from abuse
22  potential, correct?
23    MR. DAVIS:  Objection to
24  form.

Page 144

1    THE WITNESS:  Well, I may
2  have paraphrased this full bullet
3  point a moment ago.
4    But, as I said, it is not
5  refocus attention away from abuse
6  potential, it's -- the full
7  statement that I wrote is, Refocus
8  attention from abuse potential to
9  appropriate clinic use of opioid
10  analgesics, which is consistent,
11  as I pointed out earlier on Slide
12  63, with the DEA's own balanced
13  approach to promoting pain relief
14  while preventing abuse.
15  BY MS. AMINOLROAYA:
16    Q.   And refocus, Ms. Kitlinski,
17  means to take the focus off of something,
18  correct?
19    MR. DAVIS:  Objection to
20  form.
21    THE WITNESS:  As I -- as
22  I -- I mean, I can't state any
23  more clearly, to refocus attention
24  from sole -- from the abuse

Page 145

1  potential to the appropriate
2  clinical use of opioid analgesics,
3  which includes diagnosis of the
4  underlying risk factors.  We
5  talked about the psychometric
6  instruments, where possible, to
7  help the clinicians identify which
8  patients are at increased risk so
9  that those patients can be focused
10  on having themselves monitored and
11  followed up appropriately; and, at
12  the same time, the appropriate
13  clinical use of analgesics, what
14  the clinician determines is best
15  for a given patient in front of
16  them at that time, based on their
17  relative risk potential.
18    MS. AMINOLROAYA:  I'm sorry,
19  Ms. Kitlinski, I don't think you
20  understood my question.
21  BY MS. AMINOLROAYA:
22    Q.   Refocus, the word refocus,
23  means to take the attention off of
24  something, correct?

Page 146

1    MR. DAVIS:  Objection to
2  form.
3    THE WITNESS:  The word
4  refocus means to put something
5  else into focus.
6  BY MS. AMINOLROAYA:
7    Q.  Right.
8    A.  Correct.
9    Q.  So here you were not putting
10  abuse into focus; you were --
11    A.  No, we were --
12    MR. DAVIS:  Objection to
13  form.
14    THE WITNESS:  Again, we
15  were -- we were focusing on the
16  appropriate clinical use of opioid
17  analgesics, which, as you can see
18  through all of the documents, was
19  a balance of the appropriate focus
20  on risk, abuse, misuse, addiction
21  and on access and having
22  appropriate treatment as
23  determined by the clinicians.
24    MS. AMINOLROAYA:  Move to

Page 147

1  strike the entire answer.
2    1274, please.  I'm handing
3  you what's been marked as
4  Exhibit-1274.
5    - - -
6    (Whereupon, Endo-Kitlinski
7  Exhibit-11,
8  ENDO-OPIOID_MDL-02261843-845, was
9  marked for identification.)
10    - - -
11  BY MS. AMINOLROAYA:
12    Q.  I'll ask you to start on
13  Page 2, towards the bottom.  This is an
14  e-mail from you dated June 9th, 2003.
15    MS. AMINOLROAYA:  Exhibit-11
16  is ENDO-OPIOID_MDL-02261843.  It's
17  E1274.
18  BY MS. AMINOLROAYA:
19    Q.  This is an e-mail from you,
20  on the bottom of Page 2, to Carey Aron
21  and others.
22    Are these your direct
23  reports in CD&E?
24    A.  Some of them are direct

Page 148

1  reports.  Others is the vice president on
2  the medical affairs team and other
3  members of the medical affairs team.
4    Q.  And the subject is, NIPC
5  input needed for meeting.
6    And you state, Guys, Brad,
7  Scott, Jerry, Debbie, Andy and I will be
8  meeting on June 25th to make a final
9  decision on the general topic we will
10  recommend to PW for the new NIPC module.
11    Who are Brad, Scott, Jerry,
12  Debbie and Andy?
13    A.  Brad is the vice president
14  of medical affairs, scientific affairs, I
15  don't recall what it was in 2003.
16    Scott, Jerry, Debbie and
17  Andy are others on the opioid -- the
18  commercialization team we were talking
19  about earlier.
20    Q.  Scott was in marketing?
21    A.  Yes.
22    Q.  Debbie was in marketing?
23    A.  Yes.
24    Q.  And you're asking -- you're

Page 149

1  asking your direct reports for input on
2  NIPC topics?
3    A.  Yes.  At the time, the ACCME
4  guidance and the regulations enabled
5  input into broad topics and, you know,
6  overall therapeutic area to be covered,
7  provided that the CE provider had control
8  over the content and control over,
9  ultimately, the faculty that was
10  determined.
11    So we were asked for input,
12  as was the -- as was the case at that
13  time and as was compliant at that time.
14    Q.  And you state, Items to
15  consider in making this recommendation,
16  what will provide best educational ROI
17  for Endo, what the faculty/education
18  council will likely be most receptive to,
19  and what will generate best
20  interest/turnout.
21    Given the high level of
22  interest and issues surrounding with
23  opioids, coupled with our anticipated
24  launch of EN3203 -- 3202/03, I think

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  opioids should be the focus.
2          Did I read that correctly?
3          MR. DAVIS:  Objection to
4  form.
5          THE WITNESS:  Yes.  Given
6  the high level of interest and
7  issues surrounding opioids, which
8  we've been talking about, you
9  know, given the timing of this,
10 that is what this -- that is what
11 this states.
12         And just to clarify so that
13 it's clear, what the previous item
14 you had read, the items that I
15 thought was -- should be
16 considered for recommendation were
17 the -- in addition to the
18 educational, we usually would call
19 it a return on education, not
20 return on investment.
21         So that's a misnomer of a
22 word on my behalf there.
23         But, in any event, the
24 Faculty Education Council, that's

Page 151

1  the independent faculty, and the
2  planning council for the NIPC,
3  what they will be most receptive
4  to, because, obviously, they are
5  the ones who ultimately determine
6  the content -- not just the topic,
7  but the content.
8          And then what will generate
9  the best interest and turnout,
10 that would be what clinicians, by
11 virtue of their unmet needs and
12 areas of interest, what they would
13 be most likely to participate in
14 as an educational activity.
15         So I just wanted to be clear
16 that those points were not about
17 what Endo would be most receptive
18 to or would generate the best
19 interest, but what we thought the
20 faculty and educational council
21 would.
22 BY MS. AMINOLROAYA:
23     Q.   So you're saying that you
24 did not state to your colleagues here

Page 152

1  that, among the items to consider in
2  making a recommendation on topics for an
3  NIPC program would be what would provide
4  the best educational ROI for Endo?
5      A.   No.  I said that -- I did
6  acknowledge that that was a -- you know,
7  should have been a return on education as
8  opposed to return on investment.
9          And, basically, by virtue of
10 that, we have limited resources, what can
11 we put our resources towards which will
12 then -- then the next points come into
13 play -- have the most appeal for the
14 faculty and educational council, since
15 it's important that they, you know, would
16 be committed to developing the activity.
17         And then what would be best
18 interest and turnout, in terms of the
19 audience, the clinicians who would
20 ultimately decide to attend or not
21 attend, based on the content of the
22 activity and how it met their needs and,
23 you know, and their gaps in their
24 education.

Page 153

1      Q.   But your colleagues also
2  understood your reference to best
3  educational ROI to mean return on
4  investment, correct, Ms. Kitlinski?
5          MR. DAVIS:  Objection to
6  form.
7          THE WITNESS:  You know,
8  again, I've already said that I
9  used that term inappropriately.
10 And I certainly would not be able
11 to speculate what they interpreted
12 it as.
13 BY MS. AMINOLROAYA:
14     Q.   And in the 16 years that --
15 16 or -- years that have transpired since
16 this e-mail, did you ever -- strike that.
17         We don't have to speculate,
18 Ms. Kitlinski.  Let's turn to the first
19 e-mail here at the bottom of Page 1.
20     A.   Okay.
21     Q.   And this is an e-mail from
22 Nancy Alvarez responding to your e-mail.
23         Who is Nancy Alvarez?
24     A.   Nancy Alvarez was a medical

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1 information specialist in medical
2 affairs.
3      Q.   And Ms. Alvarez responds to
4 your e-mail.  And she says, in the first
5 sentence here, Opioids should be the
6 focus, despite the desire to not promote
7 other's products.
8           And the last sentence says,
9 The return on investment may be to have
10 product available when prescriptions are
11 written.
12          Did I read that correctly?
13          MR. DAVIS:  Objection to
14      form.
15          THE WITNESS:  If you'll just
16      give me a moment to read the whole
17      paragraph there so I can have it
18      in context.
19          Again, I don't know what
20      she's referring to there.  She
21      says, The return on investment may
22      be to have product available when
23      prescriptions are written.
24 BY MS. AMINOLROAYA:

Page 155

1      Q.   Ms. Kitlinski, stay with my
2 question.
3           Did I read that correctly?
4      A.   Yes, you did.
5      Q.   Okay.  Thank you.
6      A.   I'm sorry.
7      Q.   Turning to Page 1.
8           This is an e-mail from you
9 responding to Nancy and Arnold, dated
10 June 16th, 2003.  This is still regarding
11 NIPC input needed for meeting.
12          And you write, Nancy and
13 Arnold, really appreciate your input.
14 And I definitely agree with you that
15 opioids should be the focus of the new
16 NIPC module for all the reasons you both
17 outlined below (particularly to assure a
18 successful launch of 3202) and also
19 because of multiple comments Nat Katz
20 made to me during a discussion I had with
21 him this past week.
22          Did I read that correctly?
23      A.   That's what this memo says,
24 yes.

Page 156

1      Q.   3202 is a reference to Opana
2 ER, correct?
3      A.   Correct.
4      Q.   And then Mr. Galer responds
5 in the top thread, the second sentence
6 there, stating, Linda and I will be
7 meeting with our colleagues to best
8 decide how to move forward to make NIPC
9 a, quote, win/win for all involved.
10          And the colleagues that you
11 and Mr. Galer would be meeting with were
12 your marketing colleagues, correct?
13          MR. DAVIS:  Objection to
14      form.
15 BY MS. AMINOLROAYA:
16      Q.   Referenced in your e-mail on
17 the bottom of Page 2; Mr. Shively, and
18 Ms. Travers in marketing, correct?
19          MR. DAVIS:  Objection to
20      form.
21          THE WITNESS:  Yes, that's
22      where we were going to convey our
23      recommendations.  Correct.
24 BY MS. AMINOLROAYA:

Page 157

1      Q.   Thank you.
2      A.   You're welcome.
3      Q.   And to be clear, and I
4 apologize if I didn't clarify this
5 before, what does NIPC stand for?
6      A.   The National Initiative on
7 Pain Control or for pain control.
8      Q.   Thank you.
9      A.   I don't recall if it was
10 "on" or "for."
11      Q.   And did you -- did Endo
12 sponsor a continuing medical education
13 through NIPC?
14      A.   Endo supported it.  The
15 sponsor for a CE activity is the
16 accredited provider.
17          So the terminology, you
18 know -- if it's a commercial activity,
19 it's sponsored by the company.  If it's
20 an independent educational activity, it's
21 supported by.
22          But, yes, we did support
23 NIPC.
24      Q.   And did Endo support

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  publication of newsletters by the --
2  through NIPC?
3      A.   The NIPC was a multimodal
4  learning activity.  All of the
5  independent education literature
6  documents the fact that clinicians have
7  different learning styles and different
8  learning preferences.
9          So NIPC integrated
10 everything from newsletters to
11 teleconference -- audio conferences,
12 let's call them, for folks who might have
13 limited time and wanted to participate on
14 their lunch hour.
15         There were live meetings for
16 clinicians who preferred to learn in a
17 live meeting setting with their peers.
18 And there was a website, as well, for
19 those folks who preferred to do online
20 learning.
21     Q.   And did the NIPC have an
22 advisory council?
23     A.   Yes.  And I -- I don't
24 recall the exact -- there were a group of

Page 159

1  the faculty from NIPC who served in an
2  advisory capacity.
3          I don't remember if it was
4  called the council or the -- whatever
5  they called it.  But there was a group of
6  individuals who advised the CE provider
7  on that.
8      Q.   And you were close with the
9  members of the NIPC educational council,
10 correct?
11         MR. DAVIS:  Objection to
12         form.
13         THE WITNESS:  I don't recall
14         who the advisors were, because, A,
15         over time they changed; and, B,
16         there were several, you know,
17         different initiatives.  There was
18         neuropathic pain.  There was, you
19         know, the opioid initiative.
20         So I'm not sure which one
21         you're referring to and, you know,
22         who they were.
23 BY MS. AMINOLROAYA:
24     Q.   Was Dr. Argoff a member of

Page 160

1  the educational council for NIPC at a
2  certain point in time?
3      A.   Again, I would have to look
4  at the documents and tell you.
5          MS. AMINOLROAYA:  I'm
6  handing you what's been marked as
7  Exhibit-12.  The Bates number
8  KP360-OHIOMDL-000605.  It's E1342,
9  Exhibit-12.
10         - - -
11         (Whereupon, Endo-Kitlinski
12         Exhibit-12,
13         KP360-OHIOMDL-000605-626, was
14         marked for identification.)
15         - - -
16         THE WITNESS:  Thank you.
17 BY MS. AMINOLROAYA:
18     Q.   And we won't spend very much
19 time on this document.
20         This document is the
21 National Initiative on Pain Control
22 educational council meeting, January 17th
23 to 18th, 2004.  It's an executive
24 summary.

Page 161

1          And if you turn to Page 3 of
2  the document, under meeting participants,
3  NIPC educational council, is the second
4  name listed there Dr. Argoff?
5      A.   Yes, it is.
6          So, then, he is indeed a
7  member -- or was at that time, a member
8  of the NIPC education council.
9      Q.   Thank you.
10     A.   Thank you for refreshing my
11 memory.
12     Q.   And you were close with Dr.
13 Argoff, correct?
14         MR. DAVIS:  Objection to
15         form.
16         THE WITNESS:  I've remained
17         in touch with Dr. Argoff over the
18         years.  He managed my
19         mother-in-law's migraine and was
20         successful in having her, after 65
21         years of dealing with daily
22         headache pain, live the last years
23         of her life without that.
24         So I have remained in touch

Page 162

1 with Dr. Argoff.

2 I mean, it depends on what

3 your definition of "close" is.

4 MS. AMINOLROAYA: I'm

5 handing you what has been marked

6 as Exhibit-13. It's E1340,

7 ENDO-OPIOID_MDL-02206602.

8 - - -

9 (Whereupon, Endo-Kitlinski

10 Exhibit-13,

11 ENDO-OPIOID_MDL-02206602-606, was

12 marked for identification.)

13 - - -

14 THE WITNESS: Thank you.

15 BY MS. AMINOLROAYA:

16 Q. This is an e-mail from

17 Charles Argoff to Linda Kitlinski. We'll

18 actually go to Page 3 of the document.

19 A. All right.

20 Q. And on July 21st, 2008, at

21 11:06, you wrote, C, how are ya? Hope

22 your summer's going well. Best, L.

23 MR. DAVIS: Do you know if

24 the original document as produced

Page 163

1 had this highlighting?

2 MS. AMINOLROAYA: Is that

3 the only highlight you see in the

4 document?

5 MR. DAVIS: I see some -- we

6 can go off if you want -- I see

7 the first e-mail where you just

8 read, I think I see some --

9 MS. AMINOLROAYA: Sure, we

10 can go off the record.

11 VIDEO TECHNICIAN: Going off

12 the record. 12:28 p.m.

13 - - -

14 (Whereupon, a discussion off

15 the record occurred.)

16 - - -

17 VIDEO TECHNICIAN: Back on

18 record. 12:28 p.m.

19 BY MS. AMINOLROAYA:

20 Q. Welcome back.

21 We have a highlighted copy,

22 we gave you and counsel a highlighted

23 copy of Exhibit-13, I believe. And we'll

24 replace this highlighted copy with the

Page 164

1 version that was produced to us in the

2 production --

3 A. Sure.

4 Q. -- after the deposition.

5 And after writing to Dr.

6 Argoff, if you look at the bottom of Page

7 1, there's a few more e-mail chains in

8 between, where you're discussing catching

9 up with him.

10 And then on September 30th,

11 2008, the bottom of Page 1, you write Dr.

12 Argoff again, and you're discussing how

13 to shape some messaging with him,

14 correct?

15 MR. DAVIS: Objection to

16 form.

17 THE WITNESS: First of

18 all --

19 BY MS. AMINOLROAYA:

20 Q. It says --

21 A. -- let me just go back to

22 your initial -- because you left off the

23 first e-mail in the string.

24 The first message here was

Page 165

1 from Dr. Argoff to myself, as well as a

2 number of other people, telling us that

3 his e-mail address has changed, which I

4 suspect -- was coincided with his

5 relocation from Rochester up to Albany.

6 But, in any event, he's

7 telling us his e-mail address has

8 changed, to which I respond back, how are

9 you? Hope -- how are you? I hope your

10 summer is going well.

11 So I didn't want you to

12 think I just initiated and -- a reach-out

13 message to him saying, Hi, how are you?

14 Hope your summer is going well.

15 Q. But you did drop everyone

16 else off the chain in your response,

17 correct?

18 A. Of course.

19 Q. Top of Page 2, you write,

20 Great talking to you tonight. It's been

21 too long. Just one thing I feel

22 compelled to say, even though I know I

23 don't have to, please don't mention my

24 name to Bill or AAPM, lest they think our

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1 conversation was anything more than a
2 discussion of how to tactfully, in
3 quotes, address an issue. One other bit
4 of info you should know, some of the APS
5 staff are also closely involved with the
6 AAPM essentials course, so just be aware
7 of that so you don't inadvertently have
8 an oops moment. Again, C, it was so good
9 to talk to you and good luck with the
10 cell phone company. They're plain evil
11 as far as I'm concerned.
12         Did I read that correctly?
13     A.   Yes.
14     Q.   So you were telling Dr.
15 Argoff not to mention your name in the
16 context of discussing a subject with Bill
17 at AAPM?
18         MR. DAVIS: Object to form.
19         THE WITNESS: Yes.
20         And what I was saying is he
21 was going to bring this issue up,
22 and I just said, please don't
23 mention my name to him about it,
24 lest they think we had -- the

Page 167

1 issue we were discussing is the
2 fact that the American Academy of
3 Pain Medicine, and Bill, who was
4 the program director, coordinator,
5 whatever you want to call him for
6 the activity, had -- I don't want
7 to say pirated -- had modeled a
8 new educational activity at AAPM
9 after one that Dr. Argoff had
10 developed with APS.
11         And the fact was, there
12 wasn't any, I'll say, a
13 professional courtesy of them
14 asking Dr. Argoff, you know, if he
15 objected to them taking this
16 initiative that Dr. Argoff had
17 developed and had hosted at APS
18 for years and now making it
19 available to AAPM and asking
20 various industry partners if they
21 would like to provide grants for
22 the activity.
23         And so my point back to him
24 was, you know, that -- he had

Page 168

1 asked about the situation. And I
2 said that, you know, this is my
3 point on it, is there should have
4 been coordination. But since it's
5 an independent educational
6 activity, it's not for me to say,
7 so please don't mention my name to
8 Bill, lest he thinks that I'm the
9 one complaining about it, when, in
10 actuality, I was just giving you
11 my opinion.
12 BY MS. AMINOLROAYA:
13     Q.   My question was, Ms.
14 Kitlinski, you were telling Dr. Argoff
15 not to mention your name about a subject
16 that you were discussing with him,
17 correct?
18         MR. DAVIS: Objection to
19 form.
20         THE WITNESS: Yes.
21 BY MS. AMINOLROAYA:
22     Q.   Thank you.
23         And in response, he writes,
24 on the bottom of Page 1, Never.

Page 169

1         Did I read that correctly?
2     A.   Yes.
3     Q.   And you responded, See, knew
4 I didn't even have to say it.
5     A.   Yes.
6         Because he knows that I
7 would not attempt to inappropriately
8 convey information on an independent CE.
9         MS. AMINOLROAYA: Move to
10 strike everything after "yes."
11         Can we get a copy of E1403?
12         MR. DAVIS: How much do you
13 have with this one, Parvin? It's
14 been about an hour, it's 12:30.
15 I'm happy to go a little bit
16 longer if you only have a bit.
17 But if it's longer than that, then
18 we should break.
19         MS. AMINOLROAYA: Let's do
20 at -- a few more exhibits.
21         I'm handing you what's been
22 marked as Exhibit-1403. This is
23 Argoff 006513 and it's E1403.
24             - - -

Page 170

1      (Whereupon, Endo-Kitlinski
2      Exhibit-14, ARGOFF006513-515, was
3      marked for identification.)
4           - - -
5  BY MS. AMINOLROAYA:
6      Q.   And you'll see on Page 2 of
7  the document there is an e-mail -- at the
8  top of Page 2, there's an e-mail from
9  Emerson Wickwire to Nancy Santilli dated
10 June 2, 2011.
11      Ms. Santilli was your
12 supervisor for a period of time?
13      A.   Yes.
14      May I just have a minute to
15 read this, please?
16      Q.   Sure.
17      And I can tell you we're
18 going to look at the top of Page 2 and
19 Page 1.
20      A.   Okay.
21      MS. AMINOLROAYA:  We can
22 take a break for lunch now.
23      VIDEO TECHNICIAN:  Going off
24 the record.  12:36 p.m.

Page 171

1           - - -
2      (Whereupon, a luncheon
3      recess was taken.)
4           - - -
5      VIDEO TECHNICIAN:  Back on
6  record at 1:24 p.m.
7  BY MS. AMINOLROAYA:
8      Q.   Welcome back, Ms. Kitlinski.
9  We just took a break for lunch, and we're
10 back on the record.
11      You understand that you're
12 under oath?
13      A.   Yes.
14      Q.   Turning your attention back
15 to Exhibit-8, this is the Opana ER
16 business plan.
17      MR. DAVIS:  8.
18      THE WITNESS:  Thank you.
19 BY MS. AMINOLROAYA:
20      Q.   And Page 15 of the document,
21 the page we looked at before, you're
22 familiar with?
23      A.   Yes.
24      Q.   And this part of the Opana

Page 172

1  ER business plan here is, Opana awareness
2  crescendo, correct?
3      A.   Yes, that's what this slide
4  states.
5      Q.   And part of the way that
6  awareness was going to be built for Opana
7  ER was through CME, correct?
8      MR. DAVIS:  Objection to
9  form.
10      THE WITNESS:  Again, I did
11 not create this slide.  This slide
12 states that awareness would be
13 supported through publications,
14 congresses, national thought
15 leaders and CME.
16 BY MS. AMINOLROAYA:
17      Q.   Thank you.
18      And would noise for the
19 Opana ER awareness crescendo also include
20 CME?
21      MR. DAVIS:  Objection to
22 form.
23      THE WITNESS:  Again, the
24 author of this slide has listed

Page 173

1      CME, publications, congresses,
2      regional advocacy, payor
3      education, public religions and
4      distribution channel prep as
5      contributing to the noise.
6  BY MS. AMINOLROAYA:
7      Q.   And these were prelaunch
8  activities for Opana ER, correct?
9      MR. DAVIS:  Objection to
10 form.
11      THE WITNESS:  It says
12 prelaunch, so that's what this
13 slide would seem to indicate.  I
14 don't know that of my own.
15 BY MS. AMINOLROAYA:
16      Q.   Thank you.  You can set that
17 aside.
18      And you put on CME through
19 the NICP, correct?
20      MR. DAVIS:  Objection to
21 form.
22      THE WITNESS:  No.  CME is
23 conducted by the independent
24 educational provider, the CE

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 provider.
2 So as the -- as in my role
3 in clinical development and
4 education, we supported, through
5 educational grants. And the providers
6 independent CE. And the providers
7 executed them, and the faculty.
8 BY MS. AMINOLROAYA:
9 Q. So Endo supported CME,
10 correct?
11 A. Yes.
12 Q. With money?
13 A. Correct. With resources,
14 yes.
15 Q. A lot of money?
16 MR. DAVIS: Objection to
17 form.
18 MS. AMINOLROAYA: Can I have
19 1306, please?
20 VIDEO TECHNICIAN: Going off
21 the record. 1:27 p.m.
22 - - -
23 (Whereupon, a brief recess
24 was taken.)

Page 175

1 - - -
2 VIDEO TECHNICIAN: Back on
3 the record at 1:29 p.m.
4 MS. AMINOLROAYA: Ms.
5 Kitlinski, I'm handing you what's
6 been marked as Exhibit-15. This
7 is KP360_OHIOMDL_000050938, and
8 it's E1306.
9 - - -
10 (Whereupon, Endo-Kitlinski
11 Exhibit-15,
12 KP360_OHIOMDL_000050938-1097, was
13 marked for identification.)
14 - - -
15 THE WITNESS: Thank you.
16 BY MS. AMINOLROAYA:
17 Q. And if you look at the
18 bottom of the first page, the copyright
19 is 2005.
20 And these are slides for a
21 National Initiative on Pain Control
22 program entitled, Opioid Analgesia:
23 Practical Treatment of the Patient With
24 Chronic Pain.

Page 176

1 Have you seen these before,
2 Ms. Kitlinski?
3 A. I have seen these before, at
4 the time I was still working at Endo. I
5 have not seen them since I left.
6 Q. Do these -- these are slides
7 for a CME presentation, correct?
8 MR. DAVIS: Objection to
9 form.
10 THE WITNESS: Let's just
11 take a quick perusal through here.
12 They are NIPC slides. And
13 the NIPC slides were used for
14 independent education. Some CME,
15 there might have been pharmacy
16 education as well. But definitely
17 accredited continuing education.
18 BY MS. AMINOLROAYA:
19 Q. And Endo used the NIPC to
20 deliver messaging that was helpful for
21 Endo, right?
22 MR. DAVIS: Objection to
23 form.
24 THE WITNESS: No. Endo

Page 177

1 supported an independent
2 educational grant for the NIPC to
3 assure that sound pain management
4 practices, in terms of assessment,
5 patient identification,
6 identification of relative risks
7 for -- whether it be adverse
8 effects associated with
9 medications that are opioids or
10 otherwise, and providing an
11 opportunity for clinicians to
12 learn how to identify patients at
13 greater risk of abuse, misuse and
14 addiction and to take proactive
15 steps and consider whether opioids
16 are, indeed, treatment options for
17 them, or other modalities would be
18 more appropriate.
19 BY MS. AMINOLROAYA:
20 Q. And Opana ER was launched in
21 the summer of 2006; is that correct?
22 A. I recall it was 2006. I'm
23 sorry, I don't recall when -- when during
24 the course of the year.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    Q.   That's fine.  2006 is fine.
2         If you'd turn to Page 149 of
3  the document.  And this is a slide on
4  pain control studies.
5         And if you turn back just
6  two pages to Page 146, it says, Recent
7  developments in opioid therapy.
8         And one of these recent
9  developments is pain control studies of
10 oxymorphone ER, correct?
11    A.   If you'll just give me a
12 little moment to look at this section
13 here, because it's been a long time.
14         All right.  If you could
15 repeat your question for me, please, I'd
16 appreciate it.
17    Q.   One of the -- this page, one
18 of the pages in the slide deck for the
19 NIPC in 2005, was regarding pain control
20 studies on oxymorphone ER, correct?
21    A.   Yes.  The slide on Page 149
22 is entitled, Pain Control Studies for
23 Oxymorphone ER.
24    Q.   And these were studies that

Page 179

1  were conducted regarding Opana ER,
2  correct?
3         MR. DAVIS:  Objection to
4    form.
5         THE WITNESS:  Oxymorphone ER
6    is Opana ER.  It is not
7    appropriate to use brand names in
8    accredited CE, unless there's a
9    particular reason for it, you
10   know, to avoid confusion or
11   something like that.
12 BY MS. AMINOLROAYA:
13    Q.   And this was a reference to
14 studies that had been conducted for
15 oxymorphone ER in the NIPC materials,
16 correct?
17    A.   This references the NIPC
18 materials, yes.  And it was talking about
19 the pain control studies.
20    Q.   And this is a year before --
21 or the year prior to Opana ER being
22 launched, correct?
23    A.   Well, again, this whole
24 section here, which starts on Page 146,

Page 180

1  just to make sure we're looking at things
2  in context, is recent developments in
3  opioid therapy.
4         And so the first slide in
5  this section talks about transdermal
6  fentanyl, which is -- also, had not been
7  approved by the FDA for that use at this
8  time.
9    Q.   I'm sorry, Ms. Kitlinski, I
10 think we're just not on the same page
11 here.  I apologize, but my question had
12 nothing to do with transdermal fentanyl.
13         I was just asking if 2005,
14 the year of the slide deck, was before
15 the launch of Opana ER?
16         MR. DAVIS:  I would really
17   appreciate you not interrupting
18   Ms. Kitlinski's answers.  It may
19   not be the answer you want, but
20   it's her answer and she's entitled
21   to give it in full.
22         THE WITNESS:  I do need to
23   put things in context, because --
24   and perhaps I misunderstood your

Page 181

1  intent, which it seemed that we
2  were talking about Opana ER in a
3  context before the drug was
4  approved.  That is not permissible
5  in the field of scientific
6  exchange.
7         And all I was trying to
8  point out was in the NIPC, which
9  is an FDA and ACCME approved
10 medium of scientific exchange, it
11 is permissible to discuss clinical
12 studies that have been done on
13 agents that haven't yet been
14 approved by the FDA, provided you
15 are not making any claims and
16 provided it's done so -- in a
17 balanced and unbiased method.
18         And so while there is a
19 discussion of oxymorphone, there
20 is also a discussion of all of the
21 other modalities that are being
22 used in opioid therapy that are --
23 you know, were pending before the
24 FDA at that time.

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    So I didn't mean to go
2  overboard on what you were
3  looking, I just wanted to provide
4  the appropriate context.
5  BY MS. AMINOLROAYA:
6    Q.   I think that was -- I asked
7  you if 2005 was before the launch of
8  Opana ER.  And you spent about 120
9  seconds giving an answer about something
10  that is not in answer to the question
11  that I asked.
12    So I would appreciate it if
13  you could stick to my question.
14    A.   Sure.  Yes.
15    Q.   Thank you.
16    And you would agree that a
17  manufacturer like Endo is not allowed to
18  promote its drug prior to FDA approval?
19    MR. DAVIS:  Objection to
20  form.
21    THE WITNESS:  This is -- is
22  not the manufacturer promoting its
23  drug.
24    I agree with you, a

Page 183

1  manufacturer is not allowed to
2  promote its drug --
3  BY MS. AMINOLROAYA:
4    Q.   Thank you.
5    A.   -- prior to approval.
6    May I add one sentence to
7  that?
8    Q.   You can do it with your
9  counsel.
10    THE WITNESS:  I was just
11  going to say --
12    MR. DAVIS:  We can talk
13  about that later.
14    MS. AMINOLROAYA:  1313,
15  please.  We're skipping one
16  exhibit, 16, and going on to 17.
17  We added that sticker to another
18  document we're not using.
19    Exhibit-17 is
20  MDL_KP360_000000002.  It's E1313.
21    - - -
22    (Whereupon, Endo-Kitlinski
23  Exhibit-17, MDL_KP360_000000002,
24  with attachment, was marked for

Page 184

1  identification.)
2    - - -
3  BY MS. AMINOLROAYA:
4    Q.   And I'll represent to you,
5  Ms. Kitlinski, this was produced to us by
6  Ashfield, which is the successor to
7  KnowledgePoint360.
8    Did KnowledgePoint360 and
9  Professional Postgraduate Services
10  administer the NIPC?
11    MR. DAVIS:  Objection to
12  form.
13    THE WITNESS:  I'll answer
14  this question partially.
15  Professional Postgraduate Services
16  did administer NIPC.  I don't know
17  what KnowledgePoint360 is.  So if
18  I could look at the documents and
19  refresh my memory.
20  BY MS. AMINOLROAYA:
21    Q.   Sure.  And I think if you
22  look at the second page, that will
23  provide some clarification on this.
24    A.   Okay.

Page 185

1    Q.   If you look at the Row 5 it
2  says, sponsored by Professional
3  Postgraduate Services, PPS, a division of
4  KnowledgePoint360.
5    A.   Okay.  Thank you.
6    Q.   And I'll represent to you
7  that these were jobs that were produced
8  to us by Ashfield that they conducted
9  between 2003 and 2012 for Endo.
10    Starting on Page 4 of the
11  document, if you look at the Column E, it
12  says, Grant amount.
13    A.   Yes.
14    Q.   And, for example, Job B214
15  is Newsletter Number 1, and there's a
16  grant amount of $96,680.
17    Did NIPC publish -- or did
18  Physician Professional Postgraduate
19  Services publish newsletters as part of
20  the NIPC?
21    A.   Yes.
22    MR. DAVIS:  Objection to
23  form.
24  BY MS. AMINOLROAYA:

Page 186

1    Q.   And did Physicians -- I'll
2  just use the acronym here, PPS.
3        Did PPS administer dinner
4  dialogues for NIPC, such as the one
5  listed in Number 7?
6        MR. DAVIS:  Objection to
7  form.
8        THE WITNESS:  Yes.
9  Professional Postgraduate Services
10 coordinated the dinner dialogues.
11 Those were the live meetings that
12 I referenced earlier.
13 BY MS. AMINOLROAYA:
14     Q.   Thank you.
15       And we can -- you can see,
16 in the rest of the document, this
17 continues.  And we won't take the jury's
18 time of going through -- by going through
19 the entire document.
20       But the rest of the document
21 lists grant amounts for each of these
22 activities between 2003 and 2012.  And we
23 won't sit here and add up all these grant
24 amounts.

Page 187

1        But you were responsible for
2  submitting requests and obtaining
3  approval for grants of money that went to
4  support NIPC activities, correct?
5        MR. DAVIS:  Objection to
6  form.
7        THE WITNESS:  No, actually,
8  it was the other way around.  So
9  there was an online grant portal
10 that independent education
11 providers, such as Professional
12 Postgraduate Services, would
13 propose an educational grant
14 request for.
15       It would be submitted
16 through the grant portal, and then
17 we would evaluate the grant at the
18 educational grant committee
19 meeting.
20 BY MS. AMINOLROAYA:
21     Q.   Endo set up the NIPC,
22 correct?
23       MR. DAVIS:  Objection to
24 form.

Page 188

1        THE WITNESS:  Endo provided
2  the educational grant support for
3  the NIPC.
4        MS. AMINOLROAYA:  I'm
5  handing you what's been marked as
6  Exhibit-18.  This is E1324,
7  END00152457.
8        THE WITNESS:  Thank you.
9              - - -
10       (Whereupon, Endo-Kitlinski
11 Exhibit-18, END00152457-473, was
12 marked for identification.)
13             - - -
14 BY MS. AMINOLROAYA:
15     Q.   And you'll see the top
16 e-mail is from Timothy Byrne to a number
17 of your colleagues -- former colleagues
18 at Endo, including you, it's dated April
19 7th, 2011.
20       The subject is, Biden
21 letter, Endo's efforts to address
22 prescription medicine abuse and misuse.
23       And Mr. Byrne was Endo's
24 senior director of public policy,

Page 189

1  correct?
2        A.   He was -- I don't recall his
3  exact title.  That was his department,
4  though, yes.  I don't know his exact
5  title.
6        Q.   And Mr. Byrne writes to you
7  and your colleagues, Many thanks again to
8  all of you for reviewing and for
9  providing the substance to make this a
10 meaningful document.  Ivan reviewed,
11 approved and signed.  Attached is the
12 document that was sent to Vice President
13 Biden.
14       So this was a submission you
15 were making to the Vice President of the
16 United States, correct?
17       MR. DAVIS:  Objection to
18 form.
19       THE WITNESS:  If you'll just
20 give me a moment to review the
21 document.  Again, I don't --
22 BY MS. AMINOLROAYA:
23     Q.   Sure.  I can tell you I'm
24 only just going to ask you about one

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1 page --
2    A.   No, I just want to --
3    Q.   -- a few words on one page.
4    A.   I'm just interested in the
5 context of it.
6    Q.   I'm going to ask you about
7 the top of 1324.10.
8    A.   Okay.
9       Okay.  Yes, I see what you
10 mean by established.  It was our -- it
11 was our initiative that we had supported
12 from the start.
13    Q.   So here on the top of Page
14 10, it says, National Initiative on Pain
15 Control, NIPC, integrated, independent,
16 educational initiative established and
17 supported by Endo since 2001.
18    A.   Yes.
19    Q.   Did I read that correctly?
20    A.   Yes, you did.
21    Q.   Are you aware of any other
22 supporters of the NIPC since 2001?
23    A.   No.
24    Q.   You can hang on to this,

Page 191

1 we'll probably come back to it in a few
2 minutes.
3    A.   And, again, as I said, it
4 was supported by Endo through an
5 unrestricted educational grant, and that
6 was the NIPC; the establishment of the
7 NIPC was by virtue of the fact that Endo
8 provided the grant.
9       MS. AMINOLROAYA:  Move to
10 strike the entire answer.
11 BY MS. AMINOLROAYA:
12    Q.   And going back to a prior
13 document, which was the Ashfield
14 spreadsheet, the spreadsheet of grants
15 that Endo provided between 2000 and 2012,
16 we won't take the jury's time up adding
17 this up.
18       I'm going to hand you a
19 summary of this spreadsheet that contains
20 the grants for each year between 2003 and
21 2012, payments to NIPC during that time
22 period.  The source is, of this document,
23 MDL_KP360_000000008, which we just marked
24 as an exhibit.

Page 192

1       MR. DAVIS:  Do you have
2 copies, please?
3       MS. AMINOLROAYA:  And if you
4 could just hand me back that
5 document for a moment, I'm going
6 to add an exhibit number to this.
7          - - -
8       (Whereupon, Endo-Kitlinski
9 Exhibit-19, No Bates, Endo Payment
10 to NIPC, 2003-2012, was marked for
11 identification.)
12          - - -
13       MS. AMINOLROAYA:  For the
14 record, this is Exhibit-19.  A
15 summary chart of Endo payments to
16 NIPC from 2003 to 2012.  The
17 source is MDLKP-360_000000002.
18 BY MS. AMINOLROAYA:
19    Q.   And the total amount of
20 money that Endo paid to NIPC between
21 these years is over $31 million?
22       MR. DAVIS:  Objection to
23 form.
24       THE WITNESS:  That's what

Page 193

1 the -- I presume that you totaled
2 this up accurately.  I don't know
3 of my recollection what the budget
4 was.
5 BY MS. AMINOLROAYA:
6    Q.   And Endo made payments to
7 NIPC before 2003 as well, correct?
8       MR. DAVIS:  Objection to
9 form.
10       THE WITNESS:  The initiative
11 was established in the early
12 2000s.  Again, without having
13 access to my documents, you know,
14 looking back almost 20 years, I
15 don't recall the exact date.
16       But you have the materials
17 in your files from -- you know,
18 from the materials I compiled at
19 Endo that would allow you to look
20 at that.
21 BY MS. AMINOLROAYA:
22    Q.   Did you ever have occasion
23 to attend any of the programming that
24 NIPC administered?

Page 194

1   A.   Yes.
2        MR. DAVIS:  Objection to
3   form.
4   BY MS. AMINOLROAYA:
5   Q.   What types of programming
6   did you attend?
7   A.   I made it a point to be sure
8   that I -- either myself or a member of
9   our department, attended at least the
10  first of each new series, to make sure
11  that the content that was presented was
12  consistent with what the CE provider had
13  indicated they were going to do in their
14  grant proposal, to make sure that it was
15  compliant with ACCME guidelines and OIG
16  and FDA guidelines, and to make sure that
17  there was no misrepresentation of
18  factually inaccurate information, medical
19  information, about Endo's products.
20       That type of auditing is
21  very -- is very common in the CE world.
22  Some companies hire external consultants,
23  if they don't have an internal staff
24  member.  We made sure that things were

Page 195

1   compliant on our own.
2   Q.   And were recordings of --
3   strike that.
4        Did you ever attend an NIPC
5   sponsored dinner dialogue?
6   A.   Yes.
7   Q.   And were recordings of
8   NIPC's sponsored dinner dialogues kept
9   for reference or made available to
10  participants after the program?
11       MR. DAVIS:  Objection to
12  form.
13       THE WITNESS:  There were the
14  enduring materials.  So, again, if
15  you recall, we talked about the
16  different formats.
17       So the -- they did not
18  record the dinner dialogue, per
19  se, a live program recording, we
20  weren't that advanced at that
21  time.  But what they did do was
22  they would have an online version
23  of a dinner dialogue.  Towards the
24  end of NIPC, they actually did

Page 196

1   post those.
2        And then they also had the
3   video -- I mean, the audio
4   conference recordings and the
5   newsletters, as I mentioned
6   earlier, so that people had four
7   different types of learning
8   activities.
9   BY MS. AMINOLROAYA:
10  Q.   So there were --
11  A.   I want to -- I just want to
12  restate something, to make sure I didn't
13  misspeak.
14       I don't -- I don't know for
15  a fact whether they actually recorded it
16  on site.  Because I never did see that
17  myself.
18       So there was -- there were
19  dinner dialogue content posted online.  I
20  don't know for a fact where that was
21  recorded.
22  Q.   All right.  Let's talk about
23  one of the NIPC dinner dialogues.
24  Advances in opioid analgesia, maximizing

Page 197

1   benefits while minimizing risks.
2        Does that sound like -- does
3   that sound familiar?
4   A.   Do you have the paperwork
5   that goes along with it that I could look
6   at, or is it in this stack here?
7   Q.   It's not.
8        MS. AMINOLROAYA:  I don't
9   know if we have the document or
10  not.
11  BY MS. AMINOLROAYA:
12  Q.   Did you know some of the
13  speakers for the NIPC dinner dialogues?
14       MR. DAVIS:  Objection to
15  form.
16       THE WITNESS:  Again, each of
17  the series had a -- the faculty
18  council, you know, that we looked
19  at earlier.  And so, certainly,
20  that group of speakers that we
21  looked at for that particular
22  series, we know who they were.
23       But off the top of my head,
24  to know who the other faculty were

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  for the other years, I don't -- I
2  don't have access to those
3  documents.
4  BY MS. AMINOLROAYA:
5      Q.   Was Dr. Argoff one of the
6  faculty for the NIPC dinner dialogues?
7      A.   Dr. Argoff was a -- we
8  looked at him on the previous one, he was
9  a member of the NIPC faculty and the
10  council.
11     Q.   And he would have received
12  an honoraria every time he spoke at one
13  of these NIPC dinner dialogues, correct?
14     A.   Any time a faculty member
15  speaks at a CME activity, unless --
16  unless they, for whatever reason,
17  requested not to receive an honorarium,
18  they would receive an honorarium for fair
19  market value, as determined by the CE
20  provider.
21     Q.   And was Dr. Argoff one of
22  the regular speakers at the NIPC dinner
23  dialogues?
24         MR. DAVIS:  Objection to

Page 199

1  form.
2         THE WITNESS:  Again, there
3      was a designated group of faculty
4      for each topic.  And so the NIPC
5      Professional Postgraduate Services
6      folks would assign the faculty,
7      based on things like their
8      availability, the logistics,
9      geographic proximity to where the
10     activity is being held, whether
11     there was a particular audience
12     that that visiting faculty member
13     was a member of.
14         MS. AMINOLROAYA:  I'm
15     handing you what's been marked as
16     Exhibit-20.  It's
17     KP360_OHIOMDL_000003707, E1347.
18             - - -
19     (Whereupon, Endo-Kitlinski
20     Exhibit-20,
21     KP360_OHIOMDL_000003707, was
22     marked for identification.)
23             - - -
24

Page 200

1  BY MS. AMINOLROAYA:
2      Q.   This is a letter --
3         MR. DAVIS:  Let's clean this
4      up.
5  BY MS. AMINOLROAYA:
6      Q.   -- to Dr. Argoff saying,
7  Thank you for contributing both your time
8  and expertise to make the National
9  Initiative on Pain Control dinner
10  dialogue series entitled, Advances in
11  Opioid Analgesia, Maximizing Benefit
12  While Minimizing Risk, a success.
13  Enclosed please find your honorarium
14  check in the amount of $7,500 for the
15  Parsippany, New Jersey, Roslyn, New York,
16  and White Plains, New York meetings.  We
17  look forward to working with you in the
18  future.
19         Did I read that correctly?
20     A.   Yes.
21     Q.   And that's from Marilyn
22  Rodas at Thomson Professional
23  Postgraduate Services?
24     A.   Correct.

Page 201

1      Q.   So Dr. Argoff is receiving a
2  check here for $7,500 for three NIPC
3  dinner dialogues, correct?
4      A.   Correct.  This is -- that's
5  what this letter states.
6      Q.   And Dr. Argoff would have
7  received checks like this every time he
8  did a dinner dialogue, if he did more,
9  correct?
10         MR. DAVIS:  Objection to
11     form.
12         THE WITNESS:  All of the
13     faculty for any CE activity would
14     receive an appropriate honorarium
15     that was consistent with the fair
16     market value of the CE and the
17     activity that they were
18     conducting.
19  BY MS. AMINOLROAYA:
20     Q.   Just to help us keep track
21  of payments to different doctors -- and
22  Dr. Argoff would be considered a KOL?
23     A.   We use the term TE,
24  therapeutic expert, because the reason

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 these individuals are speaking at these
2 accredited educational activities is
3 because they are the therapeutic experts
4 in whatever the subject matter is.
5         So a key opinion leader is
6 more somebody who is, you know, designed
7 to sway opinions, oftentimes, as opposed
8 to these are people who are the
9 therapeutic experts and knowledgeable
10 about the best evidence medicine at the
11 time.
12        And when I say "we use the
13 term," I was referring to our department.
14 I know that different departments across
15 companies use different terms, KOLs,
16 thought leaders, you know, whatever.
17     Q.   You would agree that Dr.
18 Argoff is a recognized doctor in his
19 field?
20        MR. DAVIS:  Objection to
21 form.
22        THE WITNESS:  He is a
23 therapeutic expert, yes.
24        MS. AMINOLROAYA:  I think I

Page 203

1 will use the Elmo.  So I'd just
2 like -- to help us keep track of a
3 few things for the rest of the
4 afternoon, we're going to use the
5 Elmo.  Hopefully, I can figure
6 this out.
7         And I'll hand you a copy of
8 it as well, but you'll be able to
9 see it on the Elmo.
10        We'll mark this as --
11        MR. DAVIS:  Another copy,
12 please.
13        MS. AMINOLROAYA:  We'll turn
14 back to that in a moment.
15 BY MS. AMINOLROAYA:
16     Q.   We mentioned before there
17 were some NIPC dinner dialogues -- you
18 confirmed before there that were some
19 NIPC dinner dialogues that were recorded
20 for usage in the future, correct?
21     A.   Again, what I said was I
22 wasn't sure if they were recorded or if
23 they had an online -- in other words,
24 were they recorded live while someone was

Page 204

1 speaking, or was it that someone taped
2 a -- you know, the content of the dinner
3 dialogue and posted that directly online.
4 I just don't know if it was a live
5 program that was recording.
6     Q.   And just going back to this
7 document to help us keep track of some of
8 the documents we're going through.
9         We just looked at a document
10 sending an honorarium to Dr. Argoff, and
11 that was -- and he received thousands of
12 dollars for his participation in this
13 dinner dialogue, correct?
14        MR. DAVIS:  Objection to
15 form.
16        THE WITNESS:  He received
17        $7,500 for three presentations,
18        which was, I presume, the -- which
19        was -- our policy for honoraria,
20        first of all, it's set by the CE
21        provider, not by us.
22        But it must meet the fair
23        market value ranges that are
24        established.

Page 205

1 BY MS. AMINOLROAYA:
2     Q.   Okay.  And you would agree
3 with me that $7,500 is thousands of
4 dollars?
5     A.   For three programs, yes.
6     Q.   So we're going to write
7 down, thousands of dollars for Dr.
8 Argoff.
9         He received payments,
10 correct?
11     A.   Yes.  Indirect has been
12 taken away.  I was wondering what that
13 meant.
14     Q.   We can put indirect back.
15     A.   No, no.  I thought you were
16 right taking it away, because I was going
17 to say I didn't know what indirect meant.
18     Q.   Taking indirect away, as you
19 suggested.
20         And these programs were a
21 couple of hours, correct?
22     A.   Correct.
23     Q.   So I'll spare the -- I'd
24 like to listen to one of them, I'll spare

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 the jury from listening to the full
2 presentation, but we'll play a portion of
3 Dr. Argoff and Dr. Ford's presentation at
4 one of the NIPC dinners, Advances in
5 Opioid Analgesia, Maximizing Benefit and
6 Minimizing Risks.
7     MR. DAVIS: You're going to
8 play a recording of the --
9     MS. AMINOLROAYA: CME, yes.
10     MR. DAVIS: And you're just
11 going to play a portion of it, not
12 the entire thing?
13     MS. AMINOLROAYA: Yes.
14     MR. DAVIS: Are you going to
15 ask Ms. Kitlinski questions about
16 the portions you're about to play?
17     MS. AMINOLROAYA: Yes.
18     MR. DAVIS: I'm going to
19 object to Ms. Kitlinski answering
20 any questions about the portion of
21 a dinner dialogue, without
22 listening to the entire thing.
23 That's the same as showing her
24 about one page of a ten-page

Page 207

1 document. She's got to have the
2 whole thing for the full context.
3     MR. BUCHANAN: I disagree,
4 counsel. Ms. Kitlinski attended
5 hours and hours of meetings.
6 She's not being asked for
7 everything that happened in hours
8 and hours of meetings.
9     MR. DAVIS: I don't know
10 what she's going to be asked about
11 and I don't know what the context
12 of what you're about to play is.
13     MR. BUCHANAN: You're
14 objection is noted.
15     MR. DAVIS: I don't know
16 what -- I'm not going to let Ms.
17 Kitlinski -- can we go off the
18 record for a second?
19     MR. BUCHANAN: No, it should
20 be on the record.
21     MS. AMINOLROAYA: It should
22 be on the record.
23     MR. DAVIS: I'd like to talk
24 to my client about this, if I may.

Page 208

1 And that's not going to be on the
2 record. So let's go off for a
3 second, please.
4     MR. BUCHANAN: Who's your
5 client? You work for Endo, not
6 for Ms. Kitlinski.
7     MR. DAVIS: I do work for
8 Ms. Kitlinski as well.
9     But let's -- we're going to
10 go off the record for this
11 conversation.
12     VIDEO TECHNICIAN: Going off
13 the record. The time is 2:02 p.m.
14         - - -
15     (Whereupon, a brief recess
16 was taken.)
17         - - -
18     VIDEO TECHNICIAN: We're
19 back on record. The time is 2:06
20 p.m.
21     MR. DAVIS: So prior to any
22 questioning about the excerpt or
23 snippet of whatever recording you
24 intend to play, I just want to

Page 209

1 lodge an objection for the record.
2     We're going to permit Ms.
3 Kitlinski to answer questions, but
4 we think it's highly inappropriate
5 to be asking her questions about
6 just portions of some recording
7 that you're representing was a
8 recording from NIPC, some dinner
9 dialogue. It's no different than
10 asking her about a single page of
11 a ten-page document without
12 letting her review the entire
13 document.
14     So we think all of these
15 questions about this recording are
16 inappropriate, are objectionable.
17 But we're going to permit Ms.
18 Kitlinski to answer.
19 BY MS. AMINOLROAYA:
20     Q.  Ms. Kitlinski, you testified
21 earlier that you attended NIPC dinner
22 dialogues periodically, correct?
23     A.  Yes.
24     Q.  And did you ever see

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 invitations for these dinners?
2    A.   Yes.
3    Q.   I'm handing you what's been
4 marked as Exhibit-22.
5         - - -
6         (Whereupon, Endo-Kitlinski
7    Exhibit-22,
8    KP360_OHIOMDL_000003328-329, was
9    marked for identification.)
10        - - -
11 BY MS. AMINOLROAYA:
12   Q.   Is this an invitation to
13 join your colleagues for an interactive
14 case-based discussion on advances in
15 opioid analgesia, maximizing benefit
16 while minimizing risk dinner dialogue
17 series?
18        Did I read that correctly?
19   A.   Yes.
20   Q.   And the date here is
21 Wednesday, November 8th, 2006, correct?
22   A.   Correct.
23   Q.   And the speakers are Dr.
24 Grace Ford and Dr. Argoff?

Page 211

1    A.   Yes.
2    Q.   And this is taking place in
3 Roslyn, New York.  You can set that
4 aside.
5        MS. AMINOLROAYA:  So we'll
6    mark for the record Exhibit-23,
7    which is E1314.  Advances in
8    Opioid Analgesia, Maximizing
9    Benefits While Minimizing Risks.
10   It's Bates stamped KP360 Ohio
11   MDL00009569, produced to us by
12   Ashfield.
13        And I believe the trial tech
14   will help us out here.
15        - - -
16        (Whereupon, Endo-Kitlinski
17   Exhibit-23,
18   KP360_OHIOMDL_00009569, was marked
19   for identification.)
20        - - -
21        THE WITNESS:  If I may at
22   least have a moment to read the
23   full back of this, because this
24   details the educational objectives

Page 212

1 and the synopsis of what we should
2 be hearing.
3        MS. AMINOLROAYA:  Sure.
4 BY MS. AMINOLROAYA:
5    Q.   My question is not about the
6 educational objectives.  You're welcome
7 to read it.
8    A.   Thank you.
9        All right.  I finished
10 reading that.
11        MS. AMINOLROAYA:  The trial
12 tech will play an excerpt of this
13 dinner dialogue for us.
14        (Whereupon, a video
15 recording was played.)
16        MR. DAVIS:  Can you provide
17 a time stamp, please, Mr. Trial
18 Tech?
19        MS. AMINOLROAYA:  The first
20 portion is from 0 to 14 seconds.
21        TRIAL TECHNICIAN:  This next
22 portion will be from 1 minute and
23 10 seconds to 1 minute and 18
24 seconds.

Page 213

1        (Whereupon, the video
2 recording was played.)
3        - - -
4        MS. AMINOLROAYA:  The next
5 portion of the tape is -- I'm
6 sorry, go ahead, you have it.
7        MR. KUNYS:  The third
8 portion is from 3 minutes and 40
9 seconds to 3 minutes and 50
10 seconds.
11        (Whereupon, the video
12 recording was played.)
13        MR. KUNYS:  And the fourth
14 portion is from 17 minutes and 45
15 seconds to 18 minutes and two
16 seconds.
17        (Whereupon, a video
18 recording was played.)
19 BY MS. AMINOLROAYA:
20   Q.   Ms. Kitlinski, this was a
21 dinner dialogue that was being given by
22 Drs. Ford and Argoff, correct?
23        MR. DAVIS:  Objection to
24 form.  I am going to object again

Page 214

1  to all questions regarding the
2  snippets we just heard.  We heard
3  a snippet from the first minute, a
4  snippet from the third minute, a
5  snippet from the 17th and 18th
6  minute.  None of the speakers were
7  identified during the course of
8  that recording.
9      So you can answer, Ms.
10 Kitlinski.  But, again, I'm going
11 to object to all of these
12 questions as inappropriate.
13     MS. AMINOLROAYA:  You can
14 have an objection to this.
15 BY MS. AMINOLROAYA:
16     Q.   Do you recognize Dr. Ford's
17 voice?
18     A.   I do.
19     Q.   And was Dr. Ford discussing
20 the JCAHO standard for pain treatment?
21     A.   Can you just play through
22 those again?  Because each one of them
23 were kind of cut off, the first --
24 beginning of it and, you know --

Page 215

1      MS. AMINOLROAYA:  Sure.  Why
2  don't we play the last, the fourth
3  snippet.
4      (Whereupon, a video
5  recording was played.)
6      MR. KUNYS:  For the record,
7  this will be from 17 minutes and
8  45 seconds to 18 minutes and two
9  seconds.
10 BY MS. AMINOLROAYA:
11     Q.   Did Ms. Ford -- did Dr.
12 Ford, rather, state that comprehensive
13 assessment of pain is a requirement of
14 the JCAHO standards?
15     MR. DAVIS:  Objection.
16     THE WITNESS:  She stated
17 that comprehensive assessment of
18 pain is required -- her first part
19 of the sentence was, is required
20 for appropriate treatment, or --
21 exactly her words there.  And then
22 she indicated that it was --
23 appropriate assessment was also
24 required by the joint commission.

Page 216

1  And that pain was the fifth vital
2  sign.
3  BY MS. AMINOLROAYA:
4      Q.   And was this a new standard
5  in the treatment of pain, a new medical
6  center in the treatment of pain?
7      MR. DAVIS:  Objection to
8  form.
9      THE WITNESS:  What is the --
10 what is the date on this
11 particular --
12 BY MS. AMINOLROAYA:
13     Q.   So we know that, referring
14 back to the invitation, the date of this
15 program --
16     A.   2006.
17     Q.   -- is November 8th, 2006.
18     A.   So the joint commission
19 earlier in the 2000s had -- and I'm
20 sorry, I don't know when, so I shouldn't
21 even say earlier in the 2000s.
22     The joint commission had
23 made pain a fifth vital sign and mandated
24 that institutions evaluate that in all

Page 217

1  patients.  I'm sorry, I don't know the
2  date of that.
3      Q.   And this was a new standard
4  that JCAHO introduced, correct?
5      A.   It was new in that it hadn't
6  been in place for 50 years.  But I don't
7  know, again, what the inception of it
8  was.
9      Q.   And Dr. Ford advised that
10 doctors who were in attendance at this
11 dinner dialogue, that they would be sued
12 if they did not conduct the JCAHO -- or
13 the comprehensive assessment pursuant to
14 the JCAHO standard, correct?
15     MR. DAVIS:  Objection again.
16 And objection to the form.
17     THE WITNESS:  I heard what
18 she said, as we all did.  What she
19 meant by that, I'm not certain.
20 BY MS. AMINOLROAYA:
21     Q.   And this was a presentation
22 regarding advances in opioid analgesia,
23 correct?
24     MR. DAVIS:  Objection.  And

Page 218

1 objection to form.
2 THE WITNESS: The title was
3 to maximize benefit while
4 minimizing risk.
5 And, again, the whole
6 environment and Endo's, indeed,
7 focus on opioid, responsible
8 opioid analgesia, has always been
9 how to optimize the benefit for
10 patients and, yet, at the same
11 time, mitigate the risks to the
12 extent that that is possible with
13 an opioid.
14 BY MS. AMINOLROAYA:
15 Q. And one of the things Dr.
16 Ford was telling doctors at this
17 presentation -- well, strike that.
18 This was November 2006. So
19 was this in the time period that Opana ER
20 was being launched?
21 MR. DAVIS: Objection to
22 form.
23 THE WITNESS: As I said
24 earlier, I do know that Opana was

Page 219

1 launched in 2006. I don't know
2 the month, however. So it was
3 that year.
4 BY MS. AMINOLROAYA:
5 Q. Thank you.
6 I'm sorry, I didn't mean to
7 cut you off.
8 A. No worries.
9 Q. So in November 2006, Endo is
10 paying for a program that threatens to
11 sue doctors for not treating pain
12 adequately, correct?
13 MR. DAVIS: Objection. And
14 objection to form.
15 THE WITNESS: No. I don't
16 agree with that. Dr. Ford made a
17 comment based on her opinion.
18 Endo cannot control -- not
19 only can't control the content of
20 whatever is -- and we don't know
21 what is on the slides there,
22 because we're not looking at it,
23 but we cannot only control --
24 cannot only not control the

Page 220

1 content of the activity, we also
2 cannot control the faculty's, you
3 know, opinions or comments that
4 they may make during the course of
5 it.
6 BY MS. AMINOLROAYA:
7 Q. Well, Endo could stop paying
8 for this programming, right?
9 MR. DAVIS: Objection to
10 form.
11 THE WITNESS: Once an
12 educational grant has been
13 provided to the CE provider, then
14 the grant has been -- has been
15 made.
16 If someone were doing
17 something that was at odds, from a
18 legal perspective or a
19 medical/legal perspective or the
20 regulatory perspective of either
21 the FDA or the ACCME, Endo could
22 file an official complaint with
23 the ACCME as the accrediting
24 organization, and they have

Page 221

1 internal processes for determining
2 whether there were any -- whether
3 there were any aberrations to the
4 CE activity.
5 But we would not address
6 that directly.
7 BY MS. AMINOLROAYA:
8 Q. Did Endo ever file a
9 complaint against Dr. Ford?
10 MR. DAVIS: Objection to
11 form.
12 THE WITNESS: I don't -- I
13 honestly don't recall.
14 BY MS. AMINOLROAYA:
15 Q. Did Endo continue to make
16 payments to the -- NIPC for the NIPC
17 programming for another six years after
18 this?
19 MR. DAVIS: Objection to
20 form.
21 THE WITNESS: As you showed
22 us earlier, the NIPC program
23 continued until -- I forget if it
24 was 2012 or '13, on the bottom of

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  your sheet here.
2        2012.
3  BY MS. AMINOLROAYA:
4        Q.    And can we agree, ma'am,
5  that in 2006, Dr. Ford was advocating for
6  doctors to comprehensively assess pain in
7  a program about opioids?  Can we agree
8  that at this time, there were no studies
9  to show whether opioids -- strike that.
10       MS. AMINOLROAYA:  Can I get
11  1304, please?
12       I'm handing you what's been
13  marked as Exhibit-24.  It's E770.
14  This is the evidence
15  report/technology assessment,
16  Number 218, The Effectiveness and
17  Risks of Long-Term Opioid
18  Treatment and Chronic Pain.
19  Prepared by The Agency for
20  Healthcare Research and Quality.
21             - - -
22       (Whereupon, Endo-Kitlinski
23  Exhibit-24, No Bates, The
24  Effectiveness and Risks of

Page 223

1  Long-Term Opioid Treatment of
2  Chronic Pain; Agency for
3  Healthcare Research and
4  Quality, was marked for
5  identification.)
6        MR. DAVIS:  Just for the
7  record, this doesn't appear to
8  have a Bates number on it.
9        MS. AMINOLROAYA:  Correct.
10  BY MS. AMINOLROAYA:
11       Q.    Ms. Kitlinski, are you
12  familiar with The Agency for Healthcare
13  Research and Quality, known as AHRQ?
14       A.    I'm familiar with that
15  organization.  And I'm familiar,
16  generally, with this document.  But I
17  haven't read it in detail.
18       Q.    Okay.  Let's turn to Page 33
19  of the document -- actually, before we do
20  that, let's turn to Page 9 at the top,
21  770.9.
22       It says, The Effectiveness
23  and Risks of Long-Term Opioid Treatment
24  of Chronic Pain.  Structured abstract.

Page 224

1  Objectives.  Chronic pain is common and
2  use of long-term opioid therapy for
3  chronic pain has increased dramatically.
4  This report reviews the current evidence
5  on effectiveness and harms of opioid
6  therapy for chronic pain, focusing on
7  long-term (longer than one year)
8  outcomes.
9        And to orient us, I should
10  have mentioned this before, the bottom of
11  Page 2 contains the date of September
12  2014.  And this was prepared for the
13  Agency for Healthcare Research and
14  Quality, U.S. Department of Health and
15  Human Services, prepared by Pacific
16  Northwest Evidence-Based Practice Center,
17  Oregon Health and Science University.
18       Did I read that correctly?
19       A.    Yes.
20       Q.    Now turning to Page 9.
21       And the objective there, did
22  I read that correctly before?
23       I can read it one more time.
24  It says, Chronic pain is common and use

Page 225

1  of long-term opioid therapy for chronic
2  pain has increased dramatically.  This
3  report reviews the current evidence on
4  effectiveness and harms of opioid therapy
5  for chronic pain, focusing on long-term
6  (longer than one year) outcomes.
7        Did I read that correctly?
8        A.    Yes.
9        Q.    Turning to Page 33 of the
10  document.
11       It says, Discussion, key
12  findings and strength of evidence.
13  Second paragraph states, For
14  effectiveness and comparative
15  effectiveness, we identified no studies
16  of long-term opioid therapy in patients
17  with chronic pain versus no opioid
18  therapy or nonopioid alternative
19  therapies that evaluated outcomes at one
20  year or longer.  No studies examined how
21  effectiveness varies based on various
22  factors, including type of pain and pain
23  characteristics.
24       Did I read that correctly?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    A.   Yes, you read that excerpt
2  correctly.
3    Q.   And if we drop down to the
4  first sentence of the last paragraph --
5    A.   Is there any reason why is
6  kind of skipping around, as opposed to
7  being able to read the -- since this is
8  the key findings and strength of
9  evidence, being able to read the entirety
10 of it?
11   Q.   Sure.  You can read whatever
12 you'd like with your counsel.
13        The last paragraph of this
14 page, the first sentence states, No study
15 assessed the risk of abuse, addiction or
16 related outcomes associated with
17 long-term opioid therapy use versus
18 placebo or no opioid therapy.
19        Did I read that correctly?
20   MR. DAVIS:  If you'd like to
21   take time to read the context, you
22   may.
23   THE WITNESS:  I'd like to
24   read these two pages, at least.

Page 227

1  BY MS. AMINOLROAYA:
2    Q.   Sure.  Would you just answer
3  my last question, if I read that last
4  sentence correctly?
5    A.   Yes, you did read the words
6  correctly.
7    Q.   Thank you.
8    A.   Thank you.
9        Yeah, I'd like to just read
10 the opening statement of this document
11 and then the key --
12   Q.   Sure.
13   A.   -- key findings there.
14   Q.   Ms. Kitlinski, this is a
15 very long document and I --
16   A.   No, I was just reading, as I
17 said, the abstract and the results up
18 front, as well as the key findings and
19 summary of the strength of the evidence
20 here.
21   Q.   Sure.  So I'll tell you my
22 question.
23   A.   Okay.  Great.
24   Q.   My question is, if there was

Page 228

1  no evidence in September of 2014 that
2  long-term opioid therapy in patients with
3  chronic pain versus no opioid therapy or
4  nonalternative therapies, that evaluated
5  outcomes at one year or longer, was there
6  any evidence before September of 2014?
7    MR. DAVIS:  Objection to
8    form.
9    THE WITNESS:  Well, again,
10   and this is the importance of
11   reading the summary of the
12   document up front.
13        It also shows that the
14   evidence was insufficient to
15   establish the harms of long-term
16   opioid therapy in high-risk
17   patients or in any other
18   subgroups.
19        So the bottom line is, and
20   the reason the studies are going
21   on now, as we speak, is that in
22   order for opioid analgesics to be
23   approved by the Food and Drug
24   Administration, they have to cover

Page 229

1  the period of three months, is the
2  usual definition for chronic
3  opioid therapy, to determine
4  safety and efficacy.  And then
5  there are long-term -- longer
6  term, out to a year, studies which
7  are often open label or otherwise,
8  you know, not optimally
9  controlled.
10        So to answer your question,
11   because of the inherent nature of
12   the FDA's requirements for opioids
13   and other medications to be
14   approved, the studies that would
15   have stated, one way or the other,
16   what you asked me had not been
17   done yet.  And so that is what
18   this document is identifying,
19   evidence was insufficient to
20   evaluate benefits and harms of
21   long-term opioid therapy in
22   high-risk patients or in other
23   subgroups.
24        So those studies are now

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 being conducted by the RPC, the
2 REMS program companies. And we
3 should, hopefully, have data from
4 them to be able to guide that
5 going forward.
6 BY MS. AMINOLROAYA:
7 Q. I'm sorry, I may have misled
8 you with my question.
9 My question did not have
10 anything to do with the FDA, Ms.
11 Kitlinski.
12 My question was, in 2014, if
13 there were no long-term studies
14 evaluating the efficacy of opioids and
15 chronic pain versus no opioid therapy or
16 nonopioid therapies for one year or
17 longer in 2014, was there ever evidence
18 before 2014; yes or no?
19 A. The same evidence --
20 MR. DAVIS: Objection to
21 form.
22 THE WITNESS: The same
23 evidence exists. There are
24 different categories of evidence.

Page 231

1 And they are, I'm sure,
2 discussed in this document,
3 Category A, you know, Level 1, et
4 cetera.
5 So there is evidence and
6 what clinicians are forced to go
7 by, not only in this instance, but
8 in other types of pain therapy and
9 other types of therapeutics, where
10 a three-month duration is
11 considered chronic therapy, they
12 have to be guided by the best
13 available evidence.
14 And that continues to evolve
15 as we learn more about the drugs
16 and as we learn more about the
17 public health patient safety
18 issues, which is why, as I said,
19 they are now conducting those
20 studies to be able to determine
21 that.
22 BY MS. AMINOLROAYA:
23 Q. You would agree no evidence
24 of that existed before 2014?

Page 232

1 MR. DAVIS: Objection to
2 form.
3 THE WITNESS: No, I didn't
4 say that. No evidence of what?
5 BY MS. AMINOLROAYA:
6 Q. I asked you a question.
7 This document says, We identified no
8 long-term studies -- strike that.
9 We identified no studies of
10 long-term opioid therapy in patients with
11 chronic pain versus no opioid therapy or
12 nonopioid alternative therapies that
13 evaluated outcomes at one year or longer.
14 Did I read that correctly?
15 A. You did.
16 And so --
17 Q. Okay. Wait for a question.
18 If there were no studies in
19 2014, were there studies before 2014?
20 MR. DAVIS: Objection to
21 form.
22 THE WITNESS: There were no
23 studies of longer duration than
24 one year.

Page 233

1 BY MS. AMINOLROAYA:
2 Q. Thank you. You can put this
3 aside.
4 A. There were also, however,
5 patients who are managed with opioid
6 therapy, despite the fact that there are
7 no long-term studies for cancer pain or
8 for other types of pain.
9 MS. AMINOLROAYA: Move to
10 strike everything after "there
11 were also, however."
12 BY MS. AMINOLROAYA:
13 Q. Did the NIPC also publish a
14 newsletter called Pain Management Today?
15 MR. DAVIS: Objection to
16 form.
17 THE WITNESS: As we've
18 discussed previously, there were
19 newsletters. I don't recall the
20 name of the newsletter, I'm sorry.
21 MR. DAVIS: It's been about
22 an hour. Why don't we take
23 another quick break? Five minutes
24 or so.

Highly Confidential – Subject to Further Confidentiality Review

Page 234

1    THE WITNESS: That would be
2  great.
3    MS. AMINOLROAYA: That's
4  fine.
5    VIDEO TECHNICIAN: Going off
6  the record. The time is 2:32 p.m.
7    - - -
8    (Whereupon, a brief recess
9  was taken.)
10    - - -
11    VIDEO TECHNICIAN: Back on
12  record at 2:48 p.m.
13  BY MS. AMINOLROAYA:
14    Q.  Ms. Kitlinski, welcome back.
15  We just took a short break.
16    A.  Thank you.
17    Q.  And you had just testified
18  that you recalled the newsletter that
19  NIPC put out, correct?
20    A.  Yes, I said that I do recall
21  there was a newsletter. I did not
22  recall -- you mentioned the title of it,
23  and I don't know that.
24    MS. AMINOLROAYA: I'm

Page 235

1  handing you what's been marked
2  Exhibit-25. It's
3  ENDO-OPIOID_MDL-01605952. It's
4  E690.
5    - - -
6    (Whereupon, Endo-Kitlinski
7  Exhibit-25,
8  ENDO-OPIOID_MDL-01605952-958, was
9  marked for identification.)
10    - - -
11  BY MS. AMINOLROAYA:
12    Q.  This is --
13    A.  Pain Management Today.
14    Q.  -- Pain Management Today.
15    It sounds like you recognize
16  it?
17    A.  Yes. Now I do.
18    Q.  Great. And is the faculty
19  advisor here Dr. Argoff?
20    A.  Correct.
21    Q.  And this is -- you can see
22  the copyright date is 2001, correct?
23  Just below Dr. Argoff's photo.
24    A.  Yes.

Page 236

1    Q.  And if you turn to Page 4 of
2  the document with me, you'll see a page
3  entitled, Key Terms for Opioid
4  Analgesics.
5    And if you look in the
6  right-hand column there, you see the term
7  pseudoaddiction. It says,
8  Pseudoaddiction refers to behaviors that
9  might seem aberrant, but actually
10  indicate inadequate treatment of pain.
11  The behaviors resolve when the pain
12  medication is increased and appropriate
13  analgesia is obtained.
14    Did I read that correctly?
15    A.  Yes.
16    Q.  So the NIPC management
17  newsletters were -- included key terms
18  for opioid such as pseudoaddiction?
19    MR. DAVIS: Objection to
20  form.
21    THE WITNESS: The key terms
22    that they included -- as you can
23    see up front, the first one was
24    addiction. So that was put in

Page 237

1  appropriate context.
2    And then physical
3  dependence, tolerance and
4  pseudoaddiction.
5    MS. AMINOLROAYA: 304,
6  please.
7  BY MS. AMINOLROAYA:
8    Q.  So you also taught this
9  concept of pseudoaddiction to Endo sales
10  representatives, correct?
11    A.  Did I personally?
12    Q.  Yes.
13    A.  Again, I know that I was
14  involved in, as was our whole department,
15  in doing some clinical training for
16  Endo's internal team.
17    I don't recall whether this
18  concept was part of that or not.
19    MS. AMINOLROAYA: I'm
20    handing you what's been marked as
21    Exhibit-26. It's
22    ENDO-OPIOID_MDL-02002702. E304.
23    - - -
24    (Whereupon, Endo-Kitlinski

Page 238

1 Exhibit-26,
2 ENDO-OPIOID_MDL-02002702-703, with
3 attachment, was marked for
4 identification.)
5 - - -
6 BY MS. AMINOLROAYA:
7 Q. This is an e-mail from you
8 to Nancy Alvarez, Carey Aron and others,
9 dated April 17, 2003. Subject: LK
10 presentation for advanced rep training.
11 Is that correct?
12 A. That's what it states, yes.
13 Thank you.
14 Q. And if you turn to Page 16
15 of the document for me, it says,
16 Pseudoaddiction. Pseudoaddiction.
17 Behaviors suggestive of addiction (e.g.,
18 drug-seeking behavior) which may occur
19 when patients are not receiving adequate
20 pain relief. If pseudoaddiction,
21 behavior will cease if pain is adequately
22 treated by adjustment in opioid dose.
23 Did I read that correctly?
24 A. Yes, you read this slide

Page 239

1 correctly.
2 And this is the follow-on to
3 the previous slide, which discusses what
4 addiction is and differentiates addiction
5 from pseudoaddiction.
6 Q. And this was in 2003,
7 correct, prior to the launch of Opana ER?
8 A. The date on the e-mail is
9 2003.
10 Q. And just to clarify for the
11 jury, you're writing here to Nancy
12 Alvarez. It says, Here are my slides for
13 the Barriers pain management lecture for
14 next week, Linda.
15 Did I read that correctly?
16 A. Yes.
17 Q. These were your slides, Ms.
18 Kitlinski?
19 A. Yes.
20 Q. Thank you.
21 Turning your attention back
22 to Exhibit-18, Ms. Kitlinski.
23 This is the letter to Vice
24 President Biden.

Page 240

1 A. I'm sorry, I was just
2 looking at the rest of the slides here,
3 since I hadn't seen them.
4 Q. And if you turn to Page 10
5 of the document, the NIPC had a broad
6 reach, correct?
7 MR. DAVIS: Objection to
8 form.
9 BY MS. AMINOLROAYA:
10 Q. Under, National Initiative
11 on Pain Control, the last bullet, it
12 states, Over 1.2 million participants to
13 date: More than 130,000 live, more than
14 1.1 million via webcasts and print.
15 A. Those are the numbers that
16 are stated here, yes.
17 Q. Thank you. You can set that
18 aside.
19 MS. AMINOLROAYA: I'm
20 handing you what's been marked
21 Exhibit-27, KP360_OHIOMDL_00041.
22 It's E1282.
23 - - -
24 (Whereupon, Endo-Kitlinski

Page 241

1 Exhibit-27,
2 KP360-OHIOMDL-000241-244, was
3 marked for identification.)
4 - - -
5 BY MS. AMINOLROAYA:
6 Q. Ms. Kitlinski, this is a
7 National Initiative on Pain Control
8 executive summary, for the National
9 Initiative on Pain Control dinner
10 dialogue series, Advances in Opioid
11 Analgesia, Maximizing Benefit While
12 Minimizing Risk.
13 Did I read that correctly?
14 A. Yes, that's what the title
15 states.
16 Q. And the date of this series
17 was October 26th, 2006 through December
18 12, 2006, correct?
19 A. That's what the -- I don't
20 know that of my own knowledge, but that's
21 what this states, yes.
22 Q. And this is around the same
23 time Opana ER is being launched, correct?
24 MR. DAVIS: Objection to

Page 242

1   form.
2         THE WITNESS:  Again, as I
3   mentioned, I do know Opana ER was
4   launched in 2006.  I just don't
5   know the month and the year.
6   BY MS. AMINOLROAYA:
7         Q.   That's fine.  Not a problem.
8         So we see again here that
9   the faculty for this activity is Dr.
10  Argoff and Dr. Ford, amongst some other
11  doctors; is that correct?
12        A.   The faculty, 2, 4, 5, 6, 7,
13  8, 9 -- yes, Dr. Ford and Dr. Argoff are
14  two of the nine faculty members.
15        Q.   And if you look at Page 4,
16  it says, Open-ended question results.
17  Following this activity, what is the most
18  important change you will make in your
19  practice?
20        Did I read that correctly?
21        A.   Yes.
22        Q.   And if you look at Bullet 2,
23  does it say, More use of opioids?
24        A.   That is what Bullet 2

Page 243

1   states, yes.
2         And it also states about
3   exit strategies and more aggressive
4   screening to identify reasonable
5   candidates and to have patient agreements
6   at the start of treatment.
7         Q.   And you didn't include use
8   opioids earlier with my pain patients,
9   correct?  That's also included there?
10        MR. DAVIS:  Objection to
11  form.
12        THE WITNESS:  That is
13  correct.
14  BY MS. AMINOLROAYA:
15        Q.   And this executive summary,
16  if you go back to Page 1, third
17  paragraph, it's a summary based upon the
18  83 percent, 758 participant evaluation
19  forms that were received from 911
20  attendees.  The average attendance for
21  the series is 36 participants per
22  meeting, with a 52 percent participation
23  ratio of preregistered to final attendees
24  for the entire series, correct?

Page 244

1         A.   Yes, that's what it states.
2         MS. AMINOLROAYA:  I'm
3   handing you what's been marked as
4   Exhibit-28.  This is
5   ENDO-OPIOID_MDL-01928285.  This is
6   E1255.1.
7         - - -
8         (Whereupon, Endo-Kitlinski
9   Exhibit-28,
10  ENDO-OPIOID_MDL-01928285-286, was
11  marked for identification.)
12        - - -
13  BY MS. AMINOLROAYA:
14        Q.   And if you look at the last
15  e-mail on this page, this is from Teresa
16  Lee to Vin Tormo.
17        Mr. Tormo was your direct
18  report, correct?
19        A.   Yes.
20        Q.   And this is dated November
21  13th, 2003; is that right, regarding,
22  NIPC opioid Cinci program-fantastic
23  feedback?
24        Did I read that correctly?

Page 245

1         A.   That's what the subject line
2   states, yes.
3         Q.   And Ms. Lee writes her
4   e-mail on the next page.
5         She's the Cincinnati
6   district manager, correct?
7         A.   Yes.
8         Q.   Looking at the bottom of
9   Page 2.
10        A.   Correct.
11        Q.   And Ms. Lee provides some
12  feedback.  And in response to that
13  feedback, in the following e-mail, Mr.
14  Tormo, your direct report, writes back to
15  you and some employees of Physicians
16  World, correct, and copies you, Bradley
17  Galer ER, Debbie Travers and some others,
18  correct?
19        Correct, Ms. Kitlinski?
20        A.   I'm reading that.  I'm
21  sorry.
22        Yes, it does -- I was just
23  looking, because not all of the folks you
24  mentioned -- I mean, not all of the folks

Highly Confidential - Subject To Further Confidentiality Review

Page 246

1 copied there you had mentioned, so I
2 thought you were still reading, sorry.
3    Q.   Yes.  The record reflects
4 that there is a couple of other people
5 listed here.  For time, we won't name
6 them all.
7         And Mr. Tormo, writes,
8 Thanks for the feedback Teresa.  Glad
9 that the program went so well there.
10 Glad that your recommendation to have the
11 opioid program in Cincinnati pave the way
12 towards, and lessened the fear of
13 appropriately prescribing opioids.  The
14 efforts that you and your team made in
15 identifying the need and helping get the
16 appropriate physicians to attend no doubt
17 helped with making this program a
18 success.
19         Did I read that correctly?
20    A.   Yes.
21    Q.   And then you respond to
22 Teresa Aymsley and Vin in the following
23 e-mail.
24         And you write,

Page 247

1 Congratulations on working together to
2 really optimize the value of the NIPC
3 programs for the physicians in your area.
4 As we saw with the return on education
5 study conducted this year, the
6 effectiveness of well-planned CME content
7 and well-executed audience recruitment is
8 truly a winning combination.
9         Did I read that correctly?
10    A.   Yes.
11    Q.   So there were NIPC programs
12 in Cincinnati at this time as well,
13 correct?
14    A.   There was at least one.
15 That's what we're talking about here.
16         And this states what we said
17 earlier about the return on education,
18 that it was about getting an audience to
19 participate and have well-planned CE
20 content.
21         And I know you didn't go
22 through the whole thing, but in that part
23 that you alluded to in Vin's comments,
24 you can see the other comments from the

Page 248

1 audience as well, in terms of the caliber
2 of the content.
3         MS. AMINOLROAYA:  Move to
4    strike the last comment.
5 BY MS. AMINOLROAYA:
6    Q.   Ms. Kitlinski, do you know
7 Will Rowe?
8    A.   I knew Will Rowe.  I don't
9 currently know where Will Rowe is or have
10 had any communications with him since
11 2012-ish, something like that.
12    Q.   Ms. Kitlinski, Endo
13 continued to pay for these NIPC programs
14 until 2012, correct?
15         MR. DAVIS:  Objection to
16    form.
17         THE WITNESS:  Again, I don't
18    have my -- I don't have my
19    documents that I can refer back
20    to.
21         I know that we continued the
22    series over a period of time.  And
23    so if you have documents that we
24    could, you know, look to confirm

Page 249

1    that.
2 BY MS. AMINOLROAYA:
3    Q.   Sure.  I'll refer your
4 attention back to Exhibit-18.
5         So Page 10, you're telling
6 the vice president of the United States
7 that this program is a program that Endo
8 sponsors, correct?
9    A.   Yes.  My only -- you asked
10 me if it continued until 2012, and this
11 is dated April of 2011.  And so I just
12 indicated that I don't know the
13 termination date of NIPC.
14         MS. AMINOLROAYA:  Can we
15    have 1320, please?
16         I'm handing you what has
17    been marked as Exhibit-29.  It's
18    ENDO-OPIOID_MDL-01656768, E1320.
19         -   -   -
20         (Whereupon, Endo-Kitlinski
21    Exhibit-29,
22    ENDO-OPIOID_MDL-01656768-777, was
23    marked for identification.)
24         -   -   -

Page 250

BY MS. AMINOLROAYA:

Q. And this is an e-mail from Katherine -- Ms. Kitlinski, maybe you can help me with her last name, because I think I'm going to butcher it.

A. We called her Kathy Traz.

Q. Okay. That's easier.

A. Trzaskawka. But, Traz.

Q. I think I'll call her Kathy Traz for now.

An e-mail from Kathy Traz to a number of Endo employees, including you; is that right?

A. Yes.

Q. Dated February 21, 2012, regarding, Forward, opioid abuse articles mentioning Endo.

A. Yes.

Q. Did I read that correctly?

A. Yes.

Q. And this is around -- the time is 2012.

Is that the year that the Senate Finance Committee begins to

Page 251

investigate various opioid manufacturers and professional organizations to which they provided funding?

MR. DAVIS: Objection to form.

THE WITNESS: I recall that it was in that approximate -- 2012 was the approximate time frame. I don't have my records, so I wouldn't be able to know specifically when that was.

BY MS. AMINOLROAYA:

Q. You recall approximately, though, that it was 2012?

A. Yes. Correct.

Q. Thank you.

Let's turn to Page 3. And this is an article that Ms. Traz is sending you.

She says, Pay particular attention to the bracket and references to Endo.

And the article that she forwards is entitled, Chronic Pain Fuels

Page 252

Boom in Opioids, correct?

A. Yes, that is the title of the article.

Q. And are you familiar with Dr. Webster, Ms. Kitlinski? Lynn Webster?

A. Yes, I know -- I recognize Dr. Lynn Webster.

Q. Someone that you worked with?

MR. DAVIS: Objection to form.

THE WITNESS: I have met Dr. Webster at conferences. I have interacted with him at some of the early REMS planning programs, and I know that he had worked with Endo on some other activities as well, and I'm sure I encountered him over the years.

I don't know him extremely well. But he is well known, obviously, as a pain expert.

BY MS. AMINOLROAYA:

Page 253

Q. And did Dr. -- is Dr. Webster -- I'm sorry, you anticipated my next question, so I will strike that.

And the top of Page 3 says, The pendulum swings back. It says, Several of the pain industry's core beliefs about chronic pain and opioids are not supported by good science and contributed to the growing use of the drugs, a journal Sentinel/MedPage Today review of records and interviews found. Among the misconceptions: The risk of addiction is low in patients who obtain their narcotic painkillers legitimately. There is no max dose of the drugs that can't be prescribed -- that can't be safely prescribed; people who seek more frequent prescriptions or higher doses of the drugs aren't addicts, they are pseudoaddicts who just need more pain relief and more opioids.

And then dropping down a few sentences, it says, Lynn Webster, MD, a Utah pain specialist who has worked as a

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 consultant and adviser to most of the
2 companies in the opioid analgesic market
3 said, The pain community got some of it
4 wrong.
5          Did I read that correctly?
6     A.   Yes.
7     Q.   And Ms. Webster's quote --
8 or if we drop down to the next sentence,
9 she ends, We certainly have a lot --
10    A.   Excuse me, Dr. Webster is a
11 male, just to --
12    Q.   I apologize.  Thank you for
13 the correction.
14    A.   No worries.
15    Q.   I'm sorry.
16    A.   That's all right.  Just want
17 to be accurate.
18    Q.   I appreciate that.
19          The last sentence here in
20 the next paragraph says, We certainly
21 have a lot of reverse education that
22 needs to occur.
23          Did I read that correctly?
24    A.   I'm looking to see -- yes, I

Page 255

1 see that now.  Yes, that is in here.
2     Q.   And this is shortly after
3 the Senate Finance Committee begins to
4 investigate opioid manufacturers,
5 including Endo, correct?
6          MR. DAVIS:  Objection to
7 form.
8          THE WITNESS:  Well, this is
9 in 2012, and around the time, as
10 you said, that the Senate Finance
11 Committee investigation began.
12          However, many of these
13 statements here that are -- they
14 are misconceptions, but they had
15 been dispelled, or at least folks
16 from Endo have stated them as not
17 being correct perceptions for
18 years.
19          So not to -- not to imply
20 that it was just in the 2012 time
21 frame here.
22 BY MS. AMINOLROAYA:
23    Q.   Okay.
24    A.   This just happens to be, I

Page 256

1 guess, when this journal,
2 Sentinel/MedPage Today, article was
3 published.
4          MS. AMINOLROAYA:  Let's have
5     1304, please.
6          I'm handing you what's been
7     marked as Exhibit-30.  It's
8     END00154834.  It's E1304.
9              -  -  -
10         (Whereupon, Endo-Kitlinski
11     Exhibit-30, END00154834-856, was
12     marked for identification.)
13             -  -  -
14 BY MS. AMINOLROAYA:
15    Q.   This is an e-mail from Vin
16 Tormo to a number of Endo individuals,
17 including you.  And you can see your
18 name.  There are a lot of names on this,
19 but it's the second line or third line
20 from the top of the cc line.  And it's
21 regarding MSL meeting report, APS 2012.
22          If we look at Page 3 of the
23 document, that orients us with it,
24 it's -- the attachment of the American

Page 257

1 Pain Society, 2012 annual meeting medical
2 science liaison summary.
3          And if you turn to Page 9 of
4 the document, it says, Charles again
5 mentioned that what bothers me is we are
6 talking only about opioids and not a
7 whole approach to pain therapy.  We have
8 lost a generation of prescribers --
9     A.   I'm sorry, I didn't catch
10 where you said you were reading.
11    Q.   Top of Page 9.  First full
12 sentence.
13    A.   I see.  Thank you.
14    Q.   Charles again mentioned that
15 what bothers me is we are talking only
16 about opioids and not a whole approach to
17 pain therapy.  We have lost a generation
18 of prescribers who don't really know what
19 to do.
20          Did I read that correctly?
21    A.   Yes.  I'm just finishing --
22 I'm reading that paragraph in context.
23    Q.   And is "Charles" Dr. Argoff
24 there?

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    A.   According to this, yes,
2  that's correct.
3         And, do you know, just to
4  put this in context, again, the CIG
5  group, is that the special interest
6  group, the ethics special interest group?
7         So that's not an Endo
8  organization, it's a professional -- a
9  special interest group of the
10 professional society.
11   Q.   Okay.  Thank you.
12   A.   Sure.  So when he says we
13 are -- what bothers me is that we are
14 only talking about opioids and not a
15 whole approach to pain therapy, it is
16 consistent with what the NIPC speakers
17 like he were saying about the need for
18 multimodal, you know, assessment and
19 multimodal therapy, including
20 nonpharmacologic.
21       MS. AMINOLROAYA:  There was
22   no question pending.  Move to
23   strike.
24 BY MS. AMINOLROAYA:

Page 259

1    Q.   Turning to Page 3 of the
2  document, and the overall summary -- and
3  just to further orient us with this
4  document, you were at this meeting,
5  right, Ms. Kitlinski?
6    A.   I was at a portion of the
7  meeting, yes.
8    Q.   So the compiled by --
9    A.   And you see it says, With
10 input for Section 2 by Linda Kitlinski.
11   Q.   Right.  And it says, in the
12 overall summary, Steve Passik, Ph.D.
13 said, during one symposium, in the past
14 we made it seem like treating pain
15 patients is easy.  It's not.
16   A.   Yes.
17   Q.   And did I read that
18 correctly?
19   A.   Yes.
20        The rest of his -- the rest
21 of the comment there, the overall message
22 is about -- seemed to be about safety and
23 proceeding cautiously with opioid
24 therapy, if at all, in some patients.

Page 260

1    Q.   And for the 11 years prior
2  to this report, Endo had been funding
3  education to doctors through the NIPC,
4  correct?
5        MR. DAVIS:  Objection to
6    form.
7  BY MS. AMINOLROAYA:
8    Q.   $31 million, at least, worth
9  of funding?
10       MR. DAVIS:  Objection to
11   form.
12       THE WITNESS:  Again, I
13   don't -- I don't mean to seem like
14   I'm disputing your figures, but I
15   don't have -- I recall very
16   clearly -- when we put together
17   the documents for the Senate
18   Finance Committee, I spent a lot
19   of time looking at the particulars
20   of those grants, the support, the
21   financial amounts and having them
22   tallied up.
23       And I don't have access to
24   those documents.  So I would not

Page 261

1    want to -- I would not be in a
2    position, really, to speculate
3    about what the amounts were.
4  BY MS. AMINOLROAYA:
5    Q.   Okay.
6        MS. AMINOLROAYA:  772,
7    please.
8        THE WITNESS:  And, excuse
9    me.  You did ask me that question
10   about NIPC, you know, being
11   presented to clinicians, correct?
12   May I finish my answer on that
13   one?  The one you just asked.
14       MS. AMINOLROAYA:  One
15   moment, please.
16 BY MS. AMINOLROAYA:
17   Q.   My question was, for the 11
18 years prior to the document we were just
19 reading, Endo had been funding education
20 to doctors presented through the NIPC,
21 correct?
22       THE WITNESS:  Yes.  And I
23   just wanted --
24       MS. AMINOLROAYA:  Thank you.

Highly Confidential – Subject to Further Confidentiality Review

Page 262

1    THE WITNESS: I just
2  wanted -- you were implying that
3  that might have been all on
4  opioids, and it was on pain
5  management as opposed to just
6  opioids.
7    So since that was the
8  context here, I just wanted to
9  finish that sentence.
10 BY MS. AMINOLROAYA:
11   Q.  Opioids were a part of pain
12 management?
13   A.  Correct.  Overall pain
14 management and pain assessment, yes.
15     MS. AMINOLROAYA:  I'm
16  marking -- I'm handing you what's
17  been marked as Exhibit-31, E772.
18     - - -
19     (Whereupon, Endo-Kitlinski
20  Exhibit-31, No Bates, Maps;
21  National Center for Health
22  Statistics, was marked for
23  identification.)
24     - - -

Page 263

1  BY MS. AMINOLROAYA:
2    Q.  You can see at the bottom of
3  the document -- the source of this is the
4  National Center for Health Statistics,
5  National Vital Statistic System,
6  mortality data, and it provides a link
7  there to the CDC.gov.
8    During the course of your
9  employment at Endo, did you have occasion
10 to visit the CDC's website from time to
11 time?
12     MR. DAVIS:  Objection to
13  form.
14     THE WITNESS:  I had occasion
15  to visit the CDC website from time
16  to time, yes.
17 BY MS. AMINOLROAYA:
18   Q.  So you had access to the CDC
19 website?
20   A.  Yes.  Everyone does.
21   Q.  Let's look at Page 3 of the
22 document.  And I may use the Elmo for
23 this.
24    And the NIPC started its --

Page 264

1  Endo started funding the NIPC in 2001,
2  correct?
3    MR. DAVIS:  Objection to
4  form.
5    THE WITNESS:  Again, I
6  believe I indicated earlier it was
7  early in 2000.  Because I don't
8  have access to those documents, I
9  don't recall the exact year.  But
10  you can check our files on that.
11 BY MS. AMINOLROAYA:
12   Q.  2001 is early 2000s, right?
13   A.  Yes.
14   Q.  So we're looking at the 2001
15 page of the CDC document here, National
16 Center for Health Statistics.
17    And it's a -- you can see on
18 the right what it's including, or what
19 the map is depicting.  Estimated
20 age-adjusted death rate per 100,000.  And
21 this is -- the suggested citation for
22 this document is -- lists a number of
23 authors.  And it says, Drug poisoning
24 mortality, the United States, 1996 to

Page 265

1  2016, National Center for Health
2  Statistics.
3    This is reflecting adjusted
4  age related to death for drug appointing
5  mortality.
6    And you would agree that the
7  chart goes from blue, and then the number
8  of deaths go up as the colors change to
9  yellow, for example, and red?
10   A.  So just a question, because
11  I'm not familiar with this -- and I know
12  you usually ask me if that was correct --
13  it was 1999, not '96.
14   Q.  Thank you for that
15 correction.
16   A.  Not a big issue.  I just
17 wanted to, since I'm testifying, be
18 accurate.
19    So I don't -- I'm not
20 familiar with this chart, and I do not
21 understand the -- so while it says that
22 the source is the National Center for
23 Health Statistics, National Vital
24 Statistics System, mortality data, and it

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1 refers further to drug poisoning
2 mortality, it doesn't specify what drugs
3 we're talking about.
4        Are these all drugs?  Are
5 these opioids?  Are these prescription
6 opioids?  Are they -- does it include
7 barbiturates, for example?  I just don't
8 know what this is.
9        Q.   So let's compare the 2001
10 map to the 2012 map.
11        Would you agree there is a
12 lot of blue in the 2001 map?
13        A.   Yes.
14        MR. DAVIS:  Objection to
15 form.
16 BY MS. AMINOLROAYA:
17        Q.   And do you see less blue in
18 the 2012 map?
19        MR. DAVIS:  Objection to
20 form.
21 BY MS. AMINOLROAYA:
22        Q.   Page 14.
23        A.   And you asked me do I see
24 less --

Page 267

1        Q.   Do you see less of the color
2 blue in the 2012 map?
3        MR. DAVIS:  Objection to
4 form.
5        THE WITNESS:  Again, there
6 is -- there is less blue on this
7 map.  But I don't -- still don't
8 understand particularly what
9 the -- what it is we're talking
10 about here, what mortality data,
11 what drug poisoning mortality data
12 we're referencing.
13 BY MS. AMINOLROAYA:
14        Q.   And the color bar on the
15 right side here tells us that yellow
16 means deaths are up from 2 to 14 per
17 100,000 people.  And red means that
18 deaths are up from 2, for blue, to 26 or
19 more per 100,000 people, correct?
20        MR. DAVIS:  Objection to
21 form.
22        THE WITNESS:  Well, again, I
23 can see what the legend on the map
24 states, estimated age-adjusted

Page 268

1 death rate per 100,000.
2        But we don't know death rate
3 from what.
4 BY MS. AMINOLROAYA:
5        Q.   And do you see more yellow
6 and more orange and more red in 2012?
7        MR. DAVIS:  Objection to
8 form.
9        THE WITNESS:  Well, strictly
10 from a color perspective, the map
11 from 2001 has more blue on it and
12 less red and yellow, as you just
13 stated, than the map from 2012.
14        But, again, what that refers
15 to and what the data is, is not
16 clear from this.  And I'm not
17 familiar with it, so I don't want
18 to speculate.
19 BY MS. AMINOLROAYA:
20        Q.   And that's the same time you
21 were running the NIPC program, correct?
22        MR. DAVIS:  Objection to
23 form.
24        THE WITNESS:  The NIPC

Page 269

1 program was being conducted on
2 appropriate pain management, which
3 included opioids but was not 100
4 percent focused on opioids.  It
5 included neuropathic pain and
6 chronic pain.  And it did occur
7 during that time period.
8 BY MS. AMINOLROAYA:
9        Q.   Thank you.
10        So, Ms. Kitlinski, turning
11 back to a conversation we started a few
12 moments ago regarding Will Rowe, you said
13 you know who Will Rowe is, correct?
14        A.   Yes.
15        Q.   What period of time did you
16 know Mr. Rowe for?
17        A.   Well, again, I wish I had my
18 past files and I could look at them, but
19 I don't.  So all I can state is what I
20 recall.
21        I know that I was -- I know
22 that I interacted with him in 2012, when
23 the NIPC was being -- I'm reluctant to
24 really give a time frame on that.

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1    I do know that I knew him
2  during the course of, you know,
3  interacting with him.  But I don't have a
4  frame of reference for -- a document for
5  that.
6        Do you have those?  Because
7  we did, you know, produce all of those
8  internally.
9    Q.   I'm sure we do.  We have
10 hundreds of thousands of documents,
11 perhaps millions of documents from your
12 former employer.
13       MS. AMINOLROAYA:  Can I have
14 1343, please?
15       But to be clear, we don't
16 have all documents related to
17 opioids that Endo maintained.
18       THE WITNESS:  Okay.
19       MR. DAVIS:  Objection.
20       MS. AMINOLROAYA:  Your
21 counsel has interposed numerous
22 objections, and so there are
23 significant limitations on the
24 documents that were produced.

Page 271

1        I'm handing you what's been
2  marked as Exhibit-32.  This is
3  END00661357.  It's E1343.
4            - - -
5        (Whereupon, Endo-Kitlinski
6  Exhibit-32, END00661357-359, was
7  marked for identification.)
8            - - -
9  BY MS. AMINOLROAYA:
10    Q.   Did you reach out to Mr.
11 Rowe, Ms. Kitlinski, if there was a
12 problem or something that you were
13 concerned about that you wanted to have
14 addressed?
15       MR. DAVIS:  Objection to
16 form.
17       THE WITNESS:  If you'll just
18 give me -- this is a very brief
19 document.
20 BY MS. AMINOLROAYA:
21    Q.   Sure.  And it's not about
22 the document.  You can put the document
23 aside for right now.
24       My question is, did you

Page 272

1  reach out to Mr. Rowe when you had
2  concerns about certain issues?
3        MR. DAVIS:  Objection to
4  form.
5        THE WITNESS:  Again, without
6  knowing what type of issues you're
7  referring to --
8  BY MS. AMINOLROAYA:
9    Q.   If you had a concern about
10 how opioids were being discussed in the
11 media, would you reach out to Mr. Rowe?
12       MR. DAVIS:  Objection to
13 form.
14       THE WITNESS:  I don't recall
15 that.
16       I interacted with Mr. Rowe.
17 But I don't -- I have a document
18 in front of me that is addressed
19 from me to him, so I obviously had
20 a contact with him.  But I just
21 don't know what you're referring
22 to and what circumstance.
23 BY MS. AMINOLROAYA:
24    Q.   Let's turn to Page 2 of the

Page 273

1  document.  This is an e-mail from you to
2  Mr. Rowe and Donna Calvani.
3        And just for the jury's
4  benefit, what was Mr. Rowe's title at the
5  American Pain Foundation?
6    A.   I don't know if he was the
7  executive -- he was in a leadership role.
8  I don't know his exact title.
9    Q.   And Ms. Calvani?
10    A.   Donna Calvani was not
11 related to the American Pain Foundation.
12       But she -- she was related
13 to the NIDA initiative.  She was doing an
14 initiative with NIDA, which is why she
15 was copied on this.
16    Q.   Thank you.
17       So this is an e-mail from
18 you to Will Rowe, January 12th, 2010,
19 regarding NIDA, quote, in the news.
20       NIDA is the National
21 Institute of Drug Abuse, correct?
22    A.   Yes.
23    Q.   And here you write, Will and
24 Donna.  Second line says, Saw quote in

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  the news on opioids/addiction/risk mgmt
2  (see below) from Valerie Ulene (LA Times)
3  and Nora Volkow at NIDA...
4        And then dropping down past
5  the next sentence, it says, This quote
6  has been flying around the hallways last
7  night/today, (the comments are things
8  like, I thought NIDA valued the risk
9  management work we do on opioids, how
10 could they say something like this?).
11       And then you include, at the
12 bottom of the e-mail, an excerpt of what
13 you were talking about, right.
14       And this appears to be an
15 article from The New York Times that
16 quotes Ms. Volkow entitled, Opioid
17 Painkillers Targeted As Potential
18 Addiction and Overdose Threat.
19       And it says, in the MD
20 column, Valerie Ulene, MD, reports that
21 opioid pills are highly effective in
22 controlling pain but also produce, quote,
23 a high, quote, that makes them
24 irresistible to millions of Americans who

Page 275

1  take them for relaxation or recreation,
2  end quote.  Nora Volkow, MD, director of
3  the National Institute on Drug Abuse at
4  the National Institutes of Health says
5  that somewhere between 5 and 10 percent
6  of people who take opioids regularly
7  become addicted.
8        Did I read that correctly?
9     A.   Yes.
10       You did say New York Times,
11 but it's LA.
12    Q.   Excuse me.  Thank you for
13 that correction.
14       And Mr. Rowe writes back to
15 you, at the top of Page 2.  And he says,
16 I've met Nora a couple of times.  Maybe
17 we should ask our NIDA partners about
18 these comments.
19       Did I read that correctly?
20    A.   Yes.
21       And may I ask, were you
22 intending to finish reading the rest of
23 that quote from there?  Because that was
24 the relevant part that I think was being

Page 276

1  commented about, in my outreach to Will
2  and Donna.
3     Q.   No.  You can read that with
4  your counsel if you'd like, or you're
5  welcome to read that right now.
6        Moving on to Page 1, it
7  says -- you respond to Mr. Rowe's
8  suggestion that he reach out to his NIDA
9  partners about the comment.  And you say,
10 to Donna, Donna, since it's CME, I don't
11 want to interject anything inappropriate
12 here, but maybe give some thought as to
13 how the folks at NIDA you have been
14 working with can share that info with
15 Nora and others at NIDA so people don't
16 think industry is the problem rather than
17 part of the solution.  Thank you both.
18 Linda.
19       Did I read that correctly?
20    A.   Yes.
21    Q.   And you're sending this in
22 2010 as Endo is getting ready for the
23 launch of its reformulated Opana drug,
24 correct?

Page 277

1        MR. DAVIS:  Objection to
2     form.
3        THE WITNESS:  Again, I know
4     that we launched the reformulated
5     formation of Opana after the
6     original had been on the market
7     for a number of years.
8        But since I don't have my
9     files, and it was a fair amount of
10    time ago, I don't -- I don't know
11    the exact timing of that.
12 BY MS. AMINOLROAYA:
13    Q.   And is 2010 approximately
14 when Endo would have been getting ready
15 for the launch of the drug?
16       MR. DAVIS:  Objection to
17    form.
18       THE WITNESS:  Again, I
19    just -- I don't have a frame of
20    reference for that.  If I had my
21    files, I could give you an answer.
22 BY MS. AMINOLROAYA:
23    Q.   And Endo, over the years,
24 paid millions of dollars to the American

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 Pain Foundation, correct?
2          MR. DAVIS:  Objection to
3 form.
4          THE WITNESS:  Again, I
5 really hate to sound like a broken
6 record, but I don't have access to
7 my files.  And the time that we
8 put into assembling the amount of
9 resources that were, you know,
10 provided as educational grants
11 when we assembled that Senate
12 Finance Committee dossier, I don't
13 have access to those, and I would
14 not be able to speculate on them
15 off the top of my head, without
16 looking at them.
17          MS. AMINOLROAYA:  287,
18 please.  I'm handing you what has
19 been marked as Exhibit-33.  This
20 is ENDO-OR-CID-00754369.  E287.
21          - - -
22          (Whereupon, Endo-Kitlinski
23 Exhibit-33, ENDO-OR-CID-00754369,
24 (Starting Bates, Compilation

Page 279

1     Exhibit), was marked for
2     identification.)
3          - - -
4 BY MS. AMINOLROAYA:
5     Q.   And is this -- if you look
6 at the second page of the document, it's
7 dated August 22nd, 2012.
8          Is this a letter to Chairman
9 Baucus and Senator Grassley signed by
10 Raymond Shepherd?  You can see that on
11 Page 11.
12     A.   That appears to be what this
13 is.
14     Q.   And who is Mr. Shepherd?
15     A.   I'm sorry, I don't know
16 that.
17     Q.   Mr. Shepherd is, apparently,
18 counsel for Endo at the time.
19          MR. DAVIS:  Objection to
20 form.
21 BY MS. AMINOLROAYA:
22     Q.   Let's look at Page 21 of the
23 document.
24          And it says, Submitted to

Page 280

1 Senate Finance Committee by Endo
2 Pharmaceuticals.
3          And we'll move past the
4 first few pages to the Page 24.
5          Looking at Pages 24 and 25,
6 do these list the payments made by Endo
7 to the American Pain Foundation between
8 1999 and 2012?
9     A.   Again, that's what this
10 document appears to list.
11          You can -- and when I say
12 "appears," it contains a compilation of
13 information that came not just from me,
14 which is the pain education element of
15 it, but others.  So I couldn't speak to
16 the totality of what this represents,
17 because I don't know and it's outside of
18 the scope of my responsibility.
19     Q.   Do you think anything here
20 is inaccurate?
21          MR. DAVIS:  Objection to
22 form.
23          THE WITNESS:  I wouldn't
24 know.  I don't have a frame of

Page 281

1     reference for that, because I
2     didn't have that area.
3 BY MS. AMINOLROAYA:
4     Q.   Are you suggesting that your
5 employer submitted documents and
6 information to the Senate that's
7 incorrect?
8          MR. DAVIS:  Objection to
9 form.
10          THE WITNESS:  I'm not
11 suggesting that they did anything
12 incorrect.
13          You asked me if I thought
14 that's what this was.  And I am
15 testifying under oath, and I'm not
16 comfortable stating what it is or
17 isn't, except for those elements
18 that I know I contributed towards.
19          So I'm not saying Endo
20 didn't -- did something
21 inappropriate.  I'm just saying,
22 of my own knowledge, I haven't
23 seen this entire compilation.
24 BY MS. AMINOLROAYA:

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  Q.  Didn't you assist with the
2  preparation of this information, Ms.
3  Kitlinski?
4        MR. DAVIS:  Objection to
5  form.  I'm going to instruct --
6  you can answer that question.
7        I just want you to be
8  careful, I know there were a lot
9  of lawyers involved in the
10 assembly of this information.  So
11 you can answer that question but
12 just be careful not to reveal
13 anything that you discussed with
14 lawyers, of what you collected on
15 behalf of the lawyers.
16 BY MS. AMINOLROAYA:
17 Q.  And just to be clear, Ms.
18 Kitlinski, I'm not asking you to reveal
19 any communications you had with your
20 lawyers.
21       I'm asking you about
22 payments to the American Pain Foundation.
23 Were you responsible for collecting that
24 information in 2012?

Page 283

1  A.  As I mentioned, my
2  involvement with the report was
3  collecting information on educational
4  grant payments.  So that's my
5  involvement.
6        And this, as you can see,
7  includes a lot more than just pain
8  education.  And I did not assemble that.
9        MS. AMINOLROAYA:  I'm
10 handing you what's been marked as
11 Exhibit-34.  This is END00735362,
12 E1291.1.
13              - - -
14       (Whereupon, Endo-Kitlinski
15 Exhibit-34, was marked for
16 identification.)
17              - - -
18       MR. DAVIS:  I'm waiting for
19 the copies.
20 BY MS. AMINOLROAYA:
21 Q.  Is this an e-mail from Joann
22 Caldwell to you and Jackie McNeil
23 regarding update on Senate work
24 book/spreadsheets, dated May 24th, 2012?

Page 284

1  A.  Yes.
2  Q.  And Joanne Caldwell was an
3  administrative assistant?
4  A.  Yes.
5  Q.  Did you work with Joanne and
6  Jackie preparing this spreadsheet?
7  A.  Yes.  They were -- at the
8  time, if you recall, I said the names of
9  the departments evolved a bit, so
10 clinical development --
11       MR. DAVIS:  Ms. Kitlinski,
12 I'm going to instruct you not to
13 answer my questions on this
14 document that we're going to claw
15 back as attorney work product.
16       This is information that was
17 gathered at the request of
18 attorneys in responding to the
19 Senate Finance Committee.  So I'm
20 going to instruct you not to
21 answer any questions about that.
22 And I'd like to claw this document
23 back, if we could.  Exhibit-34,
24 just so the record is clear.

Page 285

1        MR. BUCHANAN:  Counsel, can
2  you just state more specific
3  reasons?  I don't have it in front
4  of me.  Are counsel identified?
5        MR. DAVIS:  Counsel are not
6  identified by it.  But I was
7  counsel, and I know what -- who
8  was directing these individuals to
9  collect this information and the
10 purposes for which that
11 information was being collected.
12       And the fact that it was
13 counsel directing these
14 individuals to collect this
15 information protects it from
16 disclosure because of the work
17 product protection.
18       MS. AMINOLROAYA:  This
19 information was disclosed in your
20 June 15th disclosure to the Senate
21 Finance Committee.
22       MR. DAVIS:  It was, indeed.
23 And you have that information
24 there, and the information that

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 was disclosed is fine. But the
2 information as collected by these
3 individuals specifically here, I
4 don't know if there are
5 differences, but this was
6 information provided -- collected
7 by these individuals and provided
8 to attorneys so the attorneys
9 could provide legal advice to the
10 company, and is, therefore, work
11 product.
12      MR. BUCHANAN: I'm not sure
13 how it couldn't be a waiver, if it
14 was provided to the Senate as you
15 just said.
16      MR. DAVIS: I mean, if it's
17 exactly the same as what we
18 provided to the Senate, perhaps.
19      But I don't want to sit
20 here -- we can sit here and go
21 through it if you want. I don't
22 know if this is exactly what we
23 provided to the Senate or if there
24 are any changes.

Page 287

1      MR. BUCHANAN: I'm sure we
2 can take a break in a moment.
3 Maybe you can just take a look at
4 it, so we don't have to needlessly
5 have a privilege challenge. It
6 might not be that controversial.
7      We'll agree it's not a
8 subject matter.
9      MR. DAVIS: What's that?
10      MR. BUCHANAN: We'll agree
11 that examination on this would not
12 be a broader waiver.
13      MR. DAVIS: Fair. I'll take
14 a look at it when we're on a
15 break.
16 BY MS. AMINOLROAYA:
17      Q. So, Ms. Kitlinski, you had
18 responsibility for identifying some of
19 the information that went into the Senate
20 Finance Committee?
21      MR. DAVIS: I'm going to
22 object to that as well as
23 protected by the work product
24 protection.

Page 288

1      MS. AMINOLROAYA: She
2 testified before --
3      MR. DAVIS: Ms. Kitlinski's
4 work collecting the information
5 that was provided to the Senate
6 Finance Committee was directed by
7 attorneys, provided to attorneys
8 so they could provide legal advice
9 to the company.
10      MS. AMINOLROAYA: That's the
11 same as Ms. Kitlinski gathering
12 documents subject to advice that
13 she needed to respond to a
14 subpoena.
15      MR. DAVIS: You asked the
16 specifics of what she was
17 gathering. That's not the same as
18 her gathering documents to respond
19 to a subpoena.
20      I don't think she -- that
21 wasn't done so we could provide
22 legal advice to the company. That
23 was done to be responsive to the
24 subpoena you sent her.

Page 289

1 BY MS. AMINOLROAYA:
2      Q. Ms. Kitlinski, you were
3 responsible, over the years, for
4 responding to grant requests submitted by
5 the American Pain Foundation, correct?
6      A. The grant committee reviewed
7 all grants to Endo Pharmaceuticals, and I
8 was a member of the grant committee.
9      Q. And in that capacity, you or
10 the grant committee approved millions of
11 dollars of grants to the American Pain
12 Foundation, correct?
13      MR. DAVIS: Objection to
14 form.
15      THE WITNESS: Again, as I've
16 stated, I don't have access to my
17 documents.
18 BY MS. AMINOLROAYA:
19      Q. And you have no recollection
20 about the grants approved for the
21 American Pain Foundation?
22      A. I do not. I mean, over the
23 course of the years, there were many
24 grants to many folks who submitted grant

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  requests.
2      Q.   And did you provide many
3  grants to the American Pain Foundation?
4      A.   The information that we just
5  looked at, not this specific one, shows
6  what the document indicated was provided
7  to the American Pain Foundation.
8      Q.   Okay.  Let's take a look at
9  that, then.
10         THE WITNESS:  Just to be
11  clear, this is the one that you
12  all have actually provided?
13         MR. DAVIS:  This is the
14  letter submitted to the Senate
15  Finance Committee.
16         THE WITNESS:  Yes, okay.
17         MR. DAVIS:  Look at --
18  that's the one that's marked.
19         THE WITNESS:  Okay.
20  BY MS. AMINOLROAYA:
21      Q.   And you would -- looking at
22  Pages 24 and 25, you would agree that
23  Endo provided payments to the American
24  Pain Foundation for pain education

Page 291

1  between 2002 and 2012?
2      A.   Yes.  Those are the years
3  that are covered on this document,
4  correct.
5      Q.   And it also provided
6  payments to the American Pain Foundation,
7  what it categorizes, contributions and
8  donations over the years, correct?
9      A.   Again, as I stated when we
10  first looked at this, those are not
11  within my purview of responsibility.
12         So I see they have been
13  identified as purpose of a payment.  I
14  have no -- but I have no direct knowledge
15  of that myself, and I don't want to
16  testify to something that I don't know.
17      Q.   You had no direct knowledge
18  that Endo was making payments to the
19  American Pain Foundation --
20      A.   No, I didn't.
21      Q.   -- contributions and
22  donations?
23      A.   I didn't say that.  You
24  asked me about these, you know,

Page 292

1  specifics.  And I don't have any -- any
2  information on that.
3      Q.   Who at Endo is responsible
4  for approving contributions and donations
5  to the American Pain Foundation?
6      A.   It would have been different
7  departments, different individuals over
8  the years, because that's a span of ten
9  years or so.
10      Q.   Give me names.
11         MR. DAVIS:  Objection to
12  form.
13         THE WITNESS:  This is going
14  back 20 years ago, and so the
15  names of people who worked in
16  those -- not in my department, if
17  it was my department I could tell
18  you names, but the people who were
19  in other departments, you would
20  have to -- I defer to my
21  colleagues that provide --
22  BY MS. AMINOLROAYA:
23      Q.   Which colleagues?
24         MR. DAVIS:  Objection to

Page 293

1  form.
2         THE WITNESS:  I was just
3  going to finish the sentence.
4         I would defer to my
5  colleagues who provided this
6  information, and I don't know who
7  those are.
8  BY MS. AMINOLROAYA:
9      Q.   You don't -- okay.
10         You would agree that Endo
11  provided payments for pain education
12  in -- to the American Pain Foundation in
13  2002?
14      A.   Yes.
15      Q.   And 2003?
16      A.   Correct.
17      Q.   In 2004?
18      A.   Yes.
19      Q.   In 2005 -- excuse me, in
20  2006?
21         MR. DAVIS:  Is it easier to
22  use that as a ruler?
23         THE WITNESS:  I need
24  something to go across.  Yes,

Page 294

1 thanks.
2 I don't see anything in
3 2005.
4 BY MS. AMINOLROAYA:
5 Q. 2006?
6 A. Yes.
7 Q. In 2007, payments for pain
8 education to the American Pain
9 Foundation?
10 A. Yes.
11 Q. 2008, was Endo providing
12 payments to the American Pain Foundation
13 for what it called pain education?
14 A. Yes.
15 Q. In 2009, was Endo providing
16 payments for pain education to the
17 American Pain Foundation?
18 A. Yes.
19 Q. How about 2010?
20 A. Yes.
21 Q. 2011?
22 A. Let me scroll down there.
23 Yes.
24 Q. 2012?

Page 295

1 A. Yes.
2 Q. And, in fact, the American
3 Pain Foundation shut its doors in 2012,
4 correct?
5 MR. DAVIS: Objection to
6 form.
7 THE WITNESS: Again, as I
8 said earlier, when I said that I
9 knew Will Rowe but I could not
10 specifically identify the time
11 frame, I know that the American
12 Pain Foundation closed its doors
13 some time in that general vicinity
14 of timing, but I don't know the
15 exact time frame.
16 BY MS. AMINOLROAYA:
17 Q. And Endo continued to
18 provide funding to the American Pain
19 Foundation for pain education until 2012,
20 correct?
21 MR. DAVIS: Objection to
22 form.
23 THE WITNESS: Yes. So that
24 would certainly imply that they

Page 296

1 were still in existence.
2 BY MS. AMINOLROAYA:
3 Q. And how much money did Endo
4 provide to the American Pain Foundation
5 for pain education in 2011?
6 A. I don't have a calculator
7 handy. I don't know if you do.
8 Q. Okay. Well, why don't you
9 just -- do you agree there's an entry, if
10 you look at 2011, one for the month,
11 January of 2011, Endo provides a payment
12 of $797,204; is that correct?
13 MR. DAVIS: Objection to
14 form.
15 THE WITNESS: That is
16 correct.
17 BY MS. AMINOLROAYA:
18 Q. And for 2010, the first
19 entry for 2010, the month is 2, so
20 February, February 2010, Endo provides a
21 payment of $584,144 to the American Pain
22 Foundation for pain education.
23 A. Correct.
24 And just to be clear here,

Page 297

1 so that no one thinks I'm misrepresenting
2 anything, these were not -- these were
3 unrestricted educational grants for the
4 conduct of education. It was not like a
5 fee or a payment.
6 It was in the form of a
7 payment to the American Pain Foundation,
8 but it was for execution of educational
9 activities. So the -- you know, the net
10 of that, that went to the American Pain
11 Foundation, was not -- was not those
12 numbers.
13 Q. And just doing some rough
14 math here, approximately $500,000 in
15 2010, and the first payment in 2011 is
16 approximately $800,000.
17 So you would agree over $1
18 million in pain education, just based on
19 those two payments?
20 A. That's what this -- that's
21 what this chart shows.
22 Q. And if you add to that, in
23 2010 we have another pain education
24 program that's significant, that's May

Page 298

1  2010.  There's a payment of $640,255.
2       You'll agree that millions
3  of dollars are being paid to the American
4  Pain Foundation by Endo during this time?
5       MR. DAVIS:  Objection to
6  form.
7       THE WITNESS:  And, again, I
8  don't know -- you did not ask me
9  this question, but it's very
10  important to understand.
11       This was for the NIPC
12  initiative.  So they are executing
13  all of the activities you were
14  just talking about previously.
15  BY MS. AMINOLROAYA:
16       Q.  Where does it say that, Ms.
17  Kitlinski?  I thought you were not
18  familiar with everything in the --
19       A.  No, I'm just saying that the
20  fact that you're -- you know, you can see
21  on here where the large amounts began to
22  take place, as opposed to the smaller
23  amounts earlier in time.
24       So that's my trigger, that

Page 299

1  that was when responsibility -- when the
2  ACCME changed their guidance, that was in
3  2009.
4       And so I am presuming that
5  this is around that period of time,
6  because the grant amounts are large.
7       Q.  You would agree that Endo
8  paid millions of dollars to the American
9  Pain Foundation for education, correct?
10       MR. DAVIS:  Objection to
11  form.
12       THE WITNESS:  Endo provided
13  unrestricted educational grants to
14  the American Pain Foundation to
15  execute continuing education, yes.
16  BY MS. AMINOLROAYA:
17       Q.  Where does it say continuing
18  education here?
19       MR. DAVIS:  Objection to
20  form.
21       THE WITNESS:  That's what
22  pain education is, that was the
23  educational grants that I was
24  responsible for compiling.

Page 300

1  BY MS. AMINOLROAYA:
2       Q.  Does it say that anywhere
3  here, Ms. Kitlinski?
4       A.  That's what pain education
5  is, when I was compiling it.
6       Q.  Okay.
7       A.  It may say it in the cover
8  letter.  I didn't ever see the final
9  cover letter, so I don't know.
10       Q.  And through the American
11  Pain Foundation, Endo spread a message
12  that downplayed the risks of opioids,
13  correct?
14       MR. DAVIS:  Objection to
15  form.
16       THE WITNESS:  Excuse me, may
17  I finish answering your previous
18  question, which was to ask if it
19  says that anywhere in here?
20       And on Page 287 --
21  BY MS. AMINOLROAYA:
22       Q.  Ms. Kitlinski, we have very
23  limited time.  You can do it with your
24  counsel.

Page 301

1       A.  I'm sorry, I was just trying
2  to answer your question.
3       Go right ahead.  And you
4  asked something else?
5       MS. AMINOLROAYA:  I'm
6  marking Exhibit-35.
7  ENDO-OPIOID_MDL-06234029.  It's
8  E1326.
9       - - -
10       (Whereupon, Endo-Kitlinski
11  Exhibit-35,
12  ENDO-OPIOID_MDL-06234029-037, was
13  marked for identification.)
14       - - -
15  BY MS. AMINOLROAYA:
16       Q.  And this is an e-mail from
17  you, Ms. Kitlinski, to Carol Ammon, and
18  Skip Ivison, dated August 1, 2001,
19  regarding update from American Pain
20  Foundation; is that correct?
21       A.  Yes.
22       Q.  And you're writing this to
23  Carol and Skip.
24       Who is Carol again?

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    A.   Carol Ammon was the
2 president and CEO of Endo at the time.
3    Q.   Thank you.
4         And you write, Hope this
5 finds you both well.  John Giglio, the
6 new executive director of the American
7 Pain Foundation, asked me to forward the
8 attached update to you both.  He also
9 expressed his appreciation for the
10 support Endo has provided to APF and is
11 forwarding a copy of APF's Form 990 along
12 to Skip in order to complete the grant
13 submission request for 2001.  Take care,
14 Linda.
15        And if we look at what's on
16 the next page, on Page 2, this is a
17 letter -- or a memo to you from the
18 director of the APF at the time, John
19 Giglio.
20        And on Page 3, at the bottom
21 of the page, he says, Recent APF
22 accomplishments.  With support from Endo,
23 $20,000 in 1999 and $25,000 in 2000, and
24 many other funders, APF has accomplished

Page 303

1 a lot in the past two years.
2         And he lists some websites,
3 a toll-free consumer number.
4         And then at the top of Page
5 4, it states, Patient education
6 materials.  Produced the Pain Action
7 Guide, a patient education pamphlet that
8 has been so popular with consumers and
9 healthcare providers that we are into our
10 third printing.
11        Did I read that correctly?
12   A.   Yes.
13        MS. AMINOLROAYA:  1337,
14   please.  I'm handing you what's
15   been marked as Exhibit-36.  This
16   is CHI_0004335580, and it's E1337.
17             - - -
18        (Whereupon, Endo-Kitlinski
19   Exhibit-36, CHI_000435580-597, was
20   marked for identification.)
21             - - -
22 BY MS. AMINOLROAYA:
23   Q.   And if we go to Page 9 of
24 the document, it states, Pain medications

Page 304

1 rarely cause addiction.  Morphine and
2 similar pain medications called opioids
3 can be highly effective for certain
4 conditions.  Unless you have a history of
5 substance abuse, there is little risk of
6 addiction when these medications are
7 properly prescribed by a doctor and taken
8 as directed.
9         Did I read that correctly?
10   A.   Yes, that's what it states
11 here.
12   Q.   And this was the material
13 that was put out by the American Pain
14 Foundation, correct?
15   A.   Again, what is the date on
16 this?  Do you have that here somewhere?
17   Q.   Yes.  So we've actually seen
18 a few copies of these.  We're not marking
19 all of them.  This one is copyrighted
20 2000.
21   A.   2000.  So very early.  And
22 by that I mean prior to the information
23 in the public domain about the -- a lot
24 of the patient safety and public health

Page 305

1 issues associated with opioids.
2         And I say that only because
3 just a few moments ago we were talking
4 about the American Pain Foundation in
5 2012, when they had a totally different
6 opinion on things.
7         So I just wanted to be clear
8 in my testimony that while that is what
9 this brochure says, this is a brochure
10 very early on and not relevant to the
11 work that APF was doing for NIPC or what
12 they believed in 2012.
13        MS. AMINOLROAYA:  Move to
14   strike everything after the
15   word -- well, move to strike that
16   entire answer.
17        MR. DAVIS:  We've been going
18   over an hour.  Can we take a quick
19   break?
20        MS. AMINOLROAYA:  Sure.
21        VIDEO TECHNICIAN:  Going off
22   the record.  The time is 3:58 p.m.
23             - - -
24        (Whereupon, a brief recess

Page 306

1   was taken.)
2        - - -
3        VIDEO TECHNICIAN:  We are
4   back on the record.  The time is
5   4:16 p.m.
6   BY MS. AMINOLROAYA:
7        Q.   And, Ms. Kitlinski, Endo
8   used the American Pain Foundation to push
9   back against initiatives that would
10  restrict the use of opioids, correct?
11       MR. DAVIS:  Objection to
12  form.
13       MS. AMINOLROAYA:  I'm
14  handing you what's been marked as
15  Exhibit-37.  It's
16  ENDO-OPIOID_MDL-01652584.  This is
17  E1305.
18       - - -
19       (Whereupon, Endo-Kitlinski
20  Exhibit-37,
21  ENDO-OPIOID_MDL-01652584-58628251-
22  254, was marked for
23  identification.)
24       - - -

Page 307

1   BY MS. AMINOLROAYA:
2        Q.   And this is an e-mail from
3   you to Mr. Galer, and other colleagues,
4   correct, dated August 8th, 2001,
5   regarding agenda for FDA meeting; APF
6   alert.
7        Is that right?
8        A.   Yes, that's what the
9   document states.
10       Q.   And you write to Mr. Galer,
11  During a meeting yesterday, John Giglio,
12  APF executive director, expressed deep
13  concern about three issues he expects the
14  FDA/DEA to recommend during/after this
15  meeting.
16       And to orient us, August of
17  2001, Ms. Kitlinski, is when reports of
18  abuse of OxyContin had surfaced, correct?
19       A.   There was -- again, I do
20  know that around that time there was
21  beginning to be information in the public
22  domain about increased misuse and abuse
23  of opioids.
24       I don't know specifically

Page 308

1   when the OxyContin information surfaced,
2   as you said.
3        Q.   The e-mail continues to
4   identify Mr. Giglio's concerns.
5        One, reformulation of
6   opioids to incorporate abuse deterrents.
7   Two, revision to labeling of all opioids.
8   Three, feared regulatory action - DEA's
9   unprecedented national action plan and
10  the potential for congressional action,
11  prescribing limitations, et cetera.
12       Did I read that correctly?
13       A.   Yes.
14       Q.   And then the last sentence
15  in your e-mail states, Given John's
16  access to FDA/DEA thinking and his 18
17  years experience in health
18  policy/government affairs, perhaps the
19  team could benefit from a discussion with
20  him.  We would need to keep in mind he
21  also has close contacts with PF, who is a
22  major donor to APF.  Linda.
23       Did I read that correctly?
24       A.   You did.

Page 309

1        Q.   And is "PF" Purdue
2   Frederick?
3        MR. DAVIS:  Objection to
4   form.
5        THE WITNESS:  I was just
6   sitting here trying to think of
7   who that would have been.
8        I don't -- I called Purdue,
9   Purdue, so the PF is not my usual
10  method of referring to them.  So I
11  don't know.
12  BY MS. AMINOLROAYA:
13       Q.   Was Purdue a major donor of
14  the American Pain Foundation?
15       MR. DAVIS:  Objection to
16  form.
17       THE WITNESS:  I know that
18  they worked with the American Pain
19  Foundation.  I don't know the size
20  of their donations.
21  BY MS. AMINOLROAYA:
22       Q.   Do you know if Purdue
23  provided support to the American Pain
24  Foundation?

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    MR. DAVIS:  Objection to
2    form.
3    THE WITNESS:  Well, I know
4    from their annual reports that
5    they -- that, you know, all of the
6    pain companies were -- provided
7    support to the pain foundations.
8    But I don't know, again, the
9    extent or the type of support that
10   Purdue particularly provided.
11   BY MS. AMINOLROAYA:
12   Q.   Okay.  And my question is,
13   just generally, did you know if Purdue
14   provided support to the American Pain
15   Foundation?
16   MR. DAVIS:  Objection to the
17   form.
18   THE WITNESS:  Again, of my
19   own knowledge, I don't know that.
20   I know that, according to
21   the annual report, that they were
22   listed among supporters.  That's
23   all I know.
24   BY MS. AMINOLROAYA:

Page 311

1    Q.   Which annual report are you
2    referring to?
3    A.   The APF would publish their
4    annual reports.
5    Q.   In the annual report of its
6    supporters, Purdue is listed; is that
7    right?
8    A.   Correct.
9    Q.   And any other pain
10   companies?
11   MR. DAVIS:  Objection to
12   form.
13   THE WITNESS:  There were --
14   virtually every -- I shouldn't
15   exaggerate.
16   There were multiple
17   additional -- I'm trying to be as
18   exact as possible.  There were
19   multiple pain companies that were
20   listed, as well as nonprofit
21   organizations, as well as other
22   professional societies and, you
23   know, foundations that were
24   advancing appropriate --

Page 312

1    appropriate access and treatment
2    for pain.
3    BY MS. AMINOLROAYA:
4    Q.   And more specifically, not
5    just pain companies, opioid
6    manufacturers, correct?
7    MR. DAVIS:  Objection to
8    form.
9    THE WITNESS:  Again, as I
10   just reiterated, the American Pain
11   Foundation was -- and as you saw
12   from that brochure, even though it
13   was an early one, they were
14   involved with looking to represent
15   all pain actions.
16   So, in other words, not just
17   opioids, whether it was -- whether
18   it was pharmacologic therapy,
19   whether it was nonpharmacologic
20   therapy, whether it was
21   multidisciplinary, they were
22   advocating for patients to get
23   their pain assessed and seek
24   appropriate treatment, whatever

Page 313

1    their clinicians thought that
2    should be.
3    BY MS. AMINOLROAYA:
4    Q.   And in addition to Purdue,
5    was Janssen one of the opioid
6    manufacturers that supported the American
7    Pain Foundation?
8    A.   I don't know, because
9    Janssen and J&J went through multiple
10   corporate iterations.  So I don't know
11   that.
12   Q.   But you do know that Purdue
13   is a supporter of the American Pain
14   Foundation?
15   MR. DAVIS:  Objection to
16   form.
17   THE WITNESS:  Again, I know
18   that I saw that in an annual
19   report.
20   BY MS. AMINOLROAYA:
21   Q.   And turning your attention
22   back to the Senate Finance Committee
23   submission, it's E287.
24   MR. DAVIS:  Exhibit-33; is

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  that right?
2  BY MS. AMINOLROAYA:
3      Q.   The top of Page 24, you'll
4  see that a month after you suggest a
5  meeting with John Giglio of the FDA,
6  there is a payment listed, in September
7  of 2001, to the American Pain Foundation
8  for $20,000; is that correct?
9           MR. DAVIS:  Objection to
10  form.
11          THE WITNESS:  I'm sorry?
12          MR. DAVIS:  Do you need a
13  ruler?
14          THE WITNESS:  No, I see it
15  now.  I was just looking at where
16  you were getting the month from.
17          I see that now, yes.
18          So in September of 2001,
19  there was a $20,000 donation made
20  to the American Pain Foundation.
21  BY MS. AMINOLROAYA:
22      Q.   All right.  And do you
23  recall that an advisory committee was
24  held at FDA a few months after that?

Page 315

1      A.   2001?
2      Q.   January -- excuse me,
3  January of 2002.
4           Do you recall that an
5  advisory committee was held at FDA in
6  January of 2002?
7           So four months after Endo
8  makes its contribution to the American
9  Pain Foundation and reaches out to Mr.
10  Giglio.
11          MR. DAVIS:  Objection to
12  form.
13          THE WITNESS:  No, I'm
14  familiar with the FDA advisory
15  committee meetings that occurred
16  in relation to the REMS.  And the
17  timing on that was, like, 2009
18  through, you know, 2012, when the
19  REMS was released.  And there were
20  some subsequent to them.
21          But I am not aware of, at
22  least at this point in time, from
23  my recollection, the earlier one
24  you're referring to.

Page 316

1           MS. AMINOLROAYA:  Turning
2  your attention to Exhibit-38.
3  It's JAN-MS-00925641, and it's
4  E1303.
5           - - -
6           (Whereupon, Endo-Kitlinski
7  Exhibit-38, JAN-MS-00925641-643,
8  with attachment, was marked for
9  identification.)
10          - - -
11  BY MS. AMINOLROAYA:
12      Q.   This is an e-mail from Eric
13  Hauth, chief operating officer of the
14  American Pain Foundation, to a number of
15  recipients, in December of 2011,
16  regarding APF corporate roundtable.
17          And the recipients included
18  you, if you look at the second line.
19      A.   Yes.
20      Q.   And who else did Mr. Hauth
21  send this e-mail regarding the APF
22  corporate roundtable to?
23          Did he send it to someone
24  from Cephalon?

Page 317

1      A.   Well, I would have to look
2  at each of these e-mail addresses here.
3      Q.   Sure.  And I'll direct you
4  to the e-mail, SBeckhar@Cephalon.
5      A.   I'm sorry, which line is
6  that on?
7      Q.   First line.
8      A.   Yes.
9      Q.   So Mr. Hauth sent this
10  e-mail to you and to an S. Beckhar at
11  Cephalon in 2011; is that correct?
12      A.   Yes.  And to Lilly and to
13  Bayer, it looks like, Medtronic, King,
14  Purdue, ESCI.
15      Q.   Who is the Purdue individual
16  on the e-mail that you noticed, you
17  recognized?
18      A.   I see Marcia Stan -- no, I'm
19  sorry.  Not Marcia Stanton.
20          Pamela Bennett was the one I
21  saw on that line.  Marcia was at King.
22          I mean, there's a number of
23  people here copied from Purdue.
24      Q.   Were these members of the

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1 APF corporate roundtable at the time?
2     MR. DAVIS: Objection to
3 form.
4     THE WITNESS: I don't -- I
5 don't know. I know that -- you
6 know, again, that's what the title
7 of this is, the APF corporate
8 roundtable call.
9     But I don't know, of my own
10 knowledge, that these individuals
11 were members of Purdue's corporate
12 roundtable -- I mean, are members
13 of APF's corporate roundtable from
14 Purdue. Excuse me.
15 BY MS. AMINOLROAYA:
16     Q. All right. Turn to Page 9
17 of the document. It's entitled, Vision
18 and Mission.
19     We'll go to Page 10. And
20 the mission here on Page 9, sorry, going
21 back a page, is, To educate, support and
22 advocate for people affected by pain; is
23 that right?
24     A. Yes, that's what it says.

Page 319

1     Q. The strategic vision, APF is
2 2 million supported and supportive
3 members.
4     The recipients of this
5 e-mail are employees of pharmaceutical
6 companies, of opioid manufacturers; is
7 that correct?
8     MR. DAVIS: Objection to
9 form.
10     THE WITNESS: The recipients
11 of this e-mail appear, from
12 their -- from their e-mail
13 addresses, to be employees of pain
14 management companies, whether they
15 are opioid companies or others.
16 BY MS. AMINOLROAYA:
17     Q. And among the advocacy
18 efforts, if we look at Page 11, that the
19 APF was engaged in was the Pain Care
20 Forum; is that right?
21     A. Yes, that's the first bullet
22 point there.
23     Q. And was that a 62-member
24 organization coalition committed to

Page 320

1 improving federal pain policy?
2     A. I'm familiar with the Pain
3 Care Forum. I don't know how many
4 members they had. I presume that APF
5 would have that information correct.
6     But, again, I don't know
7 that of my own knowledge.
8     Q. Do you have a reason to
9 dispute this number?
10     A. No.
11     MR. DAVIS: Objection to
12 form.
13 BY MS. AMINOLROAYA:
14     Q. Okay.
15     A. But I'm testifying to what I
16 know. So that's not something I know.
17     Q. You received this document
18 in 2011, correct?
19     A. Yes. But I would have no
20 way of confirming how many members there
21 were in the Pain Care Forum, that's all
22 I'm saying.
23     Q. Let's take a look at Page
24 15, regarding the Pain Care Forum.

Page 321

1     And, again, the document
2 repeats that, the Pain Care Forum is
3 comprised of 62 members. And it
4 identifies task forces such as REMS,
5 acetaminophen, legislative, the IOM task
6 force; is that correct?
7     A. Yes.
8     Q. And the REMS task force was
9 comprised of 35 organizations.
10     Was Endo a member of that
11 task force?
12     A. Endo was a member of the
13 REMS task force, yes.
14     Q. And underneath that, it
15 says, Create a coordinated messaging to
16 the FDA. Active presence at public
17 meetings. Over 2,500 responses to the
18 FDA docket. APF public petition had over
19 4,000 submissions.
20     Did I read that correctly?
21     A. That certainly is what this
22 slide said.
23     Q. And Endo also provided
24 support to the American Pain Society; is

Page 322

1  that correct?
2         MR. DAVIS:  Objection to
3     form.
4         THE WITNESS:  I'm sorry?
5  BY MS. AMINOLROAYA:
6     Q.  Endo provided financial
7  support to the American Pain Society; is
8  that correct?
9     A.  Yes.  The documents in the
10  Senate finance committee show that.
11     Q.  And, in fact, you were very
12  involved with Endo's effort to support
13  the American Pain Society; is that right?
14         MR. DAVIS:  Objection to
15     form.
16         THE WITNESS:  I was one of
17     the contacts for Endo with the
18     American Pain Society, and I
19     coordinated the independent
20     education that was done through
21     the APS, yes.
22  BY MS. AMINOLROAYA:
23     Q.  Were you just a contact?
24     A.  No.

Page 323

1         MR. DAVIS:  Objection to
2     form.
3         THE WITNESS:  I just said I
4     coordinated the unrestricted
5     educational grants for the
6     American Pain Society, just as I
7     did for all of the other
8     independent medical education.
9  BY MS. AMINOLROAYA:
10     Q.  And, in fact, you had a
11  close relationship with the leadership of
12  the American Pain Society?
13         MR. DAVIS:  Objection to
14     form.
15         THE WITNESS:  I actually am
16     very proud, after 35 years of
17     working in this field, to have
18     fairly good relationships with all
19     of the national professional
20     organizations and the patient
21     advocacy organizations and the
22     therapeutic experts, which is why
23     I think I am an official to them
24     as a liaison on projects like the

Page 324

1  FDA REMS and the CCE project.
2         MS. AMINOLROAYA:  I'm
3  marking Exhibit-39.
4  ENDO-Opioid_MDL01928251.
5         - - -
6         (Whereupon, Endo-Kitlinski
7  Exhibit-39,
8  ENDO-OPIOID_MDL-01928251, was
9  marked for identification.)
10         - - -
11         MS. AMINOLROAYA:  It's
12  E1269.
13  BY MS. AMINOLROAYA:
14     Q.  This is an e-mail from you
15  to Bradley Galer, copying
16  ██████████████████ and others in your
17  department at Endo; is that correct?
18     A.  Yes, others in medical
19  affairs and clinical education, correct.
20     Q.  This is dated July 31, 2002.
21  The subject is, Draft of APS
22  faculty/program for your review.
23         And here you're circulating
24  proposed topics for the APS residents

Page 325

1  program?
2         MR. DAVIS:  Objection to
3     form.
4  BY MS. AMINOLROAYA:
5     Q.  Is that right?
6     A.  Excuse me, let me read this,
7  because it seems to be somewhat different
8  than what you just characterized.  And I
9  just want to --
10     Q.  Okay.  Well, let's read the
11  document to move things along.
12     A.  Thank you.
13     Q.  You write, Charles and I
14  spoke this morning and reviewed the
15  faculty/topics you and I had discussed in
16  Seattle.
17         So, apparently, you had a
18  discussion with Bradley Galer about this?
19     A.  Yes.
20     Q.  And you write --
21         MR. DAVIS:  Objection to
22     form.
23  BY MS. AMINOLROAYA:
24     Q.  -- anyway, here is the draft

Page 326

1  we came up with, parenthesis, I'm also
2  faxing illustrate to Charles for
3  review/comment.  Five questions for you
4  to consider.  We were discussing who to
5  speak on opioids, considered Payne,
6  Portenoy, Katz, Declan Walsh.  And
7  thought Payne would be our first choice
8  and a good political move with APS.
9          And then number 2, you say,
10  We have room for two new topics.  We
11  thought we might include
12  institutionalizing pain management
13  practices:  Implications of JCAHO
14  standards, both so the residents would
15  realize the significance of pain
16  management, and also as a way to get
17  another discipline (pharmacology)
18  involved by having June Dahl speak.
19  Thoughts?
20          Did I read that correctly?
21      A.   Yes.
22      Q.   And this is a proposal
23  you're sending to Mr. Galer regarding the
24  American Pain Society's residents

Page 327

1  program?
2      A.   Correct.
3      Q.   And the American Pain
4  Society residents program trained young
5  doctors who were doing their residency;
6  is that correct?
7          MR. DAVIS:  Objection to
8  form.
9          THE WITNESS:  The American
10  Pain Society residency program was
11  designed to have residents from
12  across the country participate in
13  a week-long meeting at APS to
14  learn about -- not just about pain
15  management, but pain assessment,
16  what the new science and research
17  was, and to recognize the
18  importance of pain in their
19  practices.
20  BY MS. AMINOLROAYA:
21      Q.   And at the bottom of the
22  document you tell Mr. Galer, And, of
23  course, please add any additional words
24  of wisdom.

Page 328

1          So here you are suggesting
2  topics for the APS residents program,
3  including education on the JCAHO
4  standards, right?
5          Those were the standards
6  that we heard about from Dr. Ford
7  earlier?
8          MR. DAVIS:  Objection to
9  form.
10          THE WITNESS:  Which, again,
11  as you said, that had been a new
12  advance.  I wasn't sure what the
13  timing of it was.  Certainly, it
14  seemed to me it was earlier than
15  the 2006 date that that NIPC talk
16  was.
17          But this puts it in
18  perspective or frame of reference
19  there.
20          And, again, to your question
21  about the fact that this e-mail
22  was discussing topics, I'll just
23  point out the date of it was 2002,
24  which was consistent with what was

Page 329

1  appropriate under the independent
2  education standards at that time.
3  BY MS. AMINOLROAYA:
4      Q.   In fact, you paid millions
5  of dollars to the American Pain Society
6  for this type of education, correct?
7          MR. DAVIS:  Objection to
8  form.
9          THE WITNESS:  I would have
10  to look at the document for the
11  Senate Finance Committee.  I don't
12  recall.
13  BY MS. AMINOLROAYA:
14      Q.   Okay.  Let's take a look.
15          If we look at Page 26,
16  that's where the American Pain Society
17  payments begin.
18      A.   Yes.
19      Q.   And we see payments to the
20  American Pain Society started by Endo in
21  1998; is that right?
22      A.   Yes.
23      Q.   And we won't go through all
24  of these, but we can see that there's a

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 total for each year.
2 So in 1998, payments were
3 $20,000. They increased, in 1999, to
4 $48,665. In 2000, it's $55,935. In
5 2001, the number goes up, it's $132,400.
6 And we see listings for 2002, 2003
7 payments, 2004.
8 And this continues every
9 year --
10 A. Again, if I may just point
11 out --
12 Q. -- through 2011?
13 A. If I may just point out what
14 the -- we discussed earlier that this
15 document lists not just pain education,
16 educational grants.
17 So, again, it would not be
18 within my scope of responsibilities to
19 comment on the other payments. And you
20 could -- you know, I would defer to my
21 other colleagues at Endo in the
22 appropriate departments to share that
23 information with you.
24 Q. And is the total payments to

Page 331

1 the American Pain Society, between 1998
2 and 2012, listed in Endo's submission to
3 the Senate Finance Committee, of
4 $4,468,253.10?
5 A. Again, this includes --
6 that's what this document states.
7 Q. Thank you.
8 So you would agree that Endo
9 paid millions of dollars to the American
10 Pain Society?
11 MR. DAVIS: Objection to
12 form.
13 BY MS. AMINOLROAYA:
14 Q. And certainly pain education
15 was among the categories of services that
16 Endo paid the American Pain Foundation --
17 America Pain Society for; is that right?
18 A. Pain education was among
19 those services, yes.
20 But, again, I would not be
21 able to confirm or disaffirm the
22 millions-of-dollars total there.
23 MS. AMINOLROAYA: Move to
24 strike after "pain education was

Page 332

1 among those services, yes."
2 E1308. I'm handing you
3 what's been marked as Exhibit-40,
4 ENDO-OPIOID_MDL-05968029. E1308.
5 - - -
6 (Whereupon, Endo-Kitlinski
7 Exhibit-40,
8 ENDO-OPIOID_MDL-05968029-075, was
9 marked for identification.)
10 - - -
11 THE WITNESS: Thank you.
12 BY MS. AMINOLROAYA:
13 Q. And this is -- at the bottom
14 here of Page 2, Eric Boyer writes to you,
15 on August 21, 2009, regarding the APS
16 residents course.
17 A. Yes.
18 Q. It says, I was cleaning up
19 my office and I found a box -- the box
20 that I had packaged your APS residents
21 course syllabus in and, apparently, never
22 made it down to the FedEx drop off.
23 A. Excuse me.
24 Q. He continues, I am very

Page 333

1 sorry for the delay.
2 And then notes that he's
3 attached the first five parts of the
4 syllabus.
5 And if we turn to Page 5 of
6 the document, we see the programming for
7 the American Pain Society residents
8 program for 2009.
9 You can see on Page 4, the
10 program took place on May 5th and May
11 6th, 2009 in San Diego; is that right?
12 A. Yes, that's what the agenda
13 states.
14 Q. All right. And if we turn
15 to Page 38, the top of this box, the top
16 of the first slide says, Differential
17 diagnosis of aberrant drug-taking
18 attitudes and behavior.
19 And you'll see, is
20 pseudoaddiction (inadequate analgesia)
21 listed as --
22 A. Sorry, I was just getting to
23 the right page there.
24 Q. And you would agree that

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  part of the curriculum for the APS
2  residents course involved teaching of the
3  concept of pseudoaddiction?
4        MR. DAVIS:  Objection to
5  form.
6        THE WITNESS:  Well, again,
7  to be sure that we're putting this
8  in the correct context, the
9  differential diagnosis of
10  aberrant-drug taking attitudes and
11  behavior, the first differential
12  diagnosis is for addiction, so
13  that that is not missed and
14  misconstrued as pseudoaddiction.
15        And then, in addition,
16  chemical copers, which are people
17  who misuse opioids; other
18  psychiatric diagnosis; and then
19  criminal intent or diversion or
20  whatever.
21        So pseudoaddiction is listed
22  on that chart.  But so, too, is
23  actual addiction and the other
24  types of opioid misuse and abuse

Page 335

1        that Endo is trying to mitigate in
2        its education.
3  BY MS. AMINOLROAYA:
4        Q.   And pseudoaddiction is one
5  of the incorrect teachings that Dr.
6  Webster identified in the document we
7  looked at earlier, correct?
8        MR. DAVIS:  Objection to
9  form.
10        THE WITNESS:  The concept of
11  pseudoaddiction is not incorrect.
12        The concept of the fact that
13  you could press the -- press
14  the -- that pseudoaddiction is
15  that -- is what is occurring every
16  time you don't get a response to
17  therapy, that's incorrect.
18  BY MS. AMINOLROAYA:
19        Q.   And on Exhibit-29, on Page
20  3, Dr. Webster described the concept of
21  pseudoaddicts as something that the pain
22  community got wrong; is that correct?
23        MR. DAVIS:  Why don't you
24  let the witness take a look at it

Page 336

1        first?
2        THE WITNESS:  There we go.
3  BY MS. AMINOLROAYA:
4        Q.   Sure.
5        Do you have the document
6  now, Ms. Kitlinski?
7        A.   Yes.  And what page are you
8  referring to?
9        Q.   Page 3.
10        A.   Okay.
11        Q.   And does -- among the
12  misconceptions that are listed here, is
13  the one on the third page pseudoaddicts?
14        A.   I think my eyes are going.
15        Okay, I see it now.
16        Q.   It's highlighted on the
17  screen, if you look at the screen.
18        A.   Thank you.
19        Q.   And is this one of the pain
20  teachings that the pain community got
21  wrong, according to Dr. Webster?
22        MR. DAVIS:  Objection to
23  form.
24        THE WITNESS:  Well, again,

Page 337

1  unless I'm -- is there another
2  reference to -- and I ask this
3  question just because my eyes are
4  getting tired, and I don't want to
5  take your time up, is there
6  another place on this article
7  besides this misconception
8  statements about pseudoaddiction?
9        Does that -- does that
10  appear anywhere else on this
11  document?
12        So what Dr. Webster is
13  saying that, among the
14  misconceptions, the one that
15  refers to pseudoaddiction here,
16  people who seek more frequent
17  prescriptions or higher doses of
18  the drugs aren't addicts, they are
19  pseudoaddicts who just need more
20  pain relief and more opioids.
21        There's a difference between
22  that and -- because it's saying
23  that people are seeking more
24  frequent prescriptions or seeking

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1   higher doses of opioids, which is
2   drug-seeking behavior, as opposed
3   to the definition of
4   pseudoaddiction, which is, the
5   patient isn't obtaining sufficient
6   pain relief and if the physician
7   adjusts their pain medication,
8   they can have their pain relieved.
9       So there -- I'm not
10  saying -- I'm not disagreeing with
11  what you said, Dr. Webster did say
12  we got it wrong.  And this does
13  refer to pseudoaddicts, but
14  they're not saying that there is
15  no such thing as pseudoaddiction.
16  It's just these people who seek
17  more frequent prescriptions or
18  higher doses.
19  BY MS. AMINOLROAYA:
20      Q.   You're not a doctor, right,
21  Ms. Kitlinski?
22      A.   No, I'm not.
23          MS. AMINOLROAYA:  I'm
24  handing you what's been marked as

Page 339

1   E1300.
2               - - -
3       (Whereupon, Endo-Kitlinski
4   Exhibit-41, No Bates, American
5   Pain Society; 2017 Elizabeth
6   Narcessian Award for Outstanding
7   Educational Achievements in the
8   Field of Pain, was marked for
9   identification.)
10              - - -
11  BY MS. AMINOLROAYA:
12      Q.   In fact, you won an award
13  for your work with the American Pain
14  Society residents program; is that
15  correct?
16      A.   I won an award for
17  innovation in pain education.  That
18  was -- that is awarded annually by the
19  American Pain Society to someone who they
20  believe has made a contribution, a
21  valuable contribution, to the field of
22  pain assessment and management.
23      Q.   I'm handing you E1300.
24          It's a printout from the

Page 340

1   American Pain Society's website entitled,
2   2017 Elizabeth Narcessian Award For
3   Outstanding Educational Achievements in
4   the Field of Pain.  And we have a picture
5   of you there.
6       A.   Yes.
7       Q.   And the third -- the third
8   paragraph there states, Ms. Kitlinski is
9   a strong proponent of utilizing
10  innovative partnerships/learning
11  approaches.  She was instrumental in
12  establishing APS's interdisciplinary
13  fundamentals of pain management course,
14  which has provided over 1,150
15  residents/fellows with mentored exposure
16  to the annual scientific meeting and a
17  solid foundation for continued learning
18  on pain assessment/management.
19          Did I read that correctly?
20      A.   Yes.
21      Q.   So pseudoaddiction was part
22  of the solid foundation that was provided
23  to these young doctors; is that right?
24          MR. DAVIS:  Objection to

Page 341

1   form.
2           THE WITNESS:
3   Pseudoaddiction was one term that
4   was covered during the course of a
5   week-long -- well, a two-day
6   meeting and an additional
7   multi-days American Pain Society.
8           And it was covered along
9   with the other appropriate terms
10  for opioid awareness and
11  management.
12  BY MS. AMINOLROAYA:
13      Q.   All right.  And there
14  were -- and we looked at an earlier
15  presentation, it was a couple of hours
16  ago, but you might remember it was a 2003
17  CD&E presentation that discussed Endo's
18  participation on the APS guidelines
19  committee.
20          Do you recall that?
21      A.   I recall our discussion,
22  yes.
23      Q.   And you recall the document?
24      A.   No, I don't recall that we

Page 342

1 looked at the document, quite frankly.
2    Q.   We'll get that for you in a
3 moment.
4        MS. AMINOLROAYA:  I'm
5 handing you what has been marked
6 as Exhibit-42.  This is
7 PKY181215547.  And it's E1406.
8        - - -
9        (Whereupon, Endo-Kitlinski
10 Exhibit-42, PKY181215547-749, was
11 marked for identification.)
12       - - -
13       THE WITNESS:  Thank you.
14       Yes, we definitely did not
15 look at this.
16 BY MS. AMINOLROAYA:
17    Q.   Oh, no, this was not the
18 document I was referring to, sorry.
19 We're pulling it up.
20       And this document is the
21 Guideline for the Management of Pain in
22 Osteoarthritis, Rheumatoid Arthritis and
23 Juvenile Chronic Arthritis, second
24 edition.

Page 343

1        And you can see at the
2 bottom there the American Pain Society
3 logo, correct?
4    A.   Yes.  I was just looking to
5 see what the date was on there, but I
6 have not found that yet, just as a frame
7 of reference.
8        2002, okay, I see it.  Thank
9 you.
10    Q.   Yes.  And this was one of
11 the objectives that CD&E had in the year
12 2000.
13       If you go back to Exhibit-3,
14 Page 15 of the document, it says,
15 Establish Endo as a leader --
16       MR. DAVIS:  Do you mind just
17       waiting until we have the document
18       in front of Ms. Kitlinski, please?
19       Here you go.
20       THE WITNESS:  Thank you.
21 BY MS. AMINOLROAYA:
22    Q.   Turn to Page 15, we looked
23 at this earlier.
24       One of the tactics that CD&E

Page 344

1 was using in 2000 was -- there you can
2 see, it's several bullets down, APS
3 guideline project and implementation
4 committee; is that correct?
5    A.   Yes.
6    Q.   Thank you.
7        Does that refresh your
8 memory?
9    A.   Yes.  Thank you.
10    Q.   And what we're looking at, a
11 guideline from the American Pain Society;
12 is that correct?
13    A.   This is one of the
14 guidelines that they produce, yes.
15    Q.   And if you look at Page 14
16 of the document, is Endo Pharmaceuticals
17 a source of financial support for these
18 guidelines?
19    A.   Yes, along with multiple
20 other organizations, that's correct.
21    Q.   Okay.  So let's identify
22 some of them.
23       Is Purdue another supporter
24 of the guidelines?

Page 345

1    A.   Their name is listed here,
2 yes.
3    Q.   And do you see Janssen's
4 name?
5    A.   Yes.
6    Q.   So you weren't alone in
7 supporting these guidelines, correct, Ms.
8 Kitlinski?
9        MR. DAVIS:  Objection to
10       form.
11       THE WITNESS:  The whole
12       point of guideline projects is to
13       get the broadest support from
14       the -- not just pharmaceutical
15       industry, but groups like Hoechst
16       Foundation and the Faulding
17       Laboratories, so that the
18       guidelines are appropriately
19       funded.
20 BY MS. AMINOLROAYA:
21    Q.   I'm going to add here to our
22 chart, Ms. Kitlinski, Purdue and Janssen
23 as supporters of the American Pain
24 Society.

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    And you also supported
2 the FSMB; is that correct?
3    MR. DAVIS: Objection to
4 form.
5    THE WITNESS: I'm sorry?
6 BY MS. AMINOLROAYA:
7    Q. Endo also supported the
8 FSMB's efforts; is that correct?
9    A. The Federation of State
10 Medical Boards.
11    Q. Yes. Thank you.
12    A. Sure.
13    FSMB had a lot of efforts.
14 I'm not sure what you're specifically
15 referring to. They have efforts across
16 the country.
17    Q. Did you -- did Endo provide
18 funding for the FSMB's efforts?
19    A. Again, if you could tell me
20 which efforts --
21    MR. DAVIS: Objection.
22    THE WITNESS: -- I would
23 be -- could tell you if we did.
24 BY MS. AMINOLROAYA:

Page 347

1    Q. Sure.
2    A. Because we had them --
3    Q. Sure. Did the --
4    A. State -- they had state
5 initiatives. They had national
6 initiatives. They had different
7 projects. So I just want to be clear
8 what we're talking about.
9    Q. And let's go to the Senate
10 Finance Committee submission, Exhibit-33,
11 and turn to Page 32, please.
12    You see at the bottom of
13 this page, Endo payments to the
14 Federation of State Medical Boards?
15    A. Yes.
16    Q. In 2000?
17    A. Yes.
18    Q. In 2006?
19    A. Yes.
20    Q. Payments were made in 2007?
21    A. Yes.
22    Q. And 2008?
23    A. And 2010.
24    Q. For a total of $369,000?

Page 348

1    A. Correct.
2    Q. So you would agree Endo
3 provided funding to the FSMB in the
4 hundreds of thousands of dollars?
5    A. Pain education grants, yes.
6    Q. For pain education, correct?
7    A. Correct.
8    MS. AMINOLROAYA: Can we
9 have 423, please?
10    I'm handing you Exhibit-43.
11 This is END00051370. E423.
12    - - -
13    (Whereupon, Endo-Kitlinski
14 Exhibit-43, END00051370-443, was
15 marked for identification.)
16    - - -
17 BY MS. AMINOLROAYA:
18    Q. And this is, Responsible
19 Opioid Prescribing, a Physician's Guide.
20 And the name on the front of the cover
21 here is, Scott Fishman, MD.
22    And we also see the logo of
23 the Federation of State Medical Boards;
24 is that correct?

Page 349

1    A. Yes.
2    Q. Did you know Dr. Fishman?
3    A. I did, yes. He's one of the
4 national therapeutic experts I mentioned
5 earlier.
6    Q. And over the course of your
7 time at Endo, did you have occasion to
8 communicate with Dr. Fishman?
9    A. Yes.
10    Q. And Page 3 of the document
11 tells us that this is copyrighted 2007;
12 is that right?
13    A. Yes.
14    Q. And Endo sponsored this
15 book; is that right?
16    MR. DAVIS: Objection to
17 form.
18    THE WITNESS: Endo was one
19 of the organizations that provided
20 an educational grant towards this,
21 yes.
22 BY MS. AMINOLROAYA:
23    Q. You would agree it says --
24 withdrawn.

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1 Along with other
2 organizations. So was Purdue Pharma one
3 of these other organizations that
4 provided support?
5 A. Their name is listed here.
6 Q. And is Cephalon another
7 opioid manufacturer that provided
8 support?
9 A. Cephalon's name is listed
10 here.
11 Q. As well as the American Pain
12 Foundation?
13 A. Yes. There are quite a
14 number of nonprofit organizations listed
15 here.
16 Q. And the Federation of State
17 Medical Boards Research and Education
18 Foundation?
19 A. Well, it's their
20 publication. So, yes.
21 Q. And let's look at Page 18 of
22 the document, Assessing risk and benefit.
23 Do you see that on the lower
24 left-hand side?

Page 351

1 A. Yes. If you'll just give me
2 a moment here to read the foreword, if I
3 may. It's just one page.
4 All right. I'm sorry, you
5 were directing me to which page?
6 Q. Yes. Let's look at the top
7 of Page 19.
8 And under Assessing risk and
9 benefit, several paragraphs in, it
10 states, Another risk posed by a
11 nontreatment or undertreatment of pain
12 affects the physician but not the patient
13 directly. Physicians have been
14 successfully sued for not treating pain
15 aggressively.
16 Did I read that correctly?
17 A. I'm sorry, I still
18 haven't -- all right.
19 Q. Did I read that correctly,
20 Ms. Kitlinski?
21 A. Yes, you did.
22 Q. Okay, thanks. Let's turn to
23 Page 36.
24 A. Yes.

Page 352

1 Oh, I'm sorry, I'm looking
2 at the wrong Page 36. Go right ahead.
3 Q. Top left of the page, it
4 states, Be aware of the distinction
5 between pseudoaddiction and addiction.
6 Patients who are receiving an inadequate
7 dose of opioid medication often seek more
8 pain addictions -- excuse me -- to
9 obtain pain relief. This is called
10 pseudoaddiction because healthcare
11 practitioners can mistake it for the
12 drug-seeking behavior of addiction.
13 Did I read that correctly?
14 A. Yes.
15 Q. And then it goes on to
16 list -- the last sentence of this
17 paragraph states, Some common signs of
18 pseudoaddiction resulting from inadequate
19 analgesia -- and then it goes on to list
20 several of them; is that right?
21 A. Yes.
22 And you'll also see it goes
23 on to state that, Note that these same
24 behavioral signs can indicate addiction

Page 353

1 and that one way to discriminate between
2 the two -- which is what I was referring
3 to earlier -- is to observe, as closely
4 as possible, the functional consequences
5 of opioid use. When it resolves when the
6 patient obtains adequate analgesia,
7 addictive behavior -- I'm sorry, Whereas
8 pseudoaddiction resolves when the patient
9 obtains adequate analgesia, addictive
10 behavior does not.
11 So they are making the
12 distinction that we referred to earlier.
13 MS. AMINOLROAYA: Move to
14 strike everything after the word
15 "yes."
16 You can set that aside.
17 BY MS. AMINOLROAYA:
18 Q. Let's turn back to the
19 Senate Finance Committee submission.
20 Endo also provided millions
21 of dollars of payments to the American
22 Academy of Pain Management; is that
23 correct?
24 A. If you'll give me a moment

Page 354

1  to get to that document.
2        And you said the American
3  Academy of Pain Management or Pain
4  Medicine, which of the two?
5      Q.   Pain Medicine.
6      A.   I think I saw one on here
7  for Pain Management.  All right.
8      Q.   And if we look at Pages 25
9  and 26, do these payments start in 1999?
10     A.   That's correct.
11     Q.   And did they continue
12  through 2012?
13     A.   That's correct.
14     Q.   These payments total over $1
15  million during that time period?
16     A.   And, again, I, of my own
17  knowledge, can only speak to the pain
18  education payments.
19     Q.   The total payments that was
20  submitted to the Senate Finance Committee
21  by Endo Pharmaceuticals in 2012, was that
22  over $1 million?
23     A.   Again, I'm not trying to be
24  difficult here, but I don't know that of

Page 355

1  my own knowledge.
2        I know what the pain
3  education is on here, and I know that
4  this is the report that was submitted to
5  the Senate Finance Committee.
6        So the appropriate folks at
7  Endo would have contributed the other --
8  the other information.  I'm just trying
9  to be clear on what I know firsthand.
10     Q.   Did Endo provide money for
11  pain education to the American Academy of
12  Pain Medicine in 1999?
13     A.   Absolutely.
14        MR. DAVIS:  Objection to
15  form.
16  BY MS. AMINOLROAYA:
17     Q.   Did it provide payments --
18  and I'll call it AAPM for short.
19     A.   Sure.
20     Q.   Did it provide payments to
21  the AAPM in 2000?
22     A.   Yes.
23     Q.   And did that continue in
24  2001?

Page 356

1        MR. DAVIS:  Objection to
2  form.
3        THE WITNESS:  Yes.
4  BY MS. AMINOLROAYA:
5      Q.   2002?
6      A.   Yes.
7      Q.   '03, 2003?
8        MR. DAVIS:  Objection to
9  form.
10        THE WITNESS:  Yes.
11  BY MS. AMINOLROAYA:
12     Q.   2004?
13        MR. DAVIS:  Objection to
14  form.
15        THE WITNESS:  Yes.
16  BY MS. AMINOLROAYA:
17     Q.   Did Endo provide funding to
18  the AAPM in 2005?
19     A.   Yes.
20        Again, we're talking about
21  pain education funding, correct?
22     Q.   Yes.
23     A.   Okay.  Yes.
24     Q.   And did that -- those

Page 357

1  payments for pain education continue in
2  2007, 2008, 2009, 2010, '11 and '12?
3        MR. DAVIS:  Objection to
4  form.
5        THE WITNESS:  Yes, that is
6  correct.
7  BY MS. AMINOLROAYA:
8      Q.   And you would agree just
9  looking at between 2007 to 2012, the year
10  summaries there indicate that hundreds of
11  thousands of dollars were paid to the
12  AAPM for pain education?
13        MR. DAVIS:  Objection to
14  form.
15        THE WITNESS:  Again, the --
16  just as I mentioned when you were
17  looking at the American Pain
18  Foundation totals, those are the
19  amounts of the educational grants
20  that were paid to execute
21  activities at those organizations,
22  pain education activities.
23        So that is not to imply that
24  the AAPM received a fee of

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    hundreds of thousands of dollars.
2        It includes the pass-through
3    expenses associated with the
4    execution of the education.
5    BY MS. AMINOLROAYA:
6        Q.   And were hundreds of
7    thousands of dollars paid in grant, or
8    other forms, to the American Academy of
9    Pain Medicine for pain education by Endo?
10       A.   Yes.  I stated that.
11           MR. DAVIS:  Objection to
12       form.
13   BY MS. AMINOLROAYA:
14       Q.   So we'll add that to our
15   chart here, hundreds of thousands of
16   dollars.
17           MS. AMINOLROAYA:  We'll add
18       an exhibit number to this, this is
19       Exhibit-44.
20           - - -
21       (Whereupon, Endo-Kitlinski
22       Exhibit-44, No Bates,
23       Demonstrative, was marked for
24       identification.)

Page 359

1            - - -
2        (Whereupon, Endo-Kitlinski
3        Exhibit-21, No Bates,
4        Demonstrative, was marked for
5        identification.)
6            - - -
7    BY MS. AMINOLROAYA:
8        Q.   While we're on the Senate
9    Finance Committee document, we'll take a
10   look at one other group that we've spent
11   a bit of time talking about today, for
12   good measure, the Joint Commission on
13   Accreditation.  It's on Page 32 of the
14   document.
15           I'm running out of space,
16   but we'll add it here at the top, JCAHO
17   for short.
18           You would agree that tens of
19   thousands of dollars were paid to the
20   Joint Commission for Pain Education from
21   2000 to 2001?
22       A.   $75,000 was paid to the
23   joint commission.
24       Q.   Tens of thousands of

Page 360

1    dollars?
2        A.   Correct.
3            MS. AMINOLROAYA:  Can we
4        take a break?
5            VIDEO TECHNICIAN:  Going off
6        the record.  The time is 5:13 p.m.
7            - - -
8        (Whereupon, a brief recess
9        was taken.)
10           - - -
11           VIDEO TECHNICIAN:  We're
12       back on the record at 5:39 p.m.
13   BY MS. AMINOLROAYA:
14       Q.   Ms. Kitlinski, turning your
15   attention back to Exhibit-33.
16       A.   Thank you.
17       Q.   Endo also provided payments
18   to certain doctors in the field of pain
19   management; is that correct?
20       A.   Are you talking about on
21   Page 21?
22       Q.   21 of the document, yes.
23       A.   Yes.
24       Q.   And these weren't just any

Page 361

1    doctors in the field of pain management,
2    these were very well-respected doctors,
3    correct?
4        A.   The therapeutic experts.
5    They were honoraria payments, yes.
6        Q.   And between 1999 and 2002,
7    did Endo make payments to Russell
8    Portenoy totaling $73,855?
9        A.   That is the total that is
10   shown here on the finance committee
11   document.
12       Q.   And these were -- many of
13   these payments were for pain education,
14   correct?
15       A.   That's correct.
16       Q.   So you would agree that
17   these were payments totaling thousands of
18   dollars?
19       A.   The total, yes.  This total
20   here is -- I mean, I don't have a
21   calculator, but I presume that's
22   accurate.
23       Q.   You can see the total,
24   right, 73,000 --

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1     A.   Yes, that's what I just
2 said. I didn't total up this column.
3        And also, again, I just want
4 to be clear on this. Because of how
5 the -- what do I call it -- the
6 accounting system codes things based on
7 what department the payment was made
8 from, right; so, for example, where it
9 says pain education for Russell Portenoy
10 or Scott Fishman, or any of these
11 individuals, you cannot make educational
12 grants to individuals. You can't do
13 that.
14        So this is an indication of
15 the fact that these were -- you know, the
16 payment was coming through our department
17 for their educational involvement and
18 services.
19        So I just want to be clear
20 that this is not, you know, a payment of
21 an educational grant, as opposed to,
22 let's say, honoraria for participation in
23 activities.
24     Q.   The description here on the

Page 363

1 page under purpose of payment is pain
2 education, correct?
3     A.   I understand that.
4     Q.   Okay. Thank you.
5     A.   I'm just explaining --
6     Q.   And is the total --
7     A.   -- what it -- what the
8 internal nomenclature is that this came
9 from.
10     Q.   And the total to Russell
11 Portenoy was $73,000 between 1999 and
12 2002, correct?
13     A.   Yes. Yes.
14     Q.   Okay. And for Dr. Fishman,
15 he's the author of Responsible Opioid
16 Prescribing, right?
17     A.   Yes.
18     Q.   And Endo made payments to
19 him between 2002 and 2004 for pain
20 education?
21     A.   Correct.
22     Q.   Also thousands of dollars
23 paid to Dr. Fishman?
24     A.   $8,000, yes.

Page 364

1     Q.   And going down to Dr. Fine,
2 between 2002 and 2007, did Endo make
3 payments of thousands of dollars to Dr.
4 Fine?
5     A.   The total here is -- on the
6 document is $36,881, yes.
7     Q.   And Dr. Fine, Dr. Portenoy,
8 Dr. Fishman and Dr. Argoff all received
9 payments for pain education, correct?
10        MR. DAVIS: Objection to
11     form.
12        THE WITNESS: Are we missing
13     a page here? I don't see -- I
14     don't see Dr. Argoff's name.
15 BY MS. AMINOLROAYA:
16     Q.   We saw Dr. -- disregard Dr.
17 Argoff's inclusion in that.
18        So Dr. Fine, Dr. Portenoy
19 and Dr. Fishman received thousands of
20 dollars of payments for pain education
21 from Endo, correct?
22        MR. DAVIS: Objection to
23     form.
24        THE WITNESS: Again, I

Page 365

1 clarified what those were for.
2 But that's -- they're not
3 educational grants. They are
4 payments related to participation
5 in projects that the CD&E
6 department carried out.
7 BY MS. AMINOLROAYA:
8     Q.   Okay. Thank you.
9        At a certain point in time,
10 FDA required opioid manufacturers to
11 provide REMS education; is that correct?
12     A.   Yes.
13     Q.   And we discussed --
14     A.   Opioid -- ERLA opioid
15 manufacturers.
16     Q.   Thank you for that
17 clarification.
18        Required manufacturers of --
19 opioid manufacturers who manufactured and
20 sold extended-release long-acting opioids
21 to provide REMS education; is that right?
22     A.   Yes, that's correct.
23        And recently that's been
24 expanded to include all opioids.

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    MS. AMINOLROAYA:  Can I have
2 715, please?
3    I'm handing you ENDO-CHI_LIT
4 00241435.  This is an e-mail
5 from -- and this is E715.
6    - - -
7    (Whereupon, Endo-Kitlinski
8 Exhibit-45,
9 ENDO-CHI_LIT-00241435-436, with
10 attachment, was marked for
11 identification.)
12    - - -
13 BY MS. AMINOLROAYA:
14    Q.   This is an e-mail from you
15 to Nancy Santilli, Tara Chapman and Marc
16 Collins, dated December 14th, 2011
17 regarding -- subject:  V8 - minor tweaks
18 awakening to REMS RD lunch-and-learn
19 November 15, 2011 draft slides.
20    Is that correct?
21    A.   Yes, that's the subject line
22 here.
23    Q.   And you write to Nancy, who
24 is your supervisor at the time, These are

Page 367

1 looking really good.  I made minor tweaks
2 to slides -- and you specify which
3 ones -- primarily to emphasize the
4 death/addiction/OD aspect versus
5 misuse/abuse, since that's what FDA is
6 focusing on.
7    Is that correct?
8    A.   Yes.
9    Q.   All right.  Let's turn to
10 Page 19 of the document.
11    And this slide is entitled,
12 REMS Education Versus, in quotes,
13 Balanced Opioid Education (RiskMAP).
14    Did the company provide --
15 did Endo provide education pursuant to
16 its RiskMAP responsibilities?
17    A.   Yes.
18    MR. DAVIS:  Objection to
19 form.
20 BY MS. AMINOLROAYA:
21    Q.   And did Opana ER have a
22 RiskMAP?
23    MR. DAVIS:  Objection to
24 form.

Page 368

1    THE WITNESS:  Yes, Opana ER
2 had a RiskMAP.
3 BY MS. AMINOLROAYA:
4    Q.   And what is a RiskMAP?
5    A.   A RiskMAP is a -- prior to
6 the introduction of REMS, RiskMAP was a
7 document that the company produced to
8 voluntarily demonstrate our commitment to
9 assuring that the, at that time, if we
10 were talking about Opana, that the Opana
11 ER medications were used appropriately
12 and that the risks associated, that can
13 be associated with all opioids, were
14 mitigated to the extent that they can be
15 for controlled substance.
16    So my responsibilities for
17 the RiskMAP, which was -- it was a broad
18 program, it was not just education.  But
19 my responsibilities were the educational
20 aspects of it.
21    Q.   Thank you.
22    And was the education that
23 was provided for the RiskMAP balanced
24 opioid education?

Page 369

1    A.   Absolutely.  All of the
2 education that we ever, ever did,
3 regardless of whether it was even
4 promotional education, needs to be
5 balanced and, you know, appropriate to
6 the -- if it's CME, it has to be balanced
7 and follow the ACCME guidelines; if it's
8 promotional education, it has to be
9 balanced from the perspective of DDMAC.
10    Q.   Okay.
11    MS. AMINOLROAYA:  Would the
12 trial tech be able to highlight
13 the term "balanced" here on the
14 document?  Just the term
15 "balance."  Thank you.
16 BY MS. AMINOLROAYA:
17    Q.   And balanced opioid
18 education, underneath it, it says,
19 Addresses both aspects of public health
20 issue, responsible risk mitigation and
21 appropriate DX and TX of chronic pain.
22    Did I read that correctly?
23    A.   Yes.  Appropriate diagnosis
24 and treatment of chronic pain.

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1    Q.  Thank you.
2       And just to -- just to
3 orient us, you've sent this document to a
4 Ms. Santilli in November of 2011,
5 correct?
6       And is that before a final
7 REMS was implemented by FDA?
8    A.  Yes.  That occurred in 2012.
9       But at this stage of the
10 game, we knew what the FDA had indicated
11 needed to be in the REMS.  And this was
12 our internal education to make sure that
13 folks were aware of what the REMS was
14 going to be.
15    Q.  And the next bullet reads:
16 Discusses topics not covered by REMS.
17       And the first two bullets
18 there are, Evidence-based guidelines and
19 role of opioids in chronic pain.
20       Did I read that correctly?
21    A.  Yes.
22    Q.  And who are the IWG
23 companies, branded companies?
24    A.  The IWG was the Industry

Page 371

1 Working Group, the name of the -- that
2 preceded the RPC.  So that was the -- all
3 of the ERLA opioid manufacturers.
4    Q.  And do you know who those --
5 can you identify those companies for the
6 jury?
7    A.  They evolved over the years.
8 There were -- I believe when REMS was
9 first -- the letters first went out,
10 there were 36-plus companies.  By the
11 time the REMS was approved, I believe
12 there were 25.
13       And they are listed on the
14 FDA website and on the ERLA opioid REMS
15 website.
16       But I don't know off the top
17 of my head who they all are.
18    Q.  And according to this
19 presentation, all IWG branded companies
20 plus Covidien plan to continue balanced
21 education.
22       Did I read that correctly?
23    A.  Yes.
24    Q.  And Covidien is

Page 372

1 Mallinckrodt.
2       Do you understand that?
3    A.  Yes.
4    Q.  And on the left side of the
5 document, it states, REMS education.  And
6 the second bullet here states, Focus will
7 be on reducing risks of death,
8 unintentional OD, addiction, abuse and
9 serious AEs.
10       Did I read that correctly?
11    A.  Yes.
12    Q.  And OD --
13    A.  Overdose.
14    Q.  Overdose.
15       And "serious AEs" refers to
16 adverse events, correct?
17    A.  Yes.
18    Q.  So the REMS education is not
19 focused on these other topics that are
20 mentioned here on Page 19, correct?
21       MR. DAVIS:  Objection to
22    form.
23       THE WITNESS:  The REMS
24    education is focused, by the FDA,

Page 373

1    on the -- solely on those elements
2    that they included as part of the
3    FDA blueprint.
4 BY MS. AMINOLROAYA:
5    Q.  So the IWG branded
6 companies, would that include Endo?
7    A.  Yes.
8    Q.  And so Endo was planning to
9 continue to sponsor education that was
10 different from what FDA had asked be
11 covered under the REMS, correct?
12       MR. DAVIS:  Objection to
13    form.
14       THE WITNESS:  What -- what
15    Endo, and I'll speak just for
16    Endo, intended was to supplement
17    the REMS education by doing
18    additional education, balanced
19    education, if you will.
20       Some of the concerns we had
21    expressed by -- in the stakeholder
22    meetings from clinicians and
23    professional organizations was
24    that by focusing just on the

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1 opioid REMS, it made it seem as if
2 opioids was the be all and end all
3 and the only type of medication
4 that should be considered for the
5 management of this pain.
6 And so that's why, over the
7 course of the years, through the
8 input, the FDA obtained in the
9 docket and from the public
10 hearings, they now have required
11 that REMS education not only
12 focuses on the opioid -- opioids
13 but it is more balanced and it
14 talks about the assessment of pain
15 and the use of nonpharmacologic
16 therapy and the use of other
17 agents.
18 So that's -- that's what the
19 distinction was there.
20 BY MS. AMINOLROAYA:
21 Q. And the document here states
22 that the IWG companies plan to continue
23 balanced education.
24 Is that the type of

Page 375

1 education that was provided under the
2 RiskMAP?
3 MR. DAVIS: Objection to
4 form.
5 THE WITNESS: I don't know
6 if the other companies were
7 planning to continue --
8 BY MS. AMINOLROAYA:
9 Q. Strike my question.
10 A. Okay.
11 Q. The branded companies, Endo
12 was one of those.
13 Did Endo plan to continue to
14 provide balanced education?
15 A. In addition to what --
16 Q. Yes or no, please.
17 A. Yes.
18 Q. Yes.
19 And did -- was balanced
20 education what was provided in the
21 RiskMAP?
22 A. Yes.
23 MR. DAVIS: Objection to
24 form.

Page 376

1 BY MS. AMINOLROAYA:
2 Q. And that -- part of the
3 RiskMAP were NIPC dinner dialogues?
4 A. There were pages of
5 educational initiatives. But, yes, NIPC
6 was part of the RiskMAP.
7 Q. So threats of being sued for
8 not aggressively treating pain, that was
9 a part of balanced opioid education?
10 MR. DAVIS: Objection to
11 form.
12 THE WITNESS: Again, you're
13 isolating one comment by one
14 speaker in one program. That
15 was -- we don't even know if that
16 was part of the curriculum. We
17 would have to look at the
18 curriculum or listen to -- see the
19 slides and know, was that a
20 comment that the speaker made in
21 their own opinion, or was it
22 actually part of the curriculum?
23 BY MS. AMINOLROAYA:
24 Q. And we saw that threat

Page 377

1 again, right, in the FSMBs, responsible
2 opioid prescribing, that Endo paid for,
3 correct?
4 MR. DAVIS: Objection to
5 form.
6 THE WITNESS: We saw the
7 threat of what?
8 BY MS. AMINOLROAYA:
9 Q. The threat of being sued for
10 not aggressively treating pain.
11 MR. DAVIS: Objection to
12 form.
13 THE WITNESS: We saw -- we
14 saw the FSMB state what cases were
15 being tried at the time and what
16 the results of those outcomes
17 were.
18 BY MS. AMINOLROAYA:
19 Q. And we also saw, in the NIPC
20 newsletter, pseudoaddiction was being
21 advocated as a key term in the treatment
22 of pain with opioid analgesics, correct?
23 MR. DAVIS: Objection to
24 form.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    THE WITNESS: We saw that
2 addiction, first and foremost, and
3 overdose and then pseudoaddiction,
4 dependence and tolerance, all of
5 those terminologies are important
6 for people to be able to
7 distinguish in order to determine
8 whether, as a clinician, the
9 patient sitting in front of you is
10 an appropriate candidate to even
11 be considered for opioid therapy.
12 BY MS. AMINOLROAYA:
13    Q.   All right. And so this is
14 what Endo considers balanced education,
15 right?
16    MR. DAVIS: Objection to
17 form.
18    MS. AMINOLROAYA: Can I have
19 E1321, please?
20 BY MS. AMINOLROAYA:
21    Q.   Ms. Kitlinski, you were a
22 member of the REMS program companies
23 continuing education subteam, correct?
24    A.   Yes.

Page 379

1    Q.   I'm handing you a very large
2 document, but we're only going to look at
3 one page.
4    MS. AMINOLROAYA: This is
5 E1321. It's
6 ENDO-OPOID_MDL_DEPONENT-000015990.
7 It's Exhibit-46.
8    - - -
9    (Whereupon, Endo-Kitlinski
10 Exhibit-46,
11 ENDO-OPIOID_MDL_DEPONENT-000015904
12 -16398, was marked for
13 identification.)
14    - - -
15 BY MS. AMINOLROAYA:
16    Q.   And we obtained this
17 document as part of some documents that
18 you provided.
19    And you received this
20 document in your capacity as a member of
21 the subteam, correct?
22    A.   What is the date?
23    Q.   It's January 6th, 2016.
24    A.   I received this document --

Page 380

1 if it was in January of 2016, I would
2 have received this document as a
3 consultant to the RPC, because I -- as I
4 said, I was a member of the subteam until
5 my employment at Endo ended. And that
6 was in the middle of January '14.
7    Q.   And was -- Endo was one of
8 the REMS program companies, correct?
9    A.   Correct.
10    Q.   So Endo supported the REMS
11 education --
12    A.   Yes.
13    MR. DAVIS: Objection to
14 form.
15 BY MS. AMINOLROAYA:
16    Q.   -- at the time?
17    And this is an audit report.
18 The top here says, Dear RPC CE subteam,
19 in this audit report summary, you are
20 receiving information descriptive of
21 three audits. The audit results of the
22 three activities are attached.
23    It describes the activities
24 that are reviewed, and then it goes on to

Page 381

1 describe three different REMS programs;
2 is that correct?
3    MR. DAVIS: Objection to
4 form.
5    THE WITNESS: Yes. And,
6 again, just to clarify the
7 terminology.
8    So a program is a collection
9 of educational activities as
10 opposed to a single one-time, you
11 know, offering, if you will.
12 BY MS. AMINOLROAYA:
13    Q.   Okay. Turn to Page -- it
14 looks like we lost our E numbers on this
15 page, because it's a darker document. It
16 ends in 16042.
17    MR. DAVIS: 042?
18    MS. AMINOLROAYA: Yes.
19    - - -
20    (Whereupon, a discussion off
21 the record occurred.)
22    - - -
23 BY MS. AMINOLROAYA:
24    Q.   And if we look at 16042, the

Page 382

1  title of this is, Opioid REMS Resource
2  Tools for Assessing Patients and
3  Initiating ERLA Opioids, co-provided by a
4  few organizations there.
5        And on the next page ending
6  in 16043, it identifies the course
7  director as Dr. Perry Fine. Faculty as
8  Dr. Argoff, who we know from the NIPC
9  dinners and the NIPC faculty and the
10 e-mails that we looked at earlier. And
11 Dr. Ashburn.
12       And it states, This
13 educational activity is supported by an
14 independent educational grant from the
15 ERLA opioid analgesics REMS program
16 companies.
17       And would that include Endo?
18    A.  Yes.
19       MR. DAVIS: Objection to
20 form.
21 BY MS. AMINOLROAYA:
22    Q.  And if we look at -- I found
23 the E numbers again, E1321.265, and
24 that's ending in 16168 is the Bates.

Page 383

1        And we see the second bullet
2  there --
3     A.  Excuse me just one moment,
4  please, until I get there.
5        Thank you.
6     Q.  The second bullet there is
7  pseudoaddiction, correct?
8     A.  Correct. After addiction,
9  out-of-control compulsive drug use.
10    Q.  Right. And this is being
11 sent to you in a letter in 2016.
12       Endo is supporting education
13 that continues to tout the subject of
14 pseudoaddiction, right?
15       MR. DAVIS: Objection to
16 form.
17       THE WITNESS: As we've
18 already discussed, the concept of
19 pseudoaddiction is still a valid
20 concept.
21       What was not valid was
22 the -- you know, what Dr. -- I'm
23 trying to think of which of the
24 documents we looked at there was

Page 384

1  talking about the fact that that
2  was -- you could continue to push
3  the dose up and that was -- that
4  was the -- whereas what was
5  correct was the fact that you
6  could determine -- you could
7  differentiate between addiction
8  and pseudoaddictions by
9  determining if a bump up of the
10 opioid dose mitigated the risk or
11 continued to require the patient
12 to seek or have aberrant
13 drug-related behaviors to obtain
14 the medications.
15 BY MS. AMINOLROAYA:
16    Q.  Ms. Kitlinski, yes or no,
17 this 2016 REMS education program
18 supported by Endo lists pseudoaddiction
19 in the presentation, correct?
20       MR. DAVIS: Objection to
21 form.
22       THE WITNESS: It is one
23 bullet point on this slide out of
24 hundreds of pages, yes. And it's

Page 385

1  a valid point.
2        MS. AMINOLROAYA: My
3  colleague, Mr. Buchanan, has some
4  questions for you.
5        VIDEO TECHNICIAN: Going off
6  the record. The time is 6:01 p.m.
7           - - -
8        (Whereupon, a discussion off
9  the record occurred.)
10          - - -
11       VIDEO TECHNICIAN: We're
12 back on the record at 6:02 p.m.
13          - - -
14       EXAMINATION
15          - - -
16 BY MR. BUCHANAN:
17    Q.  Ms. Kitlinski, I know it's
18 been a long day. I hope you can bear
19 with me. I have about 30 minutes' worth
20 of questions, at most.
21       My name is Dave Buchanan, I
22 represent other plaintiffs. And I want
23 to go over a few areas and ask you a few
24 different points, okay?

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1    You spent a lot of time, I
2  think, talking about medical education --
3    A.   Yes.
4    Q.   -- with my colleague.  And I
5  just want to understand that.
6    So when you talk about
7  medical education, there were discussions
8  about dinners, there were discussions
9  about presentations at conferences.
10  There's been discussions about
11  development of slide decks, talks, all
12  that kind of work.
13    Does that all fall under the
14  umbrella of education?
15    MR. DAVIS:  Objection to
16    form.
17    THE WITNESS:  It falls under
18    the broad area of education, yes.
19    And we did talk about different
20    types of education.  We talked
21    about independent medical
22    education, such as accredited CE,
23    and those activities by a third
24    party, and then we also talked

Page 387

1    about education such as
2    therapeutic area education,
3    education for the patients and
4    families, et cetera.
5    But it's all education.
6  BY MR. BUCHANAN:
7    Q.   And just so I understand the
8  base principles, I mean, education as
9  compared to promotion.
10    Education is not supposed to
11  be promotional in nature, fair?
12    MR. DAVIS:  Objection to
13    form.
14    THE WITNESS:  Again, the FDA
15    has very clear regulatory criteria
16    about what constitutes promotion,
17    and it does not include the
18    independent medical education.
19    That's clearly determined by FDA,
20    by ACCME, by OIG and by PhRMA.
21  BY MR. BUCHANAN:
22    Q.   So the word you put in there
23  was "independent medical education."
24    That's a term in your

Page 388

1  industry or in your field, fair?
2    A.   Well, it's actually a
3  regulatory term that FDA has as their
4  indicia for what constitutes independent
5  education.  Again, OIG, PhRMA and ACCME
6  utilize that term.
7    To your other question about
8  promotional and education.  Education,
9  let's say, for an example, the marketing
10  department of a company creates a
11  brochure or something, a resource, and
12  wants to utilize that in interactions
13  with the -- with their customers, that is
14  considered promotional, because they
15  would have to take that to the
16  medical/legal review board.
17    Anything that would fall
18  under that purview would be considered
19  promotional.  It could also be
20  educational -- I mean, promotional
21  material can be educational, can have
22  educational merit.
23    Q.   But in terms of independent
24  medical education --

Page 389

1    A.   That's correct.
2    Q.   -- that's a different --
3    A.   Yes.
4    Q.   That's not promotion?
5    A.   Correct.
6    Q.   So what the marketing
7  department is doing and what's happening
8  in the marketing group is not supposed to
9  be independent medical education,
10  correct?
11    A.   Exactly.
12    Q.   So one of the words that you
13  kind of put back to me was independent
14  medical education, drawing that
15  distinction between the two.
16    The FDA has some guidances
17  on what takes it to promotional activity
18  versus what takes it to independent
19  medical education, fair?
20    A.   Yes.  Yes.
21    Q.   And, really, it's on a
22  spectrum of the sponsor, the funding
23  parties involved, industry participants'
24  involvement, true?

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1    MR. DAVIS:  Objection to
2  form.
3    THE WITNESS:  Independent
4  medical education, in this -- in
5  this decade, okay -- early on in
6  the 1990s and early 2000s, things
7  were evolving.
8    But independent medical
9  education has a distinct, you
10  know, ACCME -- even if it's not
11  accredited for an activity, to be
12  independent you would have to
13  follow the same criteria that the
14  ACCME requires for accredited
15  education and for -- OIG and PhRMA
16  regard it that way, too.
17  BY MR. BUCHANAN:
18    Q.   So we went through some
19  documents today, and there were some
20  programs that were highlighted.  I just
21  made some notes as we were going through
22  them.  Maybe they caught your eye, too.
23    We saw that there was
24  independent -- there was medical

Page 391

1  education directed to doctors, you saw
2  that?
3    A.   Clinicians, yes.
4    Q.   And clinicians of multiple
5  flavors; family practitioners, PCPs or
6  primary care physicians, pain
7  specialists, a broad gamut of physicians,
8  fair?
9    MR. DAVIS:  Objection to
10  form.
11    THE WITNESS:  Yes.
12  BY MR. BUCHANAN:
13    Q.   We saw, as a category of
14  people that you were targeting education
15  to, residents, right?
16    MR. DAVIS:  Objection to
17  form.
18  BY MR. BUCHANAN:
19    Q.   Doctors-in-training?
20    MR. DAVIS:  Objection to
21  form.
22    THE WITNESS:  Residents,
23  clinicians-in-training, yes,
24  because -- because they were

Page 392

1  all -- they were all doctors.
2    Some were pharmacists but,
3  nonetheless, yes.
4  BY MR. BUCHANAN:
5    Q.   I think we looked at a
6  document, or you looked at a document
7  with counsel, and more than 1,000
8  documents had been through the residency
9  program that Endo funded, right?
10    MR. DAVIS:  Objection to
11  form.
12    THE WITNESS:  Correct.
13  BY MR. BUCHANAN:
14    Q.   There were programs directed
15  to pharmacists, right?
16    MR. DAVIS:  Objection to
17  form.
18    THE WITNESS:  Yes.
19  BY MR. BUCHANAN:
20    Q.   That fell in your medical
21  education umbrella, right?
22    MR. DAVIS:  Same objection.
23    THE WITNESS:  Yes.
24  BY MR. BUCHANAN:

Page 393

1    Q.   Nurses --
2    MR. DAVIS:  Same objection.
3    THE WITNESS:  Yes.
4  BY MR. BUCHANAN:
5    Q.   -- fair?
6    So, really, over the period
7  of time that you had a role and
8  involvement with independent medical
9  education, you were touching, really, all
10  aspects of caregivers that could be
11  touching patients who may be exposed to
12  opioids or dealing with pain, fair?
13    MR. DAVIS:  Objection to
14  form.
15    THE WITNESS:  Your question,
16  are you asking about me
17  personally, or are you asking
18  about our education?
19  BY MR. BUCHANAN:
20    Q.   The programs that Endo
21  funded and supported.
22    A.   Yeah.  And, again, because
23  pain is ubiquitous and virtually every
24  healthcare professional manages patients

Page 394

1  with some type of pain, the intent was
2  that all folks who see patients with pain
3  could benefit from understanding the
4  risks and the -- how to balance those
5  risks.
6       Q.   Would it be fair, at least
7  within your group, I mean -- and we don't
8  have to fuss, really, about what the
9  messages are for the moment.
10      But, I mean, one of your
11 goals, through the education program, was
12 to expose doctors, nurses,
13 doctors-in-training, pharmacists, givers
14 to, we'll call it education, about
15 diagnosing, treating and prescribing for
16 pain, fair?
17      MR. DAVIS:  Objection to
18      form.
19      THE WITNESS:  Diagnosing,
20      doing a thorough assessment.  What
21      the treatment options are that are
22      available.  Looking at the patient
23      and, basically, making a tailored
24      decision for that patient.

Page 395

1       In terms of prescribing,
2       that was not part of education.
3       The difference being that that's a
4       decision between a clinician and
5       the patient that results in
6       generation of a prescription or
7       not, or a prescription, perhaps,
8       for physical therapy or injections
9       or whatever.
10 BY MR. BUCHANAN:
11      Q.   I mean, would it be
12 surprising to you, as somebody who was
13 involved in education for the number of
14 years that you were at Endo, that doctors
15 of all backgrounds, of all specialties,
16 in training or in practice for a long
17 time, had exposure to the company's
18 supported education programs over the
19 years?
20      MR. DAVIS:  Objection to
21      form.
22      THE WITNESS:  I'm sorry,
23      your question, would it surprise
24      me that they had exposure to it?

Page 396

1  BY MR. BUCHANAN:
2       Q.   Yes.
3       A.   That was the intent of
4  independent education and working with
5  the national professional organizations,
6  to assure that good education was made
7  available.
8       Q.   And we -- my co-counsel went
9  through a list and identified a number of
10 the organizations that Endo provided
11 grants to for education --
12      A.   Yes.
13      Q.   -- over the years.
14      And each of these had their
15 own programs, had their own target
16 audiences, maybe overlapping audiences,
17 from time to time, but were running
18 programs for the years in which you were
19 involved in education, fair?
20      MR. DAVIS:  Objection to
21      form.
22      THE WITNESS:  That's
23      correct.
24 BY MR. BUCHANAN:

Page 397

1       Q.   And we know that some of
2  them stopped existing at a point in time.
3       But until they stopped to
4  exist, as far as you knew, they were
5  running programs for sponsors like
6  yourself, like Endo, relating to pain and
7  diagnosis of pain, treating of pain,
8  fair?
9       MR. DAVIS:  Objection to
10      form.
11      THE WITNESS:  And, again,
12      not to parse words, but the term
13      "sponsor," especially in this --
14      in the independent education
15      community, that's the CE provider.
16      So we were the supporters.
17      And, again, I don't want to
18      miss -- parse words.  I just want
19      to be accurate for the record.
20 BY MR. BUCHANAN:
21      Q.   And I don't want there to be
22 a lot of sensitivity around that, for
23 purposes of our discussion, whether
24 it's -- I think somebody else will have

Page 398

1 an opportunity to decide whether it's
2 independent or not, in light of
3 everything that was happening.
4         So I just want to
5 understand, there were many
6 organizations, many of which Endo
7 supported, that were running training,
8 continuing education, diagnostic tools,
9 case studies, et cetera, to try and
10 educate the medical community during the
11 period of time you were in charge of
12 education at Endo, fair?
13         MR. DAVIS:  Objection to
14   form.
15         THE WITNESS:  Yes.  And,
16   again, this -- many of these
17   occurred within the context of
18   their own ongoing educational
19   efforts.
20         So, you know, the fact that
21   it did occur during that period of
22   time doesn't mean that it didn't
23   occur before or after or if they
24   hadn't received support from Endo.

Page 399

1 BY MR. BUCHANAN:
2     Q.   There was some discussion
3 with Ms. Aminolroaya about payments that
4 went to different entities over the
5 years.
6         I take it you're not fussing
7 that, you know, a lot of money was given
8 to NIPC?
9         MR. DAVIS:  Objection to
10   form.
11 BY MR. BUCHANAN:
12     Q.   I mean, you don't have
13 precision, sitting here, on whether it
14 was $9 million or $6 million or $5
15 million or what the amount was, or $30
16 million, but a lot of money was given to
17 the NIPC in support of your programs,
18 fair?
19         MR. DAVIS:  Objection to
20   form.
21         THE WITNESS:  The NIPC was
22   one of our most broad pain
23   initiatives in that it encompassed
24   chronic pain, neuropathic pain,

Page 400

1 opioids, et cetera, and all of the
2 audiences that we were discussing
3 at the time, and had multiple
4 modalities, online, you know, live
5 activities, audio conferences and
6 pain newsletters.
7         So, yes, it's not surprising
8 that that was one of the
9 activities that received a larger
10 share of grants than others.
11 BY MR. BUCHANAN:
12     Q.   I think the math, somewhere
13 on the table here, was around $30 million
14 to NIPC over the years that Endo was
15 funding it.
16         I mean, do you have a basis
17 to dispute that number, sitting here
18 today?
19         MR. DAVIS:  Objection to
20   form.
21         THE WITNESS:  Could I see
22   the Senate Finance Committee
23   report again?
24         MR. DAVIS:  Yes.  It's 33.

Page 401

1 BY MR. BUCHANAN:
2     Q.   And I was referring to the
3 summary exhibit.
4         Do you recall that one that
5 had the payments just to NIPC?  I think
6 it's 19.
7         MR. BUCHANAN:  19.  Do you
8   have that one, counsel?  Just to
9   keep us on course.
10         MR. DAVIS:  I'm --
11         MR. BUCHANAN:  It's a small
12   point in the context of what I'd
13   like to do in my 30 minutes.
14         THE WITNESS:  Sure.
15         MR. DAVIS:  You said it was
16   19?
17         MR. BUCHANAN:  That's what
18   the team tells me.
19         MR. DAVIS:  All right.
20   Let's see.
21         THE WITNESS:  If that's the
22   more appropriate one, then --
23         MR. DAVIS:  You can take a
24   look at that.

Page 402

BY MR. BUCHANAN:

Q. And if you recall, this number was derived from the information provided to us by one of the parties who received the funding from Endo.

MR. DAVIS: Objection to form.

BY MR. BUCHANAN:

Q. I just -- my question to you, ma'am, and other people can probably pin it down to the penny, but sitting here today, do you have a reason to dispute that Endo spent 30-plus million dollars in programs in which NIPC was affiliated?

MR. DAVIS: Objection to the form.

THE WITNESS: Again, I'm not trying to be difficult, but I do think that -- first of all, if it was listed on here, I could see that. But it's not.

There was another document --

Page 403

BY MR. BUCHANAN:

Q. There was another document, and I don't think we have to go through that.

I mean, if you have independent knowledge that disagrees with this, please share it with us.

Do you have independent knowledge that disagrees with it?

A. I've been gone from Endo since 2014. So I, unfortunately, don't have much recall of the details. I know the REMS inside and out, because I've been working on that. But, unfortunately, those I can't pull to mind.

Q. Fair enough, ma'am.

You talked about -- there was some discussion about NIPC dinner dialogues, and they coincided -- there were some that coincided with the launch of Opana.

MR. BUCHANAN: Do you have that exhibit handy, counsel, just

Page 404

so we can look at that?

MR. DAVIS: What was the number?

MR. BUCHANAN: I'm sorry, the one you just turned over. 19.

BY MR. BUCHANAN:

Q. There was a discussion about the dinner dialogues that NIPC was running.

Do you recall that?

A. I recall us talking about those, yes.

Q. And in the line items from the NIPC, they were in the hundreds of thousands of dollars for Dinner Dialogue 10, Dinner Dialogue 11.

Do you recall seeing that on the sheet?

A. Yes.

Q. If I understood your testimony, you or representatives of your group would attend these CME or these presentations?

MR. DAVIS: Object to form.

Page 405

THE WITNESS: On occasion what I indicated was that we would attend at least one of each series to make sure, from our due diligence standpoint, that the ACCME guidelines were being adhered to, that the learning objectives and what was put forth in the grant proposal was being adhered to.

BY MR. BUCHANAN:

Q. And as you explained to us as well, that if somebody objected, an audience member, a sponsor or a funder objected, there was a vehicle to raise a complaint about something a speaker said or a lack of fair balance or something about the content of the presentation, fair?

A. Yes. And that had to be channeled through the accredited provider, who then had to channel that through the ACCME.

Q. Can you recall, at any point

Page 406

1  in time, ma'am, Endo or you ever raising
2  such a challenge with regard to a program
3  that Endo funded?
4          MR. DAVIS:  Objection to
5  form.
6          THE WITNESS:  I can't recall
7  anyone having brought to my
8  attention that there were any
9  issues like that.
10         Again, if you look at the --
11  another part of that document we
12  were looking -- we were referring
13  to from the other party that
14  provided it was the evaluations
15  from the programs.
16         And an element of that is
17  always, did you detect bias or,
18  you know, commercial influence in
19  it?  And the ratings on that --
20  the reason we continued to work
21  with Postgraduate Professional --
22  Professional Postgraduate Services
23  was because they were regarded as
24  very balanced, unbiased and

Page 407

1  noncommercial.
2  BY MR. BUCHANAN:
3      Q.   It wasn't clear to me,
4  ma'am.
5          Are you saying that you
6  would actually receive the reviews of the
7  program?
8      A.   No.  I'm saying that the --
9  there's a Likert scale, let's say, of
10  zero to five, zero -- for an example, the
11  question would be, did you perceive
12  commercial influence or bias in this
13  program?  Zero meaning none, five meaning
14  it was a walking, you know, commercial or
15  something.
16     Q.    And my question to you was,
17  did the company, Endo, receive copies of
18  those reports back from Professional
19  Postgraduate Services?
20     A.   The CME providers maintained
21  those records.  And on a periodic basis,
22  they were required, by ACCME, to report
23  on the outcomes of those education, not
24  only things like that, but how the

Page 408

1  learners met the learning objectives.
2          So that was the context in
3  which we would see a summary, the average
4  rating for this series for these
5  particular variables was 4.8.
6      Q.   And just because my time is
7  a little brief --
8      A.   Sure.
9      Q.   You would receive copies of
10  those from time to time?
11     A.   I would.
12         MR. DAVIS:  Objection to
13  form.
14  BY MR. BUCHANAN:
15     Q.   On some periodic basis?
16     A.   We would receive copies of
17  the aggregate.  So we would not receive
18  the individual scores.
19     Q.   Professional Postgraduate
20  Services would aggregate the information
21  into some type of summary report, it was
22  relatively brief, three, four pages, and
23  they would provide it back to you at the
24  same time they would provide it back to

Page 409

1  the CME accreditor?
2      A.   Correct.
3      Q.   Now, we saw some documents
4  where --
5          MR. BUCHANAN:  Do you have
6  Exhibit-39?
7  BY MR. BUCHANAN:
8      Q.   There was some discussion
9  about this residency training program.
10  And this, to orient you, was around 2002.
11         MR. BUCHANAN:  Can you pull
12  it up, please, Exhibit-39?
13  BY MR. BUCHANAN:
14     Q.   This is an e-mail from
15  yourself to Bradley -- is it Galer?
16     A.   Galer.
17     Q.   Was he somebody at Endo?
18     A.   He was the vice president of
19  medical affairs.
20     Q.   And medical affairs, did
21  that fall on the commercial operations
22  side of the divide, so to speak?
23     A.   No.  That falls on the R&D
24  side of the business.  That's the

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1 department -- sometimes we were called
2 clinical affairs, over the course of the
3 year, sometimes medical affairs.
4    Q.   Got you.
5        And they would have
6 relationships with the key opinion
7 leaders in the field who -- they had
8 separate relationships with the medical
9 community, fair?
10       MR. DAVIS:  Objection to
11    form.
12       THE WITNESS:  I'm sorry,
13    could you restate the question?
14 BY MR. BUCHANAN:
15    Q.   Withdrawn.  It's a rabbit
16 hole we don't need to go down.
17    A.   I just want to make sure I'm
18 clear.
19    Q.   At this hour of the day, we
20 don't need to go there.
21       Looking back at this, I
22 mean, if I understand what's happening
23 here, and please let's walk through this
24 a little bit, it looks like you're

Page 411

1 reporting to your colleague in clinical
2 affairs or medical affairs, depending on
3 the name at the time, this is 2002,
4 concerning an agenda for this APS
5 residency program, fair?
6    A.   Correct.
7    Q.   And this was going to be
8 held in an annual meeting of the American
9 Pain Society, right?
10    A.   Yes.
11    Q.   And as we read this
12 together, Charles and I spoke this
13 morning and reviewed the faculty topics
14 you and I had discussed in Seattle.
15       Did I read that correctly?
16    A.   Yes.
17    Q.   So what's happening here
18 first is, I mean, you, Ms. Kitlinski,
19 and Mr. Galer, I guess, had had a
20 conversation together about the program,
21 topics and faculty, right?
22       MR. DAVIS:  Objection to
23    form.
24       THE WITNESS:  And just to --

Page 412

1 again, like you said, this was
2 2002, to put it in perspective,
3 the regulations.  At that point in
4 time, were that if the
5 organization, the professional
6 society or the CE provider,
7 requested input from the medical
8 R&D side of the business regarding
9 broad issues such as topic
10 appropriately -- clinicians who
11 were appropriate experts on the
12 subjects, they were able to
13 provide that.
14       And then the ultimate
15 control rested with the
16 third-party organization, or the
17 provider.
18 BY MR. BUCHANAN:
19    Q.   And my question really isn't
20 one of whether it was in compliance or
21 not in compliance.  Other people can
22 decide that.
23       My question was just as a
24 factual matter, if you could stay with me

Page 413

1 on that front.
2       What you have here is you
3 and Mr. Bradley had had a conversation
4 about the faculty and the topics for this
5 program that's reflected on Point 2 and
6 Point 3, the next two pages, right?
7    A.   Yes.
8    Q.   And then you had a follow-up
9 conversation with Charles.
10       Charles is, I believe,
11 copied on this?
12    A.   Charles is the program
13 director, that's why he was copied on it.
14    Q.   Dr. Argoff, I think we saw
15 him referred to as Charles, C, in various
16 documents throughout the years?
17    A.   Exactly.
18    Q.   So what you're now doing is
19 circling back to Mr. Galer, and you're
20 going through, here is where Charles and
21 I landed after our call, what do you
22 think?
23       And you're asking him for
24 his input on, what do you think about

Page 414

1  Payne, Portenoy, Katz, Declan Walsh.
2      So you guys are selecting
3  the faculty?
4      MR. DAVIS:  Objection to
5  form.
6      THE WITNESS:  No.  And just
7  so you know, Dr. Galer, prior to,
8  it was either 2002 or 2001, joined
9  Endo, he was one of the national
10 therapeutic experts in the pain
11 world, and, in particular, was
12 knowledgeable about these areas,
13 which is why his input, you know,
14 is always important.
15     Because he was a clinician.
16 And he, up until, you know, a year
17 or so before that, had been one of
18 the therapeutic experts and done
19 the research.
20     So that was -- that was why
21 Brad and I were having the
22 discussion.  And we were not
23 selecting the faculty.  We were --
24 this is the outcome of the

Page 415

1  discussion that, you know, a
2  proposed agenda, if you will, from
3  the discussion with Dr. Argoff and
4  with the input from Dr. Galer.
5  BY MR. BUCHANAN:
6      Q.  I'm just going to have to
7  move through it, because I'm a little
8  short of time.
9      A.  Sure.
10     Q.  Getting to the bottom -- and
11 the jury will have the document, I
12 assume, at some point.
13     But for the talk on the
14 clinical trials, what are meaningful
15 results?  Your call on the speaker, you
16 or John F.
17     Did I read that correctly?
18     A.  Oh, I see.  Yes.
19     Q.  You see Point 5?
20     A.  I do, yes.
21     Q.  You or John F.
22     So what's happening here is
23 you've developed some topics internally,
24 you've put together a draft program to be

Page 416

1  held at APS.  After that has happened,
2  you've now circled back with Mr. -- Dr.,
3  excuse me, Argoff, gotten his input.
4      And now you're circling back
5  again and having further discussion with
6  your internal colleague about topics and
7  faculty; is that fair?
8      MR. DAVIS:  Objection to
9  form.
10     THE WITNESS:  What we're
11 asking is, how does this look to
12 you, as a recent therapeutic
13 expert, yes.
14     And also because the topic
15 of the clinical trials, again,
16 while Brad was very experienced in
17 that himself, you know, the
18 question of whether it would be
19 appropriate, even from a -- from
20 any standpoint, to have someone
21 from the company involved with it,
22 it certainly was acceptable from a
23 CE standpoint, as long as they did
24 not talk about, you know,

Page 417

1  therapeutic -- how to treat
2  patients with these medications,
3  but, rather, clinical trial design
4  was an area of his expertise.
5  BY MR. BUCHANAN:
6      Q.  And I was just asking
7  factually.
8      That's what was happening --
9      A.  I'm sorry.
10     Q.  -- what I summarized,
11 correct?
12     A.  Yes.
13     Q.  Thank you.  I have to move
14 along.
15     So there was a -- the
16 president of the company, when Endo
17 severed from DuPont and did the reverse
18 buyout or however --
19     A.  Carol Ammon.
20     Q.  -- you want to characterize
21 that.
22     You worked with her for a
23 number of years?
24     A.  I did.

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1    MR. BUCHANAN: Can we play a
2 short clip? I think that's all I
3 have time for.
4    I'll represent to you,
5 ma'am, this is an excerpt of an
6 interview. It will show up on
7 your screen there and there.
8 We've got screens everywhere in
9 the room, just take a look,
10 please.
11    Do you recognize that as Ms.
12 Ammon?
13    MR. DAVIS: I'll make an
14 objection again of just playing a
15 clip of a recording here. You can
16 answer questions about it, but
17 it's the same objection we made
18 about the previous clip.
19 BY MR. BUCHANAN:
20    Q.  We can agree Mrs. Ammon was
21 the CEO of Endo; is that true?
22    A.  Yes.
23    Q.  Do you recognize her on the
24 screen?

Page 419

1    MR. BUCHANAN: Can we play
2 the clip?
3    MR. KUNYS: The clip will be
4 played from the 3 minute, 45
5 second mark --
6    THE WITNESS: And I'll
7 just --
8    MR. KUNYS: -- to 4 minute
9 20 second mark.
10    THE WITNESS: Just to be
11 perfectly accurate --
12    MR. BUCHANAN: Just a
13 moment, ma'am. I'm sorry, we have
14 too much cross-talk.
15    Could you please identify
16 for the court reporter the portion
17 that you're playing?
18    MR. KUNYS: The clip will be
19 played from the 3 minute 45 second
20 mark to the 4 minute 20 second
21 mark.
22    MR. BUCHANAN: Before you
23 play it. Counsel, I passed you a
24 thumb drive that has the full

Page 420

1 video on it, so you have it for
2 posterity, to the extent you don't
3 already.
4    THE WITNESS: And my point
5 was just I don't know what the
6 date of this is. At times, Carol
7 was CEO, she was president, she
8 was on the board. So her position
9 evolved over time.
10    So I don't know that she
11 was --
12 BY MR. BUCHANAN:
13    Q.  She held various
14 positions --
15    A.  Yes.
16    Q.  -- at Endo over time?
17    A.  Correct.
18    MR. BUCHANAN: This is
19 E04204, for our internal
20 reference. What's the exhibit
21 number for the record?
22    This is Exhibit-47.
23       - - -
24    (Whereupon, Endo-Kitlinski

Page 421

1 Exhibit-47, Hard drive, was marked
2 for identification.)
3       - - -
4    MR. BUCHANAN: Could you
5 play it now, please?
6       - - -
7    (Whereupon, a video
8 recording was played.)
9       - - -
10 BY MR. BUCHANAN:
11    Q.  I want to pause on that for
12 a moment.
13    Ms. Ammon used the word
14 "thought." Is she a doctor?
15    MR. DAVIS: Objection to
16 form.
17    THE WITNESS: I'm sorry,
18 she's a clinical researcher, and
19 she also has --
20 BY MR. BUCHANAN:
21    Q.  I should have said a medical
22 doctor, that would have shortened it.
23    A.  She's not an -- she's not a
24 MD, no.

Page 422

1    Q.   Fair enough.
2         She used the word in there,
3    I think it was thought leader, or key
4    opinion leader.
5         Did you hear her say that?
6    A.   Yes.
7         MR. DAVIS:  Objection to
8    form.
9    BY MR. BUCHANAN:
10   Q.   And using -- I think she
11   said using thought leaders that would
12   move the market.
13        Do you recall her saying
14   that?
15   A.   I heard her use the word
16   "thought leaders."
17   Q.   And I think you had some
18   concern, ma'am, earlier today, about the
19   use of key opinion leader.
20        Do you recall that?
21        MR. DAVIS:  Objection to
22   form.
23        THE WITNESS:  I expressed
24   the fact that we referred to them,

Page 423

1    "we" meaning our department, as
2    therapeutic experts because that's
3    the purpose that we attributed
4    them.
5    BY MR. BUCHANAN:
6    Q.   And what you told us earlier
7    is a key opinion leader is more somebody
8    who is, you know, designed to sway
9    opinions.
10        Do you recall giving us that
11   answer earlier today?
12        MR. DAVIS:  Objection to
13   form.
14        THE WITNESS:  I would not
15   recall those exact words.  I
16   remember saying that they were
17   relevant to opinions, as opposed
18   to being a therapeutic expert.
19        I don't recall my exact
20   words, but --
21   BY MR. BUCHANAN:
22   Q.   And Ms. Ammon, here in this
23   clip, is telling the interviewer that
24   that's just what Endo was looking to do,

Page 424

1    was to use key opinion leaders to move
2    the market, right?
3         MR. DAVIS:  Objection to
4    form.
5         THE WITNESS:  Again, first
6    of all, I don't know what the --
7    what venue of this is.  I don't
8    know the timing.  And it would not
9    be appropriate for me to speculate
10   on what Carol was thinking or
11   referring to at that time.
12   BY MR. BUCHANAN:
13   Q.   Do you remember that,
14   though, being the culture in the early
15   years at Endo?
16        MR. DAVIS:  Objection to
17   form.
18        THE WITNESS:  No, I don't.
19   BY MR. BUCHANAN:
20   Q.   Trying to grow this pain
21   market, to drive it --
22        MR. DAVIS:  Objection to
23   form.
24   BY MR. BUCHANAN:

Page 425

1    Q.   -- through the use of key
2    opinion leaders?
3         MR. DAVIS:  Objection to
4    form.
5         THE WITNESS:  I remember the
6    fact that we were trying to
7    establish Endo's presence as a
8    responsible pain management
9    company who were committed to
10   patients having access to
11   appropriate medications, and that
12   the risks associated -- I'm
13   sorry -- that the risks associated
14   with our medications were
15   mitigated to the extent they could
16   be.
17   BY MR. BUCHANAN:
18   Q.   I'm sorry, ma'am, I'm trying
19   to move quickly --
20   A.   No worries.
21   Q.   -- because there's going to
22   be a buzzer that goes off at some point.
23   Maybe I'll get a minute of indulgence if
24   I behave myself.

Page 426

1             - - -
2           (Whereupon, Endo-Kitlinski
3       Exhibit-48,
4       ENDO-OPIOID_MDL-04908487-488,
5       with attachment, was marked for
6       identification.)
7             - - -
8   BY MR. BUCHANAN:
9       Q.   This is Exhibit-48.  This is
10  an e-mail from Amy Lohr.  You're among
11  the recipients, and it's from 2002.
12          Do you see this e-mail
13  thread?
14      A.   I do.
15          MR. BUCHANAN:  Can you pull
16      it up on the screen, please?  It's
17      E256.
18  BY MR. BUCHANAN:
19      Q.   The subject is, Business
20  planning kickoff meeting documents.
21          Have you seen this one
22  before, ma'am?
23      A.   I can see I was copied on
24  this back in 2002.  But, again, 17 years

Page 427

1   later, after millions of documents that I
2   looked at, I don't recall what this
3   exactly is.
4       Q.   Fair enough.
5           Let's go to 1256.5.  Endo
6   Pharmaceuticals, Inc., 2003 to 2007,
7   business plan, planning kickoff meeting,
8   April 1, 2002.
9           And then just roll forward
10  to 1256.6.  Endo Pharmaceuticals vision,
11  2001.  The first one says, To be the
12  premiere pain management company.  And
13  the second one says, To drive the
14  practice of pain management.
15          Do you see that?
16      A.   Yes.
17      Q.   And you recall, ma'am, in
18  your --
19          MR. BUCHANAN:  I think it's
20      Exhibit-1, if you have it in your
21      stack, counsel, maybe you can pass
22      it to the witness.
23  BY MR. BUCHANAN:
24      Q.   In Exhibit-1, when we look

Page 428

1   at your responsibilities, really, in '98
2   and '99 -- I think it's Exhibits-1 and
3   3 -- let's start with Exhibit-1.  Thank
4   you.
5           Exhibit-1, clinical
6   development education, 1998 mid-year
7   update on goals and objectives, Linda A.
8   Kitlinski.
9           Do you see that?
10      A.   Yes.
11      Q.   Goal and objective one,
12  Financial performance.  Achieve or exceed
13  the company's financial goals for 1998
14  with regard to revenue, variable
15  contribution and cash, EBITDA -- that
16  sounds like a financial term.
17          Is that your wheelhouse?
18      A.   This is a standard
19  boilerplate objective that everyone in
20  the company had.
21      Q.   And the way you
22  characterized how you were going to go
23  about doing that was to partner with
24  sales and marketing to identify,

Page 429

1   prioritize and capitalize on what, ma'am?
2       A.   Education --
3           MR. DAVIS:  Objection.  I
4       think that's the ball game.  If
5       you have another question or two.
6           MR. BUCHANAN:  I'm pretty
7       close.  Can you indulge me for two
8       minutes?
9           MR. DAVIS:  Yes.
10  BY MR. BUCHANAN:
11      Q.   Partner with sales and
12  marketing to identify, prioritize and
13  capitalize on -- what did you write after
14  that, ma'am?
15      A.   Educational opportunities.
16      Q.   Which drive attainment of
17  what?
18      A.   Of sales quotas, while
19  optimizing resource utilization.
20      Q.   So one of your objectives
21  was to partner with sales and marketing
22  to prioritize and capitalize on
23  educational opportunities.
24          Educational opportunities

Page 430

1 towards attaining sales quotas is what
2 you wrote, correct?
3      A.   That's what I wrote, yes.
4      Q.   And then you list a number
5 of the organizations. We've got the
6 American Pain Society.
7         Do you see that?
8      A.   Yes.
9      Q.   And we've got the ACP, Pain
10 Management.
11         Do you see that?
12      A.   Yes.
13      Q.   We've got the International
14 Association For the Study of Pain, right?
15      A.   Yes.
16      Q.   Pain Management Guidelines,
17 we spent some time with that today,
18 right?
19      A.   Yes.
20      Q.   And these were the items --
21 and there's others, but I'm being told
22 I'm just about out of time. These were
23 the items you highlighted in connection
24 with your clinical development,

Page 431

1 education, goals and objectives, how you
2 were going to help achieve the financial
3 performance, correct?
4         MR. DAVIS: Objection to
5    form.
6 BY MR. BUCHANAN:
7      Q.   Is that what you
8 highlighted?
9      A.   And I'll just emphasize what
10 I said earlier. This was two months
11 after joining the company. This was -- I
12 was the only individual in the
13 department, and this was not relating to
14 independent medical education.
15         This was -- the example I
16 used was how to use a pain rating scale,
17 how to talk to your doctor about pain.
18            - - -
19         (Whereupon, Endo-Kitlinski
20    Exhibit-49, No Bates, Amended
21    Subpoena to Testify at a
22    Deposition in a Civil Action, was
23    marked for identification.)
24            - - -

Page 432

1 BY MR. BUCHANAN:
2      Q.   This is for posterity,
3 ma'am, just so we have it, in the event
4 we have to have a fuss at some point in
5 time.
6         I'm marking the last in
7 order of your deposition. You don't need
8 to review it, other than to say, does
9 that look like a copy of the subpoena you
10 were served with and provided and
11 reviewed?
12         It may have had a different
13 cover page --
14      A.   I was going to say, the
15 cover page doesn't look familiar.
16      Q.   We don't get the pretty
17 stamped one back, or maybe we didn't.
18         But the content of it, if
19 you flip the pages quickly, does that
20 look like the one you were working off of
21 when you were trying to see what
22 responsive information you had?
23      A.   There was another page,
24 calling it materials or something along

Page 433

1 that line. Here is the request -- it
2 doesn't look, quite honestly -- the
3 request for production followed right
4 after the definitions on my copy. So I
5 don't know, you know, the pages that are
6 in the intervening area here.
7         MR. BUCHANAN: Is there a
8    difference, counsel? Is there a
9    debate on this?
10         MR. DAVIS: I don't know if
11    there is a -- we can talk about
12    it. I don't think it has --
13         THE WITNESS: Just on the
14    face of things, I'm just saying
15    that it looks different to me.
16    I'm not saying that it's
17    substantively different. I'd have
18    to look at it.
19         MR. DAVIS: If we've got an
20    issue, we'll talk about it.
21         MR. BUCHANAN: Fair enough.
22 BY MR. BUCHANAN:
23      Q.   And my final inquiry, which
24 will be very brief, is, when you did your

Page 434

1  search, you said you did look for
2  materials related to REMS?
3      A.  Yes.
4      Q.  Okay.  In connection with
5  REMS, do you have interactions with
6  academics, with practitioners, with
7  people who are not in industry?
8          MR. DAVIS:  Objection to
9      form.
10         THE WITNESS:  I mean, I
11     guess I wonder what you mean by
12     "interactions."
13         So, for example, when I go
14     to the FDA public meetings?
15  BY MR. BUCHANAN:
16     Q.  I mean correspondence,
17  e-mails.
18
19     A.  All of the --
20     Q.  Does the REMS group include
21  people who are -- you know, like Dr.
22  Portenoy and folks like that?
23     A.  No.
24         MR. DAVIS:  Objection to

Page 435

1      form.
2  BY MR. BUCHANAN:
3      Q.  It's strictly industry
4  participants?
5      A.  No, it's not strictly
6  industry participants.  It's the CE
7  providers and the -- as I said, the
8  Conjoint Committee on education, the
9  Council of Medical Specialty Societies.
10         But it is not individual
11  physicians, clinicians, if you will.
12     Q.  Okay.
13     A.  Unless someone asks if
14  so-and-so is a faculty member for the
15  REMS, you know, when they're doing a
16  grant proposal or something.
17     Q.  That's fine.  Thank you.
18         MR. BUCHANAN:  I appreciate
19     your indulgence, counsel.
20         VIDEO TECHNICIAN:  Going off
21     the record.  The time is 6:35 p.m.
22             - - -
23         (Whereupon, a brief recess
24     was taken.)

Page 436

1             - - -
2         VIDEO TECHNICIAN:  We're
3  back on the record at 6:50 p.m.
4             - - -
5         EXAMINATION
6             - - -
7  BY MR. LENISKI:
8      Q.  Good evening, Ms. Kitlinski.
9  My name is Joe Leniski, no relation --
10     A.  Good evening.
11     Q.  -- at least I know of.
12         And I represent district
13  attorneys and children born with AES in
14  the state of Tennessee.  I'll be asking
15  you questions about my state and some of
16  the things going on there that you may
17  have been involved with.
18         MR. LENISKI:  Before we get
19     going, I want to note for the
20     record that the Tennessee
21     plaintiffs are taking these
22     depositions while reserving all of
23     our rights, due to our standing
24     objection to the cross-notices in

Page 437

1  the MDL and as a result of
2  production failures under the
3  standing MDL order and lack of
4  sufficient notice.
5         And we also object because
6  in Tennessee there are no time
7  limits to depositions.
8         So, with that objection,
9  we'll proceed.
10        MR. DAVIS:  If I may, just
11     because we dispute, obviously,
12     there's been any production
13     failures or notice failures.
14        We also think that, sitting
15     here in Pennsylvania deposing Ms.
16     Kitlinski, it would be the
17     Pennsylvania rules that would
18     apply, nonetheless.
19        But please go ahead.
20  BY MR. LENISKI:
21     Q.  Ms. Kitlinski, before your
22  deposition, we asked Endo's attorneys to
23  identify whether you had any knowledge
24  that was specific to the state of

Page 438

1 Tennessee as pertaining to that state
2 during your time at Endo.
3         And they informed us that
4 you held a national role, with national
5 responsibilities, and that you do not
6 have Tennessee-specific knowledge.
7         Is that an accurate
8 statement?
9     A.   That is -- that is an
10 accurate statement, with the exception --
11 I don't have Tennessee-specific
12 knowledge, with the exception of the fact
13 that I did sit on the risk management
14 committee at Endo and, at times, some of
15 the discussions that occurred at that --
16 in that forum related to various states.
17     Q.   Do you recall the first time
18 that such discussions about Tennessee may
19 have come to your attention as a member
20 of the risk management team?
21     A.   I'm sorry -- and, again, I
22 feel like a broken record today saying
23 that I wish I had my records or my
24 computer and could look at things, but I

Page 439

1 don't.
2         I just know it was prior to
3 my leaving the company in 2014.
4     Q.   And when you say "risk
5 management team," what are you talking
6 about?
7     A.   So we referred, during the
8 deposition today, to the fact that prior
9 to the REMS, Endo had a voluntary
10 RiskMAP, which we negotiated with the FDA
11 as our, you know, proactive efforts to
12 mitigate the risks associated with all
13 opioid analgesics and/or with, you know,
14 appropriate pain -- access to pain
15 medications.
16         And so part of that, part of
17 that RiskMAP was the fact that there was
18 a -- I'll call it an interdisciplinary,
19 you know, representatives from
20 regulatory, from medical, from R&D, from
21 commercial, et cetera, who would get
22 together once a month and have a
23 discussion of the various sections of the
24 Risk -- the RiskMAP that we would report

Page 440

1 on.
2     Q.   And why did you
3 understand -- or did you have an
4 understanding as to why you were asked to
5 sit on the risk management team?
6     A.   Because an important part of
7 the RiskMAP, it was a very substantial
8 commitment.  Even though it was
9 voluntary, we took the risk mitigation
10 responsibilities very seriously.
11         And a large part of it was
12 educational.  Some of it was relating to
13 independent education for clinicians,
14 other was relating to, you know,
15 education for patients or family members,
16 caregivers.
17     Q.   And, to your knowledge, who
18 set the agenda for the risk management
19 team?
20     A.   The agenda was -- came out
21 from the pharmacovigilance department.  I
22 don't know, of my own knowledge, who
23 within that group, you know, actually --
24 I'm sure it was, you know, a discussion

Page 441

1 with the folks in that department and
2 their supervisors.
3     Q.   When you say
4 "pharmacovigilance," are you talking
5 about, for example, Neal Shusterman?
6     A.   Neal was in -- at least in
7 my time at Endo was in R&D, and he had
8 the pharmacovigilance department
9 reporting to him.
10         So someone like a Marc
11 Collins.  Again, there were others in
12 that capacity prior to that time.
13     Q.   Do you recall any specific
14 discussions of any kind involving the
15 state of Tennessee while a member of the
16 risk management team?
17     A.   I remember a discussion
18 that, you know, there were areas of the
19 country, West Virginia, for example,
20 Tennessee, parts of Ohio, where there
21 appeared to be a higher -- a relatively
22 higher incidence of rates of abuse,
23 misuse, addiction, overdose, et cetera,
24 than in other geographic areas.

Page 442

1     And so as part of that --
2 and I don't recall what was -- this
3 sounds terrible, but I don't recall what
4 was Tennessee versus West Virginia
5 specifically. But it was that type of
6 discussion.
7     And one of -- what I do
8 recall is that I knew a PharmD who worked
9 with NADDI in West Virginia and
10 Tennessee. His name is Michael O'Neill.
11 And he was -- I believe he was a PharmD.
12 And he did a lot of education, sort of
13 feet on the street, if you will, in that
14 area.
15     And so I had contacted him,
16 reached out to him, to ask for his
17 recommendations on what types of
18 educational interventions might be
19 helpful in addressing, you know, the
20 issues there.
21     So that's what I recall
22 about Tennessee, you know, per se. And I
23 reported that back to the risk management
24 committee. And it was followed up on

Page 443

1 after that.
2     Q.   How long had you been
3 affiliated with or familiar with Mr.
4 O'Neill?
5     A.   I had met him at the APS
6 meeting and at NADDI a few years -- two,
7 three years, perhaps, prior to the time
8 that I reached out to him.
9     Q.   When you say "NADDI"?
10     A.   The National Drug
11 Diversion -- National Association of Drug
12 Diversion Investigators.
13     Q.   And are you testifying that
14 Mr. O'Neill worked for NADDI?
15     A.   No. I just know that he was
16 involved in some of their activities.
17 Perhaps he educated clinicians in the
18 area.
19     Q.   And you understood Mr.
20 O'Neill was located in Tennessee?
21     A.   I understood he was located
22 in West Virginia at one time and in
23 Tennessee at another time. I don't know,
24 you know, in retrospect, which was which.

Page 444

1     Q.   So when this issue came up
2 with respect to that area of the
3 country -- and I'll sometimes refer to
4 that area also as Appalachia.
5     A.   Yes.
6     Q.   Have you heard that term
7 before?
8     A.   I have.
9     Q.   And what did you understand
10 about the use of opioids in Appalachia,
11 during your time at Endo?
12     MR. DAVIS:  Objection to
13     form.
14     THE WITNESS:  Again, it was
15     my understanding that that was an
16     area of particularly hard hit with
17     the opioid overuse -- misuse,
18     abuse, overdose and addiction
19     problems.
20 BY MR. LENISKI:
21     Q.   Did you also learn that
22 Appalachia was an area of relatively
23 higher incidences of diversion of
24 opioids?

Page 445

1     A.   Yes.
2     MR. DAVIS:  Objection to
3     form.
4 BY MR. LENISKI:
5     Q.   And same question, did you
6 ever learn that the state of Tennessee
7 was -- had a relatively higher incidence
8 of diversion of opioids?
9     MR. DAVIS:  Objection to
10     form.
11     THE WITNESS:  I don't know
12     that I ever knew that particular
13     fact about the state of Tennessee.
14     I did know that that area,
15     in general, was -- was subject to
16     that.
17 BY MR. LENISKI:
18     Q.   So with respect to your
19 contacting Mr. O'Neill, was it you who
20 brought that notion to the risk
21 management team's attention?
22     MR. DAVIS:  Objection to
23     form.
24     THE WITNESS:  The notion of

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1  contacting him, or -- we were
2  brainstorming what types of
3  interventions we could pursue to
4  help address the issue that would
5  be, you know, specific to that
6  area.
7       And in my experience, a big
8  part of the educational challenge
9  is understanding what the local
10 needs are versus, you know, just
11 national needs in general.
12      And then also understanding
13 what the local norms are in terms
14 of, you know, do they have a
15 regional conference that people go
16 to?  Do they like to go to, you
17 know, their professional
18 organizations?  Or is there
19 something regional that they
20 participate in?
21      So we were brainstorming on
22 that.  And I said, let me reach
23 out to Dr. O'Neill and see if he
24 has any insights on that.

Page 447

1  BY MR. LENISKI:
2       Q.   Okay.  And do you recall
3  there being a specific incident of abuse
4  that occurred in Tennessee which prompted
5  you to seek out Mr. O'Neill?
6       A.   No.
7       Q.   Are you familiar with the
8  term "thrombotic thrombocytopenic
9  purpura"?
10      A.   Yes, TTP.
11      Q.   I'll say TTP for short.
12      A.   That's okay.
13      Q.   Thank you for not making me
14 say it again.  I appreciate that.
15      So you are familiar with
16 TTP?
17      A.   Yes, I am.
18      Q.   And what is that?
19      A.   It's a -- it's like when
20 injection drug users utilize a medication
21 inappropriately, the -- I don't know that
22 they ever really identified what was --
23 one of the diluents or whatever, but
24 something causes that, the thrombotic

Page 448

1  event.
2       Q.   And did you come to
3  understand, during your employment at
4  Endo, that there were reports of TTP
5  occurring in the state of Tennessee,
6  specifically with respect to intravenous
7  drug abuse of Opana ER?
8       A.   Again, Dr. Schusterman was
9  the individual, and others, who were
10 following up on that.  So my knowledge of
11 it, that was not my area of focus.
12      I just know from hearing
13 them refer to it during the follow-up
14 action items, for example, from the risk
15 management team meeting, that they were
16 pursuing that.
17      Q.   Did you understand that any
18 of the educational efforts that you were
19 pursuing through Mr. O'Neill in the state
20 of Tennessee had anything to do with
21 addressing the TTP issue?
22      MR. DAVIS:  Objection to the
23 form.
24      THE WITNESS:  I don't -- I

Page 449

1  don't honestly recall, because I
2  think that may have been not long
3  prior to the time of my leaving
4  Endo.  So I don't know how far
5  they progressed along those lines.
6       And I don't want to guess.
7  I don't want to speculate.  I
8  don't remember.
9  BY MR. LENISKI:
10      Q.   Do you recall any discussion
11 amongst the risk management team about
12 the ways in which Endo could address the
13 TTP problem in Tennessee?
14      A.   I recall, again -- and I
15 recall them what -- talking about the
16 fact that Dr. Schusterman was following
17 up with the FDA and with the CDC and, you
18 know, all of the other appropriate
19 organizations.  And they were waiting for
20 some data.
21      This is the limit of my
22 recollection, which is, it's not my area
23 of expertise, but I don't want you to
24 think I didn't absorb anything.  I knew

Page 450

1 that they were -- the appropriate people
2 were handling it and pursuing it.
3       But my own focus was just
4 saying, hey, I know someone who is in the
5 area, and may be able to help identify
6 what some of the needs are here, and that
7 he was involved in education in that
8 area.
9    Q.   Okay.  And do you recall
10 what Mr. O'Neill -- what ideas he had
11 with respect to what could be done, as
12 far as educational efforts in the state
13 of Tennessee, in reaction to that issue?
14    A.   He had talked about some
15 local organizations that were active in
16 doing -- you know, active in efforts to
17 try to address the addiction, abuse,
18 overdose problem.
19       I don't remember anything
20 specific about TTP.  Again, that was just
21 beginning to occur.  And so his -- his
22 follow-up action item was going to be to
23 speak with those individuals who were
24 working in these other organizations at

Page 451

1 their next meeting and report back to Dr.
2 Schusterman and determine a path forward
3 there.
4    Q.   In connection with the TTP
5 issue, do you recall reaching out to any
6 other organizations to assist Endo with
7 educational efforts in the state of
8 Tennessee?
9    A.   No, I didn't know anyone
10 else in the state of Tennessee.
11    Q.   Do you recall there being a
12 series of public service announcements,
13 or PSAs, that were aired in the state of
14 Tennessee in movie theatres in connection
15 with this issue?
16    A.   The American Chronic Pain
17 Association, yes, I do.
18    Q.   And what do you recall about
19 the involvement of the American Chronic
20 Pain Association, with respect to the TTP
21 issue?
22    A.   Yes.  Thank you for jogging
23 my memory on that.
24    Q.   It's my job.

Page 452

1    A.   Penny Cowan, who was the
2 executive director of the ACPA -- the
3 reason that didn't come to mind
4 originally is that was done more broadly
5 than just Tennessee, and I guess they
6 decided to reutilize it there.
7       And it was a brief public
8 service announcement that was designed,
9 you know, when people were coming into
10 the theatre with their popcorn and
11 waiting for the feature, to take that
12 captive audience moment, especially kids
13 and teenagers and young adults, to
14 emphasize some simple, safe messages
15 about don't share your medication.
16       And it was a very -- I
17 recall it very distinctly.  It was a very
18 dramatic PSA.  It showed, let's say,
19 three or four family members and one was
20 blacked out, you know, as if they were no
21 longer alive.  And, you know, it was
22 talking about the fact that you needed to
23 secure your medications and don't share
24 them, some simple things like that.

Page 453

1    Q.   The PSAs, to your knowledge,
2 had -- did not directly address the issue
3 of intravenous drug abuse --
4    A.   No.
5    Q.   -- with Opana ER, correct?
6    A.   No.  It was some basic
7 principles of safe -- you know, how to
8 mitigate risks associated with opioids.
9    Q.   And did the PSAs in any way
10 address specifically Opana ER?
11       MR. DAVIS:  Objection to
12 form.
13 BY MR. LENISKI:
14    Q.   To the best of your
15 recollection?
16    A.   I don't believe so.  I think
17 it was a generic, you know, public
18 service announcement.
19    Q.   And you mentioned that these
20 PSAs were targeted at young people.
21       Why was that?
22    A.   Well, when I say "targeted
23 at young people," the idea was, you know,
24 who was going to the movies at that time

Highly Confidential - Subject to Further Confidentiality Review

Page 454

1 were young adults. This was prior to
2 social media, I'm sure that would be all
3 changed now. But young adults, kids who
4 were going to the theatre.
5      And it was relevant across
6 the board, obviously, for all of the
7 general public.
8      Q.   Did Endo perceive that there
9 was a particular problem with abuse of
10 opioids and young people in the state of
11 Tennessee?
12      MR. DAVIS:  Objection to
13      form.
14      THE WITNESS:  Not to my
15      knowledge.  Again, that just
16      happened to be when the American
17      Chronic Pain Association was
18      trying to think of places to, you
19      know, show the public service
20      announcement.
21      They had had success in the
22      past with using movie theatres.
23      And so they suggested that to us.
24 BY MR. LENISKI:

Page 455

1      Q.   And who reached out to the
2 ACPA on that occasion, if anybody, to
3 bring the PSA into Tennessee theatres?
4      A.   I was originally the one who
5 had talked to the ACPA about the PSA in
6 general, because it was done through an
7 educational grant.
8      And I cannot recall who on
9 the risk management team -- I probably
10 facilitated the, you know, interaction
11 and spoke to the ACPA about whether, you
12 know, what they thought about it.
13      But in terms of the
14 logistics and, you know, the funding for
15 it and how that was executed, it wasn't
16 me. And I'm guessing it was one of the
17 members of the risk management team who
18 was responsible for that.
19      Q.   Had you been involved in any
20 grants going to the ACPA prior to that
21 occurrence of the PSA being shown in
22 Tennessee theatres?
23      A.   Yes. It was developed as an
24 educational grant. As I said, it was

Page 456

1 shown more broadly. So that was an
2 educational grant for them. Yes.
3      Q.   So it had already been
4 produced prior to the point where they
5 were -- it was shown in Tennessee
6 theatres, in other words?
7      A.   Correct.
8      And the idea was, what could
9 we utilize, you know, to be able to
10 intervene as quickly as possible to help
11 the folks in that area.
12      Q.   Other than working with Mr.
13 O'Neill and the ACPA with the Tennessee
14 theatre ads, were you involved in any
15 other educational efforts of any kind in
16 the state of Tennessee, relative to the
17 TTP issue?
18      A.   No, nothing relative to the
19 TTP issue.
20      The other -- and, again,
21 this is just me making an introduction
22 and trying to facilitate. There were a
23 series of ten, I'll call them a tear-pad
24 like this, right, of patient and family

Page 457

1 education sheets talking about basic
2 principles of safe storage of opioids,
3 you know, dispose of them properly when
4 you're finished with them.
5      And they had been developed
6 by the pain action team, which was --
7 again, had been supported originally as
8 an educational grant.
9      And so when we were talking
10 about what types of materials might be
11 helpful to addressing, not just Tennessee
12 but the issue there in the Appalachian
13 area, I said, well, you know, we could
14 perhaps follow-up and see if they would
15 be interested, in the area, in utilizing
16 those -- those opioid, you know, safe
17 storage and don't share kinds of sheets
18 that had already been developed.
19      Q.   You said pain action team.
20      Are you talking about Pain
21 Action.com?
22      A.   Yes.
23      Q.   And what is that group?
24      A.   Pain Action.com was a

Page 458

1 website that was developed by Inflexxion
2 and was the companion site to painEDU,
3 which was for clinicians.
4      So painEDU was for clinician
5 education. Pain Action was for patients
6 and caregivers.
7    Q.   And had Endo supported Pain
8 Action.com previously from the TTP issue,
9 with respect to educational grants?
10    A.   We had. As had other
11 companies.
12      But, again, it wasn't
13 specific to -- just to be clear, if I
14 understood your question right, it wasn't
15 specific to TTP. It was more how to
16 secure your medications and, you know,
17 don't share and it's illegal to share and
18 take as directed and, you know, those
19 types of -- what do you do when you go on
20 vacation types of things.
21    Q.   And just so the record is
22 clear, were you involved in any
23 educational efforts surrounding the TTP
24 issue in Tennessee that involved warning

Page 459

1 individuals or patients about intravenous
2 drug use?
3    A.   No.
4      MR. DAVIS: Objection to
5 form.
6      THE WITNESS: I'm sorry.
7      I was not.
8 BY MR. LENISKI:
9    Q.   Okay. And was it also your
10 understanding that the TTP issue that
11 arose in Tennessee at that time involved
12 the reformulated Opana ER, as opposed to
13 the old formulation?
14      MR. DAVIS: Objection to
15 form.
16 BY MR. LENISKI:
17    Q.   Is that your knowledge?
18      MR. DAVIS: Sorry.
19      THE WITNESS: By virtue of
20 the timing of things in my mind,
21 yes, that makes sense.
22 BY MR. LENISKI:
23    Q.   And was that surprising to
24 you, that the reformulated Opana ER,

Page 460

1 which was -- which Endo intended to be
2 abuse deterrent, was being used in that
3 manner?
4      MR. DAVIS: Objection to
5 form.
6      THE WITNESS: I was -- when
7 you say was I surprised, I was
8 aware of the fact that that
9 specific formulation had been
10 specifically designed to address
11 the route of administration that
12 was previously being abused, which
13 was, you know, insufflation and
14 snorting.
15      And so I had not -- you
16 know, we knew that that was going
17 to be effective for that, because
18 that's what it was designed for.
19      One of the -- one of the
20 things that I had not expected,
21 you know, was that there were
22 going to be issues with this. So
23 to that extent, I was surprised.
24 BY MR. LENISKI:

Page 461

1    Q.   Other than the educational
2 efforts you just testified about, were
3 you -- do you recall any other
4 discussions among the risk management
5 team about ways to address the
6 intravenous abuse that was occurring with
7 reformulated Opana ER?
8      MR. DAVIS: Objection to
9 form.
10      THE WITNESS: And, again, I
11 recall that Dr. Schusterman, Marc
12 Collins, there was another
13 individual, I'm sorry, I'm
14 blanking on his name, who was sort
15 of representing the commercial
16 team on that -- on that group.
17      And I know that they were,
18 you know, working together to try
19 to identify potential -- potential
20 resources, shall we say, that
21 could be brought into the area for
22 education.
23      And, in fact, I think that
24 ultimately the PSA was made

Page 462

1  available, like, on a CD or
2  something that people could
3  utilize in other -- in other
4  settings rather than just movie
5  theatres.
6      So that's the type of
7  activity I was aware of.
8  BY MR. LENISKI:
9      Q.  Did you participate in any
10 conference calls that may have occurred
11 between Endo and its sales team located
12 in Tennessee about the TTP issue?
13     A.  No, I did not.
14     Q.  Do you recall visiting with
15 any of the -- in person, with any of the
16 Endo sales team in Tennessee with respect
17 to discussions about the TTP issue?
18     A.  I never worked in -- with
19 any of our sales representatives in
20 Tennessee.
21     Q.  Did you ever travel to
22 Tennessee for work?
23     A.  No.
24     Q.  Did you have any

Page 463

1  Tennessee-specific responsibilities, to
2  your knowledge?
3      A.  No.
4      And, again, like I said,
5  I'm -- I'm just talking about the fact
6  that I did -- you know, was aware of Mike
7  O'Neill being located in that area.  And
8  so, you know, my responsibility was
9  trying to connect him up with somebody
10 who could potentially help him, you know,
11 help us.
12     Q.  I think I was calling him
13 Mr. O'Neill, but it's actually Dr.
14 O'Neill, right?
15     A.  Dr. O'Neill, yes.
16     Q.  And Dr. O'Neill, prior to
17 this occurrence of the TTP issue, had he
18 been retained as a consultant by Endo?
19     MR. DAVIS:  Objection to
20 form.
21     THE WITNESS:  Not to my
22 knowledge.  And I say that because
23 I don't know.
24     You know, there are various

Page 464

1  groups around the company that
2  were -- that were utilizing
3  different individuals for
4  different purposes.  And, in fact,
5  when I was introduced to Dr.
6  O'Neill, it was just at a function
7  at one of the congresses, you
8  know, it wasn't in context with
9  anything that Endo was actually
10 doing.
11     It was just like, oh, here
12 is -- talking to Charlie Schione
13 or something like that, and here
14 is, oh, do you know Mike O'Neill?
15 No, I don't know.
16 BY MR. LENISKI:
17     Q.  To your knowledge, did Endo
18 ever pay Dr. O'Neill as a consultant?
19     MR. DAVIS:  Objection to
20 form.
21     THE WITNESS:  Actually,
22 there -- there was a -- there was
23 some web -- it was a joint -- I'm
24 just trying to think of what this

Page 465

1  was now.
2      So I believe that Charlie
3  Schione and Mike O'Neill developed
4  a web-based something or other
5  that was related to the
6  appropriate use of opioids.  So
7  when I just said Charlie Schione's
8  name right now, that triggered
9  that.  And there was a CD that was
10 produced from that.
11     And that was -- when you say
12 paid, Dr. O'Neill, I believe that
13 would have gone, you know, since
14 it was an educational grant, to
15 the institution, university of
16 whatever it was.  But he would
17 have received, potentially, an
18 honorarium in connection with
19 that.
20 BY MR. LENISKI:
21     Q.  Do you recall Mr. -- Dr.
22 O'Neill working at or being located at
23 South College in Tennessee?  Does that
24 ring a bell?

Highly Confidential - Subject to Further Confidentiality Review

---

Page 466

1     A.   That rings a bell, yes.
2     Q.   So it's your testimony,
3  then, that you can recall Endo made
4  educational grants to South College?
5          MR. DAVIS:  Objection to
6  form.
7          THE WITNESS:  And I'll -- it
8  was either to South College or it
9  was to the West Virginia
10 University.  He was in the
11 transition, you know, of going
12 from one university to the other.
13         So I won't say explicitly it
14 was one or the other.
15 BY MR. LENISKI:
16    Q.   Is there any -- sorry.
17    A.   That's okay.
18         Because I don't recall which
19 one it was.
20    Q.   Was there any formal
21 consulting agreement of any kind between
22 Dr. O'Neill and Endo at any point?
23    A.   It would have --
24         MR. DAVIS:  Objection to

---

Page 467

1  form.
2          THE WITNESS:  It would have
3  been an educational grant
4  submission that the university,
5  whichever one it was, would have,
6  you know, submitted.
7  BY MR. LENISKI:
8     Q.   Did you continue to consult
9  with Dr. O'Neill after leaving Endo?
10    A.   I haven't spoken with him
11 since then, no.  And haven't seen him,
12 actually, at any conferences either.
13    Q.   Okay.  You're familiar with
14 the term "diversion," correct?
15    A.   Yes.
16         MR. DAVIS:  Objection to
17 form.
18 BY MR. LENISKI:
19    Q.   What is diversion?
20    A.   Diversion is when
21 medications, controlled substances in
22 this instance, are not dispensed by
23 clinicians for legitimate medical
24 purposes but, instead, are, you know,

---

Page 468

1  diverted into, shall we say, the black
2  market where they are purchased by
3  others.
4     Q.   And where does your
5  understanding about diversion come from?
6     A.   From working in this
7  educational field for, you know, 35-plus
8  years and participating at meetings like
9  the NADI conference and the -- you know,
10 going to the DEA meetings on occasion and
11 going to the FDA meetings where they will
12 talk about the issues around opioid
13 misuse and abuse and diversion.  Part of
14 the REMS.
15    Q.   Was diversion an issue that
16 Endo was concerned about, with respect to
17 Opana ER?
18         MR. DAVIS:  Objection to
19 form.
20         THE WITNESS:  I know that
21 Endo, going back to the early Endo
22 days, was one of the first
23 manufacturers of opioid
24 analgesics.  And as such, they had

---

Page 469

1  very stringent processes and
2  procedures in place at our Long
3  Island facility, the vault, in how
4  transportation occurred and was,
5  you know, monitored and all that.
6          I don't know the details,
7  because, again, that was outside
8  of my area of expertise.  But I
9  know that they had rigid processes
10 in place and systems and SOPs for
11 that.
12 BY MR. LENISKI:
13    Q.   Was --
14    A.   To prevent diversion, excuse
15 me.  Lest I imply otherwise.
16    Q.   Was recreational use of
17 opioids considered a form of diversion?
18         MR. DAVIS:  Objection to
19 form.
20 BY MR. LENISKI:
21    Q.   Do you understand what I
22 mean by "recreational use"?
23    A.   I do, but I'm sort of
24 struggling with -- could you please

---

Page 470

1  rephrase that question?
2        I'm struggling with, is that
3  a form of diversion or is that a form
4  of -- that's a form of abuse or misuse,
5  as opposed to diversion.
6        Q.   Well, sure.  When I say
7  "recreational use," does that term have
8  meaning for you in connection with your
9  time at Endo?
10       A.   It has meaning for me in the
11 field of substance abuse in general,
12 meaning that people were using what was
13 intended to be a drug that was approved
14 by the FDA for legitimate medical
15 purposes, they were using it to get high
16 or for -- you know, escape their cares,
17 or whatever, as opposed to for the
18 purpose it was prescribed for and that
19 the package labeling was intended for.
20       Q.   So using it recreationally
21 as opposed to for the manner in which it
22 was prescribed, that would be abuse; is
23 that correct?
24       A.   Correct.

Page 471

1        MR. DAVIS:  Objection to
2    form.
3  BY MR. LENISKI:
4        Q.   And would that also be a
5    form of diversion?
6        MR. DAVIS:  Objection to
7    form.
8        THE WITNESS:  You know,
9    again, I guess that would depend
10   on who was -- who was using it
11   recreationally, right?  If a -- if
12   you were prescribed a medication
13   for your use and you took it for
14   your pain, but then you also, you
15   know, took more of it because you
16   wanted to get high and it made you
17   feel good, I don't know that that
18   would qualify as diversion,
19   because it was prescribed to you
20   but it was being abused and
21   misused, because it was not being
22   used, A, as prescribed and, B, it
23   was used for nonmedical purposes.
24 BY MR. LENISKI:

Page 472

1        Q.   Would stealing a relative's
2  Opana ER and snorting it, or crushing it
3  and snorting it, would that be considered
4  diversion?
5        MR. DAVIS:  Objection to
6    form.
7        THE WITNESS:  You know, and
8    please don't think I'm being
9    evasive here, but I'm not really
10   an expert on addiction
11   terminology, per se.
12       And diversion is really more
13   of a regulatory/DEA kind of -- the
14   folks at our company that were
15   responsible for that.  So I'm more
16   familiar with the terminology that
17   is usually utilized, let's say, in
18   the pain community or in the DSM,
19   you know, criteria for that.
20       So that's my understanding.
21   The definition I gave you for
22   diversion before, that was my
23   understanding of that.
24 BY MR. LENISKI:

Page 473

1        Q.   Did you familiarize yourself
2  with the national trends in opioid use
3  and abuse during your time at Endo?
4        MR. DAVIS:  Objection to
5    form.
6  BY MR. LENISKI:
7        Q.   Do you understand my
8  question?
9        A.   If you could repeat that.
10       When you're saying "national
11 trends," are you --
12       Q.   Specifically, were you aware
13 of the rate of abuse in the state of
14 Tennessee regarding opioids relative to
15 other states?
16       Is that something you were
17 familiar with?
18       A.   Again, I was familiar with
19 the fact that that part of the country,
20 as we said earlier, you know, if we want
21 to categorize it as Appalachia, which
22 included Tennessee.
23       But I specifically did not
24 familiarize myself with -- with

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1 Tennessee-specific information.
2   Q.   All right. I told you I
3 represented individual children in
4 Tennessee who were born afflicted with
5 neonatal abstinence syndrome.
6       Do you know what that is?
7   A.   I do.
8   Q.   And what is that?
9   A.   It's when infants are born
10 going through withdrawal because their
11 mothers were addicted to opioids. It's a
12 very sad --
13   Q.   And did you ever -- did you
14 learn about ANS while you were at Endo?
15   A.   It was -- and, again, I'm
16 having a difficult time -- because I
17 remained involved with the opioids, you
18 know, as part of risk mitigation and
19 REMS, I can't recall if it was prior to
20 2014 when I actually left.
21       But I do know -- I do recall
22 when -- you know, that there was an
23 instance when the labeling was updated
24 for all opioids to include that warning

Page 475

1 in the black box up front.
2       And I know that because that
3 was a change to the REMS documents,
4 which, you know, I heard of. So that was
5 my -- that was my awareness of it.
6   Q.   In clinical affairs did you
7 ever learn of the rate of babies being
8 born in Tennessee who have ANS?
9   A.   When I was in clinical
10 affairs at Endo, it was not something
11 that was, you know, occurring, or at
12 least in the public knowledge and domain,
13 in the extent to which we would have
14 known what the condition was, but it
15 wasn't something that, until recent
16 years, had been -- had been emphasized
17 and called out.
18   Q.   So you don't recall ever
19 giving an educational grant to any
20 society specifically geared towards
21 addressing the problem of NAS?
22       MR. DAVIS:  Objection to
23   form.
24       THE WITNESS:  I don't, no.

Page 476

1       MR. LENISKI:  I have no more
2 questions at this time.
3       VIDEO TECHNICIAN:  Going off
4 the record. The time is 7:23 p.m.
5       - - -
6       (Whereupon, a brief recess
7 was taken.)
8       - - -
9       VIDEO TECHNICIAN:  We're
10 back on the record at 7:26 p.m.
11       - - -
12       EXAMINATION
13       - - -
14 BY MR. DAVIS:
15   Q.   Ms. Kitlinski, we're getting
16 close. I've just got a few more
17 questions for you that I hope will
18 clarify some of the things that you
19 testified to a bit earlier today.
20       Do you recall discussing,
21 during plaintiffs' examination,
22 independent education?
23   A.   Yes.
24   Q.   What is independent

Page 477

1 education?
2   A.   So independent education is
3 education that is designed to -- and
4 conducted by a third party, typically a
5 CE-accredited provider, to address
6 clearly defined educational needs and
7 knowledge gaps and practice gaps for
8 clinicians in clinical practice.
9   Q.   Did Endo participate in any
10 independent education?
11   A.   Endo provided unrestricted
12 educational grants for independent
13 education.
14       And, as we were just
15 referring to a short time ago, over the
16 years, the standards for independent
17 education evolved, and Endo always
18 adhered to or exceeded the standards for
19 independent education.
20       So, for an example, we were
21 talking about being able to suggest
22 topics or potential therapeutic experts
23 who might be appropriate faculty, if
24 requested, for that information by the

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1  provider, that was in the early days.
2       Currently, the ACCME
3  standards do not -- do not permit any
4  influence or input, even if asked, from
5  the -- from an industry supported
6  educational -- foreign industry-supported
7  educational program.
8       Q.   What is the ACCME?
9       A.   The Accreditation Counseling
10 Continuing Medical Education.  It is the
11 national accrediting body for CME, which
12 is continuing medical education.
13      They are the -- they set the
14 gold standard, if you will, for what is
15 independent education.  And then other
16 professional accreditors so, for
17 example, the American Nurses
18 Credentialing Group or the American
19 Academy of Family Physicians or the
20 American Osteopathic Association, adopt
21 those and agree to those standards so
22 that all independent -- and including
23 pharmacy, I didn't mean to leave them
24 out, all of them follow those same

Page 479

1  standards.
2       Q.   Do the ACCME standards --
3  you referred to guidelines in the past.
4       Are the standards you
5  referred to the same as the ACCME
6  guidelines?
7       A.   They are actually much more
8  firm than guidelines.  The correct, exact
9  title is the, ACCME Standards for
10 Commercial Support.  And it's a, you
11 know, trademarked document that they've
12 published all over the website that
13 they've cited in all of the literature
14 that served as the basis -- for example,
15 when you're talking about the REMS, which
16 was sort of a unique collaboration
17 between the FDA, industry and the ACCME,
18 the ACCME was the arbiter of assuring
19 that everything that was done, yes, it
20 was at the behest of the FDA, but it also
21 had to conform to the ACCME standards.
22      As Marie Croppolo, who was
23 the ACCME chief executive for years,
24 said, there is no safe harbor for REMS.

Page 480

1  If I had a nickel for every time he said
2  that, which is basically saying, even
3  though the REMS is CE, even though
4  industry is responsible for the REMS,
5  even though the FDA is dictating it,
6  there is no safe harbor that permits us
7  to cross certain lines, because it is
8  still, at the end of the day, accredited
9  independent education.
10      So they are much more than
11 guidelines.
12      Q.   When you say "there is no
13 safe harbor in REMS," what do you mean?
14      A.   Well, for an example, there
15 could have been a possibility that
16 someone said, hey, FDA has mandated that
17 industry must support education for, you
18 know, risk mitigation for opioids.  CE is
19 the type of education that is being
20 utilized to accomplish that.
21      And, you know, because the
22 FDA was -- the blueprint was the work
23 product of the FDA, there could have been
24 a possibility that someone said, oh,

Page 481

1  well, you know, this is different, you
2  know, we don't have to abide by those
3  same -- those same criteria, those same
4  standards for commercial support.  And
5  that was absolutely not the case.
6       We had to abide by the FDA
7  requirements and the statutory
8  requirements and, at the same time, abide
9  100 percent by the standards for
10 commercial support for the ACCME.
11      So it was charting a course
12 that allowed us to not cross the line for
13 an ACCME perspective and yet accomplish
14 what FDA was expecting us to do.
15      Q.   Prior to Endo's involvement
16 with the extended-release long-acting
17 opioid REMS, did it comply with the ACCME
18 guidelines -- the standards?  I
19 apologize.
20      MS. AMINOLROAYA:  Objection
21   to form.
22      THE WITNESS:  Did Endo,
23   you're asking?
24 BY MR. DAVIS:

Page 482

1    Q.   Yes.
2    A.   Yes.
3         Yes.  Endo has always
4   complied with the ACCME guidelines,
5   regardless of what they were.  And,
6   again, even exceeded them, because we
7   treated all independent education, even
8   though it was not necessarily a CE
9   accredited, as, you know, following those
10  same -- those same standards.
11        MS. AMINOLROAYA:  Objection
12   to form.
13  BY MR. DAVIS:
14   Q.   Did you know if -- are you
15  aware if the ACCME guidelines -- I'm
16  sorry.
17        Are you aware of the ACCME
18  standards evolving over time?
19        MS. AMINOLROAYA:  Objection
20   to form.
21        THE WITNESS:  Yes.  The
22   ACCME standards for commercial
23   support did evolve over time.
24        Prior to 2009, it was

Page 483

1   acceptable, as we said a few
2   minutes ago, for -- you know, if
3   the CE provider requested input --
4   it was recognized that many times
5   the medical and the educational
6   folks in the company were very
7   knowledgeable about certain
8   aspects of their therapeutic area,
9   and so they might know, for
10  example, who a knowledgeable
11  therapeutic expert would be or
12  what topics were of interest to
13  propose.
14        And so if -- you know, prior
15  to 2009, if the provider asked,
16  you could respond to that request,
17  as long as you gave multiple, you
18  know, suggestions and you talked
19  about the broad topics.  You did
20  not dictate content, you didn't,
21  you know, develop the content.
22  You were also provided -- you were
23  also able to provide a courtesy
24  medical review.  Again, prior to

Page 484

1   2009.
2         In 2009, those standards
3   evolved so that, number one,
4   organizations -- and these were,
5   many times, large publishing
6   organizations, such as Thomson,
7   for example, who would, you know,
8   previously be involved in CE but
9   also, perhaps, have some
10  responsibilities in industry on
11  the promotional side of the
12  business.
13        Well, in 2009, it was
14  hard-and-fast that these
15  organizations had to make a
16  decision; you needed to either
17  engage in the accredited CE side
18  of education, or you could
19  participate in promotional
20  activities with the companies or
21  do promotional ad boards, things
22  like that.
23        And so that was a standard
24  that evolved in 2009.

Page 485

1   BY MR. DAVIS:
2    Q.   Did the ACCME guidelines say
3   anything about the content of independent
4   education?
5         MS. AMINOLROAYA:  Objection
6    to form.
7         THE WITNESS:  The content of
8   independent education needs to be
9   determined by -- and it's spelled
10  out very clearly in the -- in the
11  ACCME standards, needs to be
12  determined by the faculty, the
13  program development members, so
14  there may be subject matter
15  experts who aren't necessarily
16  faculty, and the CE provider.
17  They are responsible for
18  developing that content and
19  assuring that there's no conflicts
20  of interest for any of the
21  faculties who present that
22  content.
23  BY MR. DAVIS:
24   Q.   Do the ACCME guidelines say

Page 486

1 anything about the supporters of
2 independent -- actually, do you know what
3 a supporter of independent education is?
4     A.   Yes.  A supporter of
5 independent education is -- again, it
6 could be anyone.  But, typically, when
7 we're having this conversation today,
8 it's about an industry person --
9 organization -- I'm sorry, an
10 organization that is providing an
11 unrestricted educational grant to a
12 recipient that is the CE provider or the
13 university that they're working with or
14 the professional society to develop an
15 educational -- independent educational
16 activity.
17     Q.   When you -- you said -- the
18 word "unrestricted" has come up, both
19 during questioning from plaintiffs'
20 counsel and also during our discussion.
21         What does "unrestricted"
22 mean in the context of independent
23 education?
24     A.   So it's -- you know,

Page 487

1 sometimes people have a mistaken
2 impression of that, that it means -- it's
3 not unrestricted and, in fact, I can't
4 remember who, some company refused, at
5 first, to try to adopt that, because they
6 said, well, you can go out and just have
7 a big pizza party or something, right?
8 No.
9         What ACCME means by that is
10 that you cannot dictate to -- the
11 provisions of the grant are not
12 contingent on the supporter dictating
13 those.  And so the recipient of the
14 grant, whether that's the provider or the
15 institution, has the unrestricted ability
16 to determine that the education will be
17 used in this appropriate way, based on
18 what they propose in their grant
19 proposal, based on what is approved by
20 the grant committee.
21         So it's unrestricted in that
22 it's not tethered to some, you know, you
23 have to talk about such and such or you
24 have to address these issues or you don't

Page 488

1 get the grant.
2     Q.   Do the ACCME guidelines
3 speak to a supporter's ability to
4 influence the content of the independent
5 education its grant supports?
6         MS. AMINOLROAYA:  Objection
7     to form.
8         THE WITNESS:  Again, as I
9     said, currently there is no,
10     absolutely no input or influence
11     on the educational activities,
12     unless, for example, a company or
13     an organization issues an RFP, a
14     request for proposals, or a
15     request for application, some
16     companies call them.
17         So if there is a particular
18     need -- so the REMS, for example,
19     we had to issue an RFP that said,
20     this is what FDA has decreed you
21     need to cover in order for an
22     educational activity to be REMS
23     compliant.
24         So in that case, we

Page 489

1     provided, you know, the -- here is
2     the blueprint that the FDA has
3     approved.  We needed to address
4     these audiences because these are
5     the folks that FDA has identified
6     as prescribing opioid analgesics,
7     generally speaking.
8         So to that -- to that --
9     with that exception, if you have
10     an RFP today, you do not have any
11     input or influence over the
12     content of the education.
13         Again, in early days that
14     was not the case.  Those
15     guidelines evolved over time,
16     because they could have asked for
17     your input and your -- and they
18     weren't obligated to follow it,
19     they never were.  But they were
20     able to ask and you were able to
21     do a courtesy medical review.
22 BY MR. DAVIS:
23     Q.   In what you're describing as
24 the early days, was the -- who had the

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1 final say over the content of the
2 independent education?
3       MS. AMINOLROAYA: Objection
4   to the form.
5       THE WITNESS: Whether it was
6   the early days or now, the final
7   say always rests with the CE
8   provider and the faculty. So that
9   did not ever change, even though,
10  you know, whether you could have
11  input did over time.
12 BY MR. DAVIS:
13    Q.   Why did Endo support -- did
14 Endo support independent education?
15    A.   Yes.
16    Q.   Why did Endo support
17 independent education?
18       MS. AMINOLROAYA: Objection
19   to form.
20       THE WITNESS: We supported
21   independent education because, as
22   a company that was committed to
23   pain management, I spoke to some
24   of the rationale for that up

Page 491

1   front, we wanted to make sure that
2   when clinicians -- we wanted to
3   have clinicians view education as
4   being relative to their practice
5   but also recognize it as being
6   unbiased and balanced. And so
7   that it was not advancing, for
8   example, a particular drug or a
9   particular modality.
10       And the best way of assuring
11   that -- and also, quite honestly,
12   if you are a busy clinician and
13   you are going to go to learn
14   something, you would want to
15   receive credit, you would want to
16   receive the accredited education
17   credit for the hour or two hours,
18   or whatever you spent there, as
19   opposed to just going to have, you
20   know -- it might still be good
21   education, but if you could get
22   credit for it, that was another
23   advantage to clinicians who are
24   busy these days being interested

Page 492

1   in participating.
2 BY MR. DAVIS:
3     Q.   Are you familiar, Ms.
4 Kitlinski, with the Opana ER RiskMAP?
5     A.   Yes.
6     Q.   Does the Opana -- did the
7 Opana ER RiskMAP contain certain
8 obligations?
9     A.   Yes. It was -- again, it
10 was a voluntary effort on Endo's behalf.
11       But we -- we went to the FDA
12 in advance of securing the approval for
13 Opana. We explained what types of --
14 and, again, I'll confine my comments to
15 the educational side of things.
16       So we discussed with the FDA
17 up front the types of educational
18 activities we would pursue, we showed
19 them examples. Because, you know, again,
20 we had been engaging in independent
21 education, and this is what we're talking
22 about. So it was very transparent. It
23 was very detailed about the types of
24 education we were going to pursue.

Page 493

1       And, in fact, the only
2 concern that I ever remember them raising
3 was, well, this is terrific, but if
4 you're not supposed to be able to control
5 content, how are you going to assure that
6 the education talks about and includes
7 adequate emphasis on opioid misuse and
8 abuse and addiction?
9       And so what we were able to
10 assure them of was that, in reviewing our
11 grants, we would assure that we would not
12 approve grants that were not focusing on
13 elements of misuse, abuse, addiction,
14 overdose, et cetera.
15       And so they were then
16 comfortable with that. They liked the
17 fact that it was a very comprehensive
18 activity and that it was not only
19 targeting, let's say, pain specialists
20 but also was going to reach out to
21 primary care physicians, nurse
22 practitioners, PAs, pharmacists, folks
23 who would be involved with all aspects of
24 touching a patient with pain, so that

Page 494

1 they could help educate patients and
2 caregivers, as well, on responsible pain
3 management practices.
4     Q.   Prior to the finalization of
5 the Opana ER RiskMAP, did FDA provide any
6 other feedback regarding the proposed
7 independent education that Endo intended
8 to support?
9     A.   No, they -- I mean, they
10 provided positive feedback saying that
11 this was -- this was good, it was
12 approved.  And in -- in addition, they
13 provided ongoing feedback, because it
14 was -- on a periodic basis, I believe it
15 was quarterly, we would provide a RiskMAP
16 update report to apprise them of the
17 progress that was being made and whether
18 we were -- you know, again, even though
19 it was a voluntary effort, whether we
20 were on track with what we said we were
21 going to do.
22         And because things were
23 added over time, new initiatives that --
24 that we undertook.

Page 495

1     Q.   Ms. Kitlinski, I'd like to
2 show you what's been marked as
3 Exhibit-50, please.
4     A.   Thank you.
5         - - -
6         (Whereupon, Endo-Kitlinski
7         Exhibit-50,
8         ENDO-OPIOID_MDL-01769386-592, was
9         marked for identification.)
10        - - -
11        MR. DAVIS:  John, do you
12    have a copy to hand down?  Oh,
13    yeah, we did this dance before,
14    didn't we?
15 BY MR. DAVIS:
16    Q.   So, Ms. Kitlinski, the
17 document that's been marked Exhibit-50
18 bears the Bates number
19 ENDO-OPIOID_MDL-01769386.
20        Are you familiar with this
21 document, Ms. Kitlinski?
22    A.   Yes.
23    Q.   What is this document?
24    A.   This is the -- this

Page 496

1 particular version is the September 2008
2 quarterly RiskMAP update report, which
3 covered the period from April 1st of 2008
4 to June 30th of 2008.
5         And this was produced within
6 Endo and provided to the FDA to apprise
7 them of our progress on these topics.
8 And if there are -- also to identify any
9 issues that might have arisen since the
10 last risk management -- RiskMAP report.
11    Q.   Did this Exhibit-50 here,
12 the RiskMAP update report from September
13 3rd, 2008, relate only to the -- I guess,
14 what is that, the second quarter of 2008?
15    A.   Yes.  Period covering April
16 1st to June 30th.
17    Q.   Did Endo ever submit any
18 other RiskMAP update reports to FDA?
19    A.   Yes, on a quarterly basis.
20    Q.   Did these RiskMAP update
21 reports generally follow the same format?
22    A.   We had a template, which we
23 had worked out with -- you know, again,
24 with the first submission to the agency

Page 497

1 so that it was uniform for them to follow
2 along, and also so that we were very
3 clear on who was -- you know, what fell
4 under what section, who was responsible
5 for that section and where new
6 information on that could appear.
7    Q.   Did these RiskMAP update
8 reports contain information regarding the
9 continuing education that Endo supported
10 during the quarter covered by each
11 particular report?
12    A.   Yes.
13        And, also, if new things
14 were initiated.  So it might have been
15 that the activity was -- occurred then,
16 or it might be that, let's say, they were
17 developing new curriculum for one that
18 would occur in the future.
19    Q.   Ms. Kitlinski, did FDA ever
20 provide any feedback to Endo in response
21 to its description of continuing
22 education in the quarterly RiskMAP update
23 reports?
24        MS. AMINOLROAYA:  Objection

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1 to form. You're asking, sorry, if
2 FDA provided feedback in the
3 RiskMAPs that Endo submitted?
4     MR. DAVIS: Let me ask it
5 again.
6 BY MR. DAVIS:
7     Q.   Ms. Kitlinski, did Endo ever
8 provide any feedback -- did FDA -- I'll
9 get it right.
10     A.   Three times is the charm.
11     Q.   Ms. Kitlinski, did FDA ever
12 provide Endo with feedback regarding the
13 information that Endo provided in its
14 quarterly RiskMAP update reports
15 regarding the continuing education -- the
16 independent education that Endo
17 supported?
18     A.   Not --
19     MS. AMINOLROAYA: Objection.
20     THE WITNESS: Not to my
21 knowledge, with the exception of
22 making the comment that it was,
23 you know, a good, comprehensive
24 program. And, in fact, I can't

Page 499

1 recall if it was Doug
2 Throckmartin, or someone who was
3 associated with the development of
4 the REMS, had referred to our
5 educational -- our RiskMAP as one
6 that was very thorough.
7     And so I took that as a
8 compliment.
9 BY MR. DAVIS:
10     Q.   Did FDA ever say that the
11 education that Endo was supporting was
12 not balanced?
13     A.   No. Absolutely --
14     MS. AMINOLROAYA: Objection
15 to form.
16 BY MR. DAVIS:
17     Q.   Did Endo ever -- or did FDA
18 ever tell Endo that the education -- the
19 independent education that it was
20 supporting was biased in any way?
21     MS. AMINOLROAYA: Objection
22 to form.
23     THE WITNESS: No.
24 BY MR. DAVIS:

Page 500

1     Q.   Did FDA ever tell Endo that
2 the education it was supporting minimized
3 the risks of abuse or misuse of opioids?
4     MS. AMINOLROAYA: Same
5 objection.
6     THE WITNESS: No.
7 BY MR. DAVIS:
8     Q.   Did FDA ever tell Endo that
9 the education it supported minimized the
10 risk of addiction associated with
11 opioids?
12     MS. AMINOLROAYA: Object to
13 form.
14     THE WITNESS: No.
15 BY MR. DAVIS:
16     Q.   Did FDA ever tell Endo that
17 the education it supported minimized the
18 risk of overdose associated with opioids?
19     A.   No.
20     MS. AMINOLROAYA: Objection.
21 BY MR. DAVIS:
22     Q.   Does this -- does
23 Exhibit-50, the RiskMAP report from
24 September 3rd, 2008, Ms. Kitlinski,

Page 501

1 contain information regarding the
2 education supported by Endo during that
3 quarter?
4     A.   Yes, it does.
5     Q.   Can you describe for me
6 generally the types of education Endo
7 supported, the independent education Endo
8 supported during the second quarter of
9 2008, please?
10     A.   Yes. And if you look, I'll
11 just -- rather than flipping through the
12 report, I'll just work from the table of
13 contents here.
14     You can see that it's broken
15 into several sections under education.
16 Number one, the professional education
17 initiatives. Again, those are the
18 independent education initiatives that
19 were supported through unrestricted
20 educational grants.
21     You'll see, then, there's
22 patient and -- and under that section, we
23 already discussed NIPC, so folks are
24 familiar with that.

Page 502

1    We talked about the I-med --
2  we didn't call it I-med, but it was the
3  NIDA, National Institute on Drug Abuse,
4  activity that was being coordinated by
5  Penn State College of Medicine and NIDA.
6    We talked about many of the
7  collaborative efforts with the
8  professional societies to have
9  educational activities at their annual
10  conferences.
11    We talked about the
12  residents/physician in training
13  initiative.
14    We spoke about painEDU,
15  which was the Inflexxion website, and
16  manual for clinicians.
17    And then we spoke about the
18  ACPE, accredited pharmacy education
19  monographs.
20    I think it's interesting you
21  asked me about the evolution of things.
22  In my capacity, one of my
23  responsibilities at DuPont Merck was
24  actually -- we were an accredited ACPE

Page 503

1  provider, so my activities there did
2  involve directly working with the faculty
3  and developing pharmacy education
4  modules, maintaining the accreditation
5  documents for that.  And being, you know,
6  in industry, you were ultra sure that you
7  were not only adhering but, you know,
8  exceeding those standards.
9    So I had -- I know there was
10  one area where someone was asking about a
11  pharmacy monograph and the fact that we
12  were, you know, being involved with that.
13  And that was perfectly acceptable.
14    We talked about the opioid
15  handbooks; the principles of analgesic
16  use; supporting the purchase of
17  evidence-based guidelines.
18    And then risk management
19  information and tools for clinicians --
20  I'll just refresh my memory on what
21  specifically that was that we hadn't
22  already talked about.
23    Oh, this was -- this was
24  actually not an independent educational

Page 504

1  activity.  This was the Promise
2  initiative, which was an Endo-developed
3  activity for education.
4    So that was the professional
5  education.
6    The patient and family
7  education consisted of, we've talked
8  about the Understanding Your Pain
9  brochure.  There was one on the -- that
10  was not in this section, on pain rating,
11  pain assessment inventory.
12    So when you're going to your
13  physician, how you can, you know, capture
14  on the pain scale what your pain rating
15  was, where the source of your pain was,
16  descriptors for the pain.
17    And then the Pain Action
18  website, which had materials that could
19  be downloaded, similar to those tear-pads
20  that we were discussing for the state of
21  Tennessee, you know, helping to educate
22  families and caregivers on safe use and
23  safe storage principles.
24    And then beyond that, the

Page 505

1  other area that we supported through
2  educational grants was the development of
3  psychometrically validated tools to help
4  assess patients who were being considered
5  for opioid therapy, that would be the
6  SOAPP tool, or who were already on opioid
7  therapy to manage them and to assure that
8  their risks were mitigated; so that was
9  SOAPP and CON.
10    So those were the types of
11  activities that were in our RiskMAP.
12    Q.  In addition to listing all
13  of those educational activities in the
14  table of contents, does this RiskMAP
15  report from September of 2008 contain any
16  further information about those
17  educational activities?
18    A.  It has a summary for each of
19  those.  I mean, in the purposes of time,
20  I just gave you my one-word CliffsNote
21  version of it.
22    But each of those areas
23  would have a paragraph, two paragraphs or
24  longer, describing what was relative for

Page 506

1  that quarter.
2      Q.   Did you review other
3  quarterly RiskMAP update reports, other
4  than this one from September 2008, Ms.
5  Kitlinski?
6          MS. AMINOLROAYA:  Objection
7  to the form.
8          THE WITNESS:  I --
9          MS. AMINOLROAYA:  Can we
10  specify what time period the
11  question relates to?
12          MR. DAVIS:  During the
13  course of the RiskMAP.
14          THE WITNESS:  Yes.  We would
15  do this on a quarterly basis.  So
16  once a quarter I would prepare my
17  sections, I would submit it to the
18  regulatory team.  They would
19  incorporate the other sections
20  from the other departments and
21  produce the final version like
22  we're looking at here.
23  BY MR. DAVIS:
24      Q.   Did the other RiskMAP,

Page 507

1  quarterly RiskMAP reports that you
2  reviewed, contain a similar number of
3  educational activities?
4      A.   Yes.  We are always
5  committed to a very robust risk
6  mitigation strategy.  That's why we
7  developed this in the first place.
8  That's why we did it, even though it
9  wasn't required.
10      Q.   Did FDA ever respond to any
11  of the quarterly RiskMAP update
12  reports -- let me ask a better question.
13          In response to any of the
14  RiskMAP update reports, did FDA ever ask
15  Endo to support different educational
16  activities?
17      A.   No.  We did not --
18          MS. AMINOLROAYA:  Object to
19  form.
20          THE WITNESS:  Until the REMS
21  came out, in which case that
22  applied to not just Endo, but the
23  REMS, you know, applied to
24  everyone.

Page 508

1  BY MR. DAVIS:
2      Q.   In response to any of the
3  quarterly RiskMAP update reports, did FDA
4  ever tell Endo to stop supporting any
5  particular educational activity?
6      A.   No.
7          MS. AMINOLROAYA:  Objection
8  to form.
9  BY MR. DAVIS:
10      Q.   Ms. Kitlinski, does the --
11  did the RiskMAP -- I know you talked to
12  this a second ago -- you can set that
13  aside if you'd like.
14          Does the Opana ER -- did the
15  Opana ER RiskMAP cover other areas beyond
16  independent education?
17      A.   Yes.
18      Q.   Did you have responsibility
19  for those areas?
20      A.   No, I did not.
21      Q.   Were there others at Endo
22  that had responsibility for those areas?
23      A.   Yes.  So the individuals in
24  each department would produce their

Page 509

1  section of the report, and it would be
2  compiled by the regulatory department.
3      Q.   Do you know whether -- and,
4  Ms. Kitlinski, you just referenced the
5  REMS.
6      A.   Yes.
7      Q.   Did Endo -- did the REMS --
8  were you referring to the
9  extended-release long-acting opioid REMS?
10      A.   Yes, that's correct.
11      Q.   And does -- I'll just refer
12  to that as the REMS for now.
13      A.   Yes.
14      Q.   Did the REMS contain an
15  educational component?
16      A.   Yes, it did.  They call it
17  training in the REMS language, but we
18  worked through that with them so they
19  understood it was education and we
20  understood it was training, and we used
21  the words, you know, education/training.
22      Q.   Did Endo continue to support
23  independent education following the
24  implementation of the REMS?

Page 510

1       MS. AMINOLROAYA:  Objection
2  to form.
3       THE WITNESS:  We did for a
4  period of time.  And then there
5  were concerns that by -- so I'll
6  step back for a second.
7       The REMS, besides requiring
8  education, established goals of
9  how many -- they called them
10  completers, how many clinicians
11  needed to have completed training,
12  their word, on the full blueprint
13  in order to count towards the REMS
14  goals.
15       So the FDA had very strict
16  goals of what was required within,
17  you know, the first year of the
18  REMS being available and the
19  second year, et cetera.
20       And because of the length of
21  the -- the length of the
22  blueprint, which, therefore,
23  dictated the length of the CE
24  activities, many of them were

Page 511

1  three hours long, two and-a-half
2  hours, three hours, even a little
3  bit longer than that.  There
4  was -- you know, clinicians are
5  busy and, again, were not
6  necessarily standing in line to
7  give up three or four hours of
8  their time to participate in an
9  educational activity, albeit CE
10  accredited, and albeit one of key
11  importance.
12       So what we realized after
13  the first year was that we were
14  potentially -- because there was a
15  lot of -- if there was other
16  opioid education, so, for example,
17  NIDA, I remember having a
18  discussion with NIDA, who had done
19  a Medscape activity talking about
20  the responsible use of opioid
21  analgesics, and it was three hours
22  long, again, which was similar to
23  the REMS.
24       So there was a lot of

Page 512

1  confusion that if you were a
2  practicing clinician and you
3  participated in this activity that
4  was three hours long and talked
5  about the safer use of opioids,
6  you would have considered that you
7  can -- completed, you know,
8  appropriate education on opioids.
9  You would not be likely to then
10  sit through another three hours of
11  REMS-compliant training.
12       And so that was one of the
13  big things we learned up front was
14  clinicians don't know or care what
15  REMS means; if you talk about safe
16  use of opioids, they'll be
17  interested in that.  If you say
18  you should go to this because it's
19  an FDA REMS-mandated activity,
20  they probably care less.
21       So we tried to not dilute
22  the pool of physicians and
23  clinicians who were willing to,
24  you know, participate in the REMS

Page 513

1  education, because that was
2  mandatory for us because we had
3  goals that we had to meet.
4       And so while we were trying
5  to do the right thing by offering
6  greater diversity of education, it
7  became apparent that that was
8  having a potential negative effect
9  on people participating on the
10  REMS.
11  BY MR. DAVIS:
12       Q.   At that point, did Endo
13  continue to support independent education
14  through its participation in REMS?
15       A.   Yes, we did.
16       Q.   Did FDA -- were you aware of
17  whether the REMS consortium shared any
18  information with FDA?
19       A.   With regards to the progress
20  on the REMS, is that what you're
21  referring to?
22       Q.   I'm specifically talking
23  about the content of the education
24  supported by the REMS consortium.

Page 514

1    MS. AMINOLROAYA:  Objection
2  to form.
3    THE WITNESS:  So the RPC,
4  the REMS program companies,
5  provided a -- again, a report, a
6  periodic report to the FDA, the
7  first ones were shorter periods of
8  time, the others were, you know,
9  24, 36 months, et cetera, advising
10  them of the progress, in terms of
11  the metrics, the REMS metrics,
12  where we stood with regard to the
13  goals they had determined, where
14  we stood with regards to the
15  evaluations, you know, we were
16  talking about the fact that
17  education -- accredited education
18  needs to have a metric for
19  determining whether you've
20  accomplished -- whether the CE
21  provider has accomplished the
22  goals they set out to do.
23    So all of that information
24  was communicated periodically in a

Page 515

1  very lengthy report to the FDA.
2  BY MR. DAVIS:
3    Q.   Did the FDA ever provide
4  direction to the REMS program companies
5  about the types of independent education
6  those companies should be supporting
7  through their participation in REMS?
8    A.   No.  They were part of the
9  discussions of what the intent was.  And
10  it was emphasized that it was to reach a
11  broad audience of especially primary care
12  providers.
13    They knew how, in fact, we
14  had sent the request for proposal, the
15  draft, to them in advance of putting it
16  out there to the CE community to make
17  sure that they knew what we were asking
18  for and to make sure that it was aligned
19  with their expectations.
20    And they received reports
21  from the REMS companies, for example,
22  after each grant cycle saying, these are
23  the grants that have been -- have been
24  approved.  Part of the REMS was the

Page 516

1  requirement to have a realtime website
2  that would list -- and it was searchable,
3  if you were a primary care physician in
4  Pennsylvania and you were looking to
5  participate in a REMS education activity,
6  you would be able to do a keyword search
7  and find either live or online activities
8  that were, you know, aligned with your
9  interests.
10    So the FDA received regular
11  updates on that as well.
12    Q.   Ms. Kitlinski, did Endo
13  exercise any control over the content of
14  the independent education it supported
15  through the RiskMAP?
16    MS. AMINOLROAYA:  Objection
17  to form.
18    THE WITNESS:  Through the --
19  through the RiskMAP?
20  BY MR. DAVIS:
21    Q.   Yes.
22    A.   Again, Endo did not
23  contribute -- control, exert influence or
24  control the content because, ultimately,

Page 517

1  that resided with the CE provider and
2  with the faculty and the program
3  development team.
4    I do say, as I said before,
5  in the early days, when appropriate and
6  compliant with the guidelines, when
7  asked, we did provide input on broad
8  topics, potential faculty who were -- who
9  were therapeutic experts or a courtesy
10  medical review for looking for medical
11  accuracy regarding our information.
12    Q.   In those early days, would
13  Endo provide specific content related to
14  the broad topics it had offered?
15    A.   No.
16    Q.   Did Endo exert any control
17  over the content of the independent
18  education supported through REMS?
19    MS. AMINOLROAYA:  Objection
20  to form.
21    THE WITNESS:  No.  And
22  the -- again, I'll preface this,
23  since this whole REMS was a little
24  bit of a different -- sort of a

Page 518

1 different animal, part of the REMS
2 blueprint, which FDA did require
3 each company to submit, was --
4 Section 6 of the REMS blueprint
5 was product-specific information
6 on each of the ERLA opioid REMS
7 products.
8 So, for example, for Endo,
9 Opana ER, we were required to
10 submit a one-page summary of
11 contraindications, warning,
12 dosage, any particular risk issues
13 that were in the labeling so that
14 if a clinician was going to
15 prescribe any one of the ERLA
16 opioids, they could look at
17 Section 6 and they could know what
18 the sort of relevant issues were
19 for that particular drug, as
20 opposed to for the class.
21 And so that we were asked to
22 provide -- our regulatory and our
23 R&D teams provided that to the
24 FDA. The FDA, again, made sure

Page 519

1 that it was appropriately vetted
2 through their own internal
3 organization and consistent with
4 the labeling, and also that it was
5 vetted through the DHHS, HHS,
6 NIDA, SAMSA folks who were also
7 reviewing everything.
8 So, again, that was the work
9 product of the FDA, which was what
10 the blueprint was, but we did have
11 that -- that responsibility to
12 present that one-page synopsis on
13 our particular products.
14 BY MR. DAVIS:
15 Q. Separate and apart from that
16 one-page synopsis, did Endo exert any
17 control over the independent education
18 supported through REMS?
19 A. No.
20 MS. AMINOLROAYA: Objection
21 to form.
22 BY MR. DAVIS:
23 Q. Ms. Kitlinski, I'd like to
24 ask you about a few of the documents that

Page 520

1 you went through during the course of
2 plaintiffs' examination.
3 Can we start with
4 Exhibit-35, please? And this is, again,
5 just for the record, Bates labeled
6 ENDO-OPIOID_MDL-06234029.
7 Do you recall discussion of
8 this document, Ms. Kitlinski?
9 A. Yes.
10 Q. And what is this document?
11 A. This was a -- an update from
12 the American Pain Foundation to Endo
13 about its -- when John Giglio took over
14 the responsibilities there, the overview
15 of the American Pain Foundation, what
16 some of their recent accomplishments
17 were, where they were heading in the
18 future.
19 Q. Do you recall questions
20 about Endo's support for the recent APF
21 accomplishments described in this
22 document?
23 A. I do, yes.
24 Q. And do you see that sentence

Page 521

1 on the second page of this document?
2 A. With support -- Page 2 here,
3 With support from Endo?
4 Q. Yes.
5 A. Yes.
6 Q. Was Endo the only funder of
7 APF's recent accomplishments?
8 A. No. As I pointed out when
9 we were going through the brochure itself
10 as well, there were many other funders,
11 both industry and nonindustry supporters.
12 Q. Do you recall plaintiffs'
13 counsel asking you about the patient
14 education materials described on Page 3
15 of the document?
16 A. Yes.
17 Q. Were those patient education
18 materials the only recent APF
19 accomplishments described in this letter?
20 A. No. As you can see, there
21 were at least a page of accomplishments,
22 talking about education, as well as their
23 work in the field of pain management and
24 advocacy.

Page 522

1  Q.  You just said "pain
2  management" there, Ms. Kitlinski.
3      Does that mean opioids?
4  A.  Opioids are one element of
5  pain management.  But what American Pain
6  Foundation, and all of the other national
7  pain organizations, are committed to,
8  unless it was a specific one like the
9  Varicella Zoster Foundation, which was
10 only associated with that particular area
11 of pain, but for the majority, the
12 American Chronic Pain Association, the
13 National Pain Foundation, the ACPA, all
14 of the professional organizations, their
15 goal was much broader.  It was for
16 correct and appropriate assessment of
17 patients, assuring that patients were
18 able to describe their needs to their
19 clinicians, assuring that clinicians had
20 access to a broad spectrum of analgesic
21 modalities, whether they be
22 pharmacologic, nonpharmacologic, you
23 know, combination, multimodal therapies,
24 all of those.

Page 523

1      So that's what pain
2  management is when I use that term.  And
3  certainly opioids is one element of that.
4  Q.  But just one element, right?
5  A.  Yes.  And certainly not the
6  first element.  All of the -- I know that
7  there were some sentences or bullet
8  points that pointed out today about
9  opioids and, perhaps, someone might have
10 mistakenly believed that that was the
11 first alternative that was recommended in
12 all of these educational materials,
13 whether they were independent or
14 otherwise.
15     And, indeed, without
16 exception, they all indicated that opioid
17 should be used when other modalities have
18 failed to provide sufficient pain relief
19 or when there are untoward issues which
20 necessitated adding an opioid or
21 considering adding an opioid.
22     And, again, in all
23 instances, the education emphasized the
24 need, right from the get-go, of having an

Page 524

1  exit strategy so that the patient
2  understood this was a trial.
3  Q.  Let's look at one of the
4  patient education materials referred to
5  in this APF document.  It's Exhibit-36.
6  And that bears the Bates number
7  CHI000435580.
8      Do you recall discussing
9  this document with plaintiffs' counsel,
10 Ms. Kitlinski?
11 A.  Yes.
12 Q.  And what is this document?
13 A.  Again, this is a,
14 quote/unquote, pain action guide, a
15 brochure that was developed by the
16 American Pain Foundation talking about
17 the -- again, pain in general, as we've
18 been discussing all day, that there are
19 two concomitant public health situations.
20 One is chronic pain and the other is the
21 public health situation associated with
22 abuse and misuse of opioid analgesics.
23     This was to give information
24 to patients that they could discuss with

Page 525

1  their families and their caregivers.
2  Sort of simple lay language like, what
3  can I do?  Talk to your doctor and nurse
4  about pain.  It's a common medical
5  problem that requires attention, so you
6  shouldn't be ashamed to talk about it.
7  Tell your doctor or nurse where it hurts
8  so they can help localize it.  Describe
9  how much your pain hurts.  So it was
10 practical, lay language that could be
11 utilized.
12     And resources.  Keep a pain
13 diary.  You know, use a pain rating
14 scale.  That type of thing.
15 Q.  Do you recall plaintiffs
16 asking you questions about this document?
17 A.  I recall us -- I recall us
18 talking about the document.  And I know
19 that we asked at least one question on
20 it.
21 Q.  How many pages is this
22 document?
23 A.  It looks like 14.
24 Q.  How many pages did

Page 526

1 plaintiffs ask you about?
2     A.   I believe it was one point
3 on one page.
4     Q.   Okay.  They did not ask you
5 about the whole document, did they?
6     A.   No.
7     Q.   They did not ask you about
8 anything other than this one point on
9 Page 6, correct?
10    A.   Yes, that's correct.
11    Q.   Okay.  They didn't ask you
12 about, for example, on Page 10,
13 suggestions to ask your doctor or nurse
14 about nondrug, nonsurgical treatments,
15 did they?
16    A.   No.
17    Q.   Did they ask you questions
18 about the suggestion that a patient ask
19 their doctor or nurse about ways to relax
20 and cope with pain?
21    A.   No.
22    Q.   Okay.  You can set that one
23 aside.
24        Let's look at Exhibit-40,

Page 527

1 please.  And this exhibit bears the Bates
2 number ENDO-OPIOID_MDL-05968029.
3        Ms. Kitlinski, do you recall
4 this document?
5     A.   Yes.  This was part of the
6 syllabus from the American Pain Society
7 residents course.
8     Q.   Let's flip to the primer and
9 the syllabus.
10        Just ballpark, how many
11 pages is this syllabus?
12    A.   It looked about 50 pages,
13 printouts.
14    Q.   And many of the pages
15 contain -- do many of the pages contain
16 more than one slide?
17    A.   There are generally three
18 slides, three up on each page; so 150
19 slides, approximately.
20    Q.   Do you recall how many of
21 these slides plaintiffs asked you about?
22    A.   I do not, but I believe it
23 was a limited number.
24    Q.   Do you recall plaintiffs

Page 528

1 asking you about any slide other than the
2 top slide on the page that bears the
3 Bates number ending 8066?
4     A.   No, I do not.  It was -- the
5 pseudoaddiction was the only point that
6 they raised out of this.
7     Q.   Did they -- did plaintiffs
8 ask you about, if you flip to the
9 beginning, about the agenda for the
10 fundamentals of pain management program?
11    A.   No.
12    Q.   Do all of the sessions
13 described over the several days of this
14 program relate to opioids?
15    A.   Not by a long shot, no.
16        There is one session on pain
17 pharmacology -- well, first of all, to
18 take a step back.  It's not even that
19 there are -- the whole sessions relate to
20 pharmacologic therapy.  It talks about
21 assessment and physical exam and taking a
22 history.
23        And then there is one
24 session on pain pharmacology presented by

Page 529

1 Dr. Barry Kohl, after the pain
2 pharmacology of nonopioid analgesics is
3 presented by Dr. Argoff.
4        There is also, on the second
5 day, the assessment and management of
6 aberrant behaviors associated with
7 analgesic use.
8        So those are the only --
9 unless I'm missing, my guess here, the
10 only opioid-related courses.  And
11 methadone, I'm sorry, the devil is in the
12 details, sort of discussing the dosing
13 challenges and the very variable and
14 extended half-life of that drug.
15    Q.   Did plaintiffs ask you about
16 any of the nonopioid-related sessions for
17 the fundamentals of pain management
18 section?
19    A.   No.
20    Q.   Did they ask you about any
21 of the other many slides contained in
22 this document, other than the one that we
23 just referenced?
24    A.   No.

Page 530

1   Q.   You can set that one aside,
2   Ms. Kitlinski.
3           I'd like you to look at
4   Exhibit-42, please, if you would.  This
5   document bears a number of Bates numbers,
6   but I'll go with the one at the bottom,
7   which is, I think, the one cited in the
8   record thus far, which is PYK181215547.
9           Do you recall this document,
10  Ms. Kitlinski?
11  A.   Yes.
12  Q.   What is this document?
13  A.   This is the guideline for
14  osteoarthritis, rheumatoid arthritis and
15  juvenile chronic arthritis that was
16  developed by the American Pain Society in
17  2002.
18  Q.   And did plaintiffs ask you
19  about any of the content of this
20  document?
21  A.   I don't believe so.  We read
22  it up -- and we were talking about it --
23  about guidelines, but I don't believe
24  that we actually delved into any of the

Page 531

1   content here.
2   Q.   And does -- do these
3   guidelines address topics other than
4   opioids?
5   A.   Yes, very much so.  Again,
6   pain assessment and the overview of the
7   pathophysiology associated with these
8   various disease -- arthritic types of
9   diseases.
10          Certainly, the, you know,
11  first line therapy for OA is -- are not
12  opioids; Tylenol, NSAIDs, et cetera.  So
13  this goes through the -- goes through the
14  analgesics component here, starting on
15  Page 54, talking about analgesics,
16  acetaminophen, nonsteroidals, topical
17  agents, hyaluronic acid, et cetera,
18  DMARDs.
19          And then there is, it looks
20  like, three pages on opioids, the first
21  of which is addiction, physical
22  dependence and tolerance.  One page on
23  the effectiveness and use of opioids.
24  And then one page on opioid dosing.

Page 532

1   Tramadol is an atypical agent, but could
2   be characterized as an opioid as well.
3   So there might be four pages there.
4   Q.   And how many pages is this
5   guideline?
6   A.   It looks to be about 131,
7   plus the appendices and index.
8   Q.   And was this an APS
9   guideline?
10  A.   Yes.
11  Q.   When I say "APS," do you
12  understand me to mean the American Pain
13  Society?
14  A.   The American Pain Society,
15  yes.
16  Q.   And do you have an
17  understanding of the American Pain
18  Society's objectives?
19          MS. AMINOLROAYA:  Objection
20  to form.
21          THE WITNESS:  Well, I
22  believe they -- they lay it out
23  here in the preface, which is
24  intending -- they convened an

Page 533

1   arthritis pain management panel
2   over the course of two years, with
3   all of the top therapeutic experts
4   in rheumatology, and they worked
5   with -- and orthopedic surgeons as
6   well, and developed this
7   interdisciplinary panel of experts
8   who were -- then provided the
9   recommendations for this
10  guideline.
11          So that it incorporated all
12  of the -- not just pain
13  specialists, but all the
14  specialists who manage arthritic
15  pain.
16  BY MR. DAVIS:
17  Q.   You can set that aside, Ms.
18  Kitlinski.
19          Will you look at Exhibit-43,
20  please?  And this bears the Bates number
21  END00051370.
22          Do you recall this document,
23  Ms. Kitlinski?
24  A.   Yes, I do.

Page 534

1    Q.   What is this document?
2    A.   This is the handbook
3  entitled, Responsible Opioid Prescribing,
4  a Physician's Guide, that was authored by
5  Scott Fishman, Dr. Scott Fishman, and
6  distributed -- made available through the
7  Federation of State Medical Boards.
8    Q.   How many pages is this
9  document, Ms. Kitlinski?
10   A.   It looks to be about 125
11 pages.
12   Q.   Do you recall plaintiffs
13 asking you questions about this document?
14   A.   We did look at one point in
15 here.
16   Q.   Do you recall how many pages
17 they asked you questions about?
18   A.   I know it was at least one.
19 I'm sorry, I don't.
20   Q.   Okay.  Let's look at Page
21 28, please, of the actual book copy, not
22 the number up top, sorry.
23   A.   That's all right.
24   Q.   Do you recall -- do you see

Page 535

1  the --
2    A.   Oh, yes.
3    Q.   -- do you recall plaintiffs
4  asking you about any other section of
5  this book besides that one paragraph on
6  Page 28?
7    A.   No.  It was about patient --
8  about clinicians being sued for not
9  treating pain aggressively.
10   Q.   Will you look at Page 5 of
11 the book, please, Ms. Kitlinski?
12   A.   Page 1 of the actual book,
13 Page 5 of --
14   Q.   I'm sorry, I'm going by the
15 book numbers.  So it's the page that
16 reads, Introduction, pharmacovigilance
17 and good medicine.
18   A.   Got it.  Yes.
19   Q.   Are you familiar with the
20 language on this page?
21   A.   Yes.
22   Q.   Does this language speak to
23 important public health trends?
24   A.   Yes, it does.

Page 536

1    Q.   And what are those public --
2  important public health trends described
3  by this book?
4    A.   Well, this is a really, I
5  think, appropriate way of depicting here
6  the twin serpents in the caduceus,
7  right?  So you've got the public health
8  trend of the shifting patterns of drug
9  abuse from illicit to prescription drugs,
10 a notable rise in diversion and
11 nonmedical use of opioid pain
12 medications, and then on the flip side of
13 it, the attention that pain in general,
14 chronic pain, is often undertreated or
15 undiagnosed.
16       And so it's, as the author
17 puts it, the perfect storm, if you will,
18 of clinicians needing to manage those
19 dual public health crises in a reasonable
20 way.
21   Q.   Does this language recognize
22 the risk associated with opioid
23 analgesics?
24       MS. AMINOLROAYA:  Objection

Page 537

1  to form.
2       THE WITNESS:  Absolutely.
3  BY MR. DAVIS:
4    Q.   And what does it say about
5  the risk of opioid analgesics?
6    A.   Again, it goes into the fact
7  that, you know, clinicians need to be
8  sensitive to and knowledgeable about
9  pharmacovigilance and risk management.
10       It says the combination of
11 the potential of therapeutic benefit but
12 the high risk associated with opioid
13 analgesics leaves them no alternative but
14 to become more sophisticated risk
15 managers in their patients.
16   Q.   Did plaintiffs --
17   A.   And so -- and it states
18 explicitly that, we cannot ignore the
19 potential risks associated with the use
20 of controlled substance, including
21 addiction, and that managing risk is
22 something that clinicians do in their
23 everyday clinical practice.
24   Q.   Did plaintiffs ask you any

Highly Confidential – Subject to Further Confidentiality Review

Page 538

1  questions about that language?
2      A.   No.
3      Q.   Ms. Kitlinski, we're close.
4  We're close.  I know you've been sitting
5  here for a long time.
6      A.   And I -- may I just make one
7  additional comment?
8      Q.   Please.  Please.
9      A.   One of the -- I think the
10 greatest impact of this particular tool
11 was in the foreward, which was authored
12 by James Thompson, who was the president
13 of the Federation of State Medical
14 Boards, and his comment here that says,
15 you know, Patients in pain who rely on
16 opioids for analgesia deserve access to
17 safe and effective medication; to deprive
18 them of this pain relief certainly does
19 them harm.  Yet, these same
20 life-restoring medications carry the
21 potential to do grave harm to patients
22 who may be at risk for addiction and
23 abuse.  Significant quantities of
24 prescription opioids are diverted into

Page 539

1  the illegal black market that puts
2  millions of nonmedical, quote,
3  recreational users at risk of addiction
4  and death, many of them young adults and
5  teenagers.  While very few
6  clinicians/physicians are complicit in
7  this criminal diversion and there are no
8  proven methods from preventing patients
9  from deceptively acquiring prescriptions,
10 but the fact that some patients will
11 deceive a physician in order to obtain
12 prescription opioids for nonmedical use
13 requires us to be vigilant when
14 prescribing these potent and potentially
15 abusable medications.
16        So, again, very strong,
17 emphatic statement of the recognized risk
18 and the need to really accelerate
19 awareness of that.
20     Q.   Do you agree with that?
21     A.   Absolutely.
22     Q.   Was it your understanding,
23 during your time at Endo, that the
24 company agreed with that language?

Page 540

1      A.   Yes.
2      Q.   Ms. Kitlinski, we saw a few
3  documents earlier today that contained
4  the phrase -- it might have just been two
5  documents, contained the phrase "ROI."
6        Do you recall those?
7      A.   Yes.
8      Q.   Do you have an understanding
9  as to what ROI is generally?
10     A.   Well, I understand what ROI
11 generally is in the noneducation field.
12 It's the ability to determine what the
13 return on investment is for a given
14 initiative.
15     Q.   Did Endo ever conduct any
16 return on investment with respect to
17 of its opioid -- any of the
18 opioid-related independent education it
19 supported?
20     A.   No.  It would be
21 inappropriate to do so.
22        And, you know, return on --
23 ROI is not the same as discussing a
24 return on education, in terms of, you

Page 541

1  know, were you able to have clinicians be
2  attracted to the program and participate
3  because it's good, quality education,
4  it's CE accredited, it's, you know,
5  addressing educational gaps and needs
6  that they have.
7      Q.   Do you recall, Ms.
8  Kitlinski, discussing with plaintiffs
9  their characterization of the amount of
10 money that Endo had paid to these
11 third-party organizations?
12     A.   Yes.
13     Q.   Do you recall plaintiffs
14 asking you whether Endo had paid millions
15 of dollars to certain organizations?
16     A.   Yes.
17     Q.   Did -- did those
18 organizations retain that money?
19     A.   No.  And as I tried to point
20 out on a few occasions, the educational
21 grant that is provided by Endo to any
22 professional society, CE provider, or
23 other third-party organization, is to
24 cover the entire execution of that

Highly Confidential - Subject to Further Confidentiality Review

Page 542

1 educational activity.
2          So that would include things
3 like any associated pass-through
4 expenses, which is -- the majority of an
5 educational grant would be, for example,
6 for -- if it was at a conference, for the
7 audio/visual materials and the setup and
8 the equipment and the personnel; for
9 the -- if there was a food function
10 associated, you know, with the activity,
11 the pass-through expenses for that.
12          The faculty honoraria, the
13 faculty travel expenses, the faculty --
14 you know, if there were -- well, not
15 if -- the development costs for taking
16 the material that the faculty provides
17 and putting it into an appropriate
18 format, a formatted presentation, for
19 example. Developing the enduring
20 materials, printing or posting to the
21 website.
22          So all of those pass-through
23 expenses are netted -- are not part of
24 the actual grant that is retained by the

Page 543

1 recipient. They would be retaining the
2 portion that -- of a -- whatever their
3 services were involved with time or the
4 fee for the activity. But --
5          MS. AMINOLROAYA:
6 Objection -- sorry.
7          THE WITNESS: Sorry.
8          MS. AMINOLROAYA: Objection
9 to form. Foundation.
10          MR. DAVIS: Is that an
11 objection to the question?
12          MS. AMINOLROAYA: It was an
13 objection to the question, yes.
14          MR. DAVIS: A little late.
15          MS. AMINOLROAYA: It's on
16 the record.
17 BY MR. DAVIS:
18          Q.   Ms. Kitlinski, do you recall
19 Exhibit-44?
20          A.   Yes.
21          Q.   Had you ever seen Exhibit-44
22 before today?
23          A.   No. It was developed while
24 we were here today. I hadn't seen the

Page 544

1 template either, but I'm just saying
2 the --
3          Q.   Does Exhibit-44 contain
4 handwriting?
5          A.   Yes. Printing.
6          Q.   Is any of this handwriting
7 on Exhibit-44 yours?
8          A.   No.
9          Q.   Is any of this handwriting a
10 direct quote of your testimony here
11 today?
12          A.   No.
13          Q.   How about Exhibit-21, do you
14 recall Exhibit-21?
15          A.   Could you scoot that over a
16 little closer? Thanks.
17          Yes, I recall that.
18          Q.   Had you ever seen Exhibit-21
19 before today?
20          A.   No.
21          Q.   Does Exhibit-21 contain
22 handwriting today -- on it? I'm sorry.
23          A.   Yes.
24          Q.   Is that your handwriting?

Page 545

1          A.   No.
2          Q.   Whose handwriting appears on
3 Exhibit-21?
4          A.   It's plaintiffs' counsel.
5          Q.   And how about Exhibit-44,
6 whose handwriting is on Exhibit-44?
7          A.   Once again, plaintiffs'
8 counsel.
9          Q.   And is Exhibit-21, does that
10 handwriting contain a direct quote from
11 your testimony today?
12          A.   No. I was asked what I saw
13 on certain reports, and I pointed out the
14 limitations of what I could attest to of
15 my own knowledge and what was there.
16          Q.   Okay.
17          MR. DAVIS: For the record,
18 we object to the introduction of
19 these exhibits -- these documents
20 as exhibits. They were created
21 today. They contain
22 mischaracterizations of Ms.
23 Kitlinski's testimony and
24 constitute inappropriate and

Page 546

1  improper demonstratives.
2      MS. AMINOLROAYA:  It's
3  several hours later.
4      MR. DAVIS:  One second.
5  Thank you, Ms. Kitlinski.
6      THE WITNESS:  Thank you.
7      VIDEO TECHNICIAN:  Going off
8  the record.  The time is 8:33 p.m.
9          - - -
10     (Whereupon, a brief recess
11  was taken.)
12         - - -
13     VIDEO TECHNICIAN:  We're
14  back on the record at 8:57 p.m.
15         - - -
16     EXAMINATION
17         - - -
18  BY MS. AMINOLROAYA:
19     Q.   Ms. Kitlinski, do you recall
20  a discussion you had with your counsel
21  regarding why Endo supported independent
22  education?
23     A.   Yes.
24     Q.   Can you please look at

Page 547

1  Exhibit-3?
2      And this is CD&E's 2000
3  plan.  Page 3, it's called The Critical
4  Connection -- or is entitled, The
5  Critical Connection for Success in 2000
6  and Beyond.
7      Do you see that on Page 3?
8      A.   Yes.
9      Q.   And let's look at Page 4.  I
10  overlooked this imagery before.
11      And what's depicted here is
12  someone is planting seeds, correct?
13      MR. DAVIS:  Objection to
14  form.
15      THE WITNESS:  Yes, it is
16  a -- it's a depiction of someone
17  sowing -- hoeing a row and
18  planting seeds and watering it.
19  BY MS. AMINOLROAYA:
20      Q.   All right.  And watering,
21  and then what do we have in the last
22  imagery here, the last image?
23      A.   Plants.
24      Q.   Plants, right.

Page 548

1      So this was CD&E's plan, in
2  2000, to sow the field, plant seeds and
3  then water, and then have growth as a
4  result of that, right?
5      MR. DAVIS:  Objection to
6  form.
7      THE WITNESS:  The
8  characterization of the images is
9  not consistent.  So, for example,
10  one of the responsibilities of the
11  clinical liaison team is to go out
12  into the field, so this is the
13  field, you know, that's the
14  context there, and to identify,
15  you know, what the processes are
16  that are in place to identify any
17  issues, which is, you know, sort
18  of the picking up the stones
19  there, if you will, in the second
20  part of the graphic, to be able to
21  identify, shall we say, issues or
22  concerns, like, for example, in
23  the opioid field about the things
24  we've been discussing all day

Page 549

1  about public health issues,
2  patient safety issues.
3      And then to -- in terms of
4  the watering, if you will, to be
5  able to identify what resources
6  are needed to address those issues
7  once the stones have been picked
8  out of the field.  And to provide
9  care, show that the company is a
10  caring company in that therapeutic
11  area.
12      And at the end of the day,
13  you should have a successful, new
14  therapeutic area that you're
15  involved with.
16  BY MS. AMINOLROAYA:
17      Q.   Do you see stones, Ms.
18  Kitlinski?  I don't see any stones, and
19  we don't have to spend time on this.
20      A.   The second -- the second
21  image.  But that's fine.
22      Q.   It looks like someone is
23  dropping something on the ground.
24      But what you described is

Page 550

1  not what we see on Page 5, right? What
2  we see on Page 5 is, on the left-hand
3  side, we see relationships, peer
4  influence and information.
5        So relationships, you
6  described some relationships that you
7  developed today with therapeutic experts
8  or key opinion leaders.
9        Peer influence, is that how
10 peer influence occurs? When experts in
11 the field speak to other doctors at
12 continuing medical education programs?
13       MR. DAVIS:  Objection to
14   form.
15       THE WITNESS:  It's when
16   peer-to-peer exchange, scientific
17   exchange, goes on, and what one
18   therapeutic expert is aware of is
19   conveyed to his colleagues.
20 BY MS. AMINOLROAYA:
21   Q.   And information, right?
22 Information about opioids?
23   A.   Information about --
24       MR. DAVIS:  Objection to

Page 551

1    form.
2        THE WITNESS:  Information
3    about the therapeutic area,
4    information about the risks,
5    information about the appropriate
6    assessment tools.
7        As we said, that whole gamut
8    of information is appropriate.
9  BY MS. AMINOLROAYA:
10   Q.   Right.  And the output of
11 that, at least based on what I see on
12 Page 5, is one, Competitive advantage for
13 Endo.
14       Did I read that correctly?
15   A.   Yes.
16   Q.   And two is, Expanded use of
17 current and future products.
18       Did I read that correctly?
19   A.   Yes.
20       And I think I've made no --
21 I've been very transparent about the fact
22 that I think Endo is a company that has a
23 competitive edge, advantage, in how they
24 approach their -- their business, as

Page 552

1  opposed to some other companies.
2        So it's not surprising that
3  we would want to continue that, in having
4  a competitive advantage in the pain
5  management area.
6        MS. AMINOLROAYA:  Move to
7    strike after the word "yes."
8  BY MS. AMINOLROAYA:
9    Q.   And on Page 8, we see
10 intense -- key issues for Endo in 2000
11 was intense competition for key advocates
12 and influentials, right?
13       So these were the
14 individuals who delivered your pain
15 education, correct?
16       MR. DAVIS:  Objection to
17   form.
18 BY MS. AMINOLROAYA:
19   Q.   The second bullet there
20 states, If we don't utilize, Purdue,
21 Parke-Davis, Abbott, Janssen will.
22       Did I read that correctly?
23   A.   Yes.
24       But if you see in that

Page 553

1  bullet point there, where it says,
2  Visiting faculty.  Visiting faculty is
3  the promotional speakers bureau, that's
4  not independent education faculty.
5  Publications, again, that's not
6  independent education.  Phase IV is
7  always a necessity, product specific.
8  And advisory boards, again, do not fall
9  under the purview of independent
10 education.
11       So when we're talking about
12 advocates, that's the context of that,
13 and influentials, as opposed to
14 therapeutic experts.  So just to clarify
15 that.
16   Q.   And if Endo could gain --
17 could win over these -- these therapeutic
18 experts and key opinion leaders, it would
19 give it the competitive advantage, right,
20 that you discussed here on Page 5 of this
21 presentation, and also provide expanded
22 use of current and future products,
23 correct?
24       MR. DAVIS:  Objection to

Page 554

1  form.
2      THE WITNESS:  Certainly, if
3  we had the -- if we had
4  therapeutic experts who were
5  knowledgeable about our data, who
6  were knowledgeable about our --
7  the Phase IV studies and the
8  additional research that we were
9  planning, that would give us a
10  competitive advantage.
11      Having them participate on
12  advisory boards and provide
13  unfiltered feedback to us so that
14  we, as a company, could adjust or
15  make any modifications to our plan
16  that they suggested, that would
17  definitely be a competitive
18  advantage, yes.
19  BY MS. AMINOLROAYA:
20      Q.  And on Page 13, CD&E
21  strategy, part of this sowing, planting
22  and watering strategy, was, Leverage
23  strategic alliances and relationships to
24  expand utilization of current product

Page 555

1  line.
2      Did I read that correctly?
3      MR. DAVIS:  Objection to
4  form.
5      THE WITNESS:  Yes, that's
6  what the slide says.
7      Just to correct you, though,
8  it was hoeing, not sowing.  But
9  that's okay.
10  BY MS. AMINOLROAYA:
11      Q.  Thank you.
12      A.  You're welcome.
13      And, again, I don't want to
14  keep reiterating this, but just to keep
15  in mind the time frame here of 2000, you
16  know, early in the company's development,
17  not consistent with what the current
18  division of responsibilities would be.
19      Q.  And on Page 13, another
20  strategy that CD&E listed here was -- the
21  last bullet under leveraging strategic
22  alliances is, Support and develop
23  initiatives that combat opiophobia.
24      And that was important, Ms.

Page 556

1  Kitlinski, because initiatives that
2  combat opiophobia would allow doctors to
3  write more prescriptions, correct?
4      MR. DAVIS:  Objection to
5  form.
6      THE WITNESS:  No.  As we --
7  we had this discussion earlier
8  when you asked that same question.
9      As I mentioned, opiophobia
10  is not the healthy respect and
11  fear of the potential -- the
12  potential abuse, misuse,
13  addiction, overdose aspects that
14  are associated with opioids.
15      It's the unwillingness to
16  consider that as a -- an
17  therapeutic option for patients.
18  And also that if they don't
19  utilize the medications
20  appropriately, you could actually
21  have the exact opposite effect of
22  what you were just referring to a
23  moment ago.
24  BY MS. AMINOLROAYA:

Page 557

1      Q.  Well, the jury can conclude
2  what opiophobia means.
3      But in 2001 --
4      A.  Sure.
5      Q.  -- you would agree that
6  doctors had a fear of opioids in the wake
7  of what was going on with Purdue and
8  OxyContin?
9      MR. DAVIS:  Objection to
10  form.
11      THE WITNESS:  Again, I will
12  just state that my recollection of
13  timing is, you know, not -- not
14  firm, because I don't have
15  documents to refer back to.  I do
16  know that in the early 2000s there
17  were issues of opioid abuse and
18  misuse.
19      But I think it was not fair
20  to characterize it as opiophobia,
21  so much as the people utilizing
22  these drugs in ways that were not
23  appropriate and were not intended
24  in the labeling and approved by

Page 558

1 the FDA.
2 BY MS. AMINOLROAYA:
3    Q.   And so you don't recall when
4 Purdue's problems with OxyContin first
5 surfaced in the news?
6         MR. DAVIS:  Objection to
7 form.
8         THE WITNESS:  As I -- as I
9 stated, I recall that it was in
10 the early 2000s.  Without a frame
11 of reference to look back at, I
12 don't, I'm sorry.
13 BY MS. AMINOLROAYA:
14    Q.   You had a very good memory
15 during Mr. Davis's examination.  I will
16 note that.
17    A.   Mr. Davis was examining me
18 about the aspects of my job relating to
19 educational specifics that I had written,
20 the elements for that RiskMAP.  So I have
21 a very clear recollection of that, as I
22 did for when you were asking me about
23 education-related things as well.
24    Q.   And yet another tactic on

Page 559

1 Page 16 of the document is to establish
2 pain management as a priority with PCPs.
3         And this was another tactic
4 towards the goal of gaining -- that CD&E
5 had in the year 2000 of sowing,
6 watering -- or, excuse me, hoeing,
7 planting seeds and watering in order to
8 obtain growth in the opioids market,
9 correct?
10         MR. DAVIS:  Objection to
11 form.
12         THE WITNESS:  No.  This was
13 referring to the fact that primary
14 care physicians -- that the data
15 was suggesting that primary care
16 physicians were responsible for
17 managing the great majority of
18 patients with pain, especially as
19 the healthcare system evolved and
20 visits to specialists became more
21 costly and less accessible for
22 patients.
23         So it was recognizing that
24 internal medicine specialists,

Page 560

1 family physicians, and other
2 primary care folks were critical
3 to the appropriate pain management
4 and that they did not have
5 education on that, short of one
6 hour during their -- during their
7 training programs.
8 BY MS. AMINOLROAYA:
9    Q.   And if we look at Exhibit-2,
10 the CD&E objectives that we just
11 discussed for clinical development and
12 education objectives at Endo, had the
13 objective of expanding use of current and
14 future products.
15         And that's not the only time
16 we saw that, Ms. Kitlinski.  We also saw
17 that goal in Exhibit-2, for example.
18 Number 3 in your 1999 objectives stated,
19 Maximize corporate return on current
20 product lines and seek support for new
21 product initiatives, correct?
22         MR. DAVIS:  Objection to
23 form.
24         THE WITNESS:  Correct.  And

Page 561

1 as we discussed, again, at this
2 time, in this early stage of the
3 company's development, the focus
4 was not on independent education,
5 it was on -- as a company,
6 everyone had -- your colleague
7 commented on the EBITDA term,
8 which is certainly not one that I
9 would have grasped myself.
10         So there were certain
11 initiatives that the entire
12 company had to embrace as a new
13 startup company.
14         And, again, the education
15 that we're talking about here
16 focused on educational
17 initiatives, working with the
18 professional organizations.  And
19 the patient organizations were
20 not -- were not separate and apart
21 from the responsibilities at that
22 time.
23 BY MS. AMINOLROAYA:
24    Q.   And this --

Page 562

1    A.   So I believe -- may I just
2  ask -- never mind.  It's probably not
3  appropriate.  I can't ask a question, I'm
4  sorry.
5    Q.   I'm sorry, it's not.
6    A.   Okay.
7    Q.   And if we turn to
8  Exhibit-5 -- are you familiar with the
9  IMS data, Ms. Kitlinski?
10     MR. DAVIS:  How about you
11  wait until she has the document?
12     THE WITNESS:  I know what
13  IMS data is.  I don't know,
14  like -- I don't see it.
15     I understand that that's
16  how, for example, the FDA
17  determined how many
18  extended-release, ER --
19  extended-release and long-acting
20  opioids were being prescribed at
21  the time that they put the REMS in
22  place and how many -- how many
23  prescribers, I should say, not
24  opioids, and that's how they

Page 563

1  determined their goals for what
2  the REMS education should
3  encompass.
4     So I'm familiar with what
5  IMS data is.
6  BY MS. AMINOLROAYA:
7    Q.   Thank you.
8     So turning to Page --
9  Exhibit-5, and we looked at this earlier,
10  regarding Percocet.
11     You had involvement with
12  Percocet, correct?
13     MR. DAVIS:  Objection to
14  form.
15  BY MS. AMINOLROAYA:
16    Q.   And your 1999 objectives
17  included working with the sales and
18  marketing team to successfully launch
19  Percocet, correct?
20     MR. DAVIS:  Objection to
21  form.
22     THE WITNESS:  Excuse me one
23  second until I take a look at this
24  again.  1999.

Page 564

1     Yes, the same -- again, once
2  again, what we just spoke to, in a
3  young company like that, everyone
4  was all hands on board bringing
5  their -- their aspects to the
6  table of what they can contribute
7  to the launch.
8  BY MS. AMINOLROAYA:
9    Q.   All right.  And let's turn
10  to Page 14 of Exhibit-5.
11     And Page 14 here, it
12  states --
13    A.   Yes, I have it.  I was just
14  looking back to see whose presentation
15  this was.  Okay.  I got it.
16    Q.   We looked at this earlier.
17  This was, Endo Commercial Capabilities
18  Overview by Jeremy Goldberg.  We
19  identified that the metadata for this
20  document placed this document as a 2005
21  document.
22    A.   Yes.  And this particular
23  slide, though, that you're talking about,
24  14, was not Jeremy Goldberg's.  He was in

Page 565

1  the corporate development.
2     But it was, rather, Mark
3  Gossett, who was the senior vice
4  president of the commercial business.
5    Q.   Okay.  Thank you.
6    A.   Sure.
7    Q.   And Page 14, Endo describes
8  itself as, The company that Percocet
9  built.
10     Did I read that correctly?
11    A.   That's what Mark Gossett
12  described it as in this slide.
13    Q.   Do you have reason to
14  dispute that?
15     MR. DAVIS:  Objection to
16  form.
17     THE WITNESS:  I personally
18  think that Endo is a pain
19  management company that was
20  started by Carol Ammon and her
21  colleagues.
22     But, again, he's a marketing
23  guy, and that's what he's focused
24  on.

Page 566

```
1   BY MS. AMINOLROAYA:
2      Q.   And does the second bullet
3   under Percocet state, Endo grew from $40
4   million to $214 million by 2003?
5      A.   That is what Mr. Gossett
6   says on his slide, yes.
7      Q.   And so the CD&E strategy to
8   grow sales and grow the market for
9   Percocet, it worked, Ms. Kitlinski,
10  correct?
11         MR. DAVIS:  Objection to
12     form.
13         THE WITNESS:  The company's
14     strategy to launch new forms of
15     Percocet that were more
16     available -- I'm sorry, more
17     appropriate, including, as we had
18     talked earlier about Percolone,
19     which was -- did not have the
20     acetaminophen component of that,
21     that contributed towards this.
22         What the CD&E contribution
23     was, I don't know how you would --
24     how you would gauge that.
```

Page 567

```
1   BY MS. AMINOLROAYA:
2      Q.   But the CD&E, as a member,
3   you were the director of CD&E, and this
4   was your strategy in 1999, right?
5         This was your objective, to
6   grow the market for Percocet?
7         MR. DAVIS:  Objection to
8      form.
9   BY MS. AMINOLROAYA:
10     Q.   And six years later, we see
11  that Percocet sales quintupled, from $40
12  million to $214 million -- I'm sorry, not
13  even six years later.
14        Four years later Percocet
15  sales quintupled from $40 million to $214
16  million and Percocet becomes the gold
17  standard in pain management.
18        Approximately 77 percent of
19  prescriptions for Oxycodone with
20  acetaminophen are written as Percocet; is
21  that correct?
22        MR. DAVIS:  Objection to
23     form.
24        THE WITNESS:  I don't know
```

Page 568

```
1      if that's correct or not.  That's
2      Mr. Gossett's representation of
3      the data.
4   BY MS. AMINOLROAYA:
5      Q.   If this data is, in fact,
6   correct, this would mean that the --
7   withdrawn.  Let's move on.
8         Earlier you testified -- do
9   you recall offering testimony about
10  ACCME?
11     A.   ACCME?
12     Q.   Yes.
13     A.   Yes.
14     Q.   And you said that anyone --
15  or separate from your testimony from
16  ACCME, but you said anyone can lodge a
17  complaint to a CME-accrediting
18  organization.
19        Do you recall that
20  testimony?
21        MR. DAVIS:  Objection to
22     form.
23        THE WITNESS:  Yes.
24  BY MS. AMINOLROAYA:
```

Page 569

```
1      Q.   And did Endo ever lodge such
2   a complaint?
3         MR. DAVIS:  Objection to
4      form.
5         THE WITNESS:  No.  You did
6      ask me that question and I -- as
7      did your previous -- your
8      colleague, and I indicated that I
9      was not aware of that.
10  BY MS. AMINOLROAYA:
11     Q.   Let's go to Exhibit-43.
12        Do you recall Mr. Davis
13  asking you some questions about
14  responsible opioid prescribing?
15        MR. DAVIS:  Let's wait until
16     she has it in front of her,
17     please.
18  BY MS. AMINOLROAYA:
19     Q.   My question doesn't have to
20  do with the document yet.
21        Do you recall the line of
22  questioning?
23     A.   The Federation of the State
24  Medical Board, Fishman book, is that what
```

Page 570

1 you're referring to?
2     Q.    Yes.
3     A.    Yes.
4     Q.    And I believe the concern in
5 this line of questioning was that not
6 enough pages from the book were covered.
7         And you may or may not know,
8 Mrs. Kitlinski, we have limited time and
9 we have to move along.  We only have
10 seven hours.
11         There's certainly more
12 content in here that we could cover with
13 you.  And we can look at one more example
14 to address your concern.  It's here on
15 Page 36 of the document.
16     A.    36 up --
17     Q.    Yes.  423.36.
18     A.    -- the actual -- okay.
19     Q.    And I'm only going to read
20 the first sentence, for time and for all
21 of our sakes.
22     A.    Sure.
23     Q.    It says, Beware the
24 distinction between pseudoaddiction and

Page 571

1 addiction.
2     A.    Yes.  We brought that up in
3 the past discussion.
4     Q.    We actually covered more
5 than one page --
6     A.    Yes.  And that's why I said
7 I wasn't sure how many pages, but --
8     Q.    Okay.  You said we had not
9 covered a lot of it, so I wanted to make
10 sure we give it some more attention.
11     A.    Absolutely.
12         And my concern was not so
13 much the number of pages, but just an
14 isolation -- you know, the focus on a
15 bullet point such as this as opposed to
16 the general gestalt of the book, which
17 was that addiction and abuse and misuse
18 and overdose are serious societal issues
19 that need to be addressed.
20     Q.    Another complaint that was
21 discussed during the examination was that
22 we didn't look at particular pages in the
23 2002 Guideline for the Management of Pain
24 and Osteoarthritis, Rheumatoid Arthritis,

Page 572

1 second edition by the APS.
2         And this was Exhibit -- 12?
3 That doesn't sound right.
4         MR. DAVIS:  42.
5 BY MS. AMINOLROAYA:
6     Q.    42.
7         So let's look at some of
8 these pages.
9     A.    Sure.
10     Q.    Page 95.  And under,
11 Addiction, physical dependence and
12 tolerance, if you look at the third
13 paragraph under that subheading, it
14 states, The prevalence of addiction among
15 patients who do not have a previously
16 existing substance abuse disorder is low.
17         Did I read that correctly?
18     A.    Yes, you did.
19     Q.    All right.  And following
20 that it says, Weissman and Haddox, 1989,
21 noted that patients who are given doses
22 of opioids that are inadequate to relieve
23 their pain or whose opioid dose is
24 discontinued abruptly or tapered too

Page 573

1 rapidly may develop characteristics that
2 resemble addiction, which they termed
3 iatrogenic pseudoaddiction.
4         And the last sentence there
5 states, Requests for these specific
6 medications and doses should not be
7 interpreted as necessarily indicating
8 drug-seeking behavior.
9         Did I read that correctly?
10     A.    Yes.  It was just the
11 intervening section -- sentence there
12 that put it into context that, Because
13 patients are often knowledgeable about
14 their medications and doses that have
15 worked in the past, requests for these
16 medications and doses should not be
17 interpreted as -- necessarily as
18 drug-seeking behavior.
19     Q.    Right.  And this paragraph
20 frames this in terms of pseudoaddiction,
21 correct?
22     A.    Yes.
23     Q.    And it relies on the
24 Weissman and Haddox article from 1989,

Page 574

1  correct?
2      A.   Correct.
3          MR. DAVIS:  Objection to
4  form.
5  BY MS. AMINOLROAYA:
6      Q.   And if we go to Page 97 of
7  the document, we see here, in the
8  beginning of the third full paragraph --
9  or we can go to the top paragraph here.
10         It says, Furthermore,
11 decades of clinical experience and
12 studies conducted in patients with
13 chronic malignant pain due to a variety
14 of causes have demonstrated clearly the
15 usefulness of opioids in the management
16 of a variety of chronic nonmalignant pain
17 types.
18         Did I read that correctly?
19     A.   Yes.
20     Q.   And we read earlier the
21 evidence study stating that opioids have
22 not been studied for longer than --
23 long-term efficacy studies have not been
24 conducted for opioids, correct?

Page 575

1          MR. DAVIS:  Objection to
2  form.
3          THE WITNESS:  Are you
4  referring to here, where it says,
5  There is some evidence of a
6  positive risk-to-benefit ratio in
7  the use of certain opioids for
8  people with moderate to severe
9  pain?
10 BY MS. AMINOLROAYA:
11     Q.   No.  I'm referring to the
12 sentence I just read.
13         Were you with me?
14     A.   No, I'm sorry.  I was not.
15     Q.   Let's look back up at the
16 top.
17     A.   I read the -- I did follow
18 you there at the top, and I said yes.
19         But then I thought you asked
20 me about something else.
21     Q.   Yes.  So I said earlier we
22 looked at an evidence study that was
23 prepared by a governmental agency -- and
24 I'm forgetting the acronym right now.

Page 576

1      A.   AHRQ.
2      Q.   AHRQ, thank you.
3          And based on the evidence
4  study that was prepared for that agency,
5  the document stated that long-term
6  studies have not been conducted on the
7  efficacy of opioids, correct?
8          MR. DAVIS:  Objection to
9  form.
10         THE WITNESS:  That was
11 the -- again, it was a very
12 lengthy document, and we just
13 looked at a few select items.  And
14 I'm not saying we should have
15 looked at the whole thing.
16         But I did not read that full
17 document, and so my comments on
18 that were just what I said, that
19 because of the requirements that
20 the FDA puts forth for chronic
21 opioids to be approved, that's
22 what had been studied and that my
23 colleagues in clinical
24 development, for example, could

Page 577

1  speak more appropriately to the
2  current -- the current studies
3  that are being conducted to
4  address that question.
5          Because, indeed, it has been
6  raised that there is not only
7  insufficient long-term evidence
8  with regards to the benefits, but
9  also the risks.  And so both of
10 those are being pursued as we
11 speak.
12 BY MS. AMINOLROAYA:
13     Q.   And does FDA prevent a
14 company like Endo from conducting a study
15 on the long-term safety and efficacy of
16 opioids?
17         MR. DAVIS:  Objection to
18 form.
19         THE WITNESS:  No.
20 BY MS. AMINOLROAYA:
21     Q.   Do any FDA regulations
22 prevent Endo from conducting such a
23 study?
24         MR. DAVIS:  Objection to

Page 578

```
1   form.
2         THE WITNESS:  I'm not the
3   expert on regulatory issues or
4   clinical development issues.  So I
5   would suggest that you would raise
6   that question with my colleagues.
7   BY MS. AMINOLROAYA:
8       Q.   But you mentioned the FDA,
9   Ms. Kitlinski --
10      A.   Yes.
11      Q.   -- correct?
12           You said that the studies
13  were limited because of FDA, right?
14      A.   No.  I said the studies were
15  limited because that is the requirements
16  that the FDA has to obtain approval of a
17  new chronic --
18      Q.   I think we're saying the
19  same thing.
20      A.   Okay.  We are on the same
21  page.
22      Q.    So there are certain studies
23  that a company may conduct to obtain FDA
24  approval.
```

Page 579

```
1         Does anything prevent a
2   company from conducting further studies?
3       A.   No.
4         MR. DAVIS:  Objection to
5   form.
6         THE WITNESS:  As is what
7   Endo is doing.
8   BY MS. AMINOLROAYA:
9       Q.   And Endo had not
10  conducted -- has not conducted those
11  studies in the past, correct?
12        MR. DAVIS:  Objection to
13  form.
14        THE WITNESS:  They have
15  conducted longer studies, but
16  these are long -- you know, longer
17  yet than the originals.
18          And, again, I'm not the
19  expert on what length of studies
20  we have conducted at Endo.  So
21  when you folks speak to the
22  clinical development -- I'm sorry,
23  to the R&D people, they would be
24  able to apprise you of that.
```

Page 580

```
1   BY MS. AMINOLROAYA:
2       Q.   And here on Page 97, going
3   down to the third paragraph, it states,
4   Evidence supports the use of Oxycodone
5   for moderate to severe pain that has not
6   responded to other treatments.
7         Is that correct?
8         MR. DAVIS:  Objection to
9   form.
10        THE WITNESS:  Yes.  And
11  that's the case for, again,
12  positioning opioid, not -- opioids
13  not as a first-line agent, as I
14  said when we spoke about this.
15  BY MS. AMINOLROAYA:
16      Q.   And Endo sold generic
17  Oxycodone, correct?
18      A.   Endo had a -- several
19  generic opioids and Oxycodone, I believe,
20  certainly, at one point in time we did.
21  I don't know if we still do.
22      Q.   And generic -- and Endo sold
23  generic OxyContin after the publishing of
24  these guidelines in 2002, correct?
```

Page 581

```
1         MR. DAVIS:  Objection to
2   form.
3         THE WITNESS:  I don't know
4   the answer to that question.
5   BY MS. AMINOLROAYA:
6       Q.   Okay.
7       A.   Because OxyContin was a
8   different formulation than -- this is
9   just saying generic Oxycodone, which is
10  the active ingredient, for example, in
11  Percocet.  It's not an extended-release
12  formulation of that.
13      Q.   Right.  And you discussed
14  some of your significant responsibilities
15  with the RiskMAP.
16          Do you recall there being a
17  RiskMAP for generic OxyContin during the
18  time period that Endo sold it?
19        MR. DAVIS:  Object to form.
20        THE WITNESS:  Again, I don't
21  recall there being a discussion,
22  because I don't recall that I was
23  there when Endo sold it, if,
24  indeed, they did.  So I don't
```

Page 582

1 know.
2 BY MS. AMINOLROAYA:
3    Q.   So you recall the RiskMAP
4 for Opana ER, but you don't recall the
5 RiskMAP for generic OxyContin?
6    A.   The RiskMAP for --
7       MR. DAVIS:  Object to form.
8       THE WITNESS:  The RiskMAP
9    for generic -- I'm sorry, for
10    Opana ER was negotiated and put in
11    place with the FDA while I was
12    responsible for that.  So, yes, I
13    definitely recall that.  I was
14    involved in it.
15 BY MS. AMINOLROAYA:
16    Q.   You don't recall a RiskMAP
17 for generic Oxycodone or generic
18 OxyContin?
19       MR. DAVIS:  Objection to
20    form.
21       THE WITNESS:  As I said, I
22    don't even recall if we sold that
23    drug.
24 BY MS. AMINOLROAYA:

Page 583

1    Q.   Convenient.
2    A.   No.  Just the fact that the
3 generic formulations change, literally,
4 from month to month and year to year, and
5 that was quite a number of years ago.
6    Q.   And another -- let's turn
7 back to Exhibit-40.
8       Another complaint that was
9 lodged about our review of the APS
10 residents course was also that we didn't
11 cover enough pages here.
12       Turning to Page 34 of the
13 document, the second slide on this page
14 mentions, Screener and opioid assessment
15 for patients in pain, or SOAPP.
16       You're familiar with SOAPP,
17 Ms. Kitlinski?
18    A.   Yes.
19    Q.   And this relates to opioids,
20 right?
21       So this addresses your
22 concern that we weren't addressing slides
23 that had to do with opioids.
24       And, here, SOAPP is included

Page 584

1 in one of these slides.  It's a
2 self-administered form -- excuse me, it's
3 a fourteen-item self-administered form
4 capturing the primary determinants of
5 aberrant drug-related behavior.
6       Did I read that correctly?
7    A.   I'm sorry, I was assisting
8 to locate an item.
9       A fourteen-item
10 self-administered form capturing the
11 primary determinants of aberrant
12 drug-related behavior, yes.
13    Q.   And this was something that
14 was -- that Endo suggested to doctors
15 could be used to manage the risks of
16 addiction, correct?
17       MR. DAVIS:  Objection to
18    form.
19       THE WITNESS:  The SOAPP tool
20    was the -- if you recall earlier,
21    we talked about psychometrically
22    validated tools that were
23    supported by funding from NIDA or
24    from NIH, and that Endo also

Page 585

1 provided some educational grant
2 support towards.
3       So this was a tool that was
4 developed -- and I don't recall if
5 it was NIDA or NIH, but it was
6 funding from them.  And then Endo
7 provided educational -- additional
8 educational grants so that the
9 beta -- the beta version of it,
10 once they received the feedback
11 from clinicians as to what would
12 work in their practice on a
13 day-to-day basis, they were able
14 to modify that so it could be
15 practical and inserted into their
16 patient care.
17 BY MS. AMINOLROAYA:
18    Q.   And I think my question was,
19 SOAPP was something that Endo suggested
20 to doctors could be used to manage the
21 risks of addiction; is that right?
22       MR. DAVIS:  Objection to
23    form.
24       THE WITNESS:  SOAPP was part

Page 586

1  of the independent educational
2  activities.  And so this is --
3  this is not Endo suggesting SOAPP,
4  this is the APS residents course.
5       It's not that Endo did not,
6  you know, speak to the value of
7  SOAPP.  I didn't mean to imply
8  that.  But I just want to be clear
9  that this was the faculty for the
10  program.
11      And we did, indeed -- and we
12  did, indeed, recognize the value
13  of SOAPP, because the FDA, NIH and
14  NIDA had acknowledged its
15  importance by virtue of the fact
16  that they supported ongoing
17  research with it and utilized it
18  as one of the tools that they --
19  when they were conducting their
20  evaluations.
21  BY MS. AMINOLROAYA:
22      Q.   When did FDA support
23  research of SOAPP?
24      A.   FDA did not.  NIDA or NIH

Page 587

1  did, yes.
2       Q.   And SOAPP was part of the
3  RiskMAP for Opana ER, correct?
4       A.   Yes.
5       Q.   However, when the evidence
6  report was prepared for AHRQ -- if you
7  turn to Exhibit-24.
8       A.   I'm sorry, I missed what
9  page you said.
10      Q.   So let's go to Page 90 of
11  the document.
12      I can assure you there's
13  more discussion of SOAPP in here.  I'm
14  going to point you to one to move us
15  along.
16      A.   Sure.
17      Q.   So here on Page 90, the key
18  question in 4B is, In patients with
19  chronic pain, what is the effectiveness
20  of use of risk prediction instruments on
21  outcomes related to overdose, addiction,
22  abuse or misuse?
23      Did I read that correctly?
24      A.   Yes.

Page 588

1       Q.   And the key point is, No
2  study evaluated the effectiveness of risk
3  prediction instruments for reducing
4  outcomes related to overdose, addiction,
5  abuse or misuse.  SOE:  Insufficient.
6       Did I read that correctly?
7       A.   Yes.
8       And I just wanted to see
9  what this citation here, 113 and 14 is
10  that they're citing, because it seems at
11  odds with the fact that they're saying
12  there was no study, and yet they have a
13  citation.
14      So just give me one moment
15  to look what they --
16      Q.   Well, we can look at --
17  let's look at Question 4A on Page 86.
18      A.   Okay.
19      Q.   Key Question 4A is, In
20  patients with chronic pain being
21  considered --
22      A.   Excuse me just one second
23  here.  I'm just trying to get to that
24  page.

Page 589

1       46, you said?
2       4A, okay.  I have it.
3  That's on Page 41.
4       Q.   In patients with chronic
5  pain being considered for long-term
6  opioid therapy, what is the accuracy of
7  instruments for predicting risk of opioid
8  overdose, addiction, abuse or misuse?
9       Did I read that correctly?
10      A.   Yes.
11      Q.   And the first point there
12  is, Three studies (one fair quality, two
13  poor quality) evaluated the opioid risk
14  tool, ORT, using a cutoff of more than or
15  equal to 4.  Estimates of diagnostic
16  accuracy were inconsistent, precluding
17  reliable conclusions.
18      Did I read that correctly?
19      A.   Yes.
20      Q.   And let's go to the next
21  bullet, because that one addresses SOAPP.
22      It says, Two studies
23  evaluated the screening and opioid
24  assessment for patients with pain (SOAPP)

Highly Confidential - Subject to Further Confidentiality Review

Page 590

1  Version 1 instrument.  In one fair
2  quality study, based on a cutoff score of
3  more than or equal to 8, sensitivity was
4  .68.
5         And we can go over all these
6  details.
7         But we see in the next
8  bullet, it states, One poor quality
9  study -- and it goes on to describe that.
10        The third bullet also
11 references one poor quality study.
12        And the last bullet there
13 references one poor quality study.
14        Is that correct?
15    A.   That's what it says, yes.
16        And I do want to point out
17 that, again, the bullet point above here
18 is talking about SOAPP, Version 1, which
19 we -- you know, which we referred to
20 briefly a moment ago, that that was the
21 first iteration that NIH and/or NIDA or
22 HHS supported, and that it was
23 subsequently revised.
24        So I don't know that the --

Page 591

1  I don't know that they have that included
2  in here.  This is certainly a recent
3  publication.
4     Q.   Yes.  This is 2014.
5         So if these tools of --
6  studies had not shown efficacy for these
7  studies in 2014 -- excuse me, for these
8  risk prediction instruments in 2014, had
9  they done that before then?
10        MR. DAVIS:  Objection to
11 form.
12        THE WITNESS:  And I think
13 the question here is, as it states
14 all throughout this section and
15 through the title of this
16 document, is the -- documenting
17 the risks of long-term opioid --
18 of documenting the risks and
19 effectiveness of long-term opioid
20 therapy.
21        And the SOAPP instrument
22 hasn't been used in any -- as any
23 of these others for that point,
24 you know, DIRE or ORT, have not

Page 592

1  been used in any long-term studies
2  because those long-term studies
3  are just beginning to go on, as we
4  talked about a short while ago.
5  BY MS. AMINOLROAYA:
6     Q.   And is there anything that
7  would have prevented a company like Endo
8  from conducting such a long-term study?
9         MR. DAVIS:  Objection to
10 form.
11        THE WITNESS:  I couldn't
12 speculate on that, because I'm not
13 an expert in clinical development.
14 I don't know the details about
15 patient recruitment for those
16 studies.
17 BY MS. AMINOLROAYA:
18    Q.   And earlier do you recall a
19 discussion with your counsel regarding
20 ROI, or return on investment?
21    A.   Yes.
22    Q.   And you testified that it
23 would be inappropriate to seek a return
24 on investment?

Page 593

1         MR. DAVIS:  Objection to
2  form.
3         THE WITNESS:  I testified
4  that it would be inappropriate to
5  conduct an ROI -- ROI on an
6  independent educational activity.
7         I did -- that is the -- that
8  is what I testified to.
9  BY MS. AMINOLROAYA:
10    Q.   Thank you.  I apologize.  It
11 was not a good question.
12    A.   That's okay.
13    Q.   I'm struggling at the end of
14 the day.
15    A.   We're all a little kind
16 of --
17    Q.   Right.
18        MS. AMINOLROAYA:  Let's have
19 1296, please.  Exhibit-51.  And
20 this is ENDO-OPIOID_MDL-02343835.
21 E1296.
22        - - -
23        (Whereupon, Endo-Kitlinski
24 Exhibit-51,

Page 594

1    ENDO-OPIOID_MDL-02343835, with
2    attachment, was marked for
3    identification.)
4         - - -
5         THE WITNESS:  Thank you.
6  BY MS. AMINOLROAYA:
7    Q.   Endo did conduct a return on
8  education study for its drug Lidoderm,
9  correct?
10   A.   No.  The NIPC, Professional
11 Postgraduate Services, conducted a return
12 on education study on topical analgesics.
13        Is this what you're talking
14 about, this Page 5?
15        MS. AMINOLROAYA:  Can we
16 have 1341, please?
17        This will cure an issue,
18 maybe, or cause some confusion.
19 We marked this earlier and did not
20 use it.  So this is Exhibit-16.
21 ENDO-OPIOID_MDL-06233891.  E1341.
22        - - -
23    (Whereupon, Endo-Kitlinski
24 Exhibit-16,

Page 595

1    ENDO-OPIOID_MDL-06233891-909, was
2    marked for identification.)
3         - - -
4  BY MS. AMINOLROAYA:
5    Q.   And this is a 2003
6  performance appraisal for your
7  colleague -- I'm sorry, this is not for
8  your colleague.  This is a performance
9  appraisal for you, Linda Kitlinski.
10        And if you turn to Page 7,
11 under Lidoderm, on the right-hand column,
12 it states, Expand clinical utilization
13 through advocacy development and
14 educational initiatives together with
15 CD&E team.
16        And that's your team, right,
17 Ms. Kitlinski?
18    A.   Yes.
19    Q.   It states, Contracted for
20 controlled return on education impact
21 study of the NIPC program.
22        Did I read that correctly?
23    A.   Yes.
24    Q.   Okay.  Data on 585

Page 596

1  physicians studied demonstrated
2  significant (116 percent) increase in new
3  prescriptions for the class of topical
4  analgesics in the test group physicians
5  versus control group physicians.
6         Did I read that correctly?
7    A.   Yes.
8    Q.   Does this refresh your
9  recollection on whether Endo conducted a
10 return on education study on the impact
11 of the NIPC?
12   A.   Again, it refreshes my
13 recollection that we did not.  This
14 refreshes my recollection that Endo --
15 again, as we talked earlier for
16 continuing education, there's always a
17 desire to -- for these accredited
18 providers to know what the -- whether the
19 education was effective at addressing the
20 gaps, the educational gaps and needs that
21 are identified prior to an educational
22 initiative being undertaken.
23        And what Endo did, because
24 this was a one-time -- this was a unique

Page 597

1  opportunity, because there was no -- I'm
2  sorry.  I'll wait until -- it was --
3  there were no topical analgesics that
4  were -- that were available prior to this
5  time.
6         And so this was an
7  opportunity to understand the uptake on
8  the, you know, discussion of topical
9  analgesics, how they differ from systemic
10 analgesics, how they differ from
11 transdermal analgesics, et cetera.
12        And we wanted to do it in an
13 appropriate way that would be ACCME
14 compliant.  So you can see that we
15 contracted for a controlled --
16 "controlled" meaning that there was a
17 control group that did not participate in
18 the NIPC, whatever this topic was,
19 topical analgesic program -- and they
20 were compared to the clinicians who did.
21        And the outcome was that
22 there was -- as reflected by their
23 prescribing of topical analgesics, which,
24 again, there were no -- there were no

Page 598

1 previous baseline information available
2 on that. This provided it. It was a
3 one-time commitment that we made that the
4 NIPC conducted.
5      It would not have been
6 appropriate in something like opioids,
7 where you would not have any way of
8 determining what the baseline was, you
9 would not be able to do a controlled
10 study, in that you would not be able to,
11 you know, execute that.
12      So this was the one time
13 where we conducted a return on -- where
14 we -- where we, meaning the Professional
15 Postgraduate Services folks, conducted a
16 return on education study.
17      Q.   Ms. Kitlinski, that's not
18 what this document states, though, right?
19      It states, Contracted for
20 controlled return on education impact
21 study of the NIPC program.
22      And you're including --
23      A.   Yes. That's what I just
24 said.

Page 599

1      Q.   -- this in your 2003
2 performance appraisal, correct?
3      A.   Yes.
4      Q.   And so Endo contracted for
5 this study, correct?
6      A.   Yes. But "contract" --
7      Q.   And the study --
8      A.   -- "contracted for" meant
9 provided an educational grant to the
10 independent provider to look at that
11 outcome as a metric.
12      That doesn't mean we
13 conducted it. And that doesn't mean that
14 we had input into it. We contracted with
15 them, the CE provider, to do that.
16      Q.   That wasn't my question,
17 whether you had input into it.
18      My question was whether the
19 study was conducted and whether it was at
20 your direction.
21      A.   Yes, it was --
22      MR. DAVIS: Objection to
23 form.
24      THE WITNESS: -- at our

Page 600

1 direction because we wanted to
2 obtain that baseline information
3 and identify whether the education
4 was being impactful.
5 BY MS. AMINOLROAYA:
6      Q.   All right. And the -- what
7 the study showed was that NIPC education
8 moved the needle on prescriptions, right?
9      MR. DAVIS: Objection to
10 form.
11      THE WITNESS: What it showed
12 was that clinicians who
13 previously -- again, this was not
14 the sole measure.
15      As we talked before, there
16 are the educational quality
17 measures that the providers would
18 ask, in terms of their
19 understanding of topical
20 analgesics and all of the things
21 we just talked about a moment ago,
22 as they compared to other
23 modalities.
24      And at the end, this is

Page 601

1 similar to what a CE provider
2 would do today, for example, in
3 three months after someone
4 participates in the activity; they
5 would send out a questionnaire to
6 a control group who did not
7 participate and a group that did
8 participate, and ask them, how
9 would you manage these patients
10 differently?
11      And that's what the
12 outcome -- how that is conducted
13 today in opioid analgesic CE by
14 the providers.
15      So this was Endo's -- again,
16 trying to get their hands around
17 the metrics that were appropriate
18 here.
19      MS. AMINOLROAYA: Move to
20 strike. That was not my question.
21      THE WITNESS: I'm sorry,
22 your question was, is it not that
23 Endo conducted a controlled return
24 on education, and you read that

Page 602

1     sentence.  And I said, no, we
2     contracted for it.
3       And that's what we did.  I
4     thought that was your question.
5 BY MS. AMINOLROAYA:
6     Q.   My question was whether the
7 study showed that NIPC education
8 increased sales -- increased
9 prescriptions, rather?
10     A.   And I did answer that.
11     Q.   And you agree that the
12 studies showed that NIPC education
13 increased prescriptions, correct?
14     A.   The study showed that the
15 clinicians who participated in topical
16 analgesic education also wrote, during
17 that time period, an increase in Rx's for
18 that class of topical analgesics.
19     Q.   Switching gears.
20       Do you recall a discussion
21 you had with counsel regarding the
22 RiskMAP?
23     A.   The thick document that we
24 were just talking about previously?

Page 603

1     Q.   Exhibit-50.  The risk
2 minimization action plan --
3     A.   Yes, I recall that.
4     Q.   -- for Opana ER.
5       You discussed it at length?
6     A.   At length, yes.
7     Q.   You seemed very familiar
8 with the document.
9     A.   I am very familiar with it.
10 I did it every quarter for --
11     Q.   And you testified that Endo
12 did not have control over the education
13 in the RiskMAP, correct?
14     A.   I testified that Endo did
15 not have control over the independent
16 education that was part of the RiskMAP.
17       We did have control over
18 some of the educational initiatives that
19 were in there, such as the brochures that
20 I referenced, the patient brochures, the
21 tear-pads, et cetera.
22     Q.   And the NIPC dinner
23 dialogues were a component of the RiskMAP
24 for Opana ER, correct?

Page 604

1     A.   Yes.
2     Q.   And we discussed some of
3 those dialogues today?
4     A.   Correct.
5     Q.   And we also discussed that
6 Endo was the sole funder of the NIPC,
7 correct?
8     A.   Yes.
9     Q.   So if Endo stopped funding
10 the NIPC, the NIPC program could not have
11 continued, correct?
12     A.   No --
13       MR. DAVIS:  Objection to
14 form.
15       THE WITNESS:  -- that's not
16 correct because Thomson could have
17 gotten another pharmaceutical
18 company to support it or they
19 could have gotten another
20 combination of support from other
21 folks.
22       It's speculative, you know,
23 what would happen.  I can't
24 predict.  But it was not that the

Page 605

1 initiative would magically go away
2 if we did not continue to fund it.
3       But it was a good
4 educational initiative, so there
5 was no reason to consider that.
6 BY MS. AMINOLROAYA:
7     Q.   Endo provided a lot of
8 funding for this, correct?
9       $31 million in nine years,
10 that's a lot of money; you would agree?
11       MR. DAVIS:  Objection to
12 form.
13       THE WITNESS:  We had that
14 discussion at length.  And, again,
15 what is a lot of money is relative
16 to what -- A, what the
17 implementation of that activity
18 costs, the fact that much of it
19 was pass-through expenses
20 associated with enduring
21 materials, audio/visual, any of
22 the meal functions, the faculty
23 honoraria, travel, space where the
24 programs were held, et cetera.

Page 606

1 So, again, the net amount
2 that was paid out did not include
3 all -- did not -- that was paid
4 out to the organization did not
5 include those pass-through
6 expenses.
7 BY MS. AMINOLROAYA:
8 Q. And your counsel didn't show
9 you any examples of the pass-through
10 expenses, so we haven't seen any evidence
11 of that, right, of the pass-through
12 expenses, what portion went to pay --
13 A. There wasn't anything in the
14 RiskMAP associated with that.
15 But knowing -- since I was
16 on the grant committee that reviewed the
17 grants and approved them, that was
18 something that I was familiar with.
19 And, again, I was not
20 telling you what, specifically, the
21 dollar values of the pass-throughs were;
22 simply telling you what they consisted
23 of.
24 Q. And if Endo didn't provide

Page 607

1 this funding, would Dr. Argoff, for
2 example, have received that -- continued
3 to receive honorariums?
4 MR. DAVIS: Objection to
5 form.
6 THE WITNESS: Dr. Argoff, as
7 well as the folks that were
8 participating as faculty for the
9 NIPC, by virtue of the fact that
10 they are therapeutic experts,
11 speak for many organizations, both
12 pharmaceutical companies as well
13 as professional societies and
14 nonprofits and state boards and
15 things like that.
16 So whether Dr. Argoff
17 received an honorarium from the
18 NIPC had -- I can't speculate on
19 what his other honoraria consisted
20 of, but I'm pretty sure that they
21 are not solely Endo, you know,
22 provided.
23 BY MS. AMINOLROAYA:
24 Q. If Endo cut off the funding

Page 608

1 to the NIPC, Dr. Argoff would not have
2 been paid the honorarium that he was
3 given in 2006, the one we looked at,
4 correct?
5 MR. DAVIS: Objection to
6 form.
7 THE WITNESS: If he did not
8 do the activity, that's correct.
9 BY MS. AMINOLROAYA:
10 Q. And if Endo didn't provide
11 the funding --
12 A. That's correct.
13 Q. -- he would not have
14 received that --
15 MR. DAVIS: Objection to
16 form.
17 BY MS. AMINOLROAYA:
18 Q. -- honorarium, correct?
19 But Endo continued to pay,
20 year after year, for the NIPC
21 programming, correct, between 2001 and
22 2012?
23 A. Endo continued to support an
24 educational initiative that FDA provided

Page 609

1 us feedback on was a valuable educational
2 initiative. They reviewed materials,
3 they reviewed the reports, and there was
4 no reason not to continue to support it,
5 because it was -- it was an effective
6 educational initiative, and it was
7 aligned with increasing the risk
8 awareness strategies that we were aiming
9 for.
10 Q. And you said FDA provided
11 feedback that the program that -- the
12 NIPC program was a valuable education
13 initiative.
14 Where did FDA do that?
15 A. In discussions when we would
16 submit our reports, you know, are there
17 any -- as counsel -- as our counsel
18 asked, did you ever receive any feedback
19 from the FDA?
20 I said that they had
21 commented that this was one of the
22 best -- best, excuse me, RiskMAPs that
23 they had received.
24 When we talked about -- when

Highly Confidential - Subject to Further Confidentiality Review

Page 610

1 we talked about the type of activities
2 that should be included when we were
3 planning the RiskMAP, they conveyed that
4 they -- they also conveyed it indirectly,
5 in my mind, anyway, when they determined
6 that the REMS CE was a valuable means of
7 providing the REMS training. And so that
8 was an indirect, you know, again,
9 acknowledgment of the value of that type
10 of education.
11      Q.   And when did these
12 conversations occur, Ms. Kitlinski?
13      A.   Which ones?
14      Q.   The conversations where FDA
15 was providing the feedback you just
16 described.
17      A.   Well, as I said, Dr.
18 Throckmorton commented on that at one of
19 the -- I don't remember the year, but
20 when we had submitted the RiskMAPs and
21 when we were talking about planning the
22 REMS.
23      Q.   When was Dr. Throckmorton at
24 the FDA?

Page 611

1      A.   I don't -- I don't know what
2 his tenure was there. He was there when
3 the REMS was being -- Dr. Jenkins and
4 Dr. -- and Doug Throckmorton were there
5 when the opioid, ER opioid REMS was being
6 planned.
7      Q.   You were just discussing
8 RiskMAP.
9           You said Dr. Throckmorton
10 was at FDA when the REMS was being
11 implemented, right? RiskMAP was ten
12 years prior to that?
13      A.   Doug Throckmorton has been
14 at the FDA for a long period of time. I
15 just don't know the exact years.
16      Q.   And you were involved with
17 conversations with the FDA regarding the
18 RiskMAP?
19      A.   Endo was involved in --
20      Q.   Were you involved?
21      A.   -- conversations with the
22 FDA.
23      Q.   Were you personally
24 involved? Were you at FDA meetings

Page 612

1 regarding RiskMAP?
2      A.   No --
3      Q.   No.
4           So you have no personal
5 knowledge about --
6      A.   Yes --
7      Q.   -- what you're discussing?
8      A.   I just told you what -- Dr.
9 Throckmorton made a comment at a
10 conference that I was sitting in the
11 audience for.
12      Q.   Dr. Throckmorton, was Dr.
13 Throckmorton involved in the
14 conversations between Endo and the
15 RiskMAP between 2004 and 2006?
16           MR. DAVIS: Objection to
17      form.
18           THE WITNESS: As I said, I
19      wasn't there. So I don't know
20      that --
21 BY MS. AMINOLROAYA:
22      Q.   So you have no personal
23 knowledge of FDA's interactions with Endo
24 on the RiskMAP, correct, Ms. Kitlinski?

Page 613

1           MR. DAVIS: Objection to
2      form.
3 BY MS. AMINOLROAYA:
4      Q.   You're under oath.
5      A.   I have no personal
6 knowledge --
7      Q.   Thank you.
8      A.   -- but the fact that I was
9 there. I have knowledge of what was
10 provided back to us from the individuals
11 in regulatory who did.
12      Q.   You have no personal
13 knowledge, though, correct?
14      A.   That's what I said, yes.
15           MR. DAVIS: Objection to
16      form.
17           THE WITNESS: Several times.
18 BY MS. AMINOLROAYA:
19      Q.   You did not personally have
20 the interaction with the FDA that you
21 just described, correct?
22           MR. DAVIS: Objection to the
23      form. That's not what she said.
24           THE WITNESS: That's not

Page 614

1  what I said.  Three times now I've
2  said that's not what I said.  I'm
3  sorry if I -- you know if it was
4  misunderstood.
5  BY MR. DAVIS:
6      Q.  To clarify, did you have an
7  interaction with FDA during the period of
8  time that the RiskMAP was being developed
9  and implemented for Opana ER, where the
10  FDA stated what you just said?
11         MR. DAVIS:  Objection to
12      form.
13         THE WITNESS:  I personally
14      did not.
15  BY MR. DAVIS:
16      Q.  Thank you.
17         And, in fact, you're not in
18  regulatory, correct, Ms. Kitlinski?
19      A.  That's correct.  I've stated
20  that several times.
21      Q.  Were you at the March 3rd,
22  2009 FDA meeting with industry regarding
23  REMS?
24      A.  I was at the ad com meeting

Page 615

1  that the -- I don't recall the date when
2  the RPC and FDA discussed the strawman
3  REMS proposal.  I don't recall the date,
4  I'm sorry.
5         I was intimately involved
6  with the discussions with the FDA on the
7  REMS, at least on the educational aspects
8  of those.
9         MS. AMINOLROAYA:  We're
10      marking Exhibit-52.  And I
11      apologize, it's 10:00 p.m. in the
12      evening, we were able to get one
13      copy of this document, which I'm
14      going to give you.
15         The trial tech is also going
16      to pull up a copy on the screens,
17      and we'll give this to the court
18      reporter.  And we'll provide you
19      with a copy.
20         MR. DAVIS:  I think the
21      requirements for providing
22      opposing counsel with exhibits is
23      pretty darn clear.
24         But we can go ahead here and

Page 616

1  just ask that you show the
2  courtesy --
3         MS. AMINOLROAYA:  It's 10:00
4      p.m., and we're doing our best.
5      I'm sure you can appreciate that.
6         MR. DAVIS:  That doesn't
7      change the clarity of the CMOs.
8         Take a look.
9         MS. AMINOLROAYA:  And the
10      document is available on the
11      screen, and the trial tech can --
12      will flip to the page that we're
13      looking at.
14          - - -
15         (Whereupon, Endo-Kitlinski
16      Exhibit-52,
17      ENDO-OPIOID_MDL_DEPONENT
18      000000184-189, was marked for
19      identification.)
20          - - -
21  BY MS. AMINOLROAYA:
22      Q.  So this is a document from
23  Pat Woolf to -- I believe Mr. Barto is
24  included on the "to" line here.

Page 617

1         MS. AMINOLROAYA:  And if the
2      trial tech would be so kind to
3      blow it up.
4         Thank you.
5  BY MS. AMINOLROAYA:
6      Q.  Do you know Mr. Barto at
7  FDA -- at Endo, Ms. Kitlinski?
8      A.  Yes, I know Mr. Barto at
9  Endo.
10      Q.  And how about Ms. Chapman?
11      A.  Yes.
12      Q.  And Mr. Bingol?
13      A.  Yes, I know who Mr. Bingol
14  is.
15      Q.  And this e-mail is dated
16  March 5th, 2009.  Subject is, FDA REMS
17  meeting, draft development.
18         And so I can represent to
19  you that this is after the meeting that
20  FDA had with industry in February -- or
21  in March, rather, of 2009.
22      A.  I'm just confused here,
23  because I don't know what 3317 -- I see
24  this as FDA REMS meeting.  And then it

Page 618

1  says, 3317 updated draft development
2  plan.
3      Q.   Let's not focus on that
4  right now.
5      A.   No, I'm just trying to
6  understand the context, because 3202 was
7  the ERLA opioid that Endo had that I
8  was -- I don't want to misrepresent.
9          I said I was intimately
10 involved with the conversations with the
11 FDA as it related to the ERLA opioid
12 REMS.  And so I just want to be clear
13 that that's what I was referring to, was
14 the Opana ER.  So, I don't know what --
15 I'm sorry, I don't know what 3317, 3288
16 are.
17     Q.   That's perfectly fine.  My
18 questions are not about 3317.
19         So you can see here, the
20 e-mail starts, EN3288-EN3317 team
21 members.
22         Are you familiar with
23 EN3288?
24     A.   No.  I just said I was not.

Page 619

1      Q.   I'll represent to you that
2  that's an internal number at Endo for
3  Opana ER reformulated.
4      A.   I'm also not copied on this
5  e-mail, so this is the first time I'm
6  seeing it.
7      Q.   Yes, that's correct, Ms.
8  Kitlinski, you're not copied on this
9  e-mail.
10         And the e-mail states,
11 Attached are the following documents of
12 interest.  And, really, the focus for us
13 right now is going to be slides from FDA
14 REMS meeting held on March 3 and Bob
15 Barto's overview of the FDA REMS meeting.
16         Did you know that Bob Barto
17 was at the FDA REMS meeting --
18         MR. DAVIS:  Objection.
19 BY MS. AMINOLROAYA:
20     Q.   -- held on March 3rd, 2009?
21         MR. DAVIS:  Objection to
22 form.
23         THE WITNESS:  Again, I've
24 said I don't know what the date

Page 620

1  was of that meeting.  I do know
2  that Bob Barto, as our regulatory
3  person, is involved with meetings
4  with the FDA.
5          But that's the extent that I
6  can characterize this.
7  BY MS. AMINOLROAYA:
8      Q.   And if we go to Page 8 of
9  the document, we see some slides.  It
10 says, REMS for opioid analgesics.  How
11 did we get here?  Where are we going?
12         And these slides are from
13 Bob Rappaport, MD.
14         Is that a familiar name to
15 you?
16     A.   Yes.
17     Q.   Mr. Rappaport --
18     A.   Dr. Rappaport.
19     Q.   -- or Dr. Rappaport is the
20 director of the division of anesthesia,
21 analgesia and rheumatology products at
22 the FDA.  And the slides are dated March
23 3rd, 2009.
24     A.   Yes.

Page 621

1      Q.   All right.  And so here on
2  the bottom of the slide, he's discussing
3  the scope of the problem.
4          2000, first reports of
5  widespread OxyContin abuse.  Advisory
6  committee meetings.
7      A.   I'm sorry, I was looking --
8  I must be in the wrong place.  I was
9  looking here at Dr. Rappaport's title.
10         What slide are you looking
11 at?
12     Q.   So if you go to the slide
13 just beneath that, just beneath Dr.
14 Rappaport's slide.
15     A.   I was looking at it on the
16 cover page here.  I see where you mean
17 here, scope of the problem.  Got it.
18     Q.   So scope of the problem
19 starts in 2000 with first reports of
20 widespread OxyContin abuse, correct?
21     A.   Yes.  That's what the slide
22 says.
23     Q.   2009, prescription opioid
24 abuse and misuse continues to grow.

Page 622

1      And during this period of
2  time, did Endo have a RiskMAP in place
3  for Opana ER?
4      MR. DAVIS:  Objection to the
5  form.  That's all the time we
6  have.
7      MS. AMINOLROAYA:  How much
8  time do I have left?
9      VIDEO TECHNICIAN:  That was
10  one hour --
11      MR. DAVIS:  Okay.  You're
12  done.
13      MS. AMINOLROAYA:  I just
14  have one more question with this,
15  if counsel would indulge me.
16      MR. DAVIS:  We gave Dave
17  five extra minutes --
18      MS. AMINOLROAYA:  I just
19  have literally one more
20  question --
21      MR. DAVIS:  You're done.
22      MS. AMINOLROAYA:  -- that
23  will take 60 seconds.
24      MR. DAVIS:  Thank you.

Page 623

1      MS. AMINOLROAYA:  It will
2  take 60 seconds.
3      MR. DAVIS:  We're off the
4  record.  We're done.
5      VIDEO TECHNICIAN:  This ends
6  today's deposition.  We're going
7  off the record at 10:04 p.m.
8      - - -
9      (Whereupon, the deposition
10  concluded at 10:04 p.m.)
11      - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 624

1      CERTIFICATE
2
3
4      I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
       Amanda Maslynsky-Miller
11     Certified Realtime Reporter
       Dated:  January 16, 2018
12
13
14
15
16
17      (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Page 625

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.
10      You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 626

1        - - - - - -
         E R R A T A
2        - - - - - -
3  PAGE  LINE  CHANGE/REASON
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____

Page 628

1       LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____

Page 627

1     ACKNOWLEDGMENT OF DEPONENT
2
3        I,_____, do
   hereby certify that I have read the
   foregoing pages,  1 - 624, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.
7
8  _____
   LINDA KITLINSKI          DATE
9
10
   Subscribed and sworn
11 to before me this
   _____ day of _____, 20____.
12
   My commission expires:_____
13
14 _____
   Notary Public
15
16
17
18
19
20
21
22
23
24