```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                       :  Polster
10                    -  -  -
           Tuesday, November 27, 2018
11                    -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                      -  -  -
14
               Videotaped deposition of
15   KEVIN KREUTZER, taken pursuant to notice,
     was held at the law offices of Reed Smith
16   LLP, Three Logan Square, 1717 Arch
     Street, Suite 3100, Philadelphia,
17   Pennsylvania 19103, beginning at 9:34
     a.m., on the above date, before Amanda
18   Dee Maslynsky-Miller, a Certified
     Realtime Reporter.
19
                      -  -  -
20
21
22
23          GOLKOW LITIGATION SERVICES
         877.370.3377 ph │ 917.591.5672 fax
24              deps@golkow.com
```

```
 1    APPEARANCES:
 2
           BARON & BUDD, P.C.
 3         BY:  WILLIAM POWERS, ESQUIRE
           600 New Hampshire Avenue, N.W.
 4         Washington, D.C.
           (202) 333-4562
 5         Wpowers@baronbudd.com
           - and -
 6
           BY: STERLING CLUFF, ESQUIRE
 7         15910 Ventura Boulevard
           Suite 1600
 8         Encino, California 91436
           (818) 839-2333
 9         scluff@baronbudd.com
           Representing the Plaintiffs
10
11
12
13         REED SMITH, LLP
           BY:  ROBERT A. NICHOLAS, ESQUIRE
14         BY:  JOSEPH J. MAHADY, ESQUIRE
           BY:  SAMANTHA L. ROCCHINO, ESQUIRE
15         Three Logan Square
           1717 Arch Street
16         Philadelphia, Pennsylvania 19103
           (215) 851-8100
17         Rnicholas@reedsmith.com
           Jmahady@reedsmith.com
18         Srocchino@reedsmith.com
           Representing the Defendant,
19         Amerisource Bergen Drug
           Corporation
20
21
22
23
24
```

```
 1    APPEARANCES:  (Continued)
 2
 3
          WILLIAMS & CONNOLLY, LLP
 4        BY:  MIRANDA PETERSEN, ESQUIRE
          725 Twelfth Street, N.W.
 5        Washington, DC  20005
          (202) 434-5000
 6        mpetersen@wc.com
          Representing the Defendant,
 7        Cardinal Health
 8
 9
10        COVINGTON & BURLING LLP
          BY:  KEVIN KELLY, ESQUIRE
11        850 Tenth Street, NW
          Suite 856N
12        Washington, DC 20001
          (202) 662-5000
13        kkelly@cov.com
          Representing the Defendant,
14        McKesson Corporation
15
16
17        JONES DAY
          BY:  SARAH G. CONWAY, ESQUIRE
18        555 South Flower Street
          Fiftieth Floor
19        Los Angeles, California 90071
          (213) 489-3939
20        sgconway@jonesday.com
          Representing the Defendant,
21        Walmart
22
23
24
```

```
 1    APPEARANCES: (Continued)
 2    VIA TELEPHONE/LIVESTREAM:
 3
 4
            BARTLIT BECK LLP
 5          By:  SHARON DESH, ESQUIRE
            Courthouse Place
 6          54 West Hubbard Street, Suite 300
            Chicago, Illinois 60654
 7          (312) 494-4400
            Sharon.desh@bartlit-beck.com
 8          Representing the Defendant,
            Walgreens
 9
10
11          PELINI CAMPBELL & WILLIAMS, LLC
            BY:  ERIC J. WILLIAMS, ESQUIRE
12          8040 Cleveland Avenue NW
            Suite 400
13          North Canton, Ohio 44720
            (330) 305-6400
14          ejwilliams@pelini-law.com
            Representing the Defendant,
15          Prescription Supply, Inc.
16
17
18          FOX ROTHSCHILD LLP
            BY:  JACOB S. PERSKIE, ESQUIRE
19          1301 Atlantic Avenue
            Midtown Building, Suite 400
20          Atlantic City New Jersey 08401
            (609) 348-4515
21          Jperskie@foxrothschild.com
            Representing the Defendant,
22          Validus Pharmaceuticals
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES: (Continued)
 2   VIA TELEPHONE/LIVESTREAM:
 3

 4           MORGAN, LEWIS & BOCKIUS LLP
             BY:  JONATHAN E. MAIER, ESQUIRE
 5           1111 Pennsylvania Ave. NW
             Washington, DC 20004
 6           (202) 739-3000
             Jonathan.maier@morganlewis.com
 7           Representing the Defendant,
             Teva Pharmaceuticals, Inc.,
 8           Cephalon, Inc., Watson
             Laboratories, Actavis LLC, and
 9           Actavis Pharma, Inc
10
11

             ALLEGAERT BERGER & VOGEL LLP
12           BY:  JOHN S. CRAIG, ESQUIRE
             111 Broadway, 20th Floor
13           New York, New York 10006
             (212) 616-7075
14           Representing the Defendant,
             Rochester Drug Cooperative
15
16
17           BARON & BUDD, P.C.
             BY:  JAY LICHTER, ESQUIRE
18           GRETCHEN KEARNEY, OFFICE MANAGER
             15910 Ventura Boulevard
19           Suite 1600
             Encino, California 91436
20           (818) 839-2333
             Jlichter@baronbudd.com
21           Representing the Plaintiffs
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2   VIA TELEPHONE/LIVESTREAM:
 3
 4        MARCUS & SHAPIRA, LLP
          BY:  PAUL M. MANNIX, ESQUIRE
 5        One Oxford Centre
          35th Floor
 6        Pittsburgh, Pennsylvania 15219
          (412) 471-3490
 7        Pmannix@marcus-shapira.com
          Representing the Defendant,
 8        HBC Company
 9
10        CLARK MICHIE LLP
          BY:  CHRISTOPHER J. MICHIE, ESQUIRE
11        103 Carnegie Center, Suite 300
          Princeton, New Jersey 08540
12        (609) 423-2143
          Chris.michie@clarkmichie.com
13        Representing the Defendant,
          Pernix Therapeutics Holdings, Inc.
14
15
16        REED SMITH, LLP
          BY:  ANNE E. ROLLINS, ESQUIRE
17        Three Logan Square
          1717 Arch Street
18        Philadelphia, Pennsylvania 19103
          (215) 851-8100
19        Arollins@reedsmith.com
          Representing the Defendant,
20        Amerisource Bergen Drug
          Corporation
21
22
     ALSO PRESENT:
23   Devyn Mulholland, Videographer
     Zach Posen, Trial Technician
24   Christopher Casalenuovo, AmerisourceBergen
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2                    I N D E X
 3                        -   -   -
 4

    Testimony of: KEVIN KREUTZER
 5
 6      By Mr. Cluff                              11
 7
 8                        -   -   -
 9                    E X H I B I T S
10                        -   -   -
11

    NO.              DESCRIPTION                 PAGE
12

    AmerisourceBergen-Kreutzer
13  Exhibit-1      ABDC_MDL_00304391-392          164
14  AmerisourceBergen-Kreutzer
    Exhibit-2      ABDC_MDL_00154441-443          176
15

    AmerisourceBergen-Kreutzer
16  Exhibit-3      Teva_MDL_A_(0)233-1299-320    223
17  AmerisourceBergen-Kreutzer
    Exhibit-4      Teva_MDL_A_(0)233-1346-348    250
18

    AmerisourceBergen-Kreutzer
19  Exhibit-5      Teva_MDL_A_(0)233-1426-428    274
20  AmerisourceBergen-Kreutzer
    Exhibit-6      ABDC_MDL_0045077               304
21

    AmerisourceBergen-Kreutzer
22  Exhibit-7      ABCD_MDL_0045075               306
23
24
```

1

- - -

2

E X H I B I T S

3

- - -

4

5    NO.            DESCRIPTION                    PAGE

6    AmerisourceBergen-Kreutzer
     Exhibit-8     ABDC_MDL_00045076              314
7
     AmerisourceBergen-Kreutzer
8    Exhibit-9     ABDC_MDL_00047572              361
9    AmerisourceBergen-Kreutzer
     Exhibit-10    ABDC_MDL_00151471-472          369
10
     AmerisourceBergen-Kreutzer
11   Exhibit-11    ABDC_MDL_00178337              374
12   AmerisourceBergen-Kreutzer
     Exhibit-12    ABDC_MDL_00168122 and
13                 ABDC_MDL_00168127-134          388
14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2           DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page Line     Page Line       Page Line

 7   None

 8

 9

10   Request for Production of Documents

11   Page Line     Page Line       Page Line

12   None

13

14

15   Stipulations

16   Page Line     Page Line       Page Line

17   10       1

18

19

20   Question Marked

21   Page Line     Page Line       Page Line

22   None

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    -  -  -

2              (It is hereby stipulated and

3         agreed by and among counsel that

4         sealing, filing and certification

5         are waived; and that all

6         objections, except as to the form

7         of the question, will be reserved

8         until the time of trial.)

9                    -  -  -

10             VIDEO TECHNICIAN:  We are

11        now on the record.  My name is

12        Devyn Mulholland, I'm a

13        videographer for Golkow Litigation

14        Services.  Today's date is

15        November 27, 2018.  The time is

16        9:34 a.m.

17             This video deposition is

18        being held in Philadelphia,

19        Pennsylvania, in the matter of

20        National Prescription Opiate

21        Litigation.  The deponent is Kevin

22        Kreutzer.

23             Counsel will be noted on the

24        stenographic record.  The court
```

Highly Confidential - Subject to Further Confidentiality Review

1    reporter is Amanda Miller and will

2    now swear in the witness.

3                   -  -  -

4         KEVIN KREUTZER, after having

5    been duly sworn, was examined and

6    testified as follows:

7                   -  -  -

8              EXAMINATION

9                   -  -  -

10   BY MR. CLUFF:

11        Q.    Good morning, Mr. Kreutzer.

12   As I explained earlier, my name is

13   Sterling Cluff, I work at a law firm

14   called Baron and Budd, and we represent

15   the Track 1 plaintiffs in the national

16   opiate litigation.  And I'll be taking

17   your deposition today.

18             To start off, could you just

19   spell your first and last name for the

20   record, so we have a clear record of

21   that, please?

22        A.    Sure.  It's K-E-V-I-N.  Last

23   name is K-R-E-U-T-Z-E-R.

24        Q.    And have you ever had your

Highly Confidential - Subject to Further Confidentiality Review

```
1    deposition taken before?

2         A.    I have not.

3         Q.    I'm sure that your esteemed

4    lawyers have explained sort of the

5    deposition protocols for you, so I'm

6    going to skip some of the admonitions.

7              But just remind you that

8    you're under oath, so we need to get

9    truthful answers from you.

10             And also remind you not to

11   disclose any attorney-client privilege,

12   and that if you feel like you need to

13   discuss with your lawyers about a

14   privilege, we can make arrangements for

15   that.

16             In addition to that, we're

17   entitled to your best recollection.  If

18   you don't recall, you can tell me that.

19   And I'd also caution you not to guess at

20   an answer.  If you don't know, just let

21   me know.

22             Does that all make sense?

23        A.    Yes.

24        Q.    So how long have you worked
```

Highly Confidential - Subject to Further Confidentiality Review

1    for AmerisourceBergen?

2         A.    Since 2007, so going on 11

3    years.

4         Q.    Has your employment with

5    AmerisourceBergen been continuous since

6    2007?

7         A.    It has not.

8         Q.    When you began with

9    Amerisource -- well, when you joined the

10   company in 2007, was it AmerisourceBergen

11   or was it some previous entity that

12   merged into AmerisourceBergen?

13        A.    It was AmerisourceBergen.

14        Q.    And what was your title at

15   the time that you joined

16   AmerisourceBergen?

17        A.    I believe my title was

18   collections associate.

19        Q.    And do you recall what month

20   in 2007 you started with Amerisource?

21        A.    It was April.

22        Q.    And you believe your title

23   at that time was collections associate?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall how long you

2  held that position?

3    A.    Approximately a year

4  and-a-half.

5    Q.    So that would have been

6  until approximately the middle of 2009?

7    A.    I believe so, yes.

8    Q.    And after you were a

9  collections associate, do you recall what

10  your next position with AmerisourceBergen

11  was?

12    A.    Yes.  It was diversion

13  control specialist.

14    Q.    And to the best of your

15  recollection, you would have assumed that

16  position in -- some time in 2009?

17    A.    Yes.

18    Q.    What position did you -- did

19  your position ever change at

20  AmerisourceBergen after you became a

21  diversion control specialist?

22    A.    I received a promotion last

23  year to diversion control investigator.

24    Q.    So that would have been

1  2017?

2       A.    Yes.

3       Q.    So between 2009 and 2017,

4  leaving out the time when you were

5  employed elsewhere, you were a diversion

6  control specialist?

7       A.    Yes.

8       Q.    And what department did you

9  work in as a diversion control

10 specialist?

11      A.    It was corporate security

12 and regulatory affairs.

13      Q.    And did you report to anyone

14 in that department?

15      A.    Yes.

16      Q.    Who was that?

17      A.    Ed Hazewski.

18      Q.    Was it Mr. Hazewski for the

19 entire time you were a diversion control

20 specialist?

21      A.    No, it was not.

22      Q.    Who else did you report to?

23      A.    Eric Cherveny.

24      Q.    Do you recall when you began

1    reporting to Mr. Cherveny?

2        A.    I believe it was 2015.

3        Q.    At the time you're

4    reporting -- at the time that that change

5    occurred, do you recall why you began

6    reporting to Mr. Cherveny instead of Mr.

7    Hazewski?

8        A.    I do not.

9        Q.    Was there any change in your

10   responsibilities after you began

11   reporting to Mr. Cherveny?

12       A.    No.

13       Q.    To fast-forward to the

14   change to a diversion control

15   investigator, did you report to anybody

16   in that role?

17       A.    I'm sorry, could you ask

18   that again?

19       Q.    Sure.  No problem.

20           When you were promoted to a

21   diversion control investigator, prior to

22   that time, were you still reporting to

23   Mr. Cherveny?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And after you were promoted,
2  did you continue to report to Mr.
3  Cherveny?
4    A.    Yes.
5    Q.    Was there any change in your
6  job responsibilities when you became a
7  diversion control investigator?
8    A.    No.  They were pretty much
9  the same.
10    Q.    You said there was a brief
11  interruption in your employment with
12  AmerisourceBergen.
13        What happened there?
14    A.    I applied for a position for
15  Teva Pharmaceuticals.
16    Q.    When was that?
17    A.    I started January 7th, I
18  believe, of 2012.
19    Q.    That's a pretty specific
20  date.
21        Is there some reason why
22  that date stands out to you?
23    A.    I just remember the date.
24    Q.    What prompted the

1    application to Teva Pharmaceuticals?

2         A.    It was a brand-new position

3    for the company.

4         Q.    And why did you want to

5    apply for that brand-new position?

6         A.    I thought my skill set

7    matched the job requirements.

8         Q.    What was the -- do you

9    recall what the title of the position you

10   applied for was?

11        A.    I believe it was diversion

12   operations manager.

13        Q.    And it was your

14   understanding -- or was it your

15   understanding, at the time, that Teva

16   Pharmaceuticals had never had a diversion

17   operations manager before?

18        A.    That was my understanding.

19        Q.    During the interview process

20   with Teva, did you form an understanding

21   as to why Teva Pharmaceuticals was

22   creating this new position?

23        A.    No.

24        Q.    Did you ask?

1    A.    I'm sure I did, but I don't

2  remember the questions that I asked.

3    Q.    And so looking back today,

4  you don't recall if you learned why Teva

5  was creating this new position?

6    A.    I don't know the specifics.

7  I don't recall the specifics.

8    Q.    You said you started on

9  January 7th, 2012.

10    Do you recall when you would

11  have filled out the application, or when

12  you began the application process?

13    A.    I'm not exactly sure.  Maybe

14  September or October of 2012, or maybe

15  that was 2011.

16    Q.    Do you recall who you met

17  with at Teva Pharmaceuticals about this

18  new position?

19    A.    Yes.  Colleen McGinn.

20    Q.    And who is she?

21    A.    She was my director that I

22  would be reporting to.

23    Q.    Do you recall her -- the

24  title of her position?

1        A.    No.  No, I don't.

2        Q.    If later we showed you some

3   documents between -- e-mail

4   correspondence between you and Ms.

5   McGinn, do you think it would refresh

6   your recollection about her title and her

7   position?

8        A.    Perhaps.

9        Q.    Do you recall, when you

10  worked at Teva Pharmaceuticals,

11  exchanging e-mail correspondence with Ms.

12  McGinn?

13       A.    Yes.

14       Q.    Did you report directly to

15  her at the time?

16       A.    I did.

17       Q.    So in January 2012, you

18  joined Teva Pharmaceuticals.

19            And, if I recall correctly,

20  you were applying for the division

21  operations manager -- or diversion

22  operations manager position, correct?

23       A.    Yes.

24       Q.    And did you succeed in

1    securing that position?

2         A.    I did.

3         Q.    And when you began working

4    for Teva Pharmaceuticals, was your job

5    title the same one that you applied for?

6         A.    Yes.

7         Q.    How long were you employed

8    with Teva Pharmaceuticals?

9         A.    Three months.

10        Q.    Did you say three months?

11        A.    Yes.

12        Q.    What happened -- what

13   happened when you left Teva

14   Pharmaceuticals?  Did you go -- what

15   happened with your job -- those are all

16   bad questions.

17              What did you do after those

18   three months?

19        A.    What did I do after those

20   three months?

21        Q.    Yes.

22        A.    I went back to

23   AmerisourceBergen.

24        Q.    So is it your recollection,

1　then, that you rejoined AmerisourceBergen

2　in the middle of 2012?

3　　　　A.　　Yes.　Towards the end of

4　April 2012 -- or, no, I'm sorry.　2013 --

5　yes, 2012.

6　　　　Q.　　2012.

7　　　　A.　　Yes.

8　　　　Q.　　Is it possible that you

9　worked at Teva for a year and three

10　months instead of just three months?

11　　　　A.　　No.

12　　　　Q.　　No.

13　　　　　　　Is there a reason why you

14　were considering that possibly you had

15　worked there until 2013?

16　　　　A.　　Just mixing up the dates.

17　　　　Q.　　Certainly.

18　　　　　　　So the jobs we've talked

19　about today, between AmerisourceBergen

20　and Teva Pharmaceuticals, is that

21　fully -- have we fully discussed all of

22　the positions you've had with

23　AmerisourceBergen and Teva

24　Pharmaceuticals?

1    A.    Yes.

2    Q.    Prior to joining

3  AmerisourceBergen in 2007, were you

4  employed?

5    A.    Yes.

6    Q.    Where were you employed?

7    A.    Wyeth Pharmaceuticals.

8    Q.    What is Wyeth?

9    A.    Wyeth Pharmaceuticals was a

10  manufacturer of pharmaceutical products.

11  However, they've been sold off and now

12  part of Pfizer.

13    Q.    What was your responsibility

14  there, or what was your position?

15    A.    I worked for Wyeth

16  Pharmaceuticals for 14 years.  I had many

17  different positions there.

18    Q.    What's the -- what's the job

19  title -- the earliest job title you can

20  recall?

21    A.    Back in 1992, I was a

22  security officer.

23    Q.    How long did you hold that

24  position?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Approximately a year.

2       Q.      And then did your title

3  change at that point?

4       A.      I applied for another

5  position in the packaging department.

6       Q.      So you applied internally

7  with --

8       A.      Internally.

9       Q.      -- Wyeth?

10       A.      Yes.

11       Q.      One thing we should just

12  point out again, and we haven't had a

13  problem with it yet, but we shouldn't

14  talk over each other, to the best of our

15  ability.  So I'll do my best to let you

16  finish all of your answers.

17              The only reason is we have

18  to let the court reporter get everything

19  that we're saying, so.

20       A.      Sure.

21       Q.      I'm reminding myself, just

22  as much as I'm reminding you.  Thank you.

23              What was the job title that

24  you applied for in the packaging

Highly Confidential - Subject to Further Confidentiality Review

1    department at Wyeth?

2         A.    I don't know the exact

3    title.  It was packaging operator.  I'm

4    not exactly sure.  I don't remember --

5    recall.

6         Q.    And how long did you hold

7    that position?

8         A.    Approximately a year

9    and-a-half.

10        Q.    And then what happened?

11        A.    And then that department was

12   outsourced to Puerto Rico.

13        Q.    Did you go to Puerto Rico?

14        A.    I did not.

15        Q.    Sorry to hear that.

16              What did you do instead?

17        A.    I applied for another

18   position internally in the accounts

19   receivable department.

20        Q.    And do you recall what that

21   position was?

22        A.    Accounts receivable

23   representative.

24        Q.    And how long did you hold

Highly Confidential - Subject to Further Confidentiality Review

1  that position?

2         A.    This is only an

3  approximation.  I received a couple

4  promotions in that department.  Maybe two

5  years, three years tops.

6         Q.    So you were in the accounts

7  receivable department for approximately

8  two years, but you had some promotions?

9         A.    Yes.

10        Q.    Do you recall what those

11 promotions were?

12        A.    It was just a level up, from

13 a rep 1 to a rep 2.

14        Q.    Would your job

15 responsibilities essentially have stayed

16 the same between rep 1 and rep 2?

17        A.    Pretty much so, yes.

18        Q.    And what happened after --

19 after the accounts receivable department?

20        A.    Then I applied for a

21 position in the credit department, credit

22 and collections.

23        Q.    Is that the name of the

24 department or is that --

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.

2        Q.     -- the position?

3        A.     Of the department.

4        Q.     And what was your title

5   there?

6        A.     Initially, it was a credit

7   correspondent.

8        Q.     How long did you hold that

9   position?

10        A.     I'm not exactly sure.  Maybe

11   three years.

12        Q.     And what happened after

13   those three years?

14        A.     And then I received a

15   promotion to a credit analyst.

16        Q.     How long were you a credit

17   analyst?

18        A.     Until the day I left the

19   department.  Well, the department was

20   outsourced, in 2006.  Or 2007, I'm sorry.

21        Q.     And 2007 is when you joined

22   AmerisourceBergen?

23        A.     Yes.

24        Q.     And is the outsourcing of

1   that credit and collections department,

2   is that the reason you applied to

3   AmerisourceBergen?

4            A.    Yes.  They closed the entire

5   department, and that was outsourced to

6   India.

7            Q.    Did you hold any other

8   positions when you were with Wyeth

9   Pharmaceuticals?

10           A.    No.

11           Q.    Do you know when Wyeth

12  Pharmaceuticals was merged into or

13  acquired by Pfizer?

14           A.    I'm not sure of the exact

15  year.

16           Q.    I want to start back at the

17  beginning with your job history at Wyeth

18  to kind of understand some of your roles

19  and responsibilities.

20                 So I believe you said you

21  started in approximately 1992 there,

22  "there" being Wyeth, as a security

23  officer?

24           A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.   What was your -- what were

2   your responsibilities as a security

3   officer?

4   A.   I conducted rounds of the

5   facility.  I also greeted everybody as

6   they walked into the building.  I

7   inspected packages as they left the

8   building and conducted some

9   investigations involving theft.

10   Q.   So aside from the

11   investigations involving theft, it sounds

12   like the majority of your responsibility

13   as a security officer was, essentially,

14   to be a security guard, right?

15   A.   Pretty much, yes.

16   Q.   You said -- you referred to

17   the facility.

18   What was the facility?

19   A.   The manufacturing site, the

20   building.  We had, actually, three

21   buildings.

22   Q.   Were you a security officer

23   responsible for all three?

24   A.   For all three.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How did that work out?  Let

2    me be more specific.

3          So were you assigned to

4    patrol all three at one time, or some

5    days you were assigned to one facility

6    and other days another facility?

7    A.    I was pretty much assigned

8    to all three.

9    Q.    So when you were conducting

10   rounds, you would patrol all three

11   facilities?

12   A.    Yes.

13   Q.    Was there a central desk

14   where people would come in and out of to

15   get into the three facilities?

16   A.    Yes.

17   Q.    What kind of pharmaceutical

18   products do you recall that Wyeth

19   manufactured?

20   A.    Prevnar.  There was birth

21   control pills.  Penicillin.  Those are

22   the three that I recollect the most.

23   Q.    Do you recall if Wyeth

24   Pharmaceuticals manufactured any Schedule

1    II or Schedule III controlled substances?

2           A.    I don't recall.

3           Q.    Are you familiar with what a

4    Schedule II controlled substance is?

5           A.    Yes.

6           Q.    And are you familiar with

7    what a Schedule III controlled substance

8    is?

9           A.    Yes, in basic -- yeah.

10          Q.    So did you understand, at

11   the time you worked at Wyeth

12   Pharmaceuticals, what Schedule II or III

13   controlled substances were?

14          A.    No.

15          Q.    So if Wyeth had been

16   manufacturing them, you wouldn't have

17   known about it?

18               MR. NICHOLAS:  Object to

19          form.

20               Go ahead.

21               THE WITNESS:  I may not

22          have.

23   BY MR. CLUFF:

24          Q.    So it's possible -- well,

1   would you agree with me that it's

2   possible Wyeth manufactured controlled

3   substances, you just may not have been

4   aware of it?

5          A.    They may have and I'm just

6   not aware.

7          Q.    Do you recall if, as a

8   security officer, you received any

9   training about controlled substances?

10         A.    No, I did not.

11         Q.    Did you have any other

12  responsibilities aside from, you know,

13  conducting the rounds and conducting the

14  investigations at Wyeth as a security

15  officer?

16         A.    I don't recall any

17  additional responsibilities.

18         Q.    When you mentioned

19  conducting investigations, I believe you

20  referred to it as conducting

21  investigations about theft.

22               Is that accurate?

23         A.    Correct.

24         Q.    What was your understanding

Highly Confidential - Subject to Further Confidentiality Review

1  of that responsibility as a security

2  officer?

3          A.    It was involving theft of

4  personnel, associates that had items

5  stolen from their desks or offices.

6          Q.    Are you referring to

7  personal items?

8          A.    Personal items, yes.

9          Q.    So you were not

10  investigating thefts of any of the drugs

11  that Wyeth manufactured?

12          A.    No.

13          Q.    When you worked at Wyeth

14  Pharmaceuticals as a security

15  investigator, did you receive any

16  training about diversion?

17          A.    I did not.

18          Q.    I should have asked this

19  question first.

20              Are you familiar with the

21  concept of diversion?

22          A.    Yes.

23          Q.    But at the time you worked

24  at Wyeth, you did not receive any

Highly Confidential – Subject to Further Confidentiality Review

1    training about it?

2         A.    I did not.

3         Q.    Understood.

4               How about suspicious orders;

5    were you familiar with the term

6    "suspicious orders" when you worked at

7    Wyeth?

8         A.    No.

9         Q.    You didn't receive any

10   training about suspicious orders at

11   Wyeth?

12        A.    I did not.

13        Q.    You said after about a year

14   as a security officer you applied

15   internally for a job with the packaging

16   department?

17        A.    Yes.

18        Q.    And your best recollection

19   is that you assumed a position that you

20   referred to as a packing operator,

21   correct?

22        A.    Correct.

23        Q.    Would that have been within

24   the same facilities where you were a

1    security officer?

2        A.    Yes.

3        Q.    And what were your

4    responsibilities as a packing officer --

5    or operator, excuse me?

6        A.    I was packaging, I think it

7    was mostly birth control pills.  And I

8    was also a machine operator there as

9    well, all in the same department.

10       Q.    And the department you're

11   referring to is the packaging department?

12       A.    Packaging, yes.

13       Q.    What's the procedure like

14   for packaging drugs at Wyeth, or was it

15   like, excuse me?

16            MR. NICHOLAS:  Object to

17       form.

18            THE WITNESS:  It was just

19       ensuring they were color-coded

20       pills in different rows, and we

21       had to ensure that the pills were

22       not cracked or missing, to that

23       extent.

24   BY MR. CLUFF:

1  Q.    So as a packing operator,

2  you were ensuring that the pills were

3  placed into their individual packages

4  correctly?

5  A.    Blister packs, yes.

6  Q.    Did you, as a packing

7  operator, ever have any responsibility

8  for taking individual packaging and

9  putting them into a larger shipment?

10  A.    Yes.

11  Q.    What was that process like?

12  A.    It was -- it was a belt,

13  belt-fed line, and we would collect the

14  blister packs and place them in the box.

15  And then once that box was full, wrap it

16  up and put it on a pallet.

17  Q.    So, essentially, an assembly

18  line of packages coming to you that

19  you're going to pack into a larger box?

20  A.    Yes.

21  Q.    Did you, as part of the

22  individual packaging and the larger

23  shipment packaging, get any training

24  about security related to the manufacture

1    of drugs or controlled substances?

2          A.    No, I don't believe so.

3          Q.    You mentioned the birth

4    control pills.

5                Did you ever have

6    responsibility for packaging any other

7    kinds of products that Wyeth

8    manufactured?

9          A.    Penicillin.

10         Q.    Did you get any training

11   about security related to packaging

12   penicillin?

13         A.    No, I don't believe I did.

14         Q.    And what was your other job

15   responsibility as a packaging operator?

16         A.    I was also a machine

17   operator there as well.

18         Q.    And what was involved in

19   being a machine operator?

20         A.    Just ensuring that there

21   were pills in the hopper so they could be

22   fed into blister packs and sent down the

23   line.

24         Q.    What's a hopper?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    It's a pill hopper.  It's

2 like a circular -- a cylinder-type object

3 and all the pills are in there and they

4 are fed into the blister packs and made.

5     Q.    So it's a large piece of

6 machinery --

7     A.    Yes.

8     Q.    -- that pills come into; is

9 that right?

10     A.    Yes.

11     Q.    And then the pills go

12 through the machine and into the blister

13 packs?

14     A.    Correct.  And sent down the

15 line, which is belt-fed.

16     Q.    And the line out of the bell

17 feed -- or belt feed goes to the people

18 packaging?

19     A.    Yes.  So there will be

20 approximately three people on each side

21 checking the blister packs.

22     Q.    And that was, like you said,

23 to make sure that they weren't cracked or

24 they had been packaged appropriately?

1    A.    Correct.

2    Q.    Did you have any other job

3  responsibilities within the packing

4  department that we haven't discussed?

5    A.    I believe that's it.

6    Q.    And you worked in the

7  packing department for approximately a

8  year and-a-half, right?

9    A.    Approximately a year

10  and-a-half, two years.

11    Q.    Before the packing

12  department was outsourced to Puerto Rico,

13  had you considered leaving that

14  department for another department in

15  Wyeth?

16    A.    I may have, but I don't

17  recall.

18    Q.    So, then, the outsourcing to

19  Puerto Rico, was that the primary reason

20  why you left the packing department?

21    A.    I believe so, yes.

22    Q.    So after the packing

23  department was outsourced, you went to

24  the accounts receivable department, and

1  your best recollection was that you took

2  on a role that you described as rep 1; is

3  that right?

4          A.    Correct.

5          Q.    And what was your job

6  responsibility in the accounts receivable

7  department?

8          A.    We would receive invoices

9  and -- I believe we would receive mail

10  from the customers with invoices and

11  checks where they were paying for their

12  products.

13          Q.    And so what were you doing

14  with the invoices and the checks that you

15  received?

16          A.    Entering them into the

17  system.

18          Q.    What system was that?

19          A.    It was a mainframe system.

20          Q.    Was this essentially like a

21  data entry job?

22          A.    It was data entry and

23  ensuring that the customers were paying

24  for their invoices.  I vaguely remember

Highly Confidential - Subject to Further Confidentiality Review

1  the details of this position, since it

2  was so long ago.

3       Q.    Did you have any

4  responsibility for pills within the

5  accounts receivable department?

6       A.    No.

7       Q.    Did you get any training

8  about security while you were in the

9  accounts receivable department?

10      A.    No.

11      Q.    Did you receive any training

12  about diversion when you were in the

13  accounts receivable department?

14      A.    No.

15      Q.    Did you receive any training

16  about suspicious orders when you were in

17  the accounts receivable department?

18      A.    No.

19      Q.    Just circling back to the

20  packing department again, did you receive

21  any training about security when you

22  worked in the packing department?

23      A.    No.

24      Q.    How about diversion?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      No.

2       Q.      Suspicious orders?

3       A.      No.

4       Q.      And so back to the accounts

5    receivable, you received a couple of

6    promotions, you said, while you were in

7    accounts receivable; is that right?

8       A.      Yes.

9       Q.      And I think you referred to

10   those as moving from rep 1 to rep 2; is

11   that right?

12      A.      Yes.

13      Q.      And were your job

14   responsibilities essentially the same the

15   entire time you were in that department?

16      A.      I believe they increased

17   where -- from what I remember, is that I

18   was entering -- it was a cash

19   application, where I was entering the

20   payments of the invoices that the

21   customers made to their accounts.

22      Q.      And that's a job

23   responsibility you assumed when you

24   became a rep 2?

1        A.      Yes.

2        Q.      And, again, there the

3   responsibility was mainly ensuring the

4   customers were paying their bills?

5        A.      Correct.

6        Q.      Did you have any

7   responsibility with looking at order

8   forms when you were in the accounts

9   receivable department?

10       A.      I don't recall.

11       Q.      Is it possible that you did

12  have responsibility for that and just

13  don't recall it?

14       A.      I just don't recall.

15       Q.      Do you remember the

16  approximate years, not the number of

17  years, but, like, the calendar years that

18  you were in the accounts receivable

19  department?

20       A.      I would only be guessing.

21       Q.      Was it in -- by your best

22  estimate, would it have been in the late

23  '90s or early 2000s?

24       A.      I was thinking maybe mid to

1  late '90s.

2       Q.    And then after the accounts

3  receivable department, you told me that

4  you moved to the credit and collections

5  department; is that accurate?

6       A.    Yes.

7       Q.    Do you recall what prompted

8  that application?

9       A.    It was -- I was just looking

10  to further my career in the company by

11  applying for the position.

12       Q.    How did you feel like that

13  would have furthered your career at that

14  point?

15       A.    It would give me the

16  opportunity to work more on computers.

17       Q.    So at that time, was Wyeth's

18  business operation primarily by paper?

19       A.    It was a mix.

20       Q.    What was your job title in

21  the credit and collections department?

22       A.    Credit correspondent,

23  initially.

24       Q.    And what was your

1   responsibility as a credit correspondent?

2       A.    I would have area

3   responsibility, a region within the

4   country, to follow up on customers'

5   invoices where they were past due.

6       Q.    So does the word "credit"

7   and "credit correspondent" refer to the

8   fact that you had credited these

9   customers and not been paid yet?

10      A.    Yes.  They received the

11  products and we have not yet received

12  payment.

13      Q.    And how long were you a

14  credit correspondent?

15      A.    I just don't remember how

16  long.  Two to three years, maybe.

17      Q.    And then at that point, you

18  were promoted to a credit analyst,

19  correct?

20      A.    Yes.  I went back to school

21  and I received my Associate's Degree, and

22  I received that promotion.  And I was

23  continuing on in my education.

24      Q.    So prior to this time when

Highly Confidential - Subject to Further Confidentiality Review

1    you received your Associate's Degree, you

2    had not completed a degree after high

3    school?

4            A.    I attended college, but I

5    did not fully complete college at that

6    point.

7            Q.    Do you remember when you

8    received your Associate's Degree?

9            A.    I believe it was 2003.

10           Q.    And what was your degree in?

11           A.    It was just general studies.

12           Q.    And where did you get it

13   from?

14           A.    University of Phoenix.

15           Q.    Prior to getting the degree

16   from the University of Phoenix, did you

17   attend college classes, you said?

18           A.    I did.

19           Q.    Do you recall where that

20   was?

21           A.    Yes.  Community College of

22   Beaver County.

23           Q.    Forgive my lack of knowledge

24   about the local area, is Beaver County in

```
 1    Pennsylvania?

 2          A.     It's Western PA, outside of

 3    Pittsburgh.

 4          Q.     And what was the name of the

 5    community college?

 6          A.     Community College of Beaver

 7    County.

 8          Q.     Were you a full-time student

 9    there or part-time student?

10          A.     I believe I was part time.

11          Q.     Do you recall how long you

12    were enrolled?

13          A.     I believe it was three

14    years, two and-a-half to three years.

15          Q.     Do you recall the general

16    time period you were enrolled?

17          A.     It was from '84 to '86.

18          Q.     And do you recall what you

19    studied?

20          A.     Air traffic control.

21          Q.     Was there any particular

22    reason why you didn't complete that

23    course of study?

24          A.     I decided it was not for me.
```

1  Q.    And what did you do -- were

2  you working at the time?

3  A.    I was working, yes.

4  Q.    So what prompted you to go

5  back to school to get the Associate's

6  Degree when you were in the credit and

7  collections department?

8  A.    I just realized that in

9  order for me to have a better life, I

10  needed to go back to school and have more

11  career opportunities.

12  Q.    Were the classes you took at

13  the University of Phoenix, were they

14  tailored to helping improve your ability

15  to conduct your -- or to fulfill your job

16  responsibilities as a credit analyst?

17  A.    It certainly helped.

18  Q.    What were your job

19  responsibilities as a credit analyst?

20  A.    They were similar to the

21  duties of a credit correspondent, but I

22  had larger accounts to manage.

23  Q.    When you discussed the

24  responsibilities as a credit

Highly Confidential - Subject to Further Confidentiality Review

1  correspondent, I think you mentioned that

2  you had a region you were responsible

3  for?

4          A.    Yes.

5          Q.    When you were a credit

6  analyst, were you also responsible for a

7  region?

8          A.    Yes.

9          Q.    But the accounts were

10  larger?

11          A.    The accounts were larger

12  accounts, meaning wholesaler accounts.

13          Q.    What's a wholesaler account?

14          A.    A wholesaler account would

15  be, for instance, AmerisourceBergen,

16  McKesson, Cardinal, one of those.

17          Q.    When you worked at Wyeth, do

18  you recall which wholesaler accounts you

19  were responsible for?

20          A.    I also -- I do remember

21  being in charge of the DOD account, as

22  well as -- I was either in charge of the

23  McKesson account or I helped out on the

24  McKesson account, I don't recall which.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Any other wholesalers you

2    can recall?

3    A.    No.

4    Q.    So you didn't work with

5    AmerisourceBergen?

6    A.    I did not.

7    Q.    You didn't work with

8    Cardinal Health?

9    A.    I don't believe so.

10   Q.    How about HD Smith?

11   A.    No.

12   Q.    Bellco?

13   A.    No.

14   Q.    And just so the record is

15   clear, is it you do not recall working

16   for those wholesalers -- with those

17   wholesalers or you're telling me you did

18   not?

19   A.    I don't believe I have

20   worked with those wholesalers.

21   Q.    Understood.  Thank you.

22   And even though you assumed

23   larger accounts, was the responsibility

24   still to work with those accounts to make

1    sure they paid their invoices?

2         A.    Paid their invoices.  And if

3    there were any deductions that they took,

4    I had to help resolve those situations in

5    working with the account.

6         Q.    You mentioned they took

7    deductions --

8         A.    Meaning the accounts.

9         Q.    So the accounts would have

10   been the wholesalers or the DOD or any of

11   the smaller accounts that you worked

12   with?

13        A.    That's correct.

14        Q.    What form of deductions

15   would they have been taking on their

16   invoices?

17        A.    It could have been any form;

18   it could have been a 2 percent discount

19   that we offered if they paid their

20   invoice ahead of time or any other

21   reason.

22        Q.    Do you know if Wyeth ever

23   offered discounts to wholesalers if the

24   volume of their purchasing from Wyeth was

1    higher?

2         A.    I don't recall that.

3         Q.    Do you recall if Wyeth ever

4    offered discounts to wholesalers for

5    receiving chargeback data?

6         A.    I don't recall that either.

7         Q.    Do you understand that term,

8    "chargeback data"?

9         A.    No, I really don't, because

10   I wasn't part of that, that area.

11        Q.    Just for clarity, are you

12   telling me that at the time you worked at

13   Wyeth you would not have understood what

14   chargeback data is?

15        A.    That is correct.  Because I

16   believe that was a separate department

17   that I wasn't involved in.

18        Q.    And then currently do you

19   have an understanding of what chargeback

20   data is?

21        A.    I really do not.  I don't

22   understand the full definition.

23        Q.    Do you recall who you --

24   what individuals you would have worked

1    with at McKesson when you were a credit

2    analyst?

3         A.    No.

4         Q.    Do you recall what

5    department you would have been working

6    with at McKesson?

7         A.    I don't recall the specific

8    department.

9         Q.    So eventually this credit

10   department at Wyeth was outsourced to

11   India, correct?

12        A.    Correct.

13        Q.    And your recollection was

14   that was approximately 2006 or 2007?

15        A.    That was 2007.

16        Q.    When did you apply -- or do

17   you recall when you applied for the

18   position at AmerisourceBergen?

19        A.    I don't recall exactly when

20   I applied, but I know the day that I had

21   the interview for AmerisourceBergen.

22        Q.    You recall the date when you

23   had the interview?

24        A.    It was literally three days

1    after I was let go from Wyeth

2    Pharmaceuticals.

3            Q.    What day was that?

4            A.    That was -- I believe that

5    was March 30th of 2007.

6            Q.    And is that the day you were

7    let go or the date of the interview?

8            A.    That was the date I was let

9    go, the whole department was let go.

10           Q.    And so you would have

11   interviewed approximately three days

12   later?

13           A.    Yes.

14           Q.    And do you recall who you

15   met with when you interviewed?

16           A.    Yes.  His name was Harry

17   Chamberlain.

18           Q.    Do you recall his job

19   position?

20           A.    I don't know -- I don't

21   remember his exact title, but he was the

22   director of, maybe, collections.

23           Q.    Would he have been the

24   person to whom you reported in the

1   collections department when you worked at

2   Amerisource?

3           A.      Initially, yes.

4           Q.      Did you report to somebody

5   else when you were a collections

6   associate at Amerisource?

7           A.      I did.

8           Q.      Who was that?

9           A.      Her name was Ann Marie

10  Duran.

11          Q.      Do you recall her job

12  position?

13          A.      Similar to Harry's.

14          Q.      Essentially, a director of

15  that collections department?

16          A.      Yes.

17          Q.      When we went through your

18  employment history at AmerisourceBergen,

19  I think you said your best recollection

20  was that your title in that collections

21  department was a collections associate?

22          A.      In credit collections, it

23  was initially credit correspondent and

24  then a credit analyst.

1    Q.    At AmerisourceBergen?

2    A.    Oh, I'm sorry.  I was going

3    back to Wyeth.

4          At AmerisourceBergen, I

5    believe it was collections associate,

6    yes.

7    Q.    And was that in the

8    collections department --

9    A.    Yes.

10   Q.    -- or did it have a

11   different name?

12   A.    I don't recall it had a

13   different name.

14   Q.    And how long were you a

15   collections associate in the collections

16   department?

17   A.    Approximately a year

18   and-a-half.

19   Q.    And what were your job

20   responsibilities?

21   A.    I was in charge of the

22   similar duties that I had at Wyeth

23   Pharmaceuticals, ensuring customers were

24   paying their invoices on time.

1    Q.    Anything else?

2    A.    Running statements for

3  customers, monthly statements.

4    Q.    What does that mean?

5    A.    I believe it was the 1st of

6  the month, we would run statements of, I

7  believe, it was customers' purchases.

8    Q.    What was the purpose of

9  running statements of purchases for

10 customers?

11    A.    Those customers would

12 request statements from us on a monthly

13 basis.

14    Q.    Do you recall why they would

15 request those statements?

16    A.    I do not.

17    Q.    In your work as a

18 collections associate, did you ever, as

19 part of your responsibilities, have to

20 review order forms from

21 AmerisourceBergen's customers?

22    A.    I do not recall.

23          But going back to Wyeth

24 Pharmaceuticals, I did review customer

1  orders for customers.

2          Q.    In what role at Wyeth were

3  you reviewing invoices from -- or

4  purchase orders from customers?

5          A.    It was based on their credit

6  standing with us.

7          Q.    What position did you hold

8  at Wyeth when you were reviewing the

9  order forms from customers?

10          A.    It was the credit analyst

11  role.

12          Q.    And you said "it was based

13  on their credit standing with us."

14                What does that mean?

15          A.    I don't fully recollect the

16  details of that, but it was based on

17  their payment history with Wyeth

18  Pharmaceuticals.

19          Q.    So the purpose for you

20  looking at an order form from a customer

21  would be to analyze their payment history

22  and credit standing with Wyeth?

23          A.    Correct.

24          Q.    So not to look at what they

Highly Confidential - Subject to Further Confidentiality Review

1   were ordering; is that right?

2          A.     I do remember looking at

3   what they were ordering.  But, again, it

4   was based on their credit history.

5          Q.     And do you recall looking at

6   any customer order forms when you worked

7   as a collections associate at

8   AmerisourceBergen?

9          A.     I do not remember.

10         Q.     When you were a collections

11  associate at AmerisourceBergen, did you

12  have an understanding of what diversion

13  was?

14         A.     At that time, no.

15         Q.     And at that time, when you

16  were a collections associate at

17  AmerisourceBergen, did you have an

18  understanding of what a suspicious order

19  is, or was?

20         A.     No.

21         Q.     When you were a collections

22  associate at AmerisourceBergen, did you

23  ever receive any training about security

24  around controlled substances?

1        A.     For which role?  For which

2   position?

3        Q.     When you were a collection

4   associate at AmerisourceBergen.

5        A.     No.

6        Q.     Did you receive any training

7   about diversion?

8        A.     No.

9        Q.     Did you receive any training

10  about suspicious orders?

11       A.     No.

12       Q.     Did you have any

13  responsibility for monitoring for

14  diversion when you were a collections

15  associate?

16       A.     No.

17       Q.     Did you have any

18  responsibility for identifying suspicious

19  orders when you were a collections

20  associate?

21       A.     No.

22       Q.     Just to make sure I

23  understand, no training and no

24  responsibility, correct?

Highly Confidential - Subject to Further Confidentiality Review

1  A.    For that role, yes, correct.

2  Q.    So after working at

3  AmerisourceBergen as a collections

4  associate for approximately a year

5  and-a-half to two years, you moved into

6  the position of a diversion control

7  specialist?

8  A.    Correct.

9  Q.    Do you recall what prompted

10  that change in your employment?

11  A.    Just like other roles that I

12  have had over my career, just looking to

13  further my knowledge in a different job

14  position.

15  Q.    Did you apply for that

16  position?

17  A.    I did.

18  Q.    What was the application

19  process like?

20  A.    It was filling out an

21  application form online.

22  Q.    When you say "online," do

23  you mean on the Internet?

24  A.    Inner-company web.

1    Q.    So like an AmerisourceBergen

2    intranet?

3    A.    Yes.

4    Q.    Do you recall what the

5    application was like?

6    A.    I do not.

7    Q.    Do you recall any

8    qualifications that AmerisourceBergen

9    wanted applicants to have for that

10   position?

11   A.    I don't recall.

12   Q.    Do you recall if there were

13   any educational requirements?

14   A.    I do not.

15   Q.    Do you recall if there were

16   any experience requirements?

17   A.    I do not recall.

18   Q.    Was there an interview

19   process for the diversion control

20   specialist position?

21   A.    There was.

22   Q.    What was the interview

23   process like?

24   A.    It was meeting with Ed

Highly Confidential - Subject to Further Confidentiality Review

1    Hazewski.

2          Q.    Anybody else?

3          A.    And I also met with Chris

4    Zimmerman.

5          Q.    Did you meet with Ed and

6    Chris together or separately?

7          A.    Separately.

8          Q.    Were those meetings on the

9    same day or subsequent days?

10         A.    Same day.

11         Q.    Were there any other

12   interviews besides with Ed and Chris?

13         A.    I don't believe so, no.

14         Q.    Do you recall, at the time,

15   what Ed Hazewski's position was?

16         A.    I believe it was diversion

17   control manager.

18         Q.    Do you have -- did you have

19   an understanding, at the time, of why you

20   were meeting with Ed for that position?

21         A.    To apply for the position.

22         Q.    Was he going to be your

23   direct supervisor in that position?

24         A.    He would be.

1    Q.    Do you understand why you

2    were meeting with Chris Zimmerman?

3    A.    Yes.

4    Q.    Why was that?

5    A.    My understanding is that Ed

6    wanted a second opinion, so he asked

7    Chris Zimmerman to also interview me.

8    Q.    Do you know if

9    AmerisourceBergen posted this diversion

10   control specialist job outside of

11   AmerisourceBergen?

12   A.    I do not know.

13   Q.    Did you -- did you, at any

14   time after you interviewed for that

15   position, learn whether AmerisourceBergen

16   was hiring people from outside of the

17   company?

18   A.    I do not recall.

19   Q.    During the interviews with

20   Ed -- or the interview with Ed, did they

21   ask you about your educational

22   background?

23   A.    He may have, but I don't

24   remember.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall if it was a

2    concern that you did not have more than

3    an Associate's Degree?

4    A.    I do have more than an

5    Associate's Degree.

6    Q.    Sorry.  Please forgive me.

7         Can you -- let's back up

8    right there, and you can tell me, what

9    further education have you received after

10   the Associate's Degree?

11   A.    I completed my Bachelor's

12   Degree in 2006.

13   Q.    So you completed your

14   Bachelor's Degree before applying for the

15   diversion control job?

16   A.    Yes.

17   Q.    And what is your Bachelor's

18   Degree in?

19   A.    Management.

20   Q.    Any particular kind of

21   management?

22   A.    No.  It was management.

23   Q.    And where did you complete

24   your Bachelor's Degree?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     University of Phoenix.  And

2   I also took one class towards my

3   Master's.

4          Q.     What was that class?

5          A.     That, I don't remember.

6          Q.     Do you recall what

7   institution you took it through?

8          A.     University of Phoenix.

9          Q.     What were you intending to

10  get a Master's in?

11         A.     Business.

12         Q.     Would that have been like a

13  Master's in business administration or

14  business management?

15         A.     Something like that, yes.

16         Q.     Is there any particular

17  reason why you didn't complete your

18  Master's?

19         A.     No particular reason.

20         Q.     Going back to the interview

21  with Mr. Hazewski, did he ever ask you

22  questions about your experience with

23  controlled substances?

24         A.     I don't recall that

Highly Confidential - Subject to Further Confidentiality Review

1  question.

2      Q.    Did he ask you any questions

3  about your experience with diversion or

4  monitoring for diversion?

5      A.    I don't recall.

6      Q.    Do you recall if Mr.

7  Hazewski asked you any questions about

8  your experience with suspicious orders or

9  monitoring for suspicious orders?

10     A.    No.  But we did discuss the

11 nature of the position.

12     Q.    What was that discussion

13 like?

14     A.    It was just he was telling

15 me about the role of the position that

16 I'm applying for.

17     Q.    What did he tell you about

18 the role?

19     A.    That I would be reviewing

20 orders of interest.

21     Q.    Did he use the word "order

22 of interest" or did he use the word

23 "suspicious orders"?

24     A.    I don't recall.

1    Q.    Do you recall if he may have

2    used the word "excessive purchase

3    orders"?

4    A.    That, I don't remember.

5    Q.    The word "order of

6    interest," do you recall him using that

7    word, or is that a word you're using

8    today --

9    A.    That's --

10    Q.    -- to describe --

11    A.    Sorry.

12    Q.    Is that a word you're using

13    today to describe the subject you

14    discussed back then?

15    A.    Yes.

16    Q.    But it's not the words that

17    he would have used back then?

18    MR. NICHOLAS:  Object to

19    form.

20    Go ahead.

21    THE WITNESS:  Possibly.

22    BY MR. CLUFF:

23    Q.    Was there anything else that

24    he told you about the role of diversion

Highly Confidential - Subject to Further Confidentiality Review

1    control specialist?

2         A.    I do recall talking about

3    spreadsheets.

4         Q.    What about spreadsheets?

5         A.    Just my knowledge of working

6    with Excel.

7         Q.    Did you have a working

8    knowledge of Excel?

9         A.    I had a basic understanding.

10        Q.    What did he tell you about

11   working with spreadsheets in this new

12   role as a diversion control specialist?

13        A.    I don't recall the details.

14        Q.    But he told you you would

15   essentially need to work with Excel

16   spreadsheets?

17        A.    Right.

18        Q.    We discussed your work at

19   Wyeth in pretty substantial detail, and I

20   think we agreed that you did not have any

21   experience or training at Wyeth about

22   diversion or suspicious order monitoring;

23   is that right?

24        A.    Correct.

1    Q.    Did that topic come up

2    during your interview with Mr. Hazewski?

3    A.    My recollection is that I

4    did inform him that I did review orders

5    when I was a credit analyst at Wyeth.

6    Q.    When you were at Wyeth and

7    you reviewed orders, it was to make sure

8    that Wyeth was getting paid, correct?

9    A.    When I was reviewing orders,

10   those -- the decision-making was based on

11   their credit risk with the company.

12   Q.    So what was the purpose of

13   the review of the orders at Wyeth?

14   A.    My understanding is that it

15   was to review those orders; if the

16   credit -- if the customer had a bad

17   credit history with Wyeth

18   Pharmaceuticals, that those orders would

19   not be released.  That's my recollection.

20   Q.    So when you reviewed orders

21   at Wyeth, you were not reviewing them to

22   determine whether or not they were

23   suspicious?

24   A.    I believe so.

1    Q.    But that is the role you

2  were going to take on at

3  AmerisourceBergen as a diversion control

4  specialist, correct?

5    A.    Correct.

6    Q.    Did Mr. Hazewski express any

7  concern that you did not have any

8  experience reviewing orders to determine

9  whether or not they were suspicious?

10    A.    I don't recall.

11    Q.    Do you recall if Mr.

12  Hazewski was looking for somebody with

13  experience in reviewing orders for -- to

14  determine whether or not they were

15  suspicious?

16    A.    He didn't inform me, no.

17    Q.    Do you know why

18  AmerisourceBergen was hiring additional

19  diversion control specialists at that

20  time in 2007?

21    A.    I don't know the specific

22  reasons.

23    Q.    I said 2007, that was

24  incorrect.

1                    I think you applied for that

2       position in 2009, correct?

3            A.    Correct.

4            Q.    I'll just re-ask the

5       question so it's clear.

6                    Did you have an

7       understanding of why AmerisourceBergen

8       was hiring more division -- diversion

9       control specialists in 2009?

10           A.    I don't recall.

11           Q.    When you met with Mr.

12      Zimmerman, do you recall what kind of

13      questions he asked you?

14           A.    No.

15           Q.    Did you talk about your

16      education?

17           A.    I don't recall the substance

18      that we --

19           Q.    Do you recall --

20           A.    -- the subjects we talked

21      about.

22           Q.    Do you recall if you talked

23      with Mr. Zimmerman about your experience

24      monitoring for suspicious orders?

1    A.    I don't recall.

2    Q.    Do you recall if he had any

3  concern that you did not have any prior

4  experience monitoring for suspicious

5  orders?

6    A.    No, I do not.

7    Q.    What happened after you met

8  with Mr. Hazewski and Mr. Zimmerman?

9    A.    I believe within

10  approximately a week I was informed by

11  human resources that I was being offered

12  the position.

13    Q.    So it was a one-day

14  interview process, and then you were

15  hired a week later?

16    A.    Yes.

17    Q.    Do you recall how long after

18  you were informed by HR that you assumed

19  your new responsibilities as a diversion

20  control specialist?

21    A.    I believe it was two weeks.

22    Q.    Did you receive any training

23  before you started your new job?

24    A.    I trained when I started my

1    new job.

2          Q.    What happened in the two

3    weeks between when HR let you know you

4    were getting the job and you started the

5    job?

6          A.    I had to put in my two

7    weeks' notice with my position.

8          Q.    And then you essentially

9    just wrapped up that position and started

10   the new one?

11         A.    Yes.

12         Q.    And you said you trained on

13   the job, correct?

14         A.    Yes.

15         Q.    What was that training like?

16         A.    The training was going over

17   customer orders with Ed.

18         Q.    Did you ever, like, receive

19   any written materials or policies and

20   procedures or PowerPoints?

21         A.    I'm sure there were, but I

22   just don't -- just don't recall at the

23   moment.

24         Q.    What you do recall is sort

1    of hands-on training directly with Ed

2    Hazewski?

3        A.    That is correct.

4        Q.    And you said you recall

5    looking at customer orders.

6              How would you have done

7    that?

8        A.    I would look at those orders

9    individually through the system that we

10   were using.

11       Q.    So that we can kind of

12   understand what the training process was

13   like, I'd like to back up and understand

14   what the order process was like from your

15   viewpoint.

16             So AmerisourceBergen has

17   customers, correct?

18       A.    Yes.

19       Q.    And there's some way that

20   they place orders with AmerisourceBergen?

21       A.    Yes.

22       Q.    What was your understanding,

23   in 2009, as a diversion control

24   specialist, of how customers placed

1    orders with AmerisourceBergen?

2         A.    My understanding at the time

3    is that the customers would place orders

4    through -- I believe it was CSOS and 222

5    forms.

6         Q.    What is CSOS?

7         A.    CSOS is controlled substance

8    ordering system.

9         Q.    And what's a 222 form?

10         A.    A 222 form is a DEA form

11   that has the customer's name, DEA

12   license, as well as the items that

13   they're ordering.

14         Q.    Is the CSOS system just an

15   electronic form of the 222 form?

16         A.    It is.

17         Q.    So it has all the same

18   information that a 222 form would have?

19         A.    My understanding is that

20   yes, that is correct.

21         Q.    And is it your recollection

22   that in 2009 the CSOS system was already

23   operational?

24         A.    I don't recall.

1    Q.    But at some time it did

2    become --

3    A.    Yes.

4    Q.    When you were training on

5    the job with Ed Hazewski, do you recall

6    if you looked at 222 forms?

7    A.    We did not.  The 222 forms

8    go through the distribution centers.

9    Q.    So a customer would fill out

10    a 222 form and send it to the

11    distribution center?

12    A.    Yes.

13    Q.    And then how would -- how

14    would the order come to you and Ed

15    Hazewski for review?

16    A.    I don't recall the actual

17    steps.

18    Q.    So, then, what were you

19    reviewing when you were working with Ed

20    Hazewski to start your training for this

21    new job?

22    A.    It was all the customer

23    orders that were currently in the system

24    to be reviewed.

1    Q.    Do you recall if you were

2    looking at them in an Excel spreadsheet,

3    or some other form?

4    A.    No, I don't recall.

5    Q.    What were you looking for,

6    or what was Ed Hazewski showing you to

7    look for when you were training?

8    A.    My recollection is that we

9    were looking at the product that they

10   were ordering, as well as the quantity

11   that they were ordering.

12   Q.    And what were you trying to

13   determine when you were looking at the

14   product and the quantity?

15   A.    To see if they were ordering

16   within their current purchase history.

17   Q.    When you were training with

18   Ed, did he ever explain the concept of

19   diversion to you?

20   A.    Yes.

21   Q.    What did he explain?

22   A.    It was where the -- any

23   pharmaceutical products being diverted to

24   another individual for illicit purposes.

1      Q.    You used the word "diverted"

2  to help define diversion, and I'm okay

3  with that.

4            But I'm just trying to

5  understand, like, what does diversion

6  mean?  Does that mean it's going out of

7  the regular supply chain?

8      A.    Supply chain, yes.

9      Q.    Did Ed tell you why the word

10  "diversion" mattered in your diversion

11  specialist role?

12     A.    He may have, but I just

13  don't recall.

14     Q.    What was your understanding

15  of why diversion was important in your --

16  in your role?

17     A.    My understanding, at the

18  time, was that pharmacies who were

19  ordering -- licensed pharmacies that are

20  ordering products are receiving those

21  products and not sending them to any

22  other individual for illicit purposes;

23  that they are only supposed to go to the

24  patient who has the prescription.

1         Q.    Was it your role to help

2 AmerisourceBergen prevent diversion?

3              MR. NICHOLAS:  Object to

4       form.

5              THE WITNESS:  Can you ask

6       that question again?

7 BY MR. CLUFF:

8         Q.    Sure.  I'll ask it two

9 different ways.

10              When you became a diversion

11 control specialist, did you understand

12 that your job was to help

13 AmerisourceBergen prevent diversion?

14         A.    No.

15         Q.    AmerisourceBergen doesn't

16 want to prevent diversion?

17              MR. NICHOLAS:  Object to the

18       form.

19              THE WITNESS:  I didn't say

20       that.

21 BY MR. CLUFF:

22         Q.    I'm asking.

23         A.    We have a system in place

24 that detects orders of interest, and

Highly Confidential - Subject to Further Confidentiality Review

1    those orders of interest are reviewed

2    based on the current systems that we have

3    in place.

4         Q.    When you started as a

5    diversion control specialist, did anybody

6    discuss the Controlled Substances Act

7    with you?

8         A.    I don't recall.

9         Q.    Would anybody have discussed

10   the regulations that AmerisourceBergen

11   obtains -- scratch that.

12             Did anybody discuss

13   regulations that AmerisourceBergen has to

14   comply with in relation to wholesale

15   distribution?

16        A.    Yes.

17        Q.    What did they tell you about

18   those regulations?

19        A.    It was a DEA 21 CFR FDA

20   regulation.

21        Q.    And that was explained to

22   you when you started training for a

23   diversion control specialist job?

24        A.    Yes.

1    Q.    What did they explain to you

2  about 21 CFR regulations?

3    A.    Well, they showed me the

4  regulation.

5    Q.    Which ones?

6    A.    It was the 21 CFR.  I don't

7  recall the exact number.

8    Q.    What did they tell you about

9  those regulations?

10    A.    It was regarding that

11  suppliers have to have an order

12  monitoring system in place that detects

13  orders of unusual quantities, frequencies

14  and pattern.

15    Q.    Did they explain to you what

16  a suspicious order was when you started

17  as a diversion control specialist?

18    A.    I don't recall.

19    Q.    In your time working for

20  AmerisourceBergen, has anybody explained

21  to you what a suspicious order is?

22    A.    Yes.

23    Q.    What is it?

24    A.    A suspicious order is

1  initially an order of interest, but after

2  investigation, it is then determined

3  whether that order is suspicious or not.

4          If it is suspicious, that

5  order is rejected and reported to the

6  DEA.

7      Q.    Is that your understanding

8  of a suspicious order today?  Let me make

9  my question a little more clear.

10          Do you know whether this DEA

11  21 CFR regulation defines a suspicious

12  order?

13      A.    Yes.

14      Q.    Do you know what the

15  regulations define a suspicious order to

16  be?

17          MR. NICHOLAS:  Object to

18      form.

19          THE WITNESS:  I did state

20      that earlier.

21  BY MR. CLUFF:

22      Q.    What is the definition of a

23  suspicious order in the CFR?

24          MR. NICHOLAS:  Same

Highly Confidential - Subject to Further Confidentiality Review

1          objection.

2                    Go ahead.

3                    THE WITNESS:  That is a

4          wholesaler needs to have a system

5          in place that monitors orders of

6          unusual size, frequency and

7          pattern.

8    BY MR. CLUFF:

9          Q.    So would you agree with me,

10   then, that the CFR defines a suspicious

11   order as one of unusual size, frequency

12   and pattern?

13                   MR. NICHOLAS:  Object to the

14         form.

15                   THE WITNESS:  To an extent,

16         yes, from what I recollect.

17   BY MR. CLUFF:

18         Q.    How does AmerisourceBergen

19   define an order of interest?

20                   MR. NICHOLAS:  Object to the

21         form.  He's not --

22   BY MR. CLUFF:

23         Q.    Based on your --

24                   MR. NICHOLAS:  He's not

Highly Confidential - Subject to Further Confidentiality Review

1        here --

2              MR. CLUFF:  I'm sorry, Bob,

3        I didn't mean to talk over your

4        objection.

5              MR. NICHOLAS:  I was going

6        to say, object to the form.  This

7        is not a 30(b)(6) deposition.

8              Go ahead.

9    BY MR. CLUFF:

10             Q.    You've worked with

11   AmerisourceBergen for a number of years,

12   correct?

13             A.    Yes.

14             Q.    And you were responsible --

15   well, your position was a diversion

16   control specialist?

17             A.    Yes.

18             Q.    And I've heard you use the

19   word "order of interest" a few times

20   today.

21             Do you have an understanding

22   of what an order of interest is?

23             A.    Yes.

24             Q.    What is your understanding

1    of the definition of an order of

2    interest?

3          A.    My understanding is that the

4    system we have in place, an order of

5    interest would breach two out of our

6    three parameters.

7          Q.    Does an order of interest --

8    is an order of interest of unusual size,

9    frequency or pattern?

10              MR. NICHOLAS:  Object to the

11         form.

12              THE WITNESS:  Yes.

13   BY MR. CLUFF:

14         Q.    And do you identify orders

15   of interest being unusual size, frequency

16   and pattern by looking at these

17   measurements in the system?

18              Excuse me, you used the word

19   "parameters," not measurements.

20         A.    Yes.

21         Q.    So, essentially, orders of

22   interest, in your experience at

23   AmerisourceBergen, match the definition

24   of suspicious order in the Code of

```
 1    Regulations?

 2              MR. NICHOLAS:  Object to the

 3         form.

 4              THE WITNESS:  It's a system

 5         we have in place for orders of

 6         interest that we investigate

 7         individually to determine if that

 8         order is suspicious or not.

 9    BY MR. CLUFF:

10         Q.    I asked you about your

11    understanding of the definition of orders

12    of interest.  And I believe you agreed

13    with me that orders of interest, based on

14    your work at AmerisourceBergen as a

15    diversion control specialist, were orders

16    of unusual size, frequency or pattern.

17              Did I get that right?

18              MR. NICHOLAS:  Object to the

19         form.

20              THE WITNESS:  I thought I

21         indicated that orders of interest

22         are orders that breach two of our

23         three parameters in the order

24         monitoring program system that we
```

1          currently use.

2    BY MR. CLUFF:

3          Q.    And because they breach

4    those parameters, they are of unusual

5    size, frequency and pattern?

6          A.    They are an order of

7    interest.

8          Q.    I'm asking you, based on

9    your experience as a diversion control

10   specialist, whether orders of interest

11   are of unusual size, frequency and

12   pattern?

13              MR. NICHOLAS:  Objection.

14   BY MR. CLUFF:

15         Q.    Is that a yes or a no?

16              MR. CLUFF:  Sorry, Bob.

17              MR. NICHOLAS:  Object to the

18         form.

19              THE WITNESS:  It can be,

20         yes.

21   BY MR. CLUFF:

22         Q.    And we discussed earlier

23   that the Code of Federal Regulations

24   defines suspicious orders as orders of

1  unusual size, frequency and pattern,

2  correct?

3           MR. NICHOLAS:  Object to the

4       form.

5           THE WITNESS:  Yes.

6  BY MR. CLUFF:

7       Q.    So would you agree with me,

8  based on your experience as a diversion

9  control specialist, that suspicious

10  orders, as defined in the Code of Federal

11  Regulations, are referred to at

12  AmerisourceBergen as orders of interest?

13           MR. NICHOLAS:  Object to the

14       form.

15           THE WITNESS:  No.

16  BY MR. CLUFF:

17       Q.    How are they different?

18       A.    These are orders of interest

19  that need to be investigated by our

20  investigators individually.  We look at

21  pattern, we look at the size, we also

22  look at the parameters.

23       Q.    So when you have an order of

24  interest, it has to be investigated

Highly Confidential - Subject to Further Confidentiality Review

1    because it is of unusual size, pattern

2    and frequency, correct?

3                MR. NICHOLAS:  Object to the

4         form.

5                THE WITNESS:  They breach

6         two of our three parameters in the

7         SAP system that we use.

8    BY MR. CLUFF:

9         Q.    But you just said we look at

10   pattern, we look at the size and we look

11   at the parameters.

12               You said that about orders

13   of interest, right?

14               MR. NICHOLAS:  Object to the

15        form.

16               THE WITNESS:  Yes.

17   BY MR. CLUFF:

18        Q.    And that's the same way that

19   the Code of Federal Regulations defines a

20   suspicious order, right?

21               MR. NICHOLAS:  Object to the

22        form.

23               THE WITNESS:  It's not

24        necessarily a suspicious order,

Highly Confidential - Subject to Further Confidentiality Review

```
 1              it's an order of interest.
 2   BY MR. CLUFF:
 3        Q.    Does the word "order of
 4   interest" appear anywhere in the Code of
 5   Federal Regulations that you're aware of?
 6              MR. NICHOLAS:  Well, object
 7         to form.  He's not a lawyer.  He
 8         hasn't read the entire --
 9              THE WITNESS:  No.
10              MR. NICHOLAS:  -- statute.
11              But go ahead.
12   BY MR. CLUFF:
13        Q.    So where does the word
14   "order of interest" come from?
15              MR. NICHOLAS:  Object to the
16         form.
17              THE WITNESS:  It's part of
18         the development of our system that
19         we use.
20   BY MR. CLUFF:
21        Q.    So AmerisourceBergen
22   developed the word orders -- or the term
23   "order of interest"?
24        A.    I don't know who developed
```

1   that term.  But that's the term that we

2   use.

3          Q.    Do you recall when the term

4   "order of interest" started getting used

5   at AmerisourceBergen?

6          A.    I do not.

7          Q.    Do you recall ever being

8   trained about what an order of interest

9   is?

10         A.    Yes.

11         Q.    Do you recall when that was?

12         A.    I do not recall the year.

13         Q.    If you were to estimate,

14  would you say it was before or after you

15  worked at Teva?

16         A.    I don't recall.

17         Q.    When you were training with

18  Ed Hazewski after you started this

19  position, was he training you about

20  suspicious orders?

21         A.    He was training me on order

22  review.

23         Q.    Did you form an

24  understanding, during that training, what

1    you were reviewing for?

2         A.    Yes.

3         Q.    What were you reviewing for?

4         A.    Orders of unusual size,

5    quantity and pattern.

6         Q.    So essentially the same

7    definition of a suspicious order that we

8    talked about in the Code of Federal

9    Regulations?

10             MR. NICHOLAS:  Object to the

11        form.

12             Go ahead.

13             THE WITNESS:  Just orders of

14        unusual size, quantity and

15        frequency, yes.

16   BY MR. CLUFF:

17        Q.    Why were you reviewing for

18   orders of unusual size, quantity and

19   frequency?

20        A.    I'm sorry, I didn't hear

21   your question.

22        Q.    Sure.

23             Why were you reviewing for

24   orders of unusual size, quantity and

1  frequency?

2      A.    These are orders that kicked

3  out into our system for the investigators

4  to review and determine whether the order

5  was going to be released.

6      Q.    So were you reviewing them

7  to determine whether they were

8  suspicious?

9      A.    It was a full investigation

10 of those orders to determine if that

11 order that they placed is within their

12 pattern, as well as frequency and size.

13     Q.    And the goal of that review,

14 or that full investigation that you

15 called it, was that to determine whether

16 or not orders were suspicious?

17     A.    Yes.

18     Q.    Why were you reviewing

19 orders to determine whether they were

20 suspicious?

21     A.    That was part of the

22 training that Ed indicated to me.

23     Q.    Is there any other reason?

24     A.    And also it's part of the

1    DEA regulation.

2         Q.    Did Mr. Hazewski explain,

3    during your training, that wholesalers

4    like AmerisourceBergen have a regulatory

5    requirement that they maintain a system

6    to prevent diversion?

7              MR. NICHOLAS:  Object to the

8         form.

9              THE WITNESS:  Could you ask

10        that question again, please?

11   BY MR. CLUFF:

12        Q.    Sure.

13             While you were training for

14   this new position as a diversion control

15   specialist, did Mr. Hazewski explain to

16   you that wholesalers like

17   AmerisourceBergen have a regulatory

18   requirement to maintain a system to

19   prevent diversion?

20             MR. NICHOLAS:  Object to the

21        form.

22             THE WITNESS:  No.

23   BY MR. CLUFF:

24        Q.    Has Mr. Hazewski ever

1    explained to you that AmerisourceBergen

2    has a regulatory obligation to maintain a

3    system to prevent diversion?

4                    MR. NICHOLAS:  Same

5           objection.

6                    THE WITNESS:  He indicated

7           to me that we need to have a

8           system in place that monitors

9           orders of unusual size, pattern

10          and frequency.

11   BY MR. CLUFF:

12          Q.    Did he ever tell you why?

13          A.    I'm sure he has, but I don't

14   recall the discussion.

15                   MR. NICHOLAS:  Sterling, I

16          don't want to break your flow

17          here, but it's been an hour

18          and-a-half.

19                   MR. CLUFF:  I was looking at

20          that.  I just have a couple more,

21          and then we'll break.

22   BY MR. CLUFF:

23          Q.    In your work as a diversion

24   control specialist over the years, did

1    you ever form an understanding of why

2    AmerisourceBergen is required to maintain

3    a system to monitor orders of unusual

4    size, pattern and frequency?

5           A.    Yes.

6           Q.    And what is that?

7           A.    Because it's part of the DEA

8    requirement that we have a system in

9    place.

10          Q.    A system in place to do

11   what?

12          A.    To monitor customer orders.

13          Q.    Have you ever formed an

14   understanding that AmerisourceBergen has

15   a regulatory requirement to maintain a

16   system to prevent diversion?

17                MR. NICHOLAS:  Object to the

18          form.

19                THE WITNESS:  I'm not aware

20          of that.

21                MR. CLUFF:  Let's go ahead

22          and take a break.

23                VIDEO TECHNICIAN:  We're off

24          the record at 10:56 a.m.

Highly Confidential - Subject to Further Confidentiality Review

1                     -   -   -

2              (Whereupon, a brief recess

3          was taken.)

4                     -   -   -

5              VIDEO TECHNICIAN:  We're

6          back on the record at 11:11 a.m.

7    BY MR. CLUFF:

8          Q.    All right.  Mr. Kreutzer,

9    we're back on the record, so we'll

10   continue your deposition.

11              You understand that you're

12   still under oath?

13         A.    Yes.

14         Q.    When we broke we were, I

15   believe, talking about training for the

16   position you took on as a diversion

17   control specialist at AmerisourceBergen.

18              Do you recall that?

19         A.    Yes.

20         Q.    Do you recall how long you

21   and Mr. Hazewski trained together for

22   before you started operating without

23   supervision?

24         A.    I do not, no.

1    Q.    If you were to estimate,

2    would you say it was less than a month?

3    A.    I do not know.

4    Q.    Was it less than two weeks?

5    A.    I don't recall.

6    Q.    Just so we're clear, you

7    have absolutely no recollection of how

8    long you were trained for?

9    A.    Not specific time frame, no.

10    Q.    Did you train with anybody

11    else aside from Mr. Hazewski?

12    A.    I did.  I trained with Scott

13    Kirsh.

14    Q.    Who is Scott Kirsh?

15    A.    Scott Kirsh was -- I believe

16    he also reported to Ed Hazewski at one

17    time, prior to me coming on board.

18    Q.    Do you recall what his job

19    title was?

20    A.    I believe his -- I believe

21    he was working for Bruce Gundi.  But he

22    was filling in with Ed to also help me

23    train for the position.  So he had a dual

24    role at one point.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What was the dual role?

2    A.    So he would help me review

3  orders throughout the day and also he had

4  his other job to do, reporting to Bruce

5  Gundi.  That's my recollection.

6    Q.    What work was he doing when

7  he reported to Bruce Gundi, did you know?

8    A.    It was investigations not

9  related to order monitoring.

10    Q.    We were talking about some

11  of the substantive training that you

12  received, and you mentioned reading the

13  Code of Federal Regulations.

14         I believe you referred to it

15  as DEA 21 CFR; is that right?

16    A.    Yes.

17    Q.    As part of your training,

18  did you ever read 21 USC Section 823?

19    A.    I don't recall.

20    Q.    In your work as a diversion

21  control specialist with

22  AmerisourceBergen, have you ever read 21

23  USC 823?

24         A.    I don't recall the specific

1    regulation number.

2         Q.    How about when you worked

3    for Teva Pharmaceuticals, did you ever

4    read 21 USC 823?

5         A.    I don't -- I don't remember

6    the specific regulation number.

7         Q.    Have you ever reviewed the

8    regulation or statute that governs

9    registration to manufacture or distribute

10   controlled substances?

11        A.    I don't recall.

12        Q.    Do you know if there is a

13   regulation or statute that governs

14   registrations to manufacture or

15   distribute controlled substances?

16        A.    I don't recall.

17        Q.    Do you not recall today

18   whether or not there is a regulation, or

19   is it that you never knew when you worked

20   at Teva or ABC -- excuse me,

21   AmerisourceBergen, if there was a statute

22   or regulation that governs registrations?

23             MR. NICHOLAS:  Object to the

24        form.

1              THE WITNESS:  I'm sure there

2         is, I just don't recall at the

3         moment.

4    BY MR. CLUFF:

5         Q.    Is that something you would

6    have been familiar with at some earlier

7    point in time?

8              MR. NICHOLAS:  Same

9         objection.

10             THE WITNESS:  I just don't

11        recall.

12   BY MR. CLUFF:

13        Q.    Are you aware that

14   AmerisourceBergen is required to maintain

15   a registration to distribute controlled

16   substances?

17        A.    Yes.

18        Q.    Do you know who issues that

19   registration?

20        A.    The DEA.

21        Q.    Are you aware that

22   manufacturers, like Teva, are required to

23   maintain a registration to manufacture

24   controlled substances?

1        A.    I'm not sure.

2        Q.    When you worked at Teva, did

3   anybody discuss maintaining registration

4   to manufacture controlled substances?

5        A.    I don't believe so.

6        Q.    You never received any

7   training on Teva's registration to

8   manufacture controlled substances?

9        A.    I don't recall.

10       Q.    Going back to

11  AmerisourceBergen's registration to

12  distribute controlled substances, are you

13  aware of any of the requirements to

14  maintain -- to obtain a registration to

15  distribute controlled substances?

16              MR. NICHOLAS:  Object to the

17         form.

18              THE WITNESS:  I don't

19         recall.

20  BY MR. CLUFF:

21       Q.    Your job position at

22  AmerisourceBergen, for the majority of

23  your time there, was diversion control

24  specialist, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    Are you aware, through your

3  work as a diversion control specialist,

4  whether maintaining effective controls

5  against diversion is a requirement in

6  obtaining a registration to distribute

7  controlled substances?

8            MR. NICHOLAS:  Object to the

9        form.

10           THE WITNESS:  I don't

11       recollect.

12  BY MR. CLUFF:

13    Q.    Have you ever received any

14  training about the maintenance of

15  effective controls against diversion,

16  while you've been employed by

17  AmerisourceBergen?

18    A.    I don't recall.

19    Q.    When you worked at Teva

20  under Colleen McGinn, did you ever

21  receive any training about the

22  maintenance of effective controls against

23  diversion?

24    A.    I don't recall.

1    Q.    Do you recall if

2  AmerisourceBergen conducted training

3  about the maintenance of effective

4  controls against diversion?

5    A.    I don't recall.

6    Q.    Is it possible, then, that

7  AmerisourceBergen did not provide

8  training about the maintenance of

9  effective controls against diversion?

10        MR. NICHOLAS:  Object to the

11    form.

12        THE WITNESS:  I just don't

13    recall.

14  BY MR. CLUFF:

15    Q.    How about at Teva, do you

16  recall if Teva ever offered training

17  about the maintenance of effective

18  controls against diversion?

19    A.    I don't recall.

20        MR. MAIER:  Object to form.

21  BY MR. CLUFF:

22    Q.    Do you know if

23  AmerisourceBergen maintains effective

24  controls against diversion?

1           MR. NICHOLAS:  Object to the

2       form.

3           Go ahead.

4           THE WITNESS:  I'm assuming

5       yes, we do.

6   BY MR. CLUFF:

7       Q.    What is your assumption

8   based on?

9       A.    That we have a system in

10  place that identifies orders of interest.

11      Q.    Earlier I asked you if you

12  had ever received any training about the

13  maintenance of effective controls against

14  diversion, and you said you don't recall

15  receiving any training; is that right?

16          MR. NICHOLAS:  Object to the

17      form.

18          THE WITNESS:  Can you

19      rephrase the question?

20  BY MR. CLUFF:

21      Q.    I'll re-ask the question,

22  but I'm not going to rephrase it.

23          We discussed earlier

24  training about the maintenance of

1  effective controls against diversion

2  while you worked at AmerisourceBergen.

3          And you said that you do not

4  recall receiving any training; is that

5  correct?

6          MR. NICHOLAS:  Object to the

7      form.  And I'll object to the

8      refusal to rephrase the question

9      at the witness's request.

10         Go ahead.

11         THE WITNESS:  We have a

12     system in place that identifies

13     orders of interest for unusual

14     size, frequency and pattern.

15  BY MR. CLUFF:

16     Q.    I appreciate that answer.

17  That's not -- that's not the question I

18  was asking, so let me try and get back to

19  the question I was asking.

20          Do you recall that we

21  previously discussed whether or not you,

22  at AmerisourceBergen, received training

23  about the maintenance of effective

24  controls against diversion?

```
 1                    MR. NICHOLAS:  Object to the

 2           form.

 3    BY MR. CLUFF:

 4           Q.    Do you recall that?

 5                    MR. NICHOLAS:  Object to the

 6           form.

 7                    THE WITNESS:  I don't

 8           recall.

 9    BY MR. CLUFF:

10           Q.    You don't recall receiving

11    training, or you don't recall the

12    question?

13                    MR. NICHOLAS:  I think the

14           question is confusing.  I will

15           object to the form, to the series

16           of questions that's confusing.

17                    THE WITNESS:  I don't

18           recall.

19    BY MR. CLUFF:

20           Q.    Do you recall receiving

21    training at AmerisourceBergen regarding

22    the maintenance of effective controls

23    against diversion?

24                    MR. NICHOLAS:  Same
```

Highly Confidential - Subject to Further Confidentiality Review

1    objection.

2         THE WITNESS:  Yes.

3    BY MR. CLUFF:

4         Q.    You do recall receiving

5    training?  What training --

6         A.    I recall receiving training

7    that identifies orders of interest.

8         Q.    When do you recall receiving

9    training about orders of interest?

10         A.    Throughout my career at

11    AmerisourceBergen.

12         Q.    When did the words "orders

13    of interest" start getting used at

14    AmerisourceBergen?

15         A.    I don't recall that.

16         Q.    Is it your recollection that

17    in 2009, when you became a diversion

18    control specialist, Mr. Hazewski trained

19    you about identifying orders of interest?

20         A.    I don't remember.

21         Q.    Do you recall Mr. Hazewski

22    using the words "orders of interest" in

23    2009 when he trained you?

24         A.    No, I do not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall him using the

2    words "suspicious orders"?

3    A.    No, I do not.

4    Q.    Do you recall him using the

5    words "excessive orders"?

6    A.    No.

7    Q.    What did he tell you you

8    were looking for in the orders you

9    reviewed when he was training you?

10            MR. NICHOLAS:  Object to the

11        form.

12            THE WITNESS:  Orders of

13        unusual size, quantity and

14        frequency.

15   BY MR. CLUFF:

16   Q.    And we discussed earlier

17   that that is the definition of a

18   suspicious order in the Code of Federal

19   Regulations, right?

20            MR. NICHOLAS:  Object to the

21        form.

22            Go ahead.

23            THE WITNESS:  I didn't say

24        that.  I said we have a system in

Highly Confidential - Subject to Further Confidentiality Review

1          place that identifies orders of

2          unusual -- of unusual size,

3          quantity and frequency.

4   BY MR. CLUFF:

5          Q.    Do you recall what the

6   definition of a suspicious order is in

7   the Code of Federal Regulations?

8          A.    Yes.

9          Q.    What is it?

10         A.    It's what I just stated.

11         Q.    Orders of unusual size,

12  quantity and frequency?

13         A.    Yes.  Pattern.

14         Q.    And that's what Mr. Hazewski

15  was training you to look for?

16         A.    He was training me to

17  identify orders of interest that need to

18  be reviewed individually to determine if

19  the order is suspicious or not.

20         Q.    So I just asked you if he

21  ever used the words "orders of interest"

22  when he was training you, and you told me

23  that you do not recall.

24         A.    That term, I do not recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So your recollection today

2  is that you were being trained to

3  identify orders of interest?

4         MR. NICHOLAS:  Object to the

5         form.  I believe the questions are

6         confusing.

7         THE WITNESS:  That is my

8         term that I'm using.  I don't

9         recall Ed's term that he used in

10        2009.

11  BY MR. CLUFF:

12    Q.    When you were training with

13  Ed and with Scott, did either of them

14  discuss with you the obligation or

15  regulatory requirement that a wholesale

16  distributor has to maintain effective

17  controls against diversion of controlled

18  substances?

19    A.    I don't recall that

20  discussion.

21    Q.    Your title was diversion

22  control specialist, correct?

23    A.    Yes.

24    Q.    Don't you think it would

Highly Confidential - Subject to Further Confidentiality Review

1  have been important, as a diversion

2  control specialist, to be trained on

3  diversion control?

4          MR. NICHOLAS:  Object to the

5      form.  Just argumentative.

6          THE WITNESS:  I most likely

7      was trained, I just don't recall.

8  BY MR. CLUFF:

9      Q.    What would that training

10 have looked like, if it had occurred?

11         MR. NICHOLAS:  Object to the

12     form.

13         THE WITNESS:  It was

14     hands-on training.

15 BY MR. CLUFF:

16     Q.    And that was -- sorry, go

17 ahead.  I didn't mean to interrupt you.

18     A.    As well as, I believe, we

19 also had PowerPoint trainings at

20 presentations that were conducted.  And

21 we also conducted weekly meetings.

22     Q.    Do you recall who would have

23 given the PowerPoint presentations?

24     A.    I do not.

1     Q.     What were the weekly

2   meetings you guys had?

3     A.     Weekly meetings consisted of

4   anything new that is happening in our

5   department, any pharmacy visits that were

6   being conducted, as well as any orders

7   that the investigators wanted to discuss,

8   or any other information the

9   investigators wanted to discuss on a

10   variety of subjects.

11     Q.     Who attended the weekly

12   meetings?

13     A.     Well, at the time when I

14   initially started, it was myself, I

15   believe it was Scott Kirsh, Ed.  And then

16   soon afterward Joe Tomkiewicz was hired,

17   as well as Dave Britemyer.

18     Q.     Kirsh, you mentioned, was --

19   he had a dual role helping you monitor

20   the -- review the customer orders?

21     A.     Initially, yes.

22     Q.     And working investigations

23   with Bruce Gundi?

24     A.     Yes, that's my recollection.

1    Q.    These names, Tomkiewicz and

2  Britemyer, do you recall their positions?

3    A.    Yes.  Joe was a diversion

4  control -- I believe his title was

5  investigator.

6    Q.    And that's Joe Tomkiewicz?

7    A.    Yes.

8    Q.    And how about Dave

9  Britemyer?

10   A.    Dave Britemyer was an intern

11  for AmerisourceBergen.  So he was working

12  during the summer months, and then he was

13  hired full time.

14   Q.    So we talked about the

15  training on reviewing customer orders.

16        When you went into

17  autonomous mode without training, what

18  were your responsibilities as a diversion

19  control specialist?

20   A.    To review orders or overall?

21   Q.    Overall.

22   A.    Overall.  I conducted due

23  diligence reviews for new customer

24  accounts that want to do business with

Highly Confidential - Subject to Further Confidentiality Review

1  AmerisourceBergen, as well as reviewing

2  orders of interest and any other duties

3  as assigned.

4      Q.    You said "orders of

5  interest."

6          Was that a part of the scope

7  of your job responsibility in 2009?

8      A.    To review customer orders,

9  yes.

10     Q.    But you're using orders of

11 interest today to refer to the work you

12 did back then?

13     A.    That's correct.

14     Q.    And they were not referred

15 to as orders of interest in 2009,

16 correct?

17         MR. NICHOLAS:  Object to the

18     form.

19         THE WITNESS:  I do not know

20     what they were called back then.

21 BY MR. CLUFF:

22     Q.    The reason I'm asking is

23 because we get to different time periods

24 during your work history, and I'm just

Highly Confidential - Subject to Further Confidentiality Review

1  trying to make sure that I understand the

2  correct words to use for the work you

3  were doing at the time.

4           So if there was a word that

5  you used in 2009, I'd like us to use that

6  when we talk about the 2009 time period.

7  And my understanding is that you don't

8  recall?

9      A.    I don't recall the term that

10  I used.  Maybe other investigators used a

11  different term, I don't know.

12      Q.    So I don't want to put words

13  in your mouth, but I want you to

14  understand that I'm going to refer to

15  those as customer orders in 2009, then.

16      A.    Okay.

17      Q.    Because you did not --

18  you've told me you do not recall using

19  the words "orders of interest" in 2009.

20           Does that make sense?

21      A.    Yes, I understand.

22      Q.    So in 2009, I think you

23  described to me three job

24  responsibilities.

1      One was doing customer -- or

2  conducting due diligence on new customer

3  accounts; is that right?

4      A.    As well as overall

5  customers, yes.

6      Q.    Is there a difference

7  between the due diligence on new

8  customers and what you just referred to

9  as overall customers?

10      A.    It's just reviewing customer

11  accounts throughout the month.

12      Q.    Is new customer due

13  diligence sometimes referred to as NCDD?

14      A.    Correct.

15      Q.    I've also heard the term

16  existing customer due diligence.

17          Is that ECDD?

18      A.    That's CDD.

19      Q.    CDD, without the E, okay.

20      A.    Correct.

21      Q.    And were you responsible for

22  both new and existing customer due

23  diligence?

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Are you familiar with the

2  term 590, Form 590?

3    A.    I am.

4    Q.    What is a Form 590?

5    A.    Form 590 is a pharmacy

6  questionnaire.

7    Q.    Is that a new customer due

8  diligence form?

9    A.    It's a part of it, yes.

10  Meaning that -- yes, it is a new customer

11  that would complete that form.

12    Q.    What's a Form 595?  Do you

13  know what that is?

14    A.    Form 595 is a new customer

15  due diligence, it's a checklist.

16    Q.    So it's a part of the due

17  diligence process?

18    A.    Process, yes.

19    Q.    But it's different than the

20  590?

21    A.    Correct.

22    Q.    In addition to new customer

23  and existing customer due diligence, you

24  mentioned reviewing customer orders,

```
 1    correct?

 2           A.    Yes.

 3           Q.    And then I think the third

 4    category is sort of like special projects

 5    by assignment?

 6           A.    Yes.

 7           Q.    Did you have a geographic

 8    area that you were responsible for

 9    reviewing customer orders in or from?

10           A.    I was covering, I believe it

11    was -- back then, it could have been the

12    East and South.  It's a little different

13    now.  But at the time, I think it was

14    East and South I was covering.

15           Q.    Did your geographic area of

16    responsibility for customer orders change

17    over time?

18           A.    It has.

19           Q.    And how did it change?

20           A.    It changed where I was now

21    covering just the North and East regions.

22           Q.    Are those two separate

23    regions, North and East, or --

24           A.    Yes, yes.
```

1    Q.    -- or is it Northeast?

2    A.    Yes, they are two separate

3 regions.

4    Q.    Before you became a

5 diversion control specialist in 2009, do

6 you know who was responsible for

7 reviewing customer orders out of the

8 South region?

9    A.    I do not.

10    Q.    Do you know who the

11 diversion control specialists were that

12 were employed prior to your joining in

13 2009?

14    A.    That would have been Ed

15 Hazewski and Scott Kirsh, I believe.  And

16 there may have been others that I don't

17 remember their names, but they weren't

18 there when I started.

19    Q.    So there may have been some

20 others that worked as diversion control

21 specialists before you started in 2009?

22    A.    Yes, yes.

23    Q.    And you just can't remember

24 their names?

1          A.     I don't remember their

2     names, but I know there were others.

3          Q.     And so prior to you becoming

4     a diversion control specialist, Ed and

5     Scott Kirsh would have been the two

6     persons primarily responsible for

7     reviewing customer orders?

8          A.     As well as the other

9     individuals.

10         Q.     The people you can't

11    remember?

12         A.     I just -- that I can't

13    remember.

14         Q.     Yeah, I'm just trying to

15    understand the world of individuals.

16    Okay.

17              When you were conducting new

18    customer and existing customer due

19    diligence, did you consider that to be an

20    investigation?

21         A.     It was part of our due

22    diligence process.

23         Q.     Did you have, as a diversion

24    control specialist, any responsibility

Highly Confidential - Subject to Further Confidentiality Review

1   for proactively identifying any trends in

2   the diversion of controlled substances?

3          A.    Yes.

4          Q.    What was the responsibility

5   of identifying trends?

6          A.    It was looking at a

7   spreadsheet of a customer's purchases, of

8   all of our customers' purchases.

9          Q.    Do you know what that

10  spreadsheet was called?

11         A.    There were multiple

12  spreadsheets that we had reviewed.  One

13  was an OMP size report, and there were

14  other spreadsheets that were different

15  drug families that we reviewed.

16         Q.    And OMP is a term you just

17  used.

18               What does that stand for?

19         A.    Order monitoring program.

20         Q.    So one of the spreadsheets

21  you recall would have been an order

22  monitoring or OMP size report

23  spreadsheet?

24         A.    Yes.

1    Q.    And you said there were some

2    other spreadsheets that showed drug

3    families?

4    A.    Yes.

5    Q.    What did those -- how did

6    you use those spreadsheets to identify

7    trends?

8    A.    I believe the time frame

9    that the spreadsheet covered was anywhere

10   from six to twelve months of purchases of

11   specific drug families.  So there were

12   multiple spreadsheets.

13   Q.    And how did you use those

14   spreadsheets to identify trends?

15   A.    We would look at their

16   overall usage from one month to the

17   other.

18   Q.    And when you say "their

19   usage," are you referring to a customer's

20   usage?

21   A.    Yes.

22   Q.    And you said that these

23   spreadsheets showed you transactions for

24   all customers, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    All customers that purchased

2  those specific drug families, yes.

3      Q.    So as an example, so I can

4  understand, let's use oxycodone as one

5  drug family, you would be able to see all

6  customers' purchases of that drug family

7  for a specific time period?

8      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



16    Q.    As a diversion control

17 specialist, did you ever discuss upward

18 trends, to use your phrase, with any

19 other wholesale distributors?

20    A.    Discuss that information

21 with other wholesalers?

22    Q.    Yes.

23    A.    No, we have not.  Not that

24 I'm -- not that I'm aware of.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know if any other

2    employees at AmerisourceBergen ever

3    discussed trends in distribution with any

4    other wholesale distributors?

5    A.    Not that I'm aware of.

6    Q.    Do you know if -- or have

7    you personally spoken to employees from

8    any manufacturers about trends in

9    controlled substance distribution?

10    A.    No, I have not.

11    Q.    You said you reported to Ed

12    Hazewski, correct?

13    A.    Yes.

14    Q.    Do you know if Ed Hazewski

15    ever had meetings with or discussions

16    with employees from any manufacturers

17    about trends in wholesale distribution?

18    A.    I'm not aware of any

19    discussion.

20    Q.    If Mr. Hazewski had learned

21    about a specific trend in wholesale

22    distribution from another distributor or

23    from a manufacturer, is that information

24    that he would have communicated to you?

1          MR. NICHOLAS:  Object to the

2     form.

3          THE WITNESS:  He may have, I

4     don't know.

5  BY MR. CLUFF:

6     Q.    Did you, in your role as a

7  diversion control specialist, have any

8  responsibility for identifying

9  unexplainable increases or decreases in

10  purchase quantities?

11     A.    Can you ask that question

12  again, please?

13     Q.    Sure.  Not a problem.

14          Did you not understand the

15  question or did you just --

16     A.    I didn't really understand

17  the question.

18     Q.    So as part of your job

19  responsibilities, were you trying to

20  identify any increases or decreases in

21  purchase quantities from

22  AmerisourceBergen's customers?

23     A.    Yes.  That was part of the

24  role, yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And were you looking to

2  identify an explanation for any increases

3  or decreases?

4      A.    Yes.

5      Q.    What were some of the

6  explanations for increases or decreases?

7      A.    Most times, a customer would

8  submit a consumption review form.

9      Q.    What's a consumption review

10  form?

11      A.    A consumption review form is

12  a form that a customer completes to

13  recommend -- to indicate their current

14  usage of a specific drug family and would

15  request an increase in their parameters.

16      Q.    You used the word

17  "parameters."

18          Are you familiar with the

19  term "threshold"?

20      A.    Yes.

21      Q.    In 2009, when you became a

22  diversion control specialist, were you

23  aware of AmerisourceBergen's suspicious

24  order monitoring policies and procedures?

1      A.     Yes.

2      Q.     Did you have an

3   understanding about whether

4   AmerisourceBergen used thresholds in

5   their suspicious order monitoring system

6   in 2009?

7      A.     The term "threshold"?

8      Q.     Whether they utilized a

9   threshold to identify orders?

10     A.     They did utilize a

11  threshold.

12     Q.     And in 2009, did you have an

13  understanding of how that threshold was

14  calculated?

15     A.     I really didn't have an

16  understanding.  I just have a basic

17  understanding.

18     Q.     What is your basic

19  understanding?

20     A.     That the threshold was

21  determined, it was three times -- it was

22  set at three times the normal size of a

23  pharmacy.  It's just a very basic

24  understanding.  I didn't come up with

Highly Confidential - Subject to Further Confidentiality Review

1    the -- how it was set up.

2            Q.    And do you have any

3    understanding about how long

4    AmerisourceBergen used that three times

5    the normal size threshold?

6            A.    Approximately 2010 or '11 is

7    when we moved to a new system in SAP.

8    And that term was still used up until --

9            Q.    I'm going to pause you right

10   there.

11            When you say "that term," do

12   you mean the threshold term was still

13   used?

14            A.    The threshold term was still

15   used.

16            Q.    And it was used up until --

17   go ahead.

18            A.    I want to say 2015, when we

19   had the FTI program installed.

20            Q.    In 2015, did

21   AmerisourceBergen start using a word that

22   was different than threshold?

23            A.    Yes.  I believe that was

24   parameters.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So when you're referring to

2    parameters, that is the term that was

3    used after some time in 2015, correct?

4    A.    Yes, approximately.

5    Q.    Again, I'm just trying to

6    understand the correct wording.

7              In 2015, when

8    AmerisourceBergen started referring to

9    parameters when they reviewed customer

10   orders, how did those parameters -- how

11   were those parameters established, if you

12   understand?

13   A.    I didn't set the parameters.

14   Q.    You told me earlier that you

15   didn't set the threshold, but you had a

16   basic understanding.

17             With the parameters, did you

18   have any basic understanding of how the

19   parameters were established?

20   A.    My understanding is that the

21   parameters were set as numbers based on a

22   pharmacy's peer group; so within their

23   locale and the same-sized pharmacy,

24   location, that's how those numbers were

1    established.  That's my understanding.

2        Q.    So --

3        A.    But, again, I didn't set

4    those parameters.

5        Q.    To kind of flesh out your

6    understanding.

7             I'm from Los Angeles, so

8    these parameters would have been

9    established for, like, pharmacies located

10   in the general Los Angeles area of

11   similar size?

12            MR. NICHOLAS:  Object to the

13       form.

14            Go ahead.

15            THE WITNESS:  And similar

16       business model.

17   BY MR. CLUFF:

18       Q.    What do you mean by "similar

19   business model"?

20       A.    Meaning that there's a

21   Walgreens store a block from here and

22   another Walgreens store, which basically

23   they're retail pharmacies, so we're not

24   going to compare a retail pharmacy to a

 1    hospital pharmacy or a long-term care

 2    pharmacy.

 3         Q.    Was there a differentiation

 4    between large chain pharmacies like a

 5    Walgreens compared to, like, a

 6    mom-and-pop pharmacy?

 7              MR. NICHOLAS:  Object to the

 8         form.

 9              THE WITNESS:  Meaning?  Can

10         you further elaborate?

11    BY MR. CLUFF:

12         Q.    Were those -- would a

13    mom-and-pop pharmacy be in the same

14    business class as a large chain pharmacy?

15              MR. NICHOLAS:  Object to the

16         form.  Lack of foundation.

17              Go ahead.

18              THE WITNESS:  They were

19         different.

20    BY MR. CLUFF:

21         Q.    I think earlier we were

22    talking about -- well, I think earlier

23    you mentioned looking at customer orders

24    if they hit two out of three parameters.

Highly Confidential - Subject to Further Confidentiality Review

1           How many -- did you know, or

2    do you know today, how many parameters

3    there were after 2015?

4           A.    After 2015, three.

5           Q.    How many -- do you know how

6    many parameters there were or thresholds

7    there were before 2015?

8                MR. NICHOLAS:  Object to the

9        form.

10                Go ahead.

11                THE WITNESS:  I'm not 100

12        percent sure.

13    BY MR. CLUFF:

14           Q.    Do you recognize the term

15    "COP"?

16           A.    Yes.

17           Q.    What is that?

18           A.    Customer order pattern.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

███  ████████████

███        ███      ██████████████████

3        Q.      You mentioned low risk and

4    high risk.

5              What does that refer to?

6        A.      Low-risk drug families are

7    the drug families that we decided were

8    low risk for diversion.

9        Q.      And when you say "we," who

10    do you refer to?

11        A.      Our group.

12        Q.      Is that the CSR --

13        A.      The management team;

14    management team and the analysts that we

15    have.

16        Q.      What management team is

17    that?

18        A.      That would consist of Sharon

19    Hartman, Eric Cherveny and David May.

20        Q.      And that management group

21    got together and decided that there are

22    certain drugs that are low risk of

23    diversion?

24              MR. NICHOLAS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  As well as

3          input from others.

4    BY MR. CLUFF:

5          Q.    Okay.  What's a medium-risk

6    drug?

7          A.    Medium risk, again, as it

8    states itself, is medium risk for

9    diversion.

10         Q.    And who identified this

11   class of medium-risk drugs?

12         A.    Again, that would be the

13   group that I work with.

14         Q.    That's the same management

15   team --

16         A.    Yes.

17         Q.    -- of Sharon Hartman, Eric

18   Cherveny and David May?

19         A.    As well as our analyst, Lino

20   Guerreiro.

21         Q.    Are you a part of that

22   management group that decides what class

23   drugs should be in?

24         A.    I am not.

1    Q.    So it's four people, David

2    Hartman, Eric Cherveny, David May and

3    Lino Guerreiro?

4    A.    Approximately.  There may be

5    others that I'm just not aware of.

6    Q.    Those are the four primarily

7    that you recall?

8    A.    Yes.

9    Q.    Lino Guerreiro, is that --

10   is his full name Marcelino Guerreiro?

11   A.    Yes.

■  ■  ■

■  ■

■  ■

■  ■  ■

16   Q.    And what are high-risk

17   drugs?

18   A.    High-risk drugs are the

19   high-risk drugs that are likely for a

20   potential for diversion.

21   Q.    Prior to 2015 when

22   AmerisourceBergen was identifying

23   customer orders to be reviewed using a

24   threshold, do you recall the process that

Highly Confidential - Subject to Further Confidentiality Review

1  an order would go through before you

2  would review it?  Like how an order

3  arrived at your desk for review?

4       A.    I believe those orders would

5  go through the distribution center.

6       Q.    And what happened at the

7  distribution center?

8       A.    Those orders would then be

9  sent up to CSRA to review.

10       Q.    Was there any review of

11  customer orders at the distribution

12  center level?

13       A.    There was.

14       Q.    What was the review of

15  orders at the distribution center level?

16            MR. NICHOLAS:  Object to the

17            form.

18            THE WITNESS:  My

19            recollection is that those

20            individuals were all trained to

21            review orders, customer orders,

22            and decide if those orders should

23            be released.

24  BY MR. CLUFF:

1      Q.    Do you recall, as a

2  diversion control specialist, why an

3  order would not be released at the

4  distribution center level?

5           MR. NICHOLAS:  Objection.

6      Form.  Foundation.

7           THE WITNESS:  My

8      recollection is if the trained

9      individuals at the distribution

10     center had any questions or any

11     concerns about a particular

12     customer's order that they would

13     send it up to CSRA for review.

14  BY MR. CLUFF:

15     Q.    So if we were going to

16  create a flow chart of a customer's path

17  through AmerisourceBergen, a customer

18  places an order either on CSOS or a Form

19  222, correct?

20     A.    Yes.

21     Q.    And then it goes to the

22  distribution center?

23     A.    Yes.

24     Q.    And then at the distribution

1    center, there are approximately two

2    options that I've heard, they could

3    release the order or they could identify

4    it as an order for the CSRA to review; is

5    that correct?

6         A.    That's correct.

7         Q.    If a distribution center

8    associate did not release an order, what

9    was the -- what would have raised flags

10   about an order for a distribution center

11   associate?

12              MR. NICHOLAS:  Object to the

13        form.

14              THE WITNESS:  It could be

15        anything.

16   BY MR. CLUFF:

17        Q.    Including that the order was

18   of unusual size, frequency and pattern?

19              MR. NICHOLAS:  Object to the

20        form.

21              THE WITNESS:  No.  It could

22        be that the associate that was

23        trained did not feel comfortable

24        in reviewing that order and sent

1        it up to CSRA for review.

2   BY MR. CLUFF:

3        Q.    Did AmerisourceBergen

4   encourage distribution center employees

5   to escalate orders to CSRA if they were

6   uncomfortable?

7             MR. NICHOLAS:  Object to the

8        form.  And foundation.

9             Go ahead.

10            THE WITNESS:  There was

11       information presented to those

12       individuals trained at the

13       distribution center that if they

14       were unsure about any particular

15       customer's order that they could

16       send it up to CSRA for review.

17  BY MR. CLUFF:

18       Q.    Were they given any

19  guidelines about percentages over

20  threshold at which they should or should

21  not release an order from the

22  distribution center?

23            MR. NICHOLAS:  Objection.

24       Form.  Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I don't recall

2     that.

3  BY MR. CLUFF:

4     Q.   Do you recall -- let me ask

5  that question again.

6          Before 2015, do you recall

7  if they were given instruction on when to

8  release an order from the distribution

9  center?

10         MR. NICHOLAS:  Same

11    objection.

12         THE WITNESS:  I don't recall

13    particular information.

14 BY MR. CLUFF:

15    Q.   After 2015, do you recall

16 any instruction that was given to the

17 distribution center associates about when

18 it was okay to release an order?

19    A.   After 2015, my recollection

20 is if the order was of low or medium risk

21 that they could release the orders there,

22 and that was based on their training.

23    Q.   In addition to being

24 instructed that they could release low-

1   or medium-risk orders, do you recall if

2   they were given any percentages at which

3   they should or should not release orders

4   from the distribution center?

5          A.    I don't believe so.

6          Q.    Were distribution center

7   associates ever allowed to release

8   high-risk drug orders?

9               MR. NICHOLAS:  Object to the

10         form.  Form.  Foundation.

11              THE WITNESS:  I don't recall

12         specifically.

13  BY MR. CLUFF:

14         Q.    Do you know if, before 2009,

15  distribution center associates were given

16  any specific instructions about releasing

17  high-risk orders?

18         A.    Before 2009?

19         Q.    Excuse me, before 2015.  I

20  misspoke.

21              MR. NICHOLAS:  Same

22         objection.

23              Go ahead.

24              THE WITNESS:  I don't

1         recall.

2    BY MR. CLUFF:

3         Q.    Do you recall if, after

4    2015, distribution center associates were

5    given specific instructions about

6    releasing high-risk orders?

7              MR. NICHOLAS:  Same

8         objection.

9              Go ahead.

10             THE WITNESS:  I believe they

11        were instructed to forward all

12        high-risk drug families to CSRA.

13   BY MR. CLUFF:

14        Q.    If a distribution center

15   associate released a high-risk drug order

16   after 2015, would that be a violation of

17   AmerisourceBergen's policies?

18             MR. NICHOLAS:  Object to the

19        form.

20             THE WITNESS:  Not

21        necessarily a violation, but that

22        individual would be contacted,

23        through their manager, to

24        determine the reason why they

1    released that order.

2  BY MR. CLUFF:

3       Q.    What would happen if a

4  distribution center associate released a

5  high-risk order after 2015?

6                MR. NICHOLAS:  Object to the

7           form.  Asked and answered.

8                THE WITNESS:  We would

9           contact the distribution center

10          and speak to the manager of that

11          individual who released that order

12          to find out the reason why.

13  BY MR. CLUFF:

14      Q.    Were distribution center

15  associates punished in any way if they

16  released high-risk orders?

17               MR. NICHOLAS:  Objection.

18          Form.  Foundation.

19               THE WITNESS:  I do not know.

20  BY MR. CLUFF:

21      Q.    In your work as a

22  distribution control specialist, and then

23  investigator, did you form an

24  understanding about why distribution

1  center associates were not allowed to

2  release high-risk drug orders?

3        A.    No, I did not.

4        Q.    Okay.  So going back to the

5  distribution center, after an order is

6  sent from the distribution center to the

7  CSRA group, would you have been the

8  person, as a diversion control

9  specialist, to review that order?

10        A.    I would be one of them, yes.

11        Q.    And what -- and that would

12  be when you were reviewing an order to

13  determine whether it was of unusual

14  frequency, size and pattern; is that

15  right?

16        A.    It would be an order of

17  interest.  That --

18        Q.    I'm talking -- let me

19  correct myself.

20              Prior to 2015, when an order

21  came to your desk, that is when you would

22  begin the process of reviewing that order

23  to determine if it was of unusual size,

24  frequency or pattern?

1        A.    Yes.

2        Q.    Did you do anything else

3  with orders during that review process?

4        A.    Prior to --

5        Q.    2015.

6        A.    If there were -- if I had

7  any questions regarding a customer's

8  order, I would reach out to our

9  pharmacist who is on staff.

10       Q.    Who was the pharmacist prior

11  to 2015?

12       A.    It would be Sharon Hartman.

13       Q.    Do you know when she joined

14  the company?

15       A.    I do not know the specific

16  year, but I believe she was on staff in

17  2015.

18       Q.    If I suggested that she

19  joined the company in 2014, would that

20  sound accurate to you?

21         MR. NICHOLAS:  Objection.

22    Lack of foundation.

23         Go ahead.

24         THE WITNESS:  Possibly.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. CLUFF:

2      Q.    Do you know if there was a

3  pharmacist on staff at AmerisourceBergen

4  prior to Ms. Hartman joining the company?

5      A.    I believe Joe Tomkiewicz

6  also had some pharmacy background.

7      Q.    What was his pharmacy

8  background, if you recall?

9      A.    I don't recall.

10     Q.    So prior to Ms. Hartman

11  joining the company in 2014, if you had a

12  question that warranted a pharmacist's

13  input, who would you ask about that?

14     A.    Prior to that, I don't

15  believe we had any other pharmacists on

16  staff, other than Joe.  I would contact

17  Ed Hazewski.

18     Q.    And he's who you would ask

19  questions about customer orders where you

20  needed additional input?

21     A.    Yes.  And, also, we had the

22  sales force also contact the customer at

23  that time.

24     Q.    So if you had a question

Highly Confidential - Subject to Further Confidentiality Review

1  about an order that was presented to you

2  for review, you would ask the sales force

3  sometimes for --

4      A.    Sometimes the sales force.

5      Q.    And then they would contact

6  the customer?

7          MR. NICHOLAS:  Let him

8      finish.

9          THE WITNESS:  No, no.  I'm

10     sorry you --

11  BY MR. CLUFF:

12     Q.    I didn't mean to talk over

13  you.  If you have more of an answer,

14  please give it.

15     A.    In addition to the sales

16  force reaching out to the customer, we

17  also had the distribution center manager

18  reach out to the customer as well.

19     Q.    So just to kind of

20  understand.  If there was a question that

21  you had about an order that you couldn't

22  resolve yourself, prior to 2014, a little

23  confusing now, because that's prior to

24  Ms. Hartman joining, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    You would talk to Mr.

3  Hazewski?

4      A.    Yes.

5      Q.    You could reach out to the

6  sales force, who would talk to the

7  customer?

8      A.    Yes.

9      Q.    Or you could reach out to

10 the distribution center manager, who

11 maybe also would talk to the customer?

12     A.    Correct.

13     Q.    Did you ever talk to

14 customers yourself?

15     A.    Prior to that time, I don't

16 believe I have.

17     Q.    Have you ever talked to

18 customers after that time?

19     A.    Yes.

20     Q.    When you had questions, what

21 kind of responses would you get back from

22 customers?

23          MR. NICHOLAS:  Object to the

24     form.

1          Go ahead.

2          THE WITNESS:  If I called

3     them myself?

4   BY MR. CLUFF:

5          Q.    You know, that's a good

6   point.

7          Let's talk about the before

8   2014 time period.  What kinds of

9   questions would you have for, like, the

10   sales force and the distribution center

11   manager to get information from customers

12   about?

13          A.    I would ask them the reason

14   why this pharmacy is placing a larger

15   order than they typically place.

16          Q.    And what kinds of responses

17   would you get?

18          A.    I would get a response where

19   it could be any number of reasons.  A

20   pharmacy had a robbery, they're trying to

21   replenish their inventory.  There's a

22   pharmacy that closed down the street.

23   There's product that's going to be in

24   short demand.

1          It could be any number of

2     reasons.

3          Q.    If a pharmacy was robbed,

4     would you continue shipping to that

5     pharmacy?

6               MR. NICHOLAS:  Object to the

7          form.

8               THE WITNESS:  If our

9          pharmacy was robbed, yes, after we

10          got a DEA Form 106 and a police

11          report.

12     BY MR. CLUFF:

13          Q.    Were there ever any factors

14     that you would uncover during reviewing

15     an order that warranted additional due

16     diligence, prior to 2015?

17               MR. NICHOLAS:  Object to the

18          form.

19               THE WITNESS:  I'm sure there

20          has been, but I just don't

21          recollect right now.

22     BY MR. CLUFF:

23          Q.    Based on your working

24     experience, what are some factors that

1    you would identify as requiring

2    additional due diligence?

3         A.    Currently?

4         Q.    Yes.

5         A.    I would see if we have any

6    information on the customer in our Matter

7    Management System, if we have a Form 590

8    on file for the customer, and any other

9    information that we have.

10        Q.    The information management

11   system you mentioned, is that Lawtrac?

12        A.    Lawtrac is gone.  We have

13   Matter Management System now and NetDocs.

14        Q.    Is Matter Management System

15   abbreviated MMS?

16        A.    Yes.

17        Q.    And then what was the last

18   one you mentioned?

19        A.    NetDocs.

20        Q.    What is NetDocs?

21        A.    NetDocs took the replacement

22   of Lawtrac.  So any information that was

23   previously in Lawtrac should now be in

24   NetDocs.

1    Q.    When you were reviewing an

2    order, I think you said that some of the

3    information you would look at would be,

4    you know, a Form 590, you would look at

5    the Lawtrac information, correct?

6    A.    Yes.

7    Q.    And how did those sources of

8    information inform your review of a

9    customer order that had passed the

10   distribution center?

11   A.    Well, each order is reviewed

12   individually.  So it's really the

13   totality of the circumstances, whatever

14   information we have on file to make a

15   sound decision whether to release or

16   reject and report that order.

17   Q.    Are you familiar with the

18   Form 590 project?

19   A.    I am.

20   Q.    What was the Form 590

21   project?

22   A.    The Form 590 project is a

23   listing of all the pharmacies, or all the

24   accounts that ABC services, for which we

Highly Confidential - Subject to Further Confidentiality Review

1    did not or could not find a Form 590 for.

2         Q.    Do you recall if the Form

3    590 project also included missing Lawtrac

4    information?

5         A.    I do not.

6         Q.    If an order was presented to

7    you for review and the Form 590 was

8    missing, would you have been able to do

9    an accurate review of that customer's

10   order?

11        A.    Yes.

12        Q.    How so?

13        A.    Based on the systems that we

14   have in place, we can make a decision, as

15   well as personnel we have on staff to

16   make a decision whether to release or

17   report that order, or just reject that

18   order.

19        Q.    Was the Form 590 a required

20   document at AmerisourceBergen?

21             MR. NICHOLAS:  Object to the

22        form.

23             THE WITNESS:  For new

24        customer onboardings, yes.

1    BY MR. CLUFF:

2         Q.    So if a 590 was missing from

3    a customer's file, that would reflect a

4    gap in AmerisourceBergen's policies,

5    correct?

6               MR. NICHOLAS:  Object to the

7          form.

8               THE WITNESS:  No, not a gap.

9         Just a form could have been lost.

10   BY MR. CLUFF:

11        Q.    What about if you received

12   an order from a customer to review and

13   the Lawtrac information was missing or

14   incomplete, could you do an effective

15   review of that customer's order without

16   the Lawtrac information?

17        A.    Yes.

18        Q.    How so?

19        A.    Based on the systems that we

20   have in place.

21        Q.    So you testified that you

22   believe you could do an effective review

23   of an order without a 590, with a missing

24   or incomplete Lawtrac information, and

1   both times you said you could do this

2   based on the systems you have in place.

3          Wasn't the 590 and the

4   Lawtrac part of the system that

5   AmerisourceBergen had in place to review

6   orders?

7          MR. NICHOLAS:  Object to the

8       form.

9          THE WITNESS:  To review

10      orders?  Can you ask that question

11      again, or rephrase it?

12  BY MR. CLUFF:

13      Q.   Yes.

14          So the 590 and the Lawtrac

15  information, were they a part of

16  AmerisourceBergen's suspicious order

17  monitoring system?

18      A.   It was just a piece of it.

19      Q.   Is that the same system that

20  you would have relied on to review orders

21  once they were presented to you from the

22  distribution center?

23      A.   It's just a piece of the

24  process that we would look for, yes.

1    Q.    But the piece -- but the

2  process you were using was missing

3  pieces, correct?

4              MR. NICHOLAS:  Object to the

5          form.

6              THE WITNESS:  Not

7          necessarily missing pieces.

8          Again, we have systems in place

9          that review all orders

10         individually.  So we can make a

11         sound decision with the systems

12         that we have in place.

13  BY MR. CLUFF:

14    Q.    But the systems that you

15  have in place were missing things like

16  Form 590s and Lawtrac information, right?

17             MR. NICHOLAS:  Object to the

18         form.

19             THE WITNESS:  If we had any

20         missing 590s, we would request

21         them to get completed.

22  BY MR. CLUFF:

23    Q.    Are you familiar with the

24  progress that AmerisourceBergen has made

1    in updating the Form 590s that were

2    missing?

3          A.    Yes.

4          Q.    How complete is it?

5          A.    I'm not sure of the

6    percentage that it's completed.  But it's

7    a work in progress.

8          Q.    So it's not completed,

9    right?

10         A.    It's not fully completed,

11   no.

12         Q.    Do you know when

13   AmerisourceBergen first identified that

14   there was a problem with missing Form 590

15   information?

16              MR. NICHOLAS:  Object to the

17         form.

18              THE WITNESS:  I don't know

19         the specific time frame, no.

20   BY MR. CLUFF:

21         Q.    Was it before or after 2015,

22   do you think?

23              MR. NICHOLAS:  Same

24         objection.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  I don't know.

2    BY MR. CLUFF:

3         Q.    I'm going to hand you a copy

4    of an exhibit, we're going to mark it as

5    1 to your deposition.

6                    -   -   -

7              (Whereupon,

8         AmerisourceBergen-Kreutzer

9         Exhibit-1, ABDC_MDL_00304391-392,

10        was marked for identification.)

11                   -   -   -

12   BY MR. CLUFF:

13        Q.    This is a document produced

14   by AmerisourceBergen.  It's Bates stamped

15   ABDC_MDL_00304391 to 392.

16              I'll hand you the top copy,

17   which is the exhibit copy, and you can

18   hand the rest down to your counsel.

19              So just so you're aware, I

20   want to start with the bottom e-mail that

21   starts on 304391 on the bottom of the

22   first page.

23              You can review the whole

24   document, I'm just letting you know

Highly Confidential - Subject to Further Confidentiality Review

1    that's where I want to start.

2              Do you know who Richard --

3    I'm sorry, go ahead.

4         A.    Could you hold on for one

5    second.

6         Q.    Sure.  I thought you were

7    done.  My fault.

8         A.    I'm not finished.

9         Q.    Turning to the second page,

10   which ends in 392, the numbers on the

11   bottom.

12             You see at the very top of

13   the page it says, Below is the text from

14   the initial e-mail regarding the project.

15             And the next paragraph down

16   says, We have been asked by the CSRA

17   diversion control team to assist them

18   with the collection of updated

19   documentation for a substantial number of

20   customers.

21             Did I get that right?

22        A.    Yes.

23        Q.    And was it your

24   understanding, at this time, that the 590

1    project was to be filling out new Form

2    590s for an identified list of customers?

3          A.    Yes.  Yes, that was my

4    understanding.

5          Q.    Looking down at the heading

6    that says, Next steps.  It says, Due to

7    the high number of customers that will

8    need validation, we have broken the list

9    into two groups, CPA customers and

10   non-CPA.

11               What does the abbreviation

12   CPA stand for?

13         A.    I don't remember right now.

14         Q.    Looking in the body of that

15   paragraph underneath, where it says,

16   Beginning January 11th, do you see it

17   says, The 590 forms -- it's in bold in

18   the middle -- should be completed in

19   their entirety and all responses must be

20   legible.  After each account is

21   completed, please submit the

22   documentation to customer maintenance.

23               What is customer

24   maintenance?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Customer maintenance is a

2 group that does all the gathering of data

3 for a new prospective account, including

4 Form 590s and photos.

5    Q.    Is that a sales function?

6    A.    No, it's not a sales

7 function.

8    Q.    What department does that

9 group operate under?

10    A.    It's just a -- it's a

11 separate department from my department,

12 as well as sales.

13    Q.    And they were responsible

14 for gathering customer information?

15    A.    Yeah, for new -- for

16 onboarding new customers.

17    Q.    Did they have any

18 responsibility for existing customers?

19    A.    No.  They -- they would --

20 in this example, they would forward any

21 completed 590s for new and existing

22 customers to the CSRA team to review.

23    Q.    Okay.  And so after people

24 were filling out these new 590s as part

1  of the 590 project, CSRA was reviewing

2  them?

3         A.    Yes.

4         Q.    In the next sentence down,

5  it says, CM will then add the

6  documentation to their system and forward

7  to the CSRA OMP group.

8              What is the CSRA OMP group?

9         A.    That's the corporate

10  security regulatory affairs order

11  monitoring program group.

12         Q.    Who is in that group?

13         A.    Myself.

14         Q.    Are you the only member?

15         A.    No.  Let me clarify.

16              It's myself, Carol Sherman

17  Hines, Emily Coldren, Sara Cressman,

18  Nikki Seckinger, Teresa Javier.

19              And that's primarily the

20  ones that would review 590s.

21         Q.    And are all the members of

22  the CSRA OMP group, are you diversion

23  control specialists and investigators?

24         A.    Yes.

1    Q.    Flip back to the first page

2    for me.  This e-mail at the bottom was

3    sent by a person named Richard Dominico.

4             Do you see that?

5    A.    I do.

6    Q.    Do you know who Richard

7    Dominico is?

8    A.    Other than his signature,

9    he's a district director.

10   Q.    Do you know would -- what is

11   community and specialty pharmacy in the

12   signature block?  Do you know what that

13   connotes?

14   A.    That's his title, where he

15   oversees the customers within that

16   segment.

17   Q.    So is he a customer services

18   or sales kind of a person?

19   A.    He's a sales director.

20   Q.    So would he have been

21   sending this e-mail, then, to sales

22   associates?

23   A.    His reports, yes.

24   Q.    Looking back at the second

1    page, there is a bold heading that says,

2    Note.

3              Do you see that?

4         A.    Yeah, I do.

5         Q.    The first bullet point says,

6    This documentation project should be done

7    within the normal scope of your routing.

8    The priority is still the financial

9    performance of your assignment.

10             Did I read that correctly?

11        A.    Yes.

12        Q.    So despite the fact that

13   AmerisourceBergen was missing 590s for

14   what Mr. Dominico referred to as a

15   substantial number of customers, he is

16   telling sales associates that financial

17   performance is more important?

18             MR. NICHOLAS:  Object to the

19        form.

20             THE WITNESS:  I can't

21        comment.  I'm not a part of that

22        e-mail.

23   BY MR. CLUFF:

24        Q.    But you would agree that

1    that's the words he's using, right, the

2    priority is still the financial

3    performance of your assignment?

4                MR. NICHOLAS:  Object to the

5          form.

6                THE WITNESS:  I can't agree,

7          other than what's typed here.

8    BY MR. CLUFF:

9          Q.    Who is -- turning back to

10   the first page, Marsha Widrick, if I'm

11   saying that correctly?  It's the second

12   e-mail on the page.

13         A.    Marsha Widrick, she's one of

14   the sales associates that reports to

15   Richard Dominico.

16         Q.    Do you know why she was

17   forwarding you this e-mail?

18         A.    I do not.  It appears there

19   was some accounts that were listed, and

20   she was just indicating to me that she'll

21   be sending out more requests over the

22   next couple of weeks.  And she wanted to

23   know, is there a better address to send

24   them to.

1    Q.    Do you recognize this

2    address that she references, the CSRA

3    validation project?

4    A.    Yes.

5    Q.    What was that?

6    A.    CSRA validation project is a

7    term that we use for the assignment.

8    It's not an e-mail address, which she

9    thought it was.

10    Q.    So your group used the term

11    CSRA validation project synonymously with

12    590 form project or validation --

13    A.    That's the title of the

14    spreadsheet, yes.

15    Q.    Going back to Richard

16    Dominico's e-mail, he says, To date as a

17    company, only 10 percent of the overall

18    customer list has been completed.

19            Does that refresh your

20    recollection about how complete the

21    project was, at least as it existed in

22    July 2017?

23    A.    No.

24    Q.    It does not?

1           Do you have any reason to

2   dispute that the 590 project was more

3   complete than 10 percent as of July 2017?

4           MR. NICHOLAS:  Object to the

5       form.

6           THE WITNESS:  I don't recall

7       this specific -- this specific

8       e-mail from Richard.

9   BY MR. CLUFF:

10      Q.    But you would agree with me

11  that AmerisourceBergen was essentially

12  conducting due diligence on customer

13  orders while missing Form 590s, correct?

14          MR. NICHOLAS:  Object to the

15      form.

16          THE WITNESS:  We conduct due

17      diligence on all our customers at

18      all times.

19  BY MR. CLUFF:

20      Q.    But according to the Form

21  590 project, some of that due diligence

22  was missing?

23          MR. NICHOLAS:  Object to the

24      form.

1    THE WITNESS:  Some of those

2    590s were missing.

3  BY MR. CLUFF:

4    Q.    Whose responsibility would

5  it have been to ensure that due diligence

6  was being completed fully during the

7  customer onboarding process?

8    MR. NICHOLAS:  Object to the

9    form.

10    THE WITNESS:  Part of the

11    process is customers submit a Form

12    590 and photos.

13  BY MR. CLUFF:

14    Q.    Do customers submit that

15  directly to AmerisourceBergen, or do they

16  submit it to some representative in the

17  company?

18    A.    The potential customer works

19  with the sales representative, and, in

20  turn, then sends it into the customer

21  maintenance group for their review.

22    Q.    And then what does the

23  customer maintenance group do with it?

24    A.    Then once they determine

1    that it is complete, then they will send

2    it up to the CSRA OMP group for review.

3         Q.    What does the CSRA OMP group

4    do with it?

5         A.    We review all the

6    information on the 590 to ensure all the

7    information is complete.  And we conduct

8    due diligence on the licenses, as well as

9    the doctors.

10        Q.    Is that process that you

11   just described, has that been the same

12   since 2009 all the way until the present

13   day?

14        A.    The form has changed over

15   the years, it has evolved.  So I don't

16   recollect what information was on the

17   initial 590.

18        Q.    I appreciate that

19   differentiation.

20             So the form has changed, but

21   has the process of submitting, reviewing

22   and approving a form, has that changed?

23        A.    No.

24        Q.    I want to hand you another

1   set of documents that you can pass down

2   to your counsel for me.  We'll mark this

3   as Kreutzer Exhibit-2.

4                    -   -   -

5              (Whereupon,

6         AmerisourceBergen-Kreutzer

7         Exhibit-2, ABDC_MDL_00154441-443,

8         was marked for identification.)

9                    -   -   -

10  BY MR. CLUFF:

11       Q.    It's an e-mail with an

12  attachment, it is ABDC_MDL_00154441.  The

13  attachment begins at 442 and continues

14  through 443.

15            MR. CLUFF:  You keep the one

16         with the numbers on it and pass

17         the rest down.

18  BY MR. CLUFF:

19       Q.    So I just want to give you a

20  couple of notes about this, Mr. Kreutzer.

21            MR. NICHOLAS:  You take that

22         one.

23  BY MR. CLUFF:

24       Q.    If you look at the top of

Highly Confidential - Subject to Further Confidentiality Review

1   this e-mail, just for reference, you'll

2   notice that it's from Eric Cherveny to

3   you, Kevin Kreutzer.  The subject is,

4   Openin -- which I assume is supposed to

5   be opening -- Lawtrac matters.

6             And if you look at the

7   attachments line, it says OMP Lawtrac

8   review-due diligence notes.  If you flip

9   the page, you'll see there's a subject,

10  OMP Lawtrac review/due diligence notes.

11            These documents were

12  produced as a parent e-mail and

13  attachment, so they go together.  You can

14  review them.  Thanks.

15       A.    Okay.

16       Q.    Do you recall receiving this

17  e-mail from Eric Cherveny?

18       A.    I do not.

19       Q.    But you would agree that it

20  is addressed to you, correct?

21       A.    Yes.

22       Q.    I want to start in the

23  middle of the e-mail.  You'll see those

24  headings, Date, Description, Update,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Source, Name.

 2              MR. CLUFF:  Can you blow

 3         that whole section up, Zach?

 4    BY MR. CLUFF:

 5         Q.    You can look up here, too,

 6    if it's easier for you, Mr. Kreutzer,

 7    whichever you prefer.

 8              But I'm curious, this

 9    description here, this, I'll call it a

10    box, for a lack of a better word, is that

11    an example of an entry that would have

12    been in a customer's Lawtrac file?

13         A.    It could have been.

14         Q.    Where would this kind of a

15    description be entered if it wasn't in

16    Lawtrac?

17         A.    Well, it's referring to the

18    content.  But at that time, it would have

19    been entered in Lawtrac.

20         Q.    And this kind of

21    information, where would it be recorded

22    now?

23         A.    In MMS, Matter Management

24    System.
```

1    Q.    I want to point your

2    attention to the very last sentence in

3    that block.  It says, Related documents

4    are attached.

5              From reading the text in

6    that box, do you have any understanding

7    of what related documents would have been

8    attached?

9    A.    According to the

10   description, it would be the Form 590 and

11   photos.

12   Q.    So if you were to hand me a

13   copy of a Lawtrac file, it would have,

14   I'm guessing, a series of entries like

15   this on a sheet, correct?

16   A.    At a minimum, yes.

17   Q.    And then it would also have

18   documents included with it?

19   A.    Yes.

20   Q.    And I understand that this

21   information would have existed

22   electronically on Lawtrac, which is

23   different than, like, handing me a file.

24             But was there a way to

1    export a Lawtrac file from the Lawtrac

2    database?

3           A.    It wasn't always electronic

4    in Lawtrac.  It was also in paper form

5    when I first started.

6           Q.    So in 2009, the Lawtrac

7    information existed on paper?

8           A.    It existed on paper.  And

9    all the documents, all the due diligence,

10   was included in a manilla folder entitled

11   as such.

12          Q.    Do you know where that would

13   have been housed or kept?

14          A.    It would have been kept in

15   the file cabinets in our office.

16          Q.    Which office?

17          A.    In the sales corporate

18   security/regulatory affairs office.

19          Q.    Do you know where that was

20   located?  Is it in Philadelphia, or --

21          A.    It's in Chesterbrook,

22   Pennsylvania, headquarters.

23          Q.    Do you know if those records

24   were kept, or were they destroyed ever?

Highly Confidential - Subject to Further Confidentiality Review

1       A.     They were moved around

2    after -- I'm not sure of the time frame,

3    a couple of years, they were moved off

4    site to Iron Mountain.

5       Q.     What's Iron Mountain?

6       A.     Iron Mountain is a storage

7    facility.

8       Q.     Do you have any

9    understanding of whether or not those

10   records are still kept at Iron Mountain?

11      A.     I do not.  I don't believe

12   they are.

13      Q.     Do you -- you said you don't

14   believe they are.

15             Is that because you have any

16   understanding about them being moved

17   somewhere else, or you just don't know if

18   they're there?

19      A.     I don't know if they're

20   there.

21      Q.     At some point were the paper

22   documents migrated to an electronic

23   format?

24      A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall when that

2    happened?

3    A.    I don't recall the exact

4    year.

5    Q.    Do you think it was before

6    or after 2009?

7    A.    It was after 2009.

8    Q.    It was before 2015, though,

9    presumably?

10   A.    Yes.  Approximately 2010,

11   '11.

12   Q.    What was the procedure for

13   taking the paper files and converting

14   them to an electronic format?

15   A.    I'm not following you there.

16   Q.    Sure.  Let me rephrase that.

17   Do you know if all of the

18   paper files were converted to electronic

19   format to be recorded in an electronic

20   version of Lawtrac?

21   A.    Yes, I believe they were.

22   Q.    The paper files that

23   eventually were stored at Eagle Mountain,

24   do you know how far back those records

1    went?

2         A.    I don't know.  They went

3    back a number of years.

4         Q.    So you started in diversion

5    control in 2009.

6              Do you think they went back

7    five or ten years, if you have an

8    understanding?

9         A.    I don't know.

10         Q.    You could not comment, okay.

11    That's fine.

12              MR. NICHOLAS:  Sterling, I'm

13         not going to stop you in

14         midstream, but it's 12:30.  So

15         it's been an hour and-a-half.  If

16         it's going to be a long time --

17              MR. CLUFF:  Let's just

18         finish with this document and

19         we'll move on.

20    BY MR. CLUFF:

21         Q.    I just want to go back to

22    the substance of Eric's e-mail to you, so

23    starting with the first line, where it

24    says, Kevin, per policy.  He says, It's

1  against CSRA policy to close your own due

2  diligence.

3              What does it mean to close

4  due diligence?

5        A.    I believe this is right when

6  Eric started.  And so we were using the

7  Lawtrac system.  And at that time, I

8  believe we were closing our own matters.

9        Q.    What did it mean to close a

10  matter, though?

11        A.    Meaning that all the due

12  diligence has been conducted and

13  everything is in the file.  Just because

14  it's closed doesn't mean it can't be

15  reviewed.

16        Q.    What kind of due diligence

17  would you have been conducting in this

18  kind of an instance?  Is it, like, new

19  customer due diligence?  Existing

20  customer order monitoring due diligence?

21  Can you tell?

22              MR. NICHOLAS:  Object to the

23        form.

24              THE WITNESS:  According to

Highly Confidential - Subject to Further Confidentiality Review

1          the description here, as requested

2          Form 590 and photos from -- I'm

3          not sure what that acronym stands

4          for, but he's in sales, for an

5          existing ABC retail pharmacy

6          located in Brandon, Missouri, or

7          Mississippi.

8     BY MR. CLUFF:

9          Q.    So that would have been

10   existing customer due diligence?

11        A.    Yes.

12        Q.    And at least at that time,

13   Mr. Cherveny believed that it was against

14   policy to close your own due diligence,

15   right?

16              MR. NICHOLAS:  Object to the

17        form.

18        Go ahead.

19              THE WITNESS:  Yes.

20   BY MR. CLUFF:

21        Q.    Continuing, he says, I need

22   to be able to review each due diligence

23   matter before closing.  Also, per my

24   memo, the 595 was not properly completed

1    in this matter.

2              Can you tell from the

3    substance of his e-mail to you what was

4    improperly completed on the 595?

5         A.    I do not know, other than

6    what he indicates here.

7         Q.    Okay.  His closing sentence

8    of this e-mail is, Also, ensure a 595 is

9    included in all DD.

10             Does that stand for due

11   diligence?

12        A.    It does.

13        Q.    So he wants it included in

14   all due diligence matters?

15        A.    Yes.

16        Q.    So if a 595 was missing,

17   that would have indicated a gap in the

18   due diligence process, right?

19             MR. NICHOLAS:  Object to the

20        form.

21             THE WITNESS:  Not a gap.

22        It's just it's missing.

23   BY MR. CLUFF:

24        Q.    So missing information.

1              MR. NICHOLAS:  Object to the

2         form.

3    BY MR. CLUFF:

4         Q.    I want you to turn the page

5    to the memo that Mr. Cherveny referenced

6    in his e-mail and that he attached.

7              He says that upon review of

8    due diligence matters, he observed some

9    areas that he wanted to comment on.

10             Do you recall having any

11   conversations with Mr. Cherveny about his

12   comments about due diligence in 2015?

13        A.    I do not.

14        Q.    Was new customer and

15   existing customer due diligence something

16   that you discussed with Mr. Cherveny as a

17   general part of your job

18   responsibilities?

19        A.    I don't personally recall

20   responding to him.

21        Q.    Look at the first bold

22   heading.  It says, Lawtrac matters.

23             The next heading down is,

24   Number 1, Naming matters.  He points out,

1  in the first sentence, that, All new

2  customer due diligence and existing

3  customer due diligence and threshold

4  review matters should be named

5  consistently in Lawtrac.

6            And then the last sentences

7  say, Please pay special attention to the

8  misspelling point.  This causes havoc

9  when trying to pull up a customer file.

10           Did you ever experience

11 having problems finding customer

12 information in Lawtrac because of

13 misspellings or incomplete files?

14      A.    No, I don't recall that.

15      Q.    If a customer's due

16 diligence was incorrectly named, though,

17 and you went to go search for it, would

18 you have been able to find it as part of

19 your due diligence process?

20      A.    Most likely, yes.  Because I

21 could research it by DEA license.

22      Q.    What did you think Mr.

23 Cherveny was referring to when he

24 referenced misnaming of files causing

Highly Confidential - Subject to Further Confidentiality Review

1    havoc in customer files?

2              MR. NICHOLAS:  Object to the

3         form.  Lack of foundation.

4              THE WITNESS:  It appears

5         he's just ensuring that we're all

6         on the same page and naming the

7         matters the same across the board.

8    BY MR. CLUFF:

9         Q.   Is that because Lawtrac

10   matters were an important part of

11   AmerisourceBergen's suspicious order

12   monitoring policies?

13             MR. NICHOLAS:  Object to the

14        form.

15             THE WITNESS:  They were a

16        piece of it.

17   BY MR. CLUFF:

18        Q.   Looking at Number 3, it

19   says, Articulation of matter requests,

20   threshold requests.

21             Were you responsible for

22   reviewing and approving threshold

23   requests as a diversion control

24   specialist?

1          A.     I was.

2          Q.     He says here, Please be

3    clear what the threshold request was,

4    i.e., what drug family is being requested

5    for increase.  Also, if a change is made,

6    please be clear to identify the previous

7    threshold as well as the new threshold

8    (what was it changed to).

9               When you were reviewing

10   threshold requests, did you always, you

11   know, comply with this policy?

12              MR. NICHOLAS:  Object to the

13         form.

14              THE WITNESS:  I believe I

15         have.

16   BY MR. CLUFF:

17         Q.     He says here, It's not

18   always clear what was done in the matters

19   I've looked at today.

20              Is it important to have a

21   clear idea of what somebody's threshold

22   is when you're reviewing their orders?

23              MR. NICHOLAS:  Object to the

24         form.

1          THE WITNESS:  We can see

2      what their threshold is anyway,

3      even in the system -- the order

4      monitoring system that we use.

5  BY MR. CLUFF:

6      Q.    Then do you know why he was

7  concerned that it was unclear what was

8  done in these threshold requests?

9          MR. NICHOLAS:  Object to the

10      form.  Lack of foundation.

11          THE WITNESS:  I do not.

12  BY MR. CLUFF:

13      Q.    Okay.  Look at the next

14  major bold heading.  It says, CSRA Form

15  590s.

16          If you look at the top, this

17  e-mail is dated February of 2015.  And

18  Eric Cherveny says in this memo, Please

19  be absolutely certain that any CSRA Form

20  590 is totally and completely filled out.

21  If it's not, send it back to the ACM to

22  complete.

23          Did I get that right?

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And he says, Fair warning

2   here -- which is underlined -- I'll be

3   reviewing each of these prior to closing

4   the matters and will send them back to

5   you if there's any relevant information

6   missing.

7           How important were the Form

8   590s in AmerisourceBergen's suspicious

9   order monitoring program?

10          MR. NICHOLAS:  Objection.

11          Asked and answered.  Object to the

12          form.

13          THE WITNESS:  They were

14          important.  But it's -- again,

15          it's just a piece of the due

16          diligence that we conduct daily on

17          our customers.

18   BY MR. CLUFF:

19      Q.    Does this refresh your

20   recollection at all about when the Form

21   590 problem was first identified?

22      A.    No, it does --

23          MR. NICHOLAS:  Object to the

24          form.

1              THE WITNESS:  No, it does

2       not.

3    BY MR. CLUFF:

4       Q.    But the accuracy and

5    completeness of information on the Form

6    590 was at least something that you were

7    discussing in the CSRA department as

8    early as February of 2015, correct?

9              MR. NICHOLAS:  Object to the

10      form.

11             THE WITNESS:  It could have

12      been.

13   BY MR. CLUFF:

14      Q.    I want you to look at the

15   second-to-last paragraph on the third

16   page, which ends in 443.

17             The paragraph that starts, I

18   don't want to send the wrong message.

19             He says, in the

20   second-to-last sentence, It's very

21   important that we be consistent and

22   detail oriented with all of our due

23   diligence records.

24             MR. NICHOLAS:  You don't

Highly Confidential - Subject to Further Confidentiality Review

1    want to read the first two

2    sentences to him?

3             MR. CLUFF:  Sure, Bob.

4    BY MR. CLUFF:

5         Q.    For the most part, the

6    matters I reviewed here were very clear

7    and complete.

8             Then he continues, It's very

9    important that we be consistent and

10   detail oriented with all of our due

11   diligence records.  Taking these steps

12   will help to preserve the integrity and

13   contribute to the overall success of our

14   OMP program.

15            Did I read that accurately?

16        A.    Yes.

17        Q.    So going back to the second

18   page, he's talking about accurately

19   identifying Lawtrac matters, including

20   making sure that customer due diligence

21   is there, that the threshold review

22   matters are clearly filled out.

23            He's also talking about

24   including complete Form 590s and Form

1    595s, right?

2          A.    Yes.

3          Q.    And on the last page, he

4    also talks about making sure that the

5    threshold requests are appropriately

6    named and annotated, correct?

7          A.    Yes.

8          Q.    And then he says, All of

9    this, as part of our due diligence

10   records, will help to preserve the

11   integrity and contribute to the overall

12   success of our OMP program, right?

13         A.    Yes.

14         Q.    So would you agree with me

15   that having incomplete information or

16   missing any of that information,

17   according to Eric Cherveny's memo, would

18   undermine the integrity and the success

19   of the OMP program?

20               MR. NICHOLAS:  Object to the

21         form.  Lack of foundation.  Purely

22         argument.  Argumentative.

23               Go ahead.

24               THE WITNESS:  No, I would

1    not agree.  It's just Eric is just

2    conveying a message over to all of

3    us so that we are all consistent.

4  BY MR. CLUFF:

5    Q.    But the message he was

6  conveying was that having accurate

7  recordkeeping and complete and detailed

8  due diligence records was critical to the

9  integrity and success of the OMP program,

10  right?

11    A.    That's what he said, yes.

12    Q.    And then we just reviewed an

13  e-mail prior to this, where in 2017,

14  Amerisource is still missing 90 percent

15  of the Form 590s that were identified as

16  part of the validation project, correct?

17    MR. NICHOLAS:  Objection.

18    Lack of foundation.

19    THE WITNESS:  I don't know

20    the percentage.

21  BY MR. CLUFF:

22    Q.    That's what the e-mail said,

23  right, that only 10 percent had been

24  completed by 2017?

1           MR. NICHOLAS:  Objection.

2    Bickering.

3           THE WITNESS:  Yes, that's

4    correct.

5           MR. CLUFF:  Let's go off the

6    record, and we'll break for lunch.

7           VIDEO TECHNICIAN:  Off the

8    record at 12:41 p.m.

9                -  -  -

10          (Whereupon, a luncheon

11   recess was taken.)

12               -  -  -

13          VIDEO TECHNICIAN:  We're

14   back on the record at 1:35 p.m.

15          MR. CLUFF:  Is counsel for

16   Teva on the phone?

17          MR. MAIER:  Yes.

18          MR. CLUFF:  I wanted to give

19   you a heads up that I'm going to

20   ask Mr. Kreutzer about some

21   Teva-produced documents, all of

22   which he is either an author or

23   recipient of.

24          I'm going to lay some

1    foundation to establish that he

2    worked through the scope of these

3    e-mails and documents, but I

4    wanted to give you the list now so

5    you can look at them.  I don't

6    anticipate that you'll have an

7    objection, because he's an author.

8    But do you want to write these

9    down really quick?

10           MR. MAIER:  Yes, that would

11    be great.  Thank you.

12           MR. CLUFF:  So all of these

13    have the same Teva_MDL-A prefix,

14    I'll just give you the number of

15    the lead document.

16           The first one is 0233-1299.

17           MR. MAIER:  Okay.

18           MR. CLUFF:  The second one

19    is 06441441.

20           MR. MAIER:  I'm sorry, can

21    you repeat that one?

22           MR. CLUFF:  Yeah. It's

23    06441441.

24           MR. MAIER:  Okay.

1          MR. CLUFF:  The next one is

2     0233-1346.

3          MR. MAIER:  Okay.

4          MR. CLUFF:  After that, it's

5     0233-1426.

6          And we included the

7     attachments to all of those, if

8     they had one.  I think they all

9     did.  And if they had multiple

10    attachments, we did our best to

11    make sure they were all included.

12          MR. MAIER:  Okay.

13          MR. CLUFF:  So take a look.

14    Just wanted you to be aware so

15    there weren't any surprises or,

16    you know, problems with them.

17          But as I said, I'm going to

18    lay a foundation and he's the

19    author on all of those.

20          MR. MAIER:  Okay.

21  BY MR. CLUFF:

22     Q.   So, Mr. Kreutzer, we're back

23  on the record again.  As before, you're

24  still under oath.

1          So earlier we talked about

2    thresholds and that part of your job

3    responsibilities as a diversion control

4    specialist were to review threshold

5    change requests; is that correct?

6          A.    Yes.

7          Q.    And I believe that you

8    testified, just to get the landscape

9    back, that prior to 2015 you had a basic

10   understanding of how a threshold was

11   calculated, but nothing more than that

12   basic understanding, right?

13         A.    Correct.

14         Q.    And we discussed the

15   threshold -- excuse me, you used the word

16   "parameters" -- the parameters that

17   existed after 2015, and you were able to

18   describe the names of those parameters.

19         But did you have any basic

20   understanding of how any three of those

21   parameters was calculated or established?

22         A.    No, I do not.

23         Q.    And I understand that there

24   is a privilege being asserted on some of

1  the work that FTI did in 2015 for

2  AmerisourceBergen.  I just want to remind

3  you of that.  So don't testify to

4  anything that you learned from your

5  lawyers about those parameters.

6          And your lawyer is free to

7  interpose an objection, but I just wanted

8  to all be clear that I have some

9  questions about your understanding, but I

10 don't want attorney communications.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          Q.     Do you know if the CSRA

19    department was responsible for it?

20          A.     They would be, but I don't

21    know who in the department.  That might

22    have been pre-established before I even

23    got there.

24          Q.     I've also seen a term

```
1    "threshold override."

2              Do you understand what a

3    threshold override is?

4         A.    Yes.

5         Q.    What is a threshold

6    override?

7         A.    Threshold override means

8    that the customer has an override to

9    their threshold, could be higher or it

10   could be lower, based on the decision

11   that was made to make the adjustment.

12        Q.    And then I believe you

13   testified about threshold requests or

14   change requests.

15             How would you describe the

16   documentation that a customer submits to

17   request a change to their threshold?

18   What term would you use?

19        A.    Are we talking pre-2015?

20        Q.    Yes, pre-2015.

21        A.    That would have been a

22   threshold -- the customer would complete

23   a threshold review form.

24        Q.    And who did they submit that
```

1  to?

2          A.    I don't recall if it was

3  the -- it was called the hub or the sales

4  force, if we were using that back then.

5  But that's what we're using now.

6              We also -- I do recollect

7  that, I believe, we had a threshold

8  review form mailbox that customers would

9  send the forms to.

10         Q.    Did customers ever submit

11  threshold reviews through, like, the

12  customer service or customer sales group?

13         A.    They may have.

14         Q.    How about through customer

15  maintenance?

16         A.    It's a possibility.

17         Q.    You said you had a threshold

18  review mailbox?

19         A.    Yes.

20         Q.    Would that have been an

21  e-mail box?

22         A.    It's an e-mail box, yep.

23         Q.    And do you know whose

24  responsibility it was to review e-mails

Highly Confidential - Subject to Further Confidentiality Review

1    that were sent to the threshold review

2    e-mail box?

3           A.    That would be all the

4    investigators.

5           Q.    So you would have had

6    responsibility for that at some point?

7           A.    Yes.

8           Q.    What are some of the reasons

9    why a threshold override for an increase

10   would have been approved or requested?

11   Actually, let me break that apart.

12               What are some of the reasons

13   that you saw in your work for why a

14   threshold override to increase a quota or

15   threshold would have been requested?

16               MR. NICHOLAS:  Object to the

17          form.

18               THE WITNESS:  I'm not

19          following the question.

20   BY MR. CLUFF:

21          Q.    Sure.  It was poorly asked,

22   so don't feel bad.

23               You mentioned these

24   threshold overrides.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2         Q.    And you said sometimes they

3    were for increases and sometimes they

4    were for decreases.

5               Did you ever review a

6    request for a threshold override?

7         A.    Yes.

8         Q.    Based on your review of

9    threshold override requests, what were

10   the reasons you saw for granting an

11   increase by a threshold override?

12        A.    One of the reasons would be

13   that a customer's business is growing,

14   whether it's an established business or a

15   start-up business.

16              A start-up business, it's

17   obvious you're going to have your

18   business to grow and you may exceed some

19   of your parameters at that point.  So a

20   customer would submit a threshold review

21   form for us to review and determine if

22   any adjustments need to be made.

23        Q.    So one of the reasons why

24   customers would submit a threshold review

Highly Confidential - Subject to Further Confidentiality Review

1  form is because they were exceeding

2  parameters?

3          A.    If they were having orders

4  go into review, they would know that.

5  They would notice that their order is

6  being reviewed, which would delay their

7  order being shipped to the pharmacy.

8          Q.    And before 2015, exceeding

9  parameters meant that they were exceeding

10  the threshold, correct?

11          A.    Yes.

12          Q.    So that means they were

13  exceeding three times the average for a

14  customer of their own size?

15              MR. NICHOLAS:  Object to the

16          form.

17              THE WITNESS:  I'm not sure

18          of the details.  I would have to

19          see it realtime to give you a

20          better answer.

21  BY MR. CLUFF:

22          Q.    Why would a customer request

23  a threshold override as opposed to a

24  threshold review?

1          MR. NICHOLAS:  Object to the

2     form.

3          THE WITNESS:  I believe it's

4     one and the same.

5  BY MR. CLUFF:

6     Q.    They are the same thing,

7  okay.

8          So if a customer was set at

9  an initial or default threshold, we'll

10  say, like, 1,000 units and they needed to

11  increase their threshold, the first step

12  would be to submit a threshold review --

13     A.    Form.

14     Q.    -- form, yes.

15          And that would go through

16  either the hub or sales force, or maybe

17  the e-mail folder that you talked about?

18     A.    Correct.

19     Q.    And then would CSRA review

20  that?

21     A.    Yes.

22     Q.    And then if a threshold

23  review form was approved for an increase,

24  would that show up in the customer's due

Highly Confidential - Subject to Further Confidentiality Review

1  diligence file as a threshold override?

2       A.    Yes.

3       Q.    If I wanted to track the

4  history of one customer from the

5  beginning of when ABC started to ship

6  controlled substances to them and

7  identify what the beginning threshold was

8  and every change to their threshold over

9  time, where would I start to look for

10  that kind of information?

11            MR. NICHOLAS:  Object to the

12       form.

13            THE WITNESS:  That may be in

14       Lawtrac, which is now part of

15       NetDocs.  Or Matter Management

16       System.

17  BY MR. CLUFF:

18       Q.    I don't want to quibble

19  words with you, but you said "may be."

20            Is that because you're not

21  sure if it's in there or because it might

22  also be in some other location?

23       A.    The only three locations I

24  know of are the three that I just

1    provided to you.

2         Q.    And how would I identify the

3    change in the threshold in Lawtrac?  Is

4    there a specific field of information

5    that tells me what initial thresholds

6    were and when increases were approved?

7         A.    It would indicate, in the

8    text box of the matter, of any relative

9    information.

10        Q.    Can you look at Exhibit

11   Number 1 again?  Excuse me, let's do

12   Number 2.  I misspoke.

13             In the center there, we

14   talked about that, what I called a text

15   box that had some bolded and underlined

16   headings.

17             You just referred to a text

18   box in Lawtrac.  Is this the kind of a

19   text box I would see in Lawtrac if there

20   had been a threshold request approved?

21        A.    Yes.

22        Q.    When you were reviewing

23   threshold review forms, did you

24   personally look back at previous

Highly Confidential - Subject to Further Confidentiality Review

1    threshold review requests in order to

2    determine whether a request should be

3    approved or denied?

4         A.    I would look at the matter

5    and what due diligence that we had on

6    that customer.

7         Q.    And part of that would have

8    been whether or not they had any previous

9    threshold increases?

10        A.    Including that information.

11        Q.    Okay.  You can set that

12   aside for right now.

13             Based on your experience

14   reviewing and approving thresholds, a

15   customer's complete Lawtrac file should

16   document what their initial threshold was

17   and the approval or rejection of every

18   threshold review request after that time,

19   correct?

20        A.    Yes.

21        Q.    So we would be able to track

22   a customer's threshold over time using

23   Lawtrac?

24        A.    Or the other two systems

Highly Confidential - Subject to Further Confidentiality Review

1    that I provided to you, NetDocs and MMS.

2         Q.    Understood.  And we

3    previously discussed that Lawtrac would

4    have documents attached to the customer's

5    Lawtrac record, correct?

6         A.    Yes.

7         Q.    And, theoretically, though,

8    it should have migrated to NetDocs and

9    MMS as well?

10        A.    Yes.

11        Q.    So for every threshold

12   review request form that was approved or

13   denied, there should be documentation of

14   that approval of that request, correct?

15        A.    Yes.

16        Q.    What kind of justifications

17   did people give for approving threshold

18   review requests?

19        A.    If a business is growing.

20   If a pharmacy down the street closed and

21   they're taking on their patient base.  If

22   there's an indication of any shortage of

23   that particular drug family.

24             Just those three examples

Highly Confidential - Subject to Further Confidentiality Review

1    come to mind.

2       Q.    Okay. All right. We

3    previously discussed that you briefly

4    worked at Teva, correct?

5       A.    Yes.

6       Q.    And that you worked under

7    Colleen McGinn; is that right?

8       A.    Yes.

9       Q.    In fact, I think you

10    testified that she actually interviewed

11    you for the job?

12       A.    Correct.

13       Q.    Did you -- do you recall

14    interviewing with anybody else during the

15    time you worked at Teva, or before you

16    got the job at Teva?

17       A.    I do believe I met with two

18    other individuals.

19       Q.    Who were they?

20       A.    Mike Edwards, I believe.

21    And there was an individual in customer

22    service, the manager there that I

23    interviewed with, which I cannot remember

24    her name.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Who was Mike Edwards?

2      A.    He was just another person

3  that reported to Colleen.  I don't

4  remember his title.

5      Q.    I may have asked this

6  already, and if I did, I apologize.

7            But do you recall what

8  Colleen McGinn's title was?

9      A.    I don't know exactly.

10  Diversion operations director.  I know

11  she had a director title.

12      Q.    Do you recall if she was the

13  head of DEA compliance?

14      A.    Yes.

15      Q.    So she would have been the

16  director of DEA compliance?

17      A.    Correct.

18      Q.    Do you recall working with

19  Colleen McGinn on developing Teva's

20  suspicious order monitoring program?

21      A.    I do.

22            MR. MAIER:  Object to form.

23  BY MR. CLUFF:

24      Q.    What do you recall about the

Highly Confidential - Subject to Further Confidentiality Review

1    work you did with Colleen McGinn on

2    developing the suspicious order

3    monitoring program for Teva?

4           A.    She had wanted me to work

5    with the IT group internally, as well as

6    an individual outside the company, for

7    which they had a system already in place.

8    I believe they were the developers of a

9    new -- of this system.  And she had

10   wanted me to work with him.

11          Q.    Do you recall his name?

12          A.    I believe it was Bob

13   Williamson.

14          Q.    Do you recall what company

15   he worked for?

16          A.    Buzzeo, I believe.

17          Q.    And is that the company that

18   you recall that had a system that they

19   could roll out with Teva?

20          A.    Yes.

21          Q.    Do you recall having

22   meetings with Bob Williamson?

23          A.    Yes.  At least once.

24          Q.    As part of the work you did

1   for Colleen McGinn, did you have

2   meetings, or at least prepare for

3   meetings, with Mallinckrodt?

4          MR. MAIER:  Object to form.

5          THE WITNESS:  I believe we

6      did meet Mallinckrodt in person.

7   BY MR. CLUFF:

8      Q.   Do you recall scheduling

9   meetings with the big four distributors?

10      A.   Yes.

11          MR. MAIER:  Object to form.

12  BY MR. CLUFF:

13      Q.   Do you have a recollection,

14  at the time you worked at Teva, who the

15  big four distributors were?

16      A.   I know it was ABC, McKesson,

17  Cardinal.  And I'm not sure if the fourth

18  was Morris -- it might have been Morris

19  Dickson or HD Smith, one of the two.

20      Q.   As part of your work for

21  Colleen McGinn, do you recall ever

22  putting together SOM, or suspicious order

23  monitoring, training programs or

24  presentations?

1    A.    I had -- I had presented

2    three presentations, yes.

3    Q.    And what were those

4    presentations about?

5    A.    It was the -- I believe Bob

6    Williamson helped me develop the

7    presentation.  It was about the current

8    issues with the opioid crisis and some

9    other stats.

10    Q.    And who did you give those

11    presentations to?

12    A.    One was to Colleen's group.

13    Another was the customer service group.

14    And then one I gave to the customer

15    service manager individually.

16    Q.    And Colleen's group was the

17    DEA compliance group?

18    A.    Yes.

19    Q.    At Teva, based on your work

20    there, do you recall that customer

21    service was responsible for a portion of

22    Teva's suspicious order monitoring

23    program?

24                MR. MAIER:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

 1              form.

 2                   THE WITNESS:  A small part,

 3              yes.

 4    BY MR. CLUFF:

 5              Q.    Is that why you would have

 6    been presenting to that group about

 7    suspicious order monitoring?

 8              A.    Perhaps.

 9              Q.    Okay.

10                   MR. MAIER:  Object to form.

11    BY MR. CLUFF:

12              Q.    I'll hand you a copy of what

13    we'll mark as Number 3.

14                        -   -   -

15                   (Whereupon,

16              AmerisourceBergen-Kreutzer

17              Exhibit-3,

18              Teva_MDL_A_(0)233-1299-320, was

19              marked for identification.)

20                        -   -   -

21                   MR. CLUFF:  For counsel on

22              the phone, this is the first Teva

23              document that I mentioned.  It's

24              Teva_MDL_A_(0)233-1299.  There's

1            an attachment to this e-mail that

2            is titled, Teva relaunch.zip.

3                    I've included those

4            documents with the e-mail, to the

5            best of my ability.  Some of them

6            have a designation, file produced

7            natively.  The total document runs

8            through 02331320.

9     BY MR. CLUFF:

10            Q.    Mr. Kreutzer, this is a

11     longer document.  I'm not going to ask

12     you questions about every page.

13                    So rather than us waste your

14     time with you going through every page of

15     it, which you're free to do if you

16     desire, what I was going to propose is

17     that I point to you the places in the

18     document where I'd like to discuss with

19     you.  And then when we get there, if you

20     feel like you need to review that page or

21     that piece of this document, you can let

22     me know, and we can give you a minute or

23     two off the record to do that.

24                    Does that sound like a

1    workable proposal?

2           A.    That's fair.

3           Q.    Thank you.

4                 Let's start on the first

page, which is the e-mail from Robert

Williamson.  If you look up at the top

there, it's from Robert Williamson to

you, Colleen McGinn and LeRoy Simoes.

I'm probably not saying that right.

10                Why don't you go ahead and

review this cover e-mail?

12          A.    Okay.  Good.

13          Q.    So I want to look at the

first full paragraph there under the good

morning salutation.

16                So the person writing the

e-mail is Robert Williamson.  I believe

you referred to him as Bob.  Is it okay

if I refer to him as Bob?

20          A.    Sure.

21          Q.    Not to be confused with your

esteemed lawyer here.

23                He says, I've attached some

documents that we previously worked on.

Highly Confidential - Subject to Further Confidentiality Review

1              Do you recall if the "we" he

2    was discussing was Buzzeo and Teva, or if

3    he meant just employees at Teva?

4          A.    I'm not sure.

5          Q.    He continues and says that,

6    These documents may be useful for this

7    morning's call.  If not, they surely will

8    be when he comes to meet with you --

9    "you" being Kevin.

10             Do you see that?

11         A.    Yes.

12         Q.    So without requiring you to

13   review all these documents, do you recall

14   having calls with employees from Buzzeo

15   about suspicious order monitoring?

16         A.    I do recall speaking with

17   Bob.  But I don't remember much about

18   those calls.

19         Q.    Do you recall having a

20   meeting with him some time in late

21   January or early February of 2013?

22         A.    We did meet.

23         Q.    What was the substance of

24   that meeting?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I don't remember

2    specifically.  I really don't remember

3    the content.

4        Q.    Okay.  I mean, as a general

5    matter, do you recall why you and Colleen

6    were meeting with Buzzeo during this time

7    period?

8              MR. MAIER:  Object to form.

9              THE WITNESS:  Yes.  My

10         understanding is that we were

11         trying to develop an SOM program,

12         or a system, or a more enhanced

13         system than they currently had.

14   BY MR. CLUFF:

15        Q.    Was it your understanding

16   that Teva did not have a well-developed

17   SOM system in 2013?

18             MR. MAIER:  Object to form.

19             THE WITNESS:  No, I don't

20         believe that.  I know they had a

21         system in place, but I believe we

22         were trying to enhance that

23         system.

24   BY MR. CLUFF:

1        Q.    Why were you trying to

2    enhance it?

3        A.    Just like with any system,

4    you're always trying to enhance the

5    system as it goes on.

6        Q.    In 2013 -- actually, I

7    believe we discussed earlier the time

8    period during which you worked at Teva,

9    and I think you said that you joined that

10   company in 2012 and you worked there for

11   three months.

12            Looking at the date in this

13   e-mail, which is January 2013, does that

14   refresh your recollection about how long

15   you would have worked at Teva?

16       A.    It does.

17       Q.    So is it possible that you

18   worked until the middle of 2013 instead

19   of middle of 2012?

20       A.    I started January 7th, as I

21   indicated previously, but I may have said

22   2012.  So it was 2013 until April 1st,

23   2013.

24       Q.    So your recollection is that

1    you started in January 2013 instead of

2    2012?

3              A.    That is correct.

4              Q.    Understood.

5                    And so you would have worked

6    until approximately April of 2013?

7              A.    April 1st.

8              Q.    Okay.  Understood.

9                    In the months that you

10   worked at Teva, do you think you

11   developed a pretty good working

12   understanding of Teva's suspicious order

13   monitoring system?

14             MR. MAIER:  Object to form.

15             THE WITNESS:  I felt like I

16        had a good understanding of their

17        system in place.

18   BY MR. CLUFF:

19             Q.    Did you feel like it was a

20   robust system?

21             MR. MAIER:  Object to form.

22             THE WITNESS:  I felt like it

23        was a good system that they had.

24   BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did you feel like it was

2  complying with all of the rules and

3  regulations for manufacturing controlled

4  substances?

5              MR. MAIER:  Object to form.

6              THE WITNESS:  I believe so.

7  BY MR. CLUFF:

8    Q.    I want you to turn back with

9  me ten pages back.  There is -- one of

10  the attachments is a document, it

11  should -- my copy is in color, I'm not

12  sure if yours is.

13              But at the top it says,

14  Cegedim relationship management

15  compliance solutions powered by Buzzeo

16  PDMA.  I believe that's a two-page

17  attachment.

18              Do you want to look at that

19  and familiarize yourself with it?  I have

20  a few questions for you.

21              MR. MAHADY:  13087?

22              MR. CLUFF:  I think that's

23        right.  The copy I printed for

24        myself doesn't have the Bates

1          number.

2                    We have it down here, 1308.

3                    THE WITNESS:  Just 1308 and

4          1309 to look at?

5                    MR. CLUFF:  Yes.

6                    THE WITNESS:  Okay.

7     BY MR. CLUFF:

8          Q.    So the title of this

9     document, you can see at the top, is,

10    Teva Accounts, quote, Red Flags, closed

11    quote.

12                   Do you have any recollection

13    of what this document was that Buzzeo

14    attached to its cover e-mail for you?

15         A.    I do not recollect this

16    document.

17         Q.    Do you have any reason to

18    dispute that this is a true and accurate

19    copy of a document that was provided to

20    Teva, or to you while you were employed

21    at Teva?

22         A.    I have no reason to doubt

23    that.

24         Q.    Are you familiar with the

Highly Confidential - Subject to Further Confidentiality Review

1    concept -- or what -- the term that is in

2    quotes there, red flags?

3              MR. MAIER:  Object to form.

4              THE WITNESS:  Yes.

5    BY MR. CLUFF:

6         Q.    What are red flags?

7         A.    Red flags may be situations

8    where -- a situation where you would need

9    to take a closer look at.

10        Q.    And why would you be taking

11   a closer look at them?

12        A.    I can only address what's in

13   this document.  And these are the red

14   flags that are addressed in this

15   document.

16        Q.    During your work at

17   AmerisourceBergen as a diversion control

18   specialist, did you become familiar with

19   the concept of red flags?

20        A.    I knew the term "red flags."

21   I knew the term "red flags."

22        Q.    Were red flags significant

23   to you in your work as a diversion

24   control specialist at AmerisourceBergen?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      They would take a further --

2   I would take a further look at those.

3       Q.      Why would you take a further

4   look at them?

5       A.      Because they would be

6   identified as red flags.

7       Q.      That's a situation, I guess,

8   where we're kind of running into a

9   problem again, because you used the term

10  to tell me why you would look at the

11  term.

12              So do red flags indicate

13  anything to you as a diversion control

14  specialist?

15      A.      It does.

16      Q.      What would they indicate to

17  you?

███        ███        ████████████████████

███   ████████████████████████████████████

20      Q.      Why is that a red flag?

21      A.      To me, it wouldn't really

22  necessarily be a red flag.  It would just

23  be -- I would take a second look at that

24  pharmacy.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Do you see here that Buzzeo

2  identified a large percentage of

3  controlled substances versus NCS as a red

4  flag?

5      A.    Yes.

6      Q.    You disagree with that

7  statement?

8      A.    No, I don't disagree.

9      Q.    What about going down one

10  more on the list, DEA compliance issues.

11          Do you see that Buzzeo

12  identified DEA compliance issues as a red

13  flag that Teva should be looking at?

14      A.    Right.

15      Q.    Are you aware that

16  AmerisourceBergen had its registration

17  suspended in 2007?

18      A.    Yes.

19      Q.    Would you qualify that as a

20  DEA compliance issue?

21          MR. NICHOLAS:  Object to the

22      form.  Lack of foundation.

23          THE WITNESS:  Not

24      necessarily.

1    BY MR. CLUFF:

2         Q.    So in your opinion as a

3    diversion control specialist, having

4    worked at AmerisourceBergen, losing a DEA

5    registration -- let me clarify -- having

6    a DEA registration suspended is not a DEA

7    compliance issue?

8              MR. NICHOLAS:  Object to the

9         form.  Lack of foundation.

10             THE WITNESS:  It could be,

11        based on the results of why the

12        registration was suspended.

13   BY MR. CLUFF:

14        Q.    In your work in diversion

15   control since approximately 2009, are you

16   aware that Cardinal Health and McKesson

17   also, at various points, had their

18   registrations suspended?

19             MR. KELLY:  Objection.

20        Form.

21             THE WITNESS:  I believe so.

22   BY MR. CLUFF:

23        Q.    Would you qualify those as

24   DEA compliance issues?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. NICHOLAS:  Object to the

2      form.

3          THE WITNESS:  Could be.

4  BY MR. CLUFF:

5      Q.    Was Teva currently

6  monitoring for DEA compliance issues

7  before they received this red flags list

8  from Buzzeo?

9          MR. MAIER:  Objection.  Form

10      and foundation.

11          THE WITNESS:  That, I don't

12      know.

13  BY MR. CLUFF:

14      Q.    Let's move down the list

15  three more.  It says, Lack of suspicious

16  order monitoring system.

17          Are you aware of any Teva

18  customers that lacked a suspicious order

19  monitoring system?

20      A.    I am not.

21      Q.    At the time that you

22  received this information from Buzzeo,

23  are you aware if Teva was monitoring for

24  suspicious order monitoring systems by

1   its customers?

2        A.    I believe they were.

3        Q.    How about the next one down,

4   Threshold-based suspicious order

5   monitoring system.

6              Do you see that that's a red

7   flag that Buzzeo identified for Teva?

8        A.    Yes.

9        Q.    We previously talked about

10  your work at AmerisourceBergen,

11  specifically threshold requests.

12             And you explained to us that

13  AmerisourceBergen used a threshold-based

14  system prior to 2015; is that right?

15       A.    Yes.

16       Q.    Would you agree that based

17  on this list, that should have been a red

18  flag to Teva?

19       A.    No, I do not agree.

20             MR. MAIER:  Objection.

21       Form.

22  BY MR. CLUFF:

23       Q.    But do you agree that Buzzeo

24  identified it as a red flag for Teva?

1          MR. NICHOLAS:  Object to the

2     form.  Lack of foundation.

3          THE WITNESS:  I don't agree

4     with that.

5  BY MR. CLUFF:

6     Q.   Buzzeo was hired by Teva,

7  though, to help improve Teva's suspicious

8  order monitoring system, correct?

9          MR. NICHOLAS:  Objection.

10     Form.  Foundation.

11          MR. MAIER:  Object to form.

12          THE WITNESS:  Yes.

13  BY MR. CLUFF:

14     Q.   But you disagree with their

15  recommendations regarding red flag

16  monitoring?

17          MR. NICHOLAS:  Objection to

18     the form.  Lack of foundation.

19          THE WITNESS:  I don't know

20     what discussions took place, other

21     than the document in front of me.

22     There may have been additional

23     discussions and/or documents that

24     may not be here.

1    BY MR. CLUFF:

2          Q.    That was actually my next

3    question.

4                Do you know whether Teva

5    adopted this list of red flags for their

6    suspicious order monitoring system?

7          A.    I do not.

8          Q.    So you're unaware whether

9    Teva decided to monitor its customers for

10   threshold-based systems?

11         A.    I do not know.

12         Q.    Do you see the next one down

13   on the list is, Customer due diligence

14   deficiencies?

15         A.    Yes.

16         Q.    We previously talked about

17   the problems with the Form 590 validation

18   project.

19                Would you agree that Teva

20   is -- excuse me, Buzzeo is identifying to

21   Teva due diligence deficiencies like the

22   590 project as a red flag?

23                MR. NICHOLAS:  Object to the

24          form.

1          MR. MAIER:  Objection.

2     Foundation.

3          MR. NICHOLAS:  Object to

4     form and foundation.

5          THE WITNESS:  I don't agree

6     with that.

7   BY MR. CLUFF:

8     Q.    Do you not agree that it is

9   a red flag, is what you're saying?

10    A.    I don't agree that it's a

11  red flag.

12    Q.    But do you see that Buzzeo

13  recommends it as a red flag?

14    A.    I do see that.

15    Q.    Do you know whether Teva

16  adopted that portion of the list as part

17  of its suspicious order monitoring

18  system?

19    A.    I do not know.  And I don't

20  recall this document.

21    Q.    Do you see the next major

22  heading down at the bottom of that first

23  page says, Downstream?

24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    What does that refer to?

2              MR. MAIER:  Objection.  Form

3        and foundation.

4              THE WITNESS:  I'd have to

5        read over this.

6              I'm not sure exactly what

7        that refers to.

8  BY MR. CLUFF:

9        Q.    Does it possibly -- based on

10 your understanding of Teva's business

11 model, does it possibly refer to

12 suspicious order monitoring of downstream

13 customers like pharmacies?

14             MR. MAIER:  Object to form

15       and foundation.

16             THE WITNESS:  I don't know.

17       There's not enough information

18       here for me to make a decision.

19 BY MR. CLUFF:

20       Q.    We talked about three issues

21 on this list, DEA compliance issues,

22 threshold-based suspicious order

23 monitoring system, and customer due

24 diligence deficiencies.  I think that's

Highly Confidential - Subject to Further Confidentiality Review

1    Number 2, 6 and 7 on the list.

2         A.    Yes.

3         Q.    And you said you disagreed

4    that those are red flags.

5              Why do you feel that those

6    are not red flags?

7              MR. NICHOLAS:  Object to the

8         form.

9              MR. MAIER:  Objection.

10             THE WITNESS:  I don't agree,

11        because, first, I don't recall

12        this document; and, second, there

13        may have been changes made to this

14        document that I'm unaware of.

15   BY MR. CLUFF:

16        Q.    I guess my question is a

17   little bit different.  I'm not asking you

18   whether Teva actually adopted these

19   recommendations.

20             What I was asking is, you

21   know, for example, do you think that a

22   DEA compliance issue with one of Teva's

23   customers should have been a red flag to

24   Teva?

1          MR. MAIER:  Objection.

2      Form.

3          THE WITNESS:  It could be,

4      based on the circumstances.

5  BY MR. CLUFF:

6      Q.   How about a threshold-based

7  suspicious order monitoring system, do

8  you feel that that should have been a red

9  flag to Teva about its customers?

10         MR. MAIER:  Objection.

11     Form.

12         MR. NICHOLAS:  Same

13     objection.  And lack of

14     foundation.

15         THE WITNESS:  I don't think

16     so.

17  BY MR. CLUFF:

18     Q.   Why not?

19     A.   I don't think so because

20  just because an account has a

21  threshold -- or a supplier has a

22  threshold-based system doesn't mean that

23  the customers are aware of those

24  thresholds.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.    How about customer due

2  diligence deficiencies, do you agree that

3  that should be a red flag for Teva about

4  its customers?

5         MR. MAIER:  Objection.  Form

6      and foundation.

7         MR. NICHOLAS:  Same.

8         THE WITNESS:  It could be,

9      based on the circumstances.

10 BY MR. CLUFF:

11  Q.    I want to point out one

12 more.  It says, Distribution to brokers

13 and/or buying groups.

14         Do you understand what a

15 pharmacy buying group is?

16  A.    We do have pharmacy buying

17 groups, but I'm not really familiar with

18 the complete definition.

19  Q.    But AmerisourceBergen does

20 distribute to buying groups?

21  A.    Correct.

22  Q.    What about distribution to

23 repackagers and relabelers, do you know

24 what repackagers and relabelers are?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't recall any customers

2  offhand.

3    Q.    Do you know if

4  AmerisourceBergen distributes to

5  repackagers or relabelers?

6    A.    I can't think of one

7  customer at the moment.

8    Q.    Does AmerisourceBergen, the

9  parent company, have any other business

10  segments that might qualify as

11  repackagers or relabelers, based on your

12  understanding of those terms?

13          MR. NICHOLAS:  Object to the

14      form.  Lack of foundation.

15          THE WITNESS:  I just don't

16      know.  I don't know those

17      customers.

18  BY MR. CLUFF:

19    Q.    The last term on this list

20  is suspicious activity, on the first

21  page, just above downstream.

22          Do you see that?

23    A.    Yes.

24    Q.    Do you know what suspicious

Highly Confidential - Subject to Further Confidentiality Review

1   activity Buzzeo might have been referring

2   to with that --

3                MR. MAIER:  Objection.  Lack

4        of foundation.

5   BY MR. CLUFF:

6        Q.    -- with that bullet?

7        A.    I do not.

8        Q.    If you turn two pages back

9   in the document, the Bates number is

10  ending in 1310.  The top heading is,

11  Compliance solutions powered by Buzzeo

12  PDMA.  It looks like that document is

13  four pages long, and ends at 1313.

14                I can tell you, I have just

15  a couple of questions for you and they

16  are about the comment boxes that appear

17  in the right-hand margin, which are on

18  the second and third page.

19                So you can review that

20  document, but that's the -- that's where

21  I'm going to focus.

22       A.    Okay.

23       Q.    Do you have any

24  understanding of what this document is?

1    A.    Just other than the title.

2    Q.    What does the title indicate

3  to you?

4    A.    SOM SOP template.  So I'm

5  assuming it's suspicious order monitoring

6  standard operating procedures.

7    Q.    And would these be a

8  template that Buzzeo was providing to

9  Teva as part of its suspicious order

10  monitoring policies?

11         MR. MAIER:  Objection.

12    Foundation.

13         THE WITNESS:  I don't -- I

14    don't remember this document.

15  BY MR. CLUFF:

16    Q.    Turning to the second page,

17  which is 1311, there's a Paragraph Number

18  4 that says, Responsibility.

19         And under that, in bold

20  italics, it says, DEA compliance,

21  question mark.  DEA compliance and

22  customer service, question mark.

23         And I'll note that there is

24  a comment box that pops out from service,

Highly Confidential - Subject to Further Confidentiality Review

1   with a dotted line.  It says, Comment,

2   bracket, RB1, closed bracket.

3                  Do you know what RB would

4   have stood for?

5        A.    I do not.

6        Q.    And the comment says, What

7   about limiting responsibility to DEA

8   compliance?

9                  Do you know what that refers

10  to?

11       A.    No.  I don't recall this

12  document.

13       Q.    Let's flip to the next page,

14  which ends in 1312.

15                 Looking at Paragraph 8,

16  Clearing an order from suspicion.

17  Subparagraph 8.2 says, All orders will be

18  initially investigated by customer

19  service representatives.

20                 And there's another comment

21  box, again, RB2.

22                 Does that refresh your

23  recollection about who RB2 might be?

24       A.    No.  I don't know who RB is.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then there are three

2    questions there.  Should this only be in

3    this department?  What about DEA

4    compliance?  Should they have primary

5    role?

6              Do you have any

7    understanding about what those questions

8    are about?

9         A.    No.

10        Q.    Do you have any recollection

11   of a discussion at Teva about whether

12   customer service versus DEA compliance

13   should have responsibility for suspicious

14   order policies and procedures?

15             MR. MAIER:  Objection.

16        Form.

17             THE WITNESS:  I don't recall

18        a discussion being made.

19   BY MR. CLUFF:

20        Q.    Do you recall who had

21   primary responsibility for things like

22   suspicious order monitoring and clearing

23   suspicious orders?

24        A.    I know I reviewed them when

1    I was in that role.

2           Q.    And what were you reviewing

3    them for at the time?

4           A.    According to the documents,

5    for pended orders, I was reviewing for a

6    pattern and if a drug was pended before.

7           Q.    What does it mean to be

8    pended?

9           A.    I'm assuming that means when

10   the order goes into review status.

11                 -   -   -

12           (Whereupon,

13           AmerisourceBergen-Kreutzer

14           Exhibit-4,

15           Teva_MDL_A_(0)233-1346-348, was

16           marked for identification.)

17                 -   -   -

18           MR. CLUFF:  I put a sticker

19           on my copy so -- I'll give you the

20           next document, which we marked as

21           4.

22                For those on the phone, this

23           is Teva_MDL_A_(0)233-1346.  It has

24           an attachment which begins at 1347

1        and continues to 1348.

2   BY MR. CLUFF:

3        Q.    This is a short document,

4   Mr. Kreutzer, so go ahead and familiarize

5   yourself with it.

6        A.    Okay.

7        Q.    Starting at the top, this is

8   an e-mail you wrote to Colleen McGinn,

9   February 4, 2013.  Subject:  Questions

10  for Mallinckrodt, with the attachment

11  Mallinckrodt February 7.

12            And you write, Thanks, I was

13  working on it -- I was actually working

14  on it so they were in a more organized

15  manner.

16            Do you recall receiving and

17  sending this e-mail to Colleen?

18       A.    I do not.

19       Q.    Do you have any reason to

20  dispute that this is a true and accurate

21  copy of an e-mail that you received from

22  Colleen and then replied to?

23       A.    No.

24       Q.    Looking at the attachment

Highly Confidential - Subject to Further Confidentiality Review

1    that starts on (0)2331347, have you ever

2    seen that document before?

3         A.    I don't recall this

4    document.

5         Q.    Do you recall preparing it

6    at all?

7         A.    I don't recall preparing it

8    either.

9         Q.    But do you generally recall

10   preparing for a meeting with Mallinckrodt

11   in February of 2013?

12        A.    I do, but I don't remember

13   the content, what information we were

14   preparing for our visit.

15        Q.    Do you have any reason to

16   dispute that this is a true and correct

17   copy of an e-mail that you -- I mean, a

18   document that you and Colleen McGinn

19   worked on together in February of 2014?

20        A.    No, I don't.

21        Q.    The subject matter of this

22   e-mail is, Questions for Mallinckrodt.

23             Do you see that at the top?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then turning to the

2    title of the attachment, it says,

3    Mallinckrodt, February 7, 2013 visit-SOM

4    program.

5    A.    Yes.

6    Q.    Would this, then, reflect

7    questions Teva was going to ask

8    Mallinckrodt in a meeting about its SOM

9    program?

10    A.    Yes, I believe so.

11    Q.    Do you recall whether, in

12    2013, Teva was coordinating the

13    enhancements to its suspicious order

14    monitoring program with Mallinckrodt?

15    A.    I don't recall that.

16    Q.    Based on this e-mail and the

17    questions here that are attached to that

18    e-mail, do you have any understanding

19    that Teva was coordinating its suspicious

20    order monitoring program with

21    Mallinckrodt?

22    A.    No, I don't.

23    MR. MAIER:  Form.

24    Foundation.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. CLUFF:

2       Q.   What about an understanding

3  of enhancing its program in coordination

4  with Mallinckrodt?

5       A.   I don't recall that.

6       Q.   Do you recognize the name

7  Jack Crowley?

8       A.   I don't remember his name.

9  Where do you see his name?

10      Q.   It's a name I have in my

11  head that I was curious if you

12  understand.

13           Do you know if Colleen

14  McGinn talked to anybody at any other

15  manufacturers about Buzzeo or suspicious

16  order monitoring?

17      A.   No, I don't.

18           MR. MAIER:  Objection.

19  Foundation.

20  BY MR. CLUFF:

21      Q.   In the work that you did

22  with Colleen on enhancing Teva's

23  suspicious order monitoring program, did

24  you communicate with anybody from any

1    other manufacturers?

2         A.    AmerisourceBergen.

3         Q.    That's a distributor though,

4    right?

5         A.    I'm sorry.  I misunderstood

6    the question.

7               You said manufacturers?

8         Q.    Yes.

9         A.    I did conduct an audit of

10   Cardinal's program.

11        Q.    That's also a distributor,

12   right?

13        A.    Yes.  I'm sorry.

14        Q.    So did you personally meet

15   with anybody from a manufacturer like

16   Purdue or Actavis or Endo --

17        A.    I have not, no.

18        Q.    You did mention, though,

19   that you met -- you conducted an audit of

20   Cardinal Health.

21               What was that?

22        A.    They were providing me a

23   PowerPoint presentation of their order

24   monitoring program.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall what time

2    frame that was?

3    A.    I do not, but it was within

4    my 90 days between January and end of

5    March.

6    Q.    And you mentioned

7    AmerisourceBergen, what about -- can you

8    tell me what happened with

9    AmerisourceBergen?

10    A.    Conducted an audit.  It was

11    a questionnaire that we presented to Ed

12    Hazewski.  I was with Bob Mallinckrodt --

13    not Bob Mallinckrodt, Bob Williamson on

14    my visit with Ed.

15    Q.    And that's Bob Williamson

16    from Buzzeo?

17    A.    That is correct.

18    Q.    So together you conducted an

19    audit, using a questionnaire, of

20    Amerisource's programs?

21    A.    Correct.

22    Q.    Did you -- going back to

23    this attachment, the Mallinckrodt

24    February -- Mallinckrodt February 7, 2013

1    visit, did you go -- do you know if this

2    meeting happened between Teva and

3    Mallinckrodt on February 7th?

4         A.    It did.

5         Q.    Did you attend the meeting?

6         A.    I did.

7         Q.    So you're aware of these

8    questions that were asked to Mallinckrodt

9    by Teva?

10        A.    I'm sure we did use these

11   questions as part of our visit, but I

12   don't remember their responses.

13        Q.    Do you recall if these

14   questions were asked to Mallinckrodt

15   because Teva was looking for advice on

16   how to structure its own SOM program?

17             MR. MAIER:  Objection.

18        Form.

19             THE WITNESS:  No, I don't

20        know that.

21   BY MR. CLUFF:

22        Q.    Do you have any reason to

23   dispute that Teva was asking for guidance

24   on establishing an SOM program?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Teva was looking to enhance

2   their order monitoring program.

3        Q.    And was this meeting part of

4   the effort to enhance the program?

5        A.    I don't know.

6        Q.    Okay.  Do you have any

7   recollection of why this meeting happened

8   with Mallinckrodt?

9        A.    I do not remember.

10        Q.    Looking under the category

11   general there, it's underlined at the

12   top.

13             The first question is, Can

14   you describe the SOM program you have in

15   place?

16             Would you agree here that

17   Teva was asking Mallinckrodt to describe

18   its SOM program?

19        A.    Yes.

20        Q.    The next question down is,

21   How did you roll out your program to

22   customers?

23             Is that correct?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Moving down a few it says,

2    Have you had any pushback?

3         Do you recall if

4    Mallinckrodt described any pushback about

5    its SOM program?

6    A.    I do not remember.

7    Q.    The next one down is, How do

8    you handle noncompliance issues?

9         Do you recall if

10   Mallinckrodt discussed any noncompliance

11   issues?

12   A.    No, I do not.

13   Q.    And then what about the last

14   bullet point there, it says, What kind of

15   training did you perform?  Customer

16   service?  SOM employees?

17        Do you recall discussing

18   that?

19   A.    No, I don't.

20   Q.    Under customer due

21   diligence, do you see that?  It's the

22   second underlined heading.

23   A.    Yes.

24   Q.    And you recall that this was

Highly Confidential - Subject to Further Confidentiality Review

1    occurring in February 2013?  I think the

2    question is, Do you have a risk analysis

3    of customers that are less of a threat

4    than others?

5              And there's a bullet point

6    there, For example, AmerisourceBergen,

7    Cardinal and McKesson, less than a threat

8    than a small distributor and retail

9    pharmacy chain.

10             Is that right?  Did I read

11   it accurately?

12        A.    That is correct, yes.

13        Q.    In February of 2013, were

14   you aware that AmerisourceBergen,

15   Cardinal and McKesson had all, at various

16   times, had their registrations to

17   distribute controlled substances

18   suspended?

19             MR. KELLY:  Object to the

20        form.

21             MR. NICHOLAS:  Object to the

22        form.  And foundation.

23             THE WITNESS:  I don't recall

24        the suppliers having their

1    licenses suspended.

2    BY MR. CLUFF:

3         Q.    You don't recall that these

4    suppliers had their licenses suspended?

5              MR. NICHOLAS:  Object to the

6         form.

7              THE WITNESS:  I do not

8         recall.

9    BY MR. CLUFF:

10        Q.    If you knew at the time, in

11   2013, that Amerisource, Cardinal and

12   McKesson had all had their licenses

13   suspended, would you have classified them

14   as a lower threat than smaller

15   distributors?

16             MR. NICHOLAS:  Object to the

17        form.

18             Go ahead.

19             THE WITNESS:  I don't

20        recall.

21   BY MR. CLUFF:

22        Q.    There's a note here about

23   retail pharmacy chains.

24             What companies come to mind

1  as examples of retail pharmacy chains?

2              MR. NICHOLAS:  Object to the

3         form.

4              THE WITNESS:  I don't

5         remember the pharmacy chains that

6         Teva serviced.

7  BY MR. CLUFF:

8     Q.   I'm asking just your general

9  recollection, who would be -- like,

10 qualify as a pharmacy chain?

11    A.    Rite Aid.  Walgreens.

12    Q.    CVS?

13    A.    CVS, perhaps.

14    Q.    How about Walmart?

15    A.    Walmart.

16    Q.    Were you aware that any of

17 the retail pharmacy chains, prior to

18 2013, had paid fines to the DEA for not

19 fulfilling their regulatory obligations

20 under the Controlled Substances Act?

21             MR. MAIER:  Object to form.

22             MR. NICHOLAS:  Foundation

23        and form.

24             THE WITNESS:  I don't recall

Highly Confidential - Subject to Further Confidentiality Review

1          the certain pharmacies and chains,

2          no.

3   BY MR. CLUFF:

4          Q.    If you had been aware, in

5   2013, that retail pharmacy chains had

6   paid fines for failing to fulfill their

7   duties under the CSA, would you have

8   classified them as lower risk than other

9   distributors?

10              MR. NICHOLAS:  Object to the

11         form.

12              THE WITNESS:  I don't know.

13         I would have to discuss that with

14         the management team.

15  BY MR. CLUFF:

16         Q.    Moving down the document,

17  there's an outline -- an underlined

18  heading that says, Order review.

19              It says, Teva's SOM program

20  is based on two standard deviations above

21  the average.

22              Is that an accurate

23  statement?

24              MR. NICHOLAS:  Objection.

1    Form and foundation.

2        THE WITNESS:  According to

3        what's on the form that's in front

4        of me.

5   BY MR. CLUFF:

6        Q.    Skipping down two bullet

7   points, it says, How do you determine how

8   high a threshold should be?  Do you make

9   a threshold adjustment if warranted?  How

10  is that done?

11       Would you agree here that

12  Teva is asking Mallinckrodt here for

13  advice on setting thresholds and

14  adjusting them?

15       MR. MAIER:  Object to form.

16       THE WITNESS:  I don't recall

17       the discussions that were

18       discussed with Mallinckrodt.

19  BY MR. CLUFF:

20       Q.    But at least this document

21  reflects that it was a topic that Teva

22  wanted to discuss with Mallinckrodt,

23  right?

24       A.    It was a question that was

Highly Confidential - Subject to Further Confidentiality Review

1  posed on the form.

2       Q.    If you move to the next

3  page, which ends in 1348, I'm interested

4  in the top two bullet points there.

5             The first one, How do you

6  determine if a customer exceeded their

7  threshold?  Do you release orders that

8  are over the thresholds?

9             Would you agree that Teva

10  wanted to seek Mallinckrodt's advice on

11  customers exceeding thresholds?

12       A.    I don't recall that

13  discussion.

14       Q.    But that's what the document

15  indicates, correct?

16       A.    That's what the document

17  indicates.  And I don't recall if we

18  discussed that, or what the results of

19  the question was.

20       Q.    The next one down says, What

21  actions do you take if customers are

22  exceeding your threshold?

23             Do you recall what actions

24  Teva took if customers exceeded

Highly Confidential - Subject to Further Confidentiality Review

1  thresholds?

2          A.     I do not.

3          Q.     Do you recall if Teva

4  discussed this with Mallinckrodt?

5          A.     I do not.

6                 MR. MAIER:  Objection.  Form

7          and foundation.

8  BY MR. CLUFF:

9          Q.     Let's go down to DEA

10 interaction.  The first line says, Have

11 you reported any orders deemed, quote,

12 suspicious to DEA?

13                Do you recall if Teva was

14 identifying suspicious orders to the DEA

15 in 2013?

16         A.     Yes.

17         Q.     They were?

18         A.     Yes.

19         Q.     Okay.

20         A.     I reported it myself.

21         Q.     Do you recall if Teva asked

22 Mallinckrodt whether they were reporting

23 suspicious orders to the DEA?

24                MR. MAIER:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Form.
2                   THE WITNESS:  I'm sorry,
3          could you ask that question again,
4          please?
5    BY MR. CLUFF:
6          Q.    Sure.
7                 Do you recall if
8    Mallinckrodt -- if Teva asked
9    Mallinckrodt whether they reported
10   suspicious orders to the DEA?
11         A.    I don't recall that.
12         Q.    All right.  Let's look at
13   the next underline, it's chargeback data.
14                Do you recall we previously
15   today discussed chargeback data in
16   general?
17                  MR. NICHOLAS:  Object to the
18          form.
19                  THE WITNESS:  In general,
20          yes.
21   BY MR. CLUFF:
22         Q.    It's not a quiz, I was just
23   trying to refresh that we had talked
24   about it.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Understood.

2      Q.    Does this little paragraph

3  here add any understanding or refresh

4  your recollection at all about what

5  chargeback data is or how it's used?

6      A.    I don't remember that.

7           MR. NICHOLAS:  Sterling, if

8      we're on to the next -- another

9      document, I'd like to take a

10      break.

11           MR. CLUFF:  Is there a

12      reason you would like to take a

13      break?

14           MR. NICHOLAS:  I need a

15      break.

16           MR. CLUFF:  Yeah, let's take

17      a break.

18           VIDEO TECHNICIAN:  Off the

19      record at 2:41 p.m.

20                -  -  -

21           (Whereupon, a brief recess

22      was taken.)

23                -  -  -

24           VIDEO TECHNICIAN:  We're

Highly Confidential - Subject to Further Confidentiality Review

1          back on the record at 2:56 p.m.

2     BY MR. CLUFF:

3          Q.    Mr. Kreutzer, you testified

4     that you only worked for Teva for

5     approximately 90 days?

6          A.    Yes.

7          Q.    How come you decided to

8     leave Teva after only 90 days?

9          A.    I was let go.

10          Q.    Can you share the reason why

11     you were let go?

12          A.    Sure.  I was let go because

13     Colleen felt that I wasn't doing the job

14     up to par, I guess.

15          Q.    Did she express what part of

16     the job you were not doing up to par?

17          A.    She felt like I needed more

18     assistance than I should have had.  She

19     was not -- she wasn't directly on site at

20     all times, she was off site at another

21     location.  So I was by myself on the job,

22     for the most part.

23          Q.    Was there a specific part of

24     your job parameters or job description

1    where she felt that -- where she

2    identified that your performance was

3    lacking?

4           A.    One issue was that I took it

5    upon myself to contact a customer

6    directly regarding an order that was

7    pended.  But I was previously told that

8    if I had any questions of any customers

9    that I had to go through customer

10   service, and then customer service would

11   then contact the customer with my

12   questions and then relay the answers back

13   to customer service, and then back to me.

14          Q.    And so the problem was that

15   if you contacted the customer directly?

16          A.    Yes.

17          Q.    Was that the straw that

18   broke the camel's back, so to speak?

19              MR. MAIER:  Object to form.

20              THE WITNESS:  I think it was

21        a good part of it.

22   BY MR. CLUFF:

23          Q.    Was there any other -- any

24   other specific information that was

Highly Confidential - Subject to Further Confidentiality Review

1 conveyed to you about what Colleen

2 perceived that you had not done

3 adequately enough?

4 　　　　A.　　Well, I don't recall the

5 real specifics.  But I had felt that the

6 job duties that were listed for the

7 assignment were above what I -- above my

8 current experience level at the time, and

9 I indicated that to her on my departure.

10 　　　　Q.　　So it was -- I'm trying to

11 understand.

12 　　　　　　　　Was it your belief at the

13 time that they were requiring more of you

14 than they had advertised during the

15 interview process?

16 　　　　A.　　That was my feelings.

17 　　　　Q.　　Did you feel like you got

18 adequate training to fulfill your job

19 responsibilities when you worked at Teva?

20 　　　　　　　　MR. MAIER:  Object to form.

21 　　　　　　　　THE WITNESS:  I mean, I felt

22 　　　　like I did have training, but

23 　　　　there wasn't a current department

24 　　　　that I worked in.  I was literally

Highly Confidential - Subject to Further Confidentiality Review

1          by myself.

2              It was a new role for the

3          company, so I had to figure

4          everything out for myself, as far

5          as contact people, and anything

6          else for that matter.

7    BY MR. CLUFF:

8          Q.    Did you feel like you

9    were -- that you did not have enough

10   resources to do the job that Teva was

11   asking you to do?

12         A.    I was supposed to have a

13   person to -- that was going to report to

14   me when I first received the position.

15   And then that position was taken away,

16   prior to my starting with the company.

17             But other than that, my role

18   was to mainly work with IT, as well as

19   customer service for any customer

20   inquiries that I had.

21         Q.    And was your role at Teva

22   essentially the same role that you had

23   had at AmerisourceBergen, that being sort

24   of customer order monitoring and

1    diversion control?

2         A.    It was.  But it was also a

3    role to enhance their current SOM program

4    and to develop policies and procedures.

5         Q.    How did you feel about the

6    quality of the employees you worked with

7    at Teva?  Did you feel like they were

8    qualified to do their jobs?

9              MR. MAIER:  Objection.

10             THE WITNESS:  I do.

11   BY MR. CLUFF:

12        Q.    You mentioned that you felt

13   like Teva expected more from you than

14   they advertised in the interview.

15             Do you feel like Teva

16   expected more out of its other employees

17   than they really were qualified to give?

18        A.    That, I don't know.

19             MR. MAIER:  Form.

20        Foundation.

21             MR. CLUFF:  I want to show

22        you a document.  This is produced

23        by Teva.  It's

24        Teva_MDL_A_(0)233-1426.  That's

Highly Confidential - Subject to Further Confidentiality Review

1          the e-mail with an attachment.

2          The attachment begins

3          Teva_MDL_A_(0)233-1428.  It's a

4          natively produced Bates number --

5          excuse me, it's a natively

6          produced PowerPoint, so it all has

7          the same Bates number.

8              And we'll mark it as Number

9          5.

10              -   -   -

11          (Whereupon,

12      AmerisourceBergen-Kreutzer

13      Exhibit-5,

14      Teva_MDL_A_(0)233-1426-428, was

15      marked for identification.)

16              -   -   -

17          MR. CLUFF:  I'm going to

18      have some questions for you about

19      specific slides.  But why don't

20      you go ahead and review just the

21      cover e-mail to start?

22          MR. MAHADY:  Sterling, if

23      you know, did the attachment have

24      confidentiality designations?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. CLUFF:  I'm unaware.

2      But if we want to treat it, for

3      purposes of the deposition, as

4      confidential, since the cover

5      e-mail is confidential, I'm okay

6      with that.  But I'll defer to

7      Teva's lawyer on this one.

8           Do you know if this

9      PowerPoint would have had a

10     confidentiality designation?

11          MR. MAIER:  I believe it

12     would have.  I'm not sure what

13     form you're dealing with --

14          MR. CLUFF:  Sure.

15          MR. MAIER:  -- you know,

16     what format, so I would request

17     that we would treat it that way.

18          MR. CLUFF:  We'll lodge that

19     on the record that this document

20     will be treated as confidential.

21 BY MR. CLUFF:

22     Q.   Did you have a chance to

23 review the e-mail, Mr. Kreutzer?

24     A.   Not quite yet.

1      Q.    Did you say something?

2      A.    Not quite yet.

3            MR. CLUFF:  My colleague,

4      Will Powers, here who is next to

5      me at the depo, looked in the

6      Relativity database and this

7      document, the attachment is

8      designated as confidential.  So we

9      can all agree on that.

10           THE WITNESS:  Okay.

11   BY MR. CLUFF:

12          Q.    Let's start with your e-mail

13   to Colleen McGinn on March 15th.  It's at

14   the bottom of the second page, or middle

15   of the second page.

16               It looks like you asked

17   Colleen to take a look at this

18   PowerPoint, and you describe it as a

19   PowerPoint that Bob came up with.

20               Would that have been Bob

21   Williamson?

22          A.    Yes.

23          Q.    And it says, in the next

24   sentence, When we met the other day -- is

Highly Confidential - Subject to Further Confidentiality Review

1    that you and Colleen would have met?

2          A.    Where do you see that

3    e-mail?

4          Q.    The same e-mail.  The next

5    sentence says, When we met the other day,

6    you wanted to have a couple slides from

7    Bob that had information regarding fines,

8    et cetera.

9                I was curious if the "we"

10   referred to you and Colleen?

11               MR. MAHADY:  The second

12          page.

13               MR. CLUFF:  Thanks, Joe.

14               THE WITNESS:  I think what I

15          was referring to is -- it was

16          possibly Bob, but I'm not sure.

17   BY MR. CLUFF:

18         Q.    In either event, you said,

19   Those slides are now in the presentation,

20   Slides 10, 11 and 12.

21               So those would have been

22   slides that Colleen asked you to include?

23         A.    Yes.

24         Q.    So moving to the very bottom

Highly Confidential - Subject to Further Confidentiality Review

1  of the first page, the e-mail from

2  Colleen to you, it continues on to the

3  second page.

4           Would you agree with me it

5  looks like she has some comments about

6  the slides?  Does that seem accurate?

7       A.    Yes.

8       Q.    At the end of that e-mail,

9  it says, You may want to add something in

10  here about evaluating chargeback data in

11  the future.

12           Correct?

13       A.    Yes.

14       Q.    And then let's skip up two

15  e-mails, and you essentially told her,

16  you know, Slide 23 has the facets and

17  Slide 37 mentioned the bullet points

18  about chargeback data.

19           And she says she wants you

20  to put in some more information about

21  chargeback data, right?

22       A.    Yes.

23       Q.    So that would be Slide 28,

24  according to your first e-mail?

1        A.    Correct.

2        Q.    All right.  When you were

3   reviewing the document that I handed you

4   as Exhibit-5, did you flip through the

5   PowerPoint?

6        A.    I didn't flip through it

7   yet.

8        Q.    Does it look familiar to

9   you?

10       A.    Vaguely.

11       Q.    And it appeared, based on

12  your first e-mail, this was something

13  that Bob may have drafted initially but

14  then you had some interaction with

15  working on it, correct?

16       A.    Correct.

17       Q.    Okay.  Can you turn to Slide

18  8?  It will have an 8 in the bottom

19  right-hand corner.

20            MR. CLUFF:  So the lawyers

21       on the phone are aware, when I

22       created this exhibit from the

23       production, as I said, this

24       attachment was produced in its

 1              native format.  So we printed it

 2              as a PDF so that the slide appears

 3              in the top half of the page and

 4              any speakers notes would have

 5              appeared on the bottom half of the

 6              page.

 7                   And we also formatted the

 8              footer so that it would reflect

 9              the Bates number and a page

10              number, just so that it's -- for

11              ease of reference for the witness

12              to look through.  We didn't make

13              any other -- we didn't make any

14              changes to the substance of the

15              document.

16    BY MR. CLUFF:

17         Q.    Did you look at Page 8?

18         A.    I did, yes.

19         Q.    Do you see there, DEA

20    statement is the heading?

21         A.    Yes.

22         Q.    So there it says, DEA has

23    and will continue to pursue criminal,

24    administrative and civil actions against

1    registrants who fail to comply with all

2    aspects of the CSA and its implementing

3    requirements -- or regulations as

4    required.  More recent actions include,

5    but are not limited to, actions against

6    wholesale distributors, such as Harvard

7    Drugs, KeySource, CVS, Cardinal,

8    McKesson, Southwood and Sunrise.

9              Are you aware of any

10   enforcement actions against any of those

11   distributors?

12        A.    Nothing in particular.

13        Q.    We previously talked about

14   the red flags that Buzzeo provided to

15   Teva.  And I believe one of them said

16   something about the major distributors

17   like Cardinal, McKesson and Amerisource

18   not being a risk.

19              Would you agree that, based

20   on this DEA statement regarding the

21   enforcement actions against Cardinal and

22   McKesson, that they were maybe a higher

23   risk than some other distributors?

24              MR. KELLY:  Objection to

1          form.

2                  MR. MAIER:  Object to form

3          and foundation.

4                  MR. NICHOLAS:  Join.

5                  THE WITNESS:  No, I can't

6          agree.

7     BY MR. CLUFF:

8          Q.    Why would you disagree with

9     that statement?

10         A.    Why?  Because I don't know

11    who input this document and where it came

12    from and what other discussions were

13    discussed on this PowerPoint and if any

14    changes were made.

15         Q.    As a general matter, having

16    worked in suspicious order monitoring and

17    diversion control since 2009, do you have

18    an opinion about whether a company who

19    had their -- or who was subject to a DEA

20    enforcement action would be high risk

21    versus low risk?

22                MR. NICHOLAS:  Object to the

23         form.  Lack of foundation.

24                THE WITNESS:  No.

```
 1                    MR. MAIER:  Same objection.

 2                    THE WITNESS:  No, I don't

 3          have an opinion.

 4   BY MR. CLUFF:

 5          Q.    Looking at that first line

 6   of the DEA statement slide, it says, DEA

 7   has and will --

 8                    MR. CLUFF:  Can you

 9          underline this, Zach, so he can

10          see where I'm pointing to?

11   BY MR. CLUFF:

12          Q.    DEA has and will continue to

13   pursue criminal, administrative and civil

14   actions against registrants.

15                    Are you aware of what --

16   that a violation of a CSA can result in

17   criminal action against a registrant?

18                    MR. MAIER:  Objection to

19          foundation.

20                    MR. NICHOLAS:  Same

21          objection.  Form and foundation.

22                    THE WITNESS:  I'm only aware

23          of what's highlighted in front of

24          me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. CLUFF:
 2         Q.    Based on what's in front of
 3    you, would you agree that violation of
 4    the CSA could subject the registrant to
 5    criminal action?
 6                   MR. NICHOLAS:  Object to the
 7         form.  And foundation.
 8                   MR. MAIER:  Same objection.
 9                   THE WITNESS:  It depends on
10         the circumstances.
11    BY MR. CLUFF:
12         Q.    But it's definitely a
13    possibility, right?
14                   MR. NICHOLAS:  Object to the
15         form.
16                   MR. MAIER:  Same objection.
17                   THE WITNESS:  I wouldn't say
18         it's definitely a possibility, but
19         it's a possibility.
20    BY MR. CLUFF:
21         Q.    Looking back at the second
22    page of this document, which is your
23    e-mail to Colleen, you informed her that
24    you added Slides 10, 11 and 12, right?
```

1     Do you see that there in the

2  first paragraph of your e-mail at the

3  bottom?

4     The next page.

5     A.   Yes.

6     Q.   In the PowerPoint, let's go

7  to those slides, 10, 11 and 12.

8     I want to focus on Number

9  11, if you're there.  Go ahead and read

10  that for me.

11     A.   Okay.

12     Q.   So a little sidebar, your

13  lawyers and I had -- we noted that

14  Colleen appears to have deleted and maybe

15  changed some slides.  So the original 10,

16  11 and 12 might not be the same 10, 11

17  and 12 that you're looking at here.

18     So I'll ask you, looking at

19  Number 11, is this a slide that you

20  recall having drafted?

21     A.   I don't recall this slide.

22     Q.   Looking at the top, it says,

23  Distributor and manufacturer initiative

24  program.

1          Do you see that?

2     A.   Yes.

3     Q.   Are you familiar with the

4  concept of a distributor initiative or a

5  manufacturer initiative program?

6     A.   I am not.

7     Q.   Looking at the first point

8  it says, Established in 2005 to remind

9  DEA registrants of regulatory obligation

10 to maintain effective controls against

11 diversion.

12          Do you see that?

13    A.   Yes.

14    Q.   Earlier we talked about

15 whether you might have received training

16 at AmerisourceBergen, as a diversion

17 control specialist, about effective

18 controls against diversion.

19          Having read this paragraph

20 here, do you have any recollection about

21 receiving training on effective controls

22 against diversion?

23    A.   At Teva?

24    Q.   AmerisourceBergen.

1          A.    At AmerisourceBergen.

2                I don't recall the specific

3     training that I received, but I did

4     receive training.

5          Q.    Looking down at the next

6     bold bullet point, it states that, The

7     stated goal of the program is to cut off

8     the source of supply to these (rogue pain

9     clinics, physicians and pharmacies)

10    through effective due diligence and

11    suspicious order recording.

12               Do you have any

13    understanding of that being the goal of

14    the distributor and manufacturer

15    initiatives?

16         A.    I did not.

17         Q.    Did you understand, as a

18    diversion control specialist at

19    AmerisourceBergen, that part of your

20    responsibility was to maintain effective

21    controls against diversion?

22               MR. NICHOLAS:  Object to the

23         form.

24               THE WITNESS:  No, I am not.

```
 1   BY MR. CLUFF:

 2        Q.    Did you have an

 3   understanding, as a diversion control

 4   specialist at AmerisourceBergen, that

 5   part of the way to maintain effective

 6   controls against diversion was through

 7   effective due diligence?

 8        A.    I'm aware of effective due

 9   diligence, yes.

10        Q.    Was it a part of -- strike

11   that.

12            How about suspicious order

13   reporting, was that a part of

14   AmerisourceBergen's efforts to maintain

15   effective controls against diversion?

16                MR. NICHOLAS:  Object to the

17        form.

18            Go ahead.

19                THE WITNESS:  Can you ask

20        that question -- rephrase that

21        question?

22   BY MR. CLUFF:

23        Q.    Was suspicious order

24   reporting a part of AmerisourceBergen's
```

Highly Confidential - Subject to Further Confidentiality Review

1    efforts to maintain effective controls

2    against diversion?

3                MR. NICHOLAS:  Objection.

4          Because I think you just reread

5          it.  You didn't rephrase it.

6                MR. CLUFF:  I took a few

7          words out.

8    BY MR. CLUFF:

9          Q.    Did my question make sense

10   to you?

11         A.    Not really.

12         Q.    As a diversion control

13   specialist, did you understand that

14   AmerisourceBergen had a duty to identify

15   and report suspicious orders?

16         A.    I do understand that.

17         Q.    Did you understand that that

18   duty arose from the regulatory obligation

19   to maintain effective controls against

20   diversion?

21                MR. NICHOLAS:  Object to the

22          form.

23                Go ahead.

24                THE WITNESS:  According to

Highly Confidential - Subject to Further Confidentiality Review

1        the CFR.

2    BY MR. CLUFF:

3        Q.    Can you move forward to

4    Slide Number 15, please?  I have some

5    just general questions before we get into

6    the slide.

7             Before you became the

8    diversion control specialist at

9    AmerisourceBergen -- well, in your work

10   as a diversion control specialist at

11   AmerisourceBergen, did you become

12   familiar with AmerisourceBergen's

13   suspicious order monitoring and reporting

14   policy before 2009?

15       A.    Before I was hired in the

16   department?

17       Q.    Yes.  Did you have an

18   understanding of what it was before you

19   were hired?

20       A.    No, I did not.

21       Q.    Do you know if

22   AmerisourceBergen has always reported

23   suspicious orders to the DEA?

24       A.    As far as I know, we have.

1    Q.    Are you aware that prior to

2    2007 -- or aware if, prior to 2007,

3    AmerisourceBergen reported excessive

4    purchases after it identified them as

5    such?

6    A.    I'm not aware of that.

7    Q.    I want to point your

8    attention to the very last bullet point

9    there.

10          It says, Registrants who

11    routinely report suspicious orders yet

12    fill those orders are failing to maintain

13    effective controls against diversion.

14          Do you see that?

15    A.    I do.

16    Q.    Do you have any

17    understanding of what that means?

18    A.    No.  Because I feel like

19    that's a vague statement.

20    Q.    Do you know if, at this

21    time, Teva was shipping orders that it

22    reported as suspicious?

23          MR. MAIER:  Objection.  Form

24          and foundation.

1          THE WITNESS:  No, I do not.

2  BY MR. CLUFF:

3          Q.    Do you have any

4  understanding about whether

5  AmerisourceBergen shipped orders that it

6  deemed were suspicious prior to 2015?

7          A.    Could you ask that again,

8  please?

9          Q.    Sure.  So I think -- I used

10  2015, because we talked about there was a

11  change from thresholds to parameters in

12  2015.

13          A.    Correct.

14          Q.    In your work as a diversion

15  control specialist prior to 2015, are you

16  aware of AmerisourceBergen shipping

17  orders that were deemed suspicious?

18          A.    No, I am not.

19          Q.    If that happened, would you

20  agree that it was a failure to maintain

21  effective controls against diversion?

22          MR. NICHOLAS:  Object to the

23      form.

24          THE WITNESS:  No, I do not

1      agree.

2  BY MR. CLUFF:

3          Q.    So your opinion is, based on

4  your work as a diversion control

5  specialist, that if AmerisourceBergen

6  shipped an order that it deemed was

7  suspicious, that would not be a failure

8  to maintain effective controls against

9  diversion?

10             MR. NICHOLAS:  Object to the

11        form.

12             THE WITNESS:  We would not

13        ship a suspicious order.  We would

14        reject it and report it.

15  BY MR. CLUFF:

16         Q.    What happens if it's shipped

17  after it's identified as suspicious?

18             MR. NICHOLAS:  Object to the

19        form.

20             THE WITNESS:  I don't think

21        we can ship a suspicious order.

22        Our system won't allow it.

23  BY MR. CLUFF:

24         Q.    Take a look with me at Slide

1    20.   You can go ahead and read that if

2    you'd like to.

3            A.    Okay.

4            Q.    So you see there it says,

5    System challenges and responses?

6            A.    Yes.

7            Q.    And the major heading at the

8    top is, Common SOM pitfalls?

9            A.    Yes.

10           Q.    Do you see there in bold

11   where it says, quote, Threshold, quote,

12   based systems are not sufficient?

13           A.    Yes.

14           Q.    This document, based on its

15   attachment to this e-mail, was drafted in

16   2013, correct?

17           A.    It was included in the

18   document, yes.  It came from 2007, it

19   appears.

20           Q.    The PowerPoint comes from

21   2007?

22           A.    The slide.  Well, the DEA

23   memorandum.

24           Q.    Right, yeah.  Okay.  Thank

1    you.  I was going to get to that.

2              You see at the bottom there,

3    where it says this comment about a

4    threshold sytem not being sufficient

5    comes from a December 27, 2007 DEA

6    memorandum?

7          A.    Yes.

8          Q.    We previously discussed

9    AmerisourceBergen's suspicious order

10   monitoring system, prior to 2015, was a

11   threshold-based system; is that right?

12         A.    Yes.

13         Q.    Would you agree with me

14   that, based on this DEA memorandum from

15   2007, that AmerisourceBergen's

16   threshold-based system was not

17   sufficient?

18              MR. NICHOLAS:  Objection.

19         Objection to the form.

20              THE WITNESS:  No, I do not

21         agree.

22   BY MR. CLUFF:

23         Q.    So you disagree with the

24   DEA's memorandum?

1          MR. NICHOLAS:  Objection.

2     Objection to the form.

3          THE WITNESS:  I agree with

4     the system we currently had in

5     place at the time.

6  BY MR. CLUFF:

7     Q.   So you would agree with the

8  system you had in place at the time

9  instead of the December 2007 DEA

10 memorandum?

11         MR. NICHOLAS:  Object to the

12    form.  You're asking him about a

13    document that he doesn't remember

14    that is quoting something that he

15    hasn't said he's even seen.

16         I'll object to the form.

17         THE WITNESS:  I don't -- as

18    Bob stated, I don't remember this

19    document or this slide.

20         MR. CLUFF:  Hold on.

21         THE WITNESS:  Sorry.

22         MR. CLUFF:  Bob, that's a

23    clear example of you coaching this

24    witness and influencing his

1    testimony.  I'm not going to make

2    a big deal about it, because we've

3    had a pretty collegial deposition

4    today.

5         But I'd like to request that

6    that not happen again, please.

7         MR. NICHOLAS:  Well, now --

8         MR. CLUFF:  I'm going to let

9    you finish.  But all I want to say

10   is, we've had this out before,

11   there's no reason for any of us to

12   get upset about it.  But

13   objection, form; objection,

14   foundation.  You know the proper

15   basis for an objection.  You

16   influenced his testimony, and he

17   just used your objection to answer

18   my question.  And that's not

19   proper.

20        MR. NICHOLAS:  Well, all

21   I'll say in response is that I

22   disagree with your

23   characterization of my objection

24   and his response.

1        If I think your

2        questions are unfair, I'm going to

3        say I think it's unfair.

4            Now you can proceed.

5    BY MR. CLUFF:

6        Q.    Mr. Kreutzer, your attorney

7    is entitled to object.  But I'm also

8    entitled to an answer to my question.

9    His objection is not a proper basis for

10   you to give me an answer based on his

11   objection.

12           So let's look at this

13   document again.  Quote, Threshold, closed

14   quote, based systems are not sufficient.

15           Is that right?

16       A.    That's what it states.

17       Q.    Looking down at the bottom

18   section of this document, you identified

19   that this comes from a December 2007 DEA

20   memorandum, correct?

21           MR. NICHOLAS:  Object to the

22       form.

23           THE WITNESS:  Yes.

24           MR. NICHOLAS:  And

1    foundation.

2  BY MR. CLUFF:

3        Q.    Now, do you see the bullet

4  point that immediately precedes that,

5  that says, Do not meet the regulations?

6        A.    That's what it states right

7  there.

8        Q.    Would you agree with me that

9  from 2009, when you began working as a

10  diversion control specialist, until 2015,

11  AmerisourceBergen used a threshold-based

12  system?

13        A.    We did use a threshold-based

14  system.

15        Q.    I just have one more slide

16  here to talk to you about.  Let me find

17  it.

18            I previously asked you if

19  Teva reported suspicious orders to the

20  DEA.

21            Do you remember that?

22        A.    Yes.

23        Q.    Look at Slide 38 for me.

24            And I just would point out

1     to you, the top portion of the slide

2     says, Improving our processes and target

3     dates; is that right?

4         A.    Yes.

5         Q.    Based on looking at this

6     document, do you believe that this would

7     have been Teva identifying processes that

8     needed to be improved?

9         A.    It appears to be.

10        Q.    Looking at the first bullet

11    point on that list of things that Teva

12    identified needed to be improved, would

13    you agree with me that it says, Began

14    reporting suspicious orders to the DEA?

15       A.    Yes.

16       Q.    So prior to February 2013,

17    Teva did not report suspicious orders to

18    the DEA?

19       A.    That, I don't know.

20         MR. MAIER:  Objection.

21    Form.

22  BY MR. CLUFF:

23       Q.    Do you have any reason to

24    disagree with this slide?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I can only -- I can only

2    read what's in front of me.  I don't know

3    if any orders were reported prior to --

4    from February 2013.

5    Q.    Based on the time when you

6    worked at Teva, which I believe you said

7    was January to April 1st, 2013, were you

8    aware that Teva reported suspicious

9    orders prior to February 2013?

10    A.    I am not.

11         MR. MAIER:  Object to form

12         and foundation.

13  BY MR. CLUFF:

14    Q.    Midway down the list there,

15  there's another bullet point that says,

16  Developing SOPs (targeted 03/13).

17         Was it your understanding,

18  based on your work at Teva, that Teva did

19  not have in operation standard operating

20  procedures prior to March of 2013?

21         MR. MAIER:  Objection.

22         Form.

23         THE WITNESS:  No, I believe

24         they did have some standard

Highly Confidential - Subject to Further Confidentiality Review

1      operating procedures.  But I don't

2      remember which ones they were.

3  BY MR. CLUFF:

4      Q.    Okay.  Do you have any

5  understanding of why they would have been

6  developing SOPs, then, in 2013?

7           MR. MAIER:  Objection.

8      Foundation.

9           THE WITNESS:  It may have

10      been further enhancing those SOPs,

11      but I'm not sure.

12  BY MR. CLUFF:

13      Q.    Okay.  All right.  That's

14  all I have for this document.

15           In your work at

16  AmerisourceBergen, I think you testified

17  that you worked with spreadsheets a lot;

18  is that right?

19           MR. NICHOLAS:  Object to the

20      form.

21           THE WITNESS:  We do work

22      with spreadsheets, yes.

23  BY MR. CLUFF:

24      Q.    And that your work with

1  spreadsheets was partly to review

2  customer orders when they came up from

3  the distribution centers, correct?

4       A.    Which time frame are we

5  referring to?

6       Q.    Between 2009 and 2015.

7       A.    Yes.

8       Q.    Did you ever have occasion

9  to review spreadsheets that reflected

10 orders that were reported to the DEA?

11      A.    I don't recall that.

12      Q.    Did you have occasion to

13 review spreadsheets that reflected CSRA

14 comments for shipments between 2007 and

15 2012?

16      A.    I don't recall that.

17      Q.    Did you have occasion to

18 review a history report of all shipments,

19 a spreadsheet that catalogued that

20 information?

21      A.    I don't recall.

22      Q.    Do you think if I showed you

23 a copy of some of those spreadsheets they

24 would refresh your recollection?

1          A.     Perhaps.

2          Q.     Give me one second, and I'll

3    grab these from my little box back here.

4              The first one I want to hand

5    to you is a document produced by

6    AmerisourceBergen, Bates stamped

7    ABDC_MDL_0045077.

8              I will apologize in advance

9    that these spreadsheets are very hard to

10   get onto one page.  I've tried my best to

11   do that for you.

12                -   -   -

13              (Whereupon,

14         AmerisourceBergen-Kreutzer

15         Exhibit-6, ABDC_MDL_0045077, was

16         marked for identification.)

17                -   -   -

18              MR. CLUFF:  We should

19         probably all use the blow-up on

20         the screen to the best of our

21         ability.

22              MR. MAHADY:  Sterling, these

23         spreadsheets, can we agree to

24         treat them confidential?

Highly Confidential - Subject to Further Confidentiality Review

1                MR. CLUFF:  Yes, all three.

2           So I'm going to be using 45077,

3           45075 and 45076, and all three

4           will be treated as confidential.

5      BY MR. CLUFF:

6           Q.    These are excerpts of

7      voluminous records.  They have been

8      selected to identify a single pharmacy,

9      which is Acme Pharmacy Number 30, which

10     is located in Stow, which is within --

11     off the top of my head, I can't remember

12     if it's Cuyahoga or Summit County, but

13     it's definitely a CT 1 jurisdiction.

14                Looking up on the top left

15     corner --

16                MR. CLUFF:  Can you blow

17           this up, Zach, top left corner?

18     BY MR. CLUFF:

19           Q.    -- it says, Reported to DEA,

20     report for all Ohio customers from

21     1/1/2007 to 12/31/2012.

22                Is that a spreadsheet that

23     you would have any familiarity with?

24           A.    I don't remember this

Highly Confidential - Subject to Further Confidentiality Review

1    spreadsheet.

2         Q.    Set that aside for just a

3    second, then.  That's okay.

4              I'd like to also hand you

5    another document.  It's a native file we

6    converted to PDF.  It is Bates marked

7    ABDC_MDL_0045075.  I ask that this also

8    be treated as confidential.

9                   -   -   -

10             (Whereupon,

11             AmerisourceBergen-Kreutzer

12             Exhibit-7, ABCD_MDL_0045075, was

13             marked for identification.)

14                  -   -   -

15             MR. CLUFF:  Zach, please

16             blow up the top left corner there

17             so we can all read the heading.

18   BY MR. CLUFF:

19        Q.    You can see, Mr. Kreutzer,

20   that this document is -- at least the

21   heading there at the top left is, CSRA

22   comments report for all Ohio customers

23   from 1/1/2007 to 12/31/2012.

24             Do you see that?

1      A.    Yes.

2      Q.    Is this a report that you

3  have any familiarity with?

4      A.    I do not.

5      Q.    But you worked in the CSRA

6  department, correct?

7      A.    I did.

8      Q.    Okay.  And so you would have

9  reviewed orders, as part of your work in

10  the CSRA department, to determine if they

11  could be approved or had to be cancelled,

12  correct?

13      A.    Correct.

14          MR. CLUFF:  Zach, can you

15          remove that blow-up, please?  And

16          then over to the right, there is a

17          column that says, User ID.  And

18          next to it there's another column

19          that says, Action taken.

20          Can you blow those up,

21          please?

22  BY MR. CLUFF:

23      Q.    Looking on the screen in

24  front of you, Mr. Kreutzer, do you see

1  where it says, User ID, in the top left

2  corner?

3      A.    Yes.

4      Q.    And underneath that is your

5  first initial and last name, K. Kreutzer?

6      A.    Yes.

7      Q.    So based on your work as a

8  diversion control specialist in the CSRA

9  department, and looking at this document,

10  does it reflect decisions that would have

11  been made by employees of

12  AmerisourceBergen, including yourself,

13  regarding customer orders?

14          MR. NICHOLAS:  Objection.

15      Form and foundation.

16          THE WITNESS:  Can you ask

17      that question again?

18  BY MR. CLUFF:

19      Q.    Sure.

20          I'm trying to understand

21  what this document is.  And I see that

22  it's got your first initial and your last

23  name on it.  And that it has a column

24  entitled, Action taken.

1    And I'm trying to

2  understand, you know, based on the

3  heading, CSRA comments report, and some

4  of the information that's contained in

5  the document, what's reflected in here.

6    And the question is, does

7  this contain a record of customer orders

8  that would have been reviewed by

9  AmerisourceBergen employees, specifically

10  in the CSRA department, to determine

11  whether or not they could be, you know,

12  released or cancelled?

13    A.    I believe so, yes.

14    Q.    Have you ever seen a report

15  like this before?

16    A.    I don't recall this

17  document.

18    Q.    Just to back up and talk

19  generally for a second, if an order was

20  elevated to CSRA and it was not released

21  for shipment, would that order be

22  reported to the DEA?

23    A.    It depends on the

24  circumstances.

1    Q.    Is there a circumstance

2  where a cancelled order would not be

3  reported to the DEA?

4    A.    Yes.

5    Q.    What's a circumstance like

6  that?

7    A.    A circumstance would be if

8  we received information that it was a

9  customer ordering error.

10    Q.    Is that referred to as a

11  keying error?

12    A.    Keying error.

13    Q.    That's when you hit, like,

14  78 instead of just 7?

15    A.    Correct.

16    Q.    Any other instances where an

17  order would be cancelled but not

18  reported?

19    A.    Yes.  A customer would call

20  in indicating that they didn't intend on

21  purchasing that item.

22    Q.    But those are all sort of

23  clerical errors from the customer's

24  standpoint, right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Earlier you testified that

3    if an order was reported to the DEA as

4    suspicious, it was not shipped, correct?

5        A.    Yes.

6        Q.    So looking back at, I

7    believe it's Number 6, which is 45077.

8             MR. CLUFF:  And then blow up

9        that top left corner, again, Zach.

10            MR. NICHOLAS:  Can you just

11       hold up while we catch up to you

12       here?

13            MR. CLUFF:  Sure.  I'm

14       sorry.

15            MR. NICHOLAS:  Which

16       document are we in?

17            MR. CLUFF:  It's Exhibit

18       Number 6.  It's one of the big

19       spreadsheets.  And down in the

20       bottom left corner -- bottom right

21       corner, it should have an Exhibit

22       6 tab on it.

23            And then I asked Zach to

24       blow up and highlight the heading

1          here on the screen, which you can

2          also see in front of you, because

3          I forgot to bring my magnifying

4          glass for you today.

5    BY MR. CLUFF:

6          Q.    But this document, Exhibit

7    6, which is ABDC_MDL_00045077, has a

8    heading, Reported to DEA for all Ohio

9    customers.

10          Based on your work as a

11   diversion control specialist, does this

12   appear to be a document containing orders

13   that were reported to the DEA as

14   suspicious?

15          A.    According to the document,

16   it is.  It's reported to the DEA report

17   for all Ohio customers, from January to

18   December.

19          Q.    Okay.  So if you look in the

20   middle of the document, there's a heading

21   that reads, Customer_PO_Number.  And

22   underneath that on 61 -- underneath that,

23   there is a row of what would appear to be

24   order numbers.  The first looks like it

Highly Confidential - Subject to Further Confidentiality Review

1  has one, two, three, four lines, which

2  all read CES112610.

3           Do you see that?

4      A.    Yes.

5      Q.    So if this order was

6  reported to the DEA and I looked in the

7  shipping records, your testimony is that

8  that order would have not been shipped,

9  correct?

10          MR. NICHOLAS:  Object to the

11      form.

12  BY MR. CLUFF:

13      Q.    Or do I understand that

14  correctly?

15      A.    I don't know.  I would have

16  to go back in time to see the particulars

17  of this order to make a decision like

18  that.

19      Q.    So is there a circumstance

20  where an order would have been reported

21  to the DEA but still shipped?

22      A.    If it was a mistake.  I

23  don't know how that could occur.

24      Q.    Are you aware of any orders

Highly Confidential - Subject to Further Confidentiality Review

1    that were reported to the DEA as

2    suspicious ever shipping?

3          A.    No, I'm not.

4          Q.    All right.  Let's -- I want

5    to hand you one more.

6                MR. CLUFF:  Zach, this will

7          be Number 43.

8                It's another Excel native

9          spreadsheet that was produced by

10         AmerisourceBergen that we'll treat

11         as confidential.  It is

12         ABDC_MDL_00045076, and we'll mark

13         it as Exhibit-8.

14                   -   -   -

15               (Whereupon,

16         AmerisourceBergen-Kreutzer

17         Exhibit-8, ABDC_MDL_00045076, was

18         marked for identification.)

19                   -   -   -

20               MR. CLUFF:  Zach, can you

21         blow up the top left corner of

22         that document?

23   BY MR. CLUFF:

24         Q.    It says, History report

Highly Confidential - Subject to Further Confidentiality Review

1    requested for all Ohio customers from

2    1/1/2007 to 12/31/2012.

3              Do you see that, Mr.

4    Kreutzer?

5         A.    Yes, I do.

6         Q.    Do you have any

7    understanding about whether this document

8    would reflect all shipments by

9    AmerisourceBergen to customers in Ohio

10   between 2007 and 2012?

11             MR. NICHOLAS:  Object to the

12        form.  And lack of foundation.

13             THE WITNESS:  I don't know.

14   BY MR. CLUFF:

15        Q.    You were responsible for

16   reviewing customer orders while you were

17   a diversion control specialist, correct?

18        A.    Correct.

19        Q.    Just looking at this

20   document, we'll start on the left, it

21   says, Division, DEA, at the top heading.

22             Would that be

23   AmerisourceBergen's DEA number?  Or do

24   you know whose that would be?

1        A.    I believe that is

2   AmerisourceBergen's Columbus distribution

3   center's DEA, but I'm not 100 percent

4   certain.

5        Q.    The next heading over says,

6   Customer number.

7             Based on your knowledge of

8   customer orders, does that appear to be

9   this customer, Acme Pharmacy Number 30's

10  customer number?

11       A.    Yes.

12       Q.    Moving to the right, we see

13  there's a customer name, Acme Pharmacy

14  Number 30, correct?

15       A.    Yes.

16       Q.    Then the next column over is

17  a shipping address, Line 1, that appears

18  to be just a street address for the

19  pharmacy, right?

20       A.    Yes.

21       Q.    Next column is -- I was

22  reading it without abbreviating it.

23             Do you want me to read the

24  abbreviation so it's clear?  Or if I --

1        A.    No.

2              MR. NICHOLAS:  In this case,

3        it's okay.

4   BY MR. CLUFF:

5        Q.    So the next column over,

6   based on what I'm reading, looks like

7   shipping address, city name?

8        A.    Yes.

9        Q.    Which would be the city this

10  pharmacy is located in.

11             And then the next column is

12  ship address, state code.

13             Here it looks like it's

14  Ohio, correct?

15       A.    Right.

16       Q.    Next column over is shipping

17  address, zip 5, probably code again.

18             The zip code the pharmacy is

19  listed in?

20       A.    Yes.

21       Q.    Customer PO number.

22             Would that stand for

23  purchase order number?

24       A.    Yes.

1    Q.    We looked at the DEA -- the

2   reported to DEA spreadsheet, which is

3   Exhibit-6, and we talked about that that

4   column -- that spreadsheet had a column

5   called purchase order number as well,

6   correct?

7    A.    Yes.

8    Q.    Moving to the right, again,

9   we see customer DEA is the next column,

10  and that would be this pharmacy

11  customer's DEA number, right?

12   A.    Correct.

13   Q.    The next column over is,

14  Customer chain ID.

15        Do you have any idea about

16  what a customer chain ID number is?

17   A.    Since that is a -- appears

18  to be a retail pharmacy chain, Acme, I

19  believe that's the chain ID number

20  associated with this particular customer.

21   Q.    Okay.  So chain pharmacies

22  had an additional ID aside from their

23  AmerisourceBergen customer ID?

24   A.    I don't recall.

1          Q.     Understood.

2                 The next column over, it's

3     kind of wrapped over, but it says,

4     Customer DEA TY.

5                 Do you know what that stands

6     for?  Could it refer to type?

7          A.     I believe so, yes.

8          Q.     So what would the R1

9     designation refer to?

10         A.     I'm not sure.  I don't

11    recall.

12         Q.     Does it have any relation to

13    retail chains?

14         A.     I am not sure.

15         Q.     The next column over is,

16    Customer size.  And on the first four

17    lines, there is an M and after that, the

18    designation changes to L.

19                Do you know what is

20    identified in that column?

21         A.     What the letters stand for?

22         Q.     Yes.

23         A.     That would be medium and

24    large.

1    Q.    And what significance does

2    the customer size have in relation to

3    Acme Pharmacy purchasing controlled

4    substances from AmerisourceBergen?

5    A.    I believe those sizes are in

6    reference to their customers' overall

7    purchases in dollars.

8    Q.    And did a customer's overall

9    purchases in dollars have any effect on

10   their threshold, prior to 2015?

11   A.    I don't know.

12   Can you re-ask that question

13   again, please?

14   Q.    If a customer moved from a

15   medium size with AmerisourceBergen to a

16   large size, would that result in a

17   corresponding increase of their threshold

18   for controlled substances?

19   A.    It may, but not necessarily.

20   Q.    Moving to the right one

21   more, it says, Order date.

22   That would have been just

23   the order -- or the date for this order

24   that we're looking at, right?

1    A.    Yes.

2    Q.    And the quantity ordered,

3    how does AmerisourceBergen measure

4    quantities?  So I see there at the top it

5    says 49 is the quantity ordered.

6              Does that mean 49 pills were

7    ordered?

8    A.    That just seems like an odd

9    number to -- for an order quantity.

10   Usually, they would be in even numbers.

11   Q.    But what I'm trying to

12   figure out is, were they ordering 49

13   batches of 100 pills?

14   A.    It could be 49 bottles of

15   whatever they're ordering.

16   Q.    How many bottles -- how many

17   pills would be in a bottle?

18   A.    It varies.  It could be 100

19   dosage units.  It could be 500.  It could

20   be 1,000.

21   Q.    I want to go over two -- two

22   columns that say item family and item

23   description.

24              Would these columns tell us

Highly Confidential - Subject to Further Confidentiality Review

1   what family of drug and the description

2   of what was being ordered?

3        A.    Yes.

4        Q.    So morphine solid would be a

5   solid form of a morphine pill?

6        A.    Yes.

7        Q.    And then what would a

8   morphine sulfate be, or morphine SULF?

9        A.    That's just the brand name

10  or generic name.

11       Q.    Okay.  Scrolling over, there

12  is an item schedule column.

13             Under that, it says, C-II?

14       A.    Yes.

15       Q.    So is that the class of drug

16  that would have been ordered?

17       A.    Yes.

18       Q.    And the next column over is

19  DC, with a number 10 under it.

20             Can you tell me what that

21  number is?

22       A.    That's the Columbus DC

23  number.

24       Q.    Okay.  The next column over

1    is user ID.  If you go five down, it

2    says, AREDFOX.

3                   Would that be somebody

4    else's first initial and last name

5    combined, or do you know what that --

6    what those letters designated?

7         A.    I don't know what that

8    designates.  I don't know who that is.

9         Q.    If you keep moving down that

10   column, there's a field that reads,

11   DRC1213.

12                  Do you know what that

13   designates?

14        A.    I do not.

15        Q.    Did AmerisourceBergen

16   employees such as yourself have IDs that

17   they sometimes used in addition to their

18   names or initials?

19        A.    We had user IDs, numbers.

20        Q.    So this DRC1213, could that

21   be somebody's user ID?

22                  MR. NICHOLAS:  Object to the

23          form.

24                  THE WITNESS:  I'm not sure.

```
 1    BY MR. CLUFF:

 2          Q.    If you go to the next

 3    column, it says, Release code.

 4                And then midway down on the

 5    screen, there is an abbreviation, IN.

 6                Do you know what that stands

 7    for?

 8          A.    I do not.

 9          Q.    Could it potentially stand

10    for investigation?

11                MR. NICHOLAS:  Object to the

12          form.

13                THE WITNESS:  It may, but

14          I'm not sure.

15    BY MR. CLUFF:

16          Q.    Scrolling down, do you see

17    that there is an abbreviation, AC?

18          A.    Yes.

19          Q.    Do you know what that stands

20    for?

21          A.    I do not.

22          Q.    Could it perhaps stand for

23    approved by a CSRA?

24                MR. NICHOLAS:  Same
```

 1          objection.

 2                  THE WITNESS:  That's what

 3          the comments state.

 4     BY MR. CLUFF:

 5          Q.    So is it reasonable to

 6     assume that means approved by CSRA?

 7                  MR. NICHOLAS:  Object to the

 8          form.

 9                  THE WITNESS:  For this

10          particular item, yes.

11     BY MR. CLUFF:

12          Q.    I want you to look for me

13     again at Exhibit Number 6, which is the

14     first spreadsheet I handed you that is

15     45077.

16                  Do you see that?  In the

17     middle --

18                  MR. CLUFF:  Zach, could you

19          blow up the middle of the document

20          for me where we can see the

21          customer purchase order number

22          through to the item description?

23     BY MR. CLUFF:

24          Q.    Starting in the middle of

1  that page, Mr. Kreutzer, do you see where

2  it says --

3          MR. CLUFF:  Can you pull

4      that to -- I need to see the

5      purchase order number, Zach.  It's

6      to your left.

7  BY MR. CLUFF:

8      Q.    So the purchase order number

9  says, CES112610.

10          Do you see that?

11     A.    Yes.

12     Q.    And there are four lines

13  there?

14     A.    Yes.

15     Q.    Okay.  Keep that in front of

16  you, just kind of hold it, put your

17  finger on that.  And then go back to

18  Exhibit Number 8, and go to Page 7.

19          And at the bottom third of

20  the page, you'll see midway down, in the

21  customer purchase order number column,

22  that CES112610 begins.

23          MR. CLUFF:  That's the wrong

24      one, Zach.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. CLUFF:

2        Q.    Can you see on your page,

3   Mr. Kreutzer --

4        A.    I cannot.  I can't read

5   this.

6        Q.    That probably makes a lot of

7   us.

8        A.    I mean, I can read it on the

9   monitor in front of me.

10             MR. CLUFF:  Keep going down,

11        Zach.  To the very bottom of your

12        screen right now, Zach.  Right

13        there.

14             And then drag it to your

15        left, Zach.

16   BY MR. CLUFF:

17        Q.    So do you see the order

18   number there, Mr. Hazewski?

19             MR. NICHOLAS:  You mean Mr.

20        Kreutzer?

21   BY MR. CLUFF:

22        Q.    I'm sorry.  Yes.  Mr.

23   Kreutzer.

24             Is that the same number we

Highly Confidential - Subject to Further Confidentiality Review

1    were looking at in the DEA report,

2    CES112610?

3          A.    Yes.

4          Q.    If you scroll to the right,

5    to the column that has the release codes

6    in it, if you -- if you look down at the

7    bottom of that order, there is a code

8    that says, AC.

9                Would that mean that this

10   report -- this order was approved for

11   shipment by the CSRA?

12         A.    I don't see any information.

13               MR. NICHOLAS:  I don't see

14         it either, I'm sorry.

15               MR. CLUFF:  Do this for me,

16         Zach, do you see the first

17         CES112610?

18   BY MR. CLUFF:

19         Q.    Can you see it now on there,

20   Mr. Kreutzer?

21         A.    I'm sorry, what are we

22   looking at?

23         Q.    Can you see the highlighted

24   portion --

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes, yes.

2      Q.    So if you -- all the way to

3  the left of your screen, you'll see a

4  list of order numbers.  And Zach has

5  highlighted one that says 112610 up

6  there.

7      A.    Yes.

8      Q.    There's also one that

9  precedes that, that's not highlighted

10  yet.

11          But if you travel down that

12  number, you see that the order number

13  remains the same all the way until he

14  gets to the bottom row that's

15  highlighted, correct?

16      A.    Correct.

17      Q.    And if you drag the

18  highlighted portion all the way over to

19  the end where we have those codes, you'll

20  see that they start out as IN codes and

21  then end as AC codes.

22          MR. MAHADY:  Hold on a

23      second.  I think you need to

24      take --  do you want the witness

Highly Confidential - Subject to Further Confidentiality Review

1      to leave so we can talk about

2      this?  I don't want to --

3              MR. CLUFF:  Step out for a

4      second, Mr. Kreutzer.  Give us --

5              MR. NICHOLAS:  Go out and

6      we'll talk about this so we don't

7      influence your testimony.

8              THE WITNESS:  You want me to

9      leave?

10              MR. CLUFF:  Just for a

11      minute.

12              VIDEO TECHNICIAN:  Off the

13      record at 3:51 p.m.

14                  -  -  -

15              (Whereupon, a brief recess

16      was taken.)

17                  -  -  -

18              VIDEO TECHNICIAN:  We're

19      back on the record at 4:11 p.m.

20              MR. CLUFF:  Mr. Kreutzer,

21      we're back on the record.

22              But before we start back

23      with you, your lawyers and I

24      discussed some of these

1          spreadsheets that we were asking

2          you questions about, and we've

3          come to an understanding about

4          them.  So I'm going to do what's

5          called make a record of our

6          discussion.

7              I understand that you have

8          not been privy to any discussions

9          about these spreadsheets, so I'm

10         not going to ask you any questions

11         about discussions you had in the

12         hallway.

13             So during the break, counsel

14         for AmerisourceBergen and I met

15         and conferred about what has

16         previously been identified during

17         this deposition as Exhibits 6, 7

18         and 8.  Specifically, I was

19         informed, and this is something

20         that was disclosed during document

21         production, so it was not a

22         surprise, although it was

23         re-uncovered again today during

24         the deposition, that the document

Highly Confidential - Subject to Further Confidentiality Review

1    marked as Exhibit-6, which is

2    Bates number ABDC_MDL_00045077,

3    along with the documents

4    identified as Exhibits-7 and 8,

5    are not traditionally kept in this

6    format during AmerisourceBergen's

7    regular course of business.

8         And that during the creation

9    of Exhibit-6, there was, I

10   believe, what we have mutually

11   referred to as a data collection

12   error, or a data collection

13   malfunction that resulted in

14   inaccuracies in ABDC_MDL_00045077,

15   specifically that this document

16   may reflect orders being reported

17   to the DEA that were not actually

18   reported to the DEA.

19        We understand, as

20   plaintiffs, that these documents,

21   Exhibits-6, 7 and 8, were

22   reproduced after the data

23   malfunction was discovered and

24   that subsequently produced

1    versions of these documents

2    contain more correct data.

3         So for the purposes of this

4    deposition, I will no longer be

5    relying on Exhibit-6 for further

6    questioning.  We discussed that I

7    do have some limited questions

8    regarding Exhibits-7 and 8, but

9    that the data malfunctions in

10   Exhibit-6 do not pervade

11   Exhibits-7 and 8.

12        And with that, I think I'll

13   turn it over to counsel for

14   AmerisourceBergen to correct me if

15   I'm wrong.

16        MR. MAHADY:  That is fine.

17   The only thing I'll add is that

18   the subsequently produced version

19   of Exhibit-6 was limited in scope

20   to Summit and Cuyahoga and not

21   Ohio.

22        MR. CLUFF:  Understood.

23        MR. MAHADY:  But counsel's

24   representations accurately reflect

1    our understanding of the issue.

2    And we'll meet and confer with

3    counsel following the deposition.

4  BY MR. CLUFF:

5    Q.    So with that understanding,

6  Mr. Kreutzer, we'll pick back up with you

7  and remind you that you're under oath

8  again.

9    I'll turn back to Exhibit-7

10  which is ABDC_MDL_450705.

11    Do you have that in front of

12  you?

13    A.    I do.

14    Q.    I'd like you to look at this

15  document, because we previously looked at

16  the user ID column, and we noted that

17  your -- the first initial of your first

18  name and your last name are in that

19  column.

20    MR. CLUFF:  I'm going to ask

21    Zach to blow up and highlight, so

22    we can all see the headings,

23    starting with customer purchase

24    order number all the way to action

1          taken.

2                    So we're continuing to

3          action taken.  Unfortunately,

4          these spreadsheets are rather

5          unwieldy.

6     BY MR. CLUFF:

7          Q.    So you can see on the very

8     left, highlighted, we've got purchase

9     order number.  And then on the right,

10    we've got action taken.

11                    If you see under user ID,

12    it's got your name, K. Kreutzer.

13                    I guess I should ask you.

14    Does that reflect that you were the

15    person who would have been taking action

16    on these?

17                    MR. NICHOLAS:  Are you able

18          to blow these up any more or not?

19                    MR. CLUFF:  Yeah.  Zach, can

20          you try and just blow up the user

21          ID and action taken column so we

22          can see it?

23    BY MR. CLUFF:

24          Q.    Do you see that, Mr.

1    Kreutzer?

2          A.    I do, yes.

3          Q.    Okay.  So in your role as a

4    diversion control specialist, you would

5    have reviewed customer orders that hit

6    OMP, correct?

7          A.    Correct.

8          Q.    And when employees at

9    Amerisource use the phrase "hit OMP," do

10   they mean hit or exceed the OMP threshold

11   for a drug family?

12         A.    It means that order went

13   into the OMP system --

14         Q.    Okay.  Why would --

15         A.    -- for review.

16         Q.    Why would it go into the OMP

17   system for a review?

18         A.    Well, if we're going back

19   to --

20         Q.    Yes, pre-2015.

21         A.    -- which year -- then I

22   believe we only had one threshold at the

23   time and not the three that we currently

24   have.  That is my recollection.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     So, then, why would an order

2     go into OMP for review?

3          A.     Because it exceeded their

4     threshold.

5          Q.     So if there's an order that

6     was in OMP review, that signifies to you

7     that it exceeded the threshold pre-2015,

8     correct?

9          A.     Yes.

10          Q.     Okay.  And if you look at

11     the column that says, Action taken.

12     Under there, we see two -- on the screen

13     in front of you, we see two different

14     entries.  One is, Approved for

15     processing.

16               What would you have been

17     referring to if you entered approved for

18     processing as the action taken on an

19     order that hit OMP for review?

20          A.     I'm not exactly sure,

21     because I don't remember using -- I don't

22     know if the action taken notes is

23     automatic or we have to enter those notes

24     manually.

1        This is going back eight

2   years.  I don't know other than what

3   information is on the screen here.

4        Q.    Were you looking at the

5   heading column, action name, where it

6   says, Auto and manual/auto?

7        A.    Yes.

8        Q.    Do you have any

9   understanding of what an auto action name

10  would be?

11       A.    I do not.

12       Q.    And do you have any

13  understanding of what a manual/auto

14  action would be?

15       A.    I do not.

16       Q.    Okay.  Going back to the

17  action taken column, do you see where it

18  says, Closed, notify compliant customer?

19       A.    Right.

20       Q.    When you compare that to

21  approved for processing, do you know what

22  either of those terms means, approved for

23  processing or closed, notify compliant

24  customer?

Highly Confidential - Subject to Further Confidentiality Review

 1     A.    I do not.

 2     Q.    Based on your work as a

 3   diversion control specialist, could

 4   either of those terms mean that this

 5   order was approved for shipment?

 6              MR. NICHOLAS:  Object to the

 7          form.

 8              But go ahead.

 9              THE WITNESS:  I can't

10          acknowledge that.

11   BY MR. CLUFF:

12     Q.    Okay.  But did you have any

13   understanding about what kind of terms

14   you used, pre-2015, to denote an order

15   that was approved for shipment?

16     A.    These notes listed here, I

17   don't remember using these notes.

18     Q.    Okay.  Sure.  Can you look

19   at Exhibit Number 8?  That's the heavier

20   of the two spreadsheets, or the thicker

21   of the two.  It's the one with 45076 at

22   the top.

23              I'm going to have them

24   highlight a portion of this for you, so

Highly Confidential - Subject to Further Confidentiality Review

1  you and I can talk about it.

2           The heading on this

3  spreadsheet is, History of all Ohio

4  reports.

5           And during the break, I'll

6  just make one further clarification, it

7  was represented that this document is a

8  complete list of all orders for Ohio that

9  went into OMP review.  So I'll make that

10 representation to you, just to kind of

11 clear it up.

12           MR. MAHADY:  We'll just add

13      that it's been filtered by

14      plaintiffs.

15           MR. CLUFF:  We filtered it

16      just for the Acme Pharmacy Number

17      30, which is in Stow, which is a

18      CT 1 jurisdiction.

19           Zach, can you highlight all

20      the way over to where it has the

21      notes in the column after IN?

22 BY MR. CLUFF:

23      Q.   So, Mr. Kreutzer, I had our

24 tech here blow up a portion of this

1    spreadsheet so we can look at it.

2              I will represent to you that

3    at the very left of your screen is the

4    customer purchase order number.  You can

5    see that reflected there.

6              And then to the very far

7    right is a heading called, Column 1.  And

8    immediately to the left of that, the

9    heading is, Release code.

10             I want to focus on the

11   headings with -- the two columns to the

12   very far right, the release codes and

13   then the comment.

14             So in the middle of your

15   screen on the right, there's a release

16   code that says, AC.  We previously talked

17   about this one.  And in the comment, it

18   says, Approved by CSRA per Ed

19   Hazewski/Kevin Kreutzer.

20             Reviewing the release code

21   with the comment together, do you have an

22   understanding of what the code AC stands

23   for?

24             A.    I do not.

1      Q.    Looking at comment 1, it

2  says, Approved by CSRA per Ed

3  Hazewski/Kevin Kreutzer.

4           Do you know if that means

5  this order could have been released for

6  shipment?

7      A.    According to the comment

8  section, it says the order was approved.

9      Q.    Does that mean it was

10 approved for shipment to the customer?

11     A.    I assume so, yes.

12     Q.    If you come down into the

13 highlighted -- the big block highlighted

14 portion, to the very far left of your

15 screen, the purchase order number is

16 CES042110.

17          Do you see that?

18     A.    Yes.

19     Q.    And over to the far right in

20 the comments section, there is a note

21 that is repeated in pairs a number of

22 times.  And it says, Retail oxycodone,

23 63.8 percent -- I believe it's a

24 percentage -- over.

Highly Confidential - Subject to Further Confidentiality Review

1              The quality of the copy is a

2    little bad, I apologize.  It's clearer in

3    the printout, if you look at that.

4              Do you see where that is?

5         A.    I do.

6         Q.    Do you have any

7    understanding, reading this document,

8    what that comment signifies?

9         A.    According to the release

10    code, it says IN.  So I don't know if

11    that order was approved or rejected.

12         Q.    I'm going to get to that

13    question in a second.

14              I'm trying to understand

15    what retail oxycodone 63.89 percent over

16    means.

17         A.    It could mean -- it's a

18    retail pharmacy, oxycodone drug family,

19    and the 63.89 percent over.

20         Q.    So that would have been --

21    I'm sorry, I didn't mean to interrupt

22    you.

23         A.    I'm assuming that's -- I'm

24    not really sure what that means.  It

1  could be over threshold, but I'm not

2  certain.

3          Q.    Okay.  Do you have anything

4  else that it would be besides over

5  threshold?

6          A.    Not that I can think of.

7          Q.    I want to scroll down to the

8  next page and stay with this order

9  number, which is CES042210.  Zach is

10  going to --

11              MR. CLUFF:  Blow it up for

12      us real big, Zach.

13  BY MR. CLUFF:

14          Q.    So do you see in the top

15  left corner there of the highlighted

16  block there is the customer order number,

17  which is CES042210?

18          A.    Yes.

19          Q.    That's the same order number

20  we were looking at the previous screen?

21          A.    Yes.

22          Q.    And if you go over to the

23  far right, there's the release code and

24  the comment 1.  The release code is for

1    the top -- I can't count how many lines

2    that is, but the release code is AC, and

3    the comment is, Approved per Edward -- or

4    Ed Hazewski.

5              Is that --

6         A.    Yes.

7         Q.    Would that mean that this

8    order was approved for processing and

9    shipment to the customer?

10        A.    It appears so.

11        Q.    What kind of due diligence

12   or investigation would have been

13   conducted before an order like this was

14   approved by Ed Hazewski?

15        A.    I don't know.  I don't know

16   who actually approved this order.

17        Q.    Do you have any reason to

18   believe this was not approved by Ed

19   Hazewski?

20        A.    Other than the notes say

21   otherwise.

22        Q.    If you look at the order

23   date, it looks like it goes year, month

24   and day, which would be 2010/04/22.

 1             At that point, you had been

 2   working as a diversion control specialist

 3   for over a year, correct?

 4        A.    I thought I came in to the

 5   company in September of 2009, so

 6   approximately, maybe six --

 7        Q.    Six months?

 8        A.    -- six months or so.

 9        Q.    During the six months prior

10   to this order that we're looking at, had

11   you had experience investigating orders

12   that went into OMP for review?

13        A.    Yes.

14        Q.    What kind of information

15   would you be looking at in order to

16   investigate an order like this that was

17   an OMP review?

18        A.    Whatever systems that we had

19   in place at the time, including

20   spreadsheets.  And if we could -- I'm not

21   sure of the system.

22             We didn't have a SAP system

23   back then.  That was prior to that.  And

24   I think we were using a mainframe system.

1    So as far as the information that I

2    reviewed on mainframe, I don't recall.

3         Q.    Is there other information

4    that was not on mainframe that you would

5    have reviewed?

6         A.    Whatever systems or

7    spreadsheets that we have on our

8    customers, I would have reviewed those.

9              And then anything else,

10   whether it was a 590 or any other

11   documentation we had on file.

12        Q.    Would you have been

13   concerned about releasing an order that

14   was 63.89 percent over its threshold for

15   OxyContin, oxycodone?

16        A.    I don't know.  I'd have to

17   go back in time to review that order.

18        Q.    Was it AmerisourceBergen's

19   policy that a detailed investigation be

20   carried out before reaching a conclusion

21   to release an order that was in OMP for

22   review?

23             MR. NICHOLAS:  Object to the

24        form.

1          THE WITNESS:  I don't know

2     if it was a policy or not.

3  BY MR. CLUFF:

4     Q.    Did you receive training

5  and/or instruction to conduct a detailed

6  investigation before reaching a

7  conclusion that an order should be

8  released?

9          MR. NICHOLAS:  Object to the

10     form.

11          THE WITNESS:  Yes.

12  BY MR. CLUFF:

13     Q.    Was there a policy or

14  procedure document that described to you

15  what a detailed investigation included?

16     A.    I don't recall that

17  document.

18     Q.    In your work as a diversion

19  control specialist, what would you

20  describe as a detailed investigation?

21          MR. NICHOLAS:  Object to the

22     form.

23          THE WITNESS:  To review all

24     the information that we have on a

1           particular customer, including

2           their purchase history and any 590

3           or other documents that we have on

4           file.

5      BY MR. CLUFF:

6           Q.   Was it important to you, as

7      a diversion control specialist, to

8      document any detailed investigations that

9      you conducted about orders that were in

10     OMP review?

11          A.   It is important to document

12     those orders, and there are a couple

13     different ways to document those orders.

14          Q.   What are the ways to

15     document those orders?

16          A.   On the order itself, we can

17     enter notes, as well as the Lawtrac

18     system that we used back then.

19          Q.   So where -- if you recorded

20     it on the order itself, where would that

21     be?  Would that be in CSOS or on a

22     form --

23          A.   It would be in the text

24     notes in the comment section that you see

Highly Confidential - Subject to Further Confidentiality Review

1    there.

2         Q.    So, then, this note in the

3    comments, Approved per Ed Hazewski, is

4    that an example of documentation of a

5    detailed investigation?

6         A.    I don't know.

7         Q.    This is one of the areas --

8    I'm sorry, I didn't mean to interrupt

9    you.

10        A.    I don't know.  There may be

11   other documentation elsewhere that I'm

12   not aware of.

13        Q.    But this is one area where

14   you said detailed documentation would

15   exist?

16        A.    It could, yes.

17        Q.    And you said also it might

18   be in Lawtrac?

19        A.    Yes.

20        Q.    So if a customer's order

21   hit -- or went into OMP for review and

22   there was a detailed investigation

23   carried out about that order, that would

24   be in Lawtrac, right?

1      A.    It could be, yes.

2      Q.    Would there be documentation

3 associated with that review?

4      A.    Like I said, it all depends

5 on the review, yes.

6      Q.    Were there ever any e-mails

7 generated that documented the findings of

8 these detailed investigations about OMP

9 review?

10          MR. NICHOLAS:  Object to the

11      form.

12          THE WITNESS:  I don't know.

13 BY MR. CLUFF:

14      Q.    Do you recall receiving

15 e-mails from an e-mail address

16 ABC-notification@AmerisourceBergen

17 regarding orders in OMP review?

18      A.    No, I don't recall.

19      Q.    You previously testified

20 there were a couple of places where

21 documentation about investigations like

22 this could be stored.

23          But was there a standard

24 place where it would have been stored?

1           MR. NICHOLAS:  Object to the

2      form.

3           THE WITNESS:  At that time,

4      I believe it would be either

5      Lawtrac or the system itself.

6  BY MR. CLUFF:

7      Q.    "The system itself" would

8  be?

9      A.    This system that we see in

10 front of us.

11     Q.    The system that generated

12 the spreadsheet?

13     A.    Yeah, this -- yeah, exactly.

14     Q.    And it would have been

15 recorded in this comments field?

16     A.    Yes.

17          MR. NICHOLAS:  Object to the

18     form.

19          Go ahead.

20 BY MR. CLUFF:

21     Q.    And just so I understand,

22 the system that you're referring to, you

23 didn't enter into an Excel spreadsheet

24 and manually make these notes, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Not into a spreadsheet, no.

2    Q.    You would have been working

3  with sort of a computer program that had

4  fields for you to work in?

5    A.    I'm not sure I follow you.

6    Q.    Like, when you order

7  something online, there are fields for

8  you to enter information into, like your

9  name and your address and your credit

10  card number?

11    A.    Yes.

12    Q.    So did you work with a

13  computer program that had fields similar

14  to that for you to put information into

15  when you were investigating an order?

16    A.    In that system that we used

17  in 2010, I believe there was a note

18  section where we could have put notes in.

19        MR. CLUFF:  Let's take a

20        break.  I think I have maybe one

21        more topic that I want to cover,

22        but then we'll probably wrap up.

23        I know people have flights they

24        want to catch, down at the end of

Highly Confidential - Subject to Further Confidentiality Review

1           the table.

2                VIDEO TECHNICIAN:  Off the

3           record at 4:31 p.m.

4                     -   -   -

5                (Whereupon, a brief recess

6           was taken.)

7                     -   -   -

8                VIDEO TECHNICIAN:  We are

9           back on the record at 4:41 p.m.

10   BY MR. CLUFF:

11        Q.    Mr. Kreutzer, we're back on

12   the record and you're still under oath.

13   I'll do my best to get you out of here

14   quickly, if your lawyers don't have

15   further questions on you.  So lean on

16   them, and get us all home.

17                Earlier we talked about

18   before 2015 -- let me ask this question:

19   Did the ability of DC associates to

20   review and release orders ever stop?

21        A.    Yes.

22        Q.    Do you know when it stopped?

23        A.    That stopped, I believe it

24   was earlier this year, 2018.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So prior to that time, the

2    distribution center associates maintained

3    the ability to review and release orders;

4    is that correct?

5    A.    Prior to that, they were

6    releasing low- and medium-risk drug

7    families only.

8    Q.    Was there ever a push or an

9    incentive to increase the rates at which

10   DC associates were releasing

11   low-to-medium drug families?

12   A.    We had a spreadsheet of all

13   the participation rates of all the

14   distribution centers, as far as

15   adjudicating low- and medium-risk drug

16   families.

17   Q.    Forgive my lay

18   understanding.

19        What is a participation

20   rate?

21   A.    Participation rate would be

22   the adjudication rate, let me clarify.

23   Q.    And is that adjudication

24   rate calculated by taking the total

Highly Confidential - Subject to Further Confidentiality Review

1   number of orders that come in for DC

2   review and comparing it to the number

3   that were escalated for CSRA interview?

4        A.    Yes, for low- and

5   medium-risk drug families.

6        Q.    Do you -- you're familiar

7   with the concept of a Schedule II drug

8   and a Schedule III drug?

9        A.    Yes.

10       Q.    Schedule I drug?

11       A.    Yes.

12       Q.    What is your understanding

13  of the different schedules?

14       A.    Schedule I has no legitimate

15  medical use; Schedule II is products that

16  are prone to high risk for diversion; and

17  Schedule III is just a lower risk of

18  those drugs that are a potential for

19  diversion.

20       Q.    Who classifies drugs as

21  Schedule I, II or III?

22       A.    The DEA.

23       Q.    AmerisourceBergen does not

24  ship Schedule I drugs, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I don't believe so, no.

2      Q.    But AmerisourceBergen does

3  ship Schedule II and Schedule III drugs,

4  correct?

5      A.    Yes.

6      Q.    We've previously talked, and

7  you've mentioned low-, medium- and

8  high-risk drug families.

9      A.    Yes.

10      Q.    Were there ever any other

11  categories besides low, medium and high?

12      A.    I don't believe so.

13      Q.    Do you know if Schedule II

14  drugs were classified as medium risk by

15  AmerisourceBergen?

16      A.    There may have been.  But

17  over the years, we have moved drug

18  families from low to medium, medium to

19  high and high to medium.  So it's -- we

20  do an annual refresh every year.

21      Q.    Just so I understand the

22  parallels here, though, you described a

23  Schedule II drug as a high risk for

24  diversion, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    What was -- what was the

3    high-risk category?  How did

4    AmerisourceBergen define high risk?

5                MR. NICHOLAS:  Object to the

6           form.

7                Go ahead.

8                THE WITNESS:  I believe just

9           as the explanation that I

10          provided, drug families that are

11          prone to diversion.

12   BY MR. CLUFF:

13   Q.    And so Schedule IIs had a

14   high risk for diversion.

15                But if I understand it

16   correctly, you testified that at some

17   points in time AmerisourceBergen

18   categorized Schedule IIs as medium risk;

19   is that right?

20   A.    I don't believe that.  What

21   my explanation is, is that we've always

22   had drug families that are in a high-risk

23   category.  And we -- as well as medium

24   and low.

Highly Confidential - Subject to Further Confidentiality Review

 1              But over time and in review

 2     with management and our pharmacist on

 3     staff, we determined that some risks may

 4     be -- needed to be switched from medium

 5     to high, for instance.

 6          Q.    I understand that.  Thank

 7     you.

 8              So I guess my question is

 9     maybe a little bit more specific.

10              If Schedule II drugs have

11     been determined by the DEA to have a high

12     risk of diversion, has AmerisourceBergen

13     always categorized Schedule II drugs as a

14     high-risk drug family, or have they ever

15     been categorized as medium risk?

16              MR. NICHOLAS:  Object to the

17          form.

18              THE WITNESS:  I don't recall

19          them ever being medium risk.

20     BY MR. CLUFF:

21          Q.    If a Schedule II were

22     categorized as medium risk pursuant to

23     AmerisourceBergen's policy, then DC

24     associates could have released an order

1  for that drug at the DC level, right?

2          MR. NICHOLAS:  Object to the

3      form.  And lack of foundation.

4          Go ahead.

5          THE WITNESS:  If a Schedule

6      II was identified as a medium

7      risk, yes.  Based on the training

8      that the DC associates received,

9      they are allowed to release low-

10     and medium-risk drug families at

11     the time.

12  BY MR. CLUFF:

13     Q.    At the time they were

14  categorized as medium risk, right?

15     A.    Well, at the time prior to

16  earlier this year.

17     Q.    Right.  That makes sense.

18          So prior to the change in

19  2018, if a Schedule II was classified by

20  Amerisource as medium risk, then DC

21  associates could release that order,

22  right?

23     A.    Yes.

24     Q.    I'll hand you another

1    document.  We're going to mark this as

2    Exhibit 9.  This is ABDC_MDL_00047572.

3                    -   -   -

4              (Whereupon,

5         AmerisourceBergen-Kreutzer

6         Exhibit-9, ABDC_MDL_00047572, was

7         marked for identification.)

8                    -   -   -

9    BY MR. CLUFF:

10        Q.    There were some Excel

11   spreadsheets attached to that document.

12   I elected not to include them and save

13   the paper.  I just have a couple quick

14   questions on this, Mr. Kreutzer.

15             MR. NICHOLAS:  Just give him

16        a moment.

17   BY MR. CLUFF:

18        Q.    Sure.  I'll just let you

19   know my questions are going to be about

20   the first paragraph.  So if you want to

21   focus your analysis there, that would

22   help.

23             MR. NICHOLAS:  Read the

24        whole document anyway.

1     MR. CLUFF:  Do you want to

2         go home or not, Bob?  We'll be

3         here all night reading documents.

4         MR. NICHOLAS:  I think

5         reading seven more lines is not

6         going to make the difference

7         between going home tonight or not.

8         MR. CLUFF:  Bob, I respect

9         you, but I'll respectfully

10        disagree.

11        THE WITNESS:  Okay.

12    BY MR. CLUFF:

13        Q.    So looking at this first

14    paragraph -- well, actually, let's do

15    this.

16        So from the -- in the top of

17    the e-mail, you see there's a "from"

18    line.  It's from unknown.  Do you have

19    any idea who this kind of e-mail would

20    come from?

21        A.    I've never seen that before.

22        Q.    Well, first time for

23    everything for all of us, I guess.

24        In the "to" category, you

1     see there are a number of individuals,

2     one of whom is yourself, right?

3          A.     Yes.

4          Q.     And then you see the subject

5     is, Discussion-report review, weekly OMP

6     field report performance.

7          A.     Yes.

8          Q.     Was your department having

9     weekly meetings regarding the OMP

10    performance of distribution centers?

11         A.     We were.

12         Q.     And were you also discussing

13    performance of, like, CSRA individuals,

14    as far as OMP review goes?

15         A.     I believe this particular

16    e-mail is pertaining to the DC

17    associates.

18         Q.     Understood.

19               And you mentioned that there

20    was a spreadsheet that reflected DC

21    participation in OMP review; is that

22    right?

23         A.     Correct.

24         Q.     So looking at the

Highly Confidential - Subject to Further Confidentiality Review

1   attachment, it's referred to DC OMP

2   analysis,master.xlsx.

3            Do you think that would have

4   been one of those spreadsheets that you

5   described?

6        A.    I think so.

7        Q.    And based on your

8   recollection, that spreadsheet would have

9   indicated which distribution centers were

10  releasing a percentage -- or

11  participating in releasing OMP reports?

12       A.    Correct.

13       Q.    So now looking down at the

14  substance of this paragraph, it says, The

15  purpose of this call is to discuss the

16  attached spreadsheet, with a focus on

17  Tabs 2 and 3.

18            Do you remember what would

19  have been in Tab 1?

20            It's not a guessing game.

21  If you know.

22       A.    I don't.

23       Q.    So he then specifies what's

24  in Tabs 2 and Tabs 3.  The first Tab 2

1  indicates all low- and medium-risk drug

2  families at ▓▓▓▓▓▓▓▓ above

3  threshold that were released by the DC.

4              And then indicates that

5  these should be reviewed to identify any

6  orders that were released that possibly

7  should have been escalated.

8              So did you understand that

9  DC associates should not have been

10  releasing orders that were ▓▓▓▓▓▓

11  above threshold at this time in 2015?

12              MR. NICHOLAS:  Object to the

13         form.

14              THE WITNESS:  I'm not aware

15         of that.

16  BY MR. CLUFF:

17         Q.    Do you have any reason to

18  disagree with the statements in this

19  e-mail?

20              MR. NICHOLAS:  Same

21         objection.

22              Go ahead.

23              THE WITNESS:  I don't recall

24         this document --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. CLUFF:
 2          Q.    But you --
 3          A.    -- or where it came from.
 4          Q.    -- recall -- you do recall
 5    having meetings about DC participation?
 6          A.    We did.
 7          Q.    And you recall reviewing
 8    spreadsheets about it, right?
 9          A.    Yes.
10          Q.    Okay.  So did you
11    understand, based on your work as a
12    distribution control specialist, that DC
13    associates should not be releasing orders
14    for low- and medium-risk drugs above ███
      ███    ███████    of threshold?
16          MR. NICHOLAS:  Object to the
17          form.
18          THE WITNESS:  I'm not aware
19          of any criteria like that.
20    BY MR. CLUFF:
21          Q.    Okay.  Look at the same
22    document where it says, Tab 3 indicates.
23          This says here that Tab 3
24    had all low- and medium-risk drug
```

1  families at ▬▬▬▬  or less below

2  threshold that were escalated for

3  investigation by the DC.  This report

4  will be reviewed to identify any orders

5  that were escalated that possibly should

6  have been released.

7           Do you recall a policy in

8  this time, in 2015, encouraging DC

9  associates to release orders that were ▬

▬  ▬▬▬  over threshold?

11           MR. NICHOLAS:  Object to the

12      form.

13           THE WITNESS:  I'm not aware

14      of any policy.

15  BY MR. CLUFF:

16      Q.   But this e-mail says that

17  the report should be reviewed to identify

18  orders that should have been released,

19  correct?

20           MR. NICHOLAS:  Object to the

21      form.

22           THE WITNESS:  That's what

23      the statement says, yes.

24  BY MR. CLUFF:

1    Q.    Based on reviewing this

2    paragraph here, do you have a

3    recollection that DC associates were

4    encouraged to increase their clearance of

5    orders that hit OMP review?

6              MR. NICHOLAS:  Object to the

7         form.

8              Go ahead.

9              THE WITNESS:  No, I'm not.

10   BY MR. CLUFF:

11   Q.    Was there ever any concern

12   that DC associates were releasing too

13   many orders?

14   A.    We had discussions every

15   week going over this spreadsheet and if

16   there were any inconsistencies of DC

17   associates releasing orders that they

18   shouldn't have were addressed.

19   Q.    Let's hand you the next

20   document.  This is going to be marked as

21   Number 10.

22              -  -  -

23              (Whereupon,

24         AmerisourceBergen-Kreutzer

 1          Exhibit-10, ABDC_MDL_00151471-472,

 2          was marked for identification.)

 3                  -  -  -

 4              MR. CLUFF:  It is

 5          ABDC_MDL_00151471.  It's a

 6          two-page document ending in

 7          151472.

 8              THE WITNESS:  Okay.

 9     BY MR. CLUFF:

10          Q.    At the top, this is an

11     e-mail from Eric Cherveny to Greg

12     Hamilton, with a cc to you.

13              Do you know who Greg

14     Hamilton was?

15          A.    Greg Hamilton is the CSRA

16     distribution center manager for Columbus.

17          Q.    And the subject line, can

18     you read that to me?

19          A.    The subject line is, OMP

20     policy violation.

21          Q.    Scroll down to the bottom of

22     that first page there.  It starts with an

23     e-mail from, Marcelino Guerreiro, dated

24     August 28, 2015.  He sends it to Eric

1    Cherveny, Emily Coldren, Elizabeth

2    Garcia, David Kritzer, yourself, David

3    May, Sharon Hartman, Nikki Seckinger.

4                    The subject line is

5    different.  Now it reads, OMP activity,

6    August 21 to the 27th, 2015-DC breakdown.

7                    Do you see where I'm at?

8         A.    Yes.

9         Q.    Do you see the bold

10   underlined heading, High-risk drug

11   families?  And then another bold

12   underlined heading underneath it that

13   says, Released?

14        A.    Yes.

15        Q.    And do you agree with me

16   that this document indicates that nine

17   lines of high-risk drug families were

18   released between August 21st and the

19   27th?

20        A.    The spreadsheet was cut off,

21   so I don't know.  There was more

22   information to the right that I could

23   elaborate more on.

24                    But I can only go on what

Highly Confidential - Subject to Further Confidentiality Review

1  this document says.

2       Q.    And this document says that

3  nine lines of high-risk drug families

4  were released, right?

5       A.    Yes, that's correct.

6       Q.    Earlier, we talked about

7  policy violations and whether releasing

8  high-risk drug family orders would be a

9  policy violation.

10           Looking at the revised

11  subject line on this e-mail, does that

12  clarify for you that releasing a

13  high-risk drug order would be a violation

14  of AmerisourceBergen's policies?

15           MR. NICHOLAS:  Object to the

16       form.

17           THE WITNESS:  This associate

18       was trained to only release low

19       and medium drug families, and

20       inside this DC associate released

21       a high-risk drug family, whether

22       it was a mistake or otherwise.

23           But training was completed

24       with that associate, and I don't

1          believe there were any more

2          instances after that.

3     BY MR. CLUFF:

4          Q.     Never again?

5          A.     I don't believe so.

6          Q.     You said released an order,

7     but if we look back down at the bottom,

8     it says that, actually, nine lines were

9     released.

10              So it's more than one order,

11    correct?

12              MR. NICHOLAS:  Object to the

13         form.

14              THE WITNESS:  No, I believe

15         this was one order.  It was all on

16         the same sales order number.

17              If you look at the fifth

18         column, the numbers are all the

19         same.

20    BY MR. CLUFF:

21         Q.     Sales order number.

22              If you continue to the

23    second page, do you see that there is

24    additional orders that are on a different

1    order number?

2        A.    Yes.

3        Q.    Okay.  And I've been saying

4    lines, you're saying orders.

5             It looks like, based on the

6    sales order number that you've identified

7    on this chart, that one, two, three

8    orders were cleared, for a total of nine

9    lines, right?

10        A.    Yes.

11        Q.    Okay.  And that was a

12    violation of ABC policy, correct?

13             MR. NICHOLAS:  Object to the

14        form.

15             THE WITNESS:  That this

16        associate released these orders,

17        yes.

18    BY MR. CLUFF:

19        Q.    And the results for having

20    violated an ABC policy about high-risk

21    drug orders was to be retrained; is that

22    accurate?

23        A.    That is correct.

24        Q.    And it was your testimony

1   that that didn't happen again; is that

2   right?

3        A.    That is my belief.

4        Q.    I'd like to show you another

5   document that we'll mark as 11.

6                    -  -  -

7             (Whereupon,

8        AmerisourceBergen-Kreutzer

9        Exhibit-11, ABDC_MDL_00178337, was

10       marked for identification.)

11                   -  -  -

12            MR. CLUFF:  This is

13       ABDC_MDL_00178337.

14            THE WITNESS:  Okay.

15   BY MR. CLUFF:

16       Q.    So this is an e-mail from

17   Marcelino Guerreiro to a list of

18   recipients, and you're included on that

19   list, correct?

20       A.    Yes.

21       Q.    And the date is April 17,

22   2017, correct?

23       A.    Yes.

24       Q.    The subject is, OMP

Highly Confidential - Subject to Further Confidentiality Review

1  activity, April 7 to the 13th.  And then

2  there is an ampersand, APOS;17, DC

3  breakdown, is that right?

4        A.    Correct.

5        Q.    So this would have been for

6  April 7th to the 13th in 2017?

7        A.    April 7th to the 13th, yes.

8        Q.    There is an attachment that

9  says, OMP activity, September 16th to the

10 22nd.  It looks like that would have been

11 data for 2016.

12            Is that -- do you see that?

13            MR. NICHOLAS:  At the risk

14        of incurring your wrath, I'm going

15        to ask that he be permitted to

16        just simply read through the

17        document before you ask him

18        questions.

19            MR. CLUFF:  I didn't mean

20        to --

21            THE WITNESS:  I did read

22        through it, Bob.

23 BY MR. CLUFF:

24        Q.    So let's look down here at

1    Marcelino Guerreiro's first e-mail which

2    is on the page that has 8338 on it.

3              He writes that to a group of

4    recipients, one of whom is you, and he

5    says, Please find attached the updated

6    OMP activity report complete with

7    information for the week of April 7th to

8    the 13th.  This was a great week for OMP

9    review at the DC level, where we saw

10   increased participation and no deviations

11   outside of the review policy.

12             Do you see that?

13        A.    Yes.

14        Q.    And do you see the same

15   headings that we looked at before, bold

16   underlined, high/high plus-risk drug

17   families?

18        A.    Yes.

19        Q.    And released underlined,

20   None?

21        A.    Yes.

22        Q.    Just to kind of circle back

23   on this, I asked if there were any other

24   risk categories at AmerisourceBergen, and

Highly Confidential - Subject to Further Confidentiality Review

1    here I see a high/high plus.

2              Do you know what high plus

3    is?

4         A.    I don't remember the

5    separation between the two.

6         Q.    Would that have been a

7    higher categorization for risk of

8    diversion than high?

9              MR. NICHOLAS:  Object to the

10        form.  Lack of foundation.

11             THE WITNESS:  I believe it

12        was.

13   BY MR. CLUFF:

14        Q.    Go to the bottom of Page

15   178337.  There's an e-mail there from

16   David May.

17             Do you see that at the

18   bottom?

19        A.    Yes.

20        Q.    He says, Is that a first?

21             And if you go up, the

22   answer, if you read the e-mail, is that

23   AmerisourceBergen had not had a clean

24   review week since September 16th of 2016.

1    A.    '17.

2    Q.    You're reading in the body

3  of the e-mail where it says 2017?

4    A.    Yes.

5    Q.    Do you see where it says,

6  See attached?

7    A.    Yes.

8    Q.    And the attachment refers to

9  2016?

10         MR. NICHOLAS:  Can you slow

11       down, so I can catch up to you?

12         MR. CLUFF:  Sure.  Yes, not

13       a problem.

14         THE WITNESS:  I do see that.

15         MR. NICHOLAS:  Okay.

16  BY MR. CLUFF:

17    Q.    So previously you testified

18  that there were no high-risk drugs

19  released after 2015; is that correct?

20         MR. NICHOLAS:  Object to the

21       form.  Lack of foundation.

22         THE WITNESS:  I just

23       indicated that the associate was

24       retrained.  And I believe that

1          that associate was retrained and

2          no further occurrences occurred

3          from that particular associate.

4    BY MR. CLUFF:

5          Q.    Okay.  Looking at this

6    e-mail from April 2017, would you agree

7    that in April 2017 Amerisource had not

8    had a clean review week for seven months?

9          MR. NICHOLAS:  Object to the

10         form.

11         THE WITNESS:  I don't know

12         without seeing documentation.

13   BY MR. CLUFF:

14         Q.    Do you see where it says,

15   Close to seven months, in the first page

16   of the e-mail?

17         A.    I do.

18         Q.    So would you agree with me

19   that distribution center associates

20   releasing high-risk orders was an ongoing

21   problem, even in the middle of 2017?

22         MR. NICHOLAS:  Object to

23         form.  Lack of foundation.

24         THE WITNESS:  No, it wasn't

1          an ongoing problem.

2     BY MR. CLUFF:

3          Q.    Why would you conclude it

4     was not an ongoing problem?

5          A.    Because we had approximately

6     26 distribution centers, and these

7     reports were reviewed every week and were

8     all assigned different regions.  And we

9     all had the responsibility to reach out

10    to the DCs and contact the distribution

11    center manager to inform them of any

12    associates that were releasing orders

13    that they should not have.

14         Q.    But orders were still

15    getting released well into 2017, weren't

16    they?

17              MR. NICHOLAS:  Object to the

18         form.  Lack of foundation.

19              THE WITNESS:  I don't know

20         without seeing documentation.

21    BY MR. CLUFF:

22         Q.    Based on this e-mail, it

23    says that orders were at least -- the

24    last time that a clean review happened

1    was in September, seven months prior to

2    April 2017, correct?

3         A.    Correct.

4         Q.    So that means that in

5    September, seven months prior to April

6    2017, high-risk drug orders would have

7    been released, right?

8              MR. NICHOLAS:  Okay.  I'll

9         object to the form.  Lack of

10        foundation.  And we're into the

11        bickering mode here.

12             THE WITNESS:  It doesn't say

13        anything about high-risk drug

14        families.

15   BY MR. CLUFF:

16        Q.    Did it concern you that

17   distribution center associates were

18   releasing high-risk drug orders?

19             MR. NICHOLAS:  Object to the

20        form.  Lack of foundation.

21        Bickering.

22             THE WITNESS:  I addressed

23        any issue personally with the

24        distribution center manager to get

1          those associates retrained or have

2          them removed from their positions.

3   BY MR. CLUFF:

4          Q.    Because it was a violation

5   of ABC's policy for them to release

6   high-risk drug orders?

7               MR. NICHOLAS:  Object to the

8          form.

9               THE WITNESS:  It's not just

10          high-risk drug orders, it could be

11          anything.  It could be associates

12          not doing their duties in

13          reviewing low- and medium-risk

14          drug families and sending them up

15          to CSRA for review.

16   BY MR. CLUFF:

17          Q.    That would also be a policy

18   violation, correct?

19               MR. NICHOLAS:  Object to the

20          form.

21               THE WITNESS:  Depending on

22          the circumstance, it could be.

23   BY MR. CLUFF:

24          Q.    So not releasing low and

1    medium drug orders could be a policy

2    violation, right?

3            A.    It could be.

4            Q.    And we discussed that

5    potentially Class II drugs -- or Schedule

6    II drugs were medium risk, right?

7                    MR. NICHOLAS:  Object to the

8            form.  Lack of foundation.

9                    THE WITNESS:  I don't recall

10           any high-risk drugs being medium

11           risk.

12   BY MR. CLUFF:

13           Q.    And so it was a policy

14   violation for an ABC associate not to

15   release medium drug orders from the

16   distribution center, right?

17                   MR. NICHOLAS:  Object to the

18           form.  Lack of foundation.

19                   THE WITNESS:  It is up to

20           their discretion, if they don't

21           feel comfortable releasing an

22           order, whether it's low or medium

23           risk, that they can forward it up

24           to CSRA for review.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. CLUFF:

2         Q.    And if a DC associate, prior

3    to 2017, released a high-risk drug order,

4    that would also be a violation of ABC's

5    policy, right?

6                   MR. NICHOLAS:  Object to the

7         form.  And foundation.

8                   THE WITNESS:  It could be,

9         based on the circumstance.  But

10        there are times where high-risk

11        orders do need to be released.

12   BY MR. CLUFF:

13        Q.    Released by the DC

14   associates?

15        A.    That's correct.

16        Q.    Did AmerisourceBergen have a

17   policy that required all DC orders to

18   be -- all high-risk DC orders be elevated

19   to CSRA?

20                  MR. NICHOLAS:  Object to the

21        form.

22                  THE WITNESS:  Yes.  But I

23        don't recall the specific verbiage

24        of that policy.
```

1  BY MR. CLUFF:

2      Q.    So during the pendency of

3  that policy, a DC associate who released

4  a high-risk drug order would have

5  violated ABC's policies, right?

6            MR. NICHOLAS:  Object to the

7        form.

8            THE WITNESS:  Not

9        necessarily.

10  BY MR. CLUFF:

11      Q.    You said that DC associates

12  had discretion to not release medium-risk

13  drug orders if they didn't feel

14  comfortable, correct?

15      A.    Correct.

16      Q.    If a DC associate came to

17  you and said that they were not

18  comfortable releasing an order because

19  they felt like a customer was trying to

20  game the system, would you feel like that

21  was an appropriate exercise of

22  discretion?

23            MR. NICHOLAS:  Object to the

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  I don't know.

2         It would be based on -- it would

3         be based on the discussion that I

4         had with that individual.

5    BY MR. CLUFF:

6         Q.    Did you ever have occasion

7    to remove a DC associate from their

8    responsibility for reviewing OMP orders

9    because they were not escalating orders

10   to CSRA?

11        A.    I don't recall that

12   circumstance.

13        Q.    What's a listed chemical?

14        A.    A listed chemical is

15   pseudoephedrine products.

16        Q.    How do you abbreviate that

17   term?

18        A.    Listed chemical?  LC.

19        Q.    Did AmerisourceBergen have

20   different policies and procedures for

21   suspicious orders for listed chemicals

22   than they did for, for example, like

23   opioids or controlled substances?

24        A.    I don't recall.

1    MR. CLUFF:  Why don't we
2    mutually take a break.  You guys
3    can go see if you have any further
4    questions.  I'll confer with Will.
5    And we'll come back in five
6    minutes.
7    VIDEO TECHNICIAN:  Off the
8    record at 5:11 p.m.
9    -  -  -
10    (Whereupon, a brief recess
11    was taken.)
12    -  -  -
13    VIDEO TECHNICIAN:  We're
14    back on the record at 5:19 p.m.
15 BY MR. CLUFF:
16    Q.    Mr. Kreutzer, we're back on
17 the record for the last few questions
18 that I have for you, and then I'll turn
19 it over to your counsel to talk.
20    I want to hand you -- excuse
21 me.  I'm going to hand you a copy of a
22 document that was produced by
23 AmerisourceBergen.  It's
24 ABDC_MDL_00168122, which is an e-mail

Highly Confidential - Subject to Further Confidentiality Review

1    that contains a number of attachments.

2    I've included one attachment with the

3    document that begins at ABDC_MDL_00168127

4    and goes to 168134.  I'll hand you this

5    one.

6                       -   -   -

7              (Whereupon,

8         AmerisourceBergen-Kreutzer

9         Exhibit-12, ABDC_MDL_00168122 and

10        ABDC_MDL_00168127-134, was marked

11        for identification.)

12                      -   -   -

13   BY MR. CLUFF:

14        Q.    I'm not going to ask you any

15   detailed questions about this document at

16   all.  I'd like you to just look at it.

17             You do not appear to have

18   received this document.  But we have

19   discussed today, at length, Lawtrac

20   files.  And if you look at the

21   attachments, you can see that it begins

22   with, BSD Lawtrac tech sheet, Church

23   Square Lawtrac matter, text.

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Give me a second.

2                MR. NICHOLAS:  I don't see

3       that.   Where --

4                MR. CLUFF:  The cover page,

5       the e-mail, the attachments.

6                MR. NICHOLAS:  Where it says

7       attachments, okay.  Sorry.

8                MR. CLUFF:  I misspoke.

9    BY MR. CLUFF:

10         Q.    I was just trying to

11   indicate that this e-mail contained

12   Lawtrac matter texts as attachments.

13                And then if you'll flip to

14   the next page, which has

15   ABDC_MDL_00168127, if you look at the top

16   of the page in the middle of the

17   document, there is some text that says,

18   Main matter screen.  And then underneath

19   that it says, NCDD Church Square

20   Pharmacy, Incorporated, Columbus.

21                Is this an example of a

22   Lawtrac matter for Church Square

23   Pharmacy, Incorporated?

24         A.    Yes.

1    Q.    And then look down at the

2    bottom of the page, where it says, Text

3    records.

4              Do you see that?

5    A.    Yes.

6    Q.    We previously talked, in one

7    of these exhibits, about what you and I

8    kind of referred to as a text box, and

9    you said that might have been

10   documentation that would have been

11   included in Lawtrac.

12             Would that -- that

13   information that we talked about earlier,

14   would that have been under the text

15   records section of these Lawtrac reports?

16   A.    Yes.

17   Q.    So if I were looking at a

18   Lawtrac report, text records is where I

19   would find the records of investigations

20   or information about ABC's relationship

21   with a customer?

22   A.    Correct.

23   Q.    Okay.  Can you tell me, in

24   looking at this document, where I would

Highly Confidential - Subject to Further Confidentiality Review

1  be able to locate or identify the

2  documents that were associated with this

3  Lawtrac file?

4          MR. NICHOLAS:  Object to the

5     form.

6          THE WITNESS:  It's been

7     quite a while since I used this

8     system.  I believe in the

9     documents and files column on

10     168129.

11  BY MR. CLUFF:

12     Q.    Let me redirect you to

13  168127.

14          In the upper right-hand

15  corner, there's an underlined piece of

16  text that says, Main matter screen.  And

17  there are text boxes underneath that.

18          Do you see that?

19     A.    Yes.

20     Q.    And one of them says,

21  Documents and files.

22     A.    Yes.

23     Q.     Is that the same as the one

24  you were looking at on 129?

 1          A.    Yes, that is correct.

 2          Q.    So those text boxes, would

 3    those have been what I'll refer to as a

 4    hyperlink that I could have clicked and

 5    it would have taken me to other

 6    information?

 7                MR. MAHADY:  The text box is

 8          on the right side of the document?

 9                MR. CLUFF:  Yes.

10                THE WITNESS:  I'm not sure.

11    BY MR. CLUFF:

12          Q.    Okay.  Did you use Lawtrac

13    matters like this in your work?

14          A.    I did.

15          Q.    Okay.  And I'm not trying to

16    catch you in anything.  I'm trying to

17    just understand how you would have used

18    this system.

19                So if you were looking for a

20    590 for this Church Square Pharmacy,

21    would you have clicked on documents and

22    files?

23          A.    When this Lawtrac matter was

24    created, we were not doing electronic

1    files at the time in 2008.  They more

2    than likely would have been paper files.

3         Q.    Would those paper files have

4    been migrated to this system when it was

5    created?

6         A.    It may or may not have.

7         Q.    Let's just use this as an

8    example and not focus so much on Church

9    Square.

10              If you were looking for, as

11   an example, a 590 for a pharmacy that was

12   a new customer after Lawtrac was being

13   used, where would you go to look for that

14   590?

15              MR. NICHOLAS:  Object to the

16         form.

17              THE WITNESS:  It would be in

18         here, but it appears that there

19         may be a page missing.  I see a

20         Page 2 of 3, and then nothing

21         after that.

22   BY MR. CLUFF:

23         Q.    That may be true.  I will

24   just represent to you that this is how

Highly Confidential - Subject to Further Confidentiality Review

1    the document was produced to me.

2              And I'm just trying to

3    figure out where you would click in this

4    document that is a reflection of a

5    computer program to get to the documents?

6         A.    There would be documents

7    posted here that you would be able to

8    click on.

9         Q.    When you're saying "here,"

10   can you tell me what page you're looking

11   at?

12        A.    I would -- I believe it

13   would be under the linked matters.

14        Q.    What page is that?

15        A.    Page 2 of 3.

16        Q.    I'm sorry?

17        A.    168128.

18        Q.    Okay.  So in the middle of

19   the page?

20        A.    It would be in,

21   approximately, that field.

22        Q.    And is there anywhere else

23   in this Lawtrac file where you would have

24   been able to access records from?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    No.  It would likely be in

2     this file.

3          Q.    Okay.  Go to

4     ABDC_MDL_00168129.  In the middle of the

5     page, there is a date, 06/09/14.  It

6     says, Status.  Then, Update, 06/09/14,

7     source name, in-house staff, Kevin

8     Kreutzer.

9                Do you see that?

10         A.    I do.

11         Q.    The text there says,

12    Requested and received updated Form 590

13    and photos from ACM Ron Kline for

14    existing customer.

15                Is this an example of the

16    kind of, like, ongoing due diligence that

17    AmerisourceBergen was doing for existing

18    customers?

19         A.    Yes.

20         Q.    Would there have been

21    documentation attached to this?

22         A.    Yes, there would be.

23         Q.    So that's the last sentence

24    of that paragraph, it says, Form 590 and

Highly Confidential - Subject to Further Confidentiality Review

```
1    photos are attached?

2          A.    Correct.

3                MR. CLUFF:  That's all I

4    have.

5                That's all I've got, just in

6    case you guys didn't hear me.

7                MR. NICHOLAS:  I have no

8    questions.

9                VIDEO TECHNICIAN:  This

10   concludes today's deposition.  The

11   time is 5:28 p.m.  We are off the

12   record.

13                     -   -   -

14               (Whereupon, the deposition

15   concluded at 5:28 p.m.)

16                     -   -   -

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                        CERTIFICATE

2

3

4            I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the

7    testimony given by the witness.

8

9

10

         Amanda Maslynsky-Miller

11       Certified Realtime Reporter

         Dated:  November 28, 2018

12

13

14

15

16

17            (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1        INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10              You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                          - - - - - -

                    E R R A T A

2                          - - - - - -

3    PAGE    LINE    CHANGE/REASON

4    _____   _____   _____

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

Highly Confidential - Subject to Further Confidentiality Review

1      ACKNOWLEDGMENT OF DEPONENT

2

           I,_____, do
3  hereby certify that I have read the
   foregoing pages,  1 - 396, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.

7

8  _____
    KEVIN KREUTZER                DATE
9

10

   Subscribed and sworn
11 to before me this
   _____ day of _____, 20_____.
12

   My commission expires:_____
13

14 _____
   Notary Public

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____
```