```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5

 6   ******************************

 7   IN RE:

 8   NATIONAL PRESCRIPTION OPIATE     MDL NO. 2804

     LITIGATION

 9

     This document relates to:       Case No. 17-MD-2804

10

     All cases                       Hon. Dan A. Polster

11   ******************************

12             HIGHLY CONFIDENTIAL - SUBJECT

13            TO FURTHER CONFIDENTIALITY REVIEW

14             VIDEOTAPED DEPOSITION OF:

15                    RONALD LINK

16                    MOTLEY RICE

17                  55 Cedar Street

18             Providence, Rhode Island

19             December 11, 2018      9:09 a.m.

20

21

22             Darlene M. Coppola

23           Registered Merit Reporter

24           Certified Realtime Reporter
```

Page 2

1 APPEARANCES:
2 Representing the Plaintiffs:
3     LEVIN PAPANTONIO THOMAS MITCHELL
4     RAFFERTY PROCTOR PA
5     316 Baylen Street
6     Pensacola, FL 32502
7     BY: WILLIAM BAKER, ESQUIRE
8         STEPHANIE HACKMAN, PARALEGAL
9     T 850.485.4160
10
11 Representing the Plaintiffs:
12     GARSON JOHNSON, LLC
13     101 West Prospect Avenue
14     Midland Building
15     Suite 1600
16     Cleveland, OH 44115
17     BY: JAMES A. DEROCHE, ESQUIRE
18         PATTI CARDINAL, ESQUIRE
19         (Via telephone)
20     T 216.296.9330
21     E Jderoche@weismanlaw.com
22
23 (Continued on the next page)
24

Page 3

1 APPEARANCES (Continued):
2 Representing the Plaintiffs:
3 (Via telephone)
4     WEISMAN, KENNEDY & BERRIS CO., L.P.A.
5     101 West Prospect Avenue
6     Midland Building
7     Suite 1600
8     Cleveland, OH 44115
9     BY: DANIEL P. GOETZ, ESQUIRE
10     T 216.781.1111
11     E dgoetz@weismanlaw.com
12
13 Representing the Plaintiffs:
14 (Via telephone and video stream)
15     MOTLEY RICE LLC
16     28 Bridgeside Boulevard
17     Mount Pleasant, SC 29464
18     BY: MICHAEL E. ELSNER, ESQUIRE
19         AMANDA UNTERREINER, ESQUIRE
20     T 843.216.9000
21     E melsner@motleyrice.com
22         aunterreiner@motleyrice.com
23
24 (Continued on next page)

Page 4

1 APPEARANCES (Continued):
2 Representing the Defendant CVS Indiana, CVS RX
3 Services and the Witness:
4     ZUCKERMAN SPAEDER LLP
5     1800 M Street NW
6     Suite 1000
7     Washington, DC 20036
8     BY  GRAEME W. BUSH, ESQUIRE
9     T 202.778.1800
10     E gbush@zuckerman.com
11
12 Representing the Defendants Endo Health
13 Solutions Inc., Endo Pharmaceuticals Inc.,
14 Par Pharmaceutical, Inc.; Par Pharmaceutical
15 Companies, Inc. (FKA Par Pharmaceutical
16 Holdings, Inc.):
17 (Via telephone and video stream)
18     ARNOLD & PORTER KAYE SCHOLER, LLP
19     777 South Figueroa Street
20     44th Floor
21     Los Angeles, CA 90017-5844
22     BY: TIFFANY IKEDA, ESQUIRE
23     T 213.243.4238
24     E tiffany.ikeda@arnoldporter.com

Page 5

1 APPEARANCES (Continued):
2 Representing the Defendant Walmart:
3 (Via telephone and video stream)
4     JONES DAY
5     77 West Wacker
6     Chicago, IL 60601
7     BY: JOANNE CACERES, ESQUIRE
8     T 312.269.4159
9     E jcaceres@jonesday.com
10
11 Representing the Defendant HBC Company:
12 (Via video stream)
13     MARCUS & SHAPIRA LLP
14     One Oxford Centre
15     35th Floor
16     Pittsburgh, PA 15219
17     BY: RICHARD HALPERN, ESQUIRE
18     T 412.471.3490
19     E rhalpern@marcus-shapira.com
20
21
22 (Continued on next page)
23
24

Page 6

1 APPEARANCES (Continued):

2 Representing the Defendant McKesson:

3 (Via video stream)

4    COVINGTON & BURLING LLP

5    1999 Avenue of the Stars

6    Los Angeles, CA 90067

7    BY: MICHAEL LANOSA, ESQUIRE

8    T 424.332.4780

9    E mlanosa@cov.com

10

11 Representing the Defendant Cardinal Health:

12 (Via video stream)

13    WILLIAMS & CONNOLLY LLP

14    725 Twelfth Street, NW

15    Washington, DC 20005

16    BY: ANDREW MCBRIDE, ESQUIRE

17    T 202.434.5686

18    E amcbride@wc.com

19

20 (Continued on next page)

21

22

23

24

Page 7

1 Appearances (Continued):

2

3 Representing the Defendant AmerisourceBergen:

4 (Via video stream)

5    JACKSON KELLY PLLC

6    500 Lee Street East

7    Charleston, WV 25301

8    BY: GRETCHEN CALLAS, ESQUIRE

9    T 304.340.1000

10    E gcallas@jacksonkelly.com

11

12

13 Also Present:

14 Gina Veldman, Trial Services

15 Robert Martignetti, CLVS

16

17

18

19

20

21

22

23

24

Page 8

INDEX
EXAMINATION

| Witness Name | | Page |
|---|---|---|
| RONALD LINK | | |
| Direct By Mr. Baker | ............................... | 13 |
| Cross By Mr. DeRoche | ............................... | 337 |

EXHIBITS

| CVS-LINK | Description | Page |
|---|---|---|
| No. 36A | E-mail, CVS 000012286 | 18 |
| No. 10A | E-mail dated January 9, 2014 | 22 |
| No. 25 | Track One CVS Store Information, Bates CVS 000007362 through 7364 | 24 |
| No. 3 | "Poisoning Deaths: Opioid Analgesics" | 37 |
| No. 60 | CVS Logistics, June 6, 2014, CVS 000039935 and 936 | 47 |
| No. 113 | Logistics Planning Update, CVS 000100362 through 364 | 54 |
| No. 19B | E-mail, CVS 000003076 | 57 |
| No. 49 | July 1, 2013 Wholesale Supply Agreement, CVS 000030750 through 30808 | 61 |

Page 9

INDEX
EXHIBITS

| CVS-LINK | Description | Page |
|---|---|---|
| No. 50 | July 1, 2009 Wholesale Supply Agreement, CVS 000030817 through 30891 | 65 |
| No. 51 | January 1, 2004, Wholesale Supply Agreement, CVS 000030892 and 30995 | 67 |
| No. 102 | E-mail, CVS 000091508 through 1518 | 73 |
| No. 58 | SOP, Bates CVS 34375 through 34378 | 83 |
| No. 12 | SOM Program, CVS 000002188 and CVS 000034375 through 378 | 89 |
| No. 89 | CVS SOM, May 2014, CVS 000081680 through 1681 | 93 |
| No. 120 | E-mail, CVS 000076135 | 95 |
| No. 87 | SOM, January 16, 2014, CVS 000078029 through 8031 | 95 |
| No. 104 | E-mail, CVS 0000103329 | 99 |
| No. 18 | E-mail, CVS 00007525204 through 25259 | 112 |
| No. 48 | CVS Distribution Center Policy, CVS 000024877 through 24941 | 116 |

Page 10

INDEX
EXHIBITS

| CVS-LINK | Description | Page |
|---|---|---|
| No. 57 | E-mail, CVS 000034234 through 234 | 120 |
| No. 94 | E-mail, CVS 000087889 and 890 | 123 |
| No. 98 | E-mail, CVS 000089188 | 123 |
| No. 70 | E-mail, CVS 000057751 through 754 | 124 |
| No. 97 | E-mail, CVS 000088956 with Attachment, CVS 000088957 through 9025 | 129 |
| No. 81 | E-mail, CVS 000075299 with Attachment, CVS 000075300 through 75312 | 132 |
| No. 36 | E-mail, CVS 000012286 | 146 |
| No. 67 | E-mail, CVS 000055834 | 149 |
| No. 90 | E-mail, CVS 000083367 with Attachment, Suspicious Order Monitoring for PSE/Control Drugs | 152 |
| No. 71 | E-mail, CVS 000057759 and 55834 | 155 |
| No. 43 | E-mail, CVS 0000000022040 through 2053 | 157 |
| No. 106 | E-mail, CVS 000029867 through 870 | 166 |

Page 11

INDEX
EXHIBITS

| CVS-LINK | Description | Page |
|---|---|---|
| No. 107 | E-mail, CVS 000022230 and 231 | 171 |
| No. 34 | Notes, CVS 000010529 through 532 | 187 |
| No. 103 | E-mail dated May 15, 2014 | 189 |
| No. 119 | Suspicious Order Monitoring Training, CVS 000106514 through 6561 | 198 |
| No. 95 | E-mail, CVS 000088523, Six Pages | 202 |
| No. 55 | Business Idea Description, CVS 000034175 through 177 | 217 |
| No. 82 | E-mail dated October 12, 2010 | 222 |
| No. 83 | E-mail, CVS 000075564 and 542 | 226 |
| No. 92 | E-mail, CVS 0000/83064 with Attachment, Five Pages | 232 |
| No. 53 | E-mail, CVS 000033579 through 581 | 248 |
| No. 62 | E-mail, CVS 000055298 through 302 | 255 |
| No. 54 | E-mail, CVS 000034168 through 171 | 258 |

Page 12

INDEX
EXHIBITS

| CVS-LINK | Description | Page |
|---|---|---|
| No. 85 | E-mail, CVS 000076114 through 117 | 264 |
| No. 108 | CVS DEA Visit 8/5 to 8/8/2013, CVS 000008389 through 8395 | 283 |
| No. 68 | E-mail, CVS 000057736 through 738 | 286 |
| No. 40B | E-mail, CS 000017250, Nine Pages | 305 |
| No. 111 | E-mail, CVS 000099706 through 709 | 308 |
| No. 105 | SOM Risk Analysis, CVS 000103343 | 322 |
| No. 35 | Memorandum, CVS 000010542 and 543 | 333 |
| No. 221 | E-mail, CVS 000103859 and 3867 | 337 |
| No. 222 | CVS 3322 - Brookpark Rd., Cleveland, OH, Orders of HCPs | 342 |
| No. 223 | Brookpark RD CVS Orders Places to IN DC | 345 |
| No. 201 | Hydrocodone Shipments: CVS Pharmacy No. 3322 | 353 |
| No. 213 | E-mail, CVS 000106598 through 601 | 357 |

Page 13

1　　　THE VIDEOGRAPHER: We are now on

2　the record. My name is Robert Martignetti.

3　I'm a videographer for Golkow Litigation

4　Services. Today's date is December 11, 2018,

5　and the time is 9:09 a.m.

6　　　This video deposition is being held in

7　Providence, Rhode Island In Re: National

8　Prescription Opiate Litigation. The deponent

9　is Ron Link. Counsel will be noted on the

10　stenographic record.

11　　　The court reporter is Darlene Coppola

12　and will now swear in the witness.

13

14　　　RONALD LINK,

15　　witness, having first been

16　satisfactorily identified and duly sworn,

17　testifies and states as follows:

18

19　　　DIRECT EXAMINATION

20　BY MR. BAKER:

21　　Q. Your name is Ronald Link?

22　　A. Yes, it is.

23　　Q. Could you tell us the date of today?

24　　A. December 11th.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.   Could you tell us what day of the week
2  it is?
3    A.   It is -- gee, Tuesday.
4    Q.   Okay.  Those were direct questions.
5  Those were direct answers.  And that's what
6  I'm here to do, is to ask you direct questions
7  and get direct answers.  The reason I say that
8  is because during the deposition, oftentimes
9  witnesses will take off in a direction of ten
10 or twelve sentences to answer a really direct
11 question that calls for a really direct
12 answer.
13       So, for example, I asked you what day
14 of the week it was and you gave me a day.  I
15 asked you what date it was, you gave me a
16 date.
17       So as we go through this deposition
18 and I ask you direct questions that have
19 keywords, like dates --
20   A.   Yeah.
21   Q.   -- and days and times, that's what I'm
22 looking for.
23       Fair enough?
24   A.   Yeah.

Page 15

1    Q.   So you are what with CVS?
2    A.   I am no longer employed with CVS.
3    Q.   When were you employed with CVS?
4    A.   I was employed until this past
5  December 2017.
6    Q.   You were employed from when to when?
7    A.   1994 to 2017.
8    Q.   During the period of 1994 through
9  2017, what positions did you hold and on what
10 dates did you hold those positions?
11   A.   First three years, '94 to '97, I was
12 the director of operations for the Lumberton
13 DC.
14   Q.   When you say DC, that's an acronym for
15 distribution center?
16   A.   Distribution center.
17   Q.   You understand that a jury will be
18 hearing what your testimony is today.  So when
19 you use acronyms, you have to speak up and
20 tell me what those acronyms are.  Correct?
21   A.   Correct.
22   Q.   So when we say DC throughout this
23 deposition, you're talking about distribution
24 center?

Page 16

1    A.   Distribution center.
2    Q.   When we say SOM, we're talking about
3  suspicious order monitoring, correct?
4    A.   Correct.
5    Q.   When we talk about SOP, we're talking
6  about standards of procedure; is that right?
7    A.   Correct.
8    Q.   Standard operating procedures?
9    A.   Standard operating procedures.
10   Q.   When we talk about P&P, we're talking
11 about policy and procedure, correct?
12   A.   Correct.
13   Q.   So when we say an SOM, P&P, all those
14 acronyms, you understand what we're talking
15 about, correct?
16   A.   Correct.
17   Q.   So go ahead and tell me from 1994
18 until when, you were what?
19   A.   1994 until I think it was 2007, I was
20 vice president of logistics.  And then from
21 2007 through 2017, I was senior VP of
22 logistics.
23   Q.   Vice president of logistics would be
24 what in relation to the hierarchy of logistics

Page 17

1  at CVS?
2    A.   I reported into a senior vice
3  president of logistics.  So it would be --
4    Q.   What senior -- I'm sorry.  Go ahead.
5    A.   Yeah, so I -- I would probably -- I
6  would be viewed as the number two person, I
7  guess.
8    Q.   And then from 2007 to 2017, you were
9  the number one person with respect to
10 logistics at CVS; is that correct?
11   A.   That's correct.
12   Q.   There are multiple different CVS names
13 of corporations.
14       Which CVS did you work for from 2007
15 through 2017?
16   A.   The CVS Pharmacy.
17   Q.   CVS Pharmacy is located where?
18   A.   Woonsocket, Rhode Island.
19   Q.   That's where the corporate offices
20 are, correct?
21   A.   Correct.
22   Q.   And the distribution centers that you
23 were in charge of as the number one person
24 from 2007 through 2017, that's where the CVS

Page 18

1  suspicious order monitoring program was run
2  for narcotics; is that correct?
3           MR. BUSH: Objection.
4  BY MR. BAKER:
5       Q. Is that right?
6           Let me rephrase the question.
7           Did the logistics department that you
8  were head of from 2007 through 2017 own the
9  suspicious order monitoring program?
10      A. Not -- not that entire period of time.
11      Q. During what period of time did
12  logistics own that program?
13      A. We got directly involved with that
14  around 2012, I believe the date was.
15      Q. Let me show you what's marked as
16  exhibit -- let me show you what's marked as
17  Exhibit 36A.
18
19           (Exhibit No. 36A marked for
20  identification.)
21
22  BY MR. BAKER:
23      Q. This is an e-mail from Mr. Mark
24  Nicastro to you dated 8/18/13. And in the

Page 19

1  last paragraph it says, "I know Tom and Craig
2  want the process in Woonsocket, and if they're
3  going to own it, staff it, and manage it,
4  fine. My understanding is logistics owns this
5  process, so either Dan or I have it."
6           MR. BUSH: Dean, I think you
7  meant.
8  BY MR. BAKER:
9       Q. "Dean or I have it."
10          Did I state that correct?
11      A. Correct.
12      Q. So what that means is that at least we
13  know that in 2015 that logistics owned the SOM
14  process; is that correct?
15      A. That's correct.
16      Q. And you say that they started owning
17  it -- the logistics department started owning
18  it when?
19      A. The transition, I believe, was roughly
20  the year prior.
21      Q. In 2012?
22      A. 2012.
23      Q. Which department owned the SOM process
24  before it was transferred to logistics?

Page 20

1       A. Loss prevention.
2       Q. Where is loss prevention located?
3       A. In Woonsocket, Rhode Island.
4       Q. Who was the head of loss prevention
5  during the period of time that the SOM process
6  was run out of Woonsocket?
7       A. Judy Hughes.
8       Q. Where is Judy Hughes today?
9       A. I believe she's still in Woonsocket.
10      Q. When you were vice president of
11  logistics before you became senior vice
12  president, were you in contact with Judy
13  Hughes regarding the SOM program or not?
14      A. I don't recall.
15      Q. Sir?
16      A. I do not recall.
17      Q. During the period of time that you
18  were senior vice president from 2007 through
19  2017 of logistics, were you in touch with Amy
20  Propatier, the DEA compliance coordinator for
21  CVS?
22      A. Not directly.
23      Q. Did you even know that she held the
24  position of DEA's compliance coordinator?

Page 21

1       A. Yes, I did.
2       Q. Did you ever have any communication
3  with her?
4       A. Not directly, no.
5       Q. During the period of time that the
6  suspicious order monitoring program was owned
7  by the logistics department at CVS from 2012
8  through 2014, when you were employed there,
9  you had no communication with the DEA
10 compliance coordinator, which at that time was
11 Amy Propatier?
12      A. Not directly.
13      Q. What about indirectly?
14      A. I don't recall. I don't recall.
15      Q. So you don't recall any communication
16 with the DEA compliance coordinator when you
17 were the senior vice president of logistics at
18 CVS when the logistics department owned the
19 suspicious order monitoring program, correct?
20      A. Correct.
21      Q. Let me show you Document No. 10A.
22          This is an e-mail.
23
24

Page 22

1    (Exhibit No. 10A marked for
2  identification.)
3
4  BY MR. BAKER:
5    Q.  This is an e-mail from Dean Vanelli to
6  you, Ronald Link, dated 1/9/2014.
7    At the bottom it says, "Suspicious
8  order monitoring program," it says, "assumed
9  ownership of suspicious order monitoring
10  program."
11    We know from your testimony at least
12  that the suspicious order monitoring program
13  was owned by logistics in 2012, correct?
14    A.  Correct.
15    Q.  So this is not accurate that the
16  assumption of the ownership was in 2014.  The
17  assumption of the ownership was in 2012.
18  Correct?
19    MR. BUSH:  Objection.
20  BY MR. BAKER:
21    Q.  Does that make sense?
22    A.  (Witness reviews document.)
23    Q.  Is that yes or no?
24    A.  I'm just not clear on the dates right

Page 23

1  now.  I apologize.
2    Q.  We'll move on.
3    But from your recollection, it was in
4  2012 that logistics started to own the SOM
5  program; is that correct?
6    A.  I believe that was the date where the
7  transition took place.
8    Q.  Would anybody be higher up in
9  logistics than you during the period of time
10  that the SOM program was owned by logistics
11  from 2012 to 2014?
12    A.  I was the senior person in logistics.
13    Q.  So the answer is nobody would have
14  been higher up than you?
15    A.  No.
16    Q.  Correct?
17    A.  No.
18    Q.  As the person the highest up in
19  logistics in charge of SOM, the suspicious
20  order monitoring program -- I want to make it
21  clear -- you never once remember communicating
22  with the DEA compliance coordinator, which was
23  Amy Propatier, correct?
24    A.  Correct.

Page 24

1    Q.  And you never really knew that she was
2  DEA compliance coordinator, did you?
3    MR. BUSH:  Objection.
4    A.  I knew she was the DEA compliance
5  coordinator.
6  BY MR. BAKER:
7    Q.  You never really knew what she did or
8  didn't do with that title, correct?
9    A.  I did not interact with her.
10    Q.  Let me direct you to Exhibit No. 25,
11  please.  This is a list of CVS stores in Ohio.
12    Are these CVS stores ones that were
13  served by CVS distribution centers?
14
15    (Exhibit No. 25 marked for
16  identification.)
17
18    A.  I -- I believe so.  I mean, I have --
19  I don't -- I'm not sure.  I mean, from looking
20  at the addresses, I'm not sure.  I really
21  don't know.
22  BY MR. BAKER:
23    Q.  Well, let me ask you something.  Would
24  there be anybody, other than CVS distribution

Page 25

1  centers, that would have primarily distributed
2  narcotics to CVS pharmacies during the period
3  of time that you were employed at CVS?
4    A.  Wholesalers would have been.
5    Q.  How about with respect to hydrocodone,
6  which were class 3 narcotics?
7    A.  At that time, it was CVS.
8    Q.  CVS had distribution centers
9  throughout the United States that you managed,
10  correct?
11    A.  Correct.
12    Q.  There were 19 total distribution
13  centers; is that correct?
14    A.  Currently.
15    Q.  And during the period of time that you
16  managed those distribution centers, those
17  distribution centers, at least some of them,
18  had class 3 narcotics licenses to distribute
19  narcotics, correct?
20    A.  That is correct.
21    Q.  Did all of them, or did just some of
22  them?
23    A.  They all had class 3.
24    Q.  And class 3 narcotics, up until

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    November -- excuse me -- October 6 of 2014,
2    included hydrocodone and hydrocodone
3    combination products; is that correct?
4        A.   Correct.
5        Q.   Class 2 products included OxyContin,
6    oxycodone, and those related products; is that
7    correct?
8        A.   Correct.
9        Q.   So the class 2 narcotic products were
10   supplied to CVS pharmacies throughout the
11   United States by outside vendors, correct?
12       A.   Correct.
13       Q.   And those outside vendors included
14   people like McKesson, correct?
15       A.   Correct.
16       Q.   And it included people like Cardinal,
17   correct?
18       A.   Correct.
19       Q.   It included people like Mallinckrodt;
20   is that correct?
21       A.   I am not aware of that.
22       Q.   You're not aware?
23       A.   No.
24       Q.   We'll get into those documents in just

Page 27

1    a few moments.
2        A.   Yes, yes.
3        Q.   So the class 3 narcotics, which would
4    have been hydrocodone combination products,
5    those were purchased from whom by the
6    distribution centers to be stored in the
7    distribution centers?  Who were they purchased
8    from?
9        A.   The purchasing department within CVS.
10       Q.   Where would they purchase them from?
11       A.   From the manufacturers, I believe.
12       Q.   So from various outside vendors,
13   correct?
14       A.   Yes.
15       Q.   And then once they were stored in CVS
16   distribution centers throughout the United
17   States, at some point there were orders made
18   by each pharmacy throughout the United States
19   to those distribution centers for those
20   narcotics to be distributed and supplied to
21   those -- sent to those pharmacies, correct?
22       A.   Correct.
23       Q.   And those pharmacies numbered what
24   during the period of time that you were there,

Page 28

1    ranging from when you -- when you started
2    until the time that you quit?
3        A.   Could you clarify the question?
4        Q.   Okay.  You started working -- well,
5    let's cover the period of time from 2006 until
6    2014.
7        A.   Okay.
8        Q.   How many CVS pharmacies were there,
9    approximately, in 2006 that your company
10   distributed to and then how many did that end
11   up being in 2014?
12       A.   I don't recall the exact number in
13   2006.
14       Q.   Could you give us the range?
15   Approximately 7,000?
16       A.   Yeah.  I was going to say maybe 6,000
17   stores, I would say.
18       Q.   And then in 2014, that was up to over
19   9,700; is that correct?
20       A.   I believe it's about that number,
21   yeah.
22       Q.   So during the period of time that you
23   were the senior vice president of logistics,
24   from 2007 until 2014, we're talking about

Page 29

1    between 18 and 19 distribution centers at that
2    time, correct?
3        A.   We did not have 19 distribution
4    centers, but we had -- I think we had 17
5    distribution centers.
6        Q.   Well, at some point, it bumped up to
7    19, correct?
8        A.   Correct.
9        Q.   Kansas City was the last one that you
10   opened?
11       A.   Recently.
12       Q.   Last year, correct?
13       A.   Correct.
14       Q.   And during this period of time, each
15   one of those distribution centers had a
16   process through which the pharmacies
17   throughout the United States that were CVS
18   pharmacies would order their narcotics, their
19   class 3 narcotics, the hydrocodones and
20   hydrocodone combination products, from CVS
21   distribution centers, correct?
22       A.   Could you ask the question again?
23       Q.   During the period of time from 2007 to
24   2014 that you were senior vice president of

Page 30

1  logistics --
2      A.  Right.
3      Q.  -- in charge of the suspicious order
4  monitoring program --
5      A.  Right.
6      Q.  -- at CVS --
7      A.  Right.
8          MR. BUSH:  Objection.  Go ahead.
9          MR. BAKER:  What's the
10  objection?
11          MR. BUSH:  I don't think that's
12  what he said.  He said he was in charge of the
13  suspicious order monitoring program.
14  BY MR. BAKER:
15      Q.  When were you -- when were you senior
16  vice president of logistics at CVS?
17          MR. BUSH:  That's not what I'm
18  saying.  But...
19  BY MR. BAKER:
20      Q.  When were you senior vice president of
21  logistics at CVS?
22      A.  At 2007 through 2017.
23      Q.  Okay.  During the period of time that
24  you were senior vice president of logistics at

Page 31

1  CVS, did CVS pharmacies order primarily their
2  hydrocodone combination products and class 3
3  narcotics from CVS distribution centers?
4      A.  Primarily, I would say no.
5      Q.  Okay.  Who primarily did those
6  pharmacies order class 3 narcotics from?
7      A.  The wholesalers.
8      Q.  So those would be called outside
9  vendors, correct?
10      A.  Correct.
11      Q.  So did the outside vendors then supply
12  more quantities of narcotics to those
13  pharmacies during that time frame than CVS
14  distribution centers did?
15      A.  I don't know.  I don't know the
16  quantities.
17      Q.  When I meant primarily, I meant
18  primarily who was the one that a pharmacy
19  would pick up the phone and call in order to
20  make an order?
21      A.  The wholesalers.
22      Q.  And then secondarily, they would call
23  the CVS distribution centers?
24      A.  There was a period -- there was a

Page 32

1  transition period where CVS did not carry, you
2  know...
3      Q.  Class 3?
4      A.  Class -- class, you know...
5      Q.  So let's go from --
6          MR. BUSH:  Can I -- excuse me.
7  Can I ask both of you to make sure that you
8  each let the other finish, because I think
9  it's -- you're both talking over each other.
10          MR. BAKER:  No problem.
11  BY MR. BAKER:
12      Q.  And if you think I'm overstepping you
13  in your answer, hold your hand up and I'll let
14  you finish.
15      A.  Yeah.
16      Q.  Fair enough?
17      A.  Yeah.
18      Q.  So from 2007 to 2014 when you were
19  senior vice president of logistics, there
20  was -- during that period of time from 2007
21  through October 6 of 2014, hydrocodone
22  combination products were considered
23  Schedule III narcotics, correct?
24      A.  Correct.

Page 33

1      Q.  There was a change in the scheduling
2  October 6, 2014 where HCPs or hydrocodone
3  combination products were scheduled upward by
4  the FDA to Schedule II?
5      A.  Correct.
6      Q.  So what I'm asking is, during the
7  period of time from 2007 to 2014, October --
8      A.  Correct.
9      Q.  -- when HCPs were Schedule IIIs --
10      A.  Correct.
11      Q.  -- did CVS pharmacies order those
12  hydrocodone combination products from outside
13  vendors other than CVS distribution centers?
14      A.  They did also order from outside
15  vendors, correct.
16      Q.  And did they order as much or more
17  from outside vendors than they did from CVS
18  distribution centers, or do you know?
19      A.  I don't know.
20      Q.  In addition to ordering from outside
21  vendors, did the CVS pharmacies, during that
22  time frame from 2007 through 2014 October,
23  order from CVS distribution centers when
24  they -- when they needed Schedule III

Page 34

1  narcotics?
2      A.  Yes.
3      Q.  And my question relates back to this
4  Exhibit No. 25, which is the list of Track 1
5  CVS stores which are in Ohio.
6          Did the CVS distribution centers, to
7  your knowledge, during the period of 2007
8  through 2014, October, supply class 3
9  narcotics, including hydrocodone combination
10 products, to that list of CVS stores?
11         MR. BUSH:  Objection.
12 BY MR. BAKER:
13     Q.  To your knowledge?
14     A.  My difficulty is not knowing whether
15 or not these addresses are the CVS stores,
16 but...
17     Q.  I want you to assume --
18     A.  Yeah.
19     Q.  -- for the sake of my question that --
20 I've handed you Exhibit No. 25, assume that
21 that's the list of stores in what's called the
22 Track 1 CVS, which would be -- which would be
23 inclusive of Summit County, Ohio and Cuyahoga
24 County, Ohio.

Page 35

1      A.  Okay.
2      Q.  I want you to assume that.
3      A.  Okay.
4      Q.  I want you to assume -- I'm asking
5  you, for the period of 2007 through 2014,
6  October, did CVS distribution centers supply
7  hydrocodone combination products to that list
8  of stores, if that is a list of Track 1
9  stores?
10     A.  If this is the accurate list, the
11 answer would be yes.
12     Q.  Okay.  Thank you.
13         Now, during the period of time that
14 you were employed by CVS, the CVS pharmacies
15 sold both Schedule II narcotics and Schedule
16 III narcotics, is that correct?
17     A.  Correct.
18     Q.  Then from the period of October 2014
19 when the Schedule III narcotics of HCPs,
20 hydrocodone combination products, were then
21 rescheduled to Schedule IIs, at that point,
22 all of the narcotics that were sold by CVS
23 pharmacies in Schedule IIs were provided by or
24 supplied by outside vendors, correct?

Page 36

1      A.  Correct.
2      Q.  Now, narcotics are controlled
3  substances under federal law.  You know that,
4  right?
5      A.  Yes.
6      Q.  And you know that controlled
7  substances, in order to distribute those, you
8  have to have a certain type of license from
9  the DEA, correct?
10     A.  Correct.
11     Q.  And you understand, as senior vice
12 president of logistics or prior senior vice
13 president of logistics, that that requires the
14 distribution centers to follow the rules
15 related to what DEA lays down for distribution
16 centers, correct?
17     A.  Correct.
18     Q.  Now, you're aware that during the
19 period of time of 2006, at the very least
20 2006, there was a period thereafter where
21 there was a build-up of the opioid crisis,
22 correct?
23     A.  I -- I'm not -- I'm not sure about
24 what's defined as a build-up.  I mean...

Page 37

1      Q.  Are you familiar that this country is
2  in the midst of an opioid crisis?
3      A.  Yes, I am.
4      Q.  Are you familiar that that's been
5  going on for at least the past ten years?
6      A.  Yes.
7      Q.  Are you familiar with the statistics
8  related to that?
9      A.  I am not.
10         MR. BAKER:  Could you please
11 pull up the charts, the DEA charts, please, in
12 sequence.
13         I'm on Plaintiffs' Exhibit 3.
14
15         (Exhibit No. 3 marked for
16 identification.)
17
18 BY MR. BAKER:
19     Q.  I'm going to show you -- well, first
20 of all, you know who the DEA is -- the US DEA
21 is, correct?
22     A.  Correct.
23     Q.  That's the United States Drug
24 Enforcement Administration, which governs the

Page 38

1  regulation of narcotics, correct?
2      A.  Correct.
3      Q.  Now, are you familiar with the
4  poisoning deaths of opioid analgesics having
5  increased virtually every single year from
6  1999 through 2013?
7      A.  I am not.
8      Q.  Are you familiar with the fact that,
9  for instance, in 2007, when you became senior
10  vice president of logistics, that there were
11  14,440 -- 14,459 deaths from opioid
12  analgesics?
13          MR. BUSH:  Objection.
14  BY MR. BAKER:
15      Q.  Did you know that?
16      A.  I did not.
17      Q.  Is that what that chart indicates to
18  you?
19      A.  It does, yeah.
20      Q.  Assuming this chart to be correct, did
21  you know that, during the period of time that
22  you were senior vice president of logistics at
23  CVS, that the opioid deaths increased to a
24  peak of over 16,000 per year between 2010 and

Page 39

1  2013?
2      A.  I was not aware of that.
3      Q.  Are you aware of how many people are
4  dying today?
5      A.  I do not know the stat.
6      Q.  Is this something that you studied
7  about when you were senior vice president of
8  logistics at CVS in charge of the suspicious
9  order monitoring program?
10      A.  I did not study it, no.
11      Q.  Did you ever try to familiarize
12  yourself with the extent of the crisis and the
13  extent of the deaths that were occurring in
14  the United States as a result of opioids?
15      A.  I did not.
16      Q.  Did you realize that these opioids
17  that were causing these deaths were
18  distributed through CVS pharmacies?
19          MR. BUSH:  Objection.
20  BY MR. BAKER:
21      Q.  Or distributed to CVS pharmacies?
22          MR. BUSH:  Objection.
23  BY MR. BAKER:
24      Q.  Did you know that?

Page 40

1          MR. BUSH:  Objection.
2  BY MR. BAKER:
3      Q.  Yes?
4      A.  Yes.
5      Q.  Okay.  Did you know that -- go to the
6  next one -- that the International Narcotics
7  Control Board gathered statistics in 2012 as
8  to who was consuming the highest amount of
9  hydrocodone in the world?  Did you know that?
10      A.  I did not.
11      Q.  Did you know that the United States,
12  according to the statistics kept by the DEA
13  and this chart, was the country with the
14  highest -- with the highest consumption of
15  hydrocodone, which is -- which is 99 percent
16  of global consumption?
17      A.  I'm not aware of that.
18      Q.  Okay.  Did you know that CVS sold or
19  that your distribution centers that you were
20  in charge of during the period of 2007 through
21  2014 distributed hydrocodone combination
22  products to CVS pharmacies that account for
23  part of that 99 percent?
24      A.  Yes.

Page 41

1      Q.  Let me ask you to look at the next
2  chart.  It's entitled "United States Rates of
3  Opioid Overdose Deaths, Sales, and Treatment
4  Admissions of 1999 to 2010."
5          Do you see that chart in front of
6  you?
7      A.  I do.
8      Q.  Do you see that there are three lines.
9  One is green on the top.  One is red in the
10  middle.  One is blue on the bottom.
11          Do you see that chart?
12      A.  I do.
13      Q.  Have you ever seen this chart before?
14      A.  I have not.
15      Q.  I want you to assume that these are
16  statistics that were gathered by the United
17  States DEA and charted as such.
18          Do you see that the top number there,
19  the top line is called "Opioid sales"?
20          Do you see that?
21      A.  I do.
22      Q.  And do you understand that the middle
23  line is opioid deaths, the red line?
24      A.  I do.

1  Q.  Do you see that those lines run
2  parallel to each other?
3     A.  I do.
4     Q.  Do they correlate with each other, to
5  the best of your knowledge, from looking at
6  that chart?
7     A.  Visually, they correlate.
8     Q.  Is there, according to this visual
9  correlation, an opioid sales and opioid deaths
10 correlation such that the higher the degree of
11 sales of opioids during this period of time,
12 the higher degree of deaths during this period
13 of time?
14    That's a yes or no.
15    A.  I'd say yes.
16    Q.  Let's go to the next document.
17    The next document discusses the 2012
18 Ohio drug overdose deaths.
19    Do you see that?
20    A.  Yes.
21    Q.  Can I switch with you for just a
22 second.  Let me see that one that's yellowed
23 in.
24    Do you see on the top here, it says

1  that "Drug overdose deaths continue to be a
2  public health crisis in Ohio, with a 366
3  percent increase in the number of deaths from
4  2000 to 2012"?
5     A.  Yes.
6     Q.  Okay.  Were you aware of that when you
7  were working at CVS?
8     Were you aware of this statistic?
9     A.  I was not.
10    Q.  Were you aware of any of the
11 statistics that I showed you in the other
12 charts --
13    A.  No.
14    Q.  -- from the DEA?
15    A.  I was not.
16    Q.  Skip down four bullet points.  Bullet
17 Point No. 4 and 5.
18    Do you see her where it says "Opioids
19 prescription or heroin remain the driving
20 factor behind the unintentional drug overdose
21 epidemic in Ohio, that approximately
22 two-thirds, or 1,272, of the drug overdoses
23 involved any opioid in 2012, similar to 2011."
24    Did you know that?

1     A.  I did not.
2     Q.  Do you know that these statistics were
3  gathered by the Ohio Department of Health,
4  Office of Vital Statistics analysis conducted
5  by the Injury Prevention Program?  Did you
6  know that?
7     A.  I did not.
8     Q.  Did anybody ever show you these
9  statistics, or did you ever try to study these
10 statistics when you were employed by CVS in
11 charge of the suspicious order monitoring
12 program?
13    A.  No.
14    Q.  Did the opioid crisis and the
15 statistics associated with the opioid crisis
16 have any concern of you while you were
17 employed by CVS as the senior vice president
18 in charge of logistics?
19    Did that concern you at all?
20    A.  It -- I'd say yes.  Yeah.
21    Q.  If it concerned you, then, why did you
22 not attempt to do any research on it to see
23 the extent of the problem?
24    A.  I had -- I had people directly

1  responsible for managing all that detail.
2     MR. BUSH:  Go ahead.  You can
3  answer.  It looked like Bill was going to
4  interrupt you.  I just wanted to make sure you
5  got to answer the question.
6  BY MR. BAKER:
7     Q.  But you were never told by those
8  people what the research showed; is that what
9  you're saying?
10    A.  That's correct.
11    Q.  Pull out the next chart, please.  This
12 is called the drug diversion map.
13    MR. BUSH:  I think you took the
14 exhibit from him.
15    MR. BAKER:  I'm sorry.  Let's
16 see that one back, please.
17 BY MR. BAKER:
18    Q.  This is called a "Drug Diversion Map,
19 Migration Out of Florida."
20    Have you ever seen this map before?
21    A.  I have not.
22    Q.  This map -- your lawyer can explain,
23 because we've gone over this in
24 Miss Propatier's deposition -- this map is

Page 46

1  something that is a CVS document.
2      Did you know that?
3      A.  I did not.
4      Q.  Did you know that this map was
5  contained within CVS files, the drug diversion
6  migration out of Florida map?
7      A.  I did not.
8      Q.  Have you ever heard of the opioid or
9  OxyContin Express?
10     A.  I have not.
11     Q.  Have you ever heard of something
12  called the Opioid Express?
13     A.  No.
14     Q.  Are you familiar with the concept of
15  migration of opioids out of Florida up through
16  states north of there, inclusive of Ohio?  Are
17  you familiar with that?
18     A.  I am not.
19     Q.  Nobody ever attempted to explain that
20  this exists?
21     A.  I'm not familiar with it.
22         MR. BAKER:  Let me see that
23  back, if I could.  Actually, you can have it.
24         Give me Exhibit 60, please.

Page 47

1
2      (Exhibit No. 60 marked for
3  identification.)
4
5  BY MR. BAKER:
6      Q.  I'm handing you Exhibit 60.  This is a
7  list of CVS logistics distribution centers in
8  existence as of June of 2014; is that correct?
9      A.  Correct.
10     Q.  And it lists 19 distribution centers,
11  correct?
12     A.  Correct.
13     Q.  Now, you -- did you resign from CVS?
14     A.  I retired from CVS.
15     Q.  You retired?
16     A.  Yeah.
17     Q.  What month did you retire?
18     A.  December.
19     Q.  Of 2014?
20     A.  '17.
21     Q.  '17.  I'm sorry.
22         So this is a complete list of all the
23  distribution centers in the United States even
24  as of now; is that correct?  With the

Page 48

1  exception of Kansas City.
2      A.  Correct.
3      Q.  Is that right?
4      A.  Correct.
5      Q.  Kansas City is not on this list, and
6  Kansas City would make it number 20; is that
7  right?
8      A.  Correct.
9      Q.  So right now, to your knowledge, there
10  are 20 distribution centers of CVS throughout
11  the United States?
12     A.  Yes.
13     Q.  Is that correct?
14     A.  There is no DC in Puerto Rico.
15     Q.  So there are 19 distribution centers,
16  but Puerto Rico is what?
17     A.  Puerto Rico, we had stores, but we did
18  not have a distribution center there.
19     Q.  Did the suspicious order monitoring
20  system that was run through your department
21  from 2007 through 2014, when you were employed
22  there, did it include transactions to stores
23  in Puerto Rico or not?
24         MR. BUSH:  Objection.  That

Page 49

1  misstates the record.
2      A.  I'm not aware of that.
3  BY MR. BAKER:
4      Q.  Were there CVS retail stores in Puerto
5  Rico?
6      A.  I don't recall when we opened up
7  stores in Puerto Rico.
8      Q.  Were there pharmacies in Puerto Rico?
9      A.  Yes.
10     Q.  When do you believe, to the best of
11  your recollection, there were pharmacies in
12  Puerto Rico?
13     A.  I don't recall.  I don't recall.
14     Q.  When there were pharmacies in Puerto
15  Rico during your time at CVS, did CVS supply
16  from its distribution centers any narcotics to
17  Puerto Rico pharmacies?
18     A.  No.
19     Q.  When you were employed at CVS, did the
20  Puerto Rico retailers, the Puerto Rico
21  pharmacies order all of their narcotics,
22  class 2s and class 3s, from outside vendors?
23     A.  Yes.
24     Q.  During the period of time that you

Page 50

1  were employed at CVS, did any of those drugs
2  that were supplied to the Puerto Rico
3  pharmacies run through the suspicious order
4  monitoring system at CVS?
5      A.  I am -- I don't know.
6      Q.  You don't recall having seen any of
7  that, do you?
8      A.  I don't.
9      Q.  So Puerto Rico was an outlier on its
10  own relative to whether anybody was or wasn't
11  going to monitor that in the context of CVS's
12  efforts; is that correct?
13      A.  Yeah, I'm not aware, yeah.
14      Q.  Insofar as the suspicious order
15  monitoring system that your department owned
16  from 2012 through 2014 when you were there, it
17  was responsible for doing the suspicious order
18  monitoring of all narcotics that were received
19  by the pharmacies in the CVS chain throughout
20  the United States; is that correct?
21          MR. BUSH:  Objection.
22      A.  I'm not 100 percent sure, yeah.
23  BY MR. BAKER:
24      Q.  Now, you were the person most senior

Page 51

1  in the logistics department that was in charge
2  of the suspicious order monitoring system from
3  2012 through 2014, correct?
4      A.  Correct.
5      Q.  My question is was that department in
6  charge of monitoring suspicious orders by all
7  of the CVS pharmacies throughout the United
8  States?
9      A.  I'm not sure.  Again, your -- I don't
10  know.  I'm not clear.
11      Q.  It was a nationwide suspicious order
12  monitoring system, correct?
13      A.  Correct.
14      Q.  It wasn't something that was
15  distribution center to distribution center in
16  2012, was it?
17          It was all in Indiana at that point,
18  was it not?
19      A.  Correct.
20      Q.  Okay.  So it centralized in the
21  Indiana distribution center, correct?
22      A.  Correct.
23      Q.  And that's -- that's a logistics
24  department?

Page 52

1      A.  Correct.
2      Q.  Where you were in charge of,
3  correct?
4      A.  Correct.
5      Q.  So my question is did that
6  distribution center run the suspicious order
7  monitoring system for the entire United
8  States?
9      A.  At that time yes, yes.
10      Q.  And so any narcotics that were ordered
11  by any CVS pharmacy, that's what you were in
12  charge of monitoring in Indiana, correct?
13          MR. BUSH:  Objection.
14  BY MR. BAKER:
15      Q.  Is that right?
16      A.  The -- yeah, I --
17          MR. BUSH:  You can answer the
18  question.
19      A.  I am not sure, because of the
20  outside -- outside vendor component.
21  BY MR. BAKER:
22      Q.  So let me ask it this way:  With
23  respect to class 3 narcotics, which would have
24  included hydrocodone combination products up

Page 53

1  until October 2014 --
2      A.  Correct.
3      Q.  -- all of the suspicious order
4  monitoring that was done for the class 3
5  narcotics was run out of one distribution
6  center, which was Indiana from 2012 to 2014;
7  is that correct?
8      A.  That is correct.
9      Q.  And that would include all of the
10  class 3 narcotics that would have been ordered
11  through CVS distribution centers, correct?
12      A.  Correct.
13      Q.  That would have also included all of
14  the class 3 narcotics that were ordered
15  through outside vendors by CVS pharmacies,
16  correct?
17      A.  I'm not sure.  I'm not clear on that.
18      Q.  We'll get into that in a minute.
19      A.  All right.
20      Q.  So are you familiar with even what the
21  suspicious order monitoring system monitored,
22  whether it be just those class 3 narcotics
23  that were ordered from CVS distribution
24  centers or if it also included the CVS outside

Page 54

1  vendors or not?

2  Do you know or have any idea?

3  A. I'm not clear -- not sure.

4  Q. But, again, you were the senior person

5  in charge of that program, right?

6  A. I was the senior person responsible

7  for the entire logistics organization.

8  Q. Okay.

9  A. And let me clarify. That was not my

10  sole responsibility, also. But I...

11  MR. BAKER: Could you hand me

12  Exhibit 113, please.

13

14  (Exhibit No. 113 marked for

15  identification.)

16

17  MR. BAKER: Off the record for a

18  quick break.

19  THE VIDEOGRAPHER: The time is

20  9:48 a.m., and we're off the record.

21

22  (Brief recess.)

23

24  THE VIDEOGRAPHER: The time is

Page 55

1  9:48 a.m., and we're on the record.

2

3  BY MR. BAKER:

4  Q. I'm going to hand you Exhibit 113.

5  This is Bates number 100362.

6  MR. BUSH: Can I have one?

7  BY MR. BAKER:

8  Q. This is a logistics planning update

9  dated July 8, 2013, correct?

10  A. Correct.

11  Q. Logistics planning updates are

12  summaries of how things are going as of that

13  time, more or less; is that correct?

14  A. Point in time updates, correct.

15  Q. And these are commonly done within the

16  logistics department, inclusive of where the

17  SOM system was run out of Indiana, correct?

18  A. Correct.

19  Q. Now, I want you to turn to page 3 of

20  that document, under "Suspicious Order

21  Monitoring."

22  You see the fifth bullet down where it

23  says, "SOM process"? Do you see that?

24  A. Yes.

Page 56

1  Q. It states, "SOM process will include

2  store controlled substances, orders placed

3  with CVS warehouses and outside vendors,

4  Cardinal and McKesson," correct?

5  A. Correct.

6  Q. So we know from looking at this,

7  July 8, 2013, that prospectively at least, the

8  plan was at that time to include outside

9  vendors, correct?

10  A. Correct.

11  Q. And up until that time, outside vendor

12  purchases by CVS pharmacies were not being

13  monitored by CVS; is that correct?

14  A. Again, I was not -- I'm not aware --

15  I'm not aware that it wasn't.

16  Q. At least according to the document,

17  that's what it indicates; is that right?

18  A. Correct.

19  Q. And these are the same stores that

20  were purchasing narcotics that were for sale

21  retail to the United States public; is that

22  correct?

23  A. Correct.

24  Q. And those included class 3 narcotics;

Page 57

1  is that right?

2  A. Correct.

3  Q. And those also included class 2

4  narcotics, correct?

5  A. Correct.

6  Q. So who, if anybody, was monitoring

7  those purchases by CVS pharmacies and sales to

8  the general public, to your knowledge, if

9  anybody?

10  A. I'm not aware of who would be

11  monitoring that.

12  Q. So let's proceed to document 19B.

13

14  (Exhibit No. 19B marked for

15  identification.)

16

17  BY MR. BAKER:

18  Q. This is an e-mail dated 8/22/14, from

19  Pamela Hinkle to a series of people within

20  CVS.

21  Do you see that?

22  A. I do.

23  Q. All right. You see there where she

24  says that -- it says, "So we will be out of

Page 58

1  the hydro business on October 6."
2      Do you see that?
3      A.  I do.
4      Q.  What that means to you is that the
5  hydrocodone combination products were being
6  rescheduled from a class 3 to a class 2 as of
7  that date and, therefore, CVS distribution
8  centers would no longer carry them in the
9  distribution centers, correct?
10     A.  Correct.
11     Q.  Now, you understand the context of the
12 opioid crisis relative to the increase in
13 opioid sales?
14     I showed you that in the chart,
15 correct?
16     A.  (Witness nodding.)
17     Q.  Correct?
18     A.  Correct.
19     Q.  You realize that when opioids are sold
20 and not monitored that that increases the
21 chance of diversion of those opioids, correct?
22     Yes or no?
23     MR. BUSH:  It may not be a
24 yes-or-no answer.

Page 59

1      You can answer it how you need to
2  answer it.
3  BY MR. BAKER:
4      Q.  Go ahead.
5      A.  I'm not sure that there is -- there is
6  or isn't a correlation to that, but...
7      Q.  You understand the concept of
8  diversion, don't you?
9      A.  Yes, I do.
10     Q.  Tell me what your concept of diversion
11 is.
12     A.  Product being diverted illegally for,
13 you know, you know, not being used for the --
14 its intended use.
15     Q.  The purpose of this suspicious order
16 monitoring system is to prevent or try to ward
17 off the concept of diversion of these
18 narcotics, correct?
19     A.  Correct.
20     Q.  You realize that when those narcotics
21 are not monitored under a suspicious order
22 monitoring system, that the chances of
23 diversion increases highly?
24     A.  Not sure.  Not...

Page 60

1      Q.  Well, if the purpose of the system is
2  to prevent diversion and there's no system in
3  place to do it --
4      A.  Yeah.
5      Q.  -- then naturally, the chances of
6  diversion increase, correct?
7      A.  Yes.  Yeah.
8      Q.  So, see, that's one of those questions
9  that has a logical answer.  So I appreciate
10 you answering it logically rather than trying
11 to do the dance.  Okay?
12     MR. BUSH:  Objection to the
13 speech by counsel.
14 BY MR. BAKER:
15     Q.  So these narcotics that have a higher
16 opportunity for diversion when they are not
17 being monitored, those are the same narcotics,
18 according to the DEA, that are causing deaths
19 in this opioid crisis, correct?
20     A.  Correct.
21     Q.  And those are the same narcotics that
22 are sold by CVS pharmacies, correct?
23     A.  Correct.
24     Q.  And those are the same narcotics that

Page 61

1  we've been talking about, which are Schedule
2  II narcotics and Schedule III narcotics,
3  correct?
4      A.  Correct.
5      MR. BAKER:  Could you go to
6  No. 58, please.
7      Strike that.  Go to No. 49.
8
9      (Exhibit No. 49 marked for
10 identification.)
11
12 BY MR. BAKER:
13     Q.  Do you recall where I was asking you
14 previously if you knew from whom these
15 narcotics were being purchased?  Do you recall
16 that?
17     A.  I do not.
18     Q.  We were talking about outside vendors
19 and who those outside vendors were that were
20 supplying narcotics to CVS, correct?
21     A.  Correct.
22     Q.  Do you -- you see what you have in
23 front of you -- let me see that back.
24     MR. BUSH:  I wrote on it.  I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  sorry.
2      MR. BAKER: That's fine. If you
3  hand me that back.
4  BY MR. BAKER:
5      Q. These are examples of what are called
6  wholesale supply agreements, correct?
7      A. I'm --
8          MR. BUSH: Take your time and
9  look through them, please.
10         MR. BAKER: We'll go off the
11 record while you have a chance to look through
12 them, because I want --
13         MR. BUSH: I'm sorry. You're
14 going to have to be on the record. It's your
15 deposition. It's your time.
16     If you give him a document that is
17 whatever this is, 770 pages long, he gets a
18 chance to look at it.
19         MR. BAKER: That's fine, and
20 I've offered him that. But we're not going to
21 sit here and tape it while he sits and thumbs
22 through it.
23     So we'll take a break and allow him to
24 do it.

Page 63

1      So go ahead and do it and we'll go
2  back --
3          MR. BUSH: I object to that. As
4  far as I'm concerned, you're on the record and
5  your time is running.
6          MR. BAKER: Okay.
7          MR. BUSH: That's the way it
8  works.
9          MR. BAKER: All right.
10 BY MR. BAKER:
11     Q. Let me go ahead and have you directed
12 to the front page here. It's Page No. 30750
13 of Exhibit 49.
14     Do you see it?
15     A. Okay.
16     Q. Do you see it?
17     A. Yes, yes.
18     Q. The front page?
19     A. Yes.
20     Q. It says, "This document will confirm
21 the agreement between Cardinal Health and CVS
22 Pharmacy Inc."
23     Do you see that?
24     A. Where?

Page 64

1      Q. Right here in the first paragraph?
2      A. I'm sorry. I was looking on the
3  bottom.
4      Q. Do you see that?
5      A. Yes.
6      Q. Is this an example of a wholesale
7  supply agreement between one of the pharmacies
8  and an outside vendor?
9          MR. BUSH: Objection.
10     A. This is the first time I've seen a
11 document like this. So, you know, it's the
12 first time I've seen this.
13 BY MR. BAKER:
14     Q. You've never seen this before?
15     A. I've never seen this before.
16     Q. Have you ever seen the contracts
17 between the CVS pharmacies and outside vendors
18 or not?
19     A. Never.
20     Q. We'll move on. If you've never seen
21 it, there's no sense of me going over it with
22 you.
23         VOICE: Can I have the Bates
24 number for that document, please?

Page 65

1          MR. BAKER: Yeah. Bates Number
2  30750.
3          VOICE: What --
4          MR. BAKER: Whoever that is, I'm
5  going to say the Bates number from now on, but
6  it's 30750.
7  BY MR. BAKER:
8      Q. Could you go to exhibit --
9          VOICE: So --
10         MR. BAKER: 30750. Thank you.
11 BY MR. BAKER:
12     Q. Let me show you Exhibit No. 50.
13
14     (Exhibit No. 50 marked for
15 identification.)
16
17 BY MR. BAKER:
18     Q. This is a document entitled "Wholesale
19 Supply Agreement, July 1, 2009." Do you see
20 that? Between Cardinal Health and CVS, Inc.
21     Do you see that in the first
22 paragraph?
23     A. I do.
24     Q. The Bates number on this is 30817,

Page 66

1  correct?  At the bottom?
2      A.  Correct.  Correct.
3      Q.  And this is dated July 1, 2009,
4  correct?
5      A.  Correct.
6      Q.  All right.  And you see on page 30840
7  in that agreement, but I'll show it to you
8  right here -- do you see on page 30817 in that
9  agreement that it is signed by CVS Pharmacy,
10  Inc., 7/1/2009?
11      Do you see that?
12      A.  I do.
13      Q.  This is signed by CVS Pharmacy
14  Purchasing and Pharmaceutical Relations,
15  correct?
16      A.  Correct.
17      Q.  Is that who does the purchasing of
18  these outside vendor supply --
19      A.  Yes.
20      Q.  -- of narcotics to CVS pharmacies?
21      A.  Yes.
22      Q.  And you're not made aware of that when
23  these purchases are going on, correct?
24      A.  Correct.

Page 67

1      Q.  And so you really have no idea during
2  the period of time that you were in charge of
3  the suspicious order monitoring program and
4  logistics just the extent to which these
5  outside vendors were providing narcotics to
6  CVS pharmacies; is that correct?
7      A.  That is correct.
8          MR. BAKER:  Let me show you
9  Exhibit 51.
10
11      (Exhibit No. 51 marked for
12  identification.)
13
14  BY MR. BAKER:
15      Q.  Exhibit 51 is two pages.  The first
16  page is Bates 30892.  The second page is Bates
17  30995.
18      Do you see that?
19      A.  I do.
20      Q.  Okay.  This is a wholesale supply
21  agreement between CVS and Cardinal -- the
22  first page, or the first page of a wholesale
23  supply agreement between CVS and Cardinal
24  dated January 1, 2004, correct?

Page 68

1      A.  Correct.
2      Q.  The second page is a wholesale supply
3  agreement -- or the first page of a wholesale
4  supply agreement between CVS and Cardinal,
5  July 1, 2007, correct?
6      A.  Correct.
7      Q.  Again, these are these outside vendors
8  from whom -- an example of an outside vendor
9  from whom CVS purchased narcotics, correct?
10      A.  Correct.
11      Q.  For sale in its pharmacies to the
12  public in the United States, correct?
13      A.  Correct.
14      Q.  These relationships with these outside
15  vendors go back for greater than ten years,
16  correct?
17      A.  Correct.
18      Q.  They go back to the 1990s, all the way
19  through the 2000s, all the way through where
20  we are today, correct?
21      A.  I believe so.
22      Q.  And who's monitoring those, you really
23  have no idea, correct?
24      A.  I have no idea.

Page 69

1      Q.  Or if they ever were monitored,
2  correct?
3      A.  I have no idea what the --
4      Q.  At least we know during the period of
5  time -- I'm sorry.  I overstepped you.  Go
6  ahead.
7      A.  No, that's fine.  I'm done.
8      Q.  At least during the period of time
9  that you were in charge of the suspicious
10  order monitoring program in logistics from
11  2012 through October of 2014 or December of
12  2014, you knew that these outside vendor
13  purchases were being made, correct?
14      A.  Correct.
15      Q.  And you knew that they were not being
16  monitored?
17          MR. BUSH:  Objection.
18      A.  I did not know that.  I had no
19  knowledge of that.
20          VOICE:  Object to form on behalf
21  of --
22  BY MR. BAKER:
23      Q.  Well, I showed you.  I showed you --
24          MR. BAKER:  Whoever that is,

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 please put your mute button on. Thank you.
2 MR. BUSH: He was objecting, I
3 think.
4 BY MR. BAKER:
5 Q. You knew that --
6 MR. BAKER: You understand
7 there's one defense attorney here representing
8 CVS to make those objections, so please don't
9 do that over the phone.
10 BY MR. BAKER:
11 Q. So let's move on.
12 So you knew during the period of time
13 that these outside vendor purchases were being
14 done, at least according to the logistics
15 planning document that I showed you, that SOM
16 was not being done on the outside vendors at
17 least as of July 2013?
18 MR. BUSH: Objection. Misstates
19 the record.
20 A. That, I am not aware of. I am not
21 aware of that.
22 BY MR. BAKER:
23 Q. Do you recall me showing you the
24 document where it says the plan was to do it

Page 71

1 in future?
2 MR. BUSH: Objection. That
3 misstates the record.
4 BY MR. BAKER:
5 Q. Do you recall that document?
6 A. I do recall the document.
7 Q. And do you recall that in 2014, there
8 was a retunement of the SOM process with a
9 different company other than the company that
10 you had been working with before?
11 A. Correct.
12 Q. And you understand that that new
13 company was AGI?
14 A. Correct.
15 Q. And that new company, for the first
16 time, put in a process where there would be
17 monitoring of outside vendor orders for CVS,
18 correct?
19 A. I believe that's correct, yes.
20 Q. And that outside vendor process wasn't
21 being monitored by CVS up until the time this
22 new -- this new program was instituted in
23 2014; is that correct?
24 A. I -- I am not 100 percent sure

Page 72

1 because, again, I was not that close to the
2 detail of what was happening at that time.
3 Q. As the person in charge of the
4 program, should you not be paying attention to
5 those types of details?
6 A. I -- I had people that were directly
7 responsible for doing all this work, subject
8 matter experts that were deeply involved with
9 this.
10 In my role, I mean, I had broad
11 responsibility of managing the entire
12 logistics network. So I -- I was not deeply
13 involved in every transaction that took place
14 relative to this.
15 Q. Who, if anybody that you know of, was
16 monitoring the orders made by CVS pharmacies
17 from outside vendors up until the year 2014
18 occurred?
19 A. I don't know.
20 Q. Is the answer that there was none?
21 A. No. I -- I don't know.
22 Q. You're not aware of any being done at
23 least, correct?
24 A. I -- I don't know whether it was being

Page 73

1 done or wasn't being done.
2 Q. But during the period of time that you
3 were in charge of it, from 2012 through 2014,
4 you're not aware of any outside vendor orders
5 being monitored by CVS, correct?
6 MR. BUSH: Objection.
7 A. I don't know for sure. I -- I don't
8 know.
9 BY MR. BAKER:
10 Q. If you don't know for sure, do you
11 know at all?
12 A. Yeah, I don't know. I don't know.
13 Q. So you don't know at all?
14 A. I don't know.
15 Q. At all?
16 A. At all.
17 MR. BAKER: Okay. All right.
18 Could you pull up Exhibit 102, please.
19
20 (Exhibit No. 102 marked for
21 identification.)
22
23 BY MR. BAKER:
24 Q. Let me show you what's been marked as

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Exhibit 102. These are a series of letters
2    that were sent by the DEA to distributors of
3    narcotics throughout the United States in 2006
4    and 2007.
5         Have you ever seen these letters
6    before?
7    A. I have not.
8    Q. There's an e-mail from a person named
9    Ron Buzzeo to Amy Brown, 2/21/2008, where the
10   subject matter is "DEA Letters," and it lists
11   those dates of 2006 through 2007 with the
12   letters that you see before you, correct?
13   A. Correct.
14   Q. During this period of time, you were
15   where within CVS? 2008?
16   A. Where was I located?
17   Q. Yes, sir.
18   A. In Woonsocket.
19   Q. In the corporate office?
20   A. Corporate office.
21   Q. As was Amy Lynn Brown, who's Amy
22   Propatier, correct?
23   A. Correct.
24   Q. And you were not provided these

Page 75

1    letters at all to ever read, to ever study?
2    A. I -- I have not seen these letters.
3    Q. You've never seen this before in your
4    life?
5    A. No.
6    Q. Let me show you -- we're on page 1 of
7    the September 6 letter, which is Bates
8    number 91509 where it says "Background."
9         Do you see that?
10   A. Yes.
11   Q. Highlight that first paragraph of
12   "Background" for me, please.
13        It says -- first of all, at the top,
14   it says, "This letter is being sent to every
15   commercial entity in the United States
16   registered with the DEA to distribute
17   controlled substances."
18        Do you see that?
19   A. I do.
20   Q. That would have included CVS, correct?
21   A. Correct.
22   Q. And we know CVS had these letters,
23   because they're distributing them in this
24   e-mail, correct?

Page 76

1    A. Correct.
2    Q. All right. And it says here,
3    "Background: As each of you is undoubtedly
4    aware, the abuse, nonmedical use of controlled
5    prescription drugs is a serious and growing
6    health problem in this country. DEA has an
7    obligation to combat this problem, as one of
8    the agency's core functions is to prevent the
9    diversion of controlled substances into elicit
10   channels. Congress assigned DEA to carry out
11   this function through enforcement of the
12   Controlled Substances Act and DEA regulations
13   that implement that act."
14        Do you see that?
15   A. I do.
16   Q. Are you familiar with the Controlled
17   Substances Act as it relates to the duties of
18   a distributor of narcotics such as CVS?
19   A. Yes.
20   Q. Do you see here on the second page of
21   that letter, and we're looking at Bates 91510,
22   and it starts with, midway down that page,
23   "The DEA regulations require."
24        And bold everything below that,

Page 77

1    please.
2         It says, "The DEA regulations require
3    all distributors to report suspicious orders
4    of controlled substances. Specifically, the
5    regulations state in 21 CFR 1301.74(b), the
6    registrant shall design and operate a system
7    to disclose to the registrant suspicious
8    orders of controlled substances. The
9    registrant shall inform the field division
10   office of administration in his area of
11   suspicious orders when discovered by the
12   registrant. Suspicious orders include orders
13   of unusual size, orders deviating
14   substantially from a normal pattern, and
15   orders of unusual frequency."
16        Do you see that?
17   A. I do.
18   Q. Is that the regulation that you were
19   familiar with while you were employed by CVS?
20   A. Yes.
21   Q. Is this the regulation that guided you
22   in your job in relation to suspicious order
23   monitoring?
24   A. Yes.

Page 78

1    Q.  Did you take that obligation
2  seriously?
3    A.  Yes.
4    Q.  Go to the second letter, February 7 of
5  2007, and in the second paragraph of that,
6  under "Background," if you would highlight the
7  second paragraph under "Background."
8        It says, "The CSA was designed by
9  Congress to combat diversion by providing for
10 a closed system of drug distribution."
11       Correct?  That's what it says?
12   A.  Correct.
13   Q.  So you understand that the purpose
14 behind the Controlled Substances Act that
15 guides you in your job under suspicious order
16 monitoring is to prevent diversion, correct?
17   A.  Correct.
18   Q.  And when diversion happens, that can
19 result in deaths like you saw in those charts,
20 correct?
21       It's a yes or no.
22   A.  Yes.
23   Q.  With respect to the responsibility,
24 it's the last sentence there, it says, "This

Page 79

1  responsibility is critical, as Congress has
2  expressly declared that the illegal
3  distribution of controlled substances has a
4  substantial and detrimental effect on the
5  health and general welfare of the American
6  people."
7        Correct?
8    A.  Correct.
9    Q.  Right?
10   A.  Correct.
11       MR. BUSH:  You mean that that's
12 correct what it says?
13 BY MR. BAKER:
14   Q.  That's what the letter says, correct?
15   A.  Correct.
16   Q.  And you have no reason to disagree
17 with that statement, do you?
18   A.  I have no basis to disagree with it,
19 no.
20   Q.  All right.  Go to page 91515 of that
21 letter, which would be the third page of that
22 letter.
23       And it says, at the top,
24 "Circumstances that might be indicative of

Page 80

1  diversion."  And highlight those four, please.
2        It says, "Ordering excessive
3  quantities of a limited variety of controlled
4  substances."
5        Do you see that, and in there it's
6  included as hydrocodone?
7    A.  I do.
8    Q.  Do you see that?
9    A.  I do.
10   Q.  Do you see No. 2, "Ordering a limited
11 variety of controlled substances in quantities
12 disproportionate to the quantity of
13 noncontrolled medications."
14       Do you see that?
15   A.  I do.
16   Q.  Do you see where it says, "Ordering
17 excessive quantities of a limited variety of
18 controlled substances in combination with
19 excessive quantities of lifestyle drugs."
20       Do you see that?
21   A.  I do.
22   Q.  Now, here's the next one, it says,
23 "Ordering the same controlled substances from
24 multiple distributors."

Page 81

1        Do you see that?
2    A.  I do.
3    Q.  That would include CVS ordering from
4  outside vendors, correct?
5    A.  It would.
6    Q.  And do you understand that the
7  Controlled Substances Act is supposed to cover
8  the monitoring of those outside vendor orders?
9        You understand that, correct?
10       MR. BUSH:  Objection.
11   A.  Yes.
12 BY MR. BAKER:
13   Q.  But you also don't know what, if
14 anything, that CVS was doing to monitor
15 outside vendor orders during the period that
16 you were employed there, correct?
17       Correct?
18   A.  Correct.
19   Q.  Now go to the December 7, 2000 letter
20 within that package.  It's Bates number 91517.
21       The first paragraph of that letter,
22 December 27, 2007, in this Bates number 91517
23 states, "Dear registrant:  This letter is
24 being sent to every entity in the United

Page 82

1  States registered with the DEA to manufacture
2  or distribute controlled substances."
3      Correct?
4      A.  Correct.
5      Q.  It says, "The purpose of this letter
6  is to reiterate the responsibilities of
7  controlled substance manufacturers and
8  distributors to inform the DEA of suspicious
9  orders in accordance with 211 CFR 1301.74(b)."
10     Correct?
11     A.  Correct.
12     Q.  And you know what 21 CFR 1301.74(b) is
13 because we just highlighted that repeated the
14 exact verbatim language of it in the prior
15 letter, the 2006 letter, correct?
16     A.  Correct.
17     Q.  And you know that that's the law that
18 guides you or least that guided you while you
19 were employed by CVS with respect to the
20 suspicious order monitoring system, correct?
21     A.  Correct.
22     Q.  And you understand that this letter is
23 something to reiterate, not iterate for the
24 first time, but to reiterate this to the

Page 83

1  distributors of narcotics, correct?
2      MR. BUSH:  Objection.
3  BY MR. BAKER:
4      Q.  That's what it says, right?
5      A.  It appears to be that way, yes.
6      Q.  So this -- you understand that this
7  December 2007 letter wasn't the first time
8  that CVS was informed as a distributor by the
9  DEA that there were responsibilities with
10 respect to the Controlled Substances Act,
11 correct?
12     MR. BUSH:  Objection.
13     A.  Could you ask the question again.
14 BY MR. BAKER:
15     Q.  I'll withdraw the question.
16     Do you understand that the Controlled
17 Substances Act has been on the books since
18 1971?  Did you know that?
19     A.  I did not know that.
20     MR. BAKER:  Pull up Exhibit No.
21 58, please.
22
23     (Exhibit No. 58 marked for
24 identification.)

Page 84

1
2      MR. BAKER:  Let's go off record
3  for a second.
4      THE VIDEOGRAPHER:  The time is
5  10:15 a.m., and we're off the record.
6
7      (Brief recess.)
8
9      THE VIDEOGRAPHER:  The time is
10 10:15 a.m., and we're on the record.
11
12 BY MR. BAKER:
13     Q.  I'm going to show you Exhibit 58.  And
14 this -- begins with Bates number 34375.
15 Specifically, if you turn to the last page of
16 Exhibit 58, it's Bates-numbered 34378.
17     Now, this document on the front is
18 entitled "CVS Standard Operating Procedures,"
19 correct?
20     A.  Correct.
21     Q.  So you understand this is a CVS
22 document, right?
23     MR. BUSH:  Objection.
24     A.  It --

Page 85

1  BY MR. BAKER:
2      Q.  Well, look at it.
3      A.  It appears to be, yes.
4      Q.  It appears to be a CVS document?
5      A.  (Witness nodding.)
6      Q.  You understand every time that you see
7  a Bates number that says CVS at the bottom
8  that that's a document that was provided to
9  plaintiffs' counsel by CVS during the pendency
10 of this litigation?
11     A.  Yes.
12     Q.  So this is a CVS document, correct?
13     A.  Yes.
14     Q.  So look at where it says "Introduction
15 to the CSA and DEA regs."
16     Do you see that?
17     A.  Yes.
18     Q.  Do you see where it says "The
19 Controlled Substances Act was passed in
20 1971"?
21     A.  Yes.
22     Q.  This CSA, Controlled Substances Act,
23 has been in effect since the -- for the entire
24 time that you were employed in the field of

Page 86

1  whatever you did at CVS from 1994 through
2  2017, correct?
3           MR. BUSH:  Objection.
4  BY MR. BAKER:
5       Q.   This -- this particular law was in
6  effect during the entire time that you were
7  employed by CVS, correct?
8       A.   It -- it -- yeah.  I wasn't aware of
9  it, but the answer is yes.  Yeah.
10      Q.   You weren't aware of the law, or you
11  weren't aware that it was in effect?
12      A.   In effect since 1991 (sic).
13      Q.   When did you first become aware that
14  the law even existed?
15      A.   I don't recall.
16      Q.   Was it before 2012?
17      A.   I don't recall the exact date.
18      Q.   Was it any time before 2014?
19      A.   It's -- I'm not sure.  I'm not sure.
20      Q.   Did you ever attend any DEA
21  conferences --
22      A.   No.
23      Q.   -- that talked about suspicious order
24  monitoring and what was expected of a

Page 87

1  distributor?
2       A.   No.
3       Q.   Did you ever attend any online
4  tutorials about that?
5       A.   No.
6       Q.   Did you ever attend any in-house
7  tutorials through CVS corporate or
8  elsewhere?
9       A.   No.
10      Q.   Did you ever pick up a law book and
11  read about that Controlled Substances Act?
12      A.   No, no.
13      Q.   Did you ever pick up any journals, any
14  articles to read about the opioid crisis
15  during the entire time that you were employed
16  by CVS?
17      A.   No.
18      Q.   Are you familiar with the concept of
19  the "Know Your Customer" policy?
20           Are you familiar with that?
21           Do you know what that means?
22      A.   I've heard of it, but I can't explain
23  to you exactly what it is.
24      Q.   Can you explain to me inexactly what

Page 88

1  it is?
2       A.   No.
3       Q.   Can you explain any bit of it to me?
4       A.   No.
5       Q.   You don't know what the "Know Your
6  Customer" policy is, do you?
7       A.   I don't believe so.
8       Q.   You've never even heard of it, have
9  you?
10      A.   I -- I don't remember.
11      Q.   You don't recall having heard of it at
12  all; is that correct?
13      A.   I don't recall.
14      Q.   So if I say, have you heard of the
15  "Know Your Customer" policy, the answer is
16  you've never heard of it, to the best of your
17  knowledge; is that correct?
18      A.   I don't remember the policy.  I don't
19  remember -- I don't remember the program.
20      Q.   You don't remember ever even hearing
21  about it, do you?
22      A.   I don't believe so.
23           MR. BAKER:  Let me show you
24  what's marked as No. 12.

Page 89

1
2           (Exhibit No. 12 marked for
3  identification.)
4
5  BY MR. BAKER:
6       Q.   And it's CVS Bates number 2188.
7           Would you highlight where it says,
8  "Know Your Customer"  and what the policy
9  states, please.
10          Do you see that this is a CVS document
11  at the bottom?  Do you see that?
12      A.   I do.
13          MR. BUSH:  Can we have just --
14  Bill, you keep on saying it's a CVS document,
15  and I want to make sure that the record's
16  clear on what you mean by that.
17          You mean that it was produced by CVS.
18  It doesn't necessarily mean it was created by
19  CVS.
20          MR. BAKER:  It has to be in
21  their files.
22          MR. BUSH:  It was in their
23  files.  That doesn't mean it was created by
24  them.

Page 90

BY MR. BAKER:

Q. You understand that every time there's a document that has CVS written at the bottom of it like that, a Bates number, that came from CVS files. Do you understand that?

A. I do.

Q. So to that extent, it was a CVS document, correct?

A. Correct.

Q. So look at it -- this is talking about the SOM program. That's the suspicious order monitoring system program, at the top.

Do you see that?

A. I do.

Q. That's the program that you were in charge of from 2012 through when? Through the time you left?

A. 2017.

Q. Through 2017?

A. Yeah.

Q. And this is the policy you've never heard of, correct?

MR. BUSH: Objection.

A. This policy, I believe, resided in the

Page 91

stores.

BY MR. BAKER:

Q. But not in the distribution centers?

A. No.

Q. Do you understand that this policy applies to distribution centers knowing their customer, which is the pharmacy? Do you understand it now?

A. I do.

Q. But you didn't understand it before I just said it, did you?

A. No.

Q. So look at it. It says, "'Know Your Customer' policy. First you must know and understand DEA's 'Know Your Customer' policy. This is the foundation to designing the SOM program."

Do you see that?

A. I do.

Q. Did you know that that was the foundation to designing the SOM program?

A. I did not.

Q. As somebody who was in charge of the SOM program for CVS for the period of 2012

Page 92

through 2017, do you think it would have been your duty to know that that's the foundation of designing the SOM program?

MR. BUSH: Objection.

A. Yeah, I -- again, as I stated earlier, there were people that were directly accountable for this program that were part of my organization, and the expectation was for them to be into that detail, where I was -- where I was not.

BY MR. BAKER:

Q. The policy states, "It is fundamental for sound operations that handlers take reasonable measures to identify their customers, understand the normal and expected transactions typically conducted by those customers, and consequently identify those transactions conducted by their customers that are suspicious in nature."

That's the policy according to this document, correct?

A. Correct.

Q. And you see that's taken directly from the DEA website, correct?

Page 93

A. Correct.

Q. Now, during the period of time that you were employed at CVS as the head of logistics, which ran the SOM program from 2012 through the time that you left in 2017, did you ever visit the DEA website?

A. I did not.

Q. Was it available for you to visit if you chose to do so?

A. I'm sure it was.

MR. BAKER: Let's go to Exhibit 89, please.

MR. BUSH: When you have a good moment for a break, let me know.

MR. BAKER: Right after this exhibit.

(Exhibit No. 89 marked for identification.)

BY MR. BAKER:

Q. Do you see here on Exhibit 89 where this is an exhibit, on the front page, May of 2014. This is when you would have been in

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  charge of the suspicious order monitoring
2  program within logistics, correct?
3      A.  Correct.
4      Q.  And so this is a business confidential
5  agreement.  This is a -- this is something
6  that you know to exist within the CVS
7  documents, correct?
8      A.  Yeah, I don't recall seeing this
9  document, but I know it came from CVS.
10     Q.  Okay.  And, again, this repeats on
11  page 2 of that document the obligation under
12  21 CFR 1301.74(b) that "The registrant shall
13  design and operate a system to disclose to the
14  registrant suspicious orders of controlled
15  substances."  Correct?
16     A.  Correct.
17     Q.  So this is something that's passed
18  around within that logistics operation to
19  remind people, this is what you're supposed to
20  do if you're involved with the SOM program,
21  correct?
22         MR. BUSH:  Objection.
23     A.  Again, I'm not sure if this was passed
24  around or -- again, I -- I have no

Page 95

1  recollection of seeing this document.  I don't
2  know who -- where it was passed around to.
3         MR. BAKER:  We've been going on
4  for an hour and a half, so we'll take a
5  break.
6         THE VIDEOGRAPHER:  The time is
7  10:24 a.m., and we're off the record.
8
9      (Off the record at 10:24 a.m.)
10
11     (Exhibit No. 120 marked for
12  identification.)
13
14         THE VIDEOGRAPHER:  The time is 10:37
15  a.m.  We're on the record.
16
17  BY MR. BAKER:
18     Q.  I'm going to show you Exhibit 87.
19
20     (Exhibit No. 87 marked for
21  identification.)
22
23  BY MR. BAKER:
24     Q.  Could you please go to Exhibit 87,

Page 96

1  Bates 78029, and could you please go to the
2  last page of that exhibit, 78031.
3      Now, this is a CVS document.  You see it
4  says CVS at the top of it?
5      A.  I do.
6      Q.  And on the front it says, "Suspicious
7  Order Monitoring, SOM, January 16, 2014," the
8  first page?
9      A.  I do.
10     Q.  You saw that, right?
11     A.  I do.
12     Q.  Let's go to the page that I was
13  talking about, which is the last page.  The
14  second sentence there, if you highlight the
15  second sentence where it says "The regulation
16  clearly indicates" and finish it on out.
17     The first sentence, I'll read it, then
18  I want to highlight that second one.
19     It says "DEA regulations require
20  wholesale distributors to report suspicious
21  orders of controlled substances."
22     And, again, it talks about
23  21 CFR 1301.74(b) which you know, correct?
24     A.  Correct.

Page 97

1      Q.  And it says "...specifically requires
2  that the registrant," and you understand what
3  a registrant is, right?
4      A registrant would be a licensee?
5      A.  Yes.  Correct.
6      Q.  A licensee would be the CVS
7  distribution center, correct?
8      A.  Correct.
9      Q.  "...design and operate a system to
10  disclose to the registrant suspicious orders
11  of controlled substances."
12     Now the second sentence, let's focus
13  on that.
14     "The regulation clearly indicates that
15  it is the sole responsibility of the
16  registrant to design and operate such a
17  system."  Correct?
18     A.  Correct.
19     Q.  Okay.  So let's focus on that.
20     "The regulation clearly indicates that
21  it is the sole responsibility of the
22  registrant," and the registrant, as you
23  understand it, is the distribution center that
24  has the license to warehouse and distribute

Page 98

1   these narcotics, correct?
2       A.  Correct.
3       Q.  Okay.  And the registrant would then
4   be CVS, which owns those distribution centers,
5   correct?
6       A.  Correct.
7       Q.  And so CVS is the one that has the
8   responsibility to design and operate the
9   system that monitors suspicious orders,
10  correct?
11      A.  Correct.
12      Q.  Now, CVS hired an outside company to
13  help it design such a system beginning in
14  2007, 2008, correct?
15          MR. BUSH:  Objection.
16  BY MR. BAKER:
17      Q.  That company being the Buzzeo company,
18  Ron Buzzeo?
19      A.  Yeah.
20          MR. BUSH:  Objection.
21  BY MR. BAKER:
22      Q.  Is that right?
23      A.  Yeah, I'm not sure, but I believe -- I
24  believe that's who it was.

Page 99

1       Q.  Okay.  And I think --
2       A.  I wasn't involved with that, but...
3       Q.  You were not involved with that?
4       A.  No.
5           MR. BAKER:  Let's go to Exhibit
6   104, please.
7
8           (Exhibit No. 104 marked for
9   identification.)
10
11  BY MR. BAKER:
12      Q.  Do you remember about the "Know Your
13  Customer" requirements?  We went over that --
14      A.  Yes.
15      Q.  -- with you?
16      A.  Yes.
17      Q.  Let me show you Exhibit 104.
18          Now at the top, it says "Tom," this
19  is a -- this is the e-mail, and again, this is
20  Bates Number 103329.  We're at Exhibit Number
21  104.
22          Here's the question.  Do you see where
23  it says "E-mail, Craig Schiavo, 1/18/2013 to
24  Tom Bourque."

Page 100

1           Do you see that?
2       A.  I do.
3       Q.  Are those people that were employed
4   within CVS?
5       A.  They were within CVS but not in my
6   department.
7       Q.  What department were they in?
8       A.  They were in the compliance
9   organization.
10      Q.  It says "Tom, below are some bullets
11  on the importance of including OV orders in
12  the SOM algorithm."
13          Do you see that?
14      A.  I do.
15      Q.  And OV orders are outside vendor
16  orders, correct?
17          MR. BUSH:  Objection.
18  BY MR. BAKER:
19      Q.  Is that what that means to you?
20      A.  That is my understanding.
21          MR. BUSH:  Objection.
22  BY MR. BAKER:
23      Q.  Is it --
24      A.  Yes.

Page 101

1       Q.  -- your interpretation that OV orders
2   means outside vendor orders?
3           MR. BUSH:  Objection.
4       A.  Yes.
5           MR. BAKER:  What is the
6   objection so I can clear it up?
7           MR. BUSH:  You're asking him to
8   look at and interpret a document he's never
9   seen.
10          MR. BAKER:  Okay.  All right.
11  BY MR. BAKER:
12      Q.  So what --
13          MR. BUSH:  There is no basis for
14  that.
15  BY MR. BAKER:
16      Q.  Tell me your interpretation, being a
17  CVS employee, of the acronym OV as it relates
18  to order, your interpretation of it, being an
19  insider to -- being employed there, what does
20  OV mean to you?
21      A.  My interpretation is outside vendor,
22  but I have never seen this document I have,
23  you know, I have not seen this.
24      Q.  I want you to assume that OV orders in

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  the context of this means outside vendor
2  orders, correct?
3      A.  Correct.
4      Q.  It says, "Below are some bullets on
5  the importance of including OV orders in the
6  SOM algorithm."
7          Did I state that correctly?
8      A.  Could you --
9      Q.  Did I state that document correctly?
10  Did I state --
11      A.  Yes.
12      Q.  Do you see where it says, "Why it is
13  needed," and it says "DEA 'Know Your Customer'
14  requirements."
15          Do you see that?
16      A.  Yes.
17      Q.  And do you see where it says,
18  "potential issues, if not accounted for."
19          Do you see that, in realtime below
20  that?
21      A.  I see that on a document, yes.
22      Q.  It says, if you go up at the top, it
23  says "DEA 'Know Your Customer' requirements,
24  in order for dispensing data contained in the

Page 103

1  algorithm to be useful, we must account for
2  all controlled substance orders[-D/] , to
3  track all NDC numbers ordered by store and
4  have the ability to add unknown, first-time
5  item orders into our SOM system."
6          Is that what that document says?
7          MR. BUSH:  Objection.
8      A.  I -- again, not ever seeing this
9  document before, I -- I'm not sure what it
10  means.
11  BY MR. BAKER:
12      Q.  So let me explain my question.
13      A.  Yeah.
14      Q.  All I asked you is is that what the
15  document says.  I didn't ask you if you had
16  seen it.  So is that what the document says?
17      A.  I -- I believe so.
18      Q.  So if you don't understand, you know,
19  like you say you believe it, that's -- but
20  let's read it together.
21          It says "To track all NDC numbers
22  ordered by store and have the ability to add
23  unknown, first-time orders into our SOM
24  system."

Page 104

1          That's a sentence that you just read
2  and that I read.  That's what it says,
3  correct?
4      A.  I -- I agree with you, but the only
5  thing I don't agree with is I'm just not sure
6  if that's factual or not.  I don't know if
7  that's an accurate -- accurate requirement
8  based upon this e-mail.
9      Q.  So what I'm going to ask you is if
10  that's what the document says.
11      A.  Right.
12      Q.  Now I'm going to -- if I ask you do
13  you know if that's the process or procedure
14  within CVS, then that would be appropriate for
15  you to answer that way.
16      A.  Correct.
17      Q.  Do you understand?
18      A.  Correct.
19      Q.  Does this document say "to track all
20  NDC numbers ordered by store and have the
21  ability to add unknown, first-time item orders
22  into our SOM system."
23          Does the document say that?
24      A.  Yes.

Page 105

1      Q.  Does the document say "potential
2  issues, if not accounted for in realtime,
3  store may order a little from both the OV and
4  DC to stay under radar."
5          Is that what it says?
6      A.  It does say that.
7      Q.  So stores within the CVS system were
8  ordering from outside vendors and from the
9  distribution center, correct?
10          MR. BUSH:  Objection.
11      A.  I don't know that factually.
12  BY MR. BAKER:
13      Q.  Well, you just said it earlier in your
14  deposition testimony today that that's what
15  was -- that's what was happening, correct?
16      A.  (Witness nodding.)
17      Q.  Right?
18          MR. BUSH:  Objection.
19      A.  Right.  Yes, yes.
20  BY MR. BAKER:
21      Q.  Then we took a break for roughly 20
22  minutes, correct?
23      A.  Correct.
24      Q.  Then we come back on record, I ask you

Page 106

1 the same question, and now all of a sudden you
2 say you don't know.
3          MR. BUSH:  Objection.
4 BY MR. BAKER:
5    Q.  What happened during that 20
6 minutes?
7          MR. BUSH:  I completely object
8 to this.  You're mischaracterizing his prior
9 testimony.  You're being argumentative with
10 him.
11      Ask your questions and move on.
12 BY MR. BAKER:
13    Q.  Okay.  What happened during that 20
14 minutes to change your --
15    A.  Nothing.
16          MR. BUSH:  Objection.
17 BY MR. BAKER:
18    Q.  Go ahead.
19    A.  Nothing.  Ask your question.
20    Q.  Nothing?
21    A.  Ask your question.
22    Q.  Pardon me?
23    A.  Ask your question.
24    Q.  I did ask my question.

Page 107

1      What happened during that 20 minutes
2 to change your knowledge of whether or not --
3    A.  Nothing.
4    Q.  -- CVS stores ordered from outside
5 vendors?
6          MR. BUSH:  Objection.
7 Mischaracterizes everything about what's going
8 on here.
9 BY MR. BAKER:
10    Q.  Did CVS stores order from outside
11 vendors?
12    A.  Yes.
13    Q.  And you know that, according to this
14 e-mail, it says "A store," which is a
15 pharmacy, correct?  CVS pharmacy?
16    A.  Correct.
17    Q.  -- "...may order a little from both
18 outside vendor and the distribution center to
19 stay under radar," correct?
20          MR. BUSH:  You're asking if
21 that's what it says?
22 BY MR. BAKER:
23    Q.  That's what it says, correct?
24    A.  That's what it says.

Page 108

1    Q.  "Under radar," would that be the radar
2 of the suspicious order monitoring system?
3          MR. BUSH:  Objection.
4    A.  That, I do not know.
5 BY MR. BAKER:
6    Q.  Is that the context of what it seems
7 to indicate?
8          MR. BUSH:  Objection.
9    A.  I don't understand what the context
10 would be in this case.
11 BY MR. BAKER:
12    Q.  And it says, "We report and OV reports
13 an order to the DEA if the order flags in both
14 systems."
15      Is that what it says?
16      That's not very good English in the
17 sentence, but is that what the English says in
18 that sentence?
19    A.  I am not sure.
20    Q.  Well, just read it.
21      "We report and OV reports an order to
22 the DEA if the order flags in both systems."
23      Is that what that English says in that
24 sentence?

Page 109

1    A.  Report...
2      ...to the DEA.
3    Q.  Is that what that sentence says?
4    A.  I believe so.
5    Q.  Does the next sentence say, "If we
6 bring in OV data later in the process, we may
7 ship a potentially reportable suspicious order
8 from our DC."
9      Is that what that document says?
10    A.  That's what the document says.
11    Q.  Does this document say, "Stores can
12 place phone orders which have no visibility
13 until a later time."
14      Is that what that document says?
15    A.  Yes.
16    Q.  Does this document say, "Currently
17 have a store which had a 68,000 hydrocodone
18 pill loss and was placing phone orders to OV."
19      Is that what that document says?
20    A.  It does.  Yes.
21    Q.  So when you were the vice president in
22 charge of logistics at CVS, were you made
23 aware of this 68,000 hydrocodone pill loss?
24    A.  No.

Page 110

```
 1          MR. BUSH:  Objection.
 2      A.  No.
 3  BY MR. BAKER:
 4      Q.  At any time during your employment
 5  with CVS, were you made aware of anything
 6  concerning a 68,000 hydrocodone pill loss as
 7  --
 8      A.  No.
 9      Q.  -- discussed in this e-mail?
10      A.  No.
11          MR. BUSH:  Objection.
12      A.  No.
13  BY MR. BAKER:
14      Q.  No?
15      A.  No.
16      Q.  Are you aware of whether or not that
17  was ever reported to the DEA by CVS?
18      A.  I --
19          MR. BUSH:  Objection.
20      A.  I am not aware.
21  BY MR. BAKER:
22      Q.  If there was a 68,000 hydrocodone pill
23  loss within the distribution chain of CVS or
24  within one of its pharmacies, would there, to
```

Page 111

```
 1  your knowledge, be an obligation of CVS to
 2  report that to the DEA?
 3      A.  Yes.
 4      Q.  But you're not aware of that ever
 5  being reported to the DEA?
 6      A.  I am not.
 7          MR. BUSH:  Objection.
 8      A.  I am not aware of it.
 9  BY MR. BAKER:
10      Q.  Do you know why it would be required
11  to be reported to the DEA?
12      A.  It's a requirement of the DEA.
13      Q.  It's the law, right?
14      A.  Right.
15      Q.  And if it wasn't reported, then CVS
16  would have been breaking the law, correct?
17      A.  I don't know if it was or wasn't
18  reported, so I don't know.
19      Q.  If it wasn't reported, then CVS would
20  be breaking the law, correct?
21      A.  Correct.
22          MR. BAKER:  Let's go to Exhibit
23  18 and Bates 25204.
24
```

Page 112

```
 1          (Exhibit No. 18 marked for
 2  identification.)
 3
 4  BY MR. BAKER:
 5      Q.  You know who John Mortelliti is?
 6      A.  Yes.
 7      Q.  And do you know who Todd Janson is?
 8      A.  Yes.
 9      Q.  Who was John Mortelliti, while you
10  were employed by CVS, within the CVS system?
11      A.  Loss prevention manager.
12      Q.  And who was Todd Janson within CVS
13  while you were employed there?
14      A.  Loss prevention manager.
15      Q.  And Amy Brown was the DEA compliance
16  coordinator, correct?
17      A.  Correct.
18      Q.  Now, let me show you this Exhibit 18.
19          Is it true that before August 25 of
20  2010 that CVS had no written suspicious order
21  monitoring policy placed within its policies
22  and procedures or its standard operating
23  procedures manual?
24      A.  I am not aware of that.
```

Page 113

```
 1      Q.  You're not aware of the history of how
 2  it came to be?
 3      A.  No.
 4      Q.  Okay.  Well, let me help you with
 5  that.  You see this e-mail dated November
 6  2007?
 7      A.  Yeah.
 8      Q.  Actually, it's dated January of 2008.
 9  Do you see that?  The e-mail is dated
10  January 3 of 2008, at the top?
11      A.  This one, 2007?
12      Q.  Do you see at the top, it says
13  January 2008.  Do you see that?
14      A.  Yes, I do.
15      Q.  It's talking about CVS seventh Draft
16  November 2007.
17          Do you see that?
18      A.  Yes.
19      Q.  Did you know during this time there
20  were drafts of a potential suspicious order
21  monitoring policy being passed around within
22  the CVS system?
23      A.  No.
24      Q.  Did you know that there was an e-mail
```

Page 114

1  from Amy Brown -- who is Amy Propatier,
2  correct?
3      I can represent to you that she is the
4  same person.
5      A.  Yes.
6      Q.  November 27, where there is discussion
7  about a new Rx DEA SOP.
8      Do you see that?
9      A.  Yes.
10     Q.  Rx means prescription, correct?
11     A.  Yeah.
12     Q.  Prescription drugs?
13     A.  Yes.
14     Q.  DEA means the --
15     A.  Drug Enforcement --
16     Q.  Drug Enforcement Agency.  You
17  understand that?
18     A.  Yes.
19     Q.  SOP means standard operating
20  procedure, correct?
21     A.  Correct.
22     Q.  So it says, here at the bottom, "We're
23  still in the process of writing the suspicious
24  order monitoring section of the SOP."

Page 115

1      Did you see that?
2      A.  I do see that.
3      Q.  Did you know that there was no
4  suspicious order monitoring section of the
5  SOP as of that date, at least as of
6  November 27, 2007?
7      A.  I did not.
8      Q.  Did you ever read the suspicious order
9  monitoring policy of CVS?
10     A.  I don't recall.
11     Q.  As we sit here today, can you tell me
12  yes or no if you've ever read the suspicious
13  order monitoring policy of CVS?
14        MR. BUSH:  Objection.  Asked and
15  answered.
16     A.  I don't recall reading the policy.
17  BY MR. BAKER:
18     Q.  So if you don't recall reading the
19  policy, then the answer is no, you don't
20  recall reading the policy, correct?
21     A.  No, I don't recall reading the policy.
22     Q.  And you could not tell me what that
23  policy says as we sit here today?
24     A.  No.

Page 116

1      Q.  Right?
2      A.  No.
3      Q.  You never attended any conference
4  where that policy was reviewed with you; is
5  that correct?
6      A.  Correct.
7      Q.  And you never kept a copy of that
8  policy in your office; is that correct?
9      A.  That is correct.
10     Q.  But you could have accessed it through
11  the CVS system, correct, if you had wanted to,
12  right?
13     A.  I'm not aware of that.  I have -- I
14  don't know it that well.
15     Q.  So let's go to the next document, if
16  you would.  Number 48.
17
18     (Exhibit No. 48 marked for
19  identification.)
20
21  BY MR. BAKER:
22     Q.  This is Bates number 24877.  This is
23  revision date 12/11/09.
24     You understand that what this means is

Page 117

1  that this is a copy of the policies and
2  procedures that was the standard operating
3  procedures manual for CVS as of 12/11/09?
4      Do you understand that?
5        MR. BUSH:  Objection.
6      A.  Again, the first time seeing the
7  document.
8  BY MR. BAKER:
9      Q.  Well, let me just cover it this way.
10  This says "CVS Distribution Center" at the
11  top, correct?
12     A.  Correct.
13     Q.  That's you, CVS Distribution Center,
14  correct?
15        MR. BUSH:  Objection.
16  BY MR. BAKER:
17     Q.  Logistics, right?
18     A.  I -- I had responsibility for the
19  distribution center, but in 2007 and in 2009
20  when these revisions were being made, this
21  area of responsibility did not reside within
22  logistics.
23     Q.  Did this document, at the top, say
24  that the effective date was 12/1/07?

Page 118

1    A. Yes.

2    Q. Did this document say that the

3 revision date of the document was 12/11/09?

4    A. Yes.

5    Q. Let me ask you to turn to page 24916

6 of that document. I'll review it with you, if

7 you would like. You can just look at my copy.

8 Okay?

9      You see where it says "Suspicious

10 Order Monitoring, SOM."

11      Do you see that?

12    A. Yes, yeah.

13    Q. We're on Bates number 24916.

14    A. Okay.

15    Q. Do you see that? Do you see it where

16 it says --

17    A. Yes.

18    Q. -- "Suspicious Order Monitoring"?

19    A. Yes.

20    Q. Do you see that?

21    A. I do.

22    Q. Now turn over to the next page. Do

23 you see under Paragraph B here where it says

24 "These parameters are documented in the SOP,"

Page 119

1 then it's a blank, and it says "order quantity

2 parameters for controlled drugs being

3 developed and written."

4      Do you see that?

5    A. I do.

6    Q. Let's go back and see what that means.

7 All right?

8    A. Okay.

9    Q. Go back a page, if you would, to

10 24916.

11      It says "Prior to distribution, all

12 controlled substance orders are screened and

13 reviewed by the host system prior to being

14 transmitted to the warehouse operating

15 system."

16      Do you see that?

17    A. I do.

18    Q. It says, "This process is performed

19 through the application of by item and by

20 store order quantity parameters."

21      Do you see that?

22    A. I do.

23    Q. But then the next page, you see where

24 it says, "These parameters are documented in

Page 120

1 the SOP order quantity parameters for

2 controlled drugs being developed and written."

3      Do you see that?

4    A. I do.

5    Q. So do you understand, at that point,

6 that there really is no completed SOM policy

7 in place, that these parameters are being --

8 at least at that time, being developed and

9 written?

10      Do you understand that?

11      MR. BUSH: Objection.

12    A. I am not totally clear on what this is

13 meant from the interpretation of what's being

14 meant here.

15      MR. BAKER: Let's go to Exhibit

16 No. 57, please.

17

18      (Exhibit No. 57 marked for

19 identification.)

20

21 BY MR. BAKER:

22    Q. This is Bates number 34234. It's an

23 e-mail that's dated Friday, April 3, 2009,

24 from Amy Propatier.

Page 121

1      You know who Amy Propatier was at that

2 time, correct?

3    A. Correct.

4    Q. She was the DEA compliance coordinator

5 for CVS in the corporate office, correct?

6    A. Correct.

7    Q. It says here, "Good morning. Attached

8 the is the DEA SOP which was implemented in

9 December 2007. We have made some recent

10 updates to the SOP. Please note we have

11 updated the record retention period from five

12 years to two years. Also, the SOM section is

13 still not included in the SOP."

14      Is that what that says?

15    A. Again, first time seeing this

16 document.

17      (Witness reviews document.)

18    Q. Is that what the document says?

19    A. Yes.

20    Q. And the document goes on to say, "In

21 the event of an audit and the question comes

22 up, please direct them to corporate, Frank or

23 myself, for the explanation of the program."

24      Do you see that?

Page 122

1    A.  I do.
2    Q.  So as of April 3, 2009, according to
3  this document, there was no suspicious order
4  monitoring section included within the
5  standard operating procedure of CVS, correct?
6    A.  I am, again, not clear that there was
7  or wasn't.
8    Q.  At least that document says so, right?
9    A.  Yeah, again, you know...
10    Q.  Does the document say that?
11    A.  The document appears to say that, but
12  I don't know that it's factual.
13    Q.  This is the DEA compliance
14  coordinator --
15    A.  Yeah.
16    Q.  -- saying that?
17    A.  (Witness nodding.)
18    Q.  Correct?
19    A.  Yes.
20    Q.  Right?
21    A.  Yes.
22    Q.  So let me show you Exhibit 94.
23
24       (Exhibit No. 94 marked for

Page 123

1  identification.)
2
3  BY MR. BAKER:
4    Q.  This is an e-mail dated November 5,
5  2009 from John Mortelliti.  And you know him
6  at that time to be what within -- what -- in
7  what position?
8    A.  Loss prevention.
9    Q.  Loss prevention.  And he says here, "I
10  am trying to get a rough draft SOM SOP to you
11  prior to the meeting.  This is a big issue
12  with CVS and the DEA."
13       Is that what that document says?
14    A.  That's what it says.
15    Q.  Let me show you Exhibit 98, please.
16
17       (Exhibit No. 98 marked for
18  identification.)
19
20  BY MR. BAKER:
21    Q.  This is a document dated August 23,
22  2010 from John Mortelliti in loss prevention
23  to Frank Devlin.
24       Who is Frank Devlin at that time?

Page 124

1    A.  He was the senior director of loss
2  prevention.
3    Q.  So they're copying Amy Propatier, who
4  at that time was the DEA compliance
5  coordinator for CVS, correct?
6    A.  Correct.
7    Q.  You see where it says, "Good morning,
8  Amy.  I attached the PSE SOP in this e-mail.
9  The control drug SOP is being reviewed by
10  counsel.  I hope to receive it back today."
11       Do you see that?
12    A.  I do.
13    Q.  Do you know whether or not at that
14  point the control drug SOP or the SOM,
15  suspicious order monitoring, section of the
16  SOP was even in effect?
17    A.  I do not.
18    Q.  Do you know?
19    A.  I do not.
20       MR. BAKER:  Let's go to Exhibit
21  70.
22
23       (Exhibit No. 70 marked for
24  identification.)

Page 125

1
2  BY MR. BAKER:
3    Q.  If you go back to Exhibit 98.  Let's
4  go back to Exhibit 98 at the bottom.
5       There's another e-mail that afternoon
6  -- or that morning, August 23, and it says --
7  from Frank Devlin to John Mortelliti, copying
8  Amy Propatier.
9       It says, "Good morning, John.  Can you
10  work with Amy to get the PSE, IRR and control
11  drug IRR inserted into our DEA SOP under
12  suspicious order monitoring?  We promised it
13  to the DEA by Wednesday."
14       Do you see that?
15    A.  I do see that on the document.
16    Q.  Is that what the document says?
17    A.  That's what it says.
18    Q.  You know these people to be employed
19  by CVS at the time, correct?
20    A.  Correct.
21    Q.  Within loss prevention and DEA
22  compliance, correct?
23    A.  They were part of the loss prevention
24  and DEA compliance, correct.

Page 126

1  Q.  Did you know at this time that the DEA
2  was in the midst of doing a visit to one of
3  the distribution centers, the Indiana
4  distribution center?
5  A.  I don't recall.
6  Q.  Did you know that was why this was
7  going on, that they were trying to insert it
8  while the DEA was there?
9  A.  No.
10       MR. BUSH:  Objection.
11 BY MR. BAKER:
12  Q.  Let me ask you to look at No. 70.
13 Exhibit 70.  And this is an e-mail -- we're on
14 57751, Exhibit 70.
15       This is an e-mail from Henry (sic)
16 Mortelliti to Greg Brantley, with a copy to
17 Frances Devlin.
18       Can you tell me who Greg Brantley was
19 at that time?
20  A.  I don't remember who he was.  I don't
21 know.
22  Q.  But you explained that Mr. Mortelliti
23 and Mr. Devlin worked with CVS, correct?
24  A.  Correct.

Page 127

1  Q.  And Mr. Devlin was in what department?
2  A.  Loss prevention.
3  Q.  And Mr. Mortelliti was in what
4  department?
5  A.  Loss prevention.
6  Q.  Loss prevention meaning what?  What
7  are they trying to prevent the loss of in your
8  department?
9  A.  They have -- loss prevention had broad
10 responsibilities for asset protection,
11 buildings, you know, doing background checks.
12  Q.  Asset protection.  I'm sorry.
13       MR. BUSH:  Hold on.  Hold on.
14 BY MR. BAKER:
15  Q.  Go ahead.
16       MR. BUSH:  Let him answer,
17 please.
18 BY MR. BAKER:
19  Q.  Go ahead.
20  A.  The distribution centers, the
21 facilities, making sure there's no theft
22 taking place in the buildings, in the truest
23 sense of being a loss prevention manager.
24  Q.  This e-mail from Mr. Mortelliti to

Page 128

1  Mr. Brantley says -- regarding the control
2  drug IRR draft, it says "This needs to be
3  implemented as soon as possible in your area."
4       Is that what it says?
5  A.  That's what it says, yeah.
6  Q.  Do you know what a control drug IRR
7  is?
8  A.  I don't recall what the IRR is.
9  Q.  Now let me make sure I understand
10 this, and you tell me what exactly, your
11 position, just tell me the title --
12  A.  Yeah.
13  Q.  -- between 2012 until you resigned in
14 2017.  It was the vice president, correct?
15  A.  (Witness nodding.)
16  Q.  Tell me.
17  A.  Senior VP of logistics.
18  Q.  Senior vice president of logistics,
19 correct?
20  A.  Correct.
21  Q.  And during the period from 2012 to
22 2014, October, the suspicious order monitoring
23 program was run under your department,
24 correct?

Page 129

1  A.  There was a transition period that
2  took place.  Prior to that, the entire SOM
3  program was managed by loss prevention
4  organization.
5  Q.  Right, but during 2014 it was
6  transferred -- during 2012 it was transferred
7  out of that department into logistics,
8  correct?
9  A.  Correct.
10  Q.  And that's the department you were
11 head of?
12  A.  Correct.
13  Q.  Right?
14  A.  Correct.
15       MR. BAKER:  Let's go to No. 97,
16 please.
17
18       (Exhibit No. 97 marked for
19 identification.)
20
21 BY MR. BAKER:
22  Q.  This is an e-mail with an attachment
23 of a DEA SOP for suspicious order monitoring,
24 and it's dated 8/25/10 from Amy Propatier to

Page 130

1    Annette Lamoureux.
2         Do you see that?
3    A.  I do.
4    Q.  Do you know who Annette Lamoureux
5    was?
6    A.  I don't recall who she was.
7    Q.  But you know at the time this e-mail
8    was generated, 8/26/2010, that Amy Propatier
9    was the DEA compliance coordinator for CVS in
10   the corporate office, correct?
11   A.  Correct.
12   Q.  The corporate office was located in
13   Woonsocket, Rhode Island?
14   A.  Correct.
15   Q.  So you see here where it says, "Can
16   you please post.  We added the suspicious
17   order monitoring."
18        Do you see that?
19   A.  Yes.
20   Q.  Turn to the next page of that
21   document, at the top.
22   A.  Yes.
23   Q.  Do you see where it says, "Revision
24   date, 8/25/10"?

Page 131

1         Do you see that?
2    A.  I do.
3    Q.  And now if you go back to the page
4    before that, it says, "DEA SOP 8/25/10."
5         Do you see that?
6    A.  I do.
7    Q.  So this appears to you that the
8    suspicious order monitoring section of the
9    policies and procedures, or the SOP, standard
10   operating procedure for CVS was first placed
11   into the SOP on 8/25/10 by Amy Propatier?
12        MR. BUSH:  Objection.
13   BY MR. BAKER:
14   Q.  Is that what that looks like?
15        MR. BUSH:  Objection.
16   A.  Not clear.
17   BY MR. BAKER:
18   Q.  Not clear?
19   A.  No.
20   Q.  Have you talked to Miss Propatier
21   about that?
22   A.  No.
23   Q.  Have you read anything that she has
24   testified to in this case?

Page 132

1    A.  No.
2         MR. BAKER:  Let's go to Exhibit
3    81.
4
5         (Exhibit No. 81 marked for
6    identification.)
7
8    BY MR. BAKER:
9    Q.  What are DEA speaking points?
10   A.  Not sure.
11   Q.  Have you ever participated in an
12   inspection by the DEA of any one of the
13   distribution centers?
14   A.  I have not.
15   Q.  Did you know that there was a DEA
16   inspection of the Indiana facility in 2010?
17        MR. BUSH:  Indiana -- you
18   mean --
19   BY MR. BAKER:
20   Q.  Indiana distribution -- did you
21   know -- strike that question.
22        Did you know there was a DEA
23   inspection of the Indiana distribution center
24   in 2010?

Page 133

1    A.  I don't recall.
2    Q.  Let me show you Exhibit 81.  It talks
3    about DEA speaking points.
4         This is John Mortelliti in loss
5    prevention sending this to several people.
6    Who are these people?  Ron Richmond?
7    Richard --
8    A.  Sanitate.
9    Q.  -- Sanitate.  And Matthew Forster.
10   Who are these people?
11   A.  These are individuals that worked in
12   the distribution center.
13   Q.  Which distribution center?
14   A.  At that time, I'm not sure, but it
15   appears that they worked in possibly New
16   Jersey and -- I think it's New Jersey.
17   Q.  So if you look down below that, it
18   says -- an e-mail from John Mortelliti to
19   several people.
20        Who are these people, September 1,
21   2010?
22        Maravin Jamagin.  Do you know who he
23   is?
24   A.  These were all LP individuals.

Page 134

1  Q.  LP?
2  A.  Loss prevention.
3  Q.  Loss prevention people?
4  A.  Yes.
5  Q.  Correct?
6  A.  Yes.
7  Q.  Were they in various different
8  distribution centers, or were they all in
9  corporate or where were they?  Or do you know?
10  A.  I don't know.
11  Q.  It says "Team" -- now explain to me
12  what team we're talking about?  Is this the
13  loss prevention team?
14        MR. BUSH:  Objection.
15  A.  I'm not clear.  I'm not sure if it's
16  interpreted as the -- I really don't know.  I
17  don't know.
18  BY MR. BAKER:
19  Q.  But all these people worked in loss
20  prevention, correct?
21  A.  I'm not sure.
22  Q.  At the time of this e-mail, was the
23  SOM program part of the loss prevention
24  department?

Page 135

1  A.  Yes.
2  Q.  So it says, "Team, these are the final
3  approved speaking points for the DEA agents if
4  they come to one of your facilities and
5  question suspicious monitoring.  It is okay to
6  share this document.  Please be sure your team
7  understands that before presenting it so it
8  doesn't look like a prop instead of a tool."
9        Is that what that document says?
10  A.  That's what it says.
11  Q.  What do you -- how would you define a
12  prop?
13  A.  I -- I'm not sure in the context of
14  what John is trying to -- trying to infer
15  here, I really don't -- I don't know.
16  Q.  A prop is something that's not true,
17  correct?
18        MR. BUSH:  Objection.
19  A.  I am not sure about that.
20  BY MR. BAKER:
21  Q.  A prop is something like a facade.
22  It's meant to be something that's not really
23  true.  It's just out there to try to fool
24  somebody.  Correct?

Page 136

1        MR. BUSH:  Objection.
2  A.  I -- I don't -- I don't agree with
3  that.  I'm not sure.
4  BY MR. BAKER:
5  Q.  So if we go to page 75306, which is
6  about the seventh page down in that document,
7  it talks about responsibilities.  It's page 7
8  of that document.
9        Now, the first responsibility, it says
10  that the DC Rx, review report IRR daily,
11  determine whether variances are within
12  acceptable ranges.
13        Correct?
14  A.  That's what the article -- the
15  document says.
16  Q.  Now, this document that we're talking
17  about, look on the front page.  It's called
18  "Suspicious Order Monitoring for PSE and
19  Controlled Drugs, August 27, 2010," correct?
20  A.  Correct.
21  Q.  That's what the document is that we're
22  looking at, right?
23        MR. BUSH:  Objection.
24  BY MR. BAKER:

Page 137

1  Q.  Is that right?
2        MR. BUSH:  He's never seen the
3  document.
4        MR. BAKER:  That doesn't matter.
5  I'm just asking is that what the document
6  says.
7        MR. BUSH:  Well, that he can
8  answer.
9  A.  That's what the document says, but
10  this is a first time I'm seeing this document.
11  BY MR. BAKER:
12  Q.  Now let me make sure I understand.
13        During the period of time that you
14  were employed at CVS, you were never provided
15  this document right here?
16  A.  I was never provided this document.
17  Q.  Let's look at page 7 of that document.
18        It says, "Responsibilities:  DC Rx."
19        What is a DC Rx?  Distribution center
20  of what?
21  A.  Pharmacy.
22  Q.  Distribution center pharmacy?
23  A.  Yeah, the pharmacy area within the DC.
24  Q.  So there's a specific section within

Page 138

1    the distribution center called pharmacy,
2    correct?
3        A.  Correct.
4        Q.  It says "Review the IRR -- review
5    report IRR," right?
6        A.  That's what it says.
7        Q.  Now, this is that report -- I'm
8    talking about an internal review report that I
9    asked you about earlier, correct?
10       A.  Correct.
11       Q.  You don't know what an IRR is,
12   correct?
13       A.  I did not.  At that time, I did not
14   have any visibility to the IRR report.
15       Q.  Let me see if we can answer that one
16   yes or no.
17           You do not know what an IRR report is?
18       A.  No.
19       Q.  Correct?
20       A.  Correct.
21       Q.  So it says "Review IRR -- review
22   report IRR daily and determine whether
23   variances are within acceptable ranges."
24           Is that what it says?

Page 139

1        A.  That's what it says.
2        Q.  Do you know what "variances in
3    acceptable ranges" even meant in the context
4    of an IRR?
5        A.  No.
6        Q.  Now, let's move to page 10 of that
7    document.
8            You see under FAQ -- frequently asked
9    questions, that's what that means, right?
10       A.  Correct.
11       Q.  It says, "Why is the DC responsible to
12   review suspicious orders?"
13           Do you see that question?
14       A.  I do.
15       Q.  And this document says, "The DC, as a
16   separate DEA registrant, is responsible for
17   products shipped from the facility."
18           Correct?
19       A.  That's what it says.
20       Q.  It says "The DEA regulations require
21   all distributors to report suspicious orders,"
22   correct?
23       A.  That's what the says, yes.
24       Q.  It says "Therefore, the DC, the

Page 140

1    distribution center, must review the orders of
2    PSE, EPA controlled drugs and initiate an
3    investigation," because the DC is the entity
4    that picks and distributes the product,
5    correct?
6        A.  Correct.
7        Q.  The DC is -- how many DCs were there
8    at the time in 2010, approximately?
9        A.  2010?
10       Q.  Approximately?
11       A.  It could have been ten DCs.
12       Q.  And that continued to increase for --
13   every year thereafter up until now, correct?
14       A.  Yes.
15       Q.  Where now we're -- we have -- there
16   are 19 distribution centers for CVS,
17   correct?
18       A.  Correct.
19       Q.  Go to Exhibit 97, please.  We already
20   did that.
21           So let me ask you to go back to
22   Exhibit 97.  Do you have that over there?
23           And this is the e-mail from Amy
24   Propatier dated 8/26/2010 where she's talking

Page 141

1    about the 8/25/10 SOM being inserted into the
2    SOP.
3            Do you see that?
4        A.  I do.
5        Q.  Now, I want you to -- what's attached
6    to it is that CVS distribution center standard
7    operating procedures manual that's updated
8    8/25/10, correct?
9        A.  Correct.
10       Q.  If you go to page 88996 of that
11   document, which is CVS 88996 Bates number,
12   pull that up.  88966.
13           It's approximately 40 pages down in
14   the document.
15           At the bottom it has Roman numeral
16   VIII-VI.
17               MR. BUSH:  Have you got it?
18               THE WITNESS:  966, right?
19               MR. BAKER:  996.
20               MR. BUSH:  996?
21               THE WITNESS:  996.  Sorry.
22               MR. BUSH:  You can use mine.
23               THE WITNESS:  I've got it.
24   BY MR. BAKER:

Page 142

1    Q.   Now at the bottom, it says,
2  "Prevention and monitoring of controlled drug
3  and PSE suspicious orders."
4        Do you see that?
5    A.  I do.
6    Q.   Then it goes on to the next page,
7  where it talks about items reviewed -- No. 2,
8  the top of the next page.
9    A.  Yeah.
10   Q.   Highlight that whole paragraph.
11       There it says, "CVS has established
12 controlled drug order thresholds, which will
13 flag on the IRR, item review report, as well
14 as field loss prevention notice or loss
15 prevention software reports."
16       Is that what that says?
17   A.  That's what the document says.
18   Q.   It says, "These thresholds are the
19 primary tool to prevent stores from purchasing
20 excessive or potentially suspicious controlled
21 drug orders."
22       Is that what that says?
23   A.  That's what it says.
24   Q.   It says, "These thresholds are based

Page 143

1  on historical trends of sales."
2        Is that what it says?
3    A.  Yes.
4    Q.   It says, "Stores may order more than
5  the historical average.  However, the DC may
6  not ship amounts that exceed these thresholds
7  if it is believed to be suspicious."
8        Correct?
9    A.  Correct.
10       MR. BUSH:  Correct meaning
11 that's what it says?
12 BY MR. BAKER:
13   Q.   That's what it says, correct?
14   A.  That's what it says.
15   Q.   Now, you understand that this is the
16 document that you never read while you were
17 employed by CVS, correct?
18   A.  Correct.
19   Q.   And you didn't even know that
20 thresholds were the primary tool to prevent
21 stores from purchasing excessive or
22 potentially suspicious controlled drug orders
23 while you were employed at CVS, did you?
24   A.  No.

Page 144

1    Q.   You didn't even know that that's what
2  the premise upon which the item review report
3  was based; is that correct?
4    A.  That is correct.
5    Q.   So let me go down to Paragraph 4
6  there.  It says, "Currently the item review
7  report for controlled drugs is being reviewed
8  at a central location in New Jersey.  During
9  the month of September 2010, the report will
10 be transitioned to each pharmacy DC, and the
11 following procedures will occur."  Then it
12 goes on to the following procedures.
13       Do you see that?
14   A.  I do.
15   Q.   What I'm concerned about is those
16 first couple of sentences.
17       It says, "Currently the item review
18 report for controlled drugs is being reviewed
19 at a central location in New Jersey."
20       Do you see that?
21   A.  I do.
22   Q.   So this is 8/25/10 when this is --
23 this procedure is being reported, correct?
24       MR. BUSH:  Objection.

Page 145

1  BY MR. BAKER:
2    Q.   When this document is dated, 8/25/10,
3  correct?
4    A.  That's when the document is dated,
5  correct.
6    Q.   And New Jersey, that would be
7  Lumberton, New Jersey; is that correct?
8    A.  That is correct.
9    Q.   Is that where John Mortelliti was
10 located?
11   A.  I believe so.
12   Q.   So was he doing item review reports
13 all by himself in Lumberton, New Jersey at
14 that time or not?
15   A.  I don't know.
16   Q.   It says, "During the month of
17 September 2010, the report will be
18 transitioned to each pharmacy DC."
19       Do you see that?
20   A.  I see that on the document.
21   Q.   Now, each pharmacy DC would be the
22 distribution center -- each distribution
23 center and then the pharmacy section within
24 the distribution center, correct?

Page 146

1    A.  Correct.
2    Q.  Now, do you remember where I went over
3  the documents with you previously saying that
4  this is the responsibility of each
5  distribution center to carry out the SOM
6  process?
7        Do you remember that?
8    A.  Yes.
9    Q.  And that would mean each distribution
10 center had to do that, right?
11   A.  Correct.
12   Q.  Not one location, but each
13 distribution center, correct?
14   A.  That's -- that's my understanding,
15 yes.
16   Q.  So let's go to the next document,
17 No. 36.
18
19       (Exhibit No. 36 marked for
20 identification.)
21
22 BY MR. BAKER:
23   Q.  This is a Bates number 12286.  This is
24 an e-mail dated 12/26/11 from Paul Lawson to

Page 147

1  Joseph Scholl.
2        Do you see that?
3    A.  I do.
4    Q.  Who was Paul Lawson at the time of
5  this e-mail within the context of CVS?
6    A.  I -- I don't -- I don't know -- I
7  don't know the individual.
8    Q.  How about Joseph Scholl?
9    A.  I don't know him.
10   Q.  It says, "Subject:  IRR bullet
11 points."
12       Do you see that?
13   A.  Subject...
14       (Witness reviews document.)
15   Q.  Right here, "Subject:  IRR" --
16   A.  Yes.
17   Q.  -- "bullet points."
18   A.  Yes, yes.
19   Q.  And it says here, "Joe," it says, on
20 the first paragraph there, "I've attached a
21 PowerPoint presentation that we've referred to
22 in the past for the DEA."  Correct?
23   A.  Correct.
24   Q.  Now I've shown you that PowerPoint

Page 148

1  presentation, correct?
2    A.  Correct.
3        MR. BUSH:  Objection.
4  BY MR. BAKER:
5    Q.  It explains the role of the IRR and
6  what it is.
7        "You can extract what you think would
8  be pertinent.  Let me know if this works."
9        Is that correct?
10   A.  That's what the document says.
11   Q.  At the bottom, if you highlight the
12 first sentence of the bottom paragraph,
13 please.  It says, "The IRR is mandated by the
14 DEA, therefore, we have to adhere to this
15 monitoring policy."
16       That's what the document says,
17 correct?
18   A.  That's what it says.
19   Q.  Now, you remember -- you know what an
20 IRR is now because I've shown you in the
21 document, correct?
22       MR. BUSH:  Well, I don't think
23 you have shown him an IRR.
24 BY MR. BAKER:

Page 149

1    Q.  I've shown you the definition of an
2  IRR in the suspicious order monitoring policy
3  manual, correct?
4    A.  The definition.
5    Q.  The definition.
6    A.  Correct.
7    Q.  Today is the first time you've seen a
8  definition of an internal review report,
9  correct?
10   A.  Correct.
11   Q.  And today is the first time you've
12 seen this e-mail that says "The IRR is
13 mandated by the DEA, therefore, we have to
14 adhere to this monitoring policy," correct?
15   A.  Correct.  I've never seen this before.
16   Q.  Let's go to Exhibit 67, please.
17
18       (Exhibit No. 67 marked for
19 identification.)
20
21 BY MR. BAKER:
22   Q.  Now this is an e-mail -- a series of
23 e-mails, but the first one, sequentially,
24 going from the bottom to the top, correct, on

Page 150

1  this, because it starts November 11, 2012 at
2  7:15 a.m. and then it -- up at the top, it's
3  November 11, 2012, at 7:41 a.m. Correct?
4      Correct?
5      A.  I agree with the dates.
6      Q.  So let's go to the first e-mail.  It
7  says, November 12 -- November 11, 2012, from
8  Christopher Tulley to Pamela Hinkle, copy to
9  Aaron Burtner.
10      Who was Christopher Tulley at the
11  time?
12      A.  He was a project manager.
13      Q.  And Pamela Hinkle?
14      A.  Worked in loss prevention.
15      Q.  Aaron Burtner?
16      A.  He was in loss prevention.
17      Q.  What was Aaron Burtner's role in loss
18  prevention at the time?
19      A.  I think he was the loss prevention
20  supervisor.
21      Q.  What was Pamela Hinkle's position at
22  the time within loss prevention?
23      A.  I believe she was a loss prevention
24  supervisor, also.

Page 151

1      Q.  Let's read it.  It says -- this is
2  from Christopher Tulley, dated November 11,
3  2012 to Pamela Hinkle.
4      It says, "Hi guys.  I met with John A.
5  and Ellen on Friday.  They advised when this
6  program was initially designed, it was meant
7  for the review that Aaron does to be done in
8  all eleven DCs.  Do you know why and when it
9  was consolidated to just one DC doing the
10  review?"
11      Is that what that document says?
12      A.  That's what the document says.
13      Q.  So in November 2012, at this point the
14  program -- the suspicious order monitoring
15  program was consolidated into one distribution
16  center, correct, to your knowledge?
17      MR. BUSH:  Objection.
18      A.  (Witness reviews document.)
19      I don't recall the exact date.  I -- I
20  don't recall.
21  BY MR. BAKER:
22      Q.  And would that be in Indiana that it
23  was being done in 2012?
24      A.  Correct.

Page 152

1      Q.  And that was the -- one of
2  distribution centers over which you were the
3  head, correct?
4      A.  Correct.
5      Q.  Next.  Let's go to Exhibit No. 90.
6
7      (Exhibit No. 90 marked for
8  identification.)
9
10  BY MR. BAKER:
11      Q.  Exhibit No. 90 is Bates number 83367.
12  Now, this is -- look at the bottom.  It talks
13  about a conference call that's to occur
14  Friday, September 24, 2010.
15      Do you see that?
16      A.  I do see that on the document.
17      Q.  It says -- about midway down, it says,
18  "The purpose of this call is to meet DEA
19  compliance for suspicious order monitoring."
20  Correct?
21      A.  Correct.
22      Q.  It says, "Friday, 9/24, logistics will
23  be briefed on the IRR process.  All DCs have
24  confirmed that IRR is available."

Page 153

1      And then it says, "Monday, 9/27 to
2  10/1, all DCs will begin reviewing the IRRs
3  and reporting any questions to the LP manager
4  or John Mortelliti."
5      Correct?
6      A.  That's what -- that's what the e-mail
7  says, correct.
8      Q.  So it appears, at least from this
9  e-mail, that all DCs began reviewing the IRRs
10  on a DC-by-DC basis,
11  distribution-center-by-distribution-center
12  basis, inside each distribution center
13  separately in late September, early October
14  2010, correct?
15      MR. BUSH:  Objection.
16  BY MR. BAKER:
17      Q.  Is that what it looks like?
18      MR. BUSH:  Objection.
19      A.  I -- I am not sure that the way that
20  this is written is accurate or it's clear to
21  me.  I really don't know.
22  BY MR. BAKER:
23      Q.  Where were the IRRs being reviewed
24  during that time?  Do you know?

Page 154

1  A. I don't.
2  Q. Do you know when it was moved out of
3  the DCs into one central location that we're
4  talking about?
5  A. I do not know the exact date, no.
6  Q. Do you know why it was done that way?
7  A. I am not -- I don't.
8  Q. Go back to Exhibit 90, please. And go
9  to Paragraph 10 -- I mean to Slide No. 10.
10  It's on Bates No. 83377.
11  It says there that "The DC, as a
12  separate DEA registrant, is responsible for
13  products shipped from the facility."
14  And then the question is, "Why is the
15  DC responsible to review the suspicious
16  orders?"
17  Do you see that?
18  A. I see that on the document.
19  Q. But at some point, this became a
20  centralized program, not a DC-to-DC program,
21  correct?
22  A. Correct.
23  Q. And you don't know why that became; is
24  that right?

Page 155

1  A. I don't -- I don't recall.
2  Q. Let's go to Exhibit 67, please. You
3  see where on Exhibit 67, it says on
4  November 11, 2012, it says -- go ahead and
5  skip up a little bit if you would, where it
6  says "Hi, guys" -- it starts with "Hi, guys."
7  Bring that up.
8  It says, "I met with John A. and Ellen
9  on Friday. They advised when this program was
10  initially designed, it was meant for the
11  review that Aaron does to be done in all
12  eleven DCs."
13  That's what it says, right?
14  A. That's what the document says.
15  MR. BAKER: Let's go to Document
16  71.
17
18  (Exhibit No. 71 marked for
19  identification.)
20
21  BY MR. BAKER:
22  Q. Exhibit 71. It should just be two
23  pages.
24  This is an e-mail, March 4, 2011. You

Page 156

1  see here where it says, "The IRR process has
2  been shifted to our Knoxville DC with the LP
3  analyst position."
4  Do you see that?
5  A. I see that on the document, yes.
6  Q. Are you aware of whether or not CVS
7  shifted the SOM program out of the DC-to-DC
8  basis into Knoxville as a centralized location
9  at this point?
10  A. I do not. I do not.
11  Q. Is that what it appears to you from
12  reading this?
13  A. Actually, I am not sure.
14  MR. BUSH: Objection.
15  A. I am not sure. I'm not clear on that.
16  BY MR. BAKER:
17  Q. Now, below that, there's an e-mail
18  dated March 10, 2011. And it says, "Hi, John,
19  and all our SOM DEA controlled drug experts."
20  Do you see that?
21  A. I do.
22  Q. It says, "As part of retunement of the
23  IRR SOM program, we're going to need to
24  maintain a list of all controlled drugs with

Page 157

1  their active ingredients, milligrams, et
2  cetera."
3  Is that what that says?
4  A. That's what it says.
5  Q. I'm going to get to that in a little
6  while, but I want you to remember that. Can
7  you remember that for me?
8  A. Yeah.
9  MR. BAKER: Let's go to the next
10  document, Number 43.
11
12  (Exhibit No. 43 marked for
13  identification.)
14
15  BY MR. BAKER:
16  Q. When the first written suspicious
17  order monitoring policy was inserted into the
18  CVS SOP in August of 2010, CVS used a computer
19  software program written by an outside company
20  called Cegedim, which was Ron Buzzeo's
21  company, correct?
22  A. I believe so, yes.
23  Q. Now, you know that -- from reading the
24  prior documents, that it's the responsibility

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 of the registrant, which is the licensee, to
2 design and implement a suspicious order
3 monitoring program, correct?
4     A.  Correct.
5     Q.  It's a nondelegable duty, correct?
6     A.  Correct.
7     Q.  You understand that this company is
8 somebody to whom it appears, at least partway,
9 CVS is trying to help them develop some sort
10 of program; is that right?
11     A.  It -- it appears to be, yes.
12     Q.  And you're not aware of any such
13 program being developed by CVS at any time
14 before 2007, 2008, are you?
15     A.  Before 2007, 2008, no.
16     Q.  CVS had no suspicious order monitoring
17 program before 2008, did they?
18         MR. BUSH:  Objection.
19     A.  Well, I believe -- no.  We had a
20 monitoring program in place before 2008.
21 BY MR. BAKER:
22     Q.  There was no -- no computer-generated
23 suspicious order monitoring program where you
24 could do a historical analysis with before

Page 159

1 2008, correct?
2         MR. BUSH:  Objection.
3     A.  I'm not sure.
4 BY MR. BAKER:
5     Q.  You don't know?
6     A.  I don't know.
7     Q.  Right?
8     A.  I don't know.
9     Q.  All right.  So this was the first
10 time, at least we see, where there is some
11 sort of history as to what went on with the
12 program.  This -- if you turn to the fourth
13 page of that document, it talks about -- at
14 22043.
15         Do you see that?
16         MR. BUSH:  I don't know which
17 document you're talking about.  We don't have
18 it.
19         MR. BAKER:  Exhibit 43.  I'm
20 sorry.
21         MR. BUSH:  Thank you.  And this
22 is Exhibit 43?
23         MR. BAKER:  Right.
24 BY MR. BAKER:

Page 160

1     Q.  Down at the bottom of 22043.  It says,
2 "In December 2008, CCS delivered an initial
3 SOM model to CVS, which CVS integrated into
4 the order management process."
5         Do you see that?
6         MR. BUSH:  So there's two
7 numbering systems here, and they're one --
8 wait a second.  What's going on here?
9         MR. BAKER:  Okay.
10         MR. BUSH:  I see it.  Is it the
11 first page of the -- is that it?
12         MR. BAKER:  Correct.
13         MR. BUSH:  There are two
14 numberings on here.  Then the next page has 43
15 again.
16         MR. BAKER:  Again, these are the
17 way CVS --
18         MR. BUSH:  No, I understand.
19         MR. BAKER:  I'll try to stay
20 consistent with the top number.
21         MR. BUSH:  The top number, okay.
22 The bold number?
23         MR. BAKER:  Yes, sir, I will.
24 BY MR. BAKER:

Page 161

1     Q.  So we're looking at the top number,
2 22043 Bates.
3         Do you see that?
4     A.  Yes.
5     Q.  And it says here, it says, "In
6 December 2008, CCS delivered an initial SOM
7 model to CVS which CVS integrated into their
8 order management process."
9         Do you see that?
10     A.  I do see it on the document.
11     Q.  Do you know what the order management
12 process meant?
13     A.  No.
14     Q.  Do you know that that had to do with
15 the pharmacy order management process?
16         MR. BUSH:  Objection.
17     A.  I do not.
18 BY MR. BAKER:
19     Q.  Go to the next page.  It says, "Recap
20 Of Model Design."
21         Do you see that?
22     A.  I do.
23     Q.  The first sentence says, "The SOM
24 model that has been developed and recommended

Page 162

1 by Cegedim Compliance Solutions," and that's
2 CCS, "has been designed to pend an order which
3 may be classified as a suspicious order for
4 DEA reporting purposes."
5        Is that what the document says?
6     A.  That's what the document says,
7 correct.
8     Q.  You know what a suspicious order
9 orders is because you've seen the definition
10 of it, correct?
11    A.  Correct.
12    Q.  Go to the next page.  Under -- at the
13 bottom of Paragraph 1, it says -- it's
14 underlined.  It says, "The model has been
15 designed so that any order with a score of .15
16 or higher is identified as a suspicious pended
17 and should be investigated further."
18        Do you see that?  Is that what the
19 document says?
20    A.  That's what the document says.
21    Q.  Are you aware what the word
22 "algorithm" means?
23    A.  Well, my interpretation of an
24 algorithm is some type of a mathematical

Page 163

1 model.
2     Q.  And that's what this was, was an
3 algorithm based on a mathematical model,
4 correct?
5        MR. BUSH:  Objection.
6 BY MR. BAKER:
7     Q.  To your knowledge?
8        MR. BUSH:  Objection.
9     A.  Again, I had no responsibility for
10 this tool and I spent no time understanding
11 it.  It was solely the responsibility of the
12 loss prevention organization.  They owned
13 this -- owned this at that time.
14 BY MR. BAKER:
15    Q.  At any time when you became the owner
16 of the SOM program within CVS --
17    A.  Right.
18    Q.  -- did you review any of the
19 algorithms being implemented in the SOM
20 system?
21    A.  No.
22    Q.  Okay.
23    A.  No.
24    Q.  At any time when you were the owner of

Page 164

1 the SOM system within logistics and the senior
2 vice president of logistics at CVS, did you
3 try to get familiar with the SOM
4 algorithm-based program?
5     A.  I had no need to, you know, and,
6 again, my primary reason not to was I had a
7 team of people that were directly accountable
8 within logistics and outside of logistics.
9     Q.  Right.  But you're head of logistics
10 and you're not even checking with them and in
11 the midst of an opioid crisis to find out what
12 the algorithm-based program is?
13        MR. BUSH:  Objection.
14    A.  Again, there was no need for me.  I
15 did not need to get to that level of detail.
16 BY MR. BAKER:
17    Q.  Even though you knew there was an
18 opioid crisis killing over 16,000 people a
19 year?
20    A.  I -- I didn't know that there were
21 16,000 -- that's a fact that I did not know at
22 that time.
23    Q.  But you know now?
24        MR. BUSH:  Objection.

Page 165

1     A.  I do know now.
2 BY MR. BAKER:
3     Q.  Had you known that then, do you think
4 you would you have gotten more involved with
5 understanding the system?
6     A.  I probably would not have gotten into
7 the algorithm detail.  There would have no
8 need for me to do that.
9     Q.  Would you have gotten a little bit
10 more involved in the SOM system had you known
11 that -- the extent of the deaths that were
12 going on with opioids being supplied into the
13 United States system?
14        MR. BUSH:  Objection.
15    A.  Again, in my role, I had broad
16 logistics responsibility and I had a team of
17 people that were subject matter experts on
18 this, you know, and that was -- you know, my
19 role was to make sure I had the right people,
20 you know, being part of this -- part of this
21 process.
22 BY MR. BAKER:
23    Q.  Let's go to Exhibit 102.
24        Let's go to Exhibit 106.

Page 166

1
2
3          (Exhibit No. 106 marked for
4     identification.)
5
6     BY MR. BAKER:
7         Q.  In 2012, was the SOM program under the
8     department of logistics of which you were the
9     head of the department of logistics at that
10    time?
11        A.  I believe that was the timing, yes.
12        Q.  This is an e-mail dated November 27,
13    2012 from Craig Schiavo to Aaron Burtner.
14        Craig Schiavo, at the time, was whom?
15        A.  He was a manager in the compliance --
16    the regulatory compliance area.
17        Q.  And Aaron Burtner was whom within the
18    context of CVS?
19        A.  I do not recall his role.
20        Q.  Who are all these people on here?
21    What were their roles.  Christopher Tulley,
22    Tom Bourque, Dean Vanelli, Judy Hughes, Mark
23    Nicastro, Pamela Hinkle.  What are their
24    roles?

Page 167

1         A.  Chris was a project manager.  Tom
2     Bourque worked in compliance.  Dean worked in
3     the logistics planning area.  Judy was the VP
4     of loss prevention.  And Mark was the director
5     of the Indianapolis facility.  And Pam was, I
6     believe, at that time, in loss prevention.
7         Q.  The attachment, the subject of the
8     meeting is SOM meeting 11/17/of 2012, correct?
9         A.  Appears --
10        Q.  Yes?
11        A.  -- to be, yes.
12        Q.  It says, "I tried to put down some
13    process requirements we should think about
14    when enhancing our SOM system processes that
15    we may be able to use as a guide for this
16    morning's meeting."
17          Correct?
18            MR. BUSH:  You mean correct,
19    that's what it says?
20    BY MR. BAKER:
21        Q.  That's what it says, correct?
22        A.  That's what the document says,
23    correct.
24        Q.  Go to the next page.  We're on Bates

Page 168

1     29868.  It says, "Actions to be taken to
2     enhance CVS process."
3         Do you see that?
4         A.  I see it on the document, correct.
5         Q.  It says, "Current algorithm
6     enhancements to algorithm.  Create new
7     algorithm.  Review our contract with Buzzeo.
8     Were they fired?"
9         Do you see that?
10        A.  I see it on the document.
11        Q.  At that point, was there a move to try
12    to hire another company to enhance the SOM
13    system?
14        A.  I don't recall.  And this is the first
15    time I've seen this document, so...
16        Q.  Are you -- are you aware of what
17    problems were being encountered with attempted
18    implementation of the SOM system using the
19    CCS-based software program?
20        A.  I -- I am not aware of any issues with
21    the -- with that program.
22        Q.  Under Paragraph 1(b)(3), it says, "We
23    need to understand what criteria the algorithm
24    looks at and ensure it complies with DEA

Page 169

1     regulations by monitoring each store's order
2     of unusual size, orders deviating
3     substantially from a normal pattern, and
4     orders of unusual frequency."
5         Correct?
6         A.  That's what the document says.
7         Q.  It says, "Each store should have its
8     own purchases monitored separately based on
9     their purchasing patterns to identify orders
10    deviating from its normal buying pattern and
11    to identify orders of unusual frequency."
12          Is that what it says?
13        A.  That's what it says.
14        Q.  Go to the next page.  Under the last
15    bullet, under Paragraph B, it says, "If an
16    order" -- the last bullet under Paragraph B.
17            MR. BUSH:  Wait a second.  Check
18    mark?
19            THE WITNESS:  Yeah.
20            MR. BUSH:  Okay.
21    BY MR. BAKER:
22        Q.  Yes, check mark.  It says, "If an
23    order is flagged, it should not be cut to a
24    smaller quantity in order to be below a

Page 170

1  threshhold and shipped.  Orders should be all
2  (sic) is shipped if cleared or nothing is
3  shipped."
4        Is that what it says?
5     A.  That's what the document says.
6     Q.  Now, the English is not grammatically
7  correct in that second sentence, but it says,
8  "Orders should be all is shipped if cleared or
9  nothing is shipped," correct?
10    A.  That's what it says.
11    Q.  Let me talk about that sentence above
12 it.
13       "If an order is flagged, it should not
14 be cut to a smaller quantity in order to be
15 below a threshhold and shipped."
16       That's what that document says?
17    A.  That's what it says.
18    Q.  Do you know if that was ever done by
19 anybody in the review process, if they ever
20 saw what might be a suspicious order and just
21 simply cut the order down a bit to bring it
22 within the threshold as opposed to identifying
23 it as a suspicious order and reporting it to
24 the DEA?  Do you know if that ever occurred?

Page 171

1     A.  I do not.
2     Q.  Do you know how many times that may
3  have occurred in the IRR process?
4        MR. BUSH:  Objection.
5     A.  I have no knowledge of it whatsoever.
6        MR. BAKER:  Let's go to 107,
7  please.
8
9        (Exhibit No. 107 marked for
10 identification.)
11
12       MR. BUSH:  107.
13 BY MR. BAKER:
14    Q.  Are you familiar with taking into
15 account populations of where pills are being
16 distributed by CVS distribution centers to CVS
17 pharmacies?
18    A.  No.
19    Q.  Does population have anything to do
20 with what might be considered a threshold of
21 what should be shipped to that particular
22 store, or do you know?
23    A.  I don't know.  I don't know.
24    Q.  Let me show you Exhibit No. 107.  This

Page 172

1  is an e-mail dated 5/5/14 from Mark Nicastro
2  to William Jusko.
3        Do you see that?
4     A.  I do.
5     Q.  It's a DEA closing audit.
6        Let me ask you something.  Do you know
7  what a DEA closing audit is?
8     A.  Yes.
9     Q.  What is it?
10    A.  It's the final review discussion based
11 upon an audit that took place.
12    Q.  And "audit" means when they come do an
13 inspection, the DEA shows up?
14    A.  Right.
15    Q.  And these inspections are supposed to
16 be not tipped off, but they're supposed to be
17 unannounced, correct?
18    A.  Correct.
19    Q.  And this is one that took place in the
20 Indiana distribution center; am I correct?  Or
21 do you know?
22    A.  Again, first time seeing the document.
23 I'm not sure.
24    Q.  It's okay.  It says, "DEA

Page 173

1  investigators Dan Gillen and Andrew Ratcliff
2  set up our closing meeting today with Betsy
3  Ferguson.  Betsy was here, as well as Pamela
4  Hinkle."
5        Correct?
6     A.  That's what it says.
7     Q.  Betsy Ferguson was CVS's lawyer; is
8  that right?
9     A.  That is correct.
10    Q.  And it talks about, under the third
11 paragraph here, it says, "Number 5" -- well,
12 above that, it says, "All four were considered
13 infractions and they can be worked -- and they
14 would work with us to remedy them."
15       But then it says "No. 5," it says,
16 "Failure to maintain an SOM program."
17       Do you see that?
18    A.  That's what it says on the document.
19    Q.  So the DEA was saying to your company
20 on the closing audit that your company was
21 failing to maintain an SOM program, correct?
22       MR. BUSH:  Objection.
23    A.  I am -- I'm not -- I am not clear on
24 that.  I'm not aware of that.

Page 174

BY MR. BAKER:

Q. The DEA, according to Mark Nicastro, told CVS in the DEA closing audit that there was a failure to maintain an SOM program, correct?

MR. BUSH: Objection.

A. I'm not clear on whether that -- what was meant by this.

BY MR. BAKER:

Q. Well, let's try to be extremely clear, using plain English that's not at all ambiguous whatsoever. Okay?

A. Okay.

Q. I want to be very clear, as clear as crystal to you. Okay?

A. Yeah.

Q. So let's read, word for word, what this says.

"5/15/2014, 5:45 p.m., DEA closing audit," at the top.

Do you see those words?

Do you see it right here?

A. Yes.

Q. Do you see where it says, "DEA

Page 175

investigators Dan Gillen and Andrew Ratcliff set up a closing meeting for today with Betsy Feguson. Betsy was here as well as Pamela Hinkle."

Is that clear?

A. It's clear.

Q. It says, "They cited five issues."

Is that clear?

A. Yes.

Q. And the fifth issue, "Number 5, Failure to maintain an SOM program," correct?

A. Correct.

Q. So does that appear to you in plain English that the DEA investigator said that there was a failure to maintain an SOM program? Yes or no?

A. Based upon the way this is written, yes.

Q. And then it goes on to state, "Dan Gillen recited the exact same thing he has been saying since day one. They see a lot of pills going through CVS in small towns and it has to be excessive, yet he has never seen a

Page 176

report cross his desk from CVS about a suspicious order in the three years that he has been here."

Correct?

A. That's what the e-mail says.

MR. BAKER: Let's go off the record for just a second.

THE VIDEOGRAPHER: The time is 11:47 a.m., and we're off the record.

(Off the record from 11:47 a.m. to 11:49 a.m.)

THE VIDEOGRAPHER: The time is 11:49 a.m., and we're on the record.

BY MR. BAKER:

Q. You see Exhibit 129 in front of you?

A. I do.

Q. This is an e-mail from Dan Gillen.

Now you know who Dan Gillen is because you just saw that he is a DEA investigator, correct?

MR. BUSH: Objection.

Page 177

A. Yes.

BY MR. BAKER:

Q. Let me ask you something. Did the e-mail that I showed you before now indicate who Dan Gillen was?

A. I believe it did.

Q. And it indicated to you that he was a DEA investigator, correct?

A. Correct.

Q. Okay. So it says, from Dan Gillen to Mark Nicastro, 11/25/2013.

Do you see that?

A. Yes.

Q. And that says, "CVS Store No. 06880 and 6757."

Do you know where those are located?

A. I do not.

Q. This says "Mark" -- now, this is Mark Nicastro, correct?

A. Correct.

Q. And he's in the Indiana DC at the time, correct?

A. Correct.

Q. It says, "CVS Store No. 06880 ordered

Page 178

1,886,600 dosage units of hydrocodone,
Drug Code No. 9193, between January 1, 2012
and October 2013."
    Correct?
    A.  That's what the article says -- the
e-mail says.
    Q.  And it says, "...of which, 1,766,000
tablets of hydrocodone were shipped from your
facility."
    Correct?
    A.  That's what it says.
    Q.  "The pharmacy is located in Vincennes,
Indiana with a population of approximately
18,000."
    Correct?
    A.  That's what the e-mail says, correct.
    Q.  Do you have any idea why there would
be a need to supply that many hydrocodone
pills to a town that had only 18,000 people?
    A.  I have no idea.
    Q.  Would that be considered excessive in
the way of supply compared to population?
            MR. BUSH:  Objection.
    A.  I don't know.

Page 179

BY MR. BAKER:
    Q.  You don't know?
        You can't divide 1,886,600 into 18,000
over a period of that months -- that many
months, which is 18 months, and tell me
whether or not you think that's excessive for
every man, woman, and child in that particular
location?
            MR. BUSH:  Objection.
    A.  Again, I don't have an opinion on -- I
don't know what's going on in the market.  I
don't know.  I don't know.
BY MR. BAKER:
    Q.  How many other pharmacies are located
in that city?
    A.  I have no idea.
    Q.  How many other pharmacies were selling
hydrocodone in that city?
    A.  I have no idea.
    Q.  Why would there be a need to send that
many pills into a CVS pharmacy over that
period of time for sale to the public in a
population of 18,000 people?
    A.  I don't know.

Page 180

    Q.  Your suspicious order monitoring
system did not pick this up and report it as a
suspicious order, did it?
            MR. BUSH:  Objection.
    A.  I am not aware that it did or didn't.
BY MR. BAKER:
    Q.  You're not aware of this being
reported as a suspicious order, are you?
    A.  I have -- this is the first time I'm
seeing this document; first time I'm made
aware of it.
    Q.  Look at the next sentence.  It says,
"Additionally, CVS Store No. 6757, located in
Columbus, Indiana, ordered a total of
2,012,400 tablets, of which your facility
provided 1,756,300 tablets from January 1,
2012 through October 2013.  The population of
Columbus, Indiana is approximately 45,000."
    Do you see that?
    A.  I see it on the document, yeah.
    Q.  Was this reported as a suspicious
order in any of these orders -- strike the
question.
        Were any of the orders from the CVS

Page 181

distribution center that supplied this store
during that period of time reported as
suspicious by CVS to the DEA?
    A.  I don't know.
            MR. BUSH:  Objection.
    A.  I don't know.
BY MR. BAKER:
    Q.  Do you know why there would be any
justification for sending that many pills to a
town that had that small of a population --
            MR. BUSH:  Objection.
    Q.  -- over that period of time?
    A.  I --
            MR. BUSH:  Objection.
    A.  I don't have an opinion.  I don't
know.
BY MR. BAKER:
    Q.  Can you justify that at all from the
standpoint of CVS sending that many pills from
a distribution center to its pharmacies over
that period of time in a population of a town
that has only 45,000 people?
            MR. BUSH:  Objection.
    A.  I can't -- I can't defend or disagree

Page 182

1  with it. I really don't know.
2  BY MR. BAKER:
3      Q.  You don't know?
4      A.  No.
5      Q.  It could be diversion? You just don't
6  know, correct?
7      A.  I don't know.
8      Q.  The same thing with respect to the top
9  order by the top store there, where they're
10  sending one- -- almost 1.9 million dosages
11  over a period of 18 months to a population of
12  18,000. That could be diversion, you just
13  don't know?
14          MR. BUSH: Objection.
15  BY MR. BAKER:
16      Q.  Correct.
17      Is that right?
18          MR. BUSH: Objection.
19      A.  Again, I have -- I have no -- no
20  knowledge of, you know, I have no idea.
21  BY MR. BAKER:
22      Q.  Was any of this picked up -- any of
23  the orders for these opioids picked up within
24  the CVS monitoring system and reported to the

Page 183

1  DEA as a suspicious order?
2          MR. BUSH: Objection.
3      A.  I have no knowledge of that. I don't
4  know.
5  BY MR. BAKER:
6      Q.  It says, "Both stores have purchased a
7  large quantity of hydrocodone, given their
8  population."
9      Do you see that?
10      A.  I see it on the document.
11      Q.  You have no reason to disagree with
12  that statement, do you?
13          MR. BUSH: Objection.
14      A.  It's -- I -- I don't have an opinion.
15  It's just -- it's a fact -- a point made by
16  Dan. I just -- I really don't know whether
17  it's exorbitant or not, honestly.
18  BY MR. BAKER:
19      Q.  So let me ask you, just agree or
20  disagree -- you have no reason to disagree
21  with this statement: "Both stores have
22  purchased a large quantity of hydrocodone,
23  given their population."
24      You have no reason to disagree with

Page 184

1  that statement; is that correct?
2          MR. BUSH: Objection.
3      A.  I really don't know. I mean, I don't
4  know whether it's an exorbitant amount or not.
5      I mean, it's -- again -- again, if you
6  want to ask the question a little bit
7  differently, I'll try to respond, but I'm not
8  clear.
9  BY MR. BAKER:
10      Q.  Let's see if you can answer this
11  question. Do you disagree with that
12  statement? Yes or no?
13      A.  I have no basis of agreeing or
14  disagreeing. Again, I don't know how factual
15  it is. If the -- it's possible that the data
16  might be wrong. I have no idea.
17      Q.  Have you gone back and checked that
18  data?
19      A.  I have --
20          MR. BUSH: Objection.
21      A.  I have not -- I was not involved with
22  that. I have no visibility to it.
23  BY MR. BAKER:
24      Q.  Do you doubt the efficacy of that

Page 185

1  data?
2          MR. BUSH: Objection.
3      A.  I don't know.
4  BY MR. BAKER:
5      Q.  Have you ever checked ARCOS data to
6  see how much is being distributed by the
7  distribution centers to those two stores
8  during that period of time?
9      A.  I did not.
10          MR. BUSH: Objection.
11  BY MR. BAKER:
12      Q.  Do you know what ARCOS data is?
13      A.  I was not close enough to it, no.
14      Q.  Do you know what ARCOS data is? Yes
15  or no?
16      A.  No.
17      Q.  During the entire time that you were
18  employed at CVS, you had no idea what ARCOS
19  data is, correct?
20      A.  I did not have to be directly involved
21  in looking at the data or managing the data in
22  my role.
23      Q.  I simply asked did you know what ARCOS
24  data was. I didn't ask you if you managed it.

Page 186

1    A.  I don't remember what it was.

2    Q.  Do you know what ARCOS even is?

3    A.  Yeah, I just know it's a report,

4  that's all.

5    Q.  Do you know who generates that report?

6    A.  I don't recall.

7    Q.  Do you know what the report is for?

8    A.  I don't recall.

9    Q.  Do you know what it reports?

10   A.  I don't -- I don't recall.

11   Q.  I want to make sure I understand.

12       From 2012 to 2014 -- actually, from

13  2012 to 2017, you were the senior vice

14  president of logistics, correct?

15   A.  Correct.

16   Q.  And during that period of time, the

17  suspicious order monitoring system program for

18  narcotics was under the logistics department,

19  correct?

20   A.  It was part of the logistics

21  organization, correct.

22   Q.  As we sit here today in 2018, you have

23  no idea what "ARCOS" means, correct?

24   A.  I don't recall -- I can't tell you

Page 187

1  exactly what the ARCOS report is.

2    Q.  Let me just ask you, do you know what

3  ARCOS means?  Yes or no?

4    A.  No.

5    Q.  And I know you say you don't know

6  exactly what it is.  You don't know at all

7  what it is; is that correct?

8    A.  Correct.

9        MR. BAKER:  Could you pull

10  No. 34, please.

11

12     (Exhibit No. 34 marked for

13  identification.)

14

15  BY MR. BAKER:

16   Q.  Do you remember how we talked about

17  that inspection of the facility in Indiana was

18  occurring?

19       Do you remember that?

20   A.  Yes.

21   Q.  Do you remember how that closing

22  e-mail was generated in May of '14?

23       Do you remember that?

24   A.  Yes.

Page 188

1    Q.  Do you see what's before you is

2  Exhibit No. 34, which is -- it starts with

3  Bates 10529 and goes through Bates No. 10532?

4  Do you see that?

5    A.  I do see that.

6    Q.  I'll represent to you that these are

7  written notes from the person employed by CVS

8  who would send these to somebody who then

9  makes up a final written report.

10       Do you understand that?

11       MR. BUSH:  He's just asking.

12   A.  Yes, yes.

13  BY MR. BAKER:

14   Q.  So you see here under 51414, do you

15  see that where it says "No. 5," it says,

16  "Failure to design and control suspicious

17  monitoring."

18       Do you see that?

19   A.  I do.

20   Q.  Do you see the words next to it, it

21  says "Most serious"?

22   A.  I see it on the document, yeah.

23   Q.  Go to the third page of those written

24  notes.  Do you see at the top, it says "SOM"?

Page 189

1    A.  SOM.

2    Q.  You see here --

3        MR. BUSH:  The last page of the

4  document?

5        MR. BAKER:  Yes, it is.

6  BY MR. BAKER:

7    Q.  Do you see where it says "QTY,

8  quantity going out is concerning."

9        Do you see that?

10   A.  I do see that.

11   Q.  That's consistent with the e-mail that

12  you saw where Dan Gillen reported to your

13  people at CVS that the quantity going out to

14  these small towns was concerning, correct?

15       MR. BUSH:  Objection.

16  BY MR. BAKER:

17   Q.  Is that right?

18   A.  Yes.

19       MR. BAKER:  Let's go to Exhibit

20  103.

21

22     (Exhibit No. 103 marked for

23  identification.)

24

Page 190

1    MR. BAKER:  May I see that,
2  please, sir.
3  BY MR. BAKER:
4    Q.  This is an e-mail about the closing
5  remarks, and it's -- again, you know what
6  closing remarks -- DEA closing remarks are,
7  correct?
8    A.  I do.
9    Q.  That's after there's a DEA inspection,
10 there's a closing, and then there's closing
11 remarks in this e-mail that's reported within
12 the CVS system, correct?
13   A.  Correct.
14   Q.  So Andy Eck was who at the time,
15 May 15, 2014?
16   A.  I do not know Andy Eck.
17   Q.  But he's sending it to Mr. Mortelliti,
18 who's in loss prevention; Mr. Brian Morrison,
19 who is director of loss prevention, and to
20 Jerome Carrey, who is whom?
21   A.  I don't recall.
22   Q.  He's also sending it to Andrew Peck,
23 who is whom?
24   A.  Don't know.

Page 191

1    Q.  Andy Eck, we know he's the person
2  sending it.  Pamela Hinkle, who is --
3    A.  Loss prevention.
4    Q.  Mark Nicastro, who is the director of
5  the distribution center where this took place,
6  correct?
7    A.  Correct.
8    Q.  Which was Indiana, correct?
9    A.  Correct.
10   Q.  And it says, "Brian and John, we had a
11 DEA visit back in August 2013.  Today,
12 May 15, 2014, Dan Gillen, Supervisor, and
13 Andrew Ratcliff, Investigator, came in Indy to
14 do their closing."
15      Do you see that?
16   A.  I do.
17   Q.  Under No. 5, Bullet Point No. 5, do
18 you see that, "suspicious order monitoring,"
19 at the bottom?
20   A.  I see it on the document, yes.
21   Q.  It says, "DEA thought this process was
22 not sufficient under suspicious order
23 monitoring."
24      Correct?

Page 192

1    A.  That's what it says.
2    Q.  That's consistent with what was
3  reported in the e-mail that I've shown you
4  with respect to that, correct?
5      MR. BUSH:  Objection.
6    A.  Correct.
7  BY MR. BAKER:
8    Q.  Yes?
9    A.  Yes.
10   Q.  It says, "Questions on the number of
11 inventory that leaves our facility."
12      Do you see that?
13   A.  I do.
14   Q.  That's consistent with what I just
15 showed you relative to there being a question
16 about the shipment of millions of pills to
17 small towns and small populations, correct?
18      MR. BUSH:  Objection.
19 BY MR. BAKER:
20   Q.  Is that?
21      MR. BUSH:  Objection.
22 BY MR. BAKER:
23   Q.  Is it consistent with that?
24      MR. BUSH:  Objection.

Page 193

1  BY MR. BAKER:
2    Q.  Yes or no?
3    A.  I'm just --
4  BY MR. BAKER:
5    Q.  I mean, in plain English, is that
6  consistent?
7    A.  My question is in reference to
8  inventory.  Whether they're referencing
9  something else here, I'm not too sure.
10   Q.  Well, what inventory do you
11 suspiciously order-monitor other than
12 narcotics?
13      MR. BUSH:  Objection.
14 BY MR. BAKER:
15   Q.  What?
16   A.  I'm just reading again.  Just give
17 me...
18   Q.  Why would the DEA be concerned with
19 any inventory but narcotics?  Right?
20   A.  Yeah.
21   Q.  So this deals with narcotics, right?
22   A.  Correct.
23   Q.  The question on the number of
24 inventory that leaves our facility, correct?

Page 194

1    A.   Correct.
2    Q.   And that's consistent with the e-mails
3  that I showed you relative to the dosages
4  being sent to these small towns with small
5  populations, correct?
6            MR. BUSH:  Objection.
7  BY MR. BAKER:
8    Q.   Yes?
9    A.   It appears, yes.
10   Q.   And then you go to the next bullet
11 point, on the next page, "There's concern that
12 their office did not receive any communication
13 of suspicious ordering in the last three
14 years."
15           MR. BUSH:  Objection.
16 BY MR. BAKER:
17   Q.   Right?
18           MR. BUSH:  Objection.  I'm
19 sorry.
20   A.   That's what the document says.
21 BY MR. BAKER:
22   Q.   So none of those orders that we talked
23 about, even those orders that went to these
24 small towns, were reported by CVS to the DEA

Page 195

1  during that three-year period, correct?
2            MR. BUSH:  Objection.
3    A.   I'm not sure.
4  BY MR. BAKER:
5    Q.   Well, that's consistent with --
6    A.   Yeah, yeah.
7    Q.   -- what was said, correct?
8    A.   Yeah --
9            MR. BUSH:  Objection.
10   A.   -- it says that on the document.  But,
11 again, I'm not sure that that's -- that's
12 factual or not, but that's...
13 BY MR. BAKER:
14   Q.   Well, when you put those documents
15 together as I've laid them out to you, it's
16 consistent with the premise that CVS did not
17 report any of those as suspicious orders to
18 the DEA, any of those orders that were sent
19 out during that three-year period to anybody
20 at any town, correct?
21           MR. BUSH:  Objection.
22   A.   I'm not clear.  I'm not sure.  I'm not
23 sure.
24 BY MR. BAKER:

Page 196

1    Q.   Well, read it.  It says, "Concerned
2  that their office did not receive any
3  communication of suspicious ordering in the
4  last three years."
5            "Concerned that their office," that's
6  the DEA, correct?
7    A.   (Witness nodding.)
8    Q.   Yes?
9            MR. BUSH:  Objection.
10   A.   Yeah.
11 BY MR. BAKER:
12   Q.   "Did not receive," meaning that they
13 didn't get, right?
14   A.   (Witness nodding.)
15           MR. BUSH:  Objection.
16 BY MR. BAKER:
17   Q.   Right?
18   A.   (Witness nodding.)
19   Q.   Right or wrong?
20           MR. BUSH:  Objection.
21 BY MR. BAKER:
22   Q.   They did not receive, right?
23   A.   Yes.
24   Q.   "Any."  You understand the word "any"?

Page 197

1    A.   I do.
2    Q.   "Communication."  You understand what
3  "communicate" means, right?
4    A.   Uh-huh.
5    Q.   "Of suspicious ordering."  You know
6  what "suspicious ordering" is, right?
7    A.   Yes.
8    Q.   "In the past" -- "in the last three
9  years."  You understand what the period of
10 three years is, correct?
11   A.   I do.
12   Q.   And you understand that when you
13 looked at those e-mails that dealt with the
14 distribution of the quantity of pills that was
15 reflected going into the small towns with
16 these populations that that's consistent with
17 this sentence right here, correct?
18   A.   It appears to be, yes.
19           MR. BUSH:  Objection.
20   A.   Yes.
21 BY MR. BAKER:
22   Q.   It appears to be?  Yes?
23   A.   Yes.
24   Q.   Now, from the slides that I showed you

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  from the DEA about the number of deaths that
2  were occurring in 2010, 2011, 2012, 2013, this
3  is the same three-year period that we're
4  talking about here in this e-mail, correct?
5      A.  Okay, yes.
6      Q.  The opioid crisis was increasing at
7  that time, correct?
8          MR. BUSH:  Objection.
9  BY MR. BAKER:
10     Q.  According to those slides, correct?
11     A.  According to the slides, yeah.
12         MR. BAKER:  Let me show you
13 Exhibit No. 19 -- 119.
14
15         (Exhibit No. 119 marked for
16 identification.)
17
18 BY MR. BAKER:
19     Q.  And go to -- well, first of all, what
20 you have in front of you is "Suspicious Order
21 Monitoring Training of CVS," correct?
22         It's Bates number 106514, correct?
23     A.  Correct.
24     Q.  This is a CVS document, correct?

Page 199

1      A.  Yes.
2      Q.  Yes?
3      A.  Yes.
4      Q.  Have you ever seen this document
5  before today?
6      A.  I have not.
7      Q.  It appears to be a training manual for
8  CVS employees, does it not?
9      A.  It appears to be.
10     Q.  Go to page 1.  You have it right in
11 your hand there.
12     A.  Yeah.
13     Q.  Go to page one of that manual.
14     A.  Yeah.
15     Q.  The very next page.  You have the
16 chart.  That's what I want.
17         It says, "Prescription drug abuse is
18 an epidemic."
19         Correct?
20     A.  Correct.
21     Q.  It says, "More people die from abuse
22 of prescription drugs than heroin and cocaine
23 combined."
24         Right?

Page 200

1      A.  Correct.
2      Q.  And it shows you, that top line,
3  "Opioid analgesics," and it talks about -- it
4  graphs the number of people that are dying per
5  year from opioid analgesics, that top line,
6  correct?
7      A.  Correct.
8      Q.  It's well -- well exceeds that of
9  people that die from cocaine abuse, correct?
10     A.  Correct.
11     Q.  It well exceeds that of people that
12 die from heroin abuse, correct?
13     A.  Correct.
14     Q.  And you see that the numbers are
15 increasing every single year, right?
16     A.  Correct.
17     Q.  So this is something that CVS was
18 using to train their employees about the
19 opioid epidemic, correct?
20     A.  It appears to be, yes.  First time...
21     Q.  But you never -- okay, go ahead.
22     A.  I have not seen this document.
23         MR. BAKER:  Let's move on.
24         It is 12:10 right now.  It's probably

Page 201

1  appropriate to break for lunch, if you would
2  like to.
3          MR. BUSH:  Let's go off the
4  record?
5          MR. BAKER:  Yes, let's go off
6  the record.
7          THE VIDEOGRAPHER:  The time is
8  12:07 p.m.  We're off the record.
9
10         (Recess taken from 12:07 p.m.
11         to 12:24 p.m.)
12
13         THE VIDEOGRAPHER:  The time is
14 12:24 p.m., and we're on the record.
15 BY MR. BAKER:
16     Q.  Do you remember on Exhibit No. 43
17 where I was showing you the model, the
18 algorithm model that had been developed for
19 usage and had a model that had been designed
20 that said any order with a score of .15 or
21 higher would be identified as a suspicious
22 pended order?  Do you remember that?
23         MR. BUSH:  Can you show him that
24 again?

Page 202

1    A.  I think it's right here.
2   BY MR. BAKER:
3    Q.  Do you remember that?
4    A.  I do remember seeing that on the -- on
5   the document, yes.
6    Q.  Now, do you know whether or not that
7   algorithm was ever tweaked by CVS?
8    A.  I do not.
9    Q.  Do you know whether it was ever
10  manipulated by CVS?
11   A.  I do not.
12   Q.  Let me show you -- do you know if that
13  algorithm was ever manipulated by CVS?
14   A.  I do not.
15        MR. BAKER:  Let me show you
16  what's marked as Exhibit No. 95.
17
18    (Exhibit No. 95 marked for
19  identification.)
20
21  BY MR. BAKER:
22   Q.  This is a Bates number 88523 through
23  88524, and coupled with that is Bates number
24  88734 through 88737.

Page 203

1        Do you see those?
2    A.  I do.
3    Q.  Let's go through and look -- let's
4   look at that first e-mail.  Do you see that?
5   It's dated July 26, 2010.
6    A.  I did.
7    Q.  It says ".65 is where we are now.  .7
8   looks a bit more realistic, but I still want
9   to view data."
10        Do you see that?
11   A.  I do see it on the document.
12   Q.  This is John Mortelliti sending this
13  to Robert Williamson on July 26, 2010.  Do you
14  see that?
15   A.  I do.
16   Q.  Now, you understand the program,
17  according to the document, was meant to
18  trigger at .15, correct?
19   A.  Yes.
20        MR. BUSH:  Objection.
21   A.  Yes.
22  BY MR. BAKER:
23   Q.  At this point, it's being bumped up to
24  .65 and they're contemplating .70 according to

Page 204

1   this e-mail, right?
2    A.  I am not sure.  I'm not sure.  I'm not
3   sure.
4    Q.  Let's go to the second page there.
5   June 30, 2010, at the bottom.
6    A.  Okay.
7    Q.  It says "Bob, I will be reviewing the
8   data for the next few weeks and testing some
9   of the pending items with field loss
10  prevention.  I'm going to focus on the .15
11  score for starters.  Once I determine an
12  acceptable score, I will get in touch with you
13  and Jonathan for feedback."
14        Do you see that?
15   A.  Yes, that's what it says.
16   Q.  This is John Mortelliti, right?
17   A.  Yes.
18   Q.  This is while John Mortelliti is in
19  Lumberton, New Jersey, by himself, correct?
20  Do you remember?
21        MR. BUSH:  Objection.
22  BY MR. BAKER:
23   Q.  Is that right?
24        MR. BUSH:  Objection.

Page 205

1    A.  Well, John is in -- John works out of
2   Lumberton, correct.
3   BY MR. BAKER:
4    Q.  This is when John Mortelliti was in
5   Lumberton, right?
6    A.  What's the date?  I believe he was.
7    Q.  Do you remember where the suspicious
8   order monitoring program document that was put
9   into the SOP 8/25/10 said that the SOM was
10  being conducted out of Lumberton, New Jersey,
11  out of one DC?
12   A.  Yes.
13   Q.  That was John Mortelliti, right?
14   A.  I believe so.
15   Q.  He was doing it by himself, wasn't
16  he?
17        MR. BUSH:  Objection.
18   A.  I'm not sure if he -- if it was only
19  him.
20  BY MR. BUSH:
21   Q.  Well, who else would he have had, if
22  anybody?
23        MR. BUSH:  Objection.
24   A.  Potentially other people as part of

Page 206

1  loss prevention organization.
2  BY MR. BAKER:
3      Q.  But you don't know that, do you?
4      A.  I don't know that.
5          MR. BUSH:  Objection.
6  BY MR. BAKER:
7      Q.  But you see here where he says "I'm
8  going to focus on .15 for starters," but once
9  he determines an acceptable score, he will get
10 in touch with whoever and Jonathan for
11 feedback.  Do you see that?
12     A.  That's what it says.
13     Q.  So it sounds like he's going to
14 increase the score, correct?
15         MR. BUSH:  Objection.
16 BY MR. BAKER:
17     Q.  Above .15, right?
18     A.  It appears that way, but I'm not too
19 sure that -- again, this is the first time
20 I've seen the document, so I really don't
21 know, yeah.
22 BY MR. BAKER:
23     Q.  So look at the one dated July 26,
24 2010.  Do you see that one?  Bates number

Page 207

1  88734 at the bottom?
2      A.  I do.
3      Q.  It says "I don't want to waste money
4  doing a retune if we don't need one."
5          Do you see that?  John Mortelliti.
6          MR. BUSH:  I'm sorry, I'm --
7  I've lost you.  Where are you?
8          MR. BAKER:  Right here.  Right
9  here.
10 BY MR. BAKER:
11     Q.  "I don't want to waste money doing a
12 retune if we don't need one."  Correct?
13     A.  I see that.
14     Q.  He's talking about the program that
15 he's changing from a .15 score up to .65
16 score, correct?
17     A.  It appears to be that, but I'm not 100
18 percent sure.
19     Q.  So go back to that e-mail that we
20 talked about at the -- the very first page.
21         It says ".65 is where we are now and
22 .7 looks a bit more realistic, but I still
23 want to view data."
24         Do you see that?

Page 208

1      A.  I do.
2      Q.  Now, then go to the second page of
3  that second series of e-mails, where there's a
4  response to that.
5          MR. BUSH:  I'm sorry, guys.  I
6  think I've lost a couple of pages.
7          THE WITNESS:  You might have
8  given a page back.
9          MR. BUSH:  I may have given that
10 back to you and I shouldn't have.  I think
11 I've -- I thought it was a copy of what I
12 already had.
13         Thank you.
14         MR. BAKER:  Let me start from
15 scratch.  Okay?
16         MR. BUSH:  No, you don't have to
17 start from scratch.
18 BY MR. BAKER:
19     Q.  Go to the e-mail where it says ".65 is
20 where we are now.  .7 looks a bit more
21 realistic, but I want to view data."
22         This is July 26, 2010 at 1:56 p.m.,
23 John Mortelliti to Robert Williamson,
24 correct?

Page 209

1      A.  Correct.
2      Q.  Now, go to the response, and it's the
3  second page of those series of e-mails.  It's
4  88735 Bates, July 26, 2010 at 2:31 p.m.,
5  Robert Williamson to John Mortelliti, right?
6      A.  Correct.
7      Q.  John Williamson is with the company
8  Cegedim, or C-e-g-e-d-i-m, CCS, basically,
9  correct?
10     A.  Right.
11     Q.  And he's telling John Mortelliti in a
12 response, "That's quite a departure from the
13 initial threshold."  Right?
14     A.  That's what the document says,
15 correct.
16     Q.  And the initial threshold was .15,
17 according to the documents, right?
18     A.  Correct.  Correct.
19     Q.  So it had been manipulated up from .15
20 to .65 by your company, correct?
21         MR. BUSH:  Objection.
22     A.  I'm not clear that it was actually
23 implemented.  I mean, it appears to me more of
24 a discussion, but I'm not too sure that it was

Page 210

1  actually implemented.  That's what's not clear
2  to me.
3  BY MR. BAKER:
4      Q.   So if Mr. Mortelliti testifies that he
5  manipulated it up to .65, you would have no
6  reason to disagree with that, right?
7      A.   I would have no reason to, no.
8      Q.   And if the SOM program that was
9  written by CCS had been manipulated up from
10 .15 to .65, it would be less sensitive for
11 pending orders that could be suspicious,
12 correct?
13         MR. BUSH:  Objection.
14     A.   Again, I'm not -- I'm not sure what
15 the -- what that deviation would mean
16 ultimately to the algorithm.
17         I don't know if that's significant
18 enough or -- I don't know.  I don't know the
19 significance of it.
20 BY MR. BAKER:
21     Q.   If raising the pended-to-order score
22 on the algorithm from .15 to .65 made the
23 program less sensitive to identifying
24 potential suspicious orders, that would make

Page 211

1  the program itself less sensitive, correct?
2          MR. BUSH:  Objection.
3      A.   In principle.  But, again, I'm not too
4  sure that that changed the order of magnitude
5  of impact on the algorithm.
6          So, again, I'm not close enough to it.
7  But I -- I don't know -- I don't know for
8  sure.
9  BY MR. BAKER:
10     Q.   But it's over three times what the
11 system was initially designed for, correct, if
12 it's .65?
13     A.   Correct.
14     Q.   Right?
15     A.   Correct.
16     Q.   If it's .70, that's even worse, right?
17     A.   Correct.
18         MR. BUSH:  Objection.
19     A.   Correct.
20 BY MR. BAKER:
21     Q.   How about the program itself?  This is
22 the program that was in place during that
23 period of time where, from 2010 to 2013, out
24 of the Indiana facility there was no reporting

Page 212

1  of any suspicious orders, correct?
2      A.   I'm not aware.
3          MR. BUSH:  Objection.
4      A.   I'm not aware.
5  BY MR. BAKER:
6      Q.   You're not aware of if that program
7  was in place or not?
8      A.   I know the program was in place, but
9  you said -- could you ask your question again?
10     Q.   Okay.  This program that we're talking
11 about from CCS that talks about --
12     A.   Yeah.
13     Q.   -- an initial pended .15 in the
14 algorithm that had been raised to .65 --
15     A.   Yeah.
16     Q.   -- this is the one that was in use at
17 the Indiana distribution center between 2010
18 and 2013, correct?
19     A.   Correct.
20         MR. BUSH:  Objection.
21 BY MR. BAKER:
22     Q.   Right?
23     A.   Correct.
24     Q.   And that's the one, once raised from

Page 213

1  .15 to .65, resulted in no suspicious orders
2  being reported out of the Indiana facility for
3  three consecutive years, right?
4          MR. BUSH:  Objection.
5      A.   I am not aware whether there were or
6  weren't anything reported, and I'm not sure
7  that -- again, I'm not sure that the number
8  was actually raised to that number.
9          So, again, I -- I mean, I did not have
10 direct, you know, I was -- I wasn't involved
11 with that, so I can't really tell you that the
12 algorithms were changed.  I don't know.
13 BY MR. BAKER:
14     Q.   If there was an algorithm-based
15 suspicious orders software program that was
16 being implemented for the purpose of the
17 suspicious order monitoring system --
18     A.   Correct.
19     Q.   -- would you, as the director of
20 logistics during the period of time that
21 suspicious order monitoring was under your
22 camp, would you have wanted to know that
23 somebody was manipulating the algorithm up to
24 three times more than what the initial

Page 214

1   threshold was called for?
2           Would you want to know that?
3       A.  Not sure.  Again, there were --
4   there -- again, this was not part of my
5   department.  You know, this -- this -- there
6   was an organization that had accountability
7   for it.
8           Again, my role, I had a very broad
9   role within CVS logistics.  So it was
10  definitely not brought to my attention.  I was
11  not aware of it.
12      Q.   You said this is not your department.
13  This is part of the suspicious order
14  monitoring program, right?
15      A.  Right.
16      Q.   And you're head of the suspicious
17  order monitoring program -- suspicious order
18  monitoring program from 2012 to 2017, right?
19      A.  We're talking 2010 here.
20      Q.   But you're head, from 2012 to 2017, of
21  the SOM program?
22      A.  Correct.
23      Q.  Right?
24      A.  Correct.

Page 215

1       Q.   So as head of the SOM program at CVS,
2   during the period that you were that head --
3       A.  Correct.
4       Q.   -- 2012, 2013, 2014, would you want to
5   know what was being done with the algorithm
6   and how it was designed --
7       A.  No.
8       Q.   -- and what it was ordered to do --
9       A.  No.
10      Q.   -- with respect to what --
11      A.  I --
12      Q.   -- what -- let me finish --
13      A.  Yes.
14      Q.   -- with respect to what number the
15  algorithm would flag at and what it was
16  designed to flag at; would you want to know
17  that?
18      A.  I did not need to know that.
19      Q.   As head of the system, you wouldn't --
20  you wouldn't want to know that?
21          MR. BUSH:  Objection.
22      Q.   As head of the SOM program, you
23  wouldn't --
24          MR. BUSH:  Objection.

Page 216

1       A.  I had people that were directly
2   accountable for that program, along with
3   people outside of our department that managed
4   that.
5   BY MR. BAKER:
6       Q.   Do you understand that it's a
7   nondelegable duty to the licensee insofar as
8   DEA compliance?  Do you understand that?
9       A.  I do.
10      Q.   Do you understand that you are the
11  head of the department that has a nondelegable
12  duty to report to the DEA?  Do you understand
13  that?
14      A.  Yes.
15      Q.   Do you understand that as head, that
16  you should be informed of what's going on with
17  respect to these algorithms?
18          MR. BUSH:  Objection.
19      A.  I was not informed of any changes to
20  the algorithms.
21  BY MR. BAKER:
22      Q.   Would you expect to be informed of the
23  change in the algorithms, since you're the
24  head of the SOM program?

Page 217

1           MR. BUSH:  Objection.
2       A.  I'm not sure.  Again, I'm not -- I'm
3   not or was not close enough to it to know
4   whether or not I needed to be informed of
5   those types of changes.
6           MR. BAKER:  Let's go to Exhibit
7   60.
8           Let's go to Exhibit 55.
9
10          (Exhibit No. 55 marked for
11  identification.)
12
13  BY MR. BAKER:
14      Q.   This is a business idea description
15  within CVS pharmacy.  Do you see that?
16      A.  I do.
17      Q.   CVS Pharmacy is a department within
18  the distribution center that deals with
19  suspicious order monitoring, correct?
20      A.  Correct.
21      Q.   And this is when John Mortelliti was
22  employed there, correct?
23      A.  Correct.
24      Q.   And it says under "Summary of

Page 218

1  description and objectives," it says "DEA
2  expects CVS to prevent suspicious orders from
3  being filled out of our DCs. The current IRR
4  does not provide the proper information to
5  meet the DEA's needs."
6      Did you know that?
7      A.  No.
8      Q.  You know what an IRR is now, right?
9      A.  Yes.
10     Q.  You didn't know before today what an
11  IRR was, correct?
12     A.  Correct.
13     Q.  And you didn't know before today that
14  the current IRR that they were using at the
15  time did not provide the proper information to
16  meet the DEA's needs, did you?
17         MR. BUSH:  Objection.
18  BY MR. BAKER:
19     Q.  You didn't know that, did you?
20         MR. BUSH:  Objection.
21     A.  No.
22  BY MR. BAKER:
23     Q.  And it says here, "We need controlled
24  drugs to be monitored by active ingredient."

Page 219

1      Isn't that what it says?
2      A.  That's what the document says.
3      Q.  Do you know what "active ingredient"
4  means?
5      A.  Not really, no.
6      Q.  Would you have to guess in order to
7  try to determine what that means?
8      A.  Yeah, and I wouldn't want to.
9      Q.  It says "Currently, the controlled
10  drugs are monitored by item."
11      Do you know what "by item" means in
12  terms of controlled drugs?
13     A.  By SKU, just by -- my interpretation
14  of that is, later, that by item, the actual
15  SKU or the product itself.
16     Q.  Give me an example in the context of a
17  hydrocodone combination product, what you mean
18  by a SKU.
19     A.  It would be, you know, an item would
20  be a hydrocortisone (sic) --
21     Q.  Hydrocodone?
22     A.  Hydrocodone, exactly.
23     Q.  Hydrocodone combination product?
24     A.  Exactly.

Page 220

1      Q.  Do you know what "hydrocodone
2  combination product" means?
3      A.  It's a combination of Tylenol and/or
4  hydrocodone included in the drug.
5      Q.  And you know that the hydrocodone
6  combination products include things like
7  Vicodin, Lortab, that sort of thing?
8      A.  Not to that detail, but I understand,
9  yeah, yeah.
10     Q.  It says "The IRR loses all history
11  when the info on the item changes, causing CVS
12  to be noncompliant with DEA's expectations."
13      Isn't that what that says?
14     A.  That's what it says.
15     Q.  So did anybody bring this to your
16  attention that the IRR loses all history when
17  the info on the item changes, causing CVS to
18  be noncompliant with the DEA expectations?
19     A.  No, they did not.
20     Q.  Now.  Let's take the history at this
21  point.  During 2012 to 2017 --
22     A.  Right.
23     Q.  -- you, Ron Link, are the senior vice
24  president of logistics, correct?

Page 221

1      A.  Correct.
2      Q.  You, Ron Link, during that time frame
3  were in charge of -- you were the senior
4  person over the department that was in charge
5  of suspicious order monitoring, correct?
6      A.  Correct.
7      Q.  And nobody brought to your attention
8  that the system being used for the IRR was not
9  DEA compliant, correct?
10     A.  Correct.
11     Q.  But this document sure says so,
12  doesn't it?
13         MR. BUSH:  We don't know the
14  date of this document.
15  BY MR. BAKER:
16     Q.  Doesn't it?
17     A.  It states that.  And I also was
18  looking and I don't see the date on this
19  document either.  So...
20     Q.  Well, we know the IRR was first
21  implemented in the August 25, 2010 SOM that
22  was added to the SOP, correct?
23         MR. BUSH:  Objection.
24  BY MR. BAKER:

Page 222

1    Q.  Right?
2           MR. BUSH:  Objection.
3    BY MR. BAKER:
4    Q.  Is that right?
5           MR. BUSH:  I'm going to keep on
6    objecting because --
7           MR. BAKER:  You can object.
8    That's fine.  I don't mind you objecting.
9    BY MR. BAKER:
10   Q.  Go ahead.
11   A.  What was the question again?
12   Q.  You saw the IRR was first defined in
13   the 8/25/10 suspicious order monitoring
14   addition to the SOP P&P, correct?
15          MR. BUSH:  Objection.
16   BY MR. BAKER:
17   Q.  You saw that, right?
18   A.  I believe so.
19          MR. BUSH:  Objection.
20          MR. BAKER:  Let's go to Exhibit
21   82.
22
23      (Exhibit No. 82 marked for
24   identification.)

Page 223

1
2           MR. BAKER:  Let me see that
3    back, please.
4    BY MR. BAKER:
5    Q.  Exhibit 82 is an e-mail dated
6    10/12/2010 from John Mortelliti to various
7    people, correct?
8    A.  Correct.
9    Q.  And it says "Todd, I sent you an
10   e-mail about two weeks ago explaining why I am
11   handling the controlled drug IRR for the time
12   being."
13          Correct?
14   A.  That's what it says.
15   Q.  Was anybody else handling it at that
16   time, other than John Mortelliti, to your
17   knowledge?
18   A.  I'm not aware of it.  I don't know.
19   Q.  It says "Dean, this is a rewrite we
20   are trying to get approved for the controlled
21   drug IRR.  The current report shows controlled
22   drugs by item instead of active ingredient,
23   such as PSE.  We thought this would be a great
24   idea at the time, but we found out -- found

Page 224

1    was that the system cannot match historical
2    data to an item if the manufacturer changes
3    the name of the item."
4           Is that what it says?
5    A.  That's what the e-mail says, correct.
6    Q.  And it says "Todd can forward you the
7    e-mail.  Example, hydro 5 milligrams can be
8    changed to hydro milligram 5.  The same item,
9    just put the five in front of milligram.  The
10   system cannot match item because of the
11   change, therefore, loses historical data.
12   This is why you are seeing zero for historic
13   ordering usually in LAG 3 to 6."
14          Isn't that what it says?
15   A.  That's what it says.
16   Q.  So it appears there's a problem with
17   not reporting the item properly to be able to
18   get historical data by virtue of not using
19   active ingredient to describe the item.  Is
20   that what it looks like to you?
21          MR. BUSH:  Objection.
22   A.  I'm not clear about that.  I'm not
23   sure.  I'm not sure.
24   BY MR. BAKER:

Page 225

1    Q.  Well, let's see if we can clear it up.
2    It says "The current report shows
3    controlled drugs by item instead of active
4    ingredient."
5           Correct?
6    A.  Correct.
7    Q.  And I've shown you the prior document,
8    Document No. 55 --
9    A.  Yeah.
10   Q.  -- that we just went over that said
11   "The IRR loses all order history info when the
12   item changes, causing CVS to be noncompliant."
13          And in that document, it also said
14   that it did not provide -- that "we need
15   controlled drugs to be monitored by active
16   ingredient."
17   A.  Correct.
18   Q.  You see that?
19   A.  Correct, yeah.
20   Q.  So this is consistent with the item
21   not being reported by active ingredient 10/12
22   of 2010, correct?
23   A.  Yes.
24   Q.  And it's consistent with the problem

Page 226

1  of it not being DEA compliant at that time,
2  correct?
3      MR. BUSH: Objection.
4      A.  It appears to be.
5  BY MR. BAKER:
6      Q.  So it's consistent with this sentence
7  that "The IRR loses all order history when the
8  info on the item changes, causing CVS to be
9  noncompliant with the DEA expectations,"
10  correct?
11      MR. BUSH: Objection.
12      A.  It says this in the e-mail.  I'm just
13  not sure whether it's accurate or not.
14  BY MR. BAKER:
15      Q.  But it lines up at least, right?
16      A.  It lines up to your point.
17      MR. BAKER:  So now we go to
18  Exhibit 83.
19
20      (Exhibit No. 83 marked for
21  identification.)
22
23  BY MR. BAKER:
24      Q.  It's Bates number 75564.  And this is

Page 227

1  2/15/2011.
2      First of all, before I ask you this
3  next series of questions -- could you look at
4  me, please.
5      A.  Yes.
6      Q.  Before I ask you this next series of
7  questions, do you know how long this remained
8  an issue, that is, that the controlled drugs
9  were not named by active ingredient but
10  instead were named by item?  Do you know how
11  long that remained?
12      A.  No.
13      MR. BUSH:  Objection.
14      A.  No.
15      MR. BUSH:  No foundation that he
16  knows anything about it.
17      A.  No.
18      MR. BAKER:  And you could object
19  to form, I have no problem and I respect that,
20  but anything else shouldn't be said.
21  BY MR. BAKER:
22      Q.  With respect to 2/15/11, this e-mail,
23  John Mortelliti to Frank Devlin, it says
24  "Team, several months back -- several months

Page 228

1  back, I sent out a P point."
2      That's a PowerPoint presentation,
3  correct?
4      A.  Correct.
5      Q.  "...on speaking topics for DEA visits
6  regarding suspicious order monitoring."
7      Now, you and I went over that
8  PowerPoint, right?
9      A.  Yes.
10      Q.  Earlier in this testimony?
11      A.  Yes.
12      Q.  "There's been significant changes to
13  that presentation to include the LP analyst
14  position as well as DC Rx no longer involved
15  in the investigations."
16      Do you see that?
17      A.  I see it on the e-mail.
18      Q.  Do you know what an LP analyst even
19  is?
20      A.  It's just a role within loss
21  prevention.
22      Q.  Do you know what that means, what that
23  analyst does or doesn't do?
24      A.  I have no idea what the --

Page 229

1      Q.  With respect to SOM, does that mean
2  anything at all to you, an LP analyst?
3      A.  It doesn't.
4      Q.  It says "More changes in the near
5  future will include controlled drug lag will
6  go from six months to twelve months."
7      Do you even know what a controlled
8  drug lag is?
9      A.  I have no idea.
10      Q.  Do you know what effect it will have
11  to go from six months to twelve months on a
12  controlled drug lag?
13      A.  I do not.
14      Q.  Do you know what -- the next bullet
15  says "Controlled drug item will not be listed
16  by item number but by active ingredient."
17      Do you know what that means?
18      MR. BUSH:  I don't think you
19  read that correctly.  Controlled drug IRR.
20  You said --
21      MR. BAKER:  Okay.  I'm sorry.
22  Let's go back and read it.
23  BY MR. BAKER:
24      Q.  It says "Controlled drug IRR will not

Page 230

1  be listed by item number but by active
2  ingredient, the same way PSE is captured on
3  IRR."
4      Is that what it says?
5      A.  That's what it says.
6      Q.  So this appears to be the same issue,
7  this active ingredient issue that's talked
8  about in 2010 now being talked about in 2011,
9  correct?
10         MR. BUSH:  Objection.
11  BY MR. BAKER:
12     Q.  Right?
13     A.  It appears to be, yes.
14     Q.  So it's still a problem in this
15  system, correct?
16         MR. BUSH:  Objection.
17  BY MR. BAKER:
18     Q.  Right?
19     A.  Again, first --
20         MR. BUSH:  Objection.
21     A.  -- time I'm seeing the e-mail and, you
22  know, being presented this information.
23  Again, I'm not -- I'm not too sure if it was a
24  problem, but it appears that there was a

Page 231

1  continuation of it -- of a discussion here.
2  BY MR. BAKER:
3      Q.  Okay.  Well, let's go back to item --
4  Document 55.
5      A.  Okay.
6      Q.  It says here that -- it says "The
7  controlled drug IRR" -- "The current IRR does
8  not provide proper information to meet the
9  DEA's needs."
10     Is that what it says?
11     A.  That's correct.
12     Q.  And this is in the context of it being
13  reported --
14     A.  Yeah.
15     Q.  -- by not -- not by active ingredient,
16  correct?
17     A.  It appears to be, yes.
18     Q.  So then this same issue is appearing
19  in 2011, correct?
20     A.  Correct.
21         MR. BAKER:  So let's go to 92.
22     Well, let's go to 92.
23
24     (Exhibit No. 92 marked for

Page 232

1  identification.)
2
3  BY MR. BAKER:
4      Q.  I also want to ask you, are you
5  familiar with what it means to have same
6  store, same month repetitive orders by a
7  pharmacy?
8      A.  No.
9      Q.  Let me ask you to assume this is what
10  it means:  It means that if you had a
11  pharmacy, say Pharmacy No. 100, located in a
12  certain location.  That's a CVS pharmacy.
13     A.  Uh-huh.
14     Q.  It makes an order on January 1 for
15  10,000 hydrocodone combination product pills
16  from a CVS distribution center.  All right?
17     A.  Okay.
18     Q.  Okay.  Let's suppose that runs through
19  the CVS suspicious order monitoring system and
20  that order is granted as not being suspicious.
21  Okay?
22     A.  Yes.
23     Q.  Fair enough?
24     A.  Yes.

Page 233

1      Q.  In the context of the hypothetical.
2      Let's suppose that that same store
3  decides to order again, the same exact order,
4  one week later but within the same month, the
5  same 10,000 hydrocodone combination products
6  in the same month to a distribution center.
7      Now, that's called same store, same
8  month repetitive orders.
9      Do you understand that now?
10     A.  (Witness nodding.)
11     Q.  Do you understand?
12     A.  Yes, based upon what you said, yes.
13     Q.  Now, let's go to Exhibit 92.
14     Do you know -- before you read that,
15  let me ask you something.
16     Do you know whether or not the system,
17  the suspicious order monitoring system in
18  place for CVS, during the period of time that
19  you were employed there, had a basis to pick
20  up and monitor same store, same month orders
21  under their suspicious order monitoring
22  system?  Yes or no?
23     A.  No.
24     Q.  Would you think that might be

Page 234

1  something appropriate to do in order to comply
2  with DEA expectations?  Yes or no?
3          MR. BUSH:  Objection.
4      A.  Not sure.  I'm not sure.
5  BY MR. BAKER:
6      Q.  Let me make sure -- look at me.
7      A.  Yes.
8      Q.  Are you telling me that if a store
9  ordered repetitively during the same month,
10  the same quantity of pills or even a higher
11  quantity of pills --
12      A.  Right, right.
13      Q.  -- than the initial order and only the
14  initial order was monitored, not the
15  subsequent orders, that would not have any
16  concern to you?
17      A.  It would.  It would, yes.
18      Q.  Why would it have concern to you?
19      A.  Based upon the quantities and
20  frequencies --
21      Q.  Correct, because the quantity would
22  increase?
23          MR. BUSH:  You need to let him
24  finish his answer.

Page 235

1  BY MR. BAKER:
2      Q.  Go ahead.  Go ahead.
3      A.  Quantities and frequencies would raise
4  a concern.
5      Q.  Right.  Let's go to this document, and
6  it talks about -- if you look, in terms of how
7  many distribution centers there were at this
8  time, we're looking at Exhibit 92, which is
9  Bates 83855, an e-mail dated July 10, 2012.
10      This is a period of time when you were
11  a senior vice president of logistics in charge
12  of suspicious order monitoring, correct?
13          MR. BUSH:  Objection.
14  BY MR. BAKER:
15      Q.  Right?
16      A.  First time I'm seeing the document.
17  So...
18      (Witness reviews document.)
19      What's the date?
20      Q.  July 10, 2012.
21          MR. BUSH:  I object to the
22  question.
23      A.  I believe it was around that time when
24  the transition took place, but it's possible.

Page 236

1  BY MR. BAKER:
2      Q.  It says "There are 18 CVS distribution
3  centers; 11 are DEA licensed to ship
4  controlled substance 2 through 5.  CVS does
5  not ship Schedule II products."
6      Correct?
7      A.  Where are you reading?  Down in the
8  bottom of the document?
9      Q.  I'm reading the bottom of the
10  document.
11      A.  Got it.  I'm following you.
12          MR. BUSH:  You're asking if
13  that's what it says?
14  BY MR. BUSH:
15      Q.  Is that what it says?
16      A.  That's what it says.
17      Q.  Skip over to the next page.  We're on
18  83856, at the top, the fourth line down.
19      It says "All stores receive at least
20  one order per week; some receive two."
21      Correct?
22      A.  That's correct, that's what it says.
23      Q.  That's same store, same month
24  ordering, correct?

Page 237

1          MR. BUSH:  Objection.
2  BY MR. BAKER:
3      Q.  Right?
4      A.  This -- this I don't believe
5  referenced that -- references that.
6      Q.  You don't?
7      A.  No.
8      Q.  Go down to the bottom.  It says
9  "Volume of orders, Rx controls."
10      Rx controls is what?  Drug controls?
11      A.  Yes.
12      Q.  Schedule III through V, correct?
13      A.  Yes.
14      Q.  And PSE comprises 30,000 to 40,000
15  line items; is that right?
16      A.  That's what it says.
17      Q.  Is that per night?
18          MR. BUSH:  Objection.
19      A.  Don't know.
20  BY MR. BAKER:
21      Q.  It says "Front Store Rx promo,
22  et cetera, total approximately six to eight
23  million records nightly."
24      Is that right?

Page 238

1    A.  That's what it says, yes.
2    Q.  So that's the volume of orders that
3  are going through these distribution centers
4  with respect to Rx, correct?
5        MR. BUSH:  Objection.
6  BY MR. BAKER:
7    Q.  Rx meaning drugs, right?
8        MR. BUSH:  Objection.
9    A.  Again, I'm not sure if that line --
10  one line referenced a night or -- but the
11  second line does reference that it was
12  nightly.
13       I'm not too sure about that one line
14  here on the pharmacy side.
15  BY MR. BAKER:
16    Q.  Six to eight million records nightly,
17  correct?
18        MR. BUSH:  Objection.
19    A.  Correct.
20        MR. BAKER:  We're going to take
21  a break because the food is here.
22        THE VIDEOGRAPHER:  The time is
23  12:55 p.m., and we're off the record.
24

Page 239

1        (Recess taken from 12:55 p.m.
2        to 1:24 p.m.)
3
4        THE VIDEOGRAPHER:  The time is
5  1:24 p.m., and we're on the record.
6  BY MR. BAKER:
7    Q.  Mr. Link, could you please pick up
8  Exhibit 92, which I just reviewed with you.
9    A.  Yes.
10    Q.  And could you go to page 2 of that
11  exhibit, please.
12       Now, this is an e-mail on the front
13  dated 11/29/12.  And it's from Tom Bourque to
14  several different people, Dean Vanelli.  Who
15  is Mr. Vanelli at that time?
16    A.  Dean --
17        MR. BUSH:  I'm sorry.  I'm lost
18  again.  This is page 2 of 92?
19        MR. BAKER:  We're on the front
20  page, then we're going to go to page 2.
21        MR. BUSH:  Oh, okay.  I'm sorry.
22  BY MR. BAKER:
23    Q.  Mr. Link, go to Exhibit 92, if you
24  would.  Go to the first page.

Page 240

1    A.  Got it.
2    Q.  It's an e-mail dated November 29,
3  2012.  Do you see that?
4    A.  I do.
5    Q.  It's from Tom Bourque to several
6  people within CVS, correct?
7    A.  Correct.
8    Q.  And it says "Here is the project plan
9  and process flow that Craig and I will review
10  with you at 2:00 p.m. Eastern today."
11       Do you see that?
12    A.  I do.
13    Q.  And at the top, it says "Attachments,"
14  and it talks about opportunities, et cetera.
15       Do you see that?
16    A.  I do.
17    Q.  So the next page is that attachment.
18  Do you see where it says "Opportunities,
19  current SOM process."
20       Do you see that?
21    A.  I do.
22    Q.  So this is something that's going on
23  in November of 2012 within CVS, correct?
24    A.  Correct.

Page 241

1    Q.  And it says here, "Current SOM process
2  No. 5.  If order is cleared on first of month
3  and cleared and store then orders again that
4  month, it won't be looked at.  If system flags
5  it, we are required to look at it and document
6  why it was released.  Currently we're simply
7  releasing order based on past due diligence on
8  a different order."
9       Do you see that?
10    A.  I do see that on the document.
11    Q.  This is same store, same month
12  ordering, correct?
13        MR. BUSH:  Objection.
14    A.  I am not sure.
15  BY MR. BAKER:
16    Q.  That's what it appears to be, correct?
17    A.  Not clear.
18    Q.  Well, let's go through it.
19       "If order is cleared on first of month
20  and cleared and then store orders again that
21  month."
22       Now stop.
23    A.  Correct.
24    Q.  That's same store, same order --

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 that's same store ordering same month,
2 correct?
3     A.  Correct.
4     Q.  So that's what this is talking about.
5 "If the system flags it, we are required to
6 look at it and document it before it is
7 released.  Currently we are simply releasing
8 that order based on past due diligence on a
9 different order."
10      Correct?
11          MR. BUSH:  That's what it says
12 here?
13 BY MR. BAKER:
14     Q.  That's what is says?
15     A.  Yeah.
16     Q.  It says here that it won't be looked
17 at if the same store orders in the same month.
18     A.  That's what the document says.
19          MR. BUSH:  Objection.
20 BY MR. BAKER:
21     Q.  It won't be looked at in the
22 suspicious order monitoring system, correct?
23          MR. BUSH:  Objection.
24 BY MR. BAKER:

Page 243

1     Q.  Correct?
2     A.  It -- it appears that it's stating
3 that, yes, yes.
4     Q.  So if it's not even looked at, then
5 it's not even being monitored, correct?
6          MR. BUSH:  Objection.
7     A.  Not sure.  Not sure that that's the
8 case.  But, again --
9 BY MR. BAKER:
10     Q.  Well, how is it being monitored if
11 it's same store, same order, same month?
12          MR. BUSH:  Objection.
13     A.  Again --
14 BY MR. BAKER:
15     Q.  Strike that.
16     A.  Again --
17     Q.  Strike that.
18      How is -- how is the same store
19 ordering opioids in the same month, different
20 successive orders during the same month being
21 monitored in your SOM system at that time, if
22 at all?
23     A.  Yeah, I really don't know.  I was not
24 close enough to it.  And, again, this is the

Page 244

1 first time I'm seeing this document.
2     Q.  That would be a problem to be DEA
3 compliant if that was -- if that was going on,
4 correct?
5          MR. BUSH:  Objection.
6     A.  Not sure.
7 BY MR. BAKER:
8     Q.  Let me put it this way --
9      Yeah.
10     Q.  -- if that's the nature of the
11 system --
12     A.  Yeah.
13     Q.  -- that it allows the same store to
14 make successive orders in the same month --
15     A.  Yeah.
16     Q.  -- and anything beyond the first order
17 is not even monitored --
18     A.  Right.
19     Q.  -- that's not a DEA compliant
20 suspicious order monitoring system, is it?
21          MR. BUSH:  Objection.
22     A.  Again, not -- I really don't know for
23 sure whether or not that is -- that is an
24 issue or not based upon what you're

Page 245

1 referencing.
2 BY MR. BAKER:
3     Q.  You're not sure it's an issue?
4      Let's go -- let's just go to plain
5 grammar here, because I want to make sure you
6 understand the nature of the issue.
7     A.  Yeah.
8     Q.  Okay?
9     A.  Yeah.
10     Q.  I'm going to be as explicit as
11 possible, using proper English and stopping
12 along the way to make sure you understand it.
13     A.  Go ahead.  Go ahead.
14     Q.  So here is the English of that
15 sentence.
16      The English is "If order is cleared on
17 first of month."
18      Do you understand those words?
19     A.  Yes, yeah.
20     Q.  "...and cleared."
21      Do you see understand those words?
22          MR. BUSH:  Objection.
23 BY MR. BAKER:
24     Q.  Yes or no?

Page 246

1     A.   The -- the interpretation of the
2   "cleared" is what sort of throws me off a
3   little bit, because, again, I was not deep
4   enough into the process.  So that's where I'm
5   a little bit --
6   BY MR. BAKER:
7     Q.   Okay.  Well, let's assume for the sake
8   of the hypothetical that if the order is
9   cleared on the first of the month, that means
10  that it ran through the SOM system, that the
11  order was cleared and that it was shipped.
12    A.   Yes.
13    Q.   Okay?
14    A.   Yes.
15    Q.   Assume that's what it means.
16    A.   Okay.
17    Q.   Does that sound consistent with that
18  sentence?
19    A.   Yes.
20    Q.   And then it says "...store then orders
21  again that month."
22        Now, that means that same store
23  ordering another time later in the month?
24    A.   Right.

Page 247

1     Q.   Is that consistent with what that
2   sentence means?
3     A.   Yes, yes.
4     Q.   "...it won't," meaning it will not.
5   That's English, correct?
6     A.   Yes.
7     Q.   "...be looked at."
8         Correct?
9     A.   That's what it says.
10    Q.   And now do you understand that
11  sentence?
12    A.   That's what it says, yeah.
13    Q.   And if that was going on at CVS with
14  respect to suspicious order monitoring, that
15  means that CVS was not monitoring successive
16  orders by the same store during that same
17  month.
18        Is that consistent with the English in
19  that sentence?
20        MR. BUSH:  Objection.
21    A.   That's what it says in this document.
22  BY MR. BAKER:
23    Q.   That's what I wanted you to
24  understand.

Page 248

1         And there's no reason for you to
2   disagree that this is being reported properly
3   in this document, is there?
4     A.   I -- again, this is the first time I'm
5   seeing the document and I'm not aware of the
6   issue.  Again, these are groups that are
7   involved that are outside of the logistics
8   organization that are involved with this.
9     Q.   See, the question was this:  You have
10  no reason to disagree with the statement in
11  that document, do you?
12        MR. BUSH:  He just gave you an
13  explanation of why he might.
14    A.   No.
15  BY MR. BAKER:
16    Q.   Do you have any reason to disagree
17  with that?
18    A.   I do not.
19    Q.   That was -- that's the answer.
20        So now let's move on to Exhibit 53.
21
22        (Exhibit No. 53 marked for
23  identification.)
24

Page 249

1   BY MR. BAKER:
2     Q.   Do you remember when we talked about
3   outside vendor?
4     A.   Yes.
5     Q.   That issue?
6     A.   Yes.
7     Q.   This is an e-mail dated October 8,
8   2012.  Correct?
9     A.   That is correct.
10    Q.   And there's another one below that,
11  October 5, 2012, correct?
12    A.   Correct.
13    Q.   This is called "Conference call
14  notes."  It's from Pam Hinkle to Aaron
15  Burtner, conference call notes from 10/5/12,
16  correct?
17    A.   Correct.
18    Q.   "Conference call," that means
19  somebody's on the telephone conferencing with
20  other people in CVS, correct?
21    A.   Correct.
22    Q.   And here it says "Pharmacy DC ordering
23  process conference call recap."
24        Do you see that --

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    A.  I do.
2    Q.  -- at the top?
3    A.  I do.
4    Q.  Go down, one, two, three, four, five,
5  six, seven, seven dashes from the bottom.
6    A.  From the bottom?
7    Q.  Right.
8    A.  Okay.
9    Q.  It says "All orders generated from
10  outside vendors are not pushed through the SOM
11  process."
12       Do you see that?
13    A.  I do.
14    Q.  And the date on this is 10/5/12 at the
15  top, correct?
16    A.  Correct.
17    Q.  So what that means is as of 10/5/12,
18  somebody within CVS is having a conference
19  call, generating a memo of that discussion to
20  say that all orders generated from outside
21  vendors are not pushed through the SOM
22  process, correct?
23       MR. BUSH:  Objection.
24    A.  That's what the document says.

Page 251

1  BY MR. BAKER:
2    Q.  And you have no reason to disagree
3  with the sentence in that document, correct?
4       MR. BUSH:  Objection.
5    A.  I do not.
6  BY MR. BAKER:
7    Q.  Let's go to Exhibit 113.  It's already
8  been entered, so it should be in your pile
9  over there, but she'll pull it up on the
10  screen in front of you.
11    A.  Okay.
12       MR. BUSH:  Let's pull it up so
13  you can look at the whole document.
14  BY MR. BAKER:
15    Q.  This was the logistics planning
16  update, July 8 of 2013.
17       Do you remember that?
18    A.  I remember the document.
19    Q.  And you remember me going to page 3 of
20  that document?
21       We'll highlight the second bullet from
22  the bottom where it says "SOM process."
23    A.  Yes.
24    Q.  It says "SOM process will include

Page 252

1  store controlled substances, orders placed
2  with CVS warehouses, and outside vendors,
3  Cardinal and McKesson."
4       Do you see that?
5    A.  I do.
6    Q.  So that means, again, that as of that
7  time frame, July 8, 2013, it's still not
8  picking up outside vendors orders, but it's a
9  plan to do so in the future, correct?
10       MR. BUSH:  Objection.
11    A.  It appears to be that way, but I do
12  know that Cardinal and McKesson also have
13  their own suspicious order monitoring.
14  BY MR. BAKER:
15    Q.  Let's talk about that for a second.
16       Are you telling me that you know for a
17  fact that Cardinal and McKesson were
18  monitoring these -- the orders that were
19  placed by pharmacies?
20    A.  Not for a fact, no.
21    Q.  By CVS pharmacies?
22    A.  Not for a fact.
23    Q.  I want to make sure we're clear with
24  that.

Page 253

1    A.  Yeah.
2    Q.  So you today are not testifying that
3  Cardinal and McKesson were monitoring the
4  orders that CVS pharmacies made from Cardinal
5  and McKesson, correct?
6    A.  Absolutely not.
7    Q.  Now, this adding of the outside vendor
8  to the SOM process within CVS, that was
9  something that was contemplated as part of a
10  retunement that was to be rolled out in 2014;
11  am I correct?
12    A.  Correct.
13       MR. BUSH:  Objection.
14  BY MR. BAKER:
15    Q.  You said "correct"?
16    A.  Correct.
17    Q.  And there was a delay in rolling out
18  that retunement for various reasons, correct?
19    A.  I believe so.
20    Q.  Let me go back to Exhibit No. 60,
21  which has already been entered.
22       Would you pull it up, please.
23       Go to page 2.  Excuse me, page 1.
24       Now, at the -- it says "Currently mid

Page 254

1  deployment with 9 of 19 DCs deployed live on
2  the new SOM."
3      Do you see that?
4      A.  I do.
5      Q.  And it lists the dates that the new
6  SOM process was being implemented, and the
7  first date is 3/3/14, in Indianapolis,
8  correct?
9      A.  That is correct.
10     Q.  And each successive date thereafter,
11 beginning with 3/17/14 continuing down to
12 7/7/14, shows the dates of which that process
13 was rolled out into those distribution
14 centers, correct?
15     A.  Correct.
16     Q.  And it said that "Deployment delayed
17 due to system processing and data feed issues
18 that have created SOM historical data
19 inaccuracy."  Correct?
20     A.  That's what the document says.
21     Q.  So when it was attempted to be rolled
22 out, the program wasn't working properly,
23 correct?
24         MR. BUSH:  Objection.

Page 255

1      A.  That -- that, I don't believe is the
2  case.  I'm not aware of that.
3  BY MR. BAKER:
4      Q.  It says it was -- it had data feed
5  issues that have created SOM historical data
6  inaccuracy.
7      Do you know what that means?
8      A.  No.
9      Q.  Do you know what the importance of
10 historical data is relative -- in terms of
11 running through the suspicious order
12 monitoring process?
13     A.  My interpretation of that would be
14 that you need to have, you know, you need to
15 have that as part of the overall system.
16     Q.  And if it's inaccurate, then the
17 system is flawed, correct?
18     A.  Yeah, yeah.
19         MR. BAKER:  So now we get to the
20 next document, 62.
21
22      (Exhibit No. 62 marked for
23 identification.)
24

Page 256

1  BY MR. BAKER:
2      Q.  This is the controlled substances, DEA
3  List 1, chemical order monitoring process,
4  correct?
5      A.  Correct.
6      Q.  This is, last review date, 2/24/14; is
7  that right?
8      A.  Correct.
9      Q.  It's policy and procedure, correct?
10     A.  Yeah.  Correct.
11     Q.  If you go to page 2 of that document,
12 it talks about the new algorithm within the
13 new system that's being rolled out to these
14 distribution centers in 2014, correct?
15     Under "SOM algorithm," do you see
16 that?
17     A.  Yeah, I'm just reading it.
18     (Witness reviews document.)
19     Yeah.
20         MR. BUSH:  I'm sorry.  What was
21 your question again?
22     A.  What was the question?
23 BY MR. BAKER:
24     Q.  I'm asking is that what it pertains

Page 257

1  to, that SOM algorithm?
2      Let's read it.
3      "CVS has developed, with the
4  assistance of an outside company, algorithms
5  designed to review each order of federally
6  scheduled 3 through 5 controlled substances,
7  state controlled substances, and applicable
8  listed chemicals placed at our distribution
9  centers."
10     That's the first sentence of what it
11 says, correct?
12     A.  That is correct.
13     Q.  Then it says "It takes into account
14 orders placed to outside vendors as part of
15 the 'Know Your Customer' requirement."
16     Is that what it says?
17     A.  That's what it says.
18     Q.  This is CVS policy and procedure,
19 correct?
20     A.  Correct.
21     Q.  Within logistics.  Look at the first
22 page.
23     A.  Yes.
24     Q.  And logistics is the department that

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1   you were the head of, correct?
2       A.  That is correct.
3       Q.  Did you ever read this before today?
4       A.  I don't recall.
5       Q.  Now, do you remember at the beginning
6   of your testimony I asked if you had ever
7   heard of "Know Your Customer"?
8           Do you remember that?
9       A.  Yes.
10      Q.  Do you remember you saying that no,
11  you had never heard of it?
12      A.  I didn't remember it, correct, yeah.
13      Q.  It's unlikely that you've ever read
14  this document, then -- that's in your hands
15  until today; is that correct?
16      A.  That is correct.
17          MR. BAKER:  Next let's look at
18  Exhibit No. 54.
19
20          (Exhibit No. 54 marked for
21  identification.)
22
23  BY MR. BAKER:
24      Q.  Do you know what the term "lag" means

Page 259

1   in the context of suspicious order monitoring?
2       A.  I do not.
3       Q.  Do you remember when we talked to you
4   earlier today about the fact that the
5   controlled drugs were not being described by
6   active ingredient but were instead being
7   described by item?  Do you remember that?
8       A.  Yes, I do.
9       Q.  Now, I want you to read this along
10  with me on page 2 of this document.
11          It says -- Bates Number 34169.  It's
12  an e-mail dated October 6, 2010 from John
13  Mortelliti to Gary Misiaszek.
14          Do you see that?
15      A.  I do.
16      Q.  "Importance, high."
17          Do you see that?
18      A.  I do.
19      Q.  Now, when e-mails are sent and there's
20  a relative importance put to them, is high the
21  highest level of importance that can be
22  generated?
23      A.  I am not aware of that.
24      Q.  Are you -- are you aware of anything

Page 260

1   any higher than high, so far as the level of
2   importance when exchanging e-mails within the
3   CVS system?
4       A.  I -- I am not.
5       Q.  And it says "Gary, all but one item in
6   the network was missing three to four items of
7   LAG info on today's report."
8           You don't understand what that means,
9   do you?
10      A.  I don't.
11      Q.  If it related to historical data, that
12  would be a problem, would it not?
13      A.  If it referenced that.  But, again, I
14  don't -- I don't know what LAG means as part
15  of the --
16      Q.  If you're saying that LAG means a
17  reference to historical data, that would be a
18  problem in the SOM system, would it not?
19      A.  It would.
20      Q.  And it says "Something else has
21  changed, for just about every company we deal
22  with has changed the description on their
23  drugs."
24          Is that what it says?

Page 261

1       A.  That's what the e-mail says.
2       Q.  And do you remember from reviewing
3   prior e-mails in your testimony today what
4   problem that was causing insofar as being able
5   to pull up historical data?  Do you remember
6   that?
7       A.  I do.
8       Q.  And it says "Whatever you  could do to
9   help expedite this process would be greatly
10  appreciated.  I am now reviewing the network
11  controlled drug IRR on common sense as opposed
12  to IRR historical data.  I know that is
13  scary."
14          That's what it says, right?
15      A.  That's what the e-mail says, yes.
16      Q.  That is consistent with the suspicious
17  order monitoring system being flawed,
18  correct?
19          MR. BUSH:  Objection.
20      A.  I don't necessarily believe that this
21  e-mail would mean that it's totally flawed.
22          It just references that there might be
23  an area of opportunity.
24  BY MR. BAKER:

Page 262

1  Q.  Well, if you're not able to pull up
2  accurate historical data to references against
3  an order, that's not a DEA compliant
4  suspicious order monitoring system, is it?
5        MR. BUSH:  Objection.
6  A.  Correct.
7  BY MR. BAKER:
8  Q.  Correct?
9  A.  Correct.
10  Q.  Have you ever heard of the concept of
11  BVR order?
12  A.  No.
13  Q.  Do you know what "volume, ratio, or
14  both" means?
15  A.  I do not.
16  Q.  Do you know what "both volume and
17  ratio" means?
18  A.  I do not.
19  Q.  Do you know what a store metric report
20  means?
21  A.  I do not.
22  Q.  Do you even know what store metrics
23  are?
24  A.  They can mean a lot of different

Page 263

1  things in reference to, you know, service
2  level reports, inventory reports.  But in
3  this -- in reference to what we're talking
4  about, I do not.
5  Q.  In reference to suspicious order
6  monitoring of narcotic drugs, you have no idea
7  what the term "metric report" means?
8  A.  No, none whatsoever.
9  Q.  And in particular, in the context of
10  suspicious order monitoring, you have no idea
11  what the term "store metrics" means; is that
12  right?
13  A.  That's correct.
14  Q.  And in terms of suspicious order
15  monitoring, you have no idea what a store
16  metric report even contains, do you?
17  A.  I have no idea.
18  Q.  Or what it measures?
19  A.  (Witness nodding.)
20  Q.  Correct?
21  A.  Correct.
22  Q.  Or why it's even used in the context
23  of suspicious order monitoring, correct?
24  A.  That is correct.

Page 264

1        MR. BAKER:  Okay.  Let me show
2  you Exhibit 85.
3
4        (Exhibit No. 85 marked for
5  identification.)
6
7  BY MR. BAKER:
8  Q.  This is an e-mail from Kelly Baker to
9  Mark Nicastro.
10        Do you know who Kelly Baker was at
11  that time?
12  A.  I didn't -- no, I -- I don't know.
13  Q.  If you look -- excuse me.
14        On the second page of that document,
15  up at the top, this is an e-mail from Kelly
16  Baker to Craig Schiavo and Dean Vanelli.
17        Now, who are Craig Schiavo and Dean
18  Vanelli as of July 9, 2003 within CVS?
19        MR. BUSH:  2013 you mean?
20        MR. BAKER:  I'm sorry.
21  A.  '13, yeah, '13.
22  BY MR. BAKER:
23  Q.  Let me repeat the question.
24        We're looking at an e-mail dated

Page 265

1  July 9, 2013.
2        Who is Craig Schiavo and who is Dean
3  Vanelli in the context of CVS at that time?
4  A.  Craig was the senior manager of
5  regulatory compliance.  And Dean was the
6  director of logistics planning.
7  Q.  It says "Craig, not really pertaining
8  to your question, but I did want to highlight
9  to the group that you note that I do not have
10  a backup.  Even our hourly assistant has
11  limited access.  If something happens to me
12  via active nature or illness, the current
13  daily SOM process would come to a complete
14  halt."
15        Do you see that?
16  A.  I see that in that e-mail.
17  Q.  Does that indicate to you that the
18  entire suspicious order monitoring process
19  hinged on one person at that time?
20        MR. BUSH:  Objection.
21  A.  I -- I don't believe that's accurate.
22  BY MR. BAKER:
23  Q.  Was the suspicious order monitoring
24  process in 2013 a national process run out of

Page 266

1  one distribution center?
2      A.  I believe at that time it was run out
3  of Indianapolis.
4      Q.  And it was a national process,
5  right?
6      A.  Correct.
7      Q.  When I say it's a national process,
8  it's run for every single pharmacy that's
9  making every single order out of a DC
10 nationwide every day, correct?
11     A.  Correct.
12     Q.  And every night?
13     A.  Correct.
14     Q.  Go to the front page.  This is an
15 e-mail in the middle of the page --
16     A.  Yeah.
17     Q.  -- from Kelly Baker, Thursday,
18 July, 11, 2013, 11:38.
19         Do you see that?
20     A.  I do.
21     Q.  I says, to Craig Schiavo, "Craig,
22 another concern I have is the store metric
23 report I use to analyze the BVRs on the IRR.
24 The data snapshot is a three-month window that

Page 267

1  is a year old.  Any analysis that I make from
2  the data is, for the most part, irrelevant and
3  pointless."
4          Is that what it says?
5      A.  That's what the e-mail says.
6      Q.  If the analysis being done under the
7  CVS suspicious order monitoring system was
8  based upon data that for the most part was
9  irrelevant and pointless, then the system is
10 not doing what it's designed to do, which is
11 to monitor for suspicious orders of narcotic
12 drugs, correct?
13     A.  Based upon the e-mail, I would -- I
14 would say that that's correct.  However, I'm
15 just -- again, this is the first time seeing
16 the document.  I'm just not sure it's an
17 accurate statement even though it's there.
18 But I -- yes, it's correct.
19     Q.  Now, you understand -- look at the
20 top, it says "BVR."  It defines BVR under
21 Kelly Baker's e-mail to Mark Nicastro.
22         Do you see that?
23     A.  I do.
24     Q.  It says "The BVRs are orders flagged

Page 268

1  based on volume, ratio, or both."
2          Correct?
3      A.  That's what it says.
4      Q.  It sounds to you when you read this
5  e-mail that there are problems going on in the
6  suspicious order monitoring system at CVS in
7  July of 2013, correct?
8      A.  It appears that there are some
9  opportunities that are being addressed.
10     Q.  That's the positive way to describe a
11 problem, correct -- there are opportunities
12 that could be corrected -- correct?
13     A.  Yes.
14     Q.  The realistic way is there are
15 problems that need correcting, correct?
16         MR. BUSH:  Objection.
17     A.  Based upon the e-mail, there are
18 highlighting opportunities, yes.  Yeah.
19 BY MR. BAKER:
20     Q.  Now are you aware that in 2013, the
21 DEA wrote to your company telling your company
22 that the SOM process was not sufficient?
23         Are you aware of that?
24     A.  I don't recall.

Page 269

1      Q.  Could you pull Exhibit 103.  Do you
2  remember me going over Exhibit 103 with you?
3          MR. BUSH:  We've already looked
4  at that.
5  BY MR. BAKER:
6      Q.  Skip down to the bottom.
7          Do you remember that this document
8  dated May 15, 2014 was the closing remarks of
9  the DEA to your company, and your company
10 wrote in an e-mail from Andy Eck to Mortelliti
11 and others that under the suspicious order
12 monitoring topic that the DEA thought this
13 process was not sufficient?
14         Do you remember that?
15     A.  I remember it from the e-mail.
16     Q.  And when you read e-mails like we just
17 read with Mr. Kelly Baker (sic) to Mark
18 Nicastro describing these problems with store
19 metrics and BVR orders, orders based upon
20 volume, ratio or both being provided --
21 providing original analysis of data that for
22 the most part is irrelevant or pointless,
23 that's consistent with the DEA saying this
24 process was not sufficient, correct?

Page 270

1      MR. BUSH: Objection.
2 BY MR. BAKER:
3      Q. Isn't it?
4      MR. BUSH: Objection.
5      A. It appears to be -- it appears to be,
6 yes.
7 BY MR. BAKER:
8      Q. And do you remember Exhibit No. 34?
9 Could you pull that up, please. It's already
10 been entered.
11      If you go to page 2 of that document.
12      Do you see it in front of you?
13      A. Not yet.
14      Q. It's Bates number 10530.
15      A. Yes, I see it.
16      Q. Do you remember those were the
17 notes --
18      A. Yes.
19      Q. -- that were made about the DEA
20 visit --
21      A. Yes.
22      Q. -- the visit in 2013 to the Indiana
23 facility?
24      A. Yes.

Page 271

1      Q. At the bottom, it says "Failure to
2 design and control substance monitoring, most
3 serious."
4      Correct?
5      A. That's what it says, correct.
6      MR. BAKER: Let's go to Exhibit
7 36A, please.
8      Excuse me, 10A. Let me see that for
9 just a second.
10
11 BY MR. BAKER:
12      Q. Could you go to Exhibit 36A, please.
13 I'm going to have to pull it up on the screen.
14      MR. BUSH: One we've already
15 looked at?
16      MR. BAKER: It should be, yes.
17 BY MR. BAKER:
18      Q. Now, do you remember these e-mails I
19 went over with you with Kelly Baker? Look at
20 me please, sir.
21      A. Yes.
22      Q. Do you remember these e-mails I went
23 over with Kelly Baker describing the
24 problems --

Page 272

1      A. Yes.
2      Q. -- that were going on?
3      A. Yes.
4      Q. Do you remember this series of closing
5 remarks --
6      A. Yes.
7      Q. -- that we talked about?
8      A. Yes.
9      Q. Now, at some point there was a
10 discussion within CVS to move the entire
11 process of suspicious order monitoring out of
12 logistics and to place it up into corporate up
13 here in Woonsocket, correct?
14      A. Correct.
15      Q. This is an e-mail, Exhibit 36A,
16 Bates 12363, that at 8/18/13 between Mark
17 Nicastro and you, Ronald Link, correct?
18      A. Correct.
19      Q. So you're familiar with this e-mail?
20      A. Yeah, I don't...
21      MR. BUSH: Bill, I don't think
22 you did show this before.
23      THE WITNESS: This is the first
24 time --

Page 273

1      MR. BUSH: This looks new to me.
2 How long -- is it just this page, or is there
3 more to it than that?
4      MR. BAKER: As far as I know,
5 this is it. This is the entire e-mail.
6      MR. BUSH: What's up on the
7 screen is the entire e-mail?
8
9      (Brief pause in proceedings.)
10
11      MR. BUSH: Got it. I'm sorry.
12 BY MR. BAKER:
13      Q. Let's go to Exhibit 36A.
14      A. Yes.
15      Q. Do you see that it's dated 8/18/13
16 from Mark Nicastro to you, Ronald Link?
17      A. I do.
18      Q. Correct?
19      A. Yes.
20      Q. It's called "SOM update," correct?
21      A. Correct.
22      Q. So you were involved in the SOM
23 process to some degree, were you not? I mean,
24 You're getting SOM updates, right?

Page 274

1    A.  To some degree, yes.
2    Q.  But this is your department at this
3  time, correct?
4    A.  Correct.
5    Q.  Your head of the entire SOM department
6  right?
7        MR. BUSH:  Objection.
8    A.  I -- I have -- it's within my area of
9  responsibility, but I've got people within my
10  department that oversee the SOM program.
11  BY MR. BAKER:
12    Q.  Let's go -- let's go visit that again.
13  The SOM department is owned by logistics at
14  that time correct?
15    A.  That's correct.
16    Q.  And you were the head of logistics at
17  that time?
18    A.  That's right.
19    Q.  Correct?
20    A.  Correct.
21    Q.  When this e-mail is being written, you
22  were head of logistics, which is head of
23  suspicious order monitoring, correct?
24        MR. BUSH:  Objection.

Page 275

1  BY MR. BAKER:
2    Q.  Right?
3    A.  It was within my organization,
4  correct.
5    Q.  Within the department that you were
6  head of?
7    A.  Right.
8    Q.  Right?
9    A.  That's correct.
10    Q.  And you're on this e-mail, right?
11    A.  That's correct.
12    Q.  And it deals with suspicious order
13  monitoring, right?
14    A.  That's correct.
15    Q.  So this goes down to Paragraph 2, it
16  says "Tom Bourque mentioned a reason for
17  moving the process is because we don't usually
18  get tipped off that the DEA are coming and
19  they never take a day off during the audit."
20        Correct?
21    A.  That's what it says in the e-mail.
22    Q.  So moving the process.  Is this moving
23  the process to Woonsocket?  Is that what this
24  says?

Page 276

1        Look at the bottom there.  It says "I
2  know Tom and Craig want the process in
3  Woonsocket.  And if they're going to own it,
4  staff it, and manage it, fine."
5        Correct?
6    A.  That's what it's referencing, correct.
7    Q.  So this e-mail is one that
8  contemplates moving the process out of your
9  distribution center --
10    A.  To corporate.
11    Q.  -- to corporate, correct?
12    A.  Correct.
13    Q.  And the one -- one of the reasons is
14  that because they don't usually get tipped off
15  by the DEA when they're coming to visit at the
16  distribution center, correct?
17    A.  I'm -- you know, it's on the e-mail,
18  but I was never aware of a tipping off of --
19  by the DEA visiting a distribution center.
20    Q.  Is there a better chance that CVS
21  would get tipped off by moving it to
22  Woonsocket into corporate somehow?  Is that
23  what this is all about?
24        MR. BUSH:  Objection.

Page 277

1    A.  I have no idea.
2  BY MR. BAKER:
3    Q.  Is that one of the reasons that's
4  stated in this e-mail, because you aren't
5  getting tipped off by the DEA, so let's move
6  it up to corporate in Woonsocket, Rhode
7  Island; isn't that what it says?
8    A.  I have --
9        MR. BUSH:  Objection.
10    A.  I have no idea.
11  BY MR. BAKER:
12    Q.  You have no idea?
13    A.  I don't believe that's the case at
14  all.
15    Q.  What would -- what's the reason that
16  was being discussed between you and
17  Mr. Nicastro?
18        Tom Bourque mentioned a reason for
19  moving the process is because we don't usually
20  get tipped off by the DEA -- tipped off that
21  the DEA are coming.
22    A.  I don't understand why Tom would make
23  that comment.  I don't understand.
24    Q.  Well --

Page 278

1    A.  I don't know why he would make the
2  comment.
3    Q.  Did you call Tom and say, Tom, why are
4  you saying this?
5    A.  I don't recall.
6    Q.  Are you aware of any process through
7  which CVS gets tipped off?
8    A.  No.  Absolutely not.
9    Q.  Are you aware of any process why you
10  would get tipped off if it was moved out of
11  Indiana as opposed to staying in Indiana?
12    A.  Absolutely not.  I never heard an
13  incident where the DEA would tip off a DC;
14  never once.
15    Q.  You understand that at the time of
16  this e-mail, there was no suspicious order
17  monitoring manager in place?  Did you know
18  that?
19        MR. BUSH:  Objection.
20    A.  I am not sure.  I can't remember.
21  BY MR. BAKER:
22    Q.  You say you had people that worked
23  below you.  That's including a suspicious
24  order monitoring manager, correct?

Page 279

1    A.  We had -- we had people that were
2  responsible for this, correct.
3    Q.  One of your managers, that would be a
4  suspicious order monitoring manager, correct?
5    A.  Would be part of the staff.
6    Q.  Okay.  One of your managers in your
7  department, right?
8    A.  Correct.
9    Q.  Right?
10    A.  Correct.
11    Q.  So let's go further in here.
12        It says "We may not get tipped off
13  that they are coming, but DEA audits -- DEA
14  audits typically take a day off to allow the
15  DC to get the paperwork before they come
16  back."
17        Correct?  That's what it says?
18    A.  That's what it says.
19    Q.  And then it goes on to say, "I
20  understand his trepidation given our
21  vulnerability of not having an SOM manager."
22        Isn't that what it says?
23    A.  That's what the e-mail says, correct.
24    Q.  That would be consistent with you

Page 280

1  participating in an e-mail or at least
2  receiving an e-mail from Mark Nicastro, who is
3  the Indiana DC director, August 18, 2013,
4  telling you, the senior vice president of
5  logistics, that there really is no SOM manager
6  at CVS right now, correct?
7        MR. BUSH:  Objection.
8    A.  It's purely a title.  There were
9  people managing the program.  It's just purely
10  interpretation of creating a different title
11  for people who are managing a program.  That's
12  all.
13  BY MR. BAKER:
14    Q.  Is that consistent with the way that
15  the title was created for Amy Propatier, that
16  she was DEA compliance coordinator?
17        Is that -- was that just a title, but
18  she really didn't do it?  Is that what you're
19  saying?
20    A.  No, no.
21    Q.  Is -- was the SOM manager really not
22  an SOM manager; it was just a title thrown out
23  there on somebody?
24    A.  No.

Page 281

1    Q.  Well, then, the SOM manager manages
2  the SOM system under your category, right?
3    A.  Correct.
4    Q.  So there was no SOM manager at this
5  time, correct?
6    A.  There may --
7        MR. BUSH:  Objection.
8    A.  -- not have been a titled manager.
9  There may not have been a person with that
10  title at that time.
11  BY MR. BAKER:
12    Q.  This is talking in the first paragraph
13  of this e-mail about interviewing somebody for
14  your future SOM manager, correct?
15    A.  Correct.
16    Q.  This person -- did this person ever
17  get hired?
18    A.  I don't know.
19    Q.  Do you know who this person was that
20  CVS was trying to hire?
21    A.  I don't.
22    Q.  Do you know who the next succession
23  person was to get hired on as the SOM manager?
24    A.  I know who eventually became the SOM

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    manager.
2        Q.  It was Shauna Helfrich; is that right?
3        A.  I'm not aware.  I don't believe so.
4        Q.  You're not aware of that?
5        A.  No.
6        Q.  Do you know when this SOM manager got
7    hired on, this next person?
8        A.  I do not.
9        Q.  Do you know how long it took to get an
10   SOM manager in place?
11       A.  I do not.
12       Q.  Do you know how long the SOM program
13   was unmanaged?
14           MR. BUSH:  Objection.
15       A.  It was always managed.
16   BY MR. BAKER:
17       Q.  Let's go to the next document.
18           Now, aside from the Indiana
19   distribution center, there was another
20   distribution center in Chemung, New York,
21   correct?
22       A.  Yes.
23       Q.  That particular distribution center
24   never reported a suspicious order the entire

Page 283

1    time that you were employed by CVS; am I
2    correct?
3        A.  I'm not aware of that.
4        Q.  Are you aware of one suspicious order
5    at all that was ever reported by the Chemung,
6    New York distribution center?  Yes or no?
7        A.  No.  I -- I'm not aware of any.
8        Q.  Let me ask you to look at Exhibit 108
9    with me, please.
10
11           (Exhibit No. 108 marked for
12   identification.)
13
14   BY MR. BAKER:
15       Q.  This is a memo from the Indianapolis
16   distribution center, dated August 5 through
17   August 8, 2013, discussing a DEA visit there
18   in August of 2013.
19           Is that correct?
20       A.  Yeah.  Yes.
21       Q.  If you would turn to the sixth page of
22   that document, please.  We're at Bates 8394.
23           It says -- the sixth bullet down
24   there, it says "DEA stated statistics like

Page 284

1    Indiana leads the nation in pharmacy armed
2    robberies and that several CVS stores have
3    been among those robbed."
4        Correct, that's what it says?
5        A.  Yes.
6           MR. BUSH:  I'm sorry.  Where are
7    you?
8        Got it.  Thank you
9        A.  Yes, that's what the e-mail -- the
10   document says.
11   BY MR. BAKER:
12       Q.  The document says "They question what
13   CVS is doing or can do to prevent pharmacy
14   robberies."
15       Correct?
16       A.  Correct.
17       Q.  It says "They question maybe some of
18   our stores are carrying too much hydrocodone,
19   which is a major target for robberies, and
20   that CVS continues to pump hydro into those
21   stores, some of which have been robbed
22   repeatedly."
23       Correct?
24       A.  That's what it says.

Page 285

1        Q.  Now, are you aware that these
2    robberies were going on when you were --
3        A.  No.
4        Q.  -- employed there?
5        A.  No.
6        Q.  Nobody informed you about it?
7        A.  No.
8        Q.  Isn't that part of suspicious order
9    monitoring, to know your customer?
10       A.  In reference to robberies taking place
11   in a store, I don't recall any -- any
12   discussions around that at all.
13       Q.  Isn't it part of "Know Your Customer"
14   to know that robberies are taking place in
15   your stores?
16       A.  I'm not sure.  I'm not sure.
17       Q.  Isn't it -- isn't that part of
18   diversion, when robberies take place and the
19   hydrocodone are stolen and put out onto the
20   street?
21       A.  Yes, yeah.
22       Q.  Isn't that part of what the suspicious
23   order monitoring process is all about, to
24   prevent that kind of stuff?

Page 286

1    A.  Yes.
2    Q.  Isn't this part of something that
3  should be reported to the DEA?
4    A.  Yes.
5    Q.  How many visits did you make to these
6  stores that were being robbed repeatedly?
7    A.  Me personally?
8    Q.  Yes.
9    A.  None.
10   Q.  How many visits did anybody from CVS
11 make to these stores that were being robbed
12 repeatedly?
13   A.  I have no knowledge of that.
14   Q.  What suspicious order monitoring was
15 done, if any, relative to these stores that
16 were being robbed repeatedly?
17   A.  I am not aware of anything.
18       MR. BAKER:  Let me show you
19 Exhibit 68.
20
21     (Exhibit No. 68 marked for
22 identification.)
23
24 BY MR. BAKER:

Page 287

1    Q.  Do you remember earlier in your
2  testimony today I asked if you ever heard of
3  or knew what an IRR report was?  Do you
4  remember that?
5    A.  I do.
6    Q.  Do you remember telling me that, no,
7  you never heard of it and that you didn't know
8  what it was before today, correct?
9    A.  I did not -- did not recall the
10 content of what an IRR report is, correct.
11   Q.  But I've shown you in the policies and
12 procedures manual --
13   A.  Yes.
14   Q.  -- from CVS what an IRR report is,
15 right?
16   A.  Correct.
17   Q.  So you have some knowledge of it just
18 by virtue of reading it today, correct?
19   A.  That is correct.
20   Q.  So you have some knowledge from your
21 reviewing documents with me today that there
22 was this algorithm-based system from a company
23 that had written a software program for CVS at
24 some point, correct?

Page 288

1    A.  Correct.
2    Q.  And you have knowledge at some point
3  that there was supposed to be some pend of an
4  order, based upon that algorithm, causing a
5  certain score of a certain order, correct?
6    A.  Correct.
7    Q.  Now, regardless of what that says
8  about how orders were pended or not pended,
9  let me show you what this document says.
10       Go down to where it says "Process of
11 identifying suspicious orders."
12       Do you see that?
13   A.  I do.
14   Q.  If you look at me for just a second.
15 You know the definition of a suspicious order,
16 right?
17   A.  Correct.
18   Q.  What is a suspicious order?
19   A.  It's an item that has either the
20 frequency or the velocity of the item is out
21 of -- out of norm.
22   Q.  Is that what you think it is?
23       I've read it to you like three or four
24 times today.  Is that your definition of a

Page 289

1  suspicious order?
2        MR. BUSH:  This isn't a memory
3  test.  Why don't you move on.
4    A.  Yeah.
5  BY MR. BAKER:
6    Q.  Do you know what a suspicious order
7  is?
8    A.  It's an item that has the -- it's an
9  issue with the velocity and also the frequency
10 of the order is out of the norm.
11   Q.  Velocity is speed, correct?
12   A.  Velocity is frequency.  Frequency of
13 the order and also the size of the order.
14   Q.  I'm going to let you go back at some
15 point and read the statute again.
16       But in any event, let's move forward.
17 Okay?
18   A.  Thank you.
19   Q.  So it says "Process of identifying
20 suspicious orders."
21       I'd like you to bold that first
22 sentence, please.
23   A.  Which one?
24   Q.  The trial technician is doing that, if

Page 290

1 you look at your screen there.
2 A. Okay.
3 Q. It says "In order to determine which
4 items on the control IRR are suspicious, the
5 order quantity field is observed by the DCIR
6 analyst when a quantity is ordered of ten or
7 more."
8 Let's stop right there.
9 "Ten or more" means ten bottles or
10 more, correct?
11 MR. BUSH: Objection.
12 A. Again, first time I'm seeing this
13 report. I was not that deep into the
14 reporting to understand exactly what is meant
15 by what's being reported here.
16 BY MR. BAKER:
17 Q. The bottles that were shipped of
18 hydrocodone combination products out of the
19 distribution center generally contained 500
20 pills per bottle; is that right?
21 A. I don't know.
22 Q. You don't even know that?
23 A. I don't know how many -- I have no
24 knowledge of how many pills are in each

Page 291

1 bottle.
2 Q. And then it says -- goes on to say,
3 "The month-to-date field is then observed and
4 compared to LAGs 1, 2, and 3."
5 You have no idea what LAGs 1, 2, or 3
6 are, correct?
7 A. No.
8 Q. Correct?
9 A. No.
10 Q. And then it says "If the month-to-date
11 quantity is at least three times greater than
12 the quantities in LAGs 1, 2, or 3, then that
13 item is labeled as being suspicious."
14 Is that what it says?
15 A. That's what it says.
16 Q. So go to the paragraph above that and
17 go to the last two sentences where it says
18 "the unit of measure."
19 Do you see here?
20 A. Yeah.
21 Q. It starts with, "The unit of measure,"
22 and then go ahead and bold everything down to
23 the end of that paragraph, please.
24 It says "The unit of measure does not

Page 292

1 state the form of the controlled substance,
2 (tablet, liquid, gram, et cetera) but the
3 person reviewing the report has an
4 understanding of the proper unit of measure
5 used for the controlled substances identified
6 on the report. The month-to-date order
7 quantity states the amount of the item in
8 question ordered during the current month.
9 LAG 1 is the amount ordered the month before.
10 LAG 2 is the amount ordered two months before.
11 And LAG 3 is the amount ordered three months
12 before."
13 Do you understand what LAG is now?
14 MR. BUSH: Objection.
15 A. It appears to be referencing a month,
16 but that's -- that's just my understanding
17 from reading this right now.
18 BY MR. BAKER:
19 Q. LAG 1 is the amount ordered the month
20 before.
21 You know what that means, correct?
22 A. Right.
23 Q. So if you ordered in April, that would
24 mean the amount you ordered in March, correct?

Page 293

1 A. Correct.
2 Q. If you ordered in April, LAG 2 is the
3 amount ordered two months before. So that
4 would be the amount ordered in February,
5 correct?
6 A. Correct.
7 Q. All right. And LAG 3 is the amount
8 ordered three months before. So if you
9 ordered in April, that would be the amount you
10 ordered in January, right?
11 A. Correct.
12 Q. So LAG 1 would be what? January.
13 LAG 2 would be February.
14 LAG 3 would be March.
15 Correct?
16 A. Correct.
17 MR. BUSH: I think you got that
18 backwards, but...
19 BY MR. BAKER:
20 Q. Or LAG 1 would be March. LAG 2 would
21 be February. LAG 3 would be January.
22 A. Correct.
23 Q. Correct?
24 A. Correct.

Page 294

1    Q.  That's the three LAG system that we're
2  talking about here, correct?
3    A.  Okay.
4    Q.  And it says here that "The
5  month-to-date field is then observed and
6  compared to LAGs 1, 2, and 3.  If the
7  month-to-date quantity is at least three times
8  greater than the quantities in LAGs 1, 2, or
9  3, then that item is labeled as being
10  suspicious."
11        Correct?
12    A.  That's what the document says.
13    Q.  Think about this for a second.  If
14  that's the measure, then hypothetically, what
15  that would mean is that if 10,000 pills were
16  ordered in April, then you go back -- excuse
17  me -- if 10,000 pills were ordered in January,
18  right?
19    A.  (Witness nodding.)
20    Q.  If 10,000 pills were ordered in
21  February, if 10,000 pills were ordered in
22  March, that's 10,000 pills into a pharmacy,
23  narcotics, on average, per month during those
24  LAGs, correct?

Page 295

1    A.  Correct.
2    Q.  If during April the order is not at
3  least 10,000 plus three times that -- so X
4  plus 3X -- then the order's not going to be
5  considered suspicious; but if it does equal X
6  plus 3X, it's going to be considered
7  suspicious, correct?
8        MR. BUSH:  Objection.
9  BY MR. BAKER:
10    Q.  Is that what it says?
11        MR. BUSH:  Objection.
12    A.  I'm not sure it says that.
13  BY MR. BAKER:
14    Q.  You're not sure?  Well, let's read it.
15  Okay?
16    A.  Yeah.
17    Q.  It says that "If the month-to-date
18  quantity is at least three times greater."
19        Do you know what "three times greater"
20  means?
21    A.  I do.
22    Q.  So it means -- three times greater
23  means three times greater than the prior
24  order, correct?

Page 296

1    A.  That's right.
2    Q.  So if the prior order is 10,000 and
3  the current order is not at least three times
4  more than 10,000 --
5    A.  Right.
6    Q.  -- three times 10,000 more than
7  10,000.
8    A.  Right.
9    Q.  In other words, if it isn't at least
10  40,000 --
11    A.  Right.
12    Q.  -- then if it's at least that much,
13  then the item is labeled as being suspicious,
14  correct?
15    A.  That's what it says.
16    Q.  Is that right?
17    A.  That's what it says, yes.
18    Q.  So it would take a jump from 10,000 to
19  40,000 under this definition to be labeled as
20  suspicious, correct?
21        MR. BUSH:  Objection.
22  BY MR. BAKER:
23    Q.  Right?
24    A.  Based on what is written here, yes.

Page 297

1    Q.  Do you remember when I talked about --
2  when I talked about same store, same month?
3  Do you remember?
4    A.  Yes.
5    Q.  Do you remember how I talked about how
6  the same store, same month can order and then
7  reorder and then reorder during the same
8  month, and the subsequent orders would not be
9  run through the SOM system?
10        Do you remember that, that it wouldn't
11  be looked at?
12        MR. BUSH:  Objection.
13  BY MR. BAKER:
14    Q.  Do you remember that?
15    A.  I believe so, yes.
16    Q.  That offers the opportunity out there
17  for somebody to way over-order during the same
18  month from the same pharmacy, doesn't it?
19        MR. BUSH:  Objection.
20  BY MR. BAKER:
21    Q.  Doesn't it?
22    A.  Potentially.
23        MR. BUSH:  Objection.
24    A.  Potentially, yes.

Page 298

1  BY MR. BAKER:
2      Q.  And this definition of suspicious
3  order requires X plus three -- three times X
4  in the subsequent month for it to even be
5  considered suspicious based upon a three-month
6  prior lag, correct?
7          MR. BUSH:  Objection.
8      A.  Based upon the way this is written,
9  correct.
10  BY MR. BAKER:
11      Q.  How do you feel about that, knowing
12  that that's the way it was, knowing that you
13  could do same stuff, same store, same month
14  order and have a definition as liberal as this
15  as to what a suspicious order should be?
16          MR. BUSH:  Objection.  Misstates
17  the record.
18      A.  I don't know.  I mean, I -- I...
19  BY MR. BAKER:
20      Q.  You don't know how you feel?
21      A.  I --
22          MR. BUSH:  Objection.
23  BY MR. BAKER:
24      Q.  The opioid crisis going on; people

Page 299

1  dying.
2          MR. BUSH:  Objection.  I'm not
3  sure that's a question.
4  BY MR. BAKER:
5      Q.  How do you feel about that as a
6  manager?
7      A.  I'm --
8          MR. BUSH:  Objection.
9      A.  -- just not sure that that was the
10  inappropriate protocol, based upon everything
11  else that was taking place.
12          And, again, you know, during this
13  period of time in 2011, you know, it was
14  not -- it was not part of my organization and
15  I was not, you know, privy to a lot of that
16  information.
17  BY MR. BAKER:
18      Q.  We went over that list of DCs,
19  distribution centers, in Exhibit 60, and there
20  were 19, correct?
21      A.  Correct.
22      Q.  This program that we're talking about,
23  this suspicious order monitoring program that
24  we've gone over in these documents, this is

Page 300

1  national in scope, right?
2      A.  Correct.
3      Q.  Every single state was measured under
4  this suspicious order monitoring system,
5  correct?
6      A.  Correct.
7      Q.  And over 9,500 pharmacy stores
8  throughout the United States that CVS owns are
9  being monitored under this system, correct?
10      A.  That is correct, yes.
11      Q.  Were you interviewed for a magazine
12  article concerning "CVS Health Supply Chains
13  Vigor Relies on Critical Link"?
14          That's the name of the article,
15  correct?
16          Do you remember being interviewed for
17  that article?
18      A.  Yeah, I've been interviewed by a
19  number of different --
20      Q.  Would you like to see it?
21      A.  Sure.
22          (Witness reviews document.)
23          Yeah.
24          MR. BUSH:  May I see it?

Page 301

1          MR. BAKER:  Sure.
2
3          (Brief pause in proceedings.)
4
5  BY MR. BAKER:
6      Q.  Now, this was April 10 of 2017,
7  correct?
8      A.  Yes.
9      Q.  Now, this quotes you.  I want to ask
10  you if you made this quote.
11          "The supply chains" -- "The supply
12  chain has needed to keep pace with the
13  company's growth.  I've always been very, very
14  proud of our infrastructure, our capability,
15  and the investments we have made in our
16  assets, technology, and people."
17      A.  Correct.
18      Q.  Did you make that statement?
19      A.  I did.
20      Q.  Having reviewed these documents, are
21  you proud of that now?
22          Yes or no?
23      A.  Yes, I am.
24      Q.  You're proud of that system?

Page 302

1    A.   Yeah, I am proud of our total
2  logistics and supply chain system.
3    Q.   You're proud of a system that doesn't
4  monitor same store, same store orders --
5        MR. BUSH:  Objection.
6    Q.   -- for narcotics?
7      You're proud of that?
8        MR. BUSH:  Objection.
9    A.   I believe that the system that we have
10  in place does monitor store orders
11  appropriately.
12  BY MR. BAKER:
13    Q.   You had nothing to do with the
14  suspicious order monitoring system directly,
15  did you?
16    A.   I did not.
17    Q.   You had nothing the -- no knowledge of
18  how it even worked, did you?
19    A.   I had a team of people within
20  logistics and outside of logistics that had
21  direct responsibility for managing and
22  building that system.
23    Q.   Now, you just made a statement about
24  how proud of the system you were, but you had

Page 303

1  no knowledge of the fact that even the system
2  was based upon thresholds, did you?
3    A.   I did not have deep knowledge and --
4  of what -- of how the system had to be built
5  or the way it was designed.
6    Q.   Let's just get to the skinny of this.
7      Before today you had no knowledge of
8  even what a threshold was, did you?
9        MR. BUSH:  Objection.
10    A.   I -- I had no requirement to
11  understand what a threshold was.
12  BY MR. BAKER:
13    Q.   Okay.  Before today, you had no
14  knowledge of what a threshold was in the
15  context of suspicious order monitoring,
16  correct?
17    A.   That is correct.
18    Q.   Before today, you had no knowledge of
19  what an internal review report was in the
20  context of suspicious order monitoring,
21  correct?
22    A.   That is correct.
23    Q.   Before today, you had no knowledge of
24  the fact that CVS had an algorithm-based

Page 304

1  software system that was part of its
2  suspicious order monitoring system, correct?
3    A.   Correct.
4    Q.   Before today, you really have no basis
5  to know whether you even have a genuine
6  evidence-based assumption to be proud of CVS's
7  suspicious order monitoring system, correct?
8    A.   That's not correct.
9    Q.   Sir, if you don't know what the
10  thresholds are, you don't know -- you don't
11  even know what that is, you don't know what an
12  IRR is, you don't know what the software
13  program is, you don't even know that there's
14  an algorithm-based software program.  Wouldn't
15  you say that you were not familiar with the
16  suspicious order monitoring system?
17    A.   I was not into the deep detail, but I
18  have a high degree of confidence that people
19  on my team and that the people within the
20  organization were deeply involved in
21  monitoring and building a solution that
22  ultimately filled the requirements that were
23  required of the DEA.
24    Q.   So you were proud of the people that

Page 305

1  worked for you on the SOM team, correct?
2    A.   Correct.
3    Q.   And they were happy to be there,
4  correct?
5    A.   Yes.
6    Q.   Let me ask you to look at Exhibit 40B.
7
8      (Exhibit No. 40B marked for
9  identification.)
10
11  BY MR. BAKER:
12    Q.   Now, this is an e-mail dated
13  9/27/2013, and it's from William Jusko to Mark
14  Nicastro.
15      Do you know who William Jusko is?
16    A.   I do.
17    Q.   Who is he?
18    A.   He was a regional director for DC
19  operations.
20    Q.   And then below that is an e-mail from
21  Mark Nicastro to Dean Vanelli, including
22  William Jusko, correct?
23    A.   Correct.
24    Q.   And it's September 27, 2013.  Would

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1  you read along with me, regarding SOM?
2      A.  Yes.
3      Q.  It says "I met with Steve Churchill,
4  DEA consultant, this morning.  We were talking
5  about the Kelly and Shauna."
6          Now that's Kelly Baker and Shauna
7  Helfrich, correct?
8      A.  Correct.
9      Q.  Do you know who Shauna Helfrich is?
10     A.  She worked in the Indianapolis
11 distribution center.
12     Q.  Do you know what she was?  What her
13 title was or what she did?
14     A.  I believe she had a role in working
15 with the suspicious order monitoring system,
16 but I don't know what her title was.
17     Q.  It says "We were talking about Kelly
18 and Shauna, and he told me Kelly has a phone
19 interview.  No surprise."
20         Do you see that?
21     A.  I see that.
22     Q.  Kelly's looking for another job,
23 right, at that point?
24     A.  It appears that way.

Page 307

1      Q.  It says "However, Shauna has been
2  offered a position with the law firm she used
3  to work with and it's more money."
4          Do you see that?
5      A.  Yes.
6      Q.  It says "I'll talk to her today, but
7  we could be in trouble fast."
8          Do you see that?
9      A.  I see that in the e-mail, yes.
10     Q.  It looks like Kelly and Shauna are
11 both leaving, correct?
12         MR. BUSH:  Objection.
13 BY MR. BAKER:
14     Q.  Doesn't it?
15     A.  It appears that they might be
16 entertaining another job opportunity.
17     Q.  And do you know why that would be?
18     A.  I do not.
19     Q.  Did you ever talk to Mr. Burtner about
20 employee morale, employee performance within
21 the SOM system?
22     A.  Mr. Burtner, no.
23     Q.  Let me ask you to look at Exhibit 111,
24 please.

Page 308

1
2
3          (Exhibit No. 111 marked for
4  identification.)
5
6  BY MR. BAKER:
7      Q.  Now, before you look at that, is it
8  important to have the suspicious order
9  monitoring system properly staffed and
10 properly equipped --
11     A.  Yes.
12     Q.  -- in order for it to operate
13 properly?
14     A.  Yes.
15     Q.  If it's not properly staffed and not
16 properly equipped, it's not going to operate
17 properly, correct?
18     A.  Correct.
19     Q.  It's not going to be DEA compliant at
20 that point, correct?
21     A.  It still could be DEA compliant if
22 you're potentially getting through all the
23 work that needs to be done.
24     Q.  Let's look at this.

Page 309

1          On page 3 of that document, there's an
2  e-mail dated 9/17/2013.  It's from Aaron
3  Burtner to Andy Eck.
4          Now, Aaron Burtner left CVS in late
5  2013, did he not?
6      A.  I'm not sure.
7      Q.  It goes on to state here, and they're
8  talking about Kelly Baker?  Can you read down
9  below that.
10     A.  (Witness reviews document.)
11     Q.  Well, let me ask you, look at that
12 e-mail.  Do you know who's -- who they're
13 talking about?
14         MR. BUSH:  I'm sorry, which
15 e-mail, Bill?
16     A.  I don't.
17         MR. BAKER:  We're looking at
18 9/17/2013.
19         MR. BUSH:  The top e-mail?
20         MR. BAKER:  Yes.
21 BY MR. BAKER:
22     Q.  It says "Yeah," -- look at the
23 bottom.
24         It's talking here, it says, at the

Page 310

1    bottom, September 17, 2013, at the bottom. Do
2    you see that at the bottom of this page?
3        A.  Yes.
4        Q.  Bates 99708.
5        A.  Yeah.
6        Q.  It's from Andy Eck to Aaron Burtner.
7        It says "Kelly is off his rocker."
8        Do you see that?
9        A.  I see it on the document, yes.
10       Q.  Now, you see above that it says "I
11   worry about his mental stability at this
12   point, too."
13       Do you see that?
14       Look.  "I worry about his mental
15   stability at this point, too."
16       Do you see that?
17       A.  I do.
18       Q.  Do you see above that, it says "He is
19   not stable.  Shauna is worried about him and
20   tells me that he's pretty much over the SOM.
21   This -- then he leaves her reports that she's
22   not familiar with."
23       Do you see that?
24       A.  I do.

Page 311

1        Q.  Going above that, and this is Aaron
2    Burtner to Andy Eck, "Yeah, he's completely
3    over it.  He's doing his job and my old job
4    but only being paid for one."
5        Do you see that?
6        A.  I do.
7        Q.  So at this point, Burtner is no longer
8    doing suspicious order monitoring, correct?
9            MR. BUSH:  Objection.
10   BY MR. BAKER:
11       Q.  Is that right?
12           MR. BUSH:  Objection.
13       A.  It appears -- I believe he still is.
14   BY MR. BAKER:
15       Q.  But he's -- he's passed off his
16   responsibilities to Kelly Baker, at least
17   according to this, because he says "Yeah, he's
18   completely over it.  He's doing my -- his job
19   and my old job but only being paid for one,"
20   correct?
21           MR. BUSH:  Objection.
22       A.  Yes.
23   BY MR. BAKER:
24       Q.  Yes?

Page 312

1        A.  Yes.
2        Q.  Burtner's preparing to leave, to go to
3    Amazon, correct?
4            MR. BUSH:  Objection.
5    BY MR. BAKER:
6        Q.  Right?
7        A.  Again, it's the first time I'm seeing
8    these documents, and I really don't know.
9        Q.  Well, Burtner left to go to work for
10   Amazon in Seattle, did he not?
11       A.  I don't know.  I mean, the only way I
12   know it is because of the e-mail address.
13       Q.  Look at where it's being sent from.
14   Amazon Global Security.  Do you see that?
15       A.  Yes.
16       Q.  He had already left.  He's already
17   gone, right?
18           MR. BUSH:  Objection.
19   BY MR. BAKER:
20       Q.  Right?
21       A.  Yes.
22       Q.  So Aaron Burtner is at Amazon sending
23   this e-mail to Andy Eck, correct?
24       A.  Yes.

Page 313

1        Q.  So, basically, you have Kelly Baker
2    doing Aaron Burtner's old job at this point,
3    right?
4        A.  Yes.
5            MR. BUSH:  Objection.
6    BY MR. BAKER:
7        Q.  Right?
8        A.  Yes.
9        Q.  And --
10           MR. BUSH:  Objection.
11       Q.  -- according to this e-mail, he's not
12   mentally stable, correct?
13           MR. BUSH:  Objection.
14       A.  I -- I -- it's just his -- his wording
15   interpretation, and I don't believe that would
16   be the case.
17   BY MR. BAKER:
18       Q.  And according to Kelly Baker's e-mail,
19   the data he's being provided was pointless and
20   irrelevant for use in terms of his doing his
21   job in suspicious order monitoring.  Do you
22   remember that?
23           MR. BUSH:  Objection.
24       A.  I don't remember any of this.  This is

Page 314

1  the first time I'm seeing this.
2  BY MR. BAKER:
3     Q.  Do you remember the document that I
4  just showed you today that said that?
5     A.  Yes, yes.
6     Q.  So according to Kelly Baker, who is in
7  SOM at the time --
8     A.  Yes.
9     Q.  -- he's being provided historical data
10 to do an analysis that to him the way he's
11 looking at this is pointless and irrelevant,
12 correct?
13        MR. BUSH:  Objection.
14 BY MR. BAKER:
15    Q.  That's what he says?
16    A.  That's what he's saying.  That's his
17 interpretation, yes.
18    Q.  Yes?
19    A.  Yes.
20    Q.  And then we have Mr. Burtner telling
21 Mr. Eck, Mr. Burtner's gone and he's e-mailing
22 him from Amazon, correct?
23        MR. BUSH:  Objection.
24 BY MR. BAKER:

Page 315

1     Q.  Right?
2     A.  That's what it says.
3     Q.  And Mr. Burtner says "Yeah, he's
4  completely over it.  He's doing his job and my
5  old job," talking about Kelly Baker,
6  correct?
7        MR. BUSH:  Objection.
8  BY MR. BAKER:
9     Q.  Right?
10    A.  Yes.
11    Q.  "...but only being paid for one."
12    Correct?
13        MR. BUSH:  Objection.
14    A.  That's what it says.
15 BY MR. BAKER:
16    Q.  That's what it says?
17    A.  That's what it says in the e-mail.
18    Q.  It says "Then he finds out they are
19 moving the SOM to Woonsocket, so he really has
20 no motivation at this point."
21        Isn't that what it says?
22    A.  Where does it say that?
23    Q.  The second sentence here.  "Then he
24 finds out they are moving the SOM to

Page 316

1  Woonsocket" --
2     A.  Yes.
3     Q.  -- "so he really has no motivation."
4     A.  That's what it says.
5     Q.  Right?
6     A.  That's what it says.
7     Q.  Do you remember the e-mail that I
8  showed you earlier today?
9        Please look at me.
10       You remember the e-mail that I showed
11 you earlier today where I pointed out to you
12 that there was -- that Tom Bourque had talked
13 about moving it away from Indiana --
14    A.  Correct.
15    Q.  -- because there was no tip-off that
16 the DEA was coming?  Do you remember that?
17       MR. BUSH:  Objection.
18 Objection.  Misstates the record.
19    A.  I remember -- I remember you
20 referencing that, yes.
21 BY MR. BAKER:
22    Q.  And they wanted to move it to
23 Woonsocket, Rhode Island in corporate, right?
24    A.  Correct.

Page 317

1     Q.  And so at this point, apparently, you
2  have Kelly Baker doing two jobs but being paid
3  for one, according to Aaron Burtner, at least
4  in this e-mail, right?
5     A.  That's --
6        MR. BUSH:  Objection.
7     A.  -- what the e-mail says.
8  BY MR. BAKER:
9     Q.  And then he finds out -- talking about
10 Kelly finds out that they're moving the whole
11 operation anyway, SOM to Woonsocket, so he
12 really has no motivation at that point,
13 right?
14       MR. BUSH:  Objection.
15    A.  That's what states in the e-mail from
16 Aaron Burtner, I guess his opinion.
17 BY MR. BAKER:
18    Q.  And then it says "Also the DEA
19 consultant told him his salary is about half
20 that of most SOM managers."
21       Do you see that?
22    A.  I do.
23    Q.  How much was he being paid?
24    A.  I don't know.

Page 318

1    MR. BUSH: Objection.
2  BY MR. BAKER:
3    Q.  Was his salary half of that of most
4  SOM managers?
5    A.  I don't know.
6    Q.  Was he your SOM manager at the time?
7    A.  I don't believe he was the SOM
8  manager.
9    Q.  You don't know one way or the other,
10  do you?
11    A.  I don't.
12    Q.  The next sentence of Aaron Burtner to
13  Andy Eck in this e-mail says "Seems like CVS
14  is in the business of screwing people over
15  until they've had enough and move on."
16    That's what Mr. Burtner says about CVS
17  at that point, September 2013, correct?
18    A.  That's what the e-mail says.
19    Q.  And Mr. Burtner is a former employee
20  of CVS, correct?
21    A.  Correct.
22    Q.  Let me ask you to go back to
23  Exhibit 40B that you've already looked at.
24    MR. BUSH: What does it look

Page 319

1  like?
2    MR. BAKER: It's an e-mail dated
3  9/27/10 on the front, Bates 17250.
4    MR. BUSH: I've got it. Thank
5  you.
6  BY MR. BAKER:
7    Q.  You if go to the third page,
8  November 8, 2013.
9    A.  Okay.
10    MR. BUSH: Show me that.
11    MR. BAKER: Bates 17256 at the
12  top.
13    MR. BUSH: Got it.
14  BY MR. BAKER:
15    Q.  An e-mail, November 8, 2013, from John
16  Mortelliti to various people in CVS. Do you
17  see that?
18    A.  Yes.
19    Q.  It says "Hi, Angela. Shauna is
20  replacing our SOM manager and is responsible
21  for DEA compliance. I believe Judy was
22  involved in giving her predecessor access."
23    Do you see that?
24    A.  Yeah.

Page 320

1    Q.  This November 8, 2013, correct?
2    A.  That's correct.
3    Q.  So this time when you were without an
4  SOM manager -- remember back in August we
5  showed you an e-mail --
6    A.  Yeah.
7    Q.  -- where you had no SOM manager?
8    MR. BUSH: Objection.
9  BY MR. BAKER:
10    Q.  Do you remember that?
11    MR. BUSH: Objection.
12    A.  I remember the timeline that you are
13  referencing, yes.
14  BY MR. BAKER:
15    Q.  And you remember that they were
16  interviewing somebody, they hoped to hire
17  somebody? Do you remember that?
18    MR. BUSH: Objection.
19    A.  What I do remember is that the
20  involvement here, this was all part of loss
21  prevention because Judy and that whole team,
22  they were actually involved with the hiring
23  process.
24    So my clarity or understanding of

Page 321

1  what -- again, this is the first time seeing
2  these e-mails, too. But, again, it's...
3  BY MR. BAKER:
4    Q.  Well, anyway, this says "Shauna is
5  replacing our SOM manager and is responsible
6  for DEA compliance," correct?
7    A.  That's correct.
8    Q.  So Shauna Helfrich was the person who
9  actually got hired to be the SOM manager,
10  correct?
11    A.  That's correct.
12    MR. BUSH: Objection.
13    MR. BAKER: Excuse me. What's
14  the objection?
15    MR. BUSH: There's no basis for
16  him to know that other than reading the
17  document that you put in front of him.
18  BY MR. BAKER:
19    Q.  Well, this document indicates that
20  Shauna Helfrich was hired, correct?
21    A.  That's -- that's the -- that's my
22  interpretation of that from the document,
23  correct.
24    Q.  And that she was hired in November of

Page 322

1   2013, correct?
2       A.   It appears to be that.
3       Q.   Now, even when this new system was
4   rolled out, there were multiple criticisms of
5   that program within the risk analysis run by
6   CVS, correct?
7           MR. BUSH:  Objection.
8       A.   I am not aware of any criticisms.
9   BY MR. BAKER:
10      Q.   Let me ask you to turn to Exhibit 105,
11  please.
12
13          (Exhibit No. 105 marked for
14  identification.)
15
16  BY MR. BAKER:
17      Q.   Now, this is a document entitled "SOM
18  Risk Analysis."
19          Do you see that?
20      A.   I do.
21      Q.   On the left-hand side of the page, it
22  says "Potential risk."  In the middle, it says
23  "Comments."  And in the -- on the right, it
24  says "Remediation Plan."

Page 323

1           Correct?
2       A.   Correct.
3           MR. BAKER:  If you could bold
4   that first box on the left and bring it out.
5   BY MR. BAKER:
6       Q.   The first potential risk, it says "The
7   SOM team is inconsistent with the way they
8   perform their due diligence."
9           Do you know what "due diligence" means
10  in the context of SOM?
11          Yes or no?
12      A.   That would be -- my interpretation of
13  that would be how they're doing their review.
14      Q.   Do you know what the portion of their
15  review is that's labeled "due diligence"?  Do
16  you know what that means?
17      A.   No.
18      Q.   Do you know what's required in order
19  to perform due diligence in the context of the
20  SOM process?  Yes or no?
21      A.   No.
22      Q.   It says "Not each team member is
23  aligned with the importance of reaching out to
24  our stores in order to comply with the "Know

Page 324

1   Your Customer" expectation."
2           Do you see that?
3       A.   I do.
4       Q.   It says "This could lead to
5   inconsistencies in the though (sic) process of
6   what orders should be released or blocked."
7           Isn't that what it says?
8       A.   That's what it says.
9       Q.   And the risk level associated with
10  that right next to it is high.
11          Do you see that?
12      A.   Yes.
13      Q.   If you go down to the next document.
14          MR. BUSH:  The next document?
15  BY MR. BAKER:
16      Q.   Excuse me.  Go over to the comment
17  next to it.  I'm sorry.
18      A.   Uh-huh.
19      Q.   It says "In May, the following is the
20  percentage of calls each team member made for
21  flagged orders."
22          Now you know what a flagged order is
23  by now, don't you?
24      A.   Yes.

Page 325

1       Q.   What's it mean?
2       A.   It's an order that was flagged
3   because, again, the frequency of the order,
4   the size of the order tripped the system to
5   ultimately say it needs to be reviewed.
6       Q.   With due diligence, correct?
7       A.   Yes.
8       Q.   And due diligence, part of that is
9   reaching out to the store, calling the store
10  to figure out what's going on, correct?
11          MR. BUSH:  Objection.
12      A.   It appears to be.
13  BY MR. BAKER:
14      Q.   And it says "In May, the following is
15  percentage of calls each team member made for
16  flagged orders:  Annette, 19 percent.  Colule
17  (phonetic) 15 percent.  Noah, 13 percent.
18  Caitlyn, 7 percent.  Shan, 4 percent."
19          Correct?
20      A.   That's what it says.
21      Q.   They're supposed to call 100 percent
22  of the time, are they not?
23          MR. BUSH:  Objection.
24      A.   I don't know.  I don't know if it's

Page 326

1    100 percent of the time.
2    BY MR. BAKER:
3       Q.  Well, this is one of potential risks
4    and this is one of problems that's identified,
5    right?
6              MR. BUSH:  Objection.
7       A.  (Witness nodding.)
8    BY MR. BAKER:
9       Q.  Right?
10      A.  (Witness nodding.)
11         Yes.
12      Q.  You have people with flagged orders
13   calling as little as 4 percent of the time to
14   a pharmacy to do due diligence, correct?
15             MR. BUSH:  Objection.
16   BY MR. BAKER:
17      Q.  Right?
18      A.  That's what it says --
19             MR. BUSH:  Objection.
20      A.  -- on the document, yeah.
21   BY MR. BAKER:
22      Q.  Go down to the Potential Risk No. 2.
23         It says "The SOM team is inconsistent
24   in the way they document their due diligence.

Page 327

1    Inconsistency in documentation styles and
2    approach may need lead to the team being
3    inefficient in completing their daily
4    workload.  Also, without uniform approach to
5    the documentation process, the team may not be
6    ensuring all appropriate documentation is
7    being captured."
8          That risk is high, correct?
9       A.  Yes that's what it says on the
10   document, yeah.
11      Q.  Go down to the next criticism.
12         It says "Lack of engagement by
13   management team."
14         Now let's go over to the next box
15   where it's talking about the comments with
16   respect to that.  Pull that out.
17         It says "The team is not receiving the
18   support and guidance they need to effectively
19   do their jobs."
20         Correct?
21      A.  That's what it says on the document.
22      Q.  You certainly never talked to any of
23   these team members, did you?
24      A.  I have talked to them, but I have not

Page 328

1    gone into any detail about, you know,
2    reviewing your job or your scope of their
3    jobs.
4       Q.  Well, you were not competent to do so
5    because you didn't know anything about the
6    system itself, really, did you?
7       A.  That's correct.
8       Q.  Let's go to the next potential risk.
9          It says "Lack of communication with
10   the SOM management team to the SOM analyst, as
11   well as lack of foresight by the management
12   team."
13         You know what that means, don't you?
14      A.  Yeah, that's what it says.
15      Q.  That risk is high, correct?
16      A.  That's what it says, yeah.
17      Q.  Go to the first sentence here.  Pull
18   this out.
19         It says "The management team does not
20   do an effective job at communicating to the
21   job analysts, which in turn hurts their
22   productions."
23         Correct?
24      A.  Correct.

Page 329

1       Q.  Isn't that right?
2       A.  That's correct.
3       Q.  And you certainly never talked to
4    them, correct?
5       A.  No, no.
6       Q.  That's a correct statement?
7       A.  That is correct.
8       Q.  Well, let's go down to the next one.
9          It says "Lack of resources to handle
10   the rollout of the distribution of all
11   distribution centers."
12         Now this is in 2014, correct?
13             MR. BUSH:  Objection.
14      A.  I don't know.
15   BY MR. BAKER:
16      Q.  It says "This could freeze the rollout
17   the remaining six DC or cause them to learn --
18   to not -- to not get to every flagged order
19   each day," correct?
20      A.  That's what it says.
21      Q.  Let's go to the next one.
22         It says "Today we are unclear how well
23   the system is identifying orders that should
24   actually be flagged."

Page 330

1    Correct?
2    A.  That's what it says.
3    Q.  Let's go to the next one.
4    Then it says "The SOM is not flagging
5 the drugs which are diverted the most at our
6 retail locations at a high enough rate."
7    Correct?
8    A.  That's what it says, yes.
9    Q.  Let me stop and ask you, do you
10 remember those stores I was telling you about
11 where you had 1.8, 1.9 million pills going
12 into a small population store?
13    A.  Yeah.
14    Q.  Do you remember that?
15    A.  Yeah, yeah.
16    Q.  That's a problem, isn't it?
17    A.  It is.
18    MR. BUSH:  Objection.
19 BY MR. BAKER:
20    Q.  Right.  So let's go to the next one.
21    "Not all team members" --
22    MR. BUSH:  You need to give me a
23 chance to object.
24 BY MR. BAKER:

Page 331

1    Q.  "Not all team members are adhering to
2 CVS standard operation -- operating procedures
3 of working cases in the order they are
4 presented in the queue," correct?
5    A.  That's what it says.
6    Q.  Did you talk to them about that?
7    Did you have anybody talk to them
8 about that?
9    A.  I'm sure some of my team members did
10 talk to them about that.
11    Q.  Do you know that for a fact, or are
12 you just assuming that?
13    A.  I'm assuming that.
14    Q.  Well, you also saw up there where
15 management doesn't communicate with these
16 people.  Remember, that was a problem,
17 right?
18    MR. BUSH:  Objection.
19 BY MR. BAKER:
20    Q.  Right?
21    A.  Yes.
22    Q.  So for you to say that, you're just
23 purely speculating that they did talk to them,
24 correct?

Page 332

1    MR. BUSH:  Objection.
2 Argumentative.
3 BY MR. BAKER:
4    Q.  Aren't you?  Aren't you?
5    A.  Yes.
6    Q.  Let's go to the next one.
7    It says "The SOM team is not trending
8 any of the information or cases that they are
9 seeing.  The SOM team only handles cases that
10 are flagged and not proactively working to
11 identify trends."
12    Do you see that?
13    A.  I do.
14    Q.  These are problems associated with the
15 rollout of the new system, correct?
16    MR. BUSH:  Objection.
17    A.  I'm not aware of the timing.  I don't
18 see anything that shows a date on this
19 document.
20 BY MR. BAKER:
21    Q.  Have you ever reviewed an internal
22 review report, an IRR?
23    A.  I have not.
24    Q.  Are you aware that ARCOS data -- well,

Page 333

1 first of all, you don't know what ARCOS data
2 is, right?
3    A.  I have not spent time with ARCOS data.
4    MR. BAKER:  I'm going to turn it
5 over to my partner, Mr. Jim DeRoche.  He's
6 going to go through some of that data with
7 you.
8    THE WITNESS:  Okay.
9    MR. BUSH:  Is this a good time
10 for a break, a five-minute break?
11    THE VIDEOGRAPHER:  The time
12 is --
13    MR. BUSH:  You're done, Bill?
14    MR. BAKER:  Hold on.
15    MR. BUSH:  Hold on.
16    (Brief pause in proceedings.)
17    MR. BAKER:  I tell you what,
18 let's do one more document.
19
20    (Exhibit No. 35 marked for
21 identification.)
22
23 BY MR. BAKER:
24    Q.  I'm showing you Exhibit No. 35.  This,

Page 334

1   again, is a document that you've already seen.
2   Well, maybe not.
3        It's one related to the DEA visits in
4   August.  Do you see that?
5        A.  I do.
6        Q.  Go to page 2 under the "Comments"
7   section.
8        Now go to the second flag there.  Do
9   you see that second --
10            MR. BUSH:  Bullet point.
11   BY MR. BAKER:
12       Q.  -- bullet point, yes.  I'm sorry.
13       It says "Madeline made several
14   comments during her visit.  She suggested that
15   CVS receive a DEA briefing.  She mentioned it
16   several times and thought it would be
17   beneficial to understand suspicious ordering."
18       Do you see that?
19       A.  I do see that.
20       Q.  Did you ever attend that DEA briefing
21   on suspicious ordering?
22       A.  I did not.  Never did.
23       Q.  Then it says "The DEA expects
24   registrants to know their customer and who

Page 335

1   they are buying from," correct?
2        A.  Correct.
3        Q.  It also states, "The DEA needs to be
4   aware -- needs to be made aware of orders that
5   raise flags," correct?
6            MR. BUSH:  That's what it says
7   you mean?
8   BY MR. BAKER:
9        Q.  That's what it says?
10       A.  That's what it says.
11       Q.  And do you remember earlier today
12   where the document within CVS said that you
13   shouldn't just take an order that breaches the
14   threshold and go decrease it and then ship it,
15   that you should report it instead?
16       A.  Correct.
17       Q.  Do you remember that?
18       A.  Correct, correct.
19       Q.  That's an order that raises flags,
20   right?
21       A.  Yes.
22       Q.  Do you know how many times that CVS
23   did that, where they took an order that raised
24   the flag and then decreased the order down

Page 336

1   just enough to ship it --
2        A.  I do not.
3        Q.  -- and then didn't report it to the
4   DEA?
5        A.  Do not.
6        Q.  Do you know how many of those people
7   would have ordered same time, same store, same
8   month?  Do you have any idea of that?
9        A.  No idea.  No idea.
10            MR. BAKER:  Let's take a break.
11            MR. BUSH:  Bill, you're done?
12            MR. BAKER:  For right now.  I'm
13   going to check over my outline.  I'm going to
14   try to get you out of here.
15            THE VIDEOGRAPHER:  The time is
16   2:47 p.m.  We're off the record.
17
18            (Recess taken from 2:47 p.m.
19            to 3:02 p.m.)
20
21
22            THE VIDEOGRAPHER:  The time is
23   3:02 p.m., and we're on the record.
24

Page 337

1            CROSS-EXAMINATION
2   BY MR. DEROCHE:
3        Q.  Mr. Link, my name is Jim DeRoche.
4        A.  Hi, Jim.
5        Q.  Just a few follow-up questions for
6   you.
7        First of all, I want to show you what
8   we've marked as Exhibit 221.
9
10            (Exhibit No. 221 marked for
11   identification.)
12
13            MR. DEROCHE:  Let me put a
14   sticker on that one so it would be official.
15            MR. BUSH:  What did you say it
16   was?  221?
17            MR. DEROCHE:  221.
18   BY MR. DEROCHE:
19       Q.  I hand you what we've marked as
20   Exhibit 221.
21       If you look at the first page of
22   Exhibit 221.  That's an e-mail?
23       A.  Yeah.
24       Q.  I believe you are listed as receiving

Page 338

1  a copy of that e-mail, correct?
2      A.  Yes.
3      Q.  It says Ron Link?  Yes?
4      A.  Yes.
5      Q.  Do you recall receiving this e-mail,
6  sir?
7      A.  I don't recall, but I will say I must
8  have been on the distribution, but I don't
9  recall seeing the e-mail.
10     Q.  It was in October of -- October 29,
11 2010, correct?
12     A.  Yeah.  I don't -- I don't remember.
13     Q.  I have attached as a second page, if
14 you turn to that page, sir.
15     A.  Yeah.
16     Q.  It's logistics core team update?
17     A.  Yeah.
18     Q.  Were you working in logistics at the
19 time?
20     A.  I was.
21     Q.  And under "Pharmacy Compliance," there
22 are a number of bullet points.
23         The third bullet point down talks
24 about the controlled drug suspicious order

Page 339

1  monitoring being reworked to identify active
2  ingredients versus product name.
3          Do you see that, sir?
4      A.  Yes, I do.
5      Q.  And that, again, was apparently part
6  of what the logistics team that you were the
7  head of were working on at the time,
8  correct?
9      A.  Yeah.  During 2010, the SOM team was
10 part of the logistics, loss prevention
11 organization.  And that was Frank Devlin.
12     Q.  And, again, you were copied on this
13 e-mail, so you were getting this information
14 as well, correct?
15     A.  It appears that I did, yeah.
16     Q.  In terms of the problems that were
17 associated with using the product name versus
18 active ingredient, there are two problems that
19 are identified in this document, correct?
20         The first was stores spreading orders
21 over multiple products.
22         Do you see that, sir?
23     A.  I do.
24     Q.  You understand what that means?

Page 340

1      A.  I do.
2      Q.  So, for instance, if they're ordering
3  HCPs, hydrocodone combination products, there
4  could be ten or more different products that
5  they could order at any one time, correct?
6      A.  I -- I believe so, but I'm not sure.
7      Q.  So they could order 100 HCPs made by
8  one company, 100 from another, and together
9  have 200.  And if you're only looking at it
10 based on the particular item that's ordered,
11 you wouldn't look at it as a 200-item order or
12 200-pill order, you would look at it as a
13 100-pill order.
14         Correct?
15     A.  From reading this, my -- I'm not sure
16 that was -- that would have been my
17 interpretation, but...
18     Q.  Well, you understand this is spreading
19 orders among different items, right?
20     A.  Yes.
21     Q.  And, again, that could be a problem
22 because that could inflate the number of
23 overall drugs --
24     A.  Yeah.

Page 341

1      Q.  -- that a pharmacy could order?
2      A.  Yes.
3      Q.  Correct?
4      A.  Yes, correct.
5      Q.  If you're not taking that into account
6  in your SOM program, that could be a problem,
7  right?
8      A.  Agree.
9      Q.  That could be one of the problems that
10 might lead to a pharmacy in Indiana in a small
11 town getting $2 million -- two million pills,
12 rather, in an 18-month period?  It could
13 contribute to that, correct?
14     A.  It could contribute to it, yes, yes.
15     Q.  The second problem is, again, I think
16 something we went over earlier, which was
17 the -- when the name change --
18     A.  Yes.
19     Q.  -- occurs, you lose the history,
20 right?
21     A.  Yes.
22     Q.  And that interferes with the efficacy
23 of your SOM program at that point, right?
24     A.  Yes.

Page 342

1    Q.  So it appears that using item instead
2  of active ingredient in the SOM program at
3  this point is causing at least two problems
4  with the SOM program, correct?
5    A.  Based upon this, it appears to be an
6  opportunity, yes.
7    Q.  Do you know when that was finally
8  fixed?
9    A.  I don't.
10   Q.  I want to just show you now what we've
11 marked as Exhibit 222.
12
13     (Exhibit No. 222 marked for
14 identification.)
15
16 BY MR. DEROCHE:
17   Q.  I'm going to represent to you that
18 this is a table that was extracted from
19 transaction data that pertains to CVS.
20   A.  Okay.
21   Q.  It shows orders for a particular CVS
22 store that's located on Brookpark Road in
23 Cleveland, Ohio.
24     Are you familiar with that store, by

Page 343

1  any chance?
2    A.  No, I'm not.
3    Q.  It's one of 49 stores in Cuyahoga
4  County, Ohio?
5    A.  Not familiar with the store.
6    Q.  This shows the orders that were placed
7  for hydrocodone combination products from
8  1/3/2006 through 9/23/2014, on the last page.
9      Do you see that, sir?
10   A.  Yes, I do.
11   Q.  A total of a ten-page document?
12   A.  Yeah.
13     MR. BUSH:  Jim, can you just
14 represent for the record where this comes
15 from?  Is this ARCOS data?
16     MR. DEROCHE:  This is ARCOS,
17 correct.
18 BY MR. DEROCHE:
19   Q.  I want to just pick out a couple of
20 examples that relate to this particular store
21 on Brookpark Road in Cleveland, Ohio.
22     First, if you go to page 4 of the
23 document, sir.  If you look at the entry for
24 6/23/2009.  Do you see that, sir?

Page 344

1    A.  I do.
2    Q.  That appears to be the fourth time in
3  that month that the Brookpark store had
4  ordered hydrocodone combination products.
5      Correct?
6    A.  Yeah, the fourth time, correct.
7    Q.  Do you see that?
8    A.  Yeah.
9    Q.  And the number of orders is ten
10 orders.  Do you see that, sir --
11   A.  Yes.
12   Q.  -- in the column third -- the fourth
13 column over?
14   A.  Yeah.
15   Q.  Does that indicate to you that the
16 Brookpark store is ordering ten different
17 hydrocodone combination products on that same
18 date, essentially, spreading their order among
19 ten different items?
20   A.  I --
21     MR. BUSH:  Objection.
22   A.  Yeah, I don't know, because I don't
23 understand the detail of the report and what
24 the number of orders and what it actually

Page 345

1  means.
2      MR. DEROCHE:  Sure, gotcha.
3      Why don't we give you another exhibit.
4  Maybe this will help you.
5
6      (Exhibit No. 223 marked for
7  identification.)
8
9      MR. DEROCHE:  You can look at
10 them together.  Let's go to 223.
11
12 BY MR. DEROCHE:
13   Q.  While she's marking it, do you know
14 what an NDC means?
15   A.  Yes.
16   Q.  It's a unique number that identifies a
17 particular drug?
18   A.  Yes.
19   Q.  I'm going to show you what's been
20 marked as 223.  If you hold those two
21 together, I think that might help you.
22     Again, 223 is a document that -- data
23 extracted from the ARCOS data provided to us
24 for Brookpark Road.

Page 346

1      Do you see that, sir?
2      A.  I do.
3      Q.  It's orders placed to the Indianapolis
4  DC, and the first grouping of orders is on
5  6/23.
6      A.  Yeah.
7      Q.  Same date we just looked at, right?
8      A.  Yeah, correct.
9      Q.  And it appears to list the ten
10  different orders, correct?
11      A.  It does, yeah.
12      Q.  And it indicates that they were for
13  different NDCs, again, indicating that the
14  Brookpark store was spreading its orders among
15  these ten different hydrocodone combination
16  products, correct?
17      MR. BUSH:  Objection.
18      A.  It -- it appears -- it appears that
19  way, but the only thing that, for me, is
20  missing is whether -- dosage size, differences
21  between these particular drugs, and that's not
22  clear to me.
23  BY MR. DEROCHE:
24      Q.  I understand.  The dosage size isn't

Page 347

1  on there, but the dosage units for each of
2  those ten different orders is on there,
3  correct?
4      A.  Correct.
5      Q.  And, again, they total 15,400 dosage
6  units in this particular order?
7      A.  Correct.
8      Q.  And this, again, is based on the data
9  we've been provided.  The fourth time in this
10  particular month that the Brookpark store is
11  ordering hydrocodone from Indianapolis,
12  correct?
13      A.  Appears to be so.
14      Q.  Do you know if this would be one of
15  those situations where the first order was
16  flagged for this particular store in that
17  particular month and then this order would not
18  have even been looked at?
19      MR. BUSH:  Objection.
20      A.  I wouldn't know.  I wouldn't -- I'm
21  not clear and sure that that would have been
22  what the protocol would have been around that.
23  BY MR. DEROCHE:
24      Q.  Well, you testified earlier and you

Page 348

1  saw documentation indicating that there was a
2  problem with the first order in a month being
3  flagged --
4      A.  Right.
5      Q.  -- and then the subsequent order not
6  being looked at --
7      MR. BUSH:  Objection.
8      Q.  -- in the SOM system, correct?
9      A.  Correct.
10  BY MR. DEROCHE:
11      Q.  So it's possible that could be -- that
12  could have happened here.  You just don't know
13  one way or the other?
14      A.  I just don't know whether it was
15  flagged or not.  I don't know.
16      Q.  If you look at -- let's move to
17  12/19/2009.  Let me know when you're there.
18      I believe it's on page 5 of
19  Exhibit 222.
20      A.  Got it.
21      Q.  Again, it looks like there were three
22  prior orders that month that were placed by
23  the Brookpark store to the Indianapolis for
24  HCPs, correct?

Page 349

1      A.  It appears that way, yes.
2      Q.  And, again, there are nine orders
3  listed.  And, again, the second grouping on
4  223, I believe, is that date, correct?
5      A.  Yeah.
6      Q.  And, again, it shows different NDCs,
7  different drugs that contain hydrocodone being
8  ordered all at the same time by Brookpark,
9  correct?
10      A.  It appears that way, yes.
11      Q.  And, again, it appears that they're
12  spreading the order among these nine different
13  drugs this time?
14      A.  Yes.
15      Q.  For a total of 13,700 pills being
16  delivered?
17      A.  Yes.
18      Q.  Right?
19      A.  Yes, yeah.
20      Q.  Again, do you know if this is another
21  situation where this grouping of orders
22  wouldn't have been looked at in December of
23  2009 under the SOM system because the first
24  order was cleared?

Page 350

1    A.  Again, I have -- I really don't know
2  whether or not this would have been flagged or
3  not.  I have no idea.
4    Q.  It appears from the data that we have,
5  at least if you look again at 222, that the
6  numbers of drugs being ordered starting on
7  12/8, 12/14, 12/19 at Brookpark appear to be
8  escalating, starting with 6,800 pill dosage
9  units, moving to 9,700, then to 13,700; is
10  that correct?
11    A.  Where is that -- where are you?
12    Q.  Again, it's on page 5 of Exhibit 222.
13  Looking at 12/19/2009.
14    A.  Got it.  Okay.
15    Q.  Leading up to that, there appear to be
16  escalating orders; is that correct?
17    A.  Yes.
18    Q.  Do you know why a store would do that?
19    A.  I have no idea.
20    Q.  I have one more date to look at.
21  That's on page 6 of Exhibit 222.  Let me know
22  when you're there.
23    A.  I'm there.
24    Q.  If you look at the very top entry,

Page 351

1  5/29/2010.
2    A.  Yeah.
3    Q.  Do you see that, sir?
4    A.  Yes.
5    Q.  Again, there appear to be eleven
6  different orders listed for a total of 13,000
7  dosage units of HCPs?
8    A.  Yes.
9    Q.  Again, we have it on 223 as well
10  indicating the different drugs that are being
11  combined to order these 13,000 HCPs for
12  Brookpark?
13    A.  Yeah.
14    Q.  Do you know if this, again, is a
15  situation where a store may be spreading its
16  orders among different drugs in order to avoid
17  detection by your SOM system?
18    A.  I'm not aware if that was the case.  I
19  don't know.  I can't -- I can't -- I don't
20  really know.
21    Q.  Again, this appears to be the fifth
22  time in the month that HCPs were ordered by
23  Brookpark from Indianapolis?
24    A.  Yes.

Page 352

1    Q.  So it's possible that these orders
2  would not even have been looked at?
3        MR. BUSH:  Objection.
4    A.  I have no way of knowing whether it
5  was looked at or not.
6  BY MR. DEROCHE:
7    Q.  Do you know if Brookpark Road CVS was
8  considered a high volume store in terms of
9  distributing HCPs?
10    A.  I don't.  I don't know.
11    Q.  When you designed the SOM system or
12  folks under you did, did they design a system
13  in 2009 that would compare a CVS store to
14  other stores to see how they -- how they
15  compared in terms of their ordering of
16  hydrocodone products?
17    A.  I'm not aware of how that would have
18  been designed and accounted for.
19    Q.  So you don't know if that was --
20    A.  I don't know.
21    Q.  Okay.
22    A.  I don't know if that was part of it.
23    Q.  Do you know if it was -- when the
24  system was retuned in 2011 by your consultant,

Page 353

1  do you know if that was something that they
2  designed the system so that you looked at how,
3  for instance, Brookpark would compare to the
4  average CVS in Cuyahoga county, Ohio?
5    A.  Yeah, I don't recall.  I don't recall.
6    Q.  Do you know if that was ever a
7  consideration that was factored into the SOM
8  system that was used by CVS?
9    A.  I don't -- I don't recall.
10        MR. DEROCHE:  Let's mark this
11  one as 201.
12
13        (Exhibit No. 201 marked for
14  identification.)
15
16  BY MR. DEROCHE:
17    Q.  Showing you what we've marked as
18  Exhibit 201.  Again, this is a chart that was
19  developed with reference to the ARCOS data
20  that we've been given access to.  And this,
21  again, in particular relates to the Brookpark
22  Road CVS in Cleveland, Ohio and in Cuyahoga
23  County and covers January 2006 through
24  December of 2008.

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1  If you look at that, the bars -- the
2  blue bars show the ordering on a monthly basis
3  of HCPs by Brookpark.  And the red line shows
4  the average for all CVS stores in Cuyahoga
5  County.
6  Are you with me so far?
7  A.  Yes.
8  Q.  Do you have an understanding of why a
9  store like this, this Brookpark Road store,
10  would so far on a monthly basis exceed the
11  average for the county in which it's located
12  for your own stores?
13  A.  Yeah, I would not.  I would not.
14  Q.  Is this something that you would like
15  to have looked at on an ongoing basis if you
16  were designing an SOM system to sort of put
17  some -- to put stores that had high volumes of
18  hydrocodone under a microscope?
19  A.  I would assume that this would be
20  under the visibility of a tool like this,
21  correct.
22  Q.  You would hope that it would be looked
23  at?
24  A.  Yes.

Page 355

1  Q.  But you haven't seen any evidence that
2  it ever was?
3  A.  I don't -- I don't recall, and I don't
4  recall seeing anything.
5  Q.  It looks like the average for CVS
6  stores in Cuyahoga County is somewhere in
7  between 5- and 10,000 dosage units a month,
8  and you have Brookpark upwards of 35,000 some
9  months.
10  A.  Yeah.  Again, I'm not -- I'm not aware
11  if that's an inaccurate number as an average.
12  I just don't -- didn't have that type of
13  visibility.
14  Q.  I understand.  You're going to have to
15  take my word for it that this is a calculated
16  average, sort of hope that the computer does
17  it right?
18  A.  Yeah, yeah.
19  Q.  But assuming that's correct --
20  A.  Yeah.
21  Q.  -- these numbers are right, does it
22  seem strange that you would have a store with
23  35,000-plus hydrocodone products shipped to it
24  in a month, when the average somewhere in the

Page 356

1  6,000 range?
2  A.  It appears to be a high number.  But,
3  again, not knowing the detail of, you know,
4  behind it, you know, but it does appear to be
5  high from the way it's illustrated here.
6  MR. DEROCHE:  Off the record
7  for one moment.
8  THE VIDEOGRAPHER:  The time is
9  3:20 p.m., and we're off the record.
10
11  (Off the record from 3:20 p.m.
12  to 3:21 p.m.)
13
14  THE VIDEOGRAPHER:  The time is
15  3:21 p.m., and we're on the record.
16
17  BY MR. DEROCHE:
18  Q.  Mr. Link, when the suspicious order
19  monitoring system program came under your
20  auspices in logistics in or around 2010 you
21  said, I believe?
22  A.  No.  It was more around the 2014 time
23  frame or the 2012 time frame.
24  Q.  2012?

Page 357

1  A.  Yeah.
2  Q.  You had budget responsibility in that
3  department, correct?
4  A.  Yes.
5  Q.  So you had decisions to make in terms
6  of whether to spend money, where to spend
7  it?
8  A.  Yeah.
9  Q.  Correct?
10  A.  Yes.
11  Q.  Prioritize spending?
12  A.  (Witness nodding.)
13  Q.  Is that correct?
14  A.  That's correct.
15  Q.  I'm going to show you what we've
16  marked as Exhibit 213.
17
18  (Exhibit No. 213 marked for
19  identification.)
20
21  BY MR. DEROCHE:
22  Q.  It's an e-mail on January 6, 2012 from
23  Frank Devlin to you, correct?
24  A.  Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1   Q.   And it deals in particular with a
2   proposal from an outside consultant to work on
3   the SOM program, correct?
4   A.   Correct.
5   Q.   And it involves a periodic statistical
6   review of the system to make sure it's
7   working, right?
8   A.   Correct.
9   Q.   Right?
10   A.   Correct.
11   Q.   And then an annual full retunement to
12   make sure, again, that the SOM algorithm is
13   doing what it's supposed to be doing, right?
14   A.   Correct.
15   Q.   Mr. Devlin sent you this proposal
16   from, I believe it's the Buzzeo Group,
17   correct?
18   A.   That's correct.
19   Q.   And he says "The total cost is about
20   45K for both."
21       Do you see that, sir?
22   A.   Yes, I do.
23   Q.   And he strongly suggested that CVS
24   make that investment?

Page 359

1   A.   Yeah.
2   Q.   Correct?
3   A.   Yes.
4   Q.   Again, attached to it is the proposal
5   that came from the Buzzeo Group, correct?
6   A.   Correct.
7   Q.   If you go to the page 2 of the
8   proposal.
9   A.   Yes.
10   Q.   Right at the top, it says "Once a
11   year, it is recommended that the model be
12   fully retuned so that the model co-efficient
13   can be adjusted if necessary to assure optimal
14   sensitivity."
15   A.   That's what it says, yeah.
16   Q.   When you got this, you just didn't
17   ignore it, did you, or delete this e-mail?
18   A.   No.  I mean, I'm sure I probably
19   looked at it.  And my understanding is that we
20   were -- we basically funded the work that
21   needed to be done here.
22       It was managed -- it was managed by
23   Frank Devlin, because he was the loss
24   prevention, he was the responsible party.

Page 360

1       Our department, we funded the work to
2   do that.
3   Q.   So you had to -- you had to bless the
4   expenditure, so to speak?
5   A.   I, essentially, had to provide the
6   funding to do this.
7   Q.   So you would have carefully reviewed
8   this to decide whether or not it was something
9   that you wanted to spend the money on?
10   A.   I wouldn't say we carefully reviewed,
11   because, first of all, this expenditure,
12   $45,000 wasn't that great --
13   Q.   Small amount of money?
14   A.   It was a small amount relative to
15   larger expenditures that we would have to be
16   involved with.  So this would not have gone
17   through a very heavy review process from my
18   end, I'm sure.
19   Q.   Well, you would have looked at to see
20   what they were proposing to do, correct?
21   A.   Essentially, I would have looked at it
22   and probably talked to Frank about it.  I
23   wouldn't gone into great detail because of the
24   dollar amount.

Page 361

1   Q.   If you look at the document, you see
2   it talks about "a yearly annual adjustment
3   that affords an opportunity for the attributes
4   to be reconfirmed to ensure necessary
5   information is collected so the SOM program is
6   running properly."
7   A.   (Witness nodding.)
8   Q.   Correct?
9   A.   It appears to be that, yeah.
10   Q.   And this is in January -- on
11   January 6, 2012 that this document is sent to
12   Mr. Devlin?
13   A.   Yes.
14   Q.   And he forwards it to you the same
15   day, correct?
16   A.   It appears that way.
17   Q.   So this would have called for a full
18   retunement of the co-efficient on an annual
19   basis, and it would have been done in 2012, in
20   2013 and going forward?
21       Correct?
22   A.   It appears that way, yes.
23   Q.   If CVS had decided to spend the
24   $45,000 to have this done?

Page 362

1  A. Correct.
2  Q. Now, we have a retunement document
3  that shows that it was done in 2011 by this
4  same consultant. We don't have a retunement
5  document for 2012, nor do we have one for
6  2013.
7       Is that because CVS decided not to
8  spend the money on the consultant to actually
9  have it done?
10  A. I am not sure. I am not sure what
11  transpired from that point on.
12  Q. Do you know why a retunement document
13  that was recommended by the consultant who
14  wrote the algorithm would not have been done?
15  A. I don't. I don't.
16  Q. They appear to be indicating that if
17  you don't do this, the system may not be
18  working properly because the coefficients are
19  based on historical average and they need to
20  be adjusted from time to time based on current
21  information, right?
22  A. Correct.
23  Q. If that's not done, the algorithm
24  itself may not be operating properly, correct?

Page 363

1  A. Potentially, yeah.
2  Q. And you've never seen a retunement
3  that was done in 2012 or 2013?
4  A. I don't recall.
5       MR. DEROCHE: I have nothing
6  further.
7       MR. BAKER: That's it.
8       MR. BUSH: People on the phone
9  don't have anything? I guess, give me one
10  second.
11       Off the record.
12       THE VIDEOGRAPHER: The time is
13  3:26 p.m., and we're off the record.
14
15       (Off the record at 3:26 p.m.)
16
17       THE VIDEOGRAPHER: The time is
18  3:27 p.m.
19       This deposition has concluded, and we
20  are off the record.
21
22       (Deposition concluded at 3:27 p.m.)
23
24

Page 364

1             CERTIFICATION
2       I, DARLENE M. COPPOLA, a Notary Public, do hereby
3  certify that RONALD LINK, after having satisfactorily
4  identifying himself, came before me on the 11th day of
5  December, 2018 in Providence, Rhode Island, and was by me
6  duly sworn to testify to the truth and nothing but the
7  truth as to his knowledge touching and concerning the
8  matters in controversy in this cause; that he was
9  thereupon examined upon her oath and said examination
10  reduced to writing by me; and that the statement is a true
11  record of the testimony given by the witness, to the best
12  of my knowledge and ability.
13       I further certify that I am not a relative or
14  employee of counsel/attorney for any of the parties, nor a
15  relative or employee of such parties, nor am I financially
16  interested in the outcome of the action.
17       WITNESS MY HAND THIS 14th day of December, 2018.
18
19
20
21  DARLENE M. COPPOLA          My commission expires:
22  NOTARY PUBLIC          November 11, 2022
23  REGISTERED MERIT REPORTER
24  CERTIFIED REALTIME REPORTER

Page 365

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF OHIO
3             EASTERN DIVISION
4
5
6  ********************************
7  IN RE:
8  NATIONAL PRESCRIPTION OPIATE
   LITIGATION
9
   This document relates to:
10
   All cases
11
   ********************************
12
13       I, RONALD LINK, say that I have read the foregoing
14  deposition and hereby declare under penalty of perjury the
15  foregoing is true and correct:
16  (as prepared) (as corrected on errata.)
17       Executed this _____ day of _____ 20____,
18  at _____, _____.
19
20
21
22       _____
23             RONALD LINK
24

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1     CORRECTION PAGE

2     DEPONENT:  RONALD LINK

3     DATE TAKEN: DECEMBER 11, 2018

4     CASE:     NATIONAL PRESCRIPTION OPIATE LITIGATION

5     **************************************************

6     PAGE / LINE / SHOULD READ/REASON

7     _____/_____/_____

8     _____/_____/_____

9     _____/_____/_____

10    _____/_____/_____

11    _____/_____/_____

12    _____/_____/_____

13    _____/_____/_____

14    _____/_____/_____

15    _____/_____/_____

16    _____/_____/_____

17    _____/_____/_____

18    _____/_____/_____

19    _____/_____/_____

20    _____/_____/_____

21    _____/_____/_____

22    _____/_____/_____

23    _____/_____/_____

24    _____/_____/_____