```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL       )   MDL No. 2804
     PRESCRIPTION OPIATE   )
 4   LITIGATION            )   Case No.
                           )   1:17-MD-2804
 5                         )
     THIS DOCUMENT RELATES TO  )   Hon. Dan A. Polster
 6   ALL CASES             )
                           )
 7
 8
 9                    __ __ __
10            Friday, December 14, 2018
                      __ __ __
11
12     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
13                    __ __ __
14
15
16        Videotaped Deposition of PATSY LITTLE,
     held at Stone Pigman Walther Wittmann LLC,
17   909 Poydras, Suite 3150, New Orleans,
     Louisiana, commencing at 8:06 a.m., on the
18   above date, before Michael E. Miller, Fellow
     of the Academy of Professional Reporters,
19   Registered Diplomate Reporter, Certified
     Realtime Reporter and Notary Public.
20
21
22
                      __ __ __
23
24           GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
25              deps@golkow.com
```

```
 1      A P P E A R A N C E S:
 2      CARELLA BYRNE CECCHI OLSTEIN BRODY &
        AGNELLO PC
 3      BY:  ZACHARY BOWER, ESQUIRE
             zbower@carellabyrne.com
 4           CAROLINE F. BARTLETT, ESQUIRE
             cbartlett@carellabyrne.com
 5           MICHAEL INNES, ESQUIRE
             minnes@carellabyrne.com
 6           (via teleconference)
             DONALD ECKLUND, ESQUIRE
 7           decklund@carellabyrne.com
             (via teleconference)
 8      5 Becker Farm Road
        Roseland, New Jersey 07068
 9      (973) 994-1700
        Counsel for MDL Plaintiffs
10
11      JONES DAY
        BY:  TARA A. FUMERTON, ESQUIRE
12           tfumerton@jonesday.com
             SCOTT B. ELMER, ESQUIRE
13           selmer@jonesday.com
        77 West Wacker
14      Chicago, Illinois 60601
        (312) 782-3939
15      Counsel for Walmart and The Witness
16
17      KIRKLAND & ELLIS LLP
        BY:  ZACHARY A. CIULLO, ESQUIRE
18           zac.ciullo@kirkland.com
        300 North LaSalle
19      Chicago, Illinois 60654
        (312) 862-2000
20      Counsel for Allergan Finance LLC
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        REED SMITH LLP
          BY:   NICHOLAS R. RODRIGUEZ, ESQUIRE
 3              nrodriguez@reedsmith.com
                (via teleconference)
 4        2500 One Liberty Place
          1650 Market Street
 5        Philadelphia, Pennsylvania 19103
          (215) 851-8281
 6        Counsel for AmerisourceBergen
 7
 8        ARNOLD & PORTER KAYE SCHOLER LLP
          BY:   DAVID D. FAUVRE, ESQUIRE
 9              david.fauvre@arnoldporter.com
                (via teleconference)
10        601 Massachusetts Avenue, N.W.
          Washington, D.C. 20001
11        (202) 942-5000
          Counsel for Endo Health Solutions
12        Inc., Endo Pharmaceuticals Inc., Par
          Pharmaceutical, Inc. and Par
13        Pharmaceutical Companies, Inc.
14
          COVINGTON & BURLING LLP
15        BY:   SARA SUNDERLAND, ESQUIRE
                ssunderland@cov.com
16              (via teleconference)
          One Front Street
17        San Francisco, California 94111
          (415) 591-6000
18        Counsel for McKesson Corporation
19
          WILLIAMS & CONNOLLY LLP
20        BY:   WILL HAWKINS, ESQUIRE
                whawkins@wc.com
21              (via teleconference)
          725 Twelfth Street, N.W.
22        Washington, D.C. 20005
          (202) 434-5000
23        Counsel for Cardinal Health
24
25
```

```
 1    A P P E A R A N C E S:
 2       MARCUS & SHAPIRA LLP
         BY:  DARLENE M. NOWAK, ESQUIRE
 3            nowak@marcus-shapira.com
              (via teleconference)
 4       One Oxford Center
         35th Floor
 5       Pittsburgh, Pennsylvania 15219
         (412) 471-3490
 6       Counsel for HBC Services
 7

         MORGAN LEWIS & BOCKIUS LLP
 8       BY:  MATTHEW R. LADD, ESQUIRE
              matthew.ladd@morganlewis.com
 9            (via teleconference)
         101 Park Avenue
10       New York, New York 10178
         (212) 309-6000
11       Counsel for Rite Aid
12
13    ALSO PRESENT:
14       JENNIFER B. BECHET, ESQUIRE
         Walmart Legal
15
16    VIDEOGRAPHER:
17       DAVID LANE,
         Golkow Litigation Services
18
19
20
21
22
23
24
25
```

1                           INDEX
2

       APPEARANCES                                2
3

       PROCEEDINGS                               10
4

5

       EXAMINATION OF PATSY LITTLE:
6

             BY MR. BOWER                         12
7

8

       CERTIFICATE                              442
9

       ERRATA                                   444
10

       ACKNOWLEDGMENT OF DEPONENT               445
11

       LAWYER'S NOTES                           446
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    DEPOSITION EXHIBITS
                         PATSY LITTLE
 2                     December 14, 2018
 3     NUMBER              DESCRIPTION              PAGE
 4     Walmart        Patsy Little LinkedIn Bio      23
       Little         [No Bates]
 5     Exhibit 1
 6     Walmart        12/20/05 Mallinckrodt Price    78
       Little         Decrease Letter
 7     Exhibit 2      WMT_MDL_000025989 -
                      WMT_MDL_000025990
 8
       Walmart        5/6/09 Walmart Letter         105
 9     Little         PAR_OPIOID_MDL_000040255 -
       Exhibit 3      PAR_OPIOID_MDL_000040256
10
       Walmart        September 2009 E-mail(s)      128
11     Little         ACTAVIS0639662 -
       Exhibit 4      ACTAVIS0639663
12
       Walmart        September 2009 E-mail(s)      143
13     Little         w/Attachment(s)
       Exhibit 5      Acquired_Actavis_00391960 -
14                    Acquired_Actavis_00391964
15     Walmart        10/5/10 Endo Letter          166
       Little         WMT_MDL_000021802
16     Exhibit 6
       Walmart        November 2009 Redacted       164
17     Little         E-mail(s)
       Exhibit 7      Acquired_Actavis_00224033 -
18                    Acquired_Actavis_00224034
19     Walmart        September 2009 E-mail(s)      179
       Little         w/Attachment(s)
20     Exhibit 8      WMT_MDL_000011737 -
                      WMT_MDL_000011739
21
       Walmart        October 2009 E-mail(s)       185
22     Little         w/Attachment(s)
       Exhibit 9      WMT_MDL_000011750 -
23                    WMT_MDL_000011751
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   DEPOSITION EXHIBITS
 2
     Walmart      11/16/09 Actavis Letter      188
 3   Little       WMT_MDL_000025225 -
     Exhibit 10   WMT_MDL_000025226
 4
     Walmart      1/4/10 Apotex Letter         196
 5   Little       WMT_MDL_000025550
     Exhibit 11
 6   Walmart      2/17/10 Actavis Letter       222
     Little       ACTAVIS1144542 -
 7   Exhibit 12   ACTAVIS1144543
 8   Walmart      November 2009 Redacted       232
     Little       E-mail(s)
 9   Exhibit 13   Acquired_Actavis_00224011 -
                  Acquired_Actavis_00224012
10
     Walmart      October 2015 E-mail(s)       256
11   Little       w/Attachment(s)
     Exhibit 14   WMT_MDL_000021669 -
12                WMT_MDL_000021678
13   Walmart      November 2015 E-mail(s)      265
     Little       w/Attachment(s)
14   Exhibit 15   WMT_MDL_000021921 -
                  WMT_MDL_000021924
15
     Walmart      March 2010 E-mail(s)         269
16   Little       MNK-T1_000632328 -
     Exhibit 16   MNK-T1_000632329
17
     Walmart      April 2010 Redacted E-mail(s) 273
18   Little       MNK-T1_0001961218 -
     Exhibit 17   MNK-T1_0001961219
19
     Walmart      June 2012 Redacted E-mail(s) 285
20   Little       PPLPC004000325237 -
     Exhibit 18   PPLPC004000325241
21
     Walmart      June 2011 Redacted E-mail(s) 305
22   Little       ACTAVIS0361535 -
     Exhibit 19   ACTAVIS0361538
23
24
25
```

```
 1                   DEPOSITION EXHIBITS
 2
     Walmart         November 2011 Redacted        314
 3   Little          E-mail(s)
     Exhibit 20      ACTAVIS0338793 -
 4                   ACTAVIS0338796
 5   Walmart         June 2012 Redacted E-mail(s)  327
     Little          Acquired_Actavis_00382802 -
 6   Exhibit 21      Acquired_Actavis_00382807
 7   Walmart         June 2012 E-mail(s)           336
     Little          w/Attachment(s)
 8   Exhibit 22      ALLERGAN_MDL_00144683 -
                     ALLERGAN_MDL_00144685
 9
     Walmart         November 2011 E-mail(s)       341
10   Little          ACTAVIS0338574 -
     Exhibit 23      ACTAVIS0338579
11
     Walmart         June 2012 Redacted E-mail(s)  354
12   Little          ALLERGAN_MDL_00231481 -
     Exhibit 24      ALLERGAN_MDL_00231485
13
     Walmart         July 2012 E-mail(s)           369
14   Little          WMT_MDL_000037807 -
     Exhibit 25      WMT_MDL_000037808
15
     Walmart         August 2012 E-mail(s)         373
16   Little          WMT_MDL_000033418 -
     Exhibit 26      WMT_MDL_000033424
17
     Walmart         8/23/12 Mallinckrodt Letter   388
18   Little          WMT_MDL_000025900
     Exhibit 27
19   Walmart         August 2015 E-mail(s)         393
     Little          WMT_MDL_000021757 -
20   Exhibit 28      WMT_MDL_000021759
21   Walmart         December 2015 E-mail(s)       405
     Little          w/Attachment(s)
22   Exhibit 29      WMT_MDL_000007243 -
                     WMT_MDL_000007246
23
     Walmart         June 2016 E-mail(s)           411
24   Little          MNK-T1_0004830712
     Exhibit 30
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   DEPOSITION EXHIBITS

 2

     Walmart       January 2017 E-mail(s)        420
 3   Little        WMT_MDL_000021571
     Exhibit 31

 4

     Walmart       3/30/11 Mallinckrodt Price    424
 5   Little        Decrease Letter
     Exhibit 32    WMT_MDL_000025445 -

 6                 WMT_MDL_000025447

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  PROCEEDINGS

 2         (December 14, 2018 at 8:06 a.m.)

 3              THE VIDEOGRAPHER:  We're now on

 4      the record.  My name is David Lane,

 5      videographer for Golkow Litigation

 6      Services.  Today's date is

 7      December 14th, 2018.  Our time is

 8      8:05 a.m.

 9              This deposition is taking place

10      in New Orleans, Louisiana in the

11      matter of National Prescription Opiate

12      Litigation.  Our deponent today is

13      Patsy Little.

14              Counsel, please introduce

15      yourselves and state whom you

16      represent.

17              MS. FUMERTON:  Tara Fumerton on

18      behalf of Walmart and the witness, and

19      with me today is Scott Elmer and

20      Jennifer Bechet.

21              MR. CIULLO:  Zachary Cuillo

22      from Kirkland & Ellis on behalf of

23      Allergan Finance LLC.

24              MR. BOWER:  Zach Bower on

25      behalf of plaintiffs in the MDL.
```

```
1              MS. BARTLETT:  Caroline

2       Bartlett on behalf of plaintiffs in

3       the MDL.

4              THE VIDEOGRAPHER:  Will counsel

5       on the phone please introduce

6       themselves.

7              MR. HAWKINS:  This is Will

8       Hawkins from Williams & Connolly on

9       behalf of Cardinal Health.

10             MR. LADD:  This is Matthew Ladd

11      of Morgan Lewis & Bockius on behalf of

12      Rite Aid.

13             MS. SUNDERLAND:  This is Sara

14      Sunderland with Covington & Burling on

15      behalf of McKesson.

16             MR. FAUVRE:  David Fauvre from

17      Arnold & Porter on behalf of the Endo

18      and Par defendants.

19             MS. NOWAK:  Darlene Nowak,

20      Marcus & Shapira, on behalf of HBC

21      Services.

22             MR. INNES:  Michael Innes on

23      behalf of plaintiffs in the MDL.

24             THE VIDEOGRAPHER:  The court

25      reporter today is Mike Miller, and he
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              will now swear in the witness.
 2                   PATSY LITTLE,
 3              having been duly sworn,
 4              testified as follows:
 5                   EXAMINATION
 6    BY MR. BOWER:
 7         Q.    Good morning, Ms. Little.  How
 8    are you today?
 9         A.    Good morning.  Great.
10         Q.    Thank you for being here.  We
11    appreciate it.
12              Have you ever been deposed
13    before?
14         A.    I have not.
15         Q.    You have not, okay.  So I'm
16    sure your counsel went over a few ground
17    rules for you, but just so we're all on the
18    same page, let's talk about that for a
19    minute.
20              I need you to answer if it's a
21    yes-or-no question verbally, so in other
22    words, don't nod your head, so the court
23    reporter can take down your answer.  Do you
24    understand that?
25         A.    Yes, I do.
```

1    Q.    Okay.  And in addition, I know

2    the court reporter has reminded you of this

3    already, but please let me finish my

4    questions.  Give your counsel an opportunity

5    to object before you provide your answers,

6    okay?

7    A.    Okay.

8    Q.    And as we go through the day,

9    if you don't understand a question, please

10   let me know and I will rephrase the question.

11   Otherwise, if you answer the question, I will

12   assume that you understood the question.

13        Do you understand that?

14   A.    Yes, I do.

15   Q.    Okay.  Is there anything that

16   would prevent you from testifying truthfully

17   today?

18   A.    There is not.

19   Q.    Okay.  Do you have any

20   questions before we begin?

21   A.    I do not.

22   Q.    Okay.  Who is representing you

23   here today?

24   A.    Tara and Scott.

25   Q.    Okay.  When was the first time

```
 1    you met Tara?

 2          A.      We had a phone call last week,

 3    I believe, and then I met her yesterday.

 4          Q.      So last week was the first time

 5    you ever spoke with her?

 6          A.      Yes.

 7          Q.      When was the first time you

 8    ever spoke with an attorney from her firm

 9    regarding this case?

10          A.      I'm not exactly sure.  I had a

11    call with Walmart attorneys, and I'm not sure

12    who was on the phone at that time.

13          Q.      And when was that call?

14          A.      I'm not sure of the date, but

15    November, maybe, or October.

16          Q.      Okay.  Before that, have you

17    had any discussions with anyone about this

18    case?

19          A.      No.

20          Q.      Has anyone ever asked you to

21    produce documents for the case?

22          A.      No.

23          Q.      Has anyone asked if you have

24    any relevant documents for this case?

25          A.      No.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you ever seen a document

2    request in this case?

3    A.    I don't recall, no.

4    Q.    Have you ever seen the

5    complaint in this case?

6    A.    Yes.

7    Q.    What is your understanding of

8    what this case is about?

9              MS. FUMERTON:  And I just

10             caution the witness that she can

11             reveal anything that she has learned

12             on her own, but not to reveal any

13             communication with counsel.

14   A.    I perused the first few pages,

15   maybe the first five or six pages, and I

16   don't know that I could speak in verbatim to

17   what I saw.  I knew it was Ohio over opioid

18   distribution.

19   BY MR. BOWER:

20   Q.    Other than that, do you have

21   any understanding of what the case is about?

22   A.    No.

23   Q.    Okay.  When was the first time

24   you learned that Walmart had been sued in

25   connection with this opioid distribution?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.     Whenever I had that first phone

 2    call with the Walmart attorney in October or

 3    November.

 4           Q.     Are you a current employee of

 5    Walmart?

 6           A.     I am not.

 7           Q.     When did you end your

 8    employment at Walmart?

 9           A.     In April of 2018.

10           Q.     Where do you currently work?

11           A.     I work at Louisiana Wholesale

12    Drugs.

13           Q.     Okay.  And what do you do for

14    Louisiana Wholesale Drugs?

15           A.     I'm in purchasing for them.

16           Q.     Can you just describe briefly

17    what type of business Louisiana Wholesale

18    Drugs is in.  Is it distribution?

19           A.     Yes, it's a wholesaler, a

20    regional wholesaler for prescription drugs

21    and OTC items.

22           Q.     Who does it provide those items

23    to?

24           A.     They have a group of

25    shareholders that own -- it's a co-op that
```

1    own the wholesale.  They provide them to

2    those independent pharmacies in mostly

3    Louisiana, but they're in a few other states

4    as well.

5         Q.     Does the Louisiana Wholesale

6    Drugs company distribute Schedule II

7    narcotics?

8         A.     Yes, we do.

9         Q.     Prescription opiates?

10        A.     Yes, they do.

11        Q.     They have a suspicious order

12   monitoring system in place?

13        A.     I don't purchase those

14   products.  I do know that they have a

15   suspicious order monitoring program in place.

16        Q.     What products do you purchase

17   for them currently?

18        A.     Generics and brand

19   pharmaceuticals.

20        Q.     Who is responsible for

21   purchasing Schedule II narcotics for the

22   Louisiana wholesale company?

23             MS. FUMERTON:  And I just am

24        going to object to the line of

25        questioning.  I think it's appropriate

Highly Confidential - Subject to Further Confidentiality Review

```
 1              to ask her general --

 2                  MR. BOWER:  I'm not -- you

 3          can --

 4                  MS. FUMERTON:  No, no, I'm

 5          telling you --

 6                  MR. BOWER:  You can make your

 7          objection and we can move own.

 8                  MS. FUMERTON:  Well, no, I'm

 9          going to instruct her not to answer.

10          I'm telling you --

11                  MR. BOWER:  You're instructing

12          her not to answer that?

13                  MS. FUMERTON:  -- if you start

14          to go into -- this is not a deposition

15          about her current employer.  I think

16          general background information is

17          okay.  You can ask her general

18          questions of what she does, but their

19          counsel is not here, and she's here

20          as -- in her capacity as a former

21          Walmart employee.  And so that's why

22          I'm telling you what my position is

23          with respect to this.

24                  MR. BOWER:  Tara, I'm not

25          wasting time on the record all day
```

```
 1          with your speaking objections.  You

 2          can make your objection and we can

 3          move on.

 4                 MS. FUMERTON:  And I'm telling

 5          you that I'm not going to let you --

 6                 MR. BOWER:  So if you want

 7          to --

 8                 (Simultaneous discussion

 9          interrupted by the reporter.)

10                 MR. BOWER:  If you want to

11          instruct her not to answer, then do

12          so.  If not, make your objection and

13          we'll move on, okay.

14                 Can you read back the last

15          question, please.

16                 (The following portion of the

17          record was read.)

18                 "QUESTION:  Who is responsible

19          for purchasing Schedule II narcotics

20          for the Louisiana wholesale company? "

21                 (End of readback.)

22          A.     I have been instructed by my

23    current employer's attorney to not answer

24    questions about my current job duties.

25    BY MR. BOWER:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Are you refusing to answer that

 2    question?

 3          A.     I would prefer to not answer

 4    the question.

 5               MS. FUMERTON:  I'm going to

 6          instruct her not to answer the

 7          question.

 8               MR. BOWER:  And what's your

 9          basis for that instruction?

10               MS. FUMERTON:  Again, because

11          her counsel is not here for her

12          current company.  I'm respecting her

13          today, and I'm -- as her counsel here

14          today, I am instructing her not to

15          answer that question because you're

16          getting into the details of a

17          different entity that is not why she's

18          here to testify today.

19               If you want to ask her about

20          whether or not she has -- what her

21          role is in her current job, that's

22          fine.  If you start asking her

23          questions about what other people and

24          other individuals did at her current

25          position or her current employer, I'm
```

1          going to instruct her not to answer.

2               MR. BOWER:  Move to strike

3          counsel's colloquy from the record.

4               What is the basis for your

5          objection?

6               MS. FUMERTON:  Because her --

7          you have not noticed her up in her

8          capacity as a witness for her current

9          employer.  She has been noticed up and

10         you have communicated with me as a --

11         and have asked for her in her position

12         as a former Walmart employee.

13    BY MR. BOWER:

14         Q.    Are you going to not answer the

15    question, ma'am?

16         A.    Yes, I'm not going to answer

17    the question.

18         Q.    Are you going to refuse to

19    answer any questions about your current

20    employment?

21         A.    No, I'm okay -- I'm happy to

22    answer questions in what I do in my current

23    employment.

24         Q.    Okay.  Have you ever purchased

25    Schedule II narcotics for the Louisiana

```
 1    wholesale company?

 2           A.     I have not.

 3           Q.     Are you familiar -- strike

 4    that.

 5                  You testified before that you

 6    know that the Louisiana wholesale company

 7    does, in fact, purchase Schedule II

 8    narcotics, correct?

 9           A.     Correct.

10           Q.     How do you know that?

11           A.     Because I'm familiar with the

12    book of business that we do at Louisiana

13    Wholesale.

14           Q.     And who do they purchase from?

15                  MS. FUMERTON:  Objection, I'm

16           going to instruct her not to answer.

17    BY MR. BOWER:

18           Q.     Are you familiar with that?

19           A.     I'm familiar, yes.

20           Q.     Are you going to not answer

21    that question as well?

22                  MS. FUMERTON:  I'm going to

23           instruct her not to answer the

24           question.

25    BY MR. BOWER:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Does Ms. Fumerton represent
 2    Louisiana Wholesale Drug company?
 3          A.     No, she does not.
 4          Q.     Are you going to listen to her
 5    instructions?
 6          A.     Yes.
 7          Q.     Okay.
 8                 (Walmart-Little Exhibit 1
 9          marked.)
10                 MR. BOWER:  I would just note
11          for the record while you review
12          Exhibit 1 that we don't know whether
13          my questions are relevant because you
14          won't answer them, so we will keep
15          this deposition open to the extent
16          it's necessary.
17                 MS. FUMERTON:  I disagree with
18          your characterization because your
19          questions about what Louisiana
20          Wholesale did or did not do is not
21          relevant to this litigation and
22          specifically this deposition.
23    BY MR. BOWER:
24          Q.     You've been handed what's been
25    marked as Exhibit 1.  Are you familiar with
```

1    that document?

2          A.      Yes, I am.

3          Q.      Okay.  What is that document?

4          A.      This is a résumé that I had

5    uploaded to LinkedIn.

6          Q.      Okay.  And if you notice,

7    there's no Louisiana Wholesale Drug company

8    mentioned on this document; is that correct?

9          A.      That's correct.

10         Q.      Is there a reason you haven't

11   updated your LinkedIn profile?

12         A.      It's just not something that I

13   actively do.

14         Q.      When was the last time you

15   updated it?

16         A.      I would probably say, and I

17   don't know for sure, but when I uploaded this

18   document, maybe.

19         Q.      Okay.  You notice under

20   Experience it says February 2014 to present?

21         A.      Yes.

22         Q.      You see that?

23                 So your LinkedIn profile, then,

24   is not accurate; is that correct?

25         A.      Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FUMERTON:  Objection.

 2         Objection, form.

 3              And just give me a second.

 4         You're both fast talkers, so you need

 5         to just pause a second after he asks

 6         his question.

 7    BY MR. BOWER:

 8         Q.    Why did you leave Walmart to go

 9    to Louisiana Wholesale Drug company?

      ███    ███    ████████████████████

      ███    ████████   ████████████████████████

      ███    ████████████████████████████████████

      ███    ████████████████████████

14         Q.    So at the time you were living

15    in Bentonville when you worked for Walmart?

16         A.    Correct.

17         Q.    And now you've moved back to

18    Louisiana; is that correct?

19         A.    Correct.

20         Q.    And that's where you're from

21    originally?

22         A.    We lived there the ten years

23    prior to moving to Walmart.

24         Q.    And that's where you went to

25    college as well, right?
```

1        A.      Yes, correct.

2        Q.      I just have a few questions

3    regarding your profile.  Other than the fact

4    that you haven't updated it recently, is the

5    experience that you've included here

6    accurate?

7        A.      Yes.

8        Q.      Okay.  I just have a couple of

9    questions then on some of the things you've

10   listed here on your experience.  Let's start,

11   I guess, from when you began at Walmart,

12   which was 2007, correct?

13       A.      January of 2008.

14       Q.      Okay.  Did you take a job at

15   Walmart directly after graduating from

16   Louisiana State University?

17       A.      No, I graduated from LSU the

18   first time in 1990.

19       Q.      Okay.

20       A.      I had finished my M.B.A. in May

21   of 2007.

22       Q.      What did you do between -- just

23   very briefly, between 1990 and 1993 -- strike

24   that.

25              Were you a registered nurse in

Highly Confidential - Subject to Further Confidentiality Review

```
1     1993?

2          A.      I think I graduated in '95.

3          Q.      Okay.

4                  MS. FUMERTON:  And you can look

5          at the document too.

6     BY MR. BOWER:

7          Q.      Yeah, sure, please look at the

8     document.  I'm just trying to get a very

9     brief understanding of your background.

10                 I noticed that under Education

11    you have two things listed, Itawamba

12    Community College and then Louisiana State.

13    It appears that you were a Registered Nurse;

14    is that correct?

15         A.      I was a Registered Nurse, and

16    this date of completion of 2005 is not

17    accurate.  It was 1995.

18         Q.      Okay.  That clears that up.

19                 Were you a practicing nurse

20    from 1995 until 2005 approximately?

21         A.      Until 2007.

22         Q.      Okay.  And where were you

23    employed during that time period?

24         A.      There were multiple places.  I

25    had worked at Ascension Hospital, at Lake
```

Highly Confidential - Subject to Further Confidentiality Review

1     After Hours, which was an acute care setting.

2     I worked at St. Elizabeth Hospital and I

3     worked for Infusion Network.

4          Q.     Okay.  Thank you for that.

5                 Then in 2005 you went to

6     Louisiana State to get your master's degree,

7     correct?

8          A.     That's correct.

9          Q.     Did you begin working with

10    Walmart directly after graduating with your

11    master's degree?

12         A.     About six or seven months

13    later.

14         Q.     And what were you hired at

15    Walmart to do?

16         A.     To be a buyer in the pharmacy

17    department.

18         Q.     In 2008 when you began at

19    Walmart, did you have any specific areas

20    of -- that you were responsible for buying?

21         A.     Yes.

22         Q.     Okay.  What were those areas?

23         A.     I don't remember exactly.  I

24    know skin health, antibiotics, and I don't

25    really remember the others.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.      Okay.  When did you first have

2   responsibility for buying prescription

3   opiates?

4        A.      It would have been maybe a year

5   later, a year and a half later, something

6   like that.

7        Q.      So sometime in the 2009 time

8   frame?

9        A.      Yes.

10       Q.      Okay.

11       A.      Probably.

12       Q.      And at that time, Walmart was

13  already purchasing prescription opiates,

14  correct?

15       A.      That's correct.

16       Q.      And Walmart was already

17  distributing prescription opiates; is that

18  correct?

19       A.      That's correct.

20       Q.      Do you have any idea when

21  Walmart began distributing prescription

22  opiates?

23       A.      I do not.

24       Q.      What change occurred, if any,

25  between the time you began at Walmart and the
```

```
1   time you began purchasing prescription

2   opiates?

3              MS. FUMERTON:  Objection, form.

4              MR. BOWER:  I'll rephrase.

5   BY MR. BOWER:

6        Q.    Why did you begin purchasing

7   prescription opiates for Walmart?

8        A.    We had some personnel changes,

9   and it was typical for them to change

10  categories and move buyers from different

11  categories for whatever reason at the time.

12       Q.    Okay.  And what personnel

13  changes occurred during that time period that

14  required you to be involved in purchasing

15  prescription opiates?

16             MS. FUMERTON:  Objection, form.

17             MR. BOWER:  You can answer.

18             MS. FUMERTON:  (Nods head.)

19       A.    If I remember right, I think

20  David Badeen had moved to a different

21  position, but I could be a little fuzzy on

22  that.

23  BY MR. BOWER:

24       Q.    Okay.  We'll have some

25  documents maybe that will refresh your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    recollection.
 2         A.     Okay.
 3         Q.     Okay?  And then how long did
 4    you purchase prescription opiates for
 5    Walmart?
 6         A.     On and off between that 2009
 7    time frame until maybe '16 or '17.
 8         Q.     So almost through the time you
 9    left Walmart, correct?
10         A.     Yes.  There were some time
11    frames in there that I did not -- a different
12    buyer, another buyer had that responsibility.
13         Q.     Can you explain how that works?
14    Why would one buyer come in and have that
15    responsibility and you would not have
16    responsibility?
17         A.     It was just changes that they
18    made often to give you experience, or a new
19    buyer came in and they changed the
20    categories.  I'm not sure that there was any
21    set reason for that.
22         Q.     Okay.  During your time period,
23    what other buyers had responsibility for
24    purchasing prescription opiates?
25         A.     I know Steve Potts.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.     Okay.  Anyone else?

 2         A.     I'm not sure if there was

 3   anyone else.

 4         Q.     Do you have a general idea of

 5   what time period Mr. Potts was involved in

 6   purchasing prescription opiates for Walmart?

 7         A.     I do not remember the years

 8   that he was employed in that department.

 9         Q.     Approximation?

10         A.     Maybe 2012-ish.  I'm not sure.

11         Q.     Okay.  Thank you for that.

12                Were you responsible for

13   negotiating the contract terms for purchasing

14   prescription opiates for Walmart?

15         A.     Yes.

16         Q.     Those terms frequently involved

17   rebates, correct?

18                MS. FUMERTON:  Objection, form.

19         A.     Some involved rebates.

20   BY MR. BOWER:

21         Q.     Most involved rebates.  Would

22   you agree with that?

23                MS. FUMERTON:  Objection, form.

24         A.     I can't remember the specifics

25   of all the contracts.
```

```
 1    BY MR. BOWER:

 2         Q.    What's your basis for saying

 3    that some involved rebates?

 4         A.    Well, we had rebates on

 5    multiple drugs, not just opioids, on our

 6    regular prescription drug business and on

 7    prescription opioids.  I just don't remember

 8    those specifics of contracts.

 9         Q.    Most of your contracts have

10    rebate provisions, correct?

11              MS. FUMERTON:  Objection, form.

12         A.    I don't know that "most" is

13    correct.  I don't know that.

14    BY MR. BOWER:

15         Q.    Do you recall any contract for

16    purchasing prescription opiates that did not

17    have a rebate provision?

18         A.    I don't -- I can't recall that,

19    no.

20         Q.    You can't recall a single one,

21    correct?

22         A.    I can't recall either way

23    without -- it's been a long time since I've

24    looked at those contracts.  I don't recall

25    either way.
```

1     Q.     What about the contracts that

2     were in existence in 2016 for purchasing

3     prescription opiates?  Do those have rebate

4     provisions?

5     A.     I don't recall.

6     Q.     Are you aware the country is in

7     the middle of an opioid crisis?

8           MS. FUMERTON:  Objection, form.

9     A.     I'm aware that there are people

10    that are addicted to opioids and I'm aware

11    that there are people that use prescription

12    opioids for legitimate reasons every day.

13    BY MR. BOWER:

14    Q.     Do you think the country is in

15    the middle of an opioid crisis?

16          MS. FUMERTON:  Objection, form.

17    A.     There's a lot of attention

18    regarding this subject.  I haven't looked at

19    documents.  I haven't read much about it.

20    I'm not sure how I feel about that.  I think

21    "crisis" is a difficult word.  I'm not sure

22    how I feel about it.

23    BY MR. BOWER:

24    Q.     What word would you use?

25          MS. FUMERTON:  Objection, form.

1      A.     I think any -- I think

2  addiction to any substance is disheartening

3  and is sad, whether it's opioid or a

4  different substance, and I think there are

5  plenty of issues.

6  BY MR. BOWER:

7      Q.     Have you seen any of the TV

8  reports on the opioid crisis?

9      A.     I haven't -- I've seen the

10  opioid crisis in the news.  I haven't focused

11  or studied what the -- what the facts are

12  behind those, so I'm not familiar with the

13  numbers.

14      Q.     Did you ever discuss the opioid

15  problem while you were at Walmart with

16  anybody?

17          MS. FUMERTON:  Objection, form.

18      A.     You know, we talked about --

19  there were times when there were -- we knew

20  that people had prescriptions, or I knew that

21  people had prescriptions and they weren't

22  using them for legitimate use.

23          If there were ways that we

24  could do things to stay away from -- from

25  selling to those customers or attracting

1    those customers, we would take that.  We

2    would -- we would work to put those in place.

3    BY MR. BOWER:

4         Q.    And how did you know that

5    people had prescriptions and they weren't

6    using them for legitimate use?

7         A.    Well, as a nurse, we had

8    seen -- I've seen people come into the

9    after-hours clinic or to the emergency room,

10   people that you knew were looking for drugs

11   and asking for drugs that probably didn't

12   need those products.

13        Q.    And while you were employed at

14   Walmart, did you ever receive e-mails

15   suggesting that Walmart should do more to

16   address the opioid problems?

17             MS. FUMERTON:  Objection, form.

18        A.    I don't recall that, no.

19   BY MR. BOWER:

20        Q.    So you may have received

21   e-mails; you just don't recall; is that

22   correct?

23             MS. FUMERTON:  Objection, form.

24        A.    I can't recall.

25   BY MR. BOWER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.     Well, my question is:  So you

 2   may have received e-mails, but you don't

 3   recall receiving them one way or the other,

 4   correct?

 5         A.     Correct.

 6                MS. FUMERTON:  Give me -- just

 7         again, I'm having a little bit of

 8         trouble getting an objection in.

 9                THE WITNESS:  I'm sorry.

10                MS. FUMERTON:  Just give it a

11         little bit of pause.

12   BY MR. BOWER:

13         Q.     Let's go back to Exhibit 1,

14   just a few more questions on your résumé,

15   okay?

16         A.     Yes.

17         Q.     Going back to your time from

18   2007 to 2014, you're an Rx buyer.  Do you see

19   that on the second page there, about halfway

20   down?

21         A.     Yes.

22         Q.     Okay.  Are those dates accurate

23   there, 2007 to February of 2014?  I believe

24   you said it started in 2008, correct?

25         A.     Yes, I started in January of
```

Highly Confidential - Subject to Further Confidentiality Review

1    2008.

2         Q.    And is the end date

3    approximately correct that you were the Rx

4    buyer?

5         A.    It would have ended when I left

6    Walmart in April of 2018.

7         Q.    Well, I noticed on page 1 you

8    have senior Rx buyer, if you'd turn to

9    page 1.  Did you at some point receive a

10   promotion from Rx buyer to senior Rx buyer?

11        A.    Yes.

12        Q.    Approximately when did you --

13        A.    I don't recall that date.

14   Well, February 14th, I guess, according to

15   the résumé.

16        Q.    Okay.  Well, let me ask it a

17   different way.  Did that promotion -- strike

18   that.

19             Would you agree that was a

20   promotion?

21        A.    Yes.

22        Q.    Did that have any change in

23   your duties and responsibilities?

24        A.    I don't recall if we changed

25   categories at that time or not.

1    Q.    And when you say categories,

2    what do you mean by categories?

3    A.    We divided our business up into

4    disease state categories, so you would

5    have -- you could have the pain category, you

6    could have the GI category, you could have

7    the antibiotic or whatever disease state

8    category.  I don't remember if we had eight

9    or nine categories or how many we had.

10    But we divided the drugs up

11    into those categories, and a buyer would have

12    responsibility for a set of those disease

13    state categories.

14    Q.    Okay.  And then do you recall

15    approximately for what period of time you

16    were responsible for the pain category?

17    A.    So I started I think in 2009,

18    around 2009 or 2010.  There were times

19    between then and -- I don't know when it

20    actually ended, if it was in 2016 or -- I

21    want to say '16 or '15.  I had it for that

22    period, but there were times in between when

23    others may have had it.

24    Q.    When those others may have had

25    it, was that in conjunction with you or you

1    were off it at that point and they were on

2    it?

3         A.    Yes, I was off and had

4    different categories and they were on it.

5         Q.    How would you be informed that

6    you would be off the pain category?

7         A.    They would just tell us that

8    they were changing categories up.

9         Q.    Who would tell you?

10        A.    Usually our vice president.

11        Q.    Who was that?

12        A.    It was different people at

13   different times.

14        Q.    Okay.  Well, let's just go

15   through, just to the best of your

16   recollection, who were the vice presidents

17   that would kind of be in charge of assigning

18   categories?

19        A.    So --

20              MS. FUMERTON:  Objection, form.

21              THE WITNESS:  Sorry.

22        A.    Sandy Kinsey when I first

23   started.

24   BY MR. BOWER:

25        Q.    Okay.

1      A.      Then Mark Phillips and then

2    Jinali Desai.

3      Q.      And how would they inform you

4    what category you were responsible for?

5    Would it be e-mail, phone call, meeting?

6      A.      It was just conversation.

7      Q.      And how frequently would this

8    occur?

9      A.      Every year, year or so.  It

10   wasn't a set time frame, but it happened

11   periodically.

12     Q.      Okay.  And when the categories

13   were changed, would you receive training or

14   anything in connection with your new

15   assignment?

16     A.      There was not formalized

17   training, but you had resources; the buyers

18   that purchased the category before you, your

19   replenishment managers or your other extended

20   team members that would help you with

21   questions if you had questions.

22     Q.      How would you -- when the

23   categories changed, how would you familiarize

24   yourself with what was needed for the new

25   category, for example, how much supply was

Highly Confidential - Subject to Further Confidentiality Review

1    needed?

2                    MS. FUMERTON:  Objection, form.

3         A.      You would review past supply.

4    You had those numbers that you could review.

5    You would -- you would just look at what was

6    going on in the business.

7    BY MR. BOWER:

8         Q.      And what numbers would you

9    review?

10        A.      We had past script data that

11   was out there that you could see on a certain

12   NDC, what the utilization was.

13        Q.      And was that data available

14   for -- through a certain software or data

15   system or how would you access that data?

16                    MS. FUMERTON:  Objection, form.

17        A.      It was available through Retail

18   Link.

19   BY MR. BOWER:

20        Q.      And what type of data was

21   available through Retail Link?  Was it

22   prescription level data?

23                    MS. FUMERTON:  Objection, form.

24        A.      There was prescription level

25   data.  There was sales numbers.  There were

```
 1    units.  There were store locations.  There

 2    were -- it was unlimited, really, what the

 3    data was in there.

 4    BY MR. BOWER:

 5         Q.    And was the data that you had

 6    access to limited to Walmart data, or was it

 7    data that was broader than that?

 8              MS. FUMERTON:  Objection, form.

 9         A.    It was Walmart data.

10    BY MR. BOWER:

11         Q.    Did you have access to any

12    data, for example, for other distributors,

13    such as McKesson?

14         A.    No.

15         Q.    Did you have access to data for

16    other -- strike that.

17              Did you have access to data for

18    other manufacturers, for example, quotas for

19    prescription opiates?

20              MR. CIULLO:  Objection, form.

21              MS. FUMERTON:  Objection, form.

22              Yeah, just give us -- you're

23         jumping in a little bit, that's fine.

24         A.    No.

25    BY MR. BOWER:
```

```
 1          Q.      As part of your duties and
 2    responsibilities for purchasing prescription
 3    opiates for Walmart, are you familiar with
 4    quotas?
 5                  MS. FUMERTON:  Objection, form.
 6          A.      I'm aware that there are quotas
 7    on some chemicals for opioids, yes.
 8    BY MR. BOWER:
 9          Q.      And what's your understanding
10    of why those quotas are in place?
11          A.      I'm not familiar with the
12    reason of why they are in place.
13          Q.      Are you aware that Walmart has
14    certain obligations in distributing
15    prescription opiates?
16                  MS. FUMERTON:  Objection, form.
17          A.      Yes.
18                  MR. BOWER:  What's the nature
19          of that objection?
20                  MS. FUMERTON:  "Certain
21          obligations" is incredibly vague,
22          especially -- "in distributing
23          prescription opioids" is also
24          extremely vague and could be
25          interpreted very broad or very
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              narrowly.

 2                   MR. BOWER:  Any other

 3              objections you have to that, other

 4              than vagueness?

 5                   MS. FUMERTON:  Well, I think

 6              that can be confusing in that regard

 7              as well.

 8    BY MR. BOWER:

 9         Q.    What obligations are you

10    familiar with respect to Walmart's

11    distribution of prescription opiates?

12                   MS. FUMERTON:  Objection, form.

13         A.    I'm not familiar with the

14    specifics of that.  I really was focused in

15    my job on negotiating the contracts and the

16    price and making sure we had supply at the

17    store.

18    BY MR. BOWER:

19         Q.    You're aware that Walmart is

20    required to have a suspicious order

21    monitoring system in place, correct?

22         A.    That's correct.

23         Q.    When did you first become aware

24    of that?

25         A.    I don't remember the year.
```

1  Maybe 2010, and that's just a guess on the

2  year.

3        Q.     Okay.  Did you receive any

4  training at Walmart regarding its obligations

5  to have a suspicious order monitoring

6  program?

7        A.     I did not, no.

8        Q.     Are you aware that

9  manufacturers as well must have a suspicious

10  order monitoring program in place to monitor

11  the purchases of prescription opiates by

12  distributors?

13        A.     I was aware that some

14  manufacturers had suspicious order monitoring

15  in place.

16        Q.     And, in fact, Walmart had

17  placed orders that were cut or canceled due

18  to manufacturer's suspicious order

19  monitoring, correct?

20              MS. FUMERTON:  Objection, form.

21        A.     I'm unsure about cut and

22  canceled.  I know that we have questions

23  sometimes from manufacturers if we hit up

24  against that limit.

25  BY MR. BOWER:

1        Q.      Has Walmart ever had an order

2    that was canceled because it ordered too many

3    prescription opiates from a manufacturer?

4                MS. FUMERTON:  Objection, form.

5        A.      I'm am unsure.  I did not

6    actually place the orders, so I'm unsure if

7    that happened.  I'm just not aware.

8    BY MR. BOWER:

9        Q.      You're not able to say whether

10   that ever happened?

11       A.      Correct.

12       Q.      So it could have happened; you

13   just don't remember?

14       A.      I can't recall.

15       Q.      It could have happened numerous

16   times; you just don't recall it, correct?

17               MS. FUMERTON:  Objection, form.

18       A.      Correct.

19   BY MR. BOWER:

20       Q.      It could have happened hundreds

21   of times; you don't recall it ever happening,

22   right?

23               MS. FUMERTON:  Objection, form.

24       A.      If it would have happened a

25   hundred times, I think our replenishment

Highly Confidential - Subject to Further Confidentiality Review

1    manager would have -- they would have had to

2    have notified me because we would have had an

3    issue with supply at that point.

4    BY MR. BOWER:

5         Q.    What do you mean an issue with

6    supply?

7         A.    If we were ordering product

8    that we needed and those orders were being

9    cut, we would not have received the product.

10   I would have had out-of-stocks and I would

11   have noticed at that time.

12        Q.    And what would you do if you

13   had an out-of-stock?

14        A.    I would try to go to a

15   different vendor to get supply.

16        Q.    Right.  So if a Walmart order

17   had been cut, you would simply go to a

18   different vendor to get supply, correct?

19             MS. FUMERTON:  Objection, form.

20        A.    Well, it wasn't that we would

21   do that immediately.  The only times we would

22   do that is if there was an extended supply

23   disruption in the market, not if one order

24   was cut.

25   BY MR. BOWER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Are you aware of any

2  circumstance where an order was cut and you

3  went to a different vendor to get supply?

4            MS. FUMERTON:  Objection, form.

5      A.    I'm -- I'm not aware of a

6  situation where an order was cut and I went

7  to a different vendor.

8  BY MR. BOWER:

9      Q.    Are you aware of a situation

10 where an order was not filled and you went to

11 a different vendor due to a manufacturer's

12 suspicious order monitoring program?

13           MS. FUMERTON:  Objection, form.

14     A.    In my role I wouldn't have been

15 aware of orders that were cut or not filled.

16 BY MR. BOWER:

17     Q.    Just so the record is clear,

18 you're not aware of that ever happening; is

19 that correct?

20     A.    Not that I can recall --

21           MS. FUMERTON:  Objection, form.

22           THE WITNESS:  Sorry.

23 BY MR. BOWER:

24     Q.    So it could have happened

25 several times; you may not have been aware of

1    it, right?

2              MS. FUMERTON:  Objection, form.

3         A.     It could have happened and I

4    was not aware of it, yes.

5    BY MR. BOWER:

6         Q.     Okay.  Who at Walmart would be

7    aware of it?

8              MS. FUMERTON:  Objection, form.

9         A.     We had replenishment managers

10   that were the ones that actually placed the

11   POs and talked to the manufacturers if those

12   were not filled.

13   BY MR. BOWER:

14        Q.     And who were the replenishment

15   managers that were responsible for

16   prescription opiates during your time period?

17             MS. FUMERTON:  Objection, form.

18        A.     I'm not -- I know Linda Wilson

19   was one.  I'm not sure of others.  They would

20   change their categories just like the buyers

21   would change their categories.

22   BY MR. BOWER:

23        Q.     Are there any other

24   replenishment managers that you worked with

25   on prescription opiates?

1          A.      Not that I recall at this time.

2          Q.      So to the best of your

3    recollection, Ms. Wilson had that

4    responsibility for a lengthy period of time

5    at Walmart, correct?

6                  MS. FUMERTON:  Objection, form.

7          A.      I know that she had it for a

8    period of time that I had it.  I just can't

9    remember if someone else had it as well.

10   BY MR. BOWER:

11         Q.      Okay.  Generally speaking,

12   would there be one replenishment manager

13   responsible for a category as well, or were

14   they organized differently?

15         A.      There would be a replenishment

16   manager for each category, but then they also

17   had responsibility for relationships with

18   manufacturers.

19         Q.      Okay.  And what was their

20   responsibility for relationship with

21   manufacturers?

22         A.      They would do the ordering for

23   that complete manufacturer.

24         Q.      Okay.  So in other words, there

25   was one replenishment manager that was

Highly Confidential - Subject to Further Confidentiality Review

1    responsible for each manufacturer; is that

2    correct?

3              MS. FUMERTON:  Objection, form.

4        A.    As I remember it, yes.

5    BY MR. BOWER:

6        Q.    Do you recall what manufacturer

7    Ms. Wilson was responsible for?

8        A.    I do not recall.

9        Q.    Do you recall who was

10   responsible for Purdue replenishment?

11       A.    I do not.

12       Q.    Mallinckrodt replenishment?

13       A.    I do not.

14             MS. FUMERTON:  Objection, form.

15   BY MR. BOWER:

16       Q.    Actavis replenishment?

17             MS. FUMERTON:  Objection, form.

18       A.    I do not.

19   BY MR. BOWER:

20       Q.    All right.  Let's go back to

21   your Exhibit 1 for a moment.

22       A.    Okay.

23       Q.    I want to go turn to page 2 for

24   a moment and I want to ask a couple of

25   questions on those bullet points on kind of

Highly Confidential - Subject to Further Confidentiality Review

1    the top half of the page there.  One of the

2    bullet points you note that you successfully

3    led category participation in hydrocodone

4    reclassification.

5              Do you see that?

6    A.    Yes, I see that.

7    Q.    What does that mean?

8    A.    I was a conduit on the

9    merchandising side for the C-II manufacturers

10   in our warehousing department in the moving

11   of our vault at a time period while we were

12   there.

13   Q.    What does category

14   participation mean?

15   A.    That would be the merchandising

16   category.

17   Q.    Okay.  What manufacturer did

18   you work with in context with that effort?

19             MS. FUMERTON:  Objection, form.

20   A.    Mallinckrodt, QualiTest.  I

21   don't remember who else we would have had

22   that were C-II manufacturers at the time.

23   BY MR. BOWER:

24   Q.    And what time period was that

25   approximately?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I'm not sure.  It was maybe

 2     2012 or '13.  I'm not sure.

 3          Q.     How would you communicate with

 4     them?

 5                 MS. FUMERTON:  Objection, form.

 6          A.     I would generally call them or

 7     send an e-mail.

 8     BY MR. BOWER:

 9          Q.     How frequently would you send

10     e-mails to those folks?

11                 MS. FUMERTON:  Objection, form.

12     BY MR. BOWER:

13          Q.     For example, someone at

14     Mallinckrodt?

15                 MS. FUMERTON:  Objection, form.

16                 MR. BOWER:  What's the nature

17          of that objection?

18                 MS. FUMERTON:  How frequently

19          would you send e-mails to those folks

20          about what?

21                 MR. BOWER:  About what we're

22          talking about, about the

23          hydrocodone --

24                 MS. FUMERTON:  What are we

25          talking about?
```

1            MR. BOWER:  Okay.  I'll

2       rephrase because I think the record is

3       clear and you're just objecting to

4       every question.  So I'll rephrase.

5            MS. FUMERTON:  I'm not

6       objecting to every question.  The

7       record is not clear.

8   BY MR. BOWER:

9       Q.    How frequently would you

10   discuss hydrocodone reclassification with

11   Mallinckrodt in the 2012-2013 time period?

12            MS. FUMERTON:  Objection, form.

13       A.    I can't recall, but, I mean,

14   if -- once every couple of weeks.  As we got

15   closer to the actual movement, more often.

16   BY MR. BOWER:

17       Q.    Going up a couple of bullet

18   points there, increased cash prescriptions on

19   certain items up to 45%.

20            Do you see that?

21       A.    Yes.

22       Q.    What does that mean, cash

23   prescriptions on certain items up to 45%?

24       A.    That was an initiative I had

25   done with a prescription product called

1    Latisse for eyelash growth.  It was a product

2    that was not generally reimbursed by

3    insurance plans because it was a vanity-type

4    product, so I had worked with the

5    manufacturer to secure a lower price.

6            We offered it for a significant

7    discount for customers, and then we -- I

8    worked with our marketing team to have that

9    put in our Sunday circular, and we put some

10   signage at stores just to tell customers that

11   we had a lower price on that item.

12       Q.    Did you ever work with the

13   marketing team on prescription opiates?

14            MS. FUMERTON:  Objection, form.

15       A.    I did not.

16   BY MR. BOWER:

17       Q.    Did Walmart ever receive a

18   marketing fee for prescription opiates?

19            MS. FUMERTON:  Objection, form.

20            MR. CIULLO:  Objection, form.

21       A.    Not that I'm aware of.

22   BY MR. BOWER:

23       Q.    Did you ever sign any contracts

24   where Walmart received a marketing fee for

25   prescription opiates?

```
 1                MR. CIULLO:  Objection, form.

 2                MS. FUMERTON:  Objection, form.

 3        A.      If that had happened, it

 4   wouldn't be for marketing to a consumer

 5   level.  It would really just be a rebate or a

 6   cost of good adjustment.

 7   BY MR. BOWER:

 8        Q.      What's your basis for that

 9   statement?

10        A.      Because we never did anything

11   that would promote an opioid to the customer,

12   to the end customer user, the patient that

13   would pick up the prescription.

14        Q.      And how do you know that?

15        A.      Because we had a pretty firm

16   stance on that while I was there.

17        Q.      And where did you learn of that

18   stance?

19        A.      I had asked to put a cough

20   medicine on the $4 program at one time and

21   was told that anything with controlled

22   substances, we generally would not advertise

23   or talk to the consumer about.

24        Q.      Would you talk to your

25   pharmacists about those prescription opiates?
```

1              MS. FUMERTON:  Objection, form.

2       A.      We would have done information

3  or education if we needed to.  If there was a

4  new brand that came out, we may would educate

5  them that a new product was out, but we would

6  do that with any new product that hit the

7  market.  It wasn't specific to an opioid.

8  BY MR. BOWER:

9       Q.      Right, but when an opioid

10  product was hitting the market, Walmart would

11  educate its pharmacists about that product,

12  correct?

13              MS. FUMERTON:  Objection, form.

14       A.      I can't recall if we did or if

15  we did not.  But we did at certain times send

16  information to the pharmacists about new

17  drugs that came to market.  We didn't do it

18  about every drug that came to market, and I

19  don't recall which would be the ones that we

20  did or we did not do.

21  BY MR. BOWER:

22       Q.      Do you recall educating your

23  pharmacists on fentanyl when it hit the

24  market?

25              MS. FUMERTON:  Objection, form.

1          A.     Well, fentanyl would have

2     already been in the market when I started.

3     BY MR. BOWER:

4          Q.     I'll strike that then.

5                 Do you recall educating your

6     pharmacists on new fentanyl products when

7     they hit the market?

8                 MS. FUMERTON:  Objection, form.

9          A.     We may have on the new

10    abuse-deterrent fentanyl that came out when I

11    was in that position.

12    BY MR. BOWER:

13         Q.     What's the abuse-deterrent

14    fentanyl that you're referring to?

15         A.     It would have been the fentanyl

16    matrix patch.

17         Q.     When did that come out?

18         A.     I don't remember the year, but

19    maybe 2010.

20         Q.     And who would have provided

21    that information that you passed on to your

22    pharmacists?  That would have come from the

23    manufacturer, right?

24                MS. FUMERTON:  Objection, form.

25         A.     I -- for that particular item,

1    it was a generic item.  Generally, those

2    manufacturers wouldn't provide any kind of an

3    information sheet.  I don't know if we -- we

4    had an internal communication mechanism.  It

5    was called COMAC at one time or Leadership

6    Weekly, where I could put information in

7    there to the stores.

8              I may have put, hey, this new

9    abuse-deterrent fentanyl is out and these are

10   the new item numbers, but I don't recall from

11   2010 what I did on that launch.

12   BY MR. BOWER:

13        Q.    So this co- -- was it COMAC

14   that you referred to?

15        A.    It was called COMAC.

16        Q.    Is that a way that Walmart

17   used -- strike that.

18              Did Walmart use COMAC to

19   communicate with its pharmacists?

20        A.    Yes.

21        Q.    Okay.  Would Walmart announce

22   new drugs in COMAC?

23              MS. FUMERTON:  Objection, form.

24              MR. BOWER:  Strike that.

25   BY MR. BOWER:

1        Q.      When new drugs became

2    available, would Walmart make those

3    announcements in COMAC?

4                MS. FUMERTON:  Objection, form.

5        A.      We could use that vehicle to do

6    that, yes.

7    BY MR. BOWER:

8        Q.      What other vehicles could you

9    use?

10       A.      That was really the only

11   vehicle to communicate to pharmacists.

12       Q.      Right.  So when you said --

13   your answer was we could use that vehicle, so

14   that suggests to me --

15       A.      Well, the COMAC --

16       Q.      -- that suggests to me that

17   there were other vehicles available, okay?

18   So I just want to make the record clear.

19               The question was:  When new

20   drugs became available, would Walmart make

21   those announcements in COMAC.  Can you please

22   answer that question?

23               MS. FUMERTON:  Objection, form.

24       A.      We could put those in COMAC,

25   yes.  What I wanted to make sure that I was

1    clear on is that COMAC could be used for

2    other communications.  It was not only used

3    for new drug communications to pharmacists.

4    BY MR. BOWER:

5         Q.    Okay.  And I appreciate that

6    clarity, but my question didn't -- wasn't

7    asking about COMAC; it was simply asking

8    about whether it could be used, okay?

9         A.    Uh-huh.

10        Q.    Did Walmart use COMAC to inform

11   pharmacists about the qualities of new drugs?

12             MS. FUMERTON:  Objection, form.

13        A.    I can't -- I can't remember

14   that.

15   BY MR. BOWER:

16        Q.    Did Walmart include information

17   in COMAC that it received from manufacturers

18   about new drug launches?

19             MS. FUMERTON:  Objection, form.

20        A.    On brand launches, we would

21   have used COMAC to communicate that, but

22   it -- it wasn't that we did every drug in

23   that.  It was instances here and there, and

24   it was both C-IIs and non-C-II items as well.

25   BY MR. BOWER:

1     Q.     Okay.  Going back to your

2   résumé for a moment, back still on the second

3   page.  I just have a couple more factual

4   questions about what -- kind of how the

5   business worked.

6             One of the bullet points

7   mentions spearheaded a new procurement model

8   by driving profit by lowering acquisition

9   costs on a subset of items.  What does that

10  refer to?

11    A.     So there were -- when there

12  were items in the market that were hard to

13  get or were in short supply, I had worked

14  with ANDA to be able to purchase from ANDA to

15  get some of those generic products and have

16  those sent to our stores.

17    Q.     Did those include prescription

18  opiates?

19    A.     They did not.

20    Q.     Was there ever a time in your

21  employment at Walmart where prescription

22  opiates were hard to get from your

23  perspective?

24             MS. FUMERTON:  Objection, form.

25    A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. BOWER:
 2          Q.     What would you do during those
 3     circumstances?
 4          A.     We would do the same we would
 5     do with any drug; we would look for
 6     additional supply in the market.
 7          Q.     And the bullet point above that
 8     where you mention introducing enhanced
 9     supplier onboarding process.  What does that
10     refer to?
11              MS. FUMERTON:  Are you on the
12          next page?
13              MR. BOWER:  No.
14              MS. FUMERTON:  Just so she can
15          follow.
16              MR. BOWER:  No, sorry.  The
17          second bullet point from the top,
18          partnered with cross-functional team
19          members to introduce enhanced supplier
20          onboarding process.
21          A.     When we brought a new supplier
22     into Walmart, we would set them up with a
23     supplier agreement and then we had a history
24     of just kind of pushing them off to
25     replenishment at that time to cut the orders
```

1    or work on the orders.

2              Replenishment had some feedback

3    that there were additional things they had

4    wanted the buyers to help with, so I just

5    worked with replenishment to put together a

6    program that would make sure the vendors were

7    able to get their EDI access up, that they

8    understood the things that Walmart wanted in

9    place, that they knew that they needed to

10   send a back order report, that they needed to

11   call and communicate different things with

12   Walmart.

13             So they didn't just -- there

14   were some vendors that would just think they

15   could -- we would sign the contract and then

16   their responsibility was over, and we would

17   be short and not have product that we needed.

18   BY MR. BOWER:

19        Q.    Okay.  You mentioned EEI

20   access; is that correct?

21        A.    EDI.

22        Q.    EDI access.  Okay.

23             And what is that?

24        A.    That's an electronic way that

25   you send purchase orders to the vendors so

Highly Confidential - Subject to Further Confidentiality Review

1    that they can fill the purchase orders.

2        Q.    Would purchase orders for

3    prescription opiates go through that process?

4        A.    I'm assuming all purchase

5    orders went through that process.

6        Q.    And the first bullet point

7    there on that page, Implemented a redesigned

8    rebate tracking and collection process, do

9    you see that?

10       A.    Yes, I do.

11       Q.    What does that refer to?

12       A.    So we had various rebates from

13   various manufacturers.  During some

14   restructuring internally, the group that had

15   tracked those originally, it just kind of got

16   put by the wayside, and one day we realized

17   we were behind on keeping track of when those

18   dollars came in.

19            So I worked with our assistants

20   just to put together really an Excel

21   spreadsheet to track who should be sending

22   rebates, what quarters and making sure that

23   those checks came in.

24       Q.    And who was kind of the -- in

25   charge of putting together the spreadsheet?

1          A.      Well, the assistants made their

2     own spreadsheets based off of the information

3     that we had in our contracts.

4          Q.      Okay.  Were those spreadsheets

5     saved anywhere in particular, where everyone

6     could have access to them?

7          A.      I'm not sure.

8          Q.      Did you ever -- did you have

9     access to those spreadsheets?

10         A.      I do not.

11         Q.      Did you, when you were employed

12    at Walmart, have access to those

13    spreadsheets?

14         A.      I -- I never tried to access.

15    I would just meet with them to find out, and

16    they would bring their copies.  It wasn't

17    anything that I was trying to access.

18         Q.      Okay.  And who would you meet

19    with in connection with these rebate

20    spreadsheets?

21         A.      Our two assistants, Candace

22    Baker and Rhonda Thomas.

23         Q.      Were they -- you mentioned --

24    strike that.

25                 You mentioned our two

1    assistants.  What do you mean by our two

2    assistants?

3         A.    Our department.

4         Q.    Is that the purchasing

5    department?

6         A.    The pharmacy merchandising

7    department.

8         Q.    So those assistants you

9    mentioned, would they be responsible for

10   those spreadsheets for rebates to the extent

11   they included prescription opiates?

12              MS. FUMERTON:  Objection, form.

13        A.    We received rebates from

14   multiple manufacturers.

15   BY MR. BOWER:

16        Q.    Right, and so if those rebates

17   were for prescription opiates, they would

18   have been included in those spreadsheets,

19   correct?

20              MS. FUMERTON:  Objection, form.

21        A.    They could be included in those

22   spreadsheets, but it wouldn't -- it wouldn't

23   dissect if it was for opioids or not, because

24   there were manufacturers like QualiTest that

25   we bought regular products from and we bought

```
 1    opioids from as well.

 2    BY MR. BOWER:

 3         Q.     So those rebate numbers would

 4    have included opiates and other drugs; is

 5    that correct?

 6         A.     That's correct.

 7         Q.     You mentioned -- what was the

 8    company you mentioned, QualiTest; is that

 9    correct?

10         A.     QualiTest.

11         Q.     Did you have a rebate with them

12    with respect to prescription opiates?

13                MS. FUMERTON:  Objection, form.

14         A.     I can't remember who we had the

15    rebates with.

16    BY MR. BOWER:

17         Q.     Do you recall purchasing

18    prescription opiates from QualiTest?

19         A.     I do.

20         Q.     What prescription opiates do

21    you recall purchasing from them?

22         A.     Hydrocodone is one.

23         Q.     Did that contract have a

24    rebate?

25                MS. FUMERTON:  Objection, form.
```

```
 1           A.      I don't recall that.
 2    BY MR. BOWER:
 3           Q.      And I just want to make sure
 4    that when you gave that answer the record is
 5    clear.  When you say I don't recall that,
 6    does that mean it could have and you just
 7    don't recall or you don't recall that
 8    contract having a rebate?
 9           A.      It could have, and I just don't
10    remember if it did or not.
11           Q.      Okay.  Just a couple more
12    questions on your résumé.  Going back to the
13    first page, second bullet from the bottom,
14    Introduced an audit process.
15                   Do you see that?
16           A.      Yes.
17           Q.      What was that process?
18           A.      So that was really just kind of
19    keying up a relationship with our post-audit
20    department in Walmart to set up timely
21    meetings to go over claims.
22           Q.      Was there someone in particular
23    that you worked with in the post-audit
24    department with respect to your
25    responsibility for the pain category
```

1    purchasing?

2        A.    There was not just one person.

3    The post-audits were done by manufacturer,

4    not by category, and there was a team in

5    post-audit.  We had a Walmart post-audit team

6    and he had outside audit teams as well.

7        Q.    What do you mean you had

8    outside audit teams?  Can you describe what

9    that means?

10        A.    There were outside companies.

11    After Walmart post-audit would review all of

12    our transactions they would go to outside

13    audit teams to review as well.

14        Q.    So would Walmart provide its

15    transaction history to those outside audit

16    teams?

17                MS. FUMERTON:  Objection, form.

18        A.    I'm unsure of how they got

19    their information.

20    BY MR. BOWER:

21        Q.    Do you know who would know

22    that -- that answer?

23        A.    I would imagine Walmart

24    post-audit team.

25        Q.    Okay.  And are you familiar

1    with anyone at the Walmart post-audit team

2    who worked with any of the manufacturers of

3    prescription opiates?

4              MS. FUMERTON:  Objection, form.

5         A.    Could you repeat that question?

6    BY MR. BOWER:

7         Q.    Sure.

8              Are you familiar or can you

9    name for us today any folks at the Walmart

10   post-audit team who worked on or with the

11   manufacturers of prescription opiates that

12   Walmart purchased?

13             MS. FUMERTON:  Objection, form.

14        A.    So the whole post-audit team

15   would have worked with all manufacturers, not

16   specific.  They weren't assigned by specific

17   manufacturer or by products.

18   BY MR. BOWER:

19        Q.    Okay.

20        A.    That I'm aware of.

21        Q.    Maybe I misunderstood your

22   testimony.  I thought you said that the

23   post-audit team was assigned to a specific

24   manufacturer.

25        A.    They would go through all of

1    our manufacturer transactions.

2         Q.     So there's one post-audit team

3    that's responsible for all manufacturers; is

4    that correct?

5         A.     Correct.

6              MS. FUMERTON:  Objection, form.

7    BY MR. BOWER:

8         Q.     And who were the folks --

9    strike that.

10             How was the post-audit team

11   structured, if you know?

12        A.     I do not know.

13        Q.     Who were your contacts with the

14   post-audit team?

15        A.     So through the years we had

16   multiple different contacts through the

17   post-audit team.  They would change just as

18   often as -- like our categories would change,

19   and I'm not sure that I remember every --

20   everyone's name.

21        Q.     What names do you remember?

22        A.     I remember Crystal Varela and

23   Deborah Foepel, Matt Owens, and I don't

24   really recall any other names.

25        Q.     So going back to the bullet

1    point here where you say introduced an audit

2    process, was that in connection with the

3    post-audit work by the team?

4              MS. FUMERTON:  Objection, form.

5         A.    Yes.  Prior to that, post-audit

6    would come and they would just drop off

7    claims and the buyers would have to go

8    through the claims, and it was tedious, and

9    we generally had a lot of questions about

10   claims and things that were on the claims.

11             So I really just kind of

12   spearheaded could we meet every two weeks so

13   that I could ask the in-depth questions that

14   I had on what they were trying to claim and

15   get back from manufacturers.

16   BY MR. BOWER:

17        Q.    So you would ask these

18   questions to the Walmart post-audit team; is

19   that correct?

20        A.    Correct.

21        Q.    And what were your in-depth

22   questions based on?  Were they based on

23   purchasing data?

24        A.    Well, they could be --

25             MS. FUMERTON:  Objection, form.

1    A.    They could be based on

2  purchasing data.  They could be based on

3  whatever the claim was for.  There were

4  varied reasons for the claims, and there

5  were -- I would get a general sense of what

6  the claim was about and read through and ask

7  any questions that I had at that point.

8  BY MR. BOWER:

9    Q.    In connection with those duties

10  and responsibilities, would you review the

11  purchase data --

12         MS. FUMERTON:  Objection.

13  BY MR. BOWER:

14    Q.    -- of those manufacturers?

15         MS. FUMERTON:  Objection, form.

16    A.    There could have been an

17  instance that we looked at purchase data.

18  BY MR. BOWER:

19    Q.    What data did you have access

20  to with respect to purchases Walmart made

21  from manufacturers?

22    A.    I had sales data out from the

23  store, prescription data.  There may have

24  been purchase data that I was -- had access

25  to, but it was not anything that I -- I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pulled myself.  If I was looking for purchase
 2    data, I would have asked somebody else for
 3    it.
 4         Q.     And who would you ask for it?
 5         A.     We had planning teams or
 6    business analytics that would pull that data,
 7    or replenishment.
 8         Q.     And would you use the business
 9    analytics or replenishment teams to try to
10    determine what next year's requirements might
11    be for a specific product?
12              MS. FUMERTON:  Objection, form.
13         A.     We were not tasked with looking
14    at budgeting for the next year.  The business
15    analytics team or planners or whatever they
16    called them at the time were the teams that
17    would put that together.
18    BY MR. BOWER:
19         Q.     Okay.  Was there anyone in
20    particular on those teams that was
21    responsible for prescription opiates?
22         A.     Not that I recall.
23         Q.     Well, who on those teams would
24    have been responsible for making those
25    forecasts?
```

```
 1                    MS. FUMERTON:  Objection, form.
 2        A.       They had teams of four or five
 3    different people at different times, and
 4    they -- their personnel changed out
 5    frequently as well.
 6    BY MR. BOWER:
 7        Q.       Well, because a part of your
 8    responsibility, you had to know what products
 9    you needed to purchase, correct?
10        A.       Correct.
11        Q.       And you had to know how much
12    you needed to purchase, right?
13        A.       Correct.
14        Q.       Okay.  So, for example,
15    hydrocodone, how would you know what the --
16    Walmart's needs would be for the following
17    year?
18        A.       So the responsibilities that I
19    had were deciding on the manufacturers and
20    securing the lowest price that I could for
21    the customer and ensuring that we had enough
22    product to get to the stores.
23                 Volumes for purchase orders and
24    things like that came from the replenishment
25    department.
```

1        Q.     Okay.  I just want to focus for

2    a moment on when you say ensuring that we had

3    enough product to get to the stores.

4        A.     Yes.

5        Q.     How would you know how much

6    product the stores needed?

7        A.     It wouldn't be brought to my

8    attention until we had out-of-stocks at the

9    store.  If there were out-of-stocks that were

10   for extended periods of time, then the buyer

11   would understand that and would have to start

12   looking for additional supply.

13              MS. FUMERTON:  We've been going

14        around an hour.  Can we take a break?

15              MR. BOWER:  Sure.

16              THE VIDEOGRAPHER:  Going off

17        the record, 9:03 a.m.

18              (Recess taken, 9:03 a.m. to

19        9:24 a.m.)

20              THE VIDEOGRAPHER:  Back on

21        record at 9:24 a.m.

22              (Walmart-Little Exhibit 2

23        marked.)

24   BY MR. BOWER:

25        Q.     I'm going to hand you what's

1    been marked as Exhibit 2 to today's

2    deposition.  Just take a moment and review

3    that document.

4              And for the record, the

5    document is Bates-labeled WMT_MDL, and then

6    it's 000025989.

7              (Document review.)

8    A.    Okay.

9              MS. FUMERTON:  Zach, is the

10   writing -- was that on there when it

11   was produced?

12             MR. BOWER:  Yeah.

13             MS. FUMERTON:  Okay.

14             MR. BOWER:  I believe so.  I

15   mean, as it was produced?

16             MS. FUMERTON:  Yeah.

17             MR. BOWER:  Okay.  Yeah, I

18   don't believe it's -- I don't know if

19   it's her writing.  I'm going to ask --

20             MS. FUMERTON:  Sure.  No, no.

21   I guess my question is it's not yours;

22   it's somebody else's.

23             MR. BOWER:  No.  So to the best

24   of my understanding, it's not ours.

25             MS. FUMERTON:  Okay.

1          MR. CIULLO:  You don't happen

2      to have an extra copy, do you?

3          MR. BOWER:  Oh, we didn't pass

4      them out?  Did he pass them out?

5          (Comments off the stenographic

6      record.)

7   BY MR. BOWER:

8      Q.      Have you had a chance to read

9   the document, ma'am?

10     A.      Yes, I did.

11     Q.      Does this document look

12  familiar to you?

13     A.      It does not.

14     Q.      It does not, okay.

15          Would you be surprised if this

16  came from your custodial file?

17     A.      No, I would not.

18     Q.      And why not?

19     A.      Well, we -- A, I probably don't

20  understand what "custodial file" is, so I

21  might need clarification on that.

22     Q.      Okay.  Do you

23  understanding that Walmart -- strike that.

24          Do you have any understanding

25  that Walmart has produced documents to

```
 1    plaintiffs in this case?

 2              MS. FUMERTON:  Objection.  I

 3         just caution her that to the extent

 4         that we've had any conversations, she

 5         cannot reveal the content of those

 6         conversations.

 7              MR. BOWER:  I'll rephrase the

 8         question.

 9    BY MR. BOWER:

10         Q.    You mentioned before you took

11    over for Mr. Badeen, correct?

12         A.    That's correct.

13         Q.    And this is a contract that

14    he's identified on.  Do you see him on the

15    first page there?

16         A.    Yes.

17         Q.    You see that?  And it reflects

18    that it's a modification to an existing

19    agreement, correct?

20         A.    Correct.

21         Q.    So it wouldn't be surprising,

22    then, that this would be part of your

23    business records of Walmart, right?

24              MS. FUMERTON:  Objection, form.

25         A.    It wouldn't surprise me if this
```

 1    was part of Walmart's records.

 2    BY MR. BOWER:

 3         Q.    Right.

 4         A.    I don't know if it was part of

 5    my records.

 6         Q.    Okay.  Well, at some point you

 7    became responsible for purchasing oxycodone,

 8    correct, for Walmart?

 9         A.    That is correct.

10         Q.    And at some point you became

11    responsible for purchasing hydrocodone for

12    Walmart, correct?

13         A.    That is correct.

14         Q.    And those two products are

15    reflected here, correct?

16         A.    That is correct.

17         Q.    And this document reflects that

18    these products, oxycodone and hydrocodone,

19    were eligible for ███ rebate from

20    Mallinckrodt; is that correct?

21         A.    That is correct.

22         Q.    And further, this document

23    refers to an existing contract dated

24    April 15th, 2001, correct?

25         A.    That is correct.

1    Q.    So would you agree that this

2    document reflects that Walmart did, in fact,

3    have rebate agreements for opioid products?

4              MS. FUMERTON:  Objection, form.

5    A.    Typically, if I had a contract,

6    it would be signed.  I wasn't employed there

7    at this time, so I'm not -- I'm not sure if

8    this was executed or not executed.

9              MS. FUMERTON:  Zach, just so

10         that the record is clear, I think you

11         said mistakenly that it was eligible

12         for a 50%.

13              MR. BOWER:  ▮.

14              MS. FUMERTON:  Yeah.  I just

15         wanted to make sure the record --

16              MR. BOWER:  Sorry, yeah, ▮

17              MS. FUMERTON:  It's ▮.

18    BY MR. BOWER:

19    Q.    So do you see anywhere in the

20    correspondence from Mallinckrodt to

21    Mr. Badeen that requires a signature for the

22    contract to be accepted?

23    A.    I do not see that on here.

24    Q.    Do you have any reason to

25    believe that this contract was not, in fact,

1    accepted?

2          A.    I can't tell if it was or was

3    not.

4                MR. BOWER:  Can you just read

5          back my last question?

6                (The following portion of the

7          record was read.)

8                "QUESTION:  Do you have any

9          reason to believe that this contract

10         was not, in fact, accepted?"

11               (End of readback.)

12               MS. FUMERTON:  Objection, form.

13         A.    I don't have -- I don't have

14   any reason to believe it was or was not put

15   into effect.

16   BY MR. BOWER:

17         Q.    Well, when you took over the

18   responsibility for the pain category, was

19   Walmart currently purchasing hydrocodone from

20   Mallinckrodt?

21         A.    I don't remember who we were

22   purchasing from at that time.

23         Q.    Who did you purchase

24   hydrocodone from when you had that

25   responsibility?

```
 1                    MS. FUMERTON:   Objection, form.

 2          A.     I purchased it from different

 3     manufacturers at different times.

 4     BY MR. BOWER:

 5          Q.     Was Mallinckrodt one of those

 6     manufacturers?

 7          A.     Yes, they were.

 8          Q.     What other manufacturers did

 9     you purchase hydrocodone from for Walmart?

10          A.     I do remember QualiTest was

11     one.  I remember KVK was one.  I don't

12     remember any others.

13          Q.     In connection with preparing

14     for your deposition today, did you review

15     documents?

16          A.     I reviewed some documents, yes.

17          Q.     Were those documents provided

18     to you by counsel for Walmart?

19          A.     They were provided by my

20     counsel.

21          Q.     Is that your counsel that's

22     here today?

23          A.     Yes.

24          Q.     And they're counsel for

25     Walmart, correct?
```

1        A.      I assume.

2        Q.      Is that your understanding?

3        A.      Yes.

4        Q.      What is your understanding as

5   to who Ms. Fumerton represents?

6        A.      She is representing me.

7        Q.      Are you paying her bills?

8        A.      I am not paying her bills.

9        Q.      Do you know who is paying her

10  bills?

11       A.      Walmart is paying her.

12       Q.      Walmart is paying her bills on

13  your behalf, correct?

14       A.      Yes.

15       Q.      So she's representing both you

16  and Walmart today?  Is that your

17  understanding?

18       A.      Yes.

19       Q.      How much time did you spend

20  preparing for today's deposition?

21       A.      We met yesterday.

22       Q.      And how long did you meet for?

23       A.      Yesterday during the day, eight

24  hours.

25       Q.      Okay.  And who was present for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that meeting?

 2         A.     Tara, Scott and Jennifer.

 3         Q.     Anyone else?

 4         A.     There were a couple of people

 5    on the phone.

 6         Q.     Who was on the phone?

 7         A.     I don't remember who was on the

 8    phone.  Carl from Walmart, and I don't

 9    remember.

10         Q.     Okay.  Other than speaking with

11    counsel, did you speak with anyone else about

12    this case prior to today?

13         A.     No.

14         Q.     Did you speak with any folks at

15    Walmart about the case?

16         A.     No.

17         Q.     Speak with Mr. Badeen?

18         A.     No.

19         Q.     No?

20                Have you reviewed any written

21    material -- written transcripts of other

22    folks' testimony?

23         A.     I have not.

24         Q.     The writing on the top of this

25    document, does that look familiar to you --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      No.

 2          Q.      -- that handwriting?

 3          A.      It doesn't.

 4          Q.      Not your handwriting to the

 5   best of your recollection?

 6          A.      It's not my handwriting.

 7          Q.      Okay.  Do you know what the

 8   number 32 in the top left would have referred

 9   to?

10          A.      I do not.

11          Q.      When you took over the pain

12   category from Mr. Badeen, was he leaving

13   Walmart at that point?

14          A.      He was moving to a new

15   position.

16          Q.      Do you know what position he

17   moved to?

18          A.      It was within pharmacy with --

19   I don't remember the exact position, no.

20          Q.      Did Mr. Badeen provide you any

21   training with respect to the pain category

22   when you took over the purchasing

23   responsibilities for Walmart?

24          A.      If I had questions about the

25   category, I could go to him and he would
```

1    answer those questions, yes.

2         Q.    Did you have any questions that

3    you recall?

4         A.    I can't recall.

5         Q.    You don't recall having any

6    questions?

7              MS. FUMERTON:  Objection, form.

8         A.    I don't recall right now, no.

9    BY MR. BOWER:

10        Q.    As you sit here today, you

11   don't recall ever having any questions about

12   purchasing for the pain category; is that

13   correct?

14             MS. FUMERTON:  Objection, form.

15        A.    I -- I'm sure I had a question.

16   What the question was, I can't recall.

17   BY MR. BOWER:

18        Q.    Okay.  Did you ever recall

19   asking Mr. Badeen anything about purchasing

20   oxycodone?

21        A.    I can't recall.

22        Q.    Other than Mr. Badeen, anyone

23   else that you would have asked questions to

24   about purchasing for the pain category?

25        A.    I would have talked to my vice

Highly Confidential - Subject to Further Confidentiality Review

```
 1    president at the time.  I would have talked

 2    to replenishment managers.

 3         Q.     Did you receive any formal or

 4    informal training when you took over

 5    purchasing responsibility for the pain

 6    category?

 7              MS. FUMERTON:  Objection, form.

 8         A.     No.

 9              MS. FUMERTON:  Give me time.

10              THE WITNESS:  I'm sorry.

11              MS. FUMERTON:  Thank you.

12    BY MR. BOWER:

13         Q.     When you took over purchasing

14    pain products for Walmart, how did you

15    familiarize yourself with the products it was

16    already purchasing?

17         A.     I would just review items that

18    were in that category.  Being a nurse and

19    working in that department already, I was

20    familiar with -- with all the items of the

21    department, so it wasn't -- I didn't feel

22    like I needed to focus at that time on what

23    categories -- what items were in the

24    category.

25         Q.     How did you know what items
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were in the category?  Did anyone provide you

 2    a list?

 3         A.    No.

 4         Q.    How did you know?

 5         A.    You have vendors that reach out

 6    to you to talk to you about items, you review

 7    items that were there.  We had -- I'm not

 8    sure I know how to answer that.  It was

 9    just -- it was just kind of -- to me it was

10    second nature, what items we had.  I --

11         Q.    How did you know, for example,

12    what products you needed to purchase for

13    Walmart?

14              MS. FUMERTON:  Objection, form.

15         A.    So I didn't cut the POs.  If a

16    vendor came to me to talk about pricing on an

17    item, if I was out of stock on an item, then

18    I would work and negotiate and make a

19    decision on that item.

20    BY MR. BOWER:

21         Q.    And by vendor, you referred to

22    the vendor a couple of times, do you mean

23    manufacturer?

24         A.    Manufacturer, supplier.

25         Q.    What's the difference in your
```

1    mind between manufacturer and supplier?

2        A.    Not everyone we purchased from

3    actually manufactured their products.

4        Q.    Okay.  And who did you purchase

5    from that did not manufacture products?

6        A.    There's some companies that

7    have contract manufacturers, and I'm not

8    familiar with who has that and who does not

9    have that.

10        Q.    Can you explain what you mean

11    by contract manufacturers?

12        A.    The company would have a

13    different company that -- a company would

14    manufacture the item.  They would use a sales

15    force to then work with us to purchase the

16    item.

17        Q.    And that is different than a

18    manufacturer providing an item in somehow --

19    in some way?

20        A.    In my mind, that is different.

21    A manufacturer -- if I called them a

22    manufacturer, they actually manufactured the

23    product themselves, and then they owned the

24    account managers that called on us.  There's

25    some companies that manufacture and sell to

Highly Confidential - Subject to Further Confidentiality Review

1    different companies.  Teva, for example,

2    could manufacture their own product or they

3    could buy a product that was manufactured

4    from another company.

5         Q.     Okay.

6         A.     We do use the terms

7    interchangeably.

8         Q.     Okay.  Just adds some more

9    confusion to it.

10        A.     Sorry.

11        Q.     No, that's fine.  I just want

12   to make sure we're all on the same page.

13              Does this distinction in your

14   mind apply to any prescription opiate

15   products that you purchased?

16              MS. FUMERTON:  Objection, form.

17        A.     Not that I'm aware of.

18   BY MR. BOWER:

19        Q.     So based on your experience,

20   Walmart purchased opioid products from the

21   manufacturer; is that correct?

22        A.     I'm just trying to think of

23   each -- yes.

24        Q.     All right.  I mean, you were

25   the person at Walmart responsible for the

1    purchasing, right?

2              MS. FUMERTON:  Objection, form.

3         A.    I was responsible for my

4    categories, yes.

5    BY MR. BOWER:

6         Q.    Including -- which included the

7    pain category, right?

8         A.    That is accurate, yes.

9         Q.    Which included prescription

10   opiates, right?

11        A.    Yes, it did.

12        Q.    Is there anyone at Walmart more

13   knowledgeable than you about purchasing these

14   products from 2011 to 2014?

15             MS. FUMERTON:  Objection, form.

16        A.    I don't think so.

17   BY MR. BOWER:

18        Q.    You're the person, right?

19             MS. FUMERTON:  Objection, form.

20        A.    Yes.

21   BY MR. BOWER:

22        Q.    Okay.  So let me ask you again.

23             Did Walmart ever purchase any

24   prescription opiates from companies that did

25   not manufacture them?

```
 1                   MS. FUMERTON:  Objection, form.
 2     BY MR. BOWER:
 3          Q.     During -- strike that.
 4                 From 2011 to 2014, did Walmart
 5     purchase prescription opiates from companies
 6     that did not manufacture them?
 7          A.     I cannot be a hundred percent
 8     sure.
 9          Q.     I'm not asking for -- I'm
10     asking for based on your experience, are you
11     aware of any?
12                   MS. FUMERTON:  Objection, form.
13          A.     I'm not aware.  I don't -- I
14     would have to -- I would have to look back at
15     a record and ask each manufacturer, did you
16     manufacture this or did you purchase this
17     from a contract manufacturer.  I just don't
18     have that information in my mind.
19     BY MR. BOWER:
20          Q.     Okay.  Well, let's look at this
21     Exhibit 2 then and maybe that can help us
22     move a little bit, okay.
23                 If you look at the paragraph
24     after the ███ rebate, do you see that,
25     pricing for indirect purchases?
```

```
 1                    Do you see that?

 2        A.     Yes.

 3        Q.     Are you familiar with what

 4   indirect purchases refers to?

 5        A.     Yes.

 6        Q.     What does that refer to?

 7        A.      Indirect purchases are if

 8   stores have to purchase an item from McKesson

 9   instead of through our warehouse.

10        Q.     And during this time stores had

11   that capability, correct?

12               MS. FUMERTON:  Objection, form.

13               MR. BOWER:  What's the nature

14        of that objection?

15               MS. FUMERTON:  Because it's

16        ambiguous as to what capability you're

17        talking about, and with respect to

18        McKesson, if you're talking about who

19        the original source is or whether it

20        still had to go through, for example,

21        a DC, then be routed to McKesson.

22               MR. BOWER:  Sorry, that wasn't

23        my question.

24               Could you read back the

25        question, please?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FUMERTON:  Well, I was
 2         explaining my objection.  I'm not
 3         saying that was your question.
 4              MR. BOWER:  That's fine.  Your
 5         objection is unrelated to my question,
 6         so can you please read back --
 7              MS. FUMERTON:  No, it isn't.
 8         I'm objecting to the form of your
 9         question because it's vague as to how
10         you're asking the question.
11              MR. BOWER:  Okay.
12              (The following portion of the
13         record was read.)
14              "QUESTION:  And during this
15         time stores had that capability,
16         correct?"
17              (End of readback.)
18         A.    I was not employed at Walmart
19    during this time.  I'm not sure if they had
20    those capabilities at that time.
21    BY MR. BOWER:
22         Q.    What about the time when you
23    were employed at Walmart, did they have those
24    capabilities to purchase directly from
25    McKesson?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Stores could purchase directly

2     from McKesson; on regular items that were not

3     C-II items, they could purchase from

4     McKesson.  On C-II items, those orders had to

5     be placed through our DC.  If the DC was out

6     of product, then that order would be routed

7     to McKesson.

8          Q.      What does that mean, if the DC

9     was out of product the order would be routed

10    to McKesson?

11         A.      If there was no product in the

12    Walmart distribution center to fulfill that

13    order, then somehow that order then got

14    routed to McKesson to fulfill that order for

15    the store.

16         Q.      Then McKesson would fill that

17    product, correct?

18         A.      If they had the product.

19         Q.      And they would distribute that

20    product to -- directly to the pharmacy,

21    correct?

22         A.      They would ship directly to the

23    Walmart pharmacies, yes.

24         Q.      From McKesson directly to

25    Walmart pharmacies, right?

1               MS. FUMERTON:  Objection, form.

2          A.     Yes.

3     BY MR. BOWER:

4          Q.     No ambiguity about that, right?

5               MS. FUMERTON:  Objection, form.

6               MR. BOWER:  I'll rephrase.

7     BY MR. BOWER:

8          Q.     There's no question in your

9     mind that that's what happened, right, that

10    if the DC was out of a Schedule II opioid,

11    that the pharmacy could get the product

12    directly from McKesson, right?

13              MS. FUMERTON:  Objection, form.

14         A.     The store would have to place

15    the order through the Walmart ordering

16    system.  If Walmart was out of stock, the

17    order would then go to McKesson and would be

18    filled if McKesson had that item.

19    BY MR. BOWER:

20         Q.     And let me break that down a

21    little bit.

22              How do you know that the store

23    would have to place the order through the

24    Walmart ordering system?  What's the basis

25    for that knowledge?

1    A.    We had to have a Walmart item

2  number created for those items before the

3  stores could place an order for any C-II

4  items, so if the stores ordered from

5  McKesson, they could just order an NDC, a

6  specific SKU from McKesson.

7    Q.    And the stores could do that,

8  right?  You said if the stores ordered from

9  McKesson they could just order an NDC.

10    MS. FUMERTON:  Objection, form.

11    A.    That was not for controlled --

12  for C-II items.

13  BY MR. BOWER:

14    Q.    Okay.  How do you know that?

15    A.    Stores would need to ask us to

16  create those items.  If there was an item

17  that they needed that was not something that

18  we warehoused, then we would have to look at

19  that item and make decisions on that item.

20    Q.    And all I'm trying to

21  understand is:  Where did you acquire that

22  knowledge?  Was there some written policy in

23  place that provided for that procedure?

24    A.    That was communicated to me.

25    Q.    And who communicated that to

1    you?

2         A.    I can't remember at the time.

3         Q.    Well, who were the folks that

4    could have communicated that to you?

5         A.    It could have been anyone that

6    was in our department.  It could have been --

7    it would have had to have been someone in our

8    department.  That was a conversation that we

9    would have had.

10        Q.    And this was -- you recall this

11   conversation occurring in 2008?

12        A.    I don't recall the exact

13   communication, no.

14        Q.    Well, do you recall when this

15   policy was in place?

16        A.    I do not know when the policy

17   was put into place, no.

18        Q.    It could have been a new policy

19   in 2011, for example, correct?

20             MS. FUMERTON:  Objection, form.

21        A.    For the time period that I

22   purchased opioids, if the store was going to

23   purchase an item from McKesson, they had to

24   place the order through our -- our ordering

25   system.  If the distribution center was out

1    of product, then that order would be sent to

2    McKesson.

3    BY MR. BOWER:

4         Q.    I understand that's what you

5    want to tell us today, but I'm asking you:

6    How do you know that was, in fact, occurring

7    in 2008?

8              MS. FUMERTON:  Objection, form.

9         A.    That was always my

10   understanding during the time that I had this

11   category.

12   BY MR. BOWER:

13        Q.    So let's go back then to 2.

14   You explained to me how that worked then,

15   right?  You have reference to indirect

16   purchase here.

17             Do you see that?

18        A.    On this paragraph 2?

19        Q.    Yes.

20        A.    Yes.

21        Q.    So what is an indirect purchase

22   then?

23        A.    An indirect purchase is an item

24   that was purchased from McKesson that we also

25   warehouse in our warehouse.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      So why would a purchase occur

2   from McKesson if it's also warehoused?

3        A.      With nonopioids -- I'm sorry.

4        Q.      Go ahead and finish.  I don't

5   want to cut you off.

6        A.      Okay.  With nonopioids, a store

7   may need a product quicker.  They may be in a

8   two-day area from our distribution center;

9   they may need it in one day.  With an opioid

10  it would only be if the product was out of

11  stock in our C-II warehouse.  That's a pretty

12  standard term on all item-specific contracts

13  from manufacturers, whether it's an opioid or

14  a nonopioid.

15       Q.      So is it your testimony that

16  this -- these terms distinguishing indirect

17  purchases versus direct purchase did not

18  apply to the opioid products reflected on

19  Exhibit 2?

20              MS. FUMERTON:  Objection, form.

21       A.      Could you restate that?

22  BY MR. BOWER:

23       Q.      Sure.

24              Exhibit 2 only refers to opioid

25  products, correct?

1      A.      That is correct.

2      Q.      Okay.  Does the pricing

3  provisions reflecting different pricing for

4  indirect purchases versus direct purchases

5  include these prescription opiates?

6      A.      Yes, these contract prices on

7  this sheet reflect the prices for

8  prescription opioids.

9      Q.      In fact, Walmart's purchasing

10  records would indicate whether indirect

11  purchasing occurred, correct?

12          MS. FUMERTON:  Objection, form.

13          MR. BOWER:  I'll strike that.

14  BY MR. BOWER:

15      Q.      Would Walmart's purchasing

16  records indicate whether, for example, the

17  first product here, hydrocodone bitartrate,

18  was ever purchased indirectly?

19      A.      By Walmart's purchasing record,

20  I'm not sure I understand what you mean by

21  Walmart's purchasing record.

22      Q.      Does Walmart have purchasing

23  records?

24          MS. FUMERTON:  Objection, form.

25          MR. BOWER:  I'll strike that.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOWER:

2        Q.    What records are available, if

3    any, that would reflect purchases made by

4    Walmart pharmacies of hydrocodone bitartrate?

5              MS. FUMERTON:  Objection, form.

6        A.    We would have the purchase

7    orders that we placed for those items.  The

8    manufacturer would understand what the total

9    volume purchased was, and then there are

10   McKesson invoices that Walmart would have

11   gotten from purchases that were purchased

12   from Walmart.

13   BY MR. BOWER:

14       Q.    So in other words, Walmart does

15   have records reflecting whether McKesson ever

16   provided these products to Walmart, correct?

17       A.    Correct.

18       Q.    Okay.

19             (Walmart-Little Exhibit 3

20       marked.)

21   BY MR. BOWER:

22       Q.    You've been handed what's been

23   marked as Exhibit 3 to today's deposition.

24   It's just two one-page contracts, I believe,

25   both reflecting your signature.

1          Do you see that?

2     A.    Yes.

3     Q.    Just take a moment to review

4   those documents.  I have a few questions on

5   them.

6          MR. CIULLO:  Can you read the

7     Bates number, please.

8          MR. BOWER:  Sure.  I was just

9     about to do that.  The Bates number

10    for this is PAR_OPIOID_MDL_0000400255

11    and 256.

12  BY MR. BOWER:

13    Q.    Have you had a chance to review

14  those documents, ma'am?

15    A.    Yes, I have.

16    Q.    Is that your signature on those

17  documents?

18    A.    Yes, it is.

19    Q.    And you signed those documents

20  on behalf of Walmart, correct?

21    A.    That is correct.

22    Q.    And these documents reflect

23  purchases of opioid products from Purdue,

24  correct?

25         MS. FUMERTON:  Objection, form.

1          A.      That's not correct.  These were

2     to QualiTest, and these were estimates of

3     usage in request for pricing and product.

4     BY MR. BOWER:

5          Q.      Okay.  Thank you for that

6     clarification.

7               What do you mean by estimates

8     of usage?

9          A.      If I was looking for supply, if

10    I was out of stock and had an issue in the

11    market, I would need to provide utilization

12    that I estimated that we would purchase to be

13    able to purchase those products to give them

14    an idea of what those volumes could be in the

15    future.

16         Q.      And how did you at this point

17    in time, 2009, how would you have determined

18    what those volumes would be?

19         A.      I would look at past purchases,

20    and then I would put an estimate in there for

21    any real estate or whatever we had in place

22    on our budget for purchases.

23         Q.      Can you explain what you mean

24    by real estate?

25         A.      Well, we had increases in

```
 1    utilization from additional stores opening,

 2    things like that.

 3         Q.    Did you have increases in

 4    demand over time?

 5              MS. FUMERTON:  Objection, form.

 6         A.    Yes, we would have increase in

 7    demand.

 8    BY MR. BOWER:

 9         Q.    And that would be something you

10    would factor into the quality estimation,

11    correct?

12              MS. FUMERTON:  Objection, form.

13         A.    The estimate to QualiTest, yes.

14    BY MR. BOWER:

15         Q.    Sorry, the quantity -- I

16    misspoke.  The annual quantity estimation you

17    provided here, that would have included

18    increases in expected demand, correct?

19              MS. FUMERTON:  Objection, form.

20         A.    Yes, that's correct.

21    BY MR. BOWER:

22         Q.    Okay.  Where would you have

23    gotten these numbers from?

24         A.    The past utilization?

25         Q.    Well, let me strike that.
```

1      The number reflected here,

2    right, is 1.2 million annual quantity for

3    hydrocodone/APAP 10/325mg 100s, correct?

4        A.    Correct.

5        Q.    So that's bottles of 100,

6    right?

7              MS. FUMERTON:  Objection, form.

8        A.    That is correct.

9    BY MR. BOWER:

10       Q.    So Walmart's estimated annual

11   quantity needs for bottles of 100 was

12   1.2 million in 2009, correct?

13             MS. FUMERTON:  Objection, form.

14       A.    That -- that is correct.

15   BY MR. BOWER:

16       Q.    Where would that

17   number 1.2 million have come from?  Strike

18   that.

19             Would that number have been a

20   calculation that you yourself made or would

21   someone else at Walmart have made that

22   calculation?

23       A.    It would be a random estimate

24   that I would make just based off of past

25   supply and then what I thought increases

1    could be in the future.  And I generally

2    would overestimate those numbers.

3         Q.    And you would overestimate to

4    ensure that Walmart got supply it needed,

5    right?

6         A.    I would overestimate for any

7    drug that I gave utilization on because I

8    wasn't familiar with stores that we would add

9    or different things that were going on in the

10   business.  Yes.

11        Q.    And you wanted to overestimate

12   to make sure Walmart had available supply,

13   right?

14        A.    My job was to make sure we had

15   supply for the stores, yes.

16        Q.    So you testified your

17   estimate's based on past supply and increases

18   in the future, right?  So let's break those

19   down a little bit.

20              How would you have determined

21   what the past supply was?

22              MS. FUMERTON:  Objection, form.

23        A.    We would have reports that

24   would give us what past -- what past script

25   numbers were.

```
 1    BY MR. BOWER:

 2         Q.    Would those -- strike that.

 3               Who would provide those reports

 4    to you?

 5         A.    Our planning department or --

 6    mostly the planning departments.

 7         Q.    And who from the planning

 8    departments would have provided reports with

 9    respect to prescription opiates during this

10    time period?

11         A.    The reports would have included

12    all drugs at the time, not just specific to

13    opioids.

14         Q.    Okay.  So thank you for that

15    clarification.

16               Who would have provided those

17    reports during this time period?

18         A.    It would have been people,

19    whoever worked in those departments.  I can't

20    remember specific people who would have given

21    me that.

22         Q.    Okay.  Would you have requested

23    those reports or were they provided to you

24    periodically?

25               MS. FUMERTON:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      We received monthly reports of

2   script usage.

3   BY MR. BOWER:

4      Q.      What information was on those

5   reports to the best of your recollection?

6      A.      Drugs, NDCs, pack size, GPI

7   number, script count for the current month,

8   utilization for past months.

9      Q.      What format were those reports

10   provided in, if you can recall?  Were they

11   Excels, PowerPoints, PDFs?

12      A.      They were in Excel format.

13      Q.      Who received those reports on

14   the purchasing side of things?

15           MS. FUMERTON:  Objection, form.

16      A.      I know I did.  The buyers, I'm

17   assuming.

18   BY MR. BOWER:

19      Q.      And you consider yourself a

20   buyer; is that correct?

21      A.      That's accurate.

22      Q.      And so the other criteria you

23   mentioned that went into the 1.2 million

24   estimation was increases in demand, correct?

25      A.      I don't know if I -- if we

1    looked at demand.  I would look at past

2    utilization and I would just ballpark a

3    number, and I would add additional units to

4    it.  I don't know that -- I know that I did

5    not have a set algorithm or formula that I

6    would use.  I just would -- I really just

7    would ballpark a number.

8         Q.    Well, other than past demand,

9    would you consider anything else?

10                  MS. FUMERTON:  Objection, form.

11        A.    Not necessarily when I came up

12   with the numbers, no.

13   BY MR. BOWER:

14        Q.    Okay.  So based on your

15   recollection, this annual quality

16   number here, 1.2 million, would have been

17   based solely on Walmart's purchases for the

18   prior year?

19        A.    No, I would have estimated up

20   on that number.  I would have rounded up.

21        Q.    And why would you have done

22   that?

23        A.    Because I knew that our

24   business increased year over year based off

25   of new locations, based off of new business,

1    based off of multiple things.

2         Q.    Well, but this is an estimation

3    for one product, right?

4         A.    This is an estimation for this

5    one NDC, yes.

6         Q.    So how would new businesses

7    increase -- or affect your estimation here?

8              MS. FUMERTON:  Objection, form.

9    BY MR. BOWER:

10        Q.    Can you just explain what you

11   mean by that?

12        A.    New customers coming into

13   Walmart to purchase items.

14        Q.    So this number, this estimation

15   reflects Walmart's potential growth for the

16   hydrocodone business, correct?

17             MS. FUMERTON:  Objection, form.

18        A.    This number is an estimate that

19   I just put together based off of past usage

20   and knowing that our business increased.  I

21   didn't have a formula that I put into place

22   with set numbers of a 6% growth or anything

23   like that.

24   BY MR. BOWER:

25        Q.    But you did have an expectation

1    that business would increase, correct?

2              MS. FUMERTON:  Objection, form.

3         A.    I had an expectation year over

4    year that our pharmacy business would

5    increase, yes.

6    BY MR. BOWER:

7         Q.    And that was based on past

8    increases, correct?

9              MS. FUMERTON:  Objection, form.

10        A.    Somewhat.  Yes.

11   BY MR. BOWER:

12        Q.    This letter is from you to

13   Charles Propst, correct?

14        A.    That's correct.

15        Q.    Did you ever have any meetings

16   with Mr. Propst?

17        A.    I have met with him, yes.

18        Q.    When did you meet with him?

19        A.    I would have met with him at

20   NACDS or ECRM.  I don't remember if he came

21   to our office for meetings or not.

22        Q.    In fact, you frequently went to

23   NACDS meetings, correct?

24              MS. FUMERTON:  Objection, form.

25        A.    I went to NACDS once a year.

1    BY MR. BOWER:

2        Q.    Once a year.

3              And at those meetings, you met

4    with manufacturers, correct?

5        A.    That is correct.

6        Q.    That was the purpose of you

7    attending those meetings, correct?

8              MS. FUMERTON:  Objection, form.

9        A.    That is correct.

10   BY MR. BOWER:

11       Q.    Other than meeting with

12   manufacturers, was there any other reason

13   that you would attend NACDS meetings?

14       A.    They would have some industry

15   information that -- a Doug Long presentation

16   or some other educational classes or things

17   like that.

18       Q.    At any of these NACDS meetings,

19   did you ever attend any presentations or

20   discussions regarding the opioid epidemic?

21             MS. FUMERTON:  Objection, form.

22       A.    Not that I'm aware of.

23   BY MR. BOWER:

24       Q.    Do you recall any such

25   presentations or discussions occurring?

```
 1                    MS. FUMERTON:  Objection, form.

 2          A.    Not that I'm aware of.

 3   BY MR. BOWER:

 4          Q.    What do you mean -- can you be

 5   more specific when you say not that I'm aware

 6   of?  Do you recall it happening or not?

 7          A.    There were --

 8                    MS. FUMERTON:  Objection, form.

 9          A.     There were multiple meetings

10   every year.  There were, I don't know, six or

11   eight that you could choose from to go.  I'm

12   not sure that over ten years that I remember

13   all of the classes that they offered at --

14   BY MR. BOWER:

15          Q.    And I'm asking you today as you

16   sit here under oath:  Do you recall there

17   ever being a presentation or discussion on

18   the opiate epidemic at any NACDS meeting?

19                    MS. FUMERTON:  Objection, form

20          and asked and answered.

21                    THE WITNESS:  I'm sorry, what

22          was the second part of what you said?

23                    MS. FUMERTON:  You still need

24          to answer the question if you

25          understood it.
```

```
1          A.     I don't recall.

2    BY MR. BOWER:

3          Q.     In other words, there may have

4    been one; you just don't recall?

5          A.     That's correct.

6          Q.     There may have been several;

7    you just don't recall?

8                 MS. FUMERTON:  Objection, form.

9          A.     That is correct.

10   BY MR. BOWER:

11         Q.     Going back to the -- looking

12   into this 1.2 million number here, the growth

13   factor that you included in here, would that

14   be based on your prior experience at Walmart?

15                MS. FUMERTON:  Objection, form.

16         A.     It really would just be a

17   random rounding up of a number.  I -- I did

18   not put any thought or basis into how I

19   rounded up that number.

20   BY MR. BOWER:

21         Q.     Well, here you write to

22   Mister -- and the spelling is P-R-O-P-S-T --

23   that due to the past continued market

24   shortages we're currently unable to

25   adequately fill our customers' orders.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                Do you see that?

2        A.      Yes.

3        Q.      Where would you have received

4    that information?

5        A.      So we received out-of-stock

6    reports in the morning that would tell us if

7    our DCs were out of product.  We would also

8    meet with our replenishment team and they

9    would update us on those situations.

10       Q.      So on or about May 2009,

11   Walmart could not adequately fill its

12   prescription orders for this product,

13   correct?

14       A.      That is correct, but it could

15   be due to manufacturers not shipping because

16   they did not have product or was there

17   another issue.

18       Q.      But either way, you couldn't

19   fill the orders, right?

20               MS. FUMERTON:  Objection, form.

21       A.      We were out of stock in the

22   warehouse.

23   BY MR. BOWER:

24       Q.      Right, the demand was larger

25   than the supply, right?
```

```
 1                    MS. FUMERTON:  Objection, form.
 2        A.    Well, that's not necessarily
 3   true.  It could be that our manufacturers
 4   were not shipping for some reason.
 5   BY MR. BOWER:
 6        Q.    That would be the supply,
 7   right?
 8                    MS. FUMERTON:  Objection, form.
 9        A.    For some reason our supply was
10   not in the distribution center.
11   BY MR. BOWER:
12        Q.    Right.
13              Do you recall whether the
14   supply wasn't in the distribution center
15   because Walmart had filled its quotas from
16   other manufacturers?
17                    MS. FUMERTON:  Objection, form.
18        A.    I don't recall.
19   BY MR. BOWER:
20        Q.    It could have happened, right?
21                    MS. FUMERTON:  Objection, form.
22   BY MR. BOWER:
23        Q.    Well, when you say you don't
24   recall, that means it could have happened,
25   you just remember, right?
```

1                    MS. FUMERTON:  Objection, form.

2      BY MR. BOWER:

3           Q.     Strike that.

4                  What do you mean when you say I

5      don't recall?

6           A.     I don't recall if it was a

7      market shortage, if multiple manufacturers

8      were out of product or if it was any other

9      reason.

10          Q.     What would another reason be

11     based on your experience as the person

12     responsible for buying these products for

13     Walmart?

14                 MS. FUMERTON:  Objection, form.

15          A.     What I recall is that

16     manufacturers were having trouble producing

17     enough product.

18     BY MR. BOWER:

19          Q.     Because the demand was

20     increasing, right?

21                 MS. FUMERTON:  Objection, form.

22          A.     I don't recall what the -- what

23     the demand increases were on these products

24     specifically.

25     BY MR. BOWER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Well, it could have been then

2    because the demand was increasing, right,

3    because you don't recall?

4              MS. FUMERTON:  Objection, form.

5    A.    It could have been.

6    BY MR. BOWER:

7    Q.    Because Walmart didn't

8    adequately forecast next year's demand the

9    prior year, right?  It didn't have enough

10   product?

11             MS. FUMERTON:  Objection, form.

12   A.    When we forecasted, we didn't

13   forecast at an individual SKU level.  We

14   forecasted at an overall pharmacy department

15   number.  We didn't go down to category or to

16   individual item numbers when we would put

17   together our department budgets for the year.

18   BY MR. BOWER:

19   Q.    I'm asking about Exhibit 3.  Is

20   this a forecast in your mind?

21             MS. FUMERTON:  Objection, form.

22   A.    This is a forecast.

23   BY MR. BOWER:

24   Q.    Is this on the individual SKU

25   level?

```
 1                   MS. FUMERTON:  Objection, form.

 2         A.     This is an estimated forecast.

 3    This was a number that I rounded up.  I

 4    don't --

 5                   MR. BOWER:  Move to strike that

 6         answer.  Could you just please read

 7         back my question.

 8                   (The following portion of the

 9         record was read.)

10                   "QUESTION:  Is this on the

11         individual SKU level?"

12                   (End of readback.)

13                   MS. FUMERTON:  Objection, form.

14         A.     Yes, this is an individual SKU

15    level.

16    BY MR. BOWER:

17         Q.     So as reflected in Exhibit 3,

18    you're providing an estimated usage for this

19    product to this manufacturer, correct?

20         A.     That is correct.

21         Q.     Okay.  And you're doing so

22    because you cannot fill the current need,

23    correct?

24                   MS. FUMERTON:  Objection, form.

25         A.     I'm doing so because our
```

1   warehouses were out of product, and I was

2   trying to secure additional product for our

3   warehouses.

4   BY MR. BOWER:

5         Q.    Well, you state the reason

6   here, don't you?  You say you were unable to

7   adequately fill our customer's prescription

8   orders, right?

9         A.    Correct.

10         Q.    That's why you needed more

11   product, right?

12               MS. FUMERTON:  Objection, form.

13         A.    That's correct.

14   BY MR. BOWER:

15         Q.    And you asked QualiTest to take

16   whatever steps needed to ramp up production

17   for immediate supply, right?

18         A.    Correct.

19         Q.    And then going to page 2 of

20   this exhibit, another letter to Mr. Propst,

21   same spelling, same day, right, May 9th,

22   2009?

23         A.    May 6th, yes.

24         Q.    I'm sorry, May 6th, 2009.  I

25   apologize for that.

```
 1                  Now you're writing about

 2     oxycodone, correct?

 3          A.      That is correct.

 4          Q.      Okay.  And your annual quantity

 5     for these is 228,000, correct?

 6                  MS. FUMERTON:  Objection, form.

 7          A.      That is correct.

 8     BY MR. BOWER:

 9          Q.      Other than the factors we've

10     discussed, any other factors that would have

11     gone into providing this annual quality --

12     quantity -- apologize, to QualiTest?

13                  MS. FUMERTON:  Objection, form.

14          A.      I'm sorry, could you repeat

15     that?

16     BY MR. BOWER:

17          Q.      Sure.  I'm just trying to

18     figure out whether this annual quantity

19     number was derived at in the same way as the

20     other quantity number.

21          A.      That would be correct.

22          Q.      Okay.  Thank you.

23                  And here you again write:  Due

24     to the past continued market shortages.

25     Correct?
```

1     A.     Yes.

2     Q.     So at this point in time,

3  Walmart was experiencing market shortages for

4  oxycodone, right?

5          MS. FUMERTON:  Objection, form.

6     A.     Walmart was experiencing

7  shortages in their distribution center.

8  BY MR. BOWER:

9     Q.     For oxycodone, correct?

10    A.     That is correct.

11    Q.     And just like for hydrocodone,

12  Walmart could not adequately fill its

13  customers' prescription orders for oxycodone,

14  right?

15    A.     That is correct.  If the store

16  does not have the product, we can't fill the

17  prescriptions.

18    Q.     And you wanted QualiTest to

19  take whatever steps needed to ramp up

20  production for immediate supply of oxycodone,

21  right?

22          MS. FUMERTON:  Objection, form.

23    A.     Correct.

24  BY MR. BOWER:

25    Q.     Were you aware whether the

Highly Confidential - Subject to Further Confidentiality Review

1    country was in the middle of an opioid

2    epidemic in 2009?

3                MS. FUMERTON:  Objection, form.

4         A.    In 2009 I was not aware.

5    BY MR. BOWER:

6         Q.    Do you know whether the country

7    was enduring an epidemic in 2009?

8                MS. FUMERTON:  Objection, form.

9         A.    I do not know.

10   BY MR. BOWER:

11        Q.    Do you know whether people were

12   dying from oxycodone overdoses in 2009?

13               MS. FUMERTON:  Objection, form.

14        A.    From my past history of working

15   in the emergency room, I knew that people

16   died of overdoses from drugs, yes.

17   BY MR. BOWER:

18        Q.    And you knew specifically that

19   they died of overdoses of oxycodone, right?

20               MS. FUMERTON:  Objection, form.

21        A.    I've seen overdoses of

22   different drugs, oxycodone included, but

23   other drugs as well.

24   BY MR. BOWER:

25        Q.    Did you have any concerns about

Highly Confidential - Subject to Further Confidentiality Review

1    the increase in prescription orders during

2    this time period for oxycodone?

3                MS. FUMERTON:  Objection, form,

4         lacks foundation.

5         A.    I did not have any concern, no.

6    BY MR. BOWER:

7         Q.    Why not?

8         A.    I can't recall.

9         Q.    Okay.

10               (Walmart-Little Exhibit 4

11        marked.)

12               MR. BOWER:  This is 4, I

13        believe.

14   BY MR. BOWER:

15        Q.    You've been handed what's been

16   marked as Exhibit 4.  It's an e-mail from

17   Mr. Steve Cohen to yourself dated

18   September 3rd, 2009 regarding Walmart

19   oxycodone, and the Bates number is ACTAVIS,

20   A-C-T-A-V-I-S, and then 0639662.

21               MS. FUMERTON:  You can take a

22        minute to review the document.

23               So Zach, it looks like there's

24        a page missing based on the sequence

25        of the Bates numbers.

1            MR. CIULLO:  Looks like there's

2       a page missing also -- looks like this

3       was produced in the Chicago litigation

4       from Actavis.  It doesn't have the

5       confidential stamp at the bottom.

6       There are subsequent productions

7       from -- under the Allergan MDL Bates

8       numbers that do have that.

9            MR. BOWER:  Okay.

10           MR. CIULLO:  So this should be

11      treated as a confidential document.

12           MR. BOWER:  Okay.  That's fine.

13      She's on this e-mail.

14           MR. CIULLO:  Of course.

15           MR. BOWER:  That's fine.  We'll

16      certainly treat this as confidential.

17           MR. CIULLO:  Of course, thank

18      you so much.

19           MS. FUMERTON:  But I'm going to

20      object to the use of the document as

21      being incomplete since it's missing a

22      page number based on the Bates

23      numbers.

24           MR. BOWER:  That's fine, we can

25      just look at the e-mail.  If you want

```
1          to object to that, you can pull out 65

2          and 66 if you want.  If you're going

3          to make that objection --

4               MS. FUMERTON:  Yeah, I am

5          making that objection.

6               MR. BOWER:  -- and you're going

7          to represent that you don't believe

8          this is an accurate document, then we

9          can remove it.

10              MS. FUMERTON:  Well, it's

11         missing a page is what I'm making a

12         representation of.  I don't have

13         personal knowledge of whether or not

14         this is an accurate document or not.

15              MR. BOWER:  Okay.  Well, do you

16         see the attachment?  It reflects

17         Walmart oxycodone 9209, and you see

18         the date of the attachment --

19              MS. FUMERTON:  Yes, Zach, I do.

20         Do you see the Bates number?

21              MR. BOWER:  I do.

22              MS. FUMERTON:  Do you see it

23         goes to 662 then 663 --

24              MR. BOWER:  I do.  And maybe

25         that page --
```

```
 1              MS. FUMERTON:  -- and then it

 2         misses a page and then has 665.

 3              MR. BOWER:  Maybe that cover

 4         page is missing --

 5              (Simultaneous discussion

 6         interrupted by the reporter.)

 7              MR. BOWER:  But like I said, if

 8         you want to make that -- if you want

 9         to make that an issue, we can remove

10         it from the record.  That's fine.

11              MS. FUMERTON:  Okay.

12              MR. BOWER:  So if you want to

13         just pull out the last two pages of

14         that.

15              I understand your concern about

16         the marketing fee, but we'll see a

17         contract that she signs later that

18         includes a marketing fee so --

19              MS. FUMERTON:  Well, Zach --

20              MR. BOWER:  -- I can absolve

21         you of those concerns right now.

22              MS. FUMERTON:  First of all,

23         you completely misrepresented what I

24         said.  Second of all, I'm going to

25         object -- it's your exhibit.  I'm
```

Highly Confidential - Subject to Further Confidentiality Review

1        going to object to the exhibit's use

2        since it's incomplete.  Removing these

3        two pages also makes it incomplete.

4        It is just an incomplete document.

5             If you have the entire

6        document, I would appreciate that you

7        use it with the witness so that we can

8        be as accurate as possible and not --

9             MR. BOWER:  Okay.  So we will

10       use the e-mail that the witness

11       received.

12            MS. FUMERTON:  And then the

13       e-mail is now incomplete.

14            MR. BOWER:  We're allowed to

15       use e-mails.  We're allowed to use

16       e-mails without attachments.  Are you

17       saying we're not allowed to use an

18       e-mail without an attachment?

19            MS. FUMERTON:  I'm saying that

20       you're going to have to represent that

21       the document is incomplete.  If you

22       want to say that I am using an e-mail

23       that is incomplete with the witness,

24       that's fine.  That's your prerogative.

25            MR. BOWER:  I'm not saying

Highly Confidential - Subject to Further Confidentiality Review

1          that.  I'm saying you can remove the

2          last two pages, and let me do that so

3          the record is -- you just hand me that

4          back, I'll review.

5              So based upon your counsel's

6          objection, we'll remove the last two

7          pages of this document so that it's

8          not in the record yet.

9              MS. FUMERTON:  Well, I'm

10         objecting then to the use of the

11         e-mail without the correct attachment.

12             MR. BOWER:  You can object to

13         that but I don't believe there's

14         anything preventing us from using an

15         e-mail the witness received.

16             MS. FUMERTON:  Yeah --

17             MR. BOWER:  You can note your

18         objection for the record.

19             MS. FUMERTON:  If you want to

20         make the record, I just want the

21         record to be clear that you are

22         handing the witness a document with an

23         e-mail that apparently had an

24         attachment.  You didn't bring the

25         correct attachments or you brought it

Highly Confidential - Subject to Further Confidentiality Review

1          in a way that appears based on it to

2          be incomplete, and that's my

3          objection.

4                    MR. BOWER:  What do you think

5          is incomplete about the e-mail?

6                    MS. FUMERTON:  Because there is

7          another page that's apparently missing

8          based on the Bates numbers.  You are a

9          lawyer.  You understand how Bates

10         numbers work.

11                   MR. BOWER:  Yes.

12                   MS. FUMERTON:  There's a

13         missing Bates number.

14                   MR. BOWER:  Sorry.  So just for

15         the record so we're all clear.  The

16         first page of this exhibit ends in 62.

17         The second page of this exhibit ends

18         in 63.  Okay?  That's the exhibit.

19         It's two pages.

20                   MS. FUMERTON:  And I will

21         object to this exhibit because there

22         is apparently a PDF that was attached

23         to this exhibit that you are not

24         including and showing to the witness.

25                   MR. BOWER:  I don't think that

1          that's accurate.  If you want to

2          produce something, some factual basis

3          for your statement, that's fine.  I

4          will say that this e-mail appears to

5          be a complete e-mail.  If you notice,

6          the end of it has the confidentiality

7          signature that everyone has these

8          days.  I don't think there's anything

9          incomplete about this e-mail.

10              If you have a basis to tell us

11         today that you think this is

12         incomplete, please do so.  But with

13         that, I think we can move forward.

14              MS. FUMERTON:  No.  I'm going

15         to state again to be clear since you

16         keep talking over me, I'm objecting to

17         this exhibit because as you pointed

18         out earlier, it says at the top that

19         there's a PDF that's attached.  You

20         presented a document with a missing

21         Bates number.  I don't know why it was

22         missing.  Somehow it's missing, which

23         gives me pause as to whether or not

24         this is a complete document.

25              So now you've removed the last

Highly Confidential - Subject to Further Confidentiality Review

1          two pages.  It's still an incomplete

2          document.  You can proceed how you

3          wish and I'm objecting to the use of

4          this document.

5                    MR. BOWER:  Okay.  I understand

6          your concern about what the attachment

7          says and that you've represented there

8          were no marketing fees, but we'll see

9          that document later again and we'll

10         proceed.

11                   MS. FUMERTON:  Apparently you

12         do not understand because you keep

13         misrepresenting what I said.

14                   MR. BOWER:  Okay.

15                   MS. FUMERTON:  I did not say I

16         had a concern about the document.  I

17         had a concern this exhibit is

18         incomplete.

19                   MR. BOWER:  And I understand

20         you have concerns about the exhibit,

21         you don't want it in the record, but I

22         can tell you that she signed that

23         agreement, it will come into the

24         record, so we can please move on.

25                   MS. FUMERTON:  Still, you keep

```
 1              misrepresenting what I said.  So if

 2              you would like to move on, please do

 3              not represent what I said because it's

 4              not what I said.

 5                   MR. BOWER:  Are you ready to

 6              proceed?

 7                   THE WITNESS:  Yes.

 8    BY MR. BOWER:

 9         Q.    This is -- who is Mr. Cohen?

10         A.    He was a national account

11    manager with Actavis.

12         Q.    Okay.  Prior to receiving this

13    e-mail, had you had interactions with

14    Mr. Cohen?

15         A.    I think I -- I believe I had.

16         Q.    You had been purchasing

17    products from him, correct, during this time

18    period --

19         A.    Correct.

20         Q.    -- prior to this?

21                   MS. FUMERTON:  Objection, form.

22                   MR. BOWER:  I'll rephrase.

23    BY MR. BOWER:

24         Q.    Prior to receiving this e-mail,

25    Walmart was purchasing prescription opiates
```

1    from Actavis, correct?

2           A.     That, I --

3                  MR. CIULLO:  Object to form.

4           A.     -- I'm not clear about that.  I

5    know we had a relationship with Actavis and

6    we purchased many prescription products from

7    Actavis, yes.

8    BY MR. BOWER:

9           Q.     You just don't recall while you

10   sit here today whether you had already begun

11   purchasing prescription opiates as of this

12   date, correct?

13          A.     That's accurate, yes.

14          Q.     And who is Mister -- if you see

15   the first e-mail there in the chain on the

16   bottom, Mr. Miranda.  Do you see that?

17          A.     Yes, I see that.

18          Q.     Who is Mr. Miranda, if you

19   recall?

20          A.     He is the -- I believe was the

21   contract person -- the contracting -- senior

22   contract manager key accounts for Actavis.

23          Q.     Okay.  Did you have any

24   communications with him or Mr. Cohen prior to

25   receiving this offer?

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.    I can't recall.
2         Q.    Okay.  Do you see he notes that
3    this is a business proposal for oxycodone,
4    15mg and 30mg.
5              Do you see that?
6              MS. FUMERTON:  Objection, form.
7         Again, I'm objecting to this exhibit
8         because you're referring to a business
9         proposal that's not attached.
10             MR. BOWER:  Your objection is
11        noted --
12             MS. FUMERTON:  You can't ask --
13             (Simultaneous discussion
14        interrupted by the reporter.)
15             MR. BOWER:  Your objection is
16        noted.  We need to move on.  Okay.
17             MS. FUMERTON:  But it is
18        fundamentally unfair and misleading to
19        a witness to ask them about a business
20        proposal that is not attached.  You
21        keep asking questions about --
22             MR. BOWER:  I didn't ask about
23        the proposal.  I asked --
24             MS. FUMERTON:  Yes, you did.
25        You said -- asked a question.  Go back
```

1          and look at what you said.  You asked

2          her about the business proposal in

3          this e-mail.

4                    MR. BOWER:  No, I said, do you

5          see he notes this is a business

6          proposal.

7     BY MR. BOWER:

8          Q.     That's my question.  You see --

9     do you see those words on the paper, ma'am?

10         A.     I see the words on the paper

11    that say attached.

12         Q.     Okay.  And then the e-mail on

13    top, right, you see Mr. Cohen writing to you,

14    he's saying:  We think it hits on all the key

15    segments.

16                    Do you see that?

17         A.     I see that, yes.

18         Q.     Had you had prior discussions

19    regarding these key segments with Mr. Cohen?

20         A.     I can't recall.

21                    MR. CIULLO:  Object to form.

22    BY MR. BOWER:

23         Q.     It could have happened, you

24    just don't recall it, right?

25         A.     Correct.

```
1          Q.     Okay.  One of those key

2    segments is pricing, right?  That's what it

3    says here?

4                 MS. FUMERTON:  Objection, form.

5          A.     Yes, it says that here.

6    BY MR. BOWER:

7          Q.     Right?  And one of the other

8    key segments is futures with additional

9    oxy ER that puts others at a disadvantage.

10                Do you see that?

11                MS. FUMERTON:  Objection, form.

12         A.     I see that.

13   BY MR. BOWER:

14         Q.     Do you know what he -- why he's

15   writing that to you there?  Do you have a

16   recollection of that?

17         A.     I do not recall.

18         Q.     Okay.  Do you know what oxy ER

19   is?

20         A.     Yes, I do know that.

21         Q.     What is oxy ER?

22         A.     It's an extended release form

23   of oxycodone.

24         Q.     Was -- do you recall whether

25   Walmart was purchasing extended release
```

Highly Confidential - Subject to Further Confidentiality Review

1    oxycodone from someone else in 2009?

2         A.    I do not recall.

3         Q.    Do you recall whether this was

4    a new product for Walmart?

5         A.    I do not recall.

6         Q.    Okay.  Do you know what

7    slotting allowances are?

8         A.    Slotting allowance is a rebate

9    that is paid for bringing a new item into the

10   warehouse.

11        Q.    Okay.  In addition, he mentions

12   product-specific rebates.  Do you see that?

13        A.    I see that, yes.

14        Q.    And this is -- this is after,

15   right, you have asked QualiTest for

16   additional oxycodone, correct, as we

17   discussed on Exhibit 3?

18             MS. FUMERTON:  Objection, form.

19        A.    This is after, yes.  Now, I did

20   not request oxycodone ER from QualiTest.

21   BY MR. BOWER:

22        Q.    Right.  That was going to be my

23   next question.  Those are different products,

24   correct?

25        A.    That is accurate.

```
 1          Q.     Okay.  Towards the end of his
 2   e-mail to you, it says:  Unlike other, we
 3   have both ample supply and quota this year
 4   and next.
 5               Do you see that?
 6          A.     I see that, yes.
 7          Q.     Do you have any recollection
 8   discussing with Mr. Cohen whether he had
 9   ample supply to meet Walmart's needs?
10               MS. FUMERTON:  Objection, form.
11          A.     I do not recall.
12   BY MR. BOWER:
13          Q.     It could have happened, you
14   just don't recall, correct?
15          A.     Correct.
16               (Walmart-Little Exhibit 5
17        marked.)
18   BY MR. BOWER:
19          Q.     I'm handing you what's been
20   marked as Exhibit 5.
21               Okay.  You've been handed
22   what's been marked as Exhibit 5.  This is
23   another -- this one does have a confidential
24   stamp, and it is an acquired Actavis
25   document.  It's 00391 -- sorry, 00391960,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    including the attachment this time.  I
 2    believe your counsel will note that the Bates
 3    numbers are sequential this time, so
 4    hopefully we have no objections.
 5              And I'll note that this e-mail
 6    is approximately 11 days after Exhibit 4.
 7    This is an e-mail from Bob Miranda to
 8    yourself cc'ing Steve Cohen, and it has
 9    Walmart revised offer.
10              Do you see that?
11         A.   I'm sorry, could you restate
12    that?
13         Q.   Sure.  I'm just, for the
14    record, reading in the -- kind of the details
15    on the "From" and "To" and the subject there.
16              MS. FUMERTON:  Can I just ask
17         that she has an opportunity to review
18         the document.
19    BY MR. BOWER:
20         Q.   Yes, please review the
21    document, and let us know when you're done.
22              MR. CIULLO:  While we have a
23         second, I just want to, for the
24         record, represent that that missing
25         document in the last exhibit was
```

```
 1            actually just a JPEG thing that says

 2            Actavis.

 3                  MR. BOWER:  Yeah, that's what I

 4            thought, but since I have it here I

 5            didn't need it, but I appreciate it.

 6            Thanks.

 7                  MR. CIULLO:  I just wanted to

 8            clear that up for the record.

 9                  MR. BOWER:  Hopefully that will

10            resolve your concerns.

11                  MS. FUMERTON:  It was a simple

12            concern.

13                  MR. CIULLO:  Legitimate

14            concern.

15                  (Document review.)

16      BY MR. BOWER:

17            Q.    Have you had a chance to review

18      the document, ma'am, or are you still

19      looking?

20            A.    Yes.

21            Q.    You're still looking?  Okay.

22            A.    Okay.

23            Q.    I just have a couple of

24      questions on the e-mail, and then we can turn

25      to the document itself.
```

1          Do you recall having

2    discussions with either Mr. Miranda or

3    Mr. Cohen between September 3rd, 2009 and

4    September 14th, 2009 about this offer?

5          A.     I do not recall.

6          Q.     Certainly looks like it here,

7    right?

8                 MS. FUMERTON:  Objection, form.

9    BY MR. BOWER:

10         Q.     He's sending you a revised

11   offer, correct?

12         A.     Correct.

13         Q.     So it's likely that you had

14   discussions with him in the interim about the

15   offer, right?

16                MS. FUMERTON:  Objection, form.

17         A.     I could have, yes.

18   BY MR. BOWER:

19         Q.     That wouldn't have been unusual

20   in your experience, right?

21         A.     That is correct.

22         Q.     You note here in your e-mail to

23   him -- oh, by the way, before we do that, do

24   you have any understanding as to why Walmart

25   hasn't produced this document?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. FUMERTON:  Objection, form.
 2          A.     I'm not sure what Walmart has
 3     produced or has not produced.
 4     BY MR. BOWER:
 5          Q.     Has Walmart ever asked you
 6     about this document?
 7                    MS. FUMERTON:  Objection, form.
 8          A.     Walmart has never asked me
 9     about this document.
10     BY MR. BOWER:
11          Q.     Has Walmart ever asked you
12     about any documents, whether you have them,
13     whether you have any contracts for this case?
14                    MS. FUMERTON:  Objection, form
15          in that to the extent you're --
16          actually, I'm instructing her not to
17          answer that question.
18                    MR. BOWER:  That's a yes-or-no
19          answer.  You're instructing her not to
20          answer that question?
21                    MS. FUMERTON:  Yes, I am.
22                    MR. BOWER:  What's the basis
23          for your instruction?
24                    MS. FUMERTON:  To the extent
25          that you're invading attorney work
```

1          product or privileged information.

2                    MR. BOWER:  I'm just asking

3          whether she's been asked to produce

4          documents that are relevant to this

5          case.  You're not going to let her

6          answer that question.

7                    MS. FUMERTON:  That's not what

8          you asked.

9                    MR. BOWER:  All right.  Let me

10         ask it that way.

11    BY MR. BOWER:

12         Q.    Have you been asked to produce

13    any potentially relevant documents for this

14    matter?

15         A.    I have not.

16         Q.    Did you have a phone while you

17    were at Walmart?

18         A.    Did I have -- I have a phone,

19    yes.

20         Q.    A cell phone?

21         A.    Yes.

22         Q.    A smartphone?

23         A.    Yes.

24         Q.    Did Walmart pay for that phone?

25         A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    No.  Did you communicate on

2    that phone to manufacturers about Walmart

3    business?

4    A.    I could have, yes.

5    Q.    Going back to Exhibit 5 for a

6    moment, your e-mail on Saturday,

7    September 12th, you note:  Indirect prices

8    must be rebated back to direct cost.

9         What does that mean?

10   A.    That means that the product is

11   purchased from McKesson, the vendor needs to

12   rebate us back to what our direct cost in the

13   warehouse is.

14   Q.    And why were you concerned

15   about that for this specific product?

16   A.    This was something --

17        MS. FUMERTON:  Objection, form.

18   A.    This was something that was

19   standard for we always ensured that we were

20   protecting our business by having rebates

21   back on indirect items to direct cost.

22   BY MR. BOWER:

23   Q.    Right.  And because, based on

24   your past experience, you were concerned that

25   Walmart might need to get this product from

1    McKesson, right, because you had run out of

2    these oxycodone in the past, correct?

3                 MS. FUMERTON:  Objection, form.

4         A.    This is something that's basic

5    with every item, whether it's a C-II or

6    not --

7    BY MR. BOWER:

8         Q.    Right.

9         A.    -- a C-II.

10        Q.    But your past experience with

11   this specific product, you had run out of it,

12   right?

13                MS. FUMERTON:  Objection, form.

14        A.    I'm not sure about these

15   individual SKUs.

16   BY MR. BOWER:

17        Q.    Okay.  But oxycodone in

18   general, you had had problems getting ample

19   supply, right?

20                MS. FUMERTON:  Objection, form.

21        A.    That's a potential.  That's

22   potential.

23   BY MR. BOWER:

24        Q.    Okay.  Do you recall signing

25   this agreement?

```
 1          A.      I don't recall either way.

 2          Q.      You certainly could have,

 3   correct?

 4          A.      I could have signed this

 5   agreement, yes.

 6          Q.      Right.  And you see that this

 7   agreement entitles Walmart to a █████████

 8   marketing fee.

 9                  Do you see that?

10          A.      I see that.

11          Q.      Okay.  What was that for?

12          A.      This would have been just an

13   additional way to get additional cost of

14   goods savings.

15          Q.      Right.  An incentive for

16   Walmart to purchase a product within ten

17   days, correct?

18                  MS. FUMERTON:  Objection, form.

19          A.      An incentive for Walmart to --

20   it would have been just like lowering the

21   cost of good, but yes.

22   BY MR. BOWER:

23          Q.      Well, they could have lowered

24   the cost of goods, couldn't they have,

25   without doing a marketing fee?
```

1          MS. FUMERTON:  Objection, form.

2     A.     I'm not sure of how they

3 account for things in their side, on the

4 manufacturer side.

5 BY MR. BOWER:

6     Q.     Well, they're only paying a

7 marketing fee if Walmart's initial order is

8 placed within ten days, correct?

9          MS. FUMERTON:  Objection, form.

10    A.     That's correct.

11 BY MR. BOWER:

12    Q.     And then did Walmart, in fact,

13 place such an order?

14    A.     I can't recall.

15    Q.     Documents would reflect whether

16 an order was placed or not, correct,

17 Walmart's purchasing records?

18    A.     Yes.

19    Q.     Did you have any discussions

20 with Mr. Cohen or Mr. Miranda regarding the

21 marketing fee?

22          MS. FUMERTON:  Objection, form.

23    A.     I can't recall.

24 BY MR. BOWER:

25    Q.     Earlier on today you discussed

1    not recalling any such marketing fees related

2    to prescription opiates.

3                    Do you recall that?

4                    MS. FUMERTON:  Objection, form.

5         A.    I would have -- I would have to

6    go back and look at my records, but I could

7    have said that.

8    BY MR. BOWER:

9         Q.    Does this refresh your

10   recollection whether Walmart did, in fact,

11   receive marketing fees in exchange for

12   purchasing prescription opiates?

13                   MS. FUMERTON:  Objection, form.

14        A.    The marketing fee is listed in

15   this contract, but I haven't signed this

16   contract and I'm not sure if we executed this

17   contract.

18   BY MR. BOWER:

19        Q.    If, in fact, you did execute

20   this contract, it would reflect Walmart

21   receiving a marketing fee for purchasing

22   prescription opiates, correct?

23                   MS. FUMERTON:  Objection, form.

24        A.    This ███████ is called a

25   marketing fee, but it's -- in all intents and

Highly Confidential - Subject to Further Confidentiality Review

1    purposes for my business, it was a reduction

2    in the cost of goods.

3    BY MR. BOWER:

4         Q.    But they're not reducing the

5    cost of goods, are they?

6              MS. FUMERTON:  Objection, form.

7         A.    It's -- we would consider it

8    the same as a rebate, which is a reduction in

9    the cost of goods.

10   BY MR. BOWER:

11        Q.    But you also get a rebate here,

12   right?  There's also a rebate in place?

13             MS. FUMERTON:  Objection, form.

14   BY MR. BOWER:

15        Q.    You see paragraph 6?  Do you

16   see that?

17        A.    Yes.

18        Q.    Also an ■ rebate?

19        A.    Yes.

20        Q.    So marketing fee is in addition

21   to the rebate, correct?

22             MS. FUMERTON:  Objection, form.

23             MR. BOWER:  What's the nature

24        of your objection?

25             MS. FUMERTON:  Because she's

Highly Confidential - Subject to Further Confidentiality Review

```
1            been explaining what the term

2            "marketing fee" means to her and

3            you're using it a different way, so it

4            makes it potentially vague.

5                    MR. BOWER:  No, the question

6            was -- let me rephrase it.  I'll ask

7            it differently.

8    BY MR. BOWER:

9        Q.    The marketing fee reflected in

10   paragraph 4 is in addition to the ███ rebate

11   reflected in paragraph 6; is that correct?

12                   MS. FUMERTON:  Objection, form.

13       A.    I would interpret what's under

14   Section 4 as sort of a sliding allowance

15   rebate for initially bringing this product

16   into the warehouse, and number 6, I think

17   their -- their intention is for me not to

18   just bring the product in and get the

19   ██████████; they want me to keep the award with

20   them and not move it, frankly.

21   BY MR. BOWER:

22       Q.    Right.  They want to pay you

23   ██████████ to buy the product, and they then

24   want to give you a rebate to keep the

25   product, correct?
```

```
 1                    MS. FUMERTON:  Objection, form.
 2         A.    I don't think I'm -- I think
 3    they're lowering the cost of my goods by
 4    ██████████.  I don't think it's a payment for
 5    me to buy the product.
 6    BY MR. BOWER:
 7         Q.    Is there a reason you're
 8    quibbling with their description of marketing
 9    fee?
10                    MS. FUMERTON:  Objection, form.
11                    MR. CIULLO:  Join.
12         A.    They have "marketing fee" in
13    quotation marks.  I just don't -- I think
14    we'd have to understand what they mean by
15    "marketing fee" being in quotation marks.
16    BY MR. BOWER:
17         Q.    Well --
18         A.    To me it means a rebate -- it
19    goes against cost of good.
20         Q.    What's your basis for that
21    statement?
22         A.    Because that's the way I've --
23    I would always attribute that, and because we
24    did not market C-IIs to end user customers.
25         Q.    Why would Walmart receive a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    marketing fee then?
 2               MS. FUMERTON:  Objection, form.
 3         A.    But it's stated in here it's a
 4    marketing fee just to purchase the item.
 5    BY MR. BOWER:
 6         Q.    Right.  So in other words,
 7    Actavis is paying Walmart ██████ to
 8    purchase oxycodone, correct?
 9               MS. FUMERTON:  Objection, form.
10         A.    They're giving me an additional
11    ██████ rebate to purchase the drugs.
12    BY MR. BOWER:
13         Q.    Giving Walmart an incentive to
14    purchase oxycodone 15 and oxycodone 30,
15    correct?
16               MS. FUMERTON:  Objection, form.
17         A.    Correct.
18    BY MR. BOWER:
19         Q.    Looking at paragraph 1 for a
20    moment, it notes that:  Actavis agrees to
21    supply and Walmart agrees to purchase at
22    least 80% of its oxycodone requirements from
23    Actavis.
24               Do you see that?
25               MS. FUMERTON:  I'm sorry, where
```

Highly Confidential – Subject to Further Confidentiality Review

1    are we?

2              MR. BOWER:  Paragraph 1, sorry.

3              MS. FUMERTON:  Thanks.

4         A.    Yes.

5    BY MR. BOWER:

6         Q.    What does that mean?

7         A.    That would mean that we would

8    purchase the majority of our need for these

9    two items from Actavis.

10        Q.    And this estimated annual

11   requirement, do you see that?

12        A.    Yes, I do.

13        Q.    114,000 of oxycodone

14   15-milligram, bottles of 100, correct?

15        A.    Correct.

16        Q.    And 108,000 of oxycodone

17   30 milligrams, bottles of 100, correct?

18        A.    Correct.

19        Q.    Where would those numbers have

20   come from?

21             MS. FUMERTON:  Objection, form.

22        A.    They would have come from an

23   estimate that I or another buyer would have

24   provided to them.

25             ///

```
 1    BY MR. BOWER:

 2         Q.    These are numbers provided by

 3    Walmart to Actavis, correct?

 4         A.    I would think that it is, yes.

 5         Q.    And then if you go to

 6    paragraph 6, you see that the ███ requirement

 7    is tied to the ██ quarterly rebate.

 8               Do you see that?

 9         A.    Yes.

10         Q.    And then Walmart is

11    representing in paragraph 7 that the

12    estimated annual requirement of oxycodone

13    15-milligram and 30-milligram are as defined

14    in paragraph -- on paragraph 2.

15               Do you see that?

16         A.    I see that.

17         Q.    So paragraph 7, Walmart is

18    confirming that those estimates are Walmart

19    estimates, correct?

20         A.    That is correct.

21         Q.    In paragraph 8, can you explain

22    what paragraph 8 means?

23         A.    So Actavis was -- appears was

24    going to launch oxycodone ER in the future.

25    I'm not sure if there's a date listed on
```

1    here.

2                   And they were -- there must

3    have been -- it looks like they weren't going

4    to have enough product to sufficiently supply

5    the market, so they were giving Walmart a set

6    allocation that Walmart was going to be able

7    to purchase from them.

8        Q.    Okay.  So Walmart wanted to

9    ensure that it had sufficient allocation of

10   the oxycodone ER when it was approved?

11                  MS. FUMERTON:  Objection, form.

12       A.    I would always want to make

13   sure I had sufficient allocation of any

14   product to serve our customers, yes.

15   BY MR. BOWER:

16       Q.    Right.  Including oxycodone

17   extended release, right?

18       A.    Yes.

19       Q.    And you wanted to negotiate

20   that term with Actavis, right?

21                  MS. FUMERTON:  Objection, form.

22                  MR. BOWER:  I'll strike that.

23   BY MR. BOWER:

24       Q.    You wanted to ensure that

25   Actavis provided Walmart with its expected

Highly Confidential - Subject to Further Confidentiality Review

```
 1    need, correct?

 2              MS. FUMERTON:  Objection, form.

 3        A.      I wanted to ensure Walmart had

 4    access to that product.

 5    BY MR. BOWER:

 6        Q.      And why did you want to ensure

 7    that?

 8        A.      Because my job was to ensure

 9    that Walmart had access to all prescription

10    drug products that our customers would bring

11    prescriptions in to fill.

12        Q.      And how did you know that

13    customers would be bringing in prescriptions

14    for oxycodone extended release?

15              MS. FUMERTON:  Objection, form.

16        A.      Because there would have been a

17    brand-referenced product that we were already

18    selling.

19    BY MR. BOWER:

20        Q.      Can you explain what you mean

21    by that?

22        A.      This looks like language around

23    a new generic launch, and it appears that

24    Actavis would be a single player in that

25    market because that's the situation that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    limits -- that has limits in the market to be

 2    able to fill the potential.

 3         Q.    Well, aren't there also limits

 4    because there's a quota limit for

 5    prescription opiates?

 6              MS. FUMERTON:  Objection, form.

 7         A.    There's no other conversation

 8    around oxycodone ER, though, so I'm -- with

 9    no other knowledge to what's going on here,

10    I'm having to assume that this was a launch

11    of a new product that they were wanting us to

12    commit on, and they were offering us an

13    allocation of that product.

14    BY MR. BOWER:

15         Q.    Have you ever had discussions

16    with manufacturers regarding limits, quota

17    limits for prescription opiates?

18              MS. FUMERTON:  Objection, form.

19         A.    I knew that there were quota

20    limits from the DEA in place, yes.

21    BY MR. BOWER:

22         Q.    Okay.  So could that be the

23    reason that Walmart's wanting to ensure it

24    has access to oxycodone ER, quota limits?

25              MS. FUMERTON:  Objection, form.
```

Highly Confidential – Subject to Further Confidentiality Review

1          A.     The way this paragraph is

2     worded leads me to believe that this was a

3     new product that Actavis was launching in the

4     market, and if they were giving me a set

5     allocation, there's a reason why the whole

6     market was not going to be provided for.

7               I'm having to make an

8     assumption that they were the only person

9     coming in this market, and I would have known

10    we had business based off of a brand product

11    utilization that we were already selling.

12    BY MR. BOWER:

13         Q.     Okay.  I appreciate that

14    clarification.

15               So you would have looked at the

16    brand product utilization you were selling to

17    determine whether Walmart had a need for

18    oxycodone ER, correct?

19         A.     That is correct.

20         Q.     Do you recall what that brand

21    product was?

22         A.     I believe it was OxyContin ER.

23         Q.     Do you recall who was supplying

24    that product to Walmart?

25         A.     Purdue was the manufacturer of

Highly Confidential - Subject to Further Confidentiality Review

1    OxyContin ER.

2         Q.    Do you recall ever signing any

3    contracts with Purdue for OxyContin ER?

4         A.    I don't recall.  I don't

5    remember.

6         Q.    Walmart was at this point,

7    though, distributing that product, correct?

8              MS. FUMERTON:  Objection, form.

9         A.    The OxyContin ER?

10   BY MR. BOWER:

11        Q.    Yes.

12        A.    Yes.

13             MS. FUMERTON:  Oh, yeah, she

14        was just asking if we could take a

15        break.

16             MR. BOWER:  Oh, sure.  Yeah.

17             THE VIDEOGRAPHER:  Going off

18        the record, 10:37 a.m.

19             (Recess taken, 10:37 a.m. to

20        10:58 a.m.)

21             THE VIDEOGRAPHER:  Back on

22        record.  The time is 10:58 a.m.

23             (Walmart-Little Exhibit 7

24        marked.)

25             ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:

 2         Q.    Back on the record, Exhibit 7.

 3               MS. FUMERTON:  Are we on

 4    Exhibit 7 or Exhibit 6?

 5               MR. BOWER:  I just gave her

 6    Exhibit 7, sorry.

 7               MS. BARTLETT:  We skipped 6.

 8               MR. BOWER:  We skipped 6.

 9    Sorry, we're skipping 6 for now.

10               MS. FUMERTON:  Okay.  Are you

11    going to use an Exhibit 6?

12               MS. BARTLETT:  Huh-uh.

13               MR. BOWER:  We may, we may not.

14               MS. FUMERTON:  That's so

15    confusing later on.

16               MR. BOWER:  I know, I know.

17               MS. FUMERTON:  Can we just

18    change it?

19               MR. BOWER:  You want to change

20    it?

21               MS. FUMERTON:  Why don't you

22    change it, yeah.

23               MR. BOWER:  Okay.  Let's change

24    that.

25               MS. FUMERTON:  Sorry, but it
```

```
 1          just --

 2                  MR. BOWER:  No, no, it's fine.

 3                  MS. FUMERTON:  -- a year from

 4          now --

 5                  MR. BOWER:  I agree with that.

 6                  MS. FUMERTON:  -- someone is

 7          going to...

 8                  MS. BARTLETT:  Then we're going

 9          to change -- I need all new stickers.

10          They're all pre-marked.

11                  MS. FUMERTON:  I still would

12          change it.  It's not going to take --

13          it's not that many.  We're talking,

14          what, less than ten.  Or are we

15          talking more than that?

16                  MR. BOWER:  Let's go off the

17          record.

18                  THE VIDEOGRAPHER:  Going off

19          the record.  The time is 10:59 a.m.

20                  (Discussion off the record.)

21                  THE VIDEOGRAPHER:  Back on

22          record, 11:01 a.m.

23                  (Walmart-Little Exhibit 6

24          marked.)

25                  ///
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOWER:

2         Q.    All right.  Just so the record

3    is clear, we're going to enter a new

4    Exhibit 6 so we can keep our numbers

5    sequential.  There we go.  And then we'll do

6    Exhibit 7 after this one.

7                (Document review.)

8    BY MR. BOWER:

9         Q.    Okay.  You've been handed

10   what's been marked as Exhibit 6.  It's a

11   Walmart document.  It's WMT_MDL_000021802.

12                It appears to be a letter to

13   you from Mr. Robert Candea at Endo.  Last

14   name is C-A-N-D-E-A.  Please let me know when

15   you've finished reviewing the document.

16        A.    Okay.  I'm done.

17        Q.    Okay.  Are you familiar with

18   this document?

19        A.    I don't recall this document.

20        Q.    Okay.  Do you recall purchasing

21   oxymorphone from Endo on behalf of Walmart?

22        A.    I don't remember.

23                MR. BOWER:  Our realtime has

24        gone out.  Can we go off record for a

25        moment.

1          THE VIDEOGRAPHER:  Off record,

2     11:02 a.m.

3          (Discussion off the record.)

4          THE VIDEOGRAPHER:  Back on

5     record, 11:03 a.m.

6  BY MR. BOWER:

7     Q.    I'll just read back the last

8  question.  Do you recall purchasing

9  oxymorphone on behalf of Walmart from Endo?

10    A.    I don't recall.

11    Q.    Does this document refresh your

12 recollection that Walmart purchased

13 oxymorphone from Endo?

14    A.    I signed the document, so I'm

15 going to have to say that it -- we probably

16 did.

17    Q.    Is there any reason to believe

18 that you didn't?

19    A.    There are some times that I

20 signed documents that we didn't move through

21 with the purchase, but I can't recall if

22 there were any reasons around this one that

23 we did not.

24    Q.    Okay.  You see here that Endo

25 is offering Walmart a one-time ▇ off

1    invoice stocking allowance.

2              Do you see that?

3         A.    I do.

4         Q.    Right?  So this terminology is

5    different than the marketing fee that we

6    looked at earlier, right?

7         A.    That's correct.

8         Q.    So different contracts have

9    different terms, right?

10             MS. FUMERTON:  Objection, form.

11   BY MR. BOWER:

12        Q.    Would you agree with that

13   statement?

14        A.    Different manufacturers use

15   different terminology.

16        Q.    Right.  The question is:

17   Different contracts also use different

18   terminology, correct?

19             MS. FUMERTON:  Objection, form.

20        A.    So in purchasing, the main

21   contract that we use are these individual

22   item offers; they're really offer letters.

23   And so Endo's would all look similar,

24   Actavis' would all look similar, Teva's would

25   all look similar.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:
 2         Q.     So is it your testimony that
 3    all of Endo's contracts would have this
 4    stocking allowance provision?
 5                MS. FUMERTON:  Objection, form.
 6         A.     Not -- not all of Endo's
 7    contracts would have a stocking allowance.
 8    It would -- that depends on the item.
 9    BY MR. BOWER:
10         Q.     This one does have a stocking
11    allowance, correct?
12         A.     That's correct.
13         Q.     And this one is for a
14    prescription opiate, correct?
15                MS. FUMERTON:  Objection, form.
16         A.     That is correct.
17    BY MR. BOWER:
18         Q.     Did Walmart, in fact,
19    distribute oxymorphone to its pharmacies?
20                MS. FUMERTON:  Objection, form,
21         asked and answered.
22         A.     Yes, we did.
23    BY MR. BOWER:
24         Q.     What is the reason for
25    having -- do you see -- strike that.  It was
```

Highly Confidential - Subject to Further Confidentiality Review

1    a poor question.

2              Do you see about two paragraphs

3    up from the bottom, it references this side

4    letter.

5              Do you see that?

6         A.    I do see that.

7         Q.    Okay.  What would be the reason

8    that Walmart would enter this type of

9    agreement?

10        A.    So the way Endo structures in

11   this situation -- the way they're structuring

12   this item offer is to make this an addendum

13   to their overall supplier agreement is what

14   I'm reading into this.

15        Q.    And again, Endo is only

16   offering the ███ stocking allowance if the

17   initial order is made within a certain time

18   period, right?

19        A.    That's correct.

20        Q.    And going back to the box

21   there, where it has the pricing.

22              Do you see that?

23        A.    Yes.

24        Q.    What does the direct invoice

25   price reflect?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      The direct invoice price would

2   be the price I pay for the PO that we cut or

3   the price that Walmart pays when they cut a

4   PO to purchase the product into the Walmart

5   warehouse.

6        Q.      Okay.  And then next column

7   over, what is the contract price of McKesson

8   reflect?

9        A.      The contract price at McKesson

10  would be the price the store pays when they

11  purchase the product from McKesson.

12       Q.      Okay.  In that circumstance,

13  the store is paying money directly to

14  McKesson, correct?

15             MS. FUMERTON:  Objection, form.

16       A.      That is correct.

17  BY MR. BOWER:

18       Q.      And then the last column over,

19  pricing rebate on wholesaler purchases.

20             Do you see that?

21       A.      Yes.

22       Q.      What does that amount reflect?

23       A.      So that's similar to the

24  indirect rebate that we talked about earlier.

25  If the store has to receive the product from

Highly Confidential - Subject to Further Confidentiality Review

1   McKesson and they pay the -- if you look at

2   this top item for the oxymorphone

3   5-milligram, if they pay the ████ , we will

4   be rebated ████ off of that.

5           Q.     And that rebate only occurs if

6   Walmart Distribution Center 6045 does not

7   have that product in stock; is that correct?

8           A.     That is correct.

9           Q.     I'm sorry, the numbering threw

10  me off again, but here's Exhibit 7 back.

11              MR. BOWER:  You guys still have

12          7, right?

13              MS. FUMERTON:  I do.

14              MR. BOWER:  Okay.

15  BY MR. BOWER:

16          Q.     Okay.  Now you've been handed

17  what's been marked as Exhibit 7.  You'll

18  notice the top of that document is redacted

19  because it's an Actavis document, and we're

20  not allowed to show you the communications

21  that you're not on, so that's the reason for

22  the redaction, just so you know.

23          A.     Okay.

24          Q.     So my questions will be

25  directed to the communications you are on,

1    which is just an e-mail from yourself to

2    Mr. Cohen.

3              Do you see that?

4         A.    Yes.

5              MS. FUMERTON:  And can I just

6         ask a clarifying question?

7              MR. BOWER:  Sure.

8              MS. FUMERTON:  So this is the

9         redaction that you put on.

10             MR. BOWER:  Yes.

11             MS. FUMERTON:  This is not how

12        Actavis -- okay.  Thank you.

13             MR. BOWER:  Yeah, I want to be

14        clear, yeah.  The redactions --

15        there's a few more redactions that we

16        added because the following e-mail she

17        was not on.

18             MS. FUMERTON:  Okay.

19             MR. BOWER:  So just to avoid

20        any issues we just redacted the whole

21        thing.

22             MS. FUMERTON:  Okay.

23   BY MR. BOWER:

24        Q.    Can you just -- do you recall

25   this e-mail or what was going on in this time

Highly Confidential - Subject to Further Confidentiality Review

1    period?

2         A.    I do not.

3         Q.    Okay.  Can you just give us a

4    second and just read this e-mail and just

5    have -- I'm just going to ask you what your

6    reason is for e-mailing Steve, if this

7    refreshes your recollection.

8         A.    So I'm asking him to make sure

9    this his product at McKesson has -- A, I'm

10   asking does McKesson have inventory, is there

11   an indirect contract price loaded, because

12   our stores are ordering product and they are

13   not able to get it from McKesson.

14        Q.    So at this point in time, it

15   appears that stores were ordering product

16   from McKesson, correct?

17        A.    I would take from that e-mail

18   that stores were ordering product from

19   McKesson.

20        Q.    Right.  Because it says, in

21   fact:  Our stores are not getting ordered

22   product from McKesson.  Right?

23        A.    Yes.

24        Q.    How would you have learned that

25   information?

```
 1          A.      I would have gotten complaints

 2     from the stores.

 3          Q.      And who at the stores would

 4     have complained to you?  Would it be -- is

 5     there some hierarchy or what's the process

 6     for the stores getting information to you?

 7          A.      There's not a set process that

 8     they have to follow.  A store can send an

 9     e-mail, they could reach out to their market

10     director, they could reach out to anyone they

11     wanted.

12          Q.      Okay.  What is the market

13     director?

14          A.      The market director is a

15     management-level in operations.

16          Q.      Are they responsible for the

17     pharmacies?

18          A.      They're responsible for the

19     pharmacies, yes.

20          Q.      Is there one market director

21     for each pharmacy?

22          A.      No, a market director would

23     have a set number of pharmacies.

24          Q.      Is it regional based?

25          A.      It's based off of geography,
```

Highly Confidential - Subject to Further Confidentiality Review

1    yes.

2         Q.    Right.  It's geographically

3    based?

4         A.    Correct.

5         Q.    And those market directors

6    would be one of the folks who could inform

7    you that the stores were not getting the

8    ordered product from McKesson; is that

9    correct?

10        A.    They could be one of the people

11   that would reach out to us.

12        Q.    And that would have been based

13   on the stores reaching out to them, correct?

14             MS. FUMERTON:  Objection, form.

15        A.    That would be my understanding.

16   BY MR. BOWER:

17        Q.    Okay.  Other than this

18   scenario, did you have any other reason to

19   interact with the market directors?

20             MS. FUMERTON:  Objection, form.

21        A.    We interacted with the market

22   directors all the time.

23   BY MR. BOWER:

24        Q.    Under what circumstances would

25   you interact with them?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     If there were any product

2     situations, if there were any needs, if we

3     were doing anything special at store level.

4          Q.     Do you have any recollection

5     who the market -- is it market director?  Am

6     I getting that right?

7          A.     Yes.

8          Q.     -- market director was for the

9     Ohio region?

10         A.     I do not know.

11         Q.     Do you know who would know

12    that?

13         A.     I would think anyone in Walmart

14    operations would know that.

15         Q.     Okay.  Is there a reason you're

16    reaching out to Steve Cohen with this

17    question?

18         A.     Well, one thing that I'm not

19    sure of, I had a pattern of just pulling old

20    e-mails to re-e-mail someone, so I know the

21    subject says oxycodone.  I'm not a hundred

22    percent sure that this e-mail was about

23    oxycodone unless I could see the additional

24    chain that was in there that would refer back

25    to oxycodone, because it was easier sometimes

1    for me just to grab the last e-mail out of a

2    folder and then move forward and not

3    necessarily change the subject for that, so

4    I --

5         Q.    Okay.

6         A.    That's just something I'd like

7    to point out.

8         Q.    Okay.  So if you could see that

9    full e-mail, you would be able to tell what

10   product, in fact, that was referring to?

11        A.    Correct.

12        Q.    I wish I could show it to you,

13   but unfortunately, I can't today.  You can

14   put that one aside.

15               (Walmart-Little Exhibit 8

16        marked.)

17   BY MR. BOWER:

18        Q.    You've been handed what's been

19   marked as Exhibit 8.  It's an e-mail from

20   Sally Steiner, S-T-E-I-N-E-R, to yourself.

21   It's a Walmart document ending in Bates

22   number 11737, and the attachment is two

23   pages.

24               Do you see that?

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Who is Sally Steiner?

2          A.    I'm just reading off the

3     e-mail --

4          Q.    Oh, sure, I apologize.

5                MS. FUMERTON:  Why don't you --

6     BY MR. BOWER:

7          Q.    Take your time and review the

8     document.  Thank you for reminding me.

9                MR. CIULLO:  I'm sorry, can you

10          read the whole Bates number?

11               MR. BOWER:  Sure.  It's

12          WMT_MDL_000011737.

13               MR. CIULLO:  Thank you.

14               MR. BOWER:  Sure.

15               (Document review.)

16    BY MR. BOWER:

17         Q.    Are you ready?

18         A.    I'm done.

19         Q.    Do you recall who Sally Steiner

20    was?

21         A.    I don't know her.  I see her

22    title on this e-mail, but I'm not -- I've

23    never personally met her that I'm aware of.

24         Q.    Have you ever spoken with her?

25         A.    Not that I'm aware of.
```

1    Q.    What about Dave Irwin?

2    A.    Dave Irwin, yes, I do know him.

3    Q.    How do you know him?

4    A.    He was the account contact for

5    Mallinckrodt for a period of time.

6    Q.    Including during this time

7    period in September of 2009?

8    A.    Correct.

9    Q.    Do you remember him calling you

10   to discuss fentanyl?

11   A.    I do not.

12   Q.    Do you see the attachment

13   reflected on Exhibit 8 is a contract for

14   fentanyl?

15   A.    Yes, I do.

16   Q.    And fentanyl is a prescription

17   opiate, correct?

18   A.    That is correct.

19   Q.    Highly addictive, correct?

20         MS. FUMERTON:  Objection, form.

21   A.    I know there are some people

22   that are addicted to fentanyl, yes.

23   BY MR. BOWER:

24   Q.    Fentanyl can be deadly, right?

25         MS. FUMERTON:  Objection, form.

Highly Confidential - Subject to Further Confidentiality Review

1     A.     I'm sure fentanyl has caused

2  some deaths.

3  BY MR. BOWER:

4     Q.     And here, this reflects that

5  Walmart was getting a rebate for fentanyl

6  purchases, right, ███ rebate?

7               MS. FUMERTON:  Objection, form.

8     A.     I believe at the time we

9  received a ███ rebate off of the entire book

10  of Mallinckrodt business, not just fentanyl

11  lozenges.

12  BY MR. BOWER:

13     Q.     But it includes fentanyl,

14  correct?

15     A.     That's what this is stating,

16  yes.

17     Q.     Do you have any reason to

18  believe this statement in a contract that was

19  signed by Mr. Badeen is incorrect?

20               MS. FUMERTON:  Objection, form.

21     A.     I don't.

22  BY MR. BOWER:

23     Q.     Do you have any reason to

24  believe that Walmart didn't, in fact, receive

25  a ███ rebate for fentanyl purchases from

Highly Confidential - Subject to Further Confidentiality Review

```
1    Mallinckrodt?

2         A.    No, I do not.

3         Q.    What does primary position

4    mean?  Do you know?

5         A.    They would be the primary

6    vendor that we purchased the product from.

7         Q.    And Mallinckrodt is offering

8    Walmart an additional ▮ rebate if it places

9    this product in primary position; is that

10   correct?  Sorry, I'll -- it's right under the

11   Additional Rebate Opportunity paragraph

12   there.

13        A.    That is correct.

14        Q.    Okay.  And who at Walmart would

15   make that decision, whether a certain product

16   would be placed in primary position?

17        A.    The buyer would make that

18   decision.

19        Q.    So in this case, it would have

20   been Mr. Badeen?

21        A.    Yes.

22        Q.    And for the contracts that you

23   signed, it would have been you?

24        A.    Yes.

25        Q.    And what criteria would you use
```

Highly Confidential - Subject to Further Confidentiality Review

1  to decide whether a product would be placed

2  in primary position?

3      A.      There were multiple different

4  things.  We would look at pricing, history

5  with that supplier, are they able to supply,

6  are they true, how many other players were in

7  the market, what other players were offering

8  this product at the time, was it just this

9  one, or was it two or three or four.  Those

10  are some of the criteria we looked at.

11      Q.      Pricing criteria for that?

12      A.      We definitely looked at pricing

13  criteria on all drug awards, yes.

14      Q.      Was pricing -- strike that.

15              What was the most important

16  criteria for determining whether something

17  would be in primary position?

18              MS. FUMERTON:  Objection, form.

19      A.      I can't speak for all buyers.

20  One of the main things that I looked at was

21  supply because in my position my main role

22  was to ensure that we had supply at the

23  store, then and pricing was another top

24  criteria, yes.

25              ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:

 2          Q.     There was no -- strike that.

 3                 Was there any written guidance

 4    from Walmart provided to you to determine

 5    what manufacturers should be placed in

 6    primary position for a particular product?

 7          A.     No.

 8          Q.     You were left up to your own

 9    discretion, correct?

10          A.     That is accurate, yes.

11          Q.     You can put this one aside.

12                 (Walmart-Little Exhibit 9

13          marked.)

14    BY MR. BOWER:

15          Q.     Let me hand you what's been

16    marked as Exhibit 9, so please review the

17    document before I ask you.

18                 (Document review.)

19    BY MR. BOWER:

20          Q.     Have you had a chance to review

21    the document?

22          A.     Yes.

23          Q.     Okay.  Do you recall signing

24    this document?

25          A.     I don't recall.
```

1    Q.    Okay.  What is KVK Tech?

2    A.    That is a company that sold

3    oxycodone.

4    Q.    Did Walmart purchase oxycodone

5    from them?

6    A.    Yes, we did.

7    Q.    Okay.  And you, in fact, signed

8    this contract, correct?

9    A.    I did.

10    Q.    Okay.  This is a contract for

11    oxycodone 10 and 20mg.

12          Do you see that?

13    A.    I do.

14    Q.    What's the difference between

15    10mg and 20mg?

16    A.    The strength of the tablet.

17    Q.    Do you recall why you needed to

18    acquire this product from KVK Tech?

19    A.    I do not.

20    Q.    I want to focus then your

21    attention to the text above your signature,

22    okay?  It says:  This agreement entitled

23    KVK Tech to the right of first refusal

24    corresponding to the contract position,

25    primary or secondary.

Highly Confidential - Subject to Further Confidentiality Review

1              Do you see that?

2       A.     I do.

3       Q.     What does that mean?

4       A.     That means if they were primary

5  on an award, if another manufacturer brought

6  to our -- brought to us a proposal at a lower

7  price, that we would allow KVK a chance to

8  rebid on price.

9       Q.     Okay.  And then it says:  The

10  KVK Tech products listed above will be set up

11  as a primary position on indirect contract.

12              What does that mean?

13      A.     They would list an indirect

14  contract.  They would have an indirect

15  contract price at McKesson for those items.

16      Q.     What does it mean to have a

17  primary position indirect contract?

18      A.     I think "primary position" is

19  just verbiage.  It just means they would load

20  an indirect contract through McKesson.  Items

21  weren't listed in priority at McKesson on

22  what the stores could purchase as far as

23  primary or secondary.

24      Q.     Okay.  That was the source of

25  my confusion.

1      So for products being purchased

2  by Walmart for McKesson, who determines what

3  manufacturer's products should fill the

4  order?

5      A.    On a C-II, the store has to

6  place an order for a specific NDC through the

7  Walmart system.  They only can receive that

8  NDC.  There's no substitution that's allowed

9  with C-IIs.

10      Q.    Okay.  And then it referenced

11  DEA 222 forms.

12      Do you see that?

13      A.    Yes.

14      Q.    What is a DEA 222 form?

15      A.    It's my understanding that

16  that's a form that's needed when a store

17  purchases any kind of a C-II product.

18      Q.    And it says:  Will be sent to

19  your designated wholesaler.

20      Do you see that?

21      A.    Yes.

22      Q.    And who was Walmart's

23  designated wholesaler?

24      A.    McKesson.

25      (Walmart-Little Exhibit 10

1          marked.)

2     BY MR. BOWER:

3          Q.      Now, we're on to Exhibit 10,

4     which is just another two-page contract

5     signed by yourself.  Just take a moment to

6     review it and let me know when you're done,

7     please.

8               And the Bates number of this

9     one is WMT_MDL_000025225.

10              (Document review.)

11    BY MR. BOWER:

12         Q.      Are you ready?

13         A.      Yes.

14         Q.      Okay.  This is another contract

15    you signed, correct?

16         A.      Correct.

17         Q.      Okay.  And this contract is a

18    stand-alone offer.

19              Do you see that?

20         A.      Yes.

21         Q.      What does that mean?

22         A.      What I'm interpreting from that

23    is this product is the one that's referenced

24    in the prior e-mail that we looked at, that

25    this would negate those volume limits that

Highly Confidential - Subject to Further Confidentiality Review

1    were put on that prior contract.

2         Q.    You want to pull out the e-mail

3    you're referring to, just so the record is

4    clear, so we can refer to a number?

5         A.    Exhibit 5.

6         Q.    Sorry, you're saying Exhibit 5?

7    The Actavis offer?

8         A.    Yes.

9         Q.    What is your testimony?  Can

10   you clarify that?

11        A.    It's my understanding that

12   this -- because it says it supersedes -- let

13   me find the exact words -- supersedes any and

14   all existing agreements between Walmart and

15   Actavis with respect to oxycodone CR.

16        Q.    And does Exhibit 5 reflect

17   oxycodone CR?

18        A.    Oxycodone CR and the

19   oxycodone ER are typically used

20   interchangeably.

21        Q.    Okay.  And is Exhibit 5

22   oxycodone ER?

23        A.    In number 8 --

24        Q.    Okay.

25        A.    -- there's a reference to when

```
1    this product launches.

2         Q.     Okay.  So it's superseding the

3    allocation provision, correct?

4         A.     That's my understanding.

5         Q.     But it's not superseding the

6    terms in paragraph 2 of Exhibit -- of that

7    contract in Exhibit 5, correct?

8              MS. FUMERTON:  Objection, form.

9         A.     I would not -- I would not

10   think that it was superseding 2.  I would

11   think it only referred to number 8.

12   BY MR. BOWER:

13        Q.     And it's not superseding the

14   marketing fee, right?

15             MS. FUMERTON:  Objection, form.

16             MR. CIULLO:  Objection, form.

17        A.     I would not think it would

18   supersede number 4.

19   BY MR. BOWER:

20        Q.     Okay.  So going back then to

21   Exhibit 10.  Thank you for that

22   clarification.

23             Does this contract reflect that

24   Walmart is committing to purchase those units

25   allocated to it?
```

```
 1          A.      Yes.

 2          Q.      And Walmart is, in fact,

 3    agreeing to do so in one purchase order,

 4    correct?

 5          A.      Yes.

 6          Q.      But Actavis is reserving the

 7    right to split the delivery of that order,

 8    correct?

 9          A.      Yes.

10          Q.      Do you have any idea why

11    Actavis would want to split that delivery

12    order?

13                  MR. CIULLO:  Object,

14          foundation.

15          A.      As I recall, I believe this was

16    a settlement that the brand had made with

17    some generic companies, and in their -- as I

18    understand it, in their court settlement, the

19    generic companies were given set allocations

20    to ship over a time span.

21                  So we were agreeing to purchase

22    a set number.  They were only allowing us to

23    purchase a set number.  We were agreeing to

24    purchase that set number, but they would ship

25    it to us at intervals, as they got their
```

1    allocation from the brand company.

2    BY MR. BOWER:

3         Q.    Okay.  How did you know at the

4    time you signed this agreement whether

5    Walmart had a need for these products?

6         A.    We would have looked at the

7    utilization of the current brand item.

8         Q.    And who again would provide

9    that utilization to you?

10        A.    We would get reports from

11   planners or we could run that ourselves.

12        Q.    You'd get reports from

13   planners?

14        A.    Planners or business analytics,

15   whatever they called that department at the

16   time.

17        Q.    Do you know what it was called?

18        A.    At that time I don't remember

19   what it was called.

20        Q.    And if you wanted to run it

21   yourself, what would you do?

22             MS. FUMERTON:  Objection, form.

23        A.    I could go to Retail Link and

24   pull a query of sales over the last time

25   period, whatever my time period was.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:

 2         Q.    Do you know how far the data in

 3    Retail Link went back?

 4              MS. FUMERTON:  Objection, form.

 5         A.    I do not know that.

 6    BY MR. BOWER:

 7         Q.    What were some time periods

 8    that you would look at?

 9              MS. FUMERTON:  Objection, form.

10         A.    In this situation, I would

11    typically look at a few months.

12    BY MR. BOWER:

13         Q.    So earlier when I asked you

14    about the primary position at McKesson -- do

15    you recall that discussion?

16         A.    On the indirect items --

17         Q.    Yes.

18         A.    -- the primary position at

19    McKesson?

20         Q.    Yes.  And you said that

21    McKesson could only fill -- couldn't

22    substitute, they could only fill the specific

23    NDC number, correct?

24         A.    For C-II purchases.

25         Q.    For C-II purchases, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And that's because it would
 2     have been illegal for McKesson to fill if it
 3     wasn't the identical NDC number, correct?
 4                    MS. FUMERTON:  Objection, form.
 5          A.    I'm not sure about the legality
 6     of it.  It was my understanding that if a
 7     store ordered a certain NDC, they could not
 8     substitute for a different NDC.
 9     BY MR. BOWER:
10          Q.    How did you come to that
11     understanding?
12          A.    That was just knowledge that I
13     gained in the department.  I'm not sure of
14     how I learned that or not.
15          Q.    Did someone tell you of that
16     policy at any point?
17                    MS. FUMERTON:  Objection, form.
18          A.    Someone would have had to have
19     told me at some point because I wasn't born
20     knowing that knowledge, but at my time at
21     Walmart, somebody had told me that.
22     BY MR. BOWER:
23          Q.    Are you aware of any written
24     policies and procedures that would provide
25     for that requirement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I am not aware of any written

 2    procedures, no.

 3                 (Walmart-Little Exhibit 11

 4          marked.)

 5    BY MR. BOWER:

 6          Q.     You've been handed what's been

 7    marked as Exhibit 11.  It's another contract.

 8    This one is just one page.  Please take a

 9    moment and review it, let me know when you're

10    done.

11                 (Document review.)

12    BY MR. BOWER:

13          Q.     Okay.  Are you ready?

14          A.     I am ready.

15          Q.     This is another one-time

16    purchase agreement, correct?

17                 MS. FUMERTON:  Objection, form.

18    BY MR. BOWER:

19          Q.     If you look at the second

20    bullet point, under that?

21          A.     Yes, I see that.

22          Q.     Okay.  What is the -- so let me

23    ask that question again.

24                 Do you agree this is a one-time

25    purchase agreement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.
 2          Q.      Okay.  What was the purpose of
 3    this agreement, if you can recall?
 4          A.      I don't remember this agreement
 5    exactly, but it -- I would infer from the
 6    time period, I would think it was the same,
 7    that Apotex had gotten a -- were part of the
 8    settlement with Purdue on the OxyContin ER,
 9    and that they had product to offer.
10          Q.      And you're referring back to
11    Exhibit 10?
12          A.      Yes, that is correct.
13          Q.      Okay.  And this is the same
14    product; is that correct?
15          A.      That is correct.
16          Q.      Okay.  And how can you tell
17    it's the same product?  What are you looking
18    at?
19          A.      I'm looking at the product
20    strength and size, and on Exhibit 10, the
21    product description.
22          Q.      Okay.  So even though one has
23    CR -- I mean HCL and the other doesn't, it's
24    the same product, correct?
25          A.      That's correct.
```

```
 1          Q.     Okay.  I just wanted to confirm

 2    that.

 3                 This has -- also has available

 4    units.  Do you see that?

 5          A.     I see that.

 6          Q.     Okay.  So would it be your

 7    expectation that before signing this

 8    agreement, you would have ensured that

 9    Walmart had a need for 22,563 units of

10    oxycodone 40mg?

11          A.     I would have flipped it past

12    utilization, and then I would have also asked

13    the vendors -- I would have wanted to know

14    when is a full generic coming into the market

15    to know am I purchasing for today's demand or

16    am I trying to purchase for a year's demand,

17    because a generic is not going to be in the

18    market until -- I'm just guessing --

19    November 2010.  I'm just making that up.

20          Q.     Okay.  Well, but if it -- if a

21    generic wasn't coming online for almost a

22    year later, you wouldn't hold that in

23    inventory, would you, for a whole year, this

24    amount?

25                 MS. FUMERTON:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I would try not to.  I would

 2    try to purchase the product and commit to the

 3    product and have the manufacturer hold it and

 4    purchase it as I needed it.

 5    BY MR. BOWER:

 6          Q.    And how would -- if you can

 7    just describe, just high-level speaking with

 8    respect to prescription II opiates, what do

 9    you mean by purchase it as you need it?

10                MS. FUMERTON:  Objection, form.

11          A.    As the distribution center

12    would run low on product, then I would place

13    another PO and purchase the product into the

14    distribution center.

15    BY MR. BOWER:

16          Q.    Would you get alerts when the

17    distribution center was running low on a

18    product?

19          A.    Replenishment would place those

20    orders as needed.

21          Q.    They would get alerts from a

22    distribution center that a product, for

23    example, was running under a certain amount?

24          A.    When they -- when replenishment

25    orders, it's my understanding that they have
```

Highly Confidential - Subject to Further Confidentiality Review

1    a program in the computer that they review

2    every item in inventory and place orders as

3    needed.

4         Q.    Are you copied on those orders

5    as they're placed?

6         A.    I am not.

7         Q.    Are you informed of those

8    orders as they're placed?

9         A.    I am not.

10        Q.    Okay.  How did you know at the

11   time you would have signed this agreement

12   that Walmart then had a need for this

13   product?

14             MS. FUMERTON:  Objection, form.

15        A.    I would have looked at the past

16   utilization of the product and then I would

17   have taken the information on when the new

18   generic would be fully stocked in the market

19   and made decisions off of those two points.

20   BY MR. BOWER:

21        Q.    Would you have also had to look

22   at the inventory on hand at the distribution

23   center?

24        A.    We wouldn't have warehoused the

25   brand to my knowledge.  If we warehoused the

Highly Confidential - Subject to Further Confidentiality Review

1    brand, I would have needed to have looked at

2    that inventory, but I -- to my knowledge, I

3    don't think we warehoused the brand.

4         Q.    Can you just explain for the

5    record what you mean by warehoused the brand?

6         A.    Was it in the Walmart

7    distribution center.

8         Q.    This is a generic reflected on

9    here, correct?

10        A.    Yes, this is the generic.  When

11   I'm making decisions on the generic, if I was

12   concerned about overinventoried numbers, I

13   would look at what the brand product was and

14   were we sitting on excess brand product in

15   the warehouse.

16        Q.    Okay.  So you would have looked

17   at those numbers prior to signing this

18   agreement, correct?

19             MS. FUMERTON:  Objection, form.

20        A.    Yes, I would have reviewed --

21   if we warehoused the brand, I would have

22   reviewed if we had product in the

23   distribution center, yes.

24   BY MR. BOWER:

25        Q.    Well, if you hadn't warehoused

Highly Confidential - Subject to Further Confidentiality Review

1    the brand, how would you have determined how

2    much units you needed?

3         A.    I would still have -- if we did

4    not warehouse the brand, I would still have

5    data on how many prescriptions we had

6    dispensed of the brand product.

7         Q.    Okay.  Where would you pull

8    that data from?

9         A.    That would be available in

10   Retail Link.

11        Q.    And in that scenario, if the

12   warehouse had not -- strike that.

13             What does it mean to warehouse

14   the brand?

15        A.    We would purchase it in our

16   distribution centers and then send it to the

17   stores as the stores ordered it.

18        Q.    Okay.  But if Walmart has not

19   warehoused a brand, right, how is it that

20   Walmart is filling prescriptions for that

21   product?

22        A.    We would have created an item

23   number for the product and the stores would

24   have ordered that item number from McKesson,

25   and McKesson would have shipped that product

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to the stores.

 2         Q.    So in that case, McKesson is

 3    shipping product directly to the stores for a

 4    product that Walmart does not distribute at

 5    all, correct?

 6         A.    That Walmart does not

 7    distribute?  But with all prescription

 8    medicine, we can't warehouse every

 9    prescription medicine.  There's thousands of

10    SKUs and our warehouse wouldn't hold that

11    volume.

12         Q.    Okay.

13         A.    So --

14         Q.    And let me try to clarify my

15    question.

16              Earlier today we had a

17    discussion where I believe your testimony was

18    that McKesson would only fill an order for

19    prescription opiates if the warehouse was out

20    of the product, correct?

21         A.    That is correct.

22         Q.    Now you're talking about a

23    situation where a product is not distributed

24    by Walmart, correct?

25         A.    Yes.  Let me clarify.
```

1      Q.     And in that scenario -- could

2   you just --

3      A.     Yes, I'm sorry.

4      Q.     Go ahead.

5      A.     That's okay, you finish.

6      Q.     In that scenario, would the

7   pharmacy order directly from McKesson?

8             MS. FUMERTON:  Objection, form.

9      A.     No, the pharmacy would not

10  order directly from McKesson.  We would still

11  have to create an item number in our system,

12  a Walmart item number for that item, and the

13  stores would still put the order in through

14  the Walmart system.  And then, since the

15  distribution center -- we don't warehouse the

16  item, so there's no inventory in the

17  distribution center, the order would then be

18  routed to McKesson.

19  BY MR. BOWER:

20     Q.     Okay.  Would that order be

21  routed directly to McKesson or would someone

22  at the distribution center review that order?

23     A.     It would have to go to the

24  distribution center and then I'm not sure the

25  processes at the distribution center, but

1    then the order would go to McKesson.

2         Q.    Okay.  And who is placing those

3    orders?  Is it the replenishment team still,

4    or is it the pharmacies themselves?

5              MS. FUMERTON:  Objection, form.

6         A.    Placing the orders for an item

7    that's not warehoused?

8    BY MR. BOWER:

9         Q.    Yes.

10        A.    The pharmacies.

11        Q.    The pharmacies themselves?

12        A.    Yes.

13        Q.    Going back to Exhibit 11, and I

14   appreciate that clarification.

15             Bullet point two references the

16   Walmart/Apotex Strategic Agreement Program.

17             Do you see that?

18        A.    Yes.

19        Q.    What does that refer to?

20        A.    We had certain vendors that we

21   worked with on -- we called them our

22   strategic suppliers, and we worked with them

23   on -- we would review our business and any

24   issues we had in the past.  We would look

25   into the future to new launches and maybe do

1    some pre-commitments on those new launches to

2    try to get better pricing in the market.

3         Q.    How, if at all, was a strategic

4    agreement program different than a

5    contractual agreement to supply Walmart with

6    product?

7         A.    I don't think it was, and I --

8    I'm not familiar with this terminology, if

9    she's referring to that strategic agreement

10   program we had in place or if they had some

11   sort of overarching contract that I just am

12   not remembering.

13        Q.    Well, but you're -- this is a

14   one-page contract, right?

15        A.    This is a one-page contract,

16   yes.

17        Q.    And you're the only one at

18   Walmart to sign this agreement, right?

19        A.    That's correct.

20        Q.    Your testimony today is you

21   don't know what that Walmart strategic

22   agreement program refers to?

23             MS. FUMERTON:  Objection, form.

24        A.    Today I don't know, but this

25   was eight years ago, and I've had a lot of

Highly Confidential - Subject to Further Confidentiality Review

```
1    one-page contracts and relationships with

2    vendors, and I don't remember that today, no.

3    BY MR. BOWER:

4         Q.    All right.  Approximately how

5    many manufacturers supply Walmart with

6    prescription opiates?

7              MS. FUMERTON:  Objection, form.

8         A.    I don't know the number.

9    BY MR. BOWER:

10        Q.    Just approximately.

11             MS. FUMERTON:  Objection, form.

12        A.    Five.  Five.

13   BY MR. BOWER:

14        Q.    Five?  Okay.

15             So far today we've seen Apotex,

16   right?

17        A.    Yes.

18        Q.    QualiTest?

19        A.    Yes.

20        Q.    Right?  Actavis?

21        A.    Yes.

22        Q.    Right.  Mallinckrodt?

23        A.    Yes.

24        Q.    Right.  What are the other ones

25   that come to mind?  Purdue, right?
```

1        A.      I'm not sure that we bought

2    directly from Purdue into the warehouse, but

3    Purdue was a maker of opioids that the stores

4    purchased; whether it was from McKesson or

5    the warehouse -- I was thinking you were just

6    referring to the warehouse.

7              But I know Teva.

8        Q.     J&J or any of their

9    subsidiaries?

10       A.     J&J was a brand.  I'm not as

11   familiar with their portfolio.  Again, that

12   would have gone through McKesson.

13       Q.     Okay.  Watson?

14              MS. FUMERTON:  Objection, form.

15              MR. CIULLO:  Object to form.

16              MS. FUMERTON:  I just think --

17         there's a series of questions here

18         pending after the one where there's

19         confusion so I can keep objecting to

20         form.

21   BY MR. BOWER:

22       Q.     I mean, do you understand the

23   question?

24       A.     Yes.  Watson was -- I'm not

25   sure at what point -- Watson was bought out

1    by Actavis, and I'm not sure where that

2    starts to overlap.

3         Q.    Okay.  Who is Dave Irwin?

4         A.    Dave Irwin was the national

5    account manager at Mallinckrodt.

6         Q.    Did you ever meet with him in

7    person?

8         A.    Yes, I did.

9         Q.    Where did those meetings take

10   place?

11              MS. FUMERTON:  Objection, form.

12        A.    At the home office, we met.  I

13   can speculate that we met at NACDS and ECRM

14   because I met with most manufacturers at

15   those conferences.

16   BY MR. BOWER:

17        Q.    Did you provide utilization

18   info to manufacturers?

19        A.    Yes.

20        Q.    And how would you provide that

21   information?  Via e-mail or in person?

22        A.    It could be via e-mail, it

23   could be over the phone, it could be in

24   person.  It could be any of those.

25        Q.    And what type of utilization

Highly Confidential - Subject to Further Confidentiality Review

1    info would you provide to them?

2              MS. FUMERTON:  Objection, form.

3        A.      NDC or product utilization.  If

4    they were launching a product and needed

5    utilization to understand if they could pick

6    up our business, we would provide that

7    utilization.

8    BY MR. BOWER:

9        Q.      And you did so in the context

10   of trying to negotiate a different supplier

11   agreement?  Strike that.

12              In other words, why were you

13   sharing that information with manufacturers?

14       A.      If we were requesting proposals

15   for business, we would need to share that

16   information so that they could formulate

17   pricing and they could understand if they

18   could pick up our volume.

19       Q.      And why would you be requesting

20   proposals for business if you were already

21   purchasing a product from another

22   manufacturer?

23       A.      If that manufacturer had not

24   been able to supply fully for whatever

25   reason, then I would request proposals.

1      Q.      Would you also request

2   proposals to get better pricing?

3      A.      Yes.

4      Q.      Are you familiar with a company

5   called Ethex, E-T-H-E-X?

6      A.      Ethex.

7      Q.      Ethex.

8      A.      Yes.

9      Q.      Did they ever approach you to

10  supply Walmart with oxy?

11     A.      Ethex went out of business

12  shortly after I came to Walmart.  I'm not

13  sure of the dates or what -- what may have --

14  I don't recall.

15     Q.      Do you recall telling Mr. Irwin

16  in 2010 that they approached you to supply

17  oxy?

18     A.      I don't recall that, no.

19     Q.      Do you recall speaking with

20  Mr. Irwin asking for growth of the oxy

21  market?

22             MS. FUMERTON:  Objection, form.

23     A.      I don't recall that, no.

24  BY MR. BOWER:

25     Q.      You don't recall that ever

Highly Confidential - Subject to Further Confidentiality Review

1    happening?

2         A.    No.

3         Q.    Do you recall ever asking

4    anyone about the assessment of the growth in

5    the oxy market?

6              MS. FUMERTON:  Objection, form.

7         A.    I don't recall that, no.

8    BY MR. BOWER:

9         Q.    You don't recall that ever

10   happening in your entire career at Walmart,

11   ever asking anybody about the growth of the

12   oxy market?

13             MS. FUMERTON:  Objection, form.

14        A.    I do not remember ever asking

15   that question, no.

16   BY MR. BOWER:

17        Q.    Do you recall being concerned

18   about supply issues for OxyContin in 2010?

19             MS. FUMERTON:  Objection, form.

20        A.    I don't recall specific dates.

21   I recall being concerned about supply issues

22   on all of the products in my portfolio, yes.

23   BY MR. BOWER:

24        Q.    Including OxyContin?

25             MS. FUMERTON:  Objection, form.

Highly Confidential - Subject to Further Confidentiality Review

1      A.      OxyContin was in my portfolio.

2   BY MR. BOWER:

3      Q.      Do you recall meeting with

4   Mr. Irwin to discuss your concerns?

5              MS. FUMERTON:  Objection, form.

6      A.      We met on multiple occasions.

7   I don't remember the conversation specifics.

8   BY MR. BOWER:

9      Q.      Are you familiar with a VIP

10  agreement you had with -- what company was

11  Mr. Irwin with again?  I forget.

12     A.      Mallinckrodt.  At around 2010?

13     Q.      Yeah.

14     A.      Mallinckrodt.

15     Q.      Did you have a VIP agreement

16  with Mallinckrodt during that period?

17             MS. FUMERTON:  Objection, form.

18     A.      I don't remember the specific

19  agreement, no.

20  BY MR. BOWER:

21     Q.      Just generally, did Walmart

22  have a VIP agreement with Mallinckrodt during

23  that time period?

24             MS. FUMERTON:  Objection, form.

25     A.      I don't remember the names of

Highly Confidential - Subject to Further Confidentiality Review

1    specific agreements or rebate programs.

2    It's -- we could have possibly.  I just don't

3    remember.

4    BY MR. BOWER:

5         Q.    Do you have any -- as you sit

6    here today, any understanding what a VIP

7    agreement would refer to?

8         A.    I don't know what the VIP

9    agreement means, no.

10        Q.    Okay.  Do you recall being

11   concerned about Actavis having limited

12   inventory of oxy ER?

13        A.    I don't -- I don't remember

14   that specific, but it's likely because I was

15   always concerned about product limitations on

16   any products that I was managing.

17        Q.    What products were you managing

18   in the 2010 time period?

19        A.    I don't remember the exact

20   categories, but I would have pain, heart

21   health, GI, urinary, skin health.  I did not

22   have diabetes in 2010, I know that.

23        Q.    Okay.

24        A.    But we would have five or

25   six -- four or five overarching categories.

Highly Confidential - Subject to Further Confidentiality Review

 1    Pain was one of the categories, and opiates

 2    were a small subsection of the pain category.

 3         Q.    Okay.  Let's talk about the

 4    pain category then.  When you say opiates

 5    were a small subsection, what do you mean by

 6    that?

 7         A.    Well, we also had other items

 8    in pain.  You had diclofenac, you would have

 9    ibuprofen, you would have any

10    anti-inflammatory, you would have creams or

11    ointments that were meant for pain.  There

12    are other items in that overarching category

13    besides just C-IIs.

14         Q.    With respect to the pain

15    category, were there other C-IIs that were

16    not prescription opiates?

17         A.    Yes.  They weren't in the pain

18    category.  They would have been in mental

19    health under ADHD.

20         Q.    Okay.  My question was, though,

21    pain category.

22         A.    Oh, in the pain category --

23         Q.    Yes.

24         A.    I'm sorry, could you repeat the

25    question?

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sure.

2          With respect to the pain

3    category, were there other C-IIs that were

4    not prescription opiates?

5    A.    I do not recall exactly.

6    Q.    Well, you were responsible for

7    that at Walmart, right?

8          MS. FUMERTON:  Objection, form.

9    A.    I was responsible for C-IIs at

10   Walmart.  I was not responsible for knowing

11   if the chemical composition contained an

12   opioid or not.

13   BY MR. BOWER:

14   Q.    Are you familiar as you sit

15   here today with any other C-II you purchased

16   for the pain category that was not an opiate?

17         MS. FUMERTON:  Objection, form.

18   A.    There were other -- there were

19   C-IIs that I purchased.  I just don't know if

20   they were all opioids or not is what I'm

21   saying.

22   BY MR. BOWER:

23   Q.    What ones come to mind sitting

24   here today that you're unsure about?

25   A.    Well, there's -- morphine was

1    in there, and there was Demerol that was in

2    there.  There was hydromorphone that was in

3    there.

4         Q.    Well, you know hydromorphone is

5    an opiate, right?

6         A.    I know that hydromorphone is an

7    opiate.

8         Q.    You know morphine is an opiate,

9    right?

10         A.    Well, I'm not -- today, I don't

11    know.  I'd have to research those items to

12    know if they're all actually opioids or not.

13    I don't know that off the top of my head

14    today.

15         Q.    So you're unsure as you sit

16    here today whether hydromorphone is an

17    opiate?

18         A.    Today I know that hydromorphone

19    is an opiate.

20         Q.    And what about morphine, you're

21    unsure about that one?

22         A.    I would have to -- I would have

23    to go research it.  I couldn't say that off

24    the top of my head, no.

25         Q.    That was never a consideration

Highly Confidential - Subject to Further Confidentiality Review

1    when you were making your buying decisions,

2    right, whether something was an opiate or

3    not?

4         A.    It was a consideration whether

5    it was a C-II, but not necessarily an opioid.

6         Q.    Okay.  And what consideration

7    did you give something that was a C-II?  How

8    would you treat that differently?

9              MS. FUMERTON:  Objection, form.

10   BY MR. BOWER:

11        Q.    I'm just using your words.  You

12   said it was a consideration whether it was a

13   C-II.  What does that mean?

14        A.    We knew if the items were only

15   going to come from McKesson we had to create

16   item numbers so the stores could purchase

17   them, which was different than other

18   products.

19        Q.    But Walmart didn't only get

20   C-IIs from McKesson, did it?

21             MS. FUMERTON:  Objection, form.

22        A.    No.

23   BY MR. BOWER:

24        Q.    So when you say I was -- it was

25   a consideration whether it was a C-II, how

Highly Confidential - Subject to Further Confidentiality Review

1    did that impact your buying decisions?

2              MS. FUMERTON:  Objection, form.

3         A.    If a store was going to

4    purchase an item from McKesson that was not a

5    C-II, they -- we didn't have to have a

6    Walmart item number created for that item.

7              If the item was a C-II, we had

8    to have a Walmart item number created for

9    that item.

10   BY MR. BOWER:

11        Q.    Other than having a number

12   created for an item, did the fact that a

13   product was a C-II have any other impact on

14   your purchasing decisions?

15             MS. FUMERTON:  Objection, form.

16        A.    Not in -- not in purchasing

17   decisions.

18   BY MR. BOWER:

19        Q.    Did it -- did it have any

20   impact at all in your business at Walmart --

21             MS. FUMERTON:  Objection.

22   BY MR. BOWER:

23        Q.    -- other than what you've

24   already stated?

25             MS. FUMERTON:  Sorry.

1          Objection, form.

2          A.     We kept a list of controlled

3     drugs.  I would have to make sure that that

4     item was added to that list.  There were some

5     administrative things.

6     BY MR. BOWER:

7          Q.     Can you explain what you mean

8     by that?  You kept a list of controlled

9     drugs.  What does that mean?

10          A.     There was a C-II form that had

11     the list of all the controlled drugs that we

12     had the item numbers created for as a

13     reference for anyone who would need that

14     item.

15               If I was going to -- if I was

16     going to create that item and add an item

17     number to that form, I would have to add that

18     item number to the form is what I meant to

19     say.

20          Q.     Okay.  So in other words --

21          A.     I would have to create it, but

22     it's an administrative...

23          Q.     Okay.  So in other words, if

24     you're selling -- if you're going to be

25     buying a new C-II item that Walmart hadn't

Highly Confidential - Subject to Further Confidentiality Review

1    purchased in the past, you would have to add

2    it to that list, correct?

3         A.    Correct.

4         Q.    Other than creating a number

5    and adding it to a list, did the fact that a

6    product was a C-II have any other impact on

7    your buying decisions?

8              MS. FUMERTON:  Objection, form.

9         A.    No.

10             MS. FUMERTON:  We're right at

11        12:00.  Is this a good stopping point?

12             MR. BOWER:  Let me just see.

13        Just give me one second.

14             MS. FUMERTON:  Are you okay

15        with going for a couple of more

16        minutes?

17             MR. BOWER:  We may not.  Let me

18        just -- I just want to see if I can

19        wrap up this whole question --

20             MS. FUMERTON:  Okay.

21             MR. BOWER:  -- contract issue

22        quickly.

23             Let's just do one more and then

24        we can take a lunch break.  Just

25        another brief contract.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Walmart-Little Exhibit 12

 2         marked.)

 3    BY MR. BOWER:

 4         Q.     Okay.  You've been handed

 5    what's been marked as Exhibit 12.  It's just

 6    another short contract that appears to have

 7    your signature.  Please take a moment, review

 8    it, and let me know when you're done.

 9                    This is an Actavis document,

10    the Bates number is ACTAVIS1144542.

11                    MR. CIULLO:  Again, I'll raise

12         the same objection before that to the

13         extent it's produced under the

14         Allergan MDL case numbers --

15                    MR. BOWER:  It says

16         confidential on it.

17                    MR. CIULLO:  Strike that.

18         Thank you.

19                    MR. BOWER:  Sure.  I tried to

20         pull the confidential ones that I

21         could find.

22                    Let me know when you're done,

23         okay?

24                    THE WITNESS:  Okay.

25                    (Document review.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FUMERTON:  I'll just note
 2         for the record with respect to
 3         Exhibit 12 that in the upper
 4         right-hand corner it suggests it's
 5         page 3 of 4, and it's a two-page
 6         document.
 7              MR. BOWER:  And I'll note for
 8         the record that Walmart did not
 9         produce this document.  I'm not sure
10         why.  There's lots of documents here
11         Walmart hasn't produced.
12              So if you want to inform us as
13         to why, that would maybe help clear up
14         the record.
15              That's why we're using lots of
16         documents from other defendants
17         because Walmart hasn't produced much
18         of this stuff.  Very concerning.
19              MS. FUMERTON:  Well, I disagree
20         with your characterizations, but in
21         any event, has Actavis -- did you make
22         this document from a four-page
23         document to a two-page document?
24              MR. BOWER:  I tried -- I don't
25         recall, but what I do recall trying to
```

```
1          do is provide the complete contract so

2          the record was clear.

3                    MS. FUMERTON:  Okay.  So we'll

4          just make --

5                    MR. BOWER:  If Walmart wants to

6          make a supplemental production that it

7          believes this contract is not clear or

8          if it has this contract in its

9          possession, custody or control, it

10         should produce it.

11                   MS. FUMERTON:  I'm talking

12         specific to this exhibit, and I'm

13         saying that this particular exhibit

14         suggests that there's two missing

15         pages --

16                   MR. BOWER:  And if Walmart has

17         this specific contract, it should

18         produce it.  And if Walmart has any of

19         these contracts, it should produce

20         them.

21                   MS. FUMERTON:  I'm objecting to

22         this exhibit because it appears

23         there's two pages missing.

24                   MR. BOWER:  It does not appear.

25         It says page 3 of 4.  Excuse me.
```

```
 1              Let's ask the witness whether she

 2              believes there's a page missing from

 3              this contract.

 4    BY MR. BOWER:

 5         Q.    Have you had a chance to review

 6    the document?

 7              MS. FUMERTON:  Okay.  To be

 8              clear, since you're misunderstanding

 9              my objection, my objection is to the

10              exhibit.  There appears that there are

11              a couple of pages missing from the

12              exhibit as indicated on the document

13              itself.

14              MR. BOWER:  No, this is

15              intended --

16              MS. FUMERTON:  I'm not making a

17              statement as to whether or not the

18              contract is or is not complete.

19              MR. BOWER:  Are you finished?

20              MS. FUMERTON:  Yes.

21              MR. BOWER:  Okay.  For the

22              record, this exhibit is intended to be

23              a contract that Walmart signed.  It

24              appears to us to be a two-page

25              contract.
```

```
 1                   If that's wrong, please let us
 2          know and we'll try to figure out why
 3          something is missing.
 4                   And I would note that if
 5          Walmart would, in fact, produce these
 6          contracts, we might have more insight
 7          as to what they allege is missing.
 8                   MS. FUMERTON:  Again --
 9                   MR. BOWER:  So with that --
10                   MS. FUMERTON:  Zach, you keep
11          misrepresenting what I'm saying.  I'm
12          not making any representation as to
13          whether or not there's something
14          missing from the contract.
15                   I'm saying there's something
16          that appears to be missing from the
17          document and the exhibits because
18          there are two pages that are missing.
19                   So if you're going to repeat
20          what I said, I would appreciate it if
21          you would do so accurately and to not
22          interject all sorts of other
23          misleading information.
24                   MR. BOWER:  Okay.
25                   MS. FUMERTON:  The record will
```

1          say what it is, and I suggest we move

2          on.

3                    MR. BOWER:  Just to clear up

4          what you said, my response to that is:

5          I think Walmart should produce these,

6          okay?

7     BY MR. BOWER:

8          Q.     So with that, have you had a

9     chance to review the documents?

10         A.     I did.

11         Q.     Okay.  Does this appear to you

12    to be the complete agreement that you signed

13    in February 2010?

14         A.     Yes, it does.

15         Q.     It's a two-page contract,

16    correct?

17         A.     Correct.

18         Q.     Okay.  And I just have a couple

19    of questions on this one.  Are those your

20    initials where you cross out on the box on

21    the first page the last product there?

22         A.     Yes, they are.

23         Q.     Do you have any understanding

24    as to what circumstances would have led you

25    to cross that out?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     If I felt like we were holding

 2    too much inventory or I had committed to

 3    purchase too much inventory, I would cross

 4    that out and then not purchase that item.

 5          Q.     This is another standalone

 6    agreement with Actavis, correct?

 7          A.     Yes.

 8          Q.     Is it your understanding that

 9    this standalone agreement was entered into

10    for the same reasons as the earlier one we

11    saw?

12                 MS. FUMERTON:  Objection, form.

13          A.     I think this is an additional

14    agreement related to the settlement with

15    Purdue and Actavis on OxyContin ER.

16    BY MR. BOWER:

17          Q.     And that's the reason that

18    Walmart repeatedly enters into these

19    standalone agreements, correct?

20          A.     Yes.

21                 MS. FUMERTON:  Objection, form.

22          A.     As I remember.

23                 MR. BOWER:  Okay.  Thank you.

24          We can break for lunch.

25                 THE VIDEOGRAPHER:  Going off
```

```
1          the record, 12:06 p.m.

2                  (Recess taken, 12:06 p.m. to

3          12:48 p.m.)

4                  THE VIDEOGRAPHER:  Back on

5          record, 12:48 p.m.

6    BY MR. BOWER:

7          Q.    Good afternoon, Ms. Little.

8    You understand you're still under oath?

9          A.    Yes, I do.

10         Q.    I just have a couple of cleanup

11   questions from this morning.

12                We talked about how the buying

13   side of the Walmart business was split up

14   into different categories, correct?

15         A.    That's correct.

16         Q.    Okay.  Was it ever the case

17   that more than one person would be

18   responsible for the pain category at the same

19   time?

20         A.    No.

21         Q.    Okay.  So it was organized with

22   the intent of having one person having

23   responsibility during any given time period;

24   is that correct?

25                MS. FUMERTON:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    For the -- from a buying

2    perspective, yes, but you would have

3    additional replenishment or pricing or

4    different team members that would have other

5    functions.

6    BY MR. BOWER:

7    Q.    Were there team members

8    specifically focused on pricing?

9         MS. FUMERTON:  Objection, form.

10   A.    Merchandising, pharmacy

11   merchandising has a pricing department.

12   BY MR. BOWER:

13   Q.    Would you work with them in

14   negotiating contracts with the manufacturers

15   for prescription opiates?

16   A.    No, I would not.

17   Q.    Would you have the discretion

18   to approve a price?

19   A.    Yes.

20   Q.    Did you have to check with

21   anybody in doing that?

22   A.    I did not.

23   Q.    In doing the pricing -- strike

24   that.

25         When a new price was offered

Highly Confidential - Subject to Further Confidentiality Review

1  for a prescription opiate, would you look at

2  how that pricing affected Walmart's bottom

3  line?

4              MS. FUMERTON:  Objection, form.

5       A.    I would not.

6  BY MR. BOWER:

7       Q.    What would you look at when you

8  received the new price, if anything?

9              MS. FUMERTON:  Objection, form.

10      A.    We would look at the current

11 pricing, and then we would take other factors

12 into accountability; is the current supplier

13 supplying without any issue, what's the

14 history with the supplier that's bringing the

15 pricing proposal to you and things like that.

16 BY MR. BOWER:

17      Q.    Would you consider whether

18 Walmart would make more money under the new

19 price?

20             MS. FUMERTON:  Objection, form.

21      A.    Anytime we received a lower

22 price, we knew that we would be making more

23 money as far as decreasing our cost of goods.

24 BY MR. BOWER:

25      Q.    So in other words, would

Highly Confidential - Subject to Further Confidentiality Review

```
1    Walmart reduce the price that was paid for

2    the product commensurate with its price

3    reduction received from manufacturers?

4                MS. FUMERTON:  Objection, form.

5                MR. BOWER:  I'll strike that.

6    BY MR. BOWER:

7        Q.    Was the price that Walmart paid

8    for prescription opiates -- strike that.

9    I'll try to ask a proper question.

10               Did the price that Walmart paid

11   manufacturers of prescription opiates impact

12   the price that Walmart sold the product for?

13               MS. FUMERTON:  Objection, form.

14       A.    It did not.  It did not.

15               (Walmart-Little Exhibit 13

16       marked.)

17   BY MR. BOWER:

18       Q.    I'll hand you what's been

19   marked as Exhibit 13.  Just take a moment and

20   review that document.  Again, this is another

21   document that was redacted up until the point

22   that you're included on the e-mail chain,

23   okay?  Just in case you're wondering why

24   those redactions are there.

25               (Document review.)
```

```
 1    BY MR. BOWER:
 2         Q.     Are you finished reviewing the
 3    document?
 4         A.     Yes.
 5         Q.     Okay.  My first question is
 6    whether anyone on this e-mail chain was in
 7    replenishment.
 8         A.     Yes, they were.
 9         Q.     Okay.  And who would that be?
10         A.     Rachel Galdamez and David
11    Storms.
12         Q.     Okay.  And I don't want to ask
13    about all the people on here, but do you know
14    whether all the people on the "To" line were
15    Walmart folks?  Or if you recognize any names
16    that were not Walmart folks, just let us
17    know.
18         A.     I'm not familiar with Jason
19    K-O-P-F.
20         Q.     Okay.  But everyone else on
21    that, to the best of your knowledge, was a
22    Walmart employee?
23         A.     Yes.
24         Q.     Okay.  Do you -- Ken S-A-S-S-E,
25    what position did he hold, if you know?
```

1      A.      Ken Sasse?

2      Q.      Uh-huh.

3      A.      Was a divisional operator for

4  pharmacy operations.

5      Q.      Do you have knowledge of what

6  his responsibilities were with respect to

7  prescription opiates?

8              MS. FUMERTON:  Objection, form.

9      A.      A divisional operator, the

10 hierarchy for operations management would be

11 a pharmacist, a pharmacy manager, a market

12 director, a regional director, and then a

13 divisional.

14 BY MR. BOWER:

15     Q.      Okay.  Thank you.

16             What about Phil Reynolds Jr.?

17     A.      He was a divisional operator

18 for pharmacy operations.

19     Q.      So same title as Ken?

20     A.      Yes.

21     Q.      Okay.  Tim K-O-C-H?

22     A.      Tim -- I don't remember his

23 title at the time.  It's usually in

24 regulatory or compliance.

25     Q.      Okay.  Greg Beam?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Greg Beam was in asset

2     protection.

3          Q.     What did -- did you have any --

4     strike that.

5                 In connection with your

6     responsibilities as a buyer of prescription

7     opioids, did you have any interaction with

8     Mr. Beam?

9          A.     There were times that we -- we

10    crossed paths or were in meetings together,

11    yes.

12         Q.     And under what circumstances

13    would that happen?

14                MS. FUMERTON:  Objection, form.

15    BY MR. BOWER:

16         Q.     I'm asking specifically with

17    respect to prescription opiates.

18                MS. FUMERTON:  Objection, form.

19         A.     The majority of the

20    conversations I had with him around

21    prescription opioids were if manufacturers

22    came to us with a program that they wanted to

23    implement.

24                Purdue would bring to us a

25    program about -- I don't know, it's a -- it
```

1    would be a customer-facing program around

2    opioids, I would pass that to Greg Beam.

3    BY MR. BOWER:

4         Q.    Okay.  And what would be an

5    example of a customer-facing program around

6    opioids?  What does that mean?

7         A.    I can't remember any that they

8    brought us.  They were generally around

9    safety, know your medications or things like

10   that, from what I can recall.

11        Q.    And would Walmart provide that

12   information to its customers?

13              MS. FUMERTON:  Objection, form.

14        A.    I'm not sure what happened

15   after I passed the -- made the contact

16   between the two.

17   BY MR. BOWER:

18        Q.    So you would make a contact

19   between Purdue and Mr. Beam?

20        A.    Greg Beam, yes.

21        Q.    Greg Beam.  And you don't know

22   what Mr. Beam would do with that after that;

23   is that correct?

24        A.    That's correct.

25        Q.    We would have to ask Mr. Beam

1    that, right?

2              MS. FUMERTON:  Objection, form.

3         A.    Yes.

4              (Interruption by the

5         videographer.)

6              MS. FUMERTON:  Can folks on the

7         line hear us?

8              MR. INNES:  Yes, this is

9         Michael Innes.  I had you on mute and

10        I can hear you.

11             MS. FUMERTON:  Okay.  Thanks.

12   BY MR. BOWER:

13        Q.    Jamie Newel?

14        A.    Jamie Newel, he was an

15   operations coordinator, I believe, at this

16   time.

17        Q.    Based on your experience as a

18   buyer of prescription opiates, when would you

19   have occasion to interact with the operations

20   coordinator?

21             MS. FUMERTON:  Objection, form.

22        A.    So we would interact with the

23   operation coordinator multiple times a week

24   just on our business as a whole.  I can't --

25   I don't know as far as with prescription

1    opioids.

2    BY MR. BOWER:

3         Q.    Okay.  Just generally speaking,

4    what role did the operations coordinator

5    perform?

6         A.    The operations coordinator was

7    a conduit between the home office and

8    operations management in the field.

9         Q.    Okay.  And can you be any more

10   specific, what you mean by operations

11   management in the field?  Are you referring

12   to pharmacists or something else?

13        A.    Pharmacy operations at the home

14   office and pharmacy operations at store

15   level.

16        Q.    So what does an operations

17   manager do just based on your experience?

18             MS. FUMERTON:  Objection, form.

19        A.    I'm not sure of their whole job

20   duties.  They produced the COMAC for Friday,

21   and would send the COMAC out that we talked

22   about on Fridays.

23   BY MR. BOWER:

24        Q.    And those COMACs are

25   distributed to all Walmart pharmacies?

1     A.     Yes, it's an electronic

2   document.

3          Q.     Okay.  And what type of

4   information, just generally speaking, is

5   included in that distribution?

6          A.     Any messages that the home

7   office wants to relay to the field.  And

8   I'm -- my position wasn't in the operations

9   department, so I'm not as familiar with that

10  information.

11         Q.     Okay.

12         A.      If I had any information that I

13  wanted to communicate to the stores, I would

14  use that vehicle.

15         Q.     And were you copied on those

16  distributions?

17         A.     I was sometimes, not always.

18         Q.     Okay.  And do you know whether

19  anyone at the home office was copied on those

20  distributions?

21              MS. FUMERTON:  Objection, form.

22         A.     I don't know.

23  BY MR. BOWER:

24         Q.     Were you based in the home

25  office when you were in Bentonville?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes, I was.

 2          Q.      Do you know who sent out the

 3    COMAC?

 4          A.      It came from an operations

 5    coordinator e-mail.

 6          Q.      Is there kind of like just a

 7    general e-mail address for operations

 8    coordinator that was used, or is it

 9    associated with somebody's name?

10          A.      I don't remember.

11          Q.      Okay.  So let's then turn to

12    the substance of the e-mail, okay?

13          A.      Uh-huh.  Yes.

14          Q.      Were you in a meeting with

15    Thomas Hervey, H-E-R-V-E-Y, discussing the

16    oxy 30 and 15mg C-II issue?

17          A.      I don't remember being in the

18    meeting.

19          Q.      Okay.  Do you recall reading

20    this e-mail, just generally what the issue

21    was?

22          A.      I have a recollection of what

23    the issue was.

24          Q.      Okay.  What's your

25    recollection?
```

```
 1          A.      There was some sort of an
 2    instance where systematically stores were
 3    receiving products that had not ordered on
 4    the oxy, the 30 and 15.
 5          Q.      Okay.  And in connection with
 6    this issue, it appears that Walmart looked at
 7    how much McKesson had sent to the stores; is
 8    that correct?  You see maybe in the third
 9    sentence?
10          A.      Yes.
11          Q.      Okay.  You see it says --
12          A.      Yes, they did.
13          Q.      -- the warehouse and McKesson
14    have sent out a total of 23,321 bottles of
15    the 15 and 30 combined.
16                  Do you see that?
17          A.      I do.
18          Q.      Where would you look if you
19    wanted to see how much oxy McKesson had sent
20    to the stores?  Would that be in Retail Link
21    as well?
22          A.      Typically, I would call
23    McKesson and ask McKesson for that data.
24          Q.      Okay.  That's not data you had
25    access to; is that correct?
```

```
 1          A.      Correct.

 2          Q.      Okay.

 3          A.      Now, I could back into that

 4   information from some data I have, but I

 5   would have to do some analytics to do that.

 6          Q.      How would you do that?

 7          A.      In Retail Link we would have

 8   total sales out, and then I could look at

 9   what came out of the warehouse and make an

10   assumption on the remainder.

11          Q.      Okay.  I see.  You just take

12   this whole amount from Retail Link and

13   subtract the amount from the warehouse and

14   you get the remainder?

15          A.      (Nods head.)

16          Q.      Thank you for that.

17                  In Retail Link can you

18   determine how much was sold by any individual

19   pharmacy?

20                  MS. FUMERTON:  Objection to

21          form.

22          A.      You could filter down to a

23   specific store.

24   BY MR. BOWER:

25          Q.      Okay.  And as you sit here
```

1  today, do you recall how long Retail Link

2  would maintain the -- that sale information,

3  in other words, how far back you could go?

4      A.    I think you could go 23 months

5  in Retail Link.

6      Q.    Okay.  And Thomas Hervey, it

7  says here he was logistics operations

8  coordinator of pharmacy.

9          Do you have any knowledge as to

10  how that position differs from operations

11  coordinator?

12     A.    The logistic operations

13  coordinator would be over the pharmacy

14  distribution centers.

15     Q.    So let's go up to the first

16  line of this e-mail.  It says:  Coming out of

17  the meeting last Wednesday there were some

18  concerns that the information needed to be

19  scrubbed to ensure accuracy of hands and --

20  of on-hands in the stores.

21          Do you see that?

22     A.    I do.

23     Q.    What does that refer to?

24     A.    I don't remember being at the

25  meeting.  Just reading that statement, I

Highly Confidential - Subject to Further Confidentiality Review

1    would think they were looking at some

2    on-hands, but they weren't sure if those were

3    accurate.

4         Q.    So in other words, if they

5    couldn't confirm they were accurate, they

6    would just scrub the information, correct?

7              MS. FUMERTON:  Objection, form.

8         A.    I think scrub means that they

9    would do some investigating to try to -- to

10   try to back up those numbers to make sure

11   they were accurate.

12   BY MR. BOWER:

13        Q.    So scrubbed in your mind means

14   investigating?

15        A.    It would need to be looked at,

16   investigated, have some -- I want to say

17   proven.  You know, they had to be proven what

18   they were, if they were accurate or not.

19        Q.    Okay.  And who would have done

20   those investigations?  Who would have had

21   that responsibility?

22        A.    I'm not sure where the

23   responsibility would lie.  In this instance,

24   if I wanted to ensure an on-hand, I would

25   call the store and ask them to count their

1   inventory.

2         Q.    But here we're talking about

3   on-hand, it appears to be in the stores

4   nationwide, right?

5               MS. FUMERTON:  Objection, form.

6         A.    Yes.

7   BY MR. BOWER:

8         Q.    So is it your understanding

9   that there was a nationwide investigation to

10  determine where the missing inventory was?

11              MS. FUMERTON:  Objection, form.

12        A.    I'm not sure if this is about

13  missing inventory or just about how much

14  product was shipped out from the distribution

15  center and locating that product.

16  BY MR. BOWER:

17        Q.    Right.  Okay.  I appreciate

18  that clarification.

19              It says, actually, that the

20  stores have 23,155 on hand, which is 28,032

21  [sic] more than we sent them, right?

22        A.    That's what it says, yes.

23        Q.    So the investigation would have

24  focused on that discrepancy?

25              MS. FUMERTON:  Objection, form.

```
 1          A.      Yes, trying to understand do

 2    they really have the 23,321 bottles or do

 3    they have the 26,000, which is showing up in

 4    on-hands.

 5    BY MR. BOWER:

 6          Q.      Right.  And do you know who

 7    would know who would have conducted that

 8    investigation?  I'm just trying to figure out

 9    who would have done that.

10          A.      I do not know.

11          Q.      Okay.  Do you know who I could

12    talk to to answer that question?

13          A.      I don't know.

14          Q.      In other words, do you think

15    anyone -- any of the folks on this e-mail

16    would know the answer to that question?

17          A.      I would think someone would.

18          Q.      Who would you think would be

19    most likely to know who would conduct such an

20    investigation?

21              MS. FUMERTON:  Objection, form.

22          And, Zach, the numbers --

23              MR. BOWER:  Can you just let

24          her answer the question first and then

25          you can make your statement.
```

```
 1              MS. FUMERTON:  Well, if you

 2         would read it accurately, it would

 3         make it a lot more helpful.

 4              MR. BOWER:  Well, the document

 5         is what it is, right?

 6              MS. FUMERTON:  Then the

 7         testimony gets all screwed up because

 8         you're asking questions on numbers

 9         that don't match with what the

10         document says.

11              MR. BOWER:  So why don't we let

12         her answer the question.  Then you can

13         make any statements you want for the

14         record, okay?

15         A.    I think you could ask the

16    operation coordinators or operations.

17    BY MR. BOWER:

18         Q.    Okay.  So maybe Mister -- I'm

19    sorry.  You said operations coordinator, so

20    that would be Ms. Jamie Newel.  Or who in

21    operations are you referring to?

22         A.    Jamie Newel or Chris Lykins

23    were both operations coordinators.

24         Q.    Okay.  So we'd have to talk to

25    them to get the answer to this question?
```

```
 1                    MS. FUMERTON:  Objection, form.
 2   BY MR. BOWER:
 3        Q.    I'm just trying -- there's a
 4   few people on here.  You're telling me the
 5   investigation was done, but you don't know
 6   who may have done it or what was done.  I'm
 7   just trying to understand what happened.
 8                    MS. FUMERTON:  Object --
 9   BY MR. BOWER:
10        Q.    I'm asking you if you can
11   provide information as to who might know the
12   answer to that question.
13                    MS. FUMERTON:  Objection, form.
14        A.    I think one of those two might.
15   BY MR. BOWER:
16        Q.    Okay.  Thank you.
17        A.    I think they would have to be
18   involved in that.
19        Q.    Okay.  Thank you.
20                    MR. BOWER:  Tara, did you want
21          to make a statement?
22                    MS. FUMERTON:  Yeah, I just
23          want to make a statement that the
24          numbers I think got transposed when
25          you were reading them and it did
```

```
 1          not -- the questions did not reflect

 2          accurately the numbers that were on

 3          hand, the numbers that were shipped

 4          and the numbers that -- the difference

 5          between the two.

 6               MR. BOWER:  Okay.

 7   BY MR. BOWER:

 8      Q.    And then I think this will be

 9   my last question on this one.  Why are you

10   forwarding this information to Steve Cohen?

11      A.    I can't remember.

12      Q.    Do you have any -- as you sit

13   here today, any -- can you think of any

14   reason why Mr. Cohen would have been

15   concerned with this issue?

16               MR. CIULLO:  Objection,

17          foundation.

18      A.    The only -- the only thing I

19   can think of is if I was trying to relay

20   the -- what happened to see if I could return

21   some of the product, is the only thing I can

22   think of.

23   BY MR. BOWER:

24      Q.    Okay.  Thank you.  You can put

25   that one away.
```

1    Just generally speaking, at

2    Walmart -- when you were going to buy a

3    product that had not been previously

4    distributed by Walmart, what was the process

5    or procedure?

6         A.    If I was going to buy a

7    product?  So generally that was with a brand

8    manufacturer, they would bring information to

9    us regarding what the brand was, the name of

10   the brand, what the brand was for, ZIP codes

11   where they would be marketing that brand to

12   physicians, copay tier informations for

13   third-party customers, estimated annual

14   script volume that -- for them, for that

15   year.

16                   And I'm referring to opioids

17   and nonopioids when I say that.

18        Q.    Okay.  I appreciate that.  I

19   just want to go through each of those, so let

20   me just make some notes so I can go through

21   each of those.  I'd like to go through those

22   in more detail in a minute.

23                   Was there any -- on the

24   internal Walmart side, was there any approval

25   you had to get before purchasing a product

1    for the first time?

2         A.    No.

3               MS. FUMERTON:  Objection, form.

4         A.    No.

5    BY MR. BOWER:

6         Q.    All right.  Let's walk through

7    those criteria in a little more detail, if

8    you don't mind, okay?

9               The first thing you think that

10   you considered was the brand or what it was

11   to be used for, correct?

12        A.    Correct.

13        Q.    Can you just describe in a

14   little more detail what that means?

15        A.    So if a manufacturer was

16   bringing us a new drug, I would have to

17   understand what the disease state was for and

18   look at what the prescriptions in that

19   disease state are doing.

20        Q.    So what disease states would

21   you have considered for prescription opiates?

22              MS. FUMERTON:  Objection, form.

23        A.    Well, we would look at just the

24   pain -- on the prescription opioids, if I

25   remember correctly, most of those were

```
 1    generic, so the brand was already in the

 2    market.  So I only had to look at utilization

 3    on that brand product.

 4    BY MR. BOWER:

 5         Q.    And then the next thing you

 6    mentioned was ZIP codes for marketing to

 7    physicians.  Why would that be a

 8    consideration for you?

 9              MS. FUMERTON:  Objection, form.

10         A.    So with a new brand product

11    that wasn't out there, we had to understand

12    where the information -- what doctors were

13    going to be writing that product so we could

14    ensure we had product in those ZIP code areas

15    so when a prescription came in, they would be

16    there.

17              That's, again, for brand

18    products, for products that weren't

19    previously in the market.

20    BY MR. BOWER:

21         Q.    There were -- Walmart did sell

22    brand products that were prescription

23    opiates, correct?

24         A.    Yes, we did.

25         Q.    And what was the reason for
```

Highly Confidential - Subject to Further Confidentiality Review

1    looking at this marketing information?

2              MS. FUMERTON:  Objection, form.

3         A.    So that we could understand

4    where our business was going to be.

5    Especially if the utilization on the product

6    was low, we may not warehouse the item.  If

7    the utilization was high, then we would make

8    decisions on whether we were going to

9    warehouse.

10             If it's a new product, you

11   don't expect -- depending on what they

12   estimate their script volume is going to be

13   for the year, you don't want to necessarily

14   put it in 5,000 stores if there's only going

15   to be a subset of GI specialty doctors that

16   are writing that prescription in certain

17   subsets of the country.

18   BY MR. BOWER:

19        Q.    So in other words, Walmart

20   wanted to know how popular a product was

21   going to be before committing to purchasing

22   it, correct?

23             MS. FUMERTON:  Objection, form.

24        A.    We wanted to understand what

25   our estimated utilization would be before we

Highly Confidential - Subject to Further Confidentiality Review

1    made decisions on what stores to stock the

2    product in.

3    BY MR. BOWER:

4         Q.    And as part of that estimated

5    utilization, would you look at the efforts

6    that the manufacturer was putting towards

7    marketing the product, correct?

8                MS. FUMERTON:  Objection, form.

9         A.    On new brand launches, yes, we

10   would look at that.  And I'm referring to

11   opioids and nonopioids at the time.

12   BY MR. BOWER:

13        Q.    And on the Walmart side, who

14   was part of creating those estimated numbers?

15        A.    Those numbers wouldn't be

16   created on the Walmart side.  The

17   manufacturer would come to us with what their

18   estimated yearly script volume would be for

19   the entire market.

20        Q.    And would Walmart then rely on

21   those numbers, or would it do its own

22   estimation based on all the information it

23   had available?

24                MS. FUMERTON:  Objection, form.

25        A.    I would -- I would take that

1    number and I would extrapolate what I

2    expected my market share to be and make

3    decisions based off of that.

4    BY MR. BOWER:

5         Q.    And what information would you

6    use to extrapolate what you expected your

7    market share to be?

8         A.    We used a base number that we

9    thought was our market share.

10        Q.    And do you recall what the base

11   number was?

12        A.    It was around 10%.

13        Q.    That would be for prescription

14   opiates and for other drugs as well, correct?

15             MS. FUMERTON:  Objection, form.

16        A.    That was an average market

17   share across the entire department.

18   BY MR. BOWER:

19        Q.    So that market share, you would

20   use that market share for prescription

21   opiates, correct?

22             MS. FUMERTON:  Objection, form.

23        A.    If there was a new brand launch

24   of a prescription opioid, I would have used

25   that 10% market share number, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. BOWER:
 2          Q.      Thank you.
 3                  (Walmart-Little Exhibit 14
 4          marked.)
 5     BY MR. BOWER:
 6          Q.      Okay.  You've been handed
 7     what's been marked as Exhibit 14.  I tried to
 8     include all the attachments.  It's a Walmart
 9     document and I believe it's sequential.  I
10     don't have too many questions on the
11     attachments, but I just included them so you
12     could review them if you would like.
13                  But my main question, just so
14     you can keep it in mind as you're looking at
15     the document, is your e-mail here, where you
16     state that, for later, these new item sheets
17     have not approved yet.  I just want to get an
18     understanding what that means.
19                  So with that in mind, take your
20     time and review the document.
21          A.      Thank you.
22                  MR. BOWER:  Sorry, and the
23          Bates number begins with
24          WMT_MDL_000021669, and it goes through
25          21678.
```

1          (Document review.)

2    BY MR. BOWER:

3          Q.     Are you still reading the

4    document?

5          A.     I am finished.

6          Q.     Okay.  So what did you mean

7    when you wrote these new item sheets are not

8    approved yet?

9          A.     There was a -- and I'm not

10   remembering exactly.  There was a time when

11   we started sending our new item sheets to

12   compliance to look over the NDCs to make sure

13   that they -- the manufacturer had licenses in

14   the states that we had warehouses, and I'm --

15   I think that is what I meant here, that I

16   hadn't gotten the word back from compliance

17   that they were through with their review.

18         Q.     So you couldn't -- was it --

19   strike that.

20                Did you have to wait for

21   compliance to finish their review to purchase

22   product?

23         A.     I could go ahead and create the

24   item sheets.  Replenishment could not place a

25   purchase order until we had that review from

Highly Confidential - Subject to Further Confidentiality Review

1    compliance.

2         Q.    Do you recall when compliance

3    started doing that review?

4         A.    I don't remember.

5         Q.    Do you recall whether -- strike

6    that.

7               Do you recall them ending that

8    policy?

9               MS. FUMERTON:  Objection, form.

10        A.    I do not recall them ending

11   that policy, no.

12   BY MR. BOWER:

13        Q.    Okay.  So would it be your

14   expectation that at least as of October 2015,

15   that policy was in place and would have

16   continued through 2017?

17        A.    Yes, that is accurate.

18        Q.    Do you know who specifically in

19   compliance was responsible for reviewing

20   prescription opiate products?

21               MS. FUMERTON:  Objection, form.

22               MR. BOWER:  Strike that.

23   BY MR. BOWER:

24        Q.    Do you know if anyone in

25   compliance had specific responsibility for

1    reviewing prescription opioid products?

2              MS. FUMERTON:  Objection, form.

3         A.    So we sent over the new item

4    sheets to compliance for opioid and nonopioid

5    products, and they all went to Dadrion

6    Gaston's team.

7    BY MR. BOWER:

8         Q.    You said Dadrion Gaston.  Do

9    you know the spelling of the last name?

10        A.    G-A-S-T-O-N.

11        Q.    And is that, to the best of

12   your knowledge, the e-mail address reflected

13   here, it says "emailpharmacyos"?

14        A.    No, "emailpharmacyos" was the

15   order specialists.  That was a division of

16   replenishment that actually created the items

17   after we filled out the form.

18        Q.    Okay.  So you're e-mailing them

19   to alert them that these aren't approved yet?

20        A.    Correct.

21        Q.    Okay.  And then just following

22   down the e-mail chain, it starts with you

23   sending an e-mail to Jocelyn Baker.

24              Do you see that?

25        A.    Uh-huh.

1    Q.    And she was at Teva?

2    A.    Yes, I do.

3    Q.    And you're asking her for the

4    paperwork for the product, correct?

5    A.    Correct.

6    Q.    And you needed that paperwork

7    so that it could be submitted for approval,

8    correct?

9    A.    Correct.

10    Q.    Okay.  At this point, were you

11    aware that OxyContin was being abused across

12    the country?

13          MS. FUMERTON:  Objection, form.

14    A.    I was aware that people that

15    had prescriptions for pain medicine sometimes

16    used those for ways other than they were

17    prescribed, yes.

18    BY MR. BOWER:

19    Q.    And specifically OxyContin,

20    correct?

21          MS. FUMERTON:  Objection, form.

22          MR. BOWER:  I'll strike that.

23    BY MR. BOWER:

24    Q.    Did you have that specific

25    understanding with respect to OxyContin, or

1    not?

2                    MS. FUMERTON:  Objection, form.

3          A.    I had the understanding for all

4    C-II products.

5    BY MR. BOWER:

6          Q.    Well, let me direct your

7    attention then to Bates -- it's a few pages

8    into the document ending in Bates number 673.

9                    You see that page?

10         A.    673, yes.

11         Q.    Yes.  And then it has a section

12   here that Walmart received regarding

13   postmarketing requirements under 505(o).

14                   Do you see that?

15         A.    I see that.

16         Q.    Okay.  Do you see that it

17   mentions the known serious risks of the

18   OxyContin tablets?  Do you see that?

19                   MS. FUMERTON:  Objection, form.

20         Are you reading -- what portion are

21         you reading?

22   BY MR. BOWER:

23         Q.    So you if look under the

24   postmarketing requirements, it says -- I can

25   read the whole sentence in the record if

Highly Confidential - Subject to Further Confidentiality Review

1    you'd like.

2                    MS. FUMERTON:  Sure.

3    BY MR. BOWER:

4         Q.    Okay.  It says:  As you were

5    informed in our December 30, 2009 Complete

6    Response Letter, FDA has determined that you

7    are required to conduct postmarketing studies

8    of OxyContin (oxycodone hydrochloride

9    controlled release) tablets to assess the

10   known serious risks of OxyContin tablets, in

11   particular, whether the changes made to the

12   OxyContin (oxycodone hydrochloride controlled

13   release) tablets formulation that are the

14   subject of this application and which are

15   intended to deter misuse and abuse actually

16   result in a decrease in the risks of misuse

17   and abuse, and their consequences.

18                    Do you see that?

19        A.    Yes.

20        Q.    Does that inform or refresh

21   your recollection that you knew at this time

22   whether this product was subject -- this

23   specific product was subject to abuse?

24                    MS. FUMERTON:  Objection, form.

25        A.    I did not read this document

1    when Jocelyn sent this over.  I used this to

2    forward to Dadrion to ensure that the NDC was

3    approved by the manufacturer, which is what

4    compliance was doing when looking at the

5    licenses and the NDCs.

6    BY MR. BOWER:

7        Q.    So Walmart didn't require you

8    to review this document, so you didn't review

9    it, correct?

10              MS. FUMERTON:  Objection, form.

11       A.    I did not review this document.

12   BY MR. BOWER:

13       Q.    You could have reviewed it,

14   right?

15       A.    Yes, I could have reviewed it.

16       Q.    Did you ever ask or contact

17   Purdue whether it fulfilled this requirement?

18       A.    I'm sorry?

19       Q.    I'm sorry, Teva, whether it

20   fulfilled this requirement?

21              MS. FUMERTON:  Objection, form.

22       A.    Could you repeat that?

23   BY MR. BOWER:

24       Q.    Yes.

25              The paragraph we just read is a

1    postmarketing requirement under 505(o).  Do

2    you see that?  They're required to do certain

3    things.

4              Do you see that?

5         A.    I see that.

6         Q.    Did you ever follow up with

7    them to determine whether they did those

8    things?

9              MS. FUMERTON:  Objection, form.

10        A.    I did not ask Teva.

11   BY MR. BOWER:

12        Q.    Do you know if anyone at

13   Walmart ever did?

14             MS. FUMERTON:  Objection, form.

15        A.    Not that I'm aware of.

16   BY MR. BOWER:

17        Q.    Do you know who would have done

18   so if it, in fact, had happened?

19             MS. FUMERTON:  Objection, form.

20        A.    I do not know.

21   BY MR. BOWER:

22        Q.    Do you know who at Walmart

23   would have had those types of

24   responsibilities to follow up with

25   manufacturers on these types of issues?

```
 1                    MS. FUMERTON:  Objection, form.

 2        A.     We had different departments in

 3   regulatory and in compliance.  I would have

 4   to think it was one of those departments.

 5   BY MR. BOWER:

 6        Q.     Okay.  Anyone in particular

 7   that comes to mind in those departments that

 8   would have had this kind of responsibility?

 9                    MS. FUMERTON:  Objection, form,

10        lack of foundation.

11        A.     They had multiple people that

12   were in those departments that did different

13   things.  I don't know.

14   BY MR. BOWER:

15        Q.     Okay.

16                    (Walmart-Little Exhibit 15

17        marked.)

18   BY MR. BOWER:

19        Q.     So you've been handed what's

20   marked as Exhibit 15.  Just take a moment and

21   review that.  I believe it is the

22   corresponding approval for these products,

23   but that's going to be my initial

24   questioning.  So just take a moment and

25   review the document.
```

1          MR. CIULLO:  While she's

2     reviewing, can you please read the

3     Bates.

4          MR. BOWER:  Sure.  It starts

5     with WMT_MDL_000021921, and it ends in

6     21924.

7          MR. CIULLO:  Thank you very

8     much.

9          (Document review.)

10  BY MR. BOWER:

11     Q.    Are you done?

12     A.    I'm done.

13     Q.    Is it your understanding that

14  this is the actual approval for this product?

15          MS. FUMERTON:  Objection, form.

16     A.    Yes.

17  BY MR. BOWER:

18     Q.    Okay.  And do you recall

19  sending this part to Cristy Martin -- this

20  e-mail to Cristy Martin?

21     A.    Cristy Martin was on Dadrion's

22  team, so she would have been one of those in

23  that group.

24     Q.    Okay.  Anyone else in that

25  group that you recall sending this to?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Just looking at the bottom

2    e-mail, it looks like I only sent it to

3    Cristy.

4      Q.      Okay.  Do you have any

5    familiarity with H&W Product Safety's

6    policies and procedures?

7      A.      I do not.

8      Q.      Okay.  Would we have to ask

9    Cristy what those were?

10            MS. FUMERTON:  Objection, form.

11     A.      Cristy or Dadrion.

12   BY MR. BOWER:

13     Q.      Do you have any knowledge or

14   understanding as to what standards they used

15   to provisionally approve these products?

16     A.      I do not.

17     Q.      Do you know -- you know, if you

18   look at the second full sentence, it says:

19   Additional information has been/will be

20   requested from the supplier for verification.

21            Do you see that?

22     A.      I see that.

23     Q.      Do you know who would have done

24   that additional -- made those additional

25   requests?

1          A.      It would have been someone on

2      Dadrion's team.

3          Q.      Okay.  Not you, not yourself,

4      correct?

5          A.      No.

6          Q.      Okay.  And then next, Cristy

7      goes on to state:  Continuation of business

8      is subject to the receipt of this additional

9      information from the supplier.

10              Do you see that?

11         A.      I do.

12         Q.      Did you -- do you recall ever

13     receiving any follow-up from Cristy regarding

14     these products?

15         A.      I don't remember receiving

16     anything.

17         Q.      So it would be your assumption,

18     then, that she received the information and

19     the business continued, correct?

20              MS. FUMERTON:  Objection, form.

21         A.      Yes.

22     BY MR. BOWER:

23         Q.      Do you have any understanding

24     as to what additional information would have

25     been requested?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't see any of that
 2    information here, so I do not remember.
 3          Q.    What is a launch binder?
 4          A.    What is a launch binder?  I'm
 5    not sure that I know.
 6          Q.    Has any manufacturer ever sent
 7    you a launch binder for any products?
 8                MS. FUMERTON:  Objection, form,
 9          lack of foundation.
10          A.    Not that I'm aware of.  I'm not
11    familiar with that term.
12    BY MR. BOWER:
13          Q.    Okay.
14                (Walmart-Little Exhibit 16
15          marked.)
16    BY MR. BOWER:
17          Q.    You've been handed what's been
18    marked as Exhibit 16, an e-mail from LouAnn
19    Randall at one of the manufacturers to
20    yourself.
21                MR. BOWER:  I will note for the
22          record, Tara, that this does not
23          include all the attachments, just the
24          e-mail.  Trying to save some trees.
25                MS. FUMERTON:  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:

 2          Q.     And just take a minute to

 3    review the document.  I just have a few

 4    questions.  I'm wondering first whether this

 5    refreshes your recollection of whether you've

 6    ever received a launch binder.

 7                (Document review.)

 8    BY MR. BOWER:

 9          Q.     Are you finished reading the

10    document?

11          A.     I am.

12          Q.     Okay.  So my first question:

13    Does this refresh your recollection of what

14    may be referred to as a launch binder?

15          A.     I still have no idea what that

16    term means.

17          Q.     Okay.  That's fair.

18                So then let's focus on the

19    e-mail at the bottom of the first page, your

20    e-mail to Dave Irwin.  Who is Dave?

21          A.     Dave was our account manager at

22    Mallinckrodt.

23          Q.     Okay.  And you state to him:

24    I'm ready to create fentanyl.

25                Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I do.

2    Q.    What does that mean?

3    A.    That means they must have

4    launched fentanyl.  I was ready to create the

5    Walmart item numbers for that product.

6    Q.    And what would you have done to

7    decide that you were ready to create it?  In

8    other words, what happened before your

9    decision to create that product?

10    MS. FUMERTON:  Objection, form.

11    A.    So it could have been a number

12    of instances.  Based off of something that we

13    had in one of the earlier exhibits, I think

14    this was a new launch to the market of this

15    generic product, and I'm thinking they must

16    have gotten FDA approval and were ready to

17    launch, and I had time and was ready to

18    create those items at that time.

19    BY MR. BOWER:

20    Q.    How would you have known that

21    Walmart had a need or demand for the product?

22    A.    There would have been a

23    brand-referenced product that we were already

24    dispensing.

25    Q.    Do you know what that

Highly Confidential - Subject to Further Confidentiality Review

1    brand-referenced -- strike that.

2           Do you know who would have

3    provided that brand-referenced product to

4    Walmart?

5           MS. FUMERTON:  Objection, form.

6    A.    I don't --

7           THE WITNESS:  I'm sorry.

8    A.    I don't know who the

9    manufacturer was.

10   BY MR. BOWER:

11   Q.    Then following through back to

12   the first e-mail, which appears to be a

13   different -- kind of a different subject,

14   Mr. Irwin is asking you about methadone.

15          Do you see that?

16   A.    I see that.

17   Q.    Okay.  It says:  Walmart

18   usually buys around 20,000 bottles a month,

19   but in January it dropped to 12,000 bottles.

20          Do you see that?  Did you ever

21   get back to him on that?

22   A.    I'm not sure.

23   Q.    Did you ever look at Walmart's

24   purchasing with respect to methadone?

25          MS. FUMERTON:  Objection, form.

Highly Confidential – Subject to Further Confidentiality Review

```
 1           A.      I'm not sure.
 2    BY MR. BOWER:
 3           Q.      Without a document, you
 4    wouldn't be able to tell me one way or the
 5    other; is that correct?
 6           A.      That's correct.
 7           Q.      Okay.  Do you have any
 8    understanding as to why Walmart didn't
 9    produce this e-mail?
10                   MS. FUMERTON:  Objection, form.
11           A.      I do not know.
12                   (Walmart-Little Exhibit 17
13           marked.)
14    BY MR. BOWER:
15           Q.      You've been handed what's been
16    marked as Exhibit 17.  This is another
17    Mallinckrodt document not produced by
18    Walmart.  The Bates number is
19    MNK-T1_0001961218, and again it has the
20    redactions just because you weren't on those
21    e-mails.  It's just some e-mail strings here
22    between you and Mr. Irwin again.
23                   And take a moment and review
24    this, but my main question is going to be on
25    your -- your question to Dave knowing that
```

```
 1    you have to do an assessment of the pain

 2    management category.

 3                    Are you ready or do you want

 4    some time?

 5         A.    I'm ready.

 6         Q.    Okay.  Do you know what that

 7    refers to?

 8         A.    There were times that our

 9    supervisor would ask us to put together

10    overviews of our categories, and I'm assuming

11    that this was me trying to get some data for

12    the overview of that -- of that presentation

13    I had to do.

14         Q.    Okay.  So you had to make a

15    presentation to supervisor about the pain

16    management category; is that correct?

17         A.    We would have to do this on all

18    of our categories.

19         Q.    Okay.  So in each category you

20    had to do a presentation, correct?

21         A.    Correct.

22         Q.    Okay.  And who was the

23    supervisor that would have requested this?

24         A.    Sandy Kinsey.

25         Q.    Okay.  And approximately how
```

1    often would you do these presentations?

2         A.    Maybe once a year.  I think we

3    did a couple for Sandy.  We did one for Mark

4    Phillips.

5         Q.    Okay.  Would these be

6    PowerPoint presentations or something

7    different?

8         A.    Generally, we created

9    PowerPoint decks to go with them.

10        Q.    Did you generally work with

11   anyone else on the pain management category?

12        A.     I would have reached out to my

13   top suppliers in every category or ones that

14   I knew I had a relationship with that would

15   help supply me with information that I might

16   could use.

17        Q.    Okay.  And what type of

18   information were you looking for --

19             MS. FUMERTON:  Objection, form.

20   BY MR. BOWER:

21        Q.    -- with respect specifically to

22   the pain management category?

23             MS. FUMERTON:  Objection, form.

24        A.    Well, I think with everyone I

25   was looking for any information they might

1    have on market dynamics, new products that

2    may be coming into the market, new generics

3    that I was not aware of, what that pipeline

4    looked like.

5             It really was just a fishing

6    for information of things that I could use to

7    put together for that presentation.

8    BY MR. BOWER:

9         Q.    Did the manufacturers generally

10   provide you with information you requested?

11        A.    Not generally, no.

12        Q.    Did they sometimes provide you

13   with that?

14        A.    I could get launch calendars,

15   and that was -- that was the majority of the

16   information I would get from them, what they

17   had coming up in their pipeline.

18        Q.    Okay.  So if -- if the

19   manufacturers weren't cooperative in

20   providing the information, what information

21   would you use for your presentations?

22             MR. CIULLO:  Object to form.

23             MS. FUMERTON:  Objection to

24        form.

25        A.    We would look at Drugstore News

1    or different current things that were

2    available in the market from a search, a

3    Google search or -- pipeline was the majority

4    of what we were interested in, to -- because

5    that would affect our budgeting and our

6    information for the next year.

7    BY MR. BOWER:

8         Q.     And how would the pipeline

9    affect your budgeting for the next year?

10        A.     If you had large brands that

11   were going off patent, you would see a sales

12   shift or sales would decline, but your units

13   may increase because different doctors may

14   write the drug if it was a brand and the

15   customer couldn't afford it but now they can.

16             And then you would see a shift

17   in profit.  There's more profit on a generic

18   product generally than on a brand product.

19        Q.     Were these presentations made

20   at a meeting?

21        A.     Just usually it was a meeting

22   of our category group, the buyers and our VP.

23        Q.     So what do you mean by category

24   group?

25        A.     Just our pharmacy merchandising

Highly Confidential - Subject to Further Confidentiality Review

1    group of buyers with our supervisor.

2         Q.    Okay.  So the buyers would meet

3    with the VP, Ms. Kinsey or someone else, and

4    make the presentations?

5         A.    Correct.

6         Q.    Okay.  Do you have any

7    understanding about what Ms. Kinsey would do

8    with the presentations?

9         A.    I don't know.

10        Q.    Would you provide her copies of

11   the presentations before these meetings?

12        A.    I don't -- I don't remember if

13   we sent those prior to the meetings or not.

14        Q.    Did you save these

15   presentations anywhere?

16        A.    I would think some we did.

17   Some we might not have.  I'm not sure.

18        Q.    You might have just deleted

19   them after the presentation?

20        A.    Sometimes I would print them

21   and get rid of them.  I mean, we had a lot of

22   documents.  I'm not sure if I saved them all

23   or not.

24        Q.    Has anyone asked you in this

25   case whether you've saved any of these

Highly Confidential – Subject to Further Confidentiality Review

```
 1      presentations or where they might be found?
 2                   MS. FUMERTON:  Objection, form.
 3              And I also object to the extent that
 4              you're asking a privileged question,
 5              so I'm actually going to instruct her
 6              not to answer.
 7                   MR. BOWER:  I'm just trying to
 8              figure out why Walmart hasn't produced
 9              them.
10      BY MR. BOWER:
11           Q.    Do you have any understanding
12      why Walmart hasn't produced those
13      presentations?
14           A.    I'm not sure what Walmart has
15      produced and what Walmart has not produced.
16           Q.    Walmart's never asked you
17      whether they exist, has it?
18                   MS. FUMERTON:  Objection.
19              Again, I'm going to instruct her not
20              to answer that question because you're
21              asking to potentially invade
22              privileged information.
23                   MR. BOWER:  It's just a
24              yes-or-no question.  She's allowed to
25              answer it.
```

```
 1              MS. FUMERTON:  No, you're not.
 2         It's not -- no, actually.  You can ask
 3         yes-or-no questions that go towards
 4         privileged information.
 5              MR. BOWER:  What privileged
 6         information would be called for by
 7         that answer, whether you asked her --
 8              MS. FUMERTON:  To the extent --
 9              (Simultaneous discussion
10         interrupted by the reporter.)
11              MS. FUMERTON:  To the extent
12         that I've had conversations with her,
13         I don't know that any are implicated
14         here.  I'm not saying they are, but
15         it's an inappropriate type of
16         question.
17              MR. BOWER:  Are you instructing
18         her not to answer that?
19              MS. FUMERTON:  Yes, I did.
20    BY MR. BOWER:
21         Q.    Are you going to listen to
22    those instructions?
23         A.    I am.
24         Q.    Okay.  How would Ms. Kinsey
25    inform you that a -- one of these meetings
```

```
 1    was going to occur?

 2         A.      She would just tell us in a --

 3    you know, whenever we would meet.  We would

 4    meet with her once every two weeks, and then

 5    we also had weekly category group meetings.

 6    She would just communicate in one of those.

 7         Q.      And these regular meetings, did

 8    you have meeting agendas?

 9         A.      Not -- not always.  We had a

10    basic system that we would follow, especially

11    if we had our weekly extended team meeting

12    where we would talk about things that were

13    going on in our categories.

14         Q.      Okay.  So what was just the

15    basic system that you would follow?

16         A.      The planners would give an

17    update on financials, business analytics or

18    planners would give any additional

19    information or things that were going on,

20    were they working on budgeting, what were

21    they doing at that time for that week.  Each

22    buyer would talk about what was going on in

23    their category for that week, what they were

24    doing that week.  Replenishment had an

25    opportunity to speak, the order specialists
```

1    had time that they could speak.

2              Sometimes there were other

3    people in the meeting.  It varied from week

4    to week.

5         Q.    Were there notes of these

6    meetings kept, do you know?

7         A.    No.

8         Q.    There were not?

9         A.    No.

10        Q.    Walmart -- you had these weekly

11   meetings and there was no record of them?

12             MS. FUMERTON:  Objection, form.

13        A.    We could take our own

14   individual notes if we needed to, if it was

15   something -- or notes that we had prepared

16   for the meeting, but there was -- there was

17   no -- it was not a formal-type meeting.  It

18   was a department get-together meeting.

19   BY MR. BOWER:

20        Q.    So that you had these

21   department get-together meetings on a weekly

22   basis, correct?

23        A.    Yes.

24        Q.    Okay.  And there was no written

25   record of those meetings; is that correct?

```
 1                    MS. FUMERTON:  Objection, form.

 2         A.     That's correct.

 3                    THE WITNESS:  Oh, sorry.

 4                    MR. BOWER:  I'll strike that.

 5    BY MR. BOWER:

 6         Q.     Was there any written record of

 7    those meetings?

 8                    MS. FUMERTON:  Objection, form.

 9         A.     Not that I'm aware of.

10    BY MR. BOWER:

11         Q.     Do you know -- strike that.

12                    Do you recall anyone taking

13    notes at those meetings?

14         A.     We would all take our own

15    individual notes.  I know I took notes.  I'm

16    assuming others did.  I wasn't looking to see

17    if they were or not.

18         Q.     Okay.

19                    MR. BOWER:  You want to keep

20         going or do you want to take a break?

21                    MS. FUMERTON:  Let's take a

22         break.

23                    MR. BOWER:  Okay.

24                    THE VIDEOGRAPHER:  Going off

25         the record, 1:45 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Recess taken, 1:45 p.m. to

 2         2:09 p.m.)

 3                    THE VIDEOGRAPHER:  Back on

 4         record at 2:09 p.m.

 5    BY MR. BOWER:

 6         Q.    We're back on the record.  Do

 7    you understand you're still under oath?

 8         A.    I do.

 9         Q.    Okay.  Does the name Darren

10    Townzen ring a bell to you?

11         A.    Yes, it does.

12         Q.    How are you familiar with

13    Darren?

14         A.    Darren is an associate at

15    Walmart in the pharmacy department.

16         Q.    Okay.  What is his role?

17                    MS. FUMERTON:  Objection, form.

18    BY MR. BOWER:

19         Q.    What is his title?

20         A.    I don't know his exact title.

21    He works with systems and ISD and things like

22    that.

23         Q.    Do you know if he works on

24    anything related to the distribution of

25    prescription opiates?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. FUMERTON:  Objection, form.
 2        A.      So he works in pharmacy, so I
 3   would have to make an assumption that he does
 4   things with opioids as well as our other
 5   products.
 6   BY MR. BOWER:
 7        Q.      Okay.  What about a person
 8   named Arvinder Singh, S-I-N-G-H?
 9        A.      Arvinder Singh, I'm not
10   familiar with that name.
11        Q.      No?
12        A.      No.
13        Q.      ZAS Management Systems LLC?
14        A.      I'm not familiar with that.
15        Q.      Okay.
16                (Walmart-Little Exhibit 18
17        marked.)
18   BY MR. BOWER:
19        Q.      You've been handed what's been
20   marked as Exhibit 18.  Again, it's a document
21   produced by an entity other than Walmart, and
22   its Bates number is PPLPC, and then
23   004000325237.  And again, this one has
24   redactions on it just reflecting the fact
25   that you weren't copied on subsequent
```

Highly Confidential - Subject to Further Confidentiality Review

1    e-mails, okay?

2          A.    Okay.

3          Q.    So take a moment to review your

4    document, and then this may refresh your

5    recollection about the gentleman I just asked

6    about.

7                (Document review.)

8                MR. BOWER:  Tara, while we're

9          waiting, do you have any understanding

10         as to why Walmart hasn't produced this

11         document?

12               MS. FUMERTON:  I don't know

13         whether Walmart has or has not.

14               MR. BOWER:  I'm saying it

15         hasn't.  Do you know why they haven't?

16               MS. FUMERTON:  Well, in my

17         experience, based on things you say we

18         haven't produced, a lot of them we've

19         already produced.

20               MR. BOWER:  So are you saying

21         Walmart has produced this?

22               MS. FUMERTON:  I think I

23         answered your question, which was I do

24         not know whether Walmart has or has

25         not produced this.

```
 1                    MR. BOWER:  Would there be a

 2          reason that they have not produced

 3          this?

 4                    MS. FUMERTON:  There could be.

 5                    MR. BOWER:  What would be that

 6          reason?

 7                    MS. FUMERTON:  I'm not taking

 8          my deposition today, but if you want

 9          to continue to have this discussion on

10          the record, it could be for a variety

11          of reasons.

12                    MR. BOWER:  Such as?

13                    MS. FUMERTON:  It didn't exist,

14          it wasn't responsive.  I'm not saying

15          any of these.  You asked me a

16          hypothetical question.  I could ask

17          you hypothetically, I don't even know

18          whether this has or has not been

19          produced, Zach.

20                    As I said before, it's my

21          experience in many occasions you send

22          us requests for information that we've

23          already produced and you don't realize

24          that you have it.

25                    MR. BOWER:  That is absolutely
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          incorrect and you know it.

 2                  MS. FUMERTON:  I know it's

 3          absolutely true.

 4                  MR. BOWER:  You can

 5          misrepresent the record all you want,

 6          but you know that's incorrect, and you

 7          know that there's thousands if not

 8          hundreds of thousands you are

 9          wrongfully withholding.

10                  You haven't looked for them.

11          You haven't looked in the proper

12          areas.  You haven't produced

13          contracts.  There's hundreds of

14          contracts you haven't produced.

15                  MS. FUMERTON:  I haven't

16          them -- I haven't produced any

17          contracts?

18                  MR. BOWER:  Not all the

19          contracts, no.

20                  MS. FUMERTON:  I don't think

21          that's right.

22                  MR. BOWER:  There's lots of

23          contracts you haven't produced.

24                  MS. FUMERTON:  Zach, everything

25          you've said basically is false.  Why
```

1          don't we just leave it at that.

2                    MR. BOWER:  Not true.

3                    (Document review.)

4    BY MR. BOWER:

5          Q.    Are you still reviewing?

6          A.    I am.

7          Q.    Okay.

8                    (Document review.)

9    BY MR. BOWER:

10         Q.    You ready?

11         A.    I'm done.

12         Q.    Does this refresh your

13   recollection as to Mr. S-I-N-G-H -- I'm not

14   sure how to pronounce his name.

15         A.    I don't recall ever looking at

16   this document before.

17         Q.    You don't recall receiving this

18   e-mail?

19         A.    I don't remember receiving this

20   e-mail.

21         Q.    This is an e-mail from

22   May 2012, correct?

23                   MS. FUMERTON:  Objection, form.

24                   MR. BOWER:  Sorry, you're

25         objecting to form of a question about

Highly Confidential - Subject to Further Confidentiality Review

1         the date?

2                   MS. FUMERTON:  Yep.

3         A.      I think Sandy received the

4    e-mail on May 2nd.

5    BY MR. BOWER:

6         Q.      Right.  Okay.  And then you

7    received the e-mail on May 31st, correct?

8         A.      That's what it appears here.

9         Q.      And you see Mister -- I'm not

10   going to pronounce his name -- Singh writes

11   that he also left you a voicemail, correct?

12        A.      I see that, yes.

13        Q.      You don't recall ever receiving

14   a voicemail from this gentleman?

15        A.      I don't remember receiving a

16   voicemail, no.

17        Q.      You see he wants to speak with

18   you regarding an opportunity to partner with

19   Purdue Pharma with the goal of reducing

20   OxyContin abuse in the U.S.

21                Do you see that?

22        A.      I see that in this document,

23   yes.

24        Q.      Have you ever had a

25   conversation about partnering with Purdue

1  with the goal of reducing OxyContin abuse in

2  the U.S.?

3       A.     I don't remember having a

4  conversation, no.

5       Q.     Have you ever had any such

6  conversation?

7              MS. FUMERTON:  Objection, form.

8       A.     I don't remember having those

9  specific conversations.

10  BY MR. BOWER:

11       Q.     Well, I'm just -- now, if you

12  go to the first e-mail in the chain from

13  yourself on Friday, June 1st, to Shelton

14  Benson, you say:  This is what I was talking

15  about.

16              You see that?

17       A.     I see that, yes.

18       Q.     You have no recollection of

19  that?

20       A.     I don't.

21       Q.     This is a time period when the

22  nation was in the middle of an OxyContin

23  crisis, correct?

24              MS. FUMERTON:  Objection, form.

25       A.     I'm not sure about the dates or

1    the -- or the definition of the crisis, but I

2    was aware at this point that there were

3    people who were using opioids not for their

4    intended purposes.

5    BY MR. BOWER:

6        Q.    Were you aware of any companies

7    being -- suffering criminal penalties for the

8    actions taken in connection with the crisis?

9              MS. FUMERTON:  Objection, form.

10       A.    I know that there were -- there

11   were companies that have had issues with the

12   DEA, yes.

13   BY MR. BOWER:

14       Q.    Including Purdue, correct?

15             MS. FUMERTON:  Objection, form.

16   BY MR. BOWER:

17       Q.    Are you aware whether Purdue

18   had issues with respect to OxyContin?

19             MS. FUMERTON:  Objection, form.

20       A.    I'm not -- I'm sorry.

21             I'm not aware about Purdue, no.

22   BY MR. BOWER:

23       Q.    But here you get an e-mail from

24   this gentleman suggesting that Walmart should

25   partner with Purdue to reduce OxyContin

```
 1    abuse, right?

 2              MS. FUMERTON:  Objection, form.

 3    BY MR. BOWER:

 4         Q.    That's correct, you received

 5    that e-mail, correct?

 6              MS. FUMERTON:  Objection, form.

 7         A.    I received the e-mail, yes.

 8    BY MR. BOWER:

 9         Q.    Okay.  And if you note -- if

10    you go back a few pages to the page ending in

11    239?

12         A.    Yes.

13         Q.    He -- this gentleman mentions

14    that he's providing you -- Sandy, his e-mail

15    to Sandy suggests that he's providing another

16    opportunity to partner with the manufacturer.

17              Do you see that?

18         A.    I see that, yes.

19         Q.    Do you know what that refers

20    to?

21         A.    So what exact sentence are you

22    talking about?

23         Q.    So, sorry.  The page ending in

24    239.

25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     The second full paragraph:  The
2   purpose of my e-mail today is to provide you
3   with another opportunity to partner with a
4   manufacturer.
5      A.     Oh.
6      Q.     In this case -- in this case
7   for a program to reduce risk and prevent
8   abuse around a high-profile controlled
9   substance.  Purdue Pharmaceuticals is
10  interested in working with Walmart to access
11  852,867, and deidentified prescription data
12  so the distribution of OxyContin can be
13  better monitored.
14             Do you see that?
15     A.     I do see that.
16     Q.     Did Walmart ever consider doing
17  that on its own?
18             MS. FUMERTON:  Objection, form.
19     A.     I'm not sure if Walmart did or
20  did not consider doing that on its own.
21  BY MR. BOWER:
22     Q.     Are you aware of any
23  conversations regarding Walmart looking at
24  that data to de-identify prescription data to
25  monitor the distribution of OxyContin?

1          MS. FUMERTON:  Objection, form.

2     A.     If there were conversations, I

3  wouldn't have been involved in conversations

4  regarding EDI data because it was just out of

5  my -- out of my realm.

6  BY MR. BOWER:

7     Q.     Okay.  Do you know whose realm

8  that would have been in?

9          MS. FUMERTON:  Objection, form.

10    A.     I know we had an EDI department

11  inside Walmart.

12  BY MR. BOWER:

13    Q.     Do you know whether Sandy

14  interacted with that department?

15    A.     I do not know.

16    Q.     So we'd have to ask her whether

17  she recalls this other opportunity that's

18  referred to?

19          MS. FUMERTON:  Objection, form.

20    A.     Yes, I'm not aware of this.

21  BY MR. BOWER:

22    Q.     Okay.  Do you have any

23  knowledge as to what the 852 and 867 refers

24  to?

25    A.     I do know that's it's EDI data

Highly Confidential - Subject to Further Confidentiality Review

```
 1   transmission feeds, but I don't know what

 2   each individual feed transmitter --

 3   information that is.

 4        Q.    But Walmart -- you certainly

 5   understand that someone at Walmart has access

 6   to that information, correct?

 7               MS. FUMERTON:  Objection, form.

 8        A.    Yes, I would think that data

 9   exists.

10   BY MR. BOWER:

11        Q.    Okay.  What about the gentleman

12   who Mr. Singh cc's on his initial e-mail to

13   Sandy, Dave J-A-N-C-A?  Is that name familiar

14   to you?  Sorry, it's on page ending in 238,

15   kind of the bottom there.

16        A.    I do not know him.

17        Q.    Or Lynn Rankin?

18        A.    Lynn Rankin was Sandy's

19   assistant.

20        Q.    Okay.  So it's apparent that

21   Mr. Singh knows who Sandy's assistant is,

22   correct, because he cc'd her on the e-mail,

23   right?

24               MS. FUMERTON:  Objection, form.

25        A.    It would appear that way.
```

```
 1   BY MR. BOWER:

 2        Q.    So it wouldn't be unusual to

 3   expect that Mr. Singh had previously

 4   communicated with Sandy in the past, right?

 5              MS. FUMERTON:  Objection, form.

 6        A.    I don't know that just knowing

 7   her assistant would mean that he had

 8   communicated with her in the past.  I think

 9   people knew our assistants.

10   BY MR. BOWER:

11        Q.    How would they know your

12   assistants?

13              MS. FUMERTON:  Objection, form.

14   BY MR. BOWER:

15        Q.    Well, your testimony is:  I

16   think people know our assistants.  How would

17   folks outside of Walmart know who your

18   assistants were if they'd never dealt with

19   you in the past?

20              MS. FUMERTON:  Objection, form.

21        A.    They could ask other suppliers,

22   they could get information from the company.

23   They could get it from publications that

24   could be out there.

25              ///
```

```
 1   BY MR. BOWER:

 2        Q.     What sort of publication would

 3   disclose who the assistants were for Walmart

 4   folks?

 5               MS. FUMERTON:   Objection, form.

 6        A.     We would have our contact

 7   information on e-mails or in ECRM, NACDS,

 8   anybody that had gone to those meetings.

 9   BY MR. BOWER:

10        Q.     What's ECRM?

11        A.     ECRM is a -- it's a meeting

12   that's held.  It's not pharmacy specific.

13   It's more retail specific, where you go and

14   meet with vendors and have 20-minute meetings

15   and go through -- they give you contact

16   information for people that are at the

17   meetings.

18        Q.     Okay.  Did you ever attend

19   those meetings?

20        A.     I do attend those meetings,

21   yes.

22        Q.     And for what purpose would you

23   attend those meetings?

24        A.     To meet with manufacturers or

25   suppliers or...
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     If you know -- strike that.
 2    Let me close the loop on that.
 3                 At those meetings with
 4    manufacturers or suppliers, would you discuss
 5    prescription opioids?
 6                 MR. CIULLO:  Object to form.
 7          A.     If it was a -- if it was a
 8    supplier that we purchased those products
 9    from or if those suppliers had those in their
10    pipeline, that could be a conversation, yes.
11    BY MR. BOWER:
12          Q.     Okay.  Other than NACDS and
13    these ECRM meetings, were there any other
14    similar type industry groups or organizations
15    that you attended where discussion of
16    prescription opiates would occur?
17                 MS. FUMERTON:  Objection, form.
18          A.     There are none others that I
19    attended.
20    BY MR. BOWER:
21          Q.     Okay.  If I could direct your
22    attention to -- sorry, I'm working a little
23    bit backwards here, but the page ending in
24    240.  It's kind of towards the end, second
25    page, I think, from the end.
```

Highly Confidential - Subject to Further Confidentiality Review

1              You see at the top there,

2      Mr. Singh notes in his e-mail to Sandy that:

3      The DEA raided several Walgreens and CVS

4      stores in Florida in April of 2012 while

5      investigating excessive OxyContin purchases.

6              Do you see that?

7      A.      I see that.

8      Q.      Were you aware of that?

9      A.      I was aware of that.

10     Q.      How were you aware of that?

11     A.      It was in the news at the time.

12     Q.      And then -- in the TV news?

13     A.      Uh-huh.

14     Q.      When you heard of that, did you

15     do anything at work, talk to anybody about

16     it?

17             MS. FUMERTON:  Objection, form.

18     A.      I don't remember specific

19     conversations.  I would be surprised if we

20     did not discuss it, but I don't remember any

21     specific conversations, no.

22     BY MR. BOWER:

23     Q.      And just so I can kind of close

24     your knowledge on this e-mail, you're not

25     familiar with this company, ZAS Management

1    System LLC; is that correct?

2         A.    I am not.

3         Q.    Do you know whether Sandy is

4    familiar with them?

5              MS. FUMERTON:  Objection, form.

6         A.    I don't know if Sandy is

7    familiar with them or not.

8    BY MR. BOWER:

9         Q.    Did you ever have any

10   conversations with Sandy when you received

11   this e-mail?

12        A.    Not that I recall.

13        Q.    Is there any reason that you

14   wouldn't have?  This seems to be a fairly

15   significant e-mail, correct?

16             MS. FUMERTON:  Objection, form.

17        A.    We received a lot of e-mails

18   every day.  If there -- if they weren't a

19   pressing e-mail, then I don't know that I

20   could remember every -- every e-mail I

21   received every day for the ten years that I

22   was at Walmart.

23   BY MR. BOWER:

24        Q.    So you wouldn't have considered

25   this a pressing e-mail; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

1    This e-mail suggests that Walmart should

2    partner with Purdue to reduce OxyContin

3    abuse; that's not pressing to you?

4                    MS. FUMERTON:  Objection, form.

5         A.    What I would have taken from

6    this e-mail is that they were interested in

7    852 and 867 data, and I would have passed it

8    along to somebody that worked with that data.

9    BY MR. BOWER:

10        Q.    What about you personally when

11   you received this, did you think to yourself,

12   oh, maybe we should be working to reduce

13   abuse?

14                    MS. FUMERTON:  Objection, form.

15        A.    As a buyer, my role was really

16   in making sure that we had supply and the

17   lowest possible cost I could get on those

18   products.

19   BY MR. BOWER:

20        Q.    And then you forward this

21   e-mail on to Shelton Benson.

22                    Do you see that?

23        A.    Yes.

24        Q.    And why did you do that?

25        A.    It appears that I had called

1    Shelton to ask him about it because

2    ValueCentric is an outside company, and they

3    referenced Purdue in this.  I was calling to

4    make sure that this was something he was

5    aware of and was a part of.

6         Q.    So you were familiar with

7    ValueCentric; is that correct?

8         A.    I'm familiar -- I know the name

9    ValueCentric in the market.

10        Q.    You didn't conduct any business

11   with them prior to this?

12        A.    I did not.

13        Q.    Have you ever conducted any

14   business with them?

15        A.    I did not.

16        Q.    Do you have any knowledge of

17   whether Walmart has ever conducted business

18   with them?

19             MS. FUMERTON:  Objection, form.

20        A.    I'm not aware.

21   BY MR. BOWER:

22        Q.    You're not aware either way; is

23   that correct?

24        A.    Correct.

25        Q.    Do you recall Mr. Benson ever

Highly Confidential - Subject to Further Confidentiality Review

1    responding to you?

2         A.     I do not.

3         Q.     Who is Stephen S-E-I-D?  Is

4    that name familiar to you?

5         A.     I don't recall.

6         Q.     He's not on this e-mail.

7         A.     Oh.  No.

8         Q.     No?  Ever meet -- never met

9    with anyone by that name?

10               MS. FUMERTON:  Objection, lack

11        of foundation.

12        A.     Not that I'm aware of.

13   BY MR. BOWER:

14        Q.     Okay.  Are you aware of any

15   orders that Walmart placed for oxycodone

16   being canceled due to violations of a

17   manufacturer's sales policy?

18               MS. FUMERTON:  Objection, form.

19        A.     I don't recall any, no.

20   BY MR. BOWER:

21        Q.     It could have happened; you

22   just don't recall it?

23               MS. FUMERTON:  Objection, form.

24        A.     It could -- it could have

25   happened and I don't recall.

```
 1                  (Walmart-Little Exhibit 19

 2        marked.)

 3                  MR. BOWER:  I'm just making

 4        sure the redactions are right.

 5   BY MR. BOWER:

 6        Q.    You've been handed what's been

 7   marked as Exhibit 19.  Please take a moment

 8   and review the document.

 9                  The Bates stamp is ACTAVIS, and

10   then 0361537 -- I'm sorry, that Bates number

11   is the number -- the page number of the first

12   unredacted page.  The first page of the

13   exhibit ends in 535, just so the record is

14   clear.

15                  (Document review.)

16   BY MR. BOWER:

17        Q.    Are you ready?

18        A.    Yes.

19        Q.    Okay.  Sorry.

20                  Again, Mr. Cohen was your

21   contact at Actavis at the time?

22        A.    Yes, he was.

23        Q.    Okay.  And he's writing you

24   regarding a launch of a new product, correct?

25        A.    Yes, I think so.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And he's telling Walmart that

2    Actavis will support this launch with a

3    multifaceted marketing campaign, correct?

4    A.    Yes.

5    Q.    And he's further saying that

6    this marketing campaign will target the top

7    writers of these scripts.

8         Do you see that?

9    A.    Top writer of these scripts,

10   yes.

11   Q.    And that information was

12   important to you in deciding whether to buy

13   this product; is that correct?

14        MS. FUMERTON:  Objection, form.

15   A.    That would not be accurate.

16   BY MR. BOWER:

17   Q.    Can you -- how would you

18   correct that statement?

19   A.    It was important for me to make

20   sure that we had all drugs that stores might

21   need to fill prescriptions.  I didn't care if

22   they were marketing doctors or not.  If

23   doctors were already writing the prescription

24   because the brand was in the market, then I

25   needed to have the generic when the generic

1    launched.

2         Q.    Right.  And the marketing plan

3    employed by Actavis would inform Walmart as

4    to whether stores would need to fill

5    prescriptions, correct?

6              MS. FUMERTON:  Objection, form.

7         A.    That's not correct.  The brand

8    companion to the oxymorphone 7.5 and 15 is

9    the Opana ER 7.5 and 15.

10   BY MR. BOWER:

11        Q.    Uh-huh.

12        A.    I would have script data from

13   the brand utilization that we had currently

14   and would have made my decision off of that.

15        Q.    Made your decision to do what?

16        A.    On how much product I would

17   need to bring in if I was going to warehouse

18   it or if it was going to be a product that

19   the stores had to purchase via McKesson

20   because we didn't warehouse the item.

21        Q.    So Walmart would only warehouse

22   an item if you thought the demand would be

23   sufficient; is that correct?

24             MS. FUMERTON:  Objection, form.

25        A.    In the majority of instances,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that was correct.

 2    BY MR. BOWER:

 3          Q.     And in making that

 4    determination, was one of the factors you

 5    considered whether the manufacturer was going

 6    to market the product to physicians?

 7                 MS. FUMERTON:  Objection, form.

 8          A.     On brand -- new brand launches,

 9    that would be taken into consideration.  For

10    generics, it was past utilization.

11    BY MR. BOWER:

12          Q.     And just so the record is

13    clear, was this e-mail referencing a brand

14    launch or a generic launch?

15          A.     It appears to me that it's

16    referencing a brand launch of the oxymorphone

17    7.5 and 15 milligrams.

18                 MR. CIULLO:  Object to

19          foundation.

20    BY MR. BOWER:

21          Q.     So you were also aware that

22    Actavis was marketing Kadian to physicians,

23    correct?

24                 MS. FUMERTON:  Objection, form.

25          A.     I'm not sure if I knew that or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    not at this point.
 2    BY MR. BOWER:
 3         Q.    At this point do you recall
 4    whether Walmart was warehousing Kadian?
 5         A.    I don't recall that or not.
 6         Q.    Do you recall whether Walmart
 7    ever warehoused Kadian?
 8         A.    I don't remember.
 9         Q.    You'd have to see a document to
10    refresh your recollection?
11              MS. FUMERTON:  Objection, form.
12         A.    That's true.
13              THE WITNESS:  I'm sorry.
14              MR. BOWER:  You can answer.
15         A.    That's correct.
16    BY MR. BOWER:
17         Q.    So you mentioned before you
18    believe that this was referencing a brand
19    launch, but if you see kind of the fourth
20    sentence down, Mr. Cohen writes:  We will
21    market these physicians through the year to
22    promote this important cost-saving generic
23    and its availability.
24              Do you see that?
25         A.    I do see that.  If I said it
```

1    was referencing a brand launch, I was

2    incorrect.  I think what I would have meant

3    to say is the launch -- I thought this was a

4    new generic launch for oxymorphone 7.5 and

5    15.  The brand-referenced drug was Opana ER

6    7.5 and 15.

7          Q.    Right.  But the e-mails and the

8    marketing that's reflected is reflecting

9    marketing for a generic; isn't that correct?

10               MS. FUMERTON:  Objection, form.

11         A.    That could be what he's

12   stating.  It didn't matter to me on a generic

13   if the product was marketed to a physician or

14   not.  I made decisions based on past

15   utilization of the brand when a new generic

16   came to market.

17   BY MR. BOWER:

18         Q.    So who is Rhonda Thomas?

19         A.    She was an assistant in our

20   department.

21         Q.    So you're forwarding her this

22   e-mail; is that correct?

23         A.    It appears that I did.

24         Q.    Even though you weren't

25   concerned whether Actavis was engaged in this

1    marketing?

2              MS. FUMERTON:  Objection, form.

3         A.    I'm not sure I understand the

4    question.

5    BY MR. BOWER:

6         Q.    Why did you forward Ms. Thomas

7    this e-mail?

8         A.    I'm not sure today why I

9    forwarded this e-mail to her.  She was our

10   assistant.

11        Q.    Well, what would be some

12   reasons why you would forward Ms. Thomas

13   e-mails?

14             MS. FUMERTON:  Objection, form.

15        A.    I may have wanted her to print

16   the e-mail and bring it to me in a different

17   meeting.  I may have wanted her to put it on

18   my desk.  There could be a number of reasons

19   why I forwarded this to Rhonda.

20   BY MR. BOWER:

21        Q.    And when e-mails were printed,

22   what would you typically do with them after

23   you were done looking at them?  Would you

24   save them?

25        A.    We --

Highly Confidential - Subject to Further Confidentiality Review

1              MS. FUMERTON:  Objection, form.

2       A.      When I printed, we would throw

3    them in a box for shredding.

4    BY MR. BOWER:

5       Q.      Walmart ever tell you to save

6    e-mails that related to business purposes?

7       A.      No.

8       Q.      Are you aware of any -- of any

9    Walmart policy related to saving e-mails?

10      A.      I am not.

11      Q.      From your perspective, they

12   were shredded, correct?

13              MS. FUMERTON:  Objection, form.

14      A.      If I printed them, I threw them

15   in a bin to be recycled and shredded.

16   BY MR. BOWER:

17      Q.      What about your electronic

18   copies, what would you do with those?

19              MS. FUMERTON:  Objection, form.

20      A.      Some I stored under folders in

21   my computer under the manufacturer.  Others I

22   deleted.  It depended on what I thought of

23   the e-mail at that particular time, if I

24   thought --

25              ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BY MR. BOWER:
 2           Q.    Some e-mails you deleted
 3      immediately upon receipt; is that correct?
 4           A.    Yes, that would be accurate.
 5           Q.    Walmart didn't -- did Walmart,
 6      to the best of your knowledge, have a policy
 7      regarding electronic correspondence with
 8      business partners and preserving those
 9      records?
10                 MS. FUMERTON:  Objection, form.
11           A.    Not that I'm aware of.
12      BY MR. BOWER:
13           Q.    You see at the bottom of his
14      e-mail there on that page, he notes that:
15      These two SKUs grew 50% year over year?
16           A.    Yes, I see that.
17           Q.    Those are prescription opiates,
18      correct?
19           A.    Yes, they are.
20           Q.    Was Walmart experiencing
21      similar growth of those prescription opiates?
22                 MS. FUMERTON:  Objection, form.
23           A.    I don't recall what our
24      utilization was on those drugs.
25                 ///
```

```
 1    BY MR. BOWER:

 2        Q.     Would it have been surprising

 3    to you if Walmart had not been experiencing

 4    growth corresponding to the market?

 5                MS. FUMERTON:  Objection, form,

 6         lack of foundation.

 7        A.     I don't know that I would ever

 8    just take a manufacturer's word on what the

 9    market was doing.

10    BY MR. BOWER:

11        Q.     You would look for yourself,

12    right?

13        A.     I would try to find out that

14    information myself.

15                (Walmart-Little Exhibit 20

16         marked.)

17    BY MR. BOWER:

18        Q.     I'll hand you what's been

19    marked as Exhibit 20.  Take a moment to

20    review that.  Again, it has some redaction on

21    it based on e-mails that you're not on.  This

22    is an Actavis document, but it's an e-mail

23    that you sent to Mr. Cohen again, and the

24    Bates number -- beginning Bates number is

25    ACTAVIS0338793 and it ends in 796.
```

```
 1                    (Document review.)

 2    BY MR. BOWER:

 3          Q.      Are you ready?

 4          A.      Yes.

 5          Q.      This is an e-mail from 2011

 6    from yourself to Mr. Cohen; is that correct?

 7          A.      That's correct.

 8          Q.      Okay.  And this -- would this

 9    be an example of you looking at the market

10    and noting an increase in ordering patterns?

11          A.      No.  This would be an example

12    of I was out of stock of product in the

13    distribution center and needed additional

14    supply from the manufacturer.

15          Q.      Well, in fact, your e-mail

16    states that due to market conditions.

17                  Do you see that?

18          A.      Yes.

19          Q.      Okay.  We need to increase our

20    current order patterns to satisfy increased

21    demand.

22                  Do you see that?

23          A.      Yes.

24          Q.      So Walmart was experiencing

25    increased demand for OxyContin in 2011.  Is
```

Highly Confidential - Subject to Further Confidentiality Review

1    that an accurate statement?

2                MS. FUMERTON:  Objection, form.

3         A.    We were out of product at the

4    Walmart distribution center.

5    BY MR. BOWER:

6         Q.    Ma'am, I'm just reading from

7    your e-mail here.  It says:  Satisfy

8    increased demand at the store level.

9                Do you see that?

10        A.    There could be increased demand

11   at store level because I had no product in

12   the distribution center as well as increased

13   prescriptions.  It could be either.

14        Q.    Well, is the demand impacted by

15   the availability of the product at the

16   distribution center?

17               MS. FUMERTON:  Objection, form.

18   BY MR. BOWER:

19        Q.    I mean, the demand is the

20   demand, right?

21               MS. FUMERTON:  Objection, form.

22        A.    If stores sense that there's a

23   lull in product or availability of product in

24   the market, they will try to continue to

25   order more product so that they can satisfy

Highly Confidential - Subject to Further Confidentiality Review

1    customers.  The stores never wanted to be out

2    of product and have to turn away a customer.

3    BY MR. BOWER:

4          Q.    But you're -- that's not what

5    your e-mail says, though, is it?  It says:

6    Satisfy increased demand at the store level

7    and increase safety stock, right?

8          A.    We wanted to have increased --

9                MS. FUMERTON:  Objection, form.

10   BY MR. BOWER:

11         Q.    That's what it says, correct?

12               MS. FUMERTON:  Objection, form.

13         A.    Yes, that is what it says.

14   BY MR. BOWER:

15         Q.    So Walmart is seeing increased

16   demand, correct?

17               MS. FUMERTON:  Objection, form.

18         A.    I'm seeing increased orders at

19   the distribution center based off of the

20   store demand.  Whether that store demand is

21   from stores wanting additional product

22   because they're concerned about an issue or

23   because they're concerned about the

24   out-of-stock at the distribution center or

25   they have increased scripts, I wouldn't know.

```
 1    BY MR. BOWER:

 2         Q.     I hear what you're saying, but

 3    your e-mail notes both of those, right?

 4    Because you say and increased safety stock.

 5    So there's two reasons that you need more

 6    product, right?

 7              MS. FUMERTON:  Are you finished

 8         with your question now?

 9              MR. BOWER:  Yes.

10              MS. FUMERTON:  Objection, form.

11              MR. BOWER:  I'll rephrase.

12    BY MR. BOWER:

13         Q.     Your e-mail to Mr. Cohen

14    reflects two different reasons that you want

15    him to pass this information along to his

16    planning group, correct?

17              MS. FUMERTON:  Objection, form.

18         A.     I think I have -- I have stated

19    two different reasons in here.  I think there

20    are additional things that go into those two

21    reasons.

22    BY MR. BOWER:

23         Q.     Okay.  And as you sit here

24    today, why did you believe that there are

25    additional things as opposed to relying on
```

Highly Confidential - Subject to Further Confidentiality Review

1    this e-mail?

2              MS. FUMERTON:  Objection, form.

3         A.    I know what would cause me and

4    trigger me to go out and look for additional

5    product in the market, and it would be

6    out-of-stocks at the warehouse.

7              Now, are there out-of-stocks at

8    the warehouse because a manufacturer couldn't

9    keep up with their production, if they have a

10   problem on their side?  Is it -- was every

11   manufacturer out of product and I'm just

12   trying to get bits and pieces from these

13   statements?  I can't tell what the issue was,

14   what the true market issue was at this point

15   in time.

16   BY MR. BOWER:

17        Q.    Okay.  As you sit here today,

18   do you have any reason to doubt that the

19   current order patterns -- sorry.

20             As you sit here today -- strike

21   that.  I'll start over.

22             As you sit here today, do you

23   have any reason to doubt that you needed to

24   increase our current order patterns to

25   satisfy increased demand at the store level?

1    MS. FUMERTON:  Objection, form.

2         A.    No.  I think we had increased

3    orders at the stores because we were out of

4    stock at the warehouse, but I believe we had

5    increased orders at the stores, and I needed

6    to increase my demand for that, yes.

7    BY MR. BOWER:

8         Q.    You believe that you had

9    increased orders at the stores because you

10   were out of stock, not because there was the

11   demand increase?

12        MS. FUMERTON:  Objection, form.

13        A.    That is a potential.  Our

14   orders from the stores would increase when we

15   would have out-of-stock situations.

16   BY MR. BOWER:

17        Q.    Can you explain how that would

18   work?

19        A.    If a pharmacist would detect

20   that there was an issue in the market, if we

21   had had periodic out-of-stocks, if they had

22   customers coming to them telling them they

23   couldn't receive product at another store

24   because they were out of stock, they would be

25   concerned and they would try to increase

1    their orders from the distribution center to

2    hold additional stock.

3           Q.      And Walmart had a policy in

4    place to monitor those orders, correct?

5                  MS. FUMERTON:  Objection, form.

6           A.      Yes, they did.

7    BY MR. BOWER:

8           Q.      In fact, you verified to the

9    manufacturers that Walmart had a process in

10   place, correct?

11                 MS. FUMERTON:  Objection, form.

12          A.      Correct.  Correct.

13   BY MR. BOWER:

14          Q.      And how did Walmart provide

15   such a verification?

16                 MS. FUMERTON:  Objection, form.

17          A.      We would have conversations

18   with the manufacturers or I would get them in

19   touch with people that worked on our

20   suspicious order monitoring so they could get

21   the information that they needed from them.

22   BY MR. BOWER:

23          Q.      And who would you put the

24   manufacturers in contact with at Walmart?

25                 MS. FUMERTON:  Objection, form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I don't remember specific

 2    names.  It would fall under Miranda, and I

 3    don't remember her last name as I'm sitting

 4    here.

 5    BY MR. BOWER:

 6          Q.     Miranda Johnson?

 7          A.     It could be Johnson.  I know

 8    she had gotten married, I don't remember the

 9    last name.

10          Q.     Okay.  And, in fact, Walmart's

11    contracts with its manufacturers required

12    Walmart to have those programs in place,

13    correct?

14                 MS. FUMERTON:  Objection, form.

15                 MR. BOWER:  I'll strike that.

16          I'll ask a different question.

17    BY MR. BOWER:

18          Q.     Did Walmart's contracts with

19    its manufacturers require Walmart to have a

20    suspicious order monitoring in place that met

21    the legal requirements?

22                 MS. FUMERTON:  Objection, form.

23          A.     I don't recall that.

24    BY MR. BOWER:

25          Q.     What is safety stock at the
```

1    store level?

2         A.     Safety stock at store level

3    would be an increased supply at store level

4    on their shelf that would protect them

5    against out-of-stocks if we were having

6    out-of-stocks at the distribution center.

7         Q.     Did Walmart allow the

8    pharmacies to have a safety stock for

9    prescription opiates?

10        A.     Store -- I'm not as familiar

11   with safety stock levels because that was a

12   replenishment setting.  Some settings were

13   put in from the home office and some were at

14   store level.  What the difference was between

15   opioids and regular products, I don't know.

16        Q.     So we have -- would someone --

17   strike that.

18               Who would know that?  Would

19   that be someone from the replenishment side?

20               MS. FUMERTON:  Objection, form.

21        A.     I would have to be speculating,

22   but maybe replenishment would know that or

23   should know that.

24   BY MR. BOWER:

25        Q.     Who else -- I don't want you to

1    speculate, but if we wanted to get that

2    information, who would we talk to?

3                MS. FUMERTON:  Objection, form.

4         A.    I'm not sure.

5    BY MR. BOWER:

6         Q.    Well, you're e-mailing about

7    safety stock, right?

8         A.    Yes.

9         Q.    And you're e-mailing about

10   safety stock for OxyContin, right?

11        A.    Yes.

12        Q.    So based on your understanding

13   at the time, that must have been a permitted

14   activity, correct?

15               MS. FUMERTON:  Objection, form.

16        A.    I wanted safety stock at the

17   DC.  I know that my e-mail indicates safety

18   stock at the store level.  I think I just

19   wrote a -- I had a mistake in my typing.  It

20   would be safety stock that I wanted to hold

21   at the distribution level, which is what was

22   under my control.

23   BY MR. BOWER:

24        Q.    So you have specific

25   recollection of the circumstances about this

1    e-mail?

2         A.      No, I don't.

3         Q.      Okay.  Then what's your basis

4    for that statement?

5         A.      Because I didn't have anything

6    to do with safety stock at the store level.

7    What fell under me was the safety stock at

8    the store -- at the warehouse and the product

9    that we had in the warehouse.  If there were

10   warehouse out-of-stocks, I was looking for

11   additional product.

12        Q.      So why wouldn't you have just

13   told Mr. Cohen the warehouse was out of

14   stock?

15              MS. FUMERTON:  Objection, form,

16        asked and answered.

17        A.      I think I just made an error in

18   my e-mail.  It wasn't --

19   BY MR. BOWER:

20        Q.      Why do you believe as you sit

21   here today this e-mail is in error?

22              MS. FUMERTON:  Objection, form.

23        A.      I don't believe the whole

24   e-mail is in error.  I think when I stated

25   safety stock at store level, it was an error.

1    The distribution center was under -- was what

2    I was concerned with and inventory levels at

3    the distribution center.

4    BY MR. BOWER:

5        Q.    And what about your reference

6    to increased demand at store level, do you

7    believe that was an accurate statement?

8            MS. FUMERTON:  I'm sorry,

9        inaccurate or an accurate?

10   BY MR. BOWER:

11       Q.    Increased demand at store

12   level, do you believe that was an accurate

13   statement?

14       A.    Yes, increased demand at store

15   level could mean stores were ordering

16   additional product at the distribution center

17   because I was out of stock, so they were

18   placing additional orders trying to get

19   product.

20       Q.    And they could have also been

21   placing additional orders because they, in

22   fact, had increased demand, correct?

23           MS. FUMERTON:  Objection, form.

24       A.    If the stores were placing

25   increased orders just because they had an

Highly Confidential - Subject to Further Confidentiality Review

1    increase in demand, I don't know that it

2    would trigger any response from me unless the

3    distribution center was out of product.

4    BY MR. BOWER:

5        Q.    Well, it could have been both,

6    just like your e-mail suggests, right?

7    There's increased demand and they're out of

8    product, right?

9             MS. FUMERTON:  Objection, form.

10   BY MR. BOWER:

11       Q.    Could have been both those

12   circumstances.

13       A.    It could be potentially --

14            MS. FUMERTON:  Objection, form.

15            THE WITNESS:  Sorry.

16   BY MR. BOWER:

17       Q.    Could it have been both of

18   those scenarios?

19       A.    It could have been both of

20   those scenarios.

21            (Walmart-Little Exhibit 21

22       marked.)

23   BY MR. BOWER:

24       Q.    Okay.  You've been handed

25   what's been marked as Exhibit 21.  Take a

1    moment to review this e-mail.  I note it's

2    another Actavis document.  This one is ending

3    in Bates number 00382802, and again, it has

4    redactions based on subsequent e-mails you

5    were not on.

6                  (Document review.)

7    BY MR. BOWER:

8         Q.     Are you still reviewing it?

9         A.     I'm finished.

10        Q.     Would you agree that this is an

11   example of a Walmart order for oxycodone

12   being cut?

13                MS. FUMERTON:  Objection, form.

14        A.     It appears there was a PO that

15   was canceled, yes.

16   BY MR. BOWER:

17        Q.     Okay.  And indeed, it was

18   canceled because Actavis had already filled

19   Walmart's normal monthly usage, correct?

20                MS. FUMERTON:  Objection, form.

21        A.     That is what's stated here.

22   BY MR. BOWER:

23        Q.     And Walmart attempted to order

24   above and beyond its monthly usage, correct?

25                MS. FUMERTON:  Objection, form.

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I have to go by what's on the
2    e-mail.
3    BY MR. BOWER:
4      Q.      Okay.  Well, you -- the last
5    chain in the e-mail is a -- your e-mail again
6    to Mr. Cohen saying what's up with this,
7    right?
8      A.      That's not an unusual response
9    from me.  If replenishment had contacted me
10   or copied me on any e-mail that had anything
11   to do, I would reach out to the national
12   account manager for explanation on what's
13   going on.
14     Q.      Well, but this -- doesn't this
15   e-mail tell you what's going on?  The order's
16   been cut because it's too high, right?
17            MS. FUMERTON:  Objection, form.
18            MR. BOWER:  Strike that.
19   BY MR. BOWER:
20     Q.      The order's been canceled
21   because it's above the normal monthly
22   average; is that correct?
23            MS. FUMERTON:  Objection, form.
24     A.      That's what's stated here.
25            ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:

 2         Q.     Okay.  And this order would

 3    have been placed by Rae Smith?

 4         A.     Yes.

 5         Q.     She is a replenishment manager;

 6    is that correct?

 7         A.     That's correct.

 8         Q.     Do you know what -- if you see

 9    her signature there, it has:  Rae Smith,

10    Replenishment Manager - WM Department 38.

11              Do you know what that refers

12    to?

13         A.     The pharmacy department inside

14    Walmart is department 38.

15         Q.     And for a period of time was

16    Ms. Smith responsible for replenishment

17    orders for oxy 30?

18              MS. FUMERTON:  Objection, form.

19         A.     I don't recall.  I see that she

20    was on this e-mail, so -- I don't recall.

21    BY MR. BOWER:

22         Q.     The only person you recall

23    being in replenishment for prescription

24    opiates was Traci Cope; is that correct?

25              MS. FUMERTON:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.      Linda Wilson.

2    BY MR. BOWER:

3              Q.      And Linda Wilson.

4                      Based on your experience, of

5    those -- between Ms. Smith, Ms. Cope and

6    Ms. Wilson, who held that replenishment role

7    for the longest period of time with respect

8    to prescription opiates?

9                      MS. FUMERTON:  Objection, form,

10            lack of foundation, misrepresents her

11            testimony.

12                     MR. BOWER:  I'd appreciate it

13            if you'd just keep it objection to

14            form.

15                     MS. FUMERTON:  I'd appreciate

16            if you'd ask good questions.

17             A.      I don't remember.  I'm unsure

18    if Traci ever had pain.  I just don't

19    remember.

20    BY MR. BOWER:

21             Q.      You don't remember -- what is

22    it that you don't remember -- do you remember

23    anyone who was responsible for replenishment

24    for prescription II opiates?

25                     MS. FUMERTON:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I remember Linda the last

2   couple of years that I had responsibility.  I

3   see Jasen Jarrell is on here, he's a

4   replenishment manager.  I'm not sure at this

5   period of time who had responsibility for

6   pain.

7   BY MR. BOWER:

8        Q.    I'm just asking you based on

9   your experience from 2008 to 2016, right?

10            MS. FUMERTON:  Objection, form.

11       That's not a question.

12       A.    I left Walmart in 2018.

13   BY MR. BOWER:

14       Q.    2018, sorry.

15            So between 2008 and 2018, can

16   you just provide to us who the folks are that

17   you're aware of that were responsible for

18   replenishment of prescription opiates?

19            MS. FUMERTON:  Objection, form.

20       A.    The only one I remember was the

21   last few years, was Linda.  I don't remember

22   on the early years who had that position.

23   BY MR. BOWER:

24       Q.    Okay.  What about does the name

25   Maria Lesny ring a bell?  I don't believe

```
 1    she's on this e-mail, I'm just --

 2         A.     She's right here.

 3         Q.     Oh, she is, okay.

 4         A.     Looks like she works for

 5    Actavis.

 6         Q.     Actavis.  Okay.  Right, thank

 7    you.

 8                Right.  She's the one who sends

 9    the e-mail that the order has been canceled,

10    correct?

11         A.     Yes, I see that.

12         Q.     And do you see that Rae

13    responds to her that demand has increased?

14    You see that?

15         A.     I see that --

16                MS. FUMERTON:  Are you saying

17         responds to --

18                MR. BOWER:  Yeah.

19                MS. FUMERTON:  Where are you

20         looking?

21                MR. BOWER:  Rae, top of the

22         page ending in 06, Rae's response to

23         Maria.

24                MS. FUMERTON:  You're working

25         backwards unless I'm not --
```

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BOWER:  I'm looking at the

2      top of the page ending in 06.  I

3      believe the witness sees it.

4           MS. FUMERTON:  Oh, I'm sorry.

5      It's said twice in the document.  It's

6      on a different paragraph.

7           MR. BOWER:  Okay.  I'm sorry.

8           MS. FUMERTON:  Okay.  So I'm

9      with you now.  I'm sorry, that's my

10      fault.

11           MR. BOWER:  No problem.

12           MS. FUMERTON:  Okay.

13  BY MR. BOWER:

14      Q.    So again, Walmart is telling

15  the folks at Actavis that demand is

16  increasing for OxyContin, right?

17           MS. FUMERTON:  Objection, form.

18      A.    I see that she has this in the

19  e-mail.

20  BY MR. BOWER:

21      Q.    Do you have any idea what

22  information Rae would have looked at before

23  making that statement?

24      A.    I do not know.

25      Q.    Do you have any understanding

Highly Confidential - Subject to Further Confidentiality Review

1    as to why she's telling Actavis that the

2    forecast needs to increase on your end?

3                MS. FUMERTON:  Objection, form.

4         A.    I don't know.

5    BY MR. BOWER:

6         Q.    She wants to increase your

7    orders, right, and she doesn't want them to

8    be canceled going forward; isn't that

9    correct?

10               MS. FUMERTON:  Objection, form.

11        Objection, form.

12        A.    That's what appears in the

13   e-mail.

14   BY MR. BOWER:

15        Q.    Do you recall ever receiving a

16   response from Mr. Cohen on this issue?

17        A.    I do not.

18        Q.    Did you -- do you recall taking

19   any actions in light of this issue?

20               MS. FUMERTON:  Objection, form.

21        A.    I do not.

22   BY MR. BOWER:

23        Q.    For example, did you seek

24   product from another supplier?

25               MS. FUMERTON:  Objection, form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I do not recall.

 2    BY MR. BOWER:

 3          Q.     Could have happened, you just

 4    don't recall?

 5          A.     I don't recall.  I -- just

 6    reading this today, I don't think I would

 7    because she said she still has product at the

 8    distribution center.  If there was product in

 9    the DC, I don't think I would have taken

10    action, but I don't have -- I don't recall.

11          Q.     Okay.  At what point would you

12    take action?  Would you wait until the DC was

13    out of product?

14          A.     Generally I would wait until

15    the distribution center was out of product.

16          Q.     And at that point, would you

17    seek to obtain the product from some other

18    manufacturer?

19          A.     Yes, that's what I would do.

20          Q.     Okay.

21                 (Walmart-Little Exhibit 22

22          marked.)

23    BY MR. BOWER:

24          Q.     You've been handed what's been

25    marked as Exhibit 22.  You might want to keep
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    out Exhibit 21.  I might ask some questions

 2    as they're related, because Exhibit 22

 3    appears to be an e-mail dated June 21st --

 4    sorry, June 22nd, which is the day after the

 5    prior correspondence.

 6                So just take a moment and

 7    review it, and then we can have some

 8    questions on it.

 9                (Document review.)

10                MR. BOWER:  While the witness

11          is reading the document, the Bates

12          number of this one is ALLERGAN_MDL and

13          it's 00144683 through -- and the

14          attachment is 684, and then 685 is a

15          native, and we included the native

16          with a cover sheet.

17                (Document review.)

18    BY MR. BOWER:

19          Q.    Are you done reviewing the

20    document?

21          A.    Not yet.

22          Q.    Okay.

23                (Document review.)

24    BY MR. BOWER:

25          Q.    Are you ready?
```

```
 1          A.      I'm done.

 2          Q.      Okay.  So as reflected on

 3   Exhibit 21, you e-mail Mr. Cohen on June 21st

 4   about an order that's been canceled, right,

 5   asking him what's up with this?

 6          A.      Yes.

 7          Q.      On June 22 you get an e-mail

 8   from Mr. Cohen with a snapshot of Walmart's

 9   oxy shipments, right?

10          A.      Yes.

11          Q.      Right?  And he says that they

12   will most definitely need a revised forecast

13   from you.  You see that?

14          A.      I do see that.

15          Q.      Did you ever provide him with a

16   revised forecast?

17          A.      I'm not sure if I did or not.

18          Q.      Do you know whether Linda ever

19   supplied him with a revised forecast?

20          A.      I don't remember if she did or

21   not.

22          Q.      Would you have done so --

23   strike that.

24                  If a revised forecast would

25   have been provided to Mr. Cohen, would it
```

1    have been done via e-mail?

2          A.    It could have been done e-mail

3    or telephone.

4          Q.    You can provide a forecast over

5    the telephone; is that correct?

6          A.    I can report numbers to a

7    manufacturer over the telephone, yes.

8          Q.    Okay.  And would the

9    manufacturer then allow those numbers to be

10   used for meeting their SOM requirements?

11              MR. CIULLO:  Objection,

12         foundation.

13              MS. FUMERTON:  Objection, form.

14         A.    I'm not sure what a

15   manufacturer needs to do for their SOM

16   requirements.  If --

17   BY MR. BOWER:

18         Q.    Well, if you look at the

19   e-mail, Mr. Cohen is telling you --

20              MS. FUMERTON:  She hadn't

21         finished her question.

22              MR. BOWER:  No, she said --

23         okay.  Have you finished your answer?

24              MS. FUMERTON:  She was still

25         talking and you started talking.  If

1          she's finished, that's fine.

2                MR. BOWER:  No, no, I

3          apologize.  Please finish.

4          A.    I think if I was talking to him

5     over the phone and provided something and he

6     needed me to put something in an e-mail, that

7     I would have followed up and done so at the

8     time.

9     BY MR. BOWER:

10         Q.    Okay.  And he notes here:  This

11    is part of our SOM requirements established

12    by Actavis Corp.

13                Do you see that?

14         A.    I see that.

15         Q.    And those requirements are to

16    ensure proper handling and shipments of our

17    C-IIs, right?

18         A.    Yes.

19         Q.    And so that's why he's asking

20    Walmart for a revised forecast, right?

21                MS. FUMERTON:  Objection, form.

22         A.    That's what it appears in this

23    e-mail, yes.

24    BY MR. BOWER:

25         Q.    Okay.  And he notes that:  We

1    know you're only ordering based on your

2    demand, right?

3          A.    That's what this e-mail states,

4    yes.

5          Q.    Do you have any reason to doubt

6    that that statement is accurate?

7               MS. FUMERTON:  Objection, form,

8          lack of foundation.

9          A.    I do not have any reason to

10   doubt that, no.

11   BY MR. BOWER:

12         Q.    This isn't the first time

13   Actavis has asked for additional support for

14   its SOM program, is it?

15              MS. FUMERTON:  Objection, form.

16         A.    I don't remember.

17   BY MR. BOWER:

18         Q.    You wouldn't be able to recall

19   without seeing a document; is that correct?

20         A.    That's accurate.

21              (Walmart-Little Exhibit 23

22         marked.)

23   BY MR. BOWER:

24         Q.    You've been handed what's been

25   marked as Exhibit 23.  This is another

1    Actavis e-mail.  This one does not have a

2    confidential stamp, so we should all agree

3    it's a confidential document, and the Bates

4    number is 338574 through 579.  Okay.

5                  Just take a moment to review

6    the document.

7                  (Document review.)

8    BY MR. BOWER:

9         Q.    Are you still reviewing the

10   document?

11                MS. FUMERTON:  Are you --

12        A.    I'm okay.

13   BY MR. BOWER:

14        Q.    Okay.  This is an e-mail from

15   Mr. Cohen to yourself in November 2011,

16   correct?

17        A.    Correct.

18        Q.    All right.  And this is about a

19   year prior to the prior exhibit we looked at?

20        A.    Correct.

21        Q.    And again, Mr. Cohen is asking

22   Walmart to support with documentation as to

23   its increased demand for oxycodone, correct?

24                You see Mr. Cohen's e-mail to

25   you on the bottom of the first page there on

1    November 9th at 7:48, he says:  As part of

2    our SOM -- that's suspicious order

3    monitoring, correct?

4         A.    That's correct.

5         Q.    Okay.  We need additional

6    support documentation as to why Walmart has

7    this increased demand.

8              Do you see that?

9         A.    I see that.

10        Q.    So Walmart had increased demand

11   in 2011?

12             MS. FUMERTON:  Objection, form.

13        A.    Well, what I'm not sure in this

14   e-mail -- I don't understand these numbers in

15   the back of this e-mail.

16   BY MR. BOWER:

17        Q.    Okay.

18        A.    On products and -- I don't know

19   if this is my monthly utilization, is this my

20   monthly ordering or what these numbers

21   actually mean.

22        Q.    Perhaps if we had the documents

23   from Walmart we could get to the bottom of

24   that, but unfortunately we don't.  This is

25   all we have.

```
 1           A.      And in my -- in my --

 2                   MS. FUMERTON:  Objection.  I

 3           mean, there's no question pending.

 4                   MR. BOWER:  The witness is

 5           saying this is unclear, and --

 6                   MS. FUMERTON:  Okay.  Well, you

 7           didn't ask a question, and you're

 8           making commentary, just sort of random

 9           commentary on her questions.

10                   So if you have a question, you

11           can ask her.  Otherwise I'm objecting

12           and -- to just your additional

13           commentary on what she's saying.

14   BY MR. BOWER:

15           Q.      So it appears that you made a

16   request to Mr. Cohen, right?  He notes:  As

17   per your request here's a snapshot of

18   purchasing data on our oxycodone 15 and 30

19   tablets, right?

20           A.      Yes, I do see that.

21           Q.      And you're having a hard time

22   understanding the way this -- the information

23   is reflected in the e-mail, correct?

24           A.      Yes, that is accurate.

25           Q.      The formatting makes it hard to
```

1    decipher what is actually being provided

2    here?

3         A.    That's accurate.

4         Q.    Going to the second page, do

5    you know who Jinping McCormick is?

6         A.    I do know who Jinping is.

7         Q.    Okay.  Who is Jinping?

8         A.    She worked at Actavis at this

9    time.  I don't remember her capacity, if she

10   was in demand or -- I don't remember what her

11   role was at Actavis, but I did know who she

12   was.

13        Q.    Okay.  If you'd turn to the

14   last page in the document, her signature

15   reflects that she's director of marketing.

16        A.    Oh.

17        Q.    So she's a marketer at Actavis,

18   right?

19              MS. FUMERTON:  Objection, form.

20   BY MR. BOWER:

21        Q.    Any reason to doubt that, what

22   her -- what it says there?

23        A.    That is her title here.

24        Q.    Do you have any understanding

25   as to why she's getting involved in the

Highly Confidential - Subject to Further Confidentiality Review

1    Walmart ordering?

2              MS. FUMERTON:  Objection, form.

3        A.    It's my understanding that

4    marketing on generic companies is truly like

5    pricing and contracting.

6    BY MR. BOWER:

7        Q.    In Steve's e-mail to you he

8    writes:  A short summary letter, based on

9    market conditions, lack of competitive

10   product leading to increased demand would be

11   helpful.

12             Do you see that?

13       A.    I see that.

14       Q.    Do you know whether Walmart

15   ever provided such a summary letter?

16       A.    I do not know at that time.

17       Q.    As you sit here today, do you

18   know whether that information was provided?

19       A.    Could you repeat that question?

20       Q.    Sure.

21             As you -- I asked you whether

22   Walmart ever provided a letter and your

23   response was:  I do not know at that time.

24             So I'm asking you since that

25   time, have you become aware of whether that

1    information was provided?

2         A.    I'm sorry.  I do not know at

3    this time if we provided that letter.

4         Q.    Okay.  If that information had

5    been provided to Walmart, who -- I mean,

6    sorry -- to Actavis, who at Walmart would

7    have provided that information?

8         A.    I would have provided that

9    information.

10        Q.    Okay.  Is there a reason you're

11   asking Mr. Cohen what your running average

12   for the last six months was?

13        A.    From what I'm reading in my

14   response here, is I'm not agreeing with him

15   that there's an increase in demand.

16             From what I'm reading, and I

17   can't verify it based on the formatting of

18   these back numbers, it appears to me that my

19   thought process was my orders were still in

20   line, they were just very sporadic, and it

21   was -- it was Thanksgiving month.  It was

22   November, and we typically order our month

23   supply at the early part of the month because

24   manufacturers shut down, we have less people

25   in the office.  I was just preparing for that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    holiday.

 2         Q.     What do you mean you were

 3    preparing for the holiday?  How were you

 4    preparing?  This is a replenishment order,

 5    right?

 6               MS. FUMERTON:  Objection, form.

 7         A.     Replenishment would order

 8    early.

 9    BY MR. BOWER:

10         Q.     Right.  But you weren't in

11    charge of replenishment, right?

12         A.     I was not in charge of

13    replenishment.  I was giving more of an

14    explanation to what I thought the situation

15    was.  I was not agreeing with him that we had

16    an increase in demand.

17         Q.     Well, you weren't disagreeing

18    with him, were you?

19               MS. FUMERTON:  Objection, form.

20    BY MR. BOWER:

21         Q.     Where in this e-mail do you

22    disagree with him?

23               MS. FUMERTON:  Objection, form.

24         A.     All I can do is read my

25    response here.  It says:  What is my running
```

Highly Confidential - Subject to Further Confidentiality Review

1    average for the last six months as our

2    ordering is very sporadic?  We are banking on

3    being shut down the second half of the month

4    for Thanksgiving.

5                 I know that what I meant in

6    that is we ordered early in the month and we

7    don't early -- order as much at the end.  So

8    unless I know exactly how they're calculating

9    month-to-month numbers and how I'm

10   calculating, are they looking from the 15th

11   to the 15th and I'm looking from the 1st to

12   the 30th?  Our numbers could be -- could be

13   off.

14   BY MR. BOWER:

15        Q.    Well, in fact, Jinping reflects

16   that information, right?  She says:  I

17   explained yesterday we have shipped Walmart

18   12,000 bottles in November.  Their average

19   monthly shipment is 15,704 bottles.  If we

20   ship the 4,000 open order, Walmart would have

21   been over the monthly average.  Right?

22                 MS. FUMERTON:  Objection --

23   BY MR. BOWER:

24        Q.    So she's already addressing

25   your concern.

```
 1              MS. FUMERTON:  Objection, form.

 2       A.     But are they looking at the

 3   month from -- they're apparently looking at

 4   it from November 1st to November 30th.  I'm

 5   not sure did I receive a shipment in October

 6   at all or compared to what day in October I

 7   may have received a shipment.

 8              I don't know if I got that full

 9   15,700 in October or am I -- do I have a

10   deficit today already because they only

11   shipped me, I don't know, 10,000 in October?

12   I don't know that information from what's in

13   front of me.

14   BY MR. BOWER:

15       Q.     But you do know based on this

16   e-mail that they've already shipped -- it's

17   November 9th, right?  As of this date,

18   they've already shipped 12,000 bottles in

19   November, right?

20       A.     Yes.

21       Q.     And Walmart has ordered another

22   4,000 bottles, right?  And Actavis is calling

23   that into question, right?

24              MS. FUMERTON:  Objection, form.

25              There's like seven questions in there.
```

Highly Confidential - Subject to Further Confidentiality Review

 1            MR. BOWER:  Let's break them

 2      down, right.

 3    BY MR. BOWER:

 4        Q.    As of this day, November 9th,

 5    Walmart has already -- strike that.

 6            As of November 9th, Actavis has

 7    already shipped 12,000 bottles in November,

 8    correct?

 9            MS. FUMERTON:  Objection, form.

10    BY MR. BOWER:

11        Q.    That's what's reflected on this

12    e-mail.

13        A.    I see that in the e-mail.

14        Q.    Do you have any reason to doubt

15    that that information was inaccurate?

16            MS. FUMERTON:  Objection, form.

17        A.    No.

18    BY MR. BOWER:

19        Q.    The e-mail goes on to state

20    that, their, meaning Walmart's, average

21    monthly shipment is 15,704 bottles.

22            Do you see that?

23        A.    I see that.

24        Q.    Do you have any reason to doubt

25    that information is accurate?

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MS. FUMERTON:  Objection, form.
2          A.    I do not.
3    BY MR. BOWER:
4          Q.    And then the e-mail goes on to
5    state:  If we ship the 4,000 open order,
6    Walmart would have been over the monthly
7    average and we're only the 8th day of the
8    month.
9                    Do you see that?
10         A.    I do see that.
11         Q.    Okay.  You state that -- sorry.
12   Ms. McCormick further states that:  I'm not
13   trying to hold up sales but need a reasonable
14   explanation from Walmart to follow our SOM
15   process.
16                   Do you see that?
17         A.    Yes, I see that.
18         Q.    So regardless of Walmart's
19   reasons for the order, Actavis needed
20   justification for the order from Walmart
21   pursuant to its SOM program, correct?
22                   MR. CIULLO:  Object.
23                   MS. FUMERTON:  Objection, form.
24         A.    I see that in the e-mail.
25                   ///
```

```
 1    BY MR. BOWER:

 2         Q.     Okay.  Are you familiar with

 3    what criteria a SOM program is supposed to

 4    monitor for ordering of prescription opiates?

 5                MS. FUMERTON:  Objection, form.

 6         A.     I am not.

 7    BY MR. BOWER:

 8         Q.     Are you familiar with whether a

 9    SOM program is supposed to monitor for

10    unusual volume?

11                MS. FUMERTON:  Objection, form.

12         A.     My knowledge is that it

13    monitors purchases and volume of purchases,

14    and that's all I'm aware of.

15    BY MR. BOWER:

16         Q.     Are you aware of whether a SOM

17    program is supposed to monitor for an unusual

18    pattern of purchases?

19                MS. FUMERTON:  Objection, form.

20         A.     I'm not aware.

21    BY MR. BOWER:

22         Q.     And indeed, you acknowledge

23    that our ordering is very sporadic in your

24    e-mail to Mr. Cohen, correct?

25                MS. FUMERTON:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes, I do.

 2   BY MR. BOWER:

 3          Q.     Right.  Walmart's ordering had

 4   an unusual pattern, did it not?

 5                 MS. FUMERTON:  Objection, form.

 6          A.     Yes, it did.

 7                 (Walmart-Little Exhibit 24

 8          marked.)

 9   BY MR. BOWER:

10          Q.     You've been handed what's been

11   marked as Exhibit 24.

12                 MS. FUMERTON:  We've been going

13          for a while.  Is this a good stopping

14          point?  We've been going, I think, for

15          another hour 20 minutes or so.

16                 MR. BOWER:  We've been going

17          that long?  Sure.  I didn't know we

18          had been going that long.  Sure.

19                 THE VIDEOGRAPHER:  Off the

20          record, 3:22 p.m.

21                 (Recess taken, 3:22 p.m. to

22          3:41 p.m.)

23                 THE VIDEOGRAPHER:  Back on

24          record.  The time is 3:41 p.m.

25                 ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:

 2         Q.    Okay.  Ms. Little, before we

 3    went off, I handed you Exhibit 24, but you

 4    haven't reviewed it yet.  So why don't you

 5    take a moment to review that, and then I'll

 6    have just a few questions on this one.

 7              (Document review.)

 8    BY MR. BOWER:

 9         Q.    All right.  Are you ready?

10         A.    Yes.

11         Q.    Okay.  It appears that

12    Exhibit 24 is kind of a later e-mail than

13    Exhibit 22, which Walmart has now provided

14    the updated usages, correct, to Mr. Cohen?

15         A.    For the oxy 15 and 30.

16         Q.    Right.  And he notes that:  It

17    is unlikely that we will be able to increase

18    your monthly shipments.

19              Do you see that?

20         A.    I see that.

21         Q.    Okay.  And he's writing to you

22    and Traci Cope and Patsy Little -- I'm sorry,

23    yourself and Traci Cope, right?

24         A.    Yes.

25         Q.    Do you know why he's including
```

Highly Confidential - Subject to Further Confidentiality Review

1    Traci in those e-mails?

2         A.    I'm not sure at this time.  I'm

3    guessing Traci had had some correspondence

4    and was doing some work with pain at the

5    time.

6         Q.    Well, do you see later on --

7    earlier on, rather, the document ending in

8    482, she's the one who sends him the polls

9    from the warehouse?

10        A.    I do see that.

11        Q.    Do you see that?

12             Does this refresh your

13   recollection that she was involved in

14   replenishment during this time period for

15   Schedule II narcotics?

16             MS. FUMERTON:  Objection, form.

17        A.    I don't remember this specific

18   event, but I do see it on the e-mail.

19   BY MR. BOWER:

20        Q.    I'm not asking you whether you

21   remember the specific event.  I'm asking you

22   whether this refreshes your recollection that

23   Ms. Cope was responsible for replenishment

24   for Schedule II narcotics during this time

25   period?

1              MS. FUMERTON:  Objection, form.

2        A.     I'm not sure if she was

3    responsible or if she had been assigned

4    something from Rae or someone else in

5    replenishment.

6    BY MR. BOWER:

7        Q.     Can you -- do you have an

8    understanding as to how the replenishment

9    side of the business was organized?

10             MS. FUMERTON:  Objection, form.

11       A.     There was a replenishment

12   manager assigned to a buyer, and then

13   replenishment managers also had assignments

14   of certain manufacturers that they placed

15   orders for.

16   BY MR. BOWER:

17       Q.     Okay.  So while you were

18   responsible for buying Schedule II narcotics

19   and prescription opiates, who was the

20   replenishment manager that -- manager that

21   was assigned to you?

22       A.     So it would change often when

23   they changed their assignments just like we

24   would vary and change categories.

25       Q.     Okay.  So who were the names of

Highly Confidential - Subject to Further Confidentiality Review

1    the persons that were assigned to you over

2    time?

3         A.    So the main one that I remember

4    towards the end was Linda.  I think we saw

5    Rae had communicated some e-mails and then it

6    looks like Traci is on this, so...

7         Q.    Okay.  I'm just trying to get a

8    better sense of this side of the business

9    because you mentioned that you thought maybe

10   Rae had asked her to do this.

11            Was Rae above -- strike that.

12            Did Traci report to Rae?

13        A.    I don't remember Traci

14   reporting to Rae, but Traci was a newer

15   replenishment manager at one time than some

16   of the others.

17        Q.    Okay.  And do you see in this

18   e-mail Mr. Cohen notes that:  Overall, the

19   molecule has decreased 6% for the year.

20   Based on your new forecast shortages may have

21   led to a spike at Walmart.

22            Do you see that?

23        A.    I see that.

24        Q.    Do you agree that there was a

25   spike at Walmart for oxycodone 15 and 30?

```
 1                    MS. FUMERTON:  Objection, form.

 2         A.     According to the numbers that I

 3    see on here, this three months utilization

 4    doesn't lead me to be concerned that there

 5    was a spike at Walmart.

 6    BY MR. BOWER:

 7         Q.     Okay.  And where are you

 8    looking?

 9         A.     I'm looking on the third page,

10    the warehouse pulls that Traci sent.

11         Q.     Okay.  Can you just, for the

12    record, refer to the numbers that you're

13    looking at?

14                    MS. FUMERTON:  Are you asking

15         for the Bates numbers or the

16         numbers --

17                    MR. BOWER:  No, just the

18         numbers she says -- she says according

19         to the numbers that I see on here.

20                    MS. FUMERTON:  Okay.

21         A.     So if you look at the oxycodone

22    15-milligram tablet, there's 11,400

23    bottles -- 11,411, to be clear.  From what I

24    can tell, that's indicated for March of 2012.

25                    ///
```

1    BY MR. BOWER:

2          Q.     Uh-huh.

3          A.     Then there's 11,096 bottles for

4    April of 2012, which is actually a decrease

5    from March.

6          Q.     Uh-huh.

7          A.     And then you see an increase

8    again from May of 11,971 bottles.

9                 And then the same thing for

10   oxycodone 30-milligram tablets.

11         Q.     Uh-huh.

12         A.     It appears that the number for

13   March 2012 is 15,181 bottles and it appears

14   the number for April is 14,847, and then it

15   appears the number for May 2012 is 16,410.

16                So those numbers don't lead me

17   to say that that's a spike in our business.

18         Q.     Okay.  So, for example, going

19   from 14,847 to 16,410 wouldn't be a spike

20   from your experience?

21         A.     I would have to see more

22   information on what happened in April of

23   2012.  We had declined as you can see from

24   March to April.

25         Q.     Right.  So it had declined

1    approximately 300 March to April?

2        A.      300 --

3        Q.      300 give or take, and then it

4    increases by 1700?

5                MS. FUMERTON:  Objection, form.

6        A.      I would need to look at more

7    purchase history to see exactly where we

8    shipped what we needed on those months or

9    what was happening.  It sounds to me like

10   from his e-mail that there were out-of-stocks

11   in the industry, so I would need to see were

12   we being replenished fully in those months or

13   what happened in those months.

14   BY MR. BOWER:

15       Q.      These numbers are not your

16   orders from Mr. Cohen, right?  They are --

17   let's see.  They are the usages, right?

18                MS. FUMERTON:  Objection, form.

19       A.      These are shipments from the

20   warehouse to the stores.

21   BY MR. BOWER:

22       Q.      Right.  And this is after that

23   Mr. Cohen and his -- his manufacturer has

24   already cut at least -- I'm sorry, has

25   already canceled at least one of Walmart's

Highly Confidential - Subject to Further Confidentiality Review

1    orders, correct?

2              MS. FUMERTON:  Objection, form.

3         A.    I'd have to pull that up and

4    look at the month, but -- is that November?

5    BY MR. BOWER:

6         Q.    Yeah.  Why don't we take a

7    moment and look at that, and we can...

8              So turn to Exhibit 21 on page

9    ending in 805.  You can see that that order

10   was canceled June 21st, 2012.

11        A.    I do see that.

12        Q.    Right?  So Walmart had already

13   attempted to increase its orders but those

14   orders had been canceled, right?

15             MS. FUMERTON:  Objection, form.

16   BY MR. BOWER:

17        Q.    That's why Mr. Cohen is

18   referring to a spike, isn't it?

19             MS. FUMERTON:  Objection, form.

20        A.    I would need to -- I need to

21   reread what he said.

22   BY MR. BOWER:

23        Q.    Oh, sure.  Please, take your

24   time.

25        A.    Because these numbers that

Highly Confidential - Subject to Further Confidentiality Review

1    we're talking about were not June.  We're

2    talking about March, April and May

3    utilization here.

4         Q.    Right.  And Walmart is trying

5    to get more product, right?

6              MS. FUMERTON:  Objection, form.

7         She said she needed time to review the

8         document.

9              MR. BOWER:  Okay.

10             (Document review.)

11        A.    Okay.

12   BY MR. BOWER:

13        Q.    Okay.  So Walmart, when you're

14   looking at exhibits -- sorry, just give me a

15   second to get the right number -- 21 and 24.

16   In 21, Walmart places an order in June that's

17   canceled, correct?

18        A.    That is correct.

19        Q.    And therefore, those numbers --

20   that order is not reflected in the numbers on

21   Exhibit 24, correct?

22             MS. FUMERTON:  Objection --

23   BY MR. BOWER:

24        Q.    The numbers you read into the

25   record earlier?

Highly Confidential – Subject to Further Confidentiality Review

1          MS. FUMERTON:  Objection, form.

2          A.     That canceled shipment is not

3     reflected in these numbers.

4     BY MR. BOWER:

5          Q.     Okay.  And so it could have

6     been that Mr. Cohen was referring to that

7     canceled shipment when he notes the spike at

8     Walmart, correct?

9          MS. FUMERTON:  Objection, form.

10          A.     I don't -- I don't know that I

11     can comment.  I would be speculating on what

12     his -- on what he was thinking at the time

13     that he wrote the e-mail.

14     BY MR. BOWER:

15          Q.     Well, you noted earlier that

16     you disagreed there was a spike, right?

17          A.     If I look at these numbers, I

18     do not call that a spike in utilization based

19     off of 5,000 stores, no.

20          Q.     Okay.  And my question to you

21     is:  If Mr. Cohen had been referring to

22     Walmart's canceled orders, including those in

23     his analysis, could he have been seeing a

24     spike at Walmart?

25          MS. FUMERTON:  Objection, form.

1          A.      I don't have our June numbers

2    to make a -- to make an assessment on the

3    June numbers.

4    BY MR. BOWER:

5          Q.      Well, the June numbers would

6    reflect -- strike that.

7                  What June numbers are you

8    thinking about?  The product amount that

9    would have been ordered or the product amount

10   shipped from the warehouse?

11                 MS. FUMERTON:  Objection, form.

12         A.      What had pulled from the

13   warehouse.

14   BY MR. BOWER:

15         Q.      But those June numbers would

16   have reflected the canceled order by

17   Allergan, correct?

18                 MS. FUMERTON:  Objection, form.

19                 MR. CIULLO:  Objection.

20   BY MR. BOWER:

21         Q.      Because -- well, in June,

22   Allergan canceled the Walmart order, right?

23                 MS. FUMERTON:  Objection, form.

24                 MR. CIULLO:  Objection.

25         A.      There is one order that

1    Allergan -- or that Actavis canceled in June,

2    yes.

3    BY MR. BOWER:

4         Q.    Well, there's one order we've

5    seen today, correct?

6              MS. FUMERTON:  Objection, form.

7    BY MR. BOWER:

8         Q.    You don't know whether there's

9    been more or not, do you?

10              MS. FUMERTON:  Objection, form.

11        A.    This e-mail points to one

12   order.

13   BY MR. BOWER:

14        Q.    Right.  You don't know whether

15   there were, in fact, more or not, do you?

16              MS. FUMERTON:  Objection, form.

17        A.    I do not.  I do not have any

18   data regarding June.

19   BY MR. BOWER:

20        Q.    Okay.  So if, in fact, this

21   order had not been canceled and Walmart had

22   received an additional 5,102 units of oxy 30

23   in June, would those June numbers then

24   reflect a spike, based on your experience?

25              MS. FUMERTON:  Objection, form

1          and lack of foundation.

2          A.    I would need to look at that

3    number coupled with what the pulls were from

4    the warehouse to the store.

5    BY MR. BOWER:

6          Q.    Okay.  If you turn to, in the

7    same exhibit, 24, the page ending in 84.  You

8    see another of Mr. Cohen's e-mails to you on

9    June 22nd?

10         A.    Yes.

11         Q.    And kind of the fourth sentence

12   down, he says:  Looking at the Excel

13   spreadsheet versus open orders.

14               What does that refer to?

15         A.    I can't be sure.

16         Q.    You're the only one he's

17   writing to, right?

18         A.    Yes.

19         Q.    No one else on the e-mail?

20         A.    That's correct.

21         Q.    Okay.  As you sit here today,

22   you don't know what the Excel spreadsheet

23   would be referring to?

24               MS. FUMERTON:  Objection, form.

25         A.    I don't recall.

1    BY MR. BOWER:

2         Q.    And in the first sentence there

3    he notes that:  Here is a snapshot of our oxy

4    shipments to Walmart.

5              Do you see that?

6         A.    Yes.

7         Q.    Does that maybe clarify in your

8    mind what Excel spreadsheet he would have

9    been looking at?

10             MS. FUMERTON:  Objection, form.

11        A.    That could be on the Excel

12   spreadsheet.

13   BY MR. BOWER:

14        Q.    Indeed, he's comparing the

15   Excel spreadsheet versus open orders for

16   June, one of which was an order that was

17   canceled that same day, correct?

18             MS. FUMERTON:  Objection, form,

19        lack of foundation.

20        A.    I see that in the e-mail.

21   BY MR. BOWER:

22        Q.    At some point around this time

23   period, did you become aware that Walmart, in

24   connection with its suspicious order

25   monitoring program, was cutting orders of oxy

1    30?

2                    MS. FUMERTON:  Objection, form.

3                    MR. BOWER:  I'll strike that.

4    BY MR. BOWER:

5          Q.    Do you know whether Walmart

6    ever instituted -- ever instituted a policy

7    to cut orders of oxy 30 that were over 20

8    bottles?

9                    MS. FUMERTON:  Objection, form.

10         A.    Yes, I'm aware of that.

11   BY MR. BOWER:

12         Q.    Okay.  And how did you become

13   aware of that?

14         A.    I can't recall if it was a

15   conversation or if I was involved in a

16   meeting or...

17                    (Walmart-Little Exhibit 25

18         marked.)

19   BY MR. BOWER:

20         Q.    Okay.  You've been handed

21   what's been marked as Exhibit 5.

22                    MS. FUMERTON:  25.

23                    MR. BOWER:  25, yeah.  Did I

24         say 5?

25                    MS. FUMERTON:  Uh-huh.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BOWER:  Sorry.
 2    BY MR. BOWER:
 3         Q.    Take a moment to review this.
 4    I just -- I'm just going to ask you if this
 5    refreshes your recollection of when you first
 6    became aware of the policy to cut oxy orders
 7    on more than 20 bottles of oxy 30.
 8                    MR. CIULLO:  I'm sorry, can you
 9         read the Bates.
10                    MR. BOWER:  Sure.  This is a
11         Walmart document.  The Bates number is
12         WMT_MDL_000037807 and 808.
13                    MR. CIULLO:  Thank you, sir.
14                    MR. BOWER:  Sure.
15                    MS. FUMERTON:  I'll just note
16         for the record that this document is
17         missing its attachment.
18                    (Document review.)
19    BY MR. BOWER:
20         Q.    Do you recall becoming aware on
21    or about this time period that Walmart was
22    instituting this policy?
23                    MS. FUMERTON:  Objection, form.
24         A.    Yes.
25                    ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:

 2         Q.    At this time, did you have an

 3    understanding as to why Theresa Alford was

 4    forwarding this e-mail to you?

 5         A.    I don't remember.

 6         Q.    Did Walmart's new policy have

 7    an impact on how you conducted your side of

 8    the business?

 9              MS. FUMERTON:  Objection, form.

10         A.    It would not have impacted what

11    I did on my side of the business, no.

12    BY MR. BOWER:

13         Q.    Have you ever looked back to

14    determine whether Walmart's decision to block

15    orders of more than 20 bottles of oxy 30

16    impacted the amount of oxy 30 you needed to

17    purchase?

18         A.    I had not looked back at that,

19    no.

20         Q.    Have you ever discussed that

21    with anybody?

22         A.    Not that I recall.

23         Q.    Did you ever attend any

24    meetings discussing this new policy?

25              MS. FUMERTON:  Objection, form.
```

1          A.     I can't remember if I was in a

2     meeting or not.

3     BY MR. BOWER:

4          Q.     The e-mail that you're

5     forwarded notes that:  The outline of the

6     program and changes include implementation of

7     C-II exception -- C-II order exception

8     review.

9               Do you see that?

10         A.     I see that.

11         Q.     Okay.  The first bullet point

12    says:  Blocks order of more than 20 bottles

13    of oxy 30.

14               Do you see that?

15         A.     I see that.

16         Q.     Does that suggest to you that

17    this was a new policy that Walmart was

18    instituting?

19               MS. FUMERTON:  Objection, form.

20         A.     Yes, it does.

21    BY MR. BOWER:

22         Q.     Do you know, looking at the

23    third bullet point down from that -- from the

24    top of that page ending in 08, states:

25    MD review and follow-up on all C-II order

1    exceptions.

2              Do you see that?

3         A.    I do see that.

4         Q.    Do you know what that means,

5    MD review?

6         A.    I'm not sure.

7         Q.    Do you have any recollection of

8    there being some internal debate within

9    Walmart regarding whether this was an

10   appropriate policy to follow?

11             MS. FUMERTON:  Objection, form.

12        A.    I don't recall that.

13   BY MR. BOWER:

14        Q.    Do you recall any discussions

15   about the impact of this policy?

16             MS. FUMERTON:  Objection, form.

17        A.    I don't recall.

18             (Walmart-Little Exhibit 26

19        marked.)

20   BY MR. BOWER:

21        Q.    Okay.  You've been handed

22   what's been marked as Exhibit 26.  This is a

23   rather lengthy e-mail chain, but you are

24   copied on many of the e-mails.  Just take a

25   moment to review, and I just have some

Highly Confidential - Subject to Further Confidentiality Review

```
 1    questions on this.

 2              The Bates number for this one

 3    is WMT_MDL_000033418 through 33424.

 4              (Document review.)

 5    BY MR. BOWER:

 6         Q.    Are you ready?

 7              MS. FUMERTON:  She's still

 8         reading.

 9         A.    I'm not.

10              MR. BOWER:  Okay.  Sorry.

11              (Document review.)

12              (Telephonic interruption.)

13              (Comments off the stenographic

14         record.)

15              MR. BOWER:  Can we go off the

16         record.

17              THE VIDEOGRAPHER:  Going off

18         the record, 4:09 p.m.

19              (Discussion off the record.)

20              THE VIDEOGRAPHER:  Back on

21         record, 4:10 p.m.

22    BY MR. BOWER:

23         Q.    Have you finished reviewing the

24    document --

25         A.    I have.
```

```
1          Q.      -- Exhibit 26?

2                  Do you recall receiving this

3    e-mail?

4          A.      I don't recall.

5          Q.      You don't recall that as you

6    sit here today?

7          A.      (Shakes head.)

8          Q.      Was it not a significant issue

9    for you at the time?

10                 MS. FUMERTON:  Objection, form.

11         A.      This wasn't something that

12   would have affected what I did on a daily

13   basis.  There were other groups that were

14   involved in this.

15   BY MR. BOWER:

16         Q.      Okay.  Well, Sandy added you to

17   this e-mail chain, correct?

18         A.      That is correct.

19         Q.      Do you have any understanding

20   as to why she added you?

21                 MS. FUMERTON:  Objection, form.

22         A.      She always wanted to ensure if

23   there was a subject that fell under our

24   categories, that we were at least looped in

25   to understand what was happening.
```

```
 1    BY MR. BOWER:

 2         Q.     Okay.  Well, if you note, she

 3    writes:  We should include Patsy Little, Bart

 4    Grisham, David Atwood and Larry Kirkpatrick

 5    in the meeting as they all play a vital role

 6    in the solution.

 7                Do you see that?

 8                MS. FUMERTON:  She wasn't

 9         looking at whatever page you're

10         looking at.

11    BY MR. BOWER:

12         Q.     Okay.  Sorry, I'm looking at

13    the top of page ending in 20.  I apologize

14    for that.

15         A.     Yes, I see that.

16         Q.     Do you disagree with her

17    statement that you played a vital role in the

18    solution?

19         A.     I think I needed to understand

20    what was happening in my category.

21         Q.     Okay.  And did you at some

22    point come to that understanding?

23         A.     I had an understanding or --

24    from these notifications of what was

25    happening.
```

1      Q.      And what was happening?

2      A.      That they were cutting those

3    orders for stores that were over an excess of

4    20 bottles.

5      Q.      And what was that a solution

6    to?  What was the problem?

7              MS. FUMERTON:  Objection, form.

8    BY MR. BOWER:

9      Q.      Well, I just direct you to the

10   first statement that Sandy makes:  After a

11   brief discussion with you and Susan last

12   week, I recognize we have an opportunity to

13   curb inappropriate dispensing of oxy.

14             Do you see that, top of that

15   same page in that same e-mail?

16     A.      Yes, I see that.

17     Q.      So the solution to the problem

18   was to curb -- the problem was the

19   inappropriate dispensing of oxy, correct?

20             MS. FUMERTON:  Objection, form.

21     A.      I see what the e-mail says

22   here.

23   BY MR. BOWER:

24     Q.      Do you disagree with the

25   statement Sandy is making?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. FUMERTON:  Objection, form.

2     A.    I don't know that I had

3  knowledge of what was happening on the

4  dispensing side.

5  BY MR. BOWER:

6     Q.    Okay.  Certainly Sandy appears

7  to have knowledge, correct?

8          MS. FUMERTON:  Objection, form.

9     A.    I see her statement in the

10  e-mail.

11  BY MR. BOWER:

12     Q.    Okay.  Do you disagree with her

13  statement that you would play a vital role in

14  the solution?

15          MS. FUMERTON:  Objection, form.

16     A.    I disagree that I would play a

17  vital role in what was happening here with

18  the cutting of the oxy orders.

19  BY MR. BOWER:

20     Q.    Were there any other possible

21  solutions Walmart could have implemented to

22  inappropriate dispensing of oxy?

23          MS. FUMERTON:  Objection, form.

24     A.    I don't recall being in any

25  conversations regarding that with

```
 1    other options.

 2    BY MR. BOWER:

 3         Q.    Do you recall ever attending a

 4    meeting where this was discussed?

 5         A.    I don't recall attending a

 6    meeting.

 7         Q.    Do you know whether one

 8    occurred without your attendance?

 9         A.    I just -- I can't remember.

10         Q.    Did you ever have any

11    discussions with Sandy after she added you to

12    this e-mail chain?

13              MS. FUMERTON:  Objection, form.

14              MR. BOWER:  Strike that.

15    BY MR. BOWER:

16         Q.    Did you ever have any

17    discussions with Sandy about this topic after

18    she added you to this e-mail chain?

19         A.    I can't recall.

20         Q.    None that you recall

21    specifically; is that correct?

22         A.    There's nothing I recall

23    specifically.

24         Q.    You notice the discussion goes

25    on, right, with several e-mails from Bart.
```

1    Who is Bart Grisham?

2         A.    Bart was in our replenishment

3    department at the time.

4         Q.    Was he another one of the folks

5    responsible for replenishment of prescription

6    opiates?

7              MS. FUMERTON:  Objection, form.

8         A.    Bart led the replenishment

9    department.

10   BY MR. BOWER:

11        Q.    Okay.  Do you recall the time

12   period for which he led the replenishment

13   department, or approximate time period?

14        A.    I do not.

15        Q.    Do you recall whether Bart was

16   still in that position when you left Walmart?

17        A.    When I left Walmart?

18        Q.    Yeah.

19        A.    He was not still in that

20   position.

21        Q.    Okay.  Who held that position

22   when you left?  Was that Linda Wilson?

23        A.    No, Linda was not over

24   replenishment.

25        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      I don't remember the name of

2     the gentleman that was over that department

3     at the time.

4            Q.      Okay.  Okay.  Do you see in

5     Bart's e-mail to yourself and others on the

6     bottom of page ending in 418, he refers to a

7     data source for orders that were cut due to

8     maximum order quantity could be obtained.

9                    Do you see that?

10           A.      I see that.

11           Q.      Do you know what data source he

12    is referring to?

13           A.      I do not.

14           Q.      Well, you're one of four people

15    on that e-mail, right?

16                   MS. FUMERTON:  Objection, form,

17           misstates the document.

18    BY MR. BOWER:

19           Q.      Well, the e-mail is from Bart

20    Grisham to Ms. Hiland, Mr. Worth, Sandy

21    Kinsey and yourself, right, cc'ing Paul

22    Beahm, Tim Harris and Ramona Sullins,

23    correct?

24           A.      That is correct.

25           Q.      Okay.  And as you sit here
```

```
 1    today, you're not familiar with the data

 2    source he's referring to; is that correct?

 3         A.     That is correct.

 4         Q.     Do you know who may be familiar

 5    with that data source other than Bart?

 6         A.     I don't know.

 7         Q.     Did you ever go to Sandy and

 8    say, hey, Sandy, what data source was he

 9    talking about?

10         A.     I did not.

11         Q.     No?  Just didn't concern you at

12    the time?

13              MS. FUMERTON:  Objection, form.

14         A.     This would not have affected

15    what I needed to do on a daily basis.

16    BY MR. BOWER:

17         Q.     I didn't ask whether it

18    would -- affected what you needed to do on a

19    daily basis.

20              I'm just simply asking whether

21    this concerned you at the time.

22              MS. FUMERTON:  Objection, form.

23    BY MR. BOWER:

24         Q.     Right, folks at Walmart are

25    concerned about this new policy, how it might
```

1    impact its business, right, in connection

2    with the problems with oxycodone abuse.

3              Did they concern you at all?

4              MS. FUMERTON:  Objection, form.

5         A.    I always have a personal

6    concern for anyone who is not taking a

7    medication the way they should take a

8    medication.

9              The position that I held at

10   Walmart, my focus on a daily basis was to

11   ensure that I negotiated the best prices at

12   Walmart and had supply in the warehouse of

13   both pain medications as well as other

14   medications.

15   BY MR. BOWER:

16        Q.    And I appreciate that position,

17   and I understand it.  And I'm just trying to

18   understand that in light of that concern and

19   in light of Sandy's e-mail that suggests that

20   you play a vital role in the solution, did

21   you do anything?

22             MS. FUMERTON:  Objection, form.

23        A.    I did not participate in -- I

24   had nothing to do with this.

25             ///

```
 1    BY MR. BOWER:
 2         Q.    Okay.  If you go up a couple of
 3    e-mails up, e-mail from Paul Beahm, do you
 4    know what his position was at the time?
 5         A.    Paul Beahm was the vice
 6    president of operations, I believe at this
 7    time, pharmacy operations.
 8         Q.    Okay.  And you note he raises
 9    some concerns about whether this was the
10    appropriate avenue.  You see that?
11               MS. FUMERTON:  Where?  Oh.
12         Objection.  I'm sorry.
13    BY MR. BOWER:
14         Q.    I'll just read his statement.
15    He says:  Sandy, I agree that getting all
16    thoughts on the table is the appropriate
17    avenue.
18               Do you see that?
19         A.    I see that.
20    BY MR. BOWER:
21         Q.    Okay.  The commitment to serve
22    our patients is foremost on our mind and
23    potentially preventing pharmacies from losing
24    their ability to serve their patients by not
25    losing their controlled licenses.
```

1          Do you see that?

2     A.     I see that.

3     Q.     He was concerned about

4  pharmacies losing their licenses, wasn't he?

5          MS. FUMERTON:  Objection, form.

6     A.     I see the statement in the

7  e-mail.

8  BY MR. BOWER:

9     Q.     Do you have any reason to

10  disagree that he was concerned about that?

11          MS. FUMERTON:  Objection, form,

12     lack of foundation.

13     A.     I don't.

14  BY MR. BOWER:

15     Q.     Okay.  And he recognizes that

16  Walmart is in the business of selling

17  products and services and we want to sell all

18  we can, right?

19          MS. FUMERTON:  Objection, form.

20     A.     I see the statement in the

21  e-mail.

22  BY MR. BOWER:

23     Q.     And he was concerned that

24  Walmart's cutting -- cutting the ability of

25  pharmacies to get oxy was preventing them

1    from selling all they could for oxy, right?

2              MS. FUMERTON:  Objection, form,

3         misstates the document.

4    BY MR. BOWER:

5         Q.    Well, the document:  Says We

6    want to sell all we can.  Right?

7              MS. FUMERTON:  Objection, form,

8         and if you're going to say what the

9         document says, you should read the

10         entire sentence.

11    BY MR. BOWER:

12         Q.    Okay.  Clearly you

13    understand -- and I'll rephrase.

14              Mr. Paul Beahm writes:  Clearly

15    you understand that we are in the business of

16    selling products and services and we want to

17    sell all we can in a compliant and

18    responsible way.  Right?

19         A.    I see that.

20         Q.    And he's concerned that if you

21    don't do so, Walmart might lose their

22    controlled licenses, right?

23              MS. FUMERTON:  Objection, form.

24    BY MR. BOWER:

25         Q.    Well, do you disagree that if

Highly Confidential - Subject to Further Confidentiality Review

1    Walmart does not sell its CS and controlled

2    substances in a compliant and responsible

3    way, that it could lose its controlled

4    licenses?

5              MS. FUMERTON:  Objection, form.

6         A.    Yes, I agree.

7    BY MR. BOWER:

8         Q.    Okay.  So Walmart needed to

9    make some changes to ensure that wouldn't

10   happen, right?

11             MS. FUMERTON:  Objection, form.

12        A.    I see that being discussed in

13   the e-mail.

14   BY MR. BOWER:

15        Q.    Okay.  Other than the decision

16   to cut oxy 30 orders to 20 bottles, are you

17   familiar with any other policy that was put

18   in place in connection with Walmart's

19   suspicious order monitoring program?

20             MS. FUMERTON:  Objection, form.

21        A.    I'm not -- I'm not familiar

22   with the policies around the suspicious order

23   monitoring.

24   BY MR. BOWER:

25        Q.    Okay.

```
 1                  (Walmart-Little Exhibit 27

 2         marked.)

 3    BY MR. BOWER:

 4         Q.     You've been handed what's been

 5    marked as Exhibit 27.  It's a Walmart

 6    document ending in Bates number 25900.  It's

 7    a one-page document.  Just take your time and

 8    let me know when you're done.

 9                  I can tell you my questions

10    will be focused on paragraph 4, if that

11    helps.

12         A.     Okay.

13                  (Document review.)

14    BY MR. BOWER:

15         Q.     Are you ready?

16         A.     I'm ready.

17         Q.     I note that Exhibit 26, which

18    is the e-mail chain we were discussing, was

19    in August 2012.  This is the same month,

20    correct?

21         A.     That is correct.

22         Q.     Walmart has just instituted its

23    decision to cut orders over 20, right?

24                  MS. FUMERTON:  Objection, form.

25                  MR. BOWER:  I'll strike that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:
 2         Q.     Walmart has just instituted its
 3    policy of cutting orders of oxy 30 to more
 4    than 20 bottles per month, correct?
 5              MS. FUMERTON:  Objection, form.
 6              MR. BOWER:  What's the nature
 7         of your objection?
 8              MS. FUMERTON:  I think it
 9         misrepresents the document.
10              MR. BOWER:  I'm not asking
11         about the document.
12              MS. FUMERTON:  Well, no, you
13         are, because you're saying that it's
14         just afterwards and then you're
15         referring to --
16    BY MR. BOWER:
17         Q.     So the record is clear, my
18    question is this:  Walmart has just
19    instituted the policy of cutting orders of
20    oxy 30 to more than 20 bottles per month per
21    pharmacy, correct?
22              MS. FUMERTON:  And I'm
23         objecting to the form.
24         A.     I believe it's 20 bottles per
25    week, but I would have to verify that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:

 2         Q.    So as you sit here today, do

 3    you know what the policy was?

 4              MS. FUMERTON:  Objection, form.

 5    BY MR. BOWER:

 6         Q.    And I may be mistaken, you may

 7    be right.  I'm not trying to fool you.  I

 8    just --

 9         A.    Stores received one C-II order

10    per week from the warehouse.

11         Q.    Okay.  You're right, 20 bottles

12    per week.

13         A.    20 bottles per week.

14         Q.    Okay.  So Walmart has just, in

15    August 2012, instituted that policy of

16    limiting orders to 20 bottles of oxy 30 per

17    week per pharmacy, correct?

18         A.    That's correct.

19         Q.    Okay.  And in that same month,

20    Walmart is representing and warranting to

21    Mallinckrodt that it has in place a

22    suspicious order monitoring policy as

23    required by 21 CFR Section 1301.74(b).

24              Do you see that?

25         A.    I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And this Mallinckrodt contract

2    is directed to yourself, correct?

3    A.    Yes, it is.

4    Q.    Did you do anything at this

5    time to ensure that Walmart had a compliant

6    suspicious order monitoring program?

7              MS. FUMERTON:  Objection, form.

8    A.    I was aware that we had a

9    suspicious order monitoring program, and I

10   could contact the manufacturer with that

11   department if I needed to.

12   BY MR. BOWER:

13   Q.    Did Walmart do anything at this

14   point to confirm its representations and

15   warranties to Mallinckrodt?

16             MS. FUMERTON:  Objection, form.

17   A.    I don't recall doing anything.

18   BY MR. BOWER:

19   Q.    And to the best of your

20   recollection, the only policy in place at

21   this point was the cut 20 policy, correct?

22             MS. FUMERTON:  Objection, form.

23   A.    To my knowledge there was a

24   broader suspicious order monitoring program

25   in place, and the cutting to 20 bottles a

1    week was a portion or was a different -- I

2    think there was an overall suspicious order

3    monitoring department and program in place

4    that I don't know the specifics of.

5    BY MR. BOWER:

6         Q.    Okay.  What's your

7    understanding of that department?

8              MS. FUMERTON:  Objection, form.

9    BY MR. BOWER:

10        Q.    I'm just using -- you said

11   there was an overall suspicious order

12   monitoring department.  Who was in that

13   department?

14        A.    Miranda was in that department,

15   and I'm unsure of who else was in that

16   department.

17        Q.    Okay.  And other than the cut

18   20 policy, any other policies you're familiar

19   with that department implemented to carry out

20   its suspicious order monitoring obligations?

21             MS. FUMERTON:  Objection, form,

22        asked and answered.

23             THE WITNESS:  I'm sorry?

24             MR. BOWER:  You can answer.

25             THE WITNESS:  Oh.

1          A.      I'm not familiar with their

2     policies and procedures.

3     BY MR. BOWER:

4          Q.      Did you ever attend any DEA

5     meetings regarding suspicious order

6     monitoring for prescription opiates?

7          A.      I went to a meeting in

8     Little Rock with the warehouse group and some

9     others.

10         Q.      Did you discuss suspicious

11    order monitoring for Schedule II narcotics at

12    that meeting?

13         A.      I don't remember the discussion

14    at the meeting.

15              (Walmart-Little Exhibit 28

16         marked.)

17    BY MR. BOWER:

18         Q.      Okay.  You've been handed

19    what's been marked as Exhibit 28.  It's a

20    Walmart document ending in 21757 through 59.

21    It's a two-page e-mail.  Let me know when you

22    finish reviewing.

23         A.      Okay.

24              (Document review.)

25              ///

Highly Confidential – Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:
 2         Q.    Are you ready?
 3         A.    Yes.
 4         Q.    Does this refresh your
 5    recollection whether you attended a DEA
 6    meeting to discuss suspicious order
 7    monitoring?
 8              MS. FUMERTON:  Objection, form.
 9              MR. BOWER:  What's the nature
10         of the objection?
11              MS. FUMERTON:  The purpose --
12         it's vague because you're saying that
13         she did attend it to discuss this
14         reason as opposed to attending the
15         meeting, which is what she testified
16         to before.
17              MR. BOWER:  You can answer.
18         A.    I attended the meeting as the
19    buyer of C-II products.
20    BY MR. BOWER:
21         Q.    And prescription opiates were
22    discussed at the meeting, correct?
23         A.    That is correct.
24         Q.    Okay.  Do you recall receiving
25    any documents at the meeting?
```

1      A.      I do not recall.

2      Q.      And just so the record is

3  clear, do you not recall one way or the other

4  whether you received documents or not; is

5  that correct?

6      A.      I do not recall one way or the

7  other.

8      Q.      If you know -- let's just start

9  from the bottom of Ms. Johnson's notes on the

10  second page of the document.

11          Do you recall reviewing

12  specific stores highlighted?

13     A.      I do not remember.

14     Q.      You don't remember Walmart

15  stores being highlighted for potential

16  problems with opioid prescriptions?

17          MS. FUMERTON:  Objection, form.

18     A.      I do not remember.

19  BY MR. BOWER:

20     Q.      Do you see a couple of bullet

21  points up, oxycodone distribution almost

22  doubled from 2013 to '14?

23          Do you see that?

24     A.      Yes, I see that.

25     Q.      Do you recall being concerned

Highly Confidential - Subject to Further Confidentiality Review

1    when you were presented with that

2    information?

3                    MS. FUMERTON:  Objection, form.

4         A.    I don't remember.

5    BY MR. BOWER:

6         Q.    You don't remember being

7    concerned; is that correct?

8         A.    I don't remember the specifics

9    of the meeting.

10        Q.    Do you remember generally the

11   meeting?

12        A.    I remember going to the

13   meeting.  I don't remember the specifics of

14   the meeting.

15        Q.    Did you ever have any

16   discussions with anybody after the meeting

17   about the concerns raised by the DEA?

18                    MS. FUMERTON:  Objection, form.

19        A.    I did not.

20   BY MR. BOWER:

21        Q.    Do you see the DEA provided an

22   educational session to the folks at Walmart

23   on the first page there?

24        A.    Yes, I see.

25        Q.    Do you recall what that -- what

```
1    was included in that presentation?

2         A.    I do not.

3         Q.    Do you recall the format of the

4    presentation?

5         A.    I do not.

6         Q.    Do you recall whether it was on

7    a PowerPoint or whether it was documents were

8    handed?

9         A.    I do not.

10        Q.    Okay.  Do you recall the

11   discussion of the prescription drug abuse and

12   a general overview of the problem?

13        A.    I don't remember specifics to

14   the meeting.

15        Q.    And nothing on this document is

16   refreshing your recollection about the

17   meeting?

18        A.    No.

19        Q.    And if you go back to the

20   second page again, it appears there's

21   discussion of red flags.

22              Do you see that?  Kind of

23   towards the top there after Know Your

24   Customer?

25        A.    Yes, I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      You see it says red flags?

2        A.      Uh-huh.

3        Q.      You see the same red flags that

4    we're familiar with.  Do you know what that

5    refers to?

6        A.      I do not.

7        Q.      No?

8                Is the reason that you weren't

9    concerned about this meeting is because it

10   didn't impact the side of your business?

11               MS. FUMERTON:  Objection, form.

12               MR. BOWER:  Strike that.

13   BY MR. BOWER:

14       Q.      What was the reason this

15   meeting didn't concern you?

16               MS. FUMERTON:  Objection, form.

17               MR. BOWER:  I'll rephrase.

18       That's a bad question.

19   BY MR. BOWER:

20       Q.      You attended this meeting,

21   correct?  You don't dispute that?

22       A.      I attended the meeting.

23       Q.      Do you know why you attended

24   the meeting?

25       A.      I was invited to attend as the

1    buyer of the pain category.

2          Q.     And who were you invited to

3    attend by?

4          A.     I don't remember specifically.

5          Q.     Do you recall how you were

6    notified that the meeting was going to occur?

7          A.     I think it was just a

8    conversation, but I don't remember

9    specifically.

10         Q.     Did you have any discussions

11   with anyone prior to the meeting?

12         A.     I did not.

13         Q.     Was this unusual -- strike

14   that.

15                Would this have been unusual

16   for you to attend a meeting with the DEA

17   about prescription opioid abuse?

18                MS. FUMERTON:  Objection, form.

19         A.     I don't think so.

20   BY MR. BOWER:

21         Q.     That wouldn't have been

22   unusual?  Is that your testimony?

23                MS. FUMERTON:  Objection, form.

24         A.     It wouldn't have been unusual

25   for me to attend a meeting for an overarching

1    subject that had to do with my categories.

2    BY MR. BOWER:

3         Q.     Have you ever attended a

4    meeting with the DEA other than this one?

5         A.     Not that I recall.

6         Q.     So it was unusual, correct?

7                MS. FUMERTON:  Objection, form.

8    BY MR. BOWER:

9         Q.     That's the only time it

10   happened, right?

11               MS. FUMERTON:  Objection, form.

12        A.     Yes.  It was the only time it

13   happened.

14   BY MR. BOWER:

15        Q.     A little bit unusual, right?

16               MS. FUMERTON:  Objection, form,

17        asked and answered.

18        A.     It's not unusual for us to

19   attend all sorts of different meetings.  We

20   attend lots of meetings as buyers at Walmart

21   for -- with many different groups.

22   BY MR. BOWER:

23        Q.     So in your experience in

24   attending lots of meetings, was a meeting

25   with the DEA similar to any other meeting?

1            MS. FUMERTON:  Objection, form.

2        A.      It was a similar meeting to --

3     as far as we were participants and they were

4     presenting.

5     BY MR. BOWER:

6        Q.      Well, they were presenting on a

7     pretty important issue, weren't they?

8            MS. FUMERTON:  Objection, form.

9     BY MR. BOWER:

10        Q.      Let me ask you this:  Do you

11     agree that this issue that was discussed at

12     this meeting was an important one?

13            MS. FUMERTON:  Objection, form.

14            MR. BOWER:  What's the nature

15        of that objection?

16            MS. FUMERTON:  "This issue."

17        There's several issues that were

18        discussed at the meeting.

19            MR. BOWER:  All right.  Let's

20        break them down.

21     BY MR. BOWER:

22        Q.      Do you agree that the

23     discussion of prescription drug abuse was an

24     important discussion?

25        A.      Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Do you agree that discussion of

 2   pain clinics was an important discussion?

 3                   MS. FUMERTON:  Objection, form.

 4            A.     Yes, I do.

 5   BY MR. BOWER:

 6            Q.     What about the migration of

 7   clinics from Florida to Georgia to Tennessee

 8   to Kentucky to Ohio to Missouri, was that

 9   important?

10                   MS. FUMERTON:  Objection, form.

11            A.     Yes, I do.

12   BY MR. BOWER:

13            Q.     Did you ever go back and look

14   at Walmart's data to see whether, wow, this

15   might be happening in our pharmacies?

16            A.     I did not.

17            Q.     No.

18                   What about -- turn to the

19   second page.  Do you agree it's important,

20   the discussion about oxycodone distribution

21   almost doubling from 2013 to 2014?

22                   MS. FUMERTON:  Objection, form,

23         lack of foundation.

24                   MR. BOWER:  Well, I'll strike

25         that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:
 2         Q.    Do you see the bullet points
 3    from Ms. Johnson's notes in the meeting state
 4    that oxycodone distribution almost doubled
 5    from 2013 to 2014?
 6              Do you see that?
 7              MS. FUMERTON:  Objection, form.
 8         A.    I do see that.
 9    BY MR. BOWER:
10         Q.    Do you disagree that was
11    important?
12              MS. FUMERTON:  Objection, form,
13         lack of foundation.
14         A.    That is important.
15    BY MR. BOWER:
16         Q.    By this time you were aware
17    that there was an opioid crisis, were you
18    not?
19              MS. FUMERTON:  Objection, form,
20         asked and answered.
21    BY MR. BOWER:
22         Q.    Well, now we're in August 2015,
23    right?
24         A.    I know that there's suspicious
25    order monitoring in place and these are
```

1    things that other departments in Walmart are

2    reviewing and paying attention to.

3         Q.    Okay.  So you relied on them to

4    review and pay attention to this; is that

5    correct?

6              MS. FUMERTON:  Objection, form.

7         A.    That is accurate.

8    BY MR. BOWER:

9         Q.    After this meeting, did you do

10   anything differently with respect to the

11   buying side of the business?

12        A.    I did not.

13        Q.    Were there any discussions

14   about potentially changing the way you did

15   business?

16             MS. FUMERTON:  Objection, form.

17        A.    These things wouldn't have

18   played into me trying to get lower cost of

19   goods or ensuring that we had product at the

20   distribution center.

21   BY MR. BOWER:

22        Q.    Right.  Because those were your

23   goals from your perspective, right, lower

24   cost of goods and ensuring availability of

25   product, correct?

```
 1          A.      Those were two of the main

 2   things that I focused on in my position.

 3                  MR. BOWER:  Why don't we take a

 4      break.

 5                  MS. FUMERTON:  Okay.

 6                  THE VIDEOGRAPHER:  Going off

 7      the record, 4:37 p.m.

 8                  (Recess taken, 4:37 p.m. to

 9      4:52 p.m.)

10                  THE VIDEOGRAPHER:  Back on

11      record at 4:51 p.m.

12   BY MR. BOWER:

13          Q.      All right.  Ms. Little, we're

14   back on the record.  We'll try to finish up

15   here, do the best we can.

16                  (Walmart-Little Exhibit 29

17      marked.)

18   BY MR. BOWER:

19          Q.      Exhibit 29.  And I'll just

20   note -- you take your time to review it.

21   I'll just note that I don't have really any

22   questions regarding the substance of the

23   attachments or anything.  I'm just trying to

24   figure out how this document or this e-mail

25   got to you and why you sent it to
```

1    Ms. Spruell.

2              MS. FUMERTON:  Still take time

3         to make sure you understand.

4              MR. BOWER:  Yeah, yeah, please

5         do.  I just -- I'm not going to be

6         asking, I don't think, any questions

7         on the attachments.

8              (Document review.)

9    BY MR. BOWER:

10        Q.    Are you ready?

11        A.    I'm not ready.

12        Q.    And I'll note again, I'm just

13   asking you about the first page of the

14   document, so tell me when you've had a chance

15   to review that, okay?

16             (Document review.)

17        A.    Okay.

18   BY MR. BOWER:

19        Q.    Okay.  Do you at some point

20   recall receiving an e-mail from the folks at

21   QualiTest regarding the annual review

22   reminder?

23        A.    I do not.

24        Q.    Okay.  Is it possible you were

25   bcc'd on the e-mail from Aimee Cooper to Eric

Highly Confidential - Subject to Further Confidentiality Review

```
 1     Brantley?

 2          A.     I'm unsure.

 3          Q.     You're unsure?  Well, how did

 4     this e-mail come to you?

 5               MS. FUMERTON:  Zach, the Bates

 6          numbers are out of order.  I don't

 7          know if that's -- I don't know why.

 8               MR. BOWER:  I'm not sure

 9          either, but it's Walmart's production.

10               MR. FAUVRE:  Could we get the

11          Bates number on the document?

12               MR. BOWER:  Sure.  It starts in

13          7254 -- the e-mail -- you want to just

14          do the e-mail?

15               MS. FUMERTON:  Okay.  Look, I

16          don't know what this is.  I have no

17          personal knowledge and I don't know if

18          it's on our end.  My next question is

19          do you have a question with the

20          e-mail, because I do see like it

21          looks -- it looks a little off with

22          the numbers.

23               MR. BOWER:  Right, right.

24               MS. FUMERTON:  I'm just

25          wondering if this is an attachment.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           I'm just saying it's a possibility.

 2                MR. BOWER:  E-mailed an

 3      attachment?

 4                MS. FUMERTON:  Yeah.  The

 5      attachments got out of order.

 6                MR. BOWER:  My questions are

 7      only on the pages ending in 7245 and

 8      7246, and I'm just trying to figure

 9      out how this --

10                MR. FAUVRE:  Can we get the

11      full Bates number, please?

12                MR. BOWER:  Who is that on the

13      phone?

14                MR. FAUVRE:  This is David

15      Fauvre for Endo and Par.  Can we get

16      the full Bates numbers?

17                MS. FUMERTON:  Yeah, David, it

18      starts 245 -- well...

19                MR. BOWER:  I believe it was in

20      your hard copy production.  That might

21      explain it.

22                MR. FAUVRE:  What's the prefix?

23                MR. BOWER:  Prefix is a Walmart

24      document, WMT_MDL.

25                MS. FUMERTON:  I don't know.
```

```
 1                  MR. BOWER:  Okay.  Well, why

 2         don't -- look, I'm not going to ask

 3         any questions.

 4                  MS. FUMERTON:  That's fine.

 5                  MR. BOWER:  Why don't we just

 6         leave it as it is.  I don't think

 7         there's anything controversial in it.

 8   BY MR. BOWER:

 9         Q.    My only question is:  Do you

10   have any recollection as to why you would be

11   sending this request, if you received one,

12   regarding annual SOM review to Kristy

13   Spruell?  Do you see the e-mail at the top

14   from Patsy Little to Kristy Spruell?

15         A.    I see the e-mail at the top.

16         Q.    And you see it's on December 7,

17   2015?

18         A.    Yes, I see that.

19         Q.    Right.  And that's the same day

20   that Ms. Amy Cooper sends an e-mail to Eric

21   Brantley with the same subject matter, right?

22         A.    Yes.

23         Q.    So it's possible that you were

24   bcc'd on the e-mail from Amy to Eric?

25         A.    I'm not sure.  I can't tell
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    from the document.

2         Q.    I realize that.  That's why I'm

3    asking you as you're the witness here today.

4              So do you have any

5    understanding or recollection as to why you

6    sent this to Kristy Spruell?

7              MS. FUMERTON:  I object to the

8         question because I think the document

9         is just so confused.

10             MR. BOWER:  All right.

11             MS. FUMERTON:  I just note it

12        says produced in native format,

13        actually, the first Bates number, so I

14        don't think it's a hard copy

15        production.

16   BY MR. BOWER:

17        Q.    Again, looking at the first

18   page of the document ending in 7245, an

19   e-mail from yourself to Kristy Spruell, you

20   see that?  I'm just trying to understand why

21   you were sending this to Ms. Spruell.  That's

22   my only question.

23             MS. FUMERTON:  I think my

24        objection to the question is what

25        "this" is.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOWER:
 2         Q.      Why are you forwarding this
 3    e-mail regarding annual review reminder to
 4    Ms. Spruell?
 5              MS. FUMERTON:  And just object
 6         to the form, the lack of foundation.
 7    BY MR. BOWER:
 8         Q.      Who was Ms. Spruell?
 9         A.      Ms. Spruell worked -- I
10    don't -- I can't remember if she worked on
11    the warehousing team or on Miranda's team.
12         Q.      Okay.  If she had worked on
13    Miranda's team, would that have been a reason
14    that you would have sent her this request for
15    an annual review reminder?
16              MS. FUMERTON:  Objection, form.
17         A.      Yes, that would have been the
18    reason.
19    BY MR. BOWER:
20         Q.      Okay.  Thank you.
21              (Walmart-Little Exhibit 30
22         marked.)
23    BY MR. BOWER:
24         Q.      You've been handed what's been
25    marked as Exhibit 30, which I note is a
```

Highly Confidential - Subject to Further Confidentiality Review

1    Mallinckrodt document, MNK-T1_0004830712.  I

2    don't believe this was produced by Walmart.

3                It's an e-mail from yourself to

4    Mallinckrodt LLC - Bonnie New.

5                Do you see that?

6         A.    I do see that.

7         Q.    And this was sent from your

8    iPhone correct?

9         A.    It --

10        Q.    At least it indicates that,

11   right?

12        A.    Yes.

13        Q.    Okay.  Who is Bonnie New?

14        A.    Bonnie was our account

15   representative at Walmart -- I mean at

16   Mallinckrodt.

17        Q.    Okay.  And what does that mean,

18   she was your account representative?

19        A.    She represented Mallinckrodt to

20   Walmart.

21        Q.    And what capacity did she

22   represent Mallinckrodt?

23        A.    She was my contact at

24   Mallinckrodt.  She would -- she was a

25   national account director.  I'm not sure what

1    her title was.

2         Q.    Would she notify you when new

3    products would become available?

4         A.    Yes, she would.

5         Q.    The subject of your e-mail is

6    Oxycodone Marketing Plan.

7              Do you see that?

8         A.    Yes, I do.

9         Q.    This is in 2016, correct?

10        A.    Yes, it is.

11        Q.    Okay.  Is there any reason why

12   you're e-mailing her about oxycodone

13   marketing plan in 2016?

14        A.    Well, it looks like George was

15   asking me a question, who was my VP's boss,

16   and so I must have been following up on a

17   question that he was asking me.  I don't

18   remember.

19        Q.    And who was George?  What's his

20   full name?

21        A.    George Riedl.

22        Q.    How do you spell his last name?

23        A.    I think it's R-I-D-E-L [sic].

24        Q.    Do you recall what he was

25   asking about with respect to oxycodone

Highly Confidential - Subject to Further Confidentiality Review

1    marketing plan?

2        A.    Not offhand, I don't.

3        Q.    Well, it's just you on this

4    e-mail, you're the only one from Walmart,

5    right?

6        A.    Yes, I'm the only one on the

7    e-mail.

8        Q.    As you sit here today, you

9    don't recall what this e-mail was about?

10       A.    I do not.  I didn't do an

11   oxycodone marketing plan with Mallinckrodt,

12   so I'm unsure of what the question George was

13   asking me.

14       Q.    Do you know why George would be

15   asking you about an oxycodone marketing plan

16   in 2016?

17             MS. FUMERTON:  Objection, form,

18        lack of foundation.

19   BY MR. BOWER:

20       Q.    We'd have to ask George,

21   wouldn't we?

22             MS. FUMERTON:  Objection, form.

23        You've asked two questions and she

24        hasn't answered.

25             MR. BOWER:  I'll rephrase.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOWER:

2         Q.    Do you think George would

3    recall what he was asking you?

4              MS. FUMERTON:  Objection, form.

5         A.    I'm not sure.

6    BY MR. BOWER:

7         Q.    Well, your question is actually

8    a little bit more specific, right?  You're

9    asking:  Can you outline what this looks like

10   to physicians, right?

11             MS. FUMERTON:  Objection, form.

12   BY MR. BOWER:

13        Q.    You're asking -- I'll strike

14   that.

15             In this e-mail you're asking

16   Mallinckrodt specifically what their

17   oxycodone marketing plan looks like to

18   physicians, correct?

19             MS. FUMERTON:  Objection, form.

20        A.    I don't know if Mallinckrodt

21   had an oxycodone marketing plan for

22   physicians.  I -- without seeing what George

23   asked me, I'm not clear on what this is.

24   BY MR. BOWER:

25        Q.    Well, the e-mail speaks for

1    itself, right?  You're asking Mallinckrodt

2    about what their oxycodone marketing plan

3    looks like to physicians.

4              Do you disagree with that?

5              MS. FUMERTON:  Objection, form.

6    A.     I see that in the e-mail.

7    BY MR. BOWER:

8    Q.     Do you disagree you're asking

9    Mallinckrodt this question?

10             MS. FUMERTON:  Objection, form.

11   A.     Ask -- it's in the e-mail.

12   BY MR. BOWER:

13   Q.     You sent it, right?

14   A.     I sent the e-mail.

15   Q.     Do you recall sending it?

16   A.     I do not.

17   Q.     Do you recall having any

18   conversations with George about marketing to

19   physicians for oxycodone?

20   A.     I do not.

21   Q.     Do you recall receiving a

22   response from Mallinckrodt regarding their

23   oxycodone marketing plan to physicians?

24             MS. FUMERTON:  Objection, form.

25   A.     I do not.

```
 1    BY MR. BOWER:

 2         Q.    Is there any reason why Walmart

 3    would be asking this question, from your

 4    perspective, based on your experience as a

 5    buyer of oxycodone for Walmart for 12 years?

 6                MS. FUMERTON:  Objection, form.

 7         A.    Without seeing what George's

 8    question was to me, I'm not sure what we were

 9    asking.

10    BY MR. BOWER:

11         Q.    Do you think George provided

12    you a written question?

13         A.    I can't remember.

14         Q.    How would you -- how would we

15    be able to -- how would you be able to see

16    his question if it wasn't in writing?

17                MS. FUMERTON:  Objection, form.

18         A.    I don't know.

19    BY MR. BOWER:

20         Q.    This is oxycodone, right, in

21    2016, right?

22                MS. FUMERTON:  Objection, form.

23         A.    I see that on the e-mail.

24    BY MR. BOWER:

25         Q.    This is about a little more
```

1    than two years ago, right?

2         A.    That is correct.

3         Q.    At this point, the opioid

4    epidemic had been discussed in the media

5    frequently, right?

6              MS. FUMERTON:  Objection, form.

7         A.    I don't -- I don't recall

8    specifically.

9    BY MR. BOWER:

10        Q.    It would have been the subject

11   of numerous TV shows, numerous books,

12   numerous political discussions, right?

13             MS. FUMERTON:  Objection, form.

14        A.    I don't recall.

15   BY MR. BOWER:

16        Q.    And do you recall -- do you

17   recall at any point there being a problem

18   that folks were raising about marketing

19   oxycodone to physicians?

20        A.    Walmart --

21             MS. FUMERTON:  Objection, form.

22        A.    Walmart did not participate in

23   marketing oxycodone to physicians.

24   BY MR. BOWER:

25        Q.    Well, you just said you didn't

1  recall, right?  How can you be certain?

2           MS. FUMERTON:  Objection, form,

3       misstates her testimony.

4       A.    I don't recall what this e-mail

5  is about.  I know as a buyer I did not put

6  together any plan that went to physicians

7  that was marketing.  A vendor could have

8  brought an idea to me that I reviewed or

9  looked at or saw, but we did not execute a

10  marketing plan to physicians that I'm aware

11  of.

12  BY MR. BOWER:

13      Q.    Do you know whether George ever

14  executed such a marketing plan?

15           MS. FUMERTON:  Objection, form.

16      A.    It would be unusual for him in

17  that position to execute a marketing plan.

18  BY MR. BOWER:

19      Q.    Is it unusual for you to be

20  asking Mallinckrodt about a marketing plan to

21  physicians with respect to oxycodone?

22           MS. FUMERTON:  Objection, form.

23      A.    It would not be unusual for me

24  to follow up on any question that the

25  president of health and wellness had asked

1    me.

2    BY MR. BOWER:

3         Q.    Okay.

4              (Walmart-Little Exhibit 31

5    marked.)

6    BY MR. BOWER:

7         Q.    You've been handed what's been

8    marked as Exhibit 31, it's a one page e-mail.

9    Please take a moment to review it.

10              MR. CIULLO:  What's the Bates?

11              MR. BOWER:  Yeah, the Bates

12         number is -- it's a Walmart document

13         ending in 21571.  It's a one-page

14         document.

15              MR. CIULLO:  Thank you.

16              (Document review.)

17    BY MR. BOWER:

18         Q.    Do you see that?

19         A.    I do.

20         Q.    Who is Bonnie New?

21         A.    Bonnie was our account director

22    with Mallinckrodt.

23         Q.    Okay.  And she's writing to

24    yourself and cc'ing Linda Wilson, correct?

25         A.    That is correct.

1       Q.      And she is conveying a

2    conversation we had with Ms. Wilson, right?

3    She says:  I spoke with Linda this morning.

4       A.      Yes.

5       Q.      Right?  And she spoke with

6    Linda regarding the distribution of oxy,

7    right?

8       A.      About oral solution, yes.

9       Q.      Right.

10              What is an oral solution?  Is

11   that a new product?

12      A.      It would be a liquid product.

13   This was a new -- a new offer that

14   Mallinckrodt had presented to us for a new

15   item.

16      Q.      In connection with that offer,

17   Linda was going to look at the files that

18   prescribers provided and try to identify

19   cities within the given ZIP codes that would

20   be appropriate for stocking this product at

21   the Walmart locations.

22              Do you see that?

23      A.      I see that Mallinckrodt stated

24   that, yes.

25      Q.      Okay.  Did you ever look at

1    that file of prescribers provided by

2    Mallinckrodt?

3         A.    I'm not sure if I ever looked

4    at that file or not.

5         Q.    Do you recall ever seeing such

6    a file?

7         A.    I don't recall seeing a file.

8         Q.    Do you recall speaking with

9    Linda about this product?

10        A.    I did speak to Linda about this

11   product, yes.

12        Q.    And what was that conversation

13   about?

14        A.    We talked about this product

15   was a very small product, and it was a -- not

16   a product that I really was interested in

17   purchasing.

18        Q.    And you weren't interesting in

19   purchasing because it was a small product; is

20   that correct?

21             MS. FUMERTON:  Objection, form.

22             MR. BOWER:  Let me strike that.

23   BY MR. BOWER:

24        Q.    Why were you not interested in

25   purchasing it?

1    A.    The brand of this item had been

2  off of the market, I don't remember what the

3  time span was.  The market for this item was

4  small, and I -- I didn't feel that it was an

5  appropriate item for us.

6    Q.    And what was the basis for your

7  feeling that it wasn't an appropriate item

8  for Walmart?

9    A.    Because it was an oxycodone and

10  it was a liquid product.

11    Q.    And why would that not be an

12  appropriate item for Walmart?

13    A.    In my opinion, a liquid was

14  easier to be abused and it didn't have a

15  history of selling since the brand had been

16  off the market for a couple of -- I'm saying

17  a couple of years.  I don't recall the time

18  span.

19    Q.    Well, was a product's

20  susceptibility to abuse a criteria to

21  determine whether Walmart would stock the

22  product at the warehouse?

23         MS. FUMERTON:  Objection, form.

24    A.    That generally was not -- that

25  was generally not something that I would use.

Highly Confidential - Subject to Further Confidentiality Review

 1    This was a new product coming to the market

 2    that did not have a history, and I did use

 3    that criteria in my thoughts on this product.

 4    BY MR. BOWER:

 5         Q.    So is it a true statement that

 6    you used that criteria in this scenario

 7    because it did not have a history of sales?

 8         A.    That is accurate.

 9         Q.    Okay.

10              (Walmart-Little Exhibit 32

11         marked.)

12    BY MR. BOWER:

13         Q.    You've been handed what's been

14    marked as Exhibit 32.  Take your time to

15    review it.  I can tell you that my questions

16    are simply focused on the first page at the

17    top right there, the cc and the handwriting.

18              Do you see that?

19         A.    Yes.

20         Q.    This is a contract -- you can

21    review it.  I don't mean to --

22              MS. FUMERTON:  At least give

23         her a chance to see the general --

24              MR. BOWER:  Yeah, yeah.

25              MS. FUMERTON:  It might help

```
1          inform your questions.

2                    MR. BOWER:  Sure.

3                    MR. CIULLO:  While we're

4          waiting, can you give me the Bates?

5                    MR. BOWER:  Oh, yeah, sure.

6          This is a Walmart document again,

7          25445 through 447.

8                    MR. CIULLO:  Thank you very

9          much.

10                   MR. BOWER:  Sure.

11                   (Document review.)

12                   THE WITNESS:  Okay.

13    BY MR. BOWER:

14         Q.    Okay?

15         A.    Yes.

16         Q.    You see this is a signed

17    contract by -- by yourself dated 3/30/2011?

18         A.    Yes.

19         Q.    During this time period, you

20    had a responsibility for purchasing

21    prescription opiates for Walmart?

22         A.    Yes.

23         Q.    Okay.  Is that your handwriting

24    in the top right corner of the first page?

25         A.    It is not.
```

1     Q.     Do you know whose handwriting

2  that is?

3     A.     I do not.

4     Q.     Typically, what was your

5  procedure once you signed a contract?

6           MS. FUMERTON:  Objection, form.

7     A.     The contracts were scanned in

8  electronically and e-mailed back to the

9  vendors.

10  BY MR. BOWER:

11     Q.     Did Walmart save contracts in a

12  central location?

13     A.     Not that I'm aware of.

14     Q.     Well, this contract, for

15  example, references a different contract.  Do

16  you see that?  Contract No. 0400500123.

17           Do you see that?

18     A.     Yes, I see that.

19     Q.     Did you have the ability to

20  pull up that contract and see what those

21  terms were?

22     A.     If it was a contract that I had

23  signed, I would look in my e-mail folders or

24  I would ask the manufacturer for a copy.

25     Q.     And Walmart didn't maintain

1    copies of contracts it signed anywhere?

2              MS. FUMERTON:  Objection, form.

3         A.    No, they did not.

4    BY MR. BOWER:

5         Q.    And let me ask it a different

6    way.

7              Based on your experience as a

8    buyer for Walmart for at least ten years, did

9    you save contracts that you had signed in any

10   central location?

11             MS. FUMERTON:  Objection, form.

12        A.    I saved my contracts in my

13   e-mail folders.

14   BY MR. BOWER:

15        Q.    Okay.  Did you have e-mail

16   folders for each manufacturer?

17        A.    I did.

18        Q.    Did you have e-mail folders

19   for -- organized by product?

20        A.    I did not.

21        Q.    They were organized by

22   manufacturer; is that correct?

23        A.    Yes.

24        Q.    Any other way they were

25   organized?

```
 1              A.      I think I had a brand or a
 2     generic breakdown maybe, if I remember right.
 3              Q.      Do you know what happened to
 4     those e-mails when you left Walmart?
 5              A.      I don't know.
 6              Q.      Do you know who replaced you
 7     when you left Walmart?
 8              A.      I don't know.
 9              Q.      Do you know if anyone replaced
10     you?
11              A.      I do not know.
12              Q.      Do you know what the JBP
13     program refers to?
14              A.      JBP?  Joint business plan.
15              Q.      Yeah, what is that?
16              A.      That was a program that we had
17     in place for a couple of years where we
18     aligned with certain manufacturers.  I think
19     I had mentioned it earlier, the strategic
20     planning.
21              I don't remember the exact
22     terminology earlier, but we had manufacturers
23     that we would work with on what their
24     upcoming pipelines were and do some
25     commitments on those in hopes to get a lower
```

1    cost of good, strengthen the relationship,

2    and then get supply on items that were hard

3    to supply in the market.

4         Q.    Do you recall receiving a red

5    flags video from Bonnie New?

6         A.    Red flags video?  I do not.

7         Q.    Have you ever heard the term

8    "red flags video" before?

9         A.    Not that I remember.

10        Q.    No?

11              What about a link to a letter

12   regarding a red flags video?  Do you recall

13   that?

14        A.    I don't recall that.

15        Q.    Okay.  Going back to the

16   Exhibit 32 for a moment, do you know what the

17   red folder refers to?

18        A.    I do not.

19        Q.    Okay.  Do you know -- do you

20   recognize those names in the top of the

21   document there?

22        A.    Tim Berry, I know who that is.

23   Lauren Wisbrink, I'm not familiar with that.

24   Sally Steiner may have worked for

25   Mallinckrodt.  I'm not sure.  It sounds

```
 1    familiar, but I'm not sure.

 2         Q.    What was Tim Berry's position,

 3    if you recall?

 4         A.    Tim Berry was a national

 5    account manager or was our contact for a time

 6    being.

 7         Q.    Do you recall attending a

 8    customer meeting with Ayisha Jeter?

 9         A.    I'm sorry, could you repeat

10    that.

11         Q.    Yes, do you recall ever having

12    a meeting with Ayisha Jeter regarding

13    Hysingla?

14         A.    I do not.

15         Q.    Do you recall discussing with

16    her pharmacist education of Hysingla?

17         A.    I do not.

18         Q.    Do you know whether Walmart

19    ever educated its pharmacists regarding

20    Hysingla ER?

21         A.    I do not.

22         Q.    Do you recall reviewing the

23    priority stores for Hysingla and presenting

24    the review to Ayisha?

25         A.    I do not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.      Never recall meeting Ayisha?

2        A.      The name does not sound

3    familiar.

4        Q.      If I told you she worked at

5    McKesson, would that ring a bell?

6        A.      It does not.

7        Q.      What about if she worked at

8    Purdue, would that ring a bell?

9        A.      It does not.

10       Q.      No?

11               You ever meet with Lucy Baird

12   at Purdue?

13       A.      Lucy Bard, yes.

14       Q.      Did you meet with her regarding

15   Hysingla?

16       A.      I don't remember that.

17       Q.      Did you discuss with her ever

18   marketing -- educating Walmart pharmacists on

19   Hysingla?

20               MS. FUMERTON:  Objection, form,

21          asked and answered.

22   BY MR. BOWER:

23       Q.      I'm asking about Lucy Bard now.

24   Did you ever have any discussions with Lucy

25   Bard -- I'll rephrase.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you recall ever having

 2     discussions or a meeting where such

 3     discussions occurred regarding educating

 4     Walmart pharmacists regarding Hysingla?

 5                    MS. FUMERTON:  Objection, form,

 6          asked and answered.

 7          A.    I don't remember.

 8     BY MR. BOWER:

 9          Q.    Could have happened; you just

10     don't recall, right?

11          A.    I don't recall.

12          Q.    Do you recall speaking with

13     Dave Irwin regarding oxycodone?

14                    MS. FUMERTON:  Objection, form.

15          A.    I don't remember.

16     BY MR. BOWER:

17          Q.    You don't have any recollection

18     of speaking with him about oxycodone?

19          A.    I don't remember, no.

20          Q.    Do you recall Dave Irwin

21     visiting Walmart to discuss fentanyl?

22          A.    I do not.

23          Q.    Did you discuss Mr. Irwin

24     visiting Walmart to discuss oxy ER?

25          A.    I do not.
```

1      Q.     Do you recall ever meeting with

2    Dave Irwin in person?

3      A.     Yes.

4      Q.     And where do you recall meeting

5    with him?

6      A.     I would have met with him at

7    the home office, potentially ECRM or NACDS.

8      Q.     Why would you have met with

9    him?  What was the purpose?

10     A.     Dave represented Mallinckrodt

11   at one time.  He also represented Glenmark at

12   one time.  So it would have been meetings in

13   either of those situations.

14     Q.     Do you recall ever calling Dave

15   and asking for his assessment of the growth

16   in the oxy market?

17              MS. FUMERTON:  Objection, form.

18     A.     I don't recall.

19   BY MR. BOWER:

20     Q.     It could have happened, you

21   just don't recall, correct?

22     A.     I don't remember.

23     Q.     Do you recall discussing the

24   growth in the oxy market in late 2009 with

25   Mr. Irwin?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I do not.

2        Q.      Could have happened, you just

3    don't recall, correct?

4        A.      I don't remember.

5        Q.      Do you know what ORF stands

6    for?

7        A.      I don't think so.

8        Q.      Okay.  Do you recall meeting

9    with Steve S-E-I-D -- I'm not sure how to

10   pronounce that name.

11              Do you recall ever meeting with

12   Mr. S-E-I-D from Purdue?

13       A.      I could have.  I'm unsure of

14   the gentleman that I'm thinking of, of what

15   his name was, but...

16       Q.      Okay.  Do you ever recall

17   meeting with Shelton Benson of Purdue?

18       A.      Yes.

19       Q.      Okay.  Where was that meeting?

20       A.      We would have met at the home

21   office as well as potentially NACDS or ECRM.

22       Q.      Do you recall discussing with

23   him store communication?

24              MS. FUMERTON:  Objection, form.

25       A.      Not particularly.

```
 1    BY MR. BOWER:

 2         Q.    What about generally?

 3         A.    I don't remember specifics.  I

 4    mean, it could have been a topic, but I

 5    don't -- I don't recall.

 6         Q.    Okay.  Do you recall asking for

 7    talking points to send to her stores for

 8    pharmacist review?

 9         A.    I do not.

10         Q.    Okay.  Do you recall someone

11    from Sam's Club being present at any of those

12    meetings?

13              MS. FUMERTON:  Objection, form.

14         A.    I do not.

15    BY MR. BOWER:

16         Q.    Maybe by the name of Charlie?

17         A.    I do not.

18         Q.    Doesn't ring a bell?

19         A.    Huh-uh.

20         Q.    Do you know what REMS stands

21    for, R-E-M-S?

22         A.    Yes, I do.

23         Q.    What does it stand for?

24         A.    It's a risk mitigating factor

25    on some products.
```

1    Q.    Do you recall discussing with

2  Mr. Benson the REMS in connection with

3  prescription opiates?

4    A.    I do not.

5          MR. CIULLO:  Object to form.

6  BY MR. BOWER:

7    Q.    It could have happened; you

8  just don't recall, right?

9    A.    I don't remember.

10   Q.    All right.  Do you recall

11 meeting with Mr. Benson where Walmart sales

12 data was made available?

13         MS. FUMERTON:  Objection, form.

14   A.    I do not.

15 BY MR. BOWER:

16   Q.    What is NARS data, N-A-R-S?

17   A.    I don't know.

18   Q.    Do you recall discussing with

19 Mr. Benson the value of NARS data?

20         MS. FUMERTON:  Objection, form.

21   A.    I do not.

22 BY MR. BOWER:

23   Q.    Do you recall a request to --

24 by Purdue to receive NARS data on a regular

25 basis?

```
 1                    MS. FUMERTON:   Objection, form.

 2          A.     I do not.

 3   BY MR. BOWER:

 4          Q.     Could have happened, you just

 5   don't recall, correct?

 6          A.     I do not recall.

 7          Q.     Do you recall discussions with

 8   Mr. Benson regarding Senokot?

 9          A.     I do not.

10          Q.     Do you recall meeting with

11   Steve Bishop of Purdue?

12          A.     Steve Bishop could be the one

13   person that I remember meeting with, but I

14   can't recall the name.

15          Q.     Okay.  What about Mike Cullen

16   of Purdue?

17          A.     The name doesn't ring a bell.

18          Q.     What about Tony Scifo,

19   S-C-I-F-O, of Purdue?

20          A.     Huh-uh.

21          Q.     Never met him?

22          A.     It doesn't ring a bell.

23          Q.     Ever meet him at an NACDS

24   meeting potentially?

25          A.     Not that I remember.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Who from Purdue would you meet

2    with at NACDS meetings?

3      A.     I would meet with my account

4    representative, who would have been Shelton

5    or Lucy.

6      Q.     Do you recall discussing

7    sharing the costs with Mr. Seid of oxy

8    distribution?

9           MS. FUMERTON:  Objection, form.

10     A.     I do not.

11   BY MR. BOWER:

12     Q.     Could have had those

13   discussions; you just don't recall?

14     A.     I do not remember.

15     Q.     Do you recall attending a

16   meeting put on by Mallinckrodt that included

17   a presentation by Professor David Brushwood?

18     A.     I do not.

19     Q.     Did you -- are you familiar

20   with V-I-G-I-L, VIGIL, a process of screening

21   opioid analgesic prescriptions to ensure the

22   legal requirements are met?

23     A.     I am not.

24     Q.     Do you recall Mallinckrodt

25   putting on any such presentation that you

Highly Confidential - Subject to Further Confidentiality Review

1    attended?

2          A.     I do not.

3          Q.     In 2011, an NACDS meeting, does

4    that refresh your recollection of attending

5    such a presentation?

6          A.     I do not remember.

7                 MS. FUMERTON:  You've got like

8          one minute left.

9                 MR. BOWER:  Yeah.

10   BY MR. BOWER:

11         Q.     Do you recall meeting with Mike

12   Inn- -- I-N-N-A-U-R-T-O -- regarding

13   prescription opiates in Bentonville?

14         A.     Could you respell that?

15         Q.     Sure.  I think it's Innaurato,

16   I-N-N-A-U-R-A-T-O.

17         A.     I do not.

18         Q.     Okay.  Would it help if I told

19   you he's from Purdue?

20         A.     I do not remember.

21         Q.     Okay.  Who is Crystal Varela?

22         A.     Crystal worked at Walmart.  She

23   was in our post-audit department for a while

24   and was a buyer for a short period.

25         Q.     Do you know why you and her met

Highly Confidential - Subject to Further Confidentiality Review

1   with Mallinckrodt in August 23rd, 2012?

2           MS. FUMERTON:  Objection, form,

3       lack of foundation.

4       A.    I do not.

5   BY MR. BOWER:

6       Q.    Do you recall such a meeting?

7       A.    I do not.

8       Q.    No?

█   ███████████████████████████████

█   █████████████████████████████

█   ████   ████████████████

12      Q.    That was your cell phone

13  number, in or about 2012?

14      A.    Yes.

15      Q.    Okay.  Any reason why the folks

16  at Mallinckrodt had that listed?

17          MS. FUMERTON:  Objection, form.

18  BY MR. BOWER:

19      Q.    Would you speak with folks at

20  Mallinckrodt on your cell phone regarding

21  Walmart business?

22      A.    Yes, I would.

23          MR. BOWER:  I have nothing

24      further.  I think my time is up.  Why

25      don't we switch.

Highly Confidential - Subject to Further Confidentiality Review

1          MS. FUMERTON:  I have no

2     questions.

3          MR. BOWER:  Oh, no questions?

4     Okay.

5          THE VIDEOGRAPHER:  This ends --

6          MS. FUMERTON:  Go off the

7     record.

8          THE VIDEOGRAPHER:  This ends

9     today's deposition.  Going off the

10    record at 5:28 p.m.

11          (Proceedings recessed at

12    5:28 p.m.)

13                --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   CERTIFICATE
 2             I, MICHAEL E. MILLER, Fellow of
      the Academy of Professional Reporters,
 3    Registered Diplomate Reporter, Certified
      Realtime Reporter, Certified Court Reporter
 4    and Notary Public, do hereby certify that
      prior to the commencement of the examination,
 5    PATSY LITTLE was duly sworn by me to testify
      to the truth, the whole truth and nothing but
 6    the truth.
 7             I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
11             I DO FURTHER CERTIFY that pursuant
      to FRCP Rule 30, signature of the witness was
      not requested by the witness or other party
12    before the conclusion of the deposition.
13             I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18    _____
      MICHAEL E. MILLER, FAPR, RDR, CRR
19    Fellow of the Academy of Professional Reporters
      NCRA Registered Diplomate Reporter
20    NCRA Certified Realtime Reporter
      Certified Court Reporter
21    Notary Public

22
      My Commission Expires:  7/9/2020
23
      Dated: December 19, 2018
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4      carefully and make any necessary corrections.

 5      You should state the reason in the

 6      appropriate space on the errata sheet for any

 7      corrections that are made.

 8              After doing so, please sign the

 9      errata sheet and date it.

10              You are signing same subject to

11      the changes you have noted on the errata

12      sheet, which will be attached to your

13      deposition.

14              It is imperative that you return

15      the original errata sheet to the deposing

16      attorney within thirty (30) days of receipt

17      of the deposition transcript by you.  If you

18      fail to do so, the deposition transcript may

19      be deemed to be accurate and may be used in

20      court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                           ERRATA

2    PAGE   LINE   CHANGE

3    _____  _____  _____

4           REASON: _____

5    _____  _____  _____

6           REASON: _____

7    _____  _____  _____

8           REASON: _____

9    _____  _____  _____

10          REASON: _____

11   _____  _____  _____

12          REASON: _____

13   _____  _____  _____

14          REASON: _____

15   _____  _____  _____

16          REASON: _____

17   _____  _____  _____

18          REASON: _____

19   _____  _____  _____

20          REASON: _____

21   _____  _____  _____

22          REASON: _____

23   _____  _____  _____

24          REASON: _____

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4            I, PATSY LITTLE, do hereby certify

      that I have read the foregoing pages and that

 5    the same is a correct transcription of the

      answers given by me to the questions therein

 6    propounded, except for the corrections or

      changes in form or substance, if any, noted

 7    in the attached

      Errata Sheet.

 8

 9

10

11

12    _____

      PATSY LITTLE                          DATE

13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    _____

20    Notary Public

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2

 3      PAGE      LINE

 4      _____     _____     _____

 5      _____     _____     _____

 6      _____     _____     _____

 7      _____     _____     _____

 8      _____     _____     _____

 9      _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____     _____     _____

24      _____     _____     _____

25
```