Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
-  -  -

IN RE:  NATIONAL         : HON. DAN A.
PRESCRIPTION OPIATE      : POLSTER
LITIGATION               :
                         :
APPLIES TO ALL CASES     : NO.
                         : 1:17-MD-2804

- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
-  -  -
JANUARY 22, 2019
-  -  -

Videotaped sworn deposition of

BRIAN LORTIE, taken pursuant to notice,

was held at McCARTER & ENGLISH, LLP,

1600 Market Street, Suite 3900,

Philadelphia, Pennsylvania, beginning at

9:06 a.m., on the above date, before

Margaret M. Reihl, a Registered

Professional Reporter, Certified

Shorthand Reporter, Certified Realtime

Reporter, and Notary Public.


-  -  -


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
1   A P P E A R A N C E S:
2
3   SEEGER WEISS LLP
    BY:  JENNIFER SCULLION, ESQUIRE
4       ERICA KUBLY, ESQUIRE
        SABRINA TYJER, PARALEGAL
    77 Water Street
5   New York, NY 10005
    (212) 584-0700
6   jscullion@seegerweiss.com
    Representing the Plaintiffs
7
8
    BRANSTETTER, STRANCH & JENNINGS, PLLC
9   BY:  JOE P. LENISKI, JR., ESQUIRE
    The Freedom Center
10  223 Rosa L. Parks Avenue, Suite 200
    Nashville, Tennessee  37203
11  (625) 254-8801
    joyl@bsjfirm.com
12  Representing the Tennessee Plaintiffs
13
14  GOODELL DEVRIES LEECH & DANN, LLP
    BY:  ROBERT LIMBACHER, ESQUIRE
15      ADAM S. TOLIN, ESQUIRE
    Two Commerce Square
16  2001 Market Street, Suite 3700
    Philadelphia, Pennsylvania  19103
17  (267) 765-3600
    rlimbacher@gdldlaw.com
18  atolin@gdldlaw.com
    Representing the Defendant Endo and
19  the witness
20
21
22
23
24
```

Page 3

```
1   A P P E A R A N C E S: (cont'd)
2
3   PIETRAGALLO GORDON ALFANO
    BOSICK & RASPANTI, LLP
4   BY:  DOUGLAS K. ROSENBLUM, ESQUIRE
    1818 Market Street, Suite 3402
5   Philadelphia, Pennsylvania  19103
    (215) 988-1464
6   dkr@pietragallo.com
    Representing Cardinal Health
7
8
9   ALSO PRESENT:
10
    Carolyn M. Hazard, Litigation Counsel
11  Endo
12  Bill Geigert, Videographer
13  Bradley Smith, Trial Technician
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1   APPEARANCES VIA TELECONFERENCE AND STREAM
2
3   ULMER & BERNE, LLP
    BY:  JOSHUA A. KLARFELD, ESQUIRE
    1660 West 2nd Street
4   Suite 1100
    Cleveland, Ohio  44113
5   (261) 583-7000
    jklarfeld@ulmer.com
6   Representing Amneal Pharmaceuticals, Inc.
7
8   JONES DAY
    BY:  TAYLOR GOODSPEED, ESQUIRE
9   555 California Street, 26th Floor
    San Francisco, California  94104-1500
10  (415) 875-5804
    tgoodspeed@jonesday.com
11  Representing the Defendant Walmart
12
    CLARK MICHIE LLP
13  BY:  BRUCE CLARK, ESQUIRE
        CHRISTOPHER J. MICHIE, ESQUIRE
14  220 Alexander Street
    Princeton, New Jersey  08540
15  (609) 423-2142
    Representing the Defendant,
16  Pernix Therapeutics Holdings, Inc.
17
18  REED SMITH LLP
    BY:  RYAN K. BLAKE, ESQUIRE
19  Three Logan Square
    1717 Arch Street, Suite 3100
20  Philadelphia, Pennsylvania  19103
    (215) 851-8280
21  rblake@reedsmith.com
    Representing the Defendant AmerisourceBergen
22
23          ---
24
```

Page 5

```
1           I N D E X
2   WITNESS                 PAGE
    BRIAN LORTIE
3
        By Ms. Scullion      12
4
5          E X H I B I T S
6   NO.      DESCRIPTION      PAGE
7   Endo-
    Lortie-1  Notice of Deposition of
8       Brian Lortie         13
9   Endo-
    Lortie-2  Subpoena to Testify at a
10      Deposition in a Civil Action  13
11  Endo-
    Lortie-3  Resume Brian Andrew Lortie  27
12
13  Endo-
    Lortie-4  Separation Agreement
14      dated 6/27/16
        [ENDO_OPIOID_MDL_DEPONENT-
15      000019346 through 9351]   29
16  Endo-
    Lortie-5  Endo's Open Letter on the
17      Opioid Abuse Crisis
        [no Bates]           45
18  Endo-
    Lortie-6  Endo Independent Directors'
19      Report, October 2018
        [E1588.1 through .10]  76
20
    Endo-
21  Lortie-7  Risk Minimization Action
        Plan for Opana ER
22      June 2007
        [ENDO-CHI_LIT-00234542
23      through 4587]        123
24
```

2  (Pages 2 to 5)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

E X H I B I T S
NO.    DESCRIPTION         PAGE

Endo-
Lortie-8  E-mail dated 9/7/07
          Subject, FW: Opana Top
          50 Writers
          with attachment produced
          natively
          [ENDO-OPIOID_MDL-00869053
          through 9054]         155

Endo-
Lortie-9  Document "Withheld for
          Privilege", Excel Spreadsheets
          E1247.1 through E1247.122
          [ENDO-OPIOID_MDL-02924490]  173

Endo-
Lortie-10 Report of Suspected
          Diversion, blank
          [ENDO-OPIOID_MDL-02148238]  172

Endo-
Lortie-11 E-mail string, top one
          dated 2/8/10
          Subject, RE: Dr. Winthrop
          Risk (Cedar Rapids, Iowa)
          [ENDO-OR-CID-00408959
          through 8966]          192

Endo-
Lortie-12 E-mail string, top one
          dated 3/19/10
          Subject, RE: 2009
          Performance Information
          for Corrective Action
          [ENDO-OPIOID_MDL-02098725
          through 8731]          197

Page 8

E X H I B I T S
NO.    DESCRIPTION         PAGE

Endo-
Lortie-19 Marketing and Advertising
          Review Committee
          Standard Operating Procedure
          May 2013
          [END00747404 through
          747]                  249

Endo-
Lortie-20 File Provided Natively
          Slide deck, Compliance
          Overview ELC
          March 21, 2013
          [EPI002412332]        259

Endo-
Lortie-21 Health Care Compliance
          Guide, Revised May 2009
          [END00401724 through
          1777]                 274

Endo-
Lortie-22 Provided in Response to
          Topic 13 of Plaintiffs'
          Amended Rule 30(b)(6)
          Notice to Endo
          Pharmaceuticals Inc.
          and Endo Health Solutions Inc.
          [no Bates]            283
Endo-
Lortie-23 Patient Brochure
          "Taking a Long-Acting
          Opioid, What does it
          mean to me?"
          [ENDO-CHI_LIT-00538441
          through 8449]         289

Page 7

E X H I B I T S
NO.    DESCRIPTION         PAGE

Endo-
Lortie-13 E-mail dated 4/15/10
          Subject, Corrective Action
          Request, with attachment
          [ENDO-OPIOID_MDL-02182533
          through 2536]         198

Endo-
Lortie-14 Endo Pharmaceuticals
          Percocet History
          Time & Events in the
          News Media
          [ENDO-CHI_LIT-00543478
          through 3495]         215

Endo-
Lortie-15 An opioid crisis where
          'death specification'
          prosecutions are
          only one answer:
          Carole S. Rendon (Opinion)
          [E1007.1 through 7.4]  221

Endo-
Lortie-16 Percocet Death Reports
          (1999-2000)
          [ENDO-OPIOID_MDL-03259246
          through 9247]         218

Endo-
Lortie-17 E-mail string, top one
          dated 3/18/13
          Subject, Fwd McKesson
          Contracts, with
          attachments
          [ENDO-OPIOID_MDL-01056072
          through 6200]         237
Endo-
Lortie-18 Corporate Policy for
          Promotional Materials
          Review Board
          [END00747325 through 7342]  248

Page 9

E X H I B I T S
NO.    DESCRIPTION         PAGE

Endo-
Lortie-24 American Pain Society
          article, 12/10/07
          "Advocacy,
          Definitions Related to
          the Use of Opioids
          for the Treatment of Pain
          [ENDO-OPIOID MDL-06233148
          through 3151]         295

Endo-
Lortie-25 E-mail dated 9/1/10
          Subject, RE: Opana
          ER Launch: List of
          Community Organizations
          Contacted
          with attachment
          [ENDO-CHI_LIT-00051623
          through 1624]         313

Endo-
Lortie-26 Endo Pharmaceuticals, Inc.
          Oxymorphone Extended
          Release (ER) Tablets
          EN3202
          Application Summary
          Updated Annotated Labeling
          dated 11/23/05
          [ENDO-OPIOID_MDL-00291042
          through 1088]         329
Endo-
Lortie-27 Endo letter dated
          6/30/06
          RE: NDA #21-610
          [ENDO-OPIOID_MDL-00299009
          through 9010]         329
Endo-
Lortie-28 FDA Letter re:
          NDA 21-610, dated 6/2/06
          [ENDO-OPIOID_MDL-00298948
          through 9000]         329

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
    1          E X H I B I T S
    2   NO.    DESCRIPTION          PAGE
    3
        Endo-
    4   Lortie-29 FDA letter
                NDA Approval
    5           NDA 201655
                dated 12/9/11
    6           [EPI001314350
                through 4441]        329
    7
        Endo-
    8   Lortie-30 E-mails dated 5/15/12
                Subject, Re: New language
    9           OER selling piece
                [ENDO-CHI_LIT-00206530
   10           through 6531]        346
   11   Endo-
        Lortie-31 E-mails dated 5/15/12
   12           Subject, Re: New language
                OER selling piece
   13           [ENDO-CHI_LIT-00110100]   351
   14   Endo-
        Lortie-32 E-mail string, top one
   15           dated 1/9/13,
                Subject, RE: OER Pharmacy
   16           Market Research Revised
                Report
   17           [END00095867 through 5870]  357
   18   Endo-
        Lortie-33 E-mails dated 9/17/13
   19           Subject, Re: Opana ER
                Prescriber
   20           [END00465847 through
                5848]               365
   21
   22
   23
   24
```

Page 11

```
    1          E X H I B I T S
    2   NO.    DESCRIPTION          PAGE
    3   Endo-
        Lortie-34 File Provided Natively
    4           Slide deck, Opana ER
                Crush Resistant
    5           Formulation Research
                Wave 5, Qualitative
    6           Interviews, 12/13/12
                [ENDO-CHI_LIT-001356]    368
    7
    8   Endo-
        Lortie-35 Endo Health Solutions
    9           Sues FDA to Protect
                Consumers from Non-Tamper
   10           Resistant Oxymorphone
                dated 11/30/12
   11           [no Bates]          377
   12   Endo-
        Lortie-36 File Provided Natively
   13           Compendia Status Update
                December 2012
   14           [EPI001932419 and
                EPI002485011]       389
   15
   16   Endo-
        Lortie-37 E-mail string, top one
   17           dated 1/14/13
                Subject, Re: generic
   18           OPANA ER
                [END00121820 through
   19           1822]               399
   20   Endo-
        Lortie-38 E-mail dated 1/12/13
   21           Subject, Final Opana ER
                Strategic Platform
   22           with formatting provided
                natively
   23           [ENDO-CHI_LIT-00467546
                through 7547]       403
   24           - - -
```

Page 12

```
    1            THE VIDEOGRAPHER:  Good morning.
    2    We are now on the record.  My name is
    3    Bill Geigert, I am a videographer for
    4    Golkow Litigation Services.  Today's
    5    date is January 22nd, 2019, and the time
    6    is 9:06 a.m.  This video deposition is
    7    being held in Philadelphia, Pennsylvania
    8    in the matter of National Prescription
    9    Opiate Litigation for the U.S. District
   10    Court, Northern District of Ohio,
   11    Eastern Division.
   12            The deponent is Brian Lortie.
   13            Counsel will be noted on the
   14    stenographic record.
   15            The court reporter is Peg Reihl
   16    and she will now swear in the witness.
   17            ... BRIAN LORTIE, having been
   18    duly sworn as a witness, was examined
   19    and testified as follows:
   20    BY MS. SCULLION:
   21       Q.    Good morning, Mr. Lortie.
   22       A.    Good morning.
   23       Q.    We met briefly off the record,
   24    but for the record, my name is Jennifer
```

Page 13

```
    1    Scullion, and I represent the plaintiffs in this
    2    matter.
    3            Mr. Lortie, I'm going to hand you
    4    what's been marked as Exhibits 1 and 2.
    5            (Documents marked for
    6            identification as Endo-Lortie Deposition
    7            Exhibit Nos. 1 and 2.)
    8    BY MS. SCULLION:
    9       Q.    Let me hand you Exhibit 1, which
   10    is a copy of the Notice of Deposition of Brian
   11    Lortie.
   12       A.    Thank you.
   13       Q.    And Exhibit 2 which is a copy of
   14    the subpoena.
   15            Mr. Lortie, before we look at the
   16    exhibits, have you ever been deposed before?
   17       A.    Yes, I have.
   18       Q.    How many times?
   19       A.    I would have to think, but it's
   20    been several, probably five or six.
   21       Q.    Were all of those in connection
   22    with your employment with Endo?
   23       A.    The majority have been yes, some
   24    -- one or two with my prior employer.
```

4  (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.    And starting with the depositions
2  for Endo, can you tell me the subject matter of
3  the lawsuits that the depositions took place in?
4    A.    Sure.  To the best of my
5  recollection, they were either patent litigation
6  or there were two actual anti-trust cases, and
7  that's, I think, a complete record.
8    Q.    My understanding is you did
9  testify before in an FTC proceeding.  That was
10  an in court proceeding, right?
11    A.    Correct, yes.
12    Q.    Did you also testify in
13  deposition, or are you counting that as one of
14  the depositions I asked you about?
15    A.    I'm counting that as one of the
16  depositions in front of the FTC, yes, yes.
17    Q.    Okay.  All right.  And that
18  was -- that was the Impax matter, correct?
19    A.    The FTC was involved in Impax and
20  I think it also involved Lidoderm as well, if
21  I'm recalling correctly.
22    Q.    All right.  Other than patent
23  litigations and anti-trust litigations, did you
24  testify in any other proceedings when you were

Page 15

1  with Endo?
2    A.    No, I believe that's complete.
3    Q.    Did you testify before the New
4  York Attorney General?
5    A.    No, I did not.
6    Q.    Did you submit written testimony
7  or declaration?
8    A.    I don't recall.  I may have.  I'm
9  not sure.
10    Q.    All right.  And you said that
11  other than testimony with respect to your work
12  with Endo, you also testified for some prior
13  employers.  Can you tell me about those?
14    A.    Sure.  GlaxoSmithKline was my
15  prior employer for the majority of my career.
16  There were two, I believe, depositions.  One was
17  a patent case, intellectual property case, and
18  then quite a bit earlier I was a witness in an
19  employee relations age discrimination case,
20  again, with regards to my employment there.  I
21  wasn't involved in the case.  I was a deponent.
22    Q.    So you've testified a number of
23  times, so I'm sure you're quite familiar with
24  the process, and counsel has, I'm sure, prepared

Page 16

1  you well, but just so we can go over a couple of
2  ground rules for today.
3           Probably most important is that
4  we try to not speak over each other because Peg,
5  our court reporter, needs to be able to take
6  down our words, so I'm going to try to not speak
7  over your answers, if you could wait until I
8  finish my questions, and that way we can keep it
9  straight for the court reporter.
10           Does that work for you?
11    A.    Sure.  I will do my best.
12    Q.    Thanks.  The other thing is,
13  again, for the court reporter, we do need to
14  have actually oral responses, not shaking head
15  or uh-huh or uh-uhs.  We need to actually put
16  words on the piece of paper.
17           Does that work for you?
18    A.    Yes, I understand.
19    Q.    Okay, great.  And then if at any
20  point today you don't understand one of my
21  questions, would you please let me know?
22    A.    Yes, I will.
23    Q.    Thank you.  Is there any reason
24  that you can't give your best testimony today?

Page 17

1    A.    No, I don't think so.
2    Q.    Not taking any medication that
3  would affect your cognitive abilities, for
4  example?
5    A.    That's correct.
6    Q.    That's correct that you're not
7  taking any?
8    A.    It's correct I am not.
9    Q.    Okay, thank you very much.
10           If you'll look at Exhibit Number
11  1, this is the Notice of Deposition of Brian
12  Lortie.
13           Are you aware that you are here
14  today to testify as a representative for Endo on
15  certain topics?
16    A.    I am, yes.
17    Q.    And are you aware you're also
18  here to testify today in your personal capacity?
19    A.    Yes.
20    Q.    Are you represented by counsel
21  today?
22    A.    I am.
23    Q.    Who is that?
24    A.    Counsel to my left from Goodell,

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  as well as Carrie Hazard from Endo.
2       Q.   Okay.  And can you just briefly
3  go over what I understand to be the topics that
4  you are to be representative on today, and I'll
5  ask you let me know if you understand these to
6  be the topics as well.
7            So the first topic --
8            MR. LIMBACHER:  Jen, I don't mean
9  to interrupt.
10           MS. SCULLION:  No, please.
11           MR. LIMBACHER:  Just for purposes
12  of the record, I think Endo has served
13  objections to the 30(b)(6) notice, and I
14  think there's also been considerable
15  correspondence back and forth between
16  counsel with regard to the scope of the
17  topics on which he has been designated.
18  So if there's any issues or concerns
19  there, I'm happy to discuss it with you,
20  but I think you know the basic scope on
21  which he is being presented as a
22  30(b)(6) witness.
23           MS. SCULLION:  And I'd just like
24  to confirm it with the witness.  I agree

Page 19

1       with those statements.
2  BY MS. SCULLION:
3       Q.   So the first topic is any
4  analysis of the effectiveness of Endo's sales or
5  marketing efforts, including any analysis of
6  return on investment in sales or marketing
7  activities related to Endo's opioid products.
8            Do you have an understanding that
9  you're testifying on those topics?
10      A.   Yes.  Is that -- I mean, I see
11  that the topics are listed by number here.  Can
12  I also take a look at the subpoena, just so
13  I'm --
14      Q.   The subpoena is actually
15  different, and we will get to that.  The
16  subpoena is directed to you in your personal
17  capacity.
18      A.   Okay.
19      Q.   And we will get to that.
20           What I just recited was
21  identified as topic number 9, and you said, yes,
22  you understand you're going to be testifying on
23  that topic?
24      A.   Yes, I was just accustomed to

Page 20

1  seeing it in writing, so but, yes, that sounds
2  like number 9.
3       Q.   And the next topic, which is
4  topic number 13, is the process for determining
5  the accuracy, completeness and legality of and
6  approval and implementation of any sales or
7  marketing information Endo made available to
8  medical professionals, patients or the public
9  concerning opioids or any of Endo's opioid
10  products in any format, including printed
11  materials, videos, websites, any in-person
12  messaging or detailing by sales representatives.
13
14           Do you understand that you're
15  going to be testifying as to that process,
16  generally?
17      A.   Yes, yes.
18           MR. LIMBACHER:  Jen, just so
19  we're clear on the record, he'll be
20  testifying consistent with and subject
21  to the objections that Endo has served
22  you with with regard to the 30(b)(6)
23  notice and also within the scope of what
24  we have identified as appropriate areas

Page 21

1       for testimony with regard to each of
2  these topics, and that's been set forth
3  in considerable e-mail between I believe
4  yourself and Josh Davis.
5            MS. SCULLION:  And you'll let me
6  know, obviously, you'll make an
7  objection if you think it's outside the
8  scope.
9  BY MS. SCULLION:
10      Q.   With respect, though, to the
11  claims in marketing information concerning
12  Endo's opioid products, do you also understand
13  that you are prepared to testify to certain
14  specific claims that we provided to counsel to
15  testify to just what was the support for those
16  claims?
17      A.   Yes, I understand that.
18      Q.   Okay.  And we have a chart that
19  we've been provided with, and we can walk
20  through some of that.
21           The next two topics that are
22  quite similar, and they relate to the applicable
23  policies, procedures, records and systems for
24  abuse and diversion issues at Endo.  And on that

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    what we've agreed to is that you be prepared to
2    testify to the substance of the reasons for any
3    changes to those policies or procedures, the
4    effectiveness of those policies or procedures.
5         And then topic 32 also goes to
6    the procedures, record systems, training
7    policies for ensuring compliance with abuse and
8    diversion laws and regulations and, again, the
9    substance of any reasons for any changes to
10   those and the effectiveness of compliance
11   procedures.
12        Do you understand you're
13   testifying to those issues as well?
14        MR. LIMBACHER:  Let me just
15        object, because I don't know that you
16        accurately characterized Endo's position
17        with regard to what he's actually going
18        to be designated to testify on with
19        regard to topics 30, 31 and 32.  The
20        general subject matter you have
21        accurately described, but in terms of
22        the specifics of what he's prepared to
23        testify to, I believe you misstated, but
24        having said that, you can answer the

Page 23

1    question, as best you can.
2         MS. SCULLION:  Well, on that we
3         probably should then take a break,
4         because I'm reading from language from
5         an e-mail I sent to Josh Davis and that
6         he confirmed.  So I do want to be sure
7         that we are on the same page on that.
8         So let's finish this, and then, I think,
9         take a quick break because I do want to
10        make sure that we're on the same page.
11   BY MS. SCULLION:
12        Q.    You also would speak to the role
13   of wholesalers, distributors and pharmacies in
14   monitoring for abuse and diversion?
15        A.    Yes.
16        MR. LIMBACHER:  Topic 31.
17        MS. SCULLION:  Thirty-one, yes.
18        THE WITNESS:  Yes.  And I believe
19        there's a call out one exception to
20        that, where another witness has been
21        designated as corporate representative
22        for one of the topics or one of the
23        subtopics.
24   BY MS. SCULLION:

Page 24

1         Q.    Right.  Is it your understanding
2    that a separate representative will be speaking
3    to suspicious order monitoring procedures?
4         A.    Yes, that's my understanding.
5         Q.    Okay.  That's my understanding as
6    well, so good.
7              And then topic 39 is any effort
8    you made directly or through any third party to
9    collaborate with one or more other
10   pharmaceutical manufacturers or distributors
11   concerning marketing, use, prescribing, sale,
12   distribution or regulation of any one or the
13   class of opioid products, including any
14   collaborative lobbying efforts concerning any of
15   the foregoing.
16             And do you understand you're
17   prepared to testify to that topic as well?
18        A.    I do.
19        MS. SCULLION:  Why don't we take
20        a short break, because I do want to
21        clarify the record on topics 30 and
22        32.  I apologize.
23             THE VIDEOGRAPHER:  Off the
24        record, 9:18 a.m.

Page 25

1         (Brief recess.)
2              THE VIDEOGRAPHER:  We are back on
3    the record at 9:37 a.m.
4              MS. SCULLION:  So we went off the
5         record and had a discussion with
6         Mr. Limbacher, and, Mr. Limbacher, will
7         you confirm that my description of the
8         topics for Mr. Lortie in 30 and 32 --
9         30, 31 and 32 are accurate?
10             MR. LIMBACHER:  I believe that is
11        consistent with the e-mail exchanges
12        between Mr. Davis and yourself, but we
13        stand by whatever is in those e-mails
14        and, also, our objections to the
15        30(b)(6) notice.
16             MS. SCULLION:  Okay.  And it's
17        our understanding that the objections
18        have been addressed through the e-mail
19        exchange.  We won't burden the record
20        further on that.
21   BY MS. SCULLION:
22        Q.    Mr. Lortie, can you look at
23   Exhibit Number 2, which is the subpoena?
24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1       Q.      Have you seen the subpoena
2   before?
3       A.      Yes, I have.
4       Q.      And do you understand it was
5   directed to you personally?
6       A.      I do, yes.
7       Q.      Okay.  And the subpoena, if you
8   will turn to page 2, has categories of documents
9   that were requested.
10          Did you search your personal
11  records for these documents?
12      A.      I don't have any personal records
13  with regards to this, but I was asked to confirm
14  that, yes.
15      Q.      Okay.  And that includes looking,
16  for example, at personal e-mails?
17      A.      Correct.
18      Q.      Okay.  Terrific.  We can put
19  aside Exhibit.
20  Number 2.
21          This morning we were handed a
22  copy of your CV.
23          Let me hand you a copy that's
24  been marked Exhibit Number 3.

Page 27

1           (Document marked for
2       identification as Endo-Lortie Deposition
3       Exhibit No. 3.)
4   BY MS. SCULLION:
5       Q.      Do you recognize Exhibit Number
6   3?
7       A.      I do.
8       Q.      And what is it?
9       A.      It's a current copy of my resume.
10      Q.      This is a resume you prepared?
11      A.      It is.
12      Q.      And, to the best of your
13  knowledge, it's accurate?
14      A.      Yes.
15      Q.      Okay.  We can go back, start at
16  the beginning.  As we were discussing off the
17  record, you have an undergraduate degree from BU
18  and that's a pre-med degree, correct?
19      A.      It is correct, yes.
20      Q.      And then you went on to Villanova
21  for business school?
22      A.      I did, yes.
23      Q.      And in terms of your employment
24  history, looks like the entirety of your career

Page 28

1   has been spent in the pharmaceutical industry,
2   correct?
3       A.      That is correct.
4       Q.      And you started off at SmithKline
5   in 1987, and, as I read your resume, you joined
6   Endo in July of 2009; is that correct?
7       A.      It's actually 1986.
8       Q.      I'm so sorry.
9       A.      Just to correct the record, when
10  I began with SmithKline, but you're correct,
11  2009 was when I joined Endo.
12      Q.      Okay.  And before joining Endo,
13  had you had any experience with marketing or
14  sales of controlled substances?
15      A.      No.
16      Q.      Did any of your prior -- any of
17  your work before Endo concern any pain products?
18      A.      No, it did not.
19      Q.      And at Endo, so you began in July
20  of 2009 as senior vice president and general
21  manager for branded pharmaceuticals.
22          And then you were promoted to
23  president for US branded pharmaceuticals in May
24  of 2014, correct?

Page 29

1       A.      That's correct.
2       Q.      And then you were promoted again
3   to president and CEO -- I'm sorry, I got that
4   wrong entirely -- and then you left Endo in
5   October 2016, correct?
6       A.      That is correct, yes.
7       Q.      All right.  Before we go back
8   into that, can we have Exhibit Number 4.
9           (Document marked for
10      identification as Endo-Lortie Deposition
11      Exhibit No. 4.)
12  BY MS. SCULLION:
13      Q.      Hand you Exhibit Number 4 Bates
14  stamped ENDO_OPIOID_MDL_DEPONENT-000019346.
15          Do you recognize Exhibit Number
16  4?
17      A.      Yes, I do.
18      Q.      And what is it?
19      A.      This is the Separation Agreement
20  from Endo in 2016.
21      Q.      Why did you leave Endo in 2016?
22      A.      It was as an agreement between
23  myself and the executive team and the board, I
24  had indicated that at a certain time I wanted to

Highly Confidential - Subject to Further Confidentiality Review

## Page 30

1  move on and do a different part of the
2  pharmaceutical industry, which I subsequently
3  have done. The board asked me to remain for a
4  period of time until a successor had been
5  recruited and brought on board, which I agreed
6  to do. So this memorialized the terms of that
7  agreement.
8      Q.    Make sure I understand, looking
9  at Exhibit 4, it's dated June 27th, 2016, and
10  you list on your CV that you left Endo in
11  October of 2016.
12      Do I understand correctly that
13  you entered into an agreement in June of 2016
14  where you would stay on for a short period of
15  time while Endo tried to find a successor?
16      A.    And specifically this, the
17  agreement was entered into in May. The
18  signature is dated in June, but from May until I
19  left in October, that was the period where I had
20  agreed to stay in my role until I could do a
21  hand-off to a successor.
22      Q.    Had you been asked to leave?
23      A.    Not specifically, no.
24      Q.    When you say "not specifically,"

## Page 31

1  had there been indications that Endo would
2  prefer that you leave?
3      MR. LIMBACHER: Object to form.
4      THE WITNESS: No. It was an
5  agreement that it was -- between the
6  parties, between the two of us of the
7  terms of the agreement, the time of the
8  agreement, what I would do until the
9  time came that I left.
10  BY MS. SCULLION:
11      Q.    Was there any particular
12  circumstance that led you to come to an
13  agreement with Endo in May that contemplated you
14  would be leaving, anything at all, any
15  discussions other than your personal --
16      MR. LIMBACHER: Object to form,
17  asked and answered.
18      THE WITNESS: No. No, it was the
19  timing that I wanted to do that. I
20  wanted to move on to do something
21  different in my career, and that would
22  be engaged in the founding of a company
23  involving drug development, which I
24  ended up doing, and it was time for me

## Page 32

1  to do that.
2  BY MS. SCULLION:
3      Q.    Okay. And looking at Exhibit 4,
4  the Separation Agreement, looking at paragraph
5  3, which is "Remuneration Upon Termination," on
6  to the carryover page 2, subsection (i), do I
7  understand correctly that as part of the
8  Separation Agreement, you received a payment of
9  ████████████████████████████████
10      A.    Yes, I did.
11      Q.    What was the approximate amount
12  of that payment?
13      A.    ████████████████████████████
14  ██  ██████████████████████████████████
15  
16      Q.    And it says base salary and
17  target bonus.
18      So with the target bonus, what
19  was the total amount?
20      A.    If I remember correctly, my
21  target bonus was ████████ at target. So,
22  again, doing the math on that, that probably
23  adds another ████████ I'm sorry, I'm not going
24  to do the math in my head, but in that general

## Page 33

1  area.
2      Q.    So the payment to you by Endo
3  under this agreement was sounds like roughly
4  about ████████?
5      A.    Thereabouts. There was also some
6  payment for unused vacation time, et cetera, but
7  I think that's in the range, yes.
8      Q.    Okay. And then if you'll go down
9  to paragraph number 6, "Nondisparagement and
10  Cooperation," under that subparagraph (a)
11  "Nondisparagement," you agreed not to disparage
12  or encourage or induce others to disparage Endo,
13  et cetera.
14      Does that nondisparagement clause
15  apply today to your testimony?
16      MR. LIMBACHER: Object to form.
17      THE WITNESS: I believe it does.
18  It's important also to point out that
19  that does not limit my accurate
20  testimony under oath, which, of course,
21  I understand I'm under oath, and
22  that's -- that's described in the
23  paragraph as well.
24  BY MS. SCULLION:

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  Q.   And then the next paragraph for
2  "Cooperation," paragraph (b) on page 3, are you
3  serving as Endo's corporate representative
4  pursuant to the cooperation provision here?
5       MR. LIMBACHER:  Object to form.
6       THE WITNESS:  I'm not really sure
7       I understand the question, but perhaps
8       if I can --
9  BY MS. SCULLION:
10      Q.   Let me ask it more cleanly.
11      A.   Sure.
12      Q.   Sure.  You're no longer employed
13 by Endo, right?
14      A.   That's correct.
15      Q.   Why did you agree to be Endo's
16 corporate representative today?
17      MR. LIMBACHER:  Object to form.
18      THE WITNESS:  I have no
19      objections to doing so.  I have
20      knowledge that could be helpful in the
21      case, so I agreed to do that.
22 BY MS. SCULLION:
23      Q.   Okay.  And are you being paid for
24 your time in connection with today's deposition?

Page 35

1       MR. LIMBACHER:  Object to form.
2       THE WITNESS:  I am.
3  BY MS. SCULLION:
4       Q.   And if you look at paragraph
5  (c) under -- subparagraph (c) under paragraph 6
6  it states a rate of $250 per hour for
7  cooperation.
8       Are you being paid that rate?
9       A.   Yes, I am.
10      Q.   Were you paid for time spent
11 preparing for the deposition?
12      A.   Yes, at the same rate.
13      Q.   Okay.  And you're being paid for
14 your time actually testifying today as well?
15      MR. LIMBACHER:  Object to form.
16      THE WITNESS:  Correct.  I'm being
17      paid for my time in general.
18 BY MS. SCULLION:
19      Q.   Okay.  Other than preparing for
20 today's deposition and being here today as
21 Endo's corporate representative on certain
22 topics, have you provided any other cooperation
23 to Endo in connection with this litigation?
24      MR. LIMBACHER:  Object to form.

Page 36

1       I'd caution the witness not to
2       inadvertently disclose any privileged
3       communications, but you can go ahead and
4       answer the question.
5       THE WITNESS:  No.  All of my work
6       done has been in preparation for this
7       deposition with regards to this
8       litigation.
9  BY MS. SCULLION:
10      Q.   And to make sure just more
11 broadly, since leaving Endo, have you been paid
12 for your time by Endo in connection with
13 anything other than this litigation?
14      A.   Only other litigation, which we
15 described before, other depositions in the same
16 fashion.
17      Q.   Okay.  Do you have any -- other
18 than the Separation Agreement, which is Exhibit
19 4, do you have any other current agreements with
20 Endo?
21      A.   I do not.
22      Q.   Do you have any current financial
23 interest in Endo?
24      A.   I still remain a shareholder, so

Page 37

1  I own some equity, but, other than that, no.
2       Q.   Do you know today approximately
3  how many shares you hold?
4       A.   I may hold -- it's difficult to
5  give an accurate number, but probably, to my
6  best estimate, maybe ████████ shares.
7       Q.   Do you have any options
8  currently?
9       A.   I have no active options, no.
10      Q.   Okay.  And just to be -- make
11 sure, I've asked a series of questions about
12 your relationships with Endo, do you have any
13 current relationship with Par, Par
14 Pharmaceuticals?
15      A.   Not -- no.
16      Q.   And do you have any -- so no
17 current agreements, correct?
18      A.   That's correct.
19      Q.   And no current financial
20 relationship with Par?
21      A.   That's correct.
22      Q.   Okay.  Let's go back to your CV,
23 Exhibit Number 3, and focusing on your time at
24 Endo.  It says here that you were -- on page 2

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    that you were a member of the executive
2    leadership team.
3          What was that?
4          A.    Yes, and, again, I should point
5    out just for accuracy, that period described
6    2009 through 2014, my job responsibilities
7    evolved over time, more things were added and at
8    the -- I would say around the middle of 2013, I
9    was named to the executive leadership team.  The
10   executive leadership team was essentially the
11   senior leaders of the corporation, for the most
12   part, direct reports of the CEO.  And there were
13   periods of time there where I was a direct
14   report.  There were also some periods of time
15   there where there was a chief operating officer
16   that I reported to and that person reported to
17   the CEO.
18         Q.    Do you know which period of time
19   you reported to a chief operating officer?
20         A.    The first chief operating officer
21   I reported to in, if I recall correctly, March
22   of 2011, and I believe she left in May of 2013.
23   From May of 2013, if my recollection is correct,
24   until around August or September of 2013, I

Page 39

1    reported to the chief executive.
2          Then another chief operating
3    officer was recruited and I reported to him
4    until sometime in 2014, when he departed.  I
5    don't recall the exact date.
6          And from that point forward until
7    the end of my employment with Endo, I reported
8    directly to the chief executive.
9          Q.    Okay.  What were the
10   responsibilities of the executive leadership
11   team?
12         A.    They -- the executive leadership
13   team was responsible for the management of the
14   operations, strategy of the company.  So, again,
15   it was the senior leaders that represented all
16   of the corporate functions and direct reports,
17   as I said, with a few exceptions to the chief
18   executive.
19         Q.    Did the executive leadership team
20   while you served on it have any responsibilities
21   with respect to any of Endo's generic products?
22         A.    There -- those responsible for
23   the generic business division, which was a
24   distinct separate division from the branded

Page 40

1    division, were represented on that, and, of
2    course, by virtue of the role of the chief
3    executive, he was also responsible for that
4    business.
5          I should also say that there
6    would have been members of the executive
7    leadership team in some of the corporate
8    functions that also supported all of the
9    businesses.  I'm thinking legal and human
10   resources and finance, for example.
11         Q.    During the time that you were
12   employed by Endo, I want to make sure I
13   understand, were you ever a member of the PMRB?
14         A.    I was not a direct member of the
15   PRB, although those who were reporting to me or
16   reporting up through my business were sitting
17   members on that team.
18         Q.    But you, yourself were not a
19   member of the PMRB?
20         A.    I believe I was not directly
21   myself.
22         Q.    And we'll talk a little bit in
23   more detail about PMRB in a bit, but, similarly,
24   you, yourself, were not a member of MARC,

Page 41

1    correct?
2          A.    Correct, same answer with regards
3    to MARC.  MARC was really an evolution of PMRB.
4          Q.    Did you ever sit on the risk
5    management committee?
6          A.    The risk management committee I
7    did not.  That was members cross-functionally of
8    medical, legal, regulatory, and I believe risk
9    management had marketing representation, and
10   those people would have also reported up, but I
11   didn't sit specifically on that, no.
12         Q.    Okay.  There's reference also to
13   the Endo -- I think Endo Safety Review Board,
14   ESRB.  Were you ever a member of the ESRB?
15         A.    No, that had membership, if my
16   recollection is correct, similar to the risk
17   management committee but with the exception of
18   having no commercial representation, so risk --
19   I mean safety review board was just medical,
20   primarily medical and legal and perhaps
21   regulatory.
22         Q.    Okay.  Did you ever sit on any
23   compliance committee at Endo?
24         MR. LIMBACHER:  Object to form.

11  (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    THE WITNESS: I'm -- I don't
2    recall specifically. Of course, I was
3    well involved with our compliance
4    officer and familiar with the activities
5    and the requirements of that, but
6    whether or not I actually sat on a
7    compliance committee, sitting here
8    today, I don't recall.
9    BY MS. SCULLION:
10    Q.    And you recall that Endo did
11    enter into a corporate integrity agreement
12    following the Lidoderm investigation, correct?
13    A.    Yes, that's correct.
14    Q.    And you were a certifier under
15    that corporate integrity agreement; is that
16    right?
17    A.    Yes, I was.
18    Q.    This is probably an important
19    point of clarification in terms of the scope of
20    your testimony as a corporate representative
21    today, we've been speaking of Endo. There was a
22    period of time when Qualitest was a subsidiary
23    of Endo, correct?
24    A.    Yes.

Page 43

1    Q.    And are you going to be speaking
2    today about the policies and procedures at
3    Qualitest with respect to abuse and diversion
4    issues?
5    MR. LIMBACHER: Object to form.
6    THE WITNESS: I am most familiar
7    and prepared extensively on those that
8    pertain to the branded business, which
9    was my area of responsibility, and the
10    company involved Qualitest was actually
11    the result of an acquisition, and there
12    were some distinctions there and some --
13    frankly some personnel that we were able
14    to take advantage of, but I'm not
15    specifically prepared to testify in
16    depth to Qualitest's policies and
17    procedures.
18    BY MS. SCULLION:
19    Q.    Okay. And the Qualitest
20    functions were eventually moved over to Par
21    after the Par acquisition, correct?
22    A.    Yes, that's correct. Qualitest
23    was a generic business, and so either as a
24    stand-alone or when Par came in as an extension

Page 44

1    or expansion of our generic business, they were
2    put together.
3    Q.    Okay.
4    MS. SCULLION: Can I have the
5    open letter.
6    MR. LIMBACHER: Jen, I assume
7    we're going to handle this one the way
8    we handled Kristin Vitanza's deposition.
9    You will let us know on the record when
10    you're going to be asking him questions
11    in his capacity as a 30(b)(6) witness,
12    and then when you finish those
13    questions, you'll let us know that
14    you've finished and to the extent
15    there's any uncertainty, we will assume
16    that he is being questioned in his
17    capacity as a fact witness.
18    MS. SCULLION: Yes.
19    MR. LIMBACHER: Thank you.
20    MS. SCULLION: Thank you.
21    BY MS. SCULLION:
22    Q.    And if you ever have any
23    questions during the day about what capacity I'm
24    asking you questions in, please, again, just let

Page 45

1    me know.
2    A.    I will ask for clarification.
3    Thank you.
4    (Document marked for
5    identification as Endo-Lortie Deposition
6    Exhibit No. 5.)
7    BY MS. SCULLION:
8    Q.    Let me hand you a copy what's
9    marked as Exhibit Number 5, which is a document
10    taken from Endo's website entitled "Endo's Open
11    Letter on the Opioid Abuse Crisis."
12    And, Mr. Lortie, if I can direct
13    your attention to the second paragraph, which
14    discusses, The US FDA has worked to balance
15    access to pain care medications for appropriate
16    patients while aggressively mitigating the risks
17    of opioid abuse.
18    And the next sentence "Endo
19    supports these efforts and has taken parallel
20    actions."
21    Let me ask you this question: As
22    Endo's corporate representative, are you
23    familiar with the actions that Endo has taken,
24    the parallel actions Endo has taken to mitigate

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  the risks of opioid abuse?
2       MR. LIMBACHER:  Object to form.
3  Take your time and review the document.
4       THE WITNESS:  Yeah, I just --
5  this letter actually, I believe, came
6  out after I left the company, but if I
7  could just take a second just to read it
8  for context.
9       MS. SCULLION:  Yes, please.
10      THE WITNESS:  Thank you.
11      MR. LIMBACHER:  And you're
12  questioning him with regard to which
13  topic?
14      MS. SCULLION:  I believe this
15  would be topic at least 30, likely 32.
16  Again, I think those two bleed together.
17      (Witness reviews document.)
18      THE WITNESS:  Okay, thank you.
19  I've had a chance to look it over.
20  BY MS. SCULLION:
21  Q.   Terrific.
22      MR. LIMBACHER:  Sorry, Jen.  Just
23  note my objection to the extent the
24  exhibit that you're questioning him

Page 47

1  about I think goes beyond the scope of
2  topics 30 and 32, but you can go ahead
3  and ask your questions.
4       MS. SCULLION:  Well, we really do
5  need to understand that, because this
6  does speak to parallel actions to
7  mitigate the risks of opioid abuse, and
8  topic 30 does speak to policies and
9  procedures to, among other things, halt
10  abuse.  So our understanding is this
11  falls squarely within the scope of the
12  topic.
13      MR. LIMBACHER:  It also goes on
14  to talk about things like, for example,
15  the voluntary withdrawal of Opana ER
16  from the market, which I think is beyond
17  the scope of the topics and also is
18  beyond the time period in which he was
19  an employee at the company.
20      MS. SCULLION:  I mean, to the
21  extent that Endo has identified these
22  actions as being actions to mitigate the
23  risks of opioid abuse, again, I think
24  they fall squarely within the topic, and

Page 48

1       I understand he was not at the company,
2  but he is here today as the corporate
3  representative on those issues, but let
4  me just ask you.
5  BY MS. SCULLION:
6  Q.    Are you prepared today to testify
7  as Endo's corporate representative with respect
8  to the -- what's described here some of -- as
9  the parallel actions Endo took to mitigate the
10  risks of opioid abuse?
11      MR. LIMBACHER:  Well, he's
12       prepared to testify consistent with the
13       e-mail exchanges between counsel and
14       subject to the objections to the
15       30(b)(6) notice.
16  BY MS. SCULLION:
17  Q.    Let me ask you, as Endo's
18  corporate representative, did Endo voluntarily
19  stop promoting opioid products to healthcare
20  professionals as one aspect of mitigating of the
21  risks of opioid abuse?
22      MR. LIMBACHER:  I'm going to
23       object to that question as being beyond
24       the scope of the topics on which he has

Page 49

1       been designated and as agreed upon
2       between counsel in e-mails, but he can
3       go ahead and answer the question.
4       THE WITNESS:  That action took
5  place after I had departed the company,
6  although there were periods of time
7  while I was responsible for that
8  business where we had dramatically
9  reduced promotion of our opioid products
10  or, in fact, in certain periods of time
11  eliminated active promotion.  But I do
12  believe, as I read this, specific
13  cessation of that activity that's
14  referred to in this letter did take
15  place after I had departed.
16  BY MS. SCULLION:
17  Q.    So if I understand, you're not
18  prepared to testify today as Endo's corporate
19  representative to that particular action
20  identified as an action Endo took to mitigate
21  the risks of opioid abuse?
22      MR. LIMBACHER:  Again, I'm going
23       to object to the question to the extent
24       it's beyond the scope of the topics on

13  (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  which he's been designated, but you can
2  go ahead and answer the question.
3      THE WITNESS:  I've prepared to
4  discuss the many things that Endo had in
5  place, not just from September 2016
6  onward but really back even predating my
7  arrival and able to discuss those things
8  in detail.  Endo has always been
9  committed to taking whatever steps it
10  could to mitigate abuse, diversion,
11  improper prescribing, et cetera.
12      But to the specifics around the
13  decision to be permanently -- to
14  permanently stop promoting Opana ER as
15  referred to here, there's a limit to
16  which I can represent anything there
17  because it happened after I had
18  departed.
19      MS. SCULLION:  I think we'll get
20  back to the preparation for being a
21  corporate rep, but just to make sure I
22  understand the lines being drawn here,
23  counsel, is it your position that steps
24  Endo took to mitigate the risks of

Page 51

1  opioid abuse are beyond the scope of the
2  topics here.
3      MR. LIMBACHER:  No.  My position
4  is that he's prepared to testify
5  consistent with the e-mail exchanges
6  that you entered into with Mr. Davis.
7  He's here to testify with regard to the
8  policies regarding diversion, and I
9  think that questions with regard to the
10  voluntary withdrawal, which postdate his
11  employment at the company, are outside
12  the scope of the topics on which he has
13  been designated.
14      MS. SCULLION:  I apologize for
15  burdening the record, but are you saying
16  he is designated solely with respect to
17  the issue of diversion, because our
18  understanding is he was designated with
19  respect to both diversion and abuse?
20      MR. LIMBACHER:  He's -- yes, he's
21  here to testify with regard to diversion
22  and abuse with regard to topic number
23  30, I believe.
24      MS. SCULLION:  Correct.  And so

Page 52

1  steps that Endo took to mitigate abuse,
2  how do those not fall squarely within
3  the scope of the topic?
4      MR. LIMBACHER:  How does what?
5  I'm confused by what your question is of
6  me at this point in time.
7      MS. SCULLION:  The question is
8  why he would not be prepared to speak
9  to -- as a corporate representative to
10  speak to Endo's actions taken to
11  mitigate the risks of opioid abuse.
12      MR. LIMBACHER:  He is prepared to
13  testify about that.  The point I've been
14  trying to make, counsel, is that I think
15  it's beyond the scope of the agreements
16  that have been entered into between
17  counsel that he's here to talk about
18  the -- what led up to the voluntary
19  withdrawal of the product after he left
20  the company.
21      MR. TOLIN:  And, Jen, I'd add
22  topic 48 states your decisions to
23  discontinue original Opana ER and
24  withdraw reformulated Opana ER from the

Page 53

1  market, it seems to me your specific
2  question with respect to this letter
3  would apply to topic 48 and not the
4  topics on which he was designated.
5      MS. SCULLION:  So I disagree.  I
6  mean, the topic you just read, Adam, is
7  specific to Opana ER.  The topics 30 and
8  32 speak more generally to opioid
9  products, as does the open letter, which
10  goes beyond the withdrawal of Opana ER
11  to stop -- Endo voluntarily having
12  stopped promoting opioid products to
13  healthcare professionals as an action to
14  mitigate the risks of opioid abuse.
15      I don't want to burden the record
16  further.  It is our position that this
17  is an area that Endo was obligated to
18  provide a corporate representative on.
19  We are prepared to take testimony on
20  these issues today, and whether we do it
21  during a break or otherwise, we'll need
22  to take this up with the special master.
23      MR. LIMBACHER:  Well, he's
24  prepared to testify consistent with the

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    e-mail exchanges between counsel on the
2    processes that were in place to deal
3    with suspected abuse or diversion
4    consistent with the language of topic
5    number 30 in your 30(b)(6) deposition
6    notice.
7        He's not prepared and there's
8    nothing, I don't think, in the e-mail
9    exchanges to suggest that he should be
10   prepared to talk specifically about the
11   topic number 48 in your deposition
12   notice. That is not a topic on which he
13   has been designated.
14       MS. SCULLION: All right. We're
15   going to have to do this on the record,
16   I apologize. Topic 48 is about the
17   withdrawal of Opana ER. The topics on
18   which Mr. Lortie has been designated are
19   with respect to abuse, mitigation of
20   abuse, more generally, for opioid
21   products, and he is, as per the e-mail,
22   to be testifying to the substance of any
23   changes in those policy and procedures
24   and the reasons for those changes and

Page 55

1    the effectiveness of the policies and
2    procedures.
3        And it's evident here that Endo
4    made a policy decision as part of its
5    efforts to mitigate the risks of opioid
6    abuse, a policy decision to stop
7    promoting opioid products to healthcare
8    professionals, and so I am entitled to a
9    corporate representative on that issue.
10       If he's not -- if Mr. Lortie is
11   not prepared or has not been prepared to
12   speak to that topic today, we will need
13   to have a representative prepared to
14   come back.
15       MR. LIMBACHER: He's prepared to
16   testify on topics 9, 13, 30, 31, 32 and
17   39, consistent with the e-mail exchanges
18   between counsel.
19       He is not prepared to testify,
20   for example, with regard to topic number
21   48.
22       MS. SCULLION: I think we're
23   talking past each other.
24   BY MS. SCULLION:

Page 56

1        Q.   So, Mr. Lortie, let me ask you,
2    so we can shortcut, I think, this dispute.
3        In Exhibit Number 5 in the second
4    paragraph, Endo describes a number of what it
5    calls parallel actions it has taken to mitigate
6    the risks of opioid abuse. One is it says
7    voluntarily stop promoting opioid products to
8    healthcare professionals, correct? I'm just
9    asking what it says.
10       A.   Yes, that's correct.
11       Q.   Okay. And it says it "eliminated
12   the company's entire pain product sales force,"
13   correct?
14       A.   That's what it says, correct.
15       Q.   It also does say, "Endo
16   voluntarily withdrew Opana ER from the market,"
17   correct?
18       A.   That's correct.
19       Q.   "Discontinued the research and
20   development of new opioid products", correct?
21       A.   That's correct.
22       Q.   "And implemented additional
23   anti-diversion measures," correct?
24       A.   Yes, correct.

Page 57

1        Q.   "Including product serialization
2    aimed at thwarting counterfeiting and theft to
3    protect patient safety."
4        Did I read that correctly?
5        A.   You did, you read all of those
6    correctly, and, again, it's describing those as
7    actions taken "since," I'm reading from the
8    document here, "our new executive leadership
9    team began working together in September 2016."
10       So, yes, you read that correctly.
11       Q.   Are you prepared as Endo's
12   corporate representative today to speak to any
13   of those actions Endo took to mitigate the risks
14   of opioid abuse?
15       MR. LIMBACHER: Jen, he's
16   prepared to testify consistent with what
17   I've described now repeatedly. He's
18   here to testify specifically with regard
19   to topics 30, 31 and 32 as limited by
20   the e-mail exchanges between counsel.
21       To the extent Exhibit 5
22   references issues and topics and conduct
23   that falls outside the scope of the
24   agreements that counsel have arrived at

15 (Pages 54 to 57)

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    with regard to topics 30, 31 and 32, he
2    is not prepared to testify as to that.
3         You can ask him questions, but
4    that's beyond the scope of what was
5    agreed to.
6    BY MS. SCULLION:
7         Q.    So I'm just trying -- I'm trying
8    to make sure I understand because counsel has
9    not been clear about what is the difference
10   between my understanding of the scope and his
11   understanding, so I'm trying to understand what
12   you are or are not prepared to testify to today.
13   Let's take one particular example.
14        Can you identify for me today
15   what the additional anti-diversion measures are
16   that are referenced in this second paragraph of
17   Exhibit 5?
18        MR. LIMBACHER:  Object to form,
19        object to the extent it's beyond the
20        scope of topics on which he's
21        designated, but go ahead and answer the
22        question.
23        THE WITNESS:  And I'm just going
24        to ask for clarification when you use

Page 59

1    the word "additional," because I don't
2    see that in here.  So are you referring
3    to those that are described that you
4    just read into the record and described
5    after occurring -- sorry -- occurring
6    after September 2016?
7    BY MS. SCULLION:
8         Q.    I am asking about steps taken
9    after September 2016, and if you'll look at the
10   second line from the bottom of that paragraph,
11   it indicates one of the things that happened
12   after September 2016 was Endo implemented
13   additional anti-diversion measures including
14   product serialization, and we read that, rest of
15   that sentence before.
16        Are you prepared as Endo's
17   corporate representative today to tell me what
18   those additional anti-diversion measures were?
19        MR. LIMBACHER:  That were
20        implemented after September of 2016?
21        MS. SCULLION:  That's correct.
22   BY MS. SCULLION:
23        Q.    Are you prepared to testify to
24   that today?

Page 60

1         A.    I am not, no.
2         MR. LIMBACHER:  I think that's
3    outside the scope of what he was
4    designated on.
5         MS. SCULLION:  Counsel, is it
6    your position it's outside the scope
7    because it's after September 2016?  I'm
8    not clear.
9         MR. LIMBACHER:  No, it's because
10   it's outside the scope of what you and
11   Mr. Davis agreed upon, which was for him
12   to be prepared to testify with regard to
13   the processes that were in place with
14   regard to suspected abuse and diversion.
15   So that's the basis for my objection.
16        MS. SCULLION:  Well, the topic
17   also speaks to policies and processes
18   with respect to halting diversion, and
19   anti-diversion measures clearly would be
20   halting diversion.  So it is our
21   position that this is square within the
22   topic that we need a representative on.
23   I understand, Mr. Lortie, you're not --
24   you've not been prepared on that today.

Page 61

1    BY MS. SCULLION:
2         Q.    Do you -- are you prepared to
3    speak to any policies Endo adopted after 2016
4    with regard to product serialization as one
5    anti-diversion measure?
6         A.    No, I'm not prepared for that,
7    no.  I thought actually that was your last
8    question of me so...
9         Q.    Trying to be a specific as I can.
10        A.    I understand.
11        Q.    And just to be clear, are you
12   able to speak to Endo's policy decision to
13   voluntarily stop promoting opioid products to
14   healthcare professionals as part of its
15   anti-abuse efforts?
16        MR. LIMBACHER:  And note my
17        objection as I believe that topic in
18        that question is beyond the scope on
19        which he has been designated.
20        THE WITNESS:  And I'm not
21        prepared.  Again, that happened after I
22        departed the company.
23   BY MS. SCULLION:
24        Q.    Okay.  Let's go back to then I

16  (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1   want to ask you what did you do to prepare today
2   to testify as Endo's corporate representative on
3   Endo's policies and procedures with respect to
4   abuse and diversion, including efforts to ensure
5   compliance with applicable laws and regulations?
6        A.   Sure.  And, in fact, this is
7   consistent with how I prepared for all of the
8   topics I've been designated on.
9             I spent five or six days working
10  with counsel, reviewing documents.  I spoke to
11  two Endo employees to help refresh my
12  recollection of certain specific policies,
13  procedures or identify the way certain materials
14  had been used so I -- and I had considerable
15  homework each evening.
16            So, you know, I did my best to
17  bring myself back up to speed so that I could be
18  helpful today.
19       Q.   Which were the Endo employees
20  that you spoke with?
21       A.   We spoke with Kristin Vitanza
22  and, also, Brian Munroe, M-u-n-r-o-e.  I think
23  that was the only two people we spoke with, if I
24  recall.

Page 63

1        Q.   When did you speak with
2   Ms. Vitanza?
3        A.   Yesterday.
4        Q.   Approximately how long?
5        A.   How long did we --
6        Q.   Speak.
7        A.   15, 20 minutes.
8        Q.   Was that by phone or in person?
9        A.   By telephone.
10       Q.   And did Ms. Vitanza provide you
11  with information that will inform your testimony
12  today as Endo's corporate representative on any
13  of the topics we discussed?
14       A.   Yes, she did.
15       Q.   What information did you obtain
16  from Ms. Vitanza?
17       A.   I had some specific questions on
18  certain pieces of material, promotional
19  material.  I needed some help in understanding
20  and recalling how they had specifically been
21  used and with whom.  She was able to clarify
22  that.
23       Q.   Which pieces of material did you
24  speak about?

Page 64

1        A.   Specifically, there was a series
2   of patient profiles called clin cases, if I'm
3   recalling correctly.  I didn't recall how they
4   had been used, and given, I believe, some of the
5   claims that are in question came out of those, I
6   wanted to make sure I understood with whom they
7   had been used and in what form the claims had
8   been.
9        Q.   And what did Ms. Vitanza tell you
10  in that regard?
11       A.   She clarified that they had been
12  used as educational material with physicians, so
13  we considered them promotional materials, and,
14  therefore, those claims were subject to all of
15  the necessary safeguards to ensure that they
16  were well supported by medical evidence, they
17  had been cleared by our medical, legal and
18  regulatory team.
19       Q.   Did you discuss any other
20  promotional materials with Ms. Vitanza?
21       A.   No, those were the ones in
22  question.
23       Q.   Did you discuss any other topics
24  at all with Ms. Vitanza that inform your

Page 65

1   testimony today?
2        A.   No.  She was able to answer my
3   question.
4        Q.   Okay.  And Mr. Munroe, what did
5   you speak with him about?
6        A.   I asked him to refresh my
7   recollection as to the activities specifically
8   of the Pain Care Forum.  This was relative to
9   the topic number 39, I believe.
10       Q.   Did you only speak to him about
11  the Pain Care Forum?
12       A.   Yes.
13       Q.   When did you speak with
14  Mr. Munroe?
15       A.   That was also yesterday.
16       Q.   And was that by phone as well?
17       A.   Yes.
18       Q.   About how long on the phone?
19       A.   We were on the phone maybe 45
20  minutes or so, I think.
21       Q.   And what specifically did you
22  discuss with Mr. Munroe about the Pain Care
23  Forum?
24       A.   To the extent it related to topic

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    39, I wanted to understand the specifics of how
2    that group was organized, what were the
3    objectives of the group, who were the members to
4    the extent -- sorry, let me rephrase that.
5            To what extent was it formal or
6    informal, some of the history.  I was familiar
7    with the concept of the Pain Care Forum, but in
8    order to prepare adequately, I wanted to get
9    some specifics from him.
10       Q.    And what did he provide?  What
11   did he tell you about the specifics you asked
12   about?
13       A.    He reminded me that this was an
14   informal gathering of a number of stakeholders
15   in the -- that would be interested in the world
16   of pain medicine, policy, legislation,
17   manufacturers, patient representatives, et
18   cetera.
19           And, importantly, he reminded me
20   that it was informal, the agenda was open.
21   There were no positions taken by the Pain Care
22   Forum, et cetera.  I wanted clarity on
23   specifically some of those topics, so he was
24   able to remind me of what they did.

Page 67

1        Q.    In terms of the -- you said it
2    was a forum for a number of stakeholders you
3    said including manufacturers.
4            Do you know what other
5    manufacturers other than Endo of opioid products
6    were part of that forum?
7        MR. LIMBACHER:  Jen, just so
8        we're clear, I assume these questions
9        are questions he is being asked in his
10       capacity as a 30(b)(6) witness?
11       MS. SCULLION:  That's fine.
12       THE WITNESS:  So your question
13       again, please.
14   BY MS. SCULLION:
15       Q.    Sure.  Do you know which other
16   manufacturers other than Endo of opioid products
17   were members of the Pain Care Forum?
18       A.    The way it was represented to me
19   is that the membership was evolving and dynamic.
20   People would participate in some of the
21   meetings, not participate in others; that
22   literally the agenda, as well as the
23   participation was open.  So he specifically
24   indicated that to the extent that some people

Page 68

1    would call in on a teleconference line, they
2    were not required to identify themselves, so
3    he -- the point he was making is this was an
4    open forum to anyone that may be on any number
5    of the various facets of the topic were invited
6    to listen in, call in.  So, you know, some
7    manufacturers were there routinely.  He
8    mentioned that Purdue was often represented,
9    and, in fact, that the -- but we didn't speak
10   about -- he didn't identify any other specific
11   industry attendees, because, again, that
12   attendance was something that was fluid.
13       Q.    And did you speak with Mr. Munroe
14   about the relationship between the Pain Care
15   Forum and the American Pain Foundation?
16       A.    Not specifically.
17       MS. SCULLION:  I apologize.
18       We're having a technical difficulty.
19       Off the record.
20       THE VIDEOGRAPHER:  Off the record
21       at 10:22.
22       (Brief recess.)
23       THE VIDEOGRAPHER:  We are back on
24       the record at 10:37 a.m.

Page 69

1    BY MS. SCULLION:
2        Q.    Welcome back, Mr. Lortie.  You
3    understand you're still under oath, correct?
4        A.    I do.
5        Q.    Thank you.  We were speaking
6    about your discussion with Mr. Munroe, and you
7    explained your discussion of the Pain Care
8    Forum.
9            Is there anything else that you
10   discussed with Mr. Munroe?
11       A.    No, that was essentially it.
12       Q.    Okay.  And other than Ms. Vitanza
13   and Mr. Munroe, is there anyone else other than
14   counsel that you spoke with to prepare for your
15   deposition as Endo's corporate representative?
16       A.    No.
17       Q.    You said you spent five or six
18   days preparing for -- to be Endo's corporate
19   representative.
20           When was that?
21       A.    It's all been in the month of
22   January.  I can't remember.  We started on the
23   12th or 13th perhaps, and I spent considerable
24   time last weekend, I can tell you that.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1      Q.   Okay.  And as we go through
2  today, I'll ask you whether you've reviewed
3  certain documents in connection with your
4  preparation, I think that's probably the most
5  efficient way to do that.
6  BY MS. SCULLION:
7      Q.   Other than looking at documents
8  with counsel, you said you did some home study
9  and speaking with Ms. Vitanza and Mr. Munroe, is
10  there anything else that you did to prepare to
11  testify as Endo's corporate representative
12  today?
13      A.   No, that's the complete list of
14  activities.
15      Q.   And then separate from preparing
16  to be Endo's corporate representative, is there
17  anything else that you did to prepare for
18  today's deposition?
19      A.   No, same activities helped me
20  prepare for both.
21      Q.   Did you discuss today's
22  deposition with anyone other than counsel?
23      A.   No.
24      Q.   Have you discussed this

Page 71

1  litigation with anyone other than counsel?
2      A.   I have not, no.
3      Q.   Okay.  And just so we can be
4  clear and I think move on in terms of the scope
5  of your preparation, can you just confirm for
6  me, are you prepared today to speak as Endo's
7  corporate representative on any of Endo's
8  anti-abuse policies that postdate the time you
9  worked with the company?
10      MR. LIMBACHER:  Jen, I think
11      we've been over this.  He is prepared to
12      testify with regard to abuse and
13      diversion on the topics on which he's
14      been designated consistent with the
15      e-mail exchanges between counsel.
16  BY MS. SCULLION:
17      Q.   Right.  I just want to confirm
18  because there's been some discussion about
19  things that happened after you left and things
20  that happened before.
21      Are you prepared, for example, to
22  testify as Endo's corporate representative with
23  respect to what Endo's current anti-abuse
24  policies are?

Page 72

1      A.   No, I'm not prepared to do that.
2      MR. LIMBACHER:  And I would
3  object as being beyond the scope of the
4  designations.
5      MS. SCULLION:  And we disagree
6  with that.
7  BY MS. SCULLION:
8      Q.   And then, similarly, are you
9  prepared to testify as to what Endo's current
10  anti-diversion policies are?
11      MR. LIMBACHER:  Same objection.
12      THE WITNESS:  I am not.  I
13  haven't been there for over two years,
14  so I can testify as to the activities
15  that were underway during my employment,
16  but not after.
17      MS. SCULLION:  Okay.  And, again,
18  we disagree with the objection as to
19  scope.
20      We're going to move on.  We think
21  we've made our position clear that these topics
22  do fall squarely within the agreed scope of the
23  topic.  I understand counsel has taken a
24  different position.  We will reserve our rights

Page 73

1  on that issue.
2  BY MS. SCULLION:
3      Q.   Going back to your personal
4  capacity.
5      A.   Thank you for the clarification.
6      Q.   When I asked you about Endo's
7  open letter, Exhibit 5, and the reference to
8  Endo voluntarily stopping promoting opioid
9  products to healthcare professionals as a means
10  of mitigating the risk of opioid abuse, you
11  began to discuss it sounds like steps along
12  those lines that did take place while you were
13  with Endo.  You've mentioned, I think,
14  ratcheting down on the promotion of opioid
15  products.
16      Can you tell me what -- were
17  there any steps that Endo took while you were
18  with Endo to limit promotion of opioid products
19  as a means of mitigating opioid abuse?
20      MR. LIMBACHER:  Object to form.
21      THE WITNESS:  To be clear, there
22  were a number of steps that Endo took to
23  reduce promotion generally after I
24  arrived, across all product categories,

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    including opioids, but also,
2    importantly, including others.
3         I should also maybe point out
4    that for the majority of the time I was
5    there, promotion of the opioids was not,
6    to the best of my recollection,
7    anywheres near the most significant
8    recipient of promotional attention or
9    money. But, generally, for business
10   reasons, we, I would say over the arc of
11   my time there, ratcheted down
12   promotional spend as well as detailing
13   across all products.
14        And it's in that context that I
15   was mentioning that there were times, in
16   fact, with regards to Opana ER where we
17   stopped promoting it because we were
18   launching alternative non-opioid
19   products but products that required
20   attention of the sales force, so that
21   was kind of what I was trying to
22   explain.
23   BY MS. SCULLION:
24        Q.    Can you tell me when did Endo

Page 75

1    stop actively promoting Opana ER?
2         MR. LIMBACHER:  Objection.
3    BY MS. SCULLION:
4         Q.    You just referenced a point in
5    time?
6         MR. LIMBACHER:  Object to form.
7         THE WITNESS:  Sure.  And, again,
8    just for clarification, they
9    obviously -- and this letter helps us
10   understand that they stopped permanently
11   at a period of time after
12   September 2016.
13        We had a period where Opana was
14   not actively being promoted, to the best
15   of my recollection, and that was most
16   likely sometime in 2014.  I don't recall
17   the specific dates of stopping and
18   restarting, but there was a period of
19   time there where we were launching a
20   newly acquired product and we made the
21   business decision to have the sales
22   force focus on the launch of that, and
23   we took them off of Opana ER.
24

Page 76

1    BY MS. SCULLION:
2         Q.    What was the newly acquired
3    product?
4         A.    This was a product called
5    Sumavel, S-u-m-a-v-e-l.  It was an injectable
6    product for the treatment of migraine.
7         Q.    And the decision to switch the
8    promotional efforts from Opana ER to focus more
9    on Sumavel, you said that was purely for
10   commercial reasons, correct?
11        A.    Yes.
12        Q.    It was not intended to mitigate
13   opioid abuse, correct?
14        A.    That's my recollection.
15        (Document marked for
16        identification as Endo-Lortie Deposition
17        Exhibit No. 6.)
18   BY MS. SCULLION:
19        Q.    Handing you what's been marked as
20   Exhibit Number 6.
21        MS. SCULLION:  And, I'm sorry,
22        what is the E number on this one?
23        MS. KUBLY:  1588.
24   BY MS. SCULLION:

Page 77

1         Q.    It's marked E1588 on the top
2    right-hand corner.
3         Do you recognize Exhibit Number
4    6, Mr. Lortie?
5         A.    No, I don't believe I've seen
6    this.
7         Q.    Okay.  So this was not --
8    obviously not something you reviewed in
9    connection with your preparation for today's
10   deposition, correct?
11        A.    I believe that's true.  I don't
12   recognize it.
13        Q.    Okay.  I'll represent to you that
14   it is a copy of what's labeled as the Endo
15   independent director's report of October 2018.
16   Again, this is a document we retrieved from
17   Endo's website, publicly available document.
18        If you could turn to what's page
19   1 of the document at the bottom.
20        MR. LIMBACHER:  Take your time
21        and review the document.
22   BY MS. SCULLION:
23        Q.    I'm going to just point you to
24   specific parts of the document.  If at any point

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    you think you need to review more, you can let
2    me know.
3         A.    Thank you.
4         Q.    Just looking at the top under
5    "Introduction," you will see it refers to "Since
6    its founding as a family business in 1920, Endo
7    International plc ("we", "Endo" or the
8    "Company") has evolved into a generics and
9    specialty branded pharmaceutical company with an
10   innovative suite of branded and generic
11   medications helping millions of patients lead
12   healthier lives."
13              Did I read that correctly?
14        A.    That's what it says here, yes.
15        Q.    And if you look briefly back at
16   Exhibit Number 5, which was the open letter.
17              And you see that open letter
18   again starts off similarly, "Since its founding
19   as a family business in 1920, Endo has evolved
20   into a generics and specialty branded
21   pharmaceutical company whose products help
22   millions of patients lead healthier lives."
23              Did I read that correctly?
24        A.    Yes, you did.

Page 79

1         Q.    When you were with Endo, did Endo
2    similarly promote its heritage going back to a
3    family business in 1920?
4              MR. LIMBACHER:  Object to form.
5              THE WITNESS:  No, it didn't.  In
6         fact, I'm somewhat surprised to read
7         that because that's not consistent with
8         what my understanding was, but, no, we
9         didn't promote that as part of the
10        company message.
11   BY MS. SCULLION:
12        Q.    Do you recall that there was a
13   business by the name of Endo that was founded
14   some decades prior to the Endo that you worked
15   for being founded?
16        A.    Yes, and I am aware of that in
17   history, and my understanding was that that was
18   a completely separate entity, even though the
19   name was the same name and that the name was
20   readopted after the company was established in
21   1999 or 2000 as a spin out from DuPont Merck.
22   So my understanding was always that there was a
23   disconnection between the two, other than the
24   fact that they share a name.

Page 80

1         Q.    Is your understanding, though,
2    that the Endo entity that was founded, as you
3    said, as a spin-off of DuPont Merck that it
4    acquired a portfolio of products, product rights
5    from DuPont Merck?
6              MR. LIMBACHER:  Object to form
7         and foundation.
8              THE WITNESS:  Yes, that's my
9         understanding.
10   BY MS. SCULLION:
11        Q.    And among that portfolio, there
12   was Percocet; is that right?
13        A.    Yes, that's correct, that's my
14   understanding.
15        Q.    And are you familiar with
16   Numorphan?
17        A.    Not specifically, no.
18        Q.    Okay.  Do you recall that among
19   the portfolio of product rights Endo acquired
20   from DuPont Merck were rights with respect to
21   oxymorphone products?
22        A.    That I don't know in detail.  As
23   you said, I recognize that Percocet and the
24   Percocet products were part of the -- were part

Page 81

1    of the management led buyout, but beyond that, I
2    don't know what the specific products were.
3         Q.    Okay.  And Percocet, do you
4    recall that's an oxycodone APAP combination
5    product?
6         A.    Yes, I understand.
7         Q.    So going back to this Exhibit
8    Number 6, the Independent Directors' Report, I'd
9    like to get a sense from this again of what
10   areas of Endo's risk mitigation you're prepared
11   to testify to.
12              If you look to page 2 of the
13   document, you'll see under the heading that says
14   "Recent Risk Mitigation Efforts," this section
15   appears to discuss the efforts since
16   September 2016, we've already discussed that at
17   some length about whether you're prepared to
18   testify as Endo's rep on that.
19              But let me take you to the top of
20   the next page, page 3.
21              MR. LIMBACHER:  Jen, I'm a little
22        confused.  I thought when you handed him
23        this document you said you were going to
24        be asking him questions in his capacity

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1       as a fact witness.  Are we now asking
2    him questions in his role as a 30(b)(6)
3    witness?
4            MS. SCULLION:  You're right.  I
5    have switched back to the 30(b)(6).
6    Thank you very much.
7    BY MS. SCULLION:
8       Q.    So now we're back in 30(b)(6)
9    land.
10      A.    Duly noted.  Thank you.
11      Q.    Keep saying we thought about
12   bringing actual hats, but that won't really work
13   too well.
14           So top of page 3, you see the
15   reference in the last line of the carryover
16   paragraph to "FDA's Risk Evaluation and
17   Mitigation Strategy ("REMS") program"?
18      A.    This is little (v) in that top
19   paragraph?
20      Q.    Yes.
21      A.    Yes, I see that.
22      Q.    At some point in time, Opana ER
23   was subject to a class wide REMS, correct?
24      A.    That's correct, yes.

Page 83

1       Q.    Are you prepared today to speak
2    to the policies and procedures that Endo adopted
3    to implement REMS with respect to Opana ER?
4            MR. LIMBACHER:  Just for the sake
5    of the record, to the extent that that
6    subject falls within the scope of the
7    topics on which he has been designated
8    consistent with e-mail correspondence
9    between counsel, he is prepared to give
10   that testimony.
11           And I believe we identified for
12   you yesterday some topics -- I'm
13   sorry -- some documents that he was
14   going to have in front of him, which, in
15   fact, he does have in front of him,
16   including, I think, the REMS document.
17           THE WITNESS:  Yes, that's my
18   understanding.  I will only say that I'm
19   not aware of what Endo may have done
20   since the time I left, so to the extent
21   that there are changes to it I'm not
22   aware of, I can't testify to those, but,
23   generally speaking, the REMS program I'm
24   prepared to testify on.

Page 84

1    BY MS. SCULLION:
2       Q.    Okay.  And then I think counsel
3    is also referring to a document which we'll look
4    at a little bit later, a RiskMAP.
5            Do you recall that prior to --
6    strike that.
7            Do you recall that REMS was
8    implemented for Opana ER as well as all of their
9    long-acting opioids in I believe 2012; is that
10   right?
11      A.    That's my understanding, yes.
12   That was an industry wide program that was put
13   into place that supplemented and followed but
14   didn't replace the RiskMAP.  RiskMAP had been in
15   place since 2007.
16      Q.    Right.  So you are prepared to
17   speak today to RiskMAP for Opana ER?
18      A.    I am and I also -- as counsel
19   pointed out, I have some of those documents in
20   front of me, so we can discuss those.
21      Q.    Right.
22           Are you prepared to speak to
23   Endo's RiskMAP with respect to its generic
24   OxyContin product?

Page 85

1            MR. LIMBACHER:  Object to the
2    form.
3            THE WITNESS:  I have not done
4    that, no.
5            MR. LIMBACHER:  I'm not sure that
6    falls within the scope of the topics on
7    which he's designated.
8    BY MS. SCULLION:
9       Q.    Did Endo -- do you recall that
10   Endo did for a period of time in 2004, I think
11   2004, 2006, sell a generic OxyContin --
12   oxycodone product, rather?
13      A.    For two reasons, one being that
14   that predated me by considerable time, and also
15   if it was a generic, that would have been on the
16   generic side of the business.  I don't really
17   have any particular information or knowledge on
18   that topic.
19      Q.    Oxycodone is an opioid product,
20   correct?
21      A.    Oxycodone is an opioid, yes.
22           MS. SCULLION:  Okay.  Counsel,
23   the topic was not limited to --
24   certainly was not limited to the branded

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1        opioids. It's all opioid products.
2        That product was sold by Endo, not by
3        Qualitest, and we do need a corporate
4        representative to speak to Endo's
5        policies and procedures with respect to
6        addressing risks of abuse and diversion
7        with respect to generic OxyContin. I
8        understand the witness is not prepared
9        on that today. I'm not faulting him for
10       that. I'm just pointing it out so we're
11       going to reserve our rights on that.
12              MR. LIMBACHER: I'm not sure it
13       does fall within the scope of the topics
14       on which he's been designated.
15              MS. SCULLION: We'll take it up
16       off the record. The special master made
17       very clear this case involves the
18       generics as well.
19              MR. LIMBACHER: I'm not disputing
20       that. The issue is what topics he's
21       been designated on.
22   BY MS. SCULLION:
23       Q.    If you'll go down to the bottom
24   of that same page we were on, the last paragraph

Page 87

1    speaks to "the company" -- in this case Endo --
2    "maintains programs for overseeing and tracking
3    shipments for signals of potential diversion."
4              Do you see that sentence or that
5    portion of the first sentence?
6        A.    Yes, I see that.
7        Q.    Okay. Are you prepared today to
8    speak to Endo's programs to oversee and track
9    shipments for signals of potential diversion
10   with respect to any opioid products?
11       A.    I believe this falls under the
12   suspicious order management, so I am not
13   prepared on that. I think we've got somebody
14   else who is going to cover that.
15       Q.    Okay. That's one of the things I
16   did want to clarify.
17              MS. SCULLION: Counsel, is it
18       Endo's intention to have those issues
19       addressed by the representative
20       designated for suspicious order
21       monitoring.
22              MR. LIMBACHER: Specific to
23       overseeing and tracking shipments, I
24       think the answer is yes.

Page 88

1              MS. SCULLION: Okay. The reason
2        I ask is that's not our understanding of
3        what suspicious order monitoring
4        entails, but that's fine, as long as
5        there's going to be somebody to speak to
6        that aspect of anti-diversion.
7    BY MS. SCULLION:
8        Q.    Let's continue down in that same
9    paragraph. The next to last sentence on this
10   page begins "Endo's Pharmacovigilance."
11              Do you see that?
12       A.    Yes, I see that.
13       Q.    Okay. And this speaks to
14   pharmacovigilance and risk management reviewing
15   adverse event reports received via postmarketing
16   surveillance.
17              Are you prepared today to speak
18   to Endo's policies and procedures with respect
19   to those reviews?
20              MR. LIMBACHER: And, counsel,
21       consistent with the e-mail exchanges
22       you've had with Mr. Davis, he's prepared
23       to testify with regard to the process of
24       reviewing adverse event reports received

Page 89

1        postmarketing.
2              MS. SCULLION: Terrific.
3    BY MS. SCULLION:
4        Q.    Let me ask you this as Endo's
5    corporate representative: The reference here to
6    Endo's risk management department, do you know
7    at what point in time a risk management
8    department was established at Endo? Let me ask
9    a better question.
10              Do you know when a risk
11   management department was established that had
12   as part of its responsibilities reviewing
13   adverse event reports via post-marketing
14   surveillance?
15              MR. LIMBACHER: And you're
16       referencing the language at the bottom
17       of page 3 that talks about Endo's
18       pharmacovigilance and risk management
19       department?
20              MS. SCULLION: Good point. I had
21       separated those.
22   BY MS. SCULLION:
23       Q.    Was there -- was there a separate
24   risk management department?

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    A.    My recollection, again, just to
2  make sure we're all on the same page, literally,
3  this was a report issued just a few months back,
4  so literally two years after I had left.
5         That being said, I don't recall
6  it being called pharmacovigilance and risk
7  management department, per se.  That could be
8  something that was designated subsequent to my
9  departure.  However, those functions were all in
10  place.  We had pharmacovigilance professionals,
11  risk management professionals, and they were
12  operating on the, you know, both the REMS as
13  well as the RiskMAP and other just drug safety
14  activities that any drug company would have in
15  place.
16    Q.    Okay, great.
17    A.    I'm familiar with the functions.
18  I don't recall it being called that department,
19  but those functions had been in place.
20    Q.    I think counsel's clarification
21  did help because I definitely read that as being
22  two separate departments.  Okay.
23    A.    And my recollection it was a
24  function that was done collectively.

Page 91

1    Q.    If you'll go to the next page, 4,
2  under the heading "Historical and Existing
3  Compliance Measures."
4         So a similar question to what we
5  just talked about before, but the second
6  paragraph, which refers to, in quotes,
7  compliance department, Endo's Compliance and
8  Business Practices Department, it says (the
9  "Compliance Department").
10         Do you know when Endo established
11  that department?
12    A.    Endo had a compliance function,
13  chief compliance officer reporting to the CEO as
14  well as to the board during my entire career
15  there.
16         I don't recall specifically them
17  calling it the compliance and business practices
18  department, again, but the compliance function
19  was fully staffed and an important function
20  during all of my time there, and I assume it
21  continues.
22    Q.    Do you know when before your time
23  there a chief compliance officer position had
24  been established?

Page 92

1    A.    I don't know the specific date.
2  I know that there was a chief compliance officer
3  in place when I joined in 2009, and there
4  certainly was one there when I left in 2016.
5    Q.    Okay.  Let's go down to the next
6  paragraph, which speaks to Endo's robust
7  compliance program operated by the compliance
8  department has continued to evolve since its
9  establishment in 2004.
10         As Endo's corporate
11  representative, are you prepared today to speak
12  to what efforts, what compliance efforts were in
13  place at Endo prior to 2004 with respect to
14  opioid anti-abuse regulations and policies?
15         MR. LIMBACHER:  Object to form
16    and object to the extent it's beyond the
17    scope of the topics on which he has been
18    designated.
19         THE WITNESS:  Specifically, I
20    can't, I'm not prepared, I wasn't there.
21    To the extent that they represent things
22    that continued during my tenure, I can
23    certainly speak to that, but I can't --
24    I'm not prepared to speak about what

Page 93

1  happened prior to my arrival,
2  specifically five years prior to my
3  arrival here in this case.
4  BY MS. SCULLION:
5    Q.    And I asked you that question
6  with respect to compliance efforts for
7  anti-abuse regulations.
8         Is your answer the same with
9  respect to compliance efforts for anti-diversion
10  regulations and laws prior to 2004, are you
11  prepared to speak to those?
12         MR. LIMBACHER:  Object to form
13    and object to the extent it goes beyond
14    the scope of the topics on which he's
15    been designated.
16         THE WITNESS:  No, I am not
17    prepared to address those topics.
18         MS. SCULLION:  Counsel, Endo had
19    objected to time frame initially.  That
20    objection was resolved and the time
21    frame objection was withdrawn, largely
22    in response to the special master having
23    ruled that the generics business and
24    business other than just Opana ER was

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    fairly part of this case and is
2    relevant.  So, again, I understand we
3    may have a difference of opinion.
4    Clearly, the witness is not prepared
5    and, again not faulting him, but we're
6    going to reserve our rights to seek
7    additional testimony on that period.
8         MR. LIMBACHER:  I think he's
9    prepared to testify with regard to the
10   abuse and diversion policies in place
11   that are reflected in the June of 2007
12   RiskMAP, which would predate his
13   employment at the company.  I don't know
14   that he's prepared to testify with
15   regard to policies that predate 2004.
16        MS. SCULLION:  Right.
17   BY MS. SCULLION:
18        Q.   You recall, though, that Endo was
19   actively marketing, for example, Percocet prior
20   to 2004?
21        A.   I'm not sure of the timing, but,
22   again, you've already established that that was
23   part of the company formation, so I think that
24   that's fair to say.  That was part of our, at

Page 95

1    that time, quite small generics business,
2    separate from branded, and, of course, it
3    predates me by five years.
4         Q.   Okay.  Let's go to the next page,
5    5, and I'm looking at the second full paragraph,
6    it begins "in February of 2014," second sentence
7    of that paragraph -- sorry, the paragraph is
8    discussing the corporate integrity agreement,
9    which we discussed earlier, correct?
10        A.   Yes, I see the paragraph.
11        Q.   Okay.  And the second sentence
12   says, "Pursuant to the CIA, Endo developed and
13   implemented a Field Force Monitoring Program
14   ("FFMP") to evaluate and monitor its sales
15   representatives' interactions with HCPs."
16        And, again, I'm asking you this
17   in your capacity as Endo's corporate
18   representative, what was the Field Force
19   Monitoring Program?
20        A.   So I will say that both the
21   acronyms here, the FFMP and the NPMP I'm not
22   familiar with.  I don't know if subsequent to my
23   departure they decided to put into place
24   nomenclature to help, you know, understand or be

Page 96

1    able to describe these.
2         That being said, I'm familiar
3    with many of the aspects of the CIA.  As we've
4    said before, I was a signatory on that, and, in
5    fact, field force monitoring, which for me
6    encompasses everything from selection and
7    training to monitoring the activities and
8    dealing with if any cases arose where the sales
9    force was acting outside of the well-established
10   rules and regulations, that I am familiar with.
11   I have just not seen it called specifically the
12   Field Force Monitoring Program.
13        Q.   So I take it you could not answer
14   for me today that the extent to which the
15   development and implementation of what's labeled
16   here as a Field Force Monitoring Program, you
17   couldn't tell me how that may have changed any
18   of the procedures with respect to overseeing
19   compliance with laws and regulations governing
20   sales representatives' interactions with
21   healthcare providers?
22        MR. LIMBACHER:  Object to form.
23   I think you misstated his testimony.
24        THE WITNESS:  Within the

Page 97

1    construct of the CIA, I can certainly
2    discuss some of the -- as you say, the
3    changes, which for me, to my
4    recollection, were about memorializing
5    recordkeeping reports, cooperation with
6    the Department of Justice on the aspects
7    of the CIA to ensure company compliance
8    with those things.
9         For me, importantly, activities
10   with regards to field force and
11   interactions with HCPs, et cetera,
12   really do link back to the RiskMAP and
13   then subsequently the enhancements to
14   the RiskMAP as represented by the REMS,
15   as we've spoken.  So I think all of
16   these things are fundamental to how Endo
17   trained, monitored, reported activities
18   related to its sales reps and
19   commercialization.
20   BY MS. SCULLION:
21        Q.   And we will talk about RiskMAP,
22   but you don't, sitting here today, know whether
23   the Field Force Monitoring Program referenced
24   here changed any of the policies or procedures

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    that you were familiar with under the CIA or
2    RiskMAP?
3        A.    I'm sorry, I was about to answer,
4    but your question actually confused me, so could
5    you just ask that again, if you would.
6        Q.    Sure.
7              Sitting here today, you don't
8    know whether the development and implementation
9    of what's called here a Field Force Monitoring
10   Program, whether that changed any of the
11   policies or procedures that you're familiar with
12   under, let's start with the CIA?
13       A.    The nomenclature Field Force
14   Monitoring Program is not one that I'm recalling
15   here, and I'd be happy to look at documents,
16   maybe that would help me recall it.  That being
17   said, I'm well aware of certain changes to
18   policies and procedures that were made within
19   the content and the construct of the CIA, again,
20   on topics of reporting and signing and board
21   resolutions, et cetera.
22             So to the extent that that's
23   what's being referred to here, I can do my best
24   to speak about those, but, you know, the FFMP as

Page 99

1    a specifically designated program, I would need
2    to see something to help me see whether or not I
3    could add to that.
4        Q.    Okay.  And if you go two
5    paragraphs down, the paragraph begins, "The
6    compliance department has also implemented a
7    risk assessment and mitigation process (RAMP) to
8    standardize and centralize risk assessments
9    relating to promotional activities."
10             Are you prepared as Endo's
11   corporate representative to speak to the RAMP
12   process?
13             MR. LIMBACHER:  Object to the
14             extent that that calls for him to
15             testify beyond the scope of the topics
16             on which he's been designated as
17             described in more detail in the e-mails
18             between counsel.
19             MS. SCULLION:  Again, we'll
20             disagree that it's beyond the scope.
21   BY MS. SCULLION:
22       Q.    Are you prepared to speak to
23   that?
24       A.    Again, with regards to the

Page 100

1    designation of this RAMP, that's not a -- that's
2    not an acronym that I'm familiar with, so this
3    may have come together in the period of time
4    after I left.
5              Having said that, I can certainly
6    speak to activities related to promotional
7    activities, risk assessment activities
8    undertaken that I think is in here, but I can't
9    attest to whether or not that's complete under
10   this topic of RAMP because I don't recognize
11   what RAMP -- the complete details of what RAMP
12   may refer to.
13       Q.    Okay.  If you go to the next
14   page, 6, the heading "Review and approval of
15   promotional materials," you see this first
16   paragraph refers to the "Marketing and
17   Advertising Review Committee ("MARC")"?
18       A.    Yes.  Again, I'm going to just
19   take a minute and read the paragraphs here just
20   to orient myself.
21       Q.    Sure.
22       A.    (Witness reviews document.)
23             Okay, I've read that section.
24   Thank you.

Page 101

1        Q.    Okay.  And I think you explained
2    earlier you're now prepared to testify to Endo's
3    policies and procedures implemented through MARC
4    with respect to opioid products, correct?
5        A.    Yes, I think I'm well prepared
6    for that.
7        Q.    Okay.  And to be clear, the
8    predecessor to MARC was the PMRB, correct?
9        A.    Yes.
10       Q.    And you're prepared to testify to
11   the policies and procedures used by the PMRB
12   with respect to opioid products, correct?
13       A.    I believe they're essentially one
14   in the same, to my recollection, so yes.
15       Q.    That's what we're going to get
16   to.
17             If you go to page 7, the heading
18   "Identification of healthcare providers eligible
19   for; sales calls."
20             Do you see that heading?
21       A.    I do.
22       Q.    And then the second paragraph
23   down, the second sentence says, "The company's
24   Abuse and Diversion Detection Program ("ADD

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    program") has included," and then it lists a
2    number of items there.
3              Are you familiar with the
4    company's ADD program referenced here?
5         A.    I am in general.  Again, it's --
6    I'm familiar with that acronym.  It really --
7    all of these link back to the RiskMAP, the REMS
8    in terms of policies and procedures the company
9    had in place for many years to accomplish the
10   objectives set out here and explained here.
11        Q.    I think I misheard your
12   testimony, but you are not familiar with the ADD
13   --
14        A.    I'm familiar with that acronym.
15        Q.    You are?
16        A.    I am, yes.
17        Q.    Okay, I heard wrong.  Thank you.
18        A.    Sorry, my mistake.
19        Q.    No, no, I heard incorrectly.
20             Okay.  And I think you said
21   you're prepared to speak to that today as Endo's
22   corporate representative, correct?
23             MR. LIMBACHER:  To the extent
24        that it falls within the scope of the

Page 103

1         topics on which he's been designated,
2         yes, he's prepared.
3              MS. SCULLION:  Okay.
4              THE WITNESS:  Just for clarity,
5         within the documents here that I have to
6         refer to in real time, we have the
7         RiskMAP and the REMS.  I don't think we
8         have the ADD document specifically, so
9         it may be that I need some help, but if
10        you've got some specific point in that,
11        something that I can refer to, but,
12        generally, I'm prepared to address that
13        topic.
14   BY MS. SCULLION:
15        Q.    You stated -- you referred to an
16   ADD document.
17             Was there a specific ADD document
18   similar to RiskMAP?
19        A.    My recollection is that the ADD
20   specifically as described, the ADD followed the
21   agreement with the New York Attorney General a
22   few years back, shortly before I left, and, as I
23   said before, my recollection is the majority of
24   that memorialized activities that the company

Page 104

1    had been involved in for years.  But if there's
2    a specific part of it, I may need to ask to
3    refer to a page in that agreement with the New
4    York Attorney General to refresh my specific
5    recollection.
6         Q.    Got it.  Thank you.
7              And then the last paragraph on
8    this page 7 does speak to suspicious order
9    monitoring programs, and I think we discussed
10   that there's going to be a separate corporate
11   representative on those issues.
12             But let's take off your corporate
13   representative hat then for the moment.  Just
14   based on your experience at Endo, was there
15   any -- was there any connection between the ADD
16   program and the SOM programs at Endo?
17             MR. LIMBACHER:  Object to form.
18   BY MS. SCULLION:
19        Q.    Were those sort of separately run
20   programs I guess is the question?
21        A.    Well, I don't know how to answer
22   that in that the -- you know, to my
23   understanding, the suspicious order monitoring
24   program was done in the context of all of the

Page 105

1    steps the company took for risk management,
2    mitigation of potential abuse, diversion,
3    training, et cetera, again, linking back to the
4    RiskMAP and the REMS, so I wouldn't say that you
5    can necessarily split one and say that the SOM
6    program was not in the context of the spirit of
7    the ADD as it was in the spirit of RiskMAP and
8    REMS as well.
9              So I think, if I understand your
10   question correctly, I would say that, no, you
11   can't really separate those things.  There was
12   SOMS and all the other steps were done in
13   concert with the goals of the ADD and the other
14   things we had in place.
15        Q.    Was there any one individual
16   charged with overseeing the ADD program?
17        A.    No, not to my recollection
18   specifically.  Again, the ADD, given that it was
19   a follow on and in the context of the RiskMAP
20   and REMS and all of the policies, procedures and
21   activities really the responsibilities either
22   specifically by function or collectively by
23   executive team all the way up to the CEO and the
24   board, I would say everybody had accountability

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    for making sure that the company was acting
2    appropriately.
3         Q.    Okay.  But there was no one
4    specific person charged with overseeing it?
5         A.    Overseeing ADD specifically?
6         Q.    Yeah.
7         A.    Not to my recollection.
8         Q.    Okay.
9         A.    Again, ADD, my recollection, was
10   a memorialization of things -- many things that
11   were already in place that really crossed --
12   were cross-functional in nature.
13        Q.    And with respect to SOM programs,
14   was there an individual charged with overseeing
15   Endo's SOM programs?
16            MR. LIMBACHER:  Object to form.
17   BY MS. SCULLION:
18        Q.    I can ask this in your personal
19   capacity.
20        A.    Yeah, to my recollection, again,
21   personal capacity and thinking of the branded
22   business, one of our supply chain managers
23   oversaw two aspects that I think are relevant to
24   the question.  One is Endo's branded SOP with

Page 107

1    regards to that activity and specifically, also,
2    oversight of our distribution partner, our sole
3    distribution partner for the branded business,
4    which was UPS.  UPS being the DEA license holder
5    had ultimate responsibility for managing and
6    maintaining their specific program, but that was
7    my understanding.
8         Q.    And you said there was a supply
9    chain manager.  Was that Ms. Walker?
10        A.    That was Lisa Walker, yes, at
11   least during the time that I recall.
12        Q.    One more thing, in that same
13   exhibit, the independent director's report, turn
14   to page 4, Exhibit Number 6 again.
15            Bottom of page 4, the last
16   paragraph, last sentence says, "Endo's
17   compliance program incorporates the fundamental
18   elements of an effective compliance program
19   including," and then there are bullet points at
20   the bottom of page 4 that extend over to the top
21   of page 5.  I'm asking this in your capacity as
22   Endo's corporate representative, were these
23   fundamental elements of an effective compliance
24   program applicable to Endo's compliance program

Page 108

1    for the entirety of time that Endo sold opioid
2    products?
3            MR. LIMBACHER:  Object to the
4    extent it falls outside the scope of the
5    topics on which he's been designated.
6            MS. SCULLION:  Again, we disagree
7    with that.
8            THE WITNESS:  Well, as explained
9    here, this is discussing the
10   establishment in 2004, which I wasn't
11   aware of for an earlier question, and it
12   explains that the compliance department
13   and the policies and procedures have
14   continued to evolve since that point in
15   time.
16            With regards to Opana, which was
17   launched in 2006 or Opana ER -- sorry --
18   Opana ER and Opana, I believe, were both
19   launched in 2006 and my arrival in 2009,
20   this is consistent with my recollection
21   for that period of time.  Prior to that,
22   I can't attest to what happened.
23   BY MS. SCULLION:
24        Q.    Okay.  So --

Page 109

1         A.    Or what the policies and
2    procedures were.
3         Q.    Okay.  So you'd agree that with
4    respect to compliance -- sorry.
5            With respect to enforcing, for
6    example, the regulations and laws and policies
7    for anti-abuse for opioids, that these
8    fundamental elements of an effective compliance
9    program would apply to such compliance efforts,
10   correct?
11            MR. LIMBACHER:  Object to form.
12            THE WITNESS:  I'm really sorry, I
13   really don't understand that question.
14   BY MS. SCULLION:
15        Q.    Sure, try that one again.
16        A.    Yeah.
17        Q.    Well, you're here to speak today
18   in part as Endo's corporate representative on
19   Endo's efforts to ensure compliance with
20   anti-abuse laws, regulations and policies,
21   correct?
22            MR. LIMBACHER:  Object to form.
23            THE WITNESS:  To the extent that
24   it's in the topics designated, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    BY MS. SCULLION:
2        Q.    Okay.  And same thing with
3    respect to anti-diversion laws, regulations and
4    policies, you're here to speak to Endo's
5    compliance efforts with -- to ensure compliance
6    with those laws, regulations and policies,
7    right?
8            MR. LIMBACHER:  Object to form.
9            THE WITNESS:  Yeah, with the
10           exception of specific detail on SOMS,
11           that's my understanding.
12   BY MS. SCULLION:
13       Q.    Correct, thank you.
14           And you'd agree that for those
15   compliance efforts to be effective, they would
16   need to, for example, have as indicated in the
17   first bullet point here, clear rules, clear set
18   of rules?
19           MR. LIMBACHER:  Object to form.
20           THE WITNESS:  That sounds
21           reasonable.
22   BY MS. SCULLION:
23       Q.    Written down somewhere?
24       A.    I would think so.

Page 111

1        Q.    Okay.  And there needs to be
2    training on those rules and efforts to assess
3    the effectiveness of those rules --
4            MR. LIMBACHER:  Object to form.
5    BY MS. SCULLION:
6        Q.    -- effectiveness of the training?
7            MR. LIMBACHER:  Object to form.
8            THE WITNESS:  That sounds like a
9            reasonable, reasonable statement.
10   BY MS. SCULLION:
11       Q.    There should be records kept of
12   the compliance process, correct?
13       A.    I think you're asking me just to
14   explain what a rigorous compliance program would
15   be.  In my experience, during my time there, as
16   well as at other companies, those things that
17   you're mentioning sound like reasonable aspects
18   of a typical compliance program.
19       Q.    Let's just make sure then that
20   we're on the same page on that.
21           So we said clear rules, yes,
22   written down, yes, correct?
23       A.    I would think that would be
24   reasonable, yes.

Page 112

1        Q.    We talked about training and
2    assessing the effectiveness of the training,
3    also reasonable?
4            MR. LIMBACHER:  Object to form.
5            THE WITNESS:  I think that's
6            reasonable.
7    BY MS. SCULLION:
8        Q.    Keeping records so they could be
9    subject to audit, correct?
10       A.    Again, sounds reasonable.
11       Q.    To then actually go in and audit
12   records of compliance, that would also be a
13   reasonable part of a compliance program?
14           MR. LIMBACHER:  Object to form.
15           THE WITNESS:  Probably have less
16           particular knowledge about audit
17           procedures as they -- as they pertain to
18           compliance in general, so I'm not -- I'm
19           less sure about that specifically.  I
20           know that under a CIA, for example,
21           there are explicit rules and audit
22           reporting.  I'm not sure -- you're kind
23           of describing a general concept for good
24           compliance.  So, you know, in that

Page 113

1    context, I'm not sure about the audit
2    requirements or what would or would not
3    be reasonable.  I'm not an audit
4    professional, for example.
5    BY MS. SCULLION:
6        Q.    Okay.  Would you agree that
7    consistent discipline measures to ensure
8    compliance would be a part of a reasonable
9    compliance program?
10           MR. LIMBACHER:  Object to form.
11           THE WITNESS:  I would agree with
12           that, yes.
13   BY MS. SCULLION:
14       Q.    How about what's called tone at
15   the top.  Are you familiar with that phrase?
16       A.    Generally I've heard that, yes.
17       Q.    Okay.  Well, let's look on page 4
18   of Exhibit 6.  If you look at the last bullet
19   point there it says, "Effective lines of
20   communication including messages from senior
21   level leaders regarding commitment to
22   compliance."
23           Is messages from senior level
24   leaders regarding commitment to compliance, is

29  (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    that's what referred to as tone at the top?
2         MR. LIMBACHER:  Object to form.
3         THE WITNESS:  I think that's
4    consistent with my understanding of the
5    term, yes.
6    BY MS. SCULLION:
7         Q.    Okay.  Would you agree it would
8    be inconsistent with a reasonable compliance
9    program if the tone at the top was that an
10   anti-abuse policy was, quote, unquote, window
11   dressing?
12        MR. LIMBACHER:  Object to form.
13        THE WITNESS:  Would I agree that
14   it would be inconsistent and did you say
15   that a senior leader would be the person
16   writing or communicating?
17   BY MS. SCULLION:
18        Q.    I'm sorry, that a senior leader
19   would -- would, yeah, refer to an anti-abuse
20   program as window dressing.
21        MR. LIMBACHER:  Object to form.
22        THE WITNESS:  It would be most
23   helpful if there was a specific instance
24   of communication so that I could

Page 115

1    understand the context of the person,
2    how we are describing senior leader.
3    With those qualifications, in my
4    opinion, yes, that would be correct,
5    that that would be inconsistent with
6    tone from the top.
7    BY MS. SCULLION:
8         Q.    So, for example, if a vice
9    president of regulatory affairs were to refer to
10   an anti-abuse program as being your window
11   dressing, that would not be consistent with a
12   message from a senior level leader regarding
13   commitment to compliance, right?
14        MR. LIMBACHER:  Object to form.
15        THE WITNESS:  I actually see it a
16   little bit differently.  Not that
17   that -- not that that communication
18   wouldn't be troublesome, but when I
19   think of tone from the top, I think of
20   in the context of senior leadership
21   communicating to large sections of the
22   corporation that, you know, the
23   company -- that tone from the top to me
24   is proclamations from or, you know,

Page 116

1    discussions of what's important from the
2    CEO or other members of the leadership
3    team.  Again, it would be most helpful
4    to see a specific communication so I
5    could understand the context, but tone
6    from the top is a little bit different
7    to me than what you just described, but
8    it could be that when I see some detail,
9    it would help me understand better.
10   BY MS. SCULLION:
11        Q.    You would agree that tone from
12   the top is not just the words uttered, it has to
13   be sincere, correct, a sincere tone?
14        A.    Sincere and words and actions
15   matter, that's my own personal policy.
16        Q.    And if an executive at the vice
17   president level regarded an anti-abuse program
18   as mere window dressing, that would not be
19   consistent with having a sincere belief and
20   commitment to compliance with that anti-abuse
21   program, correct?
22        MR. LIMBACHER:  Object to form.
23        THE WITNESS:  Again, as mentioned
24   before, it would be most helpful if

Page 117

1    there was a specific instance and a
2    specific person and a specific audience
3    I could review, and then I could give a
4    more fulsome answer to that.
5    BY MS. SCULLION:
6         Q.    Okay.  And with regard to Endo's
7    approach to ensuring compliance with -- let's
8    start with compliance with the laws and
9    regulations governing promotional materials --
10        A.    I'm sorry.  I coughed literally
11   when you said an important word.  So before you
12   say the whole thing, could you start again.
13        Q.    Absolutely.
14        In terms of Endo's approach to
15   ensuring compliance with laws and regulations,
16   let's start with laws and regulations that
17   govern the promotion of pharmaceutical products,
18   did Endo regard it as appropriate for -- to be
19   looking for ways to evade the applicable laws
20   and regulations?
21        MR. LIMBACHER:  Object to form.
22        Are we now asking him questions in his
23   capacity as a 30(b)(6) witness?
24        MS. SCULLION:  This is in his --

Highly Confidential - Subject to Further Confidentiality Review

Page 118

```
1        yes, 30(b)(6), yes.
2               MR. LIMBACHER: So we've switched
3    over, okay.
4               THE WITNESS: So if I understand
5    your question, did Endo find it to be
6    appropriate to seek ways to evade the
7    promotional rules and regulations?
8    BY MS. SCULLION:
9        Q.    Yeah.
10       A.    Absolutely not.
11       Q.    Do you think it should be, you
12   know, coming right up to the line of those laws
13   and regulations and pushing the envelope?
14              MR. LIMBACHER: Object to form.
15   Object to the extent it falls outside
16   the scope of his 30(b)(6) topics.
17              THE WITNESS: No, that's not my
18   recollection.
19   BY MS. SCULLION:
20       Q.    So, for example, would it be
21   appropriate for Endo to have taken a position
22   with respect to promotional materials with the
23   understanding that its position was likely to
24   draw a warning letter from the FDA?
```

Page 119

```
1               MR. LIMBACHER: Same objections.
2               THE WITNESS: Absolutely not.
3    BY MS. SCULLION:
4        Q.    Was it appropriate to essentially
5    roll the dice and say, let's give it a try and
6    see if we get a warning letter, and if we do
7    it's not a big deal?
8               MR. LIMBACHER: Object to form
9    and object to the extent it falls
10   outside the scope of the topics on which
11   he's designated.
12              THE WITNESS: No.
13              MS. SCULLION: And just to be
14   clear, I disagree with the scope
15   objections.
16              Counsel, if we can have an
17   agreement that I don't need to keep
18   saying that?
19              MR. LIMBACHER: Yes, I agree you
20   do not.
21              MS. SCULLION: Assume I don't
22   necessarily agree with your scope
23   objections.
24              MR. LIMBACHER: I understand.
```

Page 120

```
1               MS. SCULLION: Thank you, okay.
2    BY MS. SCULLION:
3        Q.    Again, continuing in your
4    capacity as a corporate representative, I want
5    to focus in on Endo's policies and procedures to
6    combat diversion of opioid products. So do you
7    know whether those policies -- start with
8    policies -- whether Endo's policies in that
9    regard changed over time?
10       A.    Again, our policies around the
11   mitigation and prevention of abuse and diversion
12   are all rooted in the RiskMAP, and that has been
13   consistent through the period of time that I was
14   there, and I believe -- I would be surprised if
15   it doesn't continue to underpin the company's
16   activities. As we've previously discussed in
17   2012, an industry-wide component of the same
18   objectives was incorporated. That would be the
19   industry-wide REMS for opioid products. So that
20   was a continued evolution. To the extent that I
21   would say it changed the fundamental objectives,
22   probably not, but it was an evolution, and then
23   we've also spoken about certain aspects as
24   memorialized in the New York Attorney General
```

Page 121

```
1    ADD program. To the extent that that happened
2    later and memorialized some of the things that
3    had happened before and perhaps there were one
4    or two changes, I'd have to look, but,
5    generally, I would say that Endo's policies,
6    procedures, activities, measurements, et cetera,
7    always have fundamentally been rooted in those
8    that are set out in the RiskMAP.
9        Q.    Okay. And as to policies that
10   predate the RiskMAP, you're not prepared to
11   speak to those, correct?
12              MR. LIMBACHER: Object to form.
13              THE WITNESS: That's correct.
14   BY MS. SCULLION:
15       Q.    Do you even know whether Endo had
16   any policies, any anti-diversion policies in
17   place prior to the implementation of RiskMAP in
18   2007?
19              MR. LIMBACHER: Object to form.
20              THE WITNESS: I don't have
21   specific knowledge of that. I really
22   look to RiskMAP as being the fundamental
23   foundation of all of that activity.
24   That's not to say that I would suspect
```

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    that they were not being a compliant
2    organization, but RiskMAP to me is
3    really the fundamental set of policies,
4    procedures, activities surrounding those
5    topics.
6    BY MS. SCULLION:
7        Q.    Okay.  And we were just speaking
8    about anti-diversion policies.  Same questions
9    with respect to anti-abuse policies, did those
10   fundamentally change over time at Endo with
11   respect to opioid products?
12           MR. LIMBACHER:  Object to form.
13           THE WITNESS:  I'm including that
14       in sort of the same answer as with
15       diversion because abuse, diversion and
16       all of the other aspects were really the
17       fundamental goal and objective of
18       RiskMAP and everything that followed
19       from that.
20   BY MS. SCULLION:
21       Q.    Make sure that I understand that
22   last answer.
23           In terms of anti-abuse and
24   diversion policies, was there any distinction

Page 123

1    between what was considered abuse and what was
2    considered diversion; was all abuse diversion
3    and all diversion abuse?
4            MR. LIMBACHER:  Object to form.
5            THE WITNESS:  No.  I think that
6        there are separate components but they
7        all are under activities that the
8        company was highly focused on to prevent
9        both of them as they pertain, in
10       particular, to the manufacture,
11       distribution and promotion of controlled
12       substances.
13           MS. SCULLION:  Okay.  Can we have
14       the RiskMAP.
15           (Document marked for
16       identification as Endo-Lortie Deposition
17       Exhibit No. 7.)
18   BY MS. SCULLION:
19       Q.    Hand you what's been marked as
20   Exhibit Number 7, and Exhibit 7 is Bates stamped
21   ENDO-CHI_LIT-00234542.
22           Mr. Lortie, do you recognize --
23   we'll go back to your personal capacity for the
24   moment.

Page 124

1            Do you recognize Exhibit Number
2    7?
3        A.    Yes, I do.
4        Q.    And is this a copy of the
5    June 2007 RiskMAP for Opana ER?
6        A.    It is, yes.
7        Q.    And this is one of the documents
8    that you did review to prepare for today's
9    deposition, correct?
10       A.    That is correct.
11       Q.    Now, this is indicated as a
12   RiskMAP for Opana ER, and it obviously details a
13   number of programs, initiatives, efforts to be
14   undertaken as part of this RiskMAP.
15           Endo did not, though, have a
16   RiskMAP for Opana IR, correct?
17           MR. LIMBACHER:  Object to form.
18           THE WITNESS:  I am not aware of
19       whether they did or did not.  I am aware
20       of this document being developed
21       specifically in the context of the
22       launch in 2006 of Opana ER, which being
23       an extended-release opioid, the company
24       felt it was responsible to put together

Page 125

1        this comprehensive program.  As to IR, I
2        don't know.
3    BY MS. SCULLION:
4        Q.    And in June 2007, the company was
5    also -- Endo was also selling Percocet, correct?
6        A.    Again, Percocet was managed at
7    that point in time, I believe, by the generic
8    division, but I think, yes, I believe they were
9    distributing it.  I don't think they were
10   actively promoting it, but I'm not sure.  Again,
11   that predates me.
12       Q.    And do you know whether Endo had
13   a risk management plan for Percocet?
14           MR. LIMBACHER:  Object to form.
15           THE WITNESS:  I don't know
16       whether they did or not.
17   BY MS. SCULLION:
18       Q.    Okay.  So I take it you also
19   couldn't speak to, for example, why Endo had a
20   RiskMAP for Opana ER but not for IR?
21           MR. LIMBACHER:  Object to form,
22       misstates his testimony.
23           THE WITNESS:  Correct, because I
24       don't -- there could have been one, I

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    just don't know.  So it's hard to -- but
2    I can -- this to me was really the
3    collection of company activities with
4    regards to long-acting opioids, in my
5    view.
6    BY MS. SCULLION:
7        Q.    And that's one of the questions I
8    have is the activities identified in Exhibit 7,
9    the RiskMAP for Opana ER, did those apply to any
10   other opioid products that Endo was selling at
11   that point in time?
12           MR. LIMBACHER:  Object to form.
13           THE WITNESS:  Well, again, with
14       the exception of Opana IR, I'm not aware
15       that the company was selling any other
16       opioids at that period of time, within
17       the -- you know, by "selling" I mean
18       promoting.  We've already established
19       that they were distributing Percocet and
20       there may have been other generics, but
21       I'm aware of this, again, from the
22       perspective of the branded business and
23       active promotion.
24           MR. LIMBACHER:  Jen, we've been

Page 127

1    going about an hour, whenever there's a
2    good time for a break.
3           MS. SCULLION:  Yeah, we can do
4       that.
5           MR. LIMBACHER:  Thank you.
6           THE VIDEOGRAPHER:  Going off the
7       record at 11:39 a.m.
8           (Brief recess.)
9           THE VIDEOGRAPHER:  We are back on
10      the record at 11:56.
11   BY MS. SCULLION:
12       Q.    Welcome back, Mr. Lortie.
13       A.    Thank you.
14       Q.    Put your corporate representative
15   hat on.
16           One aspect of diversion with
17   respect to opioid products are what is called
18   pill mills, right?
19       A.    Yes, pill mills, yes, I'm
20   familiar with that term.
21       Q.    And just so we're on the same
22   page, what's your understanding of what a pill
23   mill is?
24       A.    My understanding that would be

Page 128

1    some source of -- some inappropriate source of
2    acquiring controlled substances for the purpose
3    of using them outside of their intended medical
4    use.  So, for example, a physician's office who
5    was prescribing said medicines for purposes
6    other than their intended labeled use.
7        Q.    Okay.  And what procedures did
8    Endo have in place to monitor for pill mills?
9    Let's start with respect to Opana ER.
10       A.    Sure.  You know, if we want to go
11   into detail, that would be a good point to refer
12   back to the RiskMAP.
13       Q.    I'm happy to do so.  We have --
14   we've marked the RiskMAP, it's in front of you.
15       A.    Okay, that would be --
16       Q.    So if there are pages -- and for
17   the record again, this is Exhibit Number 7, if
18   there are specific pages within the RiskMAP that
19   help, why don't you point those out to me?
20       A.    Sure.  I'm looking at the table
21   of contents.  If you just give me a moment, I'll
22   go down.
23       Q.    Sure.
24       A.    Just generally, the policies and

Page 129

1    procedures included, first of all, training of
2    our sales representatives who were responsible
3    for calling on healthcare practitioners, giving
4    them certain education in terms of what would
5    be -- constitute a suspicious policy or
6    procedure at a physician's office.  Just give me
7    a moment to look for the specific topics here.
8        Q.    Sure.
9        A.    I mean, what comes most
10   immediately to mind is literally there is a form
11   that existed, and I assume most likely still
12   exists, that representatives were instructed to
13   use if they had suspicions that a healthcare
14   practitioner that they were -- that was on their
15   call list or the list of approved customers
16   exhibited a number of -- any number of
17   suspicious activities, and I think that's -- if
18   that's not in here, it's in the binder, and I
19   can refer to that maybe.
20       Q.    So in terms of procedures to
21   monitor for pill mills, you've identified sales
22   reps in the field being trained it sounds like,
23   I'm paraphrasing, to look for sort of the
24   hallmarks of a pill mill, correct?

33  (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1       A.    That's correct.
2       Q.    And there's a -- there was a form
3    to be used to report up if a rep believed they
4    saw the hallmarks of a pill mill, correct?
5       A.    That's correct.
6       Q.    Anything else, any other
7    procedures that Endo had in place to monitor for
8    pill mills with respect to Opana ER?
9       A.    Sure. I mean, as a result of the
10   activities that you just described very well and
11   accurately, filling out the form that had a
12   number of attributes that would constitute a
13   suspicion that a given practice was operating
14   inappropriately, that form would be submitted by
15   the representative to the compliance department,
16   the legal department and his or her direct
17   manager.
18          That would institute or set into
19   motion an investigation by someone in our legal
20   and/or compliance department to investigate
21   whether or not the evidence was corroborated,
22   and, if so, the physician was removed from the
23   call list so that that representative would no
24   longer be allowed to call on or be asked to call

Page 131

1    on that physician.
2          So that was -- you know, that's
3    sort of the foundation of how the company dealt
4    with suspicious offices that gave us an
5    indication that perhaps they weren't operating
6    as an above board healthcare practitioner
7    office.
8          And I can read through. I mean,
9    there are several attributes that help to
10   explain what that looked like. If you'd like
11   I'd be happy to give you an example of a couple
12   of those.
13      Q.    I'm not sure what you're
14   referring to. If there's something in the
15   RiskMAP specifically that you think I -- we
16   should be looking at --
17      A.    Well, I think these --
18      Q.    -- that addresses this issue?
19      A.    These are consistent certainly
20   with the RiskMAP, but, you know, you had
21   mentioned a couple of them, you know, the
22   attributes that would -- that would cause a
23   sales representative to suspect that there was a
24   --

Page 132

1       Q.    Hallmarks of pill mill is what
2    you're talking about?
3       A.    Exactly, so, you know, proportion
4    of prescriptions being paid for in cash, people
5    lined up outside the door, law enforcement
6    presence around. Including also if a sales
7    representative saw something in the media that
8    pointed to inappropriate behavior by his or her
9    physician, they were required to report that as
10   well, and that would be part of what the legal
11   and/or compliance department officer would use
12   as their investigation of the allegations.
13      Q.    So you've just described a
14   procedure by which, again, the sales reps, if
15   they see something or they hear of something
16   potentially in the media that causes them to be
17   suspicious that a physician -- strike that -- a
18   healthcare provider on their call plan may be a
19   pill mill, that they then escalate that up
20   through a reporting process, and there's an
21   investigation process that occurs, and if
22   there's corroboration the healthcare provider is
23   removed from the call list.
24          Were there any other procedures

Page 133

1    that Endo had in place, other than what you've
2    just described, to monitor for pill mills with
3    respect to Opana ER?
4          MR. LIMBACHER: Object to form.
5          THE WITNESS: Yeah, there was --
6       and, again, these are outlined in
7       Exhibit Number 7 that you handed me the
8       RiskMAP in there, and if you go through
9       the table of contents, there's a number
10      of different topics that would satisfy
11      what you just said. I'm looking at
12      media screening, for example.
13   BY MS. SCULLION:
14      Q.    If you could give me the section
15   numbers as you're looking through the table of
16   contents.
17      A.    Sure. So I'm looking on page 3
18   of the table of contents, and I'm looking at
19   Section 3.5.2.6.
20      Q.    Media screening?
21      A.    Media screening would be one.
22   And, again, if we turn to page 28, we can see
23   more specifics on that in this document. Going
24   down a couple more, I believe the Quantitative

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Internet Surveillance Program was part of that
2    as well, 3.5.2.9.
3              And then 3.2.4.3 it outlines, you
4    know, more or less what we just said about sales
5    force compliance.
6              And then, you know, a number of
7    all these other initiatives related to
8    education, training of sales force, of
9    physicians, of other healthcare practitioners,
10   of patients are all part of the -- part of the
11   RiskMAP itself.
12             And then also, I believe,
13   appendix number 2, it could potentially be
14   helpful here, which is a list of -- and appendix
15   number 2 I believe is on page number 42 of the
16   exhibit.  And while this is more about
17   distribution channel, it speaks to the number of
18   steps that Endo had in place to be alert for
19   safeguard and prevent opioid diversion.  Again,
20   not specifically relating to sales force, but
21   specifically relating to the production and
22   distribution of the product.  So that's not
23   specifically in response to your answer on pill
24   mills, but I think it's helpful because it

Page 135

1    underpins the foundation of the activities the
2    company undertook.
3         Q.    On that last point, let's make
4    sure I understand, staying on page 42 is
5    appendix 2, "Endo Safeguard to Prevent Opioid
6    Diversion."  Do I understand this appendix
7    really speaks to the distribution chain?
8         A.    Yes, that's what -- and I was
9    trying to explain that, the supply chain is what
10   I called it.
11        Q.    I'm glad you said that because I
12   do get confused with the reference to supply
13   chains, in my mind distribution chain, okay.
14             And I think you said earlier that
15   the prevention of diversion within the supply
16   chain is what you referred to broadly under the
17   heading as suspicious order monitoring, correct?
18        A.    So just to clarify a couple of
19   points, for me the difference between
20   distribution chain and supply chain is really
21   the top row here, which is the production of the
22   material.
23        Q.    That's the supply?
24        A.    And then it's distributed through

Page 136

1    the network of wholesalers, distributors, retail
2    pharmacists, you know, many different nodes in
3    that distribution channel that in combination
4    with the production constitute for me the supply
5    chain.  So that's what I think of when I think
6    of supply chain.
7              Suspicious order monitoring
8    certainly falls within one of the activities to
9    prevent diversion that occurs at the appropriate
10   levels within the distribution channel or that
11   part of the supply chain.
12        Q.    Okay.  So staying on this page
13   42, appendix 2, the first line, as you say,
14   is -- speaks to preventing diversion at the
15   factory, correct?
16        A.    Correct, or even before the
17   factory with inbound material.
18        Q.    Inbound material?
19        A.    Right.
20        Q.    So but, certainly, this is not
21   speaking to a process that would monitor for
22   pill mills?
23        A.    Correct.
24        Q.    Fair?  Okay.

Page 137

1         A.    That's right.
2         Q.    So, to be clear, there's no
3    healthcare providers involved at that stage,
4    right?
5         A.    Correct.
6         Q.    And, by the way, it says at the
7    factory, in 2007 did Endo itself have any
8    manufacturing facilities for opioid products?
9              MR. LIMBACHER:  Object to form.
10             THE WITNESS:  I believe the
11        answer is no.  Again, that predates me,
12        but my understanding is that that's not
13        the case, but still, those who did were
14        responsible to make sure that these
15        safeguards were in -- or equivalent ones
16        were in place.
17   BY MS. SCULLION:
18        Q.    Okay.  Was Endo itself overseeing
19   anti-diversion efforts at the factories that it
20   didn't own?
21             MR. LIMBACHER:  Object to form
22        and object to the extent it falls
23        outside the scope of the topics on which
24        he has been designated.

35 (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1      THE WITNESS:  So my general
2  understanding and the way I've always
3  looked at this is that -- and I believe
4  it's consistent with the FDA is that
5  Endo has the -- as the party responsible
6  for commercializing and selling shares
7  that responsibility with the
8  manufacturer, and those things are often
9  contractually agreed to.  So I don't
10  separate them generally one versus the
11  other.  In other words, I think the
12  manufacturing facility would have had
13  its own set, if not the exact same ones,
14  that Endo was requiring them to, but I
15  can't attest to that because I don't
16  have a visibility to that specific, but,
17  generally, I think of that, that both
18  parties shared the responsibility.
19  BY MS. SCULLION:
20      Q.    Right, so but you're not prepared
21  to testify today --
22      A.    That's correct.
23      Q.    -- as Endo's corporate
24  representative with respect to Endo's policies

Page 139

1  about ensuring against diversion at its
2  contracted -- sorry, contractual manufacturers,
3  correct?
4      A.    Specifically, I think you're
5  correct.
6      Q.    Okay.  And the next line on
7  appendix 42, it says "In transit to the
8  distribution center," so, again, that's not
9  speaking to monitoring for pill mills, correct?
10      A.    Correct.
11      Q.    Okay.  And I think you referenced
12  this earlier, but, again, in 2007 did Endo have
13  its own -- did Endo, own the distribution center
14  through which Opana ER was distributed?
15      MR. LIMBACHER:  Object to form.
16      THE WITNESS:  No, I don't think
17  Endo ever owned a distribution center,
18  to my knowledge.
19  BY MS. SCULLION:
20      Q.    Okay.  And are you able to speak
21  today to Endo's policies with respect to
22  ensuring that its contracted distribution center
23  had sufficient anti-diversion procedures in
24  place?

Page 140

1      MR. LIMBACHER:  Object to form
2  and object to the extent it falls
3  outside of the scope of the topics on
4  which he has been designated.
5      THE WITNESS:  Yeah, I think
6  specifically by definition what you're
7  asking is the suspicious order
8  monitoring program because that defines
9  what the distribution center has, so I
10  believe you have another witness that
11  will represent the company on that topic
12  or that portion of the topic.
13  BY MS. SCULLION:
14      Q.    And just to again confirm, the
15  next line says, "At the distribution center,"
16  again, that distribution center, that's not
17  Endo, that's UPS, right?
18      A.    Whether it was in 2007, I think,
19  but for the time period that's most important,
20  that was UPS and still is, I think.
21      Q.    And, again, this line does not
22  speak to monitoring for pill mills, right?
23      A.    That's correct.
24      Q.    And similar to the last line on

Page 141

1  this page, it says "To the wholesale
2  distributor, institution or pharmacy."
3      Was there anything in the
4  processes described in this line of appendix 2
5  that went to monitoring for pill mills?
6      A.    No.  This really describes the
7  diversion activities that are taking place in
8  the supply chain.
9      Q.    Okay.  Let's turn to Media
10  Screening you referenced.  3.5.2.6 is page 28.
11      Can you explain to me how the
12  media screening process described, pages 28 and
13  29, how that was used to monitor for pill mills?
14      A.    Media screening generally was
15  searching for a number of -- a number of topics,
16  and they're outlined here, including Opana,
17  oxymorphone, abuse, misuse, opioids and some
18  others, and the screening, among other things,
19  would capture law enforcement reports or other
20  reports in the media, and to the extent that
21  they involved our products, in some cases, would
22  be able to give the company an indication that a
23  given practitioner had either been under
24  suspicious of, investigation of or was being

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1   prosecuted for pill mill activity or
2   inappropriate activity. So that's why I
3   represented that media screening was one of the
4   tools that the company used to stay -- to the
5   best of its ability stay apprised of some of
6   those potential activities.
7        Q.   Okay. So fair to say media
8   screening here as it relates to monitoring for
9   pill mills is dependent on someone else already
10  having identified an actual or suspected pill
11  mill and reported that in the media, correct?
12       A.   I think that that's correct, yes.
13       Q.   Generally, those reports would
14  come once law enforcement had, in fact, arrested
15  or prosecuted someone for being a pill mill,
16  correct?
17            MR. LIMBACHER: Object to form.
18            THE WITNESS: I think generally
19       that's correct, yes.
20  BY MS. SCULLION:
21       Q.   Okay. And then you referred to a
22  Quantitative Internet Surveillance Program,
23  Section 3.5.2.9.
24       A.   Yes, I did.

Page 143

1        Q.   And this -- it's called the QISP.
2             Is this similar to the media
3   screening?
4        A.   I think it's similar, although
5   it's a little bit more specific in that it's
6   looking for specific mentions of, in this case,
7   the specific prescription drugs including Opana
8   ER in what I would call internet chatter often
9   amongst communities of abusers. So it's
10  slightly different, although they certainly --
11  there certainly were likely to have been cases
12  where that chatter was related to or following
13  something that had been picked up separately in
14  the media, but it's not exactly the same thing.
15  This is focused more on general mentions in
16  communities of abusers as opposed to media
17  screening for law enforcement intervention and
18  the like.
19       Q.   Now, if you look at what's
20  written in Section 3.5.2.9, it says in the very
21  last sentence, "The QISP will be used to monitor
22  mentions of Opana ER as well as other relevant
23  comparators for any apparent trends in abuse of
24  the product among prescription opioid abusers."

Page 144

1        Did I read that correctly?
2        A.   Yeah, that's what's written here.
3        Q.   And so this portion of the
4   RiskMAP is really going to looking for abuse
5   trends, correct?
6        A.   Among other things, that would --
7   my read of this is that that was one of the --
8   one of the possible outcomes of that activity.
9        Q.   Is there any mention in this
10  Section 3.5.2.9 of using QISP to monitor for
11  pill mills?
12            MR. LIMBACHER: Object to form.
13            THE WITNESS: Not explicitly but,
14       you know, again, if you consider what
15       internet chatter could be picked up, it
16       wouldn't be unreasonable to suspect that
17       there could be occasions where abusers
18       are mentioning either a pill mill where
19       they've had successful access or one
20       that they longer have access. I mean,
21       I'm just thinking of two potential -- so
22       I certainly would count this as one of
23       the ways that the company was
24       responsibly doing their best to be aware

Page 145

1        of potential occurrence of pill mill
2        type activity.
3   BY MS. SCULLION:
4        Q.   Who was responsible for
5   monitoring the QISP data?
6        A.   This, to my recollection, would
7   have come into our drug safety pharmacovigilance
8   department, so we had a set of trained
9   medical-legal professionals who would be
10  responsible for all aspects of drug safety and
11  monitoring and liaising on those topics, and
12  this would have fallen under that.
13       Q.   It wouldn't have come into, for
14  example, the compliance or legal department you
15  mentioned earlier who would be responsible for
16  responding to sales reps' reports of suspected
17  pill mills, right?
18            MR. LIMBACHER: Object to form.
19            THE WITNESS: No, I would
20       disagree. I mean, compliance and legal
21       would have had full view to any alerts
22       that were coming out of
23       pharmacovigilance or drug safety, in
24       general. That's not even just related

37  (Pages 142 to 145)

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    to our opioids. That's related to all
2    products.
3    BY MS. SCULLION:
4        Q.    Do you know for a fact whether
5    anyone in compliance was looking at QISP results
6    to monitor for pill mills, whether that was a
7    specific thing that they were doing?
8        MR. LIMBACHER: Object to form.
9        Object to the extent it falls outside
10       the scope of the topics on which he's
11       been designated.
12       THE WITNESS: I think my previous
13       answer answers that question. Drug
14       safety, pharmacovigilance group that was
15       monitoring this, as well as other
16       components, should there have been an
17       alert, the legal department, appropriate
18       compliance representatives would have
19       been aware.
20       Same thing if one of our sales
21       representatives reported up through
22       their leadership of a suspicion,
23       eventually those topics would have all
24       come into the compliance and legal

Page 147

1    group.
2    BY MS. SCULLION:
3        Q.    And is there any written protocol
4    that would state that the pharmacovigilance and
5    I think you said safety --
6        A.    Drug safety.
7        Q.    -- drug safety professionals had
8    responsibility to monitor this data to -- for
9    signs of suspected pill mills?
10       MR. LIMBACHER: Object to form.
11       THE WITNESS: I'm not sure
12       whether it's designated such as that,
13       but, again, by nature of the data of it
14       in this particular instance that they're
15       monitoring, any signs or signals of
16       inappropriate activity with regards to
17       any of our products would have been
18       something that they would have acted on
19       and alerted and, again, regardless of
20       whether it was relative to a pill mill
21       or other diversion activity or untoward
22       side effects or adverse events with the
23       products, that was the job of this
24       group, and they -- so I would suspect

Page 148

1    they probably had operating procedures.
2    I can't tell you what those were myself,
3    but it could be that they're in place.
4    BY MS. SCULLION:
5        Q.    I'm sorry. If I asked you the
6    question again as Endo's corporate
7    representative, and I apologize if I wasn't
8    clear, these questions have been in your
9    capacity as Endo's corporate representative.
10       Do you know as Endo's corporate
11   representative whether there was, in fact, a
12   policy that required the pharmacovigilance and
13   drug safety personnel to monitor the QISP data
14   for suspected pill mills?
15       MR. LIMBACHER: Object to form
16       and object to the extent it falls
17       outside the scope of the topics on which
18       he's been designated.
19       THE WITNESS: On that
20       particular -- the way you phrased that,
21       sitting here right now, I do not know
22       whether or not they did, but in terms of
23       general practice, I think I've explained
24       that that would happen. Whether or not

Page 149

1    there's a specific SOP that designates
2    the QISP and activities regarding pill
3    mills, I think that's getting very, very
4    specific.
5        My testimony is that that falls
6    into their job responsibilities and
7    general activities as drug safety and
8    pharmacovigilance professionals.
9    BY MS. SCULLION:
10       Q.    Okay. So let's look now, I think
11   you also mentioned Section 3.2.4.2. That's on
12   page 21 at the bottom, which speaks to
13   appropriate and responsible selling of Opana ER.
14       This section, 3.2.4.2 speaks to
15   training the sales force with respect to their
16   obligations, correct?
17       A.    Yes, that's correct.
18       Q.    Okay. And that's along the lines
19   of what we discussed before about the sales
20   force, if they saw hallmarks of a pill mill and
21   reporting it up, correct?
22       A.    Yes. And, again, I referred to a
23   form that was in routine use to make that
24   communication happen.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    Q.   Is there anything else in RiskMAP
2    that -- that reflects a policy or procedure at
3    Endo to monitor for pill mills with respect to
4    Opana ER, other than what we just discussed?
5         MR. LIMBACHER:  Object to form.
6    Object to the extent it falls outside of
7    the scope of the topics on which he's
8    designated.
9         Take your time and review the
10   document.
11        THE WITNESS:  What I would say is
12   that the entirety of the RiskMAP was put
13   into place to mitigate and prevent abuse
14   and misuse, right, all of the topics
15   here, whether they be related to
16   education, physicians, patients, sales
17   representatives, distribution chain,
18   tamper-resistant prescription pads,
19   pharmacovigilance, drug safety
20   monitoring and others, but I think I've
21   pointed you to what for me are the most
22   specific selling points where we would
23   be most like -- the company would have
24   been most likely to see evidence that --

Page 151

1         of a suspected pill mill activity.
2    BY MS. SCULLION:
3         Q.   Okay.  The -- Endo had access to
4    information that told it the number of
5    prescriptions for Opana ER that any given
6    physician within a call plan was writing in a
7    specific period of time, correct?
8         MR. LIMBACHER:  Object to form.
9         THE WITNESS:  From time to time
10   the company did subscribe to certain
11   audited prescription level information
12   at the pharmacy level.  IMS is usually
13   one of the customary companies, and I
14   point out that it is -- it's imprecise,
15   but it gives as close as available
16   information on that.  Imprecise being
17   that not all pharmacies report, not all
18   distributors have consistent reporting.
19   So, you know, to some extent it's
20   indexed information, but it gives us --
21   from time to time we did subscribe to
22   that information to get an idea for the
23   sales force on targeting and other
24   purposes, physician use.

Page 152

1    BY MS. SCULLION:
2         Q.   Right.  So, for example, Endo
3    made use of -- let me back up.
4         You said IMS was one source of
5    that data?
6         A.   Correct.
7         Q.   Certain point in time, Wolters
8    Kluwer was also a source of that data, correct?
9         A.   I think so.  In fact, they're
10   referred to in here.  We changed vendors once or
11   twice, I believe.
12        Q.   Regardless of the particular
13   vendor, Endo used that information about
14   prescriptions written by specific healthcare
15   providers to, as you said, set -- help set sales
16   goals, right?
17        MR. LIMBACHER:  Object to form.
18   BY MS. SCULLION:
19        Q.   For individual reps?
20        A.   Not necessarily at the individual
21   prescriber level, but we certainly would have
22   used that audited or that prescription data to
23   help set general sales goals.
24        Q.   Okay.  Did Endo use that

Page 153

1    information to designate deciles within which
2    different healthcare providers fell to assist in
3    prioritizing sales force allocation?
4         MR. LIMBACHER:  Object to form
5    and object to the extent it falls
6    outside the scope of the topics on which
7    he's been designated.
8         THE WITNESS:  Is this 30(b)(6) or
9    is this --
10   BY MS. SCULLION:
11        Q.   This is fine in your personal
12   capacity.
13        A.   Okay.  From time to time that was
14   a practice.  It wasn't always used.  It depended
15   on the importance of the product, but, yes,
16   sometimes physicians were deciled.  It also is
17   important in that it allowed us to understand
18   whether or not a given physician was an
19   experienced prescriber of pain medicines.
20        We -- best of my recollection,
21   that was an important component of the
22   targeting, where we sent our sales
23   representatives.  The physicians had to be
24   experienced pain specialists or internal

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    medicine physicians that had a subspecialty in
2    pain, for the most part.  So that deciling
3    activity helped us to confirm that.
4        Q.    Okay.  So the deciling activity,
5    though, was based, for example, on the IMS or
6    Wolters Kluwer data, correct?
7        A.    Across all -- you know, whatever
8    the basket of competing products was, not
9    necessarily specific to any one of our products.
10       Q.    You did have information, like
11   you could get on a weekly or monthly to see how
12   sales of Opana ER were doing, correct?
13       A.    Not always at the physician
14   level, but, yes, we had prescriptions, either
15   IMS or Wolters Kluwer or whomever else that gave
16   us, if we chose to subscribe to it at that
17   moment, weekly or monthly prescriptions.  We
18   didn't always purchase that information for
19   every product and every physician, so I wanted
20   to make that distinction.
21       Q.    Okay.  So, for example, from time
22   to time reports would be circulated that would
23   show specifically the top 50 prescribers for
24   Opana ER?

Page 155

1        A.    I don't necessarily recall that,
2    but if you've got something I can look at to
3    refresh my memory on that.  You look like you
4    do.
5            (Document marked for
6        identification as Endo-Lortie Deposition
7        Exhibit No. 8.)
8    BY MS. SCULLION:
9        Q.    Hand you what's been marked as
10   Exhibit Number 8.  Exhibit Number 8 is Bates
11   stamped ENDO-OPIOID_MDL-00869053, and we've
12   marked it in the upper right-hand corner, E1175.
13           Mr. Lortie, do you see Exhibit
14   Number 8 is an e-mail from Larry Romaine to
15   David Kerr and others in September of 2007?
16       A.    Yes.  I'm not -- I'm not one of
17   those others because I wasn't there at this
18   point, but I see that, yeah.
19       Q.    And you see the subject matter is
20   "Opana Top 50 Writers"?
21       A.    Yes, I read that.
22       Q.    Okay.  And then if you'll turn to
23   the attachment to the e-mail, which begins at
24   E1175.5, you'll see it's a chart headed "Top 50

Page 156

1    Opana ER Writers."  This first page is labeled
2    "Spec I," which I understand to be specialty one
3    for a period January '07 through July '07.
4            Do you see that?
5            MR. LIMBACHER:  Object to form,
6        object to questioning him in his
7        capacity as a fact witness regarding a
8        document that was created before he
9        became employed at the company.
10   BY MS. SCULLION:
11       Q.    So I understand the document was
12   created before you were employed, but I just
13   want to show you that this is -- strike that.
14           If you look on E1175.5, you see
15   it lists detailed information about individual
16   prescribers listed by name and address, correct?
17       A.    Yes, I see that.
18       Q.    And it shows their monthly sales,
19   correct?
20       A.    It appears to show that, yes.
21       Q.    Right.
22           And then it shows on the
23   left-hand column the sales representative
24   associated with that prescriber, correct?

Page 157

1        A.    Yes, I see a column titled "Rep
2    Name," so I guess that's what that is.
3        Q.    And the district manager as well
4    associated with that rep then?
5        A.    Correct.
6        Q.    And so fair to say that Endo did
7    have access to detailed information about the
8    sales of Opana ER for any given prescriber that
9    its sales reps were calling on, correct?
10           MR. LIMBACHER:  Object to form
11       and foundation.
12           THE WITNESS:  During January '07
13       and July '07, that's what this shows us,
14       yes.
15   BY MS. SCULLION:
16       Q.    And you saw similar information
17   at other points in time when you were employed
18   by Endo, correct?
19       A.    I think as I testified a minute
20   or two ago, I don't recall the top 50 list being
21   circulated, but I came in after the product had
22   been launched.  It could have been this is an
23   early launch activity.  I'm not sure.
24       Q.    Do you recall seeing similar

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  level of detail of information about any product
2  sales in terms of individual prescribers'
3  monthly sales?  Do you recall seeing that kind
4  of information?
5      MR. LIMBACHER:  Object to the
6      form.
7      THE WITNESS:  Sitting here right
8      now, I don't, but I haven't thought
9      about this for quite a while.  We
10     certainly had access to prescriptions,
11     but how it was represented from time to
12     time, it's -- you know, there would have
13     been specific instances, but this one I
14     hadn't seen before.
15 BY MS. SCULLION:
16     Q.  Are you aware of anyone -- put
17 your corporate representative hat back on.
18     A.  Okay.
19     Q.  Did Endo have any procedure
20 whereby anyone monitored the sales numbers for
21 let's just say -- let's start with an individual
22 sales territory, not individual physicians, but
23 just sales territory, looked at sales numbers
24 and sales territories to assess whether there

Page 159

1  was any unusual pattern of prescriptions for
2  Opana ER?
3      MR. LIMBACHER:  Object to the
4      extent it falls outside of the scope of
5      the topics on which he's been
6      designated.
7  BY MS. SCULLION:
8      Q.  To be clear, I'm asking as part
9  of any anti-diversion efforts, did Endo have any
10 process to examine prescription levels on a
11 territory basis to look for unusual patterns?
12     A.  Endo certainly had policies and
13 procedures to, as you said before, measure
14 prescriptions for its products.  What we
15 sometimes had view of is competing products as
16 well.  To the extent that that was used as part
17 of an abuse and diversion mitigation process, I
18 don't recall specifically, but I'm happy to look
19 at something.
20     Q.  Sitting here as Endo's corporate
21 representative, are you aware of Endo having any
22 procedure as part of its anti-diversion efforts
23 whereby someone would monitor levels of
24 prescriptions for Opana ER to see if there's an

Page 160

1  unusual pattern that might indicate, for
2  example, a pill mill?
3      MR. LIMBACHER:  Object to form.
4      THE WITNESS:  Well, I think that
5      generally in the context of the RiskMAP
6      and the REMS and the ADD activities,
7      that would fall under general activities
8      that if something jumped out at someone
9      that was seeing it, they would have had
10     a channel to report it or discuss it.
11     Whether or not that's memorialized in
12     any of those documents, I'm not sure,
13     but I will say that if somebody had
14     reason to believe that our products were
15     being abused or diverted from any
16     source, they all knew that they had an
17     obligation to report it up through the
18     channels, legal, compliance, their sales
19     leadership or whatever function they
20     were.
21     Whether or not that's a specific
22     written policy, I would have to go back
23     and do some work, but for me it falls
24     under the general compliance employee

Page 161

1  code of conduct that every employee of
2  the company, whether or not it was
3  involved in the sales force or any other
4  aspect, had signed on to.  Somebody saw
5  something that didn't look right, they
6  would report it, and they would report
7  it to the appropriate people who would
8  then investigate it.
9  BY MS. SCULLION:
10     Q.  So the question is as part of its
11 anti-diversion policies and procedures, did Endo
12 have anyone who was specifically tasked with
13 going in affirmatively, proactively to look at
14 sales data to see if it could detect any unusual
15 patterns that may be indicative of a pill mill?
16     MR. LIMBACHER:  Object to form, used as,
17     asked and answered.
18     THE WITNESS:  I would give the
19     same answer.  I think that under the
20     employee code of conduct and then
21     further on under the compliance
22     agreement and the certification and the
23     training that every employee at the
24     company had to undertake, everyone knew

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    that whether that was a signal or any
2    other signal of inappropriate use of any
3    of our products, they would know what to
4    do about that and that would be to
5    report it to somebody above them, so
6    that's my answer to that.  I think that
7    was a well-controlled process that falls
8    into the overall objectives of the
9    company.
10   BY MS. SCULLION:
11       Q.    But the answer is no, it was not
12   anyone's specific job to proactively go in and
13   monitor, let's say, on a monthly basis sales
14   data to see if it could detect any unusual
15   patterns that may be indicative of a pill mill,
16   that was not anyone's specific task to do that,
17   correct?
18             MR. LIMBACHER:  Object to form,
19   misstates his testimony.
20             THE WITNESS:  And my answer is
21   I'm not sure, but in the context of the
22   RiskMAP and the REMS and other
23   activities, there were activities that
24   encompassed that and we spoke about many

Page 163

1    of them.  If a sales rep saw
2    prescriptions being paid for in cash,
3    saw law enforcement presence, doses
4    being prescribed without being
5    individualized to a given patient,
6    frequency of prescriptions to replace
7    lost medications, and there were 10 or
8    12 things here that the sales
9    representatives and managers were
10   trained on.  So I would say that that's
11   directly related to your question,
12   but -- and that's -- you know, that's
13   such an important underpinning of the
14   company's policy in that area, to watch
15   out for signs of inappropriate use,
16   abuse, diversion of its products.
17   BY MS. SCULLION:
18       Q.    What you just described is a
19   passive process of if someone happens to see
20   something, if a sales rep happens to see
21   something, if someone happens to see a media
22   report, there was a certain obligation to report
23   it up.
24             What I'm asking was there any

Page 164

1    process as part of Endo's anti-diversion efforts
2    to proactively, actively go in and look for
3    signs of pill mills, for example, by monitoring
4    sales data?  There was no active process, was
5    there?
6             MR. LIMBACHER:  Object to form,
7    misstates his testimony, asked and
8    answered.
9             THE WITNESS:  Yeah, I'd have to
10   go back, but, again, we spoke about
11   several active activities.  We outlined
12   them when we began this discussion, the
13   internet monitoring, the Inflexxion
14   monitoring, the drug safety
15   pharmacovigilance, the reporting process
16   by which our sales reps were trained and
17   required to report things that they saw
18   and came upon, so I think for me all of
19   that, plus the employee code of conduct
20   says that if somebody, through whatever
21   activity, whether actively, which could
22   have been, I just don't recall, or
23   passively in other monitoring of
24   prescriptions to see an anomaly,

Page 165

1    something that looked unusual, every
2    employee in the company knew exactly
3    what to do with that information, that
4    would be to report it to compliance,
5    legal for follow-up.
6    BY MS. SCULLION:
7        Q.    So, for example, did Endo have
8    any algorithm that it used and applied to the
9    sales data that it was looking for for other
10   purposes, did it have any algorithm to apply to
11   that sales data to see if there was an unusual
12   pattern that may be indicative of a pill mill?
13   Did it do that?
14             MR. LIMBACHER:  Object to form.
15             THE WITNESS:  I don't recall any
16   algorithms looking for anything specific
17   in the sales data.  We had professionals
18   whose job it was to validate the sales
19   data, the prescription data for its many
20   uses, but I don't recall a specific
21   algorithm being used for any of those
22   things.
23   BY MS. SCULLION:
24       Q.    Did Endo ever have a policy as

42  (Pages 162 to 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  part of its anti-diversion efforts by which
2  sales reps were to actively go out and ask
3  healthcare providers they were calling on
4  whether those healthcare providers had
5  suspicions about any pill mills that may exist
6  in the territory that that sales rep served?
7          MR. LIMBACHER: Object to form.
8          THE WITNESS: No, absolutely not.
9      That would have been inappropriate. Our
10     sales reps were trained as sales
11     representatives, not as law enforcement
12     agents.
13 BY MS. SCULLION:
14     Q.   Well, did -- was it anyone's job
15 within Endo to survey the healthcare
16 professionals in whom it was calling to see if
17 those healthcare professionals had suspicions or
18 knowledge of pill mills in their areas?
19         MR. LIMBACHER: Object to form.
20         THE WITNESS: Oh, I would say,
21     yes, in terms of a follow-up of a
22     specific instance. Again, as I
23     hopefully explained, any time suspicion
24     was raised through the appropriate

Page 167

1      channels, a compliance officer, a member
2      of the legal department would follow
3      through, and that sometimes encompassed
4      discussions with law enforcement, with
5      physicians, with office staff. So, yes,
6      those investigations did encompass
7      exactly what you just said.
8  BY MS. SCULLION:
9      Q.   And those were investigations
10 after someone had already noticed something and
11 a sales rep or other Endo employee had noticed
12 something either in the field or in the media or
13 otherwise and reported it, right?
14     A.   I'm not aware of us investigating
15 something that hadn't been raised to the level
16 of an investigation being required.
17     Q.   Was it anyone's job at Endo to go
18 out proactively, before sales reps were calling
19 on a healthcare provider to determine whether
20 that healthcare provider might be a pill mill?
21         MR. LIMBACHER: Object to form,
22     object to the extent it falls outside
23     the scope of the topics on which he has
24     been designated, asked and answered, and

Page 168

1      we're well past 12:30 at this point,
2      counsel.
3          THE WITNESS: The -- before
4      anyone was put on the active call list,
5      they had to satisfy certain
6      requirements, licensed physician,
7      experienced in pain medicines, and I'm
8      speaking again to Opana ER promotion,
9      obviously licensed by the DEA, just
10     important to put on the record that not
11     all licensed physicians are able to
12     write or prescribe for controlled
13     substances. There are specific
14     requirements and monitoring licensure
15     and monitoring of that by DEA. So
16     before anyone was allowed to be on the
17     call list, they had to satisfy all of
18     those criteria.
19         And then, as we've testified
20     before, if in the course of calling on
21     them, whether the first time they walk
22     through the door or years after, our
23     sales representatives noticed any
24     aberrant behavior, anomalies that line

Page 169

1      up to the topics that we just spoke
2      about, they had policies and procedures
3      that are in writing, trained, certified
4      that they would follow.
5  BY MS. SCULLION:
6      Q.   So the answer is no, in order for
7  a physician to be on the call list, no one went
8  out first and did any due diligence, any office
9  visits to see whether that healthcare provider
10 might, in fact, be a pill mill, right? That
11 wasn't done before they were placed on the call
12 list?
13         MR. LIMBACHER: Same objections.
14         THE WITNESS: I think I've
15     answered the question.
16 BY MS. SCULLION:
17     Q.   So the answer is no, that did not
18 happen?
19     A.   I'm not aware of that happening.
20         MS. SCULLION: Okay. We can stop
21     here for lunch.
22         MR. LIMBACHER: Thank you.
23         THE VIDEOGRAPHER: Going off the
24     record at 12:38 p.m.

43 (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    (Luncheon recess.)
2         THE VIDEOGRAPHER:  We are back on
3    the record at 1:19.
4    BY MS. SCULLION:
5         Q.   Welcome back, Mr. Lortie.  You
6    understand you're still under oath, correct?
7         A.   Of course, yes.
8         Q.   Thank you.
9              Before lunch we were discussing
10   the process for monitoring for pill mills.  One
11   of the things that you testified to was that
12   reps could report on a suspected pill mill, and
13   if it was corroborated, the pill mill would be
14   removed from the rep's call plan, correct?
15        A.   Yeah, and just for clarification,
16   I mean pill mill is the term you're using there.
17   I don't think that's represented in our
18   documentation, but any evidence that the
19   representative saw in his or her activities that
20   suggested that that healthcare practitioner or
21   physician's office was involved in inappropriate
22   activities would lead to the set of activities
23   that we spoke about.
24        Q.   And so among the -- I think we

Page 171

1    talked about the hallmarks that a rep would be
2    trained to look for would include, for example,
3    suspiciously high numbers of prescriptions given
4    the size of the office, just a high number of
5    patients, lines out the door, those kind of
6    things, right?
7         A.   I'm going to refer to the report
8    so that I can accurately answer your question.
9         Q.   Sure.  Which report are you
10   looking at?
11        A.   So this is the report of
12   suspected diversion, which was the form by which
13   the sales representative would have submitted
14   their concern.
15        Q.   If you could hold one moment
16   because I --
17             MS. SCULLION:  Do we have the
18   report?
19   BY MS. SCULLION:
20        Q.   I apologize.  Could you read into
21   the record the numbers in the bottom there.
22        A.   Yes.  So what I'm referring to is
23   titled ENDO-OPIOID_MDL-02148238.
24        Q.   Okay.  And we're going to put an

Page 172

1    exhibit sticker on that one and make a copy at
2    the break, so we're going to mark that as
3    Exhibit Number 10.
4              (Document marked for
5    identification as Endo-Lortie Deposition
6    Exhibit No. 10.)
7              THE WITNESS:  So on this form,
8    this again is the form by which a sales
9    representative would report suspected
10   signs of a suspected diversion, includes
11   a large proportion of prescriptions paid
12   for in cash, drugs and doses being
13   prescribed are not individualized, lack
14   of qualified office staff present, such
15   as RNs or nurse practitioners, special
16   entrance requirements to the practice
17   and/or lack of signage, large distances
18   between the doctor, patients and
19   pharmacy, high frequency of
20   prescriptions to replace lost
21   prescriptions or medications, managed
22   care organization excluded this doctor
23   from writing prescriptions, law
24   enforcement presence in or around the

Page 173

1    office, prescriber told you personally
2    that he or she is no longer able to
3    prescribe scheduled products and then
4    there's an other, which, of course,
5    allowed the sales representative to
6    input whatever it was that caused them
7    concern.
8         Q.   Okay.  And to be clear, all these
9    questions are in your 30(b)(6) capacity?
10        A.   Okay.
11        Q.   Or representative capacity.
12             And let me hand you what's been
13   marked as Exhibit 9.
14             (Document marked for
15   identification as  Endo-Lortie
16   Deposition Exhibit No. 9.)
17   BY MS. SCULLION:
18        Q.   I'll hand you what's been marked
19   as Exhibit Number 9.  And Exhibit Number 9 is
20   Bates stamped ENDO-OPIOID_MDL-02924490, and we
21   have stamped it in the upper right-hand corner
22   E1247.
23             And, Mr. Lortie, if you could
24   turn to page E1247.5, which is the last of the

44  (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    ordinary size, eight and a half by 11 size
2    pages?
3        A.    Okay.
4        Q.    And this page is an instruction
5    and guidelines tab for what we understand to be
6    the Excel spreadsheet that is encompassed in
7    Exhibit Number 9, and it describes in the -- in
8    that gray box at the top, the RBD prescriber
9    removal process.
10       Do you see that?
11       A.    I do, yes.
12       Q.    Do you understand that to refer
13   to the regional business director prescriber
14   removal process?
15       A.    Yes.
16       Q.    And as part of that removal
17   process, if you go down to the
18   "Criteria/Guidelines within your district" it
19   says in the second bullet point, "Suspicion of
20   diversion should continue to be submitted to
21   Corporate Compliance for investigation and
22   removed through that process."
23       Do you see that?
24       A.    Yes, I do.

Page 175

1        Q.    Okay.  And does that refer to the
2    process you've just described of reporting up
3    suspected diversion for confirmation by
4    corporate compliance?
5        A.    Yes, I believe that does.
6        Q.    Okay.  And then if you look on
7    page E 1247.7, which is the first of the large
8    spreadsheet pages, you'll see in the right-hand
9    column -- sorry, various codes used.  For
10   example, you see new IMS reason code.  I think
11   these are all reason code it says retired, no
12   access, retired, no access, compliance.
13       Do you see those reason codes?
14       A.    Yeah, I actually see two columns
15   with reason codes.  Apparently, there was an
16   Endo reason code and an IMS reason code, and I'm
17   not sure what the difference is between them.
18       Q.    Fair enough.
19       A.    But, yes, I see the column that
20   you're reading.
21       Q.    Let's look on the Endo reason
22   code column.
23       Do you see that?
24       A.    Yes.

Page 176

1        Q.    Are these the reasons -- the
2    reason codes Endo used to indicate the reasons
3    why a prescriber was removed from a call plan?
4        MR. LIMBACHER:  Object to form,
5    foundation.
6        THE WITNESS:  It's hard for me to
7    be sure about that because I don't see
8    anything that tells me whether this was
9    physicians under investigation or before
10   they had been removed or after that had
11   taken place, but not knowing that,
12   certainly, these are the reasons for
13   investigation into whether or not they
14   should be.  It could -- it could be, but
15   I just can't tell from here.
16   BY MS. SCULLION:
17       Q.    I mean, so as Endo's corporate
18   representative, do you know what the procedures
19   were to indicate within Endo's records whether a
20   physician had been removed from a call plan for
21   compliance reasons for confirmation of being --
22   confirmation of diversion?
23       MR. LIMBACHER:  Object to form.
24       THE WITNESS:  Yes.  I mean, I

Page 177

1    think it's in the context of what we had
2    spoken about this morning, as the result
3    of suspicion being raised, and that
4    could have been raised by a number of
5    different ways, either sales
6    representatives sending in a form,
7    internet surveillance, epidemiologic
8    drug safety surveillance, review of
9    prescription by the risk management
10   team.  Any number of ways would all lead
11   to the same next step, which would be
12   investigation by compliance officer,
13   legal department to understand whether
14   or not there was a -- whether or not
15   that should result in the removal of the
16   physician from the call list or not.  So
17   there were very specific operating
18   procedures to be followed in that case.
19       MS. SCULLION:  Right.  So move to
20   strike.
21   BY MS. SCULLION:
22       Q.    My question is do you know how it
23   was recorded in Endo's records when a physician
24   was removed from the call plan for reasons of

45  (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    confirmation of diversion?  Do you know what the
2    reason code would look like?
3              MR. LIMBACHER:  Object to form.
4    I think he answered your question.  You
5    asked him what were the procedures.
6              THE WITNESS:  I was trying to
7    answer the procedures question, but your
8    question is do I know -- I believe that
9    would have been titled compliance as
10   opposed to retired, which is sort of
11   self-explained, if somebody had died
12   obviously.  No access often shows up
13   because the health system prohibits
14   access by sales representatives to
15   healthcare practitioners.
16             So I think the answer is -- my
17   understanding is the answer is
18   compliance in that case.
19   BY MS. SCULLION:
20        Q.    Okay.  So if a healthcare
21   provider had been reported up and confirmed to
22   be engaged in diversion, they would have been
23   listed -- reason code listed would have said
24   compliance for removal from the call plan,

Page 179

1    right?
2         A.    If it was listed as compliance on
3    a list of confirmed removals, and what I was
4    trying to point out before is that this may be
5    work in progress.  So listing of compliance
6    could be this person is under investigation or
7    the investigation is complete and they've been
8    removed.  I just can't tell if that's what this
9    spreadsheet is telling us or not.
10        Q.    Okay.  But if they were removed
11   eventually on a final exclusion list, it would
12   list compliance as the reason code for that
13   removal, right?
14        A.    I believe that's correct.
15        Q.    Okay.  Now, again, all within
16   your corporate representative capacity, if a
17   provider that was engaged in diversion were on a
18   call rep's -- sorry -- a sales rep's call list
19   and had not yet been removed from the call list
20   for suspected diversion -- strike that.
21             If a provider was on the call
22   list and was engaged in diversion but was never
23   reported up as being engaged in diversion, would
24   the sales rep be getting credits for the

Page 180

1    prescriptions written by that provider?
2              MR. LIMBACHER:  Object to form
3    and object to the extent it falls
4    outside the scope of the topics on which
5    he has been designated.
6              THE WITNESS:  I would hope that
7    in the vast majority of cases that
8    anyone exhibiting the activities or the
9    signs and symptoms of being a pill mill,
10   to use your word, would be reported.
11   I'm not sure whether there were -- we're
12   certainly not aware of any cases where
13   somebody was diverting drugs and doing
14   inappropriate activities related to
15   opioids that wasn't reported.
16             But if we were unaware, and by
17   "we" I mean any member of the company,
18   sales rep, sales leadership, compliance,
19   law enforcement, if no one was aware,
20   then that physician would continue to be
21   on the call list.  I'm not aware of
22   cases like that, but that would be --
23   you know, in the absence of them being
24   removed as the result of an

Page 181

1    investigation, they would be on the
2    list, I guess.
3    BY MS. SCULLION:
4         Q.    Well, certainly, you are aware of
5    instances in which the only way it came to
6    Endo's attention that there was a pill mill on
7    the call list was after the doctor was arrested
8    and, for example, it was reported in the media,
9    right; that happened?
10        A.    I'm not sure of any specific
11   instance where that was the only way we found
12   out.  That was one of the ways that we did our
13   best to keep our pulse on the -- our fingers on
14   the pulse of what was happening, but I'm not
15   sure, you know, it's an issue of timing.
16        Q.    You're not saying that the
17   Endo -- that Endo's sales reps reported up every
18   pill mill that was on their call list, are you?
19             MR. LIMBACHER:  Object to form.
20             THE WITNESS:  Oh, I'm absolutely
21   saying that.  To the extent that any of
22   our employees knew there were those
23   activities underway, they would have
24   reported it 100% of the time.

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    BY MS. SCULLION:
2         Q.    And had Endo audited its process
3    to make sure that sales reps had caught every
4    single pill mill that was on their sales list
5    and reported it up?
6              MR. LIMBACHER:  Object to form,
7         misstates his testimony.
8              THE WITNESS:  I'm not sure what
9         you mean by "audited."  We had a
10        complete set of responsibilities and
11        activities that are outlined in the
12        RiskMAP and the REMS and other
13        documents, code of conduct for every
14        employee, specific activities all
15        intended to mitigate the chances of that
16        happening.  So -- and a risk management
17        committee that, I suppose, is fair to
18        say served an audit capacity in that
19        they were monitoring prescriptions and
20        monitoring all those activities and
21        ensuring that those steps were being
22        taken, a compliance officer in a
23        compliance department who had the same
24        obligation that's reported directly up

Page 183

1         to the board.  So I would say, yes, Endo
2         did put into place a rigorous program
3         and had audit in -- internal auditing in
4         place to make sure that that was, to the
5         best of its ability, doing the job that
6         needed to be done.
7    BY MS. SCULLION:
8         Q.    Did Endo ever investigate --
9    strike that.
10             To the extent that Endo learned
11   of a pill mill on its call lists through a media
12   report and not through a sales rep report using
13   the form that you spoke of, did Endo have a
14   policy to go in and investigate why that pill
15   mill had not been reported up earlier?
16             MR. LIMBACHER:  Object to form.
17             THE WITNESS:  I'm not aware of
18        the extent to which that was part of the
19        policy.  Remember, it's -- rather, it's
20        important to just clarify that our reps
21        were not in any physician's office every
22        single day.  They called on them a
23        couple weeks, maybe a month, probably
24        that kind of a frequency.  So to the

Page 184

1         extent that they would be depended on,
2         outside of the normal course of their
3         activity, to be the first to notice
4         something, I think it's probably
5         unreasonable to expect that.
6              That being said, any time the
7         sales rep or the compliance officer
8         within our policies and procedures were
9         made aware of something that raised
10        suspicions, all of the things we talked
11        about earlier were put into motion.
12   BY MS. SCULLION:
13        Q.    So the answer is no, Endo did not
14   have a policy to go back and investigate why a
15   pill mill had not been picked up --
16             MR. LIMBACHER:  Object to form.
17   BY MS. SCULLION:
18        Q.    -- if it learned about that pill
19   mill other than through a sales rep report,
20   right?
21             MR. LIMBACHER:  Object to form.
22             THE WITNESS:  No, I'm sorry, I'm
23        not going to agree with that.  Endo had
24        an entirety of policies, procedures and

Page 185

1         people whose entire job was to mitigate
2         abuse and diversion according to the
3         RiskMAP and the REMS and the ADD, and
4         within the context of that, those
5         activities, when signaled, were followed
6         up on.
7    BY MS. SCULLION:
8         Q.    Sorry.  The question was did Endo
9    have a policy to investigate why a pill mill had
10   not been reported up if Endo only learned of a
11   pill mill through a media report, for example?
12             MR. LIMBACHER:  Object to form,
13        asked and answered.
14             THE WITNESS:  Yeah, I'm not aware
15        that there was a specific policy to
16        address that.  We felt very comfortable
17        that by following the rules and
18        regulations that we were doing our part
19        to mitigate the abuse.
20   BY MS. SCULLION:
21        Q.    And with respect to a sales rep
22   reporting up a pill mill, you agree it's
23   possible that a sales rep might decide it wasn't
24   in their best interest to report a pill mill if

47  (Pages 182 to 185)

Page 186

1  the sales rep thought that might negatively
2  impact their compensation based on sales in
3  their territory, correct?
4      MR. LIMBACHER: Object to form.
5      THE WITNESS: No, absolutely
6  disagree with that.
7  BY MS. SCULLION:
8      Q.   And why is that?
9      A.   Because the sales reps were very
10 well aware that, ultimately, if that was an
11 activity they undertook for that reason, they'd
12 be terminated.
13     Q.   If they were caught?
14     A.   We had pretty solid policies and
15 procedures that I think ensured that they would
16 be caught.
17     Q.   But those policies and procedures
18 didn't include, for example, going in and
19 investigating if, in fact, a sales rep hadn't
20 reported up a pill mill that Endo learned of
21 only through the media?  You never went back to
22 see, well, hey, why didn't the sales rep
23 actually report up that pill mill?
24     MR. LIMBACHER: Object to form.

Page 187

1      THE WITNESS: Could very well be
2  that the representative or the manager
3  was interviewed, in fact, I would be
4  surprised if that didn't happen, but
5  every activity related to this doesn't
6  require a standard operating procedure.
7  It's why we have employee code of
8  conduct, so that everybody understands
9  the overarching objections --
10 objectives, my mistake -- overarching
11 objectives of what we're trying to
12 accomplish here, and that is be
13 responsible and not allow abuse and
14 diversion of controlled substances.
15     So every single activity doesn't
16 require a written policy when you've got
17 a guidance document and people whose
18 entire job is to make sure that the
19 company is fulfilling its obligations.
20 BY MS. SCULLION:
21     Q.   So you wouldn't agree, for
22 example, that a sales rep might decide to play
23 the system and delay reporting up a suspected
24 pill mill in order to avoid negatively impacting

Page 188

1  their compensation?
2      MR. LIMBACHER: Object to form.
3  BY MS. SCULLION:
4      Q.   That would never happen?
5      MR. LIMBACHER: Object to form.
6      THE WITNESS: In my experience,
7  that would never happen.
8  BY MS. SCULLION:
9      Q.   Did Endo have any policies to
10 ensure that sales reps' compensation was not
11 negatively impacted by the pill mill reporting
12 and investigation process?
13     MR. LIMBACHER: Object to form.
14     THE WITNESS: The policy was that
15 if a given practitioner was identified
16 as possibly being involved in abuse and
17 diversion that they were removed from
18 the call list. They would -- their
19 prescriptions and relative business
20 would have also been removed from the
21 target for the representative and the
22 manager and the regional manager as
23 well, all being done to not have a
24 negative impact on someone's --

Page 189

1  someone's earning potential.
2  BY MS. SCULLION:
3      Q.   But that wasn't always the case,
4  right?  There were times when a prescriber was
5  removed from a call list and it was -- and the
6  adjustments to compensation were not made
7  retroactive for the period of the investigation
8  of the report, right?
9      MR. LIMBACHER: Object to form.
10     THE WITNESS: While the
11 investigation was underway, the
12 physician remained on the call list.
13 BY MS. SCULLION:
14     Q.   So while a physician was under
15 investigation for being a potential pill mill,
16 was the rep expected to continue to call on the
17 physician?
18     A.   No, but they weren't removed
19 until the investigation had been complete.
20     Q.   And so during that time, when the
21 investigation is ongoing, the rep is still being
22 expected to meet a sales goal based on having
23 that physician's prescriptions be part of their
24 call plan, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1     MR. LIMBACHER: Object to form.
2         THE WITNESS: No. Actually,
3  that's not correct. The -- there was a
4  general policy for correcting things
5  like that retroactively, and it was a
6  program that involved sales operations,
7  sales leadership, to go back and make
8  necessary adjustments to deal with
9  situations like that.
10 BY MS. SCULLION:
11     Q.   But that -- those were
12 discretionary adjustments, correct?
13     A.   They were, but they were part of
14 standard policy, standard approach.
15     Q.   They were discretionary, they
16 didn't always happen, right, those adjustments?
17     A.   I think they happened as a matter
18 of practice.
19     Q.   Do you think sales reps
20 understood that it would always happen?
21     A.   Yeah, I do, because they knew we
22 would always endeavor to be fair to them and not
23 penalize them for the missed activity or the
24 inappropriate activities of their customers. We

Page 191

1  wanted them to know that we expected them to
2  raise their hand and flag these activities, and
3  we didn't want that to be a financial burden on
4  them.
5      Q.   And so, certainly, if that
6  discretion was not exercised in their favor and
7  they were given instead of compensation just
8  Endo points, that would not be consistent with
9  sending the reps a message of you should report
10 and don't worry, you're not -- compensation is
11 not going to be affected, right?
12     MR. LIMBACHER: Object to form,
13 objection to the extent this falls
14 outside the scope of the topics on which
15 he's been designated.
16     THE WITNESS: Yeah, I'm not sure
17 I understand your question. Sorry.
18     MS. SCULLION: Sure. Let's look
19 at some documents. Can I have E1599,
20 1600 and 1601.
21     MR. LIMBACHER: Are these
22 questions in his capacity as a fact
23 witness or a 30(b)(6) witness?
24     MS. SCULLION: These are

Page 192

1  30(b)(6).
2      MR. LIMBACHER: I'm sorry?
3      MS. SCULLION: These are
4  30(b)(6).
5      MR. LIMBACHER: I object to the
6  extent they fall outside the scope of
7  the topics on which he has been
8  designated.
9      (Document marked for
10 identification as Endo-Lortie Deposition
11 Exhibit No. 11.)
12 BY MS. SCULLION:
13     Q.   Mr. Lortie, let me hand you
14 Exhibit Number 11, and that is Bates stamped
15 ENDO-OR-CID-00408959. Upper right-hand corner
16 we've marked it E1599.
17     And --
18     A.   I'll just take a look, if it's
19 okay.
20     Q.   Sure.
21     A.   (Witness reviews document.)
22     Thank you. I've looked it over.
23     Q.   You've looked over Exhibit Number
24 11.

Page 193

1      You see that Exhibit Number 11 is
2  a series of e-mails concerning removing a
3  physician doctor, Winthrop Risk from the call
4  list for two sales reps, Kris Baerenwald and
5  Jodi Yeggy and then also how to adjust their
6  compensation following that removal?
7      A.   I see Kris Baerenwald. I didn't
8  see the second sales rep.
9      Q.   Sure. If you look on the very
10 first page.
11     A.   The top page?
12     Q.   Yeah, the very first page,
13 E1599.1 --
14     A.   Oh, yes, thank you, yep.
15     Q.   That's a good point, E1599.1 you
16 see in the middle of that page that e-mail from
17 Dennis Breakstone to Demir Bingol?
18     A.   I do, I see Jodi Yeggy, yep.
19     Q.   Okay. And if you'll go to the
20 bottom of E 1599.1, there's an e-mail from
21 Colleen Craven to Demir Bingol and Dennis
22 Breakstone dated October 15th, 2009. That
23 carries over to E1599.2.
24     Do you see that?

49 (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    A.   Yes, I do.
2    Q.   And Ms. Craven was head of
3  compliance, correct?
4    A.   She was the chief compliance
5  officer at this time, yes.
6    Q.   So, certainly, her knowledge and
7  understanding of the policies with respect to
8  adjusting compensation in connection with
9  removal of a physician from the call list by
10  compliance, you would expect her to know what
11  she's talking about, right?
12    MR. LIMBACHER:  Object to form.
13    THE WITNESS:  With respect to the
14    removal and the rules and regulations,
15    as she outlines here in some detail,
16    absolutely.  I'm not sure the extent to
17    which she would have been involved in
18    the compensatory part of this
19    specifically, but she was certainly as
20    in her role as chief compliance officer
21    responsible for making sure that the
22    policies were appropriately executed.
23  BY MS. SCULLION:
24    Q.   And if you look at her e-mail,

Page 195

1  she says she provides a brief explanation of
2  when the corporate compliance department
3  determines removal from the call plan.
4    And she explains that "When the
5  Corporate Compliance determines that there is
6  enough evidence to remove a prescriber from the
7  call plan, the effective date is the date of the
8  physician and rarely retroactive," correct?
9    A.   I see that, yes.
10    Q.   Okay.  So, again, the removal is
11  not retroactive to remove them from the call
12  plan for -- as of the time the sales rep, for
13  example, reported the prescriber.
14    That's what she's saying,
15  correct?
16    MR. LIMBACHER:  Object to form.
17    THE WITNESS:  That's what she's
18    saying.
19  BY MS. SCULLION:
20    Q.   Okay.  And that's your
21  understanding of what the policy was, correct?
22    A.   Yes.  My understanding is that
23  they -- their name was not removed from the call
24  plan until the completion of the -- whatever

Page 196

1  investigation was undertaken.
2    Q.   And then when it was removed at
3  the completion of the investigation, it was not
4  retro -- made retroactive, correct, removal?
5    A.   Correct.
6    Q.   Okay.  And then in responding to
7  concerns raised by Dennis Breakstone about how
8  this removal -- strike that -- about how the
9  investigation period for this prescriber impacts
10  these representatives' compensation, Ms. Craven
11  says, "I do understand Dennis's concerns;
12  however, it is my understanding that sales
13  management has a way of making such situations
14  equitable.  I suggest that you speak with either
15  Maria or other RDs."
16    Do you see that?
17    A.   I do, yes.
18    Q.   So she's referring over to a
19  process to make things equitable but not a firm
20  process to retroactively adjust, right?
21    MR. LIMBACHER:  Object to form.
22    THE WITNESS:  I think she's
23    referring to the way that those
24    adjustments would be made in the normal

Page 197

1  course of business, yes.
2  BY MS. SCULLION:
3    Q.   Now, if you look on the first
4  page, E1599.1, you see then Mr. Breakstone
5  writes to Demir Bingol and says, we agreed to
6  look into getting additional discretionary bonus
7  dollars for these two reps due to their decline
8  in Opana ER business as a result of Dr. Winthrop
9  Risk, correct?
10    A.   Correct.
11    Q.   So this is looking at it for
12  discretionary adjustment to their compensation,
13  correct?
14    A.   Correct.
15    Q.   And Mr. Bingol responds, "the
16  discretionary period is forthcoming," and he is
17  going to take action, right?
18    A.   Yes, that's what he says.
19    (Document marked for
20    identification as Endo-Lortie Deposition
21    Exhibit No. 12.)
22  BY MS. SCULLION:
23    Q.   Okay.  Hand you what's been
24  marked Exhibit Number 12, and Number 12 is Bates

50  (Pages 194 to 197)

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    stamped ENDO-OPIOID_MDL-02098725, and we've
2    stamped it E1600.1.
3          And this is at the top of 1600.1
4    an e-mail from Demir Bingol to Ronda Wells
5    attaching the corrective action requests for the
6    midwest.  And if you look to pages E1600.2 and
7    1600.3, you'll see Mr. Bingol is requesting a
8    discretionary bonus for the two reps, Jodi Yeggy
9    and Kris Baerenwald based on their lost ability
10   to have called on Dr. Winthrop Risk.
11         Do you see that?
12         MR. LIMBACHER:  Object to form.
13         THE WITNESS:  So what's the -- I
14   mean, I see the two forms that you're
15   referring to, yes.
16   BY MS. SCULLION:
17         Q.   Okay.  And this is a prelude then
18   to the next document.  I just want to make sure
19   you saw the chain of events here.
20         And then let's look at Exhibit
21   Number 13.
22         (Document marked for
23         identification as Endo-Lortie Deposition
24         Exhibit No. 13.)

Page 199

1          THE WITNESS:  Let me just finish
2    with this one.
3          MS. SCULLION:  Sure.
4          THE WITNESS:  I'll take that, but
5    I'm going to look at it in a second.
6          (Witness reviews document.)
7          MS. SCULLION:  And for the
8    record, Exhibit Number 13 is Bates
9    stamped ENDO-OPIOID_MDL-02182533.
10         MR. LIMBACHER:  Again, note my
11         objection to this series of questions to
12         the extent it falls outside the scope of
13         the topics on which he's been
14         designated.
15   BY MS. SCULLION:
16         Q.   And, Mr. Lortie, do you see that
17   Exhibit 13 is Demir Bingol now writing back to
18   Dennis Breakstone and saying, "Unfortunately,
19   none of the Corrective Action requests were
20   granted for your folks."  And he attaches,
21   again, the corrective action request for Jodi
22   Yeggy and Kris Baerenwald with respect to their
23   lost ability to call on Dr. Winthrop Risk.
24   That's on pages 1601.3 and 1601.4.

Page 200

1          So is this an example of reps not
2    getting any discretionary adjustment to their
3    compensation, despite having done the right
4    thing?
5          MR. LIMBACHER:  Object to form
6    and, again, object to the extent it
7    falls outside the scope of the topics on
8    which he's been designated.
9          THE WITNESS:  I mean, I don't
10   think you can draw that conclusion.
11   What we see here is the outcome of a
12   process that was -- I can attest was
13   followed regularly, but for some reason,
14   and it's not clear in the documentation
15   that you provided, those corrective
16   action requests were not granted, they
17   were given some discretionary points as
18   part of that, but I don't know any more
19   about this.
20         What I can say, though, is that
21   our sales reps, whether for Opana or for
22   other products, whether in 2010 or years
23   before and after generally knew that
24   sales management would be fair and

Page 201

1    equitable in making adjustments for
2    anomalies in any number of things that
3    could impact their incentive comp.
4    BY MS. SCULLION:
5          Q.   I mean, do you think that these
6    sales reps felt that they had been treated
7    fairly and equitably, having not been able to
8    call on a doctor that they had reported up and
9    then not getting any discretionary compensation,
10   just getting Endo points?  You think that was a
11   message that was sent to them?
12         MR. LIMBACHER:  Object to form.
13         THE WITNESS:  You asked me two
14   questions there.  I don't know how those
15   sales reps thought.  If you would like
16   an answer to that, you would have to ask
17   them.
18   BY MS. SCULLION:
19         Q.   Looking at this from a manager's
20   standpoint, do you think this is sending the
21   right message to these sales reps?
22         MR. LIMBACHER:  Object to the
23   form and foundation.
24         THE WITNESS:  I would suggest

51  (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    that knowing how Endo approached these
2    situations, that there was very likely
3    to be a solid reason for why those were
4    not approved.  It's not evident by the
5    documentation you've given me here, and
6    that based on that, there would have
7    been a very solid answer for these two
8    representatives, and I would suspect
9    that they would have understood and
10   taken that into consideration and moved
11   on.
12   BY MS. SCULLION:
13        Q.    When you say there'd be a solid
14   reason, it's not documented by Mr. Bingol,
15   correct?
16             MR. LIMBACHER:  Object to form.
17             THE WITNESS:  In this e-mail,
18        it's not, no.
19   BY MS. SCULLION:
20        Q.    Right.  And, again, that's the
21   nature, though, of a discretionary bonus is it
22   may or may not be granted, correct?
23             MR. LIMBACHER:  Object to form.
24             THE WITNESS:  Correct.

Page 203

1    BY MS. SCULLION:
2         Q.    So the policy was that reps on a
3    discretionary basis might have their
4    compensation adjusted, but it was not
5    guaranteed, right?
6              MR. LIMBACHER:  Object to form.
7              THE WITNESS:  There was a policy
8         in place that included all of the people
9         that had relevant information and
10        decisions were made.
11   BY MS. SCULLION:
12        Q.    And that process did not include
13   a guarantee that reps' compensation would be
14   adjusted if they, in fact, reported up a doctor
15   they suspected of engaging in diversion, right?
16             MR. LIMBACHER:  Object to form.
17             THE WITNESS:  I'm sorry.  I can't
18        agree with that the way you formulated
19        it.
20             What I would say is that the
21        policy for making adjustments to sales
22        representative's incentive comp, whether
23        it's for the very specific reason that
24        you've raised here or any number of

Page 204

1    reasons, physicians who move, practices
2    that close, new practices that show up,
3    there was a -- and I would -- I would
4    certainly testify very comfortably that
5    our representatives knew that sales
6    management would do the right thing and
7    in those circumstances.  With regards to
8    this particular instance that you put in
9    front of me, I don't have enough
10   information to make a call on it.
11   BY MS. SCULLION:
12        Q.    And the question is very simple.
13        The policy, though, did not
14   guarantee that a sales rep that reported up a
15   prescriber on their call list as potentially
16   engaged in diversion would, in fact, have their
17   compensation adjusted to make up for their loss
18   during the investigation period, right?
19             MR. LIMBACHER:  Object to form
20        and object to the extent it falls
21        outside the scope of the topics for
22        which he is designated.
23   BY MS. SCULLION:
24        Q.    It wasn't guaranteed?

Page 205

1         A.    That's a statement, not a
2    question.
3         Q.    Is that correct; it was not
4    guaranteed?
5              MR. LIMBACHER:  Object to form,
6         same objections.
7              THE WITNESS:  The policy and the
8         approach to this on the part of sales
9         management was to look at each case
10        based on its own merits and make the
11        necessary adjustments.
12             It was by definition a
13        discretionary policy, but our sales
14        representatives knew that, for whatever
15        reason, if it was fair, the sales rep --
16        they would be taken care of in an
17        equitable manner.
18   BY MS. SCULLION:
19        Q.    And do you see if you look back
20   at Exhibit Number 11, going to page E1599.7, you
21   see that Kristeen Baerenwald reported up this
22   doctor as being no longer allowed to write
23   Schedule II medications because the state of
24   Iowa had suspended his ability to write

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    scheduled medication for five years, reported
2    that up on August -- in August of 2009.
3            Do you see that?
4        A.   Yes, I do.
5        Q.   And the final decision on whether
6    Kris Baerenwald would get any compensation to
7    make up for her loss during the investigation of
8    Dr. Winthrop Risk was not until April of 2010,
9    months later, right?  That's in Exhibit 13.
10       A.   Just flipping between exhibits.
11       Q.   Sure.
12       A.   Yeah, you're right.  It looks
13   like April 2010.
14           I do want to point out something
15   that you said that turned out to be factually
16   incorrect or something that the sales
17   representative and I would suspect that looking
18   through this, which is a relatively complicated
19   investigation, and I do see that our compliance
20   officer clarified subsequent to the original
21   flag that, in fact, the physician's license was
22   not revoked but that he had agreed to limit, so
23   and it's an important distinction.
24           Again, I don't know the details

Page 207

1    of this particular investigation.  You had sales
2    management, the chief compliance officer
3    spending several months in an attempt to get to
4    the bottom of it, and, ultimately, at the end,
5    for reasons that are unclear here, determined
6    that the discretionary bonus could not be
7    awarded.  That's all I can draw from this.
8        Q.   Right.
9            So if you go back to Exhibit 12,
10   and this is Mr. Bingol's corrective action
11   request, looking at page 1600, E1600.2,
12   Mr. Bingol states in the box labeled
13   "Justification for IC Corrective Action, Opana
14   ER target (Dr. Winthrop Risk) lost ability to
15   prescribe LOA" -- long-acting opioids -- "in
16   July 2009 and rep was told to stop promoting
17   Opana ER."
18           Did I read that correctly?
19       A.   Yes.
20       Q.   So this rep, regardless of what
21   the circumstances were of the investigation, was
22   told to stop promoting to this doctor, and yet
23   they did not get the lost prescriptions --
24   sorry, the lost call plan credits made up to

Page 208

1    them in a discretionary bonus, correct?
2            MR. LIMBACHER:  Object to form.
3            THE WITNESS:  Right.  This tells
4        me the rep was told to stop calling and
5        the component of their incentive, their
6        incentive bonus, which is on top of
7        their salary was -- was the incentive
8        that was at -- in question here and that
9        they were not ultimately paid that.
10           This is not a rep not getting
11       paid.  I think it's important to point
12       out.
13   BY MS. SCULLION:
14       Q.   This is -- the rep got points
15   instead of cash, though, right?
16       A.   The rep gets salary, in addition
17   to that quarterly or regular bonuses, I can't
18   remember if they were quarterly or monthly at
19   that period.
20           In this particular case, they
21   were given some points to make up for the -- for
22   the circumstances.
23       Q.   You wouldn't dispute that for
24   Endo's sales reps, let's look in 2010, that an

Page 209

1    important part of their compensation was the
2    incentive compensation that they received on top
3    of their salary?
4            MR. LIMBACHER:  Object to form
5        and object to the extent -- are we still
6        asking him questions as a 30(b)(6)
7        witness?
8            MS. SCULLION:  Yes.
9            MR. LIMBACHER:  Then I would
10       object in addition that it falls outside
11       of the scope of the topics on which he's
12       been designated.
13           THE WITNESS:  So your question
14       was was the incentive comp an important
15       part?  It was part of their
16       compensation.
17   BY MS. SCULLION:
18       Q.   It was an important part?
19       A.   They received a salary.  They
20   received bonus based on the variable part of
21   their compensation.  They received some points.
22   They received recognition, but it is not that
23   these representatives didn't receive pay.  I
24   just wanted to make that distinction.

53  (Pages 206 to 209)

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    Q.   Understood.  But they didn't
2  receive the pay that Mr. Bingol thought they
3  should have gotten when he requested the
4  discretionary bonus, right?
5         MR. LIMBACHER:  Object to form,
6    foundation.
7         THE WITNESS:  Apparently, they
8    did not receive the proposed
9    discretionary bonus.  We can't tell why
10   they didn't.  There were, I'm sure, some
11   good reasons for that, but they did not
12   receive that, no.
13 BY MS. SCULLION:
14   Q.   Keeping your 30(b)(6) hat on, as
15 part of its anti-diversion policies and
16 procedures, did Endo have any procedure to
17 actively go out and review information
18 concerning pharmacies declining to honor
19 prescriptions by specific physicians?
20        MR. LIMBACHER:  Object to form.
21        THE WITNESS:  Not that I'm aware
22   of.  In terms of active, there are, of
23   course, a number of ways that, you know,
24   our sales reps did call on pharmacies,

Page 211

1    they had relationships with pharmacists,
2    so they would have picked up on this in
3    the course of those conversations, but
4    we -- I'm not aware that we -- that Endo
5    sent people out beforehand with an
6    assumption of guilt.
7  BY MS. SCULLION:
8    Q.   Would you agree that it would be
9  a red flag of a potential -- of potential
10 diversion if multiple pharmacies within a given
11 community had said that they would not honor
12 opioid prescriptions written by a specific
13 doctor?
14        MR. LIMBACHER:  Object to form.
15 BY MS. SCULLION:
16   Q.   That'd be an indication that that
17 doctor should be -- is suspected of diversion?
18   A.   I would think that that could be
19 called a red flag, yes.
20   Q.   Okay.  Now, you said that Endo
21 didn't have anyone actively going out and
22 looking for those red flags, right?
23        MR. LIMBACHER:  Object to form.
24        THE WITNESS:  Endo did not deploy

Page 212

1    private investigators to do activities
2    like that, but we had a number of ways
3    that were put into place to hopefully
4    pick up on those things should they
5    occur, and we've spoken about many of
6    them already.
7  BY MS. SCULLION:
8    Q.   Did Endo ever go out to purchase
9  the data from pharmacies where they would report
10 on physicians whose prescriptions they weren't
11 honoring in order to -- did Endo ever buy that
12 data in order to proactively monitor for
13 potential pill mills?
14        MR. LIMBACHER:  Object to form
15   and foundation and object to the extent
16   it falls outside the scope of the topics
17   on which he has been designated.
18 BY MS. SCULLION:
19   Q.   I'm asking this as part of its
20 anti-diversion procedures.
21   A.   So you're suggesting there was a
22 database that captured whether pharmacies were
23 flagging physicians for inappropriate
24 prescribing.

Page 213

1    Q.   I'm asking whether there was data
2  could be obtained?
3    A.   I don't -- I'm not aware of such
4  data, no.
5    Q.   So it follows that there was no
6  procedure as part of Endo's anti-diversion
7  procedures to actively go out and acquire such
8  data in order to monitor that data for the red
9  flags we just talked about?
10        MR. LIMBACHER:  Object to form.
11        THE WITNESS:  I'm not aware that
12   such data exists.  It could be that it
13   does and our people were monitoring it,
14   but I'm not aware that that data -- I've
15   never heard of such a database existing,
16   no.
17 BY MS. SCULLION:
18   Q.   And you're not aware of any
19 policy or procedure Endo had to go out and
20 acquire that data for that purpose?
21        MR. LIMBACHER:  Object to form,
22   foundation and to the extent it falls
23   outside the scope of the topics on which
24   he's been designated.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    BY MS. SCULLION:
2         Q.    I'm asking all these questions as
3    Endo's corporate representative.
4         A.    And I've tried to answer that.
5    I'm not aware that that data even exists, so if
6    I'm not aware it exists, I can't be aware of a
7    policy to purchase it.
8         Q.    I agree.
9         A.    That's something I'm -- I'm
10   trying to be clear.  To the extent it exists,
11   then that's a different question, but I'm not
12   aware of that.
13        Q.    Okay.  And then you did note,
14   though, that reps did call on pharmacies, at
15   least for some period of time when Endo was
16   selling Opana ER, correct?
17        A.    From time to time, yes.
18        Q.    And as part of calling on
19   pharmacies, was it Endo's policy as part of its
20   anti-diversion efforts, that reps should be
21   asking the pharmacists whether the pharmacists
22   were aware of any pill mills or had suspicions
23   of any pill mills in the area?
24             MR. LIMBACHER:  Object to form.

Page 215

1             THE WITNESS:  I would suspect
2    that if a representative was suspicious
3    of that and in doing so was in the
4    process of having an investigation
5    mounted, I wouldn't be surprised if they
6    would ask a pharmacist, but it wasn't
7    part of policy to do that.
8             Again, our representatives were
9    not investigative agents, they were
10   sales representatives, and they had a
11   policy and procedure to follow should
12   they see something that caused them
13   concern.
14             MS. SCULLION:  Can I have E142,
15   478 and 1007, please.
16             MR. LIMBACHER:  Jen, are we still
17   asking questions as a 30(b)(6) witness?
18             MS. SCULLION:  Yes.
19             (Document marked for
20   identification as Endo-Lortie Deposition
21   Exhibit No. 14.)
22   BY MS. SCULLION:
23        Q.    I hand you what's been marked as
24   Exhibit Number 14, and Exhibit 14 is Bates

Page 216

1    stamped ENDO-CHI_LIT-00543478, and we've stamped
2    it in the upper right-hand corner E142.
3             Mr. Lortie, this is a document
4    entitled "Percocet History, Time & Events in the
5    News Media."  It bears Endo's logo and it says
6    on the front it's prepared by Dhaval Mavani and
7    Jacob Gettier.
8             Do you know who those individuals
9    were?
10        A.    I do not.  No, I don't recognize
11   either of those names.  I'll just take a look,
12   if it's okay through the slides.
13        Q.    Yeah, sure.
14        A.    (Witness reviews document.)
15             MR. LIMBACHER:  Jen, when this
16   was produced, did it have the
17   handwriting on it?
18             MS. SCULLION:  Yes, I checked
19   multiple times.  It actually looked
20   suspiciously like mine, but it's not.
21             THE WITNESS:  (Witness reviews
22   document.)
23             Okay.  I mean, I've generally
24   looked at it.  If there's a particular

Page 217

1    page, I'm sure you'll point me to it.
2    BY MS. SCULLION:
3         Q.    Sure.  Yeah, if you can go to
4    E142.7.
5             You see the box in the middle of
6    the page there that says by 2002: approximately
7    9.7 million individuals age 12 and up had used
8    Percocet, Percodan or Tylox for nonmedical use
9    at least once in their life compared to
10   1.9 million for OxyContin.
11             Do you see that?
12        A.    Yes, I do.
13        Q.    Any reason to dispute those
14   numbers?
15        A.    I have no reason to agree with
16   them nor dispute them.  I have not seen this
17   before.  It predates me by a long time and has
18   to do with Percocet, which wasn't subject of my
19   preparation today.
20        Q.    Okay.  And you'll see that that
21   box it says a source to the National Survey on
22   Drug Use and Health Report, May 2004.
23             It's at the bottom of the -- of
24   page E142.7.

55  (Pages 214 to 217)

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1    In devising its anti-diversion
2  policies for opioids, did Endo take into account
3  that Percocet, its product fell into a category
4  of products that had been used at five times the
5  rate of OxyContin for nonmedical purposes?
6    MR. LIMBACHER:  Object to form
7    and object as falling outside the scope
8    of the topics on which he's been
9    designated.
10    THE WITNESS:  I don't know.
11  BY MS. SCULLION:
12    Q.    Did it take into account that
13  Percocet had been misused by children as young
14  as 13, 14, 15 at that rate?
15    MR. LIMBACHER:  Objection, same
16    objections.
17    THE WITNESS:  I wasn't there at
18    this time in question, so I really have
19    no basis to know what Endo took into
20    account at that time.
21    (Document marked for
22    identification as Endo-Lortie Deposition
23    Exhibit No. 16.)
24  BY MS. SCULLION:

Page 219

1    Q.    Let me hand you what's been
2  marked as Exhibit 16.  And Exhibit 16 --
3    MR. LIMBACHER:  Is there a 15?
4    MS. SCULLION:  There will be.
5  BY MS. SCULLION:
6    Q.    Exhibit 16 is Bates stamped
7  ENDO-OPIOID_MDL-03259246, and we've marked it
8  E478 in the upper right-hand corner.
9    And, again, this is produced to
10  us in this case by Endo, and it's entitled
11  "Percocet Death Reports (1999-2000)," and do you
12  see that it tallies up deaths in 1999, 2000 and
13  2001 associated with Percocet or Endocet?
14    MR. LIMBACHER:  Object as falling
15    outside the scope of the topics on which
16    he's been designated.
17    THE WITNESS:  I do see those
18    headings as you've described them.
19  BY MS. SCULLION:
20    Q.    And Endocet was the branded
21  generic version of Percocet that Endo also sold,
22  correct?
23    A.    I don't recall, to be honest.
24  I'm sorry.

Page 220

1    Q.    When Endo was developing its
2  anti-diversion procedures and policies for
3  opioids, did it take into account the death
4  tolls for Percocet and Endocet?
5    MR. LIMBACHER:  Object as falling
6    outside the scope of the topics on which
7    he has been designated.
8    THE WITNESS:  This document
9    predates my time there by at least eight
10    years, so I have no basis to understand
11    what Endo took into account at that
12    time.
13  BY MS. SCULLION:
14    Q.    When Endo created the RiskMAP for
15  Opana ER, did it take into account the history
16  for death caused by Percocet?
17    MR. LIMBACHER:  Same objection.
18    THE WITNESS:  My understanding is
19    that the RiskMAP was specifically for
20    long-acting opioids, of which Opana ER
21    was the one in question, also those that
22    are being actively promoted, and that's
23    my understanding of the foundation for
24    the RiskMAP.

Page 221

1    Beyond that, I don't know what
2    Endo -- what other information Endo may
3    or may not have taken into account.
4  BY MS. SCULLION:
5    Q.    But, to your knowledge, the
6  RiskMAP was not designed to address, for
7  example, deaths caused by Percocet?
8    MR. LIMBACHER:  Object to form
9    and object as falling outside the scope
10    of the topics on which he's been
11    designated.
12    THE WITNESS:  Yeah, I don't know.
13    (Document marked for
14    identification as Endo-Lortie Deposition
15    Exhibit No. 15.)
16  BY MS. SCULLION:
17    Q.    Let me hand you now what's been
18  marked as Exhibit Number 15.
19    Exhibit 15 is an article from
20  Cleveland.com -- or it's just an opinion piece
21  rather from Cleveland.com authored by Carole
22  Rendon, and we've stamped it E1007.1, and it's
23  dated July 13th, 2016.
24    And if you'll go to page E1007.2,

56 (Pages 218 to 221)

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    Ms. Rendon states four paragraphs down, "The
2    opioid epidemic has caused an unprecedented wave
3    of death and destruction throughout Northeast
4    Ohio."
5         Did I read that correctly?
6         A.   I'd like to look at the document
7    first, if that's okay, quickly just to...
8         Q.   Sure.
9              MR. LIMBACHER:  Counsel, are we
10   asking questions with regard to this
11   document in his capacity as a 30(b)(6)
12   witness?
13             MS. SCULLION:  We are.
14             MR. LIMBACHER:  Then I would
15   object to all such questions as falling
16   outside the scope of the topics on which
17   he's been designated.
18
19             THE WITNESS:  (Witness reviews
20   document.)
21        Okay.  Thank you.  I've taken a
22   look.
23   BY MS. SCULLION:
24        Q.   Okay.  So, again, if you look on

Page 223

1    the first page E1007.1, you'll see it says
2    posted July 13, 2016.  As of that date, the
3    anti-diversion, anti-abuse measures Endo had in
4    place under the 2007 RiskMAP, which I think you
5    said continued, right, those had been in place
6    at that point for nine years, right?
7              MR. LIMBACHER:  Object to form.
8              THE WITNESS:  If this was a 2016
9    and that began in 2007, yes.
10   BY MS. SCULLION:
11        Q.   And would you agree that the
12   unprecedented wave of death and destruction in
13   Northeast Ohio was an indication that the
14   RiskMAP policies were ineffective in minimizing
15   diversion and abuse?
16             MR. LIMBACHER:  Object to form.
17             THE WITNESS:  No.
18   BY MS. SCULLION:
19        Q.   Do you dispute that there was an
20   unprecedented wave of death and destruction
21   throughout Northeast Ohio caused by the opioid
22   epidemic?
23        A.   I read that here, but I have no
24   basis to understand whether that's true or not.

Page 224

1    But even if it was, it's speaking of the opioid
2    epidemic.  It's not -- I don't see any mention
3    here of an Endo product or activity on behalf of
4    Endo so...
5         Q.   Well, if we go to the next page,
6    the top, Ms. Rendon goes on to state, "Doctors
7    and patients need more education about the
8    dangers of prescribing too many pills and
9    prescribing them too often.  The unused Vicodin
10   and Percocet in the medicine cabinet is often
11   the Gateway drug to heroin addiction."
12        Did I read that correctly?
13        A.   Yes, I see that.
14        Q.   Percocet is an Endo product,
15   correct?
16        A.   Endo is one of many manufacturers
17   of Percocet, especially in 2016.
18        Q.   Percocet is a brand name that
19   only Endo sold, correct?
20             MR. LIMBACHER:  Object to form.
21             THE WITNESS:  With all due
22   respect --
23             MR. LIMBACHER:  And object to the
24   extent it falls outside the scope of the

Page 225

1    topics on which he's been designated.
2              THE WITNESS:  The use of the word
3    Percocet is similar to the use of the
4    word band-aid or Kleenex, so we know
5    that Endo's supply of Percocet is a
6    small fraction of the prescriptions of
7    Percocet that are satisfied by any
8    number of generic manufacturers.
9         I see that the author is
10   referring to it as Percocet, but we just
11   have no way of knowing that she's
12   assigning responsibility to Endo-branded
13   Percocet or any activities by the
14   company.
15   BY MS. SCULLION:
16        Q.   So Percocet could include, for
17   example, Endocet?
18             MR. LIMBACHER:  Object to form
19   and foundation, object as falling
20   outside the scope of the topics on which
21   he's been designated.
22             THE WITNESS:  In my opinion, what
23   I would say is Percocet could be any
24   number of Oxycodone APAP manufactured by

57  (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    any number of generic manufacturers.
2    BY MS. SCULLION:
3        Q.    In devising its anti-diversion
4    policies and procedures for opioids, did Endo
5    take into -- try to address the Percocet in the
6    medicine cabinet being diverted?
7            MR. LIMBACHER:  Object to form
8        and object to as it falls outside the
9        scope of the topic on which he's been
10       designated.
11           THE WITNESS:  As I previously
12       testified, the RiskMAP was specifically
13       designed for long-acting opioids, in our
14       case Opana ER.  That being said,
15       everything from the code of conduct to
16       general understanding of all employees
17       was that we should all do whatever we
18       could if faced with evidence that any
19       medicines, whether they were ours or
20       anybody else's were diverted or abused,
21       but, specifically, to the extent that
22       Endo was thinking about Percocet when
23       the long-acting opioid RiskMAP, REMS or
24       ADD was put together, I can't answer

Page 227

1        that.
2    BY MS. SCULLION:
3        Q.    The principles that informed
4    Endo's anti-diversion policies and procedures
5    for Opana ER, do those principles include what
6    Ms. Rendon describes here as the problem with
7    prescribing too many pain pills and prescribing
8    them too often?
9            MR. LIMBACHER:  Object to form.
10           THE WITNESS:  I'm sorry.  I
11       didn't hear the question.
12   BY MS. SCULLION:
13       Q.    Sure.  In terms of the
14   principles -- are you familiar with the
15   principles that informed Endo's policies and
16   procedures to combat diversion and abuse of
17   Opana ER?
18       A.    Yes.
19       Q.    And did those principles include
20   what Ms. Rendon refers to here, which is the
21   problem of too many pain pills and prescribing
22   them too often?
23           MR. LIMBACHER:  Object to form.
24   BY MS. SCULLION:

Page 228

1        Q.    Is that something that Endo
2    agreed with as a principle underlying its
3    anti-diversion policies?
4            MR. LIMBACHER:  Object to form.
5            THE WITNESS:  I would say very
6        much it was an underlying principle with
7        the activities undertaken, yes.
8    BY MS. SCULLION:
9        Q.    So does Endo agree then that a
10   cause of the opioid epidemic was prescribing of
11   too many pain pills and prescribing them too
12   often?
13           MR. LIMBACHER:  Object to form
14       and object on the grounds that it falls
15       outside the scope of the topics on which
16       he has been designated.
17           THE WITNESS:  I think Endo has
18       acknowledged, even in some of the
19       documents we saw today, that the opioid
20       epidemic is large and requires the
21       attention and activity of many different
22       constituencies, which would include all
23       of the things we've talked about here.
24   BY MS. SCULLION:

Page 229

1        Q.    Including the phenomenon of
2    prescribing too many pain pills and prescribing
3    them too often?
4            MR. LIMBACHER:  Object to form,
5        same objections.
6            THE WITNESS:  And specifically to
7        that, I would point to the training and
8        the adherence to FDA labeling that
9        underpins promotion.  To the extent that
10       Endo could control whether physicians
11       understood clearly the appropriate use
12       of its medicines, beyond that, as you
13       well know, physicians are free to
14       prescribe what they would like to and to
15       whom, but to the extent that Endo could
16       control that in terms of promotion and
17       other activities, yes, that underpinned
18       the RiskMAP, the REMS, the ADD and the
19       company activities.
20   BY MS. SCULLION:
21       Q.    And did another principle that
22   Endo took into account in designing its
23   anti-diversion policies, was another principle
24   that prescription opioids were often the gateway

58 (Pages 226 to 229)

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    to heroin addiction?
2         MR. LIMBACHER:  Object to the
3    form and object as falling outside the
4    scope of the topics on which he's been
5    designated.
6         THE WITNESS:  I don't know.
7         MR. LIMBACHER:  We've been going
8    about an hour.  Is this a good spot for
9    a break?
10   BY MS. SCULLION:
11        Q.    Do you know who Ms. Rendon is?
12        A.    Not other than what I read here
13   on the paper.
14        Q.    At the time she was the U.S.
15   Attorney for the Northern District of Ohio,
16   correct?
17        A.    That's what this says, yes.
18        Q.    Are you aware that she is today
19   Endo's counsel in this case?
20        MR. LIMBACHER:  Object to form.
21        THE WITNESS:  I'm not aware of
22   that, no.
23        MS. SCULLION:  We can take a
24   break.

Page 231

1         THE VIDEOGRAPHER:  Off the
2    record, 2:23.
3         (Brief recess.)
4         THE VIDEOGRAPHER:  The time is
5    now 2:39 p.m.  We are back on the
6    record.
7         MR. LIMBACHER:  Jen, I just
8    wanted to put on the record, you and I
9    talked briefly during the break with
10   regard to how late we might go today and
11   what we anticipate for tomorrow.
12        My understanding is that you do
13   not think you're going to be able to
14   finish your questioning today.  The
15   witness is available to come back
16   tomorrow.  He can be here, he believes,
17   and ready to go starting at 2:30.  My
18   preference, as I indicated during the
19   break, is that we go tonight until a
20   reasonable hour, approximately 7:00 to
21   try to get as much done today so that
22   tomorrow can be relatively brief, and we
23   can complete the deposition as quickly
24   as possible.

Page 232

1         My understanding is, for reasons
2    I don't fully understand, you want to
3    shut it down today at 5:30, and I would
4    strongly encourage you to agree to let's
5    go beyond 5:30, let's go until 7:00.  I
6    think that's a reasonable time for
7    everybody, and that will make it much
8    more likely that we're going to be able
9    to complete the deposition tomorrow by a
10   reasonable hour.
11        MS. SCULLION:  And as we also
12   discussed off the record and in some
13   prior e-mails, first we do appreciate
14   the witness' ability to come back
15   tomorrow beginning at 2:30.  We had
16   noticed the deposition to go day to day,
17   and we had specifically given a heads-up
18   a few weeks ago that we did expect your
19   deposition to go for two days, given the
20   breadth of the topics on which you're
21   designated, as well as our intent to ask
22   you questions in your personal capacity.
23        And with that, although in cases
24   where we only expected to have a

Page 233

1    deposition for one day, we've been
2    willing to go what I would call these
3    marathon depositions until late in the
4    evening.  There's really just -- there's
5    no need.  We did give the heads-up.  We
6    give it for a reason.  We planned for
7    the two days.
8         I was only given notice, I
9    apologize, last night or yesterday, I
10   should say, probably yesterday afternoon
11   that you would not be available tomorrow
12   morning but only in the afternoon.
13        Nonetheless, we had planned for
14   two days, and you can correct me if I'm
15   wrong, but my understanding is that when
16   there have been depositions going for
17   two days planned in this case, that the
18   practice has been to stop at around 5:30
19   or 6:00 and then continue the next day.
20   That's our intent.  We intend to use,
21   you know, our full-time, we're trying to
22   be efficient about it.
23        I will say that our disagreements
24   as to the scope, in particular, have

59 (Pages 230 to 233)

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    caused us to have to rejigger our
2    approach to the examination, so that's
3    also problematic for us, but we will go
4    till 6:00 today, and then we can
5    reconvene tomorrow.
6        The witness did indicate, and I
7    very much appreciate it, that he is able
8    to then sit for as long as it takes, I
9    think you said, tomorrow.  We don't
10   intend to go till 10:00 or 11:00 at
11   night.  And so if we get to a point
12   tomorrow where we still have questions
13   that we need to take -- examine you on
14   and have not used our time and it's
15   getting too late, we will just reconvene
16   for another day.
17       MR. LIMBACHER:  Well, if you
18   think you're going to need two full days
19   with this witness, all the more reason,
20   if we're going to resume tomorrow at
21   2:30, that we should go later than 5:30
22   today.  I'm not sure I understand what
23   the thinking is as to why you're so
24   unwilling to make full use of the time

Page 235

1    today.  If we shut it down at 5:30, I'm
2    not even sure we're going to have had a
3    total of seven hours of questioning
4    today.
5        So, again, I would ask that we go
6    past 5:30, we go past 6:00, we get as
7    much done today as we can so that
8    realistically we can get it finished
9    tomorrow because I'm not interested and
10   I don't think we're obligated to bring
11   him back for a third day.
12       MS. SCULLION:  So I don't think
13   we need to spend more time on this.  We
14   do think that we are entitled to the two
15   full days.  Again, we hadn't known he
16   wasn't going to be available in the
17   morning.  We had given a heads-up that
18   we wanted him for two full days.  We can
19   discuss this if and when it becomes an
20   issue.
21       MR. LIMBACHER:  I'll just note
22   from my experience that Kristin Vitanza
23   was a 30(b)(6) witness as well, and we
24   finished her up as both a fact witness

Page 236

1    and a 30(b)(6) witness in one day.
2        MS. SCULLION:  And that hasn't
3    happened always.  For example, I think
4    Dr. Shusterman, you know, was two days,
5    also 30(b)(6) and a fact witness, I
6    think -- again, I think the first day
7    was ended at 5:30 or 6:00 or so.
8        MR. LIMBACHER:  Just would point
9    out that Mr. Lortie doesn't work for the
10   company anymore and to try to have this
11   deposition extend into a third day is
12   really unreasonable.  Under the
13   circumstances, we should go well beyond
14   5:30 today to try to get this finished
15   tomorrow.
16       MS. SCULLION:  And, again, we're
17   not trying to be unreasonable.  We
18   hadn't known that you weren't available
19   tomorrow morning until we were told that
20   yesterday.  We had asked for you for two
21   days.  So, again, let's deal with it if
22   the issue is still live at the end of
23   tomorrow.
24       (Document marked for

Page 237

1    identification as Endo-Lortie Deposition
2    Exhibit No. 17.)
3    BY MS. SCULLION:
4        Q.   Let me hand you what's been
5    marked as Exhibit Number 17.  And Exhibit 17 is
6    Bates stamped ENDO-OPIOID_MDL-01056072, and
7    we've stamped it in the upper right-hand corner
8    E1010.
9        And, Mr. Lortie, asking you in
10   your capacity -- these questions would be in
11   your capacity as a corporate representative on
12   the role of wholesalers and distributors and
13   retailers in combating abuse and diversion of
14   opioid products.
15       So if you'll look at Exhibit 17,
16   it's a series of e-mails attaching a McKesson
17   distribution agreement and various amendments
18   thereto.  I'm not going to be asking you to go
19   through the entirety of these contracts.  And if
20   I can direct your attention, though, to page in
21   the upper right-hand corner E1010.10?
22       A.   1010.10.
23       Q.   You got it.
24       And you'll see "Article 2 Mutual

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    Obligations," and under Section "2.3 Core
2    Services," there's a discussion of the various
3    services that McKesson will perform and provide
4    to Endo Pharmaceuticals, and the third service
5    listed there says 852 data.
6            Do you have -- are you familiar
7    with 852 data in the context of a distribution
8    agreement?
9        A.    I recognize the term.  I'd have
10   to think about refreshing my recollection.  It's
11   been a while, so I recognize that it's a term
12   used in this context, but I don't recall
13   specifically what it's referring to.
14       Q.    Okay.  Let's go down to vi under
15   2.3 refers to "Chargeback Processing."
16           Do you see that?
17       A.    Yes, I see that.  I see that vi.
18       Q.    Are you familiar with the concept
19   of chargebacks in the context of distribution
20   agreements between Endo and wholesalers?
21       A.    Generally, yes.
22       Q.    And in this paragraph 6 it
23   states, "Accurate and timely processing and
24   reconciliation of Customer chargebacks due to

Page 239

1    contract pricing between the Customer and
2    Manufacturer."
3            Did I read that correctly?
4        A.    That's what's written here, yes.
5        Q.    Okay.  And if you go to page --
6    sorry -- E1010.8, you see under "Article 1
7    Definitions" at the very bottom is the
8    beginning of -- is the definition of "Customer"?
9        A.    Yes, I do see that.
10       Q.    Okay.  And it says that the
11   "Customer means the purchaser of products from
12   McKesson, including but not limited to national
13   and regional retail chains, institutional
14   providers, and retail independent pharmacies."
15           Did I read that correctly?
16       A.    Yes, you did.
17       Q.    Is that consistent with your
18   understanding of who some of the purchasers of
19   products from McKesson would be, those
20   categories?
21           MR. LIMBACHER:  Object to form.
22           THE WITNESS:  I have no reason to
23           question that that's how McKesson
24           defines customer across their, you know,

Page 240

1    various manufacturers that they have
2    distribution agreements with.
3    BY MS. SCULLION:
4        Q.    Okay.  And I just showed you that
5    for your reference.  If you'll now go back to
6    page we were on E1010.10, which discusses the
7    chargeback processing in 2.3 vi.  The reference
8    here to customer chargebacks due to contract
9    pricing between the customer and manufacturer,
10   the manufacturer here is Endo, correct?
11           MR. LIMBACHER:  Object to form.
12   BY MS. SCULLION:
13       Q.    It's an Endo-McKesson contract,
14   right?
15       A.    I believe it is, yeah, it looks
16   to be.
17       Q.    Okay.  Do you know what is
18   referred to -- what is referenced by contract
19   pricing between the customer and Endo?  Did Endo
20   have contract pricing with any of the entities
21   that we saw fell within the definition of
22   customer, that is national and regional retail
23   chains, institutional providers and retail
24   independent pharmacies?

Page 241

1           MR. LIMBACHER:  For all of the
2           products that are identified here, or
3           are you limiting this?
4    BY MS. SCULLION:
5        Q.    We can just -- we can limit that
6    to Opana ER.
7        A.    My recollection is that national
8    and regional retail chains, yes, we had
9    relationships with.  Institutional providers, I
10   don't recall specifically.  It may or may not
11   have been, and that would be a hospital or a
12   hospital system, and my recollection is that
13   retail independent pharmacies, we did not do
14   direct shipping to.  Whether or not McKesson --
15   how they had a view to that was something I
16   don't recall specifically, but, yes, national
17   and regional retail chains for sure.
18       Q.    And by national and regional
19   retail chains, those would be pharmacy chains,
20   correct?
21           MR. LIMBACHER:  Object to form,
22           and I object to the extent it falls
23           outside the scope of the topics on which
24           he's been designated.

61 (Pages 238 to 241)

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1         MS. SCULLION:  I'll connect it
2    up.
3         THE WITNESS:  I would say that
4    that's the CVSs and the Rite Aids of the
5    world and the like.
6    BY MS. SCULLION:
7         Q.    Okay.  And the chargebacks that
8    are referenced here, those would be indications
9    of how much the customer actually paid to
10   McKesson versus the -- strike that.
11        That would be a reference to the
12   amount that the customer, such as Rite Aid,
13   would have paid under the contract pricing as
14   compared with the amount that McKesson paid to
15   Endo for the product, correct?  That's the
16   difference is that chargeback?
17        MR. LIMBACHER:  Object to form
18   and foundation.  Objection to the extent
19   it falls outside the scope of the topics
20   on which he's been designated.
21        THE WITNESS:  Yeah, it's been a
22   while since I've thought about the
23   intricacies of the contract processing.
24   We certainly had expert professional

Page 243

1    people who did this every day, but I
2    think, generally, the way you describe
3    it is, to my recollection, accurate.
4    BY MS. SCULLION:
5         Q.    Okay.  And are you familiar with
6    the concept that the chargeback data then would
7    show the individual purchases that were made
8    under the contract pricing by the national and
9    regional retail chains?
10        MR. LIMBACHER:  Same objections.
11        THE WITNESS:  My recollection is
12   that that would happen but at that level
13   of a national or regional chain and not
14   deeper than that.
15   BY MS. SCULLION:
16        Q.    Okay.  And you mentioned
17   Ms. Walker, Lisa Walker and her function before.
18        Did her group also oversee
19   processing and administration of the
20   chargeback -- chargeback process?
21        MR. LIMBACHER:  Same objections,
22   well outside the scope of the topics on
23   which he has been designated.
24        THE WITNESS:  No, that's not my

Page 244

1    recollection of Lisa's role.
2    BY MS. SCULLION:
3         Q.    Who -- was there a group within
4    Endo that was charged with administering the
5    chargeback process?
6         MR. LIMBACHER:  Same objections.
7         THE WITNESS:  There was, yes.
8    BY MS. SCULLION:
9         Q.    Okay.  Do you recall the name of
10   that group?
11        A.    We called that, as I recall, a
12   contract and pricing operations or something
13   like that.
14        Q.    Okay.  And so that group would
15   have seen again the data showing the purchases
16   by national and regional retail chains from
17   McKesson, right?
18        MR. LIMBACHER:  Same objections,
19   outside the scope of the topics on which
20   he's been designated.
21        THE WITNESS:  At some macro
22   level, yes, I believe that's true.
23   BY MS. SCULLION:
24        Q.    Okay.  So in that respect, Endo

Page 245

1    had access to information about purchases by its
2    customer's customers, that is McKesson being
3    Endo's customer and then McKesson's customers?
4         MR. LIMBACHER:  Same objections.
5         THE WITNESS:  And same answer, at
6    some high level, at some macro level,
7    not at an individual pharmacy level, for
8    example, but at a national or regional
9    level.
10   BY MS. SCULLION:
11        Q.    And did Endo have any policies or
12   procedures for trying to make use of that
13   chargeback data as part of its monitoring for
14   diversion or abuse of Opana ER?
15        A.    I don't think that information
16   would have added any value really, because it
17   was at such a macro rolled up level that it
18   wouldn't have been -- unless I'm missing
19   something, a set of data that would have really
20   been able to show anything.  So I'm not aware
21   that that was used, no.
22        Q.    Okay.  So the answer is, no,
23   you're not aware of any such policy or
24   procedure, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1          MR. LIMBACHER:  Object to form.
2          THE WITNESS:  Correct, because
3      I'm not sure that it would have been
4      valuable, so we wouldn't have put that
5      in place.
6  BY MS. SCULLION:
7      Q.    Did Endo have any policy or
8  procedure by which it sought to ask the
9  wholesalers to assist it in its anti-diversion
10 and abuse efforts with respect to Opana ER?
11         MR. LIMBACHER:  Object to form.
12         THE WITNESS:  My recollection is
13     that Endo recognized, as did the
14     wholesalers and distributors, that each
15     played an important role and each had
16     its own set of regulations to adhere to
17     and also to ensure that we were
18     comfortable that our distribution or
19     wholesale partners were doing their job
20     according to regulations and law, those
21     languages were in the distribution
22     services agreements, in other words, to
23     ensure to Endo that McKesson in this
24     case was adhering to all applicable

Page 247

1      rules, regulations and laws pertaining
2      to all aspects of their distribution.
3  BY MS. SCULLION:
4      Q.    But, for example, did Endo, as
5  part of its anti-diversion efforts, ask its
6  wholesaler, distributor such as McKesson, to
7  provide Endo with information about the
8  downstream distribution of Endo's products so
9  that Endo could, for example, monitor for
10 suspected diversion or abuse?
11         MR. LIMBACHER:  Object to form.
12         THE WITNESS:  What I would say is
13     Endo depended on the wholesaler
14     distributor to operate according to the
15     rules and regulations that pertained to
16     them and thereby entrusted that to them.
17     So to the extent to which Endo checked
18     beyond that, I don't recall.
19 BY MS. SCULLION:
20     Q.    Okay.  Do you recall whether at
21 any point in time -- strike that.
22         I'd like to ask you some
23 questions with respect to Endo's policies and
24 procedures for enforcing laws and regulations

Page 248

1  concerning promotional materials.
2      A.    Okay.
3      Q.    That's one of the areas in which
4  you have been designated, correct?
5      A.    Yes.
6      Q.    Okay.
7          MS. SCULLION:  Could we have
8      exhibits 1458 and 1456.
9          (Document marked for
10     identification as Endo-Lortie Deposition
11     Exhibit No. 18.)
12 BY MS. SCULLION:
13     Q.    I'll hand you what's been marked
14 as Exhibit Number 18.  I'm going to need a copy.
15         And Exhibit 18 is Bates stamped
16 END00747325, and we have marked it in the upper
17 right-hand corner E1458.
18         Mr. Lortie, do you recognize
19 Exhibit 18 as Endo's Corporate Policy for the
20 Promotional Materials Review Board, and if you
21 go to the last page of the exhibit, it says it
22 was revised as of 1/12/2007?
23     A.    Yes, I see that.
24     Q.    And do you recognize this as that

Page 249

1  corporate policy?
2      A.    Yes, as of that time I recognize
3  and I've reviewed this.
4      Q.    Okay.  You did review this in --
5      A.    I did.
6      Q.    -- the course of preparing for
7  today's deposition?  Okay.
8          MS. SCULLION:  And then can we
9      have 1456.
10         (Document marked for
11     identification as Endo-Lortie Deposition
12     Exhibit No. 19.)
13 BY MS. SCULLION:
14     Q.    Now I'm going to hand you what's
15 been marked as Exhibit 19.
16         And Exhibit 19 is Bates stamped
17 END00747404, and we've marked it in the upper
18 right-hand corner E1456.  And this is the
19 standard operating procedure dated May 2013 for
20 the Marketing and Advertising Review Committee,
21 and it says (MARC).
22         Did you review this document also
23 in preparation for today's deposition?
24     A.    Yes, I think I did.

63  (Pages 246 to 249)

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    Q.    Okay.  And we discussed a little
2  bit earlier the Promotional Materials Review
3  Board, PMRB, and MARC.
4         Can you tell me, to the best of
5  your understanding, was there any difference in
6  the operation of PMRB versus MARC?
7    A.    My understanding and my
8  recollection as to the differences between PMRB
9  and MARC is that as the company evolved and
10 became a company not just focused on branded
11 products and a small generic business in 2007,
12 but by 2013 a branded, a generic, a medical
13 device, a healthcare information technology
14 business, there was a requirement to make sure
15 that we had the appropriate operating procedures
16 in place to cover to the extent that they
17 pertained in some way to any of those businesses
18 so the MARC approach evolved to take that into
19 consideration.
20        I believe, also, that there was a
21 technology change, such that there was a system
22 put in place, the Zinc system that enabled sort
23 of realtime review and computer review as
24 opposed to pencil and paper review or a lack of

Page 251

1  more sophisticated description, so I think those
2  are two of the major changes.
3         What didn't change is that their
4  policies that required review and sign-off
5  across a multi-disciplinary team on any
6  promotion that was used with any sort of
7  healthcare customer, and that team comprised of
8  not just marketing but also legal, regulatory,
9  experts and others, but that's -- you know,
10 essentially this is the sign-off procedure to
11 ensure that any promotional material or claims
12 adhered to the FDA requirements were well
13 supported by medical literature and things like
14 that.
15    Q.    Okay.  So if I understand
16 correctly, under PMRB, the process was sort of
17 pen to paper, as you said, not electronically
18 done, review process for promotional materials,
19 correct?
20    A.    That's my understanding.  It may
21 have been that there was some ways to move the
22 things around by e-mail, but I know that MARC
23 and Zinc became much more sophisticated,
24 dedicated system to allow reviewers to do that

Page 252

1  work I think in an aim to be most efficient.
2    Q.    Okay.  And just sticking on
3  Exhibit Number 19, the MARC SOP.  I lost my
4  marked copy of MARC.
5         Do you understand that the Zinc
6  system included an audit trail to allow you to
7  audit the process?
8    A.    I believe that was true.  I
9  don't -- I don't recall specifically.  I wasn't
10 on the MARC team nor the PMRB.  I was on the
11 escalation occasionally, but the nuts and bolts
12 of how the system worked is something that I'm
13 not all that familiar with.
14    Q.    Did you make any attempt to
15 become familiar with that in preparation for
16 today's deposition?
17        MR. LIMBACHER:  Object to form.
18        THE WITNESS:  At that level of
19    detail specifically to the audit trail,
20    no, I did not.
21 BY MS. SCULLION:
22    Q.    Okay.  I believe, and we'll try
23 to find that, I think there's a reference to
24 there being an audit trail in Zinc.

Page 253

1         When review of promotional
2  materials was performed under the PMRB, what
3  kind of auditable records existed of that
4  review?
5    A.    I don't specifically know.  I
6  would assume that there was paper kept.  I'm
7  sure that there was a file in the regulatory
8  department because it would have been their job
9  to report these things and do the necessary
10 submissions as required by the FDA, but,
11 specifically, I don't know what the audit
12 process were, what was required.
13    Q.    Now, as you said, those are all
14 assumptions you're making, you don't know that
15 sitting here today, correct?
16        MR. LIMBACHER:  Object to form.
17        THE WITNESS:  I don't know that,
18    correct, but I would be -- you know,
19    this falls into sort of standard -- I
20    know what the regulatory people do, they
21    keep records of things.  It's their job
22    to fulfill the very clearly delineated
23    correspondence with the FDA.  So in that
24    context, I'm quite sure that they would

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    have kept copies of everything that came
2    through PMRB or at least those things
3    that were approved.
4    BY MS. SCULLION:
5        Q.    Do you recall that in connection
6    with the Lidoderm investigation and the
7    anticipation of the corporate integrity
8    agreement, there was a review of Endo's
9    compliance procedures?
10       MR. LIMBACHER:  Are you asking
11   these questions in his capacity as a
12   30(b)(6) witness?
13       MS. SCULLION:  I am, because one
14   of the aspects of the 30(b)(6) is with
15   respect to compliance as it applied to
16   enforcement of abuse and diversion laws
17   and regulations.
18       THE WITNESS:  I don't recall
19   specifically --
20       MR. LIMBACHER:  Excuse me.
21       THE WITNESS:  Sorry.
22       MR. LIMBACHER:  I would object to
23   the extent it falls outside the scope of
24   the topics on which he's been

Page 255

1    designated.
2        You can answer.
3        THE WITNESS:  I don't recall
4    specifically with regards to that
5    Lidoderm question.
6    BY MS. SCULLION:
7        Q.    Okay.  Just one second.  We'll
8    come back to that when we find it.  You guys
9    keep will looking.
10       Under both the PMRB and the MARC
11   process, am I correct that the -- I think, as
12   you were explaining, that the process itself was
13   really run by regulatory, legal and medical
14   with, as we understand it from Ms. Vitanza's
15   testimony, the marketing folks serving as
16   presenters, initiators I think is the word,
17   initiators of review on particular pieces.
18       Is that your understanding?
19   A.    That is, yes.
20       MR. LIMBACHER:  Object to form.
21   BY MS. SCULLION:
22       Q.    And so in no way should marketing
23   really be running the PMRB or MARC process,
24   correct?

Page 256

1        MR. LIMBACHER:  Object to form.
2        THE WITNESS:  I think it depends
3    on who you mean by "marketing."
4    Certainly at a certain point as MARC
5    came to be, I do recall that there was a
6    responsible party that reported up
7    through the commercial operations and
8    whose job it was to be project manager
9    of the process, not an initiator, not an
10   inputter, not a creative -- not a
11   reviewer but -- and that person reported
12   up through commercial operations.  So if
13   that's how you're defining marketing,
14   then my answer would be different.  But
15   marketing as defined by product manager
16   or anybody involved in -- directly in
17   commercialization, they were an
18   initiator of the material to be
19   reviewed.
20   BY MS. SCULLION:
21       Q.    Okay.  And do you recall that --
22   strike that.
23       Was it Endo's policy to have
24   product specific guides as the foundation for

Page 257

1    the promotional materials review process?
2        MR. LIMBACHER:  Object to form.
3        THE WITNESS:  I'm not sure what
4    that means.
5    BY MS. SCULLION:
6        Q.    Did -- was a dossier prepared for
7    each product that gave some of the basic
8    information about the product, the label,
9    labeling history and concepts that had been
10   agreed on to serve as the basis for appropriate
11   promotion for a product?
12       MR. LIMBACHER:  Object to form.
13       THE WITNESS:  I don't recall
14   specifically.  Those themes I would be
15   sure that were part of every
16   consideration, but I don't recall a
17   specific dossier or product guide, as
18   you said.  It could be, but I wasn't --
19   I wasn't involved in the day-to-day
20   operations of either of these two
21   committees or processes, that Kristin,
22   for example, would have been much more
23   close to the process.
24   BY MS. SCULLION:

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1      Q.    So, for example, then you also
2   would not be able to testify today whether the
3   product specific guide for Opana ER in its
4   original, not reformulated but original
5   formulation was ever completed?
6           MR. LIMBACHER: Object to form,
7       object to the extent it falls outside
8       the scope of topics on which he's been
9       designated. He's here to testify with
10      regard to the general process and not
11      with regard to the details that you're
12      asking him about now.
13          THE WITNESS: I don't know,
14      because I'm not aware of such a guide.
15  BY MS. SCULLION:
16      Q.    Okay. Just going back, again, to
17  the general process for promotional materials
18  review. I think, as we've discussed, it would
19  be initiated by someone from marketing, correct?
20      A.    Typically, yes.
21      Q.    Okay. And then, typically, there
22  would be a reasonable time frame in which the
23  members of the review board or MARC would have
24  to then review the promotional materials,

Page 259

1   correct?
2       A.    That's my understanding.
3       Q.    Okay. And only after that review
4   had happened if there were disagreement as to
5   how to proceed would there be potential for an
6   escalation above the board, correct?
7       A.    That's my understanding, yes.
8       Q.    Okay.
9           (Document marked for
10      identification as Endo-Lortie Deposition
11      Exhibit No. 20.)
12  BY MS. SCULLION:
13      Q.    Let me hand you what has been
14  marked as Exhibit 20, and this is going back to
15  the questions concerning review of Endo's
16  compliance procedures in connection with the
17  expected CIA, and Exhibit 20 -- do you have
18  Bates numbers? Thank you. It bears Bates
19  number EPI002412332.
20          And, Mr. Lortie, if you look at
21  the first page of the PowerPoint, it states it's
22  a compliance overview and says in the lower
23  left-hand corner "ELC, March 21, 2013."
24          Was ELC the abbreviation for

Page 260

1   Executive Leadership Committee?
2           MR. LIMBACHER: Just note my
3       objection. If you're asking these
4       questions in his role as a 30(b)(6)
5       witness, I believe it goes beyond the
6       scope of the topics on which he's been
7       designated.
8   BY MS. SCULLION:
9       Q.    Just so you know the reason we
10  disagree with that is, again, one of the topics
11  on which you've been designated are -- is with
12  respect to changes in policies and procedures
13  and reasons therefor, and we believe this
14  document goes directly to questions of changes
15  in policies and procedures that, among other
16  things, impacted efforts to ensure compliance
17  with applicable laws and regulations for the
18  sale, marketing, distribution, et cetera, of
19  opioids.
20          I'm sorry. I was asking on the
21  lower left-hand corner of the first page of the
22  PowerPoint where it says ELC, is that Executive
23  Leadership Committee?
24      A.    It was at that point in time,

Page 261

1   yes.
2       Q.    Looking at Exhibit 20, do you
3   recall seeing a compliance overview in March of
4   2013?
5       A.    I was not a member of ELC at that
6   point, so no.
7       Q.    Were you aware that -- looking at
8   this, does this refresh your recollection that
9   compliance overview was undertaken around that
10  time?
11      A.    I don't recall.
12      Q.    Okay. If you'll look at the
13  second page of the PowerPoint, it says on the
14  first bullet point "Compliance function
15  established in 2004 with increased focus as a
16  result of Lidoderm investigation
17  (January 2007)."
18          Before 2004 did Endo have any
19  compliance function?
20          MR. LIMBACHER: Again, note my
21      objection to these questions to the
22      extent it's beyond the scope of the
23      topics on which he's been designated.
24          THE WITNESS: I'm not sure. That

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1       predates me by several years.  I'm aware
2   of the compliance function that was in
3   place when I was there.
4   BY MS. SCULLION:
5       Q.   Okay.  If you will go to page 6
6   of the PowerPoint, and the third major -- second
7   major bullet point down refers to "Recent
8   precedent setting requirements," and under that
9   is a bullet point "Eliminate
10  territory/individual sales goals for sales
11  personnel and direct managers."
12      Did Endo ever consider changing
13  its policies with respect to territory and
14  individual sales goals for sales personnel and
15  direct managers in connection with the promotion
16  of Opana ER?
17      MR. LIMBACHER:  Object as beyond
18      the scope of the 30(b)(6) topics on
19      which he's been designated.
20      THE WITNESS:  And, sorry, can you
21      just ask the question it again so I can
22      answer correctly.
23  BY MS. SCULLION:
24      Q.   Sure.  Did Endo ever consider

Page 263

1   changing its policies with respect to territory
2   and individual sales goals for sales personnel
3   and direct managers in connection with the
4   promotion of Opana ER?
5       MR. LIMBACHER:  Same objection.
6       THE WITNESS:  Well, changing the
7       policy is different from eliminating,
8       that's why I asked for clarification.
9       So if you're asking did we consider
10      eliminating as it's outlined in this
11      bullet point, that's one question.
12      Changes to individual sales goals
13      happened as a matter of course.
14  BY MS. SCULLION:
15      Q.   Thanks for the clarification.
16      Did Endo ever consider
17  eliminating the territory individual sales
18  goals?
19      MR. LIMBACHER:  Same objection.
20      THE WITNESS:  Not that I'm aware
21      of.
22  BY MS. SCULLION:
23      Q.   If you go to page 9 of the
24  PowerPoint, the first bullet point says, "CIA

Page 264

1   would necessitate a significant increase in
2   monitoring for Endo Pharmaceuticals" and then
3   goes on to explain "Endo's monitoring programs
4   has not included records reviews or
5   non-promotional activities" -- I think it should
6   be of non-promotional activities -- "and current
7   resourcing would be insufficient to meet CIA
8   requirements."
9       Did Endo have any records review
10  as part of its policies and procedures to ensure
11  compliance with the laws and regulations for the
12  sale, marketing and distribution of Opana ER?
13      MR. LIMBACHER:  Object as beyond
14      the scope of the topics on which he's
15      been designated.
16      THE WITNESS:  So, you know, I'm
17      trying to clarify, because as you
18      pointed out the word or here may be
19      incorrect.  It could be of, it could be
20      on, and it does slightly change the
21      question.
22      I don't recall specifically how
23      we defined or how the author here would
24      have defined records reviews.

Page 265

1       What I can say is that the
2       entirety of the period that I was at
3       Endo and, again, going back to the 2007
4       RiskMAP, there's a comprehensive program
5       that involved many different elements,
6       all intended specifically for Opana ER
7       to do our part in mitigating abuse and
8       diversion and other things.
9       To the extent that -- you know,
10      and, again, I'm happy to look at
11      something to remind me what records
12      reviews were and how it's defined here,
13      but beyond that, I'm certainly not going
14      to say that there was nothing in place,
15      but I don't know what the author is
16      speaking about in this particular slide.
17  BY MS. SCULLION:
18      Q.   Do you have an understanding of
19  the concept of record review in connection with
20  compliance?
21      A.   This is what I'm asking for
22  clarification on because I need some help in
23  recalling what the definition of that
24  specifically is in this context.  So if you've

67  (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1   got something, I'd be happy to look at it.
2        Q.   Next bullet point says that "In
3   2012, 17 speaker program reviews and 8 field
4   ride-alongs were conducted due to resource
5   constraints, travel limits and sales force
6   restructuring."
7             Is that accurate, that in 2012
8   only 17 speaker program reviews were conducted
9   due to resource constraints, travel limits and
10  sales force restructuring?
11            MR. LIMBACHER:  Object to the
12       form and object to the extent it falls
13       outside the scope of the topics on which
14       he's been designated.
15            THE WITNESS:  I don't know.
16  BY MS. SCULLION:
17       Q.   Did Endo cut back in 2012 on
18  field ride-alongs that would be used to ensure
19  compliance with laws and regulations concerning
20  the promotion of Opana ER?
21            MR. LIMBACHER:  Same objections.
22            THE WITNESS:  I don't know.  I
23       don't recall.
24  BY MS. SCULLION:

Page 267

1        Q.   Do you know what efforts Endo --
2   strike that.
3             Do you know what policies Endo
4   had in place for the audit of the PMRB review of
5   marketing materials?
6        A.   I think we've answered that
7   question before.  I don't recall specifically
8   the details of the elements of such an audit.
9        Q.   I mean, do you know one way or
10  the other whether -- do you know one way or the
11  other whether the process was ever audited?
12            MR. LIMBACHER:  Object to form
13       and, again, outside the scope of the
14       topics on which he's been designated.
15            THE WITNESS:  To the extent that
16       the FDA or other regulatory bodies
17       required such an audit or such
18       recordkeeping, I'm sure that Endo
19       followed those policies and procedures.
20       I'm just not aware of what those were.
21  BY MS. SCULLION:
22       Q.   Okay.  So going back to the
23  policies and procedures with respect to ensuring
24  the accuracy and legality of promotional

Page 268

1   materials, do you understand that for
2   promotional materials, the label defines the
3   product?
4             MR. LIMBACHER:  Object to form.
5             THE WITNESS:  The label defines
6        the product, what I understand is that
7        all promotion has to be supported in an
8        alignment with the claims and
9        indications and information and the
10       prescribing information.
11            Is that what you mean?
12  BY MS. SCULLION:
13       Q.   Yes.  It means that the
14  promotional materials can't go beyond what's in
15  the label, correct?
16       A.   That's correct.
17       Q.   Can't contradict what's in the
18  label, right?
19       A.   That's, I think, a fair
20  statement, yes.
21       Q.   And the promotional materials
22  can't contradict the label either expressly,
23  right?
24       A.   As you recently asked, yes, I

Page 269

1   believe that's true.
2        Q.   And can't do it by implication
3   either, right?
4             MR. LIMBACHER:  Object to form.
5             THE WITNESS:  I mean, I'm not
6        sure what you mean by that.
7             What I will say is all promotion
8        has to be in alignment with the label,
9        has to be supported by medical evidence,
10       has to be signed off by medical,
11       regulatory and legal professionals and
12       also has to be submitted to the FDA, at
13       least at time of use, to give them a
14       chance to weigh in if they have any
15       objections.
16  BY MS. SCULLION:
17       Q.   Well, let me ask you specifically
18  with respect to Schedule II opioids like Opana
19  ER.
20            You'd agree that Endo couldn't
21  design promotional materials that were intended
22  to send a message to healthcare providers that
23  Endo's products were less risky than other
24  Schedule II opioids?

68 (Pages 266 to 269)

Page 270

1          MR. LIMBACHER:  Object to form.
2          THE WITNESS:  By design or by put
3    into use?  I mean, I'm drawing that
4    distinction because it's an important
5    one.
6    BY MS. SCULLION:
7       Q.    Design.
8       A.    So is your question at any point
9    would Endo or any of its agencies have mocked
10   something up for consideration that ultimately
11   may be decided was in conflict with the label,
12   or were such -- was promotion allowed to come
13   through the system and out into use that
14   qualified?
15      Q.    Right.  Could Endo have put into
16   use a promotional piece that was intentionally
17   designed to send healthcare providers a message
18   that Endo's opioid product, Opana ER, was less
19   risky than other long-acting opioids?
20         MR. LIMBACHER:  Object to form
21   and object as outside the scope of the
22   topics on which he has been designated.
23   You're now asking him questions with
24   regard to topic number 11, which he has

Page 271

1    not been designated on.
2          MS. SCULLION:  I'm asking with
3    respect to topic number 13.  I
4    understand --
5          MR. LIMBACHER:  Respectfully, I
6    disagree.
7          MS. SCULLION:  I understand you
8    made an objection.
9          THE WITNESS:  Whatever promotion
10   was put into use should adhere
11   completely to the regulations and should
12   be in -- supported by medical literature
13   and in alignment with the product
14   labeling.
15   BY MS. SCULLION:
16      Q.    The question is would you agree
17   that it'd be improper to put into use a piece of
18   promotional material that was intentionally
19   designed to send the message that Endo's Opana
20   ER was less risky than other long-acting
21   opioids?
22         MR. LIMBACHER:  Same objections.
23         THE WITNESS:  I think it depends
24   on what other long-acting opioid.  I

Page 272

1    mean, I would need to see the specifics
2    to be able to answer that accurately
3    because there may be some specific
4    instance that I'm not thinking of.  So,
5    again, my answer until I see something
6    in detail is that all promotion that was
7    put into use by the company and passed
8    through either the PMRB or the MARC
9    process and been signed off by medical,
10   legal and regulatory experts and had
11   been submitted to the FDA.  Beyond that,
12   it's hard for me to answer that question
13   unless I see specifically what you're
14   speaking of.
15   BY MS. SCULLION:
16      Q.    So you think it would depend on
17   the particular promotional material?
18         MR. LIMBACHER:  Object to form.
19         THE WITNESS:  I'd like to see
20   what you're referring to so I can give
21   you an accurate answer.
22   BY MS. SCULLION:
23      Q.    I'm asking in terms of the
24   policies and procedures that were used by Endo

Page 273

1    in reviewing promotional materials for the
2    promotion of Opana ER.  Was that one of the
3    principles that informed that process?
4          MR. LIMBACHER:  Object to form.
5          THE WITNESS:  The principles were
6    any piece put into promotion for use by
7    our company was vetted through either
8    the PMRB or the MARC process by medical,
9    legal, regulatory professionals to
10   ensure its compliance with regulations,
11   its portability by the medical
12   literature and its alignment with the
13   product label.
14   BY MS. SCULLION:
15      Q.    So, for example, if Endo had
16   market research that told it, well, doctors
17   hearing these particular words understand those
18   words to convey that the product is less risky
19   and put them at ease about using the product, it
20   would be okay for Endo to use those words in a
21   piece of promotional literature with respect to
22   Opana ER in the field; that would be okay?
23         MR. LIMBACHER:  Object to form
24   and object as beyond the scope of the

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    topics on which he's been designated.
2         THE WITNESS:  Again, it would be
3    very helpful to see the specific piece
4    of promotion that you're referring to
5    and the specific type of market research
6    because on -- blanket statements are not
7    helpful for me to be able to answer that
8    accurately.
9         (Document marked for
10    identification as Endo-Lortie Deposition
11    Exhibit No. 21.)
12   BY MS. SCULLION:
13        Q.   Okay.  Let me show you what's
14   been marked as Exhibit Number 2.
15        And Exhibit Number 21 is
16   marked -- is Bates stamped END00401724, and
17   we've marked it E1604.1 in the upper right-hand
18   corner.
19        Mr. Lortie, this is the Endo
20   Pharmaceuticals "Health Care Compliance Guide"
21   effective -- well, yeah, it says effective as of
22   June 1, 2005, revised in May 2009 in the lower
23   left-hand corner.
24        Do you see that?

Page 275

1         A.   Yes, I see that.
2         Q.   Okay.  Are you familiar with the
3    healthcare compliance guide?
4         A.   I have not seen this, no, so I'll
5    take a few minutes if that's okay.
6         Q.   You can do that off the record.
7    I actually only have a question for you about
8    one page of the Health Care Compliance Guide.  I
9    take it you did not review this in connection
10   with your preparation for today's deposition?
11        A.   I don't recall reviewing it.  If
12   you'd like to point me to the page, but I'd
13   still --
14        Q.   Sure.
15        A.   -- reserve the ability to
16   understand the context.
17        Q.   The page is E1604.18?
18        MR. LIMBACHER:  I'm sorry.  Which
19   page?
20        MS. SCULLION:  1604.18.
21   BY MS. SCULLION:
22        Q.   Are you with me?
23        A.   Yeah, I'm just understanding the
24   chapter, and I now recognize I have seen this in

Page 276

1    my preparation.
2         Q.   Terrific.  And on page E1604.18,
3    you see the chart under the heading "Advertising
4    and Promotion - Examples of Permitted vs.
5    Prohibited Activities."
6         And do you see on the right-hand
7    side it says, among other prohibited activities
8    is a third one down, "Statements about safety
9    that minimize or are inconsistent with the
10   information in the package insert."
11        Do you see that?
12        A.   I do, yes.
13        Q.   And so that was prohibited with
14   respect to promotional materials for Opana ER or
15   any other product, correct?
16        A.   As I think I've testified, the
17   expectation would be that any statements are
18   consistent with the information in the package
19   insert.
20        Q.   Right.  But this goes just beyond
21   whether they're consistent or inconsistent.
22        It also says you can't minimize
23   the statements about safety, correct?
24        MR. LIMBACHER:  Object to form.

Page 277

1         THE WITNESS:  Yeah, I see that
2    written here.
3         My knowledge of the program is
4    that it's consistency with the label
5    that's critical and to the extent that
6    that would be true or not true, again,
7    we'd have to see what exactly the claim
8    is in question.
9    BY MS. SCULLION:
10        Q.   Well, I'm sorry.  As Endo's
11   corporate representative with respect to the
12   policies used to ensure compliance with the laws
13   and regulations for promotion of Opana ER, are
14   you telling me that it was not Endo's policy, as
15   reflected in its Health Care Compliance Guide
16   that it was prohibited to use statements about
17   safety that minimized the information in the
18   package insert?
19        MR. LIMBACHER:  Object to form,
20   and I think you've misstated the topics
21   on which he's been designated as a
22   30(b)(6) witness.
23        THE WITNESS:  Again, my
24   understanding and my experience has been

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    that anything that goes out in promotion
2    passes through the PMRB or the MARC
3    process, is signed off by the
4    appropriate professionals that satisfy
5    that the statements about safety are
6    consistent with the information in the
7    package insert and/or supported by PMRB
8    approved promotional pieces it says here
9    and that it's consistent with the label.
10   BY MS. SCULLION:
11       Q.    Is there a distinction in your
12   mind between whether a statement is consistent
13   with the package insert and whether even if
14   consistent it might minimize the information in
15   the package insert?
16       MR. LIMBACHER:  Same objections.
17       THE WITNESS:  I mean, I don't
18       know what minimize means.  That's not a
19       very precise statement, so I will say
20       that, you know, I see it written here
21       and I understand that, but for me it's
22       consistency with the label and sign-off
23       in each case by the appropriate medical,
24       legal and professional representative

Page 279

1        that determined whether or not something
2        would be acceptable for use.
3    BY MS. SCULLION:
4        Q.    So, to your understanding, the
5    only line is whether it's consistent or
6    inconsistent with the package information,
7    correct?
8        MR. LIMBACHER:  Object to form.
9        THE WITNESS:  In general --
10   BY MS. SCULLION:
11       Q.    Package insert.
12       A.    -- that is my understanding as to
13   the, you know, core guiding principles.  Again,
14   all promotion at the time of use was submitted
15   to the FDA as an additional step for them in
16   case our team got it wrong, and the FDA had an
17   opportunity to review all materials, and there
18   are various mechanisms that FDA can use to
19   respond to sponsors in terms of whether or not
20   they find material to be acceptable.
21       Q.    And you agree, though, that as
22   part of your team trying to get it right,
23   according to the Health Care Compliance Guide,
24   they were prohibited from approving statements

Page 280

1    about safety that minimize the information in
2    the package insert, right?  That was
3    the policy of Endo, correct?
4        MR. LIMBACHER:  Object to form.
5        THE WITNESS:  That was according
6        to the Health Care Compliance Guide on
7        that date, yes.
8    BY MS. SCULLION:
9        Q.    You'd also agree that if FDA had
10   specifically told Endo that it couldn't say X
11   about a product, that Endo should not then say X
12   about a product in its promotional materials?
13       MR. LIMBACHER:  Object to form.
14       THE WITNESS:  I think that's a
15       fair statement, I would agree.
16   BY MS. SCULLION:
17       Q.    And same thing with respect to
18   the detailing by sales reps in the field, if FDA
19   had said you can't say X, the sales reps
20   shouldn't be saying X about the product in the
21   field, right?
22       A.    I think it's the same question,
23   yes.  If the FDA explicitly prohibits a given
24   bit of language, companies should not be doing

Page 281

1    that.
2        Q.    Now, is it just that FDA
3    prohibits a specific -- specific words or was
4    Endo also required to prohibit similar words
5    that conveyed the same message as the words that
6    the FDA had prohibited?
7        MR. LIMBACHER:  Object to form to
8        the extent it falls outside the scope of
9        the topics on which he's been
10       designated.
11       THE WITNESS:  That's a difficult
12       one that requires examination of a
13       specific piece of material or a specific
14       piece of language because, as you know,
15       specific words are prohibited.
16       Conceptually, there's a lot of
17       variability in what one party might
18       consider acceptable, and, ultimately,
19       it's we trust the process to make sure
20       we get that right.
21   BY MS. SCULLION:
22       Q.    Well, do you think it'd be
23   appropriate if -- for Endo having seen that the
24   FDA struck specific language to try to go back

71  (Pages 278 to 281)

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  and craft language that conveys the same message
2  but doesn't just use the same words that FDA
3  struck; would they be appropriate undertaking?
4       MR. LIMBACHER: Object to form.
5       THE WITNESS: I don't know how to
6  answer that question because that's a --
7  that's a specific circumstance.
8  BY MS. SCULLION:
9       Q.   Wouldn't that be an effort to
10 just end run FDA's decision to strike certain
11 language?
12      MR. LIMBACHER: Object to form.
13      THE WITNESS: No, I can't agree
14 to that statement that you just made,
15 no.
16      MS. SCULLION: I was going to
17 start a new topic. I'm not aware of how
18 long we've been going so if we -- it's a
19 good time for a break.
20      MR. LIMBACHER: It's almost an
21 hour, so maybe we'll take a short break.
22      MS. SCULLION: Yeah, that's fine.
23      MR. LIMBACHER: Thank you.
24      THE VIDEOGRAPHER: The time is

Page 283

1       3:35. We are now going off the record.
2       (Brief recess.)
3       THE VIDEOGRAPHER: The time is
4  3:48. We are now back on record.
5       (Document marked for
6  identification as Endo-Lortie Deposition
7  Exhibit No. 22.)
8  BY MS. SCULLION:
9       Q.   Mr. Lortie, let me hand you
10 what's been marked as Exhibit Number 22.
11      And Exhibit Number 22 is a copy
12 of the -- of material that your counsel provided
13 to us in advance of your deposition, and it is,
14 to my understanding, a chart showing the claims
15 that we've asked you to speak to in response to
16 topic 13 of the 30(b)(6) notice on the left-hand
17 side, and on the right-hand side are the
18 supporting references for those claims.
19      Mr. Lortie, did you review
20 Exhibit 22 before today's deposition?
21      A.   Yes, I did.
22      Q.   Do you know who prepared Exhibit
23 22?
24      A.   This was prepared by our counsel

Page 284

1  in preparation for this topic.
2       Q.   Did you assist in its
3  preparation?
4       A.   I did not prepare it. I reviewed
5  it and ensured by checking and referring to some
6  of the references so that I could familiarize
7  myself with the material.
8       Q.   Okay. The material listed as
9  supporting references on the right side of
10 Exhibit 22, were those materials that were cited
11 contemporaneously as support for the claims,
12 meaning at the time that the marketing piece
13 listed in the left-hand column of the chart was
14 authorized for use?
15      MR. LIMBACHER: Object to form,
16 outside the scope of the topics on which
17 he's been designated.
18      THE WITNESS: I believe that to
19 be the case, but I'm not sure I
20 personally checked the dates on each
21 one, but that's my understanding.
22 BY MS. SCULLION:
23      Q.   Do you have an understanding
24 about whether -- what information exists in

Page 285

1  Endo's records that would allow one to know
2  whether these materials were, in fact, the
3  materials cited contemporaneously to support a
4  claim in a given piece of marketing -- sorry,
5  promotional material?
6       MR. LIMBACHER: Object to form.
7       THE WITNESS: I'm not sure I
8  understand what you're asking.
9  BY MS. SCULLION:
10      Q.   If I want to go find out whether,
11 in fact, a particular study, for example, had
12 been cited at the time that a particular
13 promotional piece was approved, are there
14 records that allow me to determine that?
15      MR. LIMBACHER: Object to form.
16      THE WITNESS: I suspect that
17 there are. My recollection is I -- you
18 know, just in general with any piece is
19 the references are often, if not always,
20 included on the piece itself. So it
21 almost stands as its own record, but I'm
22 quite sure that Endo did maintain the
23 references and how long they maintained
24 them for and what the audit requirements

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1      are, I'm just not familiar with the
2      specific details.
3  BY MS. SCULLION:
4      Q.   I mean, you raise a good point.
5  There are certain promotional pieces that we've
6  seen that do, in fact, have footnotes and
7  citations to references.
8           Is that what you were just
9  referring to?
10     A.   That's correct.
11     Q.   But that's not always the case
12 with respect to promotional materials that Endo
13 used in connection with opioids, right?
14     A.   I'm not sure.  My recollection is
15 that that is the standard that is the customary
16 not just for Endo but for all promotional
17 material I can recall across my career, whether
18 there are exceptions to that for some reason,
19 I'm not sure, but, in general, the pieces
20 always, to my recollection, would cite the
21 supporting references right on the piece itself.
22     Q.   Okay.  If you look in the
23 left-hand column of Exhibit 22 under the column
24 for "Plaintiffs' Claims," if you will go to the

Page 287

1  second page of Exhibit 22, that column.  You see
2  where it says note, claim numbers 3, 4 and 5 not
3  included in final approved materials?
4      A.   I see that referenced here, yes.
5      Q.   Are there records within Endo
6  that would allow one to determine whether any
7  given document was a final approved piece of
8  promotional material -- stop right there.
9           MR. LIMBACHER:  Object to form
10 and foundation and further object as
11 beyond the scope of the topics on which
12 he's been designated.
13          THE WITNESS:  I'm not sure of the
14 specific records retention policies that
15 pertain here, but I would -- I'm quite
16 sure that Endo would have maintained
17 whatever they are required to maintain,
18 and, in my recollection, whenever I
19 needed to see a piece of historic
20 promotion, that was able to be provided,
21 and that would be promotion that had
22 ultimately been approved and in use.  So
23 I'm quite sure that anything that made
24 it into commercial use, there was a

Page 288

1  record retained of that.
2  BY MS. SCULLION:
3      Q.   Okay.  So is it your
4  understanding, then, that in Exhibit 22 to the
5  extent that Endo determined that we were citing
6  to pieces in our request on topic 13 that were
7  not final approved materials, that that's been
8  indicated and that the remainder are, in fact,
9  final approved materials?
10          MR. LIMBACHER:  Object to form,
11 foundation.
12          THE WITNESS:  I think what you're
13 asking is where it's noted that the
14 claims were not used in final approved
15 material, that that is indeed our
16 position, that those claims did not find
17 their way into a final piece of approved
18 material.
19 BY MS. SCULLION:
20     Q.   Right, and it's fair to say that
21 the rest were --
22     A.   I believe that in this chart
23 there's a number of designations as to the
24 specifics around the claims.  One other is

Page 289

1  important to note how they were used, for
2  example, and by whom.
3      Q.   Correct.  Okay.
4           So if we could go to claim number
5  24, which is on page 9 of Exhibit 22.  And in
6  our request with respect to this claim, we cited
7  to a document Bates stamped
8  ENDO-CHI_LIT-00538441.
9           MS. SCULLION:  And do we have
10 that, it's E785?
11          (Document marked for
12 identification as Endo-Lortie Deposition
13 Exhibit No. 23.)
14 BY MS. SCULLION:
15     Q.   Let me hand you what's been
16 marked as Exhibit 23.
17          And Exhibit 23 you'll see does
18 bear that Bates number, correct, lower
19 right-hand corner?
20     A.   Yes, it does.
21          MR. LIMBACHER:  And, counsel,
22 just so we're clear, you've been asking
23 him questions in his capacity as a
24 30(b)(6) witness?

73 (Pages 286 to 289)

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1      MS. SCULLION:  Yes, except to the
2   extent that you've objected that it's
3   beyond the scope.  We'll have to see
4   where that comes out.
5 BY MS. SCULLION:
6      Q.   And you'll see in the chart we
7 cite to certain statements in this document on
8 pages 3 and 4, and if you turn in Exhibit 23 to
9 page E785.3, you'll see on the right-hand side
10 that is page 3.
11      Do you see that?
12      A.   I see 785.3, yes, page 3, which
13 is the column, right.
14      Q.   Right.
15      A.   The right-hand column, yep.
16      Q.   All right.  So before we get into
17 specifics, if you can turn back to the first
18 page of Exhibit 23.
19      Do you understand Exhibit 23 to
20 be a copy of a brochure directed to patients?
21      A.   By the date on the back, it's a
22 2006 piece of promotion, and I believe that that
23 is provided to patients often by physicians.  So
24 these were often provided to physicians for

Page 291

1 their selective use with patients that they
2 deemed appropriate.
3      Q.   It's your understanding that this
4 is a 2006 document?
5      A.   Well, that's the date on the back
6 page.
7      MR. TOLIN:  It says 2008.
8      THE WITNESS:  I'm sorry.  That's
9   my glasses not working for me.  It looks
10   like 6 to me.
11      MS. SCULLION:  I agree I think
12   it's 2008.
13 BY MS. SCULLION:
14      Q.   Okay.  I'm sorry.  But this is a
15 brochure that was provided to patients, right?
16      A.   Provided to physicians for their
17 distribution to patients should they see the
18 value in doing that.
19      Q.   A document intended to go to
20 patients eventually, right?
21      A.   Correct.
22      Q.   And you see the front cover at
23 the bottom the logo for Promise Initiative?
24      A.   I do, yes.

Page 292

1      Q.   And do you recall that the
2 Promise Initiative was one aspect of how Endo
3 sought to implement RiskMAP for Opana ER?
4      A.   I'd have to look back at the
5 RiskMAP document to remember explicitly what it
6 was, because beyond that, I don't recall the
7 Promise Initiative, specifically.  I can refer
8 back if you -- if that's important.
9      Q.   Did you -- do you recall, though,
10 that in RiskMAP one of the elements of RiskMAP
11 was to create and distribute, among other
12 things, patient brochures on taking long-acting
13 opioids?
14      A.   Yes.
15      Q.   Okay.  And this was one such
16 brochure, right?
17      A.   Yes.
18      Q.   Okay.  And if you'll try and hold
19 both Exhibit 23 and 22 open at the same time,
20 turning to page 3 of Exhibit 23 of the brochure,
21 I just want to try and match up the language on
22 the page with the language in the claims chart
23 that is Exhibit 22.
24      Do you follow what I'm trying to

Page 293

1 do?
2      A.   Yes, I'm doing that in advance.
3      Q.   And, in particular, the language
4 that I want to focus in on is probably easiest
5 to start with Exhibit 23 under the heading on
6 page 3, "What is the risk of becoming addicted
7 to a long-acting opioid?"
8      The answer is "Addiction is
9 defined as compulsive drug seeking that is
10 beyond a person's voluntary control even if it
11 may cause harm.  Most healthcare providers who
12 treat patients with pain agree that patients
13 treated with prolonged opioid medicines usually
14 do not become addicted."
15      Did I read that correctly?
16      A.   Yes, you did.
17      Q.   And that language, in particular
18 that last sentence, "most healthcare providers
19 who treat patients with pain," that's part of
20 the claim that we asked about in claim 24 in
21 Exhibit 22, correct?
22      A.   That's correct, yes.
23      Q.   Okay.  And with respect to that
24 particular sentence on the right-hand side of

74 (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    the chart, it's called out, that particular
2    sentence, and the citation is to "Definitions
3    Related to the Use of Opioids for the Treatment
4    of Pain, Consensus Statement of the American
5    Academy of Pain Medicine, the American Pain
6    Society and the American Society of Addiction
7    Medicine."
8            Is that right?
9        A.    Yes.
10       Q.    And is that the sole support Endo
11   cited at the time for the sentence most
12   healthcare providers who treat patients with
13   pain, et cetera?
14           MR. LIMBACHER:  Object to form.
15           THE WITNESS:  Yes, I believe
16       that's the case in this particular --
17       the way that this is outlined, that's
18       the support for the statement above.
19       Statement above being pulled out of the
20       claim to the left, I think that's
21       correct.
22   BY MS. SCULLION:
23       Q.    Okay.
24       A.    That's the intention.

Page 295

1        Q.    And then we've got a lot of
2    moving pieces here.
3            MS. SCULLION:  Can we have the
4        definitions.
5            (Document marked for
6        identification as Endo-Lortie Deposition
7        Exhibit No. 24.)
8    BY MS. SCULLION:
9        Q.    I hand you what's been marked as
10   Exhibit 24.
11       A.    Should I keep these open or
12   nearby?
13       Q.    It probably will be useful.
14           And Exhibit 24 is Bates stamped
15   ENDO-OPIOID_MDL-06233148.  Mark that down,
16   Exhibit 24.
17           And Exhibit 24 is the definitions
18   section cited in the claims chart we just looked
19   at, right?
20       A.    Yes.
21       Q.    Okay.  Just one second.
22           MR. LIMBACHER:  Jen, just for the
23       record, I want to object to any
24       questions where you are showing him the

Page 296

1    supporting references and then asking
2    him questions about what is in those
3    supporting references.  I believe Josh
4    Davis made it very clear to you in his
5    e-mail of January 6, 2019 that
6    Mr. Lortie was not going to be prepared
7    to speak as a corporate representative
8    in full substantive or
9    scientific aspects of all support that
10       may be identified in this chart.
11           So if I can have a continuing
12       objection to those types of questions
13       where you're showing him the supporting
14       references and then asking him to match
15       that up with what's in the chart.
16           MS. SCULLION:  I hear your
17       objection.  You can certainly have it on
18       a continuing basis.  I'd just note that
19       our understanding was that although
20       Mr. Lortie might not be prepared to sit
21       here and parse in detail the scientific
22       basis for any particular claim that's
23       cited, that he was to be prepared to
24       speak to the support for those claims.

Page 297

1            In fact, Mr. Davis made something
2        of a point about the burden it would be
3        for Mr. Lortie to be prepared on any
4        additional claims because it had taken
5        so much to prepare him to speak to the
6        claims that we did have in the chart.
7    BY MS. SCULLION:
8        Q.    If you will go to page 2 of
9    Exhibit 24, you see under "Discussion"
10   underlined there is the sentence, "Most
11   specialists in pain medicine and addiction
12   medicine agree that patients treated with
13   prolonged opioid therapy usually do develop
14   physical dependence and sometimes develop
15   tolerance, but do not usually develop addictive
16   disorders."
17           Did I read that correctly?
18       A.    Yes, yes, you did.
19       Q.    And is the little A next to that
20   and the fact that it's underlined, is that an
21   indication that that sentence is what is cited
22   in support of the claim that we've been talking
23   about from claim 24 from the brochure?
24           MR. LIMBACHER:  Object to form,

75 (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1      same objection as stated previously.
2              THE WITNESS:  I'm not sure about
3      the underlining and the A, but if I read
4      that sentence and I see that that's
5      raised as a support -- piece of support
6      for that, I think that that's what the
7      intent is.
8      BY MS. SCULLION:
9          Q.    And the sentence in the
10     definitions that's slated as support for the
11     sentence in the brochure is then followed,
12     though, by another sentence, an important
13     qualifier to the first sentence, right?
14             MR. LIMBACHER:  Object to form.
15     BY MS. SCULLION:
16         Q.    The second sentence says,
17     "However the actual risk is not known and
18     probably varies with genetic predisposition,
19     among other factors."
20             And the next sentence,
21     "Addiction, unlike tolerance and physical
22     dependence, is not a predictable drug effect."
23             Do you see those two following
24     sentences?

Page 299

1          A.    Yes, that's part of the second
2      sentence, but, yes, I read that it follows.
3          Q.    Okay.  Now, you would agree in
4      the brochure, though, there is no such
5      additional information that qualifies the
6      statement "Most healthcare providers who treat
7      patients with pain agree that patients treated
8      with prolonged opioid medicines usually do not
9      become addicted," right?
10             MR. LIMBACHER:  Same objections.
11             THE WITNESS:  It's correct.  The
12     claim is written down and the support is
13     what's cited, but there's no additional
14     qualifier.
15     BY MS. SCULLION:
16         Q.    And so the claim is really only
17     pulling from part of what the definitions in the
18     consensus statement said with respect to the
19     risk of becoming addicted to a long-acting
20     opioid, right?
21             MR. LIMBACHER:  Same objections.
22             THE WITNESS:  There are many
23     paragraphs that follow the cited
24     reference so --

Page 300

1      BY MS. SCULLION:
2          Q.    Right.
3          A.    -- you're correct, the authors
4      did not lift the entirety of the definitions as
5      the claim or as support.
6          Q.    Right.
7              So, I mean, the brochure in
8      answering this question, this important question
9      for patients, "What is the risk of becoming
10     addicted to a long-acting opioid" only cited
11     part of the answer to that question provided in
12     the definitions of the consensus statement,
13     right?
14             MR. LIMBACHER:  Object to form.
15             THE WITNESS:  What I can say to
16     that is that the medical, legal,
17     regulatory professionals who signed off
18     on this felt that that was adequately
19     cited and supported to the extent that
20     it was put forward in a piece of
21     promotion.
22     BY MS. SCULLION:
23         Q.    But you would agree, reading
24     this, the brochure only tells, at best, half the

Page 301

1      story?
2          A.    No, I wouldn't agree with that.
3      I think that there's many paragraphs that follow
4      and that the medical professionals who signed
5      off on that as an appropriate piece of --
6      appropriate citation to support the statement
7      felt that that was adequate and well balanced,
8      and it's not my role to question that.
9          Q.    So you don't think just, you
10     know, putting aside, you know, whether it was
11     your role within Endo to look at these
12     promotional materials, because that wasn't your
13     role at the time, right?
14         A.    That's correct.
15         Q.    You don't think just as an
16     average person looking at a brochure directed to
17     patients with respect to inherently dangerous
18     and risky medications like Opana ER and other
19     long-acting opioids that it would be
20     inappropriate to only answer that "most
21     healthcare providers who treat patients agree
22     that patients treated with prolonged opioid
23     medicines usually do not become addicted" and
24     then not explain that the actual risk is not

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    known and probably varies; you don't think a
2    patient should know the actual risk is not
3    known?
4              MR. LIMBACHER: Object to form
5         and object to the extent it's outside
6         the scope of the topics on which he's
7         been designated as agreed to by counsel.
8              THE WITNESS: And, first of all,
9         I should point out that I do not agree
10        with your characterization of Opana ER
11        as an inherently dangerous medicine. It
12        was safe and effective when used as
13        directed. But going on, my answer
14        remains the same, the medical
15        professionals, whose job it was to
16        determine whether or not the support was
17        adequate, signed off on this, and it's
18        not my place either today or back then
19        to double -- to second-guess that.
20   BY MS. SCULLION:
21        Q.   So whatever they signed off on is
22   good enough for you; you're not going to
23   second-guess it?
24              MR. LIMBACHER: Object to form.

Page 303

1              THE WITNESS: I trust the policy
2         and I trust the FDA who had review
3         rights on any piece of promotion that we
4         put out. Endo never, to my knowledge,
5         received a warning letter back from the
6         FDA, so I think our policy worked.
7    BY MS. SCULLION:
8         Q.   So just because the FDA never
9    caught it and issued a warning letter, that
10   means it was okay?
11             MR. LIMBACHER: Object to form,
12        misstates his testimony.
13             THE WITNESS: I think that's an
14        important consideration.
15   BY MS. SCULLION:
16        Q.   So you don't think that a patient
17   should know the actual risk of addiction in
18   using long-acting opioids was, in fact, unknown?
19             MR. LIMBACHER: Object to form.
20             THE WITNESS: I'm not answering
21        -- I'm not agreeing to that statement.
22        What I'm saying is that the support for
23        the statement and the claim, as
24        indicated here by this -- by the

Page 304

1    citation was adequate for our medical,
2    legal and regulatory professionals, and
3    I'm not going to second-guess that.
4    BY MS. SCULLION:
5         Q.   And within the definitions,
6    there's no actual data cited here for this
7    proposition that most specialists in pain
8    medicine, addiction medicine agree that patients
9    treated with prolonged opioid therapy usually do
10   not develop physical dependence -- usually do
11   develop physical dependence and sometimes
12   develop tolerance, but do not usually develop
13   addictive disorders, there's no actual citation
14   to any survey or study or anything there, right?
15             MR. LIMBACHER: Object to form.
16        The document speaks for itself.
17             THE WITNESS: I think by its
18        definition, it is a consensus statement
19        by knowledgeable bodies who are learned
20        in the field, and it's not a statement
21        that would normally be supported by
22        specific clinical data. That normally
23        would be product A has this effect on
24        pain or product B has this effect on

Page 305

1    blood sugar levels. That's not what's
2    being stated here. This is a consensus
3    statement, a definition and it's cited
4    appropriately.
5    BY MS. SCULLION:
6         Q.   Well, the statement, though, is
7    attempting to quantify the level of agreement
8    about the level of risk of addiction to
9    long-acting opioids, right?
10             MR. LIMBACHER: Object to form.
11             THE WITNESS: Again, it's a
12        consensus statement. By definition, it
13        is what it is.
14   BY MS. SCULLION:
15        Q.   But it's a statement about
16   quantification, correct, quantification of how
17   many providers agree and what they agree about
18   in terms of the level of risk, right?
19             MR. LIMBACHER: Object to form.
20             THE WITNESS: I'm not sure I
21        agree with that, no.
22   BY MS. SCULLION:
23        Q.   Well, when it was cited as
24   support for the statement in the patient

Page 306

1    brochure, the statement in the patient brochure
2    was specifically in response to a question that
3    asked to quantify the risk of becoming addicted
4    to a long-acting opioid, right? So, again, this
5    is a statement about quantifying a risk, right?
6            MR. LIMBACHER: Object to form,
7        misstates the document.
8            THE WITNESS: And I don't know
9        what you mean by "quantify." To me
10       quantify means citing a numerical
11       response. It's saying what is the risk.
12       It's not saying is the risk greater than
13       or equal to X or Y.
14   BY MS. SCULLION:
15       Q.   Right.
16           So but what is the risk is
17   something that you would quantify, right? Is it
18   a low risk? Is it a high risk? Those are
19   quantifications of risk, correct?
20           MR. LIMBACHER: Object to form,
21       compound question and asked and
22       answered.
23           THE WITNESS: Yeah, I think we've
24       answered that. I mean, it's a consensus

Page 307

1        statement by a number of bodies who are
2        expert in the field, and it's cited
3        appropriately to support the statement.
4    BY MS. SCULLION:
5        Q.   Going, though, back to the
6    brochure that was intended to be provided to
7    patients, this is intended to answer to them --
8    for them the question of what is the risk of
9    becoming addicted to a long-acting opioid.
10   Don't you agree that the average patient reading
11   that would understand that the answer was
12   quantifying for them what the relative level of
13   risk was of becoming addicted to a long-acting
14   opioid?
15           MR. LIMBACHER: Object to form
16       and foundation.
17           THE WITNESS: I think that the
18       support here, in my view, and in the
19       view of our medical professionals or
20       those who were in place in the 2008
21       period felt that this was adequate
22       support, and I don't know what else I
23       can say.
24           MS. SCULLION: Move to strike.

Page 308

1        That was not the question.
2    BY MS. SCULLION:
3        Q.   The question is don't you think
4    the average patient getting this brochure is
5    going to read that question and understand that
6    this brochure is attempting to answer for them
7    how to quantify the risk of becoming addicted to
8    a long-acting opioid?
9            MR. LIMBACHER: Object to form
10       and foundation.
11           THE WITNESS: I'm not sure that's
12       true. That's not how I read this.
13   BY MS. SCULLION:
14       Q.   What else does it mean when the
15   question is "What is the risk of becoming
16   addicted to a long-acting opioid?"
17           MR. LIMBACHER: Object to form.
18           THE WITNESS: I think the company
19       attempted to answer that risk by citing
20       the consensus statement.
21   BY MS. SCULLION:
22       Q.   Well, but the company didn't cite
23   the consensus statement, right? It didn't cite
24   the consensus statement by name here in the

Page 309

1    brochure, and we've already established the
2    company did not, in fact, put in the complete
3    answer, even in the consensus statement
4    definitions, to that question, correct?
5            MR. LIMBACHER: Object to form.
6        Which question would you like him to
7        answer?
8            THE WITNESS: No, I don't agree
9        with that. Again, if the company -- if
10       what you're saying is the only
11       appropriate action on behalf of the
12       company would have been to send the
13       consensus statement to the patient, I
14       would contend that that would be very
15       unhelpful and uninterpretable by the
16       patient.
17           There's a claim made. It passes
18       through the legal, medical and
19       regulatory process, and it is cited by a
20       consensus statement.
21   BY MS. SCULLION:
22       Q.   You understand that the part of
23   this lawsuit, though, is about whether, in fact,
24   those claims, despite having passed through the

Highly Confidential - Subject to Further Confidentiality Review

---

Page 310

1  process, were supported, right?
2          MR. LIMBACHER: Object to form,
3  foundation.
4          THE WITNESS: I understand that
5  that's the topic that we're talking
6  about here.
7  BY MS. SCULLION:
8      Q.   Right.
9          And so trying to understand
10  whether, in fact, despite it having passed
11  through the process at Endo, was it fairly
12  supported, and in response to this question for
13  patients, "What is the risk of becoming addicted
14  to a long-acting opioid," Endo did not put in
15  the brochure that the actual risk is not known,
16  didn't tell the patients that important fact,
17  right?
18          MR. LIMBACHER: Object to form,
19  asked and answered.
20          THE WITNESS: The claim is -- the
21  claim that's in the brochure, we can
22  read the claim and we can read the
23  supportive documentation, and the
24  medical professionals and the legal and

---

Page 311

1  regulatory professionals felt that that
2  was adequate, and I'm not in a position
3  to defend that or contradict that. That
4  was their job. That's the job of the
5  process, and it's the company's
6  contention that that was adequately
7  supported.
8  BY MS. SCULLION:
9      Q.   And we know that that process,
10  though, resulted in a brochure that did not, in
11  fact, tell patients the actual risk is unknown,
12  right?
13          MR. LIMBACHER: Object to form.
14  BY MS. SCULLION:
15      Q.   Didn't tell them that?
16          MR. LIMBACHER: Foundation,
17  outside the scope of the topics on which
18  he's been designated.
19  BY MS. SCULLION:
20      Q.   Doesn't say it, right?
21      A.   Those words are not in there.
22      Q.   That's right.
23      A.   But it's -- the significance of
24  that I'm not sure what we can agree on.

---

Page 312

1      Q.   Now, in the consensus statement
2  is a consensus statement, if you go to page 3 of
3  Exhibit 24, consensus statement of the American
4  Academy of Pain Medicine, correct?
5      A.   Sorry. Let me just catch up
6  here.
7      Q.   Sure, the bottom of page 3.
8      A.   It's actually in the middle of
9  page 3, I think, right?
10      Q.   I'm looking at the page that's
11  labeled in the lower left-hand corner 3 of 4,
12  and underneath it says the date on which it was
13  approved by the AAPM Board of Directors,
14  February 13th, 2001.
15          Do you see that?
16      A.   Okay. I'm sorry I was on the
17  cover where the three organizations were listed.
18  I think they're probably the same ones, but so
19  I'll go to your page.
20      Q.   Let's -- I want to go -- be
21  specific on page 3 of 4, you see after the
22  definitions it says "Approved by the AAPM Board
23  of Directors on February 13, 2001."
24      A.   Yes.

---

Page 313

1      Q.   And the AAPM is American Academy
2  of Pain Medicine, right?
3      A.   Yes.
4      Q.   And the American Academy of Pain
5  Medicine was recognized as the industry-friendly
6  organization, correct?
7          MR. LIMBACHER: Object to form.
8          THE WITNESS: I don't know. I
9  don't know that.
10          (Document marked for
11  identification as Endo-Lortie Deposition
12  Exhibit No. 25.)
13  BY MS. SCULLION:
14      Q.   Let me hand you what's been
15  marked Exhibit 25. And Exhibit 25 is Bates
16  stamped ENDO-CHI_LIT-00051623, and we stamped it
17  E1605 at the top right-hand corner.
18          And, Mr. Lortie, you see on the
19  cover of E-25 is an e-mail at the very top from
20  David Lee to Nancy Santilli in September of 2010
21  attaching a copy of the Issues Management
22  Strategy developed prior to launch of Opana ER.
23          Do you see that?
24          MR. LIMBACHER: Take your time

---

79 (Pages 310 to 313)

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1     and read the document.
2          THE WITNESS:  I see the e-mail,
3     yes.
4     BY MS. SCULLION:
5          Q.    Okay.  And then just going to the
6     attachment to the e-mail, looking at the very
7     first page of the attachment entitled "Public
8     Stakeholder Strategy for Oxymorphone."
9          Do you see that?
10         A.    I'm sorry I'm still on the e-mail
11    trying to make sure I understand the context.
12         Q.    Sure.
13         A.    Now I'll take a look through the
14    slide deck.
15         Q.    Sure.  Just to orient you, the
16    first page of the slide deck, it's up here on
17    the screen, "Public Stakeholder Strategy for
18    Oxymorphone."
19         Do you see that?
20         A.    Yes.
21         Q.    It was prepared for Endo
22    Pharmaceuticals by its consultant Michael Bolen,
23    correct?
24         A.    I assume the date field is one of

Page 315

1     these that automatically updates, because I
2     don't think this was created three or four days
3     ago.
4          Q.    Yeah, if you're talking about the
5     date in the lower left-hand corner 1/21/2019,
6     yes, our understanding is that date populates
7     automatically when we print the document.
8          A.    We'll -- this was back in 2010 so
9     apparently --
10         Q.    Actually, according to the
11    e-mail, it was forwarded on to Nancy Santilli in
12    September of 2010, but Mr. Lee explains that it
13    was developed prior to launch of Opana ER.
14         Do you see that?
15         A.    Thank you.  Yes, I do.  That's
16    helpful.
17         Q.    Okay.  And then if you go within
18    the Public Stakeholder Strategy for Oxymorphone
19    document, if you go to page 6 of the document.
20         MR. LIMBACHER:  Take your time,
21         review the document.
22    BY MS. SCULLION:
23         Q.    You see it's entitled -- I'm
24    sorry, I think it's -- yeah, this one.

Page 316

1     "Prioritize Outreach to Third Party Groups --
2     Select Tier One Advocates."
3          Do you see that?
4          A.    I'm not quite there yet.  Give me
5     a moment, if you would.
6          Q.    Sure.
7          A.    Okay.  And you were pointing me
8     to page 6, I believe?
9          Q.    Yes, page 6 explains to
10    "Prioritize Outreach to Third Party Groups --
11    Select Tier One Advocates."
12         Do you see that?
13         A.    Yes.
14         Q.    And then it explains the criteria
15    for being selected as a tier one advocate
16    includes -- let's look at the third bullet
17    point, "Strong focus on promoting improved
18    patient and/or provider access to pain
19    management."
20         Did I read that correctly?
21         A.    I see that, yes.
22         Q.    All right.  And then if you go to
23    page 15 of the deck, you'll see it identifies as
24    a "First Tier," so meeting those criteria,

Page 317

1     "Professional Pain Management Advocacy
2     Organizations," and here it's listed the
3     "American Academy of Pain Medicine," and that
4     was the same organization that was one of the
5     organizations approving of the consensus
6     statement we were examining, correct?
7          MR. LIMBACHER:  Object to form,
8          and I would object to the extent these
9          questions fall outside the scope of the
10         topics on which he's been designated.
11         THE WITNESS:  Sorry, question?
12    BY MS. SCULLION:
13         Q.    It's the same organization,
14    right, the American Academy of Pain Medicine,
15    and that's the same organization that signed off
16    in part on the consensus statement, right?
17         A.    They were -- yes, that's one of
18    the organizations cited within the consensus
19    statement, correct.
20         Q.    And on this page, third bullet
21    point, Endo's consultant explains one of the
22    reasons that American Academy of Pain Medicine
23    is identified as a first tier advocacy
24    organization is that it is "industry friendly,"

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  correct?
2          MR. LIMBACHER:  Object to form.
3          THE WITNESS:  I see that written
4      there, yes.
5  BY MS. SCULLION:
6      Q.    And under that it says "Endo
7  advisors and speakers bureau active members."
8      Do you see that?
9      A.    I do, yes.
10      Q.    And the speakers bureau were --
11  was a effort by Endo to have various healthcare
12  providers who would go around and speak to
13  physicians and other providers about Endo's
14  products, correct?
15          MR. LIMBACHER:  Object to form
16      and object to the extent it's beyond the
17      scope of the topics on which he's been
18      designated.
19          THE WITNESS:  Speakers bureaus by
20      definition are used by companies, Endo
21      and others, to provide scientific
22      information and background in a variety
23      of different venues.
24  BY MS. SCULLION:

Page 319

1      Q.    And they're paid by Endo to do
2  that; they were when you were there?
3      A.    Well, from time to time.  I mean,
4  typically, speakers bureaus are compensated, as
5  are scientific advisors and often there's
6  overlap.
7      Q.    Right.
8      So both advisors and speakers
9  bureau participants would be compensated by
10  Endo, correct?
11          MR. LIMBACHER:  Object to form
12      and, again, object as beyond the scope
13      of the topics on which he's been
14      designated.
15          THE WITNESS:  Yeah, I mean, in
16      general, but in this context I don't
17      know specifically how Endo advisors and
18      speakers bureau active members relates
19      to the American Academy of Pain
20      Medicine, so I can't agree to that
21      statement.  I don't know that to be the
22      case.
23  BY MS. SCULLION:
24      Q.    It says -- it's referring to the

Page 320

1  fact that Endo advisors, Endo paid advisors and
2  Endo paid speaker bureau participants were also
3  active members in this industry friendly
4  organization; that's what it's saying, right?
5          MR. LIMBACHER:  Same objections.
6          THE WITNESS:  Yeah, I'm not sure
7      that's what it's saying.
8  BY MS. SCULLION:
9      Q.    Okay.
10      A.    I will also say, though, on slide
11  number 6 where you pointed me earlier, one of
12  the key criteria for a tier one advocate was
13  that it was respected and credible, so I just
14  wanted to point that out.  That's also
15  important.  Consensus statements are not written
16  to benefit any company, they're written to stand
17  alone and be supported by evidence, and I just
18  want to make that point.
19      Q.    Right.
20      But in addition to being
21  respected and credible, because there's other
22  organizations that are respected and credible,
23  to be an actual tier one advocate, there had to
24  be a strong focus on promoting improved patient

Page 321

1  and/or provider access to pain management,
2  correct?
3          MR. LIMBACHER:  Object to form
4      and, again, object as outside the scope
5      of the topics on which he has been
6      designated.
7          The subject of Endo's
8      relationship with the American Academy
9      of Pain Medicine is specifically
10      referenced in topic number 36 of your
11      30(b)(6) deposition notice, and this
12      witness has not been designated to
13      testify with regard to topic number 36.
14          MS. SCULLION:  Counsel, objection
15      to beyond the scope is just fine.  I
16      think you're now crossing a line to try
17      to coach the witness.
18          MR. LIMBACHER:  I'm not coaching
19      the witness.
20          MS. SCULLION:  It's -- it is
21      beyond --
22          MR. LIMBACHER:  I'm trying to
23      gently suggest to you, counsel --
24          MS. SCULLION:  Counsel, if you

81 (Pages 318 to 321)

Page 322

1  let me finish my statement, I let you
2  finish yours.
3      MR. LIMBACHER:  -- that you are
4  asking questions that go well beyond the
5  scope of what you know this witness has
6  been designated for.
7      MS. SCULLION:  And you know that
8  we asked for this witness both with
9  respect to his 30(b)(6) topics and in
10  his personal capacity.  If it is indeed
11  beyond the topic, which I don't agree,
12  he's perfectly welcome to answer the
13  questions in his personal capacity.
14      MR. LIMBACHER:  Well, you're not
15  going to get 14 hours of questioning of
16  this witness in his individual capacity.
17  You have to make a decision as to
18  whether or not you're asking him
19  questions in his role as a 30(b)(6)
20  witness or not.  We have an agreement
21  that we memorialized at the outset of
22  this deposition that unless you make it
23  clear that you are asking him questions
24  about 30(b)(6), then he's answering

Page 323

1  these questions in his role as a fact
2  witness, but you have told us that all
3  of the questions with regard to this
4  chart are in his capacity as a 30(b)(6)
5  witness, but the questions you are now
6  asking with regard to the American
7  Academy of Pain Medicine fall well
8  outside the scope of the topics on which
9  he has been designated and, in fact, are
10  specifically referenced in topic 36.
11      MS. SCULLION:  Right, so we
12  disagree.  I think they're also
13  encompassed within topic 37.  I suggest
14  we just -- you just say object to the
15  scope and we deal with it at some other
16  time if needed, but let's -- I think we
17  should move on with the testimony.
18  BY MS. SCULLION:
19      Q.   And then one of the other
20  organizations, going back to Exhibit 24, which
21  is the definitions and consensus statement, one
22  of the other organizations that approved the
23  definitions that you've cited was the American
24  Pain Society, and that's at page 3 of 4 of

Page 324

1  Exhibit 24, correct?
2      A.   I'm looking for that.
3      Q.   Sure.  At the very bottom
4  underneath the approval by the AAPM, you next
5  have approved by the APS Board of Directors.
6      Do you see that?
7      A.   And then under that it says
8  American Pain Society, correct?
9      Q.   Correct.
10      MR. LIMBACHER:  Same objections,
11  counsel.  And, again, American Pain
12  Society is specifically referenced in
13  topic 36.
14  BY MS. SCULLION:
15      Q.   And then if you go back to
16  Exhibit 25, you also see that American Pain
17  Society is also identified as a tier one
18  advocate, and that is at -- if you go to page --
19  where we were -- page 15, it says "First Tier
20  Professional Pain Management Advocacy
21  Organizations," right, so it's going to be
22  listing multiple organizations.  The first one
23  we've been through the American Academy of Pain
24  Medicine.

Page 325

1      Go to the next page, the next of
2  those first tier professional pain management
3  advocacy organizations is the American Pain
4  Society, correct?
5      MR. LIMBACHER:  Same objections,
6  beyond the scope.
7      THE WITNESS:  On top of page 16,
8  I see "American Pain Society," yes.
9  BY MS. SCULLION:
10      Q.   Okay.  And if you go back to
11  Exhibit 24, I think we've seen before that the
12  AAPM, American Academy of Pain Medicine and the
13  American Pain Society as well as the American
14  Society of Addiction Medicine signed off on this
15  definition as of February of 2001, correct?
16  That's what it says?
17      A.   That is what it says, yes.
18      Q.   Okay.  And as of that time,
19  February 2001, Endo had paid each of the AAPM
20  and the APS tens of thousands of dollars,
21  correct?
22      MR. LIMBACHER:  Object to form,
23  foundation, beyond the scope of the
24  topics on which he's been designated.

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    THE WITNESS: That predates me by
2    many, many years. I have no idea what
3    Endo's funding policies or practices
4    were in 2001.
5    BY MS. SCULLION:
6    Q.    During the time that you were
7    with Endo, you were aware that Endo paid each of
8    those organizations certain monies?
9    A.    No, not specifically.
10    MR. LIMBACHER: Object to form
11    and foundation, beyond the scope of the
12    topics on which he's been designated.
13    BY MS. SCULLION:
14    Q.    With respect to the payments as
15    of 2001, I won't burden the record here, but I
16    would note that they're specifically identified
17    in, among other places, Endo's July 2012 --
18    yeah, June 2012, June 15, 2012 submission to
19    Senators Max Baucus and Charles Grassley in
20    connection with their inquiries into the
21    promotion of opioids.
22    MR. LIMBACHER: Same objections
23    and move to strike.
24    BY MS. SCULLION:

Page 327

1    Q.    Now, if we go back to the
2    brochure, back to Exhibit 23, the brochure.
3    Looking at the language there, "Most healthcare
4    providers who treat patients with pain agree
5    that patients treated with prolonged opioid
6    medicines usually do not become addicted."
7    That's an indication at least -- sorry, that's a
8    representation of some level of agreement that
9    the risk of addiction to -- from the use of
10    opioids for chronic pain is low, correct?
11    MR. LIMBACHER: Object to form.
12    THE WITNESS: Can you ask a
13    question? You made a statement there.
14    BY MS. SCULLION:
15    Q.    I'm asking that's -- it's a
16    representation of --
17    A.    What's the question?
18    Q.    -- an agreement that the risk of
19    addiction from the use of opioids in treatment
20    of chronic pain for prolonged use, let's put it
21    that way, is low?
22    MR. LIMBACHER: Object to form.
23    THE WITNESS: Yeah, I disagree.
24    Again, it goes back to our previous

Page 328

1    discussion on quantification. I think
2    the statement stands on its own.
3    BY MS. SCULLION:
4    Q.    What does "usually do not become
5    addicted" mean if it doesn't mean that it's low?
6    MR. LIMBACHER: Object to form.
7    THE WITNESS: But I don't know
8    what low means in this case, so I'm not
9    prepared to quantify that.
10    BY MS. SCULLION:
11    Q.    Would you agree that it means
12    most of the time it does not occur, usually do
13    not become means most of the time not?
14    MR. LIMBACHER: Object to form
15    and beyond the scope of the topics on
16    which he's been designated.
17    BY MS. SCULLION:
18    Q.    Would you agree with that?
19    A.    Would I agree with what?
20    Q.    That usually do not become
21    addicted mean most of the time does not become
22    addicted, that's the representation?
23    MR. LIMBACHER: Same objections.
24    THE WITNESS: I think that that's

Page 329

1    fair.
2    BY MS. SCULLION:
3    Q.    And you're aware that the FDA
4    specifically struck such language from Endo's
5    label for Opana ER, correct?
6    MR. LIMBACHER: Object to form,
7    foundation, beyond the scope of topics
8    for which he's been designated.
9    THE WITNESS: I'm not aware of
10    that specifically, no.
11    MS. SCULLION: Okay. Can we have
12    the binder of labels. Can we mark these
13    as the next four exhibits.
14    (Documents marked for
15    identification as Endo-Lortie
16    Deposition Exhibit Nos. 26, 27, 28 and
17    29.)
18    BY MS. SCULLION:
19    Q.    I'm going to hand you a binder
20    with exhibits that have been marked Exhibits
21    27 --
22    A.    Mine starts with 26.
23    Q.    Twenty-six, that's what I got
24    wrong, thank you, 26, 27, 28 and 29.

83  (Pages 326 to 329)

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    And let's start with Exhibit 26,
2   which is Bates stamped ENDO-OPIOID_MDL00291042,
3   and we've marked it in the upper right-hand
4   corner E1407.1.
5        Mr. Lortie, do you recognize this
6   as Endo's Application Summary for oxymorphone
7   extended release ER tablets, and then there's a
8   code name EN3202 dated November 23rd, 2005?
9        MR. LIMBACHER:  And, counsel, at
10  this point, are we asking him questions
11  in his capacity as a fact witness or as
12  a 30(b)(6) witness?
13        MS. SCULLION:  As a 30(b)(6)
14  witness.
15        MR. LIMBACHER:  And under what
16  topic are you asking him these
17  questions?
18        MS. SCULLION:  These all go to
19  topic 13.
20        MR. LIMBACHER:  I'm sorry?
21        MS. SCULLION:  Topic 13.
22        MR. LIMBACHER:  I would object to
23  questions with regard to labeling as
24  being outside the scope of what he has

Page 331

1   been designated for on topic 13.
2        MS. SCULLION:  So on topic 13 it
3   goes to the support for the statements
4   in the brochure because, as we
5   understand, those were specifically
6   prohibited by the FDA, and that's why
7   the labeling history will show that,
8   just to give the connection.
9        MR. LIMBACHER:  And my objection
10  stands.
11  BY MS. SCULLION:
12       Q.   Do you recognize Exhibit 26 as
13  that application summary by Endo?
14       A.   I read that's what the title is.
15  This is not a document I would have referred to
16  or seen in the normal course of my time there,
17  so I don't recognize it, but the title suggests
18  that it is what you represent.
19       Q.   Okay.  If you go to page E1407.18
20  under the heading "Misuse, Abuse and Diversion
21  of Opioids."
22       A.   Yes.
23       Q.   Oh, I'm so sorry I think I
24  misspoke.  It's 1407.18?

Page 332

1       A.   That's what you said.
2       Q.   Thank you.  The screen was not
3   caught up.  That's okay.  I think I spoke a
4   little too quickly.
5       A.   I'm looking at the book, not the
6   screen.
7       Q.   Under "Misuse, Abuse and
8   Diversion of Opioids," the fourth paragraph
9   down, do you see that Endo said in its
10  original -- in its submission here, second and
11  third sentences, "The development of addiction
12  to opioid analgesics in properly managed
13  patients with pain has been reported to be rare.
14  However, data are not available to establish the
15  true incidence of addiction in chronic pain
16  patients."
17        Do you see that?
18        MR. LIMBACHER:  Object to form
19  and foundation, and, counsel, can I have
20  a continuing objection to questions with
21  regard to Exhibits 26 through 29 as
22  being outside the scope of the topics on
23  which he's been designated as a 30(b)(6)
24  witness?

Page 333

1        MS. SCULLION:  Sure.
2        MR. LIMBACHER:  Thank you.
3        THE WITNESS:  Yes, I read that
4   paragraph.
5   BY MS. SCULLION:
6       Q.   And those sentences are similar
7   to what we saw in the consensus statement
8   definitions, Exhibit 24, correct?
9       A.   I'm not sure I agree.  I mean, we
10  can look back at that if you want to parse it
11  specifically.
12       Q.   That's okay.  I think we've gone
13  through that in enough detail already.
14        But you would agree, though, that
15  as of the date of this submission, Endo agreed
16  that data are not available to establish the
17  true incidence of addiction in chronic pain
18  patients?  That's what Endo told the FDA in this
19  submission, right?
20        MR. LIMBACHER:  Objection, form
21  and foundation.
22        THE WITNESS:  That's what's
23  represented here in the paragraph in
24  this submission, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1 BY MS. SCULLION:
2       Q.    And then if you go to Exhibit
3 Number 27, which is next in your binder, and
4 it's Bates stamped ENDO-OPIOID_MDL-00299099, in
5 the upper right-hand corner we've labeled it
6 E1408.
7           Do you see this is a letter from
8 Bob Barto, senior director regulatory affairs,
9 to Dr. Bob Rappaport at the FDA dated June 30th,
10 2006?
11          MR. LIMBACHER:  Same objections
12      as stated previously.
13          THE WITNESS:  I see that.
14 BY MS. SCULLION:
15      Q.    And the second paragraph do you
16 see that Mr. Barto references an e-mail from
17 Lisa Basham, regulatory health project manager,
18 I'll represent to you she is from the FDA, to
19 Mr. Barto, and he says, "In the aforementioned
20 e-mails, Ms. Basham-Cruz relayed the following
21 request from the Division," and then he has text
22 that carries over to the next page, E1408.2, and
23 do you see the second full paragraph on 1408.2
24 has the text we were just looking at in Endo's

Page 335

1 original labeling submission, but the FDA has
2 asked for both of those sentences to be crossed
3 out and removed from the label, correct?
4           MR. LIMBACHER:  Objection, form
5      and foundation, beyond the scope and
6      predates his employment at the company.
7           THE WITNESS:  Yeah, that language
8      is struck.  This is a CBE 30, a changes
9      being effective.  What I don't know, and
10      I don't know where this lies with regard
11      to the initial marketing of the product,
12      or my other question is to what extent
13      is the agency asking for alignment to
14      the -- the labeling that's exactly
15      similar across opioids.  So those are a
16      couple questions I can't answer that
17      with this in front, but those are
18      questions that are raised.
19           So I don't know if the agency
20      struck this to make sure that the Opana
21      label before use for the first time was
22      in align to category-wide labeling or if
23      it was done in some other
24      correspondence.  We don't have the

Page 336

1 actual correspondence to refer to, but
2 anyway.
3 BY MS. SCULLION:
4       Q.    But you would agree, though, that
5 the agency, the FDA did specifically strike from
6 the initial labeling submission the statement
7 that "the development of addiction to opioid
8 analgesics in properly managed patients with
9 pain has been reported to be rare," that was
10 stricken, right?
11          MR. LIMBACHER:  Objection, form
12      and foundation and beyond the scope.
13          THE WITNESS:  Correct.  They
14      struck those last sentences in that
15      paragraph.
16 BY MS. SCULLION:
17      Q.    Okay.  And on the assumption that
18 the agency never changed that position, you
19 would agree that Endo could not make assertions
20 in its promotional materials that the
21 development of addiction to opioid analgesics in
22 properly managed patients with pain has been
23 reported to be rare, couldn't make that
24 statement, right?

Page 337

1           MR. LIMBACHER:  Objection, form
2      and foundation and beyond the scope.
3           THE WITNESS:  Well, I think it
4      would depend on when they made the
5      statement, what the language in the
6      label was that was then current at that
7      time, that would be important for the
8      group to refer to when they approved
9      such use of such a claim.
10 BY MS. SCULLION:
11      Q.    But if the FDA never approved
12 that language, you couldn't then say it in
13 promotional materials, for example, right?
14          MR. LIMBACHER:  Same objections.
15          THE WITNESS:  The important thing
16      to consider is labeling changes over
17      time, so it's the label that's in effect
18      at that moment that defines and supports
19      whether or not a given claim can be
20      made.  So I can't draw that conclusion
21      for 2008 piece from this.  It may be
22      true, but it also may not be.
23 BY MS. SCULLION:
24      Q.    But if it was, in fact, true that

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    in the label in effect as of the June 10 -- the
2    2008 piece that it did not include language with
3    respect to the development of addiction being
4    reported to be rare, that Endo should not be
5    saying that the risk of addiction is rare,
6    right?
7              MR. LIMBACHER:  Same objections.
8              THE WITNESS:  Yeah, but you're
9    asking me to speculate on what the label
10   was at the time, and, also, I'm not a
11   regulatory, medical or legal
12   professional, so we left those
13   determinations to be made by the team
14   that -- whose job it was to do that.
15             MR. LIMBACHER:  Are we at a good
16   stopping point?
17             MS. SCULLION:  Yeah, we can stop
18   there.
19             MR. LIMBACHER:  Thank you.
20             THE VIDEOGRAPHER:  The time is
21   4:43.  We're going off the record.
22             (Brief recess.)
23             THE VIDEOGRAPHER:  The time is
24   5:00 p.m.  We are now back on the

Page 339

1            record.
2    BY MS. SCULLION:
3         Q.   Mr. Lortie, welcome back.  I'm
4    going to ask you some questions in your personal
5    capacity.
6         A.   Okay.
7         Q.   Sure is good news to counsel's
8    ears at this point.
9              Mr. Lortie, when you were with
10   Endo, you recall that Endo -- sorry, Endo sought
11   FDA approval for a reformulated version of Opana
12   ER?
13        A.   Correct.
14        Q.   And Endo initially sought
15   approval for claims that the reformulated
16   version of Opana ER was crush resistant,
17   correct?
18             MR. LIMBACHER:  Object to form.
19             THE WITNESS:  That's correct.
20   BY MS. SCULLION:
21        Q.   Okay.  And the FDA did not grant
22   the claim of crush resistance, correct?
23             MR. LIMBACHER:  Object to form,
24        misstates the evidence.

Page 340

1              THE WITNESS:  Not necessarily.
2    The FDA responded to the submission of
3    the material and accepted certain claims
4    and certain language and asked us not to
5    use other language.  We made appropriate
6    revisions with the -- then sent FDA the
7    material as per the requirements and put
8    the revised version into use.
9    BY MS. SCULLION:
10        Q.   Did Endo allow its sales reps to
11   describe the reformulated version of Opana ER as
12   crush resistant?
13             MR. LIMBACHER:  Object to form,
14        foundation.
15             THE WITNESS:  The specific
16   language that was used for a period of
17   time upon agreement, you know reflection
18   on the FDA's comments and, again,
19   through our medical, legal and
20   regulatory review process was designed
21   to be crush resistant.  That was the
22   language that was used.
23   BY MS. SCULLION:
24        Q.   Right.

Page 341

1              And sales reps were specifically
2    instructed not to describe the reformulated
3    version of Opana ER as crush resistant but to
4    use the specific phrase designed to be crush
5    resistant, right?
6              MR. LIMBACHER:  Object to form.
7              THE WITNESS:  The way it was
8    represented was designed to be crush
9    resistant, and then every time that was
10   used, there was also a prominent warning
11   that said the -- and I'm parsing the
12   words here, but the degree to which that
13   conferred abuse resistance has not yet
14   been determined.
15   BY MS. SCULLION:
16        Q.   Right.
17             So it was Endo agreed that it did
18   not yet have data to show that the reformulated
19   version of Opana ER was abuse deterrent, right?
20   That's why it had that qualifying language,
21   correct?
22             MR. LIMBACHER:  Object to form,
23        foundation.
24             THE WITNESS:  Just to be

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1       accurate, the data was in evolution.  We
2       had not yet submitted that data to the
3       FDA and had FDA's endorsement of a label
4       change, very long process, very
5       well-defined.  So we were developing
6       that data in real time, of course, until
7       that was approved by the agency, no
8       label change could be made.
9   BY MS. SCULLION:
10      Q.    Right.
11            And no promotion of reformulated
12  Opana ER could be made that it was abuse
13  deterrent until the FDA had approved that,
14  right?
15            MR. LIMBACHER:  Object to form.
16            THE WITNESS:  Until the FDA would
17      have allowed label claims as to the
18      clinical relevance of the design to be
19      crush resistant, it was just simply
20      designed to be crush resistant with the
21      disclaimer that said the degree to which
22      that confers abuse resistance has not
23      been determined.
24  BY MS. SCULLION:

Page 343

1       Q.    Right.
2             And so to circle back then, the
3   product could be described as designed to be
4   crush resistant, but it could not be described
5   as crush resistant?
6             MR. LIMBACHER:  Object to form.
7             THE WITNESS:  My recollection is
8       designed to be crush resistant, but
9       could not be described as having abuse
10      deterrent relevance at that point, given
11      that the data had not been submitted.
12  BY MS. SCULLION:
13      Q.    Well, could Endo have described
14  the reformulated version of Opana ER in its
15  promotional materials as just crush resistant?
16  Could it have used that phrase without designed
17  to be?
18            MR. LIMBACHER:  Object to form.
19  BY MS. SCULLION:
20      Q.    Is that permitted?
21            MR. LIMBACHER:  And foundation.
22            THE WITNESS:  We didn't submit
23      that to the agency, to my recollection.
24      We landed on the designed to be crush

Page 344

1       resistant because we felt that that
2       provided important information to
3       physicians who wanted to know what was
4       the difference between the new and the
5       old and recognizing that there was going
6       to be a period of time where the
7       clinical trial to hopefully bring about
8       the abuse deterrent language was in
9       process, so designed to be crush
10      resistant with the prominent disclaimer
11      was where the company landed, and that's
12      what was put into commercial use.
13  BY MS. SCULLION:
14      Q.    And FDA had never signed off of
15  on just the phrase crush resistant, right?
16            MR. LIMBACHER:  Object to form.
17  BY MS. SCULLION:
18      Q.    Just had never signed off on
19  that?
20            MR. LIMBACHER:  Object to form
21  and foundation.
22            THE WITNESS:  I don't recall
23      specifically.  I don't know that we had
24      ever asked them just to sign off on

Page 345

1       that.
2             They had seen the designed to be
3       crush resistant in a submission, and
4       they allowed that to go forward, but
5       crush resistant as a stand-alone was
6       never used as a stand-alone, no, claim.
7   BY MS. SCULLION:
8       Q.    I'm sorry, so this really is a
9   yes or not question.  The FDA did not ever sign
10  off on just the phrase crush resistant, right?
11            MR. LIMBACHER:  Object to form,
12      and he responded by saying I don't
13      recall specifically.  It is not a yes or
14      no question, counsel.  Object to form
15      and foundation, asked and answered.
16            THE WITNESS:  Yeah, again, just
17      to be clear, I don't recall us ever
18      asking them to sign off on that.
19  BY MS. SCULLION:
20      Q.    Right, I understand that you
21  don't recall ever asking.  So did FDA -- do you
22  know whether FDA ever signed off on the phrase
23  crush resistant?
24            MR. LIMBACHER:  Object to form

87  (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    and foundation, asked and answered.
2        THE WITNESS:  If my position is
3    that I don't recall us even asking them,
4    how can I know if they -- how can I
5    answer that they never did?  I don't
6    believe we ever asked them that as a
7    stand-alone.  We certainly never put
8    that in use as a stand-alone.  So to
9    answer whether or not they allowed that,
10   I don't have a ground -- I don't have a
11   basis to answer that question.
12   BY MS. SCULLION:
13       Q.    And, as you said, Endo decided to
14   use the phrase designed to be crush resistant to
15   describe reformulated Opana ER, correct?
16       MR. LIMBACHER:  Object to form.
17       THE WITNESS:  Yes, that again
18   always accompanied by the appropriate
19   disclaimer.  That was what we put into
20   use.
21       (Document marked for
22   identification as Endo-Lortie Deposition
23   Exhibit No. 30.)
24   BY MS. SCULLION:

Page 347

1        Q.    Okay.  Let me show you what's
2    been marked as E14 -- I'm sorry, Exhibit 30.
3        Exhibit 30 is Bates stamped
4    ENDO-CHI_LIT00206530, and it's stamped in upper
5    right-hand corner E1497.
6        And do you recognize Exhibit 30
7    as an e-mail chain, which includes an e-mail
8    from you to Kristin Vitanza dated May 15th, 2012
9    concerning the new language for the OER selling
10   piece?
11       MR. LIMBACHER:  Take your time
12   and review the document.
13       THE WITNESS:  You said 1497,
14   correct?
15       MS. SCULLION:  Yeah.
16       THE WITNESS:  So let me just take
17   a look from the beginning to orient
18   myself.
19       (Witness reviews document.)
20       Okay.  Thank you.  I've reviewed
21   it.
22   BY MS. SCULLION:
23       Q.    Okay.  And Exhibit 30 is an
24   e-mail chain that concerns designing a selling

Page 348

1    piece for reformulated version of Opana ER using
2    the phrase designed to be crush resistant,
3    right?
4        A.    Yes, that's correct.
5        Q.    And Ms. Vitanza is writing
6    concerning the MARC review process for such a
7    piece, correct?
8        A.    She references that among other
9    things, yes.
10       Q.    And you say to her in your e-mail
11   at the top of page E1497.1, in terms of the MARC
12   review process for such a piece, "I suggest
13   accelerating and going straight to escalation,"
14   correct?
15       A.    Yes.
16       Q.    So you were advising her to have
17   an accelerated MARC review for this piece,
18   correct?
19       A.    No, no, that's not what it's
20   saying.
21       Q.    What does -- what did you mean by
22   "I suggest accelerating and going straight to
23   escalation"?
24       A.    In order -- as I read through the

Page 349

1    memo here, there was a desire to have a piece
2    ready for an upcoming sales meeting, so for
3    training on the sales meeting.  Kristin's
4    earlier e-mail suggests that it may be difficult
5    to get that into the normal MARC review schedule
6    because certain people were out of the office.
7        So one of the opportunities to
8    get the -- get something in that circumstance
9    reviewed is to go right to escalation, which
10   means the next level up in terms of medical,
11   regulatory would review on behalf of their team,
12   and I think that's what we're asking for here is
13   my endorsement to go straight to escalation so
14   that we can get this reviewed by senior medical,
15   legal regulatory in time hopefully to make the
16   meeting.
17       Q.    As you say, so the suggestion was
18   to take this outside the normal MARC review
19   process, instead use the accelerate to
20   escalation as you've recommended, correct?
21       MR. LIMBACHER:  Object to form.
22       THE WITNESS:  No, it's not
23   outside of the normal process.  The
24   escalation and that capability is part

88  (Pages 346 to 349)

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1      of what's allowed within the normal
2      process in certain circumstances. So
3      it's not circumventing or going outside
4      of the approved process. It's simply
5      using an ability, from what I recall
6      here, to get it, get this piece reviewed
7      on time.
8    BY MS. SCULLION:
9        Q.    You said, you testified in
10   response to the prior question that Kristin said
11   it may be difficult to get that in the normal
12   MARC review process, and so you were suggesting
13   the escalation. So you're contrasting
14   escalation to the normal non-escalated MARC
15   review process, correct?
16            MR. LIMBACHER:  Object to form.
17            THE WITNESS:  Escalation then as
18        distinct from non-escalation, but my
19        point is that escalation is part of
20        acceptable MARC -- in this case MARC
21        review policy and procedure in certain
22        circumstances. It's not circumventing
23        the controls or the normal medical,
24        legal, regulatory review. It's just

Page 351

1        doing it in a way that gets it done on
2        time in this particular case, and there
3        was provisions made for that for
4        circumstances just like this.
5            MS. SCULLION:  Let's look at
6        what's been marked as Exhibit 31.
7            (Document marked for
8        identification as Endo-Lortie Deposition
9        Exhibit No. 31.)
10   BY MS. SCULLION:
11       Q.    And Exhibit 31 is Bates stamped
12   ENDO-CHI_LIT00110100, and we've marked it E1482
13   in the upper right-hand corner.
14       A.    Yes.
15       Q.    And you'll see in Exhibit 31,
16   which is discussing that the same issue of the
17   process for review of a sale piece in advance of
18   the upcoming -- it says POA meeting, is that
19   plan of action meeting?
20       A.    Yes.
21       Q.    And the top third of the page,
22   you see the e-mail from Marv Kelly to Kristin on
23   May 15th at 10:23 a.m.?
24       A.    Yes, I see that.

Page 352

1        Q.    Right, and who was Marv Kelly at
2    that time?
3        A.    Marv was the marketing vice
4    president at that time.
5        Q.    Okay. And Mr. Kelly is saying to
6    Kristin Vitanza in the first paragraph of his
7    e-mail, "I know a MARC review outside of normal
8    schedules will be required" in order to get the
9    piece available for the POA, correct?
10       A.    That's what he writes, yes.
11       Q.    Right, so, again, so he's
12   suggesting at least an accelerated schedule for
13   the MARC review, correct?
14       A.    Yes, an accelerated schedule.
15       Q.    And he explains, goes on to
16   explain, "I'm going to rally all levels of the
17   organization to make this happen. We have no
18   greater priority."
19            Did I read that correctly?
20       A.    That's what he wrote, yes.
21       Q.    So this is the VP of marketing
22   who is the senior-most executive within at least
23   the marketing department at that point, correct?
24       A.    Correct.

Page 353

1        Q.    And he is dictating that the MARC
2    review process for this piece is going to
3    have -- he will make it happen on an accelerated
4    basis, correct?
5            MR. LIMBACHER:  Object to form.
6            THE WITNESS:  He's not saying
7        that he's going make MARC happen. He's
8        requesting an accele -- he's requesting
9        a outside of normal schedule MARC
10       process, which as vice president of
11       marketing he has the ability to request,
12       but he's not -- as marketing VP, despite
13       his seniority, he does not have the
14       ability to make the MARC review do
15       anything unusual. This is all within
16       normal process. There are -- as I said
17       before, there are provisions for things
18       that needed to be done outside of normal
19       schedules.
20   BY MS. SCULLION:
21       Q.    And then but he is indicating to
22   everyone that we have no greater priority than
23   to conduct a review of this piece, correct?
24            MR. LIMBACHER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1      THE WITNESS: He wrote that.
2  He's indicating his view on the
3  importance of having this done.
4  BY MS. SCULLION:
5      Q.    Now, this is in May of 2012,
6  correct?
7      A.    May 5th, in fact, yes.
8      Q.    Yes. And reformulated Opana ER
9  had been approved in the end of 2011, correct?
10      A.    Approval was December of 2011.
11      Q.    Right. And there was no specific
12  regulatory requirement that Endo had to proceed
13  with a commercial launch of the reformulated
14  version of Opana ER by any particular date in
15  May or June of 2012, right?
16      MR. LIMBACHER: Object to form.
17      THE WITNESS: Correct. The FDA
18  does not have an opinion on when
19  something gets launched, other than that
20  it be after its approved.
21  BY MS. SCULLION:
22      Q.    Okay. This was just Endo's
23  decision that it wanted to move forward as
24  quickly as possible with review of this piece in

Page 355

1  order to try to have it for a launch in June,
2  correct?
3      MR. LIMBACHER: Object to form.
4      THE WITNESS: I'm not sure that's
5  true. It's the upcoming plan of action
6  meeting. I don't believe we saw with
7  the data that it was going to be. That
8  appears to be the timing or driving the
9  timing.
10  BY MS. SCULLION:
11      Q.    Right.
12      But there was nothing that
13  required Endo to have the selling piece
14  available for that meeting, right? Endo could
15  have waited and done an ordinary course MARC
16  review of the piece, right?
17      A.    Well, what I read here is in the
18  opinion of the marketing vice president, that it
19  was important to have a piece, if approved,
20  ready to take advantage of the fact that the
21  sales team would be gathered together. These
22  are normal times when pieces are introduced,
23  adequate training is done, role playing, et
24  cetera. So I understand him making that a

Page 356

1  priority and trying to get that accomplished on
2  that timing.
3      Q.    Now, I think you testified
4  earlier that as of 2012, the FDA had not
5  approved any abuse deterrence claims with
6  respect to reformulated Opana ER, correct?
7      MR. LIMBACHER: Object to form.
8      THE WITNESS: Yes.
9  BY MS. SCULLION:
10      Q.    And that remained true throughout
11  the time that you were with Endo, right? Endo
12  asked FDA a few different times to approve ADF
13  claims for reformulated Opana ER, and those were
14  never approved, correct?
15      MR. LIMBACHER: Object to form.
16      THE WITNESS: I'm only aware of
17  one submission asking for a label
18  change, and that was not approved.
19  BY MS. SCULLION:
20      Q.    Okay. So throughout the time
21  that you were with Endo, there was never an
22  approved claim for abuse deterrence with respect
23  to the reformulated Opana ER, correct?
24      MR. LIMBACHER: Asked and

Page 357

1  answered.
2      THE WITNESS: That is correct.
3  BY MS. SCULLION:
4      Q.    Okay. But Endo did, in fact,
5  position reformulated Opana ER as abuse
6  deterrent, nonetheless, correct?
7      MR. LIMBACHER: Object to form.
8      THE WITNESS: No, that's not
9  correct at all.
10      MS. SCULLION: Can we have E1501
11  and E1498.
12      (Document marked for
13  identification as Endo-Lortie Deposition
14  Exhibit No. 32.)
15  BY MS. SCULLION:
16      Q.    I'll hand you what's been marked
17  as Exhibit Number 32.
18      And Exhibit Number 32 is Bates
19  stamped END00095867, and we've marked it E1501.
20      And, Mr. Lortie, do you see that
21  Exhibit 32 is a series of e-mails referencing
22  OER pharmacy market research revised report?
23      A.    I see that at the top. I'm just
24  going to, if it's okay, take a moment to look

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    through the e-mails here.
2        Q.    Yeah.
3        A.    (Witness reviews document.)
4             Okay.  Thank you.  I've taken a
5    look.
6        Q.    Sure.  Do you recognize Exhibit
7    32 as a series of e-mails about OER pharmacy
8    market research revised report?
9        A.    The subject line actually changes
10   a few times, but, originally, it's revised
11   report, and then it's OER pharmacy market
12   research revised report, and then it's --
13   apparently that's forwarded on.
14       Q.    Okay.  And what's discussed in
15   these e-mails in part is understanding how
16   payers' treatment of reformulated Opana ER
17   could, among other things, impact the extent to
18   which pharmacists would -- sorry -- the way that
19   pharmacists would treat prescriptions for Opana
20   ER, correct?  That's one of the topics?
21           MR. LIMBACHER:  Object to form.
22           THE WITNESS:  No.  Actually, I
23       don't agree with that.  It does speak to
24       payer policy and how they viewed Opana

Page 359

1       ER versus the generic.  Pharmacists tend
2       to follow what payers make them do.
3       It's usually directly adjudicated.
4    BY MS. SCULLION:
5        Q.    Okay.  But that's -- I'm sorry,
6    that's exactly what I was trying to get at.
7        A.    The pharmacist usually has very
8    little latitude in those cases.
9        Q.    Okay.  And if you'll turn to page
10   1501.2, top of the page, just looking at an
11   e-mail from Kevin O'Brien to you, he is
12   discussing Aetna at the end of his e-mail,
13   right, Aetna as being one of the plans he's
14   looking at, right?
15       A.    He refers to Aetna as his last
16   sentence, yes.
17       Q.    Okay.  And then going to your
18   response to that e-mail on the first page of
19   E1501, you're asking, "Is there anything we can
20   do at Aetna to change their view?  The cost of
21   abuse to them and the potential mitigation of
22   that cost should be a compelling story.  How can
23   we put it together?"
24           So you're looking to see if

Page 360

1    there's a story that can be put together and
2    presented to Aetna about the relationship
3    between the cost of abuse and the potential to
4    mitigate that through its treatment of
5    reformulated Opana ER, correct?
6            MR. LIMBACHER:  Object to form.
7            THE WITNESS:  Yeah, that's what
8        it's written here.  I don't recall the
9        exchange specifically, but that's what
10       the e-mail says.
11   BY MS. SCULLION:
12       Q.    Okay.  And then in response at
13   the top of this same page, Mr. O'Brien writes to
14   you, "We are working in 2 directions," and he
15   explains the work there in points 1 and 2.
16           And then he goes on to state, "In
17   all cases the customers know the products are
18   not interchangeable and will not force a
19   switch," and that's referring to the
20   reformulated version of Opana ER and generic
21   versions of oxymorphone that were on the market
22   at that time, correct, the interchangeability?
23           MR. LIMBACHER:  Object to form.
24           THE WITNESS:  I believe so, yes.

Page 361

1    BY MS. SCULLION:
2        Q.    Okay.  And then he states or
3    discusses "The proactive presentations on Intac
4    and abuse since November 1st have been helpful
5    yet the accounts direction and actions has
6    varied."
7            Had Endo been making proactive
8    presentations to payers in -- from November 2012
9    through January 2013 discussing the relationship
10   of INTAC and abuse?
11           MR. LIMBACHER:  Objection, form
12       and foundation.
13           THE WITNESS:  I don't recall that
14       being the case, no.
15   BY MS. SCULLION:
16       Q.    That's what he's referring to,
17   though, is presentations that were made to the
18   payers about INTAC and abuse, right?
19           MR. LIMBACHER:  Objection,
20       foundation.
21           THE WITNESS:  Yeah, that's what's
22       written in Kevin's e-mail, but I don't
23       recall the connection of one to the
24       other.

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1    BY MS. SCULLION:
2        Q.   Okay.  Mr. O'Brien was the senior
3    director for reimbursement strategy and
4    operations, managed markets at the time of the
5    e-mail, correct?  That's what's stated in his
6    signature block?
7        A.   Yes.
8        Q.   He was a trusted Endo employee in
9    that regard?
10       A.   I suppose so, yes.
11       Q.   You wouldn't expect him to
12   misrepresent an e-mail to you and other senior
13   leadership the nature of the presentations that
14   were being made to the payers, correct?
15           MR. LIMBACHER:  Object to form.
16           THE WITNESS:  It's possible he
17       misinterpreted it, though, so, again, I
18       don't recall the specifics of the
19       presentations that he's referring to,
20       sitting here today.
21   BY MS. SCULLION:
22       Q.   Well, his discussion of the
23   presentations, in fact, parallels your
24   suggestion about putting together a story to

Page 363

1    Aetna relating the cost of abuse and the
2    potential mitigation of that cost in a story to
3    be pitched to them in connection with
4    reformulated Opana ER, correct?
5           MR. LIMBACHER:  Object to form,
6       misstates the evidence.
7           THE WITNESS:  Yeah, again, I
8       don't recall the e-mail exchange or any
9       specific.  I do recall, of course, as
10      it's outlined in here that the payers
11      generally did not view the products as
12      interchangeable because the FDA did not
13      view the products as interchangeable.
14      Beyond that, I don't recall the specific
15      presentations.  If you've got something
16      you want me to look at, I can do that.
17   BY MS. SCULLION:
18       Q.   Your e-mail doesn't talk about
19   pitching on the question of interchangeability.
20   Your e-mail talks about pitching them on a story
21   about the cost of abuse and the potential to
22   mitigate that cost, right?
23           MR. LIMBACHER:  Object to form,
24       misstates the evidence.

Page 364

1           THE WITNESS:  Yeah, again, I'm
2       saying that I don't recall the exchange,
3       and I don't recall the presentations.
4    BY MS. SCULLION:
5        Q.   Now, you're aware personally that
6    providers did view Opana ER reformulated version
7    as crush resistant, correct?
8           MR. LIMBACHER:  Object to form.
9           THE WITNESS:  To the extent that
10      anyone had that impression, it was not
11      as a result of promotion, because we
12      were not allowed to promote that.
13   BY MS. SCULLION:
14       Q.   You were not allowed to promote
15   that way, right?
16       A.   We were not allowed to connect
17   crush resistance and abuse potential -- or lack
18   of abuse potential, as we've already
19   established.
20       Q.   I hand you what I marked as
21   Exhibit -- I think it's 33, right?
22       A.   Thirty-three, yes.
23           (Document marked for
24       identification as Endo-Lortie Deposition

Page 365

1    Exhibit No. 33.)
2    BY MS. SCULLION:
3        Q.   Yeah, Exhibit 33, a document
4    Bates stamped END00465847, and we've labeled it
5    E1498 in the top right-hand corner.
6           Do you have Exhibit 33?
7        A.   Yes.
8        Q.   And Exhibit 33, if you'll turn to
9    the second page, starts with an e-mail from
10   Diana Frank to you discussing a doctor who
11   visited the GRT booth at pain week.
12           GRT is that the Grunenthal booth?
13           MR. LIMBACHER:  Take your time
14      and review the document.
15           THE WITNESS:  I'm not sure.  It
16      could be.  I would draw that conclusion,
17      but I'm not precisely sure about that.
18   BY MS. SCULLION:
19       Q.   GRT was often used to reference
20   Grunenthal in your time at Endo, correct?
21       A.   That's how I would read this,
22   yes.
23       Q.   Okay.  And pain week, what was
24   pain week?

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    A.   I don't specifically recall.  I
2  think perhaps it was one of the pain conven --
3  pain oriented conventions, medical meetings.
4       Q.   Okay.  And what Ms. Frank is
5  relaying to you is the doctor had said "he would
6  not prescribe generic oxymorphone because he did
7  not believe that it was the right thing for his
8  patients (because it was not crush resistant)."
9       Do you see that?
10      A.   Just for clarification, it's
11 Frank Diana as opposed to Diana Frank.
12      Q.   Thank you.  I'm so sorry.
13      A.   He was our head of formulation.
14      Q.   Frank Diana very different.  It's
15 signed Frank, I see.
16      A.   Yes.
17      Q.   And Mr. Diana --
18      A.   Doctor, in fact.
19      Q.   Dr. Diana is saying to you this
20 doctor viewed generic oxymorphone as inferior
21 because it was not crush resistant, correct?
22      MR. LIMBACHER:  Object to form.
23      THE WITNESS:  That's what's
24 stated here, yes.  That was his --

Page 367

1  apparently, that was his belief.
2  BY MS. SCULLION:
3       Q.   And this distinction between
4  generic oxymorphone and reformulated Opana ER
5  based on crush resistance, this was a message
6  that Endo itself again sought to cultivate
7  correct?
8       MR. LIMBACHER:  Object to form,
9  misstates the evidence.
10      THE WITNESS:  No, I'm sorry.  I'm
11 not going to agree to that.  We have no
12 idea how he drew that conclusion.  He's
13 just approaching one of our rep -- one
14 of our company employees and mentioning
15 his frustration because he has been
16 forced to prescribe by the national
17 account, the payer, one product over the
18 one he would like to prescribe.  That
19 was not in any way an uncommon
20 circumstance, by the way.  Payer
21 policies drive prescribing, and
22 physicians aren't always happy about it.
23 BY MS. SCULLION:
24      Q.   Well, you had, in fact, market

Page 368

1  research that told you that prescribers were
2  learning about Opana ER reformulated being a
3  crush resistant formulation from Endo sales
4  representatives, you had market research that
5  told you that, right?
6       MR. LIMBACHER:  Object to form.
7       THE WITNESS:  I don't recall
8  seeing that, no.
9       MS. SCULLION:  Can I have Exhibit
10 1409, E1409.
11 BY MS. SCULLION:
12      Q.   Let me hand you what has been
13 marked as Exhibit -- sorry, I didn't keep track.
14      A.   Thirty-four.
15      (Document marked for
16 identification as Endo-Lortie Deposition
17 Exhibit No. 34.)
18 BY MS. SCULLION:
19      Q.   Thank you, 34, which is Bates
20 stamped ENDO-CHI_LIT-00135664, and we've marked
21 in the upper right-hand corner E1409.  If you'll
22 turn to the first page of the PowerPoint, which
23 is E1409.3, this is reporting on "Opana ER
24 Crush-Resistant Formulation Research, Wave 5,

Page 369

1  Qualitative Interviews" dated December 13th,
2  2012, correct?
3       A.   Yes.  I'll just take a minute, if
4  it's okay, and look through the deck.
5       Q.   Sure.
6       A.   (Witness reviews document.)
7       Okay.  I've taken a look at most
8  of the pages.
9       Q.   Okay.  And Exhibit 34 is
10 reporting on market research that the KJT Group
11 did on behalf of Endo, correct?
12      A.   Apparently, yes.
13      Q.   And KJT Group was a vendor that
14 Endo used regularly to perform market research
15 in this time frame, summer of 2012?
16      MR. LIMBACHER:  Object to form.
17      THE WITNESS:  I don't know that
18 to be the case.  It's not a name I
19 recognize.
20 BY MS. SCULLION:
21      Q.   Okay.  I think we've seen it a
22 few times.
23      In any event, they performed this
24 research for Endo.

93 (Pages 366 to 369)

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1            And if you go to page E1409.9,
2 the research is producing which's described here
3 as the "Evidence." In first bullet point, "Most
4 prescribers learned of the crush-resistant
5 formulation from an Endo sales representative,"
6 correct? That's what it says?
7       A.    Yeah, it is. I'm noting, though,
8 there's a footnote to that, which kind of
9 confuses me a little bit. It says "based on
10 quantitative tracking research," so I'm not sure
11 of what the vendor is using as evidence. I
12 think what they're saying is there's a
13 correlation that -- or at least there's
14 quantitative evidence that these prescribers
15 were called on by representative, unless there's
16 something I'm missing, but I'm not sure how
17 they're drawing that conclusion. I'm not saying
18 it's inaccurate, but it's interesting to note
19 that they've got this footnote here. So I'm a
20 little confused by that.
21      Q.    So based on --
22            MR. LIMBACHER: I apologize for
23 interrupting, but my real time is not
24 working. I don't know if I did

Page 371

1 something or what, I apologize, but I
2 need a little technical help.
3            THE VIDEOGRAPHER: Off the
4 record, 5:35.
5            (Pause.)
6            THE VIDEOGRAPHER: It is 5:36.
7 We are back on the record.
8 BY MS. SCULLION:
9      Q.    Back on the record. Still on
10 page E1409.9, Mr. Lortie. The report does say
11 that "Based on the quantitative tracking
12 research, most prescribers learned of the
13 crush-resistant formulation from an Endo sales
14 representative," correct; that's what it says?
15       A.    Yeah, again, as we just
16 described, there's this kind of confusing
17 footnote that says based on quantitative
18 tracking research, I'm really not sure what that
19 means.
20      Q.    But it is -- whatever that
21 research is, this is what the findings are based
22 on?
23       A.    It's the conclusion that the
24 market research company is presenting.

Page 372

1      Q.    Right. And two more bullet
2 points down, the conclusion is also that "A
3 majority of prescribers have heard all of Opana
4 ER's crush-resistant formulation messages,"
5 correct; that's what it reports here?
6       A.    That is what it's -- that's
7 what's written in the box, yes.
8      Q.    Okay. If you go to the next
9 page, E1409.10, again, in the evidence box, last
10 bullet point, the evidence recited here, again,
11 based on quantitative tracking research --
12 actually, I take that back. This one does not
13 say based on quantitative tracking research.
14 The last piece of evidence cited in that box is
15 "The new 'crush resistance' was seen as a
16 benefit (lower abuse potential), raising
17 prescriber comfort level with Opana ER, and
18 potentially leading to increased prescribing in
19 the future."
20            Did I read that correctly?
21       A.    You read that correctly.
22      Q.    And so this research report was
23 telling Endo that prescribers were getting
24 most -- getting nearly all their information

Page 373

1 from Endo sales representatives were seeing
2 crush resistance as a benefit because of their
3 understanding that that indicated a lower abuse
4 potential for the product, correct?
5            MR. LIMBACHER: Object to form,
6 misstates the evidence.
7            THE WITNESS: No, I actually
8 can't agree with that. It says most
9 prescribers learned of the
10 crush-resistant formulation --
11 BY MS. SCULLION:
12      Q.    Thank you.
13       A.    -- from a representative. It
14 doesn't suggest, as you had put, that they got
15 most of their information from a representative.
16      Q.    You're right. I did misstate
17 that. They learned of it from the sales
18 representative.
19       A.    So they were made aware that this
20 new formulation existed, that's my conclusion
21 that I draw from that statement.
22      Q.    Okay. And what they've become
23 aware of is that the new crush resistance was
24 seen as a benefit because, in their

94 (Pages 370 to 373)

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1   understanding, it created a lower abuse
2   potential for the product, correct?
3           MR. LIMBACHER:  Object to form.
4           THE WITNESS:  And, again, I don't
5   think I can draw that same conclusion.
6           What I draw from the two pieces
7   of information that you're asking me to
8   review is that they were made aware of
9   the new formulation by representative
10  and that their interpretation of crush
11  resistance, according to this, was that
12  there was a benefit (lower abuse
13  potential), but, you know, my experience
14  is the physicians get their information
15  from lots of different places, lots of
16  different sources.
17          So I don't think you can
18  necessarily draw the direct correlation
19  to any sales representative messaging
20  and what a given physician might
21  conclude.  As we've said before, our
22  representatives were not allowed to
23  promote any benefit other than designed
24  to be crush resistant, which explained

Page 375

1   the difference between the new pill and
2   the old pill.
3   BY MS. SCULLION:
4       Q.   What was the relevance, why was
5   the message designed to be crush resistant a
6   relevant message to physicians?
7       A.   We heard from physicians that it
8   was important that they understood what was
9   different between the two formulations, and they
10  knew that we were attempting to, in our own way,
11  mitigate a potential route of abuse.  That was
12  well publicized, and, frankly, they applauded
13  that.
14          What they did not hear from our
15  representatives, though, was the nexus between
16  that fact and any proven ability to mitigate
17  abuse because we had not proven that.  Our reps
18  were trained not to speak that way and all of
19  our material had a qualifier that made that
20  very, very clear.
21      Q.   And you say it was well
22  publicized that Endo was seeking to mitigate a
23  potential route of abuse.
24          Endo publicized that in part

Page 376

1   through the press release that it issued when it
2   sued the FDA -- sorry, when it filed a citizen's
3   petition with the FDA, correct?
4           MR. LIMBACHER:  Object to form.
5           THE WITNESS:  I don't recall the
6   specific public relations or the
7   specific press release, but, you know,
8   this was a topic that was spoken about
9   in the media during the period of time
10  this was all occurring.
11  BY MS. SCULLION:
12      Q.   Right, and the topic spoke about
13  in the media was that Endo contended that its
14  new reformulation of Opana ER, in fact, did
15  provide a safety advantage with respect to
16  potential routes of abuse for oxymorphone,
17  correct?
18          MR. LIMBACHER:  Object to form.
19          THE WITNESS:  The general tone of
20  the coverage was recognized that Endo
21  was trying to present a new formulation
22  of the product that might mitigate abuse
23  but that also it was in conversations
24  with the FDA and creating new clinical

Page 377

1   data before it was able to do that.  So
2   there were media reports, et cetera, and
3   if you've got a press release there, I
4   don't recall specifically the press
5   release, but we did take certain
6   actions, as you mentioned, with regards
7   to suing the FDA and others.
8           MS. SCULLION:  So do we have the
9   press release?
10          (Document marked for
11  identification as Endo-Lortie Deposition
12  Exhibit No. 35.)
13  BY MS. SCULLION:
14      Q.   Hand you what's been marked as
15  Exhibit 35.
16          And Exhibit 35 is a copy of a --
17  publicly available on Endo's website -- a copy
18  of a November 30th, 2012 press release entailed
19  "Endo Health Solutions Sues FDA to Protect
20  Consumers from Non-Tamper Resistant
21  Oxymorphone."
22          Did I read that correctly?
23      A.   Yes, that's the headline.
24      Q.   And the subheadline in the press

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1   release says, "Surveillance data show dramatic
2   decrease in abuse rates of reformulated Opana ER
3   designed to be crush-resistant when compared to
4   non-tamper resistant formulation."
5        Did I read that correctly?
6        A.   You did.
7        Q.   So Endo is highlighting in this
8   press release surveillance data that it says
9   showed a dramatic decrease for abuse rates for
10  the reformulated Opana ER with the intent to
11  be -- to indicate that there's a lower rate of
12  abuse for reformulated Opana ER as compared to
13  generic oxymorphone, correct?
14            MR. LIMBACHER:  Object to form.
15            THE WITNESS:  Or the non-tamper
16       resistant formulation, specifically.
17  BY MS. SCULLION:
18       Q.   And the non-tamper resistant
19  formulations on the market as of November 2012
20  were the generic oxymorphone manufactured and
21  sold by entities other than Endo, right?
22       A.   Yes.  By November the original
23  branded product was, to a great extent, out of
24  the distribution channel by that point.

Page 380

1   or the generic, in this case, as non-tamper
2   resistant formulation.
3        Q.   Well, in fact, in the press
4   release, Endo specifically refers to
5   reformulated Opana ER as crush resistant, if you
6   look at the bullet points one, two -- the four
7   bullet points in the middle of the first page.
8        Do you see that?
9        A.   So the fourth bullet point I see.
10  What's your question?
11       Q.   I apologize.  There's four bullet
12  points is what I meant to say.
13       Do you see that?
14       A.   In the center?
15       Q.   Yes.  And in the second bullet
16  point --
17       A.   I'm sorry.  The question was?
18       Q.   Yeah, Endo refers to the
19  requirement that any abbreviated new drug
20  applications referencing Opana ER contain data
21  and information demonstrating that the proposed
22  ANDA product is similarly crush-resistant as the
23  reformulated Opana ER designed to be
24  crush-resistant.

Page 379

1        Q.   Now, was Endo allowed to make a
2   claim with respect to the reformulated version
3   of Opana ER that it was tamper resistant?
4            MR. LIMBACHER:  Object to form
5       and foundation.
6            THE WITNESS:  No, I don't believe
7       so.
8   BY MS. SCULLION:
9        Q.   Okay.  But throughout this press
10  release, Endo is specifically contrasting
11  reformulated Opana ER to non-tamper resistant
12  generic oxymorphone, correct?
13            MR. LIMBACHER:  Object to form.
14            THE WITNESS:  It is using
15       non-tamper resistant formulations, yes,
16       to describe the other formulation.
17  BY MS. SCULLION:
18       Q.   And it's contrasting those
19  non-tamper resistant formulations to the
20  reformulated version of Opana ER, correct?
21       A.   It's describing the reformulated
22  version specifically is designed to be crush
23  resistant, that's how it's referring to the new
24  product, and it's referring to the old product

Page 381

1        Did I read that correctly?
2        A.   Yes, and just for clarity, the
3   four bullet points are explained as specifically
4   what is asked for in the citizen's petition that
5   Endo has in front of the agency at this time.
6        Q.   Right.
7            And in describing that citizen's
8   petition, Endo is stating that any generic
9   version of Opana ER should have to be
10  demonstrated to be similarly crush resistant to
11  reformulated Opana ER, right?
12            MR. LIMBACHER:  Object to form,
13       misstates the evidence.
14            THE WITNESS:  Yeah.  Again, what
15       they're ask -- what they're stating here
16       is that the citizen's petition, among
17       other requests, is asking that the FDA
18       require that any ANDA that references
19       Opana ER contain data and information
20       that demonstrates that it has the same
21       physical properties.  That's the way I
22       would read that.
23  BY MS. SCULLION:
24       Q.   And the physical property,

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1   though, stated here in this press release is
2   crush resistant, didn't just say physical
3   properties?
4        A.    Or resistant -- resistance to
5   crushing.
6        Q.    Right.  And that's the physical
7   property that Endo is highlighting with respect
8   to Opana ER, correct?
9            MR. LIMBACHER:  Object to form,
10       misstates the evidence.
11           THE WITNESS:  Well, again, I
12       think I've stated that before.  What it
13       says is they're asking that any ANDA
14       that references Opana ER has to have the
15       same evidence suggesting the same
16       physical properties to confer similar
17       resistance to crushing forces.
18  BY MS. SCULLION:
19       Q.    Right.  So, I mean -- and then
20  the next bullet point, again, Endo says its
21  citizen's petition also calls for "the
22  classification of crush-resistant technologies,
23  such as the reformulated crush-resistant Opana
24  ER."

Page 383

1            So it's ascribe -- Endo is
2   ascribing reformulated Opana ER here as crush
3   resistant, did not say designed to be crush
4   resistant, crush resistant; that's what it says,
5   right?
6            MR. LIMBACHER:  Object to form,
7        misstates the evidence.
8            THE WITNESS:  That is what it
9        says, yes.
10  BY MS. SCULLION:
11       Q.    Right.
12           Endo wasn't asking that the ANDAs
13  for generic versions of Opana ER really had to
14  show that they were designed to be crush
15  resistant.  It said they had to be crush
16  resistant; that's what it's asking for, right?
17           MR. LIMBACHER:  Object to form,
18       misstates the evidence.
19           THE WITNESS:  It was asking the
20       FDA that if any ANDA for a generic
21       referenced Opana ER, the new form that
22       was designed to be crush resistant, that
23       those ANDAs should also have to show the
24       same physical resistance to crushing.

Page 384

1   BY MS. SCULLION:
2        Q.    And Endo was aware when it put
3   out this press release, obviously that is a
4   public press release, correct?
5        A.    It's a press release, yes.
6        Q.    Right, expected that press
7   release to get then picked up by the media,
8   correct?
9        A.    Yes.  I mean, part of this is a
10  requirement when a publicly traded entity is
11  doing something as significant as suing the FDA,
12  you have to make a press release about it.
13       Q.    And Endo expected this press
14  release to get some attention, correct?
15           MR. LIMBACHER:  Object to form
16       and foundation.
17           THE WITNESS:  Well, I don't know
18       to what extent there was a desired goal
19       of attention, but it was required, given
20       the importance of the action that was
21       being reported, that we reported it to
22       the public.
23  BY MS. SCULLION:
24       Q.    And Endo expected that this press

Page 385

1   release, for example, could be conveyed through
2   media to doctors that its sales reps were
3   calling on, those could be among the audience to
4   whom this press release could be conveyed in the
5   media?
6            MR. LIMBACHER:  Object to form
7        and foundation.
8            THE WITNESS:  I think that
9        physicians could be exposed to media,
10       but the press release did not have the
11       goal of reaching physicians.
12           In other words, this was not a
13       veiled attempt at promoting to
14       physicians.  This was a public -- a
15       press release on an important legal
16       action being taken by a pharmaceutical
17       manufacturer against the FDA.
18  BY MS. SCULLION:
19       Q.    Now, you said in -- that in its
20  promotional materials, you're very clear that
21  Endo was careful to say designed to be crush
22  resistant and have that caveat that -- data to
23  show any impact on abuse liability did not
24  exist, had that caveat in its promotional

97  (Pages 382 to 385)

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1   materials, correct?
2       A.   Correct.
3       Q.   Didn't have that caveat in this
4   press release, right?
5       A.   It does actually.  If you look at
6   the -- sort of the second paragraph from the
7   bottom, it's speaks explicitly about the abuse
8   potential so, you know -- and oftentimes, if not
9   always, these were also distributed with a copy
10  of the prescribing information.
11      Q.   Right.  So it's just --
12      A.   So it's not a piece of promotion
13  and, therefore, the juxtaposition of that next
14  to the discussion is not required, but the abuse
15  potential is clearly pointed out here.
16      Q.   So you say this is not a piece of
17  promotion, so the press release then didn't have
18  to go through MARC review, right?
19      A.   A press release would have been
20  MARC reviewed, yes.
21      Q.   So it did go through MARC review?
22      A.   It went through a version of MARC
23  review, but, again, because it's not a piece of
24  promotion, press releases and other public

Page 387

1   statements had a different category of review,
2   but the same medical, legal, regulatory actually
3   often at a more senior level.
4       Q.   Do you know if Endo tracked how
5   many times this press release was picked up?
6       A.   I do not know.
7            MS. SCULLION:  And then can we
8       have E959, 1494, 1483.
9   BY MS. SCULLION:
10      Q.   Now, the other way that Endo --
11  another way that Endo got out the message that
12  the reformulated version of Opana ER was crush
13  resistant was through a formulary -- I'm
14  sorry -- compendia submissions, correct?
15           MR. LIMBACHER:  Object to form.
16           THE WITNESS:  No, that's not
17      correct.
18  BY MS. SCULLION:
19      Q.   Do you recall that Endo did make
20  submissions with respect to reformulated Opana
21  ER to various compendia?
22      A.   Yes, that's normal practice.  The
23  compendia are independent, third party groups
24  who offer opinions that are used by the payers

Page 388

1   and health insurers.
2       Q.   Right.
3            They're used by various
4   components of the medical community, those
5   opinions, correct?
6       A.   Specifically payers, health
7   insurers and the like.
8       Q.   And you were personally involved
9   in Endo's efforts to have Opana ER reformulated
10  version listed as a crush-resistant dosage form
11  by the compendia, correct?
12           MR. LIMBACHER:  Object to form.
13           THE WITNESS:  No, that's not
14      correct.
15  BY MS. SCULLION:
16      Q.   Were you involved in Endo's
17  submissions to the compendia for Opana ER
18  reformulated?
19      A.   I don't recall being directly
20  involved, no.
21      Q.   Okay.
22           MS. SCULLION:  Go to E959.
23           (Document marked for
24      identification as Endo-Lortie Deposition

Page 389

1       Exhibit No. 36.)
2   BY MS. SCULLION:
3       Q.   I've handed you what's been
4   marked as Exhibit 36.  I'll look at the Bates
5   Number in one second.
6            MR. LIMBACHER:  Take your time
7       and review the document.
8            (Witness reviews document.)
9   BY MS. SCULLION:
10      Q.   Have you had a chance to review
11  the exhibit?
12      A.   I have.  Just I'm noting page 2,
13  959.2 is blank.  Is that intentionally blank?
14      Q.   Yes.
15      A.   I just wanted to make sure I'm
16  not missing an e-mail or something.
17      Q.   No, no, you're not.
18           And if you look at the exhibit
19  and turn to page E959.3, it's labeled "Compendia
20  status update" dated December 2012, correct?
21      A.   It is, yes.
22      Q.   And then the next page, E959.4,
23  is reporting that "All 3 Data Compendia have
24  uniquely classified Opana ER with INTAC

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1    technology based on the dosage form of Crush
2    Resistant," correct?
3         A.    Yes.
4              MR. LIMBACHER:  Object to form.
5    BY MS. SCULLION:
6         Q.    You were aware at the time that
7    all three data compendia had, in fact,
8    classified Opana ER based on dosage form crush
9    resistant?
10        A.    I was aware once those conclusion
11   had been drawn that the three compendia had
12   independently taken those positions, yes.
13        Q.    Okay.
14        A.    In other words, after that
15   conclusion had been drawn.
16        Q.    And were you aware that Endo had
17   been seeking such dosage form classification for
18   reformulated Opana ER?
19        A.    Not specifically seeking
20   anything.  You don't seek anything with the
21   compendia.  You submit -- it's usually a
22   physician-to-physician interaction.  You submit
23   clinical data as they request and they draw
24   their own conclusions.  It's not a matter of

Page 391

1    what you're seeking.
2         Q.    Well, with respect to the
3    compendia, Endo did have to choose to submit
4    data to the compendia, correct?
5         A.    I'm not aware of any time a new
6    product would not have had such a submission.
7    The payers require that.  It's part of their
8    information to make determinations on products,
9    so it's just very common.
10        Q.    Okay.  And do you recall that at
11   least with respect to -- strike that.
12             Let's just go to the next page,
13   E959.5, and it's stated at the top here "Data
14   Compendia decisions have tremendous downstream
15   effects on retail, MCO, providers, and
16   patients."
17             Do you see that?
18        A.    Yes, that's the title on the
19   slide.
20        Q.    Okay.  And among the downstream
21   effects of compendia decisions identified in
22   this document is on the right-hand side, you see
23   under "Patient and Provider, social
24   implications."

Page 392

1              You see that?
2         A.    Yes.
3         Q.    And social implications were
4    important with respect to an opioid like Opana
5    ER reformulated version, correct, because of the
6    stigma sometimes associated with opioids?
7              MR. LIMBACHER:  Object to form.
8              THE WITNESS:  I actually don't
9         know what's meant here by social
10        implications.
11   BY MS. SCULLION:
12        Q.    Okay.  And it also speaks in this
13   slide to the downstream effects on "provider
14   intent when prescribing," correct?
15        A.    I'm sorry, I didn't understand
16   the question.
17        Q.    That's what it also speaks to
18   "provider intent when prescribing" as being one
19   of the downstream effects of compendia
20   decisions?
21        A.    Yes.  Again, I'm not quite sure
22   what's meant by that, but that's in that banner
23   of patient and provider.
24             I also note that on the left,

Page 393

1    compendia is described as clinical discretion
2    and nonbiased clinical position or highlighted,
3    that's why the managed care organizations depend
4    on the views of the compendia.  And that point
5    actually is represented in the middle, that the
6    managed care organizations rely on these
7    independent compendias as safeguard for unbiased
8    data and clinical information.
9         Q.    Endo engaged, in fact, an outside
10   vendor to oversee this compendia submission with
11   respect to reformulated version of Opana ER,
12   correct?
13        A.    I don't specifically recall.  I
14   wasn't part of the -- that part of the
15   development.  It was in a group a few layers
16   away from me, so I don't recall specifically the
17   mechanics in this case.
18        Q.    You don't recall that Endo
19   engaged an entity called Two Labs to act as its
20   agent in presenting the new NDCs for Opana ER to
21   three major data warehouses?
22        A.    That's correct, I do not recall
23   that specifically.
24        Q.    Okay.  You don't dispute that,

99 (Pages 390 to 393)

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1  though?
2           MR. LIMBACHER:  Object to form.
3           THE WITNESS:  I don't recall it.
4      I think that was your question.
5  BY MS. SCULLION:
6      Q.    And, as I understand it, the way
7  that the compendia work is they -- by creating a
8  new dosage form, crush resistant, the pharmacies
9  or payers that subscribe to that compendia would
10  be getting information labeling Opana ER, the
11  reformulated version, as crush resistant,
12  correct?
13          MR. LIMBACHER:  Object to form.
14          THE WITNESS:  No, I don't think
15      that's accurate.
16  BY MS. SCULLION:
17      Q.    If you go to the next page,
18  E959.6, this says it's an example of Opana ER
19  5-milligram unique GPI and dosage form from
20  Medispan.
21          Do you see that?
22      A.    Yes.
23      Q.    And Medispan was one of the
24  compendia?

Page 395

1      A.    That's I believe true, yes.
2      Q.    And the product name that
3  Medispan would use for Opana ER reformulated
4  version was Opana ER (crush resistant); that was
5  the name that was going to appear in the
6  Medispan compendia, correct?
7           MR. LIMBACHER:  Object to form.
8           THE WITNESS:  I don't recall
9      specifically, but that appears to be
10      what's represented here.
11  BY MS. SCULLION:
12      Q.    If you go to the next page
13  E959.7, this recaps the "Compendia
14  process-to-date" as of December 2012.
15          Do you see that?
16      A.    Yeah, I don't see December 2012.
17      Q.    December 2012 is the date of the
18  document.
19      A.    It's the date of the document,
20  but, yes.
21      Q.    It says "Compendia
22  process-to-date"?
23      A.    It says quarter 1, 2, 3, 4, but
24  it doesn't say which year.

Page 396

1      Q.    The document is dated December of
2  2012, right?
3      A.    The title is 2012, yes.
4      Q.    Okay.  And you see on the
5  left-hand side it says "Identified risk and
6  engaged Two Labs."
7           Do you see that?
8      A.    I do.
9      Q.    Okay.  So and then we see that
10  TL, which is Two Labs presented all the info to
11  the compendia, that's near the end of Q1,
12  correct?
13          MR. LIMBACHER:  Object to form.
14          THE WITNESS:  I see that.
15  BY MS. SCULLION:
16      Q.    Right.
17          And then we see in Q2, "Gold
18  Standard and Medispan created unique dosage
19  form/identifier for crush resistant."
20          So those two compendia had taken
21  the step of creating the new crush-resistant
22  dosage form, right?
23      A.    Yes.
24      Q.    And you see there's at the bottom

Page 397

1  a discussion of a meeting with the VP of FDB.
2           FDB was another compendia, right?
3      A.    Yes, I believe so.
4      Q.    It says a meeting with FDB, and
5  on the top half of the timeline you see in Q3 a
6  meeting with editorial director of FDB.
7           Do you see that?
8      A.    Yes.
9      Q.    Okay.
10      A.    That was following the initial --
11  it looks like an initial meeting where the
12  company was informed that, at least in their
13  opinion, FDB had a very stringent clinical
14  review process with minimal engagement from
15  manufacturers.
16      Q.    Right.  But that engagement here
17  included at least a meeting with the VP and then
18  a meeting with the editorial director, correct?
19      A.    Yes.
20      Q.    And then a -- it says a
21  presentation of "more robust clinical data and
22  call to action to FDB."
23      A.    Yes, I see that.
24      Q.    Right.  So Endo not only had two

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1   meetings with FDB, but it went back and
2   presented more clinical data and made a call to
3   action to FDB to make a decision about a
4   crush-resistant dosage form, correct?
5          MR. LIMBACHER:  Object to form
6   and foundation.
7          THE WITNESS:  I don't think I can
8          draw that conclusion from this.  It
9          doesn't say who was presenting each one
10         of these times.
11  BY MS. SCULLION:
12     Q.   Well, it's describing the
13  compendia process by Endo, right?  Was anyone
14  else presenting other than Endo's agent?
15         MR. LIMBACHER:  Object to form
16  and foundation.
17         THE WITNESS:  I don't know.  I
18         mean, in some of these cases, advisors
19         would present.  In some of the cases,
20         many cases, the compendia would call on
21         their own independent advisors.  It's
22         really important to point out that the
23         very business of these compendia is
24         about being independent.  We've seen

Page 399

1          themes of that throughout all the
2          documents you've shown me, they're
3          independent third parties that don't
4          rely on manufacturers, that draw their
5          own conclusions and upon which the
6          managed care organizations depend.
7          (Document marked for
8          identification as Endo-Lortie Deposition
9          Exhibit No. 37.)
10  BY MS. SCULLION:
11     Q.   Let me hand you what's been
12  marked as Exhibit Number 37.
13         And Exhibit 37 is Bates stamped
14  END00121820, and we've marked it E1494 at the
15  top.
16         And directing your attention to
17  middle of page E1494.2, do you see the e-mail
18  from Marv Kelly to Jason Jones on January 13th,
19  2013 when she says, Jason, "any way to influence
20  First Data Bank to accelerate their update?"
21     A.   Yes, I see that communication.
22     Q.   And Jason responds at the top, "I
23  believe FDB will be making the move this week.
24  We will follow up with compendia listings as

Page 400

1   well as our trade customers this week - now that
2   Impax is on the market."
3          Do you see that?
4      A.   Yes, I do.
5      Q.   And then on the first page of the
6   exhibit, E1494.1, you see an e-mail from Simon
7   Lemmy to Jason Jones and others on January 13th?
8      A.   Yes.
9      Q.   And he actually addresses the
10  e-mail to Marv, Marv Kelly, correct?
11     A.   Looks like to Jason Jones and
12  Marv Kelly.
13     Q.   But then the body of the e-mail,
14  he's addressing it to Marv.
15         Do you see that?
16     A.   I do, yes.
17     Q.   And he says, "We were in contact
18  with FBD last week, through our consultant, and
19  they have committed to updating their systems
20  next week and communicating to their customers."
21         So this is another example of
22  Endo, through its consultant, was in contact
23  with FBD, correct?
24         MR. LIMBACHER:  Object to form.

Page 401

1          THE WITNESS:  Yeah, apparently
2          asking for an update on their process
3          and timing.
4   BY MS. SCULLION:
5      Q.   Right.
6          So now you were copied on
7   Mr. Lemmy's e-mail, correct?
8      A.   The January 13th e-mail?
9      Q.   Yes.
10     A.   Yes, I was.
11     Q.   And then you respond, "Simon and
12  team - thanks for the diligence on this
13  mission-critical work."
14         So you regarded the compendia
15  listings for reformulated version of Opana ER as
16  mission critical to Endo, correct?
17         MR. LIMBACHER:  Object to form.
18         THE WITNESS:  Yeah, it was very
19         important.
20  BY MS. SCULLION:
21     Q.   But it was mission critical
22  important, right?
23         MR. LIMBACHER:  Object to form.
24         THE WITNESS:  That's the language

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1        I used.
2    BY MS. SCULLION:
3        Q.    And why was that?
4        A.    Well, the managed care
5    organizations require input from the compendia
6    before they can load that information into their
7    system, so just from the very basic requirement
8    that a new product doesn't get reimbursed until
9    there's a compendia load in of data in the
10   compendia's view, it's mission critical.  So,
11   you know, I'm referring to that importance and
12   also thanking the team for their diligence in
13   bringing about the action, bringing about the
14   activity and making sure that the compendia did
15   their work on a timely basis and helping to
16   manage that process.
17       Q.    This wasn't just about getting
18   the compendias to list the reformulated version
19   of Opana ER, it was about getting them to create
20   a new dosage form listing it as crush resistant,
21   right?
22       MR. LIMBACHER:  Object to form.
23       THE WITNESS:  We had no ability
24   to influence that.  We were pleased that

Page 403

1    they recognized that the products were
2    different and that they reported it that
3    way, but we had no ability to influence
4    that, other than supplying them with our
5    clinical data and the other
6    physician-to-physician communications.
7        MS. SCULLION:  Take a quick
8    break.  We have the document with us
9    before.  Let's go back to that.
10       THE VIDEOGRAPHER:  The time is
11   6:10.  We are going off the record.
12       (Brief recess.)
13       (Document marked for
14   identification as Endo-Lortie Deposition
15   Exhibit No. 38.)
16       THE VIDEOGRAPHER:  We are back on
17   the record at 6:22.
18   BY MS. SCULLION:
19       Q.    Mr. Lortie, we've handed you off
20   the record and provided to counsel a copy of
21   Exhibit Number 38, which is Bates stamped
22   ENDO-CHI_LIT-00467546, and we've Bates stamped
23   it -- or, sorry, stamped the top right-hand
24   corner E119.

Page 404

1        Do you recognize Exhibit 38 or
2    the attachment, I should say, to the e-mail, the
3    cover of Exhibit 38 as a copy of the August 2012
4    "Opana ER Strategic Platform"?
5        A.    I don't necessarily recognize it.
6    I have not reviewed this document in
7    preparation, but I see that the title is "Opana
8    ER Strategic Platform," as you point out, August
9    of 2012.
10       Q.    And just so we're -- so I'm extra
11   clear, I am asking these questions in your
12   personal capacity at the moment.
13       A.    Okay, thank you.
14       Q.    So if you look -- let's start
15   with the first page of the exhibit, which is an
16   e-mail from Kristin Vitanza to you in January of
17   2013, in which she is transmitting to you the
18   final document for the Opana ER strategy plan?
19       Do you see that?
20       A.    Final ER strategic platform as
21   opposed to strategy plan.
22       Q.    I apologize.  Her words were "the
23   final document the Opana ER Strategy Plan."
24       A.    Which is interesting.

Page 405

1        Q.    But, you're right, it is, in
2    fact, a strategic platform, correct?
3        A.    Yes, now the extent to which --
4    I'm not sure -- that's why I was flipping
5    through.  I don't recall specifically what
6    strategic platform was at that point, but I was
7    trying to educate myself on that.
8        Q.    Well, so that was the question I
9    had for you is looking at Exhibit 38, do you
10   recall a strategic platform being prepared for
11   Opana ER in August 2012?
12       A.    I don't.  I can refresh my
13   recollection by looking at it, but I don't
14   recognize it specifically, no.
15       Q.    So you've looked through it and
16   it doesn't refresh your recollection?
17       A.    I began that process and then we
18   went back on the record.
19       Q.    Well, let me ask you, let you
20   look through the document, do you recall using a
21   strategic platform for any products while at
22   Endo?
23       A.    No.  Actually, the term and the
24   format of this doesn't jump out at me as being

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1   familiar.  But, again, I saw many documents
2   during my time there, and this is quite some
3   time ago.
4        Q.    Okay.  If you want to just flip
5   quickly through the document and see if it
6   refreshes your recollection, and I can point you
7   to some specific pages.
8        A.    Okay.  Give me just a moment.
9   It's quite a comprehensive document.
10            (Witness reviews document.)
11           Why don't you point me where
12  we're going to go.
13       Q.    Sure, that might be good --
14       A.    Because, otherwise, I might be
15  flipping through pages --
16       Q.    I think that would be easier.
17       A.    -- that aren't helpful.
18       Q.    Well, let me just orient you.  If
19  you look to page E119.6 and 119.7 looks to be an
20  explanation of the overview of the strategic
21  platform format, at least, with copies I should
22  say.
23           You see it discusses that the
24  strategic platform dossier is an internal

Page 407

1   resource tool that outlines evidence-based
2   foundations/beliefs, provides strategic
3   foundation and referenced evidence that support
4   how we communicate about a treatment/disease and
5   guides coordinated activities throughout a
6   product's lifecycle.
7            Do you see that?
8        A.    Yes, I do.
9        Q.    And if you go to page E119.18,
10  which is entitled "Summary of Data Gaps," start
11  with that first page.
12       A.    118 is the first page?
13       Q.    Correct, of the Summary of Data
14  Gaps.
15       A.    I have that open.
16       Q.    This appears to be, correct, a
17  statement of aspirational statements about in
18  this case Opana ER and whether there is data as
19  of the date of this strategic platform to
20  support that aspiration or whether, as noted in
21  the top row there, data is needed; is that your
22  understanding of what this is conveying?
23           MR. LIMBACHER:  Object to form.
24           THE WITNESS:  I'm reading it in

Page 408

1   real time right now.  I mean, I honestly
2   don't recall how this was used, but, you
3   know, given the helpful slide that tried
4   to explain the purpose of the document,
5   so what I read here is that the data
6   needed column indicates areas for
7   potential investment in producing
8   additional data.  Whether or not that
9   means there's zero data now and there's
10  data desired in the future or there's
11  need to complete the data set, it's not
12  clear.
13  BY MS. SCULLION:
14       Q.    Okay.  This is a summary of -- it
15  says Summary of Data Gaps, you see that?
16       A.    Yes.
17       Q.    If you go to -- let's go to page
18  E119.51?
19       A.    51, okay.
20       Q.    Just to understand what is meant
21  here by data gap, you see on the right-hand
22  side, there are colored radio buttons on this
23  page?  You see green and red and on some of the
24  following pages, you'll see also yellow?

Page 409

1        A.    I just got to 51, so let me look
2   at it.
3        Q.    Sure.
4        A.    Yes, I think I see -- I think I
5   understand the reference here.
6        Q.    Right.  And then there's a key at
7   the bottom of this page which explains what is
8   meant by those radio buttons.  So that green
9   equals no gap for that particular item; yellow
10  being a study is planned or in progress to fill
11  the gap, correct?
12       A.    Yes.
13       Q.    And red indicates a gap exists
14  and no study is currently planned, right?
15       A.    That's what the legend explains.
16  That's how the legend explains the colors, yes.
17       Q.    Okay.  Let's keep paging ahead,
18  so for example, to page E119.53.
19           Do you see under the column
20  that's labeled "Data/Gap," the second row
21  describes "Chart review to demonstrate improved
22  functioning and sleep, and good tolerability
23  profile with Opana ER."
24           Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1    A.   Yes, I do.
2    Q.   And then in response to whether
3  there is, in fact, a data gap for that item,
4  there's a red radio button.
5       Do you see that?
6    A.   Yes, I do.
7    Q.   And is it correct that then that
8  means that there was no data to support --
9  sorry, strike that.
10      Does that red radio button mean
11  that there was, in fact, no chart review at the
12  time of this strategic platform and no study
13  currently planned, in this case a chart review?
14      MR. LIMBACHER:  Object to form
15      and foundation.
16      THE WITNESS:  Yes, with that
17      specific point that you added.  It
18      speaks to chart review, not lack of data
19      completely.
20  BY MS. SCULLION:
21    Q.   Correct.  It's stating what data
22  is missing, correct?
23    A.   It's stating in this case that a
24  chart review to demonstrate these attributes has

Page 411

1  not been conducted, and, apparently, there's no
2  plan to conduct that either.
3    Q.   Okay.
4    A.   Currently, as of this -- as of
5  the date of the production.
6    Q.   Okay.  And that would be true
7  with respect to each of the then red radio
8  buttons throughout this gap analysis, that the
9  red radio button is indicating that the specific
10  data indicated in the data gap column does not
11  exist, and no study is currently planned to fill
12  that gap?
13    A.   That's what the legend says.  Red
14  equals gap exists with no study currently
15  planned.
16    Q.   Okay.  Having looked at Exhibit
17  38 a little bit more, does this refresh your
18  recollection at all around the strategic
19  platform for Opana ER?
20    A.   Unfortunately not.  I literally
21  don't recall ever seeing this.  It's an
22  extraordinarily comprehensive document, and I'm
23  surprised I don't, so I don't -- I mean, Kristin
24  sent it to me, so it certainly was e-mailed to

Page 412

1  me, but it was six years ago, so perhaps that's
2  the reason.
3    Q.   Even putting aside the document,
4  do you recall, let's say, in the January 2013
5  time frame any discussion about looking at what
6  data or studies may be needed to extend the
7  lifecycle for Opana ER?
8      MR. LIMBACHER:  Object to form.
9      THE WITNESS:  Not specifically,
10      not without something to react to, I
11      don't.
12  BY MS. SCULLION:
13    Q.   Was lifecycle management one
14  aspect of your responsibilities in January 2013,
15  lifecycle management for Opana ER?
16    A.   Lifecycle management was always a
17  cross-functional team or the responsibility for
18  cross-functional team that included commercial
19  teams, so there would have been people who
20  reported up through my chain that were part of
21  that but also people from medical and
22  regulatory, et cetera, the other, you know, the
23  classic cross-functional teams in a pharma
24  world, so it what was a shared accountability.

Page 413

1    Q.   And as part of that shared
2  accountability, do you recall at any point in
3  time after the launch of reformulated Opana ER
4  consideration of potential ways to extend the
5  lifecycle of the product?
6    A.   Of the reformulated product?
7    Q.   Correct.
8    A.   To extend the lifecycle, not
9  sitting here right now, I don't recall any
10  specifics related to that.
11    Q.   Okay.  Was the success of the
12  citizen's petition Endo had filed against the
13  FDA to require -- strike that -- to have the FDA
14  find that Endo had withdrawn original Opana ER
15  for reasons of safety, was that something that
16  Endo understood, if successful, would extend the
17  exclusivity for Opana ER through 2029?
18      MR. LIMBACHER:  Object to form.
19      THE WITNESS:  Not necessarily.
20      Again, there were intellectual
21      property -- there was intellectual
22      property litigation ongoing throughout
23      that period that actually the company
24      prevailed in.  So the citizen's petition

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1      wasn't about extending exclusivity per
2          se, it was about asking the agency to
3          find that the old product had been
4          removed for reasons of safety, as you
5          pointed out.
6   BY MS. SCULLION:
7      Q.    But if Endo had been successful
8   in that citizen's petition, that is to remove
9   the original formulation of Opana ER NDA, then
10  the potential competitors would have to go
11  through Paragraph IV and patent challenge
12  process with respect to the reformulated version
13  of Opana ER, correct?
14         MR. LIMBACHER:  Object to form
15         and foundation.
16         THE WITNESS:  Yeah, I believe
17         that's generally correct.
18  BY MS. SCULLION:
19     Q.    Okay.  And Endo believed that if
20  the potential competitors were forced to do
21  that, that could potentially result in ongoing
22  exclusivity for reformulated Opana ER through
23  2029, correct?
24         MR. LIMBACHER:  Object to form

Page 415

1          and foundation.
2          THE WITNESS:  You know, again, as
3          I just mentioned, there was ongoing
4          patent litigation really to address
5          those topics, which the company ended up
6          prevailing in.  So the exclusivity
7          period, as it was determined, was
8          actually independent of the -- of any
9          changes to the product.
10  BY MS. SCULLION:
11     Q.    We've looked at Exhibit 38.  I
12  take it based on your testimony that you don't
13  recall the document, and you don't recall
14  discussions around data gaps concerning Opana
15  ER.  But you have no reason, though, to dispute
16  the accuracy of the statements in the document
17  as to certain data gaps that it does identify --
18         MR. LIMBACHER:  Object to form.
19  BY MS. SCULLION:
20     Q.    -- sitting here today?
21         MR. LIMBACHER:  The witness has
22         not had an opportunity to review the
23         entirety of the document.
24         THE WITNESS:  Again, I don't

Page 416

1   recall reviewing it.  I don't have any
2   reason to dispute it, but I also
3   can't -- can't attest to the validity of
4   any of it because I wasn't the author.
5   I wasn't involved in the development of
6   it.
7          MS. SCULLION:  So we're going to
8          end for today.  We have gone past 6:00.
9          We've tried to do, frankly, a good unit,
10         but we're going to end for today and
11         resume the deposition tomorrow at
12         approximately 2:30, if that is
13         convenient to you?
14         THE WITNESS:  Yes, thank you,
15         that will work.
16         MR. LIMBACHER:  I just want to be
17         clear before we all leave here today
18         that it's our position that we should be
19         able to get this deposition completed
20         tomorrow.  I would ask that everybody
21         use their best efforts to get it
22         completed tomorrow.
23             And do you have any expectation
24         as to how much more you have?

Page 417

1          MS. SCULLION:  I do not, sitting
2   here today, but we can talk tomorrow.  I
3   would anticipate that our portion of the
4   deposition would be done tomorrow.  I
5   know that counsel from Tennessee is also
6   here, so I suspect he'll have some
7   examination, as you may as well.
8          MR. LIMBACHER:  Understood.
9   Thank you.
10         THE VIDEOGRAPHER:  That concludes
11         today's testimony.  The time is
12         6:38 p.m.
13         (Witness excused.)
14              ---
15
16
17
18
19
20
21
22
23
24

105 (Pages 414 to 417)

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1        C E R T I F I C A T I O N
2              I, MARGARET M. REIHL, a
3        Registered Professional Reporter,
4        Certified Realtime Reporter, Certified
5        Shorthand Reporter, Certified LiveNote
6        Reporter and Notary Public, do hereby
7        certify that the foregoing is a true and
8        accurate transcript of the testimony as
9        taken stenographically by and before me
10       at the time, place, and on the date
11       hereinbefore set forth.
12              I DO FURTHER CERTIFY that I
13       am neither a relative nor employee nor
14       attorney nor counsel of any of the
15       parties to this action, and that I am
16       neither a relative nor employee of such
17       attorney or counsel, and that I am not
18       financially interested in the action.
19
20
21       ------------------------------
         Margaret M. Reihl, RPR, CRR, CLR
22       CSR #XI01497  Notary Public
23
24

Page 420

1        ACKNOWLEDGMENT OF DEPONENT
2
3              I, BRIAN LORTIE, do hereby
4        certify that I have read the foregoing
5        pages, and that the same is a correct
6        transcription of the answers given by me
7        to the questions therein propounded,
8        except for the corrections or changes in
9        form or substance, if any, noted in the
10       attached Errata Sheet.
11
12
13
         _____
14       BRIAN LORTIE          DATE
15
         Subscribed and sworn to before me this
16
17       _____ day of _____, 2018.
         My commission expires:_____
18
19       _____
         Notary Public
20
21
22
23
24

Page 419

1              - - - - - -
2              E R R A T A
3              - - - - - -
4        PAGE  LINE  CHANGE
5        ____ ____ _____
6        REASON: _____
7        ____ ____ _____
8        REASON: _____
9        ____ ____ _____
10       REASON: _____
11       ____ ____ _____
12       REASON: _____
13       ____ ____ _____
14       REASON: _____
15       ____ ____ _____
16       REASON: _____
17       ____ ____ _____
18       REASON: _____
19       ____ ____ _____
20       REASON: _____
21       ____ ____ _____
22       REASON: _____
23       ____ ____ _____
24       REASON: _____

106 (Pages 418 to 420)