Highly Confidential - Subject to Further Confidentiality Review

Page 421

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
- - -

IN RE:  NATIONAL            : HON. DAN A.
                            : POLSTER
PRESCRIPTION OPIATE         :
LITIGATION                  :
                            :
APPLIES TO ALL CASES        : NO.
                            : 1:17-MD-2804


- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
- - -
JANUARY 23, 2019
- - -
VOLUME II

          Videotaped sworn continued

     deposition of BRIAN LORTIE, taken

     pursuant to notice, was held at McCARTER

     & ENGLISH, LLP, 1600 Market Street,

     Suite 3900, Philadelphia, Pennsylvania,

     beginning at 2:36 p.m., on the above

     date, before Margaret M. Reihl, a

     Registered Professional Reporter,

     Certified Shorthand Reporter, Certified

     Realtime Reporter, and Notary Public.


                    - - -


          GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

## Page 422

1  APPEARANCES:
2
3  SEEGER WEISS LLP
   BY:  JENNIFER SCULLION, ESQUIRE
        ERICA KUBLY, ESQUIRE
4        SABRINA TYJER, PARALEGAL
   77 Water Street
5  New York, NY 10005
   (212) 584-0700
6  jscullion@seegerweiss.com
   Representing the Plaintiffs
7
8
   BRANSTETTER, STRANCH & JENNINGS, PLLC
9  BY:  JOE P. LENISKI, JR., ESQUIRE
   The Freedom Center
10 223 Rosa L. parks Avenue, Suite 200
   Nashville, Tennessee  37203
11 (625) 254-8801
   joeyl@bsjfirm.com
12 Representing the Tennessee Plaintiffs
13
14 GOODELL DEVRIES LEECH & DANN, LLP
   BY:  ROBERT LIMBACHER, ESQUIRE
15      ADAM S. TOLIN, ESQUIRE
   Two Commerce Square
16 2001 Market Street, Suite 3700
   Philadelphia, Pennsylvania  19103
17 (267) 765-3600
   rlimbacher@gdldlaw.com
18 atolin@gdldlaw.com
   Representing the Defendant Endo and
19 the witness
20
21
22
23
24

## Page 423

1  APPEARANCES: (cont'd)
2
3  PIETRAGALLO GORDON ALFANO
   BOSICK & RASPANTI, LLP
4  BY:  DOUGLAS K. ROSENBLUM, ESQUIRE
   1818 Market Street, Suite 3402
5  Philadelphia, Pennsylvania  19103
   (215) 988-1464
6  dkr@pietragallo.com
   Representing Cardinal Health
7
8
9  ALSO PRESENT:
10
   Carolyn M. Hazard, Litigation Counsel
11 Endo
12 Bill Geigert, Videographer
13 Bradley Smith, Trial Technician
14
15
16
17
18
19
20
21
22
23
24

## Page 424

1  APPEARANCES VIA TELECONFERENCE AND STREAM
2
3  ULMER & BERNE, LLP
   BY:  SARAH M. BENOIT, ESQUIRE
4  65 East State Street, Suite 1100
   Suite 1100
5  Columbus, Ohio  43215
   (614) 229-0016
6  sbenoit@ulmer.com
   Representing Amneal Pharmaceuticals, Inc.
7
8  JONES DAY
   BY:  TAYLOR GOODSPEED, ESQUIRE
9  555 California Street, 26th Floor
   San Francisco, California  94104-1500
10 (415) 875-5804
   tgoodspeed@jonesday.com
11 Representing the Defendant Walmart
12
   CLARK MICHIE LLP
13 BY:  BRUCE CLARK, ESQUIRE
   220 Alexander Street
14 Princeton, New Jersey  08540
   (609) 423-2142
15 Representing the Defendant,
   Pernix Therapeutics Holdings, Inc.
16
17
   REED SMITH LLP
18 BY:  SHANA E. RUSSO, ESQUIRE
        RYAN K. BLAKE, ESQUIRE
19 Three Logan Square
   1717 Arch Street, Suite 3100
20 Philadelphia, Pennsylvania  19103
   (215) 851-8280
21 srusso@reedsmith.com
   rblake@reedsmith.com
22 Representing the Defendant AmerisourceBergen
23
24             ---

## Page 425

1             I N D E X
2  WITNESS                    PAGE
   BRIAN LORTIE
3
4      By Ms. Scullion        430
       By Mr. Leniski         591
       By Mr. Limbacher       642
5
6          E X H I B I T S
7  NO.    DESCRIPTION         PAGE
8  Endo-
   Lortie-39 E-mail dated 8/1/01
9      Subject, Update from
       American Pain Foundation,
10     with attachments
       [ENDO-OPIOID MDL-06234029
11     through 4037]          443
12 Endo-
   Lortie-40 E-mail dated 11/10/15
13     Subject, Bilirakis Bill and
       CDC Guidelines
14     [ENDO-OPIOID MDL-01552423]  462
15 Endo-
   Lortie-41 E-mails dated 1/28/16
16     Subject, RE: VA PROMISE
       Act Amendments
17     [ENDO-OPIOID_MDL-01902150
       through 2151]          469
18
   Endo-
19 Lortie-42 E-mail dated 2/25/16
       Subject, Government
20     Affairs Update: Endo
       Victory on Amended
21     PROMISE Act
       [ENDO-OPIOID_MDL-01211912]  478
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 426

```
1               E X H I B I T S
2    NO.     DESCRIPTION        PAGE
3    Endo-
     Lortie-43 E-mail string, top one
4         dated 2/17/16
          Subject, RE: FW: CDC Follow-Up
5         [ENDO-OPIOID_MDL-04948416
          through 8419]          481
6
     Endo-
7    Lortie-44 E-mail dated 2/25/16
          Subject, Re: Government
8         Affairs Update: Endo
          Victory on Amended PROMISE
9         Act
          [ENDO-OPIOID_MDL-01211917
10        through 1918]          490
11   Endo-
     Lortie-45 E-mail string, top one
12        dated 3/16/16
          Subject, RE: Opana ER -
13        doses >30mg?
          [ENDO-OPIOID MDL-01902659
14        through 2662]          494
15   Endo-
     Lortie-46 E-mail string, top one
16        dated 7/7/16
          Subject, RE: Endo Government
17        Affairs Update: CARA
          [ENDO-OPIOID MDL-01230052
18        through 0055]          508
19   Endo-
     Lortie-47 E-mail string, top one
20        dated 2/12/16
          Subject, Re: Guidelines
21        [ENDO-OPIOID MDL-01563548
          through 3551]          516
22
23
24
```

Page 427

```
1               E X H I B I T S
2    NO.     DESCRIPTION        PAGE
3    Endo-
4    Lortie-48 E-mail string, top one
          dated 12/12/07
5         Subject, RE: Woman dies
          of apparent Opana ER
6         overdose in Paducah, KY
          [ENDO-OPIOID MDL-0077 4063
7         through 4067]          532
8    Endo-
     Lortie-49 Attachment 16
9         [ENDO-OR-CID-00694084
          through 4087]          538
10
     Endo-
11   Lortie-50 RiskMAP Update Report
          for Opana ER 5/22/08
12        [ENDO-CHI_LIT-00032209
          through 2237]          546
13
     Endo-
14   Lortie-51 Buc & Beardsley letter
          dated 3/2/09
15        [ENDO-OPIOID_MDL-01485661
          through 5665]          558
16
     Endo-
17   Lortie-52 Opana ER W-2 IVR vocal
          response listing for study
18        number M508202
          [Endo-CHI_LIT-00150080]   567
19
     Endo-
20   Lortie-53 E-mail dated 12/1/09
          Subject, 330SB1 Field
21        Visit - 12/1/09
          [ENDO-OPIOID_MDL-00992589
22        through 2591]          578
23
24
```

Page 428

```
1               E X H I B I T S
2    NO.     DESCRIPTION        PAGE
3    Endo-
     Lortie-54 E-mail string, top one
4         dated 1/23/19
          Subject, Opiates: Endo 30b6
5         [no Bates]             582
6    Endo-
     Lortie-55 E-mail dated 5/30/12
7         Subject, Draft Rx Drug
          Abuse Deck for 6/5/12
8         with attached slide deck
          produced natively
9         [ENDO-OPIOID_MDL-01941783
          through 1784]          596
10
     Endo-
11   Lortie-56 File Provided Natively
          slide deck of charts
12        [EPI001932425]         606
13   Endo-
     Lortie-57 E-mail dated 11/25/14
14        Subject, NOVEMBER 2014.pptx
          with attached slide deck
15        produced natively
          [ENDO-OPIOID_MDL-01333143]  615
16
     Endo-
17   Lortie-58 E-mails dated 11/13/14
          Subject, FW: TN Opana ER
18        [ENDO-OPIOID_MDL-02667006
          through 7007]          626
19
     Endo-
20   Lortie-59 E-mail string, top one
          dated 11/13/14
21        with attached slide deck
          produced natively
22        [ENDO-OPIOID_MDL-02667012]  630
23
24
```

Page 429

```
1               E X H I B I T S
2    NO.     DESCRIPTION        PAGE
3    Endo-
4    Lortie-60 E-mail string, top one
          dated 7/13/11
5         DEA meeting July 13, 2011
          [END000027562 through 7563]  660
6    Endo-
7    Lortie-61 RISKMAP UPDATE REPORT
          FOR OPANA ER
8         1/1/09-3/31/09
          [EPI000119179 through
9         9206]                  670
10   Endo-
11   Lortie-62 RISKMAP UPDATE REPORT
          FOR OPANA ER
          1/1/10-3/31/10
12        [ENDO-OR-CID-00681354
          through 1377]          671
13   Endo-
14   Lortie-63 RISKMAP UPDATE REPORT
          FOR OPANA ER
          1/1/11-3/31/11
15        [END00308793 through
          8831]                  672
16
     Endo-
17   Lortie-64 RISKMAP UPDATE REPORT
          FOR OPANA ER
18        1/1/11-9/30/11
          [EPI0000015268 through
19        5298]                  673
20   Endo-
     Lortie-65 RISKMAP UPDATE REPORT
21        FOR OPANA ER
          10/1/11-12/31/11
22        [ENDO-OR-CID-01044118
          through 4148]          675
23
24           ---
```

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1    THE VIDEOGRAPHER: Good
2    afternoon. We are back on the record.
3    Today's date is January 23rd, 2019, and
4    the time is 2:36 p.m. This is the
5    continuation of the deposition of Brian
6    Lortie.
7        Sir, I'm reminding you you're
8    still under oath.
9        THE WITNESS: Yes, thank you.
10   BY MS. SCULLION:
11       Q.   Good afternoon, Mr. Lortie.
12   Welcome back.
13       A.   Thank you.
14       Q.   As the videographer reminded you,
15   you're still under oath, you realize that?
16       A.   I understand.
17       Q.   Terrific. Between the time we
18   ended yesterday and today, did you do anything
19   further to prepare for the deposition?
20       A.   I did not.
21       Q.   Did you meet with counsel?
22       A.   Only on our way from here to --
23   as we were walking up, but nothing substantial.
24       Q.   And did you discuss your

Page 431

1    testimony with anyone other than counsel?
2        A.   No, I did not.
3        Q.   Okay. One of the things we
4    looked at early in the deposition yesterday was
5    your Severance Agreement --
6        A.   Yes.
7        Q.   -- with Endo. Do you remember
8    that?
9        A.   I do.
10       Q.   And you had testified that you
11   had told Endo that it was your intention to
12   leave Endo to go on to other prospects, correct?
13       A.   Yes, we had had that conversation
14   over the course of many months.
15       Q.   Okay. And so I think one of the
16   things that we're trying to understand is so you
17   said you were leaving Endo voluntarily, and yet
18   Endo paid you two years' worth of salary and
19   bonus.
20       Why did you get any severance
21   from Endo if you're the one who chose to leave?
22       MR. LIMBACHER: Object to form.
23       THE WITNESS: I was -- I had
24   indicated my intention to leave and go

Page 432

1    off to do something that I'd wanted to
2    do for a while. They had asked me to
3    stay so that the business wouldn't be
4    without a leader until they could have
5    adequate time to search for, recruit and
6    onboard a successor, and as a
7    compensation for that, we came to an
8    agreement for me to do that.
9    BY MS. SCULLION:
10       Q.   You stayed on for a few months
11   after you indicated that you intended to leave
12   Endo, right?
13       A.   It was actually quite a while.
14       Q.   How long?
15       A.   My announcement to the public
16   markets of my departure was, I believe, in early
17   May of 2016. We had been in discussion, of
18   course, for several months prior to that, and my
19   last day of being compensated as an employee was
20   the 30th of September, so it was the better part
21   of -- three-quarters of the year.
22       Q.   So you were -- I mean, you were
23   compensated for that time between when you made
24   the announcement and when you actually left,

Page 433

1    right?
2        A.   Yes.
3        Q.   So why did Endo pay you two
4    years' worth of salary for staying on and being
5    paid for a few months after you had indicated
6    you wanted to leave?
7        MR. LIMBACHER: Object to form
8    and foundation, asked and answered.
9        THE WITNESS: Yeah, I think I
10   answered that. It was important to them
11   to not have a period of time without
12   somebody leading one of their
13   businesses. So I agreed to stay, as
14   opposed to leaving when I had originally
15   raised my hand and said it's time for me
16   to go off and do my next project, I had
17   to delay and put off some things that I
18   was doing, and I deserved to be
19   compensated for that.
20   BY MS. SCULLION:
21       Q.   Had -- at the time that you
22   entered into the Severance Agreement, had you
23   raised any disputes with Endo with respect to
24   your employment?

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1    A.   No, I had not.
2    Q.   There's no pending dispute
3  between you and Endo?
4         MR. LIMBACHER:  Object to form.
5         THE WITNESS:  That's correct.
6  BY MS. SCULLION:
7    Q.   Okay.  Was there any pending
8  dispute between you and Endo about anything, for
9  example, intellectual property, any disputes at
10  all?
11        MR. LIMBACHER:  Object to form.
12        THE WITNESS:  No, not during the
13        entirety of my time there.
14  BY MS. SCULLION:
15   Q.   Okay.  Let's go back into your
16  corporate capacity.
17        We discussed yesterday that from
18  time to time, Endo did receive information from
19  IMS or Wolters Kluwer concerning levels of Opana
20  ER prescriptions, correct?
21   A.   I'm sorry, could you just ask
22  that again?
23   Q.   Sure.  From time to time Endo
24  received information from various sources about

Page 435

1  levels of Opana ER prescriptions, correct?
2    A.   That's correct.
3    Q.   And that would include, for
4  example, information from IMS, correct?
5    A.   Yes, IMS was one of the sources.
6    Q.   Wolters Kluwer was another
7  source?
8    A.   Yes.  I think it was IMS during
9  most of the time that I was there, but I know
10  that Wolters Kluwer was one of the other sources
11  of that type of information.
12   Q.   Okay.  And as part of its
13  anti-diversion policies and procedures, did Endo
14  have any procedures in place to actually go in
15  and investigate whether the levels of Opana ER
16  prescriptions reflected in the data that it was
17  receiving actually reflected legitimate
18  prescribing?
19        MR. LIMBACHER:  Object to form.
20        THE WITNESS:  What I can say to
21        that is, to my recollection, the risk
22        management committee met regularly and
23        one of the inputs that they had was
24        reviewing prescriptions, specifically

Page 436

1  anything that was raised as being
2        potentially anomalous.  I wasn't -- I
3        didn't sit on that committee, but there
4        were commercial representatives as well
5        as representatives from medical, legal,
6        regulatory and compliance.
7        So to the extent that they had
8        exposure to prescription patterns, I
9        would be surprised if they didn't use
10        that information for the purposes that
11        you point out, but I personally wasn't
12        part of that.
13  BY MS. SCULLION:
14   Q.   So, again, I'm asking you this as
15  the corporate representative, were there
16  policies or procedures in place under which the
17  risk management team was charged specifically
18  with investigating -- you used the word
19  anomalous -- anomalous prescribing with respect
20  to Opana ER?
21        MR. LIMBACHER:  Object to form.
22        THE WITNESS:  Well, again, I've
23        answered that to the best I could.  I
24        know that they were exposed, that one of

Page 437

1        the charters of that group was, among
2        other activities, to review
3        prescriptions that came into the types
4        of sources that you mentioned, and in
5        the context of that committee, they were
6        convened specifically for purposes of
7        risk management looking for signs of
8        abuse and diversion.  The details of how
9        that was reviewed and discussed and
10        acted on probably was a case-by-case
11        issue, so I don't have the specific
12        details on that.
13  BY MS. SCULLION:
14   Q.   And in the course of looking at
15  that data, do you know whether the risk
16  management team investigated whether the data
17  reflected legitimate prescribing?
18        MR. LIMBACHER:  Object to form.
19        THE WITNESS:  I don't know
20        specifically, but I'm sure that is
21        exactly what they were looking for, so,
22        otherwise, there was no reason for the
23        Risk Management Committee to have
24        exposure to prescriptions.  They weren't

5  (Pages 434 to 437)

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1    reviewing those prescriptions for
2    purposes of sales incentive or physician
3    targeting, for example.  They were
4    convened specifically for purposes of
5    risk management.
6  BY MS. SCULLION:
7        Q.    And what standards did the risk
8  management team use to determine whether they
9  were seeing anomalies?
10       A.    I don't know.
11       Q.    And what standard did the risk
12 management team use to determine whether any
13 prescriptions they were seeing represented
14 legitimate prescribing?
15       A.    Also, I don't know the --
16             MR. LIMBACHER:  Object to form
17       and object to the extent it falls
18       outside the scope of the topics on which
19       he's been designated.
20 BY MS. SCULLION:
21       Q.    To be clear, I'm asking was there
22 any actual policy that Endo had that the risk
23 management team relied to determine whether the
24 information it was seeing represented legitimate

Page 439

1  prescribing?
2             MR. LIMBACHER:  Same objections.
3             THE WITNESS:  Well, yes, I mean,
4       I've tried to answer that.  The team was
5       convened for that specific purpose.  So
6       one of the activities, among many that
7       they undertook on a regular basis, was
8       looking at and reviewing prescriptions
9       that came into the types and sources.
10      The specific procedure and policy I
11      wasn't part of and I didn't sit on that
12      team, so I don't have any further
13      detail.
14 BY MS. SCULLION:
15       Q.    And you can't speak to that as
16 the corporate representative today, correct?
17             MR. LIMBACHER:  Object to form
18       and object to the extent it falls
19       outside the scope of the topics on which
20       he's been designated.
21             THE WITNESS:  I've answered it to
22       the best of my ability.
23 BY MS. SCULLION:
24       Q.    Okay.  And do you know whether in

Page 440

1  -- as part of Endo's procedures -- sorry --
2  anti-diversion procedures, was the risk
3  management team making an assessment about
4  whether prescriptions were medically necessary?
5             MR. LIMBACHER:  Same objections.
6             THE WITNESS:  Yeah, I think my
7       answer is exactly the same.  They were
8       convened to look at prescriptions among
9       the other inputs to the activities of
10      that committee, for the sole purpose in
11      that case of understanding whether those
12      prescriptions were appropriate or
13      unusual for any way.
14            Beyond that, how they addressed
15      those, I'm just -- I wasn't part of that
16      team, so I can't give you any further
17      detail.
18 BY MS. SCULLION:
19       Q.    And I'm trying to understand when
20 in the context of what you just said in trying
21 to determine whether -- sorry -- whether the
22 prescriptions were appropriate or unusual in any
23 way, did that include an assessment of whether
24 the prescriptions were medically necessary?

Page 441

1             MR. LIMBACHER:  Same objections,
2       asked and answered.
3             THE WITNESS:  Yeah, and I don't
4       know any further detail than what I've
5       testified in answering that question.
6  BY MS. SCULLION:
7        Q.    Okay.  So let's turn to topic
8  number 39 for the corporate representative
9  issues, and that is Endo's collaboration with
10 other defendants.
11            Did Endo collaborate with any
12 other manufacturers with respect to issues of
13 marketing, sales, distribution of opioid
14 products?
15       A.    No.
16            MS. SCULLION:  Let's have Exhibit
17       Number E1326.
18 BY MS. SCULLION:
19       Q.    Endo was a long-time supporter of
20 the American Pain Foundation, correct?
21       A.    I'm not sure how long Endo was a
22 supporter of that.  I recognize that from time
23 to time through unrestricted medical grants and
24 the like that that that would have been one of

6 (Pages 438 to 441)

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1    the sources of support.
2        Q.    And the American Pain Foundation,
3    other supporters include other manufacturers of
4    opioids, such as Purdue, correct?
5        A.    That I don't know.
6        Q.    Do you know that as Endo's
7    corporate representative here today?
8            MR. LIMBACHER:  Object to form,
9        and I object as falling outside the
10       scope of the topics on which he's been
11       designated.  That falls under topic 36
12       of your deposition notice, and he has
13       not been designated on that topic.
14           MS. SCULLION:  This goes to the
15       questions of collaboration through the
16       APF.  Let me hand you what's been
17       marked as Exhibit Number --
18           MR. LIMBACHER:  The deposition
19       notice specifically references
20       relationships with a number of entities,
21       including the American Academy of Pain
22       Medicine, the American Pain Foundation,
23       the American Pain Society and others.
24           (Document marked for

Page 443

1        identification as Endo-Lortie Deposition
2        Exhibit No. 39.)
3    BY MS. SCULLION:
4        Q.    Let me hand you what's been
5    marked as Exhibit Number 39.
6            And for the record, Exhibit 39 is
7    Bates stamped ENDO-OPIOID_MDL-02634029.
8            Mr. Lortie, do you see Exhibit 39
9    is a August 1st, 2001 e-mail from Linda
10   Kitlinksi to, among others, Carol Ammon?
11       A.    Yes, I see that on the cover, the
12   e-mail cover, yes.
13       Q.    Carol Ammon was at the time the
14   CEO of Endo, correct?
15       A.    I believe so.  Again, August 2001
16   was fully eight years before I arrived at Endo,
17   but Carol was the founding CEO, so --
18       Q.    Right.
19       A.    -- that's probably correct.
20       Q.    Okay.  And do you see
21   Ms. Kitlinksi is referring to Mr. Giglio, the
22   new executive director of the American Pain
23   Foundation and that he's expressing his
24   appreciation for the support Endo has provided

Page 444

1    to the APF?
2            MR. LIMBACHER:  Object to form
3        and also object as falling outside the
4        scope of the topics on which he's been
5        designated.  This falls squarely within
6        topic number 36 of your deposition
7        notice.
8            THE WITNESS:  So would you just
9        mind reasking the question.
10   BY MS. SCULLION:
11       Q.    Yeah.  That Ms. Kitlinksi is
12   referring to Mr. Giglio, the new executive
13   director of the American Pain Foundation, and
14   she is conveying that he's expressing his
15   appreciation for the support Endo has provided
16   to the APF.
17           Do you see that?
18           MR. LIMBACHER:  Same objections.
19           THE WITNESS:  Yes, I read that in
20       Linda's e-mail.
21   BY MS. SCULLION:
22       Q.    And, in particular, it refers to
23   a grant submission request that the APF is going
24   to be sending to Endo, correct?

Page 445

1            MR. LIMBACHER:  Same objections.
2            THE WITNESS:  I don't know.  I'll
3        read on to see.
4    BY MS. SCULLION:
5        Q.    The end of the e-mail?
6        A.    This predates me, so, therefore,
7    I'm not -- I'm obviously not a recipient of it.
8            Yes.  And so I see where he -- as
9    you mentioned before, he expresses his
10   appreciation of support and is forwarding a copy
11   of something along related to a grant submission
12   request.
13       Q.    Okay.  And if you go to page --
14   sorry, we've marked Exhibit 39 as -- with E1326
15   at the top right-hand corner.
16           If you go to page E1326.3, which
17   is "Background and Update to Endo
18   Pharmaceuticals From the American Pain
19   Foundation."
20           Do you see in the second
21   paragraph of the overview of the American Pain
22   Foundation it states here, the "APF was founded
23   in 1997 by three former presidents of the
24   American Pain Society"?

                                    7 (Pages 442 to 445)

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1     MR. LIMBACHER: Object to form
2     and foundation and object as falling
3     outside the scope of the topics on which
4     he's been designated. Again, these
5     questions fall squarely within topic
6     number 36 of your deposition notice.
7     THE WITNESS: If it's okay, I'm
8     just going to read a couple of pages
9     here to orient myself.
10    BY MS. SCULLION:
11    Q.    I mean, the only question is do
12    you see that it says that the APF was founded in
13    1997 by three former presidents of the American
14    Pain Society?
15    A.    Yeah, just a second, if I could,
16    I just want to kind of ground myself, since this
17    was not a communication that --
18    Q.    I'll tell you, it's the only
19    question I have about this page.
20    A.    Sure, but it's just important
21    that I get what is being communicated here.
22    MR. LIMBACHER: Take your time
23    and review the document.
24    BY MS. SCULLION:

Page 447

1     Q.    I'll withdraw the question.
2     Now, is it your contention, is it
3     Endo's contention that Endo did not collaborate
4     with any other manufacturers of opioids such as
5     Purdue Pharma through the APF?
6     MR. LIMBACHER: Object to form,
7     foundation and to the extent it falls
8     outside the scope of the topics on which
9     he's been designated.
10    THE WITNESS: I believe the
11    question I answered originally was
12    regards to three specific topics, sales,
13    marketing and distribution, and the
14    answer to that is, no, Endo did not
15    collaborate with any other manufacturers
16    on those topics.
17    BY MS. SCULLION:
18    Q.    How about with respect to the use
19    of opioids, did it collaborate with other
20    manufacturers with respect to the use of
21    opioids?
22    MR. LIMBACHER: Same objections.
23    THE WITNESS: I'm not sure I
24    really understand the question.

Page 448

1     BY MS. SCULLION:
2     Q.    For example, with respect to
3     medical guidelines for the use of opioids, did
4     Endo collaborate with other manufacturers on
5     that issue?
6     MR. LIMBACHER: Same objections.
7     THE WITNESS: I don't -- I'm not
8     aware specifically because that didn't
9     fall squarely in my responsibility. To
10    the extent to which Endo collaborated
11    with any other manufacturer on a broad
12    topic, as you just mentioned,
13    guidelines, et cetera.
14    MS. SCULLION: So, counsel, is
15    Mr. Lortie here to testify on topic 39
16    with respect to collaboration among Endo
17    and any other pharmaceutical
18    manufacturers concerning use of opioid
19    products?
20    MR. LIMBACHER: He's here to
21    testify with regard to topic 39 as it
22    reads in your deposition notice and in
23    the context of the other topics which
24    you have set forth in your deposition

Page 449

1     notice.
2     He's not here to testify about
3     other topics that are clearly distinct
4     from topic number 39.
5     MS. SCULLION: Right, and is it
6     Endo's contention that topic 39 does not
7     include collaboration with other
8     pharmaceutical manufacturers concerning
9     the use of opioids as stated here --
10    I'll read for the record, our notice
11    states, any effort you, you're Endo,
12    made directly or through any third party
13    to collaborate with one or more other
14    pharmaceutical manufacturers or
15    distributors concerning marketing, use,
16    prescribing, sale, distribution or
17    regulation of any one or the class of
18    opioid products, including any
19    collaborative lobbying efforts
20    concerning any of the foregoing.
21    MR. LIMBACHER: You read that
22    correctly, counsel, and we may have
23    disagreement with regard to how you're
24    defining the word use, if that is the

8  (Pages 446 to 449)

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1    issue that's on the table.  But why
2    don't you use your time to ask him
3    questions.
4              MS. SCULLION:  I will use the
5    time to ask the questions.  It is our
6    contention that that is -- so
7    collaboration with respect to medical
8    guidelines, for example, would be part
9    of that topic.
10   BY MS. SCULLION:
11        Q.    Are you familiar with --
12            MR. LIMBACHER:  He answered those
13   questions, subject to my objections.
14            MS. SCULLION:  Right, and his
15   answer was he didn't know because it
16   wasn't within his area of
17   responsibility, and I was asking whether
18   he'd been prepared as a corporate
19   representative to speak to, for example,
20   Endo's collaboration with other
21   manufacturers on medical guidelines for
22   the use of opioids.
23   BY MS. SCULLION:
24        Q.    Let me ask you this question: are

Page 451

1    you familiar with medical guidelines?
2        A.    As a general topic.
3        Q.    Okay.  And can you explain what
4    your understanding is of --
5        A.    That was a yes.  I was asking you
6    for your clarification, as a general topic,
7    medical guidelines?
8        Q.    Yes.
9        A.    Yes, I am familiar.
10       Q.    And can you explain what your
11   understanding is of what medical guidelines are?
12       A.    Across any number of therapeutic
13   areas from time to time bodies of healthcare
14   professionals and other interested parties often
15   come together, occasionally, it's the government
16   or the CDC or others, to provide medical
17   guidelines, in other words, therapeutic
18   guidelines for approaches to certain disease or
19   diagnosis of disease or treatment of disease.
20   So just about my experience of many years in
21   this industry, that's something that occurs as a
22   matter of routine activity across any number of
23   therapeutic areas.
24   BY MS. SCULLION:

Page 452

1        Q.    And so for the layperson, do
2    medical guidelines relate to the use of the
3    given drug category?
4            MR. LIMBACHER:  Object to form.
5            THE WITNESS:  It's possible that
6    they could.  But as I tried to explain,
7    it could also speak to diagnosis,
8    therapeutic advances, therapy, as you
9    point out, so it could, but it also is a
10   broader and more broadly defined
11   category.
12   BY MS. SCULLION:
13       Q.    Could it -- do they also relate
14   to the prescribing of a given category of drug
15   products, guidelines for prescribing those?
16            MR. LIMBACHER:  Object to form.
17            THE WITNESS:  It could, yes,
18   sometimes that's the case.
19   BY MS. SCULLION:
20       Q.    Okay.  Are you prepared today, as
21   Endo's corporate representative, to speak to
22   Endo's collaboration with other manufacturers
23   concerning medical guidelines to the extent that
24   those guidelines relate to the use of opioid

Page 453

1    products?
2            MR. LIMBACHER:  Counsel, if you
3    have documents you want to put in front
4    of him that fall within the scope of
5    topic 39, he is prepared to answer those
6    questions.
7            MS. SCULLION:  I don't want to
8    sit here and show him documents if he's
9    not been prepared to speak to the topic,
10   and we are not going to have this time
11   come out of our 30(b)(6) time because
12   it's apparent that he has not been
13   prepared on the full scope of the
14   topics, but I do want to make sure I
15   understand.
16   BY MS. SCULLION:
17       Q.    Have you been prepared to speak
18   to Endo's collaboration with other manufacturers
19   on medical guidelines to the extent the
20   guidelines relate to the use of opioid products?
21            MR. LIMBACHER:  And, again,
22   counsel he's been prepared to testify
23   within the scope of a reasonable
24   definition and interpretation of topic

9 (Pages 450 to 453)

Highly Confidential - Subject to Further Confidentiality Review

Page 454

```
1      39, recognizing that there are a lot of
2    other topics in this deposition notice
3    that sometimes more specifically refer
4    to some of the issues that you are
5    raising.
6          So if you have questions about
7    particular documents, why don't you put
8    those documents in front of him, and
9    he'll be happy to answer those
10   questions, subject to my objections.
11   BY MS. SCULLION:
12        Q.   Were you prepared on that issue?
13        A.   I am sure I can shed light on
14   certain areas of that topic.  We just spoke
15   about the definition of guidelines and how
16   they're used.
17             There will be a level beyond
18   which I was not involved specifically, so I
19   can't attest based on my own experience because
20   I don't recall sitting on a guidelines
21   preparation committee, and -- but I'd be happy
22   to do my very best to answer the questions if
23   you can show me what you'd like me to respond
24   to.
```

Page 455

```
1        Q.   I was going to ask you, can you
2    tell me what you know, as Endo's corporate
3    representative, about the extent to which Endo
4    collaborated with other manufacturers of opioids
5    with respect to medical guidelines concerning
6    the use of opioids?
7             MR. LIMBACHER:  Object to form
8        and foundation and object to the extent
9        it falls outside the scope of the topics
10       on which he's been designated.  He is
11       not the corporate representative on any
12       and every issue that you care to raise
13       with him, counsel.
14            He has been specifically
15       designated on precise topics following
16       extensive communication back and forth
17       between lawyers for Endo and yourself.
18            MS. SCULLION:  None of this --
19       none of colloquy is going to be coming
20       out of our time.
21   BY MS. SCULLION:
22        Q.   Can you tell me what you know
23   about that issue as Endo's corporate
24   representative?
```

Page 456

```
1        A.   Sure, I can.  Based on my
2    experience, my recollections generally are that
3    when medical guidelines were either communicated
4    to Endo or when Endo had an opportunity to
5    respond to requests for having input, my view is
6    I understood Endo's contribution to those
7    discussions in concert with our physicians, with
8    our regulators, for example, our health economic
9    team, whatever the question was, we would
10   always, if invited, put the appropriate staff in
11   contact and respond to those.
12            To the extent that other
13   companies were involved and also asked to
14   contribute to guidelines, and, again, I'm
15   talking generally, I'm not speaking with regards
16   to any specific one, although I'd be happy to do
17   that, I can't tell you because I never had
18   visibility to the other groups, constituents or
19   companies that may have been asked to
20   contribute.  So my view on guidelines and my
21   experience with guidelines is I was looking at
22   it through Endo's involvement, but I was not
23   privy to other company's involvement.
24        Q.   Do you know, as Endo's corporate
```

Page 457

```
1    representative, can you tell me about Endo's
2    participation in the American Pain Society
3    guideline project?
4             MR. LIMBACHER:  Object to form
5        and foundation and object as falling
6        outside the scope of the topics on which
7        he's been designated.
8             THE WITNESS:  Specifically, I
9        cannot, but, again, I'd be happy to
10       review something to see if I have
11       information that would be helpful.
12   BY MS. SCULLION:
13        Q.   You've not been prepared on that
14   topic, correct?
15            MR. LIMBACHER:  That's because
16       he's not designated on that topic,
17       counsel.  The American Pain Society is
18       specifically referenced in topic 36 of
19       your deposition notice.  It is not in
20       topic number 39, and I don't see the
21       words medical guidelines anywhere in
22       topic 39.
23            MS. SCULLION:  Counsel, as you
24       know, I've asked him the question with
```

10  (Pages 454 to 457)

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1    respect to use of opioids and it's
2    squarely within topic 39.  I'm not going
3    to have any of this colloquy come out of
4    our time for a 30(b)(6) deposition.
5            MR. LIMBACHER:  You're the one
6    who is choosing to question him on
7    topics on which he has not been
8    designated.
9            MS. SCULLION:  Counsel, we're not
10   doing this.  If you want to do this off
11   the record, I'm happy to do it.  I'm not
12   doing it on the record anymore.
13   BY MS. SCULLION:
14       Q.    Do you know as Endo's corporate
15   representative whether Endo co-sponsored, along
16   with other manufacturers of opioids, prescribing
17   guides for opioids?
18       A.    I'm not aware of such a thing,
19   no.
20       Q.    Not prepared to speak to that,
21   correct?
22       A.    I'm not aware of that having
23   happened.
24            MR. LIMBACHER:  Object to form

Page 459

1    and foundation and object to the extent
2    it falls outside the scope of the topics
3    on which he's been designated.
4    BY MS. SCULLION:
5        Q.    Are you prepared to speak as
6    Endo's corporate representative with respect to
7    Endo's collaboration with other manufacturers of
8    opioids on the REMS implementation?
9            MR. LIMBACHER:  Object to form,
10   foundation and to the extent it falls
11   outside the scope of the topics on which
12   he's been designated.  I don't see any
13   reference to REMS implementation in
14   topic number 39.
15           THE WITNESS:  I think we've
16   testified before, REMS was an
17   industry-wide requirement by the FDA,
18   and, therefore, other companies -- I'm
19   sure every manufacturer was involved.
20           I know Endo's involvement in
21   that.  Again, same answer as before, to
22   the extent as REMS was being developed
23   and we were required to implement it as
24   part of our risk management program

Page 460

1    through our own internal people, I was
2    aware of our contribution to that and
3    our responsibilities.  I was not privy
4    to what other companies' input on that
5    was.  If I can just finish.
6    BY MS. SCULLION:
7        Q.    Sure, please.  I thought you
8    were.  I apologize, go ahead.
9        A.    I do recall that, in general,
10   knowing that other companies were part of that,
11   again, because it was industry wide requirement.
12       Q.    You say it was an industry-wide
13   requirement, so it was a regulation on the
14   industry with respect to opioid products,
15   correct?
16           MR. LIMBACHER:  Same objections.
17           THE WITNESS:  I believe that's
18   correct, yes.
19   BY MS. SCULLION:
20       Q.    Okay.  But you have not reviewed
21   documents or otherwise prepared to speak to
22   Endo's collaboration with any other
23   manufacturers on the REMS initiative as part of
24   the regulation of opioid products, correct?

Page 461

1            MR. LIMBACHER:  Object as falling
2    outside the scope of topic number 39 on
3    which he has been designated.
4            THE WITNESS:  I've explained to
5    you the depth of my knowledge
6    specifically on the REMS process.  I
7    wasn't a part of the working group, so I
8    don't know.
9    BY MS. SCULLION:
10       Q.    Okay.  As part of your
11   preparation for the deposition, did you review
12   the RiskMAP updates that Endo submitted to the
13   FDA?
14       A.    I reviewed probably some of them.
15   I'm not sure I reviewed every single one, but I
16   did review sequence of them and studied them to
17   get a general sense what I understand, you know,
18   so I understand what those were.
19       Q.    Okay.  We'll come back to that.
20   I just wanted to make sure I understood.
21           MS. SCULLION:  Could I have 1570,
22   1574, 1571.
23   BY MS. SCULLION:
24       Q.    I'm going to switch back to your

11 (Pages 458 to 461)

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1    personal capacity, to be very clear.
2         A.    Thank you.  I appreciate the
3    clarification.
4         Q.    No problem.
5         (Document marked for
6         identification as Endo-Lortie Deposition
7         Exhibit No. 40.)
8    BY MS. SCULLION:
9         Q.    Mr. Lortie, Endo was involved in
10   some lobbying efforts in 2016 with respect to
11   the VA Promise Act.
12        Do you recall that?
13        A.    Not specifically, but I'd be
14   happy to review documents to help jog my memory.
15        Q.    Do you recall the VA Promise Act,
16   an act that, among other things, concerned
17   medical guidelines that the VA would use with
18   respect to the use of long-acting opioids?
19        A.    Based on what you just said, I
20   recall a little bit, but not a lot of detail.
21        Q.    Okay.
22        A.    I haven't reviewed anything
23   relative to that.
24        Q.    Okay.  Let me hand you what's

Page 463

1    been marked as Exhibit 40.
2         And for the record, Exhibit 40 is
3    Bates stamped ENDO-OPIOID_MDL-01552423 and
4    that's stamped on the upper right-hand corner
5    E1570 --
6         A.    I'm sorry, just the stamp on the
7    lower right, I don't believe I've got the same
8    number you mentioned.
9         Q.    The upper right, does yours say
10   E1570?
11        A.    It says E1574.1.
12        Q.    Oh, I'm sorry.  I handed you the
13   wrong document.
14        A.    And I was also referring to the
15   Bates stamp as different.
16        Q.    I meant 1570.
17        A.    Checking to make sure I'm with
18   you.
19        Q.    Sure.  Thank you very much.  I
20   misspoke.  Thank you.
21        Try this again.  So I'm handing
22   you what's marked as Exhibit 40.
23        A.    Everyone gets a do-over.
24        Q.    Thank you.

Page 464

1         And this Exhibit 40 is Bates
2    stamped ENDO-OPIOID-MDL_01552423, and just to
3    make sure in the upper right-hand corner E1570,
4    correct?
5         A.    Yes, that is the document I have.
6         Q.    Great, terrific.
7         You see this is a November 2015
8    e-mail from Timothy Byrne to yourself and others
9    at Endo?
10        A.    I do.
11        Q.    And the subject matter here is
12   Bilirakis Bill and CDC guidelines.
13        Do you see that?
14        MR. LIMBACHER:  Take your time
15        and review the document.
16        THE WITNESS:  Yeah, that's what's
17        written in the subject line.  I'll just
18        take a look at the text here for a
19        moment.
20   BY MS. SCULLION:
21        Q.    Sure.
22        A.    (Witness reviews document.)
23        Okay.  Thank you.
24        Q.    Okay.  Looking at Exhibit 40,

Page 465

1    does this refresh your recollection about Endo's
2    lobbying with respect to what's called here the
3    Bilirakis bill, it's called within the -- sorry,
4    in the body of the e-mail, it does refer to the
5    bill, and it's -- strike that.
6         Does this refresh your
7    recollection about a bill concerning the VA's
8    use of the CDC guidelines?
9         A.    It doesn't specifically refresh
10   my recollection, but I do read that here, so
11   it's clear that that's the connection that's
12   being made.
13        Q.    Okay.  And if you -- who was Tim
14   Byrne?
15        A.    Tim Byrne was a member of our --
16   trying to remember specifically what that
17   department was called, but essentially our -- he
18   was not in our Washington office but government
19   affairs.
20        Q.    Government affairs?
21        A.    Thank you, government affairs.
22        Q.    And government affairs, among
23   other things, worked with lobbyists that Endo
24   engaged; is that right?

12  (Pages 462 to 465)

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1      MR. LIMBACHER:  Object to form
2  and foundation.
3      THE WITNESS:  Sorry, to the
4  extent that lobbyists were engaged, they
5  would have been engaged through that
6  department, yes.
7  BY MS. SCULLION:
8      Q.    Okay.  And if you look in the
9  first paragraph of Mr. Byrne's e-mail in the
10  second sentence, do you see that he explains in
11  the second half of that sentence, we are
12  opposing a provision in this Bilirakis bill,
13  "opposing a provision that would require the
14  VA/DOD Clinical Practice Guideline for the
15  Management of Opioid Therapy for Chronic Pain be
16  updated to include recommended guidelines as
17  compiled by the Centers for Disease Control and
18  Prevention (CDC)."
19      Do you see that?
20      A.    Yes, I do.  I read that.
21      Q.    Okay.  And then Mr. Byrne goes on
22  to explain in the next paragraph, "we," Endo,
23  "are currently working with many other
24  stakeholders in opposing the recently proposed

Page 467

1  CDC Guidelines for Prescribing Opioids for
2  Chronic Pain."
3      Did I read that correctly?
4      A.    You read the sentence correctly.
5      Q.    Okay.  And the other
6  stakeholders, that included other opioid
7  manufacturers; is that right?
8      A.    That's not clear here.  It says
9  other stakeholders.
10      Q.    Do you recall that Endo worked
11  with other manufacturers, among other
12  stakeholders, in opposing the CDC guidelines?
13      A.    Not specifically, I don't recall.
14      Q.    And he goes on to explain that
15  the reason that Endo was opposing the CDC
16  guidelines is because, in Endo's view, they
17  would oppose dosing and duration limits and
18  restrict access for patients.
19      Do you see that?
20      MR. LIMBACHER:  Object to form.
21      THE WITNESS:  Just finding that
22  line.  Yes, you read that correctly.
23  BY MS. SCULLION:
24      Q.    Okay.  And so, again, if you go

Page 468

1  to the last paragraph, last sentence before the
2  closing of Mr. Byrne's e-mail he says, "We will
3  also continue to work with those in the pain
4  community in proposing the proposed CDC
5  guidelines."
6      Do you see that?
7      A.    Yes, you read that correctly.
8      Q.    And looking at that, again, does
9  that refresh your recollection that Endo was
10  collaborating with other opioid manufacturers in
11  opposing the proposed CDC guidelines?
12      A.    No, it does not.
13      Q.    Do you recall that Endo worked
14  with the Pain Care Forum in opposing the CDC
15  guidelines?
16      A.    I don't, not specifically, no.
17      Q.    Do you recall Endo working with
18  any organizations in opposing the CDC
19  guidelines?
20      A.    This doesn't help me recall
21  anything, no.
22      Q.    Okay.  Let's go to -- Mr. Lortie,
23  you personally did go to lobby against the
24  inclusion -- sorry -- you went to personally

Page 469

1  lobby against a bill that would have required
2  the VA to follow only the CDC guidelines with
3  respect to the use of opioids, correct?
4      A.    I don't recall that, no.
5      Q.    Okay.  Hand you what's been
6  marked as Exhibit number 41.
7      (Document marked for
8      identification as Endo-Lortie Deposition
9      Exhibit No. 41.)
10  BY MS. SCULLION:
11      Q.    And Exhibit 41 is Bates stamped
12  ENDO-OPIOID_MDL-01902150, and it's in the upper
13  right-hand corner E1574.
14      A.    Yes, this is the one I had
15  before.
16      Q.    It is.
17      And if you will look at the
18  bottom half of the first page, E1574.1, it's an
19  e-mail -- there's an e-mail from you to Brian
20  Munroe, subject matter: VA Promise Act
21  amendments.
22      And am I correct that you are
23  writing to Brian and that you're agreeing with
24  him that the efforts Brian describes below in

13  (Pages 466 to 469)

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1   his e-mail concerning the VA Promise Act was an
2   important achievement; is that right?
3           A.    That's -- that is what I have
4   written in the e-mail, yes.
5           Q.    Okay.  So let's look at what
6   Mr. Munroe is conveying.
7               If you go to the last page of the
8   exhibit, E1574.2, you see that Mr. Munroe is
9   explaining the amendment to the VA Promise Act
10  amendment language that you're congratulating
11  him on.
12              And if you look, he explains that
13  the original version of the bill's language,
14  this is the House bill, stated in subsection
15  (a)(1) "In accordance with subsection (b),
16  common recommended guidelines for safely
17  prescribing opioids for the treatment of
18  chronic, non-cancer pain in outpatient settings
19  as compiled by the Director of the Centers for
20  Disease Control and Prevention."
21              Do you see that was the original
22  language in the bill?
23          A.    I might be looking at the wrong
24  place.  Could you just orient me, so I'm --

Page 471

1           Q.    Absolutely?
2           A.    -- page 1574.2.
3           Q.    Right.  And if you look where
4   he's explained "The amendment removes the CDC
5   language."
6               Do you see that sentence?
7           A.    I see a sentence that says that,
8   yes.
9           Q.    Right.  And then he goes on to
10  explain "The original states."
11          A.    I see that.
12          Q.    And then he's set forth the
13  original language of the House bill in question.
14          A.    So if I may just read that.
15          Q.    Absolutely.
16          (Witness reviews document.)
17  Okay.  I read that paragraph.  Thank you.
18          Q.    Okay.  So do you understand that
19  then the original language for the bill would
20  have had the VA using the guidelines for safely
21  prescribing opioids for the treatment of
22  chronic, non-cancer pain in outpatient settings
23  as compiled by the director of the Centers for
24  Disease Control and Prevention, that was the

Page 472

1   original bill language, right?
2           A.    Yes, I see that, that language
3   represented here, yes.
4           Q.    Okay.  So the original bill was
5   going to have VA using the CDC guidelines, and
6   the amendment below that that Mr. Munroe is
7   sending on to you has changed it to -- if you
8   look at subsection now (a)(1) there would be a
9   advisory committee to conduct a thorough review
10  of the most recent VA/DOD Clinical Practice
11  Guideline for Management of Opioid Therapy for
12  Chronic Pain and (2) make recommendations to the
13  secretaries with respect to updating the
14  clinical practice guideline.
15              Do you see that?
16          MR. LIMBACHER:  Object to form.
17          THE WITNESS:  Yes.
18  BY MS. SCULLION:
19          Q.    And so the amendment has gone
20  from dictating that the VA will use the CDC
21  guideline for opioids for the treatment of
22  chronic, non-cancer pain to now just a review
23  and recommendation with respect to clinical
24  practice guidelines; that's the amendment,

Page 473

1   right?
2           MR. LIMBACHER:  Object to form.
3           THE WITNESS:  Well, in subsection
4       (a), which is where you've oriented my
5       attention, it says that an advisory
6       committee will be convened to, as you
7       read, conduct a review of the guidelines
8       and make recommendations with respect to
9       updating the clinical practice
10      guideline.
11  BY MS. SCULLION:
12          Q.    Right.  Whereas the original
13  right above that stated that the secretary of
14  the VA and the secretary of defense shall
15  jointly update the VA/DOD Clinical Practice
16  Guideline for Management of Opioid Therapy for
17  Chronic Pain to include specifically the CDC
18  guideline?
19          A.    Correct.
20          Q.    So, originally, it was -- the
21  bill was you will include the CDC guideline,
22  and, as you point out, the amendment was there
23  will be a --
24          A.    An advisory committee.

14  (Pages 470 to 473)

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1    Q.    -- an advisory committee convened
2  to decide on guidelines, correct?
3    A.    Or to review and make
4  recommendations.
5    Q.    Correct, thank you.
6    A.    That's what I read, yes.
7    Q.    If you go back now to the first
8  page of Exhibit 41, looking at Mr. Munroe's
9  first paragraph of his e-mail, where he is
10  explaining to you and others, "we," Endo, "have
11  been working closely with physicians, patient
12  groups, and other external stakeholders to
13  oppose arbitrary opioid dose and duration limits
14  that are a central feature of proposed CDC
15  guidelines."
16        Did I read that correctly?
17    A.    I'm sorry, I'm just looking at
18  the overall e-mail, so could you just point me
19  to that again.
20    Q.    The very first sentence of
21  Mr. Munroe's e-mail.
22    A.    At the bottom?
23    Q.    Correct.
24    A.    Yes, okay.

Page 475

1    Q.    I read that correctly?
2    A.    Let me just -- can you just --
3  I'm sorry, can you just read that.
4    Q.    Sure. "We have been working
5  closely with physicians, patient groups, and
6  other external stakeholders to oppose arbitrary
7  opioid dose and duration limits that are a
8  central feature of proposed CDC guidelines."
9    A.    Yes, that's correct. That's
10  written correctly.
11    Q.    And then if you go to the last
12  sentence in that same paragraph, do you see it
13  references that you and Matt, which I take to be
14  Matt Maletta, were coming to the Hill next week
15  to press our case directly to key members of
16  Congress.
17        Do you see that?
18    A.    Yes, I see that he wrote that.
19    Q.    Does this refresh your
20  recollection that you and Matt, and was that
21  Matt Maletta, went to the Hill to lobby against
22  adoption of the CDC guidelines by the VA?
23        MR. LIMBACHER: Object to form.
24        THE WITNESS: It doesn't

Page 476

1  specifically. I've made a number of
2  visits to Capitol Hill with Brian and
3  others. I did go there once or twice
4  with Matt as well. Now, whether or not
5  this was that one, I don't recall
6  specifically.
7  BY MS. SCULLION:
8    Q.    Okay. But you don't have any
9  reason to dispute the accuracy of what
10  Mr. Munroe has written in his e-mail, correct?
11    A.    I don't recall it specifically,
12  and I'm noting, and this is why I was distracted
13  before, he refers a trip next week. In the
14  e-mail he writes, on January 28th and then
15  further at the top, he -- on the same date he
16  writes, thank you for your leadership and
17  friendship and for coming to DC. So unless
18  there's some inconsistency in the dates in the
19  way it was produced, which is possible, that's
20  why I'm trying to line up specifically which
21  visit we're talking about. As I said, it wasn't
22  uncommon to visit the Hill, not just for Endo --
23  not just for opioid related but for Endo related
24  business. Remember we had a pharmaceutical

Page 477

1  business that spanned broadly beyond just Opana
2  ER.
3    Q.    Right, but this is -- the first
4  paragraph of Mr. Munroe's e-mail at the bottom
5  of Exhibit 41 is speaking to Endo's efforts to
6  oppose adoption of the CDC guidelines, and it's
7  at the end of that paragraph is where he is
8  saying that you and Matt will be coming to the
9  Hill next week to press our case directly to key
10  members of Congress. He is speaking about you
11  coming to lobby on this particular topic,
12  correct?
13        MR. LIMBACHER: Object to form.
14        THE WITNESS: That's what he
15  writes about here, but not -- just for
16  clarification, you characterized it as
17  opposition to the CDC guidelines. His
18  line at the top, as you've read into the
19  record, is opposing arbitrary dose and
20  duration limits that are a feature of
21  the guidelines, so I just wanted to
22  clarify that point.
23  BY MS. SCULLION:
24    Q.    Right.

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1    Endo opposed the CDC guidelines
2  being adopted because of Endo's opposition to
3  those aspects of the guidelines, correct?
4    MR. LIMBACHER:  Object to form,
5  misstates his testimony.
6    THE WITNESS:  And, again, I don't
7  recall the specifics, but I was just
8  clarifying what you had read with regard
9  to that specific line in the context of
10  the e-mail that you had me review.
11    (Document marked for
12  identification as Endo-Lortie Deposition
13  Exhibit No. 42.)
14  BY MS. SCULLION:
15    Q.    Mr. Lortie, I'm going to hand you
16  what's been marked as Exhibit Number 42.
17    And it's Bates stamped
18  ENDO-OPIOID_MDL-01211912, and it has in the
19  upper right-hand corner E1571.1, correct?
20    A.    Yes, I have that.
21    Q.    Okay.  And this is now dated --
22  an e-mail, sorry, from Scott -- Andrew Scott
23  dated February 25th, 2016.
24    Do you see that?

Page 479

1    A.    Yes, I do.
2    Q.    And Mr. Scott, as it says in his
3  signature block, was the government affairs
4  liaison for Endo at the time, correct?
5    A.    Yes.
6    Q.    Down in DC, right?
7    A.    Yes, he worked in our office in
8  Washington, DC.
9    Q.    Okay.  And he's writing to you
10  and others at Endo, and the subject matter of
11  his e-mail is "Government Affairs Update:  Endo
12  Victory on Amended Promise Act."
13    Did I read that correctly?
14    A.    Yes, it says "Government Affairs
15  Update: Endo Victory on Amended Promise Act."
16    Q.    Okay.  In the second paragraph of
17  Mr. Scott's e-mail, do you see that he is
18  conveying that there was a significant victory
19  for Endo in the removal of language that would
20  have required the implementation of the proposed
21  CDC guidelines.
22    Do you see that?
23    A.    You read that correctly.
24    Q.    Okay.  So this is then showing

Page 480

1  that the opposition Endo had to VA's adoption of
2  that particular version of the CDC guidelines
3  through the House bill, that opposition was
4  successful, right?
5    MR. LIMBACHER:  Object to form.
6    THE WITNESS:  I'm just reading
7  elsewhere.  It appears to be he's
8  updating the recipients of the e-mail on
9  an amended version of the House
10  legislation that was moving through the
11  Congress, and it incorporated a number
12  of different things, not just
13  specifically the language that would
14  have -- I think he meant would have
15  required implementation of the
16  guidelines.
17  BY MS. SCULLION:
18    Q.    Right, but he does point out in
19  what's labeled as subparagraph number 1 in
20  Mr. Scott's e-mail what we discussed earlier,
21  which was the amended language that creates an
22  advisory committee to conduct a review of the
23  VA/DOD's Clinical Practice Guidelines, and he
24  says in the second sentence of that same

Page 481

1  paragraph, "The House version does not require
2  VA to adopt CDC guidelines," right?
3    A.    Yeah, it says "Creates an
4  advisory committee to conduct a thorough review
5  of the most recent VA/DOD Clinical Practice
6  Guideline for Management of Opioid Therapy for
7  Chronic Pain and make recommendations to update
8  the Clinical Practice Guideline," and it goes on
9  to say, "The House version does not require VA
10  to adopt the CDC guidelines."
11    Q.    And do you recall that at the
12  same time the House bill was going through,
13  there also was a Senate bill with respect to
14  adoption of the CDC guidelines?
15    A.    I do not recall that, no.
16    Q.    Okay.
17    (Document marked for
18  identification as Endo-Lortie Deposition
19  Exhibit No. 43.)
20  BY MS. SCULLION:
21    Q.    Let's look at what's been marked
22  Exhibit Number 43.
23    And Exhibit Number 43 is Bates
24  stamped ENDO-OPIOID_MDL-04948416, and at the top

16 (Pages 478 to 481)

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1    of the upper right-hand corner is E1576,
2    correct?
3         A.    Yes, I have that document.
4         Q.    Okay.  If you go to page E1576.2
5    starting at the beginning of the e-mail chain
6    here, do you see this is an e-mail from Robert
7    Smith at Venable to Drew Hudson, who is
8    indicated as being a judiciary -- sorry,
9    representative for the judiciary committee,
10   Senate judiciary committee?
11              MR. LIMBACHER:  Object to form.
12              THE WITNESS:  If I could just
13         take a minute, there's a lot of e-mails
14         here.
15   BY MS. SCULLION:
16        Q.    Sure.
17        A.    A lot of short e-mails, so I just
18   want to make sure I understand the
19   communication.
20              (Witness reviews document.)
21   Okay.  Thank you.  So you were pointing me on
22   76.2?
23        Q.    Sure, let's -- we're going to
24   start at the beginning of the e-mail chain, and

Page 483

1    let me just walk you through it.
2              You see it's an e-mail from
3    Robert Smith to Drew Hudson?
4         A.    And this is at the bottom of --
5         Q.    1576.2.
6         A.    -- the second page, yes, I see
7    that.
8         Q.    And Mr. Smith, he was a lobbyist
9    engaged by Endo, correct?
10              MR. LIMBACHER:  Objection, form
11        and foundation.
12              THE WITNESS:  I don't recall.
13   BY MS. SCULLION:
14        Q.    Okay.  And you see Mr. Smith's
15   e-mail to Mr. Hudson is referring, if you look
16   in the first line of his e-mail, to section 101
17   of S.524, that's a Senate bill, right, Senate
18   524?
19        A.    I'm not sure.  I don't know.
20        Q.    You see that Mr. Hudson, his
21   e-mail address indicates he is with the
22   judiciary committee for the Senate?  It says
23   judiciary-rep.senate.gov?
24        A.    That's his e-mail address.  I'm

Page 484

1    not really sure I know what that means, but it
2    says judiciary-rep.senate.gov.
3         Q.    Okay.  And Mr. Smith is following
4    up, it looks like, on a phone conversation that
5    Mr. Hudson had, it says, with Endo to talk about
6    section 101 of Senate 524.
7              Do you see that?
8         A.    I see the sentence that says,
9    thanks for time on the phone yesterday.
10        Q.    With Endo?
11        A.    With Endo to talk about section
12   101 of S.524.
13        Q.    And he says that the conversation
14   was to talk about "our concerns about the CDC
15   guidelines added at mark-up," correct?
16        A.    Misspelled guidelines, but, yes,
17   I see that sentence.
18        Q.    Right.
19              And then Mr. Smith goes on as a
20   follow-up to say, we, I assume he is referring
21   to Endo, can live with it if 5 words are added.
22              Do you see that?
23              MR. LIMBACHER:  Object to form.
24              THE WITNESS:  I see the sentence

Page 485

1    that has "if 5 words were added."  It
2    goes on to designate, I guess, what
3    they're adding to.
4    BY MS. SCULLION:
5         Q.    Right, he says they're adding it
6    to section 101(d)(1)(B) of Senate 524, and the
7    words he is asking to be added are "existing
8    relevant evidence-based guidelines."
9              Do you see that?
10        A.    Yes, I see that.
11        Q.    And he explains the reason Endo
12   can live with the bill if those 5 words are
13   added is "so that other evidence-based
14   guidelines (i.e., governmental (e.g. VA, DOD, et
15   al.) and nongovernmental (e.g. AMA)) also are
16   taken into consideration."
17              Do you see that?
18              MR. LIMBACHER:  Object to form.
19              THE WITNESS:  Yes.
20   BY MS. SCULLION:
21        Q.    And then if you go up to the
22   response from Mr. Hudson, Mr. Hudson says that
23   he has reached out to Chairman Grassley's office
24   about the proposal and says, "It certainly

17 (Pages 482 to 485)

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1    doesn't seem like there would be any problem
2    having the task force consider a wider range of
3    guidelines than only the ones created by the
4    CDC."
5         Do you see that?
6         A.   Yes, I do see that.
7         Q.   And that was because Endo, again,
8    was opposed to certain aspects of the CDC
9    guidelines with respect to the use of opioids in
10   the treatment of chronic, non-cancer pain,
11   right?
12        MR. LIMBACHER:  Objection, form
13   and foundation.
14        THE WITNESS:  I can't draw that
15   conclusion here.  This e-mail suggests
16   that the language that was requested is
17   added so that other evidence-based
18   guidelines as you had read, VA, DOD, et
19   al., and nongovernmental, e.g. AMA, are
20   also taken into consideration.
21   BY MS. SCULLION:
22        Q.   Right.  So the CDC guidelines
23   would not be the sole guidelines being used,
24   correct?

Page 487

1         MR. LIMBACHER:  Object to form.
2         THE WITNESS:  Again, beyond that
3    detail, I'm not sure what I can
4    conclude.
5    BY MS. SCULLION:
6         Q.   Okay.  Then if you go up to the
7    next e-mail, now a response from Mr. Smith back
8    to Mr. Hudson, after Mr. Hudson has indicated
9    that it certainly doesn't seem that there'll be
10   a problem with having the task force consider a
11   wider range of guidelines than only the ones
12   created by the CDC, Mr. Smith says, "Thanks very
13   much.  This is really important to the company
14   so please let me know if committee staff reacts
15   and if you need any additional ammo."
16        Do you see that?
17        A.   Yes.
18        Q.   And this change to the Senate
19   bill was really important to Endo, correct?
20        MR. LIMBACHER:  Object to form
21   and foundation.
22        THE WITNESS:  I don't recall.  I
23   don't recall.
24   BY MS. SCULLION:

Page 488

1         Q.   If you go to the first page of
2    Exhibit 43, now looking at the e-mail at the
3    bottom that is from Mr. Smith to Mr. Munroe
4    dated February 16, 2016.
5         Do you see that?
6         A.   From Smith to Munroe on
7    February 26th, yes.
8         Q.   February 16th.
9         A.   I'm sorry.  I thought that's what
10   I said, my mistake.  February 16th if I didn't
11   say that.
12        Q.   And Mr. Smith tells Mr. Munroe
13   "We're in," right?
14        A.   That's what's written here, yes.
15        Q.   Right.
16        And then going up above that, we
17   see Mr. Munroe is now writing to you,
18   Mr. Shusterman, Neil Shusterman -- sorry,
19   Dr. Neil Shusterman and others at Endo, correct?
20        A.   Yes, from Munroe to myself and
21   Maletta, Mattox, Shusterman, Hall and Logan.
22        Q.   And can you read for me the first
23   sentence of Mr. Munroe's e-mail to you and
24   others?

Page 489

1         A.   It says "Team, Neil's language is
2    now in the Senate bill heeding to the floor."
3         Q.   Right, so the language that
4    Mr. Smith had conveyed to Mr. Hudson and that
5    was being now inserted into the Senate bill,
6    this is language that Dr. Shusterman had come up
7    with, correct?
8         MR. LIMBACHER:  Object to form.
9         THE WITNESS:  I don't recall.
10   That's what the e-mail is suggesting,
11   but I don't personally recall.
12   BY MS. SCULLION:
13        Q.   Well, if you go up above to the
14   next e-mail at the top of Exhibit 43, do you see
15   that Dr. Shusterman's response which is "Now
16   that's cool, Brian.  First time I've ever made a
17   contribution to proposed legislation," correct?
18        A.   That's what is written in the
19   e-mail from Neil to two Brians and other people.
20        Q.   Were you involved with Endo PAC?
21        A.   Was I involved with Endo PAC?  I
22   from time to time did contribute as an employee
23   to Endo PAC, yes.
24        Q.   Do you know whether Endo PAC ever

18  (Pages 486 to 489)

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1   made any contributions in support of Senator
2   Grassley?
3        A.   I don't recall.
4        Q.   And, again, in Exhibit 43, do you
5   recall that Mr. Smith had indicated that this
6   change to the Senate bill was really important
7   to the company?  That was the second page of
8   Exhibit 43, correct?
9             MR. LIMBACHER:  Object to form.
10            THE WITNESS:  Yeah, I'm just
11       trying to find the line again.
12   BY MS. SCULLION:
13       Q.   It's in the middle, right in the
14   middle of the page.  Mr. Smith says, "thanks
15   very much.  This is really important to the
16   company."
17       A.   Yes, so Smith writes that, yes, I
18   see that.
19       Q.   Okay.  And then --
20            MS. SCULLION:  Can I have 1572.
21        (Document marked for
22         identification as Endo-Lortie Deposition
23         Exhibit No. 44.)
24   BY MS. SCULLION:

Page 491

1        Q.   And the changes to the House bill
2   we reviewed earlier, those were also really
3   important to the company, right?
4             MR. LIMBACHER:  Object to form.
5             THE WITNESS:  I don't recall.
6   BY MS. SCULLION:
7        Q.   Let me hand you what's been
8   marked as Exhibit Number 44.
9             And Exhibit Number 44 is Bates
10  stamped ENDO-OPIOID_MDL-01211917, and it's Bates
11  stamped in the upper right-hand corner E1572.
12            Do you see that?
13       A.   Yes, I have that document.
14       Q.   And do you see that this is an
15  e-mail, again from Andrew Scott with respect to
16  the significant victory for Endo, and that
17  victory being we removed the language that would
18  have required the implementation of the proposed
19  CDC guidelines.  Do you see that in Mr. Scott's
20  e-mail?
21            MR. LIMBACHER:  Object to form.
22            THE WITNESS:  Yes, you read that
23       correctly.
24  BY MS. SCULLION:

Page 492

1        Q.   And he's communicating the
2   significant victory for Endo to, among others,
3   Paul Campanelli, the president at that time of
4   Par Pharmaceutical, correct?
5        A.   Unfortunately, I don't see on
6   this document listed the people who received the
7   e-mail sent by Andrew Scott that includes that
8   sentence.  It just says Andrew Scott wrote: and
9   then the text of the e-mail.  Usually there's a
10  list of people who are included, so I don't have
11  that.  There's another e-mail above that that
12  includes a number of people, but I don't have
13  the Andrew Scott one.
14       Q.   The document you have in front of
15  you is 1572 in upper right-hand corner?
16       A.   Yes.
17       Q.   Okay.  And the bottom of the page
18  is an e-mail, it says, right, that Andrew
19  Scott wrote this and includes the language, "In
20  a significant victory for Endo we removed
21  lapping that would have required the
22  implementation of the proposed CDC guidelines,"
23  right?
24       A.   Yes.

Page 493

1        Q.   And then the top is a response
2   from Mr. Campanelli.  It says, "Outstanding
3   news.  Congratulations," right?
4        A.   That's correct.
5        Q.   This significant victory was, in
6   fact, conveyed to Mr. Campanelli, right?
7             MR. LIMBACHER:  Object to form.
8             THE WITNESS:  It appears to have
9        been forwarded, but, again, usually the
10       block of e-mail recipients, as we see in
11       the very top, I would have expected to
12       see that also attached to the
13       February 25th, 2016 at 3:39 p.m. e-mail,
14       so it could be, but I just -- I can't
15       draw that conclusion here.
16  BY MS. SCULLION:
17       Q.   Regardless of how it's showing up
18  and how this e-mail is printing out, someone
19  thought this was important enough to communicate
20  to Mr. Campanelli, right?
21            MR. LIMBACHER:  Object to form.
22            THE WITNESS:  It appears that he
23       was made aware of it because he's
24       responding to it.

19 (Pages 490 to 493)

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1    BY MS. SCULLION:
2        Q.    Okay.  And the reason that these
3    changes to the House and Senate bills with
4    respect to the CDC guidelines were so important
5    to Endo is because adoption of those guidelines
6    could have significantly impacted Endo's
7    revenues with respect to its opioid products,
8    correct?
9             MR. LIMBACHER:  Object to form.
10            THE WITNESS:  I have no way to
11   draw that conclusion.  I don't recall.
12            MS. SCULLION:  Can I have E1573,
13   please.
14            (Document marked for
15   identification as Endo-Lortie Deposition
16   Exhibit No. 45.)
17            MR. LIMBACHER:  Counsel, whenever
18   is a good time for a break.
19            MS. SCULLION:  We can finish
20   after he -- we can take a break after
21   this topic.
22            MR. LIMBACHER:  Sure.
23            MS. SCULLION:  Just a little bit
24   more.

Page 495

1             MR. LIMBACHER:  Thank you.
2    BY MS. SCULLION:
3        Q.    I'm going to hand you what's been
4    marked as Exhibit Number 45.
5             And it's Bates stamped in the
6    bottom right-hand corner
7    ENDO-OPIOID_MDL-01902659.  On the upper
8    right-hand corner is E1573.
9             Do we have the correct document?
10       A.    I have that document, yes.
11       Q.    Okay.  And if you will, again,
12   start at the back of the document, best place to
13   start is actually on the page E1573.3, at the
14   very bottom there's an e-mail from Keri Mattox
15   to John Harlow, cc'ing you and Mr. Munroe, and
16   that carries over to the next page.
17            Do you see that?
18       A.    To E1573.4?
19       Q.    Yes.
20       A.    So I'll take a look at that.
21            (Witness reviews document.)
22   Okay, thank you.  I've looked through the
23   document.
24       Q.    So starting with -- is it

Page 496

1    Ms. Mattox, Keri Mattox?
2        A.    Keri Mattox is, yes.
3        Q.    A woman?
4        A.    Yes.
5        Q.    Starting with Ms. Mattox's
6    e-mail, Ms. Mattox, she's listed as "SVP
7    Investor Relations & Corporate Affairs"; is that
8    right?
9        A.    Yes.  At that time, yes.
10       Q.    Is investor relations typically
11   the department -- was that typically the
12   department within Endo that had input with
13   respect to medical guidelines for the use of
14   Endo's products?
15            MR. LIMBACHER:  Object to form.
16            THE WITNESS:  Input into medical
17   guidelines?
18   BY MS. SCULLION:
19       Q.    Correct?
20       A.    No.
21       Q.    Ms. Mattox is only commenting on
22   the CDC guidelines because of the potential
23   impact that she says on Opana ER revenues.
24            Do you see that?

Page 497

1             MR. LIMBACHER:  Object to form.
2             THE WITNESS:  I'm not sure what
3    you're asking.
4    BY MS. SCULLION:
5        Q.    Well, why is Ms. Mattox
6    commenting on the issuance of the CDC
7    guidelines?
8             MR. LIMBACHER:  Object to form
9    and foundation.
10            THE WITNESS:  Well, if you read
11   the entirety of the e-mail chain,
12   there's a desire to assess what, if any,
13   financial impact there may be on the
14   business as a result of those
15   guidelines.  This was -- Keri was in
16   charge of investor relations, corporate
17   communications, and so this would have
18   been very normal in the course of her
19   work.
20   BY MS. SCULLION:
21       Q.    Right.  And so starting with her
22   e-mail, she explains -- strike that -- she is
23   asking whether the aspect of the CDC's -- CDC
24   guidelines concerning start low and go slow,

Page 498

1    whether that would impact Opana ER doses greater
2    than 30 milligrams, and if yes, what portion of
3    the Opana ER revenues could be affected; that's
4    what she's asking about, right?
5         MR. LIMBACHER:  Object to form.
6         THE WITNESS:  You read that
7    correctly.  That appears to be part of
8    her question.
9    BY MS. SCULLION:
10        Q.    Right.
11              And she explains that the CDC
12   guidelines reference to start low and go slow
13   she explains, start low and go slow should
14   carefully reassess evidence of individual
15   benefits and risk when considering increasing
16   dosage to greater than or equal to 50 morphine
17   milligram equivalents (MME) a day and should
18   avoid increasing dosage to greater than or equal
19   to 90 MME a day or carefully justify a decision
20   to titrate dosage to greater than or equal to 90
21   MME a day, correct?
22        A.    You read that correctly.
23        Q.    And then you respond directly to
24   Ms. Mattox on the next page, E1573.3, correct?

Page 499

1         A.    On 1573.3 in the middle, yes.
2         Q.    Yes.
3               And one of the things that you
4    explain is at the very end of your e-mail,
5    "Although this is a relatively low margin
6    business, it accounts for a bit of share."
7         Do you see that?
8         A.    Yes, you read that correctly.
9         Q.    So you thought that it was
10   worthwhile investigating the potential impact of
11   the CDC guidelines on Endo's revenues for Opana
12   ER, correct?
13        MR. LIMBACHER:  Object to form.
14        THE WITNESS:  That's not what I
15   recall from reading that, no.
16   BY MS. SCULLION:
17        Q.    In the same e-mail you do again
18   remind folks that thanks to Brian, which I
19   understand to be Brian Munroe, and the GA team,
20   that's the government affairs team, right?
21        A.    Yeah, I think so.
22        Q.    And the government affairs team,
23   the VA/DOD have expressly removed the guidelines
24   from consideration for active military and

Page 500

1    veterans/families.
2         Did I read that correctly?
3         A.    Yes, you did.
4         Q.    And that's a reference to what we
5    saw earlier with respect to the changes to the
6    House and Senate bills, correct?
7         A.    I can't draw that conclusion
8    here.  I have to look back at the timing, so I'm
9    not completely sure.
10        Q.    Okay.  But, regardless, you are
11   reminding folks that, in fact, as Endo desired,
12   the VA/DOD removed the CDC guidelines from
13   consideration for active military and veterans
14   family, correct?
15        MR. LIMBACHER:  Object to form.
16        THE WITNESS:  Again, I'd have to
17   go back and tie this together in time
18   and process, but you read the sentence
19   accurately.
20   BY MS. SCULLION:
21        Q.    Okay.  And then if you go to the
22   next e-mail, which is from John Harlow, vice
23   president and general manager, pain business
24   unit, and his e-mail starts on page E1573.2 at

Page 501

1    the bottom and carries over to the top of
2    1573.3.  Mr. Harlow is now writing to you and to
3    Ms. Mattox, correct?
4         A.    And others.
5         Q.    And Mr. Harlow explains that he
6    has reviewed the guidelines and some of the
7    noise around them, right?
8         A.    Yes, you read that correctly.
9         Q.    And one of the things he has
10   concluded, if you look in the second paragraph
11   of his e-mail, second sentence is "You have to
12   calculate the total daily spelling dose of OER
13   first, so these guidelines could impact the 20,
14   30 and 40 mg dosages," correct?
15        A.    Yes, you read that correctly.
16        Q.    And then if you go above that,
17   Ms. Mattox responds to Mr. Harlow, thanks for
18   the -- thanks.  That clarification is helpful.
19              And she indicates that they will
20   look for the portion of revenues represented by
21   those dosages and will keep you posted regarding
22   final key messages, correct?
23        A.    Yes, you read that correctly.
24        Q.    And then above that, then, we

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1    have some beginning assessment of the potential
2    impact with respect to those dosage forms. We
3    have Mr. Chris Degnan -- is it Mr. or Ms.; do
4    you know?
5         A.    That was Mr.
6         Q.    Mr. Chris Degnan is writing back
7    to Kerry with an analysis of the 2015 actual
8    Opana ER ex-factory units and net sales by
9    strengths, correct?
10        A.    Yes, you read that correctly.
11        Q.    And what Mr. Degnan says a couple
12   points to note are that the 30 and 40-milligram
13   doses, which Mr. Harlow said could be impacted
14   by the CDC guidelines, account for about 40% of
15   the volume sold in 2015, correct?
16        A.    I'm sorry.  Point me to that once
17   again, please.
18        Q.    So we saw that Mr. Harlow had
19   said that the dosages that could be impacted by
20   the CDC guidelines were the 20, 30 and
21   40-milligram dosages, correct.  That was in the
22   bottom e-mail at the bottom of E1573.2?
23        A.    Within those sold within this
24   channel, I should point that out, within the

Page 503

1    VA/DOD military channel.
2         Q.    Well, this is no longer just
3    about the VA/DOD, right; this is about CDC
4    guidelines, more generally?
5              MR. LIMBACHER:  Object to form.
6              THE WITNESS:  That's not how I
7         recall it, no.  That's not what I read.
8         I read this as an approximation of the
9         impact of the VA/DOD guidelines which
10        are specifically for products sold
11        within that distribution channel or that
12        channel of business.
13   BY MS. SCULLION:
14        Q.    Well, if you go back to E 1573.3,
15   your e-mail.
16        A.    Yes, in the middle.
17        Q.    Yeah, your e-mail is confirming
18   that, in fact, by this point in 2016, the VA/DOD
19   had already expressly removed the guidelines
20   from consideration of active military and
21   veteran families, right?
22        A.    It doesn't clearly indicate the
23   timing.
24        Q.    I'm sorry.  It says the VA/DOD

Page 504

1    have expressly removed the guidelines from
2    consideration for active military and veterans
3    families.  That's what you wrote on March 15th,
4    2016, right?
5              MR. LIMBACHER:  Object to form.
6              THE WITNESS:  That's what's
7         written here, but, again, as I've
8         testified before, I don't recall how
9         this lines up to the publication of the
10        guidelines or when they were put into
11        action.  I'm not sure whether they were
12        in place by then or not.  I just don't
13        recall, sitting here today.
14   BY MS. SCULLION:
15        Q.    Regardless of when they were
16   published, at this point in time as of
17   March 2016, the VA/DOD had already removed those
18   guidelines from its medical guidelines; that's
19   what you were saying, right?
20              MR. LIMBACHER:  Object to form.
21              THE WITNESS:  No, that's not what
22        I was saying.  That's the point I'm
23        trying to clarify.  I don't know that.
24   BY MS. SCULLION:

Page 505

1         Q.    Okay.  In any event, going back
2    to Mr. Degnan's e-mail at the top of E1573.2,
3    he's conveying that of the dosage forms that
4    Mr. Harlow indicates may be impacted by the CDC
5    guidelines, that the 30 and 40-milligram doses
6    account for about 40% of volume sold in 2015,
7    right?
8              MR. LIMBACHER:  Object to form.
9              THE WITNESS:  And, again, I'm
10        confused.  There's really a missing
11        piece of information in all of these
12        e-mails, and that is to extent of which
13        the measurement is relative to the
14        VA/DOD distribution channel, which is a
15        discrete channel of business versus all
16        doses, so it's not clear.
17        I would suspect that at the time
18        everybody knew exactly how and what
19        channel was being discussed at which
20        point, but it's just not clear, and,
21        sitting here today, I don't recall how
22        that was being calculated.
23   BY MS. SCULLION:
24        Q.    Okay.  You would agree that

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1    Mr. Degnan's e-mail doesn't reference the VA
2    channel, correct, doesn't say it's -- doesn't
3    say it's with respect to the VA channel, right?
4            MR. LIMBACHER:  Object to form.
5            THE WITNESS:  None of them
6        explicitly say that.  That's why I'm
7        confused, and I don't recall exactly how
8        this was being characterized.
9    BY MS. SCULLION:
10       Q.    And then if you go to first page
11   of Exhibit 45, looking now at Ms. Mattox's
12   March 16th e-mail responding to Mr. Degnan's,
13   she is now drafting key messages with respect to
14   the CDC guidelines, correct?
15       A.    She is, yes.
16       Q.    Okay.  And among the key messages
17   that she has drafted here, if you look at the
18   second bullet point under her second paragraph
19   is "These guidelines could potentially affect
20   Endo's opioid product portfolio," correct?
21       A.    Yes.
22       Q.    And she says underneath of that
23   that she does not anticipate a material impact
24   to Schedule III Belbuca, right?

Page 507

1        A.    That's what's written, yes.
2        Q.    Okay.  But the key message with
3    respect to Opana ER that she writes here is
4    "Opana ER indicated 'for the management of pain
5    severe enough to require daily,
6    around-the-clock, long-term opioid treatment and
7    for which alternative treatment options are
8    inadequate'; doses most likely to be affected
9    are the 20 mg, 30 mg and 40 mg doses, which made
10   up 65% of product volume and 83% of product
11   revenue in 2015."
12           Did I read that correctly?
13       A.    Yes, you did.
14           MS. SCULLION:  Can I have E1559.
15           MR. LIMBACHER:  Counsel, we've
16       been going for --
17           MS. SCULLION:  This is all part
18       of the same topic, we will finish it up.
19           MR. LIMBACHER:  Well,
20       respectfully, I'd like to take a break.
21       Is there a reason why you're not
22       accommodating the hourly request for a
23       break.  We're now approximately 20
24       minutes past an hour.

Page 508

1            MS. SCULLION:  Because we spent
2        some of that time, unfortunately, on
3        colloquy about the scope of the
4        30(b)(6), and we are trying to be finish
5        up this issue.  We're trying to be
6        efficient and get through it.  We're in
7        the middle of it so I think it would be
8        much more efficient.
9            MR. LIMBACHER:  Are you close to
10       finishing?
11           MS. SCULLION:  Yes, we are.
12           (Document marked for
13       identification as Endo-Lortie Deposition
14       Exhibit No. 46.)
15   BY MS. SCULLION:
16       Q.    I'll show you what's been marked
17   as Exhibit Number 46.
18           Exhibit 46 is Bates stamped
19   ENDO-OPIOID_MDL-01230052, and it says in the
20   upper right-hand corner E1559.1.
21           Are we on the same page?
22       A.    Yes, we are indeed.
23       Q.    Okay.  And here if you'll go to
24   page E1559.3, which is the beginning of -- at

Page 509

1    the bottom the beginning of Andrew Scott's
2    e-mail of July 7th, 2016 to you, Mr. Campanelli
3    and others, which carries over to page E1559.4?
4        A.    Okay.  I will just look at it, if
5    I can.
6        Q.    Sure.
7        A.    (Witness reviews document.)
8    Okay.  I have looked at that e-mail.  I have to
9    refer to others but if you're going to point me
10   towards that one --
11       Q.    Sure.
12       A.    -- I've looked it over.  Thank
13   you.
14       Q.    I'm going to the second page
15   E1559.4, the second half of Mr. Scott's e-mail,
16   where he is conveying the significant successes
17   Endo has achieved on the conference legislation.
18   It's referring to Comprehensive Addiction and
19   Recovery Act, and he says that those significant
20   successes Endo has achieved include, first one,
21   "We defeated an effort to make the CDC
22   guidelines mandatory - they instead remain
23   voluntary," correct?
24       A.    You read that correctly, yes.

23 (Pages 506 to 509)

Page 510

1     Q.    Okay.  So Endo had significant
2  success in not having CDC guidelines be
3  mandatory.
4              Number 3 he lists here is
5  defeating an effort by senator Baldwin and
6  Gillibrand to broaden the CDC guidelines to
7  include acute pain.  That was another
8  significant success, according to Mr. Scott,
9  correct?
10     A.    Yes, according to Mr. Scott, you
11  read that correctly.
12     Q.    Okay.  And then another
13  significant success Mr. Scott conveys is to help
14  pass a new model opioid guideline development
15  process.
16              Do you see that, number 4?
17     A.    Number 4 I read, "We were key in
18  helping to pass a new model opioid guidelines
19  development process that is open and includes
20  the input of a broad range of government and
21  external stakeholders."
22     Q.    Right, and he goes on to explain
23  that the expectation is that this new process
24  will -- right, "will compete with the CDC

Page 511

1  guidelines."
2              Do you see that?
3     A.    The second sentence reads, "This
4  new process is supported by patient and
5  physician groups, and we expect will compete
6  with the CDC guidelines."
7     Q.    Right.  So among the significant
8  successes are CDC guidelines are no longer
9  mandatory, they're not being broadened to
10  include acute pain, and there's going to be an
11  attempt to develop a competing set of guidelines
12  to the CDC, correct?
13              MR. LIMBACHER:  Object to form.
14              THE WITNESS:  You read into the
15       record what Andrew Scott wrote here, and
16       I agree with what you read.
17  BY MS. SCULLION:
18     Q.    And if you go back to then page
19  E1559.3, you see your response to Mr. Scott?
20     A.    At the top?
21     Q.    Yes.
22     A.    Yes.
23     Q.    And you're not disputing
24  Mr. Scott's assessment that these were

Page 512

1  significant successes for Endo, right?
2     A.    Well, specifically, I'm happy to
3  read what I wrote.  "Andrew and team" --
4     Q.    I didn't ask -- I'm sorry.  I'm
5  just asking did you --
6     A.    "Truly excellent work across an
7  impressive set of accomplishments."
8              MS. SCULLION:  I move to strike.
9       I didn't ask him to read the e-mail.
10              MR. LIMBACHER:  Complete your
11       response.
12              THE WITNESS:  You asked me to
13       characterize the response and how I
14       viewed his document.  I'd like to read
15       what I wrote him.
16  BY MS. SCULLION:
17     Q.    That's fine, you can read it.
18     A.    "Andrew and team, truly excellent
19  work across an impressive set of
20  accomplishments.  As we've stated many times, as
21  a company we are supportive of treatment and
22  therapeutic guidelines that balance the needs of
23  all stakeholders - most importantly patients and
24  the physicians who treat them.  Your work to

Page 513

1  ensure checks and balances against purely
2  political agendas is much appreciated."
3     Q.    So you didn't disagree with him
4  that what he recited were significant successes
5  for Endo, correct?
6              MR. LIMBACHER:  Object to form.
7              THE WITNESS:  Correct.
8  BY MS. SCULLION:
9     Q.    And, in fact, you characterized
10  the agendas against which Endo was successful as
11  purely political, right?
12              MR. LIMBACHER:  Object to form,
13       misstates the evidence.
14              THE WITNESS:  Yeah, I can read it
15       again if you'd like.
16  BY MS. SCULLION:
17     Q.    That's okay.
18              Did you regard the efforts to
19  have the CDC guidelines become mandatory as
20  purely political?
21              MR. LIMBACHER:  Object to form.
22              THE WITNESS:  I don't recall
23       specifically, no.
24  BY MS. SCULLION:

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1    Q.    Did you regard the efforts to
2  broaden the CDC guidelines to include acute pain
3  as a purely political agenda?
4            MR. LIMBACHER:  Object to form.
5            THE WITNESS:  I don't recall
6      specifically.
7  BY MS. SCULLION:
8      Q.    Let me just ask you more
9  generally.
10           Did you regard anything -- any
11  efforts with respect to developing guidelines
12  for the use of opioids in the treatment of
13  chronic, non-cancer pain to be a purely
14  political agenda?
15           MR. LIMBACHER:  Object to form.
16           THE WITNESS:  I don't recall
17      specifically, no.
18  BY MS. SCULLION:
19     Q.    What was the purely political
20  agendas that you were referring to here in your
21  e-mail?
22     A.    I don't recall specifically, but
23  I'm congratulating the work of the team on
24  behalf of -- you know, as I said, guidelines

Page 515

1  that balance the need of all stakeholders.
2            MR. LIMBACHER:  I thought we were
3      stopping after this.
4            MS. SCULLION:  This is all part
5      of the same.
6            MR. TOLIN:  I think, in fairness,
7      when the witness is reading from other
8      parts of the document but your tech guy
9      is just highlighting the parts you're
10     reading, he should also highlight the
11     parts --
12           MS. SCULLION:  I agree with that.
13     The intention is that he should be
14     highlighting whatever the witness is
15     reading.  Thank you.
16           MR. TOLIN:  Thank you.
17           MR. LIMBACHER:  Again, we've now
18     been going for an hour and a half.
19           MS. SCULLION:  This is the last
20     document.
21           MR. LIMBACHER:  Okay, thank you.
22           MS. SCULLION:  This is the last
23     document in this sequence.
24           (Document marked for

Page 516

1      identification as Endo-Lortie Deposition
2      Exhibit No. 47.)
3  BY MS. SCULLION:
4      Q.    Mr. Lortie, let's put your
5  corporate representative hat back on.
6            And Endo did, in fact,
7  collaborate with other manufacturers of opioids,
8  including defendants in this action, through the
9  PCF in opposing implementation of the CDC
10  guidelines, correct?
11           MR. LIMBACHER:  Object to form
12      and object to the extent it falls
13      outside of the scope of the topics on
14      which he's been designated.
15           THE WITNESS:  I don't believe
16      that to be the case, no.
17  BY MS. SCULLION:
18     Q.    Show you what's been marked as
19  Exhibit 47.
20           And Exhibit 47, for the record,
21  is Bates stamped ENDO-OPIOID_MDL-01563548.
22           Let me direct your attention to
23  the second to last page of Exhibit 47, which has
24  in the middle an e-mail from Wade Delk to Burt

Page 517

1  Rosen, subject matter, Brooks bill.
2            Do you see that?
3      A.    And just so I'm clear, this one
4  is not intended to have a marking.
5      Q.    Correct, it doesn't an E number
6  at the top, that's right.
7      A.    So you want me to look at the
8  third page.
9      Q.    Looking at the Wade Delk e-mail
10  to Burt Rosen, subject matter, Brooks bill?
11     A.    Yes, okay.
12     Q.    Do you see that?
13     A.    Yes, on February 12th.
14     Q.    2016?
15     A.    Yes.
16     Q.    And Mr. Rosen was an employee of
17  Purdue Pharma, correct?
18     A.    Well, his e-mail is pharma.com,
19  and I believe that is a Purdue e-mail, so yes.
20     Q.    And Mr. Delk, in writing to
21  Mr. Rosen, states "Burt, can you please send
22  this out to the PCF."
23           Do you see that?
24     A.    Yes.

25 (Pages 514 to 517)

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1    Q.    And it's with regard to, he says,
2  "This bill is moving fast and we would like to
3  see if others support this approach."
4          Do you see that?
5    A.    Yes, that's -- you read that
6  correctly.
7    Q.    And the bill that he is referring
8  to, if you go down to his -- the draft he has
9  addressed to the Pain Care Forum members, he is
10  discussing "The below amendment (which passed
11  the Senate Judiciary Committee) would codify
12  essentially the Brooks language (HR 2805) which
13  many of us have been supportive of.  That is, we
14  support guidelines as long as they are fair,
15  balanced, constructed in an unbiased way, and
16  done with evidence and data.  Importantly, the
17  committee added FDA to the list of advisory
18  groups, and it also added language that the
19  proposed CDC guidelines be considered along with
20  all of the other information/perspectives
21  offered by the entire task force and its
22  participants," correct?
23          MR. LIMBACHER:  Object to all of
24    these questions as falling outside the

Page 519

1    scope of the topics on which he's been
2    designated.  There is no specific
3    reference to the Pain Care Forum in
4    topic 39.  It is specifically referenced
5    in both topic 36 and topic 40, so I
6    believe it's outside the scope of the
7    topic on which he has been designated.
8  BY MS. SCULLION:
9    Q.    I'm happy to have you answer
10  these questions in your personal capacity
11  because you're on these e-mails.
12          Did I correctly read Mr. Delk's
13  draft communication to the Pain Care Forum
14  members?
15    A.    Yes, and do we know who Mr. Delk
16  is?  His e-mail is just at Gmail address, so I
17  don't recognize that name.  I don't know who he
18  is.
19    Q.    I do not know.
20          In any event, if you go then to
21  the -- turning to the next e-mail in Exhibit 47,
22  it actually begins on the very first page of the
23  exhibit.
24    A.    First page back in time?

Page 520

1    Q.    The very first page of Exhibit
2  47, 0156345 -- 3548, rather.
3    A.    The top page.
4    Q.    Yeah.  Do you see at the bottom
5  it begins -- it's an e-mail from Burt Rosen, as
6  you said, at pharma.com, right?
7    A.    Yes, that's where it says "begin
8  forwarded message"?
9    Q.    Right.
10    A.    Yeah.
11    Q.    And Mr. Rosen has addressed his
12  e-mail to a quite lengthy list of folks.
13    A.    It's the entirety of the second
14  page.
15    Q.    Correct.  And among the people to
16  whom he's forwarding the e-mail, if you look at
17  the third line down on that second page, it's
18  all the e-mail addresses is Brian Munroe at
19  Endo, correct?
20    A.    Give me a moment.
21    Q.    Sure.
22    A.    There's a lot here.
23    Q.    They appear to be in alphabetical
24  order by first name?

Page 521

1    A.    That's an interesting way.  Okay,
2  yes, I see Brian Munroe listed there.
3    Q.    And do you see right next to
4  Brian Munroe, Bruce Colligen with an e-mail
5  address at jnj.com?
6    A.    Its.jnj.com, yep.
7    Q.    Right, and jnj, that would be
8  Janssen and Johnson, right?
9    A.    I'm not sure.  Did you say
10  Janssen Johnson or Johnson & Johnson.
11    Q.    Johnson & Johnson.
12    A.    It could be, it's jnj, but I'm
13  not sure.
14    Q.    And if you'll go down, look on
15  the left-hand side of this block of e-mails, you
16  see about a quarter of the way down, Derek Naten
17  at Mallinckrodt.com?
18    A.    Yes, on the left-hand side, yes,
19  I do see that.
20    Q.    All right.  And, obviously,
21  that's referring then to Mallinckrodt, correct?
22    A.    It's a Mallinckrodt e-mail
23  address.
24    Q.    Right.  Mallinckrodt is another

26 (Pages 518 to 521)

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1    defendant in this lawsuit. You understand that,
2    correct?
3        A.   I'm not familiar with all of the
4    defendants in the lawsuit.
5        Q.   And right under, if you just go
6    right under Mr. Naten's e-mail, you see
7    Alexander Kraus at Grunenthal.com.
8            Do you see that?
9        A.   Yes, I do.
10       Q.   And Grunenthal had been Endo's
11   partner in the development of reformulated Opana
12   ER, correct?
13           MR. LIMBACHER:  Object to form.
14           THE WITNESS:  That's correct.
15   BY MS. SCULLION:
16       Q.   Okay. Keep going down in that
17   left-hand side of this block, you'll see Dr. J.
18   David Haddox at pharma.com. Do you see that?
19       A.   How far down am I?
20       Q.   Not too far down, about five, six
21   lines below, Dr. J David Haddox at pharma.com?
22       A.   Below Grunenthal.
23       Q.   Correct?
24       A.   Yes, I see that.

Page 523

1        Q.   And so, again, that's a Purdue
2    Pharma e-mail address, correct?
3        A.   I believe pharma.com is their
4    e-mail address.
5        Q.   Okay. If you go to about halfway
6    down on the left-hand side, halfway down this
7    block of e-mails, you also see Julian Malasi at
8    Mallinckrodt.com?
9        A.   Yes, I see that.
10       Q.   And staying on that same line on
11   the right-hand side, do you see the e-mail is
12   also addressed to Karen Hill at tevapharm.com?
13       A.   Same line, yes. Yes, I see that.
14       Q.   And going down, follow down from
15   Ms. Hill's e-mail, four lines down, do you see
16   Kristin Recchiuti?
17       A.   I'm sorry to say I lost my place.
18   Can you just reorient me.
19       Q.   Sure. If you look at Ms. Hill's
20   address, Karen Hill.
21       A.   Okay, yes.
22       Q.   And then go about four lines
23   down, you see Kristin Recchiuti?
24       A.   On the right side.

Page 524

1        Q.   Correct. You see that?
2        A.   Yes, yes.
3        Q.   And that lists again an address
4    at its.jnj.com?
5        A.   Yes, it does.
6        Q.   And, in fact, the next two -- I'm
7    sorry -- the next e-mail Lauryl Jackson is also
8    for its.jnj.com?
9        A.   On the next line?
10       Q.   Right.
11       A.   Yes, correct.
12       Q.   If you'll go to the next page of
13   the exhibit, the end of the next page of the
14   exhibit, at the top is the end of the chain of
15   e-mails to which Mr. Rosen has forwarded this
16   communication?
17       A.   So I'm at the top of the third
18   page now?
19       Q.   Correct. You see Susan Stone at
20   Allergan.com?
21       A.   Stone_Susan at Allergan, yes, I
22   see that.
23       Q.   So that's -- obviously, that's an
24   Allergan e-mail address, correct?

Page 525

1        A.   It says Susan underscore -- or it
2    has Allergan.com, and that's the only conclusion
3    I'm going to be able to draw.
4        Q.   Okay. And then Mr. Rosen writes
5    here that the request is from Wade, that would
6    be Wade Delk, and he identifies Wade Delk as
7    being from the American Society for Pain
8    Management Nursing.
9            Do you see that?
10           MR. LIMBACHER:  Object to form.
11           THE WITNESS:  So I'm still on the
12   top of the third page?
13   BY MS. SCULLION:
14       Q.   Yes.
15       A.   So this is -- I'm just reminding
16   myself. So this all relates to the forwarded
17   message from Burt Rosen at pharma.com on the
18   first page, right?  I'm just making sure.
19       Q.   That's how I read it, yes. Is
20   that how you read it?
21       A.   It's just a very long set of
22   addresses.
23       Q.   It is.
24       A.   Yes, okay. It appears to be what

Highly Confidential - Subject to Further Confidentiality Review

Page 526

1  it is, yes.
2      Q.    Okay.  And then going to the
3  first page of the exhibit, which is Bates
4  stamped 01563548?
5      A.    Before I do, I think you read --
6  I just want too make sure we're correct, so you
7  talked about the bill -- or sorry -- the subject
8  of the e-mail from Burt Rosen to the long number
9  of addressees, and then it says "Please see this
10  request from Wade at the American Society for
11  Pain Management Nursing.  Wade is requesting a
12  timely reply from your organization."  Is that
13  the -- that's what you wanted me to see, right?
14      Q.    Right.  I want to see that that's
15  identifying -- you asked who Mr. Delk was, and
16  it's identifying him as being from the American
17  Society For Pain Management Nursing.
18      A.    Thank you.  Yep.
19      Q.    Do you see that?
20      A.    Yes.
21      Q.    And then on the very first page
22  of the exhibit, you see that -- so Mr. Munroe
23  has forwarded this communication to you, among
24  others, at Endo, correct?

Page 527

1      A.    Munroe to me and others, yes.
2      Q.    And your response at the very top
3  of the page, Exhibit 47, was what?
4      A.    I sent a note to Brian, Deb
5  Logan, Neil Shusterman, Matt Maletta, Jen Dubas,
6  John Harlow, Timothy Byrne, Keri Mattox and
7  Andrew Scott, and I wrote "well done."
8      Q.    So you're congratulating
9  Mr. Munroe on this coordinated effort through
10  the Pain Care Forum members to communicate their
11  opposition to implementation of the CDC
12  guidelines as set forth in the draft
13  communication we looked at, the last two pages
14  of the exhibit?
15          MR. LIMBACHER:  Object to form.
16          THE WITNESS:  Is that a question?
17  BY MS. SCULLION:
18      Q.    Is that what you were
19  congratulating him on?
20      A.    No, I don't believe that's the
21  case.  I can't draw that conclusion from reading
22  what you've presented to me.
23          MS. SCULLION:  Okay.  We can take
24      a break.

Page 528

1          MR. LIMBACHER:  Thank you.
2          THE VIDEOGRAPHER:  Off the
3  record, 4:16.
4          (Brief recess.)
5          THE VIDEOGRAPHER:  We are back on
6  the record at 4:33.
7  BY MS. SCULLION:
8      Q.    Mr. Lortie, asking you in your
9  capacity as a corporate representative, with
10  respect to the effectiveness of Endo's
11  anti-diversion procedures, did Endo ever
12  determine that any prescriptions of Opana ER
13  were medically unnecessary?
14      A.    Is your question did Endo ever
15  determine that any individual prescription was
16  medically unnecessary?
17      Q.    We can start with that.
18      A.    I'm not aware of whether the
19  company did or did not.  That's a level of
20  detail I'm not familiar with.
21      Q.    Same question, though, but with
22  respect to did Endo -- strike that.
23          Did Endo ever determine that any
24  prescriptions of Opana ER were medically

Page 529

1  unnecessary at some higher level, not just
2  individually, but at a higher level?
3          MR. LIMBACHER:  Object to form.
4          THE WITNESS:  Yes, I'm sure that
5      there were cases that would fall under
6      that heading, yes.
7  BY MS. SCULLION:
8      Q.    Does Endo have records indicating
9  findings that certain cases I think as you said
10  were determined to be medically unnecessary?
11          MR. LIMBACHER:  Object to form.
12          THE WITNESS:  I don't know
13      specifically, but I would -- I would
14      think that our pharmacovigilance and
15      drug safety department would have
16      maintained such records.
17  BY MS. SCULLION:
18      Q.    Did you review any such records
19  in preparation for today's deposition?
20      A.    No, not specifically at that
21  level of detail, no.
22      Q.    Okay.  As part of Endo's
23  anti-diversion efforts, did Endo monitor for
24  signals that Opana ER had street value?

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1           MR. LIMBACHER: Object to form.
2           THE WITNESS: I believe that
3    whether it was actively -- as a result
4    of active monitoring or as a result
5    of -- well, let me restate that.
6           As part of the internet
7    surveillance and other surveillance of
8    media and chat rooms and the like that
9    are part of the RiskMAP and subsequently
10   added to by the REMS, that that was part
11   of what the team did, and then those
12   things were reviewed at the -- my
13   understanding is reviewed at the Risk
14   Management Committee level.
15   BY MS. SCULLION:
16       Q.   And in terms of the effectiveness
17   of Endo's procedures you just described, did
18   Endo, in fact, see evidence that Opana ER had a
19   street value?
20          MR. LIMBACHER: Object to form
21   and to the extent it falls outside the
22   scope of the topics he's been
23   designated.
24          THE WITNESS: Yeah, my answer was

Page 531

1    regarding the question of did Endo
2    monitor for that.
3    BY MS. SCULLION:
4        Q.   Yes.
5        A.   And the answer was yes. Beyond
6    that, I don't know.
7        Q.   That's what I'm asking. In terms
8    of understanding the effectiveness of its
9    monitoring, do you know whether those -- that
10   monitoring was, in fact, effective to pick up
11   signals that Opana ER had street value?
12          MR. LIMBACHER: Same objections.
13          THE WITNESS: I don't know. I
14   mean, the monitoring was done. I'm not
15   sure how you quantify effectiveness of
16   monitoring. By virtue of monitoring,
17   you see things that are posted, and
18   that's reviewed by the Risk Management
19   Committee, but I don't know beyond that
20   how to quantify the effectiveness in
21   that context.
22   BY MS. SCULLION:
23       Q.   Do you understand, though, that
24   Endo did, in fact, see evidence that Opana ER

Page 532

1    early on had street value?
2           MR. LIMBACHER: Object to form.
3           THE WITNESS: I don't recall that
4    specifically. I didn't sit on that
5    committee, so I, you know, wasn't
6    familiar with that.
7           MS. SCULLION: Can I have E1585,
8    please.
9           (Document marked for
10   identification as Endo-Lortie Deposition
11   Exhibit No. 48.)
12   BY MS. SCULLION:
13       Q.   I'm going to hand you what's been
14   marked as Exhibit Number 48.
15          And Exhibit 48 is Bates stamped
16   ENDO-OPIOID_MDL-00774063, and we've marked it
17   E1585 in the top right-hand corner.
18          Mr. Munroe, I'd like to direct
19   your attention to page E1585.3.
20       A.   I think you mean Mr. Lortie but
21   --
22       Q.   I am so sorry.
23       A.   He's the other Brian.
24       Q.   Thank you, Mr. Lortie. I direct

Page 533

1    your attention to page E1585.3. You see at the
2    bottom, there's an e-mail from John Bullock to
3    Sherri Ferstler. And the content of that e-mail
4    starts at the bottom of 1585.3 and continues all
5    the way through 1585.5. I just want to orient
6    you to the document.
7           MR. LIMBACHER: Are we asking him
8    now in his capacity as a fact witness?
9           MS. SCULLION: Sure.
10          THE WITNESS: Okay. So I see
11   that e-mail that starts on the bottom of
12   1585.3. Would you like me to read that?
13   BY MS. SCULLION:
14       Q.   Sure. You can go ahead and read
15   through that.
16       A.   Okay. Thank you. Give me a
17   moment to do that.
18          (Witness reviews document.)
19   Okay. I've read that e-mail. Thank you.
20       Q.   Okay. And do you see the e-mail
21   is forwarding on an article from the Paducah Sun
22   dated December 10th, 2007 concerning an overdose
23   death being investigated by the Marshall
24   sheriff's office?

29  (Pages 530 to 533)

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1    A.    Yes, December 10th is on the next
2  page.
3    Q.    Right.
4    A.    It evidently refers to it in the
5  e-mail as December 11th but, yes, it appears to
6  be following -- sorry -- forwarding along that
7  newspaper article.
8    Q.    And if you go down on page 1585.4
9  within the body of the article, go towards the
10 last quarter of that page where it begins the
11 words Miranda Minter-Banister.
12    Do you see that?
13    A.    Yes, I do.
14    Q.    Do you see this is conveying that
15 Miranda Minter-Banister, age 27, of Benton,
16 Kentucky died at her home and it was after using
17 an Opana pill purchased, says Minter-Banister
18 bought a second Opana pill for $30 from
19 Spiceland that Minter-Banister and her husband
20 later inhaled.
21    Do you see that?
22    MR. LIMBACHER: Object to form.
23    THE WITNESS: I mean, you've
24    picked a couple of lines out of that --

Page 535

1    out of that paragraph, but I see where
2    you're reading that, yes.
3  BY MS. SCULLION:
4    Q.    So this is referring to a
5  purchase of Opana other than through a
6  prescription, correct?
7    A.    It could be. I mean, I'm reading
8  it at the same time you are.
9    Q.    Right. It's referring to someone
10 buying an Opana pill from another person, a
11 neighbor or a friend, correct?
12    MR. LIMBACHER: Object to form.
13    THE WITNESS: It appears that
14    that could be the case.
15 BY MS. SCULLION:
16    Q.    Okay. And then if you go right
17 above that paragraph, you see the paragraph that
18 says Opana is similar to the painkiller
19 OxyContin and it goes by the street name.
20    And what's the street name
21 indicated here for Opana?
22    A.    You're asking me that?
23    Q.    Yeah.
24    A.    You'd like me to read that?

Page 536

1    Q.    Yeah.
2    A.    It has the words stop sign in
3  quotation marks.
4    Q.    Right. So by this time Opana --
5  at least by this time, Opana is not only being
6  sold but, in fact, has a street name; that's
7  what the article is conveying, right?
8    MR. LIMBACHER: Object to form.
9    THE WITNESS: It is -- it is
10    suggesting that for some reason the
11    author is reporting that it goes by the
12    street name stop sign. That's what it
13    says.
14 BY MS. SCULLION:
15    Q.    And you saw other similar media
16 reports during your time at Endo, correct,
17 conveying that Opana ER was being bought and
18 sold on the street, had street value, had a
19 street name, was resulting in overdose deaths,
20 correct?
21    MR. LIMBACHER: Object to form
22    and foundation.
23    THE WITNESS: I don't recall
24    that. That was certainly not a regular

Page 537

1    part of my responsibilities.
2  BY MS. SCULLION:
3    Q.    You don't recall ever seeing any
4  media reports about Opana ER contributing to the
5  opioid epidemic?
6    A.    From time to time I'm sure things
7  were forwarded along, as this one appears to
8  have been. This one actually predates me by
9  some time, but I don't recall any specific ones,
10 and it was not a routine part of my job
11 responsibilities to review media reports.
12    Q.    And you recall, though, that you
13 were employed by Endo in 2011, correct?
14    A.    Yes.
15    Q.    And where was your office?
16    A.    In 2011 where was my office? It
17 was in --
18    Q.    What town?
19    A.    Chaddsford.
20    Q.    Pennsylvania?
21    A.    Yes.
22    Q.    That's just outside of
23 Philadelphia?
24    A.    It's 15 or 20 miles outside of

Highly Confidential - Subject to Further Confidentiality Review

Page 538

1    Philadelphia.
2        Q.    And do you recall in 2011 that
3    the Philadelphia office of the DEA specifically
4    issued an alert with respect to Opana's -- Opana
5    ER's street use and its contribution to the
6    opioid epidemic?
7            MR. LIMBACHER:  Object to form.
8            THE WITNESS:  Do I recall that?
9    BY MS. SCULLION:
10       Q.    Yes.
11       A.    I do not recall that.
12           MS. SCULLION:  Can I have E563,
13   please.
14           (Document marked for
15   identification as Endo-Lortie Deposition
16   Exhibit No. 49.)
17   BY MS. SCULLION:
18       Q.    I hand you what's been marked as
19   Exhibit Number 49.
20           And Exhibit 49 is Bates stamped
21   ENDO-OR-CID-00694084.  And, Mr. Lortie, it bears
22   number E563 at the top right-hand corner,
23   correct?
24       A.    Yes, I have that document.

Page 539

1        Q.    Okay.  In 2011 did you have any
2    responsibilities as part of your product
3    portfolio for Opana ER?
4        A.    I had commercial
5    responsibilities, yes, I think we've already
6    established that.
7        Q.    If you go to page E563.2, do you
8    see this is a Drug Intelligence Brief from the
9    Philadelphia Division Intelligence Program for
10   Drug Enforcement Administration?
11       A.    That's how it's titled, yes.  I
12   see that on the top of the document.
13       Q.    And what is the title of this
14   Drug Intelligence Brief itself?
15       A.    Underneath the header that says
16   "Drug Intelligence Brief," it says "Opana
17   (Oxymorphone) Abuse."
18       Q.    And can you read the summary of
19   this Drug Intelligence Brief, please.
20       A.    You'd like me to read what the
21   summary statement is?
22       Q.    Yeah, what the DEA has stated in
23   its summary here?
24       A.    So underneath the headline it

Page 540

1    says, "Summary, the Philadelphia Division
2    Intelligence Program received information on a
3    possible emerging trend in the region;
4    Oxymorphone (brand name Opana) has been reported
5    by several sources of information as the 'big
6    thing right now' in pharmaceutical drug abuse in
7    the region."
8        Q.    And Endo was aware in at least
9    May 2011 that, in fact, Opana ER was being
10   reported as the big thing right now in
11   pharmaceutical drug abuse, at least in the
12   Philadelphia region; is that correct?
13           MR. LIMBACHER:  Object to form
14   and foundation.
15           THE WITNESS:  So I have not seen
16   this before.  At least I don't recall
17   seeing it before, so I can't attest to
18   whether or not the company saw this.
19           I can say that I don't recognize
20   seeing it.
21   BY MS. SCULLION:
22       Q.    You don't recall ever, as someone
23   with commercial responsibility for Opana ER in
24   May of 2011, ever being told that the

Page 541

1    Philadelphia Division Intelligence Program, the
2    DEA was issuing a brief indicating that the
3    product you had commercial responsibility for
4    was the big thing right now in pharmaceutical
5    drug abuse in the region?
6            MR. LIMBACHER:  Object to form.
7    BY MS. SCULLION:
8        Q.    It never came to your attention?
9        A.    I don't recall seeing this, no.
10       Q.    Okay.  And among other things,
11   this Drug Intelligence Brief confirms, if you
12   look in the details section below the summary --
13       A.    Still on the same page, .2?
14       Q.    Correct.
15           You see the details section
16   confirms that not only is Opana being reported
17   as of May 2011 as the big thing right now in
18   pharmaceutical drug abuse, but that "in the
19   early 1970s, oxymorphone in the form of
20   Numorphan instant-release tablets was one of the
21   most sought-after and well-regarded opioids of
22   the class IV community."
23           Do you see that?
24       A.    Yes, I see the sentence that you

31 (Pages 538 to 541)

Highly Confidential - Subject to Further Confidentiality Review

Page 542

1    just read.
2         Q.    And then it goes -- and it goes
3    on to explain that oxymorphone in the form of
4    Numorphan instant-release tablets, in fact, had
5    a street name popularly known as "blues" for
6    their blue coloring.
7              Do you see that?
8              MR. LIMBACHER:  Object to form.
9              THE WITNESS:  I see the line you
10             just read, it's a part of the next
11             sentence.
12   BY MS. SCULLION:
13        Q.    Okay.  So, again, so the DEA is
14   not only confirming that as of May 2011 Opana ER
15   is being abused as a street drug, but, in fact,
16   oxymorphone had a history of such abuse,
17   correct?
18             MR. LIMBACHER:  Object to form.
19             THE WITNESS:  You read the
20             summary, you read the details, so I
21             think the text explains apparently what
22             the DEA was reporting.
23   BY MS. SCULLION:
24        Q.    And you don't have any reason to

Page 543

1    dispute what the DEA, the federal agency charged
2    with enforcement of laws concerning Opana ER and
3    other narcotics, you don't dispute their
4    assessment of Opana ER's street use, do you?
5              MR. LIMBACHER:  Object to form.
6              THE WITNESS:  Providing this is
7              truly a DEA brief, no, I don't have any
8              grounds to dispute DEA actions.
9    BY MS. SCULLION:
10        Q.    Okay.
11             MR. LIMBACHER:  Counsel, Exhibit
12             49 has on the first page "Attachment
13             16."  Was this part of a larger
14             document?
15             MS. SCULLION:  I will tell you it
16             was produced to us this way, so I do not
17             know.
18             MR. LIMBACHER:  Would it be with
19             other attachments?
20             MS. SCULLION:  I do not know,
21             sitting here.
22             MR. LIMBACHER:  So you don't know
23             to what it was attached to --
24             MS. SCULLION:  Or not attached.

Page 544

1              MR. LIMBACHER:  -- or what it was
2              part of?
3              MS. SCULLION:  I do not.
4    BY MS. SCULLION:
5         Q.    You said that in connection with
6    your preparation for the deposition, you did
7    review some of the RiskMAP updates that Endo
8    submitted for Opana ER to the FDA, right?
9         A.    Yes.
10        Q.    And do you recall that those
11   RiskMAP updates did include discussions of cases
12   of apparent abuse of Opana ER from time to time?
13        A.    Generally, from time to time,
14   yes.  Again, I didn't review every single one,
15   but just to refresh my recollection or to
16   understand that these were regular part of the
17   risk management team's activities.
18        Q.    And those reports also showed
19   from time to time overdoses from Opana ER,
20   correct?
21             MR. LIMBACHER:  Object to form.
22             THE WITNESS:  I would put those
23             under the same heading as adverse
24             events.

Page 545

1    BY MS. SCULLION:
2         Q.    So deaths from Opana ER?
3              MR. LIMBACHER:  Object to form.
4              THE WITNESS:  I do think that the
5              one I reviewed that I did see that, but,
6              again, I don't recall the details.  I
7              wasn't reviewing it at that level of
8              detail.
9    BY MS. SCULLION:
10        Q.    And showed reference to street
11   use of Opana ER, correct?
12             MR. LIMBACHER:  Object to form.
13             THE WITNESS:  If there's a
14             specific report that you'd like me to
15             look at, I could probably give you more
16             information.
17   BY MS. SCULLION:
18        Q.    Do you recall those same
19   indications that Opana ER was being abused,
20   including by people buying and selling Opana ER?
21             MR. LIMBACHER:  Object to form.
22             THE WITNESS:  I know in the
23             records that I reviewed, I don't
24             specifically recall that, but, again, as

32  (Pages 542 to 545)

Highly Confidential - Subject to Further Confidentiality Review

Page 546

1    I said, I'd be happy to review a
2    specific one, if you'd like, if that
3    would be helpful.
4              MS. SCULLION:  Let's see if we
5    can.  Can we have the Q1 2008 RiskMAP
6    update.
7              (Document marked for
8    identification as Endo-Lortie Deposition
9    Exhibit No. 50.)
10   BY MS. SCULLION:
11       Q.   Let me hand you what's been
12   marked as Exhibit 50.
13            And Exhibit 50 is Bates stamped
14   ENDO-CHI_LIT-00032209.  And, Mr. Lortie, this
15   does not bear an E number.
16       A.   Okay, thank you.
17       Q.   This is the RiskMAP update report
18   for Opana ER dated May 22nd, 2008 covering the
19   period January 1st, 2008 to March 31, 2008,
20   correct?
21       A.   Yes, that's the date that's on
22   the title page.
23       Q.   And if you'll turn to page 20 of
24   the update report, the page numbers are in the

Page 547

1    upper right-hand corner.
2        A.   Yes, got it.
3        Q.   And if you'll go to the section
4    "6. Post Marketing Surveillance," section "6.1
5    Periodic Reports," going down to the subheading
6    "Drug Abuse/Intentional Drug misuse."
7              Are you with me?
8        A.   Yeah, I'm just going to kind of
9    orient myself here.
10       Q.   Yep.
11       A.   (Witness reviews document.)
12            Okay.  And you'd like me to look
13   at the subsection?
14       Q.   The subsection "Drug
15   Abuse/Intentional Drug Misuse."
16       A.   Okay.
17       Q.   Are you there?
18       A.   Yes, I'm focused on that.
19       Q.   Okay.  And in this update report,
20   Endo has reported to the FDA "There were 7
21   reports related to drug abuse and misuse of
22   Opana ER," correct?
23       A.   That's what the sentence says,
24   yes.

Page 548

1        Q.   That's what Endo told the FDA in
2    this report, correct?
3              MR. LIMBACHER:  Object to form.
4              THE WITNESS:  Yes, that's what's
5    written in the report.
6    BY MS. SCULLION:
7        Q.   And then Endo further told the
8    FDA, "In all 7 reports, Opana ER was misused by
9    crushing and snorting the tablets," correct?
10       A.   Yes, that's what it says.
11       Q.   And then if you'll go down to the
12   sentence that begins, "another report."
13       A.   Yes.
14       Q.   You see that?
15       A.   On the fourth line.
16       Q.   And this is indicating -- sorry,
17   strike that.
18            In this sentence Endo has told
19   the FDA that "Another report (OPER20080023)
20   involved a 45-year-old man who was a known drug
21   abuser being treated for drug addiction, was
22   purchasing Opana ER 40 mg tablets with a
23   twenty-dollar co-pay and was also buying the
24   product on the streets."

Page 549

1              Do you see that?
2        A.   Yes, I do.
3        Q.   So, I mean, Endo is telling the
4    FDA that it has reports as of at least May 22nd,
5    2008 of Opana ER being purchased on the street,
6    correct?
7              MR. LIMBACHER:  Object to form.
8              THE WITNESS:  That apparently is
9    what's in the report, yes.
10   BY MS. SCULLION:
11       Q.   So Endo knew at that point, at
12   least, if not earlier, that Opana ER had street
13   value, correct?
14            MR. LIMBACHER:  Object to form.
15            THE WITNESS:  Well, it's
16   acknowledging and reporting to the FDA
17   that in this case that product was
18   purchased on the street.
19   BY MS. SCULLION:
20       Q.   Which meant it had street value,
21   right?
22            MR. LIMBACHER:  Object to form.
23            THE WITNESS:  I'm not sure what
24   street value means.  It doesn't quantify

33 (Pages 546 to 549)

Highly Confidential - Subject to Further Confidentiality Review

Page 550

1    it, but it was purchased, so I imagine
2    there was an exchange of value of some
3    sort.
4    BY MS. SCULLION:
5        Q.    I mean, as your -- in your time
6    with commercial responsibility for Opana ER, did
7    you have any training on the concept of Opana ER
8    or other opioid products being bought and sold
9    on the street and having street value?  Is that
10   something you had training on?
11           MR. LIMBACHER:  Object to form.
12           THE WITNESS:  I don't understand
13       what training would be with regards to
14       street value.
15   BY MS. SCULLION:
16       Q.    Were you given training on the
17   ways in which narcotics like Opana ER could be
18   diverted?
19           MR. LIMBACHER:  Object to form.
20           THE WITNESS:  That's a very
21       different question.
22   BY MS. SCULLION:
23       Q.    I'm asking a different question.
24   Were you given training on that issue?

Page 551

1        A.    All employees, as part of the
2    code of conduct, especially those with
3    involvement in our controlled substances had to
4    undergo periodic training, certify their
5    compliance with that, and within that context,
6    generally, I would say that all employees were
7    aware of the potential for diverse and abuse --
8    or abuse and diversion of the opioid product.
9    So at that level, everyone was aware because it
10   was part of the responsibility to watch out for
11   that, and it's the underpinning of the RiskMAP
12   and the REMS and all of the other documents.
13           Beyond that, I don't recall any
14   specific training on street value or any of the
15   like at that level, I don't.
16       Q.    Putting your 30(b)(6) hat, your
17   corporate representative hat back on, seeing all
18   the reports of abuse, misuse, diversion of Opana
19   ER over the years that were reported to the FDA
20   in the RiskMAP updates, did Endo ever tell the
21   FDA that its RiskMAP was ineffective to combat
22   diversion or abuse?
23           MR. LIMBACHER:  Object to the
24       form and object as falling outside the

Page 552

1    scope of the topics on which he's been
2    designated.
3        THE WITNESS:  I don't know.
4    BY MS. SCULLION:
5        Q.    Did -- in response to all the
6    evidence of abuse and diversion of Opana ER over
7    a number of years in which the RiskMAP updates
8    were submitted to the FDA, did Endo ever change
9    its policies or procedures with respect to
10   combating diversion of Opana ER in response to
11   that evidence?
12           MR. LIMBACHER:  Same objections.
13           THE WITNESS:  As we've testified
14       before, the RiskMAP formed the basis in
15       2007 of a broad array of activities
16       undertaken by the company.  The RiskMAP
17       report that you just focused me on from
18       2008, reports like that were done
19       periodically as part of that.  The
20       RiskMAP was enhanced in 2012 with the
21       industry-wide REMS, so I would say that
22       constituted a change or an evolution of
23       the policies and procedures.
24           There was a further evolution as

Page 553

1    a result of discussions with the New
2    York Attorney General later, several
3    years later.
4        So I would say that, yes, Endo's
5    policies and procedures did evolve over
6    time, but they were always grounded in
7    the same principles that were put
8    forward back in 2007 in the very
9    comprehensive RiskMAP.
10   BY MS. SCULLION:
11       Q.    So the question is, though,
12   during the period when Endo had its RiskMAP in
13   place, did Endo ever change its anti-diversion
14   procedures in response to the growing evidence
15   that Opana ER was being abused?
16           MR. LIMBACHER:  Same objections,
17       asked and answered.
18           THE WITNESS:  Same answer.  I
19       mean, I can repeat the answer, if you
20       would like.
21   BY MS. SCULLION:
22       Q.    Well, the answer, as I
23   understood, was that the change occurred, in
24   your view, when REMS was implemented.

Highly Confidential - Subject to Further Confidentiality Review

Page 554

1    Before REMS, if I'm wrong, you'll
2  tell me no, before REMS, did Endo change any of
3  its anti-diversion procedures in response to the
4  evidence of Opana ER abuse?
5    MR. LIMBACHER:  Same objections,
6    and I think you misstated his testimony.
7  BY MS. SCULLION:
8    Q.    Please let me know if I did.
9    A.    You did.  So I'll explain again.
10    The principles as put forth in
11  the 2007 REMS were the underpinning of all of
12  the activities.
13    Q.    Did you mean RiskMAP?
14    A.    What did I say?
15    Q.    REMS.
16    A.    Strike that, please, or I'll
17  repeat that.  Thank you.
18    In the 2007 RiskMAP the
19  principles that were put forward there were the
20  -- formed the foundation of the broad array of
21  activities that continue today.  So the RiskMAP
22  was not replaced by the REMS, it was supplanted
23  by it or it was supplemented by the REMS.
24    As I said, also, as a result of

Page 555

1  discussions with the New York Attorney General
2  several years later, there was some further
3  evolutions of policies and procedures, but I
4  can't attest that those are in response to any
5  specific trigger or any specific event.  They
6  were in response to ongoing focus by a broad
7  array of cross-functional experts within the
8  company to make sure that the company was doing
9  everything within its power to mitigate abuse
10  and diversion.  Again, those are the principles
11  as put forward in the 2007 RiskMAP.
12    Q.    Well, in response to the evidence
13  of abuse of Opana ER, did Endo ever, for
14  example, say, well, we want to go beyond just
15  monitoring and we want to go out and actively
16  look for pill mills and ensure that our product
17  is not being supplied to pill mills?
18    MR. LIMBACHER:  Same objections.
19    THE WITNESS:  Endo certainly had
20    safeguards in place to mitigate the
21    chance that its products were being
22    diverted to, as you say, pill mills.
23    Whether that was in response to any one
24    specific trigger, it was in response to

Page 556

1  broad understanding that opioids had the
2  potential of being abused and diverted.
3  BY MS. SCULLION:
4    Q.    But can you identify any
5  particular change Endo made to its
6  anti-diversion procedures in response to growing
7  evidence of Opana ER abuse, any specific,
8  concrete changes that Endo made?
9    MR. LIMBACHER:  Same objections.
10    THE WITNESS:  As I said before,
11    the REMS, industry-wide REMS was part of
12    the evolution of the program.  The
13    changes put forward as a result of
14    discussions with the New York Attorney
15    General, the ADD program had several
16    enhancements to it.
17    I would say that one of the
18    changes Endo made in response to
19    knowledge of the growing threat was to
20    formulate a product that was designed to
21    mitigate at least one of the forms of
22    abuse of the product.  So, yes, Endo
23    undertook several steps to try and
24    mitigate that problem.

Page 557

1  BY MS. SCULLION:
2    Q.    But the FDA didn't agree that, in
3  fact, the reformulated version of Opana ER was
4  any more effective at combating abuse, correct?
5    MR. LIMBACHER:  Object to form.
6  BY MS. SCULLION:
7    Q.    The FDA never accepted any data
8  that Endo put forward on that point?
9    MR. LIMBACHER:  Object to form.
10    THE WITNESS:  Oh, FDA accepted
11    all the date we submitted.
12  BY MS. SCULLION:
13    Q.    It didn't accept the conclusion
14  that reformulated Opana ER was, in fact, abuse
15  deterrent, right; they never made that finding?
16    MR. LIMBACHER:  Object to form.
17    THE WITNESS:  Correct.  At the
18    end of the submission and the
19    evaluation, the FDA ultimately did not
20    agree, but they accepted everything we
21    submitted.
22  BY MS. SCULLION:
23    Q.    Now, you just referenced REMS --
24    A.    Yes.

35 (Pages 554 to 557)

Highly Confidential - Subject to Further Confidentiality Review

Page 558

1    Q.   -- as being enhancement I think
2  is how you described it to Endo's
3  anti-diversion, anti-abuse efforts; is that
4  right?
5    A.   I would say an enhancement.  I
6  think I also used the word supplemental.  So, in
7  other words, the point I was -- the distinction
8  I was trying to make is that it did not replace.
9  RiskMAP stays -- I assume the RiskMAP is still
10  in place today, but the REMS, the industry-wide
11  REMS was additive in terms of steps taken,
12  again, in the -- in the pursuit of activities to
13  mitigate abuse and diversion.
14      MS. SCULLION:  Can I have E1610,
15      please.
16      (Document marked for
17      identification as Endo-Lortie Deposition
18      Exhibit No. 51.)
19  BY MS. SCULLION:
20    Q.   Mr. Lortie, but it's, in fact,
21  the case that the industry-wide working group
22  opposed applying REMS to focus on abuse,
23  deliberate abuse, correct?
24      MR. LIMBACHER:  Object to form

Page 559

1      and foundation and to the extent it
2      falls outside the scope of the topics on
3      which he's been designated.
4      THE WITNESS:  I don't know that
5      to be correct, no.
6  BY MS. SCULLION:
7    Q.   Okay.  Going to hand you what's
8  been marked as Exhibit 51.
9      And Exhibit 51 is Bates stamped
10  ENDO-OPIOID_MDL-01485661, and we've stamped it
11  E1610.
12      Mr. Lortie, you'll see that
13  E16 -- sorry -- Exhibit 51 is a letter from
14  Nancy Buc at Buc & Beardsley in Washington, D.C.
15  to Dr. Bob Rappaport at the CDER.
16      Do you see that?
17    A.   Yes, I see that as the cover
18  letter, yes.
19    Q.   And Ms. Buc refers in her first
20  paragraph of her cover letter to "In preparation
21  for the March 3 meeting on extended release
22  opioid analgesics, a number of sponsors invited
23  to the meeting and others with an interest in
24  the issues to be discussed have prepared the

Page 560

1  attached concept paper and the attached list of
2  questions for the FDA."
3      Do you see that?
4      MR. LIMBACHER:  Object to the
5      form and foundation and to the extent it
6      falls outside the scope of the topics on
7      which he's been designated.
8      THE WITNESS:  You read the
9      sentence accurately.
10  BY MS. SCULLION:
11    Q.   And Endo was part of this group
12  of sponsors and others with interest in the
13  issues that were supporting the concept paper
14  that Ms. Buc is forwarding on to Dr. Rappaport,
15  correct?
16      MR. LIMBACHER:  Same objections.
17      THE WITNESS:  I do not know.
18  BY MS. SCULLION:
19    Q.   Okay.  If you'll go to the
20  concepts themselves in the concept paper, page
21  E1610.2.
22    A.   If it's okay, I'll read through
23  the paper.
24    Q.   No, I actually want to just refer

Page 561

1  you to the concepts.  I'm not looking at the
2  entirety of the paper, just there's certain
3  concepts.  If you'll look to concept number 3.
4    A.   Sorry.  If it's okay, I'll look
5  through the document.
6      MR. LIMBACHER:  Yeah, take your
7      time and review the document.
8      MS. SCULLION:  Well, I'm not
9      going to have our time taken up with
10      reading through the document on the
11      record.  We can take a break and read it
12      off the record and come back on, if
13      that's okay, happy to do that.
14      MR. LIMBACHER:  He has been
15      reading the documents you've been
16      putting in front of him on the record
17      for the last two days.
18      MS. SCULLION:  Right.
19      MR. LIMBACHER:  And I think he
20      does it in a reasonably expeditious
21      manner, so if you just give him a minute
22      or two, I'm sure he can answer whatever
23      questions you have, but I don't think
24      it's fair or appropriate for you to ask

Highly Confidential - Subject to Further Confidentiality Review

Page 562

1    him questions about a document and not
2    give him the opportunity to at least
3    look through it.
4           MS. SCULLION:  I'm happy to have
5    him look through it, as long as it
6    doesn't come out of our time.
7           THE WITNESS:  I've never seen the
8    document.  It predates me.  I'd like to
9    look it so I can understand the context.
10   It's three pages.  We've used up more
11   time than I think I'm going to use to
12   look at it.
13          (Witness reviews document.)  I've
14   taken at least an overview of it.  Thank
15   you.
16   BY MS. SCULLION:
17      Q.    Right, and if you look at page
18   E1610.2, you see that one of the concepts being
19   put forward by this group, concept number 3 was
20   that "FDA should give priority to consideration
21   of REMS and other regulatory options for
22   patients whose exposure to excess drug stems
23   from accidental misuse, rather than diverters
24   and abusers whose exposure to excess drug stems

Page 563

1    from deliberate abuse."
2           Do you see that?
3       A.    Yes, I see that sentence.
4       Q.    And, again, Endo supported that
5    concept as part of its collaboration with other
6    sponsors with respect to what REMS should or
7    should not focus on, correct?
8           MR. LIMBACHER:  Object to the
9           form and foundation and to the extent it
10          falls outside the scope of the topics on
11          which he's been designated.
12          THE WITNESS:  I don't have any
13          grounds to say that that's correct.  I
14          don't see anything in here that refers
15          to Endo in any way as being part of
16          this.  I don't know.
17   BY MS. SCULLION:
18      Q.    The document was produced to us
19   from Endo's production; you understand that?
20      A.    I don't know the technicalities
21   of the production, so I do not understand that.
22      Q.    Put that aside.
23          Let's go back again to your
24   corporate representative capacity.  With respect

Page 564

1    to topic number 13, did Endo's policies permit
2    promotion of Opana ER as having low euphoria
3    prior to 2010?
4           MR. LIMBACHER:  Object to form
5           and foundation.
6           THE WITNESS:  Did Endo's policies
7           permit promotion, I don't recall that
8           being the case.
9           MR. LIMBACHER:  And I object to
10          the extent it falls outside the scope of
11          the topic as counsel have discussed
12          among themselves and how topic 13 is
13          going to be defined.
14   BY MS. SCULLION:
15      Q.    I'm sorry.  You said your
16   recollection, you don't recall that being the
17   case, right?
18      A.    Well, I don't recall that
19   being -- I would need to see if that claim was a
20   claim that was used in promotion.  I think what
21   I'm asked to do for that topic is speak about
22   the process and the support for any given
23   claims, so if that claim was used, I'd be happy
24   to look at it.

Page 565

1       Q.    Let's go back then to your
2    personal capacity.
3           You had responsibility for --
4    commercial responsibility for Opana ER when you
5    came on in 2009; is that right?
6       A.    Among several products, yes.
7       Q.    Okay.  At that time did Endo have
8    any substantial evidence to support a claim that
9    Opana ER had low euphoria?
10          MR. LIMBACHER:  Object to form
11          and foundation.
12          THE WITNESS:  I do not recall the
13          specific support for every claim made,
14          but I'd be happy to review a document,
15          if that would be helpful.
16   BY MS. SCULLION:
17      Q.    Do you recall at any point in
18   time Endo having support for a claim that Opana
19   ER had low euphoria?
20      A.    Again, Opana ER was one of the
21   products that I was responsible for, so I did
22   not have committed to memory all of the
23   particular claims and what could be used and
24   couldn't.

37  (Pages 562 to 565)

Highly Confidential - Subject to Further Confidentiality Review

Page 566

1      What I can attest to, though, is
2  any claims that were used were subject to and
3  made it successfully through our comprehensive
4  review process.
5      Q.   I think we discussed earlier that
6  from time to time, Endo used various pieces of
7  market research to assess the effectiveness of
8  its promotion, promotional messages with respect
9  to Opana ER, correct?
10     A.   I'm not sure I would agree with
11  the characterization, but, yes, from time to
12  time market research was employed to understand
13  many different aspects of promotion,
14  specifically whether it was to measure
15  effectiveness.  I can't agree to that as a
16  blanket statement.
17     Q.   Did from time to time Endo use
18  research to assess the extent to which its sales
19  representatives were conveying appropriate
20  messages with respect to Opana ER?
21          MR. LIMBACHER:  Object to form.
22  BY MS. SCULLION:
23     Q.   Sorry, approved messages with
24  respect to Opana ER.

Page 567

1      A.   Market research was used from
2  time to time to understand what physicians'
3  perceptions were and attitudes, et cetera,
4  sometimes with regards to Endo products,
5  sometimes with regards to competitive products,
6  recognizing that physicians -- that inputs to
7  physicians' perceptions weren't necessarily
8  solely because of Endo's promotional activities
9  or sales force activity.
10          MS. SCULLION:  Can we have E281,
11  please.
12          (Document marked for
13  identification as Endo-Lortie Deposition
14  Exhibit No. 52.)
15  BY MS. SCULLION:
16     Q.   Hand you what's been marked as
17  Exhibit Number 52.
18          Exhibit 52, which is Bates
19  stamped ENDO-CHI_LIT-00150080 and is stamped
20  hopefully helpfully in the upper right-hand
21  corner E281.
22          Mr. Lortie, you see Exhibit 52 is
23  identified in the upper left-hand corner, first
24  page Opana ER W2 IVR vocal response listing for

Page 568

1  study number M508-202?
2      A.   Yeah, I see that identifier, yes.
3      Q.   From time to time, in your
4  experience, did Endo use vocal response research
5  to assess the messages that healthcare providers
6  were receiving with respect to its products,
7  including Opana ER?
8      A.   I actually don't know what vocal
9  response listing is, to be accurate.  I am not
10  sure I've seen that term.  This was the night --
11  sorry, 2007 at least it's dated 2007, so this
12  would not have been something I would have seen.
13     Q.   You see, though, that the -- that
14  Exhibit 52 appears to be reciting verbatims with
15  respect to in-person sales presentations of
16  Opana ER listing specific call dates on the
17  right-hand side?
18          MR. LIMBACHER:  Object to form
19  and foundation, and as the witness has
20  noted, the document predates his
21  employment and he's not seen it before.
22          THE WITNESS:  Yeah, I mean, I
23  really don't know what I'm seeing here.
24  BY MS. SCULLION:

Page 569

1      Q.   Have you seen from time to time
2  reports of verbatim responses from physicians
3  with respect to Endo products; did you see
4  those?
5      A.   I don't recall seeing those at
6  Endo, no.  It could be.  I was there for seven
7  or eight years, and I had responsibility for
8  many products, but I don't -- this I have not
9  seen for sure, and I really don't know what it's
10  representing.
11     Q.   Okay.  If you'll go to page
12  E281.9.
13          MR. LIMBACHER:  Same objections
14  to the extent you're going to be
15  questioning him about what's been marked
16  as Exhibit 52.
17  BY MS. SCULLION:
18     Q.   No, I apologize.  Let's go to
19  page E281.24.
20     A.   281?
21     Q.   281.24, yes.
22     A.   Okay, I have that page.
23     Q.   And the bottom half of the page,
24  there's a report with respect to what's labeled

Highly Confidential - Subject to Further Confidentiality Review

Page 570

1    "Sequence." If you go down to sequence
2    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, the bottom third of the page.
3         Do you see that?
4         A.   Yes, I do.
5         MR. LIMBACHER:  Same objections.
6    BY MS. SCULLION:
7         Q.   Under "Specialty" it's listed
8    "PCP."
9         Do you see that?
10        A.   Just going across on that?
11        Q.   Correct, the next column.
12        A.   Yes.
13        Q.   And PCP was a generally used
14   abbreviation for a primary care physician,
15   correct?
16        A.   In the context of specialty,
17   that's the conclusion I would draw.  Again, not
18   having seen this, but, yes, I think that's
19   probably accurate.
20        Q.   And this exhibit is reflecting
21   for that sequence in-person sales presentation
22   in the summary it asks, "In one or two
23   sentences, please describe what was new," and
24   what's described here is "less euphoria and

Page 571

1    maybe less addictive potential."
2         Do you see that?
3         MR. LIMBACHER:  Object to form.
4         THE WITNESS:  Yes, you read that,
5         that's what's represented here on the
6         page.
7    BY MS. SCULLION:
8         Q.   Okay.  And that's dated as of
9    11/14/2007, correct?
10        A.   That's the --
11        Q.   For the call date?
12        A.   That's the date on that line,
13   yes.
14        Q.   For the call date, right?
15        A.   It appears to be, that's yes.
16        Q.   And Endo referred to in-person
17   detailing on healthcare providers as calls,
18   right?
19        A.   Yeah, I would think a call would
20   be a detail.
21        Q.   So one could understand that a
22   call date referred to the date on which that
23   physician was -- that prescriber -- provider
24   rather, sorry -- that provider was detailed,

Page 572

1    correct?
2         A.   All I can attest to is that the
3    date that they have on the call date is
4    11/14/2007, as you pointed out.
5         Q.   And then you go to the next page
6    E281.25, and we'll see for sequence number
7    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.
8         Do you see that sequence number?
9         A.   The lowest one on the list, yes,
10   I do.
11        Q.   And for the specialty it's
12   indicated again primary care physician, correct?
13        A.   The header is not represented on
14   the page, but if it follows the previous one, I
15   think I see PCP in that column.
16        Q.   And here for this sequence when
17   asked to describe in one or two sentences,
18   please describe what was new, what was reported
19   was "low incidence of euphoria," correct?
20        MR. LIMBACHER:  Same objections.
21        THE WITNESS:  Yes, that's what's
22        written in that column.
23   BY MS. SCULLION:
24        Q.   And if you go to page E281.94.

Page 573

1         A.   94?
2         Q.   Correct.
3         And here on this page, if we go
4    to sequence number, again, bottom approximately
5    third of the page, sequence number 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.
6         A.   994?
7         Q.   Yes, are you there?
8         A.   Yes, I am.
9         Q.   And, again, specialty here is
10   primary care physician, correct?
11        A.   PCP is what's listed.
12        Q.   That's primary care physician
13   again, correct?
14        A.   Well, I think that's what we've
15   assumed it's referring to.
16        Q.   Okay.  And if you go to the
17   column header for the next right-hand column, do
18   you see that the column here is asking about "Of
19   all the topics discussed by the sales
20   representative during the presentation, what one
21   topic, from your perspective, was the most
22   important to you?"
23        Did I read that correctly?
24        A.   Yes, that's -- you read that

Page 574

1    accurately.
2         Q.    And under that column for
3    sequence number 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 it indicates, "Low
4    incidence of abuse due to low incidence of
5    euphoria."
6              Did I read that correctly?
7              MR. LIMBACHER:  Same objections
8         to all of these questions with regard to
9         Exhibit 52.
10             THE WITNESS:  You read the
11        sentence accurately.
12   BY MS. SCULLION:
13        Q.    Okay.  And then if you go to page
14   E281.96, drawing your attention again to the
15   bottom third of the page, just to the column
16   headers, again see sequence, next column
17   specialty, correct?
18        A.    In the bottom section here?
19        Q.    Yes.
20        A.    On 96, correct?
21        Q.    Correct.
22        A.    Still on the right page, yes.
23        Q.    You see sequence, next column to
24   the right is specialty again, correct?

Page 575

1         A.    Correct.
2         Q.    Next column is "Of all the topics
3    discussed by the sales representative during the
4    presentation, what one topic, from your
5    perspective, was the most important to you?"
6              Did I read that correctly?
7         A.    You did.
8         Q.    And if you go to the next page,
9    E281.97, go to sequence Number 115-0 -- sorry,
10   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, do you see the specialty listed
11   here now is pain management?
12        A.    Yes, that's the second from the
13   bottom.
14        Q.    Yep.
15        A.    I do.
16        Q.    And here in response to all of
17   the topics discussed by the sales
18   representatives -- sales representative during
19   the presentation what one topic, from your
20   perspective, was the most important to you, the
21   response was "Low abuse potential and low
22   euphoria potential."
23             Did I read that correctly?
24             MR. LIMBACHER:  Same objections.

Page 576

1              THE WITNESS:  Yes, you read that
2         accurately.  That's what's on the page.
3    BY MS. SCULLION:
4         Q.    And you were aware, were you not,
5    that, in fact, Endo sales representatives were
6    communicating the message to healthcare
7    providers that Opana ER had low euphoria as
8    reflected in the exhibit we were just looking
9    at, correct; you were aware of that?
10             MR. LIMBACHER:  Object to form,
11        foundation.
12             THE WITNESS:  No, I was not aware
13        of that.  This entire document predates
14        me by a couple of years, and I don't
15        recall ever seeing it.
16   BY MS. SCULLION:
17        Q.    Well, let's look -- are you
18   familiar with Endo -- Endo coaching or Endo sale
19   coaching reports?
20        A.    Endo sale coaching reports?
21        Q.    Yes.
22        A.    That doesn't ring a bell.
23        Q.    Did Endo use coaching by its
24   district managers to observe the effectiveness

Page 577

1    and appropriateness of sales representatives in
2    the field?
3              MR. LIMBACHER:  Objection, form
4         and foundation.
5              THE WITNESS:  Certainly, our
6         district managers had the
7         responsibility, among others, of
8         observing sales representatives and
9         coaching their activities and making
10        sure that they were effective, but also,
11        of course, activities were within
12        compliance.  From time to time there
13        were various reports that were used to
14        memorialize that.
15   BY MS. SCULLION:
16        Q.    Okay.
17        A.    I don't recall the specific ones,
18   though.
19        Q.    So it never came to your
20   attention, for example, that the Endo sale
21   coaching reports reflecting as early as May 2007
22   that representatives were characterizing Opana
23   ER to healthcare providers as a great choice for
24   older patients due to clean safety profile and

Highly Confidential - Subject to Further Confidentiality Review

Page 578

1    less euphoria?
2            MR. LIMBACHER: Objection, form
3    and foundation. I would note it
4    predates his employment at the company.
5            THE WITNESS: You're correct. I
6    don't recall that. It never was brought
7    to my attention that I recall.
8            MS. SCULLION: Can I have E1593.
9            (Document marked for
10   identification as Endo-Lortie Deposition
11   Exhibit No. 53.)
12   BY MS. SCULLION:
13       Q.   I hand you what's been marked as
14   Exhibit 53.
15           And Exhibit 53 is Bates stamped
16   ENDO-OPIOID_MDL-00992589, and we've marked it
17   E1593 in the upper right-hand corner.
18           Do you see this is an e-mail from
19   Ben Manibog to Demir Bingol?
20       A.   I do see that, yes.
21       Q.   And that was dated as of
22   December 1st, 2009, correct?
23       A.   That's the date on the e-mail,
24   yes.

Page 579

1        Q.   And at the time of this e-mail
2    you were employed by Endo and had responsibility
3    for Opana ER, correct?
4        A.   Yes, as of that date I did.
5        Q.   And Mr. Bingol, what was his
6    position with Endo in December of 2009?
7        A.   To the best of my recollection,
8    he had marketing responsibility for Opana.
9        Q.   Was he also serving as a regional
10   business director for the Midwest region during
11   that period?
12       A.   No.
13       Q.   You don't recall he had
14   concurrent responsibilities for a period of time
15   both as brand manager and as a regional business
16   director?
17       A.   Oh, I do recall that, but it was
18   not at this time. It was later.
19       Q.   What's your understanding of when
20   he had the concurrent responsibilities?
21       A.   It was later than December of
22   2009, I'm certain of that. I don't recall
23   specifically, but it was either later in 2010 or
24   in 2011, he had a developmental assignment,

Page 580

1    where he, as you say, had concurrent
2    responsibilities.
3        Q.   If you go to page E1593.2, you
4    see this is a Work Session Planner dated
5    December 1st, 2009?
6            MR. LIMBACHER: Objection, form
7    and foundation.
8            THE WITNESS: I see that as the
9    title or the header on that page, 93.2.
10   BY MS. SCULLION:
11       Q.   And then if you go to page
12   E1593.3, do you see that Mr. Manibog has stated
13   in this Work Session Planner under Number 6
14   "What action steps are you taking to insure that
15   your top writers are growing?" The first action
16   step listed there is "Opana ER - focusing on the
17   benefits of true 12-hour dosing and lack of
18   euphoria."
19           Did I read that correctly?
20           MR. LIMBACHER: Objection, form
21   and foundation.
22           THE WITNESS: Just making sure --
23   so you're now on page 93.3. This is
24   number 6, I think.

Page 581

1    BY MS. SCULLION:
2        Q.   That's right, and the very first
3    action step listed there.
4        A.   Okay, I see that. What was the
5    question again, please?
6        Q.   The question is do I understand
7    correctly that the first action step listed
8    there was Opana ER targets focusing on the
9    benefits of true 12-hour dosing and lack of
10   euphoria?
11       A.   Yes, that's what it writes -- or
12   that's what's written there.
13       Q.   And was that an appropriate focus
14   as of December 2009 for Opana ER, lack of
15   euphoria?
16           MR. LIMBACHER: Objection, form
17   and foundation.
18           THE WITNESS: I don't recall the
19   specific product claims or their support
20   or what the sales force was asked to
21   focus on at that date, so I don't know.
22           MS. SCULLION: Let's take a quick
23   break.
24           THE VIDEOGRAPHER: Going off the

41 (Pages 578 to 581)

Highly Confidential - Subject to Further Confidentiality Review

Page 582

1    record 5:30.
2         (Brief recess.)
3         THE VIDEOGRAPHER:  We are back on
4    the record at 5:52.
5         (Document marked for
6    identification as Endo-Lortie Deposition
7    Exhibit No. 54.)
8         MS. SCULLION:  Mr. Lortie,
9    welcome back.  I have no further
10   questions for you today.  I do want to
11   mark as an exhibit, though, for the
12   record, we'll mark it as Exhibit Number
13   54.
14        And Exhibit 54 is a printout of
15   an e-mail I sent to Mr. Davis, counsel
16   to Endo in this case on August 10th,
17   2018, and I'm marking it as an exhibit
18   to the record because it reflects at
19   least some of the agreements we came to
20   with Endo a few months ago as to the
21   scope of the 30(b)(6) responses to be
22   provided, including Mr. Lortie's
23   testimony, and the agreements that we
24   reached, to my understanding, were not

Page 583

1    honored, as reflected in the record
2    yesterday, where we had to spend an
3    inordinate amount of time understanding
4    what Endo had chosen and not chosen to
5    prepare the witness to testify to as its
6    corporate representative.
7         So, among other things, the
8    e-mail recites that with respect to time
9    frame for the 30(b)(6) responses that in
10   its August 1st letter, Endo indicated it
11   would not provide responsive information
12   concerning pre-June 2004 periods ("Time
13   Period Limit").  On our August 3 call,
14   Endo confirmed that, consistent with
15   special master Cohen's rulings, Endo is
16   withdrawing its Time Period Limit, and
17   it was, therefore, our understanding
18   that, in fact, there were no time period
19   limits with respect to Endo's 30(b)(6)
20   responses.  However, as reflected
21   yesterday, the witness was not prepared
22   to speak to virtually any of Endo's
23   policies or procedures or other topics
24   in which he was designated for any time

Page 584

1    periods prior to the launch of Opana ER.
2         Similarly, with respect to
3    products other than Opana ER, the e-mail
4    reflects that Endo's objections to
5    providing discovery for all of its
6    opioid products (branded and generic)
7    have been overruled.
8         MR. LIMBACHER:  Jen,
9    respectfully, is there a reason why
10   you're putting this on the record.
11        MS. SCULLION:  Yes, I'm.
12        MR. LIMBACHER:  Because you've
13   marked the e-mail as an exhibit.  It
14   will be attached to the transcript.  Why
15   are we doing this?
16        MS. SCULLION:  Counsel, we spent
17   an inordinate amount of time trying to
18   parse out again what this witness had or
19   had not been prepared to and we're going
20   to put on the record what the agreement
21   was back in August of 2018 as to the
22   scope of the 30(b)(6) responses.  Sorry.
23   So let me start again.
24        Now, with respect to the scope

Page 585

1    for the products that Endo's objections
2    for providing discovery for all of its
3    opioid products (branded and generic)
4    have been overruled.
5         Next sentence, thus we understand
6    Endo will now be providing discovery
7    (including 30(b)(6) testimony/written
8    responses) not only for Opana ER but
9    Opana IR, Numorphan, Percocet, Percodan
10   and Endo's various generic opioids, as
11   well as opioids as a class.  As
12   reflected in the record from yesterday,
13   the witness was not prepared to speak
14   to, for among other things, Percocet or
15   Endo's generic OxyContin product.  I
16   think the witness said today that he was
17   also not familiar -- maybe it was
18   yesterday, I apologize, that he was not
19   familiar with Numorphan.  And so it is
20   our position, again, that no fault of
21   the witness' but that he was not
22   properly prepared to speak to the
23   entirety of the scope of the topics on
24   which he was designated and which we

Highly Confidential - Subject to Further Confidentiality Review

Page 586

1  prepared to take his testimony over the
2  course of the last two days.
3      We reserve all our rights with
4  respect to what we believe was a
5  violation of the rules, and with that,
6  we will end our questioning here today,
7  but with the right to continue
8  questioning on the issues for which
9  we've had no representative provided.
10     MR. LIMBACHER:  Respectfully,
11 counsel, I disagree.  I think the
12 witness was fully prepared to testify
13 with regard to all of the topics on
14 which he had been designated.  You've
15 provided a self-serving e-mail only from
16 you without any response from Mr. Davis
17 that goes back to August of 2018.  There
18 has been considerable subsequent e-mail
19 exchanges between the parties with
20 regard to the proper topics under the
21 30(b)(6) notice and which witness is or
22 is not being designated on specific
23 topics.
24     Without being comprehensive, I

Page 587

1  would refer you to an e-mail dated
2  December the 12th, 2018 from Mr. Davis,
3  an e-mail dated January the 6th of 2019
4  from Mr. Davis.  I would also refer you
5  to an e-mail dated October 22nd, 2018
6  from Mr. Davis, January 29th of 2019
7  from Mr. Davis, and I could go on and on
8  and on.
9      So by no means does Exhibit 54
10 reflect all of the agreements between
11 the parties that were worked out amongst
12 counsel in advance of Mr. Lortie's
13 deposition, and I strenuously reject the
14 notion that this witness was not
15 properly prepared.  You asked him
16 multiple questions on multiple topics
17 that clearly fell outside the scope of
18 the language in the 30(b)(6) notice and
19 were inconsistent with both the letter
20 and the spirit of the e-mail exchanges
21 between counsel.
22     I'd also point out since you went
23 to the trouble of marking this
24 August 10th, 2018 e-mail but none of the

Page 588

1  other e-mails that reflect the
2  agreements among counsel, that even in
3  this e-mail that you, counsel, wrote,
4  you say at the bottom on the first
5  page -- near the bottom of the first
6  page that even you acknowledge that
7  Endo's willingness to provide 30(b)(6)
8  discovery with respect to generic opioid
9  products sold, licensed, distributed by
10 its wholly-owned subsidiary Par
11 Pharmaceuticals remains unclear.
12     So with that, counsel, I think we
13 can move on and try to accomplish
14 something since it's 6:00 at night.
15     MS. SCULLION:  I just do want to
16 respond that the sentence you just
17 referred to was with respect to Par's
18 generics.  The sentence before that was
19 with respect to Endo's generics.  Endo,
20 long before the Par acquisition, did, in
21 fact, have its own generic opioid
22 products, including generic OxyContin,
23 including Endocet.
24     MR. LIMBACHER:  Counsel, am I

Page 589

1  right that you and Mr. Davis have
2  engaged in multiple exchanges of e-mails
3  subsequent to August of 2018 with regard
4  to the agreements amongst counsel
5  concerning what this witness and other
6  witnesses are going to be designated to
7  testify on?
8      MS. SCULLION:  The answer is,
9  yes, we did, and in none of those e-mail
10 exchanges was there ever a change in the
11 fact that the 30(b)(6) responses,
12 whether written, in writing or in
13 testimony were not to be limited to any
14 particular time frame, nor were they to
15 be limited solely to Opana ER, and that
16 is what we have witnessed over the
17 course of the last two days.
18     And I do want to make clear,
19 because I don't think I was clear
20 before, that with respect to reserving
21 our rights, we are also reserving the
22 right to seek preclusion to the extent
23 Endo would try to offer or seek to offer
24 any evidence with respect to the topics

43 (Pages 586 to 589)

Highly Confidential - Subject to Further Confidentiality Review

Page 590

1    on which this witness has not prepared.
2        I understand that it sounds like
3    from counsel from Endo there's a
4    disagreement about that, but I am making
5    that clear for the record that we're
6    reserving our right to, in fact, seek
7    preclusion.
8        MR. LIMBACHER:  Well, again, I
9    object to an attempt here through this
10   Exhibit 54 to suggest that an e-mail
11   from August of 2018 is a reflection of
12   the actual state of the agreement
13   amongst counsel.  That's simply not
14   correct.
15       And, again, this witness was
16   fully and properly prepared to testify
17   with regard to the topics on which he
18   was designated, as reflected by multiple
19   exchanges of e-mails that are subsequent
20   to August of 2018.
21       MS. SCULLION:  Thank you for your
22   time.
23       THE VIDEOGRAPHER:  Going off the
24   record at 6:02.

Page 591

1        (Pause.)
2        THE VIDEOGRAPHER:  We are back on
3    the record at 6:03.
4    BY MR. LENISKI:
5        Q.   Good afternoon, Mr. Lortie.  My
6    name is Joe Leniski, we met yesterday.  I
7    represent plaintiffs in Tennessee, and I'm going
8    to try to be brief, and I know it's been a long
9    two days.
10       MR. LENISKI:  So before I begin,
11   though, I need to state that the
12   Tennessee state plaintiffs have a
13   standing objection, which I will adopt
14   here, to these depositions due to a lack
15   of adequate notice, a lack of document
16   production and because there are
17   different civil rules that apply in
18   Tennessee, including the lack of a
19   limitation on time limits for
20   depositions.  Unless you have some
21   response, counsel, I'll proceed.
22       MR. LIMBACHER:  No, we understand
23   your position.
24       MR. LENISKI:  Thank you.

Page 592

1    BY MR. LENISKI:
2        Q.   I'm going to be asking questions
3    today both as a fact witness and in your
4    capacity as 30(b)(6), similar to the MDL
5    counsel.
6        MR. LIMBACHER:  And, counsel,
7    just so we have the same understanding,
8    unless you make it clear on the record
9    that you're asking him in his capacity
10   as a 30(b)(6) witness, I think my
11   position will be that he's being
12   questioned in his capacity as a fact
13   witness.
14   BY MR. LENISKI:
15       Q.   Understood.  And I'll try to make
16   that clear.  I'll use the hat analogy, so go
17   ahead and put on your 30(b)(6) hat.
18       A.   Thank you.
19       Q.   Before Endo began marketing
20   Opana, did it believe that prescription abuse
21   was a real problem?
22       MR. LIMBACHER:  Object to form
23   and object to the extent it falls
24   outside the scope of the topics on which

Page 593

1    he's been designated.
2        THE WITNESS:  My recollection is
3    Opana was marketed after 2006.  So prior
4    to that, it was prior to 2006.  I joined
5    in 2009, so I can't really draw a
6    conclusion as to what Endo's position
7    was back then.
8    BY MR. LENISKI:
9        Q.   So as of 2009, did Endo believe
10   that prescription abuse of opioids was a real
11   problem?
12       MR. LIMBACHER:  Same objections.
13       THE WITNESS:  I think in the
14   report of the -- the independent board
15   report that we looked at yesterday, it
16   states the company's position at least
17   as of now, which I think is consistent,
18   that opioid abuse and diversion remains
19   a problem that requires the cooperation
20   of multiple stakeholders to try and
21   improve.
22   BY MR. LENISKI:
23       Q.   And I'm asking --
24       A.   Sorry, let me finish.

44  (Pages 590 to 593)

Highly Confidential - Subject to Further Confidentiality Review

Page 594

1       Q.    I don't mean to cut you off.
2    Sorry.
3       A.    The extent to which that position
4    was held at various points in time is sort of
5    difficult for me to quantify.
6       Q.    So my question, again was in
7    2009, when Endo was marketing the Opana ER --
8    I'll call it the original formulation; is that
9    fair?
10      A.    Okay.
11      Q.    Okay.  The question was in 2009
12   when Endo was marketing original formulation
13   Opana ER, did it believe that prescription abuse
14   of -- or abuse of prescription opioids, rather
15   was a real problem?  Am I to understand from
16   your answer that you don't know definitively
17   what Endo's position was at that time?
18          MR. LIMBACHER:  Same objections.
19          THE WITNESS:  No.  What I can say
20      is -- and I'll refer back to the 2007
21      RiskMAP, because I think it provides a
22      foundation for not only the company's
23      view on the problem but the steps that
24      the company was putting into place and,

Page 595

1    therefore, because there were
2    significant steps across the entire
3    company, certainly, there was a
4    recognition that there was a potential
5    for abuse and diversion of these
6    controlled substances.
7    BY MR. LENISKI:
8       Q.    Did Endo ever question whether
9    prescription -- abuse of prescription opioids
10   was a real problem?
11          MR. LIMBACHER:  Same objections.
12          THE WITNESS:  I don't know.  I
13      don't recall that myself, but I don't
14      know.
15   BY MR. LENISKI:
16      Q.    At any point do you recall Endo
17   claiming the problem of abuse of prescription
18   opioids was merely a perception created by the
19   media and the government?
20          MR. LIMBACHER:  Objection, same
21      objections.
22          THE WITNESS:  I don't recall
23      that.
24          (Document marked for

Page 596

1    identification as Endo-Lortie Deposition
2    Exhibit No. 55.)
3    BY MR. LENISKI:
4       Q.    Handing you Exhibit 55.  There's
5    extra copies here for counsel on down.
6          This is ENDO-OPIOID_MDL-01941783.
7    It's an e-mail with an attached PowerPoint.
8          MR. LIMBACHER:  This is 55?
9          MR. LENISKI:  Correct, sorry,
10      Exhibit 55.
11   BY MR. LENISKI:
12      Q.    Mr. Lortie, do you recognize the
13   document?
14      A.    I don't recall seeing it, but I
15   recognize it as a document from Brian Munroe to
16   myself and others.
17      Q.    Okay.  And this is dated
18   May 30th, 2012, correct?
19      A.    Yes, that's correct.
20      Q.    And this is approximately the
21   time that Endo is launching the reformulated
22   Opana ER; is that your recollection?
23      A.    Yes, I think that's true.  That
24   was in the middle of 2012.

Page 597

1       Q.    Okay.  And if you look, the
2    attachment is titled Rx drug abuse deck for
3    6/5/12.
4          MR. LIMBACHER:  Counsel, to the
5      extent it's not clear, I'm continuing my
6      objections to this line of questions to
7      the extent it falls outside the scope of
8      the topics on which he's been
9      designated.
10   BY MR. LENISKI:
11      Q.    Okay.  In this e-mail Mr. Munroe
12   sent to yourself he writes, thanks team for
13   helping put this together.  Brian, I promised
14   you a draft to look at before I send to Julie
15   and I thought I would include everyone on the
16   team if anyone has comments or improvements.  I
17   plan on highlighting, Brian, our close
18   partnership with you and your team on every
19   aspect of what we are doing.
20          Have I read that correctly?
21      A.    Yes.
22      Q.    And the Brian, is the Brian he's
23   referring to in those comments you?  Is that a
24   fair assumption?

Highly Confidential - Subject to Further Confidentiality Review

Page 598

1   A.   I think that's a fair assumption.
2   It's written a little bit awkwardly, but there's
3   no other Brian on the e-mail so I can --
4       Q.   And when he's referring to our
5   close partnership with you and your team, is he
6   referring to the partnership between the
7   legislative and regulatory team at Endo and your
8   division at Endo?
9       A.   It could be that's what he means.
10  I mean, it's not my e-mail.  It's written to me,
11  but it's not written by me, so beyond reading
12  here, I can't tell you exactly what he was
13  thinking.
14      Q.   Does this refresh your
15  recollection at all about why Mr. Munroe was
16  putting this particular slide deck together?
17      A.   No, it does not.  I'm happy to
18  look through the deck to see if anything in here
19  does refresh my recollection.
20      Q.   Okay.  Go ahead.
21      A.   (Witness reviews document.)
22      Q.   And when you're ready, I'm going
23  to refer to you page 2 and 3 of the slide deck.
24      A.   Okay.  I'll just take a minute to

Page 599

1   quickly review the document.  (Witness reviews
2   document.)
3       MR. LIMBACHER:  Counsel, which
4   topic in the 30(b)(6) notice are you
5   claiming this line of questioning is
6   covered by?
7       MR. LENISKI:  Well, I can
8   actually question him in his personal
9   capacity, since he received the e-mail.
10      MR. LIMBACHER:  Okay.
11      MR. LENISKI:  But I would think
12  it would be proper under policies for
13  abuse and diversion issues at Endo
14  ensuring compliance with anti-diversion
15  laws and regulations.
16      MR. LIMBACHER:  Are you going to
17  be now questioning him in his individual
18  capacity?
19      MR. LENISKI:  I am right now.
20      MR. LIMBACHER:  Thank you.
21      THE WITNESS:  I looked through
22  generally, so I've got an idea of the
23  document.  I don't recall seeing it.
24  BY MR. LENISKI:

Page 600

1       Q.   Okay.  On page 2 of the slide
2   deck, there's a question posed, "Is prescription
3   drug abuse really a problem?"
4       Do you see that?
5       A.   I do, yes.
6       Q.   And then the answer, "It is for
7   Endo.  (Did you see the letters from Sens.
8   Baucus and Grassley?)"
9       Have I read that correctly?
10      A.   You read that correctly, yes.
11      Q.   Okay.  And then there's a -- the
12  next slide over, the question is "Why?"  And the
13  answer given in the slide is "Because the media
14  and the government say so (frequently)."
15      Did I read that correctly?
16      A.   Yes, that's what's written here.
17      Q.   Okay.  Is Endo contending that
18  the prescription drug abuse problem in this
19  country in 2012 was really only a problem
20  because the media and the government said it
21  was?
22      MR. LIMBACHER:  Objection, form
23  and foundation.
24      THE WITNESS:  And, sorry, just

Page 601

1       for clarification, are you asking for
2       Endo's position on that statement or my
3       position on that?
4   BY MR. LENISKI:
5       Q.   I'm asking -- well, let me ask
6   for your position.
7       A.   I would say that that is
8   inconsistent entirely with my understanding of
9   the operations and the views of the company
10  during the entire time I was there.  I didn't
11  write this.  I don't recall seeing it, and I'm
12  not really sure of the audience of it.  That
13  being said, my recollection is that the
14  company's policy was not that -- or the
15  company's view was not that prescription drug
16  abuse was only a problem because of media and
17  government.
18      Q.   Look at page 5 of the slides.
19  Endo writes here, "Perception is reality" -- or
20  quotes rather Lee Atwater saying "Perception is
21  reality" and also quotes Dr. Phil, "There is no
22  reality - only perception," correct?
23      MR. LIMBACHER:  Object to form.
24      THE WITNESS:  Yes, you've read

46 (Pages 598 to 601)

Highly Confidential - Subject to Further Confidentiality Review

Page 602

1    that correctly.  That's what's on the
2    slide.
3    BY MR. LENISKI:
4         Q.   Okay.  And was it your
5    understanding at this time in 2012 it was Endo's
6    position that prescription drug abuse was merely
7    a matter of perception?
8         MR. LIMBACHER:  Objection, form
9         and foundation.
10        THE WITNESS:  No, my recollection
11        is that that's not true.
12   BY MR. LENISKI:
13        Q.   In fact, was it -- is it your
14   understanding that Endo's position in 2012 was
15   that prescription drug abuse was not, in fact, a
16   reality?
17        MR. LIMBACHER:  Objection, form
18        and foundation.
19        THE WITNESS:  No.
20   BY MR. LENISKI:
21        Q.   Slide 12, turn there, on the
22   slide it states "Big Problem = Effective
23   Solutions take time and policymakers don't have
24   time," correct?

Page 603

1         A.   You've read that accurately, yes.
2         Q.   And the next slide under the
3    header "Threats to Good Public Policy," it lists
4    "Bipartisan alarm about perceived 'crisis'."
5         Did I read that correctly?
6         A.   You read that correctly, yes.
7         Q.   And, once again, you disagree
8    that in 2012, Endo believed that the crisis
9    surrounding prescription abuse of opioids was
10   simply a matter of perception; is that correct?
11        MR. LIMBACHER:  Objection, form
12        and foundation.
13        THE WITNESS:  I think I followed
14        your question, but could you just ask
15        that question again.
16   BY MR. LENISKI:
17        Q.   You disagree that in 2012, Endo
18   believed the crisis surrounding prescription
19   abuse of opioids was simply a matter of
20   perception, correct?
21        MR. LIMBACHER:  Same objection.
22        THE WITNESS:  I disagree, that is
23        correct.
24   BY MR. LENISKI:

Page 604

1         Q.   Did you -- do you recall ever
2    responding to Mr. Munroe or making any comment
3    disagreeing with the notion that opioid or the
4    prescription drug abuse or opioid abuse was
5    simply a matter of perception?
6         MR. LIMBACHER:  Object to form,
7         misstates the evidence.
8         THE WITNESS:  I don't recall
9         receiving the document, and I don't
10        recall responding to it.  I'd be happy
11        to review a document if you have
12        something you'd like me to look at.
13        I will say I was not always able
14        to respond to every e-mail I received,
15        so just wanted to put that out there.
16   BY MR. LENISKI:
17        Q.   Do you recall having reviewed the
18   document, having any input into the content of
19   this document?
20        A.   I don't recall having seen it.  I
21   don't recall having received it, having input
22   either before or after the fact.
23        Q.   There's also another threat
24   listed on slide on page 13 it says "'fix it now'

Page 605

1    syndrome."
2         Do you see that?
3         A.   So back on 13 again?
4         Q.   Yes.
5         A.   I see that written here, yes.
6         Q.   And what does that mean?
7         A.   I have no idea.  I didn't write
8    it.
9         Q.   There is a conclusion here on
10   page 13.  It says, "Need for a strong defense to
11   prevent harmful policy actions."
12        Did I read that correctly?
13        A.   Yes, you did.
14        Q.   Okay.  Here is Endo suggesting
15   with that statement that it must defend itself
16   against government action to stop the opioid
17   crisis?
18        MR. LIMBACHER:  Objection, form
19        and foundation.
20        THE WITNESS:  The author was a
21        single person not necessarily speaking
22        on behalf of the company, or at least I
23        have no grounds to accept that he was
24        speaking on behalf of the company, so --

47  (Pages 602 to 605)

Highly Confidential - Subject to Further Confidentiality Review

Page 606

1      and, also, it wasn't written by me, so I
2      don't know what he meant by that.
3  BY MR. LENISKI:
4      Q.    So you don't know, you have no
5  understanding, as you sit here today, what was
6  meant by a need for a strong defense to prevent
7  harmful policy actions?
8      A.    That is correct, I do not know.
9      Q.    Put that document aside.
10          (Document marked for
11      identification as Endo-Lortie Deposition
12      Exhibit No. 56.)
13          MR. LENISKI:  I'm handing the
14      witness Exhibit 56 to his deposition,
15      and this is EPI001932425.
16  BY MR. LENISKI:
17      Q.    Mr. Lortie, I'll represent to you
18  that this came from your custodial file, and
19  there is no cover page that was produced to us
20  that we could locate.  It's just what appears to
21  be slides, for your reference.
22      A.    For my efforts, sorry?
23      Q.    For your reference?
24      A.    For my reference, okay.  May I

Page 607

1  take a look through them?
2      Q.    Yes.  And when you're ready, I'm
3  going to be asking you questions specifically
4  about what's on pages 9 through 13.
5      A.    Okay, that's helpful.  Thank you.
6          (Witness reviews document.)
7  Okay.  I haven't read the whole document, but
8  I've read up through 9 through 13, so I'm happy
9  to look at it.
10      Q.    Do you recognize the document?
11      A.    I don't, not sitting here, no, I
12  don't, and I don't -- as you said, there's not a
13  cover letter that orients us, but so I don't
14  recall -- I don't recognize it sitting here.  I
15  haven't reviewed it.
16      Q.    Okay.  And looking at -- starting
17  on slide 9 of the document, there's a slide
18  titled first quarter of 2013 Routes of Abuse:
19  Tennessee vs. Other States.
20          Do you see that?
21      A.    I do, yes.
22      Q.    Okay.  Do you recall or does that
23  refresh your recollection about any involvement
24  you may have had in your personal capacity with

Page 608

1  respect to a safety signal for abuse that was
2  occurring in Tennessee during 2013?
3          MR. LIMBACHER:  Object to form.
4          THE WITNESS:  I recall,
5      generally, the incident or the issue as
6      it arose.  It certainly was handled by
7      the medical and the drug safety and
8      pharmacovigilance team as primary
9      responsibility, but I remember receiving
10      information that this was something that
11      they were seeing happening and
12      understanding, you know, that there were
13      certain signals that were surprising.
14      Beyond that, I don't recall the
15      specifics because it was done by the
16      medical professionals.
17  BY MR. LENISKI:
18      Q.    Do you recall what role you had
19  individually, if any, with respect to Endo's
20  response to the abuse signals from Tennessee on
21  or about this time of 2013?
22          MR. LIMBACHER:  Object to form.
23          THE WITNESS:  I don't recall
24      having a specific personal

Page 609

1      responsibility, other than my general
2      responsibilities at that time in May of
3      2013 as the head of the pharmaceutical
4      business.
5  BY MR. LENISKI:
6      Q.    Put on your 30(b)(6) hat for a
7  moment.
8      A.    Okay.
9      Q.    What was Endo's response in 2013
10  in addressing the safety signal that was coming
11  from Tennessee that's identified in these
12  slides?
13          MR. LIMBACHER:  Object to the
14      extent it falls outside the scope of the
15      topics on which he's been designated.
16          THE WITNESS:  I don't recall the
17      entirety of the response.  I recall
18      being made aware of the issue and being
19      kept updated from time to time.  I
20      recall understanding that some of our
21      medical professionals made contact with,
22      in some cases, the patients in this
23      case.
24          I believe I recall that our

Highly Confidential - Subject to Further Confidentiality Review

Page 610

1     appropriate personnel had contact with
2     some of the local law enforcement, but
3     those are sort of general recollections.
4     I don't recall specific steps or
5     specific actions.  That was managed and
6     action within a -- you know, within the
7     specific team, whose responsibilities
8     day to day were to do -- take care of,
9     you know, and be part of those
10    activities.
11    BY MR. LENISKI:
12         Q.    Do you -- again, 30(b)(6)
13    witness, do you recall what policies or
14    procedures Endo put in place to address the
15    abuse safety signal that it was receiving from
16    Tennessee in 2013?
17              MR. LIMBACHER:  Object to the
18         extent it falls outside of the scope of
19         the topics on which Mr. Lortie has been
20         designated.
21              THE WITNESS:  I don't recall
22         specific policies and procedures with
23         regards to any given state, including
24         Tennessee.

Page 611

1              That being said, all of the
2     activities that the company had
3     undertaken for years prior to this and
4     after this based foundation -- with the
5     foundation of the RiskMAP activities,
6     the REMS, the New York Attorney General
7     ADD would have encompassed the types of
8     activities that the company would have
9     undertaken for signals such as this
10    occurring in any state.
11    BY MR. LENISKI:
12         Q.    And do you -- this is, again,
13    just you in your individual capacity, do you
14    recall that the safety signal that Endo was
15    receiving out of Tennessee at this time was
16    involving injection, intravenous abuse of the
17    reformulated Opana ER?
18              MR. LIMBACHER:  Object to form.
19              THE WITNESS:  I see that in the
20         deck here so that refreshed my
21         recollection as to some of the specific
22         attributes of it, but beyond that, I did
23         not recall the specific details.
24    BY MR. LENISKI:

Page 612

1         Q.    Okay.  Put back on your 30(b)(6)
2     hat.  Look at slide 13.
3         A.    I was just going to add, just to
4     finish my --
5         Q.    Sorry.
6         A.    It is nearly six years since
7     this.
8         Q.    Understood.  Put back on your
9     30(b)(6) hat.  Look at slide 13.
10        A.    Thirteen, okay.
11        Q.    Slide 13 has a header "NAVIPPRO
12    Analysis - Injection," correct?
13        A.    I do see that, yes.
14        Q.    Okay.  And what is NAVIPPRO?
15        A.    My recollection is that they were
16    two sources, two sources that I recall, at
17    least, of surveillance of inappropriate drug
18    activity, NAVIPPRO being one of those two.  I
19    don't recall the specific source of NAVIPPRO
20    versus Inflexxion or RADARS being the other one,
21    but I think my recollection is that it was one
22    of the sources of independent data that the
23    company relied on to understand if there were
24    signals of abuse and misuse of its products.

Page 613

1         Q.    And as the analysis we see in
2     slide 13, is that Endo's analysis of the
3     NAVIPPRO data or is this NAVIPPRO's analysis
4     that Endo is repeating in the slide?
5              MR. LIMBACHER:  Object to the
6         extent it falls outside the scope of the
7         topics on which he's been designated.
8              THE WITNESS:  And I really don't
9         know.  I can't really draw that
10        conclusion either way from what I see
11        here.
12    BY MR. LENISKI:
13        Q.    In any event, the first point
14    states, "Percentage of reported injection
15    observed for Opana ER CRF is not specific to
16    Tennessee," correct?
17              MR. LIMBACHER:  Same objections.
18              THE WITNESS:  You read that
19        accurately, yes.
20    BY MR. LENISKI:
21        Q.    Okay.  And was this Endo's
22    understanding -- or strike that.
23              Did Endo have any reason to
24    dispute that analysis we see in that first

49 (Pages 610 to 613)

Highly Confidential - Subject to Further Confidentiality Review

Page 614

1   bullet point that I just read?
2          MR. LIMBACHER:  Objection, form
3   and foundation, and it falls outside the
4   scope of the topics on which he's been
5   designated.
6          THE WITNESS:  Just by reviewing
7   this, I don't have a basis to have an
8   opinion on that.
9   BY MR. LENISKI:
10      Q.    And then look at the third bullet
11  states, "May portend further increases in other
12  states as availability increases in those states
13  and abusers become more experienced with the
14  reformulation."
15         Did I read that correctly?
16      A.   Yes, you did.
17      Q.    Okay.  And at this time did Endo
18  have any reason to dispute that analysis?
19         MR. LIMBACHER:  Same objections.
20         THE WITNESS:  Again, I didn't
21  author these slides, so I really don't
22  have a basis to either confirm nor
23  dispute what is stated there.
24  BY MR. LENISKI:

Page 615

1       Q.    Put that down.  Do you recall
2   being asked some questions earlier about the
3   risk management team?
4       A.   I recall that we've discussed
5   that, but I don't recall the specific questions.
6       Q.    At no point did you in your
7   individual capacity were a member of the risk
8   management team, correct?
9       A.   That is correct.
10         (Document marked for
11         identification as Endo-Lortie Deposition
12         Exhibit No. 57.)
13         MR. LENISKI:  I apologize, I
14         think I need a copy back.  Hand the
15         witness Exhibit 57,
16         ENDO-OPIOID_MDL-01333143.
17  BY MR. LENISKI:
18      Q.    My question to you, and this is
19  in your capacity as a 30(b)(6) witness, is
20  whether or not you reviewed this document in
21  preparation for your testimony today?
22      A.   Before I answer that, can I just
23  point out that the next page has a different
24  number on the bottom.  It has 144 and then there

Page 616

1   are no such numbers on the deck whatsoever.
2       Q.    And let me explain that.  So this
3   is how it was produced to us.  The cover page
4   says "Produced in Native Format."
5       A.   Yes.
6       Q.    And what you see ensuing is the
7   printout of the native PowerPoint presentation,
8   which is why there are no Bates stamps on it
9   because we don't Bates stamp evidently native
10  files.
11      A.   Okay, I understand.  I just
12  wanted to make sure that I was looking at the
13  right thing.
14         So I believe you asked me if I
15  had seen this in preparation.  I do not recall
16  seeing this specific document.
17      Q.    Okay.  The cover e-mail is from
18  Mark Collins, and you recognize that Mr. Collins
19  was a member of the risk management team,
20  correct?
21      A.   I believe that's true, yes.
22      Q.    To Deborah Logan, and who is
23  that?
24      A.   I believe Deborah Logan was one

Page 617

1   of our corporate attorneys.  I'm not completely
2   sure, but I believe that's the case.
3       Q.    If you look at page -- I'm sorry,
4   item 6 on the agenda which is on page 2 of the
5   PowerPoint.
6       A.   And so this is the PowerPoint,
7   the November 2014 PowerPoint that's referred to
8   in the attachment.
9       Q.    Correct, this is -- correct, so
10  this is the PowerPoint that's identified in the
11  cover e-mail.
12      A.   Okay.  And you're pointing me to
13  page 2, the agenda?
14      Q.    Correct.
15      A.   I have that in front of me now.
16      Q.    Do you see number 6, Inflexxion,
17  third quarter 2014 update?
18      A.   Yes, I see that.
19      Q.    And you -- earlier you stated
20  that you knew one of the data sources that Endo
21  collected information from with respect to abuse
22  was Inflexxion, correct?
23      A.   I did say that.  I can't recall
24  if Inflexxion was the provider or if it was the

Highly Confidential - Subject to Further Confidentiality Review

Page 618

1    name of the report or both, but I remember
2    Inflexxion was involved in that.
3        Q.    Okay.  And if you look at the --
4    I neglected to identify this, but on page 1 of
5    the slides it states, "November 2014, Opana ER,
6    Risk Management Committee Meeting, November 25,
7    2014," correct?
8        A.    Yes, I see that.
9        Q.    Okay.  Can you turn to page --
10   I'm sorry slide 14.
11       A.    Slide 14.  Mine, actually, I
12   don't have a slide 14.
13           MR. LIMBACHER:  I don't either.
14           THE WITNESS:  I go from 12 to 15.
15           MR. LENISKI:  One second.  Off
16   the record real quick.
17           THE VIDEOGRAPHER:  Off the
18   record, 6:32.
19           (Pause.)
20           THE VIDEOGRAPHER:  Back on the
21   record at 6:35.
22   BY MR. LENISKI:
23       Q.    Exhibit 57 that I've handed you
24   was produced to us with odd numbered slides, so

Page 619

1    what you have before you is what was produced to
2    at least Tennessee plaintiffs.  So if it's
3    missing numbers, misnumbered slides, that's how
4    it was produced.  I'll represent that to you,
5    okay?
6            MR. LIMBACHER:  Joe, just so
7        we're clear on the record, I obviously
8        don't have the ability or opportunity to
9        verify what you just said, so I'll
10       object to questions with regard to
11       Exhibit 57 to the extent it's an
12       incomplete document, but I understand
13       what your position is, and go ahead and
14       ask your questions.
15   BY MR. LENISKI:
16       Q.    Okay.  If you turn to the slide
17   16.
18       A.    Okay, yes, I have that in front
19   of me.
20       Q.    Okay.  And this slide title is
21   "Inflexxion ASI-MV - Routes of Administration by
22   Region," correct?
23       A.    Yes, that's the title of the
24   slide.

Page 620

1        Q.    What is ASI-MV?
2            MR. LIMBACHER:  I'm at this point
3        going to object to the extent that the
4        questioning you're now getting into
5        falls outside the scope of the topics on
6        which he's been designated.
7            THE WITNESS:  I have no idea.  I
8        don't recognize that nomenclature.
9    BY MR. LENISKI:
10       Q.    Okay.  And if you look at the
11   bottom part of the graph, there are various
12   categories.  Do you recognize those as routes of
13   administration for abuse -- potential abuse of
14   Opana ER?
15           MR. LIMBACHER:  Same objections.
16           THE WITNESS:  Well, it's titled
17   routes of administration by region, and,
18   certainly, with the exception of oral,
19   which is an acceptable, approved, FDA
20   approved route of administration,
21   snorting, smoking, injecting are not.
22   So to the extent that it's identifying
23   those, I would agree with that, with
24   that qualification.

Page 621

1    BY MR. LENISKI:
2        Q.    But it's not Endo's position,
3    correct, that Opana ER could not have been
4    abused vis-a-vis an oral route of
5    administration, correct?
6            MR. LIMBACHER:  Same objections.
7            THE WITNESS:  I think that's
8        accurate, correct.
9    BY MR. LENISKI:
10       Q.    Okay.  So if you look at the
11   fourth category over -- under "Inject," there's
12   a series of lines there, the first one lists a
13   percentage for a combination of all states,
14   correct?
15       A.    Again, using that ASI-MV
16   nomenclature, the legend suggests that that
17   first bar is all ASI-MV states.
18       Q.    Okay.  And the second bar over is
19   for Tennessee, correct?
20       A.    Yes, the next bar appears to be
21   Tennessee.  It's not produced in color, but I
22   can see it on the screen here, that's helpful.
23       Q.    And the last bar is for all other
24   states other than Tennessee, correct?

51 (Pages 618 to 621)

Highly Confidential - Subject to Further Confidentiality Review

Page 622

1    A.    Again, that's what the legend
2  tells us.
3    Q.    And was it Endo's understanding
4  at this time that there continued to be
5  problems, specifically in Tennessee, with
6  respect to abuse of Opana ER reformulated by
7  injection?
8         MR. LIMBACHER:  Objection, form,
9      foundation and outside the scope of the
10     topics on which he's been designated.
11        THE WITNESS:  I don't have a
12     basis to provide an answer to that.
13 BY MR. LENISKI:
14   Q.    Take a look at the slide that's
15 19.  Again, this is under the header "Inflexxion
16 ASI-MV," the second bullet down says, higher
17 percentage of reported injection observed for
18 Opana ER CRF is not limited to Tennessee.
19        Did I read that correctly?
20        MR. LIMBACHER:  And, again, same
21     objections to the extent you're going to
22     be asking him questions on this document
23     in his capacity as a 30(b)(6) witness.
24        THE WITNESS:  You read that

Page 623

1      correctly.  That's what I see
2      represented on the page.
3  BY MR. LENISKI:
4    Q.    And do you know whether that
5  conclusion was -- or that observation was one
6  that Inflexxion made, or was that a conclusion
7  drawn by Endo based on its reviewer analysis of
8  the Inflexxion data we see here?
9         MR. LIMBACHER:  Same objections.
10        THE WITNESS:  I have no basis to
11     have an opinion on that, so I do not
12     know.
13 BY MR. LENISKI:
14   Q.    Okay.  Second bullet -- I'm
15 sorry -- the subbullet "higher abuse of Opana ER
16 CRF and opioids in general in this area compared
17 with other states."
18        Did I read that correctly?
19   A.    Yes, I see that here on the page.
20   Q.    Okay.  And does that accurately
21 reflect Endo's assessment of the rate of abuse
22 in Tennessee relative to other states as it
23 concerned Opana ER CRF at this time?
24        MR. LIMBACHER:  Same objections.

Page 624

1         THE WITNESS:  I don't have a
2      basis to draw a conclusion as to what
3      that -- what that means.
4  BY MR. LENISKI:
5    Q.    The third bullet reads, "The
6  number of prescriptions dispensed within a
7  geographic region is related to a product's
8  potential diversion and abuse."
9         Did I read that correctly?
10   A.    Yes, you read that accurately.
11   Q.    And, once again, did Endo -- did
12 that bullet accurately reflect Endo's
13 understanding about how the number of
14 prescriptions dispensed within a geographic
15 region relates to a product's potential
16 diversion and abuse?
17        MR. LIMBACHER:  Objection, form,
18     foundation and outside the scope of the
19     topics on which he's been designated.
20        THE WITNESS:  I don't have an --
21     I don't have a basis to draw a
22     conclusion on that question, so I don't
23     know.
24 BY MR. LENISKI:

Page 625

1    Q.    And then the fourth bullet -- or
2  the subbullet there reads, the level of
3  prescriptions dispensed for Opana ER CRF in
4  Tennessee (307.39 prescriptions per 100,000
5  population) is the highest among states within
6  the ASI-MV network.
7         Did I read that correctly?
8    A.    Yes, you read that accurately.
9    Q.    And, again, does that subbullet
10 accurately reflect Endo's understanding of what
11 the rate was for level of prescriptions
12 dispensed for Opana ER CRF in Tennessee at this
13 time?
14        MR. LIMBACHER:  Same objections.
15        THE WITNESS:  I don't have a
16     basis to draw a conclusion as to what
17     Endo's view was on that, so I do not.
18 BY MR. LENISKI:
19   Q.    Okay.  I'm done with that.
20        Mr. Lortie, before your
21 deposition, counsel for Endo informed counsel
22 for Tennessee plaintiffs that you had no
23 Tennessee-specific knowledge.
24        Was that an accurate statement?

52  (Pages 622 to 625)

Highly Confidential - Subject to Further Confidentiality Review

Page 626

1     A.   Yes, I think that's true.
2     Q.   Do you recall there being an
3  instance during your time at Endo, and I'm
4  asking you in your personal capacity, whether
5  you were involved in discussions as to whether
6  Endo should stop distributing Opana ER to the
7  state of Tennessee?  Do you recall that?
8     A.   Not in any detail, but, as you
9  mentioned that, I remember that topic coming up
10 to the extent that I was involved in the
11 discussions or if somebody had mentioned it to
12 me.  I don't recall any detail, but, you know, I
13 recall the topic.
14    Q.   Do you recall the timing when
15 that topic arose?
16    A.   No, I do not.
17    (Document marked for
18 identification as Endo-Lortie Deposition
19 Exhibit No. 58.)
20    MR. LENISKI:  Handing the witness
21 Exhibit 58 to his deposition.  This is
22 ENDO-OPIOID_MDL-02667006.
23 BY MR. LENISKI:
24    Q.   Mr. Lortie, do you recognize the

Page 627

1  e-mails I just handed you?
2     A.   I don't recall them specifically.
3  I'm reading them right now, though.
4     (Witness reviews document.)
5  Okay.  I have reviewed it.  There's nothing on
6  the second page other than the company logo; is
7  that correct?
8     Q.   That's correct.
9     Okay.  So Exhibit 58 is two
10 e-mails, correct?
11    A.   That is true, yes.
12    Q.   And the first e-mail
13 chronologically at the bottom is from you to
14 Jason Reckner on November 13, 2004, correct?
15    A.   2014.
16    Q.   I'm sorry, 2014, thank you.
17    A.   That's correct.
18    Q.   Who is Jason Reckner?
19    A.   Jason at that point had
20 responsibility for pain products portfolio.  I
21 don't recall specifically which products he had.
22 His job evolved over time, but he worked on the
23 pain marketing team.
24    Q.   Were you Mr. Reckner's boss?

Page 628

1     A.   He reported up to me.  I can't
2  remember if he was reporting directly to me at
3  that time, but he was reporting in my business.
4     Q.   Okay.  And you write to
5  Mr. Reckner, Jason, just making sure that you
6  will take the lead on the Tennessee Opana ER
7  actions from yesterday's review:  And let's
8  take -- well, let me just ask you, does that
9  refresh your recollection at all about there
10 being some meeting or review that you took part
11 in to discuss the state of Tennessee in November
12 of 2014?
13    A.   Not in specific detail.  I think
14 it's consistent with what I said to you a few
15 minutes ago is that I generally recall the topic
16 having come up in conversation.  I don't recall
17 what actions were ultimately taken or not, but
18 what this suggests is that at the budget review
19 with Rajeev, who was my boss, the chief
20 executive, that there was a discussion about
21 potentially stopping distribution, which, again,
22 is consistent with my recollection that you
23 refreshed my memory on.
24    Q.   And do you recall how that topic

Page 629

1  got brought up during that budget review?
2     A.   No, I do not.
3     Q.   Do you recall -- so you don't
4  recall who brought up that topic?
5     A.   That's correct, I do not recall
6  that.
7     Q.   In any event, you in the e-mail
8  below are asking him, Mr. Reckner that is, for
9  particular items, and let's just take them one
10 at a time.
11    The first one is Tennessee
12 distribution/prescriptions in a specific area,
13 correct?
14    A.   Yes, that's what's written there.
15    Q.   Okay.  And why were you asking
16 Mr. Reckner to gather that information?
17    A.   Again, I don't recall any further
18 detail other than the topic coming up.  This
19 sort of points us to the fact it came up during
20 a budget review.  I don't know who raised it, so
21 I don't have specific recollection beyond what I
22 just said.
23    Q.   Do you recall whether Mr. Reckner
24 was able to get you the information about

Highly Confidential - Subject to Further Confidentiality Review

Page 630

1 Tennessee distribution and prescriptions in a
2 specific area?
3     A.    No, I do not recall.
4          (Document marked for
5     identification as Endo-Lortie Deposition
6     Exhibit No. 59.)
7 BY MR. LENISKI:
8     Q.    Keep that one handy.
9     A.    Okay.
10    Q.    I'm handing you Exhibit 59 to
11 your deposition.  This is
12 ENDO-OPIOID_MDL-02667012.  It includes printouts
13 of native -- of a native version of the
14 spreadsheet that was attached.
15    A.    Is it just -- it's what's
16 stapled, I guess, right?  There was a paper
17 clip, but it doesn't appear to be doing
18 anything.
19    Q.    Correct, you should have a
20 stapled version?
21    A.    That's the entirety of the
22 exhibit there?
23    Q.    Yes.
24    A.    Okay.  I'm sorry.  If you asked

Page 631

1 me a question, I was paying more attention to
2 the making sure I had the correct exhibit.
3     Q.    No problem.
4          So I've handed you Exhibit 59.
5 It's a series of e-mails, which you are not
6 copied on, but the first e-mail in the sequence
7 is from Jason Reckner on November 13, 2014 at
8 9:10 a.m.
9          Do you see that on the second
10 page?
11    A.    Yes.
12    Q.    And he is writing to Rowan
13 D'Annibale; is that correct?
14    A.    D'Annibale.
15    Q.    And Christina Donato.  The
16 subject is Tennessee volume, correct?
17    A.    Yes, I see that.
18    Q.    He writes, any chance either one
19 of you can help me understand the Opana ER
20 business in just Tennessee.  Volume, net sales,
21 trends over 12 months, I probably can't have too
22 much information on this topic.  Can we dig
23 deeper than just the state?  Are zip codes
24 available?

Page 632

1          Have I read that correctly?
2     A.    Yes, that's what's written here.
3     Q.    Does that refresh your
4 recollection at all about the information that
5 you were asking Mr. Reckner to obtain after this
6 meeting or the purpose for which you were asking
7 him to obtain it?
8          MR. LIMBACHER:  Object to form.
9          THE WITNESS:  No, it does not.
10 BY MR. LENISKI:
11    Q.    You see it later in the e-mail,
12 he writes, this is a follow-up from Rajeev's
13 budget meeting yesterday, correct?
14    A.    Yes, on the bottom of that, yes,
15 I do see that.
16    Q.    And go forward to the first page,
17 the e-mail at the top of the page, this is from
18 Ms. Donato and copying -- to Mr. Reckner copying
19 is that or -- is Rowan a male or female?
20    A.    It's a she.
21    Q.    Okay.  And who -- what was
22 Christina Donato's role at Endo?
23    A.    Christina, if I recall correctly,
24 was in our commercial operations department, so

Page 633

1 she would have had access to prescription trends
2 and prescription information that was used for a
3 number of different things, and I think Rowan
4 was either a colleague or potentially Christina
5 reported to Rowan.  I don't recall specifically.
6 They were both in commercial operations.
7     Q.    And from what source was
8 Ms. Donato obtaining information about
9 prescription trends and prescription
10 information; do you know?
11         MR. LIMBACHER:  Object to form
12    and foundation.  I object to questioning
13    the witness with regard to a document
14    that he neither authored nor received.
15         THE WITNESS:  I don't know.  She
16    would have used whatever source that the
17    company was using at that point for
18    prescription level data.
19 BY MR. LENISKI:
20    Q.    Do you know how long Endo had
21 been -- had access to information data about
22 prescription trends, prescription information
23 such as that which is being forwarded by
24 Ms. Donato in this exhibit?

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 634

1    A.    Specifically, I do not.  I mean,
2  generally, the company from time to time would
3  access prescription data or prescription level
4  data for a number of purposes, as I think we've
5  testified yesterday as well, but, specifically,
6  with regards to this, I can't tell you which
7  source she used and the duration of that source.
8    Q.    Did Endo have access to
9  prescription level data, at least as long as you
10 were part of the company?
11           MR. LIMBACHER:  Object to form
12    and foundation.
13           THE WITNESS:  Yes, data on
14    prescriptions, that's correct.
15 BY MR. LENISKI:
16    Q.    And in the e-mail Ms. Donato is
17 telling Mr. Reckner, Hi Jason, please see the
18 attached Opana ER TRx for the last 12 months.
19 Tennessee is second largest contributor, 8.5% to
20 Opana ER TRx volume compared to other states.
21    Did I read that correctly?
22    A.    Yes, you read that sentence
23 correctly.
24    Q.    Okay.  And she goes on, last 12

Page 635

1  months, total Opana ER TRx volume was 47,742.
2  There are 938 Opana ER prescribers in the last
3  12 months in Tennessee.
4    Did I read that correctly?
5    A.    You did, yes.
6    Q.    Now, to your knowledge, how long
7  had Endo been able to access data which -- by
8  which it could tell how many Opana ER
9  prescribers were in a given state?
10           MR. LIMBACHER:  Objection, form
11    and foundation.
12           THE WITNESS:  I don't know.  I'm
13    not aware of the specific source or how
14    long the company had access to that.
15 BY MR. LENISKI:
16    Q.    Do you know if the company had
17 access to such data at least as long as you were
18 part of the company?
19    A.    I don't.
20    Q.    Take a look, I'm not going to ask
21 you any questions in detail about the attached
22 spreadsheet that Ms. Donato forwarded to
23 Mr. Reckner, but in looking at it, do you recall
24 whether Mr. Reckner ever shared this information

Page 636

1  that's in the spreadsheet with you?
2           MR. LIMBACHER:  Object to form.
3           THE WITNESS:  No.
4  BY MR. LENISKI:
5    Q.    Do you know what, if anything,
6  Endo -- and I'll ask you in 30(b)(6) capacity,
7  do you know what if anything Endo did with the
8  information that Mr. Reckner obtained from
9  Ms. Donato with respect to the Tennessee data?
10           MR. LIMBACHER:  Objection, form
11    and foundation and outside the scope of
12    the topics on which he's been
13    designated.
14           THE WITNESS:  No, I do not
15    recall.
16 BY MR. LENISKI:
17    Q.    Okay.  Go back to Exhibit 58.
18 This is the e-mail.
19    A.    I have it.
20    Q.    Look at the second item on your
21 e-mail to Mr. Reckner.  You asked the question
22 "What if we closed off distribution there?"  And
23 then right below that you write "Impact on
24 sales?"

Page 637

1    Did I read those correctly?
2    A.    You did, yes.
3    Q.    Okay.  What do you recall -- do
4  you recall why you asked Mr. Reckner to obtain
5  information about the potential impact on Endo
6  sales if we were to close off distribution in
7  Tennessee?
8           MR. LIMBACHER:  Object to form.
9           THE WITNESS:  I do not know.
10 BY MR. LENISKI:
11    Q.    Do you know whether Mr. Reckner
12 was able to get you the information that you
13 asked him to obtain which would tell you what
14 the impact on Endo sales would be if it closed
15 off distribution with the state of Tennessee?
16    A.    No, I don't.
17    Q.    And then you write, "What did
18 Purdue do and how?  (Brian Munroe can provide
19 assistance on this one through his contacts)."
20    Did I read that correctly?
21    A.    Yes, you did.
22    Q.    Okay.  And what did you mean by
23 that?
24           MR. LIMBACHER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 638

1          THE WITNESS:  I don't
2    specifically recall.
3    BY MR. LENISKI:
4          Q.    Okay.  Looking at Mr. Reckner's
5    e-mail above, his second line of his e-mail
6    writes -- he is writing to Mr. Munroe and he
7    writes, "We understand that Purdue has done this
8    with OxyContin," correct?
9          A.    Yes, you've read that accurately.
10          Q.    Okay.  Does that refresh your
11    recollection at all about what you were asking
12    Mr. Reckner, what information you were asking
13    him to obtain with respect to what Purdue did in
14    the state of Tennessee?
15          A.    No.  I think the document itself
16    actually outlines what I asked in the e-mail,
17    but this doesn't add to my recollection.
18          Q.    To the best of your knowledge,
19    were you the point person for this item that was
20    discussed at the budget meeting to determine
21    whether or not Opana ER in the state of
22    Tennessee, Endo should stop selling that product
23    in the state of Tennessee?
24          MR. LIMBACHER:  Object to form.

Page 639

1          THE WITNESS:  Your question is
2    was I the point person?
3    BY MR. LENISKI:
4          Q.    Correct.
5          A.    I don't recall that being the
6    case, no.
7          Q.    Do you recall who was the point
8    person if it was not you?
9          MR. LIMBACHER:  Object to form.
10          THE WITNESS:  I don't recall.
11    The e-mail suggests that I've asked
12    Jason to take the lead, so to the extent
13    that means he was the point person, but
14    that's only from reading the e-mail.  I
15    don't recall any specific details.
16    BY MR. LENISKI:
17          Q.    Do you know how this topic of
18    whether or not to close off distribution of
19    Opana ER in the state of Tennessee, how that was
20    resolved?
21          A.    I do not sitting here today, no.
22          Q.    As sitting here today, are you
23    aware that Endo did not, in fact, close off
24    distributing Opana ER in the state of Tennessee

Page 640

1    in 2014 forward?
2          MR. LIMBACHER:  Object to form.
3          THE WITNESS:  I don't recall that
4    we did, and I don't recall that we did
5    not.  I mean, it's been several years
6    since this happened, so I don't recall.
7    BY MR. LENISKI:
8          Q.    In your 30(b)(6) capacity, do you
9    know why Endo discussed a policy of halting
10    distributing Opana ER in the state of Tennessee
11    in 2014?
12          MR. LIMBACHER:  Object to form
13          and foundation and outside the scope of
14          the topics on which he's been
15          designated.
16          THE WITNESS:  I don't recall, no.
17    BY MR. LENISKI:
18          Q.    Whose decision -- who would have
19    to be the decision-maker in this instance to
20    decide whether or not Endo should close off
21    distributing Opana ER to the state of Tennessee;
22    do you know?
23          MR. LIMBACHER:  Same objections.
24          THE WITNESS:  It certainly would

Page 641

1    not have been part of any stated company
2    policy.  That's not a typical decision,
3    so I would say that if a decision like
4    that were to ever be made with regards
5    to Tennessee or any other state, it
6    would probably be the chief executive.
7    I mean, ultimately, that's the person
8    who is responsible for the company.
9    BY MR. LENISKI:
10          Q.    Can you recall an instance where
11    Endo discussed ceasing distribution of Opana ER
12    in any state other than Tennessee?
13          MR. LIMBACHER:  Object to form
14          and foundation.
15          THE WITNESS:  No, I don't.  I
16    didn't recall Tennessee either until you
17    brought it up, so, no, I don't.
18          MR. LENISKI:  I don't think I
19    have any further questions.  Thank you.
20          MR. LIMBACHER:  Take a short
21    break.
22          THE VIDEOGRAPHER:  Going off the
23    record, 6:59.
24          (Brief recess.)

56 (Pages 638 to 641)

Highly Confidential - Subject to Further Confidentiality Review

Page 642

1    THE VIDEOGRAPHER:  We are back on
2  the record at 7:18.
3  BY MR. LIMBACHER:
4    Q.    Good evening, Mr. Lortie.  Now
5  it's my opportunity to ask you some questions.
6  I know it's been a couple of very long days.
7  It's after 7:00 at night.  I'm not going to
8  prolong this too much, but I want to just have
9  you, first of all, tell us a little bit about
10  yourself.
11    Tell us where do you live?
12    A.    I live in the Western suburbs of
13  Philadelphia in Paoli, Pennsylvania.
14    Q.    And are you married, sir?
15    A.    I am, yes.
16    Q.    Do you have kids?
17    A.    I have two lovely daughters, both
18  grown.
19    Q.    And I know it's been covered over
20  the course of the past couple days, but remind
21  us, when were you employed at Endo?
22    A.    I began in July of 2009, and I
23  left in September of 2016.
24    Q.    Where do you work now?

Page 643

1    A.    I work for a company called
2  Onspira Therapeutics.
3    Q.    And what do you do there?
4    A.    I'm the CEO.
5    Q.    Can you tell us just a little bit
6  about your education, please.
7    A.    Yes, I went to Boston University
8  for my undergraduate, pursued a premedical
9  curriculum, graduated with honors in 1982 and
10  then went to work essentially almost the
11  entirety of my career in the pharmaceutical
12  industry, starting with Smith, Kline & French,
13  which became SmithKline Beecham which then
14  became GlaxoSmithKline, had a number of
15  different assignments along the way starting in
16  the --
17    Q.    If I can interrupt, when did you
18  start actually at GlaxoSmithKline or one of the
19  predecessor companies?
20    A.    In the mid '80s, '84, '85, '86 in
21  that area.  I think my resume is available.
22    I began in sales force.  I spent
23  year and a half or two years in the sales force,
24  and then I was transferred into the home office

Page 644

1  into a marketing role, where I grew through a
2  number of different roles of increasing
3  responsibility.  I was then given the
4  opportunity to take my family and move to
5  Ireland for four years.
6    Q.    Nice.
7    A.    And I was the general manager
8  there of our pharmaceutical business.
9    Returning from Ireland, I was
10  posted to a senior sales management job based in
11  Dallas, Texas for about 18 months or so and from
12  there returned to the home office in
13  Philadelphia as a commercial leader with -- as a
14  marketing vice president.
15    Q.    And when you left GSK, was that
16  in 2009?
17    A.    Yes.
18    Q.    And you left there, then started
19  at Endo?
20    A.    That's correct.  I was recruited
21  to Endo.
22    Q.    And what was your job title when
23  you first started working at Endo in 2009?
24    A.    It was senior vice president of

Page 645

1  the pain business.
2    Q.    And did your title change over
3  the course of the years that you worked with the
4  company?
5    A.    Yes, it did.
6    Q.    And when you left in 2016, what
7  was your job title at that point in time?
8    A.    I was president of the
9  pharmaceutical business.
10    Q.    And what were your basic
11  responsibilities while you were running the pain
12  part of the business for Endo during this period
13  of 2009 until 2016?
14    A.    So when I was the senior vice
15  president of the pain business, I had
16  essentially commercial responsibility for our --
17  the entirety of the pain portfolio, half a dozen
18  products, large and small, with responsibility
19  for the sales and marketing functions and some
20  of the ancillary support functions.
21    Over time, as my career grew and
22  the company changed, I added responsibilities.
23  In early 2011 I took on responsibility for the
24  piece of the branded business that was not pain

57 (Pages 642 to 645)

Highly Confidential - Subject to Further Confidentiality Review

Page 646

1    related and, therefore, from January 2011, if
2    I'm correct, onward, I had essentially
3    responsibility for all commercial aspects of
4    branded pharmaceuticals as distinct from
5    generics or later devices and information
6    technology.
7         Q.    And when you started with the
8    company in 2009, did you have some
9    responsibility for Opana ER?
10        A.    Yes, Opana was one of the
11   products in the pain products portfolio.
12        Q.    One of the documents that we
13   talked about a lot over the last couple of days
14   is this Risk Minimization Action Plan that got
15   marked as Exhibit 7.
16            Do you have that in front of you,
17   sir?
18        A.    Yes, I do.
19        Q.    And when you started at the
20   company in 2009, did you familiarize yourself
21   with the Risk Minimization Action Plan?
22        A.    Yes, I was certainly aware of the
23   goals and objectives of the RiskMAP, as we
24   called it, all of the various responsibilities

Page 647

1    contained within that.
2         Q.    And was the RiskMAP in place when
3    you started with the company in 2009?
4         A.    It was, yes.
5         Q.    And when you went back and
6    reviewed it, what was your understanding as to
7    the purpose of the RiskMAP, generally?
8             MS. SCULLION:  Objection,
9             mischaracterizes the testimony.
10            THE WITNESS:  My recollection is
11            that the RiskMAP really formed the
12            foundation for a broad set of activities
13            that the company undertook to do its
14            best to mitigate abuse and diversion of
15            its controlled substances, ranging from
16            education to monitoring to reporting to
17            education and training of the sales
18            force, many, many different things, all
19            of which are outlined actually in the
20            RiskMAP itself.
21   BY MR. LIMBACHER:
22        Q.    Well, let's take a look at some
23   of that, please.  If you could turn to page 9 of
24   the RiskMAP.  Is that where it starts to

Page 648

1    identify the different strategy and tools that
2    the company used to try to minimize the risks
3    that you described?
4             MS. SCULLION:  Objection,
5             leading.
6             THE WITNESS:  It does, and I also
7             referred to the -- you know, originally
8             to the table of contents, which is the
9             comprehensive list, but on page 9 it
10            starts to put some context into the
11            strategy and tools.
12   BY MR. LIMBACHER:
13        Q.    And what are some of the strategy
14   and tools that are identified in the RiskMAP?
15        A.    Well, referring in order, the
16   first that's mentioned is the product labeling.
17   This, of course, is an important document for
18   any prescription medicine, particularly so for
19   opioids, in that it's the result of submission
20   of clinical data, manufacturing data, all
21   aspects of a pharmaceutical product, reviewed by
22   the FDA, upon which at the end of their review,
23   the agency makes a decision on whether or not to
24   approve that product for sale.

Page 649

1             The labeling is critical in that
2    it has to be part of every interaction that a
3    representative of the company has with a
4    representative of the healthcare practitioner's
5    universe, and it outlines the safety aspects,
6    the efficacy aspects, the summaries of the
7    clinical trial, how the products are supplied,
8    all things that a physician should know to make
9    an informed prescription, because, of course,
10   all of these products need to be prescribed to a
11   patient by a physician who is licensed to do so.
12            MS. SCULLION:  Move to strike as
13            nonresponsive.
14   BY MR. LIMBACHER:
15        Q.    Does the RiskMAP set out an
16   educational component?
17        A.    Yes, there are components of
18   education in the RiskMAP both for healthcare
19   practitioners as well as for patients.  It also
20   outlines some of the requirements for sales
21   force education and training and documentation
22   and the like.
23        Q.    And if I can jump ahead to page
24   25 of the RiskMAP, were there certain databases

Highly Confidential - Subject to Further Confidentiality Review

Page 650

1 that the company accessed to try to obtain
2 information?
3      A.   Yes.  The company did subscribe
4 to and monitor a number of different available
5 surveillance databases or vendors to -- that in
6 a variety of ways, using a variety of tools
7 would present that information as part of the
8 company's surveillance of the way the products
9 were used or abused.
10      Q.   And the information that the
11 company was accessing, was that reviewed by
12 different individuals at the company?
13      A.   Yes.
14      Q.   And if I could refer you to page
15 30 of the RiskMAP.  Do you see where it says
16 there "Evaluation Plan"?
17      A.   Yes, I do.
18      Q.   And how did Endo go about
19 evaluating the information that it was
20 gathering?
21      MS. SCULLION:  Objection,
22 foundation.
23      THE WITNESS:  Well, there were
24 two teams, two sets of company

Page 651

1 employees, cross-functional in nature in
2 both cases, who, among other
3 responsibilities, were accountable for
4 monitoring the things you just pointed
5 out, one being the safety review board,
6 the other being what we called the risk
7 management team.  They differed a little
8 bit.
9      Safety review board was in place
10 for all products, all prescription
11 products, and their job was to monitor
12 for adverse events, safety signals,
13 regardless of whether it was a
14 controlled substance or not.
15      The members of the safety review
16 board, to my recollection, I think it's
17 actually pointed out here, would include
18 physicians from our medical, scientific
19 departments, professionals from our drug
20 safety and pharmacovigilance group,
21 whose job it was specifically to monitor
22 these types of signals, scientific
23 affairs, regulatory affairs.  I believe
24 there's somebody from legal that was

Page 652

1 involved in that.
2      The risk management team was
3 similar.  I think most of those
4 functions were also represented.  In
5 addition, there was a commercial
6 representative, usually the product
7 manager or his or her designee on that
8 team, and that was -- to my
9 recollection, was specifically for our
10 Opana ER in this case or our controlled
11 substances.
12 BY MR. LIMBACHER:
13      Q.   I think you were shown a copy of
14 one of these, but did Endo provide any regular
15 updates of its RiskMAP activities to the FDA?
16      A.   Yes, it did.  My understanding is
17 that that was a requirement and an agreement
18 between the FDA and companies that
19 commercialized controlled substances is that
20 regular reports, if I recall correctly, they
21 were quarterly in nature, that were a standard
22 part of the -- making sure that the FDA was
23 aware of what the company knew and the actions
24 the company was taking, so sort of a progress

Page 653

1 report.
2      MS. SCULLION:  Move to strike the
3 narrative beyond, "yes, it did."
4 BY MR. LIMBACHER:
5      Q.   And based on your experience at
6 the company, Mr. Lortie, how did Endo approach
7 its commitments that are laid out in the RiskMAP
8 document that we've been talking about?
9      MS. SCULLION:  Objection to form,
10 foundation.
11      THE WITNESS:  Endo took those
12 commitments and those responsibilities
13 very seriously.  It always -- the
14 entirety of the time I was there was
15 part of the company culture and just
16 really what the company was about as a
17 provider of pain medicine that was
18 deeply rooted in providing medicines for
19 patients who suffered from chronic pain
20 that it understood that there was also
21 required to be serious attention paid to
22 the potential for misuse, abuse,
23 diversion of these products.  The
24 RiskMAP really memorialized that once

59 (Pages 650 to 653)

Highly Confidential - Subject to Further Confidentiality Review

Page 654

1      the first extended-release opioid was
2      put on the market.
3             MS. SCULLION:  Objection, move to
4      strike as nonresponsive to the extent he
5      talked about information beyond the
6      RiskMAP.
7      BY MR. LIMBACHER:
8         Q.    I think you mentioned sales force
9      training as one of the components of the
10     RiskMAP.  What, if anything, were sales reps
11     trained to do if they learned of information
12     that raised concerns about possible diversion of
13     Opana?
14        A.    Every sales representative was
15     trained by the company upon the initiation of
16     their employment or their assignment to a sales
17     responsibility, and those training activities
18     were updated over time.  We also had training in
19     place for managers and sales leaders as well.
20     Part of that, in addition to learning about the
21     specifics about the medicines and the disease
22     that they treated, was -- specifically with
23     regards to the controlled substances was
24     explicit training on how to watch out for and

Page 655

1      what the signals to watch out for for evidence
2      that they may encounter in the course of their
3      day-to-day job with regards to potential abuse
4      and diversion and misuse.
5             They had explicit instructions on
6      what to do, and that was, you know, in essence,
7      to report that up through their leadership
8      channel, also to compliance and legal.  There
9      were a set of very clear guidances on how to do
10     that, and, in fact, there's a specific form that
11     I think I referred to earlier in my testimony
12     that had a number of attributes that were
13     reminders to the sales rep of things that if
14     they were to encounter those were signals that
15     they should report, and then there were actions
16     that the company took once that initiation took
17     place.
18        Q.    Let's take a look at that --
19            MS. SCULLION:  Objection, sorry,
20     move to strike everything before part of
21     that and everything that discussed
22     anything except the sales training.
23     BY MR. LIMBACHER:
24        Q.    Let's take a look at that form

Page 656

1      that you were just mentioning.  I think you have
2      it in front of you.  It was marked by counsel as
3      Exhibit 10.
4             Do you have that there,
5      Mr. Lortie?
6         A.    Yes, I do.
7         Q.    And what are some of the things
8      that are -- that the sales reps were to be
9      looking for to see if there was any suspected
10     diversion?
11        A.    I can read some of them here.  I
12     mean, there were nine specifically listed that
13     were signals or attributes of situations that a
14     rep may encounter in the course of their
15     day-to-day responsibilities.  They include a
16     large proportion of prescriptions being paid for
17     in cash, drugs and doses being prescribed not
18     individualized, meaning every prescription that
19     was written by a physician was for 40-milligram
20     tablets rather than titrated to a given -- the
21     need of a given individual patient.
22            Lack of qualified office staff,
23     such as no nurses or PAs in the office.  Special
24     entrance requirements to the practice or lack of

Page 657

1      signage that indicates, you know, what you would
2      normally expect to see.  Large distances between
3      the doctor, patients and pharmacy.  High
4      frequency of prescriptions to replace lost
5      prescriptions or medications.  Managed care
6      organization excluding a particular physician
7      from the ability to write prescriptions that are
8      reimbursed by that managed care organization.  A
9      presence of law enforcement in or around the
10     office.  Indication from the prescriber to the
11     sales representative personally that the
12     prescriber is no longer allowed or able to
13     prescribe scheduled products.  And then there's
14     a section here, of course, that the
15     representative could fill in if there was
16     something that fell outside of those particular
17     attributes that caused them concern.
18        Q.    When you joined the company, what
19     was the state of the development of the
20     reformulated version of Opana?
21            MS. SCULLION:  Objection,
22     foundation.
23            THE WITNESS:  To my recollection,
24     it certainly was in development and

60  (Pages 654 to 657)

Highly Confidential - Subject to Further Confidentiality Review

Page 658

1    underway.  The product was submitted to
2    the FDA in 2010, I believe, and, of
3    course, it was the subject of a typical
4    and lengthy and comprehensive
5    development program that involved trying
6    out different formulations, finding
7    formulations that worked during the
8    clinical trials, putting those clinical
9    trials together, submitting the dossier.
10   That's a comprehensive process, of
11   course, and it takes some time.  So, you
12   know, my recollection is that that began
13   perhaps in 2006 or 2007, certainly began
14   before 2009, because, as I said --
15   because, as I said, the submission was
16   done in 2010, I believe.
17           MS. SCULLION:  Move to strike,
18       everything, the narrative beyond the
19       statement "development and underway."
20   BY MR. LIMBACHER:
21       Q.   As head of the pain business at
22   Endo at this time when you joined the company in
23   2009, did you come to understand why the company
24   embarked on a program to develop a new

Page 659

1    formulation of Opana?
2        A.   My understanding was, and, again,
3    this development was underway prior to my
4    arrival, but that it was undertaken as a result
5    of the company realizing that one of the routes
6    of abuse and misuse that was being seen for
7    long-acting opioids, not just Opana but others
8    as well, was the crushing and snorting, so
9    insufflation, and the company realized through
10   investigation that there was an ability from a
11   technological standpoint that had a chance of
12   mitigating that through physical
13   characteristics.
14           They embarked on finding a
15   technology that worked, licensing that
16   technology in and then completing a development
17   program, but it was all done to mitigate one
18   form of abuse.  Everybody recognized, of course,
19   that there was no one approach that would
20   mitigate all forms of abuse, but crushing and
21   snorting was a big problem, and it was one that
22   the company thought they could solve.
23           MS. SCULLION:  Objection to the
24       narrative beyond "physical

Page 660

1    characteristics."
2    BY MR. LIMBACHER:
3        Q.   Did you participate in meetings
4    with the DEA, Mr. Lortie, regarding Endo's
5    development of a reformulated version of Opana
6    ER?
7        A.   I do recall at least one meeting
8    where I personally attended with the DEA on that
9    topic, yes.
10       Q.   Let me show you what we've marked
11   as Exhibit number 60.
12           (Document marked for
13       identification as Endo-Lortie Deposition
14       Exhibit No. 60.)
15   BY MR. LIMBACHER:
16       Q.   I ask you to take a look at that
17   and let us know if this references that meeting
18   that you just testified about.
19       A.   (Witness reviews document.)
20           MS. SCULLION:  Do you want to
21       read the Bates number into the record?
22           MR. LIMBACHER:  Sure.  It's Bates
23       number END00027562.
24           THE WITNESS:  Yes, this is the

Page 661

1    meeting that I had in mind.
2    BY MR. LIMBACHER:
3        Q.   And this is an e-mail dated
4    July 13th of 2011; is that right?
5        A.   Yes, that's correct.
6        Q.   And the e-mail is written by
7    Steven Cowan?
8        A.   Yes.
9        Q.   Was Mr. Cowan also at the
10   meeting?
11       A.   He was, yes.
12       Q.   And did you receive a copy of the
13   e-mail that's been marked as Exhibit 60?
14       A.   I'm cc'd on it, so, yes, I'm sure
15   I did.
16       Q.   And do you recall attending this
17   particular meeting?
18       A.   I do, yes.
19       Q.   And what do you recall about the
20   DEA's views regarding Endo's plans to introduce
21   a reformulated version of Opana ER?
22           MS. SCULLION:  Objection,
23       foundation.
24           THE WITNESS:  I recall very

61  (Pages 658 to 661)

Highly Confidential - Subject to Further Confidentiality Review

Page 662

1    clearly that the DEA, first of all, by
2    the fact that they allowed us to have
3    this meeting with the fairly high
4    ranking number of DEA personnel was
5    quite remarkable, and I recall them
6    indicating to us that they were also --
7    they shared our objective of making
8    incremental steps to try and mitigate
9    abuse of in this case -- in our case of
10   Opana.  They recognized that crushing
11   and snorting was an important route of
12   abuse and misuse, and they were
13   particularly aligned with our efforts in
14   support of -- in fact, there's some text
15   in here that indicates the DEA being
16   highly aligned with Endo's plan to
17   introduce a new formulation as quickly
18   as possible.
19        And, again, generally, I recall
20   them recognizing and being in alignment
21   with our recognition of the problem and
22   our plans to try to address it.
23        MS. SCULLION:  Note also my
24   objection to the hearsay.

Page 663

1    BY MR. LIMBACHER:
2        Q.    If you have in front of you
3    Exhibit 55.  I wanted to ask you a couple of
4    questions about that.  That's one of the
5    exhibits that counsel from Tennessee was asking
6    you about.
7        A.    And you said 55?
8        Q.    Yes.
9        A.    Thank you.  Sorry about that.
10       Q.    Take a look at Exhibit 55.
11            Do you recall being asked
12   questions about this particular document by
13   counsel representing plaintiffs from Tennessee?
14       A.    Yes, I do.
15       Q.    And do you recall that the
16   questions you were being asked suggested that
17   Endo considered abuse and misuse an issue of
18   mere perception?
19       A.    I do recall that, yes.
20       Q.    Did he show you various pages
21   from the slide deck that is attached to the
22   first page of Exhibit 55?
23       A.    Yes, he did.
24       Q.    Let me refer you to slide number

Page 664

1    6 of Exhibit 55.  It has the heading "Abuse &
2    Misuse Overview."
3        A.    Yes, I have slide 6.
4        Q.    Did counsel show this particular
5    slide to you?
6        A.    I do not believe he did, no.
7        Q.    Can you summarize for us what's
8    set forth on this particular slide?
9            MS. SCULLION:  Objection to form,
10           foundation.  As I recall, the objection
11           was made to the witness testifying about
12           the slide deck on the grounds that he
13           did not recall it.
14   BY MR. LIMBACHER:
15       Q.    You can go ahead and answer the
16   question.
17       A.    Thank you.  So what I read on
18   this slide is that it's acknowledging -- that
19   the author is acknowledging after the previous
20   slides to set up whatever the discussion is and,
21   again, just to reinforce, I wasn't part of that
22   discussion, so I don't know who the audience was
23   or the context, but after setting that up with
24   some of the previous slides that I reviewed, the

Page 665

1    author now states that abuse and misuse, at
2    least in the view of the author, is a real
3    public health epidemic, a real public health
4    epidemic and has several points of support for
5    that statement, including number of overdoses,
6    deaths related to overdoses, how many Americans
7    reported nonmedical use of prescription pain
8    medications, emergency department visits,
9    nonmedical use of prescriptions medications
10   costing health insurers billions of dollars.
11           So it puts into context, I think,
12   a view on the seriousness of the abuse and
13   misuse of controlled substances.
14       Q.    We've been here two days and
15   you've answered a lot of questions, Mr. Lortie.
16   I just want to have you step back for just a
17   moment and ask you how would you describe Endo's
18   efforts to minimize the risk of abuse and
19   diversion of Opana?
20           MS. SCULLION:  Objection to form.
21           THE WITNESS:  I spent seven years
22           or so there in a senior position, always
23           with some close proximity to the pain
24           business, and it was a company that was

Highly Confidential - Subject to Further Confidentiality Review

Page 666

1    deeply rooted in pain therapeutics and,
2    therefore, believed importantly that
3    patients who suffer from chronic pain
4    deserve access to medicines that help
5    them live as nearly normal a life as
6    possible.
7         The company always also
8    recognized that there's a potential for
9    diversion and misuse and abuse of these
10   medicines.  That's been long established
11   long before I got there.
12        And, therefore, always had in
13   place not just policies and procedures
14   and professionals whose job it was to
15   play an important role in making sure to
16   the extent of the company's capabilities
17   that that was taken seriously and
18   necessary steps were taken, but also a
19   company culture of compliance with
20   regulations and the spirit so that there
21   wasn't jeopardy to patients who deserved
22   to have access to important medicines to
23   live their normal lives.
24        So it was not just company

Page 667

1    activity, but it was really a cultural
2    aspect of compliance, and I'm proud of
3    my time there.  I really feel that the
4    company did what it could and always
5    took it very seriously.
6         MS. SCULLION:  Move to strike as
7    improper narrative.
8         MR. LIMBACHER:  Thank you,
9    Mr. Lortie.  That's all the questions I
10   have.
11        THE VIDEOGRAPHER:  Going off the
12   record at 7:43 p.m.
13        (Brief recess.)
14        THE VIDEOGRAPHER:  We are back on
15   the record at 8:01.
16   BY MS. SCULLION:
17   Q.    Mr. Lortie, welcome back.
18        Counsel had asked you to describe
19   Endo's efforts to minimize their risk of abuse
20   and diversion of Opana.
21        Do you remember he asked that
22   question?
23   A.    Yes, I do.
24   Q.    Okay.  Now, the fact is that Endo

Page 668

1    withdrew original Opana ER for safety reasons,
2    correct, discontinued for safety reasons?
3         MR. LIMBACHER:  Object to form.
4         THE WITNESS:  That was our
5         understanding at the time, yes.
6    BY MS. SCULLION:
7    Q.    And the safety reasons for which
8    Endo cited for the withdrawal were that Opana ER
9    was subject to both intentional and inadvertent
10   abuse and misuse, correct?
11        MR. LIMBACHER:  Object to form.
12        THE WITNESS:  I believe that to
13        be the case at the time.  That was the
14        company's understanding, yes.
15   BY MS. SCULLION:
16   Q.    And, in fact, throughout the time
17   that Endo was submitting RiskMAP updates to the
18   FDA, Endo was consistently noting case after
19   case of abuse and misuse of Opana ER, correct?
20        MR. LIMBACHER:  Object to form.
21        THE WITNESS:  The subject of the
22        RiskMAP -- of the RiskMAP updates would
23        have included that type of information,
24        that is correct.

Page 669

1    BY MS. SCULLION:
2    Q.    Let's look at some of the RiskMAP
3    updates.  Can you pull back Exhibit Number 50.
4    A.    I will find it, yes.
5    Q.    Do you have Exhibit Number 50 in
6    front of you?
7    A.    I do have Exhibit Number 50, yes.
8    Q.    Okay.  And this is the RiskMAP
9    update report we looked at before dated
10   May 22nd, 2008.
11        Can you turn to page 20 of that
12   exhibit?
13   A.    Sure.
14   Q.    You see under "Periodic Reports"
15   that Endo reports to the FDA that there were a
16   total of 306 adverse event reports submitted to
17   the agency since approval of the product,
18   correct?
19   A.    Yes, that's correct.
20   Q.    Endo then goes on to state in the
21   last sentence of that paragraph, "Post marketing
22   safety surveillance of Opana ER since launch has
23   not identified any new safety issues," correct?
24   A.    That's what it says, yes.

63  (Pages 666 to 669)

Highly Confidential - Subject to Further Confidentiality Review

Page 670

1    Q.    Right.  And then that was the
2  update report covering January 1st, 2008 to
3  March 31st, 2008.
4          Let's look at the next year.
5          (Document marked for
6      identification as Endo-Lortie Deposition
7      Exhibit No. 61.)
8  BY MS. SCULLION:
9    Q.    Show you what's been marked as
10  Exhibit 61.
11          And Exhibit 61 for the record is
12  Bates stamped EPI000119179, and this is a
13  RiskMAP Update Report covering the period
14  January 1st, 2009 to March 31st, 2009.
15          If you could turn to page 16 of
16  this RiskMAP Update Report.  And again looking
17  under "Post Marketing Surveillance," 6.1, do you
18  see the last sentence of that paragraph, Endo
19  once again reports "Post marketing surveillance
20  of Opana ER since launch has not identified any
21  new safety issues."
22          Did I read that correctly?
23    A.    Let me just catch up to you here.
24  And that's in paragraph 6.1, correct.

Page 671

1    Q.    Last sentence.
2    A.    Periodic reports.
3          Yes, I believe you read that
4  accurately.
5    Q.    And let's look now at the report
6  for January 1st, 2010 to March 31st, 2010.
7          (Document marked for
8      identification as Endo-Lortie Deposition
9      Exhibit No. 62.)
10  BY MS. SCULLION:
11    Q.    It's Exhibit Number 62.
12          And it's Bates stamped
13  ENDO-OR-CID-00681354.  And here again, if you'll
14  turn to page 15 of this RiskMAP update, bottom
15  of the page, "Post Marketing Surveillance,
16  Periodic Reports," and the paragraph carries
17  over to the top of the next page, page 16, and,
18  once again, at the end of that paragraph, Endo
19  reports "Postmarketing surveillance of Opana ER
20  since launch has not identified any new safety
21  issues," correct?
22    A.    Yeah, I read that as any new
23  safety issues, in other words, any new safety
24  issues that have not been previously described

Page 672

1  in terms of the definition of them.
2    Q.    It's the same sentence in every
3  report so far, right?
4          MR. LIMBACHER:  Object to form.
5          THE WITNESS:  I'm not sure.
6          (Document marked for
7      identification as Endo-Lortie Deposition
8      Exhibit No. 63.)
9  BY MS. SCULLION:
10    Q.    So then let's go to the report
11  for the period January 1st, 2011 to March 31st,
12  2011.  I hand you what's been marked as Exhibit
13  Number 63.
14          And that is Bates stamped
15  END00308793.
16          And, again, if you'll turn to
17  page 18, section "Post marketing Surveillance,"
18  subsection 6.1, "Periodic Reports."
19    A.    Can you just let me catch up to
20  where you are.
21    Q.    Sure.
22    A.    Okay, thank you.  You said 18,
23  correct?
24    Q.    Correct.  Do you see paragraph

Page 673

1  6.1 Periodic Reports?
2    A.    I do.
3    Q.    And, again, Endo reports to the
4  FDA "Postmarketing surveillance of Opana ER
5  since launch has not identified any new safety
6  issues."
7          That's what it says, right?
8    A.    You read that correctly.
9    Q.    Okay.  And let's look at the
10  report for the last half of 2011.
11          (Document marked for
12      identification as Endo-Lortie Deposition
13      Exhibit No. 64.)
14  BY MS. SCULLION:
15    Q.    Hand you what's been marked as
16  Exhibit Number 64.
17          And Exhibit 64 is Bates stamped
18  EPI000015268.
19          And if you'll turn in this
20  exhibit to page 18, I direct your attention
21  again to the section "Post Marketing
22  Surveillance," paragraph 6.1, "Periodic
23  Reports."
24          Are you with me?

64  (Pages 670 to 673)

Highly Confidential - Subject to Further Confidentiality Review

Page 674

1      A.    Yes, on the top of 18.
2      Q.    And, once again, for the period
3  July 1st, 2011 to September 30th, 2011, Endo's
4  reporting "Postmarketing surveillance of Opana
5  ER since launch has not identified any new
6  safety issues."
7            Did I read that correctly?
8      A.    Yes, you did.
9      Q.    Now, as we saw earlier in your
10  testimony, as of May 2011, the DEA for the
11  Philadelphia area office had, in fact,
12  identified that there was evidence of widespread
13  abuse of Opana ER, correct?
14            MR. LIMBACHER:  Object to form,
15      foundation.
16            THE WITNESS:  I'd be happy to
17      look at that document again.  We saw it
18      a while ago.
19  BY MS. SCULLION:
20      Q.    It's in the record.
21            So now let's turn to the RiskMAP
22  Update Report for the period October 1st, 2011
23  to December 31st, 2011, and I'll note it's dated
24  March 7th, 2012.

Page 675

1            (Document marked for
2        identification as Endo-Lortie Deposition
3        Exhibit No. 65.)
4  BY MS. SCULLION:
5      Q.    It's Exhibit 65.
6            And Exhibit 65 is Bates stamped
7  ENDO-OR-CID-01044118.
8      A.    Yes, I have that.
9      Q.    Okay.  Now, if you'll go to page
10  4 of this report, under the heading
11  "Introduction," looking at the second paragraph,
12  and Endo reports to the FDA, "Overall, during
13  this period no safety signals have been
14  identified and no patterns have diversion were
15  observed in the supply chain."
16            Did I read that correctly?
17            MR. LIMBACHER:  Object to form.
18            THE WITNESS:  That's -- you read
19      the sentence accurately.
20  BY MS. SCULLION:
21      Q.    Next sentence, "Based on the
22  available data, no new trends were observed, but
23  abuse and misuse of Opana and Opana ER continues
24  to be a problem."

Page 676

1            Do you see that?
2      A.    Yes, again, you read that
3  correctly.
4      Q.    Okay.  So Endo is acknowledging
5  finally in this report that abuse and misuse of
6  Opana ER is a problem, nonetheless Endo is
7  saying there's no safety signal; is that
8  correct?
9            MR. LIMBACHER:  Object to form,
10      misstates the evidence.
11            THE WITNESS:  Well, you pointed
12      me to a different spot.  I'd be happy to
13      go back and look at the other exhibits.
14      We didn't look at the introduction, so I
15      can't comment on the -- whether or not
16      the comment about abuse and misuse of
17      Opana and Opana ER continues to be a
18      problem.  I suspect it's in the
19      introduction of the other documents as
20      well.
21  BY MS. SCULLION:
22      Q.    Well, if you look at the date for
23  Exhibit 65, this is dated March 7th, 2012,
24  correct?

Page 677

1      A.    That's the date of the report,
2  yes.
3      Q.    And as of that date, Endo now had
4  FDA approval for its reformulated version of
5  Opana ER, correct?
6      A.    Well, as of March 7th it did.  Of
7  course, the period is covering December 31st,
8  the product had just received approval, but it
9  was not yet marketed.  In fact, in March of 2012
10  it was not on the market.
11      Q.    But as of the date of the report,
12  Endo had in hand now approval to launch a new
13  product, correct?
14      A.    FDA approval was received in
15  December of 2011, but there was some time to
16  ensure manufacturing of adequate supply before
17  it was put into the marketplace.
18      Q.    And the question is, though, as
19  of the date of this report, Endo now had in hand
20  FDA approval for a reformulated version of Opana
21  ER, right?
22      A.    As of the time of the report it
23  did, yes.
24      Q.    And Endo's intention was to

Highly Confidential - Subject to Further Confidentiality Review

Page 678

1    substitute the reformulated version of Opana ER
2    for the original version, correct?
3             MR. LIMBACHER:  Object to form
4        and foundation.
5             THE WITNESS:  The plan was to
6        effect as smooth as possible a
7        transition between the original
8        formulation and new formulation, the key
9        objective being to ensure that patients
10       who were titrated to effect were not --
11       didn't experience an interruption in
12       supply.  We had some challenges doing
13       that but...
14   BY MS. SCULLION:
15       Q.    But Endo intended at the end of
16   that to have the newly reformulated version of
17   Opana ER replace the old version, correct?
18           MR. LIMBACHER:  Same objections.
19           THE WITNESS:  The ultimate plan
20       was to have only the new version on the
21       market.
22   BY MS. SCULLION:
23       Q.    Correct.
24             And, as we discussed before,

Page 679

1    Endo's intent was to have that reformulated
2    version approved as an abuse deterrent
3    formulation, correct?
4            MR. LIMBACHER:  Same objections.
5            THE WITNESS:  That was the intent
6        and the objective, yes.
7    BY MS. SCULLION:
8        Q.    Right, and the FDA never approved
9    the reformulated product as an abuse deterrent
10   formulation, correct?
11           MR. LIMBACHER:  Object to form,
12       asked and answered.
13           THE WITNESS:  Ultimately, after
14       much deliberation and submission of data
15       and negotiations and discussions, that's
16       correct, they have not yet or they never
17       did finally approve that language.
18   BY MS. SCULLION:
19       Q.    And you're aware, are you not,
20   that after a number of years of selling the
21   reformulated product, Endo withdrew that product
22   after the FDA had determined that the abuse of
23   the reformulated product also showed that its
24   risks outweighed its benefits from a safety

Page 680

1    perspective, correct?
2            MR. LIMBACHER:  Object to form
3    and outside the scope of the direct.
4            THE WITNESS:  I understand that
5        is what eventually happened.  That, of
6        course, happened after I left the
7        company, so I wasn't part of that
8        decision.
9    BY MS. SCULLION:
10       Q.    So, overall, the original Opana
11   ER proved to be too unsafe because of abuse, and
12   the reformulated version of Opana ER likewise
13   proved to be too unsafe because of abuse,
14   correct?
15           MR. LIMBACHER:  Objection, form
16       foundation and misstates the evidence.
17           THE WITNESS:  Yeah, I don't think
18       I can agree with that, so I disagree.
19           MS. SCULLION:  I have no further
20       questions.
21           THE VIDEOGRAPHER:  That concludes
22       today's deposition.  The time is
23       8:14 p.m.
24           (Brief recess.)

Page 681

1            (Deposition resumes at 8:15 p.m.)
2            MR. LIMBACHER:  We have no
3    questions.
4            (Witness excused.)
5                 - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

66 (Pages 678 to 681)

Highly Confidential - Subject to Further Confidentiality Review

Page 682

```
 1        C E R T I F I C A T I O N
 2            I, MARGARET M. REIHL, a
 3    Registered Professional Reporter,
 4    Certified Realtime Reporter, Certified
 5    Shorthand Reporter, Certified LiveNote
 6    Reporter and Notary Public, do hereby
 7    certify that the foregoing is a true and
 8    accurate transcript of the testimony as
 9    taken stenographically by and before me
10    at the time, place, and on the date
11    hereinbefore set forth.
12            I DO FURTHER CERTIFY that I
13    am neither a relative nor employee nor
14    attorney nor counsel of any of the
15    parties to this action, and that I am
16    neither a relative nor employee of such
17    attorney or counsel, and that I am not
18    financially interested in the action.
19
20
21    ------------------------------
      Margaret M. Reihl, RPR, CRR, CLR
22    CSR #XI01497  Notary Public
23
24
```

Page 684

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3            I, BRIAN LORTIE, do hereby
 4    certify that I have read the foregoing
 5    pages, and that the same is a correct
 6    transcription of the answers given by me
 7    to the questions therein propounded,
 8    except for the corrections or changes in
 9    form or substance, if any, noted in the
10    attached Errata Sheet.
11
12
13
      _____
14    BRIAN LORTIE            DATE
15
      Subscribed and sworn to before me this
16
      _____ day of _____, 2018.
17
      My commission expires:_____
18
19    _____
      Notary Public
20
21
22
23
24
```

Page 683

```
 1          - - - - -
 2         E R R A T A
 3          - - - - -
 4    PAGE  LINE  CHANGE
 5    ____  ____  _____
 6    REASON: _____
 7    ____  ____  _____
 8    REASON: _____
 9    ____  ____  _____
10    REASON: _____
11    ____  ____  _____
12    REASON: _____
13    ____  ____  _____
14    REASON: _____
15    ____  ____  _____
16    REASON: _____
17    ____  ____  _____
18    REASON: _____
19    ____  ____  _____
20    REASON: _____
21    ____  ____  _____
22    REASON: _____
23    ____  ____  _____
24    REASON: _____
```

67 (Pages 682 to 684)