1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4                     -  -  -
5

IN RE:  NATIONAL          :   HON. DAN A.
6  PRESCRIPTION OPIATE      :   POLSTER
   LITIGATION               :
7                           :
   APPLIES TO ALL CASES     :   NO.
8                           :   1:17-MD-2804
                            :
9

            - HIGHLY CONFIDENTIAL -
10
   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                    -  -  -
12
                  March 15, 2019
13
                    -  -  -
14
15          Videotaped deposition of
   STEPHEN C. MACRIDES taken pursuant to
16  notice, was held at the offices of
   McCarter & English, LLP, 1600 Market
17  Street, Philadelphia, Pennsylvania,
   beginning at 9:05 a.m., on the above
18  date, before Michelle L. Gray, a
   Registered Professional Reporter,
19  Certified Shorthand Reporter, Certified
   Realtime Reporter, and Notary Public.
20
                    -  -  -
21
22        GOLKOW LITIGATION SERVICES
      877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1  APPEARANCES:
 2
 3  SEEGER WEISS, LLP
    BY: DAVID R. BUCHANAN, ESQ.
    77 Water Street
 4  New York, New York 10005
    (212) 584-0700
 5  Dbuchanan@seegerweiss.com
 6  Representing the Plaintiffs
 7  BRANSTETTER, STRANCH & JENNINGS, PLLC
    BY: MICHAEL G. STEWART, ESQ.
 8  223 Rosa L. Parks Avenue
    Suite 200
 9  Nashville, Tennessee 37203
    (615) 254-8801
10  Mstewart@bsjfirm.com
    Representing the Tennessee Plaintiffs
11
12  McCARTER & ENGLISH LLP
    BY: AMY M. VANNI, ESQ.
13  1600 Market Street, Suite 3900
    Philadelphia, Pennsylvania 19103
14  (215) 979-3848
    avanni@mccarter.com
15
        - and -
16
    McCARTER & ENGLISH LLP
17  BY: HAYLEY J. REESE, ESQ.
    Renaissance Centre
18  405 N. King Street, 8th Floor
    Wilmington, Delaware 19801
19  (302) 227-6308
    hreese@mccarter.com
20  Representing the Defendants, Endo Health
    Solutions; Endo Pharmaceuticals, Inc.;
21  Par Pharmaceutical Companies, Inc. f/k/a
    Par Pharmaceutical Holdings, Inc. and the
22  Witness
23
24
```

Page 3

```
 1  APPEARANCES: (Cont'd.)
 2
 3  PIETRAGALLO GORDON ALFANO BOSICK &
    RASPANTI, LLP
 4  BY: ALEXANDER M. OWENS, ESQ.
    1818 Market Street, Suite 3402
 5  Philadelphia, Pennsylvania 19103
    (215) 320-6200
 6  amo@pietragallo.com
    Representing the Defendant, Cardinal
 7  Health
 8
    JONES DAY
 9  BY: ADAM HOLLINGSWORTH, ESQ.
    North Point
10  901 Lakeside Avenue
    Cleveland, Ohio 44114
11  (216) 586-3939
    ahollingsworth@jonesday.com
12  Representing the Defendant, Walmart
13
    TELEPHONIC/STREAMING APPEARANCES:
14
15  BRANSTETTER, STRANCH & JENNINGS, PLLC
    BY: JOE P. LENISKI, JR., ESQ.
16  223 Rosa L. Parks Avenue
    Suite 200
17  Nashville, Tennessee 37203
    (615) 254-8801
18  Joeyl@bsjfirm.com
    Representing the Tennessee Plaintiffs
19
20  JACKSON KELLY, PLLC
    BY: JON L. ANDERSON, ESQ.
21  500 Lee Street East
    Charleston, West Virginia 25301
22  (304) 340-1288
    Jlanderson@jacksonkelly.com
23  Representing the Defendant,
    AmerisourceBergen
24
```

Page 4

```
 1  TELEPHONIC/STREAMING APPEARANCES:
    (Cont'd.)
 2
 3  BAILEY WYANT PLLC
    BY: MICHAEL W. TAYLOR, ESQ.
 4  500 Virginia Street East, Suite 600
    Charleston, West Virginia 25301
 5  (304) 345-4222
    Mtaylor@baileywyant.com
 6  Representing the Defendant, West
    Virginia Board of Pharmacy
 7
 8  ULMER BERNE, LLP
    BY: SARAH MILLER BENOIT, ESQ.
 9  65 East State Street
    Columbus, OH 43215
10  (614) 229-0016
    Sbenoit@ulmer.com
11  Representing the Defendant, Gemini
    Laboratories, Inc.
12
13  ARNOLD & PORTER KAYE SCHOLER, LLP
    BY: JOANNA PERSIO ESQ.
14     JOSHUA M. DAVIS, ESQ.
    601 Massachusetts Avenue, NW
15  Washington, D.C. 20001
    (202) 942-5866
16  Joanna.persio@arnoldporter.com
    Joshua.davis@arnoldporter.com
17  Representing the Defendants, Endo
    Health Solutions; Endo Pharmaceuticals,
18  Inc.; Par Pharmaceutical Companies, Inc.,
    f/k/a Par Pharmaceutical Holdings, Inc.
19
20
21
22
23
24
```

Page 5

```
 1  APPEARANCES (Cont'd.)
 2
 3
    ALSO PRESENT:
 4
 5  Elina Rakhlin - Law Clerk
    Charles Bachmann - Paralegal
 6  (Seeger Weiss)
 7
    Jobina Jones-McDonnell, Esq.
 8  (Endo)
 9
    VIDEOTAPE TECHNICIAN:
10
11  Devyn Mulholland
12
    LITIGATION TECHNICIAN
13
    Bradley Smith
14
15
16
17
18
19
20
21
22
23
24
```

## Page 6

- - -
# I N D E X
- - -

Testimony of:

### STEPHEN C. MACRIDES

By Mr. Buchanan        21
By Mr. Stewart         555

- - -
# E X H I B I T S
- - -

NO.        DESCRIPTION        PAGE

Endo
Macrides-1  Curriculum Vitae     21
           Stephen C. Macrides
           E0548.1
Endo
Macrides-2  Notice of Deposition  28

Endo
Macrides-3  E-mail Thread        29
           3/12/19
           Subject, Opiates
           Macrides' Topics
           (No Bates)

## Page 7

- - -
# E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

Endo
Macrides-4  Graph              44
           1999-2017 Endo
           Total Pills/Units
           Shipped
           E1811.1
Endo
Macrides-5  Graph              44
           Par Total Pills/
           Units
           E1809.1
Endo
Macrides-6  QT Total Pills/    44
           Unit Counts
           E1810.1
Endo
Macrides-7  Graphs of Maps     70
           Estimated Age-
           Adjusted Death
           Rate Per 100,000
           1999-2016
           E0772.1
Endo
Macrides-8  E-mail, 10/2/03    119
           Subject, Revised
           DEA Meeting Minutes
           ENDO-OPIOID_MDL-
           01706006-11
           E0550.1

## Page 8

- - -
# E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

Endo
Macrides-9  E-mail, 7/14/03    121
           Subject, Action
           Plan to Prevent
           Diversion
           ENDO-OPIOID_MDL-
           01692316-21
           E0548.1

Endo
Macrides-10  Exhibit A to Par's  146
           Supplemental
           Interrogatory Responses
           E1848.1
           (No Bates)

Endo
Macrides-11  E-mail Thread     159
           5/13/10
           Subject, Review Report
           PAR_OPIOID_MDL_
           0001053153-68
           E1056.1
Endo
Macrides-12  E-mail, 6/21/12   177
           Subject, Suspicious
           Order Monitoring
           (SOM)
           PAR_OPIOID_MDL_
           0001058273-79
           E1839.1

## Page 9

- - -
# E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

Endo
Macrides-13  Par SOP           193
           SO0002.0
           PAR_OPIOID_MDL_
           0001410508-13
           E1841.1

Endo
Macrides-14  E-mail Thread     210
           7/15/15
           Subject, Buzzeo
           PDMA DEA Audit
           Report 4/28-30/15
           PAR_OPIOID_MDL_
           0001024034-79
           E1072.1

Endo
Macrides-15  E-mail Thread     241
           10/25/16
           Subject, SOMs
           PAR_OPIOID_MDL_
           0002161313-34
           E1840.1

Endo
Macrides-16  Summary Chart     254
           To Exhibit 6
           E1847.1
           (No Bates)

Page 10

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Endo.
Macrides-17  E-mail, 5/27/10    259
100507 Qualitest
Overview for
BusDev
PAR_OPIOID_MDL_
0001593258-75
E1813.1

Endo.
Macrides-18  Effective Controls   295
Against Diversion
Of Controlled
Substances
Meeting with Vintage
Pharma 3/6/13
PAR_OPIOID_MDL_
0002016179-89
E1117.1

Endo.
Macrides-19  E-mail Thread    316
3/7/13
Subject, Charts
From DEA Meeting
ENDO-OPIOID_MDL-
02975958-18
E0575.1

Endo.
Macrides-20  E-mail, 4/12/13    324
Subject, Attached
Image
PAR_OPIOID_MDL_
0001647888-9T
E1824.1

Page 11

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Endo.
Macrides-21  E-mail Thread    361
3/13/13
Subject, Slide Deck
For this Morning's
Meeting
PAR_OPIOID_MDL_
0000365381
E0581.1

Endo.
Macrides-22  E-mail, 1/22/17    372
SOM 101.pptx
PAR_OPIOID_MDL_
0001355348-49
E0589.1

Endo.
Macrides-23  E-mail Thread    387
9/4/08
Subject, Qualitest
08-2008
PAR_OPIOID_MDL_
0000076009-1T
E1051.1

Endo.
Macrides-24  E-mail Thread    412
12/1/08
Subject, SOM Intro
Call
PAR_OPIOID_MDL_
0001656118-2T
E1790.1

Page 12

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Endo.
Macrides-25  E-mail, 7/2/09    432
Subject, Reports
From Recent Reviews
PAR_OPIOID_MDL_
0000398174-9T
E1037.1

Endo.
Macrides-26  E-mail Thread    444
11/16/11
Subject, DEA
Inspection Wrap-Up
In Charlotte
PAR_OPIOID_MDL_
0000390035-37
E0567.1

Endo.
Macrides-27  (Skipped)

Endo.
Macrides-28  E-mail Thread    454
3/22/13
Subject, Composite
Risk Assessment
PAR_OPIOID_MDL_
0000035162-64
E0573.1

Endo.
Macrides-29  Summary of Meeting   457
With DEA Quota Office
PAR_OPIOID_MDL_
0000369261-63
E1082.1

Page 13

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

Endo.
Macrides-30  (Skipped)

Endo.
Macrides-31  E-mail, 2/9/13    468
Subject, DEA Compliance
Initiatives Presentation
PAR_OPIOID_MDL_
0000034190
0001424664-67
E1052.1

Endo.
Macrides-32  E-mail, 2/9/13    478
Subject, DEA
Compliance Initiatives
Presentation
PAR_OPIOID_MDL_
0000034190-15
E107.1

Endo.
Macrides-33  E-mail, 1/17/14    487
Subject, Advanced
Pharmacy
PAR_OPIOID_MDL_
0000020402-19
E1137.1

Endo.
Macrides-34  E-mail, 12/30/13    505
Subject, Big Tex
Pharmacy
PAR_OPIOID_MDL_
0000020216-19
E1139.1

Page 14

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Endo.Macrides-35 | E-mail, 12/31/13 Subject, BZ Pharmacy PAR_OPIOID_MDL_0000020254-57 E1138.1 | 509 |
| Endo.Macrides-36 | Site Visit Report PAR_OPIOID_MDL_0001599706 E1087.1 | 516 |
| Endo.Macrides-37 | E-mail, 1/16/15 Subject, SOMs Customers PAR_OPIOID_MDL_0000017143 E1151.1 | 520 |
| Endo.Macrides-38 | (Skipped) | |
| Endo.Macrides-39 | (Skipped) | |
| Endo.Macrides-40 | E-mail Thread 5/8/13 Subject, TopRx Pharmacy, Revocation Of Registration PAR_OPIOID_MDL_0001648312-56 E1868.1 | 532 |

Page 15

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Endo.Macrides-41 | Suspicious Orders And Customers Reported To DEA by Par (No Bates) E1788.1 | 530 |
| Endo.Macrides-42 | Supply Chain & DEA Compliance ENDO_OPIOID_MDL-02278909-17 E0391.1 | 476 |
| Endo.Macrides-43 | (Skipped) | |
| Endo.Macrides-44 | Transactions Pended and Cleared E1869.1 | 539 |
| Endo.Macrides-45 | Cross Notice Tennessee | 555 |
| Endo.Macrides-46 | E-mail Thread 5/9/14 Subject, SOM Summary ENDO_OPIOID_MDL-05948280-85 | 608 |

Page 16

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Endo.Macrides-47 | E-mail Thread 8/31/17 Subject, Privileged & Confidential Draft Response ENDO_OPIOID_MDL-06235529-37 | 612 |
| Endo.Macrides-48 | E-mail Thread 7/11/12 Subject, American Pain ENDO_OPIOID_MDL-06211237-45 | 613 |
| Endo.Macrides-49 | E-mail Thread 8/9/12 Subject, UPS's Know Your Customer Program ENDO_OPIOID_MDL-05968927-29 | 627 |
| Endo.Macrides-50 | E-mail Thread 10/16/13 Subject, DEA Presentation Review EPI001763070 | 629 |

Page 17

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Endo.Macrides-51 | Supplemental Declaration of Mark Collins | 652 |
| Endo.Macrides-52 | E-mail Thread 10/29/13 Subject, Opana ER Risk Management ENDO_OPIOID_MDL-01398417-20 | 653 |
| Endo.Macrides-53 | E-mail Thread 2/1/17 Subject, Opana ER Risk Management ENDO_OPIOID_MDL-01239749-53 | 659 |
| Endo.Macrides-54 | E-mail Thread 4/1/14 Subject, C-II Orders Handled by Memphis ENDO_OPIOID_MDL-05962559-63 | 667 |
| Endo.Macrides-55 | Fueling An Epidemic Report 3 HSGAC Minority Staff Report | 676 |

Highly Confidential - Subject to Further Confidentiality Review

Page 18

```
1              - - -
2     E X H I B I T S  (Cont'd.)
3              - - -
4
5  NO.      DESCRIPTION      PAGE
6  Endo
   Macrides-56  E-mail, 10/3/16    680
7            Subject, Pilot
             Doctors Pharmacy
8            Data
             ENDO_OPIOID_MDL-
9            01905809
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 20

```
1              - - -
2         THE VIDEOGRAPHER:  We are
3  now on the record.  My name is
4  Devyn Mulholland.  I'm a
5  videographer for Golkow Litigation
6  Services.
7         Today's date is March 15,
8  2019.  The time is 9:05 a.m.
9         This video deposition is
10 being held in Philadelphia,
11 Pennsylvania, in the matter of
12 National Prescription Opiate
13 Litigation.
14        The deponent is Steven
15 Macrides.
16        Counsel will be noted on the
17 stenographic record.
18        The court reporter is
19 Michelle Gray and will now swear
20 in the witness.
21             - - -
22        ... STEPHEN C. MACRIDES,
23 having been first duly sworn, was
24 examined and testified as follows:
```

Page 19

```
1              - - -
2     DEPOSITION SUPPORT INDEX
3              - - -
4
5  Direction to Witness Not to Answer
6  PAGE   LINE
   None.
7
8  Request for Production of Documents
9  PAGE   LINE
   None.
10
11 Stipulations
12 PAGE   LINE
   None.
13
   Questions Marked
14
   PAGE   LINE
15 None.
16
17
18
19
20
21
22
23
24
```

Page 21

```
1              - - -
2         EXAMINATION
3              - - -
4  BY MR. BUCHANAN:
5     Q.   Good morning, Mr. Macrides.
6  How are you today?
7     A.   Good.  How are you?
8     Q.   Good.  Welcome to your
9  deposition.  Could you state your full
10 name for the record, please?
11    A.   Steven Christopher Macrides.
12    Q.   Okay.  I understand that you
13 are a current employee of Endo
14 International; is that correct?
15    A.   I am.
16    Q.   Okay.  Let me pass you a
17 copy of your CV.
18        (Document marked for
19        identification as Exhibit
20        Endo-Macrides-1.)
21 BY MR. BUCHANAN:
22    Q.   It's been handed to me by
23 your counsel.  I assume you saw it before
24 you came in today.
```

Page 22

1     A.   I have.
2     Q.   Is this your current CV,
3 current form of your CV?
4     A.   It's the most updated
5 version, yes.
6     Q.   Okay.  And I put that
7 qualifier on, because I understand that
8 it hasn't been updated in a few months,
9 years, how long?
10    A.   I haven't updated this
11 probably in a year, year and-a-half.
12    Q.   Okay.  I see the last most
13 recent updated entry at the bottom of
14 page one, vice president global supply
15 chain 6-2017 to the present for Endo
16 International, correct?
17    A.   Right.  That's not my
18 current title, however.
19    Q.   Okay.  What is your current
20 title?
21    A.   My current title is senior
22 vice president of global supply chain.
23    Q.   Okay.  And we're not going
24 to have a copy of this for the video, so

Page 23

1 can I have the Elmo, please.
2          All right.  To orient us
3 here, sir, this is Exhibit 1 to your
4 deposition.  This is the most current
5 version of your CV, correct?
6     A.   Yes.
7     Q.   Okay.  And you corrected or
8 clarified orally this entry at the
9 bottom, or at least provided a more
10 current title.  It's senior vice
11 president; is that right?
12    A.   That's correct.
13    Q.   Same division or function,
14 global supply chain?
15    A.   Global supply chain.
16    Q.   Gotcha.
17          Okay.  You have been with
18 Endo, as I understand it, for a few
19 years; is that right?
20    A.   Since 2012.
21    Q.   Okay.  And senior director
22 finance enterprise supply chain 2012 to
23 2015; is that right?
24    A.   That's correct.

Page 24

1     Q.   Okay.  Moved up and became a
2 vice president in 2015, correct?
3     A.   Correct.
4     Q.   And then that was vice
5 president supply chain generics from
6 February 2015 to 2017, correct?
7     A.   Correct.
8     Q.   And then in 2017, you became
9 the vice president of global supply
10 chain, so you took responsibility, I take
11 it for both branded and nonbranded
12 products; is that right?
13          MS. VANNI:  Object to form.
14          THE WITNESS:  At that time I
15     had some responsibility for
16     branded and generics, yes.
17 BY MR. BUCHANAN:
18    Q.   Okay.  So prior to 2017,
19 from 2015 to 2017, to be more specific,
20 you were responsible for the supply chain
21 for generics, correct?
22    A.   Correct.
23    Q.   Okay.  Have you had your
24 deposition taken before?

Page 25

1     A.   Once.
2     Q.   And what was the context on
3 that?
4     A.   It was a litigation related
5 to a previous company that I worked for.
6     Q.   Okay.  How many years ago?
7     A.   That would have been in --
8 prior to 2000.  I don't remember the
9 exact year.
10    Q.   You understand, sir, your
11 deposition is being taken today by
12 counsel for various municipalities,
13 counties, states for the MDL and
14 litigation against manufacturers and
15 distributors of opioid products, correct?
16    A.   I understand.
17    Q.   Okay.  In connection with
18 your prior deposition, was your prior
19 deposition in an action that related in
20 any way to opioid products?
21    A.   No.
22    Q.   Okay.  Did it relate to drug
23 products?
24    A.   No.

Page 26

1    Q.   Okay.  Was it a personal
2  matter?
3    A.   It was a -- how do I
4  describe it?  It was a matter related to
5  diversion of funds.  That's the best way
6  I can describe it.
7    Q.   Okay.  A claim involving a
8  government entity or not?
9    A.   No, it was a claim involving
10  a contractor and a CEO who had been
11  involved in some redirection of funds for
12  personal use.
13    Q.   Okay.  And what entity were
14  you working for at that time?
15    A.   I was working for a company
16  called Astra USA.
17    Q.   Okay.  So you have been an
18  employee of Endo or Endo affiliates since
19  2012?
20    A.   Correct.
21    Q.   Okay.  And current home base
22  for you is here in the states or
23  overseas?
24    A.   I'm an ex-pat.  So I -- my

Page 27

1  job technically is based in Dublin,
2  Ireland.
3    Q.   Okay.  So let's -- when we
4  see here employment history 2015 to the
5  present.  Is the entity that you work for
6  still Endo International PLC?
7    A.   It is.
8    Q.   Okay.  You were working for
9  Endo International PLC, no longer at the
10  Malvern location, but now in an ex-US
11  location?
12    A.   My office is in Dublin,
13  Ireland.
14    Q.   Gotcha.  And how long has
15  that been the case?
16    A.   About two years.
17    Q.   Okay.  You understand, sir,
18  that you've been called to testify
19  obviously about information that you may
20  have personally.  But you've also been
21  designated to speak on behalf of the
22  company on certain topics, correct?
23    A.   I understand that.
24      MR. BUCHANAN:  Okay.  Can I

Page 28

1  have a copy of the notice and the
2  letter.
3      (Document marked for
4    identification as Exhibit
5    Endo-Macrides-2.)
6  BY MR. BUCHANAN:
7    Q.   Passing you, sir, what's
8  been marked as Exhibit 2 to your
9  deposition.  It's a document entitled
10  "Notice of Deposition of Stephen
11  Macrides."  That's for here at this
12  location today.
13      Do you see that?
14    A.   I see it.
15    Q.   You see that it was a notice
16  that was issued to the entities.  And
17  you've been designated to testify on
18  certain particular topics.  Do you see
19  those topics?  30, 31, 32, 33, and 35?
20    A.   I see that.
21    Q.   Okay.  I take it that you've
22  had a chance to see this notice before,
23  sir?
24    A.   Yes, I've seen this notice.

Page 29

1    Q.   I take it that you've had a
2  chance to see the topics?
3    A.   I've seen the topics.
4    Q.   Okay.  Passing you what we
5  are marking as Exhibit 3.
6      (Document marked for
7    identification as Exhibit
8    Endo-Macrides-3.)
9  BY MR. BUCHANAN:
10    Q.   And this is kind of the
11  inside baseball, the way this case is
12  proceeding.
13      It's an e-mail thread
14  between --
15      MS. VANNI:  Thank you.
16  BY MR. BUCHANAN:
17    Q.   -- counsel for your employer
18  and related entities, and counsel for
19  plaintiffs concerning those topics.
20      Have you seen this
21  correspondence?  Feel free to flip the
22  pages.
23    A.   I haven't actually seen this
24  document.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 　Q.　Let -- let me direct your
2 attention, sir, to, for the record,
3 Exhibit 3 is an exchange among
4 Ms. Scullion of my office and Mr. Davis
5 and others, counsel noted in the room,
6 related to the deposition today.
7 　　　Do you see the headline,
8 subject Re, opiates Macrides topics?
9 　A.　I see that.
10 　Q.　Okay.  And I understand you
11 may not have seen the topics in this
12 form, you may have seen them in some
13 other digested form.  But I just want to
14 confirm that we are on the same page
15 before we get rolling today, okay.
16 　　　Let's turn to Page 3, turn
17 to Page 3.
18 　　　And we have at the bottom of
19 the page it says, "For ease of reference
20 we set forth here our now modestly
21 revised agreements on topics to which
22 Mr. Macrides will be prepared to testify
23 under Rule 30(b)(6) as a corporate
24 representative for Endo/Par."

Page 31

1 　　　Do you see that?
2 　A.　I see it.
3 　Q.　Do you see the statement for
4 Topic 30?
5 　A.　I see it.
6 　Q.　Okay.  I'll just give you a
7 moment to read that.  I'll read it while
8 you read it to yourself.  "For Endo and
9 Par, including Qualitest, for all periods
10 during which any Class II opioids were
11 sold, an explanation of the applicable
12 policies, procedures, records and systems
13 to investigate, report or halt actual or
14 suspected suspicious orders, as well as
15 the substance of, A, the reasons for
16 material changes to the same; B, the
17 effectiveness of the same; and C, reports
18 to the DEA or Ohio authorities with the
19 understanding that the witness will not
20 have committed to memory every report."
21 　　　Did I read that correctly?
22 　A.　You did.
23 　Q.　Did you have that
24 understanding, sir, that you were to be

Page 32

1 prepared to talk about that today?
2 　A.　I understand.
3 　Q.　Okay.
4 　　　MS. VANNI:  Counsel, just
5 note for the record that there is
6 a time limitation that we worked
7 out with counsel, Ms. Scullion,
8 with respect to Qualitest
9 Pharmaceuticals and the purchase,
10 and this witness is prepared to
11 testify as far back as
12 October 31st, 2007.
13 　　　MR. BUCHANAN:  Yeah, I --
14 there's -- there's some debate
15 about that point, and we'll
16 clarify that as we proceed today.
17 　　　But I'll -- I'll note that,
18 and the e-mail also notes a
19 clarifying point on that.  And
20 we'll get to that in a moment.
21 BY MR. BUCHANAN:
22 　Q.　For Par, including
23 Qualitest, for all periods during which
24 any Class II opioids were sold an

Page 33

1 explanation of the applicable policies,
2 procedures, records and systems to
3 investigate, report or halt actual or
4 suspected abuse or diversion, as well as
5 the substance of, A, the reasons for
6 material changes to the same; B, the
7 effectiveness of the same; and C, reports
8 to the DEA or Ohio authorities with the
9 understanding the witness will not have
10 committed to memory every report."
11 　　　Did I read that correctly?
12 　A.　Yes.
13 　Q.　And you have that
14 understanding --
15 　A.　I understand.
16 　Q.　-- to be prepared to testify
17 to that today?
18 　A.　I understand.
19 　Q.　Okay.  Please take a look at
20 Topic 31.  I don't think I'm going to
21 litter the record with a reading of each
22 of these.
23 　　　I'd like you to read
24 Topic 31 to yourself.  It's displayed on

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 the screen so there's no dispute as to
2 what we're referring to.
3         There are two bullets there,
4 one for Endo and Par, and one for Par
5 separately.  Just let me know after
6 you've read it.
7     A.   I've read it.
8     Q.   Okay.  Are you prepared to
9 testify on those topics today, sir?
10     A.   I am.
11     Q.   Okay.  Topic 32.  Please
12 read those two bullets.  They are now
13 displayed on the screen.  One for Endo
14 and Par.  One for just Par including
15 Qualitest.
16     A.   I've read it.
17     Q.   Okay.  You had that
18 understanding before you came in today,
19 sir, you were going to be providing
20 testimony on those topics?
21     A.   I understand.
22     Q.   Okay.  And you are prepared
23 to do so?
24     A.   I am.

Page 35

1     Q.   Okay.  Topic 33.  Could you
2 read that please?
3     A.   I've read it.
4     Q.   Okay.  Before you came in
5 today you had the understanding you were
6 going to be providing testimony on that
7 topic?
8     A.   I understand.
9     Q.   Are you prepared to do so?
10     A.   I am.
11     Q.   Okay.  And Topic 35.  Could
12 you read that, please?
13     A.   I read it.
14     Q.   Okay.  Are you prepared to
15 provide testimony on that topic?
16     A.   I am.
17     Q.   And you had that
18 understanding before you came in today?
19     A.   Yes.
20     Q.   Okay.  Good.  All right.  A
21 number of the topics, sir, that are --
22 are listed, or a number of the subject
23 matters that are touched on concern
24 issues related to, I'll say, suspicious

Page 36

1 order monitoring, diversion, abuse, you
2 saw those in your re-reading of the
3 topics?
4     A.   I did.
5     Q.   Okay.  Have you held a DEA
6 compliance function for Endo, Par, or
7 Qualitest?
8     A.   The DEA compliance function
9 reports to me.
10     Q.   So my question was, have you
11 held a DEA compliance function in your
12 time at Endo, Par, or Qualitest?
13     A.   When you say held, I'm not
14 sure exactly what you mean by held.
15     Q.   Okay.  I looked at your
16 CV --
17     A.   Have -- have I been the head
18 of DEA compliance?
19     Q.   Yeah.
20     A.   No, I have not been the head
21 of DEA compliance.
22     Q.   Have you been somebody who
23 has been kind of hands-on in ensuring DEA
24 compliance?

Page 37

1     A.   I've not been hands --
2         MS. VANNI:  Object to form.
3         THE WITNESS:  I've not been
4     a hands-on DEA compliance person.
5 BY MR. BUCHANAN:
6     Q.   Okay.  So if we looked at an
7 org chart and we looked at DEA
8 compliance, for example, there would be a
9 head of DEA compliance, right?
10     A.   That's correct.
11     Q.   And there may not have been
12 a head of DEA compliance at various
13 points in time.  But there currently is,
14 correct?
15         MS. VANNI:  Objection.
16         THE WITNESS:  There is.
17 BY MR. BUCHANAN:
18     Q.   Okay.  And if we looked
19 underneath of the -- the role of DEA
20 compliance, we would see names of other
21 people that fulfilled some responsibility
22 within that function, correct?
23     A.   You would.
24         MS. VANNI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

BY MR. BUCHANAN:

Q.    Would you fall either in the head or underneath that kind of pyramid of structure for DEA compliance?

A.    The head of DEA compliance would report to me --

Q.    Okay.  So --

A.    -- as part of my overall responsibility.

Q.    So the answer to my question would be you would not be within that umbrella, you would be above that umbrella?  That's correct.

A.    That's correct.

Q.    Okay.  So you're saying that the person responsible for that was responsible to report to you?

A.    Correct.

Q.    Okay.  Have you been responsible yourself for suspicious order monitoring?

MS. VANNI:  Object to form.

THE WITNESS:  Not directly.

BY MR. BUCHANAN:

Page 39

Q.    Okay.  Have you been responsible yourself for ensuring there were effective controls against diversion?

A.    Yes.

Q.    In what sense, sir?

A.    In the sense that the DEA compliance function as part of my overall responsibilities as a senior vice president of global supply chain.

Q.    Okay.  And that became the case at what point in time?

A.    The DEA compliance function reported to me in early 2015.

Q.    Okay.

A.    I don't remember the exact date.

Q.    Okay.  So -- so let's -- let's do a little history so we can kind of orient ourselves with these companies.  Because the companies merged and had prior histories prior to the mergers, correct?

A.    That's right.

Page 40

Q.    Okay.  Endo is the result of a few executives from DuPont, Merck leaving in 1997, forming a new entity around that time, correct?

A.    That's my understanding.

Q.    And Endo has been in the business of the manufacture and sale and distribution of opioids since about 1997, fair?

A.    That's my understanding.

MS. VANNI:  Just for the record, you're asking him these questions in his personal capacity, based on his personal understanding or are you asking his 30(b)(6)?

MR. BUCHANAN:  I think I need to understand how he could do his job as a 30(b)(6).  So I mean -- on the 30(b)(6) topics.  So we're trying to elicit corporate testimony.

BY MR. BUCHANAN:

Q.    Prior to the merger with

Page 41

Endo in 2010, Qualitest was a standalone entity, correct?

A.    That's my understanding.

Q.    Qualitest was in the business of the manufacture and sale of opioid products prior to 2010, correct?

A.    Opioids and other medications.

Q.    Qualitest has a history going back to the '80s, correct?

MS. VANNI:  Object to form.

THE WITNESS:  It has a long history.  I'm not sure exactly when they began.

BY MR. BUCHANAN:

Q.    Do you have that knowledge, that Qualitest has been in the business of manufacturing, distributing opioids for dozens of years?

A.    I have an understanding that Qualitest has been in the business of manufacturing and distributing opioids, yes.  Through some time period.

Q.    Prior to the 2000s?

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  A.  Prior to 2000s, yes.

2  Q.  Okay.  Fine.  Without

3  fussing on a year, prior to the 2000s.

4  Okay.

5  All right.  Par is a third

6  entity and prior to its, I'll say, merger

7  with the Endo entities in 2015, was also

8  in the business of the manufacture and

9  distribution and the sale of opioids,

10  correct?

11  A.  That's my understanding.

12  Q.  Okay.  It's got a history of

13  making opioids for years prior to the

14  merger with the Endo/Qualitest entities,

15  correct?

16  MS. VANNI:  Object to form.

17  THE WITNESS:  It has a

18  history.  I don't know the exact

19  details of the history.  I'm much

20  more familiar, given that I was an

21  Endo employee.  But I do

22  understand that Par was in that

23  business of distributing and

24  manufacturing opioids.

Page 43

1  BY MR. BUCHANAN:

2  Q.  You understand that you've

3  been designated to testify --

4  A.  I understand.

5  Q.  Let me just finish the

6  question.  And I realize it's been a

7  while since you've last been deposed.

8  But just so we are not stepping on each

9  other with our questions and answers.

10  You understand that you've

11  been designated to testify about systems,

12  procedures, the effectiveness of those

13  procedures that Par, as an entity,

14  maintained or had with regard to opioids,

15  correct?

16  A.  I understand that.

17  Q.  Okay.  You understand that

18  Par was in the business of manufacturing,

19  distributing, and selling opioids prior

20  to 2015, correct?

21  A.  I do.

22  Q.  Okay.  And you are prepared

23  to talk about that today, correct?

24  A.  I am.

Page 44

1  MR. BUCHANAN:  Can I have

2  E-1811, E-1809, and E-1810.  How

3  are they being numbered?

4  (Document marked for

5  identification as Exhibit

6  Endo-Macrides-4.)

7  (Document marked for

8  identification as Exhibit

9  Endo-Macrides-5.)

10  (Document marked for

11  identification as Exhibit

12  Endo-Macrides-6.)

13  BY MR. BUCHANAN:

14  Q.  Let's start with Endo just

15  to orient ourselves a little, sir.  Just

16  passing you what we're marking as

17  Exhibit 4 to your deposition.

18  MR. BUCHANAN:  Can you

19  please pull up E-1811.

20  Can you pull up the

21  left-hand column.

22  BY MR. BUCHANAN:

23  Q.  Sir, on the screen and

24  before you -- it might be easier to read

Page 45

1  on the screen.  You're welcome certainly

2  to try it on the printout.  My eyes are

3  challenged for that kind of print.

4  But on the screen you'll see

5  a chart prepared from shipping data that

6  Endo has produced to us and pointed us to

7  in its answers to interrogatories.

8  In connection with your

9  preparation today, sir, did you review

10  Endo, Par, and Qualitest answer to

11  interrogatories?

12  A.  Can you just clarify?  When

13  you say answer to interrogatories?

14  Q.  Right.  So what we do kind

15  of when we try to figure things out in

16  litigation, is sometimes we ask for

17  documents, sometimes we ask for answers

18  to questions in writing.

19  They're called

20  interrogatories.  It's a formal legal

21  exchange.  We have served those on the

22  Endo entities, including Par.  We have

23  received responses to those, certain of

24  those questions concerned issues relevant

Page 46

1 to our discussion today, including
2 shipment data, including suspicious order
3 monitoring protocols, including due
4 diligence investigations. They represent
5 the company's formal statement back to us
6 in response to questions.
7          Have you reviewed the
8 company's answers to those questions by
9 us?
10     A.   I haven't specifically seen
11 those questions. I reviewed a number of
12 documents in preparation. But I have not
13 specifically seen questions from you
14 to --
15     Q.   That's fine. And maybe I'll
16 show you one and we can mark that in the
17 record and get confirmation whether
18 you've seen that or not.
19          I'll represent to you, sir,
20 that what we see on the screen is
21 prepared from shipping data that Endo has
22 pointed us to.
23          And it reflects a range of
24 products over a range of years, opioid

Page 47

1 products that Endo has manufactured,
2 marketed and sold. Do you see that list,
3 sir?
4     A.   I see it.
5     Q.   Do you recognize that, sir,
6 as a list of products, opioid-containing
7 products that Endo has made over the
8 years?
9          MS. VANNI: Object to form.
10          THE WITNESS: I do.
11 BY MR. BUCHANAN:
12     Q.   Okay. And you can see at
13 the bottom, sir, there's a tally of total
14 pills and units shipped for each of the
15 years.
16     A.   I see that.
17     Q.   Okay. And you can see, and
18 we can go back in time. All the way, not
19 too long after Endo's beginning. Endo is
20 shipping hundreds of millions of pills or
21 dosage units of opioid-containing
22 products, correct, sir?
23          MS. VANNI: Objection.
24 BY MR. BUCHANAN:

Page 48

1     Q.   Do you see that?
2     A.   Yes. Endo is shipping
3 opioid pills to the patients that needed
4 them.
5     Q.   Well, Endo was shipping
6 opioids to who was ordering them,
7 correct?
8          MS. VANNI: Object to form.
9          THE WITNESS: Yes, Endo was
10     shipping patients -- Endo was
11     shipping pills, medicines to our
12     customers to give to patients who
13     needed them.
14 BY MR. BUCHANAN:
15     Q.   Okay. Well, the way it
16 works, sir, as I understand it, in your
17 business, is the company gets orders,
18 right?
19     A.   That's correct.
20     Q.   And the company processes
21 orders, right?
22     A.   We do.
23     Q.   Okay. So that little piece
24 that you're putting on the end -- and you

Page 49

1 understand that Endo, Par and Qualitest
2 products were subject to abuse and
3 diversion, correct?
4          MS. VANNI: Object to form.
5          THE WITNESS: I understand
6     that opioid products, if not
7     properly controlled and kept
8     within a closed system, can be
9     subject to abuse.
10 BY MR. BUCHANAN:
11     Q.   By definition, sir,
12 controlled substance, certainly a C-II
13 controlled substance has a high risk of
14 abuse and diversion, correct?
15          MS. VANNI: Object to form.
16          THE WITNESS: It does, which
17     is why we have regulations and
18     controls that we abide by in the
19     management, manufacture, and
20     distribution of those products.
21          MR. BUCHANAN: We'll move to
22     strike everything after "it does."
23 BY MR. BUCHANAN:
24     Q.   And we can agree, sir, over

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 the years that Endo, Qualitest and Par's
2 products were abused and diverted,
3 correct?
4         MS. VANNI:  Objection.
5         THE WITNESS:  I don't know
6     to what degree Endo and Qualitest
7     products were diverted.
8 BY MR. BUCHANAN:
9     Q.   I didn't ask you to what
10 degree.  We can agree that Endo and
11 Qualitest opioid products were abused and
12 diverted, correct, sir?
13        MS. VANNI:  Objection.
14        THE WITNESS:  We can agree
15    that if these products are not
16    properly controlled, they can be
17    diverted and abused.
18 BY MR. BUCHANAN:
19    Q.   That's not my question.
20        Sitting here today, as the
21 corporate representative for Par, Endo
22 and Qualitest, is it your testimony, sir,
23 that no -- and we're looking at hundreds
24 of millions of pills and dosage units for

Page 51

1 each year, that none of the Endo opioids,
2 of the Par opioids, of the Qualitest
3 opioids, were abused or diverted, is that
4 your testimony, sir?
5        MS. VANNI:  Objection.
6        THE WITNESS:  I can't -- I
7    cannot speak to the degree to
8    which Endo or Qualitest opioid
9    products may or may not have been
10    abused.
11        What I can testify to is
12    that if these products are not
13    properly controlled, they -- they
14    can be abused and diverted.
15 BY MR. BUCHANAN:
16    Q.   Right.  And again, you keep
17 coming back to the degree, which I guess
18 does answer my question, sir.
19        Because do you agree that
20 Endo, Qualitest and Par products were
21 abused and diverted?
22    A.   I agree that these
23 products --
24        MS. VANNI:  Objection.

Page 52

1 Objection.  Misstates his
2 testimony.
3        Go ahead.  Give me a second
4 to object.
5        THE WITNESS:  I -- sorry.
6        MS. VANNI:  It's okay.
7 BY MR. BUCHANAN:
8    Q.   You can answer.
9        MS. VANNI:  You can answer.
10        THE WITNESS:  I'm testifying
11    that these products, if not
12    properly controlled, can be abused
13    or diverted.
14 BY MR. BUCHANAN:
15    Q.   I'm just trying to get an
16 answer, sir, to a very, I think, simple
17 question.
18        Is it the testimony of Endo,
19 Par and Qualitest corporate designee that
20 Endo, Qualitest, and Par's opioid
21 products were not abused or diverted?
22        MS. VANNI:  Objection.
23 BY MR. BUCHANAN:
24    Q.   Is that your testimony, sir?

Page 53

1        MS. VANNI:  Objection.
2 Asked and answered.
3        THE WITNESS:  My testimony
4    is that if these products are not
5    properly controlled, they can be
6    abused or diverted.
7 BY MR. BUCHANAN:
8    Q.   Okay.  I don't think we're
9 communicating, are we?
10        MS. VANNI:  Objection to
11 colloquy.
12 BY MR. BUCHANAN:
13    Q.   This feels like a Sunday
14 morning talk show five minutes in.
15        Are you having a problem
16 understanding my question?
17        MS. VANNI:  Objection.
18        THE WITNESS:  I don't --
19    I -- I'm not having a problem
20    understanding your question.
21 BY MR. BUCHANAN:
22    Q.   Okay.  So my question, sir,
23 and just as a -- it will really help us,
24 I think, throughout the day, if I

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 understand really the point of view of
2 the company with regard to whether or not
3 its drugs have been -- have been abused
4 or diverted.
5         MS. VANNI: Objection.
6         Asked and answered.
7 BY MR. BUCHANAN:
8     Q.   Is it the companies'
9 understanding that its drugs have not
10 been abused or diverted?
11         MS. VANNI: Objection.
12         THE WITNESS: I'm saying
13         that it's the companies'
14         understanding that if its products
15         are not properly controlled and
16         kept within a closed system, that
17         they can be abused or diverted.
18         That's how I'm answering the
19         question.
20 BY MR. BUCHANAN:
21     Q.   I -- I understand that, as
22 a -- as a speaker of the English
23 language, do you understand my question?
24         MS. VANNI: Objection to

Page 55

1     form. Argumentative.
2 BY MR. BUCHANAN:
3     Q.   Do you understand what I'm
4 asking?
5     A.   I understand what you're
6 asking.
7     Q.   And you're electing not to
8 answer it?
9     A.   You're asking me if I have
10 specific knowledge that our products have
11 been abused, and I'm telling you that I
12 do not.
13     Q.   No, no.
14     A.   What I -- what I'm telling
15 you is that I have an understanding that
16 if our products are not properly
17 controlled, they can be abused or
18 diverted.
19     Q.   Would it surprise you to
20 learn, sir, that, in fact, Endo's,
21 Qualitest's, and Par's products were
22 indeed abused and diverted?
23         MS. VANNI: Object to form.
24 BY MR. BUCHANAN:

Page 56

1     Q.   Would that surprise you?
2     A.   As I stated, if our products
3 are not properly controlled, they can be
4 diverted.
5     Q.   I'm asking you whether you'd
6 be surprised to learn that your products
7 were abused and diverted?
8         MS. VANNI: Object to form.
9         THE WITNESS: I would be
10         surprised in the context that we
11         have proper controls in place to
12         prevent abuse and diversion.
13 BY MR. BUCHANAN:
14     Q.   I -- what does that mean?
15 I'm just asking you as a fact.
16         As a fact, would it be
17 surprising to you, sir, that drugs were
18 not used for legitimate medical need
19 pursuant to proper prescription, would
20 that surprise you?
21         MS. VANNI: Object to form.
22         THE WITNESS: I understand
23         that there is an opioid abuse
24         epidemic in this country.

Page 57

1 BY MR. BUCHANAN:
2     Q.   Okay.
3     A.   And I understand that opioid
4 products are making their way out of the
5 closed system and are subject to abuse
6 and diversion. Yes, I understand that.
7     Q.   Okay. Okay. So we can
8 agree on a few things then.
9         There's an opioid epidemic.
10         MS. VANNI: Object to form.
11         THE WITNESS: Opioid abuse
12         epidemic.
13 BY MR. BUCHANAN:
14     Q.   Okay. So, meaning opioids
15 are being abused that were made for
16 medical purposes, but are, in fact, being
17 abused and used in illicit ways, fair?
18     A.   I understand that there is
19 abuse of opioids.
20     Q.   You are, you, speaking for
21 the company, are a very large
22 manufacturer and distributor of opioid
23 products, correct?
24         MS. VANNI: Object to form.

Page 58

1    THE WITNESS:  We are a
2  manufacturer and distributor of
3  opioid products.
4  BY MR. BUCHANAN:
5    Q.  Okay.  Looking at our chart
6  here, we see billions and billions and
7  billions of pills for one of the three
8  entities that were made over the years of
9  opioid products, correct?
10    MS. VANNI:  Objection.  Also
11  objection to the use of this
12  demonstrative with this witness.
13  You're asking him to authenticate
14  your demonstrative.  I think it's
15  an improper use.
16    MR. BUCHANAN:  Well, that's
17  interesting, because we've asked
18  you to authenticate things and you
19  just consistently refuse to do so.
20    So I do have a corporate rep
21  who is here so...
22  BY MR. BUCHANAN:
23    Q.  So are you aware of anything
24  that's wrong with this chart, sir?

Page 59

1    A.  What I see with this chart
2  is an average of about 440 million
3  tablets per year being distributed.
4    Q.  Consistent with your
5  knowledge and understanding of Endo's
6  production of opioids over the years,
7  sir?
8    A.  It is.
9    Q.  Okay.  So we see all the way
10  back in 1999 hundreds of millions of
11  opioid pills being made by Endo and
12  entering the market, correct?
13    MS. VANNI:  Object to form.
14    THE WITNESS:  We see pills
15  being distributed to customer to
16  be distributed to patients who
17  need them.
18  BY MR. BUCHANAN:
19    Q.  Mm-hmm.  And answering my
20  question:  Hundreds of millions of pills,
21  correct?
22    A.  Is there a specific --
23    Q.  Back in 19 --
24    A.  Is there a specific year you

Page 60

1  want me to?
2    Q.  I was referring to 1999 to
3  orient you.
4    A.  1999, 357 million.
5    Q.  And we can go forward to
6  2000 and we see, I guess, business has
7  grown, right?
8    MS. VANNI:  Object to form.
9    THE WITNESS:  We see --
10  BY MR. BUCHANAN:
11    Q.  Did you see more or less in
12  2000?
13    A.  We see 545 million in -- I'm
14  sorry, 2000?
15    Q.  2000, what do you see?
16    A.  452 million.
17    Q.  Yeah.  And my question was,
18  was it growing over 1999?
19    MS. VANNI:  Object to form.
20    THE WITNESS:  2000 is a
21  higher number than 1999.
22  BY MR. BUCHANAN:
23    Q.  That would mean it's
24  growing?

Page 61

1    A.  There's growth.
2    Q.  Okay.  And let's see, how
3  did we do from 2000 to 2001, sir?
4    Doing better?
5    MS. VANNI:  Object to form.
6  BY MR. BUCHANAN:
7    Q.  Selling more?
8    MS. VANNI:  Objection.
9    THE WITNESS:  We're shipping
10  more product to patients who need
11  them.
12  BY MR. BUCHANAN:
13    Q.  Okay.  500 plus million,
14  half a billion pills; is that right?
15    A.  516 million.
16    Q.  Okay.
17    MS. VANNI:  Also note my
18  objection that he is not a
19  30(b)(6) on sales history.
20  BY MR. BUCHANAN:
21    Q.  Okay.  I believe, in fact,
22  you are a designee on suspicious order
23  monitoring, correct?
24    A.  Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  Q.   Okay.  Each of the shipments
2  that are memorialized in shipping records
3  followed an order, right?
4       MS. VANNI:  Object to form.
5       THE WITNESS:  You need an
6    order to ship a product.
7  BY MR. BUCHANAN:
8    Q.   Understood.  Since the
9  beginning of Endo's existence, Endo has
10 been charged with maintain -- maintaining
11 effective controls against diversion,
12 correct?
13      MS. VANNI:  Object to form.
14      THE WITNESS:  The
15   regulations state that we need to
16   have controls to prevent
17   diversion.
18 BY MR. BUCHANAN:
19   Q.   Not just any controls,
20 right?
21   A.   Can you clarify what you
22 mean by that?
23   Q.   You have to have effective
24 controls, right?

Page 63

1    A.   Yes.  We have to have
2  controls in place to prevent diversion.
3    Q.   You have to have -- what's
4  the word you dropped?
5       MS. VANNI:  Object to form.
6  BY MR. BUCHANAN:
7    Q.   Effective controls, right?
8    A.   That those controls should
9  be effective.
10   Q.   That's right.
11   A.   I don't disagree with you.
12   Q.   Okay.  So from the
13 beginning, from 1999 till today, Endo has
14 been responsible for ensuring it has
15 effective controls to prevent diversion,
16 correct?
17   A.   By the regulations, that's
18 what we need to do.
19   Q.   As a reasonable company,
20 that's what you need to do --
21      MS. VANNI:  Object to form.
22 BY MR. BUCHANAN:
23   Q.   -- right?
24   A.   We have a responsibility to

Page 64

1  abide by the regulations and make sure we
2  have effective controls in place to
3  prevent the abuse and diversion of our
4  products, and that's what we've done.
5    Q.   As a human being or a
6  company that's supposed to be acting like
7  a human being, you have an obligation to
8  keep this stuff in its channel, right?
9       MS. VANNI:  Object to form.
10      THE WITNESS:  I don't know
11   what you mean by acting like a
12   human being.  That's very vague.
13      What I can tell you is that
14   we have a responsibility to abide
15   by the regulations that are in
16   place to prevent the abuse and
17   diversion of our products.
18 BY MR. BUCHANAN:
19   Q.   Is there any doubt in your
20 mind, sir, that this stuff is dangerous?
21      MS. VANNI:  Object to form.
22      THE WITNESS:  These
23   products, if not properly
24   controlled and kept within the

Page 65

1    controlled system, can be abused
2    and diverted and in that context
3    could be dangerous.
4  BY MR. BUCHANAN:
5    Q.   Dangerous how?
6       MS. VANNI:  Object to form.
7       THE WITNESS:  I understand
8    they can lead to addiction which
9    can lead to other problems.
10 BY MR. BUCHANAN:
11   Q.   Like what?
12      MS. VANNI:  Objection.  It's
13   beyond the scope of his 30(b)(6).
14      THE WITNESS:  It can lead to
15   all kinds of problems.  I'm not a
16   doctor, so I can't necessarily
17   speak to the specifics of that.
18 BY MR. BUCHANAN:
19   Q.   As a -- as an executive in a
20 pharmaceutical company making opioids in
21 2019, what are some of those dangers,
22 sir?
23      MS. VANNI:  Object to form.
24      THE WITNESS:  Opioid

Page 66

1 products, if not properly
2 controlled, can lead to misuse,
3 diversion, and abuse.
4 BY MR. BUCHANAN:
5 Q. And what does that mean,
6 sir? What does that mean?
7 A. That means they -- they can
8 fall outside of the prescribed use for
9 the products and could be dangerous.
10 Q. Dangerous in the sense that
11 they can kill people, right?
12 MS. VANNI: Object to form.
13 THE WITNESS: That could be
14 one outcome.
15 BY MR. BUCHANAN:
16 Q. Are you surprised to learn,
17 sir, that as sales of opioid products
18 have increased over the years, the body
19 count from opioid deaths has increased?
20 MS. VANNI: Objection.
21 BY MR. BUCHANAN:
22 Q. Year after year after year?
23 MS. VANNI: Objection.
24 THE WITNESS: As I stated

Page 67

1 earlier, I understand that there
2 is an opioid abuse epidemic in
3 this country.
4 BY MR. BUCHANAN:
5 Q. Okay. And I'm talking about
6 one of those dangers with a senior
7 executive of a company that's pretty big
8 in opioids.
9 So is one of those dangers,
10 sir, death?
11 MS. VANNI: Object to the
12 colloquy.
13 THE WITNESS: I don't have
14 specific knowledge on the outcomes
15 of opioid abuse.
16 What I can tell you is that
17 if our products are not properly
18 controlled and kept within the
19 closed system, they can be
20 diverted and abused.
21 Our focus as an organization
22 is to put the right controls in
23 place to make sure that these
24 products are not abused and

Page 68

1 diverted.
2 MR. BUCHANAN: Can we have
3 the sales chart back up?
4 BY MR. BUCHANAN:
5 Q. So over the course of Endo's
6 history, sir, it looks like you sold
7 enough opioids to give, what, every human
8 being in the United States a 30-count
9 bottle?
10 MS. VANNI: Object to form.
11 BY MR. BUCHANAN:
12 Q. Every human being in the
13 United States?
14 MS. VANNI: Same objection.
15 BY MR. BUCHANAN:
16 Q. Maybe a little shy. 29, 28
17 pills?
18 A. We -- we've sold --
19 MS. VANNI: Same objection.
20 THE WITNESS: We've sold
21 quantities of products based on
22 orders from customers based on
23 patients who need them.
24 BY MR. BUCHANAN:

Page 69

1 Q. So, I mean let's -- let's
2 look at really what's happened at this
3 same timeline.
4 Am I correct, sir, in
5 understanding that you don't have an
6 appreciation that deaths secondary to
7 opioid use have increased dramatically as
8 use of opioids has increased
9 dramatically?
10 MS. VANNI: Objection.
11 Misstates his testimony.
12 THE WITNESS: As I stated
13 earlier, I understand that there
14 is an opioid abuse epidemic in
15 this country. And I understand
16 that death could be an outcome of
17 that.
18 BY MR. BUCHANAN:
19 Q. Okay. Okay. And then do
20 you understand, sir, that as sales of
21 opioids have gone up, yours included,
22 deaths have gone up?
23 MS. VANNI: Objection.
24 BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 Q. Do you have that
2 understanding, sir?
3 A. I don't have specific
4 knowledge about the number of -- of
5 deaths related to opioid abuse.
6 Q. Okay. Am I correct, sir,
7 you have current responsibility for DEA
8 compliance?
9 A. I have responsibility for
10 DEA compliance.
11 (Document marked for
12 identification as Exhibit
13 Endo-Macrides-7.)
14 BY MR. BUCHANAN:
15 Q. Passing you what we're
16 marking as Exhibit 7 to your deposition.
17 In examining the companies'
18 DEA compliance function, and the
19 effectiveness of the companies' controls,
20 have you sought to understand really what
21 has happened in terms of abuse and death
22 as sales have boomed?
23 MS. VANNI: Objection.
24 BY MR. BUCHANAN:

Page 71

1 Q. Grown?
2 MS. VANNI: Objection to
3 form. Beyond the scope of his
4 30(b)(6). You can answer.
5 THE WITNESS: As I stated
6 earlier, what I understand is that
7 there is an opioid abuse epidemic
8 in this country. And I understand
9 that that has gotten worse over a
10 period of time.
11 And as a responsible person
12 for DEA compliance, we have
13 continued to evolve and enhance
14 our programs to ensure that we
15 have the proper controls in place
16 to prevent diversion and abuse.
17 BY MR. BUCHANAN:
18 Q. Okay. Well, let's look at
19 where we were in 1999, sir. Where we
20 were in this country in terms of deaths
21 per 100,000 people in this country from
22 opioids.
23 Do you see the chart in
24 front of you?

Page 72

1 A. Yeah, I see a chart with a
2 lot of colors on it.
3 Q. Right. And what -- most of
4 them are blue, right?
5 A. Right.
6 Q. You recognize blue as being
7 a pretty good thing, or at least on the
8 lower end of the scale, right?
9 MS. VANNI: Object to form.
10 THE WITNESS: I see the
11 scale says estimated age, adjusted
12 death rate. I see that.
13 BY MR. BUCHANAN:
14 Q. Per 100,000. And you see
15 you know, less than two is deep blue.
16 And then, you know, going from blue to
17 red. Red and brown. That's really where
18 you don't want to be, right?
19 MS. VANNI: Object to form.
20 And object to use of this in any
21 capacity as a 30(b)(6) witness.
22 THE WITNESS: I -- I
23 don't --
24 MS. VANNI: Let me just

Page 73

1 finish my objection, Steve.
2 THE WITNESS: Sorry.
3 MS. VANNI: He was noticed
4 to provide testimony on the
5 applicable procedures and policies
6 of the company, and you're asking
7 him now to interpret data, the
8 source of which he doesn't even
9 know.
10 MR. BUCHANAN: I -- I
11 understand your objection. I
12 think it fits either his 30(b)(6)
13 or his personal capacity, Counsel.
14 We don't have to fuss about it.
15 He is an executive with
16 current responsibility over DEA
17 compliance.
18 MS. VANNI: Just note my
19 objection.
20 BY MR. BUCHANAN:
21 Q. But you'd agree, sir -- I
22 don't think I got an answer to my last
23 question.
24 You could agree that brown

Highly Confidential – Subject to Further Confidentiality Review

Page 74

1 is worse, right?
2         MS. VANNI: Object to form.
3         THE WITNESS: I'm just
4     trying to interpret this.
5 BY MR. BUCHANAN:
6     Q. You haven't seen it before?
7     A. What -- what -- what is
8 the --
9     Q. Let's start with --
10     A. -- estimated age adjusted
11 death rate. Death from opioids? It
12 doesn't say that.
13     Q. Have you seen this before,
14 sir?
15     A. I don't believe I've seen
16 these documents.
17     Q. Okay. Well, let's scroll
18 forward in time. See, let's just kind of
19 take a snapshot here. Let's go to 2005.
20 You see that?
21     A. 2005.
22     Q. Actually let's go to --
23 yeah, 2005 is good.
24     A. Okay.

Page 75

1     Q. You see the blue starting to
2 get from deep blue to lighter blue, we're
3 starting to see more orange or more brown
4 in the chart?
5         MS. VANNI: Object to form.
6         THE WITNESS: I see that.
7 BY MR. BUCHANAN:
8     Q. Okay. Let's move forward
9 now to I guess around the time -- when
10 did you say you joined the company?
11     A. 2012.
12     Q. 2012. Let's -- let's kind
13 of scroll forward. 2012. Wow, we got a
14 lot of brown and amber and red and
15 yellow.
16         A lot less blue, right, sir?
17         MS. VANNI: Object to form.
18         THE WITNESS: There's less
19     blue than there was in the first
20     chart.
21 BY MR. BUCHANAN:
22     Q. A lot more brown, and a lot
23 more red, right?
24         MS. VANNI: Object to form.

Page 76

1         THE WITNESS: I see that.
2 BY MR. BUCHANAN:
3     Q. Okay. And we're talking
4 about brown, we're talking about
5 age-adjusted death rates per 100,000
6 people greater than 30, right?
7     A. That's what it says.
8     Q. Talking about the deepest
9 blue, we are talking about less than two,
10 right?
11     A. That's what it says.
12     Q. Okay. So we got a lot of
13 bodies piling up in this country.
14         MS. VANNI: Object to form.
15 BY MR. BUCHANAN:
16     Q. Did you have that knowledge,
17 sir?
18         MS. VANNI: Objection.
19 BY MR. BUCHANAN:
20     Q. Due to opioids?
21         MS. VANNI: Objection.
22         THE WITNESS: As I stated
23     earlier, I -- I understand that
24     there is an opioid abuse epidemic

Page 77

1     in this country. And I understand
2     that that has gotten worse over
3     some time period.
4 BY MR. BUCHANAN:
5     Q. Okay.
6     A. As I stated earlier, we have
7 put enhanced controls in place over the
8 years to prevent the diversion and abuse
9 of our products.
10         I don't really know how to
11 interpret these charts relative to Endo's
12 products.
13         What I can tell you is what
14 I just stated.
15     Q. Right. Would it surprise
16 you, sir, that abuse and diversion was
17 increasing over the years for opioids?
18     A. I just --
19         MS. VANNI: Object to form.
20         THE WITNESS: -- stated that
21     I understood there was an opioid
22     abuse epidemic and it had been
23     getting worse over some time
24     period.

Page 78

BY MR. BUCHANAN:

Q. Fair enough.

Okay. So we can agree, sir, that abuse and diversion were getting worse, right?

MS. VANNI: Object to form.

THE WITNESS: I understand that there is an opioid abuse epidemic in this country and that it has gotten worse over some time period.

BY MR. BUCHANAN:

Q. We can agree that deaths in terms of the frequency of people dying has gotten worse, right?

MS. VANNI: Object to form.

THE WITNESS: I understand that death is an outcome, potential outcome of opioid abuse.

BY MR. BUCHANAN:

Q. And it's gotten worse?

MS. VANNI: Objection.

BY MR. BUCHANAN:

Q. Do we have to fuss that?

Page 79

I'm not asking for a specific number, sir.

But do you have a general understanding that in 2019, we are in a far worse place in terms of opioid abuse, diversion and death than we were in 1999?

MS. VANNI: Objection to form and beyond the scope.

THE WITNESS: I've already stated that I understand that there's an opioid epidemic abuse in this country and that it's gotten worse over some period of time.

BY MR. BUCHANAN:

Q. Okay. And so I guess as far out as this goes, is 2016. And this would be around the time, you assumed -- was this the year that you assumed responsibility for, I guess, DEA compliance that Endo reported into you?

A. I assumed responsibility for DEA compliance in early 2015.

Q. Okay. So you had

Page 80

responsibility for DEA compliance in 2016; is that right?

A. I did.

Q. And would that be for all of the Endo entities, Par, Qualitest, and Endo?

A. That would have been for Qualitest.

Q. Okay. So Qualitest Par at that --

A. And Par at some point during that time point.

Q. Whenever the transition --

A. Whenever the transaction was finalized.

Q. When did you assume responsibility for Endo's DEA compliance, Endo -- this gets a little confusing today. So let's just take a step back and make sure we have terminology clear.

Endo is the parent company; is that right?

A. Endo International is the parent company.

Page 81

Q. Okay. There's an operating company known as Endo, right?

A. Right.

Q. That line of business includes the company's branded portfolio; is that accurate?

A. That would be accurate.

Q. Okay. There's an operating company known as Par today?

A. Correct.

Q. Just owned by the Irish Endo entity, correct?

A. Correct.

Q. Par today owns what used to be Endo's generic business, as well as what used to be called Qualitest's business, correct?

MS. VANNI: Object to form. He's also not a corporate designee on corporate structure, corporate history.

BY MR. BUCHANAN:

Q. And I'm really not trying to do that, you know, for a legal purpose.

Page 82

1 I just want to make sure we're clear in
2 communicating today, because it could get
3 confusing.
4      A.   What I can tell you is Par
5 had a generics business. Endo had a
6 generics business that it operated as
7 Qualitest. Par and Qualitest were merged
8 into a single generics business that now
9 operates under the Par name.
10     Q.   Okay. So the current -- the
11 current generics business is all under
12 the Par name. Is it in the Par entity?
13          MS. VANNI: Object to form.
14          THE WITNESS: I'm not an
15     expert on our legal entity
16     structure. Our generics business
17     operates under the Par name.
18 BY MR. BUCHANAN:
19     Q.   Okay.
20     A.   That's what I can tell you.
21     Q.   We have named Par and we
22 have named Endo.
23     A.   Right.
24     Q.   I want to know when I talk

Page 83

1 about Par as the legal entity that we've
2 sued, that I'm talking about Par and all
3 of -- any of the Endo affiliates'
4 generics businesses. Would that be
5 accurate?
6          MS. VANNI: Object to form.
7 BY MR. BUCHANAN:
8      Q.   To the best of your
9 knowledge?
10     A.   To the best of my knowledge,
11 that's accurate.
12     Q.   Okay. The way you
13 understand the company is currently
14 operating and configured, the branded
15 business exists within the Endo
16 affiliate, subsidiary, and the generic
17 business operates under the Par
18 affiliate; is that accurate?
19     A.   That's accurate.
20     Q.   Thank you.
21          Okay. So where we are in
22 2016 here, back to our chart, sir, you
23 have assumed responsibility as of
24 2015/2016 for the Par and Qualitest DEA

Page 84

1 compliance responsibility. And I guess
2 I'd say it reported into you. You were
3 not the boots on the ground, so to speak,
4 on DEA compliance, right?
5          MS. VANNI: Object to form.
6          THE WITNESS: Correct.
7 BY MR. BUCHANAN:
8      Q.   Okay. But this is a
9 snapshot, at least of where we are, in
10 terms of the epidemic that you understand
11 we are currently in as of 2016. It's
12 722.18.
13          MS. VANNI: Object to form.
14 BY MR. BUCHANAN:
15     Q.   The number is in the top
16 right corner. Fair to say, sir, in this
17 chart, we're in a pretty different place
18 than we were in 1999?
19          MS. VANNI: Object to form.
20          THE WITNESS: I see
21     different colors than I saw in the
22     earlier charts.
23 BY MR. BUCHANAN:
24     Q.   Okay. And those different

Page 85

1 colors, indicating that -- well, per
2 100,000 people, a lot of people are
3 dying?
4          MS. VANNI: Object.
5 BY MR. BUCHANAN:
6      Q.   Right?
7          MS. VANNI: Object to form.
8          THE WITNESS: I see the
9     colors changing. I don't know the
10    origin of these charts.
11 BY MR. BUCHANAN:
12     Q.   As a person who had at least
13 the ability to dictate and direct and
14 fund DEA compliance within Qualitest and
15 Par, you were not aware, really, of the
16 details of the scope of the epidemic as
17 of 2016?
18          MS. VANNI: Object to form.
19          THE WITNESS: I stated
20    earlier that I understand that
21    this is an opioid abuse epidemic
22    in this country. I understand
23    that that has gotten worse over
24    some time period.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 And certainly that knowledge
2 and information would be taken
3 into consideration as we enhance
4 and develop our programs to
5 prevent diversion and abuse.
6 BY MR. BUCHANAN:
7 Q. Okay. But it's really not
8 news that opioids are addictive, right?
9 MS. VANNI: Object to form.
10 BY MR. BUCHANAN:
11 Q. Is that news to you?
12 A. I understand that opioids
13 can be addictive.
14 Q. And you knew that, sir,
15 before you went and worked for an opioid
16 manufacturer, didn't you?
17 MS. VANNI: Object to form.
18 THE WITNESS: I understand
19 that opioids can be addictive.
20 BY MR. BUCHANAN:
21 Q. Right. Because, I mean,
22 these drugs, whether derived directly
23 from poppies or the milk from poppies
24 that's dried out, or synthetically

Page 87

1 derived, they go back a long period of
2 time, right?
3 MS. VANNI: Object to form.
4 And beyond the scope of his
5 30(b)(6).
6 BY MR. BUCHANAN:
7 Q. Do you have that knowledge,
8 sir?
9 A. I don't understand the
10 complete history of opioids. But I do
11 understand that they've been around for a
12 number of years.
13 Q. Right. And we know poppies,
14 and you probably learned this in college,
15 were used by Egyptians thousands of years
16 ago and were known for their addictive
17 and abuse properties.
18 Did you know that?
19 MS. VANNI: Object to form.
20 THE WITNESS: I understand
21 that opioids can be addictive.
22 Opioids also serve a real purpose
23 to patients with chronic pain who
24 need these products.

Page 88

1 BY MR. BUCHANAN:
2 Q. And that's why, because
3 they're addictive, because they're prone
4 to abuse and have been forever, and you
5 keep this stuff in cages and vaults in
6 your warehouses, right?
7 MS. VANNI: Object to form.
8 THE WITNESS: We keep the
9 product in controlled areas based
10 on what the regulations state that
11 we need to do. There are
12 regulations to control these
13 products because, if not
14 controlled properly, they can be
15 diverted and abused.
16 BY MR. BUCHANAN:
17 Q. To answer my question, sir,
18 your oxycodone products, for example,
19 controlled substance, right? That's a
20 yes answer?
21 A. Yes.
22 Q. I knew it, but it won't show
23 up on the transcript if you don't speak.
24 A. Understood.

Page 89

1 Q. Okay. Schedule II?
2 A. Schedule II.
3 Q. Got to store it in a safe?
4 A. It has to be stored in a
5 vault or a safe per regulations.
6 Q. In a vault or a safe.
7 Why do you think that is,
8 sir?
9 MS. VANNI: Object to form.
10 Beyond the scope.
11 THE WITNESS: The
12 regulations require us to store
13 these products in vaults and safes
14 because they have the potential to
15 be diverted or abused.
16 BY MR. BUCHANAN:
17 Q. Right.
18 In the warehouse you've got
19 to store this stuff in a safe, correct?
20 MS. VANNI: Objection.
21 Asked and answered.
22 THE WITNESS: The product is
23 stored in a vault with a number of
24 controls around how it's handled,

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 how it's moved through the
2 facility, and how it's ultimately
3 manufactured and distributed.
4 BY MR. BUCHANAN:
5 Q. Right. When you move the
6 product through the facility, you got to
7 have two people moving it from Point A to
8 Point B, right?
9 A. We have a number of controls
10 in place to ensure that the product isn't
11 diverted as it moves through the
12 facility.
13 Q. Do you agree with me what I
14 just said, sir, that's one of them
15 though? You've got to have two people
16 watching it?
17 A. One of -- one of the
18 controls we have is to ensure that we
19 have multiple people managing the product
20 as it moves through the facility.
21 Q. Because this stuff is highly
22 prone to being diverted, correct?
23 MS. VANNI: Objection.
24 Asked and answered.

Page 91

1 THE WITNESS: These
2 products, Schedule II products,
3 can be diverted, have a high
4 propensity to be diverted.
5 Therefore, there are controls in
6 place required by the regulations
7 for manufacturers and distributors
8 to abide by.
9 BY MR. BUCHANAN:
10 Q. So whenever --
11 A. Those are the controls that
12 we implement. Those are the controls
13 that we follow.
14 Q. So -- in the warehouse, keep
15 it in a vault. Moving it to the
16 manufacturing line, the raw material to
17 make the pills, got to have two people
18 watching it.
19 On the line you've got to
20 have people watching each other on the
21 line so they don't slip it in their
22 gloves, put it in their pockets, or
23 otherwise try and I guess take, damaged
24 pills, finished pills, all concerns

Page 92

1 because of the abuse potential for these
2 drugs, in the warehouse, or in the
3 manufacturing plant, fair?
4 MS. VANNI: Object to form.
5 THE WITNESS: We treat these
6 products very uniquely versus
7 products that are noncontrolled.
8 And we have a whole set of
9 controls that apply to the
10 handling of Schedule II products
11 as they move through the facility,
12 so that we can prevent the abuse
13 and diversion of these products
14 and ensure that they get to the
15 patients who need them.
16 BY MR. BUCHANAN:
17 Q. You'd agree with me, sir,
18 that the concern that's exercised with
19 keeping it in a vault or in a safe or
20 making sure that your own employees are
21 not trying to slip it into the gloves or
22 take it out the door, it shouldn't stop
23 at the point in time when you receive an
24 order for the product, right?

Page 93

1 MS. VANNI: Object to form.
2 THE WITNESS: There -- there
3 are other regulations, controls,
4 that we follow that would more be
5 under the category of suspicious
6 order monitoring when it comes to
7 DEA compliance, to ensure that
8 orders are properly reviewed,
9 investigated before they are
10 distributed.
11 BY MR. BUCHANAN:
12 Q. Okay. And that's what I
13 wanted to understand.
14 So the concern that you have
15 and the care you have to take with
16 handling this product in the warehouse or
17 handling this product in manufacturing
18 with your own employees, people who you
19 trust and hire, has to be exercised in
20 investigating, in reviewing, every single
21 order you receive, because that concern
22 doesn't stop in the warehouse, right?
23 MS. VANNI: Object to form.
24 THE WITNESS: The control --

Page 94

1　the proper control of these
2　products extends throughout the
3　supply chain.
4　BY MR. BUCHANAN:
5　　Q.　Right.　So when the company
6　receives an order for one of its
7　controlled products, it has an obligation
8　to maintain effective controls against
9　diversion with regard to the orders it
10　receives, right?
11　　　MS. VANNI:　Object to form.
12　　　THE WITNESS:　We have a
13　responsibility under the
14　regulations to make sure that we
15　are reviewing orders, that we are
16　understanding any orders of
17　interest, we are investigating
18　those.　And if it comes to it, and
19　if we determine that the order is
20　suspicious, then not to ship that
21　order.
22　BY MR. BUCHANAN:
23　　Q.　Okay.　So we were looking at
24　the Endo orders just a moment ago, just

Page 95

1　to give us some context.　I believe it's
2　Exhibit 4.
3　　　Let's look at 1999.　You
4　know, shipped -- shipped hundreds of
5　millions of opioid products in 1999.
6　Every one of those was by an order.
7　　　And how many suspicious
8　orders did the company report to the DEA
9　in 1999 for Endo products, sir?
10　　　MS. VANNI:　Object to form.
11　The colloquy.
12　　　THE WITNESS:　I don't
13　believe we reported any suspicious
14　orders as an outcome of our
15　investigations.
16　BY MR. BUCHANAN:
17　　Q.　Okay.　So in 1999 the
18　company reported no suspicious orders to
19　the DEA for Endo's orders?
20　　A.　I don't believe we reported
21　any suspicious orders to the DEA in 1999
22　as a result of our investigations.
23　　Q.　Okay.　How about in 2000,
24　we've got, you know, hundreds of millions

Page 96

1　of pills again, 400 million plus.　I
2　guess that's also syrups, so dosage units
3　of syrups.
4　　　400-plus million pills and
5　dosage units all pursuant to orders.　And
6　how many suspicious orders did -- did
7　Endo report to the DEA for 2000?
8　　　MS. VANNI:　Object to form.
9　　　THE WITNESS:　I don't
10　believe we reported any suspicious
11　orders in 2000 as an outcome of
12　our investigations into anything
13　that was of interest.
14　BY MR. BUCHANAN:
15　　Q.　Okay.　How about 2001, it
16　looks like -- well, sales are growing.
17　We talked about that a moment ago.
18　500-plus million pills and dosage units
19　for Endo in 2001.
20　　　How many suspicious orders
21　got reported to the DEA that year?
22　　　MS. VANNI:　Object to the
23　colloquy.　You can answer.
24　　　THE WITNESS:　I don't

Page 97

1　believe we reported any suspicious
2　orders to DEA after the outcome of
3　our invest -- as an outcome of our
4　investigations into anything that
5　was of interest.
6　BY MR. BUCHANAN:
7　　Q.　Oh.　Okay.　So thousands and
8　thousands and thousands of orders, right?
9　　A.　We had orders.　I can't tell
10　you specifically how many orders we had.
11　But we had orders that represented these
12　quantities.
13　　Q.　Okay.　That -- that on an
14　annual basis would give every American an
15　opioid, right?
16　　　MS. VANNI:　Object to form.
17　　　THE WITNESS:　We got
18　order -- we received orders for
19　opioids from our customers who in
20　turn sold them to patients who
21　needed them.
22　BY MR. BUCHANAN:
23　　Q.　And not one suspicious order
24　was reported to the DEA in 2001?

Page 98

1  A.  We did not report any
2  suspicious orders to DEA after
3  investigating internally any orders that
4  we deemed as of interest.
5  Q.  Okay.  How about 2002?
6  Sales still on the move.  Growing along,
7  I guess we can pull out our -- our death
8  map that we looked at a moment ago.  We'd
9  see the deep blue going to lighter blue,
10  going to tan and yellow, and more people
11  dying.
12  How many suspicious orders
13  did you report to the DEA in 2002?
14  MS. VANNI:  Objection.
15  THE WITNESS:  I don't
16  believe we reported any orders,
17  suspicious orders to DEA as an
18  outcome of our internal
19  investigations into any orders of
20  interest.
21  BY MR. BUCHANAN:
22  Q.  Okay.  2003, sales still on
23  the move, right?  We are back on
24  Exhibit 4.

Page 99

1  800 million pills, opioids,
2  dosage units in 2003.  All pursuant to
3  orders the company received, right?
4  MS. VANNI:  Object to form.
5  THE WITNESS:  Yes.  We would
6  receive orders to represent those
7  quantities shipped.
8  BY MR. BUCHANAN:
9  Q.  Okay.  And how many of those
10  did the company identify as suspicious?
11  A.  I don't believe we reported
12  any suspicious orders to the DEA as an
13  outcome of our internal investigations
14  into any orders of interest.
15  Q.  Okay.  So you didn't report
16  any over this period of time as we just
17  looked at a five-year window.
18  How many did you not ship?
19  A.  I don't believe we
20  ultimately -- we ultimately shipped all
21  of these orders as an outcome of our
22  internal investigations into any orders
23  of interest.
24  Q.  Okay.  So you've got a drug

Page 100

1  that is -- a drug, I'm sorry, 15 or more
2  drugs that Endo is making, highly prone
3  to abuse and diversion over which, for as
4  long as you've been selling them, you've
5  got to keep them in vaults and cages and
6  under camera and under a watchful eye for
7  which you receive thousands of orders,
8  and which you've shipped as of this point
9  in time a few billion pills, right?
10  MS. VANNI:  Object to form.
11  BY MR. BUCHANAN:
12  Q.  Or dosage units?
13  MS. VANNI:  Same objection.
14  BY MR. BUCHANAN:
15  Q.  Would that be right?
16  A.  That would be correct.
17  Q.  Okay.  Hadn't identified a
18  single suspicious order in that five-year
19  period of time?
20  A.  As I stated, any orders that
21  were deemed of interest based on our
22  internal reviews under our suspicious
23  order monitoring system would have been
24  reviewed and investigated.  If we

Page 101

1  determined the order to not be
2  suspicious, we would have shipped it.
3  MS. VANNI:  David, we've
4  been going about an hour, whenever
5  we can take a break.
6  MR. BUCHANAN:  Yeah.  Let me
7  finish this.  Can I finish this
8  thread?
9  BY MR. BUCHANAN:
10  Q.  Are you okay?  It will be
11  under five minutes.
12  MS. VANNI:  We can finish
13  this thread.
14  THE WITNESS:  Okay.
15  BY MR. BUCHANAN:
16  Q.  So, sir, we can go forward
17  in time here, and I guess we can do it
18  year by year and maybe my tech can blow
19  out the bottom, but so we don't belabor
20  this too much.  Hundreds of millions of
21  pills and dosage units year after year
22  shipped by Endo for its opioid products,
23  fair?
24  MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    THE WITNESS: Are you asking
2 me to verify the number here?
3 BY MR. BUCHANAN:
4    Q.   That's what I'm saying.  If
5 you look forward in time, sir, for the
6 remaining 2004 to the end?
7    A.   Right.
8    Q.   Okay.  And we go, you know,
9 eight-plus billion pills and dosage units
10 for the Endo entity?
11    A.   Over an 18-year period, yes,
12 that's what it says here.
13    Q.   Yeah, and in fact we'll talk
14 about it a little later that, for some of
15 the later years, some of these products
16 got moved into the Qualitest and Par
17 affiliates, right?
18    A.   They did.
19    Q.   Okay.  Like Endocet and
20 Percocet.  And there are some big numbers
21 on here for those products.  In the
22 earlier period of time they got pushed
23 into the ledger for Qualitest, at a later
24 point in time, right?

Page 103

1    MS. VANNI:  Object to form.
2    THE WITNESS:  Some of these
3 generics were moved into the
4 generic operating unit.
5 BY MR. BUCHANAN:
6    Q.   Okay.  Still made by, if you
7 will, the Endo family of companies, but
8 just for the corporate organization, the
9 branded ultimately got shipped -- excuse
10 me -- organized into the Endo subsidiary,
11 and the generic ultimately got organized
12 into the Par/Qualitest subsidiary, right?
13    MS. VANNI:  Object to form
14 beyond the scope of 30(b)(6).
15    THE WITNESS:  Some of these
16 products were sold by different
17 entities over the time period.
18 BY MR. BUCHANAN:
19    Q.   Okay.  So where we land
20 though, with regard to Endo the entity,
21 that's reflected, the sales data that's
22 been provided to us, is some eight
23 billion dosage units and pills over the
24 course of many years, fair?

Page 104

1    A.   Over the course of about
2 18 years.
3    Q.   With thousands and thousands
4 and thousands of orders, right?
5    MS. VANNI:  Object to form.
6    THE WITNESS:  I don't know
7 exactly how many orders.  There
8 were orders that reflect these
9 quantities.
10 BY MR. BUCHANAN:
11    Q.   Please tell the jury how
12 many of those orders the company didn't
13 ship.
14    MS. VANNI:  Object to form.
15    THE WITNESS:  We shipped all
16 of those orders after thorough
17 review within our SOM system, and
18 any investigations into orders of
19 interest to make a determination
20 if the order was suspicious or
21 not.
22 BY MR. BUCHANAN:
23    Q.   Every single order Endo
24 received, it shipped; is that correct,

Page 105

1 sir?
2    MS. VANNI:  Object to form.
3    THE WITNESS:  We shipped
4 these orders after thorough review
5 under our suspicious order
6 monitoring system, under our
7 distributor's suspicious order
8 monitoring system, and the orders
9 were deemed to not be suspicious
10 and they were shipped.
11    MR. BUCHANAN:  Move to
12 strike the nonresponsive portion.
13 BY MR. BUCHANAN:
14    Q.   My question, sir, is, every
15 single order that Endo received for its
16 opioid products, it shipped, correct?
17    MS. VANNI:  Object to form.
18    THE WITNESS:  The orders
19 you're referencing --
20 BY MR. BUCHANAN:
21    Q.   Yes or no?
22    A.   The orders you're
23 referencing shipped after thorough review
24 and investigation into any orders of

Page 106

1  issues through our suspicious order
2  monitoring system. That's my answer.
3      Q.   Not a single one was ever
4  reported to DEA?
5      A.   If an order had been
6  determined to be suspicious, it would
7  have been reported to DEA.
8      Q.   As a numbers matter, sir,
9  just stay with my question.
10         Did the company ever report
11  any order that Endo received for any of
12  its opioid products over the period of
13  time, 1999 to present to the DEA as a
14  suspicious order?
15         MS. VANNI: Object to form.
16         THE WITNESS: If an order
17      was deemed suspicious --
18  BY MR. BUCHANAN:
19      Q.   Did the company ever do it?
20      A.   If the order was -- if an
21  order was deemed suspicious, it would
22  have been reported to the DEA.
23      Q.   It doesn't answer my
24  question. I just want the fact. Not an

Page 107

1  if. Did the company ever report any
2  order that Endo received for any of its
3  opioid products from 1999 to 2019 to the
4  DEA as suspicious?
5         MS. VANNI: Object to form.
6  BY MR. BUCHANAN:
7      Q.   Did it ever do that?
8      A.   We --
9      Q.   You've got to answer it yes
10  or no, sir.
11      A.   We did not have any orders
12  that we deemed suspicious during that
13  time period.
14      Q.   So the answer to my
15  question --
16      A.   So the orders were
17  subsequently shipped.
18      Q.   My question was, did you
19  ever report any order that Endo received
20  for any controlled substance over the
21  last 20 years to the DEA ever?
22         MS. VANNI: Objection.
23      Asked and answered.
24         THE WITNESS: I think I

Page 108

1  answered your question.
2  BY MR. BUCHANAN:
3      Q.   You haven't. You haven't.
4  You're answering something that you'd
5  like me to ask you. But I'm not asking
6  you that.
7         MS. VANNI: Objection to the
8      colloquy.
9  BY MR. BUCHANAN:
10      Q.   My question to you is, did
11  Endo ever report any order to the DEA as
12  a suspicious order for any Endo product
13  from 1999 to present?
14      A.   And my answer, is that we
15  determined through our SOMs system that
16  the orders you're referring to were not
17  suspicious and, therefore, we did not
18  report any suspicious orders to the DEA
19  during that time period.
20      Q.   So the answer to my
21  question, sir, is you did not report any
22  orders to the DEA during that time
23  period, correct?
24         MS. VANNI: Objection.

Page 109

1      Asked and answered. Misstates his
2      testimony. You just don't like
3      his answer.
4         THE WITNESS: That's what I
5      just stated.
6         MR. BUCHANAN: Thank you.
7      We can take a break.
8         THE VIDEOGRAPHER: Off the
9      record at 10:14 a.m.
10         (Short break.)
11         THE VIDEOGRAPHER: We are
12      back on the record at 10:30 a.m.
13  BY MR. BUCHANAN:
14      Q.   Mr. Macrides, we kind of got
15  into it pretty early. I just wanted to
16  circle back with your 30(b)(6) notice.
17         You obviously did some work
18  to prepare for today, fair?
19      A.   Fair.
20      Q.   Okay. Who did you talk to
21  other than counsel?
22      A.   I spoke with Lisa Walker who
23  currently works within Endo.
24      Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    A.   I spoke with Angela Feniger
2  who has some history with DEA compliance
3  on the Par side of the business.
4    Q.   Could you clarify on the Par
5  side?  Just because of the merger I get
6  confused.
7    A.   So -- so she would -- she
8  was essentially the head of DEA
9  compliance for Par prior to its
10 acquisition by Endo.  And then she
11 continued in that capacity for some
12 period of time after the acquisition.
13   Q.   Is she still with the
14 company?
15   A.   She's still with the
16 company.  She actually works in the
17 quality organization now.
18   Q.   So she's not in DEA
19 compliance currently?
20   A.   Not anymore.
21   Q.   What was her title when she
22 was at Par?
23   A.   I think it was -- I don't
24 remember exactly.  I think she had

Page 111

1  quality compliance and DEA compliance in
2  her title.
3    Q.   Okay.  So she had a -- she
4  wore multiple hats?
5    A.   She wore multiple hats.
6    Q.   Okay.  Anyone else you spoke
7  with?
8    A.   I spoke with Mike
9  Meggiolaro, who is our current head of
10 DEA compliance.
11   Q.   And how long has he been in
12 that capacity?
13   A.   He has been in that capacity
14 since June of 2018.
15   Q.   Gotcha.  Anyone else?
16   A.   He has a person, Mary-Lou
17 Schoonover, who is currently our manager
18 of suspicious order monitoring.
19   Q.   So if I was looking on an
20 org chart today, I'd see Mike Meggiolaro
21 as the head of DEA compliance.  And I'd
22 see Mary-Lou Schoonover underneath of him
23 as somebody who does SOMs or suspicious
24 order monitoring?

Page 112

1    A.   Correct.
2    Q.   Gotcha.  Anyone else you
3  spoke with?
4    A.   I think that's it.  Well, I
5  spoke with -- with counsel.
6    Q.   Okay.  And let -- let's talk
7  about the time you spent with each of
8  these four individuals.  Was that time
9  together with counsel or without counsel?
10   A.   With counsel.
11   Q.   Okay.  So how many meetings
12 did you have with counsel?
13   A.   I'm going to say five or
14 six.
15   Q.   Okay.  Beginning when?
16   A.   In the January time frame.
17 I think this thing has been delayed a few
18 times.
19   Q.   I thought at your request,
20 but --
21   A.   I don't know.  I'm just
22 telling you what I know.
23   Q.   I would have rather have
24 done it two months ago, sir.

Page 113

1        All right.  So you said four
2  or five times.  Roughly how long was each
3  meeting?
4    A.   The meetings probably ranged
5  in time frame anywheres from four to six
6  or seven hours.
7    Q.   Okay.  So apart from your
8  time in these meetings, did you have
9  teleconferences or kind of review
10 sessions where you'd look at stuff on the
11 screen?
12   A.   No.
13   Q.   Okay.  Did you have any
14 teleconferences?
15   A.   We had a few
16 teleconferences, very brief.
17   Q.   Okay.  Most of your prep
18 work with counsel was in meetings,
19 those --
20   A.   In meetings.
21   Q.   Okay.  Where did you do
22 that, over in Ireland?
23   A.   I've been spending --
24        MS. VANNI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  THE WITNESS: I've been
2  spending more time in the U.S. in
3  the first quarter. So we did it
4  over here in the U.S.
5  BY MR. BUCHANAN:
6  Q.  Okay. Okay. So you're in
7  Malvern now?
8  A.  My job requires me to be in
9  a lot of places.
10  Q.  Okay. At least with regard
11  to the first quarter of 2019, have you
12  been more in the Pennsylvania area?
13  MS. VANNI: Object to form.
14  THE WITNESS: I've been in
15  Pennsylvania. I've been in New
16  York. I've been in various
17  places.
18  BY MR. BUCHANAN:
19  Q.  So we've got the --
20  the four to five meetings. That sounds
21  right to you, four to five meetings, or
22  more?
23  A.  I said five to six I
24  believe.

Page 115

1  Q.  Five to six meetings, okay.
2  I apologize.
3  So that still -- as we're
4  talking through this and you're thinking
5  about the people you've met with and over
6  the time period, is that --
7  A.  That sounds about right.
8  Q.  Okay. And somewhere between
9  a half a day and a full day each of these
10  meetings?
11  A.  Yes.
12  MS. VANNI: Object to form.
13  BY MR. BUCHANAN:
14  Q.  Okay. Apart from your time
15  with counsel, you know, in the meetings,
16  were you reviewing things that you were
17  provided or that you accessed on your
18  own?
19  A.  I would say yes, I reviewed
20  certain documents on my own.
21  Q.  Okay. And did those refresh
22  your recollection, sir, or at least
23  assist you in preparing for your
24  testimony today?

Page 116

1  MS. VANNI: Object to form.
2  THE WITNESS: I would
3  categorize those documents as
4  helping prepare me for today.
5  BY MR. BUCHANAN:
6  Q.  In some respects, you were
7  probably learning things, right?
8  MS. VANNI: Object to form.
9  THE WITNESS: In my 30(b)(6)
10  capacity I think I learned some
11  things. I think that's a fair
12  statement.
13  BY MR. BUCHANAN:
14  Q.  Right. And so what did you
15  look at to learn the things you learned?
16  MS. VANNI: Object to form.
17  He's not going to tell you
18  specific documents that he
19  reviewed. That's privileged.
20  MR. BUCHANAN: I don't think
21  it is. It's the foundation for a
22  30(b)(6) testimony.
23  MS. VANNI: Okay. Well, we
24  can agree to disagree. You can

Page 117

1  ask him about categories of
2  documents. He's already told you
3  amply how he's prepared for today.
4  We'll represent to you that
5  he has not seen anything that
6  hasn't already been produced in
7  this litigation.
8  BY MR. BUCHANAN:
9  Q.  Okay. Did you review
10  testimony, sir?
11  A.  I read some depositions.
12  Q.  Okay. Did you review the
13  deposition of Mr. Brantley?
14  A.  I did.
15  Q.  Did you review the
16  deposition of Ms. Walker?
17  A.  I did.
18  Q.  Did you review the testimony
19  of Ms. Hernandez Norton?
20  A.  I did.
21  Q.  Any other witnesses that you
22  reviewed?
23  A.  No.
24  Q.  Did you review the videos of

Page 118

1 those witnesses' testimony?
2     A.   I viewed brief video clips
3 of Lisa Walker's testimony and of Tracey
4 Norton Hernandez's testimony.
5     Q.   Okay.  And did they help
6 acquaint you with particular issues?
7     A.   I would say they clarified
8 certain things for me.
9     Q.   Is their testimony the
10 foundation of testimony you're going to
11 provide to us today?
12         MS. VANNI:  Object to form.
13         THE WITNESS:  I would say
14     no.
15 BY MR. BUCHANAN:
16     Q.   Did you review the exhibits
17 to their depositions, any of them?
18         MS. VANNI:  Object to form.
19         THE WITNESS:  I may have
20     viewed some of them.  Mostly I
21     read the text.
22 BY MR. BUCHANAN:
23     Q.   Okay.  Did you talk to
24 anyone else within Endo, Qualitest, Par,

Page 119

1 current employees or former employees as
2 part of your preparation?
3     A.   I did not.
4     Q.   Okay.  Nobody else in the
5 management team, executive team, of the
6 companies?
7     A.   No.
8     Q.   No third parties?
9     A.   No.
10     Q.   Okay.  I wanted to circle
11 back to something that we talked about
12 before in terms of your awareness or not
13 of Endo's products being diverted.
14         MR. BUCHANAN:  Could we pull
15     up 550 and provide a copy to
16     counsel.
17         MS. VANNI:  Note my
18     objection to the colloquy.
19         MR. BUCHANAN:  I'm sorry,
20     what did I say?  It seems pretty
21     innocuous to me, but...
22         (Document marked for
23     identification as Exhibit
24     Endo-Macrides-8.)

Page 120

1 BY MR. BUCHANAN:
2     Q.   I'm passing you, sir, what
3 we're marking as Exhibit 8 to your
4 deposition.
5         MS. VANNI:  Thank you.
6 BY MR. BUCHANAN:
7     Q.   Sir, you'll recall before
8 the break we were talking about your
9 awareness or not of Endo's products being
10 diverted.  Do you recall that?
11     A.   I recall that.
12     Q.   Okay.  Showing you what is
13 an e-mail from Mr. Barto to Ms. Connell
14 from 2003, subject revised DEA meeting
15 minutes.  Do you see that?
16     A.   I see it.
17     Q.   Okay.  Who's Mr. Barto?
18     A.   I believe he was a former
19 employee of Endo.
20     Q.   You recognize him as being
21 in regulatory affairs for Endo?
22     A.   It says here that he worked
23 in regulatory affairs.
24     Q.   Okay.  Ms. Connell, you

Page 121

1 recognize her as being on the supply
2 chain side?
3     A.   I do.
4     Q.   Okay.  In connection with
5 your preparation, sir, were you aware
6 that the company sat down with the DEA in
7 2003 to discuss abuse and diversion
8 measures with regard to Endo's products?
9         MS. VANNI:  Object to form.
10         THE WITNESS:  In 2003?
11 BY MR. BUCHANAN:
12     Q.   Mm-hmm.
13     A.   I was aware that Endo had
14 discussions with DEA during the time
15 period that we are talking about.
16     Q.   Okay.  I'll pass you, sir,
17 Exhibit 9 to your deposition.
18         (Document marked for
19     identification as Exhibit
20     Endo-Macrides-9.)
21 BY MR. BUCHANAN:
22     Q.   Is that a yes answer, that
23 you're aware that the company had
24 discussed abuse and diversion of Endo's

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  product with the DEA and FDA as far back
2  as 2003?
3      A.   I'm aware of that, yes.
4      Q.   Okay.  And we looked at the
5  sales chart that covered that period that
6  you'll recall that went all the way back
7  to 1999 that the company was making
8  controlled substances, correct?
9      A.   Correct.
10     Q.   Okay.  So one of the
11 company's products was Percocet, right?
12     A.   Percocet.  Yes.
13         MR. BUCHANAN:  Can we pull
14     up that sales chart real quick and
15     then take a look at it to see what
16     the company was doing with
17     Percocet in the early 2000s.  It's
18     E -- excuse me for the video
19     record, it's E-1811.  It's
20     Exhibit 4 to the deposition.  Pull
21     up the product list.
22 BY MR. BUCHANAN:
23     Q.   I understand, sir, you
24 weren't at the company, but many of these

Page 123

1  brands are brands that you're familiar
2  with, right?
3      A.   I'm familiar with these
4  brands.
5      Q.   Endocet is just Percocet in
6  a different name, right?
7         MS. VANNI:  Object to form.
8         THE WITNESS:  Endocet is a
9     generic version of Percocet.
10 BY MR. BUCHANAN:
11     Q.   Right.  Percocet is an
12 oxycodone product, right?
13     A.   Correct.
14     Q.   Oxycodone is the active
15 pharmaceutical ingredient in OxyContin,
16 correct?
17         MS. VANNI:  Object to form.
18         THE WITNESS:  As I
19     understand it, yes.
20 BY MR. BUCHANAN:
21     Q.   Okay.  So we've got
22 Percocet, which has oxycodone in it.
23 We've got oxycodone ER, oxycodone/APAP.
24 Do you recognize oxycodone/APAP, sir, as

Page 124

1  another formulation of Percocet?
2         MS. VANNI:  Object to form.
3         THE WITNESS:
4     Oxycodone/APAP, I do.  It's a
5     generic version.
6  BY MR. BUCHANAN:
7      Q.   Generic version.  The active
8  pharmaceutical ingredient in Percocet and
9  Endocet is oxycodone, correct?
10     A.   That's correct.
11     Q.   One of them.
12     A.   That's correct.
13     Q.   And APAP is acetaminophen;
14 is that right?
15     A.   APAP is acetaminophen.
16     Q.   So it's essentially
17 oxycodone combined with Tylenol, right?
18         MS. VANNI:  Object to form.
19         THE WITNESS:  Oxycodone and
20     APAP.
21 BY MR. BUCHANAN:
22     Q.   APAP is Tylenol?
23     A.   Acetaminophen.
24     Q.   And acetaminophen is

Page 125

1  Tylenol?
2      A.   The brand name is Tylenol.
3      Q.   Fair enough.  Thanks.  Just
4  want to make sure we're communicating.
5         The brand name of
6  OxyContin -- excuse me.  The brand name
7  of oxycodone or one formulation of
8  oxycodone is OxyContin, right?
9         MS. VANNI:  Objection.
10         THE WITNESS:  As I
11     understand it, yes.
12 BY MR. BUCHANAN:
13     Q.   And the brand name of APAP
14 or acetaminophen is Tylenol, right?
15     A.   Right.
16     Q.   So Percocet is a combination
17 of oxycodone and acetaminophen, or
18 Tylenol, right?
19         MS. VANNI:  Object to form.
20         THE WITNESS:  As I
21     understand it.
22 BY MR. BUCHANAN:
23     Q.   So when we look here on this
24 chart, we see Percocet, Endocet,

Page 126

1 oxycodone/APAP. All three of those are
2 essentially the same pharmaceutical
3 combination, they just get marketed in
4 different ways, right?
5 MS. VANNI: Objection.
6 Beyond the scope.
7 THE WITNESS: Some are
8 branded and some are generic.
9 BY MR. BUCHANAN:
10 Q. Fair. I mean, I wasn't
11 trying to be tricky with that. I just
12 wanted to -- the company, for whatever
13 its business reasons over time, has used
14 different trade names or branded names
15 for the same pharmaceutical combination,
16 true?
17 MS. VANNI: Object to form.
18 THE WITNESS: The branded
19 name is Percocet. And then there
20 are generics that go by different
21 names.
22 BY MR. BUCHANAN:
23 Q. Okay. All right, good. So
24 Percocet in abuse and diversion was a big

Page 127

1 deal into the early 2000s; isn't that
2 right?
3 MS. VANNI: Objection.
4 THE WITNESS: I don't have
5 specific knowledge on Percocet
6 abuse because --
7 BY MR. BUCHANAN:
8 Q. Sorry.
9 A. Well, as I stated earlier,
10 if our products aren't properly
11 controlled, if they get out of the closed
12 system, then they have -- they can be
13 abused and diverted.
14 Q. Okay.
15 MR. BUCHANAN: Can we pull
16 up the chart for the first --
17 let's just say through 2003,
18 please.
19 There you go.
20 BY MR. BUCHANAN:
21 Q. All right. So we can see
22 that in fact Percocet, Endocet, and
23 oxycodone/APAP -- let's get the Percocet
24 up there. Those are big movers for the

Page 128

1 company in the early -- late '90s, early
2 2000s, right?
3 MS. VANNI: Object to form.
4 THE WITNESS: Can you
5 clarify what you mean by "big
6 mover"?
7 BY MR. BUCHANAN:
8 Q. I guess, for simplicity,
9 two-thirds of your sales?
10 A. We were shipping Percocet
11 and Endocet based on orders from our
12 customers based on patient demand.
13 Q. I understand that, sir. But
14 looking at the chart so we have some
15 rough sense of what the business
16 represented, about two-thirds of sales,
17 at least in terms of pills, was Percocet
18 or Percocet-like formulations, correct,
19 sir?
20 MS. VANNI: Object to form.
21 THE WITNESS: Yes, based
22 on -- if we're looking at 1999, a
23 majority of the tablets shipped
24 were Percocet or Endocet.

Page 129

1 BY MR. BUCHANAN:
2 Q. Right. And roughly, what is
3 that, 260 million pills, Percocets,
4 versus a total of 360 or so?
5 A. Right.
6 Q. Okay. And excuse my
7 rounding. I'm just trying to make it
8 faster and simpler for both of us.
9 All right. We go forward in
10 2000. And you're, you know, again, at
11 roughly 340 million of 450 million pills
12 are the Percocet and Endocet drugs,
13 right?
14 MS. VANNI: Object to form.
15 THE WITNESS: That's what it
16 says.
17 BY MR. BUCHANAN:
18 Q. Percocet was Endo's brand?
19 A. Percocet was a branded
20 product or is a branded product.
21 Q. But the brand Percocet, was
22 that Endo's brand name?
23 A. It was.
24 Q. They owned it?

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  MS. VANNI: Object to form.
2  THE WITNESS: Correct.
3  BY MR. BUCHANAN:
4  Q. So when the jury or consumer
5  hears Percocet, they should think of
6  Endo?
7  MS. VANNI: Object to form.
8  BY MR. BUCHANAN:
9  Q. Right?
10  A. Percocet is the brand.
11  Q. That's the name you marketed
12  it under, right?
13  A. That's the name that Endo
14  marketed the product under, Percocet.
15  Q. And if we looked at Percocet
16  pills shipped by Endo, we'd see a little
17  R with a circle around it, right?
18  It was your registered trade
19  name for it, correct?
20  A. It was.
21  Q. You had the exclusive right
22  to use that name, right?
23  MS. VANNI: Object to form.
24  Beyond the scope.

Page 131

1  THE WITNESS: From a
2  regulatory perspective, yes.
3  BY MR. BUCHANAN:
4  Q. Right. So when the jury
5  hears Percocet it can think Endo, right?
6  MS. VANNI: Objection.
7  BY MR. BUCHANAN:
8  Q. It has your name?
9  MS. VANNI: Objection.
10  THE WITNESS: Percocet was
11  our branded product. I will say
12  though, that as a strip that you
13  put on a cut, it's called a
14  Band-Aid, there is a branded
15  Band-Aid. And there are a lot of
16  other kinds of band-aids.
17  There is a branded Percocet
18  product and there are a lot of
19  generic Percocet products. Some
20  distributed by Endo, some
21  distributed not by Endo.
22  So there are a number of
23  products, generic products, that
24  get referred to as Percocet, that

Page 132

1  may or may not be the branded
2  Percocet.
3  BY MR. BUCHANAN:
4  Q. Fair point, sir.
5  And we see, in fact, you
6  sold a generic version of your own
7  branded product, right?
8  A. We did.
9  Q. Right. Well, we can't
10  dispute that -- or you don't dispute, do
11  you, sir, that you sold a lot of
12  Percocet?
13  MS. VANNI: Object to form.
14  BY MR. BUCHANAN:
15  Q. And its generic equivalence?
16  MS. VANNI: Object to form.
17  THE WITNESS: We sold
18  Percocet. I'm not disputing that.
19  BY MR. BUCHANAN:
20  Q. Okay. And as we see through
21  the years, certainly the early years
22  here, sir, Percocet is a big part of your
23  sales portfolio, right?
24  MS. VANNI: Object to form.

Page 133

1  THE WITNESS: We sold the
2  quantities of Percocet that are
3  listed on this sheet.
4  BY MR. BUCHANAN:
5  Q. Okay. So by 2003, wow, you
6  have taken, with your Percocet and
7  Endocet brand, you've gone from, what,
8  about 260 million pills of Percocet and
9  Endocet in 1999, to, what is that, about
10  640 million pills, of Percocet and
11  Endocet for one year in 2003?
12  A. About that.
13  Q. Just about doubled, five
14  years.
15  A. Right. Reflecting the
16  demand for the product, for the patients
17  that need it.
18  Q. A lot of growth, agreed?
19  MS. VANNI: Object to form.
20  BY MR. BUCHANAN:
21  Q. Doubled sales in five years
22  of Percocets?
23  A. There's growth from 1999 to
24  2003 reflecting the increased demand for

Page 134

1  the products for the patients that need
2  them.
3      MR. BUCHANAN: Let's --
4  let's have 548, please.
5      THE WITNESS: 548?
6  BY MR. BUCHANAN:
7      Q. I called it 548. We have a
8  system that'll just help our tech to pull
9  up the documents. That's in the top
10  right corner.
11      A. Oh, I see. I see.
12      Q. From time to time I will
13  refer to the point numbers for your
14  convenience and mine.
15      MR. BUCHANAN: But we've
16  marked it as what exhibit number?
17  BY MR. BUCHANAN:
18      Q. Okay. Passing you
19  Exhibit 9, sir. It's an action plan to
20  prevent diversion.
21      Do you see that?
22      A. I do.
23      Q. Okay. Sue Tolen, do you
24  remember her?

Page 135

1      A. No.
2      Q. She preceded you?
3      A. I don't know Sue Tolen.
4      Q. Didn't speak with her in
5  your preparation for today?
6      A. No. No, I have not.
7      Q. It's a -- it's an alert from
8  the DEA, do you see that?
9      Drugs and chemicals of
10  concern. It says, "Oxycodone." And it
11  says, "Action plan to prevent the
12  diversion and abuse of OxyContin."
13      Do you see that?
14      A. I see that.
15      Q. Okay. I'll direct you to
16  548.3. To orient us, this is an e-mail
17  exchange from 7/14/2003. We are now on
18  .3 at the bottom, please.
19      MR. BUCHANAN: Can you blow
20  out that paragraph.
21  BY MR. BUCHANAN:
22      Q. It reads: "Oxycodone has
23  been marketed in combination products
24  with aspirin and acetaminophen, Percodan

Page 136

1  and Percocet for many years."
2      What's the next sentence
3  say, sir?
4      A. It says, "Diversion and
5  abuse of these products continue."
6      Q. Let's pause. Okay. Does
7  that help you understand, sir, in the
8  context of your earlier testimony that
9  really fairly early on Endo's products
10  were a subject of abuse and diversion?
11      MS. VANNI: Objection.
12      THE WITNESS: What I stated
13      earlier was that if our products
14      aren't properly controlled through
15      the regulations and the controls
16      we put in place to prevent abuse
17      and diversion, then they could be
18      abused and diverted.
19  BY MR. BUCHANAN:
20      Q. And what this says, sir, is
21  that diversion and abuse of these
22  products, referencing Percodan and
23  Percocet in the prior sentence,
24  continues.

Page 137

1      Do you see that, sir?
2      MS. VANNI: Object to form.
3      THE WITNESS: I see what it
4      says here.
5  BY MR. BUCHANAN:
6      Q. And you've told us, sir,
7  Percocet was your brand name. You see
8  the little R there, right?
9      A. I see that R.
10      Q. That's Endo's product, with
11  the R.
12      How about Percodan, was that
13  also your brand name, sir?
14      A. Yeah, I believe we sold
15  Percodan for some period of time, yes.
16      MR. BUCHANAN: Can we go
17      back to Exhibit 4 for a moment.
18  BY MR. BUCHANAN:
19      Q. Percodan is the combination
20  of oxycodone and aspirin, right?
21      MS. VANNI: Object to form.
22      THE WITNESS: Yes, yes.
23      MR. BUCHANAN: Can you
24      highlight the Percodan there?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  Okay.
2  And I think the -- maybe you
3  could blow it out so we can see
4  the -- the actual sales up through
5  2003.
6  Thank you. Good.
7  BY MR. BUCHANAN:
8  Q. All right. So Percodan is a
9  good product for you. Do you see that?
10  MS. VANNI: Object to form.
11  THE WITNESS: I see that we
12  sold Percodan.
13  BY MR. BUCHANAN:
14  Q. Millions and millions and
15  millions of Percodan as well, right?
16  MS. VANNI: Objection.
17  THE WITNESS: I see we sold
18  42 million Percodan tablets over
19  18 years.
20  BY MR. BUCHANAN:
21  Q. Okay. How about over this
22  period of time, because it looks like --
23  and I guess this is just the nongeneric
24  formulation, right?

Page 139

1  Because you made a generic
2  formulation of Percodan, correct?
3  A. We did.
4  Q. Okay. You made Endodan. So
5  let's talk about that one.
6  MR. BUCHANAN: Can you
7  highlight that line as well?
8  Okay.
9  BY MR. BUCHANAN:
10  Q. So we see for Endodan over
11  that four-year period of time, you sold
12  85 million tablets of Endodan, right?
13  A. About that.
14  Q. Okay. It looks like another
15  30, 35 million of Percodan, right?
16  A. About that.
17  Q. It's over a hundred million
18  Percodan products, right, oxycodone and
19  aspirin combined, right?
20  A. That's what it says here.
21  Q. Okay. And just satisfy me,
22  sir, that both the Percocet products
23  which you sold in the quantities we've
24  talked about, and the Percodan products

Page 140

1  that you sold and we've talked about,
2  were in fact highlighted by the DEA as
3  products for which diversion and abuse
4  continued as of 2003?
5  MS. VANNI: Object to form.
6  BY MR. BUCHANAN:
7  Q. Can you confirm that's what
8  the DEA reported?
9  A. What it says here is,
10  "Oxycodone has been marketed in
11  combination with products with aspirin
12  and acetaminophen, Percodan and Percocet,
13  for many years. Diversion and abuse of
14  these products continue."
15  Q. Thank you.
16  A. That's what it says here.
17  Q. Okay. So by 2003,
18  certainly, we have this DEA release in
19  the company's files.
20  And you don't dispute that
21  the company was aware as of that point in
22  time that diversion and abuse were
23  continuing with Percocet and Percodan as
24  of that point in time, do you, sir?

Page 141

1  MS. VANNI: Object to form.
2  THE WITNESS: As I stated
3  earlier, if these products aren't
4  controlled properly, they can be
5  abused and diverted. I also
6  stated that branded products like
7  Percocet, Percodan, and many times
8  the generic is confused with the
9  brand or people refer to the
10  branded product -- to the generic
11  product as the branded product.
12  BY MR. BUCHANAN:
13  Q. Are you disputing the DEA's
14  statement, sir, that diversion and abuse
15  continued with regard to Percodan and
16  Percocet as of 2003?
17  MS. VANNI: Object to form.
18  THE WITNESS: I'm not
19  debating what it says in front of
20  me.
21  BY MR. BUCHANAN:
22  Q. Okay. And continue means
23  it's happened before and it's still
24  happening, fair?

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    MS. VANNI:  Object to form.
2    THE WITNESS:  Abuse and
3  diversion can happen if these
4  products aren't properly
5  controlled.  Misuse of the
6  products can also occur with
7  people who have a valid
8  prescription for the product.  I'm
9  not disputing that.
10 BY MR. BUCHANAN:
11   Q.   I'm not asking you in a
12 general sense.  I'm asking to make sure
13 we understand each other with regard to
14 what the word "continue" means.
15   Continue means is it was
16 happening and is happening; is that fair?
17   MS. VANNI:  Object to form.
18   THE WITNESS:  That's what
19  DEA is saying here.
20 BY MR. BUCHANAN:
21   Q.   Abuse and diversion of
22 Percodan and Percocet has happened and
23 it's still happening, right?
24   MS. VANNI:  Object to form.

Page 143

1    THE WITNESS:  That's what it
2  says here.
3  BY MR. BUCHANAN:
4    Q.   Okay.  And that's something
5  that Endo was certainly aware of as of
6  2003?
7    MS. VANNI:  Object to form.
8    THE WITNESS:  Endo had this
9  communication from DEA in 2003.
10 BY MR. BUCHANAN:
11   Q.   Thank you.
12   MR. BUCHANAN:  You can take
13  that down.
14 BY MR. BUCHANAN:
15   Q.   I don't know an easy way to
16 kind of talk about Par versus Qualitest
17 versus Endo, because their timelines are
18 different.  So I'm going to try to do
19 them separately to keep the record clear.
20 So I'm going to announce to you that I'm
21 going to be focusing on the Par period of
22 time.  Okay?  And the pre-merger into the
23 Endo entity's period of time, fair?
24   A.   Fair.

Page 144

1    Q.   So to orient you from a time
2  frame perspective, it'll be the time
3  period, I believe, prior to 2015, 2016,
4  and Par's activities, conduct, drugs,
5  things like that, okay?
6    Passing you, sir, what we're
7  marking as Exhibit 5, filling in some
8  gaps from earlier.
9    Par is a company that, like
10 Endo, has made opioids over the years,
11 correct, sir?
12   A.   Correct.
13   Q.   This is, in fact, a chart of
14 the opioid-containing products that Par
15 has identified to us over the years.
16   The way it's been produced
17 to us, I'll represent to you, doesn't
18 draw a distinction between the pre-merger
19 entity and the post-merger entity.  So at
20 some point in time, I'm assuming, as of
21 2016 to 2018, sales for Qualitest are
22 reflected in there, but let's focus first
23 on the 2010 to 2015 period of time.
24 Okay?

Page 145

1    A.   Right.  I believe, in
2  looking at the chart, the Qualitest
3  products are included in 2015.
4    Q.   And you're making that
5  inference based on the product mix and
6  the quantities?
7    A.   I'm making that inference
8  based on my knowledge of the product mix
9  and the quantities.
10   Q.   Okay.  So if we want to get
11 a sense of kind of Par's pre-merger
12 opioid business, we can get a pretty good
13 perspective looking at the 2014 prior
14 period?
15   MS. VANNI:  Object to form.
16   THE WITNESS:  I think that
17  would make sense.
18 BY MR. BUCHANAN:
19   Q.   Okay.  So the company is
20 making some hydrocodone products, right?
21   MS. VANNI:  Just note my
22  objection to the use of this
23  document consistent with my prior
24  objection.

Highly Confidential - Subject To Further Confidentiality Review

Page 146

1 Also, it looks to have a
2 product from another manufacturer
3 on here, Purdue, oxycodone,
4 Purdue.
5 MR. BUCHANAN: This is as
6 produced to us by the defense.
7 And actually, it was a question
8 that I was going to ask the
9 witness.
10 MS. VANNI: Okay. Also note
11 my objection that he is not a
12 30(b)(6) on sales, and he can't
13 authenticate the information
14 contained in this.
15 You can proceed.
16 (Document marked for
17 identification as Exhibit
18 Endo-Macrides-10.)
19 BY MR. BUCHANAN:
20 Q. Passing you also, sir,
21 Exhibit 10.
22 Exhibit 10, is, I'll
23 represent to you, sir, Exhibit A to Par's
24 supplemental interrogatory responses. We

Page 147

1 asked for the records of the products
2 that were shipped by Par. That is the
3 data that was given to us, and it's been
4 collapsed and enlarged for your
5 convenience in the prior exhibit. I
6 think you'll find the prior exhibit,
7 Exhibit 5 easier to read.
8 A. I can't read that.
9 Q. That's why we did what we
10 did.
11 A. Okay.
12 Q. Okay. You have the source
13 materials, if you'd like, Exhibit 10.
14 Exhibit 5 is our summary
15 table for your convenience.
16 All right. So we see prior
17 to the 2015 merger that Par is in the
18 business of making a hydrocodone kind of
19 liquid.
20 Do you see that?
21 A. I see that.
22 Q. Okay. As of 2014 selling a
23 hundred-plus million dosage units of
24 that. It's got an oral transmucosal

Page 148

1 fentanyl citrate product.
2 Do you see that?
3 A. I see that.
4 Q. And fentanyl is a pretty
5 potent opioid, fair?
6 MS. VANNI: Object to form.
7 THE WITNESS: I understand
8 that fentanyl is an opioid.
9 BY MR. BUCHANAN:
10 Q. Do you understand that it's
11 fairly potent?
12 A. I don't have specific
13 knowledge of the potency of fentanyl. I
14 understand it's an opioid.
15 Q. Okay. Do you have a sense
16 of the relative desirability of different
17 active pharmaceutical ingredients in
18 terms of the street value?
19 MS. VANNI: Object to form.
20 THE WITNESS: I don't have
21 any specific knowledge of that. I
22 understand that my responsibility
23 is to control all opioid products
24 in the same way to prevent the

Page 149

1 diversion and abuse of those
2 products.
3 BY MR. BUCHANAN:
4 Q. Certain products can be more
5 desirable than others though in the
6 street, true?
7 MS. VANNI: Object to form.
8 THE WITNESS: I imagine that
9 could be true. I have no --
10 BY MR. BUCHANAN:
11 Q. Do you have any knowledge in
12 that regard?
13 A. I have no specific
14 knowledge --
15 Q. Fair enough.
16 A. -- on the --
17 Q. Okay.
18 So we see the company is
19 making fentanyl patches in 2014. It's
20 got -- making oral transmucosal fentanyl
21 citrate. It's making morphine sulfate.
22 Do you see that?
23 A. I see that.
24 Q. Okay. It's -- there's a

Page 150

1  line item here for oxycodone and on the
2  chart that was produced to us it says --
3        MR. BUCHANAN:  I'm sorry,
4     can you pull up E1809 for
5     everyone's benefit.
6        If I do that again, just
7     somebody give me an elbow so you
8     can see.  Okay?
9        Can you blow out to 2014.
10    The -- actually include 2015, just
11    so we have a -- no, I'm sorry,
12    with the drug names all the way to
13    2015.
14       Thank you.  Okay.
15 BY MR. BUCHANAN:
16    Q.   That may help you if you
17 want to read the screen, sir.
18    A.   Oh, I can read this.
19    Q.   Okay.  So Par, prior to its
20 merger with Endo and Qualitest in 2015 is
21 also in the opioid business, right?
22    A.   They are.
23    Q.   Okay.  Millions of pills and
24 millions of dosage units of syrups,

Page 151

1  patches.  It looks like oral
2  transmucosals, of various opioid
3  formulations.
4        Is that fair?
5        MS. VANNI:  Object to form.
6        THE WITNESS:  Yes.  Parceled
7     and marketed opioid products.
8  BY MR. BUCHANAN:
9     Q.   Okay.  It looks like they
10 are also in the Percocet business, right,
11 2014?
12    A.   The -- the Percocet would
13 have been -- I believe that would be the
14 Endo product.
15    Q.   Well, we know Endo doesn't
16 buy Par until when?
17    A.   2015.
18    Q.   Right.  So in 2014, in the
19 data that's been provided to us, we see
20 some 272 million pills?
21    A.   That's oxycodone/APAP, not
22 Percocet.  You said Percocet.  Percocet
23 was zero in 2014.
24    Q.   Oh, I'm sorry.  Is -- is

Page 152

1  oxycodone/APAP not the generic
2  formulation of Percocet?
3     A.   It is the generic
4  formulation of Percocet.  I was just
5  confused because you said Percocet and
6  Percocet is zero on here in 2014.
7     Q.   Oh, that -- that's fair.
8  Okay.
9        So what I'm -- what I'm
10 highlighting, sir, is oxycodone/APAP is
11 the generic form of Percocet.  And I
12 apologize if I confused you with that.
13       By 2014, Par is in the
14 Percocet business, right?
15       MS. VANNI:  Object to form.
16       THE WITNESS:  They are in
17    the generic Percocet business,
18    yes.
19 BY MR. BUCHANAN:
20    Q.   Okay.  By 2014, Par is in
21 the generic Percocet business, do you
22 agree?
23    A.   I agree.
24    Q.   To the tune of about a pill

Page 153

1  for every American?
2        MS. VANNI:  Object to form.
3        THE WITNESS:  The quantity
4     here says 272 million tablets.
5  BY MR. BUCHANAN:
6     Q.   Okay.  About a pill for
7  every American?
8        MS. VANNI:  Object to form.
9     Beyond the scope.
10       THE WITNESS:  It's 272
11    million tablets.
12 BY MR. BUCHANAN:
13    Q.   A lot of pills, right?
14       MS. VANNI:  Object to form.
15       THE WITNESS:  It's 272
16    million tablets.
17 BY MR. BUCHANAN:
18    Q.   Okay.  And Par as a
19 manufacturer of opioids and a distributor
20 of opioid products, was also charged with
21 maintaining effective controls against
22 diversion, correct?
23    A.   Correct.
24    Q.   Also had to have a

Page 154

1 suspicious order monitoring program,
2 right?
3    A.   Correct.
4    Q.   Also received orders before
5 it shipped each of those pills, patches
6 and liquids, correct?
7    A.   Correct.
8    Q.   In 2010 how many -- and I'll
9 represent to you, sir, I don't have data
10 that goes back prior to 2010 for -- for
11 Par.  That may be because they didn't
12 make it prior to that point in time, or
13 it may be because it just wasn't given to
14 us.
15       But as of 2010, did the
16 company stop shipping any order it
17 received because of excessive quantity,
18 frequency, or any of the other categories
19 for a suspicious order?
20    MS. VANNI:  Object to form.
21    THE WITNESS:  Par had a DEA
22    compliance function and procedures
23    around reviewing orders.  I don't
24    believe there were any orders

Page 155

1    reported that were deemed
2    suspicious after review and
3    investigation of any orders of
4    interest.
5 BY MR. BUCHANAN:
6    Q.   Any order that it
7 stop-shipped and didn't fill?
8    A.   I don't believe so.
9    Q.   Okay.  So for 2010, no
10 orders reported to DEA and no orders
11 stop-shipped, true?
12    A.   My understanding is that we
13 did not report any suspicious orders
14 after investigation of any orders of
15 interest that came through our SOMs
16 program.
17    Q.   Okay.  2011, again,
18 150 million pills, units, patches.  I
19 guess it's just pills, excuse me.  Oral
20 transmucosal fentanyl and cough syrup at
21 that point in time.
22       Any reports to the DEA in
23 2011?
24    MS. VANNI:  Object to form.

Page 156

1    THE WITNESS:  I'm not aware
2    of any orders that were reported
3    as suspicious after review and
4    investigation of any orders of
5    interest.
6 BY MR. BUCHANAN:
7    Q.   Okay.  Any stop-ships?
8    A.   Not that I'm aware of.
9    Q.   Okay.  2012, 190 million,
10 180 million, something like that, dosage
11 units, pills, patches, liquids.
12       Numbers going up, right?
13    A.   So these products in 2012,
14 Par had a very active history as a
15 generics company of launching new
16 products.  These products appear to have
17 been launched in 2012, which is why
18 they -- they show up there.
19    Q.   So --
20    A.   I'm not aware of any orders
21 that were reported as suspicious after
22 review and investigation through our SOMs
23 system.
24       Also any time a product was

Page 157

1 launched there were specific procedures
2 around reviewing customers who were
3 ordering that product, you know, to
4 ensure that they had the appropriate
5 licenses, programs, et cetera, in place
6 to control these products properly.
7    Q.   Well, let's talk about that,
8 I guess.
9       In 2010, please describe for
10 the jury what Par's suspicious order
11 monitoring program was.
12    A.   I would describe the program
13 as standard operating procedures looking
14 at orders that would be deemed of
15 interest based on orders that were
16 excessive relative to, you know,
17 historical parameters.
18       There was also, as I
19 understand it, diligence around new
20 customers.
21       Those -- those SNOPs and
22 programs would have been evolving.
23    THE VIDEOGRAPHER:  Off the
24    record at 11:11 a.m.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1     (Brief pause.)
2     THE VIDEOGRAPHER:  We are
3  back on the record at 11:12 a.m.
4  BY MR. BUCHANAN:
5     Q.   Okay.  I apologize for
6  the -- for the interruption, sir.
7        You were telling us about
8  Par's suspicious order monitoring program
9  back in time here, pre-merger period.
10        In fact, as of 2010, the
11  company didn't even have a suspicious
12  order monitoring program, isn't that
13  true?
14        MS. VANNI:  Object to form.
15        THE WITNESS:  You might
16  describe it more as an order
17  management program.  I think new
18  customers were being reviewed and
19  orders were being reviewed at some
20  level.
21        MR. BUCHANAN:  Can I have
22  1056, please.
23  BY MR. BUCHANAN:
24     Q.   Did you find an SOP for a

Page 159

1  suspicious order monitoring program for
2  Par as of 2010, sir?
3     A.   I looked at a lot of
4  documents.  If you can show me a document
5  that you're referring to.  I looked at a
6  lot of documents.  I don't remember
7  exactly all the documents that I looked
8  at.  I did look at documents with
9  specific procedures for Par around
10  suspicious order monitoring, new
11  customers -- setting up new customers, et
12  cetera.
13     Q.   The hard thing for me is I
14  can't show you something that doesn't
15  exist.  So in 2010, sir, are you aware of
16  an SOP or a policy or procedure for
17  suspicious order monitoring?
18     A.   I reviewed policies and
19  procedures for Par.  I don't remember the
20  exact dates.
21        (Document marked for
22        identification as Exhibit
23        Endo-Macrides-11.)
24  BY MR. BUCHANAN:

Page 160

1     Q.   I'm passing you, sir, what
2  we've marked as, I think that's
3  Exhibit 11 for your deposition.
4        MR. BUCHANAN:  Provide a
5        copy to counsel, please.
6        Can you pull up E-1056.
7  BY MR. BUCHANAN:
8     Q.   All right.  This, sir, is an
9  e-mail from Joseph -- I'll probably
10  mispronounce his name.
11     A.   Barbarite.
12     Q.   Barbarite.  Okay.  To Angela
13  Feniger and others.  Was Ms. Feniger one
14  of the people you talked with?
15     A.   She was.
16     Q.   Okay.  When you talked with
17  her, sir, did she tell you that they had
18  no suspicious order monitoring in place
19  while they were selling controlled
20  substances in 2010?
21        MS. VANNI:  Object to form.
22        THE WITNESS:  I don't
23        believe we specifically discussed
24        that.

Page 161

1  BY MR. BUCHANAN:
2     Q.   Okay.  Y'all invited a
3  company in to take a look at your systems
4  in 2010, right?  A company called Cegedim
5  Dendrite.  Buzzeo might be another name
6  that you recall.
7     A.   Yeah.  That's what it says
8  here, yes.
9     Q.   Okay.  Had you seen this
10  document before?
11     A.   I had not seen this
12  document.
13     Q.   Okay.  So this is the report
14  back from your consultant to you in, I
15  guess, early 2010, following an
16  April 2010 inspection.  Let's go to
17  1056.2.  That is the cover letter that
18  accompanies the report.
19     A.   I see it.
20     Q.   Signed by Mr. Buzzeo, chief
21  compliance officer.
22        Do you see that?
23     A.   I see that.
24     Q.   Okay.  You've seen reports

Page 162

1 and analyses by Mr. Buzzeo over the years
2 to your company?
3     A.   I have.
4     Q.   Okay.  The company worked
5 with Mr. Buzzeo after this point in time,
6 right?
7         MS. VANNI:  Object to form.
8         THE WITNESS:  We did.
9 BY MR. BUCHANAN:
10     Q.   And before this point in
11 time, right?
12     A.   We did.
13     Q.   All right.  You relied on
14 him?
15         MS. VANNI:  Object to form.
16         THE WITNESS:  We used them
17     for input into how we can improve
18     our programs.
19 BY MR. BUCHANAN:
20     Q.   And you respected their
21 advice, right?
22         MS. VANNI:  Object to form.
23         THE WITNESS:  If we hired a
24     consultant it was to give us

Page 163

1     specific input to challenge us and
2     to give us suggestions on how we
3     can improve.
4 BY MR. BUCHANAN:
5     Q.   Sure.
6     A.   In that context that's why
7 we -- that's how we would have --
8     Q.   And you invited them into
9 your shop, right?
10         MS. VANNI:  Object to form.
11 BY MR. BUCHANAN:
12     Q.   Per the 1056.3?
13     A.   I'm just looking this over.
14 Yes, it looked like there was a visit to
15 the facility.
16     Q.   Visit to the facility, short
17 review of documents, to provide findings
18 and recommendations back to the company,
19 correct?  We're going to 1056.10.
20     A.   1056.10?
21     Q.   Yes.  Is that correct?  You
22 called them in.  They looked at stuff.
23 They gave you a report and analysis back?
24 Fair, sir?

Page 164

1     A.   It looked like they did an
2 audit and gave us some -- some findings.
3     Q.   Okay.  Let's go to Finding
4 Number 8.
5     A.   Are you on --
6     Q.   1056.10.
7     A.   Okay.
8     Q.   I'm sorry.
9         Finding Number 8, SOM,
10 below.  I guess there's two Finding
11 Number 8 -- Findings Number 8.
12         Finding Number 8, SOM.
13 Could you read that sentence for us, sir?
14     A.   "There is no suspicious
15 order monitoring program in place."
16     Q.   Okay.  Let's pause there.
17 As of 2010, the company is selling
18 controlled substances that it must keep
19 in a vault and in a cage in its warehouse
20 and production facilities, correct?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  Par was
23     selling opioids that had certain
24     regulations on how they needed to

Page 165

1     be stored and controlled.
2 BY MR. BUCHANAN:
3     Q.   And there is a requirement?
4         MR. BUCHANAN:  Can we blow
5     that out?
6 BY MR. BUCHANAN:
7     Q.   Under 21 C.F.R. 1301.74(b).
8 Do you see that?  That the company must
9 maintain and operate a system to disclose
10 to the registrant suspicious orders of
11 controlled substances, right?
12         Do you see that?
13     A.   Yeah.  And if I could just
14 have a minute to read it.  Yes, this is
15 what the regulation says.
16     Q.   Okay.  And that regulation's
17 not a new one, right?
18     A.   No.
19     Q.   I mean, that regulation has
20 been around for as long as Endo has been
21 around, right?
22         MS. VANNI:  Objection.
23         THE WITNESS:  The
24     regulations has been in place for

Page 166

1  whatever period of time they've
2  been in place.
3  BY MR. BUCHANAN:
4      Q.  Right.  And the Controlled
5  Substance Act actually has a provision
6  that manufacturers and distributors are
7  supposed to maintain effective controls
8  against diversion, right?  Are you aware
9  of that?
10     A.  I'm aware of that, yes.
11     Q.  Okay.  So as of 2010, sir,
12 there is no suspicious order monitoring
13 program in place.  That's what you're
14 told by the consultants you hired to look
15 at this issue, correct?
16     A.  That's what the report says.
17     Q.  Okay.
18     A.  So as I said earlier, we
19 hired --
20     Q.  That's my question sir.
21         Recommendation underneath,
22 "Although it was stated that sales are
23 mainly to large wholesalers" -- let's
24 pause.

Page 167

1          As a registrant, you have an
2  obligation to maintain a suspicious order
3  monitoring program, period, correct, sir?
4          MS. VANNI:  Object to form.
5          THE WITNESS:  We have an
6      obligation to do what it says here
7      in the regulations, to design and
8      operate a system to disclose to
9      the registrant suspicious orders
10     of controlled substances.
11 BY MR. BUCHANAN:
12     Q.  Right.
13     A.  That's what we have an
14 obligation to do.
15     Q.  Right.  It doesn't -- the
16 explanation given to your consultant that
17 well, we just sell to wholesalers, that
18 doesn't mean that you don't have to have
19 a suspicious order monitoring program,
20 right?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  We have to --
23 BY MR. BUCHANAN:
24     Q.  You know better than that?

Page 168

1          MS. VANNI:  Object to form.
2          THE WITNESS:  We have to do
3      what it says in the registrant --
4      in the register -- in the -- I'm
5      sorry, in the C.F.R.  We have to
6      do what it says in the C.F.R.
7  BY MR. BUCHANAN:
8      Q.  Right.  You must have a
9  program, right?
10     A.  We must have a system to
11 disclose suspicious orders of controlled
12 substances.
13     Q.  That's right.  And it says
14 here, a program must be what?
15 Instituted, correct?
16     A.  I'm sorry.  Where are you
17 reading that?
18     Q.  The top says, "There is no
19 suspicious order" -- "no suspicious order
20 monitoring program in place."
21         First sentence, right?
22     A.  Right.
23     Q.  It advises your team, there
24 is a regulation that requires one.

Page 169

1  That's the second part, right?  It says
2  that's the requirement?
3      A.  Yes, they are quoting the
4  regulations here.
5      Q.  And then they are saying,
6  here is our recommendation, that you
7  institute one, that you comply with the
8  law.
9          MS. VANNI:  Object to form.
10         THE WITNESS:  The way I
11     interpret this document, we hired
12     these consultants to come in
13     because we recognized that the --
14     as I said earlier, that these
15     products, opioid products, if they
16     are not properly controlled, can
17     be abused and diverted.
18         We -- we brought these
19     consultants in, in a proactive
20     way, to give us guidance and
21     direction on how to develop a
22     better program for ensuring that
23     our orders were reviewed properly,
24     comprehensively, and ultimately

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1   any orders of interest were
2   investigated.
3   BY MR. BUCHANAN:
4       Q.   Did you say --
5       A.   That's how I interpret this
6   document.
7       Q.   Did you say a better
8   program, sir?  A better?
9           There was no program prior
10  to this point in time.  None.
11      A.   I'm not interpreting this
12  document to suggest that there was no
13  program.
14      Q.   What did they say, sir?
15      A.   I'm -- I'm interpreting this
16  document as the consultants, as they
17  would define a suspicious order
18  monitoring program, that they felt that
19  we needed to improve.
20      Q.   Please tell the jury what
21  SOP Par had for suspicious order
22  monitoring prior to this date, sir.
23      A.   I'm not referencing a
24  specific SOP.  I'm just telling you how

Page 171

1   I'm interpreting this document.
2       Q.   Well, please tell me --
3       A.   I'm not interpreting the
4   document to suggest that Par wasn't in
5   some way reviewing orders that, you know,
6   potentially would be excessive based on
7   historical parameters.
8           Now, that may not be the way
9   the consultant is defining the suspicious
10  order monitoring program.  But that
11  doesn't mean that these orders weren't
12  being looked at to determine whether or
13  not there was an order that was, quote,
14  excessive.
15      Q.   So these consultants that
16  you hired came in, and you understand
17  they have specific DEA compliance
18  experience, Cegedim, Dendrite, Buzzeo?
19      A.   Of course.
20      Q.   Okay.  Brought them in to
21  look at your system, sir.  They looked at
22  the system, and finding Number 8 says
23  there is no suspicious order monitoring
24  program in place.

Page 172

1           We can agree that's not an
2   ambiguous sentence, correct?
3           MS. VANNI:  Object to form.
4           THE WITNESS:  We can agree
5       that's what they said and wrote
6       into the report.
7   BY MR. BUCHANAN:
8       Q.   Right.  And we can also
9   agree sitting here today, sir, you are
10  not aware of a standard operating
11  procedure that the company actually has
12  dated prior to this point in time
13  concerning suspicious order monitoring,
14  correct?
15      A.   Like I said, I reviewed a
16  lot of documents.  I reviewed a lot of
17  Par SOPs.  I can't go back and tell you
18  exactly what date.
19          I -- I do know that Par had
20  an evolving program, as did Qualitest, as
21  did Endo, around suspicious order
22  monitoring and ensuring that our -- our
23  orders were reviewed and investigated to
24  prevent abuse and diversion.

Page 173

1       Q.   Sitting here today, sir, you
2   don't recall a single Par policy,
3   procedure, or standard operating document
4   prior to the date of this memo for
5   suspicious order monitoring, correct,
6   sir?
7           MS. VANNI:  Object to form.
8           THE WITNESS:  I do recall a
9       suspicious order monitoring SOP.
10          I do not recall the time
11      frame at which that was
12      implemented.
13  BY MR. BUCHANAN:
14      Q.   Okay.  Well, we'll look at
15  that.  Okay.
16          Because the company, a few
17  years later, implements an SOP, right?
18          MS. VANNI:  Object to form.
19  BY MR. BUCHANAN:
20      Q.   After it's been selling
21  opioids for years --
22          MS. VANNI:  Objection.
23  BY MR. BUCHANAN:
24      Q.   -- right?

Highly Confidential – Subject to Further Confidentiality Review

Page 174

1    MS. VANNI:  Objection.
2    THE WITNESS:  As I said, our
3  programs were evolving in response
4  to increasing our diligence around
5  monitoring orders and ensuring
6  that we were doing everything we
7  could within the regulations to
8  prevent our abuse and diversion.
9    This step of bringing in a
10  consultant, which we do quite
11  frequently, to challenge us, to
12  help us raise the bar, to give us
13  their view on things.
14    MR. BUCHANAN:  Move to
15  strike.
16  BY MR. BUCHANAN:
17    Q.   My question was, the company
18  has been selling opioids for years prior
19  to the time it implements its first SOP.
20    Do you know that, sir?
21    MS. VANNI:  Objection.
22  Asked and answered.
23    THE WITNESS:  I have data
24  here that says the company was

Page 175

1    selling opioids in 2010.
2  BY MR. BUCHANAN:
3    Q.   Okay.  Let's take a look
4  at -- and you are not aware of an SOP
5  from 2010, are you, sir?
6    MS. VANNI:  Objection.
7  BY MR. BUCHANAN:
8    Q.   For suspicious order
9  monitoring?
10    MS. VANNI:  Objection.
11    THE WITNESS:  I think I
12  already said that I reviewed SOPs,
13  but I -- I did not -- I'm not
14  aware of the actual dates.  I
15  don't remember the dates of -- of
16  specific SOPs that I reviewed.
17  BY MR. BUCHANAN:
18    Q.   Okay.  We can agree that --
19  we have -- we have your memory obviously
20  of not having a specific date for an SOP.
21    We have your consultants
22  though who came in and did a
23  three-year -- three-day, excuse me, site
24  visit.  Spoke with people, looked at

Page 176

1  things, and delivered a report which said
2  there is no suspicious order monitoring
3  program in place as of this date in 2010,
4  correct, sir?
5    MS. VANNI:  Object to form.
6    THE WITNESS:  As the
7  consultants define suspicious
8  order monitoring program, their
9  input was we needed to enhance
10  whatever we were doing in terms of
11  looking at orders and formalize
12  the program.  That's how I would
13  interpret their response here.
14  BY MR. BUCHANAN:
15    Q.   Okay.  And so the answer to
16  my question, sir, though about whether
17  you are aware of a standard operating
18  procedure for SOMs or a policy as of 2010
19  is still the same, you're not aware of
20  one, correct?
21    MS. VANNI:  Objection.
22  Misstates his testimony.
23    THE WITNESS:  I reviewed a
24  lot of documents.  I know I

Page 177

1  reviewed documents, Par documents,
2  that were related to suspicious
3  order monitoring.
4    I don't remember -- I don't
5  recall the date.  I looked at a
6  lot of documents to prepare for
7  this.  I didn't commit them all to
8  memory.
9  BY MR. BUCHANAN:
10    Q.   Okay.  Let me show you the
11  first one we found, sir.  Okay.
12    MR. BUCHANAN:  Can I have
13  1839.
14    (Document marked for
15  identification as Exhibit
16  Endo-Macrides-12.)
17  BY MR. BUCHANAN:
18    Q.   I'm passing you, sir, what
19  we're marking as Exhibit 12.  This is an
20  e-mail from Ms. Feniger to Ms. Lipari and
21  some others on the team.  Suspicious
22  order monitoring.
23    SOM, do you see that?
24    A.   I see that.

Page 178

1    Q.    Attachments SO002.  Do you
2  see that?
3    A.    I see that.
4    Q.    Okay.  The quality is
5  something we're both suffering with, sir.
6  I wish I could have given you a better
7  copy.
8          And so what we have here is
9  the SOM.  And it's SOP number SO002.0.
10  Do you see that?
11    A.    I see that.
12    Q.    And it says supersedes.
13  What does it say after that?
14        MR. BUCHANAN:  Can you go to
15  .2 please.
16        THE WITNESS:  I'm sorry.
17  BY MR. BUCHANAN:
18    Q.    I'm sorry.  It's the top of
19  the page, sir.  I know my question was
20  confusing.
21          We see the SOP number on the
22  right.  You recognize that companies like
23  yours number their SOPs?
24    A.    Right.

Page 179

1    Q.    And they often put a version
2  number, a dot after to indicate an
3  incremental change to an SOP?
4    A.    Right.
5    Q.    Okay.  What's the title of
6  this particular SOP, sir?
7    A.    Suspicious order monitoring.
8    Q.    Okay.  And the SOP number
9  for it is SO002.0, correct?
10    A.    Correct.
11    Q.    Supersedes?
12    A.    It says not applicable.
13    Q.    What is the date, the
14  effective date of this SOP, sir?
15    A.    April 17th of 2012.
16    Q.    Okay.  And we've got
17  signatures and approvals written by,
18  checked by, approved by.
19          Do you see all that?
20    A.    I do.
21    Q.    Okay.  This was actually
22  written by the head of sales?
23    A.    Written by Patricia Lipari,
24  director of sales.

Page 180

1    Q.    Okay.
2    A.    Sales operations.
3    Q.    Okay.  Sales ops.  And it
4  was checked by a technical writer in
5  documentation, right?
6    A.    Checked by, yeah, Angela
7  Feniger.
8    Q.    I can't read the approved by
9  name.  Do you know that name?
10    A.    Dino Taraban.
11    Q.    Okay.  And so, sir, this
12  is -- the .0 or the first version of
13  Par's SOM, suspicious order monitoring
14  SOP, correct, sir?
15    A.    Appears to be the first
16  specific SOP entitled suspicious order
17  monitoring.
18    Q.    Okay.  And --
19    A.    But I wouldn't interpret
20  that as suggesting that orders were not
21  being looked at in some capacity prior to
22  that.
23    Q.    Yeah, that wouldn't be
24  helpful, right?  That'd be a real

Page 181

1  problem?
2        MS. VANNI:  Object to form.
3  BY MR. BUCHANAN:
4    Q.    I mean, you had a consultant
5  come -- withdrawn.
6          You had a consultant come in
7  in 2010, in April, right?  The Buzzeo
8  group came in in April 2010?
9    A.    April.
10    Q.    We looked at that.
11    A.    Right.
12    Q.    They said, "There is no
13  suspicious order monitoring program," is
14  what they said, right?
15    A.    That was their observation.
16    Q.    Right.
17    A.    Those were their words.
18    Q.    They showed you the C.F.R.
19  They made a recommendation, right?  They
20  said, "You need an SOP," right?
21        MS. VANNI:  Object to form.
22  The document speaks for itself.
23        MR. BUCHANAN:  I'm happy to
24  let it speak for all of us.

Page 182

1     THE WITNESS:  They said --
2     MR. BUCHANAN:  I told you
3  I'd allow that to happen.
4     THE WITNESS:  My
5  interpretation of what they said
6  is they said we need to improve
7  our program around order
8  monitoring.
9  BY MR. BUCHANAN:
10     Q.   What they said, "There is no
11  suspicious order monitoring program in
12  place."  You can agree that's what they
13  wrote and told the company in early 2010,
14  correct?
15     A.   That's what they said in
16  2010, based on the way they would define
17  suspicious order monitoring.
18     Q.   Right.  And -- well, they
19  said you had no suspicious order
20  monitoring program in place.  Yes or no?
21     A.   That's what it says here.
22     Q.   Thank you.  They quoted you
23  the regulation.  Yes or no?
24     A.   They quoted the regulation.

Page 183

1     Q.   They said, "Although it was
2  stated" -- okay, do you understand that
3  to be referring to your people talking to
4  the Buzzeo folks, right?
5     MS. VANNI:  Object to form.
6  BY MR. BUCHANAN:
7     Q.   "Although it was stated that
8  sales are mainly to large wholesalers" --
9  is that your understanding, sir?
10     A.   Right.
11     Q.   The Buzzeo folks got that
12  information from your team at Par, right?
13     A.   Presumably yes, they were
14  speaking to people at Par.
15     Q.   Right.  "Although it was
16  stated that sales are mainly to large
17  wholesalers, a program must be instituted
18  based on customer sales, volumes,
19  seasonal fluctuations, et cetera, with a
20  firm statistical analysis as the basis
21  for such a program."
22     Did I read that correctly,
23  sir?
24     A.   You read -- that's what it

Page 184

1  says.
2     Q.   Okay.  "It is further
3  recommended that the basis for
4  conducting" -- what?  Due diligence.
5     Do you see that?
6     A.   I see that.
7     Q.   -- "of new and existing
8  customers and identifying and
9  investigating and clearing of reporting
10  suspicious orders be documented in an
11  SOP."
12     Did I read that correctly,
13  sir?
14     A.   You did.
15     Q.   Okay.  And so we have now,
16  the rest of 2010 passes without an SOP,
17  right?
18     A.   This appears to be the first
19  SOP that is specifically titled
20  "Suspicious Order Monitoring."
21     Q.   All of 2011 passes without
22  an SOP, right?
23     A.   As I said, this is the first
24  SOP that appears to be entitled

Page 185

1  "Suspicious Order Monitoring."  That
2  doesn't mean that Par wasn't complying
3  with the registration around identifying
4  potentially suspicious orders --
5     Q.   And then in --
6     A.   -- in the 2010-2011 time
7  frame.
8     Q.   Then sometime around April
9  of 2012, you got around to getting an
10  SOP, huh?
11     MS. VANNI:  Object to form.
12  BY MR. BUCHANAN:
13     Q.   Do I have that right?
14     MS. VANNI:  Object to form.
15     THE WITNESS:  In April
16  of 2012, we published an SOP.
17  BY MR. BUCHANAN:
18     Q.   Okay.  And you published
19  that SOP, and, you know, we can agree
20  some 200 million units of pills and doses
21  and patches -- I guess it's not pills.
22  It's oral transmucosal fentanyl citrate
23  and syrups, are going out the door with
24  hydrocodone and fentanyl in 2010 and

Page 186

1 2011, correct?
2          MS. VANNI:  Object to form.
3          MR. BUCHANAN:  Withdrawn.
4     Very confusing question.
5          MS. VANNI:  Very.
6 BY MR. BUCHANAN:
7     Q.    You told us earlier in
8 April 2012 you published that SOP.  Yet
9 in 2010 and 2011 some 200 million dosage
10 units of fentanyl citrate and hydrocodone
11 went out the door, correct?
12    A.    We sold those products in
13 2010 and 2011.
14    Q.    Okay.
15    A.    You're assuming that the
16 lack of -- the lack of an SOP meant that
17 those orders were not being looked at or
18 not being reviewed.
19    Q.    You have not been able to
20 highlight any written procedure, any
21 documentation for the company that
22 preceded the April 2012 SOP, correct,
23 sir?
24          MS. VANNI:  Object to form.

Page 187

1          THE WITNESS:  I don't have a
2     document.
3 BY MR. BUCHANAN:
4     Q.    So could you describe for
5 us, sir, where in Exhibit 12 the company
6 describes how it's going to determine
7 what gets reported to the DEA?
8     A.    If you can give me a minute
9 to review this.
10    Q.    Sure.  Let's just -- let's
11 just go to 1839.2 real quick.
12    A.    1839.2.
13    Q.    We can agree under purpose,
14 policy, and responsibility, there's
15 nothing in here about reporting stuff to
16 the DEA, correct?
17    A.    It says, "Define process of
18 suspicious order monitoring as determined
19 by sales operations that we are in line
20 with DEA requirements."
21          So if -- if the order needs
22 to be reported to DEA, that would be in
23 line with DEA requirements.
24    Q.    Okay.  So what orders, then,

Page 188

1 are suspicious orders under your SOP for
2 suspicious order monitoring, sir?
3     A.    Orders that would be deemed
4 of interest.
5     Q.    Where are those?  You're
6 looking -- it sounds like you are not on
7 1839.2.  You are now on 18 point --
8     A.    I'm just reviewing the
9 document.
10    Q.    -- 1839.3.  We can agree
11 1839.2 doesn't identify what a suspicious
12 order is, correct?
13          MS. VANNI:  Object to form.
14 BY MR. BUCHANAN:
15    Q.    Characteristics, quality.
16 We could agree?
17    A.    It says, "Define a process
18 for suspicious order monitoring that's in
19 line with DEA requirements."  That's what
20 it says.
21    Q.    Okay.  Let's go to 1839.3.
22          So what were you telling
23 your sales operations folks was a
24 suspicious order on 1839.3?

Page 189

1     A.    So what this is telling me
2 is that they're looking at orders that
3 are considered to be excessive.  "If
4 quantities are higher than the average
5 transmission, it is questioned."
6     Q.    Where are you, sir?
7     A.    I'm on -- under procedure.
8     Q.    Okay.  What paragraph?
9     A.    The second one.  "Weekly
10 replenishment purchase orders are
11 analyzed by account service executives
12 versus customer provided usages.  If
13 quantities are higher than the average
14 transmission it is questioned.
15          "The buyer is contacted to
16 review a written request, is asked as to
17 the reason for the increase.  It is
18 reviewed to ensure it is correct and
19 warranted."
20    Q.    Mm-hmm.  And then what gets
21 reported to the DEA?
22    A.    If there is not a reasonable
23 explanation for the order, and it was
24 deemed suspicious, then under the

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1 regulations it would need to be reported
2 to DEA.
3       Q.   Okay.  And where is that?
4 I'm just trying to find that?
5       Can we agree, sir, nothing
6 in here spells out what and how it gets
7 reported to the DEA?
8       A.   It doesn't seem to describe
9 that exact process.  It seems to talk
10 more about monthly reports are generated
11 and sent to quality compliance for
12 submission to DEA on a quarterly basis.
13      Q.   Okay.  We can agree, sir, in
14 2010, I think your testimony was no
15 orders were identified as suspicious or
16 reported to DEA, correct?
17      A.   We did not submit any
18 suspicious orders based on our review of
19 the orders.
20      Q.   And not in 2011 or in 2012,
21 correct, sir?
22      A.   Not to my knowledge.
23      Q.   Okay.
24      A.   After review and

Page 191

1 investigation.
2       Q.   Well, in fact, there was no
3 SOP in force until April of 2012,
4 correct?
5       MS. VANNI:  Object to form.
6       THE WITNESS:  Yes.  No SOP
7 specifically entitled "Suspicious
8 Order Monitoring."
9 BY MR. BUCHANAN:
10      Q.   Okay.  And, in fact, please
11 tell the jury who had a responsibility
12 for evaluating orders once you had an
13 SOP.
14      Let's go to 1839.2.  Do you
15 see the heading that says Responsibility?
16      Who had responsibility?
17      A.   "Sales" -- "sales
18 operations/account services to monitor
19 applicable Par trade customer purchase
20 orders."
21      Q.   Okay.  So the sales group?
22      A.   These aren't -- these aren't
23 salespeople.  These are -- these are
24 people that -- these are more clerical

Page 192

1 people, administrative people that take
2 the orders.  They are not salespeople.
3       Q.   They are not compliance
4 people.
5       MS. VANNI:  Object to form.
6       THE WITNESS:  No, they are
7 customer service people.
8 BY MR. BUCHANAN:
9       Q.   Customer service -- in the
10 sales side of the organization, correct?
11      A.   They would sit in the sales
12 organization.
13      Q.   Okay.  And so not too long
14 after this particular SOP, sir, you
15 crafted another SOP, right?
16      Have you seen any of these,
17 by the way?
18      A.   I've reviewed SOPs,
19 policies.
20      Q.   Have you seen these?
21      A.   I saw this one.
22      Q.   Oh, you did.  Okay.  So --
23      A.   Like I said earlier, I
24 just -- I couldn't recall the date.  I

Page 193

1 have seen the document.
2       Q.   Okay.  All right.  Let's go
3 to 1845, please.
4       We're going to pass it over
5 to you.  It's going to be the next in
6 order.
7       MR. BUCHANAN:  What is the
8 next in order?
9       13.
10      (Document marked for
11 identification as Exhibit
12 Endo-Macrides-13.)
13 BY MR. BUCHANAN:
14      Q.   Okay.  So here we go, sir.
15 Passing you what we now have as
16 Exhibit 13 to your deposition.
17      This is the next iteration
18 of the suspicious order monitoring
19 protocol, correct?
20      A.   Version 2.1, yes.
21      Q.   Okay.  And that's the way we
22 can track these SOPs, by an SOP number
23 and then a dot with a version number?
24      A.   Version number.

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  Q.   Okay.  That's kind of the
2  way the corporate stuff works?
3  A.   That's how we work from a
4  compliance perspective.
5  Q.   Gotcha.  And then it says
6  over here, "Supersedes."  And it lists
7  the prior one we just looked at, right?
8  A.   That's correct.
9  Q.   Okay.  Does that help give
10 you comfort, sir, we were looking at the
11 first SOP just a moment ago on suspicious
12 order monitoring of Par, as of
13 April 2012?
14 A.   Yeah, I believe I already
15 said that.
16 Q.   Okay.  Well, let's look at
17 how the company framed its suspicious
18 order monitoring duties.
19 MS. VANNI:  Object to form.
20 MR. BUCHANAN:  Can we go
21 to -- I think it's .3.
22 Actually, just for the
23 jury's benefit can we go back to
24 .1.

Page 195

1  BY MR. BUCHANAN:
2  Q.   This was put in force in
3  October of 2012, correct?
4  A.   That's what it says.
5  Q.   Okay.  And then if we go to
6  dot -- and again it was -- go back again,
7  I'm sorry.
8  Again, it was written by the
9  same director of sales operations, right?
10 A.   Right.
11 Q.   And signed off by the --
12 excuse me, checked by the account
13 services executive, right?
14 A.   Right.
15 Q.   That's a different name than
16 last name.
17 And then we've got that same
18 Dino person, head of QA?
19 A.   Yeah, he was -- he was head
20 of compliance for the -- for Par.
21 Q.   Okay.
22 A.   All of compliance.
23 Q.   Okay.
24 A.   Quality and DEA compliance.

Page 196

1  Q.   Okay.  And well, let's look
2  at how this SOP evolved.
3  MR. BUCHANAN:  Can we go to
4  .3.
5  BY MR. BUCHANAN:
6  Q.   It says, "Reporting
7  suspicious criminal activities."
8  Do you see that?
9  A.   I see that.
10 Q.   Okay.  "If criminal activity
11 is suspected, report the following" --
12 "report the following to the state
13 agencies that are" -- "that license the
14 facility, e.g., board of pharmacy and
15 Food and Drug Administration, as well as
16 Drug Enforcement Administration for
17 controlled substances within three days
18 of suspecting criminal activity."
19 Do you see that, sir?
20 A.   I see that.
21 Q.   Okay.  We can agree, sir,
22 that your obligation and your promise as
23 a registrant, is to report orders of
24 unusual frequency, orders of unusual

Page 197

1  size, consistent with the regulation we
2  looked at a moment ago.
3  Do you recall that?
4  A.   The regulation states that
5  if we deem an order to be suspicious,
6  then we report it.
7  Q.   Right.  I mean, the standard
8  is not whether it's suspicious criminal
9  activities, right?
10 MS. VANNI:  Object to form.
11 THE WITNESS:  If we deem an
12 order to be suspicious, then we
13 report it.
14 BY MR. BUCHANAN:
15 Q.   Right.  That is what the
16 regulation requires, right?
17 A.   That's what the regulation
18 says.
19 Q.   Right.  And what this says
20 is, if criminal activity is suspected,
21 that's when you have to do this, correct?
22 MS. VANNI:  Object to form.
23 THE WITNESS:  That's not how
24 I would interpret this.  This

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  seems to be covering more broadly
2  activity around -- I think it's
3  a -- it's a broad statement that
4  goes beyond just identifying a
5  suspicious order.
6  BY MR. BUCHANAN:
7      Q.   Well, we could agree, sir,
8  that the language that's reflected here
9  in terms of, if criminal activity is
10 suspected report the following to, and it
11 lists the agencies and whatnot.
12         That does not align with
13 what the Buzzeo group told you in 2010,
14 correct?
15         MS. VANNI:  Object to form.
16 BY MR. BUCHANAN:
17     Q.   Of your regulatory
18 responsibility?
19     A.   The Buzzeo report
20 specifically referenced the C.F.R.
21     Q.   Right.
22     A.   This is talking about
23 suspicious criminal activity.
24     Q.   Okay.

Page 199

1      A.   Which goes, in my
2  interpretation, beyond simply identifying
3  and reporting a suspicious order.
4      Q.   Right.  Well beyond, right?
5          MS. VANNI:  Object to form.
6  BY MR. BUCHANAN:
7      Q.   This was, in fact, sir, the
8  SOP that you had in force for the next
9  several years, right?
10         MS. VANNI:  Object to form.
11         THE WITNESS:  Well, this SOP
12     would have been in existence until
13     we revised it.
14 BY MR. BUCHANAN:
15     Q.   Okay.  Well, we could agree
16 that the Buzzeo group said you need a
17 statistically valid suspicious order
18 monitoring methodology that took account
19 of seasonal fluctuation, customer sales
20 volumes, with a firm statistical analysis
21 and basis for the program.  We can agree
22 that's what they told you to do, right?
23     A.   Buzzeo made a recommendation
24 of what they felt we should do, yes.

Page 200

1      Q.   Okay.  Based on somebody
2  with a lot of industry exposure,
3  experience, and knowledge of what's
4  expected under the regulations, fair?
5      A.   Based on their experience,
6  yes.
7      Q.   Okay.  We could agree that
8  you did not institute a program with a
9  firm statistical analysis, sales volume,
10 seasonal fluctuations, as the basis for
11 your suspicious order monitoring program,
12 correct?
13         MS. VANNI:  Object to form.
14         THE WITNESS:  I wouldn't
15     characterize it that way.
16 BY MR. BUCHANAN:
17     Q.   Okay.  Because frankly,
18 there is no statistical analysis that's
19 performed as part of Par's suspicious
20 order monitoring program as of 2012,
21 right, sir?
22         MS. VANNI:  Object to form.
23         THE WITNESS:  What this
24     says, and what we were doing was

Page 201

1      looking at orders versus
2      historical parameters and making
3      an assessment of whether or not
4      the order was exceeding that.  And
5      then doing the appropriate
6      investigation to determine whether
7      we conclude whether the order
8      could be suspicious.
9  BY MR. BUCHANAN:
10     Q.   Right.
11     A.   That's what we were doing.
12 Which -- which the regulation requires us
13 to have a program in place to identify a
14 suspicious order.
15     Q.   Right.
16     A.   The SOP is focused on
17 meeting that obligation under the
18 regulation.
19     Q.   Okay.  We can agree, sir,
20 without regard to whether you said it met
21 it or didn't meet it, that the program
22 the company had in place as of 2012 did
23 not have a firm statistical foundation
24 that was accounting for seasonal

Page 202

1  fluctuation of customer sales volumes,
2  other classes of trade, et cetera,
3  correct?
4          MS. VANNI:  Object to form.
5          THE WITNESS:  Well, that
6      would depend upon what your
7      definition of a -- of a firm
8      statistical analysis here.  We do
9      talk about -- in the SOP, you
10     know, we do talk about looking at
11     these orders and understanding if
12     an order deviates from what we
13     expect, then reviewing that across
14     a number of parameters, one of
15     which could be seasonality.
16  BY MR. BUCHANAN:
17     Q.   Where are the records of all
18  of the orders that pended -- so you
19  understand there's some language they use
20  in this space as pended or held with
21  regard to orders that come in under
22  suspicious order monitoring systems?
23         MS. VANNI:  Object to form.
24  BY MR. BUCHANAN:

Page 203

1     Q.   Do you understand that
2  language?
3     A.   I understand that language,
4  yes.
5     Q.   So Par had a sales order
6  system, right?
7     A.   Par had a system for taking
8  orders, yes.
9     Q.   So how many orders that Par
10  had between 2010 and prior to the
11  acquisition by Qualitest or Endo were
12  pended?
13     A.   I don't have that
14  information.
15     Q.   Okay.  What system did
16  Qualitest track its orders by?
17     A.   Are you asking me about Par
18  or Qualitest?
19     Q.   Did I say Qualitest?
20         MS. VANNI:  You said
21     Qualitest.
22         THE WITNESS:  You said
23     Qualitest.
24         MR. BUCHANAN:  That was a

Page 204

1  slip.
2  BY MR. BUCHANAN:
3     Q.   What system did Par,
4  pre-merger with Qualitest, use to conduct
5  its suspicious order monitoring?
6     A.   I believe Par at that time
7  would have been using JD Edwards as its
8  ERP system to take orders.  So how orders
9  were held or pended would have depended
10  on the functionality of JD Edwards.
11     Q.   Okay.  And does the JD
12  Edwards system have records of all the
13  pended orders?
14     A.   I can't speak to that.
15     Q.   Are you aware of any orders
16  that were ever pended between 2010 and
17  2015 for Par customers?
18     A.   I can't speak to which
19  specific orders were pended.  I can only
20  speak to what we were doing here relative
21  to the SOP.
22     Q.   Okay.  And did the JD
23  Edwards system actually have an algorithm
24  in it as of 2010, 2011, 2012?

Page 205

1     A.   The JD Edwards system would
2  have had information on the history --
3  the history of orders.
4     Q.   Not asking you that, sir.
5  I'm asking you whether they actually had
6  an algorithm to identify orders of
7  interest.
8         MS. VANNI:  Object to form.
9         THE WITNESS:  There were
10     sales history, order history to
11     use to evaluate orders.
12  BY MR. BUCHANAN:
13     Q.   So you're saying that a
14  customer service person was supposed to
15  look at order history for every order.
16  The system wasn't doing anything to flag
17  orders?
18     A.   I don't know if there
19  were --
20         MS. VANNI:  Object to form.
21         THE WITNESS:  I'm sorry.
22     I don't know if there were
23     specific reports that people
24     were -- JD Edwards has a report

Page 206

1 writing mechanism. There may have
2 been specific reports that
3 customer service representatives
4 were looking at or had developed
5 by IT that would help them, you
6 know, collate that data for their
7 review.
8 BY MR. BUCHANAN:
9 Q. Okay. Well, you do have
10 some knowledge, obviously, of what an
11 algorithm looks like for suspicious order
12 monitoring, correct?
13 A. Correct.
14 Q. We'll talk about later
15 today, Qualitest implemented something in
16 2013 and '14 a more involved suspicious
17 order monitoring --
18 A. We used -- yeah, we used
19 Cegedim to develop the algorithm.
20 Q. You used the very
21 consultant --
22 A. We did.
23 Q. -- that came in and told you
24 in 2010 that there was no suspicious

Page 207

1 order monitoring program for Par,
2 correct?
3 MS. VANNI: Object to form.
4 THE WITNESS: As I said,
5 we've used consultants over the
6 years to help us enhance our
7 programs.
8 BY MR. BUCHANAN:
9 Q. That wasn't my question. My
10 question was you used the same consultant
11 to incorporate the suspicious order
12 monitoring algorithm in 2014 that told
13 you, you had no program in 2010 in Par,
14 correct?
15 MS. VANNI: Object to form.
16 THE WITNESS: We used
17 Cegedim to develop an algorithm
18 for us.
19 BY MR. BUCHANAN:
20 Q. Okay. And that algorithm,
21 we could agree, is certainly more
22 advanced than what's reflected in the
23 exhibit before you, the 2012 SOP,
24 correct, sir?

Page 208

1 A. I think this is -- as the
2 landscape has evolved here around
3 suspicious order monitoring, the
4 algorithms have become more
5 sophisticated.
6 Q. Well, sir, y'all were pretty
7 sophisticated in figuring out how to sell
8 your products, right?
9 MS. VANNI: Object to form.
10 THE WITNESS: I'm not here
11 to testify on how we sell our
12 products.
13 BY MR. BUCHANAN:
14 Q. I know, but --
15 A. That's somebody else's
16 responsibility.
17 Q. You used a lot of different
18 systems to make money, right?
19 MS. VANNI: Objection.
20 Beyond the scope. Argumentative.
21 BY MR. BUCHANAN:
22 Q. I'm just suggesting, sir --
23 I mean, look, the company had success
24 growing its business. We looked at the

Page 209

1 charts. We looked at how the pill counts
2 grew. We looked at how that evolved. We
3 looked at how -- and we know how
4 companies invest in infrastructure to
5 figure out how to best promote and sell
6 and make money. Do you agree --
7 MS. VANNI: Object.
8 BY MR. BUCHANAN:
9 Q. -- companies do that?
10 MS. VANNI: Objection to
11 form.
12 THE WITNESS: We are a
13 company that sells --
14 BY MR. BUCHANAN:
15 Q. Do you agree that companies
16 do that?
17 MS. VANNI: Objection to
18 form. You just cut him off. He
19 was answering.
20 Go ahead and answer.
21 THE WITNESS: We are a
22 company that sells --
23 BY MR. BUCHANAN:
24 Q. Withdrawn. No question.

Page 210

1     MS. VANNI:  Can we take a
2  lunch break now?  We've been going
3  about an hour and a half.
4     MR. BUCHANAN:  Let me -- let
5  me just finish this thread.
6     MS. VANNI:  Okay.
7     MR. BUCHANAN:  So -- can I
8  have 1072?
9  BY MR. BUCHANAN:
10     Q.   So, in 2015, sir, you call
11  the Buzzeo folks back in again, right?
12     MS. VANNI:  Thank you.
13     I'm sorry, what number is
14  this?
15     MR. BUCHANAN:  14.
16     MS. VANNI:  Thank you.
17     (Document marked for
18  identification as Exhibit
19  Endo-Macrides-14.)
20  BY MR. BUCHANAN:
21     Q.   In 2015 you call the Buzzeo
22  folks back in?
23     Do you remember this?
24     A.   July 2015.  Yeah.

Page 211

1     Q.   Okay.  You -- you agree?
2     A.   Yeah, we called Buzzeo back
3  in.
4     Q.   Okay.  And they did an
5  audit, right?
6     A.   Yes.  We do audits
7  periodically.
8     Q.   Okay.  And is this in the
9  pre-acquisition time period, sir?
10     A.   This would have been
11  preclosure I believe.
12     Q.   Okay.  So let's go to
13  E-1072.4.  We have their letter to you,
14  by Mr. Barbarite.
15     Am I mispronouncing that?
16     A.   Barbarite.
17     Q.   Barbarite, thank you.
18     Received a letter from
19  Mr. Buzzeo.  Same folks from before,
20  right?
21     A.   Right.
22     Q.   Okay.  And attached is a
23  report of our DEA audit of your
24  operations, right?

Page 212

1     A.   Right.
2     Q.   Okay.  Let's go to E-1072.7,
3  summary of findings.
4     We are now five years after
5  the first audit by Buzzeo, right?
6     A.   2015, right.
7     Q.   That would be five years
8  after the first one?  Okay.
9     About seven bullets down.
10  "A suspicious order monitoring system
11  must be devised for all
12  non-practitioners, which includes
13  manufacturers."
14     Do you see that?
15     A.   That's what they say here,
16  yes.
17     Q.   They told you that five
18  years earlier, right?
19     MS. VANNI:  Object to form.
20     THE WITNESS:  They told us
21  that we had to have a system in
22  place in order to be able to
23  detect suspicious orders.
24  BY MR. BUCHANAN:

Page 213

1     Q.   They told you that in 2010,
2  right, sir?
3     A.   That's what it said in the
4  report.
5     Q.   Yeah.  Let's go to 1072.23.
6     All manufacturers, first
7  bullet.
8     "Non-practitioners of
9  controlled substances must design and
10  operate a system that discloses
11  suspicious orders of controlled
12  substances and report those orders to the
13  DEA.
14     "Further, the company must
15  make a good faith effort to ensure that
16  it is shipping controlled substances to
17  companies that are appropriately
18  registered to receive those substances."
19     Did I read that correctly?
20     A.   That's what it says here.
21     Q.   It's telling your folks that
22  Par regulatory has a responsibility to
23  report those orders to the DEA, right?
24     MS. VANNI:  Object to form.

Page 214

BY MR. BUCHANAN:

Q.   As to the second bullet, I'm sorry.

A.   It says that at all -- if an order is determined to be suspicious that it is reported, yes.

Q.   And we can agree, sir, between 2010 and 2015, not a single order was reported by Par to the DEA, correct?

MS. VANNI:  Object to form.

THE WITNESS:  After review of the orders and investigation of any order of interest, there were no orders that were deemed to be suspicious.

BY MR. BUCHANAN:

Q.   Okay.  Let's scroll down.

Third bullet, "The DEA's expectation is noted in the regulations and additional communications to registrants is that the order should be evaluated and reported to the DEA if suspicious as defined in the regulations."

Page 215

Did I read that correctly, sir?

MS. VANNI:  Sorry, David, but where are you?

MR. BUCHANAN:  Third bullet, second half of the bullet.

MS. VANNI:  Okay.  Thank you.

MR. BUCHANAN:  Sorry, I'm just trying to get through this before lunch.

THE WITNESS:  If -- yeah, it says here that if -- if DEA's expectation is that as we determine a suspicious order, that we should report it.

BY MR. BUCHANAN:

Q.   Okay.  Then notes that when the -- when the Buzzeo people were there, the person responsible for the system wasn't available for the interview; however, your SOP was provided.

Do you see that?

A.   Yes.

Page 216

Q.   It then goes through and talks about your SOP, do you see that?

A.   Yes.

Q.   It says, "According to the SOP, Par PhRMA's top trade customers are asked to submit usage reports," right?

A.   Yes.

Q.   You saw that in the SOP, you recall that?

A.   That's what it says in the SOP.

Q.   Yeah, the SOP says we'll ask our customers how much they are going to use, and then we'll ask them if they want more.

MS. VANNI:  Object to form.

BY MR. BUCHANAN:

Q.   And we adjust the schedule.

Do you remember reading all that in that SOP run by sales and customer service?

A.   I remember reading that the customer provides usage reports and we look at their orders against historical

Page 217

usage and we make a decision whether or not we need more information to ship the order.

Q.   Right.  It then states at the bottom bullet, "The SOP does not" -- "does not contain instructions for reporting suspicious orders."

Do you see that?

A.   I see that.

Q.   Your SOP on suspicious order monitoring, sir, does not contain instructions for reporting them, correct?

A.   That's what it says.

Q.   And we can agree that none were reported?

MS. VANNI:  Object to form.

THE WITNESS:  We can agree that no orders were deemed suspicious.

BY MR. BUCHANAN:

Q.   We can agree that none were reported, correct?

A.   If an order wasn't deemed to be suspicious, then it wasn't -- it

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  wasn't reported.
2      Q.   Okay.  Instead, there is a
3  section which is bolded which states,
4  "Criminal activities will be reported to
5  federal and state agencies, including the
6  Food and Drug Administration and the
7  board of pharmacy within three days."
8          Did I read that correctly?
9      A.   That's what it says.
10     Q.   All right.  And then on the
11 next page it says, "Review findings and
12 recommendations."
13         And these -- these are the
14 people that you hired, right?
15         MS. VANNI:  Object to form.
16         THE WITNESS:  We hired
17     consultants to come in and help us
18     improve our systems and controls.
19 BY MR. BUCHANAN:
20     Q.   And they said your system is
21 going to be difficult to defend, right?
22         MS. VANNI:  Object to form.
23         THE WITNESS:  Where are you?
24     What --

Page 219

1  BY MR. BUCHANAN:
2      Q.   "Par's current SOM system as
3  it currently operates may be difficult to
4  explain and defend during a DEA review."
5          Did I read that correctly?
6      A.   That's what -- that's what
7  it says.
8      Q.   And so then it states
9  your -- it states recommendations here at
10 the bottom.
11         Do you see that?
12         "It's recommended that Par
13 PhRMA evaluate its ongoing program in
14 light of the following recommendation and
15 best practices with an aim to improve
16 their SOM program."
17     A.   Yes.  I read that.
18     Q.   Okay.  "One, a defensible
19 statistical SOM model."
20         Did I see that -- did I read
21 that correctly?
22     A.   Yes.
23     Q.   Okay.  And again, that's
24 what they were telling you in 2010,

Page 220

1  five years earlier, you needed a
2  defensible statistical SOM model, right?
3          MS. VANNI:  Object to form.
4          THE WITNESS:  They've given
5      us input on evolving and
6      developing our suspicious order
7      monitoring system over a period of
8      time.
9  BY MR. BUCHANAN:
10     Q.   Let's be clear what I'm
11 asking.  I'm sorry, let's be clear about
12 what I'm asking.
13         That's what they told you
14 that you needed to do in 2010, correct?
15     A.   That's what the report said,
16 yes.
17     Q.   Okay.  And they are telling
18 you that you need to do that in 2015,
19 correct?
20     A.   They're telling us that
21 these are recommendations and best
22 practices that are aimed at improving our
23 suspicious order monitoring program,
24 which is what we brought them in to do.

Page 221

1      Q.   Right.  And so in between,
2  sir, an SOP was created, correct?
3      A.   We created an SOP.
4      Q.   And the advice from the
5  consultants you hired is the same after
6  the SOP about your need for a
7  statistical -- statistical SOM model to
8  detect orders of interest, correct?
9          MS. VANNI:  Object to form.
10 BY MR. BUCHANAN:
11     Q.   Before and after whatever
12 you did in 2012?
13     A.   I'm not determining it to be
14 the same.  I'm determining there needs to
15 be recommendations to continue to improve
16 and enhance our program --
17     Q.   Let's just read it.
18     A.   -- as it states here.
19     Q.   Let's just read it.
20         The recommendation,
21 "Implement a defensible statistical SOM
22 model," correct?  Is that what they
23 wrote?
24     A.   A defensible statistical

Page 222

1  SOMs model, that goes on.
2      Q.   Yeah.  "Identifies orders of
3  unusual size, orders deviating
4  substantially from a normal pattern, and
5  orders have unusual frequency."
6  Statistically based model, correct?
7      A.   Correct.
8      Q.    And they told you in 2010
9  you needed a statistically based model,
10  correct, sir?
11          MS. VANNI:  Object to form.
12          THE WITNESS:  That was their
13      recommendation in 2010.
14  BY MR. BUCHANAN:
15      Q.   Understood.  They also told
16  you, you needed appropriate due diligence
17  in know your customer activities, right?
18      A.   Right.
19      Q.   Okay.  Had to be looking at
20  the legitimacy of your current and
21  existing and potential customers,
22  correct?  Correct?
23      A.   That's what this says.
24      Q.   You needed to do appropriate

Page 223

1  review -- appropriate review and/or
2  investigations of pended orders, right?
3      A.   That's what it says.
4      Q.   What did they tell you
5  appropriate review is, sir?
6      A.   Differentiation of
7  appropriate roles for sales and
8  regulatory.
9      Q.   Right.  Because we know that
10  sales has a conflict of interest as it
11  comes to investigating suspicious orders,
12  right, sir?
13          MS. VANNI:  Objection.
14          THE WITNESS:  I wouldn't
15      agree with that characterization.
16  BY MR. BUCHANAN:
17      Q.   Really, sir?  Did you
18  look --
19      A.   In fact --
20      Q.   -- Qualitest's documents?
21      A.   In fact, the customer
22  service people that were doing this work
23  did have specific knowledge about order
24  quantities and historical ordering

Page 224

1  patterns of customers.
2      Q.   We can agree, sir, that your
3  consultant that you hired, the same one
4  that you hired five years earlier and the
5  same one whose model you implemented for
6  Qualitest, told you that you needed to
7  differentiate appropriate roles for sales
8  and regulatory, correct sir?  Is that
9  what they wrote?
10      A.   Yes.  The consultant wrote
11  that under the category of
12  recommendations for improvement and best
13  practices.
14      Q.   Okay.
15      A.   That's why we hire a
16  consultant, so they can challenge what
17  we're doing, give us best practice
18  recommendations, and help us to improve.
19          MR. BUCHANAN:  Move to
20      strike.  Nonresponsive.
21  BY MR. BUCHANAN:
22      Q.   They also told you that you
23  needed clear, comprehensive SOM SOPs,
24  right?

Page 225

1      A.   That's what it says here.
2      Q.   Right.  So the consultant
3  says that you don't have a clear and
4  defensible SOP.  It may be difficult to
5  defend to the DEA.  Yet this was
6  something that was supposed to be used by
7  your employees, right?
8          MS. VANNI:  Object to form.
9          THE WITNESS:  The consultant
10      is giving us their input on how we
11      can improve our programs and our
12      SOPs, which subsequently we took
13      this input and continued to evolve
14      and improve our programs.
15  BY MR. BUCHANAN:
16      Q.   Right.  Well, they gave
17  input in 2010, right?
18      A.   They gave us input in 2010
19  that we used to improve as well.
20      Q.   Right.  And we know that
21  certainly between 2010 and 2015, you
22  still didn't have a statistically based
23  model for identifying orders of interest,
24  correct?

Page 226

1    MS. VANNI:  Object to form.
2    THE WITNESS:  We used the
3  data that was available to us in
4  the systems that we had to ensure
5  that we were monitoring our orders
6  and ensuring that we had the
7  ability to monitor --
8    MR. BUCHANAN:  Move to
9  strike.  Nonresponsive.
10    THE WITNESS:  -- suspicious
11  orders.
12    MS. VANNI:  You're moving to
13  strike his answer that he hasn't
14  even provided.  Let him at
15  least --
16    MR. BUCHANAN:  Stay with my
17  question.  Okay?
18  BY MR. BUCHANAN:
19    Q.   And we know that between
20  2010 and 2015, you still had not
21  implemented a statistically based model
22  for identifying orders of interest; isn't
23  that true?
24    MS. VANNI:  Objection.

Page 227

1    THE WITNESS:  We used the
2  information that was available to
3  us in our systems to review orders
4  and identify orders of interest
5  that were potentially suspicious.
6  BY MR. BUCHANAN:
7    Q.   Okay.  Which means you
8  didn't do it?
9    MS. VANNI:  Object to form.
10    THE WITNESS:  I answered
11  your question.
12  BY MR. BUCHANAN:
13    Q.   Right.  Because you didn't
14  have a statistically based model in 2010,
15  correct?  Correct?
16    A.   We reviewed the information
17  that was available on the historical
18  pattern of orders and quantities to make
19  a determination as to whether or not an
20  order was deemed of interest and
21  potentially suspicious, which is what
22  we're required to do under the
23  regulations.
24    Q.   You did not -- my -- it's a

Page 228

1  factual question.  Your consultant told
2  you that you didn't have a statistically
3  based model in 2010, correct?
4    A.   The consultant told us that
5  we could enhance our program by
6  implementing a statistically based model
7  or an improved statistically based model.
8    Q.   They said you need one.  You
9  need a statistically based model.  You
10  didn't have one in 2010.  That's what
11  they told you, sir, correct?
12    A.   The consultant gave us
13  recommendations on how to improve our
14  program.
15    Q.   Okay.  And we know that the
16  recommendation they gave you in 2010
17  about implementing a statistically based
18  program, they were giving you the same
19  recommendation in 2015, correct?
20    A.   That's your interpretation.
21    Q.   That's what the document
22  states.  That's what they wrote, correct?
23    Is that what they wrote,
24  sir?

Page 229

1    A.   SOMs is an evolving
2  landscape.
3    Q.   Is that what they wrote,
4  sir?
5    You'll have a chance to give
6  speeches and stuff with counsel, and do
7  whatever you guys need to do.
8    For my examination, is that
9  what they wrote?
10    MS. VANNI:  Objection to
11  colloquy and arguing with the
12  witness.
13    THE WITNESS:  What specific
14  part of the document are you
15  referring to?  Let's go back and
16  look at it.
17    MS. VANNI:  I'm going to
18  need a lunch break soon.  We've
19  been going over an hour and a
20  half.
21    MR. BUCHANAN:  I -- I
22  understand that and I -- I
23  certainly would not have
24  anticipated this kind of fuss on

Highly Confidential – Subject to Further Confidentiality Review

Page 230

1 this point.
2 BY MR. BUCHANAN:
3 Q. Okay. Let's go to 11.
4 A. Page 11?
5 Q. I'm sorry, Exhibit 11,
6 E-1056.10.
7 A. Oh, I'm sorry. Back in the
8 other one.
9 Q. At the bottom it states,
10 "Although it was stated that sales are
11 mainly to large wholesalers, a program
12 must be instituted based on customer
13 sales volume, seasonal fluctuations, et
14 cetera, with a firm statistical analysis
15 as the basis for such a program."
16 Did I read that correctly?
17 A. You read it correctly.
18 Q. Let's go to 2015, sir.
19 Exhibit 14.
20 Let's go to -- this is the
21 five-year refresh with Cegedim Dendrite
22 and Mr. Buzzeo, a DEA consultant called
23 in, who looks, after several days, at
24 your SOM process. And writes, "It's

Page 231

1 recommended that you improve your SOM
2 program with a defensible statistical SOM
3 model."
4 That's 1072.24. Do you see
5 that, sir?
6 A. I see that.
7 Q. Thank you.
8 MR. BUCHANAN: We can take a
9 break.
10 THE VIDEOGRAPHER: Off the
11 record at 12:09 p.m.
12 - - -
13 (Lunch break.)
14 - - -
15 A F T E R N O O N   S E S S I O N
16 - - -
17 THE VIDEOGRAPHER: We are
18 back on the record at 12:58 p.m.
19 - - -
20 EXAMINATION (Cont'd.)
21 - - -
22 BY MR. BUCHANAN:
23 Q. All right, sir, welcome
24 back. Do you understand you're still

Page 232

1 under oath?
2 A. I do.
3 Q. Okay. We were looking at
4 Exhibit 14 before the break. To orient
5 ourselves and the jury it's E-1072 on the
6 screen.
7 This was the distribution of
8 a report by Angela Feniger. I think you
9 talked about her from Par, DEA
10 compliance, July 2015, to a team of folks
11 following the Buzzeo PDMA DEA audit which
12 occurred over three days in 2015.
13 Do you see that?
14 A. I see that.
15 Q. Okay. Just to orient you,
16 sir, we were talking about some of the
17 findings. Let's start at 1072.4.
18 We looked at a portion of
19 the report before lunch, but I'll just
20 orient us on the letter. Second to last
21 paragraph reads, "Findings and
22 recommendations in this report are
23 offered as consistent with DEA
24 regulations and industry best practice

Page 233

1 for enhanced regulatory compliance for
2 those areas reviewed."
3 Did I read that correctly?
4 A. You did.
5 Q. All right. Let's go on
6 to -- we spent some time, and I'll
7 characterize it, a little bit of a fuss
8 before lunch, talking about the review of
9 the suspicious order monitoring system at
10 .23.
11 Do you recall our discussion
12 before lunch?
13 A. I do.
14 Q. Okay. And let's look at the
15 last bullet again. "The SOP does not
16 contain instructions for reporting
17 suspicious orders. Instead, there is a
18 section which is bolded which states that
19 criminal activities will be reported to
20 federal and state agencies, including the
21 Food and Drug Administration and the
22 board of pharmacy within three days."
23 Do you see that, sir?
24 A. I see that.

Page 234

1  Q.   And I -- didn't I read it
2  correctly that says, "The SOP does not
3  contain instructions for reporting
4  suspicious orders," correct?
5  A.   That's what Buzzeo is
6  stating here, yes.
7  Q.   Okay.  We looked at .24
8  where the Buzzeo folks said that "your
9  suspicious order monitoring protocol may
10  be difficult to defend to the DEA."
11  Do you recall that?
12  Review findings and
13  recommendations.  Do you see that
14  portion, sir?
15  A.   I do.
16  Q.   And they again noted, "It
17  may be difficult to explain and defend
18  during a DEA review," correct?
19  A.   That's what they say, yes.
20  Q.   That's with regard to Par's
21  current SOM system as it currently
22  operates, correct?
23  A.   That's what it says.
24  Q.   Okay.  All right.  Now let's

Page 235

1  move forward to -- I guess there's a
2  separate section here.  It was a specific
3  review of the company's SOP.
4  I'll take you back to .39.
5  It's on the screen for your convenience
6  as well, sir.
7  This is another letter from
8  Mr. Buzzeo to Mr. Barbarite.  And it's
9  reviewing standard operating procedures,
10  including the suspicious order monitoring
11  SOP, SOP.
12  Do you see that, sir?
13  A.   Yeah, if I can just take a
14  quick look at that.
15  Q.   Sure.  That's fine.
16  And I can tell you quickly,
17  I'm going to take you to .40, the next
18  page for my next question.
19  A.   Okay.
20  Q.   Okay.  So at the top of
21  Page .40, it says, "Par Pharmaceutical
22  Inc. review of standard operating
23  procedures."
24  And just to orient

Page 236

1  ourselves, this is a report that was
2  prepared by the Buzzeo folks and sent to
3  you guys, right, Par Pharmaceutical?
4  A.   Right.
5  Q.   Okay.  Review of standard
6  operating procedures.  Can you scroll
7  down, please.
8  And it highlights, "The
9  following Par Pharmaceutical SOPs were
10  selected for the consultants for review."
11  And let's pause up top.
12  "Suspicious order
13  monitoring, SOM number," and then it says
14  SO002.1.
15  Do you see that?
16  A.   I see that.
17  Q.   Do you recollect that
18  number, sir, as being the -- the SOM --
19  excuse me, the SOP version and number for
20  the suspicious order monitoring protocol
21  we looked at from, I believe it was
22  October 2012?
23  A.   I do.
24  Q.   Okay.  So does that indeed

Page 237

1  indicate to you, sir, that the
2  October 2012 SOM was the current SOM as
3  of the time of this review in mid 2015 by
4  your consultants?
5  A.   That's the one they are
6  reviewing.
7  Q.   Okay.  And the jury will
8  have this document, but it certainly
9  identifies deficiencies and other issues
10  with regard to the SOP.
11  But I want to direct your
12  attention to the next page, .41.
13  Could you turn the page,
14  please, sir?
15  MS. VANNI:  Object to form.
16  BY MR. BUCHANAN:
17  Q.   Are you on the other page?
18  A.   41?
19  Q.   Yes.
20  "As noted, the entire
21  approach" -- it's the first full
22  paragraph.  Do you see that?
23  A.   I see that.
24  Q.   "As noted, the entire

Page 238

1  approach to SOM should be evaluated.
2  However, the requirement to report
3  suspicious criminal activity rather than
4  suspicious orders should be corrected as
5  soon as possible, since it misses the
6  point of the regulations."
7          Did I read that correctly,
8  sir?
9      A.   That's what it says.
10     Q.   And you had this information
11 certainly within the walls of Par
12 certainly by mid 2015, right?
13         MS. VANNI:  Object to form.
14         THE WITNESS:  We had what
15 information?  We had this report?
16 BY MR. BUCHANAN:
17     Q.   Yeah, you had the analysis
18 of your SOP from the consultants
19 internally by mid 2015, correct?
20     A.   Yes.  That's when we had the
21 report.
22     Q.   Okay.  And then it states,
23 "Suspicious orders should be reported as
24 soon as they are identified."

Page 239

1          Did I read that correctly?
2      A.   You read that correctly.
3      Q.   Okay.  And, in fact, sir,
4  you continued to work with this same SOP
5  for another year, right?
6          MS. VANNI:  Object to form.
7          THE WITNESS:  We continued
8      to work with this SOP.
9  BY MR. BUCHANAN:
10     Q.   This SOP that has been
11 evaluated and criticized and commented on
12 by your consultants in 2015, Par
13 continued to use as its SOP for its
14 suspicious order monitoring for another
15 year, correct?
16     A.   At some point --
17     Q.   At least?
18         MS. VANNI:  Object to form.
19         THE WITNESS:  At some point,
20     once we completed the transaction,
21     we essentially merged all of the
22     Par products into the Qualitest
23     program.
24

Page 240

1  BY MR. BUCHANAN:
2      Q.   Yeah.  And so the merger
3  happens when, sir?
4      A.   I believe the transaction
5  completed some time in late 2015.
6      Q.   Yeah.  And for --
7      A.   I don't have the exact date.
8      Q.   For a period of time
9  thereafter, the company -- well, the
10 companies tried to integrate and do
11 things -- the Par business continued to
12 remain within the Par line for some
13 period of time, and the Qualitest
14 functions continued to maintain in the
15 Qualitest functions until an integration
16 could be complete?
17         MS. VANNI:  Object to form.
18         THE WITNESS:  Well, you
19     being various integration --
20     integration activities that
21     carried through that time period.
22         MR. BUCHANAN:  Can I have
23     1840, please.
24

Page 241

1  BY MR. BUCHANAN:
2      Q.   Okay.  Passing to you what
3  we're marking as Exhibit 15.
4          (Document marked for
5          identification as Exhibit
6          Endo-Macrides-15.)
7  BY MR. BUCHANAN:
8      Q.   And Exhibit 15 is an e-mail
9  exchange, if we start at bottom up, which
10 would be on the second page, sir, 1840.2.
11 We see an e-mail from Jaydeep Shukla to
12 Jessica Clark and others.
13         Do you see that?
14     A.   Yes.
15     Q.   Jaydeep Shukla, do you know
16 who that is?
17     A.   She was a -- actually, I
18 think it's a he.  I apologize.  Works in
19 the DEA compliance group within Par.
20     Q.   Okay.  Are you getting that
21 just from the e-mail signature, or did
22 you --
23     A.   No, no.  I know who this
24 person is.

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    Q.   Okay.  Okay.  Fair.  There's
2  a question that's being sent.  Was
3  Jaydeep part of the former organization
4  of Par or the former organization of
5  Qualitest?
6    A.   Former organization of Par.
7    Q.   Okay.  So Jaydeep was asking
8  her colleague?  Or his colleague?
9    A.   Jaydeep is a he.
10    Q.   Thank you.  Is asking his
11  colleague, Ms. Clark, what SOP they are
12  using to do suspicious order monitoring,
13  correct?
14    A.   "Is your group evaluating
15  controlled substance orders as per
16  SOP" -- yeah.  He appears to be trying to
17  confirm that.
18    Q.   Okay.  And the response that
19  he gets in April of 2016, so about a year
20  after the last Buzzeo audit is, "Yes, we
21  evaluate controlled substance orders
22  based on customer provided usage and/or
23  customer typical purchase patterns."
24       Did I read that correctly?

Page 243

1    A.   That's what she says.
2    Q.   And the customer provided
3  usage, that is what was reflected in the
4  SOP that we spent some time on before the
5  lunch break, SOP SO002, correct?
6    A.   Correct.
7    Q.   Okay.  And in fact that SOP
8  number that we referenced there, SOP
9  SO002, is one that was the subject of the
10  comments and criticisms of the Buzzeo
11  group a year earlier, correct?
12       MS. VANNI:  Object to form.
13       THE WITNESS:  Are we talking
14    about 002.1?  Because that would
15    have been the SOP that would have
16    been in place at this time.
17  BY MR. BUCHANAN:
18    Q.   I think, sir, that that's
19  where some confusion exists.  But the --
20  I'll ask your testimony -- I should not
21  testify for you.
22       It looks like the attachment
23  to that e-mail.  The attachment to the
24  e-mail that we're looking at, sir, is

Page 244

1  actually from Ms. Clark's later e-mail of
2  October 25, 2016.
3       Do you see that?
4    A.   Right.
5    Q.   And so she's forwarding
6  along two SOPs that she's directing
7  should then be retired.
8       Do you see that?
9    A.   Yeah.  So we would have been
10  in the integration process at this point.
11    Q.   And that's what I wanted to
12  confirm with you.
13       So prior to October 25,
14  2016, or some time, I guess it would be
15  fair to say, Jaydeep Shukla sends her --
16  his e-mails in April 2016 saying, "Are we
17  still using SOP SO002," from which he
18  gets a reply from Ms. Clark, "Yes, we
19  are."  That's as of April 2016, correct?
20    A.   Correct.
21    Q.   And then we have the
22  ultimate response -- later response from
23  Ms. Clark some five or six months later,
24  "It's time to retire those SOPs,"

Page 245

1  correct?
2    A.   Yes.
3       MS. VANNI:  Object to form.
4       THE WITNESS:  We would have
5    retired those SOPs because the
6    legacy Qualitest SOPs would have
7    now covered those products.
8  BY MR. BUCHANAN:
9    Q.   And thank you, sir, for
10  anticipating where I'm going.
11       So, basically, the SOP
12  structure for the Par operations would
13  have been under the no written SOP
14  framework from 2010 to 2012, correct?
15       MS. VANNI:  Object to form.
16       THE WITNESS:  We would have
17    been reviewing orders even though
18    we didn't have a specific SOP
19    entitled "Suspicious Order
20    Monitoring," we would have been
21    looking at orders for excessive
22    quantities and determining if any
23    order -- if an order was deemed
24    suspicious, then we would have

Page 246

1  taken the appropriate steps.
2       MR. BUCHANAN:  I'll move to
3  strike.
4  BY MR. BUCHANAN:
5       Q.   I just want to be precise on
6  this.  Between 2010 and 2012 there was no
7  SOP for suspicious order monitoring,
8  correct?
9       A.   There was no SOP entitled
10  "Suspicious Order Monitoring."
11       Q.   Okay.  Are you aware of
12  another SOP of Par that provided a
13  suspicious order monitoring function
14  between 2010 and 2012?
15       A.   I'm not aware of one.
16       Q.   Okay.  Thank you.
17       A.   However that doesn't mean
18  that we weren't reviewing orders.
19       Q.   My question was tied to the
20  SOP, sir, as guided by the Buzzeo group
21  in 2010.
22       You were not aware of an
23  SOP, whether titled "Suspicious Order
24  Monitoring," "SOMs," or something else,

Page 247

1  that memorialized the company's practices
2  with regard to suspicious order
3  monitoring between 2010 and 2012,
4  correct?
5       MS. VANNI:  Objection.
6  Asked and answered.
7       THE WITNESS:  I'm not aware
8  of an SOP.
9  BY MR. BUCHANAN:
10       Q.   Thank you.
11       A.   But we do not have SOPs to
12  cover all of our procedures.
13       Q.   Understood.  You're not
14  aware of a policy or procedure -- you're
15  not aware of a written document that sets
16  forth policy -- excuse me.
17       You're not aware of a
18  written document under any name, standard
19  operating procedure, guideline, some
20  other title, by which Par was operating,
21  that memorializes what their guidance was
22  to their employees between 2010 and 2012,
23  correct?
24       MS. VANNI:  Object to form.

Page 248

1       THE WITNESS:  I'm not aware
2  of a document that formalizes or
3  in writing defines how we were
4  reviewing orders during that time
5  frame.
6  BY MR. BUCHANAN:
7       Q.   Between 2012 and 2016, we've
8  identified the SOP, SO002 suspicious
9  order monitoring document that was a
10  discussion of the Buzzeo 2015 audit,
11  correct?
12       A.   I think we've identified
13  SOP --
14       Q.   .0?
15       A.   .0 and .1.
16       Q.   Right.  So between 2012 and
17  2016 to the point of its retirement as an
18  SOP, that was the written SOP that
19  governed the conduct of Par's suspicious
20  order monitoring program, correct, sir?
21       A.   That appears to be the SOP
22  that was in place during that time frame.
23       Q.   And then you alluded to the
24  fact that Par was acquired by Qualitest

Page 249

1  in 2016 -- 2015 right at the time --
2       A.   Par was acquired by Endo.
3       Q.   Pardon?
4       A.   Par was acquired by Endo.
5       Q.   Thank you.  Par was acquired
6  by Endo, but the operations of the
7  generic components of prior Endo are
8  merged with the operations of Par,
9  correct?
10       A.   That's correct.
11       Q.   That doesn't happen in a
12  day, it happens over some period of time,
13  correct?
14       A.   Different parts move quicker
15  than others, but it happens over a period
16  of time.
17       Q.   Okay.  And so ultimately by,
18  it looks like late 2016, the Qualitest
19  organization assumes responsibility for
20  suspicious order monitoring for Par
21  sales, fair?
22       MS. VANNI:  Object to form.
23       THE WITNESS:  For all
24  generic sales.

Page 250

BY MR. BUCHANAN:

Q. Including the prior Par products?

A. That's correct.

Q. Thank you.

Okay. So let's talk a little about Qualitest, then.

A. Okay.

Q. I'm just going to keep my stacks clean.

MR. BUCHANAN: Can you get that ready for me?

BY MR. BUCHANAN:

Q. Before we move into talking in detail about Qualitest, can you pull up Exhibit 4, please.

We spent some time looking at this briefly at the outset. This is, to reorient yourself, sir, this is Exhibit 4. It's -- looks like it's to your right.

Yeah. This is a chart of the -- the Endo sales of opioid-containing products over the

Page 251

years.

Do you see that?

A. I do.

Q. Now, I'll represent to you, sir, the yellow-shaded columns indicate that in the data that was provided to us by counsel, we don't know the size of the unit. We don't know whether it's 100-count bottle. We don't know if it's a, you know, one pint, whatever. Those are just units in the yellow so you understand why there's a different shading there.

But fair to say --

MR. BUCHANAN: And could you just blow up the -- the far right column and the far left column, please.

BY MR. BUCHANAN:

Q. We see in the left column, Endo's product portfolio of opioid containing products over the years, correct?

A. Correct.

Page 252

Q. We see on the right, sales and units, pills or doses, for those various products, correct, sir?

A. Right.

Q. And we're looking at what, about eight billion pills over the years for Endo?

MS. VANNI: Object to form.

THE WITNESS: Over 18 years, eight billion pills over 18 years which is about 440,000 a year I believe, if I did my math right.

BY MR. BUCHANAN:

Q. 440,000?

A. 440 million, I'm sorry.

Q. Yeah, 440 million, right.

We looked at Par's.

MR. BUCHANAN: Can I go to Exhibit 5, please.

BY MR. BUCHANAN:

Q. So we've got about eight billion on Endo.

For Par...

MR. BUCHANAN: Can you do

Page 253

the same thing, please, and blow up the left and the right. Thank you.

BY MR. BUCHANAN:

Q. Par, through the data provided to us, is pushing out, you know, seven to eight billion pills and units of opioid-containing products over its 2010 to 2018 year, correct?

MS. VANNI: Object to form.

THE WITNESS: Par is manufacturing and distributing these quantities based on orders from customers based on orders from patients. And this includes the --

BY MR. BUCHANAN:

Q. You understand patients --

A. This includes the Qualitest portfolio as well.

Q. Yeah, it's an -- it's an interesting point you're making, sir. I don't know how to draw that out, because the way it was produced to us is this is Par data. And I will show you Qualitest

Page 254

1  data in a moment.
2      A.   Sure.
3      Q.   Okay.  But the data as
4  produced to us does include data for the
5  year 2016, '17, and '18.
6          But the aggregate for Par,
7  obviously includes post-merger sales as
8  well, correct?
9      A.   It would.
10     Q.   Okay.  We're looking at
11  seven to eight billion pills and dosing
12  units over the 2010 to 2018 period for
13  Par, correct?
14     A.   That's what it says here.
15     Q.   Okay.  All right.  Let's
16  take now a look at Qualitest.
17         (Document marked for
18         identification as Exhibit
19         Endo-Macrides-16.)
20  BY MR. BUCHANAN:
21     Q.   Sir, passing you what's --
22  what we're marking as Exhibit 6.
23         Again, as in the last case,
24  sir, Exhibit 6 is the summary chart.

Page 255

1          MS. VANNI:  Thank you.
2          MR. BUCHANAN:  Can I
3      actually have the underlying
4      schedule that was provided to us
5      by defense counsel?
6  BY MR. BUCHANAN:
7      Q.   I say provided to us by
8  defense counsel.  The -- this was the
9  data that was identified by Par as its
10  sales and shipments of opioid-containing
11  products over the years.
12     A.   So this data is this --
13     Q.   Yeah.  It's -- it's just
14  collapsed down so that you can see it.
15     A.   Thank you.
16     Q.   On a sheet.
17         MR. BUCHANAN:  What did we
18     call this?  Exhibit 6.
19  BY MR. BUCHANAN:
20     Q.   Okay.  So let's now look at
21  Exhibit 6.  And feel free to reference
22  Exhibit 16 which is the underlying data,
23  if you need to.  To me it's easier to
24  look at Exhibit 6.

Page 256

1          But looking at Exhibit 6.
2          MR. BUCHANAN:  And pulling
3      up 1810 on the screen, please.
4  BY MR. BUCHANAN:
5      Q.   Qualitest data was produced
6  to us only from 2008 to 2015.  So our
7  chart here starts at 2008.
8          It is my understanding, sir,
9  is it yours, that Qualitest was in the
10  business of making opioids well before
11  2008?
12         MS. VANNI:  Object to form.
13         THE WITNESS:  I can't speak
14      to Qualitest prior to 2007.  That
15      was a different company.
16      I can tell you that we would
17      have been distributing opioids in
18      2007.  I can't speak to prior to
19      2007.
20  BY MR. BUCHANAN:
21     Q.   Obviously the -- the entity
22  was bought by, is it Apax Partners or --
23  do you -- do you know who the predecessor
24  entity was before Endo bought Qualitest?

Page 257

1      A.   I believe it was a company
2  called Apax.
3      Q.   Right.  And they bought an
4  established business in late 2007 that
5  continued to do business as Qualitest,
6  correct?
7          MS. VANNI:  Object to form.
8          THE WITNESS:  The company
9      that Endo purchased did business
10      as Qualitest.
11  BY MR. BUCHANAN:
12     Q.   And the company that Endo
13  purchased it bought from Apax, correct?
14     A.   That is my understanding.
15     Q.   Apax is a private equity
16  firm?
17     A.   That is my understanding.
18     Q.   Apax bought the company in
19  2007, gussied it up and flipped it off to
20  Endo in 2010.
21         MS. VANNI:  Object to form.
22         THE WITNESS:  I don't really
23      know much about Apax' operating
24      philosophy.  I just know that they

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  owned the company and then sold it
2  to Endo.
3  BY MR. BUCHANAN:
4      Q.  Okay.  Well, and I guess the
5  relevant point for us, sir, is that the
6  entity that Apax bought in 2007 had been
7  in the opioid business for years, right?
8      A.  I can't really speak to
9  anything prior to 2007.  I -- I
10  believe -- I believe that Endo bought
11  different legal entities than what was
12  being operated prior to 2007.
13          But I don't have specific
14  knowledge about the legal entity
15  structure of those companies.
16      Q.  Okay.  Let's -- let's take a
17  short fork in the road just so we can
18  make sure the record is clear.
19          MR. BUCHANAN:  Could I have
20      1813, please.  I think that's one
21      of my -- there we go.
22          What's this going to be next
23      in order, 17?
24          (Document marked for

Page 259

1      identification as Exhibit
2      Endo-Macrides-17.)
3  BY MR. BUCHANAN:
4      Q.  There you are, sir.  Passing
5  you what's been marked as Exhibit 17 to
6  your deposition.  It's an e-mail between
7  Paul Evans and Jeremy Tatum.  Do you know
8  Paul?
9      A.  I do not know Paul Evans.
10      Q.  Do you know Mr. Tatum?
11      A.  I do know Jeremy Tatum.
12      Q.  Who's Mr. Tatum?
13      A.  Jeremy Tatum was involved in
14  the commercial organization within
15  Qualitest.
16      Q.  Okay.  Well, let's -- we are
17  looking at a Par document here from 2010.
18  Let's go to -- there's an e-mail between
19  them, Mr. Evans and Mr. Tatum on May 27,
20  2010.  "Qualitest overview for business
21  development."
22          Let's go to 1813.3, company
23  overview.
24          "Qualitest is a U.S.-based

Page 260

1  pharmaceutical company focused on the
2  development, manufacture, sale and
3  distribution of high quality, low cost
4  generic pharmaceutical products."
5          Do you see that?
6      A.  I see that.
7      Q.  And that's true as far as
8  you understand, as of 2010, correct, sir?
9      A.  That's my understanding.
10      Q.  Okay.  In fact, they say
11  they are a leading developer, going to
12  1813.4, correct?  "A leading developer,
13  manufacturer and marketer of prescription
14  generic pharmaceutical products,"
15  correct?
16      A.  That's what it says here.
17      Q.  And you agree with that as
18  of that point in time, correct, sir?
19      A.  I agree that Qualitest
20  developed, manufactured and marketed
21  prescriptions and generic pharmaceuticals
22  products.  The word "leading" is somebody
23  else's word, but it's not my word.
24      Q.  Okay.  Well, it's certainly

Page 261

1  from -- from one senior guy to another
2  senior guy, right?
3          MS. VANNI:  Object to form.
4  BY MR. BUCHANAN:
5      Q.  Mr. Evans was the VP of
6  business development who's sending this
7  along?
8      A.  That's what his title says.
9      Q.  Okay.  So from one senior
10  guy to another senior guy, fair?
11          MS. VANNI:  Object to form.
12          THE WITNESS:  It's a
13      communication between two people
14      with a document with some
15      information about Qualitest.
16  BY MR. BUCHANAN:
17      Q.  And Qualitest's business was
18  focused on controlled substances, right?
19          MS. VANNI:  Object to form.
20  BY MR. BUCHANAN:
21      Q.  Do you see that in the
22  middle?  It says, "Focused on controlled
23  substances and developing a broad line of
24  OCs."

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1          Do you see that?
2     A.   "Focused on controlled
3  substance and developing a broad line of
4  OCs."
5          That's what it says.
6     Q.   Okay.  And so you
7  understand, sir, that over time,
8  Qualitest started to get into the oral
9  contraceptive market?
10    A.   I understand that.
11    Q.   Okay.  Started to develop --
12 expand into oral contraceptives, right?
13         MS. VANNI:  Objection as
14    beyond the scope.  Go ahead.
15 BY MR. BUCHANAN:
16    Q.   I just want to know --
17 that's what we are talking about with
18 OCs, right?
19    A.   Qualitest expanded into oral
20 contraceptives.
21    Q.   The jury might see OxyContin
22 or oxycodone as OC.  I just didn't want
23 to sew confusion with that.
24         So as I understood that

Page 263

1  reference, it was referring to oral
2  contraceptives?
3     A.   That's my understanding as
4  well.
5     Q.   Right.  And at this point in
6  time, Qualitest was developing a new line
7  in trying to grow its oral contraceptive
8  business, right?
9          MS. VANNI:  Object to form.
10         THE WITNESS:  As I
11    understand it, they -- they had a
12    desire to move into that business.
13 BY MR. BUCHANAN:
14    Q.   Right.  But their -- the
15 real focus as of that point in time was
16 controlled substances, right?
17         MS. VANNI:  Object to form.
18         THE WITNESS:  That's what
19    this document says.
20 BY MR. BUCHANAN:
21    Q.   So let's go to 1813.5.
22         This is the history of the
23 fifth largest U.S. generics company.
24    A.   Oh, I'm sorry.

Page 264

1     Q.   Which you understand is
2  Qualitest as of this point in time,
3  correct?
4     A.   It says here that, "History
5  of the fifth largest U.S. generics
6  company."
7     Q.   Founded in 1983 with who?
8     A.   "Founded as a generic
9  product distribution, joint venture with
10 Kmart."
11    Q.   Kmart.  As in the store?
12         MS. VANNI:  Object to form.
13         THE WITNESS:  I can't
14    speak --
15         MS. VANNI:  And beyond the
16    scope of his 30(b)(6).
17         THE WITNESS:  -- to this.
18    That's 1983.  I don't know.
19 BY MR. BUCHANAN:
20    Q.   Okay.  Founded as a generic
21 product distribution JV with Kmart 1983.
22 And it kind of runs through the history
23 of Qualitest through the years.
24         So Qualitest has a history

Page 265

1  that goes back to the early '80s,
2  according to the VP of business
3  development for Qualitest, correct?
4     A.   According to what it says
5  here.
6     Q.   Sure.  It says it was
7  acquired by Apax Funds in 2007, right?
8     A.   Acquisition by Apax Funds,
9  2007.
10    Q.   Right.  Then it was just the
11 seventh largest generic company, right?
12    A.   That's what they say here.
13    Q.   And then in three years, as
14 I say, they gussied up a little bit, grew
15 the business.  And by 2010 you were the
16 fifth largest generic company; isn't that
17 right?
18         MS. VANNI:  Object to form.
19         THE WITNESS:  That's what it
20    says here.
21 BY MR. BUCHANAN:
22    Q.   Talking about how the
23 revenue had grown in 2009 to over 300
24 million, right?  That's what it says,

Page 266

1 right?
2     A.   Yeah.
3     Q.   I mean, opioids, which
4 Qualitest was focused on, were good for
5 business, right?
6        MS. VANNI:  Object to form.
7        THE WITNESS:  Opioids were
8     products that people with severe
9     pain needed.
10 BY MR. BUCHANAN:
11     Q.   And we saw how those colors
12 changed over the years in terms of, as
13 sales increased, how the body count
14 increased in this country.  Do you recall
15 us looking at that, sir, with those maps
16 of the CDC?
17        MS. VANNI:  Objection.
18        THE WITNESS:  I recall
19     looking at the color-coded maps.
20 BY MR. BUCHANAN:
21     Q.   You agree that the rate of
22 deaths due to opioid use increased over
23 the years?
24        MS. VANNI:  Objection.

Page 267

1 BY MR. BUCHANAN:
2     Q.   Steadily from 2000 to 2016?
3        MS. VANNI:  Objection.
4        THE WITNESS:  I can't
5     interpret those -- those graphs
6     and I don't believe it said
7     anywhere on there that it was
8     specific to opioid abuse.
9 BY MR. BUCHANAN:
10     Q.   Okay.  Let's look at 1813.9.
11 "Diversified portfolio of specialty
12 generics positioned in" -- what does that
13 say -- "attractive product categories."
14     A.   "Attractive product
15 categories."  That's what it says.
16     Q.   And the first one listed on
17 the left is what?
18     A.   It says controlled
19 substances.
20     Q.   Okay.  As an attractive
21 product category.  It states, "Leading
22 manufacturer of controlled substances in
23 the United States."
24        Did I read that correctly,

Page 268

1 sir?
2     A.   That is what they say here.
3     Q.   When you say "they," you're
4 referring to the vice president of
5 business development for Qualitest,
6 right, on a Qualitest PowerPoint that
7 says Qualitest Pharmaceuticals at the
8 bottom, right?
9        MS. VANNI:  Objection.  Lack
10     of foundation.
11        THE WITNESS:  Yes, this is a
12     document that describes
13     Qualitest's business.
14 BY MR. BUCHANAN:
15     Q.   And the way Qualitest is
16 describing itself to others, is a leading
17 manufacturer of controlled substances in
18 the United States, right, in 2010?
19     A.   That's what it says here.
20     Q.   43 percent of total revenues
21 for this company in 2009 are for
22 controlled substances, correct, sir?
23     A.   Controlled substances across
24 all scheduled categories, Schedule II

Page 269

1 through Schedule V.  And certainly a
2 pharmaceutical company is in the business
3 to provide products to patients who need
4 them.  So when we -- when we say
5 attractive product category, we're
6 defining that as where the patient need
7 is because we are in the business of
8 supplying these products to patients who
9 need them.
10     Q.   It looks like you're really
11 defining attractive product category
12 here, sir, by how much money you make,
13 right?
14        MS. VANNI:  Object to form.
15 BY MR. BUCHANAN:
16     Q.   Isn't that how you define
17 attractive, by how much money you make?
18        MS. VANNI:  Objection.
19        THE WITNESS:  Our mission as
20     a pharmaceutical company is to
21     provide products to patients who
22     need them.
23 BY MR. BUCHANAN:
24     Q.   I don't see any of that on

Page 270

1 this page about attractive product
2 categories, sir. I see you talking about
3 dollars.
4 　　　Would you agree with me
5 that's what you're talking about on this
6 page, not the speech you're starting to
7 provide or have been providing about
8 that?
9 　　　MS. VANNI: Object to form.
10 BY MR. BUCHANAN:
11 　　Q. Do you agree with me?
12 　　　MS. VANNI: Same objection.
13 　　　THE WITNESS: I don't agree
14 with your characterization. This
15 doc --
16 BY MR. BUCHANAN:
17 　　Q. Let's take a look.
18 　　A. -- this document is a
19 business development document prepared
20 most likely to market Qualitest to
21 potential buyers.
22 　　Q. And so what we have here,
23 Qualitest in 2010, talking about itself,
24 how it's positioned in attractive product

Page 271

1 categories. Category 1, controlled
2 substances, correct?
3 　　　Do you see that?
4 　　A. That's what it says.
5 　　Q. Leading manufacturer of
6 controlled substances in the United
7 States at a point when people are getting
8 addicted more, people are dying more,
9 people are entering treatment more than
10 they ever have before.
11 　　　And that's your attractive
12 product category, correct?
13 　　　MS. VANNI: Objection.
14 　　　THE WITNESS: These products
15 were being supplied to patients
16 who are in pain, who need pain
17 management.
18 　　　We had programs, processes,
19 and procedures in place to prevent
20 the diversion and abuse of these
21 products.
22 BY MR. BUCHANAN:
23 　　Q. We saw all the way back in
24 2003, sir, Percodan, Percocet being

Page 272

1 abused and diverted. Endo's trade name.
2 Their products being abused and diverted
3 as reported by the DEA.
4 　　　You saw that, correct?
5 　　　MS. VANNI: Object to form.
6 　　　THE WITNESS: I saw that in
7 the DEA communication.
8 BY MR. BUCHANAN:
9 　　Q. All right. Well, let's look
10 at this.
11 　　　43 percent of total revenues
12 in 2009 under controlled substances.
13 　　　Top three products by
14 revenue.
15 　　　Again, we are talking -- and
16 the company presenting its business here,
17 is presenting it in terms of revenue,
18 right?
19 　　A. As I said, this is a
20 business development document. This --
21 　　Q. Is that how it's presenting
22 itself, with revenue?
23 　　A. That's what it says here.
24 　　Q. Thank you.

Page 273

1 　　　Top three products by
2 revenue. Number one, controlled
3 substance.
4 　　A. Hydrocodone, Schedule III at
5 that time.
6 　　Q. Okay. Where is it today, by
7 the way?
8 　　A. Schedule II.
9 　　Q. Why is that?
10 　　　MS. VANNI: Object to form.
11 　　　THE WITNESS: DEA had
12 reclassified it at some point.
13 BY MR. BUCHANAN:
14 　　Q. Because of all the abuse and
15 diversion.
16 　　　MS. VANNI: Objection.
17 BY MR. BUCHANAN:
18 　　Q. Right?
19 　　A. Making it subject to the
20 same guidelines as other Schedule IIs.
21 　　Q. Oxycodone, one of your top
22 three products by revenue, right?
23 　　A. That's what it says.
24 　　Q. Okay. And we see, if you

Highly Confidential - Subject to Further Confidentiality Review

Page 274

¹ look at the bottom, 2009 segment revenue,
² or overview, dollars in revenue, there's
³ a little pie chart, right?
⁴          Controlled substances
⁵ tablets, 36 percent of your revenue was
⁶ selling opioids to the American people,
⁷ right?
⁸          MS. VANNI:  Object to form.
⁹          THE WITNESS:  Well, that's
¹⁰    controlled substances.  That would
¹¹    include all products from
¹²    Schedule II through Schedule V.
¹³          Not all of those products
¹⁴    are opioids.
¹⁵ BY MR. BUCHANAN:
¹⁶     Q.   Controlled substances
¹⁷ liquid, you picked up another 7 percent
¹⁸ there, right?
¹⁹          MS. VANNI:  Object to form.
²⁰          THE WITNESS:  That's what
²¹    the chart says.
²² BY MR. BUCHANAN:
²³     Q.   Go to the next page, sir.
²⁴          "Qualitest has a strong

Page 275

¹ presence and broad product line in the
² controlled substances market."
³          Do you see that?
⁴     A.   I see that.
⁵     Q.   And that was a true
⁶ statement as of 2009 and '10, right?
⁷     A.   That's how Qualitest was
⁸ describing themselves.
⁹     Q.   Well, you're not saying they
¹⁰ were misdescribing themself, are you,
¹¹ sir?
¹²          MS. VANNI:  Object to form.
¹³          THE WITNESS:  I'm saying
¹⁴    that Qualitest was manufacturing
¹⁵    and distributing opioids during
¹⁶    this time frame.
¹⁷ BY MR. BUCHANAN:
¹⁸     Q.   And what Qualitest was
¹⁹ saying and what Endo bought, Endo found
²⁰ Qualitest attractive and purchased it,
²¹ correct?
²²          MS. VANNI:  Object to form.
²³          THE WITNESS:  Endo purchased
²⁴    Qualitest.

Page 276

¹ BY MR. BUCHANAN:
²     Q.   Right.  So what Qualitest is
³ selling here, from a business
⁴ perspective, Endo wanted, right?
⁵          MS. VANNI:  Object to form.
⁶          THE WITNESS:  Endo was
⁷    looking to diversify and purchase
⁸    a generics business.  That's my
⁹    understanding.
¹⁰ BY MR. BUCHANAN:
¹¹     Q.   Endo was selling plenty of
¹² generics before, true?
¹³          MS. VANNI:  Object to form.
¹⁴ BY MR. BUCHANAN:
¹⁵     Q.   We looked at your Endocet
¹⁶ pills and all the other generics that
¹⁷ Endo was selling in the charts briefly
¹⁸ this morning.
¹⁹          Do you remember that?
²⁰     A.   Endo was selling generic
²¹ products.
²²     Q.   Okay.  Well, let's look at
²³ what Qualitest is saying.  They've got a
²⁴ strong presence and broad product line in

Page 277

¹ the controlled substances market.  And
² the strategy, in the controlled substance
³ market, continue to expand portfolio and
⁴ broaden offerings in what, sir?
⁵     A.   In controlled substances.
⁶     Q.   In this category, in
⁷ controlled substance.  Broaden the
⁸ portfolio and offerings.  We talk
⁹ offerings, we're talking about controlled
¹⁰ substances, right?
¹¹     A.   Right.  There are many
¹² products that are controlled substances
¹³ that aren't necessarily opioids.
¹⁴     Q.   Who is looking at those
¹⁵ death maps at Qualitest and Endo in 2009?
¹⁶          MS. VANNI:  Objection.
¹⁷ BY MR. BUCHANAN:
¹⁸     Q.   Seeing what a big problem we
¹⁹ had in this country?
²⁰          MS. VANNI:  Objection.
²¹          THE WITNESS:  I can't speak
²²    to your death maps.  I don't know
²³    the origin of those documents.
²⁴ BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1     Q.   Who is looking at the rates
2  of abuse and death and treatment in this
3  country in 2009 and 2010 when Endo is
4  buying a company that's looking to expand
5  its portfolio and broaden its offerings
6  in controlled substances?
7          MS. VANNI:  Object to form.
8          THE WITNESS:  I can tell you
9      that we were developing controls
10     and enhancing our processes and
11     procedures to ensure the proper
12     control of these products, so that
13     they weren't diverted or abused.
14 BY MR. BUCHANAN:
15     Q.   We already saw back in 2003
16 the DEA had to issue a notice about your
17 two products, right, Percocet and
18 Percodan?
19         MS. VANNI:  Object to form.
20         THE WITNESS:  There was a
21     communication from the DEA in
22     2003 --
23 BY MR. BUCHANAN:
24     Q.   Right.

Page 279

1     A.   -- expressing some concerns
2  about --
3     Q.   The American public?
4          MS. VANNI:  Object to form.
5  BY MR. BUCHANAN:
6     Q.   Not just to you, to
7  everybody, right?
8     A.   That's correct.
9     Q.   Let's look, so we have a
10 sense of where Qualitest came from back
11 in 1983.  Starting with Kmart, and
12 focused on controlled substances to a
13 place where in 2009, 43 percent of its
14 business is controlled substances.  You
15 understand that from what we just
16 reviewed, correct, sir?
17         MS. VANNI:  Object to form.
18         THE WITNESS:  That's what it
19     says there, yes.
20 BY MR. BUCHANAN:
21     Q.   Okay.  This was the business
22 that Endo and we saw how Qualitest was
23 looking to broaden its offerings.  You
24 recall seeing that, correct?

Page 280

1     A.   That's in the document.
2     Q.   Okay.  Well, let's look at
3  the Qualitest numbers again.  So looking
4  at Exhibit 6.  Can we pull up 1810.
5          All right.  So it looks like
6  it worked.
7          MS. VANNI:  Is there a
8      question?
9  BY MR. BUCHANAN:
10     Q.   Do you see the growth?
11     A.   Are you asking me a specific
12 question?
13     Q.   I am.  Do you see the
14 growth?
15         MS. VANNI:  Object to form.
16         THE WITNESS:  Which growth
17     are you referring to?
18 BY MR. BUCHANAN:
19     Q.   Well, okay.  So we're
20 looking now at Exhibit 6, 1810 by E
21 number.  What we see in 2008, it's 957
22 million pills.  957 million pills in a
23 year, or dosage units.
24         Do you see that?

Page 281

1     A.   I see that as the total for
2  2008.
3     Q.   And then we see, you know,
4  with this predecessor firm that got in
5  and grew the business a little bit, from
6  957 million pills to 1.3 million pills
7  right, or dosage units?
8          Do you see that, sir?
9     A.   That's the total for 2009.
10     Q.   Up to 1.6 billion in 2010,
11 right?
12     A.   That's the number for 2010.
13     Q.   Up, up, and away.
14         MS. VANNI:  Objection.
15         MR. BUCHANAN:  I'm sorry.
16 BY MR. BUCHANAN:
17     Q.   The business grew, right?
18     A.   The units sold are
19 increasing.
20     Q.   Okay.
21         MR. BUCHANAN:  Can you take
22     that down.  And let's see with a
23     little more -- oh, it looks like
24     it's still going.

Page 282

BY MR. BUCHANAN:

1. Q. 2011. Do you see that? 2.4 billion?

MS. VANNI: Object to form.

BY MR. BUCHANAN:

Q. Moving more opioids, moving more controlled substances, growing the businesses, growing your revenue.

MS. VANNI: Object to form.

BY MR. BUCHANAN:

Q. Right?

A. There's growth here from across this time arising due to probably a number of circumstances.

Q. Okay. 2012, three billion. That's quite a five-year run, sir. Would you agree?

MS. VANNI: Object to form.

THE WITNESS: I don't know what you mean by that. There is sales growth from 2008 to 2012 in terms of the number of tablets shipped.

BY MR. BUCHANAN:

Page 283

Q. Yeah. There's sales growth that -- would you call a 400 percent sales growth, 300 percent sales growth pretty significant, sir, in five years?

MS. VANNI: Object to form.

THE WITNESS: It's a growing business. There are a number of factors that influence that. Other companies come off the market, demand moves around. This is a generics market. There is a lot of fluctuation in the demand. Customers move products for various reasons.

BY MR. BUCHANAN:

Q. So 300 percent growth, your role in this market, 300 percent growth from where you were in 2008 to 2012, correct?

A. That's what the numbers say.

Q. By 2012, you're pushing out ten pills for every human being in the United States?

MS. VANNI: Object to form.

Page 284

And note my objection. This is beyond the scope of his 30(b)(6) testimony. He's not designated as a person to interpret sales -- witness to interpret sales. Excuse me.

BY MR. BUCHANAN:

Q. Do you see that, sir?

A. Can you repeat your question, please.

Q. By 2012, you're pushing out ten pills for every human being in the United States; isn't that right, sir?

MS. VANNI: Object to form.

THE WITNESS: By 2012, we're manufacturing and distributing 3.2 billion pills to patients who need them.

BY MR. BUCHANAN:

Q. Okay. You know a lot of those drugs were abused and diverted, don't you, sir?

MS. VANNI: Objection.

THE WITNESS: I can't speak

Page 285

to the specific amount of these products that may or may not have been diverted. I can tell you that we had controls in place to prevent diversion and abuse.

BY MR. BUCHANAN:

Q. Not good ones.

MS. VANNI: Objection.

BY MR. BUCHANAN:

Q. Right?

MS. VANNI: Objection.

THE WITNESS: I wouldn't characterize it that way. We had evolving controls in place to --

BY MR. BUCHANAN:

Q. You had --

A. -- prevent diversion and abuse.

Q. You had inadequate controls to monitor for suspicious order -- suspicious orders of controlled substances at Qualitest; isn't that true, sir?

MS. VANNI: Object to form.

Page 286

1 　　　　THE WITNESS: I wouldn't
2 agree with that characterization.
3 BY MR. BUCHANAN:
4 　　Q.　Isn't that what your
5 consultants told you?
6 　　　　MS. VANNI: Object to form.
7 　　　　THE WITNESS: We hired
8 consultants to challenge us. Our
9 consultants tell us a lot of
10 things. We hire them and pay them
11 to come in and challenge us and
12 raise the bar for us. We don't --
13 we don't necessarily take every
14 recommendation that a consultant
15 gives us. We evaluate, and we use
16 their input to improve and enhance
17 our programs.
18 BY MR. BUCHANAN:
19 　　Q.　The answer to my question
20 would be yes, your consultants did tell
21 you that, right?
22 　　　　MS. VANNI: Objection.
23 　　　　THE WITNESS: Our
24 consultants told us a number of

Page 287

1 things.
2 BY MR. BUCHANAN:
3 　　Q.　Did your consultants tell
4 you that, sir?
5 　　A.　Is there a specific document
6 that you're referring to with that --
7 　　Q.　Do you have that
8 recollection, sir, that your consultants
9 told you in or around 2013 that you had
10 inadequate suspicious order monitoring
11 practices?
12 　　A.　Our consultants --
13 　　　　MS. VANNI: Objection.
14 　　　　THE WITNESS: Sorry.
15 BY MR. BUCHANAN:
16 　　Q.　Do you recall that, yes or
17 no?
18 　　A.　I recall our consultants
19 giving us a lot of input at various
20 intervals during that time frame. They
21 may have used the word "inadequate." If
22 you can point to a specific document
23 where they may or may not have used that
24 word, then I can comment on it.

Page 288

1 　　Q.　You also know, sir, in 2012,
2 there's a declaration by the CDC that
3 this was an epidemic, right?
4 　　　　MS. VANNI: Object to form.
5 BY MR. BUCHANAN:
6 　　Q.　Did you hear that?
7 　　　　MS. VANNI: Beyond the
8 scope.
9 　　　　THE WITNESS: I believe I
10 testified earlier that I
11 understood that there was an
12 opioid abuse epidemic in this
13 country.
14 　　　　MR. BUCHANAN: Can we pull
15 that back up, please.
16 BY MR. BUCHANAN:
17 　　Q.　You see your role in the
18 epidemic certainly between 2008 and 2012,
19 certainly there is no debate that
20 Qualitest's contribution to this market
21 increased a lot between 2008 and 2012,
22 correct?
23 　　　　MS. VANNI: Objection.
24 　　　　THE WITNESS: Qualitest's

Page 289

1 sales of tablets increased during
2 that time frame.
3 BY MR. BUCHANAN:
4 　　Q.　300, 350 percent, right?
5 　　A.　In that vicinity.
6 　　Q.　Okay. All right. So when
7 we look, blow this out and we go forward
8 in time -- we only have data through
9 2015, sir. I guess that's because after
10 2015, some of the Qualitest data is
11 probably reported on the Par sheets.
12 Would that be your expectation?
13 　　A.　That would be correct.
14 　　Q.　The way the reporting --
15 　　A.　That would be correct.
16 　　Q.　Okay. So we see here for
17 the, what is that, eight years we have
18 data, in eight years Qualitest put out
19 close to 19 billion tablets and dosage
20 units of opioid containing products.
21 　　　　MS. VANNI: Objection.
22 Beyond the scope.
23 　　　　THE WITNESS: Over this time
24 period, just under 19 billion

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  tablets.
2  BY MR. BUCHANAN:
3      Q.   Yeah.  And over this time
4  period, we're not incorporating the --
5  the legacy Qualitest products after 2016.
6  So there would be more, right?
7      A.   Those would be on the Par
8  sheet.
9      Q.   Right.  So additional
10 billions of pills for 2016, '17 and '18
11 until today, correct?
12         MS. VANNI:  Object to form.
13         THE WITNESS:  Whatever the
14     numbers are.  We can go look at
15     the numbers if you want.
16 BY MR. BUCHANAN:
17     Q.   Sure.  Go ahead.  What
18 exhibit are you referring to?
19     A.   I'm referring back to
20 1809.1.
21     Q.   Can you give us the numbers
22 for 2015 on the Par sheet?
23     A.   It says 2.6 billion.
24     Q.   Can you give us the numbers

Page 291

1  for 2016?
2      A.   2.1 billion.
3      Q.   Can you give us the number
4  for the 2017?
5      A.   1.4 billion.
6      Q.   And in 2018?
7      A.   660 million.
8      Q.   Okay.  But if we wanted to
9  get a sense, if you will, of the combined
10 contribution of Par, Endo and Qualitest's
11 manufacture and shipments of opioid
12 products, we could look at the total of
13 the three sheets and just put them
14 together, right?
15         MS. VANNI:  Object to form.
16         THE WITNESS:  With the
17     exception of 2015, because I think
18     2015 is duplicated on the Par and
19     the Qualitest sheets.
20 BY MR. BUCHANAN:
21     Q.   I -- I -- that may be so.  I
22 don't have a way to reconcile that.
23 We -- we got the data streams that were
24 provided by counsel.

Page 292

1      A.   It was -- it's difficult,
2  because that was the integration period
3  but --
4      Q.   Okay.
5      A.   I think you would have to --
6      Q.   Have to tease that one out a
7  little bit?
8      A.   You'd have to consider that.
9      Q.   Okay.  At this point we've
10 just relied on the -- the summary sheets
11 that have been provided to us by counsel.
12         So what do you -- what do
13 you get when you add those three up, what
14 is that, over 30 billion?
15         MS. VANNI:  Object to form.
16     Beyond the scope.
17         THE WITNESS:  It would be --
18     it would be in that vicinity.
19 BY MR. BUCHANAN:
20     Q.   Yeah.  I guess like 34
21 billion pills and dosage units of opioids
22 made by the Endo entities during the
23 various windows for which we've been
24 given data.  Fair?

Page 293

1          MS. VANNI:  Same objection.
2          THE WITNESS:  According to
3      the data, yes.
4  BY MR. BUCHANAN:
5      Q.   Okay.  I'd like to talk to
6  you about Qualitest's specific suspicious
7  order monitoring programs.  You've been
8  designated on that as well.  You are
9  aware of that?
10     A.   I am.
11     Q.   Okay.
12         MR. BUCHANAN:  Do you mind
13     if we do an early break?
14         MS. VANNI:  No.  We can take
15     a break.
16         THE VIDEOGRAPHER:  Off the
17     record at 1:47 p.m.
18         (Short break.)
19         THE VIDEOGRAPHER:  We are
20     back on the record at 1:56 p.m.
21 BY MR. BUCHANAN:
22     Q.   All right, sir.  Just to
23 orient you and kind of keep our buckets
24 clean, we spent some time talking about

Page 294

1 Par and kind of its evolution, its
2 business, its suspicious order monitoring
3 practices over time.
4        Do you recall that?
5    A.   I do.
6    Q.   Now I'm going to focus in
7 on -- because I'm going to probably use
8 the time -- the name Par from time to
9 time and Qualitest from time to time.
10       But I want to refer to the
11 predecessor entity's business that was
12 Qualitest. That's where we finished up
13 before the break, and if there's any
14 confusion in my terminology, please ask
15 me to clarify and I'll be happy to do
16 that.
17       Okay?
18   A.   Okay.
19   Q.   All right. So in 2013, you
20 are aware that the company actually gets
21 called into DC by the DEA, right?
22       MS. VANNI: Object to form.
23       THE WITNESS: I'm aware of
24    the fact that Qualitest was asked

Page 295

1    to come meet with the DEA.
2 BY MR. BUCHANAN:
3    Q.   Right. In fact, they did,
4 right?
5    A.   They did go meet with the
6 DEA.
7    Q.   Okay.
8       (Document marked for
9    identification as Exhibit
10   Endo-Macrides-18.)
11 BY MR. BUCHANAN:
12   Q.   I'm going to pass you
13 Exhibit 18. I assume you've seen this,
14 sir.
15       It's a copy of a binder that
16 was given to the Qualitest folks who went
17 and met with the DEA on that day,
18 correct?
19       MS. VANNI: Can I have a
20    copy?
21       What is this, 18?
22       MR. BACHMANN: Yes.
23 BY MR. BUCHANAN:
24   Q.   Are you looking to orient

Page 296

1 yourself, sir? I just want to make sure
2 I get an answer --
3    A.   I'm just looking to orient
4 myself to the document.
5    Q.   Okay. That's fine.
6       For the record, we're
7 looking at a lengthy document entitled
8 "Effective Controls Against Diversion of
9 Controlled Substances, Meeting With
10 Vintage Pharmaceuticals March 6, 2013."
11       Do you see that, sir?
12   A.   I see that.
13   Q.   Okay. And you understand
14 Vintage Pharmaceuticals was one of the
15 entities that did business as the name
16 Qualitest, correct?
17   A.   One of the legal entities.
18   Q.   There was a legal entity
19 known as Generics Bidco. There was
20 another entity called Vintage
21 Pharmaceuticals.
22       They both did business as
23 Qualitest from the years before Endo
24 acquired them until the merger with Par

Page 297

1 in 2015-'16, correct?
2    A.   Correct.
3    Q.   Okay. So that we can
4 consider this effectively a meeting with
5 the business that called itself Qualitest
6 at this point in time, correct?
7    A.   I agree.
8    Q.   Okay. And taking your
9 30(b)(6) hat off for the moment.
10   A.   Okay.
11   Q.   Were you -- were you in the
12 Qualitest side of the business prior to
13 the merger?
14   A.   I was an Endo employee at
15 this particular time.
16   Q.   But just to answer my
17 question. Did -- did you have
18 Qualitest's role and function prior to
19 the merger?
20   A.   Prior to the merger, prior
21 to the Par merger?
22   Q.   Yes, sir.
23   A.   So I was an Endo employee
24 initially. At some point I became a

Page 298

1 Qualitest employee. I believe that was
2 in early 2015.
3    Q.   Okay.  So in and around the
4 time that the Par-Qualitest transaction
5 was going to happen?
6    A.   Correct.
7    Q.   Okay.  So at this point in
8 time really, and in the information,
9 testimony you're going to provide is
10 really on the basis of the preparation
11 that you've done to -- to testify for the
12 company today?
13       MS. VANNI:  Object to form.
14       THE WITNESS:  Correct.
15 BY MR. BUCHANAN:
16    Q.   When I say "and around this
17 point in time," I'm pointing to the
18 document.
19       But when we're talking about
20 the interaction between Qualitest or
21 Vintage Pharmaceuticals and the DEA in
22 2013, your testimony really reflects the
23 preparation you've done to answer these
24 questions for us today, correct?

Page 299

1    A.   I would agree.
2    Q.   No firsthand experience at
3 the time, correct?
4    A.   Correct.
5    Q.   All right.  Thank you.  So
6 what happened here is the DEA called you
7 in, in I guess early 2013 to alert you to
8 some information, right?
9       MS. VANNI:  Object to form.
10      THE WITNESS:  The DEA asked
11 us to come in for a meeting.
12 BY MR. BUCHANAN:
13    Q.   Okay.  Well, I mean, they
14 came in and they presented you
15 information about your business as well
16 as the business of people you were
17 selling to and sometimes the business
18 your customers were selling to, right?
19    A.   Right.  The DEA periodically
20 does these things to provide information
21 and to provide guidance.
22    Q.   Well, what they told you was
23 that, you know, the information in this
24 should not be considered new information,

Page 300

1 right?
2    A.   Are you on --
3    Q.   I'm on Page .3.
4    A.   Okay.  I'm sorry.  I was
5 still on the first page.
6    Q.   That's fine.  I didn't move
7 you yet.  Let's go to 1117.3.  Bottom of
8 the page, or bottom slide.
9       I guess I should say, sir,
10 do you recognize this essentially as a
11 printout of a slide deck, the way a
12 PowerPoint gets formatted in printout
13 form?
14    A.   That's what it appears to
15 be, yes.
16    Q.   Okay.  And you understood
17 that at that particular meeting in March
18 of 2013, the DEA presented a narrative
19 slide deck and also presented charts and
20 tables to the company, correct?
21    A.   That's my understanding.
22    Q.   Okay.  It says, "The
23 information presented should not be
24 considered new information."  Right?

Page 301

1    A.   That's what it says.
2    Q.   "The substance of this
3 presentation has been previously
4 available and communicated through the
5 Controlled Substance Act, its
6 regulations, federal register notices,
7 DEA, and sponsored conferences,
8 correspondence from the DEA, releases
9 from the popular press, in addition to
10 the registrant's own sales data."
11       Did I read that correct?
12    A.   You did.
13    Q.   Okay.  Turn to the next
14 page.  "Each registrant within the closed
15 system of distribution has defined
16 privileges and responsibilities in which
17 they must operate."
18       Do you see that?
19    A.   I see that.
20    Q.   Do you agree with that?
21    A.   I agree we have
22 responsibilities within the closed
23 system.
24    Q.   Right.  And you understand

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 that you're not making, obviously,
2 pencils and pens and staples and things
3 like that. I mean, you're making drugs
4 that need to be kept in safes and vaults,
5 right?
6        MS. VANNI: Object to form.
7        THE WITNESS: I understand
8     that we have a responsibility to
9     control these products as defined
10    in the regulations, yes.
11 BY MR. BUCHANAN:
12    Q. And to maintain effective
13 controls against diversion, right?
14    A. We have a responsibility to
15 have effective controls in place to
16 prevent the diversion and abuse of our
17 products.
18    Q. Okay. Okay. It says, "Each
19 registrant within the closed system of
20 distribution has defined privileges and
21 responsibilities in which they must
22 operate." And then the next slide says,
23 "When a registrant fails to adhere to
24 their responsibilities, those violations

Page 303

1 represent a danger to the public and
2 jeopardize the closed system of
3 distribution."
4        Did I read that correctly?
5    A. You did.
6    Q. Do you agree with that, sir?
7    A. I think I've been clear that
8 if these products aren't controlled and
9 kept within the closed system, they have
10 the potential to be diverted and abused.
11    Q. So you'd agree with the DEA
12 in that regard?
13    A. I would agree that that can
14 be -- that can present a danger.
15    Q. Okay. And so the
16 registrants really must adhere to their
17 responsibilities so not to present and
18 risk of danger to the public, right?
19        MS. VANNI: Object to form.
20        THE WITNESS: We -- we have
21     a responsibility to abide by the
22     regulations.
23 BY MR. BUCHANAN:
24    Q. So as not to present a

Page 304

1 danger to the public, right?
2    A. That's what it says here.
3    Q. Okay. You don't fuss with
4 that. You agree with that, right?
5    A. As I've testified, I agree
6 that we have a responsibility to follow
7 the regulations, so as to prevent the
8 diversion and abuse of these products.
9    Q. You agree also, you have an
10 obligation to know your customer, right?
11       MS. VANNI: Object to form.
12       THE WITNESS: I agree that
13    part of the -- part of the
14    regulation is to understand our
15    customer.
16 BY MR. BUCHANAN:
17    Q. Okay. You've got to know
18 your customer. That's not something that
19 you needed the DEA to tell you in 2013,
20 right?
21       MS. VANNI: Object to form.
22       THE WITNESS: Part of the
23    regulations that we -- companies
24    who distribute these products need

Page 305

1    to understand their customers.
2 BY MR. BUCHANAN:
3    Q. Right. You've got to know
4 your customer's customer, right?
5       MS. VANNI: Object to form.
6 BY MR. BUCHANAN:
7    Q. As best you're able?
8    A. DEA describes that as
9 knowing your customer's customer as
10 best -- to the best of our capability.
11    Q. Right. And that's what
12 you're required to do in this system, to
13 know your customer, and your customer's
14 customer, right, as best you're able?
15    A. That's my understanding of
16 the regulations.
17    Q. Right. And you didn't need
18 the DEA to tell you that in 2013, right,
19 sir?
20       MS. VANNI: Object to form.
21       THE WITNESS: Well, what
22    I -- what I would say is that the
23    know your customer's customer is
24    not specifically defined in the

Page 306

1 regulations and something that DEA
2 has tried periodically to provide
3 guidance around. Companies have
4 sought guidance around that
5 particular aspect of the
6 regulations.
7 And certainly in this
8 meeting, some of that guidance was
9 provided.
10 BY MR. BUCHANAN:
11 Q. That's not the first time
12 that the company was aware of the know
13 your customer and know your customer's
14 customer obligation, right?
15 A. No.
16 Q. You were aware of that
17 before that, right?
18 A. We had an understanding of
19 the regulations.
20 Q. And the know your customer
21 and know your customer's customer
22 obligation before that?
23 A. As part of the regulation.
24 MS. VANNI: Object to form.

Page 307

1 BY MR. BUCHANAN:
2 Q. Thank you.
3 THE VIDEOGRAPHER: Off the
4 record at 2:06 p.m.
5 (Brief pause.)
6 THE VIDEOGRAPHER: Back on
7 the record at 2:08 p.m.
8 BY MR. BUCHANAN:
9 Q. Sir, we are on Exhibit 8 --
10 is it 8 or 18? It's 18.
11 A. 18.
12 Q. Yeah. Thank you. Exhibit
13 18, effective controls against diversion.
14 This presentation, the DEA made and
15 presented and provided you with in March
16 of 2013.
17 A. Oh, I'm sorry.
18 Q. I'd like to go to 1117.11.
19 It's talking about due diligence and know
20 your customer. We spent a moment -- we
21 had some discussion about that a moment
22 ago.
23 "Prior to filling an order,
24 the distributor should review the

Page 308

1 following: Unusual frequency of orders,
2 unusual size of orders, deviating from a
3 normal" -- "deviating substantially from
4 a normal pattern." It says, "Mandated by
5 the regulation."
6 Do you see that?
7 A. I see that.
8 Q. And then it continues with
9 due diligence below that. Consider the
10 range -- it states, "Range of products
11 being purchased."
12 Do you see that?
13 A. I see that.
14 Q. "Methods of payment, cash,
15 insurance, Medicaid."
16 Do you see that?
17 A. I see that.
18 Q. "Location and hours of
19 operation."
20 Do you see that?
21 A. I see it.
22 Q. "Percent of controlled
23 versus noncontrolled."
24 Do you see that, sir?

Page 309

1 A. I see that.
2 Q. "Customer picking it up at
3 the distributorship."
4 Do you see that?
5 A. I see that.
6 Q. Recognizing those are all
7 considerations in evaluating your
8 customers and their customers' practices,
9 correct?
10 A. I understand.
11 Q. Something important to do in
12 knowing your customer, right?
13 MS. VANNI: Object to form.
14 THE WITNESS: These are all
15 aspects of how you would look at a
16 customer.
17 BY MR. BUCHANAN:
18 Q. Let's look at 1117.12. And
19 the DEA actually gave you a picture of
20 kind of a waiting room in a pharmacy. Do
21 you see that?
22 A. It's kind of hard to see,
23 but --
24 Q. Yeah, it's probably easier

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1  on the screen, but that's not even great.
2       Do you see it?
3       A.   I see the picture.
4       Q.   People kind of mulling
5  around, crowded on the outside of a room
6  with a glass window?
7       A.   I see that.
8       Q.   Okay.  Certainly important
9  for the company to conduct site visits
10 and see its customers and see how its
11 customers are operating, right?
12      MS. VANNI:  Object to form.
13      THE WITNESS:  I think that
14      site visits are certainly a -- a
15      one aspect of a comprehensive
16      suspicious order monitoring
17      program.
18 BY MR. BUCHANAN:
19      Q.   Good thing to do, right?
20      MS. VANNI:  Object to form.
21      THE WITNESS:  Part of a
22      comprehensive suspicious order
23      monitoring program.
24 BY MR. BUCHANAN:

Page 311

1       Q.   Comprehensive is a good
2  thing, right?
3       A.   Comprehensive is a good
4  thing.
5       Q.   Right.  So doing due
6  diligence and doing site visits are a
7  good thing, right?
8       MS. VANNI:  Object to form.
9       THE WITNESS:  They are --
10      they are one aspect of a
11      suspicious order monitoring
12      program.
13 BY MR. BUCHANAN:
14      Q.   And certainly, if, you know,
15 half your business is controlled
16 substances, you -- you want to take that
17 obligation seriously, right?
18      MS. VANNI:  Object to form.
19      THE WITNESS:  We take that
20      obligation very seriously and have
21      taken that obligation very
22      seriously in terms of the
23      development and evolution of our
24      programs.

Page 312

1  BY MR. BUCHANAN:
2       Q.   Okay.  And we'll have an
3  opportunity to talk about some of the
4  things you were doing and not doing as
5  part of that.
6       The -- the DEA also gave you
7  charts of your sales, right?
8       A.   Yeah, there were some charts
9  that were reviewed at the meeting as I
10 understand it.
11      Q.   Right.  Let's just go to
12 1117.232.
13      We don't need to live on
14 this page long.  Just, you recognize the
15 top manufacturers/distributors of
16 oxycodone 15-milligram, 100 counts.
17 Sales and dosage units from January 1,
18 2011, to December 31, 2011.
19      Do you see that?
20      A.   I see that.
21      Q.   Okay.  And then on the far
22 left there's some columns that show
23 Vintage Pharmaceuticals and Generic
24 Bidco.

Page 313

1       Do you see that?
2       A.   Right.
3       Q.   Pushing off a couple hundred
4  million between them, right?
5       MS. VANNI:  Object to form.
6       THE WITNESS:  I think you
7       actually -- one of these is the
8       manufacturing entity and one of
9       these is the distributor entity.
10      So you can't really add those two
11      numbers together.
12 BY MR. BUCHANAN:
13      Q.   Oh, I see.  So the way we
14 should look at this is -- because the
15 company had two registrations?
16      A.   We had a manufacturer's
17 registration.  We had a distributor's
18 registration.
19      Q.   Fair enough.
20      A.   Some of these other
21 companies that are on here might only
22 have a distributor's --
23      Q.   Gotcha.
24      A.   -- registration.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    Q.   So what we should be looking
2  at here is, you know, one or the other,
3  one is a manufacturing, one is the
4  distributing, right, distributor?
5    A.   Right.  I'm just clarifying
6  that point.
7    Q.   No, I appreciate that.
8         So, you know, we can split
9  the difference here and call it roughly
10 100 million tablets put out in this 2011
11 period of just one NDC number, right?
12        MS. VANNI:  Object to form.
13        THE WITNESS:  This appears
14        to represent how much oxycodone
15        15-milligram we manufactured and
16        distributed.
17 BY MR. BUCHANAN:
18    Q.   In a one-year period of
19 time?
20    A.   January through
21 December 2011.
22    Q.   And you didn't just make oxy
23 15s, right?
24        MS. VANNI:  Object to form.

Page 315

1  BY MR. BUCHANAN:
2    Q.   You made oxy 30s?
3    A.   We made multiple strengths
4  of oxycodone.
5    Q.   Right.  So this is one
6  particular strength of a highly abused
7  and diverted opioid, for one year, made
8  by the company's affiliate, correct?
9        MS. VANNI:  Object to form.
10       THE WITNESS:  This is one
11       particular strength of oxycodone
12       that was manufactured and
13       distributed to patients in pain.
14 BY MR. BUCHANAN:
15    Q.   Okay.  About 100 million
16 pills over that one year, right?
17    A.   About 100 million pills.
18    Q.   Okay.  All right.  So we
19 have the -- the binder.
20       And was this circulated to
21 you in your kind of supply chain role and
22 function for Endo, the same period of
23 time?
24    A.   This -- this binder?

Page 316

1    Q.   Yeah.  Did you get it,
2  outside of your preparation for today?
3    A.   I don't believe I ever saw
4  this outside of my preparation for today.
5        MR. BUCHANAN:  Okay.  Can I
6  please have 575.
7        THE WITNESS:  But I -- you
8  know, that's my recollection.
9        (Document marked for
10        identification as Exhibit
11        Endo-Macrides-19.)
12 BY MR. BUCHANAN:
13    Q.   Passing you what we're
14 marking as Exhibit 19 to your deposition,
15 sir.
16        It's a transmittal from
17 Ms. Hernandez to Peter Bigelow, Sanjay
18 Patel, and Denise Hudson.
19        Do you see that?
20    A.   I see that.
21    Q.   It's kind of reading from
22 the bottom up.  March 6, 2013.  Says,
23 "Attached are the charts that the DEA
24 reviewed with us at the meeting today.

Page 317

1  As we expected."
2        Do you see that?  "As we
3  expected"?
4    A.   I see that.
5    Q.   Okay.  "They are broken out
6  by state and then further broken down by
7  customers within that state.  They don't
8  show all the customers in the state.
9  Only those with the highest volume
10 purchases."
11        So what the DEA -- did I
12 read that correctly, first, sir?
13    A.   That's what it says.
14    Q.   Okay.  And so what the DEA
15 was doing was sending -- or sitting down
16 with you and saying we've got some
17 concerns, right?
18        MS. VANNI:  Object to form.
19        THE WITNESS:  I think what
20        this says is the DEA was showing
21        us data around where some of the
22        sales were going, different states
23        and different customers.  I
24        believe that's what these charts

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1　represent.
2　BY MR. BUCHANAN:
3　　Q.　Are you fussing with whether
4　the DEA conveyed concern to Qualitest,
5　sir?
6　　A.　I'm -- I'm just clarifying
7　what's here.
8　　Q.　Okay.　But I mean
9　generally --
10　　A.　You asked me if I read this,
11　and I said that I read it.
12　　Q.　Apart from reading the
13　sentence that we're focused on right
14　there, do you understand, sir, at that
15　meeting, that the DEA was expressing its
16　concern, A, with the volume that was
17　being produced, and B, with the company's
18　suspicious order monitoring practices?
19　　　MS. VANNI:　Object to form.
20　　　THE WITNESS:　I think the
21　　　DEA expressed a number of concerns
22　　　and suggestions and guidances at
23　　　the meeting as I understand it.
24　BY MR. BUCHANAN:

Page 319

1　　Q.　That's fine.　I just wanted
2　to make sure we were clear on that.
3　　　So this gets distributed to
4　Mr. Bigelow.　Who is he again?
5　　A.　So Peter was the person that
6　was responsible for, call it the business
7　side of Qualitest.
8　　Q.　Okay.
9　　A.　And what I mean by that is
10　more of the commercial side of the
11　business, whereas Denise Hudson was more
12　accountable for the supply chain and the
13　manufacturing side of Qualitest.
14　　Q.　Mr. Bigelow growing the
15　business, Ms. Hudson fulfilling the
16　orders in a timely -- from more of an
17　operations perspective.　Would that be
18　fair?
19　　　MS. VANNI:　Object to form.
20　　　THE WITNESS:　I believe what
21　　　I said was that Mr. Bigelow would
22　　　have been responsible for the
23　　　commercial side of the business
24　　　and Ms. Hudson would have been

Page 320

1　responsible for the supply chain
2　and manufacturing side of the
3　business.　Those were your
4　characterization, not mine.
5　BY MR. BUCHANAN:
6　　Q.　Yeah, I just -- I can't
7　understand your characterization.　That's
8　my concern.　When you say responsible for
9　the commercial side, does that mean sales
10　and marketing?
11　　A.　Sales and marketing.
12　　Q.　I see.　Okay.　So commercial
13　means sales and marketing in your
14　parlance?
15　　A.　Commercial means sales and
16　marketing.
17　　Q.　Okay.　So Mr. Bigelow is a
18　sales and marketing person.　And that's
19　who Ms. Hernandez is sending around some
20　quick comments on, kind of on her way
21　back on the train, I assume --
22　withdrawn -- right after the meeting?
23　　A.　Apparently.
24　　Q.　Okay.　All right.　It states

Page 321

1　at the bottom, "DEA is saying that
2　anything above the average should be
3　investigated.　There may be justification
4　for why they are above the average, but
5　there may not be.　If there's not
6　adequate justification, we should be
7　discontinuing sales to that customer or
8　inquiring our customer to discontinue
9　sales to that entity for us to continue
10　doing business with them, and we are
11　required to report the suspicious
12　activity to the DEA."
13　　　Did I read that correctly,
14　sir?
15　　A.　You did.
16　　Q.　Okay.　"An evaluation of
17　data such as this is one part of the
18　company's overall suspicious order
19　monitoring program.　It doesn't replace
20　the need to use a statistically based
21　program to evaluate orders initially
22　based on frequency, volume and size, and
23　it doesn't mean that these sales are the
24　only customers that we should be looking

Page 322

1 at or the only trending data. However,
2 it is where some of the most telling data
3 originates which is why DEA chose" --
4 "DEA chose to share this information with
5 us specifically."
6          Did I read that correctly?
7     A.   You did.
8     Q.   Okay.  All right.  And so at
9 this point in time, Qualitest does not
10 have a statistically founded order of
11 interest flagging system, correct?
12          MS. VANNI:  Object to form.
13          THE WITNESS:  I believe at
14      this time Qualitest was looking at
15      excessive orders.  Did not have a
16      sophisticated statistical
17      algorithm.  We had not really
18      evolved to that point with the
19      program.
20 BY MR. BUCHANAN:
21     Q.   Right.  When you say you
22 hadn't really evolved to it, I mean, that
23 was -- that was really despite the fact
24 that it was the leading opioid

Page 323

1 manufacturer in the country, right?
2          MS. VANNI:  Object to form.
3          THE WITNESS:  I think we
4      talked about -- what document are
5      you referring to?
6 BY MR. BUCHANAN:
7     Q.   Well, we looked at the
8 business description of Qualitest from
9 2010.
10          Do you recall that?
11     A.   It said it was the -- it
12 said leading manufacturer of controlled
13 substances.
14     Q.   Right.
15     A.   It didn't say leading
16 manufacturer of opioids.  It say leading
17 manufacturer of controlled substances.
18     Q.   Thank you.  With that
19 clarification -- thank you.
20     A.   That would include Schedule
21 II to Schedule V.
22     Q.   What were the top two
23 controlled substances that Qualitest
24 noted in its business overview from 2010?

Page 324

1     A.   Hydrocodone and oxycodone.
2     Q.   Okay.  Opioids?
3     A.   Those two products are
4 opioid.
5     Q.   Number one and number two
6 from a revenue perspective, correct?
7     A.   That's what they -- that's
8 what the document said.
9     Q.   Okay.  All right.  So
10 let's -- let's orient ourselves a little
11 further in that meeting.
12          MR. BUCHANAN:  Can I please
13      have E-1824.
14          (Document marked for
15      identification as Exhibit
16      Endo-Macrides-20.)
17 BY MR. BUCHANAN:
18     Q.   I'm passing to you what
19 we're marking as Exhibit 20 to your
20 deposition today, sir.
21          It's an e-mail from
22 Mr. Patel to Ms. Hernandez from 2013
23 forwarding an image.
24          Do you see that?  Do you see

Page 325

1 that, sir?
2     A.   Yeah.  I see it's forwarding
3 an image.  I'm just familiarizing myself
4 with the document.
5     Q.   And this says Mr. Patel is
6 with Endo?
7     A.   He was an Endo employee.
8     Q.   Okay.  So what was his role
9 and function at Endo?
10     A.   He was at that time
11 responsible for Endo's supply chain
12 function.  And he was a -- it was a
13 corporate position.  So that would have
14 extended to supply chain operations
15 within the Qualitest business.
16     Q.   Okay.  And so the Endo folks
17 were supporting the Qualitest folks?
18          MS. VANNI:  Object to form.
19          THE WITNESS:  Well, let me
20      try to explain it.  I think what
21      you had there was certain
22      functions that were more
23      corporate, what you might call a
24      corporate function.  And so people

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1  who were Endo employees who were
2  in the supply chain corporate
3  function had some responsibilities
4  for some of the activities within
5  Qualitest.
6        And so Sanjay happened to be
7  an Endo employee who had some
8  responsibilities for some of the
9  activities under Qualitest.
10 BY MR. BUCHANAN:
11     Q.   Understood.  So at this
12 point in time, even though there were
13 separate legal entities, Endo employees
14 would have some responsibilities for
15 Qualitest stuff, Qualitest employees
16 would have some responsibility for Endo
17 stuff, in some sense?
18        MS. VANNI:  Object to form.
19 BY MR. BUCHANAN:
20     Q.   Is that fair?
21     A.   Mostly the first way.  Endo
22 employees -- some Endo employees who were
23 considered to be more at the corporate
24 level would have some accountability for

Page 327

1  certain activities within Qualitest.
2      Q.   Yeah.  Was Mr. Patel a more
3  senior person within Endo?
4      A.   I believe he was a vice
5  president.
6      Q.   Oh, I see.  So Mr. Patel is
7  forwarding along, it looks like -- this
8  is an image, right?  I don't know.  It's
9  a PDF of minute -- withdrawn.
10       Mr. Patel is forwarding
11 along minutes of this DEA meeting from
12 March of 2013.
13       Do you see that?
14     A.   Yes, these appear to be
15 minutes from the meeting.
16     Q.   Okay.  Did you get a chance
17 to look at this in connection with your
18 preparation for today?
19       MS. VANNI:  Object to form.
20       THE WITNESS:  I have seen
21     this document.
22 BY MR. BUCHANAN:
23     Q.   Okay.  And so this is
24 reporting on the meeting among the DEA

Page 328

1  folks and the Qualitest folks in early
2  March of 2013, correct?
3      A.   Correct.
4      Q.   Okay.  And this was a
5  sit-down that went on for a few hours,
6  right?
7        MS. VANNI:  Object to form.
8  BY MR. BUCHANAN:
9      Q.   Do you have that
10 understanding?
11     A.   I actually don't know how
12 long the meeting went on for.
13     Q.   Okay.  So I'd like to direct
14 your attention to 1824.3.
15       MR. BUCHANAN:  And the SC
16     Levin paragraph, can we blow that
17     out.
18 BY MR. BUCHANAN:
19     Q.   It states, "SC Levin spoke
20 of the current epidemic of prescription
21 drug abuse in the United States."
22       You understand SC Levin is
23 an individual with the DEA?
24     A.   I do.

Page 329

1      Q.   Okay.  "SC Levin stated that
2  80 percent of all controlled substances
3  manufactured in the world are prescribed
4  and consumed in the United States."
5        Did I read that correctly?
6      A.   You did.
7      Q.   Okay.  "SC Levin stated that
8  the abuse and diversion of oxycodone 15
9  and 30-milligram tablets is a major
10 problem."
11       Did I read that correctly,
12 sir?
13     A.   That's what it says here.
14     Q.   Y'all were big manufacturers
15 of oxycodone 15 and 30, right?
16       MS. VANNI:  Object to form.
17       THE WITNESS:  Qualitest
18     manufactured oxycodone
19     15-milligram and 30-milligram.
20 BY MR. BUCHANAN:
21     Q.   Okay.  "SC Levin discussed
22 the pain clinic issues in Florida as well
23 as other drug abuse trends around the
24 country.  He outlined the methods of

Page 330

1  diversion of these products and advised
2  that Qualitest is responsible for
3  monitoring and reviewing their suspicious
4  order monitoring system, assuring
5  Qualitest is reporting to the ARCOS" --
6  "to ARCOS correctly, visiting and knowing
7  their customers, maintaining a due
8  diligence file on their customers, and
9  knowing where their products are ending
10 up."
11      Did I read that correctly?
12  A.   You did.
13  Q.   First of all, this sentence
14 that "80 percent of controlled substances
15 manufactured in the world are prescribed
16 and consumed in the United States," do
17 you understand that's what the company
18 was told by the DEA in 2013?
19  A.   That's what it says here.
20  Q.   Does the United States have
21 80 percent of the world's population?
22      MS. VANNI:  Object to form.
23  Beyond the scope.
24      THE WITNESS:  I would say

Page 331

1      no.
2  BY MR. BUCHANAN:
3  Q.   Do you think we are the only
4  people in pain?
5      MS. VANNI:  Object to form.
6  Beyond the scope.
7      THE WITNESS:  I'm not
8      qualified to speak on medical
9      matters.  I'm not a doctor.
10 BY MR. BUCHANAN:
11  Q.   You don't think the United
12 States population has a franchise on
13 pain, do you?
14      MS. VANNI:  Objection.
15 BY MR. BUCHANAN:
16  Q.   Or an exclusive on pain?
17      MS. VANNI:  Objection.
18      THE WITNESS:  I understand
19      that pain is a serious medical
20      issue.  And I understand that
21      opioid products are used to treat
22      significant pain issues that
23      people experience.
24 BY MR. BUCHANAN:

Page 332

1  Q.   Do you understand that all
2  human beings on this planet, this big
3  planet of ours with lots of people, have
4  pain?
5  A.   I understand that there are
6  people who are in severe pain who need
7  these products.  We distribute products,
8  we manufacture and distribute products to
9  people who need them for those symptoms.
10  Q.   Let me just understand
11 factually, sir.
12      As part of the company
13 suspicious order monitoring program, the
14 company considered the extent to which
15 the population here that was consuming
16 opioids exceeded in some sense --
17 withdrawn.
18      Does the United States have
19 80 percent of the world's population of
20 people?
21      MS. VANNI:  Objection.
22  Asked and answered.
23      THE WITNESS:  I don't know
24      what the actual percentage of the

Page 333

1      United States population is versus
2      the world population.
3  BY MR. BUCHANAN:
4  Q.   All right.  So let's --
5  let's talk about what you heard from
6  SC Levin at this meeting.
7      "One, abuse and diversion
8  are a major problem," right?
9      Did I read that correctly?
10  A.   That's what he says.
11  Q.   In fact, back in 2003,
12 10 years earlier, the DEA said abuse and
13 diversion of OxyContin, and Percocet,
14 Percodan, all oxycodone products, were a
15 problem, right?
16      MS. VANNI:  Object to form.
17      THE WITNESS:  DEA had
18      provided some guidance around
19      those products in 2003, per the
20      document we looked at earlier.
21 BY MR. BUCHANAN:
22  Q.   Right.  So this isn't news.
23 It's just gotten a lot worse, right?
24      MS. VANNI:  Object to form.

Page 334

1    THE WITNESS:  I believe that
2  I've already testified that I
3  understand that there is an opioid
4  abuse epidemic in this country and
5  that it has gotten worse over some
6  period of time.
7  BY MR. BUCHANAN:
8    Q.   Okay.  And so to be clear,
9  there was an opioid abuse and diversion
10  problem with oxycodone products in 2003,
11  we can agree, right?
12    MS. VANNI:  Object to form.
13    THE WITNESS:  DEA provided a
14  document that suggested that, yes.
15  BY MR. BUCHANAN:
16    Q.   And then they sat down with
17  you ten years later and said, abuse and
18  diversion of oxycodone is a major problem
19  in 2013, right?
20    A.   That's what they say here.
21    Q.   Okay.  And they say you are
22  responsible for monitoring or reviewing
23  your -- the orders that are coming in,
24  right?

Page 335

1    A.   That's correct.
2    Q.   Okay.  They stress the
3  obligation of you doing due diligence on
4  your customers, right?
5    MS. VANNI:  Object to form.
6    THE WITNESS:  I think DEA in
7    this paragraph is providing
8    multiple areas of guidance around
9    how companies should be improving
10    their suspicious order monitoring
11    systems.
12  BY MR. BUCHANAN:
13    Q.   And this was talking to you,
14  right?  This was a meeting with you?
15    A.   This was a meeting between
16  Qualitest and the DEA, correct.
17    Q.   Right.  Okay.  Let's go to
18  1824.4.  Actually, let's -- let's hit the
19  carryover, if we could from the prior
20  page.
21    There's a discussion of the
22  review of the graphs with you.  Do you
23  see that?  We looked at some of those
24  graphs in the prior exhibit.

Page 336

1    Do you recall?
2    A.   Oh, is that where it says at
3  the conclusion of?
4    Q.   Yeah, it says, "At the
5  conclusion of the PowerPoint
6  presentation, SC Levin presented graphs
7  documenting the distribution of
8  oxycodone 15 and 30-milligram tablets and
9  hydrocodone 10/325 and 10/500-milligram
10  tablets by Qualitest."
11    Did I read that correctly?
12    A.   Correct.
13    Q.   These distributions were
14  derived from ARCOS reports submitted by
15  Qualitest under specific NDC numbers.
16    Do you see that?
17    A.   I see it.
18    Q.   And so what Qualitest does,
19  it submits information to the DEA on its
20  sales and shipments, right?
21    A.   Yeah, we're -- we are
22  required to do that.
23    Q.   So the data concerning your
24  sales and shipments you've got in your

Page 337

1  own computer systems, right?
2    A.   We have data on our sales.
3    Q.   Sure.  That was my question.
4    A.   Who we -- who we shipped --
5  who we sold our products to.
6    Q.   Sure.  That's one piece of
7  information you have, right?
8    MS. VANNI:  Object to form.
9  BY MR. BUCHANAN:
10    Q.   I mean, you have information
11  obviously on who placed an order and the
12  product you ship to them, right?
13    A.   Correct.
14    Q.   And then you have other data
15  within the company, data known as
16  chargeback data, sometimes data purchased
17  from outsiders called IMS data from which
18  you can discern really your product in
19  secondary customers' hands, correct?
20    MS. VANNI:  Object to form.
21    THE WITNESS:  Potentially.
22    Provided that data is in the
23    correct format, provided that the
24    products are actually on contracts

Highly Confidential - Subject to Further Confidentiality Review

Page 338

where there actually are chargebacks.

But, yes, there is other data that is potentially useful as part of a SOMs program.

BY MR. BUCHANAN:

Q. Yeah, I mean chargebacks, I guess as part of your supply chain work, maybe you can explain to the jury what a chargeback is.

A. So a chargeback is where a product is sold from a wholesaler, which a majority of prescription pharmaceuticals are sold to wholesalers, who then in turn sell them along to retail customers.

If there happens to be a contract between the wholesaler and that retail customer that specifies a certain price of the product that is below the price that the wholesaler acquires the product from the manufacturer or distributor, then there is what's called a chargeback, whereas, the wholesaler can

Page 339

effectively charge back the difference to the manufacturer or distributor, the selling entity.

Q. Right. And so -- so the manufacturer doesn't just get into a "trust me" discussion with the distributor on this. The manufacturer requires information back from its wholesaler distributor customer concerning the differential and the volumes that were shipped to particular retail customers, correct?

A. Right. Chargeback data is primarily financial data. It's primarily -- its primary use is to reconcile sales -- gross sales to net sales from a, you know, financial statement perspective.

Q. And so the company actually has chargeback -- chargeback agreements, and there is a standard data protocol format, an ESI protocol format, to exchange chargeback transaction data back and forth between wholesalers,

Page 340

distributors and manufacturers, correct?

A. Yeah. Some of that data is communicated electronically.

Q. Right. It's electronically transmitted, can be assimilated, and then the manufacturer obviously wants to make sure that if the distributor says that it ended up shipping a lot of stuff for more than it paid, that in fact it has data to support that, correct?

MS. VANNI: Object to form.

THE WITNESS: As I said, it's primarily -- its primary use is financial reconciliation.

BY MR. BUCHANAN:

Q. Right. But what that provides you with, sir, is visibility to the customers of your customer, correct?

MS. VANNI: Objection.

THE WITNESS: In the right format, it can provide visibility.

BY MR. BUCHANAN:

Q. Sure. Data has to be presented in a format for which it can be

Page 341

understood. But chargeback data provides visibility to the manufacturer to the sales of its distributor, correct?

MS. VANNI: Object to form.

THE WITNESS: Chargeback data provides certain visibility to downstream transactions.

BY MR. BUCHANAN:

Q. Right. And what the DEA is saying here at this point in time, is you've got to look at chargeback data, right?

MS. VANNI: Object to form.

BY MR. BUCHANAN:

Q. Can we go to 1824.4. Final paragraph.

A. Yeah, if I can just find where it says that.

Q. Do you recall seeing it in the document before, sir?

A. I have seen the document before.

Okay.

Q. "SC Levin stated that

Page 342

1 Qualitest must review the chargeback
2 information which they have access to,
3 immediately address deficiencies in their
4 suspicious order monitoring system, have
5 compliance people visit their customers
6 to review their suspicious order
7 monitoring system, and review the top
8 customers of their customers and pay
9 visits to pharmacies that purchase their
10 products."
11         Did I read that correctly?
12     A.   You did.
13     Q.   Okay.  So quite a few things
14 that you need to start doing, right?
15         MS. VANNI:  Object to form.
16         THE WITNESS:  As I stated
17     earlier, there was a number of
18     things that the DEA provided
19     guidance on in this meeting that
20     took place in 2013.
21 BY MR. BUCHANAN:
22     Q.   What SC Levin told you was
23 that Qualitest's current system, as
24 explained to him by your employees, March

Page 343

1 of 2013, and as seen in the ARCOS data,
2 is inadequate to say the least, correct?
3     A.   That's what he states here.
4     Q.   Right.  He said that
5 Ms. Hernandez, who was then head of DEA
6 compliance, had to go back and educate
7 people on what to do with these
8 controlled substances, right?
9     A.   He suggests here that one
10 aspect of how he can improve the program
11 would be to do more education, which was
12 something that we were in fact doing.
13     Q.   One of the things that
14 you've got to do is educate Qualitest
15 employees, right?
16     A.   Training is an important
17 aspect of any -- not just suspicious
18 order monitoring, but across the entire
19 range of DEA compliance activities.
20     Q.   So there's a bit of a run-on
21 there in the middle of that paragraph
22 that I just want to circle back to.
23         It says, "SC Levin stated
24 that Qualitest" -- and then it's got a

Page 344

1 list of things that you need to do,
2 right?
3         Do you see that?
4     A.   Where are you reading now?
5     Q.   Middle of the page.  "SC
6 Levin stated that Qualitest must review."
7     A.   "Stated that Qualitest must
8 review the chargeback information which
9 they have access to."
10         Is that what you're
11 referring to?
12     Q.   Yeah, that's what I'm
13 referring to.  Do you see that list of
14 items there?
15     A.   I see them.
16     Q.   Okay.  As of this point in
17 time, sir, was Qualitest reviewing the
18 chargeback data that it had access to as
19 part of its suspicious order monitoring
20 process?
21     A.   Prior to this meeting?
22     Q.   Mm-hmm.
23     A.   I don't believe that prior
24 to this meeting that Qualitest had

Page 345

1 developed a mechanism to put that data in
2 the right -- in a usable format to look
3 at.
4     Q.   Okay.  And so the answer to
5 my question would be no, prior to this
6 point in time, Qualitest was not
7 reviewing chargeback data as part of its
8 SOM process, correct?
9         MS. VANNI:  Object to form.
10         THE WITNESS:  To my -- to my
11     knowledge, Qualitest was reviewing
12     orders, investigating those orders
13     of interest that popped out based
14     on historical parameters,
15     investigating and making a
16     determination as to whether or not
17     those orders were suspicious.
18         If they were suspicious,
19     reporting them to DEA; if not,
20     then shipping them.
21         I don't believe that
22     chargeback data at that point was
23     a significant part of the program.
24 BY MR. BUCHANAN:

Page 346

1  Q.   Next thing that you were
2  supposed to do is immediately address
3  deficiencies in your SOM system, right?
4     A.   That's what it says here.
5     Q.   So you have that
6  understanding, sir, that as of March of
7  2013, the DEA told you that your SOM
8  system was deficient, right?
9     A.   My interpretation of this
10 document is that DEA was providing us
11 guidance across a number -- number of
12 areas of our SOM system as to how we
13 could improve.
14     In fact from the time
15 that -- from the 2011 time frame onwards,
16 prior to this meeting, we had already
17 identified a number of areas within our
18 overall DEA compliance responsibilities
19 where we could enhance and improve, not
20 just within suspicious order monitoring,
21 but across the full range of DEA
22 compliance.
23     MR. BUCHANAN:  Move to
24     strike as nonresponsive, sir.

Page 347

1  BY MR. BUCHANAN:
2     Q.   My question to you was, you
3  had the understanding that as the DEA
4  related to you in March of 2013, your SOM
5  system was deficient, correct?
6     MS. VANNI:  Object to form.
7     THE WITNESS:  I'm not
8     interpreting DEA's comment here
9     that our entire SOM system was
10     deficient.
11 BY MR. BUCHANAN:
12     Q.   Well, the DEA told you, you
13 had to immediately address deficiencies
14 in the suspicious order monitoring
15 system, correct?
16     A.   Those are DEA's words.
17     Q.   Understood.  That was my
18 question.  It said you had to have
19 compliance people visit Qualitest's
20 customer to review their suspicious order
21 monitoring system, correct?
22     A.   That was one of the
23 recommendations -- excuse me.  That was
24 one of the recommendations that DEA made.

Page 348

1     Q.   Right.  So you shouldn't be
2  selling your product to a customer that
3  doesn't have a suspicious order
4  monitoring system, right?
5     MS. VANNI:  Object to form.
6     THE WITNESS:  We should be
7     ensuring that customers that we're
8     selling product to have proper
9     controls in place.
10 BY MR. BUCHANAN:
11     Q.   Because this closed system
12 doesn't work if you're selling it -- if
13 you're keeping it in the vault, in the
14 manufacturing center and in the warehouse
15 at the distribution center, system breaks
16 down if you start selling it to customers
17 who really aren't maintaining suspicious
18 order systems themselves, right?
19     MS. VANNI:  Object to form.
20     THE WITNESS:  It's important
21     that we take the appropriate steps
22     to ensure that our customers have
23     adequate controls in place to
24     mitigate the risk of diversion and

Page 349

1  abuse, to mitigate that risk.
2  That doesn't mean that somebody
3  who has a valid prescription for a
4  product then gets that filled by a
5  physician, can't divert that
6  product.
7     It's -- our job is to make
8  sure that within the distribution
9  of that product, to the ultimate
10 customer, that we have the proper
11 controls in place.
12 BY MR. BUCHANAN:
13     Q.   Okay.  And so the answer to
14 my question is, you've got to make sure
15 your customers have good practices,
16 procedures, and suspicious order
17 monitoring protocols to ensure there's
18 not diversion of product, correct?
19     A.   We should be making sure
20 they have adequate controls in place.
21 That's what I stated.
22     Q.   And then you've also got to
23 look at the top customers of your
24 customers, right?

Page 350

1    A.  "Review the top customers of
2 their customers and pay visits to
3 pharmacies that purchase their products."
4    Q.  When they say their
5 customers, they are referring to
6 Qualitest there, right?
7    A.  Correct.
8    Q.  Okay.  So review the top
9 customers of Qualitest and pay visits to
10 pharmacies that purchase their products,
11 right?
12    A.  That's what it says.
13    Q.  Okay.  And this is supposed
14 to be done by compliance people, but not
15 salespeople, right?
16    MS. VANNI:  Object to form.
17    THE WITNESS:  DEA is
18    suggesting here that it should be
19    done by compliance people.
20 BY MR. BUCHANAN:
21    Q.  And that's not the first
22 time you've heard that, right, as of
23 March of 2013?
24    MS. VANNI:  Object to form.

Page 351

1    THE WITNESS:  It's not the
2    first time that I've heard?
3 BY MR. BUCHANAN:
4    Q.  That's not the first time
5 Qualitest heard that --
6    A.  That it should visit
7 customers?
8    Q.  -- that it -- yeah.
9    A.  In fact, we were visiting
10 customers.
11    Q.  No, it's not the first time
12 that Qualitest heard, in March of 2013,
13 that it shouldn't have -- it should have
14 compliance people visiting customers,
15 rather than sales or customer service
16 people visiting customers.
17    MS. VANNI:  Object to form.
18    THE WITNESS:  Is there a
19    specific document we're referring
20    to there?
21 BY MR. BUCHANAN:
22    Q.  Do you have that knowledge,
23 sir?  You don't have that knowledge
24 sitting here today as part of your

Page 352

1 preparation?
2    A.  I have knowledge --
3    MS. VANNI:  Objection.  It's
4 not a memory test.
5    THE WITNESS:  Like I said,
6 I've reviewed a lot of documents.
7 I don't remember exactly what they
8 all said.
9    I know that part of a
10 suspicious order monitoring system
11 is visiting customers.  And in
12 fact, we were doing that prior to
13 the meeting in 2013.
14 BY MR. BUCHANAN:
15    Q.  Okay.  Well then, please
16 tell me which customers Qualitest had
17 visited with its compliance team prior to
18 the meeting with the DEA.
19    A.  I don't have a list of
20 specific customers that were visited.  I
21 do know that our sales organization was
22 visiting customers on a somewhat regular
23 basis.
24    Q.  Oh, sales folks.

Page 353

1    A.  Prior to 2013.
2    Q.  Sales folks.
3    A.  That's correct.
4    Q.  Okay.  Yet you don't see the
5 conflict of interest in that, sir?
6    MS. VANNI:  Object to form.
7    THE WITNESS:  I wouldn't
8 make a broad-based assumption that
9 a salesperson doesn't have the
10 ability or the integrity to visit
11 a customer and make a
12 determination as to whether that
13 customer potentially was diverting
14 product.
15 BY MR. BUCHANAN:
16    Q.  Okay.
17    A.  In fact, a salesperson with
18 their specific knowledge of the customer
19 and their experience might be in a very
20 good position to do that.
21    Q.  How many -- how many
22 suspicious customers did your sales folks
23 report out to DEA compliance and
24 ultimately to the DEA?

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1    A.  I don't have the exact
2 number.  I don't have those details.
3    Q.   Any?  Did they report any?
4    A.   During what time frame are
5 you referring to?
6    Q.   We're talking about prior to
7 this meeting with the DEA in March of
8 2013.  I think you're telling us that
9 even though SC Levin is telling you,
10 you've got to get your people out there,
11 you've got to due diligence -- do due
12 diligence, you've got to build a file,
13 you're saying to me that you were doing
14 this before the meeting with the DEA?
15        MS. VANNI:  Objection.
16        Misstates his testimony.
17 BY MR. BUCHANAN:
18    Q.   Did I just misstate your
19 testimony?
20    A.   Let me clarify.  What I'm
21 suggesting, what I'm saying is that we --
22 we had salespeople visiting customers
23 prior to 2013.
24        I'm not debating the point,

Page 355

1 as DEA is suggesting, that it's best
2 practice as part of your evolution of
3 your program to move that responsibility
4 into a more dedicated compliance
5 function, which is, in fact, what we did
6 subsequent to 2013 and had already
7 identified prior to the meeting in 2013
8 that that was something, you know, that
9 would further enhance our program.
10    Q.   Okay.  But -- I appreciate
11 the clarification, sir, but what you
12 called to our attention is that you were
13 actually handling that function, you
14 were -- you had salespeople meeting your
15 customers and you said they were doing
16 due diligence.
17        Do I understand your
18 testimony correctly?
19    A.   What I'm suggesting is we
20 had salespeople visiting customers.  And
21 certainly those salespeople would have
22 been observing the customer, would have
23 been observing the customer's practices,
24 and if there was something objectionable

Page 356

1 there, would have reported that back.
2    Q.   You're speculating.
3        MS. VANNI:  Object to form.
4 BY MR. BUCHANAN:
5    Q.   You're hoping that's what
6 would happen.
7        MS. VANNI:  Object to form.
8        THE WITNESS:  That's not
9    my --
10 BY MR. BUCHANAN:
11    Q.   Did you have an SOP or a
12 guidance that guided your sales team to
13 report that back to you?
14    A.   I don't believe we had a
15 specific SOP -- S and OP -- SOP in place
16 to guide those visits until later.
17    Q.   When it became a DEA
18 compliance function?
19    A.   I'm just telling you that we
20 were doing -- we were visiting our
21 customers.
22    Q.   Of course.  You were trying
23 to sell more drugs.
24        MS. VANNI:  Objection.

Page 357

1 BY MR. BUCHANAN:
2    Q.   That's what sales does.
3 Sales sells, right?
4        MS. VANNI:  Objection.
5 BY MR. BUCHANAN:
6    Q.   Isn't that what the sales
7 function is designed to do, sir, to sell?
8    A.   Sales has a primary
9 responsibility to sell product.  Sales
10 has other responsibilities that you
11 know, get into the compliance part of the
12 business.
13    Q.   Please cite for me somewhere
14 sir, in your sales SOPs or in your
15 guidance where your sales force was
16 instructed to do the due diligence on
17 suspicious orders and suspicious
18 customers.
19    A.   I'm not pointing to an SOP.
20    Q.   I'm asking you to do so.
21    A.   We didn't have -- I'm --
22 I -- I am not able to do that.
23    Q.   Okay.  So we can agree, sir,
24 that there's nothing in writing where you

Page 358

1 have trained your sales team up to
2 identify pharmacies that have cages and
3 bars and waiting rooms that are crowded
4 and it's all crash transactions, that are
5 pill mills.
6         We can agree that there's
7 not a training that you provided that
8 required the salespeople to report that
9 up to compliance, right?
10     A.   I'm not aware of any
11 specific training.  What I'm telling you
12 is that we had salespeople regularly
13 visiting customers.  And those
14 salespeople had the integrity that if
15 they would have seen something as you've
16 described, they would have reported that
17 back.
18     Q.   Okay.  Well, so how many
19 suspicious customers did your salespeople
20 report back to the company based on it's
21 many, many sales visits between 2010 and
22 2013?
23     A.   I don't have that specific
24 information.

Page 359

1     Q.   Any?
2     A.   I'm not aware of any.  I'm
3 just explaining to you what we were doing
4 during that time frame.
5     Q.   Well, we know none were
6 reported to the DEA, right?  There were
7 no reports to the DEA of a suspicious
8 customer or a suspicious order or
9 suspicious activity prior to the meeting
10 with the DEA in March 2013, right?
11         MS. VANNI:  Object to form.
12 BY MR. BUCHANAN:
13     Q.   None.
14     A.   We did not have -- we were
15 not reporting suspicious orders because
16 our systems and processes were not
17 identifying suspicious orders.
18     Q.   Y'all weren't doing
19 anything?
20     A.   I wouldn't --
21         MS. VANNI:  Object.
22 BY MR. BUCHANAN:
23     Q.   No due diligence, right?
24         MS. VANNI:  Object to form.

Page 360

1         THE WITNESS:  I wouldn't
2 characterize it that way.
3 BY MR. BUCHANAN:
4     Q.   No, because it's not good.
5         MS. VANNI:  Objection.
6         THE WITNESS:  We had
7 programs in place where we were
8 reviewing orders against
9 historical parameters.  We were
10 flagging those orders as of
11 interest.  We were investigating
12 those orders and making a
13 determination as to whether they
14 were suspicious or not.
15 BY MR. BUCHANAN:
16     Q.   Okay.  We're going to break
17 this down a little bit, because Qualitest
18 also had some people come in and take a
19 look at its systems over the years,
20 right?
21     A.   As I said earlier, we
22 periodically have consultants come in and
23 look at our systems.
24         MR. BUCHANAN:  Can I have

Page 361

1 581, please.
2 BY MR. BUCHANAN:
3     Q.   And just to clarify this,
4 this thing about the sales team.
5         (Document marked for
6         identification as Exhibit
7         Endo-Macrides-21.)
8 BY MR. BUCHANAN:
9     Q.   Passing you what we've
10 marked as 581 -- excuse me.  That's my
11 internal numbering.
12         MR. BUCHANAN:  What's the
13 numbering on it?
14         MR. BACHMANN:  It is 21.
15 BY MR. BUCHANAN:
16     Q.   Exhibit 21.  This is a
17 PowerPoint that Ms. Hernandez circulated
18 shortly after the meeting, about a week
19 after the meeting with the DEA in March
20 of 2013, right?
21     A.   March 13th, yes.
22     Q.   Okay.  It says, "Attached is
23 a slide deck we will be reviewing with
24 you at this morning's 8:00 a.m. central

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  time meeting."
2        So you meet with the DEA.
3  PowerPoint deck is put together.  It's
4  sent around, talking about critical
5  elements of DEA compliance, if you go to
6  581.5.
7        "Suspicious order
8  monitoring.  Implement a solution that
9  proactively discloses suspicious orders."
10       Do you see that?
11       A.  I see that.
12       Q.  Okay.  You recognize
13  "implement" to mean make?
14       MS. VANNI:  Object to form.
15  BY MR. BUCHANAN:
16       Q.  Install?
17       MS. VANNI:  Same objection.
18       THE WITNESS:  I recognize
19       "implement" to mean in this
20       context continue to evolve and
21       improve our program.
22  BY MR. BUCHANAN:
23       Q.  Okay.  Let's go to the next
24  page, sir.  581.6.

Page 363

1        "DEA SOMs feedback.  You
2  need to differentiate between the sales
3  team role and the DEA compliance role.
4  You need to visit your customers!"
5        Do you see that?
6        A.  I see that.
7        Q.  You had your people in the
8  room with the DEA a week earlier, right?
9        A.  We did.
10       Q.  Your people could have told
11  the DEA precisely what the company was
12  doing, right?
13       MS. VANNI:  Object to form.
14  BY MR. BUCHANAN:
15       Q.  I suspect they probably did,
16  right?
17       MS. VANNI:  Object to form.
18       THE WITNESS:  I'm sure there
19       was some communication around what
20       we were currently doing with our
21       programs.
22  BY MR. BUCHANAN:
23       Q.  Right.  And the message you
24  heard back with an exclamation point on

Page 364

1  the end was you need to visit your
2  customers, right?
3        A.  Right.
4        Q.  And you had to hire people
5  to put boots on the ground to do that,
6  right?
7        MS. VANNI:  Object to form.
8        THE WITNESS:  What we did
9        was move the responsibility for
10       visiting customers in the context
11       of suspicious order monitoring
12       into a dedicated DEA compliance
13       team.  That's what we hired people
14       to do.
15  BY MR. BUCHANAN:
16       Q.  Right.  So the visiting
17  customers perspective of the sales team
18  is selling product, and so you actually
19  had to get a compliance hat on and start
20  making sure that you weren't selling
21  stuff to people who were not legitimate
22  pharmacies, not legitimate distributors
23  who were selling it to pharmacies who
24  weren't real, not selling it for --

Page 365

1  withdrawn.
2        A.  I think if you go back --
3        MS. VANNI:  He withdrew the
4        question.
5        MR. BUCHANAN:  It's
6        withdrawn.  It's withdrawn.  Going
7        to move us forward.
8  BY MR. BUCHANAN:
9        Q.  "You need to use chargeback
10  data to understand what your customers'
11  customers are doing," correct?
12       A.  Yes.  That was one of the
13  suggestions DEA made.
14       Q.  "You need to use."  It
15  doesn't sound much like a suggestion.
16  It's you need to, right?
17       MS. VANNI:  Object to form.
18       THE WITNESS:  Yeah, we saw
19       this in the letter, the DEA --
20  BY MR. BUCHANAN:
21       Q.  Right.  "You need to use the
22  chargeback data."  "You need to
23  differentiate between the sales team role
24  and the DEA compliance role."

Page 366

1    It's good sense, right?
2    MS. VANNI:  Object to form.
3    THE WITNESS:  I think I
4  testified that that would be a
5  best practice evolution of your
6  program.
7 BY MR. BUCHANAN:
8    Q.   I mean, did you need
9  somebody to tell you that?
10    MS. VANNI:  Object to form.
11 BY MR. BUCHANAN:
12    Q.   That the sales folks were
13 about selling and the compliance people
14 were about compliance?
15    MS. VANNI:  Same objection.
16    THE WITNESS:  As I -- as I
17  stated earlier, we had already
18  identified prior to the meeting in
19  2013 that there were enhancements
20  that we needed and wanted to make
21  to our program.
22 BY MR. BUCHANAN:
23    Q.   Right.  We'll talk about
24 that in a moment.

Page 367

1    Next, "You must know the
2 customers you're selling to," right?
3 "You must know the customers you're
4 selling to."
5    Do you see that?
6    A.   That's what it says here.
7    Q.   Scrolling down.  "Look at
8 the charts provided."  And again, this is
9 the DEA communicating to the company as
10 related by Ms. Hernandez, right?  DEA
11 SOMs feedback?
12    A.   She's summarizing the
13 meeting with DEA.
14    Q.   Right.  "Look at the charts
15 provided.  We will visit your site and we
16 want to see an improvement in six
17 months," right?
18    A.   That's what it says here.
19    Q.   It says you've got a
20 six-month window, straighten up?
21    MS. VANNI:  Object to form.
22    THE WITNESS:  They said they
23  would like to see some of these
24  improvements they suggested

Page 368

1  implemented over a six-month time
2  period.
3 BY MR. BUCHANAN:
4    Q.   Mm-hmm.  "We will visit your
5 site and we want to see an improvement in
6 six months.  We will not look the other
7 way if someone screws up."
8    And they told you what the
9 consequence was, right?
10    A.   Well, it's pretty clear what
11 the consequences of not abiding by the
12 regulations are.
13    Q.   Right.  Well, this is the
14 point in time when the company took
15 action, when it knew that it could get
16 its licenses revoked when its business
17 was threatened?
18    MS. VANNI:  Object to form.
19    THE WITNESS:  I don't agree
20  with that characterization at all.
21 BY MR. BUCHANAN:
22    Q.   Okay.  We'll look at what
23 happened over time throughout the day
24 today.

Page 369

1    "You need to visit your
2 customers' customers and document your
3 findings," right?
4    A.   That's what it says.
5    Q.   Okay.  You weren't visiting
6 your customers' customers prior to this
7 point in time, right?
8    A.   As I said, we had
9 salespeople doing visits to customers.
10 I'm not sure exactly what customers they
11 were going to.  But they were visiting
12 customers.
13    Q.   Right.  But they weren't
14 visiting customers of customers, right?
15    A.   I couldn't -- I couldn't
16 tell you whether they were or they
17 weren't.
18    Q.   And then the DEA told you
19 unequivocally, you cannot sell these
20 products until you've satisfactorily
21 closed out the investigation, right?
22    A.   Yes.
23    Q.   Right.  You can't ship until
24 you've done thorough due diligence,

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1 right?
2    A.   Right, which was already
3 part of our program.  We were reviewing
4 orders.  We were making a determination
5 of whether those orders --
6        MR. BUCHANAN:  Move to
7    strike --
8        THE WITNESS:  -- exceeded
9    historical parameters and we were
10   investigating as appropriate.
11       MR. BUCHANAN:  Move to
12   strike.
13 BY MR. BUCHANAN:
14    Q.   You had the knowledge, sir,
15 that you were not permitted to sell the
16 products until you had done satisfactory
17 due diligence and closed out the
18 investigation, right?
19    A.   Correct, which is, in fact,
20 what we were doing.
21       MR. BUCHANAN:  Move to
22   strike.
23 BY MR. BUCHANAN:
24    Q.   If you fail to adhere to

Page 371

1 your responsibilities, you present a
2 danger to the public.  That's what you
3 were told, right?
4    A.   Those were DEA's words.
5    Q.   Okay.  People are dying.
6 Kids are born addicted.  These people
7 wouldn't have the drugs if it weren't for
8 who?
9    A.   Do you want me to read
10 what's here?
11    Q.   Yeah.  What's it say?
12    A.   "If it weren't for
13 manufacturers and distributors."
14    Q.   Okay.  And Qualitest in this
15 instance -- instance was both, right?
16    A.   Qualitest was a manufacturer
17 and a distributor.
18    Q.   Mm-hmm.  Okay.  All right.
19       So -- I just want to make
20 sure we're not confused on a point, sir.
21       MR. BUCHANAN:  What exhibit
22   will this be?  23?
23       (Document marked for
24   identification as Exhibit

Page 372

1    Endo-Macrides-22.)
2 BY MR. BUCHANAN:
3    Q.   Passing you Exhibit 22 to
4 your deposition.  It's a series of slide
5 decks.
6       Okay.  It's a --
7 Mr. Brantley is forwarding an e-mail
8 to -- it looks like himself.
9 Ericbrantley@mahoganymoon.com.
10       SOM 101, SOM customer
11 resource, SOM Training 3.
12       Is Mr. Brantley still with
13 the company?
14    A.   No.
15    Q.   Sending it to himself when
16 he was leaving?
17       MS. VANNI:  Object to form.
18 BY MR. BUCHANAN:
19    Q.   Do you know when he left?
20    A.   Sometime in 2017.
21    Q.   Okay.
22       He forwards a series of
23 PowerPoints.  Suspicious Order Monitoring
24 101 -- excuse me.  Suspicious order

Page 373

1 monitoring SOM 101.  History current
2 state, notes, et cetera.
3       I'd like to take you to
4 589.22, what's referred to as, "The
5 Meeting."
6       Do you see that?
7    A.   I'm getting there.
8    Q.   What we were told.
9    A.   Okay.  I'm there.
10    Q.   Okay.
11    A.   If I could just have a
12 minute to look at this.
13    Q.   What we were told.  The
14 meeting.  Make comparisons to national
15 averages.  Separation between sales and
16 SOMs/DEA compliance.
17       Do you see that?
18       MS. VANNI:  You can review
19   the document.
20       THE WITNESS:  I see that.
21 BY MR. BUCHANAN:
22    Q.   "Sales is seen as a conflict
23 of interest."  Do you see that?
24    A.   I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1    Q.   "Customers must be visited.
2  Visits are not to be conducted by sales."
3         Correct?
4    A.   Correct.
5    Q.   Prior to 2013, sir, the only
6  visits with customers were being done by
7  sales, correct?
8    A.   I believe that's what I
9  testified.
10   Q.   Okay.  And where would we
11 find -- I think you said the sales team
12 would provide its due diligence on its
13 meetings with customers, right?  If the
14 sales team saw something?
15   A.   I said that if the sales
16 team saw something objectionable, they
17 would come back with that information.
18 That's what I said.
19   Q.   Okay.  And so where did the
20 company keep its due diligence files that
21 these sales reps generated?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  I'm not aware
24   of due diligence files from those

Page 375

1    sales visits.  There may have been
2    communications between the sales
3    personnel and the compliance
4    personnel if there was something
5    that needed to be discussed.
6         I don't know to what extent
7    those were documented.
8  BY MR. BUCHANAN:
9    Q.   As part of your preparation,
10 sir, to testify for the company, are you
11 aware of any communications from sales
12 reps with compliance that led to cutting
13 an order for a particular client?
14   A.   I don't recall any specific
15 documents.
16   Q.   And I'm focused on this pre
17 March of 2013 time frame.
18   A.   I don't recall.
19   Q.   Okay.  Any communications
20 from sales representatives who were
21 supposedly, in your words, doing due
22 diligence?
23   A.   I don't recall any specific
24 documents that I reviewed.  As I

Page 376

1  testified, I only had salespeople
2  visiting customers.
3    Q.   Right.  And your sales reps
4  were doing sales calls, right?
5    A.   They were visiting
6  customers.
7         MS. VANNI:  Object to form.
8  BY MR. BUCHANAN:
9    Q.   To do sales calls, right,
10 sir?
11        MS. VANNI:  Object to form.
12        THE WITNESS:  They were
13   visiting customers.  That's my
14   answer.
15 BY MR. BUCHANAN:
16   Q.   Okay.  And we could agree
17 that you're not aware of any visit with a
18 customer that resulted in a report from a
19 sales rep that led to a report to the
20 DEA, correct?
21        MS. VANNI:  Objection.
22   Asked and answered.
23        THE WITNESS:  As I
24   testified, I'm not aware of any

Page 377

1    documents documenting those
2    visits.
3  BY MR. BUCHANAN:
4    Q.   Not aware of any document
5  from a sales rep with a customer that led
6  to cutting or refusing to ship an order,
7  right?
8    A.   I'm not aware of any
9  documentation around that specific issue.
10   Q.   Okay.  So what you are aware
11 of, sir, is that due diligence actually
12 commenced after the DEA sat down with you
13 and said your license could be revoked if
14 you don't shape up, right?
15        MS. VANNI:  Object to form.
16        THE WITNESS:  I wouldn't
17   characterize it that way.  I
18   would --
19 BY MR. BUCHANAN:
20   Q.   Well, we could agree that
21 that's when the company started to do due
22 diligence visits, after the DEA sat down
23 with them in March 2013 and said the
24 consequences are severe.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    MS. VANNI:  Object to form.
2    THE WITNESS:  Prior to 2013,
3    the company had already recognized
4    that it needed to make certain
5    enhancements to its DEA compliance
6    program across a number of areas.
7    BY MR. BUCHANAN:
8    Q.   Had not instituted due
9    diligence visits prior to sitting down
10   with the DEA in March of 2013, yes or no?
11   MS. VANNI:  Objection.
12   Asked and answered.
13   THE WITNESS:  The company
14   had recognized that it needed to
15   make improvements to its
16   suspicious order monitoring
17   system, including increasing
18   customer visits prior to the
19   meeting with DEA.
20   BY MR. BUCHANAN:
21   Q.   You never quite got there
22   until the DEA sat down with you, right?
23   MS. VANNI:  Object to form.
24   THE WITNESS:  Subsequent to

Page 379

1    2013, or during 2013, we were --
2    we were continuing to make
3    enhancements to our program --
4    BY MR. BUCHANAN:
5    Q.   After --
6    A.   -- using -- using the
7    guidance the DEA provided to us in the
8    meeting.
9    Q.   Okay.
10   A.   Along with other inputs that
11   we had gotten prior to the meeting in
12   2013.
13   Q.   So the answer to my
14   question, sir, is, prior to 2013, you're
15   not aware of any customer due diligence
16   visits concerning SOMs, correct?
17   A.   I said I'm not aware of any
18   documentation.
19   Q.   Okay.
20   A.   Around any customer
21   visits --
22   Q.   Okay.
23   A.   -- specific to SOMs.
24   Q.   Okay.  Which would also mean

Page 380

1    that you're not aware of any customer due
2    diligence visits relevant to SOMs,
3    correct?
4    MS. VANNI:  Objection.
5    THE WITNESS:  I said I'm not
6    aware of any -- I said we were --
7    we had salespeople visiting
8    customers.  I said I wasn't aware
9    of any documentation as it related
10   to SOMs-specific components of
11   those visits.
12   BY MR. BUCHANAN:
13   Q.   The first due diligence
14   visits you're aware of that relate to
15   SOMs occurred after March of 2013,
16   correct, sir?
17   A.   The first due diligence
18   visits --
19   MS. VANNI:  Object to form.
20   THE WITNESS:  -- by DEA
21   compliance people, as part of a
22   DEA compliance team that we had
23   put together were done post the
24   DEA meeting in 2013.  That's

Page 381

1    correct.
2    MR. BUCHANAN:  Okay.  And
3    just can we pull up, please,
4    Exhibit 6 again.
5    THE WITNESS:  Which one was
6    that?
7    BY MR. BUCHANAN:
8    Q.   I put it up on the screen
9    for you.
10   And so in this meeting with
11   the DEA in March of 2013, the DEA told
12   you that your current system was
13   inadequate to say the least, correct,
14   sir?
15   A.   That was how DEA
16   characterized it.  I wouldn't agree with
17   that characterization.
18   Q.   Okay.  DEA told you the
19   things that needed to be changed
20   imminently over the next six months, and
21   they were going to get back with you,
22   right?
23   MS. VANNI:  Object to form.
24   THE WITNESS:  DEA made

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1  suggestions of areas where we
2  could improve and enhance our
3  program and they said they would
4  like to come back in six months
5  and see how many of those we
6  implemented.
7  BY MR. BUCHANAN:
8      Q.   Okay.  And so we can agree,
9  sir, that prior to this meeting with the
10  DEA, certainly in 2012, you shipped
11  3.2 billion pills and other units of
12  opioid-containing products, correct, sir?
13          MS. VANNI:  Object to form.
14          THE WITNESS:  In 2012, we
15      shipped 3.2 billion.
16  BY MR. BUCHANAN:
17      Q.   During the time when,
18  according to the DEA, your SOMs were
19  inadequate to say the least?
20          MS. VANNI:  Object to form.
21  BY MR. BUCHANAN:
22      Q.   Correct?
23      A.   In 2012, we were reviewing
24  orders that came in for these products

Page 383

1  against historical parameters,
2  identifying orders of interest and
3  investigating those.
4          MR. BUCHANAN:  Move to
5      strike.  Nonresponsive.
6  BY MR. BUCHANAN:
7      Q.   In 2011, you shipped
8  2.3-plus billion units and pills, various
9  opioid-containing products, right?
10          MS. VANNI:  Objection.
11      Beyond the scope of his 30(b)(6).
12          THE WITNESS:  In 2011 we
13      shipped 2.4 billion of the
14      products listed on this list.
15  BY MR. BUCHANAN:
16      Q.   During a period when,
17  according to the DEA, your SOMs were
18  inadequate to say the least, right?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  I don't
21      agree -- I don't agree with that
22      characterization.  These orders
23      for the products that were shipped
24      in 2011 were reviewed against

Page 384

1  historical parameters, and any
2  orders of interest would have been
3  investigated.
4  BY MR. BUCHANAN:
5      Q.   Okay.  Which -- which orders
6  in 2008, 2009, 2010, 2011, or 2012 did
7  the company report to the DEA as
8  suspicious?
9      A.   I don't believe we had
10  identified any suspicious orders during
11  that time frame based on our review of
12  the orders and investigation.
13      Q.   Which of the orders that the
14  company received between 2008, 2009,
15  2010, 2011, and 2012 -- I mean, that
16  looks like -- I don't know.  What is
17  that, 10 billion pills?  Is that 10
18  billion pills, sir?  Withdrawn.  I'll do
19  the math first and give you a clean
20  question.
21          MS. VANNI:  Can we take a
22      break too?
23          MR. BUCHANAN:  After this,
24      sure.

Page 385

1  BY MR. BUCHANAN:
2      Q.   Sir, it looks like between
3  2008 and 2012, the company shipped
4  between eight and a half or 9 billion
5  pills.  Does that sound about right?
6      A.   It looks about right.
7      Q.   Okay.  Between 8 and 9
8  billion, fair?
9      A.   Fair.
10      Q.   Okay.  For the 8 to 9
11  billion pills or at least the orders that
12  generated shipments of those amount,
13  which of those orders did the company
14  pend and refuse to ship?
15      A.   I don't have the specific
16  details on what orders were reviewed.  I
17  can only speak to the fact that we had a
18  process where orders were reviewed.
19      Q.   So between this point in
20  time during which 8 to 9 billion pills
21  were shipped pursuant to various orders,
22  you're not aware of a single order that
23  was reported to the DEA by Qualitest,
24  correct?

Page 386

1    A.   I am not aware of a
2  suspicious order that had been identified
3  that would subsequently have been
4  reported to DEA.
5    Q.   You're not aware of a single
6  order that was not shipped during this
7  period of time?
8    A.   I'm not aware of an order
9  that was identified as suspicious and was
10 not shipped.  That's not to say there
11 weren't any.  I'm not aware of them.
12    MR. BUCHANAN:  Let's take a
13 break.
14    THE VIDEOGRAPHER:  Off the
15 record at 3:13 p.m.
16    (Short break.)
17    THE VIDEOGRAPHER:  We are
18 back on the record at 3:32 p.m.
19 BY MR. BUCHANAN:
20    Q.   Okay.  Sir, I'm passing you
21 over a stack of exhibits.  We'll go
22 through them in sequence.  There's -- why
23 don't we start with what's been marked as
24 Exhibit Number 23.

Page 387

1    (Document marked for
2  identification as Exhibit
3  Endo-Macrides-23.)
4    MR. BUCHANAN:  Charles,
5  could you pass a copy for defense
6  counsel.
7  BY MR. BUCHANAN:
8    Q.   For the record, it's
9  internally labeled as E-1051.  If we can
10 pull up that on the screen.  E-1051, sir,
11 is an e-mail to John Schultz, Mike
12 Reiney, Charles Propst, others.
13    Do you recognize any of
14 those names?
15    A.   I recognize most of the
16 names.
17    Q.   Okay.  And a Mr. Mapes, a
18 former DEA agent, conducted an audit of
19 your facility in 2008 and provided a
20 report of that back to Qualitest
21 Pharmaceuticals.
22    Do you see that?
23    A.   Right.  Michael Mapes was
24 brought in to do an audit.

Page 388

1    Q.   Who is Michael Mapes?
2    A.   I don't personally know him.
3  I believe he had been an ex-DEA person
4  who had gone into consulting.
5    Q.   Okay.  So this is reporting
6  on a -- reporting on a visit of Mr. Mapes
7  on an audit, from August 19 and 20 of
8  2008, correct?
9    A.   Correct.
10    Q.   Of Qualitest, correct?
11    A.   Correct.
12    Q.   Met with several individuals
13 from Qualitest, correct?
14    A.   He did.
15    Q.   Reviewed the practices as
16 described to him and whatever paperwork
17 surrounded that, correct?
18    A.   Correct.
19    Q.   He indicates the issues that
20 were noted during the review were
21 reporting of suspicious orders to DEA in
22 addition to reporting suspicious sales.
23    Do you see that?
24    A.   I see that.

Page 389

1    Q.   Okay.  Also noted is selling
2  quantities of controlled substances that
3  are under the Qualitest thresholds to
4  pharmacies that have reached the
5  thresholds with other distributors is an
6  issue considered, correct, sir?
7    A.   That's what he identifies
8  here.
9    Q.   Mr. Tatum was in what
10 function?
11    A.   I believe he was in the
12 sales and marketing function at that
13 time.
14    Q.   Okay.  And so Mr. Tatum is
15 somebody who had a role and involvement
16 for order review at this point in time,
17 correct?
18    A.   As I understand it.
19    Q.   The SOP, it's referring to
20 review of -- let's talk about details at
21 the bottom.
22    MR. BUCHANAN:  I'm sorry.
23 Can you please go to .2.  Thank
24 you.

Page 390

BY MR. BUCHANAN:

Q. In the middle it says the issues were noted during the review, and we talked about 1 and 2.

Do you recall that, sir?

A. Right.

Q. Okay. And then the details are spelled out below. And there is a review of a Qualitest SOP for suspicious orders. One that was effective as of 2007, correct?

A. That's what it says.

Q. It says "The SOP states that the Qualitest senior management will make a determination if a suspicious order is reported to DEA," correct?

A. Correct.

Q. And as best as you are aware, sir, there had been no reports of suspicious orders by Qualitest back in this period of time, correct?

A. Not that I'm aware of.

Q. Right. The earliest report of a suspicious order you're aware of to

Page 391

the DEA follows the sit-down with the DEA in March of 2013, correct?

MS. VANNI: Object to form.

THE WITNESS: That's my understanding.

BY MR. BUCHANAN:

Q. Okay. Nonetheless, there's a sit-down obviously or an audit being conducted by Mr. Mapes together with Qualitest employees and reviewing some of the people's awarenesses or not of what the regulations require. Fair?

A. Yes, he's reviewing the program that was in place.

Q. Right. "A check with Mr. Schultz showed that in the past eight months no reports of suspicious orders were sent to DEA," correct?

A. That's what it says.

Q. Okay. "While discussing issues with Jeremy Tatum he was not aware that in addition to notifying DEA of sales that were above established thresholds and suspicious, they are

Page 392

expected to report to DEA suspicious orders, even if they were declined by Qualitest."

Did I read that correctly?

A. You read it correctly.

Q. "The Qualitest system for reporting suspicious orders to DEA needs to be improved to comply with 21 C.F.R. 1301.74," correct?

A. That's what the document says.

Q. "In several instances sales were made to a pharmacy," continuing to the next page, "that was under the established threshold for that drug established by Qualitest when the account representative was aware that the customer had been limited in quantity for the same drug by another wholesaler."

Did I read that correctly?

A. You read it correctly.

Q. "Generally speaking, Jeremy Tatum is responsible for releasing orders for retail pharmacies and doctors where

Page 393

the quantity shipped is above the established thresholds for the particular drug as established by Qualitest."

Did I read that correctly?

A. You did.

Q. At this point in time, Qualitest was selling drugs directly to doctors, right?

MS. VANNI: Object to form.

THE WITNESS: This is 2000 -- I believe they were, yes.

BY MR. BUCHANAN:

Q. And directly to pharmacies, right?

MS. VANNI: Object to form.

THE WITNESS: There was a point where they stopped selling certain products directly to pharmacies. I don't recall whether it was prior to or after this date.

BY MR. BUCHANAN:

Q. Okay. It says, "At the present time Mr. Tatum is the one who is

Page 394

1 making the call about whether to ship
2 these orders when they are above the
3 thresholds," right?
4      A.   He's reviewing the orders.
5      Q.   He's a sales guy, right?
6           MS. VANNI:  Object to form.
7           THE WITNESS:  I believe he
8      worked in sales and marketing,
9      yeah.
10 BY MR. BUCHANAN:
11      Q.   Okay.  So the sales guy is
12 deciding whether to ship the sale?
13           MS. VANNI:  Object to form.
14 BY MR. BUCHANAN:
15      Q.   As of this point in time?
16      A.   This is saying it was his
17 responsibility to review the orders.
18      Q.   It says, "It's imperative
19 that the controlled substance
20 questionnaire that has been developed be
21 finalized and put into the system.
22 Without that level of information
23 Qualitest will be making the ship/not
24 ship decision with insufficient

Page 395

1 information."
2           Correct?
3      A.   That's what he says.  He's
4 pointing out that having a questionnaire
5 that goes out to customers will -- will
6 assist in gathering information about the
7 customer so that we can improve the way
8 we make these decisions.
9      Q.   Right.  And prior to this
10 point in time you didn't have such
11 questionnaire, correct?
12      A.   It looks like what he's
13 saying here is that the questionnaire had
14 been developed but maybe not yet
15 finalized.
16      Q.   So my -- my point would be,
17 sir, prior to this point in time a
18 questionnaire had not been used in
19 connection with the company's suspicious
20 order monitoring practices, correct?
21      A.   That's what -- what the
22 document appears to be suggesting there.
23      Q.   And Mr. Mapes notes that
24 without having such a questionnaire you

Page 396

1 are making a ship/not ship decision with
2 insufficient information, correct?
3      A.   He's suggesting that the --
4 that the questionnaire will provide
5 additional information that could be used
6 to make a decision.
7      Q.   Well, what he wrote was,
8 "Without that level of information,
9 Qualitest will be making the ship/not
10 ship decision with insufficient
11 information."
12           That's what's written,
13 correct?
14      A.   That was the opinion of the
15 consultant.
16      Q.   Right.  And so prior to
17 implementing the questionnaire, in the
18 words of the consultant, he'd be making
19 that determination with insufficient
20 information, correct, sir?
21      A.   In his opinion.
22      Q.   It then continues, "It's
23 important for Qualitest" -- at the end,
24 I'm sorry.  Last paragraph on this page.

Page 397

1           "It is important for
2 Qualitest to work with all controlled
3 substance customers, including those who
4 will further distribute Qualitest
5 products to other DEA registrants, to
6 assure that the controlled substances are
7 distributed only to customers who have
8 systems in place to assure that the
9 controlled substances will be used for
10 legitimate medical purposes."
11           Do you see that, sir?
12      A.   I see that.
13      Q.   Okay.  So what you are being
14 told here is that you got to know your
15 customer, right?
16           MS. VANNI:  Object to form.
17 BY MR. BUCHANAN:
18      Q.   In 2008, right?
19      A.   In 2008, we were engaging a
20 consultant to come in, an -- an ex-DEA
21 consultant, to give us information to
22 help us improve our suspicious order
23 monitoring programs.
24      Q.   Okay.  And what you --

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1    A.   That's what this document
2  is -- is doing.
3    Q.   And maybe you didn't hear my
4  question, sir.  I was focused on this
5  paragraph.
6        In this paragraph where it
7  says, "It is important for Qualitest to
8  work with all controlled substance
9  customers, including those who will
10 further distribute Qualitest products to
11 other DEA registrants, to assure that the
12 controlled substances are distributed
13 only to customers who have systems in
14 place to assure that the controlled
15 substances will be used for legitimate
16 medical purposes."
17       Did I read that correctly?
18   A.   You read it correctly.
19   Q.   Okay.  So it's important for
20 Qualitest, one, to implement a
21 questionnaire to know its customers,
22 correct?
23   A.   That was one of his
24 recommendations.

Page 399

1    Q.   And it's important for
2  Qualitest to make sure that its customers
3  and those to whom the customers are going
4  to distribute the drug or drugs, have
5  systems in place to monitor for
6  suspicious orders, right?
7        MS. VANNI:  Object to form.
8        THE WITNESS:  I believe I've
9     already testified that it's an
10    important part of a suspicious
11    order monitoring program is to
12    understand your customers and
13    their customers.
14 BY MR. BUCHANAN:
15   Q.   And to make sure you're
16 sending it to someone, who, like the
17 person shipping the product, should be
18 trying to keep this circle closed, a
19 closed system of distribution, right?
20   A.   You should be understanding
21 what your customers are doing to control
22 diversion.  You should be working with
23 them to improve those systems.
24   Q.   Effective controls against

Page 400

1  diversion don't stop with a vault and a
2  cage and cameras and people looking at
3  each other in the warehouse, right?
4        MS. VANNI:  Object to form.
5  BY MR. BUCHANAN:
6    Q.   Right, sir?
7    A.   The responsibilities, as a
8  manufacturer and a distributor, go beyond
9  just what happens in the physical plant.
10 They extend into the distribution channel
11 as we've been discussing today.
12   Q.   Must take gate care in who
13 you sell to to make sure that who you
14 sell to also exercises great care with
15 these very dangerous products, correct?
16       MS. VANNI:  Object to form.
17       THE WITNESS:  We have our
18    responsibilities under the
19    regulations to make sure that
20    proper controls are in place and
21    to understand what our customers
22    are doing in that regard.
23       Again, this document was --
24 BY MR. BUCHANAN:

Page 401

1    Q.   Is that a yes answer to my
2  question?
3    A.   I just answered your
4  question.
5    Q.   I just want to understand.
6  Were you agreeing with me?
7        MS. VANNI:  Object to form.
8        THE WITNESS:  I answered
9     your question.
10 BY MR. BUCHANAN:
11   Q.   Okay.  So you didn't -- I
12 thought you were agreeing with me.  But I
13 just want to make sure that we have
14 agreement here, that as a registrant
15 manufacturer and distributor, your
16 obligation was to take great care in who
17 you sold to, and as part of that process,
18 ensure that they had systems in place to
19 take great care to prevent diversion,
20 correct?
21       MS. VANNI:  Object to form.
22       THE WITNESS:  Our
23    responsibilities under the
24    regulations are to make sure that

Page 402

1  we have the proper controls in
2  place, that we understand our
3  customers and what their controls
4  are, so that we can mitigate the
5  diversion and abuse of our
6  products.
7  BY MR. BUCHANAN:
8      Q.   And not to mitigate --
9      A.   You're characterizing it as
10 great care -- as great care.  I don't
11 know what that means.  What I'm telling
12 you is under the regulations what we have
13 a responsibility to do and what we were
14 in fact doing and evolving and bringing
15 in consultants such as Mr. Mapes here,
16 you know, was a proactive effort, to
17 better, you know, understand the
18 expectations and to better develop and
19 enhance those programs.
20     Q.   Okay.  And so the statutory
21 obligation, is to maintain effective
22 controls against diversion, right?
23     A.   Effective controls.
24     Q.   Okay.  And effective

Page 403

1  controls against diversion makes sure
2  that you don't sell your product to
3  somebody who does not have effective
4  controls against diversion, right?
5      A.   To the best of our ability
6  and the best information we can -- we can
7  obtain, that's what we do.
8      Q.   And that was something that
9  you knew as of this point in time in
10 2008, when you were getting input from
11 Mr. Mapes, right?
12     A.   Mr. Mapes gave us input on
13 how we can improve our programs.
14     Q.   And how to ensure that your
15 customers and their customers' customers
16 had programs in place, right?
17     A.   He gave us information on
18 that.
19     Q.   Okay.  How, sir, did you
20 monitor the effectiveness of your
21 controls against diversion?
22     A.   At that time we were
23 reviewing orders.  At that time period we
24 were using thresholds to review orders

Page 404

1  and understand -- you know, investigate
2  if something were exceeding those
3  thresholds, to understand why the
4  customer was ordering that and to do the
5  appropriate investigation.
6      Q.   Well, and I guess that
7  wasn't my question, sir, not what your
8  algorithm was or how you were identifying
9  orders of interest.
10         We've looked at documents,
11 one from 2003, one from 2013, that
12 highlighted your products, were products
13 being abused and diverted.  Do you recall
14 looking at those documents today, sir?
15         MS. VANNI:  Object to form.
16         THE WITNESS:  I recall us
17     looking at documents.
18 BY MR. BUCHANAN:
19     Q.   Talking about abuse and
20 diversion with Percocet and Percodan and
21 later oxycodone 15 and 30.  Do you recall
22 us looking --
23     A.   I recall those documents.
24     Q.   Okay.  So my question to

Page 405

1  you, sir, is how were you measuring the
2  effectiveness of your controls given that
3  there clearly was diversion?
4          MS. VANNI:  Object to the
5      form.
6          THE WITNESS:  The way we
7      measure the effectiveness of our
8      controls is to ensure that we are
9      reviewing orders, we are
10     identifying orders of interest,
11     and we are investigating those,
12     because if we are doing that, and
13     we are working to the best of our
14     ability to understand our
15     customers, then we are doing our
16     diligence and ensuring that our
17     products are going to the patients
18     who need them and are not getting
19     diverted or abused.
20 BY MR. BUCHANAN:
21     Q.   Well, we know your products
22 were being diverted, right?
23         MS. VANNI:  Object to form.
24 BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1    Q.   We've talked about that
2  today.
3    A.   I don't know to what degree
4  our products were being --
5    Q.   Not to what --
6    A.   -- diverted.
7    Q.   -- degree.  We know your
8  products were being diverted.  Others
9  will decide --
10   A.   We know that oxycodone
11  15-milligram and 30-milligram were being
12  diverted.  There are other companies that
13  manufacture those products.
14   Q.   We know that Percocet and
15  Percodan, at least the branded names,
16  pursuant to the DEA notice in 2003, were
17  being abused and diverted, correct?
18        MS. VANNI:  Object to form.
19        THE WITNESS:  We know that
20     the DEA mentioned in their letter
21     the brand names Percocet and
22     Percodan which also can be readily
23     confused with generics products.
24  BY MR. BUCHANAN:

Page 407

1    Q.   Your brand name drugs, sir,
2  were called out by the DEA as drugs that
3  were being abused and diverted agreed?
4        MS. VANNI:  Object to form.
5  BY MR. BUCHANAN:
6    Q.   Do we agree on that?
7        MS. VANNI:  Object to form.
8        THE WITNESS:  DEA mentioned
9     Percocet and Percodan in the
10     letter that we looked at earlier
11     today.
12  BY MR. BUCHANAN:
13   Q.   Okay.  And so in terms of a
14  system in place through which you were
15  monitoring the effectiveness of your
16  controls, it doesn't sound like you had
17  one?
18        MS. VANNI:  Object to form.
19  BY MR. BUCHANAN:
20   Q.   Right?
21        MS. VANNI:  Same objection.
22  BY MR. BUCHANAN:
23   Q.   Because if you're trying to
24  prevent something from happening --

Page 408

1  withdrawn.
2        If you're trying to prevent
3  something from happening and you want to
4  see how effective you're doing at
5  preventing something from happening, one
6  of the things that you want to try and
7  measure is the extent to which it's
8  happening, notwithstanding your efforts,
9  right?
10        MS. VANNI:  Object to form.
11        THE WITNESS:  If we have
12     procedures in place to review
13     orders and make a determination if
14     those orders are suspicious, then
15     we are effectively doing our
16     diligence, because we are not
17     shipping orders that potentially
18     are suspicious and could be
19     diverted.
20  BY MR. BUCHANAN:
21   Q.   Well, if something you're
22  trying to prevent from happening, sir, is
23  still happening, we can agree there's
24  more than that can be done, right?

Page 409

1        MS. VANNI:  Objection.
2        THE WITNESS:  We have
3     continued to enhance and develop
4     our programs over the time periods
5     that we're discussing.  We've seen
6     that, we've seen various
7     company-initiated efforts to bring
8     consultants in to identify
9     opportunities in areas where we
10     can improve.
11  BY MR. BUCHANAN:
12   Q.   So we agree?
13   A.   We agree on what?
14   Q.   We agree, sir, that if
15  you're trying to prevent something from
16  happening, but it's still happening,
17  there's more that can be done?
18        MS. VANNI:  Object to form.
19        THE WITNESS:  What I've
20     testified to is that we continued
21     to evolve our programs and enhance
22     our programs.  And that is the
23     best way for us to mitigate
24     diversion of our products.

Page 410

1　　　　Could our products be
2　diverted in other mechanisms?  I
3　think I testified to that earlier.
4　Someone who gets our product under
5　a valid prescription could divert
6　the product.
7　BY MR. BUCHANAN:
8　　　Q.　But, sir, you knew at the
9　end of 2008 that Qualitest's process that
10　you've talked about and you've suggested,
11　I guess were getting things done, were in
12　no sense compliant, even by 2008
13　standards, right?
14　　　　MS. VANNI:  Object to form.
15　　　　THE WITNESS:  I disagree
16　with your characterization that
17　our procedures weren't compliant.
18　BY MR. BUCHANAN:
19　　　Q.　Okay.  Can I have --
20　　　A.　Our procedures were
21　structured to identify suspicious orders.
22　　　　MR. BUCHANAN:  Can I have
23　Exhibit 24, please.
24　BY MR. BUCHANAN:

Page 411

1　　　Q.　Because you all had some
2　interactions with the DEA following this
3　Mapes audit, correct?
4　　　　Do you recall that, sir,
5　having some interactions with the DEA in
6　the fall of 2008?
7　　　　Did you become aware of that
8　as part of your preparation for today,
9　sir?
10　　　A.　I think I --
11　　　　MS. VANNI:  Objection.
12　　　　THE WITNESS:  Sorry.
13　　　　MS. VANNI:  No, go ahead.
14　　　　THE WITNESS:  I think I'm
15　aware of the fact that we had
16　ongoing contact with the DEA
17　throughout the period we are
18　discussing.
19　BY MR. BUCHANAN:
20　　　Q.　Okay.
21　　　A.　Is there some -- is there a
22　specific interaction that you're
23　referring to?
24　　　Q.　Yeah.  Well, the -- the

Page 412

1　Mapes folks had an interaction with you
2　earlier in 2008.  The DEA came down and
3　sat down with you in the fall of 2008.
4　And then you -- you reached out to
5　Cegedim Dendrite again, the Buzzeo folks,
6　to talk about suspicious order
7　monitoring, right, in the fall of 2008?
8　　　A.　That's this document here?
9　　　Q.　Yeah.
10　　　A.　Like I said, I reviewed a
11　lot of documents.  I don't have them all
12　committed to memory.
13　　　Q.　Okay.
14　　　A.　If I could just review the
15　document then.
16　　　Q.　That's fine.
17　　　　(Document marked for
18　identification as Exhibit
19　Endo-Macrides-24.)
20　BY MR. BUCHANAN:
21　　　Q.　Who -- who is Gary Glotz,
22　sir?
23　　　　MS. VANNI:  Do you want him
24　to review the document or do you

Page 413

1　want him to answer your question?
2　　　　MR. BUCHANAN:  Well,
3　let's -- let's identify the people
4　and then --
5　　　　MS. VANNI:  Okay.
6　　　　MR. BUCHANAN:  -- the review
7　is fine.
8　　　　MS. VANNI:  For the record,
9　this is Exhibit 24?
10　　　　MR. BUCHANAN:  24.
11　　　　MS. VANNI:  Thank you.
12　BY MR. BUCHANAN:
13　　　Q.　Do you see a reference on
14　the first page to a Gary Glotz, Spike
15　Pannell, and John Schultz?
16　　　A.　I do.
17　　　Q.　Okay.  And who were they?
18　　　A.　John Schultz was the head of
19　compliance, DEA compliance at Qualitest
20　at that time.
21　　　Q.　Okay.
22　　　A.　I believe Spike Pannell
23　was -- worked in the commercial
24　organization.

Highly Confidential – Subject to Further Confidentiality Review

Page 414

1  LeeAnn Smith, as I
2  understand it, was an IT person.
3      Q.   Okay.
4      A.   I don't know who these other
5  people are.  I am assuming that they are
6  consultants.
7      Q.   Okay.  And so let's look at
8  the outreach to Cegedim Dendrite.  Let's
9  go to -- it's -- it's Page Number 3.  I
10 don't have dot numbers on mine.
11     In the middle of the page
12 there's an outreach from Qualitest to --
13 in December of 2008, to Dendrite.
14     Comment:  "In the process of
15 reviewing our current suspicious order
16 monitoring process" --
17     MR. BUCHANAN:  Can you blow
18     up the comment, please.
19     There you go.  Right there.
20     Thank you.
21 BY MR. BUCHANAN:
22     Q.   "In the process of reviewing
23 our current suspicious order monitoring
24 process, but we are well aware that what

Page 415

1  we have is NOT compliant by today's
2  standards."
3      Did I read that correctly,
4  sir?
5      A.   That's what this e-mail
6  says.
7      Q.   Okay.  And I guess, so the
8  record is clear, not is in all caps?
9      A.   Not is in all caps.
10     Q.   Okay.  And so this is, again
11 orienting ourselves, a few months after
12 the meeting with Mr. Mapes, or the audit
13 of Mr. Mapes, correct?
14     A.   It's after the audit of
15 Mr. Mapes.
16     Q.   Okay.  Reporting out and
17 seeking consultant advice because your
18 system is not compliant by today's
19 standards.  That's what's written,
20 correct?
21     A.   That's what an IT person
22 wrote who would not be qualified to
23 assess the compliance of our suspicious
24 order monitoring or any other aspect of

Page 416

1  DEA compliance.
2      Q.   And indeed she looped in the
3  head of the compliance as part of the
4  meeting, correct?
5      Mr. John Schultz, I think
6  you told us, was the head of compliance.
7      Do I have that correctly,
8  sir?
9      A.   John Schultz, as I
10 understand it, was DEA compliant.
11     Q.   Let's look at the
12 PowerPoint --
13     A.   John Schultz didn't write
14 this e-mail.  LeeAnn Smith, the IT
15 person, wrote this e-mail.
16     Q.   Right.  And you don't
17 think --
18     A.   And she wouldn't be
19 qualified for evaluating or assessing
20 whether we were or weren't in
21 compliance --
22     Q.   I see --
23     A.   -- with suspicious order
24 monitoring or other aspects of DEA.

Page 417

1      Q.   Were -- were you a part of
2  the conversations among Ms. Smith and
3  Mr. Schultz and others in 2008, sir?
4      A.   I didn't work for the
5  company in 2008.
6      Q.   Okay.  So in terms of your
7  attempted commentary on how this
8  originated, you don't have any insight to
9  bear -- to bring beyond the document
10 itself, fair?
11     MS. VANNI:  Object to form.
12     THE WITNESS:  I'm just
13     telling you that an IT person
14     isn't qualified to comment on DEA
15     compliance.
16 BY MR. BUCHANAN:
17     Q.   What does she say in terms
18 of "we are all well aware that what we
19 have is NOT," in all caps, "compliant by
20 today's standards."
21     Did I read that correctly,
22 sir?
23     A.   That's what this woman wrote
24 in this e-mail, who is an IT person who

Page 418

1 is not qualified to comment on DEA
2 compliance or suspicious order
3 monitoring.
4 Q. "We are looking for
5 assistance," correct?
6 A. She uses the word we.
7 Q. And who is the we that she
8 includes, sir, in the meeting?
9 Spike Pannell and John
10 Schultz?
11 A. She is including them in the
12 meeting.
13 Q. Okay. And John Schultz
14 would be the head of compliance at that
15 point in time, correct, sir?
16 A. Right. But John Schultz
17 isn't making this comment. The IT person
18 is making this comment.
19 Q. Right. Right. And we have
20 your testimony as to who the we are, sir.
21 Let's go to the PowerPoint.
22 Can we go to .5. Suspicious order
23 monitoring.
24 Mr. Hamby, Gary Glotz making

Page 419

1 the presentation.
2 .7. "Companies are not
3 meeting the regulatory requirements."
4 Did I read that correctly?
5 A. That's what the consultant
6 says in his presentation.
7 Q. "Inconsistent implementation
8 and lack of understanding of regulatory
9 requirements."
10 Did I read that correctly?
11 A. That's what it says.
12 Q. Next page, .8, middle
13 bullet. "SOM, as well as appropriate due
14 diligence and 'know your customer'
15 efforts are key" --
16 A. I'm sorry, wait. I'm on the
17 wrong page.
18 Q. .8?
19 A. Just give me a minute.
20 Okay. I'm there.
21 Q. "SOM, as well as appropriate
22 due diligence and 'know your customer'
23 efforts are key to DEA's efforts to curb
24 diversion of controlled drugs and listed

Page 420

1 chemicals."
2 Did I read that correctly?
3 A. You read it correctly.
4 Q. And certainly the company
5 had that understanding as of 2008,
6 correct?
7 A. The company had that
8 understanding.
9 Q. Okay. There's a listing on
10 the next page of SOM requirements.
11 Do you see that, sir?
12 MS. VANNI: Take your time
13 and review it.
14 THE WITNESS: This is the
15 same quote from the C.F.R. that we
16 reviewed earlier.
17 BY MR. BUCHANAN:
18 Q. Right. And it says,
19 "Further iterated in September of '06,
20 February of '07 and December of 2007 DEA
21 letters," correct?
22 A. That's what it says.
23 Q. You've seen those letters,
24 sir?

Page 421

1 A. I've seen some of these
2 letters. I'm sure I reviewed them as
3 part of my preparation.
4 Q. And those letters say that
5 rigid formulas are insufficient as part
6 of a SOMs program, correct, sir?
7 A. DEA is using these letters
8 to provide guidance around the evolving
9 landscape around SOMs --
10 Q. I'm not asking --
11 A. -- to encourage companies to
12 improve their programs.
13 Q. Sir --
14 A. That's the purpose of these
15 letters and these guidelines.
16 Q. I'm not asking you for the
17 purpose, sir. I'm asking you what it
18 communicated.
19 A. It communicated guidelines
20 on how to improve your SOMs programs.
21 Q. And the guidelines stated
22 that rigid formulas were inadequate as a
23 basis for identifying suspicious or
24 non-suspicious, correct?

Page 422

1  MS. VANNI: Objection. Are
2  you characterizing the letters
3  from DEA for him?
4  MR. BUCHANAN: I'm asking
5  him.
6  BY MR. BUCHANAN:
7  Q. Do you agree, sir? And we
8  can pull out the letters if you think
9  necessary.
10  A. Let's look at one of the
11  letters.
12  Q. Okay. We'll come back to
13  it.
14  Do you have a recollection,
15  sir, as to whether the DEA was advising
16  registrants that rigid formulas were
17  inadequate to identify suspicious orders?
18  MS. VANNI: Objection.
19  BY MR. BUCHANAN:
20  Q. Do you have that
21  recollection? Yes or no.
22  MS. VANNI: Objection.
23  Go ahead. You can answer.
24  THE WITNESS: The DEA was

Page 423

1  providing guidance around a number
2  of areas related to suspicious
3  order monitoring, including
4  algorithms and how orders should
5  be looked at. I have that
6  understanding.
7  BY MR. BUCHANAN:
8  Q. You have the understanding
9  that rigid formulas, the DEA says are
10  inadequate, correct?
11  MS. VANNI: Object to form.
12  THE WITNESS: I don't
13  remember seeing that specific
14  language. But if we look at a
15  letter that would refresh my
16  memory, then we can do that.
17  BY MR. BUCHANAN:
18  Q. Let's go to the last bullet.
19  "In addition, DEA's chemical
20  handler's" -- "In addition, DEA's
21  chemical handler's manual devote several
22  pages to know your customer in proof of
23  identity due diligence issues."
24  Do you see that, sir?

Page 424

1  A. I see that.
2  Q. Next page. "Arbitrarily set
3  values do not satisfy the regs in terms
4  of SOMs."
5  Do you see that, sir?
6  A. I see that.
7  Q. You got to review things by
8  category of accounts, classes of trades,
9  right?
10  A. That's what the consultant
11  is communicating.
12  Q. What are they referencing
13  there?
14  A. They're referencing the
15  December 2007 DEA letter.
16  Q. Okay. They identify on .11,
17  "Overall objective, a total SOM program
18  that meet DEA requirements."
19  First bullet, what does it
20  say?
21  A. "Develop a total SOM
22  solution to review each of your
23  customer's orders product by product
24  comparing orders with historical ordering

Page 425

1  patterns for that customer and product."
2  Q. I'm sorry, sir. I was
3  identifying --
4  A. You asked me to read the
5  first.
6  Q. -- the first bullet at the
7  bottom of the page. "Overall objective,
8  a total SOM program that meets DEA
9  requirements.
10  "1. Statistically viable
11  system, justifiable and defensible."
12  Right?
13  A. That's what they say here.
14  Q. Do you remember seeing that
15  in a letter two years later that went to
16  Par Pharmaceuticals?
17  MS. VANNI: Object to form.
18  BY MR. BUCHANAN:
19  Q. From 2010, from that
20  consultant presentation?
21  A. I remember looking at that
22  earlier.
23  Q. Okay. "Statistics,
24  methodologies and indexes are confirmed

Page 426

1 and validated."
2      Do you recall that, sir?
3      A.   I understand that DEA was
4 making suggestions to move -- to
5 statistical algorithms.  I do.
6      Q.   Right.  And this is 2008,
7 correct?
8      A.   This is 2008.
9      Q.   And the company, in terms of
10 implementing such an algorithm, first did
11 so in late 2013, early 2014, correct,
12 sir?
13     A.   The company continued to
14 evolve its programs to review potentially
15 suspicious orders --
16     Q.   Please tell the jury --
17     A.   -- in that time frame.
18     Q.   Please tell the jury when
19 the company first implemented a
20 statistically validated algorithm.
21     A.   In 2013 we engaged with
22 Cegedim to do that.
23     Q.   Okay.  So the very
24 consultant who told you in 2005 this is

Page 427

1 what -- excuse me, in 2008, that this is
2 what was required, right?
3      A.   All companies were reviewing
4 the guidance by DEA to move in the
5 direction of statistical models --
6      Q.   You still have to answer my
7 question.
8      A.   -- to adapt their programs.
9      MS. VANNI:  Objection to
10 form.
11 BY MR. BUCHANAN:
12     Q.   You still have to answer my
13 question.  So my --
14     A.   Can you ask it again,
15 please.
16     Q.   Yeah.  My question to you,
17 sir, after you said, "In 2013, we engaged
18 with Cegedim to do that," I said, "So the
19 very consultant who told you in 2008 that
20 this is what was required was the
21 consultant you used in 2013 to implement
22 the statistically validated algorithm for
23 Qualitest, correct?"
24     A.   We worked with them in 2013

Page 428

1 to enhance the program and build us a,
2 you know, more advanced algorithm.
3      Q.   Right.  In fact you did that
4 after you sat down with the DEA in March
5 of 2013, correct?
6      A.   I think I testified earlier
7 that we had identified areas to improve
8 our program throughout that period but as
9 early as 2011 when we had engaged Tracey
10 Hernandez to lead our DEA compliance.
11     Q.   When did management first
12 approve and fund a statistically
13 validated algorithm to detect potentially
14 suspicious orders, sir?
15     MS. VANNI:  Objection.
16 BY MR. BUCHANAN:
17     Q.   Before or after the
18 March 2013 meeting with the DEA?
19     A.   In 2013 we engaged with
20 Cegedim to develop the algorithm.
21     Q.   After you met with the DEA,
22 correct?
23     A.   Subsequent to March of 2013.
24     Q.   Which means after, right?

Page 429

1      A.   It was implemented after the
2 meeting.
3      Q.   And you engaged them after
4 the meeting to implement a statistically
5 validated algorithm, correct sir?
6      A.   To do the specific work
7 around implementing the algorithm.
8      Q.   All right.  So let's go to
9 .12.  We talk about a statistically
10 defensible system that consultants have
11 been recommending since 2008 to the
12 company.
13     It says, "Rather than
14 looking just at purchasing volume, it
15 evaluates a variety of order
16 characteristics, such as order size,
17 history, trends, frequency, et cetera."
18     Did I read that correctly?
19     A.   You read that correctly.
20     Q.   Okay.  And those are the
21 characteristics of the system the company
22 ultimately implemented after the DEA sat
23 down with it and said it had six months
24 to get its stuff together, right?

Highly Confidential – Subject to Further Confidentiality Review

Page 430

1    MS. VANNI:  Object to form.
2    THE WITNESS:  What they are
3 saying is that these things should
4 be part of a -- what they are
5 saying with this bullet is that
6 these things should be part of the
7 review of the orders.
8    In fact, you would have
9 his -- you would have history on
10 orders that you could look at
11 without even developing an
12 algorithm.
13 BY MR. BUCHANAN:
14    Q.   Sir, these are the order
15 characteristics, order size, history,
16 trends, frequency, et cetera, that are
17 implemented in the statistically
18 validated algorithm the company adopted
19 through Cegedim, this very vendor, five
20 years later after the DEA sat down with
21 it in March of 2013, correct?
22    MS. VANNI:  Objection.
23    THE WITNESS:  These
24 parameters would be part of a

Page 431

1 statistical model.
2 BY MR. BUCHANAN:
3    Q.   Thank you.  Let's go to .14.
4    The consultant you reached
5 out to in 2008 told you that you had to
6 investigate your accounts, right?
7    A.   Are you reading the first
8 bullet here, "SOPs on rules around
9 account investigation and order release"?
10    Q.   Well, let's just read it,
11 sir.  Says, "Account investigation and
12 disposition:
13    "Establish an
14 appropriate" -- "establish appropriate
15 practices for investigation of
16 potentially suspicious" -- "suspicious
17 accounts."
18    Is that one of the items
19 that was identified for the company?
20    A.   That's in the report, yes.
21    Q.   Okay.  "SOPs on rules around
22 account investigation and order release,"
23 correct?
24    That's what it states?

Page 432

1    A.   That's what it says.
2    Q.   Customer self-assessment
3 questionnaires, correct?
4    A.   That's what it says.
5    Q.   "On-site account
6 verification visits."
7    Did I read that correctly?
8    A.   That's what it says.
9    Q.   Okay.  You can set that one
10 aside, sir.  Moving forward, from 2008.
11    Let's go to 2009.
12    (Document marked for
13 identification as Exhibit
14 Endo-Macrides-25.)
15 BY MR. BUCHANAN:
16    Q.   In 2009, sir, we're now
17 looking at Exhibit 25, Mr. Mapes, your
18 consultant, is back in the mix, right?
19    A.   Mr. Mapes.  Yes, I see that.
20    Q.   Okay.  Mike Mapes sends an
21 e-mail to John Schultz.  The same John
22 Schultz we were just talking about, head
23 of compliance, right?
24    A.   Correct.

Page 433

1    Q.   Okay.  And we're looking at
2 E-1037, please.  It's from July 2009.  If
3 we go to .2, it says, "Review of order
4 monitoring program, Qualitest
5 Pharmaceuticals."
6    It says -- let's go forward
7 now to .4, which reports on suspicious
8 order reporting to DEA.
9    A.   .4?
10    Q.   .4.  It's the top right
11 corner.
12    A.   Can you just give me a
13 minute to look at this?
14    Q.   Sure.  I've got it on your
15 screen there if that helps.
16    Last paragraph says, "The
17 review of order release requests showed
18 that many requests were made for
19 quantities of drugs that were several
20 times greater than the current limit set
21 in the order monitoring system."
22    Let's pause on that.
23    So your consultant comes in
24 and is looking at certain order release

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1 requests.
2          Do you see that?
3     A.   I see that.
4     Q.   So you talked about a system
5 that would identify potentially
6 suspicious orders, right, do you recall
7 that?
8     A.   I do.
9     Q.   And at this point in time,
10 the company was using, not a
11 statistically validated model, but a
12 different one, pursuant to its SOPs,
13 right?
14    A.   I'm sorry, repeat that
15 please.
16    Q.   At this point in time, the
17 company was not using the Cegedim
18 statistically validated model, correct?
19    A.   Correct.
20    Q.   Okay.  This is 2009.  And it
21 says, "In most of those instances,"
22 meaning those where the requests -- where
23 there were orders that were pended and
24 then released, "the size of the order was

Page 435

1 cut down and the order was approved to be
2 released with some increase to the limit
3 in the order monitoring system."
4          Did I read that correctly?
5     A.   Yes, that's what it says.
6     Q.   Okay.  So what's happening
7 here, sir, is that orders are tripping
8 the wire under whatever method the
9 company was using under its SOPs at that
10 point in time.  And the sales team that's
11 reviewing the orders is reducing the
12 order to get close to thresholds, raising
13 the threshold a little bit, and then
14 authorizing the order to be shipped.
15         That's what the company is
16 being told by its consultants, right?
17         MS. VANNI:  Object to form.
18         THE WITNESS:  The
19    consultants are -- I'm -- I'm
20    trying to read the document while
21    you are talking.  I'm sorry.  I'm
22    just trying to familiarize myself
23    with this last paragraph.
24         Just ask me the question

Page 436

1 again, please.
2 BY MR. BUCHANAN:
3     Q.   Okay.  My question, sir, was
4 that, what's happening here is orders are
5 tripping the wire, meaning there's an
6 algorithm --
7     A.   Orders are being identified
8 that are of interest.
9     Q.   Of interest.  "The order
10 size is several times higher than the
11 threshold."
12         That's what's reported in
13 the analysis from your consultants,
14 correct?
15    A.   That's correct.
16    Q.   And what's happening is the
17 folks who were reviewing these, which
18 would have been the sales folks at that
19 time, right?
20         That's a yes answer?
21    A.   It would have been the sales
22 folks.
23    Q.   Okay.  So the sales folks,
24 what they are doing is, they are either

Page 437

1 cutting them down in size or increasing
2 the order threshold, right?
3         MS. VANNI:  Object to form.
4         THE WITNESS:  They are,
5    where there -- where there could
6    be valid reasons to do either one
7    of those things.
8 BY MR. BUCHANAN:
9     Q.   Right.
10    A.   Upon investigation.
11    Q.   And then what the consultant
12 is stating here is that -- and the
13 consultant is noting this as a concern,
14 right?
15         MS. VANNI:  Object to form.
16         THE WITNESS:  The consultant
17    is suggesting that those orders,
18    because they've been modified,
19    should be reported to the DEA.
20 BY MR. BUCHANAN:
21    Q.   Right.  You can't cut and
22 ship -- when I say cut and ship, I mean
23 reduce the size of the order and ship
24 without telling the DEA, right?

Page 438

1    A.   Consultant is saying that
2  these orders should be sent to DEA as a
3  suspicious order.
4    Q.   Okay.  And we can agree --
5    A.   He is indicating that this
6  would document to DEA that Qualitest is
7  monitoring orders.
8    Q.   "Each order release request
9  that is rejected or modified by Qualitest
10  should be sent to DEA as a suspicious
11  order."
12       Is that what you were told
13  in 2009, sir?
14    A.   That's what he's saying in
15  this document.
16    Q.   And, sir, sitting here
17  today, as part of your preparation as the
18  corporate representative for Qualitest,
19  you were not aware of any suspicious
20  orders that were reported for Qualitest
21  in 2009 or 2008, or frankly anytime prior
22  to that meeting with the DEA, right?
23       MS. VANNI:  Object to form.
24       THE WITNESS:  I said -- I

Page 439

1       stated earlier that I wasn't aware
2       of a suspicious order that had
3       been submitted to the DEA.
4  BY MR. BUCHANAN:
5    Q.   Okay.  And your consultants
6  actually looked at specific requests --
7  excuse me, specific orders that were cut,
8  reduced, and shipped and not reported to
9  the DEA, correct?
10    A.   The orders were adjusted,
11  and according to the consultant, not
12  reported to the DEA.
13    Q.   Not before he came in mid
14  2009, right?
15       MS. VANNI:  Object to form.
16       THE WITNESS:  Not before
17  he --
18  BY MR. BUCHANAN:
19    Q.   Not before or after this
20  audit, right?
21    A.   I'm not sure what you mean.
22    Q.   I'm saying there are orders
23  that are identified by the consultant as
24  cut and shipped, right?

Page 440

1    A.   Yes, and he's suggesting
2  that those orders should have been
3  reported to the DEA.  And he's saying
4  sending orders to the DEA will document
5  to DEA that Qualitest is monitoring the
6  orders on a continuing basis and is
7  monitoring controlled substance orders in
8  a reasonable manner.
9    Q.   Right --
10    A.   This is his suggestion.
11  He's not suggesting that these orders are
12  suspicious.  He's suggesting that
13  Qualitest should report them.
14    Q.   He's saying, sir, each order
15  that is released that is rejected or
16  modified by QT should be sent to DEA as a
17  suspicious order.
18       Did I read that correctly,
19  sir?
20       MS. VANNI:  Object to form.
21       Asked and answered.
22  BY MR. BUCHANAN:
23    Q.   Did I read that correctly?
24    A.   You read that correctly.

Page 441

1    Q.   Thank you.
2       Let's look at -- I mean, in
3  fact --
4    A.   But he's saying sending
5  these orders to DEA --
6    Q.   No question pending, sir.
7       MR. BUCHANAN:  Can I have
8  589 for counsel.  Oh Exhibit 22.
9       THE WITNESS:  22.  Oh.
10       MR. BUCHANAN:  Can we pull
11  up 589, please.
12  BY MR. BUCHANAN:
13    Q.   I'd like to direct your
14  attention, sir, to .24 is the page
15  number, we looked at this a little
16  earlier today.  And this is a
17  presentation from Mr. Brantley.  He was
18  the head of suspicious order monitoring
19  for a period of time at Qualitest after
20  that DEA meeting, correct?
21    A.   He was.
22    Q.   Okay.  He put together a
23  PowerPoint that we spent some time
24  looking at.  This one's entitled

Page 442

1 suspicious order monitoring, SOM 101.
2     A.   This is the one that he sent
3 to himself?
4     Q.   This is what he sent to
5 himself, but it's from 2015, Par,
6 actually to orient ourselves here.
7 589.4 is the cover page.
8         Do you see that?
9     A.   I see that.
10     Q.   "Suspicious order
11 monitoring, SOM 101, history, current
12 state, and notes from judgments and
13 MOAs." Did I read that correctly?
14     A.   Yes.
15     Q.   2015, Par Pharmaceutical.
16 Now I'd like to take us forward to .24.
17         It states under notes,
18 "Suspicious orders must not be cut down
19 to fit within acceptable parameters."
20         Did I read that correctly?
21     A.   That's what he says here.
22     Q.   Okay.  What system did the
23 company track -- Qualitest track its
24 shipments into?

Page 443

1     A.   Qualitest had a MAPIC
2 system, I believe was what it was called
3 that's, that it used for its -- for its
4 ERP.
5     Q.   Okay.  Does that -- would
6 that system provide the basis to
7 determine whether an order has been cut
8 from its originally ordered quantity?
9     A.   If the order were adjusted,
10 it would be adjusted in the system and
11 then would be moved into the distribution
12 part of the system.
13     Q.   Did the company retain
14 records, sir, of all of the orders that
15 it cut and shipped?
16     A.   I couldn't -- I couldn't
17 speak to what records were -- the company
18 maintained.
19     Q.   We know certainly that to
20 the best of your knowledge, prior to
21 March of 2013, there's no record of the
22 company ever reporting a cut and shipped
23 order to the DEA, correct?
24     MS. VANNI:  Object to form.

Page 444

1         THE WITNESS:  I don't have
2     any specific knowledge of that.
3 BY MR. BUCHANAN:
4     Q.   Or as the document on the
5 screen reflects, there's no record of the
6 company ever reporting an order that it
7 had to cut to fit within acceptable
8 quantities, correct?
9     A.   I don't have any information
10 on that.
11     Q.   Okay.  Let's go forward to
12 Exhibit 26.  You can set that one aside
13 now, sir.
14         (Document marked for
15     identification as Exhibit
16     Endo-Macrides-26.)
17 BY MR. BUCHANAN:
18     Q.   Okay.  We're now moving
19 forward.  We're up to 2011.  This is an
20 exchange among Ms. Hudson, Ms. Hernandez
21 and others.
22         At this point in time, on
23 the first page, 567.1 we see the e-mail
24 from her to several, from November 16,

Page 445

1 2011.
2         Do you see that?
3     A.   I see that.
4     Q.   It's reporting on a
5 conversation with a DEA investigator.
6         Do you see that, all?
7     A.   I see that.
8     Q.   Okay.
9     A.   This was an inspection.
10     Q.   Directing your attention to
11 567.2.
12         And it's recounting in the
13 second paragraph, "He noted."  And
14 there's some discussion about whether the
15 company is properly accounting for and
16 retaining, if you will, a loss of
17 64 kilograms of active ingredient.
18         Do you see that?
19     MS. VANNI:  Object to form.
20     THE WITNESS:  If I could
21     just read the paragraph.
22 BY MR. BUCHANAN:
23     Q.   I'm going to read it while
24 you do.

Page 446

1    A.   That's fine.

2    Q.   "He noted that he was

3 concerned because even though we may have

4 lost .15 percent for one of the products

5 when calculated using all of the batches

6 manufactured during their audit period,

7 that .15 percent equated to 64 kilograms

8 of raw material."

9        Do you see that sentence,

10 sir?

11   A.   I see it.

12   Q.   And then he goes on to talk

13 about several other examples.  "He went

14 on to say that manufacturers are making

15 larger batch sizes and greater quantities

16 of controlled product than in years

17 past."  It's talking about how y'all are

18 making more controlled substances than

19 have been made in years before, right?

20       MS. VANNI:  Objection.

21       THE WITNESS:  He's

22   referencing the fact that the

23   demand for these products is

24   increasing or that certain

Page 447

1    companies are taking on a greater

2    percentage of the overall market.

3 BY MR. BUCHANAN:

4    Q.   And your sales certainly

5 reflected that in 2011, right, sir?

6        MS. VANNI:  Objection.

7        THE WITNESS:  I think we

8    already talked about the fact that

9    our sales increased over time.

10   But what you have to understand is

11   that those sales may have

12   increased because business from

13   other companies may have shifted

14   to our company.  It doesn't

15   necessarily mean that the overall

16   market was growing.

17 BY MR. BUCHANAN:

18   Q.   "He went on to say that

19 manufacturers are making larger batch

20 sizes and greater quantities of

21 controlled product than in years past.

22 DEA is seeing a much higher rate of

23 prescription drug abuse and diversion as

24 compared to illicit drugs now.  Yet, in

Page 448

1 his opinion, nothing has changed on the

2 manufacturer's side in regards to the way

3 we do reconciliations.  He stated that we

4 have the public's trust in our hands and

5 we need to be sure that we are staying

6 ahead of the curve by monitoring current

7 diversion trends and tightening our

8 processes."

9        Did I read that correctly?

10   A.   You read it correctly.

11   Q.   Continuing on to 567.3.  It

12 continues.  "We discussed how DEA is

13 thinking in regards to accountability has

14 changed over the years."

15       Do you see that sir?

16   A.   I see that.

17   Q.   Okay.  "And how it was

18 similar to the policy change that

19 occurred a couple of years ago as

20 suspicious order monitoring, SOMs.  DEA

21 then spoke about SOMs at length and also

22 discussed the need to monitor customers,

23 wholesalers in particular, including our

24 wholesalers' customers through periodic

Page 449

1 audits or on-site visits."

2        Did I read that correctly?

3    A.   That's what it says.

4    Q.   Okay.  And then what did

5 Ms. Hernandez say about whether Qualitest

6 was doing that?

7    A.   Do you want me to read it?

8    Q.   Yeah.

9    A.   "This is not something that

10 we are currently doing and another item

11 that we will need to work on improving."

12   Q.   Right.  So this is now 2011,

13 sir.  And we're looking at DEA in a

14 sit-down with the company is talking

15 about how manufacturers aren't doing

16 enough, and they're just growing batch

17 sizes, and you've got the public's trust

18 in your hands.  Yet you are not

19 monitoring your customers or your

20 customers' customers, right?

21       MS. VANNI:  Object to form.

22       THE WITNESS:  I think this

23   -- I think this document is

24   outlining a lot of areas the DEA

Page 450

1  was providing guidance on
2  improving.
3        A lot of what they're
4  talking about here is
5  accountability within the plants,
6  which was another big area of
7  focus for us in terms of improving
8  those processes and procedures,
9  given the limitations of some of
10 the systems to, you know, account
11 and properly reconcile the
12 inventories.
13 BY MR. BUCHANAN:
14    Q.   It says, "DEA then spoke
15 about SOMs at length and also discussed
16 the need to monitor customers,
17 wholesalers in particular."
18    A.   Right.
19    Q.   Do you see that?
20    A.   I see that.
21    Q.   "Including our wholesalers'
22 customers."
23        Do you see that, sir?
24    A.   I see that.

Page 451

1     Q.   "Monitor your customers and
2  your customers' customers."
3        Something you were told by
4  the DEA in 2011, correct, sir?
5     A.   That's what the inspector
6  said here, yes.
7     Q.   "Through periodic audits and
8  on-site visits," correct?
9     A.   Correct.
10    Q.   Okay.  And we could agree,
11 sir, that Ms. Hernandez was the head of
12 DEA compliance at this point in time,
13 right?
14    A.   She was the head of DEA
15 compliance.
16    Q.   And she said, in response to
17 that observation and discussion, "This is
18 not something we are currently doing,"
19 correct?
20    A.   That's what she says.
21    Q.   Right.  And sitting here
22 today, sir, you don't have any facts to
23 disagree with her, correct?
24        MS. VANNI:  Object to form.

Page 452

1        THE WITNESS:  I think I
2  testified earlier that we were --
3  we had salespeople prior to this
4  time frame that were visiting
5  customers.
6        I think I said -- testified
7  that I did not have specific
8  information about whether or not
9  those salespeople were visiting
10 customers' customers.
11       I think what Tracey is
12 referring to here is that one of
13 the basic improvements we wanted
14 to make in the program was that --
15 was to, you know, actually put in
16 place and document visits not only
17 to our customers, but our
18 customer's customer.  That's what
19 she's referring to.
20 BY MR. BUCHANAN:
21    Q.   Well, certainly the -- the
22 sentence that precedes the one that
23 you're characterizing from Ms. Hernandez
24 states, "DEA and" -- "DEA then spoke

Page 453

1  about SOMs at length and also discussed
2  the need to monitor customers,
3  wholesalers in particular, including our
4  wholesalers' customers through periodic
5  audits and on-site visits."
6        Do you see that sentence,
7  sir?
8     A.   I see that.
9     Q.   And she writes as the head
10 of DEA compliance, "This is not something
11 we are currently doing," correct?
12    A.   That was her view at the
13 time.
14    Q.   Okay.
15       MR. BUCHANAN:  Next
16 document.  We're going to -- we're
17 going to 573 which is Exhibit 28.
18       (Document marked for
19 identification as Exhibit
20 Endo-Macrides-28.)
21 BY MR. BUCHANAN:
22    Q.   I'm passing you another
23 little stack, sir.
24       Okay.  This is an e-mail

Page 454

1 exchange, let's see. It's in early 2013,
2 but it's forwarding a September 2012
3 spreadsheet. Integrated compliance risk
4 assessment. Do you see that, sir?
5     The -- the e-mail at the
6 bottom of the page from Ms. Hudson to
7 others is discussing a composite risk
8 assessment based on discussions.
9         Do you see that?
10     A.   I see that.
11     Q.   Okay. And that's from, I
12 guess what, September of 2012?
13         And let's go to 573.6,
14 integrated risk assessment, DEA, it's the
15 third line item, suspicious order
16 monitoring is the risk.
17         "Risk description.
18 Monitoring and reporting, not meeting all
19 requirements."
20         Do you see that, sir?
21     A.   You said 573.6?
22     Q.   Yes, third line. And it's
23 highlighted on the screen or should be in
24 a moment.

Page 455

1         "Monitoring and reporting
2 not meeting all requirements,
3 inconsistency across Endo."
4         Did I read that correctly,
5 sir?
6     A.   You read that correctly.
7     Q.   Okay. Evidence of risk,
8 okay, the DEA regulations themselves are
9 cited as evidence of your risk, right?
10         Do you see that, sir?
11     A.   The evidence of risk, DEA
12 regulations, observations.
13     Q.   Well, there's -- there's a
14 series of items that are there.
15         The first item that is
16 listed is evidence of risk is DEA
17 regulations. That's what's cited here,
18 right?
19     A.   Right. We would have cited
20 that because we would say that --
21     Q.   I'm just asking whether it's
22 written there, sir.
23         Is that what's written
24 there?

Page 456

1     A.   That's the -- that's the
2 word that's written there. I'm trying to
3 explain --
4     Q.   And what is the composite
5 risk that is flagged for this particular
6 item?
7     A.   High.
8     Q.   Okay. High. This is six
9 months before the DEA calls you in to sit
10 down, right?
11         MS. VANNI:  Object to form.
12         THE WITNESS:  This is a --
13 BY MR. BUCHANAN:
14     Q.   Is this six months before
15 the DEA calls you in to sit down, sir?
16         MS. VANNI:  Object to form.
17 BY MR. BUCHANAN:
18     Q.   That's my question.
19     A.   This is -- let me look at
20 the date. March 22nd -- I'm sorry.
21     Q.   Remember there's the
22 e-mail --
23     A.   September 3, 2012.
24     Q.   Thank you, sir.

Page 457

1         We can go to the next
2 document now, sir.
3         (Document marked for
4     identification as Exhibit
5     Endo-Macrides-29.)
6 BY MR. BUCHANAN:
7     Q.   It's Exhibit 29.
8         Okay. This is a report of a
9 meeting with the DEA, I guess on quota
10 issues in November of 2012.
11         Do you see that, sir?
12     A.   I see that.
13     Q.   We're not going to spend
14 time today talking about quota. I know
15 you haven't been designated on that
16 issue.
17         But there was a meeting
18 among the compliance folks and -- and the
19 DEA concerning the allocation of the
20 company to quota for manufacturing of
21 certain products, correct?
22     A.   That's correct.
23     Q.   Okay. I'd like to direct
24 your attention to 1082.2, in the middle

Page 458

1 of the page. And we're just going to try
2 and move through this quickly, sir.
3         "Ms. Gehrmann also pointed
4 out that we must realize that some of our
5 molecule..."
6         Do you see that paragraph?
7     A.  I see that.
8     Q.  Okay. In the middle of the
9 page she said, "Ms. Gehrmann also stated
10 that she reviews our sales data
11 specifically looking at which customers
12 we sell to, and if it is someone we
13 shouldn't be like CVS in Florida."
14        Let's pause on that.
15        Do you recall you were
16 overselling drug that went to the CVS in
17 Florida that had its license revoked?
18     MS. VANNI:  Object to form.
19     THE WITNESS:  Do I recall
20     that we were selling to a CVS in
21     Florida?
22 BY MR. BUCHANAN:
23     Q.  You were selling drug that
24 went to a CVS in Florida that had its

Page 459

1 license revoked.
2     A.  I don't have any specific
3 knowledge of that.
4         Did we review a document
5 that stated that?
6     Q.  Let me -- let's just move
7 forward.
8         "Ms. Gehrmann also stated
9 that she reviews our sales data
10 specifically looking at which customers
11 we sell to and if someone" -- "if it is
12 someone we shouldn't be, then she would
13 not grant us additional quota."
14        And then it continues: "We
15 concluded from this statement that if we
16 aren't monitoring and evaluating who we
17 sell our products to, the DEA certainly
18 is and expects that we are. This further
19 supports the DEA compliance group's
20 position on enhancing our SOMs program
21 for the Qualitest business."
22        Do you see that, sir?
23     A.  I see that.
24     Q.  Okay. And we know, sir,

Page 460

1 that the company was not looking at
2 chargeback data prior to sitting down
3 with the DEA in March of 2013, correct?
4     MS. VANNI:  I object that
5     you didn't read the complete
6     sentence there.
7     MR. BUCHANAN:  I'm fine with
8     that.
9         I don't know where it is.
10     Is it on the screen still? I
11     think I did read the complete
12     sentence.
13     MS. VANNI:  No.
14     MR. BUCHANAN:  All right.
15     The question is lost to me at this
16     point, but...
17     THE REPORTER:  Do you want
18     me to read back?
19     MR. BUCHANAN:  Okay.
20     THE REPORTER:  Want me to
21     read it back?
22     MR. BUCHANAN:  I'll read
23     the -- the full sentence.
24 BY MR. BUCHANAN:

Page 461

1     Q.  "We concluded from the
2 statement that if we aren't monitoring
3 and evaluating who we sell our products
4 to, the DEA certainly is and expects that
5 we are."
6         Did I read that correctly,
7 sir?
8     A.  You did.
9     Q.  "This further supports the
10 DEA compliance group's position on
11 enhancing our SOMs program for the
12 Qualitest business as well as the
13 transferring the responsibility for its
14 execution into the DEA compliance group."
15        Did I read that correctly,
16 sir?
17     A.  You did.
18     Q.  Okay. You had consultants
19 come in again in early 2013. You
20 actually got tipped off that the DEA was
21 going to be calling you in to talk to
22 them, right, sir?
23     MS. VANNI:  Object to form.
24     THE WITNESS:  I'm not sure

Page 462

1  what you're referring to.
2  BY MR. BUCHANAN:
3  Q.  In January 2013, the company
4  got a heads-up that it was going to get
5  called in to see the DEA in March.
6  MS. VANNI:  Object to form.
7  BY MR. BUCHANAN:
8  Q.  Do you remember that?
9  A.  I'm not sure what heads-up
10  you're referring to.  Is there a document
11  that you're referring to?
12  Q.  Have you seen -- are you
13  aware of that, sir, as a representative
14  for the company, that in early
15  January 2013 the company got a heads-up
16  that it was going to get called in to see
17  the DEA in March about its shipments of
18  various controlled substances?
19  MS. VANNI:  Objection.  It's
20  not --
21  BY MR. BUCHANAN:
22  Q.  Are you aware of that?
23  MS. VANNI:  Objection.  It's
24  not a memory test.

Page 463

1  THE WITNESS:  I don't recall
2  a, quote, heads-up specifically.
3  BY MR. BUCHANAN:
4  Q.  Okay.  How about just
5  notice?  Do you remember the company got
6  notice that it was going to get called in
7  to speak to the DEA about its SOMs
8  programs and its shipments of controlled
9  substances?
10  A.  I understand that the
11  company was asked to come and meet with
12  DEA in March of 2013.
13  Q.  And then in January of 2013,
14  the company called Buzzeo Cegedim to come
15  in and do an audit again, right?  Sir,
16  I'm sorry, it was confusing.  We are in
17  Exhibit 31.
18  A.  Oh, I'm sorry.
19  (Document marked for
20  identification as Exhibit
21  Endo-Macrides-31.)
22  MS. VANNI:  I don't have
23  that exhibit.
24  THE WITNESS:  I don't have

Page 464

1  that exhibit.  I'm on Exhibit 30.
2  MS. VANNI:  I don't have --
3  BY MR. BUCHANAN:
4  Q.  Let's move to Exhibit 31,
5  get everybody caught up.
6  MS. VANNI:  This is 31?
7  MR. BUCHANAN:  Mm-hmm.
8  MS. VANNI:  Thank you.
9  THE WITNESS:  Okay.  So this
10  is --
11  BY MR. BUCHANAN:
12  Q.  It's an e-mail from
13  Ms. Hernandez further forwarding an
14  earlier e-mail reporting on the Buzzeo
15  audit.
16  Do you see that, sir?
17  A.  So I see an audit was done
18  in January.
19  Q.  Okay.  "On January 16th and
20  17th, 2013, a review of our suspicious
21  order monitoring system was conducted by
22  consultants."
23  Do you see that?
24  A.  I see that.

Page 465

1  Q.  "The consultants concluded
2  that our current SOM program systems and
3  procedures 'do not meet the regulatory
4  requirements,'" in quotes.
5  Do you see that, sir?
6  Middle of the page.
7  MR. HOLLINGSWORTH:  I think
8  you might be moving a little fast
9  --
10  BY MR. BUCHANAN:
11  Q.  "The consultants concluded
12  that our current SOMs program systems and
13  procedures 'do not meet the regulatory
14  requirements.'"
15  Do you see that, sir?
16  A.  I see that statement.
17  Q.  Okay.  They're recommending
18  increasing due diligence, correct?
19  Do you see that, sir?
20  A.  Yes.
21  Q.  They're saying you've got to
22  remove sales and marketing and customer
23  service functions from the SOM
24  decisionmaking process, correct?

Page 466

1    A.   That's one of the
2 recommendations.
3    Q.   So that was still going on
4 in 2013, right?
5       MS. VANNI:  Object to form.
6 BY MR. BUCHANAN:
7    Q.   As of the time of this
8 audit, sales and marketing and customer
9 service functions were overseeing the
10 SOMs process?
11    A.   The order -- the review of
12 orders was still occurring within the
13 sales and marketing and customer service
14 functions.
15    Q.   Notwithstanding what you had
16 been told about the conflict of interest
17 with sales?
18       MS. VANNI:  Object to form.
19 BY MR. BUCHANAN:
20    Q.   Correct?
21    A.   The order -- the review of
22 orders was still being done by the sales
23 and marketing group, who also have a
24 responsibility for compliance.

Page 467

1    Q.   Well, your consultants
2 certainly told you straight up, again,
3 that sales and marketing and customer
4 service needed to be removed from the
5 decisionmaking process, right?
6       MS. VANNI:  Object to form.
7       THE WITNESS:  That was the
8    recommendation of the consultants.
9 BY MR. BUCHANAN:
10    Q.   Because it's contrary to
11 their primary mission of helping accounts
12 with their current business and
13 encouraging new business.  That's what
14 they wrote to you, right?
15    A.   That was their
16 recommendation.
17    Q.   Okay.  And again, at 1052.4,
18 Item 5, some five years after consultants
19 had told you that you needed a
20 statistically defensible validated SOM
21 program, your consultants are evaluating
22 your program and saying, you need a
23 statistically tested and validated SOM
24 program, right?

Page 468

1    A.   That's one of their
2 recommendations.
3    Q.   Okay.
4       (Document marked for
5    identification as Exhibit
6    Endo-Macrides-32.)
7 BY MR. BUCHANAN:
8    Q.   Let's go to Exhibit 32.
9 Following this audit by -- I guess this
10 is the Cegedim Buzzeo group again,
11 Ms. Hernandez, in communication with her
12 boss or colleague, sends a DEA compliance
13 initiatives presentation.
14       Do you see that, sir?
15    A.   I see that.
16    Q.   Okay.  I'd like to direct
17 your attention to Page 1071.8.  Those
18 numbers in the top right corner.  This is
19 a SWOT analysis summary, right?
20    A.   That's what it is.
21    Q.   Okay.  And so as of
22 February 2013, the company has an
23 awareness that it has inadequate SOMs,
24 right, sir?

Page 469

1       MS. VANNI:  Object to form.
2 BY MR. BUCHANAN:
3    Q.   Do you see that, sir?
4    A.   I'm just looking at it here.
5 That's the term she uses.
6    Q.   Right.  Inadequate, correct?
7    A.   That's the term she uses.
8    Q.   Okay.
9    A.   I wouldn't necessarily agree
10 with that.
11    Q.   Well, what the head of DEA
12 compliance wrote about the company's
13 suspicious order monitoring system as of
14 February 2013, before the DEA even had to
15 say anything to you, was that you had not
16 adequate SOMs?
17       MS. VANNI:  Object to form.
18       THE WITNESS:  This document
19    is --
20 BY MR. BUCHANAN:
21    Q.   Is that what the head of DEA
22 compliance wrote in February 2013, sir?
23    A.   That's the word she used on
24 this slide here.

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1    Q.   Okay.  She also wrote --
2    A.   I can tell you what this
3  document -- what this document -- the
4  intent of this document was to be
5  impactful to create urgency around
6  driving this change, that in fact we were
7  already -- had identified these areas as
8  areas we needed to improve.
9    Q.   In fact, sir, you were not
10 apart of this discussion or process in
11 any respect, correct?
12       MS. VANNI:  Object to form.
13       THE WITNESS:  I was not
14    involved in creating this
15    document, if that's what you're
16    asking me.
17 BY MR. BUCHANAN:
18    Q.   You were not of the process
19 of evaluating the SOMs system in 2013,
20 correct?
21    A.   I was not.
22    Q.   You were not part of
23 interacting with the DEA on the SOMs
24 system in 2013, correct?

Page 471

1    A.   I was not.
2    Q.   You were not part of
3  assessing whether it was adequate or not
4  for purposes of the company in 2013,
5  correct?
6    A.   I was not.
7    Q.   The person who did wrote
8  that you had inadequate SOMs as of
9  February 2013, correct?
10    A.   That's the word she used.
11    Q.   She also said, you had a
12 lack of training and compliance-first
13 culture, correct?
14    A.   Those are the words she
15    used.
16    Q.   She said you had limited
17 resources, right?
18    A.   Those are the words she
19    used.
20    Q.   Another weakness she said
21 were your DEA-related security and
22 controls, right?
23    A.   That's what she wrote.
24    Q.   Because you'd actually had

Page 472

1  some issues with that, right, loss and
2  material that was unaccountable or
3  unaccounted for, sir?
4        MS. VANNI:  Object to form.
5        THE WITNESS:  I'm aware that
6     we had some situations where we --
7     some reconciliation issues, some
8     diversion issues within the plant.
9        I'm aware of some events
10    around that.
11       This document is --
12 BY MR. BUCHANAN:
13    Q.   It's not good, right?
14       MS. VANNI:  Object to form.
15       THE WITNESS:  This document
16    is highlighting again areas that
17    we had identified where we could
18    improve and enhance our programs.
19    That was the purpose of the
20    document.
21 BY MR. BUCHANAN:
22    Q.   And one of the reasons why,
23 sir, is because you had inadequate SOMs
24 in the words of the DEA compliance head

Page 473

1  as of this point in time, correct, sir?
2        MS. VANNI:  Object to form.
3        THE WITNESS:  I don't agree
4     that our programs were inadequate.
5        I believe we had programs in
6     place to review suspicious orders,
7     to identify suspicious orders, and
8     to prevent the abuse and diversion
9     of our products.
10 BY MR. BUCHANAN:
11    Q.   And with respect, sir, you
12 had no role or responsibility for any
13 aspect of this in 2013?
14    A.   I already testified to that.
15    Q.   The answer to that is,
16 "You're right, Mr. Buchanan, I didn't."
17    A.   I didn't have direct --
18       MS. VANNI:  Object to form.
19    Argumentative.
20 BY MR. BUCHANAN:
21    Q.   Right?
22    A.   I did not have direct
23 responsibility for DEA compliance.
24    Q.   You had no responsibility

Page 474

1  for DEA compliance in 2013, none.
2      A.   I did not have
3  responsibility for DEA compliance.  I
4  already testified to that.
5          MR. BUCHANAN:  Okay.  Do you
6      want to take a short break?
7          MS. VANNI:  Yeah.
8          THE VIDEOGRAPHER:  Off the
9      record at 4:41 p.m.
10         (Short break.)
11         THE VIDEOGRAPHER:  We are
12     back on the record at 5:14 p.m.
13  BY MR. BUCHANAN:
14     Q.   Okay.  Sir, we're going to
15  shift gears a little bit.  We spent some
16  time, and we're still talking about
17  Qualitest at this point.  We've been
18  doing that for the last several minutes
19  certainly.
20         We talked about the meeting
21  that the DEA had with the Qualitest folks
22  in March of 2013.  Then we talked about
23  some of the statements and
24  recommendations, requests made of

Page 475

1  Qualitest with regard to its SOMs program
2  at that point in time.
3          And then we looked to orient
4  you again about kind of the statements
5  that have been made and the information
6  the company received from consultants and
7  its internal folks about the limitations
8  or inadequacies of the program or other
9  facts about the program over time.
10         Do you recall our
11  discussions about those items?
12     A.   I recall the discussions
13  we've had.
14     Q.   Okay.  Now I want to zoom
15  forward a little bit, because what ended
16  up happening, sir, is that after the --
17  after the meeting with the DEA, this
18  whole thing got escalated up to the board
19  of directors and the company started
20  implementing some of these changes,
21  correct?
22         MS. VANNI:  Object to form.
23         THE WITNESS:  I wouldn't
24     characterize it that way.  In

Page 476

1      fact, you know, these improvement
2      opportunities, many of them had
3      been identified prior to the DEA
4      meeting and had been identified as
5      part of a comprehensive compliance
6      program with relation to the
7      Qualitest business.
8  BY MR. BUCHANAN:
9      Q.   Okay.  Well, I mean,
10  let's -- you don't have to characterize
11  it, sir.  We've got the memo that went to
12  the board of directors.
13         It's not in your stack right
14  now.  I didn't intend to mark this, but
15  we will.
16         MR. BUCHANAN:  It's E-391.
17     I'll get it up on the screen while
18     we're getting ready to mark it.
19     And this is going to be -- our
20     next in order is what, Charles?
21         (Document marked for
22     identification as Exhibit
23     Endo-Macrides-42.)
24         MR. BUCHANAN:  42.

Page 477

1  BY MR. BUCHANAN:
2      Q.   Exhibit 42 is a memo to the
3  board of directors, right?
4          MS. VANNI:  Thank you.
5  BY MR. BUCHANAN:
6      Q.   Executive sponsor, Peter
7  Bigelow.  Brian Lortie.  Risk manager,
8  James Edwards.  Michael Moes.  Sanjay
9  Patel.  BOD committee.
10         Do you see that, sir?
11     A.   I see that.
12     Q.   Okay.  Key action date, June
13  6, 2013, ELC discussion.
14         Do you see that off to the
15  right?
16     A.   I see that.
17     Q.   And then BOD discussion.
18         Do you see that?
19     A.   I see that.
20     Q.   BOD is board of directors?
21     A.   BOD is board of directors.
22     Q.   BOD committee, to the left
23  says full BOD, right, meaning full board
24  of directors?

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1　A.　Correct.  The risk plan
2　would have been presented to the full
3　board.
4　　　Q.　And ELC is the executive
5　leadership committee?
6　　　A.　Executive leadership
7　committee.
8　　　Q.　Okay.  So the supply chain
9　and DEA compliance meeting is being
10　presented to not only the executives but
11　also the full board of directors,
12　correct?
13　　　A.　Yeah, just to clarify.  This
14　document is part of the normal risk
15　assessment process that is conducted by
16　the company as a regular course of
17　business and presented to the board of
18　directors periodically.
19　　　　So it wouldn't have just
20　been supply chain and DEA compliance.  It
21　would have been the full risk profile of
22　the business that would have been
23　presented to the board of directors.
24　　　Q.　I'm just going to ask you to

Page 479

1　stay with my question, sir.  I do have
2　limited time unless we are going to go
3　over a little bit.
4　　　　So, staying with my
5　question, this was presented to the full
6　board of directors, correct?
7　　　A.　This document was presented
8　to the full board of directors.
9　　　Q.　Seen it before --
10　　　A.　I just --
11　　　Q.　Have you seen it before,
12　sir?
13　　　A.　I have seen this document.
14　　　Q.　You have, okay.  All right.
15　So let's move forward to Risk Component
16　2.  It's on 391.5.
17　　　　"Impact of DEA remediation
18　efforts to address the compliance
19　findings in our internal manufacturing
20　plants."
21　　　A.　You're on 391.5?
22　　　Q.　Continuing onto 391.6.
23　　　A.　Oh, okay.
24　　　Q.　Last sentence at the bottom.

Page 480

1　　　A.　I see it.
2　　　Q.　It could have eluded you.
3　　　　I'm sorry.  Below that,
4　please.
5　　　　"Impact of DEA remediation
6　efforts to address the compliance
7　findings in our internal manufacturing
8　plants."  It says, "Potential business
9　impact could vary from formal agency
10　regulatory observations during external
11　audits to agency regulatory actions
12　preventing us from commercially
13　distributing one or more products due to
14　license revocation," right?
15　　　　Do you see that, sir?
16　　　A.　Yeah.
17　　　Q.　Did I read that correctly?
18　I'm not asking for comments.  Do you see
19　that, sir?
20　　　A.　Yeah, I see it.
21　　　Q.　Okay.  Let's focus on,
22　"Background and current state, Qualitest
23　business unit."
24　　　　Do you see that section?

Page 481

1　　　A.　I see that.
2　　　Q.　"In a meeting with DEA on
3　March 6, 2013, DEA identified gaps
4　associated with our suspicious order
5　monitoring system and lack of monitoring
6　of sales to customers' customers."
7　　　　Did I read that correctly,
8　sir?
9　　　A.　You did.
10　　　Q.　That March 6, 2013, meeting
11　is the meeting we've been talking about,
12　right?
13　　　A.　It would be.
14　　　Q.　Okay.  "The compliance team
15　has additionally identified risks
16　associated with employee background
17　checks, high number of incidents related
18　to potential diversion, mezzanine
19　activities and end-of-year inventory
20　reconciliation."
21　　　　Did I read that correctly?
22　　　A.　You read it correctly.
23　　　Q.　It said, "Qualitest had
24　experienced nine DEA-reportable events so

Page 482

1  far in 2013." Right?
2      A.  That's what it says.
3      Q.  And when it's talking about
4  those reportable events, we know those
5  aren't suspicious orders that are being
6  reported.  Those are in fact other things
7  that are going on in plants, right?
8          MS. VANNI:  Object to form.
9          THE WITNESS:  Those could be
10  any number of things.
11 BY MR. BUCHANAN:
12     Q.  We know they're not
13  suspicious orders, right, as of this
14  point?
15     A.  My understanding would be
16  that those would not be suspicious
17  orders.
18     Q.  Okay.  Thank you, sir.  And
19  then there's an action plan described,
20  right?
21     A.  Yes.  The purpose of this
22  document is to highlight risks across the
23  business and --
24          MR. BUCHANAN:  Move to

Page 483

1      strike, sir.  Please stay with my
2      question.
3  BY MR. BUCHANAN:
4      Q.  There is an action --
5      A.  I'm answering your question.
6      Q.  No.  My question is, there
7  is an action plan, correct?
8      A.  There is an action plan.
9  That's what we've been talking --
10     Q.  Thank you.  Within that
11  action plan it says, "Implement" --
12  implement is the word that's used,
13  correct?
14     A.  That's the word that's used.
15     Q.  "Implement the suspicious
16  order monitoring program by end of 2013
17  for Qualitest and mid-2014 for branded
18  products."
19          Do you see that, sir?  Do
20  you see that, sir?
21     A.  I see that.
22     Q.  Okay.  "The program will
23  create a solution to monitor," and then
24  it lists three things, four things,

Page 484

1  correct?
2          Do you see that, sir?
3      A.  I see that.
4      Q.  It says, "The program will
5  create a solution to monitor, first,
6  sales orders to customers," right?
7      A.  Sales orders to customers.
8      Q.  "It will create a system to
9  review chargeback data," correct?
10     A.  Review chargeback data.
11     Q.  "It will create a system to
12  know your customer," right?
13          MS. VANNI:  Object to form.
14          Use of the word "system."
15          THE WITNESS:  These are
16          components of an enhanced
17          suspicious order monitoring
18          program that this document --
19 BY MR. BUCHANAN:
20     Q.  "The program will create a
21  solution to monitor know your customer
22  program," correct?
23          Is that what it states?
24     A.  These are components --

Page 485

1      Q.  Is that what it states, sir?
2      A.  It states, "Know your
3  customer program as a component of an
4  enhanced suspicious order monitoring
5  program."
6      Q.  It says, "The program will
7  create a solution," correct, sir?
8      A.  That's what the document
9  says.
10     Q.  Okay.  And also create a
11  SOMs database, correct, sir?
12     A.  That's what it says.
13     Q.  Okay.  And it talks about
14  how the company is now investing and
15  hiring personnel to further manage a SOMs
16  program.
17          Do you see that?
18     A.  I see that.
19     Q.  Okay.  One of the
20  individuals that was hired as part of
21  that process was a Mr. Brantley, correct?
22     A.  Eric would have been hired
23  to work in the DEA compliance group.
24     Q.  Okay.  And he was hired to

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1 work in the suspicious order monitoring
2 group, correct?
3          MS. VANNI:  Object to form.
4          THE WITNESS:  He was hired
5     to enhance the suspicious order
6     monitoring program.
7 BY MR. BUCHANAN:
8     Q.   Okay.  Well, it says here to
9 create one, right?
10          MS. VANNI:  Object to form.
11 BY MR. BUCHANAN:
12     Q.   That's what it said, right?
13     A.   What this document is saying
14 is to --
15     Q.   Withdrawn, sir.
16     A.   -- to agree to enhance --
17     Q.   Withdrawn.  Withdrawn, sir.
18     A.   DEA compliance.
19     Q.   Withdrawn.
20          MS. VANNI:  You need to
21     allow --
22 BY MR. BUCHANAN:
23     Q.   Sir, if you're not staying
24 with my questions, we're going to move

Page 487

1 along.
2          Exhibit 33.  Do you have
3 that before you?
4          MS. VANNI:  I don't.
5          (Document marked for
6     identification as Exhibit
7     Endo-Macrides-33.)
8          MR. BUCHANAN:  You were
9     passed that one already.
10          MS. VANNI:  I was?  Okay.
11 BY MR. BUCHANAN:
12     Q.   So what ended up happening,
13 sir, is Mr. Brantley was hired in the
14 fall of 2013.  And the company got about
15 implementing a suspicious order
16 monitoring program, right?
17     A.   The company enhanced its
18 suspicious order monitoring system.
19     Q.   Well, we've looked,
20 obviously, at language the company was
21 using about implementing and creating a
22 program, right?  You saw that language?
23     A.   I'm here to -- I'm here to
24 testify on behalf of the company, and I'm

Page 488

1 testifying that the company was
2 implementing an enhanced suspicious order
3 monitoring program.
4     Q.   Again, as a person who is
5 disagreeing with the language in
6 documents who is not involved with the
7 decision in any way in 2013, correct?
8     A.   I reviewed documents --
9     Q.   Were you involved in any
10 way --
11     A.   I'm speaking on behalf of
12 the company --
13          MS. VANNI:  Let him answer
14     the question.
15          THE WITNESS:  I have
16     reviewed documents --
17          MR. BUCHANAN:  Withdrawn.
18     Withdrawn.
19          MS. VANNI:  I'm going to
20     state an objection too, because he
21     was educated and he's here
22     testifying as a 30(b)(6).  And you
23     can't accept testimony that's
24     convenient for you and reject

Page 489

1 testimony that's not convenient
2     for you.
3          This witness has been
4     educated on 30(b)(6) issues and is
5     entitled to infer documents that
6     you are asking him to infer.  And
7     it is not fair to take part of it
8     and not another part.  Just note
9     my objection.
10          MR. BUCHANAN:  All you got
11     to say is "objection to form."
12 BY MR. BUCHANAN:
13     Q.   Okay.  So the question was
14 withdrawn.  And, therefore, it was an
15 inapt comment.
16          MS. VANNI:  Well, it applies
17     retroactive to your other
18     document.
19          MR. BUCHANAN:  Mr. -- I
20     don't know what that applies to.
21 BY MR. BUCHANAN:
22     Q.   Mr. Macrides --
23          MS. VANNI:  The record will
24     speak for itself.

Page 490

1    MR. BUCHANAN:  As it always
2    does.
3  BY MR. BUCHANAN:
4    Q.   Mr. Macrides, you were not
5  involved in the decisions either at the
6  board of director, at the ELC level, or
7  at the management level concerning
8  response to the DEA's actions in March of
9  2013, correct?
10    A.   I sat -- during this time
11  frame, I sat on Denise Hudson's
12  leadership team.  Denise Hudson had
13  overall responsibility for the compliance
14  program at Qualitest, including DEA and
15  FDA compliance.
16    In my role at that time, I
17  would have had visibility to these plans
18  and I would have had the opportunity to
19  comment on them.
20    Q.   So we just took about a
21  25-minute break.  And I got to know, sir,
22  what did you look at on the break that
23  caused you to just change your testimony
24  about your role and involvement about the

Page 491

1  company's response to the DEA meeting in
2  2013?
3    MS. VANNI:  Objection to
4  form.
5  BY MR. BUCHANAN:
6    Q.   What were you shown to
7  refresh your recollection and recant your
8  testimony before the break about your
9  role and involvement about response to
10  the DEA meeting in March of 2013?
11    Please tell the jury.
12    A.   I --
13    MS. VANNI:  Objection.  And
14  he is not recanting any testimony.
15  It's an unfair characterization.
16  BY MR. BUCHANAN:
17    Q.   What did you review during
18  the break?
19    A.   I didn't review anything.  I
20  just -- you just -- you challenged me on
21  my knowledge and my engagement in some of
22  these documents and some of these issues
23  were discussed.  And I'm just clarifying
24  that my -- my involvement and engagement,

Page 492

1  that's all.
2    Q.   During the break were you
3  having discussions with counsel, sir?
4    A.   Of course I was having
5  discussions with counsel.
6    Q.   Thank you.
7    MS. VANNI:  Object to form.
8    MR. BUCHANAN:  Was the
9  witness shown documents during the
10  break, Counsel?
11    MS. VANNI:  Oh, I'm not
12  being deposed, Counsel.  And you
13  are not entitled --
14    MR. BUCHANAN:  Aiding the
15  witness in recanting and changing
16  his testimony is inappropriate.
17    MS. VANNI:  Okay.  Well, I
18  take offense to that, because I
19  have not done any such thing and
20  would never do any such thing.
21    MR. BUCHANAN:  Well, when --
22    MS. VANNI:  And this witness
23  is not recanting his testimony.
24  He is providing context to

Page 493

1  documents that you are questioning
2  him about and then saying he
3  was -- he has no personal
4  knowledge of it.
5    All we're saying is he was
6  shown documents in preparation for
7  his 30(b)(6) testimony here.
8  Those documents regardless of
9  whether he was involved in them
10  personally or not, if he was
11  educated on them, he should be
12  allowed to testify fully to them.
13    MR. BUCHANAN:  He is --
14    MS. VANNI:  And not what you
15  want to choose to ask him about.
16    He should be able to provide
17  context, and you are moving to
18  strike his testimony in an
19  improper way, frankly, because he
20  didn't have personal knowledge of
21  it.
22    And our -- my point simply
23  is, that he has been educated on
24  these documents and should be able

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1  to testify fully to them.
2      MR. BUCHANAN:  What he
3  shouldn't be is educated over a
4  break by counsel, during an
5  examination, Counsel.
6      MS. VANNI:  And -- and he
7  was not done --
8      MR. BUCHANAN:  He was in the
9  middle of cross-examination.  And
10  I -- look, the record does speak
11  for itself and the jury or the
12  judge will decide whether, in
13  fact, he was coached into changing
14  his testimony.
15      MS. VANNI:  Okay.  Well, I
16  wanted the record to be clear --
17  BY MR. BUCHANAN:
18      Q.   I'm referring to
19  Exhibit 33 --
20      MS. VANNI:  Well, wait.  I
21  want the record to be clear --
22      MR. BUCHANAN:  We'll just
23  add time to this.
24      MS. VANNI:  -- that I

Page 495

1  engaged in no such coaxing.
2      MR. BUCHANAN:  Okay.
3      MS. VANNI:  I want the
4  record to be clear.
5      MR. BUCHANAN:  We have the
6  witness's testimony before and
7  after the break that's pretty
8  evident.
9      MS. VANNI:  That's fine.
10  BY MR. BUCHANAN:
11      Q.   Mr. Brantley was, in fact,
12  an individual that was brought in to --
13  as a SOMs manager, correct?
14      A.   He was.
15      Q.   Okay.  Customer due
16  diligence and SOMs manager.
17      This is a letter that -- or
18  a report of a site visit from early 2014.
19      Do you see that, sir?
20      A.   I see that.
21      Q.   Because what's happening
22  here, and after the meeting with the DEA
23  in the spring of 2013, is Mr. Brantley is
24  now boots on the ground and going out to

Page 496

1  visit some of these customers that
2  haven't been visited by compliance,
3  right?
4      A.   He's visiting customers as
5  part of an enhanced suspicious order
6  monitoring program that we were
7  implementing.
8      Q.   And -- and what he's
9  finding, sir, when he goes and puts boots
10  on the ground and turns over the log and
11  looks underneath, isn't so pretty, right?
12      MS. VANNI:  Object to form.
13      THE WITNESS:  Are -- are you
14      asking me to comment on a specific
15      part of the --
16  BY MR. BUCHANAN:
17      Q.   Have you -- well, did you
18  look at these due diligence files that
19  Mr. Brantley generated when he started
20  going to look at some of the people you
21  were selling drugs to?
22      MS. VANNI:  Objection.
23  BY MR. BUCHANAN:
24      Q.   My question to you, sir, is

Page 497

1  did you look at the due diligence files
2  of Mr. Brantley from when he actually put
3  boots on the ground?
4      A.   Did I review them as part of
5  my preparation?
6      Q.   Yes.
7      MS. VANNI:  Objection.
8      THE WITNESS:  Yes, I
9      reviewed documents around customer
10      visits.
11  BY MR. BUCHANAN:
12      Q.   And so what we see here is a
13  report of a customer visit to -- it looks
14  like he took a road trip through Texas,
15  looking at a bunch of Texas entities.
16      Do you recall looking at
17  those, sir?
18      MR. BUCHANAN:  Can we go,
19      please, to the second page?
20      THE WITNESS:  Is that --
21  BY MR. BUCHANAN:
22      Q.   Exhibit 33.  "A Qualitest
23  Pharmaceuticals retail pharmacy
24  questionnaire was received from the

Page 498

1 following retail pharmacy seeking to
2 continue purchasing controlled substances
3 from Qualitest."
4        Do you see that, sir?
5    A.   I see that.
6    Q.   Advanced Pharmacy is the one
7 that he's referring to?
8    A.   Yes, in Texas.
9    Q.   Goes into the pharmacy and
10 he sees no front-end merchandise, right?
11   A.   Yes.
12   Q.   Nothing?
13   A.   Right.
14   Q.   Went in, all he had to do
15 was walk in the door and know that it
16 didn't smell right in that situation,
17 right?
18        MS. VANNI:  Object to form.
19        THE WITNESS:  He conducted
20    a -- he conducted a site visit and
21    generated some concerns about this
22    customer.  That's what this
23    document is highlighting.
24 BY MR. BUCHANAN:

Page 499

1    Q.   Right.  And he went in and
2 he asked for dispensing history as part
3 of the questionnaire and the Q&A process.
4 And it looks like the customer was
5 manipulating the dispensing histories,
6 right?
7        It reads, "The dispensing
8 histories were not from the program used
9 by the pharmacy, but appeared to be Excel
10 files that had been manipulated."
11   A.   That's his observation.
12   Q.   "According to the
13 questionnaire, 30 percent of all
14 prescriptions were paid in cash."
15        You know that's a red flag,
16 right?
17   A.   That's his observation.
18        MS. VANNI:  Object to form.
19 BY MR. BUCHANAN:
20   Q.   But you know that, sir, as
21 the company, right?
22        You know that 30 percent of
23 transactions in cash is a red flag?
24        MS. VANNI:  Object to form.

Page 500

1        THE WITNESS:  That would be
2    a concern as he's highlighting
3    here.
4 BY MR. BUCHANAN:
5    Q.   And, in fact, the
6 recommendation was, you shouldn't do
7 business with them anymore, right?
8    A.   "The recommendation of the
9 SOMs team that shipments of controlled
10 substances to Advanced Pharmacy are
11 discontinued."
12   Q.   Right.  And so first time
13 we've got boots on the ground in your
14 customers.
15        By the way, Qualitest is
16 still doing direct business with retail
17 pharmacies after telling the DEA in 2009
18 that it wasn't going to do it anymore.
19        MS. VANNI:  Object to form.
20 BY MR. BUCHANAN:
21   Q.   Right?
22        As of 2014, Qualitest is
23 still doing business with retail
24 pharmacies directly, correct, sir?

Page 501

1        MS. VANNI:  Object to form.
2        THE WITNESS:  I believe
3    the -- the decision was that we
4    weren't shipping hydrocodone
5    products to independent retail
6    pharmacies.
7 BY MR. BUCHANAN:
8    Q.   I see.  But the rest of the
9 holy trinity was okay?
10        MS. VANNI:  Object to form.
11        THE WITNESS:  I'm just
12    clarifying your assessment.
13 BY MR. BUCHANAN:
14   Q.   Okay.  So you put boots on
15 the ground, and he actually learned this
16 isn't a real pharmacy, right?
17        MS. VANNI:  Object to form.
18        THE WITNESS:  As part of our
19    enhanced SOMs program, he
20    conducted a visit and he came to
21    some conclusions that resulted in
22    us not shipping further to this
23    customer.
24 BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1    Q.  Enhanced being actually
2  doing due diligence, actually going to
3  see your customer, right?
4        MS. VANNI:  Object to form.
5        THE WITNESS:  I've testified
6     that this was a result of
7     enhancing our suspicious order
8     monitoring program.
9  BY MR. BUCHANAN:
10   Q.  Well, okay, sir.  So are you
11  saying a salesperson went in there and
12  saw that and thought that it was okay?
13        MS. VANNI:  Object to form.
14        THE WITNESS:  I have no
15     knowledge of a salesperson
16     visiting this customer prior to
17     Eric's visit.
18  BY MR. BUCHANAN:
19   Q.  Because that -- I mean,
20  pretty obvious, right?  You walk in,
21  transactions are cash, manipulated
22  records, and there's no front-end
23  merchandise.  It didn't take a compliance
24  person to sniff that out, right?

Page 503

1        MS. VANNI:  Object to form.
2  BY MR. BUCHANAN:
3    Q.  Or shouldn't have.  Can we
4  agree on that?
5        MS. VANNI:  Same objection.
6        THE WITNESS:  What I can
7     tell you is that Eric Brantley
8     visited this customer, generated
9     this report, and as a conclusion
10     that we stopped shipping to this
11     customer.
12  BY MR. BUCHANAN:
13   Q.  Okay.  Well, certainly, if a
14  sales rep had gone in and seen that and
15  allowed that to go on, that wouldn't have
16  been right, right?
17        MS. VANNI:  Objection.
18        THE WITNESS:  I have no
19     knowledge of a salesperson going
20     and visiting this customer prior
21     to Mr. Brantley's visit.
22  BY MR. BUCHANAN:
23   Q.  Right.  You have no
24  knowledge of a sales rep having gone in

Page 504

1  and done due diligence on any customer,
2  right, sir?
3        MS. VANNI:  Objection.
4        THE WITNESS:  I believe I
5     testified that salespeople were
6     visiting customers, but I didn't
7     have the detail of which customers
8     were visited and which customers
9     weren't.
10  BY MR. BUCHANAN:
11   Q.  Well, we can agree if they
12  visited this one, they didn't do a very
13  good job, right?
14        MS. VANNI:  Objection.
15        THE WITNESS:  I have no
16     knowledge of a salesperson
17     visiting this customer prior to
18     Mr. Brantley's visit.
19  BY MR. BUCHANAN:
20   Q.  Okay.  Let's look at
21  Exhibit 34.
22        MS. VANNI:  Can I have that?
23        (Document marked for
24     identification as Exhibit

Page 505

1     Endo-Macrides-34.)
2  BY MR. BUCHANAN:
3    Q.  December 30, 2013,
4  Qualitest -- this is E-1139.  It's an
5  e-mail from Mr. Brantley to Ms. Hernandez
6  concerning Big Tex Pharmacy.  We're still
7  on Mr. Brantley's Texas road trip.  Turn
8  another log and see what's under them.
9        And December 30, 2013.
10  "Qualitest Pharmaceuticals retail
11  pharmacy questionnaire was received from
12  the following retail pharmacy seeking to
13  continue purchasing controlled substances
14  from Qualitest."
15        Do you see that, sir?
16        MS. VANNI:  Objection.
17        THE WITNESS:  That's what it
18     says.
19  BY MR. BUCHANAN:
20   Q.  Okay.  Talking about this
21  pharmacy in Houston.  "The past
22  12 months, Qualitest has sold dosage
23  units for several products, roughly a
24  third of which are unaccounted for by any

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1 logs," right?
2 A. 12,000 doses of
3 Carisoprodol. Yes, I read that.
4 Q. "1,700 were dispensed.
5 4,200 were unaccounted for," correct?
6 A. That's what it says.
7 Q. It goes on, and there's
8 other prescriptions for other controlled
9 substances for which pills are
10 unaccounted for, and the owner's got no
11 explanation for what's going on, right?
12 A. Tex pharmacy had no
13 explanation.
14 Q. Right. And it says
15 photographs revealed once again what,
16 sir?
17 A. "Photographs reveal no
18 front-end merchandise."
19 Q. What else did the
20 photographs reveal, sir?
21 A. "There is a waiting room
22 with sofa and chairs. There are secured
23 windows for consultations and pick-ups."
24 Q. No front-end merchandise.

Page 507

1 They got a waiting room outside. And
2 there's secured window for consultations
3 and pick-ups, right?
4 A. That's what it says.
5 Q. Okay. And so, this is
6 another one of those pharmacies that the
7 sales personnel were charged with doing
8 due diligence on, sir?
9 MS. VANNI: Object to form.
10 THE WITNESS: I have no
11 knowledge of a salesperson
12 visiting this pharmacy before the
13 questionnaire was provided.
14 BY MR. BUCHANAN:
15 Q. You have no knowledge of a
16 sales representative doing due diligence
17 on any pharmacy, correct, sir?
18 MS. VANNI: Objection.
19 THE WITNESS: I testified
20 that sales personnel were visiting
21 customers.
22 BY MR. BUCHANAN:
23 Q. Oh, I understand.
24 A. I testified that I didn't

Page 508

1 have details on those visits.
2 Q. I understand what you said,
3 sir. And I said, you have no evidence of
4 any visit by a salesperson to a pharmacy
5 to conduct due diligence, correct, sir?
6 MS. VANNI: Objection.
7 THE WITNESS: I believe I
8 testified that I don't have
9 details on customer visits that
10 sales personnel did.
11 BY MR. BUCHANAN:
12 Q. Okay. Because sales was
13 selling, right, sir? They weren't doing
14 due diligence?
15 MS. VANNI: Objection.
16 Asked and answered.
17 THE WITNESS: I believe I
18 testified earlier that -- and I
19 could clarify, that all of our --
20 all of our employees had
21 responsibilities relative to FDA
22 and DEA compliance and compliance
23 in general.
24 If a salesperson was

Page 509

1 visiting the customer, then
2 compliance would be one of the
3 things that they should have been
4 observing.
5 BY MR. BUCHANAN:
6 Q. Let's go onto the next one
7 in this Texas road trip.
8 A. Would that be Exhibit 35?
9 Q. Sure.
10 (Document marked for
11 identification as Exhibit
12 Endo-Macrides-35.)
13 BY MR. BUCHANAN:
14 Q. Again, actually going and
15 meeting your customers. Good idea,
16 correct, sir?
17 MS. VANNI: Objection.
18 BY MR. BUCHANAN:
19 Q. Can we agree that going and
20 meeting your customers, their place of
21 business when they're handling controlled
22 substances, is a good idea?
23 A. I think I've testified that
24 visiting customers is an important part

Highly Confidential – Subject to Further Confidentiality Review

Page 510

1 of a suspicious order monitoring program.
2      Q.   Absolutely.  And so after
3 you sat down with the DEA in March of
4 2013, you hired somebody to go and do
5 that, right?
6           MS. VANNI:  Object to form.
7 BY MR. BUCHANAN:
8      Q.   There's a question pending.
9      A.   We enhanced our SOMs program
10 in 2013 --
11      Q.   And that included hiring
12 somebody --
13      A.   -- by hiring personnel, by
14 creating a dedicated group to manage all
15 aspects of DEA and compliance including
16 the suspicious order monitoring and
17 customer visits.
18      Q.   Let's go to Exhibit 35, sir.
19      Exhibit 35, .2 reflects
20 another site visit from this trip to
21 Texas.
22           BZ Pharmacy in Houston.
23 Mr. Brantley requests dispensing
24 histories for controlled substance.

Page 511

1 According to the pharmacy, they filled
2 450 to 600 prescriptions monthly.  About
3 44 percent.
4           But when the actual
5 dispensing history was asked for, the
6 pharmacy refused to provide it, correct?
7      A.   Yeah.  I think what this
8 report is saying --
9      Q.   Is that what it states, sir?
10      A.   Yeah, the question -- in the
11 questionnaire --
12      Q.   Excuse me, sir.  Please stay
13 with my questions.
14           According to the
15 questionnaire, 70 percent of the
16 prescriptions were paid in cash.  Is that
17 what it states?
18      A.   That's what it says.
19      Q.   Okay.  We know that's not
20 right.
21           MS. VANNI:  Object to form.
22 BY MR. BUCHANAN:
23      Q.   Right?
24      A.   Certainly that would be a

Page 512

1 concern, and the recommendation as a
2 result of those concerns was discontinue
3 shipment to this customer.
4      Q.   Right.  Because when you
5 actually went out and did questionnaires
6 and did due diligence with your
7 customers, who you were already shipping
8 products to, you found these are not
9 customers that we can trust for
10 maintaining effective controls against
11 diversion; isn't that right?
12           MS. VANNI:  Object to form.
13           THE WITNESS:  As I stated
14      earlier, during this time frame,
15      we were -- we were enhancing our
16      suspicious order monitoring
17      program, and these enhancements
18      were resulting in decisions we
19      took to not ship to certain
20      customers --
21 BY MR. BUCHANAN:
22      Q.   Again --
23      A.   -- as in this example.
24      Q.   Again, after the sit-down

Page 513

1 with the DEA in March of 2013, right?
2           MS. VANNI:  Object to form.
3           THE WITNESS:  We had
4      identified previously to 2013 that
5      we needed to make certain
6      improvements to our DEA compliance
7      programs.
8 BY MR. BUCHANAN:
9      Q.   You had been told for years,
10 years, that you needed to make
11 improvements, but it wasn't until after
12 you sat down with the DEA in March of
13 2013 that you hired a head of SOMs and
14 you actually sent DEA compliance to start
15 knocking on your customers' doors,
16 correct?
17           MS. VANNI:  Object to form.
18           THE WITNESS:  I don't agree
19      with that characterization.
20 BY MR. BUCHANAN:
21      Q.   When was Mr. Brantley hired,
22 sir?
23      A.   We had an evolving program
24 throughout that time period.  The DEA

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1  meeting in 2013 was another part of that
2  evolution to get additional information,
3  additional guidance, so we could develop
4  improved programs.
5      Q.   Okay.  When was Mr. Brantley
6  hired, before or after the DEA meeting?
7      A.   After the DEA meeting.
8      Q.   Thank you.  He was the head
9  of what?
10     A.   He was the manager of
11 suspicious order monitoring.
12     Q.   Okay.  And he is the one who
13 was actually doing DEA due diligence
14 visits, correct?
15     A.   He did some DEA due
16 diligence visits.
17     Q.   Okay.  And the
18 recommendation following the interaction
19 with this customer was stop selling,
20 right?
21     A.   Based on the questionnaire,
22 yes.
23     Q.   Okay.  So those were all
24 retail pharmacies, or some retail

Page 515

1  pharmacies during this Texas road trip in
2  late 2013, early 2014.
3          I'd like to talk about some
4  of your interactions with your
5  distributors.
6          Did some business with an
7  entity called FW Kerr.  You know that,
8  right?
9      A.   FW Kerr was a wholesaler.
10     Q.   I'm sorry.  Okay.  So not an
11 end -- not somebody who was selling
12 directly to patients.  An entity that was
13 selling to other retail pharmacies,
14 correct?
15     A.   They sold to other retail
16 pharmacies.
17     Q.   Thank you.
18          And this is talking about a
19 site visit conducted by Mr. Brantley.
20 And this is Exhibit 36, site visit
21 report.
22          You see that?
23          (Document marked for
24     identification as Exhibit

Page 516

1      Endo-Macrides-36.)
2          THE WITNESS:  I see that.
3  BY MR. BUCHANAN:
4      Q.   Okay.  FW Kerr, in fact,
5  services, what is it, about 130
6  pharmacies, do you see that?
7          I'm sorry, withdrawn.
8          I'd like to direct your
9  attention to the paragraph, this is
10 1087.1.  Exhibit 36.
11         Site visit was conducted on
12 June 16, 2014, by Mr. Brantley out there
13 in Michigan.  Says it's an -- "FW Kerr is
14 engaged in the distribution of
15 pharmaceuticals including controlled
16 substances primarily to independent
17 pharmacies," in Michigan and where, sir?
18     A.   Ohio.
19     Q.   Ohio.  Okay.  Says, in terms
20 of its SOM program, "FW Kerr does not
21 require its customers to complete
22 questionnaires," right?
23     A.   That's what it says.
24     Q.   That is a red flag, right?

Page 517

1          MS. VANNI:  Object to form.
2          THE WITNESS:  That would be
3      a potential concern.
4  BY MR. BUCHANAN:
5      Q.   You had been told that by
6  consultants all the way back in 2008 and
7  2009.  You need questionnaires.  You've
8  got to understand your customers'
9  business, right?
10     A.   Consultant's advice is that
11 we should understand our customers and
12 their customers.
13     Q.   Consultant's advice, DEA
14 advice, internal people advice.  All
15 things you needed as part of an effective
16 program, correct, sir?
17     A.   I've already testified that
18 knowing customers and their customers is
19 part of an effective SOMs program.
20     Q.   Yeah, the customers are
21 visited not by DEA compliance but by the
22 sales team, right?
23         MS. VANNI:  Object to form.
24 BY MR. BUCHANAN:

Page 518

1  Q.  Do you see that?
2      "FW Kerr's customers are
3  visited on a regular basis by the sales
4  team," right?
5      A.  I see that.
6      Q.  That's the way you used to
7  do it prior to that meeting with the DEA,
8  and before you decided that wasn't good
9  enough, right?
10     MS. VANNI:  Object to form.
11     THE WITNESS:  It says here,
12     "The customers are visited on a
13     regular basis by the sales team.
14     Mr. Young stated that he conducts
15     visits as well."
16 BY MR. BUCHANAN:
17     Q.  Okay.  And I think in the
18 bottom it says they service, what, 130
19 pharmacies?  Do you see that?
20     A.  It says they service 130
21 pharmacies currently.
22     Q.  Okay.
23     A.  At the time of this visit.
24     Q.  And so one of the things

Page 519

1  that was decided after the meeting with
2  the DEA, after they told you you needed
3  to do this, was you were going to start
4  looking at chargeback data, at long last.
5  Right, sir?
6      MS. VANNI:  Object to form.
7      THE WITNESS:  DEA suggested
8      that we look at chargeback data,
9      yes.
10 BY MR. BUCHANAN:
11     Q.  Said you need to look at
12 chargeback data, right?
13     A.  As one component of the SOMs
14 program.
15     Q.  Right.
16     A.  That was the
17 recommendations.
18     Q.  And so what you did when you
19 looked at chargeback data is you saw
20 that -- you saw a whole bunch of problems
21 with FW Kerr's customers; isn't that
22 right?
23     MS. VANNI:  Object to form.
24 BY MR. BUCHANAN:

Page 520

1      Q.  Did you have that awareness,
2  sir?
3      A.  Is there a specific document
4  you're referring to?  I'm --
5      Q.  Sure.  Exhibit 36 --
6      A.  -- I'm aware that we were
7  using chargeback data and that I reviewed
8  some documents around that, but I don't
9  have them committed to memory.
10     Q.  Okay.  Let's go to
11 Number 37, please.
12     A.  37.
13     MS. VANNI:  Thank you.
14     (Document marked for
15     identification as Exhibit
16     Endo-Macrides-37.)
17 BY MR. BUCHANAN:
18     Q.  And this is some
19 correspondence from Mr. Shaffer to Justin
20 Wood, the DEA.
21     Do you see that?
22     A.  Yes.
23     Q.  So you had a little back and
24 forth with FW Kerr concerning its

Page 521

1  customers, right?
2      Do -- do you know that, sir,
3  independent of reading a document?
4      A.  I know we had interactions
5  with a number of our customers and
6  wholesalers.  If there's a specific
7  incident that you're referring to, like I
8  said, I reviewed a lot of documents.  I
9  haven't committed them all to memory.
10     Q.  Okay.  Well, we could agree,
11 sir, that what this e-mail says is the
12 company had reviewed its chargeback data,
13 identified problematic customers of
14 certain of your customers, and had asked
15 your customers to cease distribution of
16 Qualitest products to certain of your
17 customers' customers.
18     Do you see that?
19     A.  Yes.  It says, "Cease
20 distribution of Qualitest hydrocodone to
21 the following customers."
22     Q.  And that determination was
23 made through the review of chargeback
24 data, right?

Page 522

1      A.    Through chargeback data.
2      Q.    That's a reasonable thing to
3  do, right?
4          MS. VANNI:  Object to form.
5          THE WITNESS:  It's part of
6      a -- a component of a SOMs
7      program.
8  BY MR. BUCHANAN:
9      Q.    Okay.  And it was in fact
10  the basis through which you identified
11  several problematic pharmacies from FW
12  Kerr, correct?
13      A.    I don't know if these
14  customers specifically were customers of
15  FW Kerr.  It doesn't say that here.
16      Q.    I'll represent to you that
17  the five on the left are FW Kerr
18  customers.  I'll represent to you, sir,
19  that the five on the right are Morris and
20  Dickson customers.
21      A.    Okay.
22      Q.    Okay.  Accepting that
23  representation, sir, you'll see that
24  Sussex Drug, Benson Drug, Parks Drug,

Page 523

1  Fairway Drugs, Pine Knob Pharmacy were
2  identified through chargeback data as
3  problematic customers of your customer,
4  right?
5          MS. VANNI:  Object to form.
6          THE WITNESS:  They were
7      raised as concerns based on review
8      of chargeback data.
9  BY MR. BUCHANAN:
10      Q.    Okay.  And so chargeback
11  data can help you identify if your
12  customers are not maintaining effective
13  controls or their customers are not
14  maintaining effective controls, or
15  present a diversion risk, correct?
16      A.    Chargeback data can be
17  useful as part of a comprehensive SOMs
18  program.  We had done a lot of work at
19  Qualitest, which Eric continued when he
20  was hired, to get the chargeback data
21  into a format that we could use.
22          It also is data that has to
23  be looked at over a period of time, not
24  necessarily a point in time, given the

Page 524

1  actual buying patterns of customers.
2          So we had done, you know, a
3  lot of work to get this data in a format
4  that was usable.  And you're seeing the
5  outcome of that here.
6      Q.    So you had to cut off FW
7  Kerr from selling to those customers,
8  where FW Kerr hadn't done it on its own,
9  right?  That's what happened?
10          MS. VANNI:  Objection.
11          THE WITNESS:  We had
12      identified concern about these
13      customers of FW Kerr, yes.
14  BY MR. BUCHANAN:
15      Q.    In fact, if we look
16  backwards now -- I mean, this is
17  happening in 2015.  FW Kerr had bought
18  $205 million worth of opioids from your
19  company, Qualitest, as of 2015.  We only
20  go back to 2008.  I can't go back further
21  than that, sir.
22          Did you know that?
23          MS. VANNI:  Object to form.
24          THE WITNESS:  Did I know

Page 525

1      that FW Kerr --
2  BY MR. BUCHANAN:
3      Q.    They're a big customer?
4      A.    They were a -- they were a
5  significant customer.
6      Q.    Right.  And they were a
7  significant customer that had purchased
8  greater than 100 million pills, tablets,
9  liquids, of your products from 2008 to
10  2015 before you first conducted the due
11  diligence that led to cutting their
12  orders, right?
13          MS. VANNI:  Objection.
14          THE WITNESS:  We had
15      enhanced our SOMs program, and as
16      a result of that, we identified
17      some concerns around some of FW
18      Kerr's customers.  I don't know
19      how long these customers had been
20      customers of FW Kerr.  But we
21      identified them as concerns, and
22      we communicated that
23      appropriately.
24  BY MR. BUCHANAN:

Page 526

1   Q.   Okay.  You sent a report to
2   the DEA about the ten customers of FW
3   Kerr.
4          Do you see that?
5   A.   That's what this e-mail is.
6   Q.   Right.  And you didn't
7   identify your customer who had been
8   selling to those particular customers,
9   correct?
10          MS. VANNI:  Object to form.
11          THE WITNESS:  It doesn't
12          identify FW Kerr in this e-mail,
13          no.
14   BY MR. BUCHANAN:
15   Q.   Right.  How about with
16   regard to your direct customers?  I mean,
17   we looked at Exhibit 33, 34, 35, those
18   customers that Mr. Brantley popped in on
19   in his Texas road trip.  And you elected
20   to stop doing business with them because
21   of their suspicious activities.
22   A.   We did.
23   Q.   You didn't report any of
24   those to the DEA, did you?

Page 527

1          MS. VANNI:  Object to form.
2          THE WITNESS:  The reports
3          here are just the reports of the
4          visit and the decision that was
5          made.  This doesn't talk about
6          whether or not these were reported
7          to the DEA.
8   BY MR. BUCHANAN:
9   Q.   The three exhibits that we
10   looked at, 33, 34, 35, were in fact
11   direct retail customers of Qualitest,
12   some four or five years after Qualitest
13   had told the DEA it wasn't going to sell
14   to retail pharmacies anymore, right?
15          MS. VANNI:  Object to form.
16          THE WITNESS:  Qualitest, I
17          believe, told DEA it wasn't going
18          to ship hydrocodone to independent
19          retail pharmacies.  I believe that
20          communication was in 2008.
21   BY MR. BUCHANAN:
22   Q.   Okay.  And we looked at
23   shipments to retail pharmacies for
24   hydrocodone.  You recall that?  Do you

Page 528

1   have that recollection, sir?  I'm sorry
2   if you don't.
3   A.   I'm just looking back at the
4   product here.  This says carisoprodol,
5   alprazolam.
6   Q.   I'll direct you to 35, sir,
7   BZ Pharmacy.
8   A.   Okay.
9   Q.   "A full dispensing history
10   was requested, but BZ Pharmacy did not
11   provide the information.  As a result,
12   the percentage controlled substances
13   prescriptions could not be verified.  Of
14   the controlled substances dispensed,
15   hydrocodone, carisoprodol made up the
16   majority of the" -- "made up the
17   majority, followed by alprazolam."
18          Do you see that, sir?
19   A.   That's what he says.
20   Q.   Okay.  And so the company
21   had a discussion with the DEA back in
22   2008 about not sending to retail
23   pharmacies -- not selling directly to
24   retail pharmacies anymore.  You recall

Page 529

1   that?
2   A.   I recall there was a
3   communication to DEA.
4   Q.   And after you cut off these
5   three retail pharmacies that you were
6   still selling to, Exhibits 33, 34, and
7   35, we can agree that you didn't report
8   them to the DEA, correct?
9          MS. VANNI:  Object to form.
10          THE WITNESS:  There's no
11          knowledge here that -- or
12          information that they were
13          reported to the DEA.
14   BY MR. BUCHANAN:
15   Q.   Because in fact, you were
16   the person selling to them?  You were
17   selling directly to people that were
18   problematic customers, right?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  We were
21          selling to these customers.
22   BY MR. BUCHANAN:
23   Q.   Please look at Exhibit 41,
24   sir.

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1    (Document marked for
2    identification as Exhibit
3    Macrides-41.)
4        THE WITNESS:  41?
5  BY MR. BUCHANAN:
6    Q.   Yeah.  Exhibit 41, sir, is
7  excerpted from the company's
8  interrogatories that were prepared by the
9  company and counsel and produced to us in
10  the last two weeks.
11        It says suspicious orders
12  and --
13        MS. VANNI:  This is a
14    demonstrative based on the --
15        MR. BUCHANAN:  It -- it's a
16    demonstrative.  But it is, in
17    fact, the entire chart as -- as
18    reflected in the interrogatory.
19  BY MR. BUCHANAN:
20    Q.   These are, in fact, either
21  suspicious orders or customers reported
22  to DEA by Par Pharmaceuticals, as
23  disclosed in discovery responses to us,
24  sir.

Page 531

1        We could agree, sir, looking
2  at this list, that you don't see any
3  reports to the DEA of any suspicious
4  orders or any suspicious customers prior
5  to the meeting with the DEA in March of
6  2013, correct, sir?
7        MS. VANNI:  Objection.
8        THE WITNESS:  All these
9    dates are after March of 2013.
10        MS. VANNI:  I want to make
11    one more objection to the extent
12    that I don't -- I don't know
13    whether that interrogatory even
14    called for that information.
15        MR. BUCHANAN:  It does.  But
16    your objection is noted.
17        MS. VANNI:  I also object to
18    completeness.
19  BY MR. BUCHANAN:
20    Q.   We could also agree, sir,
21  that the pharmacies that were cut off by
22  the company in -- following the Texas
23  road trip, 33, 34 and 35, Big Tex,
24  Advanced Pharmacy, BZ Pharmacy, those are

Page 532

1  not reflected anywhere on this sheet that
2  the company ever reported them as a
3  suspicious customer, correct, sir?
4        MS. VANNI:  Object to form.
5        THE WITNESS:  I don't see
6    them on the sheet.
7  BY MR. BUCHANAN:
8    Q.   And we don't see that the
9  company ever looked back and reported
10  their prior purchases as suspicious
11  orders, right, sir?
12        MS. VANNI:  Object to form.
13        THE WITNESS:  I don't see
14    that on that -- on this sheet.
15    (Document marked for
16    identification as Exhibit
17    Endo-Macrides-40.)
18  BY MR. BUCHANAN:
19    Q.   Okay.  Let's move on real
20  quick.
21        Exhibit 40 is before you.
22  It's an exchange concerning a pharmacy
23  called Top Rx.  Top Rx was one of those
24  entities that was identified in your

Page 533

1  meeting with the DEA in March of 2013.
2  Isn't that right, sir?
3    A.   Top Rx was identified in the
4  2013 meeting.
5    Q.   Yeah.  Top Rx was a customer
6  of one of your customers.  Do you
7  remember that sheet?
8        I'm sorry, Top Rx was a
9  direct customer of Qualitest.  Do you
10  know that, sir?
11    A.   Yeah, which sheet are you
12  referring to?
13    Q.   The company had a meeting
14  with the DEA in March of 2013 --
15    A.   I'm aware of that.
16    Q.   There was a binder that was
17  prepared that showed the company's
18  shipments of various products --
19    A.   Try to find that -- right.
20  Right.
21    Q.   We don't need to dig -- dig
22  it out.
23        Do you have knowledge, sir,
24  as a representative for the company that

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1 one of the customers that was highlighted
2 by the DEA to the company was a company
3 called Top Rx?
4      A.   I do.
5      Q.   In fact, Top Rx had some
6 real problems, right?
7           MS. VANNI:  Object to form.
8           THE WITNESS:  What do you
9      mean by real problems?
10     Can you clarify that?
11 BY MR. BUCHANAN:
12     Q.   You were shipping a whole
13 ton of controlled substances to Top Rx,
14 and then it had its license revoked,
15 right?
16          MS. VANNI:  Object to form.
17          THE WITNESS:  I don't -- I
18     don't have the specific quantity
19     of product we shipped to them.
20 BY MR. BUCHANAN:
21     Q.   Do you have knowledge that
22 Top Rx was a customer of Qualitest?
23     A.   I do.
24     Q.   At the bottom of Page 1 of

Page 535

1 Exhibit 40, it's May 8, 2013.
2 Ms. Hernandez is sending around a notice
3 that Top Rx -- sending around a notice
4 that was published in the federal
5 register concerning Top Rx, a decision
6 and order revoking their registration.
7          Do you see that?
8      A.   I see that.
9      Q.   Okay.
10          In fact, prior to getting
11 their registration revoked, I mean you
12 had sold some, what, 40, $50 million
13 worth of opioids to this company?
14          MS. VANNI:  Objection.
15 Beyond the scope.
16          THE WITNESS:  Is there a
17     document that -- that I have that
18     says that?
19 BY MR. BUCHANAN:
20     Q.   Do you have an awareness
21 that Top Rx was a substantial customer --
22     A.   I understand that they were
23 a customer of -- of Qualitest.  I
24 don't -- I don't recall the exact

Page 536

1 quantities of products that we shipped to
2 them without seeing it on a document.
3      Q.   Top R -- Top Rx was a
4 pharmacy, I'll represent to you, sir,
5 that was called to your attention in your
6 meeting with the DEA in March of 2013.
7          You agree, I think, from
8 your prior testimony.
9      A.   Yeah, we already covered
10 that, yes.
11     Q.   Okay.  Top Rx was a
12 substantial customer of Qualitest,
13 correct?
14     A.   They were a customer of
15 Qualitest.
16     Q.   In fact, the company had
17 shipped millions and millions of orders,
18 excuse me, close to $50 million worth of
19 opioids in the five years prior to the
20 registration revocation.
21          Isn't that true, sir?
22          MS. VANNI:  Objection.
23 Beyond the scope.
24          THE WITNESS:  I don't have

Page 537

1     the details of how much dollar
2     value or product we shipped to
3     Top Rx.
4 BY MR. BUCHANAN:
5      Q.   Okay.  Let's move on.
6          I told you we were going to
7 talk in segments today.  I want to return
8 to one we'd talked about at the
9 beginning.
10     A.   Okay.
11     Q.   Endo.
12     A.   Okay.
13          MR. BUCHANAN:  Can I have,
14     please, Exhibit 4 back up on the
15     screen.
16 BY MR. BUCHANAN:
17     Q.   What we have here, sir, is
18 the -- the summary of data reflecting,
19 you know, the pills for various
20 categories over various years that the
21 company sold relating to opioid products.
22          Do you recall our
23 discussions about that earlier?
24     A.   Yeah, I have it in front of

Page 538

1  me.
2      Q.   Okay.  The company -- we've
3  asked the company to tell us how we can
4  identify those orders that were pended
5  over time and then released.
6          There's a system that tracks
7  orders in -- orders by Endo, as to
8  whether they've been pended, correct?
9      A.   That would be in SAP.
10     Q.   Okay.  And so whatever the
11 algorithm was at the time, it would pend,
12 and then after it was pended it could be
13 released, correct?
14     A.   If it pended after it was
15 reviewed and investigated, it could be
16 released.
17     Q.   And I think your testimony,
18 sir, is that in no instance was a pended
19 order not shipped for Endo, correct?
20     A.   That was my testimony.
21     Q.   And in no -- in no instance
22 was a pended order ever reported as
23 suspicious to the DEA, correct?
24     A.   As a result of our review

Page 539

1  and investigation, no orders were deemed
2  to be suspicious and, therefore, reported
3  to FDA -- or DEA, I'm sorry.
4          (Document marked for
5          identification as Exhibit
6          Endo-Macrides-44.)
7  BY MR. BUCHANAN:
8      Q.   I'm passing you, sir,
9  Exhibit 44.
10         Here you go.  You can take
11 the rubber band off it, sir.
12         MS. VANNI:  Do you have a
13         copy for me?
14         MR. BUCHANAN:  We do.  Do
15         you want it?
16         You can probably take
17         that -- I'll take the cardboard
18         back from you, sir.
19         (Discussion held off the
20         record.)
21 BY MR. BUCHANAN:
22     Q.   Sir, I'll represent to you
23 that we asked the company to identify for
24 us the transactions that had been pended

Page 540

1  and cleared --
2      A.   Okay.
3      Q.   -- by the team at Endo.  And
4  they pointed us to a spreadsheet, and
5  this is the spreadsheet that reflects
6  them.
7          Could you go to the first
8  substantive page of that document, sir?
9          MR. BUCHANAN:  Can we pull
10         it up on the screen, please.
11         All right.  The print could
12         be challenging on pages of that
13         size, but too many trees were
14         dying to provide copies as it was.
15         THE WITNESS:  I can see it.
16 BY MR. BUCHANAN:
17     Q.   Does this reflect, sir, to
18 your knowledge an output of the system
19 that tracks pended orders?
20     A.   This appears to be output
21 from our SAP system.
22     Q.   That is indeed the system
23 that would track pended orders?
24     A.   That's the system where the

Page 541

1  orders would be.
2      Q.   Okay.  These have been
3  identified, sir, as the pended orders
4  over the years for Endo, I'll represent
5  to you.  To my knowledge, through our
6  team's review, it only reflects orders
7  prior to 2014.
8      A.   Prior to 2014.
9      Q.   Okay.  Is there another
10 system that would track pended orders
11 after that point in time?
12     A.   The system is still SAP.
13 The only thing that's significant about
14 the 2014 time frame is there was a fairly
15 substantial upgrade that was done to SAP.
16     Q.   I'll represent to you, sir,
17 that there are 147,000-plus lines of
18 orders.
19     A.   Okay.
20     Q.   That were pended by Endo.
21     A.   Okay.
22     Q.   Am I correct in
23 understanding your testimony, sir, that
24 for each and every one of those 147,000

Page 542

1  orders, somebody pressed "ship" for Endo
2  after it tripped a wire for suspicious
3  order flags?
4      MS. VANNI:  Object to form.
5      THE WITNESS:  What I can
6  tell you is that if these orders
7  were pended, as they were here,
8  then they were reviewed and
9  investigated, including contacting
10  the customer and requesting
11  specific information about the
12  order, and then if they were
13  deemed to be not suspicious, then
14  they were released.
15      Additionally, these orders
16  would then have gone to a
17  third-party distribution partner,
18  UPS, and would have gone through
19  UPS's SOMs program and algorithm
20  for further review.
21      And if it pended in UPS
22  system, then there would have been
23  further discussion and review
24  before the orders shipped to the

Page 543

1  ultimate end customer.
2  BY MR. BUCHANAN:
3      Q.   UPS didn't have a
4  relationship with your customers,
5  correct?
6      A.   UPS is our distribution
7  partner.
8      Q.   My question to you, sir, is,
9  UPS -- you were UPS's customer, correct?
10      MS. VANNI:  Object to form.
11      THE WITNESS:  UPS --
12  correct.  UPS is a third-party
13  distributor.
14  BY MR. BUCHANAN:
15      Q.   Right.  UPS did not have
16  visibility to your customers and did not
17  conduct due diligence of your customers,
18  correct, sir?
19      MS. VANNI:  Object to form.
20      THE WITNESS:  No UPS -- UPS
21  is the registrant for
22  distribution, for the distribution
23  license would be required to have
24  a suspicious order monitoring

Page 544

1  program in place.
2  BY MR. BUCHANAN:
3      Q.   My --
4      A.   It would be the
5  responsibility of the client, in this
6  case Endo, to manage the customer
7  relationship.
8      Q.   For you to manage your
9  customer, your Morris and Dickson, your
10  FW Kerr, your Top Rx, your BZ Pharmacies.
11  Those were your customers?
12      A.   That's how -- yes, that's
13  how these relationships work.
14      Q.   Right.  And it was your job
15  to manage your -- and do -- manage and do
16  the due diligence on your customers,
17  correct?
18      MS. VANNI:  Object to form.
19      THE WITNESS:  The model here
20  is to outsource distribution.  The
21  customer relationship, the
22  customer diligence is with Endo in
23  that case.
24      Now UPS, given the fact that

Page 545

1  they have a SOMs program and given
2  the fact that they ship on behalf
3  of multiple clients to, you know,
4  the same customers, certainly
5  might have information that's
6  valuable to us and certainly
7  outputs of their SOMs programs
8  would be -- would be information
9  we would be interested in.  And
10  that's a collaboration.  That's a
11  partnership.
12      But the ultimate
13  responsibility for the customer
14  resides with Endo, not with UPS.
15  BY MR. BUCHANAN:
16      Q.   Okay.  And so with regard to
17  the spreadsheet printout that is before
18  you, do you think there is a similar
19  transaction record for everything after
20  2014 in another system?
21      A.   There should be.
22      Q.   And as I understand it, sir,
23  the way it worked is the computer flagged
24  orders as potentially of concern or

Page 546

1  suspicious for tripping a wire, some
2  threshold, some frequency concern,
3  whatever it was in this pre-2014 period?
4      A.   Quantity, frequency, you
5  know, order patterns, you know, we have
6  products that are seasonal, for example.
7  So those products would tend to kick out
8  in this kind of a program.  And then you
9  would look at it, and you would examine
10  it and you would say, "Oh, okay, this is
11  a seasonal product.  So there's more that
12  gets ordered during certain times of the
13  year."
14      Q.   And in every single
15  instance, each of the 147,000 orders
16  required a human being to say, "Send it,"
17  right?
18          MS. VANNI:  Object to form.
19  BY MR. BUCHANAN:
20      Q.   A human being from Endo
21  after the computer had held the order as
22  suspicious for one of those factors, had
23  to press "ship," right?
24          MS. VANNI:  Object to form.

Page 547

1          THE WITNESS:  An employee of
2      Endo had to complete a review and
3      investigation on why that order
4      kicked out, and there could be
5      numerous reasons why the order
6      pended that would have to be
7      investigated before the order
8      could be moved into UPS's system.
9  BY MR. BUCHANAN:
10      Q.   And of 147,000 orders, the
11  Endo people who are looking at this
12  didn't identify one, not a single order
13  over the 15 years that are reflected in
14  the data before you that compose 147,000
15  orders that shouldn't --
16      A.   147,000 line items.  That's
17  not necessarily 147,000 orders --
18      Q.   Thank you.
19      A.   -- just to clarify.
20      Q.   The team at Endo who looked
21  at these, or the person or people who
22  looked at these over this period of time
23  didn't identify a single product order or
24  line item, as you stated, that it found

Page 548

1  shouldn't be shipped or that it found
2  needed to be reported to the DEA,
3  correct?
4          MS. VANNI:  Object to form.
5          THE WITNESS:  After review
6      and thorough investigation of
7      these orders that pended, the
8      conclusion was that the order
9      pended for a valid reason and,
10      therefore, was not suspicious, and
11      was therefore moved to UPS to go
12      through the additional check of
13      UPS's suspicious order monitoring
14      system.
15  BY MR. BUCHANAN:
16      Q.   Sir, the total value of the
17  pended orders in that spreadsheet is
18  $4.5 billion.
19          Did you know that?
20          MS. VANNI:  Objection.
21      Beyond the scope.
22          THE WITNESS:  I didn't know
23      the exact quantity of this.  But I
24      do -- I do have an understanding

Page 549

1  of our -- our sales.
2  BY MR. BUCHANAN:
3      Q.   Every one of them shipped?
4      A.   After the proper due
5  diligence was performed and the
6  conclusion was made that the order was
7  not suspicious, it was moved to UPS.  It
8  went through UPS's suspicious order
9  monitoring system, UPS's algorithm.  And
10  if it passed successfully through that,
11  it shipped.
12      Q.   Please tell the jury how
13  many orders UPS reported to the DEA for
14  Endo products?
15      A.   These orders, after going
16  through UPS system --
17          MS. VANNI:  Object to form.
18          THE WITNESS:  -- were
19      further concluded that they were
20      not suspicious.
21  BY MR. BUCHANAN:
22      Q.   In fact, UPS paid a
23  $40 million fine for its activities in
24  shipping controlled substances and

Page 550

1 soliciting business from people who were
2 diverting controlled substances and
3 opioids.
4         MS. VANNI: Objection.
5 BY MR. BUCHANAN:
6     Q.   Do you know that, sir?
7         MS. VANNI: Objection.
8         THE WITNESS: I know that
9     UPS was fined, I believe related
10    to their small parcel business,
11    which -- which wasn't the business
12    that we were using for
13    distribution of these products.
14 BY MR. BUCHANAN:
15    Q.   Did you know UPS was
16 soliciting business, sir, from internet
17 pharmacies and not reporting the
18 suspicious orders that they were
19 receiving from those pharmacies? Did you
20 know that?
21        MS. VANNI: Objection.
22 BY MR. BUCHANAN:
23    Q.   They were, in fact,
24 soliciting business from them.

Page 551

1         MS. VANNI: Objection.
2         THE WITNESS: I understand
3     that UPS was fined for activities
4     in, I believe, their small parcel
5     business.
6         MS. VANNI: Counsel, by my
7     calculation, I think we are at
8     seven hours.
9         MR. BUCHANAN: Okay.
10    And just so we have the fact
11    clear.
12 BY MR. BUCHANAN:
13    Q.   To your knowledge, sir, not
14 a single Endo order processed by UPS has
15 ever been reported to the DEA, correct?
16        MS. VANNI: Object to form.
17        THE WITNESS: I believe I've
18    testified that after review and
19    investigation and a run through
20    UPS's SOM systems, the orders were
21    deemed to not be suspicious and,
22    therefore, were shipped.
23        MR. BUCHANAN: I'm -- I'm
24    out of time.

Page 552

1         THE VIDEOGRAPHER: Off the
2 record at 6:13 p.m.
3         (Short break.)
4         MS. VANNI: I object to any
5 questioning by counsel for
6 Tennessee. This witness,
7 Mr. Macrides, has no special
8 knowledge related to Tennessee.
9 We do not believe that this
10 deposition was properly
11 cross-noticed.
12        We are going to allow
13 Mr. Macrides to testify in a very
14 limited capacity today. I don't
15 expect there to be any
16 duplication. And the questioning
17 should be related to Endo, and
18 in -- only in connection with any
19 Tennessee issues.
20        If -- if it becomes
21 duplicative or if it exceeds the
22 parameters of questions related to
23 Endo in connection with Tennessee,
24 I'm going to instruct the witness

Page 553

1 not to answer.
2         MR. STEWART: And I'll just
3 say obviously it's a properly
4 noticed deposition. If -- if
5 defendant had an objection,
6 defendant could have sought a
7 protective order. Has chosen not
8 to do so. So it's properly
9 noticed per -- in the same way
10 that the other multiple
11 depositions that we participated
12 in has been properly noticed.
13 And -- and so we're here
14 appropriately, and we plan to
15 question the witness about any
16 aspect of the testimony for which
17 he's been put forward, which is
18 Items 30, 31, 32, 33 and 35,
19 without limitation.
20        And I'll just tell you we
21 will probably take two hours.
22        So I don't know if you want
23 to take a break before we get
24 started --

Page 554

1    MS. VANNI: Yes, we are
2  going to take a break. But my
3  objection stands.
4      (Short break.)
5      MS. VANNI: With respect --
6  I want to further clarify my
7  objection to this line of
8  questioning. With respect to the
9  cross-notice I want to note that
10  it was just issued yesterday and
11  we did lodge an objection via
12  e-mail to counsel, and at that
13  point in time, told counsel that
14  we weren't going to allow any
15  questioning, which our objection
16  is in line with the CMO on the
17  deposition and the parameters
18  that -- that this counsel's
19  colleagues have been following
20  with respect to Endo witnesses in
21  the Tennessee litigation.
22      And just note, that as a
23  concession, we're going to allow
24  the testimony but under the

Page 555

1  limited parameters that I've
2  previously stated.
3      Thank you.
4      MR. STEWART: And -- and
5  like I said, it's properly noticed
6  and we're going to proceed as we
7  have in all the other depositions
8  that we've taken.
9      THE VIDEOGRAPHER: On the
10  video record at 6:34 p.m.
11          - - -
12      EXAMINATION
13          - - -
14  BY MR. STEWART:
15      Q.  And I'd like to hand you,
16  sir, an exhibit, marked Exhibit 45.
17      (Document marked for
18  identification as Exhibit
19  Endo-Macrides-45.)
20  BY MR. STEWART:
21      Q.  Do you see that?
22      MS. VANNI: Do you have a
23  copy for me?
24      MR. STEWART: I think it's

Page 556

1  right in front of you.
2      MS. VANNI: This is it?
3      MR. STEWART: Yes.
4      MS. VANNI: Okay.
5      THE WITNESS: I see this.
6  BY MR. STEWART:
7      Q.  Yeah, do you see a document
8  that has an exhibit sticker 45 on it?
9      A.  I do.
10      Q.  And do you see it's a
11  cross-notice of oral videotaped
12  deposition with your name?
13      It's the very first line,
14  please take notice, or -- or the heading?
15      A.  I see that.
16      Q.  Okay. And, sir, can you
17  turn to Page 16 of that -- of the
18  document that accompanies the notice
19  that's part of Exhibit 45?
20      Do you see that?
21      A.  I see 16.
22      Q.  And do you see Item 30?
23      A.  I see Item 30.
24      Q.  And is that -- are Items 30

Page 557

1  and 31 two of the subjects you're
2  supposed to testify on today?
3      MS. VANNI: Objection.
4  These have been further revised
5  subject to communications with
6  counsel for the MDL. And to the
7  extent that he is only going to be
8  questioned with respect to Endo,
9  he has not been designated with
10  respect to diversion or abuse with
11  respect to Endo. The record
12  should be clear on that.
13      It's being handled by
14  another witness.
15  BY MR. STEWART:
16      Q.  You can answer.
17      I mean, you're here to talk
18  about the suspicious order monitoring
19  program with respect to opioids.
20      Is that fair?
21      A.  I believe that's fair.
22      Q.  Okay. Let me ask you. Do
23  you -- do you recall in your testimony
24  today at length you've talked about

Highly Confidential - Subject to Further Confidentiality Review

Page 558

1  suspicious order monitoring practices
2  that -- that your company has
3  participated in over time.
4      Do you remember that
5  testimony?
6      A.   I have talked about that
7  today.
8      Q.   And -- and the suspicious
9  order monitoring practices you've talked
10 about, were these designed to be national
11 in scope?
12     MS. VANNI:  Object to form.
13     THE WITNESS:  Our suspicious
14     order monitoring programs are --
15     are designed to encompass all
16     orders, all shipments, all
17     customers.  So in that context you
18     could call them national.
19 BY MR. STEWART:
20     Q.   They are supposed to apply
21 to every order of controlled substances
22 distributed in the United States, fair?
23     A.   That's how we view it.
24     Q.   There's no state in which

Page 559

1  you have different practices, other than
2  the ones you've testified about today,
3  fair?
4      A.   That's a fair statement.
5      Q.   And -- and so all those
6  practices would have been applicable in
7  the appropriate time periods to the State
8  of Tennessee?
9      A.   They would have.
10     Q.   Do you know if you've ever
11 conducted site visits, has Endo ever
12 conducted site visits in Tennessee?
13     A.   I don't know the answer to
14 that.  I know we've done a number of site
15 visits.  I don't know that we've done one
16 or haven't done one specifically in
17 Tennessee.
18     Q.   How would I find out?  Where
19 would I find out whether or not Endo has
20 conducted a site visit in Tennessee?
21     A.   We have files within the DEA
22 compliance group that would have
23 documented some of the documents that we
24 previously looked at, for example, that

Page 560

1  would have documented customer visits.
2      Q.   And what specific file would
3  I look at to figure out whether or not
4  somebody has conducted a site visit in
5  the State of Tennessee?
6      A.   You would have to go into
7  the actual files within our DEA
8  compliance function where those trip
9  reports would be kept.
10     Q.   So if there was a site
11 visit, there would be a trip report; is
12 that fair?
13     A.   There should be.
14     Q.   And who would be responsible
15 for maintaining that record, if I wanted
16 to go get that record?
17     A.   That would be held within
18 our DEA compliance function.
19     Q.   So we would go to your DEA
20 compliance function, and that -- the
21 people directing that function would have
22 access to the trip reports, fair?
23     A.   To the extent that they
24 exist, yes.

Page 561

1      Q.   Today, what human being
2  would have the best knowledge of the
3  existence of a trip report with respect
4  to a visit to Tennessee?
5      MS. VANNI:  Object to form.
6      THE WITNESS:  You would need
7      to go to our head of DEA
8      compliance.
9  BY MR. STEWART:
10     Q.   And who's that?
11     A.   That would be a gentleman
12 named Mike Meggiolaro, who is in our
13 Chestnut Ridge, New York office.
14     Q.   Do you know if particular
15 orders of interest have been identified
16 with respect to the State of Tennessee?
17     A.   Well, we had a document
18 earlier that had 147,000 line items.
19     I don't know specifically if
20 any of those 147 relate to the State of
21 Tennessee.  But I imagine, given the
22 quantity of orders that we've pended,
23 it's probably likely.
24     Q.   And we could look at that

Highly Confidential – Subject to Further Confidentiality Review

---

Page 562

1  document and figure out whether or not
2  there have been particular orders of
3  interest with respect to entities in
4  Tennessee, fair?
5      A.   If the ship to location is
6  on that document, which I believe it
7  would be, we could potentially get that
8  information.
9      Q.   Because you've got
10  records -- and I say you, I'm using the
11  term "you" for Endo as defined in your
12  notice.  Can we agree on that?
13      A.   Repeat that, please.
14      Q.   When I use the word "you,"
15  I'm talking about Endo.  Fair?
16      A.   Fair.
17      Q.   And Endo will have a record
18  of every order of interest that reflected
19  an order out of the State of Tennessee,
20  fair?
21          MS. VANNI:  Sorry.  Object
22      to form.
23          THE WITNESS:  I think Endo
24      would have records similar to what

---

Page 563

1      we looked at earlier of orders
2      that had pended within our SAP
3      system.
4  BY MR. STEWART:
5      Q.   And what about -- what about
6  investigations in Tennessee with respect
7  to orders of interest?  Would those
8  generate a record within Endo?
9      A.   Not necessarily.  Those
10  orders were investigated by the
11  responsible people in the ordinary course
12  of business.  I don't know to what the
13  extent to those would have been
14  documented.  That work would have been
15  done outside the system, if you will.
16  The order would pend in the system.  You
17  would get a report of an order that
18  pended.  You would then do whatever due
19  diligence was necessary on that order.
20          Sometimes that would be
21  very -- a very brief review.  Okay, the
22  product had been backordered for three
23  months, and now the customers were
24  restocking.  So, therefore, we would see

---

Page 564

1  large orders coming in.
2          It might be that simple.  It
3  might be complex.  We need to go back to
4  the customer and get information from the
5  customer.  There may likely be e-mails
6  that, you know, talk about some of those
7  orders, but I don't believe there's a
8  database of that information if that's
9  what you're asking.
10      Q.   So is it -- are you saying
11  there's not a standardized document that
12  memorializes an investigation of an order
13  that's been identified as an order of
14  interest?
15          MS. VANNI:  Object to form.
16          THE WITNESS:  Not that I'm
17      aware of.
18  BY MR. STEWART:
19      Q.   So I can't say give me all
20  the documents that show every
21  investigated order out of Tennessee?
22      A.   Not in the same way you're
23  getting the stack of orders that pended.
24      Q.   Okay.  What sort of

---

Page 565

1  information could I find about specific
2  actions taken by Endo personnel with
3  respect to investigating suspicious
4  orders from the State of Tennessee?
5      A.   I think you would be relying
6  on, to the extent that they exist, e-mail
7  communications between the people that
8  were actually doing the -- those
9  investigations, that due diligence, with
10  whomever they were getting information
11  from, whether that be the customer, the
12  wholesaler, whomever.
13      Q.   Tell me the people that I
14  would -- that would generate the e-mails
15  that you just described with respect to
16  investigations of orders coming out of
17  the State of Tennessee?
18      A.   So these are -- so with
19  regard to Endo, these would be people
20  that would work within the group that
21  Lisa Walker is responsible for.  Those
22  are -- those are -- that's the group that
23  actually manages the orders and
24  interfaces with the distribution partner.

---

Page 566

1   Q.   And is Lisa Walker the
2   person that would have the greatest level
3   of knowledge of those persons and their
4   activities?
5          MS. VANNI:  Object to form.
6          THE WITNESS:  She would.
7   BY MR. STEWART:
8   Q.   And how long has Lisa Walker
9   been in that position?
10  A.   In excess of 15 years.
11  Q.   And can you tell me the
12  people that you can identify who work for
13  Lisa Walker who would have been
14  participating in these investigations
15  that you describe?
16  A.   I can't give you necessarily
17  the specific names of those people.
18  There's a team there.  I think some of
19  those people actually might even sit in
20  Memphis.  So you'd have to -- really have
21  to get that detail, the names of people
22  in the group, you know, from -- from her.
23  Q.   And what we have to do, you
24  say, to figure out the nature of any

Page 567

1   claim coming out -- or any order coming
2   out of the State of Tennessee that was
3   investigated, we would actually have to
4   look at the e-mails back and forth with
5   respect to these people in Lisa Walker's
6   department?
7          MS. VANNI:  Object to form.
8          THE WITNESS:  I'm saying
9      there is an -- to the question
10     that you asked earlier, I'm saying
11     there isn't necessarily a database
12     where you could go to get all of
13     that information.
14  BY MR. STEWART:
15  Q.   Is there a database where I
16  could go to get a list of pharmacies
17  within the State of Tennessee that Endo
18  has identified as potentially involved in
19  suspicious activity with respect to
20  controlled substances?
21  A.   If there were site visits,
22  or if there were actions or
23  recommendations like we saw earlier,
24  based on information provided in

Page 568

1   questionnaires, then that information,
2   you know, to the extent that it exists,
3   would be housed within our DEA compliance
4   function, our records.
5   Q.   Well, but I'm looking -- I'm
6   trying to figure out if you have a
7   specific document or database where Endo
8   maintains a list of pharmacies suspected
9   to be engaged in suspicious or illegal
10  activities within the State of Tennessee?
11  A.   I don't believe we have a
12  specific database.  I'm not aware of a
13  specific database that would be dedicated
14  to that information.
15  Q.   Does Endo have a database or
16  a document that is designed to maintain a
17  list of physicians, nurse practitioners,
18  and other medical providers who've been
19  engaged in or are suspected to be engaged
20  in suspicious or illegal activity?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  Not that I'm
23     aware of.  However, I will tell
24     you that there are other functions

Page 569

1      within Endo, within regulatory,
2      within the R&D organization, for
3      example, that deal with patient
4      safety issues, that deal with
5      complaints, that deal with other
6      aspects of compliance that could
7      have the type of information
8      you're looking for.  But I do not
9      have specific knowledge of those
10     areas of the company.
11  BY MR. STEWART:
12  Q.   But as far -- as far as the
13  suspicious order monitoring system, that
14  system doesn't encompass databases or
15  documents that contain this information
16  about suspicious pharmacies or suspicious
17  medical providers?
18  A.   Only to the extent that it
19  was identified through a site visit like
20  I talked about earlier, or a specific
21  order that we were -- you know, we were
22  questioning or investigating.
23  Q.   With those narrow
24  exceptions, you are not aware of any

Highly Confidential – Subject to Further Confidentiality Review

Page 570

1 document or database that maintains all
2 of this information with respect to the
3 specific order monitoring program, fair?
4     A.   That's correct.
5     Q.   And is there a moment, is
6 this a meeting that is held or a -- or a
7 telephone conference in a systematic way
8 in which suspicious order monitoring
9 issues with respect to particular orders
10 are evaluated?
11     A.   If an order was deemed to be
12 suspicious and investigated and concluded
13 to be suspicious and, therefore, a
14 notification to DEA was required, that
15 would go -- that would go up to the head
16 of DEA compliance within the
17 organization, who ultimately would have
18 responsibility to ensure that that was
19 reported properly within the regulations.
20     Q.   But that's only where you
21 have an order that is deemed to require
22 reporting to the DEA.
23        Is that fair?
24     A.   That's part of it.  If we

Page 571

1 did a site visit that -- that concluded,
2 you know, as we saw earlier, conclusions
3 that we should not ship to a customer all
4 products or certain products or whatever
5 that decision might be, then that would
6 certainly be communicated with the -- the
7 sales organization as we saw in some of
8 those communications that we -- we -- we
9 discussed earlier.
10     Q.   It sounds like there's no
11 formal meeting in which people involved
12 with the suspicious order monitoring
13 program meet to determine whether or not
14 a -- a suspicious order needs further
15 attention after an investigation.
16        Is that fair?
17     MS. VANNI:  Object to form.
18     THE WITNESS:  As I stated,
19 that would -- that would go up to
20 the head of DEA compliance who
21 would then decide if it -- if it
22 was necessary to involve other
23 functions, other people across the
24 organization.

Page 572

1     Our head of DEA compliance
2 also meets regularly with our CEO
3 to, you know, provide information
4 regarding our SOMs program.
5 BY MR. STEWART:
6     Q.   So the head of DEA
7 compliance ultimately meets with the CEO,
8 and then it's determined whether or not a
9 report should be sent onto the DEA?
10     A.   No.  The -- the head of DEA
11 compliance would make that decision.
12 What I'm saying is, you know, we do have
13 regular meetings with our CEO to inform
14 him on the status of our -- of our SOMs
15 program.  That's more of an inform.
16     The decisions within the
17 regulations in terms of a suspicious
18 order or a customer, that those decisions
19 would be made by the head of DEA
20 compliance in his capacity.
21     Q.   And -- and tell me -- so
22 when I asked about a meeting, what you're
23 saying is the information gets sent to
24 the head of DEA compliance, that human

Page 573

1 being makes the decision.
2        Is that fair?
3     MS. VANNI:  Object to form.
4     THE WITNESS:  The role of
5 the -- the head of DEA compliance
6 is to make those decisions.  It's
7 a very black -- it's a very black
8 and white area as are, you know,
9 other aspects of compliance, FDA
10 compliance for example, the head
11 of quality makes those decisions.
12 BY MR. STEWART:
13     Q.   And the -- the head of DEA
14 compliance makes the decision to refer
15 a -- an entity involved in a suspicious
16 order to the DEA.  Fair?
17     A.   In the context of the
18 regulations, yes.
19     Q.   And -- and does the same
20 person, the head of DEA compliance, also
21 make the decision as to whether to tell a
22 distributor to stop distributing Endo
23 products to a particular entity?
24     A.   If we had evidence to

Page 574

1 suggest that that decision should be
2 taken, then yes, it would go through that
3 person.
4    Q.   Any other decisions relating
5 to the suspicious order monitoring
6 program that the head of DEA compliance
7 makes in this way?
8    A.   The head of DEA compliance
9 would make all really decisions relative
10 to suspicious order monitoring in the
11 context of the regulation, including, you
12 know, evaluating and assessing how we
13 should enhance or improve our program,
14 you know, based on information we're
15 getting, whether that information is
16 coming from our own internal programs or
17 whether that information is coming from
18 external parties, conferences that --
19 that they attend, et cetera.
20    Q.   Who is the head of DEA
21 compliance?
22    A.   Mike Meggiolaro.
23    Q.   How long has he been head of
24 DEA compliance?

Page 575

1    A.   Mike's been on board since
2 June of 2018.
3    Q.   Before Mike who was head of
4 DEA compliance?
5    A.   Prior to that we had
6 effectively two heads of DEA compliance.
7 We had a woman named Heather Jones who
8 occupied the role in Huntsville.  We had
9 Angela Feniger who was in that role in
10 the legacy Par business.
11       Those roles were eventually
12 merged and we hired a corporate head of
13 DEA compliance and that's the role that
14 Mike occupies currently.
15    Q.   Prior to Mike Meggiolaro,
16 did you say, taking that role, how would
17 the two predecessors have determined who
18 makes the decision to refer a provider or
19 an entity to the DEA?
20       MS. VANNI:  Objection.
21       THE WITNESS:  Well,
22    effective -- effectively when we
23    completed the transaction with Par
24    sometime in 2016, all of the

Page 576

1    distribution or all of the
2    suspicious order monitoring for
3    Par and -- legacy Par and legacy
4    Qualitest controlled products was
5    going through the system in
6    Huntsville.  So it would have been
7    the responsibility of that person
8    in that role to make those
9    assessments and make those
10    communications.
11 BY MR. STEWART:
12    Q.   And who was that?
13    A.   That would have been Heather
14 Jones up until the -- the point in time
15 where she left the company prior to us
16 closing the facilities in Alabama.
17    Q.   And then Heather Jones took
18 care of those decisions with respect to
19 pharmaceuticals distributed through
20 Huntsville, fair?
21       MS. VANNI:  Object to form.
22       THE WITNESS:  All generic
23    control products were distributed
24    through Huntsville prior to --

Page 577

1    from -- at some point in 2016
2    through to June of 2018.
3 BY MR. STEWART:
4    Q.   And who is the other person
5 that essentially had this role of head of
6 DEA compliance with respect to the other
7 drugs distributed by the company?
8    A.   So prior to the
9 consolidation, if we can call it that, of
10 all of the generic controlled substances
11 going through the legacy Qualitest
12 suspicious order monitoring system, the
13 legacy Par products would have gone
14 through the Par suspicious order
15 monitoring system, and that was under
16 Angela Feniger who was the head of DEA
17 compliance for the legacy Par
18 organization.
19    Q.   Where was she based?
20    A.   Chestnut Ridge, New York.
21    Q.   And you mentioned these
22 informal meetings with the CEO to discuss
23 the suspicious order monitoring program.
24 Can you describe what you -- what you do

Page 578

1  in those meetings?
2      A.   Well, as we -- as I've
3  testified earlier, you know, the -- the
4  landscape continues to evolve and we need
5  to continue to monitor that landscape and
6  we need to continue to enhance our
7  programs around all aspects of DEA
8  compliance, not just suspicious order
9  monitoring.
10      So the nature of those
11  discussions would be, if there was any
12  issues to communicate, like we talked
13  about an order -- relative to an order or
14  a customer.  Otherwise, it would be a
15  more -- more of an update on, you know,
16  how the program is evolving.  You know,
17  what are some of the specific activities
18  we're doing, are there any concerns.
19      Q.   And how often would those
20  meetings be held with the CEO?
21      A.   I think that currently
22  we're -- we're doing those on a monthly
23  basis.  That's something we started to do
24  fairly recently.

Page 579

1      Q.   When do you think you
2  started those meetings?
3      A.   Shortly after Mike came on
4  board.  Right.  So probably sometime the
5  back half of last year.  I don't know --
6  I don't know the exact date.
7      Q.   And who attends those
8  meetings with the CEO?
9      A.   It's our head of DEA
10  compliance, along with our CEO.
11      Q.   Are you at the meeting?
12      A.   I'm not at the meeting.
13      Q.   And --
14      A.   I could have attended
15  meeting.  I haven't actually attended
16  one.  Sometimes it just has to do with my
17  schedule.
18      Q.   Anyone else that you know
19  who attends them?
20      A.   No.
21      Q.   And are minutes kept or is
22  there some record kept of the meetings
23  between the head of DEA compliance and
24  the CEO?

Page 580

1      A.   I'm not -- I'm not -- I'm
2  not sure if we're actually keeping
3  minutes from those meetings.
4      Q.   Do you get a summary e-mail
5  of what they talked about?
6      A.   I discuss it with Mike.
7      Q.   And you say, one of the
8  subjects that's discussed with the CEO in
9  this meeting is, you know, do you have
10  some order that's triggering a DEA
11  referral, for example?
12      MS. VANNI:  Object to form.
13      THE WITNESS:  It would be if
14  that were the case.
15  BY MR. STEWART:
16      Q.   What about before these
17  monthly meetings with the CEO began?  Was
18  there some systematic communication with
19  the CEO with respect to the suspicious
20  order monitoring program?
21      A.   There would have been
22  communication.  So -- I almost lost my --
23  sorry.
24      There would -- yeah, we

Page 581

1  would have had communication.
2      The period of time from --
3  it's probably good to clarify.  The
4  period of time from 2016 forward, you
5  know, was really a -- we were really
6  integrating our DEA function, because as
7  I've described it, we had a DEA function
8  within the legacy Qualitest business.  We
9  had a DEA compliance function within the
10  legacy Par business.
11      As we merged those two
12  businesses, we had to integrate all
13  functions, including the DEA compliance
14  function.
15      We also had the decision
16  during that time frame to effectively
17  close our facilities in Alabama.
18      There are numerous DEA
19  compliance activities that need to be
20  conducted around closing a facility, so
21  that had a -- that had an impact
22  obviously on the timing of us
23  integrating -- fully integrating the
24  function.

Highly Confidential - Subject to Further Confidentiality Review

Page 582

1  So as we moved through 2017
2  into 2018, we, you know, created the role
3  that Mike currently occupies and really
4  completed, fully completed the
5  integration of the DEA compliance
6  activities across the various entities.
7  Q.  Before -- before Mike
8  started his monthly meetings with the
9  CEO, how would -- what meetings were used
10  or communications appraise the CEO of
11  suspicious order monitoring issues?
12  MS. VANNI:  Object to form.
13  THE WITNESS:  So as part of
14  my responsibility I would meet
15  regularly with our DEA compliance
16  personnel.  And if there were
17  issues, if there were concerns,
18  then I would make those
19  communications.
20  BY MR. STEWART:
21  Q.  You would communicate with
22  the CEO?  You were the conduit?
23  A.  If there -- if there was a
24  need to do that, I would do that.

Page 583

1  Q.  During what period would you
2  say that you were primary person that
3  would take information about suspicious
4  order monitoring issues to the CEO of
5  Endo?
6  A.  I would say from the period
7  from 2016 through early 2018.  But most
8  of those communications at that time
9  really had to do with the integration of
10  the function, you know, how we were
11  evolving the function, how we were
12  replacing some of the positions and the
13  activities that historically had been in
14  Huntsville.  And specifically also around
15  how we were transitioning the
16  distribution as we closed the
17  distribution center in Huntsville and
18  transitioned all of the generic
19  controlled distribution to the UPS
20  facility in Memphis.
21  Q.  I take it during this
22  period, if there was going -- this is
23  2016 forward, if there was going to be a
24  referral of an entity to the DEA because

Page 584

1  of suspicious activity, that the CEO
2  would have been made aware of that by
3  you; is that fair?
4  MS. VANNI:  Object to form.
5  THE WITNESS:  If it was
6  necessary to inform the CEO.  I
7  mean, again, as I said earlier, it
8  was really up to the DEA
9  compliance personnel in their
10  roles and responsibilities to do
11  those reviews and investigations
12  and make those decisions.
13  The more important
14  communication really would be to
15  the commercial organization if we
16  were going to cancel an order, if
17  we were not going to ship an
18  order, if we were going to -- had
19  a concern or a decision around a
20  customer.
21  BY MR. STEWART:
22  Q.  And but just so I'm clear,
23  it sounds like you're not aware of an
24  instance in which there was a DEA

Page 585

1  referral that wasn't run by the CEO of
2  the company?
3  MS. VANNI:  Objection.
4  THE WITNESS:  Can you
5  clarify your question?
6  BY MR. STEWART:
7  Q.  Sure.  There was never an
8  instance where a proposal to refer a
9  customer to the DEA was not run by the
10  CEO before that was done, that you're
11  aware of; is that fair?
12  MS. VANNI:  Object to form.
13  THE WITNESS:  I'm not aware
14  of a specific decision that --
15  relative to an order that we would
16  have asked the CEO for input on.
17  Like I said, it's more of an
18  inform.
19  BY MR. STEWART:
20  Q.  Did you ever ask the CEO of
21  Endo or propose referring an entity to
22  the DEA and have that decision reversed
23  by the CEO?
24  MS. VANNI:  Object to form.

Page 586

1    THE WITNESS:  With regard to
2  referring an entity to the DEA?
3  BY MR. STEWART:
4    Q.   Yes.
5    A.   No.
6    Q.   Did you ever have an
7  instance where you discussed with the CEO
8  of Endo the cancellation of an order?
9    A.   Of a specific order?
10    Q.   Sure.
11    A.   Not of a specific order that
12  was identified of interest.
13    Q.   Did you ever discuss with
14  the CEO the decision to cut off a
15  particular distributor from the
16  distribution of drugs produced by Endo or
17  one of its subsidiaries?
18    A.   Yes.
19    Q.   Tell me about that
20  discussion.
21    MS. VANNI:  Objection.
22    THE WITNESS:  So we -- we
23  discussed the -- I believe this
24  was in 2018, Morris and Dickson a

Page 587

1  distributor, had -- I believe it
2  was two of the licenses suspended
3  by -- by the DEA.  We were
4  notified of that and immediately
5  stopped distributing to them.
6    There were -- that was
7  pretty clear-cut.  They didn't
8  have their licenses.
9    At some point, those
10  licenses were reinstated and there
11  were discussions that included the
12  CEO around what action that we
13  would take with regard to
14  continuing to ship to Morris and
15  Dickson.
16  BY MR. STEWART:
17    Q.   What was the CEO's opinion?
18    MS. VANNI:  Object to form.
19    THE WITNESS:  I would -- I
20  would say that the CEO listened to
21  the facts.  We agreed that we
22  would discuss with Morris and
23  Dickson to gain an understanding
24  of the status of their program.

Page 588

1  So there were numerous discussions
2  along that, as that whole
3  situation played out.
4    It was a little bit
5  complicated for us by the fact
6  that -- I shouldn't say
7  complicated.  It was just an added
8  step that while that -- while that
9  was playing out, if you will, we
10  -- we moved our distribution to
11  UPS.
12    And so Morris and Dickson's
13  license were reinstated.  And then
14  subsequent to that, UPS who is now
15  our distributor, notified us that
16  they were, as a result of their
17  SOMs program, were no longer going
18  to ship controlled products to
19  Morris and Dickson.
20  BY MR. STEWART:
21    Q.   Did Endo -- before UPS took
22  that position, did Endo reinstate its
23  distribution through Morris and Dickson?
24    MS. VANNI:  Object to form.

Page 589

1    THE WITNESS:  There was a
2  brief period of time after the
3  licenses were reinstated where,
4  after review of these orders
5  through our algorithm, and, you
6  know, investigation and review of
7  anything that may or may not have
8  kicked out, that we did continue
9  to ship to them or reinstate
10  shipping to them, however you want
11  to describe that.
12  BY MR. STEWART:
13    Q.   Did you ever actually stop
14  shipping to Morris and Dickson?
15    A.   We did.
16    Q.   And then you decided to
17  continue shipping once they got their
18  licenses back, is that fair?
19    MS. VANNI:  Object to form.
20    THE WITNESS:  Once the
21  specific action that the DEA had
22  taken was reversed.  There was a
23  previous step where I believe
24  Morris and Dickson received some

Highly Confidential – Subject to Further Confidentiality Review

Page 590

1 kind of a favorable court ruling
2 and came back to us and asked us
3 to ship to them. We did not.
4 When the license were
5 finally reinstated and DEA, you
6 know, effectively reversed
7 whatever action they had taken,
8 then we did, like I say, resume
9 shipping to them under the obvious
10 direction of our -- of our SOMs
11 program.
12 BY MR. STEWART:
13 Q. And I take it that what
14 triggered your decision to not ship to
15 Morris and Dickson was the DEA's
16 revocation of their license, fair?
17 MS. VANNI: Object to form.
18 THE WITNESS: Well, the --
19 the DEA's revocation of their --
20 of their license was --
21 effectively we couldn't ship to
22 them. They didn't have a license
23 anymore. So, you know, I think
24 we -- as I -- as I recall, you

Page 591

1 know, we did go back and review
2 our data and we had not -- we had
3 not seen any orders, you know,
4 recent orders that we had
5 identified as potentially
6 suspicious.
7 BY MR. STEWART:
8 Q. Was there any other instance
9 where you discussed with the CEO the
10 potential for ceasing shipments to any
11 entity?
12 MS. VANNI: Object to form.
13 THE WITNESS: Not that I
14 recall. Morris and Dickson was
15 the one we discussed.
16 BY MR. STEWART:
17 Q. And it sounds like the CEO
18 definitely would have been involved in
19 any discussion about cutting off
20 shipments to a customer, fair?
21 MS. VANNI: Object to form.
22 THE WITNESS: Not just any
23 customer.
24 If it was a significant

Page 592

1 customer, then we could have that
2 discussion.
3 And -- and again some of
4 that is an -- is an inform. We're
5 not necessarily asking for
6 permission.
7 BY MR. STEWART:
8 Q. Well, there's -- there's no
9 instance that you can recall, I take it,
10 from your testimony that -- that Endo
11 made the decision to cease shipments to a
12 customer in which the CEO did not approve
13 that decision?
14 MS. VANNI: Object to form.
15 THE WITNESS: I'm not aware
16 of any instance.
17 BY MR. STEWART:
18 Q. We talked about your
19 communicating with the CEO 2016 to 2018.
20 What about prior to 2016, while you were
21 at the company, who would have made those
22 communications with the CEO of Endo?
23 A. Prior to 2016?
24 Q. Sure.

Page 593

1 A. Well, again, if there was a
2 need to communicate with the CEO we would
3 have communicated with the CEO. I'm --
4 I'm not suggesting that every aspect of
5 DEA compliance or every order that pended
6 was communicated to the CEO.
7 We -- we communicate
8 significant things. For example, if
9 there is an inspection, the DEA
10 inspection at one of our sites, we're
11 typically providing daily updates to
12 senior management on the status of the
13 inspection. So it's significant things
14 like that that would get communicated.
15 Q. And would you have been the
16 communicator during the 2014-2015 time
17 frame?
18 A. I could be. You know,
19 the -- I could have been. I became
20 responsible for DEA compliance in early
21 2015. So I wouldn't have been in -- in
22 that capacity prior to 2015.
23 Q. So that's the point forward
24 in which you probably would have been the

Page 594

1  point person communicating with the CEO,
2  fair?
3       MS. VANNI:  Objection.
4       THE WITNESS:  If there was a
5     need to do that.
6  BY MR. STEWART:
7    Q.   It wouldn't have been
8  someone else with respect to DEA
9  compliance after 2015, fair?
10      MS. VANNI:  Objection.
11      THE WITNESS:  It's a fair
12    statement.
13 BY MR. STEWART:
14   Q.   Okay.  And who would have
15 predated you, who would have done it
16 prior to the time you took over as head
17 of DEA compliance?
18   A.   So there was -- now you are
19 getting back into the Tracey Hernandez
20 time frame.  Also, there were other
21 people within Qualitest for example, that
22 were involved in -- in DEA compliance.  I
23 think we are talking about Endo.  That
24 could have gone through the regulatory

Page 595

1  group.
2       As I said, there were other
3  groups within Endo that -- you know,
4  that, you know, that were looking, you
5  know, at various aspects of compliance
6  including DEA compliance.
7    Q.   Do you think Tracey
8  Hernandez was the most likely person that
9  would have those conversations with the
10 CEO of Endo?
11   A.   Well, that would --
12 that's -- yeah --
13      MS. VANNI:  Objection.  It
14    exceeds the scope of --
15      THE WITNESS:  Right.
16      MS. VANNI:  -- of his
17    designation and also is related to
18    Qualitest and Par.  I'm not going
19    to allow him to answer that.
20      MR. STEWART:  Okay.  What's
21    your basis?
22      MS. VANNI:  I just stated,
23    stated it.
24      MR. STEWART:  Well, Endo is

Page 596

1  defined as including its
2  subsidiaries.
3       You're saying prior to these
4  entities becoming part of Endo, is
5  that your position, counsel?
6       MS. VANNI:  Well, my
7  position --
8       MR. STEWART:  It's a
9  momentous event to tell a witness
10 not to answer in a deposition, so
11 I'm wondering what your
12 justification is.
13      MS. VANNI:  Well, this is
14 based on my well-articulated
15 objection at the outset of this
16 deposition, that this deposition
17 was not properly noticed.  Despite
18 what you say, it was noticed
19 yesterday.  Not in compliance with
20 the deposition CMO.
21      We objected and said we
22 weren't going to allow him to
23 testify to anything, because Par
24 isn't even a defendant in any

Page 597

1  Tennessee action.
2       Today we're making a
3  concession, based on goodwill and
4  the fact that you're here,
5  allowing him to testify as to
6  Endo.  That is my basis.
7       MR. STEWART:  Okay.  I guess
8  what I'm saying is, first of all,
9  Par is a component of Endo as it
10 stands today.  So -- so Endo
11 encompasses Par as -- as indicated
12 by the notice and now by your
13 local counsel in Tennessee.
14      Beyond that, as you know,
15 the scope of a deposition, those
16 sorts of objections can be made
17 for the record, but that's not one
18 of the three bases under Rule 30
19 to tell a witness not to answer.
20      So I'm just going to tell
21 you if you -- if you interfere
22 with the deposition and tell the
23 witness not to answer for some
24 reason, other than those

Highly Confidential – Subject to Further Confidentiality Review

Page 598

1 articulated in the Rules of Civil
2 Procedure, I think you are -- I
3 think it's likely we'll have to
4 come back and just get those
5 questions at a different time,
6 likely at your expense.
7     MS. VANNI:  If this was a
8 properly noticed deposition, I
9 might agree with you.  This is not
10 a properly noticed deposition, and
11 your colleagues in the Tennessee
12 litigation have been following the
13 protocol with respect to
14 cross-noticing of depositions with
15 respect to cases where Endo is a
16 defendant.  Not Par.
17     Given that he is testifying
18 on behalf of Endo and Par, we are
19 permitting him to testify with
20 respect to your questions as to
21 Endo also.
22     MR. STEWART:  Like I said, I
23 think we obviously have a
24 disagreement about the application

Page 599

1 of Rule 30, the law, the
2 proprietary of the notice and so
3 forth.
4     But we've set it out on the
5 record, and we'll have to contend
6 with it after this deposition.
7     I think telling the witness
8 not to answer is improper.
9 BY MR. STEWART:
10     Q.   Tell me, did anyone at --
11 did anybody while you were at Endo ever
12 review information about doctors, nurse
13 practitioners, physician assistants, or
14 other providers who had been arrested or
15 disciplined for overprescribing opioids
16 in Tennessee?
17     A.   Not that I was involved in,
18 although I will -- as I said earlier,
19 there are other departments, other groups
20 in Endo that deal with various aspects of
21 compliance, complaints, patient safety,
22 et cetera.  And they may have been
23 involved in that type of activity.
24     Q.   I take it that Endo's

Page 600

1 specific order monitoring program never
2 encompassed an effort to review records
3 of physicians, nurse practitioners, and
4 physician assistants who had been
5 arrested and disciplined?
6     MS. VANNI:  Object to form.
7     THE WITNESS:  The nature of
8 Endo's SOMs program is to review
9 orders, customers.  We don't get
10 orders from doctors or nurse
11 practitioners.  So that
12 wouldn't -- that wouldn't be part
13 of the actual suspicious order
14 monitoring program.
15     Again, those -- that
16 information could likely come
17 through other areas, other
18 departments of Endo.  I just don't
19 have specific knowledge of that.
20 BY MR. STEWART:
21     Q.   But the suspicious order
22 monitoring program did encompass a duty
23 imposed by federal law to know your
24 customer's customer, fair?

Page 601

1     MS. VANNI:  Object to form.
2     THE WITNESS:  That's part of
3 the regulations.
4 BY MR. STEWART:
5     Q.   And the customer's customer
6 there, we're talking about pharmacies,
7 fair?
8     MS. VANNI:  Object to form.
9     THE WITNESS:  It could be a
10 pharmacy.
11 BY MR. STEWART:
12     Q.   And we're talking about the
13 nature of -- who else could it be other
14 than a pharmacy, when we are talking
15 about the customer's customer with
16 respect to compliance with the DEA's
17 directives?
18     A.   I think on the Endo side, it
19 would primarily be a pharmacy.  It could
20 be a government entity.  You know, most
21 of the product goes to a wholesaler, and
22 from there it could go to a government
23 entity or more likely a pharmacy.
24     Q.   And did Endo have access to

Highly Confidential – Subject to Further Confidentiality Review

Page 602

1 data about where pharmacies that received
2 Endo products were then selling Endo's
3 products?
4        MS. VANNI:  Objection.
5     Asked and answered.  This was
6     covered in detail by counsel for
7     the MDL, in which you were present
8     for the deposition.  Becoming
9     repetitive.
10 BY MR. STEWART:
11    Q.   Go ahead and answer.  I
12 mean, that was your testimony earlier
13 today, fair?
14    A.   I've testified on suspicious
15 order monitoring.
16    Q.   I mean, my point is it's not
17 controversial that among the information,
18 the items of information that Endo would
19 look at would be information showing
20 where pharmacies receiving Endo products
21 then distributed those products?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  You mean
24     prescription data?

Page 603

1 BY MR. STEWART:
2    Q.   That's correct.
3    A.   Specific prescription data
4 is not necessarily housed within the SOMs
5 program.
6    Q.   But I think you testified
7 earlier today, at times it was available,
8 and at times you used it with respect to
9 the SOMs program?
10    A.   We talked about chargeback
11 data --
12    Q.   Okay.
13    A.   -- specifically chargeback
14 data.
15    Q.   Can you identify other data
16 that would identify providers obtaining
17 Endo products that you relied on as part
18 of your suspicious order monitoring
19 program?
20    A.   I'm not aware of specific
21 prescription data that we used in that
22 context.
23    Q.   Did Endo, as part of its
24 suspicious order monitoring program,

Page 604

1 review news accounts about Tennessee
2 pharmacists or pharmacies that had been
3 subject to arrest or discipline or legal
4 action?
5        MS. VANNI:  Object to form.
6        THE WITNESS:  I don't have
7     specific knowledge of that.  I can
8     tell you that there are -- there
9     are other areas, as I've testified
10     earlier, other groups, other
11     departments within Endo that deal
12     with various aspects of
13     compliance, including DEA
14     compliance, who could very likely
15     have that information.
16 BY MR. STEWART:
17    Q.   Just so we're clear, as part
18 of the suspicious order monitoring
19 program, Endo did not affirmatively take
20 steps to review news reports about
21 pharmacists or medical providers in the
22 State of Tennessee who were disciplined
23 for, arrested for, or investigated for
24 inappropriate distribution of opioids,

Page 605

1 fair?
2        MS. VANNI:  Object to form.
3        THE WITNESS:  What I would
4     tell you is that our DEA
5     compliance function, our
6     suspicious order monitoring
7     function within Endo was actively
8     reviewing orders.  To the extent
9     that there was information that
10     was relevant to suspicious order
11     monitoring that came in through a
12     different part of the company,
13     then it's likely that that
14     information would be communicated.
15 BY MR. STEWART:
16    Q.   But there is no systematic
17 approach within Endo's suspicious order
18 monitoring system to look throughout the
19 United States or in Tennessee to identify
20 pharmacies, doctors, nurse practitioners,
21 engaged in suspicious behavior by looking
22 at news reports, fair?
23        MS. VANNI:  Object to form.
24        THE WITNESS:  What I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 606

1  saying is that there are other
2  areas within the company where
3  people may likely be looking at
4  that information.  That's not my
5  area of expertise.
6  BY MR. STEWART:
7     Q.   Where else in the company
8  would -- would somebody be tasked with
9  systematically assembling and evaluating
10 news reports about pharmacies,
11 pharmacists, doctors, nurse
12 practitioners, who had been arrested or
13 disciplined for improper prescribing of
14 opioids?
15        MS. VANNI:  Objection.
16    Beyond the scope of his 30(b)(6)
17    designation.
18 BY MR. STEWART:
19    Q.   You can answer.
20    A.   Well, based on my knowledge,
21 I think there are -- there are multiple
22 areas where that type of information
23 could come into the company.  Through the
24 commercial organization, we have people

Page 607

1  that focus on patient safety.  We have a
2  regulatory group.  We have legal people.
3  So there are any number of areas where
4  that type of information could be
5  identified.
6     Q.   Just so we have a clear
7  record though.  Within your -- within the
8  groups that were involved with Endo's
9  suspicious order monitoring program,
10 there was no systematic approach to
11 assembling information about news reports
12 of arrests, legal action, disciplinary
13 action against medical providers or
14 pharmacists in the State of Tennessee,
15 fair?
16        MS. VANNI:  Objection.
17    Asked and answered.
18        THE WITNESS:  If you're
19    asking me if there was a specific
20    role dedicated to reviewing news
21    reports or that sort of
22    information, no, there wasn't.
23        But we do have -- our DEA
24    compliance people are plugged into

Page 608

1  various external communications
2  where information like that
3  could -- could be -- could be
4  identified.
5        (Document marked for
6    identification as Exhibit
7    Endo-Macrides-46.)
8  BY MR. STEWART:
9     Q.   I'll hand you Exhibit 46.
10        And can you turn -- do you
11 see that you have got a document in front
12 of you that's got an exhibit sticker, 46?
13    A.   I do.
14    Q.   Do you see at the bottom of
15 the document, there's a marker, bottom
16 right-hand corner, it says
17 ENDO-OPIOID_MDL-05948280.
18        Do you see that?
19    A.   I see that.
20    Q.   If you turn to the page
21 marked 282, the number that ends in 282.
22 It's the third page of the document.
23    A.   I see that.
24    Q.   Okay.  Take a moment, if you

Page 609

1  want to review the document.  Does -- are
2  you familiar with this statement here,
3  SOMs process flow?
4     A.   I've seen this document.
5     Q.   Do you see that it sets out
6  the current process and then the new
7  process?
8     A.   I see that.
9     Q.   Okay.  And do you see it
10 says, "Current process, limited SOM
11 program in the current SAP system"?
12    A.   I see that.
13    Q.   And then do you see, in the
14 next section under new process, it says,
15 "Robust SOM program in the new SAP system
16 will be implemented May 5th for the
17 branded business unit."  Do you see that?
18    A.   I see that.
19    Q.   So is it fair to say that we
20 can read this to say that the robust SOM
21 program by Endo's account began on May 5,
22 2014?
23        MS. VANNI:  Object to form.
24 BY MR. STEWART:

Highly Confidential - Subject to Further Confidentiality Review

Page 610

1    Q.   Is that -- is that the way
2  to read this document?
3        MS. VANNI:  Objection.
4        THE WITNESS:  The way to
5    read this document is that the --
6    the capabilities within SAP for
7    reviewing orders was enhanced with
8    the upgrade to SAP that -- that
9    occurred in 2014 and more
10   functionality was available and,
11   therefore, implemented.
12       So that's what this document
13   is -- is talking about.
14 BY MR. STEWART:
15   Q.   But the document, when it's
16 describing the robust program that you
17 just described, was put into place in May
18 of 2014, right?
19       MS. VANNI:  Object to form.
20       THE WITNESS:  Robust
21   referring to enhanced capabilities
22   within the SAP system.
23 BY MR. STEWART:
24   Q.   And -- and --

Page 611

1    A.   You see it says, "Their
2  robust SOM program in the new SAP
3  system."
4    Q.   I do.  And so the robust
5  program for Qtest was July 2014, fair?
6        You see that's the next
7  line?
8        MS. VANNI:  Objection.
9        THE WITNESS:  That's what it
10   says.
11 BY MR. STEWART:
12   Q.   Okay.  But so -- prior to
13 that then you have what is described in
14 this document as just the limited SOM
15 program, right?
16       MS. VANNI:  Object to form.
17       THE WITNESS:  Limited --
18   limited capabilities in SAP
19   relative to what was going to be
20   available in the new version of
21   SAP.  Orders were still being
22   reviewed based on historical
23   parameters and pended based on
24   those reviews and investigated.

Page 612

1        (Document marked for
2        identification as Exhibit
3        Endo-Macrides-47.)
4  BY MR. STEWART:
5    Q.   Let me hand you Exhibit 47.
6        Do you see that you're
7  copied on this document?
8    A.   I'm copied on this document.
9    Q.   Is that right?
10       And do you see that the
11 bottom of the right-hand corner of
12 Exhibit 47, you've got a -- a number
13 ENDO-OPIOID_MDL-06235529?
14   A.   I see that.
15   Q.   Okay.  Can you take a look
16 at this document and tell me what it is,
17 what is the purpose of this document?
18       MS. VANNI:  I'm going to
19   object to this line of questioning
20   because, regardless of whether
21   it's a -- the Bates stamp is
22   ENDO-OPIOID, this is clearly a Par
23   document.
24       And for the reasons I -- I

Page 613

1    articulated at the outset of your
2    questioning, Counsel, the fact
3    that this is not a properly
4    noticed deposition, the fact that
5    Par is not a defendant in any
6    Tennessee case, I'm not going to
7    allow him to address this
8    document.
9  BY MR. STEWART:
10   Q.   Because your counsel is --
11 is telling you not to answer, we'll move
12 on to the next document.
13       I'd like to hand you
14 Exhibit 48.
15       (Document marked for
16   identification as Exhibit
17   Endo-Macrides-48.)
18 BY MR. STEWART:
19   Q.   And I'll ask you to look at
20 the document, and first tell me if it's
21 got a marker at the bottom
22 ENDO-OPIOID_MDL-06211237?
23   A.   It does.
24   Q.   Okay.  Do you know who Aaron

Highly Confidential - Subject to Further Confidentiality Review

Page 614

1  Graham is?
2      A.   Aaron Graham was head of
3  security at Qualitest in Huntsville.
4          MS. VANNI:  I'm going to
5      make the same objection as to this
6      document.  It's clearly a Par
7      document.  Aaron Graham, as the
8      witness just stated, was the
9      senior director of corporate
10     security at Huntsville.
11         Because Par is not a
12     defendant in the Tennessee cases,
13     and this deposition was not
14     properly noticed, and this is not
15     related to Endo, I'm not allowing
16     him to answer.
17         MR. STEWART:  Let's make
18     sure I understand.  I thought -- I
19     thought the witness just said he
20     was with Qualitest.
21         MS. VANNI:  Qualitest is not
22     a defendant in any of your
23     Tennessee matters.
24  BY MR. STEWART:

Page 615

1      Q.   Okay.  Maybe you can answer
2  this question generally.
3          When did -- when did Endo
4  purchase Qualitest?
5          MS. VANNI:  Objection.
6      Covered during the main deposition
7      of the MDL.
8  BY MR. STEWART:
9      Q.   It was 2010, right?  You can
10  answer.
11     A.   Endo acquired Qualitest in
12  2010.
13     Q.   Okay.
14         MR. STEWART:  And so here we
15     have a 2012 document.  Endo has,
16     by your own witness's statement,
17     acquired Qualitest.  I don't
18     understand your objection even by
19     your improper framework that
20     you've created, Counsel.  This is
21     a Qualitest document.  Endo owns
22     Qualitest at this time.
23         What possible reason can you
24     have to tell the witness not to

Page 616

1  answer the question?
2          MS. VANNI:  Counsel, I've
3  said it about three times now.
4          Tennessee counsel, your
5  co-counsel in all the Tennessee
6  litigation has appeared in cases
7  where Endo is a defendant.
8          This deposition is not
9  properly noticed with respect --
10  just generally, with respect to
11  the CMO.  It's not properly
12  noticed.
13         And we -- we went on record
14  yesterday as saying we weren't
15  going to even allow this witness
16  to testify.  Today we are making a
17  concession since you are here
18  allowing him to testify as to Endo
19  issues.  This document is clearly
20  a Qualitest document.
21         MR. STEWART:  But Qualitest
22  is part of Endo at the time in
23  question.  What -- what
24  distinction are you making?

Page 617

1          MS. VANNI:  Qualitest was a
2  separate corporate entity.  It's
3  not a defendant in the Tennessee
4  litigations.
5          MR. STEWART:  Counsel, let
6  me ask you something, just to make
7  sure we're clear on this.  Because
8  I think it's extraordinary what
9  you're doing.
10         Do you know that in the --
11  and you're welcome to look at
12  Exhibit 45.  Here is how you
13  define Endo.  Okay?  Your own
14  counsel defined Endo as:
15         Endo Health Solutions Inc.
16  and Endo Pharmaceuticals Inc. and
17  their officers, directors,
18  employees, partners,
19  representatives, agents, corporate
20  parents, subsidiaries, affiliates,
21  divisions, predecessors or
22  successors in interest and other
23  persons or entities acting on its
24  behalf."

Page 618

1 Now, are you, for the
2 purposes of this deposition,
3 fashioning a new heretofore
4 unprecedented definition of the
5 word Endo?
6 Explain.
7 MS. VANNI: Are you asking
8 me a question?
9 MR. STEWART: I am. Yeah, I
10 am asking you to justify your
11 extraordinary decision to tell
12 this witness not to answer a
13 question about a document marked
14 Endo, which is clearly about Endo.
15 MS. VANNI: This is not --
16 this document is clearly not about
17 Endo. I'm looking at the First
18 Amended Complaint right now that's
19 filed in the Tennessee actions
20 where you name a number of
21 defendants, and with respect to
22 Endo, you name Endo Health
23 Solutions Inc. and Endo
24 Pharmaceuticals Inc. There is no

Page 619

1 mention of Par or Qualitest who
2 are separate corporate entities.
3 MR. STEWART: Right.
4 MS. VANNI: That's my
5 position.
6 MR. STEWART: A separate
7 corporate entity owned by Endo at
8 the time the document was created
9 and defined by you as Endo.
10 I can tell you this is
11 extraordinary. This is improper
12 what you're doing. We're going to
13 be back at your expense to ask the
14 witness about this fundamental
15 document.
16 MS. VANNI: So fundamental
17 that it wasn't even covered by
18 counsel for the MDL.
19 BY MR. STEWART:
20 Q. Are you aware -- is
21 Tennessee a hot spot location, considered
22 by Endo a hot spot?
23 MS. VANNI: Object to form.
24 THE WITNESS: What do you

Page 620

1 mean by hot spot?
2 BY MR. STEWART:
3 Q. You tell me. Does Endo ever
4 identify states as hot spots? Have you
5 ever heard that term?
6 A. I've heard the term.
7 Q. What does it mean within
8 your company, sir? What does hot spot
9 mean?
10 A. Well, I would say that
11 potentially there are areas may be
12 referred to that way, where there's a
13 higher incidence of abuse of opioid
14 products.
15 Q. Do you know if Tennessee was
16 ever designated a hot spot?
17 A. I believe there's some areas
18 in Tennessee that have been designated or
19 have been described that way that I'm
20 aware of.
21 Q. You're using the passive
22 voice. Who would have made that
23 description and described certain areas
24 of Tennessee as hot spots within your

Page 621

1 company?
2 A. I think from a DEA
3 compliance perspective, we certainly are
4 tuned in to those types of -- that type
5 of information to the extent that, you
6 know, it's -- we see it. We see it in
7 news reports. We see it on the internet.
8 Q. And what -- if I wanted to
9 find out for a given time period whether
10 areas of Tennessee were considered a
11 hot -- were considered hot spots by your
12 company, how would I -- how would I do
13 that?
14 A. Well, I stated earlier that
15 our suspicious order monitoring program
16 is the same for all orders and all
17 states.
18 So we are applying the same
19 diligence to an order that comes in from
20 any state where there is the potential
21 for abuse. So I wouldn't -- I wouldn't
22 make a determination that one state
23 should have a higher level of scrutiny
24 from a SOMs perspective than another

Page 622

1 state.  All states, all orders receive
2 the same level of scrutiny.
3     Q.   But when you talked about
4 hot spots, is that a term that is used
5 within Endo such that particular states
6 are placed on a hot spot list for a given
7 period?
8          MS. VANNI:  Object to form.
9          THE WITNESS:  I said that I
10         had or people within our DEA
11         compliance function would have
12         awareness to that based on our --
13         the normal course of our jobs and
14         the way we are tuned into the
15         external environment.
16             I'm not suggesting that
17         somehow we alter our program based
18         on that information.
19 BY MR. STEWART:
20     Q.   Was there ever -- I take it
21 from what you're saying, you don't
22 alter -- you haven't altered your program
23 with respect to combatting suspicious
24 orders in a particular area, because it

Page 623

1 was designated a hot spot.  Is that
2 Endo's position?
3          MS. VANNI:  Object to form.
4          THE WITNESS:  Our -- our
5         program provides the same level of
6         scrutiny to every order.  It has
7         to.  There's no -- I mean, abuse
8         and diversion can happen
9         everywhere if we are not properly
10        reviewing and investigating
11        orders.
12 BY MR. STEWART:
13     Q.   But does your DEA compliance
14 section generate a list of hot spots?
15     A.   I said we had --
16         MS. VANNI:  Object to form.
17         THE WITNESS:  We had
18        information that we gather in the
19        ordinary course of our business.
20        We don't necessarily keep a
21        database of that, if that's what
22        you're asking me.
23 BY MR. STEWART:
24     Q.   Well, is there a list?  Do

Page 624

1 you or people in the DEA compliance
2 function or anybody that you're aware of
3 within Endo keep a list of locations
4 identified as hot spots?
5     A.   I'm not aware of an actual
6 list, but we have general awareness of
7 those areas that have been designated
8 that way.  In fact, you know, DEA at
9 times will provide guidance on those
10 topics.
11    Q.   Has the DEA provided Endo
12 guidance with respect to hot spots?
13    A.   DEA -- not specifically
14 Endo.
15    Q.   What does that mean?
16    A.   It means I can only answer
17 that question based on Endo, and I said
18 not specifically to Endo --
19    Q.   So the DEA --
20    A.   -- that I'm aware of.
21    Q.   Has the DEA provided Endo
22 information about areas that are hot
23 spots for opioids generally?
24    A.   In -- the DEA has provided

Page 625

1 Endo guidance around abuse and diversion
2 of opioids and guidelines and suggestions
3 around suspicious order monitoring as
4 we -- as we discussed earlier in the day.
5     Q.   And has the DEA identified
6 areas as hot spots?
7     A.   I haven't seen any specific
8 communications to Endo with regard to hot
9 spots.
10    Q.   Have you seen communications
11 by the DEA or documents identifying areas
12 as hot spots, whether Endo -- directed to
13 Endo or not?
14    A.   I told you I had general
15 awareness, based on information that I've
16 seen, or that my DEA team has seen, you
17 know, in terms of us monitoring the
18 external environment.
19    Q.   What -- what are those
20 things that you've seen that would
21 identify certain areas as hot spots?
22    A.   I've seen news reports.
23 I've seen internet articles.  I would say
24 that our DEA people go to conferences

Highly Confidential - Subject to Further Confidentiality Review

Page 626

1 where those things are discussed. So
2 there's a variety of sources of
3 information like that.
4    Q.   Have you ever seen a
5 document within Endo that identified
6 particular areas as hot spots?
7    A.   I haven't seen a document
8 within Endo that I recall seeing. I've
9 seen a lot of documents. I don't
10 remember them all. I don't recall one
11 specific to that topic.
12       THE WITNESS: Can we have
13 a --
14       MS. VANNI: Counsel,
15 whenever we have a logical
16 stopping point.
17       MR. STEWART: Sure. We can
18 take a break. Absolutely.
19       THE VIDEOGRAPHER: Off the
20 record at 7:37 p.m.
21       (Short break.)
22       THE VIDEOGRAPHER: We are
23 back on the record at 7:48 p.m.
24       (Document marked for

Page 627

1    identification as Exhibit
2    Endo-Macrides-49.)
3 BY MR. STEWART:
4    Q.   I'm going to hand you
5 Exhibit 49: Do you see at the bottom of
6 Exhibit 49, it's got a marker that says
7 ENDO-OPIOID_MDL-05968927.
8    A.   I see that.
9    Q.   Okay. And can you flip over
10 to the second page. Actually the third
11 page. Do you see that there is an
12 address block for Lisa Walker?
13    A.   I see that.
14    Q.   You see it's got her e-mail?
15    A.   I see that.
16    Q.   What's her e-mail say?
17    A.   It says
18 Walker.Lisa@Endo.com.
19    Q.   Okay. And who's Lisa Walker
20 again?
21    A.   She's the associate director
22 of customer service and distribution for
23 Endo.
24    Q.   Okay. And who is Larry

Page 628

1 Shaffer?
2    A.   Larry was a DEA compliance
3 manager in Huntsville.
4    Q.   And do you see the listing
5 here, know your customer questionnaire,
6 customer rating key?
7       Do you see that?
8    A.   I see that.
9    Q.   Are you familiar with that
10 concept, a customer rating key?
11    A.   I'm just familiarizing
12 myself with the document.
13    Q.   Sure.
14    A.   This appears to be a
15 document that would somehow prioritize
16 customers.
17    Q.   Okay. And did you ever use
18 a customer rating key or know your
19 customer questionnaire in your work at
20 Endo?
21    A.   Not directly in my role.
22    Q.   But you were familiar with
23 these documents?
24    A.   I'm familiar with the

Page 629

1 document.
2    Q.   And do you see Paragraph 3,
3 identified as 3, it says, "What
4 geographical areas will you be primarily
5 be distributing product to? Hot spots
6 location FL, etc.," and it says, "Various
7 locations." And at the bottom, it says,
8 "Suggest hot spot locations, FL, TX KY,
9 TN, CA, IL, and NB."
10       Do you see that?
11    A.   I see that.
12    Q.   So here, the hot spot
13 location suggestions include Tennessee,
14 fair?
15    A.   That's what it says here.
16       (Document marked for
17    identification as Exhibit
18    endo-Macrides-50.)
19 BY MR. STEWART:
20    Q.   I'll give you another
21 document marked as Exhibit 50. Do you
22 see that this document attaches a
23 PowerPoint or series of PowerPoints that
24 are being prepared for the DEA meeting,

Page 630

1 2013?
2     A.   I see that this is a
3 document to prepare for a meeting with
4 DEA.
5     Q.   Okay.  Are you familiar with
6 it?
7     A.   I've seen this document.
8     Q.   Okay.  Turn to Page 18 of
9 the document.
10        Before we talk about the
11 document, Page 18, can you just tell me
12 which meeting, which DEA meeting was this
13 PowerPoint designed to relate to?
14     A.   Which DEA meeting?
15     Q.   Sure.  I mean, tell me a
16 link, if you could, the document we're
17 looking at, the PowerPoint, to a
18 particular meeting with the DEA if you
19 can?
20        MS. VANNI:  Object to form.
21        THE WITNESS:  It says
22     meeting with DEA on October 17,
23     2013.
24 BY MR. STEWART:

Page 631

1     Q.   Okay.  So this -- these --
2 these slides would have been prepared to
3 present to the DEA.  Is that --
4     A.   That is my understanding.
5     Q.   Okay.  Tell me, Page 18.  Do
6 you see that there is a statement on
7 Page 18 that says, "We will likely need
8 to request additional hydrocodone quota
9 much earlier in 2014 than normal if the
10 full amount of the request is not
11 granted"?
12     A.   I see that.
13        MS. VANNI:  Objection.
14 BY MR. STEWART:
15     Q.   Okay.  Can you tell me what
16 that means?
17        MS. VANNI:  Objection.
18     Beyond the scope of his 30(b)(6)
19     designation.
20 BY MR. STEWART:
21     Q.   Okay.  You can answer.
22     A.   So what that means is that
23 DEA grants -- you submit a quota
24 application based on your historical

Page 632

1 sales and DEA evaluates that based on
2 market share data, other data, sales data
3 that DEA has access to, and they grant
4 quota.
5        The -- the suggestion here
6 is that we may need to request additional
7 quota in 2014 if DEA weren't to grant the
8 full amount of the quota.
9     Q.   Do you know if DEA granted
10 the full amount or not for this period?
11     A.   I don't recall specifically
12 the grant.  But it may have been less
13 than what was requested.
14        And -- and this was a time
15 period where I believe you had a lot of
16 shift in demand.  It may have been after
17 the -- the high dose APAP products were
18 removed from the market such that the --
19 that kind of threw the -- the market into
20 a little bit of flux given where quota
21 was and who had quota and who didn't have
22 quota depending on, you know, what
23 volumes of products people had that --
24 you know, those products that were

Page 633

1 withdrawn.
2     Q.   Now, can you turn to, it's
3 another two pages down in the document,
4 there's a document, a slide entitled
5 "Phase I."
6        Do you see that?
7        MS. VANNI:  What page
8     number?
9        THE WITNESS:  Line --
10        MR. STEWART:  I believe so.
11        THE WITNESS:  Phase I.
12 BY MR. STEWART:
13     Q.   Yeah.  Do you see that?
14     A.   I see that.
15     Q.   And do you see that the
16 first sentence, the first portion of the
17 slide says, "Enhancement of the existing
18 SOMS calculation for all customers, all
19 controlled products and pseudoephedrine
20 products"?
21     A.   Can I see that?
22     Q.   And given the time table,
23 October of 2013, do you know what this
24 refers to?

Highly Confidential – Subject to Further Confidentiality Review

Page 634

1    MS. VANNI:  Object to form.
2    THE WITNESS:  Well, this is
3  providing DEA with an update on
4  the -- the status of enhancing
5  our -- our algorithm for
6  suspicious order monitoring.
7  BY MR. STEWART:
8    Q.   Can you turn to the next
9  page?
10    Do you see it says Phase II
11  at the top?
12    A.   I see that.
13    Q.   And do you see the first
14  phrase on this page says, "Hired
15  individuals to support the program"?
16    MS. VANNI:  Note my
17  objection.  This deals with
18  Qualitest and was covered already
19  during MDL counsel's questioning.
20  BY MR. STEWART:
21    Q.   Here you are talking about
22  hiring people to support the SOM program,
23  fair?
24    A.   Fair.

Page 635

1    Q.   Let me ask you, before you
2  hired these individuals in 2013, how many
3  individuals within the company were
4  devoted full-time to the SOM program, the
5  suspicious order monitoring program?
6    MS. VANNI:  Are you asking
7  as to Endo?
8    MR. STEWART:  I'm asking as
9  to Endo and all entities owned by
10  Endo.
11  BY MR. STEWART:
12    Q.   How many people were in
13  charge or were paid to involve themselves
14  with a suspicious order monitoring
15  program before 2013?
16    MS. VANNI:  You can answer
17  as to Endo.
18    THE WITNESS:  I can -- okay.
19  I can answer as to Endo?
20    MS. VANNI:  Mm-hmm.
21    THE WITNESS:  I can't give
22  you an exact number.  Endo had
23  various organizations within the
24  company.  People that had

Page 636

1  responsibilities that you would --
2  you would call DEA compliance.  I
3  don't know the exact number of
4  people.
5  BY MR. STEWART:
6    Q.   With the accurate statement
7  being that before you hired these
8  individuals in 2013, there was
9  actually -- there were zero individuals
10  within the Endo organization specifically
11  devoting their full-time employment to
12  the SOM program?
13    MS. VANNI:  Object to form.
14    THE WITNESS:  This is --
15  this document is talking about
16  Qualitest.
17  BY MR. STEWART:
18    Q.   My question is real simple.
19    Prior to October 2013 was
20  there a single human being working within
21  the Endo organization that devoted his or
22  her full-time employment to the
23  suspicious order monitoring program?
24    MS. VANNI:  Object to form.

Page 637

1  He can answer as to Endo.
2    THE WITNESS:  I can only
3  answer to Endo?
4    MS. VANNI:  Yes.
5    THE WITNESS:  There were
6  people at Endo within the Lisa
7  Walker group that we discussed
8  earlier who were reviewing -- were
9  executing the suspicious order
10  monitoring program, reviewing
11  orders of interest and
12  investigating those.
13    So those roles were involved
14  in DEA compliance as it relates to
15  suspicious order monitoring.
16    There were other people in
17  the regulatory organization that
18  were also involved in the various
19  aspects of DEA compliance as it
20  would have related to REMS
21  requirements that we had on
22  certain products and developing
23  those -- those plans.
24    So there were a number of

Highly Confidential – Subject to Further Confidentiality Review

Page 638

1  people who had various
2  responsibilities that you could
3  classify as DEA compliance.  I
4  don't have an exact number for
5  you.
6  BY MR. STEWART:
7    Q.   Turn to Page 27.  Do you see
8  you have a -- a slide, and it's entitled,
9  "Rates of abuse self-reported at U.S.
10  drug treatment centers data through
11  second quarter 2013."
12      Do you see that?
13    A.   I see the document.
14    Q.   Okay.  And do you see there
15  is a graph for generic oxymorphone HCL?
16    A.   I see that.
17    Q.   Okay.  And what does that
18  graph show, can you tell?
19      MS. VANNI:  Object to form.
20      THE WITNESS:  If I'm reading
21  this graph it says, "Cases per
22  100,000 prescriptions dispensed."
23  BY MR. STEWART:
24    Q.   When it says cases, what

Page 639

1  case, these are abuse cases, people
2  abusing generic oxymorphone HCL?
3    A.   It says the number of
4  reported -- self-reported abuse cases.  I
5  think that's what it's showing.
6    Q.   So what the chart is showing
7  is they are going up for the generic
8  oxymorphone HCL, the abuse cases?
9    A.   That's what the chart says.
10    Q.   Now, do you see at the
11  bottom there is a source listing?
12    A.   I see that.
13    Q.   It says, "Source:  National
14  Addictions Vigilance Intervention and
15  Prevention Program, NAVIPPRO"?
16    A.   I see that.
17    Q.   Are you familiar with
18  NAVIPPRO?
19    A.   I have a general
20  understanding that they collect
21  information about opioid abuse.
22    Q.   And fair that Endo here is
23  using NAVIPPRO data to make this
24  presentation to the DEA?

Page 640

1      MS. VANNI:  Object to form.
2      THE WITNESS:  That's what it
3  appears.
4  BY MR. STEWART:
5    Q.   Okay.  I take it Endo, when
6  it presents to the DEA, tries to rely on
7  data it deems to be reliable?
8      MS. VANNI:  Object to form.
9      THE WITNESS:  I -- I can't
10  really speak to how this chart was
11  prepared.  I was not -- this is
12  not something that I was involved
13  in.
14  BY MR. STEWART:
15    Q.   My point is a little
16  different, which is just that Endo
17  doesn't produce reports to the DEA that
18  contain information that it deems
19  unreliable, fair?
20      MS. VANNI:  Object to form.
21      THE WITNESS:  Fair.
22  BY MR. STEWART:
23    Q.   And do you use NAVIPPRO, the
24  NAVIPPRO system, in your work at Endo?

Page 641

1    A.   I do not.
2    Q.   Okay.  Turn over to the next
3  page.  Do you see that Page 28 of this
4  exhibit, Exhibit 50, is entitled "Rates
5  of abuse reported to U.S. Poison Control
6  Centers data through first quarter of
7  2013"?
8      Do you see that?
9    A.   Yes, I do.
10    Q.   Let's make sure we're tied
11  up here.  Can you turn to the front page
12  of the document.  Real quick.  Just
13  confirm that it's Exhibit 50.
14    A.   It is.
15    Q.   Okay.  Good.  So Exhibit 50,
16  Page 28 we've got rates -- we've got a
17  slide entitled "Rates of abuse reported
18  to U.S.  poison centers - data through
19  first quarter of 2013," right?
20    A.   That's what it says.
21    Q.   Okay.  And do you see that
22  it's got Opana ER and other Schedule II
23  opioids?
24    A.   I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 642

1    Q.   Would other Schedule II
2  opioids include generic opioids?
3         MS. VANNI:  Object to form.
4         THE WITNESS:  I don't know
5    what -- like I said, I didn't
6    prepare this.  So I don't know
7    what's included in other Schedule
8    II opioids.
9  BY MR. STEWART:
10   Q.   Okay.  From a -- just a
11 common sense standpoint, the generic
12 oxycodone, for example, is a Schedule II
13 opioid, right?
14        MS. VANNI:  Object to form.
15        THE WITNESS:  Generic
16   oxycodone is a Schedule II opioid.
17 BY MR. STEWART:
18   Q.   Generic oxymorphone HCl is a
19 Schedule II opioid, right?
20   A.   Yes.
21   Q.   Do you see at the bottom of
22 slide -- of Exhibit 50, Page 28,
23 there's -- it says, "Source:  RADARS
24 system, Poison Control Center program"?

Page 643

1    A.   I see that.
2    Q.   Are you familiar with the
3  RADARS system Poison Control Center
4  program?
5    A.   I am not.
6    Q.   It's not something that you
7  used in your work?
8    A.   It's not an area that I
9  would be directly involved in.
10   Q.   Okay.  What about -- do
11 people working under you use RADARS
12 system Poison Control Center program?
13   A.   Not that I'm aware of.  But
14 there -- as I said earlier, there are
15 other areas within Endo who would, you
16 know, be involved in this activity and
17 using this data, particularly in the
18 development of REMS programs, for
19 example.
20   Q.   Okay.  What's a REMS
21 program, so the record is clear?
22   A.   A risk evaluation and
23 mitigation strategy.  This is something
24 that FDA requires of certain products

Page 644

1  that have a high propensity to be abused
2  or diverted.
3    Q.   Turn to page -- and with
4  respect to what you just described, the
5  REMS program, that's an area where Endo
6  uses data from the RADARS Poison Control
7  Center program?
8    A.   Potentially.  I'm not
9  involved in developing those strategies.
10 It's not my area of responsibility.  I'm
11 generally aware of what a REMS program is
12 and that we have people in the
13 organization that work on that.
14   Q.   Am I hearing you to say that
15 in the suspicious order monitoring
16 program, you don't rely on RADARS data?
17        MS. VANNI:  Object to form.
18        THE WITNESS:  We don't
19   directly rely on RADARS data.
20 BY MR. STEWART:
21   Q.   How about indirectly?  How
22 do you rely -- if you do, how do you rely
23 on it indirectly?
24        MS. VANNI:  Object to form.

Page 645

1         THE WITNESS:  What I would
2    say is that, with regard to Endo,
3    if there were information that
4    came through this data source from
5    another area of the company that
6    was relevant to DEA compliance,
7    then it would be communicated to
8    DEA compliance.
9  BY MR. STEWART:
10   Q.   And can you remember
11 instances in which that's the case?
12   A.   I don't recall a specific --
13 specific incidence where that was the
14 case.
15   Q.   Do you know who within Endo
16 during the time that you've been at Endo
17 has been the expert on use of the RADARS
18 program?
19        MS. VANNI:  Object to form.
20        THE WITNESS:  No.
21 BY MR. STEWART:
22   Q.   Do you see page -- can you
23 turn to Page 33 of Exhibit 50.  Do you
24 see that that page is entitled

Page 646

1 "Distribution of routes of administration
2 reported by individuals within the
3 NAVIPPRO ASI-MV Network in 2Q 2013"?
4     A.   I see that.
5     Q.   Okay.  And do you see that
6 it identifies individuals who have
7 abused, reformulated Opana ER, original
8 Opana ER, and oxymorphone ER generics?
9         MS. VANNI:  Objection.
10        Beyond the scope of his 30(b)(6)
11        designation.
12 BY MR. STEWART:
13    Q.   Is that what the slide
14 shows?
15        MS. VANNI:  It covers abuse
16        for Endo.
17 BY MR. STEWART:
18    Q.   Is that what the slide
19 shows?
20    A.   I'm just -- if you can just
21 let me familiarize myself --
22    Q.   Sure.
23    A.   -- with the slide, because
24 it is not my area of responsibility.

Page 647

1     Okay.  So it seems to be
2 describing routes -- as it says, routes
3 of administration of misuse of product.
4     Q.   Can you tell me, do you
5 think there's a correlation between
6 misuse of Endo opioid products and abuse
7 of those products on the one hand, and
8 suspicious orders being filled in a
9 particular area?
10        MS. VANNI:  Object to form
11        and beyond the scope.
12        THE WITNESS:  I don't think
13        I understand your question.  Can
14        you clarify?
15 BY MR. STEWART:
16    Q.   Well, sure.  You're in
17 charge of suspicious order monitoring,
18 fair?
19        MS. VANNI:  Objection.
20        THE WITNESS:  I'm
21        responsible for DEA compliance.
22 BY MR. STEWART:
23    Q.   Okay.  And are you saying
24 that data that would show you where

Page 648

1 people are abusing and diverting Endo
2 Schedule II opioid products is not
3 germane to your work monitoring
4 suspicious orders?
5         MS. VANNI:  Object to form
6         and beyond the scope.
7         THE WITNESS:  I testified
8 earlier that we apply the same
9 scrutiny to every order that comes
10 in, regardless of where it comes
11 from.  We do the same diligence.
12 We review, we investigate, we make
13 a decision as to whether or not
14 that order is suspicious or not.
15 If it's not suspicious, we move it
16 on.
17 BY MR. STEWART:
18    Q.   Is one of the data points
19 that you look at whether or not, in a
20 particular area that an order comes from,
21 there's a very high level of abuse of
22 opioids?
23        MS. VANNI:  Object to form.
24        THE WITNESS:  I said

Page 649

1 earlier -- I testified that we had
2 awareness to those areas.  It
3 could certainly influence how we
4 visit customers.  I also testified
5 that if there was relevant data
6 that was coming through another
7 area of the company that was
8 relevant to DEA compliance, then
9 that data would come to DEA
10 compliance from wherever it came
11 from in the company.
12 BY MR. STEWART:
13    Q.   But I do think you also
14 testified that -- that with respect to
15 reviewing suspicious orders, your --
16 your -- the data you evaluate is
17 essentially uniform.  You don't have
18 different standard operating procedures
19 for reviewing suspicious orders from,
20 say, Tennessee as opposed to California?
21    A.   We apply the same scrutiny
22 to all orders.
23    Q.   Turn to the next page,
24 Page 34 of Exhibit 50.

Page 650

1     Do you see that this slide
2 presented to the DEA is entitled
3 "Injection data in ASI-MV comparison of
4 proportion of abusers who reported
5 injecting Opana ER CRF in TN, the other
6 states."
7     Do you see that?
8     A.   I see that.
9     Q.   Do you see that -- that this
10 slide, Page 34, compares Tennessee with
11 non-Tennessee states with respect to the
12 proportion of abusers reporting injection
13 of Opana ER?
14     MS. VANNI:  Object to form.
15     THE WITNESS:  I'm just
16     trying to understand the slide
17     here.
18 BY MR. STEWART:
19     Q.   Sure.
20     A.   I don't -- I don't know what
21 ASI/MV means.  Can you clarify that for
22 me?
23     Q.   I can't.
24     You can't clarify it, I take

Page 651

1 it?
2     A.   No, as I said earlier, this
3 is -- preparing these slides is not
4 within my area of responsibility.
5     Q.   Do you -- do you see that --
6 that that's a comparison here being made
7 between Tennessee and all the other
8 states?
9     A.   I see that there is some
10 comparison being made here between
11 Tennessee and other states.
12     Q.   Do you know, within your
13 experience within Endo, if you've ever
14 seen other documents in which Tennessee
15 was singled out for comparison with all
16 other states because of its unusual use
17 or abuse or diversion of Endo products?
18     MS. VANNI:  Object to form
19     and beyond the scope.
20     THE WITNESS:  I don't recall
21     seeing other documents that
22     specifically compare Tennessee to
23     other states.
24 BY MR. STEWART:

Page 652

1     Q.   You don't recall seeing
2 documents with words like the Tennessee
3 effect or Tennessee is different.  That
4 sort of thing?
5     MS. VANNI:  Object to form.
6 BY MR. STEWART:
7     Q.   Is that fair?
8     A.   I do not recall seeing those
9 types of documents.
10     Q.   Okay.  When did you arrive
11 at Endo?
12     A.   October of 2012.
13     Q.   Ever heard of somebody named
14 Mark Collins?
15     A.   I've seen that name in some
16 of the documentation I've reviewed in
17 preparing for my deposition.
18     (Document marked for
19     identification as Exhibit
20     Endo-Macrides-51.)
21 BY MR. STEWART:
22     Q.   I'll hand you Exhibit 51 --
23 I'll hand you Exhibit 51.
24     Have you ever seen that

Page 653

1 document, Exhibit 51?
2     A.   I have not seen this
3 document.
4     Q.   And I take it you haven't
5 seen -- when you say that, you haven't
6 seen a draft of that document or any
7 aspect of that document before.
8     Is that fair?
9     MS. VANNI:  Object to form.
10     THE WITNESS:  I don't
11     believe I've seen this document.
12 BY MR. STEWART:
13     Q.   I'll hand you another
14 document.
15     (Document marked for
16     identification as Exhibit
17     Endo-Macrides-52.)
18 BY MR. STEWART:
19     Q.   This is marked Exhibit 52.
20     Do you see at the bottom
21 right-hand corner of that document you've
22 got the Bates number
23 ENDO-OPIOID_MDL-01398417, do you see
24 that?

Highly Confidential - Subject to Further Confidentiality Review

Page 654

1    A.   I see that.
2    Q.   Okay.  And do you see this
3 is Lisa Walker who you've spoken about,
4 sending an e-mail to Mark Collins?
5    A.   I see that.
6    Q.   Do you see, it talks about a
7 suspicious order monitoring white paper?
8    A.   I see that.
9    Q.   Okay.  Have you testified
10 today about a suspicious order monitoring
11 white paper?
12        MS. VANNI:  Object to form.
13        THE WITNESS:  I've testified
14    today on Endo's suspicious order
15    monitoring program.
16 BY MR. STEWART:
17    Q.   It's fair to say that you
18 didn't testify today about a document
19 that was called a suspicious order
20 monitoring white paper that you can
21 recall?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  I don't
24    believe I specifically testified

Page 655

1    on a white paper.
2 BY MR. STEWART:
3    Q.   Okay.  Do you see that Lisa
4 Walker says to Mr. Collins, "In Endo's
5 SAP system we have a limited SOM program
6 that looks at our buying wholesalers'
7 customers' 3-month and 12-month history,
8 and if any order is above the 3 or
9 12-month, it goes on hold until it's
10 reviewed by customer service"?
11    A.   I see that.
12    Q.   And do you know why she
13 describes -- does she describe this
14 program as limited, because at this point
15 you haven't implemented all these
16 additional changes that were implemented
17 in Endo after meetings with the DEA in
18 2013?
19        MS. VANNI:  Object to form.
20        THE WITNESS:  I believe that
21    this document references back to
22    the document that we ultimately
23    looked at earlier, where the SAP
24    system was enhanced in 2014 and,

Page 656

1    therefore, had more functionality
2    as it related to looking at
3    orders, whereas in the previous
4    prior to 2014, it's being referred
5    to as limited given that the --
6    the system had the capability to
7    do what she's describing here,
8    looking at customers' 3-month and
9    12-month history, and then if the
10    order pended based on that review,
11    it was -- it was -- it was further
12    reviewed and investigated.
13        You'll also note here that
14    it talks about how, regardless of
15    the outcome of what you could call
16    that first step in SAP, the orders
17    then go through UPS's suspicious
18    order monitoring program as well.
19 BY MR. STEWART:
20    Q.   That goes to my question.
21        Do you see the document
22 that's attached, which is the next page,
23 is a January 24, 2010, document titled
24 "SOM Executive Summary"?

Page 657

1    A.   I see that.
2    Q.   Do you see at the very
3 bottom of the page, last sentence of the
4 page, in describing the UPS monitoring
5 system, the document says, "The tool is
6 not able to forecast order trends and
7 cannot take into account future business
8 distribution events such as product
9 promotions, volume ramp-up for product
10 launches or other supply chain anomalies,
11 therefore, there will always be a level
12 of human evaluation by the RA department
13 in conjunction with our clients to
14 analyze such spikes to the historical
15 trend."
16        Do you see that?
17    A.   I see that.
18    Q.   What -- what that's saying
19 is, right, UPS could never, its system
20 could never have a full picture for
21 suspicious order monitoring of Endo
22 products because it doesn't have all the
23 internal Endo information, right, for
24 product trends and the like?

Page 658

1      MS. VANNI:  Objection.
2      THE WITNESS:  I think what
3   this is saying is that their
4   algorithm, and this would be true
5   with a lot of algorithms, could
6   not necessarily build in every
7   possible shift in product demand
8   that could occur in a business,
9   so, therefore, in the absence of
10   human intervention, to understand
11   those things, that, you know, the
12   system would not be robust.  Or
13   the system would pend orders that
14   potentially were valid orders that
15   should be distributed.
16  BY MR. STEWART:
17      Q.   Or for that matter miss
18   orders -- miss suspicious orders that
19   were suspicious but would not be picked
20   up because of the lack of robustness of
21   the UPS system, right?
22      MS. VANNI:  Objection.
23      THE WITNESS:  I wouldn't
24   characterize it that way.  This is

Page 659

1   speaking more to orders that would
2   pend due to shifts in demand that
3   could not be built into the
4   algorithm and, therefore, would
5   need to be examined, reviewed, and
6   investigated by people who had an
7   understanding of those demand
8   shifts.
9  BY MR. STEWART:
10      Q.   These people would have to
11   be within Endo?
12      A.   Those people would be within
13   Endo.
14      (Document marked for
15   identification as Exhibit
16   Endo-Macrides-53.)
17  BY MR. STEWART:
18      Q.   I'm going to hand you
19   Exhibit 53.  Do you see on Exhibit 53,
20   the bottom right-hand corner of the page,
21   there's a Bates -- what we call Bates
22   number, which is this marker at the
23   bottom.  It says
24   ENDO-OPIOID_MDL-01239749.

Page 660

1      A.   I see that.
2      Q.   Okay.  And do you see a
3   fellow named Neil Shusterman says to
4   Harris Rotman, Tara Chapman, and Nancy
5   Fetrow, "This is from Lisa Walker in
6   2013.  I think we should re-meet with her
7   to understand where we are now in 2017."
8      Do you see that?
9      A.   I see that.
10      Q.   Okay.  Neil Shusterman is
11   the chief medical officer at Endo?
12      A.   He was at that time.
13      Q.   Do you know why you're not
14   copied on this, given your role with the
15   suspicious order monitoring program?
16      MS. VANNI:  Object to form.
17      THE WITNESS:  I can't tell
18   you specifically why I'm not
19   copied on this document.
20  BY MR. STEWART:
21      Q.   Do you know --
22      A.   And as I stated to you
23   earlier, from 2016 through 2017, we were
24   in the process of integrating our

Page 661

1   businesses.  My historical roles had
2   primarily been involved on the generics
3   business.  So it could be that it was
4   just simply part of the integration as to
5   why it was not included on here.
6      Q.   Did you ever have
7   conversations with Dr. Shusterman
8   about -- I presume he's a doctor -- about
9   the suspicious order monitoring program?
10      A.   No.  I think what he -- what
11   he asked for here was a summary from the
12   people that were executing that program
13   on a day-to-day basis, which would have
14   been in Lisa Walker's group.
15      Q.   So you don't -- you don't
16   remember having conversations with him
17   about --
18      A.   I don't recall
19   conversations.
20      Q.   Do you think you would
21   recall having a conversation with the
22   chief medical officer at Endo about the
23   suspicious order monitoring program?
24      MS. VANNI:  Object to form.

Page 662

1  THE WITNESS: I think I
2  would. I suspect that he got the
3  information that he needed from
4  Lisa Walker and her team.
5  BY MR. STEWART:
6  Q. We talked about meetings
7  that you had with the CEO. Let me ask a
8  different question. Have you -- how many
9  presentations have you made to the board
10  of Endo with respect to the suspicious
11  order monitoring program?
12  MS. VANNI: Object to form.
13  THE WITNESS: I don't
14  believe I've ever made a
15  presentation to the board of
16  directors specifically on
17  suspicious order monitoring.
18  BY MR. STEWART:
19  Q. Have you made a presentation
20  to the board of directors of Endo about
21  any subject?
22  A. I have made --
23  MS. VANNI: Object to form.
24  THE WITNESS: -- several

Page 663

1  presentations to the Endo board of
2  directors.
3  BY MR. STEWART:
4  Q. And have any of them
5  involved the suspicious order monitoring
6  program, any of your presentations to the
7  board of directors of Endo?
8  A. Not directly related to
9  suspicious order monitoring.
10  Q. Well, what --
11  A. Not that I have personally
12  presented to the board of directors.
13  Q. How many times have you
14  personally presented to the board of
15  directors of Endo?
16  A. I don't recall exactly. But
17  I'm going say probably about three times.
18  Q. Tell me what you recall --
19  the subject matter of your presentations
20  to the board of directors of Endo.
21  A. So there were several
22  topics. So in my -- I was hired into
23  Endo actually in a finance role
24  supporting the operations of the

Page 664

1  business.
2  Part of my responsibilities
3  were to manage capital investment plans
4  and speak to significant projects that
5  Endo was investing in from a capital
6  investment perspective.
7  I know one of the topics
8  that I presented to the board on was
9  construction of a vault, a controlled
10  substance vault in Huntsville, for
11  example.
12  Q. What other presentations did
13  you make to the board of directors?
14  A. I would have presented to
15  the board on the various -- various
16  components of the capital investment plan
17  specifically as it related to capital
18  investment within the Qualitest business,
19  mostly directed at compliance activities,
20  both FDA and DEA compliance included in
21  that.
22  Q. You made presentation about
23  how much money you were going to have to
24  spend to set up or to have an appropriate

Page 665

1  suspicious order monitoring program?
2  MS. VANNI: Object to form.
3  THE WITNESS: That would
4  have been a component of the
5  investment plan that was being
6  implemented at that time.
7  BY MR. STEWART:
8  Q. What was -- you say in that
9  time. When did you make that
10  presentation to the board?
11  A. I believe those
12  presentations would have been in the
13  2013, 2014 time frame. I don't remember
14  exactly.
15  Q. Do you know what prompted
16  those presentations about the investment
17  plan that you just described?
18  MS. VANNI: Object to form.
19  THE WITNESS: That would
20  have been in the normal course of
21  materials that would be presented
22  to the board of directors, was my
23  understanding.
24  BY MR. STEWART:

Page 666

1    Q.   Was there a precipitating
2 event that triggered the investment plan
3 that you spoke to the board about?
4      MS. VANNI:  Object to form.
5      THE WITNESS:  I wouldn't
6   describe it as a precipitating
7   event.  What I would describe to
8   you is Endo, after acquiring
9   Qualitest, was looking at all
10   aspects of compliance and building
11   an investment plan to address
12   enhancements and improvements in
13   FDA and DEA compliance across that
14   business.
15      And those -- those plans
16   were, we looked at a document
17   earlier that was a -- that
18   highlighted certain risks.  Those
19   plans were typically developed
20   from, you know, those risk
21   assessments.
22 BY MR. STEWART:
23    Q.   Did -- did you have
24 discussions at any time within Endo about

Page 667

1 whether a third party, perhaps a seller
2 of Qualitest, should be financially
3 obligated to Endo to pay money to
4 compensate Endo for failures with respect
5 to past suspicious order monitoring
6 programs?
7      MS. VANNI:  Object to form.
8      THE WITNESS:  No.
9      (Document marked for
10   identification as Exhibit
11   Endo-Macrides-54.)
12 BY MR. STEWART:
13    Q.   I'm going to hand you
14 Exhibit 54.
15      And do you see at the bottom
16 of Exhibit 54, there's a Bates number
17 which is -- it states
18 ENDO-OPIOID_MDL-05962559?
19    A.   I see that.
20    Q.   Do you see you're copied on
21 this e-mail from Tracey Hernandez?
22    A.   I am.
23    Q.   Okay.  What was Tracey
24 Hernandez's role?

Page 668

1    A.   She was the head of DEA
2 compliance for Qualitest.
3    Q.   Okay.  And do you see that
4 she forwards an e-mail from her to
5 Charles Propst and Phil Cupero dated
6 March 9, 2014.
7      Do you see that?
8    A.   I see an e-mail here from
9 Tracey.
10    Q.   Do you see the subject of
11 the e-mail is "C-II orders handled by
12 Memphis"?
13    A.   I see that.
14    Q.   That's Schedule II
15 narcotics?  Is that what C-II means?
16    A.   Correct.
17    Q.   And it says -- do you see
18 she says, "I may not be able to attend
19 Monday's distribution meeting since I'll
20 be flying to Boca.  However, I want you
21 to have my concerns related to idea of
22 outsourcing C-II distribution to UPS.
23 This will really create some challenges,
24 both from a regulatory and a customer

Page 669

1 service perspective.  For example," and
2 then she lists a whole series of
3 concerns.
4      Do you see that?
5    A.   She listed some concerns
6 here, yes.
7    Q.   Do you remember reviewing
8 and addressing this list of concerns?
9    A.   Well, I should clarify.  I
10 was not responsible for DEA compliance at
11 this time.
12    Q.   What was your role at this
13 time when this e-mail was sent?
14    A.   My role was in finance.
15    Q.   Okay.
16    A.   But my involvement in
17 specifically what's here is that there
18 was a significant project being
19 contemplated at that time to move the --
20 to outsource the distribution -- the
21 generics distribution that was being done
22 in Huntsville, to outsource that to UPS
23 where our branded distribution was being
24 done.  That was the basis for this

Highly Confidential - Subject to Further Confidentiality Review

Page 670

1  document.
2       My involvement in this
3  document or in this was based on the
4  significant scope of that project.
5       Q.  And what did you do with
6  respect to Ms. Hernandez's concerns, what
7  was your role?
8       MS. VANNI:  Object to form
9  to the extent that this relies --
10 or relates to Qualitest.
11      If you could answer it with
12 respect to Endo, you can go ahead
13 and answer.
14      THE WITNESS:  I don't -- I
15 don't know that I had a specific
16 role with regard to that.  There
17 were a number of us that were
18 evaluating UPS as a potential
19 alternative to distribute --
20 distributing the products from
21 Huntsville.  So there would have
22 been a number of parameters that
23 would be evaluated around that.
24      I think what Tracey is

Page 671

1  specifically addressing here is
2  some of her questions regarding
3  how the DEA aspect of that would
4  be handled.
5  BY MR. STEWART:
6       Q.  And do you see that there is
7  a large document attached entitled
8  "Tracey Hernandez questions"?
9       A.  I see that.
10      Q.  Do you remember, did you
11 prepare that document?
12      MS. VANNI:  Object to form.
13      THE WITNESS:  I didn't
14 prepare this document.
15 BY MR. STEWART:
16      Q.  Were you -- were you
17 involved in the preparation or review of
18 the document?
19      A.  I'm sure I would have
20 reviewed this document.  I may have had
21 some input to it.
22      Q.  Back to the page marked with
23 a marker that ends in 560.  Can you turn
24 back to that, which is her bullet point

Page 672

1  list?
2       A.  Yes.
3       Q.  Just highlight one bullet
4  point.
5       Do you see the second bullet
6  point?  Ms. Hernandez says, "C-II
7  products," meaning Schedule II products,
8  "would fall under UPS's suspicious order
9  monitoring program as part of the upgrade
10 to our own program.  We reviewed UPS's
11 program, it's extremely basic.  They have
12 no capability to know our customers'
13 customers as they have no chargeback data
14 and they do not perform customer due
15 diligence visits.  If they were to
16 implement this, have we factored in the
17 cost of them doing our chargebacks and
18 additional" -- "or the additional audits.
19 Do we really want UPS auditing our
20 customers?"
21      Do you see that?
22      MS. VANNI:  Again note my
23 objection as that pertains to
24 Qualitest.

Page 673

1       THE WITNESS:  Yes.
2  BY MR. STEWART:
3       Q.  And do you share her -- her
4  assessment of UPS's suspicious order
5  monitoring program at this time?
6       A.  No, I do not.  Nor do I
7  agree that -- first of all, the
8  chargeback data would be -- would
9  continue to be housed internally.  So you
10 wouldn't rely on UPS for chargeback data.
11 Nor would you rely on UPS to do customer
12 due diligence visits.  The only thing
13 that was being contemplated here was
14 using UPS to distribute the product.
15      Q.  I take it --
16      A.  As a -- as a registrant, UPS
17 would have to perform a SOMs check in
18 addition to the SOMs check that we would
19 perform, similar to what Endo was doing
20 in SAP.
21      Q.  But I just take it you're
22 not -- you don't think Ms. Hernandez's
23 description of the status of UPS's
24 suspicious order monitoring program for

Highly Confidential - Subject to Further Confidentiality Review

Page 674

1 this period is inaccurate, is that fair?
2      You agree with her
3 assessment?
4      MS. VANNI:  Object to form.
5      THE WITNESS:  Do I agree --
6 are you asking me if I agree with
7 her assessment that --
8 BY MR. STEWART:
9      Q.   Yeah --
10     A.   -- their program is
11 extremely basic?
12     Q.   Yes, and doesn't have
13 capabilities as she describes it?
14     MS. VANNI:  Objection.
15     THE WITNESS:  I don't agree
16 with her assessment, and nor do
17 I -- nor do I agree that --
18 it's -- her comments around UPS
19 doing chargeback data and customer
20 visits is not relevant, because we
21 would not have asked them to do
22 that.
23     That -- that responsibility
24 would remain with the company.

Page 675

1      These are our customers, not UPS's
2 customers.
3 BY MR. STEWART:
4      Q.   How long did Tracey
5 Hernandez remain director of DEA
6 compliance?
7      MS. VANNI:  Object to form.
8      THE WITNESS:  I think she
9 left sometime in 2014.
10 BY MR. STEWART:
11     Q.   Why did she leave the
12 company, why did Tracey Hernandez leave
13 Endo?
14     MS. VANNI:  Same objection.
15     THE WITNESS:  As I
16 understand it, she got a better
17 opportunity to go work somewhere
18 else.
19 BY MR. STEWART:
20     Q.   Do you know where she went
21 to work?
22     A.   I don't recall where she
23 went from Endo.  I know she's had a
24 number of different jobs.

Page 676

1      (Document marked for
2 identification as Exhibit
3 Endo-Macrides-55.)
4 BY MR. STEWART:
5      Q.   I'll hand you another
6 document.
7      A.   Thank you.
8      Q.   55.
9      Now, you have in front of
10 you something entitled "Minority Staff
11 Report, Fueling an Epidemic, Report 3."
12      Do you see that?
13     A.   I see it.
14     Q.   Is that Exhibit 55 to your
15 deposition?
16     A.   That's what it says.
17     Q.   Are you familiar with this
18 document?
19     A.   I'm not familiar with this
20 document.
21     Q.   Okay.  You have not looked
22 at -- at this report at all that you can
23 recall?
24     MS. VANNI:  Object to form.

Page 677

1      THE WITNESS:  I have not
2 reviewed this report.
3 BY MR. STEWART:
4      Q.   Okay.  And do you remember
5 doing anything to prepare materials that
6 would go into a Senate report like this?
7      MS. VANNI:  Object to form.
8      THE WITNESS:  This is the
9 McCaskell report?
10 BY MR. STEWART:
11     Q.   That's correct.
12     A.   I'm aware that people in our
13 company provided information and in --
14 input into this as Endo participated in
15 providing input that ultimately went into
16 this report.
17     Q.   How often does Endo review
18 chargeback data to identify customer
19 facilities of interest, do you know?
20     A.   Endo doesn't review
21 chargeback data specific to the branded
22 products, because they are such a small
23 percentage of the branded products that
24 actually are on contract, on retail

Highly Confidential - Subject to Further Confidentiality Review

Page 678

1 contract. So it's really not a material
2 set of data in that -- in that sense.
3 It's a very small percentage.
4     Q.   What data does Endo review
5 with respect to nonbranded generic
6 products?
7         MS. VANNI:  Object to form.
8     With respect to suspicious
9     order monitoring?
10        MR. STEWART:  That's
11    correct.
12        THE WITNESS:  Can I answer
13    that?  That would be Par.
14        MS. VANNI:  You're asking
15    Endo, what's Endo review?
16        MR. STEWART:  I don't -- I
17    don't respect the limitations
18    of --
19 BY MR. STEWART:
20    Q.   I want to know for Endo, for
21 Endo and all of its subsidiaries.
22    A.   You asked specifically about
23 generics?
24    Q.   That's correct.

Page 679

1         MS. VANNI:  He's not
2     answering as to Par.
3         MR. STEWART:  Okay.  That's
4     improper.
5 BY MR. STEWART:
6     Q.   You can answer to the extent
7 you can.
8     A.   I think I've been advised
9 not to answer.
10        MS. VANNI:  Based on my
11    previously articulated objections
12    that Par is not a defendant in the
13    Tennessee litigation, that this
14    deposition wasn't properly
15    noticed, that we've now been going
16    about two hours on Tennessee
17    questions and 11 hours
18    cumulatively throughout the entire
19    day.
20        And if you could answer as
21    to Endo, you can answer.  But not
22    as to Par.
23        THE WITNESS:  I think I
24    already answered as to Endo.

Page 680

1         (Document marked for
2     identification as Exhibit
3     Endo-Macrides-56.)
4 BY MR. STEWART:
5     Q.   I'll give you a document
6 marked as Exhibit 56.
7         You don't appear copied on
8 the document.  Do you recognize that?
9     A.   I don't recognize this
10 document.
11    Q.   Can you recall any
12 discussions that you've had, in which you
13 specifically discussed the State of
14 Tennessee and particular aspects of
15 suspicious order monitoring in Tennessee?
16    A.   No.
17    Q.   Can you tell me, if you've
18 had conversations with Aaron Graham about
19 suspicious orders?
20    A.   If I've had conversations
21 with Aaron Graham?
22    Q.   Yes.
23    A.   I don't recall a
24 conversation that I had with Aaron Graham

Page 681

1 on suspicious orders.  I have a lot of
2 conversations.  I don't recall that one.
3     Q.   Within Endo, I take it it's
4 accepted that Endo has and always has had
5 an obligation to monitor suspicious
6 orders with respect to generic pain
7 medicines as well as branded pain
8 medicines, fair?
9         MS. VANNI:  Object to form.
10        THE WITNESS:  That's a fair
11    statement.
12 BY MR. STEWART:
13    Q.   Tell me every database that
14 you're aware of that provides detail
15 about where generics products are sold,
16 what customers obtain them, the pattern
17 of use of those products?
18        MS. VANNI:  Object to form.
19        THE WITNESS:  Well, we would
20    have -- there would be similar
21    data to what we -- what we saw
22    earlier in terms of data around
23    orders and where those orders were
24    shipped to.

Page 682

1 BY MR. STEWART:
2    Q.  When you say where those
3 orders were shipped to, are you talking
4 about data with respect to shipping
5 orders to distributors and then to
6 pharmacies?
7    A.  To customers.
8    Q.  Okay.  Customers.  What
9 about data that shows where generics end
10 up in terms of in the hands of providers
11 and then human beings receiving medical
12 treatment?
13        MS. VANNI:  Objection.
14        THE WITNESS:  There would be
15    chargeback data that would --
16    could be used to understand that.
17 BY MR. STEWART:
18    Q.  With respect to generics as
19 well as branded, fair?
20    A.  To the extent that there are
21 chargebacks.
22    Q.  And there are often
23 chargebacks, so that they can provide
24 insight -- chargeback data can provide

Page 683

1 inside into generics, fair?
2        MS. VANNI:  Object to form.
3        THE WITNESS:  That's fair.
4 BY MR. STEWART:
5    Q.  What about other data?  What
6 about IMS data?
7    A.  IMS data is prescription
8 data.
9    Q.  Does Endo ever use IMS data
10 to evaluate the distribution of generic
11 products?
12    A.  We use IMS data for various
13 things.  I personally don't use IMS data.
14    Q.  Are you aware of Endo as a
15 company or anyone in Endo using IMS data
16 to evaluate the distribution or sale or
17 use of unbranded generic Schedule II
18 drugs?
19        MS. VANNI:  Object to form.
20    Beyond the scope.
21 BY MR. STEWART:
22    Q.  You can answer.
23    A.  You said -- you mean generic
24 products?

Page 684

1    Q.  Correct.  Yes.
2    A.  As I stated, I personally
3 don't use IMS data.  I'm not aware of how
4 everybody in the company uses IMS data.
5 I know that we use IMS data across the
6 company.
7    Q.  Can IMS data be used, to
8 your knowledge to evaluate the patterns
9 of use by people receiving medical care
10 of generic products?
11        MS. VANNI:  Objection.  Lack
12    of foundation.
13        THE WITNESS:  As I
14    understand, IMS data can be used
15    to determine things like market
16    share, what percentage of
17    prescriptions of your products are
18    being written.
19 BY MR. STEWART:
20    Q.  And that's for generic and
21 branded products, fair?
22    A.  I believe so, yes.
23    Q.  Let me ask you a question.
24 This is a document -- you were told not

Page 685

1 to answer questions about a July 2012
2 e-mail from Aaron Graham to Sandra
3 Parker.  Can you reach back in your pile
4 and grab that.  It should be probably
5 Exhibit 45, I think.
6        Do you see that?
7    A.  45 is this thing.
8    Q.  If you'll hand it to me,
9 I'll show you where it is.  If you can --
10 let me just see me the pile, and I'll
11 tell you where it is.
12        MS. VANNI:  48.
13 BY MR. STEWART:
14    Q.  48.  Can you turn to
15 Exhibit 48.
16        Can you tell me, do you see
17 that Aaron Graham's e-mail is included?
18    A.  I see that.
19    Q.  What is his e-mail?
20    A.  It says
21 Graham.Aaron2@Endo.com.
22    Q.  Endo.com.  @Endo.com, is
23 that an e-mail typically used by Endo
24 employees?

Page 686

1    MS. VANNI:  Object to form.
2    THE WITNESS:  Yes and no.  I
3  have three different e-mail
4  addresses.
5  BY MR. STEWART:
6    Q.   Do you know anybody who uses
7  an e-mail that ends in Endo.com who's not
8  an Endo employee?
9    A.   I had an Endo e-mail
10  address, and I was a Qualitest employee.
11    MR. STEWART:  How much time
12  do I have?
13    THE VIDEOGRAPHER:  One
14  minute.
15    MR. STEWART:  Okay.
16  BY MR. STEWART:
17    Q.   Did you personally ever
18  travel to Tennessee to investigate
19  anything involving suspicious order
20  monitoring for Endo?
21    A.   No.
22    Q.   Do you know anyone who's
23  ever traveled to Tennessee in connection
24  with suspicious order monitoring at Endo?

Page 687

1    A.   I don't know specifically of
2  any person who traveled to Tennessee for
3  that purpose.
4    Q.   The reason that you're
5  phrasing it that way is because Endo for
6  a while had a Memphis -- might have --
7  there was a distribution center in
8  Memphis; is that fair?
9    A.   UPS distributes from
10  Memphis.
11    Q.   Okay.
12    A.   That still -- that still
13  exists today.
14    Q.   All right.  So that might
15  have been a reason to travel, independent
16  of the suspicious order monitoring
17  program to Tennessee, fair?
18    MS. VANNI:  Object to form.
19    THE WITNESS:  Yes.  It also
20  could be that people that travel
21  to Memphis to -- as part of
22  suspicious order monitoring, since
23  that's where UPS is, and they're
24  doing a SOMs check of our orders

Page 688

1  in Memphis.
2  BY MR. STEWART:
3    Q.   But as we sit here today,
4  you can't remember such a visit?
5    A.   I don't recall such a visit.
6    MR. STEWART:  Okay.  I think
7  we're out of time.  Thank you.
8    THE VIDEOGRAPHER:  Off the
9  record at 8:45 p.m.
10    (Short break.)
11    MR. STEWART:  I just want to
12  say, you articulated a position
13  for why you're telling the witness
14  not to answer certain questions.
15  I rejected that position, and we
16  haven't changed our positions,
17  fair?
18    MS. VANNI:  I have not
19  changed my position, and I will
20  note for the record that I gave
21  you a full two hours and a lot of
22  leeway to ask questions.  And you
23  sat through the deposition that
24  Mr. Buchanan took.  He had seven

Page 689

1  hours of questioning.  And our
2  position is the same as I've
3  already articulated.  And you have
4  not been prejudiced in any way.
5    MR. STEWART:  I think we
6  have been prejudice.  And
7  obviously we have the right to
8  come back and retake this
9  deposition to obtain the
10  information that we wanted.
11    This is a properly noticed
12  deposition.  We were entitled to
13  not two hours, as directed by you,
14  but as we decided.  So I think
15  we've definitely been prejudiced.
16  But I imagine you and I or others
17  will work this out in the future.
18  Thank you.
19    MS. VANNI:  Just final --
20  just I want to say that I disagree
21  with that characterization.
22    And with that, we can close
23  the deposition.  I don't have
24  redirect.

Highly Confidential - Subject to Further Confidentiality Review

Page 690

1     (Excused.)
2     (Deposition concluded at
3   approximately 8:46 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 692

1     INSTRUCTIONS TO WITNESS
2
3     Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8     After doing so, please sign
9   the errata sheet and date it.
10     You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14     It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 691

1
2     CERTIFICATE
3
4
5     I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6   deposition is a true record of the
testimony given by the witness.
7
     It was requested before
8   completion of the deposition that the
witness, STEPHEN C. MACRIDES, have the
9   opportunity to read and sign the
deposition transcript.
10
11
12
     _____
13   MICHELLE L. GRAY,
A Registered Professional
Reporter, Certified Shorthand
14   Reporter, Certified Realtime
Reporter and Notary Public
15   Dated:  March 18, 2019
16
17
18     (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

Page 693

1     - - - - - -
      E R R A T A
2     - - - - - -
3
4   PAGE LINE  CHANGE
5   ____ ____ _____
6     REASON: _____
7   ____ ____ _____
8     REASON: _____
9   ____ ____ _____
10     REASON: _____
11   ____ ____ _____
12     REASON: _____
13   ____ ____ _____
14     REASON: _____
15   ____ ____ _____
16     REASON: _____
17   ____ ____ _____
18     REASON: _____
19   ____ ____ _____
20     REASON: _____
21   ____ ____ _____
22     REASON: _____
23   ____ ____ _____
24     REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

Page 694

ACKNOWLEDGMENT OF DEPONENT

I,_____, do
hereby certify that I have read the
foregoing pages, 1 - 695, and that the
same is a correct transcription of the
answers given by me to the questions
therein propounded, except for the
corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.


_____
STEPHEN C. MACRIDES            DATE


Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____


_____
Notary Public

Page 695

LAWYER'S NOTES
PAGE  LINE
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____