Highly Confidential - Subject to Further Confidentiality Review

```
1              IN THE UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF OHIO

2                      EASTERN DIVISION

3

    ------------------------    )

4   IN RE: NATIONAL             ) MDL No. 2804

    PRESCRIPTION OPIATE         )

5   LITIGATION                  ) Case No.

    ------------------------    ) 1:17-MD-2804

6                               )

    THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster

7   ALL CASES                   )

    ------------------------    )

8

9

10                  HIGHLY CONFIDENTIAL

11       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

13              VIDEOTAPED DEPOSITION OF

14                    BARBARA MARTIN

15                   January 25, 2019

16

17                   Chicago, Illinois

18

19

20

21

22

23           GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```

## Page 2

1
2
3
4
5     The videotaped deposition of BARBARA MARTIN,
6  called by the Plaintiffs for examination, taken
7  pursuant to the Federal Rules of Civil Procedure of
8  the United States District Courts pertaining to the
9  taking of depositions, taken before CORINNE T.
10  MARUT, C.S.R. No. 84-1968, Registered Professional
11  Reporter and a Certified Shorthand Reporter of the
12  State of Illinois, at the offices of Bartlit Beck
13  LLP, Suite 600, 54 West Hubbard Street, Chicago,
14  Illinois, on January 25, 2019, commencing at 9:07
15  a.m.
16
17
18
19
20
21
22
23
24

## Page 4

1  APPEARANCES (Continued):
2    ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
      ENDO PHARMACEUTICALS, INC.,
3    PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
      COMPANIES, INC. (f/k/a Par Pharmaceutical
4    Holdings, Inc.):
5      BAKER HOSTETLER LLP
        Key Tower - Suite 2000
6      127 Public Square
        Cleveland, Ohio 44114-1214
7      216-621-0200
        BY: KENNETH G. PRABUCKI, ESQ.
8        kprabucki@bakerlaw.com
          (via telephone/livestream)
9
10  ON BEHALF OF McKESSON CORPORATION:
11    TABET DIVITO & ROTHSTEIN LLC
      209 South LaSalle Street, 7th Floor
12    Chicago, Illinois 60604
      312-762-9461
13    BY: DANIEL L. STANNER, ESQ.
        dstanner@tdrlawfirm.com
14
15
16  ON BEHALF OF CARDINAL HEALTH, INC.:
17    ARMSTRONG TEASDALE LLP
      7700 Forsyth Boulevard, Suite 1800
18    St. Louis, Missouri 63105
      314-621-5070
19    BY: JULIE FIX MEYER, ESQ.
        jfixmeyer@ArmstrongTeasdale.com
20
21
22
23
24

## Page 3

1  APPEARANCES:
2    ON BEHALF OF THE PLAINTIFFS:
3      LEVIN PAPANTONIO THOMAS MITCHELL
        RAFFERTY & PROCTOR P.A.
4      316 South Baylen Street, Suite 600
        Pensacola, Florida 32502
5      205-396-3982
        BY: PETER J. MOUGEY, ESQ.
6        pmougey@levinlaw.com
          -and-
7      PAGE A. POERSCHKE, ESQ.
        ppoerschke@levinlaw.com
8      JEFF GADDY, ESQ.
        jgaddy@levinlaw.com
9        (via telephone/livestream)
10
      GARSON JOHNSON LLC
11    101 West Prospect Avenue
      Midland Building, Suite 1610
12    Cleveland, Ohio 44115
      800-747-9330
13    BY: JAMES A. DEROCHE, ESQ.
        jderoche@garson.com
14      (via telephone/livestream)
15
16  ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
    aka WALGREEN CO.:
17
      BARTLIT BECK LLP
18    54 West Hubbard Street, Suite 300
      Chicago, Illinois 60654
19    312-494-4475
      BY: BRIAN C. SWANSON, ESQ.
20      Brian.Swanson@BartlitBeck.com
        KATHERINE M. SWIFT, ESQ.
21      kswift@bartlit-beck.com
22
23
24

## Page 5

1  APPEARANCES (Continued):
2    ON BEHALF OF AMERISOURCEBERGEN CORPORATION:
3      REED SMITH LLP
        355 South Grand Avenue Suite 2900
4      Los Angeles, California 90071
        213-457-8135
5      BY: SARAH B. JOHANSEN, ESQ.
        sjohansen@reedsmith.com
6
7    ON BEHALF OF WALMART:
8      JONES DAY
        77 West Wacker Drive
9      Chicago, Illinois 60601-1692
        312-782-3939
10      BY: JASON Z. ZHOU, ESQ.
        jzhou@jonesday.com
11
12    ON BEHALF OF HBC COMPANY:
13      MARCUS & SHAPIRA LLP
        One Oxford Centre, 35th Floor
14      Pittsburgh, Pennsylvania 15219
        412-338-4383
15      BY: PAUL M. MANNIX, ESQ.
        pmannix@marcus-shapira.com
16        (via telephone/livestream)
17
18    ON BEHALF OF MALLINCKRODT PHARMACEUTICALS:
19      HAHN LOESER & PARKS LLP
        65 East State Street, Suite 1400
20      Columbus, Ohio 43215
        614-233-5174
21      BY: ANTHONY J. MARTUCCI, ESQ.
        amartucci@hahnlaw.com
22        (via telephone/livestream)
23
24

## Page 6

1  ALSO PRESENT:

2    ALEXANDRA M. GARLOCK, Paralegal
       agarlock@levinlaw.com

3    KAROLYNN SCHNEEGAS, Paralegal
       kschneegas@levinlaw.com

4    KATRINA MOUGEY, Legal Assistant
       Levin Papantonio Thomas Mitchell

5      Rafferty & Proctor P.A.

6

7    MICHAEL TOTH, Trial Technician

8

9

10  VIDEOTAPED BY:  MICHAEL NEWELL

11

12

13  REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968

14

15

16

17

18

19

20

21

22

23

24

## Page 7

1              I N D E X
2  BARBARA MARTIN              EXAMINATION
3      BY MR. MOUGEY................  11
         BY MR. SWANSON................  356
4      BY MR. MOUGEY................  361
5
6              E X H I B I T S
7  WALGREENS-MARTIN EXHIBIT          MARKED FOR ID
8  No. 1    Resume and personnel file,        21
         Barbara A. Martin;
9        no Bates numbers
10  No. 2    8/25/09 document, "MartinB,        47
         Order Item Detail";
11       WAGMDL00674550
12  No. 3    4/10/12 e-mail string;      112
         WAGMDL00580316 - 00580318
13
     No. 4    Document, first line,      124
14       "6 - Retain an outside
         consultant to audit your DEA
15       compliance"; WAGMDL00709393
16  No. 5    Document, "Suspicious Orders";    127
         WAGMDL00709431
17
     No. 6    5/7/08 e-mail with attachment;    133
18       WAGMDL00324911 - 00324914
19  No. 7    handwritten notes;      135
         WAGMDL00658243
20
     No. 8    handwritten notes;      142
21       WAGMDL00658228 - 00658229
22  No. 9    8/28/09 memo; WAGMDL00658227      151
23
24

## Page 8

1              E X H I B I T S
2  WALGREENS-MARTIN EXHIBIT          MARKED FOR ID
3  No. 10   handwritten notes;        155
         WAGMDL00658254 - 00658255
4
     No. 11   Document, Report No. CD500014;    161
5        WAGMDL00396133 - 00396134
6  No. 12   Document, Report No. CD500013;    163
         WAGMDL00394499 - 00394500
7
     No. 13   handwritten notes;      172
8        WAGMDL00658242
9  No. 14   6/23/08 memo;      179
         WAGMDL00624503 - 00624509
10
     No. 15   9/27/06 letter from U.S. DOJ    185
11       DEA; MCKMDL00478906 - 00478909
12  No. 16   2/7/07 letter from U.S. DOJ    196
         DEA; ABDCMDL00269687 - 00269690
13
     No. 17   12/27/07 letter from U.S. DOJ    198
14       DEA; WAGMDL00753976 - 00753977
15  No. 18   Document,          227
         "Intercepted/Suspicious Store
16       Orders";
         WAGMDL00658202 - 00658216
17
     No. 19   3/27/00 e-mail string with      245
18       attachments;
         WAGMDL00325368 - 00325378
19
     No. 20   8/25/09 document, "MartinB,    257
20       Order Item Detail";
         WAGMDL00674553
21
     No. 21   Document, "July 2011, DEA    266
22       Statistics"; WAGMDL00492171
23
24

## Page 9

1              E X H I B I T S
2  WALGREENS-MARTIN EXHIBIT          MARKED FOR ID
3  No. 22   10/27/11 e-mail with      273
         attachment;
4        WAGMDL00119542 - 00119548
5  No. 23   Document, "Functional      279
         Requirements & (Macro)
6        Design";
         WAGMDL00400342 - 00400356
7
     No. 24   4/27/12 e-mail with      285
8        attachment;
         WAGMDL00119539 - 00119541
9
     No. 25   Document, "Business      290
10       Requirements";
         WAGMDL00491251 - 00491258
11
     No. 26   9/14/12 e-mail string;      296
12       WAGMDL00667935
13  No. 27   10/12/12 e-mail with      299
         attachments;
14       WAGMDL00319129 - 00319239
15  No. 28   11/9/12 e-mail with      316
         WAGMDL00658246 - 00658248
16
     No. 29   8/3/10 e-mail with      324
17       attachments;
         WAGMDL00660331 - 00660337
18
     No. 30   1/10/11 e-mail string;      329
19       WAGFLDEA00000846 - 00000851
20  No. 31   Binder of documents,      338
         "Settlement and Memorandum of
21       Agreement" and various other
         documents; beginning Bates No.
22       WAGMDL00490963
23
24

Highly Confidential – Subject to Further Confidentiality Review

Page 10

1　THE VIDEOGRAPHER: We are now on the record.
2　My name is Michael Newell. I'm a
3　videographer for Golkow Litigation Services.
4　Today's date is January 25, 2019, and
5　the time is 9:07 a.m.
6　This video deposition is being held in
7　Chicago, Illinois, in the matter of National
8　Prescription Opiate Litigation for the Northern
9　District of Ohio, Eastern Division.
10　The deponent today is Barbara Martin.
11　Will counsel please identify themselves.
12　MR. MOUGEY: Peter Mougey with Levin
13　Papantonio for the Plaintiffs.
14　MS. GARLOCK: Alexandra Garlock for the
15　Plaintiffs.
16　MS. SCHNEEGAS: Karolynn Schneegas for the
17　Plaintiffs.
18　MR. SWANSON: Brian Swanson for Walgreens.
19　MS. SWIFT: Kate Swift for Walgreens.
20　MR. STANNER: Dan Stanner for McKesson.
21　MS. FIX MEYER: Julie Fix Meyer for Cardinal
22　Health.
23　MS. JOHANSEN: Sarah Johansen for
24　AmerisourceBergen Drug Corporation.

Page 11

1　MR. ZHOU: Jason Zhou, Jones Day, for Walmart.
2　MS. MOUGEY: Katrina Mougey for Plaintiffs.
3　MR. MOUGEY: Is there anybody on the phone?
4　We got them.
5　MR. SWANSON: Who's on the phone?
6　MR. PRABUCKI: Ken Prabucki from Baker
7　Hostetler for the Endo Defendants.
8　MR. MANNIX: Paul Mannix with Marcus & Shapira
9　for HBC Services.
10　MR. MARTUCCI: Anthony Martucci with Hahn,
11　Loeser & Parks for Mallinckrodt Pharmaceutical.
12　THE VIDEOGRAPHER: The Court Reporter today is
13　Corinne Marut and will now swear in the witness.
14　(WHEREUPON, the witness was duly
15　sworn.)
16　BARBARA MARTIN,
17　called as a witness herein, having been first duly
18　sworn, was examined and testified as follows:
19　EXAMINATION
20　BY MR. MOUGEY:
21　Q. Good morning, Ms. Martin. My name is
22　Peter Mougey. I represent the Plaintiffs in this
23　case. Have you given testimony before?
24　A. I did once before, yes.

Page 12

1　Q. And in what kind of case?
2　A. It was a pricing concern about 10 or 15
3　years ago.
4　Q. When you say "a pricing concern," you
5　testified as a Walmart employee -- I'm sorry --
6　Walgreens employee?
7　A. Yes.
8　Q. And do you remember what the case was?
9　A. Not really. I was a very short
10　deposition, and I'm not even sure that it went to
11　court.
12　Q. And it was 10 or 15 years ago. Where
13　was the case?
14　A. It was local.
15　Q. It was here in Chicago?
16　A. Uh-huh.
17　Q. Now, I asked you about testimony. Does
18　that include -- have you given any sworn statements
19　to any regulators?
20　A. No.
21　Q. Have you ever -- have you met with
22　regulators on behalf of Walgreens in relation to
23　your capacity as a Walgreens employee?
24　A. I'm not quite sure how to answer that.

Page 13

1　So, I mean, if like I was a pharmacist when the
2　state inspector came in, would that count for
3　anything?
4　Q. That could. Why don't we -- so, you've
5　met with state inspectors that came in just to do
6　routine --
7　A. Routine.
8　Q. -- audits?
9　A. Yeah, look at some paperwork.
10　Q. All right. Anything else?
11　A. No.
12　Q. Did you meet with any of the
13　representatives from the DEA in relation to the
14　warrants served in the State of Florida on specific
15　pharmacies?
16　A. No.
17　Q. You didn't meet with any DEA
18　representatives in relation to the warrants served
19　on the Jupiter distribution center?
20　A. No.
21　Q. Did you provide any written statements
22　to the regulators in response to the DEA's
23　inquiries into Walgreens pharmacies and
24　distribution centers?

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  A.  No.

2  Q.  In any capacity have you met with any
3  federal regulators, like the DEA, in relation to
4  any of Walgreens' business practices including
5  dispensing and distribution?

6  A.  No.

7  Q.  When I said "met with," I don't mean
8  just in person.  I mean telephonically or via
9  video.  Anything along those lines?

10  A.  No.

11  Q.  One thing, kind of a little bit of the
12  lay of the land here.  You've got a monitor in
13  front of you and the monitor will be the document
14  that I am referring to.  I'll also hand you the
15  document so you have it in paper format in front of
16  you.

17  So, obviously feel free to review the
18  screen or the paper version, whichever you'd
19  prefer.  Sometimes it's easy to look on the screen
20  to show you where I am on the document.  Okay?

21  A.  All right.

22  Q.  One thing I am 100% confident of, at
23  some point today you'll take a breath and I think
24  you're finished and I'll continue with my next

Page 15

1  question.  If at any point in time I interrupt you
2  or that you're not finished, if you'd just tell me
3  and I'll stop and you can finish with your answer.
4  Okay?

5  A.  Sounds good.

6  Q.  Pardon me?

7  A.  Sounds good.

8  Q.  Okay.  Ms. Martin, you've been at
9  Walgreens as an employee in different capacities
10  since 1986, correct?

11  A.  Actually 1985.

12  Q.  1985.  And that was -- this was your
13  first kind of real job, so to speak, after
14  finishing at undergrad, correct?

15  A.  Yes.

16  Q.  And I think you went to, was it Duquesne
17  for undergrad?

18  A.  Duquesne University.

19  Q.  You had your B.S. in pharmacy, correct?

20  A.  Correct.

21  Q.  First job at Walgreens was a staff
22  pharmacist, correct?

23  A.  Well, going back to May of 1985, I was
24  an intern.  I didn't have my -- I didn't graduate.

Page 16

1  I graduated in '86.

2  Q.  Okay.  And the '85 internship I don't
3  believe is on your resume, correct?

4  A.  I probably thought it was irrelevant.
5  Sorry.

6  Q.  It's irrelevant.  But I just asked you
7  do you recall if it was on your resume?

8  A.  I don't remember.

9  Q.  You don't remember.  All right.

10  So, what I'd like you to do to start
11  this morning, over your period of time at
12  Walgreens, is give me kind of a 30,000-foot view of
13  your different roles and, more specifically, where
14  they impacted suspicious order monitoring policy
15  for Walgreens.  Okay.

16  Now, if I say "suspicious order
17  monitoring policy," do you have an understanding of
18  what that means?

19  A.  I wouldn't mind if you kind of clarified
20  it, so we are on the same page.

21  Q.  Actually, why don't you tell me what you
22  think suspicious order monitoring at Walgreens is
23  from all of your various capacities.  You tell me.

24  A.  It would be a process put in place to

Page 17

1  monitor ordering for any type of unusual or
2  potentially suspicious activity.

3  Q.  And that would include, but not limited
4  to, Schedule II and III narcotics, correct,
5  controlled substances?

6  A.  Not limited to but, yes, correct.

7  Q.  Yes, ma'am.  And what we're here
8  specifically today about is Schedule II, like
9  OxyContin, and then hydrocodone, which was
10  Schedule III and then became Schedule II, correct?

11  A.  Okay.

12  Q.  So, the suspicious order monitoring
13  policy, you referred to a process that's put in
14  place to identify unusual or potential suspicious
15  activity.  Is that what your answer was?

16  A.  Yes.

17  Q.  Now, would you please explain to me what
18  you mean by "potential suspicious activity."

19  A.  What I mean by that is it could be
20  something that looks like it's outside of a normal
21  parameter, but there would be some logical and
22  justifiable reason for it to be outside of those
23  parameters.

24  Q.  So, it's outside of normal parameter,

Page 18

1 but there may be a reason for being outside the
2 parameter. Is that what you're saying?
3      A.   Yes.
4      Q.   Okay. So, is it then suspicious and
5 then you figured out it's not -- there is a reason
6 and then it becomes not suspicious?
7      A.   I think I used the word "potentially
8 suspicious."
9      Q.   Oh. So, it's potentially suspicious.
10 So, it's outside the normal parameter. Would you
11 say it's fair to call that an outlier?
12      A.   Yes.
13      Q.   So, it's an outlier and then you do some
14 homework on it to see if there is a reason for it
15 being an outlier?
16      A.   Correct.
17      Q.   All right. Now, when you use the words
18 "unusual," what's different about unusual as
19 compared to an outlier?
20      MR. SWANSON: Object to form.
21 BY THE WITNESS:
22      A.   I'm not sure there would be something
23 different between outlier and unusual.
24 BY MR. MOUGEY:

Page 19

1      Q.   Okay. So, unusual is kind of the same
2 thing as potentially, potentially suspicious, or an
3 outlier?
4      A.   Yes.
5      Q.   All right. So, a process put in place
6 to find outliers or identify outliers, is that
7 fair, on the suspicious order monitoring policy?
8      A.   Yes.
9      Q.   Okay. Now, during your tenure from 1985
10 up until today, you've had various capacities at
11 Walgreens, correct?
12      A.   Yes.
13      Q.   Anything from intern, staff pharmacist,
14 pharmacy manager, you worked in a department that
15 managed data for Walgreens, and then you went to
16 kind of an inventory or supply-type role, correct?
17      A.   Yes.
18      Q.   And some of those roles touched on
19 suspicious order monitoring as you just defined it,
20 a process to identify outliers, right?
21      MR. SWANSON: Object to form.
22 BY THE WITNESS:
23      A.   It was developed. It wasn't anything
24 part of my normal course of business when I first

Page 20

1 started in corporate.
2 BY MR. MOUGEY:
3      Q.   All right. So, when you say it was
4 developed, over time it progressed, is that fair?
5 Is that what you're saying?
6      A.   Yes. I was asked to take part in
7 different types of activities around ordering.
8      Q.   So, help me -- that's what I want to
9 understand. Okay. If you would just help me
10 understand, as that process developed along the
11 way, what your understanding of the process was,
12 who participated in that process from Walgreens, if
13 you know, and then the modifications or the
14 developments along the way.
15           Can you help me kind of put some meat on
16 the bones, so to speak, in that regard?
17      A.   I'll try.
18      Q.   All right. Why don't we start off what
19 your first recollection is of Barbara Martin being
20 contacted in Walgreens and asked to participate in
21 suspicious order monitoring.
22      A.   That would have been during my corporate
23 time. I really wouldn't have been involved with
24 anything like that while I was in the stores.

Page 21

1      Q.   Okay. So, during your corporate time,
2 are you referring to your tenure in the department
3 that was managing some of the databases?
4      A.   No. It was once I moved to inventory.
5      Q.   Once you moved to inventory, which is in
6 2007?
7      A.   If that's what my resume says, it's --
8      Q.   Would it help if I put your resume in
9 front of you so you could kind of remember which --
10 let me hand you what we'll mark as Martin 1.
11           (WHEREUPON, a certain document was
12           marked as Walgreens-Martin Exhibit
13           No. 1: Resume and personnel file,
14           Barbara A. Martin; no Bates
15           numbers.)
16 BY MR. MOUGEY:
17      Q.   So what you have in front of you is
18 Martin 1.
19      A.   Okay.
20      Q.   And I believe this is a copy of your
21 resume and then behind that is the -- is your
22 personnel file, but let's just start on the -- your
23 resume.
24           Does this look like an accurate version

Page 22

1 of your resume?

2    A.    Yes.

3    Q.    Is this something that you put together?

4    A.    Yes.

5    Q.    Did you review it in preparation for

6 today?

7    A.    No.

8    Q.    So, your first page -- let's walk

9 through.  Turn to the second page of it, and it

10 starts with your education, which we just went

11 through, Duquesne University, I think that's around

12 1985, you started as an intern at Walgreens.  Do I

13 have that right?

14    A.    Yes.

15    Q.    And your first role from '86 to '90 was

16 a staff pharmacist, correct?

17    A.    Yes.

18    Q.    And then your second role was a pharmacy

19 manager and you were in that position for 14 or 15

20 years, from 1990 to 2004, correct?

21    A.    Yes.

22    Q.    And then you were the supervisor of the

23 drug database from 2004 to 2007, correct?

24    A.    Yes.

Page 23

1    Q.    And then from 2007 to present you were

2 manager, pharmacy inventory control, correct?

3    A.    Correct.

4    Q.    And, so, when you mentioned earlier that

5 your first recollection of being involved with

6 suspicious order monitoring policy was when you got

7 to corporate, are you referring to the last entry

8 on your resume, manager, pharmacy inventory

9 control, beginning in July of 2007?

10    A.    I am, but it was much after '07.

11    Q.    It was much after '07.  Do you mean by

12 like '08 or '09?

13    A.    Definitely probably closer to '09.  It

14 might have been '08.

15    Q.    Okay.  Late '08, early '09, is that

16 fair, something like -- something around that time

17 frame?

18    A.    Dates are a little hard to keep straight

19 sometimes.  Sorry.

20    Q.    Sure.  Late '08, early '09, what is your

21 first recollection of suspicious order monitoring

22 policy at Walgreens and what were you asked to do?

23    A.    I'm not sure what came first and what

24 came second.  I know that my team was asked to

Page 24

1 provide data to field leadership in various states

2 regarding purchasing and dispensing of controlled

3 substances.

4         And then as we developed systems, I was

5 one of a number of different people, I can't

6 remember all the names, but I worked actively with

7 Loss Prevention.  Marcie Ranick was one of the

8 people that I worked with.  And she and I were

9 looking at reports on our system to see if we were

10 flagging the right types of orders or if we were

11 indiscriminately flagging orders.

12    Q.    Were those the two kind of broader

13 categories that you weren't sure that came first?

14 One was data to the field in various states

15 regarding purchasing/dispensing and, two, develop

16 systems with, and you included Loss Prevention and

17 Marcie Ranick, to look at reports that flagged to

18 determine if they were the right types of orders or

19 not.  Did I get that right?

20    A.    Yes.

21    Q.    Is that fair?  Okay.

22         So, those were the two broader

23 categories?

24    A.    Yes.

Page 25

1    Q.    So, those were the two -- you don't

2 remember which order, but that's your first kind of

3 recollection of how you became involved in

4 suspicious order monitoring at Walgreens?

5    A.    Correct.

6    Q.    All right.  So, let's start with, and I

7 recognize that you don't remember which specific

8 order, but let's start with the category data that

9 you were pulling to for the field.

10         So, first of all, when you say "field,"

11 who do you mean?

12    A.    It's people that supervise the stores,

13 pharmacy manager, district leaders.  I forget all

14 the exact titles above that.  Could be regional

15 vice presidents or things like that.

16    Q.    Is field just non-corporate?

17    A.    Yes.

18    Q.    So, if you're not here in Deerfield,

19 you're in the field.  Is that -- is that fair?  Or

20 tell me how you --

21    A.    Field or the stores.

22    Q.    Field or the stores.

23    A.    So, like we have the distribution

24 centers as well.  So...

Highly Confidential – Subject to Further Confidentiality Review

Page 26

1 Q. So, if you say "field," that's field
2 maybe in a regional office or the stores but not
3 the distribution centers?
4 A. Correct.
5 Q. So, just to get our lingo straight here,
6 we have corporate. We have field, which would be
7 regional offices or the stores. Am I right so far?
8 A. Yes.
9 Q. And then you have distribution centers?
10 A. Yes.
11 Q. Okay. So, data to the field in various
12 states regarding purchasing, dispensing. Do you
13 recall what specific types of data you were asked
14 to pull?
15 A. A few times I remember working with
16 different departments to obtain purchasing records
17 on select controlled substances. I don't remember
18 exactly which drugs. And then I also worked with
19 other groups to look at dispensing of the same
20 product.
21 Q. Now, when you say "purchasing records,"
22 can you give me a little color. What do you mean?
23 A. Purchasing records would be anything
24 that was bought from our stores from a distribution

Page 27

1 center or from another vendor.
2 Q. All right. Was that in particular in
3 regard to relationship to controlled substances?
4 A. Yes.
5 Q. So, you're looking at, tell me, like
6 ordering patterns and volume for controlled
7 substances, Schedule II, Schedule III. Is that
8 fair?
9 A. I really was just pulling the data. I
10 wasn't looking for patterns at the time.
11 Q. Okay. So, help me to understand what
12 type of data when you say "purchasing records."
13 Just give me some examples.
14 A. It would be, you know, a select store or
15 a group of stores and a drug and a time period.
16 Q. And so how many orders and how many
17 essentially dosage units are coming in from the
18 distribution centers and being dispensed through
19 the pharmacy?
20 MR. SWANSON: Object to the form.
21 BY THE WITNESS:
22 A. If we're focused on the purchasing,
23 we're not looking at the dispensing side. I'm just
24 looking at what's coming in, what did the store

Page 28

1 order.
2 BY MR. MOUGEY:
3 Q. And then the second step was also
4 dispensing, correct?
5 A. Correct.
6 Q. We're looking at purchasing meaning what
7 did the store order and then also dispensing
8 meaning what was going out the door to patients,
9 correct?
10 A. Correct.
11 Q. So, can you give me an example -- based
12 on your days as the supervisor and drug database,
13 I'm assuming you're familiar with the term
14 "fields," right? "Fields" meaning different types
15 of data stored in a database?
16 A. Okay.
17 Q. And familiar with that term?
18 A. Yes.
19 Q. Okay. So, fields is typically a column
20 or a piece of data that's kept in a database. Are
21 you comfortable with that description?
22 A. Yes.
23 Q. Okay. So, what fields, when you were
24 pulling data on purchasing records and dispensing,

Page 29

1 what were you pulling?
2 A. I don't remember the exact fields.
3 Again, it would be either a store or a group of
4 stores, a drug, a group of drugs, and a time frame
5 to look at the quantity over that time period. I
6 don't remember specifics.
7 Q. Were there multiple time periods so
8 there could be comparisons made from one time
9 period to another time period?
10 MR. SWANSON: Object to form, vague as to
11 time.
12 BY THE WITNESS:
13 A. I don't remember that specifically.
14 BY MR. MOUGEY:
15 Q. Are we confused about the time? We were
16 still talking about late '08, early '09, right?
17 Talking about when you -- you told me you were
18 initially contacted about suspicious order
19 monitoring. The answers you've just given me,
20 you're comfortable that we're still in the late
21 '09, early -- late '08, early '09 time period?
22 A. Yes.
23 Q. Okay. So, what I asked was: Were there
24 different time periods pulled so there could be

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 comparisons made?
2     A. I wasn't involved with any comparisons.
3 The requests I got were more ad hoc one-offs. So,
4 if someone else was asking me to do it and making
5 comparisons, I'm not aware of that.
6     Q. How often would those requests come in
7 in late '08, early '09?
8     A. My best recollection is a few.
9     Q. Beginning late '08, early '09, were
10 there any other requests for data to Barbara Martin
11 or your team in late '08, early '09?
12     A. It's hard to remember specifics.
13     Q. Generally. I haven't really asked you
14 anything specifically so far, at least that you
15 have been able to provide an answer.
16     Other than the couple of examples,
17 pulling purchasing data and dispensing data for
18 certain stores, groups of stores and time frames,
19 anything else generally you recall pulling in
20 late '08, early '09?
21     A. No.
22     Q. And you weren't involved in any form or
23 fashion of analyzing the data you were pulling?
24     A. No.

Page 31

1     Q. And you were pulling that data for the
2 field, which you defined as pharmacy managers,
3 maybe district supervisors, I think you gave the
4 vice president title, but folks in the field, not
5 in the distribution centers and not in corporate is
6 your recollection, correct?
7     A. Correct.
8     Q. Do you recall who you were pulling that
9 data for, any names?
10     A. Not off the top of my head.
11     Q. So, now let's move out of late -- is
12 your answer so far -- that's your complete
13 recollection of your involvement of suspicious
14 order monitoring from when you began at Walgreens
15 all the way up to now in early '09.
16     Does that data pull kind of capture
17 everything that you can recall you were involved in
18 in relation to suspicious order monitoring, looking
19 to identify outliers --
20     MR. SWANSON: Object to form.
21 BY MR. MOUGEY:
22     Q. -- for controlled substances?
23     MR. SWANSON: Object to form; mischaracterizes
24 her testimony.

Page 32

1 BY THE WITNESS:
2     A. I believe to the best of my knowledge,
3 yes.
4 BY MR. MOUGEY:
5     Q. So, is there any point in '09 when the
6 scope of what you were being asked to do changed
7 from pulling the data you just described?
8     A. We started to develop systems, more
9 logic in our ordering systems. And this new logic
10 was generating data and reports.
11     Q. Now, when you said "we," who is that?
12     A. The team that designed the ordering
13 system, Loss Prevention, and probably several other
14 groups that I don't remember.
15     Q. The team that developed the system. Do
16 you know who that is?
17     A. Steve Bamberg comes to mind.
18     Q. Okay. How about Wayne Bancroft?
19     A. Yes.
20     Q. How about Mr. -- I am going to
21 mispronounce his name -- Piñon?
22     A. Yeah, I believe he was providing
23 information as well.
24     Q. And I never remember one of his

Page 33

1 associate's name. Zagami. I think it's Patty?
2     A. Oh, Patty Zagami.
3     Q. Yes.
4     A. I don't remember her being around in
5 that time period, but that could just be my memory.
6     Q. Okay. So, do you remember -- Steve
7 Bamberg is a technology guy, right?
8     A. Yes.
9     Q. And Wayne Bancroft is kind of the smart
10 math guy, right?
11     A. Yes.
12     Q. All right. And Mr. Piñon is out of
13 regulatory and law, correct?
14     A. Yes.
15     Q. So, other than the IT guy, the smart
16 math guy and Mr. Piñon from regulatory and law and
17 yourself, do you recall any other departments being
18 present when your group was working on developing
19 the system?
20     A. Loss Prevention --
21     Q. Okay.
22     A. -- would have been involved. Again, I
23 keep remembering Marcie's name. I'm sure she had a
24 boss, Ed something I think. I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  Q.  Okay.
2  A.  And then there would have been other
3 people from pharmacy operations.  I believe my boss
4 at the time was Joanna Lalich.
5  Q.  How do you spell Joanna's last name?
6  A.  L-a-l-i-c-h.
7  Q.  How long was she -- did she remain your
8 boss from this late '08, early '09 until when?
9  A.  I think about '09.
10  Q.  Okay.
11  A.  '09, '010, she might have left.
12  Q.  Because after that period in time it was
13 Denny Martin, correct?
14  A.  Denny Murray.
15  Q.  Denny Murray was your direct report,
16 correct?
17  A.  Yes.
18  Q.  And then the step above him was Mike --
19  A.  Bleser.
20  Q.  -- Bleser, right?
21  A.  Yes.
22  Q.  So, you mentioned a logic, developed
23 systems and I think you referred to it as logic.
24 Is that correct?

Page 35

1  A.  That's the term I'm using, yes.
2  Q.  Help me.  What does that mean to you,
3 logic?  What is that?
4  A.  It would have been programming that
5 would have been put in place to help identify
6 potentially suspicious orders.
7  Q.  Potentially suspicious orders.  So, we
8 have got still kind of a 30,000-foot view, and we
9 are going to drill down into some of these later.
10 Okay?
11  So, what I'd like to help me do now,
12 so we have the data pull that you described that
13 you began to work on the systems with that group
14 you just walked me through.
15  Do you recall how long you stayed
16 involved in working on the systems or the logic?
17  A.  I wasn't directly involved with
18 developing the system.
19  Q.  When you say "directly involved," I
20 mean, you're not the guy writing the big long math
21 formula, right, or the lady?
22  A.  No.
23  Q.  Okay.  That was Mr. Bancroft and his
24 crew, right?

Page 36

1  A.  I believe that Wayne was actually
2 providing the logic and Steve would have been doing
3 the programming.
4  Q.  There we go.  So, they needed color or
5 context in order to write the formula so it worked
6 logistically within Walgreens, correct?
7  A.  Correct.
8  Q.  And you were one of the people there to
9 help give some color or context so they could put
10 the formula together and then implement it from a
11 technology perspective, correct?
12  A.  We were working on the best guidance
13 that was provided from our legal counsel.
14  Q.  All right.  So, when you say "I wasn't
15 directly involved in the system," let's do it this
16 way.  Will you just tell me what your role was in
17 developing that system.
18  A.  I really wasn't involved with that part.
19  Q.  Wasn't involved at all.
20  So, once it was developed, did you have
21 any input into the implementation?
22  A.  No.
23  Q.  What involvement did you have with the
24 system that you were working on with the team you

Page 37

1 just described?
2  A.  Once it was in pilot testing phases,
3 there were reports that were being generated, and
4 myself and Marcie Ranick were looking at those
5 reports, trying to see if the logic was sound.
6  Q.  Trying to see if the logic was logical.
7 Being a little sarcastic.  Sorry.
8  All right.  So, we're checking to see if
9 the logic was sound.  What time frame was that?
10  A.  '09, '010.
11  Q.  Okay.  Now, how often were you and
12 Marcie reviewing reports from logic to determine if
13 the methodology was sound?
14  A.  We probably met several times a month,
15 maybe weekly.
16  Q.  Did this group, was it -- did it have a
17 name?  Was it a task force or a committee?
18  A.  If we had a name, I don't remember it.
19  Q.  So, several times a month, maybe weekly,
20 would you and Marcie sit in the same room with some
21 reports?
22  A.  Yeah.
23  Q.  Okay.  So, you'd get together and would
24 you print the reports out?

Page 38

1    A.   Would pull them up on one of our
2    computers and then if we needed to, we would print
3    things.
4    Q.   All right.  And what were you looking
5    for on these reports to determine if the
6    methodology was sound?
7    A.   We were looking first to see what was
8    flagged and then we were looking to see why it was
9    flagged and if it was flagged for a reason that
10   seemed correct or not.
11   Q.   And I apologize.  I know I already asked
12   you this, but you said you think this was '09?
13   A.   Yeah.
14   Q.   Okay.  Were there changes made to the
15   methodology based on yours and Marcie's reviews of
16   the reports?
17   A.   I believe so.
18   Q.   Was there another group at Walgreens
19   that were reviewing the methodology and the results
20   to see if it was sound?
21   A.   I'm not 100% certain.
22   Q.   And who did you report back to after
23   reviewing the reports, yours and Marcie's, I'll say
24   conclusions?

Page 39

1    A.   I gave some of my feedback directly to
2    my boss, Joanna.
3    Q.   Okay.
4    A.   And I know that Marcie was also giving
5    feedback to her boss as well.
6    Q.   And I get a little confused with all the
7    names of the departments at Walgreens because I
8    swear everybody calls different -- Loss Prevention,
9    I get that's where Marcie is.
10        Your resume indicates pharmacy inventory
11   control.  Is that -- so, when you say your boss
12   Joanne, that's your department, pharmacy inventory
13   control?
14   A.   I don't remember what our department was
15   called at the time.
16   Q.   Okay.  But it wasn't --
17   A.   My title --
18   Q.   I'm not crazy.  It was called
19   something -- it varied over time.  Is that fair?
20   A.   Correct.
21   Q.   So, I'm not that nuts.  There were
22   different names for your department.  It changed
23   over time.
24        Do you recall any other names other than

Page 40

1    pharmacy inventory control?
2    A.   I mean, our current title is
3    biopharmaceutical development and supply chain.
4    Q.   That sounds very fancy, yes, and a
5    mouthful.
6    A.   This is why we try to keep it simple.
7    Q.   Okay.  You did not accomplish that with
8    biopharmaceutical -- I can't even remember --
9    development and supply chain.
10        But how about pre -- pre the current
11   name, anything else you can think of?
12   A.   No.
13   Q.   Inventory supply, is that kind of the
14   wheelhouse of yours and Mr. Dymon and Mr. Bleser's
15   kind of scope of responsibility?
16   A.   Right.
17   Q.   Is that fair?
18   A.   Yeah.
19   Q.   Okay.  So, any input you had into the
20   reports you gave to your direct report, your boss,
21   correct?
22   A.   Yes.
23   Q.   And you think Marcie may have provided
24   input to her direct report in Loss Prevention,

Page 41

1    correct?
2    A.   Yes.
3    Q.   Any idea why you and Marcie were asked
4    to be the ones looking at the reports?
5    A.   I don't know why Marcie was asked.
6    Q.   Okay.  How about yourself?
7    A.   I was asked because of my experience as
8    a pharmacist in the stores and in my current role
9    at inventory.  So, I was able to relate to how
10   pharmacists would fill prescriptions and why they
11   would fill prescriptions, and I was also able to
12   understand the system and look at item movement and
13   make conclusions to the best of my ability.
14   Q.   All right.  So, if you use the term
15   "Chemical Handler's Manual," are you familiar with
16   that?
17   A.   No.
18   Q.   Are you familiar with suspicious reports
19   at Walgreens that the methodology, at least in
20   part, is three times an average?
21   A.   I've heard that term.  I don't know
22   where it was being used.
23   Q.   Okay.  You don't recall looking in any
24   reports that the methodology was three times an

Page 42

1 average, correct?

2    A.   No.

3    Q.   The reports you were looking at were

4 driven by the formula that Mr. Bamberg and

5 Mr. Bancroft's team put together and began to

6 implement at Walgreens?

7    A.   Yes.

8    Q.   Now, the reports that you looked at from

9 Mr. Bancroft and Mr. Bamberg's -- I'm going to call

10 it an algorithm.  Is that fair?

11    A.   It's fair.

12    Q.   All right.  So, the reports that you

13 looked at from the Bancroft algorithm, were those

14 orders, at least in 2009, that had already been

15 shipped?

16    A.   I believe so, yes.

17    Q.   Okay.  And was the scope of your review

18 primarily to determine if the algorithm was doing

19 its job to identify outliers?

20    A.   What we were looking at was why these

21 orders flagged and if the reason they were flagged

22 was overreactionary or sound.

23    Q.   Were you looking at that, for the

24 overreactionary or sound, for the purpose of

Page 43

1 providing feedback to Mr. Bancroft and Mr. Bamberg

2 about the methodology so it could be modified or

3 fine-tuned?

4    A.   Yes.

5    Q.   Any other reasons why you and Ms. Ranick

6 were reviewing the reports identifying the outliers

7 from Mr. Bancroft and Mr. Bamberg?

8    A.   At that time that's what we were focused

9 on, evaluating the logic.

10    Q.   And you think that was -- that was '09?

11    A.   Yes.

12    Q.   Did that change at any point in time?

13    A.   It did change.  Again, the dates get a

14 little vague.

15    Q.   Okay.  Let me go back to your previous

16 answer just to make sure we're on the same page.

17       I asked you, "Are there any other

18 reasons why you and Ms. Ranick were reviewing the

19 reports identifying outliers from Mr. Bancroft's

20 algorithm?"  And you said, "That's what we were

21 focused on."

22       I'm sorry for wordsmithing here a little

23 bit.

24       That was your primary focus and there

Page 44

1 was something else you were looking at or that is

2 in its entirety what you were looking at, which was

3 to make sure that the -- that you were evaluating

4 the methodology?

5    A.   Correct.  In the beginning we wanted to

6 make sure that the logic was sound and that we

7 weren't flagging too many orders, that we were

8 flagging the right orders so that our stores could

9 get the product they needed to service their

10 patients.  We wanted to make sure that the logic

11 was accurate.

12    Q.   Okay.  And that was the scope, flagging,

13 making sure that it was flagging the right orders

14 is what you and Ms. Ranick were looking at in and

15 around 2009?

16    A.   Yes.

17    Q.   And is it your recollection that that

18 was still when the Bancroft algorithm was in its

19 pilot phase?

20    A.   Yes.

21    Q.   All right.  Now, generally, was -- did

22 your scope of review change after you and

23 Ms. Ranick were evaluating whether or not the

24 Bancroft algorithm was flagging the right orders?

Page 45

1    A.   After a period of time, once we felt the

2 logic was sound or I know that there were some

3 tweaks made to the logic as well -- I don't

4 remember what they were.  I'm not a programmer --

5 then we started looking not only at individual

6 reports but then Marcie took on a stronger role and

7 I was more helping her just understand the store

8 side of it.  She started focusing on summary

9 reports of stores that might show up weekly or

10 monthly.

11    Q.   Do you have an understanding of when

12 that time period is?

13    A.   '09, '010.

14    Q.   Do you still speak with Ms. Ranick?

15    A.   Unfortunately I lost contact with her

16 shortly after she left Walgreens.

17    Q.   Give me a little more information, if

18 you would, please, on the "We started looking not

19 only at individual reports but then Marcie took on

20 a stronger role and I was more helping her just to

21 understand the store side of it."  What do you mean

22 by that?

23    A.   So, part of the database that we were

24 looking at, when it would flag individual orders,

Page 46

1 it was also creating weekly and monthly summaries.
2     So, Loss Prevention and Marcie felt that
3 it was important to start looking at those weekly
4 and monthly summaries to identify stores that were
5 consistently on the report; and Marcie would come
6 to me and show me things, and I could look in the
7 store system and see what they were doing and try
8 to put some logic behind it or an explanation as to
9 what they might be doing.
10     Q.   You were helping get Marcie up to speed
11 on the, quote-unquote, "store side" of it to put
12 some of this in context.  Is that fair?
13     A.   I understood item movement better than
14 she did.
15     Q.   Now, when you say "item movement," just
16 the -- explain what you mean by that.
17     A.   Item movement in a store is any type of
18 activity.  It can be receiving the product,
19 dispensing it, transferring it to another store,
20 returning it, different types of activity.
21     Q.   Okay.  Bear with me.  I need your help
22 looking at some reports.
23     I will hand you what we will mark as
24 Martin 2.

Page 47

1     (WHEREUPON, a certain document was
2       marked as Walgreens-Martin Exhibit
3       No. 2:  8/25/09 document, "MartinB,
4       Order Item Detail"; WAGMDL00674550.)
5 BY MR. MOUGEY:
6     Q.   Do you recognize this report?  It's
7 Bates No. 674550.
8     A.   Yes, I've seen this.
9     Q.   And tell me what this is.
10     A.   So, this would have been an example of a
11 specific order that was being flagged, and this is
12 one that I would have said it wasn't being flagged
13 for the right reasons.  This would have been one
14 that even though it showed up on this report, it
15 wasn't flagged for the right reasons.  This is when
16 I was saying logic needed to be changed.
17     Q.   Now, you came to that conclusion
18 relatively quickly on a report that's dated
19 August 25, 2009.  Tell me how you just did that so
20 fast.
21     A.   Well, there is -- there is three numbers
22 I am looking at.
23     Q.   Okay.
24     A.   So, the suspicious -- the suggested

Page 48

1 quantity is 3.  The ordered quantity is 3.
2     Q.   All right.  You're talking about the
3 right-hand side, correct?
4     A.   Yes.  And then below that is a tolerance
5 limit of 5.
6     Q.   Okay.
7     A.   3 is less than 5.
8     Q.   All right.  So, were you providing,
9 then, input back to the group about this type of
10 order and why it was being flagged?
11     A.   Yes.
12     Q.   And so this is 8/25/09.  Do you see the
13 date in the upper right-hand corner?
14     A.   Yes.
15     Q.   And this is during what you recall as
16 the pilot period, correct?
17     A.   Yes.
18     Q.   And, I mean, this -- your understanding
19 is this report wasn't being used to fulfill
20 Walgreens' obligations as the distributor to
21 identify suspicious orders during this period of
22 time, correct?
23     MR. SWANSON:  Object to form.
24 BY THE WITNESS:

Page 49

1     A.   I'm not sure about what Walgreens'
2 responsibility would have been.  That would have
3 been for our legal counsel to provide that type of
4 guidance.
5 BY MR. MOUGEY:
6     Q.   I don't think I asked you that.  I asked
7 you, I said, was it your understanding this report
8 was being used to fulfill Walgreens' obligations as
9 a distributor to identify suspicious orders during
10 this time period?
11     MR. SWANSON:  Object to form.
12 BY THE WITNESS:
13     A.   It wasn't my area of responsibility to
14 know what Walgreens was supposed to be doing.  I
15 wasn't in charge of distribution regulations.
16 BY MR. MOUGEY:
17     Q.   I didn't think you were in charge of
18 distribution regulations.  You're a Walgreens
19 employee, correct?
20     A.   Yes.
21     Q.   You've been asked to serve on a team
22 with several other individuals from Walgreens to
23 work on an algorithm identified -- identifying
24 outliers, correct?

Page 50

1    A.    Yes.
2    Q.    You were asked to look at these reports
3 to determine if they were false hits, correct?
4    A.    Yes.
5    Q.    And you understood that this entire
6 process was because Walgreens had responsibility to
7 monitor and identify suspicious orders, correct?
8    A.    That's the statement I'm struggling
9 with.  I don't remember at that time what I knew
10 and what I didn't know.  I don't believe that
11 someone sat down and said Walgreens has to do this
12 because we're a distributor.  I just remember being
13 told to start looking at these reports.
14    Q.    Okay.  Then --
15    A.    What I know now versus what I know then,
16 it's hard to differentiate.
17    Q.    Fair enough.  So, '08 and '09, you
18 certainly then weren't performing due diligence on
19 orders that were being identified by the algorithm
20 to determine if they were suspicious, correct?
21    MR. SWANSON:  Object to form.
22 BY THE WITNESS:
23    A.    I'm not sure what you're trying to ask
24 me.

Page 51

1 BY MR. MOUGEY:
2    Q.    Do you understand what the words "due
3 diligence" are?
4    A.    Yeah.
5    Q.    So, since you didn't understand what
6 Walgreens' responsibilities were as a distributor,
7 you certainly weren't being asked by Walgreens to
8 perform due diligence on orders identified by the
9 Bancroft algorithm, correct?
10    MR. SWANSON:  Object to form.
11 BY THE WITNESS:
12    A.    I'm not sure I completely understand
13 your question, but I will try to answer it anyway.
14 BY MR. MOUGEY:
15    Q.    That will be great.  Why don't we try to
16 answer as best you can.
17    A.    I was asked to look at these reports to
18 determine why they may or may not have been flagged
19 and to see if the logic was sound.  At that time I
20 really don't remember what I was told about
21 Walgreens' legal obligations to report ordering.
22        That's the part of the question that I'm
23 struggling with.  It's what did I know then versus
24 what do I know now.

Page 52

1    Q.    Would you go back --
2    A.    I remember being asked to look at these
3 reports.
4    Q.    Would you go back to Martin 1, please.
5 You see the last entry under "Manager, Pharmacy
6 Inventory Control, July 2000 to present"?
7    A.    Yes.
8    Q.    "Assisted in the creation of the control
9 drug order monitoring reports"?
10    A.    Yes.
11    Q.    Are the control drug order monitoring
12 reports, is an example of one what I just put in
13 front of you as Martin 2?
14    A.    Yes.
15    Q.    So, on your resume you agree that the
16 information on this resume is accurate, correct?
17    A.    Yes.
18    Q.    It's complete, correct?
19    A.    It's a summary, yes.
20    Q.    Yes, ma'am.  And you understand when you
21 put together a resume that it's important that the
22 information you relay to the reader be accurate,
23 correct?
24    A.    Yes.

Page 53

1    Q.    And when you took the time to put
2 together this resume, you claim that you assisted
3 in the creation of the control drug order
4 monitoring reports, correct?
5    A.    That's what it says.
6    Q.    But is it your testimony today that you
7 don't have an understanding of the regulatory
8 structure that Walgreens was attempting to comply
9 with?
10    A.    Correct.  I was relying on our legal
11 counsel to provide that guidance.
12    Q.    And I understand.  But I'm asking you
13 your understanding, not what your reliance -- not
14 what you were relying on.  I'm asking your
15 understanding of what the regulatory structure is.
16        And I believe, and I'm not trying to put
17 words in your mouth, you tell me, you don't have an
18 understanding of what the regulatory structure was,
19 correct?
20    A.    As I've said, I don't really remember
21 what I knew then versus what I know now.
22    Q.    What do you -- so, you think it's
23 possible that you were assisting in the creation of
24 the control drug order monitoring reports but had

Page 54

1  no understanding of the regulatory structure that
2  Walgreens was trying to comply with. Is that your
3  testimony?
4      A.   Our legal counsel was responsible for
5  looking at the -- at the regulation and providing
6  the necessary guidance.
7      Q.   That's not what I asked you. I didn't
8  ask you if regulatory structure. And I understand
9  that's the drumbeat. But what I'm asking you is
10 different.
11         What did Barbara Martin, who had been at
12 Walgreens at this point by 2008, 2009 for over 20,
13 almost 25 years, and you were assisting in the
14 creation of the control drug order monitoring
15 reports, what was Barbara Martin's understanding of
16 the regulatory structure with Walgreens as a
17 distributor?
18     MR. SWANSON: Object to form, asked and
19 answered.
20 BY THE WITNESS:
21     A.   Again, I don't even remember when I
22 created this resume. Obviously it was after '07,
23 but it wasn't any time in the last year or two. I
24 haven't had a need to update my resume.

Page 55

1         As far as the creation of the report,
2  this report that we are talking about, if I'm
3  looking at this and saying I'm looking at this
4  report, is the logic sound or not, I can report on
5  that.
6  BY MR. MOUGEY:
7      Q.   But that's a little different than the
8  question I asked, not whether your resume was right
9  and you remember it was or the report.
10         What I'm asking you is: Does -- did
11 Barbara Martin, you, have an understanding of what
12 the general obligations were of Walgreens as a
13 distributor under federal law when you were
14 assisting in the creation of the control drug order
15 monitoring reports? Yes or no.
16     MR. SWANSON: Asked and answered.
17 BY THE WITNESS:
18     A.   Again, I struggle with what I knew then
19 versus what I know now.
20 BY MR. MOUGEY:
21     Q.   So, you don't even know whether you
22 understood it or not. Is it your practice to work
23 on assisting in the creation of the control drug
24 order monitoring reports as an employee of

Page 56

1  Walgreens of almost 25 years at that point and you
2  don't understand the regulatory structure?
3      A.   It was a new task that my boss asked me
4  to take on. She said look at these reports. Look
5  at item movement.
6      Q.   Do you have a recollection of when you
7  were educated on Walgreens' responsibilities as a
8  distributor?
9      A.   The exact dates, no. And like I said,
10 it's hard to quantify what I know now versus what
11 I've learned in the past, what dates I learned
12 different things. It's -- sorry.
13     Q.   I'm not really asking you for August 23
14 I reviewed regulatory Section 1301.74.
15         I'm saying generally, do you have an
16 understanding when you got up to speed on the
17 regulatory structure of Walgreens as a distributor?
18     MR. SWANSON: Object to form.
19 BY THE WITNESS:
20     A.   Again, as far as regulatory structure, I
21 was relying on our legal department to provide that
22 guidance so that they were the ones telling us what
23 we needed.
24 BY MR. MOUGEY:

Page 57

1      Q.   I understand. But when you say
2  providing guidance, so they were providing guidance
3  to you, correct?
4      A.   To the group.
5      Q.   To the group. They were providing
6  guidance. When did Barbara Martin have a general
7  understanding of Walgreens' responsibilities as a
8  distributor under the applicable federal code and
9  regs?
10     A.   Again, I struggle with that because
11 you're going -- you're talking about regulatory
12 codes and regulations, and I don't know if I ever
13 knew the exact codes and regulations. I was asked
14 to look at reports and determine if the logic was
15 sound.
16     Q.   Now, when I use the words "general
17 understanding," you know what that means, right?
18 General understanding. General understanding.
19     A.   I think so.
20     Q.   Let's do it this way.
21         When did Ms. Martin have a general
22 understanding of Walgreens' responsibilities as a
23 distributor?
24     MR. SWANSON: Object to form.

Page 58

1  BY THE WITNESS:
2      A.  I really -- I really don't know.  Sorry.
3  BY MR. MOUGEY:
4      Q.  Do you understand that Walgreens has
5  responsibilities as a distributor separate and
6  apart from its obligations as a pharmacy?
7      A.  I know you're looking at my title as
8  inventory, but I was not really involved on the
9  distribution side.  I kind of look at distribution
10 different than ordering.
11     Q.  Okay.  So, during your career at
12 Walgreens, from the beginning to today, you don't
13 believe that the work you performed was to ensure
14 that Walgreens was filling its role as a
15 distributor?
16     MR. SWANSON:  Object to form, mischaracterizes.
17 BY THE WITNESS:
18     A.  Again, I'm not quite sure I understand
19 your question.
20 BY MR. MOUGEY:
21     Q.  What part of that do you not understand?
22 I'll say it again for you to make sure.
23     A.  Yeah, please.
24     Q.  So, during your career at Walgreens,

Page 59

1  from the beginning, just cut it off at 2015, you
2  don't believe that the work you performed was to
3  ensure that Walgreens was filling its role as a
4  distributor, correct?
5      A.  My role at various times, I was asked to
6  look at reports, look at item movement and
7  determine if the logic was sound.  How that was
8  being interpreted in regards to various
9  regulations, I honestly didn't know how that fit
10 in.
11     Q.  And you can't recall ever being educated
12 on what Walgreens' responsibilities as a
13 distributor were?
14     A.  I'm sure I've heard different bits and
15 pieces of things over the courses of years, but
16 it's hard to pinpoint exactly when I would have
17 learned what types of information.  And, again, my
18 role wasn't involved with determining what the
19 rules were.  I was asked to determine if logic was
20 sound.
21     Q.  My question was a little different.  You
22 said, "I've heard bits and pieces over the years.
23 It's hard to pinpoint exactly when I learned
24 specific types of information."

Page 60

1      But the simple question I asked you was:
2  Do you ever recall being educated on what
3  Walgreens' responsibilities as a distributor were?
4  Yes or no.
5      MR. SWANSON:  Asked and answered.
6  BY THE WITNESS:
7      A.  I relied on other people to make sure
8  that they knew that the -- Walgreens was following
9  the policies and procedures.
10 BY MR. MOUGEY:
11     Q.  So, the answer to my question is no,
12 correct?  You can't recall ever being educated on
13 what Walgreens' responsibilities as a distributor
14 were, correct?
15     MR. SWANSON:  Object to form, mischaracterizes
16 her testimony.
17 BY THE WITNESS:
18     A.  If that's how you want to interpret what
19 I'm saying.
20 BY MR. MOUGEY:
21     Q.  You have said repeatedly that you relied
22 on other people, and I don't know if by relying on
23 other people that you just reviewed the reports and
24 someone else implemented.  What I'm asking you is a

Page 61

1  simple question, and I'm going to ask it for about
2  the fourth or fifth time.
3      Do you recall ever being educated about
4  what Walgreens' responsibilities were as a
5  distributor?
6      MR. SWANSON:  Asked and answered.
7  BY MR. MOUGEY:
8      Q.  Yes or no.
9      MR. SWANSON:  Asked and answered.
10 BY THE WITNESS:
11     A.  Again, I was relying on other people to
12 determine what the regulations were.
13 BY MR. MOUGEY:
14     Q.  So, the answer is --
15     A.  Our legal.
16     Q.  -- no, you've never been educated --
17     MR. MOUGEY:  I am sick and tired of the head
18 shaking on the yes and no from you two.  I do not
19 want yeses, nos, in answers.
20     I will tell you what.  We are going to
21 take a break.  Do we have an extra camera?  Do we
22 have another camera?  Get the camera off of me and
23 let's put it on Walgreens counsel with the yeses
24 and nos and the head shaking repeatedly in the

Page 62

1 peripheral sight of the witness. This has been
2 going on for two months with Kate over there
3 shaking her head yes and no.
4     MR. SWANSON: You are not putting a camera on
5 me. So, you can turn it off or keep it on you.
6     MR. MOUGEY: I do not want --
7     MR. SWANSON: Stop the speech. Ask questions.
8     MR. MOUGEY: -- any more gestures.
9         There is no speech. I do not want any
10 more yes or no head shaking. It's the most
11 unprofessional. And your office has done this
12 repeatedly over and over again for two months.
13     MR. SWANSON: Are you done?
14     MR. MOUGEY: Are you done? Are we done with
15 the head shaking? The witness is right there.
16     MR. SWANSON: Do you need a breather?
17     MR. MOUGEY: The witness -- I don't need a
18 breather. I need you to stop head shaking.
19     MR. SWANSON: Then calm down.
20     MR. MOUGEY: Don't tell me to calm down.
21     MR. SWANSON: And ask questions.
22     MR. MOUGEY: I am sick and tired of Kate
23 sitting there shaking her head in the direct
24 peripheral sight of the witness for answers.

Page 63

1     THE WITNESS: I am not even looking at Kate.
2     MR. SWANSON: Nobody needs your speech, Peter.
3 Go ahead.
4     MR. MOUGEY: I don't need the head shaking.
5 Are you done with the head shaking?
6     MR. SWANSON: I'm not going to respond.
7     MR. MOUGEY: Are you done with the head
8 shaking?
9     MR. SWANSON: Do you want to go off the record
10 and take a break or not?
11     MR. MOUGEY: No, I don't need a break.
12     MR. SWANSON: Then ask a question.
13     MR. MOUGEY: Are you done with the head
14 shaking? Yes or no. Are we done?
15     MR. SWANSON: Ask a question.
16     MR. MOUGEY: I will take that as a yes, we're
17 done. And every time I get a head shake, I'm going
18 to announce it on the record.
19     MR. SWANSON: That's great.
20     MR. MOUGEY: That is great.
21 BY MR. MOUGEY:
22     Q.   Do you recall ever being educated on
23 Walgreens' responsibility as a distributor during
24 your tenure at Walgreens?

Page 64

1     MR. SWANSON: Asked and answered.
2 BY THE WITNESS:
3     A.   Again, as far as regulations, I relied
4 on our legal department to provide that guidance.
5 BY MR. MOUGEY:
6     Q.   Did you -- did you -- were you trained
7 in any shape, form or fashion on Walgreens'
8 responsibilities as a distributor?
9     A.   Again, Walgreens' responsibilities, I
10 left that up to other people to determine.
11     Q.   So, you didn't receive any training from
12 anyone else about what Walgreens' responsibilities
13 and duties were as a distributor?
14     MR. SWANSON: Objection.
15 BY THE WITNESS:
16     A.   It wasn't my area of responsibility to
17 determine how to interpret rules and regulations.
18 BY MR. MOUGEY:
19     Q.   I understand that your -- you think it's
20 someone else. But all I'm simply asking is: Did
21 you get any training about what Walgreens'
22 responsibilities were as a distributor? It's a
23 simple yes or no answer.
24         And if it's no, it's okay. Just say no.

Page 65

1 If you didn't get any training about Walgreens'
2 responsibilities as a distributor, no is fine.
3     A.   I relied on other people to interpret
4 the regulations. So, if you want to interpret that
5 as a no, please do so.
6     Q.   I'm not trying to interpret. I want you
7 to tell me generally do you ever recall being
8 trained on Walgreens' responsibility as a
9 distributor?
10     A.   And, again, my answer is it's not my
11 responsibility to interpret regulations.
12     Q.   So, I didn't use the word "regulations"
13 in my question. Okay. I have taken out "code."
14 I've taken out "regulations." And I've used the
15 word "responsibilities." You understand the
16 difference, correct?
17     A.   In this context, I'm not sure I do.
18     Q.   Okay. I'm not using the word
19 "regulation." I'm not using the word "code." You
20 understand that, right?
21     A.   You didn't use those words, yes, I
22 understand that.
23     Q.   And when I use the word "training,"
24 at Walgreens, training was often done through

Page 66

1 PowerPoints or memos, things along those lines.
2 You understand that, right?
3    A.  More toward to the stores. I don't
4 remember being trained as a corporate employee
5 using PowerPoint presentations.
6    Q.  So, you went to conferences and attended
7 conferences, correct?
8    A.  I was reminded that I attended one
9 conference.
10    Q.  So, did you attend conferences or
11 meetings or continuing education or anything
12 explaining what Walgreens' responsibilities were as
13 a distributor?
14    A.  I remember at some point. I don't
15 remember the date. It was brought up in
16 discussions that I attended one seminar. It wasn't
17 direct to Walgreens' roles and responsibilities.
18 It was some company's presentation, and they were
19 trying to sell their order patterns.
20    Q.  That's the only time you remember any
21 continuing education, seminar, explanation, about
22 what Walgreens' responsibilities as a distributor
23 were, correct?
24    A.  That wasn't a continuing education

Page 67

1 seminar. I wish it would have been. I would have
2 at least gotten some credit.
3    Q.  Right. But what I asked was: The only
4 time you remember any educational piece about what
5 Walgreens' duties or responsibilities were as a
6 distributor was a third-party conference that was
7 trying to sell a product? Yes?
8    A.  Again, I wasn't there to interpret
9 Walgreens' regulations or responsibilities. I went
10 more interested in to see what this company's logic
11 was doing and how to compare it to ours.
12    Q.  And I appreciate that that you weren't
13 there to interpret. I know you're not a lawyer.
14 We have gone through your resume. I didn't ask if
15 you were there to interpret.
16      What I've asked was: Other than the one
17 seminar given by a third party, was there any
18 instance generally where you were educated on
19 Walgreens' responsibilities as a distributor?
20    A.  I relied on other people to interpret
21 Walgreens' responsibilities.
22    Q.  So, you did not specifically have an
23 understanding of what Walgreens' responsibilities
24 were as a distributor, correct?

Page 68

1    A.  I was trusting --
2    MR. SWANSON: Object to form.
3 BY THE WITNESS:
4    A.  -- our legal department to interpret the
5 responsibilities.
6 BY MR. MOUGEY:
7    Q.  I understand. That's not the question
8 about who you were relying on. I asked did Barbara
9 Martin have an understanding of what Walgreens'
10 responsibilities were as a distributor? Did you
11 specifically, Barbara Martin, or were you relying
12 solely on other departments to fill that role?
13    A.  I was relying on other departments to
14 fill that role, and as I've said over the course of
15 my years of experience, I've learned things. It's
16 hard to say what I learned when and when I learned
17 it. So, if I learned something in '09, I can't
18 recall if I learned it in '09, 2012 or two weeks
19 ago.
20    Q.  I didn't ask what year. I didn't ask
21 what month. I didn't ask two weeks ago. What I've
22 asked is: Does Barbara Martin have an
23 understanding of what Walgreens' responsibilities
24 generally as a distributor are?

Page 69

1    MR. SWANSON: Object to form, asked and
2 answered.
3 BY THE WITNESS:
4    A.  And I've relied on other people to
5 interpret what those responsibilities were. I
6 could -- once they would tell us what the
7 responsibilities were, I could then interpret that
8 into my job as to how to look at reports or
9 something like that if that was needed.
10 BY MR. MOUGEY:
11    Q.  And where did you -- who told you what
12 Walgreens' responsibilities were as a distributor?
13    A.  We would have been relying on our legal
14 department, Dwayne Piñon and his team, to review
15 guidance.
16    MR. MOUGEY: Let's take a break.
17    THE VIDEOGRAPHER: We are going off the record
18 at 10:15.
19      (WHEREUPON, a recess was had
20       from 10:15 to 10:31 a.m.)
21    THE VIDEOGRAPHER: We are back on the record
22 at 10:31.
23 BY MR. MOUGEY:
24    Q.  Ms. Martin, we are in '09, 2010 where

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 you are reviewing reports generated by Wayne
2 Bancroft's algorithm.
3     In a general description, can you tell
4 me what other areas of responsibility you had with
5 Walgreens suspicious order monitoring?
6     A.    At that time all I was really doing was
7 looking at these reports in regards to order
8 monitoring. I had a lot of other roles and
9 responsibility in inventory.
10     Q.    How many hours a week on average in '09
11 were you looking at these reports?
12     A.    One to three maybe.
13     Q.    And do you have an understanding of how
14 many hours a week in '09 Marcie was looking at
15 these reports?
16     A.    I do not.
17     Q.    How many reports would you look at
18 during the one to three hours a week?
19     A.    It's difficult to quantify that. It
20 would depend on how easy they were to look at. The
21 one that we looked at, it's simple. 3 is smaller
22 than 5.
23     Q.    Right.
24     A.    There were others that I might have had

Page 71

1 to have done a much deeper dive into. So, no set
2 number. Depends on...
3     Q.    Are we talking a dozen, 15? Are we
4 talking 1,000?
5     A.    Definitely not 1,000.
6     Q.    Are we talking several hundred?
7     A.    Again, it's -- it's hard to quantify.
8 Could be anywhere between 10 to 75. I really don't
9 know.
10     Q.    How about less than 100, more than 10 a
11 week? Is that fair? Somewhere in that range?
12     A.    That sounds fine.
13     Q.    Did you and Marcie Ranick divide them up
14 in any way that she looked at some and you looked
15 at others?
16     A.    No. When she came down, we would spend
17 time together going through things, and then I'm
18 sure she was looking at stuff on her own. But I
19 don't know what she was doing.
20     Q.    How would you determine, I'm going to
21 call it a batch that you would look at, the 10 to
22 less than 100 you'd look at a week?
23     A.    Randomly pulling up reports.
24     Q.    Do you have an understanding of how many

Page 72

1 reports were being flagged on a weekly basis in
2 2009?
3     A.    I don't remember.
4     Q.    Thousands?
5     A.    I wouldn't even want to take a guess.
6 Sorry.
7     Q.    Is there anywhere at Walgreens where the
8 orders that were being flagged by Wayne Bancroft's
9 algorithm were kept?
10     A.    I don't believe that data is stored
11 anywhere.
12     Q.    So, a report would populate and it would
13 just disappear into the Internet?
14     A.    The reports populated. They held for a
15 period of time. I don't remember what that period
16 of time is or was. I know that our algorithms and
17 order of monitors and order of logic have been
18 evolved over the years; and with that, there would
19 have been different types of reporting that would
20 have replaced the stuff I was looking at.
21     Q.    There were a batch of I'm going to say
22 20, 25 different individual pieces of paper printed
23 like the document I put in front of you as
24 Martin -- I believe it was 2.

Page 73

1     Do you have an understanding of -- do
2 you have a paper file of 20 or 25 of those reports
3 from Bancroft's algorithm?
4     A.    I don't remember. I mean, I know I kept
5 a sample of the reports. How many they were, I
6 don't remember.
7     Q.    Why did you keep a sample of the
8 reports?
9     A.    I guess I just kept them just to see how
10 our system evolved over the years. I'm not really
11 sure why.
12     Q.    Did you look at them in preparation for
13 today?
14     A.    There were a few that we looked at, yes.
15     Q.    All right. So, we've gone through your
16 participation in Walgreens' suspicious order
17 monitoring policies up until 2009 I believe. Okay?
18     Can you give me any more examples moving
19 forward in time of your different roles?
20     A.    In relationship to the order monitoring
21 process or my roles in general with inventory?
22     Q.    Walgreens -- as far as your role is what
23 we're talking about, your role with reviewing
24 procedures and policies, reports for Walgreens

Page 74

1 implementing its responsibilities as a distributor.
2    A.   I wasn't responsible for writing SOPs
3 for Walgreens.  I know that I provided information
4 for guidance for the stores and how to look up
5 things, but I wasn't writing SOPs.
6    Q.   Okay.  And I'm -- I'm sorry.  I don't
7 think I used the word "writing SOPs."  So, just
8 we're getting -- going through --
9    A.   Sorry.  I misinterpreted what you said.
10    Q.   General understanding.  Seems to be a
11 little bit of a problem for the last two hours.
12       So, generally your roles with Walgreens
13 and its suspicious order monitoring policies, what
14 are some of the roles you filled?  That's what I'm
15 asking you to describe to me.
16       So, you didn't write the policies.  We
17 got that.  You're not a lawyer.  We got that.
18 You're not interpreting anything.  I got that.  You
19 can't remember any specific education or training
20 with Walgreens as a distributor.
21       Just give me some general descriptions
22 of other duties you filled with Walgreens'
23 suspicious order monitoring policies.
24    MR. SWANSON:  Object to the lawyer testifying,

Page 75

1 but you can answer the question if you understand
2 it.
3 BY THE WITNESS:
4    A.   What time frame are you talking about?
5 BY MR. MOUGEY:
6    Q.   We are moving on from 2009.  So, I think
7 we've captured everything up to 2009, correct?
8    A.   To the best of my recollection.
9    Q.   To the best of your recollection.  So,
10 let's -- moving forward, give me some general
11 descriptions of your duties with Walgreens'
12 suspicious order monitoring policies and
13 procedures.
14    A.   Again, what time -- we're looking at
15 2010 now?
16    Q.   I'm just -- you don't remember dates
17 specifically.
18    A.   No, that's what I'm trying to --
19    Q.   I understand.  I'm saying moving through
20 '09 and afterwards.  I'm giving you a really broad
21 window for you to generally describe to me what
22 Barbara Martin did in relation to Walgreens'
23 suspicious order monitoring policies and
24 procedures.

Page 76

1    A.   So, I would have been continuing to work
2 with Marcie to help her review and understand these
3 reports.  I would also work with her when she came
4 down to look at the monthly and quarterly reports.
5       Again, we had talked previously about me
6 supplying data when it was requested regarding
7 purchases.
8    Q.   So, you continued to work with Marcie
9 and help her review and understand the reports.
10 That's one topic, right?
11    A.   Um-hmm.
12    Q.   You also worked with her when she came
13 down to look at the monthly and quarterly reports,
14 correct?
15    A.   Right.
16    Q.   Kind of the same area, right?
17       And then supplying data or data when
18 asked, right?
19    A.   Um-hmm.
20    Q.   Is there any other roles Barbara Martin
21 filled until the end of 2015 in relation to
22 Walgreens' suspicious order monitoring policies and
23 procedures?
24    A.   It's hard to think of something right

Page 77

1 off the top of my head.  I'm sure I had
2 correspondence and communication with other team
3 members.
4    Q.   So, when we look at your resume,
5 Martin 1, the only entry I see on your entire
6 resume in relation to Walgreens' suspicious order
7 monitoring policies and procedures with regard to
8 its role as a distributor is that last entry,
9 "assisted in the creation of the control drug order
10 monitoring reports."  Do you see anything else?
11    A.   That's -- that's the one that talks
12 about order monitoring, yeah.
13    Q.   Right.
14    A.   For potentially suspicious orders.
15    Q.   Anything else on your resume where
16 you're describing your, Barbara Martin's, roles or
17 duties in relation to Walgreens' suspicious order
18 monitoring policies and procedures as a
19 distributor?
20    A.   I -- I can't think of anything.
21    Q.   All right.  So, let me just make sure if
22 I can get a general understanding of what you were
23 doing.
24       You helped create the drug order

Page 78

1 monitoring reports, correct? By "create," you
2 provided some input into the reports. Is that --
3 is that fair?
4     A.   Yeah, I mean, I didn't design the
5 report, but I looked at the data that was generated
6 off of the reports.
7     Q.   And you gave input on some of the data
8 that the reports were flagging. Is that fair?
9     A.   Yes.
10     Q.   All right. You pulled data kind of on
11 an ad hoc basis when people would ask. Is that
12 fair?
13     A.   Yes.
14     Q.   All right. And you helped Nancy --
15 no -- Marcie Ranick interpret some of these reports
16 and understand the flow within the inventory. Is
17 that fair?
18     A.   Yes.
19     Q.   All right. Am I kind of capturing your
20 recollection of what Barbara Martin did in relation
21 to Walgreens as a distributor in relation to its
22 suspicious order monitoring policies and
23 procedures?
24     A.   Yeah, I mean, there might have been

Page 79

1 other things. Nothing comes to mind. And, again,
2 I was more store-facing than distribution.
3     Q.   Now, let me maybe make sure you and I
4 aren't talking past each other and the use of the
5 word "distributor" maybe is causing you some
6 questions about your answer.
7         So, if I were to change the question and
8 say describe to me your roles, Barbara Martin's
9 roles, at Walgreens in relation to Walgreens
10 filling its role as a pharmacy through, for
11 example, good faith dispensing. Did you have
12 any -- did you have any duties in that respect?
13     A.   I was aware of good faith dispensing.
14 It was something that I was taught back in pharmacy
15 school. I practiced it when I was a pharmacist in
16 the stores. I wasn't involved with writing the
17 Walgreens procedures for good faith dispensing, but
18 generally aware of them through my entire career
19 starting in school.
20     Q.   So, you were a pharmacist, both a
21 staff -- an intern, a staff pharmacist and a
22 pharmacy manager all the way up to 2004, correct?
23     A.   Yes.
24     Q.   So, post-2004, when you were more at the

Page 80

1 corporate level, correct?
2     A.   Um-hmm.
3     Q.   So, post-2004, would you describe to me
4 what, if any, roles you had assisting Walgreens
5 with its compliance in its role as a distributor?
6 I'm sorry. As a pharmacy.
7     A.   I'm sorry. I'm struggling with how to
8 answer that question, because when I think of like
9 Walgreens as a pharmacy, I would think of each
10 individual pharmacy.
11     Q.   Fair enough. And if your answer is no,
12 I really didn't have jobs or duties in relation to
13 ensuring Walgreens was compliant in its role as a
14 pharmacy, that was more at the pharmacy level, then
15 that's a fine answer.
16         I'm just trying to understand what
17 Barbara Martin did and didn't do. So, if that was
18 something that you didn't do, that's okay. I just
19 want to know so I can figure out what to do with
20 the rest of our time.
21         Did Barbara Martin have any jobs or
22 responsibilities or duties post-2004 where you were
23 helping Walgreens with its compliance, good faith
24 dispensing, as a pharmacy?

Page 81

1     MR. SWANSON:  Object to form.
2 BY THE WITNESS:
3     A.   So, I mean, I wasn't really responsible
4 for interpreting the regulations. But what I did
5 focus on, again, we can go back to I was looking at
6 these reports and other data. You know, I'm sure I
7 had conversations with various groups. It's hard
8 to remember what I've done in the last 30 years.
9         But, again, these reports were a big job
10 and then as we got out of these reports and the
11 system got more sophisticated, I transitioned back
12 into other inventory supporting roles.
13 BY MR. MOUGEY:
14     Q.   But I think what you told me earlier
15 this morning is that you were pulling the data
16 pulls and you weren't reviewing those. You were
17 simply giving the data you were asked to pull to
18 the field. Correct?
19     A.   Correct.
20     Q.   So, let's partition that one aside.
21 Okay?
22         So, the only reports that you were
23 looking at were the ones that you and Marcie were
24 looking at during the pilot phase. Is that fair?

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A.  Yes.

2    Q.  All right. So, and when I asked you

3 about what your jobs and responsibilities were, the

4 answer I have gotten back like 15, 20 times today

5 is that I'm not interpreting. And I'm not asking

6 you if you're not interpreting because you're not a

7 lawyer, right?

8    A.  No.

9    Q.  You're not reading regs and codes and

10 opening up law books and looking at it on Google

11 and trying to figure out what Walgreens'

12 responsibilities were by looking at code, right?

13    A.  Right.

14    Q.  I'm not suggesting that you were. And

15 my question is a little different.

16    So, what my question is: Just explain

17 your duties helping Walgreens ensure its compliance

18 with its role as a pharmacy through good faith

19 dispensing.

20    A.  One of the biggest things I did was just

21 work on these reports.

22    Q.  Okay. So, when you say reports, those

23 are the Bancroft algorithm --

24    A.  That example --

Page 83

1    Q.  -- reports, correct?

2    A.  That example that you showed, the Martin

3 2.

4    Q.  And that, you believe, was both ensuring

5 compliance with Walgreens as a distributor and

6 Walgreens as a dispenser, correct?

7    A.  Again, I'm struggling with

8 interpretation of words. So, I was asked to look

9 at these reports and see if the logic was sound.

10 How that rolled up into any type of regulation,

11 that's where my role wouldn't have come into direct

12 play.

13    Q.  I didn't use the word "regulation." I

14 didn't use the word "code."

15    I simply asked that you believe your

16 role reviewing these reports was helping to assist

17 with ensuring compliance with Walgreens as a

18 distributor and with Walgreens as a dispenser,

19 correct?

20    A.  When I first started looking at these

21 reports, quite frankly, I'm not sure I knew all of

22 that as far as Walgreens' responsibilities and

23 roles. I was asked to look at these reports and

24 interpret them.

Page 84

1    Q.  Okay. So, is it fair to say that you're

2 not really sure what the purpose of you looking at

3 the reports was other than to make sure the logics

4 made sense?

5    A.  That's a fair assumption.

6    Q.  That's fair?

7    A.  Yes.

8    Q.  All right. So, when you were looking at

9 these reports to make sure the logic makes sense,

10 you, Barbara Martin, didn't have a general

11 understanding of what the rules and regulations

12 were with Walgreens as a distributor, correct?

13    A.  I was relying on other people --

14    Q.  Yes.

15    A.  -- to interpret that.

16    Q.  Again, where the disconnect is, when I

17 ask that question, you say, "I was relying on other

18 people." And, so, to me that -- and I apologize

19 that we're talking past each other, but that to me

20 doesn't answer my questions.

21    If you were relying on other people, did

22 you have an understanding is what I'm asking. By

23 saying "I'm relying on other people," you said,

24 "No, I really didn't understand. I'm looking at

Page 85

1 this logic report. I am giving input but I didn't

2 really have an understanding of the regulations."

3    That's kind of what I am asking in a

4 long-winded way. Okay? So, I'll ask it again.

5 Not did somebody else do it, and that's okay if

6 they did, but I just need to know that.

7    Did Barbara Martin have an understanding

8 that when you were looking at those reports of what

9 Walgreens' general responsibilities were as a

10 distributor?

11    A.  Again, when I was looking at these

12 reports in this time frame, it's hard to know --

13 it's hard to remember what I know now and what I've

14 learned over the years as to what I knew then.

15 When I became aware of Walgreens' responsibilities,

16 it's hard to say.

17    And, again, even what I was aware of, it

18 was -- I left it up to other people to make sure

19 the regulations and responsibilities were being

20 interpreted appropriately.

21    Q.  I'm not asking about interpretation.

22 I'm not asking. I just want to know what you

23 understood. I'm not asking if you interpreted

24 anything. I'm just asking your general

Page 86

1 understanding.
2         Did you have a general understanding of
3 what Walgreens' responsibilities as a distributor
4 in 2009 and 2010 when you were looking at these
5 reports?  Yes or no.
6     A.   I don't remember what I knew then.
7     Q.   Let's turn to -- you're aware that there
8 is an annual performance review as a Walgreen
9 employee, correct?
10    A.   Yes.
11    Q.   All right.  And it's several pages in
12 to -- actually, it's the third page in behind your
13 resume.
14        All right.  Do you see the first page?
15 It's P-WAG-1950.
16    A.   Okay.
17    Q.   It says, "Barbara Martin, Supervisor,
18 Inventory Management System, WHS Customer
19 Solutions."
20        Do you see that?
21    A.   Yes.
22    Q.   And the reviewer is Denman Murray, and
23 he was your direct report as of the date of this
24 performance review dated 9/1/2010 to 8/31/2011.

Page 87

1         Do you see that?
2     A.   I was actually his direct report.
3     Q.   I'm sorry.  Yes.  Thank you.  I said
4 that backwards.
5         Now, if you would turn to what's page 5
6 of 16 and you'll see a bunch of black lines on the
7 exhibit.
8         Have you reviewed this in preparation
9 for today?
10    A.   I have not.
11    Q.   Okay.  You will see a bunch of black
12 lines here that your counsel has redacted.  Okay.
13        And the agreement was that we were
14 supposed to receive information regarding reviews
15 with opiate-related performance, including
16 marketing, legal, regulatory compliance with
17 opiate-related laws or rules.  Okay?
18        I'm a little confused as to why the
19 first one we received was dated September '10.  Do
20 you believe that you've had performance reviews
21 from your boss that reviewed your performance in
22 relation to opiates prior to September '10?
23    A.   I -- I can't remember.
24    Q.   If you were doing material work in --

Page 88

1 related to opiates, would it have been in your
2 performance review?
3     MR. SWANSON:  Object to form, foundation.
4 BY THE WITNESS:
5     A.   It was such a small portion of my job,
6 so I would find it hard to believe that it was in
7 past reviews.
8 BY MR. MOUGEY:
9     Q.   When you say in the past few years,
10 I'm looking for more --
11    A.   Past reviews.
12    Q.   Past reviews.  I'm sorry.
13        I'm looking for more pre-2010.  Do you
14 believe it was such a small portion of your job
15 pre-2010 that it's possible it wasn't even covered
16 in your review?
17    A.   Correct.  The purpose of this type of
18 review is to look at some bigger projects, not
19 every little task that people were doing --
20    Q.   Okay.  So, if it's --
21    A.   -- in their jobs.
22    Q.   I'm sorry.  If it's a small little task,
23 it typically wouldn't be included in your review.
24 That's your understanding?

Page 89

1     A.   Correct.
2     Q.   Okay.
3     MR. MOUGEY:  So, Counsel, I would ask that if
4 we could double-check before 9 of '10, that we
5 didn't get anything before 9/10, which struck me as
6 a little odd given some of the prior testimony.  If
7 you guys could double-check and even have somebody
8 look and maybe we missed it, but I don't think so.
9         And I have it -- I think the last report
10 is dated either '12 or '13.  I believe it's 8/12.
11 No, I apologize.  8/13.  So, the time period that I
12 have is 9/10 to 8/13.  It's the end date makes
13 sense, but the beginning date doesn't.
14        So, if you all will check and either we
15 missed it or it wasn't produced.
16    MR. SWANSON:  We can check.  I disagree with
17 your characterization of what makes sense and
18 doesn't make sense.  But we'll check and see what's
19 there.
20    MR. MOUGEY:  Be more than happy if you all
21 would stipulate that such a small portion of
22 Ms. Barb Martin's job prior to '10 that it didn't
23 make it on her performance review, that would be
24 okay with us.  So --

Page 90

1    MR. SWANSON:  We are not making any such
2  stipulation.
3    MR. MOUGEY:  If not --
4    MR. SWANSON:  You probably knew that.
5    MR. MOUGEY:  I would like even if the report
6  doesn't -- if Ms. Martin's report prior to 9/10
7  does not mention anything opiates-related, I'd
8  appreciate an affirmation of such so we're not left
9  wondering why it wasn't produced.
10  BY MR. MOUGEY:
11    Q.   Let's, if you would, turn to page 5 of
12  16.
13       Now, as a Walgreens employee, do you
14  receive these reviews after your supervisor
15  provides their input?
16    A.   Yes.
17    Q.   Okay.
18    A.   It's more than that, but yes.
19    Q.   And if you would, let's go to page 5 of
20  16 where it says, "Enhancement of Suspicious Orders
21  Monitoring Process."
22       Do you see that?
23    A.   Yes.
24    Q.   It says, "Decrease number of false

Page 91

1  positive hits on report."  And that's kind of
2  exactly what you were just showing me where I think
3  it was 5 and 3 and the numbers didn't make sense,
4  right?
5    A.   Yes.
6    Q.   All right.  And then "Allow process to
7  include 52 weeks of history."
8       Is that just increasing the lookback of
9  data available for the reports?
10    A.   Right.  I don't remember what the first
11  report used, if it was 13 weeks or 26 weeks, but I
12  know that we wanted to go back an entire year.
13    Q.   It was just increasing the lookback?
14    A.   Data points.
15    Q.   Yes, ma'am.  And it says, "Improve
16  accessibility of data on report."
17       Do you have an understanding of what
18  that means?
19    A.   Based on my words, again, this is going
20  back a number of years and trying to remember what
21  I meant when I wrote that, but my assumption would
22  be that I was trying to make it -- these reports
23  more reader, more reader friendly, more user
24  friendly, easier to get to, easier to download.

Page 92

1    Q.   And, so, these three entries that we
2  just walked through at the top of page 5, you put
3  those entries in?
4    A.   Yes.
5    Q.   Who puts in the weight?
6    A.   It's calculated by how many different
7  goals you put down.  And if memory serves me
8  correct, because we've changed our process a few
9  times, that I believe that my manager could go in
10  and make some weighted higher than others.  But
11  whether he did that or not on this, I don't
12  remember.
13    Q.   Tell me -- I'm sorry.  I'm not following
14  you.
15       What do you think the weight indicates?
16    A.   You can put down a number of different
17  goals.  I could have put down two goals for the
18  year.  I could have put down 15 goals for the year.
19    Q.   Okay.  Oh, I see.
20    A.   And then that breaks it down.  So, if
21  you have two goals, each one would be weighted 50%
22  or one could be weighted 75 and one could be
23  weighted 25.
24    Q.   Would you link the goals to -- for

Page 93

1  example, the title is "Enhancement of Suspicious
2  Order Monitoring Process."  At least some of your
3  goals would have been linked to -- to that title?
4    A.   This was one -- that was -- would have
5  been -- that title was one of my goals.
6    Q.   Okay.  Where are your goals on this
7  report?
8    A.   I mean, some of them might have been
9  taken out if they weren't related to this
10  particular subject.
11    Q.   If it has a weight of 18%, something
12  was --
13    A.   I would have had -- I don't even
14  remember my goals I put in for this year, to be
15  perfectly honest.
16    Q.   But do you see them here?
17    A.   The rest, I mean, this is probably
18  another one that was taken out.
19    Q.   The part that's blacked out?
20    A.   Yeah, below "Rating Scale" on page 4,
21  the one after it, "Development Goals."
22    Q.   Let me just make sure I understand so
23  I'm clear.
24       That in order to have any weight

Page 94

1 assigned, anything more than zero, some percentage
2 of your goals had to be attributable to this
3 enhancement of suspicious orders monitoring
4 process, right?
5    A.   18% of my --
6    Q.   Yes, ma'am.
7    A.   -- goal.
8    Q.   And your goals are typically contained
9 in this annual performance review that we're
10 looking at, correct?
11    A.   Yes.
12    Q.   Okay.  If you were looking at it and
13 these weren't all blacked out, you think your goals
14 are typically in here somewhere?
15    A.   They should be in here.
16    Q.   Okay.  Thank you.  All right.
17        Underneath the "Comments," it says,
18 "Barbara Martin (self)," and you type in, "Defined
19 early requirements document, meeting scheduled to
20 discuss enhancements and request funding."
21        Correct?
22    A.   That's what it says.
23    Q.   What does the "request funding" mean?
24    A.   So, Walgreens is a big company.  It has

Page 95

1 a lot of departments.  Any time we want to do any
2 type of change to an existing program, we have to
3 go out and request funding to ask for that program
4 to be implemented.
5    Q.   Do you have an understanding of who
6 ultimately, which group within Walgreens, funded
7 the program?
8    A.   At this point I don't remember for sure.
9    Q.   Do you have a couple of groups that you
10 could recall that would have funded it?
11    A.   Our inventory team would have been one
12 of the groups --
13    Q.   Okay.
14    A.   -- funding it.
15    Q.   Anybody else?
16    A.   This is guessing because I don't
17 remember at this point.  But besides our team, it
18 could have possibly have been IT.  It could have
19 been our legal department.  It could have been Loss
20 Prevention.  I don't remember.
21    Q.   Is there a compliance department?
22    A.   Yeah, I think I usually lump them in
23 with legal.
24    Q.   Okay.

Page 96

1    A.   That might be my misinterpretation.
2    Q.   No, it's probably about right.
3        So, compliance you think your
4 interpretation is encompassed under the legal
5 umbrella?
6    A.   They might feel differently.
7    Q.   Okay.  And Mr. Murray relays that
8 "Progress has been very slow, most of the delay has
9 been because of IT."
10        Is that consistent with your
11 recollection?
12    A.   I really don't remember.  So, it's nice
13 to see this document to help me remember.
14    Q.   So, what we went through this morning,
15 meaning you reviewing the reports with Marcie
16 Ranick, providing input, false hits, that is what's
17 encompassed on page 5 of 16, correct?
18    A.   Yes.
19    Q.   All right.  So, if we could, let's go to
20 the next -- it's kind of difficult to navigate
21 because there is -- it's the next report dated
22 9 of '11 to August 31.  It's annual performance
23 review.  It's after page 16 of 16.  It's the next
24 page.

Page 97

1        So, go to page 16 and then the next one
2 begins anew.  Does that make sense?
3    A.   Yes.
4    Q.   All right.  Again, the reviewer is
5 Mr. Murray, your boss, right?
6    A.   Yes.
7    Q.   And if you turn to page 5 of 16,
8 "Complete Suspicious Ordering Reports" from
9 9 of '11 to August of '12.  Do you see that?
10 "Status, Completed."
11    A.   Yes.
12    Q.   "Design reporting of suspicious ordering
13 system to be compliant with DEA regulations.
14 Expect to pilot February/March of 2012."
15        Do you see that?
16    A.   Yes.
17    Q.   Now, why did you think that the system
18 was compliant with DEA regulations?
19    A.   I was probably writing words that
20 someone else gave to me.
21    Q.   So, you didn't have an understanding of
22 whether or not this was compliant with DEA
23 regulations.  You were relying on someone else
24 telling you that?

Page 98

1    A.   Right.
2    Q.   Because you didn't really have a general
3  understanding of the DEA regs.  Somebody was
4  telling you what they were?
5    A.   Correct.
6    Q.   And if they said they complied with DEA
7  regs, you relied on them?
8    A.   Yes.
9    Q.   And who was it that told you that the
10  suspicious ordering system was compliant with DEA
11  regs?
12    A.   We would have been relying on our legal
13  team.
14    Q.   That's Mr. Piñon?
15    A.   Yes.
16    Q.   And those in his office?
17    A.   Yes.
18    Q.   Now, I just want to make sure we're
19  still talking about the same suspicious ordering
20  reports.
21        These were the -- these are the Bancroft
22  algorithm reports, correct?
23    A.   I believe so.  At 2012, our logic might
24  have been getting more sophisticated.

Page 99

1    Q.   But the foundation of the suspicious
2  order monitoring policies and reports remained that
3  Bancroft algorithm, correct?
4        And I understand that there were changes
5  and enhancements, but we're not talking about a
6  whole different type of reporting system is all I'm
7  trying to get to.
8    A.   I mean, I --
9    MR. SWANSON:  Object on foundation.
10  BY THE WITNESS:
11    A.   We were trying to make the reporting,
12  you know, more online and more user friendly than
13  this.
14  BY MR. MOUGEY:
15    Q.   Okay.  And I understand there were
16  changes and modifications and tweaks.  I just want
17  to make sure that the reports that you started with
18  in 9 are the continuation and enhancements are what
19  you're referring to here in the suspicious ordering
20  reports?
21    A.   I believe so, yes.
22    Q.   Okay.  Thank you.  Now, do you have a
23  recollection of what you meant by "Expect to pilot
24  February/March of '12"?

Page 100

1    A.   That means that whatever changes we had
2  made to the reporting, that I felt that we would be
3  ready.  Piloting means that we put it in a group of
4  stores to see if it's doing what we expect it to do
5  and does no harm.
6    Q.   So, now, again, your weight is 20% and
7  you think that's the number of your goals that are
8  linked with suspicious ordering reports.  Do you
9  see that?  The 20% on the next page?
10    A.   Yes, I see that.
11    Q.   You don't see your goals in the previous
12  pages, correct?
13    A.   Well, this, again, this would have been
14  one of the goals I had submitted for that year.
15    Q.   Comments below, "Barbara Martin:  The
16  rollout of the dashboard has been completed."
17        What are you referring to?  Which
18  dashboard?
19    A.   That would have been what I have been
20  talking about with these reports, making them more
21  user friendly, more easily to access and putting
22  them on some type of a database where we could
23  download forms rather than print out individual
24  pieces of paper.

Page 101

1    Q.   So, to me -- what do you mean by the
2  word "dashboard"?
3    A.   Something that would be a computer
4  program that you could pull up and then search.
5    Q.   So, there might be a metric on the
6  dashboard that you could click on and the -- it
7  would be an interface with a database that would
8  organize data.  Does that make sense?
9    A.   Yeah, like in this case we could type in
10  a store number and see orders or something like
11  that.
12    Q.   Were there -- did you have a specific
13  name for this dashboard?
14    A.   I don't remember what it was called.
15  I'm sure -- it had to have been named something.
16    Q.   Are you familiar with Tableau?  No?
17  That doesn't ring a bell?
18    A.   Sorry.  No.
19    Q.   No.  Okay.  Do you know who used this
20  dashboard once it was rolled out?  What department?
21    A.   I believe it would have been my team and
22  Marcie Ranick's team; and depending on the level of
23  access, it could even have been down to like field
24  leadership, district managers and things like that.

Page 102

1  I don't remember.
2      Q.  Okay.  But it was more than one group
3  that relied on this dashboard?
4      A.  It would have been at least my team and
5  Loss Prevention, if nothing else.
6      Q.  So, was the way the dashboard worked
7  that if you wanted to drill down into a specific
8  store, you could just kind of click through from
9  the dashboard?
10     A.  It's been a long time since I've seen
11  this dashboard or worked on it.  I believe that we
12  could have searched by store, drug, dates, probably
13  several other fields.
14     Q.  The user could drive the queries of what
15  they were trying to look for on the dashboard.  Is
16  that a fair statement?
17     A.  That's ultimately what I hope we would
18  have designed.
19     Q.  Okay.  And that was in place of having
20  kind of auto-populated reports, that individuals
21  could use the dashboard instead?
22     A.  Yes.
23     Q.  And those reports -- I'm going to use
24  queries -- from the dashboard wouldn't be saved or

Page 103

1  auto-saved in any particular folder or shared drive
2  or anything?
3      MR. SWANSON:  Objection; foundation.
4  BY THE WITNESS:
5      A.  I don't know.
6  BY MR. MOUGEY:
7      Q.  Let me see if I can do it this way.
8         The dashboard was used to have unique
9  queries for the user to drill down on Walgreens
10  data?
11     A.  Related to ordering of controlled
12  substances.
13     Q.  Yes, ma'am.  And that the data related
14  to ordering of controlled substances included both
15  dispensing data and inventory data, correct?
16     MR. SWANSON:  Object to form, foundation.
17  BY THE WITNESS:
18     A.  No, it did not have dispensing data.
19  BY MR. MOUGEY:
20     Q.  So, tell me what kind of data it had in
21  there, then.
22     A.  It -- again, it's been a long time since
23  I've looked at this report.  Our focus would have
24  been more on ordering habits.

Page 104

1      Q.  The dashboard didn't give access to --
2  to the residence, state of residence of the
3  patient?
4      MR. SWANSON:  Object to form, foundation.
5  BY THE WITNESS:
6      A.  I don't remember one way or the other if
7  it did.
8  BY MR. MOUGEY:
9      Q.  Did the dashboard have access to the
10  prescriber as far as identifying who it was?
11     MR. SWANSON:  Same objection.
12  BY THE WITNESS:
13     A.  I don't think it did.
14  BY MR. MOUGEY:
15     Q.  Did the data have access to a specific
16  patient history of how many times they've submitted
17  prescriptions to Walgreens?
18     MR. SWANSON:  Same objection.
19  BY THE WITNESS:
20     A.  No.  It definitely would not have had
21  that.
22  BY MR. MOUGEY:
23     Q.  Definitely.  Mr. Murray relays, "The
24  dashboard was completed and rolled out.  The

Page 105

1  version available today does not totally meet the
2  needs of the business, many changes are needed."
3         What -- do you have an understanding of
4  what he was referring to there?
5      MR. SWANSON:  Foundation objection.
6  BY THE WITNESS:
7      A.  It's been so long I don't remember.
8  BY MR. MOUGEY:
9      Q.  "Rx inventory team needs to work closer
10  with the other business units to have a successful
11  evolution of SOM."
12         Do you see that?
13     A.  Yes, I see that.
14     Q.  Any understanding what that is?
15     A.  Again, this is so long ago.  Obviously,
16  Denny feels that we weren't working with another --
17  enough other departments or we needed to bring in
18  more departments.  I don't know what those
19  departments are.  But we would have needed to bring
20  in more groups to get their input to make sure that
21  this dashboard had everything that everyone needed.
22     Q.  Okay.  And now we're into '12.  Was it
23  consistent that your kind of average weekly time
24  commitment to the suspicious order monitoring is

Page 106

1 still in the same of a few hours a week?
2    A.   Yes.
3    Q.   Okay.  So, that year ends on page 16,
4 and if you would turn to the next year dated 9/2 --
5 9/1/2012 to 8/31/2013.
6        And more specifically, on the 9/1/2012
7 to 8/31/2013, if you'd look at page 5 of 17,
8 "Develop SOM/CSR Toolkit."
9        Do you see that?
10    A.   Yes.
11    Q.   And SOM/CSR.  What is CSR?
12    A.   Controlled substance review.
13    Q.   And what is a --
14    A.   Excuse me.  Controlled substance
15 reporting.
16    Q.   Okay.  And what is -- is controlled
17 substance reporting something different than what
18 we have been talking about the first couple hours
19 this morning?
20    A.   Probably not.  Just newer versions and
21 reiterations.
22    Q.   Continue --
23    A.   Improvements.
24    Q.   I'm sorry.  Continued improvements?

Page 107

1    A.   Yes.
2    Q.   And "Work with the Pharmaceutical
3 Integrity team."  Do you have an understanding of
4 when the Pharmaceutical Integrity team was created?
5    A.   Yeah, I mean, roughly in this time
6 period.  I don't remember exactly when they were
7 founded.
8    Q.   Somewhere in late '12, early 2013?
9    A.   Yes.
10    Q.   And you worked with the Pharmaceutical
11 Integrity team, IT, legal, supply chain and LP.
12 That's Loss Prevention, right?
13    A.   Yes.
14    Q.   "To develop and evolve a dynamic
15 Suspicious Order Monitoring/Controlled Substance
16 Reporting toolkit that will maintain the integrity
17 of the Company's distribution of controlled
18 substances."
19        Do you see that?
20    A.   Yes, I see that.
21    Q.   What do you mean by -- and you wrote
22 that, correct?
23    A.   I believe that this was a joint goal by
24 a number of different people.  I probably would not

Page 108

1 have used the word "dynamic."  Doesn't mean that
2 that's not the correct context.  That's just not a
3 word that --
4    Q.   Little fancier than maybe you would have
5 done.
6        How about "maintain the integrity of the
7 Company's distribution."  Do you have any
8 understanding what that relates to?
9    A.   Again, I feel that that might have been,
10 as you can see, that the number of different teams
11 that were involved with this, integrity, IT, legal,
12 supply chain, LP, I'm going to say "maintain the
13 integrity" was probably supplied by the legal team.
14    Q.   But you don't have an understanding of
15 what that means?
16    A.   I mean, I understand those words, but to
17 get into the specifics of what it would be
18 required, again, I would have relied on other
19 teams.
20    Q.   Again, you mentioned the dashboard below
21 and that you were going to support the
22 pharmaceutical team, correct?
23    A.   The integrity team.
24    Q.   Yes, sir -- yes, ma'am.  Thank you.

Page 109

1        In the bottom here under Mr. Murray's
2 comments that "With the advent of Pharmaceutical
3 Integrity, your involvement in this program has
4 waned, which was expected and needed."
5        Is that accurate?
6    A.   Yes, that as the integrity team grew and
7 developed and became more robust and understood
8 their jobs, I wouldn't be needed.  They would take
9 over this.
10    Q.   So, as 2013 progressed, your involvement
11 became less and less and less?
12    A.   Absolutely.
13    Q.   So, it was a few hours maybe in earlier
14 years, '9, '10, '11, '12, even got smaller than
15 that?
16    A.   Yeah, a few hours a week to a few hours
17 a month or down to zero.
18    Q.   So, we're now kind of, you know, down to
19 zero.  We've now kind of covered the whole period
20 here that you recall from -- I think we started off
21 in late 8/2009 all the way up to 2012.
22        On average, you think your hourly
23 involvement in this process was less than 10 hours
24 a week throughout this entire time period,

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  sometimes it might have gotten a little more but
2  sometimes it was a little less, but on average five
3  to ten hours a week?
4      A.   It's hard to quantify.  I'm sorry.  I
5  just don't remember.
6      Q.   It was not a significant -- we've just
7  gone through four years, five years.  And you've
8  never told me that this was a material part of your
9  job.  The weights that we're looking at are all 10,
10  18, 20% of your time.  Isn't that -- I'm sorry.  Of
11  your goals.  Isn't that indicative of how much of
12  your overall job duties suspicious order monitoring
13  policies were?
14      MR. SWANSON:  Object to the preface.  Go ahead
15  and answer if you can.
16  BY THE WITNESS:
17      A.   The weights could vary based on the
18  amount of time you spend on a project or the
19  weights could be how important your boss thought
20  that project was compared to other projects.
21  BY MR. MOUGEY:
22      Q.   Can you point me to any point in time
23  from late '08 when we started all the way to end of
24  '12, that your week-to-week involvement in

Page 111

1  suspicious order monitoring policies and
2  procedures, reviewing reports, was ever more than
3  five to ten hours a week?
4      A.   It's -- it's been so long, I can't put
5  hours to it.  I really don't remember how much
6  time.  It wasn't a significant amount of time, but
7  I'd hate to quantify it.
8      Q.   Let's not qualify it.
9          You're comfortable with your language
10  that you previously provided that the suspicious
11  order monitoring policies and procedures from '08
12  to the point where it got down to zero and it waned
13  was a small portion of your time?
14      MR. SWANSON:  Object to form.
15  BY MR. MOUGEY:
16      Q.   Are you comfortable with that?
17      A.   Sure.
18      Q.   Ms. Martin, I have a series of documents
19  that I just had some general questions on that I
20  didn't quite understand and I was hoping you could
21  help me with?
22      MR. MOUGEY:  What number are we on?
23      THE REPORTER:  3 is next.
24      MR. MOUGEY:  This is Polster 3 -- I'm sorry.

Page 112

1  Martin 3.
2          (WHEREUPON, a certain document was
3          marked as Walgreens-Martin Exhibit
4          No. 3:  4/10/12 e-mail string;
5          WAGMDL00580316 - 00580318.)
6  BY MR. MOUGEY:
7      Q.   All right.  Ms. Martin, this is an
8  e-mail from your boss, Mr. Murray, to yourself
9  dated 4/10/12.  Do you see yourself in the "To"
10  line?
11      A.   I see myself.  I also see Mike Bleser.
12      Q.   Yes, ma'am.  Thank you.
13          And the e-mail is discussing who was
14  responsible for monitoring the suspicious ordering
15  dashboard, amongst other information.
16          Do you see that?
17      A.   I'd have to read this.
18      Q.   Go ahead.  Take your time.
19          I'll tell you.  Why don't we just start
20  at the back and we'll work our way through and give
21  you a chance to look at it.  Okay?
22      A.   Sure.
23      Q.   So, the very back is where the e-mail
24  chain starts.  It's from Mike Bleser to Frank

Page 113

1  Destefano, Jeffrey Berkowitz, your boss, Denman
2  Murray, and William Groth, correct?
3      A.   Yes, I see that.
4      Q.   So, this includes both your boss and
5  your boss's boss, correct?
6      A.   Correct.
7      Q.   And the subject line is "Update," dated
8  April 6, 2012.  The Bates number is 5801 -- 0317,
9  and it references "Jupiter DC fills 128 different
10  C2," that's Class II, correct?
11      A.   Yes.  Schedule II drugs.
12      Q.   "NDC" codes, and that's identifying
13  which C-IIs, correct?
14      A.   Yes.
15      Q.   "For 2,471 stores," and it lists,
16  "Perrysburg and Woodland DCs service the remaining
17  stores."
18          And Perrysburg is in Ohio, correct?
19      A.   Yes.
20      Q.   Right outside of Toledo, correct?
21      A.   I'm not good geographically in Ohio.
22      Q.   And Woodland DC is California, correct?
23      A.   Yes.
24      Q.   "On a once-a-week basis.  Initial plan

Page 114

1  in the event of a Jupiter C2 shutdown."
2        Do you understand why internally your
3  boss and your boss's boss were discussing a Jupiter
4  shutdown as early as April 6, 2012?
5        MR. SWANSON: Object to foundation.
6  BY THE WITNESS:
7    A.  Again, it's hard to remember what I
8  would have known then versus what I've learned now.
9  BY MR. MOUGEY:
10   Q.  Okay.  Well, why don't you help me with
11 why there was a discussion in April 6 of 2012 about
12 Jupiter 2 shutting down.
13       MR. SWANSON: Foundation.  Objection.
14 BY THE WITNESS:
15   A.  I wasn't on this e-mail.  It was
16 forwarded to me several e-mails after that.  So,
17 why they were writing this, I'm uncomfortable
18 speculating.
19 BY MR. MOUGEY:
20   Q.  Okay.  That would be pretty big news if
21 you got a -- here you are in inventory and supply
22 chain and you get an e-mail about one of your
23 distribution centers shutting down.  That would be
24 kind of something you'd pay attention to, wouldn't

Page 115

1  it?
2        MR. SWANSON: Object to form.
3  BY THE WITNESS:
4    A.  That's why my boss and my boss's boss
5  are involved with this.
6  BY MR. MOUGEY:
7    Q.  So, the Jupiter distribution center is
8  one of just a few distribution centers that ship
9  Schedule II opiates and narcotics, correct?
10   A.  Correct.  At the time we had three
11 distribution centers that handled C-IIs.
12   Q.  And the e-mail is forwarded to --
13 actually, Mr. Ed -- I never can pronounce his name
14 right.  Svihra?
15   A.  Svihra.
16   Q.  Svihra.  And he is in Loss Prevention,
17 right?
18   A.  Correct.
19   Q.  At the corporate level in Deerfield,
20 correct?
21   A.  Yes.
22   Q.  And he e-mails your boss's boss,
23 correct?
24   A.  Yes.

Page 116

1    Q.  And he says, he responds, "To clarify,
2  Loss Prevention," and that's his department, the
3  guy sending this e-mail, Edward, correct?
4    A.  This is his e-mail, yes.
5    Q.  Yes, ma'am.  He says, "Loss Prevention
6  has not been responsible for reporting and taking
7  action with direct supervision since January '11 as
8  you state in your e-mail.  We did agree to assist
9  with the analysis and design of the reporting.  The
10 Rx purchasing team still has the responsibility to
11 ensure the proper balance between in-stock
12 condition, while limiting excess on-hand
13 quantities."
14       Is Rx purchasing team, is that your
15 department?
16   A.  Yes.
17   Q.  That's one of the names that we changed
18 over time.  So, that's your group?
19   A.  Yeah, under Mike Bleser, yes.
20   Q.  Yes, ma'am.  And when I say "your
21 group," that's part of the group you worked in
22 under Ms. Bleser -- Mr. Bleser and Mr. Murray,
23 correct?
24   A.  Yes.

Page 117

1    Q.  Along with a bunch of other people,
2  correct?
3    A.  Yes.
4    Q.  Now, Mr. Murray responds to Ed's e-mail
5  and copies you, correct, at the very top of the
6  page?
7        MR. SWANSON: Object to form, mischaracterizes
8  the document.
9  BY THE WITNESS:
10   A.  On the e-mail we're looking at now, yes,
11 it's Denny, myself and Mike Bleser.
12 BY MR. MOUGEY:
13   Q.  Yes, ma'am.  So, Mr. Murray responds to
14 Mike Bleser's e-mail and copies you, correct?
15   A.  No.  He's responding to Ed's e-mail.
16   Q.  There is an e-mail right in the middle
17 of the page.  Do you see -- I got confused too.  Do
18 you see Mike Bleser's e-mail in the middle?
19   A.  I didn't see that.
20   Q.  I didn't either at first.
21       Do you see the "Let's discuss"
22 underneath that?
23   A.  Yes.
24   Q.  I just forgot it.  So, we see Mike

Page 118

1 Bleser.  He responds, includes you, and says,
2 "Let's discuss," correct?
3     A.   Yes.
4     Q.   Okay.  Now let's go to the top of the
5 page where we just were and I missed it.
6         So, this is Mr. Murray responding to
7 Mr. Bleser's e-mail about "Let's discuss," correct?
8     A.   Yes.
9     Q.   And you're on the chain and he,
10 Mr. Murray says, "I agree with Ed 100%.  Our
11 systems," and he gives a bunch of acronyms, "are
12 designed to keep all prescription drugs at good
13 in-stock conditions while limiting excess
14 inventory."
15        Do you agree with that statement?
16     A.   That was our intention --
17     Q.   Yes, ma'am.
18     A.   -- with how we designed ordering logic.
19     Q.   And "The Suspicious Order program
20 prohibits ordering of controlled substances outside
21 of the tolerance limits."
22        That is the logic program that you've
23 been referencing this morning, correct?
24     MR. SWANSON:  Object to form.

Page 119

1 BY THE WITNESS:
2     A.   Again, there have been several
3 iterations.  I don't know what logic we're running
4 at this point.  I can't remember.
5     Q.   I understand.  But we can agree that
6 there is a logic system that went through several
7 reiterations, correct?
8     A.   Yes.
9     Q.   And that was Walgreens' suspicious order
10 monitoring program that you were familiar with,
11 correct?
12     A.   Yes.
13     Q.   So, this sentence that says "The
14 Suspicious Order program," you take -- you
15 understand that to be the logic, that program and
16 the reiterations that you were working on, correct?
17     A.   Correct.
18     Q.   The last sentence says, "LP," and that's
19 Loss Prevention, correct?
20     A.   Yes.
21     Q.   "Is responsible for monitoring the
22 Suspicious Ordering dashboard."
23        Do you see that?
24     A.   Yes.

Page 120

1     Q.   We just looked in your personnel review
2 where you reference a dashboard being completed,
3 and I asked you who was responsible for reviewing
4 that dashboard.
5         Do you agree that LP, Loss Prevention,
6 was responsible for reviewing that dashboard?
7     MR. SWANSON:  Object to form.
8 BY THE WITNESS:
9     A.   Walgreens is a big company.  There were
10 a number of different departments.  So, I don't
11 remember who took ownership.
12        Looking at this e-mail, Denny is saying
13 that this should be more LP's responsibility than
14 our team's responsibility; and that would have
15 probably corresponded with some of my past comments
16 that we've had today where I was more in an
17 assistant role working with Marcie.
18 BY MR. MOUGEY:
19     Q.   Yes, ma'am.  And what this e-mail is
20 discussing was internal confusion at Walgreens
21 about who was responsible for reviewing the
22 suspicious ordering dashboard, correct?
23     MR. SWANSON:  Object to form, foundation.
24 BY THE WITNESS:

Page 121

1     A.   Again, you're asking me to kind of
2 speculate.  I didn't write this e-mail.  Denny did.
3 I can try to interpret his words, but I don't
4 really want to comment for him.
5     Q.   I'm not asking you to comment.  I'm
6 asking your understanding of this e-mail.
7         Your understanding of this e-mail is
8 there was confusion between Mr. Svihra's department
9 and Mr. Bleser's department, yours, about who was
10 responsible for monitoring the suspicious ordering
11 dashboard, correct?
12     MR. SWANSON:  Object to form and foundation.
13 BY THE WITNESS:
14     A.   It's hard for me to interpret that.
15 BY MR. MOUGEY:
16     Q.   Hard for you to interpret this too?
17     MR. SWANSON:  Object to the comment.
18     MR. MOUGEY:  That's a question.
19 BY MR. MOUGEY:
20     Q.   It's hard for you to interpret this too?
21 This is difficult for you to interpret?
22     MR. SWANSON:  Okay.  Then asked and answered.
23 BY MR. MOUGEY:
24     Q.   This is difficult for you to interpret,

Page 122

1 this e-mail that you're copied on with you and your
2 boss's boss discussing who was responsible for the
3 dashboard, that's difficult for you to interpret?
4     MR. SWANSON: Object to form.
5 BY THE WITNESS:
6     A. I didn't write this e-mail.
7 BY MR. MOUGEY:
8     Q. So, the answer is yes, it's difficult
9 for you to interpret?
10     A. I don't want to put words in someone
11 else's mouth.
12     Q. I'm not asking you to put words in
13 someone else's mouth. I'm asking you what you
14 understood.
15         So, your answers to me today repeatedly
16 have said, "I don't want to interpret." I'm not
17 asking you to interpret what someone else said.
18 I'm asking what you understood.
19         So, what I'm -- I'll ask you again just
20 to make sure there was any confusion about whether
21 I was asking about what Mr. Bleser was
22 interpreting.
23         Do you, Barb Martin, understand that
24 there was confusion about who was responsible for

Page 123

1 reviewing the suspicious order monitoring
2 dashboard?
3     MR. SWANSON: Object to form.
4 BY THE WITNESS:
5     A. Again, I wasn't the one that was writing
6 this e-mail.
7 BY MR. MOUGEY:
8     Q. I think -- I get that. I understand.
9 You didn't write it. And I'm not asking you to
10 interpret what somebody else said.
11         What I've asked you is: Is it your
12 understanding that there was confusion about whose
13 responsibility it was to review the suspicious
14 order monitoring dashboard?
15     A. Well, since I was working with Marcie
16 and I was helping her, I was under the assumption
17 that she had a larger role. That was my
18 interpretation of her responsibilities.
19     Q. Yes, ma'am. That Marcie and that Loss
20 Prevention, your understanding was, they were
21 reviewing the suspicious order monitoring
22 dashboard, correct?
23     A. Yes.
24     Q. Okay. And you weren't reviewing on a

Page 124

1 daily basis the suspicious order monitoring
2 dashboard, correct?
3     A. No one asked me to.
4     Q. Yes, ma'am. I hand you what we will
5 mark as Martin 4.
6         (WHEREUPON, a certain document was
7         marked as Walgreens-Martin Exhibit
8         No. 4: Document, first line,
9         "6 - Retain an outside consultant
10         to audit your DEA compliance";
11         WAGMDL00709393.)
12 BY MR. MOUGEY:
13     Q. There's a few documents that I believe
14 were pulled from your files, and I don't know
15 necessarily what they are and I was hoping you
16 could help me.
17         So, this Bates number is WAGMDL709393,
18 and it -- it's P-WAG-205 and it begins with "6."
19         Do you see that?
20     A. Yes. I see that.
21     Q. And the first line says, "Retain an
22 outside consultant to audit your DEA compliance.
23 At a minimum, this consultant should conduct annual
24 site visits to ensure the consistency of the

Page 125

1 registrant's," it says, "SOPs," that's standard
2 operating procedures, correct?
3     A. Yes.
4     Q. "Compliance with DEA regulations, and
5 adherence with the company's established program
6 for detecting suspicious orders."
7         Do you see that?
8     A. That's what it says.
9     Q. Okay. Do you have an understanding or
10 recollection of where this came from?
11     A. I have absolutely no idea where this
12 came from.
13     Q. I will represent to you that it was
14 produced as part of your files with your name on
15 it. You don't have any recollection of where this
16 came from?
17     A. If it was in my files, then my
18 assumption is I picked this up in a meeting
19 somewhere and put it in a file, and that's the best
20 I can give you. Sorry.
21     Q. Do you have an understanding of whether
22 Walgreens ever hired an outside consultant to audit
23 its DEA compliance?
24     A. I don't know one way or another.

Page 126

1    Q.   It's I think consistent with what you've
2  told me this morning is that you did not perceive
3  your job to ensure Walgreens' compliance with DEA
4  rules and regs regarding its role as a distributor,
5  correct?
6    A.   I was relying on other people's
7  interpretations of the rules and regulations.
8    Q.   I know.  And we're back to that word
9  "interpretation."  I didn't ask you if you
10 interpreted anything.
11       All I simply asked was you did not
12 perceive your job to ensure Walgreens' compliance
13 with DEA rules and regs regarding its role as a
14 distributor, correct?
15   MR. SWANSON:  Object to form.
16 BY MR. MOUGEY:
17   Q.   Yes or no.  Was that part of your job?
18   A.   Again, it goes back to I wasn't
19 responsible for the regulations.  Someone said,
20 "Look at this report.  Look at this data.  Does it
21 make sense?  Pull this."
22   Q.   And you -- your job wasn't to say, "I've
23 looked at this report, I've looked at the
24 responses," and comparing that to what Walgreens'

Page 127

1  obligations were as a distributor, correct?
2    A.   I wasn't asked to do that.
3    Q.   You were just looking at reports?
4    A.   Correct.
5    Q.   You had no idea what the structure was
6  of the rules and regulations.  You were relying on
7  somebody else, correct?
8    A.   Correct.
9    Q.   I'm sorry if you already answered this.
10 But are you aware of whether or not Walgreens ever
11 hired an outside vendor to audit Walgreens'
12 compliance with DEA rules and regs?
13   A.   I don't know one way or another.
14   Q.   Okay.  I'm going to hand you what --
15 hand you what we'll mark as Martin 5.
16       (WHEREUPON, a certain document was
17       marked as Walgreens-Martin Exhibit
18       No. 5:  Document, "Suspicious
19       Orders"; WAGMDL00709431.)
20 BY MR. MOUGEY:
21   Q.   I believe this is another document,
22 Bates No. 709431, that came from your custodial
23 files.
24       Do you recognize these notes?

Page 128

1    A.   I don't recognize them.  It's obviously
2  instructions on how to pull something.
3    Q.   Well, help me because it's not obvious
4  to me.  So, "Open Windows SQL.  Enter password and
5  user name."
6        So, you're trying to enter into what?
7    A.   Again, there is really not a lot of
8  context on this form.  My assumption is that this
9  is the order monitoring system when we have talked
10 about moving from the old reporting to a dashboard.
11 I think this might be how to get into that
12 dashboard.  I mean, there really isn't a lot of
13 information on this sheet of paper other than some
14 instructions.
15   Q.   In the upper left-hand corner, do you
16 see the words "Suspicious Orders," correct?
17   A.   Um-hmm.
18   Q.   There is no "potential" in front of it,
19 correct?
20   A.   There is no "potential" in front of it.
21   Q.   There is no "possible" in front of it,
22 right?
23   A.   Correct.
24   Q.   Just says "Suspicious Orders," correct?

Page 129

1    A.   Correct.
2    Q.   And it appears that after running a
3  query, there are orders cut-and-pasted into an
4  Excel file, correct?
5    MR. SWANSON:  Object to form and foundation.
6  BY THE WITNESS:
7    A.   That's my assumption.
8  BY MR. MOUGEY:
9    Q.   I don't want you to assume when it says
10 it right here on the page.  It says, "Open up the
11 query that is saved in documents," correct?
12   A.   Yes.  But I don't know what's in that
13 document.
14   Q.   All right.  We know it has something to
15 do with suspicious orders up there in the left-hand
16 side, don't we?
17   MR. SWANSON:  Object to form, foundation.
18 BY THE WITNESS:
19   A.   It has to do with the order monitoring
20 process, yes.
21 BY MR. MOUGEY:
22   Q.   And it says, "Change the date ranges."
23       Do you see that the dates in parens?
24   A.   Yes.

Page 130

1    Q.   How do you change those date ranges?
2    MR. SWANSON:  Objection; foundation.
3 BY THE WITNESS:
4    A.   I really don't know.  I'm sorry.
5 BY MR. MOUGEY:
6    Q.   You don't know?
7    A.   I mean, it might be easier if we had the
8 database in front of us, and it might not even be
9 the same database anymore.
10       Just looking at this, it's instructions,
11 but this -- I don't really remember much of
12 anything about this particular sheet of paper.  I
13 would need more background.
14   Q.   Do you see the dates 1111001?
15   A.   Yes.
16   Q.   Has an extra digit in it, does it not?
17   MR. SWANSON:  Object to form.
18 BY THE WITNESS:
19   A.   Again, I'm struggling with how this
20 dates.  It might not be a logical date as we would
21 interpret, you know, today's date of January 1st
22 25, 2019.
23       This could be -- Walgreens had internal
24 weeks.  Again, I'm jumping to conclusions.

Page 131

1 Walgreens had weeks and databases that way.  So,
2 these extra digits could have pertained to weeks in
3 the Walgreens systems.
4 BY MR. MOUGEY:
5    Q.   But you don't remember --
6    A.   It doesn't --
7    Q.   -- having to -- you don't remember
8 having to modify date ranges to where the user
9 could understand a calendar date?
10   A.   However this was written, you know, the
11 date ranges, we're going around -- like I said, I
12 don't know what these date ranges represent, but
13 you would go in and you would know what period of
14 time you wanted to look at and you would put that
15 date range in, whatever.
16   Q.   Let's just do it this way.  Do those
17 date ranges make any sense to you?
18   A.   Like I said, without more context, it's
19 hard for me to know for sure what those date ranges
20 meant.  Like I said, they could have been
21 representative of internal weeks.
22   Q.   Look at the bottom left-hand corner of
23 the page.  Is that your handwriting?
24   A.   The -- where it says like a "2K" kind of

Page 132

1 thing?
2    Q.   Yes, ma'am.
3    A.   That is not my handwriting.
4    Q.   That's not your handwriting.
5    A.   No.  I don't make my Ts like that.
6    Q.   Does that appear to give -- somebody
7 else it looks like is also confused with that date
8 where it says, it has four 1s in a row, two zeros
9 and a 1?
10   MR. SWANSON:  Object to foundation.
11 BY MR. MOUGEY:
12   Q.   You don't have any recollection of this?
13   A.   No, I don't.
14   Q.   "Attach file into an e-mail."  I'm
15 looking at the last bullet.  "Attach file into an
16 e-mail addressed to Adriana Smyly and Barb Martin."
17       Do you see that?
18   A.   Yes, I see that.
19   Q.   All right.  And do you -- who is Adriana
20 Smyly?
21   A.   I don't remember her title, but for a
22 period of time Adriana was one of my direct
23 reports.
24   Q.   What was her responsibility?

Page 133

1    A.   She would have helped me on all types of
2 inventory-related topics.  It could have been order
3 monitoring or returns, non-controlled substances.
4 There were a number of different things that I
5 worked on regarded to inventory management.
6    Q.   I'm going to hand you what will be
7 marked as Martin 6.
8       (WHEREUPON, a certain document was
9        marked as Walgreens-Martin Exhibit
10       No. 6:  5/7/08 e-mail with
11       attachment; WAGMDL00324911 -
12       00324914.)
13 BY MR. MOUGEY:
14   Q.   Start on the last page, Bates
15 No. 324913, the e-mail content is redacted.
16       So, go to the middle of the page, Bates
17 No. 11, appears to be an e-mail dated 5/7/2008 to
18 Rick Gates, subject:  "Pharmacy Shrink Task Force,"
19 and it says -- you respond, "Rick, Number 3 on the
20 list will probably become ours.  Barbara Martin,
21 R.Ph., Supervisor, Pharmacy Inventory Systems."
22       That's you, right?
23   A.   That's me, yes.
24   Q.   Do you have any recollection of what

Page 134

1 number 3 on the list is?
2    A.   No.
3       MR. SWANSON:  You can answer that yes or no.
4 BY THE WITNESS:
5    A.   No.
6 BY MR. MOUGEY:
7    Q.   And then Richard Gates responds, says,
8 "Barb, Tasha just discussed it with me."
9       You know Ms. Polster, correct?
10   A.   Yes, I know Tasha.
11   Q.   "We need to start looking into this and
12 get a plan in motion.  Rick."
13      Does that refresh your memory of what
14 this is discussing?
15   A.   No, it doesn't.
16   Q.   And at this point in time, Ms. Polster
17 was the director of pharmacy operations
18 optimization.  Do you recall any -- your group and
19 Loss Prevention and Tasha Polster's pharmacy
20 operations optimization working jointly on a
21 project?
22   A.   No, I don't remember anything.  Sorry.
23   Q.   I hand you P-WAG-201, which is Martin 7.
24      (WHEREUPON, a certain document was

Page 135

1       marked as Walgreens-Martin Exhibit
2       No. 7:  Handwritten notes;
3       WAGMDL00658243.)
4 BY MR. MOUGEY:
5    Q.   Is that your handwriting, Ms. Martin?
6    A.   Yes, it is.
7    Q.   Let's just kind of go through this
8 together and let me know if I have this right.
9       I'm going to start, do it as quick as I
10 can, start on the first line.
11      "Pulled 1 year date 2 to 5"?
12   A.   That's what it says.
13   Q.   "Pulled 2 year date"?
14   A.   That's what it says.
15   Q.   Third line, does that say "Sparse"?
16   A.   Yes.
17   Q.   "Sparse sales.  1-2 observations per
18 year."
19      Is that what that says?
20   A.   That's what it says.
21   Q.   "Order" -- it says, "OR order."
22      Is that right?
23   A.   I said, "Or order quantity."
24   Q.   Okay.  "Or order quantity same each

Page 136

1 time - can't calculate."
2       Did I get that right?
3    A.   Yes.
4    Q.   Okay.  "Deviation (standard error)."
5       Do I still have it right?
6    A.   That's what it says.
7    Q.   And then, "Will assume order/sales are
8 legitimate."
9       Do I have that right?
10   A.   Yes.
11   Q.   And then, "Unusual size/frequency, DEA
12 guidelines."
13      Do you see that?
14   A.   That's what I wrote.
15   Q.   "Tolerance limit," and then it says,
16 "Y geometric distribution."
17      Correct?
18   A.   It's not a Y.  It's like an arrow down.
19   Q.   Arrow down.
20   A.   "Frequency," I'm arrowing, "Frequency"
21 to "geometric distribution."  Interpreting my
22 handwriting because I have no idea when I actually
23 wrote this.  There is no date on it.
24   Q.   Let's first figure out what it says.

Page 137

1       The last part of that section says,
2 "Look at manual changes."
3       Correct?
4    A.   Yes.
5    Q.   And then "Line in adjustments."
6       Do I have that right?
7    A.   Tie.
8    Q.   "Tie in adjustments."  Okay.
9       And the last sentence says, "Once limits
10 are in place, if store level had previous
11 suspicious orders, system would not catch."
12      Correct?
13   A.   I think you added in a word there.
14   Q.   Okay.  Where did I add it?
15   A.   I think you said something about level.
16 I don't see the word level in here.
17   Q.   Okay.  Is that "total"?  What do you see
18 after "store"?
19   A.   "Store had previous."
20   Q.   Okay.  Had.  All right.  So, let me read
21 it again.
22      "Once limits are in place if store had
23 previous suspicious orders, system would not
24 catch."

Page 138

```
1        Correct?
2    A.   That's what I wrote.
3    Q.   Do you have any recollection of when
4 these notes were?
5    A.   I have no idea when I wrote this.
6    Q.   So, it would have been sometime after
7 2008 and through 2009 and '10 when the suspicious
8 order monitoring algorithm was being updated,
9 correct?
10   MR. SWANSON:  Object to form and foundation.
11 BY THE WITNESS:
12   A.   I have no idea when I wrote this.
13 BY MR. MOUGEY:
14   Q.   You have no earthly idea.
15        Okay.  But after 2010 did you continue
16 to work on implementing updates and tweaks to the
17 Bancroft algorithm?
18   A.   I might have sat into meetings where I
19 made these notes.  Again, I have no idea when these
20 notes were written.
21   Q.   So, at least as of the date of these --
22 at least at the time of these notes, you had an
23 understanding that you were looking for unusual
24 size/frequency as the DEA guidelines, right?
```

Page 139

```
1    A.   Yes.
2    Q.   So, somebody had talked to you at some
3 point and told you what the DEA guidelines were
4 and, as the notes are here, unusual size/frequency.
5 Correct?
6    MR. SWANSON:  Object to form.
7 BY THE WITNESS:
8    A.   That's what it says, yes.
9 BY MR. MOUGEY:
10   Q.   And that's what your -- accurate with
11 your understanding of what the DEA guidelines were?
12   A.   I'm -- it's hard to take this.  It's out
13 of context.  I don't know where I wrote this.  I
14 could have been in a meeting where someone was --
15 I'm just scribbling notes based on what I'm hearing
16 in a meeting.
17   Q.   Yes, ma'am.  So, over entire mid-2008
18 all the way till when your participation waned down
19 to zero for suspicious order monitoring policy and
20 I asked you earlier what kind of training you had,
21 is -- this is the only piece of kind of evidence we
22 have at this point of what your understanding of
23 the DEA guidelines are, correct?
24   MR. SWANSON:  Object to form, mischaracterizes.
```

Page 140

```
1 BY THE WITNESS:
2    A.   Again, I don't know what I knew when.
3 BY MR. MOUGEY:
4    Q.   Okay.
5    A.   When I learned things.
6    Q.   So, "Once limits are in place, if store
7 had previous suspicious orders, system would not
8 catch."  So, tell me what is a limit, "once limits
9 are in place."  What is that?
10   MR. SWANSON:  Object to form, foundation.
11 BY THE WITNESS:
12   A.   Again, I don't know when I wrote this.
13 The notes are so vague, I'm not comfortable
14 interpreting what I meant.  I'm sorry.
15 BY MR. MOUGEY:
16   Q.   Yes, ma'am.  So, you don't know what you
17 meant by looking at these notes?
18   A.   I have no idea when I wrote these or
19 what I meant.
20   Q.   Do you know what a line limit report is?
21   A.   I know what a line limit is, yes.
22   Q.   What's a line limit?
23   A.   A line limit would be some type of logic
24 where we can go in and it can be by store or by
```

Page 141

```
1 drug and say never order more than a certain
2 quantity.
3        I don't know if this type of line
4 limit -- because this says "once limit."  It
5 doesn't say "line limit."  So, it could be a
6 different type of limit than a line limit.
7    Q.   Did you have any involvement with the
8 line limit report?
9    A.   I did not.
10   Q.   Did you have any involvement with
11 creating the line limit?
12   A.   No.  That was in place long before I
13 came into the team.
14   Q.   Did you have any involvement with
15 reviewing line limit reports?
16   A.   I did not.
17   Q.   Did you have any involvement with
18 looking at orders that were canceled due to line
19 limit reports?
20   A.   No.
21   Q.   So, you had zero involvement with
22 anything to do with line limits?
23   A.   I knew of line limits.
24   Q.   Other than knowing what a line limit
```

Page 142

1 was, you didn't have any involvement with that
2 process?
3    A.   No.
4    Q.   Okay.  I hand you what we'll mark as
5 Martin 8.
6         (WHEREUPON, a certain document was
7          marked as Walgreens-Martin Exhibit
8          No. 8:  Handwritten notes;
9          WAGMDL00658228 - 00658229.)
10 BY MR. MOUGEY:
11    Q.   Is this your handwriting, Ms. Martin?
12    A.   Yes, this is my handwriting.
13    Q.   Let's do the same thing we just did.
14 Okay?  I know it's a little tedious, but I need to
15 understand what your notes say.  Suffice it to say
16 your handwriting is 50 times better than mine.  So,
17 let's see if we can --
18    A.   Then your handwriting must be really
19 bad.
20    Q.   It's really bad.  No one can read it,
21 including myself.
22         So, "Cardinal SOM."  You understand SOM,
23 suspicious order monitoring?
24    A.   Yes.

Page 143

1    Q.   And "9/18" off to the side.  Do you have
2 an understanding, is that September 18, September
3 2018?
4    A.   It's September 18.  I don't know what
5 year.
6    Q.   Okay.  So, let's kind of go through
7 these one by one.  I'm going to read it, you tell
8 me.
9         "Obligation ID'd in 13.0174 regs,"
10 regulations.
11         Do you see that?
12    A.   That's what it says.
13    Q.   Do you know that 1301.74 is the reg that
14 is directly applicable to Walgreens as a
15 distributor?
16    A.   I wrote this number.  It must have been
17 important for something, but knowing this number
18 and what it actually meant, I don't know.
19    Q.   No idea.
20         "A registrant (Rx)," prescription,
21 "selling to?) or chain wholesaler)."
22         Did I get that right?
23    MR. SWANSON:  I'm sorry.  Can you just read
24 back again.

Page 144

1    MR. MOUGEY:  Sure.
2 BY MR. MOUGEY:
3    Q.   "A registrant (Rx selling to)," and I
4 think that's a question mark.  Tell me if I'm
5 wrong.
6    A.   No.  It says, "Rx selling to MD."
7    Q.   MD.  Okay.  Thank you.
8         "A registrant."  What do you mean by
9 "Rx selling to MD"?  Do you recall?
10    A.   I don't remember.
11    Q.   Okay.  "Or chain wholesaler."  You don't
12 have any -- "A registrant (Rx selling to MD) or
13 chain wholesaler," you don't know what that
14 references?
15    A.   "Chain wholesaler" sounds like the
16 Walgreens distribution centers.
17    Q.   Okay.  Continues, "To be, 1, design and
18 implement SOM to report," and I can't read the
19 language on the first line after that.
20    A.   "Analysts."
21    Q.   Okay.
22    A.   "Must look at."
23    Q.   "Size, frequency/pattern, total drug
24 family."

Page 145

1         Right?
2    A.   That's what I wrote, yes.
3    Q.   "Total drug family," is that by drug
4 code?
5    A.   I don't remember.  I mean, it's like a
6 group of drugs.
7    Q.   A group of drugs.  So, would that --
8 would oxycodone be a total drug family?
9    A.   Yes.
10    Q.   So, that would be drug code 9143.  Do
11 you know that?  You don't know?
12    A.   I wouldn't know the code number.  Sorry.
13    Q.   "Disproportionate number to a store
14 versus other stores."
15         Do I have that right?
16    A.   Yes.
17    Q.   "ID store and block order until figure
18 out what is happening."
19         Do you see that?
20    A.   That's what I wrote.
21    Q.   "Possibly required to report to DEA
22 field office."
23         Correct?
24    A.   That's what it says.

Page 146

1    Q.   "Obligation to report drug order."
2         Did I get that correct?
3    A.   No.  That's not what it says.
4    Q.   What does it say?
5    A.   "Obligation to report on any order."
6    Q.   On any.  All right.
7         "Team of 14, 3 RPH."  What's that stand
8  for?
9    A.   Registered pharmacist.
10   Q.   Under that, "3 analysts."
11        Is that right?
12   A.   Yes.
13   Q.   And "4 investigators"?
14   A.   Yes.
15   Q.   And then "1" -- is it "document"?
16   A.   Yeah.  Yeah.  That's what it looks like.
17 I'm not sure either.  Sorry.
18   Q.   Does that sound like the description of
19 what ultimately became Pharmaceutical Integrity?
20   MR. SWANSON:  Object to form, foundation.
21 BY THE WITNESS:
22   A.   I don't believe so.
23 BY MR. MOUGEY:
24   Q.   Okay.

Page 147

1    A.   Again, the title is Cardinal.  So, I
2  think I'm learning something from Cardinal.  This
3  might be what they're doing.
4    Q.   All right.  "Two types of alerts - order
5  held stopped."
6         Did I get that right?
7    A.   Yes.
8    Q.   The second one is -- I can't read that.
9  Is it --
10   A.   "Anomaly."
11   Q.   That's "anomaly"?
12   A.   Yeah.
13   Q.   Okay.  "Anomaly preliminary" -- is it
14 "in store"?
15   A.   I think I'm writing "INQ" like shorthand
16 for inquiry, "Inquiry to store."
17   Q.   Okay.  "Starting to deviate from norm."
18        Do you see that?
19   A.   Yes.
20   Q.   And then it continues off in the column.
21 Does it say "Rx" -- is that "Patrol"?
22   A.   That's what it says, yes.
23   Q.   "E-mail alerts, Rx robberies."
24        Did I get that right?

Page 148

1    A.   Yes.
2    Q.   And it continues, "For all card
3  customers, they hold about 13 to 15 a day."
4         Did I get that right?
5    A.   It says, "10 to 15 day."
6    Q.   10 to 15?
7    A.   "Day/month."
8    Q.   "10 to 15 day/month."  Okay.
9         And then is it -- is that "beg"?
10   A.   That's what it looks like, begin.
11   Q.   Like beginning.
12        "100/day end of month."  Did I get that
13 right?
14   A.   Yes.
15   Q.   "Less than 1% of orders."
16        Did I get that right?
17   A.   That's what it says.
18   Q.   And "7 million orders/night."
19   A.   That's what it says, yes.
20   Q.   All right.  And then "Looking at rolling
21 20 day cycle, not month hard stop."
22        Did I get that right?
23   A.   Yes.  That's what it says.
24   Q.   And then, "Side note (Do we need to look

Page 149

1  at C2 TSL and order days cycle."
2         What do you think?  How did we do?  Did
3  we get it?
4    A.   Did you read that correctly?
5    Q.   Yes, ma'am.
6    A.   Yes, you did.
7    Q.   What's TSL stand for?
8    A.   Targeted service level.
9    Q.   What is that?
10   A.   Other people on my team would be able to
11 explain this better than I.  John Merritello.
12        It was a type of order logic that we
13 moved for faster-moving drugs to make sure that we
14 kept a quantity plus a safety stock on hand in the
15 stores by store by drug so that we could always
16 have enough product to service our patients' needs.
17   Q.   Okay.  The next line says,
18 "Size/pattern/location/LTV."
19        What does that say?
20   A.   I'm not sure.  Sorry.
21   Q.   The last word there is "up," right?
22   A.   I think it's "op."  Not "up."
23   Q.   Okay.  And then there is a star and it
24 says, "We are" -- is that "not"?

Page 150

1    A.   I think it's "not."
2    Q.   "We are not looking at store to store
3  comparisons."
4       Did I get that right?
5    A.   That looks like what I wrote, yes.
6    Q.   All right.  Now that we've gone through
7  kind of interpretations of your notes, do you have
8  an understanding of what you were capturing here?
9    A.   My best understanding of trying to
10  search my memory banks on this is that I believe
11  that I'm taking notes listening to what Cardinal is
12  doing and trying to figure out if there is anything
13  that we need to be changing on our side.
14    Q.   Okay.  Let me hand you what --
15    MR. SWANSON:  Peter, I let you go about an
16  hour and a half here.
17    MR. MOUGEY:  That was nice of you.  Thank you.
18    MR. SWANSON:  You're welcome.
19    MR. MOUGEY:  I appreciate that.
20    MR. SWANSON:  We'd like to take a break.
21    MR. MOUGEY:  I have -- 1, 2 -- three more docs
22  that I just generally would like to ask some
23  questions before lunch.
24       Ms. Martin, can you hold on for like

Page 151

1  another 15 or 20 minutes?
2    MR. SWANSON:  It's totally your call.  Do you
3  want to break now?  Do you want lunch now or do you
4  want --
5    MR. MOUGEY:  I think I got 15 or 20 minutes on
6  these couple docs.
7    THE WITNESS:  I think I can give you another
8  15 minutes.
9    MR. MOUGEY:  That would be fantastic.  Thank
10  you very much.  And I'll hurry.
11  BY MR. MOUGEY:
12    Q.   I will hand you what we are going to
13  mark as Martin 1 -- I'm sorry.  9.  Thank you.  And
14  I'm on Bates No. 658227.  It's a memo dated
15  August --
16       (WHEREUPON, a certain document was
17        marked as Walgreens-Martin Exhibit
18        No. 9:  8/28/09 memo;
19        WAGMDL00658227.)
20  BY MR. MOUGEY:
21    Q.   It's Bates No. 658227, dated August 28,
22  2009, and it's P-WAG-5301.  And this is -- appears
23  to be a memorandum from you and the "To" is empty,
24  correct?

Page 152

1    A.   That is correct.
2    Q.   "Suspicious Ordering Pilot."  And that's
3  consistent with your recollection that the
4  suspicious order monitoring algorithm from
5  Mr. Bancroft was still a pilot in August 28 of
6  2009, correct?
7    MR. SWANSON:  Object to form.
8  BY THE WITNESS:
9    A.   I think so, yes.
10  BY MR. MOUGEY:
11    Q.   All right.  And it lists seven stores
12  that the group was capturing data but not cutting
13  orders, right?
14    A.   That's what it says.
15    Q.   And it lists those seven stores, and
16  Walgreens keeps track of stores by store number
17  rather than -- correct?
18    A.   Yes.
19    Q.   And it says, "10 orders flagged.
20  Identified necessary fix-System should consider
21  both positive and negative adjustments."
22       What I needed your help with is this
23  next part.  "Only if sum of adjustments is a

Page 153

1  negative quantity equal to or greater than package
2  size will item be marked as substantial inventory
3  adjustment."
4       What did you mean by that?
5    A.   Again, we're going back a number of
6  years trying to remember what I wrote.
7       I can break this down.  A positive
8  adjustment is if a store changes the current
9  on-hand higher.  A negative adjustment is obviously
10  changing it lower.
11       We, Walgreens, when I say "we," our
12  systems would look at adjustments over a period of
13  a week total, which is where I'm assuming the sum
14  would have come in, that week's total.
15       So, I think what I'm meaning is that I
16  wouldn't want just one order, one adjustment to
17  flag as suspicious.  I was saying that I think
18  negative adjustments would be more suspicious than
19  positive adjustments.  And when I say suspicious,
20  I'm not talking about suspicious ordering.  Just
21  suspicious behavior.  Someone would need to go in
22  and investigate why did they change the quantity.
23    Q.   Okay.  So, let's keep going.  The last
24  part says, "Who will fund project to move to Phase

Page 154

1  II (telling DC to cut orders)?  Estimated to take
2  780 hours at a cost of $50,000."
3      I got that right, right?
4      A.   That's what it says.
5      Q.   Do you know who -- what internal group
6  at Walgreens ended up funding that project?
7      A.   I don't know off the top of my head.
8      Q.   Do you know that it was an issue getting
9  a group to fund it?
10      A.   It usually wasn't an issue to get a
11  group to fund it.  It's just when you have a number
12  of different teams working on a project like this
13  where we have LP and legal and our group, it just
14  comes down who wants to be the ones to put the
15  money in their budget to have to pay for it.
16      Q.   Were individuals bonused on the
17  profitability of their group?
18      A.   No.
19      Q.   So, what -- why would it matter about
20  whose budget line item the fix would be in?
21      A.   The budgets for a department were kind
22  of above my pay grade.
23      Q.   Do you recall that the allocating the
24  cost of the project slowed it down?

Page 155

1      MR. SWANSON:  Object to form.
2  BY THE WITNESS:
3      A.   I'm not sure.  I would like to say no.
4  BY MR. MOUGEY:
5      Q.   I hand you another series of -- Martin
6  10 -- some notes.  If you could help me.
7      We have one after this, and we'll take a
8  break.
9      (WHEREUPON, a certain document was
10      marked as Walgreens-Martin Exhibit
11      No. 10:  Handwritten notes;
12      WAGMDL00658254 - 00658255.)
13  BY MR. MOUGEY:
14      Q.   Do you see that on P-WAG-202, Bates
15  No. 658254, there is a line about a quarter down
16  the page, a handwritten line?
17      A.   Yeah.  I see that.
18      Q.   I want to start below that.  Okay?
19      A.   Okay.
20      Q.   "How do we shut off PDQ for select
21  items?  What items do we want to turn off,
22  oxycodone, et cetera."
23      Did I get that?
24      A.   That's what it says, yes.

Page 156

1      Q.   Do you have an understanding of why you
2  were looking to shut off PDQ for select items?
3      A.   Again, I have no idea when this was
4  written.  I'm sure we were just looking at
5  different options of what we want to do with
6  ordering logic.
7      Q.   PDQ was a gap in Walgreens system
8  wherein a store could continually order PDQ and as
9  long as it didn't trip the line item report, they
10  could continue to receive new shipments, correct?
11      MR. SWANSON:  Object to form.
12  BY THE WITNESS:
13      A.   I really don't agree with anything that
14  you just said.  I could explain what the intention
15  of PDQ ordering is if you would like me to.
16  BY MR. MOUGEY:
17      Q.   What I'd like to know is not the
18  intention, but the gap.
19      Was there a gap associated with PDQ?
20      MR. SWANSON:  Object to form.
21  BY THE WITNESS:
22      A.   If there was, I'm sure our team was
23  doing anything they could have to fix it.
24  BY MR. MOUGEY:

Page 157

1      Q.   I'm sure they were.  But you don't have
2  an understanding what you were referencing here on
3  this note?
4      A.   No, I don't.
5      Q.   No idea?
6      A.   If you want me to speculate, I'd be
7  happy to do that.
8      Q.   No, I just want to make sure that if you
9  have an understanding of what this note means, you
10  have an opportunity to do that now.  And if you
11  don't have an understanding of what it is, that's
12  okay, but just tell me, "I don't have an
13  understanding of what this note is."
14      A.   I don't remember when this was written,
15  and I could reiterate the words and make
16  speculative comments on them if you'd like me to.
17      Q.   So, the question I asked was, now the
18  third time, do you have an understanding of what
19  "How do we shut off PDQ for select items?  What
20  items do we want to turn off, oxycodone,
21  et cetera," do you have an understanding of what
22  that means?
23      A.   I understand what those words mean, yes.
24      Q.   In the context of this note, what do

Page 158

1 those words mean?
2    A.   That's the problem.  It's hard to put it
3 in context of this note.  I don't know when this
4 note was written.  I don't know what discussions
5 were going on behind this.  I know what the words
6 mean.
7    Q.   All right.  So, the notes don't help
8 refresh your memory as to what you meant when you
9 wrote these?
10    A.   Even if you put a date on this, I'm --
11 I'm not even sure it would help me remember.
12    Q.   Okay.  So, the next is, I believe -- is
13 it "Sue," is it T-h-e-i-s-s?
14    A.   Sue Thoss.
15    Q.   Thoss.
16    A.   T-h-o-s-s.
17    Q.   Okay.  "Can have someone on her team
18 create program change."
19       Is that -- did I get that right?
20    A.   That's what it says, yes.
21    Q.   And it says, "Go to Mike B."
22       I'm assuming that's your boss, correct?
23    A.   So, this was go to Mike Bleser.  Again,
24 depending on when this note was written, I might

Page 159

1 not have been reporting to Mike's group.
2    Q.   Okay.  And then the next says, "How do
3 we let the store know the order will not be
4 processed."
5       Do you see that?
6    A.   That's what it says.
7    Q.   This note is discussing closing down or
8 shutting the process for PDQ for OxyContin,
9 correct?
10    MR. SWANSON:  Object to form, foundation.
11 BY MR. MOUGEY:
12    Q.   If you don't know, that's fine.
13    A.   I don't know.
14    Q.   Okay.  "Doug Peterson can have system
15 create" -- is it ISM?
16    A.   ISN.
17    Q.   What's that stand for?
18    A.   Insufficient stock notice.
19    Q.   Okay.  "Doug Peterson can have system
20 create insufficient stock notice back to store and
21 prevent order from going to Cardinal."
22       Did I read that right?
23    A.   That's what it says.
24    Q.   "Program to read file and create ISN

Page 160

1 record."
2       Do you see that?
3    A.   That's what it says.
4    Q.   But you don't have any recollection of
5 this note or what it's discussing sitting here
6 after just reviewing it?
7    A.   No, it doesn't trigger any memory.
8    Q.   Doesn't trigger or just generally
9 understanding what this note is discussing, you
10 don't know?
11    A.   Not off the top of my head, no.
12    Q.   I'm not asking you off the top of your
13 head.  I've just given you four or five paragraphs
14 of notes.  After reviewing those notes, you can't
15 tell us what those mean, correct?
16    A.   I can tell you what I wrote and I can
17 try to interpret it.  What I meant at the time I
18 wrote it, I don't know.
19    Q.   So, you've told me that you can't do it
20 without speculating and that you don't know without
21 a date and that you don't know without context.
22       So, simply yes or no.  Can you tell me
23 what those notes mean outside of the simple words
24 that are on that page?

Page 161

1    A.   No.
2    Q.   One more.  Let me skip this one.
3    MR. MOUGEY:  All right.  That's perfect.
4 Thank you.
5    THE VIDEOGRAPHER:  We're going off the record
6 at 12:11.
7       (WHEREUPON, a recess was had
8        from 12:11 to 1:05 p.m.)
9    THE VIDEOGRAPHER:  We are back on the record
10 at 1:05.
11 BY MR. MOUGEY:
12    Q.   Ms. Martin, I'm going to hand you what
13 we'll mark as Martin 11.
14       (WHEREUPON, a certain document was
15        marked as Walgreens-Martin Exhibit
16        No. 11:  Document, Report No.
17        CD500014; WAGMDL00396133 -
18        00396134.)
19 BY MR. MOUGEY:
20    Q.   P-WAG-0061 and Bates No. 396133.
21       Do you see at the top right-hand corner,
22 Ms. Martin, it says "Walgreen Company" and directly
23 below it "Suspicious control orders," and it says,
24 "For the month of."

Page 162

1    Do you see that?
2    A.   Yes, I see that.
3    Q.   Okay.  And on the left-hand side, the
4  date is 1/29/07 and 12/06.  Do you see the range of
5  dates on the left-hand side?
6    A.   I see those dates.  I don't think it's a
7  range.
8    Q.   Okay.  So, have you seen a similar
9  document to Martin 11?
10   MR. SWANSON:  Object to form.
11 BY THE WITNESS:
12   A.   This document doesn't look familiar to
13 me.
14 BY MR. MOUGEY:
15   Q.   This document doesn't look familiar.
16       And when you say "this document," I'm
17 not necessarily referring to the exact same one
18 with the same date, but just I just wanted to make
19 sure when you and I were talking about reports this
20 morning, we were talking about the same one.  And I
21 believe it was Martin 2, and this is a different
22 report, and I wanted to make sure that we were on
23 the same page.
24       This report or the layout or the format

Page 163

1  doesn't look familiar?
2    A.   The format or layout of this report
3  isn't familiar to me.
4    Q.   Okay.  I hand you one more, Martin 12,
5  which I believe is a report in similar format.
6            (WHEREUPON, a certain document was
7            marked as Walgreens-Martin Exhibit
8            No. 12:  Document, Report No.
9            CD500013; WAGMDL00394499 -
10           00394500.)
11 BY MR. MOUGEY:
12   Q.   Again, upper right-hand side, "Walgreen
13 Company," below that, "Suspicious Control Drug
14 Orders for the Month of," and there is a date on
15 the left-hand side that says 1/3 of '12.
16       Are we on the same page?
17   A.   Yes, that's --
18   Q.   And this is Bates --
19   A.   I see where you're reading.
20   Q.   Yes, ma'am.  Bates No. 394499.
21       And take a minute and look through this
22 document.  Similar to the last document, does this,
23 too, not the form and the format and the contents,
24 not look familiar to you?

Page 164

1    A.   None of this looks familiar to me.
2    Q.   Let me look and have you look at both
3  Martin 11 and 12 and look directly in the middle of
4  the page where it says, "Description.  Average
5  order," and it has a star, "times DEA factor equals
6  trigger."  And then below that it says, "Oxy-APAP
7  5-325," and then below it says 6, 3 and 18.
8        Do you see that?
9    A.   Yes, I see that.
10   Q.   Does any of that look familiar?
11   A.   No, none of this looks familiar to me.
12   Q.   Okay.  And again, just to make sure that
13 we're on the same page, and I'm not asking if this
14 specific example looks familiar, but this form,
15 format and style of report does not look familiar?
16   A.   This report, this format is not familiar
17 to me.
18   Q.   Okay.  Does the language in the middle
19 of the report, the "DEA factor," does that seem
20 familiar to you?
21   A.   No, it does not.
22   Q.   The what appears to be 6 and 3 and 18
23 below, does that look familiar to you?
24   A.   No, it doesn't.

Page 165

1    Q.   Anything 6 times 3 equals 18 in relation
2  to a DEA factor equals trigger look familiar to
3  you?
4    A.   It does not.
5    Q.   Okay.  Does the internal phrase
6  "Chemical Handler's report" ring a bell to you?
7    A.   No, it doesn't.
8    Q.   Does the reference to E-3 of the
9  Chemical Handler's report ring a bell to you?
10   A.   No, it doesn't.
11   Q.   And during your tenure at Walgreens, is
12 it -- can we conclude by the fact you don't recall
13 looking at those reports or that Chemical Handler's
14 report does not ring a bell to you, that you
15 weren't performing due diligence on any of those --
16 the orders identified in those reports?
17   MR. SWANSON:  Object to form.
18 BY THE WITNESS:
19   A.   Looking just at these reports, I am not
20 familiar with these reports.  I personally wasn't
21 doing due diligence.  That doesn't mean that
22 someone else in the company wasn't.
23 BY MR. MOUGEY:
24   Q.   Totally understand.  And I'm not -- you

Page 166

1  know who Mr. Bratton is, correct?
2      A.  Yes.
3      Q.  And were you interviewed by Mr. Bratton
4  or did you discuss with Mr. Bratton in the last
5  month or two about your different roles at
6  Walgreens in relation to suspicious order
7  monitoring policies?
8      A.  I talked to him about some of the things
9  that I did.
10     Q.  In the last month or two?
11     A.  Yes.
12     Q.  I'm going to read you some of his
13  testimony as Walgreen representative, and I want
14  you to help me understand if this is accurate from
15  your perspective. Okay?
16         And I asked him, "Was there ever due
17  diligence performed on the orders that were flagged
18  as part of the Chemical Handler's report?"
19         And as the Walgreens representative he
20  said, "It's my understanding based on discussions
21  with folks from our inventory team and Loss
22  Prevention, they would look at retrospective
23  analysis of a sample of these orders and review
24  them for appropriateness."

Page 167

1          Okay. Now, I know there is a lot of
2  different names for different groups. But your
3  group was often referred to as the inventory team.
4  Is that fair?
5      A.  That is correct.
6      Q.  And I followed up and I said, "So,
7  Barb Martin and Marcie Ranick were the ones
8  responsible then for performing due diligence on
9  those Chemical Handler reports?"
10         And he answered, "They would investigate
11  the sample of the orders in those reports."
12         Do you recall at any point in time at
13  Walgreens reviewing samples of the Chemical
14  Handler's reports and performing due diligence on
15  those suspicious orders?
16     MR. SWANSON: Object to form.
17  BY THE WITNESS:
18     A.  I'm not familiar with the Chemical
19  Handler's report. I can say that I did review
20  other orders. But if they were tied to the
21  Chemical Handler report, I have no knowledge of
22  that.
23  BY MR. MOUGEY:
24     Q.  But the reports that I just -- you and I

Page 168

1  just went through, which was a sample of a couple,
2  with the "DEA factor" referenced in the middle of
3  the report, you don't recall ever seeing those
4  reports?
5      A.  I have not seen these.
6      Q.  And you don't recall ever performing any
7  due diligence on a sampling of those reports?
8      MR. SWANSON: Object to form, foundation.
9  BY THE WITNESS:
10     A.  I have not performed due diligence on
11  these reports.
12  BY MR. MOUGEY:
13     Q.  The only reports you recall doing due
14  diligence on was a sample of which we looked at
15  this morning of Martin 2, correct?
16     MR. SWANSON: Object to form.
17  BY MR. MOUGEY:
18     Q.  If you need to go back and pull Martin 2
19  and look at it again and refresh your memory,
20  that's okay.
21         Those are the reports you remember using
22  a sampling to look at -- I believe your words
23  were -- I'm going to call it testing or sampling of
24  those reports, correct?

Page 169

1      A.  I would review a portion of those
2  reports.
3      Q.  Yes, ma'am.
4      A.  Correct.
5      Q.  I want to make sure because you and I
6  are both using "those reports," I want to make sure
7  what we're saying is the same thing.
8         Martin 2 from this morning -- and I
9  think just to make sure we're on the same page, if
10  you pull it back out and take a look. I will too.
11     A.  Yes.
12     Q.  Martin 2 is what you recall looking at a
13  sampling of those reports, correct?
14     A.  Yes.
15     Q.  And there are a couple different
16  variations of these types of reports, but this is
17  what you and Ms. Ranick were reviewing to test,
18  correct?
19     MR. SWANSON: Object to form.
20  BY MR. MOUGEY:
21     Q.  If you don't like the word "test," use
22  your word. I can't remember exactly what the words
23  you used.
24         But when you were looking at these

Page 170

1 reports, what were you doing again? What did you
2 call it, sampling, something?
3     A.   We were looking at samples of these
4 reports to validate the logic.
5     Q.   Thank you. The only reports that you
6 recall using were reports similar to the format in
7 Martin 2 during your tenure at Walgreens regarding
8 suspicious order monitoring policies, correct?
9     MR. SWANSON:  Object to form.
10 BY THE WITNESS:
11     A.   Those reports, and I also looked at what
12 we talked about the dashboard that was turned over
13 to Rx Integrity, but I can't really remember what
14 that looked like.
15 BY MR. MOUGEY:
16     Q.   Okay. So, the reports that you were
17 referencing this morning validating the samples
18 were variations from the Bancroft algorithm and the
19 improvements over time, correct?
20     A.   Yes.
21     MR. SWANSON:  Objection.
22 BY MR. MOUGEY:
23     Q.   I want to make sure that we're both on
24 the same page here so we don't...

Page 171

1        You do not ever recall sampling or
2 validating reports that use that DEA factor as part
3 of your duties at Walgreens, correct?
4     A.   They were not part of my duties.
5     Q.   And do you know sitting here today who,
6 if anyone -- you referenced earlier somebody else
7 might have been.
8        Do you know if anyone was reviewing the
9 DEA factor reports or the Chemical Handler reports?
10     A.   I have no direct knowledge of anyone
11 doing that. That doesn't mean it wasn't being
12 done.
13     Q.   Yes, ma'am. I understand.
14        But sitting here today, you don't have
15 any independent knowledge of anyone reviewing those
16 Chemical Handler reports?
17     A.   I personally do not.
18     Q.   Do you know anyone that does believe
19 they knew who was reviewing the Chemical Handler
20 reports?
21     A.   Maybe someone in the distribution
22 centers. I don't know.
23     Q.   Are you guessing?
24     A.   I'm guessing.

Page 172

1     Q.   You don't have any independent knowledge
2 that there is anyone at Walgreens who knows someone
3 that was reviewing the Chemical Handler DEA factor
4 reports?
5     A.   I'm sure somebody knows somebody.
6     MR. SWANSON:  Object to form.
7 BY THE WITNESS:
8     A.   But I don't know.
9 BY MR. MOUGEY:
10     Q.   You don't. Fair enough.
11        More notes I need your help with.
12 Martin 13.
13        (WHEREUPON, a certain document was
14        marked as Walgreens-Martin Exhibit
15        No. 13:  Handwritten notes;
16        WAGMDL00658242.)
17 BY MR. MOUGEY:
18     Q.   The first entry, I'm just going to --
19 like we did in the last exercise, I'm going to read
20 what I think it says and you tell me if I'm
21 correct.
22        It says, "DEA," it says, "requires
23 registrants to report suspicious or excessive
24 orders."

Page 173

1        Did I get that right?
2     A.   That's what it says, yes.
3     Q.   "Now informing that formula is not
4 enough."
5        Did I get that right?
6     A.   Yes.
7     Q.   Do you have -- and it says on the
8 left-hand margin, I think it says, "Last Monday
9 7/28"?
10     A.   I believe that's actually a 4/28.
11     Q.   4/28? Okay.
12        I believe the next entry says, "Current
13 report kept for five years at DC, not really
14 work/used."
15        Do you see that?
16     A.   Yes, I see that.
17     Q.   Do you know what you're -- first of all,
18 are these your notes?
19     A.   Yes, this is my handwriting.
20     Q.   And do you know what you were
21 referencing when you say "Current report kept for
22 five years at DC, not really work/used"?
23     A.   Again, not knowing when I wrote this or
24 having any other context than just looking at this,

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 I believe I might be sitting in a meeting taking
2 notes on things that I'm hearing from other groups.
3     Q.   The last Monday that was 4/28 was in
4 2008.  I'm sure somebody can correct me at a later
5 point if I'm wrong.  So, 4/28/2008 was the last
6 time that was a Monday.  Okay?
7         So, does that help you recall what "Now
8 informing that a formula is not enough, cannot
9 report" -- "current report kept for five years at
10 DC, not really work/used"?  Do you know what report
11 you're referencing?
12    A.   I do not.  I mean, it's something that
13 obviously it's the DCs.  I was more store-facing
14 than DC-facing.
15    Q.   Someone is telling you that a "formula
16 is not enough" and that the "current report not
17 really work/used" and you're taking a note,
18 correct?
19    MR. SWANSON:  Object to form.
20 BY MR. MOUGEY:
21    Q.   Correct, Ms. Martin?
22    A.   That is what I wrote.
23    Q.   Do you recall having a meeting that you
24 were involved with with the DEA where they passed

Page 175

1 along, they passed along that information?
2     A.   I believe I was taking notes from some
3 other meeting.  I don't remember being in any
4 meetings directly with the DEA.
5     Q.   The next section says, "DEA really wants
6 us to validate orders and only report true
7 suspicious orders and what was done to approve
8 orders."
9         Do you know what that references?
10    A.   I could just reverbalize what I wrote.
11    Q.   What it says?
12    A.   Yes.
13    Q.   But you have no independent recollection
14 of writing these notes or what context it was in?
15    A.   No, I don't.
16    Q.   Same where the next section, "Just
17 reporting these orders not good enough.  Need to
18 document what happens."
19        Do you see that?
20    A.   Yes, I see that.
21    Q.   Do you have any independent recollection
22 of taking that entry?
23    A.   No, I don't.
24    Q.   So, looking through the rest of these

Page 176

1 notes, does anything on this page give you any
2 context of what this conversation, who it was with?
3     A.   No.
4     Q.   Other than the entry with Steve Bamberg,
5 correct?
6     A.   I just wrote his name.  That doesn't
7 even mean he was in the meeting.  It just means
8 maybe I want to talk to Steve about that sentence
9 that I wrote.
10    Q.   All right.  But you have -- looking at
11 these notes, you don't have any recollection of
12 what meeting it was from, correct?
13    A.   No, I don't.
14    Q.   You don't have any recollection of what
15 context these notes were taken in?
16    A.   I do not.
17    Q.   And the report that you reference at the
18 very -- at the third line that with the formula and
19 with the following entry that "not really
20 work/used," you don't know what reports you were
21 referring to?
22    MR. SWANSON:  Object to form.
23 BY THE WITNESS:
24    A.   I do not.

Page 177

1 BY MR. MOUGEY:
2     Q.   Do you know of any reports at Walgreens
3 that are run for suspicious order monitoring on a
4 formula?
5     A.   Again, if you're going back to if you
6 said this was '08, I think that was prior to the
7 reporting I was working on.  So, my answer would be
8 no.
9     Q.   And the report with the Bancroft
10 algorithm, you wouldn't refer to that as a formula,
11 like 3 times we just saw in the DEA Chemical
12 Handler, would you?
13    MR. SWANSON:  Object to form, foundation.
14 BY THE WITNESS:
15    A.   I believe it was more complicated.  I
16 don't know the exact logic he used.
17 BY MR. MOUGEY:
18    Q.   When you referenced your conversation
19 with Mr. Bratton earlier, do you recall discussing
20 the Chemical Handler's report with him?
21    A.   I -- no, I wasn't familiar with the
22 Chemical Handler's report.
23    Q.   So, even though that was just a month or
24 two ago, you don't recall talking about the

Page 178

1  Chemical Handler's report with him?
2      A.   No, I had nothing to do with the
3  Chemical Handler's report, so I wouldn't have had
4  anything to discuss with him.
5      Q.   All right.  And similarly that -- I'm
6  going to call it the criteria for the Chemical
7  Handler's report being 3 times, do you recall
8  speaking with Mr. Bratton about that criteria?
9      A.   No.
10     Q.   And do you recall discussing with
11 Mr. Bratton that you were reviewing samplings of
12 that report as due diligence?
13     MR. SWANSON:  Object to form.
14 BY THE WITNESS:
15     A.   I wasn't reviewing sampling of that
16 report.
17 BY MR. MOUGEY:
18     Q.   And I understand.  I'm sorry.  I'm
19 trying not to ask you the same question although
20 sometimes I do that on accident.  But what I'm
21 asking you is a little different, which is:
22         Do you recall speaking with Mr. Bratton
23 about performing due diligence on the Chemical
24 Handler's report or any variation thereof with the

Page 179

1  criteria being 3 times?
2      A.   No.
3      Q.   All in the context of suspicious order
4  monitoring policy.  That doesn't ring a bell with
5  you and your conversations with Mr. Bratton?
6      A.   I had nothing to do with the Chemical
7  Handler's reporting.  I wouldn't be able to discuss
8  that.
9      Q.   Okay.  So, let me make sure we're on the
10 same page still.  You don't recall discussing that
11 with Mr. Bratton in the last month or two?
12     A.   No, I wouldn't have any knowledge to be
13 able to discuss it with him.
14     Q.   Okay.  Thank you.
15         All right.  We're going to go back to
16 almost where we started this morning.  I told you
17 that we had talked about some 30,000-foot views,
18 and I'd like to drill down on a couple of topics.
19 Okay?
20         And the first one is the P-WAG-1747A,
21 Bates No. 624503, and it's Martin 14.
22             (WHEREUPON, a certain document was
23             marked as Walgreens-Martin Exhibit
24             No. 14:  6/23/08 memo;

Page 180

1              WAGMDL00624503 - 00624509.)
2  BY MR. MOUGEY:
3      Q.   Take a second and just kind of flip
4  through it, and we'll go through it in some detail.
5         Does this look familiar to you?
6      A.   My name is on it, so I must have seen it
7  at one point or another.
8      Q.   Did you review it in preparation for
9  today?
10     A.   No, I didn't.
11     Q.   So, it's dated June 23, 2008, right?
12     A.   Yes.
13     Q.   And you see, when you said your name is
14 on it, on the "To" line, you see Barb Martin,
15 obviously, correct?
16     A.   Yes.
17     Q.   You there with Mr. Piñon, who is from
18 the regulatory and law department, correct?
19     A.   Yes.
20     Q.   Steve Bamberg, which is the IT that you
21 mentioned earlier, correct?
22     A.   Yes.
23     Q.   Along with other managerial level
24 individuals at Walgreens, correct?

Page 181

1      A.   I'm not familiar with all the names.
2      Q.   Okay.  And then it's from Wayne
3  Bancroft, and do you recognize the name Tracy
4  Morris?
5      A.   Vaguely, yes.
6      Q.   She was another one of the kind of math
7  smart people along with Wayne?
8      A.   I know she worked on IT.
9      Q.   Okay.  And then do you know who Joseph
10 Tiemeyer is in cc?
11     A.   I remember his name.  Maybe Wayne
12 reported to him.  I'm not sure.
13     Q.   The re line or the regarding, it's
14 "DEA Suspicious Order Reporting."
15         Do you see that?
16     A.   Yes, I see that.
17     Q.   And then, as we mentioned, the date is
18 June 23, 2008.  So, consistent with your
19 recollection this morning, last half of 2008 is
20 when you recall beginning to be involved with
21 suspicious order monitoring at Walgreens.  Is that
22 fair?
23     A.   Yes.
24     Q.   Okay.  And the deliverable is a

Page 182

1 "Proposal for defining 'suspicious orders' in the
2 Walgreen distribution system."
3    Did I read that right?
4    A.  That's what it says.
5    Q.  All right.  And then the "Overview"
6 section below, "The DEA is requiring Walgreens to
7 monitor the orders, for control substances, that
8 our stores place on distribution centers for
9 suspicious activity.  Suspicious orders are defined
10 in terms of order size and order frequency."
11    Did I get that right?
12    A.  That's what it says.
13    Q.  Is that consistent with your
14 understanding that suspicious orders are defined in
15 terms of order size and order frequency?
16    A.  I'm not sure I would have been able to
17 define it.  It's clearly written here, though.
18    Q.  "This document proposes a methodology
19 for identifying suspicious orders in terms of order
20 size and order frequency.  First the reasoning
21 behind this method is described.  Followed by the
22 steps needed to perform the analysis.  The Appendix
23 gives examples using real data."
24    Did I get all that right?

Page 183

1    A.  That's what it says.
2    Q.  Okay.  And I promise that I'm not going
3 to make you tell me what the algorithm is and the
4 math, but what I'd like to get is just some of the
5 details.
6    You'd agree that -- well, tell me what
7 you -- what your part in this process with
8 Mr. Bancroft in this June 23, 2008 memorandum.
9    A.  I mean, I don't really remember any of
10 this.  I would have to assume that my
11 responsibility would probably be on the analysis
12 side, making sure that we're doing the right thing
13 to make sure that Walgreens isn't generating or
14 fulfilling suspicious orders but that we're doing a
15 right balance between making sure that our stores
16 have the product they need to service their
17 patients.
18    Q.  Is it fair to say that your role on
19 this -- in this group during this period of time
20 was to ensure that controlled substances as part of
21 inventory supply were still making their way to the
22 pharmacies?
23    MR. SWANSON:  Object to form.
24 BY THE WITNESS:

Page 184

1    A.  My role was to make sure that the stores
2 had what they needed to meet their patients' needs.
3 BY MR. MOUGEY:
4    Q.  Now, do you agree with me that an order
5 flagged by the Bancroft algorithm was suspicious?
6    MR. SWANSON:  Object to form.
7 BY THE WITNESS:
8    A.  I would need to see specific examples
9 and try to make a determination there.
10 BY MR. MOUGEY:
11    Q.  Do you have an understanding that an
12 order that Walgreens flags as suspicious needs to
13 be reported to the DEA?
14    MR. SWANSON:  Object to form.
15 BY THE WITNESS:
16    A.  Based on some documents that we're
17 reading here, I'm starting to --
18 BY MR. MOUGEY:
19    Q.  Starting to understand.
20    Well, why don't we do this.  I have a
21 couple of letters that were written to Walgreens by
22 the DEA, and let me just see if this is something
23 that you had an understanding of when this memo
24 came out in Martin 14 on June 23, 2008.  So, keep

Page 185

1 that document out and keep that date in your head.
2 Okay?  June 2008.  All right.
3    I'm going to hand you what is P-GEN-50.
4    (WHEREUPON, a certain document was
5    marked as Walgreens-Martin Exhibit
6    No. 15: 9/27/06 letter from U.S.
7    DOJ DEA; MCKMDL00478906 - 00478909.)
8 BY MR. MOUGEY:
9    Q.  Do you see the date at the top,
10 September 27, 2006, on Martin 15?  Same page?
11    A.  I see the date, yes.
12    Q.  And the second sentence of this -- let
13 me deal with the first sentence.
14    "The letter is being sent to every
15 commercial entity in the United States registered
16 with the Drug Enforcement Agency to distribute
17 controlled substances."
18    And you understand that's Walgreens,
19 correct?
20    A.  I understand that that's Walgreens in
21 the broad sense.
22    Q.  Do you think you understood -- in 2000
23 and -- we'll go back to Martin 14.
24    In 2008, did you understand that

Page 186

1 Walgreens had two different functions, one as a
2 pharmacy and one as a distributor?
3    A.   Yes, I knew that.
4    Q.   All right.  So, let's go back to Martin
5 15, and it says, "The purpose of this letter is to
6 reiterate the responsibilities of controlled
7 substance distributors in view of the prescription
8 drug abuse problem our nation currently faces."
9         Did I read that right?
10    A.   Yes, you did.
11    Q.   Now, did you understand in 2008, while
12 you were working with Mr. Bancroft and the folks on
13 this memorandum, that our country was currently
14 facing a prescription drug abuse problem?
15    A.   It's been in the news for many years,
16 yes.
17    Q.   Yes, ma'am.  And, so, the second
18 paragraph that says, "As each of you is undoubtedly
19 aware, the abuse (non-medical use) of controlled
20 prescription drugs is a serious and growing health
21 problem in this country."
22         You were aware of that when you were
23 working in 2008 with Mr. Bancroft and the
24 individuals on this memorandum, correct?

Page 187

1    A.   It would be hard to deny that there's
2 been abuse of controlled substances.
3    Q.   Now, let's go to the third paragraph.
4         CSA, do you know what that stands for?
5    A.   I'm looking above where it says
6 Controlled Substances Act.
7    Q.   All right.
8    A.   I wouldn't have been able to make that
9 determination on my own.
10    Q.   Okay.  "The CSA," Controlled Substance
11 Act, "was designed by Congress to combat diversion
12 by providing for a closed system of drug
13 distribution."
14         Do you know what a closed system means?
15    A.   I do not.
16    Q.   Let's go on to the next sentence.
17         "Distributors are, of course, one of the
18 key components of the distribution chain."
19         Did you understand that Walgreens as a
20 distributor, different than a pharmacy, was a key
21 component of the distribution chain?
22    A.   That makes logical sense.
23    Q.   The next sentence.  "If the closed
24 system is to function properly as Congress

Page 188

1 envisioned, distributors must be vigilant in
2 deciding whether a prospective customer can be
3 trusted to deliver controlled substances only for
4 lawful purposes."
5         Did you understand at any point in time
6 that Walgreens, as a distributor, that it must be
7 vigilant when deciding whether a prospective
8 customer can be trusted to deliver controlled
9 substances to?
10    MR. SWANSON:  Object to form.
11 BY THE WITNESS:
12    A.   That was not my area of responsibility.
13 BY MR. MOUGEY:
14    Q.   The next sentence, that the
15 "responsibility," referring to Walgreens as a
16 distributor, "is critical."
17         When you were working as part of this
18 group on the Bancroft algorithm, did you understand
19 that Walgreens' responsibility was critical?
20    MR. SWANSON:  Object to form.
21 BY THE WITNESS:
22    A.   I mean, that's what it says.
23 BY MR. MOUGEY:
24    Q.   Did you understand in 2008 that

Page 189

1 Walgreens' function as a distributor was critical?
2    MR. SWANSON:  Object to form.
3 BY MR. MOUGEY:
4    Q.   When you say 2008, I'm referring to
5 Martin 14, the memorandum that you're copied on
6 from Wayne Bancroft.
7    A.   I'm not sure I understood how critical
8 the role was at that point.
9    Q.   The next paragraph, it says, "The
10 Statutory Scheme and Legal Duties of Distributors
11 As DEA Registrants."
12         It says, "Although most distributors are
13 already well aware of the following legal
14 principles, they are reiterated here as additional
15 background for this discussion."
16         Did I read this right, that right?
17    A.   Yes, you read that correctly.
18    Q.   If you go to the next page, and we are
19 going to walk through some of those details, look
20 at the second paragraph, second sentence that
21 begins with "Moreover."  Let me know when you're
22 there.
23    A.   I have found it.
24    Q.   "Moreover, all registrants -

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1 manufacturers, distributors, pharmacies and
2 practitioners - share responsibility for
3 maintaining appropriate safeguards against
4 diversion."
5     Now, you understand that Walgreens
6 filled kind of two of those hats, both a
7 distributor and a pharmacy, correct?
8     A.  That is correct.
9     Q.  Did you know that at the time in 2008
10 that Walgreens had responsibilities as both a
11 distributor and a pharmacy?
12     A.  I'm not sure I knew what
13 responsibilities we had.
14     Q.  The next sentence, "Nonetheless, given
15 the extent of prescription drug abuse in the
16 United States, along with the dangerous and
17 potentially lethal consequences of such abuse, even
18 just one distributor that uses its DEA registration
19 to facilitate diversion can cause enormous harm."
20     Did I read that right?
21     A.  Yes, you read that correctly.
22     Q.  Now, below, the DEA elaborates on some
23 of those factors and cites to the U.S. Code.  Do
24 you see the USC cite in the next paragraph?

Page 191

1     First sentence.  "The statutory factors
2 DEA must consider in deciding whether to revoke a
3 distributor's registration are set forth in 21 USC
4 823."
5     Do you see that?
6     A.  I see that on the document, yes.
7     Q.  And the next sentence says, "Listed
8 first among these factors is the duty of
9 distributors to maintain effective controls against
10 diversion of controlled substances."
11     Ms. Martin, did you have an
12 understanding that what you were working on as part
13 of Martin 14 in June 23 of 2008 was part of
14 Walgreens' duty as a distributor to maintain
15 effective controls against diversion of controlled
16 substances?
17     MR. SWANSON:  Object to form.
18 BY THE WITNESS:
19     A.  I believe that there were people in
20 Walgreens that knew this.  I wasn't really
21 responsible for trying to interpret the law or the
22 duties set out by the DEA.
23 BY MR. MOUGEY:
24     Q.  The next paragraph.  "The DEA

Page 192

1 regulations require all distributors to report
2 suspicious orders of controlled substances."
3     So, let's stop there.
4     That sentence is crystal clear, is it
5 not, that Walgreens as a distributor has to report
6 suspicious orders, correct?
7     A.  That's what this says, yes.
8     Q.  Now, were you aware at the time that
9 this June 23, 2008 memorandum was written that you
10 were copied on that Walgreens had a duty to report
11 suspicious orders to the DEA?
12     A.  I honestly don't remember what I knew in
13 2008 versus what I know now.
14     Q.  And the DEA went on to cite that
15 21 CFR 1301.74(b).  Now, do you remember that
16 notation in one of your handwritten notes earlier?
17     A.  I remember seeing that in my notes
18 earlier.
19     Q.  "The registrant shall design and operate
20 a system to disclose to the registrant suspicious
21 orders of controlled substances.  The registrant
22 shall inform the Field Division Office of the
23 Administration in his area of suspicious orders
24 when discovered by the registrant.  Suspicious

Page 193

1 orders include orders of unusual size, orders
2 deviating substantially from a normal pattern, and
3 orders of unusual frequency."
4     Did I read that correct?
5     A.  Yes, that's what this says.
6     Q.  Now, let's go through those one by one.
7     Walgreens had to design and operate a
8 system to disclose suspicious orders, number one,
9 right?
10     MR. SWANSON:  Object to form.
11 BY THE WITNESS:
12     A.  I don't see that in the writing.  I'm
13 sorry.
14 BY MR. MOUGEY:
15     Q.  It's the very -- it's okay.  The very
16 first sentence that begins with "The registrant" in
17 the block quote.
18     "The registrant shall design and operate
19 a system to disclose to the registrant suspicious
20 orders."
21     Correct?
22     A.  Yes, I see that.
23     Q.  Then, number two, once those suspicious
24 orders are identified, the registrant shall inform

Page 194

1 the Field Office Division of the Administration in
2 his area of those suspicious orders, correct?
3 　　A.　That's -- that's what this says, yes.
4 　　Q.　That's pretty clear, isn't it, both
5 number one and number two?  Design a system that
6 identifies suspicious orders and report them to the
7 DEA field office in your area, correct?
8 　　MR. SWANSON:  Object to form.
9 BY MR. MOUGEY:
10 　　Q.　Pretty clear?
11 　　A.　That's what this says, yes.
12 　　Q.　Yes, ma'am.  And pretty clearly,
13 correct?
14 　　A.　If you're -- it has fancy legalese
15 words.
16 　　Q.　But you get what it's saying, correct?
17 　　A.　I think so.
18 　　Q.　The third sentence, "Suspicious orders
19 include orders of unusual size, orders deviating
20 substantially from a normal pattern, and orders of
21 unusual frequency."
22 　　　　Do you see that?
23 　　A.　Yes, I see that.
24 　　Q.　Okay.  So, that's step 1 and step 2.

Page 195

1 　　　　I want you to look at, skip a paragraph,
2 and look at the paragraph that begins with, "Thus,
3 in addition."  Do you see where I am?
4 　　A.　Yes, I see that.
5 　　Q.　"Thus, in addition to reporting all
6 suspicious orders, a distributor has a statutory
7 responsibility to exercise due diligence to avoid
8 filling suspicious orders."
9 　　　　Did I read that right?
10 　　A.　Yes.  That's what the document says.
11 　　Q.　So, once the suspicious order is
12 identified, then due diligence has to be performed
13 before it's filled, correct?
14 　　MR. SWANSON:  Object to form.
15 BY THE WITNESS:
16 　　A.　It says, "avoid filling."  I mean...
17 BY MR. MOUGEY:
18 　　Q.　So, "Due diligence to avoid filling
19 suspicious orders."  Correct?
20 　　A.　Yes.
21 　　Q.　Now, this document, Martin 15, is
22 approximately 22 months before your June 23, 2008
23 meeting with Mr. Bancroft, correct, Ms. Martin?
24 　　A.　If you're looking at the dates, yes.

Page 196

1 　　Q.　Now, do you recall anyone from Walgreens
2 when you sat down to work on this Bancroft
3 algorithm with the other members of the team, did
4 anyone show you that letter or any pieces or parts
5 thereof to help educate you on the process?
6 　　A.　I don't remember.
7 　　Q.　Let me hand you what we'll mark as
8 Martin 16.
9 　　　　(WHEREUPON, a certain document was
10 　　　　marked as Walgreens-Martin Exhibit
11 　　　　No. 16:  2/7/07 letter from U.S.
12 　　　　DOJ DEA; ABDCMDL00269687 -
13 　　　　00269690.)
14 BY MR. MOUGEY:
15 　　Q.　I want you to keep 15 out because the
16 next question I'm going to ask you is, 15 and 16,
17 are they almost identical other than the date.
18 　　　　Now, Martin 15 that we just went through
19 was dated --
20 　　A.　Sorry.
21 　　Q.　-- September 27, 2006.  Do you see 15 is
22 September 2006?
23 　　A.　Yes.
24 　　Q.　And 16 is February 2007, correct?

Page 197

1 　　A.　Yes.
2 　　Q.　So, October, November, December,
3 January, five months later the DEA sends out what I
4 believe to be almost an identical letter to the one
5 five months before.
6 　　　　So, I'm not going to ask you word for
7 word, but what I would like to you to tell this jury
8 is:  Does the February 7, 2007 letter appear to be
9 very similar to the September 2006 letter?
10 　　A.　The first page does.  Do you want me to
11 go through every page?
12 　　Q.　Unfortunately I do.  I promise that's
13 why I am asking very similar versus identical so
14 you don't have to give us word for word.
15 　　　　How many pages have you gotten through
16 there, Ms. Martin?
17 　　A.　I'm on page 3.
18 　　Q.　Are the first three pages very, very
19 similar in the -- in both of those two letters from
20 the DEA?
21 　　A.　Yes.
22 　　Q.　Okay.  So, in the February 7, 2007
23 letter from the DEA in the first two paragraphs,
24 the DEA again reiterates the responsibilities of a

Page 198

1 distributor, correct?
2     A.   That's what this document says, yes.
3     Q.   And in paragraph 2, it again warns
4 distributors that "the abuse of controlled
5 prescription drugs is a serious and growing health
6 problem in the country," correct?
7     A.   That's what this says, yes.
8     Q.   Second time in five months, correct?
9     A.   That's what this says, yes.
10     MR. SWANSON:  Object to form.
11 BY MR. MOUGEY:
12     Q.   You don't recall anyone giving you this
13 letter with the DEA laying out a distributor's
14 duties prior to your meeting with the team,
15 including Wayne Bancroft on Exhibit 14 by June 23
16 of 2008, correct?
17     A.   I don't remember it, yes.
18     Q.   I hand you what we will mark as Martin
19 17.
20         (WHEREUPON, a certain document was
21         marked as Walgreens-Martin Exhibit
22         No. 17: 12/27/07 letter from U.S.
23         DOJ DEA; WAGMDL00753976 -
24         00753977.)

Page 199

1 BY MR. MOUGEY:
2     Q.   And this is another letter from the DEA
3 dated December 27, 2007.
4         Do you see that?
5     A.   Yes, I see that.
6     Q.   And it is another letter to distributors
7 and registrants reiterating the responsibilities
8 under 21 CFR 1301.74.
9         Do you see that in the first paragraph?
10     A.   Yeah, this is to one specific
11 registrant.  I don't know who the other ones were
12 addressed to because they were blanked out.
13     Q.   But you see in the first sentence that
14 "This letter is being sent to every entity in the
15 United States registered with the Drug Enforcement
16 Agency."
17         Do you see that?
18     A.   I do see that, yes.
19     Q.   All right.  And, again, this letter,
20 like the others, walks the distributor through its
21 responsibilities under the United States code,
22 correct?
23     MR. SWANSON:  Object to form, foundation.
24 BY THE WITNESS:

Page 200

1     A.   I'd have to read this through, if you
2 want us to spend the time doing that, otherwise
3 I'll just agree with what you're saying.
4 BY MR. MOUGEY:
5     Q.   Well, doesn't -- let's just take --
6     MR. SWANSON:  Objection.  If you need to look
7 through a document and testify, you are entitled to
8 do that.  You don't have to accept his
9 representations.
10     MR. MOUGEY:  Thank you for that warning.
11 BY MR. MOUGEY:
12     Q.   So, I was just going to say why don't we
13 just go through it together so you can review it.
14 Okay?
15     A.   Thank you.
16     Q.   So, the -- let's just look at the second
17 paragraph.
18     A.   Am I reading this as it's own document
19 or am I comparing it to something else?
20     Q.   No, ma'am.  This letter we are going to
21 just look at by itself.  Okay.
22         So we're looking at the December 27,
23 2007, Martin 17, and I want you to go to the second
24 paragraph, to the middle of the first sentence that

Page 201

1 begins with "DEA regulations."  It's on the
2 right-hand side.
3         Do you see "DEA regulations require all
4 manufacturers and distributors to report suspicious
5 orders of controlled substances"?
6     A.   Yes, I see that.
7     Q.   Okay.  And it's, again, like the
8 previous two letters, "requires that a registrant
9 design and operate a system to disclose to the
10 registrant suspicious orders of controlled
11 substances," correct?
12     A.   That's what this says, yes.
13     Q.   And that "The registration clearly
14 indicates that it is the sole responsibility of the
15 registrant to design and operate a system," correct?
16 correct?
17     A.   That's what this says, yes.
18     Q.   So, this is the third letter from
19 September 2006 to the end of December '07, so
20 approximately 14 months, 15 months, with the DEA
21 reiterating what distributors', Walgreens',
22 responsibilities are under the United States code,
23 correct?
24     A.   That's what this says, yes.

Page 202

1  Q.  Yes, ma'am.  Now, you haven't seen this
2  letter before today either, correct?
3     A.  I have not.
4     Q.  So, let's look at the third paragraph.
5        "The regulation also requires that the
6  registrant inform the local DEA Division Office of
7  suspicious orders when discovered."
8        Do you see that and it's underlined?
9     A.  Yes, I see that.
10    Q.  The next sentence says, "Filling a
11 monthly report of completed transactions
12 ('excessive purchase reports' or 'high unit
13 purchases') does not meet the regulatory
14 requirement to report suspicious orders."
15       That's pretty clear, is it not?
16    MR. SWANSON:  Object to form, foundation.
17 BY THE WITNESS:
18    A.  I am not the one that's responsible for
19 interpreting regulations.
20 BY MR. MOUGEY:
21    Q.  And I understand you're not, and I'm not
22 asking you if you were the one responsible.  But
23 what I'm asking...
24       You're about as good as a Walgreens

Page 203

1  employee can be with information coming from
2  corporate, correct?  You expect corporate to help
3  educate you on topics and responsibilities,
4  correct?
5     MR. SWANSON:  Object to form.
6  BY THE WITNESS:
7     A.  That's -- that's an odd question.  Yes.
8  Do I believe that my company is going to give me
9  the necessary information for me to perform my job?
10 Yes.
11 BY MR. MOUGEY:
12    Q.  And you were relying, I believe -- you
13 tell me.  I don't mean to put words in your mouth.
14 But I think you were relying on regulatory and
15 legal to help you understand what Walgreens'
16 responsibilities were as a distributor, correct?
17    MR. SWANSON:  Object to form.
18 BY THE WITNESS:
19    A.  Yeah, our legal department would be the
20 one that would be reading these letters, not me.
21 BY MR. MOUGEY:
22    Q.  And you would expect that your legal
23 department would pass this information along to
24 people like Barb Martin that are being asked to

Page 204

1  serve on a group to pilot its suspicious order
2  monitoring policies, correct?
3     MR. SWANSON:  Object to form.
4  BY THE WITNESS:
5     A.  I believe that they'd be passing on
6  information to the necessary person, whether it was
7  me or someone else that might have been doing other
8  reports.
9  BY MR. MOUGEY:
10    Q.  But being asked to serve on a committee
11 that the deliverable, "Proposal for defining
12 suspicious orders in the Walgreen distribution
13 system," as on Martin Exhibit 14, as a member of
14 this group, you would expect to be armed with the
15 knowledge you needed to provide intelligent input,
16 correct?
17    A.  There was representation from our legal
18 department.  So I'm relying on their guidance.
19    Q.  Yes, ma'am.  And you would expect as a
20 member of this group, on the June 23, 2008
21 memorandum regarding proposal for defining
22 suspicious orders, that you be provided the
23 information necessary for you to provide --
24 contribute intelligently to this group, correct?

Page 205

1     A.  Or I'm relying on them to make sure the
2  group is going down the right path.
3     Q.  Let's continue with Martin 17, and we
4  are in the third paragraph.  I'm right in the
5  middle that begins with "Registrants."
6        "Registrants are reminded that their
7  responsibility does not end merely with the filling
8  of suspicious order reports.  Registrants must
9  conduct an independent analysis of suspicious
10 orders prior to completing a sale to determine
11 whether the controlled substances are likely to be
12 diverted from legitimate channels."
13       Did I get that right?
14    A.  I believe the word is "filing," not
15 "filling."
16    Q.  Thank you.  Other than that, did I get
17 that right?
18    A.  That's -- that's what it says, yes.
19    Q.  You understand from the -- from this
20 paragraph and the last sentence that simply
21 reporting an order as suspicious and then filling
22 does not meet Walgreens' obligations under the
23 United States code?
24    MR. SWANSON:  Objection; foundation, calls for

Page 206

1  a legal conclusion.
2  BY THE WITNESS:
3      A.   Again, it's not my area of
4  responsibility to interpret this.
5  BY MR. MOUGEY:
6      Q.   Sounds kind of like what your lawyer
7  just said.
8          So, I didn't ask you -- you went to --
9  are you from Pittsburgh originally, Ms. Martin?
10     A.   I grew up in the Pittsburgh area, yes.
11     Q.   And you went to Duquesne?
12     A.   Yes, I did.
13     Q.   Not an easy school to get into.  I went
14 to Creighton, kind of similar school.
15         So, you studied for four years --
16     A.   Five.
17     Q.   -- with a pharmacy degree.  Five years
18 with a pharmacy degree, correct?
19     A.   Yes.
20     Q.   Not an easy curriculum, correct?  Heavy
21 sciences?
22     A.   I --
23     Q.   Go ahead.
24     A.   I'm good in sciences.

Page 207

1      Q.   Heavy sciences.  What I'm -- you're more
2  than capable of reading a letter from the DEA and
3  understanding what it says, correct?
4      MR. SWANSON:  Object to form.
5  BY THE WITNESS:
6      A.   I disagree with that statement.  Am I
7  capable of reading this letter?  Yes.
8  BY MR. MOUGEY:
9      Q.   So, what I'm asking you is to tell me if
10 you understand the plain language of this letter,
11 and this sentence more specifically, "Reporting an
12 order as suspicious will not absolve the registrant
13 of responsibility if the registrant knew, or should
14 have known, that the controlled substances were
15 being diverted."
16         You understand that sentence, correct?
17     MR. SWANSON:  Object to form.
18 BY THE WITNESS:
19     A.   It's a long sentence, but most of it
20 makes sense.
21 BY MR. MOUGEY:
22     Q.   Meaning you can't just report it as
23 suspicious and then fill it knowing or should have
24 knowing that the controlled substances were being

Page 208

1  diverted, correct?
2      A.   That's what it says, yes.
3      Q.   Let's go to the second page,
4  second-to-last paragraph.  Begins with "Lastly."
5          "Lastly, registrants that routinely
6  report suspicious orders, yet fill these"
7  suspicious "orders without first determining that
8  order is not being diverted into other than
9  legitimate medical, scientific and industrial
10 channels, may be failing to maintain effective
11 controls against diversion."
12         Does that sentence make sense to you?
13     A.   It's a complicated sentence.  I'm not
14 sure I'm the right person to be able to make the
15 determination as to what our responsibilities would
16 be.
17     Q.   You understand from just reading that
18 sentence that registrants that just report
19 suspicious orders, then fill them without
20 determining the order is being diverted for other
21 than medical, scientific and industrial channels,
22 may not be -- may not have an effective system.
23         Do you see that?  Does that make sense?
24     A.   That's what --

Page 209

1      MR. SWANSON:  Object to form.
2  BY THE WITNESS:
3      A.   That's what this says.
4  BY MR. MOUGEY:
5      Q.   And you understand that, correct?
6      MR. SWANSON:  Same objection.
7  BY THE WITNESS:
8      A.   I'm not an attorney.
9  BY MR. MOUGEY:
10     Q.   So, after --
11     A.   It's not my area of responsibility.
12     Q.   After spending 20, 30 minutes, whatever
13 it's been, 40 minutes, going through those three
14 letters over the course of a 14- or 15-month
15 window, having those letters while participating in
16 this group working on the proposal for defining
17 suspicious orders in the Walgreens distribution
18 center -- system would be helpful, would it not?
19 It would have been helpful?
20     MR. SWANSON:  Object to form.
21 BY THE WITNESS:
22     A.   I don't know who did or didn't have
23 these letters.  I know I did not.
24 BY MR. MOUGEY:

Page 210

1  Q.  Yes, ma'am, I understand.  What I'm
2  asking is:  From your perspective, Barbara Martin,
3  that having three letters in the course of 14 or 15
4  months laying out the responsibilities of a
5  distributor, the critical nature, those would have
6  been helpful when participating in the group
7  working on the proposal for defining suspicious
8  orders in the Walgreen distribution center --
9  system, correct?
10  MR. SWANSON:  Objection.
11  BY THE WITNESS:
12  A.  As long as someone had knowledge and
13  they're guiding us down the right path.
14  BY MR. MOUGEY:
15  Q.  Yes, ma'am.  What I'm asking for you.
16  You value your own opinion, do you not?
17  A.  Sometimes.
18  Q.  Do you have kids?
19  A.  I do not.
20  Q.  Do you -- I mean, when you sit on a
21  committee, do you want people to value what Barbara
22  Martin has to say?
23  A.  If I have something to say, yes.
24  Q.  Yes, ma'am.  And in order to have

Page 211

1  something to say, to use what you got upstairs, you
2  need to be armed with the right information,
3  correct?
4  A.  In this context, I could have been even
5  without the law.  I understood the stores.  I
6  understood item movement.  I was brought in
7  probably for some other area of expertise than
8  interpreting laws.
9  Q.  So, it's your testimony to this jury as
10  a member of this committee, working on the
11  deliverable for defining suspicious orders in the
12  Walgreens distribution system, you did not need to
13  have an understanding of the applicable
14  regulations?
15  A.  As long as our legal representatives --
16  representatives that were on this committee had it.
17  Q.  And passed it along to you, correct?
18  MR. SWANSON:  Object to form.
19  BY THE WITNESS:
20  A.  Sure.
21  BY MR. MOUGEY:
22  Q.  So, let's look, continue looking at
23  Martin 14.
24  You see in the second paragraph --

Page 212

1  MR. SWANSON:  Hang on.  Thank you.  14 you
2  said?
3  MR. MOUGEY:  14.
4  BY MR. MOUGEY:
5  Q.  Martin 14, "DEA Suspicious Order
6  Reporting, June 23, 2008."  Second paragraph.
7  Mr. Bancroft relays that "To monitor the
8  orders size, tolerance limits will be established
9  for each store/item combination.  If an order is
10  placed on the DC that exceeds its tolerance limit,
11  the order is flagged as suspicious."
12  Do you see that?
13  A.  Yes, that's what this says.
14  Q.  As of the date of this memorandum, any
15  order that's flagged as a result of Mr. Bancroft's
16  algorithm is determined to be suspicious, correct?
17  MR. SWANSON:  Object to form,
18  mischaracterizes.
19  BY THE WITNESS:
20  A.  It has the potential to be suspicious.
21  BY MR. MOUGEY:
22  Q.  I am sorry, but I don't see the word
23  "potential" in that sentence.
24  "If an order is placed on the DC,"

Page 213

1  that's distribution center, "that exceeds its
2  tolerance limit, the order is flagged as
3  suspicious."
4  Is that the plain language of this
5  document, Ms. Martin?
6  A.  That's the words used in this document,
7  yes.
8  Q.  Do you see anywhere in that sentence
9  that I just read the use of the word "potential,"
10  "potentially suspicious"?
11  A.  I do not see it on the document.
12  Q.  Do you see the word "possibly
13  suspicious"?
14  A.  I do not see that in this sentence.
15  Q.  Do you see the words "it might be
16  suspicious"?
17  A.  I do not see those words.
18  Q.  Do you see the phrase "to conduct due
19  diligence to see if it's suspicious"?
20  A.  In this sentence I do not.
21  Q.  Instead, what it says, "If an order is
22  placed on the DC that exceeds its tolerance limit,
23  the order is flagged as suspicious."  Correct?
24  A.  That's what this says, yes.

Page 214

1    Q.   And it continues, "To monitor order
2  frequency, the geometric distribution," skip some
3  of the math language in the beginning -- I mean in
4  the middle -- then "the next order is placed
5  earlier than expected, that order is flagged as
6  suspicious." Correct?
7    A.   That's what the document says.
8    Q.   It doesn't say "possibly," correct?
9    A.   The document doesn't use that word.
10   Q.   It doesn't say "potentially," correct?
11   A.   It does not.
12   Q.   Now, do you think that that language is
13 in error on Martin 14?
14   MR. SWANSON:  Object to form.
15 BY THE WITNESS:
16   A.   Yes, I believe that we should have used
17 "potentially suspicious," because if you looked at
18 my earlier report, I think it was the 2 or 3, that
19 one was flagged but it wasn't in my mind
20 suspicious.
21 BY MR. MOUGEY:
22   Q.   So, when you got this memorandum and you
23 participated in the committee, is the communication
24 coming out of this group, will we see in later

Page 215

1  memorandums that that language is cleared up and
2  the word "potentially" or the word "possibly" is
3  inserted in front of "suspicious"?
4    A.   I --
5    MR. SWANSON:  Objection.
6  BY THE WITNESS:
7    A.   I don't know what future documents say
8  without looking at them.  Sorry.
9  BY MR. MOUGEY:
10   Q.   I will tell you that we will look at
11 them.
12        So, why don't we continue with Martin 14
13 for now, and if you'd turn the page and look at
14 No. 5.
15   A.   Page 5?
16   Q.   No, I'm sorry.  No. 5 on page 2, Bates
17 No. 04.  No. 5, "If an order."
18        Do you see that?
19   A.   Yes, I see that.
20   Q.   "If an order is placed on the DC for an
21 item and the order quantity exceeds the upper
22 limit, it is flagged as suspicious."
23        So, that's the third time that the words
24 "possibly" or "potential" do not appear, correct?

Page 216

1    MR. SWANSON:  Objection.
2  BY THE WITNESS:
3    A.   In what we've reviewed.
4  BY MR. MOUGEY:
5    Q.   Yes, ma'am.  And on page 2, do you see
6  the box in the bottom with the different --
7  different information?
8    A.   I see the box.
9    Q.   Right.  And it's titled "Order Quantity
10 Logic Matrix."  Do you see it?
11   A.   That's what this says, yes.
12   Q.   And "Order Quantity Versus Suggested
13 Quantity" in the middle of that box, "Flagged as
14 Suspicious."  Do I have that right?
15   A.   Yeah, I mean, it looks like we are
16 skipping over a few steps, but I wouldn't be able
17 to interpret what they meant.
18   Q.   So, you believe in later reiterations,
19 after June of '08, that we will see a correction
20 that orders placed on the DC exceed its tolerance
21 limit, the order is, and we'll see the words
22 "potentially" or "possibly" in future reiterations
23 of this document.  Is that your testimony to this
24 jury?

Page 217

1    MR. SWANSON:  Object to form.
2  BY THE WITNESS:
3    A.   I do not --
4    MR. SWANSON:  Mischaracterizes what was said.
5  BY THE WITNESS:
6    A.   I do not know if we'll see those words
7  or not.
8  BY MR. MOUGEY:
9    Q.   Did you kind of raise your hand in this
10 committee and say, "Hey, this isn't what I thought
11 we were doing.  I thought we were -- these were
12 potentially suspicious or possibly suspicious"?
13        Did you give that input during this
14 meeting?
15   A.   I do not remember giving that input one
16 way or another.
17   Q.   Mr. Piñon, do you see him as one of the
18 recipients under "To" on the very first page?
19   A.   Yes, he's on this document.
20   Q.   He is pretty senior at Walgreens, is he
21 not?
22   A.   Yes.
23   Q.   And he's been one of the people you've
24 been pointing to all day about the individuals

Page 218

1  responsible for interpreting the code and the regs.
2  That's him, right?
3      MR. SWANSON: Object to form.
4  BY MR. MOUGEY:
5      Q.  He's head of that group, is he not?
6      A.  I'm not sure he was head of the group.
7  I don't remember his ranking at that time.
8      Q.  He's a lawyer, right?
9      A.  Yes.
10     Q.  He's part of regulatory and legal that
11 you've been pointing to today as the people
12 responsible for interpreting the laws and the regs,
13 correct?
14     A.  Yes.
15     Q.  If this was incorrect and that it wasn't
16 orders flagged by the system as suspicious, you'd
17 expect Mr. Piñon to have raised his hand or
18 corrected it after this memo, would you not?
19     MR. SWANSON: I'm going to object and instruct
20 you not to answer.  You're not going to get into
21 what Mr. Piñon said or didn't say in meetings.
22 BY MR. MOUGEY:
23     Q.  I didn't ask you what he said.
24     MR. SWANSON: Yes, you did.

Page 219

1  BY MR. MOUGEY:
2      Q.  What I asked you is would you --
3      MR. SWANSON: You asked about content.  I'm
4  going to instruct her not to answer.
5      MR. MOUGEY: I suggest you --
6      MR. SWANSON: Go ahead and ask the question.
7      MR. MOUGEY: I said --
8      MR. SWANSON: Go ahead and ask it.  No, go
9  ahead and ask it --
10     MR. MOUGEY: Thank you.
11     MR. SWANSON: -- just so I can make sure I've
12 got it clear.
13     MR. MOUGEY: Okay.
14 BY MR. MOUGEY:
15     Q.  So, if the portion of this memorandum
16 that does not contain the word "possible" or
17 "potential," you'd expect Mr. Piñon to have raised
18 his hand and corrected it?
19     MR. SWANSON: All right.  And I'm going to
20 instruct her not to answer because she can't -- she
21 can't answer that question without disclosing what
22 Mr. Piñon did or didn't do in that meeting, which
23 you know you are not entitled to get into.
24     MR. MOUGEY: I don't know about know not

Page 220

1  entitled.  This is going to come from Polster, and
2  you guys are hiding behind this and you know you
3  are.
4      Look, why don't you all just go ahead
5  and assert the advice of counsel defense and go
6  ahead and assert it and waive your privilege.  I
7  know you all know what it is.  Just go ahead and do
8  it.  Go ahead and say, "Our advice of counsel is a
9  defense, let's waive privilege," and let's go ahead
10 and release the 48,000 docs you all are hiding
11 behind.
12 BY MR. MOUGEY:
13     Q.  So, Mr. Piñon is on this committee and
14 he's in --
15     MR. MOUGEY: Kate, I don't need any more head
16 shaking.
17 BY MR. MOUGEY:
18     Q.  Dwayne Piñon is part of regulatory and
19 legal that you've been pointing to as the group you
20 were relying on for its interpretations of the
21 applicable federal code and regs, correct?
22     MR. SWANSON: Object to form.
23 BY THE WITNESS:
24     A.  I was relying on his legal expertise,

Page 221

1  yes.
2  BY MR. MOUGEY:
3      Q.  Yes, ma'am.  And the answer is yes, that
4  you were relying on Mr. Piñon and his group at
5  regulatory and legal for their interpretations of
6  the applicable federal code and regs, correct?
7          Do you want me to read it again?
8      A.  Yeah.
9      Q.  Sure.  You were relying on Mr. Piñon and
10 his group as regulatory and legal that you've been
11 pointing to as the group you were relying on for
12 their interpretations of the applicable federal
13 code and regs, correct?
14     MR. SWANSON: Object to form.
15 BY MR. MOUGEY:
16     Q.  That's him?
17     A.  I was relying on our legal department.
18     Q.  Yes, ma'am.  And when you were putting
19 together your input as part of this group, you were
20 relying on the advice of counsel, correct?
21     MR. SWANSON: Object to form,
22 mischaracterizes.
23 BY THE WITNESS:
24     A.  I'm not -- I didn't write this document.

Page 222

1  So, I'm not sure what Wayne and Tracy, who they
2  talked to before they presented this.
3  BY MR. MOUGEY:
4     Q.   Yes, ma'am.  But that's a little
5  different than what I asked.
6        What I asked you was:  When you were
7  providing your input as part of this group for
8  defining suspicious orders in the Walgreens
9  distribution system, you were relying on the advice
10  of counsel, correct?
11     MR. SWANSON:  Object to form.
12  BY THE WITNESS:
13     A.   I'm not sure I was putting input.  I
14  might have been just sitting there listening to
15  other people, learning.
16  BY MR. MOUGEY:
17     Q.   Okay.  So, I must have been confused.
18  So, you weren't providing any input.  You were just
19  sitting in this committee?
20     MR. SWANSON:  Object to form.
21  BY THE WITNESS:
22     A.   This document is from 2008, and I
23  honestly don't remember what I did or didn't do or
24  say or didn't say back then.

Page 223

1  BY MR. MOUGEY:
2     Q.   Ms. Martin, you sat and participated in
3  some form or fashion as part of Walgreens'
4  suspicious order monitoring policies in 2008?  Yes
5  or no.
6     A.   Yes.
7     Q.   2009?
8     A.   Yes.
9     Q.   Yes or no.
10       2010?
11     A.   Yes.
12     Q.   2011?
13     A.   Probably not as much.
14     Q.   2012?
15     A.   Definitely less.
16     Q.   Is it your testimony that you never
17  provided any input into Walgreens' suspicious order
18  monitoring policies and procedures in '08, '9, '10,
19  '11 and '12?
20     MR. SWANSON:  Object to form, mischaracterize
21  her testimony.
22  BY THE WITNESS:
23     A.   I don't remember what input I did or
24  didn't put into these meetings.  I know that I was

Page 224

1  brought in as a store expert.
2  BY MR. MOUGEY:
3     Q.   Yes, ma'am.  It's a little different
4  than what I asked.
5        What I asked you was:  Did you provide
6  input into Walgreens' suspicious order monitoring
7  policies and procedures at any point in time in
8  '08, '9, '10, '11 or '12?
9     MR. SWANSON:  Objection; asked and answered.
10  BY THE WITNESS:
11     A.   I -- I don't remember what input I put
12  in.  I know I put input into the reporting and I
13  gave input on how to change the reporting.
14  BY MR. MOUGEY:
15     Q.   So, you did provide some input?
16     A.   I guess I did.
17     Q.   Yes, ma'am.  So, in providing that input
18  into this group and the folks working on this
19  suspicious order monitoring policy and program, did
20  you rely on the advice of counsel?
21     MR. SWANSON:  Object to form.
22  BY MR. MOUGEY:
23     Q.   On interpreting the regulations and the
24  applicable codes.

Page 225

1     MR. SWANSON:  Object to form.
2  BY THE WITNESS:
3     A.   Yes, I would have relied on our legal
4  department to review the regulations.
5     MR. SWANSON:  Let's take a break if you are
6  switching documents.
7     MR. MOUGEY:  Sure.
8     MR. SWANSON:  Thanks.
9     THE VIDEOGRAPHER:  We are going off the record
10  at 2:18.
11        (WHEREUPON, a recess was had
12        from 2:18 to 2:42 p.m.)
13     THE VIDEOGRAPHER:  We're back on the record at
14  2:42 p.m.
15     MR. SWANSON:  If I can just put on the record.
16  This is Brian Swanson.
17        I in the previous session had given an
18  instruction to the witness not to answer a question
19  based on attorney-client privilege.  I've
20  considered that objection, and I'm withdrawing the
21  instruction.  If Mr. Mougey would prefer to ask
22  that same question again, I will let her answer.
23  Up to you, but your witness.
24     MR. MOUGEY:  I appreciate that.  Just trying

Page 226

1 to go back at this point and find the question.
2 I'm not prepared to do that at this point.
3 BY MR. MOUGEY:
4 Q. Ms. Martin, your -- you continued to be
5 involved with the group reviewing the Bancroft
6 algorithm for a period of years after that June 23,
7 2008 memorandum, correct?
8 MR. SWANSON: Object to form.
9 BY THE WITNESS:
10 A. I'm not really sure based on that date
11 when we first started generating reports. I looked
12 at them for a period of time, that is correct.
13 BY MR. MOUGEY:
14 Q. I think the simple question I asked you
15 was that you continued to be involved with the
16 group reviewing the Bancroft algorithm for a period
17 of years after the June 23, 2008 memorandum,
18 correct?
19 A. I was responsible for -- I was one of
20 the people responsible for reviewing reports.
21 Q. And when sample -- strike that.
22 When modifications or adjustments to the
23 algorithm were proposed, you would provide input
24 into that, correct?

Page 227

1 A. I was providing input to the data I saw
2 in regards to whether or not I thought it was
3 flagging the right orders.
4 Q. You would review the proposed
5 adjustments or modifications in a memorandum format
6 and provide input or language into those, correct?
7 MR. SWANSON: Object to form.
8 BY THE WITNESS:
9 A. I'm not sure I provided the input in
10 memorandum. Could have been an e-mail or a phone
11 call. I'm not sure.
12 BY MR. MOUGEY:
13 Q. Provided any input. You provided input
14 into the process of Walgreens working on its
15 suspicious order monitoring policies and procedures
16 after 2008, correct?
17 A. I provided input on the reporting I was
18 reviewing.
19 Q. Were you aware in late -- never mind.
20 Let me hand you what we will mark as
21 Martin 18.
22 (WHEREUPON, a certain document was
23 marked as Walgreens-Martin Exhibit
24 No. 18: Document,

Page 228

1 "Intercepted/Suspicious Store
2 Orders"; WAGMDL00658202 -
3 00658216.)
4 BY MR. MOUGEY:
5 Q. Bates No. 658202, P-WAG-227, entitled
6 "Intercepted/Suspicious Store Orders," and on the
7 right-hand side, "Store Ordering Team,
8 February 2009." Correct?
9 A. That's what this says, yes.
10 Q. And do you see in the lower left-hand
11 corner, G:\SIMS Order Management Team\Intercept
12 Suspicious Orders\DEA Suspicious Order DOC
13 Draft.doc?
14 A. That's what this says.
15 Q. Is that -- do you know who had access to
16 that drive?
17 A. I don't remember everyone who had access
18 to this.
19 Q. How about which groups?
20 A. Probably inventory and the Store
21 Ordering Team, IT, legal, Loss Prevention.
22 Q. A wide range of people?
23 A. Yes.
24 Q. And I'm sorry. Again, inventory is your

Page 229

1 group, correct?
2 A. Yes.
3 Q. Okay. When it says "Order Management
4 Team," is that your group?
5 A. Where do you see "Order Management
6 Team"?
7 Q. In the very bottom. Right there. I'm
8 sorry. It's right on the screen in front of you,
9 and it's the bottom left-hand corner of the
10 document where it says, "G:\SIMS Order Management
11 Team."
12 A. I'm not sure.
13 Q. You don't know who that is, what team
14 that is?
15 A. It could be the IT group that was
16 responsible. SIMS is the system. So, I'm leaning
17 towards that's not my group.
18 Q. Okay. Now, it says, "Prepared By: Ora
19 Yelvington." Do you know who that is?
20 A. Her name is familiar.
21 Q. But you don't -- can't place her?
22 A. I believe she was part of the IT team
23 working under Steve Bamberg.
24 Q. Okay. And I apologize if I've already

Page 230

1  asked this. But under "Walgreens" above, "Store
2  Ordering Team," is that your group?
3      A.  The Store Ordering Team I believe would
4  be Steve Bamberg's team.
5      Q.  Steve Bamberg's team.  Okay.  All right.
6          So, you see that we have handwriting on
7  this document.  It appears to say "Controlled
8  Substance Threshold."
9          Do you see that?
10     A.  Yes.
11     Q.  Is that your handwriting?
12     A.  It could be.  It looks familiar to mine.
13     Q.  Okay.  So, was it your practice when
14 these proposals on adjustments to the algorithm
15 would come out that you would review these and mark
16 up and make notes?
17     A.  If I was one of the people responsible
18 for approving the document, then yes.
19     Q.  Okay.  So -- and you're not sure if
20 that's your handwriting on the first page?
21     A.  I'm fairly confident it's mine, but it
22 doesn't mean that someone else didn't scribble that
23 with similar handwriting.
24     Q.  Sure.  So, if we see your handwriting,

Page 231

1  which maybe we will be able to figure out as we go
2  through here, that's an indication that you were
3  one of the people responsible for approving the
4  document.  Is that a fair statement?
5      A.  If -- if this is a full document, there
6  should be business approvers' names in the document
7  somewhere else.
8      Q.  So, is that kind of a fancy way of
9  saying yes, if you have -- if you have handwriting,
10 your handwriting on this document, that you were
11 part of the team responsible for approving the
12 document?
13     MR. SWANSON:  Object to form, mischaracterize
14 her testimony.
15 BY THE WITNESS:
16     A.  Or my name could be in the document as
17 an approver.
18 BY MR. MOUGEY:
19     Q.  Bear with me.  I thought I was just
20 asking a simple question.  All right.
21         I asked you earlier -- I asked if it was
22 your practice when these proposals or adjustments
23 to the algorithm would come out that you would
24 review these and mark up and make notes, and your

Page 232

1  answer was, "If I was one of the people responsible
2  for approving the document, then yes."
3          So, then I asked a follow-up question:
4  So, if your handwriting and notes are on these
5  documents, you were one of the people responsible
6  for approving them?
7      A.  That's correct.
8      Q.  Okay.
9      A.  But there would probably be a simpler
10 way of finding that out by looking to see who the
11 business approvers were.
12     Q.  Okay.  Well, we'll do that while we go
13 through.
14         The answer to the question I asked, and
15 maybe there is a better way to get there, but the
16 answer is if your handwriting is on here, that's a
17 good indication that you were one of the people
18 responsible for approving the document.  Not the
19 only way we can find out, but it's one of the ways?
20     A.  Most likely I would be one of the people
21 responsible, yes.
22     Q.  Okay.  So, now when you would go through
23 these documents and mark them up, would you be
24 looking for statements or pieces of the document

Page 233

1  that were inaccurate?
2      A.  Either inaccurate or something that I
3  thought we needed to change.
4      Q.  And this is February 2009.  The date of
5  Martin 18 is approximately 8 months after the
6  January 23, 2008 memorandum where Mr. Bancroft was
7  proposing an algorithm for Walgreens' suspicious
8  order monitoring policies, correct?
9      A.  That timeline seems accurate, yes.
10     Q.  And during that course of six, seven,
11 eight months, was there a group of individuals
12 meeting and were you all reviewing the algorithm as
13 it developed?
14     A.  I don't really remember exact details
15 between that time period.
16     Q.  I didn't ask you exact details.  I
17 didn't ask you what meeting did you have on
18 November 2, 2008.
19         I just said during that course of the
20 six, seven, eight months, were there a group of
21 individuals meeting and were you all reviewing the
22 algorithm as developed.  I mean, just were you
23 meeting?
24     A.  I'm sure there were groups of people

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 meeting. It could have been small groups, large
2 groups.
3     Q.    And were you a part of those groups of
4 people meeting that you recall after the initial
5 memo came out over the six, seven, eight months
6 afterwards?
7     A.    I'm sure I was part of some groups.
8     Q.    Do you have an understanding of how
9 often you would meet to talk about the Walgreens
10 suspicious order policies and procedures?
11     A.    I don't remember how often we met.
12     Q.    Do you have an idea of when you started
13 looking at sample reports to determine the validity
14 of the reports?
15     A.    I don't really remember when I started
16 looking at reports.
17     Q.    All right. So, let's look at the
18 "Overview" and you can see that the -- under the
19 first sentence says, "The Controlled Substance Act
20 is the primary federal law regulating the flow of
21 controlled substances into the marketplace for
22 medical purposes. Among those requirements, the
23 act requires that distributors register with the
24 Drug Enforcement Agency to sell controlled

Page 235

1 substances to retail pharmacies and report to the
2 DEA suspicious orders."
3         Did I get that right?
4     A.    That's what this document says, yes.
5     Q.    And the next couple of sentences relays
6 that "The DEA is requiring Walgreens to monitor
7 orders for controlled substances that are placed at
8 the stores and sent to our DCs for filling. Such
9 drugs are to be monitored for suspicious activity.
10 Suspicious orders are defined by the DEA in terms
11 of an Order Size and Order Frequency."
12         Did I get that right?
13     A.    That --
14     MR. SWANSON: Objection.
15 BY MR. MOUGEY:
16     Q.    I'm sorry? Ms. Martin, did I get that
17 right?
18     A.    That's what the document says.
19     Q.    In the middle of the paragraph, "Any
20 Control Drug Orders that are deemed suspicious will
21 be flagged as suspicious and populated in a file to
22 be sent up centrally to Loss Prevention and
23 Rx Services for review/analysis."
24         Now, do you have a memory of who was

Page 236

1 reviewing suspicious orders and performing due
2 diligence on those?
3     A.    So, in this sentence?
4     Q.    It says that it's sent up centrally to
5 Loss Prevention and services for review/analysis.
6 Do you know who that is?
7     A.    So, Loss Prevention would have been
8 Marcie's group. And in this context, Rx Services
9 would have been the inventory team or other people
10 that were involved with pharmacy operations.
11     Q.    All right. So, I'm going to have to
12 keep a running list. So, is Rx Services another
13 name for your group?
14     A.    Rx Services was a broader name. It
15 included inventory as well as other.
16     Q.    Okay. So, that was a part of the
17 umbrella that your group functioned under, meaning
18 Rx Services?
19     A.    Yes. Inventory was part of services.
20     Q.    Thank you. Let's -- so, Loss
21 Prevention. Do you have an understanding of, as
22 part of this group that's working on Walgreens'
23 suspicious order monitoring, who in Loss Prevention
24 was reviewing orders that were flagged as part of

Page 237

1 the algorithm to perform analysis on those orders?
2     A.    I know that Marcie and I worked on
3 reporting. I don't know if there was anyone else
4 in Loss Prevention.
5     Q.    So, your recollection, it was -- in that
6 sentence, Loss Prevention and Rx Services, that's
7 both Marcie and yourself and you're not sure if it
8 was anyone else?
9     A.    Correct.
10     Q.    Okay. And your review on the orders
11 that were flagged as suspicious was to look for
12 ways to possibly review those reports -- I mean,
13 improve those reports, correct?
14     A.    Yes, was the data on the report
15 accurately reflecting what we thought we needed to
16 capture.
17     Q.    And the next sentence says, "The order
18 that is flagged as suspicious on the store side
19 will be intercepted." So, let's stop there.
20         So, as of February of '08, if an order
21 is flagged after entered on the store side, it's
22 considered suspicious as of February of '09,
23 correct?
24     MR. SWANSON: Object to form. You might just

Page 238

1 want to read it again. Two different dates, just
2 so you're clear. You said '08 and then you said
3 '09.
4 MR. MOUGEY: Thank you.
5 MR. SWANSON: You're welcome.
6 BY MR. MOUGEY:
7 Q. The order that is flagged as suspicious
8 on the store side and was intercepted was
9 considered suspicious as of February of '09,
10 correct?
11 MR. SWANSON: Object to form.
12 BY THE WITNESS:
13 A. That would appear to be matching the
14 dates on this form.
15 BY MR. MOUGEY:
16 Q. Yes, ma'am. And not just the dates, but
17 there is no "possibly suspicious" in front of that
18 description, correct?
19 A. The word "possibly" is not there.
20 Q. And the word "potential" is not there,
21 right?
22 A. It's not.
23 Q. The "orders of interest" as a different
24 category isn't here, correct?

Page 239

1 A. It is not.
2 Q. It's simply an order that's flagged by
3 the algorithm at Walgreens is considered
4 suspicious, correct?
5 MR. SWANSON: Object to form.
6 BY THE WITNESS:
7 A. That's the words on this form.
8 BY MR. MOUGEY:
9 Q. And now if you'll flip through, and we
10 are going to come back to this page, but if you'll
11 flip through the next couple pages, we will see
12 several places, for example, on the bottom of
13 page Bates No. 05 under 8, you have -- there is
14 handwritten notes, correct?
15 A. Um-hmm.
16 Q. You have handwritten notes at the top of
17 page 06, correct?
18 A. Yes.
19 Q. On "Assumptions/Exceptions" under 1,
20 there is additional handwritten notes, correct?
21 A. Yes.
22 Q. And if we turn to Bates No. 07, in the
23 table, on four separate boxes are your individual
24 notes, correct?

Page 240

1 A. Yes. This definitely looks more like my
2 handwriting.
3 Q. Yes, ma'am. Thank you.
4 And on the next page, page 7 of 15 of
5 this document, there are another eight, nine, ten
6 different tables, eight or nine different entries
7 on these tables where you provide handwritten
8 notes, correct?
9 A. Yes.
10 Q. And continuing on to Bates No. 09, you
11 have more handwritten notes, correct?
12 A. Yes.
13 Q. So, you were clearly reviewing this
14 document within the scope of area that you were
15 covering and providing input, correct?
16 A. Yes.
17 Q. I'm sorry?
18 A. Yes.
19 Q. Now, if we go back to the sentences we
20 were just reviewing on Bates No. 04, you do not
21 have any handwritten notes where you indicated that
22 the orders flagged by the Walgreens algorithm
23 weren't suspicious, correct?
24 MR. SWANSON: Object to form.

Page 241

1 BY THE WITNESS:
2 A. I have no notes there.
3 BY MR. MOUGEY:
4 Q. Do you remember anyone else saying in
5 the group during any of the meetings reviewing this
6 February of '09 document saying that orders flagged
7 by the system were not suspicious?
8 A. I don't have any memory.
9 Q. You don't have any memory of anyone
10 saying anything?
11 A. I don't remember a meeting from '08.
12 Sorry.
13 Q. Well, and maybe broader. From June of
14 '08 now to February of '09, your group's been
15 meeting, there are -- we reviewed at least two
16 memorandums in writing. They both refer to orders
17 flagged as suspicious.
18 Do you recall any discussion making its
19 way into a memorandum that orders flagged by
20 Walgreens' system weren't suspicious?
21 A. Could you --
22 Q. Do you recall any discussion that made
23 its way into a memorandum that the orders flagged
24 by Walgreens' algorithm were not considered

Page 242

1 suspicious?

2    A.   I don't have any memory.

3    Q.   Because based on the DEA letters that we

4 reviewed earlier and your review of those, if

5 Walgreens had orders that were being flagged as

6 suspicious, they were required to be reported to

7 the DEA, correct?

8    MR. SWANSON:  Object to form, calls for legal

9 conclusion, misstates the evidence.

10 BY THE WITNESS:

11    A.   Again, I'm not the one that is

12 responsible for deciding what needs to be reported

13 to the DEA.

14 BY MR. MOUGEY:

15    Q.   I understand.  That sounds a lot like

16 what your lawyer just said.

17    MR. SWANSON:  Sounds nothing like what I just

18 said.

19    MR. MOUGEY:  Sounds exactly like what you just

20 said.  Every time you all object for a legal

21 conclusion, then the witness repeats, "I'm not a

22 lawyer."  That's been the MO for two months.

23 BY MR. MOUGEY:

24    Q.   But that's not really what I asked.

Page 243

1 What I asked you was --

2    MR. SWANSON:  She didn't say "I'm not lawyer,"

3 so you are misrepresenting her testimony too.

4    MR. MOUGEY:  Why don't you just let the

5 witness testify instead of you all saying

6 repeatedly -- what was the objection?

7    "Object to form, calls for a legal

8 conclusion."  And then the answer is, "Again, I'm

9 not the one that is responsible for deciding what

10 needs to be reported."

11 BY MR. MOUGEY:

12    Q.   And all I simply asked was:  Based on

13 the DEA letters, three of them that we reviewed,

14 Ms. Martin, '06, early '07, late '07, if an order

15 is identified as suspicious, it needs to be

16 reported to the DEA, correct?

17    MR. SWANSON:  Same objections.

18 BY THE WITNESS:

19    A.   I'm not the one that was responsible for

20 determining the legal requirements.

21 BY MR. MOUGEY:

22    Q.   Ms. Martin, I know you're not.  Okay.  I

23 know you're not the one making the decisions at

24 Walgreens about what's getting reported and what's

Page 244

1 not.  I understand.

2    But what I'm asking you to do, and

3 unfortunately you and I are stuck here today and I

4 get to ask you questions and you got to kind of

5 answer them.  Okay?

6    And I hate to do this again, but maybe

7 we should go back to the letters.

8    And I know you're not the person

9 upstairs saying, "Okay, these orders were flagged

10 as suspicious, let's look at these."

11    But go back and look at those three

12 letters from the DEA that are right in front of you

13 in your stack.

14    You can look at any one of the ones you

15 want to pick, for example, Martin 15.  Which one

16 did you pick?

17    A.   I pulled out Martin 15.

18    Q.   All right.  Do you see the block quote

19 in the middle of the page on Bates No. 907?

20    Do you see the block quote?

21    A.   I see it on that screen, yeah.

22    Q.   Yes, ma'am.  Did you find it in front of

23 you?  I know it might be easier.  Do you see it in

24 front of you?

Page 245

1    A.   Yes.

2    Q.   The second sentence of that block

3 quote, "The registrant," that's Walgreens, "shall

4 inform the Field Division Office of the

5 Administration in his area of suspicious orders

6 when discovered by the registrant."

7    The clear language of Martin 15 dated

8 September 27, 2006 is that when a suspicious order

9 is identified by Walgreens, it has to be reported

10 to the DEA's Division Office of Administration,

11 correct?

12    MR. SWANSON:  Object to form.

13 BY THE WITNESS:

14    A.   I believe that that's what this document

15 says.

16 BY MR. MOUGEY:

17    Q.   What this document says, correct?

18    A.   Yes.

19    Q.   I hand you what we will mark as Martin

20 19.

21        (WHEREUPON, a certain document was

22        marked as Walgreens-Martin Exhibit

23        No. 19: 3/27/00 e-mail string with

24        attachments; WAGMDL00325368 -

Page 246

1          00325378.)
2   BY MR. MOUGEY:
3      Q.   Do you see the date at the top of this
4   e-mail on Martin 19, that you are part of the cc on
5   this e-mail, correct?
6      A.   That is correct, yes.
7      Q.   Along with Mr. Bancroft that wrote the
8   algorithm, correct?
9      A.   Yes. Wayne's name is also here.
10     Q.   Yes, ma'am. And Tracy Morris that was
11  in working with Mr. Bancroft on the algorithm,
12  correct?
13     A.   It looks like this was addressed to
14  Tracy.
15     Q.   And do you see Steven Bamberg from the
16  IT department that was help drafting some of the
17  code is on here, correct?
18     A.   Yes, Steve's name is on here.
19     Q.   I'm probably going to mispronounce this
20  next one. Khanna Rakesh is also --
21     A.   Rakesh Khanna.
22     Q.   Rakesh. Thank you.
23          And Ora Yelvington, the drafter of one
24  of the last documents we looked at, correct? These

Page 247

1   are all familiar names that have been on the other
2   documents, correct?
3      A.   Yes, that's correct.
4      Q.   Now, if you continue down this e-mail,
5   the next section appears to have been sent. Do you
6   see where "Tracy Morris/Corp/Walgreens"?
7      A.   Yes, I see that.
8      Q.   So, if you read what Ms. Morris relayed,
9   she said, "Please review the Suspicious Order DEA
10  Compliance Summary document which we have revised
11  based on the discussions in our meeting last week."
12          Okay. So, as meetings are occurring,
13  those discussions are being incorporated into these
14  documents, correct?
15     A.   One would assume so, yes.
16     Q.   Yes, ma'am. That's kind of normal in a
17  meeting in a corporation like Walgreens. There is
18  meetings and discussions and then revisions to
19  documents as they progress, correct?
20     A.   That would be normal processes, yes.
21     Q.   Yes, ma'am. And as people make --
22  identify problems or issues, they're corrected; and
23  the document is kind of living and breathing as
24  it's moving forward, correct?

Page 248

1      A.   Sounds right.
2      Q.   Changes are being made, modifications
3   are being incorporated from those discussions,
4   correct?
5      A.   One would assume -- would expect that,
6   yes.
7      Q.   Yes, ma'am. And if you turn the page --
8   you know what? I apologize. Before we turn, let's
9   read that last sentence.
10          "There are some highlighted portions
11  that need verified as either acceptable/changes,
12  please cc this distribution list with any revisions
13  needed in preparation for the larger group meeting
14  on Monday."
15          Did I get that right?
16     A.   That's what this says, yes.
17     Q.   And the second paragraph of the next
18  page under the section "Compliance Status of
19  Controlled Substances by Order Size," second
20  paragraph says that "Orders that are flagged as
21  suspicious will be interpreted and the order
22  quantity will be reduced to a level which is not
23  considered to be an outlier when compared to other
24  stores within its history."

Page 249

1          Did I get that right?
2      MR. SWANSON: Objection. You didn't. So just
3   read it again.
4      MR. MOUGEY: Thank you.
5   BY MR. MOUGEY:
6      Q.   "Orders that are flagged as suspicious
7   will be intercepted and the order quantity will be
8   reduced to a level which is not considered to be an
9   outlier when compared to other orders within its
10  history."
11          Did I get that right that time?
12     A.   Yes, you read that correctly.
13     Q.   Okay. Good.
14          So, as the algorithm progressed through
15  2009 and 2010, there was a modification made that
16  an order that was flagged as suspicious was
17  reduced, correct?
18     A.   That's what this document says, yes.
19     Q.   Do you recall, have an independent
20  recollection that that was the progression of the
21  algorithm, that suspicious orders were cut to a
22  non-suspicious level?
23     A.   I know there were a number of
24  progressions.

Page 250

1    Q.   Do you have an understanding of whether
2  or not the orders that were flagged as suspicious
3  were reported to the DEA?
4    A.   That wasn't my area of responsibility.
5    Q.   So, you don't have an understanding,
6  right?
7    A.   I don't know one way or another.
8    Q.   Okay.  Now, sitting in these meetings,
9  did you hear anyone discussing about whose
10 responsibility it was to send the orders that were
11 being flagged by the Walgreens algorithm as
12 suspicious, who was responsible for reporting those
13 to the DEA?
14   A.   I don't remember.
15   Q.   You don't remember or you don't remember
16 anyone ever talking about it?
17   A.   I don't remember either way.
18   Q.   All right.  You would -- if these orders
19 were in fact being reported to the DEA as
20 suspicious, would you expect to see an assignment
21 of whose responsibility that was in these
22 algorithms?  I'm sorry.  In these memorandums?
23   MR. SWANSON:  Object to form.
24 BY THE WITNESS:

Page 251

1    A.   I'm sorry.  Could you repeat that?
2  BY MR. MOUGEY:
3    Q.   Certainly.
4    A.   Or rephrase it.
5    Q.   In the memorandums that we're going
6  through that are part of the living, breathing
7  document, if an individual at Walgreens was
8  assigned the responsibility for taking orders that
9  were flagged by the Bancroft algorithm as
10 suspicious and reporting those to the DEA, you
11 would expect to see that in these memorandums,
12 would you not?
13   A.   In this particular document you're
14 showing me, maybe not.
15   Q.   I'm not asking you this particular
16 document.  Any documents as this -- these
17 memorandums are progressing through Walgreens'
18 systems, would you expect to see an assignment
19 somewhere about who at Walgreens was responsible
20 for reporting suspicious orders that were flagged
21 by the Bancroft algorithm?
22   MR. SWANSON:  Objection; vague.
23 BY THE WITNESS:
24   A.   If someone was already doing that work,

Page 252

1  it wouldn't be necessary.
2  BY MR. MOUGEY:
3    Q.   But you don't know who that person would
4  be?
5    A.   Wasn't my area of responsibility.
6    Q.   All right.  Do you know if once an order
7  that was flagged by the Bancroft algorithm as
8  suspicious, who it was that was performing the
9  analysis or review on those orders to determine the
10 due diligence analysis?
11   A.   On this reporting, it would have been
12 primarily at this time myself and Marcie Ranick and
13 probably various other members of the Loss
14 Prevention team.
15   Q.   So, were you and Ms. Ranick contacting
16 pharmacies and inquiring about the reason why the
17 order was flagged on the Walgreens algorithm?
18   A.   I don't know what Marcie was doing.
19   Q.   But how about yourself?
20   A.   Yes, there were times that I reached out
21 to stores.
22   Q.   So, would you -- would the order, if it
23 was flagged by Walgreens algorithm and it was, as
24 these memos indicate, suspicious, would you perform

Page 253

1  your analysis or review prior to the order being
2  shipped?
3    A.   I -- I don't remember which came first.
4    Q.   You don't remember, sitting here today,
5  whether the order was shipped before you had to
6  perform due diligence?
7    A.   I believe the orders were shipped, but I
8  don't know for certain.
9    Q.   When you say "the orders were shipped,"
10 do you mean the orders were shipped prior to you
11 performing any due diligence or analysis, correct?
12   A.   I believe so, but in some of this logic,
13 there was also talk about orders being cut and
14 reduced.  So, they would have been reduced before
15 they were shipped.
16   Q.   Now, do you believe that an order that
17 is identified as suspicious can become
18 non-suspicious by the fact that Walgreens reduced
19 the order -- the amount ordered?
20   MR. SWANSON:  Object to form.
21 BY THE WITNESS:
22   A.   I think you're trying to get me to
23 answer questions that, you know, I don't know --
24 BY MR. MOUGEY:

Page 254

1  Q.  You don't know?

2  A.  -- for sure.

3  Q.  Okay.  But what we do know, looking at

4  Martin 19, is that as of March 27, 2009, internally

5  Walgreens is still marking orders that are flagged

6  by the algorithm as suspicious, correct?

7  A.  That is correct, yes.

8  Q.  And I apologize if I'm repeating myself.

9  But if in fact that order or an order as

10  referenced on Bates No. 69 is being flagged as

11  suspicious and then shipped without any due

12  diligence being performed, would you agree that

13  that does not comply with the language in the three

14  DEA letters that we reviewed?

15  MR. SWANSON:  Object to form, calls for a

16  legal conclusion.

17  BY THE WITNESS:

18  A.  I'm not sure I'm capable of answering

19  that question.

20  BY MR. MOUGEY:

21  Q.  Well, let's go back to the same letter

22  we were just -- we are back into Martin 15, and I'd

23  like you to be -- I'd like you to go to the second

24  page under the block quote where we just were, and

Page 255

1  the paragraph that begins with "Thus, in addition."

2  Are you there?

3  A.  Yes, I see that.

4  Q.  Martin 15 says, "Thus, in addition to

5  reporting all suspicious orders, a distributor has

6  a statutory responsibility to exercise due

7  diligence to avoid suspicious orders that might be

8  diverted into other than legitimate medical,

9  scientific, and industrial channels."

10  Okay?  Are you following me?

11  A.  Yes.  I saw that in the document, yes.

12  Q.  All right.  So, the language of Martin

13  15 is that a distributor like Walgreens has a

14  responsibility to exercise due diligence to avoid

15  filling an order that had been marked as

16  suspicious, correct?

17  A.  That's what the document says.

18  Q.  So, if Walgreens is shipping prior to

19  exercising due diligence, it is not complying with

20  the language in the DEA letter dated September 27,

21  2006, correct?

22  MR. SWANSON:  Object to form, incomplete

23  hypothetical.

24  BY THE WITNESS:

Page 256

1  A.  Yeah, I'm not sure I'm capable of

2  answering that question.

3  BY MR. MOUGEY:

4  Q.  I have -- I got confidence in you.

5  Okay?  I think you can answer it.  You've -- I

6  understand your lawyer continues to object as to

7  legal conclusions and incomplete hypotheticals.

8  But let's you and I work through to where your --

9  where we're both on the same page.

10  So, we are on Martin 19.  Okay?  And

11  Martin 19 says, "Orders that are flagged as

12  suspicious."  And that's an order that is flagged

13  by Walgreens' algorithm, correct?

14  MR. SWANSON:  Object to form,

15  mischaracterizes.

16  BY THE WITNESS:

17  A.  It says that an order flagged as

18  suspicious.

19  BY MR. MOUGEY:

20  Q.  Yes, ma'am.  So, let's go back, then, to

21  Martin 15, as of September 27, 2006, the Walgreens

22  in a letter to -- I'm sorry -- DEA in a letter to

23  Walgreens indicates that Walgreens "has a statutory

24  responsibility to exercise due diligence to avoid

Page 257

1  filling suspicious orders," correct?

2  MR. SWANSON:  Object to form.

3  BY THE WITNESS:

4  A.  That's what the document says.

5  BY MR. MOUGEY:

6  Q.  Yes, ma'am.  Ms. Martin, I'm going to

7  hand you what we're going to mark as Martin 20.

8  (WHEREUPON, a certain document was

9  marked as Walgreens-Martin Exhibit

10  No. 20:  8/25/09 document,

11  "MartinB, Order Item Detail";

12  WAGMDL00674553.)

13  BY MR. MOUGEY:

14  Q.  This is an example of one of the reports

15  you're reviewing as part of your role in this group

16  working on Walgreens' suspicious order monitoring

17  policies, correct?

18  A.  Yes.

19  Q.  And this report has your name at the

20  very top, "MartinB," correct, that's you?

21  A.  Yes.

22  Q.  Is that because you pulled it?

23  A.  Yes.

24  Q.  Or is that because it --

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    A.   I printed this report.
2    Q.   So, whoever printed it had their name on
3  it?
4    A.   Whoever pulled it up and printed it,
5  yes.
6    Q.   Okay.  So, if Steve Bamberg had on
7  there, instead of "MartinB," it would have
8  "BambergS"?
9    A.   I don't know what his sign-on code would
10  be.
11    Q.   Okay.  But it would have some indication
12  that it would be his sign-in code?
13    A.   Yes.
14    Q.   And it's -- this is dated 8/25/2009,
15  correct?
16    A.   That's correct.
17    Q.   And as you see at the bottom, the
18  suspicious reason code is T, exceeds tolerance
19  limit, right?
20    A.   That's what it says, yes.
21    Q.   And the upper -- this is now, let's see,
22  this is 14 months after the initial Bancroft
23  algorithm memo discussing Walgreens' suspicious
24  order monitoring policy, correct?

Page 259

1    A.   Sure.
2    Q.   June 2008.  We are in August of 2009.
3  Maybe my math is wrong.  14, 15 months, something
4  in that ballpark, right?
5    A.   Yeah, I was thinking '09 instead of '08,
6  so...
7    Q.   So, August 25 of 2009, on the upper
8  right-hand corner is indicating that the order is
9  suspicious.
10        Do you see that?
11    A.   That's the name of the report, yeah.
12    Q.   Okay.  So, it's not "potentially
13  suspicious" or "probably suspicious."  It's just a
14  suspicious order, correct?
15    A.   It's what we named this.
16    Q.   Yes, ma'am.  Not -- but, I mean, after
17  reviewing this report, you had been looking at this
18  now for several months, correct?
19    A.   Yes.  I've --
20    Q.   Nobody ever changed it to "potentially
21  suspicious" or "probably suspicious" or anything
22  along those lines, correct?
23    A.   It probably wasn't -- no one probably
24  looked at it as it was worth changing.

Page 260

1    Q.   Now, were you aware that, according to
2  the DEA correspondence, the '06 and the two letters
3  in '07, indicated that Walgreens should be sending
4  these suspicious orders to the DEA?
5    A.   It wasn't my area of responsibility.
6    Q.   So, is the answer no, you really weren't
7  aware?
8    A.   I don't know who was sending the
9  reporting.
10    Q.   And I understand.  We don't know who was
11  sending it and it wasn't your area of
12  responsibility.
13        But all I'm simply asking is:  Were you
14  aware that the DEA in letters in '06 and beginning
15  of '07 and late '07 had said suspicious orders need
16  to be sent to the DEA?  Were you aware, Barbara
17  Martin?
18    A.   I'm not sure what I knew in what time
19  frames.  Based on some of these documents, I'm not
20  sure I knew that information back in '06 or '07.
21  In fact, I'm not even sure I was on the inventory
22  team in those time frames.
23    Q.   Would that have been information that
24  you would think would have been important for you

Page 261

1  to have as part of this group, that orders that
2  were being flagged as suspicious were required to
3  be reported to the DEA?
4    A.   If someone else was reporting it, I
5  didn't need to.
6    Q.   But as part of this committee, this
7  group, with six, seven, eight, nine people on it,
8  wouldn't it have been important for you to know
9  that orders that were flagged as suspicious need to
10  be reported to the DEA?
11    MR. SWANSON:  Object to form.
12  BY THE WITNESS:
13    A.   I don't know if someone was reporting it
14  or not.
15  BY MR. MOUGEY:
16    Q.   And I understand.  That's a little bit
17  different than what I asked.
18        What I simply asked was:  As you, as
19  probably one of the ten people working on this
20  project, wouldn't it have been important for you to
21  understand that orders that Walgreens was flagging
22  as suspicious needed to be reported to the DEA?
23    A.   If someone else was reporting it, then I
24  didn't need to know.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    Q.   So, you didn't -- you as a participant
2  in this committee that are marking up, reviewing
3  and approving the Walgreens suspicious order
4  monitoring policies and procedures, you don't think
5  it was important for you to understand that orders
6  flagged as suspicious needed to be reported to the
7  DEA?
8      MR. SWANSON:  Objection; mischaracterize the
9  evidence.
10 BY THE WITNESS:
11    A.   If someone else was doing it, I didn't
12 need to know.  It wasn't my area of responsibility.
13 BY MR. MOUGEY:
14    Q.   Not important to you?
15    A.   It wasn't my area of responsibility.
16    Q.   Not important to you?
17    MR. SWANSON:  Asked and answered.  Move on.
18 BY MR. MOUGEY:
19    Q.   Not important to you, Ms. Martin?
20      I'm not moving on.  I'd like an answer
21 to my question.  I understand it was someone else's
22 responsibility you believed.  What I'm asking is
23 something different.
24      Was it not important to you to comply

Page 263

1  with the letters that we reviewed from the DEA that
2  suspicious orders need to be reported?  Was that
3  information not important to Barb Martin in 2009
4  when you're looking at these reports?
5    A.   Walgreens is a large company.  We have a
6  number of different groups and a number of
7  different teams.  I can look at what I'm doing and
8  I can be held accountable for what I am doing.  If
9  someone else was doing their job, I didn't need to
10 know what they were doing.
11    Q.   So, the answer is no, it wasn't
12 important to me?
13    A.   It wasn't my area of responsibility.
14    Q.   So, no, it was not important to you.  I
15 understand it's not your area of responsibility.
16 That's different than the question I'm asking.  I
17 understand it was somebody else's job to interpret.
18 I understand it was somebody else's job to do the
19 due diligence.  I understand it was somebody else's
20 job.
21      But what I'm asking is:  As a --
22 somebody that worked at Walgreens for 25 years, had
23 a significant background in this industry, had a
24 five-year college degree in pharmacy, was it

Page 264

1  important for you as part of this group of people
2  to understand that an order that's flagged as
3  suspicious be reported to the DEA as the DEA said
4  in three letters in the course of 14, 15 months?
5      MR. SWANSON:  Object to form.
6  BY THE WITNESS:
7    A.   If someone else was doing that work, I
8  didn't need to know.
9  BY MR. MOUGEY:
10    Q.   So, it's not important, correct?
11    A.   If you want to put words in my mouth.
12    Q.   I'm asking.  It's not important to you
13 because it was somebody else's job.  Is that what
14 you're saying?
15    A.   It wasn't my area of responsibility.
16    Q.   It was somebody else's job, correct,
17 Ms. Martin, and it wasn't important to you?
18    MR. SWANSON:  Object to form.
19 BY THE WITNESS:
20    A.   It wasn't my area of responsibility.
21 BY MR. MOUGEY:
22    Q.   You understand at this point that one of
23 the leading cause of deaths in the United States
24 are overdoses from prescription opiates, correct?

Page 265

1    A.   I understand that there is --
2    MR. SWANSON:  Object to form.
3  BY THE WITNESS:
4    A.   -- an opioid and a drug abuse problem in
5  the United States, yes.
6  BY MR. MOUGEY:
7    Q.   A little different.  The answer is a
8  little different than what I asked.  I understand
9  there is a drug abuse problem, and I understand
10 that opiates are part of it.  What I asked was a
11 little different.
12      What I asked was that at this point in
13 time, when you're looking at the reports that we
14 have just gone through, that did you understand
15 that one of the leading cause of deaths in the
16 United States was attributable to overdoses from
17 prescription opiates?
18    A.   You're asking me if I knew that in '09?
19    Q.   Yes, ma'am.
20    A.   Versus -- I have trouble remembering
21 what I knew then versus what I know now.
22    Q.   I hand you what we're going to mark as
23 Martin 21.
24      (WHEREUPON, a certain document was

Page 266

1    marked as Walgreens-Martin Exhibit
2    No. 21: Document, "July 2011, DEA
3    Statistics"; WAGMDL00492171.)
4  BY MR. MOUGEY:
5    Q.  Bates No. 492171. It's P-WAG-18.
6      Do you see the title at the top,
7  Ms. Martin, "July 2011 DEA Statistics"?
8    A.  Yes, I see that.
9    Q.  Do you recognize these tabulations of
10 different metrics regarding --
11   A.  I don't remember this document.
12   Q.  Bear with me, Ms. Martin. Let me make
13 sure we're on the same page.
14     Thank you, Ms. Martin. Do you see the
15 title "July '11 DEA statistics"?
16   A.  Yes, I see that.
17   Q.  And that "How many orders are flagged
18 each month?" It says, "Total 20,699 are marked
19 suspicious."
20     Do you see that?
21   A.  That's what this says, yes.
22   Q.  Again, now, here we are in July of 2011.
23 So, approximately -- '9, '10, '11 -- three years
24 after the June of '08 memo, and we're still talking

Page 267

1  about orders being flagged as suspicious, correct?
2    MR. SWANSON:  Objection; foundation.
3  BY THE WITNESS:
4    A.  That's what this document says, yes.
5  BY MR. MOUGEY:
6    Q.  You don't see the word "potential" or
7  "probable" or anything, anything in here, correct?
8    A.  Not in the upper sentences, no.
9    Q.  Now, do you see the number at the bottom
10 of the page, total of 109,309 order items have been
11 cut and reduced by now. Correct?
12   A.  That's what this says, yes.
13   Q.  Yes, ma'am. And that's -- have you seen
14 this memorandum before?
15   A.  It doesn't look familiar to me, no.
16   Q.  Now, if 109,000 orders had been reduced,
17 that's not dosage units. That's orders. Correct?
18   MR. SWANSON:  Object to form, mischaracterizes
19 and foundation.
20 BY THE WITNESS:
21   A.  It could be individual items.
22 BY MR. MOUGEY:
23   Q.  Like a fentanyl patch, correct?
24   A.  Correct.

Page 268

1    Q.  And that would mean --
2    A.  Because it says "order items."
3    Q.  Yes, ma'am. But for Oxy and hydro and
4  hydromorphone, what have you, Schedule IIs, that
5  aren't -- aren't sprays or patches or lollipops or
6  whatever, the orders are typically consist of
7  prescriptions of dosage units, correct?
8    MR. SWANSON:  Object to form, foundation.
9  BY THE WITNESS:
10   A.  Could you reask the question? I'm
11 sorry.
12 BY MR. MOUGEY:
13   Q.  Sure. An order is typically comprised
14 of dosage units for most Schedule II, like Oxy,
15 hydromorphone, at this point -- yeah, just use Oxy
16 and hydromorphone. It's usually in prescriptions
17 or in dosage units, correct?
18   A.  Correct.
19   Q.  So, if 109,000 orders have been flagged
20 as suspicious and then cut and reduced, in order to
21 figure out the number of dosage units, we'd have to
22 look at prescription by prescription by
23 prescription, correct?
24   MR. SWANSON:  Foundation objection.

Page 269

1  BY THE WITNESS:
2    A.  Orders and prescriptions are different.
3  BY MR. MOUGEY:
4    Q.  I understand. Let's do it this way. In
5  order to -- and maybe I'm confusing my lingo, and I
6  apologize.
7      What I'm trying to do is that in order
8  to determine what the dosage units are, we'd have
9  to go back and look at the specific order, correct?
10   A.  Correct.
11   Q.  And, so, it's common -- and orders can
12 be anything from 50 dosage units to thousands,
13 correct?
14   A.  There are all kinds of different package
15 sizes, yes.
16   Q.  Yes, ma'am. All I'm trying to get to,
17 probably a little inartfully, is that 109,000 isn't
18 the number of dosage units or pills, it's the
19 number of orders, correct?
20   MR. SWANSON:  Objection; foundation,
21 mischaracterizes.
22 BY THE WITNESS:
23   A.  It's the number of unique --
24 BY MR. MOUGEY:

Page 270

1    Q.   Orders?
2    A.   -- items.
3    Q.   Yes.  Unique orders, correct?
4    A.   There's a difference between item and
5  order.
6    Q.   Let's just talk Oxy so we don't make
7  anything confusing.  Okay?
8         Oxy comes in an order, will have -- the
9  order will be for a certain number of dosage units.
10  That's how it's tracked within Walgreens, correct?
11    A.   For each unique type of Oxy.
12    Q.   Yes, ma'am.  For each unique NDC code,
13  correct?
14    A.   Yes.
15    Q.   All I'm trying to suggest is that
16  109,309 -- I'm sorry -- 109,309 is an order, not a
17  dosage unit, correct?
18    MR. SWANSON:  Object to form, mischaracterizes.
19  BY THE WITNESS:
20    A.   It's orders or items.  So, in an order
21  you could have multiple items.
22  BY MR. MOUGEY:
23    Q.   When you use the word "item," what do
24  you mean?

Page 271

1    A.   So, one order could consist of multiple
2  items.  So, in one order, I could order two bottles
3  of oxycodone 40 milligrams, I could order one
4  bottle of hydrocodone 5-325.
5         So, when you're looking at order items,
6  it's hard -- when you're looking at this 109,000,
7  it might not be 109,000 separate orders.  It could
8  be 109,000 items in a smaller number of orders.
9    Q.   So, an order could be -- I apologize if
10  I'm slow here, but an order item could be 50
11  bottles of a specific NDC code for Oxy?
12    A.   Your example would be one item within an
13  order.  That order could have other items in it
14  besides your -- what was your -- 50 bottles was
15  your example?
16    Q.   Yes.
17    A.   But then it could have two boxes of
18  fentanyl patches.  That's one order.  It has
19  multiple items.
20    Q.   I didn't mean to make this more
21  confusing.  All I was trying to suggest was that
22  order items isn't dosage units, right?
23    MR. SWANSON:  Object to form.
24  BY THE WITNESS:

Page 272

1    A.   That is correct.
2    MR. MOUGEY:  I will save that to where it's
3  not 4:00 in the afternoon.
4  BY MR. MOUGEY:
5    Q.   Here we are in 2011 and the memorandum
6  is still --
7    MR. MOUGEY:  I'm sorry?
8    MR. SWANSON:  Didn't say anything.
9    MR. MOUGEY:  Kate did.  I thought you all were
10  trying to say something.
11    MR. SWANSON:  Not what the record shows.
12    MR. MOUGEY:  I'm sorry.  What?
13    MR. SWANSON:  That's not what the record
14  shows.
15    MR. MOUGEY:  No because you can't -- the
16  record is not picking up the two of you all, which
17  is why I mentioned the camera earlier.  Ms. Swift
18  did say something and I asked what she said.  It
19  was enough that I heard it, but I'm sure it didn't
20  get picked up by the Court Reporter, and you
21  responded.
22         So, I don't think me asking -- I thought
23  you were asking me a question and all I asked was,
24  "What?"

Page 273

1    MR. SWANSON:  Did you say you want to take a
2  break before we start the document?
3    MR. MOUGEY:  I don't care.  Doesn't matter at
4  this point.
5  BY MR. MOUGEY:
6    Q.   Do you want to take a break, Ms. Martin?
7    A.   Just a few minutes.
8    Q.   That's fine.
9    THE VIDEOGRAPHER:  We are going off the record
10  at 3:37.
11         (WHEREUPON, a recess was had
12          from 3:37 to 3:56 p.m.)
13    THE VIDEOGRAPHER:  We are back on the record
14  at 3:56.
15         (WHEREUPON, a certain document was
16          marked Walgreens-Martin Exhibit
17          No. 22:  10/27/11 e-mail with
18          attachment; WAGMDL00119542 -
19          00119548.)
20  BY MR. MOUGEY:
21    Q.   Ms. Martin, do you have in front of you
22  Bates No. 542, Martin 22, an e-mail dated
23  October 27, 2011 and from Rakesh Khanna, correct?
24    A.   That is correct, yes.

Page 274

1    Q.   And you're copied on this e-mail?
2    A.   Yes, I am.
3    Q.   And Rakesh relays to Kristie, "As per
4 your request, I am sending you this document, which
5 explains the business reason behind the DEA
6 project."
7        Correct?
8    A.   That's what it says, yes.
9    Q.   And "the DEA project" that's referenced,
10 if you turn the page to Bates No. 43, is a
11 memorandum entitled "DEA Intercept Suspicious
12 Order." Correct?
13   A.   That's what this says, yes.
14   Q.   And you received this as part of your
15 duties at Walgreens?
16   A.   I'm sorry. What do you mean by the
17 question?
18   Q.   You received this in your e-mail box as
19 part of your duties at Walgreens?
20   A.   My name is on it, so yes.
21   Q.   Okay. If you turn the page again to
22 Bates No. 43 under "Overview," you can see again
23 this is a memorandum drafted now a little over
24 three years into the project with Walgreens and the

Page 275

1 Bancroft algorithm, correct?
2    A.   I'm not sure what algorithms we were
3 using at this time frame. They were probably maybe
4 a little more robust than the original one.
5    Q.   Right. As we've said, the foundation is
6 the Bancroft algorithm and there is modifications
7 or tweaks along the way, correct?
8    A.   That's correct.
9    Q.   And the purpose of this overview was to
10 explain the current status of the project, so to
11 speak, correct?
12   A.   It says, "the business reason behind the
13 DEA project."
14   Q.   In the second paragraph of the
15 memorandum on Bates No. 43, "The purpose of this
16 project is to create a process to systematically
17 identify and prevent suspicious orders based on a
18 formula used to determine inconsistent (suspicious)
19 ordering patterns for controlled drugs."
20       Did I get that right?
21   A.   That's what this says, yes.
22   Q.   And the following -- skip a sentence and
23 go to the following, which says, "The order that is
24 flagged as suspicious on the store side will be

Page 276

1 intercepted."
2        Did I get that right?
3    A.   That's what that part of the document
4 says, yes.
5    Q.   And then similar to these last several
6 documents that we've reviewed, now that Walgreens
7 is three years into this project, orders being
8 flagged are identified as suspicious, correct?
9    A.   The system is flagging what we consider
10 possibly suspicious orders.
11   Q.   Yes, ma'am. Now, I must have just
12 missed it. Is the word "possibly" in there?
13   A.   That word is not in here.
14   Q.   Or "probably" is not in here, right?
15   A.   It is not in here.
16   Q.   It just says, "The order that is flagged
17 as suspicious on the store side will be
18 intercepted," correct?
19   A.   That's the first part of this sentence,
20 yes.
21   Q.   And just like we've done now, I hope we
22 don't need to go back to the DEA letters, but just
23 like the DEA letter said in '06 and early '07 and
24 late '07, the DEA has told Walgreens in its role as

Page 277

1 a distributor that it needs to report suspicious
2 orders as part of the regulatory requirements,
3 correct?
4    A.   Again, I'm not the one that's
5 responsible for determining what the DEA
6 requirements are.
7    Q.   I know you're not. We have gone through
8 that. I didn't ask if you were.
9        What I've simply asked you to do is --
10 you and I went through three couple-page letters,
11 and I hope we don't have to go back to them, but
12 the letters are clear that as a distributor,
13 Walgreens is required to report suspicious orders
14 to the DEA, correct?
15   A.   Yes.
16   MR. SWANSON: Object.
17 BY THE WITNESS:
18   A.   I believe that that's what that document
19 says.
20 BY MR. MOUGEY:
21   Q.   And according to Walgreens, orders that
22 are being flagged by the Walgreens algorithm are
23 suspicious, correct?
24   MR. SWANSON: Object to form, mischaracterizes

Page 278

1 the evidence.
2 BY THE WITNESS:
3 　A.　I know it's not in the document, but I
4 believe that they are potentially suspicious.
5 BY MR. MOUGEY:
6 　Q.　I understand.  But the -- we're now into
7 three years of you working on this and memos being
8 drafted.  I think we've gone through three, four,
9 five of them over the course of three years.  And
10 Walgreens internally is still referring to orders
11 being flagged by the Walgreens algorithm as
12 suspicious, correct?
13 　　MR. SWANSON:  Object to form.
14 BY THE WITNESS:
15 　A.　That's the term they're using in these
16 documents.
17 BY MR. MOUGEY:
18 　Q.　And according to the plain language of
19 the letters that we have gone through, Walgreens is
20 required to report those orders to the DEA,
21 correct?
22 　　MR. SWANSON:  Object to form.
23 BY THE WITNESS:
24 　A.　I believe that that's what those

Page 279

1 documents say, yes.
2 BY MR. MOUGEY:
3 　Q.　I hand you what we've marked as Martin
4 23.
5 　　(WHEREUPON, a certain document was
6 　　marked as Walgreens-Martin Exhibit
7 　　No. 23:  Document, "Functional
8 　　Requirements & (Macro) Design";
9 　　WAGMDL00400342 - 00400356.)
10 BY MR. MOUGEY:
11 　Q.　And Martin 23, it's dated, the last date
12 on this document is 4/6/2012.
13 　　Do you see that in the left-hand box in
14 the middle of the page?
15 　A.　Yes, I see that date, yes.
16 　Q.　And do you see the business owner as
17 Barb Martin.  That's you, right?
18 　A.　I am listed as the business owner on
19 this document, yes.
20 　Q.　Yes, ma'am.  And it says program
21 manager, Mr. Bamberg, and project manager, Rakesh
22 Khanna, correct?
23 　A.　That's what this says, yes.
24 　Q.　And these functional requirements are

Page 280

1 documents, this form that we are looking at here,
2 these are sent out regularly in the management of a
3 project, correct?
4 　A.　That's correct, yes.
5 　Q.　And this is a mechanism to communicate
6 amongst different departments at Walgreens as a
7 project is being implemented, correct?
8 　A.　These particular documents, when they're
9 sent out in this form, are used to capture system
10 programming changes, not necessarily policies and
11 procedures.
12 　Q.　These documents, like Martin 23, are
13 helpful with communicating amongst multiple team
14 members, correct?
15 　A.　Regarding system enhancements.
16 　Q.　So, let's -- and these are the same
17 people that have been working on this project, now
18 we're into 2012, almost four years, correct?
19 　A.　Yes.
20 　Q.　So, if you turn to Bates No. 43, under
21 "Phase 1 Overview."  Do you see that in the middle
22 of the page?
23 　A.　Yes, I see that.
24 　Q.　The first sentence says, "In this phase,

Page 281

1 DEA suspicious orders were not reduced."
2 　　Did I read that correctly?
3 　A.　Yes, you did.
4 　Q.　So, as of -- let's do the next one.
5 　　"Phase 2 Overview:  In this phase, DEA
6 suspicious orders were started to reduce."
7 　　Correct?
8 　A.　That's what part of that sentence says,
9 yeah.
10 　Q.　So, as of April of 2012, Walgreens is
11 still identifying orders flagged by the -- its
12 algorithm as suspicious, correct?
13 　　MR. SWANSON:  Object to form, mischaracterizes.
14 BY THE WITNESS:
15 　A.　Our system was flagging orders that
16 needed to be reviewed.
17 BY MR. MOUGEY:
18 　Q.　And it was referring to those as
19 suspicious, correct, internally?
20 　A.　That was the terms that we used.
21 　Q.　But now here we are four years into this
22 process with your name marked as the business owner
23 and we've seen instances with you reviewing and
24 correcting.  You haven't corrected anything that

Page 282

1  we've seen to this point inserting the words
2  "potentially suspicious" or "probably suspicious"
3  or clearing up what you now claim is inaccurate,
4  correct?
5      A.   I did not make those adjustments.
6      Q.   And neither did anyone else that you can
7  recall now four years into this project say,
8  "Orders flagged by our algorithm really are not
9  suspicious.  They're possibly suspicious or
10 potentially suspicious."  You don't recall anyone
11 in four years ever saying that, correct?
12     MR. SWANSON:  Object to form.
13 BY THE WITNESS:
14     A.   It's hard to remember what was discussed
15 in the number of different meetings over that
16 period of time.
17 BY MR. MOUGEY:
18     Q.   I understand, and I'm not asking you to
19 identify the specific person or the specific time.
20      But you can't remember one instance from
21 June of '08 into now April of 2012 where somebody
22 says, "We need to correct all of these memos.
23 They're wrong.  We need to put the word 'possible'
24 or 'potential' in front of 'suspicious,'" correct?

Page 283

1      A.   I have no memory of that, correct.
2      Q.   Now, if you turn to Bates No. 44
3  under 9.
4       "Start saving 52 weeks of order history
5  data for more accurate observations.  The process
6  was already changed in December 2010 to purge the
7  order history after 52 weeks."
8       Did I read that right?
9      A.   Yes, you read that correctly.
10     Q.   Okay.  I have two questions.  Do you
11 understand what the reason is, as the business
12 owner of this specific memorandum, why 52 weeks of
13 order history data was needed for more accurate
14 observations?
15     A.   Well, that's the reason, to get more
16 accurate observations.
17     Q.   It had nothing to do with the fact that
18 it would reduce the number of orders that were
19 flagged as suspicious?
20     A.   I don't remember having those
21 discussions.  We wanted to have more accurate data.
22 That's what this says.
23     Q.   And the goal of increasing the data
24 points for a longer observation period was not to

Page 284

1  reduce the number of flagged observations as
2  suspicious?
3      A.   Absolutely not.
4      Q.   If you would, ma'am, please turn to
5  Bates No. 46, box 4.
6       "This business requirement addresses the
7  need to change the order frequency calculation
8  method because now we have 52 weeks of sales data
9  available.  This needs to be done" -- "This needs
10 to be done in order to reduce the total number of
11 order items flagged 'Suspicious' for frequency."
12      Did I read that right?
13     A.   You read that correctly.
14     Q.   So, according to box 4 under
15 "Description," a longer observation period, 52
16 weeks, does in fact reduce the number of orders
17 that were flagged as suspicious, correct?
18     MR. SWANSON:  Object to form, mischaracterizes.
19 BY THE WITNESS:
20     A.   And if you read the previous sentence
21 where it says we're getting more accurate
22 information, I remember looking at reports.  In
23 fact, the first one that you showed me, is that the
24 Martin 2, that one wasn't a suspicious order.  If

Page 285

1  we had had better data, it might not have been
2  flagged.  If we had had different types of logics,
3  that one might have not been flagged.
4       We weren't trying to reduce the number
5  of items flagged to hide something.  We were trying
6  to capture the most accurate data so we could take
7  appropriate action on the ones that were truly
8  suspicious.
9      Q.   Yes, ma'am.  But the note that's
10 indicated here is that the 52-week observation
11 reduces the total number of orders flagged as
12 suspicious, correct?
13     A.   In that box it does.  And in line 9 it
14 says, "For more accurate observations."
15     Q.   Yes, ma'am.  And it wasn't -- it was
16 just -- it's not Walgreens' objective to reduce the
17 number of suspicious flags, correct?
18     A.   Our objective was to have -- to capture
19 the most accurate data.
20     Q.   I hand you what we're going to mark as
21 Martin 24.
22      (WHEREUPON, a certain document was
23      marked as Walgreens-Martin Exhibit
24      No. 24:  4/27/12 e-mail with

Page 286

1     attachment; WAGMDL00119539 -
2     00119541.)
3 BY MR. MOUGEY:
4   Q.  This is an e-mail from Mr. Bancroft, one
5 of the drafters of the Walgreens algorithm, to you,
6 correct, ma'am?
7   A.  That's what this says, yes.
8   Q.  And it's also copied to your boss,
9 correct, Denman Murray, correct?
10   A.  That is correct.
11   Q.  And it is titled "DEA Suspicious Store
12 Ordering," correct?
13   A.  That's the title of the document.
14   Q.  Mr. Bancroft relays, "Hi Barb, The
15 enclosed offers two possible enhancements to the,"
16 it says "DES" but I assume he means DEA,
17 "suspicious store ordering application for your
18 consideration."
19     Correct?
20   A.  That's what that says, yes.
21   Q.  So, four years later, Mr. Bancroft, as
22 there is enhancements or modifications to the
23 algorithm, Mr. Bancroft is still in the mix,
24 correct?

Page 287

1   A.  That is correct.
2   Q.  And Mr. Bancroft, he had a pretty good
3 command of what Walgreens was attempting to
4 accomplish through its suspicious order monitoring?
5   A.  I don't want to speak for what Wayne
6 knew or didn't know.
7   Q.  Your interactions with him, do you
8 believe he was knowledgeable about what Walgreens
9 was trying to achieve with its suspicious order
10 monitoring policies?
11   A.  I believe -- again, you're asking me to
12 speculate on what Wayne knows.
13   Q.  I'm really not. I'm asking you,
14 Barb Martin, in your interactions with
15 Mr. Bancroft, did you believe that he had a command
16 of what Walgreens was attempting to accomplish
17 through its suspicious order monitoring policies
18 and procedures?
19   A.  To the best of his abilities, sure.
20   Q.  He's got a math Ph.D. He must have
21 pretty high abilities.
22     Did you think Mr. Bancroft had a command
23 of Walgreens' objectives with its suspicious order
24 monitoring policies?

Page 288

1   A.  Again, I'm not 100% certain of what
2 Wayne did or didn't know.
3   Q.  I didn't ask you what he knew or what he
4 didn't know. What I asked you was: You had
5 interactions with him on this algorithm for over
6 four years, correct?
7   A.  Yes.
8   Q.  You sat in meetings with him over four
9 years, correct?
10   A.  That is correct.
11   Q.  You had conversations with him about
12 this algorithm over four years, correct?
13   A.  Probably.
14   Q.  You both participated in memorandums
15 updating the progress of Walgreens' suspicious
16 order monitoring policies, correct?
17   A.  Sure.
18   Q.  You provided input in writing on some of
19 these memorandums intended for Mr. Bancroft and the
20 team to incorporate into the policies and
21 procedures, correct?
22   A.  Yes.
23   Q.  In your interactions with Mr. Wayne
24 Bancroft, did you believe that he had a command of

Page 289

1 what Walgreens was trying to achieve with its
2 suspicious order monitoring policies and
3 procedures?
4   A.  I believe that based on my interactions,
5 that Wayne knew as much as he could given
6 information that he was given.
7   Q.  If you would, turn to page 2. When I
8 say page 2, page 40 of the Bates, titled "DEA
9 Suspicious Store Ordering Application Proposed
10 Enhancement."
11     Do you see that?
12   A.  Yes.
13   Q.  Okay. And I just want to direct your
14 attention to the last sentence of the first
15 paragraph, Mr. Bancroft in 2012, in April, four
16 years after the initial memo, "Orders placed on the
17 distribution center that exceed its tolerance limit
18 are flagged as suspicious."
19     Do you see that?
20   A.  Yes, I see that sentence.
21   Q.  So, as the store -- as the order is
22 entered from the pharmacy and flagged as
23 suspicious -- and flagged, Walgreens is still
24 referring to that internally as suspicious,

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 correct?

2    MR. SWANSON: Object to form, overbroad.

3 BY THE WITNESS:

4    A. In this document, yes.

5 BY MR. MOUGEY:

6    Q. I hand you what we'll mark as Martin 25.

7       (WHEREUPON, a certain document was

8       marked as Walgreens-Martin Exhibit

9       No. 25: Document, "Business

10       Requirements"; WAGMDL00491251 -

11       00491258.)

12 BY MR. MOUGEY:

13    Q. Document entitled "Business

14 Requirement," "Project Name: DEA Suspicious

15 Ordering - Phase 5."

16    Do you see that?

17    A. Yes, I see that.

18    Q. In the left-hand corner, second box, the

19 date is August 2, 2012, correct?

20    A. Yes. I see that.

21    Q. And "Business Owner" on the right-hand

22 side still includes you, Barb Martin, correct?

23    A. I am one of the owners, yes.

24    Q. And under the "Business Objectives," now

Page 291

1 more than four years after the initiation of

2 Walgreens' suspicious order monitoring program with

3 the Wayne Bancroft algorithm, if you look in the

4 third paragraph of Bates No. 51, the sentence that

5 begins with "The order that is flagged."

6    Did you find the spot?

7    A. Yes, I see that sentence.

8    Q. "The order that is flagged as suspicious

9 on the store side will be intercepted and the

10 quantity will be reduced to a non-suspicious (order

11 limits) level."

12    Correct?

13    A. That's what that sentence says, yes.

14    Q. Even now, in phase 5 of the DEA

15 suspicious ordering program, April '12 -- I'm

16 sorry -- August 2012, in a project that you're the

17 business owner of, this algorithm is still being

18 referred to or -- I'm sorry -- the orders flagged

19 by this algorithm are still being referred to as

20 suspicious, correct?

21    A. That is what this document says, yes.

22    Q. And, again, now four years later, no

23 notes, no input from you or any members of the team

24 saying that language is incorrect. It should

Page 292

1 include the words "potential." It should include

2 the words "probable." You don't see that change

3 after four years anywhere, correct?

4    A. As they say, hindsight is 20/20.

5    Q. Ms. Martin, if you'd give me just one

6 second.

7    While I am pulling this next document,

8 Ms. Martin, your reference to hindsight being

9 20/20, you and I just reviewed five or six pages of

10 DEA letters from '06 and '07 that even for a

11 non-lawyer had some fairly solid direction from the

12 DEA about what it was asking, correct?

13    A. Again, I wasn't responsible for the DEA

14 interpretations.

15    Q. I understand that. What I'm asking is,

16 you and I just went through three letters from the

17 DEA that had some fairly clear direction on what it

18 required of distributors like Walgreens, correct?

19    MR. SWANSON: Object to form.

20 BY THE WITNESS:

21    A. Again, it wasn't my responsibility to

22 interpret the DEA regulations.

23 BY MR. MOUGEY:

24    Q. I understand. But today you and I get

Page 293

1 to talk a little bit and I get to ask questions and

2 hopefully we get some answers. And what I'm asking

3 you isn't was it your responsibility.

4    You and I have been through three

5 different letters from the DEA from September of

6 '06 to December of '07, correct?

7    A. You showed me the three letters, yes.

8    Q. And this isn't an exercise in hindsight

9 because, in fact, the DEA gave clear direction in

10 late '06 and early '07 about Walgreens reporting

11 suspicious orders, correct?

12    MR. SWANSON: Object to form.

13 BY THE WITNESS:

14    A. Again, it wasn't my area of

15 responsibility to interpret these regulations.

16 BY MR. MOUGEY:

17    Q. And I understand. But you did review

18 these letters today, correct?

19    A. Today, yes.

20    Q. And you would agree today, reading them,

21 that in '06 and '07 the DEA gave clear direction

22 about Walgreens' responsibilities to report

23 suspicious orders to the DEA, correct?

24    MR. SWANSON: Object to form.

Page 294

BY THE WITNESS:
    A.   There is nothing in this document that says that we're not reporting.
BY MR. MOUGEY:
    Q.   I understand.  That's not what I asked either.  Let's try it one more time.  Okay?
        So, in 2006 late, in 2007 on two separate occasions, the DEA provided clear direction that orders identified as suspicious needed to be reported for Walgreens to fulfill its obligations as a distributor, correct?
    A.   That's what those documents say.
    Q.   This isn't an exercise in hindsight.  In fact, the DEA gave that direction prior to these several documents we have just reviewed over the last hour, hour and a half that suspicious orders had to be reported to the DEA, correct?
    A.   That's what those documents say.
    Q.   And this is not an exercise in hindsight, correct, Ms. Martin?
    A.   I'm not sure I understand your question.
    Q.   Well, Ms. Martin, you said hindsight is always 20/20.
        Walgreens provided -- I'm sorry.

Page 295

        The DEA provided clear direction in late '06, throughout 2007 that suspicious orders needed to be reported to the DEA for Walgreens to fill its responsibilities as a distributor, correct?
    MR. SWANSON:  Object to form, asked and answered.
BY THE WITNESS:
    A.   Again, it wasn't my responsibility to know what Walgreens needed to provide to the DEA.
BY MR. MOUGEY:
    Q.   I understand, but that's not what I'm asking, if that was your responsibility.
        Today, reading these letters, it's clear to you that DEA gave Walgreens direction that it needed to report suspicious orders in 2006 and 2007; and this is not an exercise in hindsight, correct?
    A.   I'm not sure I understand your question.  I'm sorry.  Could you rephrase it.
    Q.   Walgreens had the information it needed based on these 2006 and 2007 letters from the DEA that it was supposed to report suspicious orders to its field offices, correct?
    A.   That's what --

Page 296

    MR. SWANSON:  Object to form.
BY THE WITNESS:
    A.   That's what those letters say, yes.
BY MR. MOUGEY:
    Q.   Ms. Martin, I'm going to hand you what we'll mark as Martin 26.
        (WHEREUPON, a certain document was marked as Walgreens-Martin Exhibit No. 26:  9/14/12 e-mail string; WAGMDL00667935.)
BY MR. MOUGEY:
    Q.   Look at the bottom of this e-mail.  This is from you to your boss, Denman Murray, correct?
    A.   Yes.
    Q.   And you relay to Mr. Murray on September 14, 2012, "The DEA at the Jupiter distribution center 9/14/2012," correct?  That's the same day?
    A.   That's the subject line, yes.
    Q.   Yes, ma'am.  And, so, the same day that the DEA is at the Jupiter distribution center, you were e-mailing Mr. Murray, correct?
    A.   Yeah, that's what the e-mail says.
    Q.   Yes, ma'am.  And you were relaying to

Page 297

Mr. Murray that "The DEA showed up at our Jupiter distribution center and changed the locks on the control cages."
        Do you see that?
    A.   Yes, that's on this e-mail.
    Q.   And you had an understanding that the Walgreens -- I'm sorry -- that the DEA, by changing the locks on the control cages, that Walgreens was no longer allowed to access its at least Schedule II and Schedule III opiates, correct?
    A.   The control cages could be anything, C-IIs through III through Vs.
    Q.   Yes, ma'am.  That's why I said including Schedule II and IIIs, correct?
    A.   And the IVs and Vs.
    Q.   Thank you.  Walgreens could not access OxyContin in the cage, correct?
    A.   I'm not at the Jupiter DC, but, yes, I'm assuming so.
    Q.   Walgreens could not access hydromorphone in its own cage in its own distribution center, correct?
    A.   That would be my assumption based on this information.

Page 298

1    Q.   Walgreens could not access hydrocodone
2  in the cage, correct?
3    A.   That would be my assumption based on the
4  information on this e-mail.
5    Q.   Did you have an understanding that the
6  DEA issued an Order to Show Cause and an Immediate
7  Suspension Order on September 13, 2012 regarding
8  Walgreens' failure to abide by its responsibilities
9  as a distributor?
10   MR. SWANSON:  Object to form.
11 BY THE WITNESS:
12   A.   Could you rephrase the question.
13 BY MR. MOUGEY:
14   Q.   Yes, ma'am.  Were you aware that the DEA
15 entered an Order to Show Cause and an Immediate
16 Suspension Order regarding Walgreens' Jupiter
17 distribution center?
18   A.   I'm not sure what I knew on which day.
19   Q.   What you relayed to Mr. Murray in this
20 e-mail is the contingency plan about how Walgreens
21 was going to get its controlled substances to its
22 pharmacies, correct?
23   A.   I -- this is so long ago, I'd have to
24 read it all through to get a better memory of what

Page 299

1  the plan is here.
2    Q.   Why don't you go ahead and review the
3  bottom half of that e-mail if you need to,
4  Ms. Martin.
5      You were working on the contingency plan
6  with your boss to ensure that Walgreens' shipments
7  of controlled substances would continue to the
8  stores on September 14, 2012 after the DEA locked
9  up Walgreens' cage, correct?
10   A.   That's what this says, "implement
11 contingency plan."
12   Q.   Ms. Martin, I'm going to hand you what
13 we're going to mark as Martin 27.
14     (WHEREUPON, a certain document was
15      marked as Walgreens-Martin Exhibit
16      No. 27: 10/12/12 e-mail with
17      attachments; WAGMDL00319129 -
18      00319239.)
19 BY MR. MOUGEY:
20   Q.   Ms. Martin, you are familiar with a
21 third-party vendor Buzzeo?
22   A.   It's stretching my memory, but...
23   Q.   I'll represent to you that this is an
24 e-mail from your e-mail box from a Leslie Lowry

Page 300

1  dated October 12, 2012.
2      Do you see that?
3    A.   I see that, yes.
4    Q.   Ms. Martin, I'm going to ask you
5  something out of order because I keep forgetting.
6      Your CV references that you were a guest
7  speaker at HDMA.  Do you recall that off the top of
8  your head?
9    A.   I was a guest speaker at an HDMA seminar
10 in Milwaukee.  I forget what year.  It was
11 regarding returns.
12   Q.   Okay.
13   A.   Which is one of my areas.
14   Q.   When you say "returns," what does that
15 mean?
16   A.   Both salable and salvage returns.  So,
17 if we have product in our stores and it's not
18 selling, maybe the patient moved, maybe someone
19 ordered too much, maybe the doctors' prescribing
20 habits changed, we were running reports to help the
21 stores identify these items and get them back to
22 our vendors so that we could maximize our credits
23 and salvage was once the product nears its
24 expiration date, getting it back to return to get

Page 301

1  it off of our shelves so that we're dispensing the
2  most in-date product for patient safety.
3    Q.   Were you a member of HDMA?
4    A.   I am not.
5    Q.   Is Walgreens a member of HDMA?
6    A.   I don't know for sure.
7    Q.   How did you -- how did it come about you
8  were asked to be a guest speaker at an HDMA
9  conference?
10   A.   My boss asked me to present.  I don't
11 know how they -- who they reached out to or how
12 that all happened.
13   Q.   You just know you were asked and you
14 went to Milwaukee?
15   A.   I was asked and it's something I know
16 very well and so I went.
17   Q.   Back to Martin 27.  Just if you would,
18 please.  This is Bates No. 319129.  If you turn to
19 the second page of the document.  "Welcome,
20 Suspicious Order Monitoring Seminar, Regulatory
21 Issues and Handling Increased Enforcement."
22     Do you recall attending this conference
23 at the Hyatt Regency O'Hare on October 11, 2012?
24   A.   My memory was recently refreshed about

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 my attendance.
2 Q. Okay. By looking at this document?
3 A. Yes.
4 Q. And was this the first Buzzeo conference
5 that you went to?
6 A. I believe it was the only one I ever
7 attended.
8 Q. Were you -- how did you become aware of
9 who Buzzeo was?
10 A. I don't even believe I ever met him.
11 This was -- I believe Tasha Polster or someone else
12 found out about this seminar and recommended that I
13 attend. I believe that there were other Walgreens
14 representatives there as well, but I don't
15 remember.
16 Q. Your recollection, it was Tasha Polster?
17 A. I believe so, yes.
18 Q. Are you aware of anyone from Walgreens
19 had ever been to any other -- and I'm using Buzzeo.
20 Maybe that's inartful. Did -- I never can
21 pronounce this right. Is it Cegedim?
22 A. Cegedim.
23 Q. Cegedim. Same question. Had you been
24 to any Cegedim conferences prior to this one?

Page 303

1 A. I don't believe so.
2 Q. Had you -- do you recall looking at any
3 Cegedim material prior to 2012?
4 A. No.
5 Q. Did anyone at Walgreens that you were
6 aware of receive or review any Cegedim material
7 prior to 2012?
8 A. Nothing that I know of.
9 Q. Who did you -- and I apologize if you
10 already told me this, but who did you attend this
11 conference with?
12 A. I don't remember.
13 Q. Okay. But you -- how many -- it was a
14 one-day conference?
15 A. For some reason I think it was a day and
16 a half.
17 Q. A day and a half.
18 A. It was definitely more than one day.
19 Q. So, we just went through the e-mail
20 where the DEA changed the padlock on the cage in
21 September, September 14, 2012. This is
22 approximately a month after, correct?
23 A. That's what the dates show, yes.
24 Q. Did you find it odd that you were being

Page 304

1 asked to go to a conference on suspicious order
2 monitoring?
3 A. I didn't really think about it one way
4 or another.
5 Q. Your job was more inventory flow and
6 store management. Did you wonder why you were
7 being asked to go to a suspicious order monitoring
8 conference?
9 A. I guess I just felt that my boss wanted
10 me there, so it didn't seem any point to argue or
11 question.
12 Q. Was Tasha Polster your boss?
13 A. No, Denny Murray was.
14 Q. Did Mr. Murray ask you to go as well?
15 A. I believe that Tasha was the one that
16 went to Denny.
17 Q. You're familiar with a group that about
18 this time was forming at Walgreens called
19 Pharmaceutical Integrity?
20 A. Yes.
21 Q. And you assisted Walgreens in
22 Pharmaceutical Integrity, kind of the transition as
23 that group got started, correct?
24 A. Yeah, I helped them on like their

Page 305

1 reporting and monitoring of the reports that I was
2 looking at.
3 Q. And I think we looked at this morning on
4 your performance reviews that on the performance
5 reviews, your participation in suspicious order
6 monitoring, I think the term was, waning into 2012?
7 A. Right, because of the other groups
8 being...
9 Q. Yes, ma'am. Why were you not asked to
10 be part of Pharmaceutical Integrity, if you know,
11 or were you asked?
12 A. I wasn't asked. I don't know why I
13 wasn't.
14 Q. And did you ever wonder why you weren't
15 asked?
16 A. No.
17 Q. So, do you recall reviewing this
18 presentation when it was e-mailed to you?
19 A. I probably shared some of it with Denny
20 and Tasha. I don't really have direct memory of
21 it.
22 Q. Do you recall -- you have a direct
23 memory of attending the conference and seeing this
24 PowerPoint?

Page 306

1    A.   My memory was refreshed.
2    Q.   Do you remember walking away from this
3  PowerPoint -- this presentation at the Hyatt
4  Regency O'Hare about suspicious order monitoring
5  with any perceptions or conclusions about the
6  viability of Walgreens' suspicious order monitoring
7  program?
8    A.   The one perception that I remember
9  walking away from this seminar from is that this
10 company was trying to sell us some of their
11 processes.
12   Q.   Did you think that their processes were
13 thorough and that they knew what they were talking
14 about?
15   A.   They seemed to know what they were
16 talking about.
17   Q.   Were they thorough?
18   A.   I -- I don't think I'd be the right
19 person to be able to answer that question.
20   Q.   Who would be?
21   A.   Maybe someone in IT that could sit down
22 and look at their program and compare it to ours.
23   Q.   But do the folks in IT have a command of
24 the regs and the code of what obligations they were

Page 307

1  trying to meet?
2    MR. SWANSON:  Object to form, foundation.
3  BY THE WITNESS:
4    A.   I don't know.  I don't know what they
5  would know.
6  BY MR. MOUGEY:
7    Q.   Who at Walgreens is the right person to
8  talk to about understanding what Walgreens' beliefs
9  regarding its obligations as a distributor were
10 under the Controlled Substance Act?
11   A.   In what time frame?
12   Q.   This entire time frame that we have been
13 talking about that you've been involved, mid-2008
14 until now we are in October of 2012.
15       Who at Walgreens understood Walgreens'
16 responsibilities and duties as a distributor under
17 the federal regulations?
18   MR. SWANSON:  Object to form, foundation.
19 BY THE WITNESS:
20   A.   My best guess would be someone in the
21 legal department.
22 BY MR. MOUGEY:
23   Q.   And that would be Mr. Piñon?
24   A.   Probably.

Page 308

1    Q.   Can you identify anyone else at
2  Walgreens based on your 2008, 2009, 2010, 2011 and
3  now we are here we are in October of 2012, who
4  understood Walgreens' responsibilities and duties
5  as a distributor under the federal code and federal
6  regs?
7    MR. SWANSON:  Object to form.
8  BY THE WITNESS:
9    A.   Since it wasn't my area of
10 responsibility to interpret the regs, I would defer
11 to someone that had more knowledge and expertise.
12 BY MR. MOUGEY:
13   Q.   And who was that outside of Mr. Piñon?
14 Can you point to anyone outside of him or his group
15 that had -- all day you've been saying, "It wasn't
16 my job to interpret.  I didn't need to understand
17 them.  Somebody else did."
18       Who was that?  Who were those people,
19 Mr. Piñon and his group?
20   A.   Yes.
21   Q.   Anyone else?
22   A.   Those were the people that I was relying
23 on to have the expertise to interpret the
24 regulations.

Page 309

1    Q.   Thank you.  If you would, please, turn
2  to page 33 of the presentation or 68 of the Bates
3  number, and it's entitled "Red Flags."
4        Are you there?
5    A.   Yes, I'm on page 33.
6    Q.   Now, you have a general understanding of
7  what the Walgreens suspicious order monitoring
8  system was designed to detect as part of its
9  algorithm, correct?
10   A.   Yes.
11   Q.   Was there any system in place at
12 Walgreens that looked for controlled substances
13 paid for in cash?
14   MR. SWANSON:  Object to form, foundation.
15 BY THE WITNESS:
16   A.   My area didn't look at transactions.
17 BY MR. MOUGEY:
18   Q.   Fair enough.  All I'm asking you about
19 is Barb Martin's understanding of any systems that
20 were in place looking for red flags that included
21 controlled substance payments in cash.
22   A.   I don't know if anyone was looking at
23 that or not.
24   Q.   But I'm asking you a little something

Page 310

1 different, and I understand you don't know the
2 whole Walgreens.
3        Do you have an understanding,
4 Barb Martin, were there any systems that were in
5 place looking for red flags that included
6 controlled substance payment in cash?
7    MR. SWANSON:  Object to form, asked and
8 answered.
9 BY THE WITNESS:
10    A.   The systems that I worked on didn't look
11 at that.
12 BY MR. MOUGEY:
13    Q.   And you're not aware of any that did?
14    A.   I don't have any direct knowledge.  I'm
15 sure there was stuff out there.
16    Q.   You're sure there is stuff out there.
17    A.   It's a big company.  We got to track
18 something.
19    Q.   I'm asking you.  Do you have any
20 personal knowledge of any system at Walgreens as
21 part of its suspicious order monitoring policies
22 and procedures that was designed to detect payments
23 in cash?
24    MR. SWANSON:  Object to form.

Page 311

1 BY THE WITNESS:
2    A.   I don't have that direct knowledge.
3 BY MR. MOUGEY:
4    Q.   Do you have any direct knowledge of any
5 system at Walgreens as part of its suspicious order
6 monitoring policies and procedures that was
7 designed to identify red flags such as out-of-state
8 patients?
9    A.   That wasn't anything that I was working
10 on.
11    Q.   So, no, you do not have any
12 understanding?
13    A.   I'm not aware if that was going on or
14 not.
15    Q.   What I'd like you to do is if you have
16 an understanding, just tell me yes, I know, and if
17 I don't know of anything, no.  I know you don't
18 know the whole corporation and I know you don't --
19 that there might be somebody else.  But I'm just
20 asking if you know of anyone.  Okay.
21        Do you know of any systems for
22 suspicious order monitoring that were looking to
23 detect out-of-state patients?
24    MR. SWANSON:  Object to the speech and the

Page 312

1 direction.  You can answer the question however you
2 feel appropriate.
3 BY THE WITNESS:
4    A.   I didn't have any direct knowledge of
5 looking at out-of-state patients.
6 BY MR. MOUGEY:
7    Q.   Do you have any direct knowledge of any
8 system at Walgreens identifying suspicious orders
9 looking for large percentage of controlled
10 substances versus non-controlled substances?
11    A.   Early on in my testimony I talked about
12 running some ad hoc reporting, and we did pull data
13 like this occasionally.  If there is other people
14 doing it more routinely, I'm not aware of that.
15 But I know that we pulled some in my team several
16 different times.
17    Q.   And you understand that that was
18 Walgreens filling its roles as a distributor
19 looking at the percentage of controlled substances
20 versus non-controlled substances?
21    A.   I'm not sure that I knew all of that at
22 the time of the request, but when the request came
23 in, I knew I needed to help the people that were
24 making the requests.

Page 313

1    Q.   Lack of patient contracts.  Was that any
2 part of Walgreens' suspicious order monitoring
3 policies or procedures that you're aware of?
4    A.   I don't even understand what "patient
5 contracts" means.
6    Q.   Lack of alternative treatments.  Are you
7 aware of anything?
8    A.   I'm sorry.  Am I aware of?
9    Q.   Same question I've asked like 14 times.
10        Are you aware that Walgreens had any
11 policies and procedures in place analyzing whether
12 or not the prescribers had alternative treatments?
13    A.   I personally did not have any direct
14 knowledge of that.
15    Q.   Same question for the next, DEA
16 compliance issues.  Do you know if anybody was
17 paying attention to Walgreens' compliance issues?
18    MR. SWANSON:  Object to form.
19 BY THE WITNESS:
20    A.   I'd probably need a little more
21 information on what was being defined as a
22 compliance issue.
23 BY MR. MOUGEY:
24    Q.   How about settlement agreements with the

Page 314

1 DEA regarding Walgreens' dispensing practices?

2    A. I had some indirect knowledge of that.

3    Q. Were you aware that Walgreens entered

4 into an agreement with the DEA regarding its

5 dispensing practices in San Diego in 2011?

6    A. I'm going to say no to that one.

7    Q. Were you aware that there was specific

8 agreements between Walgreens and the DEA that it

9 would take specific courses of action as a result

10 of that agreement in 2011?

11    A. I wasn't aware of that agreement. If

12 someone asked me to do something based on that

13 settlement, they didn't explain why.

14    Q. If you turn back to page 30, Bates

15 No. 165, "Common SOM Pitfalls."

16    I apologize. Just one second,

17 Ms. Martin. Lost my place.

18    I apologize, Ms. Martin. I went to the

19 wrong page.

20    Would you mind going to Bates No. 92 and

21 a section entitled "SOM," Suspicious Order

22 Monitoring, "System," it says "Best Worst

23 Practices." Are you there?

24    A. No. I don't have the Bates numbers. I

Page 315

1 don't know what you are talking about.

2    Q. I'm sorry.

3    A. Sorry.

4    Q. It's my fault. It's Bates No. 92. It's

5 the last two digits. The title is "SOM,"

6 Suspicious Order Monitoring, "System Best," and

7 it's crossed out, "Worst Practices."

8    Do you see that?

9    A. Yes, I see that.

10    Q. And the third section down, "System

11 allows for 'cutting' orders to a 'more acceptable'

12 order size."

13    Did I read that right?

14    A. Yes, you read that correctly.

15    Q. And that is exactly what Walgreens had

16 been doing, cutting orders back to what it deemed

17 were an acceptable level, correct?

18    A. That was one of the things that we were

19 doing, yes.

20    Q. Did you take that back to your superiors

21 at Walgreens and said that "The Cegedim during the

22 conference you sent me said that we shouldn't be

23 cutting orders to a more acceptable order size"?

24    A. I'm not sure I did or didn't. I'm

Page 316

1 looking at this document. I don't know who wrote

2 this document, if this is just Cegedim's

3 interpretation or if this is, you know, legalese.

4    Q. Okay. Did you take it to Mr. Piñon and

5 his group and say, "I just got this from Cegedim

6 and it's telling us that one of the worst practices

7 is to reduce orders or cutting them to a more

8 acceptable order size"?

9    A. I honestly don't remember what I did or

10 didn't do with this information.

11    Q. So, that's October 12, 2012. Let me

12 hand you P-WAG-1050. We will mark as Martin 28.

13    (WHEREUPON, a certain document was

14    marked as Walgreens-Martin Exhibit

15    No. 28: 11/9/12 e-mail string;

16    WAGMDL00658246 - 00658248.)

17 BY MR. MOUGEY:

18    Q. I want you to turn you to the last page so

19 we can see that this is an e-mail from Rex Swords

20 who was the divisional vice president of pharmacy

21 services. Are you familiar with Mr. Swords?

22    A. Yes, I know him.

23    Q. Okay. If you turn two pages forward,

24 you can see that he sent an e-mail to Kermit

Page 317

1 Crawford. Do you know who Kermit Crawford is?

2    A. Yes.

3    Q. Who is Mr. Crawford?

4    A. I believe that he was Rex's boss at the

5 time.

6    Q. This is about as senior at Walgreens as

7 you can get here at corporate, correct?

8    A. Short of going to like a company

9 president or CEO.

10    Q. Yes, ma'am. And Mr. Swords, we

11 mentioned Pharmaceutical Integrity, correct,

12 earlier?

13    A. Yes.

14    Q. And Ms. Polster, yes, Ms. Polster was

15 head of Pharmaceutical Integrity, correct?

16    A. That is correct.

17    Q. And Pharmaceutical Integrity in late

18 '12, early '13 took over suspicious order

19 monitoring policies, correct?

20    A. Yes.

21    Q. And, so, Mr. Swords copies Ms. Polster

22 and also here's Mr. Piñon again, correct, Piñon?

23    A. His name is here, yes.

24    Q. Yes, ma'am. And his department,

Page 318

1 regulatory and law, Patty Zagami, correct?
2     A.   Her name is listed here too, yes.
3     Q.   Yes, ma'am.  And now if you look above
4 that, Anika Madarasz.  Can you help me out with
5 that?
6     A.   I vaguely remember her.
7     Q.   Okay.
8     A.   I'm not comfortable correcting your
9 pronunciation.
10     Q.   All right.  And then -- so, that e-mail
11 then is forwarded to several people, correct?
12     A.   Yes, she sent this e-mail to a number of
13 different people, yes.
14     Q.   And then Mike Bleser sent the e-mail to
15 you, correct?
16     A.   Me, Denny and Frank.
17     Q.   I might just be tired.  But do you see
18 Anika, Anika's name anywhere on that e-mail below?
19     A.   I do not.
20     Q.   Do you have any understanding of how
21 Anika could forward an e-mail that we don't see her
22 copied on?
23     A.   Someone cut something out.  I -- I don't
24 know.

Page 319

1     Q.   And then Mr. Bleser forwarded the
2 contents of the e-mail to you, correct?
3     A.   Correct.
4     Q.   So, let's look back down at Mr. Swords'
5 e-mail to Kermit Crawford, amongst others, and what
6 I want to direct your attention to is that he's
7 referencing a November 8th DEA meeting at NAPB,
8 correct?
9     A.   That's the subject line, yes.
10     Q.   I forget the acronym.  National
11 Association of?
12     A.   Boards of Pharmacy.
13     Q.   There you go.
14         And he relays that "I have the sense
15 that today's meeting was a condensed version of the
16 regional meetings the DEA is holding throughout the
17 country for pharmacists."  He references that he
18 thought several of the chains were there.
19         Do you see that?
20     A.   Yes.
21     Q.   But below that, what I want to point
22 out, do you see Joseph Rannazzisi?
23     A.   I see his name, yes.
24     Q.   Yes, ma'am.  And do you recognize his

Page 320

1 name as the gentleman that signed the three letters
2 that we went through earlier from the DEA in 2006,
3 early 2007 and late 2007?
4     A.   I don't remember looking at the
5 signatures of those letters.
6     Q.   And if you'd turn the page to Bates
7 No. 47, at the top of the page, the fourth bullet
8 down, "Reviewed 21 CFR 1301.74."  Are you there
9 with me?
10     A.   Yes, I see that.
11     Q.   And you recognize that language.  That
12 was in all of the letters that we reviewed from the
13 DEA in 2006 and 2007 about the registrant designing
14 and operating "a system to disclose to the
15 registrant suspicious orders of controlled
16 substances."  Correct?
17     A.   That's what this says, yes.
18     Q.   And the bullet below, "If suspicious -
19 you don't ship.  Decreasing the order and shipping
20 is not complying with the regulation."
21         Did I read that right?
22     A.   You read that correctly, yes.
23     Q.   So, we just looked at a Buzzeo
24 presentation that you attended in October of 2012

Page 321

1 and within a month of the Buzzeo presentation
2 Mr. Rex Swords is at another meeting with the DEA
3 where he's being told, "Decreasing the order and
4 shipping is not complying with the regulation,"
5 correct?
6     A.   That's what this says, yes.
7     Q.   And this was sent to you as well,
8 correct?
9     A.   It was forwarded on to me, yes.
10     Q.   And then the next bullet says, "Ignoring
11 suspicious orders will result in civil penalties.
12 Cited Cardinal, ABC and McKesson fines."
13         Correct?
14     A.   That's what that statement says, yes.
15     Q.   Now, let's go down to three-quarters of
16 the page and you see "Red Flags"?
17     A.   Yes, I see that.
18     Q.   And at least some of these red flags are
19 the same red flags that were identified in the
20 Buzzeo presentation, correct?
21     A.   I believe so.
22     Q.   And this is coming directly from the DEA
23 to Walgreens, correct?
24     MR. SWANSON:  Object to form, lacks

Page 322

1  foundation.
2  BY THE WITNESS:
3      A.  It's coming from an e-mail that Rex
4  wrote.
5  BY MR. MOUGEY:
6      Q.  Yes, ma'am.  Where he references a
7  meeting with Joseph Rannazzisi, the Deputy
8  Administrator -- Deputy Assistant Administrator,
9  Office of Diversion Control, correct?  First page,
10  middle of the page.
11      A.  Yes.
12      Q.  And he -- Mr. Swords goes on,
13  "Mr. Rannazzisi presented a large PowerPoint deck
14  on prescription drug trafficking and abuse for two
15  hours," correct?  "Approximately two hours,"
16  correct?
17      A.  That's what that says, yes.
18      Q.  So, you, your boss, Mr. Bleser,
19  Mr. Murray and several senior members of Walgreens
20  management were put on alert that decreasing the
21  order and shipping is not complying with the
22  regulation as of November 9, 2012, correct?
23      A.  That's what this document says, yes.
24      Q.  Did Walgreens take the information that

Page 323

1  Mr. Swords passed around and change its algorithm
2  to no longer cut what it internally was calling a
3  suspicious order?
4      MR. SWANSON:  Object to form, lacks
5  foundation.
6  BY THE WITNESS:
7      A.  I know over the years we have made a lot
8  of different changes.  What we did when is a little
9  bit vague to me.  But I would believe that, yes, we
10  did act on this information.
11  BY MR. MOUGEY:
12      Q.  Do you recall that version 5.5, which
13  was entered after these October and
14  November e-mails, still included in the algorithm a
15  suspicious order being cut and not reported to the
16  DEA?
17      MR. SWANSON:  Object to form.
18  BY THE WITNESS:
19      A.  I don't remember that directly off the
20  top of my head.
21  BY MR. MOUGEY:
22      Q.  Ms. Martin, I want to go back in time to
23  August of 2010.  Mark this as Martin 29.  This is
24  an e-mail from Daniel Coughlin to yourself, amongst

Page 324

1  others.  Do you see that?
2      A.  I don't have a copy of the paper yet.
3      Q.  I'm sorry, Ms. Martin.
4          (WHEREUPON, a certain document was
5           marked as Walgreens-Martin Exhibit
6           No. 29:  8/3/10 e-mail with
7           attachments; WAGMDL00660331 -
8           00660337.)
9  BY MR. MOUGEY:
10      Q.  Do you have it in front of you,
11  Ms. Martin?
12      A.  Yes, I do.
13      Q.  All right.  This is an e-mail from
14  Daniel Coughlin to yourself, amongst others, dated
15  August 3, 2010, correct?
16      A.  It's to Marcie, and I'm cc'd among
17  another bunch of people.
18      Q.  Yes, ma'am.  And including Mr. Piñon,
19  correct?
20      A.  Yes, I see his name.
21      Q.  Do you recall who Daniel Coughlin is?
22      A.  I know he had something to do with the
23  distribution centers.  I'm not sure of his exact
24  title.  I want to say vice president.

Page 325

1      Q.  Do you know if he was in a specific
2  distribution center or was he in corporate?
3      A.  I don't remember where he was based.
4      Q.  So, the subject line is "Suspicious
5  Controlled Drug Orders."
6          Do you see that?
7      A.  Yes, I see that subject line.
8      Q.  And he had two questions.  Do you see
9  that it's No. 1 and No. 2?
10      A.  Yes, I see that.
11      Q.  And No. 1, he said, "I recall the old
12  paper report as being inches thick.  This was
13  replaced by same data on disk and eventually
14  electronic transmission.  We were instructed in
15  1985 not to review or contact anyone on the data."
16          Did I get that right?
17      A.  That's what this says, yes.
18      Q.  Okay.  "Who from your group has been
19  reviewing the data collected for the past 25
20  years?"
21          Now, did that give you some pause for
22  alarm in August 3 of 2010 that Mr. Coughlin was
23  asking Ms. Ranick in Loss Prevention and copying
24  you asking who has been reviewing the suspicious

Page 326

1 controlled drug orders for the last 25 years?
2     MR. SWANSON:  Object to form, foundation.
3 BY THE WITNESS:
4     A.   This e-mail wasn't sent to me.  So, I
5 don't know what Marcie or her team was doing and --
6 BY MR. MOUGEY:
7     Q.   Did you ask?
8     A.   I personally did not.
9     Q.   And did you not ask because when you
10 look at an e-mail like this that you've got Dwayne
11 Piñon from legal on this that you assumed that
12 regulatory and law was ensuring that Walgreens was
13 complying with its obligations as a distributor
14 under the federal code and the federal regs?
15     MR. SWANSON:  Object to form.
16 BY THE WITNESS:
17     A.   I was assuming that if this was
18 addressed to Marcie, that her and her team were
19 taking appropriate action.
20 BY MR. MOUGEY:
21     Q.   25 years.  Who has been reviewing these
22 reports for the last 25 years, somebody from the
23 distribution center, under suspicious drug
24 controlled drug orders.  That doesn't make you stop

Page 327

1 what you're doing for the course of the day and
2 follow up?  25 years?
3     A.   It wasn't my area of responsibility.
4     Q.   Did it not give you any concern that a
5 member of Walgreens distribution center is asking
6 who has been reviewing our suspicious controlled
7 drug orders for the last 25 years?
8     MR. SWANSON:  Object to form.
9 BY THE WITNESS:
10     A.   He's asking a question.  We don't know
11 based on this e-mail who was or who wasn't doing
12 it.  Just because he's asking who doesn't mean it
13 wasn't being done.
14 BY MR. MOUGEY:
15     Q.   And it certainly wasn't you, correct?
16     A.   This reporting was not my area of
17 responsibility.
18     Q.   And not just reporting.  Reviewing.
19 What he is asking is who from the group has been
20 reviewing the data collected for the last 25 years,
21 suspicious controlled drug orders.  That was not
22 you, correct?
23     MR. SWANSON:  Object to form.
24 BY THE WITNESS:

Page 328

1     A.   No, it was not me.  We didn't have --
2 the program that I worked on didn't exist 25 years
3 ago.
4 BY MR. MOUGEY:
5     Q.   At any point in time in your tenure at
6 Walgreens that we have been discussing today from
7 the suspicious order monitoring that you were
8 involved in, so, from 2008 to 2012, were you
9 charged with reviewing suspicious controlled drug
10 orders to perform due diligence to ensure the
11 viability of those orders going to legitimate
12 patients outside of just testing the validity of
13 the reports?
14     MR. SWANSON:  Object to form.
15 BY THE WITNESS:
16     A.   Yes, I was performing due diligence on
17 some of those reports.
18 BY MR. MOUGEY:
19     Q.   And define for me what you mean by due
20 diligence.
21     A.   I would look at data.  I would look at
22 the store's history and see if it made sense.  If
23 something didn't make sense to me, I would call the
24 store or the district manager or the pharmacy

Page 329

1 supervisor and try to obtain additional
2 information.
3     Q.   And that was part of your
4 responsibilities in the, you know, a few hours up
5 to ten hours a week reviewing the reports from the
6 algorithm?
7     A.   Yes.
8     Q.   Let me hand you Martin 30.
9         (WHEREUPON, a certain document was
10          marked as Walgreens-Martin Exhibit
11          No. 30:  1/10/11 e-mail string;
12          WAGFLDEA00000846 - 00000851.)
13 BY MR. MOUGEY:
14     Q.   This is an e-mail chain with you
15 included and Kristine Atwell.  Are you familiar
16 with Ms. Atwell?
17     A.   I remember her name, yes.
18     Q.   Yes, ma'am.  You remember her name from
19 this e-mail exchange?
20     A.   Yeah, I remember we had -- she worked in
21 Jupiter.  We had a number of different
22 conversations via either phone call or e-mails.
23     Q.   She worked at the Jupiter distribution
24 center?

Page 330

1   A.   Yes.
2   Q.   The one that was padlocked by the DEA,
3   correct?
4   MR. SWANSON:  Object to form.
5   BY MR. MOUGEY:
6   Q.   Correct?
7   A.   She worked in Jupiter, yes.
8   Q.   Yes, ma'am.  The same Jupiter that the
9   DEA came in and locked up the cage and kept
10  Walgreens from accessing its Schedule II and
11  Schedule III opiates, correct?
12  A.   That's in a different time period than
13  this e-mail.
14  Q.   Yes, ma'am.  That's not what I asked.
15  What I simply asked you was:  This is
16  the same Jupiter that was ultimately where the
17  locks were changed by the DEA, correct?
18  A.   Yes.
19  Q.   And this e-mail chain is dated
20  January 10, 2011, correct?
21  A.   That is correct.  Yes.
22  Q.   And if we start at the bottom of this
23  e-mail chain on Bates No. 51, the very last page,
24  there is two sets of Bates numbers.  This is

Page 331

1   WAGFLDEA851, very last page.
2   A.   Yes, I see that.
3   Q.   You can see this is an e-mail from
4   Kristine Atwell.
5   "What are your thoughts on this matter?"
6   Do you see that?
7   A.   I see that, yes.
8   Q.   Okay.  Let's go to the previous
9   page where Ms. Atwell from the Jupiter distribution
10  center asks you, "I have" -- and I'm on Bates
11  No. 50 -- "I have several stores that are ordering
12  huge quantities of 682971 on a regular basis."
13  And that is a controlled substance,
14  correct?
15  A.   Off the top of my head I don't remember
16  what that WIC number is associated with, but --
17  Q.   This is -- I'm sorry.  Go ahead.  Were
18  you finished?
19  A.   We'll just assume it's some kind of a
20  C-II because she is mentioning the 222 forms.
21  Q.   Yes, ma'am.  The 222 forms need to be
22  filled out when a certain amount of controlled
23  substances are shipped, correct?
24  A.   The 222 form is required by the DEA when

Page 332

1   you're purchasing or returning C-II drugs.
2   Q.   "This is creating an issue in
3   maintaining enough 222 forms to fill all of the
4   orders because a new 222 form is generated for
5   every 128 bottles of this WIC," and that is the --
6   what's WIC stand for again?
7   A.   Walgreens item code.
8   Q.   -- "that are ordered.  For example, when
9   they order 450 bottles, there will be four 222
10  forms printed to accommodate this one order.  I
11  feel that this store needs to justify the large
12  quantity."
13  Did I read that right?
14  A.   That's what she wrote, yes.
15  Q.   "Three stores that come to mind are,"
16  and I'm going to -- I want you to help me remember
17  these.  Write these down.  Do you have a pen over
18  there?
19  A.   I do not.
20  Q.   Okay.  7298, 3836 and 5018.  Okay.  Got
21  it?
22  A.   I might have to flip back and forth.
23  Q.   All right.  We'll just kind of put this
24  document off to the side.

Page 333

1   So, essentially Ms. Atwell is asking
2   you, these stores should justify these large
3   amounts of Schedule II controlled substance,
4   correct?
5   A.   Of this particular item, yes.
6   Q.   Yes, ma'am.  And you respond to her on
7   Bates No. 49 and reply, "I am able to look at store
8   item movement if this helps."
9   Do you see where I am?
10  A.   Yes.
11  Q.   "You can contact the store for more
12  information."
13  So, you didn't contact the store.  You
14  told her to contact the store.  Correct?
15  A.   That's what I wrote, yes.
16  Q.   Somebody in the distribution center,
17  correct?
18  A.   That's what I wrote, yes.
19  Q.   Not Barb Martin performing the due
20  diligence.  You told her to contact the store,
21  correct?
22  MR. SWANSON:  Object to form.
23  BY THE WITNESS:
24  A.   I told Kristine to reach out to the

Page 334

1  store, yes.
2  BY MR. MOUGEY:
3      Q.   You said, "These sales are quite high
4  compared to other non-Florida stores."
5          Correct?
6      A.   That's what I wrote, yes.
7      Q.   "Store 7298 sells about 22,000 tabs of
8  682971 every week."
9          Correct?
10     A.   That's what I wrote, yes.
11     Q.   "That translates to 220 bottles per
12 week."
13         Is that "SO"?  Is that supposed to be
14 "of"?
15         Oh, I'm sorry.  Never mind.
16         "That translates to 220 dollars per
17 week, so 450 bottles is more than a two-week
18 supply." (As read.)
19         Did I get that right?
20     A.   I wrote "a little more than a two-week
21 supply."
22     Q.   Yes, ma'am.  And if you turn to Bates
23 No. 47, you e-mailed her again and said, "I ran a
24 query to see how many bottles we have sent to store

Page 335

1  3836 and we have shipped them 3271 bottles between
2  12/1/10 and 1/10/11."
3          Correct?
4      MR. SWANSON:  Object to form, mischaracterizes
5  the document.
6  BY MR. MOUGEY:
7      Q.   "I ran a query to see how many bottles
8  we have sent to store 3836 and we have shipped them
9  approximately 3271 bottles between 12/1/10 and
10 1/10/11."
11         Did I read that right?
12     MR. SWANSON:  Same objection.
13     MR. MOUGEY:  What's your objection, Counselor?
14     MR. SWANSON:  You said she wrote it.
15     MR. MOUGEY:  You're right.  These e-mails are
16 so jacked up.
17     MR. SWANSON:  Wasn't hard for me to figure
18 out.
19     MR. MOUGEY:  Yes, because you are so much
20 smarter than me.  I appreciate that.  You all
21 remind me of that every day.  I will work hard to
22 get there.
23 BY MR. MOUGEY:
24     Q.   So here you are.  I apologize.  Let's

Page 336

1  redo that.
2          Ms. Atwell responds to you.  That makes
3  it even better.
4          She runs "a query to see how many
5  bottles we have sent," and she says, "store 3836,"
6  "and we have shipped them 3271 bottles between
7  12/1/10 and 1/10/11."
8          Now do I have that right?  That's from
9  her to you, correct?
10     MR. SWANSON:  Object to the preface.  Go ahead
11 and answer.
12 BY MR. MOUGEY:
13     Q.   That's from her to you, correct?
14     A.   Yes, she wrote this e-mail.
15     Q.   So, she runs the query and then she
16 says, "I don't know how they can even house this
17 many bottles to be honest."
18         Correct?  Did I get that right?
19     A.   That's what she wrote, yes.
20     Q.   "How do we go about checking the
21 validity of these orders?"
22         Correct?
23     A.   That's what she wrote, yes.
24     Q.   Here we are, Barb Martin doing due

Page 337

1  diligence on the store, gets contacted by the
2  distribution center.  There is 3271 bottles.  The
3  distribution center is asking you what do we do.
4  And what do you tell her on the first page,
5  Ms. Martin?
6          Make sure I get this right.  This is
7  from you to her, right?
8          You don't make the call.  You tell her
9  after 3200 bottles of a Schedule II to one
10 pharmacy, you tell her, "Terry Collins is the
11 district pharmacy supervisor.  His cell is," and
12 you give her the cell, "He may be able to shed the
13 light on the subject."
14         Did I get that right?
15     A.   That's what I wrote, yes.
16     Q.   Yes, ma'am.  Now, when you were
17 testifying to this jury about the due diligence you
18 would perform on orders that would -- that were
19 flagged, is this the kind of due diligence you
20 performed where you told the distribution center
21 after they ask you how do we check about the
22 viability, you tell them to contact the district
23 pharmacy supervisor?
24     A.   That is one way of doing it.  I can look

Page 338

1 at sales history and I can see what was ordered.
2 But I'm not near that store. I don't have access
3 to the prescriptions that they're filling and I
4 don't have access to any of their patient
5 information.
6      That is why I referred her to Terry who
7 is in the district, and he could go and work with
8 that store to determine why they're filling so many
9 prescriptions for their patients.
10     Q. So, this is the typical type of due
11 diligence when you mentioned it earlier, you would
12 tell the Jupiter distribution center that was
13 ultimately locked by the DEA that she should call
14 the district pharmacy supervisor, correct?
15     MR. SWANSON: Object to form.
16 BY THE WITNESS:
17     A. It's one of the types. Since I didn't
18 have access to this store's information, that's --
19 I couldn't take any direct action.
20         (WHEREUPON, a certain document was
21         marked Walgreens-Martin Exhibit
22         No. 31: Binder of documents,
23         "Settlement and Memorandum of
24         Agreement" and various other

Page 339

1         documents; beginning Bates No.
2         WAGMDL00490963.)
3 BY MR. MOUGEY:
4     Q. I hand you what we're going to mark as
5 Martin 31, and I ask you to remember that store
6 number.
7      So, before we go to Exhibit 31, the
8 store number that she was asking about with the
9 3,200 bottles on Bates No. 47 is 3836. Okay?
10     Do you see that, 3836?
11     A. I see that, yes.
12     Q. Martin 21 -- 31 is titled Settlement and
13 Memorandum of Agreement, correct?
14     A. That's the title of this document, yes.
15     Q. Yes, ma'am. And if you look at No. 4 on
16 Bates No. 63, you'll see that it references
17 "Walgreens' Jupiter Distribution Center is
18 registered with the DEA as a distributor of
19 Schedule II through IV." (As read.)
20     Do you see that? Paragraph 4?
21     A. Yes, I see that.
22     Q. You will see in paragraph 5, "On
23 September 13, 2012, the DEA by its Administrator
24 issued an Order to Show Cause and Immediate

Page 340

1 Suspension to Walgreens Jupiter," and it cites to
2 Exhibit B.
3      Do you see that?
4     A. I see that, yes.
5     Q. Okay. Let's go to Exhibit B. Go to the
6 tab. It says Appendix B. It's dated September 13,
7 2012.
8      Do you see that?
9     A. I see that, yes.
10     Q. That was one day after your e-mail to
11 your boss informing him that the DEA had changed
12 the locks on Walgreens' cage, correct?
13     A. I don't remember the exact dates.
14     Q. This document, Exhibit B, Order to Show
15 Cause and Immediate Suspension of Registration on
16 Page No. 28 of 349, correct?
17     Do you see the page numbers in the
18 middle of the page, 28 of 349?
19     A. At the bottom, yes.
20     Q. Yes, ma'am. And you see the title where
21 it says Order to Show Cause and Immediate
22 Suspension of Registration, correct?
23     A. Yes.
24     Q. And if you look at paragraph 1, it's

Page 341

1 referencing Walgreens Jupiter Florida distribution
2 center, correct? Paragraph 1.
3     A. Yes.
4     Q. If you look at paragraph 2, the first
5 sentence, "Since at least 2009, the State of
6 Florida has been the epicenter of a notorious,
7 well-documented epidemic of prescription drug
8 abuse."
9      Did I get that right?
10     A. That's the statement written here, yes.
11     Q. And follows it up with, "In July of
12 2011, the Florida Surgeon General declared a public
13 health emergency based on the prescription pill
14 epidemic which results in an average of seven
15 overdose deaths per day in Florida."
16     Correct?
17     A. That's what this document says.
18     Q. The dates in paragraph 2 from 2009 to
19 2011 cover the exact same time span when you and
20 your colleagues at Walgreens are working on the
21 suspicious order monitoring policy with Mr. -- with
22 Mr. Bancroft, correct?
23     A. Yeah, that sounds right.
24     Q. If you turn the page to page 30 of 349,

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 at the top of the page lists six store locations.
2 Do you see those?
3    A.   Yes, I see those.
4    Q.   And if you look at No. 4, 3836 is the
5 exact same store that Ms. Atwell was e-mailing you
6 about in the beginning of 2011, correct?
7    A.   That is, yes, one of the stores.
8    Q.   When she relays, "I ran a query to see
9 how many bottles we have sent to store 3836. We've
10 shipped them 3271 bottles from 12/1/10 to 1/10/11.
11 I don't know how they can keep this many bottles to
12 be" -- "how they can even house this many bottles
13 to be honest. How do we go about checking the
14 validity of these orders?"
15       Correct?
16    A.   That's what she wrote, yes.
17    Q.   Yes, ma'am. And if you look at No. 4 on
18 store 3836, oxycodone is Schedule II and one of the
19 most highly abused controlled substance --
20 controlled substances, correct?
21    A.   By definition, when the DEA classifies a
22 product as a Schedule II, it's both highly
23 addictive and abusable.
24    Q.   And according to these numbers and the

Page 343

1 agreement between Walgreens and the DEA in 2009,
2 there were 344,000 dosage units of oxycodone in
3 2009, correct?
4    MR. SWANSON:  Object to form, characterization.
5 BY THE WITNESS:
6    A.   I'm not sure where this data is being
7 supplied from.
8 BY MR. MOUGEY:
9    Q.   Yes, ma'am. Because you certainly
10 didn't go and look. You told her to contact the
11 pharmacy supervisor, correct?
12    MR. SWANSON:  Object to form, argumentative.
13 BY MR. MOUGEY:
14    Q.   Because you don't know the numbers,
15 correct? You never looked?
16    A.   For this particular store, if you go
17 back on my e-mail, I was unable to look because I
18 was unable to access the store's system. Since I
19 didn't have any other information to justify the
20 information, I referred her to someone that was
21 closer to the store and could have helped her.
22    Q.   While seven people a day in the State of
23 Florida are overdosing, the oxycodone purchases by
24 dosage unit from 2009 to 2010, according to the

Page 344

1 agreement with the DEA, Walgreens went from 344,000
2 dosage units to 849,000 dosage units, correct?
3    MR. SWANSON:  Object to form, mischaracterizes
4 the document you're reading from.
5 BY THE WITNESS:
6    A.   I see the changes in numbers. Again,
7 I'm just not -- I'm not sure where this data is
8 coming from.
9 BY MR. MOUGEY:
10    Q.   I understand. But let's just look --
11 let's do this just to clear up any confusion.
12       Turn to page 2 of 349 and keep your
13 thumb in 30 of 49. Do you see "Stipulation and
14 Agreement"?
15    A.   I see that title.
16    Q.   What do you understand, Ms. Martin, that
17 "Stipulation and Agreement" means?
18    A.   I'm not really sure. This looks like a
19 very complicated legal document, and I would leave
20 it for someone that's more --
21    Q.   Yes, ma'am, like Mr. Piñon to tell us.
22       Paragraph No. 2, "Walgreens acknowledges
23 that suspicious order reporting for distribution to
24 certain pharmacies did not meet the standards

Page 345

1 identified by DEA in three letters from DEA Deputy
2 Assistant Director, Office of Diversion Control,
3 sent to every registered manufacturer and
4 distributor, including Walgreens, on September 27,
5 2006, February 7, 2007 and December 27, 2007."
6       Did I get that right?
7    MR. SWANSON:  Object to the preface to that
8 question. Go ahead and answer.
9 BY MR. MOUGEY:
10    Q.   Did I get that right, Ms. Martin?
11    A.   I believe you read the words correctly.
12    Q.   Do you recognize those dates as the
13 letters we went through earlier, September of '06,
14 February of '07 and December of '07?
15    A.   Vaguely.
16    Q.   Yes, ma'am. And you understand that
17 Walgreens is acknowledging that its suspicious
18 order reporting for the Jupiter distribution center
19 did not meet the standards identified in those
20 letters?
21    A.   That's the verbiage on this form.
22    Q.   Yes, ma'am. That Walgreens signed and
23 agreed to, correct, ma'am?
24    A.   I have no direct knowledge of who signed

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1 it.

2 Q. I thought you might say that, so why
3 don't we turn to page 11 of 349, less than ten
4 pages after the Stipulation and Agreement wherein
5 "Walgreens acknowledges that suspicious order
6 reporting for distribution to certain pharmacies
7 did not meet the standards identified by the DEA,"
8 you see that Thomas Sabatino, executive vice
9 president, general counsel and corporate secretary,
10 signed on behalf of Walgreens on June 10, 2013,
11 correct?

12 A. I see that, yes.

13 Q. Yes, ma'am. So let's go back to page 30
14 of 349 and store 3836.

15 So, in the data provided in this
16 agreement, Walgreens dosage units of oxycodone from
17 the store that you were contacted about in
18 January of '11 went from 344,000 dosage units
19 according to this document to 849,000, correct?

20 MR. SWANSON: Object to the characterization.

21 BY THE WITNESS:

22 A. That's what the numbers on the form say.

23 BY MR. MOUGEY:

24 Q. And you understand that that is an

Page 347

1 increase of approximately 150% in the course of
2 that one year, correct?

3 A. I don't -- I wouldn't be able to do
4 those calculations in the top of my head.

5 Q. How about this. It's more than double?
6 344,000 times 2 is 688,000, right, more than
7 double?

8 A. I'll agree to that, yes.

9 Q. Now, you were contacted by Ms. Atwell
10 and asking you to check the validity of those
11 orders in the very beginning of 2011, January,
12 correct?

13 A. Got the dates on the e-mail.

14 Q. Yes, ma'am.

15 A. Okay.

16 Q. Very beginning of 2011, correct?

17 A. Yes, I see that.

18 Q. And in 2011, the dosage units to this
19 one store that you were contacted by -- about in
20 January, the annual dosage units for just oxycodone
21 were 1.4 million.

22 Do you see that?

23 A. I see that number, yes.

24 Q. Do you have any idea how large the

Page 348

1 community is in store 3836, Port Richey, Florida?

2 A. I -- I don't know that area.

3 Q. Do you have Google on your computer?

4 A. I do now. I don't know if I had it back
5 then.

6 Q. So, if you would have Googled Fort
7 Pierce back then, you would know -- I'm sorry --
8 Port Richey, you would have looked and found that
9 Port Richey, Florida has a population of
10 approximately 5,000 people.

11 5,000 people in January '11, over
12 1.4 million dosage units of oxycodone, correct?

13 MR. SWANSON: Object to form, assumes facts
14 not in evidence, foundation.

15 BY THE WITNESS:

16 A. I'm not sure I understand what you're
17 trying to ask me.

18 BY MR. MOUGEY:

19 Q. Yes, ma'am. If you would have looked in
20 January -- at the beginning of January '11, you
21 would have been able to determine that Port Richey,
22 Florida has a population of approximately 5,000
23 people and potentially prevented Walgreens from
24 dispensing 1.4 million dosage units in that

Page 349

1 community, correct?

2 MR. SWANSON: Object to form.

3 BY THE WITNESS:

4 A. Again, I'm still not sure what your
5 question is.

6 BY MR. MOUGEY:

7 Q. Yes, ma'am. As part of your due
8 diligence, did you even look to see how many people
9 lived in this community that you were contacted
10 about on January '11 about 3271 bottles coming off
11 the shelves?

12 A. I personally did not --

13 Q. Yes, ma'am.

14 A. -- look at the population. Quite
15 frankly, I would think that that would be -- do
16 more harm than good.

17 As a pharmacist, I wouldn't want to turn
18 away a patient just because they didn't live in the
19 same city my store was in. I personally live in
20 Chicago and I shop in a store in Park Ridge.

21 So, if I looked at just the population
22 of each city, and I said I can only fill that many
23 prescriptions, I think we would be doing more harm
24 than good to our patient population.

1    And that's why I referred her to Terry
2 because he was in the area. He would know what
3 that store is doing and if they had patients that
4 they were serving from other areas.
5    Q.  So, the fact that when you looked, that
6 849,000 dosage units of oxycodone was given -- was
7 being dispensed into a town of 5,000 people would
8 not have caused Barb Martin any alarm in the
9 beginning of 2011?
10    MR. SWANSON:  Object to form.
11 BY THE WITNESS:
12    A.  I wasn't looking at that data.
13 BY MR. MOUGEY:
14    Q.  Yes, ma'am, and that's not what I asked,
15 if you looked at it. We've already established you
16 didn't know that there was 5,000 people in that
17 community. What I asked was a little different.
18    If you had looked in the beginning of
19 2011 and you would have seen that 849,000 dosage
20 units of oxycodone were being dispensed by
21 Walgreens where you had spent almost 25 years at
22 this point, would that have caused you any alarm?
23    MR. SWANSON:  Object to form.
24 BY THE WITNESS:

1    A.  I would need to know more history than
2 just a couple of the numbers on a piece of paper.
3 BY MR. MOUGEY:
4    Q.  And that's exactly the point of
5 performing due diligence, correct, Ms. Martin, is
6 that you gather information to make an educated
7 decision, correct?
8    A.  And if I'm not capable of gathering that
9 information, I find other people that can.
10    Q.  So, when you told this jury earlier that
11 you were performing due diligence on stores, your
12 realm of expertise, your wheelhouse does not even
13 include Googling the city where the pharmacy is
14 located to see what the population is?
15    A.  Again, I don't see how that's relevant.
16 I wouldn't want to limit patients to only go to
17 pharmacies in the city they live in.
18    Q.  Do you understand what the word
19 "systemic" means, Ms. Martin?
20    A.  I guess it depends in what context you
21 want to use the word.
22    Q.  Just systemic. Corporate-wide. Do you
23 understand what "systemic" means?
24    MR. SWANSON:  Object to form.

1 BY MR. MOUGEY:
2    Q.  I'm sorry?
3    A.  I understand what the word means. I'd
4 like to know in what context you're trying to use
5 it.
6    Q.  Turn to page 38 of 349 of this same
7 document. Paragraph No. 23. The context that I'm
8 referring to the use of the word "systemic" is
9 "Voluntary dispensing restrictions enacted either
10 in anticipation of" -- are you there?
11    A.  I'm sorry. I guess I'm -- because I
12 don't --
13    Q.  Let's do the bottom --
14    You said page 48, right?
15    Q.  The bottom page numbers, 38 of 349.
16    A.  I'm sorry.
17    Q.  38. That's okay.
18    A.  I turned to 48.
19    Q.  Paragraph 23.
20    A.  Okay. I see 23.
21    Q.  "Voluntary dispensing restrictions
22 enacted either in anticipation of, or in reaction
23 to regulatory action, do not indicate to me that
24 the Respondent and its parent company have

1 recognized and adequately reformed the systemic
2 shortcomings discussed herein."
3    So, in that context, language from the
4 DEA about Walgreens' systemic shortcomings, what
5 does that mean to you, Ms. Martin?
6    MR. SWANSON:  Object on foundation.
7 BY THE WITNESS:
8    A.  It's not my responsibility to determine
9 what the DEA means. I left that up to our legal
10 department.
11 BY MR. MOUGEY:
12    Q.  Sitting here today in 2018, to this
13 jury, when I'm asking you what the word "systemic
14 shortcoming" means in this document from the DEA,
15 you don't have the wherewithal or the ability to
16 tell me what that means?
17    MR. SWANSON:  Object to form.
18 BY THE WITNESS:
19    A.  Again, I'm not comfortable making a
20 legal decision on a legal document.
21 BY MR. MOUGEY:
22    Q.  I'm asking you to tell us what the
23 meaning of a word, "systemic," is in a sentence.
24    You're not comfortable making that

Page 354

1 determination today?

2     MR. SWANSON:  Objection; foundation.

3 BY THE WITNESS:

4     A.   I'm not comfortable responding on a

5 legal document.

6 BY MR. MOUGEY:

7     Q.   Yet you're telling this jury that from

8 the middle of 2008 until the end of 2012, you were

9 a material participant in developing Walgreens'

10 suspicious order monitoring policies and

11 procedures, correct?

12     A.   I was one of a number of people involved

13 with the processes, yes.

14     Q.   You were one of a number of people who

15 were charged with the objective of identifying and

16 reporting suspicious orders to the DEA, correct?

17     A.   I thought our objective was more coming

18 up with system enhancements.  I wasn't involved

19 with the reporting part.

20     MR. MOUGEY:  Let me take a quick break and let

21 me review what I got left.  How much time do we

22 have left?

23     THE VIDEOGRAPHER:  Got about 27 minutes.

24     MR. MOUGEY:  Thank you.

Page 355

1     THE VIDEOGRAPHER:  We're going off the record

2 at 5:33.

3         (WHEREUPON, a recess was had

4           from 5:33 to 5:53 p.m.)

5     THE VIDEOGRAPHER:  We're back on the record at

6 5:53.

7     MR. MOUGEY:  I don't have any further

8 questions other than the issue of the performance

9 review.  I just wanted a confirmation that if we

10 are not getting performance reviews in specific

11 years, does that mean that they don't exist or that

12 there is no reference to opiate-related performance

13 in that review.

14         So, subject to that answer, because I

15 believe we're supposed to be receiving them prior,

16 72 hours prior to the depos, that's the only

17 caveat.  I don't have any questions and don't

18 anticipate a problem, but I would just appreciate

19 an answer.

20     MR. SWANSON:  Okay.  So I don't have an answer

21 right now, as I told you.  You understand.  My

22 understanding is we have tried to answer that

23 question for you.  If it hasn't been done to your

24 satisfaction, I can't speak to that but we will

Page 356

1 look into it and respond if required.

2     MR. MOUGEY:  That's fine.  Thank you.

3     MR. SWANSON:  Thanks.

4         EXAMINATION

5 BY MR. SWANSON:

6     Q.   So, Ms. Martin, it's been a long day,

7 and I know you're tired; and I promise that I'm not

8 going to take a whole lot more of your time, but I

9 do have just a few questions that I hope I can ask

10 and you can help clarify some questions that I had

11 from your earlier testimony.

12         Earlier, actually for a good part of the

13 afternoon today, Mr. Mougey went through several

14 documents with you, memoranda, business requirement

15 documents, et cetera, that related to the

16 suspicious order monitoring system that you had

17 some involvement in working on.

18         Do you recall that generally?

19     A.   Yes.

20     Q.   And he focused a lot of his attention on

21 a specific word that was contained in those

22 reports, and that was "suspicious orders."  Do you

23 remember that?

24     A.   Yes.

Page 357

1     Q.   And there were some back-and-forth

2 between you and Mr. Mougey over whether that was a

3 reference to an actual suspicious order or a

4 potential or possible suspicious order.  Do you

5 recall that?

6     A.   Yes.

7     Q.   And can you tell us what your

8 understanding of that term "suspicious order" as it

9 was used in those business requirement documents

10 referred to?

11     A.   Even though the document didn't use the

12 word "potentially," that was what my belief was,

13 that we were looking for orders that had the

14 potential to be suspicious.  But until we did more

15 evaluations of those orders, we weren't sure

16 whether they were suspicious or not.

17     Q.   And he pulled out or he showed you

18 during the course of the day a couple of different

19 reports, and I'd like to ask you about those now.

20         The first is, was marked Martin

21 Exhibit No. 2.  Could you pull that out, please.

22     A.   Here I have it.

23     Q.   Okay.  And is Martin Exhibit No. 2 one

24 of the reports that was generated by the system

Page 358

1  that you were asked questions about today?
2      A.   Yes.
3      Q.   And if you look, it's a document dated
4  August 25 of 2009, right?
5      A.   Correct.
6      Q.   And in the top right corner, it says
7  "Suspicious Order," right?
8      A.   Right.  That's the name that we were
9  using.
10     Q.   Okay.  And as you review Martin
11 Exhibit 2, is this a document that you -- well, let
12 me ask you first a prefatory question.
13         Was this a document, Martin 2, a
14 document that was flagged by the system for you to
15 review?
16     A.   This item was flagged, yes.
17     Q.   If you look at Martin Exhibit 2, do you
18 consider this to be a suspicious order as you
19 understand that term?
20     A.   I do not consider this to be a
21 suspicious order.  My reasoning for that is that
22 the suggested order quantity and the ordered
23 quantity are both 3.  So, there was no changes that
24 the store made from what our system wanted to

Page 359

1  order.  And then that number 3 is well below the
2  tolerance limit of 5.
3      Q.   So, even though Martin Exhibit 2 was a
4  report that was flagged by the system, it said
5  "Suspicious Order" on it, you don't consider this
6  to be a suspicious order?
7      A.   No.
8      Q.   And then the only other document he
9  showed you a report that he showed you was Martin
10 Exhibit 20.  Can you pull that one out, please.
11     A.   Might be faster if I just look on the
12 screen.
13     Q.   Okay.  That's fine.  Thank you.
14         This is another report that Mr. Mougey
15 showed you, again, with a title or a -- the words
16 on there "Suspicious Order."
17         Do you see that in the upper right
18 corner?
19     A.   Yes.
20     Q.   And was this a report that was flagged
21 by the system that Mr. Mougey asked you about
22 today?
23     A.   Yes.
24     Q.   Do you consider Martin Exhibit 20 to be

Page 360

1  a suspicious order?
2      A.   I do not consider this order to be
3  suspicious either.  While the suggested quantity,
4  the system order was zero, there was an order by a
5  store user with a user ID of Zulic that ordered a
6  quantity of 2.  This is equal to the tolerance
7  limit, so I would not consider this suspicious.
8          They could have been punching this order
9  manually for a number of different reasons.  The
10 first one that would come to my mind would be the
11 fact that it's possible without seeing any other
12 different information that this store never had an
13 order history in the past.  If they hadn't had it
14 before and a new patient presented a prescription,
15 the system wouldn't know to order it.  They would
16 have to order it manually.
17     Q.   So, even though Martin Exhibit 20 was a
18 report that was flagged by the system marked as a
19 suspicious order, you don't consider this to be in
20 fact a suspicious order?
21     A.   I do not think this is a suspicious
22 order.
23     Q.   Was it flagged as a potential suspicious
24 order?

Page 361

1      A.   It was flagged for our review, which is
2  why I kept using the term "potentially suspicious."
3      MR. SWANSON:  Thank you.  That clarified it
4  for me.  I don't have any more questions.
5      MR. MOUGEY:  I have a couple follow-up
6  questions, Ms. Martin.
7              FURTHER EXAMINATION
8  BY MR. MOUGEY:
9      Q.   So, how many years did you review these
10 reports?
11     A.   Somewhere between 2 and 4.
12     Q.   Somewhere between 2 and 4.  So,
13 beginning of 2009 to late 2012, right?
14     A.   Middle 2012 when the Rx Integrity team
15 came and there were various iterations of this form
16 as well.
17     Q.   Now, what was produced out of your file
18 was about 22 or 23 of these suspicious order
19 reports.  Do you have any idea why you had 22 or 23
20 of these reports isolated?
21     A.   I have no idea why I chose to kept
22 those.
23     Q.   You just happened to keep 22 or 23 of
24 these reports?

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1     A.   They were probably random documents that
2 I kept just to have for some kind of reference
3 purpose.
4     Q.   Do you know where the rest of them are?
5     A.   I --
6     MR. SWANSON:  Object to form.
7 BY THE WITNESS:
8     A.   I really don't know.  I mean, I don't
9 know if I printed all of them when I looked at
10 them.  I didn't always need to print them.
11 BY MR. MOUGEY:
12     Q.   You don't recall whether you printed
13 them or whether your practice was to look at them
14 on your computer?
15     A.   Most of the time I would try to look at
16 them on the computer without printing them.
17     Q.   Is there a reason why you happened to
18 print these handful?
19     A.   Some of the ones I know I printed more
20 is when I was working with other people so we could
21 sit down and go over the document and maybe pull up
22 other screens so we had several different frames of
23 reference.
24     Q.   Is it fair to say that the Walgreens

Page 363

1 suspicious order monitoring system flagged tens and
2 tens and tens of thousands of orders during the
3 period that you -- during the period that you
4 happened to be reviewing samples of them?
5     A.   I wouldn't be able to quantify how many
6 orders it was.
7     Q.   Just ballpark it.  I mean, how many are
8 you -- tens and tens of thousands?
9     A.   I'm not comfortable providing just a
10 guess.
11     Q.   We looked at the internal document that
12 had 104,000 specific orders on it, correct?
13     MR. SWANSON:  Object to form.
14 BY THE WITNESS:
15     A.   That form had -- it used the word
16 "order" and "line."  So, it might not just have
17 been orders.  Like I said, lines can be within an
18 order.
19 BY MR. MOUGEY:
20     Q.   It had 104,000, correct?
21     A.   Yeah, I think that's what, over 100.
22     Q.   And you printed off 22.  That's what
23 Walgreens has is 22 or 23 of those reports,
24 correct?

Page 364

1     MR. SWANSON:  Object to form.
2 BY THE WITNESS:
3     A.   I don't know if other people have forms.
4 That's what I had.
5 BY MR. MOUGEY:
6     Q.   I didn't ask other people.  I said
7 you've printed off 22 or 23.  That's all you have.
8 That's the only evidence you have of four years of
9 looking at those reports.  You have 22 or 23 of
10 them, correct?
11     A.   That's all I kept.  I don't know why I
12 kept them.
13     Q.   Did you testify today about the -- how
14 you selected the sampling of the reports you looked
15 at?
16     A.   It was just random.
17     Q.   It was random?
18     A.   There might have been times that someone
19 asked me to look at something specific.  But most
20 of the time if I didn't get a request to look at a
21 store, it was just random.
22     Q.   Was there a pool that you could isolate
23 all of these suspicious orders for any given day?
24     MR. SWANSON:  Object to form.

Page 365

1 BY THE WITNESS:
2     A.   I don't understand your question.  I'm
3 sorry.
4 BY MR. MOUGEY:
5     Q.   Was there -- how did you figure out
6 where to look?  Where were the suspicious orders?
7     A.   You mean that report, where did it
8 reside?
9     Q.   Yes.
10     A.   It was on the ADR4 screens, a computer
11 program that Walgreens has.
12     Q.   But the documents that you provided were
13 printoffs, and they were given to us as a pdf so I
14 don't know what the report looks like.
15     What does the report on your computer
16 look like?
17     A.   It wasn't a report.  I logged into a
18 screen, and I would -- I could pull up information.
19     Q.   All right.  So, how would you pull them
20 out?  Would they be on a spreadsheet?  Would they
21 be on a -- organized --
22     A.   It looked exactly like that report.
23 That's --
24     Q.   And you would just scroll through one by

Page 366

1  one by one that day --
2      A.   Yeah.
3      Q.   -- and look at the sample?
4      A.   I would select random stores and look at
5  their orders.
6      Q.   And you don't have any recollection
7  sitting here today what percentage of the orders
8  flagged as suspicious you would look at?
9      A.   No.
10     Q.   So, you don't know how many you looked
11 at, right?
12     A.   No.
13     Q.   You don't know what percentage you
14 looked at, correct?
15     A.   Correct.
16     Q.   You don't know where they're kept,
17 correct?
18     A.   You mean --
19     Q.   The reports today.  Where are all the
20 reports that were flagged as suspicious?  You don't
21 know where they're kept?
22     A.   I don't know where that --
23     MR. SWANSON:  Object to form.
24 BY THE WITNESS:

Page 367

1      A.   -- that is.
2  BY MR. MOUGEY:
3      Q.   You don't why you printed off the 22 or
4  '3 that you printed off, correct?
5      A.   I don't remember.
6      Q.   And you have no criteria for which
7  sampling of the reports you looked at, correct?
8      MR. SWANSON:  Object to form, mischaracterizes.
9  BY THE WITNESS:
10     A.   I wasn't asked to come up with any
11 criteria.  I was told to look at stores.
12     MR. MOUGEY:  Thank you.  I don't have anything
13 else.
14     MR. SWANSON:  You say you're done?
15     MR. MOUGEY:  Yes.
16     MR. SWANSON:  Nothing more from me.
17     THE VIDEOGRAPHER:  We're going off the record
18 at 6:05 p.m.
19     (Time Noted:  6:05 p.m.)
20     FURTHER DEPONENT SAITH NAUGHT.
21
22
23
24

Page 368

1
2      I, CORINNE T. MARUT, C.S.R. No. 84-1968,
   Registered Professional Reporter and Certified
3  Shorthand Reporter, do hereby certify:
       That previous to the commencement of the
4  examination of the witness, the witness was duly
   sworn to testify the whole truth concerning the
5  matters herein;
       That the foregoing deposition transcript
6  was reported stenographically by me, was thereafter
   reduced to typewriting under my personal direction
7  and constitutes a true record of the testimony
   given and the proceedings had;
8      That the said deposition was taken
   before me at the time and place specified;
9      That the reading and signing by the
   witness of the deposition transcript was agreed
10 upon as stated herein;
       That I am not a relative or employee or
11 attorney or counsel, nor a relative or employee of
   such attorney or counsel for any of the parties
12 hereto, nor interested directly or indirectly in
   the outcome of this action.
13
14     _____
       CORINNE T. MARUT, Certified Reporter
15
       (The foregoing certification of this
16 transcript does not apply to any
   reproduction of the same by any means, unless under
17 the direct control and/or supervision of the
   certifying reporter.)
18
19
20
21
22
23
24

Page 369

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4  carefully and make any necessary corrections.  You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7         After doing so, please sign the errata
8  sheet and date it.
9         You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12         It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the
15 deposition transcript by you.  If you fail to do
16 so, the deposition transcript may be deemed to be
17 accurate and may be used in court.
18
19
20
21
22
23
24

Page 370

```
1       - - - - - -
          E R R A T A
2       - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6       REASON: _____
7  ____  ____  _____
8       REASON: _____
9  ____  ____  _____
10      REASON: _____
11 ____  ____  _____
12      REASON: _____
13 ____  ____  _____
14      REASON: _____
15 ____  ____  _____
16      REASON: _____
17 ____  ____  _____
18      REASON: _____
19 ____  ____  _____
20      REASON: _____
21 ____  ____  _____
22      REASON: _____
23 ____  ____  _____
24      REASON: _____
```

Page 372

```
1   LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
```

Page 371

```
1
2       ACKNOWLEDGMENT OF DEPONENT
3
4       I, BARBARA MARTIN, do hereby certify
5  under oath that I have read the foregoing pages,
6  and that the same is a correct transcription of the
7  answers given by me to the questions therein
8  propounded, except for the corrections or changes
9  in form or substance, if any, noted in the attached
10 Errata Sheet.
11
12
13 _____
14 BARBARA MARTIN          DATE
15
16
17 Subscribed and sworn
   to before me this
18 _____ day of _____, 20____.
19 My commission expires:_____
20
   _____ Notary Public
21
22
23
24
```