Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                     EASTERN DIVISION

 3   IN RE:  NATIONAL        :  MDL No. 2804

     PRESCRIPTION OPIATE     :

 4   LITIGATION              :  Case No. 17-md-2804

                             :

 5   APPLIES TO ALL CASES    :  Hon. Dan A. Polster

                             :

 6                           :

 7

 8                 HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                      - - - -

12                  JANUARY 25, 2019

13                      - - - -

14    VIDEOTAPED DEPOSITION OF ROBERT A. MCCLUNE,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Friday,

20   January 25, 2019, commencing at 9:11 a.m.

21                      - - - -

22             GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

23                 deps@golkow.com

24

25
```

```
 1                A P P E A R A N C E S
 2   On behalf of Plaintiffs
 3            WAGSTAFF & CARTMELL, LLP
              BY:  ERIC D. BARTON, ESQUIRE
 4            AND  BRITT WICKLUND, ESQUIRE
              4740 Grand Avenue, Suite 300
 5            Kansas City, Missouri  64112
              816.701.1100
 6            ebarton@wcllp.com
              bwicklund@wcllp.com
 7
 8   On behalf of Defendant AmerisourceBergen Drug
     Corporation
 9
              (By Phone/Livestream)
10            JACKSON KELLY, LLP
              BY:  ANDREW N. SCHOCK ESQUIRE
11            50 South Main Street, Suite 201
              Akron, Ohio  44308
12            330.252.9078
              anschock@jacksonkelly.com
13
14   On behalf of Defendant Cardinal Health, Inc.
15            PIETRAGALLO GORDON ALFANO BOSICK &
              RASPANTI, LLP
16            BY:  JOHN A. SCHWAB, ESQUIRE
              One Oxford Centre, 38th Floor
17            301 Grant Street
              Pittsburgh, Pennsylvania  15219
18            412.263.2000
              jas@pietragallo.com
19
20   On behalf of Defendants Endo Pharmaceuticals, Endo
     Health Solutions and Par Pharmaceuticals
21
              (By Phone/Livestream)
22            ARNOLD & PORTER KAYE SCHOLER LLP
              BY:  DAVID KOUBA, ESQUIRE
23            601 Massachusetts Avenue, NW
              Washington, DC  20001-37453
24            202.942.5743
              david.kouba@arnoldporter.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S (Continued)
 2      On behalf of Defendant HBC Service Company
 3              MARCUS & SHAPIRA, LLP
                BY:  JOSHUA A. KOBRIN, ESQUIRE
 4              AND  ROBERT M. BARNES, ESQUIRE
                One Oxford Centre, 35th Floor
 5              Pittsburgh, Pennsylvania  15219
                412.471.3490
 6              jkobrin@marcus-shapira.com
                rbarnes@marcus-shapira.com
 7
 8      On behalf of Defendant McKesson Corporation
 9              COVINGTON & BURLING, LLP
                BY:  RAJ PAUL, ESQUIRE
10              One CityCenter
                850 Tenth Street, NW
11              Washington, DC  20001-4956
                202.662.5807
12              rpaul@cov.com
13
        On behalf of Defendant Walmart
14
                (By Phone/Livestream)
15              JONES DAY
                BY:  ALEXANDRA J. WOLTER, ESQUIRE
16              555 South Flower Street
                Fiftieth Floor
17              Los Angeles, California  90071
                213.243.2651
18              awolter@jonesday.com
19
        Also present
20
                Kevin Frank, legal videographer
21
22
23
24
25
```

```
 1                   * I N D E X *
 2  ROBERT A. MCCLUNE                              PAGE
 3    EXAMINATION BY MR. BARTON              7, 223
      EXAMINATION BY MS. WICKLUND                209
 4    EXAMINATION BY MR. KOBRIN                  219
 5          * INDEX OF HBC-MCCLUNE EXHIBITS *
 6  NO.                 DESCRIPTION             PAGE
    Exhibit 1   Robert McClune's LinkedIn profile   16
 7
    Exhibit 2   Giant Eagle Pharmacy Administration  78
 8              as of August 2015 org chart
                HBC_MDL00002191
 9
    Exhibit 3   Invitation to the presentation of    80
10              Giant Eagle Pharmacy Year 2015 AOP/
                Business Plan, 6/24/14
11              HBC_MDL00034114 - 00034149
12  Exhibit 4   Email chain, 8/28/14, from J. Fogt   99
                to K. Remas, subject: RE: VAWD
13              Information still needed, attaching
                Prasco VAWD documents
14              HBC_MDL00128238 - 00128260
15  Exhibit 5   Suspicious Order Monitoring Summary  105
                HBC_MDL00132616
16
    Exhibit 6   Email chain, 8/12/15, from D.        145
17              Bertucci to A. Zakin, et al.,
                subject: VAWD Physical Inspection
18              Preparation, attaching VAWD Survey
                Process Guide
19              HBC_MDL00076207 - 00076218
20  Exhibit 7   Email chain, 8/20/15, from G.        149
                Carlson to J. Jenson, et al.,
21              subject: FW: Thrifty White Notes
                HBC_MDL00069566 - 00069571
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      * INDEX OF HBC-MCCLUNE EXHIBITS (Continued) *
 2    NO.                DESCRIPTION                 PAGE
      Exhibit 8    Email, 8/28/15, from J. Millward to   158
 3                 E. Hart, et al., subject: 30-010 -
                   Inventory Control - Suspicious Order
 4                 Policy FINAL.docx, attaching 30-010 -
                   Inventory Control - Suspicious Order
 5                 Policy FINAL.docx
                   HBC_MDL00169475 - 00169477
 6
      Exhibit 9    Email chain, 8/28/15, from R.         163
 7                 McClune to J. Millward, et al.,
                   subject: RE: 30-010 - Inventory
 8                 Control - Suspicious Order Policy
                   FINAL.docx
 9                 HBC_MDL00169466
10    Exhibit 10   Email chain, 9/2/15, from E. Hart     167
                   to R. McClune, subject: RE Vault/
11                 Refrigeration
                   HBC_MDL00127457 - 00127460
12
      Exhibit 11   Email chain, 8/31/15, from R.         172
13                 McClune to P. Raub, et al., subject:
                   FW: Thank you, attaching Thrifty
14                 White policies and procedures
                   HBC_MDL00055709 - 00055788
15
      Exhibit 12   Email, 9/16/15, from R. McClune to    176
16                 G. Chunderlik, et al., subject:
                   Thrifty White Controlled Substance
17                 Policies, attaching subject document
                   HBC_MDL00042149 - 0004226
18
      Exhibit 13   Email chain, 10/8/15, from R.         182
19                 McClune to G. Chunderlik, subject:
                   FW: Consultant Retained by MNK for
20                 SOM and Other Matters: BuzzeoPDMA,
                   attaching various BuzzeoPDMA
21                 documents
                   HBC_MDL00028251 - 00028272
22
      Exhibit 14   Email, 12/3/15, from J. Millward      183
23                 to G. Chunderlik, et al., subject:
                   Order Monitoring System Policy and
24                 Procedures.docx, attaching subject
                   document
25                 HBC_MDL00056199 - 00056203
```

```
 1        * INDEX OF HBC-MCCLUNE EXHIBITS (Continued) *
 2    NO.                DESCRIPTION                PAGE
      Exhibit 15  Email, 9/28/15, from R. McClune to   188
 3                J. Millward, et al., subject:
                  Control Blocking Policy and Procedure
 4                HBC_MDL00005466 - 00005467
 5    Exhibit 16  Email, 11/21/16, from P. Raub to     200
                  M. Doerr, et al., subject: RE:
 6                Suspicious Order Monitoring (SOM)
                  HBC-MDL00046220 - 00046228
 7
      Exhibit 17  Email chain, 10/8/15, from G.        210
 8                Carlson to R. McClune, subject: FW:
                  Giant Eagle First Amendment,
 9                attaching First Amendment to
                  Services Agreement
10                HBC_MDL00035614 - 00035624
11    Exhibit 18  Giant Eagle First Amendment to       216
                  Services Agreement
12                HBC_MDL00132477 - 00132479
13                         - - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                P R O C E E D I N G S
 2                      - - - -
 3            THE VIDEOGRAPHER:  We are now on the
 4   record.  Today's date is January 25, 2019, and the
 5   time is approximately 9:11 a.m.
 6       This is the videotaped deposition of Robert
 7   McClune in the National Prescription Opiate
 8   Litigation.
 9       All counsel and parties present will be noted
10   on the stenographic record.
11       Will the court reporter please swear in the
12   witness.
13                  ROBERT A. MCCLUNE,
14      having been first duly sworn, was examined
15              and testified as follows:
16                    EXAMINATION
17   BY MR. BARTON:
18       Q.   Mr. McClune, my name is Eric Barton.
19   I'm here from Wagstaff & Cartmell in Kansas City.
20   We met just before the deposition; correct?
21       A.   Correct.
22       Q.   Would you go ahead and -- just a
23   formality -- but state your full name for the
24   record again, please.
25       A.   Sure.  It's Robert Anthony McClune.
```

```
 1          Q.    Thank you.   I'm going to have a number

 2    of questions for you today.

 3          You understand you're here to have your

 4    deposition taken in a case that is pending in the

 5    Northern District of Ohio by plaintiffs, cities,

 6    and counties, against a number of companies,

 7    including HBC, arising out of the opioid epidemic?

 8          A.    Yes.

 9          Q.    You understand that's why you're here

10    today?

11          A.    Yes.

12          Q.    Have you ever had your deposition taken

13    before?

14          A.    I've had a deposition before, yes.

15          Q.    And when was -- when was that?

16          A.    Last deposition, two years ago, roughly.

17          Q.    Okay.

18          A.    Not for this case.

19          Q.    So you've been deposed more than one

20    time?

21          A.    I had one formal.  The other one, I

22    don't think it would count as a deposition.  So

23    just one; just one.

24          Q.    And how about testifying in trials?

25    Have you ever actually testified in a courtroom,
```

```
 1   in a trial, for any reason?

 2        A.   No.

 3        Q.   The deposition, if you don't mind me

 4   asking, I don't need you to get into real details

 5   of it, but what was the nature of the case in

 6   which you have previously given a deposition?

 7        A.   It was an antitrust case.

 8        Q.   And you say that was about two years

 9   ago?

10        A.   Yes.

11        Q.   Do you know what court that case was

12   pending in?

13        A.   I do not.

14        Q.   Were you deposed as an employee or

15   representative of Giant Eagle?

16        A.   Yes.

17        Q.   Were you represented at that deposition

18   by this same law firm, Marcus & Shapira?

19        A.   Yes.

20        Q.   Do you remember any of the parties

21   involved in that case other than Giant Eagle?

22        Do you remember the names of anyone else

23   involved?  The defendants?

24        A.   By "defendants," you mean the

25   manufacturers that would be associated in the
```

1   case?

2       Q.   I guess, yes, if there were

3   manufacturers involved, yes.

4       A.   AbbVie and Teva Pharmaceuticals.

5       Q.   So it was an antitrust case involving

6   pharmaceuticals?

7       A.   Yes.

8       Q.   So you've been through this process

9   before, so we don't have to belabor too much of

10  the rules of the road.  But let me just ask you a

11  few, again, just to make sure we have the same

12  understanding.

13      You do understand you are under oath today,

14  just as if you were testifying in a courtroom at

15  trial; correct?

16      A.   Yes.

17      Q.   And you understand that this deposition

18  is being videotaped in the event that there may be

19  a trial, and you may not be required to appear

20  personally at that trial, but your testimony today

21  could be used as some of the testimony to be

22  played at that trial?

23      A.   Yes.

24      Q.   If today I ask you a question that you

25  don't understand, would you please feel free to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   tell me so and I will phrase it?

 2        A.   Yes.  No problem.

 3        Q.   And as we get going, if you fail to give

 4   like an audible answer, a "yes" or a "no," and

 5   instead just nod your head or say "uh-huh," I

 6   might ask for a clarification for the sake of our

 7   written record.

 8        Is that okay?

 9        A.   Yes.  I'll do my best.

10        Q.   Generally, and I'm not asking you to

11   reveal any, you know, actual communications,

12   conversations that you've had with your lawyers

13   here today, but what did you do generally to

14   prepare for this deposition today?

15        A.   I've worked for Giant Eagle for ten

16   years and in preparation for this case reviewed

17   relevant case materials that would possibly come

18   up as part of this deposition.

19        Q.   And case materials, for example -- I'll

20   just ask you a few specifics just to see.

21        Did you review any of the actual what we call

22   pleadings, the complaint, what the case alleges,

23   or any of those types of documents that have been

24   filed in court?

25             MR. KOBRIN:  I'm going to object.  I
```

1    mean, I'm okay with you asking him -- objection.

2        I'm okay with you asking him about whether he

3    looked at documents, but I don't want you doing a

4    line of inquiry that's going to essentially reveal

5    whatever we showed him, because I think that's

6    work product.

7            MR. BARTON:  That's fine.  I think we

8    can just take that as it goes, but I'm only asking

9    just a general sense of what he looked at.

10       I'm not going to try to have him tell me

11   every single document --

12           MR. KOBRIN:  Yeah.  If you're trying to

13   narrow it down by asking the areas of documents

14   and the types of documents, I think that would be

15   inappropriate.

16           MR. BARTON:  I think I'm keeping it to

17   categories is my goal.

18   BY MR. BARTON:

19       Q.   But just categorically, did you review

20   any of the pleadings in the case?

21       A.   Early on, yes.

22       Q.   And I assume you might have gone back

23   and looked at emails that you were involved in,

24   you know, that may have pertained to the time

25   period relevant to the case?

```
 1              MR. KOBRIN:  Object to form.

 2              THE WITNESS:  Yes.

 3   BY MR. BARTON:

 4        Q.   Have you, other than -- well, I assume

 5   you met with your attorneys to prepare for the

 6   deposition before today?

 7        A.   Yes.

 8        Q.   About how long did you spend preparing

 9   with them?

10        A.   Since HBC was added to the case.

11              MR. KOBRIN:  Do you mean in general or

12   yesterday?

13              MR. BARTON:  I guess all total.

14   BY MR. BARTON:

15        Q.   You met maybe perhaps more than one time

16   with counsel to prepare for the deposition?

17              MR. KOBRIN:  To prepare for the

18   deposition.

19              THE WITNESS:  I met yesterday to prepare

20   for the deposition eight to ten hours.

21   BY MR. BARTON:

22        Q.   Other than meeting with counsel, have

23   you spoken with others to help you prepare for the

24   deposition?  "Others" meaning other employees of

25   Giant Eagle first.
```

```
1        A.   Yes.  We've spoken about the case.

2        Q.   Other people have been deposed.  And so

3   maybe you've spoken with others who had their

4   depositions taken.

5             MR. KOBRIN:  You're talking about just

6   in preparation for the deposition?

7             MR. BARTON:  Correct.

8             THE WITNESS:  Yes.

9   BY MR. BARTON:

10       Q.   Who have you spoken to just in

11  preparation for this deposition in terms of other

12  employees at Giant Eagle?

13       A.   Can you restate that question.

14       Q.   Yeah.  What other employees of Giant

15  Eagle have you spoken to in preparation for your

16  deposition today?

17       A.   George Chunderlik, Jim Tsipakis, Mike

18  Bianco, Fred Bencivengo.  Just others that would

19  be involved with this case.

20       Q.   In terms of any of those conversations

21  you've had with them that have not been in the

22  presence of counsel, that have not been during a,

23  you know, prep session at which counsel was

24  present, have you had those conversations just in

25  the hallway?
```

 1                MR. KOBRIN:  I object to that.  I don't

 2      want him to get the impression that just because

 3      counsel was not present in person during

 4      conversations where he's preparing for his

 5      deposition that it's not privileged.

 6          If it was at the direction of counsel or we

 7      were involved in any way, I think that's still

 8      privileged.  So I still don't want him getting

 9      into the nature of those preparatory

10      conversations.

11                MR. BARTON:  Okay.

12      BY MR. BARTON:

13          Q.   I don't want you to reveal anything that

14      you may have talked about with George Chunderlik

15      or Mike Bianco that is advice or communications

16      you've had with counsel, relaying to each other

17      things that you've spoken about with counsel.  I'm

18      putting that aside.

19          I'm just getting a sense for what subjects

20      have you talked with them about in preparation for

21      your deposition.

22          A.   Most of our conversations were with

23      counsel present, not to say there haven't been

24      cases where there haven't been.  Most of it was

25      just rehashing --

```
 1              MR. KOBRIN:  Don't get into the content
 2   of the conversation.  Just the fact that we were
 3   present means it's privileged.
 4              MR. BARTON:  Well, I think the subjects
 5   are okay, just subject matter.
 6              MR. KOBRIN:  No.  I'd rather he not talk
 7   about subject matter.  I think that's work product
 8   and confidential privileged communications.
 9              MR. BARTON:  Well, we'll move on.  I
10   disagree, but we'll move on from that right now.
11   BY MR. BARTON:
12       Q.   So other than other employees of Giant
13   Eagle, is there anyone else who you may have
14   spoken with in preparation for the deposition?
15       A.   No.
16              (HBC-McClune Exhibit 1 was marked.)
17   BY MR. BARTON:
18       Q.   I'm going to hand you what we've marked
19   as Exhibit 1.  It's P-GEN 128.
20       I'll represent to you that we have, I
21   believe, printed this from LinkedIn.  And it
22   appears to be a profile that you can download in
23   PDF from LinkedIn that summarizes your work and
24   educational background.
25       Is that true?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.  Based on my review, it does look
 2   like it came from LinkedIn.
 3        Q.   And what is LinkedIn?
 4             MR. KOBRIN:  Object to form.
 5             THE WITNESS:  An online social media
 6   site more for business networking.
 7   BY MR. BARTON:
 8        Q.   You're familiar with LinkedIn as a
 9   social media platform, whatever it is?
10        A.   Yes.
11        Q.   Is this Exhibit 1 content that you
12   provided to LinkedIn to create or maintain your
13   profile on LinkedIn?
14        A.   I've not read this document verbatim,
15   but it does appear to be information that I
16   updated online and posted.
17        Q.   And that's my question.  At some point
18   in time, this is content that you likely provided
19   as opposed to somebody -- some other third party
20   providing content?
21        A.   Yes.  That's correct.
22        Q.   Well, I just want to walk through some
23   of the history here, your employment background,
24   educational background, starting with -- I noted
25   that you graduated from Beaver Area Senior High
```

1    School in 1997; correct?

2        A.    That is correct.

3        Q.    Beaver, Pennsylvania, kind of between

4    here and Youngstown?

5        A.    That's correct.

6        Q.    And those are the Beaver Bobcats?

7        A.    That's also correct.

8        Q.    And I wonder why they weren't called the

9    Beaver Beavers.

10       A.    Yeah.  It's a good question.  I think

11   there are other neighboring schools that use that

12   as a mascot.

13       Q.    At Penn State, you list a bachelor of

14   science, but what did you get your degree in?

15       A.    My undergrad is in advertising.

16       Q.    Did you have any computer or information

17   systems kind of coursework or studies in college?

18       A.    Yes.  A lot of my coursework was built

19   around analytics, advertising analytics.

20       Q.    So that was part of your advertising

21   degree, I guess?

22       A.    Yes.

23       Q.    Have you taken any graduate school of

24   any kind?

25       A.    I took one postgrad programming class at

1    Penn State.  I don't have it listed on there.

2        Q.   And was that programming in any, you

3    know, kind of particular language or --

4        A.   SQL.

5        Q.   And SQL, is that -- I won't be very

6    precise in some of the technical questions.  But

7    is that kind of a database language --

8        A.   Yes.

9        Q.   -- for lack of a better word?

10       A.   Standard query language, yes.

11       Q.   Standard query language.  That's what

12   SQL stands for?

13       A.   Yes.

14       Q.   Do people sometimes say SQL instead of

15   SQL?

16       A.   Yes.

17       Q.   So that is -- well, describe for me,

18   since you know more about it than I do, what is

19   the function of SQL?

20       A.   It's a language that allows you to merge

21   together and run reports, analytics, calculations

22   against standard structure database, so a

23   relational database.

24       Q.   Relational database is a good way to put

25   it perhaps as just a broad category?

1        A.    Yeah.

2        Q.    So other than that, that postgraduate

3    class in the SQL language, have you had any other

4    formal technical training past your undergraduate

5    degree?

6        A.    No.

7        Q.    I want to flip to what's on page 4.

8    Just noting that you went to work in August 2004

9    for AstraZeneca; correct?

10       A.    Yes.

11       Q.    And worked for, it looks like, about a

12   year and a half as a marketing representative;

13   correct?

14       A.    Yes.

15       Q.    Was this job your first experience

16   working in the pharmaceutical industry?

17       A.    Yes.

18       Q.    And as part -- I know the first bullet

19   point that you list there describing some of your

20   job responsibilities says, "Conducted and designed

21   marketing programs targeting physicians for

22   products including Nexium and Crestor."

23       Do you see that?

24       A.    Yes.

25       Q.    That's one thing you did for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    AstraZeneca?

 2         A.   Yes.

 3         Q.   Did you learn through the experience of

 4    working for AstraZeneca that the prescribing

 5    habits and choices of individual physicians have a

 6    significant impact on how much of any one drug or

 7    class of drug is sold?

 8              MR. KOBRIN:  Object to form.

 9              THE WITNESS:  Can you repeat that

10    question.

11    BY MR. BARTON:

12         Q.   Yeah.  It probably wasn't very well

13    said.

14         Did you learn through your experience with

15    AstraZeneca, your first job in the pharmaceutical

16    industry, that the individual prescribing habits

17    or practices of physicians can have a significant

18    impact on the quantity of any given drug being

19    sold?

20              MR. KOBRIN:  Object to form.

21              THE WITNESS:  Being that I wasn't

22    directly involved with the sales team, I'm not

23    sure of the influence.  But our programs were

24    designed to provide information to doctors so they

25    can make a more educated decision.
```

```
 1   BY MR. BARTON:

 2        Q.   With the end goal of the company being

 3   to sell the drugs that the company makes to sell;

 4   correct?

 5             MR. KOBRIN:  Object to form.

 6             THE WITNESS:  I suppose that's correct.

 7   BY MR. BARTON:

 8        Q.   Nexium and Crestor, those are -- are

 9   those controlled substances?  Like, are they

10   Schedule anything controlled substances?

11        A.   From a DEA perspective non-schedule, but

12   Schedule VI technically.

13        Q.   Right.  Nexium, is that -- that's like a

14   reflux medication?

15        A.   Yes.

16        Q.   And Crestor, is that a cholesterol

17   medication, lowering your cholesterol?

18        A.   Yes.

19        Q.   At any time, when working for

20   AstraZeneca, were you involved in marketing any

21   Schedule II or III controlled substances?

22             MR. KOBRIN:  I just want to object to

23   form.

24        How far do you think you're going to go down

25   the path on AstraZeneca?  Because I may want to
```

```
 1    talk to the client at some point just to make sure

 2    that we're not breaching any kind of

 3    confidentiality here.

 4              MR. BARTON:  Not very far.  I'm asking

 5    basically the question I just asked, and that's

 6    probably about it.

 7              MR. KOBRIN:  Okay.

 8    BY MR. BARTON:

 9         Q.   Did you ever sell -- did you ever help

10    market any opioid pain medications for

11    AstraZeneca?

12         A.   No.

13         Q.   Or any other controlled substances that

14    you recall?

15         A.   No.

16         Q.   All right.  Your next position it

17    appears was with an entity called IMS Health;

18    correct?

19         A.   Yes.

20         Q.   How would you describe the business of

21    IMS Health at the time that you worked for them?

22         A.   IMS Health is a major data provider for

23    the pharmaceutical industry.  There were many

24    aspects of the business that I was not intimately

25    involved with.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        My group worked on Rx database management,

 2   working with retailers, bringing that information

 3   into a database, and then selling that information

 4   back out to manufacturers.

 5        Q.   Is IMS Health based in Pittsburgh?

 6        A.   No.

 7        Q.   Where are they headquartered?

 8        A.   I'm not a hundred percent -- I think

 9   they're using Stamford, Connecticut as their

10   headquarters right now.  I was based out of

11   Plymouth Meeting, Pennsylvania, just outside of

12   Philadelphia.

13        Q.   And your position you described as

14   business analyst.  And you just described a little

15   bit about what the company did; correct?

16        A.   Yes.

17        Q.   Can you tell me just what your -- in

18   general, describe what you did for IMS Health at

19   that time.

20        A.   Yes.  I worked with the retailers to

21   make sure their data came into our repository, the

22   data was in line with our projected or imputed

23   expectations.

24        Once we qualified that data, we married it

25   into our larger database that drove deliverables
```

Highly Confidential - Subject to Further Confidentiality Review

1    out to the manufacturing community.

2        Q.    So if I understand what you're saying,

3    one of the things that IMS Health did, and maybe

4    still does, is to collect sales transactional data

5    from retailers about their sales of prescription

6    drugs; correct?

7        A.    Yes.

8        Q.    And then it collects that information

9    from a number of different retailers; right?

10       A.    Yes.

11       Q.    And then it will combine all that data

12   into a larger database so that it can evaluate

13   larger trends and get a bigger picture of what's

14   going on than just any one retailer might see from

15   their own data?

16           MR. KOBRIN:   Object to form.

17   BY MR. BARTON:

18       Q.    Is that one of the purposes of doing

19   that?

20       A.    Yes.

21       Q.    And so the retailers can, I assume,

22   subscribe or enter into a relationship of some

23   kind with IMS Health to be able to provide their

24   data and, in return, get access to the analytics

25   and the analysis of the larger data that IMS

Highly Confidential - Subject to Further Confidentiality Review

1  Health may use; correct?

2      A.   At this point in time when I was with

3  IMS, the deliverables were mainly manufacturer

4  focused.

5      Q.   And so the deliverables, meaning the

6  output of IMS from the analysis that it did of

7  whatever data they got.

8      A.   Yes.

9      Q.   That's what you mean by "deliverables"?

10     A.   Correct.

11     Q.   And so they were -- their customers were

12 manufacturers who were interested in knowing what

13 all of the retailer data looked like?

14     A.   Yes.

15     Q.   One of the bullet points on the IMS

16 Health position I just wanted to ask you about, it

17 looks like it's five bullet points down, but you

18 say -- one of the things that you've listed there

19 was to build an Excel-based analytical tool used

20 by the entire department for processing and

21 comparing data in paralleling systems during the

22 migration from a mainframe system to an Oracle

23 database system.

24     Did I read that correctly?

25     A.   Yes.

1    Q.   The Excel-based analytical tool, I just

2    want to ask, is that a reference -- you're using a

3    lower case E there, but is that a reference to

4    Microsoft Excel?

5    A.   Yes.

6    Q.   And Microsoft Excel is a program that is

7    part of the Microsoft Office suite that a lot of

8    people have on their computers?

9    A.   Yes.

10    Q.   And that was true -- "that" being that

11    Microsoft Excel was part of the Microsoft Office

12    package, that was true back in 2006, 2007;

13    correct?

14    A.   Yes.

15    Q.   I remember it.  I even remember way back

16    then.

17         Was this job at IMS Health your first

18    full-time job that focused on data analytics

19    specifically in the pharmaceutical industry?

20    A.   Yes.

21    Q.   And that was maybe the change from

22    AstraZeneca to IMS Health, is you really started

23    to get into data analytics with IMS Health?

24         MR. KOBRIN:  Object to form.

25         THE WITNESS:  Yes.  I did less analytics

```
 1    at AstraZeneca than I did at IMS.

 2    BY MR. BARTON:

 3         Q.   While you were at IMS Health, did you

 4    meet or come into contact with people from Giant

 5    Eagle?

 6         A.   No.  Giant Eagle was not a data provider

 7    to IMS at that point in time.

 8         Q.   That's why I asked.  Because we actually

 9    have some emails where we see that Giant Eagle did

10    provide data to IMS later in time.

11         And that's why I just wondered if that was a

12    connection of how you got to Giant Eagle, but --

13         A.   No, it's not.

14         Q.   -- we'll get there.  We'll get there.

15    Okay.  I just wondered.

16         A.   I'm from here.  That's how.

17         Q.   Okay.  Very good.

18         A.   Just fast-forward.

19         Q.   You're from Beaver.

20         A.   Close enough.

21         Q.   Before I leave it, I realize this is

22    kind of elementary to you.  But a lot of people

23    are, at least in my world, pretty familiar with

24    Microsoft Word, word processing program, and maybe

25    fewer people in my world are as familiar with
```

1    Microsoft Excel and what it does and what it can

2    do.

3        Can you just describe generally for us what

4    Microsoft Excel is to you?

5            MR. KOBRIN:  Object to form.

6        To the extent that you know.

7    BY MR. BARTON:

8        Q.   Just describe what -- what does it do?

9        A.   It's a spreadsheet application that is

10   used to organize data and information for business

11   or personal or whatever use.

12       Q.   So within Microsoft Excel you can enter

13   a lot of data and organize it, as you said;

14   correct?

15       A.   Yes.

16       Q.   And is it also possible within Microsoft

17   Excel to create formulas or sort data in ways that

18   you can, you know, compare one dataset to another

19   dataset, for example?

20       A.   Yes.

21       Q.   So if you know how to manipulate

22   Microsoft Excel, it is a software program that

23   allows you to create and do certain things with

24   data in a database; true?

25           MR. KOBRIN:  Object to form.

```
 1              THE WITNESS:  Yes.

 2  BY MR. BARTON:

 3      Q.    Would you agree, I guess, that Microsoft

 4  Excel is one kind of tool for data analytics?

 5      A.    Yes.

 6      Q.    Just moving up your job history here, it

 7  appears you then moved from IMS Health initially

 8  to the Nielsen Company; correct?

 9      A.    Yes.

10      Q.    And that job looks like it wasn't really

11  focused in the pharmaceutical industry.  Is that

12  true?

13      A.    That is true.

14      Q.    And then the next position -- you were

15  there until July 2008 at the Nielsen Company.  And

16  then in July 2008, it appears that you became a

17  business analyst and a senior pharmacy business

18  analyst.  And that was for Giant Eagle; correct?

19      A.    Yes.

20      Q.    So you started employment with Giant

21  Eagle in approximately July 2008?

22      A.    Yes.

23      Q.    How did you come to be hired by Giant

24  Eagle?

25      A.    How much history do you want?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Well, I know you lived in Beaver, and I

 2   know you're from here.

 3        But I guess I was just curious if you had a

 4   specific connection to a person here or just what

 5   happened.

 6        A.   No.  The Nielsen Company, the position

 7   was here in Pittsburgh.  My job was transferred to

 8   San Francisco, and I did not want to move.  So I

 9   put my résumé out there, applied for positions at

10   Giant Eagle, and was contacted by HR for an

11   interview.

12        Q.   Well, it would appear that the job

13   description, as you provided it here on your

14   profile, the kinds of things you did, it appears

15   like it was a pretty good fit for some of the

16   experience you already developed with IMS Health

17   and before; correct?

18        A.   I would agree with your opinion.

19        Q.   So in your position as a business

20   analyst and senior pharmacy business analyst --

21   well, first of all, are those two different titles

22   that you held during that two-year form of

23   timeframe?

24        A.   Yes.  And just to help, as you progress

25   through this, I've lumped -- sometimes I'm in the
```

1    role and promoted pretty much doing the same

2    function.

3         I've, in this breakdown, lumped those

4    together.  So you'll see that maybe more than once

5    as we continue through.  I haven't fully reviewed

6    what I have on here because I don't update it that

7    often.

8         Q.   So that's how I read it and assumed that

9    was true, that those were two different titles,

10   but the kind of description of what you did below

11   that is relatively applicable to that whole

12   timeframe when you held a couple of different

13   titles; correct?

14        A.   Yes.  That's correct.

15        Q.   So can you tell me, if you remember,

16   where in the organizational chart for Giant Eagle,

17   where did the -- obviously, you were in the

18   pharmacy side of the business; correct?

19             MR. KOBRIN:  Object to form.

20   BY MR. BARTON:

21        Q.   Let me just try to narrow it down.

22        I'm just trying to figure out where this fell

23   organizationally, and let me just ask more

24   specific questions.

25        Did you have someone you reported to in that

1   position?

2       A.   Yes.

3       Q.   Who was that?

4       A.   Sean Raynak.

5       Q.   What was Sean Raynak's position?

6       A.   He was -- I may not have the title

7   exactly right because it's been ten years now --

8   manager of pharmacy finance.

9       Q.   Do you know who Sean Raynak reported to

10  at that time?

11      A.   I believe he reported directly to Randy

12  Heiser.

13      Q.   Who was?

14      A.   The VP of pharmacy at that point in

15  time.

16      Q.   Thanks.  Did you, in turn, at this point

17  in time -- from July of 2008 to October of 2010,

18  do you recall, did you have people under you or

19  who worked for you and who reported to you?

20      A.   No.

21      Q.   Were you part of a team of business

22  analysts or senior pharmacy business analysts who

23  reported to --

24      A.   Sean Raynak?

25      Q.   Sean, yeah.  I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    It was a team of one.

 2        Q.    Do you recall, was that a newly created

 3   position for you and for Giant Eagle, or were you

 4   filling someone's shoes who had left?

 5        A.    I was filling someone's shoes that had

 6   transferred to a different position internally.

 7        Q.    Who was that person, if you recall?

 8        A.    I believe it was Al Makita.

 9        Q.    This position, one of the things that

10   you describe as your responsibilities then was

11   that you were accountable for the design,

12   management and distribution of all pharmacy

13   advanced analytics; correct?

14        A.    Yes.  That's what I wrote on here.

15        Q.    When you use design in that description,

16   what do you mean by design?

17        A.    Work with the business lead to

18   understand what information they needed, harvested

19   that information from the database and provided it

20   in a report.

21        Q.    Okay.  So...

22        A.    I guess to elaborate a little more, it

23   wasn't my responsibility.  I was in support of the

24   business leads.  So they technically maybe would

25   have been the designers.  I was just supporting
```

1    their design.

2         Q.   And I'm trying to think of a way to

3    describe it.

4         But you had some technical skills with

5    respect to the analytical tools, the database

6    tools.  You had the ability to extract or find

7    data and have it analyzed in certain ways.

8         And so if somebody asked you to try to come

9    up with a way to analyze data, you could use the

10   tool to try to figure out how to do that.  That's

11   a poor description, but is that somewhat accurate?

12        A.   Yes.

13             MR. KOBRIN:  Object to form.

14             MR. BARTON:  Yeah.  I'd object to the

15   form of that, too.  That was bad.

16   BY MR. BARTON:

17        Q.   Let me try it a little better, just

18   because I -- when we get into the areas of

19   technical computer skill and that, those of us who

20   don't have that lose some of the facility of the

21   language.

22        So with your various software tools,

23   including Microsoft Excel and others that were

24   available to you for analytics, you had the

25   ability and the knowledge to customize those and

Highly Confidential - Subject to Further Confidentiality Review

```
 1   use those tools to design or create the kind of
 2   reports that might be requested of you from the
 3   businesspeople for whatever objectives they had.
 4          MR. KOBRIN:  Object to form.
 5          THE WITNESS:  Yes.
 6   BY MR. BARTON:
 7       Q.   And so that was your job -- part of your
 8   job from 2008 to October 2010, July 2008 to
 9   October 2010; correct?
10       A.   Yes.
11       Q.   And the next bullet point again says you
12   created an automated Excel-based reporting system;
13   right?
14       A.   Yes.
15       Q.   And that again -- you use lower case E,
16   but you're, again, referring there to Microsoft
17   Excel; correct?
18       A.   Yes.  Maybe I should capitalize those.
19       Q.   No, I'm not being critical.  You know,
20   excel, lower case E, could mean something else,
21   you know.
22       A.   No.  No.
23       Q.   You could excel at something.
24       A.   I appreciate the clarity and the
25   feedback.  I'll make sure I update that right
```

1   after this.

2        Q.   Well, it's fine.  It's kind of a

3   millennial thing to use lower case.

4        A.   I don't categorize the millennials.

5        Q.   No, neither do I.  That's why I don't

6   know what I'm talking about.

7        So in the next bullet point you say,

8   "Responsible for all technical Giant Eagle

9   pharmacy strategic analysis."

10       That sounds like a lot.  Can you kind of

11  describe for me what you mean by that?  What

12  technical Giant Eagle pharmacy strategic analysis

13  are you referring to in general there?

14       A.   At the time I wrote this, I had added

15  longitudinal patient analysis, MPR/PDC scoring,

16  behavioral analysis, therapeutic analysis, in

17  addition to prescription or companion prescription

18  management, retention and nutrition models.

19       That's just a few of the things I would say.

20       Q.   And I won't have you exhaustively

21  describe all of those, but just so that we have a

22  basic understanding of what some of those things

23  mean or do, what does longitudinal patient

24  analysis mean?  What is that?

25       A.   It's analytics revolving around looking

1    at a patient, not just at a single point in time,

2    but over a course of therapy, this year versus

3    next year versus the following year, as disease

4    states progress or get better over time.

5         Q.   Analyzing the data as it relates to a

6    particular patient over time?

7         A.   Yes.

8         Q.   And what prescriptions they use and

9    don't use and when and how much and those kinds of

10   things; correct?

11        A.   Yes.

12        Q.   And then MPR/PDC scoring, what is that?

13        A.   MPR is an acronym used in adherence

14   scoring called medication possession ratio.  And

15   PDC scoring is another calculation method, which

16   is proportion of days covered.  It's, more or

17   less, looking at a patient's life cycle from a

18   prescription to identify if they have gaps in

19   coverage.

20        We can look and see that you didn't take your

21   meds for five days and as a clinician intervene or

22   reach out to the customer to make sure they were

23   compliant with the medication the doctor

24   prescribed.

25        Q.   I understand.  So gaps in coverage.

Highly Confidential - Subject to Further Confidentiality Review

1         When you say that, you're not referring to

2    insurance coverage as we sometimes think of as

3    coverage, but you're referring to the period of

4    time that somebody had been prescribed to take

5    medication.

6         And if the data that Giant Eagle has is that

7    there was a greater period of time, for example,

8    between the time they next filled that

9    prescription, that might indicate a gap in their

10   coverage?

11        A.   Yes.

12        Q.   So that's just yet another way that

13   Giant Eagle is looking at individual patient data

14   to analyze what is happening with patients to see

15   if the patients need some additional help or

16   counseling or services; correct?

17        A.   Yes.  We would use them for chronic

18   medications.

19        Q.   During this period of time, when you

20   were a team of one and doing this kind of business

21   analytics that you have described here -- and I

22   know those are just two examples, I'm not trying

23   to suggest that's exhaustive.

24        But during the time you were doing it, what

25   tools other than Microsoft Excel did you use for

1    your data analytics at Giant Eagle?

2            MR. KOBRIN:  Object to form.

3            THE WITNESS:  Microsoft Excel was

4    primarily the delivery, the report delivery

5    system.  On the back end, behind Excel, a

6    combination of Visual Basic programming and SQL,

7    or SQL as we referred to it earlier.

8        SQL development applications would include

9    Toad or SQL Developer, which Giant Eagle licensed

10   during that time period.

11   BY MR. BARTON:

12       Q.   So Toad and SQL Developer are kind of

13   names of -- are those software programs that can

14   be used to use SQL to kind of create relational

15   databases?

16       A.   Yes.  Mainly we used them for harvesting

17   or pulling the information out of the database.

18       But yes, you would develop your programming

19   in that application, in either of those two.

20       Q.   Maybe the best way to describe it might

21   be that Giant Eagle through its 200-plus retail

22   pharmacies acquires over time and accumulates a

23   lot of data about patients, about volumes of drugs

24   going from one place to another, and that all

25   resides in sort of Giant Eagle databases

```
 1    somewhere; correct?

 2              MR. KOBRIN:  Object to form.

 3              THE WITNESS:  Yes.  We store a sizable

 4    amount of data.

 5    BY MR. BARTON:

 6         Q.   And so what you've just described is you

 7    might use Toad or SQL Developer to create ways,

 8    formulas -- create ways to extract certain data

 9    that you want from that big database in just the

10    way you want it; is that right?

11         A.   Yes.

12         Q.   And so that's what those tools do, is

13    just help you kind of customize data extraction

14    and analysis?

15         A.   It's one of the things it can be used

16    for, yes.

17         Q.   The Visual Basic thing you mentioned,

18    how does that differ?  What is Visual Basic?  Is

19    it just another example of the same thing?

20         A.   Or what we used it for was Excel-based

21    back-end programmings.  You could automate

22    processes within Excel to extract data, organize

23    the data, send out the information to respective

24    business leaders, or save it and archive it as

25    necessary.
```

1    Q.   That Visual Basic is a programming

2  language; right?

3    A.   Yes.

4    Q.   And so that is something that Excel can

5  understand.  You can put Visual Basic programming

6  into Excel in certain ways to allow Excel to

7  extract and present data.

8    A.   Yes.

9         MR. KOBRIN:  Object to form.

10  BY MR. BARTON:

11    Q.   So the big database, I guess -- I don't

12  know if it's one or more than one.  The database

13  of all this patient data, for example, that you

14  have referenced, did that database have a name

15  within Giant Eagle at the time?

16    A.   I can't recall what the name was.

17    Q.   Were there any other tools that you used

18  for data analytics other than what we have already

19  talked about, Excel, and then you using these

20  back-end or programming additional tools, Visual

21  Basic, Toad, SQL Developer?

22         MR. KOBRIN:  Object to form.

23         THE WITNESS:  Not that I can recall.

24  BY MR. BARTON:

25    Q.   So during this time -- and then we'll

1    move on -- but during this time, from July 2008 to

2    October 2010 that we're talking about, do you

3    recall anyone at Giant Eagle asking you to design

4    any system or analytics specifically to identify

5    purchase orders of controlled substances by a

6    Giant Eagle pharmacy that might deviate from some

7    norm in a way that might raise potential suspicion

8    about diversion or misuse of those controlled

9    substances?

10          MR. KOBRIN:  I'm going to object to

11    form.

12          THE WITNESS:  I can't recall any

13    specifics.

14    BY MR. BARTON:

15       Q.   Can you recall anything general?

16       A.   At times we would -- loss prevention or

17    someone would reach out asking for supplemental

18    reports on research, and we would provide that.

19       I can't recall the exact context of any one

20    of those events.

21       Q.   Do you recall anything more?  And

22    specifically my question was really just:  Did

23    anyone ask you to sort of, that you recall, design

24    a system to try to identify orders that might need

25    some investigation as potentially suspicious?

```
 1              MR. KOBRIN:  Object to form.

 2              THE WITNESS:  No.  No one asked for a

 3      system.

 4      BY MR. BARTON:

 5         Q.   If you had been asked -- knowing what

 6      you knew then about the data that Giant Eagle had

 7      and your tools that you had to analyze it, if

 8      somebody had asked you to do that between 2008 and

 9      2010, could you have done it?

10              MR. KOBRIN:  Object to form.

11      Speculative.

12         And make sure, you know, you have the

13      information you need to understand what he's

14      asking, what you would have had to have known then

15      to build what he's asking you about now.

16              THE WITNESS:  Could you repeat the

17      question.

18      BY MR. BARTON:

19         Q.   During that time, between July 2008 and

20      2010, October 2010, if you had been asked to

21      design or create or perform some analytics for

22      that purpose, to try to identify orders from Giant

23      Eagle pharmacies of controlled substances that

24      might warrant further investigation as

25      potential -- potentially suspicious, could you
```

```
 1   have done it?

 2            MR. KOBRIN:  Object to form.  It's

 3   speculative and vague as to what he would have had

 4   to build.

 5            THE WITNESS:  No.

 6   BY MR. BARTON:

 7       Q.   You don't think you could have done it?

 8       A.   Under the guise that in 2008 I didn't

 9   have the skill set needed to do that.

10       Q.   That's fair.  What I'm interested in is

11   whether, in your opinion -- because that's what

12   you're doing right now, is you -- I'm asking you,

13   do you think you could have done it.  So I'm

14   asking for your opinion.

15       You said you don't think you had the skill

16   set.  And that's fair.  If you don't think you had

17   it, you didn't have it.

18       But by that, do you mean you really didn't

19   have the technical skill to do it, or did you not

20   have the information you needed in order to try to

21   do it?

22            MR. KOBRIN:  Object to form.

23            THE WITNESS:  Likely a combination of

24   both.

25
```

1    BY MR. BARTON:

2        Q.    But in either case, you weren't asked to

3    do it during that period of time; correct?

4        A.    No.

5        Q.    The next job on your résumé is also with

6    Giant Eagle, correct, the senior business analyst,

7    strategic financial planning and analysis; right?

8        A.    Yes.

9        Q.    And that's from October 2010 to August

10   of 2012, so almost a two-year period there;

11   correct?

12       A.    Yes.

13       Q.    And that also appears to not be

14   exclusive to the pharmacy side; true?

15       A.    Yes.  I would agree.

16       Q.    So did you kind of move in the

17   organizational chart out from under reporting

18   to --

19       A.    Sean Raynak.

20       Q.    -- Sean Raynak -- sorry.  That name is

21   not sticking.

22       But did you move from reporting to him to

23   reporting to somebody else during that period of

24   time?

25       A.    Yes.

```
 1        Q.    Who did you report to?

 2        A.    Valery Ciarimboli.

 3        Q.    And what was her position?

 4        A.    May not remember the exact title.

 5   Manager of business planning and FP&A.

 6        Q.    That last thing you said, FP&A, what

 7   does that stand for?

 8        A.    Financial planning and analysis.

 9        Q.    Got it.  What was the reason for your

10   change of position then?

11        A.    FP&A needed an SQL programmer and they

12   sought me out.

13        Q.    How did that work differ from what you

14   had been doing before?

15        And I know it's obvious, if you were out of

16   pharmacy and you're now in sort of the bigger

17   Giant Eagle scope.  But like how did it differ,

18   the work you were doing?

19        A.    Dramatically.  I worked with other lines

20   of businesses helping them build business plans.

21        Q.    And in terms of helping the other lines

22   of business build business plans, what was your

23   role and contribution in helping them do that?

24        A.    Many business leaders are not analytics

25   or financial experts.  So you would work with them
```

Highly Confidential - Subject to Further Confidentiality Review

1    on their business plan to understand what their

2    goals were and then construct either the budget or

3    the analytics needed in order for them to achieve

4    their goals.

5         Q.   During that period of time, October 2010

6    to August 2012, in this different role did you

7    have different or additional analytical tools

8    available to you for that?

9         A.   Yes.

10        Q.   What did you have available to you then

11   that you hadn't had before?

12        A.   Several series -- several applications

13   built more around finance, Hyperion Strategic

14   Planning, PACE.  And there might have been another

15   one.  I think Hyperion Strategic Finance was the

16   other one.  It's been a while, so...

17        Q.   That's fine.  The last thing you said,

18   it's a word that is eluding me.  Hydroperion?

19        A.   Hyperion.

20        Q.   Oh, Hyperion.  Okay.

21        A.   Sorry.

22        Q.   What is Hyperion?

23        A.   I may have this wrong, but I believe it

24   was an application company that was later acquired

25   by Oracle.  So it was just the name of their

1    analytical platform.

2       Q.   So, obviously, in this new role and in a

3    different place in the company, there were

4    obviously different business plans and objectives

5    applicable to that side of the business.

6       And maybe for that reason, I think as you've

7    indicated, there were some different tools that

8    cater to what they're interested in, the planning

9    and the PACE and whatever those things were;

10   right?

11      A.   Yes.

12      Q.   Were those tools that you've just

13   referenced using during that period of time, were

14   those tools kind of in the company during the

15   prior period, 2008 to 2010, but just simply not

16   really relevant to the analyst job you were doing

17   for pharmacy?

18      A.   I don't know.

19      Q.   That's fair.  Well, I ask because we're

20   talking about an area of, to some extent, software

21   programming.  And those things change over time as

22   well; correct?

23      A.   Yes.

24      Q.   New software comes out, new tools become

25   available just through advanced technology; right?

1     A.   Yes.

2     Q.   So that is part of what I was wondering,

3  is whether these were new tools that you started

4  using in that new position, whether it was your

5  sense they were then available to you because they

6  were just new programs or whether they just were

7  simply more relevant to that business.

8          MR. KOBRIN:  Object to form.

9  BY MR. BARTON:

10    Q.   Do you recall one way or the other?

11    A.    I don't know if they were new or just

12  new to me.

13    Q.   The tools that you had used prior, Excel

14  and the back-end programming tools and languages

15  that you used, the SQL programming tools, those

16  were still available to you in your new position;

17  correct?

18    A.   Yes.  We still used Excel.

19    Q.   Then it appears in August 2012 you moved

20  back to the pharmacy side of the business;

21  correct?

22    A.   Yes.

23    Q.   And so from August 2012 to

24  December 2014, you had the positions of manager

25  and senior manager of financial planning for the

1    pharmacy side; right?

2        A.    Yes.

3        Q.    In that position, who did you report to

4    then?

5        A.    Under the manager title, directly to

6    Greg Carlson.  Under the senior manager title,

7    directly to Brett Merrell.

8        Q.    So that was in a different place

9    organizationally in the company than you had been

10   back when you were a business analyst in July 2008

11   to October 2010; correct?

12       A.    Yes.

13       Q.    Some of the descriptions you provide of

14   the work that you were doing seem like there's

15   some overlap or they seem somewhat similar.

16       But why don't you tell me:  How did this job

17   from August 2012 to December 2014 differ from what

18   you had been doing July 2008 to October 2010?

19       A.    When I returned, I was in a more

20   elevated role.  I was replacing Sean Raynak who

21   had left the organization, which is why you see a

22   lot of the same business functions.

23       Q.    In the first bullet point you are just

24   describing analytics for the pharmacy department,

25   in general, and describe some types that you were

1    doing.  You mention shrink.

2         What does shrink mean as you use it there?

3         A.   Shrink is lost, expired product that we

4    have to return to the manufacturer for

5    instruction, or could be valuation changes on a

6    product.

7         Q.   So shrink then would represent any

8    change in the value of the inventory of product on

9    hand due to expiration, loss or reduction of

10   value?

11              MR. KOBRIN:  Object to form.

12              THE WITNESS:  Yes.

13   BY MR. BARTON:

14        Q.   You reference the acquisition of the

15   first closed-door specialty pharmacy in that third

16   bullet point.

17        What was the specialty pharmacy that was

18   acquired there?  What did it do?

19        A.   The specialty pharmacy was primarily

20   focused on hepatitis C patient management.

21        Q.   Where was it located?

22        A.   Rocky River, Ohio.

23        Q.   As you recall, if you recall, was that

24   created because there was a particular hepatitis C

25   problem that that specialty pharmacy could serve

```
 1   for that area?

 2       A.   I don't recall.

 3            MR. KOBRIN:  How are you doing

 4   time-wise?  Do you want to take a break?  Is this

 5   a good time for you to take a break?

 6            MR. BARTON:  That's fine.

 7            THE WITNESS:  Yeah.  I wouldn't mind

 8   using the restroom and getting another coffee.

 9            THE VIDEOGRAPHER:  Going off the record.

10   The time is 10:11 a.m.

11            (Recess from 10:11 a.m. to 10:33 a.m.)

12            THE VIDEOGRAPHER:  Now going back on the

13   record 10:33 a.m.

14   BY MR. BARTON:

15       Q.   We're back on the record.  And I've been

16   asking you about your employment history at Giant

17   Eagle and just some of the positions you've had,

18   some of the responsibilities you've had, who you

19   worked for, those types of things.

20       I have a few more down that, and so we'll

21   stay with your LinkedIn profile here for a little

22   bit.  But I wanted to go back just to clarify

23   something in my own mind that I don't think I

24   asked or didn't understand.

25       I'm trying to understand the relationship
```

1    similarities/differences between the job that you

2    had as the business analyst from July 2008 to

3    October 2010 and then the job that you had two

4    jobs later, from August 2012 to December 2014,

5    both in the pharmacy department, both involving

6    some data analytics components to it.

7        But as you have testified, you were really

8    reporting to different people at the time, and so

9    it wasn't the same job.  It was a little bit of an

10   elevated job for you, the second one; right?

11       A.   Just to clarify, you're contrasting

12   August 2012 to December 2014 with July 2008 to

13   October 2010?

14       Q.   Yes.  That's what I'm trying to do.  I'm

15   trying to understand how those jobs were similar

16   or different and who else kind of had those

17   similar jobs.  I'm just trying to figure out where

18   you were in the company each time.

19       And so what I understand you to have told me

20   is that when you were the business analyst from

21   July 2008 to October 2010, that at that point in

22   time, you were -- and now I can't even read my

23   notes -- but you were reporting to Sean Raynak?

24       A.   Correct.

25       Q.   And Sean Raynak at that time you

Highly Confidential - Subject to Further Confidentiality Review

1    understood to be reporting to whom?

2        A.   I believe it was Randy Heiser.

3        Q.   Randy Heiser.  Right.  Okay.  That's

4    what I thought.  And so that's kind of what you

5    recall having been the case from July 2008 to

6    October 2010.

7        And then when you moved into the position of

8    the manager, senior manager of financial planning

9    in August 2012 -- so you had gone out of the

10   pharmacy side and then came back to the pharmacy

11   side -- at that time, what you've told me is you

12   kind of replaced Sean Raynak, but you were

13   reporting at that time initially, to Greg Carlson;

14   correct?

15       A.   Yes.

16       Q.   And had Greg Carlson at that point --

17   was Randy Heiser still with the company?

18       A.   I can't recall.

19       Q.   So at the time that you were reporting

20   to Sean Raynak in the business analyst position,

21   so back in 2008 to 2010 -- and I'm sorry I'm

22   jumping back and forth.  I'm trying to understand

23   kind of just if there were changes

24   organizationally in the company that I'm just

25   trying to figure out.  That's all.

```
 1        At the time you reported to Sean Raynak, you

 2  had told me you were -- you were kind of a team of

 3  one in terms of this data analytics person with

 4  the SQL and Visual Basic skills under him;

 5  correct?

 6        A.   Yes.  That's correct.

 7        Q.   At that time, do you know, was there any

 8  data analytics person with programming skills

 9  reporting to Greg Carlson -- or it may not have

10  been Greg Carlson, but reporting to that other

11  line of business that you moved into in 2012?

12             MR. KOBRIN:  Object to form.

13             THE WITNESS:  Can you restate that.

14  BY MR. BARTON:

15        Q.   Yeah.  I'm trying to decide -- I'm just

16  trying to understand -- I know we're talking about

17  two different time periods, but I'm just trying to

18  understand if you kind of -- let me ask it

19  differently.

20        If you know, during the time of July 2008 to

21  October 2010, during that time that you were in

22  business analytics, team of one, reporting to Sean

23  Raynak, do you know anyone else on the pharmacy

24  side who also was in data analytics for purposes

25  of the pharmacy, who had the SQL skills, those
```

1    types of things?

2            MR. KOBRIN:  Did he know at that time --

3            MR. BARTON:  Yes.

4            MR. KOBRIN:  -- or does he know of now

5    whether there was somebody at that time?

6            MR. BARTON:  I'm asking him.

7    BY MR. BARTON:

8        Q.   Do you know now whether there was

9    somebody at that time?

10       A.   There were IT people with varying skill

11   sets, but I can't recall specifics.

12       Q.   Do you recall working with anyone else

13   during that period of time who also kind of had

14   programming skills and used them for data

15   analytics purposes for the pharmacy?

16       A.   No.

17       Q.   Did Sean Raynak have those kinds of

18   programming or data analytics skills?

19       A.   No.

20       Q.   And did Greg Carlson?

21       A.   No.

22       Q.   Now moving forward to the August 2012 to

23   December 2014 period again, so I'll leave 2008 to

24   2010 alone now, in this time period of August 2012

25   to December 2014, did you, by then, have people

Highly Confidential - Subject to Further Confidentiality Review

1    under you who reported to you?

2        A.   Between August 2012 and December 2014 in

3    the manager and senior manager roles, I had

4    several direct reports during that time.

5        Q.   Who were they?

6        A.   Kayla Voelker, Brad Devine, Sheila

7    Yates, Jennifer Horin.  I think that's it.

8        Q.   Did they have similar job

9    responsibilities or did they all differ, the four

10   of them?

11       A.   They all had different job

12   responsibilities.

13       Q.   Did any of them have programming skills

14   or background?

15           MR. KOBRIN:  Object to form.

16           THE WITNESS:  Can you rephrase that or

17   restate that.

18   BY MR. BARTON:

19       Q.   Those four you just mentioned, did any

20   of those four who were your direct reports, did

21   any of them have skills in programming, either in

22   Visual Basic or in SQL development skills?

23       A.   Yes, but very light.

24       Q.   Which of them had those skills?  Did

25   they all have those skills or did just some of

1  them?

2      A.   Kayla Voelker had skills.  The other

3  three obtained skills during their tenure, but did

4  not enter the organization with those skills.

5      Q.   And tell me a little more about Kayla

6  Voelker.  Do you know when she entered the

7  organization?

8      A.   I don't recall specifically.

9      Q.   Do you know if she was in the

10  organization as far back as the 2008 to 2010 time

11  period?

12      A.   She started with the organization after

13  I started.

14      Q.   Which was July 2008.  But do you recall?

15  Can you even ballpark it?  Do you know how long

16  after you started that she did?

17          MR. KOBRIN:  Object to form.

18          THE WITNESS:  I can't -- I can't

19  speculate.

20  BY MR. BARTON:

21      Q.   What's her background with programming

22  or analytics as you would describe it?

23      A.   When she entered the organization, very

24  light.  During her tenure with the organization,

25  she obtained a bachelor's degree in a similar

Highly Confidential - Subject to Further Confidentiality Review

```
 1   skill area.  I don't recall the specific degree.

 2        Q.   And as you sit here, do you know when

 3   she acquired that bachelor's degree?

 4        A.   I don't.

 5        Q.   You think it was in some kind of

 6   technical computer-related field of study?

 7        A.   I believe that to be true.

 8        Q.   And you characterize her skills at the

 9   time she entered the company as very light;

10   correct?

11        A.   Yes.

12        Q.   That does distinguish her from the other

13   three I think you listed who were also your direct

14   reports during that 2012 to 2014 time.

15        Am I correct in understanding they -- as

16   understand it, they may have entered the company

17   with no such skills, but then whatever they

18   learned, they learned on the job?

19             MR. RYAN:  Object to form.

20             THE WITNESS:  Can you restate which

21   specific skills you're referring to?

22   BY MR. BARTON:

23        Q.   Yeah.  Good question.  The skills I'm

24   referring to right now are skills that involve

25   using effectively the tools of data analytics,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    including Excel and any of the other tools that

 2    we've talked about so far that you've used for

 3    data analytics.

 4         A.   So to retract my earlier comment, they

 5    all had some level of Excel skill prior to

 6    reporting directly to me.

 7         Q.   Okay.

 8         A.   Kayla had some programming language

 9    experience.  The other three did not.

10         Q.   Thank you for that clarification.  And I

11    think that's kind of what I understood from what

12    you said before anyway, but I didn't probably

13    phrase the -- I wanted to phrase the basic

14    question broadly to see what the baseline was

15    there.

16         In the last bullet point of your summary of

17    your experience for the August 2012 to December

18    2014 job -- so I'm looking at the top of page 3,

19    Exhibit 1 -- that bullet point references the

20    development of the pharmacy enterprise reporting

21    system.  Do you see that?

22         A.   I do see that.

23         Q.   What does that refer to?  What was the

24    pharmacy enterprise reporting system?

25         A.   It's a further augmentation of the
```

1    Excel-based reporting system that was created in

2    2008 and 2010.

3        Q.    And I believe you had mentioned that

4    that one was capable of managing or creating over

5    100 unique periodic reports, as you said it back

6    then; correct?

7        A.    That's correct.

8        Q.    So this was a further development of

9    that system then?

10       A.    That's correct.

11       Q.    What were the reports -- and I won't ask

12   you to name all 100.  But, I mean, in terms of the

13   types of reports, the business purposes for which

14   they were used, what types of reports are we

15   talking about?

16            MR. KOBRIN:  Object to form.

17            THE WITNESS:  Namely, sales-based

18   reporting by store, by pharmaceutical plan -- by

19   that, I mean insurances -- looking at antibiotics

20   performance, which was a promotion we had during

21   that time, diabetes medication performance, just

22   to name a few.

23   BY MR. BARTON:

24       Q.    So the pharmacy enterprise reporting

25   system, as you've just described it there, you

1    used that to kind of refer to your system, in

2    essence, that you had developed and created to

3    give the businesspeople reports that they asked

4    for.

5         Whatever it may focus on -- whatever the

6    focus may have been, that's sort of a broad term

7    to say that's the system I created to get them the

8    data they asked for.

9              MR. KOBRIN:  Object to form.

10             THE WITNESS:  Yes.

11   BY MR. BARTON:

12        Q.   And primarily, as I understand it, at

13   least from the reporting side, in terms of the

14   reports you would actually give, Excel would be

15   the tool that you used to kind of generate the

16   reports; right?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  Yes.  It was a Visual

19   Basic language embedded into the back of Excel

20   that executed a series of SQL statements, pulling

21   the data into the Excel documents, then leveraging

22   the SMTP server to email these reports out to the

23   respective business users.

24   BY MR. BARTON:

25        Q.   And so a little bit in layperson

```
1    language, what you're talking about is not

2    something that just comes already built into Excel

3    when you buy it from Microsoft.  It was using

4    Excel, but you had to add programming to it to

5    allow it to perform all these operations you're

6    talking about?

7              MR. KOBRIN:  Object to form.

8              THE WITNESS:  Yes.  Excel was the

9    application.  Language was added to it.

10   BY MR. BARTON:

11      Q.   And the language that was added to it

12   during 2008 to 2010, was there anyone other than

13   you who added that language to it to help it

14   perform the way it performed?

15             MR. KOBRIN:  "It" being Excel --

16             MR. BARTON:  Yes.

17             MR. KOBRIN:  -- in this specific

18   context?

19             MR. BARTON:  Yes.  And the system he's

20   kind of described here.

21             THE WITNESS:  Can you restate that one

22   more time.

23   BY MR. BARTON:

24      Q.   Yeah.  Were there any other programmers

25   or people with programming experience and skills
```

```
 1    who -- in the 2008 to 2010 timeframe, that first

 2    time when you developed it, were there any other

 3    programmers who added programming to Excel to have

 4    it perform all those functions and generate those

 5    reports?

 6         A.   No.

 7         Q.   And then in 2012 to 2014, during that

 8    period of time when you've said that system got

 9    certain enhancements to it, were there other

10    people, individuals, including anyone under you,

11    who added programming to that system?

12         A.   Yes.  Technology enhanced dramatically

13    in that window of time that allowed us better

14    management of the reports that were being created

15    and distributed.

16         That allowed me to train my direct reports --

17    not all of them had the same level of training,

18    but allowed me to train them to manage the

19    application that had been previously created so

20    they could manage it instead of me.

21         Q.   We'll see some documents here going

22    forward, in which there came a period of time, and

23    I believe it was in late 2003 -- 2013 when some

24    programming was created or added to, I believe, an

25    Excel application that Giant Eagle and HBC started
```

Highly Confidential - Subject to Further Confidentiality Review

1  using to generate what we call daily threshold

2  reports.

3      Do you recall that?

4          MR. KOBRIN:  Object to form.

5          THE WITNESS:  I do.

6  BY MR. BARTON:

7      Q.   And do you recall that happening in

8  approximately that timeframe, late 2013?

9      A.   I do.

10     Q.   That programming that was added to the

11 system to generate those reports, was that

12 programming created by you?

13     A.   Not me personally.  Someone on my team.

14     Q.   Was it created by Kayla?

15     A.   Based on my best recollection, yes.

16     Q.   And we have documents.  We'll kind of go

17 through them.  So I know I'm just asking for your

18 memory right now.

19     But that programming that Kayla added to the

20 system was -- you're familiar with -- I mean, you

21 know what we're talking about.  You're familiar

22 with what kind of programming that was that she

23 did; right?

24     A.   Generally speaking, yes.

25     Q.   And, again, I struggle to use the right

1    kind of terminology.  But she was using some SQL

2    elements to generate these daily threshold

3    reports; right?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  Yes.  It used the

6    combination of Visual Basic, the SQL executing

7    against the database using the ODBC connection,

8    and then leveraging the SMTP server to email out

9    those reports to respective users.

10   BY MR. BARTON:

11        Q.   And that programming that started

12   generating those reports and to email them out to

13   people, when do you recall Kayla creating that

14   programming?

15        A.   Can you restate that question so I make

16   sure I'm answering in the right context.

17        Q.    In your answer just a moment ago, I

18   think you just kind of described the combination

19   of programming that enabled the daily threshold

20   reports to be generated and emailed out to their

21   recipients; correct?

22        A.   Yes.

23        Q.   So that programming that enabled that

24   process to occur, when do you recall that

25   programming being created by Kayla?

1       A.    The programming to run the engine was

2  originally created by me, that engine used to

3  service up the report you're referring to, which

4  I'd like you to clarify which report it is and

5  then re-ask the question with the right time

6  period so I make sure I'm answering...

7       Q.    No.  I appreciate it.  I want us to be

8  accurate.  I want us to know what we're talking

9  about here.

10       A.    That's fine.

11       Q.    The program to run the engine, what you

12  just used, are you referring in that statement to

13  the programming necessary to take a report that is

14  generated within Excel and email it out to the

15  recipients?

16       A.    So the programming to make the report

17  happen was originally written by me.

18       Q.    Let's be clear.  Right now I'm asking

19  about the daily threshold report.

20       A.    Okay.

21       Q.    And to be more specific, to make sure

22  we're communicating, the daily threshold report

23  that I'm referring to, as I understand it, was a

24  report that would identify the sales quantities by

25  individual pharmacies of Schedule II or III

Highly Confidential - Subject to Further Confidentiality Review

```
 1   controlled substances, that would identify sales

 2   quantities of controlled substances from those

 3   pharmacies in relation to a threshold that had

 4   been determined by some formula.

 5       In other words, it would compare sales at a

 6   given time to a predetermined threshold.  Are we

 7   talking about the daily threshold report?

 8           MR. KOBRIN:  Object to form.  I don't

 9   think they were distributing any Schedule IIs at

10   that time as well.

11   BY MR. BARTON:

12       Q.   Yeah.  I mean just controlled

13   substances.

14       A.   Without having a copy of the report

15   right in front of me, I don't want to misstate, so

16   I'm not sure.

17       Q.   How would you describe the daily

18   threshold report that you think we're talking

19   about?

20       A.   It was a daily run report that looked at

21   volumes we were distributing and compared that to

22   a threshold.

23       Q.   And the volumes that were being

24   distributed, for purposes of this daily run report

25   that we're talking about, are we talking about
```

1    controlled substances only or any drugs?

2        A.    Based on my recollection, it was

3    isolated to controlled substances.

4        Q.    So you created the programming to enable

5    that daily run report to be generated?

6        A.    Yes.

7        Q.    When do you recall creating that

8    programming?

9        A.    I began development on it in likely

10   2009.  Just to be clear, we're talking about the

11   engine to make reporting capable, not necessarily

12   the unique report you're referring to in the daily

13   threshold report.

14       Q.    Okay.

15       A.    That technology enhanced.  We continued

16   to build upon that to bring us to, I guess, 2013

17   when that daily threshold report was created and

18   placed in the engine, and "the engine" meaning the

19   pharmacy enterprise reporting system as referred

20   to in my LinkedIn profile.

21       Q.    So the programming that generated or

22   created the report, you said you started that

23   program in 2009; right?

24       A.    Can you restate that question.

25       Q.    Yeah.  I'm trying to follow from what

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you said.
 2         I think that you gave me the date of 2009 as
 3    the date when you said you started some
 4    programming that was used, ultimately, in the
 5    generation of the daily threshold report starting
 6    in 2013.
 7              MR. KOBRIN:  Object to form.
 8              THE WITNESS:  That's incorrect.
 9    BY MR. BARTON:
10         Q.   How?  How is it incorrect?
11         A.   In 2009, we began developing an engine
12    that would later become the enterprise reporting
13    system.
14         Q.   And then is it true that the daily
15    threshold report that started being generated in
16    2013 was one eventual application, so to speak, of
17    the enterprise reporting system?
18              MR. KOBRIN:  Object to form.
19              THE WITNESS:  It was one of the reports,
20    one of -- that would be managed and distributed by
21    the enterprise reporting system.
22    BY MR. BARTON:
23         Q.   And those reports did not begin to be
24    generated -- no one began generating those reports
25    until 2013; correct?
```

1           MR. KOBRIN:  Object to form.

2           THE WITNESS:  No.  That's incorrect.

3    BY MR. BARTON:

4       Q.   When did they start getting generated?

5       A.   I began writing reports in 2008 that

6    later moved into a morphing system as technology

7    enhanced through 2009, that eventually, in 2012,

8    became that reporting system.

9           In early years technology wasn't there, and

10   these reports were extremely manual.

11      Q.   When you said you began writing reports

12   in 2008, as you've said, as your résumé says, you

13   were managing or generating over 100 unique

14   periodic reports; correct?

15      A.   That's correct.

16      Q.   You were generating lots of reports in

17   as early as the 2008 to 2010 timeframe; correct?

18      A.   Yes.

19      Q.   And is it your testimony that at that

20   point in time, the technology did not exist for

21   you to generate and distribute a daily threshold

22   report like what started being distributed in

23   2013?

24      A.   I can't recall specifically if the

25   technology or data would have been available.

1    Q.   When you said you started writing

2 reports in 2008, did you start writing reports

3 that compared quantity sold of controlled

4 substances to some threshold in 2008?

5    A.   No.

6    Q.   When did you start writing or generating

7 those reports?

8         MR. KOBRIN:  Object to form.

9         THE WITNESS:  I don't recall

10 specifically.

11 BY MR. BARTON:

12    Q.   We know that it started in 2013 at

13 least; correct?

14         MR. KOBRIN:  Object to form.

15         THE WITNESS:  I believe that it started

16 in 2013 based on the reports that were generated.

17 BY MR. BARTON:

18    Q.   And as you sit here today, you can't

19 testify as to that reporting of comparing sales of

20 controlled substances at a pharmacy to some

21 threshold; you can't recall or testify having

22 started earlier than 2013; correct?

23    A.   No.

24    Q.   And "no" in answer to my question there

25 means no, you can't -- I asked it in a double

1  negative, and I just want the record to be clear.

2      You do not have any recollection of it

3  starting earlier than 2013; true?

4      A.   I don't have recollection of the daily

5  threshold reports starting any earlier than its --

6  than 2013.

7      Q.   And I appreciate that.  And I just want

8  to make sure I'm following, because we know the

9  daily threshold reports, as named, started being

10 distributed in 2013.  Let me just make sure I

11 follow you.

12     Do you have any ability to testify based on

13 your recollection of reports that compared sales

14 of controlled substances at an individual Giant

15 Eagle pharmacy to some threshold by whatever name

16 the report might be?  Do you have the ability to

17 testify that any reports of those kinds were

18 generated by your system prior to 2013?

19          MR. KOBRIN:  Object to form.

20          THE WITNESS:  Could you just reclarify

21 the question and the time period so I answer

22 accurately for you.

23 BY MR. BARTON:

24     Q.   I'm sorry.  So we've talked about the

25 daily threshold report.  And then I'm just making

Highly Confidential - Subject to Further Confidentiality Review

1   sure that I'm not missing some report that may

2   have been called something else --

3        A.   Okay.

4        Q.   -- but that also compared the sales of

5   controlled substances at an individual pharmacy to

6   a threshold.

7        So my question is:  Apart from the daily

8   threshold report that started being distributed in

9   2013, are you aware of any reports generated by

10  your system that compared sales of any controlled

11  substance at a Giant Eagle pharmacy to some

12  threshold having been generated by your system

13  prior to 2013?

14            MR. KOBRIN:  Object to form.

15            THE WITNESS:  Being that it's six years

16  later, I can't recall if we did or did not.

17  BY MR. BARTON:

18       Q.   Fair enough.  But you cannot testify

19  that you did.

20       A.   I also can't testify that we didn't.

21       Q.   So you have no recollection.

22       A.   That is correct.

23       Q.   Sorry.  That was a lot, but we'll move

24  on.  I just want to be clear on that.

25       The next two jobs that are shown on your

1    LinkedIn profile in Exhibit 1 that we haven't

2    talked about is a director of pharmacy business

3    analytics, December 2014 to September 2015.

4         First, how was that a change from your

5    previous position?

6         A.   Generally speaking, the position was the

7    same.  They promoted me again, but they flipped me

8    over to report again to SFP&A rather than up

9    through the pharmacy org chart.

10        Q.   So in terms of individuals, you started

11   reporting at that point to whom?

12        A.   Jason Lapina.

13        Q.   And during that ten-month period, did

14   you continue to have a team of individuals under

15   you who were directly reporting to you?

16        A.   Yes.

17        Q.   So did the whole team move over, so to

18   speak, in the org chart?

19        A.   I can't recall specifically.  If I had

20   to guess, I'd say yes.

21        Q.   And then the last job that is -- well,

22   no.  I guess there are two more.

23        Then we see director of pharmacy category

24   management, August 2015 to January 2018, correct,

25   on page 1.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    That's correct.

2          Q.    So then how was that a change from your

3    preceding positions?

4          A.    In August 2015, they took me out of

5    pharmacy finance and analytics and made me

6    responsible for brand and generic manufacturer

7    relationships in procurement, and I relinquished

8    all analytics and finance direct reports.

9          Q.    What prompted that change for you?

10         A.    The former senior category manager had

11   left the organization, and they needed someone to

12   fill the place.

13         Q.    And who was the former senior category

14   manager?

15         A.    I should retract that.  I'm not sure

16   that was his exact title.  It was Mike Bianco.

17         Q.    In general terms, you replaced Mike

18   Bianco when he left the organization?

19         A.    Yes.

20         Q.    And was that something you chose or just

21   were directed to do?

22         A.    They asked me if I was interested.  Do

23   you really have a choice?

24         Q.    I don't know.  It depends.

25         A.    I accepted the position.

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.   In that position who were you reporting

 2  to?

 3      A.   I reported to Adam Zakin.

 4           MR. BARTON:  Let's go ahead and mark

 5  Exhibit 2.

 6           (HBC-McClune Exhibit 2 was marked.)

 7           THE WITNESS:  I won't be able to find my

 8  name there.

 9           MR. BARTON:  I won't either.

10  BY MR. BARTON:

11      Q.   I've handed you what we've marked as

12  Exhibit 2.  And it just appears to be a partial

13  organizational chart for pharmacy administration

14  as of August 2015.  Is that true?

15      A.   Based on my look at this right now, yes.

16      Q.   And it appears to match up with what you

17  were just testifying about, the change in your

18  position as of August 2015, that you started

19  reporting directly to Adam Zakin; correct?

20      A.   Yes.

21      Q.   And it would appear that at this point

22  in time, at least from an organizational chart

23  standpoint, there was a team of individuals under

24  you reporting to you; correct?

25      A.   That's correct.

```
 1        Q.   One of the members of that team is Kris

 2   Remas; correct?

 3        A.   Yes.

 4        Q.   Is that Kris male or female?

 5        A.   It's female.

 6        Q.   So by this point in time, given the

 7   change of role for you, were you kind of out of

 8   the analytics and data programming side of things

 9   by now?

10        A.   Yes.

11        Q.   And then it appears that in February of

12   2018, you took on a new position again referred to

13   as senior director of pharmacy procurement and

14   business analytics.

15        Do you see that?

16        A.   Yes.

17        Q.   And that's your current position?

18        A.   That is correct.

19        Q.   Does that reflect kind of coming back

20   into the analytics side of things?

21        A.   It is me maintaining the procurement

22   piece and then reassuming the analytics side.

23        Q.   The job just keeps growing.

24        A.   Yes.

25        Q.   We might be done with Exhibits 1 and 2.
```

```
1        A.    I'll keep them handy in case you want to
2    go back.
3              MR. BARNES:  We should get through three
4    or four exhibits today.
5              MR. BARTON:  If we're lucky.
6              (HBC-McClune Exhibit 3 was marked.)
7    BY MR. BARTON:
8        Q.    I've handed you what I've marked as
9    Deposition Exhibit 3.  This is a multiple-page
10   document.  It has our reference number of
11   P-HBC-1003 at the top and a Bates number at the
12   bottom HBC_MDL00034114.
13       Do you have that in front of you?
14       A.    Yeah.  That's what it looks like.
15       Q.    And we won't spend a lot of time on
16   this, but I have a couple of questions about it.
17       First, on the cover page there, it would
18   appear to be a meeting appointment type of notice
19   that was sent to you, among others; correct?
20       A.    Yes.
21       Q.    And so it would appear that it's kind of
22   setting a meeting in the boardroom for Tuesday
23   executive updates to all of the people who
24   received that invitation; correct?
25       A.    Yes, based on my review here.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Were you someone who regularly attended

2    a meeting like Tuesday executive updates?

3    A.   Not Tuesday executive updates.  In this

4    particular -- I think they used that as a meeting

5    organizer, not necessarily a person in the Outlook

6    system.

7    Q.   Was this something that was just kind of

8    distributed to you in the regular course of your

9    job at Giant Eagle?

10   A.   This particular document, this would --

11   it's for an annual operating plan, so it's once a

12   year.

13   The Tuesday meetings happened every week.  So

14   I didn't go every Tuesday, but I would go at least

15   once a year, oftentimes more, but at least once.

16   Q.   And if something like an annual plan

17   were to be on the agenda for a Tuesday meeting,

18   that might make it more likely that you would have

19   gone then?

20   A.   I would agree with you there.

21   Q.   So let's just talk about what this plan

22   really was.

23   First, on the first page it refers to Fiscal

24   Year 2015 AOP/Business Plan; correct?

25   A.   Yes.

1    Q.   And this appears to just relate to the

2    pharmacy division or part of Giant Eagle; correct?

3    A.   Looking at the front page, yes.

4    Q.   Right, based on the title.

5    And it has a date of June 24, 2014.  And I

6    believe that's when the meeting notice on the

7    first page appears to have been set.

8    So, first, let me just ask:  What was the

9    fiscal year for Giant Eagle at that time?  Did it

10   run midyear to midyear or calendar year?

11   A.   Since I've been at Giant Eagle, it runs

12   July to June.

13   Q.   July 1 to June 30?

14   A.   Yeah.  Date falls slightly off because

15   of the leap years, et cetera.

16   Q.   So was it usual and customary for Giant

17   Eagle as it approached the end of a fiscal year

18   to develop, circulate and talk about a plan for

19   the coming fiscal year?

20   A.   Yeah.  We go through planning cycles.

21   Q.   That's kind of a normal business thing

22   to do; correct?

23   A.   Based on my experience at Giant Eagle,

24   yes.

25   Q.   Yes.  And fiscal year 2015 would refer

1    to the fiscal that began July 1, 2014 and ended

2    June 30, 2015; is that right?

3        A.   Roughly.  Again, not sure if it started

4    on the 1st, but...

5        Q.   So if you'll turn with me to what is the

6    fifth page of this -- actually, let's do the

7    fourth page, the one up at the top that's 001.4.

8    I guess there's another page 4 on the bottom;

9    right?

10       There's a box there called Key Initiatives,

11   and it just identifies certain issues.  The first

12   issue that is listed there is an issue called

13   Noncompliance.  Do you see that?

14       A.   Yes.  I see it.

15       Q.   And there's not a lot of detail here and

16   so I don't know whether you can put that in any

17   context for me or not.

18       But do you know in that context what was

19   being conveyed or meant by noncompliance?

20       A.   I do not.

21       Q.   That's fine.  If you turn the page, page

22   5, there's a box listing a series of initiatives;

23   correct?

24       A.   Yes.

25       Q.   And then there are also columns for

1    what's said is "Owner."  But I presume that's

2    assigning that initiative to a person who is

3    primarily responsible for it; correct?

4         A.   Yes.  That would be my assumption.

5         Q.   And then a target date for some of them;

6    right?

7         A.   Yes.

8         Q.   So the first initiative shown there

9    says, "Obtain vendor accredited wholesale

10   certification at HBC"; right?

11        A.   Yes.  That's how it reads.

12        Q.   Are you familiar with that effort, in

13   general, that Giant Eagle and HBC set out to

14   obtain VAWD, the Vendor Accredited Wholesale

15   Distributors, certification for the HBC facility,

16   and this describes that initiative?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  Yes.  I am familiar.

19   BY MR. BARTON:

20        Q.   So as of June 24, 2014, when this was

21   prepared, is it true that VAWD certification for

22   the HBC facility had not yet been obtained?

23        A.   To my best recollection, yes.  It has

24   not been obtained.

25        Q.   And the target date as set here in this

1   business plan was for that to happen in -- would

2   you interpret that as the third quarter, Q3, of

3   fiscal year 2015?

4        A.   Yes.

5        Q.   So at the time in June of 2014, the goal

6   of the company as it related to VAWD certification

7   for HBC was to accomplish that by the third

8   quarter of fiscal year 2015, which would have

9   been, I assume, kind of January to March of 2015.

10       A.   Yes.

11       Q.   And it has a bullet point under it.  It

12  says, "Qualifies HBC to distribute to Maryland and

13  Indiana."

14       Did you understand that to be the primary

15  business benefit to HBC in obtaining VAWD

16  certification for the HBC warehouse?

17       A.   Yes.

18       Q.   That was kind of the motivating reason

19  that it was an initiative as of then?

20       A.   Yes.

21       Q.   And then if you go down further, there's

22  an initiative that says, reads, "Enhance

23  suspicious order monitoring system (SOMS) at HBC."

24       Do you see that?

25       A.   Yes.  I see that.

1    Q.    And then it cites a federal requirement

2  underneath it, 21 CFR 1301.74(b); correct?

3    A.    Yes, it does.

4    Q.    Do you recall being a part of any

5  discussions at this time or in this meeting about

6  what was needed to enhance the suspicious order

7  monitoring system at that time?

8         MR. KOBRIN:  Object to form.

9         THE WITNESS:  I don't recall specifics.

10 BY MR. BARTON:

11   Q.    But you would agree from this document

12 and that being listed as an initiative like the

13 other initiatives you see there, that as of

14 June 24, 2014, it was an initiative or goal of

15 Giant Eagle to enhance its suspicious order

16 monitoring system at HBC for the coming fiscal

17 year?

18   A.    Based on how this reads, yes, we were

19 looking to continually improve.

20   Q.    But as you sit here today, you don't

21 recall specific discussions about exactly what

22 enhancements were being talked about in this

23 meeting at that time?

24   A.    I don't recall specifics, no.

25   Q.    It would appear that Joe/HBC is

1    assigned, if you will, as owner of that

2    initiative; true?

3         A.   Yes.

4         Q.   Does that refer to Joe Millward?

5         A.   I'm not sure.

6         Q.   And you would agree that there was not a

7    target date specifically established, at least in

8    this plan, as of that time; correct?

9         A.   According to the document, the date was

10   TBD.

11        Q.   To be determined; correct?

12        A.   If that's your interpretation of it,

13   yes.  Yes.

14        Q.   Is that your interpretation?

15        A.   That would be my interpretation of it.

16        Q.   Are you aware of any specific target

17   date outside of this document that was established

18   then or shortly thereafter for that initiative?

19        A.   I don't recall specifically.

20        Q.   The next one right below it is,

21   "Implement controlled substances ordering system,"

22   and then in paren what we sometimes say as "CSOS,"

23   that's C-S-O-S; correct?

24        A.   Yes.  I see that.

25        Q.   And there's an owner or person assigned

1    to that that is Greg.  And do you interpret that

2    to mean Greg Carlson?

3         A.   I would agree with that interpretation.

4         Q.   And with a target date of that

5    implementation of second quarter of fiscal year

6    2015; correct?

7         A.   That's correct.

8         Q.   Which, based on the fiscal year and when

9    it falls, second quarter of fiscal year 2015 would

10   have been October, November, December of calendar

11   year 2014; correct?

12        A.   Correct.

13        Q.   Can you just describe generally what the

14   CSOS or controlled substances ordering system was

15   for Giant Eagle?

16             MR. KOBRIN:  Object to form.  No

17   foundation.

18   BY MR. BARTON:

19        Q.   Or HBC.

20             MR. KOBRIN:  Same objection.

21             THE WITNESS:  It's a system that

22   electronically would maintain DEA certificates so

23   we would not have to use paper 222s to order

24   controlled substances, Schedule IIs, from any

25   wholesale distributor.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BARTON:

2        Q.   So up until the implementation of this

3    controlled substances ordering system, was Giant

4    Eagle using paper forms to order controlled

5    substances from distributors like McKesson?

6        A.   To the best of my knowledge, yes.

7        Q.   Was there any other functionality

8    intended to be used from this controlled

9    substances ordering system?

10            MR. KOBRIN:  Object to form.

11            THE WITNESS:  I can't recall

12   specifically.

13   BY MR. BARTON:

14       Q.   If we flip forward a couple of pages to

15   page 7, there's some sales and costs and margin

16   numbers on there.  We're not going to go through

17   all of them, but I wanted to ask you about one.

18        There's a line down toward the bottom of this

19   chart that identifies Sourcing Savings.  Do you

20   see that?

21       A.   I do.

22       Q.   There's a number there in the Cost

23   column which would appear to represent a negative

24   18,419,331.  And then that number also shows up

25   correspondingly as a positive in the Margin

```
 1    column; correct?

 2         A.   I see that.

 3         Q.   So would it be correct to interpret that

 4    line item as indicating that Giant Eagle for --

 5    well, first of all, let's just make sure we are

 6    clear on what part of the chart we're in.

 7         This appears in a part of the chart, as I see

 8    it, that is for fiscal year 2015 base; correct?

 9         A.   I want to track with you the right way.

10         Q.   Yeah.  No problem.

11         A.   Can you say it one more time.

12         Q.   Yeah.  There appear to be two parts of

13    this chart, and the the top part starts -- the

14    first line is Fiscal Year 2014 Forecast; right?

15         A.   Okay.

16         Q.   And I'm assuming what that means is

17    Giant Eagle is just coming up to the end of its

18    fiscal year.  It's maybe within days of the end of

19    its fiscal year, right, at this time, June 2014;

20    correct?

21         A.   Yeah.  I would agree.

22         Q.   And so when it says Fiscal Year 2014

23    Forecast and it has some numbers there, I'm

24    assuming the top part of that chart is saying,

25    we're about to the end of our fiscal year and
```

```
 1    here's what we think the numbers look like in

 2    those categories for the pharmacy part of the

 3    business; right?

 4         A.    I would agree.

 5         Q.    Then there's a darker line and then the

 6    Fiscal Year 2015 Base part of the chart goes down

 7    from there; right?

 8         A.    Yeah.  I can see that.

 9         Q.    And it appears from the top bullet point

10    that fiscal year 2015 base probably is shorthand

11    for the fiscal year 2015 baseline forecast; is

12    that right?

13              MR. KOBRIN:  Object to form.

14              THE WITNESS:  I would agree with your

15    assessment based on what I'm looking at in the

16    chart.

17    BY MR. BARTON:

18         Q.    Right.  So the bottom part of the chart

19    is a forecast, in these areas, a forecast by the

20    company for the coming fiscal year.

21         A.    Which line are you referring to?

22         Q.    Right now the Fiscal Year 2015 Base,

23    just the total line.  This whole part of that

24    chart is what --

25         A.    So yes.
```

1      Q.   Those are kind of projections for the

2   fiscal year that's about to start?

3      A.   Correct.

4      Q.   And so the sourcing savings, whatever

5   that means -- do you know what sourcing savings

6   refers to?

7      A.   Yes.

8      Q.   What does it refer to?

9      A.   Attempting to gain better cost of goods

10  to combat inflation and lower reimbursement rates

11  from insurance companies.

12     Q.   So attempting to obtain better cost of

13  goods.  The rest of what you said are the reasons

14  for doing that; right?

15     A.   Correct.

16     Q.   But the sourcing savings, as you

17  understand it, refers to trying to lower the cost

18  of the goods that Giant Eagle pharmacies are

19  selling; right?

20     A.   Yes.

21     Q.   Was the HBC warehouse one of the ways,

22  one of the mechanisms or strategies that Giant

23  Eagle used to lower its cost of goods sold?

24     A.   Yes.  We would use all sourcing vehicles

25  in order to improve our cost of goods.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And there are some other sourcing lines

2    in this breakdown.

3        But as you just would interpret sourcing

4    savings, that would be any way in which Giant

5    Eagle was attempting to lower its cost of goods

6    sold; right?

7    A.   Yes.

8    Q.   And so the forecast for fiscal year of

9    2015 was -- Giant Eagle was forecasting that it

10   believed it could save 18,419,000 in sourcing

11   savings and thereby add that amount to its margin,

12   its profit margin; correct?

13   A.   Based on this chart, that is an ask from

14   the board for our budget.  I don't know if that's

15   an achievable number, but...

16   Q.   Right.  For purposes of that number,

17   that was what was in this business plan at least

18   as of June 24; correct?

19   A.   I would agree, yes.

20   Q.   We don't have any more detail in terms

21   of what was behind that number, but that's just

22   sort of a big number on that point; right?

23       MR. KOBRIN:  Object to form.

24       THE WITNESS:  I see the number of 18,4

25   as you described.

1    BY MR. BARTON:

2        Q.   So would you turn with me to page --

3             MR. KOBRIN:  Do you have a lot more on

4    this exhibit?  Do you want to take a break or do

5    you want to finish this exhibit?

6             MR. BARTON:  If you don't mind, we'll

7    finish.  I don't have that much more.  I have a

8    little bit more.

9             MR. KOBRIN:  Finish off the exhibit.

10            THE WITNESS:  We can finish the exhibit,

11   and then, I guess, take a break.

12            MR. BARTON:  That's fine.  Okay.

13   BY MR. BARTON:

14       Q.   If you'll turn with me to page 10.  Page

15   10 is another slide, I guess.

16       Does this look like kind of a PowerPoint

17   presentation to you, by the way, this whole

18   exhibit?

19       A.   Yeah.  The whole exhibit does look like

20   a PowerPoint presentation.

21       Q.   So page 10 is another slide with the

22   title Role of Pharmacy Within Giant Eagle.  Do you

23   see that?

24       A.   Yeah.  I see it.

25       Q.   And it starts with the statement,

1    "Within Giant Eagle, pharmacy is critical to our

2    success."

3        Do you agree that Giant Eagle considered

4    pharmacy as critical to the success of Giant

5    Eagle?

6        A.    I think all departments within Giant

7    Eagle are critical to its success.  So, yes, I

8    would agree that pharmacy is one of those

9    departments.

10       Q.    And the chart there in the middle of the

11   page appears to just provide some numbers or

12   context on that.

13       And it would appear, just so that I'm

14   interpreting it correctly, that the YTD P11 FY14

15   would suggest that these are fiscal year '14

16   numbers; correct?

17       A.    Make sure -- I lost where you're YTD is.

18       Q.    I'm sorry.  I'm looking at the little

19   fine print under the box just to see what these

20   numbers represent.

21       A.    Yes.  And I would agree.  It's year to

22   date, period 11.

23       Q.    So the Sales row refers to, I assume,

24   total sales in those categories.  And the Margin

25   refers to kind of the profit margin or the amount

1    of profit realized from those sales.

2         Is that how we interpret that?

3         A.    Technically, as it's posted here, it

4    would be the gross profit before expenses.

5         Q.    That's what Margin represents?

6         A.    That's what Margin represents.

7         Q.    So in fiscal year '14, would you read

8    and interpret this as suggesting that the sales

9    from the pharmacy side of Giant Eagle, the sales

10   from the pharmacy represented ███ percent of all

11   of Giant Eagle's sales?

12        A.    It's all of ████████ of supermarket

13   and Market Districts, ████████ in total

14   sales.

15        Q.    And so that's -- you've just defined

16   what SM plus MD means.  That's supermarket plus

17   Market District?

18        A.    That's correct.

19        Q.    So Giant Eagle may have some sales that

20   aren't supermarket and Market District, is that

21   what you're suggesting?

22        A.    That's correct.

23        Q.    So pharmacy represents ████ percent of

24   the supermarket and Market District sales; right?

25        A.    Yes.

1        Q.   If we turn to page 28 of this exhibit,

2   the title of this is Sourcing Efficiency.

3        Do you see that?

4        A.   Yeah.  I do see that.

5        Q.   And just for context -- I should have

6   told you to keep a thumb on page 7, but just to

7   match up the numbers.

8        Back on that chart that we were looking at,

9   there was a line item for sourcing efficiency with

10  a total of 1.585 million projected cost savings

11  there.

12       Do you see that?

13       A.   Yeah.  I do see that.

14       Q.   So then back to 28.  This slide appears

15  to provide some further detail on where that 1.585

16  sourcing efficiency cost savings is projected to

17  come from; correct?

18       A.   According this document, yes.

19       Q.   And so according to this document, the

20  VAWD certification piece of that initiative that

21  we looked at was projected, as of this document,

22  projected to contribute $335,000 in cost savings

23  to the company in fiscal year 2015; correct?

24       A.   Yes.

25       Q.   And CSOS implementation was projected to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   save or provide a cost savings of $1 million to

 2   the company in fiscal year 2015; correct?

 3        A.   Yes.  To clarify, cost savings is more

 4   overhead cost in this context.

 5        Q.   I appreciate the clarification.

 6        Do you know if VAWD certification for the HBC

 7   warehouse to enable it to ship to Maryland and

 8   Indiana, do you know if that VAWD certification

 9   was obtained?

10        A.   I know that it was not.

11        Q.   Do you know why it was not?

12        A.   Because we closed the pharmacy portion

13   of that warehouse.

14        Q.   Did that happen in fiscal year 2015?

15        A.   No.

16        Q.   When did that happen?

17        A.   In fiscal year 2016.

18        Q.   I think what you testified is you didn't

19   get the VAWD certification because you closed the

20   warehouse, or the plan became to close the

21   warehouse, I suppose.

22        A.   I'll clarify saying the plan was to

23   close the warehouse.

24        Q.   You didn't close the warehouse because

25   you didn't get VAWD certification for Indiana and
```

```
 1   Maryland; correct?

 2       A.   That's correct.  We did not close it for

 3   that reason.

 4       Q.   But was the effort to obtain VAWD

 5   certification abandoned at some point because the

 6   plan became to close the warehouse for pharmacy?

 7       A.   That's why we did not get the location

 8   certified, because we did intend to close the

 9   warehouse.

10            MR. BARTON:  Okay.  Very good.  We can

11   take a break now.

12            THE VIDEOGRAPHER:  We're going off the

13   record.  The time now is 11:46 a.m.

14            (Recess from 11:46 a.m. to 12:07 p.m.)

15            THE VIDEOGRAPHER:  We're now going back

16   on the record.  The time is 12:07 p.m.

17            (HBC-McClune Exhibit 4 was marked.)

18   BY MR. BARTON:

19       Q.   Mr. McClune, I'm going to move on to a

20   new exhibit, you'll be happy to know.  I'm handing

21   you what we've marked as Exhibit 4.

22            MR. KOBRIN:  Is Mr. McClune on this

23   exhibit?

24            MR. BARTON:  He is not.

25
```

1   BY MR. BARTON:

2       Q.   I will represent to you, Mr. McClune,

3   and your counsel, that this document that has a

4   Bates number HBC_MDL00128238 and our reference

5   number of 05039.  It's a multiple-page document.

6   It goes through MDL00128260.

7       This document doesn't -- you are not on any

8   of the emails that I see here, but I'll represent

9   to you that this was produced to us as part of

10  what is described as your custodian file, meaning

11  whatever that means.

12      It means that it was produced to us by Giant

13  Eagle as a document that you were at least deemed

14  to have custody of as part of your set of

15  electronic documents or whatever.  I won't say

16  anything more about it because I don't know what

17  that means.

18      I don't know if you've ever seen it before,

19  but I just wanted to ask you if this looks

20  familiar, if you've ever seen this document

21  before, which is an email chain with some

22  attachments.

23      A.   Give me one minute and make sure I

24  review this.

25      Q.   Yeah.  And I don't have many questions

1   about it, but I did just want to see if this was

2   familiar to you.

3        A.   Yeah.  I mean, there's only a couple of

4   pages here, so...

5        I am not familiar with this document in

6   particular.  I am familiar with this type of

7   document, though.

8        Q.   And that was really going to be what I

9   asked.  What I wanted to ask you is:  This

10  particular document I don't think has any unique

11  significance, to me certainly, but would this

12  document be an example of a document, a set of

13  communications that was occurring in August of

14  2014 around the effort to try to attempt to obtain

15  VAWD certification for the HBC warehouse?

16            MR. KOBRIN:  Object to form.

17            THE WITNESS:  Yes.  When we began

18  organizing our efforts for VAWD, we -- there are

19  certain requirements.  We built those requirements

20  and started working with our manufacturer partners

21  to make sure that paperwork was on file in our

22  system.

23  BY MR. BARTON:

24       Q.   This email exchange involves a woman I

25  asked you about earlier, Kris Remas; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And she was part of your team; is that

 3   right?

 4        A.    Not on August 28, 2014, but at a later

 5   date and time.

 6        Q.    That's right.  That's right.  That org

 7   chart was as of August '15, and that was

 8   representing a change for you; correct?

 9        A.    Yes.  That change occurred in August of

10   2015.

11        Q.    Got you.  Okay.  So this is August of

12   2014.  She wasn't yet a part of your team, but you

13   know who she is.

14        A.    Yes, I do.

15        Q.    And she, at least, was a part of this

16   effort to do -- as you described, to go get

17   certain documentation from manufacturers or

18   suppliers as part of the effort to obtain -- try

19   to obtain VAWD accreditation.

20        A.    Yes.

21        Q.    And is it true that as of August of

22   2014, at the time that this effort, like this

23   document and maybe others like it, were occurring,

24   that at that point in time Giant Eagle, among

25   other things, was trying to begin to document the
```

Highly Confidential - Subject to Further Confidentiality Review

1    policies and procedures that it used with respect

2    to its business practices in a greater way than it

3    had before for purposes of VAWD certification?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  VAWD requires an

6    incredible amount of effort in organizing existing

7    paperwork.

8         I recall many of these, and a lot of them

9    were already on file.  This is just one event

10   where we needed either a new form filled out or

11   updated paperwork from the manufacturer.

12        And I'm not sure if I answered your question

13   but...

14        Q.   Yeah.  I didn't ask a very good one.

15   But I think you did.

16        The process that Giant Eagle was going

17   through in seeking VAWD certification for the HBC

18   warehouse, that process itself, did it cause Giant

19   Eagle to organize and, in some instances,

20   generate, create some documentation that it didn't

21   used to have so that it could satisfy VAWD's

22   expectations?

23             MR. KOBRIN:  Object to form.

24             THE WITNESS:  Mostly just organizing

25   existing paperwork.

1    BY MR. BARTON:

2        Q.   So in context here, this is happening

3    in -- I don't know.  August 28, would that be the

4    end of the first quarter of fiscal year 2015?

5        A.   End of period 2, yes.

6        Q.   Okay.

7        A.   Is that right?  August -- end of

8    period 1.

9        Q.   Period 1.  Right.

10       A.   No.  Period 2.  July, then August, so

11   yeah.

12       Q.   Yeah.  I don't know how you count the

13   periods.

14       A.   Neither do I.

15       Q.   Well, it's the end of the second month

16   of fiscal year 2015.

17       A.   That's correct.

18       Q.   And based on this, that appears to fit

19   the timeframe that we looked at from the business

20   plan, which was -- the initiative, as of this

21   point in time, was still to try to obtain VAWD

22   certification by quarter 3 of fiscal year 2015,

23   which would have been the first part of 2015;

24   right?

25       A.   I apologize.  I'm flipping back.

1      Q.    That's fine.

2      A.    Yes, so by the end of quarter 3.  We're

3   in quarter 1.  So, yeah, we are working on our

4   efforts to gain that accreditation.

5      Q.    And you would interpret just that set of

6   documents that's Exhibit 4 as just one piece --

7   there were probably lots of other pieces like

8   it -- one piece of the effort to try to get that

9   VAWD certification?

10     A.    Correct.  Every manufacturer required

11  this set of documents or documents that were very

12  similar to this to be on file.

13          (HBC-McClune Exhibit 5 was marked.)

14  BY MR. BARTON:

15     Q.    I hand you Exhibit 5.  Exhibit 5 is a

16  one-page document, the Bates number

17  HBC_MDL00132616 and our number HBC-1126.

18     Have you seen this document before?

19     A.    Do we know -- do you know when this

20  document was created?  I don't have a date on it.

21     Q.    Yeah.  You're right.  It doesn't have a

22  date on it.  What I would represent to you is that

23  we did receive as part of the production of

24  documents what we call metadata for documents.

25     And I will represent to you that our review

Highly Confidential - Subject to Further Confidentiality Review

1    of the metadata that was produced with this

2    document has a date of 11/16/2014, so November 16,

3    2014.  I won't represent anything more about the

4    metadata as far as whether that's date created or

5    date last revised or whatever.

6        I only can say there is a date that is

7    associated with this of November 16, 2014.  So

8    that's the best I can do.

9        A.   I'm not a hundred percent sure I've seen

10   this document in this state, in this form.

11       Q.   And it's not a document, for example,

12   that you reviewed in preparation for your

13   deposition?  You haven't seen it recently;

14   correct?

15           MR. KOBRIN:  Object to form.  I don't

16   want him answering whether he's seen this or any

17   other document in preparation for his deposition.

18           MR. BARTON:  Well, I think he's answered

19   it anyway.

20   BY MR. BARTON:

21       Q.   Because this is not familiar to you; is

22   that fair?

23           MR. KOBRIN:  As a general matter, is it

24   familiar to you or not in your general work at

25   Giant Eagle?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  The document or the

 2     context?

 3     BY MR. BARTON:

 4          Q.   I just want to separate them, yeah.

 5     Because right now I'm just asking you about the

 6     document, and then I will ask about the context

 7     and the content.

 8          But the document itself, is it something that

 9     rings a bell, you think you've seen before in that

10     form?

11          A.   I can't say for certain.

12          Q.   The content, let's talk about the

13     content of the document.

14          Does the content describe a subject matter

15     that is familiar to you and that you have had some

16     exposure to with Giant Eagle?

17          A.   Yes.

18          Q.   And what was your experience with the

19     suspicious order monitoring program for Giant

20     Eagle?

21                MR. KOBRIN:  Object to form.

22                THE WITNESS:  In what context?

23     BY MR. BARTON:

24          Q.   Let me use a different word.  Experience

25     is broad enough that that's a problem, I think.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Did you have any role or responsibility in

2   the creation of Giant Eagle's suspicious order

3   monitoring program to comply with

4   21 CFR 1301.74(b)?

5           MR. KOBRIN:  Object to form.

6           THE WITNESS:  At what date and time?

7   BY MR. BARTON:

8      Q.   At any date and time.

9      A.   I think the answer is yes.

10     Q.   So at what date and time did you have a

11  role in that creation or development of that

12  program?

13     A.   This particular segment of the

14  regulation is part of a much larger issued

15  regulation by the DEA.

16      Just about every aspect of the business works

17  on constant improvement of maintaining and

18  upholding the law, the regulation.  This

19  particular segment, I don't know it offhand

20  verbatim, but I've seen it before.

21      So in many aspects through the years, either

22  in support of or continuing to enhance our

23  existing processing system.

24     Q.   Well, okay.  Let me just break that down

25  a little bit.

```
 1          Giant Eagle, as an owner and operator of

 2    pharmacies, and HBC, as a distributor wholesaler

 3    of pharmaceutical drugs, including controlled

 4    substances, both had obligations under the

 5    Controlled Substances Act as a whole to comply

 6    with various federal laws and regulations as it

 7    relates to controlled substances; correct?

 8          MR. KOBRIN:  Object to form.

 9          There's a lot of statements and assumptions

10    built in there about the relationship between HBC

11    and Giant Eagle which I don't think are in the

12    record or supported by the testimony.

13          THE WITNESS:  Can you clarify it.

14    BY MR. BARTON:

15      Q.   Well, okay.  Let's just talk about HBC

16    for now.  Was HBC a distributor of prescription

17    drugs?

18      A.   Yes.  HBC is registered as a -- with the

19    DEA as a distributor of prescription drugs.

20      Q.   And during the time, during the entire

21    time that you've worked for HBC starting in 2008,

22    did HBC distribute prescription medication?

23          MR. KOBRIN:  Object to form.

24          Is he drawing a legal conclusion on these

25    issues or is he just stating what he knows to be
```

1    factual regarding the content of HBC's warehouse?

2            MR. BARTON:  I'm just asking him.  I'm

3    not trying to use distributor in any legal sense

4    other than just how it's used in his

5    understanding.

6            THE WITNESS:  Can you restate it, and

7    then I'll make sure I answer correctly.

8    BY MR. BARTON:

9        Q.    What did HBC do?

10       A.    HBC purchased, warehoused and

11   distributed to Giant Eagle locations prescription

12   drugs.

13       Q.    And for a period of time, it also

14   included within that distributed some controlled

15   substances, some scheduled controlled substances;

16   correct?

17       A.    Yes.

18       Q.    And for purposes of the controlled

19   substances part of its distribution, that was from

20   2009 to 2014; is that correct?

21       A.    Yes.  I believe that to be correct.

22       Q.    And you worked for Giant Eagle during

23   that entire time; correct?

24       A.    Yes, I did.

25       Q.    As a distributor of controlled

Highly Confidential - Subject to Further Confidentiality Review

1    substances, did you understand that HBC had

2    obligations under the Controlled Substances Act to

3    comply with certain federal laws and regulations

4    relating to the distribution of controlled

5    substances?

6            MR. KOBRIN:  Object to form.  Again, it

7    assumes a legal conclusion.

8            THE WITNESS:  Yeah.  I preface my

9    response by saying I am not a lawyer, so I can't

10   fully interpret what the legal obligation is

11   there.

12       So I don't think I'm in a position to answer

13   unless you have another way to re-form the

14   question.

15   BY MR. BARTON:

16       Q.   All right.  That's fine.

17       You don't want to be one to say whether HBC

18   had any legal obligations under the Controlled

19   Substances Act or not; correct?

20       A.   Again, my nonlegal interpretation is

21   Giant Eagle had an obligation to the DEA due to

22   our registered licenses with the DEA.

23       The regulation is contextual.  So because we

24   are a captive self-distributor, the interpretation

25   of the vague regulations is better subject to

1    legal opinion and not mine.

2        Q.   But are you comfortable though giving us

3    your opinion that Giant Eagle at all times was in

4    compliance with whatever regulations they were

5    subject to?

6        A.   Yes.  Giant Eagle was definitely in

7    compliance.

8        Q.   And that's based on -- I mean, what do

9    you base that opinion on?  Is that just sort of a

10   hopeful aspiration?

11            MR. KOBRIN:  Object to form.

12            THE WITNESS:  Can you restate that?

13   BY MR. BARTON:

14       Q.   If you aren't comfortable kind of

15   expressing your understanding of what regulations

16   Giant Eagle was subject to or not subject to, how

17   can you be comfortable expressing the opinion that

18   Giant Eagle was always in compliance with the

19   regulations?

20            MR. KOBRIN:  Object to form.

21   Misrepresents his testimony.

22        You asked a long question related to what HBC

23   was required to do versus what Giant Eagle was

24   required to do.  And that's what started this

25   whole thing as to who had the requirements and who

Highly Confidential - Subject to Further Confidentiality Review

1    was under the regulations.  And that's what led to

2    his answer that he's not a lawyer.

3        Putting an additional gloss on that and

4    saying he's not comfortable answering certain

5    questions -- he's told you that he is comfortable

6    answering the compliance question, that he

7    believes they were in compliance.

8            MR. BARTON:  Right.  I'm exploring why

9    he's comfortable answering the question about why

10   he knows they're in compliance and not comfortable

11   answering questions what they're subject to.

12   That's all.  I'm just exploring what the basis for

13   that is.

14           MR. KOBRIN:  Yeah.  And I'm just --

15           MR. BARTON:  You can object to form all

16   you want.  I'm just seeing what the witness is

17   willing to tell me.

18           MR. KOBRIN:  My objection to form is

19   that you're misrepresenting what he said and what

20   he was comfortable and not comfortable doing.

21           MR. BARTON:  I disagree.  And if he

22   thinks I've done that, he's free to ask me to

23   rephrase.

24   BY MR. BARTON:

25       Q.   All right.  We don't need to belabor

```
 1    this, but this exhibit that we're looking at right

 2    now, Exhibit 5, in terms of its content, does it

 3    describe, at least in part, part of what Giant

 4    Eagle was doing at some point in time in an

 5    attempt to meet obligations it believed it had

 6    under the 21 CFR 1301.74(b)?

 7              MR. KOBRIN:  Object to form.

 8              THE WITNESS:  In my nonlegal opinion,

 9    this would be one of the aspects we used in order

10    to maintain compliance.

11    BY MR. BARTON:

12         Q.   And this aspect described in here, the

13    first sentence of the second paragraph, let's look

14    at that.  "Giant Eagle has created monthly

15    ordering threshold levels for products based on

16    GPI level reporting for controlled substances."

17         Did I read that correctly?

18         A.   Yes.

19         Q.   First of all, what is GPI level?

20         A.   GPI stands for generic product

21    indicator.  The level would be at which the

22    product is that level.  It's organized by GPI and

23    not another level.

24         Q.   I guess I need to ask a little bit more

25    about that just to understand it.
```

1      GPI level, how would GPI level help Giant

2    Eagle -- would the GPI level be used to help

3    create the threshold levels against which it was

4    comparing monthly ordering?

5      A.   Yes.  Reviewing and analyzing at the GPI

6    level rather than the NDC level is the more

7    accurate way to look at any analytics regarding

8    any medication, for that matter.

9      Q.   How so?  Like what's the difference

10   between the GPI level and the NDC level?

11     A.   Under a single 14-digit GPI, you'll --

12   you could have one brand NDC, which stands for

13   National Drug Code, and many generic NDCs that all

14   are therapeutically equivalent in nature.

15     Again, preface this I'm not a clinician, so

16   that may be subject to interpretation.

17     Q.   Who assigns the GPI level to a given

18   medication?

19          MR. KOBRIN:  Object to form.

20          THE WITNESS:  I don't know the answer to

21   that question.

22   BY MR. BARTON:

23     Q.   All I'm trying to understand -- I don't

24   think there's anything nefarious in it.  I'm just

25   trying to understand what it is.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    GPI is issued by Medi-Span.

 2          Q.    And who is that?

 3          A.    It's a subsidiary of Wolters Kluwer.

 4    It's a data provider for the pharmaceutical

 5    industry cataloging.

 6          Q.    Got it.  So GPI level is just a way to

 7    try to identify or capture a certain class or

 8    category of related products; is that fair?

 9          A.    That's a fair assessment, yes.

10          Q.    And the reason it's better than NDC

11    level is NDC level -- if you were just trying to

12    count by NDC level, you might miss some generics

13    that are presumed to be therapeutically equivalent

14    and may be prescribed for the same reason as the

15    brand NDC level; right?

16                MR. KOBRIN:  Object to form.

17                THE WITNESS:  Again, not a clinician,

18    but yes.

19    BY MR. BARTON:

20          Q.    I think I'm following now.  So GPI level

21    is better because it's hopefully more inclusive

22    than NDC level; right?

23          A.    Yes.

24          Q.    So the first sentence then, "Giant Eagle

25    has created monthly ordering threshold levels for
```

```
 1    products based on GPI level reported for

 2    controlled substances," is that a statement that

 3    you think accurately reflects something that Giant

 4    Eagle did at some point in time?

 5         A.    Again, I don't know if this document was

 6    in draft form, final, or what the context was.

 7    But yes.

 8         Q.    And were you personally involved -- is

 9    one of the things you did personally was

10    contribute to that creation of the monthly

11    ordering threshold levels for products?

12         A.    Yes, myself or my team.

13         Q.    And is that part of the programming

14    project that occurred that led to the generation

15    of the daily threshold reports?

16         A.    Again, this document was dated

17    11/16/2014.  We know that the threshold, daily

18    threshold reports started in 2013 based on our

19    earlier review.

20         So this statement would refer to that or some

21    subsequent work associated to that analytics and

22    reporting.

23         Q.    Yeah.  Absolutely fair enough.  And I'm

24    not trying to suggest that it only happened in

25    November of 2014.  I'm actually not concerned --
```

Highly Confidential - Subject to Further Confidentiality Review

1    I'm not, for purposes of the question, focused on

2    the date.

3        I understand why you're wanting to make sure

4    you're aware of what time period we're talking

5    about.  But I'm just asking the question of you

6    were involved in that project it describes.

7        A.   In some capacity, yes.

8        Q.   And that project of creating the monthly

9    ordering threshold levels and the programming that

10   related to that to generate those reports, that's

11   the same thing we were talking about earlier that

12   you were a part of and know it happened by 2013,

13   but you can't say that it happened before 2013;

14   correct?

15       A.   Yeah.  It's six years ago, so I'm not a

16   hundred percent sure when the work started or when

17   the first report was created.

18       But the programming work for the system and

19   then the subsequent programming that went into

20   future reports coming out of the system were

21   partially responsible by me and/or somebody on my

22   team.

23       Q.   And the second sentence says, "Generated

24   orders are compared against the threshold level

25   established for each controlled substances

1    entity."  Correct?

2         A.    Yes.  That's what that sentence says.

3         Q.    And that kind of describes the, I

4    guess -- does that describe what, in essence, the

5    daily threshold reports were trying to reflect,

6    that is, comparing generated orders against

7    established threshold levels?

8         A.    Yes.

9         Q.    And that functionality required what

10   technology to make that happen?

11        MR. KOBRIN:  Object to form.  Do you

12   mean when it initially happened or --

13   BY MR. BARTON:

14        Q.    So to generate an order -- excuse me --

15   to compare an order that's been generated within

16   the Giant Eagle HBC system, to compare an order

17   with some established threshold level within the

18   data, that requires what kind of technology?

19   Excel?

20        A.    There's a whole line of technology

21   that's involved in actually making all of that

22   work.

23        Q.    Like what?  I mean, I don't know.  I

24   can't program.  So what had to be done to allow

25   that to occur?

1            MR. KOBRIN:  Object to form.  Are you

2     referring to the 2013 system specifically or just

3     as a general matter?

4            MR. BARTON:  Well, I'm referring to that

5     as a general matter right now.  I'm not trying to

6     limit it.  We know what happened in 2013.

7        I'm trying to refer to what it takes to make

8     that happen, is my question.

9            THE WITNESS:  Restate the question

10    exactly, and I'll --

11    BY MR. BARTON:

12        Q.   What technology is required to have a

13    system in which generated orders are compared

14    against threshold levels established for each

15    controlled substance?

16        A.   You need a warehouse management system

17    that captures invoices in EDI form and loads them

18    into the database, and then another system, which

19    we've described earlier, to harvest that data and

20    information saved, and create reporting for

21    business users to make more educated decisions.

22        Q.   So is that it?

23        A.   Likely not.  But that, I think, gets you

24    a large portion of what you need.

25        Q.   The warehouse reporting or warehouse

Highly Confidential - Subject to Further Confidentiality Review

1   management system that captures invoices in EDI

2   form, did that system exist in 2013 within HBC and

3   Giant Eagle?

4       A.   I can't say for certain.  I believe the

5   answer is yes, but I'm not an IT person nor a

6   warehouse person.

7       Q.   And what is EDI form?

8       A.   Again, not an IT person, but I believe

9   it stands for electronic data interface.  That's a

10  guess though.

11      Q.   What's the significance to you -- you

12  used the term in saying you need that.  What's the

13  functional significance of EDI form for purposes

14  of what we're talking about?

15      A.   That's what generates the capturing of

16  orders from stores to our wholesaler distribution

17  partners.

18      Q.   So as I understand it, stores would

19  order controlled substances for their pharmacies

20  from other wholesale distribution partners like

21  McKesson or Anda; correct?

22      A.   That's correct.

23      Q.   But they also would order -- could order

24  controlled substances, at least Schedule IIIs,

25  that were -- that HBC was licensed to distribute

Highly Confidential – Subject to Further Confidentiality Review

1    as well; correct?

2         A.   Yes.

3         Q.   So those orders would be placed directly

4    to HBC; true?

5         A.   Yes, but not a hundred percent of the

6    time.

7         Q.   And the exceptions to that would be

8    what?

9         A.   If the warehouse order had already been

10   selected for that store for the day and they still

11   had time to get an order in for a valid

12   prescription from McKesson or Anda for next day

13   delivery, they would place that subsequent order

14   for a product that was at the GPI level at least

15   in our warehouse.

16        Q.   So without getting into all of the

17   variations in that way that could occur in the day

18   to day of trying to make sure that pharmacies got

19   the product that they wanted and needed to meet

20   their customers' needs, is it true that there were

21   effectively orders placed by pharmacies, either to

22   HBC or to a third-party wholesaler distributor,

23   just depending on what the pharmacy needed?

24        A.   Yes.  That's a fair assessment.

25        Q.   And since those orders are going to

Highly Confidential - Subject to Further Confidentiality Review

 1    different recipients, if you want to have a system

 2    in which you capture all of those orders,

 3    including ones going to a third party, you have to

 4    have some management system where you capture that

 5    data somehow; correct?

 6              MR. KOBRIN:  Object to form.

 7              THE WITNESS:  If you want to run

 8    analysis on all of those different data points,

 9    yes, you'd have to have a way to capture all that

10    information.

11    BY MR. BARTON:

12        Q.   So the information about orders to HBC,

13    directly to HBC, that information would be coming

14    straight to HBC; right?

15              MR. KOBRIN:  Object to form.  I think

16    asked and answered here.  He explained.

17              THE WITNESS:  Yeah.  Ask it again.  And

18    if it's a redundant question, I'll answer it

19    again.

20    BY MR. BARTON:

21        Q.   It may be, but I'm not trying to be.

22        A.   Yeah.  I know.  That's fine.

23        Q.   I'm trying to simplify something that

24    may not be as simple as I want it to be.

25              One universe of orders that Giant Eagle

Highly Confidential - Subject to Further Confidentiality Review

1    retail pharmacies would place from time to time

2    would be orders directly to the HBC warehouse as

3    the distributor; is that right?

4         A.    That is correct.

5         Q.    And another universe of orders that they

6    might place would be orders to a McKesson or an

7    Anda, or some other wholesaler distributor;

8    correct?

9         A.    That's also correct.

10        Q.    Were there any other universes of orders

11   that they might place for controlled substances?

12        A.    I can't think of them.  These orders are

13   aggregated and then kind of shoot out to the

14   different wholesalers based on which wholesaler is

15   responsible for managing that product.

16        Q.    If you're trying to track all of the

17   orders by a particular pharmacy for a certain

18   category of drug, a certain GPI level, you're

19   trying to capture all the orders in a given time

20   period for a certain pharmacy, what technology did

21   Giant Eagle need to capture those?

22             MR. KOBRIN:  Object to form.

23   Speculative.

24             THE WITNESS:  I'm not an IT expert, so

25   probably wouldn't answer your question accurately.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BARTON:

 2        Q.   You don't think even in 2008 Giant Eagle

 3   had the technology to capture all of the

 4   information about the orders that its pharmacies

 5   were placing for its products wherever they were

 6   placing them; correct?

 7             MR. KOBRIN:  Object to form.

 8             THE WITNESS:  I can't --

 9             MR. KOBRIN:  You're saying he doesn't

10   believe it?

11             MR. BARTON:  No.  I'm asking him did

12   they.

13   BY MR. BARTON:

14        Q.   Do you believe that Giant Eagle had that

15   technology in 2008 to know what orders that all of

16   its retail pharmacies were placing?

17        A.   That's ten, eleven years ago.  I'm not a

18   hundred percent sure what was captured in every

19   form, what system was used, and where it was all

20   stored, unfortunately.

21        Q.   It sounds to me like basic database

22   technology.  There's a certain number of retail

23   pharmacies that Giant Eagle owns and cares how

24   they perform in terms of costs and sales, stuff

25   that shows up on the business plan; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. KOBRIN:  Object to form.

 2              THE WITNESS:  Restate that, please.

 3    BY MR. BARTON:

 4         Q.   Giant Eagle has control over its retail

 5    pharmacies.  Do you agree?

 6         A.   Yes.  All retail pharmacies are owned

 7    and operated by Giant Eagle.

 8         Q.   It tracks all kinds of financial data

 9    and information about the operation of each of

10    those pharmacies; correct?

11         A.   Yes.

12         Q.   And it collects data about each of those

13    pharmacies and stores it in large databases full

14    of lots of data; right?

15              MR. KOBRIN:  Object to form.

16              THE WITNESS:  Yes.  A lot of data is

17    captured and a lot of data is stored.

18    BY MR. BARTON:

19         Q.   And for a period of time you

20    specifically -- one of your responsibilities for

21    the company was to come up with ways to help

22    analyze that data that Giant Eagle collects from

23    all its pharmacies; right?

24         A.   Yes.  One of my jobs was analyst, so I

25    did pull a lot of that information.
```

```
 1        Q.   And you're telling me that you're unable

 2   to testify that as of 2008, when you started doing

 3   data analytics for Giant Eagle, you're unable to

 4   testify that as of 2008, Giant Eagle could capture

 5   all of the data it needed to know what orders its

 6   retail pharmacies were placing for controlled

 7   substances?

 8             MR. KOBRIN:  Object to form.

 9             THE WITNESS:  Can you restate that one

10   more time.

11   BY MR. BARTON:

12        Q.   In 2008, was Giant Eagle able to capture

13   all of the data to show what orders its retail

14   pharmacies were placing for controlled substances?

15        A.   I believe we had good visibility to the

16   data.  In what form or what system, I can't really

17   speak to that.

18             MR. KOBRIN:  Break for lunch?

19             MR. BARTON:  Sure.

20             THE VIDEOGRAPHER:  Going off the record.

21   The time is 12:49 p.m.

22             (Recess from 12:49 p.m. to 1:43 p.m.)

23             THE VIDEOGRAPHER:  We're going back on

24   the record.  The time now is 1:43 p.m.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BARTON:
 2       Q.   Mr. McClune, I'm going to ask you a few
 3   more questions about Exhibit 5.  We'll keep that
 4   in front of you.
 5       I want to try to ask just a cleaner question
 6   for you about 2008 and what data you believed
 7   Giant Eagle was capturing from its retail
 8   pharmacies that relates to what we're talking
 9   about in Exhibit 5.
10       As of 2008, when you joined Giant Eagle, was
11   Giant Eagle able to electronically capture data
12   about what quantities of controlled substances at
13   a GPI level a single pharmacy was ordering in a
14   given month?
15       A.   Yes.  That data would have been
16   available in some capacity.
17       Q.   The process that's described in
18   Exhibit 5 of monthly ordering thresholds and so
19   forth that we've been going through, I wanted to
20   ask you a few more things about it.
21       The second sentence, we were focusing on
22   that, "Generated orders are compared against the
23   threshold level established for each controlled
24   substance entity."
25       That comparison of orders to a threshold
```

1    level that's been established, that was part of

2    the system that you helped create at least as of

3    2013; right?

4          A.    Yes.

5          Q.    And my question first is:  With

6    reference to the threshold levels that that's

7    talking about, did someone have to decide what

8    threshold level to choose to be the basis for

9    comparison with orders?

10         A.    Someone would have to choose the

11   calculation method.  Our team would have to choose

12   the calculation method in which those thresholds

13   would be set.

14         Q.    So do you know who chose or set the

15   threshold levels to use for this program described

16   in Exhibit 5?

17         A.    I do not know the specific person or

18   team that would have assisted.

19         Q.    You were involved and your team were

20   involved in actually writing the code that kind of

21   implemented the threshold level so that reports

22   could be generated using that threshold level;

23   right?

24         A.    Yes.  That's correct.

25         Q.    So someone gave to you or told you, this

1    is the threshold level or this is how we want to

2    set the threshold level in the system?

3          A.    I'd be speculating, but -- so no.

4                MR. KOBRIN:  Don't speculate.

5    BY MR. BARTON:

6          Q.    Yeah.  That's good.  If you don't know

7    or don't remember, that's fine.  I'm wanting to

8    know what you know.

9          Did you, Bob McClune, did you decide what

10   threshold level should be used to compare orders

11   against for purposes of this program?

12         A.    What date and time are we referring to?

13         Q.    At the time that the code was written to

14   generate reports that were the daily threshold

15   reports.

16         A.    So no, not me personally.

17         Q.    Do you know what that threshold level

18   was, like what it was based on?

19         A.    I can't quote exactly.  So I don't know

20   off the top of my head.

21         Q.    Do you know if the same threshold was

22   used for every Giant Eagle pharmacy?

23         A.    I do believe that to be correct, yes.

24         Q.    And was it based on a companywide

25   average, based on kind of the quantities sold or

```
 1    ordered by all Giant Eagle stores?

 2              MR. KOBRIN:  Object to form.

 3              THE WITNESS:  To confirm, are you

 4    referring to the threshold or the orders?

 5              MR. BARTON:  The threshold.

 6              THE WITNESS:  The threshold used a

 7    companywide average.

 8    BY MR. BARTON:

 9         Q.   And do you know, was it an average based

10    on sales of a GPI level or orders?  Do you know?

11         A.   It was orders.

12         Q.   And the companywide average that was

13    used, was that an average that was fixed for a

14    given period of time, or did it change every

15    month?

16         Was it like a rolling average?

17         A.   It was based on a rolling average.

18         Q.   So it would apply for a month and then

19    reset and recalculate based on the preceding

20    12 months' companywide average for orders?

21         A.   Yes.

22         Q.   Do you know whether Kayla chose that

23    threshold?

24              MR. KOBRIN:  Object to form.

25              THE WITNESS:  I don't know.
```

1    BY MR. BARTON:

2        Q.   Do you know how long that threshold was

3    used for purposes of this program of comparing

4    retail store orders against a threshold as part of

5    the suspicious order monitoring program?

6            MR. KOBRIN:  Object to form.

7            THE WITNESS:  I believe it was in

8    production through January of 2016.

9    BY MR. BARTON:

10       Q.   Were you involved in any of --

11       A.   Let me rephrase that.  I think it's

12   January of 2017.

13       Q.   2017.  Okay.

14       A.   Sorry.  I just wanted to make sure I had

15   the right date, year on that.

16       Q.   That's fine.  Were you involved in any

17   discussions about changing the threshold?

18       A.   We constantly worked on enhancing the

19   whole threshold and controlled substance

20   compliance program that Giant Eagle managed, which

21   included controls at the warehouse, controls at

22   retail.

23       This added system to look at thresholds isn't

24   explicitly stated in the DEA regs, but we thought

25   it would be a redundant added process.  We

Highly Confidential - Subject to Further Confidentiality Review

```
 1   continued to add to and augment.

 2        Q.   I don't think that answered my question.

 3   I'm just asking:  At the time that the threshold

 4   part of this program --

 5        A.   Okay.

 6        Q.   -- I'm not suggesting it's the entire

 7   program.  But at the time that the threshold part

 8   of this monitoring program was changed, were you

 9   involved in the discussions about changing it?

10        A.   Yes.  I was involved in discussions

11   about changing this program and future iterations

12   of it.

13        Q.   And who else was involved in those

14   discussions?

15        A.   Definitely George Chunderlik.  I can't

16   recall any other specific parties.

17        Q.   Did those discussions start prior to

18   January 2017?

19        A.   Yes.  We continually talked about

20   compliance, controlled substance compliance, this

21   being one of the aspects of it.  So, yes, we

22   discussed it on a periodic basis throughout time.

23        Q.   Did you have some concerns yourself,

24   just personally, about whether the companywide

25   average threshold that was being used for this
```

1    purpose, this part of the suspicious order

2    monitoring program, that the companywide average

3    threshold was not optimal?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  Can you restate the

6    question?

7    BY MR. BARTON:

8         Q.   Yeah.  Did you have personal concerns at

9    any time that the companywide average threshold

10   was being used as the threshold in this program?

11        Did you have personal concerns that that was

12   not the optimal threshold to use?

13        A.   I didn't have any concerns about that

14   not being the optimal threshold.

15        Q.   Do you recall any conversations or

16   communications, maybe in 2013 or 2014, about

17   whether that threshold should be used or continues

18   to be used as it was?

19        A.   I don't recall any specifics.

20        Q.   Would you agree that a companywide

21   threshold which is used for this purpose to just

22   provide some line against which orders from a

23   given store are compared to see if they fall over

24   the line or not, would you agree that a

25   companywide average, as a threshold, has a

1    weakness in terms of its applicability to stores

2    within the Giant Eagle system that routinely are

3    based on their own characteristics well below or

4    well above the company average for sales?

5             MR. KOBRIN:  Object to form.

6             THE WITNESS:  Can you restate?

7    BY MR. BARTON:

8        Q.   Yeah.  Bad question.  Let me ask a

9    different question.

10       A.   Okay.  That's fine.

11       Q.   If you use a company average as your

12   threshold -- you have to choose some threshold,

13   right, if that's what you're going to do, is

14   compare orders against a threshold?

15       If you use a company average as a threshold,

16   one thing that you aren't doing then through that

17   is comparing a store's ordering patterns to

18   itself; true?

19             MR. KOBRIN:  Object to form.

20             THE WITNESS:  I mean, if you're using a

21   companywide average, no, you wouldn't be looking

22   at just solely the store's history.

23   BY MR. BARTON:

24       Q.   Right.  Those two things are mutually

25   exclusive.  If what you're looking at is comparing

1    the store to the company average, you're not

2    comparing that store to itself; right?

3        A.    Correct.

4        Q.    So, for example, if you had a small

5    store relative to the company average -- and there

6    were such stores, I assume, in the Giant Eagle

7    system; right?

8            MR. KOBRIN:  Object to form.

9            THE WITNESS:  I'd have to see the data,

10   but you're going to have some high-performing and

11   lower-performing stores.

12   BY MR. BARTON:

13       Q.    So if you had a smaller store relative

14   to company average, then always comparing that

15   store's orders to the company average might never

16   reveal a pattern occurring within that store's

17   orders that might deviate or change, but never

18   reach the threshold.

19       That could happen; right?

20           MR. KOBRIN:  Object to form.

21           THE WITNESS:  There are still other

22   processes in place that would catch those

23   abnormalities.  This check was just an additional

24   redundant check.

25

```
 1   BY MR. BARTON:

 2       Q.   Well, I understand.  So my question

 3   though is just whether you agree that could happen

 4   under a system where you're using a threshold

 5   that's based on the company average.

 6            MR. KOBRIN:  You're saying only?

 7   BY MR. BARTON:

 8       Q.   I'm just talking about the data

 9   analytics part of the program.  I think your

10   answer was to say, well, we had other things in

11   place.  And we can talk about -- we'll talk about

12   those in a minute.

13       But just focusing on this piece that is

14   described in Exhibit 5, kind of the data analytics

15   piece, if your data analytics piece of this

16   program uses a company average, then one thing

17   that could happen is that you could have a

18   low-performing -- I want to use that word -- or

19   just say a low-volume store that might have

20   unusual patterns within its ordering on a

21   controlled substance, but never reached the

22   threshold of the company average simply because

23   it's a smaller store.

24       That could happen theoretically; correct?

25            MR. KOBRIN:  Object to form.
```

```
 1    Speculative.

 2              THE WITNESS:  Yeah.  I'd have to see the

 3    data to validate that.

 4    BY MR. BARTON:

 5         Q.   Yeah.  I'm asking hypothetically.  I

 6    mean, I'm asking if you believe, based on how the

 7    system worked, that's a possibility.  I'm not

 8    asking whether you know whether it happened or

 9    not.

10         That's one possibility if you're using just

11    the company average as your threshold; would you

12    agree?

13              MR. KOBRIN:  Same objection.

14              THE WITNESS:  I wouldn't know for sure.

15    BY MR. BARTON:

16         Q.   Regardless, I mean, I'm not -- you've

17    testified you are confident you aren't the one

18    that said, let's use company average as our

19    threshold for purposes of this part of the system;

20    correct?

21              MR. KOBRIN:  This part of the system

22    being the document?

23              MR. BARTON:  What's described in

24    Exhibit 5, the suspicious order monitoring program

25    described in Exhibit 5.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  And do we have a specific
 2   report this refers to though?  Because the way I
 3   read this, it's more than just that one single
 4   daily threshold document.
 5   BY MR. BARTON:
 6        Q.   Well, I've been focusing on, I guess,
 7   the first three sentences of the second paragraph
 8   and what's kind of described there, which I
 9   understand to be the piece that you had some
10   involvement in helping to create and develop.
11        A.   The third sentence refers to the daily
12   threshold report is generated to notify
13   corporate-level personnel as to which registrant
14   store has items in a given order that exceed an
15   ordering threshold.
16        The other two sentences refer to more broad,
17   which would include not only the daily threshold
18   report referred to in sentence 3, but other
19   thresholds and management SOPs that would identify
20   orders of abnormality.
21        Q.   So your testimony is that -- the way you
22   read the second paragraph is that the first two
23   sentences, when using the word "threshold," it may
24   refer to other thresholds within the company or
25   applied by the company, not just the one that was
```

1  coded into the system to generate the daily

2  threshold report.

3      A.   I mean, again, this document is taken

4  out of context.  I don't know what it's exactly

5  attached to in this particular sense.

6      Our threshold management and suspicious order

7  monitoring program transcended all aspects of

8  Giant Eagle.  The threshold management, which

9  isn't even a requirement by the DEA, was put in

10 place to be a redundant check against already

11 existing processes and procedures.

12     Q.   For whatever reason it was put into

13 place, at some point Giant Eagle decided to add

14 that to its suspicious order monitoring program;

15 correct?

16     A.   Yes, at some point.

17     Q.   Let me just ask:  What is the value

18 of -- to you, as a data analytics person who has

19 worked in that area, what value is there of using

20 a data analytics tool like that for purposes of

21 suspicious order monitoring?

22     A.   In what context?

23     Q.   In the context of Giant Eagle and HBC

24 wanting to comply with its obligations under the

25 Controlled Substances Act.

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. KOBRIN:  Object to form.

2              THE WITNESS:  It was our continued will

3     to enhance existing processes and procedures.

4         What year are we talking about here?

5     BY MR. BARTON:

6         Q.   I guess at any time that it was subject

7     to the Controlled Substances Act.  So at any time.

8         A.   So from 1970 to present?

9         Q.   Yeah.  What value did adding data

10    analytics to that program add?

11        A.   As systems continue to enhance, hardware

12    improved, applications improved, there was a

13    heightened sense of awareness around controlled

14    substance and controlled substance management,

15    which we took continued action to improve our

16    existing systems.

17        Q.   So one part of the system that others

18    have testified about is that, for example,

19    employees in the HBC warehouse, sometimes called

20    pickers, might develop some familiarity with

21    ordering patterns by specific pharmacies.

22        You think that's probably true?

23        A.   Yes.

24              MR. KOBRIN:  Object to form.

25
```

1    BY MR. BARTON:

2         Q.   And so those pickers might perceive a

3    deviation in an ordering pattern just at the time

4    that they're filling orders physically by picking

5    things out of bins and putting them into totes, or

6    whatever they would use, to send them to retail

7    pharmacies; right?

8              MR. KOBRIN:  Object to form.

9              THE WITNESS:  I'm not in charge of the

10   warehouse, so I'm not exactly sure what their

11   practices are.  But I'm -- you know, I'm sort of

12   not comfortable speculating, but --

13   BY MR. BARTON:

14        Q.   Do you think that piece -- I'm not

15   suggesting that was exclusive either of the entire

16   program.

17        But do you think that was part of Giant Eagle

18   and HBC's suspicious order monitoring program?

19        A.   It certainly was.

20        Q.   And what weaknesses did that have as

21   part of the suspicious order monitoring program?

22             MR. KOBRIN:  Object to form.  No

23   foundation.

24   BY MR. BARTON:

25        Q.   In your view.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. KOBRIN:  Object to form.

 2              THE WITNESS:  You can pick at any one of

 3    these pieces and find flaws.  It's the combination

 4    of all the pieces together working in coordination

 5    that gives you a tight set of controls and

 6    security as explained by the regulation.

 7    BY MR. BARTON:

 8         Q.   No question.  But it's the pieces that

 9    you have and how tight each of them are that

10    really determines whether your system is tight

11    enough to comply with the law or not; right?

12              MR. KOBRIN:  Object to form.

13    Argumentative.

14              MR. BARTON:  The answer was

15    argumentative.

16    BY MR. BARTON:

17         Q.   Yeah, you're right.  You can have as

18    many pieces as you want to try to meet your burden

19    to comply.  But they either collectively do or

20    they don't; right?

21              MR. KOBRIN:  Object to form.

22    BY MR. BARTON:

23         Q.   Isn't it fair for us --

24         A.   It's an opinion.

25         Q.   -- to at least -- isn't it fair for us
```

Highly Confidential - Subject to Further Confidentiality Review

1    to talk about each piece and just see what its

2    strengths and weaknesses are?

3         That seems like a reasonable thing for a

4    business to do when it's thinking about are we

5    complying with the law or not.

6              MR. KOBRIN:  Object to form.

7    Argumentative.

8         He said that he doesn't feel necessarily

9    qualified to talk specifically about those

10   warehouse pieces.  He knows that they existed.  He

11   knows they were part of the SOM process.

12   BY MR. BARTON:

13        Q.   Do you have any familiarity with the

14   picker piece as far as what they actually do day

15   in and day out, what they get exposed to?

16        A.   The warehouse pickers do not report up

17   to me, so no.

18        Q.   Right.  So you don't know what it's like

19   to be a picker and what they see and what they

20   don't see; fair?

21        A.   No.  We rely on other management staff.

22        Q.   And your job with Giant Eagle, really

23   from the time that you were hired on in various

24   capacities, involved, in large respects, the

25   analysis of data to help Giant Eagle do what it

Highly Confidential - Subject to Further Confidentiality Review

1    was trying to do; right?

2         A.    I would agree with that assumption.

3         Q.    Because that's where your skill set

4    really rested, was in data analytics and figuring

5    out how to draw the right information and

6    conclusions from data; correct?

7         A.    Yes.

8              (HBC-McClune Exhibit 6 was marked.)

9    BY MR. BARTON:

10        Q.    Let's move on to a new exhibit.  I hand

11   you Exhibit 6.  I won't spend a lot of time on

12   this.

13        This is a multi-page document.  First page is

14   HBC_MDL00076207, and our reference number is

15   P-HBC.  Do you see that?

16        A.    Yes.

17        Q.    This document appears to have at the top

18   of the first page another one of the meeting

19   notifications that we've seen before with an

20   organizer of Dominic Bertucci.

21        And you are listed among the recipients of

22   that; is that correct?

23        A.    Yes.  I see my name on there.

24        Q.    This document appears to, then below,

25   have a message from Dominic to several people.

1    You're not on that list.

2        But the message appears to relate to getting

3    ready for a VAWD physical inspection on August 31,

4    and we are now in 2015 here.

5        Do you see that?

6        A.    I do see that.

7        Q.    Now, does this document and the things

8    that are behind it, does it appear to relate to

9    efforts by the company to prepare for VAWD

10   inspections and, hopefully, certifications of the

11   GERX warehouse facility?  Do you know?

12       A.    This is August 17, 2015.  So at that

13   point in time the GERX warehouse was not in

14   operation.  Am I right on that?  In the wrong

15   year.

16       Q.    Not yet in operation perhaps?

17       A.    Hold on.

18           MR. KOBRIN:  Do you have anything you

19   can show him to refresh his memory on that?

20           MR. BARTON:  Yeah.  Well, I have some

21   other stuff that we can get to that all fall into

22   the same context.

23       And, really, I'm not trying to trick him.

24   I'm trying to separate -- there was a VAWD

25   certification process that we talked about

 1    relating to HBC.  And I think he testified already

 2    that that kind of didn't come to completion and

 3    stopped, but then we have more picking up in 2015.

 4          And I'm just basically --

 5                MR. KOBRIN:  Do you have a reason for me

 6    to believe this is GERX?

 7                MR. BARTON:  I do, I guess.

 8                MR. KOBRIN:  Do you have a reason to

 9    believe this is GERX?

10                MR. BARTON:  No.

11                MR. KOBRIN:  I just know that he wants

12    to make sure that his testimony is completely

13    accurate.

14          If you can refresh him with an additional

15    document, that might help, and then he'll know

16    whether he's right or not.

17    BY MR. BARTON:

18          Q.    Well, let's just go on.  Let me just ask

19    you about this Exhibit 6.

20          A.    Sure.

21          Q.    I truly was actually just trying to make

22    sure I wasn't confused, and I may be, and I'm not

23    helping.  So let me just ask you whether --

24          A.    No.  That's fine.

25          Q.    -- you recall anything about this

1    particular meeting in this timeframe and what's

2    being discussed here.

3        A.   No, not for this specific meeting.  I

4    remember VAWD.

5        Q.   Right.  Okay.  So I guess I will just

6    ask you this question:  Do you remember VAWD being

7    an issue or initiative both with respect to the

8    HBC warehouse and with respect to the GERX

9    facility?

10       A.   Yes.  So at this point in time, if I

11   have my years right, and I do believe I do, we had

12   approval to move the warehouse, closing HBC,

13   opening GERX.

14       We had already done most of the paperwork for

15   VAWD knowing that we had a deficiency in climate

16   control at HBC, but thought it was in our best

17   interest to go through the exercise, since most of

18   the work for VAWD is paperwork, validate that we

19   passed at HBC with the exception of the climate

20   control so we'd be ready for inspection at the

21   other facility.

22       Q.   Okay.  I think that helps.

23       And let me mark the next exhibit, and that

24   may clear this all up.

25       A.   So we're done with 5 or 6?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Yeah.
 2              (HBC-McClune Exhibit 7 was marked.)
 3   BY MR. BARTON:
 4        Q.    I'm handing you Exhibit 7.  This is a
 5   multi-page document.  First page is
 6   HBC_MDL00069566.
 7        This document has some emails.  And I would
 8   direct you to the second email down on the first
 9   page, so the one that's kind of in the middle of
10   the page, from Joseph Millward on Thursday,
11   August 20, 2015.
12        Do you see that?
13        A.    Yes.  I see it.
14        Q.    And you are one of the recipients of
15   this email; correct?
16        A.    Yes, I am.
17        Q.    And the subject of it is Thrifty White
18   Notes.  Do you see that?
19        A.    I do see that.
20        Q.    And if we turn the page to the second
21   page, there's an email that appears to be from
22   you, also August 20 in the morning, also with the
23   same subject Thrifty White Notes.
24        And you're saying, "Team, I want to send a
25   note out regarding our trip to Thrifty White
```

Highly Confidential - Subject to Further Confidentiality Review

1    yesterday in conjunction with the planned

2    warehouse move of all the refrigeration."

3        Do you see that?

4        A.   I do see that.

5        Q.   So we're in the same kind of timeframe.

6    August 20, 2015 is what we were just looking at,

7    which I think was August 17.

8        Does this refresh any recollection about what

9    was happening at that period of time?

10       A.   The exact contents of this, I won't be

11   able to speak to exactly without further review,

12   but I do remember this time period.

13       Q.   Do you remember, for example, taking a

14   trip to Thrifty White to, you know, meet with them

15   and look and see what they were doing in their

16   warehouse or pharmacy operations?

17       A.   I do.

18       Q.   And was that in Denver?

19       A.   No.

20       Q.   I might be confused there.  Where did

21   you go Thrifty White?  Where was that?

22       A.   They're headquartered just outside of

23   Minneapolis.

24       Q.   What was the purpose of you sending this

25   team the email that you did with Thrifty White

1    notes?

2        A.    So the email was to four team members

3    who accompanied myself on the trip.  And the cc

4    line includes other respective parties that would

5    be interested in the information and the findings

6    from that trip.

7        Q.    And the overall context for you taking a

8    trip to Thrifty White was what?  What were you

9    trying to accomplish?

10            MR. KOBRIN:  Feel free to read it over

11   if you want to refresh yourself.

12            THE WITNESS:  So in preparation for our

13   move from the HBC warehouse to the GERX warehouse,

14   we were looking at expanding our refrigeration

15   capabilities and building a controlled substance

16   vault to add to our existing CIII to V cage, which

17   we had at the other HBC facility.

18       Thrifty White ran and operated both, well, I

19   guess vault cage and refrigeration.  And we're a

20   noncompeting share partner with them, so at times

21   we share information about our operations.

22   BY MR. BARTON:

23       Q.    So, in general terms, were you visiting

24   with maybe a peer or another organization's

25   operations that were sufficiently analogous to

Highly Confidential - Subject to Further Confidentiality Review

1    what Giant Eagle was considering doing, that you

2    were just gathering information you thought could

3    be helpful for Giant Eagle?

4         A.   Yes.  That's a fair assumption.

5         Q.   And were you in your role on this

6    team -- well, I'll just ask it.

7         What was your role on this team of people who

8    went to Thrifty White?

9         A.   So this is August 20 of 2015.  I took

10   the senior category manager position effective 8/2

11   of 2015.  So I'm 18 days on the job when this

12   email was sent.  I assume the trip was a day or

13   two prior.

14        So I was in charge of procurement as -- on

15   the trip.  We also had an IT person, a warehouse

16   person -- actually, two warehouse people, one

17   compliance person, and one IT person on the trip

18   with me.

19        Q.   So let's just identify who was who, to

20   help me.

21        You were procurement, I think you said.

22        A.   Yes.

23        Q.   So there was a compliance person on the

24   trip.  That was who?

25        A.   Joe Millward.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   And did you say there was an IT person?

2        A.   Yes.  Philip Raub.

3        Q.   And then Walt Durr was on the trip?

4        A.   Yeah, in addition to Christy --

5        Q.   Christy Hart.

6        A.   -- Hart.

7        Q.   And what were Walt Durr's and Christy

8   Hart's responsibilities, roles?

9        A.   I don't know their exact titles at this

10  time.  Walt Durr was responsible for overseeing

11  the HBC warehouse.  And Christy Hart was

12  supervisor of the pharmacy portion of the HBC

13  warehouse at that point in time.

14       Q.   And so taken in combination, your email

15  to the team -- well, let me just direct you to it.

16       It appears that in your second paragraph of

17  your email -- I'm looking on page 2 -- you say,

18  "Please chime into this email string with your

19  Thrifty White notes.  Don't worry about

20  duplication, just brain dump."

21       Do you see that?

22       A.   I do see that.

23       Q.   So, in essence, you were asking the team

24  to share with the team all of the notes that any

25  team member may have taken on that visit so
```

1    everybody could have access to the full

2    information?

3         A.   Yeah.  That's correct.  There were a lot

4    of conversations, and they do a lot of things that

5    we were interested in or we had been considering.

6    And it was a great share opportunity for the

7    teams.

8         Q.   And so Joe Millward responded to your

9    email that afternoon.  And as you asked, he said,

10   "Here are my notes."

11        And he wrote them and shared them with the

12   team; correct?

13        A.   Can you say that one more time.  Sorry.

14   I was trying to catch up.

15        Q.   Joe Millward's email that starts on

16   page 1 was a -- appears to have been a response to

17   your request to chime into this email string with

18   your Thrifty White notes.

19        Would you agree?

20        A.   I would agree.  He sent it about five

21   hours later.

22        Q.   And that's what his email is, is just,

23   "Here are my notes."  And it's the same Thrifty

24   White visit; right?  Do you agree?

25        A.   I would -- I agree.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   In his second paragraph he says, in his

2  notes, he says, "It is critical to have a robust

3  suspicious order monitoring program."

4      One, do you agree with that statement just as

5  a general proposition?

6      A.   Yes.  I agree.

7      Q.   And the next statement that he has in

8  his notes to the team is in quotes.  And it says,

9  "Relying on threshold is not good enough for the

10  DEA," end quote.

11      Do you see that?

12      A.   Yeah.  I do see that.

13      Q.   Do you interpret that statement in

14  quotes, in this context, as a statement from Joe

15  to the team that, you know, was more or less

16  quoting something told to him by someone at

17  Thrifty White on that visit?

18           MR. KOBRIN:  Object to form.

19           THE WITNESS:  I can't say for sure his

20  use of quotes in that particular case.

21  BY MR. BARTON:

22      Q.   That's fine.  You didn't write it.  I

23  just wondered what you might glean from that

24  statement.

25      Suffice it to say, that second paragraph,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   kind of in its entirety, deals with suspicious

 2   order monitoring; correct?

 3        A.   Bear with me one minute while I read it.

 4        Q.   Sure.

 5        A.   Okay.  Can you ask your question again.

 6        Q.   Yeah.  Really, the whole second

 7   paragraph of his notes, does that just concern

 8   kind of the subject of suspicious order monitoring

 9   procedures or policies?

10        A.   I would agree that it's one -- it's some

11   of the aspects they may have used.

12        Q.   And that subject was within Joe's real

13   area of interest as being the compliance person on

14   the trip.

15        Would you agree?

16             MR. KOBRIN:  Object to form.

17             THE WITNESS:  It's one of the interests

18   from the trip.  We were inspecting or having an

19   opportunity to see all aspects.

20        So it's not the only, but it was one of the

21   things he was interested in as part of the trip.

22   BY MR. BARTON:

23        Q.   Right.  And I noted, and it didn't

24   surprise me, that your notes from the trip don't

25   appear to have anything about discussions
```

1    concerning suspicious order monitoring, or at

2    least I didn't see them.  And that's not a

3    criticism.

4         I'm just trying to see if I'm right in that

5    Joe included that in his notes because he was

6    focused on that as the compliance person on the

7    trip.

8         A.   Yeah.  Everyone had a different focus.

9         Q.   And his was compliance; correct?

10        A.   He was in charge of compliance at that

11   time, yes.

12        Q.   So he's kind of addressing one of the

13   things he picked up about compliance on the trip.

14        That seems like a fair way to read that; is

15   that true?

16             MR. KOBRIN:  Object to form.

17        There are numerous other paragraphs here on

18   which are itemized -- most of which relate to

19   compliance other than that one.

20             THE WITNESS:  And there's a lot of

21   context in here.  I mean, there were a lot of

22   conversations that happened.

23        That paragraph you read is one of the things

24   that he highlighted from his conversations on the

25   trip.

```
 1                  (HBC-McClune Exhibit 8 was marked.)

 2   BY MR. BARTON:

 3        Q.   I hand you Exhibit 8.  This is a

 4   document with the first page Bates No.

 5   HBC_MDL00169475.  And our reference number is

 6   HBC 1198.

 7        Does this appear to you to be an email plus

 8   an attachment to the email that was sent from Joe

 9   Millward on Friday, August 28, 2015 to you and, it

10   looks like, three other people -- well, four

11   including George Chunderlik.

12        A.   Yes.  It appears to be an email with an

13   attachment sent to those people.

14        Q.   Do you believe this to be an email that

15   you received at Giant Eagle on that day?

16        A.   Yeah.  We can -- I'll agree that it

17   definitely landed in my inbox.

18        Q.   But I'll ask you anyway.  Do you recall

19   receiving this?

20        A.   This specific email, no.  I get 400 to

21   500 emails a day.

22        Q.   Is this -- well, what does this email

23   do?  What's he conveying to the recipients?

24             MR. KOBRIN:  Object to form.

25        Do you want him to just interpret the email
```

1    from reading it now?  If he has no recollection of

2    it, I'm not sure what the value of that is.

3    BY MR. BARTON:

4        Q.   Would you agree that in this email

5    Mr. Millward is sending an attachment, and he says

6    in the first line, "Here is the policy we

7    submitted for VAWD"?

8        Do you agree with that?

9        A.   I read the first sentence.  It does say

10   that, yes.

11       Q.   And do you believe that the policy we

12   submitted for VAWD is in reference to the attached

13   two-page document?

14       A.   It looked like his statement and the

15   document are related, yes.

16       Q.   And so do you know why he was forwarding

17   that to you and the other recipients on August 28?

18       A.   Based on his email, it looks like it's

19   an FYI.

20       Q.   And why might he have been sending it as

21   an FYI at this period of time?  Do you know?

22            MR. KOBRIN:  If you know.

23            THE WITNESS:  I'd be speculating.

24   BY MR. BARTON:

25       Q.   In the second, I guess, paragraph, at

1    least the line that starts, "We have threshold

2    monitoring...", do you see that?

3         A.   I do see that.

4         Q.   He says, "We have threshold monitoring

5    that uses an average company movement for each

6    scheduled chemical entity."

7         Correct?

8         A.   Correct.

9         Q.   And we've already gone over that.  But

10   would you agree, that kind of accurately describes

11   at least that aspect of threshold monitoring by

12   the company at that time?  True?

13        A.   I agree that that is one of the aspects

14   used for threshold monitoring at that time, yes.

15        Q.   And in terms of any generation of daily

16   threshold reports within the company at that time,

17   that was the only threshold used for that purpose;

18   correct?

19        A.   Restate that.

20        Q.   Yeah.  Would you agree that was the only

21   threshold, that is average company movement, that

22   was the only threshold being used for purposes of

23   generating those daily threshold reports at that

24   time?

25        A.   That was the only threshold used in the

1  daily threshold report, yes.

2      Q.   And he says -- continues, "...but the

3  thresholds are not customized to individual store

4  movements."

5      Do you see that?

6      A.   I do see that.

7      Q.   And does that also accurately reflect

8  how the thresholds were used for purposes of

9  generating the daily threshold reports at that

10 time?

11     A.   Yes.  Because it's not customized by

12 store.  The store is picked up in some of these

13 subsequent bullets that he has listed on here.

14     Q.   And then the last sentence at the bottom

15 of his main paragraph there says, "Team members at

16 the distribution center identify unusual pick

17 quantities and escalate the flagged items to the

18 facility supervisor who escalates the issue to the

19 G pharmacy team."

20     Did I read that correctly?

21     A.   Your dictation is accurate.

22     Q.   And is he also then in that part of his

23 email describing that part of a suspicious order

24 monitoring program that the company was using at

25 the time?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I agree, but you did skip over these
 2   other two points on here.
 3        Q.   I did.  And we can go over them.  I was
 4   just referring to the one we had already talked
 5   about, and, actually, my colleague may ask you
 6   some things about Supplylogix.  So I was just
 7   trying to save some questions for her.
 8        In fairness, there's two additional points in
 9   this email describing Supplylogix and its
10   functionality in terms of trying to also help in
11   the suspicious order monitoring program; is that
12   true?
13        A.   Yes.
14        Q.   So when he sent this email attaching
15   this policy, this written policy that he says was
16   submitted for VAWD, and then the remainder of his
17   email, which he leads by saying, "The execution
18   occurs as follows," do you think that email in its
19   entirety kind of -- fairly summarizes the
20   execution of Giant Eagle's suspicious order
21   monitoring program at this point in time?
22        A.   From the perspective of the warehouse,
23   it's still lacking the inventory receipt, the
24   incoming product, the on-hand counts, the invoices
25   going out.
```

1          So there are other things that we're doing

2     that aren't included in his email here.

3          Q.   Other things, you're referring to other

4     things that happened at the warehouse?  Is that

5     what you're referring to?

6          A.   I was using the warehouse as a

7     perspective.  There were other things.  They had

8     retail counts, daily counts on certain substances,

9     prescription drug monitoring at retail looking for

10    bad docs, bad patients, et cetera.

11         Q.   Understood.  And I understand you to

12    be -- kind of when you expanded that and described

13    more things, aren't you kind of talking about

14    really controlled substance monitoring and

15    controls, broadly?

16         Not just suspicious orders for a distributor;

17    fair?

18         A.   We're really going after interpretation

19    of the exact way it's written, not necessarily the

20    contextual feeling at the time.

21         There's -- many of those terms can be used

22    interchangeably, so I don't want to limit the

23    scope by saying this is everything we do for that.

24              (HBC-McClune Exhibit 9 was marked.)

25

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BARTON:

2         Q.   I'm handing you Exhibit 9, which is just

3    a one-page document, HBC_MDL00169466, and our

4    reference HBC 1248.

5         You have Exhibit 9 in front of you?

6         A.   Yes.  I have Exhibit 9.  Sorry.

7         Q.   Not a problem.  Does the top email

8    appear to be an email from you, on Friday,

9    August 29, 2015 at the time of 16:41:46, to Joe

10   Millward, Erin Hart, Philip Raub, and John Hutten,

11   copying George Chunderlik?

12        A.   Yes.

13        Q.   And was this an email that you sent to

14   them responding to the email we just looked at as

15   Exhibit 8 from Joe Millward?

16        A.   Yes.  It appears to be in direct

17   response to the previous email.

18        Q.   And you say in the email after "Thanks,

19   Joe," "I would say the highlighted below need to

20   be further developed, especially the team member

21   discretion one."

22        Correct?

23        A.   Yeah.  I see that, but I can't see the

24   highlight.

25        Q.   I can't either, and that may be just an

```
1    artifact of digital saving and reproduction.

2         So that was going to be my question,

3    initially, is:  Do you know what you highlighted

4    at this point in time when you look at this email?

5         A.   I wish I could say I did.  That would

6    help.  But I can't tell.

7         Q.   Suffice it to say, it would appear that

8    you had highlighted something below and expressed

9    your opinion that there was a need to further

10   develop that which you highlighted; correct?

11        A.   It would be safe -- per this email, it

12   looks like I'm recommending that.  I can't tell

13   which part or parts.

14        Q.   And as you sit here, you don't recall

15   what you thought from the email below needed to be

16   further developed at the time you sent that email.

17        A.   No.  I don't recall.

18        Q.   You especially call out the team member

19   discretion one; true?

20        A.   Yes.  It does say team member

21   discretion.

22        Q.   And so that's a reference to that last

23   sentence in his email there about team members at

24   the distribution center identify unusual pick

25   quantities; right?
```

```
 1          A.   Can't say for sure.  Because the other

 2    items also may contain discretion that would be

 3    interpretation of team members.  So I'd be

 4    speculating if I confirmed what you said.

 5          Q.   Well, at a minimum, you would agree that

 6    the last item that Joe had talked about, the team

 7    members at the distribution center identifying

 8    unusual pick quantities, that, as he describes it,

 9    that process would involve team member discretion.

10          Would you agree?

11          A.   I'm not certain, because I wasn't

12    responsible for the warehouse at the time.  For

13    all I know, they had guidelines on what they had

14    to flag or not flag.

15          Q.   Well, do you know one way or the other

16    whether they had guidelines on what to flag or not

17    flag?

18          A.   No.  I wish I did.  I don't, no.

19          Q.   So, I mean, that -- so as you sit here,

20    you aren't sure, when you said team member

21    discretion, on what you were referring to below.

22    Is that what your testimony is?

23          A.   Yeah.  I can't -- because it's not

24    highlighted, I can't see what's highlighted, and I

25    don't recall this email specifically, I can't tell
```

1    you.  It's been three and a half years now.

2         And I have three kids, so imagine.

3              (HBC-McClune Exhibit 10 was marked.)

4    BY MR. BARTON:

5         Q.   I'm handing you what we've marked as

6    Exhibit 10, which is a multi-page document.  First

7    page is HBC_MDL00127457, and our reference number

8    is HBC 1249.

9         This appears to be a series of emails that

10   start on August 27, 2015.  That's the first email

11   chronologically that I see in this document at the

12   bottom of the first page.  Do you see that?

13        A.   Bottom of the first page?

14        Q.   Um-hum.  I mean, that's where that email

15   starts.

16        A.   Okay.  This email starts, okay.

17        Q.   Yeah.  I don't see an earlier one, I

18   guess is what I'm saying.  That's where I --

19   that's where I think I see this chain beginning.

20        A.   It's just attachments.  So just to

21   confirm, these attachments are associated to this

22   email from Erin; is that correct?

23        Q.   Well, let's go through it and see if we

24   can figure that out.

25        A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   That's really -- that's my

 2   interpretation, but I want to know what yours is

 3   since you're on the email, so...

 4        So looking at this document, let's just kind

 5   of walk through it chronologically, and let me ask

 6   you kind of what you either remember or can tell

 7   us about this document.

 8        So the email on August 27, 2015 at 5:22 p.m.

 9   was from you to the people named there in the To

10   and the cc lines; correct?

11        A.   Yes.

12        Q.   From reviewing this now, as you have

13   just for a few moments, do you recall sending this

14   email and participating in this exchange?

15        A.   I do not recall this email specifically,

16   but I do recall the events around this time.

17        Q.   And you don't dispute that the first

18   email, the one on the bottom, on Thursday,

19   August 27 at 5:22, was an email that was sent by

20   you to those team members; correct?

21        A.   I do see my name there, yes.

22        Q.   The subject of your email was Vault

23   Refrigeration; true?

24        A.   Yes.  It is true.

25        Q.   You reference in your first paragraph
```

1    after saying, "Team," you say, "I realize that

2    much of this may end up being overkill, but I want

3    us to be 100 percent prepared for the inspection,

4    and some of these items, if missed, could be

5    costly mistakes."

6        Correct?

7        A.    That is what that says, yes.

8        Q.    So do you recall what inspection you're

9    referring to in that statement?

10       A.    Bear with me for a second.  This email

11   is quite lengthy.  I'm going to review.

12       Q.    That's fine.

13       A.    I don't remember for certain.

14       Q.    To be clear, you don't remember for

15   certain what inspection was being referenced

16   there?

17       A.    Correct.  Yeah.  I do not recall which

18   inspection.

19       Q.    But do you appear to be referencing some

20   anticipated inspection of the GERX, G-E-R-X,

21   facility that was in process to be opened?

22            MR. KOBRIN:  Object to form.  Asked and

23   answered.

24            THE WITNESS:  Yes.  That would appear to

25   be correct.

1    BY MR. BARTON:

2        Q.   The first bullet point that you address

3    in your list of items is suspicious order

4    monitoring.

5        Do you see that?

6        A.   I do see that.

7        Q.   And then it appears that you have

8    several subpoints under that heading with a name

9    attached to each one.

10       And you've got three things that it looks

11   like you've attributed or listed with Joe Millward

12   and one for you; correct?

13       A.   That does appear to be correct.

14       Q.   Are you really kind of trying to confirm

15   or make assignments there, both to yourself and to

16   Joe, to make sure certain things get done with

17   respect to suspicious order monitoring there?

18       A.   That appears to be what I'm doing here.

19       Q.   And for you, specifically, you've

20   reminded yourself in these notes to reach out to

21   Thrifty White to see if they could share a little

22   more about how they monitor; correct?

23       A.   That is correct.

24       Q.   Why do you think you were interested in

25   that at that point in time?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Referring back to; the subject, we were

2   preparing to open a vault.  We're nine days, eight

3   days post our trip out to see Thrifty White.  We

4   were looking at building our SOPs and process for

5   maintaining and managing a vault.

6        Q.    And did you have -- well, let me ask

7   this:  Did Joe kind of report to you within the

8   context of this particular team?

9        A.    No.  Not really, no.

10       Q.    It was maybe not a good way to ask the

11  question.  Did you have primary responsibility for

12  the vault and refrigeration pieces of opening the

13  GERX facility?

14       A.    Technically speaking, no.

15       Q.    Who did?

16       A.    It would have been the head of pharmacy

17  at that point in time and the head of warehouse

18  operations for Giant Eagle.

19       Q.    I understand.  So ultimate

20  responsibility were people above you in the

21  organizational chart is what you're saying?

22       A.    Yes.

23       Q.    Within the context of this team, was

24  there kind of a hierarchy of somebody who had

25  primary responsibility?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No definitive hierarchy.

 2        Q.    Joe says -- or excuse me -- I think

 3   these are your words if I'm interpreting it right.

 4        You have listed your first bullet for Joe

 5   Millward, "Work on figuring out what we have in

 6   place throughout our supply chain so we can better

 7   understand our gaps."

 8        Do you see that?

 9        A.    I do see that.

10        Q.    Do you have any recollection of what

11   gaps you may have been concerned about having in

12   your supply chain at that point in time with

13   respect to suspicious order monitoring?

14             MR. KOBRIN:  Object to form.

15             THE WITNESS:  I have no recollection of

16   gaps, but the business constantly changes, so an

17   extra look was certainly in order here.

18             (HBC-McClune Exhibit 11 was marked.)

19   BY MR. BARTON:

20        Q.    I'm handing you Exhibit 11.

21             MR. KOBRIN:  This is a big document.  Do

22   you want to take a break before?  Is it going to

23   be a lot of questions or --

24             MR. BARTON:  It won't be that many, but

25   we can certainly -- I don't know where we are on
```

Highly Confidential - Subject to Further Confidentiality Review

1    time.  I'm not looking at the clock.  It's

2    probably a good time.  Okay.  Let's go ahead and

3    take a break.

4        I mean, I'm not trying to set him up, but I

5    don't have that many questions about it.  It's

6    relatively self-explanatory how it relates to the

7    last one, I think.

8        But, yeah, take a look.  Take your time.

9            MR. KOBRIN:  Do you want to take a break

10   or do you want to keep on?

11           THE WITNESS:  Why don't we take a break.

12           THE VIDEOGRAPHER:  2:53 p.m., we're

13   going off the record.

14           (Recess from 2:53 p.m. to 3:19 p.m.)

15           THE VIDEOGRAPHER:  We're now back on the

16   record.  The time is 3:19 p.m.

17   BY MR. BARTON:

18       Q.   I hand you what we marked as Exhibit 11.

19   It's kind of a big, thick document.

20       What it appears to be is an email from -- the

21   top email in the chain, top of the first page, is

22   that an email from you on Monday, August 31, 2015

23   to some of the same people you've been emailing

24   with in previous exhibits, Philip Raub, John

25   Hutten, Joe Millward, Richard Shaheen, Walt Durr,

Highly Confidential - Subject to Further Confidentiality Review

1    and then a few people copied on the cc line?

2        Correct?

3        A.    Yes.

4        Q.    And are you, in that email, forwarding

5    to that group of recipients the attached Thrifty

6    White policies for CII vault management, and

7    you're telling them, "We can use these as a

8    reference as we craft our own internal processes"?

9        A.    That is what I'm saying.

10       Q.    And the email below that is to you from

11   Becky Wilson at Thrifty White earlier that same

12   day.  And she was attaching the copy of, she says,

13   our policies and procedures" and other things and

14   forms that they use and a training guide; correct?

15       A.    I do see that.

16       Q.    So there's also, on the second page, a

17   couple of emails of thank yous, and kind of

18   appears just sort of post visit to Thrifty White

19   between you and a Justin Heiser; correct?

20       A.    Yes.

21       Q.    Starting on the fourth page of this

22   document then really all of the rest of the

23   exhibit are the attachments that are kind of

24   described in the attachments line of your email to

25   everyone on August 31; is that correct?

1     A.   That's what it appears to me.  I have

2   not flipped through every page, to be clear.

3     Q.   That's fine.

4     Fair to say that you felt there was value at

5   that time, at the time you sent this email, you

6   felt there was value in circulating -- both

7   receiving and circulating to the team the Thrifty

8   White policies for controlled substance CII

9   management and vault management; correct?

10          MR. KOBRIN:  Object to form.

11          THE WITNESS:  Yes.  Anything that helped

12   us improve or get better were -- was of value, in

13   my opinion.

14   BY MR. BARTON:

15     Q.   And at that point in time, in August of

16   2015, August 31 of 2015, as we've -- as I think

17   you've testified, Giant Eagle was preparing to

18   start distributing CII, Schedule II, controlled

19   substances for the first time in its GERX

20   facility; correct?

21     A.   Yeah.  That would be the case.

22     Q.   But it's also true, as of that point in

23   time, that at least for almost a five-year period,

24   from 2009 to 2014, that HBC, as a part of Giant

25   Eagle, had distributed Schedule III controlled

1  substances from its HBC warehouse; correct?

2      A.   Yes.

3      Q.   Did you feel like the Thrifty White

4  policies that you had received and presumably

5  reviewed, did you feel like those would give your

6  team a good starting point on comparable policies

7  for controlled substance management and compliance

8  for your GERX warehouse?

9          MR. KOBRIN:  Object to form.

10         THE WITNESS:  I thought it would give us

11 another perspective.  I don't know if there was

12 anything my team would find value in, but it's

13 better than no comparison.

14 BY MR. BARTON:

15     Q.   And at least internally, did you feel

16 like there wasn't a good comparison of internal

17 documents already in existence at Giant Eagle?

18         MR. KOBRIN:  Object to form.

19         THE WITNESS:  There was already internal

20 documents, because we had been doing and have been

21 doing and managing controlled substances

22 transcending all these time periods.

23         (HBC-McClune Exhibit 12 was marked.)

24 BY MR. BARTON:

25     Q.   I handed you what we've marked as

1    Exhibit 12.  It's also another similarly thick

2    document with an email on the top.  And its

3    beginning Bates number is HBC_MDL00042149.

4        Do you see that?

5        A.   I do see that.

6        Q.   And is this an email from you to George

7    Chunderlik, Joe Millward, Adam Zakin, cc'g Philip

8    Raub, dated September 16, 2015, again forwarding

9    the Thrifty White controlled substance policies?

10       A.   Yeah.  That is the case.

11       Q.   And really, does it appear to be the

12   same set of policies that you had previously

13   forwarded to some of the same people but some

14   different people also back a couple of weeks

15   earlier on August 31?

16       A.   Yeah.  It appears to be the same set of

17   documents, slightly different group on the to

18   line.

19       Q.   And do you recall, as you now look at

20   this document, whether there was some different

21   purpose in sending these policies to that slightly

22   different group on the to line?

23       A.   I don't recall specifically.

24       Q.   In your email, you have a statement

25   there after you tell the team you've attached the

1    policies and procedures documents you received

2    from Thrifty White, you have a statement there

3    that starts, "Pam Menerey..."

4         Do you see that?

5         A.   Yeah.  I do see that.

6         Q.   You know, I don't see her on the email

7    and I don't know who she is.

8         Who is Pam Menerey?

9         A.   I believe she's one of the women at

10   Thrifty White that gave us the tour.

11        Q.   And it's possible her name shows up on

12   an earlier email.  I'm not trying to trick you.  I

13   didn't see it.

14        But that's what your recollection is:  You

15   may be just referencing her there because she, you

16   think, may be connected to Thrifty White?

17        A.   This email appears as if I'm sending

18   this to the team, and I'm sending a comment or a

19   series of comments from Pam and a comment from

20   Justin Heiser to the team.

21        Q.   As you read this now, do you believe

22   that when you said, following Pam Menerey, "We

23   developed it internally and established thresholds

24   based on a rolling 30-day purchase history that is

25   reported and reviewed daily," do you believe that

1    is a statement that you're reporting as having

2    been said to you by Pam Menerey?

3        A.   Yes.

4        Q.   So you may be describing -- or, I should

5    say, relating or relaying her description of kind

6    of the Thrifty White process?

7        A.   Yes.  I'm not sure if it was I talked to

8    them on the phone or some other method.  But as I

9    read this today, that's my interpretation.

10       Q.   And Justin Heiser, he was from Thrifty

11   White also; correct?

12       A.   Correct.  He's the SVP of operations for

13   Thrifty at this time.

14       Q.   And so you are relating to the team that

15   he told you or you recall him telling you that --

16   he was asking you, let him know if you see

17   anything missing or if Giant Eagle gets any

18   feedback from the DEA that they might find

19   helpful; is that right?

20       A.   Yes.  That's how I read it.

21       Q.   And then you finish by saying, "I would

22   use these as a starting point."

23   Correct?

24       A.   That is what I said.

25       Q.   And by saying these, you're referring to

Highly Confidential - Subject to Further Confidentiality Review

1    the attached policies and procedures you were

2    forwarding to the team?

3              MR. KOBRIN:  Object to form.

4              THE WITNESS:  Yeah.  But I think this is

5    more of a starting point as they build processes

6    for the new CII distribution, just to be clear.

7    BY MR. BARTON:

8         Q.   And Thrifty White, having been

9    distributing CIIs, you would agree at that point

10   in time had a more robust set of policies and

11   procedures for controlled substance compliance

12   than Giant Eagle had?

13             MR. KOBRIN:  Object to form.  Misstates

14   the evidence and the testimony.

15             THE WITNESS:  Yeah.  I can't agree or

16   disagree with that.  If you'd like to restate your

17   question.

18   BY MR. BARTON:

19        Q.   Well, I guess I'm just asking:  In

20   forwarding the Thrifty White policies and

21   procedures to this group and recommending that

22   they use them as a starting point -- which is what

23   you did; correct?

24        A.   Yes.

25        Q.   In doing that, you were not directing

1  this team to a set of existing Giant Eagle

2  controlled substance policies to use as a

3  startling point; true?

4        MR. KOBRIN:  Object to form.

5        THE WITNESS:  I can't say what the

6  starting point was.  It could be the starting

7  point for one of the things they'd used for their

8  process, one of the things they had augmenting its

9  existing documentation.

10     At this point in time we weren't distributing

11  CIIs.

12  BY MR. BARTON:

13     Q.   The group that you were forwarding this

14  to, George Chunderlik, Joe Millward, and Adam

15  Zakin, did they have responsibilities for

16  controlled substance compliance for Giant Eagle

17  and its new GERX family?

18     A.   I reported directly to Adam Zakin at

19  this point in time.  Joe Millward, I'm not sure

20  who he reported to, but he was senior manager of

21  compliance, and George was manager of compliance.

22     So based on their title, and I don't know

23  their full job description by heart, but they were

24  responsible for compliance where these documents

25  could be beneficial as they build out additional

Highly Confidential - Subject to Further Confidentiality Review

```
 1    policies and procedures.

 2        Q.   And it wasn't your responsibility at

 3    that point in time, ultimately, to put together

 4    whatever controlled substance policies Giant Eagle

 5    was going to have in place for GERX; correct?

 6        A.   That's correct.

 7             (HBC-McClune Exhibit 13 was marked.)

 8    BY MR. BARTON:

 9        Q.   I'm handing you Exhibit 13.  This is a

10    multi-page document, starts Bates

11    No. HBC_MDL00028251.  And this appears to have as

12    the top email on page 1 an email from you to

13    George Chunderlik, cc'g Joseph Millward.  And this

14    is on October 8, 2015.

15        Do you see that?

16        A.   Yeah.  I do see that.

17        Q.   And does this appear to be you

18    forwarding to Joe Millward and George Chunderlik

19    documents relating to suspicious order monitoring

20    and regulatory compliance and related matters that

21    you had received from Mallinckrodt?

22        A.   Yeah.  So Bonnie New was our rep with

23    Mallinckrodt at that particular point in time, and

24    she provided these documents.

25        Q.   To you; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yeah, to Giant Eagle.  Because, in

 2   discussion, they knew we were in the process of

 3   opening up a controlled substance vault

 4   potentially, and Mallinckrodt has experience in

 5   that space.

 6        Q.   So, again, you were being helpful.  You

 7   were receiving documents that may be relevant to

 8   the compliance people especially and forwarding

 9   them on to compliance people; is that fair?

10        A.   I love to learn from other people.

11        Q.   But that's what you were doing there?

12        A.   Yes.

13        Q.   So it was really kind of, just in the

14   same vein, as forwarding the Thrifty White

15   documents; correct?

16             (HBC-McClune Exhibit 14 was marked.)

17   BY MR. BARTON:

18        Q.   I handed you Exhibit 14.  This is a

19   five-page document, and the first page is Bates

20   No. HBC_MDL00056199, and reference No. 5030.

21        Does this appear to you to be an email from

22   Joe Millward on Thursday, December 3, 2015 to you

23   and a number of other people, both in the to line

24   and the cc line?

25        A.   It does appear to be from Joe and it
```

```
 1   does go to me.

 2        Q.   And Joe says, "Team, attached is the

 3   latest draft of the SOM procedures for the Giant

 4   Eagle order monitoring system policy."

 5        Correct?

 6        A.   That is what Joe says.

 7        Q.   So does this reflect that as of

 8   December 3 of 2015, the process internally within

 9   Giant Eagle of, you know, trying to take all the

10   information that had been gathered prior to this

11   time, including things we've seen that you

12   forwarded, and start putting together Giant

13   Eagle's own order monitoring system and policy?

14        This just reflects part of that process, a

15   step in that process?

16             MR. KOBRIN:  Object to form.  Assumes

17   facts not in evidence.

18             THE WITNESS:  Can you repeat the

19   question.

20   BY MR. BARTON:

21        Q.   Yeah.  I'm just sort of asking for your

22   interpretation of what's going on here.  So I

23   don't know the easiest way to ask that.  So I'll

24   ask it that way.

25        What's going on here?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. KOBRIN:  If you know.

2     It's not an email from the deponent.

3          MR. BARTON:  No, but it's an email to

4  him.

5          MR. KOBRIN:  It is.

6          THE WITNESS:  It appears Joe was sending

7  this for feedback as we were developing procedures

8  for our new warehouse.

9  BY MR. BARTON:

10     Q.   Right.  And the procedures specifically

11  that are being in development in this email are an

12  order monitoring system policies and procedures;

13  correct?

14     A.   That is what it's called in this email.

15     Q.   And you were a part of the team that Joe

16  wanted feedback from on these order monitoring

17  system policies and procedures; correct?

18     A.   I would assume that's why he sent it to

19  me.

20     Q.   If you go to page -- gosh, it's the last

21  page of the bullet points before the form, the

22  investigation form right at the end.

23     The very last bullet point, there is -- and

24  this is just a draft; correct?

25     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   His email says he's just sending a

2  draft, this is looking for feedback; correct?

3    A.   It appears very much so in draft form.

4    Q.   Right.  At this point, the draft that

5  he's putting together contemplates that there

6  would be an OMS review committee, and it would

7  consist of the following team members that he's

8  kind of identified by title; right?

9    A.   That does appear what -- to be what this

10  draft says.

11    Q.   And a couple of bullet points above

12  that, it just talks about the OMS review committee

13  that's being contemplated there.

14    And it says, "The OMS review committee will

15  evaluate the effectiveness of the OMS in

16  identifying orders of unusual size, pattern, or

17  frequency."

18    Correct?

19    A.   That is what it says.

20    Q.   And then it says, "The committee will

21  make appropriate recommendations to improve the

22  function and efficacy of the system."

23    Correct?

24    A.   That is what the next sentence says.

25    Q.   Did the OMS review committee, in more or

1    less the form that he is describing it there, come

2    into existence sometime after this December 3,

3    2015?

4         A.   I don't recall specifically.

5         Q.   Are you -- well, is your title listed in

6    there?  In those list of titles, would that be --

7    as of December 3, 2015, would you have been a part

8    of that committee had it been formed as described

9    there?

10        A.   Yeah.  In the draft here, I would be the

11   third bullet from the bottom, senior pharmacy

12   category manager.

13        Q.   Right.  Okay.

14        A.   Again, don't know what the final version

15   of this document said.

16        Q.   Right.  And certainly not representing

17   that it is the final, it's clearly a draft.  But I

18   just wondered if that kind of ended up turning

19   into a committee as it was described in the draft

20   form there.

21        Are you a member -- in your current position,

22   are you a member of any committee that monitors or

23   evaluates the order monitoring system of Giant

24   Eagle on an ongoing basis?

25        A.   Can you define committee?

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Well, no.  A committee that Giant Eagle

2   might call or describe itself as a committee.

3          Is there a committee formed, as such, and

4   called a committee that reviews the order

5   monitoring system?

6      A.   I can't say there is or is not, correct.

7   There is groups of people that meet to improve

8   things like this on an ongoing basis.  I don't

9   know if it's called what's stated in this draft

10  document.

11     Q.   Are you a part of such a group that

12  meets on an ongoing basis to review things like

13  that?

14     A.   I am called upon at times to take part

15  in meetings where content like this is and could

16  be discussed.

17          (HBC-McClune Exhibit 15 was marked.)

18  BY MR. BARTON:

19     Q.   I'm handing you Exhibit 15.  Exhibit 15

20  is a two-page document that appears to be an email

21  from you to Joe Millward, Jessica Boyd, George

22  Chunderlik, Adam Zakin, and Justin Daugherty; is

23  that correct?

24     A.   Yes.

25     Q.   And this email is dated Monday,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    September 28, 2015; true?

 2         A.   Yes.  That is what it says.

 3         Q.   And the subject is Control Blocking

 4    Policy and Procedure.  Do you recall sending this

 5    email?

 6         A.   I don't recall sending this email

 7    specifically.

 8         Q.   Do you recall drafting the email?

 9         A.   I don't recall putting this into Outlook

10    specifically.

11         Q.   Do you have any reason to question its

12    genuineness as reflecting an email actually sent

13    by you to those people as part of your job?

14         A.   No.  It looks like, contextually, things

15    that we would have been working on at that time.

16         Q.   And you say here, "Based on our call

17    from Friday, here's how I see the current process

18    working in the short term knowing that an overhaul

19    is imminent considering the GERX distribution

20    facility at FFM will be handling CIIs shortly."

21         Right?

22         A.   Yes.  That's what it says.

23         Q.   And so what process are you really

24    describing here?  You said, "This is how I see the

25    current process working."
```

1       What is the process that you're describing in

2    this email?

3            MR. KOBRIN:  Give him a chance to read

4    through the whole thing.

5            MR. BARTON:  Sure.

6            THE WITNESS:  Yeah.  If you give me one

7    minute or you'd to comment on a specific bullet.

8    BY MR. BARTON:

9       Q.   No.  I'll let you read it.  Go right

10   ahead.

11           MR. KOBRIN:  Read it for context.

12           THE WITNESS:  Okay.

13   BY MR. BARTON:

14      Q.   You've had a chance to read it?

15      A.   Yes.

16      Q.   So what process are you describing in

17   this email to this team of people you're sending

18   it to?

19      A.   In bullet No. 1, "McKesson and Anda

20   blocks the controlled substance order to the store

21   based on their managed thresholds."

22      So when that occurs -- so Giant Eagle fills

23   prescriptions for -- valid prescriptions for

24   customers on an ongoing basis.  Sometimes volume

25   and demand goes up.

1        McKesson and Anda maintained thresholds

2    internally, but they don't have full purview of

3    Giant Eagle's purchases from all entities in our

4    prescriptions to all customers.

5        So at times they would block an order for

6    which we'd have to provide data and answers to a

7    series of questions at times back to these

8    distributors.

9        And what we're attempting to do is streamline

10   that process so we can have faster turnaround on

11   these and get it back to the distributors faster,

12   getting, if approved, the prescriptions or the

13   medications needed in order to fill customer

14   prescriptions.

15       Q.   So you're describing a process that --

16   how you see the current process working when

17   McKesson or Anda blocks a controlled substance

18   order from a store; correct?

19       A.   That is correct.  I mean, some of this

20   might be out of context.  Some of this might be me

21   trying to better understand this.

22       I know that at this time we had instances

23   where stores were potentially cut off for a

24   particular medication, and we had to go through a

25   process of asking for additional product in order

Highly Confidential - Subject to Further Confidentiality Review

1   to fill valid prescriptions.

2       Q.   Right.  Because if a store's orders are

3   blocked for any product -- but controlled

4   substances are what we're talking about here.

5       If a store's orders are blocked, that could

6   create a problem for that store in being able to

7   fulfill prescriptions and really orders from its

8   customers for those medications; correct?

9       A.   That's correct.  And this would also

10  apply to any medications on allocation, not just

11  controlled substances.

12      Q.   And so when you say you're trying to

13  streamline the process, you are wanting the

14  process of resolving a blocked order, one way or

15  another, either in favor of the order being

16  approved or rejected, you're wanting to make that

17  process be as efficient and quick as possible for

18  the store's benefit; is that true?

19      A.   Yeah.  Certainly an opportunity to

20  streamline and improve was in order at that point

21  in time.

22      Q.   But you were constrained by what

23  McKesson or Anda would require in terms of

24  resolving an order that they had blocked.

25      They had certain requirements that they were

1    expecting of Giant Eagle in order to evaluate and

2    resolve one of those blocked orders; correct?

3         A.   They would, and they would vary over

4    time based on the situation.

5         Q.   So this email to the team is just trying

6    to help this team of people understand your

7    understanding of how Giant Eagle is addressing

8    those blocked order situations from Anda and

9    McKesson and to do so as efficiently as possible.

10        A.   That's correct.

11        Q.   McKesson and Anda blocking an order, you

12   indicate in this email that this starts -- the

13   process you're discussing starts with McKesson or

14   Anda blocking a controlled substances order --

15   substance order to the store based on their

16   managed thresholds.

17        I understand you're referring there to

18   McKesson or Anda managed thresholds; is that

19   right?

20        A.   That's correct.

21        Q.   So they have their own threshold system

22   they were applying to orders made to their

23   warehouses for controlled substances?

24        A.   That's correct.

25        Q.   And did they have a system in which if

1    thresholds -- however they determined their

2    thresholds, that was up to them; right?

3        A.   Yeah.  We had no say in how they set

4    their thresholds.

5        Q.   So did they have a system in which if an

6    order from a store for a controlled substance

7    exceeded their threshold, that an order might be

8    just automatically blocked by their system?

9            MR. KOBRIN:  Object to form.

10           THE WITNESS:  That is what would happen,

11   yes.

12   BY MR. BARTON:

13       Q.   And, therefore, that created this

14   process you're describing, which is, what can we

15   do when that happens to, you know, efficiently and

16   correctly address the blocked order?

17       A.   That's correct.

18       Q.   Did your system at HBC during the time

19   that HBC was distributing Schedule III controlled

20   substances, did your system automatically block

21   orders when a given store's order might exceed the

22   thresholds that your system had put in place?

23           MR. KOBRIN:  Object to form.  You're

24   assuming that he understands exactly how the

25   McKesson -- I mean, he sees when it gets blocked.

 1        But is there an assumption here that he

 2   understands how the blocking system works at

 3   McKesson?

 4            MR. BARTON:  No.  My question is about

 5   the HBC system.

 6            MR. KOBRIN:  Well, you just asked him to

 7   compare it.  I mean, when you say blocked, you

 8   mean as in how you're referring to what you

 9   believe the McKesson system does; correct?

10            MR. BARTON:  I just asked him some

11   questions about this response to the McKesson

12   system based on his understanding.

13        I don't need him to testify about the details

14   of how McKesson blocks.  I'm asking him --

15            MR. KOBRIN:  I don't know if he knows

16   any of those details.

17            MR. BARTON:  I'm not asking him.

18            MR. KOBRIN:  Well, you said automatic.

19   That's the only concern I have as to whether

20   he's internalizing.  I just want to make sure the

21   record is clear.

22        Maybe you can clarify whether he knows

23   whether the McKesson system automatically does

24   anything.

25            MR. BARTON:  Well, let me just ask the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    question and see what happens.

 2    BY MR. BARTON:

 3        Q.   To your knowledge, did HBC's system for

 4    comparing orders to threshold levels that you've

 5    testified about, and we've talked about earlier

 6    today, did HBC's system have as a function of that

 7    system a blocking of an order that was identified

 8    as above the threshold?

 9        Did that happen, you know, automatically?

10            MR. KOBRIN:  Object to form.

11            THE WITNESS:  Just because an order was

12    above a threshold didn't mean the order was

13    necessarily suspicious or diverted in any way.  So

14    there was --

15    BY MR. BARTON:

16        Q.   Right.  Understanding that --

17            MR. KOBRIN:  Can you let him finish.

18            THE WITNESS:  There was a process to

19    block what would be deemed as orders of interest

20    from going and being distributed to the stores

21    until they were reviewed thoroughly.

22        I'm not a hundred percent familiar on the

23    technical aspects of how that worked, but there

24    was a process in place to do that.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BARTON:
 2        Q.   Okay.  So whatever process then that
 3    you're not apparently familiar with the technical
 4    aspects of, but whatever process was in place as
 5    you understand it at HBC to -- that would result
 6    in the blocking of an order by a store for
 7    controlled substances, that process was not
 8    something that you coded into the daily threshold
 9    report monitoring system.
10        A.   No.  There's a lot of programming that
11    goes into a lot of different aspects.  It's -- you
12    know, we've talked about it being Excel workbook.
13    It's way more than that, and it has to interact
14    and integrate with a lot of different systems
15    within Giant Eagle.
16        So I'm not responsible for any application
17    integration with other warehouse management
18    systems.
19        Q.   To your knowledge, was there an
20    automated -- computer-coded, automated generated
21    blocking of an order based on the exceeding of a
22    threshold?  Or did it require some manual review,
23    investigation before an order would be blocked?
24            MR. KOBRIN:  Object to form.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BARTON:

 2        Q.   If you know.

 3        A.   Yeah.  I don't know how it worked

 4   because I wasn't responsible for that team.  But

 5   we're a captive distributor and we're sending it

 6   to our store.  So, technically, it's still in

 7   inventory, and we're just transferring product.

 8        So is it a requirement to block?

 9        Q.   Well, you're transferring product from a

10   distributor to a retailer; correct?

11        That's what HBC was doing.  Agreed?

12        A.   A captive distributor, yes.  We're

13   distributing to ourselves.

14        Q.   Right.  But once it's in the hands of

15   the retailer, then that product is no longer in

16   the hands of the distributor, HBC; correct?

17             MR. KOBRIN:  Object to form.  It

18   misrepresents the defendants' relationships.

19   BY MR. BARTON:

20        Q.   Well, I understand that HBC is Giant

21   Eagle.  Right.  I mean, it is captive.  They're

22   separated; true?

23        A.   Yeah.  It's one company, yes.

24        Q.   But once the product is in the retail

25   hands, I guess my question is:  What's blocking it
```

Highly Confidential - Subject to Further Confidentiality Review

1    from being sold to a patient if there isn't some

2    block of the actual order from HBC?

3         A.   We have controls throughout our whole

4    network that would include controls at retail

5    where we're reviewing and looking at prescriptions

6    that would not allow that prescription -- that

7    medication to get into a patient's hand if it was

8    suspected to be an order of interest in any way,

9    shape or form.

10        Q.   So your understanding is that if an

11   order exceeded the threshold under the threshold

12   reporting system that you helped create at Giant

13   Eagle, that until there was some resolution of why

14   that threshold had been exceeded by that order,

15   the product associated with that order, those

16   products would not leave the pharmacy and get into

17   the hands of the prescribing -- of the public?

18             MR. KOBRIN:  Object to form.

19             THE WITNESS:  Having a threshold

20   management system isn't a DEA requirement.

21   BY MR. BARTON:

22        Q.   You're not answering my question,

23   though.  I'm just asking about how your system

24   worked.  I'm not asking about what DEA required on

25   that.

Highly Confidential - Subject to Further Confidentiality Review

1         Did your system work in such a way that if on

2   a daily threshold report there was an order that

3   exceeded the threshold, that the product, if

4   shipped and transferred anyway to the ordering

5   pharmacy, would not leave the pharmacy until that

6   threshold issue had been investigated and

7   resolved?

8              MR. KOBRIN:  Object to form.

9              THE WITNESS:  There was exhaustive due

10  diligence at wholesale and retail.

11       I'm not in charge of compliance so I'm not at

12  liberty to say when and how that was executed.

13  I'm also not in charge of operations.

14  BY MR. BARTON:

15       Q.   So you don't know is the answer to the

16  question.

17       A.   I think that's a true statement.

18            (HBC-McClune Exhibit 16 was marked.)

19  BY MR. BARTON:

20       Q.   I've handed you Exhibit 16.  This is a

21  document with the first page Bates

22  No. HBC_MDL00046220.

23       Exhibit 16 jumps ahead on the timeline to

24  November of 2016.  So I just want to point that

25  out.  I'm not connecting it really to the things

1    that we were just looking at in time or anything.

2    But I wanted to ask you about this.

3        This is a document that appears to be an

4    email from Philip Raub on November 21, 2016 to the

5    recipients named there, including Adam Zakin and

6    George Chunderlik, and several others, that

7    identifies an attachment described as Project

8    Scope Drug Control Program 11/21/2016.

9        Do you see that?

10            MR. KOBRIN:  Before he testifies, can I

11    have a standing objection?

12        We don't see this is relevant because this,

13    on its face and by the date on it, relates to

14    GERX, which is not a party to this case.

15            MR. BARTON:  That's fine.  You can have

16    a standing objection to that.

17    BY MR. BARTON:

18        Q.   Do you agree, I've kind of described the

19    email correctly as far as what it appears to be?

20        A.   It appears to be from Phil Raub, as you

21    mentioned, to a series of people with an

22    attachment for project scope.

23        Q.   The scope document that is attached --

24        A.   I'm also not on this email.

25        Q.   Correct.  Correct.  You're not on the

```
1    email.  Your name is in the project scope

2    document, which is -- I just wanted to help you

3    understand the context of where this document is

4    coming from at this point in time.

5         A.   Okay.

6         Q.   The document that was circulated among

7    those people, not you, is the document that is

8    attached.

9         And my question is:  Does this document look

10   familiar to you?

11        And I'm not suggesting this is a final

12   document.  It doesn't appear to be.  But does that

13   document look familiar to you?

14        A.   I've seen a significant amount of

15   project scope documents.  So, generally speaking,

16   it looks familiar.

17        Q.   On the -- it's page 3 of 8 of the

18   project scope document, there's an identification

19   of stakeholders.  And that's where your name

20   appears as the Section 1.2 project

21   decision-makers.  Do you see that?

22        A.   I do see my name.

23        Q.   Is this a project that you participated

24   in as a decision-maker with these other people

25   identified?
```

1      A.    This is a project that I participated in

2    some capacity.   This is an IT document, I'd like

3    to kind of point out as we continue to go through

4    this.   So...

5      Q.    And what do you mean by that?   Prepared

6    by IT?

7      A.    It's prepared and managed by IT.   IT is

8    in charge of project management.   And so project

9    manager on this one is Jill Jenson.

10      Q.    And, in fact, the revision history on

11    the second page of this document has a couple of

12    dates and the contributor, Phil Raub, with an

13    initial draft and an update.

14      Do you see that?

15      A.    I do see that.

16      Q.    So does that mean that Phil Raub was

17    likely the -- was he the primary drafter of this

18    document?

19      A.    He's the business analyst, and signed

20    this page, assigned to this project.   So he would

21    be in support of Jill Jenson and the rest of the

22    team on the project.

23      Q.    Do you know who the drafter was of this

24    document?

25      A.    I don't know who constructed every line

1    on this.  These are prepared by IT, though.

2        Q.   And what was your understanding of the

3    purpose of this document?

4             MR. KOBRIN:  Do you have an

5    understanding of the purpose of the document?

6        We haven't established that he saw the

7    document.  So object to form.

8             MR. BARTON:  That's fine.

9    BY MR. BARTON:

10       Q.   Do you have an understanding of what the

11   purpose of this document was?

12       A.   I have a general understanding of what

13   we were trying to do with this document.

14       Q.   What is that understanding?

15       A.   Continued improvement of our controlled

16   substance management process.

17       Q.   Do you know whether the project

18   described in this document -- and this is just a

19   scope document, as I understand it.  But do you

20   know whether the project described here was

21   completed?

22       A.   As it's described here, I can't say for

23   certain that all aspects of this drafted scope

24   document were completed.

25       Q.   Is there currently a project called a

Highly Confidential - Subject to Further Confidentiality Review

1    drug control program at Giant Eagle that is still

2    ongoing that you are a part of?

3              MR. KOBRIN:  Object to form.  Ongoing,

4    you mean the project is ongoing?

5              MR. BARTON:  Yeah, the project.

6    BY MR. BARTON:

7         Q.   Is there a drug control program project

8    still in process or ongoing at Giant Eagle that

9    you are involved with?

10        A.   Project --

11             MR. KOBRIN:  Object to form.

12   Do you mean in contrast to it having been

13   applied, still being worked on, when you say

14   ongoing?  Or is your prior question related to

15   whether he knew it was completed?

16   So I think there's some confusion in that.

17             MR. BARTON:  I don't mean to be unclear

18   on that.  I appreciate it.  That's fair.

19   BY MR. BARTON:

20        Q.   I think you said you weren't sure

21   whether this project, as described in this scope,

22   was completed, as described in this scope.

23        Is that accurate?

24        A.   That's an accurate statement.

25        Q.   So understanding that, I guess I was

1    trying to ask whether you know whether at some

2    point this project was modified in any way that

3    you can tell me about, that you can see from

4    looking at this scope as described.

5         A.    We continued -- I mean, this is

6    November 21 of 2016.  Since that date and time

7    we've continued to enhance and improve our drug

8    control program in all aspects.  So, yes, it has

9    been.

10        Is it a formalized project as seen in this

11   scope document?  There's probably several of them

12   that are similar to this, but I'm not familiar

13   with every document that IT creates.

14        Q.    That's understood.

15        If you can go back to Exhibit 14 real quick,

16   I had asked you some questions about this document

17   and the draft order monitoring policy that Joe

18   Millward had circulated.

19        And I wanted to ask you about the attachment

20   to the policy in Joe's email on the last page.

21        Do you see that?

22        A.    On the last page?

23        Q.    The last page of the document, if you

24   turn to that.

25        A.    Yes.  I see it.

1     Q.   It's got a heading Order Monitor System

2  (OMS) Investigation Form; correct?

3     A.   That is what the heading says.

4     Q.   Does that form look familiar to you?

5     A.   No, not really.

6     Q.   Do you know if that form is currently in

7  use as such at Giant Eagle?

8     A.   I don't.

9     Q.   And if it were, it probably wouldn't be

10  a form that you would be interacting with or using

11  on a regular basis; correct?

12     A.   Yeah.  I'm not responsible for the

13  warehouse or operations or compliance, so no.

14     Q.   You had described, when we were looking

15  at Exhibit 15, about the McKesson and Anda

16  blocking orders and the process you were

17  describing that Giant Eagle would go through when

18  that happened.

19        This form here, does it appear to you to be

20  an investigation form that might be used as part

21  of an order monitoring system that had flagged an

22  order as, you know, over a threshold, and then

23  just a form used to document the investigation of

24  why that flag had occurred?

25        MR. KOBRIN:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Speculative.  He's not familiar with the document.
 2            THE WITNESS:  Yeah.  I mean it's a draft
 3   form.  I'm not familiar with the form.  It never
 4   went -- I don't know if this ever became final, so
 5   I don't know.  I can't answer.
 6   BY MR. BARTON:
 7        Q.   I don't either, right, and I wouldn't
 8   want you to speculate on that.
 9        But do you know of any forms like this that
10   were in existence prior to the creation of this
11   form, which has a created date of 12/2/2015?
12        A.   Yeah.  I'm not positive one way or the
13   other.
14        Q.   You had not created any form like this
15   anywhere along the line when you were involved in
16   any respect with the order monitoring system?
17        A.   No.  I mean, I think the form that I
18   worked on creation was referred in your other
19   example.
20        Q.   Are you pointing to Exhibit 15?
21        A.   Yes.
22        Q.   Yeah.  And I think you had referred --
23   there was a form that was created or used to help
24   resolve McKesson or Anda blocking of orders;
25   correct?
```

1      A.   Right.  And there was forms that

2   compliance had.  I was not super familiar with

3   those.  Again, in December of 2015, I guess I was

4   in procurement then.  That's probably when I

5   started seeing those forms.

6         So, I mean, up until August of 2015, I wasn't

7   even in a role that would have anything to do with

8   this aspect of the business directly or indirectly

9   for that matter.

10     Q.   Fair enough.

11          MR. BARTON:  I'm going to pass the

12   witness to my colleague here, Ms. Wicklund, if

13   you're ready.

14        Do we need to take a short break?

15          MS. WICKLUND:  Can we take a short

16   break?

17          MR. KOBRIN:  Sure.

18          THE VIDEOGRAPHER:  We're going off the

19   record.  The time is 4:14 p.m.

20          (Recess from 4:14 p.m. to 4:28 p.m.)

21          THE VIDEOGRAPHER:  We're now going back

22   on the record.  The time is 4:28 p.m.

23                    EXAMINATION

24   BY MS. WICKLUND:

25     Q.   Mr. McClune, I'm Britt Wicklund.  We met

1    earlier.  I just wanted to ask you a few

2    questions.

3              MS. WICKLUND:  I am going to mark this

4    as Exhibit 17.

5              (HBC-McClune Exhibit 17 was marked.)

6    BY MS. WICKLUND:

7         Q.   I'll pass that to you.  And

8    Exhibit 250 -- I'm sorry -- Exhibit 17 that I've

9    just marked is our internal reference of number

10   HBC-150.  It is an email that is Bates numbered

11   HBC_MDL00035614.

12        This appears to be an email forwarded to you

13   from Greg Carlson on October 8, 2015?

14        A.   That appears to be accurate.

15        Q.   And this email has some attachments.  It

16   appears that he's forwarding an email to you that

17   had an original date of July 28, 2014.

18        A.   I saw that.

19        Q.   And the attachments are what appears to

20   be contracts for Supplylogix services.  Would you

21   agree?

22        A.   That appears -- at first glance, it

23   appears to be an unexecuted contract or an

24   amendment to a service agreement for Supplylogix,

25   yes.

```
 1        Q.   Correct.  So the first few pages, the
 2   Bates numbers ending in 615 through 617 is the
 3   unexecuted amendment to the Supplylogix contract,
 4   and then after it appears to be the original
 5   Supplylogix contract.
 6        A.   I do see that.  And the second -- the
 7   service agreement does appear to be executed.
 8        Q.   Good.  Can you tell me a little bit
 9   about what Supplylogix is?
10        A.   Supplylogix is a McKesson-owned
11   subsidiary that assists retailers with inventory,
12   many aspects of inventory management.
13        Q.   And what are those aspects?
14        A.   They have a series of modules including
15   Pinpoint Launch, which is when a branded product
16   comes to market, you can use your generic -- your
17   branded volume to drive generic volume and
18   decrease your branded onhand lowering your shrink
19   risk from an inventory perspective.
20        Pinpoint Order, which is an order point
21   management system that does interface in our
22   system with PDX, which is our prescription or
23   prescribing platform for order point management.
24   So it looks at your history.  It says, hey, you
25   probably need three bottles on the shelf in order
```

```
 1    to satisfy patient demand, sets the order point in

 2    the system, doesn't allow onhands to go below that

 3    three-bottle threshold, will prompt or commit

 4    orders to our wholesale distributors when it drops

 5    below that so the store doesn't have to worry

 6    about managing inventory manually and orders.

 7        Pinpoint Transfer, which identifies dead

 8    overstock products that you can transfer from

 9    store to store.  There's another segment of that

10    Pinpoint Transfer.  It's more of a return to

11    vendor module.  So it looks at -- it does

12    interface well with McKesson and basically

13    identifies items that are dead overstock that

14    don't need to be transferred, but they could go

15    back to the wholesaler for return, so opening up

16    more capital.

17        There's also Pinpoint Audit and Pinpoint

18    Monitor.  I get those a little confused in my

19    head, so I'm not sure which one is which and what

20    they do, but they are more built around inventory

21    levels, thresh -- or not threshold management --

22    identification of risk levels, doctors, patients,

23    et cetera, at retail that could be an issue from a

24    controlled substance perspective.

25        Q.   So these are primarily store-facing
```

Highly Confidential - Subject to Further Confidentiality Review

1    software applications?

2            MR. KOBRIN:  Object to form.

3            THE WITNESS:  The application interface

4    is available anywhere you have a valid log-in, but

5    most of the analytics built into their platform

6    would be store centric.  But you could leverage

7    chain or whole chain depending on which module or

8    aspect you're using.

9    BY MS. WICKLUND:

10       Q.   And the contract in Exhibit 17, this is

11   for -- the original contract appears is for

12   Pinpoint Audit service and then managed EDI

13   services.  Can you explain to me what the managed

14   EDI services is?

15           MR. KOBRIN:  Where are you seeing this?

16           MS. WICKLUND:  I'm sorry.  It's Bates

17   number ending in 622.

18           MR. KOBRIN:  Exhibit A?

19           MS. WICKLUND:  Yes.

20           THE WITNESS:  I'm not an expert when it

21   comes to EDI, so I'd only be speculating to tell

22   you what the answer to that is.

23           MR. KOBRIN:  Don't speculate.

24   BY MS. WICKLUND:

25       Q.   Then Pinpoint Audit services here, as I

1    understand, this is what you described earlier

2    with tracking store inventory and loss.  Is that a

3    reasonable --

4         A.   Again, my expertise is minimal when it

5    comes to all these -- all of what these

6    applications or modules do.  I understand them

7    from a management perspective, not the

8    particulars.

9         So this would be one of the modules that

10   would help Giant Eagle keep our stores or allow

11   our stores view into potential risk from a

12   controlled substance perspective.

13        Q.   And potential store losses is just one

14   aspect of diversion risks; is that a fair thing to

15   say?

16             MR. KOBRIN:  Are you reading the

17   potential store losses?  Where is that in the

18   document?

19             MS. WICKLUND:  I'm so sorry.

20   BY MS. WICKLUND:

21        Q.   It's point B in Pinpoint Audit where

22   it's talking about Supplylogix monitors.

23   "Supplylogix will provide a web-based interface

24   for a customer to view stores and items in

25   inventory that may have a history of loss based

1    upon Supplylogix's proprietary evaluation of

2    customers' transactional data.  This transactional

3    data includes any EDI 810 or invoice data made

4    available to Supplylogix by customer and/or

5    customer suppliers listed in Exhibit B.  Results

6    of the proprietary evaluation may not result in

7    100 percent accuracy with respect to identifying

8    potential losses, and customers should conduct

9    their own research with respect to potential

10   losses."

11       A.   I mean, that is one of the things that

12   the audit function would do, yes.

13       Q.   And it also says that "The store and

14   activity dashboard screens are available by NDC

15   and GPI.  Additionally, there's a detailed

16   transaction report sorted in chronological order

17   available to export."

18       Do you know if Giant Eagle regularly exported

19   these reports from Supplylogix?

20            MR. KOBRIN:  Object to form.

21   Foundation.

22            THE WITNESS:  I know that there was

23   continual interaction with the Supplylogix

24   interface.  To what capacity and what activities

25   the analysts were doing, I'm not a hundred percent

1    sure.

2    BY MS. WICKLUND:

3        Q.   And then I'll move to -- there's the

4    first part of this, the amendment to this

5    contract.  That's Bates number ending 615.  And

6    this --

7        A.   Do you know, I mean, based on your

8    findings whether this was executed or not?

9        Q.   Yes.  I guess I could go ahead --

10       A.   Is it your next one?  Sorry.  It's up to

11   you.  I was trying to get a date on the execution

12   for context.

13            (HBC-McClure Exhibit 18 was marked.)

14   BY MS. WICKLUND:

15       Q.   This is Exhibit 18.  Exhibit 18, and I

16   will represent to you that this was in with the

17   documents that were produced to us as your

18   custodial file.  This appears to be the same

19   amendment to this contract.

20       Looking at the last page, it appears that it

21   was executed -- signed by Mark Wilgus.  Is it

22   Wilgus?

23       A.   Yeah.  I'm not sure of the Supplylogix.

24       Q.   I'm sorry.  By Joseph Lucot, dated

25   September 30, 2014.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I agree with that.
 2        Q.   So this contract amendment in Exhibit 17
 3   and 18, I guess the second page of Exhibit 18 adds
 4   something called Pinpoint Monitor services which
 5   is number six under F.
 6        A.   Okay.
 7        Q.   So can you tell me about the Pinpoint
 8   Monitor services?
 9        A.   From a general perspective, again, it's
10   a tool that identifies dispensing of controlled
11   substances against ourselves and peers on a
12   rolling basis that we can use and analyze as a
13   secondary avenue for researching any risks that
14   the organization may have from a controlled
15   substance perspective.
16        Q.   From Giant Eagle's perspective, would
17   you say that the Pinpoint Monitor services
18   described in Exhibit 18 are -- would that be a
19   suspicious order monitoring program or part of a
20   program?
21             MR. KOBRIN:  Object to form.
22             THE WITNESS:  Again, it's part of the
23   bigger program that Giant Eagle would use.  This
24   is another tool we would have at our disposal to
25   execute against that program.
```

1    BY MS. WICKLUND:

2         Q.   And do you know if the Pinpoint Monitor

3    services generated any type of report to Giant

4    Eagle?

5         A.   I know that the tool was used ongoing by

6    the compliance team through the years.  But to

7    what information, what reports came out of it and

8    what action was taken, I'm not familiar.

9         Q.   That's fair.  And HBC distributed HCPs,

10   which are hydrocodone combination products.  Am I

11   correct in saying that HBC distributed HCPs

12   between November 2009 and October 2014 when they

13   were rescheduled as Schedule II?

14        A.   Based on the best of my knowledge, yes,

15   we distributed those drugs as they were Schedule

16   IIIs.  When they became Schedule IIs, we no longer

17   were licensed to distribute those.

18        Q.   So with that in mind, would it be a fair

19   assumption then to say that by the time that this

20   contract was executed, the Pinpoint Monitor

21   services were probably not in full operation with

22   Giant Eagle?

23             MR. KOBRIN:  Object to form.

24             THE WITNESS:  The Pinpoint Monitor tool

25   was to review retail compliance as part of our

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring, our whole compliance

2    program.

3    BY MS. WICKLUND:

4         Q.   Correct.

5         A.   So it doesn't matter what the

6    distributor was for that particular product.  It

7    was looking at your retail dispensing to find out

8    if there was any abnormalities and flag those

9    accordingly.

10        Q.   But this service was not in operation by

11   HBC or Giant Eagle during the time that HBC was

12   distributing HCPs?

13        A.   I don't recall the last date we

14   distributed, but since the execution of this was

15   9/30/13, it would be close to the end of our

16   distribution of HCPs out of HBC.

17        Q.   I think I'm done.

18             THE VIDEOGRAPHER:  Going off the record.

19   The time is 4:45 p.m.

20             (Recess from 4:54 p.m. to 4:54 p.m.)

21             THE VIDEOGRAPHER:  We're now back on the

22   record 4:55 p.m.

23                          EXAMINATION

24   BY MR. KOBRIN:

25        Q.   Mr. McClune, earlier today opposing

Highly Confidential - Subject to Further Confidentiality Review

1   counsel showed you a lot of emails from the 2015

2   period.  Do you recall that?

3       A.   Yes.  I do recall reviewing a series of

4   emails.

5       Q.   A lot of those emails had to do with

6   suspicious order monitoring, both programs by

7   Giant Eagle and programs by other entities like

8   Thrifty White.  Do you recall that?

9       A.   I do remember being requested to review

10  those older emails.

11      Q.   When opposing counsel was asking you

12  about those emails from 2015, you mentioned

13  controls at the pharmacy when he was asking you

14  about distribution controls.

15      Why did you bring up controls at the pharmacy

16  in relation to those 2015 emails?

17      A.   The pharmacies is one of our main

18  locations for our controlled substance monitoring

19  program.  It's integral to it.  In addition, in

20  2015 we weren't distributing hydrocodone

21  combination products out of our HBC warehouse and

22  stores.

23      Q.   So those products would not have even

24  been in the distribution pipeline for HBC?

25      A.   Yeah.  They would not have been.

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   Could you turn to -- do you have your

2   exhibits?

3       A.   I have them all here.

4       Q.   Look at Exhibit 3.  Could you turn to

5   the page 10 in the presentation.  It's also .10 at

6   the top of the page.  It has the title Role of

7   Pharmacy Within Giant Eagle.

8       A.   Okay.

9       Q.   Do you recall looking at this page

10  earlier today when you were answering questions

11  from opposing counsel?

12      A.   I do.

13      Q.   Do you recall that you talked about the

14  numbers in the box under the pharmacy column?  You

15  talked about the sales number and the margin

16  numbers.  Do you remember that?

17      A.   Yes.  I do recall talking about the

18  pharmacy number and then the other number being

19  the [REDACTED] being supermarket and Market

20  District.

21      Q.   Right.  What do those numbers in the

22  Pharmacy column, what do those numbers represent?

23      A.   In the Pharmacy column?

24      Q.   Yes.

25      A.   Just to be clear, in the Pharmacy column
```

1    it's all pharmaceutical sales, whether it's MDI

2    inhalers or anything, you know, any pharmaceutical

3    product.

4         Q.   Would that number include sales of

5    cholesterol medications?

6         A.   Yes, it would.

7         Q.   Would it include sales of vitamins?

8         A.   Yes, it would.

9         Q.   Would it include sales of even diabetes

10   testing supplies or other equipment?

11        A.   Basically anything you would need a

12   prescription for or you couldn't or wouldn't want

13   to sell on the shelf.

14        Q.   Approximately what percentage of those

15   numbers would be made up by the sale of controlled

16   substances, if you know?

17        A.   I don't know an exact number, but it's

18   very small in contrast to total pharmacy sales.

19        Q.   What percentage of that amount of

20   controlled substances sales would be hydrocodone

21   combination products?

22        A.   An even smaller amount of that.  So a

23   percent or two at most.

24        Q.   And what percentage of that number or of

25   that subset, that small percent, would be

1    hydrocodone combination products that were sold

2    into Summit County and Cuyahoga County, Ohio?

3        A.    A really, really -- an even smaller

4    amount.  I don't have a number off the top of my

5    head, but small.

6        Q.    Thank you, Mr. McClune.

7        MR. BARTON:  Just a couple of follow-ups

8    on that.

9                    RE-EXAMINATION

10   BY MR. BARTON:

11       Q.    Just on those last questions about sales

12   volumes of hydrocodone-containing products by

13   Giant Eagle, and I understand you were just kind

14   of trying to give some general estimates or

15   perspectives based on your general familiarity

16   with the data during the time that you were at

17   Giant Eagle.  Correct?

18       MR. KOBRIN:  Object to form.

19       THE WITNESS:  Can you repeat that.

20   BY MR. BARTON:

21       Q.    Yeah.  You just said -- for example, you

22   estimated maybe a percent or two of the sales.

23   I'm not even sure what the percent or two was in

24   relation to, was it in relation to the total

25   number of sales or just the total number of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sales of pharmaceuticals.

 2        But you were just estimating kind of what you

 3    believe the percentage of sales to be in Giant

 4    Eagle of hydrocodone-containing products; correct?

 5             MR. KOBRIN:  Object to form.

 6             THE WITNESS:  This is my business.  I'm

 7    in charge of finance for pharmacy, so I'm very

 8    familiar with the amounts.  It is a very small

 9    amount of the total sales for pharmacy.

10    BY MR. BARTON:

11        Q.   Right.  So my question is:  You have

12    data that can answer those questions exactly;

13    correct?

14        A.   Giant Eagle would have dispensing data

15    for that.

16        Q.   You have data, Giant Eagle has data that

17    can tell us exactly how many

18    hydrocodone-containing products were sold into

19    Cuyahoga and Summit counties during any time

20    period that we might choose; correct?

21        A.   I suppose we would, yes.

22        Q.   And wouldn't Giant Eagle even have data

23    that would -- that could tell us exactly how many

24    hydrocodone-containing products were sold under a

25    specific doctor's prescription?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. KOBRIN:  Object to form.

 2              THE WITNESS:  Giant Eagle has that

 3    information, but it's a patient record, so it

 4    would be protected.

 5    BY MR. BARTON:

 6         Q.   Understood that patient records are

 7    protected.  I'm just asking if Giant Eagle

 8    actually has that data.

 9              MR. KOBRIN:  Actually beyond the scope

10    of direct.  How is that related to the scope of

11    direct?

12              MR. BARTON:  You asked him questions to

13    sort of give us some general estimates about

14    percentages of hydrocodone products.  Now I'm just

15    exploring, wait a minute, we don't have to rely on

16    estimates.  I'm just asking exactly what data do

17    you have and how specific is it.

18              MR. KOBRIN:  That has nothing to do with

19    sales data.  It's beyond the scope of our

20    redirect.  And, furthermore, it's beyond the scope

21    of the court's order in this case, in discovery

22    order 8, which said that prescription data was

23    beyond the scope of discovery in this case.

24              MR. BARTON:  I disagree.  I'm just

25    asking him -- you asked him what kind of
```

 1    percentages he believes there are of hydrocodone

 2    products going into Summit and Cuyahoga County.  I

 3    am simply j asking him exactly what kind of data

 4    the company has.

 5            MR. KOBRIN:  Yeah.  You gone to that.  I

 6    just don't understand why the prescription data

 7    has anything to do with that.

 8            MR. BARTON:  It's just related to the

 9    type of data we're talking about.

10    BY MR. BARTON:

11        Q.  Let me just ask.  The sales data that

12    Giant Eagle collects from its pharmacies includes,

13    one, the drugs that are sold, correct,

14    hydrocodone?  That's why you know.  That's why you

15    know as a finance guy and a data guy that with a

16    sufficiently -- a sufficient amount of confidence

17    to testify to it under oath, you can say, eh, one

18    to two percent of the drugs we sold were

19    hydrocodone-containing products, right, because

20    you collect data of how many of those drugs are

21    hydrocodone-containing products; correct?

22            MR. KOBRIN:  Object to form.

23            THE WITNESS:  The data is created at the

24    time of adjudication.  I don't know what our

25    retention policy on that, off the top of my head.

Highly Confidential - Subject to Further Confidentiality Review

```
1    So there is data and was data.  I don't know how
2    much of it still exists.
3    BY MR. BARTON:
4         Q.   Let's just flesh out what that data is
5    that you're collecting at the time regardless of
6    what the retention policy.
7         The data that would be collected, it would be
8    the same data from which you would form an opinion
9    about relative percentages of
10   hydrocodone-containing products, that same data
11   could include relative percentages or amounts of
12   drugs prescribed by a specific physician, for
13   example; correct?
14             MR. KOBRIN:  Object to form.
15   BY MR. BARTON:
16        Q.   It's transactional data of patients;
17   correct?
18             MR. KOBRIN:  Object to form.  It's again
19   beyond the scope of redirect, and it's beyond the
20   scope of the discovery order number 8 in this
21   case.
22   BY MR. BARTON:
23        Q.   Is that true?  Transactional data
24   collected by Giant Eagle, do you agree?
25        A.   Yes, it is.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   And that's the same kind of data that

 2   you were charged with analyzing at times to

 3   provide reports when asked to provide reports;

 4   correct?

 5              MR. KOBRIN:  Object to form.  Same

 6   objection as prior.

 7              THE WITNESS:  Yes.

 8              MR. BARTON:  No further questions.

 9              THE VIDEOGRAPHER:  This concludes the

10   deposition.  We're going off the record at

11   5:04 p.m.

12              (Whereupon, at 5:04 p.m., the taking of

13   the instant deposition ceased.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   COMMONWEALTH OF PENNSYLVANIA  )

 2   COUNTY OF ALLEGHENY           )     SS:

 3               C E R T I F I C A T E

 4           I, Ann Medis, Registered Professional

 5   Reporter, Certified Livenote Reporter and Notary

 6   Public within and for the Commonwealth of

 7   Pennsylvania, do hereby certify:

 8           That ROBERT ANTHONY MCCLUNE, the witness

 9   whose deposition is hereinbefore set forth, was

10   duly sworn by me and that such deposition is a

11   true record of the testimony given by such

12   witness.

13           I further certify the inspection,

14   reading and signing of said deposition were not

15   waived by counsel for the respective parties and

16   by the witness.

17           I further certify that I am not related

18   to any of the parties to this action by blood or

19   marriage and that I am in no way interested in the

20   outcome of this matter.

21           IN WITNESS WHEREOF, I have hereunto set

22   my hand this 30th day of January, 2019.

23

                      _____

24                              Notary Public

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    COMMONWEALTH OF PENNSYLVANIA    )    E R R A T A
      COUNTY OF ALLEGHENY             )     S H E E T
 2
 3         I, ROBERT A. MCCLUNE, have read the
      foregoing pages of my deposition given on
 4    January 25, 2019, and wish to make the following,
      if any, amendments, additions, deletions or
 5    corrections:
 6
      Page   Line    Change and reason for change:
 7
      ____   ____    _____
 8
      ____   ____    _____
 9
      ____   ____    _____
10
      ____   ____    _____
11
      ____   ____    _____
12
      ____   ____    _____
13
      ____   ____    _____
14
      ____   ____    _____
15
      ____   ____    _____
16
      ____   ____    _____
17
      ____   ____    _____
18
19    In all other respects, the transcript is true and
      correct.
20
21                   _____
                     ROBERT A. MCCLUNE
22
23    _____ day of _____, 2019.
24    _____
                     Notary Public
25
```