```
 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                    EASTERN DIVISION

 3

     ------------------------    )

 4   IN RE: NATIONAL             ) MDL No. 2804

     PRESCRIPTION OPIATE         )

 5   LITIGATION                  ) Case No.

     ------------------------    ) 1:17-MD-2804

 6                               )

     THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster

 7   ALL CASES                   )

     ------------------------    )

 8

 9                 HIGHLY CONFIDENTIAL

10       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12              VIDEOTAPED DEPOSITION OF

13                  JOHN MERRITELLO

14                 January 18, 2019

15

16                  Chicago, Illinois

17

18

19

20

21

22            GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

23              deps@golkow.com

24
```

## Page 2

```
 1
 2
 3
 4         The videotaped deposition of JOHN MERRITELLO,
 5   called by the Plaintiffs for examination, taken
 6   pursuant to the Federal Rules of Civil Procedure of
 7   the United States District Courts pertaining to the
 8   taking of depositions, taken before CORINNE T.
 9   MARUT, C.S.R. No. 84-1968, Registered Professional
10   Reporter and a Certified Shorthand Reporter of the
11   State of Illinois, at the offices of Bartlit Beck
12   LLP, Suite 600, 54 West Hubbard Street, Chicago,
13   Illinois, on January 18, 2019, commencing at 8:01
14   a.m.
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1  APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3       NAPOLI SHKOLNIK, PLLC
          360 Lexington Avenue, 11th Floor
 4       New York, New York 10017
          212-397-1000
 5       BY: HUNTER J. SHKOLNIK, ESQ.
           hunter@napolilaw.com
 6          -and-
          PAUL NAPOLI, ESQ.
 7        pnapoli@napolilaw.com
          RODNEY CABRERA, ESQ.
 8        rcabrera@napolilaw.com
          SHAYNA SACKS, ESQ.
 9        ssacks@napolilaw.com
            (via telephone/livestream)
10
11       LEVIN PAPANTONIO THOMAS MITCHELL
          RAFFERTY & PROCTOR P.A.
12       316 South Baylen Street, Suite 600
          Pensacola, Florida 32502
13       205-396-3982
          BY: BRANDON BOGLE, ESQ.
14        bbogle@levinlaw.com
            (via telephone)
15
16
17    ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
       aka WALGREEN CO.:
18
          BARTLIT BECK LLP
19       54 West Hubbard Street, Suite 300
          Chicago, Illinois 60654
20       312-494-4475
          BY: PETER B. BENSINGER, JR., ESQ.
21        Peter.Bensinger@BartlitBeck.com
22
23
24
```

## Page 4

```
 1  APPEARANCES (Continued):
 2    ON BEHALF OF JOHNSON & JOHNSON,
       JANSSEN PHARMACEUTICALS, INC.,
 3    ORTHO-McNEIL-JANSSEN PHARMACEUTICALS, INC.
       n/k/a JANSSEN PHARMACEUTICALS, INC.;
 4    JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN
       PHARMACEUTICALS, INC.:
 5
          TUCKER ELLIS LLP
 6       233 South Wacker Drive, Suite 6950
          Chicago, Illinois 60606
 7       312-624-6300
          BY: BRITTANY L. WEISS, ESQ.
 8        brittany.weiss@tuckerellis.com
            (via telephone)
 9
10
       ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
11     ENDO PHARMACEUTICALS, INC.,
       PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
       COMPANIES, INC. (f/k/a Par Pharmaceutical
12     Holdings, Inc.):
13
          ARNOLD & PORTER KAYE SCHOLER LLP
14       70 West Madison Street, Suite 4200
          Chicago, Illinois 60602-4231
15       312-583-2435
          BY: EMILY NEWHOUSE DILLINGHAM, ESQ.
16        emily.dillingham@arnoldporter.com
            (via telephone/livestream)
17
18
       ON BEHALF OF McKESSON CORPORATION:
19
          TABET DIVITO & ROTHSTEIN LLC
20       209 South LaSalle Street, 7th Floor
          Chicago, Illinois 60604
21       312-762-9461
          BY: DANIEL L. STANNER, ESQ.
22        dstanner@tdrlawfirm.com
23
24
```

## Page 5

```
 1  APPEARANCES (Continued):
 2    ON BEHALF OF CARDINAL HEALTH, INC.:
 3       ARMSTRONG TEASDALE LLP
          7700 Forsyth Boulevard, Suite 1800
 4       St. Louis, Missouri 63105
          314-621-5070
 5       BY: JULIE FIX MEYER, ESQ.
           jfixmeyer@ArmstrongTeasdale.com
 6
 7    ON BEHALF OF AMERISOURCEBERGEN CORPORATION:
 8       JASZCZUK, P.C.
          311 South Wacker Drive, Suite 3200
 9       Chicago, Illinois 60606
          312-442-0509
10       BY: MARGARET M. SCHUCHARDT, ESQ.
           mschuchardt@jaszczuk.com
11
12    ON BEHALF OF WALMART:
13       JONES DAY
          901 Lakeside Avenue
14       Cleveland, Ohio 44114-1190
          216-586-3939
15       BY: PATRICIA OCHMAN, ESQ.
           pochman@jonesday.com
16          (via telephone/livestream)
17
18  ALSO PRESENT:
19       CHELSEA THOMPSON, Paralegal,
          Napoli Shkolnik PLLC
20
21       ZACH HONE, Trial Technician
22
       VIDEOTAPED BY: BEN STANSON
23
24  REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968
```

Highly Confidential – Subject to Further Confidentiality Review

Page 6

```
1              I N D E X
2  JOHN MERRITELLO            EXAMINATION
3    BY MR. SHKOLNIK............  10
4
5
6            E X H I B I T S
7  WALGREENS-MERRITELLO EXHIBIT      MARKED FOR ID
8  No. 1   12/7/12 e-mail with attachment;   64
         WAGMDL00114602 - 00114625
9
   No. 2   Excerpts of Personnel File,    116
10        John Merritello;
          not Bates stamped
11
   No. 3   Document,                132
12        Intercepted/Suspicious Store
          Orders, Requirements Document;
13        WAGMDL00491863 - 00491877
14 No. 4   Document, "P09002 Threshold   149
          Controlled Substance, Macro
15        Design";
          WAGMDL00491961 - 00491989
16
   No. 5   Document, "Project: DEA   154
17        Suspicious Order - Phase III";
          WAGMDL00492378 - 00492380
18
   No. 6   Document, "Functional    159
19        Requirements & (Macro) Design";
          WAGMDL00492562 - 00492579
20
   No. 7   Document, "Business    168
21        Requirements";
          WAGMDL00133996 - 00134003
22
23
24
```

Page 7

```
1            E X H I B I T S
2  WALGREENS-MERRITELLO EXHIBIT      MARKED FOR ID
3  No. 8   6/6/12 e-mail string with   199
          attachment;
4         WAGMDL00670686 - 00670694
5  No. 9   11/29/12 e-mail string with   202
          attachment;
6         WAGMDL00609440 - 00609441
7  No. 10  11/12/12 e-mail string;   204
          WAGMDL00426251 - 00426254
8
   No. 11  11/9/12 e-mail string;   205
9         WAGMDL00658246 - 00658248
10 No. 12  Document, "Technical    211
          Requirements & Design";
11        WAGMDL00624441 - 00624451
12 No. 13  12/2/13 e-mail string;    212
          WAGMDL00336103 - 00336106
13
   No. 14  Document, "Technical    217
14        Requirements & Design";
          WAGMDL00624487 - 00624497
15
   No. 15  PowerPoint, Controlled    219
16        Substance Order Monitoring
          System";
17        WAGMDL00675532 - 00675568
18
19
20
21
22
23
24
```

Page 8

```
1       THE VIDEOGRAPHER:  We are now on the record.
2  My name is Ben Stanson.  I'm a videographer for
3  Golkow Litigation Services.
4       Today's date is January 18, 2019, and
5  the time is 8:01 a.m.
6       This video deposition is being held in
7  Chicago, Illinois in the matter of the National
8  Prescription Opiate Litigation, MDL No. 2804,
9  pending in the U.S. District Court, Northern
10 District of Ohio, Eastern Division.
11      The deponent is John Merritello.
12      Will counsel please identify yourselves
13 for the record.
14      MR. SHKOLNIK:  Hunter Shkolnik on behalf of
15 Cuyahoga County and MDL Plaintiffs.
16      MR. BENSINGER:  This is Peter Bensinger, Jr.
17 of Bartlit Beck on behalf of Walgreen Company.
18      MR. SCHUCHARDT:  Margaret Schuchardt, Jaszczuk
19 PC, on behalf of AmerisourceBergen Drug
20 Corporation.
21      MS. FIX MEYER:  Julie Fix Meyer, Armstrong
22 Teasdale, on behalf of Cardinal Health.
23      MR. STANNER:  Dan Stanner, Tabet DiVito &
24 Rothstein, on behalf of McKesson.
```

Page 9

```
1       MS. THOMPSON:  Chelsea Thompson, Napoli
2  Shkolnik, with Plaintiff.
3       MR. SHKOLNIK:  Anybody up in the -- up in the
4  air want to make an appearance?
5       MS. DILLINGHAM:  Yes.  This is Emily
6  Dillingham from Arnold & Porter on behalf of the
7  Endo and Par Defendants.
8       MS. WEISS:  Hi.  This is Brittany Weiss on
9  behalf of Johnson & Johnson and Janssen
10 Pharmaceuticals.
11      MS. OCHMAN:  Patricia Ochman, Jones Day, on
12 behalf of Walmart.
13      MR. CABRERA:  This is Rodney Cabrera again on
14 behalf of Napoli for Plaintiff.
15      MR. SHKOLNIK:  And Paul Napoli is in the
16 background.
17      MR. BOGLE:  Brandon Bogle on behalf of the MDL
18 Plaintiffs, Levin Papantonio.
19      MR. SHKOLNIK:  Thank you.
20      THE VIDEOGRAPHER:  Thank you.  Our Court
21 Reporter today is Corinne Marut.  Will you please
22 swear in the witness.
23           (WHEREUPON, the witness was duly
24                sworn.)
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    JOHN MERRITELLO,
2 called as a witness herein, having been first duly
3 sworn, was examined and testified as follows:
4    EXAMINATION
5 BY MR. SHKOLNIK:
6    Q.  Good morning, Mr. Merritello.  My name
7 is Hunter Shkolnik.  I'm going to be asking you a
8 series of questions today primarily focused around
9 your work over the years at Walgreens.
10    I have a tendency to try to stay focused
11 and stay slow, but sometimes it gets fast.  I try
12 to ask good questions, but sometimes no one
13 understands what I'm saying.
14    If you're ever in that position where
15 you are looking, you are saying I don't even know,
16 just tell me.  It's my job to ask a good question,
17 your job to answer.  Okay?
18    And you just did something that the
19 Court Reporter will yell at both of us for.
20    A.  Yes, I will.
21    Q.  Thanks.
22    A.  Got it.  Speak is what you're telling
23 me.
24    Q.  And also let me say thank you for

Page 11

1 agreeing to come an hour earlier today to help
2 accommodate all of us getting out of a potential
3 snowstorm.
4    A.  No problem.
5    Q.  Are you currently working at Walgreens?
6    A.  Yes, I am.
7    Q.  When did you first start at Walgreens
8 and in what capacity?
9    A.  I started with Walgreens in September of
10 1977.
11    Q.  Wow.
12    A.  At 87th and Cicero in Oak Lawn,
13 Illinois, as a -- what you would refer to as today
14 as a service clerk.
15    Q.  So, you basically -- you worked the cash
16 register and stocked the shelves?
17    A.  And the camera counter, which we don't
18 have anymore, correct.
19    Q.  So, why don't you take us through.
20 That's a long history.  Why don't you take us
21 through.  You don't have to go into great details
22 of the different positions.  But just kind of give
23 us a background on your experiences with Walgreens.
24    A.  Okay.  So, from joining as a service

Page 12

1 clerk when I was about age 18 and I was at the
2 University of Illinois Chicago studying, I was
3 promoted to an assistant manager's role.  And I did
4 that throughout my college as I was a commuter here
5 in Chicago, and I went to college and did the
6 assistant manager role.
7    And then even beyond after college, I
8 went to -- at the end of the college, I went to
9 their executive assistant manager training, which
10 prepares you to be a store manager; and I was
11 promoted about a year and a half I think after I
12 got out of college to store manager, and I had
13 store manager experience for almost two years.
14    Q.  Was that one store or did you move from
15 store to store?
16    A.  As an assistant manager I probably
17 worked at, I would say, at least 25 different
18 locations.
19    Q.  Here in Chicago?
20    A.  All in Chicago, southwest, Chicago and
21 southwest suburbs in Chicago.
22    And from when I was a store manager I
23 was on the southeast side of Chicago at Avenue L
24 and 106th Street, if anyone is familiar with the

Page 13

1 area.
2    From there I worked with my district
3 manager and told him what my aspirations were, and
4 I was interviewed at corporate and went to
5 corporate.  And I think that was like 1988, roughly
6 speaking.
7    And I worked as a what they called the
8 operations research analyst, which did some -- did
9 some work for early for the SIMS project, strategic
10 inventory management system, and we were laying the
11 groundwork to computerize and automate our
12 inventory and it started with -- with front end.
13    I went from the position --
14    Q.  When you say "it started with front
15 end," that's the store?
16    A.  The non-pharmacy.  Everything in front
17 of the store as you would -- if you walked into one
18 of our stores, that's what it is.
19    So, we -- we did -- I worked in that
20 capacity.  The project went for a good four years
21 or so until we finally started to roll out into
22 stores, if you would, and then the store folks were
23 using our system.
24    And then from there, I was in a group

Page 14

1 called marketing systems and the marketing systems
2 group, I was still doing enhancements, so on and so
3 forth, to store order system and store receiving
4 system, item movement, sales logging, all front end
5 still.
6      And then from there I went to -- I went
7 across back with -- to work, if you will, with the
8 programmers with the more technical team in an
9 organization we called retail systems.
10   Q.   Now, did you have a background in the
11 technical side as well as sort of the operations
12 side or was it something you learned by doing?
13   A.   I have been schooled and I have a degree
14 in what they call quantitative methods, which is
15 operations research. Computer programming. There
16 is a section on that. And it's real close to
17 industrial engineering. They call it information
18 and decision sciences today I believe is the term
19 you would use.
20   Q.   So, you were on the cutting edge on what
21 was becoming a whole new way of running retail
22 stores?
23   A.   Well, yeah, we were -- when I left the
24 university, I was almost -- I was almost a little,

Page 15

1 you know, dumbfounded, what am I going to do with
2 this degree I have. I am going to be a store
3 manager.
4      And one of the fellows that I finished
5 one of my last exams with said, "Well, maybe you
6 can put the stockroom on a computer." Well, we did
7 a little bit more than that.
8   Q.   Put a lot of stockrooms?
9   A.   Yeah, we put everything on. Monitoring
10 inbound and outbound using a computer, yes.
11   Q.   I interrupted you. I'm sorry. What was
12 the next -- you said you went --
13   A.   Retail systems. That's more of working
14 right with the programmers, and I was -- and I
15 acted as a -- that evolved into a role they call a
16 program manager.
17      The program manager's role is to
18 interface between store operations folks and to
19 figure out what the system needs and to make sure
20 projects are logged, cost benefits, so on and so
21 forth, work with the programmers, interpret what
22 the operations folks are trying to say and then
23 make sure that the programmers understand what
24 needs to be changed, enhanced, coded, because there

Page 16

1 was enhancement after enhancement after enhancement
2 to the inventory system.
3      The retail systems position, the
4 organization kind of changed names and changed
5 leadership and evolved into what they call store
6 systems, and the role of program manager was still
7 there.
8      I actually didn't have folks reporting
9 to me specifically, but I was in charge of the
10 program, if you would; and my program was the
11 inventory management system.
12   Q.   SIMS?
13   A.   SIMS, correct.
14   Q.   Another witness referred to you as sort
15 of the godfather of SIMS.
16   A.   Oh, brother. Well, that's a
17 self-proclaimed name. That is actually intended to
18 make folks smile, which you just did. And now it's
19 evolved to the point where I am the grandfather of
20 SIMS now that I have grandchildren, so, and I've
21 been there for a long time.
22   Q.   So, you've mentioned that there is the
23 retail side and then there is inventory side of the
24 systems. Could you just briefly tell us how -- how

Page 17

1 that is different --
2   A.   Yeah.
3   Q.   -- or how that's interrelated?
4   A.   Yes. The inventory, you have to start,
5 if you're going to be able to do automated ordering
6 and if you're going to be able to track product,
7 you have to be able to account for what comes in
8 and what goes out. So, I need --
9   Q.   At which level, store level,
10 distribution?
11   A.   All -- all of this. Well, it's -- yeah.
12 And you just -- actually, you put a compound
13 question on there, because the store system
14 interfaced, if you would, or had a branch to the
15 distribution center, which also had two corporate,
16 there was two main corporate systems that fed into
17 both of those.
18      And the reason why we had two is because
19 the heads of the projects at that time couldn't
20 agree to have just one, and they each wanted their
21 own, Ripley's believe it or not. So, but there
22 were two.
23      And I was -- I had, you know,
24 interactions with all of the different teams, the

Page 18

1  distribution team, the marketing team, if you
2  would, which did the corporate programming, and the
3  stores team, which did the stores inventory
4  management system.
5      So, you needed -- you need to monitor
6  what comes in and out.  That's essential for to
7  begin.  And I call that, I'll refer to that as
8  inventory balance control.  So I know what's
9  received at my store and I know what I'm selling
10  and if something goes to a different store, I send
11  candy bars to a different store because they need
12  them, that's an outbound transaction or a claim.
13  So, something --
14      Q.   That would be like -- you're suggesting
15  like interstore, like if your store has too many
16  candy bars and he --
17      A.   I might share with you down the street,
18  right.
19      Q.   Okay.
20      A.   So, all of that is inventory balance
21  control and then we do know what's sold.  So,
22  that's outbound, too, and that goes to customer.
23      Those sales are accumulated by week, if
24  you will, and then knowing that information and

Page 19

1  over time you develop -- you can develop a forecast
2  for what you think you're going to sell in the next
3  period or the next week based on the weeks in the
4  past.  And then you turn those -- that over to
5  ordering strategies and you can generate your
6  orders.
7      Q.   So, basically the computer system has an
8  understanding of the needs over specific times and
9  can automatically place orders to make sure the
10  shelves are stocked at the right time?
11      A.   That is correct, and it's all designed
12  to bring in the adequate amount without too much
13  inventory investment because if we have too much
14  inventory investment, that's no good for cash flow.
15  And I think people understand, realize what the
16  cash flow part is.
17      Q.   And I would assume that over the years
18  that you're talking about was a -- it was a
19  development of that whole system from ground up?
20      A.   Yes, correct.  It was -- it did not
21  exist really when I hit corporate.  It was an idea,
22  and there was a small project team that had already
23  been formed.  There was many, many doubting people
24  who thought that it couldn't be done.

Page 20

1      And one of the very first things that I
2  did before I actually joined the project itself
3  full time, the SIMS project itself, was to create a
4  little mini-system that took POS scanning data and
5  we put it in with an old diskette, if you can
6  remember the diskettes, into a microcomputer.
7      And at that time I had actually written
8  the code to generate an automated order.  And it
9  gave the user an interface so that they could see
10  what was being ordered on a weekly basis to the
11  warehouse and so on and so forth and an opportunity
12  to adjust for --
13      Q.   It's interesting.  When you say the
14  microcomputer, that was the size of half the table?
15      A.   Yes.  It was -- it was the size of -- a
16  good size.  And then the other one, they had the
17  suitcase.  That was your IBM 486 I think.
18      Q.   486.
19      A.   I have gone through them all.  I've been
20  with them since the very, you know.  The younger
21  folks these days look at it and they go, "What?
22  What -- diskettes, what are you talking about?"
23  And yet I have a Google phone, too.  So I'm trying
24  to stay with it.

Page 21

1      Q.   So, you have stayed as in some capacity
2  involved with the SIMS program throughout your
3  career since development and now?
4      A.   Correct.
5      Q.   I'm not going to ask you to go through
6  all the changes over the time, but at some point
7  I'm going to take you through some specific changes
8  that were made as it relates to controlled
9  substance order monitoring.
10      A.   Okay.
11      Q.   Was that -- we had heard that as being
12  called sort of an add-on to the SIMS system that
13  was done at some point in time?
14      A.   Um-hmm.
15      Q.   Is that a correct way of saying it?
16      A.   Yes.
17      Q.   So, the SIMS system is -- it was a
18  running order management and maintenance system
19  that was in place?
20      A.   Correct.
21      Q.   And at some point in time a corporate
22  decision was made let's try to augment the system
23  with a controlled substance order monitoring
24  plug-in?

Page 22

1    A.   Just so one more step in there to maybe
2 help make it clearer on SIMS is that SIMS was
3 developed for the front end.
4         And when it came time to make changes to
5 SIMS to adapt it to reorder in the pharmacy and to
6 control the inbound-outbound and monitoring all of
7 the receiving and all of those things I talked
8 about for pharmacy, that was one of the things
9 where I actually was like the leader of the project
10 team, if you would.  Not the programmers' direct
11 report.  I worked with -- I worked with team
12 leaders who programmers reported to at the time.
13    Q.   So, earlier you were mentioning that the
14 SIMS was a front -- front end system?
15    A.   It started there, yes.
16    Q.   And then at some point it gets expanded
17 to include even non-front end, which would be the
18 pharmaceutical side?
19    A.   Correct.
20    Q.   When was that?  I don't need to know the
21 exact date.
22    A.   Like in the 1996, '97 we did work on it.
23 It took a while to get it up to snuff.  We actually
24 had a -- our first generation system that fulfilled

Page 23

1 or packaged prescriptions for customers was called
2 Intercom.  I don't know if anybody has mentioned
3 that term.
4         But that was the -- that was round 1 of
5 John's coming in for his prescription.  He gets
6 this medicine, quantity, and bags it up and prints
7 a label and so on.
8         The second generation of that was
9 IntercomPlus; and when IntercomPlus was starting to
10 roll, we rolled pharmacy ordering right behind it.
11    Q.   So, that would be the replenishment of
12 the pharmaceutical.  If patient X comes in, John
13 comes in, pharmacist fills it out, now there is a
14 hole potentially in the stock in the store.  You
15 then connected that to the corporate system to
16 replace?
17    A.   Yeah.  There was a first generation of
18 something that would actually reorder goods into
19 the pharmacy that was hooked -- I better not use
20 that term -- that was attached to the Intercom
21 system and it was a system of counters.
22         And, so, what would happen in there is
23 that after you reached a package, it would reorder
24 the package for you automatically and then the user

Page 24

1 at that point in time could add one or take one
2 off.
3         That was -- it was not very
4 sophisticated, but that was an early ordering
5 machine.  That didn't have visibility, though, to
6 on-hand.
7    Q.   When you say "visibility," visibility to
8 corporate, visibility to the pharmacist?
9    A.   To anybody.
10    Q.   Okay.
11    A.   It did not -- it did not have all of
12 those monitoring of here's a receipt from a
13 warehouse, here's a receipt from a vendor, you
14 know, here's the sales -- well, it had sales and
15 then it did the counter.  But it then -- and it
16 didn't have a way to maintain that on-hand balance,
17 if you would.
18    Q.   And, so, as it progressed, you would be
19 able to track the pill from the purchase from
20 manufacturer to the distribution center to the
21 store to the sale?
22    A.   SIMS would -- SIMS the DC system had
23 capabilities of tracking from what was purchased
24 and what comes into the DC.  The store system,

Page 25

1 which is what I work on and what I did have worked
2 on for many, many years, that has -- that has just
3 visibility into its own store.
4         Of course, all that activity, whenever
5 there is a receipt or whenever there is sales, both
6 on the fulfillment side as well as on the SIMS
7 side, the information is uploaded, if you would, to
8 a central databank so there is ways you can get at
9 the -- you can get at the data.
10    Q.   Was the central database also referred
11 to as the UNIX system at some point?
12    A.   I don't know if it's UNIX or it would
13 be -- I don't know.  I can tell you one thing at
14 the time it wasn't called Cloud because that's a
15 new term, right?  And I'm sorry.  I don't know the
16 name.
17    Q.   I just saw --
18    A.   We refer to it as the data warehouse.
19 I'm sorry.
20    Q.   In some documents I saw there was
21 reference to "backup to UNIX."  So, I just --
22    A.   It very well could be, but I'm not the
23 expert there.
24    Q.   You weren't working on that, on those

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 servers?

2    A. I did not work on the data warehouse

3 application. I can -- I do, however, in certain

4 capacities have a little bit of access to it. Not

5 the pharmacy data, but the SIMS data.

6    Q. Now, if you could just explain for me

7 the difference of the pharmacy data, SIMS data --

8    A. Yeah. I can --

9    Q. -- DC data and, say, corporate data.

10    A. Well, corporate data, it all starts with

11 corporate data, right, so there is an item.

12    But the pharmacy fulfillment system has

13 a -- has a different data source where a different

14 item master, if you would, had a different source

15 of all of the -- of the information and a team that

16 maintains that integrity of that data, and that's

17 on the IntercomPlus system.

18    So, there is what they call a corporate

19 editor and there is a team of folks that are --

20 that maintain that data. And there are some feeds

21 between SIMS and the corporate editor for cost

22 information and so on and so forth, and the teams

23 do work together to try to make sure that what's

24 over here is the same that's up over here on the

Page 27

1 SIMS side.

2    But then the SIMS data starts at -- I

3 mentioned those two bigger machines. And then that

4 information gets cascaded into the store AS400.

5    And when I say "store AS400," you should

6 recognize there is actually an AS400 in each one of

7 the Walgreen stores.

8    Q. Okay. Let me try to break this down so

9 I get an understanding.

10    Now, if I was working at Walgreens,

11 where would I be to have -- where would I be

12 working to have access to IntercomPlus system?

13    A. So, you would have the IntercomPlus

14 system if you were in the pharmacy, you would have

15 that store's capability and I believe you would

16 also be able to see patient data from other stores.

17 So, that's where you would be. You would be on the

18 pharmacy, what I'll refer to as the fulfillment

19 system. That is John is coming for his Lisinopril,

20 quantity, here's the package.

21    Q. Then you mention the AS400. I've

22 actually seen that reference in some documents.

23 What is the AS400?

24    A. The AS400 is an IBM computer application

Page 28

1 system 400 I believe it's short for, and that's --

2 I'm reaching back in the database on what the names

3 are. But that's where the inventory system

4 resides.

5    So, on the pharmacy system, they'll log

6 my sale for my prescription and then that sale

7 gets, if you would, transmitted on an hourly basis

8 to the store's AS400. But the store AS400 doesn't

9 know it's John, it doesn't know it was -- it's --

10 it doesn't even know if it's a -- one prescription

11 or two.

12    It will -- what it does is it gathers

13 whatever it sold in one hour period of time. It

14 sends a WIC, Walgreen item code, and a UPC,

15 universal product code, and a quantity and a

16 transaction type.

17    So, let's -- for instance, transaction

18 type is 2, and that currently means that the

19 prescription was -- a label was printed for John's

20 prescription, if I can keep using myself as an

21 example. That label has been printed and it says,

22 okay, this WIC, UPC, that quantity, and get

23 transmitted over to SIMS.

24    Q. Okay. So, now AS400 sends it to SIMS?

Page 29

1    A. No, no. IntercomPlus sends it to SIMS

2 which resides on the AS400.

3    Q. Okay.

4    A. I'm sorry. Maybe I'm going too fast.

5    Q. So, then where would I be in the -- in

6 the system if I -- who has access to the SIMS?

7    A. Pharmacists, pharmacist tech, store

8 managers, support people, support personnel, John

9 Merritello.

10    Q. Would someone up in Rx Integrity have

11 the ability to look into SIMS?

12    A. Yes.

13    Q. Would someone in distribution center,

14 while you were still distributing -- I'm focusing

15 primarily today on controlled substances.

16    A. Okay.

17    Q. But if it applies to both, let me know.

18    So, if I'm -- when you were distributing

19 controlled substances, when Walgreens was, if

20 they're in the DC, could they look at SIMS?

21    A. Most likely not because they're looking

22 at their own -- they're looking at their own SIMS,

23 a DC. The DCs each have their own AS400 and their

24 own applications that control.

Page 30

1 And I don't know everything they do
2 control, but it controls everything from, you know,
3 the conveyors and the receiving dock and all of
4 their applications that brings things into the
5 warehouse in the one door and out the other door,
6 if you would.
7 And my knowledge to that, I have a --
8 just kind of an arm's length knowledge, if you
9 would. I know a little bit.
10 And we do interface with the folks at
11 the DC because at the time, when you're ordering --
12 well, we still are for self-service. The DC
13 actually sends your order schedule to you and says
14 I expect this store's order on Wednesday, I expect
15 this store's order on Thursday. And so those two
16 machines are talking to one another, if you will.
17 Q. Other than Rx Integrity, the people on
18 the ground in the store, the manager, the
19 supervisor, who else would have access to the SIMS
20 data that is generated for the stores?
21 A. You mentioned -- on SIMS, on the store
22 AS400, you mentioned support personnel, and the
23 store manager, pharmacy personnel, I think and
24 our -- all our support folks, help center, those

Page 31

1 kind of things.
2 Q. The tech people.
3 A. They have to fix problems.
4 Q. Would that also have a direct feed up to
5 corporate?
6 A. We have a way -- I guess maybe this
7 answers your question. We have a way of -- I can
8 pull on my laptop, I can bring up a session that
9 actually virtually looks as if I am in the store
10 and I have the store's system, if you would, on
11 my -- and I can control it.
12 Q. If you wanted to, you could make an
13 order in the store or make -- you know, pull up
14 data on what's happening in the store?
15 A. Make an order --
16 MR. BENSINGER: Objection; compound.
17 MR. SHKOLNIK: I'll rephrase it.
18 BY MR. SHKOLNIK:
19 Q. From where you are in corporate, if you
20 go into the interface for the store level SIMS, you
21 can actually see transactions at the store level?
22 A. Yes. I can see transactions at the
23 store level.
24 Q. Could you execute transactions at the

Page 32

1 store level, if you wanted to?
2 A. It would be a no-no, but yes.
3 Q. And I don't mean you personally. Could
4 someone up in the corporate level cancel an order
5 at the store level if they wanted to?
6 MR. BENSINGER: Objection; foundation.
7 BY THE WITNESS:
8 A. When you say "cancel," do you mean
9 completely delete an entire list of items that were
10 going somewhere?
11 BY MR. SHKOLNIK:
12 Q. No, no, let me rephrase it.
13 Let's assume you're sitting in corporate
14 and you're on the interface for Store No. 22 --
15 A. Okay.
16 Q. -- in -- down the street here. And you
17 just today feel like looking at that store and you
18 see an order that's being entered realtime and
19 you're like wait a second, someone says they're
20 buying 2,000 OxyContins. You're like there's
21 something wrong here.
22 Is there someone at corporate that can
23 actually stop that transaction if they happen to
24 have seen it happen realtime by looking at the

Page 33

1 interface?
2 MR. BENSINGER: Objection; foundation.
3 BY THE WITNESS:
4 A. Someone theoretically could change that
5 order or delete that line item.
6 BY MR. SHKOLNIK:
7 Q. And prevent it from being --
8 A. It would never -- wouldn't be an item.
9 It wouldn't be an order, rather. It would be
10 erased.
11 Q. To your knowledge, has there ever been
12 someone at corporate whose job it was to look at
13 orders realtime for any type of controlled
14 substance purchases at the pharmacy level by using
15 a remote access to the SIMS -- the store SIMS?
16 MR. BENSINGER: Objection; foundation.
17 BY THE WITNESS:
18 A. I guess I'm trying to understand what
19 you're asking me. Are you saying that I want to
20 audit an equation that I -- in other words, I see
21 that there is two pieces ordered and I want to know
22 how the computer arrived at two bottles? Or --
23 BY MR. SHKOLNIK:
24 Q. Let me rephrase the question.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    A.    Yeah, I'm --
2    Q.    I'm just --
3    A.    Yeah.
4    Q.    In the years that as SIMS developed and
5  it involved the pharmacy level transactions, has
6  there been -- has there been any procedure where
7  someone at corporate would be monitoring the sales
8  transactions on a real-time basis in the stores
9  based on algorithms or other type of preset numbers
10 where it would sort of ring a bell at corporate and
11 say, wait a second, look at this screen; maybe this
12 shouldn't happen, this sale shouldn't occur?
13     MR. BENSINGER:  Objection; foundation.
14 BY THE WITNESS:
15     A.    I think you're referring to do we audit,
16 do we -- do we go and say this order has been
17 produced at this quantity and is that following the
18 formulas that we believe are in our programs and
19 then we would take -- I'll call it paper and pencil
20 out to say, yes, it's calculating correctly, yes,
21 based on this series of weekly sales data that's
22 logged in the SIMS system, the forecast is correct,
23 and the order quantity is doing as expected.  I was
24 getting the expected result.

Page 35

1       That's more of an auditing function to
2  make sure that the program is doing what it's
3  supposed to be doing.
4       Yes, we -- I've done -- I do that.  But
5  not while an order, if you would -- not with the
6  intention that I would alter an order.  That's a
7  no-no.
8  BY MR. SHKOLNIK:
9    Q.    Okay.  So, maybe to help me understand
10 the system itself.
11      The SIMS as it relates to the pharmacy
12 side, it is a program or a series of programs that
13 helps the pharmacy determine electronically how
14 many pills they should be ordering to make sure
15 there is enough pills or other type of drugs behind
16 the counter for when a patient comes in?
17     MR. BENSINGER:  Objection to form.
18 BY MR. SHKOLNIK:
19     Q.    Is that a fair statement?
20     A.    Is your question what is SIMS' purpose
21 for pharmacy ordering?  What is the --
22     Q.    Let me rephrase it.  That's a better
23 question.  You asked a better question than I did.
24      What is the purpose of SIMS at the

Page 36

1  pharmacy level?
2    A.    SIMS replaces, makes it easy for you
3  because you no longer have to create your own
4  orders and it is designed to meet -- let me use the
5  term -- management's expectation on inventory
6  levels by ordering an amount that is adequate to
7  serve your customers without ordering too much and
8  it's also -- it's also to say this item doesn't
9  sell often enough and I simply do not want to carry
10 it because I may never sell it again.
11      So, what it's doing is taking your place
12 of walking around the pharmacy with a -- remember
13 those old devices and they used to punch like this
14 here and then guess at a random quantity.  Takes
15 all the guesswork out of that, applies science and
16 statistics and order methodologies and creates and
17 transmits the order.  That's what SIMS does.
18     Q.    So, it basically allows the pharmacist
19 to do the pharmacy job instead of just looking at
20 shelves and stocking and restocking analysis?
21     A.    Yes.  It doesn't put the order away when
22 it comes in because that would be -- we would need
23 a robot.  But it does --
24     Q.    That's coming.

Page 37

1    A.    Well, yeah, very well could be.  I don't
2  know if I'll still be there to see that.
3    Q.    So, was it ever -- was SIMS ever
4  designed to implement controls related to the
5  Controlled Substances Act and limitations on how
6  C-II to C-V controlled substances were distributed?
7    MR. BENSINGER:  Objection; compound.
8  BY THE WITNESS:
9    A.    When you use the word "distributed,"
10 that to means --
11 BY MR. SHKOLNIK:
12     Q.    That's a problem.  I'll rephrase it.
13     A.    Okay.
14     Q.    Was SIMS, as it was originally designed
15 and implemented, was it -- one of its elements
16 to control the sale of C-II to C-V controlled
17 substances in accordance with the Controlled
18 Substances Act?
19     A.    Control the sale.  I'm lost.
20     Q.    I'll try it again.
21     A.    Sorry.
22     Q.    Sooner or later I'll get it right.
23     A.    Okay.
24     Q.    My question, Mr. Merritello, is:  Did

Page 38

1 SIMS treat controlled substances any differently
2 than any other pharmaceutical in terms of its
3 inventory management purposes when it was first
4 designed?
5    A.   When we actually first started, just so
6 that you know, we didn't have an automated way to
7 do control II, and that was an add-on shortly after
8 we rolled out following IntercomPlus.
9    Q.   Why was that different?
10    A.   Let me -- I'm going to have to reach
11 into the databank here up here, so please bear with
12 me.
13        At the time -- when the other orders --
14 the other store orders, legend Rx, C-III through V
15 as front end, we would -- we could transmit those
16 orders directly to the DC and then the DC would
17 pick, pack and ship, send it to the store.
18        The system for control II requires
19 document 222 form.
20        And I'm not a pharmacist.  I don't know
21 if you realize that.  I'm not a pharmacist.  So, if
22 I --
23    Q.   I get it.
24    A.   Okay.

Page 39

1    Q.   You're doing pretty good, though.
2    A.   And our C-II warehouse at the time --
3 so, there is two nuances, the 222 form and that our
4 C-II facility actually only was open four days a
5 week when we first started and there was only one
6 of them in Orlando, Florida.  So, there was
7 differences that the store system couldn't address
8 at first.
9    Q.   At some point it was upgraded?
10    A.   At some -- we did several initiatives
11 and then we automated the control II substance.
12    Q.   So, this would -- would this still be
13 somewhere in the late '90s we're talking?
14    A.   Boy.  I'm going to guess yes, but I'm
15 kind of guessing.
16    Q.   Okay.  Once you made the system -- you
17 made the adjustments so the system could include
18 the C-IIs, did the SIMS system for the store act
19 the same way in terms of inventory management as
20 any other product in the pharmacy and the rest of
21 the store?
22    A.   The -- the C-IIs would use the same
23 ordering formulas?  Is that what you're asking me?
24    Q.   Yes.

Page 40

1    A.   Yes.
2    Q.   So, there would be an algorithm for the
3 stores on how much of whether it's toilet paper,
4 chocolate bars, underarm deodorant, heart
5 medication, the C-IIs, the computer would say this
6 is, based on our analysis, how much you should
7 have.  It's not too much.  Not too little.  It will
8 service your customers for the next week or two
9 weeks or whatever.
10    A.   One of the things you -- the front end
11 works slightly different.  There is some other
12 things in there, parameters that we're not -- we
13 don't have to adhere to in the pharmacy.  But, yes,
14 in a sense your statement is correct.
15    Q.   Now, did that type of -- I'm sure the
16 system has been upgraded quite a few times over the
17 years.  Fair statement?
18    A.   Yes.
19    Q.   And I've seen a whole bunch of work
20 orders and technical orders and things, which we're
21 going to go into.
22        But for the most part, does the SIMS
23 system in the store run today in virtually the same
24 manner as it did before with upgraded bells and

Page 41

1 whistles but doing the same -- same thing?
2    MR. BENSINGER:  Objection; vague.
3 BY THE WITNESS:
4    A.   Yeah, it's -- our formulas today and
5 our -- the logic that we've put together is so far
6 advanced I'd hate to say it's -- I mean, does it
7 generate an order?
8 BY MR. SHKOLNIK:
9    Q.   Yes.
10    A.   Yeah.  But it does it so much better
11 today.
12    Q.   But what I'm saying is it now has its
13 algorithms can even narrow down to, you know, one
14 bottle versus a carton.  You have algorithms to
15 look at things much more acutely compared to what
16 you did in the past I'm sure?
17    A.   So, you use the word "acute," which to
18 me implies a drug that is for a condition that you
19 have.
20    Q.   No, no, let me -- I'm not talking about
21 a drug.  I'm just talking in general.
22        Your algorithms developed over the years
23 so that what may have been appropriate to have ten
24 bottles of something, your algorithm now looks and

Page 42

1 says you really don't need ten. You could probably
2 have two and the next order will fit the need?
3     MR. BENSINGER: Objection; vague.
4 BY THE WITNESS:
5     A.   I think I can answer you, though, that
6 the -- I'm -- I personally am constantly tasked
7 with how do we do good service with less inventory,
8 always, and you can imagine.
9         So, if that is answering your question
10 that we continue to find better ways to be able to
11 still serve the customers on less inventory dollars
12 in the pharmacy and in the store, so the answer to
13 that is yeah, we strive to do that and that we
14 strive so that the pharmacist has to do very little
15 work to achieve that goal.
16 BY MR. SHKOLNIK:
17     Q.   And very little work towards inventory
18 management as opposed to being a pharmacist?
19     A.   They -- yeah, they still have to, you
20 know, log their receipts. They still have to --
21 there is rules about controlled substances that
22 says I'm bringing in a receipt. I have to audit
23 line by line and all of that.
24         But, yeah, the ordering, the idea that I

Page 43

1 have that machine in my hand and I'm walking around
2 and I'm doing things, we try to limit the amount of
3 work that they need to do. That saves them time.
4 They could service the patient.
5     Q.   And that's the same with respect to C-II
6 to C-Vs in the pharmacies?
7     A.   Correct.
8     Q.   Can pharmacists still do that hand
9 manual order for C-II to C-Vs?
10     MR. BENSINGER: Objection; vague.
11 BY THE WITNESS:
12     A.   Can -- I think your question is can a
13 pharmacist say I want a C-II or C-III through V
14 item, this NDC or UPC, if you would. There is
15 one-to-one relationship. And can they actually
16 order one or -- yes, they can. That's true.
17 BY MR. SHKOLNIK:
18     Q.   And today how would that -- let's take
19 today. Let's assume the pharmacist down on the
20 corner at the Walgreens decides I want 1,000 C-IIs.
21 Pick any UPC or NDC code. And instead of waiting
22 for the SIMS algorithm to generate that next bottle
23 of 1,000, that pharmacist says, "I want to order it
24 today." What is the process that happens today?

Page 44

1     A.   A C-II item?
2     Q.   Yeah.
3     A.   You did say C-II specifically.
4     Q.   I'm saying C-II.
5     A.   So, for whatever reason the pharmacist
6 wanted to add one bottle and whether -- 1,000 count
7 bottle. They would use -- they have to go through
8 the SIMS system. They can't order it online. They
9 can't use any other mechanism.
10         That C-II order must be, once it's
11 transmitted, must go through our DC system today;
12 and it goes in through the CSOS, and then the order
13 is then routed to the vendor.
14         Now, in today's world, though, if that
15 order of 1,000 tablets puts them either over -- if
16 it puts them over the so-called ceiling limit that
17 you've probably heard much about, that order would
18 never leave the store.
19     Q.   It would just be stopped?
20     A.   It's -- it vaporizes.
21     Q.   It's either fill or kill?
22     A.   Well, no. Fill or kill, that's a DC
23 term. I'm sorry.
24     Q.   I appreciate --

Page 45

1     A.   Fill or kill is I'm your vendor. I'm
2 Amerisource and I want fill or kill. So, you can't
3 send it to me, you send me back an omit, an order
4 omit. So I don't have this today. And then I can
5 take that and do something else with it.
6         But not if it's a C-II. That's it.
7 It's over. We don't send. We don't send C-IIs
8 anywhere else. We have only one source.
9     Q.   Now we're talking about -- we are in --
10 I was going to say 2018. 2019.
11     A.   Yes.
12     Q.   So, was there period of time where, go
13 back to that same pharmacist, and they say, "I just
14 don't want to wait for SIMS to do my regular
15 refill. I want 1,000 tablets of some C-II. I'm
16 going to place an order and I'm going to do it
17 manually myself," and that order then goes up
18 through the system. Was that possible?
19     A.   If I heard your question correctly,
20 you're asking me at one point in time where there
21 wouldn't be a ceiling limit? Is that your --
22     Q.   Yes. Was there a period of time when
23 there was no ceiling limits?
24     A.   The ceiling limits were put in in late

Page 46

1  2012, if my memory is serving me correct.

2      Q.   And whether or not it's '12 or '11, '13,

3  whichever one it is, I'm not -- we'll look at

4  documents in a little bit.

5          Once ceiling limits were put in place,

6  was that the point in time where the pharmacist

7  could not order that pill, whether they wanted to

8  or tried to?

9      MR. BENSINGER:  Objection; vague.

10 BY THE WITNESS:

11     A.   I think --

12 BY MR. SHKOLNIK:

13     Q.   I'm saying through the SIMS system.

14     A.   I think if your question -- well, if

15 your question is can the pharmacist order

16 quantity 1 prior to that ceiling limit put in there

17 and then most likely receive 1, that could be.  He

18 could use the PDQ function and that would release

19 it that day, too.

20     Q.   What is -- I've heard that phrase PDQ,

21 pretty damn quick?

22     A.   Well, let's say pretty darn quick.

23     Q.   Pretty darn quick.  I'm sorry.

24     A.   To be a little bit more --

Page 47

1      Q.   Politically correct?

2      A.   -- politically correct today.  Yes.

3      Q.   So, pretty darn quick.  So, that was

4  actually a function that was included in SIMS?

5      A.   That one goes back and has history.

6      Q.   Could you tell us?

7      A.   So, PDQ in the SIMS world actually

8  started before SIMS.  So, what they would do with

9  PDQ orders is back in the day, I mentioned that

10 counter system that we had, and what they had for

11 PDQs back in the day is they were able to order, a

12 store could order 15 lines of quantities.  That

13 would be less than double digits.

14         So, they could order up to nine and up

15 to 15 items in St. Louis, Phoenix and Chicago, and

16 receive those items the next day for legend Rx or

17 for C-III -- I think we would have had C-III

18 through C-V in our DCs at that point in time.  Not

19 C-IIs.  So, that's the original PDQ.

20     Q.   Because those were the -- those three

21 areas were distribution centers, St. Louis,

22 Phoenix, and Chicago?

23     A.   Um-hmm.

24     Q.   And you could order direct and it would

Page 48

1  come quick?

2      A.   There is functionality that was in -- I

3  think it was in the Intercom system at first where

4  they could pull up a screen, type in a Walgreen

5  item code, which is a six-digit Walgreen, it means

6  this NDC/UPC, but it's the Walgreen item code, and

7  then the quantity.

8          And there would have to be a single

9  digit, to the best of my knowledge, in Intercom;

10 and then it would go, and that would get shipped

11 the next day along with your film and your mail.

12     Q.   And did that --

13     A.   Like letters, you know, not e-mails.

14     Q.   And did that PDQ system carry over to

15 SIMS when it came into place?

16     A.   Yeah, and it -- it carried over at

17 first, and then it was -- that was one of my --

18 that was one of my jobs that was directed by

19 pharmacy, by the pharmacy user and his boss, and he

20 says, "Get rid of PDQ because I don't -- stores are

21 using it, you know.  They don't need to do that and

22 it costs us a lot of money to use it."  And he

23 wanted to get rid of that.  So, we didn't have that

24 too far -- too far once we came up with SIMS.

Page 49

1          But today there still exists the PDQ,

2  and that's where the store can add a C-II item or

3  an item -- we have certain items from the Valiant

4  Company that are consignment items and those are in

5  our DCs.  Very little other -- that's about the

6  only pharmacy product we have in our DC are these

7  Valiant items.

8      Q.   And what is a Valiant items?

9      A.   It's a manufacturer's name, Valiant.

10 And it's consignment.  In other words, we don't pay

11 for it until we sell it.

12     Q.   Does Valiant provide any C-IIs to C-Vs?

13     A.   No.  So -- go ahead.

14     Q.   In looking at documents, I see the use

15 of PDQ occurring in the latter 2000s, in the early

16 2012s continuing up to present.  So, did PDQ get

17 programmed back in at some point?

18     MR. BENSINGER:  Objection; vague.

19 BY THE WITNESS:

20     A.   PDQ was in there, and we actually never

21 took it out.  It's just that it wouldn't -- there

22 was probably a period of time when it wouldn't do

23 anything for you because particularly what happens

24 when a store uses that function is it stamps the

Page 50

1 order with a certain -- with an X, if you would,
2 and once it got to the DC, it says, oh, we can't
3 order type X and it would just kind of go right
4 back to the store and say you're not getting this.
5 BY MR. SHKOLNIK:
6     Q.   When did PDQ functionality where it
7 would actually allow processing return to the SIMS
8 system?  I don't need to know the exact date.  Give
9 or take.
10     MR. BENSINGER:  Objection; vague.
11 BY THE WITNESS:
12     A.   I think that was -- I think we put it --
13 we enabled it just after we put in the program to
14 allow -- to accommodate C-II orders on SIMS.
15 BY MR. SHKOLNIK:
16     Q.   So, that would have been in the 2000s
17 time frame?
18     A.   Might have -- could have been before but
19 not much before.
20     Q.   So, if we're talking the period of 2000
21 up to 2014 when Walgreens stopped distributing C-II
22 to C-Vs, was the PDQ functionality available to the
23 pharmacists seeking to fill orders for C-II to
24 C-Vs?

Page 51

1     A.   PDQ would only be for C-IIs.
2     Q.   Why would it only be -- why was it only
3 limited to C-IIs?
4     A.   Because the reason for that is that
5 the -- and you're talking about -- make sure I'm
6 clear on this.
7         Are you talking about 2014 now when all
8 our inventory is being sourced from
9 AmerisourceBergen?
10     Q.   No, I'm saying up to.  I'm taking the
11 period 2000 --
12     A.   Okay.
13     Q.   -- give or take, when it got re- --
14     A.   Yeah, when we took it -- remember I
15 mentioned that we took it out.
16     Q.   Yeah.
17     A.   Okay.  That was it for C-III through V.
18     Q.   Never got turned back on for --
19     A.   It did not get turned back on for C-III
20 through C-V.
21     Q.   Was there a reason why it didn't get
22 turned back on for them?
23     A.   We didn't want to send orders from the
24 parent DC on a next-day basis for those stores.

Page 52

1 So, that's why it was turned off for that for that
2 reason.
3     Q.   Was there a reason why it turned on for
4 C-II products?
5     A.   I can guess.
6     Q.   I'll take a guess, but I understand.
7     MR. BENSINGER:  Objection; foundation.
8 BY MR. SHKOLNIK:
9     Q.   I understand.
10     A.   I'll give you a guess.  I think it
11 was -- I think the reason we had C-II and we wanted
12 to continue to use that is that, you know, not all
13 stores had -- carried a full complement of C-II.
14         A C-II you might need for a customer for
15 a disease state or something, an emergency need.  I
16 believe it was to get that merchandise to the store
17 quickly to help the customer, help the patient.
18     Q.   As opposed to C-III to C-Vs, which were
19 not sort of a quick need type of an opioid?
20     A.   C-III through --
21     MR. BENSINGER:  Objection; mischaracterization.
22 BY THE WITNESS:
23     A.   C-III through C-V, stores prior to -- I
24 believe prior to the ceiling tool going in, C-III

Page 53

1 through C-V, I think we could actually order
2 direct to Cardinal, if my memory is serving me
3 correctly, and did not -- and C-III through C-V
4 does not require the 222 form, which that stuff
5 goes through our DC system and the 222 forms are
6 created on behalf of the store.
7 BY MR. SHKOLNIK:
8     Q.   From 2014 when you stopped distributing
9 up to the present, can the pharmacy still utilize
10 the PDQ application for C-II orders?
11     A.   Yes, yes, they can.
12     Q.   But it would go through SIMS, through
13 the whole ceiling process, then get released to a
14 vendor?
15     A.   Then it would get then -- it would go
16 through the DC system and through what they call
17 electronic 222 forms or I believe the system is
18 called CSOS.  They refer to it as CSOS.  And that
19 would then get sent on via EDI to AmerisourceBergen
20 in the current state.
21     Q.   And then AmerisourceBergen may do its
22 own assessment of the order and decide to ship or
23 not ship?
24     MS. SCHUCHARDT:  Objection; foundation.

Page 54

1    MR. BENSINGER: Objection; foundation.
2 BY THE WITNESS:
3    A.  That's my understanding, that
4 AmerisourceBergen also has a monitoring system.
5 BY MR. SHKOLNIK:
6    Q.  Do you work in any capacity with the
7 programming of CSOS, C-S-O-S?
8    A.  No, not directly.
9    Q.  How about indirectly?
10    A.  Well, I think I have to have you clarify
11 what indirectly meant.
12    Q.  Okay.  In the work you do with SIMS, is
13 CSOS a, for lack of a better way of putting it, is
14 that sort of an add-on system to SIMS?
15    A.  To DC SIMS.
16    Q.  Okay.
17    A.  If I can use that word.
18    Q.  Okay.
19    A.  Not to store SIMS.
20    Q.  Okay.  Because we didn't get into DC
21 SIMS yet.  We have been talking primarily store
22 SIMS.  Am I correct?
23    A.  My focus is store SIMS.  That's where my
24 area is, my expertise.  That's where all my work

Page 55

1 gets related.  And I know some bits and pieces of
2 how other things interface together, if you would.
3    Q.  How about the suspicious order
4 monitoring add-on.  Is that the DC SIMS or is that
5 store SIMS or both?
6    MR. BENSINGER: Objection; vague, foundation.
7 BY THE WITNESS:
8    A.  Ceiling limits tool?  Ceiling limits.
9 BY MR. SHKOLNIK:
10    Q.  Ceiling limits.
11    A.  Let's just call it ceiling limits.
12       Yeah, that's store SIMS.
13    Q.  To your knowledge, is there any -- is
14 there any other program at the DC SIMS that
15 performs an analysis like the ceiling limit or
16 tolerance limit to C-IIs to C-Vs?
17    MR. BENSINGER: Objection; foundation.
18 BY THE WITNESS:
19    A.  I don't know if there is or there isn't.
20 BY MR. SHKOLNIK:
21    Q.  There was quite a bit of work between
22 2009 and late 2013 focusing on developing the
23 ceiling limits, tolerance limits tools for the
24 purposes of controlling controlled substances and

Page 56

1 the way in which they were distributed at
2 Walgreens.  Am I correct?
3    A.  No, not exactly.
4    Q.  Okay.
5    A.  Ceiling limits was something that I
6 believe we worked on, started work on in the early
7 part of 2012, if my memory is serving me correctly,
8 and was non-existent prior to that and wasn't
9 implemented until I believe it was November 2012.
10 I think somebody might have to check my...
11    Q.  We got some here.
12    A.  58.  Okay.  So...
13    Q.  You're doing pretty good.  I'm 58 also.
14    A.  Okay.
15    Q.  So, there is also something that was
16 called a tolerance limit for controlled substances,
17 wasn't there?
18    A.  There exists -- there exists a
19 tolerance.
20    Q.  Now, where is the tolerance limits
21 algorithm housed, to your knowledge?
22    MR. BENSINGER: Objection; foundation.
23 BY THE WITNESS:
24    A.  To the best of my knowledge, that's also

Page 57

1 on the store AS400.
2 BY MR. SHKOLNIK:
3    Q.  That's the store's -- the store's AS400
4 SIMS?
5    A.  SIMS, the application.
6    Q.  And between 2008 or '9 and 2012 when the
7 ceiling limits were included in the SIMS, was the
8 tolerance level being utilized by the --
9    MR. BENSINGER: Object.
10 BY MR. SHKOLNIK:
11    Q.  -- the SIMS system?
12    MR. BENSINGER: Objection; mischaracterization.
13       Could you read that question back,
14 please.
15    MR. SHKOLNIK: I'll rephrase it because it was
16 actually kind of difficult as I look at it.
17 BY MR. SHKOLNIK:
18    Q.  Was there a period of time before the
19 ceiling limits application was put in place that
20 the tolerance application was in use?
21    A.  Yes.  Tolerance came first.
22    Q.  And do you recall approximately when
23 tolerance came into use in the SIMS system?
24    MR. BENSINGER: Objection; foundation.

Page 58

BY THE WITNESS:

A. I'm not certain when and the different time frames on that because tolerance was something that I didn't work on.

BY MR. SHKOLNIK:

Q. Do you know who -- what group was working on the tolerance limits application?

A. I believe -- well, the tolerance limits, the tolerance add-on to SIMS, if I may, was programmed by Steve Bamberg's group, the ordering team. Does that -- is that your question?

Q. That's my question.

A. Okay.

Q. So, just so I understand it, the ceilings tool was an add-on, am I correct?

A. To SIMS.

Q. To SIMS. Tolerance tool was an add-on to SIMS?

A. Correct.

Q. At some point in time both add-ons were working together, am I correct?

MR. BENSINGER: Objection; vague.

BY THE WITNESS:

A. When we introduced ceilings there was

Page 59

much debate about do we even need tolerance, and at the point in time the group that was working on the ceiling limits chose to continue to have the tolerance run and they work in harmony.

So, once ceiling was introduced, and, again, I think it's November of 2012, tolerance and ceiling are both part of the system and I believe they're both still there today.

BY MR. SHKOLNIK:

Q. Who would be the manager for tolerance and ceiling? Like which group would be the responsible group? When I say "manager," I don't mean person manager with a title. I mean, what group would be responsible for managing tolerance and ceiling?

MR. BENSINGER: Objection; foundation.

BY THE WITNESS:

A. I know Wayne Bancroft helped them with the formula. I think the question you're asking me is who championed it.

BY MR. SHKOLNIK:

Q. Yes.

A. I think at the time the champion would have been Barb, Barb Martin, and her -- her -- I

Page 60

believe it was Joanna Lalich, who no longer works for Walgreens, was her direct supervisor.

And I believe Joanna at the time was a director and I think Barb would have been a manager at that point in time.

Q. And did you work -- did you have any hands-on with the team in developing -- I'm going to focus first on tolerance add-on to SIMS?

A. No.

Q. Did you have any hands-on involvement with the team developing the ceiling add-on to SIMS?

A. Yes.

Q. Given your extensive history and background with SIMS, why is it you weren't involved in the tolerance program?

MR. BENSINGER: Objection; foundation.

BY MR. SHKOLNIK:

Q. If there was a reason.

A. That's a very good question.

Q. I have one a day. That was it.

A. That was a very good question.

I can't even guess at the answer, and this was 2000 and -- you said 2000 --

Page 61

Q. '8 or '9.

A. Was it 2008? I was -- I don't know. Sorry.

Q. Were you being consulted by any of the team for any input with respect to developing the tolerance add-on for SIMS?

A. Not that I can recall.

Q. Did you, as part of your job, once tolerance was put in place as an add-on, did you have to interface with that aspect of the program?

MR. BENSINGER: Objection; vague.

BY THE WITNESS:

A. No.

BY MR. SHKOLNIK:

Q. How did it come about that you were sort of brought back into the fold when they started talking the ceilings add-on?

MR. BENSINGER: Objection; foundation.

BY MR. SHKOLNIK:

Q. I'm not making any -- it's not derogatory when I say brought into the fold. I'm saying how is it that now you were brought in on this project?

MR. BENSINGER: Objection; foundation.

Page 62

BY THE WITNESS:

A. For ceiling limits, the group was -- the compliance, loss prevention, there was a very large group that was trying to figure out I believe the next steps into monitoring controlled substances; and I was asked by Denman Murray, who was my director, to in his -- I believe the words. I can almost remember it because I think I might have said, "Oh, shoot," but after he said, "We need your help on this. You're coming to this meeting." And then I went into the room with -- there is a large room.

I remember that well because it turned out to be a lot of work. That's how you remember it well.

BY MR. SHKOLNIK:

Q. It was a lot of work in a short period of time?

A. Yes, sir.

Q. And it was around that time that the DEA was taking action against the company, was it not?

A. Can you --

MR. BENSINGER: Objection; vague.

BY MR. SHKOLNIK:

Page 63

Q. I'll rephrase it.

A. Can you clarify "action"?

Q. In that 2000 time frame, 2012 time frame, the DEA had issued -- initiated some legal action against a distribution center and was initiating further action against the Perrysburg distribution center, and there was a lot of concern about upgrading your suspicious order monitoring system, correct?

A. I'm not --

MR. BENSINGER: Objection; foundation.

BY THE WITNESS:

A. Yeah, I'm not certain, you know, what legal actions occurred and when. I just knew that there was a desire to upgrade what we were doing.

BY MR. SHKOLNIK:

Q. And with that desire there was also a sense of urgency to try to get an upgraded system in place, wasn't there?

A. I would say yes. That's probably why they came and got me.

MR. SHKOLNIK: We have been going over an hour. Can we just take a five-minute break?

THE VIDEOGRAPHER: We're off the record at

Page 64

9:08 a.m.

(WHEREUPON, a recess was had from 9:08 to 9:17 a.m.)

THE VIDEOGRAPHER: We are back on the record at 9:17 a.m.

(WHEREUPON, a certain document was marked Walgreens-Merritello Exhibit No. 1: 12/7/12 e-mail with attachment; WAGMDL00114602 - 00114625.)

BY MR. SHKOLNIK:

Q. Mr. Merritello, I just handed you what has been marked as Exhibit 1 for today, and it's an e-mail with an attached PowerPoint presentation.

And if I'm not mistaken, I thought I had it highlighted, I think your name was in the distribution somewhere, but I may be wrong. But --

MR. STANNER: It's on the screen.

MR. SHKOLNIK: Thank you. Boy, you are so much faster than the other day.

I'm not going to say that on the record.

It's a pleasure.

MS. DILLINGHAM: For those of us on the phone, could you read the Bates number.

Page 65

MR. SHKOLNIK: I was just about to do that. I was flipping the page. I was just laughing before that. Bates No. is 00114602.

(Clarification requested by the reporter.)

MS. DILLINGHAM: This is Emily Dillingham.

BY MR. SHKOLNIK:

Q. And that's an e-mail from January 31, 2013 referencing a meeting in a conference room of the pharmacy purchasing and supply chain quarterly meeting.

MR. BENSINGER: Mr. Shkolnik, I think you misspoke in identifying the date.

MR. SHKOLNIK: Did I? I have January -- did I say 13 or 31?

MR. BENSINGER: The e-mail is dated December 7, 2012.

MR. SHKOLNIK: Oh. I'm saying the meeting was January 31, 2012. I was reading off a different line.

MR. BENSINGER: But your statement referred to the e-mail date.

MR. SHKOLNIK: Okay.

MR. BENSINGER: I just wanted to point that

Page 66

1 out to you.

2 MR. SHKOLNIK: Let me correct it so it's

3 clear.

4 BY MR. SHKOLNIK:

5 Q. We have an e-mail dated December 7, 2012

6 to a whole group of people, and it references a

7 meeting that's going to occur on January 31, 2013

8 of the pharmacy purchasing and supply chain

9 quarterly meeting.

10 What -- do you know what the pharmacy

11 purchasing and supply chain quarterly meeting was?

12 A. The -- this meeting -- I'm going to

13 guess it's either -- it might be Mike Bleser's

14 meeting or it might be Frank DeStefano's meeting

15 where he brings all of his -- everybody together in

16 one big group to do updates. They try to do it I

17 guess -- well, it says quarterly.

18 Q. Quarterly.

19 A. So, it's four times a year.

20 Q. Are you part of his group or of these

21 groups?

22 A. Yes. I'm part -- I'm part of that

23 group, right.

24 Q. So, your immediate supervisor is Denny

Page 67

1 Murray?

2 A. Denman Murray.

3 Q. Denman Murray. And his superior would

4 be Mr. Bleser, am I correct?

5 A. Mike Bleser.

6 Q. And Mr. Bleser's superior is

7 Mr. DeStefano?

8 A. Yeah, but there was a time when he went

9 to -- it depends on -- I don't know the date if he

10 was -- if Frank DeStefano was in Switzerland or not

11 because he left for a while and then he came back.

12 Q. So, at this meeting, there is a

13 PowerPoint that was presented. As you sit here

14 today do you have any recollection of attending the

15 meeting?

16 A. I can take a guess. I'm guessing I was

17 there.

18 Q. I'm just going to jump ahead. If we

19 could go to Page No. -- we call them Bates numbers,

20 but at the bottom of the page there are numbers.

21 The last three digits are 612.

22 MR. BENSINGER: Mr. Shkolnik, the exhibit that

23 I have does not have Bates numbers on the

24 PowerPoint.

Page 68

1 MS. FIX MEYER: Only on the back pages.

2 MR. SHKOLNIK: It's two versions in the family

3 for some reason. One has, one doesn't. One is

4 native and --

5 MS. FIX MEYER: It's the same.

6 MR. SHKOLNIK: It's the same PowerPoint, but

7 the way it was produced to us, it has it in two

8 versions. One is with Bates. One is without. I'm

9 using the one that's full page.

10 MR. BENSINGER: Thank you for clarifying.

11 MR. SHKOLNIK: It's just, fortunately or

12 unfortunately, a lot of these natives have come in

13 this way where you have two versions of the same

14 attachment but in a different format.

15 BY MR. SHKOLNIK:

16 Q. So, I'm directing us or directing you to

17 the page 4612 that's entitled "DEA Update."

18 Do you recall being at any meetings

19 where a presentation was being made about what was

20 happening with respect to the DEA around the time

21 that you had been brought in to work on the ceiling

22 add-on to the SIMS system?

23 A. I don't recall this particular slide.

24 Q. If we can just go to the next page,

Page 69

1 which was 613.

2 I believe this was Mr. Bleser's

3 PowerPoint presentation for the group, and he

4 included this slide that's entitled "Troubling

5 trend in the United States: Leading cause of death

6 Rx drugs." And it's showing a graph in the

7 PowerPoint.

8 Did there come a time where you became

9 aware that the people at Walgreens were being told

10 that prescription drugs were now exceeding motor

11 vehicles as well as other drugs and poisoning as

12 the other number one cause of death in the

13 United States?

14 A. I'm drawing a blank on this one.

15 Q. Did you ever just from your own

16 knowledge ever come across information that in the

17 2010 to 2011 period, prescription drugs became the

18 leading cause of accidental death in the

19 United States?

20 A. I may have seen this, but I don't recall.

21 Q. Do you know if it was a topic of

22 discussion in the company that we have to do

23 something with respect to our oversight of the

24 distribution and sale of prescription opioids

Page 70

1 because trends in the United States were showing
2 that prescription drugs were the leading cause of
3 accidental death in the United States?
4     MR. BENSINGER: Objection; foundation.
5 BY THE WITNESS:
6     A. I don't -- I don't recall any
7 conversations that I would have had with anybody.
8 BY MR. SHKOLNIK:
9     Q. If we can go to the next slide. It's
10 page 12 of the PowerPoint, Bates numbered 614.
11        In the presentation given to the group
12 by Mr. Bleser and his group, he provided a timeline
13 of what he identified as the "Evolution of
14 Suspicious Order Monitoring: Timeline of Events."
15        Do you recall being part of the meeting
16 where the presentation included bringing all of the
17 members of the pharmacy purchasing and supply chain
18 groups up to speed on what was happening with
19 respect to suspicious order monitoring of
20 controlled substances?
21     A. I don't recall this at all.
22     Q. Did you know back in 2012 that it was
23 one of the obligations of the company to have in
24 place adequate controls for the distribution and

Page 71

1 sale of controlled substances like C-II to C-V?
2     A. Yeah, I -- no, I don't think I was that
3 close to the distribution and whatever rules, I'm
4 calling them rules, if I would, and whatever
5 compliance that they're -- that they had.
6     Q. I'm just going to take -- whether -- let
7 me know if you recall or don't recall. I
8 understand.
9     A. Okay.
10     Q. You may not recall these things.
11        Do you recall any discussions in the
12 supply chain group, in particular the people
13 working on developing the ceiling applications for
14 suspicious order monitoring, where it was a
15 discussion that before August of 2010 there had
16 been steady increases in Florida pill mills and
17 prescribers dispensing medication? Did you ever
18 become aware of that?
19     A. Not that I can recall until I became
20 part of that group. Then I believe there was some
21 conversations --
22     Q. Yeah, here we're --
23     A. -- within that group.
24     Q. Yeah, we're here -- this presentation is

Page 72

1 now January 31 of 2013.
2     A. Which is after that.
3     Q. Yeah, so you've been in the group now
4 for a few months working on the -- on the new
5 ceiling application. Am I correct?
6     A. Correct.
7     MR. BENSINGER: Objection; misstatement.
8 BY MR. SHKOLNIK:
9     Q. And then do you recall anyone as part of
10 the group talking about that in October of 2010
11 there was change in Florida law that restricted
12 prescribers on how they could dispense or how much
13 they could dispense of pain medications? Did
14 anyone talk about that, to your recollection?
15     A. I can't recall.
16     Q. Did anyone talk about, in the context of
17 developing the ceiling applications, that between
18 October of 2010 and March of 2011, there had --
19 that the company, actually Walgreens, as well as
20 other pharmacies, were seeing an increase in the
21 number of -- a dramatic increase in the number of
22 opioid pain medication prescriptions -- I'll speak
23 English well -- prescriptions seen at retail
24 stores?

Page 73

1        Was that a topic that was discussed by
2 the team working on the ceiling?
3     A. I don't -- I don't remember any
4 specifics. So, I'd have to say I don't recall.
5     Q. Okay. And do you recall the team
6 talking about the fact that Florida prohibited
7 practitioners in July of 2011 from dispensing C-II
8 and C-IIIs except in very limited circumstances?
9        Once again, is that a conversation that
10 was had by the group other than this presentation
11 made by Mr. Bleser?
12     A. I don't recall this specifically coming
13 up in that group and...
14     Q. Besides being part of the group, do you
15 recall having -- hearing about that during that
16 time frame, that the company was seeing marked
17 increases of opioids being sold at the store level
18 and ordered through the distribution channels
19 following changes in laws in Florida?
20     MR. BENSINGER: Objection to form.
21 BY THE WITNESS:
22     A. I don't -- I don't recall anybody
23 involving me in conversations.
24 BY MR. SHKOLNIK:

Page 74

1   Q.   Going on, October of 2010, do you have
2   any -- I'm sorry.  If we can go to the next page.
3        Do you recall a discussion in Walgreens
4   when they brought you into the team to work on the
5   ceiling limits where you were being told that the
6   DEA had issued Administrative Inspection Warrants
7   on six stores and the Jupiter distribution center
8   in April of 2012?
9   A.   I can recall some action taken by the
10  DEA which basically ceased Jupiter from operating
11  and some number of stores, and I think I can recall
12  some conversations around that.
13  Q.   And did it also include stopping the
14  distribution of C-IIs out of the distribution
15  center in Jupiter?
16  A.   That's the -- I think that was the DEA
17  action that I was referring to.  That was both in
18  the office talk, if you would, and I think I
19  remember seeing that on news and Internet and all
20  the news, if you would.
21  Q.   At about that time, in April of 2012,
22  was there also discussion in the office that in
23  addition to the Jupiter shutdown regarding C-IIs,
24  DEA was also commencing action against

Page 75

1   Perryville -- Perrysburg.  I'm sorry.  Why did I
2   say Perryville -- Perrysburg distribution center
3   and the Woodland distribution center related to the
4   C-II distribution?
5   MR. BENSINGER:  Objection to form,
6   mischaracterization.
7   BY THE WITNESS:
8   A.   Those I don't recall.  I can recall,
9   though, the day or maybe it was the day after when
10  the news hit and the media came out and the talk in
11  the office that the Jupiter DC was ordered to --
12  I'll use my own term -- cease sending drug out of
13  it, all of it.  They closed us -- they closed it
14  up.
15  BY MR. SHKOLNIK:
16  Q.   And back at that time there was only
17  three facilities that were distributing C-IIs for
18  Walgreens?
19  A.   Walgreen owned, yes.
20  Q.   There was outside vendor, Cardinal
21  Health, also at that time, wasn't there?
22  A.   Correct.  We -- if our DC did not carry
23  a certain C-II, they would forward it on to the
24  vendor because it was -- I'll use the word catalog.

Page 76

1   There's the catalog of all, all the lists and we
2   only carried a subset of the catalog of the list.
3   But if there was --
4   Q.   But also if for whatever reason a store
5   could not get an order from the distribution
6   centers because they hit tolerance, those same
7   stores were able to order from the vendor for a
8   certain period of time before that was stopped in
9   the SIMS system?
10  MS. FIX MEYER:  Objection; foundation.
11  MR. BENSINGER:  Objection; foundation.
12  BY THE WITNESS:
13  A.   I think the answer to your question is
14  no, they weren't.  All the C-II orders had to flow
15  through the -- our distribution center and then it
16  would have been forwarded on.
17       So, the store -- I think what you
18  described, if I can, that you described a store
19  ordering directly from the vendor.  And that would
20  not -- never be the case with C-II.  Has to go
21  through our distribution center first.
22  BY MR. SHKOLNIK:
23  Q.   And that's your best recollection today
24  that that -- that's the process.  There was never a

Page 77

1   period of time where the C-II could be purchased
2   directly from Cardinal Health or another vendor
3   without going through the SIMS process through the
4   distribution center?
5   MR. BENSINGER:  Objection.
6   MS. FIX MEYER:  Objection.  Go ahead.
7   MR. BENSINGER:  Objection; foundation,
8   misstatement.
9   MS. FIX MEYER:  Same objection.
10  BY THE WITNESS:
11  A.   I do not recall a time where a store was
12  ever able to send an order of a control II
13  substance without going through the DC system.
14  BY MR. SHKOLNIK:
15  Q.   If we just go on, do you recall
16  discussions in around May or June of 2012 where the
17  company voluntarily removed all C-II products,
18  Xanax and Soma from eight stores and then did a
19  company-wide launch, relaunch of good faith
20  dispensing policy?
21  A.   I don't recall this particular instance.
22  The term "good faith dispensing" is a term I
23  have -- I've heard.
24  Q.   When did you first begin to hear that

Page 78

1 terminology used?

2     A. I'm not quite certain.

3     Q. According to Mr. Bleser's PowerPoint, in
4 September of 2012, what's called an ISO was issued
5 for Jupiter at that time, basically stopping
6 Jupiter from distributing C-IIs and in November, an
7 Order to Show Cause was issued to three pharmacies
8 in Florida. Do you recall having a discussion
9 about that?

10     A. I'm not familiar with ISO. Can you help
11 me?

12     Q. I'm just saying --

13     A. What is ISO? What does ISO mean?

14     Q. I'm just saying did you ever hear
15 someone saying ISOs were issued by --

16     A. I don't know what --

17     Q. -- the DEA?

18     A. If I don't know what an ISO is.

19     Q. Then you don't know?

20     A. I would be the first person to ask
21 somebody what that three-letter thing means that
22 they're getting at.

23     Q. And if we can turn to the next page.

24     Do you recall, was there any discussion

Page 79

1 that in February of 2013 there were DEA hearings
2 involving the shutdown of Jupiter and the stores
3 proceeding? Was that something discussed?

4     A. I --

5     MR. BENSINGER: Objection; foundation.

6 BY THE WITNESS:

7     A. I can vaguely remember that there was
8 discussions, but that would be a compliance-led
9 initiative.

10 BY MR. SHKOLNIK:

11     Q. If we can go to page 16, please.

12     Have you ever seen this presentation --

13     MR. BENSINGER: Mr. Shkolnik, forgive me. You
14 say 16. But the Bates number is 4618?

15     MR. SHKOLNIK: Yes.

16     MR. BENSINGER: For the benefits of those on
17 the phone and record.

18     MR. SHKOLNIK: Yes.

19     MR. BENSINGER: Perhaps you could start your
20 question again.

21 BY MR. SHKOLNIK:

22     Q. I'm turning us to Bates ending 618,
23 which is page 16 of the PowerPoint, and it's
24 entitled "Rx Purchasing and Supply Chain

Page 80

1 involvement in SOM is through inventory control."

2     Have you ever seen this graph before?

3     A. Yes.

4     Q. Can you tell us in what context you've
5 seen this graph before?

6     A. This graph pretty much represents the
7 theory of how the ceiling tools -- ceiling tool and
8 the ceiling limit works.

9     Q. And could you explain that for us,
10 please.

11     A. I can.

12     Q. Would you.

13     A. And here it comes.

14     Q. Okay.

15     A. I will -- I will explain, and I will try
16 to leave technical terms out and try to explain
17 without using that.

18     Q. Okay.

19     A. It might take me a minute.

20     Q. That's fine.

21     A. Okay.

22     Q. We got time.

23     A. All right. Okay.

24     So, this pretty much is the idea that I

Page 81

1 brought to the meeting the day that Denman said he
2 needed help that I had spoke of earlier.

3     Q. Yes.

4     A. My theory is that as a store, we have --
5 we measure -- let's take a step back.

6     We measure store volume by the number of
7 prescriptions that they do and monitor an average
8 per day for each store in the enterprise. Okay.

9     And so, along the, if you will, X axis
10 or horizontal axis, we'll see that we have 100
11 prescriptions, 200 prescriptions, 300, 400 and 500
12 and so on.

13     Q. If I can ask you a question about that.

14     A. Sure.

15     Q. So, is this a -- are you picking a
16 specific store to come up with this analysis or is
17 this a hypothetical store? What type of data are
18 you drawing upon to come up with the blue, the
19 orange, the green along that axis?

20     A. So, the theory again, I'll try and
21 explain it here, is that as a store's volume gets
22 higher and higher, you would expect the store to
23 use more of all drugs, high blood pressure pills,
24 statins for cholesterol, flu shots.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    So, you would -- there should be a
2  relationship between the number of Rx's you do per
3  day and the usage of any given item.
4    Q.  If you're a high-volume store, you're a
5  high-volume store?
6    A.  You should be selling more of any given
7  product than the lower volume store would do.
8    This data is a plot of the I believe
9  four weeks' worth of receiving from each of the
10  stores, and then the average chain-wide
11  relationship line that you see there --
12    Q.  That's the black line.
13    A.  -- is the product of a linear
14  regression, which is, in better terms, more
15  English-like terms, is I'm trying to fit a best fit
16  line, the one that represents what a normal store
17  would do at each volume level.
18    It uses a technical term called a least
19  squares method, which is no more than trying to
20  find the line that represents the least amount of
21  error for the whole universe of stores for that
22  molecule strength.
23    Q.  Okay.
24    A.  And from that then, you can see the plot

Page 83

1  of all stores and you can see that many stores are
2  going to be below your expectation, some stores are
3  going to hit it right on the head, probably not
4  likely right down to the pill, but -- and then
5  you'd have stores that are selling more than the
6  norm.
7    And then the process goes and says if
8  you're too far away from the norm, you're exceeding
9  the ceiling; and as you approach the ceiling, the
10  activity should be monitored.  That's the whole
11  premise of it.
12    So, as a store is approaching the
13  ceiling as your orange dots and it's configurable
14  where we left a lot of user-driven, you can be, you
15  know -- once you get to 75% of your ceiling, then,
16  you know, we are going to put you on the dashboard
17  and lights start beeping, take a look at this
18  store, and then the ceiling itself is the level
19  that says --
20    Q.  That's the hard stop?
21    A.  -- that's no more.  You don't go above
22  the ceiling.  So, we won't generate above a
23  ceiling.
24    And that's the gist.  Now, I said a

Page 84

1  bunch.  I'll let you --
2    Q.  No.
3    A.  I'll let you ask your --
4    Q.  I think you explained it -- you
5  explained it very well.
6    So, based upon -- this is -- what we are
7  looking at chain -- we are not looking at any small
8  group of stores.  We are looking at chain-wide data
9  that has been accumulated and through a regression
10  analysis, you determined what would be the range of
11  norm for the average store across the chain?
12    A.  The entire enterprise consisting of and
13  including the actions of, you know, two pharmacists
14  or three pharmacists per store.  All that data is
15  all lumped in there.
16    Q.  This could be the pharmacy on a street
17  corner in some little town as well as someone in
18  midtown Manhattan in a superhigh-volume store.
19  You're going across the whole board?
20    A.  Correct.
21    Q.  Correct?
22    A.  Correct.
23    Q.  So, what I'm trying to figure out is how
24  do you extrapolate an Oxy 30 milligram ceiling from

Page 85

1  average -- when you're looking at average
2  prescriptions across all stores or were you looking
3  at Oxy 30 prescriptions chain-wide specifically?
4    A.  Okay.  I need to stop you and say that
5  we are not looking at prescriptions.  This is
6  receiving data into the store.
7    Q.  Okay.  I'm sorry.
8    A.  The prescriptions, though, I did
9  mention, that's the level on the X axis and the
10  independent variable, which shows where we can plot
11  the stores on the X axis.  That's the independent.
12    And the dependent variable is as the
13  store's volume goes up, you would tend to order or
14  you would tend to receive more of all types of
15  product.
16    Now, we don't monitor for legend Rx
17  that's non-controlled because we're not interested
18  in that.  That's not -- that's not the issue or the
19  problem that we were trying to address.  We would
20  have C-II, III through V and PSE all go through
21  this -- all go through this process.
22    And it's based on receiving in the store
23  and we have very good controls on receiving.
24  Amerisource sends us this, the DC sends us this,

Page 86

1 the store has to sign, they have to keep forms.
2 And I don't even know all of it, but I just know
3 there is a whole bunch of activity that goes on
4 there.
5       So, what this does is it says, okay,
6 associated with developing the what is a norm,
7 there's also a deviation as a by-product of that
8 calculation and the user can set the deviation,
9 which sets the, if you will, if I can use the term,
10 sensitivity.
11      So, if he wants to set the sensitivity
12 really tight and have -- and have more stores then
13 would be reaching their ceiling. But then it's a
14 process, it was an iterative process that the
15 user -- this is user-driven now.
16      I don't -- I don't drive it. I
17 developed it for them and then they developed their
18 dashboards and all, pulling all of that data
19 together and all of that reporting, and the
20 integrity group uses this data to evaluate.
21   Q.   So, to determine the ceiling, the one
22 item that you talked about was you're looking at
23 the purchases of the store from the DC level. Am I
24 correct?

Page 87

1       MR. BENSINGER: Objection; vague.
2 BY MR. SHKOLNIK:
3   Q.   As one element?
4   A.   The receipts, total receipts from the DC
5 or a vendor, all of it. It goes -- for this
6 molecule strength. So, when I say that, we are not
7 just looking at -- if Oxy is a generic drug and
8 maybe there is several different manufacturers for
9 it, it's all of the receipts of Oxy 30 that get
10 baked into this.
11 BY MR. SHKOLNIK:
12   Q.   And this type of ceiling analysis would
13 be done on each molecule?
14   A.   Each molecule strength because you could
15 have Oxy 30, 15. So, they're separate. They are
16 in different what we call planogram link groups.
17 Terrible term. Group of items that are the same
18 molecule strength. I think that makes sense.
19   Q.   So, it could be a generic, it could be a
20 brand. As long as it's the same molecule, Oxy
21 30 milligram, it doesn't make a difference if it's
22 from Mallinckrodt, Purdue, from -- name the
23 company. It's the drug and the milligrams or the
24 molecule itself that's taken into consideration to

Page 88

1 determine the ceiling?
2   A.   It wouldn't mix the branded with the
3 generic.
4   Q.   Why wouldn't it?
5   A.   The -- the way that the -- the way the
6 system works for all items is that the brand -- and
7 you know how brand and a generic works. All of a
8 sudden generic comes on, it's much cheaper. It's
9 what we try to get for our customers.
10      So, what we do is we never mix the brand
11 in with that generic. But usually what would
12 happen is the brand's volume would go to zero and
13 we would just sell the generic in most cases. And
14 we don't mix those two.
15   Q.   But if you're trying to determine a
16 ceiling for a controlled substance, whether or not
17 it's a brand Oxy or a generic Oxy, if what you're
18 really trying to determine is whether or not that
19 pharmacy is buying too much of that controlled
20 substance and thereby filling too many
21 prescriptions possibly, wouldn't the algorithm be
22 more accurate if you included both together so
23 you'd see total volume?
24      MR. BENSINGER: Objection; vague.

Page 89

1 BY THE WITNESS:
2   A.   I don't believe you would gain any
3 accuracy for the reason that the branded volume
4 usually disappears and goes very close to zero or
5 if not just goes away.
6       So, the way we -- the way we have the
7 order. This works off the same principles as the
8 ordering system. The ordering system would perhaps
9 order a branded item, but most likely not because
10 the cost is much higher and we're probably not
11 selling it anymore. So, it wouldn't make any sense
12 or wouldn't make any difference even if you put it
13 in there.
14      And the link group itself is the
15 molecule strength of all of the generics, and
16 within that there is usually one generic item that
17 is our preferred manufacturer and that's what the
18 system is always pointing at.
19 BY MR. SHKOLNIK:
20   Q.   But when Purdue's OxyContin was on the
21 market, there was also variations, generic
22 variations, and both continued to have fairly
23 strong market acceptance at the same time. Wasn't
24 there periods where that occurred?

1    A.   I'm not familiar with Purdue or the
2  manufacturers or the players in the game.  But
3  Purdue would be evaluated, if what you're
4  indicating to me is that it's a brand and it's
5  still selling, well, then it would have its own
6  line and its own norm and it would have its own
7  ceiling and if we were selling too much Purdue, it
8  would also be subject to the same rules.
9    Q.   But it would be -- the rule would be
10  based just upon Purdue's OxyContin versus the
11  generic OxyContin sales of virtually the same drug
12  at the same time, correct?
13    MR. BENSINGER:  Objection; mischaracterization,
14  vague.
15  BY THE WITNESS:
16    A.   Again, you're mixing the brand and
17  generic together, and we just -- we just don't do
18  that.  I'm not certain how to answer you there.
19  BY MR. SHKOLNIK:
20    Q.   I'm not -- I'm -- my question is just
21  from the analytical standpoint.
22    If you're selling a lot of one of -- a
23  molecule that's a brand molecule and you're selling
24  a lot of a generic of the same molecule, both being

1  Oxy 30, just from trying to control the numbers and
2  oversee the purchases from the DC and the sales at
3  the store, wouldn't another analysis for ceiling
4  that would make it more accurate be a combination
5  of both, just to see total numbers that are being
6  sold so that you could set a ceiling based on total
7  numbers of the molecule, whether it's Acme, you
8  name the company, you know, isn't that one other
9  way of setting a ceiling that could increase
10  accuracy?
11    MR. BENSINGER:  Objection; mischaracterization.
12  BY THE WITNESS:
13    A.   Again, in practice everything where
14  we have the brand sales go to near zero and we stop
15  selling brand and we sell generic.
16    And to mix them together, if in your
17  case that you had strong sales in both, I think if
18  you had strong sales in both, you'd -- you would
19  find that this tool would work for the brand as an
20  independent and the generic as an independent as
21  well.
22    It would work -- it would work both
23  ways, and what you're describing could work.
24  BY MR. SHKOLNIK:

1    Q.   So, and maybe I am beating a dead horse
2  and I apologize if I do it.
3    If the store is buying 1,000 Oxy a month
4  and that's its ceiling and it's Oxy from
5  Mallinckrodt, and in the same month they're also
6  purchasing 1,000 Purdue and they're purchasing
7  1,000, once again, Oxy 30s, and they're also
8  purchasing Teva, one of their generics of an Oxy
9  30, all in the same month, 1,000, 1,000, 1,000.
10    The way your system of developing a
11  ceiling would be each one of those purchases would
12  have its own ceiling calculation based on the
13  manufacturer?
14    A.   That's not correct.  You gave me a
15  scenario where you gave me two manufacturers that
16  are generic.  Those would be lumped together.
17    Q.   Okay.
18    A.   The brand would be left on its own.
19    Q.   So, if there's a series of generics,
20  that ceiling is based on not manufacturer.  It's
21  the molecule and all generics together?
22    A.   Molecule strength, that's correct.
23    Q.   If you combine all generics of the same
24  molecule to set ceiling because they're in essence

1  the same molecule, why wouldn't you also include a
2  branded version of the same molecule in that
3  algorithm?
4    MR. BENSINGER:  Asked and answered.
5  BY THE WITNESS:
6    A.   The brand generally goes to zero.
7  BY MR. SHKOLNIK:
8    Q.   But if it doesn't?
9    A.   Then these rules are going to apply to
10  that branded item, and you'll have a -- you'll have
11  a separate dashboard for them.
12    And if what you're describing is
13  happening with strong sales, you're probably going
14  to find a pool of stores that are riding right
15  along with what the norm is; and then you're going
16  to find -- you may find a few that are above the
17  line and they would get, for that molecule,
18  strength, they would get two lights on the
19  dashboard and not just one.  So, it would say, oh,
20  he's doing this and he's doing this too.
21    Q.   But let's assume both stores are keeping
22  it under the ceiling, one brand, one generic.  That
23  would be a manner in which a store could double its
24  purchases and sales of that Oxy 30 if you're

Page 94

1  running a robust brand sale and a robust generic
2  sale? It's like doubling what you would have,
3  correct?
4      A.   Hypothetically you're correct.
5      Q.   Who determined that there should be a
6  separation between brand and generic when
7  evaluating ceilings?
8      MR. BENSINGER: Objection; foundation. You
9  may answer.
10 BY THE WITNESS:
11     A.   It's not -- it's not just for ceilings.
12 It -- the brand, the brand item is always kept
13 separate from the generic family, if you would.
14 That's how the -- that's how we group our items in
15 planogram, what we call again the planogram link
16 group.
17         The brand link group may have, you know,
18 two or three different package sizes, but it's one.
19 It's the one brand manufacturer.  He owns the
20 patent.  And the other, the other group would have
21 all of your package sizes and all of your
22 manufacturers and everything put together.  And
23 basically we do that for ordering strategies as
24 well.

Page 95

1  BY MR. SHKOLNIK:
2      Q.   If you're running two separate ceilings,
3  one for a brand C-II and one for a generic C-II,
4  and the customer is purchasing with cash, they're
5  not limited by their health insurer on who they
6  can -- what they can buy.  They are not being
7  forced to get generic or the like or a benefits
8  plan that requires generic.
9          Would running two separate ceilings, one
10 for generic and one for brand, be a way in which
11 the pharmacy could sell twice as much of the C-II
12 without triggering a ceiling if they have a large
13 number of patients that were willing to pay in cash
14 at the store level?
15     MR. BENSINGER: Could I have that question
16 read back, please.
17         (WHEREUPON, the record was read
18          by the reporter as requested.)
19     MR. BENSINGER: Objection; foundation.
20 BY THE WITNESS:
21     A.   So, there's a couple things that come
22 into my mind when you ask that.
23         So, first of all, I'm a little bit
24 familiar with how our fulfillment system

Page 96

1  IntercomPlus works.  IntercomPlus is always trying
2  to give the customer the value.  So, it's -- there
3  are things in there that are steering the
4  pharmacist when they fill to the generic, just
5  based on what you are supposed to give the
6  customer.
7          Now, that's not to say if the customer
8  is at the counter and he's --
9  BY MR. SHKOLNIK:
10     Q.   "I want Oxy."
11     A.   -- his name is Howard Hughes and he
12 wants a brand and he wants to pay the price.  So
13 they could fill for the brand if he has a valid
14 prescription.
15     Q.   And that, if you have a large number of
16 Howards showing up willing to pay whatever it costs
17 to get a bottle of OxyContin and you have another
18 large group that are buying the generic, by having
19 two separate ceilings, not combining the two, would
20 allow a store to dispense more of the C-II, the
21 controlled substance, than if you had combined them
22 under one ceiling, correct?
23     A.   Let me think about that for a minute
24 because you have a norm based on the chain and you

Page 97

1  have a ceiling that's based on a deviation from the
2  norm.
3          It wouldn't be a one-for-one
4  relationship.
5      Q.   Okay.
6      A.   Because that brand item would
7  probably -- I would think that Howard -- even
8  Howard Hughes, the probability of having a bunch of
9  Howard Hughes's coming to one store is pretty low
10 and the probability of having a bunch of Howard
11 Hughes's in the universe of 8,200 stores or 8,000
12 stores or 7,800 stores is pretty low.
13         So, I would say because it's not a
14 one-to-one, that you can't necessarily make the
15 statement that you would double it.
16         But I think, duly noted, let's be fair,
17 that I think what your point you're trying to make
18 is that there is two groups.
19     Q.   And whether or not they're Howard Hughes
20 or not or you happen to have a bunch of young
21 people coming in from West Virginia or Ohio with a
22 pile of cash that was given to them to go buy as
23 many pills as they could, they could actually go to
24 a store with some of them filling brand Oxy and

---

Page 98

1 some other ones filling generic Oxy and max out the
2 store's pills. Since there is two separate
3 ceilings, it's not going to trigger a violation.
4 Doesn't have to be a Howard Hughes. Has to just be
5 people willing to buy them. Correct?
6 MR. BENSINGER: Objection; foundation,
7 improper hypothetical.
8 BY THE WITNESS:
9 A. I think you lost me a little bit --
10 BY MR. SHKOLNIK:
11 Q. I'll rephrase it.
12 A. -- with a group coming from West
13 Virginia into some other state with a handful of
14 prescriptions.
15 Q. And a lot of cash.
16 A. And a lot of cash and it's the same guy
17 that's going to go around to a bunch of pharmacies.
18 He's committing a crime now, isn't he?
19 Q. It's possible. But the fact --
20 A. Terrible.
21 Q. But the fact of the matter is if you
22 have people willing to pay cash, I don't care if
23 it's Howard Hughes or John Smith from Main Street,
24 if you have a group of people willing to pay cash

---

Page 99

1 and the store has two separate ceilings, one for
2 generic OxyContin and one for brand OxyContin, that
3 would be a way for the store to sell upwards of
4 double of the OxyContin without triggering
5 ceilings --
6 MR. BENSINGER: Objection; foundation.
7 BY MR. SHKOLNIK:
8 Q. -- if you don't combine them?
9 MR. BENSINGER: Objection; foundation,
10 improper hypothetical.
11 BY THE WITNESS:
12 A. I'm going to have to argue with you
13 because across the universe, the brand line would
14 be very, very low and even a prescription or two
15 could put a store over its ceiling in a minute.
16 That number is going -- you're going to
17 be crawling -- that number is going to be crawling
18 along the bottom here without --
19 MR. SHKOLNIK: Can you put that back up on the
20 screen, please.
21 BY THE WITNESS:
22 A. Oh.
23 BY MR. SHKOLNIK:
24 Q. No, it's fine. I didn't realize it was

---

Page 100

1 shut down.
2 I gather what you're saying --
3 MR. BENSINGER: Excuse me. Mr. Merritello,
4 had you finished your answer?
5 MR. SHKOLNIK: Oh, I'm sorry.
6 MR. BENSINGER: Could you read back the answer
7 and you let us know if you had finished or you were
8 interrupted.
9 MR. SHKOLNIK: I don't mean to cut you off.
10 (WHEREUPON, the record was read
11 by the reporter as requested.)
12 BY THE WITNESS:
13 A. Let me rephrase just a little bit of
14 what I said.
15 BY MR. SHKOLNIK:
16 Q. Sure.
17 A. The regression line would be very, very,
18 very, very low. That number would be a very small
19 number. And if you filled a prescription of 30 or
20 60 and you did it twice, you're going to be sizably
21 out of range for that branded item and it's going
22 to be reported back.
23 Q. Okay.
24 A. Okay? And the other, the generic line,

---

Page 101

1 I would anticipate that under normal circumstances
2 in a normal store would be much higher than that
3 branded item. So, the idea that you could double
4 there, I don't agree with that. I don't believe
5 you could do that.
6 Q. If I take out double, you could still
7 have increased sales by not combining the two
8 ceilings?
9 MR. BENSINGER: Objection; foundation,
10 improper hypothetical.
11 BY THE WITNESS:
12 A. A very slight one.
13 BY MR. SHKOLNIK:
14 Q. And do you know what was happening in
15 Florida during the 2010 to 2012 time frame in terms
16 of the numbers of pills that were being dispensed
17 at the Walgreens pharmacies? When I say pills, the
18 C-IIs, the controlled substances.
19 A. No, no, I can't recall that.
20 Q. If we can go to the next page, which is
21 619 of the PowerPoint. Here there's a description
22 and it says -- we know this PowerPoint is in
23 January of 2013. The PowerPoint is now saying,
24 "SOM version 5.5 is an industry leading enhancement

---

Page 102

1 to SIMS."

2 Do you recall what 5.5 was?

3 A. Not -- not off the top of my head. I'm

4 sorry.

5 Q. But by this point in time, your team had

6 already developed the ceiling algorithm, by 2013,

7 correct?

8 A. I'll guess that 5.5 is referring to the

9 ceiling tool, the whole thing, including the

10 dashboard for the integrity group and all of the

11 workings on the store AS400.

12 Q. And here it says, "Program enhancement

13 to SIMS to impact ordering processes of all

14 controlled substances and PSE.

15 "Part of the calculations use an

16 accumulation of receipts of each controlled

17 substance over the last six weeks time."

18 Was part of the analysis, I guess it's

19 the regression model that's being utilized, did it

20 contemplate a six-week lookback or were you

21 contemplating some other -- did you consider other

22 lookback periods in developing the algorithm?

23 A. So, when I went to the meeting and then

24 there was subsequent meetings and an iteration with

Page 103

1 programmers and design, that six-week is

2 configurable.

3 Six weeks was what I thought they ought

4 to start at, and I believe they are still using six

5 weeks today because that's recent enough history

6 and it actually is a complete six weeks. Today a

7 receipt comes in and six weeks go and a day, that

8 one comes out of that total that the store has

9 received in six weeks.

10 That's the -- that's the amount that

11 you're looking at. You're looking at a six-week

12 amount of receipts at that store pitted against the

13 whole chain.

14 Q. And so when you say six weeks receipts,

15 are we talking receipts buying from the

16 distribution center or receipts related to sales or

17 both?

18 MR. BENSINGER: Objection.

19 BY THE WITNESS:

20 A. Receipts and sales, in my terminology,

21 we have to keep separate.

22 A receipt is an inbound from a vendor or

23 from a distribution center or from another store,

24 which is a no-no I think, but at points in time in

Page 104

1 the past they had done that.

2 BY MR. SHKOLNIK:

3 Q. Understand.

4 A. Or they had buyouts from where we would

5 take over a pharmacy and we would induct a receipt

6 into the system.

7 All of those are considered receipts of

8 product as it's coming in the door.

9 Q. Okay. I'm glad you clarified.

10 A. Not sold. Not sold, though. That's

11 different.

12 Q. I just didn't want anyone to be looking

13 at this thinking when I think of a receipt, I'm

14 like I go buy something, they give me a piece of

15 paper, that's a receipt. We're talking a different

16 receipt in the sense of ceiling application?

17 A. Correct. And we could even use the

18 word, instead of receipts, which seems to be

19 confusing, we could just say received quantity and

20 we would be more proper.

21 Q. So, what -- the ceiling calculation that

22 you had suggested and which actually was adopted

23 into the ceiling program was a lookback of six

24 weeks of what was received by the specific

Page 105

1 pharmacy, it's calculated, and it's compared to

2 similar pharmacies across the chain in terms of

3 their receipts, their average receipts, for that

4 molecule?

5 MR. BENSINGER: Objection;

6 mischaracterization. You can answer.

7 BY THE WITNESS:

8 A. I think you're close to the idea.

9 BY MR. SHKOLNIK:

10 Q. I'm trying.

11 A. It's drawing what a normal store should

12 be receiving in a six-week period of time and then

13 pits that against what's actually happening at that

14 given location. And if it's too far away from the

15 norm, it becomes that 75% or it becomes over the

16 ceiling, if you would.

17 Q. But when you're saying, and using your

18 phraseology, the normal store, the normal store

19 would be a store similar to the one we're

20 analyzing, not just store in Little Town in Iowa

21 and store in Manhattan that may have vastly

22 different receipts of -- received -- receivables of

23 the opioids. You're using similar class stores,

24 are you not?

Page 106

1    MR. BENSINGER: Objection; vague.
2  BY THE WITNESS:
3    A.  No.  When I -- when I say norm, normal,
4  I'm lumping them by volume group.  So, for a store
5  that does 400 prescriptions, 405 would be
6  different.  500, you would come out with a
7  different number from the regression line as it
8  moved up the line or down the line.  Not geography.
9  I think that's what you were getting at.
10 BY MR. SHKOLNIK:
11   Q.  No.  I was just talking about -- I
12 should have clarified it.
13       So, you're looking at stores by volume.
14 It could be a store in Little Town in Florida that
15 may take receipt of a million pills.  You compare
16 it to a store anywhere, could be a city or a town
17 somewhere else that gets a million pills.  That
18 would be a -- that's the norm.
19   A.  All gets baked into this equation.
20   Q.  Then it says up on the PowerPoint,
21 "Tolerance and ceiling limits are applied to
22 individual orders at the store level."
23       So, now in the 5.5 version, what's being
24 done at Walgreens, and this is sometime in 2013,

Page 107

1  there is two different models that are running that
2  would have to -- that an order would be run through
3  before it's distributed, correct?
4    MR. BENSINGER: Objection; mischaracterization.
5  BY MR. SHKOLNIK:
6    Q.  I'll rephrase it.
7    A.  Thanks.
8    Q.  At this point in 2013 when 5.5 is
9  initiated, when an order is placed, before it's
10 received in the store, there is going to be two
11 analyses applied to the order.  One is the
12 tolerance and one is the ceiling limit.  Am I
13 correct?
14   MR. BENSINGER: Same objection.  You can
15 answer.
16 BY THE WITNESS:
17   A.  Before the order is placed, before it
18 becomes an order, and if it's a suggested order,
19 which means it's generated by the system, it will
20 take into account the ceiling value and then if
21 the -- and I'm going to use the term "user," but
22 let's say it's the pharmacist or whoever in the
23 pharmacy, operator, alters the suggested quantity
24 or has created a manual order, that would be

Page 108

1  subject then to the tolerance and, again, before it
2  transmits to the ceiling.
3        Does that make sense?
4  BY MR. SHKOLNIK:
5    Q.  Yes, yes.
6    A.  Okay.
7    Q.  So, now as a result of the 5.5, the
8  distribution center never gets an order if it
9  exceeds either tolerance or ceiling or both,
10 irrespective if it's a computer-generated one or a
11 manual one?
12   A.  If an order is -- will not be generated,
13 an automated order, if it's generated, will not
14 exceed the ceiling limit and if the user enters a
15 quantity which pushes the -- that above the
16 ceiling, they get zero.
17       If there was an order for, say, two
18 bottles and that was below the ceiling but the user
19 went and put in three, they get zero.  Never goes
20 out.
21   Q.  That became in effect in 2013?
22   A.  With this.
23   Q.  5.5?
24   MR. BENSINGER: Objection; misstatement.

Page 109

1    MR. SHKOLNIK: I'll rephrase it.
2  BY MR. SHKOLNIK:
3    Q.  Did that go into effect as part of 5.5,
4  whatever date 5.5 became effective?
5    MR. BENSINGER: Objection; foundation.
6  BY THE WITNESS:
7    A.  That's how the ceiling works.  If the
8  store forces a quantity -- when I say "force."  If
9  a store manipulates a suggested quantity or enters
10 a quantity that's above the ceiling, no order is
11 placed.  Zero.  Whether there was one already there
12 for some number of packages and the additional
13 packages the store is requesting brings it over,
14 they get zero.
15 BY MR. SHKOLNIK:
16   Q.  Wasn't there a period of time where the
17 computer would reduce it to either the ceiling or
18 the tolerance level or both and let the order
19 proceed?
20   A.  Ceiling does not work that way.  I'm not
21 the expert on tolerance, but I believe tolerance
22 would have -- there was a time when the tolerance
23 would actually adjust the order and then send it.
24   Q.  So, when you put in the ceiling

Page 110

1 criteria, that stopped that process from happening?
2    A.   Yes, sir.
3    MR. BENSINGER:  Objection; vague.
4 BY MR. SHKOLNIK:
5    Q.   Would I be correct in stating that
6 around the time when you released 5.5 there was a
7 discussion amongst the people working on this
8 ceiling task that the company was concerned that
9 its use of a reduction factor to allow an order to
10 go forward was somehow violative of the DEA's
11 recommendations?
12    MR. BENSINGER:  Objection; foundation.
13    And, Mr. Merritello, I admonish you not
14 to reveal the substance of attorney-client
15 communications to the extent the answer calls for
16 it and to confer with me as counsel to the extent
17 you have any question or concern as to whether in
18 answering the question you might reveal a
19 privileged attorney-client communication.
20    Otherwise you may answer if you have the
21 question in mind.
22 BY MR. SHKOLNIK:
23    Q.   Do you want me to ask it again?  I could
24 read it back.

Page 111

1    A.   Yes.
2    MR. BENSINGER:  Could you read it back.
3    Could you read it back.
4    MR. SHKOLNIK:  I'm sorry.  I was going to
5 reask the question, but read it back is fine.
6    (WHEREUPON, the record was read
7    by the reporter as requested.)
8 BY THE WITNESS:
9    A.   Was there a concern?  I -- I can't
10 recall.  I'm trying to put my arms around what that
11 means.
12 BY MR. SHKOLNIK:
13    Q.   Okay.  Let me -- were there any
14 discussions among the group that were working on
15 the ceiling project that went along the lines of we
16 have been reducing orders that exceeded tolerance
17 and the DEA has indicated that that's not an
18 appropriate way to handle an over-tolerance order
19 and that now with respect to ceilings, we're going
20 to stop that?
21    MR. BENSINGER:  Again, Mr. Merritello, we
22 should confer before you answer if to any extent
23 your answer is eliciting an attorney-client
24 communication.

Page 112

1 BY THE WITNESS:
2    A.   I guess I don't understand, I'm sorry,
3 the question.  I don't know.
4 BY MR. SHKOLNIK:
5    Q.   If you don't understand, I have to retry
6 it until I get for you to understand.
7    Did you become aware at any point in
8 time, and I don't mean with conversations with
9 counsel in prep for a deposition, did you,
10 Mr. Merritello, back when you were working on the
11 project, the ceiling project, did you become aware
12 that the DEA had indicated to Walgreens and other
13 pharmacy distributors that the reduction of a
14 potentially suspicious order to a lower amount to
15 avoid hitting ceiling, that that was an
16 inappropriate practice?
17    MR. BENSINGER:  So, Mr. Merritello, my
18 admonition is not limited to attorney-client
19 communications in preparing for your deposition
20 today.
21    If at the time in order to answer the
22 pending question you have some doubt in your mind
23 as to whether in answering you'd be revealing an
24 attorney-client communication that took place back

Page 113

1 at the time, I need to confer with you before you
2 answer and we'll go off the record.  Otherwise you
3 can go ahead and answer.
4 BY THE WITNESS:
5    A.   I guess -- I'm trying to figure.  I
6 can't even guess at what you're -- at what I'm
7 being asked.  There is -- your --
8 BY MR. SHKOLNIK:
9    Q.   I don't want you to guess.
10    A.   Okay.
11    Q.   I'll rephrase.  It's easier.
12    You were aware that prior to the ceiling
13 being implemented under 5.5, one of the practices
14 at Walgreens was if an order was placed, whether it
15 was an electronic or by a pharmacist manually, if
16 the order would have exceeded the tolerance, there
17 was an automatic reduction of the order to a level
18 that was below the tolerance and allow the order to
19 go through?  You were aware of that, correct?
20    MR. BENSINGER:  Objection; foundation.
21 BY THE WITNESS:
22    A.   Yeah, I'm aware of how tolerance works,
23 and there was a period of time when they had the
24 tolerance program without the ceiling program, that

Page 114

1 there was an adjustment made to that.
2 BY MR. SHKOLNIK:
3     Q.   Did you become aware when you got on to
4 the team working on ceiling that Walgreens had been
5 advised by DEA that the practice of making the
6 adjustment, the reduction down, was an
7 inappropriate practice?
8     MR. BENSINGER:  Objection; vague.
9 BY MR. SHKOLNIK:
10     Q.   From the DEA's perspective.
11     MR. BENSINGER:  Objection; vague.
12 BY THE WITNESS:
13     A.   Again, the ceiling doesn't allow the
14 order to go.
15 BY MR. SHKOLNIK:
16     Q.   I understand.
17     A.   It vaporizes.  It's just non- -- it's
18 non-existent.
19     Q.   But I'm talking about before you
20 implemented the ceiling.  Did you become aware that
21 the DEA had suggested to Walgreen, DEA
22 representatives had suggested to Walgreens, the
23 practice of adjusting down as was being done with
24 the tolerance program was an inappropriate

Page 115

1 practice?
2     A.   You're asking me that at the time that
3 we were putting together this program was I aware
4 of that?
5     Q.   Yes.
6     A.   I'm going to have to tell you I don't
7 recall.  I may have heard discussion, but...
8     Q.   Okay.  Would it be fair to say it was
9 not one of the program requirements that you were
10 charged with, that we have got to get rid of the
11 adjustment down component when we implement
12 ceiling?
13     A.   Ceiling doesn't work that way.  We
14 just -- this is it and no more.
15     Q.   I understand.
16     A.   And that was a -- that was also not a
17 very popular answer to the group.  They didn't like
18 the idea that, well, what if we need to get it?
19 No.  You got to go to the integrity team now.
20     Q.   If someone had -- I'll withdraw the
21 question.
22     MR. SHKOLNIK:  Let's take our break now.  We
23 have been going at this a while.  Thank you so
24 much.

Page 116

1     THE VIDEOGRAPHER:  We are off the record at
2 10:26 a.m.
3         (WHEREUPON, a recess was had
4         from 10:26 to 10:37 a.m.)
5     THE VIDEOGRAPHER:  We are back on the record
6 at 10:37 a.m.
7         (WHEREUPON, a certain document was
8         marked Walgreens-Merritello Exhibit
9         No. 2:  Excerpts of Personnel File,
10         John Merritello; not Bates
11         stamped.)
12 BY MR. SHKOLNIK:
13     Q.   Mr. Merritello, I'm going to hand you
14 what we're marking as Exhibit 2.  It's a copy of
15 excerpts of your personnel file.  Really not going
16 to go into a lot of it.  If you could --
17     MR. SHKOLNIK:  And there's no Bates -- for the
18 people above, there is no Bates number on this
19 because it was just produced.  It hasn't been
20 processed.  But it is the personnel file.
21 BY MR. SHKOLNIK:
22     Q.   If you could turn to page -- in the
23 first section on the bottom it says page 6 of 18,
24 because there is two segments where you'll have

Page 117

1 those numberings.  Maybe not.  Yeah.  The first
2 section is where I'm going.  6 of 18.
3         And from looking at this document, which
4 is highly redacted, at the bottom of the page, it
5 says "Annual Performance Review (Fiscal Year 13) -
6 Corporate, John Merritello, Jr."
7         Have you had an opportunity to see this
8 document before?
9     A.   It looks a little familiar.
10     Q.   As part of the yearly reviews, is it
11 common at Walgreens that you would put in your
12 assessment of what you think you accomplished and
13 then your immediate supervisor here, Denman Murray,
14 would put in his evaluation and that's what your
15 yearly review would include?
16     A.   Yes.
17     Q.   In -- on this page, page 8 (sic) of 18,
18 one section is "SOM/Tool Kit" up on the top.  And
19 then it says, "v5 implemented Q2, v6 and 7
20 implemented Q4."
21         Just so we're talking the same language,
22 when they say "v5 implemented Q2," what does that
23 mean?
24     A.   I'm guessing that that means version 5.

Page 118

1    Q.   Of the SOM?

2    A.   Of the SOM.

3    Q.   And that's what we were just talking

4  about, the ceiling component?  Am I correct?

5    A.   Yep.

6    Q.   And then "version 6/7 implemented Q4,"

7  we can go into later what 6 and 7 were, but that

8  just means based upon your -- what you're writing

9  here in your personnel file that both 5, 6 -- I'm

10  sorry.  Not both.  5, 6 and 7 were all implemented

11  fiscal year 2013 which began on September 1, 2012

12  and ended August 3, 2013?

13    A.   I believe that's correct.

14    Q.   And when it says Q2, that would mean v5

15  was implemented sometime in the winter of 2013,

16  correct?

17    A.   That makes sense.

18    Q.   The first quarter being September to

19  December.  Quarter 2, January to, say, March or so,

20  correct?

21    A.   Yeah, quarter 1 is September, October,

22  November.  Quarter 2 would be December, January,

23  February.

24    Q.   Okay.

Page 119

1    A.   Right?  Yes.  I believe that's correct.

2    Q.   I'll take your math over mine any day.

3    A.   Okay.

4    Q.   So, that would mean sometime, whether

5  it's September to February of 2012 into the

6  beginning of 2013, the version 5, the ceiling, was

7  implemented into the SOM, correct?

8    A.   Yes.

9    Q.   And then the 6/7 were implemented, that

10  would have been the summer of 2013, sometime

11  between June and the end of August?

12    A.   June, July and August.

13    Q.   As you're sitting here today, do you

14  know what the 6/7 upgrades were or versions were?

15    A.   I'm not certain, no.

16    Q.   And if we could turn to the next page,

17  also during this time frame, there is another

18  section of your yearly performance review that's

19  entitled "Transition C-II distribution from

20  Walgreens and Cardinal over to AmerisourceBergen

21  and ANDA."

22        Correct me if I'm wrong that somewhere

23  around March of 2013 the contract between Walgreens

24  and AmerisourceBergen was announced, right around

Page 120

1  that time?

2    MR. BENSINGER:  Objection; foundation.

3    MS. SCHUCHARDT:  Objection; foundation.

4  BY THE WITNESS:

5    A.   I don't have the exact date, but it's

6  probably close.

7  BY MR. SHKOLNIK:

8    Q.   And at the same time it became clear

9  that the Cardinal Health contract that was expiring

10  in the end of August 2013 was not going to be

11  extended, correct?

12    A.   I believe that's correct, yes.

13    Q.   And during that winter 2013 into the

14  fall -- I'm sorry.  The winter 2013 into the spring

15  2013, there was a lot of work going on trying to

16  set the transition into work between Walgreens and

17  AmerisourceBergen and separating from the Cardinal

18  Health transaction as the contract was ending?

19    MR. BENSINGER:  Objection; foundation.

20  BY THE WITNESS:

21    A.   When we -- when we changed from the --

22  having Cardinal as our wholesaler to having

23  Amerisource and then to eliminating our DC

24  inventory or eliminating almost all of it, legend,

Page 121

1  everything, brand, brand went first and then

2  generic went second, there was, and I think you

3  used the term, a lot of work.

4  BY MR. SHKOLNIK:

5    Q.   And when you're talking about transition

6  here, you participated in some fashion in the work

7  that had to be done to make the systems talk to

8  each other when it transitioned to ABC, am I

9  correct?

10    A.   There were a whole bunch of changes

11  because we went from twice-a-week model for our DCs

12  and then a backup vendor, Cardinal, to we're daily

13  and, yes, there was a -- just a ton of work, and I

14  was heavily involved in it.

15    Q.   And part of that was -- I'm going to say

16  you're the grandfather of SIMS.  At one point you

17  were the dad.

18        But part of that transition required

19  SIMS to be able to integrate with the new ABC

20  system.  Am I correct?

21    A.   When you say "new ABC system," just --

22  I --

23    Q.   Let me rephrase that.  I could have left

24  that out.  Let me rephrase that.

Page 122

1 Part of the work that had to be done was
2 getting SIMS to integrate with ABC during this
3 transition period?
4 A. That's correct.
5 Q. You weren't wiping out your whole SIMS
6 system and then adopting a new system, were you?
7 A. No.
8 Q. And it was an important aspect of the
9 transition that you made sure SIMS integrated with
10 the ABC system so there was a -- a flow of orders
11 and distribution without any downtime, correct?
12 MS. SCHUCHARDT: Objection; foundation.
13 BY THE WITNESS:
14 A. We wanted to make it as seamless as
15 possible to the stores. Is that your question?
16 BY MR. SHKOLNIK:
17 Q. That was the word I couldn't get out of
18 my head. Seamless. You wanted a seamless
19 transition, correct?
20 A. We always want to minimize impact to the
21 stores.
22 Q. And part of your job was working on that
23 part of the transition, the ordering system
24 transition, to make it seamless between stores and

Page 123

1 ABC, correct?
2 A. That's correct.
3 Q. All right. And when we go through this
4 portion of your personnel assessment for 2000 --
5 fiscal year 2013, the first line says, "As Wag,"
6 Wag being Walgreens, am I correct?
7 A. Yes.
8 Q. "As Wag C-II distribution is suspended
9 at Jupiter, Perrysburg and Woodland facilities,
10 develop a consistency plan to move the process over
11 to a designated wholesaler."
12 Does that refresh your recollection that
13 there was a period, whether it was the latter part
14 of December or the early part of -- I'm sorry --
15 the latter part of 2012 and the early part of 2013
16 that not only Jupiter was shut down or suspended by
17 the DEA related to C-II distribution, but it had
18 been spreading to Perrysburg and then Woodland
19 facilities?
20 MR. BENSINGER: Object to the
21 characterization.
22 BY THE WITNESS:
23 A. No. I think what this is suggesting is
24 that we were -- we are going to get out of the

Page 124

1 business of being -- of housing C-II drugs anywhere
2 within our distribution systems. Not that -- not
3 that something happened at Perrysburg or Woodland.
4 BY MR. SHKOLNIK:
5 Q. But certainly Jupiter had been
6 suspended?
7 A. That's -- that was clear. But --
8 Q. And as you're sitting here today, you
9 just don't remember one way or the other if action
10 had occurred by the DEA at Perrysburg and was
11 impending in Woodland?
12 A. I don't recall any action, no.
13 Q. You do recall that there was a
14 contingency plan being developed to fill C-II
15 orders for the stores at the wholesaler at a vendor
16 sourcing, correct?
17 A. We were moving away from having any
18 goods in our warehouse, Rx in our warehouses at
19 all, and we were moving that all over to
20 Amerisource.
21 Q. But in this interim period in August
22 2000 -- I'm sorry -- interim period in 2013,
23 Cardinal Health was being utilized to fulfill the
24 C-II orders pursuant to contract that had already

Page 125

1 been in place. Am I correct?
2 MS. FIX MEYER: Objection; foundation.
3 BY THE WITNESS:
4 A. I'm not sure.
5 BY MR. SHKOLNIK:
6 Q. It says, "Transition of all primary C-II
7 distributions from Wag DCs to identified
8 wholesalers by June 1st. Transition of all C-II
9 distributions from one wholesaler to another as
10 business needs dictate."
11 What do you mean by, first, number one,
12 transferring the C-II distribution from DC to
13 identified wholesalers?
14 A. These are shared goals I think that
15 we're reading. I don't know what -- this isn't
16 something I would have typed in here.
17 This -- this to me means simply we're
18 moving away from a warehouse model where the
19 product is in our own warehouses and we're moving
20 that to the vendor.
21 Q. Did anyone ever talk to you and your
22 group and say why you're stopping having the C-IIs
23 in your own warehouses?
24 A. I can't recall.

Page 126

1   Q.   Do you recall right about that time
2  Walgreens announcing that they had paid an
3  $80 million fine as a result of violations down at
4  the Jupiter distribution center?
5      MR. BENSINGER:  Objection; vague.
6  BY THE WITNESS:
7      A.   I do recall a fine.  80 million,
8  whatever the dollar value you said, does ring a
9  bell.  So...
10 BY MR. SHKOLNIK:
11     Q.   And it was in relation to the Jupiter
12 operations?
13     A.   Yes.
14     Q.   And did you also become aware that as
15 part of the agreement to resolve all the claims and
16 pay the 80 million, Walgreen agreed not to
17 distribute C-IIs or controlled substances going
18 forward beginning in 2014?
19     A.   That I am not aware of.  I don't know
20 all of the -- the 80 million is on the TV.
21     Q.   So, it goes on to say, "Develop
22 contingency backup wholesalers to ABC for phase 2
23 and 3."
24     Would that be what's referenced up on

Page 127

1  top ANDA?
2      A.   Phase -- I believe phase 2 is legend
3  brand to Amerisource and phase 3 is our generic to
4  Amerisource, and then as part of that project of
5  going to Amerisource, we did -- we do have a backup
6  and that is ANDA.  And I -- and I worked on that,
7  yes.
8      Q.   So, just in case ABC just didn't have
9  the product, from a corporate standpoint, in order
10 to make things seamless, you want to have a backup
11 wholesaler to fill an order if the need be.  Is
12 that a fair statement?
13     MS. SCHUCHARDT:  Objection; foundation.
14 BY THE WITNESS:
15     A.   I think a better statement would be that
16 ANDA would -- we would send orders to ANDA based on
17 omits that came from Amerisource where they could
18 not fill our order first, and then we would send an
19 order to ANDA to try to help the store stay in
20 stock and that would be for legend, non-control and
21 control III through V.
22 BY MR. SHKOLNIK:
23     Q.   So, not C-IIs?
24     A.   Correct.

Page 128

1      Q.   So, just so I'm clear, ANDA as a backup
2  once AmerisourceBergen came in was not a backup for
3  filling C-II deliveries of generic or brand?
4      A.   The ANDA code on the store system, the
5  store AS400, which was one of the projects that I
6  worked on, would only order legend, non-control,
7  C-III through C-V and not C-II.  Does that help?
8      Q.   That helped.
9      A.   Okay.
10     Q.   When you use the word "legend," that
11 means brand.  Am I correct?
12     A.   Legend means Rx.  Not -- not --
13 requiring a prescription.
14     Q.   So, whenever you're saying "legend,"
15 that's a -- that is a product that requires a
16 prescription?
17     A.   That -- yes.  That's a pharmacist term.
18     Q.   Now, the next says, "Support Supply
19 Chain's efforts to move C-II ordering over to
20 CSOS."
21     Can you explain for us what that means?
22     MR. BENSINGER:  Objection; foundation.
23 BY THE WITNESS:
24     A.   Well, CSOS is electronic 222 forms, and

Page 129

1  there's a team that was -- that actually is a part
2  of the distribution center's team that did that
3  work.
4      I was not part of the CSOS.  But in the
5  event that they needed support, in whatever
6  capacity, they could come and ask me questions.
7  And I believe that's why that line is there.
8      And that may be, again, a common goal
9  for more than just me.
10 BY MR. SHKOLNIK:
11     Q.   So, just so I understand it, this supply
12 chain effort to move C-II ordering to CSOS, that
13 was not an add-on component to the SIMS store SIMS.
14 That's something different.  Correct?
15     A.   That's correct.
16     Q.   That's a -- that's a distribution center
17 process, the 222s, correct?
18     A.   Correct.
19     Q.   And you wouldn't have been working on
20 the distributions SIMS platform.  That's a
21 different group of people?
22     A.   That's correct.  I do not work on that.
23     Q.   Who is the group that oversees the
24 district -- distribution center SIMS application?

Page 130

1    MR. BENSINGER: Objection; foundation.
2  BY THE WITNESS:
3    A.   There is a team.  I know several of the
4  individuals.  It's changed over time.  Names
5  like -- well, once upon a time it was Sue Thoss.
6  She was over all of that.  Brian Amend.  I don't
7  know if that name is in some of the papers.  And
8  then I know several of the programmers.
9  BY MR. SHKOLNIK:
10   Q.   And I'm going to go on to the last line.
11  "Work with Rx Integrity team and Legal to identify
12  and mitigate any potential risks to the C-II
13  business."
14       What did you mean there?
15   A.   I think this is -- again, you think this
16  is a shared goal.  I'm not so certain -- you said
17  what did I mean there.  I'm not so certain that I
18  entered these or they were entered for us.  That's
19  how these annual goals, which --
20   Q.   Let me ask it this way.  Do you have any
21  idea what is meant by that?
22   A.   I think that that -- that what that
23  means is any questions that the integrity team has
24  on as they are doing their audits and their checks,

Page 131

1  that I was to support them.  I think that's what
2  that is there.
3       And I will give an example that if we
4  looked at one item, we looked at thousands where
5  the integrity team would say, John, you know, this
6  item didn't order.  Why did this happen?  Why did
7  this happen?  Why did this happen?
8       And I would reenter, go back and forth
9  with them and validate to make sure that the
10  equations were right and that the logic was right
11  and that everything was tight and that's -- I'll
12  call it tight or working properly in the system.
13   Q.   And just to follow up on that one point.
14       Would I be correct in stating that you
15  wouldn't look at the individual store to determine
16  if it should be shipped or not shipped or reported
17  to the DEA.  You were mainly looking at was the
18  system running appropriately when it either
19  approved or disapproved of an order?
20   A.   That's correct.  I do not look at
21  specific orders.  I do not alter orders.  That's a
22  no-no, as I said earlier in the day.  But my
23  charter is to make sure and validate that equations
24  are right, mathematics are right, least squares

Page 132

1  algorithms are right, so on and so forth.
2    Q.   And it would be the integrity people
3  that would be looking more at the specific order
4  and the whys and the elements of the order and
5  whether or not it's approved or not approved?
6    MR. BENSINGER: Objection; foundation.
7  BY THE WITNESS:
8    A.   That's their team.  They drive it.  Not
9  me.
10  BY MR. SHKOLNIK:
11    Q.   I'm going to show you a document which
12  I'm going to mark as Exhibit 3.
13       (WHEREUPON, a certain document was
14        marked as Walgreens-Merritello
15        Exhibit No. 3:  Document,
16        Intercepted/Suspicious Store
17        Orders, Requirements Document;
18        WAGMDL00491863 - 00491877)
19  BY MR. SHKOLNIK:
20    Q.   Exhibit 3, which I just handed you, is
21  Bates numbered 00491863, and it's entitled
22  "Intercepted/Suspicious Store Orders, Project
23  No. P99999."
24       Are you familiar with this type of

Page 133

1  requirements document from working at Walgreens?  I
2  don't mean this specific one, but the type of
3  document first.
4    A.   I'm familiar with the format, if that's
5  what you're asking.
6    Q.   Yes.
7    A.   Yes.
8    Q.   And in looking at this, it appears to be
9  originated from the Store Ordering Team, and it
10  involves a retail applications inventory systems
11  development.
12       Is that -- I don't know the technical
13  names of the systems in Walgreens, but is that SIMS
14  that they're talking about or some aspect of SIMS?
15    MR. BENSINGER: Objection; foundation.
16  BY THE WITNESS:
17    A.   Could you help me out and point that to
18  me where I am.
19  BY MR. SHKOLNIK:
20    Q.   Sure.  We're at the top here.
21    A.   Oh, okay.
22    Q.   "Retail applications, Inventory Systems
23  Development, Store Ordering Team."
24    A.   That's the -- that's the SIMS team.

Page 134

1  Q.  Okay.
2  A.  SIMS stores team.
3  Q.  So, when I see that, I can say I know
4  I'm talking about SIMS, SIMS store team, not SIMS
5  distribution center team?
6  A.  Correct.
7  Q.  And here the heading of this project is
8  "Intercepted/Suspicious Store Orders."  And it's
9  prepared by Ora Yelvington in February of 2009.  Do
10  you know who Ora Yelvington is?
11  A.  Yes.
12  Q.  Is she still with the company?
13  A.  The last I knew of it, I want to say yes
14  but...
15  Q.  Never know.
16  A.  I have not -- I haven't seen Ora in
17  quite some time.
18  Q.  And was she a computer side person or
19  business side person or both?
20  MR. BENSINGER:  Objection; foundation.
21  BY MR. SHKOLNIK:
22  Q.  Or something else?
23  A.  I'm trying to recall Ora's background
24  the best that I can.  I think she had some store

Page 135

1  experience like myself and she was a technical, if
2  you would, she did programming and then she -- I
3  think she was a team lead or a team -- or -- and
4  perhaps she's even a manager.
5  Q.  Would you be considered part of a Store
6  Ordering Team?
7  MR. BENSINGER:  Objection; vague.
8  BY THE WITNESS:
9  A.  Would I be considered part of a Store
10  Ordering Team?  When I was taking you through my
11  timeline, in retail systems, I was a program
12  manager and I was closely related to them.
13  But, no, I would not be in my role after
14  leaving retail systems, store systems and going
15  back over to marketing systems, I would not be
16  considered that.
17  BY MR. SHKOLNIK:
18  Q.  So, what years -- what year are we
19  talking about that you left?
20  A.  I was -- I was in marketing systems from
21  2002 to 2008 or somewhere close, and 2008 to
22  current I'm in -- I'm with under Mike Bleser's
23  group.
24  Q.  Is that part of store ordering or no,

Page 136

1  Mike Bleser's group?
2  A.  No.
3  Q.  What is the difference between Store
4  Ordering Team and where you are?  I'm just trying
5  to get an understanding.
6  A.  How can I best?
7  Store Ordering Team is a technical team.
8  They write these types of business requirements.
9  They provide coding.  They work with QA for
10  testing.
11  Bleser's team does a bunch of different
12  things.  I think he has generic purchasing.  He
13  maintains the relationships with the vendors.
14  And then you have store inventory, which
15  that's my particular team under Denny Murray, and
16  my link to them is that I was on original SIMS and
17  it followed me.
18  Q.  Wherever you go?
19  A.  Just about all the time.
20  Q.  Okay.  And here specifically this is --
21  this is a business document related to an inventory
22  systems which is related to SIMS, correct?
23  A.  I'm -- yeah, that's what it would appear
24  here.

Page 137

1  Q.  If we could turn to Bates numbered 865,
2  and I think on the first page we saw that it was
3  February of 2009.
4  So, in 2009, the overview of what was
5  being done regarding controlled substances and the
6  inventory system is outlined here, is it not?
7  MR. BENSINGER:  Objection; foundation.
8  BY THE WITNESS:
9  A.  There's a lot here.
10  BY MR. SHKOLNIK:
11  Q.  Okay.  I'll take you through it.
12  A.  Yeah, and I don't think that this is
13  something that I was a part of.
14  Q.  Here it says that "The Controlled
15  Substances Act is primary federal law regulating
16  the flow of controlled substances into the
17  marketplace for medical purposes.  Among other
18  requirements, the act requires distributors
19  register with the DEA to sell controlled substances
20  to retail pharmacies and report to the DEA
21  suspicious orders."
22  Were you aware that was an obligation
23  that the company had when it was distributing C-II
24  products?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    A.   I don't -- I don't recall this at all.

2    Q.   Did you know that the DEA in 2009 was

3  requiring that Walgreens monitor orders for

4  controlled substances that are placed at the stores

5  and sent to the DCs for filing?

6         Were you told that that was an

7  ongoing -- that was an issue in 2009?

8    A.   This I wasn't involved with.  So, no.

9    Q.   Did you know that the DEA had gone into

10 Perrysburg in 2006 and issued some -- issued a

11 letter questioning the suspicious order monitoring

12 processes that were being utilized?

13   A.   No, I wasn't aware of that.

14   Q.   Did you know how the company was

15 reporting suspicious orders from 2006 up until

16 2012? Were you involved in that at all?

17   A.   No.  Not involved.

18   Q.   Were you aware that the company was

19 required to monitor controlled substances for

20 suspicious activity?  Were you aware of that?

21   A.   No.  I -- I mean, I'm on --

22   Q.   There is nothing wrong with saying no.

23 I'm just asking the questions.

24   A.   I'm out here on this one.  So...

Page 139

1    Q.   Did you know that suspicious orders were

2  defined by the DEA in terms of an order size or

3  order frequency?  Did anyone ever tell you that?

4    A.   In this time frame?

5    Q.   Yeah.

6    A.   No.

7    Q.   Did they tell you that during the time

8  frame when you were working on the ceiling?

9    A.   It's hard for me to say, but I may have

10 heard that.

11   Q.   Now, were you aware that prior to

12 working on the ceiling project, that there had been

13 a project ongoing from 2009?

14        "The purpose of the project is to create

15 a process to systematically identify and prevent

16 suspicious orders based on a formula used to

17 determine inconsistent (suspicious) ordering

18 patterns for controlled drugs."

19        Were you aware that there was an ongoing

20 project before the ceiling?

21   MR. BENSINGER:  Objection; vague.

22 BY THE WITNESS:

23   A.   I was not involved in this.

24 BY MR. SHKOLNIK:

Page 140

1    Q.   When you got -- when you became part of

2  the ceiling process, did someone say we already had

3  an ongoing process that involved Mr. Bancroft

4  developing an algorithm and applying it across the

5  ordering platform?

6    A.   Can you be specific in the name?  Are

7  you suggesting --

8    Q.   I call it the Bancroft algorithm, but I

9  don't know what they called it.

10   A.   Are you calling it the tolerance?

11   Q.   I believe it became known as the

12 tolerance.

13   A.   So, I knew of it, but I was not part of

14 it.

15   Q.   Were you aware that part of the project

16 that was implemented in the 2008, 2009 period

17 included that any C-II drug orders that were deemed

18 suspicious would be flagged as suspicious and

19 populated in a file sent up to loss prevention and

20 prescription services for review and analysis?

21 Were you aware that that was an ongoing process at

22 Walgreens?

23   MR. BENSINGER:  Objection; vague.

24 BY THE WITNESS:

Page 141

1    A.   No.  Again, this wasn't me.

2  BY MR. SHKOLNIK:

3    Q.   Okay.  Were you aware that if an order

4  was flagged as suspicious on the store side, it

5  would be intercepted and the order quantity would

6  be reduced to a non-suspicious order limits level?

7         Were you aware that there was a

8  reduction going on systematically?

9    MR. BENSINGER:  Objection; vague.

10 BY THE WITNESS:

11   A.   I wasn't aware of any of this.

12 BY MR. SHKOLNIK:

13   Q.   And were you aware that an item would be

14 reduced to a non-suspicious level in order to

15 prevent suspicious orders from being sent over to

16 the distribution center?

17   MR. BENSINGER:  Objection; vague.

18 BY THE WITNESS:

19   A.   Again, I'm not aware of any of this that

20 was going on.

21 BY MR. SHKOLNIK:

22   Q.   Were you aware that the purpose of the

23 reduction was to help ensure that distribution

24 centers did not receive suspicious orders from

Page 142

1  stores and limit the possibility of fines that may
2  be imposed by the DEA?
3      MR. BENSINGER: Same objection.
4  BY MR. SHKOLNIK:
5      Q.  Did you know that that was the procedure
6  in place from 2009 up until when you became
7  involved with respect to ceilings?
8      A.  Until I got there, I didn't know what
9  they were doing.  Does that help you?
10     Q.  That helps me.
11     A.  Okay.
12     Q.  If we can go to Bates No. 868.  This
13 document outlines what I think you've referred to
14 as the tolerance limit or tolerance that was being
15 utilized prior to implementation of your ceiling
16 program.
17         Taking a quick look at that, does this
18 refresh your recollection as this was the program
19 that was in place to identify the suspicious orders
20 prior to implementation of the ceiling?
21     MR. BENSINGER:  I object to the attorney
22 testifying as facts.  You may answer.
23 BY THE WITNESS:
24     A.  I think you may have lost me there.  Can

Page 143

1  you come again?
2  BY MR. SHKOLNIK:
3      Q.  You had mentioned that there was a
4  tolerance in place before ceiling.  By looking at
5  this, does this appear to be what you were
6  referring to?
7      MR. BENSINGER:  Objection; foundation.
8  BY THE WITNESS:
9      A.  This appears to be the tolerance.
10 BY MR. SHKOLNIK:
11     Q.  And I'm just going to go to a couple
12 of -- and so it's clear, you were not involved in
13 developing the tolerance, correct?
14     A.  Correct.
15     Q.  Do you know if Mr. Bamberg was the
16 author of the -- of that tolerance equation?
17     A.  Can you -- can you define author?
18     Q.  I'll rephrase that.  I used the wrong.
19 I should have said Mr. Bancroft.
20         Do you recall if Mr. Bancroft was the
21 architect of the algorithm for the tolerance limit?
22     MR. BENSINGER:  Objection; foundation.
23 BY THE WITNESS:
24     A.  I think you can say that I know Wayne

Page 144

1  worked on it.  Does that answer -- help you?
2  BY MR. SHKOLNIK:
3      Q.  That helps.
4      A.  Okay.
5      Q.  Did he work with you on the ceiling
6  algorithm?
7      A.  Yes.  Wayne -- Wayne helped on the
8  ceiling algorithm.
9      Q.  You were telling us before about the
10 ceiling that you -- we went through the graph of
11 how the ceiling was going to be applied.
12         What aspect of it would Mr. Bancroft
13 have played in that, of taking I guess your thought
14 process?  What did he do?
15     A.  So, just to recall that the stores'
16 average Rx's are from every prescription that they
17 fill, and I made him understand that, and I said
18 that that is the dependent variable -- or that's
19 the independent variable and that the dependent
20 variable would be the amount of that molecule
21 strength that would move and to find the norm and
22 to draw a least squares line and I needed an
23 equation.  And Mr. Bancroft knew how to put that
24 equation on paper, and that was his involvement.

Page 145

1      Q.  So, he was the statistician and
2  mathematician that transferred your thought process
3  into a physical equation that could be put in
4  place?
5      A.  Correct.  He wrote the equation.
6      Q.  And is it your understanding he did the
7  equation for tolerances previously?
8      A.  It's my understanding that Wayne worked
9  on tolerance.  So, I can't imagine these equations
10 coming from anyone else.
11     Q.  One of the -- it says, "To monitor the
12 orders size, tolerance limits are established for
13 each item.  Any order with an order quantity
14 greater than tolerance is limited" -- "tolerance
15 limit is flagged as suspicious."
16         Did you have a chance to review the
17 tolerance protocol before you became involved in
18 the ceiling to get a feel for what they were doing?
19     MR. BENSINGER:  Objection; vague.
20 BY THE WITNESS:
21     A.  I did not go through the tolerance.
22 BY MR. SHKOLNIK:
23     Q.  Going down to the third paragraph, it
24 says, "Using all the orders for the past," it says,

Page 146

1  "T weeks (that is, 52), find the sample mean and
2  the standard deviation."
3      If I recall, your ceiling formula
4  utilized six weeks, am I correct, as the lookback
5  period?
6      A.  Ceiling limits utilizes all of the
7  prescriptions filled on a daily average of the
8  last -- that's four weeks.
9      Q.  Four weeks.
10     A.  The accumulation of receipt data is set
11  at six weeks.  Both of those numbers are
12  configurable.  It could be changed.  I do not know
13  that they've ever changed them, though.
14     Q.  Now, this tolerance is using a 52-week.
15  Yours is using a much tighter window, whether it's
16  four or six.  We'll go with either depending on
17  which variable.
18     What is the significance of using a
19  longer period versus a shorter period in terms of
20  determining what is the most accurate criteria?  Is
21  a longer period better, shorter period?  Is it
22  tighter or longer?  What's your opinion?
23     MR. BENSINGER:  Objection; foundation, calls
24  for expert opinion testimony.  You can answer.

Page 147

1  BY THE WITNESS:
2      A.  I think that's a question for Wayne.
3  BY MR. SHKOLNIK:
4      Q.  Okay.
5      A.  I don't know why he chose what he chose.
6      Q.  Did he -- but you chose the four and
7  six, didn't you?
8      A.  I told him that that would be a very
9  good starting point, and we left it as a variable
10  inside of the system.  So, as the integrity team
11  learned using their tool, that they could change it
12  without a programmatical change.
13     Q.  Do you know if they ever tried running
14  it at a 52?
15     MR. BENSINGER:  Objection; vague, foundation.
16  BY THE WITNESS:
17     A.  52 weeks for?
18  BY MR. SHKOLNIK:
19     Q.  For -- in terms of the mean.  Here
20  they're looking at orders for the past 52 weeks.
21     In your algorithm for either the orders
22  or the receipts, did you ever -- did you ever try
23  to run it at 52?
24     MR. BENSINGER:  Objection; vague.

Page 148

1  BY MR. SHKOLNIK:
2      Q.  For the ceiling.
3      A.  I wouldn't have done that first because
4  I don't have the dashboard.  That would have been
5  the choice of the integrity team.
6      So, did they ever try to -- did they for
7  whatever reason fluctuate that?  I don't know.
8      Q.  As part of development of the ceiling
9  limit, did you ever suggest we should try different
10  time periods for either receipts or the orders?
11     MR. BENSINGER:  Objection; vague.
12  BY THE WITNESS:
13     A.  I just suggested to them that those two
14  numbers, that the daily average of all
15  prescriptions served from the pharmacy, to find
16  that daily average at four weeks would work and to
17  then -- the six weeks of receipts added up would be
18  a very good starting point.
19     And, again, we left them as variables
20  and other individuals may have done something with
21  data, data analysis, and so on and so forth.  I
22  never did.
23     MR. SHKOLNIK:  I'm going to mark the next
24  exhibit, Exhibit 4.  It is Bates numbered 00491961.

Page 149

1      (WHEREUPON, a certain document was
2          marked as Walgreens-Merritello
3          Exhibit No. 4:  Document, "P09002
4          Threshold Controlled Substance,
5          Macro Design"; WAGMDL00491961 -
6          00491989.)
7  BY MR. SHKOLNIK:
8      Q.  I just handed you a document.  It's a --
9  it's entitled an application overview from June of
10  2009, and it -- the application function is
11  referred to as the threshold controlled substance
12  and the author is Rakesh, R-a-k-e-s-h, Khanna,
13  K-h-a-n-n-a.
14     Did you know Rakesh?
15     A.  I do know Rakesh Khanna, yes.
16     Q.  In what area did Rakesh Khanna work?
17     A.  Rakesh was a -- was he a senior
18  programmer analyst?  He's no longer with Walgreens.
19     Q.  If we go down into the second portion of
20  the first page, it's referencing the "Following
21  functionality will be implemented in the Second
22  Phase."
23     And then it goes on and says, "Track the
24  User and Date who adjusts the order quantity for

Page 150

1  any item ordered from the warehouse during the
2  Review Suggested Order process."
3       Then it says, "Reduce the order quantity
4  for C-II and pseudoephedrine items based on the
5  Tolerance Limit and order frequency as is
6  applicable. This is the same as No. 8."
7       When they are referencing these steps
8  and the functionality, are these steps in the SIMS
9  system at the store level or in some other place,
10 do you know?
11     MR. BENSINGER: Objection; foundation.
12 BY THE WITNESS:
13     A.  At the store -- well, ADR4 is not the
14 store. That's central. Statement No. 3 refers to
15 ADR4.
16         ADR, by the way, stands for at
17 Deerfield.
18 BY MR. SHKOLNIK:
19     Q.  Oh.
20     A.  In case anybody is wondering.
21         But the tracking and reducing and --
22 again, I didn't work on this document, I don't
23 believe. I don't think I've ever seen it before.
24 But that looks like it suggests that it's on a

Page 151

1  store system. Was that your question?
2      Q.  That was my question.
3      A.  Okay.
4      Q.  Does it appear to be in the store
5  system?
6      A.  Yes.
7      Q.  It makes a reference to OR772P. Do you
8  know what that type of coding means?
9      A.  Yeah. There -- throughout the SIMS
10 system, the file names, all the data files will
11 be -- pretty much the convention or the way they
12 decided they would do it would be the first two
13 letters refers to what system it's in, is it item
14 management, is it pricing, is it claims, is it
15 store receiving, SR. OR just refers to an ordering
16 and a data file and the file is a number.
17         And the P at the end of it is an AS400,
18 I think -- now this is like a little gray zone
19 here -- but the P I believe stands for physical
20 file and not one that -- in other words, there is a
21 physical something written to disk.
22     Q.  When it says "ordering," would that be
23 store level? Would that be Deerfield or
24 distribution center or all or some?

Page 152

1      A.  And --
2      MR. BENSINGER: Objection; foundation.
3  BY THE WITNESS:
4      A.  Which line?
5  BY MR. SHKOLNIK:
6      Q.  It says "Order items file OR7" -- I'm
7  sorry. I changed page. I apologize. It's in both
8  actually.
9         Let's go to No. 4 on the next page. It
10 says, OR771P, order items file. Where would this
11 data be kept?
12     MR. BENSINGER: Objection; foundation.
13 BY THE WITNESS:
14     A.  That's not clear. I could -- I could
15 guess but I don't know.
16 BY MR. SHKOLNIK:
17     Q.  What's your best guesstimate on it?
18     A.  My guess is that this data would be --
19 if it's on the store system, would first reside on
20 the store and it was probably sent to central so
21 that someone could see the collective of all the
22 stores.
23     Q.  And, so, what this is really saying in
24 this No. 4, "Track and log every C-II and

Page 153

1  pseudoephedrine items in DEA suspicious order items
2  file, OR771P, which needed to go through the DEA
3  limitations, whether the item was suspicious or
4  not. This will make it easy to analyze and
5  determine as to why an item order size was or was
6  not suspicious."
7         So, in terms of the process they are
8  talking here, is this something that is -- begins
9  at an order at the store level into the SIMS system
10 and then it's being processed sort of up the chain
11 somewhere?
12     MR. BENSINGER: Objection.
13 BY MR. SHKOLNIK:
14     Q.  Or do you know?
15     MR. BENSINGER: Objection; foundation.
16 BY THE WITNESS:
17     A.  I don't know what this is referring to,
18 quite frankly.
19 BY MR. SHKOLNIK:
20     Q.  Okay.
21     MR. SHKOLNIK: If we could go to tab 69,
22 please.
23         I'm going to mark as Exhibit -- that's
24 not right. Should be 5.

Page 154

1    I'm going to mark as Exhibit 5 a
2  document entitled "DEA Suspicious Order -
3  Phase III," Bates numbered 492378.
4         (WHEREUPON, a certain document was
5         marked as Walgreens-Merritello
6         Exhibit No. 5:  Document, "Project:
7         DEA Suspicious Order - Phase III";
8         WAGMDL00492378 - 00492380.)
9  BY MR. SHKOLNIK:
10   Q.   When you became involved in phase 5 of
11 the suspicious order monitoring system, did you try
12 to take a lookback as to see what the prior phases
13 were that had been implemented by the company?
14   A.   I don't recall doing that, no.
15   Q.   If we just go down in this document,
16 Bates No. 00492378, under No. 5, it says, "DEA data
17 needs to be saved for five or seven years on ADR4
18 or in the store?  What is the purpose?"
19       The answer that's being given here is,
20 "Five years on UNIX platform."
21       Do you know what that references?
22   MR. BENSINGER:  Objection; foundation.
23 BY MR. SHKOLNIK:
24   Q.   What is the UNIX platform?

Page 155

1    A.   I think we were talking about that
2  earlier this morning, and no, I don't.
3    Q.   Okay.  Thought maybe I'd refresh your
4  recollection a little bit here.
5        No. 6, it says, "Only DC auto ordering
6  and PDQ ordering is going through DEA limitations."
7  This is dated September 23, 2011.
8        We may have talked about PDQ before.  I
9  think we did.  But when it says, "Only DC auto
10 ordering and PDQ ordering is going through DEA
11 limitations," do you have any understanding as to
12 what that means?
13   A.   No, quite frankly.  Not as it's written
14 here.
15   Q.   Were you -- did you ever become aware
16 that during the years before you started working on
17 the ceiling that if an order had been flagged under
18 the tolerance system, that the pharmacy could place
19 the order through Cardinal without going through
20 the tolerance system?
21   MS. FIX MEYER:  Objection; foundation.
22 BY THE WITNESS:
23   A.   Again, I'm not the expert on tolerance,
24 so I'm not sure how it all works.

Page 156

1  BY MR. SHKOLNIK:
2    Q.   If we could go to No. 9, please.
3        It says, "If DEA reduced item is
4  manually ordered from Cardinal within 96 hours,
5  what kind of action to take place?"
6        And then it says, "Show user on the
7  report or on the ADR4 online screens."
8        Do you know what's referenced by the
9  "ADR4 online screens"?
10   A.   Not in this context here.  ADR4 is at
11 Deerfield.  That's the central AS400, but...
12   Q.   And then the next line says, "Let the
13 system order the item but show the user on the
14 reports."
15       So, if I'm reading this correctly, this
16 Item 9 is saying an item could have been reduced
17 by -- by the tolerance system, but then the order
18 could then have been placed through Cardinal and
19 the system would allow the order to go forward?
20   MS. FIX MEYER:  Objection; form.
21 BY MR. SHKOLNIK:
22   Q.   Am I reading that correctly?
23   MR. BENSINGER:  Objection; foundation,
24 argumentative.

Page 157

1  MS. FIX MEYER:  Objection; form.  Objection;
2  foundation.  Objection; misstates the facts.
3  BY THE WITNESS:
4    A.   I'm not the expert on this, and I don't
5  know what they're getting at.
6  BY MR. SHKOLNIK:
7    Q.   Down to No. 13, if we could.  I'm sorry.
8  Make it 12.  My mistake.
9        It says, "Do we need central store
10 system based functionality to maintain and control
11 item to go through the DEA limitations?  It was
12 also discussed in previous phases to include a code
13 to explain why a specific item should or not go
14 through DEA limitations A new DB file was already
15 created for this purpose."
16       It says, "Barb Martin has already said
17 yes to the item level DEA control."
18       And then on to 13, it says, "We reduce
19 the suspicious orders at the time of releasing the
20 order to the DC," and, "Will continue."
21       Were you aware that the system in 2011,
22 the tolerance system, was reducing the orders and
23 releasing them to the distribution center?
24   A.   I can't --

Page 158

1    MR. BENSINGER: Asked and answered.
2  BY THE WITNESS:
3    A.   I can't recall this. I don't know what
4  they were doing.
5  BY MR. SHKOLNIK:
6    Q.   Were you aware that stores could have
7  been -- the SIMS ordering from stores that --
8  withdraw that. I'm sorry.
9        Prior to beginning work on the ceiling,
10  were you aware that in utilizing the SIMS system
11  that certain stores could have been removed from
12  the DEA suspicious order limitations review, that
13  they could have been taken out of going through
14  that process?
15    MR. BENSINGER: Objection; foundation.
16  BY THE WITNESS:
17    A.   On the tolerance? Again I --
18  BY MR. SHKOLNIK:
19    Q.   Didn't know?
20    A.   I'm not the expert. I don't know.
21    Q.   On ceilings, was that an option in the
22  system?
23    MR. BENSINGER: Objection; vague.
24  BY THE WITNESS:

Page 159

1    A.   I believe there is an option in the
2  ceiling that if -- I don't think they use it, but I
3  think there is an option in there that they can --
4  they can change -- they can do something with an
5  item so that it doesn't follow that.
6        But, again, we'd have to get the drivers
7  of the dashboard. I can't really recall exactly
8  how it works.
9    MR. SHKOLNIK: I'm going to mark as Exhibit 6
10  Bates No. 00492562.
11        (WHEREUPON, a certain document was
12        marked as Walgreens-Merritello
13        Exhibit No. 6: Document,
14        "Functional Requirements & (Macro)
15        Design"; WAGMDL00492562 -
16        00492579.)
17  BY MR. SHKOLNIK:
18    Q.   I just handed you a document that I
19  think is now in the proper time frame for when you
20  were involved with ceilings. It's dated -- I know
21  it's dated somewhere -- May 1, 2012, and it says
22  business owner, Barb Martin and John Merritello.
23        Are you familiar with this type of
24  document, "Functional Requirements & (Macro)

Page 160

1  Design"?
2    A.   Yes, I am.
3    Q.   And it says the program name is "Retail
4  applications: Inventory systems development -
5  store ordering."
6        That's SIMS. Am I correct?
7    A.   Correct.
8    Q.   Project name here is "DEA suspicious
9  ordering - phase IV (controlled substance
10  threshold)."
11        Does this refresh your recollection that
12  you were assisting Barb Martin at the time phase 4
13  was being developed?
14    A.   It looks like I had joined the group by
15  this time, by May 1st of 2012.
16    Q.   And we have the next page, which ends in
17  563, and basically this "Purpose" section is what
18  we read from the earlier document. I believe
19  it's -- it was Exhibit 4. Pretty much the same
20  historical rendition. Am I correct?
21    MR. BENSINGER: Objection to form.
22  BY MR. SHKOLNIK:
23    Q.   We can go read the whole thing again
24  like we did the last one.

Page 161

1    A.   I am reading through it.
2    Q.   Please take a look at it.
3    A.   I think -- it appears to be that he
4  block copied.
5    Q.   What was from the 2009 document,
6  correct?
7    A.   Yeah.
8    MR. BENSINGER: Objection; foundation.
9  BY MR. SHKOLNIK:
10    Q.   So, here in this -- in this functional
11  requirements design document, it gives a history of
12  what phase 1 was and it says, "In Phase I, DEA
13  suspicious orders were not reduced. System was
14  implemented as a 'Proof of concept.'"
15        Does that refresh your recollection as
16  to how the SOM system was implemented?
17    MR. BENSINGER: Objection; foundation.
18  BY THE WITNESS:
19    A.   No.
20  BY MR. SHKOLNIK:
21    Q.   It goes on to say in the document,
22  "Phase II. In this phase, DEA suspicious orders
23  were started to reduce, based on calculated
24  tolerance and the ordering frequency."

Page 162

1 Was it your understanding that this
2 process, the tolerance limit and ordering frequency
3 calculation, remained in effect from whenever phase
4 2 began up until the time your ceiling stage -- I'm
5 sorry -- phase 5 came into effect?
6 MR. BENSINGER: Asked and answered.
7 BY THE WITNESS:
8 A. Yeah, we incorporated the tolerance in
9 with the phase 5. We did both.
10 (Clarification requested by the
11 reporter.)
12 BY THE WITNESS:
13 A. The group decided that tolerance would
14 remain, so that we had both ceiling and tolerance
15 in the system.
16 BY MR. SHKOLNIK:
17 Q. So, but in this functionality,
18 functional requirements document for phase 4, it
19 goes on to give an overview of what phase 4 is.
20 First of all, what aspect of this
21 project did you participate in in supporting
22 Barb Martin?
23 A. I didn't. I wasn't there until phase 5.
24 Q. But this is -- this says that you're the

Page 163

1 business owner?
2 A. It's got my name here.
3 Q. Yeah.
4 A. Yeah.
5 Q. Okay. You just don't know?
6 A. Don't know.
7 Q. Because in phase 4 it says one of the
8 changes that are being done in phase 4 is,
9 "Rx vendor (Cardinal) manual orders need to go
10 through DEA limitations."
11 At the time you got involved, that was
12 already implemented, wasn't it? If it was a vendor
13 order, manual order, it had to go through the SOM
14 process, correct?
15 MR. BENSINGER: Objection; foundation.
16 BY THE WITNESS:
17 A. I -- I'm not exactly sure.
18 BY MR. SHKOLNIK:
19 Q. When the ceiling was implemented, at
20 that time certainly if someone did a manual order
21 to a vendor like Cardinal, that had to go through
22 the SOM, correct?
23 A. Correct. Ceilings -- that we
24 implemented vendor and distribution at the same

Page 164

1 time.
2 Q. And it says in No. 2, "PFL orders need
3 to go through the DEA limitations along with the
4 adjustment done in 30 minute order review period."
5 What is a PFL?
6 A. The term PFL refers to a partial fill.
7 That's when you the customer comes into my
8 pharmacy, and I have -- I have only five of your
9 tablets available, so I'll give you five now and I
10 will do a partial fill for an additional 25.
11 PFL orders are also ordered
12 automatically. They are as part of the reordering
13 system.
14 Q. So, when the pharmacist fills that
15 partial prescription, the SIMS systems will trigger
16 the order automatically, the purchase of additional
17 pills to fill the rest of the prescription?
18 A. Not exactly. I could take you through
19 how that works.
20 Q. Please do. Would you. I'd appreciate
21 that.
22 A. Okay. So, first, the system figures out
23 what the need is based on replenishment, and it
24 does that with respect to whatever someone may have

Page 165

1 entered earlier manually during the day.
2 And this is -- this is current code,
3 daily ordering. Okay?
4 And then -- and then it will look and
5 see if there are any PFL or OOS, which is
6 out-of-stocks. I'm out. I do not have John's
7 medicine.
8 And then it says is there enough being
9 ordered by replenishment and if there is, we don't
10 have to order any additional quantities to cover
11 the OOS or the PFL. But if it's not enough to
12 cover the OOS or the PFL, it will increase the
13 quantity so that we get that quantity in.
14 That's how it works today.
15 Q. Do you know if that was what was
16 happening in 2012 when --
17 A. It worked a little different now.
18 Q. How was it done then?
19 A. The PFL vendors identified inside of the
20 system and since our own warehouse only came to us
21 with a delivery twice per week, the PFL would go
22 through and order daily those -- for the PFL
23 vendor, it would look and see do I have any and it
24 would get an order to that vendor for next day.

Page 166

1     Q.    Now with the ABC contract, you are
2  getting them daily anyway?
3     A.    Everything is going together, yes, sir.
4     Q.    So, you wouldn't -- you wouldn't -- it
5  wouldn't have to do that process.  It's already a
6  daily delivery, correct?
7     A.    Correct.
8     Q.    In terms of if a PFL or an out-of-stock
9  occurred.  This is back before the ABC changeover.
10    A.    Okay.
11    Q.    Would the PFL, the automatic order
12 that's triggered, would it only be for the amount
13 that's needed for Mr. Smith's prescription or would
14 it replenish the out-of-stock and send additional?
15    A.    It would only be for Mr. Smith's, and it
16 wouldn't be for a control II substance.
17    Q.    You wouldn't have a PFL?
18    A.    Can't.
19    Q.    You couldn't back then in 2012?
20    A.    It's my understanding.
21    Q.    Well, according to this change that they
22 talk about in phase 4, this is dealing with the
23 C-IIs.
24    MR. BENSINGER:  Objection.

Page 167

1  BY MR. SHKOLNIK:
2     Q.    It says, "PFL orders need to go through
3  DEA limitations along with adjustment done 30
4  minutes."
5        Doesn't it indicate that they were
6  allowing them to go through even for the C-IIs to
7  C-Vs back then?
8     MR. BENSINGER:  Objection; foundation.
9  BY THE WITNESS:
10    A.    Partial fills cannot be -- cannot occur
11 on a C-II.  It's my understanding.  Again, I'm not
12 a pharmacist.
13    MR. SHKOLNIK:  Could we take a break now.
14 Let's grab our lunch break.
15    THE VIDEOGRAPHER:  We are off the record at
16 11:44 a.m.
17        (WHEREUPON, a recess was had
18          from 11:44 a.m. to 12:17 p.m.)
19    THE VIDEOGRAPHER:  We are back on the record
20 at 12:17 p.m.
21 BY MR. SHKOLNIK:
22    Q.    Mr. Merritello, I'm going to hand you
23 what I'm marking as Exhibit 7.  Bates number is
24 117 -- I'm sorry.  133996.  It's a "Business

Page 168

1  Requirements" document.
2        (WHEREUPON, a certain document was
3          marked as Walgreens-Merritello
4          Exhibit No. 7:  Document, "Business
5          Requirements"; WAGMDL00133996 -
6          00134003.)
7  BY MR. SHKOLNIK:
8     Q.    This is a document where I see your name
9  is included along with Barb Martin and Kristie
10 Provost.  This deals with phase 5.  So, I think I
11 could feel comfortable that I finally hit one that
12 you're involved with.
13    A.    Yes.
14    Q.    Okay.  I knew sooner or later I'd get
15 it.
16        Now, this is what's called the "Business
17 Requirements" document for DEA suspicious ordering
18 phase 5.  We had been referring to that as the
19 ceiling limit?
20    A.    Yes.
21    Q.    Who is Kristie Provost?
22    A.    I believe at this point she's a vice
23 president, but I think at this point in time she
24 was -- had a position of some sort in Rx

Page 169

1  operations.  But I'm not totally certain about
2  that.  She was -- her level was above mine when I
3  walked in the room.  I think she was a director at
4  the time.
5     Q.    So, if we go down into this document,
6  under the "Business Objective," it's "The
7  Controlled Substance Act is primary federal law
8  regulating the flow of controlled substances into
9  the marketplace for medical purposes.  Among other
10 requirements, the act requires that distributors
11 register with the Drug Enforcement Agency to sell
12 controlled substances to retail pharmacies and
13 report to the DEA suspicious orders."
14        So, that's the same statement we saw in
15 the prior documents, if I'm not mistaken?
16    A.    Part of it, looks like, yeah.
17    Q.    Then it goes on.  Now it's talking about
18 what the project is that you're embarking on in --
19 this appears to be around August of 2012 time
20 frame, and it kind of gives the background of what
21 has been done so far.  Am I correct?
22    MR. BENSINGER:  Objection; foundation.
23 BY MR. SHKOLNIK:
24    Q.    Let me rephrase it, then.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  The next paragraph gives a brief
2 overview of the controlled -- the DEA suspicious
3 ordering and the prior phases, correct?
4  MR. BENSINGER: Objection; misstatement,
5 vague.
6 BY THE WITNESS:
7  A.  I think this document was designed to
8 kick off the project and to get the project going
9 on what work needed to be done to support all of
10 the -- that idea that I had.
11  Although I'm trying to look for the date
12 here. 8/2. That seems like it's later than -- I'm
13 trying to -- there is a few pieces to this.
14 BY MR. SHKOLNIK:
15  Q.  According to this, it says the 1.1
16 version of phase 5 was August 2. Version 1.1 is
17 October 2012, correct?
18  A.  Yeah. That's right.
19  Q.  So, let's just go back down under the
20 "Business Objectives" and read that second
21 paragraph.
22  "The purpose of the project is to create
23 a process to systematically identify and prevent
24 suspicious orders based on formulas used to

Page 171

1 determine suspicious ordering patterns for
2 controlled substances. These formulas will
3 calculate both Tolerance Level (previously built
4 and deployed in phase 4)."
5  So, just stopping right there.
6  When you were getting involved,
7 tolerance was already in the system. Now you're
8 embarking on the next, which is, it goes on to say,
9 "and Ceiling," correct?
10  A.  And now it's --
11  MR. BENSINGER: Objection; asked and answered,
12 compound.
13 BY MR. SHKOLNIK:
14  Q.  You can answer, yes.
15  A.  We are adding ceiling into the equation.
16  Q.  "And Ceiling (developed in this phase
17 5)."
18  So, an order -- if I'm not mistaken, it
19 goes on to explain what is meant by ceiling. Am I
20 correct?
21  MR. BENSINGER: Objection; vague.
22 BY THE WITNESS:
23  A.  It looks like it's trying to -- it's
24 trying to put an English like on to say, you know,

Page 172

1 bring the data back to corporate, put it on and get
2 it prepared to be put on someone's dashboard at
3 the -- for the integrity group.
4 BY MR. SHKOLNIK:
5  Q.  "An order will be analyzed to determine
6 if it exceeds either limit. Any order that exceeds
7 either limit will be flagged as suspicious."
8  So, it's now -- with this phase, it's
9 saying it could either be suspicious under
10 tolerance, it could be suspicious under ceiling or
11 both, and someone has to look at it?
12  A.  That's what it's lending itself to, yes.
13  Q.  And you keep referring to the dashboard.
14 That's basically the screen that's on someone's
15 desk, correct?
16  A.  Correct.
17  Q.  And "Any controlled substance orders
18 that are deemed suspicious will be," and it
19 basically is saying what will happen under the
20 process. Am I right?
21  MR. BENSINGER: Objection; vague.
22 BY THE WITNESS:
23  A.  I believe so.
24 BY MR. SHKOLNIK:

Page 173

1  Q.  If we -- just want to go through
2 those --
3  A.  And when I -- can I clarify something?
4  Q.  Sure, sure.
5  A.  When I say "dashboard," Rx -- the
6 integrity group. It's all intended to get that
7 information back to an integrity group.
8  Q.  Okay.
9  A.  Okay.
10  Q.  So, these are steps that would happen
11 once the program determines that an order for a
12 controlled substance is deemed, and the word is,
13 quote, "suspicious," correct?
14  A.  Correct.
15  Q.  And then so, A, it would be "Flagged and
16 populated in a file to be sent up centrally to
17 corporate office for review and analysis."
18  So, there that's basically saying it's
19 going to the dashboard in Rx Integrity?
20  A.  And it's going to be put front and
21 center in front of them. Getting a report on it.
22  Q.  At this point in time Rx Integrity was
23 just coming -- coming together, correct?
24  A.  I believe they were putting together the

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 group.

2 Q. Then it says, "Intercepted at the time

3 of release (either to a warehouse or directly to a

4 third party vendor) and reduced to non-suspicious

5 level."

6 So, in this phase 5 -- first of all, did

7 I read that correctly?

8 A. I'm trying to think. Where are you

9 exactly? You are still over here?

10 Q. I'm on B.

11 A. Well, I don't know if she's got it

12 totally correct here in the document. But if it

13 goes over a ceiling -- it won't go over a ceiling.

14 But if a user puts it over a ceiling, then it

15 goes -- it's reduced to zero and sent up as

16 suspicious.

17 Q. According to this, they were still

18 doing, at this point in time, reducing to a

19 non-suspicious level, reducing it to below ceiling

20 if we take it as written?

21 A. For the tolerance piece, yes, but not

22 the ceiling limits.

23 Q. Oh. So, now you help -- now I think I'm

24 understanding.

Page 175

1 So, if it didn't hit ceiling but it hits

2 tolerance, it could -- it would be reduced?

3 A. That's what this -- that's what this

4 document is saying, yes.

5 Q. But if it hit ceiling, it would be shut

6 off?

7 MR. BENSINGER: Objection; vague.

8 BY THE WITNESS:

9 A. It's held to the ceiling. If a manual

10 override to that pushed it over the ceiling, then

11 they would get zero. If there was no ceiling

12 remaining, you've already received your six-week

13 allocation, you will get nothing. It won't

14 generate.

15 BY MR. SHKOLNIK:

16 Q. The next thing would be someone would

17 have to do an override at that point?

18 A. And the pharmacist or staff at the store

19 would recognize that, okay, I'm not getting

20 anything here and I need to try to fill out an

21 override form and then there is a -- they have a

22 whole process. That one, I don't know that process

23 either. But there is a whole process.

24 Q. Good.

Page 176

1 A. And I'm sure -- I hope somebody else has

2 taken you through all of that.

3 Q. I was going to say that's now going to

4 cut off another section of my questioning.

5 A. Okay.

6 Q. I'm sure everybody is unhappy about

7 that.

8 So, I just want to go back just so it's

9 clear on the record.

10 At this point in time, once phase 5 is

11 implemented, the order gets run through both

12 algorithms, whether it's tolerance or ceiling or --

13 I mean both. They actually go through both. And

14 if it doesn't hit ceiling but it hits tolerance or

15 exceeds tolerance, it would be reduced and the

16 order would go forward as long as it still was

17 under ceiling?

18 A. Okay. When you say "order," I need to

19 have you say specifically do you mean automatic

20 computer-generated order without a user interface

21 or without user interventions?

22 Q. Let's start with that one.

23 A. Okay. So, that one would recognize the

24 limit and if it's not touched by the store, then it

Page 177

1 does its thing where it either sends you nothing or

2 it sends you what it can underneath the ceiling and

3 it's also reporting back that you are over your

4 75%. That's the intention and the lights go on.

5 Tolerance works off of manual orders and

6 adjustments that someone would do.

7 Q. So, the tolerance was not running as to

8 the computer-generated orders, automatic orders?

9 A. The tolerance is in place on

10 user-modified orders.

11 Q. Was it always that way?

12 MR. BENSINGER: Objection; foundation.

13 BY THE WITNESS:

14 A. When you say "always," now we're going

15 through that whole period of time and all those. I

16 don't know. I'm going to have to say I don't know.

17 BY MR. SHKOLNIK:

18 Q. So, from the time of phase 5 forward,

19 it's your understanding that would be the manually

20 involved order would be affected by the tolerance?

21 A. Tolerance governs manual changes --

22 changes and manual adds.

23 Q. And the ceiling applies to automatics or

24 any order at that point?

Page 178

1   A.   Everything.
2   Q.   Everything.
3   A.   Yes.
4   Q.   I may be slow, but I'm starting to get
5   it.
6   A.   No.
7   Q.   The next page on top, it says, "This
8   method will prevent stores from receiving
9   abnormally large quantities of controlled
10  substances."
11      I mean, that was the goal here?
12  A.   There is many goals.
13  Q.   This was one?
14  A.   This would be one of them.  But the
15  information coming back, being in front of somebody
16  who can take action, that's also a goal.
17  Q.   Was there anything about this algorithm,
18  the work you guys did, and I'm not suggesting it
19  wasn't important and you didn't do it quick.  Is
20  there anything that would have -- that could have
21  prevented this type of system being put in place,
22  let's say, in 2010?
23  MR. BENSINGER:  Objection; vague.
24  BY THE WITNESS:

Page 179

1   A.   Yeah, could you ask your question again.
2   Maybe a different way.
3   BY MR. SHKOLNIK:
4   Q.   The work you did here.  The work you did
5   in terms of this -- I'm going to refer to it as
6   bolt-on to the SIMS.
7       Was there anything from a technological
8   standpoint that prohibited this type of a ceiling
9   algorithm to be put into the SIMS program?
10  A.   We could have done it in 2010, if that's
11  what you're asking.
12  Q.   Could you have done it in 2009?
13  A.   I believe so.
14  Q.   How far back do you think you could go
15  and feel comfortable in telling me when it could
16  have been done based on the system as it was in
17  existence?
18  A.   It's a good question.
19  Q.   That's my second one today.
20  A.   Good question there.
21      Because as we evolved, SIMS Rx pharmacy
22  ordering, you know, we didn't have automatic
23  generation of jobber-only items, in other words,
24  Cardinal items.  We started to evolve, evolve,

Page 180

1   evolve.
2       But I would have to be guessing in order
3   to give you a date.
4   Q.   But let's say 2008.  You were pretty far
5   advanced.  You had Cardinal in place.  You had
6   automatic.
7   A.   Yeah, as long as we had all of the
8   interfaces to receipts and we had the interface to
9   the total scripts average per day for each store in
10  a chain.  And I don't know.  By 2008, would we have
11  had enough computer power?  I'm sure we would have
12  been a little bit ahead of a 486.
13  Q.   We know you had UNIX.
14  A.   '08 -- I'd say '08, could have probably
15  done it, '09, '10.
16  Q.   Thank you.  So, in the next section here
17  it talks about the scope, and I think you may have
18  already touched on these, but I want to just
19  confirm it.
20      So, under No. 1, "The following types of
21  orders that will go through ceiling validation was,
22  1, the replenishment."  Those are the auto orders,
23  am I correct?
24  A.   A replenishment order as referred to

Page 181

1   here would be, yeah, the system is trying to
2   replenish inventory that it has sold and it's not
3   an emergency order, yeah.
4   Q.   And it says, "Direct vendor."  That
5   would not be SIMS.  That would be someone -- you
6   could go around SIMS?
7   A.   No, that would be vendor ordering.
8   Q.   Through SIMS?
9   A.   On the system and accounting for the
10  receipt from the direct vendor, Cardinal.
11  Q.   And then the PDQ would also go through
12  the ceiling validation?
13  A.   Right.
14  Q.   And as you -- based on your best
15  recollection, at that same time, only manuals would
16  be going through the tolerance simultaneously,
17  correct?
18  A.   Only tolerance.  Only manual orders or
19  adjustments to the suggested order.  So, in other
20  words, they may have manipulated it.  I could
21  elaborate if you'd like.
22  Q.   I was going to ask you to follow up on
23  that.  Could you tell me what you mean by that?
24  A.   Okay.  Today's world with Amerisource,

Page 182

1 part of the project was we were trying to get as
2 much information into the order development -- into
3 the development of the order. So, we give the
4 store people, the store users, pharmacy personnel,
5 zero review.
6        So, in other words, at 5:15 at night, in
7 most stores, at 5:15 it starts to go through this
8 process and within 15 or 20 minutes it's sending
9 the order out to Amerisource and they're picking it
10 up and answering back for all the receiving, so on
11 and so forth, and that order is coming in the next
12 day.
13        So, in order to tighten that window, we
14 wouldn't -- we eliminated, we took the person out
15 of the ordering. We don't show him, him or her the
16 suggested order and allow them to, oh, I don't want
17 this and I want this, I want more. No. We took
18 that all away from them.
19    Q.   The computer is doing it?
20    A.   The computer is doing it. If they add
21 something earlier in the day, you know, it's there.
22        RxQuick Order screen, it goes through
23 SIMS and they can put things on there and then the
24 rest of the process works with respect to entries

Page 183

1 they may have made including tolerance because it's
2 a manual.
3    Q.   So, let's assume the pharmacist for
4 whatever reason puts in an order earlier in the day
5 for I would say a bottle of 1,000 OxyContin as a
6 manual.
7        That will -- that will sit to the end of
8 the day and will be applied to that ceiling before
9 all those orders go out?
10    A.   In today's world, if you went and
11 ordered one bottle of OxyContin, then there
12 would -- it would establish a line and then the
13 replenishment system would come through and say --
14 and say, okay, do we need any, do we need any. No,
15 we don't.
16        Let's just say this example is no, we
17 don't, but there is one here. So, that's going
18 into the order because the store requested it. But
19 then that gets subjected to the ceiling limit.
20    Q.   That would also -- that would get
21 subjected to --
22    A.   And subjected to the tolerance limit.
23    Q.   Tolerance limit.
24    A.   But a quantity 1, you can well imagine,

Page 184

1 you know, is the tolerance going to affect an order
2 that's quantity 1?
3    Q.   When you say just one bottle?
4    A.   One bottle, right.
5    Q.   I'm just trying to use that as an
6 example.
7        That's how -- that 1,000 bottle order.
8 I'm sorry. 1,000 pill bottle order would at the
9 end of the day be calculated against the ceiling so
10 that the auto order, if the order would have been
11 another 1,000 and that blew the ceiling, it just
12 wouldn't let another order go through?
13    A.   If the system wanted 1,000 -- I think
14 this is your question.
15    Q.   Yes.
16    A.   If the system wanted 1,000 and the store
17 already put the 1,000 out there, it's going to get
18 checked by the ceiling. If it's good to go, it
19 goes. The system doesn't add to the store user's
20 order.
21    Q.   If we go to the No. 2, "Ceiling will be
22 applied to an order at the time the order is
23 released to warehouse or vendor."
24        At this point, do -- is there any

Page 185

1 reduction potentially occurring before it's
2 released to the vendor based on ceiling?
3    MR. BENSINGER: Objection; vague.
4 BY THE WITNESS:
5    A.   It's going to run up against the ceiling
6 values before it's released to the warehouse or to
7 the vendor, which means it's checked.
8 BY MR. SHKOLNIK:
9    Q.   So, if it's -- let's assume it's a
10 manual and the order is placed and the manual --
11 and that -- it exceeds tolerance.
12        Would the -- that order be reduced to
13 below tolerance and then subjected to ceiling
14 before it's released?
15    A.   Always subjected to ceiling, if that's
16 your question.
17    Q.   It was a two-part question. It's
18 reduced. So -- it could still be reduced based
19 upon the tolerance algorithm. But then before the
20 end of the day, it's still going to be hitting --
21 it still has that ceiling. If there is no room in
22 the ceiling, it's not going?
23    A.   That's it.
24    Q.   Now, if we go down to No. 5, "The Order

Page 186

1  Frequency calculation will no longer be used to
2  flag items."
3       What was the reason why order frequency
4  was taken out of the suspicious order monitoring
5  calculation at that time?
6       MR. BENSINGER: Objection; foundation.
7  BY THE WITNESS:
8    A.  You just gave me a good question.
9       Frequency --
10 BY MR. SHKOLNIK:
11   Q.  Three today.
12   A.  Three times. You got three there.
13      Frequency worked with tolerance somehow.
14 I don't know why that portion of it was -- was
15 taken out. Probably because it wasn't needed and
16 the ceiling was already doing the job.
17   Q.  Now, No. 6, it says, "The amount of
18 sales history used in the tolerance calculation
19 will be reduced from 52 weeks to 26 weeks."
20      Do you know why in phase 5 they reduced
21 tolerance to basically cutting down by half a year?
22      MR. BENSINGER: Objection; foundation.
23 BY THE WITNESS:
24   A.  I'm not sure why that's listed. I don't

Page 187

1  know where that -- the requirement of 52 to 26
2  unless -- I'd be just guessing.
3  BY MR. SHKOLNIK:
4    Q.  No. 7, "By default, all stores will
5  initially be turned on for these calculations.
6  However, an individual store can be turned off with
7  the following system implications: Orders
8  exceeding tolerance or ceiling values will not be
9  cut. Information from the store will not be sent
10 to corporate office for review and action."
11      Do you know why that this option was put
12 into phase 5, why you could just take a store out?
13   A.  I think that the -- this was one of the
14 group's requirements. They wanted to be able to
15 unflag a store. And I -- for the life of me, I
16 can't remember what their reasoning was for that.
17   Q.  Basically it's saying a floor could
18 be -- a store could be taken out of the system, the
19 ceiling and tolerance system, for 15 days at a time
20 and then it would be automatically turned back on?
21      MR. BENSINGER: Objection; foundation.
22 BY THE WITNESS:
23   A.  I could give you a guess. I think it's
24 for a store that would be recovering from, say,

Page 188

1  like a hurricane where it may be closed for, you
2  know, a store could be closed.
3       We had stores in Puerto Rico that were
4  closed for six months, even a year and then we
5  finally got them reopened. AS400 was still good.
6  Turn it back on. And there is -- there is no
7  history in there. There is no -- there is no data
8  in there to do this right.
9       And, so, if we wanted to open it up for
10 a short period of time and then the window closes
11 again. And I'm guessing.
12 BY MR. SHKOLNIK:
13   Q.  I'm just --
14   A.  I think it's for disaster recovery.
15   Q.  But my question is who determines if it
16 could be turned off?
17      MR. BENSINGER: Objection; foundation.
18 BY MR. SHKOLNIK:
19   Q.  Do you know?
20   A.  All of this is driven by the integrity
21 team.
22   Q.  So, the store couldn't say I am turning
23 off for 15 days?
24   A.  Oh, no.

Page 189

1    Q.  Okay. And just the last area on this
2  page, it's talking about the codes if something
3  occurs.
4       If an item is "reduced by ceiling only."
5  It's saying again "reduced by ceiling," not -- not
6  stopped.
7       Is it possible that for a period of time
8  they were still reducing on ceiling?
9    A.  If the ceiling is 1,000 tablets and you
10 have already received 900 and the system thinks it
11 wants to order you 200, it won't.
12   Q.  But it will give you the 100.
13   A.  It will only order you 100.
14   Q.  Okay. So, it's reducing the order?
15   A.  It's keeping you under the ceiling and
16 reporting.
17   Q.  Reporting to who?
18   A.  To the dashboard that the store is at
19 the ceiling.
20   Q.  Is it reporting to DEA?
21   A.  To the integrity group, to the best of
22 my knowledge.
23   Q.  So, does that --
24   A.  I don't know if it's going -- if that's

Page 190

1 getting forwarded on some way. You would have to
2 ask those folks.
3    Q.   But in terms of what your team
4 developed, there was no automatic report at the
5 pharmacy level up to DEA that the order passed
6 ceiling, got pushed back to 100. That was not put
7 in there?
8    A.   Not to my knowledge. Everything is
9 going back to the integrity team.
10    Q.   And if an item is V, that means "Item
11 tracked by ceiling - order not reduced."
12       So, that means it either may not have
13 exceeded ceiling -- the order was made and there
14 was still more room on the ceiling?
15    A.   I think that might be where it's
16 reaching that 75%. So, the warning is coming on,
17 if you would, that they're getting close.
18    Q.   Now, is the store getting that warning
19 or is it integrity getting it or both?
20    A.   It was designed to have integrity
21 getting it. I'm not sure if integrity did anything
22 else to let the stores know, to give the stores to
23 look at this data. You'd have to check with
24 somebody on the integrity team.

Page 191

1    Q.   "T, items reduced by tolerance only."
2       "D, items reduced by tolerance and
3 ceiling.
4       "X, items reduced by tolerance and
5 tracked by ceiling."
6       What does that mean?
7    A.   It sounds like tolerance somehow made an
8 adjustment in there and it's getting close to its
9 ceiling.
10    Q.   And under I, "Items for which inventory
11 adjustments occurred but orders were not reduced."
12       What does that mean when you have an
13 inventory adjustment?
14    A.   An inventory adjustment refers to I'm
15 visualizing my stock and the system is telling me I
16 have 425 tablets and I make a determination that I
17 have only 410. So, I've adjusted and then I enter
18 that into the system. I have done an adjustment of
19 15 tablets. That's an inventory adjustment.
20 That's what that phrase would mean.
21    Q.   Is it some type of -- what is done,
22 then, to try to determine why there is less pills
23 than the computer says you should have?
24    A.   Adjustments over time are tracked. If

Page 192

1 you see -- if a store -- if a loss prevention was
2 to see many adjustments and see an inbound
3 movement, no sales, a lot of adjustments, it might
4 mean that items are exiting without being paid for
5 or going through the IntercomPlus. Indicates a
6 possible theft.
7    Q.   So, that's a loss prevention issue at
8 that point?
9    A.   Yes, loss prevention.
10    Q.   I just want to go to the last section of
11 this business document. "Out-of-Scope and
12 Exclusions." It says, "The following orders will
13 be considered in accumulating receipts."
14       And, once again, when they say
15 "receipts," they means receivables, pills that were
16 received, correct?
17    A.   Yeah, I think I am lost. Can you tell
18 me where?
19    Q.   Bates No. is 998. Looks like this
20 without yellow.
21    A.   I must have jumped.
22    Q.   There it is.
23    A.   There we go. Okay.
24    Q.   "The following orders will be considered

Page 193

1 in accumulating receipts, but their order quantity
2 will not be reduced by ceiling."
3       So, when we talk about receipts, similar
4 to when we were talking before, that is pills
5 received at the store, correct?
6    A.   That's receipts, inbound, inbound
7 movement from vendor or warehouse or another store.
8    Q.   And it's saying that even though these
9 types of receivables occur, they are not going to
10 be reduced by the ceiling. "These orders could
11 therefore result in store receipts temporarily
12 exceeding the ceiling."
13       Just generally speaking, what is being
14 said in layman's terms? What are they suggesting
15 here?
16    MR. BENSINGER: Objection; foundation.
17 BY THE WITNESS:
18    A.   These are -- these are orders that are
19 not going through at that point in time when this
20 document is written. They are not going through
21 the store AS400. So, the AS400 has no way to check
22 them.
23       340B, we get orders from 340B as
24 replacement product. The whole program has to do

Page 194

1  with getting -- the Government gets allocation of
2  product and we can dispense that and then it's
3  replacement inventory.
4        At the time 340B orders would be placed
5  by the 340B system based on a counter and then
6  become an open order. Once they become an open
7  order, then it becomes part of that, oh, I got a
8  receipt coming even if it isn't here. I'm
9  expecting it to arrive. So, count it now. So, it
10 does see it there. But yet the 340B order did not
11 go through the store AS400 and then out.
12       Now, that's not true of today.
13 BY MR. SHKOLNIK:
14    Q.   I was going to say that was a change
15 that was implemented, was it not?
16    A.   Yeah, yes.
17    Q.   And some stores were 340B depots,
18 weren't they, like they would be the receiving
19 store for the replenishment pills?
20    A.   Yeah, and you use -- you use the word
21 "depot," just to be clear on that. Here's my
22 understanding, and I'm not the 340B expert, but I
23 know a thing or two.
24       So, there's a group of stores that can

Page 195

1  sell for a client and then out of those there may
2  be some number of some subset of those that could
3  receive. So, you may have ten that can actually
4  produce orders and then only three or four stores
5  can get the replacement product back in.
6        It makes it easier for -- it's less
7  charges against the client I guess, and this is
8  what -- we try to get it so you can put them in
9  everywhere because that's the most efficient way to
10 replace the inventory back into the Walgreens
11 system.
12    Q.   So, 340B could be an entity, whether
13 it's a hospital, whether it's a health services,
14 some government-supported facility and they
15 contract with their own distributor?
16    A.   Well --
17    MR. BENSINGER:  Objection; foundation.
18 BY MR. SHKOLNIK:
19    Q.   Correct?
20    A.   They're contracted with one of the
21 three. I think it's possible there is more. I
22 think it's McKesson, Amerisource and Cardinal, and
23 I don't know if there is someone else.
24       But it's the 340B team that does the

Page 196

1  accumulation. It figures out at what point in time
2  to bring replacement product back into the Walgreen
3  chain.
4        And those orders, to your point that you
5  just said, now do go through the ceiling and go
6  into the store and they're subject to ceiling.
7    Q.   So, a store could get a larger
8  replacement quantity that would not be, at that
9  time, calculated in terms of determining what
10 the ceiling is for that store?
11    A.   Not in a sense of -- it could get the
12 order. It could usually push it over the ceiling.
13 I think that's what your point was. But then at
14 that point it's part of the receipts and you're
15 not -- we're not going to order you any more
16 because until that number of receipt in six weeks
17 period of time drops back underneath the ceiling.
18 So...
19    Q.   Is that the way it was before or that's
20 the way it is now?
21    A.   It's the way it is before. Now the
22 order itself actually comes in and gets checked
23 before it goes out by the ceiling for 340B.
24       Now, there's a bunch of other order

Page 197

1  types here that we would -- we would not, we would
2  not use. We don't allow interstores I believe
3  anymore. And that's -- it's a no-no.
4        You know, we don't allow controlled
5  substances to be phoned in or used on the Internet
6  or anything like that.
7        Local events tool was a -- it was our
8  president of our company way, way back in the day
9  who wanted us to be able to order things for a
10 parade, and it would have nothing to do with
11 pharmaceuticals except there was no block on that.
12 But that thing has since gone away. It's gone.
13       Group sheets, we don't order pharmacy
14 items on group orders.
15       Authorized --
16    Q.   Was group orders ever --
17    A.   That was like to support your sales,
18 your -- you used to see our ad in the paper and all
19 these different things on sale and then they do
20 what they call a group order. I don't even know if
21 they use that anymore. And that's the front of the
22 store thing.
23       And then authorized distribution, there
24 may be a case where -- that something would be sent

Page 198

1  in from corporate with some type of authorization,
2  but I don't think we use that for controlled
3  substances anymore.
4      Q.   And the interstore had been occurring
5  but that got shut down, correct?
6      A.   I think the interstores are a no-no for
7  controlled substance.  So...
8      Q.   The No. 2 is "Mail location will not be
9  included in this project scope."  Was there a mail
10  order part of this?
11      A.   Well, we --
12      MR. BENSINGER:  Objection; foundation.
13  BY THE WITNESS:
14      A.   We had a mail order where they were
15  filling prescriptions on behalf of the store, so
16  they would take it and they would fill it at the
17  mail --
18          (Clarification requested by the
19          reporter.)
20  BY THE WITNESS:
21      A.   On behalf of the store, that they -- we
22  filled them in a central, like a central fill.  I
23  think that's what this is referring to, and then
24  the store and then the orders.  But that is no

Page 199

1  longer in play either.  It's gone.
2  BY MR. SHKOLNIK:
3      Q.   Central store is gone?
4      A.   We don't have that anymore.
5      MR. SHKOLNIK:  I'm going to give you the next
6  document.  Mark it as Exhibit 8.  Bates No. is
7  00670686.
8          (WHEREUPON, a certain document was
9          marked as Walgreens-Merritello
10          Exhibit No. 8:  6/6/12 e-mail
11          string with attachment;
12          WAGMDL00670686 - 00670694.)
13  BY MR. SHKOLNIK:
14      Q.   On the document I just marked as
15  Exhibit 8, it's an e-mail with an attachment
16  "Suspicious V - Meeting Notes 6/5/2012," and I
17  believe you are on the lower portion of the chain
18  dated June 6, 2012 at 10:06.  And there is an
19  attachment and -- there is two attachments, but the
20  second one is Bates numbered 0670689.
21          Do you recall ever seeing this
22  PowerPoint?
23      A.   This one is -- yeah, no, not really.
24  But I've seen -- I've seen this type of I guess

Page 200

1  legend in PowerPoints, but this one particular
2  doesn't ring a bell.
3      Q.   Now, it -- on this first page of the
4  PowerPoint, there is the arrows and it says, "Data
5  setup, Accumulate receipts and Open orders,
6  Generate order," and then there is -- with a
7  question mark and then there is "Maintain order"
8  with an X in it and then "Release order."
9          And there seems to be some type of
10  dialogue at the bottom or there appears to be a
11  dialogue at the bottom as to the question and as to
12  the X.
13          And focusing on "Generate order" where
14  the question mark, it says, "Do we want to reduce
15  suggested quantity or wait for order release to
16  reduce to under ceiling?"
17          What ultimately was done?  What was
18  the -- what was implemented?
19      A.   What was implemented is we would
20  generate with respect to the ceiling limit, when I
21  say "respect to," not exceed the ceiling limit.
22      Q.   So, it would release up to the limit is
23  what you're saying?
24      MR. BENSINGER:  Objection; mischaracterization.

Page 201

1      MR. SHKOLNIK:  I'll rephrase it.
2  BY MR. SHKOLNIK:
3      Q.   Am I misstating what you said?
4      MR. BENSINGER:  Could you --
5  BY MR. SHKOLNIK:
6      Q.   By saying -- I'll rephrase it.
7          Was the decision made that the order
8  could be released up to the amount that would not
9  exceed the ceiling if the requested order had been
10  greater than ceiling?
11      MR. BENSINGER:  Objection; vague.
12  BY THE WITNESS:
13      A.   I think I might have answered this one,
14  but I think I'll answer it again is that if the
15  system thinks it needs 200 tablets and you don't
16  have 200 in your ceiling, you only have 100, well,
17  it will allow the 100.  It won't give you 200.
18  BY MR. SHKOLNIK:
19      Q.   Okay.
20      A.   Is that -- does that answer it?
21      Q.   You answered the question.
22      A.   Okay.
23      Q.   And you did answer it before and I
24  apologize.

Page 202

1    A.    That's quite all right.
2    Q.    Just double-checking.
3         Now, the next part of the arrow where it
4  says, "Maintain order," where the X is, and it
5  says, "Per June 5 discussion, removed interactive
6  reduction of adjustments and manual orders - will
7  reduce only at time of order release."
8         Can you explain to us what that means?
9    A.    I'm not sure what it means.  It
10 certainly looks like it's written by a programmer.
11   Q.    Okay.  We'll leave it to the programmer.
12        I'm going to show you another document,
13 Exhibit 10.
14        I'm going to show you an exhibit I'm
15 marking as Exhibit 9.  I stand corrected.  Thank
16 you.  And it's Bates numbered 00609440.
17        (WHEREUPON, a certain document was
18        marked as Walgreens-Merritello
19        Exhibit No. 9:  11/29/12 e-mail
20        string with attachment;
21        WAGMDL00609440 - 00609441.)
22 BY MR. SHKOLNIK:
23   Q.    Earlier we had had discussions about
24 Mr. Bancroft's -- I don't know if Mr. or

Page 203

1  Dr. Bancroft.  I don't want to misstate it -- work
2  with you in terms of developing the algorithm when
3  you were working on phase 5.
4         What I've handed you is an e-mail from
5  Mr. -- Mr. or Dr. Bancroft to you dated
6  November 29, 2012 that references tolerance limit.
7         And then if we go to the attachment,
8  there is an equation there.
9         What was the purpose of inquiring at
10 that time into what was the tolerance limit while
11 you were working on the ceiling algorithm?
12   A.    Well, in November 29, 2012, it would
13 indicate to me that I -- that I asked Wayne for the
14 tolerance equation for some reason.  I can't tell
15 you why.  I'm sorry.  I don't know why I would --
16 unless maybe -- you want me to guess?
17   Q.    No.
18   A.    Okay.  Because I didn't want to guess
19 either.
20   Q.    Would it be fair to say that as part of
21 your job you'd want to know what was being done --
22 before you implement a change, you want to see
23 what's going on.  Is that a fair statement?
24   A.    Yes, and I was going to add that I was

Page 204

1  probably going to reference this as I was doing my
2  pencil and paper check to make sure everything was
3  working right, as we had done thousands and
4  thousands of times to make sure we audit our own
5  work, that I needed to know how this worked exactly
6  and so there was some question in there in my mind.
7    Q.    And if we look at the tolerance limit
8  calculation, he says, "Find all positive orders in
9  the past 52 weeks from the current business week
10 for an item."
11        Basically as of November 2012, the
12 tolerance algorithm is focusing on a 52-week
13 lookback for a specific NDC or specific drug?
14   A.    I can't necessarily say that because it
15 might have -- it might have changed in the system
16 and yet Wayne's documentation still alludes to 52
17 weeks.
18   MR. SHKOLNIK:  Okay.  I'm going to mark as
19 Exhibit 10 -- am I right?  I'm right.  It's an
20 e-mail from Denman Murray, November 12, 2012, to
21 Mr. Bamberg and yourself, Bates No. 00426251.
22        (WHEREUPON, a certain document was
23        marked as Walgreens-Merritello
24        Exhibit No. 10:  11/12/12 e-mail

Page 205

1        string; WAGMDL00426251 - 00426254.)
2  BY MR. SHKOLNIK:
3    Q.    This is an e-mail that was -- appears to
4  have been sent to you.  It was a forward of an
5  e-mail that had been generated by Mr. Swords.
6         And a lot of this Exhibit No. 10 is what
7  we call redacted.  So, I'm going to mark
8  Exhibit 11, which appears to be the blanked-out
9  part of Exhibit 10.  It's Bates No. 00658246.
10        (WHEREUPON, a certain document was
11        marked as Walgreens-Merritello
12        Exhibit No. 11:  11/9/12 e-mail
13        string; WAGMDL00658246 - 00658248.)
14 BY MR. SHKOLNIK:
15   Q.    Sorry for the -- for being so
16 complicated on this.
17        So, what we have in Exhibit 10 is the
18 e-mail that Mr. Murray is forwarding on to you,
19 Mr. Bamberg and to Sue Thoss and Barb Martin, and
20 if I'm reading it correctly, it says, "Summary from
21 Rex on recent meeting at NABP."
22        Do you know what NABP is?
23   A.    I do know.  It's National Association
24 and Board of Pharmacists.

Page 206

1    Q.   And it says that "Note that they
2  specifically say that cutting an order is
3  insufficient.  We must hold and investigate.  This
4  is a critical element of the next version.  I also
5  included Sue on this e-mail.  If we are creating,
6  holding and then releasing orders, this may
7  dramatically impact the way we distribute C-IIs in
8  the future.  Once-a-week orders may need to be
9  reconfigured."
10       Do you recall getting this information
11 from Mr. Murray at that time?
12   A.   I do.  I do have a recollection of this.
13 I think this is Denman reiterating that what we're
14 about to put out and that it's critical that we had
15 that piece in to our configuration of what's going
16 out for the next wave, in other words, when we do
17 introduce seedlings and go out chain-wide with it.
18   Q.   And that you had to -- that if there is
19 a reduction, they couldn't be shipped.  They had to
20 be reviewed before shipping is what they are
21 talking about, isn't it?
22   MR. BENSINGER:  Objection; foundation.
23 BY THE WITNESS:
24   A.   That -- that I think went Sue's way, Sue

Page 207

1  Thoss's way, and I don't know if that was meant
2  for, you know -- it says to me.  I get it.  But it
3  looks like that was more of a, you know, to put Sue
4  on notice.
5  BY MR. SHKOLNIK:
6    Q.   If we could look at Exhibit 11, which
7  is -- appears to be the lower portion of this
8  e-mail that's blacked out in Exhibit 10.
9         If we go to the section where it says
10 Rex Swords and he's writing to Kermit Crawford.
11 That was the president at the time, correct?
12   A.   Kermit was the president of the pharmacy
13 operations portion.  He wasn't the -- he wasn't the
14 overall.  I think Mr. Wasson was, wasn't he, in
15 2012?
16   Q.   But he was the pharmacy services?
17   A.   Top pharmacy operator.  Okay.
18   Q.   And down at the bottom it says, this is
19 what Rex Swords is writing to Mr. Crawford and a
20 number of other people, "I have a sense that
21 today's meeting was a condensed version of a
22 regional meeting the DEA is holding throughout the
23 country for pharmacists.  Although no attendance
24 list was available, I believe most, if not all,

Page 208

1  major chain operators were present at the meeting,"
2  and he lists, "CVS, Walmart/Sams, Rite Aid,
3  Safeway, Kroger, Giant Eagle, Kmart to name a few
4  and approximately 50 people in attendance."
5         I'm going to -- and it identifies who is
6  speaking at this conference, and it's Joseph
7  Rannazzisi, attorney and pharmacist, Deputy
8  Assistant Administrator, Office of Diversion
9  Control.
10        Do you remember reading this part of
11 that e-mail that was forwarded?
12   A.   No, I do not.
13   Q.   Does the name Joseph Rannazzisi ring any
14 bells?
15   A.   No.
16   Q.   Did you ever see any of the 60 Minutes
17 stories on the opioid epidemic?
18   A.   I can't say I did.
19   Q.   If we go down to the second page of
20 Exhibit 11, there is -- I had it highlighted, but I
21 lost it.  One second.
22        If you go to the -- 1, 2, 3, 4 -- fifth
23 bullet.  It says, "If suspicious - you don't ship.
24 Decreasing the order and shipping is not complying

Page 209

1  with the regulation."
2         Was there any -- first of all, did I
3  read that correctly?  It's up on the screen.  It
4  will probably help.
5    A.   I do see the -- I do see the line here.
6    Q.   Was there any discussion when you were
7  doing version 5 that the idea of just, you know,
8  not shipping altogether when the order that was
9  generated would exceed ceiling rather than shipping
10 the amount up to ceiling?
11   MR. BENSINGER:  Here, Mr. Merritello, again,
12 to the extent in answering you would reveal any
13 attorney-client communications, I ask you confer
14 with me before answering so we can determine
15 whether an assertion of privilege is appropriate,
16 if it's at all applicable.
17 BY MR. SHKOLNIK:
18   Q.   Do you want to read the question back?
19   A.   Yeah.
20   MR. BENSINGER:  Would you read it back,
21 please.
22        (WHEREUPON, the record was read
23         by the reporter as requested.)
24 BY THE WITNESS:

Page 210

1    A.   I'm still a little lost.  I apologize.
2  BY MR. SHKOLNIK:
3    Q.   Maybe I could rephrase it.
4        This e-mail chain highlighted the fact
5  that the DEA director -- I may have said the wrong
6  title.  I apologize.  One second.
7        The DEA Deputy Assistant Administrator
8  had advised virtually all of the major pharmacies,
9  including Walgreens, that if the order is placed,
10 you don't ship and that decreasing the order and
11 shipping is not complying with the regulations.
12       With that background, when your team was
13 working on the ceiling algorithm and the next
14 phase, phase 5, did anyone say if an order exceeds
15 the ceiling, we should just shut it down completely
16 and not reduce it to ceiling and then report it to
17 the DEA?
18   A.   I don't recall.
19   Q.   The next document I'm going to give you
20 and mark it as Exhibit 12 is a "Technical
21 Requirements & Design Document," Bates numbered
22 00624441.  Pass it to counsel.
23       (WHEREUPON, a certain document was
24            marked as Walgreens-Merritello

Page 211

1        Exhibit No. 12:  Document,
2        "Technical Requirements & Design";
3        WAGMDL00624441 - 00624451.)
4  BY MR. SHKOLNIK:
5    Q.   And this one indicates it's a version 6.
6  It's phase 6 for the DEA suspicious ordering
7  program.  Manager is Steve Bamberg, project manager
8  Jerry Lemke and you're the business owner.
9        Do you recall working on version 6?
10   A.   Well, it says here that I did.  I'm not
11 exactly sure in the top of my mind what version 6
12 is.  I'd have to read through this.
13   Q.   Could you just take a quick look under
14 the purpose or whatever else you need to look at.
15 I don't want to limit you.
16   A.   This lends itself to they're trying to
17 track who, right?  If I'm reading that correctly.
18   Q.   I don't know.  I'm asking you.
19   A.   "To capture the correct store user
20 information for each line that's changed."
21       So, if someone -- I believe what this is
22 trying to do here is that if somebody modifies a
23 line, that we know who did it because we never
24 would be able to do that prior to this.

Page 212

1    Q.   Okay.
2    MR. SHKOLNIK:  If we could mark the next
3  exhibit 13.  It's Bates numbered 00336103.
4        (WHEREUPON, a certain document was
5             marked as Walgreens-Merritello
6             Exhibit No. 13:  12/2/13 e-mail
7             string; WAGMDL00336103 - 00336106.)
8  BY MR. SHKOLNIK:
9    Q.   I just handed you Exhibit 13.  This is
10 an e-mail from you to a Mohammed Rahman,
11 R-a-h-m-a-n.  Reference in the subject line is
12 "Controlled substance special order."
13       And if we can just go to the second
14 page.  There is an e-mail from you to Mr. Bamberg
15 and Mr. Murray.  It says, "Denman and I met with
16 several members of the integrity team two days
17 ago," and this is November 27, 2013, "to discuss
18 Passport orders of controlled substances.  The
19 business problem is stores ordering beyond limits
20 through Passport for C-III to C-V drugs.  The
21 simple answer may be to turn off the ability to
22 order these drugs via Passport system but in doing
23 so we would also turn off the ability for the
24 stores to order a non-formulary (controlling)

Page 213

1  item."
2        What are you -- what are you discussing
3  here?
4    A.   Okay.  So, first of all, a Passport
5  order is the Amerisource online tool at the time.
6  They have -- it's called something different today.
7        We did take away the store's capability.
8  They can look for stock and they can look for NDCs,
9  but they cannot place an order on Passport for
10 controlled substance.  The order must go through
11 the store's AS400.
12       And I believe what this is saying is our
13 preferred item is Teva but the customer, for
14 whatever reason, wants Merritello brand.  Okay.
15 And we needed to give them a -- when we went to
16 having our stores serviced by Amerisource for all
17 the inventory, we have to give them a vehicle to be
18 able to order that non-formulary, if you would, the
19 brand name Merritello, same strength, same
20 molecule, we got to give them a way of doing it.
21       And I believe that that's what this is,
22 and this is probably a precursor from us -- in
23 today's AS400 on our RxQuick Order, we have an
24 indicator on the right side of the column that says

Page 214

1  "Sub"; and if you put -- if you put an NDC in or
2  UPC, which is specific to a non-formulary, and you
3  put an asterisk there, then it will take that
4  order, go through all the processing that we have
5  been talking about today, but it will send that
6  line to Amerisource and that would probably take
7  this and make it not needed anymore, if you would.
8       Does that make sense?
9    Q.   Yeah.  So, basically if someone wants a
10  non-formulary, they could, first of all, look and
11  see if it's available and if it's available, they
12  could make the order but it would still go through
13  your suspicious order monitoring algorithm, ceiling
14  and tolerance, before it's shot over to
15  AmerisourceBergen?
16   A.   Correct.  And that required us to do an
17  upgrade on that screen, which was a project, which
18  takes time.
19   Q.   Now, if we go to the attachments, you
20  have a couple of screen shots that are attached to
21  the e-mail.  And are these screen shots something
22  that is seen, this is what we would see today if
23  someone was ordering?
24   A.   You got to -- have to ask the integrity

Page 215

1  team.
2    Q.   Okay.
3    A.   Because this is their CSO override which
4  sends the order from the store to the integrity
5  team for those to manage all of that activity.
6    Q.   But, to your knowledge, was this form --
7  when the store places the order, does something
8  show up on the screen that tells the store "Order
9  Not Approved" or "Order Approved"?
10   A.   It lend --
11       MR. BENSINGER:  Objection; foundation.
12  BY THE WITNESS:
13   A.   It lends itself here that this is the
14  screen that they use to try to place the order and
15  then some type of message here below that says your
16  store is over its allocation.
17  BY MR. SHKOLNIK:
18   Q.   If we go to the second page, it shows,
19  "Order Not Approved.  This item is a controlling
20  item.  You can place the order through an
21  RxQuick Order."
22       What does that mean?
23   A.   At the time the quick order screen will
24  always order the controlling item or the formulary

Page 216

1  item.  Controlling formulary equals equals.  And
2  what they're telling -- what I believe that that
3  statement was is that you don't need to do that
4  here.  You can do that in the -- right on your
5  quick order screen.
6    Q.   So, this is -- this is not -- when they
7  are saying "Order Approved," "Order Not Approved,"
8  this is not relating to tolerance or ceiling.  This
9  is whether or not the formulary versus
10  non-formulary is being approved?
11   A.   I'm a little gray on this, but this is
12  something to do with the CSO override form that the
13  integrity team is in charge of.
14   Q.   Okay.
15       MR. SHKOLNIK:  I'm going to mark as
16  Exhibit No. 14, "Technical Requirements" document
17  phase 6 dated 2/5/14, and it's Bates numbered
18  00624487.
19  BY MR. SHKOLNIK:
20   Q.   Appears to be another "Technical
21  Requirements" document where you're listed as the
22  business owner, Tasha Polster is the sponsor and
23  it's in 2014 now.
24       (WHEREUPON, a certain document was

Page 217

1       marked Walgreens-Merritello Exhibit
2       No. 14:  Document, "Technical
3       Requirements & Design";
4       WAGMDL00624487 - 00624497.)
5  BY MR. SHKOLNIK:
6    Q.   Could you take a quick look at this
7  overview and can you give us an explanation as to
8  what was being requested at this time in phase 6.
9    A.   Can I ask a question, please?
10   Q.   Sure.
11   A.   This appears to be -- is this not the
12  same document that we already went over,
13  Exhibit 12?
14   Q.   I thought it's different.  Maybe I'm --
15   A.   14 and 12 appear to be the same.  I
16  think we already covered this.  Didn't we or did we
17  not?
18   Q.   Different date.  Different date and I
19  think a different --
20   A.   Okay.  And I apologize.
21   Q.   They look alike.  If you go to the
22  second page.
23   A.   It certainly does because it's the same
24  name too.

Page 218

1    Q.   If you go to the second page, it has a
2 different purpose.  It says, "DEA Suspicious
3 Ordering - Phase 6 Project (Load 2) has the
4 requirement."
5        Then it says, "Incorporate the DEA
6 limits (Tolerance and Ceiling) to the suggested
7 order quantity being calculated for Order on Fly
8 batches."
9        Could you tell us what that means?
10   A.   Okay.  I can guess.
11   Q.   I don't want you guessing.
12   MR. BENSINGER:  Objection; calls for
13 speculation.
14 BY MR. SHKOLNIK:
15   Q.   Thank you for --
16   A.   I think I know what it is, but...
17   Q.   What's a fly order?
18   A.   Well, I think it's their term for
19 self-service.  Remember the tool is monitoring PSE
20 and PSE is in one of two product categories in
21 front end departments, and this probably lends
22 itself that this second part of this that we talked
23 about, this is part 2.
24   Q.   Meaning 12?

Page 219

1    A.   Yeah.  Then they are coming across here
2 and trying to do something with this order on the
3 fly application and -- but that's a guess.  I'm not
4 sure what order on the fly.  And I know my name is
5 on it.  Order on the fly.
6    Q.   No worries.
7    MR. SHKOLNIK:  I'm going to mark one more
8 exhibit.  We are almost done here.
9        Did that one already.  That's good.
10 Just one last -- I think it's one last document,
11 right?
12        I'm going to mark Exhibit 15, which will
13 be the last document, and we will be finishing up.
14 It's Exhibit No. 00675532.  It's a PowerPoint.
15        (WHEREUPON, a certain document was
16        marked as Walgreens-Merritello
17        Exhibit No. 15:  PowerPoint,
18        Controlled Substance Order
19        Monitoring System"; WAGMDL00675532
20        - 00675568.)
21 BY MR. SHKOLNIK:
22   Q.   The document I just marked as
23 Exhibit No. 15 is a PowerPoint from Tasha Polster,
24 and it refers to "Controlled Substance Order

Page 220

1 Monitoring System."  And it's a series of screen
2 shots.  It appears to be a series of screen shots.
3        And I'm -- I guess my question to you
4 is:  Do you recognize what any of these screen
5 shots are?
6    A.   Educated guess that this is the
7 integrity team's dashboard or tool or screens that
8 they use to do all the monitoring, and this is
9 where all of the data that we accumulate in the
10 stores come back to their team -- I mean we
11 came out with one version of them and I'm guessing
12 that -- well, I actually have some knowledge that
13 they have enhanced their own processes, their own
14 screen, their own web stuff and all of their things
15 on the integrity team, Ed Bratton, Steve Mills.
16   Q.   I'm going to ask you about a few --
17   A.   So on and so forth.
18   Q.   I'm just going to ask you about a few of
19 screen shots.
20   A.   Okay.
21   Q.   And not go into great detail.
22        If we can go to -- Bates No. at the
23 bottom is 75536.  We're looking at a screen shot
24 that has a heading "Select date range," but we see

Page 221

1 a lot of data on here.
2        Could you just briefly tell us where
3 this data is coming from.  Is there any way of
4 determining that?
5    MR. BENSINGER:  Objection; foundation.
6 BY THE WITNESS:
7    A.   This appears to be data that's coming
8 back to the integrity team, probably a recap of the
9 activity that went on in the store I believe.
10 BY MR. SHKOLNIK:
11   Q.   And that was going to be my follow-up
12 question.
13        Does this appear to be a way of looking
14 at a specific store and its orders and what's --
15 you know, what drugs were being ordered and what
16 were being shipped to them?
17   MR. BENSINGER:  Objection; foundation.
18 BY THE WITNESS:
19   A.   Again, I'm not the expert on the
20 integrity team screens, but I think they had
21 developed a lot of screens that would be able to so
22 that they could visualize stores, items, you know,
23 to look at their data cut in different ways.  When
24 I use the word "cut," gathered together in

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  different ways so that they can do their
2  evaluations.
3  BY MR. SHKOLNIK:
4      Q.   If we go to Bates No. 538.
5      A.   Sorry, I apologize.  I hope that
6  didn't -- 538.  Okay.
7      Q.   Here we have a screen shot, "Sort by
8  subheader."  But if we look on the left, the item
9  description is a series of different drugs and then
10  it tells us what schedule they are.  It gives us an
11  order number.  It gives an order release date in a
12  column.  Am I correct?
13          Then it says, "System Suggested Order
14  Quantity."  So, when we were talking earlier about
15  these automatic orders by the system, it would --
16  that's what we are seeing under "System Suggested
17  Order," correct?
18      A.   I believe that's correct, what I'm
19  looking at here.
20      Q.   Before you said you made a change to the
21  system.  If someone made a change, it was now going
22  to tell you who did it so we can see under "Change
23  by User" and it actually gives us a person name?
24      A.   Yeah, their sign-on and ID.

Page 223

1      Q.   The next one is the "Actual Order
2  Quantity" so that's what actually was put into the
3  district -- into the distribution center, correct?
4      A.   So, this is C-IIs.  So, it would go
5  through that system.  There is PSE here too.  Yeah,
6  I believe that's correct.
7      Q.   Then we have another column that says,
8  "System Reduced Order Quantity."  Do you know what
9  that means?
10      A.   Good question.  No. 4 or 5.
11          Well, no, not exactly.  I'm sorry.
12      Q.   No worries.  If we could jump ahead to
13  Bates 543.  Actually, there is a few of them.  It's
14  540, 541 and 543.  They're black background
15  screens.  Do we see up here?
16      A.   Um-hmm.
17      Q.   It says that there is a "Log Into SIMS
18  With Corporate Sign-on."  What is the screen we are
19  looking at, do you know?
20      A.   Yes, I do know.
21      Q.   What is it?
22      A.   This is a -- this is our -- when we
23  built SIMS, along the way we came up with a -- we
24  used to call it the Joe Tiemeyer screen because

Page 224

1  that was the guy who originally programmed it.  So,
2  the Joe T screen.
3          But what it does is what they are
4  lending themselves here is the navigation into a
5  corporate user going into the back side and being
6  able to look at order detail for -- in a particular
7  store.
8      Q.   And let's go -- I'm going to focus on
9  the 544.
10      A.   Okay.
11      Q.   What we see in 544 is someone -- they
12  are sort of doing a deeper dive into the company's
13  data where it's identifying a specific drug, UPC
14  code and orders.  Am I correct?
15      A.   Yeah, they're in the store.  They're
16  looking at this particular Walgreen item code UPC,
17  that's correct, PLN.  They are looking at a
18  historical order because today the date of the
19  screen shot is 12/17.  This is already -- this is
20  over.  It's 12/15 estimated delivery.  So, they're
21  looking after the fact.
22      Q.   They are looking backwards?
23      A.   Yeah.  It's not a current order they are
24  looking at.

Page 225

1      Q.   So, and when they say "orders," these
2  are orders of product from the distribution center.
3  Am I correct?
4      A.   These are orders --
5      MR. BENSINGER:  Objection; foundation.
6  BY THE WITNESS:
7      A.   These are orders that are -- that are
8  generated on the store system, and I don't know if
9  alprazolam is a C-III or C-II.  Let's see here.
10  Doesn't give a vendor.
11  BY MR. SHKOLNIK:
12      Q.   Let's go to 545, which is oxycodone.
13      A.   Okay.
14      Q.   We're looking at -- this is a historical
15  set of orders for oxycodone for a specific store?
16      MR. BENSINGER:  Objection; foundation.
17  BY THE WITNESS:
18      A.   Yes.  This appears to be history of
19  various orders -- I would -- of various delivery
20  dates.
21  BY MR. SHKOLNIK:
22      Q.   There is a column that says "Vendor and
23  Supply ALT."  Do you know what that refers to?
24      A.   I think the "Supply" is referring to

Page 226

1  days of supply. So, it's a -- what it's doing
2  there is it's not necessarily -- judging from my
3  experience with this screen, it may or may not be
4  accurate at this point, but that's what it was
5  intended.
6        And, actually, this was one of these
7  screens that was put out at first for front end and
8  that's why "Supply" is there.
9        And then "ALT" had something to do
10  with -- again, it's a front end thing. I think
11  where it's telling you that the order is not going
12  to your parent distribution center, but it's going
13  to be sent to another Walgreen DC for like a
14  centralized thing.
15        And I believe that column -- now, we
16  wouldn't do that, I don't believe, for C-II.
17    Q.  But this is a C -- 545 is a C-II, it's
18  oxycodone?
19    A.  Right.
20    Q.  30 milligrams?
21    A.  And then "ALT" is blank here.
22    Q.  Okay. I see what you're saying.
23    A.  Yes.
24    Q.  And when we see this date at the top,

Page 227

1  that's the date when someone was actually accessing
2  this screen and taking this screen shot?
3    A.  11:26.
4    Q.  Is the time?
5    A.  Well, that's 12. And 1/15/13 appears to
6  be the date that somebody is visualizing this
7  screen and then hits print screen.
8    Q.  If we go to the next page, which is 546,
9  once again, is this data dealing with a specific
10  store and orders by the store to either the -- to
11  the distributor or to an outside vendor?
12    MR. BENSINGER: Objection; foundation.
13  BY THE WITNESS:
14    A.  This order is oxycodone, which is a
15  C-II. I'm not entirely sure what this means.
16  Order item.
17        Yeah, this -- if I'm reading this a
18  little bit more, I believe this is indicating that
19  Ferraro adjusted his order.
20  BY MR. SHKOLNIK:
21    Q.  Okay. If we could jump now to 550.
22  This screen is looking at an oxycodone purchasing
23  history. Am I correct?
24    MR. BENSINGER: Objection; foundation.

Page 228

1  BY THE WITNESS:
2    A.  This screen shows a lot of data, not
3  just purchasing history. So --
4  BY MR. SHKOLNIK:
5    Q.  Let --
6    A.  So, the receipts --
7    Q.  Yeah.
8    A.  -- is what is coming into the store as
9  logged by the AS400. 100 in week 2, 200 in week 1,
10  and so on and so forth.
11        The sales in this case is the data that
12  has been transmitted by UPC/WIC and quantity from
13  the fulfillment system to SIMS on that hourly
14  transactions.
15    Q.  When you say "the fulfillment system,"
16  that's sales from the distribution center to the
17  store?
18    A.  No, no. This is -- this is
19  IntercomPlus. I'm selling -- for week 2, I've sold
20  a collective 330 tablets.
21    Q.  Those are the sales to the people coming
22  in and giving prescriptions?
23    A.  Pharmacy, yes.
24    Q.  Okay. So, whenever we see sales in this

Page 229

1  screen shot, we're talking about this is what
2  pharmacy, whatever one we're looking at here, made
3  in week 2 of oxycodone 30?
4    A.  It indicates 330 tablets of oxycodone 30
5  has been sold by the pharmacy system.
6    Q.  But it only received in 100 that week?
7    A.  That week it only received 100. That's
8  correct.
9    Q.  When it says "Week," the week number
10  first week, second week, third week, up to 52
11  weeks?
12    A.  Yeah, in our business weeks are really
13  weird. They start on Wednesday and end on Tuesday.
14  Don't ask me. I don't know why they did that,
15  but...
16    Q.  If we could go to 5551. We have a
17  "Pharmacy Supervisor E-Mail Template." Was this in
18  any way connected to the SIMS program?
19    A.  Again, this one I'm not real familiar
20  with. It appears that it's one of the integrity,
21  an integrity template that they used to send to the
22  pharmacy supervisors.
23    Q.  The next series all deal with a
24  step-by-step process for ceiling increases. Were

Page 230

1  you involved in any way with working on that

2  algorithm on how they go about doing it?

3      A.  I wouldn't -- I guess I wouldn't use the

4  word "algorithm," but their procedure.

5      Q.  Procedure.

6      A.  And the integrity team, no, that's not

7  my -- that's not my to do.  I was not part of that.

8      MR. SHKOLNIK:  I don't know if you're going to

9  be upset, but I have no further questions.

10      MR. BENSINGER:  Let's take a break.

11      THE VIDEOGRAPHER:  We are off the record at

12  1:36 p.m.

13          (WHEREUPON, a recess was had

14          from 1:36 to 1:47 p.m.)

15      THE VIDEOGRAPHER:  We are back on the record

16  at 1:47 p.m.

17      MR. BENSINGER:  We reserve the right to read

18  and sign, and at this time we'll stand adjourned

19  and go off the record.

20      MR. SHKOLNIK:  Thank you very much.

21      THE VIDEOGRAPHER:  We are off the record at

22  1:47 p.m.

23      (Time Noted:  1:47 p.m.)

24      FURTHER DEPONENT SAITH NAUGHT.

Page 231

1      I, CORINNE T. MARUT, C.S.R. No. 84-1968,
   Registered Professional Reporter and Certified
2  Shorthand Reporter, do hereby certify:
       That previous to the commencement of the
3  examination of the witness, the witness was duly
   sworn to testify the whole truth concerning the
4  matters herein;
       That the foregoing deposition transcript
5  was reported stenographically by me, was thereafter
   reduced to typewriting under my personal direction
6  and constitutes a true record of the testimony
   given and the proceedings had;
7      That the said deposition was taken
   before me at the time and place specified;
8      That the reading and signing by the
   witness of the deposition transcript was agreed
9  upon as stated herein;
       That I am not a relative or employee or
10 attorney or counsel, nor a relative or employee of
   such attorney or counsel for any of the parties
11 hereto, nor interested directly or indirectly in
   the outcome of this action.
12
13
   _____
14      CORINNE T. MARUT, Certified Reporter
15
       (The foregoing certification of this
16 transcript does not apply to any
   reproduction of the same by any means, unless under
17 the direct control and/or supervision of the
   certifying reporter.)
18
19
20
21
22
23
24

Page 232

1          INSTRUCTIONS TO WITNESS

2

3      Please read your deposition over

4  carefully and make any necessary corrections.  You

5  should state the reason in the appropriate space on

6  the errata sheet for any corrections that are made.

7      After doing so, please sign the errata

8  sheet and date it.

9      You are signing same subject to the

10 changes you have noted on the errata sheet, which

11 will be attached to your deposition.

12      It is imperative that you return the

13 original errata sheet to the deposing attorney

14 within thirty (30) days of receipt of the

15 deposition transcript by you.  If you fail to do

16 so, the deposition transcript may be deemed to be

17 accurate and may be used in court.

18

19

20

21

22

23

24

Page 233

1          - - - - - -
           E R R A T A
2          - - - - - -

3

4  PAGE LINE  CHANGE

5  ____ ____  _____

6      REASON: _____

7  ____ ____  _____

8      REASON: _____

9  ____ ____  _____

10     REASON: _____

11 ____ ____  _____

12     REASON: _____

13 ____ ____  _____

14     REASON: _____

15 ____ ____  _____

16     REASON: _____

17 ____ ____  _____

18     REASON: _____

19 ____ ____  _____

20     REASON: _____

21 ____ ____  _____

22     REASON: _____

23 ____ ____  _____

24     REASON: _____

Page 234

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4          I, JOHN MERRITELLO, do hereby certify
5   under oath that I have read the foregoing pages,
6   and that the same is a correct transcription of the
7   answers given by me to the questions therein
8   propounded, except for the corrections or changes
9   in form or substance, if any, noted in the attached
10  Errata Sheet.
11
12
13  _____
14  JOHN MERRITELLO          DATE
15
16
17  Subscribed and sworn
    to before me this
18  _____ day of _____, 20_____.
19  My commission expires:_____
20
    _____ Notary Public
21
22
23
24

Page 235

1                LAWYER'S NOTES
2   PAGE  LINE
3   _____  _____  _____
4   _____  _____  _____
5   _____  _____  _____
6   _____  _____  _____
7   _____  _____  _____
8   _____  _____  _____
9   _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____