Highly Confidential - Subject to Further Confidentiality Review

```
  1              UNITED STATES DISTRICT COURT

  2              NORTHERN DISTRICT OF OHIO

  3                   EASTERN DIVISION

  4   --------------------------) MDL No. 2804

  5   IN RE:  NATIONAL          )

  6   PRESCRIPTION OPIATE       )

  7   LITIGATION                )

  8   --------------------------) No. 1:17-MD-2804

  9   THIS DOCUMENT RELATES TO:  )

 10   ALL CASES                 )

 11   --------------------------) Hon. Dan A. Polster

 12

 13              HIGHLY CONFIDENTIAL

 14       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

 15

 16              The videotaped deposition of MICHAEL M.

 17   MILLER, M.D., called by the Plaintiffs for

 18   examination, taken pursuant to the Federal Rules of

 19   Civil Procedure of the United States District Courts

 20   pertaining to the taking of depositions, taken before

 21   JULIANA F. ZAJICEK, a Registered Professional Reporter

 22   and a Certified Shorthand Reporter, at the offices of

 23   Foley & Lardner, Suite 400, 150 East Gilman Street,

 24   Madison, Wisconsin, on June 4, 2019, at 10:00 a.m.
```

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         CRUEGER DICKINSON LLC
           4532 North Oakland Avenue
 4         Whitefish Bay, Wisconsin 53211
           414-210-3767
 5         BY:  ERIN DICKINSON, ESQ.
                ekd@cruegerdickinson.com
 6
                     -and-
 7
           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
 8         275 Battery Street, 29th Floor
           San Francisco, California 94111-3339
 9         415-956-1000
           BY:  DONALD C. ARBITBLIT, ESQ.
10              darbitblit@lchb.com
11                   -and-
12         BARON & BUDD, P.C.
           15910 Ventura Boulevard, Suite 1600
13         Encino, California 91436
           818-839-2333
14         BY:  JAY LICHTER, ESQ. (Telephonically)
                jlichter@baronbudd.com
15
                     -and-
16
           SIMMONS HANLY CONROY LLC
17         112 Madison Avenue, 7th floor
           New York, NY 10016
18         212-784-6400
           BY:  SANFORD SMOKLER, ESQ. (Telephonically)
19              ssmokler@simmonsfirm.com
20
21
22
23
24
```

```
 1   APPEARANCES: (Continued)
 2   ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
     AMERISOURCEBERGEN DRUG CORPORATION:
 3
         REED SMITH LLP
 4       1301 K Street, N.W., Suite 1000 - East Tower
         Washington, D.C. 20005
 5       202-414-9403
         BY:  KELLY H. HIBBERT, ESQ.
 6            khibbert@reedsmith.com
 7                -and-
 8       REED SMITH LLP
         Three Logan Square
 9       1717 Arch Street, Suite 3100
         Philadelphia, Pennsylvania 19103
10       215-851-8100
         BY:  JEFFREY R. MELTON, ESQ. (Telephonically)
11            jmelton@reedsmith.com
12
     ON BEHALF OF HBC SERVICES:
13
         MARCUS & SHAPIRA LLP
14       One Oxford Centre, 35th Floor
         Pittsburgh, Pennsylvania 15219
15       412-471-3490
         BY:  DARLENE M. NOWAK, ESQ. (Telephonically)
16            nowak@marcus-shapira.com
17
     ON BEHALF OF PURDUE PHARMA, L.P., PURDUE PHARMA, INC.
18   and THE PURDUE FREDERICK COMPANY, INC.:
19       DECHERT LLP
         Three Bryant Park
20       1095 Avenue of the Americas
         New York, New York 10036-6797
21       212-698-3500
         BY:  NEGIN HADAGHIAN, ESQ. (Telephonically)
22            negin.hadaghian@dechert.com
23
24
```

```
 1   APPEARANCES: (Continued)

 2   ON BEHALF OF JOHNSON & JOHNSON AND JANSSEN

     PHARMACEUTICALS, INC.:

 3

         O'MELVENY & MYERS LLP

 4       1999 Avenue of the Stars, 8th Floor

         Los Angeles, California 90067

 5       310-246-6705

         BY:  RYAN SNYDER, ESQ. (Telephonically)

 6           rsnyder@omm.com

 7

     ON BEHALF OF WEST VIRGINIA BOARD OF PHARMACY:

 8

         BAILEY & WYANT, PLLC

 9       500 Virginia Street, Suite 600

         Charleston, West Virginia 25337

10       304-345-4222

         BY:  JUSTIN TAYLOR, ESQ. (Telephonically)

11           jtaylor@baileywyant.com

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                     I N D E X

 2

 3  WITNESS:                                 PAGE:

 4   MICHAEL M. MILLER, M.D.

 5       EXAM BY MS. DICKINSON...............   7

 6       EXAM BY MS. HIBBERT.................  270

 7

 8                     *****

 9

10                 E X H I B I T S

11  MILLER EXHIBIT                     MARKED FOR I

12   No. 1   Plaintiffs' Notice of Oral        20

13           Videotaped Expert Deposition of

14           Michael Miller

15   No. 2   Expert Report of Michael M.       27

16           Miller, M.D., DFASAM, DLFAPA, May

17           10, 2019

18   No. 3   Updated version of Dr. Miller's CV  26

19   No. 4   Michael M. Miller, M.D., DFASAM,   21

20           DLFAPA - Supplemental List of

21           Materials Reviewed and Considered,

22           June 3, 2019

23

24
```

```
 1                    (WHEREUPON, certain documents were

 2                     marked Miller Deposition Exhibit

 3                     Nos. 1 through 4, for identification,

 4                     as of 06/04/2019.)

 5          THE VIDEOGRAPHER:  We are now on the record.  My

 6     name is Ben Stanson.  I am a videographer for Golkow

 7     Litigation Services.

 8                    Today's date is June 4th, 2019, and the

 9     time is 10:22 a.m.

10                    This video deposition is being held in

11     Madison, Wisconsin in the matter of the National

12     Prescription Opiate Litigation MDL No. 2804, pending

13     in the US District Court, Northern District of Ohio,

14     Eastern Division.

15                    Are the -- the deponent is Michael Miller.

16                    Will counsel please identify yourselves

17     for the record.

18          MS. DICKINSON:  Erin Dickinson and Don Arbitblit

19     for the Plaintiffs.

20          MS. HIBBERT:  Kelly Hibbert from Reed Smith on

21     behalf -- half of AmerisourceBergen Drug Corporation.

22          THE VIDEOGRAPHER:  Counsel on the phone, if you

23     could announce yourselves for the record.

24          MR. Snyder:  This is Ryan Snyder from O'Melveny
```

Highly Confidential - Subject to Further Confidentiality Review

1    & Myers on behalf of Johnson & Johnson and Janssen.

2        MS. HADAGHIAN:  This is Negin Hadaghian from

3    Dechert LLP on behalf of the Purdue Defendants.

4        MS. NOWAK:  This is Darlene Nowak from Marcus &

5    Shapira on behalf of HBC Services.

6        THE VIDEOGRAPHER:  Thank you.

7            Our court reporter is Juliana Zajicek.

8    Will you please swear in the witness.

9                (WHEREUPON, the witness was duly

10                sworn.)

11               MICHAEL M. MILLER, M.D.,

12   called as a witness herein, having been first duly

13   sworn, was examined and testified as follows:

14                    EXAMINATION

15   BY MS. DICKINSON:

16       Q.   Good morning, Dr. Miller.  Could you state

17   your full name for the record, please?

18       A.   Yes.  Michael M. Miller, M.D.

19       Q.   Okay.  Dr. Miller, we have just met a few

20   minutes ago, correct?

21       A.   Yes.

22       Q.   I -- can you state for the record whether

23   you've ever been known by any other name other than

24   Michael M. Miller?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I have not.

 2        Q.    Okay.  Can you confirm your home address

 3   for me, please?

 4        MS. HIBBERT:  Objection.  That's calling for

 5   private information.

 6              Does Dr. Miller list his address, his

 7   professional address, on his CV?  I'm sure he does.

 8   Is that not sufficient, Counsel?

 9        MS. DICKINSON:  It just is an easier way of

10   getting to the question.  I'm -- I'm unaware of ever

11   having this be an issue.

12   BY MS. DICKINSON:

13        Q.    What's your home address?

14        MS. HIBBERT:  How about a professional address?

15   That should be sufficient.

16        MS. DICKINSON:  Are you really instructing him

17   not to answer the question of where he lives?

18        MS. HIBBERT:  Yes.  A professional address

19   should be sufficient.

20        MS. DICKINSON:  Okay.  Well, we'll have to deal

21   with that issue, too, as well, apparently.

22   BY MS. DICKINSON:

23        Q.    What city do you live in, Dr. Miller?

24        A.    Madison.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  How long have you lived in Madison?

2      A.    30 years.

3      Q.    Okay.  Have you lived anywhere else in the

4    last 30 years?

5      A.    No.

6      Q.    Okay.  And what is your business address

7    currently?

8      A.    It depends on which business you speak of.

9    So I have a -- a private practice that's located at

10   6333 Odana Road, Suite 3, Madison 53719.

11     Q.    Okay.  And do you have any other business

12   addresses currently other than the Odana Road address?

13     A.    I use as my business address the address

14   of my LLC, which is 22 Settler Hill Circle in Madison

15   53717.

16     Q.    And which LLC is that that uses that

17   address?

18     A.    It is entitled Michael M. Miller, M.D.,

19   Consulting LLC.

20     Q.    Okay.  Are you still practicing medicine

21   today?

22     A.    I do.

23     Q.    And where do you practice medicine?

24     A.    I practice in three locations.

1      Q.     Okay.  What are those?

2      A.     I have a halftime teaching position at the

3   University of Wisconsin.  So I teach addiction

4   medicine fellows and see patients with them.  And we

5   also work at Access Community Health Center one

6   afternoon a week seeing outpatients.  I have a 12-hour

7   week position with Rock County Department of Human

8   Services in their therapeutic court services area.  So

9   that's a drug court and an OWI court, and that is at

10  303 West Court Street in Janesville, Wisconsin.  So,

11  again, that's 12 hours a week.

12         My private practice is a practice of not

13  more than ten patients.  Right now I think I have a

14  census of seven.  They are all licensed professionals.

15  I think I have one attorney out of that bunch, but the

16  rest are physicians, nurses, pharmacists, dentists,

17  therapists, psychologists who have addiction issues

18  and are being monitored.  And so that's the Odana Road

19  address.

20         Those are the three locations where I see

21  patients.

22     Q.     Okay.  When you said halftime position at

23  UW, how many hours a week do you spend teaching at UW?

24     A.     20.

1       Q.      Dr. Miller, how many years have you worked

2  in the area of addiction medicine?

3       A.      I generally date it to the beginning of my

4  fellowship because I worked in addiction in the -- in

5  my fellowship, but I've been in practice, done with

6  training since 1983.

7       Q.      Okay.  Ooh, math is not my strong point.

8  How many years is that?

9       A.      That's 36.

10      Q.      Have you alls -- also worked in the field

11 of public health?

12      A.      I am not a public health professional, but

13 I have worked in that area.  I could describe.

14      Q.      Okay.  Can you just briefly describe your

15 work in the area of public health?

16      A.      Right.  Well, currently I am the

17 chair-elect and as of next week will be the chair of

18 the American Medical Association Council on Science

19 and Public Health where we assist the AMA to develop

20 policy on public health.  In Wisconsin I was a

21 volunteer consultant to the Division of Public Health

22 in its development of the 20 -- or I'm sorry -- the

23 2000 and 2010 state health plans.

24              Excuse me.  I've got a cord that's around

Highly Confidential - Subject to Further Confidentiality Review

1    my foot and it is very uncomfortable.  So let me try

2    to undo.

3         Q.    Of course.

4         A.    There we go.  So -- pardon me.

5              So -- and actually, I coined the term, our

6    state health plan is called "Healthiest

7    Wisconsin 2000" and "Healthiest Wisconsin 2010."  And

8    so I -- the CV would have the actual titles.  I worked

9    on the addiction committee or subcommittee or

10   something like that with one addition, and I was on

11   the steering committee for the overall health plan, I

12   think for the second one, which was the 2010 health

13   plan.  So these were volunteer things that I did.

14        Q.    Okay.  I thought I saw in your CV, have

15   you also taught at the School of Public Health at UW?

16        A.    The -- the sch -- the medical school

17   changed its name to the School of Medicine and Public

18   Health.  So it's the medical school and the public

19   health school all blended into one.  They now

20   encourage students to spend five years and get an MPH

21   while they get their M.D.s, but there is -- there is

22   not a separate public health school in Madison.

23        Q.    In your halftime position teaching at UW,

24   do you teach the MPH students as well as the medical

Highly Confidential - Subject to Further Confidentiality Review

1  students?

2      A.    Actually, the preventive medicine

3  residency involves physicians who get an MPH during

4  their two-year preventive medicine residency placement

5  here, and I'm teaching one of their students now.

6      Q.    Okay.  Have you in the course of your

7  experience sat on any opioid task forces?

8      A.    Yes.

9      Q.    Okay.  Which ones?

10     A.    One for the Wisconsin Medical Society,

11  which I think is called Opioid Task Force, one for

12  Dane County, and that particular task force has

13  several subgroups and one is a health professionals

14  group and that's the one I sit on, which is

15  extraordinarily interesting, and I'm currently

16  co-chair of that group.  And the staff for that group

17  is a wonderful organization called Safe Communities of

18  Madison and Dane County.  We have a merged city/county

19  health department.  So I -- I don't know how that task

20  force brands itself as a county/city or city/county.

21     Q.    Okay.  And is -- is it fair to say that

22  all of those task forces were formed to address the

23  opioid epidemic?  Is that a fair characterization of

24  the purpose of those task forces?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. HIBBERT:  Objection to form.

 2   BY THE WITNESS:

 3        A.    The -- I would not respond in that way.  I

 4   would say that the Wisconsin Medical Society task

 5   force was developed to assist practicing physicians in

 6   improving their practice with regard to opioid

 7   prescribing.  And the changes in opioid prescribing

 8   and the adverse effects of prescribing were part of

 9   the impetus to create that.

10            The Dane County task force came out of an

11   initiative concerned about overdose deaths in our

12   county, yes, ma'am.

13   BY MS. DICKINSON:

14        Q.    Dr. Miller, is there an opioid epidemic in

15   the United States today?

16        MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18        A.    People use that term, but I say there are

19   several.

20   BY MS. DICKINSON:

21        Q.    Okay.  Is there one today?

22        MS. HIBBERT:  Objection to form, asked and

23   answered.

24   BY THE WITNESS:
```

```
 1       A.     An epidemic related to opioids, yes,

 2  definitely.

 3  BY MS. DICKINSON:

 4       Q.     Is there an opioid epidemic in Wisconsin

 5  today?

 6       MS. HIBBERT:  Objection to form.

 7  BY THE WITNESS:

 8       A.     There certainly is an epidemic of overdose

 9  deaths in Wisconsin today.

10  BY MS. DICKINSON:

11       Q.     Dr. Miller, you understand that you are

12  here giving testimony in the multidistrict litigation.

13  It's called the In Re Prescription Opioid Litigation,

14  is that right?

15       A.     Yes, ma'am.

16       Q.     Okay.  You understand that I represent

17  some of the communities' plaintiffs in that

18  litigation.

19              Is that your understanding?

20       MS. HIBBERT:  Objection to form.

21  BY THE WITNESS:

22       A.     I'm -- you are -- you are informing me of

23  such, I'll accept that.

24  BY MS. DICKINSON:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And you and I have obviously not

2  met before today, is that right?

3    A.    That's right.

4    Q.    Okay.  And you are here today offering

5  testimony on behor -- behalf of AmerisourceBergen Drug

6  Corporation, is that right?

7    A.    I didn't know the word "drug" was in the

8  title until I just heard it this morning.

9    Q.    Okay.  You have -- you are here giving

10  testimony on behalf of the company that is referred to

11  as AmerisourceBergen, is that fair?

12    A.    That's very fair.

13    Q.    Okay.  Who is AmerisourceBergen Drug

14  Corporation?

15    MS. HIBBERT:  Objection to form, calls for

16  speculation.

17  BY THE WITNESS:

18    A.    Yeah...

19  BY MS. DICKINSON:

20    Q.    What's your understanding of what the

21  company is that you are providing testimony on behalf

22  of?

23    A.    I have not looked at their SEC filings or

24  their website to know what all they are, but one of

```
1    the things they do is they serve as one of the major

2    distributors of pharmaceuticals to retail pharmacies

3    and hospitals in the United States.

4        Q.    And are they one of the major distributors

5    of prescription opioids?

6        A.    I haven't --

7        MS. HIBBERT:  Objection to form, calls for

8    speculation.

9    BY THE WITNESS:

10       A.    Yes, I have no idea.  I honestly have no

11   idea.

12   BY MS. DICKINSON:

13       Q.    You don't know?

14       A.    I don't know the -- I don't know their

15   market share for opioids.  That was the form of your

16   question.  I have no idea.

17       Q.    Okay.  You mentioned in your report that

18   your opinions may be offered on behalf of certain

19   other distributor defendants in this consolidated

20   action.

21             Which ones?

22       A.    I don't recall, and that's a very honest

23   answer.

24       Q.    Have you been retained by any other
```

Highly Confidential - Subject to Further Confidentiality Review

1   company to provide expert witness testimony in this

2   matter?

3        A.    I will give the answer to the best of my

4   ability.  I believe that there is a joint defense

5   agreement.  I don't think I signed anything.

6        Q.    Are you aware --

7        A.    But I agreed -- I agreed to be a part of a

8   joint defense process because that was considered to

9   be something that several defendants wanted to do.

10       MS. HIBBERT:  And, Counsel, first I'll advise

11  the witness and instruct the witness not to disclose

12  any communications that have taken place with any of

13  the attorneys involved in this matter.

14            And, Counsel, for the record, I will

15  represent the specific defendants that have adopted

16  Dr. Miller's opinions set forth in his report are

17  disclosed in the certain disclosures submitted with

18  those defendants' expert reports.  And for the record,

19  I believe the distributor defendants referenced in

20  Dr. Miller's report are Cardinal and McKesson.

21  BY MS. DICKINSON:

22       Q.    Dr. Miller, were you aware before sitting

23  here today listening to what counsel just said on the

24  record that you were offering opinions regarding

1    Cardinal and McKesson?

2        A.    Yes, I'm offering -- I'm offering opinions

3    on behalf of more than one distributor defendant in

4    this litigation.

5        Q.    Okay.  And are you aware that your -- your

6    report does not specifically refer to other

7    distributor defendants by name?

8        MS. HIBBERT:  Objection to form.

9    BY THE WITNESS:

10       A.    I don't believe my report lists them by

11   name.

12   BY MS. DICKINSON:

13       Q.    Okay.  Is it your understanding that

14   you've been retained by the AmerisourceBergen Drug

15   company to offer expert testimony in this case?

16       A.    Yes.

17       Q.    Okay.  Have you signed a retainer

18   agreement with any other defendant in the case?

19       MS. HIBBERT:  Objection to form.

20   BY THE WITNESS:

21       A.    Not that I recall.

22   BY MS. DICKINSON:

23       Q.    Let's do a little housekeeping first.

24             I'm going to hand you what's been marked

Highly Confidential - Subject to Further Confidentiality Review

```
 1   as Exhibit 1 to your deposition.

 2              Have you ever seen this document?

 3      A.    A copy of it, yes.

 4      Q.    Okay.  When did you first receive a copy

 5   of Exhibit 1?

 6      A.    Oh, let me think.  It's dated May 21, so

 7   it's been within the last two weeks.

 8      Q.    Okay.  You don't recall other than within

 9   the last two weeks more specifically when you were

10   given a copy of Exhibit 1?

11      A.    No, ma'am.  I would say it was closer to

12   May 21 than -- than it is to today.

13      Q.    Okay.  And can you turn to the last

14   page of Exhibit 1, please.  The last page of Exhibit 1

15   has a title "Exhibit A."

16              Do you see that?

17      A.    Yes, ma'am.

18      Q.    Okay.  And Exhibit A requests that the

19   deponent bring a number of materials.  There are three

20   items listed there.

21              Do you see that?

22      A.    Yes, ma'am.

23      Q.    Did you review these items at the time you

24   received Exhibit 1?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Since then I have, yes.

 2      Q.    Okay.  In Item 1 requests:  "All documents

 3  or other materials you reviewed since the date of your

 4  report that you did not specifically identify in your

 5  report in preparation for your testimony today."

 6            Are there items responsive to Question 1?

 7      A.    Yes.

 8      MS. HIBBERT:  Objection to form.

 9            Give me a pause to put an objection on the

10  record before you answer, okay.

11      THE WITNESS:  Okay.

12  BY MS. DICKINSON:

13      Q.    And what are those items?

14      A.    There were several additional journal

15  articles and I did not bring the list with me and I

16  have seen the document that responded to this request

17  or demand.

18      Q.    I'm going to hand you what's been marked

19  as Plaintiffs' Exhibit 4 -- or Miller Exhibit 4.

20            Are -- is Miller Exhibit 4 a list of the

21  materials that you have reviewed since the time of

22  preparing your report?

23      A.    That were not specifically listed in my

24  report at the time, yes.
```

```
1        Q.    Okay.  Item 2 on this list is an --

2   requests:  "An itemization of hours spent, and

3   compensated pay" -- "compensation paid, or to be paid,

4   for your work in this matter and your staff's work in

5   this matter, including all invoices you have submitted

6   to counsel."

7              Do you see that?

8        A.    Yes, ma'am.

9        MS. HIBBERT:  Objection to form.

10       THE WITNESS:  Oh, I'm sorry.

11  BY MS. DICKINSON:

12       Q.    Did you bring an itemization of the hours

13  you've spent to date including all of your invoices

14  that you have submitted to counsel with you today?

15       MS. HIBBERT:  Objection, as previously discussed

16  off the record, but for the record we have submitted

17  our objections to this request including the format in

18  which these requests were made, being a Notice of

19  Deposition as opposed to a Rule 45 subpoena.  The

20  issue is under consideration by the Special Master.

21  There has been recent correspondence, as recent as

22  Sunday on this, if not Monday morning, and we are

23  still awaiting guidance from Special Master Cohen as

24  to the specifics as to what indeed needs to be
```

 1    produced.  And as I specified in my e-mail to counsel

 2    last night, Mr. -- sorry -- Dr. Miller is prepared to

 3    testify here today about the number of hours spent and

 4    invoiced in this matter.  And -- and the amount of

 5    monies invoiced in this matter as well.

 6        MS. DICKINSON:  So for the record, nothing is

 7    being produced with respect to Request No. 2,

 8    including redacted invoices that would show the number

 9    of hours spent and the total amount, is that correct,

10    Counsel?

11        MS. HIBBERT:  Nothing has been produced at this

12    time.

13        MS. DICKINSON:  Okay.

14    BY MS. DICKINSON:

15        Q.    Dr. Miller, do you keep an itemization of

16    yours hours and time spent in this case?

17        A.    I do.

18        Q.    Okay.  Do you submit it to counsel?

19        A.    I do.

20        Q.    Okay.  And is that in the form of a

21    monthly invoice?

22        MS. HIBBERT:  Objection to form.

23    BY THE WITNESS:

24        A.    It is.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. DICKINSON:

2        Q.    Okay.  Do any of the detail in the

3    mount -- monthly invoices summarize actual

4    conversations or the substance of conversations

5    between you and counsel to your knowledge?

6        MS. HIBBERT:  Objection to form, calls for a

7    legal conclusion that Dr. Miller is not qualified to

8    provide.

9            But to the extent that you can answer with

10   that qualification, Dr. Miller, please do.

11   BY THE WITNESS:

12       A.    I'm going to read her question, if I may.

13   BY MS. DICKINSON:

14       Q.    I'll just ask it maybe a little more

15   simply, Dr. Miller.

16           Do any of the detail in your invoices

17   summarize the actual substance of what you may have

18   discussed with counsel in this case?

19       MS. HIBBERT:  Objection to form.  Again, calls

20   for a legal conclusion.  Without those invoices in

21   front of him, I think it's pretty impossible for him

22   to say whether or not every single itemized narrative

23   description may include information pertaining to

24   conversations with counsel in this case.

1          Dr. Miller, again, to the extent that you

2    can answer with that qualification and instruction,

3    please do.

4         MS. DICKINSON:  And I'm going to object --

5    object to the speaking objections.  If you have an

6    objection to form, that's fine.  If you are going to

7    instruct him not to answer, that's fine.  But beyond

8    that, you are coaching the witness.

9    BY MS. DICKINSON:

10        Q.   So could you --

11        MS. HIBBERT:  If you're going to --

12   BY MS. DICKINSON:

13        Q.   -- answer to the best of your ability,

14   Dr. Miller?

15        MS. HIBBERT:  If you are going to delve into

16   privileged communications with Dr. Miller in this

17   case --

18        MS. DICKINSON:  I am actually not asking him

19   that.  I'm asking whether they do contain such

20   communications.

21        MS. HIBBERT:  You're asking him for a legal

22   conclusion which is improper.

23   BY MS. DICKINSON:

24        Q.   I am not asking you the substance of the

Highly Confidential - Subject to Further Confidentiality Review

 1    conversation, okay?  I'm asking whether your invoices

 2    record substance of conversations or just something

 3    else?

 4         MS. HIBBERT:  Objection to form, calls for a

 5    legal conclusion.

 6    BY THE WITNESS:

 7         A.    They do not have anything on the substance

 8    of conversations.

 9    BY MS. DICKINSON:

10         Q.    Okay.  And Item 3 is a copy -- requests a

11    copy of your most current and accurate curriculum

12    vitae.  I am going to hand you what has been marked as

13    Exhibit 3.

14               Exhibit 3 is what was provided to us by

15    counsel as an updated version of your curriculum

16    vitae.

17               Does that look like an updated version of

18    your curriculum vitae?

19         MS. HIBBERT:  Objection to form.

20    BY THE WITNESS:

21         A.    It does, and if I may, it also lists two

22    talks I'm about to give that I haven't given yet.

23    BY MS. DICKINSON:

24         Q.    Okay.  We are going to cover that in just

Highly Confidential - Subject to Further Confidentiality Review

1    a moment.  Let me do one more housekeeping matter

2    before we do.

3            I'm going to hand you what has been marked

4    as Miller 2.

5        A.    Oh, yes.

6        Q.    Can you reach?  There you go.

7            Dr. Miller, I've handed you what has been

8    marked as Miller Exhibit 2.  I'll represent to you

9    that that is the report that was provided to us by

10   counsel on May 10th.

11           Does that look correct to you?

12       MS. HIBBERT:  Objection to form.

13   BY THE WITNESS:

14       A.    It looks right to me.

15   BY MS. DICKINSON:

16       Q.    Okay.  It is dated May 10th on the front

17   cover, is that right?

18       A.    It is.

19       Q.    Okay.  And Exhibit 2 has two appendices to

20   it, is that correct?

21       A.    That is correct.

22       Q.    Okay.  And Appendix A that was attached to

23   what was produced to Plaintiffs on May 10th, 2019,

24   looks to be a copy of your curriculum vitae, is that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   fair?

 2        A.    Right.  There was slight revisions.  I

 3   revise it a few times a month as things come along.

 4   And the what -- and what -- and the exhibit you gave

 5   me before is a more up-to-date version, but very

 6   little difference than what's in the report.

 7        Q.    That was going to be my next question.

 8              Is Exhibit A the updated version of the CV

 9   that was produced on May 10th?

10        A.    No, no, no.

11        Q.    Exhibit 3?

12        A.    Please restate your question.

13        Q.    Is Exhibit -- what I handed you as

14   Exhibit 3, is that the updated version of your CV that

15   is included in Exhibit 2?

16        A.    Yes.

17        Q.    Okay.  Tell -- could you tell me on

18   Exhibit 3 what was added, that might make the day

19   shorter, to -- if you know?

20        A.    Oh, my goodness.  I'm trying to recall any

21   updates since May 10 in areas other than additional

22   professional presentations, and I would say end dates

23   of certain committee involvements.

24        Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    I know that my -- I can speak to one

2   specific fact, if you really want to know.  Meriter

3   Hospital is a hospital where I joined the medical

4   staff in 1989.  I was on the active staff for

5   21-and-a-half years and served as a medical director

6   of their addiction services.  I have remained on their

7   medical staff in different capacities since April

8   of 1989.  And as of June 1 I relinquished my

9   consulting privileges and am now considered a member

10  of the honorary medical staff as a retiree.  So this

11  is the year I'm transitioning into retirement.  And

12  what that means is that I don't pay dues anymore for

13  the next -- for the next dues year.

14       Q.    And is that change noted on your current

15  CV that -- which is marked as Exhibit 3?

16       A.    Yes.  If you were to painstakingly go

17  through and compare them line by line, you would see

18  that the one in Exhibit 2 says I am on the medical

19  staff and the one in Exhibit 3 says I switched to

20  honorary status as of three days ago.

21       Q.    That was three days ago.  That's what I'm

22  trying to avoid is to painstakingly walk through and

23  figure out what's new.

24             So if you can, can you identify anything
```

1    else that was added since May 10th to the best of your

2    ability on Exhibit 3?

3         A.    I -- I honestly can't recall.

4         Q.    Fair enough.

5               I think you testified, I just want to be

6    clear for the record, that you may have added a few

7    presentations to Exhibit 3 that are new since

8    May 10th, is that fair?

9         A.    Um-hum.

10        Q.    Okay.

11              Other than presentations as you are

12   sitting here today and the job that we just talked

13   about at Meriter, you can't recall any other additions

14   to Exhibit 3 that would have been additional since

15   May 10th?

16        A.    May I reference the documents?

17        Q.    Of course.

18        A.    Okay.  Oops.

19        THE WITNESS:  Thank you.

20        MS. HIBBERT:  You're welcome.

21   BY THE WITNESS:

22        A.    I looked at what I was looking for and

23   some of the updates were, in fact, done by May 10 and

24   so the newer one reflects nothing newer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. DICKINSON:

 2        Q.    Okay.  Exhibit 3, is that your most

 3   current curriculum vitae?

 4        A.    It is.

 5        Q.    Okay.  To the best of your ability, does

 6   Exhibit 3 accurately summarize your work and

 7   professional history?

 8        MS. HIBBERT:  Objection to form.

 9   BY THE WITNESS:

10        A.    Yes.

11   BY MS. DICKINSON:

12        Q.    Dr. Miller, I forgot to ask you this, but

13   have you ever been deposed before?

14        A.    I have.

15        Q.    Okay.  How many times?

16        A.    My memory on that is really not as good as

17   it should be.  I've reflected on this obviously in

18   preparation for today.  And I -- I think in terms of

19   court reporters and videos and things like that, and

20   there have been a number of times that I've been in

21   that scenario, but I don't know if those were all

22   depositions.  I'm trying to figure it out.

23        Q.    Okay.

24        A.    I know that I was deposed in a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    professional liability case and I -- I've been deposed

 2    in other cases and the one thing that I can tell you

 3    is that I think my professional life in general and

 4    days like today in specific would have been better if

 5    I had kept detailed records of every legal thing I

 6    ever did since day one.  And I never actually kept a

 7    tally or a spreadsheet -- or a flow sheet.  So I'm

 8    relying on my memory.

 9             I've been involved in legal cases, but I

10    don't have a recollection of being formally deposed

11    except that most recent one.  I believe I've been

12    deposed as a fact witness somewhere, but never as an

13    expert until today.

14       Q.    Okay.  You actually guessed one of my

15    questions.

16             Okay.  Doctor, you testified that you may

17    have been deposed in a professional liability case.

18    What case was that?

19       A.    I cannot give you the name, but I can tell

20    you something about it.

21       Q.    Okay.  Can you tell me something about it?

22       A.    Yes.  When I was working as medical

23    director of the Herrington, with an E, Recovery Center

24    at Rogers Memorial Hospital, now rebranded as Rogers
```

Highly Confidential - Subject to Further Confidentiality Review

1    Behavioral Health, there was a patient who died while

2    in residential treatment.  The estate filed an action

3    against various parties, including the hospital,

4    various employees, and at least two physicians, one of

5    whom was the attending physician and one of whom was

6    myself as the medical director.  We were originally

7    named in the litigation and in the middle of the

8    process -- or in the midst of the process I was

9    removed from the case.

10        Q.    Were you removed from the case through a

11   settlement?

12        A.    No.

13        Q.    How were you removed from the case?

14        A.    The plaintiffs decided to not pursue that

15   line of litigation.

16        Q.    Okay.  And you think you gave a

17   deposition, much like we are doing today in that case?

18        A.    Oh, I know I did.

19        Q.    Okay.  It sounds like it was not a

20   pleasant memory.

21        A.    No, I -- quite frankly, I am really

22   impressed by the whole process and the -- the way

23   attorneys are and the way it's done.  I mean, I used

24   to be a high school drama coach and I just -- I just

1    think it's fascinating and -- and the preparation you

2    folks do.  So, no, I -- it was -- I was cool with it.

3        Q.    That is much kinder than most people that

4    are sitting in your chair, so I do appreciate it.

5    That is not usually people's reaction to a deposition,

6    but okay.

7              Did you testify at the trial in that case

8    or a trial in that case?

9        A.    I did not.

10       Q.    Okay.  What year was that case in?

11       A.    I believe it was 2016.

12       Q.    Did you treat the patient that was in that

13   case or were you just sued as -- in your capacity as

14   the medical director?

15       A.    That requires more specificity.

16       Q.    Were you a treating physician of the

17   patient who died?

18       A.    I was not his attending physician.

19       Q.    Okay.  Had you treated him, though, at

20   all, as other than a non-attending?

21       A.    I had seen him as a consultant.

22       Q.    Okay.  Do you know how many times you had

23   seen him as a consultant?

24       A.    Actually, I'd like to restate my answer.

Highly Confidential - Subject to Further Confidentiality Review

```
1    I saw him as -- as a covering physician.  The day I

2    met the individual, the deceased, I had not done a

3    consult formally.  That was the first to sit down with

4    the individual and his physician was out of the

5    building and I saw the individual hours before the

6    demise.  And so because I had had a clinical

7    interaction and charted on it, I was -- I was in the

8    chart.

9        Q.    You are doing a really nice job.  I

10   actually -- one other thing I forgot was to go through

11   some basic ground rules of a deposition.  Since you've

12   given one, this is going to be fairly easy.

13           The court reporter is here taking down

14   everything we say.  We can't talk over each other.

15   We'll do our best.  Is that okay?

16       A.    Yes, ma'am.

17       Q.    You are doing a nice job of answering

18   verbally instead of "uh-huhs," "uhn-uhns," saying

19   "yes" or "no," but that is a way that this record can

20   be clean.  So we'll try to do that.  I'll try to

21   remind you if you don't, okay?

22       A.    That's fine.

23       Q.    All right.  You understand that you are

24   under oath today, correct?
```

```
 1     A.    Yes, ma'am.

 2     Q.    If at any time during the course of the

 3  deposition you don't understand the question I'm

 4  asking you, please ask me to rephrase, okay.  I will

 5  assume that if you are answering the question you've

 6  understood the question I'm asking.

 7           Okay?

 8     A.    Yes, ma'am.

 9     Q.    All right.  Fair.

10           You are doing a very nice job of it so

11  far, so I'll give you a compliment.  You gave lawyers

12  a compliment.  I will give you a compliment.

13           You said a minute ago that you had never

14  given a deposition as an expert witness, is that

15  correct?

16     MS. HIBBERT:  Objection to form.

17  BY THE WITNESS:

18     A.    I can't swear that I haven't, but I can't

19  recall a specific one.

20  BY MS. DICKINSON:

21     Q.    Okay.  Have you ever served as an expert

22  witness before?

23     MS. HIBBERT:  Objection to form to the extent

24  the question is asking for information about any
```

1   expert retentions in cases in which Dr. Miller was not

2   disclosed as an expert.

3           If you can answer, Dr. Miller, go ahead.

4   BY MS. DICKINSON:

5       Q.   Dr. Miller, have you ever been hired as an

6   expert witness before?

7       MS. HIBBERT:  Same objection.

8   BY THE WITNESS:

9       A.   That's --

10      MS. HIBBERT:  I'll -- I'll instruct not to

11  answer as to any cases in which you were hired as an

12  expert witness and not disclosed, the specifics of

13  those, okay.

14  BY THE WITNESS:

15      A.   Ms. Dickinson, I believe I've just been

16  instructed by counsel not to answer.

17  BY MS. DICKINSON:

18      Q.   Okay.  Dr. Miller, just so we are clear

19  and -- and the record is clear, I'm not asking you to

20  disclose which cases or for who.  I'm just asking

21  whether you have been hired as an expert witness

22  before.  So please don't answer beyond the question of

23  have you been hired as an expert witness before.

24          But have you been hired as an expert

1   witness before?

2       A.    I will answer that by saying I've been

3   asked to provide expert witness services to law firms

4   in the past.

5       Q.    Okay.  On how many occasions?

6       A.    Four for which I have a clear memory and I

7   would think a couple more.

8       Q.    Is it fair to say somewhere between four

9   and ten?

10      MS. HIBBERT:  Objection to form.

11  BY THE WITNESS:

12      A.    I would say as an expert witness below ten

13  is the definite correct answer.

14  BY MS. DICKINSON:

15      Q.    When was the last time before this case

16  that you were hired as an expert witness?

17      A.    One of two cases, and I can speak to

18  either.  I don't recall the sequence.

19      Q.    Okay.  Those two cases, roughly when was

20  the last -- when was that time that you were hired as

21  an expert witness?  I'm just trying to get a sense of

22  when the last time you served as an expert or were

23  hired as one before this case.

24      A.    I think those would both be in the

 1   vicinity of four to eight years ago.

 2       Q.    Have you ever discussed serving as an

 3   expert witness with a set of lawyers where you decided

 4   not to serve as an expert?

 5       MS. HIBBERT:  Objection to form.  Again, with

 6   the qualification as to she is not asking about the

 7   specifics of those conversations, just yes or no.

 8   BY THE WITNESS:

 9       A.    Yes.

10   BY MS. DICKINSON:

11       Q.    How many times?

12       A.    Less than six.

13       Q.    Okay.  When was the last time that you

14   were asked to serve as an expert but declined to do

15   so?

16       MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18       A.    Within the last 60 days.

19   BY MS. DICKINSON:

20       Q.    And was that case about -- had -- did that

21   case have anything to do with opioids?

22       MS. HIBBERT:  Objection to form.  Again, not

23   asking for anything more specific than yes or no

24   there.

1          And, Counsel, I'm not trying to coach the

2   witness in any way.  If you want to say the same thing

3   in your question, that's fine, too.

4       A.    I --

5       MS. HIBBERT:  Dr. Miller, just let me finish

6   real quick.

7          I'm not trying to coach the witness.  I

8   just want to make sure that we are protecting any

9   confidential communications with any other attorneys,

10   okay.

11          Go ahead, Doctor.

12   BY THE WITNESS:

13       A.    I attest, I'm not being coached because

14   I've figured this out myself.  Anything to do with

15   opioids, yes.

16   BY MS. DICKINSON:

17       Q.    And in that instance who approached you

18   about serving as an expert witness?

19       MS. HIBBERT:  Objection to form.

20          I'll instruct you not to answer that

21   question.  That's getting -- that's crossing the line

22   as to --

23       MS. DICKINSON:  Counsel, unless it is someone he

24   has a current retainer agreement, I -- I don't

Highly Confidential - Subject to Further Confidentiality Review

 1  understand how any of that is protected.  We've asked

 2  and been given testimony on this in every case.  If --

 3  prior to a retainer letter, there is no privilege.  So

 4  if you want to instruct him not to answer, we may have

 5  to call the special master, but I'm asking for -- I

 6  can ask it a different way.  I can ask if he was

 7  retained in the case.  He just said he wasn't.  So I'm

 8  entitled to explore who approached him and why he

 9  didn't do it.

10      MS. HIBBERT:  I think you need to ask clarifying

11  questions, because I think Dr. Miller might be

12  confused.  If he was never retained, then I'd say

13  that's a fair question.  If he was retained to review

14  any records and offer any opinions but not

15  disclosed --

16      MS. DICKINSON:  Fair.

17      MS. HIBBERT:  -- that's not fair, okay.

18      MS. DICKINSON:  Fair, but that's not what I was

19  asking.  So we'll go at this --

20  BY MS. DICKINSON:

21      Q.    I want to make sure you totally understand

22  what I'm asking, okay, Dr. Miller?

23          A few minutes ago I asked whether you had

24  ever been asked to work as an expert witness and

Highly Confidential - Subject to Further Confidentiality Review

1   declined to do so.

2          Do you remember that?

3       A.    Yes, ma'am.

4       Q.    And that's what I'm asking about right

5   now.  I'm not asking about instances in which you

6   actually accepted and were retained to work as an

7   expert, okay?

8       A.    Correct.

9       Q.    And you said there was one in the last

10  60 days in which you were asked to work as an expert

11  but you declined?

12      A.    Correct.

13      Q.    Okay.  And so what was the substance of

14  that case?

15      MS. HIBBERT:  Objection to form.

16  BY THE WITNESS:

17      A.    That was a case that I would say doesn't

18  have anything to do with opioids, but your question

19  was so broad, were there any patients ever prescribed

20  opioids in all of those cases, yes.  And were there

21  drug tests that looked for opioids in those cases,

22  yes.

23          But in the -- in that particular case

24  there were questions -- there -- there was the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opportunity to provide expert testimony on behalf of a

 2    company that has a 1-800 number phone bank to connect

 3    people with treatment centers and has a company that

 4    does urine drug tests.  And I was asked if I would be

 5    willing to provide expert testimony with regard to

 6    those aspects of a very complex litigation.  And I

 7    said I'm -- I just don't have the time, I cannot do

 8    it.

 9    BY MS. DICKINSON:

10         Q.    Okay.  And who was that company?

11         A.    There were two separate firms that find

12    experts for law firms.  One was Thomson Reuters and

13    another is a company that is named in my CV, and if I

14    could look at it, I could find it for you.

15         Q.    Of course.

16         A.    It's called Vident Partners in York, Maine

17    on the bottom of Page 12 of Exhibit 3.

18         Q.    Is it fair to say that both Thomson

19    Reuters and Vident Partners contacted you about

20    serving as an expert witness?

21         MS. HIBBERT:  Objection to form.

22    BY THE WITNESS:

23         A.    They contacted me to say would you be

24    interested in providing expert witness services in our
```

Highly Confidential - Subject to Further Confidentiality Review

1  case.

2  BY MS. DICKINSON:

3      Q.    Okay.  And is that because you are listed

4  as an expert for Thomson Reuters or Vident Partners as

5  someone who may be interested in expert testimony?

6      MS. HIBBERT:  Objection to form.

7  BY THE WITNESS:

8      A.    I don't know if I've signed anything with

9  Vident, but one of the attorneys simply knows me from

10  a previous case.

11          Thomson Reuters, I believe I signed a --

12  an agreement saying, yeah, you can call me if you'd

13  like.

14  BY MS. DICKINSON:

15      Q.    Could you give me a list of the companies,

16  the expert finder companies that you are currently

17  working with?

18      A.    Those two.

19      Q.    Okay.

20      A.    Thomson Reuters Expert Witness Services is

21  initials TREWS, Vident Partners of York, Maine and

22  the -- the Gerson Lehrman Group, which goes by GLG.

23      Q.    Okay.  When did you first start working

24  with GLG?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    My CV says July 2018 to the present and I
 2   would say that's correct.
 3        Q.    What is the nature of your relationship
 4   with GLG?
 5        MS. HIBBERT:  Objection to form.
 6   BY THE WITNESS:
 7        A.    It is interesting.  GLG sends blast
 8   e-mails out to physicians and says, Would you like to
 9   do this, and a lot of what they have is surveys where
10   you spend a half hour or an hour or whatever, and a
11   lot of it is market research for pharmaceutical
12   companies.  It looks like a lot of it is for venture
13   capital.  And they want to say, Do you have experience
14   in this domain and would you provide us some
15   information and blah, blah, blah.  And they cap their
16   rates at 250 an hour, and I'm not interested in a lot
17   of the things they have, but it's -- but when I was
18   expanding my consultation business, I said, Well, I'll
19   sign up with these people and see what happens.
20             I did not realize that within GLG they had
21   an expert witness finding.  So it can include that,
22   but most of it is just the survey stuff.  I believe
23   that's my answer to you.
24   BY MS. DICKINSON:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And did there come a point in time when

2    you were expanding your consulting business that you

3    did sign up with several expert witness finders?

4        MS. HIBBERT:   Objection to form.

5    BY THE WITNESS:

6        A.    The only one that I -- I'm trying to think

7    of how to answer that question, because I have had a

8    dialogue relationship with -- with TREWS for a while,

9    but I put in my CV May of '19 because that probably

10   means that I signed something, and I did not -- I

11   was -- I had a -- I had a dialogue relationship with

12   them before I signed anything.

13        With Vident they found me for another case

14   several years ago, and that's one of the ones I

15   mentioned to you.  And if I signed something, it would

16   be very recent.  So those actually predated.  So the

17   form of your question was since I decided to expand my

18   consultation business have I signed up with firms, and

19   the only firm that I have a new relationship with

20   since I left full-time employment at Rogers is GLG.

21   BY MS. DICKINSON:

22        Q.    Okay.  Well, let's talk about -- actually,

23   when -- when did you decide to expand your consulting

24   business?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     In the summer of 2018.

 2        Q.     I'm sorry.  Did you say '18 or '19?  I

 3   didn't hear you.

 4        A.     I said '18.

 5        Q.     So last summer?

 6        A.     Yes, ma'am.

 7        Q.     Okay.  And why last summer did you decide

 8   to expand your consulting business?

 9        A.     Again, I will give you several answers

10   today under the rubric of transitioning toward

11   retirement.  So I was trying to set up things that I

12   could do after I'm not getting a paycheck.

13        Q.     And are you currently transitioning toward

14   retirement?

15        A.     You are watching it happen.

16        Q.     I wish, and I am jealous about that.  No,

17   I'm just kidding.  Okay.

18               When do you anticipate that you will be

19   fully retired or retired period?

20        MS. HIBBERT:  Objection to form.

21   BY THE WITNESS:

22        A.     My salaried positions, the ones I

23   mentioned, the 12-hour job with Rock County is on

24   notice October 21.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. DICKINSON:

 2       Q.    Okay.

 3       A.    And the UW position of -- of a 20-hour a

 4   week on salary is on notice for November 29.

 5       Q.    And are those both of 2019?

 6       A.    Yes, ma'am.

 7       Q.    Okay.

 8             And as of October and November of 2019, do

 9   you intend to fill that time with consulting work or

10   do you intend to retire?

11       A.    I intend to much more retire than fill it

12   with consulting work.

13       Q.    Okay.  Is it fair to say, I think you said

14   that you were -- in the summer of 2018 you decided to

15   expand your consulting practice.

16             Since the summer of 2018, have you been

17   doing more consulting than you had prior to the summer

18   of 2018?

19       MS. HIBBERT:  Objection to form.

20   BY THE WITNESS:

21       A.    Yes.

22   BY MS. DICKINSON:

23       Q.    Okay.  And in looking at doing more

24   consulting, have you provided your name to these three
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    groups we've talked about, GLG, Thomson Reuters and

 2    Vident, as someone who may be willing to provide

 3    expert testimony?

 4         MS. HIBBERT:  Objection to form.

 5    BY THE WITNESS:

 6         A.    Yeah, I would -- I don't know what

 7    objection to form really means.

 8         MS. HIBBERT:  Don't worry.

 9    BY THE WITNESS:

10         A.    But -- but -- but I would object to form

11    because I didn't -- I didn't send my name to anybody.

12    BY MS. DICKINSON:

13         Q.    I'm just trying to get a sense of

14    currently do those three companies have your name as

15    someone who is willing to provide expert testimony?

16         A.    I would think that's correct.

17         Q.    Okay.  With GLG did you provide your name

18    to them or did they find you?

19         A.    All of these places found me.

20         Q.    Okay.  When was your first contact with

21    GLG about doing expert witness work?

22         MS. HIBBERT:  Objection to form.

23    BY THE WITNESS:

24         A.    That's a specific question.
```

Highly Confidential - Subject to Further Confidentiality Review

1          My first contact with GLG regarding doing

2   expert witness work was within the last couple of

3   months.

4   BY MS. DICKINSON:

5          Q.    Okay.  And who did you talk to at GLG

6   about doing that?

7          A.    There is a contact person.  Am I to name

8   them?

9          Q.    You can if you know it.

10         A.    Eleanor Hamilton.

11         Q.    Okay.  And do you know what your hourly

12   rate or compensation is for any work you may get hired

13   to do through GLG?

14         A.    Well, I listened to your English.  My rate

15   that I would be hired to do is a higher rate because I

16   changed my rates this year, and I'm working off of old

17   rates now.

18         Q.    Okay.  What is the hourly rate that if you

19   were hired through GLG you would be making?

20         A.    ███

21         Q.    Okay.  And with Thomson Reuters, what was

22   the first time you had contact with Thomson Reuters

23   about serving as a potential expert witness?

24         MS. HIBBERT:  Objection to form.

```
 1   BY THE WITNESS:

 2        A.    I honestly believe that I had some contact

 3   with them a while back, which is why I answered the

 4   way I did earlier that it was not since I've decided

 5   to expand my consult practice, which is the way you

 6   phrased it, but a very specific case came up within

 7   the last two months.

 8   BY MS. DICKINSON:

 9        Q.    Okay.  Did you end up being hired for that

10   very specific case that you are talking about in the

11   last few months?

12        A.    By Thomson Reuters?

13        Q.    Yes.

14        A.    No.

15        Q.    Okay.  Did you decline to be hired for

16   that very specific case?

17        A.    Now I've got to think.

18              Yes.

19        Q.    And what was the substance, generally, of

20   that case?

21        A.    I have testified to it previously, and it

22   is the one where I said I don't have time to do all of

23   that stuff.

24        Q.    Fair.  The one we talked about a few
```

```
 1    minutes ago with the -- the 1-800 number company,

 2    correct?

 3         A.    And the drug testing.

 4         Q.    Okay.  Do you know if prior to the time

 5    you signed a contract with Thomson Reuters whether

 6    they had your name as someone they might contact about

 7    expert witness testimony, do you know if they had your

 8    name?

 9         MS. HIBBERT:  Objection to form, calls for

10    speculation.

11    BY THE WITNESS:

12         A.    Exactly, I don't know.

13    BY MS. DICKINSON:

14         Q.    You don't know.

15               With respect to Vident Partners, when was

16    the first time you had contact with Vident Partners

17    about doing potential expert witness testimony?

18         A.    That was the one I mentioned the four to

19    eight-year window, and I really don't think it was

20    under that name at that point.  It was the same guy.

21    I don't know if the company has changed names.

22         Q.    I need to ask you one more question about

23    the Thomson Reuters relationship.

24               If you -- have you taken any case as an
```

1    expert witness that was brought to you through the

2    Thomson Reuters relationship?

3         A.    I have not.

4         Q.    Okay.  And if you do choose to take such a

5    case, do you know what your hourly rate will be?

6         A.    ███████

7         Q.    Okay.  Have you taken any case through a

8    relationship or with Vident Partners?

9         A.    I was involved with a case with, I think,

10   essentially the same entity.  I'm not sure if the name

11   is the same.

12        Q.    And remind me.  I'm sorry.  When was that?

13        A.    That was the four to eight years ago one.

14        Q.    Okay.  And did you serve as a disclosed

15   expert in that case or a consulting expert?

16        MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18        A.    I was never disclosed.

19   BY MS. DICKINSON:

20        Q.    Okay.  Okay.  I am going to -- we marked,

21   I think you have in front of you as Exhibit 2, could

22   you pick that up.  Just find it in the shuffle of

23   papers in front of you.

24              Okay.  What is Exhibit 2?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     My expert report in this case.

2      Q.     Okay.

3             Does Exhibit 2, your expert report in this

4   case, list all of the opinions you intend to offer in

5   this case?

6      MS. HIBBERT:  Objection to form.

7   BY THE WITNESS:

8      A.     Yes.

9   BY MS. DICKINSON:

10     Q.     Okay.  Do you have any plans to render any

11  additional opinions not listed here in Exhibit 2

12  before the trial?

13     MS. HIBBERT:  Objection to form.

14  BY THE WITNESS:

15     A.     I do not.

16  BY MS. DICKINSON:

17     Q.     Okay.

18     THE WITNESS:  Sorry.

19  BY MS. DICKINSON:

20     Q.     Does your report and all of the appendices

21  which are also contained in Exhibit 2 list all of the

22  bases for the opinions in this report?

23     MS. HIBBERT:  Objection to form.

24  BY THE WITNESS:

1      A.    No.

2  BY MS. DICKINSON:

3      Q.    Okay.  What is not listed in the expert

4  report that formed the bases of your opinions?

5      A.    Years of practice, lots of reading of

6  things other than listed here, just my general

7  orientation as an experienced clinician in addiction

8  medicine and working in addiction policy.  So I did

9  not specify where every idea came from.  You said the

10  basis.

11      Q.    Well, Doctor, you understand that in -- if

12  you serve as an expert witness in litigation, you are

13  under an obligation to disclose the entire bases for

14  the opinions you are rendering in the case.

15          Do you understand that?

16      MS. HIBBERT:  Objection to form.

17  BY THE WITNESS:

18      A.    If I have a general thought about

19  something that has grown over decades of experience

20  and it's what I think and what I understand to be

21  true, that can form my opinion without my having to

22  reference any new specific article to put in a

23  bibliography.

24  BY MS. DICKINSON:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Totally understood, and I think even in

2  the report you discussed your professional experience.

3            So taking your professional experience

4  aside, I'm just trying to understand as we sit here

5  today whether there is anything that you haven't

6  mentioned in your report that you relied upon in

7  forming the opinions that you -- that are contained in

8  this report?

9      A.    Yeah, I --

10     MS. HIBBERT:   Objection to form.

11  BY MS. DICKINSON:

12     Q.    Do you understand my question?

13     A.    I --

14     MS. HIBBERT:   Same objection.

15  BY THE WITNESS:

16     A.    I think we are getting there.  I think you

17  are asking is there something specific like a journal

18  article that I have not included, and I would say no.

19  BY MS. DICKINSON:

20     Q.    Okay.  And if you could turn to Page 2 of

21  your report, please.  It is Page 2 at the bottom.

22     A.    Yes, ma'am.

23     Q.    The Paragraph 4 at the last sentence says:

24            "This expert report and Appendix B should

1    be read collectively as they are intended to set forth

2    my opinions regarding validity and material I relied

3    on in performing those opinions."

4         Do you see that?

5    A.   Yes.

6    Q.   So this report and the Appendix B, is that

7    an accurate statement that that was intended to set

8    forth both your opinions and the materials you relied

9    on?

10   MS. HIBBERT:  Objection to form.

11   BY THE WITNESS:

12   A.   Yes, ma'am.

13   BY MS. DICKINSON:

14   Q.   And I believe we marked, just to be fair

15   to you, I believe we've marked as Exhibit 4 some

16   additional materials that you've reviewed and

17   considered as of -- the date on this is June 3rd,

18   2019, is that right?

19   A.   Yes, ma'am.

20   Q.   And do those materials change -- the

21   review of those materials change the opinions in any

22   way that you have in Exhibit 2?

23   MS. HIBBERT:  Objection to form.

24   BY THE WITNESS:

1     A.    No.

2  BY MS. DICKINSON:

3     Q.    Are there any corrections to Exhibit 2

4  that you're aware of that need to be made today?

5     A.    I have not discussed this with anyone, but

6  I think there are some secretarial issues with the

7  way -- with regard to the way some of the pages lined

8  up and some of the footnotes were cited.  So it could

9  be -- if there is an opportunity before trial, it

10  would be clearer if there could be some secretarial

11  amendments, but not anything on substance.

12     Q.    Okay.  Fair enough.

13          There may be some typos or some formatting

14  issues, but as you sit here today, do you believe

15  there is any substantive correction that needs to be

16  made to Exhibit 2 to accurately and fully state your

17  opinions in this case?

18     A.    I do not think so.

19     Q.    As -- as will happen throughout the day,

20  you are entitled breaks any time.  I think we've been

21  going over an hour, so let's take a quick break.  I

22  don't want to exhaust you, and so if you need a break

23  give me or your counsel a high sign and we'll take a

24  break.  We'll try not to do that more than every hour

Highly Confidential - Subject to Further Confidentiality Review

```
1    if that's okay, just to keep it moving, but why don't

2    we take five and come back just to keep it moving.  If

3    you need longer than that, you certainly are entitled

4    to it?

5        A.    Thank you so much, ma'am.

6        MS. DICKINSON:  Okay.  Back in just -- I'll be

7    back in five.  Whenever you are all ready, that would

8    be helpful if we could just keep moving.

9        THE VIDEOGRAPHER:  We are off the record at

10   11:20 a.m.

11                  (WHEREUPON, a recess was had

12                   from 11:20 to 11:31 a.m.)

13       THE VIDEOGRAPHER:  We are back on the record at

14   11:31 a.m.

15   BY MS. DICKINSON:

16       Q.    Dr. Miller, back on the record after a

17   short break.

18              When was the first time that you were

19   contacted about serving as an expert witness in this

20   case?

21       A.    Last summer.

22       Q.    Okay.  And by who?

23       A.    It may have been by Ms. Hibbert, but it

24   may have been by somebody else.  I -- I don't remember
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the very first call.

 2         Q.    Do you remember if it was someone at the

 3    Reed Smith firm?

 4         A.    It wasn't a third party.

 5         Q.    Was it an attorney?

 6         A.    Probably.  That's speculating.

 7         Q.    Okay.

 8         A.    I don't remember.

 9         Q.    Had you ever worked with anyone at the

10    Reed Smith firm before this case?

11         A.    No.

12         Q.    I assume that means you had not worked

13    with Ms. Hibbert before this case?

14         A.    Correct.

15         Q.    Okay.  What do you remember about the

16    first conversation about this case when you were

17    contacted?

18         A.    It was a phone call and they said we have

19    a litigation where we are wanting somebody to be an

20    expert to explain what addiction is.

21         Q.    Did that person let you know in that call

22    that they represented AmerisourceBergen?

23         MS. HIBBERT:  Objection to form.

24    BY THE WITNESS:
```

1      A.    I don't believe that came up in the first

2  call.

3  BY MS. DICKINSON:

4      Q.    How long was the first call?

5      A.    I don't remember.

6      Q.    Less than an hour?

7      A.    Yes.

8      Q.    Less than 15 minutes?

9      MS. HIBBERT:  Objection to form.

10 BY THE WITNESS:

11     A.    Probably not.  Or may -- maybe.

12 BY MS. DICKINSON:

13     Q.    Okay.

14     A.    Maybe.

15     Q.    Prior to you being officially retained as

16 an expert in this case, did you have additional phone

17 calls or meetings to discuss the litigation?

18     MS. HIBBERT:  Objection to form.

19 BY THE WITNESS:

20     A.    My recollection is that before I was sent

21 any materials to sign there was more than one phone

22 call.

23 BY MS. DICKINSON:

24     Q.    Do you know when you signed a retainer to

```
1    serve as an expert in this case?

2        A.    I -- I don't know exactly when, but what

3    you are getting at is some timeframes and I would say

4    this summer I think was when there was the first phone

5    call, but I traveled to their offices in July -- in

6    August for a face-to-face get acquainted meeting and

7    any signing would have been between the first phone

8    call and actually having a face-to-face meeting with

9    Ms. Hibbert and a -- another attorney from the firm.

10       Q.    Okay.  At some point in the summer

11   of 2018, you had a meeting at the Reed Smith law firm,

12   is that fair?

13       A.    Yes.  And as I sit here with you in

14   deposition, I could have gotten the first phone call

15   before the first day of summer.  It could have been in

16   late spring.

17       Q.    Okay.  And I'm just trying to find out

18   what -- how many contacts in between the time you were

19   first contacted and the time that you signed a

20   retainer letter with the Reed Smith law firm or with

21   Amerisource, how many contacts with there?

22       MS. HIBBERT:  Objection to form, lack of

23   foundation as well referencing the retainer letter as

24   opposed to a retention letter, just for clarification.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. DICKINSON:

 2        Q.    Actually, let's just start simple.

 3              Do you have an agreement to work as an

 4   expert in this case?

 5        A.    Yes.

 6        Q.    Okay.  What is that agreement called?

 7        A.    Well, I don't know.  It's a legal term.

 8        Q.    Is the agreement a retainer letter or a

 9   retention letter, do you have any idea?

10        A.    Legal terms.  Not -- not my area.

11        Q.    You don't -- okay.

12        A.    The diff -- the difference between a

13   retainer and a retention, I -- you could give me some

14   medical terms, but those are legal terms I don't know

15   the meaning of.

16        Q.    Okay.  For purposes of our discussion, so

17   we know what we are talking about --

18        A.    Yeah.

19        Q.    -- when we refer to your agreement to work

20   in this case, can we call it your retainer agreement?

21        MS. HIBBERT:  Objection to form.

22   BY MS. DICKINSON:

23        Q.    Is that fair?

24        A.    I'll -- I'll go with that.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Is there something that more accurately

2    summarizes what the agreement is?  I -- I -- I'm just

3    trying to refer to it as something so we both

4    understand what we are talking about when we talk

5    about the agreement to work in this case.

6             Is there something better?

7    A.    Very honestly, under oath, the word

8    "agreement" comes to mind.  Any adjective doesn't.

9    Q.    Okay.  Let's -- when we talk about this

10   for the purpose of the next few minutes, let's just

11   call it your agreement, okay?

12   A.    Thank you.

13   Q.    All right.  And you think you signed your

14   agreement in this case in the summer of -- August of

15   20 18?

16   A.    Before.

17   Q.    Okay.  Sometime over the summer --

18   MS. HIBBERT:  Objection to form.

19   BY MS. DICKINSON:

20   Q.    -- of 2018?

21   A.    That's my best recollection.

22   Q.    Is your agreement with AmerisourceBergen

23   or with the Reed Smith law firm?

24   A.    I believe it's with the firm.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    And before you signed your agreement,

 2   which lawyers at the Reed Smith law firm did you have

 3   conversations with?

 4       MS. HIBBERT:  Objection to form.

 5   BY THE WITNESS:

 6       A.    I don't remember all of the names.

 7   BY MS. DICKINSON:

 8       Q.    Can you remember -- tell me the ones you

 9   do remember.

10       A.    The only names I remember are Eric

11   Alexander, I think it is, and Ms. Hibbert, and that's

12   it.  I have not met with any other attorneys from that

13   firm or conversed with that I can recall.

14       Q.    Prior to signing your agreement, were you

15   given any documents to review?

16       MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18       A.    I don't recall I got anything before I

19   signed an agreement.

20   BY MS. DICKINSON:

21       Q.    Okay.  Prior to your agreement to serve as

22   an expert for AmerisourceBergen, were you provided

23   with any information about the case?

24       MS. HIBBERT:  Objection to form.
```

1    BY THE WITNESS:

2        A.    Yes.

3    BY MS. DICKINSON:

4        Q.    What information?

5        A.    That there was a case and that there were

6    plaintiffs and that there were distributor defendants

7    and that my expertise was going to be limited to

8    discussing what is addiction.

9        Q.    Is that the total of the information you

10   were provided before you signed your agreement?

11       MS. HIBBERT:  Objection to form.

12   BY THE WITNESS:

13       A.    I recall nothing else.

14   BY MS. DICKINSON:

15       Q.    And with that information, you executed an

16   agreement to serve as an expert for AmerisourceBergen,

17   is that right?

18       MS. HIBBERT:  Objection to form.

19   BY THE WITNESS:

20       A.    I did.

21   BY MS. DICKINSON:

22       Q.    And is your understanding of what your

23   opinion is limited to, does it fall within the subject

24   area of the what is addiction subject area?

```
 1        MS. HIBBERT:  Objection to form.

 2   BY THE WITNESS:

 3        A.    Yes, ma'am.

 4   BY MS. DICKINSON:

 5        Q.    Do you know if your retainer agreement is

 6   just for this case, the National Prescription Opiate

 7   Litigation that is MDL 2804 or is it a general

 8   agreement to testify in other matters?

 9        MS. HIBBERT:  Objection to form.

10   BY THE WITNESS:

11        A.    I can answer that, but if I may, I'd like

12   to correct my previous answer.

13   BY MS. DICKINSON:

14        Q.    Oh, sure.  Of course.

15        A.    When you said is it limited to what is

16   addiction, there are some related questions:  How does

17   addiction happen, who gets it, what are the factors

18   involved in the development of addiction.  I believe a

19   description of the condition and its pathogenesis is

20   what I am -- what I was and am being asked to opine

21   on.

22        Q.    Okay.  Prior to you signing the agreement,

23   did you have any discussions about what you would not

24   be willing to opine on?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. HIBBERT:  Objection to form.

 2   BY THE WITNESS:

 3        A.    No.

 4   BY MS. DICKINSON:

 5        Q.    Is your agreement in this case, and this

 6   is what I was asking you a few minutes ago --

 7        A.    Oh, yes.

 8        Q.    -- I'm going to get back to it.  But let

 9   me ask the question just so the record is clear.

10             Is your agreement in this case to provide

11   testimony just in -- limited to MDL 2804, which is the

12   National Prescription Opiate Litigation or is it a

13   general retainer agreement with AmerisourceBergen to

14   provide testimony in an undefined set of cases?

15        MS. HIBBERT:  Objection to form.

16   BY THE WITNESS:

17        A.    I will answer the question to the best of

18   my ability.

19   BY MS. DICKINSON:

20        Q.    Okay.

21        A.    I believe that it's a retainer with the

22   firm.  They told me that their primary client is

23   AmerisourceBergen.  They later told me that there were

24   other distributor defendants who might want to use my
```

```
 1    expert opinion on their behalf.  It has also been

 2    mentioned that there could be other litigations

 3    besides the Ohio one.  And my understanding, which in

 4    all honesty could be a misunderstanding, but based on

 5    conversations, my understanding is that my expertise

 6    is being provided to Reed Smith to assist them in

 7    their representation of whoever might request their

 8    services for whatever litigation might happen.  So I

 9    think their primary relationship is with

10    AmerisourceBergen, as I understand it, and to the

11    extent that there could be other litigation regarding

12    AmerisourceBergen and the general topic of opioids in

13    other jurisdictions, I might be involved in those.

14         Q.    Okay.

15         A.    That's my -- that's the best I can say.

16         Q.    That was actually exactly my question.

17    That you understand -- do you understand that there

18    are thousands of cases filed into this multidistrict

19    litigation and AmerisourceBergen is a defendant in

20    those cases?

21         MS. HIBBERT:  Objection to form.

22             And I'll instruct the witness not to

23    disclose any conversations or communications that you

24    had with counsel about any other cases or this case.
```

```
 1   BY THE WITNESS:

 2       A.    That's granted.  And -- and, in fact, I

 3   was thinking in a whole different direction.

 4             From the general media, news reports, and,

 5   of course, I work in this area, I -- I read stuff, I'm

 6   aware that there is a lot of stuff going on.  And --

 7   and to the extent to which various manufacturers,

 8   distributors and retail pharmacies might be involved

 9   in these, I'm aware that there is a lot of active and

10   potential litigation in general, and that comes from

11   my -- you asked my knowledge, that comes from my

12   knowledge, not from discussions with Reed Smith.  I'm

13   just...

14       Q.    Were you disclosed as an expert in the

15   State of Oklahoma case, for example?

16       MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18       A.    No.

19   BY MS. DICKINSON:

20       Q.    Have -- has anyone -- are you serving as

21   an expert in the City of Baltimore case?

22       MS. HIBBERT:  Objection to form.

23             Objection to form and instruction not to

24   answer to the extent that no expert witnesses have
```

Highly Confidential - Subject to Further Confidentiality Review

1    been dis -- disclosed in the City of Baltimore case.

2    So whether or not Dr. Miller or any other expert is

3    serving as an expert in that case is beyond the line

4    of --

5         MS. DICKINSON:  Well --

6         MS. HIBBERT:  -- what's appropriate for

7    Dr. Miller to respond to in this deposition.

8         MS. DICKINSON:  Act -- actually, he lists the

9    designation of experts in his CV --

10        MS. HIBBERT:  He lists the --

11        MS. DICKINSON:  -- or in his materials

12   considered list, so I -- I think it's been disclosed.

13        MS. HIBBERT:  He lists the designation of

14   Plaintiffs' experts.  There have been no defense

15   experts disclosed in that case.

16             If you want to -- if you want to phrase

17   the question of, Dr. Miller, have you been disclosed

18   as an expert witness in that case, that's a fair

19   question, but whether or not he is offering any

20   opinions in that case at this point prior to

21   disclosure of defense expert witnesses for that or any

22   other case is inappropriate and I'll instruct him not

23   to answer that question.

24   BY MS. DICKINSON:

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Have you been disclosed as an expert in

2   any other opioid-related litigation?

3        MS. HIBBERT:  Objection to form.

4   BY THE WITNESS:

5        A.    Not that I'm aware of.

6   BY MS. DICKINSON:

7        Q.    Okay.  Outside of your agreement to work

8   as an expert in this case, have you discussed working

9   as an expert but have not yet been retained with any

10  other law firm regarding opioid litigation?

11       MS. HIBBERT:  Objection to form.

12  BY THE WITNESS:

13       A.    No.

14  BY MS. DICKINSON:

15       Q.    Dr. Miller, can I ask you what I think is

16  an important question:  Why did you agree to defend

17  AmerisourceBergen in this case?

18       MS. HIBBERT:  Objection to form.

19  BY THE WITNESS:

20       A.    I agreed to provide an expert opinion to

21  the attorneys at Reed Smith and who their client was

22  doesn't really change that opinion.  It's just an

23  expert opinion.  Who the client was wasn't a central

24  consideration for me.
```

```
 1   BY MS. DICKINSON:

 2       Q.    Do you understand that your expert opinion

 3   is being offered on behalf of Defendant

 4   AmerisourceBergen and the other distributor defendants

 5   that we talked about?

 6       A.    I do.

 7       MS. HIBBERT:  Objection to form, asked and

 8   answered.

 9   BY MS. DICKINSON:

10       Q.    Did you understand that before you

11   rendered the opinion?

12       MS. HIBBERT:  Objection to form.

13   BY THE WITNESS:

14       A.    Yes.

15   BY MS. DICKINSON:

16       Q.    Okay.  And I guess I'm asking you if you

17   had that understanding, why did you agree to render an

18   opinion on behalf of AmerisourceBergen and some other

19   distributor defendants in the opioid litigation --

20       MS. HIBBERT:  Objection to form.

21   BY MS. DICKINSON:

22       Q.    -- that we are discussing today?

23       MS. HIBBERT:  Sorry.  Same objection.

24   BY THE WITNESS:
```

1       A.      Because I believe in the American legal

2   system.

3   BY MS. DICKINSON:

4       Q.      What does that mean?

5       A.      There are different sides.  Everybody has

6   a right to have their side heard.

7       Q.      Did you look at any internal documents

8   from AmerisourceBergen in rendering your opinion?

9       A.      No.

10      Q.      Did you look at any of the conduct of any

11  AmerisourceBergen or any of the distributor defendants

12  in rendering your opinion?

13      MS. HIBBERT:  Objection to form.

14  BY THE WITNESS:

15      A.      I -- I did not.

16  BY MS. DICKINSON:

17      Q.      Did you ever ask to?

18      A.      No.  I read the Complaint.

19      Q.      That wasn't my question.  I was just --

20      A.      I know, but that -- that's -- as far as

21  the conduct of parties in this litigation, I know

22  nothing about the con -- I -- I have no specific

23  knowledge of the conduct of parties other than the

24  allegations of the Complaint.

1      Q.     You don't know whether the allegations of

2   the Complaint are true or not, right, fair?

3      A.     I think that's why there is a trial.

4      Q.     Would it -- was it important to you to

5   know if whether the allegations in the Complaint are

6   true or not in deciding whether to testify on behalf

7   of AmerisourceBergen?

8      MS. HIBBERT:  Objection to form.

9   BY THE WITNESS:

10     A.     I -- in all due respect, I believe you are

11  not asking me my opinion.  I believe you are asking me

12  my personal motives.

13  BY MS. DICKINSON:

14     Q.     Which is the question.

15     A.     And is that a fair question?

16     Q.     Yes.

17     A.     Okay.

18     MS. HIBBERT:  Objection.  Same objection.  I'm

19  not really sure what question is pending right now,

20  so.

21  BY MS. DICKINSON:

22     Q.     I'll read it to you.

23            Was it important for you to know in

24  deciding whether to testify on behalf of

1    AmerisourceBergen whether the allegations in the

2    Complaint were true or not?

3        MS. HIBBERT:  Objection to form.

4    BY THE WITNESS:

5        A.    Again, given my previous statement about

6    the American legal system, I wasn't asked to opine on

7    the allegations or the behaviors or anything.  I was

8    asked to opine on what is addiction, and that is

9    independent of whether even companies exist or are

10   incorporated.  And so I look at this as a matter of

11   being somebody who works in the field, has attained

12   certain status in the field, has certain expertise to

13   share and possibly said light -- shed light on a legal

14   process, and so I'm kind of neutral in this.

15   BY MS. DICKINSON:

16       Q.    Is the answer to my question then it was

17   not important to your opinion whether the allegations

18   in the Complaint are true or not, right?

19       MS. HIBBERT:  Objection to form, asked and

20   answered.

21   BY THE WITNESS:

22       A.    It was not an important consideration of

23   mine in my decision.  That's where you began.

24   BY MS. DICKINSON:

1    Q.    Okay.  What is your compensation

2  arrangement in this case?

3    A.    Hourly rate for different services.

4    Q.    And what is that hourly rate?

5    A.    The hourly rate in this case for general

6  review of records and general consultation with

7  counsel, review of materials is 475 an hour, the rate

8  for deposition and preparation for deposition is 650

9  an hour, and the rate for trial is a half day and a

10  full day rate, and we haven't gotten there and you

11  have the exhibit somewhere, I believe, and I'm not

12  remembering.  It is in the letter of agreement.  There

13  is a $5,000 number, as I recall, and I don't remember

14  if that's a half day or a full day.

15    Q.    Okay.  Is -- I don't see it in your

16  report.

17          Is there a flat fee arrangement if you're

18  to give trial testimony of some kind for your work?

19    A.    It's a -- it's a -- it's a daily rate.

20    Q.    Okay.  And do you have any idea what that

21  daily rate is?  I don't see it in here.

22    A.    I would tend to think -- I would tend to

23  think it was a $5,000 rate is what was -- again, the

24  rates I'm working under, not my current rates for

Highly Confidential - Subject to Further Confidentiality Review

 1    future work.

 2         Q.    Have your current rates for future work

 3    changed from the rates we just described in this case?

 4         A.    Yes.

 5         Q.    Okay.  And how have they changed?

 6         A.    Gone up.

 7         Q.    To what?

 8         A.    It was a significant change based on the

 9    fact that I have been working off of rates that I set

10    in 2004.  I never changed my rates.  And in having a

11    conversation with a colleague who does a lot of this,

12    and we talked about other colleagues and her awareness

13    of what rates were, I realized that I had an

14    opportunity to revise my rates.  And so I changed my

15    basic hourly rate from 475 to 675 and I changed the

16    trial rate in an equivalent percentage.

17         Q.    Okay.  And who was the colleague you

18    discussed that with?

19         A.    Do I have to disclose that?

20         Q.    Yes.

21         A.    Andrea Barthwell.

22         Q.    And who is Andrea Barthwell?

23         A.    She is a former president of the American

24    Society of Addiction Medicine, like myself.

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.      Is she an addiction medicine specialist?

2       A.      She is.

3       Q.      Okay.  And how do you know Dr. Barthwell?

4       A.      Well, we originally met when we were on

5   the faculty together of the first ASAM review

6   course --

7       Q.      Okay.  Have -- have you done --

8       A.      -- back in the '80s.

9       Q.      Sorry.  I spoke over you.

10      A.      That's quite all right.

11      Q.      Have you known each other ever since?

12      A.      Oh, yes.

13      Q.      Okay.  Did anyone else in this case assist

14  with your work in preparing your opinions and your

15  report?

16      A.      No.

17      MS. HIBBERT:  Objection to form.

18  BY MS. DICKINSON:

19      Q.      No staff time or anything like that?

20      A.      You are looking at staff.

21      Q.      Okay.  How many hours have you spent

22  working on the case to date?

23      A.      Less than a hundred.

24      Q.      Okay.  And when did you start billing
```

Highly Confidential - Subject to Further Confidentiality Review

 1    hours in this case?

 2         A.    My recollection is it was July.

 3         Q.    July of 2018?

 4         A.    Yes, ma'am.

 5         Q.    Okay.  Can you give me a sense of how the

 6    less than a hundred hours you -- you've spent

 7    developing the opinions in the case were spent over

 8    the course of that year, and what -- what I mean by

 9    that --

10         A.    Yes, ma'am.

11         Q.    -- is I just want a sense of if you have

12    spent 15 minutes in the last summer and a hundred

13    hours in the last two months, can you just give me a

14    general sense of how those hours were spent?

15         MS. HIBBERT:  Objection to form.

16    BY THE WITNESS:

17         A.    I know that there were three or four

18    months where there was no activity in the middle.  I

19    did a lot of reading at first because I read the

20    Complaint.

21    BY MS. DICKINSON:

22         Q.    Okay.

23         A.    Okay.  Then, because I knew I would write

24    an expert report for the first time in my career, I

Highly Confidential - Subject to Further Confidentiality Review

1    was sent expert reports from totally unrelated cases

2    just to read to get a sense of what's the tone, what's

3    the depth, what's the duration, just a general frame

4    of reference of how to construct an expert report.

5              And before I began my position at the

6    university in October 1, I had time on my hands and I

7    began initial drafts of this report even back in

8    September.  So I think September billing was a decent

9    number.  And then things went pretty quiet.  And then,

10   I don't know, three months ago things picked up again.

11   And May was probably my biggest month because I was

12   reading depositions of other experts and reading

13   them -- rereading journal articles, and so the last

14   two months have been pretty busy.

15        Q.    Okay.  Let's break this up a little bit.

16              First, what expert reports from the sample

17   expert reports were you given?

18        MS. HIBBERT:  Objection to form.

19   BY THE WITNESS:

20        A.    Could I reference my report?

21   BY MS. DICKINSON:

22        Q.    Yes.  I don't see them anywhere in there.

23   That's what I'm asking.

24        A.    Oh, they weren't in there?

```
1       Q.     I -- I don't see them.

2       A.     Oh.

3       Q.     If you can find them, great, but what

4  expert reports were you given is my question?

5       MS. HIBBERT:  I'll put an objection on the

6  record and instruct the witness not to answer.  These

7  aren't materials that are relied upon for Dr. Miller's

8  opinions.  They don't fall within any of the

9  exceptions to the communications disclosure under

10 Rule 26 and I'll thus instruct Dr. Miller not to

11 answer any questions pertaining to those

12 communications between counsel and himself.

13      MS. DICKINSON:  So, Counsel, for the record, you

14 are instructing the witness not to answer materials he

15 was given by counsel and considered in -- for -- in

16 drafting his opinion in this case, is that correct?

17      MS. HIBBERT:  You can ask him that question

18 whether he considered those reports in drafting his

19 opinions in this case.

20      MS. DICKINSON:  He just testified he did, so...

21      MS. HIBBERT:  He didn't.  That's a

22 mischaracterization.

23      MS. DICKINSON:  Are you instructing him not to

24 answer which reports he was given?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. HIBBERT:  Yes.

 2   BY MS. DICKINSON:

 3        Q.    Okay.  Dr. Miller, you testified a minute

 4   ago you were given some expert reports from other

 5   cases, is that right?

 6        A.    Yes, ma'am.

 7        Q.    Did you read and review those?

 8        MS. HIBBERT:  Objection to form.

 9   BY THE WITNESS:

10        A.    I did.

11   BY MS. DICKINSON:

12        Q.    Okay.  Did you read and review those prior

13   to drafting your opinions in this case?

14        MS. HIBBERT:  Objection to form.

15   BY THE WITNESS:

16        A.    I did.

17   BY MS. DICKINSON:

18        Q.    Okay.  And what was the subject matter of

19   those expert reports?

20        MS. HIBBERT:  Objection to form.

21   BY THE WITNESS:

22        A.    I don't recall.

23   BY MS. DICKINSON:

24        Q.    Okay.  Would your billing detail show what
```

Highly Confidential - Subject to Further Confidentiality Review

1    the subject matter of those expert reports were?

2        MS. HIBBERT:  Objection to form.

3    BY THE WITNESS:

4        A.    Probably, yes.

5    BY MS. DICKINSON:

6        Q.    Okay.  Did you -- or who are the authors

7    of those expert reports?

8        MS. HIBBERT:  Objection to form.

9    BY THE WITNESS:

10       A.    I don't recall.

11   BY MS. DICKINSON:

12       Q.    Okay.  Would your billing detail show

13   that?

14       MS. HIBBERT:  Objection to form.

15   BY THE WITNESS:

16       A.    Probably.

17   BY MS. DICKINSON:

18       Q.    All right.  And, Dr. Miller, can -- can

19   you give me your best -- do you recall what date you

20   started working on this report?

21       A.    That's a matter of interpretation.  I

22   began working on the case and all of the work has

23   contributed to the report in some way, but actually

24   began drafting the report is a different question.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Okay.  Fair enough.

2             Do you recall what date you started

3    working on the case?

4       A.    No, but it was right when we signed the

5    agreement and I would say that's when I began work.

6       Q.    Okay.  Would your invoices show what date

7    you started billing on the case?

8       MS. HIBBERT:  Objection to form.

9    BY THE WITNESS:

10      A.    They would.

11      MS. DICKINSON:  And for the record, we don't

12   have your invoices here today, do we?

13      MS. HIBBERT:  Objection to form, calls for

14   speculation.

15   BY THE WITNESS:

16      A.    I don't have them.

17   BY MS. DICKINSON:

18      Q.    Okay.  Do you have an idea what month you

19   started working on the case?

20      A.    Again, I believe it was in July.

21      Q.    July of 2018?

22      A.    Yes, ma'am.

23      Q.    Okay.  How many hours did you spend in

24   July of 2018 when you first started working on the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   case?

 2        A.    Less than 15.

 3        Q.    And what did you do in those less than

 4   15 hours in July of 2018?

 5        A.    Madam, I'm going to be very careful in

 6   answering these questions because I'm having to guess

 7   at things that I really don't have specific memories

 8   of.  You are asking me to break things down by month

 9   and specific things.  I didn't review any of that and

10   I didn't try to refresh my memory and didn't reference

11   anything in preparation for today's deposition.  I can

12   tell you some things I've already testified to.  They

13   called me, we spoke, they said, What are your rates.

14   I pulled up my rate sheet which was my 2004 rate

15   sheet.  We spoke.  They said, Are you interested?  I

16   said, Sure.  They sent me a letter of agreement which

17   says, We are agreeing to do this and there is a

18   paragraph on rates and I don't even remember if it

19   specified what all I -- what all I was to do.  I don't

20   know if it, like, said, You will be asked to report,

21   you will be asked to appear at trial.  I don't

22   remember if it said all of that stuff.  It was

23   basically an agreement, okay?  So I signed it.  And

24   then they began shipping me stuff, like the Complaint,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it's a long Complaint, okay.  Then they asked me to

 2    start doing some research, and I began using my

 3    librarian at Meriter Hospital to find articles and I

 4    began reading that stuff.  And then, again, as I've

 5    said in different ways, I didn't know what to do with

 6    it.

 7            The other reports were sent -- not -- like

 8    I said, I don't remember what they were on or who the

 9    authors were.  It was only formatting, it was the

10    concept -- the -- the -- it was the process of how one

11    does a report.  It didn't form my opinion.  It just

12    formed how I would package all of my knowledge and

13    expertise that's in my CV and the articles I read into

14    a report.  And then I began drafting in September.

15    That's what I can testify to the best of my ability.

16        Q.    Okay.  Doctor, you realize I'm just trying

17    to get a sense of what you did, what your methodology

18    was and how many hours you spent doing certain things

19    to get to the endpoint, okay?

20        A.    Okay.

21        Q.    That's the purpose of what -- these

22    questions that I'm about to ask you.

23            If you had your invoices in front of you,

24    could you tell me how many hours you spent reviewing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   materials in July of 2018?

 2        MS. HIBBERT:  Objection to form.

 3   BY THE WITNESS:

 4        A.    If I had them in front of me, it would

 5   specify what I did.

 6   BY MS. DICKINSON:

 7        Q.    Okay.  If you had your invoices in front

 8   of you, could you tell me what you did in August

 9   of 2018 before you started writing your report?

10        MS. HIBBERT:  Objection to form.

11   BY THE WITNESS:

12        A.    I would -- I would certainly think so.

13   BY MS. DICKINSON:

14        Q.    Okay.  If you had both of those two

15   invoices, could you tell me how many hours you spent

16   prior to the writing where you started writing the

17   report?

18        MS. HIBBERT:  Objection to form.

19   BY THE WITNESS:

20        A.    I would think so, yes.

21   BY MS. DICKINSON:

22        Q.    Okay.  Do you have any idea sitting here

23   today how many hours you spent both reviewing the

24   materials that were shipped to you, doing research or
```

1  anything else before you started drafting in

2  September?

3      MS. HIBBERT:  Objection to form.

4  BY THE WITNESS:

5      A.    I hope my answer is correct.  30.

6  BY MS. DICKINSON:

7      Q.    Are you guessing?

8      A.    Yeah.

9      Q.    Okay.  Do you have any idea how long you

10  spent reviewing the Complaint?

11      A.    Yes, I have an idea.  I would say it was

12  two or three hours.

13      Q.    Okay.  Would your invoices show exactly

14  how long it actually was?

15      MS. HIBBERT:  Objection to form.

16  BY THE WITNESS:

17      A.    I think that level of detail would appear.

18  BY MS. DICKINSON:

19      Q.    Okay.  Do you have any idea -- you said

20  you were shipped a number of materials after you

21  started work and before you started drafting.

22          Where do I find -- how long did you spend

23  reviewing those materials?

24      MS. HIBBERT:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. DICKINSON:

 2        Q.    Before you started drafting?

 3        MS. HIBBERT:  Same objection.

 4   BY THE WITNESS:

 5        A.    Ten hours maybe.

 6   BY MS. DICKINSON:

 7        Q.    Is that a guess?

 8        A.    Absolutely.  These are all going to be

 9   guesses.

10        Q.    Okay.  You said you were asked to do some

11   research?

12        A.    Or estimates.

13        Q.    You said you were asked to do some

14   research.  Is -- prior to the drafting of your report,

15   did you conduct research?

16        A.    Yes, ma'am.

17        Q.    Okay.  What did you do to conduct

18   research?

19        A.    I read -- well, I had my own articles from

20   my own literature files that I keep and then I would

21   look in the bibliography and find other articles I

22   thought would be a deeper dive, provide more relevant

23   information.  I did some searches to find some

24   articles.  I asked the librarian at Meriter Hospital,
```

```
 1   Robert Koehler, K-o-e-h-l-e-r, to find things on

 2   different topics for me.  He is wonderful.  And so I

 3   had articles that I found on my own and that was part

 4   of what I used.

 5       Q.    Okay.  How many hours did you spend doing

 6   that research up until the time you started drafting?

 7       MS. HIBBERT:  Objection to form.

 8   BY THE WITNESS:

 9       A.    Again, I'm -- I'm thinking that seeking,

10   finding, reading, and taking notes on articles and

11   such was probably 30 hours.

12   BY MS. DICKINSON:

13       Q.    Is that also a guess?

14       MS. HIBBERT:  Objection to form.

15   BY THE WITNESS:

16       A.    Correct, ma'am.

17   BY MS. DICKINSON:

18       Q.    Okay.  Are all of the materials that you

19   pulled in researching before you started drafting, are

20   they all listed in the Appendix of Materials

21   Considered to Exhibit 2, your report?

22       MS. HIBBERT:  Objection to form.

23   BY THE WITNESS:

24       A.    Well, I read so much and -- and what's in
```

Highly Confidential - Subject to Further Confidentiality Review

1  the report is things relative to my opinions that

2  substantiate my opinions.  I could have read something

3  and decided, eh, that's not relevant and so it's not

4  included.

5  BY MS. DICKINSON:

6      Q.    I'm not asking what you thought was

7  relevant to your opinions.  I'm asking about materials

8  you reviewed or considered, okay.  And so in doing the

9  research prior to the writing of the report, are there

10  articles that you reviewed or considered that do not

11  appear in Appendix B of the Materials Considered?

12      MS. HIBBERT:  Objection to form.

13  BY THE WITNESS:

14      A.    I'm under oath and I'm going to answer

15  this as best I can.

16          Practicing addiction medicine is what I

17  do.  Delving into the topic of what is addiction is

18  something I really spend time on.  I'm always reading,

19  whether there is a lawsuit or not and whether I'm

20  involved in it or not, I'm always reading on the

21  topic.  I'm always finding new articles.  I am always

22  a student of the field in which I work.  And in all

23  due respect, I think I'm sitting in this room because

24  I am an expert on this area of what is addiction.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Are there articles I have read in my life

 2      that I have not cited here, sure.  They are what I've

 3      done as part of my career, not as an expert witness,

 4      to understand the disease I treat and the patients

 5      that I take care of.  And so that when I give talks,

 6      they are based on fact as much as possible and not on

 7      speculation on my part.

 8                   Is there a whole library of literature

 9      from my 30-year career that has contributed to my

10      thinking on this matter that I didn't go back and

11      reread specifically for this case, if there was

12      something I read for this case, you know about it and

13      it's public record in this document.  There is nothing

14      I've hidden, nothing else, but I can't say that there

15      is -- there aren't other articles I've ever read that

16      helped shape my understanding of what addiction is and

17      how people get it.

18                   So I believe I've done a very good faith

19      and accurate representation to meet the legal

20      requirements of citing so that both sides have access

21      to it, but your questions have been sort of broad and

22      I -- I -- and I can't -- I can't -- I -- I can't rule

23      out that there is some article somewhere that somebody

24      wrote or some lecture I went to that helped shape my
```

Highly Confidential - Subject to Further Confidentiality Review

1    opinions that I -- I -- that I'm able to cite.  I -- I

2    can't cite every single thing I've read in the last

3    30 years and I'm sorry.

4        MS. DICKINSON:  Objection; nonresponsive.

5    BY MS. DICKINSON:

6        Q.    Doctor, my question was actually very,

7    very different.  And I hope you understand I'm not

8    actually trying to ask you broad questions or trying

9    to be tricky.  All I'm trying to understand is what

10   you did.

11           So my question was, you said you did

12   research.  And I asked you, is -- are all of the

13   articles you pulled in the course of that research,

14   are they listed in Exhibit -- or Appendix B to

15   Exhibit 2?  Simple question.

16       MS. HIBBERT:  Objection to form, asked and

17   answered.

18   BY THE WITNESS:

19       A.    I'm going to answer no so that you can ask

20   a follow-up.

21   BY MS. DICKINSON:

22       Q.    Okay.  Where would I find the -- a list of

23   the articles that don't appear in Exhibit B?

24       MS. HIBBERT:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    Okay.

 3   BY MS. DICKINSON:

 4       Q.    Or Appendix B, I'm sorry, Exhibit 2.

 5       MS. HIBBERT:  Same ob -- same objection.

 6   BY THE WITNESS:

 7       A.    Yeah, within discussions between the law

 8   firm that has retained me and me, the expert, there

 9   have been other articles that I've read that I thought

10   didn't pertain and so aren't listed.

11   BY MS. DICKINSON:

12       Q.    Is there anywhere that I can find the

13   articles that you read that you did not list here?

14       MS. HIBBERT:  Objection to form, asked and

15   answered.

16   BY THE WITNESS:

17       A.    Yes.

18   BY MS. DICKINSON:

19       Q.    Where?

20       A.    At my house.

21       Q.    Do you have a file on this case that those

22   articles would exist in?

23       MS. HIBBERT:  Objection to form.

24   BY THE WITNESS:
```

```
 1        A.    I do.

 2   BY MS. DICKINSON:

 3        Q.    Is it a hard copy file or an electronic

 4   file?

 5        A.    Hard copy.

 6        MS. HIBBERT:  Objection to form.

 7             Give me a pause, please, Dr. Miller.

 8        THE WITNESS:  Yes, ma'am.

 9   BY MS. DICKINSON:

10        Q.    So there are articles in that hard copy

11   that we were just talking about that you may have

12   read, but didn't feel that were relevant but they

13   are -- exist in that hard copy?

14        MS. HIBBERT:  Objection.

15   BY MS. DICKINSON:

16        Q.    Is that a fair statement?

17        MS. HIBBERT:  Same objection.

18   BY THE WITNESS:

19        A.    That is a fair statement.

20   BY MS. DICKINSON:

21        Q.    Okay.

22             And were you asked by counsel when

23   preparing Appendix B to Exhibit 2 to list all of the

24   materials that you had read?
```

```
 1        MS. HIBBERT:  I'll object to that question and

 2   instruct the witness not to answer any communications

 3   with counsel outside of the boundaries of Rule 26 for

 4   which that question does not fall.

 5   BY MS. DICKINSON:

 6        Q.    Do you know why there were materials that

 7   you read that aren't listed in Appendix B?

 8        MS. HIBBERT:  Objection to form and you are not

 9   to disclose any communications that you had with

10   counsel, Dr. Miller.  You can answer to the extent

11   that you can with that qualification.

12   BY THE WITNESS:

13        A.    If they are not listed, I thought they

14   were from the literature but not relevant to my

15   opinions as formulated in my report.

16   BY MS. DICKINSON:

17        Q.    Okay.  Let's talk about you started

18   drafting your report, I think you said, in September

19   of 2018, is that right?

20        A.    I believe that's correct.

21        Q.    You said in September that you had done a

22   decent amount of work.

23              What does that mean, roughly, how many

24   hours?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. HIBBERT:  Objection -- objection to form.

 2   BY THE WITNESS:

 3        A.    I'll answer it a bit differently.  I'd say

 4   I -- I -- I did 40 percent of the rough draft of the

 5   report.

 6   BY MS. DICKINSON:

 7        Q.    Does that mean you said you spent roughly

 8   100 hours.  Does that mean 40 so of them were spent in

 9   last September?

10        MS. HIBBERT:  Objection to form.

11   BY THE WITNESS:

12        A.    No, I would not make that calculation.

13   BY MS. DICKINSON:

14        Q.    Okay.  How much of the 100 or so hours

15   that you have worked on this case preparing your

16   report or working on the case were spent on drafting

17   back in last September?

18        A.    Between four and six, as I recall.

19        Q.    Four and six hours?

20        A.    Yes, ma'am.

21        Q.    Okay.  And you said that there were a

22   couple months after September where there wasn't much

23   work, is that accurate?

24        A.    Yes, ma'am.
```

1    Q.    Okay.  Did you do any work in October or

2  November of 2018 on the case?

3    A.    I believe I did work in October.  I don't

4  recall about November.  And I believe that to the best

5  of my memory January through March were dead months.

6    Q.    When you say dead months, did you do any

7  work?

8    A.    No work, no billing.

9    Q.    Okay.  And you said you believed you did

10  work in October and November.

11        How many hours did you spend in those

12  months?

13    A.    I -- I -- I would just be guessing.

14    Q.    If you had your invoices, would you know?

15    MS. HIBBERT:  Objection to form.

16  BY THE WITNESS:

17    A.    I believe I would.

18  BY MS. DICKINSON:

19    Q.    You said January to March there was no

20  work, so that takes us up to April of 2019, is that

21  right?

22    A.    Right.  So March I really don't remember,

23  but April picked up and May was very heavy.

24    Q.    Okay.  Do you know how many hours you

```
 1    billed in April and May of 2019?

 2         A.     I know that in May it was, like, 33.

 3         Q.     Okay.  Do you know how many in April?

 4         A.     No.

 5         Q.     Do you know what -- if you had your

 6    invoices, would you know how many hours you spent in

 7    April?

 8         MS. HIBBERT:  Objection to form.

 9    BY THE WITNESS:

10         A.     I would.

11    BY MS. DICKINSON:

12         Q.     Do you know how many of the 33 hours you

13    billed in May, do you know how those hours were spent?

14         A.     We just finished May, right?

15         Q.     You told me that you thought you had spent

16    33 hours in May.  I'm just asking how were those

17    33 hours spent, what kinds of activities were you

18    performing?

19         A.     Reading the expert opinion of Dr. Lembke,

20    reading the deposition of Dr. Lembke.  I actually read

21    a bunch of expert opinions which are listed in the

22    document here.  You've got those names of expert

23    opinions in this case.  And I did more writing, maybe

24    some revision, I finished up the final draft, and had
```

Highly Confidential - Subject to Further Confidentiality Review

1   phone calls and had -- in May I had a meeting with

2   Ms. Hibbert.

3       Q.    Without your invoices, do you know how

4   much time you spent on each of those activities

5   sitting here today?

6       MS. HIBBERT:  Objection to form.

7   BY THE WITNESS:

8       A.    Within the -- I could give some percentage

9   guesstimates on the breakdown of the 33 hours if you

10  would like.

11  BY MS. DICKINSON:

12      Q.    It is the best we have, so sure.

13      A.    Thank you, ma'am.

14      MS. HIBBERT:  Objection to form, calls for

15  speculation.

16  BY THE WITNESS:

17      A.    In May a meeting with Ms. Hibbert at

18  around six hours; other consultation with her I would

19  guess about three in the course of the month; reading

20  of the Lembke deposition, probably three; reading

21  extra articles, eight.

22            I'm actually getting a little tired.  So

23  I'm -- I'm going to -- I've -- I've answered that

24  about as well as I could.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. DICKINSON:

 2        Q.    Okay.  Do you need to take a break?

 3        A.    I think it's mental fatigue related to

 4   this line of questioning --

 5        Q.    Okay.

 6        A.    -- in all -- in all honesty.

 7        Q.    I -- I think we are almost done with the

 8   line of questioning --

 9        A.    That's cool.

10        Q.    -- so if you are okay we'll keep going,

11   but if you need a break --

12        A.    No.

13        Q.    -- we certainly can take one.

14        A.    I'm -- I'm -- I'm doing fine except for

15   this line of questioning.  I think we'll be fine.

16        Q.    Okay.  Of the 33 hours you just -- I just

17   want to make sure I heard you correctly and then I

18   think we'll move on, you think you spent nine of those

19   meeting with the attorneys, is that right?

20        A.    Right.

21        Q.    Okay.

22        A.    Six face-to-face, three on the phone,

23   right.

24        Q.    Three hours reviewing the testimony of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Dr. Lembke, is that right?

 2        MS. HIBBERT:  Objection to form.

 3   BY THE WITNESS:

 4        A.    That's what I said, I think.

 5   BY MS. DICKINSON:

 6        Q.    Okay.  I just wanted to make sure I wrote

 7   it down accurately.

 8             And about eight hours reviewing articles,

 9   is that right?

10        MS. HIBBERT:  Objection to form.

11   BY THE WITNESS:

12        A.    Okay.

13   BY MS. DICKINSON:

14        Q.    Okay.  The Appendix B to Exhibit 2, can

15   you turn to that?  When you get there, let me know.

16        A.    Um-hum.

17        Q.    Tell me, what is Appendix B to Exhibit 2?

18        MS. HIBBERT:  Object to form.

19   BY THE WITNESS:

20        A.    Appendix B is Materials Reviewed and

21   Considered.  And in the course of doing this work I've

22   come to understand how lawyers do this.  I consider

23   the literature to be the -- the materials, but

24   obviously there's all sorts of materials, these
```

```
 1    Complaints.

 2             So what we see is one, two, three, four,

 3    five, six Complaints, we see a little over three pages

 4    of citations of articles and documents from

 5    professional literature, a list of one, two, three,

 6    four, five, six transcripts of depositions, and a list

 7    of -- I thought it was ten expert reports, one, two,

 8    three, four, five, six, seven, eight, nine -- boy, my

 9    memory was right -- ten.

10        Q.    We are not going to cover again the -- the

11    things we've already gone over with respect to

12    materials considered.  You have this broken down into

13    several sections, so I'll just take them in sections.

14             One is court documents where you list some

15    various Complaints, right?

16        A.    Yes.

17        Q.    Okay.  Who selected which court documents

18    you would look at in the case?

19        A.    I have no idea.

20        MS. HIBBERT:  Objection to form.

21    BY MS. DICKINSON:

22        Q.    It was not you?

23        MS. HIBBERT:  Objection to form.

24    BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     It was not me.

 2   BY MS. DICKINSON:

 3        Q.     Okay.  Once you had -- or have you read

 4   each and every page of the court documents that are

 5   listed in Appendix B?

 6        A.     No.

 7        Q.     Okay.  Which part -- portions of the court

 8   documents in Exhibit -- or Appendix B have you read?

 9        MS. HIBBERT:  Objection to form.

10   BY THE WITNESS:

11        A.     If I may, in the four Ohios there was a

12   city and a county and there was a lot of repetition.

13   And one of them I read from start to finish and I

14   can't remember which of the four.  And then when I got

15   into the others, I zoomed in because I wasn't going

16   after all of the various allegations and what have

17   you.  And then when I was sent the Baltimore, my

18   recollection is that I looked at that less than an

19   hour total, again, to just look at some things that

20   would be relevant to what I thought I was asked to

21   form expert opinions on.

22             So I did not read all of these.  I -- I

23   read enough of Ohio that I got a sense of the broad

24   case and -- and then I -- I read segments of the
```

```
1    others, and that would be on the court documents.

2              Now, was your question on the court

3    documents?

4    BY MS. DICKINSON:

5         Q.    Just on the court documents.  Let's take

6    it one by one.  Okay?

7         A.    Yes, ma'am.

8         Q.    Why was it relevant to you to consider the

9    City of Baltimore designation of experts and the

10   Second Amended Complaint in the City of Baltimore

11   case?

12        MS. HIBBERT:  Objection to form.

13   BY THE WITNESS:

14        A.    I would not say it was considered relevant

15   by me.

16   BY MS. DICKINSON:

17        Q.    I guess I -- I'm not sure.  We talked

18   earlier about the materials that you reviewed that you

19   thought weren't relevant.  You didn't list in the --

20   the list of materials, but here you list them.

21              So is there a reason these are listed and

22   other irrelevant materials were not?

23        MS. HIBBERT:  Objection to form.

24   BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     I listed all of the things that I would

2   consider non-literature, all of the legal things, I'll

3   use that term, legal things sent to me by Reed Smith.

4   And I didn't get anything in the -- in the form of

5   a -- of a legal thing from them that I didn't put in

6   the report.

7   BY MS. DICKINSON:

8        Q.     Okay.  Let's move onto the Professional

9   Literature portion.

10              The professional literature listed here

11  and the additional articles listed in Exhibit 4, is

12  that a complete list of the specific professional

13  literature that you reviewed with respect to this

14  case?

15       A.     Yes, ma'am.

16       MS. HIBBERT:  Objection to form.

17       THE WITNESS:  Sorry.

18       MS. HIBBERT:  Asked and answered.

19  BY MS. DICKINSON:

20       Q.     Are all of the professional literature

21  sources on this list sources that you found in your

22  own research?

23       MS. HIBBERT:  Objection to form.

24  BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2   BY MS. DICKINSON:

 3        Q.    Okay.  What other source did you receive

 4   professional literature from?

 5        A.    Okay.

 6        MS. HIBBERT:  Objection --

 7              Hold on.

 8              Objection to form.

 9              She is not asking you about any substance

10   of the communications that you had with counsel, okay.

11   Understand?  With that qualification you can answer.

12   BY MS. DICKINSON:

13        Q.    I'll ask a better question.

14              Did you receive some of the professional

15   literature cited in here from counsel?

16        MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18        A.    Yes.

19   BY MS. DICKINSON:

20        Q.    Okay.  Which articles on the professional

21   literature list, both in Exhibit 2, Appendix B, and

22   Exhibit 4, did you receive from counsel?

23        MS. HIBBERT:  Objection; form.

24   BY THE WITNESS:
```

1        A.    Okay.  Let's take a deep breath.  If I

2    were to go through this list, which I have not done,

3    and say where did they come from, there are three

4    sources.  One is articles -- well, four sources.  One

5    is articles I already had.

6    BY MS. DICKINSON:

7        Q.    Okay.

8        A.    Another is articles that I researched on

9    my own using my librarian in Madison.

10            Then there were two different types of

11   articles sent to me by counsel.  One was things I

12   asked for --

13       Q.    Uh-huh.

14       A.    -- because I became impressed with the

15   quality of their library service and they could ship

16   me something in a printed form and I didn't have to

17   print it myself off an electronic, and I asked for a

18   number of things from them.  Then there was a

19   literature file that they had compiled for their own

20   purposes so they could understand the issues in the

21   case and they shared some articles with me that they

22   had researched on their own that I had not researched

23   myself.  So there is a mixture.

24       Q.    Okay.  I'm interested in the last bucket,

Highly Confidential - Subject to Further Confidentiality Review

```
1    which is just the things -- you said there are four

2    buckets, and I just want to make sure I understand you

3    correctly --

4         A.    Yes.

5         Q.    -- so I'm not misunderstanding.

6               There are things that you have on your

7    own?

8         A.    Right.

9         Q.    There is library research that you had

10   done on your behalf with your assistant or the library

11   you work with, correct?

12        A.    Yes.

13        Q.    Okay.  There are things that you --

14   articles that you asked counsel to provide you,

15   correct?

16        A.    Yes.

17        Q.    And then there are things that the lawyers

18   had in their own file that they provided to you

19   without you making a specific request for, is that

20   fair?

21        MS. HIBBERT:  Objection to form.

22   BY MS. DICKINSON:

23        Q.    Does that summarize what you just told me?

24        A.    It does.
```

1     Q.    Okay.  That last bucket, the things the

2     lawyers had that you had not specifically asked for or

3     you haven't found on your own, how do I find those on

4     this list of professional literature?

5         MS. HIBBERT:  Objection to form.

6     BY THE WITNESS:

7         A.    You would not be able to because I have

8     not demarcated.

9     BY MS. DICKINSON:

10        Q.    Okay.  Do you have any idea as we sit here

11    today which of those articles fall in that Category

12    No. 4?

13        MS. HIBBERT:  Objection to form.

14    BY THE WITNESS:

15        A.    I could go through the list and give you

16    some examples that I hope would be accurate, because I

17    promise you there were things that they sent that

18    they -- were in their file, I already had them.  I had

19    already read them.  Things that were novel to me that

20    I would not have necessarily seen had it not been for

21    their prior research that they shared with me, I could

22    go through the list and name a few if that would be of

23    any help.

24    BY MS. DICKINSON:

```
 1        Q.    It would.  Do you mind?

 2        A.    I don't.

 3        Q.    Okay.

 4     MS. HIBBERT:  Objection to form.

 5  BY THE WITNESS:

 6        A.    Are you ready?

 7  BY MS. DICKINSON:

 8        Q.    Yes.

 9        A.    I don't believe I had seen the Marchione.

10  I had seen things similar, but I don't think I had

11  seen that.

12        Q.    Okay.

13        A.    The one after that, whatever MagMutual is,

14  I don't think I found that.  I don't think the

15  FDA news was one of mine.

16        Q.    Is that the one right after the MagMutual?

17        A.    Yes, ma'am.

18              I'm guessing on Baker.  I don't know if

19  I've read that before.

20        Q.    Okay.

21        A.    I had read the Peggy Compton article,

22  Tompkins lead author, when it first came out, but it

23  appearing on this list is a result of it being sent to

24  me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.      Okay.

2         A.      I didn't pull this one, but I had read it

3    before.

4         Q.      Okay.

5         A.      I asked for Kendler, I was sent Noble, I

6    think I was sent Volkow and Wang, Proceedings of

7    National Academy of Sciences.  That's a great article.

8    Boscarino came off of another expert's report and then

9    came into my report.  I'm trying to remember that one.

10   Boscarino's did not come from my research.  The

11   Degenhardt article did not come from my research.  The

12   Wise and Koob article did not come from my research.

13            Is Bosco list -- Boscarino listed twice or

14   are there three Boscarinos?  2015 -- I think that

15   Boscarino is listed twice.

16        Q.      Okay.

17        A.      It definitely is listed twice.

18            The NIH News and Events

19   titled "10 Percent," I don't believe that came from

20   me.

21            That's it.

22        Q.      Okay.  When -- just for -- so the record

23   is clear, when you say it didn't come from you, then

24   if it didn't come from you, it came from the lawyers
```

1    at Reed Smith, is that correct?

2        MS. HIBBERT:  Objection to form.

3    BY THE WITNESS:

4        A.    It came in the binder of literature that

5    they shared with me from their previous research.

6    BY MS. DICKINSON:

7        Q.    And when you say "they," you mean the

8    lawyers at Reed Smith?

9        A.    I do, ma'am.

10       MS. HIBBERT:  Objection to form.

11   BY MS. DICKINSON:

12       Q.    I was just trying to make sure that there

13   wasn't anyone else that was providing you articles, is

14   that fair?

15       MS. HIBBERT:  Objection to form.

16   BY THE WITNESS:

17       A.    That is very fair.

18   BY MS. DICKINSON:

19       Q.    Okay.  And then could you quickly just

20   take Exhibit 4, the few articles that were on that

21   Exhibit 4.

22           Were those articles you found yourself

23   following the generation of your expert report on

24   May 10th and between that time and June 3rd, which is

```
 1    the date on Exhibit 4 or were those provided to you?

 2         MS. HIBBERT:  Objection to form.

 3    BY THE WITNESS:

 4         A.    Krebs was provided.

 5    BY MS. DICKINSON:

 6         Q.    Okay.

 7         A.    Edlund and Vowles I requested.

 8         Q.    Okay.

 9         A.    Robins I basically requested.  I had it,

10    but they got the new copy.

11         Q.    Had you reviewed any of the materials on

12    Exhibit 4 prior to authoring your expert report in the

13    case?

14         MS. HIBBERT:  Objection to form.

15    BY THE WITNESS:

16         A.    Could I have a moment?

17    BY MS. DICKINSON:

18         Q.    Of course.

19         A.    This may take a while, if you don't mind.

20         Q.    Maybe I can ask the question just a little

21    bit better and maybe it will make it faster, but I

22    don't know.

23         A.    I don't know if it will --

24         Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.     -- but go ahead.  Go ahead.

 2       Q.     I was just going to say that Exhibit 4 is

 3   titled "Supplemental List of Materials Reviewed and

 4   Considered as of June 3rd, 2019"?

 5       A.     That would suggest that they were not in

 6   my report and I -- and I read them after.  I don't

 7   think they are cited in my report.  I know Robins

 8   isn't, but I read that years ago.

 9       Q.     Did you -- did you, for example, consider

10   the Vowles article that's listed here in rendering

11   your report on May -- prior to rendering your report

12   on May 10th, I guess is the question?

13       A.     I -- I --

14       MS. HIBBERT:  Objection to form.

15   BY THE WITNESS:

16       A.     -- I think not.

17   BY MS. DICKINSON:

18       Q.     Okay.  The same with the Edlund study that

19   appears on the supplemental list, did you consider

20   that in rendering your opinions that were generated on

21   May 10th?

22       MS. HIBBERT:  Objection to form.

23   BY THE WITNESS:

24       A.     You have stated that correctly.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. DICKINSON:

 2        Q.    Okay.  Same with Krebs, fair?

 3        A.    Yeah.

 4        Q.    Okay.  And Robins, correct?

 5        A.    Yes.

 6        MS. HIBBERT:  Objection to form.

 7   BY THE WITNESS:

 8        A.    Right.

 9        MS. HIBBERT:  Just give me a pause.

10        THE WITNESS:  Yeah.

11   BY MS. DICKINSON:

12        Q.    Okay.  All right.  You said when you were

13   testifying a few minutes ago about the eight or so

14   hours you spent in May reviewing articles, you used

15   the word "extra articles."  It may have just been that

16   you misspoke, but I was just trying to understand,

17   were there articles in May -- why did you use the word

18   "extra"?  Maybe that's the easiest way.

19        MS. HIBBERT:  Objection to form.

20   BY THE WITNESS:

21        A.    I think I --

22        THE WITNESS:  Pardon me, ma'am.  Pardon me.

23   I've been -- I've been very disrespectful to

24   Ms. Hibbert repeatedly, I'm sorry.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1  BY MS. DICKINSON:

 2       Q.    It's hard to do.

 3       A.    Well, I am trying to be conversational

 4  with you and she is --

 5       Q.    Right.

 6       A.    -- jumping in as she is required to do,

 7  and I appreciate it.

 8             I used the wrong word.  "Supplemental" is

 9  the right word.

10       Q.    That's what I was getting at.

11             Were the eight hours spent reviewing the

12  articles on Exhibit 4?

13       MS. HIBBERT:  Objection to form.

14  BY THE WITNESS:

15       A.    The eight hours included my rereading my

16  stuff -- well, rereading the articles I cited.

17  BY MS. DICKINSON:

18       Q.    Okay.

19       A.    I -- I will -- I will violate the

20  directions I've been given by my -- by -- by counsel.

21  She said --

22       MS. HIBBERT:  Please don't.

23  BY THE WITNESS:

24       A.    -- "Know your report."  And so I knew my
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    report.  I read my report again and again and I reread

 2    the articles I used just to make sure because I knew I

 3    was coming to a deposition.  So the eight hours was

 4    not for Exhibit 4.

 5    BY MS. DICKINSON:

 6        Q.    Okay.

 7        A.    The eight hours included my rereading the

 8    literature that I had cited in my report to refresh my

 9    memory given that the original drafting had begun way

10    back in September.

11        Q.    Fair enough.  I was just trying to

12    understand whether there were extra articles because

13    you used the word.

14        A.    No, ma'am.

15        Q.    Okay.

16        A.    No, ma'am.

17        Q.    All right.  We can cross that off the

18    list.

19        A.    Right.

20        Q.    In total -- the articles that are

21    mentioned in your professional literature list, both

22    on Appendix B of Exhibit 2 and Exhibit 4, did you read

23    each article start to finish?

24        MS. HIBBERT:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY THE WITNESS:

2        A.    Essentially, yes, I read the whole thing.

3    BY MS. DICKINSON:

4        Q.    Okay.  And how many hours total did you

5    spend reading and reviewing the articles that are

6    listed in both Appendix B to Exhibit 2 and in

7    Append -- and in Exhibit 4?

8        A.    Ms. Dickinson, I'm -- I -- I obviously

9    want to give you very accurate answers for the purpose

10   of our meeting today and I really don't want to be

11   tripped up by saying something that then didn't make

12   sense.

13       Q.    Okay.

14       A.    It wasn't more than a hundred hours.  I

15   did spend time writing.  I mean, I think I spent half

16   of the hundred hours reading because it's a lot of

17   reading.  I think I probably spent, I don't know, 25

18   to 40 percent of the time reading legal things and 60

19   to 75 percent of the time reading journal articles.

20   So some of the answers I've given before, if you

21   compare them, and maybe, Ah-ha, his math is wrong.

22   I'm doing my best.

23       Q.    I'm actually not at all trying to trip you

24   up on math.  The problem is I don't have your invoices

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in front of me.  So it would be a lot easier if I did.

 2    Because I don't, I have to ask you the questions about

 3    what you did and when without the benefit of the

 4    documents.

 5              Do you understand, I'm not trying to

 6    actually trip you up?

 7         MS. HIBBERT:  Objection to form, move to strike

 8    the colloquy.

 9    BY MS. DICKINSON:

10         Q.   Do you understand why I'm asking these

11    questions and you have to answer them without the

12    document in front of you?

13         MS. HIBBERT:  Objection to form.

14    BY THE WITNESS:

15         A.   Ah, yes, and I'm -- and I'm doing my best.

16    So I would guess -- I would guess that I spent 30,

17    40 hours just reading journal articles.  That's just a

18    guess.

19    BY MS. DICKINSON:

20         Q.   Okay.  And, again, if we had your

21    invoices, would you know that is more for certain?

22         MS. HIBBERT:  Objection to form.

23    BY THE WITNESS:

24         A.   We'd have a really good estimate, yes,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   ma'am.

 2   BY MS. DICKINSON:

 3       Q.    Okay.  Let's move onto the depositions

 4   that you list here.  There are one, two, three, four,

 5   five, six deposition transcripts.

 6             Is that -- have I read that correctly?

 7       A.    Yes, ma'am.

 8       Q.    Okay.  Who determined which deposition

 9   transcripts you received in the case?

10             Was it you?

11       A.    I don't know.  I don't -- it was not me.

12       Q.    Okay.

13       MS. HIBBERT:  Objection to form.

14   BY MS. DICKINSON:

15       Q.    Did you ask for all of the deposition

16   transcripts in the case?

17       MS. HIBBERT:  Objection to form.

18   BY THE WITNESS:

19       A.    I did not ask for any.

20   BY MS. DICKINSON:

21       Q.    And were the deposition transcripts

22   provided to you by counsel at Reed Smith?

23       A.    Yes, ma'am.

24       Q.    Okay.  Let's look at the last portion,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    which is -- oh, I'm sorry.  Can we just -- can I ask

 2    you one more question about the depositions?

 3              You had testified earlier about reading

 4    Dr. Lembke's deposition for roughly three hours.  The

 5    remaining five depositions, do you know how much time

 6    you spent reviewing those?

 7         MS. HIBBERT:  Objection to form.

 8    BY THE WITNESS:

 9         A.    They are listed here, ma'am, but I don't

10    recall reading any of those depositions besides

11    Lembke's.

12    BY MS. DICKINSON:

13         Q.    Okay.

14         A.    And I read that one in detail.

15         Q.    Okay.  Prior to rendering your report on

16    May 10th, the only deposition you can recall reading

17    prior to that report is Dr. Lembke's, is that fair?

18         MS. HIBBERT:  Objection to form.

19    BY THE WITNESS:

20         A.    That's my best recollection.

21    BY MS. DICKINSON:

22         Q.    Okay.  Have you read those deposis --

23    depositions since rendering your report on May 10th?

24         A.    Yes.
```

```
 1        Q.     Okay.  When did you do that?

 2        A.     Since May 10th.

 3        Q.     Okay.

 4        A.     Sometime in May.

 5        Q.     Why did you not review them before you

 6   rendered your opinions but you read them in May?

 7        MS. HIBBERT:  Objection to form.

 8   BY THE WITNESS:

 9        A.     I did not have them.  I wanted to -- my

10   intent was to generate what I considered a clean

11   report, which is my thoughts and -- and the opinions

12   of Dr. Lembke are for a matter of the proceedings, not

13   for a matter of my statement.

14   BY MS. DICKINSON:

15        Q.     Fair.

16               How much time have you spent -- or

17   actually, just have you reviewed each and every

18   page of the rest of depositions after generating your

19   report in May?

20        MS. HIBBERT:  Objection to form.

21   BY THE WITNESS:

22        A.     No, ma'am.

23   BY MS. DICKINSON:

24        Q.     Okay.  Did you read certain portions?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No, ma'am.

 2        Q.    Okay.  Would -- I guess I'm trying -- I

 3   asked you if you read the whole thing and I asked you

 4   if you read certain portions.

 5              What did you do with the rest of the

 6   deposition transcripts in terms of reading them?

 7        A.    My best recollection, and I -- you know,

 8   this may be -- my memory may be off because obviously

 9   they are listed in the report and the date of the

10   report is May the 10th.  I didn't think I read this

11   stuff before -- oh, no, totally incorrect.  Totally

12   incorrect.

13        Q.    Okay.

14        A.    Yeah.

15        Q.    You can correct it.

16        A.    Oh, yeah.  No, no, right.

17              My report includes some rebuttal of some

18   of these -- well, it -- no, it wasn't deposition.

19   Let's be clear.  The last page is expert reports which

20   you haven't gotten to.

21        Q.    Correct.

22        A.    I read all of those.

23        Q.    Okay.

24        A.    And I rebutted some of them in my report.
```

Highly Confidential – Subject to Further Confidentiality Review

1    The deposition, I don't think I saw it until after the

2    report was done, and that was Lembke, and I don't

3    recall seeing the others even though they are listed

4    here.  So that may be a secretarial thing.

5         Q.    No, that's fine.

6               Sitting here today, do you think you've

7    read the other depositions other than Dr. Lembke?

8         A.    I believe I have not.

9         Q.    Okay.  Let's flip over --

10        A.    Yes, ma'am.

11        Q.    -- to -- to the last portion which is the

12   Plaintiffs' Expert Reports?

13        A.    Yes, ma'am.

14        Q.    You list a number of Plaintiffs' expert

15   reports.

16               Do you know if these are all of the

17   Plaintiffs' experts in this case?

18        MS. HIBBERT:  Objection to form.

19   BY THE WITNESS:

20        A.    I have no idea.

21   BY MS. DICKINSON:

22        Q.    Okay.  Did you select which Plaintiffs'

23   experts reports you wanted to look at in this case?

24        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    Okay.  Did the counsel at Reed Smith

2   select those?

3       MS. HIBBERT:  Objection to form.

4   BY THE WITNESS:

5       A.    I believe so.

6   BY MS. DICKINSON:

7       Q.    And the counsel at Reed Smith sent you the

8   reports that are listed here, is that right?

9       A.    That is correct.

10      Q.    Okay.  Do you know when you received the

11  reports that are listed here?

12      A.    I do not.

13      Q.    And you said you read all of those reports

14  cover to cover, is that right?

15      A.    I did.

16      Q.    Okay.  Do you know how long you spent

17  doing that?

18      A.    Six, eight maybe.

19      Q.    And when you say, "six, eight," six, eight

20  hours?

21      A.    Hours, yes, ma'am.

22      Q.    If you had your invoices, would you know

23  how long you spent reading the reports?

24      A.    Yes, ma'am.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. HIBBERT:  Objection to form.

 2             Give me a pause, Dr. Miller.

 3        THE WITNESS:  Sorry.

 4   BY MS. DICKINSON:

 5        Q.    Did you ask for any other expert reports

 6   that you didn't receive?

 7        A.    No.

 8        Q.    Okay.  Did you ask counsel to provide you

 9   with certain specialties of expert reports or did

10   counsel simply select?

11        MS. HIBBERT:  Objection to form.

12   BY THE WITNESS:

13        A.    Counsel selected.

14   BY MS. DICKINSON:

15        Q.    Did you review the attachments to the

16   Plaintiffs' experts reports that are on your

17   Appendix B of Exhibit 2?

18        A.    I'm sorry.  Did I --

19        Q.    Did you review the attachments to the

20   expert reports or just the reports themselves?  A lot

21   of these reports have various attachments or

22   appendix -- appendices.

23        A.    Oh, the Lembke report came as two huge

24   ring binders and all of her attachments, and I did not
```

Highly Confidential - Subject to Further Confidentiality Review

1    read all of that stuff.

2         Q.    Okay.  What portion of the binders did you

3    read?

4         MS. HIBBERT:  Objection to the form.

5    BY THE WITNESS:

6         A.    I read her bibliography and I'm pretty

7    sure that she had articles from her bibliography

8    preprinted attached to the report and I read a number

9    of those, but there was other stuff she -- there was a

10   transcript of a public radio show or something and

11   there was the entire photocopy of her book, which I --

12   I bought her book, I haven't read it yet, and I just

13   glossed over it to see what it was.  The only thing --

14   the only things I would have read were her report in

15   full and literature articles she cited, not all of

16   that other, what did you call them, attachments, yeah,

17   yeah, no, I didn't read that stuff.

18   BY MS. DICKINSON:

19        Q.    Okay.  Would the time spent reviewing

20   Dr. Lembke's articles or materials that were sent in

21   the binders, would -- would that be included in the

22   six to eight hours that you said you spent on the

23   Plaintiffs' expert report review or is that something

24   in addition?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Included.

 2        Q.    Okay.  I think -- actually, do you have

 3   something...

 4              Do you know or do you -- do you still have

 5   the binders that were sent regarding Dr. Lembke?

 6        A.    I do.

 7        Q.    Okay.  Are those in your physical file?

 8        MS. HIBBERT:  Objection to form.

 9   BY THE WITNESS:

10        A.    Yes.

11   BY MS. DICKINSON:

12        Q.    Okay.  Do you know if all of the materials

13   that were in those binders are on the literature list

14   of your materials considered or are there additional

15   materials in those binders?

16        MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18        A.    Let me answer your question to the best of

19   my ability.

20   BY MS. DICKINSON:

21        Q.    Okay.

22        A.    She chose her list of articles.  Edlund

23   and Vowles were examples.  So if she had an article I

24   thought was relevant, I put it here.  If she had other
```

1    stuff that I didn't find relevant to anything except

2    to her opinion, she is entitled to her opinion, I

3    didn't list it.  It's -- it's -- it's -- but she

4    listed it --

5        Q.    Okay.

6        A.    -- so it's a matter of court record.

7        Q.    Oh, sure.  I was just trying to understand

8    what it was that you read with respect to her

9    materials.  Does that make sense?  I mean, if you have

10   any idea of which materials of hers you read or maybe

11   you don't.  I'm -- I'm just trying to understand what

12   you actually looked at in that set of materials.

13       MS. HIBBERT:  Objection to form.

14   BY THE WITNESS:

15       A.    What's going through my mind, madam, is

16   that it -- it's sort of a blur.  I'm trying to make a

17   separation in my mind between her report and her

18   deposition and articles that she cited in one versus

19   the other.

20            If she cited it in her report and you know

21   that I had rebutted some things she said in her report

22   in my report, I could have included those articles in

23   my list of articles.  If there is something that she

24   cited in her deposition that was not previously

Highly Confidential - Subject to Further Confidentiality Review

```
 1    listed, I -- I -- I think that's where this -- this is
 2    where this list of -- I don't know where Krebs came
 3    from, but Edlund and Vowles were things she really
 4    relied on and I really wanted to study those
 5    carefully.  And so I listed them here.  There is
 6    nothing else that was in those binders that is not
 7    listed in Appendix 4 -- I'm not -- not listed in
 8    Exhibit 4 or Exhibit 2.
 9    BY MS. DICKINSON:
10         Q.    Okay.
11         A.    Nothing.
12         Q.    Did reviewing the list of materials on
13    Exhibit 4 change your opinions from your May 10th
14    report in any way?
15         A.    No.
16         Q.    Okay.  All right.  I think this is a good
17    time to take a lunch break, and maybe we only have one
18    more segment to go, but I can't promise.  I'm just
19    going to try, okay.  So --
20         A.    That's cool.
21         MS. DICKINSON:  So let's try to take a quick one
22    given that because I don't think we are going to go,
23    you know, three more segments here.
24         THE WITNESS:  Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. DICKINSON:  So however long you need, but

 2   I'm going to be back in here in 20 or 25 minutes.  How

 3   about that?

 4        THE WITNESS:  Are -- are we off the record?

 5        MS. HIBBERT:  Not yet.

 6        THE VIDEOGRAPHER:  We are off the record at

 7   12:50 p.m.

 8                  (WHEREUPON, a recess was had

 9                   from 12:50 to 1:28 p.m.)

10        THE VIDEOGRAPHER:  We are back on the record at

11   1:28 p.m.

12   BY MS. DICKINSON:

13        Q.   Okay.  Dr. Miller, we are back on the

14   record after lunch.  If you could pull out Exhibit 2

15   and turn to Appendix A, that would be helpful for the

16   next line of questions.

17        A.   All righty.

18        Q.   Okay.  And just so the record is clean,

19   remind me what Appendix A is in Exhibit 2?

20        A.   It is my curriculum vitae.

21        Q.   Oh, you know what, I -- let's actually not

22   do that.  If you could pull out Exhibit 3, I'm sorry,

23   your current curriculum vitae, that would be helpful.

24        A.   Okay.
```

1       Q.    Okay.  Dr. Miller, prior to this case had

2   you ever worked with AmerisourceBergen before?

3       A.    No, ma'am.

4       Q.    Okay.  Prior to this case, had you done

5   any other work for any other pharmaceutical companies?

6       MS. HIBBERT:  Objection to form.

7   BY THE WITNESS:

8       A.    Yes.

9   BY MS. DICKINSON:

10      Q.    Okay.  I'm going to try to make this as

11  quick as I can.  If you can turn to Page 11 of

12  Exhibit 3 -- I'm sorry.  Maybe it is Page 10.  I'm

13  sorry.

14            Page 10 had -- has a section that starts

15  and it says, "Consulting Positions."

16            Do you see that?

17      A.    Yes, ma'am.

18      Q.    Would all of the work that was -- that you

19  have done with pharmaceutical companies be listed in

20  this section regarding consulting positions?

21      A.    I believe it would.

22      Q.    Okay.  Could we go through this list of

23  consulting positions and you identify for me which

24  ones are consulting positions with pharmaceutical

Highly Confidential - Subject to Further Confidentiality Review

```
 1   companies, just so we can make the record clear?

 2        A.    Yes, ma'am.

 3        Q.    Okay.

 4        A.    On Page 11, No. 4, Braeburn.

 5        Q.    Okay.

 6        A.    Two down from that, BioDelivery Sciences.

 7        Q.    Okay.

 8        A.    Below that, Purdue Pharma.  On the next

 9   page, the top of the page, US WorldMeds.

10        Q.    Okay.

11        A.    And just below the middle of that

12   page another US WorldMeds.  Those are the

13   pharmaceutical companies.

14        Q.    Okay.  Let us, if you could, let's turn

15   back to the first one, Brae -- Braeburn

16   Pharmaceuticals.

17              It looks like from your CV that you did --

18   have done work for Braeburn Pharmaceuticals from

19   January of 2013 to the present.

20              Is that accurate?

21        A.    The relationship has not closed, but there

22   has been no activity in many years.  This activity was

23   pretty much 2013, '14, maybe '15.

24        Q.    Okay.  And what were you doing for
```

1    Braeburn Phar -- Pharmaceuticals in between 2013 and

2    2015?

3         A.    They established an advisory board of

4    addiction experts and key opinion leaders to talk

5    about a product they wanted to bring to market.

6         Q.    And what was that product?

7         A.    The tradename is Probuphine.

8         Q.    And what is Probuphine?

9         A.    It is an implantable form of Buprenorphine

10   that's used to treat opioid addiction.

11        Q.    Okay.  And were -- how much time did you

12   spend on the advisory board for Braeburn

13   Pharmaceuticals in between 2013 and 2015?

14        A.    I would estimate less than 20.

15        Q.    And when you say that, 20 hours?

16        A.    Yes, ma'am.

17        Q.    Okay.  Were you compensated for your time?

18        A.    Yes, ma'am.

19        Q.    At what rate?

20        A.    I don't recall exactly, and it was not a

21   rate that I set.  It was a usual and customary rate

22   set by them based on industry standards and FDA

23   regulations.

24        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      A.      And it was a daily rate more than an

2   hourly rate.

3      Q.      Fair enough.

4              Do you recall what the daily rate roughly

5   was?

6      A.      Being that it was that many years ago, I

7   think it was in the vicinity of ███████████

8      Q.      Okay.  And typically -- or actually, why

9   don't I ask you this:

10             What were you doing when you sat on the

11  advisory board for Braeburn Pharmaceuticals?

12     A.      Providing information about patients with

13  opioid addiction, the kind of patients who might be

14  candidates for this medication, existing medications

15  in the market and how this might find its own market

16  niche.  We also talked about how to use this

17  medication, how to train physicians, how to market the

18  drug to physicians.  I believe that's the summary.

19     Q.      Okay.  During -- when you were serving on

20  the advisory board, did Braeburn Pharmaceuticals pay

21  for your travel expenses with respect to your time on

22  the advisory board?

23     A.      Yes.

24     Q.      Did they pay for your meals with respect

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to your time that you were spending on the advisory

 2    board?

 3         A.    Yes.

 4         Q.    Okay.  Did you have a written agreement

 5    with Braeburn Pharmaceuticals?

 6         A.    Yes.

 7         Q.    Okay.  Do you still have that?

 8         A.    I think I could find it, yes.

 9         Q.    Do you know if that agreement has now

10    expired or is it currently ongoing, you just haven't

11    done any work for them?

12         A.    I don't know the answer to that question.

13    I -- I can tell you, I'm, again, saying more than a

14    yes-or-no answer, the folks involved with that company

15    still come to ASAM meetings, American Society of

16    Addiction Medicine, I see people there, there is

17    nothing active that they are asking me to do.  There

18    is the potential that there could be.  So it's -- it

19    was -- I have not looked to see if there was an

20    expiration date.

21         Q.    Do you know if -- typically in advisory

22    boards is it fair to say that you are providing

23    feedback to the pharmaceutical company?

24         MS. HIBBERT:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY THE WITNESS:

2         A.    Well, feedback means they present you

3    something and you react to it, and some of it was that

4    they would present us something and we would react to

5    it.  There is a -- you know, documents that they must

6    create.  I'm not recalling with this product if we met

7    before or only after the new drug application was

8    approved by the FDA, but they would sometimes show us,

9    you know, we are thinking of presenting this to the

10   FDA and do you agree with that or how would you phrase

11   it.  And of course marketing materials.  And so some

12   of it was feedback but some of it was just, You tell

13   us about patient types.

14        Q.    Okay.  Who was your main contact at

15   Braeburn Pharmaceuticals?

16        A.    There was a -- an individual that I was

17   introduced to who arranged the relationship, and I

18   don't remember the extent to which she was on the

19   payroll or a consultant to them, and her name is

20   Sonnie Kim.

21        Q.    Okay.

22        A.    S-o-n-n-i-e, Kim, she is Korean.

23        Q.    And when you received compensation with

24   respect to your role on the advisory board for
```

Highly Confidential - Subject to Further Confidentiality Review

1    Braeburn, was that compensation being paid directly by

2    Braeburn or some other third party?

3         A.    I think it was paid by Braeburn.

4         Q.    Okay.  Okay.  Let's go on to the next

5    pharmaceutical company for which you worked -- did

6    work with, and -- and that one you identified as

7    BioDelivery Service -- or Sciences, is that right?

8         A.    Right.

9         Q.    Okay.

10        A.    They go by BDSI.

11        Q.    I'm sorry.  Say it again.  BDSI?

12        A.    SI.

13        Q.    Okay.

14        A.    For "Incorporated."

15        Q.    And what -- what were you doing for BDSI?

16        A.    Well, their product is a very, very

17   interesting product, and this was direct work and your

18   previous question was pharmaceutical company, Curry

19   Rockefeller is not a pharmaceutical company, but they

20   work -- provide services for pharmaceutical companies.

21   So some of the contract work was with Curry

22   Rockefeller as opposed to with BDSI itself, but I had

23   relationships with both regarding this particular

24   product called Bunavail, which is another formulation

1    of Buprenorphine which is a specialized partial opioid

2    agonist, a-g-o-n-i-s-t, used to treat opioid

3    addiction.

4         Q.    Okay.  And it -- the -- your CV states

5    that you work -- did the work from February 2014 to

6    December 2016, is that accurate?

7         A.    Correct.

8         Q.    And I'm sorry.  Curry Rockefeller, what

9    kind of entity was that or what did they do?

10        A.    It's a consulting firm that says that

11   their services are education, and so some of it is

12   developing formal patient education documents required

13   by the FDA and some is marketing materials.

14        Q.    You said the -- you said they say that

15   their services are educational in a way that made --

16   made me think that you were thinking it was something

17   else.

18             Is that -- did I understand you correctly

19   or not?

20        MS. HIBBERT:  Objection to form.

21   BY THE WITNESS:

22        A.    Well, if -- if it's -- if it's marketing

23   materials, the word "promotional" would be an

24   appropriate word.

1    BY MS. DICKINSON:

2        Q.    I -- I just want to understand, was it

3    your feeling that these educational materials were

4    really more like promotional materials?

5        MS. HIBBERT:  Objection to form.

6    BY THE WITNESS:

7        A.    Some yes, some no.  And -- and, again,

8    some of it was also, How do you develop continuing

9    education programs for physicians.  And so some of it

10   was, What would the content of a continuing education

11   program be to practicing physicians to teach them

12   about this medication.

13   BY MS. DICKINSON:

14       Q.    Okay.  Fair.

15             For this engagement with Bi -- the

16   pharmaceutical company BioDelivery Sciences, were you

17   compensated?

18       A.    Yes.

19       Q.    Okay.  And in what amount?  Or in what

20   way, an hourly rate or daily or --

21       A.    A daily rate.

22       Q.    Okay.

23       MS. HIBBERT:  Objection to form.

24             Dr. Miller, please give me a pause after

Highly Confidential - Subject to Further Confidentiality Review

```
1    the question is asked --

2         THE WITNESS:  Okay.

3         MS. HIBBERT:  -- so I can put an objection on

4    the record, okay?

5    MS. DICKINSON:

6         Q.    And what was the daily rate that you were

7    compensated on by BioDelivery Sciences?

8         A.    My recollection would be less than ███████
```



```
10        Q.    And do you know how much time in between

11   2014 of -- April 20- -- I'm sorry -- December 2014 and

12   December 2016 you spent performing services for

13   BioDelivery Sciences?

14        A.    My recollection would be three days max.

15        Q.    Can you briefly describe what type of

16   services you were providing to BioDelivery Sciences?

17        A.    I think my answers that are provided for

18   Braeburn would apply to BioDelivery Sciences.

19        Q.    The same kind of work?

20        A.    Yes.

21        Q.    Okay.  And the same questions as I asked

22   you for Braeburn, when you were working for

23   BioDelivery Sciences, when you were serving on the

24   advisory board, did they pay your travel with respect
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to your services on the advisory board?

 2         A.    Yes, ma'am.

 3         Q.    Did the BioDelivery Service -- Sciences

 4    pay for your meals with respect to your services?

 5         A.    Yes, ma'am.

 6         Q.    Was there a reason that you stopped

 7    working in 2016 for BioDelivery Sciences?

 8         A.    They stopped supporting the product.

 9         Q.    Okay.  Did they ever bring that product to

10    market?

11         A.    Oh, yes.

12         Q.    Okay.  What did you mean by "they stopped

13    supporting the product"?

14         A.    If you support a product, you generate

15    educational materials, you have a sales staff, a

16    marketing staff and you are really trying to actively

17    grow market share, you are trying to sell --

18         Q.    Uh-huh.

19         A.    -- more product, and they pulled all of

20    their investment in this product and went to a

21    different product.  I think -- I think I'll -- I'll

22    just say that.

23         Q.    Okay.  Do you -- do you know why they

24    pulled their investment and went to a different
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    product?

2         MS. HIBBERT:  Objection to form, calls for

3    speculation.

4    BY THE WITNESS:

5         A.    Pardon me for sounding lawyerly, but I

6    think that there was probably a confidentiality

7    agreement with them that would prevent me from sharing

8    any of that sort of information.

9    BY MS. DICKINSON:

10        Q.    Okay.  Totally fair.  I don't want to get

11   you into anything that would --

12        A.    Right.

13        Q.    -- run you afoul of that.

14              So had -- you said they went to a new

15   product -- or BioDelivery Sciences went to a new

16   product.

17              What was the new product?

18        A.    I don't remember the name of it, but I

19   could describe it to you.

20        Q.    Okay.  Please do.

21        A.    Okay.  What is unique about this product

22   is the engineering of how it's delivered to the

23   bloodstream, and it's -- the engineering has to do

24   with a patch that you don't put on your skin and it's
```

Highly Confidential - Subject to Further Confidentiality Review

1    not like some other Buprenorphine products that you

2    put under your tongue and dissolve, but it's a patch

3    that you place on the inside of your cheek.

4         Q.    Okay.

5         A.    And it has a special engineering to stick

6    to the inside of your cheek and it has a special

7    engineering for the active ingredient to flow from the

8    product into your bloodstream --

9         Q.    Okay.

10        A.    -- which has to do with all sorts of

11   physiology and pharmacology and physics, and that was

12   the engineering.

13             And they developed another product using

14   that engineering that was a treatment for pain as

15   opposed to a treatment for addiction and had a

16   different brand name, a different strength, and they

17   thought that their -- buccal means inside the cheek --

18   they thought that product would have a better chance

19   of improving the company's bottom line than the

20   Bunavail product.

21        Q.    Did they stop selling the original

22   Bunavail product?

23        A.    No, you --

24        MS. HIBBERT:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    -- you can buy it today.  You can -- I can

 3   prescribe it today.

 4   BY MS. DICKINSON:

 5       Q.    But internally they stopped -- I think

 6   your words were "supporting" --

 7       A.    Right.

 8       Q.    -- the Bunavail product, correct?

 9       A.    Right.

10       Q.    Okay.  And were they then turning to

11   supporting the new product that was being used in the

12   treatment for pain instead, is that a fair --

13       A.    That's my understanding.

14       MS. HIBBERT:  Objection to form.

15            Dr. Miller --

16       THE WITNESS:  Oh, I'm sorry.

17   BY MS. DICKINSON:

18       Q.    And at that time is that the reason you

19   stopped working for BioDelivery Sciences?

20       MS. HIBBERT:  Objection to form.

21   BY THE WITNESS:

22       A.    Yes.  I really liked the product and I

23   wished they had kept it going, and they stopped the

24   support which included paying physicians to help them
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with it.

 2   BY MS. DICKINSON:

 3        Q.    Did you use BioDelivery Sciences's product

 4   Bunavail at any time in your practice?

 5        A.    Yes.

 6        Q.    How often?  Frequently?

 7        A.    No.

 8        Q.    Did you use the -- the other product, the

 9   one that was in the treatment for pain in your

10   practice at any time?

11        A.    No, ma'am.

12        Q.    Okay.  Why not?

13        A.    Because I'm not a pain medicine doctor.

14        Q.    I forgot to ask you with respect to your

15   work for Braeburn Pharmaceuticals, did you use -- or

16   did their product come to market?  I'm sorry.

17        A.    Yes.

18        Q.    And did you use their product in your

19   practice?

20        A.    No.

21        Q.    Why not?

22        A.    Because I never went through the training

23   because it's an injectable and there are specific

24   things you have to do to be trained to be someone to
```

Highly Confidential - Subject to Further Confidentiality Review

1  put the implant in and take the implant out.

2     Q.    Was it -- it wasn't something you thought

3  would be useful in your practice, I take it?

4     MS. HIBBERT:  Objection to form.

5  BY THE WITNESS:

6     A.    I believe the product has merit and could

7  have been helpful to some of my patients, but I

8  decided to not go through the steps required to obtain

9  the expertise to do a minor office surgical procedure

10  in the practice settings where I practiced because it

11  is a minor surgical procedure.

12  BY MS. DICKINSON:

13     Q.    Okay.  All right.  Let's move to the next

14  one, Purdue Pharma.

15     A.    Yes, ma'am.

16     Q.    I see from your CV that you did work for

17  Purdue Pharma, it says from October 2016 to

18  December 2016.

19          Is that accurate?

20     A.    Yes, ma'am.

21     Q.    Okay.  Was that the first, October 2016,

22  was that the first time you had ever worked with

23  Purdue Pharma?

24     A.    Yes, ma'am.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Had you ever come in contact with anyone
2   at Purdue Pharma prior to October 2016?
3        MS. HIBBERT:  Objection to form.
4   BY THE WITNESS:
5        A.    Could you restate that?
6   BY MS. DICKINSON:
7        Q.    Yes.
8              Had you ever come in contact with anyone
9   at Purdue Pharma prior to the time you went to work
10  for them in October of 2016?
11       MS. HIBBERT:  Same objection.
12  BY THE WITNESS:
13       A.    I was in places where their sales force
14  was promoting their drug, exhibits at meetings.
15  Because I didn't prescribe their products, I didn't
16  talk to them about it.  I would say I had no contact
17  with any quote/unquote corporate types.  So there is
18  nothing of substance that I would say would be an
19  affirmative answer to your question before I got this
20  phone call from Purdue Pharma.
21  BY MS. DICKINSON:
22       Q.    Okay.  What types of meetings would you be
23  at where there were sales representatives promoting
24  products to other doctors?
```

```
1        MS. HIBBERT:  Objection to form.

2   BY THE WITNESS:

3        A.    Medical conferences where there would be

4   an exhibit hall.

5   BY MS. DICKINSON:

6        Q.    Okay.  Can you give me a couple of

7   examples of what types of medical conferences you were

8   attending where there would be sales reps promoting

9   Purdue's products?

10        MS. HIBBERT:  Objection to the form.

11   BY THE WITNESS:

12        A.    Madam, that's a very good question because

13   I'm originally trained in psychiatry and I go to

14   psychiatry meetings and I am an addiction medicine

15   physician, go to addiction meetings, and I'm trying to

16   think if I ever, for instance, would speak at a pain

17   conference.  Certainly I've -- I've been -- yes, I've

18   been on the faculty for a pain board review course

19   right here in Madison at the university.  And there

20   could have been Purdue Pharma reps having an

21   exhibit promoting their pain products to pain doctors

22   at those sorts of meetings.

23   BY MS. DICKINSON:

24        Q.    Okay.  What was the first -- was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    October 2016 the first date on which you performed

 2    work for Purdue?

 3        A.    Yes.

 4        Q.    Okay.  How did you first come in contact

 5    with Purdue Pharma?

 6        A.    I got a phone call --

 7        MS. HIBBERT:  Objection to form.

 8        THE WITNESS:  Sorry.

 9    BY MS. DICKINSON:

10        Q.    Go ahead.

11              Do you want me to repeat the question?

12        A.    No.

13        Q.    How did you first come in contact with

14    Purdue Pharma?

15        MS. HIBBERT:  Objection to form.

16    BY THE WITNESS:

17        A.    I got a phone call from a member of their

18    staff.

19    BY MS. DICKINSON:

20        Q.    Who is that?

21        A.    Gina Barbara -- Barbarotta, I believe it

22    is.

23        Q.    Could you give her your best idea of how

24    that is spelled, her last name?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Again, I -- I don't have any devices here,

2  so I can't look her up, because she is not with them

3  anymore, but B-a-r-b-a-r-o-t-t-a, I believe it is.

4  G-i-n-a, Gina Barbarotta.

5    Q.    Did you know Ms. Barbarotta before you

6  received the phone call?

7    A.    I did not.

8    Q.    Okay.  Who -- what position did

9  Ms. Barbarotta hold at Purdue at the time you received

10  the phone call?

11    A.    My understanding is that her job was to

12  help populate physician advisory boards for them.  She

13  would find physicians to sit on ad boards.

14    Q.    And is that what the phone call was asking

15  you to do?

16    A.    It was, but it was a different kind of ad

17  board.

18    Q.    Okay.  Let's talk about that.  So what was

19  Ms. Barbarotta asking you to do?

20    MS. HIBBERT:  Objection to form.

21  BY THE WITNESS:

22    A.    She was asking me to sit on an advisory

23  board, not for a pain medication or a product they

24  were selling, but to sit on an ad board to advise

Highly Confidential - Subject to Further Confidentiality Review

1    senior leadership of Purdue Pharma about addiction.

2    BY MS. DICKINSON:

3        Q.    Okay.  Anything else she told you about

4    what she wanted you to do when you had that first

5    conversation?

6        A.    My best guess is that any answer to that

7    question or follow-up questions of a similar type

8    would be covered by a confidentiality agreement I

9    signed with Purdue Pharma regarding being a member of

10   this addiction advisory board that I sat on.

11       Q.    Okay.  Do you -- can you tell me who the

12   senior leadership was that you were hired to advise

13   about addiction?

14       MS. HIBBERT:  Objection to form.

15   BY THE WITNESS:

16       A.    There was a -- I believe he was the chief

17   medical officer for the company.  When we met I

18   believe, if my memory serves me, the chief marketing

19   officer and the CEO of the whole company sat in for

20   part of the meeting.

21   BY MS. DICKINSON:

22       Q.    Okay.  How many -- how many meetings did

23   you have in the course of sitting on this advisory

24   board for Purdue Pharma?

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    One face-to-face meeting and I think two

 2  follow-up conference calls.

 3       Q.    Okay.  Tell me when the face-to-face

 4  meeting was?  Was it sometime during -- between

 5  October and December of 2016?

 6       A.    I believe it was in October.

 7       Q.    Okay.  And who was present at the

 8  face-to-face meeting?

 9       A.    Physicians, many of whom I knew from the

10  addiction community, and a variety of employees from

11  Purdue.  I would say 60 to 75 percent of the people in

12  the room were Purdue people because they wanted to

13  have a large number of their people hear directly what

14  the advisers were sharing.

15       Q.    Okay.  How many people from Purdue would

16  you estimate were in the room on that day?

17       MS. HIBBERT:  Objection to form.

18  BY THE WITNESS:

19       A.    I would say between 15 and 20.

20  BY MS. DICKINSON:

21       Q.    Okay.  And that included both the chief

22  marketing officer and the chief medical officer?

23       MS. HIBBERT:  Objection to form.

24  BY MS. DICKINSON:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    I think you told me that -- a minute ago

2    that the chief marketing officer --

3      A.    Yes, sir -- yes, ma'am.

4      Q.    -- and the chief medical officer sat in on

5    a meeting that you had at Purdue, was -- did the chief

6    marketing officer and the chief medical officer sit in

7    on that meeting in October?

8      MS. HIBBERT:  Objection; form, mischaracterizes.

9    He said he believes that they may have.

10          But you can answer, Dr. Miller.

11   BY THE WITNESS:

12     A.    Yes.

13   BY MS. DICKINSON:

14     Q.    Okay.  I'm going to ask the question again

15   because I'm totally confused now.

16          Is your answer yes that -- that you

17   believe the chief marketing officer and the chief

18   medical officer were at that October meeting?

19     MS. HIBBERT:  Objection to form.

20   BY THE WITNESS:

21     A.    Yes.

22   BY MS. DICKINSON:

23     Q.    Okay.  Do you know either one of those

24   individuals' names?

```
 1      A.    I also don't know if they are still there.

 2      Q.    That's okay.

 3            Do you know either one of those two

 4  individuals' names?

 5      A.    Uhn-uhn.

 6      Q.    Okay.

 7      A.    I'm sorry, ma'am, to the transcriptionist,

 8  "no," not "uhn-uhn."

 9      Q.    Do you -- other than Ms. Barbarotta, do

10  you know any of the other Purdue employees' names that

11  were in the room of the 15 to 20 people?

12      A.    David Haddox was there.

13      Q.    Okay.  Did you know Dr. Haddox before this

14  October meeting?

15      A.    Yes.

16      Q.    How?

17      A.    He came to ASAM conferences because he is

18  a member.

19      Q.    When did you first meet David Haddox?

20      A.    I don't remember, but I would estimate it

21  was at least four years prior and maybe a long time

22  before that.

23      Q.    Okay.  How often per year did you interact

24  with David Haddox?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Less than once a year.  Let me answer your
 2   question.  I think I probably ran into David four to
 3   six times over a span of years.
 4      Q.    Okay.  During those four to six times, did
 5   you ever have substantive interaction with David
 6   Haddox on the issue of opioids?
 7      MS. HIBBERT:  Objection to form.
 8   BY THE WITNESS:
 9      A.    I'm going to speculate and give you a -- a
10   yes answer to that.
11   BY MS. DICKINSON:
12      Q.    Okay.  What was the substance of the
13   conversation you had with David Haddox on the
14   substance -- that had to do with opioids?
15      MS. HIBBERT:  Objection to form, calls for
16   speculation.
17   BY THE WITNESS:
18      A.    The American Society of Addiction Medicine
19   has offered a special continuing education course for
20   20 years now called "Pain and Addiction:  Common
21   Threads."
22      Q.    Okay.
23      A.    I have been on the faculty of that course
24   a number of times and have served on the program
```

```
1    committee for that course for a number of years, all

2    of which is reflected somewhere in Exhibit 3.

3         Q.    Okay.

4         A.    Both of those, look for the words "Common

5    Threads."

6              Dr. Haddox attended and served as faculty.

7    I don't believe he ever served on the program

8    committee.  But I would interact with him by sitting

9    in the audience with him, we would discuss informally

10   presentations that were made.  We were acquainted.

11             I will go a bit afield and say I was

12   President of the American Society of Addiction

13   Medicine, so I was more known to others than I would

14   know them.  Everybody knows who the president is.

15        Q.    Right.

16        A.    And so he made himself familiar to the

17   president.  So we had an acquaintanceship through the

18   American Society of Addiction Medicine where he was a

19   dues paying member, so we were equals in that regard.

20             So that's where -- or that would be the

21   context in which we might have interactions regarding

22   the substance of opioids, and one of the main purposes

23   of the Common Threads course is what do you do if

24   there is a common thread, what if you have a patient
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    with addiction who has pain, how do you manage pain in

2    a patient with addiction, and would you ever use an

3    opioid to treat pain in a patient with addiction.  And

4    certainly Dr. Haddox had opinions about that, as would

5    other people.

6              So that -- that's -- when you said was

7    there a discussion about substance, that's what it

8    would have included.

9         Q.   Did you ever have lunches or dinner with

10   Dr. Haddox outside of presentations at ASAM?

11        MS. HIBBERT:  Objection to form.

12   BY THE WITNESS:

13        A.   None that I can recall.

14   BY MS. DICKINSON:

15        Q.   Did you have -- for your work with Purdue

16   Pharma, did you have a written agreement?

17        A.   Yes.

18        Q.   Okay.  Do you still have a copy of that?

19        A.   Probably.

20        Q.   Okay.

21              Was the written agreement to provide

22   services on their advisory board that we just

23   discussed?

24        MS. HIBBERT:  Objection to form.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    On this advisory board, yes.

 3   BY MS. DICKINSON:

 4        Q.    Did you provide any services to Purdue

 5   Pharma other than work on this advisory board?

 6        A.    No.

 7        Q.    Okay.  You said there was a one-day

 8   meeting.

 9              Where did that take place?

10        A.    Corporate headquarters, Stamford,

11   Connecticut.

12        Q.    Okay.

13              And you said there were a number of

14   physicians in attendance.  Were those physicians also

15   members of the advisory board?

16        A.    Yes.

17        Q.    Can you tell me who any of those

18   physicians were?

19        A.    The one I have the greatest recollection

20   of is my friend and colleague, David Gastfriend,

21   G-a-s-t-f-r-i-e-n-d, M.D.

22        Q.    Okay.  Anyone else that you can remember

23   that was at that meeting that was a physician?

24        A.    I do not have specific recollections of
```

1    others besides David.

2        Q.    Do you know -- did -- did the physicians

3    on the advisory board that day give presentations?

4        A.    No.

5        Q.    Okay.  What -- what was the structure of

6    the one-day meeting?

7        MS. HIBBERT:  Objection to form.

8    BY THE WITNESS:

9        A.    Roundtable.

10   BY MS. DICKINSON:

11       Q.    Did it have an agenda?

12       A.    Yes.

13       Q.    Do you know what types of issues were on

14   that agenda?

15       MS. HIBBERT:  Objection to form.

16   BY THE WITNESS:

17       A.    Yes.

18   BY MS. DICKINSON:

19       Q.    Okay.  What types of issues?

20       MR. HADAGHIAN:  Counsel for Purdue joins the

21   objection.

22              (Reporter clarification.)

23   BY MS. DICKINSON:

24       Q.    I'm sorry.  Do you know what types of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    issues were on the agenda at that October meeting?

 2         MS. HIBBERT:  I'll object to form and also to

 3    the extent that any of these -- this information is

 4    protected pursuant to your confidentiality agreement,

 5    I would instruct the witness not to answer.

 6         MR. HADAGHIAN:  Counsel for Purdue joins the

 7    objection.

 8    BY THE WITNESS:

 9         A.    I believe I can say something general that

10    is not forbidden by the confidentiality agreement.

11    BY MS. DICKINSON:

12         Q.    Okay.

13         A.    Again, in general, actually what we were

14    told is that this would be experts to advise Purdue on

15    what it could do about addiction.  And the substance

16    of what we advised them I certainly can't share with

17    you.

18              In the course of the day other than the

19    roundtable they threw in a couple of extra things, and

20    one was to present data on other products that they

21    had that had reached market or were being considered

22    for market, and I would put this under the overall

23    category of abuse deterrent formulations.  So some of

24    their medication development folks used this audience
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to throw out some ideas that quite honestly I thought
 2    was off topic and I think my colleagues thought was
 3    off topic, and it was like, What -- what's all this.
 4    And we were not terribly helpful to them because we
 5    said, You're choosing the time to do that, we thought
 6    we were going to talk about addiction.
 7              So the agenda included that they wanted to
 8    throw these things in that we thought were not
 9    pertinent to what we were doing in giving them advice,
10    but -- so that's general subject headings, but you
11    said -- what was it -- so in general, no, none of
12    the -- none of the physician experts who were brought
13    in gave presentations.  We all were in a roundtable
14    discussing concepts and brainstorming.
15         Q.   Okay.  Did you feel like the other
16    subjects that were thrown in about abuse deterrent
17    formulations, did you feel like that was a sales
18    pitch?
19         MS. HIBBERT:  Objection to form.
20         MR. HADAGHIAN:  Counsel for Purdue joins the
21    objection.
22    BY MS. DICKINSON:
23         Q.   Go ahead.
24         A.   I believe -- I believe you understand that
```

Highly Confidential - Subject to Further Confidentiality Review

 1    this has nothing to do with the opinions I was asked

 2    to formulate in this case.

 3        Q.    Understood.

 4        A.    This is completely off topic.

 5              So you are asking my beliefs?

 6        Q.    Well, you understand that Purdue is a

 7    defendant in this case, correct?

 8        A.    Yes.

 9        Q.    Okay.  So I'm going to ask you again, you

10    stated that -- that some of the topics of that

11    roundtable were off topic for what you understood was

12    going to happen that day, is that fair?

13        A.    Correct.

14        MS. HIBBERT:  Objection; form.

15    BY MS. DICKINSON:

16        Q.    And did you feel like those topics that

17    were off topics were kind of part of a sales pitch?

18        MS. HIBBERT:  Objection to form.

19        MR. HADAGHIAN:  Purdue joins the objection.

20    BY THE WITNESS:

21        A.    I -- I would actually not characterize it

22    in that way, no, ma'am.

23    BY MS. DICKINSON:

24        Q.    How would you characterize it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      MS. HIBBERT:  Objection to form.

 2      MR. HADAGHIAN:  Counsel for Purdue joins the

 3  objection.

 4  BY THE WITNESS:

 5      A.    It was more about, What are you experts on

 6  addiction, because you are not pain experts, we get

 7  advice from them in other ad boards, what do you

 8  experts on addiction think of this material we are

 9  sharing with you, just react to it.  So i -- I did not

10  see it as a sales pitch.

11  BY MS. DICKINSON:

12      Q.    Okay.  Did -- did the group on the

13  advisory board give their opinions and reactions to

14  people at Purdue?

15      MS. HIBBERT:  Objection to form.

16      MR. HADAGHIAN:  Counsel for Purdue joins the

17  objection.

18  BY THE WITNESS:

19      A.    We did.

20  BY MS. DICKINSON:

21      Q.    Okay.  Do you know -- did -- did the group

22  make any recommendations to Purdue of things they

23  should do differently or the same?

24      MS. HIBBERT:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MR. HADAGHIAN:  Counsel for Purdue joins the

 2   objection.

 3   BY THE WITNESS:

 4        A.    We do what we are asked to do, yes.

 5   BY MS. DICKINSON:

 6        Q.    Okay.  And do you know if any of those

 7   recommendations were followed by Purdue?

 8        MS. HIBBERT:  Objection to form.  It calls for

 9   speculation.

10   BY THE WITNESS:

11        A.    I do not know.

12        MS. HADAGHIAN:  Counsel for Purdue joins the

13   objection.

14   BY MS. DICKINSON:

15        Q.    Which colleagues in the field of addiction

16   medicine also were sitting on the Purdue advisory

17   board that you were sitting on, other than I think you

18   mentioned -- I'm sorry, the gentlemen you mentioned, I

19   can't remember his name?

20        A.    His name is Gastfriend and --

21        Q.    Okay.

22        A.    -- and what I've already testified is I

23   don't remember any other specific people.

24        Q.    Okay.
```

```
 1      A.    There -- there were certainly long time

 2   friends and acquaintances there, but I don't remember

 3   who was in that room that day.

 4      Q.    Okay.  You said you had a written

 5   agreement with Purdue.

 6            What was the compensation under that

 7   written agreement?

 8      A.    It was a daily rate.

 9      Q.    And do you know how much that was?

10      A.    Again, because we are getting closer to

11   the current days, I think it was higher than the

12   others.  I think it was probably ████.

13      Q.    Okay.  And were you paid for the day that

14   you spent in October of 2016?

15      A.    Yes.

16      Q.    Okay.  And with respect to traveling to

17   Purdue's corporate headquarters, did Purdue pay for

18   the travel?

19      A.    Yes.

20      Q.    Did Purdue pay for your meals during that

21   time that you were -- spent traveling to that meeting?

22      A.    Yes.

23      Q.    Okay.  Aside from that day, did you do any

24   other work for Purdue under the agreement you signed
```

1    to be on their advisory board?

2         A.    Yes.

3         Q.    Okay.  What other work did you do?

4         A.    I joined in conference calls that were

5    follow-up to the face-to-face meeting.

6         Q.    Okay.  How many conference calls in the

7    months that you served on the advisory board did you

8    participate in?

9         A.    My memory is that there were two that I

10   participated in.

11        Q.    Do you know how long those were in length?

12        A.    An hour or less.

13        Q.    Okay.  And were you paid for your time on

14   those conference calls by Purdue?

15        A.    I do not think I was.

16        Q.    Did you participate in any written

17   communication or e-mail communication with folks at

18   Purdue pursuant to the agreement that you had between

19   October 2016 and December 2016?

20        MS. HIBBERT:  Objection to form.

21   BY THE WITNESS:

22        A.    I believe I did.

23   BY MS. DICKINSON:

24        Q.    Okay.  Who were you communicating with?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    The point person who the Purdue hierarchy

2 assigned to this was the CMO, and so I believe there

3 was e-mail exchange with him.

4      Q.    And who was the CMO?

5      A.    I have no idea.

6      Q.    Okay.  What was the purpose of the e-mail

7 exchange with the CMO following the meeting in October

8 of 2016?

9      MS. HIBBERT:  Objection to form.

10      MS. HADAGHIAN:  Purdue joins the objection.

11 BY THE WITNESS:

12      A.    Yeah.  I believe you previously asked me

13 did we provide any ideas to them.  And the conference

14 call, I think the first one was:  This is the list of

15 what we heard you say.  Did we hear correctly?  We

16 just want to know if this list is an accurate list.

17 And then another call was an update on what might

18 happen regarding any implementation, and that was it.

19      Q.    What was being discussed to be

20 implemented?

21      MS. HIBBERT:  Objection to form.

22 BY THE WITNESS:

23      A.    That's -- I think that's definitely --

24      MS. HADAGHIAN:  Purdue --

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY THE WITNESS:

2         A.    That's --

3         MS. HADAGHIAN:  Purdue joins the objection.

4              I'm sorry for interrupting, Dr. Miller.

5         THE WITNESS:  No, that's quite all right.

6    BY THE WITNESS:

7         A.    But I was going to say that's -- that

8    would definitely be covered by the confidentiality

9    agreement.

10        MS. DICKINSON:  Counsel, are you taking the

11   position that he can't answer these questions because

12   I -- I think documents have actually been produced

13   about his participation in the advisory board and

14   e-mails -- the e-mail exchanges have been produced.

15             Are you taking the position he can't

16   answer these questions?  I think any confidentiality

17   has probably been waived by the production.  If you

18   want to mark the transcript confidential, I

19   understand, maybe you have a position there, but the

20   questions about it, I'm not sure you can instruct him

21   not to answer if the documents have been produced in

22   the case.

23        MS. HIBBERT:  I don't know what Purdue's

24   position is on this, but my position as being here
```

 1   with Dr. Miller here today, I've not instructed him, I

 2   don't think, not to answer specific questions as to

 3   this, but with regard to what Dr. Miller feels

 4   comfortable answering pursuant to his confidentiality

 5   agreement, I can't control, he is the only person that

 6   knows about that, and the -- maybe counsel for Purdue,

 7   too.  I -- I won't also advise him to answer questions

 8   pertaining to matters that may or may not have been

 9   put into the record into this case.  I haven't seen

10   those documents.  I haven't shown those document --

11   documents to Dr. Miller.  So if he doesn't feel

12   comfortable providing responses because he believes

13   the responses are covered pursuant to his

14   confidentiality agreement, that's a decision that

15   Dr. Miller has to make, but I am not instructing him

16   not to answer based on the -- his own confidentiality

17   agreement.

18           Counsel for Purdue, I don't know if you

19   have any other comment on that, but...

20      MS. HADAGHIAN:  Purdue's position is consistent

21   with what counsel for Dr. Miller has stated.

22   BY THE WITNESS:

23      A.    And -- and my answer is I'm trying to make

24   them general.  I think they are not a violation of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    confidentiality agreement I signed.  There was an ad

 2    board.  It wasn't about a product.  It was general,

 3    and this is why addiction experts were brought in.

 4    Were we asked to provide ideas, yes.  Did they write

 5    them down, yes.  Do I know if they implemented them,

 6    no.  And specific advice we gave then, that's what

 7    they paid for in confidence and that would be

 8    propriety.  So that's the way I'm dealing with this --

 9    BY MS. DICKINSON:

10         Q.    Okay.

11         A.    -- line of questions.

12         Q.    Fair.

13               Do you believe that written down and

14    summarized in these either e-mail exchanges or in some

15    written form following the first meeting were the

16    ideas that were discussed?  You don't have to tell me

17    what was in the written form.

18         MS. HIBBERT:  Objection to form.

19         MS. HADAGHIAN:  Purdue objects to form.

20    BY MS. DICKINSON:

21         Q.    Go ahead.

22         A.    I would think so.

23         Q.    Okay.  Did you see documents that were

24    summarizing the discussion from the October meeting?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       MS. HIBBERT:  Objection to form.

 2       MS. HADAGHIAN:  Purdue joins the objection.

 3  BY THE WITNESS:

 4       A.    I'm not trying to be splitting hairs, but

 5  I think "related to" would be a better term than

 6  "summarized" because I don't think it was a -- an

 7  encapsulation, but it was related to the discussions

 8  we had, yes.

 9  BY MS. DICKINSON:

10       Q.    Okay.  Were there minutes from the

11  October meeting that you ever saw?

12       A.    No.

13       Q.    Okay.  Were there written documents that

14  discussed some of the ideas that were discussed at the

15  October meeting that you saw?

16       MS. HIBBERT:  Objection --

17       MS. HADAGHIAN:  Purdue objects to form.  And I

18  apologize if I interrupted.

19       MS. HIBBERT:  That's okay.  I join the

20  objection.

21  BY THE WITNESS:

22       A.    Not wanting to make a misstep in my

23  answer, yes, there were e-mails that would have

24  content.  I believe that, you know, that e-mails can
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    have more informality than form -- than final

2    documents.  I don't know that any of the e-mails

3    represented documents.  They may list ideas, points or

4    concepts.  How much that ever became part of a

5    document, I have no idea.

6           Do I ever recall getting an e-mail

7    attachment of a Purdue synopsis or anything like that,

8    no.  I just recall getting an e-mail -- getting

9    e-mails where, Ladies and gentlemen, we think this is

10   what you said, does this reflect that, and any further

11   elaboration you have on the ideas that we brainstormed

12   about.  I think that's about as far as it goes.

13       Q.    Okay.  Your CV lists the relationship for

14   Purdue ending in December 2016.  How did the

15   relationship end?

16       MS. HIBBERT:  Objection to form.

17       MS. HADAGHIAN:  Purdue joins the objection.

18       THE WITNESS:  Should I proceed with an answer?

19       MS. HIBBERT:  Yes.  To the extent that you can,

20   yes.

21   BY THE WITNESS:

22       A.    Yeah, no.  It was interesting, I'll --

23   I'll speak under oath that this is my opinion and my

24   recollection -- not my opinion, my -- my -- my
```

 1    attitude about all of this, we hoped Purdue was doing

 2    this in good faith.  We thought there was a chance

 3    they were doing it in good faith.  We had no idea what

 4    would happen as a result of this.  We gave them some

 5    pretty good and provocative ideas.

 6             After a relatively brief period of time,

 7    one of the comments made was, We want broad input on

 8    this.  We're probably going to rotate the membership

 9    of this advisory board and maybe you'll be in it after

10    January 1st and maybe you won't.  And after this brief

11    of an engagement, I found that curious.  And basically

12    by the time the calendar year 2016 ended, they said

13    something not explicit but sort of in the ballpark of,

14    Thank you.  We don't need you anymore and you are not

15    going to be involved anymore, and they -- and so,

16    honestly, honestly, because I revise my CV from time

17    to time, nothing happened after December '16, but it

18    was open-ended and I called Ms. -- Ms. Barbarotta and

19    I said, What would you say was the end date of this

20    deal?  And she said, December 16th.  So that's what I

21    put down.  I probably entered that date a year or two

22    later.  So it was just sort of -- it just sort of

23    evaporated.

24    BY MS. DICKINSON:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    After December of 2016, did you have any

2  further contact with Purdue at any time?

3      A.    I had further contact with --

4      MS. HADAGHIAN:  Purdue objects to form.

5      THE WITNESS:  I'm sorry, ma'am.  Pardon me.

6  BY MS. DICKINSON:

7      Q.    Go ahead.

8      MS. HADAGHIAN:  I apologize.  Please go ahead.

9      THE WITNESS:  Yes.

10  BY THE WITNESS:

11      A.    I had a few conversations with

12  Ms. Barbarotta along the line of, Hey, what's going

13  on, because at that time I still had it open, anything

14  going on, you need me for anything, and her answer

15  was, I hadn't heard anything from home office that

16  anything is happening on this.  So I touched base with

17  her a couple of times to say, Is this an active deal

18  and she said not for you at this time.  And then

19  eventually I came to understand that she found another

20  professional opportunity.

21  BY MS. DICKINSON:

22      Q.    How did you come to understand that?

23      A.    She told me.

24      Q.    Okay.  When did you talk to her about when

Highly Confidential - Subject to Further Confidentiality Review

1   she came to take another professional opportunity?

2        A.    Whenever it happened.  I don't -- I would

3   say probably -- probably in '18.

4        Q.    Did she tell you why she was leaving

5   Purdue?

6        A.    No.

7        Q.    Why were you talking to her in 2018?

8        MS. HIBBERT:  Objection to form.

9        MS. HADAGHIAN:  Purdue objects to form.

10  BY MS. DICKINSON:

11       Q.    Go ahead.

12       A.    We were connected on LinkedIn and so I can

13  speculate that I would have posted something on

14  LinkedIn that she may have at one point said, Oh, good

15  comment.  Or that she put something on LinkedIn and I

16  had said, Good comment.  And then I think probably

17  what happened was I saw that she had posted something

18  on LinkedIn, you know how these things work.

19       Q.    Uh-huh.

20       A.    And she had a different title, different

21  company.  And I wrote and said, Hey, you are no longer

22  at Purdue.  And she goes, No.  And that was it.

23       Q.    Do you know where she went after Purdue?

24       A.    No.  It's in her LinkedIn.  Go look -- go

Highly Confidential - Subject to Further Confidentiality Review

1    look her up.

2         Q.    Okay.

3               After the advisory committee and those two

4    phone calls, I take it from your comments, but I want

5    to make sure, that no one at Purdue ever reached out

6    to you again for your opinions or to serve on a

7    further advisory board, is that true?

8         A.    Right.  Except -- they did not reach out

9    after things came to whatever end they came to at the

10   end of 2016.

11        Q.    Okay.  Have you had at Pur -- have you had

12   any interaction with anyone at Purdue about any

13   addiction treatment drugs that they have either

14   patented or are considering?

15        MS. HIBBERT:  Objection to form.

16        MS. HADAGHIAN:  Purdue joins the objection.

17   BY THE WITNESS:

18        A.    No.

19   BY MS. DICKINSON:

20        Q.    Okay.  You -- let's go to the last

21   pharmaceutical company that you listed on -- under

22   Consulting Positions that you worked for.

23               US WorldMeds.  What is US WorldMeds?

24        A.    It's a pharmaceutical company in

Highly Confidential - Subject to Further Confidentiality Review

1    Louisville, Kentucky that is marketing and

2    distributing a medication for the treatment of opioid

3    withdrawal.  It's a non-opioid medication.

4         Q.    Okay.  And your CV lists November 4, 2017

5    as a date that you worked for US Meds and also a

6    little bit later, September 2018 to present.

7              Are those both accurate?

8         A.    They are accurate, but it might require

9    some elaboration.

10        Q.    Yes, okay.  So let's just take them in

11   turn.

12             The first one lists a Opioid Withdrawal

13   Leaders Forum Advisory Group on November 24th, 2017.

14             Have I read that correctly?

15        A.    Yes, ma'am.

16        MS. HIBBERT:  I'll object to form.  That's not

17   the date it says, but...

18   BY MS. DICKINSON:

19        Q.    November 4th, 2017.

20        MS. HIBBERT:  You said 24th, but...

21        MS. DICKINSON:  Oh, I'm sorry.

22        MS. HIBBERT:  Just so the record is clear.

23   BY MS. DICKINSON:

24        Q.    Doctor, let's read it again.  This -- part

1    of your CV lists a withdrawal -- Opioid Withdrawal

2    Leaders Forum Advisory Group on November 4th of 2017.

3              Have I read that correctly?

4        A.    Yes, ma'am.

5        Q.    Okay.  And were you hired by US WorldMeds

6    pharmaceutical company to do some work with respect to

7    their Opioid Withdrawal Leaders Forum?

8        MS. HIBBERT:  Objection to form.

9    BY THE WITNESS:

10       A.    My recollection is that a third party

11   found the participants and then all of the payments

12   were through US WorldMeds.

13   BY MS. DICKINSON:

14       Q.    Okay.  Who is the third party?

15       A.    I'm drawing a blank.

16       Q.    Okay.  Do you know when you were first

17   contacted by -- by anyone regarding US WorldMeds?

18       A.    I would guess it was within 60 days of

19   that face-to-face meeting in November.

20       Q.    Okay.  60 days prior?

21       A.    Yes, ma'am.

22       Q.    What -- what were the service -- were you

23   hired to perform services on an advisory board for

24   US WorldMeds?

```
 1        MS. HIBBERT:  Objection to form.

 2   BY THE WITNESS:

 3        A.    No.

 4   BY MS. DICKINSON:

 5        Q.    Okay.  What were the services that you

 6   performed for US WorldMeds that are listed in this

 7   first entry?

 8        A.    It was interesting because it was as if it

 9   were an advisory board but it was 85 people.  So

10   because of the scope, you couldn't do it like an ad

11   board and it was a one-and-done deal.  So this was

12   physicians of a variety of specialties, mostly

13   addiction medicine.  I can't remember who else would

14   have been there.  Maybe some pain medicine docs, but

15   at any rate, we were in breakout groups and we did the

16   sort of things that an ad board would do --

17        Q.    Uh-huh.

18        A.    -- in one day to advise them about their

19   product.  And there was follow-up e-mail with them

20   regarding documents and it had to do specifically with

21   some real formal documents, patient education

22   documents, again, required by the FDA and how you

23   would phrase them.

24             Also, the slide deck.  So, if you
```

```
 1    understand how the pharmaceutical industry works,

 2    speakers bureau PowerPoints are developed by a company

 3    but they cannot be used unless approved by the FDA,

 4    and then you cannot deviate from them if you are a

 5    speakers bureau presenter.

 6              So we gave a lot of very direct hands-on

 7    input to them about what their slide deck might look

 8    like before they presented it to the DEA for final

 9    approval and -- and actual use in marketing.  So we

10    really contributed quite a bit.  And I don't think we

11    were paid beyond the one-time meeting, but it was a

12    fairly handsome payment.  I think it was ███████  for

13    the day, if I recall correctly, but so -- so what

14    happened with that is that they had this thing that

15    was way too many individuals to be a functioning ad

16    board but did similar functions.  It was one and done

17    with some follow-up and then they got their FDA

18    approval and they brought their drug to market and

19    then they built their cadre of speakers, okay.  And

20    then the same third-party company invited me to go to

21    the speakers bureau training.  So that was in

22    September of '18, okay.

23         Q.    Um-hum.

24         A.    I think the first speakers bureau
```

Highly Confidential - Subject to Further Confidentiality Review

1    presentations were probably given in around

2    November or December for that product.  And the

3    elaboration that I was going to give is that I began

4    working for the University of Wisconsin on October 1st

5    as a faculty member and I had a strong hunch that

6    there would be prohibitions against being on speakers

7    bureaus for pharma companies by the medical school or

8    the UW Medical Foundation.  And I will -- again, I'm

9    elaborating here.  I asked for clearance regarding

10   conflict of interest and permission because I have my

11   relationship with Ammon Labs and I had this open

12   relationship with this one pharma company and I had

13   the potential to be on speakers bureaus for other

14   companies.

15           Actually, Alkermes is listed here

16   somewhere.  I'd be happy to talk about Alkermes.  It's

17   not listed here because it never went anywhere, but

18   I'll be happy to talk about Alkermes which makes a

19   non-opioid blocker, a product called Vivitrol.

20           But that having been said, when I began at

21   the university I stopped doing all form of work.  I

22   told different pharma companies I'm on hold until I

23   get a legal opinion.  It took me months to get the

24   opinion that I thought I would get, which is, Can't do

```
1    it.  And on my disclosure slides and all of my

2    PowerPoints, if you were to ever subpoena all of my

3    PowerPoints, you would see that my disclosure listed

4    several pharmaceutical companies for a while until

5    the -- I got my legal opinion, I have taken that off

6    of my disclosure slide because I can't do it.

7             So -- so I never gave a speakers bureau

8    presentation for US WorldMeds, I never gave one for

9    Alkermes, I did give one for Bunavail, that was before

10   I worked at the university, and so that gave you some

11   information.

12        Q.   Okay.

13        MS. HIBBERT:  Counsel, we've been going for

14   about an hour now, can we take a comfort break?

15        MS. DICKINSON:  Sure.  Let's do five quick

16   minutes.

17        THE WITNESS:  Good timing.

18        THE VIDEOGRAPHER:  We are off the record at

19   2:26 p.m.

20             (WHEREUPON, a recess was had

21              from 2:26 to 2:35 p.m.)

22        THE VIDEOGRAPHER:  We are back on the record at

23   2:35 p.m.

24   BY MS. DICKINSON:
```

1          Q.    Dr. Miller, we are back on the record

2    after a short break.

3               We were just discussing the last

4    pharmaceutical company that you worked for that's on

5    your CV, US WorldMeds.

6               Do you recall that?

7          A.    Yes, ma'am.

8          Q.    Okay.  We had briefly started talking

9    about the first entry for US WorldMeds which was an

10   advisory group.

11              Is -- am I correct that in that advisory

12   group one of the things you were advising on was the

13   slide deck for later speakers bureaus for a drug for

14   US WorldMeds?

15         A.    Yes.

16         MS. HIBBERT:  Objection to form.

17         THE WITNESS:  Oh, sorry.

18   BY MS. DICKINSON:

19         Q.    Okay.  And what was the drug?

20         MS. HIBBERT:  Objection to form.

21   BY THE WITNESS:

22         A.    The tradename is L-u-c-e-m-y-r-a.

23   BY MS. DICKINSON:

24         Q.    And from your experience with

Highly Confidential - Subject to Further Confidentiality Review

1    pharmaceutical company speakers bureaus, I think you

2    testified, but I just want to make sure, that the way

3    that the speakers bureau systems works is that

4    speakers are handed a slide deck drafted by the

5    pharmaceutical company, is that true?

6         A.    That's the way I understand it to be.

7         Q.    In your experience, are speakers that are

8    paid speakers in a speakers bureau for pharmaceutical

9    companies allowed to make revisions to that slide

10   deck?

11        MS. HIBBERT:  Objection to form, calls for

12   speculation.

13   BY THE WITNESS:

14        A.    Speakers are instructed that they should

15   not go off script, but if they want to put in their

16   own slides, they have to identify them as their own

17   slides and not the company's slides.

18   BY MS. DICKINSON:

19        Q.    And the script, the original script comes

20   from whichever pharmaceutical company is sponsoring

21   the speakers, correct?

22        A.    Yes.

23        MS. HIBBERT:  Objection to form.

24   BY MS. DICKINSON:

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Okay.

 2       MS. HIBBERT:  Dr. Miller --

 3       THE WITNESS:  Sorry.

 4       MS. HIBBERT:  -- give me a pause, please.

 5       THE WITNESS:  Sorry.

 6  BY MS. DICKINSON:

 7       Q.    Which pharmaceutical companies have you

 8  served on the speakers bureau for, could you give me a

 9  list of those?

10       A.    BDSI and US WorldMeds.

11       Q.    You mentioned Ammon Labs.

12             Did you serve on the speakers bureau for

13  Ammon Labs?

14       A.    That's a different deal, but, in fact,

15  yes.  They -- they don't really have it well formed,

16  but I've given talks on their behalf and been

17  compensated for them.

18       Q.    Okay.  You mentioned an additional company

19  that makes Vivitrol, I believe.

20             What is the name of that company?

21       A.    A-l-k-e-r-m-e-s.

22       Q.    Have you ever served on the speakers

23  bureau for Alkermes?

24       A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Have you ever done any work for Alkermes?

2        A.    Yes.

3        Q.    What kind?

4        A.    I have been trained to be on the speakers

5   bureau twice.  Once I was compensated for that time

6   spent in training, then years later they revised the

7   deck and you have to do updates, and I did not get

8   compensated that time, but never did it get to the

9   point that I got an appointment date to go give a

10  talk.

11       Q.    Okay.  If I go through the list, BDSI,

12  US WorldMeds, and Ammon Labs, you have been

13  compensated as a paid speaker for those three

14  companies, is that correct?

15       MS. HIBBERT:  Objection to form.

16  BY THE WITNESS:

17       A.    That's not correct because I'm on the

18  speakers bureau for US WorldMeds but haven't taken any

19  engagements because I now work for an academic medical

20  center employer that does not allow such

21  relationships.

22  BY MS. DICKINSON:

23       Q.    Okay.  Fair.

24             I think my original question had been what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    companies have you been on the speakers bureau for,

 2    and you listed BDSI and US WorldMeds, is that correct?

 3         A.    And, again, to clarify my answers, I'm on

 4    the list but haven't actualized it.

 5         Q.    That was going to be my next question.

 6               Did you ever give paid speeches for either

 7    BDSI or US WorldMeds?

 8         A.    Only BDSI.

 9         Q.    Okay.  How many did you give for BDSI?

10         A.    I believe just one.

11         Q.    And do you know what you were compensated

12    for that?

13         A.    I am pretty sure it was between ████

      ██   ████████

15         Q.    Okay.  And then you mentioned you were

16    compensated for speeches from Am -- Ammon Labs, is

17    that correct?

18         A.    Correct.

19         Q.    How many speeches?

20         A.    I have given one.

21         Q.    Okay.  About what product?

22         A.    About their drug testing services.

23         Q.    Okay.  And then you testified that you had

24    been trained twice for another pharmaceutical company,
```

1    Alkermes, but that you haven't yet given a paid speech

2    for Alkermes, is that correct?

3         A.    Yes.  And to -- I need to retract --

4    revise my answer to the previous question.

5              I have not given any sort of promotional

6    speeches for Ammon about their drug testing services

7    per se.  I have given goodwill presentations at their

8    request to audiences they have selected about

9    addiction and using medications to treat addiction.

10   There could be a few slides in there about the fact

11   that you should be doing drug testing when you are

12   treating patients, but it really was general education

13   about addiction treatment to clinical audiences who

14   might potentially become customers of Ammon.  They

15   were not -- they were very, very indirectly

16   promotional for Ammon, for Ammon's drug testing

17   services which is what their business line is.

18        Q.    Have we talked about all of the

19   pharmaceutical companies for which you've given paid

20   speeches in the last few minutes?

21        MS. HIBBERT:  Objection to form.

22   BY THE WITNESS:

23        A.    I believe we have.

24   BY MS. DICKINSON:

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  And you mentioned that in

2   October you went back to your employment with the

3   University of Wisconsin, is that correct?

4        A.    Yes, ma'am.

5        Q.    And you testified that University of

6   Wisconsin had a prohibition on taking money from

7   pharmaceutical companies, is that correct?

8        MS. HIBBERT:  Objection to form.

9   BY THE WITNESS:

10       A.    Some would characterize it as that.

11   It's -- it's a -- it would have to be much more

12   specifically stated, but physicians cannot be on

13   speakers bureaus, I can tell you that as a very

14   specific.

15   BY MS. DICKINSON:

16       Q.    Okay.  What is the rule at University of

17   Wisconsin about taking any sort of compensation from

18   pharmaceutical companies?

19       MS. HIBBERT:  Objection to form.

20   BY THE WITNESS:

21       A.    I can only speak to it in general.

22   BY MS. DICKINSON:

23       Q.    Okay.  What is the general rule?

24       A.    If you are getting any money to support
```

1    your research, you have to disclose that big time.  So

2    that would be considered industry-supported research.

3    You cannot be on ad boards for pharmaceuticals and you

4    cannot be on speakers bureaus for pharmaceuticals.

5        Q.    Why is -- why is it that you cannot be on

6    ad boards or speakers bureaus while you are working at

7    the University of Wisconsin?

8        MS. HIBBERT:  Objection to form.

9    BY THE WITNESS:

10       A.    I think you should ask them.

11   BY MS. DICKINSON:

12       Q.    Do you know?

13       MS. HIBBERT:  Objection to form.

14   BY THE WITNESS:

15       A.    I don't know.  No, I don't know.  I --

16   I -- I -- I have -- I -- that's -- that's their deal.

17   BY MS. DICKINSON:

18       Q.    What is your understanding of why you

19   can't be on speakers boards or ad boards while you are

20   working for the University of Wisconsin?

21       MS. HIBBERT:  Objection to form.

22   BY THE WITNESS:

23       A.    The general sense is that physicians'

24   prescribing habits are influenced by corporate

Highly Confidential - Subject to Further Confidentiality Review

```
 1   relationships.

 2   BY MS. DICKINSON:

 3        Q.    Okay.  You mention on Page 3 of your

 4   report that -- and when I'm talking about your report,

 5   I'm talking about the report in Exhibit 2, if you want

 6   to turn there you certainly can.  I'm just going to

 7   ask you a question about Paragraph 7 of your report.

 8             Paragraph 7, I'm going to read just the

 9   second sentence of the Paragraph 7.

10             "I was the first" --

11        A.    Just one second.  Can I put this away?

12        Q.    Oh, I'm sorry.

13        A.    Can I put this away?

14        Q.    Of course you -- I wouldn't put it away,

15   to be honest.

16        A.    Well --

17        Q.    We are not quite done.  But -- but, yes,

18   you can pick up Exhibit 2.

19        A.    Yes, No. 7, yes, ma'am.

20        Q.    Okay.  Paragraph 7 in the sent -- the last

21   sentence states:

22             "I was the first physician in Madison,

23   Wisconsin to prescribe this medication and I am

24   considered a key opinion leader in medication-assisted
```

Highly Confidential – Subject to Further Confidentiality Review

```
1    treatment, MAT, of addiction by all leading

2    manufacturers of FDA-approved medications to treat

3    addiction involving opioid use."

4           Did I read that correctly?

5    A.    Yes, ma'am.

6    Q.    When -- when it was referring to this

7    medication, is that Buprenorphine?

8    A.    Yes, ma'am.

9    Q.    Okay.  So you can put the report aside.

10          When you were referring to working as a

11   key opinion leader for all of the major manufacturers

12   of Buprenorphine, what is a key opinion leader?

13   MS. HIBBERT:  Objection to form.

14   BY THE WITNESS:

15   A.    In my life I have read a definition,

16   because I think it exists.  My understanding of the

17   concept is that it is an experienced physician whose

18   opinions are valued by their colleagues.

19   BY MS. DICKINSON:

20   Q.    Okay.  Have you ever served as a paid key

21   opinion leader for any pharmaceutical company?

22   A.    Absolutely nothing beyond what we have

23   already discussed.

24   Q.    Okay.  You stated that you serve as a key
```

Highly Confidential – Subject to Further Confidentiality Review

1    opinion leader for the man -- for the manufacturers of

2    Buprenorphine.

3              Which manufacturers of Buprenorphine do

4    you serve as a key opinion leader for?

5       MS. HIBBERT:  Objection to form,

6    mischaracterizes the statement made in this report and

7    his deposition testimony.

8    BY MS. DICKINSON:

9       Q.    Doctor, let's just go back, if we have to,

10   to Paragraph 7.  It just says:

11             "I am considered a key opinion leader in

12   medication-assisted treatment of addiction by all

13   leading manufacturers of FDA-approved medications to

14   treat addiction involving opioid use."

15             Have I read that correctly?

16      A.    Yes, ma'am.

17      Q.    Okay.  What manufacturers of FDA-approved

18   medications to treat addiction involving opioid use

19   are you referring to there?

20      A.    Again, I -- I completely agree with the

21   objection by counsel.  That statement says my

22   understanding is that they have a consideration of me,

23   an opinion of me, but I don't have a relationship with

24   those companies and I'm not compensated to offer key

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opinions.  I'm considered to have an opinion that

 2    carries weights with my colleagues because of my

 3    experience and my leadership role in addiction

 4    professional organizations.  But when I -- when I say

 5    all the manufacturers of addiction -- FDA-approved

 6    medications, I'll have to give you the list of the

 7    medications and I'll do that.  And it's a -- it's a

 8    shortlist.

 9         Q.    Okay.

10         A.    Okay.

11               Injectable naltrexone.  The product is

12    Vivitrol and the manufacturer is Alkermes and we have

13    the spellings of that already.

14               Buprenorphine, the first medication was

15    trade named Suboxone.  It is no longer made.  The

16    original company was called Reckitt Benkiser,

17    R-e-c-k-i-t-t, second word B-e-n-k-i-s-e-r, a German

18    manufacturer.  Reckitt has got two T's, I think.  They

19    changed their name to Indivior, I-n-d-i-v-i-o-r.

20               The second product to market was Zubsolv,

21    it is capital S -- capital Z-u-b, capital S-o-l-v.

22    I'm not sure if they've kept the S capital since.  The

23    corporation is called Orexo, O-r-e-x-o.

24               The next product was the Bunavail product
```

```
 1     made by BDSI which we've talked about.

 2              The next product was the Probuphine

 3     injection made by Braeburn.

 4              The next product is Sublocade,

 5     S-u-b-l-o-c-a-d-e, made by Indivior.

 6              There was a branded product called Revia,

 7     R-e-v-i-a, that was oral naltrexone that's been off

 8     patent for years.  I don't remember who the

 9     manufacturer was.

10              Now oral naltrexone is only by a number of

11     generic houses.  So when I made my comment about being

12     considered a key opinion leader, because I was the

13     founding president of this state's chapter of ASAM and

14     had been on the board of directors of the Wisconsin

15     Society of Addiction Medicine since its founding over

16     25 years ago, and because I've been President of the

17     American Society of Addictive Medicine, people

18     consider that my opinion carries weight.  And so the

19     manufacturers know who the leaders of the professional

20     societies are and I meant nothing beyond that and I

21     definitely meant nothing fiduciary other than things

22     I've testified to otherwise.

23        Q.    Okay.  Are you aware that the

24     pharmaceutical company Actavis makes a Buprenorphine
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    product?

 2         A.    I am not aware of that and I also don't

 3    know if that indication is for addiction or for pain.

 4         Q.    I'm just asking if you are aware.

 5         A.    Yeah.

 6         Q.    Are you aware that the company Mylan makes

 7    a Buprenorphine product?

 8         A.    I'm not aware.

 9         Q.    Are you aware that the company Rhodes

10    makes a Buprenorphine product?

11         A.    It sounds like generic houses.  I have --

12    I have -- I have never heard the name Rhodes.

13         Q.    Okay.  Are you a -- you are not aware that

14    Rhodes is connected to Purdue Pharma in any way?

15         MS. HIBBERT:  Objection to form.

16    BY THE WITNESS:

17         A.    I'm definitely not aware.

18         MS. HADAGHIAN:  Purdue joins.

19    BY MS. DICKINSON:

20         Q.    Okay.  Are you aware of -- that the

21    company Mallinckrodt sells a Buprenorphine product?

22         A.    I am not so aware.

23         Q.    Are you aware that the company Teva sells

24    a Buprenorphine product?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I am not so aware.  I'm -- I'm aware that

 2   companies make Buprenorphine for pain and some of

 3   those companies that you listed make pain meds and

 4   they may even be companies that are defendants in this

 5   case, but pain is not my specialty, so I don't keep

 6   track of the products.

 7        Q.    Okay.

 8        A.    I don't remember who makes Bu -- Butrans

 9   even.  That's the best known.  I don't know who makes

10   it.

11        Q.    Okay.  If you would turn to Exhibit, let's

12   go to 3, your CV, if you would again.

13        A.    I'm ready.

14        Q.    Okay.  I'm going to try to go through some

15   of this in the quickest way possible.  I will promise

16   you I will not go through every entry.  I'm going to

17   try to just ask you some general questions about

18   groupings on your CV and maybe it can go a little

19   faster, I hope.

20              So at the very top of Page 1 of Exhibit 3,

21   you have a -- a grouping of entries that starts with

22   "Clinical Instructor at University of Wisconsin."

23              Do you see that?  It's probably the second

24   full paragraph.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. HIBBERT:  He is looking at Page 1 of your --

 2        MS. DICKINSON:  Page 1.

 3   BY THE WITNESS:

 4        A.   I'm going to say something which will

 5   disappoint my counsel.

 6   BY MS. DICKINSON:

 7        Q.   Okay.

 8        A.   On Page -- on Page 8 at the top of

 9   Hospital Affiliations --

10        Q.   Okay.

11        A.   -- I've testified to this whole story

12   about honorary medical staff.

13        Q.   Yes.

14        A.   Of Meriter.

15        Q.   Yes.

16        A.   This does not reflect that.  There is a --

17        Q.   Understood.

18        A.   There is a newer addition of that page.

19        Q.   Okay.

20        A.   Somewhere that somebody is going to want

21   to make an exhibit in this litigation.

22        Q.   Okay.

23        A.   I'll have to generate that for everybody

24   and get that to you.
```

Highly Confidential - Subject to Further Confidentiality Review

1            And so the most current version of my CV

2    is a version that -- that lists that change as of

3    June 1st which was three days ago.

4        Q.    Okay.

5        A.    So I just want -- I -- I just noticed that

6    and I wanted to be honest with you about that.

7        Q.    I appreciate it.  And if at any time when

8    we are going through your CV, it's -- it's not a

9    perfection test.  If you notice another time and there

10    is just an inaccuracy, just let me know.  Okay?

11        A.    Thank you, ma'am.  What page are you on,

12    please?

13        Q.    Page 1.

14        A.    Yes.

15        Q.    Right at the top, the first -- the

16    grouping of entries --

17        A.    Yes.

18        Q.    -- that starts with "Clinical Instructor"?

19        A.    Yes, ma'am.

20        Q.    Does that grouping of entries summarize

21    your current employment?

22        A.    Those four lines do, yes, ma'am.

23        Q.    Okay.  Can you tell me, please, can you --

24    actually, can you give me a breakdown if -- if

Highly Confidential - Subject to Further Confidentiality Review

1    100 percent of your time is spent between these four

2    what percent is spent on which employment?

3         A.    I'm happy to.

4               Line 1 --

5         MS. HIBBERT:  Objection to form.

6    BY THE WITNESS:

7         A.    Oh, I'm sorry.  Oh, my goodness.

8         Q.    You are good.  Go ahead.

9         A.    Not being a lawyer, I don't know what's

10   objectionable.

11        Q.    No, you're all right.

12        MS. HIBBERT:  You are not required to,

13   Dr. Miller.  You are required to give me a -- a beat

14   to put the objection on the record.

15        THE WITNESS:  I am and I apologize.

16   BY THE WITNESS:

17        A.    Line 1, 50 percent.

18   BY MS. DICKINSON:

19        Q.    Okay.

20        A.    Line 2, 1 percent.  Line 3, 30 percent.

21   Line 4, 6 percent.  And the remaining percentage is my

22   consultation business which is not really employment.

23   It is just what I do.  All of my consultation

24   activities would be beyond those hours.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Of your -- when you say your "consultation

2    activities," is that your litigation consulting?

3      A.    All.

4      Q.    Okay.  And what percentage of your work

5    time does your consultation activities take up?

6      A.    On my daily schedule it would be

7    12 percent max, but lately I've been working overtime.

8      Q.    In the last year, if by my math you were

9    up to about 60 percent of your work time, has

10   40 percent been spent on consulting activities?

11     MS. HIBBERT:  I'll object to your math.

12   BY MS. DICKINSON:

13     Q.    Okay.  Go ahead and answer.

14     A.    I will too.

15     Q.    All right.  So -- so what is the math, how

16   much of the last year have your activities been spent

17   on consulting?

18     A.    I would say in the whole year, and, again,

19   going over 40 hours a week, I would say that we are

20   20 percent consulting.

21     Q.    How -- how much money have you been paid

22   to date in this case?

23     A.    In this case?

24     Q.    Um-hum.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     I think I've received about $22,000.

 2        Q.     Do you have any outstanding invoices that

 3    are not included in that $22,000?

 4        A.     Yes.

 5        Q.     Do you know how much are in those

 6    outstanding invoices?

 7        A.     I would say about 21.

 8        Q.     So the rough total of services built --

 9    billed to date in this case is roughly $43,000?

10        A.     Yes, ma'am.

11        Q.     What was your annual income in 2018?

12        MS. HIBBERT:  Objection to form.

13    BY THE WITNESS:
```



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

██  ████████████████████████████

██      ██    ██████    ████████████████

██  ████████████████████████████████████

██  ████████████████████████████████████

██      ██    ████████

6        MS. HIBBERT:  Objection to form.

7        THE WITNESS:  Sorry.

8    BY MS. DICKINSON:

9        Q.    Correct?

10       A.    Yes, ma'am.

11       Q.    Okay.  When did you stop working for

12   Rogers?

13       A.    June.

14       Q.    I'm sorry.  June of 2018?

15       A.    Yes, ma'am.

16       Q.    And did you resign or were you terminated?

17       A.    I resigned.

18       Q.    Why did you resign in June of 2018 from

19   Rogers?

20       A.    Multiple factors, but one of them is what

21   we talked about many hours ago, the path toward

22   retirement.  And, quite honestly, leaving what I've

23   referred to as a job for life at Meriter through 2010,

24   leaving there to go to Rogers was part of the idea of

Highly Confidential - Subject to Further Confidentiality Review

1   disengagement from something that I was intensely

2   workaholicly engaged in.  And so I've been disengaging

3   from professional role gradually since 2010.  And part

4   of leaving full-time employment to do part-time things

5   and build the consulting practice for the retirement

6   years was getting out of those obligations.  And so I

7   left.

8       Q.   Has it been hard to disengage?  It sounds

9   like it.

10      MS. HIBBERT:  Objection to form.

11  BY THE WITNESS:

12      A.   It -- it's been okay.

13  BY MS. DICKINSON:

14      Q.   Okay.  Fair.

15           Let's look at the same page, Page 1.  You

16  have a section called "National Activities."

17           Do you see that?

18      A.   Yes.

19      Q.   Can you briefly tell me what you were

20  doing in the first one of those listed activities on

21  the Council on Science and Public Health, American

22  Medical Association?

23      A.   Yes.

24      Q.   Okay.  What, briefly, were you doing or

Highly Confidential - Subject to Further Confidentiality Review

1    are you doing there?

2         A.     Still doing it.

3         Q.     Good.

4         A.     I become chair of the council in a week.

5         Q.     What are -- what generally are your duties

6    as chair of the council?

7         A.     The council assists the AMA house of

8    delegates in developing the official policies of the

9    AMA, specifically those policies related to science

10   and public health.

11        Q.     Okay.  I'm sorry.

12               You also list below it a:  "Chair

13   Professional Technical Advisory Committee Hospital

14   Accreditation Program, the Joint Commission, formerly

15   JACO, in 1998."

16               Do you see that?

17        A.     Yes, ma'am.

18        Q.     What was that position?

19        A.     That was a position where I was appointed

20   to the PTAC to a seat that was jointly held or granted

21   to three organizations:  The National Association of

22   Addiction Treatment Providers (NAATP), the National

23   Association of Alcohol and Drug Abuse Counselors

24   (NAADAC), and the American Society of Addiction

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Medicine (ASAM).  So of the 40-something seats on the

 2    Hospital Accreditation Program Advisory Committee, one

 3    seat was jointly held by these three organizations.

 4    And the other organizations would generally turn to

 5    the physician organization, ASAM, and say, give us a

 6    nominee.

 7            I was asked by the leadership of ASAM to

 8    serve on the Professional Technical Advisory

 9    Committee, which I did from '94 to '98.  And the

10    members of that advisory committee, all volunteers,

11    selected a chair to preside over the meetings.  And so

12    my peers there picked me to be the chair.

13        Q.    Okay.  When you served on that technical

14    advisory committee, who else was serving on that

15    committee?

16        A.    Representatives from professional

17    societies, from hospitals.  So it was physicians,

18    nurses, psychologists, hospital administrators, people

19    who were stakeholders in the process of accrediting

20    hospitals.

21        Q.    And what did the committee do?

22        A.    We provided professional technical advice.

23        Q.    What does that mean?

24        A.    Well, that means the accreditation
```

Highly Confidential - Subject to Further Confidentiality Review

1    programs, and at that time I think the Joint

2    Commission had five or six, one for nursing homes, one

3    for hospitals, one for outpatient clinics, one for

4    health plans, for instance.

5             So these accreditation programs go to

6    organizations and survey them to determine if they

7    meet quality standards.  So the Joint Commission is

8    the best known entity to conduct surveys of hospitals

9    to determine that they are providing quality care

10   according to a million little dimensions that are

11   codified in the standards manual.  So the Joint

12   Commission develops standards and then it develops

13   survey procedures, then it executes surveys, and then

14   it reports results.

15            Our committee was to provide advice to the

16   Joint Commission on its standards primarily, its

17   survey procedures to some extent, its reporting

18   mechanisms.  I think back around that era, public

19   reporting of outcomes was just coming into the fore,

20   and so being stakeholders, again, hospital

21   administrators, members of hospital medical staffs,

22   nurses, pharmacists, professional societies, it is a

23   very diverse, very nice, very esteemed group, very

24   exciting, we would get together and we would be

Highly Confidential - Subject to Further Confidentiality Review

 1    presented an agenda to react to, and back then the

 2    PTACs met either four to six times a year.  I think

 3    they met less and less during the time and they've

 4    become less and less influential since 1998, but the

 5    PTACs were a big deal back in the '90s.

 6         Q.    Your experience as the chair of the -- can

 7    we call it the PTAC committee, is that fair?

 8         A.    The PTAC, yes.

 9         Q.    Okay.  Was Joint Commission hospital

10    accreditation important to the hospitals?

11         A.    Oh, yes.

12         Q.    Why?

13         A.    It has to do with stature and prestige.

14    You don't want to be unaccredited.  So it's like a

15    Good Housekeeping seal or a Consumer Reports seal.

16    That's extremely important.  But there was a bottom

17    line consideration as well, and that is something that

18    I will call "deemed status."  And this was set up by

19    the Federal Government.

20              The Centers for Medicare and Medicaid

21    Services are the branch of the Federal Department of

22    Health & Human Services that oversees the Medicare and

23    Medicaid program and how they pay inpatient,

24    outpatient, nursing home, healthcare providers for

Highly Confidential - Subject to Further Confidentiality Review

1     healthcare services, okay.

2            To be a hospital that receives Medicare

3     payments, you have to be surveyed by CMS.  The CMS

4     gave deemed status to the Joint Commission years ago,

5     and by that they mean if you have been surveyed by the

6     Joint Commission, you are deemed to be surveyed by

7     CMS.  And so the Joint Commission surveys serve in

8     lieu of a government survey to determine if you are

9     eligible to receive Medicare services.  Therefore, if

10    you lose Joint Commission accreditation, you lose your

11    ability to get paid by Medicare and Medicaid.  You

12    might imagine the impact that would have on a

13    hospital.

14        Q.   It's a huge financial impact, correct?

15        MS. HIBBERT:  Objection to form.

16    BY THE WITNESS:

17        A.   Exactly, that's the point I was trying to

18    make.

19    BY MS. DICKINSON:

20        Q.   You made -- you actually made it very

21    clear, in an area that is really complicated.  I

22    appreciate it.  I used to defend hospitals years ago

23    and I'm not sure I ever heard someone put it that

24    succinctly.

Highly Confidential - Subject to Further Confidentiality Review

1          So, what relationship did this Joint

2    Commission standards have to Joint Commission

3    accreditation?

4        MS. HIBBERT:  Objection to the previous colloquy

5    before the question.

6          Go ahead.

7    BY THE WITNESS:

8        A.    The -- the surveyors go into facilities

9    and survey regarding to what extent on probably a

10   five-point grade, one, two, three, four, five, to what

11   extent are the structures and processes of the

12   provider organization adhering to the standards.  So

13   that's the -- that's the checklist they use is the

14   standards manual.  So what's in the manual matters.

15   BY MS. DICKINSON:

16       Q.    So essentially what's in the manual also

17   matters to the hospital's bottom line, is that fair?

18       MS. HIBBERT:  Objection to form.

19   BY THE WITNESS:

20       A.    There is a circuitous dotted line, but,

21   yes, Point A does go to Point Z at some point.

22   BY MS. DICKINSON:

23       Q.    The survey that you talked about that does

24   matter to the bottom line is based essentially on a

1    checklist of are they meeting the standards, is that

2    fair?

3        MS. HIBBERT:  Objection to form.  Also object to

4    this line of questioning, getting pretty far afield

5    from the scope of the opinions that Dr. Miller has

6    offered in this case and supposedly the purpose of

7    this deposition.

8            You can answer, Dr. Miller, if you can.

9    BY MS. DICKINSON:

10       Q.    You can answer.  Go ahead.

11       A.    Your general characterization is accurate.

12       Q.    Okay.

13            Can we refer to the JACO standards manual

14   as the JACO standards?  Do you understand what I'm

15   talking about when I say that?

16       MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18       A.    I can give you a technical term.

19   MS. DICKINSON:

20       Q.    Okay.  That would be great.

21       A.    The CAMH.

22       Q.    What does CAMH stand for?

23       A.    The Comprehensive Accreditation Manual for

24   Hospitals.  Again, each of the Joint Commission

1    accreditation programs has its own manual.  There is a

2    Comprehensive Accreditation Manual for Behavioral

3    Healthcare, the CAMH is the Comprehensive

4    Accreditation Manual for Hospitals.

5        Q.    Okay.  Are you familiar with the

6    University of Wisconsin Pain and Policy Study Group?

7        A.    I am.

8        MS. HIBBERT:  Objection to form.

9    BY MS. DICKINSON:

10       Q.    Okay.

11       THE WITNESS:  Sorry.

12       MS. HIBBERT:  If you give me a pause, please,

13   Dr. Miller.

14   BY MS. DICKINSON:

15       Q.    Who is that group?

16       A.    I don't --

17       MS. HIBBERT:  Objection to form.

18           Also, again, Dr. Miller is not being

19   offered as a fact witness in this case.  He has not

20   been noticed as a fact witness.  This is supposed to

21   be an expert deposition pertaining to the opinions

22   that Dr. Miller has offered in this case and outlined

23   in his report marked as Exhibit No. 2.  I'll allow

24   this line to continue for a little bit longer, but,

Highly Confidential - Subject to Further Confidentiality Review

1    again, I caution I think we are getting a little far

2    afield from the expert deposition that's supposed to

3    be taking place today.

4        MS. DICKINSON:  Counsel, this is absolutely in

5    the scope of questions that can be asked about his

6    background, his experience in the field, and -- and

7    you can instruct him not to answer if you want to, but

8    we are going to call Special Master Cohen if you do

9    because that's just a completely inappropriate

10   objection.

11   BY MS. DICKINSON:

12       Q.    So, Doctor, I'll just start again.

13             What -- what is the UW Pain and Policy

14   Group?

15       MS. HIBBERT:  Objection to form, lack of

16   foundation.

17   BY THE WITNESS:

18       A.    I don't know that it exists today.

19   BY MS. DICKINSON:

20       Q.    Okay.  What was it?

21       A.    When I was aware of it, it was a group

22   that tried to advise various entities or stakeholders

23   on what policies they should have about the use of

24   opioids in the management of pain.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How long have you been familiar with that

2  group?

3         MS. HIBBERT:  Objection to form.

4  BY THE WITNESS:

5    A.    I believe the early '90s.

6  BY MS. DICKINSON:

7    Q.    Okay.  Generally were -- did that group

8  have a previous name?  I think I read somewhere it was

9  the Comprehensive Cancer Center or something like

10  that?

11         MS. HIBBERT:  Objection to form.

12  BY THE WITNESS:

13    A.    Again, this is all sorts of facts that I'm

14  trying to help you with with your questions, but the

15  Carbone Comprehensive Cancer Center is largely a

16  clinical and research entity.  It is not a policy

17  entity.

18  BY MS. DICKINSON:

19    Q.    And who -- are you familiar with the

20  Carbone Cancer Center -- Comprehensive Cancer Center?

21    A.    I am.

22    Q.    Okay.  And what is that?

23    A.    It's the division of university hospital

24  and the medical school that houses clinical and

Highly Confidential - Subject to Further Confidentiality Review

```
 1   research oncologists and medical scientists that do

 2   cancer research.

 3        Q.   Do you know if the Carbone Comprehensive

 4   Cantor -- Cancer Center physicians had a role in

 5   advocating for the use of opioids?

 6        MS. HIBBERT:  Objection to form, calls for

 7   speculation.

 8   BY THE WITNESS:

 9        A.   Yeah, this is way outside of -- I did not

10   form an opinion about that.  I don't have anything

11   formal to say about that.  My -- my -- my --

12   BY MS. DICKINSON:

13        Q.   Do you know is what I'm asking?

14        MS. HIBBERT:  Objection to form.

15   BY THE WITNESS:

16        A.   Can -- let me reread the question here.

17             "Do you know if Carbone Comprehensive

18   Cancer Center physicians had a role in advocating for

19   the use of opioids?"

20             Interesting question.  I don't know if

21   they did.

22   BY MS. DICKINSON:

23        Q.   Okay.  Do you know any of the doctors

24   in -- that were a part of the UW Pain and Policy
```

Highly Confidential - Subject to Further Confidentiality Review

1   Group?

2       MS. HIBBERT:  Objection to form.

3   BY THE WITNESS:

4       A.   Yes.

5   BY MS. DICKINSON:

6       Q.   Okay.  Which doctors?

7       A.   I don't know of any physicians, but you

8   said doctors.

9       Q.   Right, Ph.D.s would be included in my

10  question.

11      A.   Exactly.

12           And David Joranson was a principal,

13  J-o-r-a-n-s-o-n, Ph.D., and either a part of or a

14  regular consultant to the WPP -- what are they called,

15  Wisconsin Pain & Policy Project, is that what they're

16  called, WPPP?

17      Q.   Typically it's referred to as the UW PPSG,

18  I think.

19           Does that sound right?

20      A.   Whatever.

21      Q.   Okay.  We know what we are talking about,

22  correct?

23      A.   Yes.

24      MS. HIBBERT:  Objection.

```
 1   BY MS. DICKINSON:

 2        Q.    Okay.

 3        A.    But June Dahl.

 4        Q.    Okay.

 5        A.    D-a-h-l, Ph.D.

 6        Q.    How long have you known Dr. Joranson?

 7        MS. HIBBERT:  Objection to form.

 8   BY THE WITNESS:

 9        A.    Over 25 years.

10   BY MS. DICKINSON:

11        Q.    How did you first know Dr. Joranson?

12        A.    I either attended a presentation he gave

13   or we were on a panel together presenting together to

14   some sort of conference.

15        Q.    Have you worked on -- have you worked with

16   Dr. Joranson over the years?

17        MS. HIBBERT:  Objection to form.

18   BY THE WITNESS:

19        A.    Again, listening to your question, I would

20   not say I have worked with him which implies

21   collaboration.  I have not.

22   BY MS. DICKINSON:

23        Q.    Okay.  That's a fair distinction.

24              You have not collaborated with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Dr. Joranson on professional projects, is that fair?

 2         A.    I'm having a hard time answering your

 3    question, ma'am, because it was so many years ago and

 4    would one characterize it as collaboration to be

 5    working as an addiction medicine physician with a

 6    professional society on a topic that they were also

 7    working with.  So I didn't work with him, but did we

 8    ever work in parallel and, you know, on -- on the same

 9    general theme.  Well, certainly I've -- I've already

10    implied that we have sat on panels together where a

11    topic was discussed and the topic would be the use of

12    pain meds.

13         Q.    And when you say the use of pain meds, do

14    you mean the opioid pain meds?

15         A.    Yes, ma'am.

16         Q.    Okay.  How many times do you think you

17    interacted with Dr. Joranson on panels and those types

18    of things with respect to opioids over the 25 years?

19         MS. HIBBERT:  Object to form.

20    BY THE WITNESS:

21         A.    My best guess would be three to six.

22    BY MS. DICKINSON:

23         Q.    And when you say three to six, three to

24    six times?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Three to six times --

 2      Q.    Okay.

 3      A.    -- in 25 years, yes, ma'am.

 4      Q.    Okay.  How long have you known June Dahl?

 5      A.    Again, about 25 years, maybe a little

 6  bit -- I -- I knew June before I knew David by a few

 7  years.

 8      Q.    Okay.  And what was June Dahl's specialty?

 9      MS. HIBBERT:  Objection to form.

10  BY THE WITNESS:

11      A.    I should know the answer.  I'm pretty

12  certain she is a pharmacologist and not a pharmacist,

13  but she teaches in the school of pharmacy.  I don't

14  think she is a pharmacist.  I think she is a

15  pharmacologist.

16  BY MS. DICKINSON:

17      Q.    And teaches in the school of pharmacy you

18  meant at UW?

19      A.    University of Wisconsin, Rennebohm School

20  of Pharmacy.

21      Q.    How did you come to know Dr. Dahl?

22      A.    Again, she has been faculty, but mostly it

23  would be we were on faculty together in a particular

24  course.  We've taught together a number of times.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  What course have you taught with

2  June Dahl?

3      A.     Well, most recently the board review

4  course for pain medicine sponsored by UW, and that's

5  in my CV.  I did it four or five years in a row.

6      Q.     Okay.  Have you taught other courses with

7  June Dahl?

8      A.     My general recollection is yes.  Specifics

9  I don't have.  I would certainly think that we invited

10  her to speak at Wisconsin Society of Addiction

11  Medicine educational conferences where I was also on

12  the faculty, but maybe that didn't happen, but I think

13  it did.

14      Q.     Okay.  On the courses that you taught with

15  June Dahl at UW, was there a syllabus?

16      A.     Yes.

17      Q.     Do you still have copies of those written

18  syllabus?

19      A.     I actually have thumb drives with three

20  different years' worth of syllabi.

21      Q.     And which years do you think you have?

22      A.     '18, '17 and '16 of this century.

23      Q.     Prior to these last five years where you

24  taught the course with June Dahl at UW, did you teach

1    other courses with her ever at UW?

2         A.    You know, I don't even know if it's in my

3    CV, but it might be.  Over the years I have been asked

4    to present to classes in the law school, in the social

5    works school, in the pharmacy school, maybe even the

6    physical therapy school, maybe even the vet school,

7    I -- you know, but people just call up and say, We've

8    heard you are a good speaker or we need an expert.

9    And so I've probably taught in one of June's courses

10   where I'd come in for one session and teach a session.

11        Q.    Okay.  We talked about your work on the

12   PTAC for the Joint Commission back in 1998.

13            Did you ever come into contact with either

14   Dr. Dahl or Dr. Joranson during your time working on

15   that committee?

16        A.    Yes.

17        Q.    Okay.  When?

18        A.    My last year.

19        Q.    Okay.  And then is -- was that 1998?

20        A.    I believe so.

21        Q.    Okay.  What was the substance of that

22   contact?

23        A.    A presentation was made to the PTAC about

24   the idea of a new standard to put in -- in the manual.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Okay.  And when you say "the manual," we

2  are talking about this CAMH?

3     A.    CAMH, yes, ma'am.

4     Q.    Okay.  And was -- that presentation was

5  made by Dr. Dahl and Dr. Joranson?

6     MS. HIBBERT:  Object to form.

7  BY THE WITNESS:

8     A.    No.

9  BY MS. DICKINSON:

10     Q.    Okay.  I'm sorry.  Who made that

11  presentation?

12     A.    Dr. Joran- -- Dr. Dahl and another person

13  whose name I don't recall.

14     Q.    Was that other person someone at the UW

15  pain and policy group?

16     MS. HIBBERT:  Objection to form.

17  BY THE WITNESS:

18     A.    To the best of my recollection, it was

19  not.

20  BY MS. DICKINSON:

21     Q.    Okay.  Was that other person someone from

22  the University of Wisconsin?

23     A.    To the best of my knowledge, it was not.

24     Q.    Okay.  Do you know what entity that other

Highly Confidential - Subject to Further Confidentiality Review

```
 1   person was affiliated with?

 2        MS. HIBBERT:  Objection to form.

 3   BY THE WITNESS:

 4        A.   No.

 5   BY MS. DICKINSON:

 6        Q.   Were there more than just Dr. Dahl and

 7   this other person that you don't recall making that

 8   presentation to the PTAC regarding the CM -- CAMH

 9   standards?

10        A.   Yes.

11        Q.   Okay.  Who else was making the

12   presentation?

13        A.   The Joint Commission staff.

14        Q.   Okay.  Which Joint Commission staff?

15        A.   I have no idea what their name was.  I

16   don't remember if they worked for what was called

17   the -- the SSP, the Standards and Survey Processes

18   committee, which was one level up, if I can digress

19   for a second --

20        Q.   Yes.

21        A.   -- the Joint Commission has a Board of

22   Commissioners which is like the board of directors.

23   The SSP reports to them and oversees standards and

24   survey procedures across all of the accreditation
```

1    programs for the Joint Commission.  And then each of

2    the accreditation programs, as I mentioned, ambulatory

3    care, behavioral care, hospitals, long-term care, each

4    of those had a PTAC.

5            So the SSP was in between the PTACs and

6    the -- and the Board of Commissioners.  So to get a

7    new standard, staff has to conceptualize it, you have

8    to present it to the PTAC and the PTAC has to approve

9    it.  It goes to the SSP, this is the way it was then,

10   the SSP has to review it and approve it.  If they

11   approve it, it goes to the Board of Commissioners and

12   the Board of Commissioners has to approve it and it

13   gets put in the book.  That was the process.

14           And I don't remember if it was formally

15   somebody that worked for SSP or of it was just a staff

16   member, pardon the phrase, in the bowels of the Joint

17   Commission, who came, but it was a proposal of a new

18   standard.

19       Q.    Okay.  And what was the content of the

20   proposal of the new standard that Dr. Dahl and the

21   others were --

22       MS. HIBBERT:  Objection.

23   BY MS. DICKINSON:

24       Q.    -- presenting on?

```
 1      MS. HIBBERT:  Sorry.  Same objection.

 2  BY MS. DICKINSON:

 3      Q.    Go ahead.

 4      A.    The proposal was that there be a standard

 5  in the manual that would address how the accredited

 6  organization addresses pain complaints.

 7      Q.    And what were they proposing the

 8  accredited organization would do to address pain

 9  complaints?

10      MS. HIBBERT:  Objection to form.

11  BY THE WITNESS:

12      A.    To shorten our dialogue, they were

13  proposing what became known as the Joint Commission

14  pain standard.

15  BY MS. DICKINSON:

16      Q.    Okay.  The Joint Commission pain standard,

17  what was the general substance of the content of that?

18      MS. HIBBERT:  Objection to form.

19  BY THE WITNESS:

20      A.    Again, I don't have any opinions about

21  this.  I have facts because I was there at the time.

22  BY MS. DICKINSON:

23      Q.    Okay.

24      A.    The Joint Commission pain standard says
```

1    that an accredited organization will be able to

2    demonstrate to the surveyors that it assesses patients

3    regularly regarding the status of any pain that they

4    may have.

5        Q.    Did that standard that they were adav --

6    advocating for require that every patient who came

7    into the hospital be assessed for pain?

8            Is that a short way of saying it?

9        MS. HIBBERT:  Objection to form.

10   BY THE WITNESS:

11       A.    That's fair.

12   BY MS. DICKINSON:

13       Q.    Okay.  Is this -- was the standards

14   summarizing what has been often called as the pain is

15   the vi -- fifth vital sign concept?

16       MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18       A.    I will answer your question by saying that

19   that is an extraordinarily commonplace and inaccurate

20   conflation of two different concepts.

21   BY MS. DICKINSON:

22       Q.    Okay.  I -- I want to stick with what the

23   actual standard they were advocating for was.

24       A.    That's good.

1    Q.    And so the standard, you said, I think,

2    and I just want to be clear, the standard that they --

3    Dahl and the others were advocating for was that each

4    patient that came into the hospital setting would be

5    assessed for pain.

6          Is that accurate?

7    A.    Yes.

8    Q.    Okay.

9    A.    To be -- to be clear, the fifth vital sign

10   language was never used by the Joint at that time.

11   Other people at the same time were developing the

12   concept of fifth vital sign.  That was not the Joint

13   Commission.

14   Q.    Okay.  Do you know who else was developing

15   that concept, the fifth vital sign?

16   MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18   A.    It came from some people, some clinicians,

19   some whatevers, some in California, and some in the

20   VA, both -- both California through some bureaucratic

21   arm of the state government and maybe the health

22   department, whatever.  Somebody in California adopted

23   that term and some -- and the VA hospital system

24   developed that term, but they were never Joint

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Commission terms.

 2   BY MS. DICKINSON:

 3        Q.    Okay.  Is pain a vital sign?

 4        A.    No.

 5        MS. HIBBERT:  Objection to form.

 6   BY MS. DICKINSON:

 7        Q.    Do you --

 8        MS. HIBBERT:  Please.

 9   BY MS. DICKINSON:

10        Q.    -- the standard that we talked about with

11   respect to Dr. -- that Dr. Dahl was advocating for,

12   okay, so the Joint -- Joint Commission pain standard

13   change that she was advocating for, did you agree with

14   the change that she and others were advocating for?

15        MS. HIBBERT:  Objection to form.

16             Again, this is far afield from the expert

17   opinions that Dr. Miller has offered in this case.

18   Are you asking his personal opinion in this question,

19   because he is clearly not offering an expert opinion

20   about anything that you have been asking about pretty

21   much this entire deposition since we haven't talked

22   about his substantive opinions once.

23        MS. DICKINSON:  I am entitled to ask him about

24   his background.  This is his background.
```

Highly Confidential - Subject to Further Confidentiality Review

1      MS. HIBBERT:  This is not background.

2  BY MS. DICKINSON:

3      Q.    Doctor, please answer the question.

4      MS. HIBBERT:  This is a -- this is a opinion

5  about a -- this is a question about an opinion that he

6  has not offered in this case.

7  MS. DICKINSON:

8      Q.    Doctor, please answer the question.

9      A.    May I?

10     Q.    Did you agree with the -- with the change

11  in the standard that Dr. Dahl and others were

12  proposing?

13     MS. HIBBERT:  Objection for the same reasons I

14  just stated.

15  BY MS. DICKINSON:

16     Q.    Go ahead, Doctor.

17     THE WITNESS:  May I proceed with the objection

18  on -- on the table?

19     MS. HIBBERT:  You can proceed if you can answer

20  the question.

21  BY THE WITNESS:

22     A.    I can answer the question.

23  BY MS. DICKINSON:

24     Q.    I thought so.  Go ahead.

```
 1        MS. HIBBERT:  Same objection.

 2   BY THE WITNESS:

 3        A.    The PTAC advised that the standard not be

 4   adopted.

 5   BY MS. DICKINSON:

 6        Q.    And did you agree with the PTAC committee

 7   that the standard should not be adopted?

 8        MS. HIBBERT:  Objection to form.

 9   BY MS. DICKINSON:

10        Q.    Go ahead.

11        A.    I did.

12        Q.    When you were on the PTAC committee, did

13   the standard get adopted?

14        A.    It did not.

15        Q.    Okay.  Do you know if after you left the

16   committee that standard was adopted?

17        A.    It was.

18        Q.    Okay.  When?

19        A.    The following year.

20        Q.    Do you know if Dr. Dahl had renewed her

21   request to the committee the following year when it

22   was adopted?

23        MS. HIBBERT:  Objection to form, calls for

24   speculation.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    It -- it does call for speculation.  I --

 3   I -- I believe that it was the exact same process

 4   presented to a differently composed PTAC, possibly

 5   with more forceful arguments, but I believe the

 6   process of presenting it was staff with these

 7   excise -- ex -- external people with them and it was

 8   adopted.

 9   BY MS. DICKINSON:

10       Q.    Okay.  And was one of the external people

11   to your understanding when the process happened the

12   next year Dr. Dahl?

13       MS. HIBBERT:  Objection to form.

14   BY THE WITNESS:

15       A.    You asked me only to my understanding, and

16   I would say to my understanding, but I could be wrong.

17   BY MS. DICKINSON:

18       Q.    Is it -- to your understanding is the

19   answer yes?

20       MS. HIBBERT:  Objection to form, asked and

21   answered.  He told you what he knew.  He said he

22   doesn't know is his understanding.

23   BY THE WITNESS:

24       A.    Yeah, I -- I don't --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MS. DICKINSON:

 2       Q.    I'm ask -- wait, wait, wait.  Let's stop.

 3       MS. HIBBERT:  You are putting words in his mouth

 4   and we are not going to continue doing this.  This

 5   is --

 6       MS. DICKINSON:  I am not putting words in his

 7   mouth.

 8       MS. HIBBERT:  Yes, you are.  You absolutely are.

 9       MS. DICKINSON:  I asked for his understanding

10   and he is going to give the answer.  Counsel, you are

11   breaking up the deposition --

12       MS. HIBBERT:  He has given the answer.

13       MS. DICKINSON:  -- to the point where the -- I

14   can't understand the witness's questions because you

15   are talking over him.

16       MS. HIBBERT:  He has not asked any questions.

17   He was giving a --

18       MS. DICKINSON:  Can you please be respectful and

19   wait --

20       MS. HIBBERT:  -- responsive answer.

21       MS. DICKINSON:  -- until he has finished his

22   answer.

23       MS. HIBBERT:  I will not.

24       MS. DICKINSON:  And there is another question on
```

Highly Confidential - Subject to Further Confidentiality Review

1    the table.

2        MS. HIBBERT:  I can object.  I can put an

3    objection on the record in between your question and

4    the answer.  I don't even know what you are talking

5    about.

6        MS. DICKINSON:  I will give you a running

7    objection to this entire line of questions if you

8    would stop breaking up the witness's testimony by

9    talking over him.

10       MS. HIBBERT:  No.

11       MS. DICKINSON:  Would you like a running

12   objection?

13       MS. HIBBERT:  Please ask a question.

14   BY MS. DICKINSON:

15       Q.    Okay.  I'm sorry, Doctor.  Can we start

16   again.

17           I asked if your understanding was the year

18   that it passed, the year after you rotated off the

19   PTAC committee, if Dr. Dahl had participated in again

20   advocating for the change?

21       MS. HIBBERT:  Objection; form.  He has already

22   answered that question.

23   BY MS. DICKINSON:

24       Q.    Go ahead, Doctor.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah.  I am not certain that she was

 2   there, but I think she was there.

 3        Q.    Okay.  And when the new standards passed

 4   requiring hospitals to assess pain in each patient,

 5   did hospitals around the country have to follow them?

 6        MS. HIBBERT:  Objection to form, calls for

 7   speculation, lack of foundation.

 8   BY THE WITNESS:

 9        A.    No hospital has to follow any standard.

10   BY MS. DICKINSON:

11        Q.    Fair enough.

12              If hospitals did not follow the Joint

13   Commission standards, they would essentially -- they

14   may lose their accreditation, is that correct?

15        MS. HIBBERT:  Objection to form.

16   BY THE WITNESS:

17        A.    It takes a lot to lose accreditation.

18   BY MS. DICKINSON:

19        Q.    Okay.  We talked earlier, generally

20   hospitals endeavor to follow the standards, don't

21   they?

22        MS. HIBBERT:  Objection to form, calls for

23   speculation, lack of foundation.

24   BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Is your question do hospitals in general

2   endeavor to adhere to Joint Commission standards?

3   BY MS. DICKINSON:

4        Q.    Yes.

5        A.    In general --

6        MS. HIBBERT:  Objection.  Same objections.

7   BY THE WITNESS:

8        A.    In general, hospitals do.

9   BY MS. DICKINSON:

10       Q.    In general was this new standard in your

11  view a good or a bad thing?

12       MS. HIBBERT:  Objection to form, outside the

13  scope of this witness' opinions.  This witness is not

14  being offered as a fact witness.

15  BY THE WITNESS:

16       A.    Yeah, I really feel like this is far

17  afield from what I've been asked to present as an

18  expert.  I don't have any opinions here about pain, I

19  don't have any opinions about pain treatment, about

20  evaluation of pain, about hospital accreditation.

21  Those are not opinions I was asked to formulate, nor

22  have I researched them.  You know --

23  BY MS. DICKINSON:

24       Q.    Doctor, this is a part of your background.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       MS. HIBBERT:  Let him finish.  You are

 2   interrupting his answer now.

 3           Doctor, are you finished?

 4   BY THE WITNESS:

 5       A.   No, no -- - my -- I -- I am never, ever

 6   supposed to be debate you, but I -- I disagree with

 7   your characterization that asking me my opinion about

 8   whether a given Joint Commission standard was well

 9   crafted or not is my background.

10   BY MS. DICKINSON:

11       Q.   Well, you served on the PTAC for the Joint

12   Commission, did you not?

13       A.   Oh, I did.

14       Q.   Okay.  So I'm going to ask my question

15   again.

16           Did you believe in your opinion that this

17   standard change was a good thing or a bad thing?

18       MS. HIBBERT:  Same objections, asked and

19   answered.

20   BY THE WITNESS:

21       A.   I -- I honestly don't understand the

22   ramifications of my answering or not answering.  I

23   don't know if I'm compelled to answer.  I'm just

24   trying to understand the process, because, really, you
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    are asking me about a lot of stuff that is not part of

2    what I thought I was brought here to do under oath,

3    honestly.

4    BY MS. DICKINSON:

5        Q.    Doctor -- doctor, I'm not trying to trick

6    you.  If you have no opinion, that's fine.  But if you

7    do have a pin -- an opinion, you are under oath.

8            Do you have an opinion whether the new

9    standard was a good or a bad thing?

10       A.    I do not --

11       MS. HIBBERT:  Objection to form.

12   BY THE WITNESS:

13       A.    Right, right, I don't have an opinion.

14   BY MS. DICKINSON:

15       Q.    You don't have an opinion.

16           Have you ever stated an opinion in public

17   about --

18       MS. HIBBERT:  Objection.

19   BY MS. DICKINSON:

20       Q.    -- whether the standard was a good or a

21   bad thing?

22       MS. HIBBERT:  Objection to form.

23   BY THE WITNESS:

24       A.    My understanding is that stating an
```

1    opinion in public and stating an opinion in deposition

2    as an expert are very different things.

3    BY MS. DICKINSON:

4        Q.    Doctor, I am not trying to argue with you.

5    I'm just asking if you hold an opinion.  You told me a

6    minute ago you do not have an opinion.  I was asking

7    if you ever have stated such an opinion in public.

8        MS. HIBBERT:  Objection --

9    BY MS. DICKINSON:

10       Q.    Have you?

11       MS. HIBBERT:  Objection to form, asked and

12   answered.

13   BY THE WITNESS:

14       A.    I don't think I've answered the question

15   of have I stated a general viewpoint in public about

16   the standard.  I have.

17   BY MS. DICKINSON:

18       Q.    Okay.  And what was that general viewpoint

19   about the standard that you have stated in public?

20       MS. HIBBERT:  Objection to form.

21   BY THE WITNESS:

22       A.    I think the standard, on balance, has not

23   been helpful.

24   BY MS. DICKINSON:

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.      And -- and why is that?

2       A.      Because I believe that hospitals in their

3    efforts to adhere to the standards and implement

4    policies did things that were never required by the

5    Joint Commission.  I believe the hospitals did things

6    that have not been helpful.

7       Q.      When you say things that have not been

8    helpful, do you mean that the standard increased the

9    use of opioids?

10      MS. HIBBERT:  Objection to form.

11   BY THE WITNESS:

12      A.      I think I know the question that I'd like

13   you to ask, and it is very similar to the one you

14   asked.  Could you rephrase, maybe?

15   BY MS. DICKINSON:

16      Q.      I can't guess as to one you want me to

17   ask.

18      A.      That's right, you can't read my mind.

19      Q.      I'm sorry.

20              Is part of the way that the standards have

21   not been helpful increasing the use of opioids in your

22   view?

23      MS. HIBBERT:  Objection to form.

24   BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2   BY MS. DICKINSON:

 3        Q.    Doctor, do you know if the UW Pain and

 4   Policy Group also worked with the Federation of State

 5   Medical Boards?

 6        A.    I do know that.

 7        MS. HIBBERT:  Objection to form.

 8        THE WITNESS:  Sorry.

 9   BY MS. DICKINSON:

10        Q.    Okay.  Do you know what their work with

11   the Federation of State Medical Boards was?

12        MS. HIBBERT:  Objection to form.

13   BY THE WITNESS:

14        A.    I have a general sense, yes.

15   BY MS. DICKINSON:

16        Q.    Okay.  What is that general sense?

17        A.    They advised the federation to revise its

18   own views on opioid prescribing.

19        Q.    Okay.  And in -- in what way were those

20   views revised?

21        MS. HIBBERT:  Objection to form.

22   BY THE WITNESS:

23        A.    Again, this is way outside of my expert

24   opinion, but you asked my knowledge about what
```

Highly Confidential - Subject to Further Confidentiality Review

1  happened, and I certainly have knowledge about all of

2  those things that played out.

3           Their hope was that licensure boards would

4  not discipline physicians for overprescribing and, in

5  fact, as a result of the dialogue, the federation

6  members who were the individual state licensure

7  entities became more prone to disciplining physicians

8  for undertreating pain.

9      MS. DICKINSON:  Doctor, I think it might make

10  sense to take a very short break and then I think we

11  have less than a half hour to go.  Maybe even much

12  shorter than that.  I'm going to try to consolidate a

13  little bit, okay?

14      THE WITNESS:  Yes, ma'am.

15      THE VIDEOGRAPHER:  We are off the record at

16  3:43 p.m.

17               (WHEREUPON, a recess was had

18                from 3:43 to 3:49 p.m.)

19      THE VIDEOGRAPHER:  We are back on the record at

20  3:50 -- 49 p.m.

21  BY MS. DICKINSON:

22      Q.    Okay.  Dr. Miller, we are back on the

23  record after a very short break, and I do appreciate

24  you keeping the breaks really short.  It has really

Highly Confidential - Subject to Further Confidentiality Review

```
 1   helped the day move along.

 2            I just have a -- I -- I may jump around

 3   just a little bit with these last set of questions on

 4   some different subject areas, so just let me know if

 5   you don't understand where we are or what we are

 6   talking about.

 7            With respect to Exhibit 3, I just want to

 8   ask about one more of your positions that you listed

 9   in that.  At Page 10 at the top, could you go to that?

10       A.    Yes, ma'am.

11       Q.    Okay.  The -- under Consulting Positions,

12   the very top one says:  "To attorneys and insurance

13   companies" and then it says:  "Re legal consultations,

14   depositions, case reviews and independent medical

15   exams."

16            Is -- is this a description of the work

17   that you do for Michael Miller, M.D. LLC, your

18   consulting company?

19       A.    Yes, ma'am.

20       Q.    Okay.  We've already talked about some of

21   your consulting arrangements today.

22            Are there -- is there any work that you

23   are doing for attorneys consulting that we haven't

24   talked about today?  I don't want -- I don't want
```

Highly Confidential - Subject to Further Confidentiality Review

1    specifics yet.  Just let me ask the question first and

2    then I'll ask a follow-up.

3             Is there any work for attorneys that you

4    are currently performing for Michael Miller, M.D. that

5    we haven't talked about already today?

6        MS. HIBBERT:  Objection to form.

7    BY THE WITNESS:

8        A.    Yes, there is.

9    BY MS. DICKINSON:

10       Q.    Okay.  Does any of that work that we

11   haven't talked about already today have to do with

12   opioids?

13       MS. HIBBERT:  Objection to form.

14   BY THE WITNESS:

15       A.    You asked me that question before and,

16   again, if there is ever a case of opioid addiction, a

17   case of opioid withdrawal, I mean, there -- there

18   could be some in there, and -- and with regard to this

19   litigation and the -- and the -- and the issues here,

20   no, but opioids in the broadest sense, sure.

21   BY MS. DICKINSON:

22       Q.    Okay.  Maybe it's easiest to ask it this

23   way:

24             How much of your time, professional time,

```
1    is spent for Michael Miller Consulting?

2        MS. HIBBERT:  Objection to form, asked and

3    answered.

4    BY THE WITNESS:

5        A.    The work expands as it presents itself.

6    So it could be as little as 5 percent of a 40-hour

7    workweek or it could expand to 20 hours a week which

8    would make my workweek 60 hours, so...

9    BY MS. DICKINSON:

10       Q.    Generally, I just want to get a sense of

11   it, and I may have already asked you this, I do really

12   apologize if I have, in the last year how much of your

13   time has been spent for Michael Miller Consulting?

14       MS. HIBBERT:  Objection to form, asked and

15   answered.

16   BY MS. DICKINSON:

17       Q.    What percentage?

18       MS. HIBBERT:  Same objection.

19   BY THE WITNESS:

20       A.    Again, I've been quite involved with

21   consulting work since I left full-time work.  And --

22   and, again, part of the reason to leave full-time work

23   is to be able to do more consulting work because I

24   kept getting demands for consult work and I'd keep
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    going to my employer and saying, Can I do this, is it

2    a conflict, so finally we decided just leave this

3    full-time job so I could go do all of this stuff.

4              So, it's gotten to be pretty busy.  I have

5    two open cases now in addition to this one and I have

6    another one or two pending and another which has

7    already wrapped up all in the last ten months.

8    BY MS. DICKINSON:

9        Q.    Okay.  Is your ultimate goal to transition

10   your entire professional work to the consulting

11   business?

12       A.    Yes.

13       Q.    Okay.  Does UW allow you to do -- run your

14   consulting business?

15       A.    Yes.

16       MS. HIBBERT:  Objection to form.

17       THE WITNESS:  Sorry.

18   BY MS. DICKINSON:

19       Q.    So the UW prohibition on working for

20   advisory boards or speakers bureaus or things of that

21   nature does not extend to expert witness work for

22   pharmaceutical companies, is that fair?

23       MS. HIBBERT:  Objection to form.

24   BY THE WITNESS:
```

1        A.    I am not aware of any such prohibition.

2    BY MS. DICKINSON:

3        Q.    Prior to 2018 when I think you were saying

4    you were starting to wrap up your consulting business,

5    what portion of your professional work in the last

6    five years has generally been for Michael Miller

7    Consulting?

8        A.    5 percent.

9        Q.    Okay.  Fair.

10            This was an odd question, actually, I

11    have.  Appendix A had some portions of your CV that

12    were in bold.

13            Is there any sig -- significance to the

14    bold?

15        A.    Where?

16        Q.    On mine, let's see, a good example on mine

17    was Page 14, and maybe this only existed on Appendix A

18    and not actually on Exhibit 3.

19        A.    Oh, those are things I considered to be

20    pretty significant, a total subjective rating by me.

21        Q.    Okay.  So there is actually a significance

22    to the bold, those are -- those are more significant

23    events on your CV, is that fair?

24        A.    More significant events on the CV, right,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   more significant committees, more significant

 2   publications, more significant presentations.

 3       Q.   I'm glad I asked because I just thought it

 4   was a mistake.

 5       A.   No, no.  It's like -- it's like if you

 6   don't want to read all of this stuff, just let your

 7   eyes go to the bolds.

 8       Q.   Okay.  Fair.  That is helpful.

 9            Do you retain copies of the presentations

10   that are listed in your CV?

11       A.   Some.

12       Q.   Okay.  So we would have to ask on a

13   specific basis whether you retained a copy?

14       A.   You would.

15       Q.   Okay.  Did you -- I think you mentioned in

16   your report you had involvement in the authorship of

17   the ASAM criteria for defining addiction, is that

18   right?

19       A.   You just conflated two things.

20       Q.   Oh, fair enough.  Okay.

21            What -- what two things?

22       A.   Ans -- answer yes to both.

23       Q.   Okay.

24       A.   But -- but -- but it is not the same
```

Highly Confidential - Subject to Further Confidentiality Review

1    thing.

2        Q.    Okay.  What involvement did you have in

3    authoring the ASAM criteria, what was typically

4    referred to as ASAM criteria?

5        A.    Exactly.  The first edition was published

6    in '91.  I had no role.

7        Q.    Okay.

8        A.    The next edition was published in '94, I

9    think, and I was on the work group that wrote it.

10       Q.    Okay.

11       A.    I was not on any other work groups

12   thereafter.  But then I was asked to be the managing

13   editor of the current edition, which was '13 and I

14   contributed, and I don't think I really got credit

15   for, the chapter on treatment of tobacco use disorder

16   and the treatment of seniors.  And so I reviewed the

17   full draft of the current edition and served as

18   managing editor.

19       Q.    Okay.  So the 2013 version is the current

20   version, correct?

21       A.    Yes, ma'am.

22       Q.    Okay.  I assume, but I'm not going to

23   assume, are you satisfied with the language in the

24   current version?

```
 1        MS. HIBBERT:  Objection to form.

 2   BY THE WITNESS:

 3        A.    The reason I will say that you asked a

 4   loaded question is because I was specifically asked to

 5   contribute to language.

 6   BY MS. DICKINSON:

 7        Q.    Okay.

 8        A.    I was specifically asked to assist with

 9   terminology, and I failed to mention that in addition

10   to the roles I have previously just testified to, I

11   wrote paragraphs -- I don't think a chapter, but

12   paragraphs with regard to terminology and I tried to

13   edit the full book for terminology with respect to the

14   ASAM definition, because the ASAM definition is a

15   specific thing and the ASAM criteria says that it uses

16   terminology of the Diagnostic and Statistical Manual

17   of the American Psychiatric Association which isn't

18   the same as the terminology of the ASAM definition of

19   addiction.  Therefore, language is something that

20   matters, and you said am I satisfied with the

21   language.  I am okay with where we got to in the final

22   version.

23        Q.    Okay.  And that includes the definition of

24   addiction?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Yes.

 2        Q.     Okay.  Does the ASAM criteria define

 3   opioid use disorder?

 4        A.     No.

 5        Q.     Does the ASAM criteria rely on the DSM for

 6   the definition of opioid use disorder?

 7        MS. HIBBERT:  Objection to form.

 8   BY THE WITNESS:

 9        A.     I'm scratching my head.  That was a very,

10   very specific question, and it -- what it does is it

11   relies on the DSM for all substance use disorder

12   diagnoses, and so I guess opioids would be included,

13   but it's -- it's not as precise as your question was.

14   BY MS. DICKINSON:

15        Q.     Okay.  Fair.

16               How does the ASAM criteria rely on the DSM

17   for all substance use diagnoses?

18        MS. HIBBERT:  Objection to form.

19   BY THE WITNESS:

20        A.     The way it does it goes back to the first

21   edition in '91, and it says:  This is the criteria for

22   the treatment of substance use disorder.  And it says

23   that a necessary first step is a diagnosis, that you

24   don't offer treatment for what I call addiction unless
```

1    addiction is present.  So it says you must have a

2    diagnosis present and the diagnosis must comply with

3    the current edition of the DSM.  That's how it does

4    it.

5    BY MS. DICKINSON:

6        Q.    Totally understood.

7              Did you have any involvement with

8    authorship of any of the DSM criteria?

9        MS. HIBBERT:  Objection to form.

10   BY THE WITNESS:

11       A.    I was in regular dialogue with the

12   authors, but I was on none of the work groups and my

13   name is nowhere in it.

14   BY MS. DICKINSON:

15       Q.    Okay.  Who were the authors that you were

16   in regular dialogue with?

17       A.    The addiction and substance related

18   disorders chapter was chaired by Charles O'Brien and a

19   very active member of the committee was Wilson Compton

20   and those are the two gentlemen that I had most of my

21   e-mails with.

22       Q.    Was Charles O'Brien the pry -- and

23   Wills -- Wilson, I'm sorry, what is his last name?

24       A.    Compton.

1    Q.    Compton.

2          Were Charles O'Brien and Wilson Compton

3    the primary authors of the addiction and substance

4    abuse portion of the DSM-V?

5    A.    That's not the way the APA categorizes it.

6    They say everything is done by committee and there are

7    committee chairs.  You can decide if that's the

8    equivalent of author.

9    Q.    Okay.  That's fair.

10          Who -- were Charles O'Brien and Wilson

11   Compton the committee chairs in charge of authoring

12   the addiction and substance abuse portion of DSM-V?

13   A.    I don't recall any particular title that

14   Dr. Compton had, but Dr. O'Brien was the chair of the

15   chapter.

16   Q.    Okay.  Do you know who else served on the

17   committee authoring that chapter other than

18   Dr. O'Brien and Dr. Compton?

19   A.    I do not recall today, ma'am.

20   Q.    Okay.  Did you have regular interaction

21   with Dr. O'Brien over the substance of what was going

22   to be in DSM-V?

23   A.    No.

24          MS. HIBBERT:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        THE WITNESS:  Sorry.

 2   BY THE WITNESS:

 3        A.    No, I did not.

 4   BY MS. DICKINSON:

 5        Q.    Okay.  Did you have regular interaction

 6   with Dr. Compton over the substance of what was going

 7   to be in DSM-V?

 8        MS. HIBBERT:  Objection to form.

 9   BY THE WITNESS:

10        A.    No.

11   BY MS. DICKINSON:

12        Q.    When you said that you had regular

13   interaction with Dr. O'Brien and Dr. Compton over the

14   DSM criteria, what was the regular interaction about?

15        MS. HIBBERT:  Objection to form,

16   mischaracterizes the testimony.

17   BY THE WITNESS:

18        A.    Yeah, I don't recall that I ever said

19   "regular."  It was episodic.

20   BY MS. DICKINSON:

21        Q.    Okay.  Sorry.  I didn't mean to put words

22   in your mouth.

23             When you say that you had episodic

24   interaction with Dr. Compton and Dr. O'Brien over the
```

Highly Confidential - Subject to Further Confidentiality Review

1    DSM criteria, what was that episodic interaction

2    about?

3         MS. HIBBERT:  Objection to form.

4    BY THE WITNESS:

5         A.    I recall some specific, very specific

6    dialogue I had with them regarding cannabis use

7    disorder and tobacco use disorder and how I thought

8    that they could have formatted that differently.  I

9    had no specific comments about opioid use disorder.  I

10   had general concerns about the sort of fundamental

11   framework which considers there to be a continuity

12   between mild, what they call mild SUD and moderate and

13   severe SUD.

14        Q.    And did you discuss those concerns with

15   Dr. -- either Dr. O'Brien or Dr. Compton?

16        A.    I did.

17        Q.    With both of them?

18        A.    At different times.  I don't know if I

19   ever sent an e-mail copy to both, but at different

20   points each of them.

21        Q.    Did the resulting DSM-V reflect -- or was

22   the resulting DSM-V in -- in align with the way you --

23   that's a terrible question.  God, I'm sorry.  It is

24   getting late.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              The concerns you were expressing about the

 2    language of the -- to Dr. Compton and Dr. O'Brien,

 3    were those addressed in your view in the ultimate

 4    resulting language in DSM-V?

 5         MS. HIBBERT:  Objection to form.

 6    BY THE WITNESS:

 7         A.    No.

 8         THE WITNESS:  Sorry.

 9    BY THE WITNESS:

10         A.    No.

11    BY MS. DICKINSON:

12         Q.    Were Dr. O'Brien and Dr. Compton to your

13    knowledge on the committee that authored DSM-IV?

14         A.    I don't know.

15         Q.    Okay.  Same question with respect to

16    DSM-III, were Dr. O'Brien and Dr. Compton on the

17    committee that authored DSM-III?

18         A.    I do not recall.

19         Q.    Do you know what -- at what point in time

20    Dr. O'Brien started to chair the committee regarding

21    the DSM diagnostic criteria, specifically the

22    addiction and substance abuse chapter?

23         A.    I do not know exactly when that happened.

24         Q.    Do you know roughly?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. HIBBERT:  Objection to form.

 2   BY THE WITNESS:

 3        A.    I believe that the project was an

 4   eight-year project and I think he was probably there

 5   at the start.

 6   BY MS. DICKINSON:

 7        Q.    Okay.

 8        A.    But I don't know that he was the original

 9   chair.  I honestly don't know.

10        Q.    Fair enough.

11              To your knowledge, he was involved in the

12   entirety of the project whether or not he was the

13   chair of that project the entire time you don't know,

14   is that fair?

15        MS. HIBBERT:  Objection to form.

16   BY THE WITNESS:

17        A.    I honestly don't know if he was on the

18   committee from day one.  I -- I can only speculate as

19   to that.

20   BY MS. DICKINSON:

21        Q.    Okay.  In -- in your experience, did you

22   view Dr. O'Brien and Dr. Compton as the -- as the face

23   of that committee essentially?

24        MS. HIBBERT:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    I -- I would only characterize Dr. O'Brien

 3   as such.

 4   BY MS. DICKINSON:

 5        Q.    Fair.  Okay.

 6              Let's talk for a minute about diagnostic

 7   criteria for addiction.  In your clinical practice,

 8   how do you conduct an evaluation for diagnosing

 9   someone with addiction?

10        A.    Clinical interview.

11        Q.    Are there any diagnostic tools that you

12   use, such as an MRI or a PET scan or some other

13   diagnostic tool other than a clinical interview to

14   diagnosis someone with addiction?

15        MS. HIBBERT:  Objection to form.

16   BY THE WITNESS:

17        A.    I don't use anything besides the clinical

18   interview.  At -- at times I've used a standard

19   questionnaire called the Michigan Alcoholism Screening

20   Test which was adapted to be the Drug Abuse Screening

21   Test by actually a colleague here at Wisconsin.  So

22   I've used the MAST and the DAST at times.

23        Q.    Anything else other than that?

24        A.    Nothing else.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    Have you ever met with any other experts

2   on the defense side in this case?

3       MS. HIBBERT:  Objection to form, lack of

4   foundation.

5   BY THE WITNESS:

6       A.    I don't know who they are.

7   BY MS. DICKINSON:

8       Q.    Fair enough.  You are not aware that

9   you've met with any of the other experts that were

10  disclosed as defense experts regarding this case, is

11  that fair?

12      A.    Now, that was very well phrased because

13  they be and I may not know it and I may have met with

14  them in a meeting.

15      Q.    That was why I asked it the way I did.

16      A.    Yeah, I have no idea.

17      Q.    Okay.

18      A.    Yeah.

19      Q.    Have you been asked to provide trial

20  testimony in this case?

21      MS. HIBBERT:  Objection to form.

22  BY THE WITNESS:

23      A.    I don't -- I don't know how to answer that

24  question.  It hadn't -- it had -- it hasn't gotten to
```

Highly Confidential - Subject to Further Confidentiality Review

1    that point.

2    BY MS. DICKINSON:

3        Q.    Totally fair.  My question -- my only

4    question is do you have plans to be at the

5    October trial in this case?

6        MS. HIBBERT:  Objection to form.

7    BY THE WITNESS:

8        A.    If I'm asked to appear as an expert

9    witness, I expect to be there.

10   BY MS. DICKINSON:

11       Q.    Have you been asked to appear at the trial

12   as of today?

13       MS. HIBBERT:  Objection to form, calls for a

14   disclosure of communications between Dr. Miller and

15   counsel that are outside of the bounds of Rule 26 and

16   I'll advise you not to answer.

17       THE WITNESS:  I will -- I will follow your

18   advice.

19   BY MS. DICKINSON:

20       Q.    Dr. Miller, has -- have you blocked out on

21   your calendar the trial dates in this case?

22       A.    Yes.

23       Q.    You talked earlier about a presentation

24   that you may have given with David Haddox, and bear

1    with me, I'm just reading from my notes so I'm not

2    sure if I'm characterizing this the correct way, the

3    DSM-V and the new ASAM criteria, is that a

4    presentation that you gave jointly with David Haddox?

5        MS. HIBBERT:   Objection.

6    BY THE WITNESS:

7        A.    Absolutely not.

8    MS. DICKINSON:

9        Q.    Okay.  I thought my notes were wrong on

10   that.  Let's just talk about the presentation then.

11   There was a presentation listed in your CV, "DSM-V and

12   the New ASAM Criteria."

13            Do you know if you have and retained a

14   copy of that presentation?

15       A.    Do you see in your notes, ma'am, to whom

16   the audience was?

17       Q.    I don't, but the date on it was June 13th

18   of 2014.

19       A.    Of the ones that come to mind, I think I

20   still have all of those.

21       Q.    Okay.  Oh, here.  Now here is where my

22   notes were about it -- this.

23            There was -- you talked about serving on a

24   panel with David Haddox at the ACM meetings, is that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   accurate?

 2       MS. HIBBERT:  Objection to form.

 3   BY THE WITNESS:

 4       A.    That's accurate.

 5   BY MS. DICKINSON:

 6       Q.    Okay.  And there was a presentation

 7   roughly titled "Pain and Addiction:  Common Threads,"

 8   am I saying that accurately?

 9       A.    That, ma'am, would be the name of the

10   course.  The presentation I have no idea what the --

11   what it was or if it happened.  I was speculating.

12       Q.    Okay.  Do you have course materials from

13   that course, have you retained those?

14       MS. HIBBERT:  Objection to form.  He just said

15   he didn't know if it happened.

16   BY THE WITNESS:

17       A.    I don't know what I have and don't have.

18   I have some things.  I may have some of my talks.

19   They may be too old to have been retained.  And I may

20   have some syllabi, but I don't recall which ones.

21   BY MS. DICKINSON:

22       Q.    Okay.  Did Charles O'Brien participate in

23   the ASAM conferences that you were discussing earlier?

24       MS. HIBBERT:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    I do not believe that Dr. O'Brien was ever

 3   on the faculty for Common Threads.

 4   BY MS. DICKINSON:

 5       Q.    Do you know if Dr. Bri -- O'Brien

 6   generally participated in the ASAM organization?

 7       MS. HIBBERT:  Objection to form, calls for

 8   speculation.

 9   BY THE WITNESS:

10       A.    My response to your question is that

11   Charlie was a frequent attendee and a not uncommon

12   presenter at ASAM conferences over decades.

13   BY MS. DICKINSON:

14       Q.    Okay.  Dr. Miller, do you own stock in any

15   pharmaceutical companies currently?

16       A.    I do not.

17       MS. DICKINSON:  I think that's all of the

18   questions I have for now.  I don't know if you are

19   going to ask questions, but I could -- if you're --

20   while you are asking, I could look at my notes,

21   otherwise I just need, like, a two-minute break.

22       MS. HIBBERT:  Let's take a two-minute break.

23       MS. DICKINSON:  Okay.

24       THE VIDEOGRAPHER:  We are off the record at
```

```
 1    4:12 p.m.

 2                    (WHEREUPON, a recess was had

 3                     from 4:12 to 4:14 p.m.)

 4         THE VIDEOGRAPHER:  We are back on the record at

 5    4:14 p.m.

 6         MS. DICKINSON:  Dr. Miller, we are back on the

 7    record.  You are still under oath.

 8              I think I am finished with my questions

 9    for you here today.  I may have a few more depending

10    on what your counsel asks.

11              But just for the record, Counsel, I know

12    you were working on whether redacted invoices could be

13    produced here at the deposition today given Special

14    Master Cohen's ruling a few hours ago.

15              Is -- is that able to be done today or are

16    we going to have to wait?

17         MS. HIBBERT:  Like I said off the record, we are

18    working on getting those invoices together and

19    redacted in hopes of producing them this evening.  I

20    have not gotten word that those are ready yet.  So

21    currently I'm still hoping to produce them this

22    evening, but I don't have them right now.

23    BY MS. DICKINSON:

24         Q.    Okay.  Dr. Miller, have I been respectful
```

Highly Confidential - Subject to Further Confidentiality Review

1   to you today?

2       MS. HIBBERT:  Objection to form.

3       THE WITNESS:  Objection to form?

4   BY THE WITNESS:

5       A.    Have you been respectful to me, yes,

6   ma'am.

7       MS. DICKINSON:  Thank you.  I don't think I have

8   any further questions, again, unless your counsel asks

9   something I need to clean up.  So thank you very much

10  for your time here today.  I really appreciate it.

11      THE WITNESS:  You are very welcome.  Thank you

12  too.

13                  EXAMINATION

14  BY MS. HIBBERT:

15      Q.    Just a couple of quick questions,

16  Dr. Miller.

17          Earlier today you talked about a couple of

18  sample expert reports that were sent to you by

19  counsel.

20          Do you recall that testimony?

21      A.    I believe I do.

22      Q.    Did you rely on --

23      A.    Do you want to sit over there or I'll

24  just --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.     No.

 2        A.     -- I'll just not make eye contact with

 3   you.

 4        MS. DICKINSON:  I think she wants you to look at

 5   the video.

 6        THE WITNESS:  Yeah, yeah.

 7   BY MS. HIBBERT:

 8        Q.     Did you rely on your review of any of

 9   those sample expert reports in forming your opinions

10   that you are offering in this case?

11        A.     Oh, absolutely not.  They -- they were --

12   they had no -- no material basis.

13        Q.     Earlier, Dr. Miller, you discussed some

14   limited engagements that you have had with various

15   pharmaceutical manufacturers as well as a drug testing

16   company.

17               Do you recall that testimony?

18        A.     Yes, ma'am.

19        Q.     Have any of those limited engagements

20   influenced the opinions that you are offering in this

21   case in any way?

22        MS. DICKINSON:  Objection; form.

23   BY THE WITNESS:

24        A.     I was really, really trying to understand
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   how the answer could possibly be yes, and it's just

 2   absolutely no, not at all.  It's no.

 3        MS. HIBBERT:  Those are all of the questions

 4   that I have for you, Dr. Miller.  Thank you.

 5        THE WITNESS:  Oh, my goodness.  Thank you.

 6        MS. DICKINSON:  I have nothing further.  You are

 7   free.  Thank you.

 8        THE VIDEOGRAPHER:  We are off the record at

 9   4:16 p.m.

10             (Time Noted:  4:16 p.m.)

11             FURTHER DEPONENT SAITH NAUGHT.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  REPORTER'S CERTIFICATE

 2

 3              I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4    a Certified Shorthand Reporter, do hereby certify:

 5              That previous to the commencement of the

 6    examination of the witness herein, the witness was

 7    duly sworn to testify the whole truth concerning the

 8    matters herein;

 9              That the foregoing deposition transcript

10    was reported stenographically by me, was thereafter

11    reduced to typewriting under my personal direction and

12    constitutes a true record of the testimony given and

13    the proceedings had;

14              That the said deposition was taken before

15    me at the time and place specified;

16              That I am not a relative or employee or

17    attorney or counsel, nor a relative or employee of

18    such attorney or counsel for any of the parties

19    hereto, nor interested directly or indirectly in the

20    outcome of this action.

21              IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 5th day of June, 2019.

23

24              JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  DEPOSITION ERRATA SHEET

 2

 3

 4     Case Caption:  In Re:  National Prescription

 5                    Opiate Litigation

 6

 7          DECLARATION UNDER PENALTY OF PERJURY

 8

 9              I declare under penalty of perjury that I

10     have read the entire transcript of my Deposition taken

11     in the captioned matter or the same has been read to

12     me, and the same is true and accurate, save and except

13     for changes and/or corrections, if any, as indicated

14     by me on the DEPOSITION ERRATA SHEET hereof, with the

15     understanding that I offer these changes as if still

16     under oath.

17

18                                MICHAEL M. MILLER, M.D.

19

20     SUBSCRIBED AND SWORN TO

21     before me this        day

22     of                  , A.D. 20__.

23

24            Notary Public
```

```
 1                    DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23     SIGNATURE:_____DATE:_____

24                  MICHAEL M. MILLER, M.D.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      DEPOSITION ERRATA SHEET

 2      Page No._____Line No._____Change to:_____

 3      _____

 4      Reason for change:_____

 5      Page No._____Line No._____Change to:_____

 6      _____

 7      Reason for change:_____

 8      Page No._____Line No._____Change to:_____

 9      _____

10      Reason for change:_____

11      Page No._____Line No._____Change to:_____

12      _____

13      Reason for change:_____

14      Page No._____Line No._____Change to:_____

15      _____

16      Reason for change:_____

17      Page No._____Line No._____Change to:_____

18      _____

19      Reason for change:_____

20      Page No._____Line No._____Change to:_____

21      _____

22      Reason for change:_____

23      SIGNATURE:_____DATE:_____

24                      MICHAEL M. MILLER, M.D.
```