```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3    IN RE: NATIONAL        )
      PRESCRIPTION           )  MDL No. 2804
 4    OPIATE LITIGATION      )
      _____ )  Case No.
 5                           )  1:17-MD-2804
                             )
 6    THIS DOCUMENT RELATES  )  Hon. Dan A.
      TO ALL CASES           )  Polster
 7
 8            THURSDAY, NOVEMBER 8, 2018
 9       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
10
                       - - -
11
12          Videotaped deposition of Steven
13    Mills, held at the offices of BARTLIT BECK
14    HERMAN PALENCHAR & SCOTT LLP, 54 West
15    Hubbard, Suite 300, Chicago, Illinois,
16    commencing at 9:07 a.m., on the above date,
17    before Carrie A. Campbell, Registered
18    Diplomate Reporter and Certified Realtime
19    Reporter.
20
21
22                     - - -
              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
25
```

Page 2

```
 1        A P P E A R A N C E S :
 2
 3   LEVIN PAPANTONIO THOMAS MITCHELL
     RAFFERTY PROCTOR, P.A.
 4   BY: PETER MOUGEY, ESQUIRE
        pmougey@levinlaw.com
 5   316 South Baylen Street
     Pensacola, Florida 32502
 6   (850) 435-7000
 7
 8   NAPOLI SHKOLNIK, PLLC
     BY: HUNTER J. SHKOLNIK, ESQUIRE
 9      hunter@napolilaw.com
        JOSEPH CIACCIO, ESQUIRE
10      WENDY MITCHELL, ESQUIRE
        (VIA TELECONFERENCE)
11      JODI KLOCKENGA, ESQUIRE
        (VIA TELECONFERENCE)
12   360 Lexington Avenue, 11th Floor
     New York, New York 10017
13   (212) 397-1000
14   Counsel for Plaintiffs
15   WILLIAMS & CONNOLLY LLP
16   BY: JOSEPH S. BUSHUR, ESQUIRE
        jbushur@wc.com
17   725 Twelfth Street, N.W.
     Washington, DC 20005
18   (202) 434-5331
19   Counsel for Cardinal Health, Inc.
20   COVINGTON & BURLING LLP
     BY: J. ALEJANDRO BARRIENTOS, ESQUIRE
21      abarrientos@cov.com
        (VIA TELECONFERENCE)
22   850 Tenth Street, NW
     Washington, DC 20001-4956
23   (202) 662-6000
24   Counsel for McKesson Corporation
25
```

Page 3

```
 1   REED SMITH LLP
     BY: BRIAN HIMMEL, ESQUIRE
 2      bhimmel@reedsmith.com
     Reed Smith Centre
 3   225 Fifth Avenue
     Pittsburgh, Pennsylvania 15222
 4   (412) 288-3131
     Counsel for AmerisourceBergen
 5
 6
 7   BARTLIT BECK HERMAN PALENCHAR &
     SCOTT LLP
 8   BY: HAMILTON HILL, ESQUIRE
        hamilton.hill@bartlit-beck.com
 9      ALEX J. HARRIS, ESQUIRE
        alex.harris@bartlit-beck.com
10   54 West Hubbard Street, Suite 300
     Chicago, Illinois  60654
11   (312) 494-4475
12   Counsel for Walgreens
13   JONES DAY
     BY: MARK DEMONTE, ESQUIRE
14      mdemonte@jonesday.com
     77 West Wacker
15   Chicago, Illinois 60601-1692
     (312) 782-3939
16   Counsel for Walmart
17
18   PELINI, CAMPBELL & WILLIAMS LLC
     BY: PAUL B. RICARD, ESQUIRE
19      pbricard@pelini-law.com
     8040 Cleveland Avenue NW, Suite 400
20   North Canton, Ohio 44720
     (330) 305-6400
21   Counsel for Prescription Supply,
     Inc.
22
23
24
25
```

Page 4

```
 1   ARNOLD & PORTER KAYE SCHOLER, LLP
     BY: SEAN P. HENNESSY, ESQUIRE
 2      sean.hennessy@arnoldporter.com
        (VIA TELECONFERENCE)
 3   601 Massachusetts Avenue, NW
     Washington, DC 20001-3743
 4   (202) 942-5000
     Counsel for Endo Pharmaceuticals
 5   Inc., and Endo Health Solutions Inc.
 6
 7   MORGAN, LEWIS & BOCKIUS LLP
     BY: MATTHEW R. LADD, ESQUIRE
 8      matthew.ladd@morganlewis.com
        (VIA TELECONFERENCE)
 9   101 Park Avenue
     New York, NY 10178-0060
10   (212) 309-6141
11   Counsel for Rite Aid
12   KIRKLAND & ELLIS, LLP
     BY: PAUL J. WEEKS, ESQUIRE
13      paul.weeks@kirkland.com
        (VIA TELECONFERENCE)
14   655 15th Street, NW, Suite 1200
     Washington, DC 20005
15   (202) 879-5000
16   Counsel for Allergan Finance, LLC
17   CAVITCH, FAMILO & DURKIN
     BY: L. WILLIAM "CHIP" ERB, ESQUIRE
18      LWErb@cavitch.com
        (VIA TELECONFERENCE)
19   1300 East 9th Street, 20th Floor
     Cleveland, Ohio 44114
20   (216) 621-7860
     Counsel for Discount Drug Mart
21   VIDEOGRAPHER:
22      MICHAEL NEWELL,
        Golkow Litigation Services
23
24   TRIAL TECHNICIAN:
        COREY SMITH,
25      Golkow Litigation Services
                   - - -
```

Page 5

```
 1              INDEX
 2                   PAGE
 3   APPEARANCES...................  2
 4   EXAMINATIONS
 5     BY MR. SHKOLNIK...........   10
 6     BY MR. HILL................ 391
 7     BY MR. SHKOLNIK........... 406
 8     BY MR. HILL................ 410
 9
10          EXHIBITS
11   No.   Description            Page
12   Walgreens  Steven Mills LinkedIn profile    35
     Mills 1   printout
13
14   Walgreens  September 27, 2006 letter to     54
     Mills 2   registrants from the US
15             Department of Justice, Drug
               Enforcement Administration,
16             ABDCMDL00269691 -
               ABDCMDL00269694
17   Walgreens  US Department of Justice, Drug    82
     Mills 3   Enforcement Administration
18             February 7, 2007 letter to
               registrants,
19             ABDCMDL00269687 -
               ABDCMDL00269690
20
21   Walgreens  US Department of Justice, Drug    86
     Mills 4   Enforcement Administration
22             December 27, 2007 letter to
               registrants,
23             ABDCMDL00269685 -
               ABDCMDL0026966
24
25
```

Page 6

1  Walgreens  US Department of Justice, Drug      109
Mills 5    Enforcement Administration June
2            12, 2012 letter to registrants,
           ABDCMDL00269683 -
3          ABDCMDL0026964
4  Walgreens  Settlement and Memorandum of       120
Mills 6    Agreement, P-WAG-0001
5
   Walgreens  E-mail(s),                           155
6  Mills 7    WAGMDL00308265 - WAGMDL00308266
7  Walgreens  E-mail(s),                           183
   Mills 8    WAGMDL00308192 - WAGMDL00308212
8
   Walgreens  E-mail(s),                           189
9  Mills 9    WAGMDL00308327 - WAGMDL00308349
10 Walgreens  E-mail(s),                           198
   Mills 10   WAGMDL00060739 - WAGMDL00060764
11
12 Walgreens  E-mail(s),                           238
   Mills 11   WAGMDL00303383 - WAGMDL00303384
13 Walgreens  E-mail(s),                           261
   Mills 12   WAGMDL00245867 -
14           WAGMDL00245879; WAGMDL00245916
           - WAGMDL00245920
15
16 Walgreens  E-mail(s),                           285
   Mills 13   WAGMDL00299885 - WAGMDL00299888
17 Walgreens  E-mail(s),                           296
   Mills 14   WAGMDL00312091 - WAGMDL00312093
18
19 Walgreens  E-mail(s),                           299
   Mills 15   WAGMDL00414048 - WAGMDL00414049
20 Walgreens  E-mail(s),                           315
   Mills 16   WAGMDL00060931 - WAGMDL00060933
21
22 Walgreens  E-mail(s),                           326
   Mills 17   WAGMDL00056871 - WAGMDL00056876
23 Walgreens  E-mail(s),                           330
   Mills 18   WAGMDL00108483 - WAGMDL00108485
24
25 Walgreens  E-mail(s),                           337
   Mills 19   WAGMDL00107173 - WAGMDL00107177

Page 7

1  Walgreens  E-mail(s),                           340
   Mills 20   WAGMDL00107557 - WAGMDL00107565
2
3  Walgreens  E-mail(s),                           350
   Mills 21   WAGMDL00107267 - WAGMDL00107271
4  Walgreens  E-mail(s),                           354
   Mills 22   WAGMDL00059074 - WAGMDL00059081
5
6  Walgreens  E-mail(s),                           362
   Mills 23   WAGMDL00413949 - WAGMDL00413950
7  Walgreens  E-mail(s),                           364
   Mills 24   WAGMDL00107384 - WAGMDL00107386
8
9  Walgreens  E-mail(s),                           366
   Mills 25   WAGMDL00107468 - WAGMDL00107469
10 Walgreens  E-mail(s),                           372
   Mills 26   WAGMDL00110737 - WAGMDL00110738
11
12 Walgreens  E-mail(s),                           375
   Mills 27   WAGMDL00244813 - WAGMDL00244815
13 Walgreens  E-mail(s),                           377
   Mills 28   WAGMDL00102390 - WAGMDL00102392
14
15 Walgreens  E-mail(s),                           383
   Mills 29   WAGMDL00414646 - WAGMDL00414648
16 Walgreens  E-mail(s),                           388
   Mills 30   WAGMDL00062061
17
   (Exhibits attached to the deposition.)
18
19
20
21
22
23
24
25

Page 8

1        VIDEOGRAPHER:  We are now on
2  record.
3        My name is Michael Newell.  I'm
4  a videographer for Golkow Litigation
5  Services.
6        Today's date is November 8,
7  2018, and the time is 9:07 a.m.
8        This video deposition is being
9  held in Chicago, Illinois, in the
10 matter of National Prescription Opiate
11 Litigation.
12       The deponent is Steve Mills.
13       Will counsel please identify
14 themselves.
15       MR. SHKOLNIK:  Hunter Shkolnik
16 on behalf of the MDL plaintiffs.
17       MR. CIACCIO:  Joseph Ciaccio on
18 behalf of MDL plaintiffs.
19       MR. MOUGEY:  Peter Mougey on
20 behalf of the MDL plaintiffs.
21       MR. RICARD:  Paul Ricard,
22 Prescription Supply, Inc.
23       MR. HIMMEL:  Brian Himmel for
24 AmerisourceBergen.
25       MR. BUSHUR:  Joseph Bushur for

Page 9

1  Cardinal Health.
2        MR. DEMONTE:  Mark DeMonte for
3  Walmart.
4        MR. HARRIS:  Alex Harris for
5  Walgreens.
6        MR. HILL:  Hamilton Hill for
7  Walgreens.
8        VIDEOGRAPHER:  The court
9  reporter today is Carrie Campbell and
10 will now swear in the witness.
11       MR. BARRIENTOS:  Alejandro
12 Barrientos for McKesson.
13       MR. HILL:  Anyone else on the
14 phone?
15       MR. LADD:  Matthew Ladd, Morgan
16 Lewis, representing Rite Aid.
17       MR. SHKOLNIK:  Say that one
18 again, please.
19       MR. LADD:  Matthew Ladd from
20 Morgan, Lewis & Bockius representing
21 defendant Rite Aid.
22       MR. HENNESSY:  And this is Sean
23 Hennessy from Arnold & Porter
24 representing the Endo and Par
25 Pharmaceutical defendants.

Page 10

1    MR. ERB:  And this is Chip Erb
2  with Cavitch, Familo & Durkin
3  representing Discount Drug Mart.
4    MR. WEEKS:  Paul Weeks for
5  Allergan Finance.
6    MS. KLOCKENGA:  Jodi Klockenga
7  with Napoli Shkolnik.
8    MS. MITCHELL:  Wendy Mitchell
9  with Napoli Shkolnik.
10
11    STEVEN MILLS,
12  of lawful age, having been first duly sworn
13  to tell the truth, the whole truth and
14  nothing but the truth, deposes and says on
15  behalf of the Plaintiffs, as follows:
16
17    DIRECT EXAMINATION
18  QUESTIONS BY MR. SHKOLNIK:
19    Q.    Mr. Mills, my name is Hunter
20  Shkolnik.  I'm going to be asking you a
21  series of questions here today, but anytime
22  you don't understand me, please let me know.
23    I have a tendency to sometimes
24  talk fast.  Usually by the time it starts
25  affecting you, the court reporter usually

Page 11

1  throws something at me and stops me.  But if
2  at any time I start going too fast, just tell
3  me to slow down.
4    If you don't understand a
5  question, let me know.  I try my best, but
6  every once in a while I do ask a bad
7  question.  So if you don't understand it,
8  just say.  I'll rephrase the question.
9    Okay?
10    A.    Okay.
11    Q.    And whenever there's a
12  question, it has to be a verbal answer.  A
13  nod doesn't -- doesn't help.  May show up on
14  the video but not on the transcript.
15    Okay?
16    A.    Got it.
17    Q.    Sir, you work for Walgreens at
18  the current time?
19    A.    I do.
20    Q.    And how long have you worked
21  for Walgreens?
22    A.    The past 13 years.
23    Q.    So over the 13 years you've
24  been working at Walgreens, do you have an
25  understanding that there was an opioid

Page 12

1  epidemic developing in the United States?
2    A.    I have an understanding, yes.
3    Q.    When did you first become aware
4  that there was an opioid epidemic developing
5  in the United States?
6    MR. HILL:  Object to the form.
7    THE WITNESS:  2012.
8  QUESTIONS BY MR. SHKOLNIK:
9    Q.    So what happened in 2012 that
10  made you come to a realization that there was
11  an opioid epidemic in the United States?
12    A.    There was a creation of the RX
13  integrity team, which I'm currently a member
14  of.
15    Q.    And prior to 2012, were you
16  involved in any capacity with prescription
17  integrity at Walgreens?
18    MR. HILL:  Object to the form.
19    THE WITNESS:  No.
20  QUESTIONS BY MR. SHKOLNIK:
21    Q.    Was prescription integrity a
22  new department that was developed at some
23  point in time at Walgreens while you were
24  there?
25    A.    Yes.

Page 13

1    Q.    So before the company developed
2  prescription integrity department -- withdraw
3  that.
4    Was it called the prescription
5  integrity department?
6    A.    Pharmaceutical integrity.
7    Q.    Okay.  Pharmaceutical integrity
8  department.
9    Prior to the development of the
10  pharmaceutical integrity department at
11  Walgreens in 2012, was there any other
12  department in existence at Walgreens that had
13  the same responsibilities as the now new
14  pharmaceutical integrity group --
15    MR. HILL:  Object to the form.
16  QUESTIONS BY MR. SHKOLNIK:
17    Q.    -- or department?
18    A.    I don't know.
19    Q.    Did you do anything prior to
20  2012 in terms of pharmaceutical --
21  pharmaceutical integrity work, the type
22  you're doing after 2012 prior to 2012?
23    A.    No.
24    Q.    What type of work did you do
25  before 2012?

Page 14

1    A.    Prior to 2012, I was working in
2 the pharmacy inventory group where we manage
3 item vendor catalog setup so our stores can
4 order product accordingly.  If the item's not
5 set up, then our stores don't have the
6 ability to order it per our ordering system.
7    Q.    Was there any specific aspect
8 of that job that dealt with opioids or
9 Class II, Class III pharmaceuticals?
10    A.    Can you rephrase your question?
11    Q.    Sure.
12          Was any aspect of your job
13 prior to 2012 dealing with the distribution
14 of opioids?
15    A.    To answer your question, yes, I
16 would be responsible for setting up items to
17 be available for ordering through our catalog
18 for opioids, C-II, C-III.  I believe that's
19 what you're asking.
20    Q.    Okay.  Tell me what you did
21 with respect to setting up and cataloging of
22 opioid, C-II, C-III, drugs prior to 2012.
23    A.    So it would be logging into a
24 computer system, to a web UI, setting up the
25 NDC codes, setting up the UPC numbers and

Page 15

1 then loading that into our ordering system so
2 stores would be able to get replenishment.
3    Q.    So it was a job that focused
4 more on the logistics aspect of the
5 pharmaceutical side of the company or just --
6 withdraw that.
7          So was your job dealing more
8 with logistics, making sure that product was
9 available and product could be shipped?
10    A.    Nothing to do with product
11 availability.
12    Q.    Okay.
13    A.    It was more data entry and item
14 maintenance.
15    Q.    What is your background in
16 terms of education, sir?
17    A.    Communications degree from
18 Northeastern University.
19    Q.    And when you were at
20 Northeastern, did you work for Walgreens as
21 part of any of the -- they have the work
22 study programs there.  Did you start with
23 Walgreens back then?
24    A.    I started with Walgreens while
25 I was in college, yes.

Page 16

1    Q.    Like the co-op programs they
2 had back then?
3    A.    I didn't take advantage of any
4 programs.
5    Q.    So you've been with Walgreens
6 ever since Northeastern up until the present
7 time?
8    A.    Yes.
9    Q.    Now, going back to the issue of
10 opioid epidemic, tell me what it was that
11 triggered in your mind that 2012 there was an
12 opioid epidemic in the United States.
13          MR. HILL:  Object to the form.
14          THE WITNESS:  Due to the
15    information that was available around
16    the DEA visits to our Jupiter DCs
17    around opioid dispensing.
18 QUESTIONS BY MR. SHKOLNIK:
19    Q.    And other than the fact that
20 the DEA came down on Walgreens through its
21 Jupiter distribution facility, you had not
22 been aware that there was a problem with
23 opioids in the United States and it was at
24 epidemic level before that?
25          MR. HILL:  Object to the form.

Page 17

1    Assumes facts.
2          THE WITNESS:  I don't know.  It
3    wasn't part of my job responsibilities
4    prior.
5 QUESTIONS BY MR. SHKOLNIK:
6    Q.    Well, I mean, did people talk
7 about it at Walgreens prior to 2012, there's
8 an opioid problem in the United States?
9          MR. HILL:  Object to the form.
10          THE WITNESS:  I can't remember.
11 QUESTIONS BY MR. SHKOLNIK:
12    Q.    Did you know any people that
13 had suffered from the ill effects of opioids
14 prior to 2012?
15    A.    No.
16    Q.    Prior to 2012, to your
17 knowledge, did -- withdraw that.
18          Part of your job is suspicious
19 order monitoring work; am I correct?
20          MR. HILL:  Object to the form.
21          THE WITNESS:  That is a part of
22    my job, yes.
23 QUESTIONS BY MR. SHKOLNIK:
24    Q.    Prior to 2012, had you ever
25 heard of the phrase "suspicious order

Page 18

1 monitoring"?
2    A.    No.
3    Q.    Prior to 2012, did you have any
4 knowledge of any of the requirements that
5 applied to Walgreens regarding monitoring of
6 the dispensing of C-II or C-III
7 pharmaceuticals?
8    A.    No.
9    Q.    Prior to 2012, did you have any
10 experience whatsoever with the Walgreens
11 responsibility regarding the distribution of
12 opioids?
13    A.    No.
14    Q.    Prior to 2012, did you have any
15 training whatsoever in the proper oversight
16 of suspicious orders and distribution in
17 Walgreens?
18        MR. HILL:  Object to the form.
19        THE WITNESS:  No.
20 QUESTIONS BY MR. SHKOLNIK:
21    Q.    When in 2012 did you first get
22 any training on what is known as suspicious
23 order monitoring in the distribution chain of
24 opioids or C-II, C-III --
25        MR. HILL:  Object to the form.

Page 19

1 QUESTIONS BY MR. SHKOLNIK:
2    Q.    -- pharmaceuticals?
3        MR. HILL:  Object to the form.
4        THE WITNESS:  It was once we
5        established the ground rules of the
6        creation of the RX integrity -- or
7        pharmaceutical integrity team that
8        those ground rules were kind of set.
9 QUESTIONS BY MR. SHKOLNIK:
10    Q.    Was that in June of 2012?
11    A.    No.  The team officially was
12 created in December of 2012.
13    Q.    So in essence, your first
14 experience with anything related to
15 suspicious order monitoring and distribution
16 of opioids didn't occur until the last month
17 of December 2012 at Walgreens?
18    A.    Yes.
19    Q.    How many other people were
20 joined together into this prescription
21 integrity group in 2012?
22    A.    Are you speaking currently
23 or --
24    Q.    No, then.
25    A.    Then?

Page 20

1    Q.    Yeah.
2        MR. HILL:  Object to the form.
3        THE WITNESS:  It was just two
4        of us at the moment.
5 QUESTIONS BY MR. SHKOLNIK:
6    Q.    Who was the other person?
7    A.    Tasha Polster.
8    Q.    And she was your superior at
9 that time?
10    A.    Yes.
11    Q.    Is she still -- I'm not saying
12 it in a negative way.  She's a direct report
13 up?
14    A.    At that moment she was.
15    Q.    Now she's two up; am I correct?
16    A.    Yes.
17    Q.    So for the year 2012, let's
18 talk from January until December, you had no
19 involvement whatsoever with any aspect of
20 opioid suspicious order monitoring at
21 Walgreens?
22        MR. HILL:  Object to the form.
23        THE WITNESS:  I can't remember.
24 QUESTIONS BY MR. SHKOLNIK:
25    Q.    Is it possible it may have been

Page 21

1 a day or two before December?  Is that the
2 issue?
3    A.    Yeah, there could have been --
4 the timing.
5    Q.    Okay.  When you started with
6 suspicious order monitoring -- withdraw that.
7        When you started with the
8 integrity group, did you -- did you sit down
9 with Ms. Polster and say, "Why are we doing
10 this now?  Why are we starting this process
11 now?"
12    A.    No, that conversation never
13 happened.
14    Q.    Did you have an understanding
15 as to why it was starting then versus years
16 before?
17    A.    Yes.
18        MR. HILL:  Object to the form.
19 QUESTIONS BY MR. SHKOLNIK:
20    Q.    What was your understanding?
21 Could you tell the Court and jury?
22    A.    Due to the investigation the
23 DEA had performed at our Jupiter DC and the
24 seizure of licensure at six of our locations
25 in Florida, our team was created to ever

Page 22

1 prevent anything like this from happening
2 again.
3     Q.    Okay.  And was there also an
4 investigation on the facility in Ohio at the
5 same time but they hadn't seized it?
6         MR. HILL:  Object to the form.
7 Foundation.
8         THE WITNESS:  I don't know.
9 QUESTIONS BY MR. SHKOLNIK:
10     Q.    And when you first got together
11 with Ms. Polster, did you ask her, "What did
12 we do at Walgreens before 2000 --
13 December 2012 in terms of suspicious order
14 monitoring since we're now going to implement
15 the program for going forward?"
16     A.    I can't remember if I ever had
17 that conversation.
18     Q.    Well, did you ever undertake
19 any investigation on your own to say, "What
20 were we doing to monitor suspicious orders in
21 our company before I got charged with that
22 job?"
23         MR. HILL:  Object to the form.
24         THE WITNESS:  No.
25

Page 23

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    Was it your understanding that
3 there were some failures on the part of
4 Walgreens in terms of suspicious order
5 monitoring for opioids prior to 2012?
6     A.    Yes, that is my understanding.
7     Q.    And I take it you took it very
8 seriously, when you were assigned to this new
9 team, to make sure those type of failures
10 didn't happen again, correct?
11     A.    Correct.
12     Q.    And that was the goal of the
13 integrity team:  Let's put something in place
14 that's not going to let these prior failures
15 happen again.
16         MR. HILL:  Object to the form.
17         THE WITNESS:  Correct.
18 QUESTIONS BY MR. SHKOLNIK:
19     Q.    And would it be fair to say
20 that from that point on, when you got
21 involved, you have done your best to make
22 sure that Walgreens adheres to the -- the
23 letter of the law in terms of suspicious
24 order monitoring as best as you could?
25         MR. HILL:  Object to the form.

Page 24

1 Foundation.
2         THE WITNESS:  Yes.
3 QUESTIONS BY MR. SHKOLNIK:
4     Q.    I mean, that's your
5 responsibilities for the company, to do that
6 as best as you can, correct?
7         MR. HILL:  Same objections.
8         THE WITNESS:  Yes.
9 QUESTIONS BY MR. SHKOLNIK:
10     Q.    And your team of two people
11 grew after December of 2012, correct?
12     A.    Yes.
13     Q.    Now, over the period of time
14 after 2012, did you continue to have some
15 further understanding that the epidemic in
16 the United States, the opioid epidemic, was
17 growing -- a growing problem?
18         MR. HILL:  Object to the form.
19         THE WITNESS:  Just from what
20 I've noticed in the news.
21 QUESTIONS BY MR. SHKOLNIK:
22     Q.    Did you notice that any
23 other -- that any companies were implicated
24 or in some way referenced as being part of
25 the cause of the epidemic?

Page 25

1         MR. HILL:  Same objection.
2         THE WITNESS:  Just what I've
3 noticed in the news and in reading.
4 QUESTIONS BY MR. SHKOLNIK:
5     Q.    I understand.
6         So tell me some of the
7 companies that you came to understand were
8 sort of implicated in this opioid epidemic
9 developing.
10         MR. HILL:  Object to the form
11 and calls for speculation.
12         THE WITNESS:  Nothing really
13 stands out at the moment.  That was
14 several years ago.  I can't recall.
15 QUESTIONS BY MR. SHKOLNIK:
16     Q.    How about Purdue Pharma?  Does
17 that name ring any bells that may have been a
18 factor in developing the epidemic, the opioid
19 epidemic?
20         MR. HILL:  Same objections.
21         THE WITNESS:  I know that they
22 manufacture OxyContin.  That's a very
23 potent opioid.
24 QUESTIONS BY MR. SHKOLNIK:
25     Q.    You've also come to know that

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 that was also an opioid that has been linked
2 to abuse, correct?
3          MR. HILL: Same objection.
4          THE WITNESS: Yes, these
5     medications can be abused.
6 QUESTIONS BY MR. SHKOLNIK:
7     Q.    But specifically the OxyContin
8 from Purdue, that was one that's been
9 implicated as being connected with abuse and
10 the opioid epidemic, correct?
11          MR. HILL: Object to the form.
12     Calls for speculation.
13          THE WITNESS: I've heard their
14     name referenced in news articles, yes.
15 QUESTIONS BY MR. SHKOLNIK:
16     Q.    How about Mallinckrodt; do you
17 know that company?
18     A.    Yes.
19     Q.    And do you know they make
20 generic versions and brand versions of
21 opioids?
22     A.    Yes.
23     Q.    And do you know that that
24 company has been implicated in terms of the
25 opioid epidemic as one of the companies

Page 27

1 involved in the cause?
2          MR. HILL: Object to the form.
3     Calls for speculation.
4          THE WITNESS: I can't recall if
5     I ever read any specific articles
6     about Mallinckrodt.
7 QUESTIONS BY MR. SHKOLNIK:
8     Q.    Any other companies while we're
9 sitting here that may ring -- you know, now
10 that we've been talking about it that may
11 have been implicated in the opioid epidemic?
12     A.    Maybe Watson. That's the only
13 one I can -- kind of comes to my mind.
14     Q.    How about McKesson, the
15 distributor?
16          MR. HILL: Same objections.
17 QUESTIONS BY MR. SHKOLNIK:
18     Q.    Did that ever come up in terms
19 of your knowledge of companies being somehow
20 connected to failures and suspicious order
21 monitoring as it related to the opioid
22 epidemic?
23     A.    I don't recall reading about
24 McKesson.
25     Q.    Okay. Now, in terms of

Page 28

1 suspicious order monitoring and the
2 prescription integrity responsibility, do you
3 have an understanding on -- as to why you
4 have to monitor the opioid distribution in
5 that department?
6          MR. HILL: Object to the form.
7 QUESTIONS BY MR. SHKOLNIK:
8     Q.    What's your understanding of
9 your job?
10          MR. HILL: Objection.
11     Compound.
12          MR. SHKOLNIK: I'll rephrase
13     the question.
14 QUESTIONS BY MR. SHKOLNIK:
15     Q.    What's your understanding of
16 your job in the prescription integrity group
17 in terms of suspicious order monitoring and
18 why you do it?
19          MR. HILL: Same objection.
20          THE WITNESS: My position in
21     the team is to ensure that we impose
22     specific limits on specific drugs to
23     ensure that there isn't a -- that no
24     one -- one store is getting an
25     overload of medication.

Page 29

1          So we put limits and processes
2     in place to ensure that if -- stores
3     don't get too much product.
4 QUESTIONS BY MR. SHKOLNIK:
5     Q.    Why wouldn't you want a store
6 to get too much product? Wouldn't it be a
7 good thing from a corporate perspective to
8 make sure there's plenty of product on hand?
9          MR. HILL: Object to the form.
10     Foundation.
11          THE WITNESS: I don't know.
12 QUESTIONS BY MR. SHKOLNIK:
13     Q.    Is it possible that if a store
14 has too much product on hand, it may result
15 in diversion of the drug into inappropriate
16 streams?
17          MR. HILL: Object to the form.
18     Foundation.
19          THE WITNESS: I don't know.
20 QUESTIONS BY MR. SHKOLNIK:
21     Q.    So as part of the training for
22 the prescription integrity group, no one ever
23 sat down and said, "We're doing this for some
24 specific reason, our job is for a reason,
25 other than to make sure drugstores don't have

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 too many pills on hand."
2          Other than that, did anyone
3 tell you anything else?
4          MR. HILL: Object to the form.
5          THE WITNESS: We were told
6     that, you know, we need to make sure
7     that the medication is being dispensed
8     to the legitimate patients, and the
9     stores that have the legitimate
10    patients are getting the legitimate
11    product.
12 QUESTIONS BY MR. SHKOLNIK:
13    Q.    And one of the problems is if
14 there's too many pills at a store or a store
15 is getting too much, there's a possibility
16 the pills may end up in the hands of
17 inappropriate users; is that a fair
18 statement?
19          MR. HILL: Object to the form.
20    Speculation.
21          THE WITNESS: No.
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    So, really, it doesn't make a
24 difference if too many pills were sitting in
25 the pharmacy; is that a fair statement?

Page 31

1          MR. HILL: Object to the form.
2          THE WITNESS: No.
3 QUESTIONS BY MR. SHKOLNIK:
4    Q.    If a pharmacy is -- I mean,
5 there has to be a reason why you want to
6 control how many pills end up in each one of
7 your pharmacies, other than for inventory
8 management; am I correct?
9    A.    Yes.
10    Q.    I mean, your job isn't designed
11 to say, "We don't want too many pills in
12 store X in Cleveland because they just happen
13 to have too many for an inventory purpose."
14          That's not your job, to monitor
15 that, correct?
16          MR. HILL: Object to the form.
17          THE WITNESS: No, that's not my
18    job.
19 QUESTIONS BY MR. SHKOLNIK:
20    Q.    Your job is to make sure that
21 pharmacy in Cleveland doesn't have too many
22 pills on hand and those pills don't get into
23 the wrong hands from the pharmacy; fair
24 statement?
25          MR. HILL: Object to the form.

Page 32

1          THE WITNESS: My role is to
2     make sure that the legitimate patients
3     receive the medication for their
4     legitimate medical needs.
5 QUESTIONS BY MR. SHKOLNIK:
6    Q.    And the converse of that is,
7 your job's responsibility is to make sure the
8 illegitimate users don't get those pills
9 through your pharmacies, correct?
10          MR. HILL: Same objection.
11          THE WITNESS: Correct.
12 QUESTIONS BY MR. SHKOLNIK:
13    Q.    And one of the ways of doing
14 that is to closely monitor how many pills are
15 being distributed out of a distribution
16 center to an individual pharmacy and whether
17 or not that pharmacy is following proper
18 procedures in terms of dispensing those
19 drugs; fair statement?
20    A.    Yes.
21    Q.    And that's part of your
22 responsibility in pharmacy integrity?
23    A.    Yes.
24    Q.    And there's another group that
25 you work kind of hand-in-hand with that's --

Page 33

1 would that be the pharmacy -- is it a
2 management group? There's a group that
3 actually gets the pills distributed to the
4 stores?
5    A.    We work closely with the
6 pharmacy inventory management group.
7    Q.    Inventory management, I'm
8 sorry.
9    A.    Okay.
10    Q.    And would it be fair to say the
11 pharmacy inventory management group, their
12 goal is to get the pills into the stores to
13 make sure the stores are properly stocked at
14 all times, correct?
15          MR. HILL: Object to the form.
16    Foundation.
17          THE WITNESS: Their goal is to
18    ensure that the logic is in place for
19    reordering and making sure that
20    inventory replenishment is successful.
21 QUESTIONS BY MR. SHKOLNIK:
22    Q.    And the pharmacy may say, "We
23 need pills," they go up through pharmacy
24 inventory management, but then your
25 department actually looks at that request and

Page 34

1 determine whether or not inventory management
2 should actually fulfill that order and send
3 the pills to that pharmacy, correct?
4     A.    No.
5     Q.    So tell me where you come in in
6 that process.
7         MR. HILL:  Object to the form.
8         THE WITNESS:  So if a store is
9     looking to receive some unallocated
10     product, they would contact our team.
11     Pharmacy inventory does not involve --
12     there's no involvement there.
13 QUESTIONS BY MR. SHKOLNIK:
14     Q.    So it goes to your team first
15 and then --
16     A.    We make the determination if
17 the product is warranted and should be
18 fulfilled.
19     Q.    Now, before your group got
20 established in 2012, who did that project?
21     A.    Pharmacy inventory management
22 team.
23     Q.    So the request would go
24 straight to inventory management, and they
25 would make the decision whether to ship it

Page 35

1 down?
2         MR. HILL:  Object to the form
3     and foundation.
4         THE WITNESS:  Yes.
5     (Walgreens-Mills Exhibit 1
6     marked for identification.)
7 QUESTIONS BY MR. SHKOLNIK:
8     Q.    I'm going to hand you what I've
9 marked as Plaintiff's Exhibit 1, and I'll
10 give you some extra copies.  We only have
11 three copies today.  So I don't know who gets
12 all the copies, but...
13         Mr. Mills, we printed this off
14 the Internet.  I think -- I think my office
15 got it from LinkedIn, and it appears to be a
16 bio of yours.
17         Could you take a quick look at
18 it?
19         Is this a document you had
20 prepared?
21     A.    I've never prepared this
22 document.
23     Q.    Do you know who prepared your
24 LinkedIn bio?
25     A.    I filled in the information.

Page 36

1 I've never seen it in this format.
2     Q.    Okay.  I guess my question was
3 bad.  You got me on one.
4         The information that's
5 contained in your LinkedIn, which we printed
6 out in this format, is that information that
7 you put into the program?
8     A.    Yes.
9     Q.    And would I be correct in --
10 well, let me -- let me withdraw that.
11         Is the information contained in
12 there accurate in terms of your job
13 responsibilities and duties at Walgreens from
14 2006 to the present?
15     A.    Yes.  I mean, this is a very
16 small picture, but, yes.
17     Q.    I understand.
18         So I'm going to focus primarily
19 on the 2000 -- December 2012 to present
20 responsibilities, and that's senior business
21 analyst.
22         So that position is a senior
23 business analyst in the pharmacy integrity
24 group at Walgreens, correct?
25     A.    Yes.

Page 37

1     Q.    How many senior business
2 analysts are there in that group at the
3 current time?
4     A.    Five.
5     Q.    And when the group was first
6 started, you were picked to be the one
7 analyst on the group at that time?
8     A.    Yes, but there was movement to
9 hire more.
10     Q.    I understand.
11         It was being developed into a
12 department?
13     A.    Correct.
14     Q.    And you were -- for lack of a
15 better phrase, you were on the ground floor
16 with Ms. Polster developing this new -- new
17 group?
18     A.    Correct.
19     Q.    When you were doing that in
20 2012, December, November, whichever date it
21 was, were you utilizing the services of any
22 outside consultants to help train you and
23 Ms. Polster on what needs to be done for
24 suspicious order monitoring?
25         MR. HILL:  Object to the form.

Page 38

1  THE WITNESS: No, not that I
2  can recall.
3  QUESTIONS BY MR. SHKOLNIK:
4  Q.  Where did -- I gather there was
5  a -- there was a directive that we now need
6  to start a pharmaceutical integrity program
7  by the end of December -- by the end of 2012
8  at Walgreens, and that Ms. Polster and
9  yourself were picked to lead that charge.
10  What background did you have in
11  this field to determine what would be an
12  appropriate program for pharmaceutical
13  integrity, both you and Ms. Polster, at that
14  time?
15  And I'm not suggesting in any
16  negative way.  I'm just trying to figure how
17  you guys were the ones picked.
18  MR. HILL: Object to the form,
19  the foundation and the compound
20  question.
21  THE WITNESS: I believe I was
22  picked or selected with my previous
23  experience in pharmacy inventory
24  management group, working closely with
25  how the ordering system kind of works.

Page 39

1  There was a lot of other
2  outside groups within Walgreens that
3  helped create and establish kind of
4  the rule sets of how our systems work,
5  so it just wasn't Tasha and I coming
6  up with these ideas.
7  QUESTIONS BY MR. SHKOLNIK:
8  Q.  Okay.  Can you tell us who
9  participated, outside of you and Tasha, to
10  develop what is now becoming the pharmacy
11  integrity group?
12  MR. HILL: Object to the form.
13  THE WITNESS: So I just want to
14  clarify your question.
15  You're asking who else outside
16  of Tasha and myself was involved?
17  QUESTIONS BY MR. SHKOLNIK:
18  Q.  Yeah.
19  A.  We had players from the
20  inventory management group, so Denny Murray.
21  We had people from our IT department, so
22  Wayne Bancroft, John Merritello, Steve
23  Bamberg --
24  Q.  So let me stop you right there.
25  A.  Sure.

Page 40

1  Q.  So the IT group was helping set
2  up the actual programming; am I correct?
3  A.  Yes.
4  Q.  And whatever platform you were
5  going to develop?
6  A.  Yes.
7  Q.  And you said Mr. Demmit?
8  A.  Denny.
9  Q.  Denny.
10  He was with inventory
11  management?
12  MR. HILL: Just so the record's
13  clear, it's not Mr. -- Denny's his
14  first name.
15  MR. SHKOLNIK: Oh, I'm sorry.
16  QUESTIONS BY MR. SHKOLNIK:
17  Q.  Denny, he was with inventory
18  management; am I correct?
19  A.  Yes, he's the director.
20  Q.  Oh, so he's the director of
21  inventory?
22  A.  Yes.
23  Q.  So he was bringing in the
24  inventory management side of the -- the
25  knowledge curve into this program, correct?

Page 41

1  A.  Yes.
2  Q.  And then in addition to the IT
3  platform people, who else?
4  A.  There were some players from
5  the pharmacy operations group, so how we
6  execute things in our store, our projects and
7  programs in our store.
8  Q.  And I'm trying to separate
9  between distribution --
10  A.  Sure.
11  Q.  -- and store.
12  So what do they play in terms
13  of either distribution, store or both, this
14  other group?
15  A.  Store execution.
16  Q.  Okay.  Who else was brought in?
17  A.  That's all I can recall.
18  Q.  Was there anyone who was sort
19  of an expert on what the regulatory
20  requirements were brought into the group?
21  MR. HILL: Object to the form
22  and the foundation.
23  THE WITNESS: There -- there --
24  there would have been some regulatory
25  lawyers.

Page 42

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    And do we know their -- I'm
3 sorry.  Do you know their names?
4         MR. HILL: Same objection.
5         THE WITNESS: Dwayne Piñon.
6 QUESTIONS BY MR. SHKOLNIK:
7     Q.    I'm sorry?
8     A.    Dwayne Piñon.
9     Q.    Okay.  Is he still with the
10 company?
11     A.    Yes.
12     Q.    To your knowledge, was Dwayne
13 Piñon involved in the Jupiter issue with the
14 DEA, one of the lawyers involved in that?
15         MR. HILL: Object to the form.
16         THE WITNESS: I don't know.
17 QUESTIONS BY MR. SHKOLNIK:
18     Q.    Okay.  Did he help -- and I
19 don't want you to go into any conversations
20 with what he did, but did he help provide
21 some guidance as to the regulatory aspect of
22 what your group was going to do?
23         MR. HILL: And that's a yes or
24     no, if you know.
25         THE WITNESS: No.

Page 43

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    In addition to the lawyers and
3 the other people, the other groups that you
4 mentioned, anyone else participate in this
5 development of pharmacy integrity?
6     A.    No, not that I can recall.
7     Q.    Was there a program that was
8 chosen as the platform to utilize, or did
9 Walgreens develop a program for this -- this
10 group?
11         MR. HILL: Object to the form.
12         THE WITNESS: We developed our
13     own logic and program.
14 QUESTIONS BY MR. SHKOLNIK:
15     Q.    Were there any outside
16 consultants that helped with the logic in
17 that program or that platform?
18     A.    I don't know.
19     Q.    Did you contribute to --
20 withdraw that.
21         Are you familiar with the
22 phrase "algorithms" -- or the word
23 "algorithm"?
24     A.    Yes.
25     Q.    In terms of the platform that's

Page 44

1 utilized by Walgreens in the pharmacy
2 integrity group, was there an algorithm
3 developed to help set off alarms or triggers
4 when orders were deemed to be suspicious?
5     A.    Yes, there is an algorithm that
6 sets and imposes limits on controlled drugs.
7     Q.    We're going to get into the
8 specifics of algorithms a little bit later --
9     A.    Sure.
10     Q.    -- but who developed the
11 algorithm at that time?
12         MR. HILL: Object to the form.
13     Foundation.
14         THE WITNESS: It would have
15     been Wayne Bancroft.
16 QUESTIONS BY MR. SHKOLNIK:
17     Q.    And he's a Walgreens employee?
18     A.    Yes.
19     Q.    Is he still there, to your
20 knowledge?
21     A.    Yes.
22     Q.    Did you have any discussions
23 with Mr. Bancroft as to where he developed --
24 how he developed, I should say, the algorithm
25 that he put in place?

Page 45

1     A.    No, nothing about how; just the
2 output of the algorithm and how it worked.
3     Q.    So you basically were -- he
4 develops -- his people develop the algorithm;
5 you're then shown how it -- how it operates,
6 basically?
7         MR. HILL: Object to the form.
8         THE WITNESS: I'm shown how it
9     calculates, and then my job as the
10     analyst would be to review the output
11     to make sure it is working correctly.
12 QUESTIONS BY MR. SHKOLNIK:
13     Q.    Okay.  Going back to Exhibit 1,
14 it says that part of your responsibilities is
15 to "monitor compliance with Walgreens'
16 dispensing practice through utilization of a
17 wide variety of analytic techniques."
18         We're going to go into a lot
19 more detail later, but I'd just like to
20 figure out, generally speaking, what are the
21 wide variety of analytic techniques that
22 you're applying there, other than this
23 algorithm that we just talked about?
24     A.    So we can monitor -- you know,
25 I can write SQL code, pull dispensing data,

Page 46

1 review dispensing patterns and histories to
2 see if there's any trending, things like
3 that.
4      Q.    Let me ask you a question.  If
5 there's a request that comes in -- and I'm
6 just -- I refer to Cleveland because
7 that's -- that's where our clients are right
8 now.  So I'm just going to keep
9 hypothetically talking Cleveland, if you
10 don't mind.
11          I have a store in Parma, which
12 is a place in Cleveland, and there's -- I
13 think every store has a store number,
14 correct?
15      A.    Yes.
16      Q.    So if I come up with a store
17 number, and I went to you and I said, "You
18 know, I'd like to know what store number X in
19 Parma, Ohio, has been doing in terms of its
20 ordering practices and suspicious orders that
21 may have come in and whether or not they've
22 been approved, shipped or not shipped since
23 2012," could we do that?
24          MR. HILL:  Object to the form.
25      Foundation.

Page 47

1          THE WITNESS:  Yes.
2 QUESTIONS BY MR. SHKOLNIK:
3      Q.    And we could actually identify
4 any store in the Walgreens family by num --
5 get a number, and by accessing the programs
6 that you have in pharmacy integrity, we can
7 run store by store the analytics for
8 suspicious orders that were generated,
9 correct?
10          MR. HILL:  Object to the form.
11      Foundation.
12          THE WITNESS:  Yes.
13 QUESTIONS BY MR. SHKOLNIK:
14      Q.    And that would take us 2012,
15 whatever date the program started -- I'm not
16 going to hold you to that -- right up until
17 November -- what day are we today? --
18 November 8, 2018.  And we could go store by
19 store and come up with a run; fair statement?
20          MR. HILL:  Same objections.
21          THE WITNESS:  Yes.
22 QUESTIONS BY MR. SHKOLNIK:
23      Q.    And that's an important aspect
24 of the program.  Let's say today a pharmacy
25 in Parma, Ohio, ordered a ridiculous number

Page 48

1 of pills according to your -- the program.
2 It would be a good thing to be able to say,
3 "wait a second, let's look at this -- this
4 pharmacy for the last six years and see what
5 they've done," or one year or two years or
6 three years.
7          That's something you're able to
8 do to help you as an analyst get a feel for
9 that individual pharmacy, correct?
10          MR. HILL:  Object to the form.
11          THE WITNESS:  Yes.
12 QUESTIONS BY MR. SHKOLNIK:
13      Q.    And that is a -- that's not a
14 hard thing to do it, is it?  If I gave you a
15 list of pharmacy numbers, identifiers,
16 someone in your group could actually run
17 those -- those searches for us; fair
18 statement?
19          MR. HILL:  Object to the form.
20          THE WITNESS:  Yes.
21 QUESTIONS BY MR. SHKOLNIK:
22      Q.    And that wouldn't have to be
23 generated on paper.  That could actually be a
24 program run in a computer and just a transfer
25 of data.  You know, it doesn't have to be

Page 49

1 paper, spreadsheets and tens of thousands of
2 paper; it could actually be electronic, fair
3 statement?
4          MR. HILL:  Object to the form
5      and foundation for this witness.
6          THE WITNESS:  No.
7 QUESTIONS BY MR. SHKOLNIK:
8      Q.    It has to be paper?
9      A.    I don't think I understand your
10 question.
11      Q.    Let me rephrase it.
12          If I asked you and I said Store
13 Number 22 in Parma, Ohio, give me a run from
14 2012 until November 8, 2018, you could
15 actually run that search and it could be
16 transferred digitally.  It would -- it would
17 be an electronic sheet of some type or
18 electronic printout of some type; fair
19 statement?
20          MR. HILL:  Same objections.
21          THE WITNESS:  Are you
22      suggesting an Excel spreadsheet?
23 QUESTIONS BY MR. SHKOLNIK:
24      Q.    That's the word.
25      A.    Okay.  Yes, we could copy the

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  data into an Excel spreadsheet.
2      Q.    Thank you.
3           Now, you were answering my
4  questions about a wide variety of analytic
5  techniques.
6           So other than the program,
7  which other -- what other analytic techniques
8  do you apply in this suspicious order
9  monitoring or compliance that you're
10  referencing here?
11          MR. HILL:  You mean other than
12      the ones he already talked about?
13          MR. SHKOLNIK:  Yes, I mean
14      other than that.  I'm sorry.
15          THE WITNESS:  It would be, you
16      know, reviewing limits, making sure
17      systems are set in place, making sure
18      that there's no stores that are
19      outliers.
20  QUESTIONS BY MR. SHKOLNIK:
21      Q.    Now, the second one says,
22  "Unlocks visibility using data mining to
23  understand business needs for improving and
24  optimizing distribution for the enterprise,
25  all while diminishing diversion."

Page 51

1           Could you explain for me what
2  that means?
3      A.    Sure.
4           Reviewing data to ensure that
5  we have limits and processes set in place so
6  that we are getting the legitimate patients
7  the legitimate medication they need.
8      Q.    Okay.  But you use a word in
9  there which I'd like to talk a little bit
10  about, "diminishing diversion."  So the word
11  I'm looking at is "diversion."
12          What is diversion in your
13  understanding?
14      A.    My understanding in my job,
15  diversion typically results in employee
16  theft.  So diversion of pills due to
17  nonprescription, usually due to an employee
18  at the store pilfering.
19      Q.    Is that a big problem in
20  Walgreens?
21          MR. HILL:  Object to the form.
22          THE WITNESS:  I don't think it
23      is.
24  QUESTIONS BY MR. SHKOLNIK:
25      Q.    But it's something you have to

Page 52

1  monitor and track?
2      A.    Yes.
3      Q.    Okay.  So when you're using
4  diversion, that's not being utilized in the
5  sense of the Controlled Substances Act and
6  suspicious order monitoring?
7          MR. HILL:  Object to the form.
8           And I'm not trying to be
9      difficult.  When you say when he's
10      using diversion, you mean in his
11      LinkedIn --
12          MR. SHKOLNIK:  Yeah, I'm sorry,
13      in the LinkedIn.  I'm under Exhibit 1,
14      just so it's clear.
15          THE WITNESS:  The diversion
16      that I'm speaking of is the diversion
17      of medication, unlawfully, without a
18      prescription, leaving the pharmacy.
19  QUESTIONS BY MR. SHKOLNIK:
20      Q.    Okay.
21      A.    That's the diversion I'm
22  speaking of.
23      Q.    All right.  Are you familiar
24  with the diversion in the sense that
25  diversion -- I'm sorry, withdraw that.

Page 53

1           Are you familiar with the term
2  or the word "diversion" being utilized in
3  terms of suspicious order monitoring
4  requirements for Walgreens?
5          MR. HILL:  Object to the form
6      and foundation.
7          THE WITNESS:  I'm not aware.
8  QUESTIONS BY MR. SHKOLNIK:
9      Q.    Were you aware that diversion
10  was one of the issues that was at the center
11  of the Jupiter distribution center DEA
12  actions?
13          MR. HILL:  Same objection.
14          THE WITNESS:  I'm not aware of
15      the word "diversion."
16  QUESTIONS BY MR. SHKOLNIK:
17      Q.    Okay.  We'll talk a little bit
18  more about that in a bit.
19           I'm just going to briefly --
20  prior to 2010, inventory specialist, you told
21  me a little bit about your responsibilities
22  back then.
23           Just so it's clear and I have
24  no question, you were not responsible for
25  what is now known as pharmacy integrity work

Page 54

1 regarding the opioids, or C-II, C-III
2 products, in 2010 up to December of 2012,
3 correct?
4     A.   That is correct.
5     Q.   Was there a person designated
6 responsible to oversee suspicious order
7 monitoring in the company, to your knowledge,
8 prior to your group being established?
9     MR. HILL: Object to the form.
10 Foundation. Calls for speculation.
11     THE WITNESS: I don't know.
12 QUESTIONS BY MR. SHKOLNIK:
13     Q.   When you guys were charged with
14 starting up this group, did you ever think to
15 say, "Who did this before us so we can get
16 some -- some guidance, some understanding, as
17 to what we were doing"?
18     MR. HILL: Object to form.
19     THE WITNESS: It was my
20 understanding at the time that we
21 didn't have anything, so that's why
22 this team was created.
23     (Walgreens-Mills Exhibit 2
24 marked for identification.)
25

Page 55

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.   I'm going to mark a series of
3 three letters -- I'm sorry, four letters as
4 Exhibit 2. You know what? Let's do one
5 letter at a time. Let's make this a series
6 of exhibits.
7     I'm going to mark as Exhibit 2
8 a letter dated September 27, 2006, from the
9 US Department of Justice, Drug Enforcement
10 Administration.
11     When you -- when you say you
12 didn't have anything prior to 2011, you're
13 saying, to your knowledge, there was not a
14 program in place for pharmaceutical integrity
15 as it relates to suspicious order monitoring
16 for opioids, correct?
17     MR. HILL: Objection to the
18 form. Misstates his testimony.
19     MR. SHKOLNIK: I think that's
20 what his testimony was, but -- I'll
21 stick with my question.
22     THE WITNESS: To my knowledge,
23 there was no team outside of the
24 creation of pharmacy integrity.
25

Page 56

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.   And to your knowledge, there
3 was no person with that title, correct?
4     MR. HILL: Object to the form.
5 What title?
6     MR. SHKOLNIK: Being
7 responsible for suspicious order
8 monitoring for Walgreens as it relates
9 to C-II and C-III opioid distribution.
10     THE WITNESS: I don't know.
11     MR. HILL: Object to the form.
12 QUESTIONS BY MR. SHKOLNIK:
13     Q.   This is Exhibit 2.
14     I'm going to show you what we
15 just marked as Exhibit 2. It's the letter
16 dated September 27, 2016.
17     A.   Just to clarify, it says 2006.
18     Q.   Sorry, 2006. My apologies.
19     A.   Okay.
20     Q.   Before I go to this Exhibit 2,
21 when you and Tasha got assigned to this new
22 department, which was triggered because of
23 what happened down in Jupiter, Florida, did
24 you not think it was odd that there was not a
25 group in place to do this job before 2012?

Page 57

1     MR. HILL: Object to the form.
2     THE WITNESS: I don't know. I
3 can't recall.
4 QUESTIONS BY MR. SHKOLNIK:
5     Q.   At that point Walgreens was, if
6 not the -- one of the biggest pharmacies in
7 the United States, was it not?
8     A.   It may have been. I don't
9 know.
10     Q.   Did you ever determine when you
11 got -- when you were an inventory specialist,
12 did you ever have any idea how many opioids
13 the company was distributing around the
14 United States during that time frame?
15     MR. HILL: Object to the form.
16     THE WITNESS: No, that was
17 outside my responsibilities.
18 QUESTIONS BY MR. SHKOLNIK:
19     Q.   Well, when you got on -- when
20 it became your responsibility in integrity in
21 2012, did you come to realize how many -- or
22 how much opioids your company distributed
23 through its pharmacies around the United
24 States?
25     MR. HILL: Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1      THE WITNESS:  Yes.
2  QUESTIONS BY MR. SHKOLNIK:
3      Q.    And it was a lot, was it not?
4      A.    I guess -- I guess it would be
5  a lot.  I don't know.
6      Q.    Well, you had almost 8,000
7  stores around the United States.  You would
8  assume it was a lot, right?
9      MR. HILL:  Object to the form.
10      THE WITNESS:  Yeah.
11  QUESTIONS BY MR. SHKOLNIK:
12      Q.    And just from your own personal
13  take on this, when you get into this job
14  after the DEA shuts down distribution
15  facilities, did you say to yourself, "How
16  could we be the first group responsible for
17  pharmacy integrity over opioids in this
18  company at this point in time?  Where was
19  this before?"
20      Did that come to your mind at
21  all?
22      MR. HILL:  Object to form.
23      When you say "pharmacy" -- let
24  me just ask the question.  When you
25  say "pharmacy integrity," are you

Page 59

1  talking about the name of his group,
2  or are you talking about some concept
3  generally?
4      Because you keep using that
5  phrase, and I just want to make sure.
6      MR. SHKOLNIK:  I'd appreciate
7  that you not do that.  All right?  I'm
8  using the phrase he used.  Thank you.
9  And I'm not going to go into it any
10  further with you.  I'm sorry.
11  QUESTIONS BY MR. SHKOLNIK:
12      Q.    Just so it's clear, sir, when
13  you get into pharmacy integrity group, you
14  and Tasha are starting this group, and you
15  now know you have over 8,000 pharmacies in
16  the United States.  You know you're
17  dispensing a lot of opioids throughout the
18  country.  You know your responsibility is to
19  implement a program for suspicious order
20  monitoring for the company.
21      Did you not say, "Why didn't we
22  have a group like this before?"
23      MR. HILL:  Object to the form.
24  Compound.
25

Page 60

1  QUESTIONS BY MR. SHKOLNIK:
2      Q.    Did you ever say that?
3      MR. HILL:  Compound.
4  Foundation.
5      THE WITNESS:  I don't recall.
6  QUESTIONS BY MR. SHKOLNIK:
7      Q.    All right.  Did it surprise you
8  that your company did not have a group
9  directly responsible to oversee suspicious
10  order monitoring throughout the United
11  States --
12      MR. HILL:  Object to the form.
13  QUESTIONS BY MR. SHKOLNIK:
14      Q.    -- up until starting your group
15  in 2012?
16      MR. HILL:  Object to the form.
17  Misstates the evidence.
18      THE WITNESS:  I don't recall if
19  there was any specific guidelines
20  around suspicious order monitoring
21  imposed by the DEA at that moment.
22  QUESTIONS BY MR. SHKOLNIK:
23      Q.    Okay.  If we could turn to
24  Exhibit 2, if you would.
25      This is that letter of 2006,

Page 61

1  September 2006, and I think maybe this will
2  help us determine if there was any
3  requirements prior to 2012, and then -- let's
4  read it together.
5      So this is a letter that was
6  sent to every commercial entity in the United
7  States registered with the Drug Enforcement
8  Administration to distribute controlled
9  substances.
10      Sir, was your understanding
11  Walgreens was a registered entity by the DEA
12  for the distribution of controlled
13  substances?
14      MR. HILL:  Object to the form.
15  Foundation.
16      THE WITNESS:  Yes.
17  QUESTIONS BY MR. SHKOLNIK:
18      Q.    Based on this letter, you would
19  assume Walgreens would have received it if it
20  was one of every -- since it was being sent
21  to every entity in the United States.
22      MR. HILL:  Object to the form.
23  QUESTIONS BY MR. SHKOLNIK:
24      Q.    Correct?
25      MR. HILL:  Foundation.

Page 62

1    THE WITNESS:  Yes.
2    QUESTIONS BY MR. SHKOLNIK:
3    Q.    It goes on to say, "The purpose
4    of this letter is to reiterate the
5    responsibilities of controlled substance
6    distributors in view of the prescription drug
7    abuse problem our nation currently faces."
8    So in this time it was 2006.
9    If I'm not mistaken, you were still in
10   school, correct?
11   A.    Correct.
12   Q.    But at this time you were also
13   starting with Walgreens in some capacity in
14   employment, were you not?
15   A.    I did.
16   Q.    Now, at that point in time --
17   and I know you were young and you were just
18   starting out -- did you have any
19   understanding that in the United States there
20   was a drug abuse problem, in the United
21   States or in our nation at that time?
22   MR. HILL:  Object to the form.
23   THE WITNESS:  No.
24   QUESTIONS BY MR. SHKOLNIK:
25   Q.    Okay.  We're going to go on and

Page 63

1    read a little more of it.
2    "As you are undoubtedly aware,
3    the abuse, nonmedical use of control
4    prescription drugs, is a serious and growing
5    health problem in the country."
6    I'm assuming at that time you
7    weren't aware of that, correct?
8    MR. HILL:  Object to the form.
9    Foundation.
10   THE WITNESS:  I don't remember.
11   QUESTIONS BY MR. SHKOLNIK:
12   Q.    Go down to the next paragraph.
13   "The CSA, that's the Controlled Substances
14   Act, was designed by Congress to combat
15   diversion by providing for a closed system of
16   drug distribution in which all legitimate
17   handlers of controlled substances must obtain
18   a DEA registration, and as a condition of
19   maintaining such registration, must take
20   reasonable steps to ensure their registration
21   is not being utilized as a source for
22   diversion."
23   Now, that word "diversion" that
24   we were talking about a little while ago is
25   used twice in that paragraph.

Page 64

1    Did anyone ever tell you that
2    as far back as 2006 the DEA was telling
3    companies like Walgreens that they had to
4    take steps to prevent diversion under the
5    Controlled Substances Act?
6    Did anyone ever tell you that
7    when you took your job?
8    MR. HILL:  Object to the form.
9    THE WITNESS:  No.
10   QUESTIONS BY MR. SHKOLNIK:
11   Q.    Did anyone ever tell you that
12   your job, when you were in integrity, in
13   prescription integrity, was to implement
14   processes under the Controlled Substances Act
15   to implement reasonable steps to ensure your
16   registration was not being utilized as a
17   source for diversion?
18   Did anyone ever use that
19   phraseology and tell you that was part of
20   your job?
21   MR. HILL:  Object to the form.
22   THE WITNESS:  I don't remember.
23   QUESTIONS BY MR. SHKOLNIK:
24   Q.    Did anyone ever tell you
25   diversion was not limited to whether or not

Page 65

1    people stole, like employees stole, pills
2    that diversion was a much bigger problem as
3    it related to opioids and the requirements
4    under the Controlled Substances Act?
5    A.    I don't remember.
6    Q.    Well, as you're sitting here
7    today, do you now believe part of your job is
8    implementing for Walgreens the reasonable
9    steps to ensure that the registration was not
10   being utilized for diversion --
11   MR. HILL:  Object to the form.
12   QUESTIONS BY MR. SHKOLNIK:
13   Q.    -- other than employees
14   stealing?
15   MR. HILL:  Object to the form.
16   Foundation.
17   THE WITNESS:  Can you rephrase
18   your question?  I got lost in there.
19   QUESTIONS BY MR. SHKOLNIK:
20   Q.    Okay.
21   A.    I'm sorry.
22   Q.    You know, we're reading this.
23   Do you have -- withdraw that.
24   So is it fair to say that up
25   until today no one ever told you that part of

Page 66

1  your job was to implement some of these
2  reasonable steps to prevent the registration
3  for being utilized for a source of diversion?
4      To this day, did anyone ever
5  tell you that?
6      MR. HILL:  Object to the form.
7  Foundation.
8      THE WITNESS:  I don't know.  I
9  don't remember.
10  QUESTIONS BY MR. SHKOLNIK:
11     Q.    After this deposition, you're
12  going to -- will you go back and ask someone,
13  "Is diversion more than pilfering from
14  stores?"
15     A.    Yes.
16     Q.    Now, it goes on to say,
17  "Distributors are of course" -- withdraw
18  that.
19          At the current time, Walgreens
20  is no longer a distributor of opioids; am I
21  correct?
22     A.    At the time of today or --
23     Q.    Yeah, today.  Today.
24     A.    Today?  We are no longer.
25     Q.    That stopped in 2013 or '14,

Page 67

1  depending upon which drugs?
2      A.    That sounds correct.
3      Q.    Do you know why the company
4  stopped -- you know, gave up the distribution
5  registrations?
6      A.    I don't know.
7      Q.    But up until the time that
8  Walgreens gave up their distribution
9  registrations, you understood your
10  prescription integrity group to be
11  responsible for oversight of the
12  responsibilities related to the distribution
13  of the opioids under the Controlled
14  Substances Act, correct?
15      MR. HILL:  Object to the form.
16      THE WITNESS:  Yes.
17  QUESTIONS BY MR. SHKOLNIK:
18      Q.    And since the registrations
19  were surrendered, would I be correct in
20  stating that your department continues in the
21  oversight area, but it's now focused on
22  whether or not the stores are distributing or
23  selling appropriately?  Is that a fair
24  statement?
25      MR. HILL:  Object to the form.

Page 68

1  Compound.
2      THE WITNESS:  Can you rephrase
3  your question?
4  QUESTIONS BY MR. SHKOLNIK:
5      Q.    I'll rephrase that.  That was a
6  bad question.
7          Since the company gave up its
8  distribution registrations, has your
9  responsibilities changed at all?
10      A.    No.
11      Q.    Would it be fair to say since
12  the distribution registrations were
13  surrendered, the actual distribution occurs
14  between outside vendors and the Walgreens
15  stores as it relates to opioids and doesn't
16  come through Walgreens itself?
17      MR. HILL:  Objection.  Form.
18      THE WITNESS:  To clarify, your
19  question is do our stores order their
20  products through a vendor and then
21  that vendor then replenishes that
22  order to the store?
23  QUESTIONS BY MR. SHKOLNIK:
24      Q.    That's a good way of putting
25  it, yes.

Page 69

1      A.    Yes.
2      Q.    Okay.  So someone else is the
3  actual distributor in that setting as it
4  relates to opioids?
5      A.    Yes.
6      Q.    Those vendors that are utilized
7  for opioids, do they provide you at Walgreens
8  information regarding their suspicious
9  ordering -- suspicious order monitoring
10  findings with respect to stores?
11      MR. HILL:  Object to the form.
12  Foundation.
13      THE WITNESS:  I don't know how
14  they utilize their suspicious order
15  monitoring, because that's proprietary
16  to them.  If there's something that
17  they deem is a suspicious or flagged
18  order, they will let us know.
19  QUESTIONS BY MR. SHKOLNIK:
20      Q.    So it comes through your -- I
21  think you may have answered my question.
22          If the distributor, that vendor
23  distributor, determines an order to be
24  suspicious, is part of the process at
25  Walgreens that your group would be notified?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  A.   Yes.
2       MR. HILL: Object to form.
3  QUESTIONS BY MR. SHKOLNIK:
4    Q.   Are there occasions where your
5  group notifies the vendor that you think an
6  order may be suspicious?
7    A.   No.
8    Q.   Let's go back to Exhibit 2.
9       It goes on to say -- I lost
10 where I was. Okay. "Distributors are, of
11 course, one of the key components in the
12 distribution chain. If the closed system is
13 to function properly as Congress envisioned,
14 distributors must be vigilant in deciding
15 whether a prospective customer can be trusted
16 to deliver controlled substances only for
17 lawful purposes."
18      Now, prior to your -- well,
19 when you started your job in prescription
20 integrity, did you ask anyone, "What was the
21 system in place at Walgreens in terms of how
22 they vigilantly decided whether a prospective
23 customer could be trusted to deliver
24 controlled substances?"
25      Did you ask anybody, "How were

Page 71

1  we doing that?"
2       MR. HILL: Object to the form.
3       THE WITNESS: I don't remember.
4  QUESTIONS BY MR. SHKOLNIK:
5    Q.   Did you ever come to know what,
6  if anything, Walgreens was doing prior to
7  2012 to comply with that requirements -- that
8  requirement of the CSA?
9    A.   I don't remember.
10   Q.   Would it be fair to say that it
11 was your understanding back there that they
12 weren't taking any steps to control -- to
13 comply with CSA as it relates to determining
14 whether a prospective customer could be
15 trusted?
16      MR. HILL: Object to the form.
17 Foundation.
18 QUESTIONS BY MR. SHKOLNIK:
19   Q.   Wasn't that your understanding?
20      MR. HILL: Same objections.
21      THE WITNESS: No.
22 QUESTIONS BY MR. SHKOLNIK:
23   Q.   So what was your understanding?
24   A.   That Walgreens had processes in
25 place around the order replenishment.

Page 72

1    Q.   You just don't know what they
2  were?
3    A.   I don't remember.
4    Q.   If we can go to the next page,
5  middle of the page, fourth paragraph down,
6  "The DEA regulations require all distributors
7  to report suspicious orders of controlled
8  substances. Specifically, the regulations
9  state in 21 CFR Section 1301.74(b), 'The
10 registrant shall design and operate a system
11 to disclose to the registrant suspicious
12 orders of controlled substances. The
13 registrant shall inform the field division of
14 the Administration in his area of suspicious
15 orders when discovered by the registrant.
16 Suspicious orders include orders of unusual
17 size, orders deviating substantially from
18 normal pattern and orders of unusual
19 frequency.'"
20      When you got assigned the task
21 in 2012, did anyone ever tell you that that
22 was your responsibility in the integrity
23 group?
24      MR. HILL: Object to the form.
25      THE WITNESS: That was a part

Page 73

1  of our responsibility.
2  QUESTIONS BY MR. SHKOLNIK:
3    Q.   So someone actually told you
4  those are the requirements? You were -- you
5  had an obligation to identify suspicious
6  orders, as well as you had responsibilities
7  of reporting the suspicious orders to the
8  DEA.
9       MR. HILL: Object to the form.
10 QUESTIONS BY MR. SHKOLNIK:
11   Q.   Correct?
12   A.   Yes, this is what the --
13 guidelines of the DEA.
14   Q.   And it also -- we can go down
15 further, two more paragraphs, "Thus, in
16 addition to reporting all suspicious order, a
17 distributor had a statutory responsibility to
18 exercise due diligence to avoid fulfilling
19 suspicious orders that might be diverted into
20 other than legitimate medical, scientific,
21 industrial channels. Failure to exercise
22 such due diligence could, as circumstance
23 warrant, provide a statutory basis for
24 revocation or suspension of distributor's
25 registration."

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Were you told that when you
2  took over your charge in the integrity group?
3          MR. HILL:  Object to the form.
4          THE WITNESS:  I don't remember.
5  QUESTIONS BY MR. SHKOLNIK:
6    Q.    Okay.  Did you ask anybody,
7  "How were we taking steps and honoring our
8  responsibility" -- withdraw that.
9          Did you ever ask anybody in
10 2012, "How did we perform due diligence to
11 avoid fulfilling suspicious orders that might
12 be diverted into other than legitimate
13 medical, scientific, industrial channels?"
14 prior to your group being established?
15         MR. HILL:  Object to the form.
16         THE WITNESS:  I don't remember.
17 QUESTIONS BY MR. SHKOLNIK:
18   Q.    It would have been nice to
19 know, wouldn't it, so that you could either
20 follow it, if it was good, or not follow it,
21 if it was bad, practice?  Wouldn't that be
22 true?
23         MR. HILL:  Object to the form.
24         THE WITNESS:  That is true,
25     that would be good information to

Page 75

1     know.
2  QUESTIONS BY MR. SHKOLNIK:
3    Q.    And to the best of your
4  knowledge at the time in 2012, there was not
5  proper procedures in place, and that's what
6  led to the DEA action down in Jupiter; fair
7  statement?
8          MR. HILL:  Object to the form
9      and foundation.
10         THE WITNESS:  I don't know all
11     the ins and outs of the processes in
12     place prior to 2012.
13 QUESTIONS BY MR. SHKOLNIK:
14   Q.    Well, if proper practices were
15 in place, would you agree with me the DEA
16 probably wouldn't have suspended the
17 distribution facilities; fair statement?
18         MR. HILL:  Objection to form.
19     Misstates the facts.  It calls for
20     speculation.
21         THE WITNESS:  I don't know.
22 QUESTIONS BY MR. SHKOLNIK:
23   Q.    I mean, I don't want you to
24 speculate, but would it be fair to say that
25 if everybody was doing the right thing at the

Page 76

1  distribution center in Jupiter in terms of
2  its responsibilities under the CSA, the DEA
3  probably wouldn't have suspended the license
4  of the facility for the distribution of
5  opioids?
6          MR. HILL:  Same objection.
7      Asked and answered.
8          THE WITNESS:  I don't know.
9          MR. SHKOLNIK:  I think we just
10     did an hour.  Want to take the first
11     break?
12         MR. HILL:  Sure.
13         VIDEOGRAPHER:  Going off the
14     record at 10:11.
15      (Off the record at 10:11 a.m.)
16         VIDEOGRAPHER:  We're back on
17     the record at 10:29.
18 QUESTIONS BY MR. SHKOLNIK:
19   Q.    Mr. Mills, I just want to go
20 back to Exhibit 2, if we could.  And if you
21 could turn to the third page of the document,
22 and I'll ask you some questions about the
23 issue of diversion as that definition is used
24 by the DEA.
25         If we go to page 3, the heading

Page 77

1  is "Circumstances that might be indicative of
2  diversion."
3          "The DEA investigations have
4  revealed that certain pharmacies engaged in
5  dispensing controlled substances for other
6  than legitimate medical purpose often display
7  one or more of the following characteristics
8  in the pattern of ordering controlled
9  substances:  Ordering excessive quantities of
10 limited variety of controlled substances,
11 that is, ordering phentermine, hydrocodone,
12 alprazolam, while ordering few, if any, other
13 drugs."
14         Did anyone ever tell you that
15 that would be -- that is a form of diversion?
16         MR. HILL:  Object to the form.
17         THE WITNESS:  I don't remember.
18 QUESTIONS BY MR. SHKOLNIK:
19   Q.    "Ordering a limited variety of
20 controlled substances in quantities
21 disproportionate to the quantity of
22 noncontrolled medications ordered."
23         Did anyone at Walgreens ever
24 tell you that would be an indication of
25 diversion?

Highly Confidential – Subject to Further Confidentiality Review

Page 78

1    A.    I don't remember.
2    Q.    Up until the present time, has
3 anyone ever told you that?
4          MR. HILL:  Object to the form.
5          THE WITNESS:  I can't recall.
6 QUESTIONS BY MR. SHKOLNIK:
7    Q.    You're aware part of your
8 responsibilities in pharmaceutical integrity
9 is to prevent diversion as it is defined by
10 the DEA in the Controlled Substances Act;
11 fair statement, sir?
12         MR. HILL:  Object to the form.
13 Foundation.
14         THE WITNESS:  I see that on the
15    document.  I can't recall.
16 QUESTIONS BY MR. SHKOLNIK:
17    Q.    But do you think it would be
18 important for Walgreens to have told the
19 people in pharmaceutical integrity that their
20 responsibility was to take steps to avoid
21 diversion as it is defined in the Controlled
22 Substances Act as it relates to the people
23 who are charged with that responsibility?
24         MR. HILL:  Object to the form.
25         THE WITNESS:  Yes.  I mean, we

Page 79

1    would have been exposed or been
2    explained this document -- or I'm
3    sorry, not the document, but the
4    nature of how diversion works.
5 QUESTIONS BY MR. SHKOLNIK:
6    Q.    So at the current time -- let
7 me just finish it, and then we can go back to
8 that.  I'll withdraw that question.
9          So 3, "Ordering excessive
10 quantities of a limited variety of controlled
11 substances in combination with excessive
12 quantities of lifestyle drugs, and ordering
13 the same controlled substance from multiple
14 distributors."
15         Did anyone ever tell you that
16 those two items were evidence of diversion as
17 it is defined by the CSA and the Drug
18 Enforcement Administration of the US
19 Department of Justice?
20         MR. HILL:  Object to the form
21    and asked and answered.
22         THE WITNESS:  I don't recall.
23 QUESTIONS BY MR. SHKOLNIK:
24    Q.    There is no question --
25 withdraw that.

Page 80

1          Did you see anyone in this
2 definition that diversion should be limited
3 to keeping track of pilfering of pills by
4 employees in the company?
5          MR. HILL:  Same objections.
6          THE WITNESS:  I do not see that
7    here in this document.
8 QUESTIONS BY MR. SHKOLNIK:
9    Q.    In terms of being able to do
10 your job as best as you could do, sir, which
11 I assume you truly want to do, would you have
12 liked Walgreens to have sat down with you and
13 said, "The DEA has determined that these are
14 signs of diversion," what I've read to you
15 from Exhibit 2?
16         Wouldn't you have liked that,
17 sir?
18         MR. HILL:  Object to the form.
19 Foundation.
20         THE WITNESS:  I cannot remember
21    if that conversation occurred or not.
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    If it didn't occur, would you
24 think that would, you know -- you know, hurt
25 your ability to do your job right?

Page 81

1          MR. HILL:  Calls for
2    speculation.
3          THE WITNESS:  Is that -- is
4    that my opinion?
5 QUESTIONS BY MR. SHKOLNIK:
6    Q.    Yeah.
7          MR. HILL:  Same objection.
8          THE WITNESS:  Yes.
9 QUESTIONS BY MR. SHKOLNIK:
10   Q.    Did you ever get a copy of this
11 letter sent to you by e-mail, by hand, by
12 fax, by anything, from the people at
13 Walgreens, copy of Exhibit 2, the letter from
14 the US Department of Justice, Drug
15 Enforcement Administration, dated
16 September 27, 2016 {sic}, as part of your
17 training to be one of the founding members of
18 the pharmacy integrity group at Walgreens?
19         MR. HILL:  Object to the form.
20 Compound.
21         THE WITNESS:  I don't remember.
22 QUESTIONS BY MR. SHKOLNIK:
23   Q.    Would you like to have a copy
24 of this document at your desk if you ever
25 needed to question whether or not you were in

Page 82

1  compliance with the Drug Enforcement
2  Administration's Controlled Substances Act
3  requirements in order to do your job?
4       MR. HILL:  Object to the form.
5       THE WITNESS:  Yes.
6       (Walgreens-Mills Exhibit 3
7    marked for identification.)
8  QUESTIONS BY MR. SHKOLNIK:
9       Q.   I'm going to mark as
10 Exhibit 3 -- by the way, you don't have a
11 copy of this letter at your desk, do you?
12      A.   I do not know.
13      Q.   Is it possible you have a copy
14 of it at your desk?
15      A.   I have many documents at my
16 desk, many documents from DEA.  I don't know.
17      Q.   Do you have a binder with all
18 the -- where you keep your DEA documents?
19      A.   I have a file folder.
20      Q.   You do?
21      A.   (Witness nods head.)
22      Q.   Has that been turned over to
23 counsel?
24      MR. HILL:  Object to the form
25    and foundation.

Page 83

1       THE WITNESS:  I don't know.
2  QUESTIONS BY MR. SHKOLNIK:
3       Q.   Why don't you tell me
4  everything you have in your desk and on your
5  laptop, your computer, that relates to your
6  job in terms of pharmacy integrity, in terms
7  of documentation from the DEA and/or the
8  company that you're maintaining in your
9  office.
10      MR. HILL:  Object to the form.
11      THE WITNESS:  I have many
12   documents, subpoenas, from DEA
13   requesting data.  I don't know the
14   nature of every single document.
15 QUESTIONS BY MR. SHKOLNIK:
16      Q.   What's your responsibility with
17 respect to subpoenas from the DEA that you're
18 saying are in your office?
19      A.   Provide any of the data
20 requests that they're looking for as it
21 relates to patients, prescribers or audits.
22      Q.   And those are maintained -- you
23 maintain files on each of those; am I
24 correct?
25      A.   Yes, we have files.

Page 84

1       Q.   Okay.  And were any of them
2  related to opioids, or any of the Class II or
3  III narcotics?
4       MR. HILL:  Object to the form.
5       THE WITNESS:  I don't know.
6  QUESTIONS BY MR. SHKOLNIK:
7       Q.   Generally speaking, when the
8  DEA has been seeking information about
9  doctors, pharmacies or individuals, isn't it
10 usually related to some type of
11 opioid-related investigation in recent years?
12      A.   No, not always.
13      Q.   I don't mean always, but a good
14 number of times?
15      A.   I don't know the number.
16      Q.   More than one?
17      A.   More than one what?
18      Q.   More than one time it's been
19 related to opioids.
20      A.   Maybe.
21      Q.   What are the other ones that
22 you can recall them investigating?  Is it
23 PSE, possibly?
24      MR. HILL:  Object to the form.
25      THE WITNESS:  It could be.

Page 85

1       MR. SHKOLNIK:  We would ask for
2    the production of all of the documents
3    maintained in the personal file of
4    Mr. Mills relating to subpoenas or any
5    of Justice Department requests for
6    information that in any way or any
7    form relate to suspicious order
8    monitoring and/or opioids.
9       And I'm just -- this is just
10   for the record.  I'm not suggesting
11   you go do anything, sir.
12 QUESTIONS BY MR. SHKOLNIK:
13      Q.   I'm going to hand -- this is
14 Exhibit 3, and we're going to staple them.
15      I'm going to show you what's
16 been marked as Exhibit 3.  It looks like a
17 similar letter, but, in fact, it's a
18 different one.  And this one is dated
19 February 7, 2007.
20      Once again, sir, this is a
21 letter that was sent to all the registrants
22 in 2007.  And again, it's the -- the DEA
23 writing to all registrants who distribute
24 controlled substances to reiterate
25 responsibilities of controlled substance

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 distributors in view of the prescription drug
2 abuse problem our nation currently faces.
3        And if you could take a quick
4 look at it. It's fairly similar to the last
5 one in terms of its content.
6        Have you ever seen this
7 document, sir?
8    A.   I don't remember.
9    Q.   Do you recall if you have a
10 copy of this document on your desk?
11    A.   I don't know.
12        (Walgreens-Mills Exhibit 4
13    marked for identification.)
14 QUESTIONS BY MR. SHKOLNIK:
15    Q.   I'm going to hand you what is
16 marked as Exhibit 3. I'm sorry, 4.
17 December 27, 2007.
18        I just handed you what has been
19 marked as Exhibit 4, another letter from the
20 US Department of Justice Drug Enforcement
21 Administration, December 27, 2007.
22        This is another "dear
23 registrant" letter. "This letter is being
24 sent to every entity in the United States
25 registered with the Drug Enforcement

Page 87

1 Administration to manufacture or distribute
2 controlled substances. The purpose of the
3 letter is to reiterate responsibilities of
4 controlled substance manufacturers and
5 distributors and to inform the DEA of
6 suspicious orders in accordance with 21 CFR
7 1301.74."
8        Did you ever see this guidance
9 letter that was issued in December of 2007
10 regarding the reporting of suspicious orders?
11    A.   I don't remember.
12    Q.   If we can go down to the third
13 paragraph. It says, "The regulation also
14 requires that the registrant inform the local
15 DEA division office of suspicious orders when
16 discovered by the registrant."
17        Would it be fair to say today
18 you at Walgreens comply with this requirement
19 that once a suspicious order is discovered,
20 you report to the DEA?
21        MR. HILL:  Object to the form.
22        THE WITNESS:  In today?
23 QUESTIONS BY MR. SHKOLNIK:
24    Q.   Yeah.
25    A.   Currently?  Yes.

Page 88

1    Q.   Are there ever -- how is that
2 done?  What is the process in terms of
3 reporting it to the DEA today?
4    A.   If we determine an item, due to
5 the nature of the outlined regulations the
6 DEA has given us, to be suspicious, then we
7 report it via fax to the local DEA office.
8    Q.   And is there an algorithm where
9 a computer determines if an order is
10 suspicious?
11    A.   No.  It is a manual
12 intervention by someone on our team to
13 review.
14    Q.   It goes on in the -- it goes on
15 to say, "Filing a monthly report of completed
16 transactions, excessive purchase report or
17 high unit purchases does not meet the
18 regulatory requirement to report suspicious
19 orders.  Registrants are reminded that their
20 responsibility does not end merely with
21 filing of suspicious order report.
22 Registrants must conduct an independent
23 analysis of suspicious orders prior to
24 completing a sale to determine whether the
25 controlled substances are likely to be

Page 89

1 diverted from legitimate channels.  Reporting
2 an order as suspicious will not absolve the
3 registrant of responsibility if the
4 registrant knew or should have known that the
5 controlled substances were being diverted."
6        Today at Walgreens, if a
7 suspicious order is flagged, is that
8 immediately reported or is the investigation
9 undertaken and then a decision made to
10 report?
11        MR. HILL:  Object to the form.
12        THE WITNESS:  There is an
13    investigation performed by someone on
14    our team, and then the determination
15    is made if the order is suspicious and
16    it should be reported.
17 QUESTIONS BY MR. SHKOLNIK:
18    Q.   Is there -- is -- when -- is
19 there a name given to the order before it's
20 either ruled in or ruled out as suspicious?
21        Is there some type of -- what's
22 that limbo period where something is brought
23 to your attention and then the investigation
24 begins?
25        I'm just trying -- I want to

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 make sure I'm using the same words so I don't
2 confuse things.
3      A.    We call them flagged orders.
4      Q.    Flagged orders.
5      Okay. So what is the
6 difference between a flagged order and a
7 suspicious order?
8      A.    So a flagged order is the
9 algorithm working and identifying orders
10 of -- that deviate based on the DEA's
11 guidelines, and then our team reviews. And
12 depending on the information we receive in
13 reviewing, we make the determination if that
14 order should be marked as suspicious.
15      Q.    I see.
16      But something in the algorithm
17 has already -- is what brings it to your
18 attention; is that a fair statement to make?
19      When you say "flagging" -- so
20 there's an algorithm that flags it. Then it
21 gets looked at by a human being, who then
22 implements a review process?
23      A.    Yes. That's a little bit
24 oversimplifying, but, yes, that's essentially
25 what happens.

Page 91

1      Q.    Now, if it's deemed suspicious,
2 I assume you don't ship it, correct?
3      A.    Correct.
4      Q.    If it's -- so just so I
5 understand it -- I want to make sure that I'm
6 not misunderstanding the process.
7      If the algorithm flags it as
8 potentially suspicious based on that
9 definition of deviating from the norm, I
10 think the phraseology you were using, and
11 it's marked as flagged, is the flagging then
12 reported to the DEA?
13      MR. HILL: Object to the form.
14      THE WITNESS: No, the flagged
15      is reviewed by someone on our team,
16      and then at that time, depending on
17      the conclusion of their review, it's
18      determined if it's suspicious or not.
19 QUESTIONS BY MR. SHKOLNIK:
20      Q.    So then -- so the ship -- the
21 ship or non-ship decision is made at the
22 point that the person who does -- who has
23 completed their review, they're saying it's
24 either suspicious, we're not going to ship,
25 or it's not suspicious and we can ship. So

Page 92

1 it's all -- and then there's reporting done
2 at that point in time. It's all done
3 simultaneously at that point?
4      MR. HILL: Object to the form.
5      THE WITNESS: Yes.
6 QUESTIONS BY MR. SHKOLNIK:
7      Q.    It would be fair to say that
8 you do not report them on a monthly basis,
9 these suspicious orders, correct?
10      A.    Correct.
11      Q.    You report them -- if it's
12 determined suspicious, you report it as
13 suspicious at that -- at that time?
14      A.    All the reported -- all orders
15 marked suspicious are reported daily.
16      Q.    And in fact, it's your
17 understanding if you had collected them and
18 waited to do it at the end of the month, that
19 would not be appropriate under the
20 regulations, correct?
21      MR. HILL: Object to the --
22      calling for a legal conclusion.
23      THE WITNESS: I don't know that
24      to be accurate. I don't know.
25 QUESTIONS BY MR. SHKOLNIK:

Page 93

1      Q.    No one ever said that to you in
2 your department?
3      A.    I don't know. I don't
4 remember.
5      Q.    Well, we just read it here.
6 "Filing a monthly report of completed
7 transactions does not meet the regulatory
8 requirement to report suspicious orders."
9      So based on what we just read,
10 your company was not doing monthly reports of
11 all these suspicious. You were doing them
12 contemporaneous with determinations on a
13 daily basis?
14      MR. HILL: Object to the form,
15      and vague in terms of time.
16      MR. SHKOLNIK: I don't need to
17      say what time.
18      MR. HILL: It's vague.
19      MR. SHKOLNIK: Not to me.
20      THE WITNESS: We were filing
21      suspicious orders daily.
22 QUESTIONS BY MR. SHKOLNIK:
23      Q.    Okay. Did anyone ever tell you
24 when you got involved in this, "The one thing
25 we're not going to do here, we are not going

Page 94

1 to report on a monthly basis because the DEA
2 says that's inappropriate"?
3          MR. HILL:  Object to the form.
4          THE WITNESS:  I don't know.
5 QUESTIONS BY MR. SHKOLNIK:
6     Q.    Did anyone ever tell you
7 Walgreens got in a lot of trouble because
8 they were reporting on a monthly basis prior
9 to the implementation of your team?
10          MR. HILL:  Object to the form
11     and the foundation.
12          THE WITNESS:  I don't know.
13 QUESTIONS BY MR. SHKOLNIK:
14     Q.    So as you sit here today, you
15 have no knowledge as to whether or not
16 Walgreens, prior to the implementation of
17 your department, your prescription integrity
18 department, whether or not Walgreens was
19 carrying out its reporting requirements on a
20 monthly basis?  You didn't know that one way
21 or the other?
22          MR. HILL:  Same objection.
23          THE WITNESS:  I don't know.
24 QUESTIONS BY MR. SHKOLNIK:
25     Q.    Did someone, when you set up

Page 95

1 the program in your office, say, "The one
2 thing we're going to make sure of, when we do
3 our suspicious orders, we're going to report
4 them daily"?
5          MR. HILL:  Same objection.
6 QUESTIONS BY MR. SHKOLNIK:
7     Q.    Someone had to make that
8 decision, correct?
9     A.    Yeah, I don't know.  I was not
10 involved.
11     Q.    Sort of outside of your pay
12 grade or someone else doing that, but that
13 was the plan, correct?
14     A.    I don't know.
15     Q.    But that was the plan?
16     A.    I don't know.
17     Q.    From the moment you got
18 involved in the group, it was always a daily
19 reporting, correct?
20     A.    From the moment we started,
21 yes.
22     Q.    Okay.  And as we sit here
23 today, do you know the why that was done?
24     A.    No, I don't.
25     Q.    As we sit here today, do you

Page 96

1 know why they didn't do monthly?
2          MR. HILL:  Same objections, and
3     asked and answered.
4          THE WITNESS:  No, I don't.
5 QUESTIONS BY MR. SHKOLNIK:
6     Q.    Do you have any recollection of
7 anyone ever saying, "The one thing we're
8 never going to do at Walgreens ever again is
9 report our suspicious orders on a monthly
10 basis"?
11          MR. HILL:  Same objections.
12          THE WITNESS:  I don't remember.
13 QUESTIONS BY MR. SHKOLNIK:
14     Q.    Did anyone ever tell you there
15 was a person whose responsibility it was to
16 collect all the suspicious orders once a
17 month, burn them on a CD and mail them to all
18 the DEA offices around the country?
19          Did anyone ever tell you that's
20 what Walgreens was doing prior to you getting
21 involved?
22     A.    I don't remember.
23     Q.    To your knowledge, would anyone
24 condone that in your group, that procedure:
25 Once a month, download them all to a CD and

Page 97

1 mail them out to every office in the country?
2          Would anybody in your office
3 condone that?
4          MR. HILL:  Same objections.
5          THE WITNESS:  I don't believe
6     that to be true.
7 QUESTIONS BY MR. SHKOLNIK:
8     Q.    Meaning you don't believe it to
9 be true that anyone would condone that?
10     A.    Correct.
11     Q.    Based on your understanding of
12 your requirements to perform your suspicious
13 order monitoring from 2012 until the time you
14 stopped distributing, it was your
15 understanding it would be improper for
16 Walgreens to have reported your suspicious
17 orders on a monthly basis by burning them on
18 a CD and mailing the same CD to every local
19 office for the DEA around the country; fair
20 statement?
21          MR. HILL:  Object to the form
22     and calls for a legal conclusion.
23          THE WITNESS:  I don't know.
24 QUESTIONS BY MR. SHKOLNIK:
25     Q.    But you yourself would never do

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 that, would you, sir?
2        MR. HILL:  Same objection.
3        THE WITNESS:  No, I would never
4    do that.
5 QUESTIONS BY MR. SHKOLNIK:
6    Q.    Let's go to page 2 of
7 Exhibit 4.
8        Do you rely on any type of
9 rigid formula to determine whether an order
10 is suspicious, from 2012 when you got
11 involved until the time when you stopped
12 distributing?
13    A.    Can you clarify "rigid
14 formula"?
15    Q.    Basically a formula that says X
16 percent or X times prior sales would be an
17 automatic flag.
18    A.    We have an algorithm in place.
19    Q.    That does something like that?
20    A.    Yes.
21    Q.    But that just turns into a
22 flag; am I correct?  It doesn't make it a
23 suspicious order?
24    A.    Yes.
25    Q.    So you wouldn't use that

Page 99

1 algorithm alone and just say suspicious order
2 report.  That flags it, and then an analysis
3 has to be done under your procedures?
4        MR. HILL:  Object to the form.
5        THE WITNESS:  Yes.
6 QUESTIONS BY MR. SHKOLNIK:
7    Q.    And is it your understanding
8 that had you simply relied upon an algorithm,
9 a rigid formula in a computer that spits it
10 out, and just reported all those to the DEA,
11 that would not have been doing your due
12 diligence part of the analysis; fair
13 statement?
14        MR. HILL:  Object to form.
15    Vague.
16        THE WITNESS:  It would be a
17    fair statement to say that we would
18    not be doing our due diligence if we
19    just relied on a simple algorithm.
20 QUESTIONS BY MR. SHKOLNIK:
21    Q.    And in fact, from the moment
22 you became involved in this process with
23 Tasha in the integrity group, your group did
24 not use the rigid formula algorithm and
25 simply just mail them or fax them to the DEA,

Page 100

1 whatever popped out, correct?
2        MR. HILL:  Same objection.
3        THE WITNESS:  Yes, every
4    suspicious order that we reported had
5    a manual intervention by someone on
6    our team.
7 QUESTIONS BY MR. SHKOLNIK:
8    Q.    And that was so you could
9 really look at it and determine if it in fact
10 was potentially a suspicious order or not;
11 fair statement?
12    A.    Yes.
13    Q.    I mean, there is sort of a due
14 diligence aspect.  You want to figure out
15 something about the customer, something about
16 the underlying order before you would simply
17 say, "Well, the computer says it's
18 suspicious; let's just report it to the DEA";
19 fair statement?
20        MR. HILL:  Object to form.
21        THE WITNESS:  Yes.
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    And in fact, you have a whole
24 series of criteria that you would apply in
25 your group from the -- the manual part of it,

Page 101

1 the person part of it, after the flagging by
2 the computer, correct?
3    A.    There are steps that we take to
4 evaluate, yes.
5    Q.    So going to page 2,
6 "Registrants that rely on rigid formulas to
7 define whether an order is suspicious may be
8 failing to detect suspicious orders.  For
9 example, a system that identified orders as
10 suspicious only if total amount of controlled
11 substance ordered during one month exceeds
12 the amount ordered the previous month by
13 certain percentage or more is insufficient.
14 This system fails to identify orders placed
15 by a pharmacy if the pharmacy placed
16 unusually large orders from the beginning of
17 its relationship with its distributor.  Also,
18 this system would not identify orders as
19 suspicious if the order was solely for one
20 highly abused controlled substance if the
21 orders never grew substantially."
22        In reading that, do you
23 understand what that -- what's being said
24 there?
25        MR. HILL:  Object to the form.

Page 102

1 Foundation.
2 THE WITNESS: I understand the
3 basis of it, what -- what's being
4 said.
5 QUESTIONS BY MR. SHKOLNIK:
6 Q. So basically it -- what it's
7 saying is if you just look at the computer
8 algorithm with a simple formula, if I sold a
9 thousand pills last month and this month I
10 sold 3,000 pills, and that's the algorithm,
11 and it spits it out as suspicious, that would
12 not be appropriate according to what the DEA
13 is saying here, correct?
14 MR. HILL: Object to the form.
15 THE WITNESS: Based on the
16 document, yes, I would agree with
17 that.
18 QUESTIONS BY MR. SHKOLNIK:
19 Q. So based on December 2007, such
20 a formula, I think we would agree, would not
21 be in compliance with what Mr. Rannazzisi is
22 saying in his notification to registrants?
23 MR. HILL: Object to the form,
24 the foundation.
25 THE WITNESS: Can you -- can

Page 103

1 you rephrase it?
2 QUESTIONS BY MR. SHKOLNIK:
3 Q. Sure.
4 A. Sorry.
5 Q. The letter is 2007. So as of
6 that date, Mr. Rannazzisi, the man who signed
7 the letter, the Deputy Assistant
8 Administrator of Office of Diversion Control,
9 is saying a rigid formula or approach of,
10 say, three times what the last month was as
11 an automatic reporting trigger as a
12 suspicious order would not be appropriate?
13 MR. HILL: Object to the form.
14 Foundation.
15 QUESTIONS BY MR. SHKOLNIK:
16 Q. Correct?
17 A. I can't interpret what
18 Mr. Rannazzisi was trying to interpret here
19 in this document.
20 Q. Well, he basically explains
21 that if -- if the registrant uses a rigid
22 formula, and he goes on to say -- and
23 describes it, for example, where a suspicious
24 order is an amount -- "total amount of
25 controlled substance ordered during one month

Page 104

1 exceeds the amount ordered in the previous
2 month by a certain percentage or more is
3 insufficient."
4 What he's saying there is if
5 you're reporting your suspicious orders by a
6 straightforward multiplier-type of algorithm
7 or rigid formula, that would not be
8 appropriate, correct?
9 MR. HILL: Object to the form.
10 Foundation. Calls for speculation.
11 THE WITNESS: I see the words.
12 QUESTIONS BY MR. SHKOLNIK:
13 Q. And that's what he's saying --
14 MR. HILL: Same objections.
15 QUESTIONS BY MR. SHKOLNIK:
16 Q. -- correct?
17 A. I don't know if this is exactly
18 what he's interpreting, but this is -- I see
19 the words that you're referring to.
20 Q. And those words would say, if
21 your algorithm, your rigid formula, was 1,000
22 pills one month and then the next month is
23 now 3,000 pills, three times the 1,000, that
24 type of rigid formula would be a violation of
25 what he's saying in 2007, correct?

Page 105

1 MR. HILL: Same objections.
2 QUESTIONS BY MR. SHKOLNIK:
3 Q. At least under his
4 interpretation?
5 MR. HILL: Same.
6 THE WITNESS: I don't know
7 how -- what -- what his interpretation
8 was at this moment and if 3,000 is
9 deemed suspicious. I don't -- I
10 don't --
11 QUESTIONS BY MR. SHKOLNIK:
12 Q. Let me put it this way: If
13 your algorithm is three times whatever the
14 prior month is, I don't care if it's 3,000 --
15 A. Sure.
16 Q. -- or 2,000, if it's a
17 stringent formula that if one month -- from
18 one month to the next, it's a rigid formula
19 of times three, that that would be a flag,
20 that rigid formula would not be appropriate
21 under his example?
22 MR. HILL: Same objections, and
23 asked and answered multiple times.
24 THE WITNESS: Again, I don't
25 know if 3 X -- he doesn't say 3 X is a

Page 106

1 bad thing.
2 QUESTIONS BY MR. SHKOLNIK:
3     Q.    No, he's simply saying any
4 rigid formula like that is bad; isn't that
5 what he's saying?
6          MR. HILL: Same objections.
7          THE WITNESS: I don't know what
8     he's trying to say. I understand the
9     rigid formula, but I don't know -- I'm
10    not following the exact percentages,
11    and I don't know what he's referring
12    to in this document. I'm sorry.
13 QUESTIONS BY MR. SHKOLNIK:
14    Q.    But he's basically saying --
15 and let me -- I don't want to beat a dead
16 horse, but if your system is flagging it as
17 suspicious and reported, and it's based upon
18 one month exceeds the amount ordered by the
19 previous month by a certain percentage or
20 more, that would be inappropriate, whatever
21 the percentage is.
22          He's not even telling you
23 whether it's one time, two times, three
24 times, four times. He's saying if you're
25 using a straightforward rigid formula based

Page 107

1 on a percentage multiplier, that is
2 inappropriate.
3          MR. HILL: Same objections and
4     compound.
5          THE WITNESS: Again, I see the
6     words in the document, but I don't
7     know.
8 QUESTIONS BY MR. SHKOLNIK:
9     Q.    You wouldn't do that at
10 Walgreens after you became part of the
11 program in 2012. You would not have used a
12 rigid formula where you simply looked at a
13 pharmacy and applied a multiplier to its
14 prior month to trigger a suspicious order
15 report. You would never have done that after
16 you became part of that new program for
17 pharmaceutical integrity; fair statement?
18          MR. HILL: Object to the form.
19 QUESTIONS BY MR. SHKOLNIK:
20    Q.    -- sir?
21    A.    I don't remember.
22    Q.    Well, you never did that,
23 correct?
24          MR. HILL: Same objection.
25          THE WITNESS: I don't remember.

Page 108

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    Is there a possibility that you
3 guys may have done that for a little bit of
4 time between 2012 and 2013?
5     A.    I don't know.
6     Q.    Let's go on to the third
7 paragraph. "Lastly, registrants that
8 routinely report suspicious orders yet fill
9 these orders without first determining that
10 the order is not being diverted into other
11 than legitimate medical, scientific,
12 industrial channels may be failing to
13 maintain effective controls against
14 diversion."
15          Is that your understanding as
16 to what your responsibilities were from when
17 you became involved up until the company
18 stopped distributing?
19          MR. HILL: Object to the form.
20    Foundation.
21 QUESTIONS BY MR. SHKOLNIK:
22    Q.    That you -- really you
23 shouldn't be shipping it before you do your
24 due diligence?
25          MR. HILL: Same objections.

Page 109

1          THE WITNESS: Yes, that is my
2     understanding. We would not ship
3     anything unless we did our --
4     performed due diligence.
5          (Walgreens-Mills Exhibit 5
6     marked for identification.)
7 QUESTIONS BY MR. SHKOLNIK:
8     Q.    Okay. If we could now go to
9 Exhibit 5. I've now handed you Exhibit 5.
10 It's a letter dated June 12, 2012.
11          So -- from the US Department of
12 Justice, Drug Enforcement Administration.
13 And once again, it's a "dear registrant"
14 letter that's being sent to every entity in
15 the United States who is a registered Drug
16 Enforcement Administration -- registered by
17 or with the Drug Enforcement Administration
18 to manufacture or distribute controlled
19 substances. And that's June 12, 2012.
20          So now this is the letter that
21 is six months, approximately, before you
22 become involved in pharmaceutical integrity;
23 fair statement?
24    A.    Yes.
25    Q.    And did anyone when -- when you

Page 110

1 got involved, did anyone say, "We have a
2 communication from the DEA from less than six
3 months ago that's giving us the guidance on
4 what we're supposed to do regarding our
5 suspicious order monitoring and our
6 compliance with the Controlled Substance
7 Act"?
8         Did someone specifically say,
9 "We've got a communication from this year"?
10        MR. HILL:  Object to the form.
11    Compound and assumes facts.
12        THE WITNESS:  I don't remember.
13 QUESTIONS BY MR. SHKOLNIK:
14    Q.    This letter is dated right
15 around the time when Walgreens entered into
16 its resolution with the Department of Justice
17 for $80 million over the problems associated
18 with the facility, distribution facility,
19 down in Jupiter, Florida, correct?
20        MR. HILL:  Object to the form.
21    Foundation.
22        THE WITNESS:  I don't know the
23    exact timeline of when the DEA would
24    have visited Florida.
25

Page 111

1 QUESTIONS BY MR. SHKOLNIK:
2    Q.    So when you got involved, you
3 were aware it had just concluded; is that a
4 fair statement?
5    A.    Yes.
6    Q.    And part of the resolution of
7 that process, besides paying $80 million, was
8 that the company was charged with the
9 responsibility to establish the integrity
10 group which you then became part of, correct?
11        MR. HILL:  Object to form.
12    Foundation.
13        THE WITNESS:  Yes.
14 QUESTIONS BY MR. SHKOLNIK:
15    Q.    I mean, that was a requirement
16 that led to the resolution of the claims
17 being brought against Walgreens, correct?
18        MR. HILL:  Objection.  Calls
19    for speculation.
20        THE WITNESS:  I don't know
21    that.
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    Okay.  Now, this June 12, 2000
24 {sic} letter, second paragraph, it says, "On
25 September 27, 2006, DEA sent a letter to this

Page 112

1 registrant community expressing concerns
2 regarding drug abuse in the United States and
3 highlighted the responsibility to
4 manufacturers and distributors to be vigilant
5 in the distribution of controlled
6 substances."
7         It goes on to say, "Although
8 the DEA's September 2006 letter included a
9 list of factors that might be an indication
10 of diversion, DEA wants to stress that it was
11 not a comprehensive list of all possible
12 indications of diversion.  DEA encourages
13 registrants to take an integrated approach.
14 This point was emphasized in the 2007 letter,
15 and the DEA is once again bringing it to your
16 attention."
17         When you got involved in the
18 group, would you have liked to have had this
19 piece of guidance in your hand so you could
20 read it, as well as the other letters, the
21 prior letters which we've gone through, to
22 help you get a background, an understanding,
23 as to what your job was going to entail on
24 behalf of Walgreens?
25         MR. HILL:  Object to the form.

Page 113

1         Assumes facts not in evidence.
2         THE WITNESS:  I can't remember
3    if I read this document.
4 QUESTIONS BY MR. SHKOLNIK:
5    Q.    If it was given to you in 2012,
6 along with the prior letters that are
7 referenced in it, is it something you would
8 have kept?
9         MR. HILL:  Object to the form.
10        THE WITNESS:  I don't know if
11    this is something I would have kept.
12 QUESTIONS BY MR. SHKOLNIK:
13    Q.    As you sit here today, do you
14 have any recollection of ever reading the
15 June 12, 2012 letter marked as Exhibit 5?
16    A.    I don't remember.
17    Q.    Let's go down to the last
18 paragraph.  "Registrants who rely on rigid
19 formulas to identify whether an order is
20 suspicious may fail to detect suspicious
21 orders.  For example, the system might not
22 identify a suspicious order is placed by a
23 pharmacy if that pharmacy placed unusually
24 large orders from the beginning of its
25 relationship with the supplier."

Page 114

1       Now, when you got involved, do
2  you ever recall reading that statement or a
3  statement similar to that before taking over
4  your responsibility?
5       MR. HILL:  Object to the form.
6       THE WITNESS:  I don't remember.
7  QUESTIONS BY MR. SHKOLNIK:
8       Q.    When you and Tasha took over
9  this program -- or started this program, I
10 should say, in 2012, how did you go about
11 determining what would be the appropriate
12 ceilings for the various pharmacies across
13 the country?
14      MR. HILL:  Object to the form.
15      THE WITNESS:  Previously I
16   mentioned that larger group.  There
17   was many factors, many players, that
18   would have contributed to how ceilings
19   would have been set appropriately.
20 QUESTIONS BY MR. SHKOLNIK:
21      Q.    Can you define for the Court
22 and jury what is meant by ceilings at
23 Walgreens in terms of your department?
24      A.    It's a maximum limit of a
25 controlled substance drug a store can receive

Page 115

1  over a defined period of time.
2       Q.    In addition to ceilings --
3  withdraw that.
4       The ceiling that's designated
5  for a specific pharmacy, is that something
6  that is shared with the pharmacy?
7       A.    No.
8       Q.    Why wouldn't that be shared
9  with a pharmacy?
10      Why wouldn't you want to do
11 that?
12      A.    We do not want them to try to
13 outsmart the system or try to manipulate or
14 create suspicious orders that we would deem
15 suspicious.
16      Q.    Well, is it one of the reasons
17 that -- when you say you don't want them to
18 outsmart the system by telling them what the
19 ceiling is, they may be able to manipulate
20 ordering so that the trigger doesn't get
21 set -- set off in the company, the flag
22 doesn't happen in the company?
23      MR. HILL:  Objection.  Form.
24      THE WITNESS:  No, that's not
25   what I'm saying.

Page 116

1  QUESTIONS BY MR. SHKOLNIK:
2       Q.    So maybe you can explain it to
3  me better then.  Why wouldn't you want them
4  to know?
5       A.    We don't -- we want to be
6  siloed.  We don't want stores aware of, you
7  know, where they're at within their limits,
8  just like we don't know our vendors' limits.
9  So everybody is kind of siloed in respect to
10 keeping that information kind of --
11      Q.    Secret?
12      A.    Not secret.  I'm not trying to
13 say secret, but --
14      Q.    I don't mean it in a negative
15 way.  I'm just saying --
16      A.    Oh, okay.  It's not a secret.
17 It's just more or less to keep everybody on
18 point and keep them kind of -- the store
19 should be doing what they're doing, and if
20 they're not, then our team is able to
21 identify that.  Just like if we're not doing
22 the right thing, then the vendor can identify
23 that.
24      Q.    So, I mean, isn't it recognized
25 in your field that if the store knows its

Page 117

1  ceiling, and for whatever reason they want to
2  get around the possible flagging as a
3  suspicious order, they can manipulate their
4  orders to avoid hitting a ceiling?
5       Isn't that a fact that can be
6  done?
7       MR. HILL:  Object to the form.
8       THE WITNESS:  No, that's not a
9   fact.
10 QUESTIONS BY MR. SHKOLNIK:
11      Q.    That can't be done?
12      A.    It cannot be done.
13      Q.    Well, isn't it possible they
14 could -- if they're hitting a ceiling, they
15 could potentially divert -- bad word.  Let me
16 not use divert.
17      If they know the ceiling and
18 they know they're approaching a ceiling,
19 isn't it possible for a store to go to a
20 different vendor and order a shipment from a
21 new vendor so that it doesn't trigger the
22 ceiling?
23      A.    No, that's not true.
24      Q.    Okay.  Explain to me why.
25      A.    So ceilings are housed

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 internally at the store. If they're trying
2 to order a specific item, no matter from what
3 vendor, that item is -- runs through that
4 calculation and says how much product can you
5 order at that moment. So if they're hitting
6 their limit, the order will never go through.
7     Q.    So the vendor -- it would be
8 triggered to the vendor, or it would be
9 triggered to you and you would tell the
10 vendor?
11     A.    If the store tried to order
12 something above and beyond their limits, it
13 would be flagged and our team would review.
14     Q.    Would the vendor be told about
15 that, or was it only after you review it?
16         MR. HILL:  Object to the form.
17         THE WITNESS:  The vendor would
18     not be told.
19 QUESTIONS BY MR. SHKOLNIK:
20     Q.    Why wouldn't you share that
21 with the vendor?
22     A.    Because that is not technically
23 an order yet.  That is a request to get
24 product, and that request violated our
25 internal limits, so then our team gets

Page 119

1 involved.
2     Q.    Was that procedure in place
3 while you were -- when the company still was
4 a registered distributor, was the same
5 procedure in place?
6         MR. HILL:  Object to the form.
7     Foundation.
8         THE WITNESS:  Yes.  In 2012,
9     that is the creation of pharmaceutical
10     integrity.
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.    Were there ever occasions where
13 pharmacies, in fact, bounced over to
14 alternative distributors to fulfill orders
15 that were not stopped through integrity?
16     A.    All orders would have been
17 reviewed and stopped by integrity no matter
18 who the vendor is that they were trying to
19 order from.
20     Q.    Were there ever occasions where
21 pharmacies were hitting stops or hitting
22 ceilings that they would go to pharmacies in
23 the area to try to fulfill additional orders
24 without going through a distributor?
25     A.    No, we put blocks in place to

Page 120

1 prevent any inter-storing or transfer of
2 controlled drugs between stores.
3     Q.    When did you put the blocks in
4 place?
5     A.    I don't remember the exact
6 date.
7     Q.    You were having a problem with
8 intra-storing after you became involved in
9 the system, and then you put blocks in place;
10 fair statement?
11     A.    I don't remember the date that
12 we put the blocks in place.
13     Q.    But you were aware of occasions
14 where there was intra-storing while you were
15 in charge of pharmacy -- involved in pharmacy
16 integrity, and you had to put stops in place
17 because pharmacists were intra-storing to get
18 pills, correct?
19         MR. HILL:  Object to the form.
20         THE WITNESS:  I don't remember.
21     (Walgreens-Mills Exhibit 6
22     marked for identification.)
23 QUESTIONS BY MR. SHKOLNIK:
24     Q.    We'll talk about that a little
25 bit later.

Page 121

1         This is going to be 6.  I'm
2 going to hand you a book that we've marked as
3 Exhibit 6.  I'm going to take you through
4 this document a little bit.
5         MR. HILL:  Can he just read
6     this whole thing quickly?
7 QUESTIONS BY MR. SHKOLNIK:
8     Q.    There's a compilation of
9 documents in here.  It was just easier to
10 keep it together.
11         Have you ever had an
12 opportunity to review the settlement and
13 memorandum agreement between Walmart -- I'm
14 sorry, Walgreens -- I'm sorry -- Walgreens
15 and the Department of Justice?
16     A.    Yes, I have seen this document
17 before.
18         MR. HILL:  Object.  Let's just
19     make one thing clear.
20         When you say you've seen this
21     document, I just want to make for
22     the -- this is a -- Exhibit 6 is a
23     compilation of a whole bunch of
24     different documents --
25         MR. SHKOLNIK:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 122

1  MR. HILL: -- Mr. Shkolnik
2  said, and just going to note that for
3  the record.
4  I think it's important to be
5  clear which one of these we're talking
6  about when we're talking about each
7  one.
8  MR. SHKOLNIK: I'm going to do
9  that.
10 QUESTIONS BY MR. SHKOLNIK:
11 Q.   And just so it's clear, when
12 you said you've seen "the document," you mean
13 the settlement agreement document?
14 A.   The MOA, the memorandum of
15 agreement.
16 Q.   Of agreement.
17 Okay. Did you ever see one
18 with signatures on it?
19 A.   I don't remember.
20 Q.   Did you ever -- when did you
21 have an opportunity to see it?
22 A.   At the beginning of my
23 employment on the pharmaceutical integrity
24 team.
25 Q.   And was there a meeting of some

---

Page 123

1  sort where -- where it was -- where it was
2  discussed that there was a settlement and
3  that's why you're -- you're putting together
4  the integrity team?
5  MR. HILL: Object to form.
6  THE WITNESS: I recall a
7  meeting. I don't remember -- because
8  we already would have been created. I
9  don't know.
10 QUESTIONS BY MR. SHKOLNIK:
11 Q.   Was the meeting -- would the
12 meeting have been like the big group or just
13 you and Tasha or...
14 A.   I can't recall who was in the
15 meeting.
16 Q.   Would it be fair to say that in
17 2012 when this was all happening, the
18 settlement with the DEA was considered sort
19 of a big deal, an important thing that had
20 happened, and the company was trying to move
21 forward and fix any problems that they had
22 had?
23 MR. HILL: Object to the form.
24 THE WITNESS: I can't recall.
25

---

Page 124

1  QUESTIONS BY MR. SHKOLNIK:
2  Q.   Did anyone ever say that the
3  company paid $80 million to put this issue
4  behind them?
5  MR. HILL: Object to the form.
6  THE WITNESS: I don't -- I
7  can't recall. I don't know.
8  QUESTIONS BY MR. SHKOLNIK:
9  Q.   Did anyone ever tell you that
10 implementation of a pharmacy integrity team
11 and process was an important component of the
12 resolution of the Department of Justice
13 investigations and the lawsuits?
14 A.   Again, I can't recall.
15 Q.   When you read the document, the
16 MOA, did you come away with the understanding
17 that the company paid $80 million and that
18 part of it was to -- a requirement was to
19 implement the suspicious monitoring programs
20 that you were now embarking on?
21 MR. HILL: Object to the form.
22 THE WITNESS: Yes, I do recall
23 reading that.
24 QUESTIONS BY MR. SHKOLNIK:
25 Q.   And I'd like to go to the

---

Page 125

1  second page -- well, let me start at the
2  first page. It says, "The memorandum of
3  agreement. The agreement is entered into by
4  and between the United States Department of
5  Justice and United States Drug
6  Enforcement Administration, the DEA, and
7  Walgreens Company and its wholly-owned
8  subsidiaries, Walgreens and each party and
9  collectively the parties."
10 It goes on to say that "this
11 agreement shall be applicable to Walgreens
12 corporate and any facility owned or operated
13 by Walgreens that is or was registered with
14 the DEA to dispense, distribute or otherwise
15 handle controlled substances or List I
16 chemicals."
17 It was your understanding that
18 the agreement reached with DOJ was applying
19 to the whole company at that time, correct?
20 A.   Yes, based on the document.
21 Yes.
22 Q.   Now, if we can turn to the next
23 page, which would be page 2 of the document,
24 under Stipulation and Agreement. Second
25 paragraph of that lower section, Stipulation

---

Page 126

1 and Agreement. Walmart -- I'm sorry. Why do
2 I keep doing that to you.
3          MR. DEMONTE: I appreciate the
4 correction.
5          MR. HILL: You're doing it to
6 us, too.
7          MR. SHKOLNIK: They didn't pay
8 80 million.
9 QUESTIONS BY MR. SHKOLNIK:
10     Q.   "Walgreens acknowledges that
11 suspicious order reporting for distribution
12 to certain pharmacies did not meet the
13 standards identified by DEA in three letters
14 from the DEA's Deputy Assistant
15 Administrator, Office of Diversion Control,
16 sent to every registrant, manufacturer and
17 distributor, including Walgreens, on
18 September 27, 2006, February 7, 2007, and
19 December 27, 2007."
20          Did I read that accurately
21 first?
22     A.   Yes.
23     Q.   Did you understand that
24 Walgreens acknowledged, that they admitted,
25 that their suspicious order reporting for

Page 127

1 distribution did not meet the standards
2 identified by the DEA in the three letters
3 that we had gone through together?
4          MR. HILL: Object to the form.
5          THE WITNESS: Yes, I see the
6 words here that says that Walgreens
7 acknowledged.
8 QUESTIONS BY MR. SHKOLNIK:
9     Q.   Did you ever ask anybody,
10 "Please tell me what we were doing wrong back
11 then that led to this so that we don't ever
12 do it again"?
13          MR. HILL: Object to the form.
14          THE WITNESS: I don't remember.
15 QUESTIONS BY MR. SHKOLNIK:
16     Q.   Would you have liked to have
17 known what Walgreens had done wrong in terms
18 of reporting for distribution and violating
19 the three letters we talked about?
20          Would you have liked to have
21 known that before you embarked on your job,
22 to try to fix the problem?
23          MR. HILL: Object to the form.
24 Foundation. Calls for speculation.
25          THE WITNESS: I can't recall if

Page 128

1 that conversation did occur or not,
2 and it wouldn't have mattered. I
3 still would have taken the position.
4 QUESTIONS BY MR. SHKOLNIK:
5     Q.   Yeah, but there's like --
6 there's sort of a saying that, you know, you
7 want to know the past so you don't repeat it
8 in the future.
9          Would you agree, sir, that it
10 would be important to know what was done
11 wrong in the past so no one would repeat it
12 again in the future?
13          MR. HILL: Object to the form
14 and assumes facts.
15          THE WITNESS: I cannot recall
16 if I did ask those questions or not.
17 QUESTIONS BY MR. SHKOLNIK:
18     Q.   Well, as a group, when you're
19 all getting together and starting to embark
20 on this process and trying to come together
21 and figure out what's the right thing to do
22 for this new enterprise, would it be fair to
23 say that everyone was of the opinion that you
24 were going to make sure that whatever was
25 done in the future did not violate any of the

Page 129

1 letters or any of the terms of the agreement
2 with DEA?
3          MR. HILL: Objection. Calls
4 for speculation.
5          THE WITNESS: I don't remember.
6 QUESTIONS BY MR. SHKOLNIK:
7     Q.   I mean, let's just -- whether
8 you remember it or not.
9     A.   Yeah.
10     Q.   As we sit here today, do you
11 feel that your responsibility at the time was
12 to make sure that your group -- there's only
13 two of you, plus your supporting people
14 helping you at that time. Did you feel, you
15 know, I want to make sure we're doing it
16 right, and we don't do what the DEA said our
17 company did wrong in the past?
18          MR. HILL: Same objection.
19 It's vague.
20 QUESTIONS BY MR. SHKOLNIK:
21     Q.   I mean, isn't it a fair thing
22 that you want?
23     A.   My opinion in the matter is
24 yes.
25     Q.   And to the best of your

Page 130

1 knowledge, from that point forward you got
2 together, you developed a program to make it
3 right so this doesn't happen again, correct?
4          MR. HILL: Object to the form.
5 Assumes facts not in evidence.
6          THE WITNESS: My opinion is
7     yes.
8 QUESTIONS BY MR. SHKOLNIK:
9     Q.    Can we assume that what was
10 being done before you got involved wasn't
11 right?
12          MR. HILL: Object to the form.
13 Calls for speculation.
14 QUESTIONS BY MR. SHKOLNIK:
15     Q.    When I say "you," I mean your
16 group?
17     A.    I don't know.
18     Q.    Do you think your company would
19 have entered into an agreement with the
20 Department of Justice where it acknowledges
21 that its reporting did not meet the standards
22 of the DEA's letters and guidance if the
23 company had been doing things right?
24          MR. HILL: Same objection.
25 Calls for speculation.

Page 131

1          THE WITNESS: I don't know.
2 QUESTIONS BY MR. SHKOLNIK:
3     Q.    If we could jump to the next
4 page, page 3 of 13, under Covered Conduct.
5     By the way, back at that time
6 frame Jupiter was distributing not only to
7 Florida but was distributing to other
8 regions, was it not?
9          MR. HILL: Objection.
10 Foundation.
11          THE WITNESS: I don't recall
12     the territory that it would have been
13     distributing to.
14 QUESTIONS BY MR. SHKOLNIK:
15     Q.    Well, Perrysburg was just
16 coming on line around then, wasn't it?
17          MR. HILL: Same objections.
18          THE WITNESS: I don't know that
19     to be accurate.
20 QUESTIONS BY MR. SHKOLNIK:
21     Q.    Well, as to opioids?
22     A.    I don't know.
23     Q.    Okay. Would there be someone
24 in the company that could tell us when the
25 different -- that you know of, that someone

Page 132

1 could tell you, when did we start
2 distributing out of different facilities at
3 what time and to what regions?
4     A.    Probably Denny Murray, who I
5 spoke about earlier.
6     Q.    Thank you.
7          So under Covered Conduct: "For
8 the purpose of this agreement, covered
9 conduct shall mean the following: whether it
10 occurred at a specific Walgreens DEA
11 registrant or elsewhere within Walgreens."
12          And then under the section for
13 Distribution Centers: Number 1, "Conduct
14 alleged on the September 13, 2012 order to
15 show cause involving the Walgreens Jupiter
16 facility."
17          Then we go to number 2.
18 "Failure regarding any distribution center to
19 maintain effective controls against diversion
20 of controlled substances into other than
21 legitimate medical, scientific, industrial
22 channels, as required by 12 USC section 823 B
23 and E, including any failure to conduct
24 adequate due diligence to ensure that
25 controlled substances were not diverted into

Page 133

1 other than legitimate channels on or before
2 the effective date of the agreement."
3          So after reading this, it was
4 your understanding that one of the charges
5 that were required -- I say "charges" not in
6 the sense of a charge, but the responsibility
7 following this agreement was that you were to
8 establish controls, effective controls, at
9 the distribution level to prevent against
10 diversion; fair statement?
11          MR. HILL: Object to the form.
12 Foundation. Calls for a legal
13 conclusion.
14          THE WITNESS: I don't know.
15 QUESTIONS BY MR. SHKOLNIK:
16     Q.    Were you aware that they had --
17 that the company had entered into another
18 memorandum of agreement just about a year
19 before entering the -- this MOA?
20     A.    No, I don't know.
21     Q.    If we could turn to page 5 of
22 the document, number 3, "Effect of 2001 MOA.
23 The obligations contained in the 2001 MOA are
24 superseded by the obligations contained
25 within this agreement."

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  Did anyone ever tell you that
2  the company had entered into another
3  memorandum of agreement with the Department
4  of Justice just about a year before regarding
5  its conduct in terms of selling opioid pills?
6  A.  I don't recall.
7  Q.  Was there any talk around the
8  company that, wow, we had to enter into an
9  MOA in 2011 and then another one and now pay
10  $80 million in 2012?
11  Was there any kind of like
12  chatter around the company that is something
13  wrong here?
14  A.  I don't know.
15  MR. HILL:  Object to form.
16  QUESTIONS BY MR. SHKOLNIK:
17  Q.  As you sit here today, do you
18  think that is a problem, that a company
19  enters into a memorandum of agreement with
20  the Department of Justice in 2011 and then
21  continues to have conduct that warrants a
22  second memorandum of understanding -- or
23  agreement and a payment of $80 million in
24  fines and the implementation of an integrity
25  program about a year later?

Page 135

1  Did you think there was
2  anything wrong -- do you think there's
3  anything wrong with that?
4  MR. HILL:  Object to the form.
5  Speculation.
6  THE WITNESS:  I don't know.
7  QUESTIONS BY MR. SHKOLNIK:
8  Q.  Doesn't sound good, does it?
9  MR. HILL:  Object to the form.
10  THE WITNESS:  I would agree it
11  doesn't sound good.
12  QUESTIONS BY MR. SHKOLNIK:
13  Q.  Do you think there's a
14  possibility that the conduct that was
15  exhibited at Walgreens prior to you becoming
16  involved in this oversight process may
17  have -- may have, sir -- led to the diversion
18  of pills as part of this opioid epidemic
19  across the United States?
20  MR. HILL:  Objection.
21  Foundation.  Calls for speculation.
22  THE WITNESS:  I don't know.
23  QUESTIONS BY MR. SHKOLNIK:
24  Q.  You'd agree with me, sir, that
25  diversion as referred to in the various

Page 136

1  letters and in this document talk about
2  diversion of pills, not some pilfering from
3  pharmacies, but the distribution of pills out
4  into the public for nonmedical, nonresearch
5  use that may contribute to an opioid epidemic
6  developing?
7  MR. HILL:  Object to the form.
8  Foundation.  Speculation.
9  QUESTIONS BY MR. SHKOLNIK:
10  Q.  Just your personal feeling,
11  sir.
12  MR. HILL:  Same objections.
13  THE WITNESS:  I don't know.
14  QUESTIONS BY MR. SHKOLNIK:
15  Q.  You'd certainly believe --
16  withdraw that.
17  You would certainly agree that
18  you have now done, once you get involved,
19  everything you could to try to prevent the
20  inappropriate diversion of opioid pills out
21  into the community that may possibly support
22  an opioid epidemic; you do everything to
23  prevent that, right, sir?
24  MR. HILL:  Object to the form.
25  THE WITNESS:  Yes, we put

Page 137

1  measures in place to ensure that we're
2  dispensing legitimate medication to
3  legitimate patients.
4  QUESTIONS BY MR. SHKOLNIK:
5  Q.  Have you ever heard of a phrase
6  "reverse distribution"?
7  A.  Yes, I've heard of that phrase.
8  Q.  What does that mean?
9  A.  That is a return of a
10  Schedule II medication.
11  Q.  Is that from the pharmacy to
12  the distribution or distribution back to the
13  manufacturer, or could it be all those?
14  A.  Typically we use that for
15  destruction, so expired medications.
16  Q.  If we could jump to page 15 of
17  this document.  If you look in the bottom
18  right, there's 15 of 343.  It's a 343-page
19  document.
20  MR. HILL:  343-page compilation
21  of documents?
22  MR. SHKOLNIK:  Yeah,
23  compilation.
24  QUESTIONS BY MR. SHKOLNIK:
25  Q.  If you could look at page 15

Page 138

through page 21.  It's a seven-page document
entitled "Administrative Memorandum of
Agreement" between the Justice Department and
Walgreens dated April 7, 2011.
    Have you ever seen this
agreement, sir?
    A.    No, I've never seen this.
    Q.    Do you know -- can we go back
to the page, please?  The signature page.
    Do you know who Richard
Ainsworth is -- I'm sorry, Ashworth is?
    A.    Yes, he's one of our
leadership.
    Q.    And at this time in 2011, he
was the divisional vice president when he
signed this memorandum of agreement.
    Do you know if he's still a
divisional vice president or is he
somewhere --
    A.    He's further up.
    Q.    -- up the food chain?
    Up the corporate ladder?
    A.    Yeah.
    Q.    Did anyone ever talk to you
about -- that this memorandum of agreement

Page 139

was entered into the year prior to the MOA
and the payment of the $80 million fine?
    A.    Not that I can remember.
    Q.    If we can go back to page 10 --
I'm sorry, page, yeah, 10, of the Exhibit 6,
in the middle of it under number 7 it says,
"All communications and notices to Walgreens
pursuant to this agreement shall be made in
writing to the following individuals with
notice of information may be altered from
time to time by Walgreens providing written
notification to DEA."
    And then it says, "A, Dwayne A.
Piñon" -- that's P-i-n, with a little
squiggly on top, P-i-n-o-n -- "director,
pharmacy law operations and services,
Walgreens."  I think that's a name you
mentioned earlier.
    Is that the person that you
mentioned earlier in some questioning?
    A.    Yes.
    Q.    He was the gentleman who
participated as part of the team to organize
the pharmacy integrity group?
    MR. HILL:  Object to the form.

Page 140

Foundation.
    THE WITNESS:  I don't recall
his exact involvement in the creation
of pharmacy integrity.  He was there
to help us with understanding and
making sure we're following the
guidelines.
    MR. HILL:  And, Mr. Mills, just
be careful not to disclose anything
that Mr. Piñon said to you or anyone
else.
QUESTIONS BY MR. SHKOLNIK:
    Q.    But I'm just -- the purpose of
my question is, was that the same -- is this
the same individual?  I don't want to go
through the details of what he did or didn't
do, but that's the individual you referenced
earlier as part of that group when formation
was happening?
    A.    Yes.
    Q.    Was there any other pharmacy
lawyers involved at that time that you knew
of?
    MR. HILL:  Object to the form.
    THE WITNESS:  Not that I can

Page 141

recall.
QUESTIONS BY MR. SHKOLNIK:
    Q.    If we go to the next page under
Addendum Prospective Compliance, it says,
"Walgreens" -- under A.  "Walgreens will
maintain a department of pharmaceutical
integrity composed of personnel with
pharmacy-related training and managerial
personnel who shall be trained in relevant
diversion-related issues to coordinate
compliance efforts related to controlled
substances.  Within one month of the
effective date of the agreement, Walgreens
will identify a dedicated contact point,
including a dedicated e-mail address, for the
DEA within the department of pharmaceutical
integrity to facilitate Walgreens' response
to DEA request for information and documents
specifically including those requests for
dispensing log data and pseudoephedrine
data."
    Was it your understanding that
your group -- when I say "your group," the
pharmacy integrity group -- was the
department of pharmaceutical integrity that

Page 142

1 was established in compliance with this
2 agreement?
3      A.    Yes.
4      Q.    And could you tell me, Tasha
5 Polster, was she involved in the pharmacy --
6 pharmaceutical integrity side of the company
7 prior to forming this group?
8      A.    I don't recall Tasha Polster's
9 previous employment.
10      Q.    Did you ever work with her
11 before?
12      A.    No.
13      Q.    Did she ever tell you she had
14 been responsible for suspicious order
15 monitoring programs before?
16      A.    No.
17      Q.    Did she ever tell you she had
18 any oversight of whatever suspicious
19 monitoring program was being utilized prior
20 to 2012 at Walgreens?
21      MR. HILL:  Object to the form.
22      THE WITNESS:  No.
23 QUESTIONS BY MR. SHKOLNIK:
24      Q.    Was it your understanding that
25 she had some specific expertise in the area

Page 143

1 of suspicious order monitoring prior to
2 joining the team along with you?
3      MR. HILL:  Same objection.
4      THE WITNESS:  Is that my
5 opinion?
6 QUESTIONS BY MR. SHKOLNIK:
7      Q.    No.  No.
8           Did you have any understanding
9 that she had specific expertise in this area?
10      A.    I don't remember.
11      Q.    Did you ever ask anyone:  "Who
12 was the person in charge of pharmaceutical
13 integrity prior to the establishment of this
14 department pursuant to the agreement?"
15      MR. HILL:  Object to form, and
16 it assumes facts.
17      MR. SHKOLNIK:  It's true.  That
18 was assuming there would be somewhere.
19      MR. HILL:  No, it assumes that
20 the department that you said was
21 created then was also there before.
22 That's where it was assuming.
23      THE WITNESS:  I don't know.
24 QUESTIONS BY MR. SHKOLNIK:
25      Q.    Was there a department of

Page 144

1 pharmaceutical integrity before you
2 established yours?
3           When I say "yours," the group
4 you're in.
5      MR. HILL:  Object to the form.
6      THE WITNESS:  There was no
7 dedicated team, but there were several
8 team members throughout the
9 organization that may have been
10 contributing.
11 QUESTIONS BY MR. SHKOLNIK:
12      Q.    Was Mr. Stahmann one of the
13 people contributing?
14      A.    He may have been in his
15 previous roles.  I don't know what his
16 involvement was.
17      Q.    Is he -- is he in your group
18 now?
19      A.    Yes.
20      Q.    What is his position in your
21 group now?
22      A.    He is a manager.
23      Q.    Do you direct report to him or
24 does another -- someone else report to him?
25      A.    I do not directly report to

Page 145

1 him.  He has other analysts that report to
2 him.
3      Q.    Do you have a region that
4 you're responsible for?
5      A.    Yes.  My region would be the
6 Northeast through the Midwest.
7      Q.    So Ohio would be your region?
8      A.    Ohio is within my region.
9      Q.    West Virginia, is that yours?
10      A.    Yes.
11      Q.    Does it go down as far as,
12 like, say, Kentucky?
13      A.    It goes across West Virginia to
14 Kentucky and then up north into Minnesota and
15 back.
16      Q.    Boy, they gave you -- they gave
17 you a good one.
18      A.    It's good.
19      Q.    Sorry.
20      MR. SHKOLNIK:  I think we've
21 been going an hour.
22      MR. HILL:  The lunch is here,
23 so I'm fine to keep going for a little
24 bit and then take lunch, or if you
25 want to take lunch right now.

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    MR. SHKOLNIK: Let's take a
2 break now. I like to break at an hour
3 because I get a little -- it's always
4 easier for the witness and myself.
5    MR. HILL: That's fine. How
6 long do you want? 45 minutes?
7    MR. SHKOLNIK: 30?
8    MR. HILL: 30? That's fine
9 with us.
10    VIDEOGRAPHER: We're going off
11 the record at 11:39.
12    (Off the record at 11:39 a.m.)
13    VIDEOGRAPHER: We're back on
14 the record at 12:24 p.m.
15 QUESTIONS BY MR. SHKOLNIK:
16    Q.    Mr. Mills, before we were
17 talking a little bit, and you used the
18 phrase, and you defined it for me,
19 flagging -- an order being flagged versus an
20 order that is a -- a suspicious order.
21    Is there also a term of art
22 utilized where an order is considered an,
23 quote, "order of interest"?
24    Is that phraseology ever used?
25    A.    That term may be interchanged

Page 147

1 with flagged order.
2    Q.    Okay. Because in looking at
3 the MOA, they reference what's referred to as
4 a, quote, "order of interest," close quote,
5 or a, quote, "suspicious order," close quote.
6    MR. HILL: What page?
7    MR. SHKOLNIK: I'm about to
8 give you the page.
9 QUESTIONS BY MR. SHKOLNIK:
10    Q.    Page 13.
11    And Item Number 2 is where
12 we're focusing. "For the purposes of
13 complying with suspicious order monitoring
14 reporting requirements for orders to be
15 supplied by Walgreens' distribution center,
16 Walgreens will maintain the tolerance
17 threshold, ceiling limits and other elements
18 of its current suspicious order monitoring
19 and reporting system, either for the duration
20 of this agreement or until Walgreens'
21 distribution activities are transitioned to a
22 third party."
23    At the time of the agreement,
24 did you know what the tolerance threshold or
25 ceiling -- do you know how tolerance

Page 148

1 threshold and ceiling limits were established
2 at the time that the agreement was reached?
3    MR. HILL: Object to the form.
4    THE WITNESS: Both tolerance
5 and ceiling have their own separate
6 algorithms and how they're calculated.
7 QUESTIONS BY MR. SHKOLNIK:
8    Q.    And that was sort of a
9 computer-generated analysis?
10    MR. HILL: Object to form.
11 Foundation.
12 QUESTIONS BY MR. SHKOLNIK:
13    Q.    Let me withdraw that. Let me
14 break it up. That was two different things.
15    The order of interest, was that
16 based on some type of algorithm that is --
17 that is not involving a -- the unit analysis?
18    MR. HILL: Object to the form.
19 Foundation. Calls for speculation.
20    THE WITNESS: The orders of
21 interest, or flagged orders, are
22 generated based off of the tolerance
23 limits/ceiling limits that are then
24 reviewed by our team.
25

Page 149

1 QUESTIONS BY MR. SHKOLNIK:
2    Q.    Okay. So -- so I want just --
3 so I think we've gone over this before, but I
4 just want to make sure. So there is a
5 ceiling limit or a tolerance limit in the
6 computer system so that when someone places
7 an order from a store, it may trigger that --
8 sort of like that alarm, that it hit the
9 ceiling, and then it would spit it out as a
10 order of interest.
11    Is that a fair statement?
12    MR. HILL: Object to the -- I'm
13 not trying to be difficult, but are
14 you talking about what's said in this
15 settlement, or are you talking about
16 what they do today?
17    MR. SHKOLNIK: No, I'm talking
18 about the settlement agreement.
19    MR. HILL: Okay. Object to the
20 form and foundation then.
21    Go ahead.
22    THE WITNESS: Okay.
23 QUESTIONS BY MR. SHKOLNIK:
24    Q.    I mean, just so it's clear,
25 this was -- you're not -- you're not

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 distributing anymore, so this paragraph
2 refers to until you transition your
3 distribution facilities, as I just read it.
4        So at the time, 2012, until
5 Walgreens transitioned to a third party, its
6 distribution activities to a third party,
7 it's talking about thresholds, ceiling
8 limits, suspicious orders and orders of
9 interest.
10        And I'm just trying to just
11 clarify.  When it was being done back then,
12 the computer would generate what is
13 identified as the order of interest based on
14 the ceiling limits or the algorithm in the
15 computer, correct?
16        MR. HILL:  Object to the form.
17 Foundation.  Calls for speculation.
18        THE WITNESS:  Orders of
19      interest are identified when an item
20      is ordered or being requested and it
21      is over their tolerance and/or ceiling
22      limit.
23 QUESTIONS BY MR. SHKOLNIK:
24      Q.    Okay.  Then that order of
25 interest is then -- once it's flagged as an

Page 151

1 order of interest, then goes into the -- that
2 manual process to determine if it's
3 suspicious or not?
4        MR. HILL:  Object to the form.
5 Vague.
6        THE WITNESS:  When an item is
7      flagged, it is manually reviewed by
8      our team.
9 QUESTIONS BY MR. SHKOLNIK:
10      Q.    And now if we could turn to
11 page 219 of 343 of Exhibit 6, there's a
12 Section 32 that refers to Dwayne Piñon,
13 senior attorney at Walgreens.
14      A.    Page 219, correct?
15      Q.    219 of 343.
16      A.    Okay.
17      Q.    Are you there?
18        If we could go to the third
19 paragraph, the last one -- I'm sorry, the
20 last paragraph on the document where it
21 starts with "surprisingly."
22        "Surprisingly, a number of
23 these documents are communications from
24 attorney Dwayne Piñon and appear to be
25 offered as evidence of the defense previously

Page 152

1 raised in Respondent's prehearing statement
2 that their suspicious order reporting system
3 is based on DEA's guidance for reporting of
4 suspicious List I chemical transactions."
5        Did you ever hear anyone
6 discuss in the company that they were
7 utilizing a suspicious monitoring algorithm
8 that was based upon List I chemical
9 transactions?
10        MR. HILL:  Object to the form.
11        THE WITNESS:  What time frame
12      are we speaking --
13 QUESTIONS BY MR. SHKOLNIK:
14      Q.    I'm going to get to the time
15 frame.
16        I'm just saying, did you ever
17 hear of anyone saying that that was a formula
18 that was being utilized?
19        MR. HILL:  Same objection.
20        THE WITNESS:  We have
21      algorithms --
22 QUESTIONS BY MR. SHKOLNIK:
23      Q.    Uh-huh.
24      A.    -- to identify these sus --
25 orders of interest.

Page 153

1      Q.    But do you know if it's based
2 upon DEA's Chemical Handler's Manual?
3      A.    I don't know.
4      Q.    If we continue reading down,
5 "Exhibit 298 purports to be a letter from
6 Mr. Piñon to DEA official in Detroit in which
7 he advises that Walgreens is revising its
8 controlled substance suspicious order system
9 in accordance with the formulas taken from
10 the DEA's Chemical Handler's Manual, which
11 itself is listed as Respondent's proposed
12 Exhibit 296.  In its proposed Exhibit 299,
13 Respondent offers an e-mail sent by Mr. Piñon
14 on March 26, 2008, which discusses the
15 proprietary of using suspicious order system
16 for controlled substance."
17        My question, sir:  Did anyone
18 ever tell you that the system in place from
19 2008 up until the conversion over to the --
20 the post-settlement integrity program was
21 based upon an algorithm contained in the DEA
22 Chemical Handler's Manual?
23        MR. HILL:  Object to the form,
24      and lack of foundation with this
25      document.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    THE WITNESS: I don't recall.
2  QUESTIONS BY MR. SHKOLNIK:
3    Q.   Do you even know what the DEA
4  Chemical Handler's Manual is?
5    MR. HILL: Object to the form.
6    THE WITNESS: I don't know.
7  QUESTIONS BY MR. SHKOLNIK:
8    Q.   Do you know if the DEA Chemical
9  Handler's Manual in any way references
10 controlled substances such as C-II and C-III
11 narcotics, opioids?
12   MR. HILL: Object to the form.
13   THE WITNESS: I don't know.
14 QUESTIONS BY MR. SHKOLNIK:
15   Q.   Have you ever had an
16 opportunity to review either the 2008 e-mail
17 or the DEA Chemical Handler's Manual that was
18 relied upon by Walgreens in setting its
19 suspicious order algorithm that had been in
20 existence prior to your group?
21   MR. HILL: Object to the form.
22   THE WITNESS: I don't recall.
23 QUESTIONS BY MR. SHKOLNIK:
24   Q.   If we can continue on that page
25 220, "By offering Exhibits 250, 298, 299,

Page 155

1  communications from Mr. Piñon to DEA
2  officials, as purported evidence of
3  Walgreens' reliance on the Chemical Handler's
4  Program for designing its controlled
5  substance suspicious order program, Walgreens
6  has made the reasonableness of any
7  conclusions or advice drawn from these
8  documents a matter in controversy."
9    Does that in any way refresh
10 your recollection that Walgreens, prior to
11 the settlement with the DEA in 2012, based
12 its -- and I'm going to refer to it as the
13 SOM, the suspicious order monitoring
14 algorithm, the SOM algorithm -- on the
15 manual, the Chemical Handler's Program
16 Manual?
17   MR. HILL: Object to the form.
18   Asked and answered.
19   THE WITNESS: I don't know.
20   (Walgreens-Mills Exhibit 7
21   marked for identification.)
22 QUESTIONS BY MR. SHKOLNIK:
23   Q.   I'm going to show you what
24 we're marking as Exhibit 7. It's an e-mail
25 dated 10/19/12 from Mr. Denman to Lorinda

Page 156

1  Tisdell and copying yourself. This is an
2  e-mail that refers to WAG SOM.
3    What is your understanding of
4  SOM?
5    A.   The abbreviation?
6    Q.   Yes.
7    A.   Suspicious order monitoring.
8    Q.   And it says, "Attachments,
9  controlled substance order SOM procedure."
10 And this is the e-mail from Denman Murray,
11 Pharm.D., director of that prescription
12 inventory management drugstores.
13   Is that the gentleman that you
14 mentioned earlier?
15   A.   Yes, he's Denny.
16   Q.   If you could turn to the second
17 page, this is a document that says,
18 "Controlled substance orders and SOM event
19 procedures."
20   Have you ever seen this
21 document before?
22   A.   Yes.
23   Q.   And can you tell us what it is?
24   A.   It's a summary of -- of the
25 processes that we were applying at that

Page 157

1  moment in time around SOM.
2    Q.   And it's talking about the
3  historical -- this is what was being done
4  from June 2012 until October of 2012; am I
5  correct?
6    MR. HILL: Object to the form.
7    Foundation.
8    THE WITNESS: That's what it
9    says here, yes.
10 QUESTIONS BY MR. SHKOLNIK:
11   Q.   And could you tell us what the
12 procedure is in terms of trying to -- if you
13 have a controlled substance and -- withdraw
14 that.
15   What is meant by "quantity
16 override forms"?
17   MR. HILL: Object to the form.
18   THE WITNESS: Quantity override
19   form is a -- a web form that stores
20   can submit to request additional
21   product that may be above their
22   ceiling limits.
23 QUESTIONS BY MR. SHKOLNIK:
24   Q.   Now, how would the -- how would
25 the pharmacy know that they were asking to --

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  for an order above their limit if no one
2  tells them what their limit is?
3      A.   They would simply not receive
4  the product in their next shipment.
5      Q.   Would there be -- if they put
6  the order in, are they told, "You're not
7  getting it," or they'll sit there waiting at
8  the door and no box shows?
9          MR. HILL:  Object to the form.
10         THE WITNESS:  They would simply
11     not receive the product the next day.
12 QUESTIONS BY MR. SHKOLNIK:
13     Q.   There was no system in place to
14 tell them it's not coming?
15         MR. HILL:  Object to the form.
16 QUESTIONS BY MR. SHKOLNIK:
17     Q.   Your request was rejected?
18         MR. HILL:  Object to the form,
19     and vague as to time.
20         THE WITNESS:  There is no
21     system to tell them that they're not
22     getting the product.
23 QUESTIONS BY MR. SHKOLNIK:
24     Q.   And so let's assume they place
25 an order, they don't get the product.  What

Page 159

1  happens next if they still want the product?
2      A.   They have the ability to fill
3  out one of these override forms.
4      Q.   So if they didn't get the
5  product, would that be in essence them being
6  told, "You've hit your max"?
7          MR. HILL:  Object to the form.
8          THE WITNESS:  No.  That may not
9      be true.
10 QUESTIONS BY MR. SHKOLNIK:
11     Q.   How?  Why else would they not
12 get the product?  The computer wasn't
13 working?  Some technical glitch or something?
14     A.   That could be a possibility as
15 well.
16     Q.   Other than a potential glitch
17 in the ordering system, what other causes
18 would there be for that pharmacist to be
19 standing there waiting for a shipment that
20 never arrives?
21     A.   Could be a newer item that
22 they've never stocked in their store, so
23 their limits may not be set appropriately.
24     Q.   Okay.  Let me put it as we have
25 a pharmacy that's been distributing

Page 160

1  hydrocodone for years.  They place an order.
2  They're expecting a delivery the next day.
3  The deliveries come, no hydrocodone.
4          Would that be a flag to the
5  pharmacy, "I hit my limit.  Now if I want it,
6  I've got to go online and submit an override
7  form"?
8          MR. HILL:  Object to the form.
9      Asked and answered.
10         THE WITNESS:  No, because there
11     could be an issue with product
12     availability for that NDC that was
13     attempted to be ordered.  So there
14     could be an underlying circumstance
15     why they didn't get shipped.
16 QUESTIONS BY MR. SHKOLNIK:
17     Q.   But if the form is called an
18 override form, wouldn't that be a suggestion
19 in and of itself that you hit your max, and
20 the only way you're getting the pills is to
21 submit an override form to have it evaluated
22 to have it sent -- you know, have the --
23 excuse me, the shipment approved?
24         MR. HILL:  Object to form.
25         THE WITNESS:  That is just

Page 161

1      simply what we called it.
2  QUESTIONS BY MR. SHKOLNIK:
3      Q.   I mean, they could have called
4  it a "didn't receive form," you know,
5  "investigation of missing order form."  A lot
6  of other things they could have called it
7  other than an override form, correct?
8      A.   Possibly.
9      Q.   I mean, this is basically
10 telling the pharmacist, oops, I hit your
11 limit, now submit a form asking for us to
12 override it.
13         MR. HILL:  Objection.  Asked
14     and answered three times now.
15 QUESTIONS BY MR. SHKOLNIK:
16     Q.   Yeah, it's not telling them
17 it's lost, it's understocked, it's a new
18 drug.  It's telling you, fill out an override
19 form to get my pills, correct?
20         MR. HILL:  Object to the form.
21         THE WITNESS:  We simply call it
22     the override form, but the override
23     form can mean many different things.
24     There's no definition that says,
25     "you've hit your limit, fill out this

Page 162

1    override form."
2    QUESTIONS BY MR. SHKOLNIK:
3       Q.    Well, let's read what it says.
4    "The online form is for pharmacies that
5    required large quantities of orders for any
6    controlled substance C-II to C-V."
7           Then it goes on and tells us
8    what the process is.  "The RX inventory
9    receives the override form from RXS."
10          Who's RXS?
11      A.    At that time RXS was a pharmacy
12   supervisor, so the store's direct supervisor.
13      Q.    "RX inventory reviews the
14   request based on the reason stated and
15   approves or denies the request."
16          There's no reference in here
17   whatsoever that the override form is utilized
18   for anything other than seeking large
19   quantities of controlled pills, substance
20   pills or drugs, correct?
21          MR. HILL:  Object to the form.
22          THE WITNESS:  There is no
23      indication that it's only used for
24      large quantity orders.
25

Page 163

1    QUESTIONS BY MR. SHKOLNIK:
2       Q.    Well, let's go down to the
3    fourth bullet point.  "Denied orders are sent
4    back to RXS requesting more specific
5    information that may include GFD."
6           Good faith dispensing?
7       A.    Correct.
8       Q.    Does that have anything to do
9    with not enough inventory in the warehouses
10   or a computer glitch or anything like that?
11          MR. HILL:  Object to the form.
12      You're mixing two concepts together.
13          MR. SHKOLNIK:  No, I'm not, and
14      please do not do that.  It has been a
15      number of these speaking objections,
16      which are frowned upon.  In fact,
17      Judge Polster was discussing it the
18      other day, and I'd ask you not to do
19      that.
20   QUESTIONS BY MR. SHKOLNIK:
21      Q.    So let me go back to my
22   question.
23          Denied orders are sent back to
24   RXS.  And it talks about GFD.  GFD has
25   nothing to do with computer malfunction, the

Page 164

1    warehouse being empty or any of those
2    alternative items.
3           That deals with whether or not
4    it's a suspicious order and you hit your max,
5    correct?
6       A.    No.
7       Q.    Okay.  What does it have to do
8    with?
9       A.    There were reasons why we may
10   deny a request.  So, for instance, an item is
11   on backorder or an item -- they had a
12   computer glitch or whatever the issue is.  If
13   the quantity that we are receiving from the
14   override request seems large or inappropriate
15   for whatever reasons, we may deny those
16   requests and then ask for specific
17   information around good faith dispensing.
18      Q.    So if it's a computer glitch,
19   you're going to ask about good faith
20   dispensing?
21      A.    Possibly.
22      Q.    Why?
23      A.    Why not?  It's our duty to
24   perform our due diligence, right?  So if
25   there's some reason why that quantity doesn't

Page 165

1    make sense, we may flag -- we may push back
2    and ask for more information.
3       Q.    So if it's a computer glitch,
4    that means the quantity doesn't make sense?
5           MR. HILL:  Object to the form.
6           THE WITNESS:  We're speaking of
7       the quantity on the override form.
8       I'm not talking about a computer
9       glitch.  I'm talking about the
10      quantity on the override form.
11   QUESTIONS BY MR. SHKOLNIK:
12      Q.    I'm still trying to get to the
13   bottom of why you're calling it an override
14   form if it's for a computer glitch or an
15   empty warehouse, and you're not calling it
16   something else.
17          MR. HILL:  Object to the form.
18   QUESTIONS BY MR. SHKOLNIK:
19      Q.    Sir, the form that is submitted
20   when someone hits their threshold and still
21   wants to get the drugs delivered to the
22   pharmacy is an override form, correct?
23      A.    An override form is what we
24   call it.  It can be used for multiple
25   reasons.

Page 166

1    Q.    I'm sure it could.
2         But when they hit their max and
3    they still want the drugs, they have to fill
4    an override form?
5    A.    They may not be at their max.
6    There might be a reason why an override form
7    is required that doesn't require them to be
8    at their max.
9    Q.    Then the next bullet point,
10   "Once RXS has provided a detailed
11   explanation" -- so that's the supervisor for
12   the pharmacy -- "then RX inventory approves
13   the order."
14        So at this point, from
15   June 2012 up until October, it's basically
16   the inventory department that decides whether
17   or not to ship or not --
18        MR. HILL:  Object to the form.
19   QUESTIONS BY MR. SHKOLNIK:
20   Q.    -- correct?
21   A.    At this moment in time, we did
22   not have the creation of pharmaceutical
23   integrity, so it fell on the hands of the
24   most appropriate group.
25   Q.    And at that point in time,

Page 167

1    pharmacists were receiving bonuses based on
2    how many pills they were selling --
3         MR. HILL:  Object to the form.
4    QUESTIONS BY MR. SHKOLNIK:
5    Q.    -- correct?
6         MR. HILL:  Sorry.  Object to
7    the form and foundation.
8         THE WITNESS:  I don't know.
9    QUESTIONS BY MR. SHKOLNIK:
10   Q.    Let's go back to Exhibit 6.
11   Exhibit 6, page 12 of 343, paragraph
12   number 6.  "Beginning in 2014, Walgreens will
13   exclude any accounting for controlled
14   substance prescriptions dispensed by a
15   particular pharmacy from bonus computations
16   for pharmacists and pharmacy technicians at
17   the pharmacy."
18        So if my math is correct,
19   June 2012 was before 2014, and at that point
20   in time they were still calculating pharmacy
21   bonuses based on -- bonus computations on
22   accounting for controlled substance
23   prescriptions being dispensed; fair
24   statement?
25        MR. HILL:  Object to the form.

Page 168

1    Foundation.
2         THE WITNESS:  I don't know.
3    QUESTIONS BY MR. SHKOLNIK:
4    Q.    That's what it says there,
5    doesn't it?
6    A.    I see the words, but I don't
7    know anything about that.
8    Q.    I mean, we can only assume that
9    when they signed this $80 million deal, they
10   were under -- they were stating accurately
11   that their pharmacists were getting a bonus
12   based upon how many controlled substance
13   prescriptions they dispensed, correct?
14        MR. HILL:  Object to the form.
15   Foundation.
16        THE WITNESS:  I don't know.
17   QUESTIONS BY MR. SHKOLNIK:
18   Q.    If we can go back to Exhibit 7,
19   please.
20        So we have the inventory
21   department approving the suspicious order
22   overrides for the pharmacists at the store
23   level who are getting bonuses based on how
24   many pills they sold up to June of 2012 -- up
25   through June 2012, correct?

Page 169

1         MR. HILL:  Same objections.
2         THE WITNESS:  I don't know
3    that.
4    QUESTIONS BY MR. SHKOLNIK:
5    Q.    It's a good inference, is it
6    not?
7         MR. HILL:  Same thing.
8         THE WITNESS:  I don't know.
9    QUESTIONS BY MR. SHKOLNIK:
10   Q.    If the company still had a
11   bonus program in place where the pharmacist
12   got a bonus on how many Schedule II through V
13   controlled substance prescriptions they
14   dispensed, based on what we're reading here
15   as the policy for SOM in the overrides, it
16   was inventory department that was approving
17   the pharmacists' bonuses when they approved
18   the overrides, correct?
19        MR. HILL:  Same objections.
20   Compound.
21        THE WITNESS:  I don't know that
22   to be accurate.
23   QUESTIONS BY MR. SHKOLNIK:
24   Q.    Sir, it's exactly what it says
25   on the document.  In order to get it

Page 170

1 approved, someone in charge of inventory, the
2 sales inventory of the company, was approving
3 the bonuses for the sale of controlled
4 substance pills at the pharmacy level; fair
5 statement?
6        MR. HILL: Same objections, and
7    asked and answered.
8        THE WITNESS: I don't know.
9 QUESTIONS BY MR. SHKOLNIK:
10    Q.   Do you think it's right for a
11 pharmacist to get a bonus based on how many
12 opioid pills they distribute?
13        MR. HILL: Object to the form.
14        THE WITNESS: I don't know.
15 QUESTIONS BY MR. SHKOLNIK:
16    Q.    And you wouldn't like -- you
17 don't approve of that yourself, do you?
18        MR. HILL: Same objections.
19 QUESTIONS BY MR. SHKOLNIK:
20    Q.    Forget about Walgreens.
21 Yourself.
22        Do you approve of the fact that
23 a pharmacist would get a bonus on how many
24 opioid pills they sell?
25        MR. HILL: Same objections.

Page 171

1        THE WITNESS: I don't know.
2 QUESTIONS BY MR. SHKOLNIK:
3    Q.    We know there was an opioid
4 epidemic at least in 2012, according to your
5 testimony, correct?
6        MR. HILL: Object to the form.
7        THE WITNESS: I was aware of an
8    opioid epidemic.
9 QUESTIONS BY MR. SHKOLNIK:
10    Q.    At that time?
11    A.    At that time.
12    Q.    And do you think getting a
13 bonus on how many pills you could sell --
14 when I say "pills," opioids. Do you think
15 the incentive of getting a bonus for how many
16 pills you sell may play a role in whether or
17 not you dispense the drug and try to get
18 overrides to get more of the drug to sell?
19        MR. HILL: Object to the form.
20    Foundation. Asked and answered.
21        THE WITNESS: I don't know.
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    Human nature, isn't it? You
24 sell more pills, you make more money.
25 Wouldn't that be an incentive to many people?

Page 172

1        MR. HILL: Same objections.
2        THE WITNESS: I don't know.
3 QUESTIONS BY MR. SHKOLNIK:
4    Q.    Let's go down to the next
5 section on Exhibit 7?
6        Do you think it's a good idea
7 to pay a bonus to a pharmacist to sell
8 prescription opioids?
9        MR. HILL: Same objections.
10        THE WITNESS: I don't know.
11 QUESTIONS BY MR. SHKOLNIK:
12    Q.    I mean, we're not talking
13 Pampers. We're not talking household
14 products. We're talking addictive opioid
15 pills.
16        Do you think it's appropriate
17 for a company to be paying the pharmacist a
18 bonus for that by the pill?
19        MR. HILL: Asked and answered
20    many times.
21        MR. SHKOLNIK: And it will be
22    asked again.
23        THE WITNESS: I don't know.
24 QUESTIONS BY MR. SHKOLNIK:
25    Q.    Let's go to history of SOM

Page 173

1 daily reporting.
2        "Beginning October 2012,
3 Cardinal Health has been providing a daily
4 list of pharmacy orders that have triggered a
5 SOM event from the previous order day. The
6 SOM report is reviewed by RX inventory to
7 identify any red-flagged Florida pharmacies
8 blocked from ordering controlled substances.
9 Also identified are any large orders that the
10 system generated or manually keyed by the
11 pharmacy that are not red-flag locations."
12        First of all, do you know what
13 a red flag means?
14    A.    Red flag can mean anything.
15    Q.    What did it mean in the sense
16 of SOM daily reporting when you took over
17 integrity in December of 2012?
18    A.    A red flag could be an order
19 that was of interest.
20    Q.    Did you ever have any dealings
21 with Cardinal over their SOM policy and the
22 reporting to your company?
23    A.    Can you rephrase that question?
24    Q.    Yeah.
25        Did you ever have any

Page 174

1 interaction with Cardinal Health in 2012 when
2 you took over -- when you and Tasha took over
3 pharmacy integrity about what their process
4 was when they were receiving orders from your
5 stores?
6      A.    I don't know any -- I don't
7 have any information on what Cardinal was
8 doing.
9      Q.    Was Cardinal a distributor that
10 was being utilized by the stores at that
11 time?
12      A.    Yes, one of many.
13      Q.    If Cardinal was the
14 distributor, was the order going through
15 inventory -- inventory management?
16           MR. HILL:  Object to the form.
17 Foundation.
18 QUESTIONS BY MR. SHKOLNIK:
19      Q.    In that time?
20      A.    What time? I'm sorry.
21      Q.    In the 2012 time frame before
22 you took over.
23           MR. HILL:  Same objections.
24           THE WITNESS:  Were orders being
25      transmitted to Cardinal; is that what

Page 175

1      you're asking?
2 QUESTIONS BY MR. SHKOLNIK:
3      Q.    No.  No.
4           If a store needed -- needed
5 more opioids and they were utilizing Cardinal
6 Health as a distributor, would the order go
7 through pharmacy management, or would it go
8 directly from store to Cardinal back then?
9           MR. HILL:  Same objections.
10           THE WITNESS:  I can't recall.
11 QUESTIONS BY MR. SHKOLNIK:
12      Q.    Were stores receiving
13 distribution from Cardinal and Walgreens
14 during the 2012 time frame?
15      A.    I can't recall.
16      Q.    Could a store get multiple --
17 withdraw that.
18           Could stores have multiple
19 sources for opioids when you took over the
20 program?
21           MR. HILL:  Object to the form.
22           THE WITNESS:  I can't recall.
23 QUESTIONS BY MR. SHKOLNIK:
24      Q.    Are there any documents
25 anywhere that would help -- that you think

Page 176

1 would refresh your recollection as to what
2 was done when you took over?
3           I mean, it seems like you don't
4 recall a lot of this stuff.  I'm just trying
5 to figure out what I should be looking at.
6           MR. HILL:  Object to the form.
7           MR. SHKOLNIK:  I'll rephrase
8      it.
9 QUESTIONS BY MR. SHKOLNIK:
10      Q.    Let's continue looking at this
11 document.
12           It says, "Cardinal Health is
13 providing daily lists of pharmacy orders that
14 have triggered SOM event from the previous
15 order day."
16           Would that be maybe something
17 that refreshes your recollection that
18 Cardinal Health was actually distributing to
19 your pharmacies beginning in October 2012?
20           MR. HILL:  Object to the form.
21           THE WITNESS:  They may have
22      been dispense -- or distributing, but
23      they -- I can't speculate on the drugs
24      that were flagged.
25

Page 177

1 QUESTIONS BY MR. SHKOLNIK:
2      Q.    Oh, so this is possibly not
3 related to opioids; is that the issue?
4      A.    Yes.
5      Q.    Well, it goes on to show --
6 say -- I'm sorry, it goes on to say, "Also
7 identified are any large orders that the
8 system generated, SIMS, or manually keyed by
9 the pharmacy that are not red-flag
10 locations."
11           Were you aware of red-flag
12 locations in Florida or around the country
13 when you took over?
14      A.    Only the locations that were a
15 part of the seizure of the licensure in
16 Florida.
17      Q.    "SOM daily report is filtered
18 to identify red-flag Florida stores.  These
19 orders are reviewed by RX inventory to
20 determine how they were generated."
21           Would that be an indication
22 that these stores may have been requesting
23 fills or orders directly from Cardinal and
24 not going through inventory management?
25           MR. HILL:  Object to the form.

Page 178

1     THE WITNESS:  I want to make
2  sure I understand your question.
3  QUESTIONS BY MR. SHKOLNIK:
4     Q.   Yeah.
5     A.   The orders that were
6  identified?
7     Q.   Yeah.
8     A.   Were they placed directly to
9  Cardinal or placed through our system?
10    Q.   Well, it says here they have to
11  do an investigation to see whether or not
12  the -- whether RX inventory -- you know, how
13  it was even generated, the request.
14       Is there a possibility that
15  back at that time when you took over these
16  pharmacies, the store level, were able to
17  just go straight to Cardinal and order these
18  opioids without going through inventory
19  management so no one in the company knew what
20  they were getting?
21       MR. HILL:  Object to the form.
22  Foundation.
23       THE WITNESS:  That's not how
24  the system -- ordering system works.
25       The ordering system, you can't

Page 179

1  order Control IIs or opioids through
2  Cardinal directly.
3  QUESTIONS BY MR. SHKOLNIK:
4     Q.   Was that after you took over or
5  previously --
6     A.   Previously.
7     Q.   -- before that?
8     A.   Previously.
9     Q.   So any order to Cardinal would
10  have gone through inventory management?
11       MR. HILL:  Object to the form
12  and foundation.
13       THE WITNESS:  It would have
14  gone through the ordering system.  May
15  not necessarily need to go to RX
16  inventory for review.
17  QUESTIONS BY MR. SHKOLNIK:
18    Q.   So it would go to the ordering
19  system, but from the ordering system they may
20  click on Cardinal and send the order directly
21  to Cardinal?
22       MR. HILL:  Object to the form
23  and foundation.
24       THE WITNESS:  No, it doesn't
25  work that way.

Page 180

1  QUESTIONS BY MR. SHKOLNIK:
2     Q.   How does it work?
3       MR. HILL:  Same objection on
4  foundation.
5       THE WITNESS:  The store would
6  place the order within the ordering
7  system, SIMS, S-I-M-S, SIMS.  That
8  order is then forwarded to their
9  servicing DC, who completes the
10  required 222 form.  That 222 form is
11  then mailed to the vendor, in this
12  case Cardinal.  Cardinal would receive
13  that 222 form, fill the order and then
14  ship the order.
15  QUESTIONS BY MR. SHKOLNIK:
16    Q.   And you say the DC.  Is that
17  where -- the processing center?
18    A.   Distribution center.
19    Q.   Oh, distribution center, I'm
20  sorry.
21       So it would -- the request
22  would always go through a Walgreens
23  distribution center?
24       MR. HILL:  Object to the
25  foundation.

Page 181

1  QUESTIONS BY MR. SHKOLNIK:
2     Q.   Not that it'll be filled
3  through the distribution center.
4     A.   Yes.  Yes.  Because they are
5  the POA for all of our stores.
6     Q.   POA?
7     A.   Power of attorney.
8     Q.   And as you understand it,
9  there's no way that the pharmacy can go
10  directly to either an Anda or an ABC or a
11  Cardinal to fill an order for opioids absent
12  going directly through the SIM process into
13  Walgreens corporate?
14       MR. HILL:  Object to the form.
15       THE WITNESS:  They cannot.
16  QUESTIONS BY MR. SHKOLNIK:
17    Q.   Or they should not, correct?
18    A.   They cannot.
19    Q.   They cannot?
20    A.   Cannot.  They need a 222 form.
21  Stores do not have 222 forms.
22    Q.   And what is a 222 form, if you
23  could explain that?
24    A.   It is a DEA form that is issued
25  to be able to transfer Control II, such as

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  opioids, between a vendor and a store.
2      Q.    And would that allow the
3  inventory management to always be able to
4  track pills on hand in a store?
5      A.    With a 222 form?
6      Q.    Since it has to go through the
7  main distribution center even if they don't
8  fill it.
9          MR. HILL: Object to the form.
10         THE WITNESS: I don't -- I'm
11    not following your question.
12  QUESTIONS BY MR. SHKOLNIK:
13     Q.    I'll withdraw it. Let me
14  rephrase it. I'm sorry.
15         The requests going through a
16  distribution center, a Walgreens distribution
17  center, whether or not they actually
18  distribute the drug or not, does that allow
19  inventory management to keep track of how
20  many pills a store may have actually
21  purchased in total per month?
22         MR. HILL: Object to the form.
23         THE WITNESS: We can receive
24    reporting within the ordering system
25    of what was received at the store, if

Page 183

1    that's what you're asking.
2  QUESTIONS BY MR. SHKOLNIK:
3      Q.    And what was approved?
4      A.    What was received at the store.
5      Q.    Okay. So when the -- when the
6  request goes into the -- I think you said it
7  was the SIM request to a distribution center,
8  then the 222 is issued for filling it. This
9  is back prior to 2012, before your integrity
10  program was put in place.
11         Is someone at the distribution
12  center either giving a thumbs up or a thumbs
13  down as to whether or not it should ever be
14  sent to either Cardinal or the actual
15  distributor based on a suspicious order
16  monitoring event going on in the company?
17         MR. HILL: Objection.
18    Foundation.
19         THE WITNESS: I don't know what
20    was happening at that time.
21       (Walgreens-Mills Exhibit 8
22    marked for identification.)
23  QUESTIONS BY MR. SHKOLNIK:
24     Q.    If we could mark Exhibit 8,
25  please.

Page 184

1          MR. HILL: And this is a --
2          MR. SHKOLNIK: It's an e-mail
3    with an attachment.
4          MR. HILL: Is this all of them
5    or is this -- oh, this is multiple
6    copies?
7          MR. SHKOLNIK: Yeah. We're
8    trying to -- trying to move it fast.
9          MR. HILL: No. No. I get it.
10    It's just following together.
11  QUESTIONS BY MR. SHKOLNIK:
12     Q.    I've just handed you a
13  document, Exhibit 8, which is an e-mail with
14  an attachment. The e-mail references SOM war
15  room processes, 12/14/12, and that there's a
16  PowerPoint attached. It's from an Anika,
17  Madarasz, M-a-d-a-r-a-s-z, to Steven Mills.
18         Who is Anika?
19     A.    She was a project manager.
20     Q.    Do you know what department?
21     A.    Project management office. I'm
22  not sure department.
23     Q.    An e-mail went to yourself and
24  Tasha, and it referenced war room process.
25         What's a war room? Or what was

Page 185

1  the war room or is the war room?
2      A.    So that was the ground floor
3  right when our team was being built up. We
4  took over a conference room and started
5  writing all of our policies and processes
6  and -- was just basically a room that no
7  one else could enter.
8      Q.    If we could go to the third
9  page of the document, this PowerPoint, it's a
10  Bates number that ends in 195. When I say
11  "Bates number," that's that little number on
12  the bottom right.
13     A.    Okay.
14     Q.    It says, "Initial sorts in
15  suspicious order monitoring system, D5," and
16  it talks about "individual analysts will be
17  assigned to specific states."
18         And then the next bullet point
19  is, "Orders will be investigated whenever the
20  ceiling limit is 100 percent or over.
21  Standard investigating will be initiated
22  through e-mails to the pharmacy supervisors
23  where ceilings are 100 to 149 percent."
24         I'm assuming that means over.
25         Then "deep dive is done when

Page 186

1  ceilings limits are 150 percent and over."
2       Now, can you explain to me how
3  it was that investigations were only -- were
4  only being -- well, investigations would be
5  triggered when they were only 100 percent
6  over limit?
7       MR. HILL: Object to the form.
8  QUESTIONS BY MR. SHKOLNIK:
9       Q.  And that a deeper dive would be
10 done when it's 150 percent, and a standard at
11 100 to 149 percent?
12      A.  At this time we were on the
13 ground floor. There was a lot of information
14 coming at us. We were trying to stay ahead
15 of it, trying to keep our head above the
16 water, so to speak, so we were trying to
17 figure out what was the best way of attacking
18 this.
19      Q.  But initially, because of the
20 load that you were now being dealt with,
21 unless it was 100 percent over the ceiling,
22 there was no investigation even being done,
23 according to this PowerPoint.
24      MR. HILL: Object to the form.
25      THE WITNESS: Can you rephrase

Page 187

1  your question?
2  QUESTIONS BY MR. SHKOLNIK:
3       Q.  Sure.
4       According to what we read in
5  the suspicious order monitoring system,
6  bullet point 2, "Orders will be investigated
7  whenever the ceiling limit is 100 percent or
8  over."
9       So what does that mean?
10      MR. HILL: Object to the form.
11      THE WITNESS: I can't recall
12 the specifics of why we determined
13 that number.
14 QUESTIONS BY MR. SHKOLNIK:
15      Q.  But the idea that you use
16 different levels of investigation when
17 anything -- whether it's 100, 150, 149, just
18 doesn't seem to make sense to me.
19      Could you just explain to me
20 why you would use a different level of
21 analysis in any over-ceiling-limit case? Why
22 wouldn't they all meet the same level of
23 investigation?
24      MR. HILL: Object to the form.
25      THE WITNESS: At this time,

Page 188

1  like I said, we were still trying to
2  understand all the analysis and all
3  the data that we were receiving and
4  going through. So at this time we may
5  have broken it out, but we do not --
6  no longer do this. It's all the same
7  analysis required.
8  QUESTIONS BY MR. SHKOLNIK:
9       Q.  Okay. So there was a period of
10 time -- and I understand. It was a major
11 undertaking you're now being involved in.
12      There was a period of time that
13 the influx was so high that you had to triage
14 it, so to speak. And you got the most
15 attention to the 150-pluses, the less
16 attention to the 100 to 149 percent, and then
17 there was some investigation if it was over
18 100.
19      MR. HILL: Object.
20 QUESTIONS BY MR. SHKOLNIK:
21      Q.  Fair statement?
22      MR. HILL: Object to the form.
23      THE WITNESS: At this time
24 there was only me doing the analysis,
25 so just the sheer volume, we had to do

Page 189

1  something.
2  QUESTIONS BY MR. SHKOLNIK:
3       Q.  Yeah.
4       When did they give you help?
5       A.  January, February, almost every
6  month after that until the team was built
7  out.
8       Q.  Can you give us some indication
9  on the kind of numbers that you -- that you
10 were seeing when you first started? Are we
11 talking like 10, 20, hundreds --
12      MR. HILL: Object to the form.
13      THE WITNESS: I don't know.
14 QUESTIONS BY MR. SHKOLNIK:
15      Q.  -- thousands?
16      A.  I don't remember.
17      Q.  Let's go to the next exhibit.
18      (Walgreens-Mills Exhibit 9
19 marked for identification.)
20 QUESTIONS BY MR. SHKOLNIK:
21      Q.  I'm going to hand you what has
22 been marked as Exhibit 9.
23      Exhibit 9 is -- I'm going to
24 hand you a document, Exhibit 9, that appears
25 to be an appointment e-mail or, you know --

Page 190

1 or an appointment invite from Manuela
2 Chirica, C-h-i-r-i-c-a, to a whole group of
3 people.
4        Who is Manuela?
5    A.   She was an IT programmer.
6    Q.   Was she part of -- part of the
7 team that was developing the program that was
8 going to be utilized for the integrity group?
9    A.   Manuela's involvement was
10 creation of the user interface screens that
11 we would interact with.
12   Q.   Are those user interface
13 screens still in use today that -- you know,
14 some version of those?
15   A.   Yes.
16   Q.   And we talked earlier about
17 being able to put a store number in. It's
18 that interface, it's that program, that you
19 would do your searching through, or is it a
20 different program?
21   A.   It is that program.
22   Q.   And the invite is to review
23 application screens and proposed changes to
24 make navigation easier, and our date here is
25 12/17/2012.

Page 191

1        And there's a group of people
2 on this list, and I just want to go through
3 them, and maybe you could tell me who they
4 are.
5        Mayur Tailor, M-a-y-u-r. Do
6 you know who that is?
7    A.   He was a gentleman that was my
8 counterpart, same position.
9    Q.   So he was part of that new
10 startup team in -- now we're in January
11 of 2013?
12   A.   Correct.
13   Q.   And you already told us about
14 Anika Madarasz.
15       Who's Ora Yelvington,
16 Y-e-l-v-i-n-g-t-o-n?
17   A.   Manuela's direct supervisor.
18   Q.   And what department is that?
19 It's IT?
20   A.   IT. Yeah, I don't know the
21 exact department.
22   Q.   Okay. We have Rajitha,
23 R-a-j-i-t-h-a, Teega, T-e-e-g-a?
24   A.   Counterpart to Manuela.
25   Q.   Patricia Daugherty?

Page 192

1    A.   Manager, pharmacy integrity.
2    Q.   So she was your direct report?
3    A.   She is my direct report. Or I
4 directly report to her, sorry.
5    Q.   Yes, that's what I meant.
6        Christopher Dymon, D-y-m-o-n?
7    A.   Another manager on the RX
8 integrity team.
9    Q.   And then we have Raymond
10 Stukel, S-t-u-k-e-l?
11   A.   Raymond was a counterpart. I
12 can't recall his exact involvement or his
13 title, I'm sorry.
14   Q.   Okay. Now, if we go into the
15 attachment that's -- that's attached to this
16 e-mail invite, can you just quickly look
17 through it and just tell me what this process
18 was? What were they -- you know, what were
19 they trying to do at this point in time with
20 the interface?
21   A.   So this is what we call a BRD
22 document, business requirement document, for
23 changes to the system. There were
24 apparently, during this period of time, ten
25 different fixes that we identified that we

Page 193

1 needed updating in the tool.
2    Q.   Yeah. One of them that I'm
3 curious about is there's a -- on the BR 2.O,
4 it talks about order items manually changed,
5 or store manually changed order.
6        What is the significance from
7 the integrity side that you'd want to be able
8 to track the fact that they're changing the
9 order?
10   A.   So any manual change would be
11 someone touched the order. Anytime someone
12 touches the order, we want to be able to
13 capture that and see why was it changed, and
14 then when the system -- if the system flags
15 it for being over their limits, capturing
16 that information.
17   Q.   I guess my question is if
18 someone gets notice -- or gets -- becomes
19 aware that they don't get a ship, so that
20 would be an indication, potentially, that
21 they hit ceiling, would one way to try to get
22 the shipment and avoid a full review is to
23 just cut down, reduce your order and see if
24 that one gets through?
25       MR. HILL: Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 194

1 THE WITNESS: No, that's not
2 how the system is designed.
3 QUESTIONS BY MR. SHKOLNIK:
4 Q. So a pharmacy couldn't do that?
5 MR. HILL: Object to the form.
6 THE WITNESS: The pharmacy can
7 cut their order, but the order that
8 they see is their suggested order
9 because that's all they would be able
10 to adjust, would be a system says, I
11 should order this much product, and
12 say it's three and they want one, they
13 can reduce it to one.
14 QUESTIONS BY MR. SHKOLNIK:
15 Q. Or let's assume they want three
16 but they realize they hit ceiling or they
17 have to go for an override. Rather than go
18 for an override, could they simply just
19 reduce the order and avoid going through the
20 override process?
21 MR. HILL: Object to the form.
22 THE WITNESS: I don't follow
23 your question.
24 You're saying if they have --
25 they want three and the system is

---

Page 195

1 ordering three but they reduced it
2 down, that's going -- bypassing the
3 system?
4 QUESTIONS BY MR. SHKOLNIK:
5 Q. What I'm suggesting to you is
6 if they feel that it's going to cause an
7 investigation by requesting an override,
8 would the pharmacy be able to ask for less to
9 prevent the investigation from happening?
10 MR. HILL: Object to the form.
11 THE WITNESS: So the ordering
12 system, the way that logic works and
13 the suggested order quantity is
14 displayed to the user, has already
15 gone through their ceiling limit check
16 to make sure that they're within their
17 limits, and the item is never
18 ordered -- the system will never order
19 more than what you're supposed to get.
20 So if they were reducing,
21 they're just doing themselves a
22 disservice.
23 QUESTIONS BY MR. SHKOLNIK:
24 Q. So they would -- maybe you
25 could help clarify for me.

---

Page 196

1 If they put in an order that
2 would be above ceiling, would a portion of
3 the order be shipped up to the ceiling?
4 A. No, the whole order is flagged
5 and not shipped.
6 Q. So at that point if -- say the
7 pharmacy had asked for ten pills -- ten
8 bottles, and it doesn't get shipped, they hit
9 ceiling, and then the only way you get it now
10 is you have to go through the override
11 system.
12 Rather than go through the
13 override system, could they say, "Just send
14 me two bottles," and would it avoid any
15 investigation --
16 MR. HILL: Object to the form.
17 QUESTIONS BY MR. SHKOLNIK:
18 Q. -- since it's no longer an
19 override?
20 A. Kind of throwing a couple
21 different scenarios at once, so let me just
22 kind of narrow it down here.
23 Q. Yeah, please.
24 A. So you have an order that
25 generates --

---

Page 197

1 Q. Uh-huh.
2 A. -- let's just call it two. The
3 store is trying to order ten. They place the
4 order for ten. That entire order is canceled
5 because ten is over their limit. Okay?
6 Q. Yes.
7 A. Two is not shipped. Nothing is
8 shipped.
9 Q. Uh-huh.
10 A. Same order, different scenario.
11 They see two, but now they want one. One is
12 still under their limits because it's below
13 the suggested. One is shipped.
14 Q. Okay.
15 A. Does that clarify?
16 Q. Now, try my scenario.
17 A. Okay.
18 Q. They want ten, they don't get
19 ten, so they -- rather than file an override
20 request to get ten, they knock it down to two
21 to try to figure out where the ceiling level
22 is.
23 Can they -- can they reduce
24 their order to try to figure out where the
25 ceiling is so they don't have to trigger an

---

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  override?
2        MR. HILL: Object to the form.
3        THE WITNESS: They can
4  certainly adjust the order at any
5  point, but the ceiling limits are
6  recalculated every single day.
7  QUESTIONS BY MR. SHKOLNIK:
8     Q.    Okay.
9     A.    So there's very low percentage
10 that they'll ever be able to guess it.
11    Q.    Was -- is there -- when you're
12 saying it's recalculated every day, are there
13 vast swings on a daily basis?
14    A.    There could be.
15    Q.    Do you know if there was a
16 system like that in place prior to your
17 implementing this algorithm?
18       MR. HILL: Object to the form.
19       THE WITNESS: I don't know.
20       (Walgreens-Mills Exhibit 10
21 marked for identification.)
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    I'm going to hand you a
24 document. The next document is an e-mail
25 dated March 1, 2013.

Page 199

1        MR. HILL: And the attachment,
2  too?
3        MR. SHKOLNIK: And there's an
4  attachment.
5        MR. HILL: Is -- I'm not -- is
6  this part of the -- I got this --
7        MR. SHKOLNIK: Wait a second.
8  You gave --
9        MR. HILL: I got the e-mail, I
10 got a PowerPoint, and then I got
11 produced in native format.
12       Is that all part of it?
13       MR. SHKOLNIK: Oh, okay. What
14 I'm giving you is the whole family,
15 the way it's produced to us.
16       MR. HILL: Okay. What page
17 does it end at?
18       MR. SHKOLNIK: Which page do
19 you have?
20       MR. HILL: This is the third
21 document that -- it says it's part of
22 the --
23       MR. CIACCIO: The last Bates
24 number is 764.
25       MR. HILL: This one goes to

Page 200

1  767, and then there's a page with
2  nothing.
3        MR. CIACCIO: Okay. So then
4  maybe too much was just included.
5        MR. SHKOLNIK: Yeah, we
6  accidentally handed --
7        MR. CIACCIO: A couple extra
8  pages.
9        MR. DEMONTE: You gonna give us
10 the Bates numbers?
11       MR. SHKOLNIK: Yeah, so it's
12 7 -- it's WAG_MDL_60739 through 764.
13       MR. HILL: Okay. The witness
14 has one -- all right. So you gave us
15 765. Do you not want us to have
16 these?
17       MR. CIACCIO: Yeah. It should
18 be the exhibit and two copies. No?
19       MR. HILL: I just got -- you
20 handed me one for him and one for me.
21       MR. SHKOLNIK: I'm sorry. On
22 that one we're short on copy.
23       MR. CIACCIO: Oh, I'm sorry I
24 do have another one.
25       MR. SHKOLNIK: We'll get it

Page 201

1  under control. We were doing good up
2  until now.
3  QUESTIONS BY MR. SHKOLNIK:
4     Q.    Exhibit 10 we just handed you
5  is an e-mail from yourself to Tasha dated
6  March 1, 2013; subject, market leadership
7  presentation, DEA market meeting update. And
8  it has an attachment, which is a PowerPoint.
9        So now March 2013, your
10 integrity group is now up and running for
11 about three months, correct, give or take?
12 Three going on four months?
13    A.    Yes.
14    Q.    And we have this PowerPoint, if
15 we could turn to it.
16       Did you -- did you attend this
17 meeting?
18    A.    Market leadership presentation,
19 I probably did not attend this, no.
20    Q.    What does that -- what does
21 market leadership meeting mean? What is it?
22    A.    So markets are -- we have
23 clusters of stores that kind of group up and
24 then that makes up a market. And then the
25 leaders from those markets across the chain

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 would meet for this meeting.
2    Q.   Okay.  And at that point now,
3 the company was doing presentations to these
4 groups by prescription integrity so that they
5 would be updated on what you're doing?
6    A.   Yeah, that's what this is for.
7    Q.   And if we could turn to the
8 agenda, which is the second page of the
9 document, Bates 742, and it talks about "drug
10 overdose deaths continue to rise."
11        Then the fourth -- the fourth
12 bullet, "target drug good faith dispensing,"
13 and then it says, "Perrysburg update."
14        Do you recall if you were
15 provided any reports from Tasha from this
16 meeting?
17    A.   I don't recall.
18    Q.   Did you prepare this PowerPoint
19 for her?  I see that you're sending it to
20 her.
21    A.   I don't remember if I prepared
22 this.
23    Q.   If we can go to page 3 of the
24 slide deck.  "Drug overdose deaths continue.
25 In 2010, drug overdose deaths increased for

Page 203

1 the eleventh consecutive year in the US.
2 Nearly 60 percent of the drug overdose deaths
3 in 2010 involved pharmaceutical drugs."
4        Were you told by Tasha that
5 this was a statistic that Walgreens was
6 presenting to its different regional
7 employees at these meetings?
8    A.   What was your question?
9    Q.   Were you advised of these type
10 of statistics, that nearly 60 percent of drug
11 overdose deaths in 2010 involved
12 pharmaceutical drugs?
13        MR. HILL:  Object to the form.
14        THE WITNESS:  I may have seen
15    this, but I was not advised.
16 QUESTIONS BY MR. SHKOLNIK:
17    Q.   "Opioid analgesics were
18 involved in about three of every four
19 overdose deaths.  Total 4,030 overdose deaths
20 occurred in 1999, and the number has
21 increased dramatically to 15,597 deaths in
22 2009, 16,651 deaths in 2010, related to
23 opioid analgesics."
24        Did you ever have a discussion
25 with Tasha about this statistic and, you

Page 204

1 know, what is the significance of that in
2 terms of Walgreens' drug integrity
3 obligations?
4        MR. HILL:  Object to the form.
5        THE WITNESS:  I don't remember.
6 QUESTIONS BY MR. SHKOLNIK:
7    Q.   "CDC states that states are
8 taking action again the epidemic in the
9 following ways:  Starting or improving
10 prescription drug monitoring programs; using
11 prescription drug monitoring programs, public
12 insurance programs and workers' compensation
13 data to identify improper prescribing
14 opioids; passing, enforcing and evaluating
15 pill mill, doctor shopping and other state
16 laws to reduce prescription opioid abuse; and
17 encouraging state licensing boards to take
18 action against inappropriate prescribing."
19        Were you aware of any of these
20 actions being taken at that time?
21    A.   I can't remember.
22    Q.   Was there ever any discussions
23 in the integrity group that part of your job
24 was to help stop the epidemic?
25        MR. HILL:  Object to the form.

Page 205

1        THE WITNESS:  I don't recall.
2 QUESTIONS BY MR. SHKOLNIK:
3    Q.   Do you personally believe part
4 of your job in integrity was to help put the
5 brakes to the epidemic in any way that
6 Walgreens could?
7        MR. HILL:  Object to the form.
8        THE WITNESS:  Our role was to
9    make sure that the appropriate
10    medication was -- was getting into the
11    hands of the people that need it the
12    most, with the legitimate medical
13    needs.
14 QUESTIONS BY MR. SHKOLNIK:
15    Q.   If we can go to the next page,
16 please, there's a section called, "IC and
17 prescription leaflet."
18        What is IC and prescription
19 leaflet blocking reference?
20    A.   So IC+ is our prescription
21 processing application that stores use to
22 type in prescription data.
23        The prescription data that's
24 typed in, the pharmacist reviews it.  The
25 leaflet that prints out is the validation

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1  that -- the pharmacist who reviewed it, and
2  it's ready for filling at that point.
3      Q.    Is that like the thing they
4  stick on the bottle?
5      A.    That would be the label.
6      Q.    Okay.
7      A.    The leaflet is -- if you've
8  gotten a prescription from Walgreens, there's
9  like a pamphlet that's attached with your
10  name and your address, and that's the
11  leaflet.
12      Q.    Okay.  So this program, once
13  they put the doctor's DEA number in, if the
14  doctor has an invalid DEA number, it would
15  not print.  As I understand it, it would not
16  print the leaflet or the prescription?
17      A.    I see that here.  I don't
18  recall this program --
19      Q.    Okay.
20      A.    -- specifically.
21      Q.    And it goes down to the bottom.
22  This new addition from February was invalid
23  prescriber DEA notification form.
24          Was there a standard -- was
25  there a requirement that the pharmacies

Page 207

1  notify DEA if it turned out they're getting
2  prescriptions from a -- from a -- basically a
3  bad prescriber?
4          MR. HILL:  Object to the form.
5          THE WITNESS:  This specifically
6      is only speaking about if there's an
7      invalid DEA number within our
8      processing application, to open a
9      ticket so that it may be resolved.
10  QUESTIONS BY MR. SHKOLNIK:
11      Q.    I mean, it's a possibility that
12  someone forged a prescription, they used a
13  bad number, and it would show up on your
14  computer system, wouldn't it?
15          MR. HILL:  Object to the form.
16          THE WITNESS:  According to the
17      guidance here, the pharmacy team
18      member would check the DEA website for
19      validity of that DEA number.
20  QUESTIONS BY MR. SHKOLNIK:
21      Q.    Does -- but does the system
22  search the DEA number itself once it's put
23  in?  Is that part of the process of
24  processing the prescription?
25      A.    There is a search that's

Page 208

1  performed to identify that DEA number with
2  that prescriber's name, address, location,
3  kind of thing.
4      Q.    That's part of the good faith
5  dispensing process.  You'd want to make sure
6  that when you put the name in and the DEA
7  number, that it's a real doctor with a real
8  DEA -- I'm sorry, a real DEA number with a
9  doctor associated with it, with an address
10  that's consistent with the prescription
11  that's been handed to the pharmacist?
12      A.    It's part of the prescription
13  processing review, which may or may not be
14  included within the GFD.
15      Q.    Okay.  We'll go on to that
16  next.
17          If we can go to the next page,
18  please.  Target drug good faith dispensing.
19  The pilot has been in place since December.
20  We reduced quantities dispensed --
21          MR. HILL:  It's page 6.
22          MR. SHKOLNIK:  Oh, I'm sorry,
23      two pages later.
24          THE WITNESS:  Sorry.
25

Page 209

1  QUESTIONS BY MR. SHKOLNIK:
2      Q.    Bates number is 746.
3          Pilot has been in place since
4  December.
5          So is it fair to say that part
6  of this whole conversion at the time with
7  the -- into good faith -- I'm sorry, the
8  prescription integrity unit is when the good
9  faith dispensing requirement was implemented
10  as well?
11          MR. HILL:  Object to the form.
12          THE WITNESS:  I don't know that
13      to be accurate.
14  QUESTIONS BY MR. SHKOLNIK:
15      Q.    Well, it says here the pilot
16  has been in place since December, and it's
17  target good faith dispensing.
18          Does that in any way refresh
19  your recollection that that's when it was
20  implemented?
21      A.    Target drug good faith
22  dispensing is different than good faith
23  dispensing.
24      Q.    Okay.  So tell me what -- how
25  it's different, just so I understand.

Page 210

1    A.    Target drugs is only related to
2 specific drugs that we deemed --
3    Q.    Okay.  Thanks for clarifying
4 that.
5         So starting in December, there
6 was a certain group of drugs that you were
7 focusing in on with respect to the good faith
8 dispensing in particular at your group?
9    A.    Yes.  The pilot was to put --
10 emphasize focus around these specific drugs
11 and make sure that GFD is being applied.
12   Q.    It says, "We reduced quantities
13 dispensed of target drugs while maintaining
14 market share for other C-II medications."
15        Can you tell us, what were the
16 target drugs that were being focused on by
17 Walgreens between December and March --
18 December of 2012 and March of 2013?
19        MR. HILL:  Object to the form.
20        THE WITNESS:  I don't remember.
21 It's changed, so I can't recall.
22 QUESTIONS BY MR. SHKOLNIK:
23   Q.    But wouldn't it be fair to say
24 that at the time your team came into place in
25 December, the focus was on opioids and to

Page 211

1 some extent PSE as well?
2        MR. HILL:  Object to the form.
3        THE WITNESS:  I don't remember.
4 QUESTIONS BY MR. SHKOLNIK:
5    Q.    Well, we went through the
6 agreement with the government, and it
7 specifically said -- and I think we read it
8 together -- that the integrity program was
9 going to be focused on the relevant
10 diversion-related issues --
11        MR. HILL:  I'm sorry, what page
12 are you on?
13        MR. SHKOLNIK:  I'm on page 11
14 of 343 of Exhibit --
15        MR. HILL:  Thank you.
16        MR. SHKOLNIK:  -- 6.
17 QUESTIONS BY MR. SHKOLNIK:
18   Q.    But, I mean, we can agree,
19 sir -- withdraw that.
20        We can agree the agreement with
21 the DEA in 2012 was related to the improper
22 distribution of opioids.  We agree -- we can
23 agree on that, correct?
24        MR. HILL:  Object to the form
25        and the foundation.

Page 212

1        THE WITNESS:  I cannot say that
2 is only related to opioids.
3 QUESTIONS BY MR. SHKOLNIK:
4    Q.    Primarily?
5    A.    I cannot say.
6    Q.    What drugs did you think it was
7 really focused on that they got in a little
8 bit of trouble with down in Florida?
9        MR. HILL:  Objection.
10 Foundation.
11        THE WITNESS:  I don't know.  I
12 wasn't there.
13 QUESTIONS BY MR. SHKOLNIK:
14   Q.    Well, we read the agreement.
15 Didn't it talk about the distribution of the
16 controlled substances and that it also
17 referenced -- I'll withdraw it.
18        Let's just go back to this
19 exhibit.  Back to Exhibit 10.
20        "So the pilot has been in place
21 since December.  We reduced the quantity of,
22 dispense of target drugs while maintaining
23 market share for other C-II medications."
24        What's a C-II medication?
25    A.    It's a Schedule II medication

Page 213

1 that the DEA says -- based on its addictive
2 properties.
3    Q.    So were there's certain opioids
4 that were considered target drugs by the
5 company when you took over the program?
6        MR. HILL:  Object to the form.
7 Foundation.
8        THE WITNESS:  Can you clarify
9 your question?
10 QUESTIONS BY MR. SHKOLNIK:
11   Q.    I'm just asking you:  Were
12 there certain target opioids that you were to
13 focus in on as part of your -- your pharmacy
14 integrity obligations?
15   A.    I don't recall what we were --
16 what drugs we were specifically targeting in
17 2013.
18   Q.    How about OxyContin, was that
19 one, possibly?
20   A.    I don't know.
21   Q.    How about hydrocodone?
22   A.    I don't know.
23   Q.    How about hydromorphone?
24   A.    I don't know.
25   Q.    What about Subsys, did you guys

Page 214

1  distribute that?
2         MR. HILL:  Object to the form.
3         THE WITNESS:  I don't know.
4  QUESTIONS BY MR. SHKOLNIK:
5     Q.   How about fentanyl, did you
6  distribute that?
7         MR. HILL:  Same objection.
8         THE WITNESS:  We may have
9  dispensed fentanyl.
10         Is that what your question is?
11  QUESTIONS BY MR. SHKOLNIK:
12     Q.   Yes, that's my question.
13         Now, you have no recollection
14  as you're sitting here as to whether or not
15  those groups of drugs were in fact the target
16  drugs that led to your -- your whole group
17  being established?
18         Is that your testimony here
19  today, sir, you don't have a recollection?
20     A.   I cannot recall the drugs in
21  2013 that were on the target good faith
22  dispensing.
23     Q.   Not even one?  You can't even,
24  like, even give us a guess as to one of the
25  target drugs?

Page 215

1         MR. HILL:  Objection.  Calls
2  for speculation.
3         MR. SHKOLNIK:  That's all
4  right.  Please don't say
5  "speculation."  You can say "objection
6  to form."  Enough of this.
7  QUESTIONS BY MR. SHKOLNIK:
8     Q.   You can't even give us your
9  best guesstimate as to one drug that was a
10  target drug in 2012 and 2013 when you took
11  over the -- became part of this new integrity
12  program?
13         You can't even give us the name
14  of one single drug targeted; is that your
15  testimony?
16         MR. HILL:  Object to the form.
17         THE WITNESS:  I don't want to
18  guess and mislead.
19  QUESTIONS BY MR. SHKOLNIK:
20     Q.   I wouldn't want you to mislead
21  anybody, sir.
22         But you couldn't even say
23  oxycodone was a target drug in 2012 and 2013
24  when you saw the statistics of all those
25  deaths associated with opioids?

Page 216

1         MR. HILL:  Object to the form.
2         Asked and answered.
3  QUESTIONS BY MR. SHKOLNIK:
4     Q.   You can't tell us that?
5     A.   I can't recall.
6     Q.   Could you tell us hydrocodone,
7  was that a target drug in 2012 and 2013 for
8  your company, Walgreens, after it paid an
9  $80 million fine to the DEA and you set up
10  this new integrity program?
11         Are you not able to tell this
12  Court and jury that hydrocodone was one of
13  the drugs --
14         MR. HILL:  Object to the form.
15  QUESTIONS BY MR. SHKOLNIK:
16     Q.   -- that were targeted?
17     A.   I cannot recall.
18     Q.   Can you tell the Court and jury
19  whether or not -- you know, let me ask you:
20  Are you able to tell the Court and jury
21  whether or not fentanyl was one of the drugs
22  that was a target drug for the good faith
23  dispensing in 2012 and 2013, sir?
24         Can you tell the Court and jury
25  that was one of the target drugs or not after

Page 217

1  your company paid an $80 million fine?
2         MR. HILL:  Object to the form.
3         THE WITNESS:  I cannot recall.
4  QUESTIONS BY MR. SHKOLNIK:
5     Q.   Because you don't want to
6  guess, right?
7     A.   I do not want to guess.
8     Q.   Could you go to the next page,
9  which is 747?  We have a page here that was
10  presented at this meeting that talks about
11  how the ceiling is calculated.
12         And if we go back to the e-mail
13  from you to Tasha, it specifically refers to
14  this slide, and it says, "I wasn't quite sure
15  where in the presentation you wanted these
16  slides, so I stuck them where I thought
17  appropriate.  Let me know if there's
18  something more or different you want."
19         And let me go down to the
20  bottom where the e-mail from Denman Murray to
21  you says, "Can you guys add a slide to the
22  presentation about the current state of
23  ceiling levels?  Graph to talk to -- graph to
24  talk to would be nice.  Sorry for the short
25  notice, but I will need this back by noon.

Page 218

1  Use the old reliable scatter graph with corp
2  and store limits.  Some bullet points about
3  the difference and current level of
4  oxy/hydro."
5      Does that refresh your
6  recollection if oxycodone and hydrocodone was
7  one of the target drugs in 2013 that your
8  company was focusing in on after paying an
9  $80 million fine?
10      MR. HILL:  Object to the form.
11      THE WITNESS:  I don't recall.
12  QUESTIONS BY MR. SHKOLNIK:
13      Q.    What's oxy/hydro?
14      A.    In this sense, it's referring
15  to the generic chemical compound oxycodone
16  and hydrocodone.
17      Q.    Did you ever hear anything or
18  any -- have any discussions about whether or
19  not those two drugs were potentially the
20  causes of many of those deaths that were
21  referred to in the first slide between 1999
22  and 2010?
23      MR. HILL:  Object to the form.
24      THE WITNESS:  I may have read
25      an article in the news about it.

Page 219

1  QUESTIONS BY MR. SHKOLNIK:
2      Q.    You think that would be a good
3  enough reason to target those drugs from an
4  integrity standpoint?
5      MR. HILL:  Object to the form.
6      THE WITNESS:  I cannot recall.
7  QUESTIONS BY MR. SHKOLNIK:
8      Q.    So let's go to the good old --
9  I'm sorry, the old reliable scatter graph,
10  and maybe you can explain it to me.
11      A.    Sure.
12      Q.    First of all, what did he mean
13  by "the old reliable scatter graph" --
14      MR. HILL:  Objection.
15  Foundation.
16  QUESTIONS BY MR. SHKOLNIK:
17      Q.    -- when he's talking about oxy
18  and hydro levels?
19      A.    Just so we're clear, this
20  scatter graph here is a demonstration of how
21  our ceiling limits are calculated and what
22  limits are appropriate for what stores.
23      Q.    Okay.
24      A.    This has nothing to do with
25  good faith or target drug dispensing.

Page 220

1      Q.    I didn't ask that.  I just want
2  to know about old reliable.
3      A.    Okay.
4      Q.    So this is the old reliable
5  chart -- graph on corporate and store upper
6  limits for oxycodone and hydrocodone,
7  correct?
8      A.    There's no specific drug listed
9  here for what I'm -- what -- this is just a
10  sample.
11      Q.    Okay.  So why don't you walk us
12  through the old reliable.
13      What is it showing us, and how
14  does that help explain how you determine
15  corporate upper limit, store limit and
16  corporate lower limit?
17      A.    So the algorithm will calculate
18  which limit should be used, rather if it's
19  the corporate upper limit, the store limit or
20  the corporate lower limit.  These limits are
21  configurable by our team.  The limits are
22  calculated based on your script volume, so
23  how many prescriptions do you process per
24  day, and that's on your X axis.
25      And then for comparison, I'm

Page 221

1  showing the pills sold over the last four
2  weeks on the Y axis.
3      Q.    So if I look at this scatter
4  chart, there are actually some stores that
5  were selling in excess of 35,000 pills for --
6  in a four-week period, or am I reading that
7  wrong?
8      A.    That is correct.
9      Q.    I mean, there's a bunch of dots
10  over 15,000 a week, correct?
11      A.    That is correct.
12      Q.    Now, why is there a corporate
13  upper limit and then you have sales above
14  that?
15      A.    Corporate upper limit is a
16  average over all the stores.  There might be
17  unique situations where a store may dispense
18  more, i.e., hospice location or oncology
19  servicing location, so there might be
20  circumstances why these outliers exist.
21      Q.    Or next to a doctor that was
22  inappropriately prescribing as well, correct?
23      MR. HILL:  Object to the form.
24      THE WITNESS:  I don't know.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    Well, sir, it's not just a
3 hospice or a hospital that could be an
4 explanation for an outlier of 35,000 pills.
5 It could also be a doctor running a mill,
6 issuing prescriptions like paper, like, you
7 know, pouring like water out of his door,
8 that could account for that as well?
9         MR. HILL: Objection to the
10     form.
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.    Isn't that a fair statement?
13         MR. HILL: Same objection.
14         THE WITNESS: I don't know that
15     to be true.
16 QUESTIONS BY MR. SHKOLNIK:
17     Q.    Well, we know down in Florida
18 there was a number of pharmacies that were
19 doing just that: They were exceeding
20 national averages. And it was not because of
21 a hospice; it was not because of a mill;
22 it was not because of cancer. It was because
23 there were a group of doctors that wrote pill
24 after pill prescription after pill
25 prescription and exceeded national numbers.

Page 223

1         So that is an explanation, is
2 it not, for an outlier?
3         MR. HILL: Objection. Form.
4     Foundation.
5 QUESTIONS BY MR. SHKOLNIK:
6     Q.    Am I right?
7     A.    I don't know that to be true.
8     Q.    You never heard that there was
9 a group of pharmacies in Florida being
10 distributed by the Jupiter distribution
11 center that were writing so many
12 prescriptions that they exceeded the national
13 numbers across the country at Walgreens?
14         You were never told that when
15 you took over integrity?
16         MR. HILL: Same objections.
17         THE WITNESS: At that time in
18     2012, I did not -- I was not aware.
19 QUESTIONS BY MR. SHKOLNIK:
20     Q.    How about after 2012, did
21 someone tell you that?
22         MR. HILL: Same objections.
23         THE WITNESS: Once we reviewed
24     the MOA, that was when I was aware.
25

Page 224

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    So going back to my question.
3 There is the possibility that some of these
4 outlier numbers of 35,000 and 30,000 and
5 25,000 could, in fact, be associated with a
6 pill mill doctor just as likely as it is to a
7 cancer center or a hospice or a hospital,
8 absent looking at the individual store and
9 doing due diligence, correct?
10         MR. HILL: Object to the form.
11     Asked and answered.
12         THE WITNESS: Each of these
13     outliers are reviewed and evaluated by
14     our team.
15 QUESTIONS BY MR. SHKOLNIK:
16     Q.    Well, they're supposed to have
17 been.
18     A.    This data that we're looking at
19 here is just sample data. This doesn't
20 represent any specific drug. This is just a
21 sample of how our limits are calculated.
22         So it may not be accurate to
23 say that all of our stores are above the
24 upper limits. We're just looking at a sample
25 here, just to be clear.

Page 225

1         MR. HILL: Whenever you get --
2     we've been going about an hour and 20.
3     Whenever you get to a good breaking
4     point.
5         MR. SHKOLNIK: This is good.
6     Thank you.
7         VIDEOGRAPHER: We're going off
8     the record at 1:45.
9     (Off the record at 1:45 p.m.)
10         VIDEOGRAPHER: We're back on
11     the record at 2:07.
12 QUESTIONS BY MR. SHKOLNIK:
13     Q.    We left off at the --
14 Exhibit 10, which was the PowerPoint
15 presentation, and we were on the old reliable
16 scatter graph, page 7.
17         And just so I understand it,
18 looking at this graph, we're not talking
19 about any specific drug, we're not talking
20 about any controlled substance -- I'm sorry,
21 we're not talking about any specific opioid.
22 This is just a generic scatter chart of
23 showing people what a corporate upper limit
24 is, a store limit and a corporate lower
25 limit.

Page 226

1    Is that a fair statement?
2    A.    Yes.
3    Q.    Okay.  When it talks about
4  total scripts divided by 30 versus some
5  generic-named pills, that's not talking about
6  opioids, correct?
7    A.    Correct.
8    Q.    And when it goes down three
9  lines and it says, "Top 100 DEA analysis
10  store indexing, store potential," that has
11  nothing to do with opioids?
12    MR. HILL:  Object to the form.
13    THE WITNESS:  There is no
14    indication here that this is -- this
15    chart is related to opioids.
16  QUESTIONS BY MR. SHKOLNIK:
17    Q.    When it says that in that same
18  line, "The composite ranked top 100 DEA
19  analysis store indexing," that is not an
20  index of stores as it relates to the
21  distribution of opioids?
22    A.    I do not know what the DEA
23  analysis store indexing algorithm or formula
24  would be used to calculate that.
25    Q.    Let's go to the second slide

Page 227

1  that you prepared for this PowerPoint.
2  Withdraw that.
3    Where did you get that slide
4  from?
5    A.    This slide was produced by --
6  so prior to this, we spoke about team
7  members, and there was a name that came up,
8  Raymond Stukel.
9    Q.    Uh-huh.
10    A.    Seeing this chart, he is the
11  one who produced this chart for me in
12  Tableau, the software Tableau.
13    Q.    Thank you.
14    Next chart, the page that you
15  put into the PowerPoint, is stores affected
16  by ceiling.  And this one we can say with
17  absolute certainty, can't we, that this deals
18  with oxycodone and hydrocodone?
19    A.    Yes, that is correct.
20    Q.    Okay.  Because we have that
21  actually written there.  So that refreshes
22  your recollection, right?
23    A.    Yes.
24    Q.    And what is that telling us?
25    A.    This is a count of the total

Page 228

1  number of stores at different various levels
2  of their ceiling for these particular
3  products.
4    Q.    So there are -- we're looking
5  at the light gray.  That's oxycodone -- oh,
6  it's blue up there.  Okay.  I'm sorry.
7    The blue is oxycodone, the red
8  is hydrocodone, and when it says -- is that
9  greater than or equal to 100 percent is over
10  400 for the oxy, and that's over 693 stores
11  that are greater than or equal to 100 percent
12  of their ceiling, correct?
13    A.    For hydrocodone, correct.
14    Q.    All right.  And then we have --
15  so is that significant, that these -- these
16  stores were greater than 100 percent of
17  ceiling?  Does that many stores -- what's the
18  significance of that?
19    A.    This is just indicating how
20  many stores that are either -- that are at
21  their limit, that are no longer going to get
22  product at that moment in time.  Again, these
23  ceilings are calculated daily, so it changes.
24    Q.    So that's a snapshot in time?
25    A.    A snapshot in time.

Page 229

1    Q.    So we have a bunch of stores
2  that are 91 to 99 percent, and then we have
3  the store ceilings at 76 to 90 percent of
4  ceiling.  So there's -- there's -- that's not
5  telling us that there's 973 stores that are
6  between 76 and 90 percent as it relates to
7  oxycodone and 456 as it relates to
8  hydrocodone?
9    A.    I'm sorry, I missed your
10  question.
11    Q.    I'm just saying, that's what
12  that's showing us?
13    A.    It's showing this, yes, at this
14  moment in time, yes.
15    Q.    What was the purpose of showing
16  a snapshot of when -- you know, one time in
17  this presentation?
18    A.    To familiarize the market
19  leadership who are -- this is being presented
20  to and how their stores were at that moment,
21  where the stores were affected at that
22  moment.
23    Q.    Now, if we can go to the next
24  page, that's Bates 479 --
25    MR. HILL:  749?

Page 230

1    MR. SHKOLNIK: I'm sorry, 749,
2    yes.
3    QUESTIONS BY MR. SHKOLNIK:
4    Q.    Status at Perrysburg.
5    Perrysburg is a distribution center, correct?
6    A.    It is a Walgreens distribution
7    center.
8    Q.    And that is the region you're
9    in -- that you're overseeing, correct?
10    A.    Perrysburg is in Ohio.
11    Q.    Now, Perrysburg supplies 5,523
12    stores, is that what that's telling us?
13    A.    At this moment in time --
14    Q.    Yes.
15    A.    -- that is what this is saying,
16    yes.
17    Q.    And then it says, "CAH, ABC,
18    Anda." Those are all distributors, correct?
19        CAH are Cardinal Health?
20    A.    These are all vendors that we
21    use, yes.
22    Q.    But they are distributors of
23    drugs?
24    A.    They can be distributors of
25    drugs.

Page 231

1    Q.    And Anda is a distributor?
2    A.    Yes.
3    Q.    And ABC is AmerisourceBergen?
4    A.    Yes.
5    Q.    Now, we're at a time frame when
6    this was done in 2013.
7        Walgreens still had its --
8    still had some of its distribution
9    registration licenses at that time, didn't
10    they?
11        MR. HILL: Object to the form.
12    Foundation.
13        THE WITNESS: I don't remember
14    at this moment in time.
15    QUESTIONS BY MR. SHKOLNIK:
16    Q.    But we read that there was
17    going to be a transition out. That was
18    already being talked about in the settlement
19    document.
20    A.    That is correct. In the
21    settlement document there was talks of
22    transitioning to a third party.
23    Q.    Now, what does it mean,
24    Cardinal Health, CAH, 4972, so they have --
25    they're distributing the 4,972 stores. And

Page 232

1    then it says 4,369 without red stores.
2        What does that -- what does
3    that mean?
4    A.    I don't know.
5    Q.    What does a green, yellow,
6    orange, red, for Cardinal Health mean?
7    A.    I don't know.
8    Q.    Okay. We go over to Anda.
9    They're only distributing to 427; 381 without
10    not cleared stores.
11        Do you know what cleared versus
12    not cleared?
13    A.    I don't know.
14    Q.    Do you know what it means, 43
15    Boston, three Swedesboro?
16    A.    No, I don't.
17    Q.    Staying at Perrysburg equals
18    333 CAH red stores plus 46 Anda not cleared
19    stores equals 379.
20        What does that mean?
21    A.    I don't know.
22    Q.    Is it possible that means that
23    as of the snapshot of this status on
24    Perrysburg, there are 379 stores that had
25    suspicious orders that had not been cleared?

Page 233

1        MR. HILL: Object to the form.
2    Foundation.
3        THE WITNESS: I don't know that
4    to be true.
5    QUESTIONS BY MR. SHKOLNIK:
6    Q.    You've never heard the phrase
7    "utilized as cleared versus not cleared" as
8    it relates to the Anda SOM procedures for the
9    Walgreens distribution?
10        MR. HILL: Same objection.
11        THE WITNESS: I am not familiar
12    with these terms. I've never seen
13    those terms.
14    QUESTIONS BY MR. SHKOLNIK:
15    Q.    And you've never seen Cardinal
16    Health flagging stores as green, yellow,
17    orange, red, as it relates to their
18    suspicious order monitoring analyses?
19        MR. BUSHUR: Objection. Form.
20        MR. HILL: Same objection.
21        THE WITNESS: No, that would
22    have been something Cardinal would
23    have done on their own. Again,
24    siloed.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    But obviously someone told
3 Walgreens that, and it was incorporated in a
4 Walgreens PowerPoint. So someone in
5 integrity must have known what the scoring
6 was for Cardinal Health and Anda; fair
7 statement?
8         MR. HILL: Object to the form.
9         THE WITNESS: I don't -- I
10     don't have any knowledge of this.
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.    Well, how about we go to
13 page 11 of the PowerPoint, which is 751, and
14 maybe we can get to the bottom of red,
15 orange, yellow, green.
16         Wholesaler designation
17 definitions.
18         MR. SHKOLNIK: Can we highlight
19     the red -- that's perfect, Corey.
20     That's even better.
21 QUESTIONS BY MR. SHKOLNIK:
22     Q.    Red. Stores that do not pass
23 the objective assessment and have monthly
24 average purchases of oxycodone above 5,000 or
25 hydrocodone above 10,000.

Page 235

1         And we have a date. Status is
2 March 4th, and it's saying that there's no
3 narcotic analgesic shipments. All narcotic,
4 nonnarcotic analgesic products will be
5 shipped.
6         Threshold limits. Narcotic
7 analgesic threshold limits at 1, and
8 threshold limit setting methodology applied
9 for nonnarcotic analgesic drug families.
10         Follow-up. QRA or surveillance
11 site visit depending on the zone.
12         Does that now give you some
13 indication what it means when we saw on that
14 slide that as of the date of that analysis
15 for Perrysburg, and apparently it's
16 March 4th -- March 4th, that red meant there
17 was 333 stores that had -- had a stop
18 shipment in place?
19         MR. BUSHUR: Objection. Form.
20         MR. HILL: Objection. Form.
21         THE WITNESS: I don't know.
22     I've personally never seen this
23     document.
24 QUESTIONS BY MR. SHKOLNIK:
25     Q.    Well, what is the scope of your

Page 236

1 responsibility in terms of determining
2 whether or not there is shipment or
3 nonshipment? I mean, just tell us what your
4 responsibilities are.
5         MR. HILL: Object to the form.
6 QUESTIONS BY MR. SHKOLNIK:
7     Q.    I mean, you told us you don't
8 know this, and it seems like this is right up
9 your alley, but maybe I'm confused.
10     A.    This is not something that I've
11 personally put together or ever seen, so I
12 don't know if this is something that Cardinal
13 specifically provided to us as a guide or a
14 key, but I don't have any knowledge base of
15 this.
16     Q.    Of that actual format?
17     A.    Of this -- of this document.
18     Q.    Let's go back to the color
19 coding section.
20         So just so it's clear, you
21 have -- and you've never come across any
22 e-mails or notifications to you that your
23 wholesalers were marking stores red, orange,
24 yellow, green, in terms of whether or not
25 they were going to ship, not ship, be near

Page 237

1 limits, over limits, nothing like that.
2         You're just not aware of that
3 at all as part of your job for pharmacy
4 integrity?
5         MR. HILL: Object to the form.
6         THE WITNESS: I am not aware.
7     Cardinal would have done their own
8     analysis and investigation on the
9     stores.
10 QUESTIONS BY MR. SHKOLNIK:
11     Q.    But Cardinal tells Walgreens
12 when they -- when they have no ships and when
13 they have suspicious -- when they have
14 suspicious orders, they actually tell you
15 that, sir, don't they?
16         MR. HILL: Same objection.
17         THE WITNESS: We do receive a
18     report from Cardinal of orders of
19     interest.
20 QUESTIONS BY MR. SHKOLNIK:
21     Q.    On a weekly basis?
22     A.    I can't recall if it's weekly.
23     Q.    By e-mail?
24     A.    By e-mail.
25     Q.    And you never saw them refer to

Page 238

1 stores in terms of red-flagged or red?
2 　　　　MR. HILL: Object to the form.
3 　　　　THE WITNESS: I have never seen
4 　　them classify stores as red, orange,
5 　　yellow or green.
6 　　　　(Walgreens-Mills Exhibit 11
7 　　marked for identification.)
8 QUESTIONS BY MR. SHKOLNIK:
9 　　Q.　　Based on the way the document
10 was produced, it's a compilation. And each
11 one of these is a complete compilation, so we
12 can give you the whole family. We didn't
13 want to just take one piece of the family.
14 　　　　MR. HILL: Just let me look and
15 　　make sure the Bates numbers...
16 　　　　MR. SHKOLNIK: Ready?
17 　　　　MR. HILL: Ready.
18 　　　　THE WITNESS: (Witness nods
19 　　head.)
20 QUESTIONS BY MR. SHKOLNIK:
21 　　Q.　　Exhibit Number 11. Thank you.
22 　　　　We have an e-mail from
23 Christopher Dymon to Patricia Daugherty, and
24 down in the second part of it there is an
25 e-mail from Dymon to yourself dated

Page 239

1 January 14, 2013. It says, "Do you have any
2 documents on your computer for current
3 process flow? If you can -- if you do, can
4 you send them to me when you can?"
5 　　　　You write back saying you don't
6 have a PowerPoint, but you gave him what you
7 had in terms of process flow documents.
8 　　　　And attached to it I have the
9 next document in this compilation of the
10 exhibit, Bates-numbered 3385. We have a DEA
11 controlled substance reporting.
12 　　　　Can you tell us what this --
13 this document is that you provided attached
14 to that e-mail?
15 　　A.　　This was a document that I
16 created to kind of go through how we review
17 orders of interest.
18 　　Q.　　So this comes into play, this
19 process, this flow, after the computer
20 generates what we referred to earlier as the
21 order of interest based on the
22 straightforward algorithm?
23 　　A.　　Based on -- yes.
24 　　Q.　　And so now you have the order
25 marked as order of interest. Now, some

Page 240

1 person will go through this flow sheet to
2 determine whether or not you should either
3 mark it suspicious, stop the order or approve
4 it, correct?
5 　　A.　　Correct.
6 　　Q.　　And this document is something
7 you prepared as the -- the steps that anyone
8 working in integrity should be following in
9 terms of their analysis. This is sort of a
10 step by step. It doesn't tell you everything
11 you have to do, but it's the step-by-step
12 process?
13 　　　　MR. HILL: Object to the form.
14 　　　　THE WITNESS: This was
15 　　something that we created at the very
16 　　beginning. The process has been
17 　　modified and tweaked over time, but
18 　　this was something that we had -- had
19 　　the basis of, the bones.
20 QUESTIONS BY MR. SHKOLNIK:
21 　　Q.　　If we can go down to the
22 bottom, if you would -- first of all, what is
23 RxNet? Let me ask you that.
24 　　A.　　That's the internal intranet
25 that we have for the company.

Page 241

1 　　Q.　　Is there -- is there a share
2 drive in there for suspicious ordering?
3 　　A.　　No.
4 　　Q.　　Is there a share drive for the
5 integrity group?
6 　　A.　　Yes, there is a share drive for
7 the integrity group, but that is separate
8 from what RxNet is.
9 　　Q.　　What do you call the shared
10 drive for integrity?
11 　　A.　　Integrity share drive.
12 　　Q.　　Pretty good. That was a good
13 one.
14 　　　　If you go down to action plan,
15 if you would, there's -- and something you
16 mentioned earlier, it says -- you know, one
17 of the things that could be done is a good
18 faith dispensing analysis, MD clinic visits,
19 loss prevention, interview staff at the
20 pharmacy. And then there's a section that
21 says, "Explain sales trend," and it's
22 something you mentioned before, if there's a
23 hospice.
24 　　　　Just so I understand it, the
25 fact that there's a hospice does not in and

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  of itself explain away a suspicious order,
2  does it?
3         MR. HILL:  Object to the form.
4         THE WITNESS:  It could.
5  QUESTIONS BY MR. SHKOLNIK:
6     Q.    It could?
7     A.    It could.
8     Q.    But it's not a simple -- it's
9  not simply there's a hospice across the
10 street, therefore, suspicious orders -- it's
11 not a suspicious order; is that a fair
12 statement?
13        MR. HILL:  Same objection.
14        THE WITNESS:  Because there's a
15        hospice across or near your location
16        may indicate why certain products
17        might be utilized more where you would
18        hit the limit sooner.  So that could
19        explain why an override form would be
20        warranted.
21 QUESTIONS BY MR. SHKOLNIK:
22    Q.    But that, in and of itself,
23 you'd have to look at more than simply a
24 hospice being nearby to approve an override?
25    A.    Yes, we would definitely look

Page 243

1  at the other factors as well, as far as GFD
2  and other things that are listed here.
3     Q.    All right.  Now, the next
4  document in this compilation starts at 3387,
5  and it's a flow chart for store flag.
6         What does that mean?
7     A.    So these would be the orders of
8  interests and then the steps taken thereafter
9  to validate.
10    Q.    So -- if we could go back for a
11 second.  So the machine -- I'm sorry, the
12 machine.  The algorithm says, "Order
13 flagged," then this flow chart comes into
14 play?
15    A.    Again, this flow chart was kind
16 of used as the bones back in 2012, 2013.
17 This is probably not the same process flow we
18 use currently.  This is just something we
19 started with and built off of.
20    Q.    Is when you were down in the
21 war room and that small group were working
22 together?
23    A.    This is something we would have
24 created from that war room, yes.
25    Q.    So it says, "Store flagged due

Page 244

1  to ceiling violation," and then next one is,
2  "large dispen, quantity large negative
3  adjustment."
4         What does that mean?
5     A.    I can't recall the exact reason
6  why this is on here.
7     Q.    How about loss prevention, what
8  does that mean?
9     A.    Loss prevention is our -- we
10 have managers in the field that monitor
11 theft, and so they would review different
12 reporting analytics.  So asset protection is
13 the name of the group now.
14    Q.    So someone would look at it and
15 say, "Wait a second.  Is this because there
16 was a theft at the store?"  And then the flow
17 would go one direction versus the other one?
18    A.    I believe at this time the idea
19 was is that we would have a flagged order,
20 and then we would look to see if there was a
21 large quantity dispensed or a large negative
22 adjustment and then contact loss prevention
23 for their review to determine if there was an
24 LP, loss prevention, issue, i.e., theft, at
25 the store.

Page 245

1     Q.    And when you say "large
2  negative adjustment," what's that mean?
3     A.    Accounting of their on-hands.
4  They can adjust the on-hands that they have
5  within the ordering system.  It keeps track
6  of your current on-hand.
7         So, you know, the system shows
8  I have a thousand, but I only actually have
9  zero on hand.  That's a large negative
10 adjustment, right?  So that would be if
11 something's flagged, and we'd want loss
12 prevention to review to make sure that there
13 wasn't any theft or diversion.
14    Q.    And does it also show up if
15 only small discrepancies in on-hand but it
16 goes on for repetitive time?  Would that be a
17 flag also?
18        Like someone maybe taking ten
19 pills or five pills on a regular basis, would
20 that show up in the system somehow?
21    A.    So this review here of the
22 adjustments is a manual review by someone
23 here, by myself or someone on the team,
24 sorry.
25        So it would be that

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1 determination of that expert who is reviewing
2 it to say, "Hey, looks to be a problem here.
3 Let's contact loss prevention."
4    Q.   Okay.  So this is basically a
5 rough outline of what the person, yourself or
6 someone like yourself, would do once you're
7 given that -- that flag -- flagged order?
8    A.   When you're reviewing the
9 orders of interest, yeah.
10    Q.   If we can go to the next
11 document, 3388.
12        Could you tell us what we're
13 looking at here?
14    A.   I'm not entirely sure what this
15 document -- I believe it might be a training
16 of some sort.  I'm not sure.
17    Q.   At the bottom they refer to
18 something called IntercomPlus.
19        Do you know what that is?
20    A.   That is that prescription
21 software that I -- IC+ that we spoke of
22 earlier.
23    Q.   Okay.
24    A.   It stands for IntercomPlus.
25    Q.   Are there actually scanned

Page 247

1 copies of the prescriptions put into
2 IntercomPlus?
3    A.   Yes, all prescriptions are
4 scanned into the system.
5    Q.   And are those kept as part of
6 the due diligence on the orders, or on the
7 prescriptions?
8    A.   Yes.  We're legally required to
9 retain those.
10    Q.   We can go to the next document,
11 3390.  It's a document entitled "Suspicious
12 order monitoring program:  Policies and
13 procedures for RX integrity team."  And it is
14 a -- I believe it's a nine-page document.
15        Could you tell us what this is?
16    A.   This was standard operating
17 procedures that our team created when the
18 team was kind of formed.  So this is the
19 results of the war room.  So we -- you know,
20 all the findings and theories and procedures
21 that we were going to follow to review orders
22 of interest are all in here.
23    Q.   And that's still -- this is
24 still in existence today, is it not?
25    A.   Of their -- a version of this

Page 248

1 does exist.
2    Q.   And if we go into the section,
3 "How to identify normal, expected
4 transactions," it talks about ceiling limit?
5    A.   What page are you on?
6    Q.   I'm sorry, the first page.
7 "How to identify normal, expected
8 transactions."
9        "Following two items allow
10 Walgreens to understand and identify normal
11 and expected transactions which will then
12 allow Walgreens to identify suspicious
13 orders."
14        So there's an accumulation of
15 receipts over time.  The system accumulates
16 the amount of each controlled substance over
17 a limitation period, over the last -- that
18 is, over the last six weeks, and then it
19 tells us what a ceiling limit is.
20        "Data mining is done across
21 Walgreens retail pharmacies to determine the
22 maximum amount that a pharmacy should be
23 allowed to receive on a rolling six-week time
24 period.  Based on a statistical linear
25 regression, the analysis compares like

Page 249

1 pharmacies across the country based on script
2 volume and determines by drug what would
3 represent unusual quantities."
4        So correct me if I'm wrong,
5 this is the Walgreens criteria for setting
6 ceiling limits?
7        MR. HILL:  Object to the form.
8        THE WITNESS:  This is the
9    criteria that we use to set what I'll
10    call global ceiling limits.
11 QUESTIONS BY MR. SHKOLNIK:
12    Q.   Wait.  What's the difference
13 between global and regional and --
14    A.   Global just refers to -- for
15 the chain.  And store-by-store basis, they
16 may have slightly different limits.  So there
17 was a corporate upper limit, store limit,
18 corporate lower limit, depending on where
19 that falls.  I'll just call it the global
20 corporate limits.
21        There's also that store limit
22 that may be a factor in determining what the
23 limit is.
24    Q.   So that -- the store limit
25 would take into -- into consideration

Page 250

1 something unique about -- it may be the same
2 type of store in terms of volume, but because
3 of where it is or its own character, it may
4 have its own ceiling applied to it?
5     A.     Correct.  Based on their
6 business needs, justification, there might be
7 a reason why that store may have a slightly
8 higher limit.
9     Q.     Example being if the store
10 happened to be inside a big hospital, it may
11 have a different -- it may have a different
12 need than, say, a similar volume prescription
13 for someone who is not in a hospital in
14 another part of the country?
15     A.     Correct.
16     Q.     Go down to the next section,
17 "Factors for assessing all orders to
18 determine whether the purchase is
19 reasonable."
20          "Available order.  Pharmacies
21 are allowed to order the quantity that is
22 left open, which is the ceiling limit set
23 through the analytical technique identified
24 above, minus any accumulation of receipts
25 over the six weeks, along with any currently

Page 251

1 open orders that are in the supply pipeline."
2 And then it gives us a description.
3          So if we're reading this
4 document, it's basically saying the ceiling
5 is set as described above, not as to a store
6 by store.
7          When did that change?
8          MR. HILL:  Object to the form.
9          THE WITNESS:  Can you -- can
10     you clarify that?
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.     Sure.
13          This is saying a store's --
14 they're talking about a specific example
15 here.
16          A pharmacy is allowed to order
17 that quantity that is left open, which is the
18 ceiling limit set through the analytical
19 technique identified above.  The "analytical
20 technique identified above" we just read in
21 the prior paragraph.
22          So it's suggesting in this
23 document that all stores with the same script
24 volume would be determined -- its ceiling
25 would be determined based upon what's being

Page 252

1 described here; am I correct?
2          MR. HILL:  Object to the form.
3          THE WITNESS:  I'm getting lost
4     in your question.
5 QUESTIONS BY MR. SHKOLNIK:
6     Q.     Yeah, me too.  I mean, maybe
7 I'm not -- you told me there's a separate
8 store ceiling, but I'm reading a document
9 that says --
10     A.     So --
11     Q.     Let me just finish my question.
12     A.     Sure.  Sure.
13     Q.     I'm reading a document here
14 that says a pharmacy is allowed to order that
15 quantity that is left open, so that's the
16 difference between ceiling, and where they
17 are today, their on-hand -- on what they've
18 ordered -- already had delivered during that
19 period.
20          So it's that spread they're
21 still allowed to -- to purchase; am I
22 correct?
23          MR. HILL:  Object to the form.
24          THE WITNESS:  Can I -- can I
25     clarify --

Page 253

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.     Sure, please.
3     A.     -- and maybe this might help?
4     Q.     Uh-huh.
5     A.     So we use the -- the
6 statistical linear regression line to set the
7 limits.
8     Q.     Uh-huh.
9     A.     Now, based on your store, there
10 might be exceptions to that, and that's when
11 we use that store limit.
12          But let's just say for the
13 majority of the time, stores use the global
14 limits.  Okay?
15          Let's say I'm a store that does
16 200 prescriptions a day.  My limit is set to
17 10,000.  So no matter if I'm in Boston,
18 Chicago, wherever, I do -- I have a limit of
19 10,000.
20     Q.     Uh-huh.
21     A.     Now, on a store-by-store basis,
22 depending on how much product I've received
23 over the defined period, which in this case
24 is six weeks, have I received -- let's say
25 it's 5,000, and I have another order that's

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 pending to be filled for one thousand --
2 Q. So now you've eaten 6,000 of
3 the 10,000.
4 A. The remainder is 4,000 that I
5 have available to order to me today.
6 Q. And that's -- that would be --
7 generally it would be the average of the
8 similar pharmacies except if you're that
9 one -- one of those pharmacies that may be an
10 outlier that has its own specific ceiling
11 because of its own variables?
12 A. Correct.
13 Q. But looking at average
14 pharmacies across the country, for the most
15 part it's following this analytical approach
16 that we just looked at?
17 A. The -- what I just explained,
18 yes. Yes.
19 Q. Thank you for explaining that
20 to me.
21 I'm going down to the next
22 section where it says, "central monitoring
23 and control" -- let me speak English maybe --
24 "control dashboard."
25 "Walgreens is able to centrally

Page 255

1 monitor when a particular pharmacy is
2 approaching a percentage of their ceiling
3 limit, that's 75 percent, for any selected
4 controlled substance as an early warning
5 system to alert the corporate team of a
6 potential concern. The team can then contact
7 the store to determine if there is a concern,
8 if the demand is justifiable."
9 Now, we've already talked
10 earlier today that you would never tell the
11 store what the ceiling is. You just don't do
12 that for whatever reason.
13 A. Correct.
14 Q. What makes it okay to tell
15 them, "Well, you're at 75 percent"?
16 MR. HILL: Object to the form.
17 QUESTIONS BY MR. SHKOLNIK:
18 Q. Can't they do the math
19 themselves and say, oh, if I -- using the
20 example above, I'm allowed 10,000. "I just
21 got a call from corporate that -- I'm at 75
22 or 78 percent; therefore, I have 1,500 more
23 pills before I set off an alarm."
24 I mean, isn't that -- by
25 allowing this, aren't you doing the exact

Page 256

1 same thing that you were saying you shouldn't
2 do by telling them what the ceiling is?
3 MR. HILL: Object to the form.
4 THE WITNESS: No.
5 Stores don't know the
6 algorithm. They don't know how the
7 ceilings are calculated. They don't
8 know the time period of which they're
9 calculated against. It would be
10 impossible for them to figure this
11 out.
12 QUESTIONS BY MR. SHKOLNIK:
13 Q. But if someone calls them up
14 and says, "You hit 75 percent today," I mean,
15 why would you ever tell -- strike that.
16 Why would you ever tell a
17 store, "You're at 75 percent"? They know how
18 much they've ordered.
19 A. We may never tell the store a
20 percent. The percent here is just an
21 indication to our team to take some action,
22 maybe contact the store saying, "Hey, we've
23 noticed an increase in sales or growth.
24 What's the contributing factors?" We would
25 never tell them a specific number or percent.

Page 257

1 Q. Okay. Is there any -- I mean,
2 I've read whatever has been produced to us in
3 terms of suspicious order monitoring policy
4 and procedures for RX integrity team.
5 I couldn't find anywhere, in
6 any of your documents, that there is an
7 instruction to people in your department not
8 to tell the store that they're at 75 percent
9 or to tell them the ceiling at all. I didn't
10 see that written anywhere.
11 Where is that documented in
12 this company?
13 A. I'm not aware of that being
14 documented anywhere, but through training and
15 working with new employees and myself -- I
16 mean, I've been here since day one. I would
17 instruct -- and I'm the one that usually does
18 the training with our new employees -- that
19 we would never -- that's something we don't
20 express to the stores. And everyone is aware
21 of that, and no one, to my knowledge, has
22 ever done that.
23 Q. Because one of the reasons
24 by -- one of the reasons for not disclosing
25 it is to prevent the store from somehow

Page 258

1  getting around the ceiling notification
2  process?
3         MR. HILL: Object to the form.
4         THE WITNESS: No. The logic is
5  still there. If they know their
6  limit, they know their limit, but
7  they're not going to be able to order
8  past it. It cuts them off. It stops
9  them cold.
10        So, you know, just because they
11  may know the limit doesn't mean that
12  they're going to be able to order more
13  than the limit.
14  QUESTIONS BY MR. SHKOLNIK:
15     Q.   Go to the next page, please.
16        "Reporting to DEA. Reporting
17  is required to the DEA when a regulated
18  transaction takes place that involves an
19  extraordinary quantity of a controlled
20  substance. The processes and policies put in
21  place by Walgreens prevent any transactions
22  from occurring that involves an extraordinary
23  quantity. However, should such an order take
24  place, it must be investigated before it is
25  deemed suspicious. If during the process the

Page 259

1  order of interest is shown to be valid,
2  documentation is required before the ceiling
3  limit can be increased and additional orders
4  can be shipped. If during the course of the
5  investigation the order is deemed suspicious,
6  the order is not shipped, and that said order
7  is reported to the DEA."
8         So that's basically in writing
9  what you described for me earlier today.
10  There is the trigger that shows the order of
11  interest based on the algorithm. Once
12  that's -- that's hit, the due diligence has
13  to be done on that order of interest, and
14  it's not until someone says "it's okay"
15  before it could be shipped.
16     A.   Correct.
17     Q.   And if it -- if the person says
18  it's not okay -- that's my own wording of it.
19  But if the person says it's a suspicious
20  order, then it's immediately reported to DEA
21  that day?
22         MR. HILL: Object to the form.
23         THE WITNESS: Yes, we report it
24  that day.
25

Page 260

1  QUESTIONS BY MR. SHKOLNIK:
2     Q.   And this is the codification of
3  that procedure; am I --
4         MR. HILL: Same objection.
5  QUESTIONS BY MR. SHKOLNIK:
6     Q.   Am I correct?
7     A.   Yes, this is the procedures.
8     Q.   Well, if you can just turn to
9  the last document in that -- in that exhibit,
10  and it's the 3406 document. It's entitled
11  "RXS investigates straw man."
12         MR. HILL: It's the last two
13  pages.
14         THE WITNESS: Okay.
15  QUESTIONS BY MR. SHKOLNIK:
16     Q.   What does that mean?
17         MR. HILL: Object to the form.
18  QUESTIONS BY MR. SHKOLNIK:
19     Q.   What does "RXS investigates
20  straw man" mean?
21     A.   Okay. So RXS, remember, we
22  spoke earlier, is the pharmacy supervisor.
23     Q.   Yeah.
24     A.   Supervisor for the stores.
25     Q.   Uh-huh.

Page 261

1     A.   So this is kind of their
2  outline, or straw man, of steps that they can
3  take to kind of justify the business need for
4  additional product if they're hitting limit.
5     Q.   So this is the -- so this is
6  basically the flow sheet for the -- the
7  supervisor, the pharmacy supervisors?
8     A.   Yes, that is correct.
9     Q.   So you have -- the pharmacy
10  makes the order, they want to ask for an
11  override, so now supervisor has to undertake
12  this as part of the due diligence?
13     A.   These are the questions they
14  should be asking when going through their
15  mind to approve it.
16     Q.   Okay. We can...
17         MR. SHKOLNIK: Exhibit 12 we're
18  going to hand you in a second.
19         (Discussion off the record.)
20         (Walgreens-Mills Exhibit 12
21  marked for identification.)
22  QUESTIONS BY MR. SHKOLNIK:
23     Q.   We just handed you what's been
24  marked as Exhibit 12. It's an e-mail from
25  yourself to Jeffrey Tolva.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    Who is Jeffrey Tolva?
2    A.    He's another analyst on the
3 team.
4    Q.    And it references new hires,
5 and it shows a series of attachments.  One is
6 a pharmacy integrity organizational chart,
7 and if you turn the page, that's Bates
8 numbered 245868.
9    A.    I see that.
10    Q.    And then it says -- the next
11 thing is the DEA SOM job, and I believe
12 that's 4/1/2013.
13    MR. HILL:  I'm sorry, what page
14 number is that?
15    MR. SHKOLNIK:  I'm just reading
16 off of here.
17    MR. HILL:  Oh, oh, oh, I see.
18 From page.
19    MR. SHKOLNIK:  From page.
20    THE WITNESS:  Oh, I'm sorry.
21 I'm sorry.
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    I just want to make sure we
24 have the right attachments.
25    A.    Right.  Yeah.  Okay.

Page 263

1    Q.    And that would be the -- that's
2 the SOM monitoring program policies and
3 procedures, is it not?
4    A.    Yes.  Yes.  I believe so.
5    Q.    And that Bates number is 869,
6 ending in 869 and 870.
7    And then the third document is
8 parameters of SOM.
9    A.    I have that document prior
10 ending on a different Bates.
11    Q.    What do you have?
12    A.    What number is it?  877, was
13 it?
14    Q.    870.
15    A.    877?
16    Q.    869.
17    MR. HILL:  Yeah, ours goes to
18 {sic} 869 to 877.  Stapled together,
19 it's nine pages long.
20    MR. SHKOLNIK:  Yes.
21    MR. HILL:  Okay.
22    MR. SHKOLNIK:  Yeah.  Then we
23 go to 879, and it says "parameters of
24 suspicious order."
25    MR. HILL:  878?

Page 264

1    THE WITNESS:  878.
2    MR. SHKOLNIK:  879.  It's
3 actually 878 and 879 because it a --
4 it's a redline -- it looks like a
5 redline document.
6    Then there is a SOM PPT,
7 there's a PowerPoint, and the SOM
8 process flow document for January
9 of 2013.
10    MR. HILL:  Can we have that?
11    THE WITNESS:  I don't think I
12 have that.
13    MR. SHKOLNIK:  Don't have that
14 one?
15    MR. HILL:  Huh-uh.  Ours is --
16 the last one is the PowerPoint.
17    MR. SHKOLNIK:  This is the last
18 one.  I want to make sure we're all on
19 the same page.
20    THE WITNESS:  I don't have that
21 page.
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    Yeah, this is the last -- last
24 one in the series of the attachments.  I'm
25 sorry, this was late-night printing

Page 265

1 yesterday.
2    A.    That's 916, right?
3    Q.    That is 916, yes.
4    A.    Through 920.  Okay.
5    MR. HILL:  Just so it's clear
6 on this Bates label issue you
7 identified, which is the last -- the
8 PowerPoint that begins on -- last
9 three digits 880, is 35 slides -- or
10 36 slides, all numbered 880.  And then
11 the next document that's attached to
12 them is the one that is titled
13 "Process flow to identify and evaluate
14 orders of interest" that begins on
15 Bates number that ends 916.
16    MR. SHKOLNIK:  Yes.
17    MR. HILL:  Okay.
18 QUESTIONS BY MR. SHKOLNIK:
19    Q.    So this e-mail where it says
20 it's for new hires, is this a compilation of
21 documents that as you were building up the
22 team in 2000 -- early 2013, did you put
23 together a series of materials for the new
24 hires; is that what this is related to?
25    A.    Yes, these are documents we

Page 266

1 created that kind of help on-board new hires.
2    Q.    So it was sort of like a
3 training packet of materials so they would
4 learn what they had to do in the department?
5    A.    It was an overview of
6 everything in the department as it's stated
7 at that moment.
8    Q.    And so we have a -- on -- it's
9 868. It's the second page of the document.
10 We have this integrity group chart.
11       So by August -- I'm sorry. By
12 April of 2013, the group that started as you
13 and Tasha then became 13 -- 13 people, or was
14 going to be 13 people?
15    A.    Yeah, that's -- that looks
16 about right.
17    Q.    And currently, how big is the
18 group?
19    A.    11.
20    Q.    Did it ever get up to the 13?
21    A.    I don't believe so.
22    Q.    And the business analysts are
23 the people that are actually doing the due
24 diligence work; am I correct?
25       MR. HILL: Object to the form.

Page 267

1       THE WITNESS: It would be a
2    combination of the business analyst,
3    the senior business analyst and the
4    manager.
5 QUESTIONS BY MR. SHKOLNIK:
6    Q.    Okay. Would managers get them
7 after the analysts or senior analysts
8 reviewed, or does everyone pitch in and do a
9 part of the due diligence reviews?
10       MR. HILL: Object to the form.
11       THE WITNESS: Everybody would
12    pitch in; however, if there was an
13    issue with a specific order or store
14    or incident, it might be vetted up to
15    the senior analyst or to the manager.
16 QUESTIONS BY MR. SHKOLNIK:
17    Q.    And the second document is one
18 we just reviewed previously; am I correct?
19 We had gone through this.
20    A.    Yes, it appears to be the same
21 document.
22    Q.    Now, there's a series of
23 documents from Bates-numbered 871 to 875, and
24 they look like screenshots from a computer, a
25 computer screen, or an interface.

Page 268

1       Could you just tell us -- I'm
2 not going to go through each one. Could you
3 just tell us what we're looking at here?
4    A.    So previously I spoke of the
5 UI, user interface. This is the user
6 interface that we built out.
7       MR. SHKOLNIK: If we could zoom
8    in on the upper right side, that whole
9    interface.
10       MR. HILL: Could you read those
11    numbers for us?
12       THE WITNESS: Sure.
13       MR. SHKOLNIK: If you could
14    just back out of that one.
15       THE WITNESS: If there's
16    something specific you're wanting to
17    see on that screen --
18 QUESTIONS BY MR. SHKOLNIK:
19    Q.    Yeah, I'm just trying to get a
20 feel for the categories. There's like a
21 graph to the right-hand side --
22    A.    Yeah.
23    Q.    -- there are a series of
24 numbers below that, and then there's columns
25 to the left.

Page 269

1       Could you just tell us what the
2 different areas are so we have some
3 understanding?
4    A.    I believe if we can move to
5 the -- the Bates 880, there's a couple
6 cleaner screenshots.
7    Q.    Oh, yeah. Let's do that. I
8 think that's why you gave it to us in native.
9    A.    Specifically page 4.
10    Q.    Okay.
11    A.    That's a -- I don't know if you
12 have that up.
13    Q.    Yep.
14    A.    That is essentially the same
15 screenshot that you saw previously.
16    Q.    Here we go.
17    A.    Okay. So this is kind of the
18 dashboard look at a high level. So here it
19 shows you by schedule on the top box there on
20 the left. Order -- number of order
21 flagged --
22    Q.    Where are we looking where it
23 says "red-flagged"? Items of -- okay.
24 "Flagged," I see.
25    A.    Sorry. The top is more of like

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 your demographics, so what are we looking at
2 time-period-wise and that and other.
3 Below that is how many orders
4 were identified or flagged, and then the
5 reason why they were flagged, and then
6 percent of stores who manually changed that
7 order.
8 And then there's some system
9 reduced orders from -- for additional
10 breakdown of the store manually change order.
11 Q. So this is a region that we're
12 looking at?
13 A. This is -- I believe this is
14 for the chain. So location right up above in
15 that dropdown says "chain," so this would be
16 the entire Walgreens chain.
17 Q. Okay. If we can go to the next
18 page -- withdraw that.
19 Can we actually in -- through
20 this interface decide we want to go -- where
21 it says "store," it says "all," we want to
22 say -- if we move to the right of that --
23 let's say you click green under -- is it COMP
24 or -- what's the next one? Yeah, that one.
25 Are we able to then search

Page 271

1 individual stores or individual regions?
2 A. We can search by those, yeah.
3 Not through here, but from that dropdown you
4 can actually change the type of search
5 parameters that you're looking for. So if
6 you select a region or a store, it would have
7 a text box that pops up with -- you would
8 type in a store number.
9 Q. Okay. This interface, this is
10 something your team developed; am I correct?
11 MR. HILL: Object to the form.
12 Foundation.
13 THE WITNESS: This is something
14 we worked together with their IT
15 counterparts to help create.
16 QUESTIONS BY MR. SHKOLNIK:
17 Q. Now, was there something like
18 this before your group came into existence?
19 MR. HILL: Same objections.
20 THE WITNESS: I'm not aware of
21 any other interface.
22 QUESTIONS BY MR. SHKOLNIK:
23 Q. So it wasn't like you worked
24 off of something and let's kind of tweak it
25 to make it what we want; you guys started

Page 272

1 ground up?
2 MR. HILL: Object to the form
3 and foundation.
4 THE WITNESS: This was a
5 homegrown application.
6 QUESTIONS BY MR. SHKOLNIK:
7 Q. When you say "homegrown," did
8 your team start from scratch?
9 You brought in your developers
10 and say, "We want to develop a suspicious
11 order monitoring system" and -- I mean, did
12 they base it off of something that was
13 already in existence at all?
14 MR. HILL: Object to the form.
15 Foundation.
16 THE WITNESS: So this is just a
17 dashboard. This is not the logic.
18 QUESTIONS BY MR. SHKOLNIK:
19 Q. Okay.
20 A. So this is just representing
21 the output of those orders of interest.
22 Does that makes sense?
23 Q. So was this data kept somewhere
24 else before this working interface was
25 developed by you?

Page 273

1 MR. HILL: Object to the form.
2 QUESTIONS BY MR. SHKOLNIK:
3 Q. When I say "you," your group.
4 MR. HILL: Foundation.
5 THE WITNESS: I don't remember
6 if it was stored somewhere else before
7 this application was online.
8 QUESTIONS BY MR. SHKOLNIK:
9 Q. Now, part of the job was to
10 determine ceilings for stores that have been
11 in existence long before your team ever got
12 into place, correct?
13 These weren't like all new
14 stores on December 12 -- December 2012.
15 These were stores that Walgreens were running
16 over the period of years before you guys
17 started, correct?
18 MR. HILL: Object to the form.
19 THE WITNESS: Correct.
20 QUESTIONS BY MR. SHKOLNIK:
21 Q. How did you determine ceilings
22 for stores, individual stores, without having
23 the data with respect to individual stores
24 that pre -- occurred before the beginning of
25 your team coming into play?

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1     MR. HILL: Object to the form.
2     THE WITNESS: Ceilings are
3  based on the dispensing, so remember,
4  we looked at that graph, that scatter
5  graph, and it had the total number of
6  RXs that you dispense per day versus
7  the total number of tablets.
8     So we have that data available
9  from our IntercomPlus system. That's
10  where we process and capture all the
11  information of dispensing.
12  QUESTIONS BY MR. SHKOLNIK:
13    Q.    So that's the actual
14  transaction data?
15    A.    That's the transaction data.
16    Q.    And so you utilize -- you had
17  that data for pre-2012 that you could utilize
18  to come up with your ceilings for 2012
19  forward.
20    A.    We use the data there to set
21  the baselines of where the limit should
22  approximately be. Obviously it's not going
23  to always be a home run, first swing, so
24  that's why there was some analysis done and
25  regression lines performed and that kind of

Page 275

1  nature.
2     Q.    Did you also have to take into
3  consideration the number of suspicious orders
4  that had existed before 2012 to help you
5  determine this algorithm that you were now
6  putting in place?
7     MR. HILL: Object to the form.
8     THE WITNESS: To my knowledge,
9  I don't know.
10  QUESTIONS BY MR. SHKOLNIK:
11    Q.    Who would know that?
12    A.    I would talk to Wayne Bancroft.
13    Q.    Now, maybe -- let me ask this
14  question: If there were pharmacies that had
15  very high numbers of suspicious orders prior
16  to 2012, would that have been something that
17  had to be considered in determining
18  appropriate ceilings?
19    MR. HILL: Object to the form.
20    THE WITNESS: I don't know.
21  That would be something that would be
22  in the algorithm base of it, and I
23  wasn't a part of that.
24  QUESTIONS BY MR. SHKOLNIK:
25    Q.    Let me ask the question this

Page 276

1  way: When you guys started, you set
2  ceiling -- you had ceilings set. If a whole
3  group of pharmacies were responsible for high
4  numbers of suspicious orders, and if you
5  didn't know what those were, couldn't that
6  affect the accuracy of the ceilings that were
7  set beginning in 2012?
8     MR. HILL: Object to the form.
9  Foundation.
10    THE WITNESS: I really cannot
11  recall.
12  QUESTIONS BY MR. SHKOLNIK:
13    Q.    Well, I mean, let me ask it
14  this way: If you had a high number of
15  suspicious orders, couldn't that cause an
16  artificially high ceiling to have been set in
17  2012?
18    MR. HILL: Object to the form.
19  Foundation.
20  QUESTIONS BY MR. SHKOLNIK:
21    Q.    Is that a possibility?
22    A.    I don't believe that to be
23  true.
24    Q.    How would you -- how would you
25  rule that out?

Page 277

1     A.    Based on the analysis that
2  we've performed when tweaking the system at
3  inception, I don't believe that we would have
4  had limits that were out of -- out of the
5  range of a store.
6     Q.    I mean, you certainly had to
7  take into consideration all the stores in
8  Florida as part of these national numbers,
9  and weren't there a large number of stores in
10  Florida that had unusually high numbers of
11  sales that were deemed to be potentially
12  suspicious?
13    MR. HILL: Object to form and
14  foundation.
15    THE WITNESS: I don't know how
16  the Florida stores were incorporated
17  into the calculation of the final
18  output of the ceiling limits.
19  QUESTIONS BY MR. SHKOLNIK:
20    Q.    But let's assume you had --
21  we'll leave out Florida. Let's say there was
22  a group of stores that were in areas that
23  were known to be problematic in terms of
24  suspicious ordering and dispensing.
25     If those regions were included

Page 278

1 in the analysis, is it a possibility that
2 could have artificially established a ceiling
3 that was too high, at least initially?
4         MR. HILL:  Object to the form
5 and the foundation.
6         THE WITNESS:  I don't believe
7 that to be true because we don't
8 compare stores of a region; we compare
9 stores over the chain.  So if you want
10 to use Florida as your example of
11 cluster of stores, that volume of
12 scripts that they're producing daily
13 is compared to stores across the
14 entire country.  And if they're the
15 outliers, their ceiling limits are
16 going to be set lower because the
17 other stores of the same likeness are
18 not dispensing that much.
19 QUESTIONS BY MR. SHKOLNIK:
20     Q.    And then if we add into that
21 stores in West Virginia, in Kentucky, in
22 Arkansas and Ohio which were having some high
23 numbers of dispensed drugs as well, if you
24 add all those areas that had very, very high
25 distribution and potentially high numbers of

Page 279

1 suspicious orders being distributed, by
2 adding those in, in addition to Florida,
3 couldn't those artificially increase the
4 ceilings on like-sized stores?
5         MR. HILL:  Same objections.
6         THE WITNESS:  I don't know that
7 to be true.
8 QUESTIONS BY MR. SHKOLNIK:
9     Q.    But it's a possibility?
10         MR. HILL:  Same objection.
11         THE WITNESS:  I can't
12 speculate.
13 QUESTIONS BY MR. SHKOLNIK:
14     Q.    Then if you could just turn to
15 what would be number 5 --
16         MR. HILL:  Oh, we don't have
17 it.
18         MR. SHKOLNIK:  It's the same
19 thing.  I think it's the same thing.
20 Is it still select date range?
21         MR. HILL:  Yes.
22         THE WITNESS:  Yes.
23 QUESTIONS BY MR. SHKOLNIK:
24     Q.    If we could just put that up on
25 the screen.

Page 280

1         In this page -- now, we're
2 looking at whole chain still; am I correct?
3     A.    Yes.
4     Q.    That location says "chain"?
5     A.    Yes.
6     Q.    And it says, "schedule all."
7         Then it says --
8     A.    State.
9     Q.    -- "state all"?
10     A.    All states.
11     Q.    "Order type all," and then it
12 has a calendar.
13         Can you tell me what we're
14 looking at here to help me get a feel for
15 this interface?
16     A.    So this would be a review of
17 the orders identified as orders of interest,
18 and then the date range would be the orders
19 that -- for whatever reason we may want to
20 look at a certain date range for a certain
21 store or drug or whatever the analyst or --
22 is doing.
23         So that's -- that's really what
24 the -- it's driving here, is you can select a
25 date range to see --

Page 281

1     Q.    And which category of drugs you
2 can do as well, correct?
3     A.    Yes.
4     Q.    So we can do it anything down
5 to the individual store, we could do it by
6 the region, we could do it by the whole
7 country, by date range, and it would run for
8 us what drugs were orders of interest?
9     A.    Correct.
10     Q.    And then we could also click
11 somewhere in here, and it would tell us which
12 ones were actually determined to be
13 suspicious orders and reported?
14         MR. HILL:  Object to the form.
15         THE WITNESS:  Yes.  So the
16 column that's titled "Order Number,"
17 that is a link where it's underlined,
18 the number that's underlined, and that
19 will take you to another page, and it
20 would have a detail of why it was an
21 order of interest and then was it
22 reported.
23 QUESTIONS BY MR. SHKOLNIK:
24     Q.    If we could flip through it,
25 does it -- maybe it -- is that shown

Page 282

1 somewhere in here?
2      How about let's go to
3 number 10.  Work us through it.
4      A.    Okay.
5      Q.    There's something called log
6 into SIMS with corporate sign-on.
7      A.    Yes.
8      Q.    Why is -- why is integrity
9 now -- why are they being taught that they
10 can log into SIMS as part of their -- of
11 their work?
12      A.    Because there's further
13 analysis we can perform within the ordering
14 system, so we can remote into and -- in
15 remote like we're at the store, but we're at
16 our corporate desks, to take a look at
17 additional data to help us make that
18 decision.
19      Q.    So when we get -- now, if we
20 jump ahead to number 21.
21      A.    21.
22      Q.    I'm going by the bottom, the
23 number on the panel of the PowerPoint.  It's
24 easier for me.
25      A.    Uh-huh.  Okay.

Page 283

1      Q.    This one says, "Suspicious
2 orders faxed daily to local DEA office."
3      So there would be able --
4 there'd be a way, if we wanted to -- so --
5 and you have what will be page 21, suspicious
6 order --
7      A.    Yes.
8      Q.    -- faxed daily?
9      A.    I have that in front of me.
10      Q.    A search could be done based on
11 pharmacy, any individual pharmacy, and
12 determine every suspicious order faxed to the
13 DEA for that pharmacy --
14      MR. HILL:  Object to the form.
15 Foundation.
16 QUESTIONS BY MR. SHKOLNIK:
17      Q.    -- correct?
18      A.    Yes, we can query that
19 information.
20      Q.    If we go to the next page,
21 which is 22.  If you could turn to the
22 document "suspicious order criterion."  Here
23 there's a panel in the PowerPoint that has
24 six headings, and it says, "Suspicious order
25 criterion."

Page 284

1      How was this developed?
2      A.    These were some of the outcomes
3 of that war room and trends that we saw when
4 we were reviewing the orders of interest.
5      Q.    Is this information that's
6 incorporated in that policy statement that we
7 were referring to earlier?
8      A.    I don't believe so, because
9 this -- this may include, but it's not
10 limited to these factors.
11      Q.    Here we talk -- one of them is,
12 "Store has made an inventory adjustment that
13 deviates two packages -- package size,
14 positive or negative, anytime in the last 13
15 weeks, it's automatically flagged as a
16 suspicious," it says.
17      When it's automatically flagged
18 that way, is that reported, or does it go to
19 the due diligence process?
20      A.    It goes through the due
21 diligence.  It's a poor use of suspicious.
22 It should be order of interest.
23      Q.    So each of these where it says
24 it's being flagged as suspicious, it's really
25 being flagged as order of interest?

Page 285

1      A.    Correct.
2      MR. SHKOLNIK:  Okay.
3      MR. HILL:  Hunter, whenever you
4 get to a decent breaking point, it's
5 been about an hour and five minutes.
6      MR. SHKOLNIK:  Before I start a
7 document is probably the best time to
8 do it, so let's...
9      VIDEOGRAPHER:  We're going off
10 the record at 3:14.
11      (Off the record at 3:14 p.m.)
12      VIDEOGRAPHER:  We're back on
13 the record, 3:33.
14      (Walgreens-Mills Exhibit 13
15 marked for identification.)
16 QUESTIONS BY MR. SHKOLNIK:
17      Q.    Mr. Mills, I've just handed you
18 what's been marked as Exhibit 13.  It's an
19 e-mail that's four pages long, and it's an
20 e-mail from you to Patricia Daugherty
21 regarding the integrity internal audit,
22 prescription integrity internal audit, and
23 it's an e-mail from February 17, 2015.
24      Did there come a time when an
25 audit was done of the integrity system and

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 they were trying to determine how the
2 algorithm -- how the algorithms were being
3 tested during development, the algorithm with
4 respect to ceiling limits?
5     A.    Just want to make sure I
6 understood your question.  You're asking if
7 there was ever an internal audit performed on
8 our algorithms to validate?
9     Q.    To validate, yes.
10    A.    Yes.
11    Q.    And am I correct that at the
12 time they could not locate -- they weren't
13 able to locate any of the Q&A testing that
14 was done on the ceiling limits algorithm?
15    A.    Internal audit cannot find in
16 their audit of our systems appropriate
17 validation during the quality assurance
18 testing of the algorithm.
19    Q.    And in fact, if we go to the
20 second -- the lower portion of Exhibit 13,
21 it's Mr. Bamberg writing to a number of
22 people.  It's Michael Pelc, P-e-l-c, Chandra
23 Vadamodula, V-a-d-a-m-o-d-u-l-a, yourself,
24 John Merritello, M-e-r-r-i-t-e-l-l-o.
25         And he says, "Michael,

Page 287

1 Chandra" -- excuse me -- "internal audit is
2 questioning how we tested DEA suspicious
3 ordering functionality a couple of years ago.
4 Is there any way to easily identify the CMATs
5 involved in this project to get the test
6 plans and results extracted for IA" -- IA
7 being internal audit -- "to review?  If not,
8 is there a possibility to leverage the QA
9 team to help us test and prove that the
10 current calculations are correct and valid?"
11         And then that e-mail was sent
12 to you, and then you send an e-mail to
13 Patricia Daugherty that says, "FYI."
14         What was ever done after this?
15    A.    There were subsequent meetings
16 that occurred after this e-mail with
17 reviewing of the calculations and proving
18 that the calculations are working correctly.
19    Q.    So did they ever find the CMATs
20 or the QA testing for the ceiling limits and
21 the functionality?
22         MR. HILL:  Object to the form.
23         THE WITNESS:  I don't know, to
24    my knowledge, if they ever found those
25    documents.

Page 288

1 QUESTIONS BY MR. SHKOLNIK:
2    Q.    Who participated in -- who
3 participated in the subsequent meetings that
4 occurred after this e-mail to review
5 calculations and proving that the
6 calculations are working correctly?
7    A.    This was myself, Steve Bamberg,
8 John Merritello, Wayne Bancroft, all the key
9 players who worked on the initial -- or
10 worked on the algorithm.
11    Q.    I mean, in order for us to
12 determine if the proper ceiling limits were
13 set initially based on the algorithm,
14 wouldn't it have been important to see those
15 CMATs and the Q&A test results that occurred
16 at the time of development?
17         MR. HILL:  Object to the form.
18         THE WITNESS:  I believe that's
19    what internal audit was -- was
20    questioning.
21 QUESTIONS BY MR. SHKOLNIK:
22    Q.    And they could never find that,
23 correct?
24    A.    To my knowledge, I don't know
25 if these documents were ever identified and

Page 289

1 produced.
2    Q.    And whether or not the ceilings
3 were appropriate three years later, based
4 upon your analysis at that time, does not
5 answer the question of whether or not the
6 ceilings were properly calculated back in
7 2012 for the initial ceilings; isn't that a
8 fair statement?
9         MR. HILL:  Object to the form.
10    Foundation.
11         THE WITNESS:  I don't have any
12    knowledge of how the initial
13    calculations were done.  That would
14    have been the other group that I spoke
15    of, Steve Bamberg, John Merritello,
16    Wayne Bancroft, who would have done
17    the testing.
18 QUESTIONS BY MR. SHKOLNIK:
19    Q.    But when you -- let's go to
20 Bates number 887 of Exhibit 13.  That's the
21 second to last page.  And this is the e-mail
22 from you to Mr. Bamberg on February 16, 2015.
23         And just so it's clear, that's
24 now three years after you start -- I'm sorry,
25 this is a little over two years after you

Page 290

1 started the program, the integrity program.
2 "We just received our results
3 from internal audit, where they have several
4 questions about documentation of the initial
5 testing of S" -- I'm sorry, "the CSOM
6 process."
7 CSOM, that's the suspicious
8 ordering monitor process, correct?
9 A. C is the control; SOM,
10 suspicious order monitoring.
11 Q. And "can you take a look at --
12 below at some of the questions and let me
13 know if you have supporting documentation to
14 respond to IA?"
15 And number 7, down below, it
16 says, "There was no validation performed to
17 ensure that the weekly store RX script
18 count" -- that's prescription script count --
19 "file has been received by the IFS prior to
20 calculating the ceiling limit."
21 What does that -- what is IFS,
22 and what does RX script count mean?
23 A. RX script count is what I spoke
24 about earlier, how many scripts does your
25 store dispense per day. So this is the file

Page 291

1 that's transmitted from one server to
2 another.
3 So they're saying that there is
4 no validation to ensure that that file
5 transfer is being performed. That's the
6 findings of internal audit.
7 Q. "In the event the new weekly
8 file is not received, the job to calculate
9 the ceiling limits will not fail, but rather
10 the old data, the last successful feed, will
11 be used to calculate the ceiling limit."
12 And here's the risk. This is
13 the risk as identified by internal audit; am
14 I correct?
15 A. Yes.
16 Q. "Should the weekly RX script
17 count for store drop, there is a risk the
18 store being assigned inappropriate ceiling
19 limits for each item. This could result --
20 this could result in orders being generated
21 that may be flagged as suspicious by ABC."
22 That would be
23 AmerisourceBergen?
24 A. Correct.
25 Q. "And reported to the DEA, which

Page 292

1 could expose Walgreens to an enforcement
2 action by DEA. Recommendation: A file name
3 check should be performed by the IFS to
4 verify the date of the RX script count file
5 prior to calculating the weekly ceiling
6 limits. If the file is not current, the job
7 should fail and the IT support should be
8 notified."
9 Was that ever -- did they ever
10 find the information necessary to validate
11 the RX script count for when the program was
12 initiated?
13 A. To my knowledge, I'm not -- I
14 don't remember.
15 Q. Okay. And we're going to go on
16 to the next page where it says, number 8,
17 "ceiling calculations, ceiling count" --
18 "ceiling limit calculation," I'm sorry.
19 "During our review of the
20 controlled substance monitoring process, IA
21 noted that Walgreens' employee involved in
22 defining the methodology and creating the
23 formula used in calculating the ceiling
24 limits had a Ph.D. from Illinois Institute of
25 Technology and Management Sciences and was

Page 293

1 versed in management computer science with
2 strengths in statistics and forecasting."
3 Do you know who that is?
4 A. Wayne Bancroft.
5 Q. "In addition, it appears that
6 the user's acceptance testing was performed
7 to verify that the low ceiling limits were
8 calculated correctly. However, IA was unable
9 to determine if the testing performed was
10 adequate, as no formal test plans were
11 documented nor documentation maintained to
12 support the testing performed and the
13 conclusions reached."
14 Now, isn't it important for the
15 company to be sure that ceiling limits were
16 calculated appropriately, initially, in 2012?
17 MR. HILL: Object to the form.
18 THE WITNESS: Yes, it would be
19 appropriate or important.
20 QUESTIONS BY MR. SHKOLNIK:
21 Q. And here they're saying what
22 the risk is. "If the ceiling limits are not
23 calculated appropriately, there's a risk of,
24 one, lost sales and customer dissatisfaction
25 if the ceiling is limit -- if the ceiling

Page 294

1 limit is set too low; or, two, suspicious
2 orders being generated and reported to the
3 DEA if the ceiling limit is set too high.
4 This may expose Walgreens to an enforcement
5 action by DEA."
6          Was this a concern of the
7 company at that time, that there is a
8 possibility that these ceiling calculations
9 were, in fact, wrong in 2012?
10          MR. HILL:  Object to the form.
11     Foundation.
12          THE WITNESS:  No, I don't think
13     that's what it's saying.  It's saying
14     that the documentation to support the
15     initial findings was inadequately
16     retained and, therefore, was unable to
17     confirm at that moment.
18 QUESTIONS BY MR. SHKOLNIK:
19     Q.    It actually says there's no
20 formal test plans that were created.
21          So that means -- that would
22 actually mean that they didn't even have any
23 formal test plans to determine if the
24 ceilings were done appropriately.
25          MR. HILL:  Object to the form.

Page 295

1          THE WITNESS:  I can't answer
2     that.  I don't know.
3 QUESTIONS BY MR. SHKOLNIK:
4     Q.    It would be a problem if the
5 ceilings were inappropriately set, correct?
6          MR. HILL:  Object to the form.
7          THE WITNESS:  It could
8     potentially create an issue.
9 QUESTIONS BY MR. SHKOLNIK:
10     Q.    No one ever went back and
11 confirmed the initial ceilings after this
12 2015 series of e-mails.  What you did was you
13 went back to determine if the current
14 ceilings were accurate.
15          MR. HILL:  Object to the form.
16          THE WITNESS:  I don't know what
17     testing or if there was any results of
18     Wayne producing any documents later.
19          As an outcome of the internal
20     audit, to satisfy them, we did test
21     our current limits at that moment.
22 QUESTIONS BY MR. SHKOLNIK:
23     Q.    And that was based upon the
24 data that had been accumulated over the
25 two-year period and had been running in your

Page 296

1 system for that two-year period, correct?
2     A.    I cannot recall the exact
3 testing that we did and how it was calculated
4 at that moment.
5          (Walgreens-Mills Exhibit 14
6     marked for identification.)
7 QUESTIONS BY MR. SHKOLNIK:
8     Q.    Let me show you the next
9 exhibit at 14, three-page e-mail chain from
10 February 2015.  It's on the same topic.
11          And it has an additional line
12 on it, and that's an e-mail that was the
13 response -- there was an e-mail from Patricia
14 Daugherty to you.  I'm not saying it's a
15 response; it was an e-mail back to you.
16          And you had asked her, "Do you
17 want me to follow the direction from Bamberg
18 below and complete the attached form?"
19          And she says, "Thanks, Steve.
20 No, let's hold off on completing the form.
21 Tasha is going to meet with audit team end of
22 the week.  Our recommendation is not to
23 pursue that enhancement at this time due to
24 low risk."
25          And if we go to the bottom of

Page 297

1 the e-mail from Bamberg to you it says,
2 "Steve, for all implementations of all
3 software, we always have test plans
4 documented in CMAT to provide full SOX
5 compliance.  I am extremely surprised that
6 our internal audit folks cannot find the
7 CMATs for implementations that were done for
8 DEA suspicious orders over the years.  I will
9 check in with Sabine in audit why they cannot
10 find these.  As for the script count
11 validation, changing how we process the files
12 and checking for current data would be an
13 enhancement that would need to be requested
14 as a new project."
15          Just -- just so it's -- just so
16 it's clear, did anyone ever report to you
17 that they found the CMATs for this DEA
18 suspicious ordering program?
19          MR. HILL:  Object to the form.
20          THE WITNESS:  Are you
21     specifically talking about for 7 and 8
22     or just number 8?
23 QUESTIONS BY MR. SHKOLNIK:
24     Q.    How about both.
25     A.    Number 7 is not -- number 7 is

Page 298

1 something different, I believe.  This is more
2 of the validation to ensure that the job to
3 get the new file every week is occurring.
4        Number 8 is obviously the user
5 acceptance testing that was done --
6    Q.    For the ceilings?
7    A.    -- for the ceiling limit
8 calculation.
9        What Steve Bamberg's
10 represent -- or what he's mentioning here in
11 the third paragraph is the script validation
12 piece, so number 7.  So he's saying that if
13 we want to move forward and go with the
14 recommendation of internal audit, then we
15 will need to submit a new project request to
16 have that updated.  And that's my question to
17 Patty --
18    Q.    Okay.
19    A.    -- in this e-mail string.
20    Q.    So you're talking about the
21 RX --
22    A.    Script validation.
23    Q.    Not the CMATs or the ceiling
24 limit and the DEA suspicious ordering --
25    A.    No.

Page 299

1    Q.    -- component of the program?
2    A.    That's what Steve Bamberg says
3 here, that he's going to check with Sabine in
4 internal audit to find out why they cannot
5 find these documents.
6    Q.    And my question is:  Did anyone
7 ever tell you they found them?
8    A.    I do not recall.
9        (Walgreens-Mills Exhibit 15
10    marked for identification.)
11 QUESTIONS BY MR. SHKOLNIK:
12    Q.    In those early days when you
13 first got started, was it a little hectic in
14 the war room?
15    A.    Yes.
16    Q.    And there was a lot of
17 suspicious orders or orders of interest being
18 generated since this process was really
19 being -- just started in the company?
20        MR. HILL:  Object to the form.
21        THE WITNESS:  I don't recall on
22    exact numbers how busy we were.  I
23    know we were extremely busy trying to
24    start a new team and review orders.
25

Page 300

1 QUESTIONS BY MR. SHKOLNIK:
2    Q.    Okay.  Let me go to the second
3 page of the document, e-mail from you to
4 Tasha, January 3, 2013.
5        "As of today, we have 537
6 stores over the ceiling on 209 items.  What
7 other data did you want me to pull?"
8        And then there's an e-mail back
9 from Tasha that says, "I just need to let
10 Kermit know what kind of workload that you
11 guys have.  He is going to want -- he is
12 going to want to know that we are justifying
13 the head count we requested.  How many of
14 those orders were reported to the DEA?"
15        And then you respond back on
16 January 4th at 8:40 a.m. on the ceiling
17 update.
18        "Currently today we have the
19 ability to investigate orders submitted by
20 RXS" --
21        Those are the supervisors; am I
22 correct?
23    A.    Yes.
24    Q.    -- "when they are using the
25 controlled substance quantity override

Page 301

1 forms."
2        Is there a number for those
3 forms?  Is that -- is there a number for that
4 form, or is that just the way it's referred
5 to?
6    A.    I'm not sure I understand.
7    Q.    No.  The substance quantity
8 override form.  Is there -- like before you
9 said the 222s.  Was it --
10    A.    Oh, no, this is an internal
11 form that we created.
12    Q.    In here it says, "The orders --
13 the war room members are able to" -- "The
14 orders the war room members are able to
15 investigate today are a week old.  In most
16 cases these orders have been -- already been
17 shipped making it very hard for us to report
18 any orders using Manuela's dashboard."
19        First of all, I understand it
20 was hectic at the time, but did the company
21 implement any instructions across the board
22 that until the war room is able to catch up
23 and review the orders of interest, that
24 orders were not supposed to be shipped in
25 accordance with the regulations?

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 MR. HILL: Object to the form.
2 Foundation.
3 THE WITNESS: I don't recall.
4 QUESTIONS BY MR. SHKOLNIK:
5 Q. Based on this e-mail, there was
6 a period of time where orders were shipped
7 even before your group had a chance to
8 complete your monitoring requirements,
9 correct?
10 MR. HILL: Object to the form
11 and foundation.
12 THE WITNESS: According to this
13 e-mail specifically, it does state
14 that we were investigating orders that
15 were approximately one week in the
16 rear.
17 QUESTIONS BY MR. SHKOLNIK:
18 Q. Any one of those orders that
19 shipped were a violation of the Controlled
20 Substances Act if they were shipped while
21 they were deemed orders of interest before
22 you had a chance to determine if they were
23 suspicious or not?
24 MR. HILL: Objection to the
25 form. Foundation.

Page 303

1 THE WITNESS: I don't recall.
2 QUESTIONS BY MR. SHKOLNIK:
3 Q. I'm not asking if you recall.
4 If an order was flagged by the system and it
5 took you a week to review it, and the
6 company, for whatever reason, shipped it out
7 before integrity performed its analysis,
8 that's a violation of both your policies and
9 the law.
10 MR. HILL: Objection.
11 QUESTIONS BY MR. SHKOLNIK:
12 Q. Yes or no, sir?
13 MR. HILL: Objection to the
14 form. Foundation. Calls for
15 speculation.
16 MR. SHKOLNIK: No, please,
17 please stop doing that. He's not
18 speculating. It's his job to make
19 sure that this company complies with
20 the federal laws, the Controlled
21 Substances Act. Please don't give him
22 instructions like that.
23 QUESTIONS BY MR. SHKOLNIK:
24 Q. It was either they violated it
25 or they didn't at the time. If you shipped

Page 304

1 it before you did the review, that was a
2 violation of law, correct, sir?
3 MR. HILL: Same objections.
4 THE WITNESS: I don't remember
5 what items were shipped and if they
6 would have been approved by our team
7 after review. I can't answer that.
8 QUESTIONS BY MR. SHKOLNIK:
9 Q. Sir, how about taken in the
10 abstract. If you had suspicious orders, and
11 rather than wait to ship until after you had
12 a chance to do due diligence, and you simply
13 shipped them -- and when I say "you," I don't
14 mean you personally. I know you didn't do
15 this. It's the company -- the company
16 shipped it anyway before you had a chance to
17 do your job, which you were trying to do, the
18 company was in violation of the law. They
19 should not have shipped it.
20 MR. HILL: Same objections.
21 THE WITNESS: I don't know what
22 items these were, and I don't know
23 how -- I don't know which -- if we
24 were to review them, how many percent
25 of those would have been not marked as

Page 305

1 suspicious.
2 QUESTIONS BY MR. SHKOLNIK:
3 Q. That's not the law, sir, is it?
4 MR. HILL: Object to the form.
5 QUESTIONS BY MR. SHKOLNIK:
6 Q. That is not the law. You are
7 not allowed to ship until you complete your
8 review, correct?
9 MR. HILL: Object to the form.
10 Foundation.
11 THE WITNESS: I'm only going
12 off the guidelines that I had at that
13 time. I don't know.
14 QUESTIONS BY MR. SHKOLNIK:
15 Q. Who was supposed to know in
16 Walgreens after you -- the company has just
17 entered an agreement and paid $80 million and
18 said, we're going to implement an integrity
19 program, that we were going to comply with
20 the Controlled Substances Act, who was
21 supposed to know in this company that you're
22 not supposed to ship before you complete a
23 suspicious order analysis?
24 MR. HILL: Object to the form.
25 THE WITNESS: That would be one

Page 306

1 of the representatives in our
2 regulatory law group that would be
3 responsible for interpreting and
4 advising us on correct processes.
5 QUESTIONS BY MR. SHKOLNIK:
6     Q.    Did anyone ever tell you, sir,
7 that you weren't supposed to ship orders
8 until the suspicious order monitoring process
9 was complete, the due diligence?
10         MR. HILL:  Object to the form.
11         THE WITNESS:  I cannot
12     remember.
13 QUESTIONS BY MR. SHKOLNIK:
14     Q.    Earlier we talked about the
15 agreement that -- the company acknowledged
16 they had violated the DEA letters, the three
17 letters, that we had read earlier.
18         Do you remember us reading that
19 from the agreement?
20         MR. HILL:  Object to the form.
21 QUESTIONS BY MR. SHKOLNIK:
22     Q.    Do you remember us reading in
23 the stipulation that Walgreens acknowledges
24 that suspicious order reporting for
25 distribution to certain pharmacies did not

Page 307

1 meet standards identified in DEA -- three
2 letters from the DEA Deputy Assistant
3 Administrator of Office of Diversion Control
4 sent to every register {sic} dated
5 September 27, '06, February 7, '07, and
6 December 27 of '07?
7         Do you recall the company
8 agreeing to that in its settlement?
9     A.    I do agree --
10         MR. HILL:  Object to the form.
11         THE WITNESS:  I do agree
12     reading those documents this morning.
13 QUESTIONS BY MR. SHKOLNIK:
14     Q.    And the letter, sir, say that
15 the company --
16         MR. SHKOLNIK:  If you could
17     pull up for me exhibit -- I think it
18     was 2?  It was the February 7, 2007
19     letter.  3, I'm sorry.
20 QUESTIONS BY MR. SHKOLNIK:
21     Q.    If we could go to -- it's
22 Exhibit 4, I'm sorry.  Second page, second
23 last paragraph.
24         "Lastly, registrants that
25 routinely report suspicious orders, yet fill

Page 308

1 these orders without first determining that
2 the order is not being diverted into other
3 than legitimate medical, scientific,
4 industrial channels, may be failing to
5 maintain effective controls against
6 diversions."
7         Sir, was it your understanding
8 that you were allowed to ship while you were
9 still doing the analysis?
10         MR. HILL:  Object to the form.
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.    I just want to know.  At the
13 time of this, in 2013, when we're reading
14 this e-mail that was sent, was it your
15 understanding you could ship before you
16 cleared a suspicious order?
17     A.    I don't --
18         MR. HILL:  Same objection.
19         THE WITNESS:  I don't recall
20     what my understanding was at that
21     moment.
22 QUESTIONS BY MR. SHKOLNIK:
23     Q.    Did anyone ever tell you that
24 that would be a violation of the law?
25         MR. HILL:  Object to the form.

Page 309

1         THE WITNESS:  I don't remember.
2 QUESTIONS BY MR. SHKOLNIK:
3     Q.    Let's go back to 15, if we
4 could.
5         "As of today, we have nine
6 controlled substance quantity override forms
7 that we deem suspicious."
8         If those were deemed
9 suspicious, those nine, and those orders had
10 already been shipped, was that appropriate?
11         MR. HILL:  Object to the form.
12         THE WITNESS:  So these override
13     forms are not orders that would have
14     been released.  These are orders that
15     have to be reviewed by the team -- by
16     the team members.
17         So those override forms are not
18     orders, those are requests for orders,
19     and it would have been someone in the
20     war room's responsibility to review
21     that, deem it either appropriate and
22     place the order or not appropriate and
23     mark it suspicious.
24 QUESTIONS BY MR. SHKOLNIK:
25     Q.    I understand.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 310

1    And once they've been marked
2 suspicious, you report that to the DEA?
3    A.    Yes.
4    MR. HILL:  Object to the form.
5 QUESTIONS BY MR. SHKOLNIK:
6    Q.    But as we read in the prior
7 paragraph, your company was already shipping
8 the pills out before you made the
9 determination of suspicious orders.
10    A.    The orders above that we're
11 referencing are orders that the algorithm
12 picked up.
13    Q.    Yes.
14    A.    That's separate from the
15 override form.
16    Q.    Ah.
17    A.    The override form is a separate
18 form to request additional product when
19 product is not received.
20    Q.    Let's go back to the beginning.
21    A.    Okay.
22    Q.    "Currently today we have the
23 ability to investigate orders submitted by
24 the RXS when they are using the controlled
25 substance quantity override forms.  The

---

Page 311

1 orders the war room members are able to
2 investigate today are a week old.  In most
3 cases these orders have already been shipped,
4 making it very hard for us to report any
5 orders using Manuela's dashboard."
6    Sir, are you suggesting that it
7 was okay to ship before you completed your
8 review?
9    MR. HILL:  Object to the form.
10 Foundation.
11    THE WITNESS:  No, that's not
12 what I'm saying.
13 QUESTIONS BY MR. SHKOLNIK:
14    Q.    Okay.  Was it acceptable to
15 ship before you had a chance to complete your
16 review?
17    MR. HILL:  Object to form.
18 Asked and answered.
19    THE WITNESS:  I don't know.
20 QUESTIONS BY MR. SHKOLNIK:
21    Q.    If this had happened today --
22 you're still doing this job.  If your
23 department had an order of interest come in
24 and it was a week old and before your people
25 or you had a chance to review it today, they

---

Page 312

1 had already shipped it, that would have been
2 a violation of the policy and something you
3 would not condone, sir?
4    MR. HILL:  Object to the form.
5    THE WITNESS:  That's not how
6 our system works today.  Again, this
7 is very early stages of how the system
8 was being worked, and there's been
9 changes and retweaks to all of this
10 logic.
11    If there's an order flagged of
12 interest today, it is never, ever
13 shipped until someone on our team
14 reviews it.
15 QUESTIONS BY MR. SHKOLNIK:
16    Q.    When did they implement that
17 stuff?
18    A.    I don't recall the exact dates.
19    Q.    Do you know if it was in 2013?
20    A.    I don't know.
21    Q.    Do you know if it was '14?
22    A.    I don't know.
23    Q.    "The war room" -- I'm going to
24 go down to the third paragraph.  "The war
25 room team members have about 40 stores on

---

Page 313

1 their radar having possible suspicious
2 ordering habits which categorize them as,
3 quote, 'stores of interest,' close quote.
4 With any of these stores we have multiple
5 orders on various items which contain large
6 negative adjustments, manual orders and
7 manually manipulated warehouse orders.  As we
8 decrease the upper limit of ceiling more, the
9 number of stores' workload will be increased.
10 We can control the workload by how much we
11 decrease the ceiling at any given time."
12    Did someone actually consider
13 changing ceilings so that the workload -- I'm
14 sorry.  Did anyone ever consider in the
15 integrity department, why don't we change the
16 ceiling level so we have less orders of
17 interest flagged?
18    MR. HILL:  Object to the form.
19    THE WITNESS:  No, that never
20 happened.
21 QUESTIONS BY MR. SHKOLNIK:
22    Q.    That's basically what your
23 e-mail is suggesting; it could be done to
24 reduce the workload, right?
25    MR. HILL:  Object to the form.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  THE WITNESS: Yes, I'm saying
2  it could be done, but it's not
3  something that I'm being directed to
4  do.
5  QUESTIONS BY MR. SHKOLNIK:
6  Q.  Were there ever any
7  conversations with anyone in the company that
8  said, "You know what? One way for us to
9  reduce the likelihood of having to make
10  reports to the DEA is to change our ceilings
11  to reduce our workload"?
12  Did anyone ever say that?
13  A.  No.
14  Q.  Okay.  When you wrote that to
15  Tasha and she said, "Perfect, thanks" --
16  MR. SHKOLNIK:  Can you go to
17  the top?
18  QUESTIONS BY MR. SHKOLNIK:
19  Q.  What part of this did she say
20  was "perfect, thanks"?
21  MR. HILL:  Object to form.
22  Foundation.
23  QUESTIONS BY MR. SHKOLNIK:
24  Q.  Or was it all of it?
25  A.  I can't speculate on what she

Page 315

1  was meaning here.
2  Q.  Is it possible she was saying
3  we can control the workload by how much,
4  decrease the ceiling value at any time, and
5  she was saying, "perfect, thanks"?
6  A.  I can't speculate on that.
7  (Walgreens-Mills Exhibit 16
8  marked for identification.)
9  QUESTIONS BY MR. SHKOLNIK:
10  Q.  Okay.  Next.
11  I'm handing you -- I'm handing
12  you what has been marked as Exhibit 16.  It's
13  e-mails from March of this year, March 9,
14  2018.  It's an e-mail.  Subject is "EDI omit
15  codes."
16  Could you tell us what EDI omit
17  codes means?
18  A.  EDI is the transfer of data
19  between -- that we use between our servers
20  and our vendors.
21  Q.  So --
22  A.  And occasionally our vendors
23  may send us an omit code for certain products
24  that are not going to be fulfilled.
25  Q.  So when it's saying not being

Page 316

1  fulfilled -- so if there was a stop order,
2  would that be an omit?
3  A.  It could be an omit code for a
4  stop order.  It could be an omit for an item
5  not available.  It could be a data
6  transmission error.  It could be several --
7  several reasons why an omit code would fire.
8  Q.  So if we go to the second page,
9  it's like the beginning of the chain, so it's
10  your writing to John Infante.
11  Who is John Infante?
12  A.  John Infante was a manager of
13  supply chain.  He was the responsible -- he
14  was the person that was like the EDI --
15  responsible for EDI transmissions.
16  Q.  In here it says, "Hi, John.
17  Question:  When ABC passes back to the
18  AS/400" --
19  What's AS/400?
20  A.  That's the server that we use
21  for our ordering system.
22  Q.  -- "that an item will not be
23  filled, what code is passed back?  Do we have
24  a code specifically for ABC OMP?"
25  What's ABC OMP?

Page 317

1  A.  ABC OMP stands for order
2  monitoring program, so it's their version of
3  our limit, ceiling limits.
4  Q.  So "code specifically for the
5  ABC OMP limit that kills a controlled
6  substance and prevents the item from being
7  shipped -- being sent to Anda for
8  fulfillment.  I'm finding examples where ABC
9  has rejected an order, but due to -- an order
10  due to OMP, and the order is still passed on
11  to Anda.  I'd like to confirm the process."
12  So if I'm reading that
13  correctly, in 2018 --
14  MR. HILL:  Objection.
15  MR. SHKOLNIK:  I didn't finish
16  yet.
17  MR. HILL:  You're saying --
18  it's 2016.  I'm not trying to jump in,
19  but...
20  MR. SHKOLNIK:  Huh.  That's
21  interesting.
22  THE WITNESS:  I can provide
23  clarity.  The omits codes here, I
24  spoke with John Merritello, and he
25  asking if I had any e-mails that kind

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  of broke down what the omit codes
2  mean, so I sent him this e-mail.
3  QUESTIONS BY MR. SHKOLNIK:
4      Q.   Okay.  Let me rephrase my
5  question.  Thank you for correcting me.
6          So in reading this e-mail, in
7  2016 -- so the system is now -- the integrity
8  system department has been in place for three
9  years, and there appears to be situations
10  where AmerisourceBergen gets a request
11  through your ordering system.
12          AmerisourceBergen says, "We're
13  not going to ship it because of" -- it
14  reached limits of some type, OMP meaning
15  their suspicious order monitoring program
16  spit it out and said, we're not shipping.
17      A.   It could also mean that it's an
18  order of interest that they're reviewing.
19      Q.   Well, whatever it is, it killed
20  an order using -- it killed a controlled
21  substance shipment.
22          But apparently you saw examples
23  where once ABC rejected the order due to OMP,
24  the order still went to Anda, another
25  distributor, for processing.

Page 319

1          At what point did the company
2  put in place a stop that would prevent an
3  order bouncing to another distributor when it
4  was rejected as a suspicious order by another
5  distributor?
6          MR. HILL:  Object to the form.
7          THE WITNESS:  I don't know the
8      exact dates or fixes; however, I can
9      comment that the reason why these
10      orders were being rerouted to Anda,
11      the secondary vendor, was because ABC
12      was sending the wrong omit codes to
13      our system.
14  QUESTIONS BY MR. SHKOLNIK:
15      Q.   And explain that for me
16  further, if you would.
17      A.   So I can't recall what omit
18  code it was that fired when ABC would review
19  something under their OMP guidelines, but
20  they were sending us, I believe, an IW or an
21  IA.  I can't recall the exact omit code.
22      Q.   Okay.
23      A.   But what that caused in our
24  system was it to reroute.  So we worked with
25  AmerisourceBergen to fix their omit codes so

Page 320

1  we would get the appropriate omit code so we
2  wouldn't reroute the orders.
3          So this wasn't necessarily a
4  Walgreens issue; this was a -- us receiving
5  data from ABC and then the order being
6  rerouted.
7      Q.   Okay.  But for how many years
8  was ABC utilizing a code that wouldn't
9  trigger Walgreens stopping a redirection to
10  Anda?
11      A.   I don't know --
12          MR. HIMMEL:  Objection.
13  Foundation.
14          MR. HILL:  And form.
15          MR. SHKOLNIK:  You must
16  represent...
17          THE WITNESS:  I don't know when
18  ABC's OMP team would have started this
19  process.
20  QUESTIONS BY MR. SHKOLNIK:
21      Q.   Let's go into where John is
22  writing you on July 29 of 2016.
23          "Steven, can you supply an
24  example of those items stores being ordered
25  to Anda, and I can confirm what ABC did send?

Page 321

1  I believe we'll see an IW being sent back,
2  but I should be able to confirm it."
3          And that's now July 29 of 2016;
4  am I correct?
5      A.   That is correct.
6      Q.   And "here are the codes that
7  are in our guides."  And it says, "ABC has
8  also used these, IB equaling used in ABC
9  backordering.  We will get some of the
10  quantity filled and their auto orders more
11  into their distribution center."
12          Then it says, "IW is used in
13  C-II orders to acknowledge the PO."
14          What's PO?
15      A.   Purchase order.
16      Q.   "When the e222 is ready, we get
17  an IA sent."
18          What does that mean?
19      A.   Remember, we were speaking
20  about that 222 form?
21      Q.   Yes.
22      A.   This is an electronic version
23  of that form.
24      Q.   And that's sort of the purchase
25  order request; am I correct?

Page 322

1    A.    That is -- it is tied to the
2  purchase order.  It is the legal document
3  that allows ABC to ship the product to
4  Walgreens.
5    Q.    But in 2016, they were -- they
6  were using IW where it was a questionable
7  order quantity that needs to be reviewed
8  before filling the order.
9    A.    That is what this says.  I
10 don't know if that to be true, because we
11 were seeing orders -- at least I had
12 identified orders previously in my e-mail to
13 John saying otherwise.
14   Q.    But that was a problem,
15 correct?
16   A.    Absolutely.
17   Q.    And at some point -- was it in
18 2016 it was fixed, at '17 or '18?  Because I
19 see the next e-mail is 2018.
20   A.    Again, I don't know what
21 happened -- I don't recall what happened
22 after this.  This was, again, an issue with
23 ABC's data that they were sending us.
24   Q.    Or your company's understanding
25 of the codes that were being sent?

Page 323

1          MR. HILL:  Object to the form.
2          THE WITNESS:  The codes that
3    are being sent are agreements between
4    Amerisource and Walgreens.
5  QUESTIONS BY MR. SHKOLNIK:
6    Q.    I understand.
7          And it also says the IW code
8  was utilized for C-IIs where it was a
9  questionable order that needed to be reviewed
10 before filling.
11         So there was some kind of
12 miscommunication between the two companies
13 during that time period?
14   A.    Yes, I would agree to that.
15   Q.    Do you know how many pills were
16 shipped when -- you know, through alternative
17 vendors, alternative distributors, when
18 AmerisourceBergen issued an IW stop?
19         MR. HIMMEL:  Objection.
20 Foundation.
21         MR. SHKOLNIK:  You did the
22 right thing.
23         MR. HILL:  Object to the form.
24         THE WITNESS:  I don't know.  I
25 can clarify that Anda, as our

Page 324

1    secondary vendor, does not stock all
2    these controlled substances and would
3    not be able to ship it, even if it was
4    an order placed to them.
5  QUESTIONS BY MR. SHKOLNIK:
6    Q.    So Anda wasn't able to fill
7  orders for the controlled substances such as
8  OxyContin, hydrocodone and the like?
9    A.    I don't know the exact items,
10 but I know that a majority of the items we
11 only used them as a secondary vendor for like
12 regular RX items, noncontrols.
13   Q.    Well, these are clearly
14 controlled.  The ones you were concerned with
15 were controls?
16   A.    Yes.
17   Q.    That were sent to Anda for
18 filling?
19   A.    It doesn't mean that Anda
20 filled it.  It just means it was shipped --
21 they were sent there.
22   Q.    Could we go and look in the
23 company's database today to determine how
24 many IW stops from ABC were diverted to
25 either Anda or Cardinal Health or some other

Page 325

1  distributor between 2012 and 2000 -- either
2  '16 or '17, whichever -- whenever it was
3  stopped?
4          MR. HILL:  Object to the form.
5          THE WITNESS:  Someone could.  I
6    cannot.  I don't have the access to
7    pull that kind of data.
8  QUESTIONS BY MR. SHKOLNIK:
9    Q.    But that data is in the
10 company?
11         MR. HILL:  Object to form.
12 Foundation.
13         THE WITNESS:  I don't -- I
14 don't know.
15 QUESTIONS BY MR. SHKOLNIK:
16   Q.    Well, you found it when you did
17 this e-mail.
18   A.    On a one-off basis.
19   Q.    No, I think you said you saw --
20 "I find examples where ABC rejected an order
21 due to OMP, and the order is still passed to
22 Anda."
23         So it sounds like you found
24 more than one; am I correct?
25         MR. SHKOLNIK:  Can you go there

Highly Confidential – Subject to Further Confidentiality Review

Page 326

1    and just circle that for me, please?
2  QUESTIONS BY MR. SHKOLNIK:
3    Q.    "I find examples" right there.
4  Am I right?
5    A.    How I found those examples, I'm
6  not --
7    Q.    Okay.
8    A.    -- aware.  I don't remember.
9    Q.    All right.  You got this?
10    (Walgreens-Mills Exhibit 17
11    marked for identification.)
12  QUESTIONS BY MR. SHKOLNIK:
13    Q.    Exhibit 17.  Passing it over.
14    I'm handing you an e-mail chain
15  from 2017, Exhibit Number 17, and it
16  references OMP activity weekly, Walgreens.
17  And I'm just going to focus on just the top
18  of this one, and it -- where it says,
19  "Shirley" -- you're writing to Shirley.  "I
20  find it hard to believe this store is hitting
21  the OMP limit when the only dispensed" --
22  when the only -- when the only -- typo.
23    A.    Sorry.
24    Q.    -- "only dispensed 600
25  tablets" -- don't worry.  If you read my

Page 327

1  e-mails, it would be worse.
2    -- "600 tablets over the last
3  90 days.  Also, the store does not appear on
4  the OMP reporting we receive weekly from
5  ABC."
6    When did ABC start providing
7  the weekly reports to Walgreens of the OMPs?
8    A.    I can't recall the exact date.
9  It would be somewhere along the lines of when
10  their OMP team formed, but I don't know the
11  exact time.
12    Q.    So when that issue was -- you
13  know, came up with the IW code, those IWs
14  would also have been on -- would have been on
15  the weekly OMP report, wouldn't they, if they
16  were issuing OMP reports at that time?
17    A.    The IW is an internal code.  It
18  would not appear on this report.
19    Q.    No, but it was --
20  AmerisourceBergen stopped an order based upon
21  their OMP, is what we read in that last
22  e-mail, correct?
23    A.    Correct.
24    Q.    And an OMP -- ABC would send
25  you a weekly report of all the OMPs?

Page 328

1    A.    Correct.
2    Q.    So if someone had been looking
3  at the weekly report of OMPs from ABC,
4  someone would have known that the order that
5  was diverted to Anda to ship -- I use the bad
6  word, diverted -- sent over to Anda to ship
7  was actually an OMP -- an OMP listed order,
8  isn't it?  Isn't that a fact?
9    MR. HILL:  Object to the form.
10    THE WITNESS:  Based on the
11    analysis that I did in the previous
12    e-mail, yes.
13  QUESTIONS BY MR. SHKOLNIK:
14    Q.    And someone should have been
15  comparing the OMP weekly report to the
16  shipments that were being moved around from
17  AmerisourceBergen to Anda and stop that
18  process immediately, correct?
19    MR. HILL:  Object to the form
20    and foundation.
21    THE WITNESS:  Those -- that
22    error code that we were receiving
23    previously was from ABC.  It was an
24    ABC error to our team.
25

Page 329

1  QUESTIONS BY MR. SHKOLNIK:
2    Q.    I understand.
3    A.    Okay.
4    Q.    But it was your understanding
5  that it was -- the code was confusing, or you
6  didn't quite understand that it was a stop
7  ship.  But if it's on the list of OMP
8  separately, if it's also there, wouldn't
9  someone be saying, wait a second, we got a
10  pharmacy that has a stop ship from ABC.  And
11  look at this, that same pharmacy got that
12  shipment over to Anda.
13    I mean, shouldn't someone have
14  been comparing the weekly reports to this IW
15  report?
16    MR. HILL:  Object to the form.
17    Foundation.
18    THE WITNESS:  That report that
19    we receive is one week old.  These IWs
20    are realtime.  This is the same day.
21    I can't -- I don't have that report
22    from a week prior at that moment --
23  QUESTIONS BY MR. SHKOLNIK:
24    Q.    I see.
25    A.    -- when that order is released

Page 330

1  to review.
2      Q.    Got it.
3          (Walgreens-Mills Exhibit 18
4      marked for identification.)
5  QUESTIONS BY MR. SHKOLNIK:
6      Q.    All right.  I'm handing you
7  Exhibit 18.
8          I just handed you Exhibit 18,
9  and it is a e-mail chain from March and
10  February of 2017.  We can start at the
11  bottom.
12          You weren't on the initial
13  e-mail, but it ultimately gets sent to you.
14  So I'm going to start at the bottom.  And it
15  says, "BCBS MS," so that's Blue Cross Blue
16  Shield of Mississippi, "is implementing a
17  medical policy on opioid and
18  opioid-combination medication.  The medical
19  policy will go into effect on March 1, 2017."
20  And that it's been -- "this blast has been
21  sent out to the pharmacies."
22          And then when you go up to the
23  e-mail from Chris McLaurin, M-c-L-a-u-r-i-n,
24  to RX integrity at Walgreens -- if it says RX
25  integrity at Walgreens, does that go to

Page 331

1  everybody in the group?
2      A.    No, we have a dedicated e-mail
3  box.
4      Q.    And who reviews that?
5      A.    Everyone on the team has
6  access.
7      Q.    So this would have been
8  something that was available to you as well
9  at the time, even though it was forwarded to
10  you later?
11      A.    It may have been.
12      Q.    It says, "Both BCBS of MS" --
13  of Mississippi, so Blue Cross Blue Shield of
14  Mississippi -- "and Mississippi Medicaid are
15  adopting and implementing CDC guidelines for
16  opioid usage.  BCBS is the largest commercial
17  insurer in the state.  MS Med is 750,000
18  lives."  And it goes on to say that it's
19  adopting the CDC guidelines.
20          And in the second paragraph it
21  says, "The one item I come up with is when a
22  physician tries to get around the
23  60-tab-month limit of MS MED, he'll write two
24  prescriptions for 60 each, and the patient
25  puts one on the insurance card and pays one

Page 332

1  in cash.  I'd like to discontinue this
2  practice in terms of dispensing but need an
3  opinion from your team or someone who would
4  provide that opinion."
5          So basically Blue Cross Blue
6  Shield and Medicaid of Mississippi said a
7  prescription can only be -- is only
8  reimbursable up to, I assume, 60 tablets per
9  month.  But the doctor wants to give a
10  patient, let's say, 120, so they split one
11  prescription for 60 that's paid for by Blue
12  Cross Blue Shield and MS Medicaid, and then
13  the patient gets another one that they say,
14  here's the cash so I can get 120 pills.
15          And this person from your
16  company, Chris McLaurin, is saying, I want to
17  stop that.  And he wants -- he doesn't want
18  people to be able to split it up because it's
19  an end round to the limitations, correct?
20      MR. HILL:  Object to the form
21  and the foundation.
22      THE WITNESS:  I'm not diversed
23  in third-party practices to be able to
24  comment on this.  I don't know.
25

Page 333

1  QUESTIONS BY MR. SHKOLNIK:
2      Q.    Well, but what it's saying here
3  is they're coming up with a way around the
4  limitation by splitting it up into part
5  insurance and part cash.  That's what they're
6  writing to your group.
7      MR. HILL:  Same objections and
8  foundation.
9      THE WITNESS:  Yes, I see that's
10  what Chris is writing to our group.
11  QUESTIONS BY MR. SHKOLNIK:
12      Q.    Then it goes up the chain and
13  it says -- this is Patricia saying, "Hey,
14  Chris, that's correct, patients using
15  Medicaid should not be paying cash for the
16  second prescription in your example below.
17  If they have Medicaid, we cannot accept cash
18  for the remainder quantity.  Our stores
19  should be going through the proper prior
20  authorization process as outlined in the
21  document."
22          So Patricia from your group is
23  basically saying, "You're right, you're doing
24  the right thing.  When they come in with two
25  prescriptions, you only fill the one

Page 334

1  prescription because that's the regulation
2  under Medicaid."
3        And she's agreeing with that,
4  correct?
5        MR. HILL:  Object to the form.
6        THE WITNESS:  I'm not an expert
7  on third-party billing, and I don't
8  know.
9  QUESTIONS BY MR. SHKOLNIK:
10     Q.    But that's what she's saying.
11 Whether you're expert or not --
12     A.    Okay.
13     Q.    -- your group is -- the person
14 who's your supervisor in your group is
15 telling him, "That's right, they shouldn't be
16 filling cash prescriptions where there's a
17 second Medicaid prescription."
18     A.    I see that's what Patty is
19 recommending, yes.
20     Q.    Okay.  And so Chris then writes
21 back, and now you're on the e-mail chain.
22 You're from -- Patty includes you on that
23 first one we just read.
24        "Now, same for Blue Cross as
25 well?  Thanks.  Hi, Chris, it's a third party

Page 335

1  and not Medicaid.  That's different.
2  Patients with private third party should be
3  able to pay cash for a second script if
4  needed."
5        Now, was that a policy of
6  Walgreens, that they would fulfill orders
7  where the patient would walk in with two
8  prescriptions that circumvented the CDC
9  guidelines for safe prescription of opioids
10 in 2017?
11        MR. HILL:  Object to the form.
12 QUESTIONS BY MR. SHKOLNIK:
13     Q.    If the person was a private
14 insured patient.
15        MR. HILL:  Object to the form
16 and the foundation.
17        THE WITNESS:  I don't know.
18 QUESTIONS BY MR. SHKOLNIK:
19     Q.    Well, we know that the CDC
20 guidelines are what they were relying upon at
21 Blue Cross Blue Shield and MS Medicaid,
22 according to the e-mail chain to integrity.
23        So when Patty says, well, it's
24 okay to fill that cash -- second prescription
25 and get around the CDC guideline, who is she

Page 336

1  speaking for when she tells Chris McLaurin at
2  Walgreens, the health care supervisor for the
3  State of Mississippi for Walgreens?
4        MR. HILL:  Object to the form
5  and foundation.
6        THE WITNESS:  I don't know who
7  she's speaking upon.  You would have
8  to ask Patty.
9  QUESTIONS BY MR. SHKOLNIK:
10     Q.    We will.
11        Would you condone a practice of
12 dispensing drugs that did an end run around
13 the CDC guidelines for suspicious -- I mean,
14 for safe prescription habits?  Would you
15 personally, sir?
16        MR. HILL:  Object to the form.
17        THE WITNESS:  I cannot comment.
18 I'm not a pharmacist by trade.
19 QUESTIONS BY MR. SHKOLNIK:
20     Q.    Would you think it's right to
21 get around -- to find ways around safe
22 practices of the CDC in terms of dispensing
23 as a company integrity officer?
24        MR. HILL:  Object to the form.
25 Foundation.

Page 337

1        THE WITNESS:  I don't know.
2  QUESTIONS BY MR. SHKOLNIK:
3     Q.    Who would know that answer?
4     A.    I would start with Patty.
5        (Walgreens-Mills Exhibit 19
6  marked for identification.)
7  QUESTIONS BY MR. SHKOLNIK:
8     Q.    I'm going to show you -- I'm
9  going to give you what's been marked as -- or
10 about to be marked as -- 19?
11        I'm going to go through a bunch
12 of these as quickly as I can without going
13 too fast.  We're going to be winding down
14 soon.
15        MR. HILL:  And that's fine.  I
16 do think, you know, just Steve, you
17 take the time -- don't unnecessarily
18 read a bunch, but if you need to look
19 to get the context, take your time,
20 but I understand what you're saying.
21        MR. SHKOLNIK:  I'm not trying
22 to rush you.  I'm just trying to give
23 everybody a little bit of a thought
24 process where I am.
25

Page 338

1 QUESTIONS BY MR. SHKOLNIK:
2 Q. I handed you Exhibit 19, which
3 is an e-mail from you to Paul Rattana,
4 December 26, 2012, and I just want to direct
5 your attention to the second paragraph of the
6 first page.
7 "As an FYI, prior to last week,
8 we still had line limits in place at the DC
9 level that would block any high orders a
10 store would PDQ. Our team has removed these
11 blocks and have instated new order review
12 logic."
13 Could you just tell me what
14 that means, to have line limits in place at
15 the DC level that would block high orders a
16 store would, quote, PDQ?
17 A. I cannot recall what line
18 limits were and how they were set at the DC.
19 Q. But at least according to this
20 e-mail, by the latter part of December you
21 had now already started the algorithm
22 regarding ceilings and began the process of
23 reviewing the orders -- orders of interest,
24 correct?
25 A. Can you repeat your question?

Page 339

1 I'm sorry.
2 Q. Sure.
3 I'm just -- here you're saying,
4 well, our team has removed blocks and have
5 instated a new order review logic.
6 So that's the logic you're
7 referring to at that point in time. You had
8 ceilings -- you now have implemented
9 ceilings, and you're starting the process
10 that we've been talking about all day?
11 A. Yes.
12 Q. Was there any written protocols
13 regarding this idea of line limits at the DC
14 level if there's PDQ?
15 A. I cannot recall. I don't know.
16 Q. What is PDQ?
17 A. PDQ is a function of our
18 ordering system that allows stores to order
19 Control II medications. It's a manual order
20 for Control II medications.
21 Q. But PDQ means something more
22 than just saying it's a way to order
23 manually. Is it a faster one?
24 It's an abbreviation for
25 something, isn't it? Does it mean quick?

Page 340

1 A. It stands for pretty darn
2 quick.
3 Q. Pretty darn quick. That's what
4 I thought.
5 (Walgreens-Mills Exhibit 20
6 marked for identification.)
7 QUESTIONS BY MR. SHKOLNIK:
8 Q. Just handed you an e-mail that
9 is Exhibit 20, and it appears to be an e-mail
10 at the top from you on January 31, 2013, to a
11 series of people, and it references a
12 District 200 hydrocodone 7.5-325 purchase.
13 If we can just go to the back.
14 If we go to Bates number 560? And it's an
15 e-mail from RX integrity to Brian, and it's
16 signed by you. So I assume you used the RX
17 integrity e-mail at that time to respond to
18 the store.
19 MR. HILL: Just so it's clear,
20 you said turn to the back. There's
21 additional e-mails after this, but I
22 know what page --
23 MR. SHKOLNIK: I'm sorry, I
24 just turned -- I didn't mean to go off
25 the first page, but page 560 is what I

Page 341

1 was referring to.
2 QUESTIONS BY MR. SHKOLNIK:
3 Q. Okay. In fact, let me just go
4 back to 7562. This is an e-mail from Ben
5 Bringedahl, B-r-i-n-g-e-d-a-h-l, to Penny
6 Nichole.
7 Who's Penny?
8 MR. HILL: Nichole Penny.
9 QUESTIONS BY MR. SHKOLNIK:
10 Q. Or Nichole Penny.
11 A. Leadership at that market. I
12 don't know her exact role.
13 Q. Okay.
14 "Nichole, unfortunately there
15 is now way to handle. We are turning away
16 many RXs that are legitimate. We have shared
17 the wealth with neighboring stores. This
18 only works when you have close stores. This
19 is something I was going to discuss with Chad
20 on my visit."
21 Was it a policy back in 2013
22 for stores to be sharing the wealth with
23 neighboring stores when it relates to
24 hydrocodone shipments?
25 MR. HILL: Object to the form.

Page 342

1  THE WITNESS:  Can you clarify
2  your question?  I got lost.  I'm
3  sorry.
4  QUESTIONS BY MR. SHKOLNIK:
5  Q.  Sure.
6  We have here -- we have a
7  pharmacy telling someone in Walgreens,
8  Nichole Penny, the best way to handle high
9  volume, and we know from this e-mail chain
10 it's talking about attempt to get a delivery
11 of hydrocodone 7.5/325.  And he says that he
12 has been sharing the wealth with neighboring
13 stores.  This only works when you have a
14 close store.
15 And I assume, and I think as we
16 go through the e-mail you're going to agree
17 with me, that he's actually intra-storing to
18 get his hands on more opioids to fulfill
19 orders, correct?
20 MR. HILL:  Object to form.
21 THE WITNESS:  No, that's not
22 correct.
23 QUESTIONS BY MR. SHKOLNIK:
24 Q.  So when he says he's sharing
25 the wealth with neighboring stores, he's not

Page 343

1  talking about intra-storing?
2  MR. HILL:  Object to the form.
3  Foundation.
4  THE WITNESS:  I --
5  MR. SHKOLNIK:  I don't know
6  what the foundation means.  It's not
7  one of the federal objections that
8  we're allowed to do, but so be it.
9  QUESTIONS BY MR. SHKOLNIK:
10 Q.  But is it your opinion when he
11 says, "We have shared the wealth with
12 neighboring stores," that's not
13 intra-storing?
14 MR. HILL:  Same objection.
15 THE WITNESS:  No, that's not
16 how I interpret this.
17 QUESTIONS BY MR. SHKOLNIK:
18 Q.  Let's move on up.  Let's go to
19 560, and let's blow up the January 17th,
20 11:55 p.m. e-mail from you to the store,
21 writing back to Brian.
22 "The information you're
23 requesting is very sensitive."
24 He's asking you -- he wanted
25 you to tell him what his ceiling was,

Page 344

1  correct?
2  A.  Correct.
3  Q.  "Have we met our limit?  What
4  is the limit?"
5  A.  Correct.
6  Q.  And you say to him, "It's very
7  sensitive, and we will not be able to provide
8  you with any specifics.  What I can tell you,
9  however, is that you are not hitting your
10 ceiling on this item."
11 Why would you tell him he
12 wasn't hitting his ceiling?
13 A.  I believe at this moment when I
14 was referring, I was trying to give him some
15 sort of comfort that there was some product
16 that was going to be scheduled to be shipped
17 to his store.  That's all I meant by that.
18 Q.  You're not supposed to tell him
19 if he's hitting his ceiling or near hitting
20 his ceiling at any time, correct, sir?
21 MR. HILL:  Object to the form.
22 THE WITNESS:  No, I never said
23 that.
24 QUESTIONS BY MR. SHKOLNIK:
25 Q.  Oh, so you're allowed to tell

Page 345

1  them that they're getting near ceiling?
2  A.  We're allowed to let them know
3  if they're nearing a ceiling.  We don't ever
4  tell them a specific number or give them any
5  specific details, but they should be allowed
6  to know if they're nearing something.
7  Q.  So from Walgreens' perspective,
8  it is appropriate to tell the pharmacies that
9  they're getting near ceiling?
10 MR. HILL:  Object to the form.
11 THE WITNESS:  I don't recall at
12 this moment if that was something that
13 we had in place; however, today we do
14 let -- stores aware of where they're
15 at, if they're nearing their ceiling
16 limit.
17 QUESTIONS BY MR. SHKOLNIK:
18 Q.  And then it goes on to say,
19 "However, I will tell you to stop
20 intra-storing controls."
21 Does that refresh your
22 recollection that when you read his sharing
23 the wealth e-mail, he was telling the company
24 he engages in intra-storing of his opioids
25 with neighboring stores?

Page 346

1    A.    Seeing this e-mail now, it does
2  ring a bell.
3    Q.    Okay.  Let's continue on in
4  this e-mail.  Look at more about Brian at
5  Store Number 7158.
6         So if we go and look at the
7  next e-mail up on page 558, or on the e-mail
8  up at 558, it says -- and this is Brian
9  writing to you.  "After running out of
10 hydrocodone last night and transferring
11 multiple scripts out, I pulled the 52-week
12 WIC activity report shown below.  This is the
13 most up-to-date access."
14        He goes on to say, "This has
15 not been enough to meet our sales, and that
16 gap has been filled by auto orders from
17 Cardinal, increasing our shrink."
18        What does that mean?
19        MR. HILL:  Object to the form.
20        THE WITNESS:  I'm sorry, I'm
21 lost.  558, is that where we're at?
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    Yeah.  If you look up on the
24 screen, it's right here.
25    A.    Okay.  Sorry.

Page 347

1    Q.    "This has not been enough to
2  meet our sales, and that gap has been filled
3  by auto orders from Cardinal, increasing our
4  shrink."
5         What does that mean?
6         MR. HILL:  Same objections.
7         THE WITNESS:  This means that
8  the -- at this time we were still
9  distributing hydrocodone from our DCs,
10 and what he's saying is that the
11 suggested orders to the DC is not
12 generating enough, and it's causing
13 orders to be shipped from Cardinal,
14 which costs more money than buying it
15 from our local DC, which is what the
16 shrink he's referring to is.
17 QUESTIONS BY MR. SHKOLNIK:
18    Q.    Well, he's saying that -- so
19 basically they're not making as much money by
20 having to go to Cardinal instead of
21 self-distribute?
22    A.    Yes.
23    Q.    Is that a term of art at
24 Walgreens, "increasing the shrink," so let's
25 keep it vertically integrated and not going

Page 348

1  to Cardinal, or is that just his -- his
2  interesting phraseology?
3         MR. HILL:  Object to the form.
4         THE WITNESS:  I -- I don't
5  know.  I think that this is his -- I
6  don't know.
7  QUESTIONS BY MR. SHKOLNIK:
8    Q.    Let's go up to the next e-mail
9  up above at 7557.
10        Now, this is your e-mail to
11 Nichole after this series of exchanges.
12        "Nichole, something doesn't
13 make sense here."  And you go through the
14 fact that he's purchasing twice as much as
15 the rest of the district and is number 2 in
16 the entire chain for hydrocodone.
17        When you say "the entire
18 chain," that's Alaska to Florida to Key West
19 to Hawaii to Maine, correct?
20    A.    The entire chain, yes.
21    Q.    So this is a guy who's writing
22 you, who's telling you that he's sharing the
23 wealth, he's exceeding Cardinal's -- he's
24 worrying about, you know, buying from
25 Cardinal versus vertically integrating his

Page 349

1  distribution.
2         And then you write, "I'm
3  concerned if the DEA gets wind of this store
4  and wants to do their own investigation, we
5  do not have a justified response as to why
6  O7158 is purchasing this much product.  At
7  this time, I cannot approve any additional
8  product to the store, and my recommendation
9  is for LP and yourself to perform a thorough
10 investigation.  I would also recommend the
11 store stop intra-storing the product in order
12 to bypass the ordering system."
13        The intra-storing in and of
14 itself would have been a DEA violation,
15 wouldn't it?
16        MR. HILL:  Object to the form.
17 Foundation.
18        THE WITNESS:  I don't recall
19 any of the regulations around
20 intra-storing with the DEA at that
21 time.
22 QUESTIONS BY MR. SHKOLNIK:
23    Q.    Did you ever report this guy to
24 the DEA?
25    A.    I don't know.

Page 350

1    MR. HILL: Same objections.
2  QUESTIONS BY MR. SHKOLNIK:
3    Q.   Could we go into the company's
4  computers and determine if Store Number 07158
5  was ever reported by Walgreens to the DEA for
6  his actions that you describe here?
7    A.   Yes, we could look that up.
8    Q.   Do you have any idea where
9  Store 01758 is?
10    Are we able to determine that?
11    A.   Yes, I know where that store is
12  located.
13    Q.   And where is that?
14    A.   Battle Creek, Michigan.
15    (Walgreens-Mills Exhibit 21
16  marked for identification.)
17  QUESTIONS BY MR. SHKOLNIK:
18    Q.   Here we go. Let's go to 21.
19    Here we have an e-mail,
20  December 31, 2012, Exhibit 21. It's an
21  e-mail from you to Matt Forster, and it talks
22  about Store 05814.
23    Do we know where this guy --
24  where this store is?
25    A.   No, it doesn't ring a bell.

Page 351

1    Q.   How did you know that the other
2  one was in Battle Creek?
3    Was it from something on the
4  e-mail or just it's a store you remember?
5    A.   It's a store I remember.
6    Q.   What was it about that store
7  that you remember?
8    A.   That e-mail kind of summed it
9  up.
10    Q.   He was one of the bad eggs,
11  wasn't he?
12    MR. HILL: Object to the form.
13    THE WITNESS: I don't know that
14  to be true.
15  QUESTIONS BY MR. SHKOLNIK:
16    Q.   He appeared to be a bad egg,
17  did he not?
18    MR. HILL: Same objection.
19  QUESTIONS BY MR. SHKOLNIK:
20    Q.   Let's go to the e-mail,
21  Exhibit 21. "Store 05814 has fallen below
22  the ceiling for this item."
23    That's a good thing, am I
24  correct, to fall below it, or is that a bad
25  thing?

Page 352

1    A.   It's a good thing.
2    Q.   Okay. "The store received
3  seven bottles on their next warehouse order.
4  What concerns me about this store is the fact
5  that they have been intra-storing
6  hydrocodone, 10, 500 milligrams from their
7  neighbor stores. This is a red flag. We do
8  not want intra-storing any controlled
9  substance unless RXS has been contacted and
10  signs off. Store" -- dropping down, it says,
11  "Store 05184 needs to stop immediately from
12  intra-storing any controlled substances, as
13  they will only prolong the store from getting
14  product through the warehouse. We cannot
15  stress enough how important it is for stores
16  not to manipulate the ordering system by
17  intra-storing, manually increasing or
18  manually generating orders, as they all can
19  be deemed suspicious and will be reported to
20  the DEA."
21    Did you ever suggest to the
22  company that 05814 should be investigated
23  because they were intra-storing?
24    A.   I don't remember.
25    Q.   Did you ever report to anyone

Page 353

1  up the chain that you had stores where you
2  were finding out intra-storing was going on?
3    A.   Yes, I would have reported that
4  up the chain.
5    Q.   Did anyone ever do anything
6  about that from the corporate level?
7    Did they issue any notices out
8  to all the stores: Stop intra-storing for
9  opioids because -- withdraw that.
10    Did you ever see that corporate
11  ever issue any notice to all the stores:
12  Stop intra-storing opioids?
13    MR. HILL: Object to the form.
14    THE WITNESS: I don't remember.
15  QUESTIONS BY MR. SHKOLNIK:
16    Q.   Okay. Was this pharmacy
17  reported to the DEA for suspicious conduct?
18    A.   I cannot recall.
19    Q.   The mere fact that they didn't
20  hit ceiling is not the only reason why you
21  wouldn't -- withdraw that.
22    You can be deemed to be
23  acting -- withdraw that.
24    Surpassing the ceiling isn't
25  the only reason for a store to be reported to

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 the DEA, is it?
2     A.    No, that's not the only reason
3 why a store could be reported.
4     Q.    A store could be keeping its
5 numbers under the ceiling yet still be in --
6 can still be acting inappropriately in terms
7 of its opioid dispensing and purchasing,
8 correct?
9         MR. HILL:  Object to the form.
10         THE WITNESS:  Opioid purchasing
11     specifically.
12 QUESTIONS BY MR. SHKOLNIK:
13     Q.    So, I mean, a pharmacy like
14 this one that is manipulating the ordering
15 system and intra-storing may actually be a
16 flag that could be a trigger for an
17 investigation, couldn't it?
18         MR. HILL:  Object to the form.
19     Foundation.
20         THE WITNESS:  Yes, which is my
21     investigation here that I provided in
22     the summary to Matt.
23         (Walgreens-Mills Exhibit 22
24     marked for identification.)
25

Page 355

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    I'm going to show you 22.
3         MR. HILL:  When you get to --
4     we've been going for an hour and 20.
5     When you get to a decent breaking
6     point...
7         MR. SHKOLNIK:  Sure.
8 QUESTIONS BY MR. SHKOLNIK:
9     Q.    I'm going to show you an
10 e-mail.  It's a fairly long compilation, but
11 it deals with some requests -- or a request
12 from a store.  I believe it's Store 05498, I
13 think it is.  We have a map which helps us
14 here.  It says Modesto, so I assume that's
15 California.
16         And we have an e-mail at the
17 top from integrity, and it appears to be from
18 yourself to Tapan Shah where you're attaching
19 a map.  And it says, "Looking over the map,
20 there are several Walgreens locations that
21 would be able to supplement your hydrocodone
22 volume.  You will need to have conversations
23 with prescribers in your area to not E-scribe
24 all scripts to your store."
25         So in this e-mail, are you

Page 356

1 saying that it's -- it's appropriate for him
2 to go to these local stores to get some
3 intra-storing?
4     A.    No, that's not at all what I'm
5 saying.
6     Q.    Okay.  Let me go to the top.
7         "We're reviewing your ceiling
8 limits at this time, and you are currently
9 not exceeding or nearing the ceiling for any
10 hydrocodone product.  Also, as far as
11 servicing your patients, even though you may
12 not be hitting our internal limits, you may
13 be -- you may end up hitting ABC's OMP limit.
14 Looking over the map, there are several
15 Walgreens stores that would be able to
16 supplement your hydrocodone volume.  You will
17 need to have conversations with the
18 prescribers in your area not to E-scribe all
19 scripts to your store."
20         So would one way of avoiding
21 hitting the ceiling would be to get pills
22 intra-shipped from another store in the area?
23         MR. HILL:  Object to the form.
24         THE WITNESS:  No.
25

Page 357

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    Well, it certainly would be a
3 way of avoiding the ABC OMP limit, wouldn't
4 it?
5         MR. HILL:  Same objection.
6         THE WITNESS:  I don't know that
7     to be true.
8 QUESTIONS BY MR. SHKOLNIK:
9     Q.    Well, in 2015,
10 AmerisourceBergen was a supplier of the -- of
11 C-II products, correct?
12     A.    Yes.
13     Q.    And in this case, this pharmacy
14 in Modesto, there was a concern that his
15 orders may trigger ABC's OMP limit.
16         That's what you're saying here,
17 isn't it?
18     A.    What I'm saying here is that
19 the prescribers in the area were sending all
20 the scripts E-scribed, electronic
21 prescriptions, to one location.  If one
22 location is getting all the scripts, we're
23 going to eventually hit our limits and ABC's
24 limits, affecting patient care.
25         The e-mail simply states that

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  they should have conversations with the
2  prescribers to help spread the load of all
3  the patients who are receiving that
4  medication to other supporting stores so we
5  don't run into an issue with hitting internal
6  limits.
7      Q.   Isn't that also another way of
8  saying you may have a bad doctor in the area
9  who's sending too many prescriptions to one
10 place; share the wealth with the other stores
11 and you'll keep the limits low?
12     MR. HILL:  Object to the form.
13 QUESTIONS BY MR. SHKOLNIK:
14     Q.   You won't push ceilings?
15     A.   No, that's not at all what I'm
16 saying.
17     Q.   But that's a possibility.  You
18 may have a doctor in that area that's sending
19 too many prescriptions, and it's a flag.  So
20 send them to different stores, and by sharing
21 it among -- what do we have here?  One, two,
22 three, four, five, six stores -- no one may
23 hit a limit, and this doctor can keep sending
24 all those prescriptions.
25     Isn't that another way of

Page 359

1  looking at this?
2      A.   I don't know the prescribing
3  habits or practices by the physicians in
4  Modesto, California.
5      Q.   Well, how about the
6  prescription -- this doctor keeps sending too
7  many to him.  Maybe someone should have
8  investigated him and said, "Hey, is this guy
9  a mill?"
10     MR. HILL:  Object to the form.
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.   I mean, did anyone consider
13 that as an option rather than say, send them
14 to the other stores so we don't lose the
15 sales?
16     A.   I don't singly count one
17 prescriber here.  I'm saying prescribers.  So
18 I don't know -- I don't know the answer to
19 that question.
20     Q.   Okay.  If you go to the next
21 page, 075.  "In the last six months, auto
22 order exceeded ABC's OMP limit two times,"
23 two times in the last six months, "and we
24 provided satisfactory explanation to ABC.
25 Based on that experience, we are manually

Page 360

1  decreasing suggested order to avoid OMP
2  thresholds."
3      It appears to be someone is
4  playing with the thresholds so this guy can
5  keep filling as many prescriptions as he
6  gets.  Is that one way of looking at this?
7      MR. HILL:  Object to the form.
8      THE WITNESS:  These are not my
9  words.  These are from Tapan Shah.
10 QUESTIONS BY MR. SHKOLNIK:
11     Q.   Well, and Tapan Shah is the
12 supervisor for that region, correct?
13     A.   He is a supervisor for that
14 region.
15     Q.   So AmerisourceBergen is trying
16 to do the right thing here to try to stop
17 suspicious orders from being shipped, and
18 someone in your company is coming up with a
19 really creative plan on how to get around
20 ABC's OMP limit.
21     Do you think that's
22 appropriate?
23     MR. HILL:  Object to the form.
24     THE WITNESS:  We have never
25 instructed anyone to do that.

Page 361

1  QUESTIONS BY MR. SHKOLNIK:
2      Q.   Well, someone did it, whether
3  you instructed it or not; am I correct?
4      MR. HILL:  Object to form.
5      THE WITNESS:  Based on the
6  descriptions here in this e-mail, it
7  appears that someone has been trying
8  to decrease their order to get less
9  product to try to avoid OMP limits at
10 ABC.
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.   And that's a flag that the DEA
13 would love to know about, correct?
14     A.   I don't know.
15     MR. SHKOLNIK:  Okay.  Thank
16 you.
17     MR. HILL:  Are we taking a
18 break?
19     MR. SHKOLNIK:  Yes, please.  I
20 think you said at the end of this one.
21 Thank you.
22     MR. HILL:  No, I didn't.
23     VIDEOGRAPHER:  We're going off
24 the record at 4:53.
25     (Off the record at 4:53 p.m.)

Page 362

1    VIDEOGRAPHER: We're back on
2 the record at 5:13.
3    (Walgreens-Mills Exhibit 23
4 marked for identification.)
5 QUESTIONS BY MR. SHKOLNIK:
6    Q.    Mr. Mills, we're handing you
7 what has just been marked as Exhibit 23.
8 It's an e-mail from May of 2013, and at the
9 bottom there's an e-mail from Emily House.
10    Do you know who Emily House is?
11    A.    Yes, I know who Emily House is.
12    Q.    Who is she?
13    A.    She's a director on the
14 purchasing side.
15    Q.    And it says, "Chris, Tasha,
16 here is the most recent red store list from
17 Cardinal. I was told that the bottom ten
18 stores are restricted from purchasing any
19 controlled substances. Pam has also provided
20 me a schedule of store inspections which I'll
21 forward to you upon receipt. I just want to
22 understand how I can help your team. I'm
23 assuming that we want to see if we can move
24 stores to ABC as soon as possible if Cardinal
25 refuses to provide them with controlled

Page 363

1 substances."
2    Was this a common practice back
3 in 2013, that if your stores were getting cut
4 off of controlled substances by Cardinal the
5 company would just simply switch it over to
6 ABC so they would start providing the
7 controlled substances?
8    A.    I don't know.
9    Q.    Would you condone that
10 practice?
11    A.    I cannot speculate.
12    Q.    You think the DEA would like to
13 know that the company is -- is transferring
14 to alternative distributors when one
15 distributor refuses to provide them
16 controlled substances?
17    MR. HILL: Object to the form.
18    THE WITNESS: I don't -- I
19 don't know.
20 QUESTIONS BY MR. SHKOLNIK:
21    Q.    Did the company -- well, now
22 that you see this now, is this a practice you
23 would condone today?
24    MR. HILL: Object to the form.
25    THE WITNESS: Today we don't do

Page 364

1 anything like this.
2 QUESTIONS BY MR. SHKOLNIK:
3    Q.    Why is that?
4    A.    We only have one vendor.
5    Q.    And who is the one vendor now?
6    A.    ABC.
7    (Walgreens-Mills Exhibit 24
8 marked for identification.)
9 QUESTIONS BY MR. SHKOLNIK:
10    Q.    I'm going to hand you what has
11 been marked as Exhibit 24. It's an e-mail
12 chain that's part of a request for an
13 override. The store is 34744, and they're
14 asking for an override for hydrocodone and
15 acetaminophen 10.
16    If we go to the -- what would
17 be the second page, there's an e-mail from
18 Katie Gehrand, G-e-h-r-a-n-d.
19    Do you know who that is?
20    A.    Yes.
21    Q.    She's in inventory?
22    A.    Yes.
23    Q.    It says, "Chris, this store has
24 2,150 tablets on hand."
25    That's what OH means, right?

Page 365

1    A.    Correct.
2    Q.    "We do not see the need for the
3 store to have more product than that. Their
4 average weekly sales are usually less than
5 that amount that they have on hand."
6    Then we go up the e-mail where
7 it's Chris writing back to inventory. "I
8 appreciate your response. Currently, their
9 level is greater than their need. Next week
10 at the same time their on-hand will run about
11 1,300."
12    Let's skip down, and it says,
13 "We will start the OOS/PFL process" --
14    What is that?
15    A.    OOS stands for out of stock.
16 PFL is partial fill.
17    Q.    And it says, "process again
18 except we order through Cardinal. I don't
19 wish to supplement through Cardinal, as we
20 lose excessive profit dollars. Should I wait
21 until next week or the week after to submit
22 the request again? I'm simply trying to stay
23 ahead of the game and be proactive versus
24 reactive; proactive, save company money,
25 versus reactive, cost the company money."

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    And on October 31, 2012, you're
2  sending this e-mail to Mr. Denman, saying,
3  "Please see the response below."
4    Do you have any idea what was
5  significant about this, why you would want
6  Mr. Murray to have seen this?
7    A.    I don't know exactly why I
8  would have flagged this for his attention.
9    Q.    This is at a time when you were
10  in inventory specialist; you weren't in
11  integrity, correct?
12    A.    Correct.
13    (Walgreens-Mills Exhibit 25
14    marked for identification.)
15  QUESTIONS BY MR. SHKOLNIK:
16    Q.    Here's an override request, and
17  you're sending an e-mail from -- you're
18  sending an e-mail to a Woodland SAIL
19  coordinators.
20    What is that?
21    A.    Our Walgreens distribution
22  center.  They are the individuals who would
23  have processed and placed the order.
24    Q.    But Woodland SAIL, is that a
25  person?  Is that a place?  Is that a --

Page 367

1    A.    Woodland, California.
2    Q.    Oh.
3    A.    Sail is their title or
4  function, and their title is coordinator.  So
5  it's just put together for an e-mail address.
6    Q.    And the second page it says,
7  "Store is selling over 32 bottles per week,
8  and they have been limited to 12 bottles a
9  week due to limit.  The store receives only
10  one order per week.  They are getting only
11  two bottles from Cardinal, but now Cardinal
12  has stopped, too.  Store numerous partial
13  fills, and we are getting requests for
14  transfers."
15    And you're asking -- you're
16  sending this along, "So please approve this
17  order."
18    On what basis would you be
19  suggesting they approve this order, where
20  they've been stopped by Cardinal and they're
21  hitting their ceilings?
22    There's nothing here, am I
23  correct, to either approve it or not approve
24  it?
25    A.    I don't recall the exact

Page 368

1  scenario.  That would have been some analysis
2  or review that I would have done to look at,
3  you know, their dispensing histories and
4  purchase histories, but I don't recall this
5  e-mail.
6    Q.    So at this time you were in
7  inventory based on the date, am I correct?
8    A.    Yes.
9    Q.    So here your job was you trying
10  to get them inventory, you know, in 2000 --
11  in August, your job is to try to get
12  inventory to stores when they need them,
13  correct?
14    A.    Yes, my job here is to get them
15  the product they need to service their
16  legitimate patients.
17    Q.    And the subject here is
18  controlled substance order quantity override
19  form.
20    Who was the one that would
21  be -- who decides to approve an override?
22    A.    Prior to the creation of the RX
23  integrity team, the responsibility fell on RX
24  inventory.
25    Q.    And then you send it to the

Page 369

1  local distribution center for them to do the
2  override, or is that you giving the override?
3    A.    I'm approving the override.
4  I'm giving them authorization to process the
5  order request.
6    Q.    Was that your job back at that
7  time?  You were -- you were the person
8  overseeing, you know, overrides?
9    A.    In 20 -- in late 2012 whenever
10  the override form came to fruition, that was
11  a part of my job responsibilities.  Not the
12  only responsibility, but part of it.
13    Q.    So even before you became part
14  of the integrity group, you were the person
15  responsible for assessing suspicious order
16  monitoring -- withdraw that.
17    Prior to joining integrity, you
18  were in some way charged with responsibility
19  for suspicious order monitoring?
20    MR. HILL:  Object to the form.
21    THE WITNESS:  Prior to RX
22    integrity, I was in charge of
23    reviewing order requests from this
24    override form, reviewing them and then
25    sending them off to be processed.

Highly Confidential – Subject to Further Confidentiality Review

Page 370

1 QUESTIONS BY MR. SHKOLNIK:
2 Q. Was that a big part of your
3 job?
4 A. No, this was not a big part of
5 my job. This was a subsection of my job.
6 That was not the only thing I did.
7 Q. Was it -- did this -- was this
8 your responsibility from, say, June until
9 December, or was it for years?
10 A. I'm not aware of the exact
11 dates of the controlled substance override
12 form going into being live. So I don't know
13 the exact dates of when I would have been
14 reviewing and approving these forms.
15 Q. What was the criteria you were
16 utilizing before integrity for approving
17 overrides?
18 A. Based on my previous mention, I
19 would review dispensing, purchasing history
20 as well the information provided by their
21 direct superior, in this case, Satinder.
22 Q. And direct superior would be
23 the regional manager for that area?
24 A. Regional manager or district
25 manager. I don't know exact title, what he

Page 371

1 was at that point.
2 Q. Was there any written policies
3 and procedures in integrity -- not integrity,
4 in inventory on what should be considered in
5 terms of suspicious order monitoring?
6 A. I don't recall.
7 Q. What was the procedures that
8 you applied -- let me withdraw that.
9 Who taught you your job? Who
10 taught you how you would approve or not
11 suspicious orders?
12 MR. HILL: Object to the form.
13 THE WITNESS: I would work with
14 the various managers within the RX
15 inventory group to review. Some of
16 them are pharmacists by trade, so
17 review that my decision made through
18 them to make sure that this made
19 sense.
20 QUESTIONS BY MR. SHKOLNIK:
21 Q. Who were some of those people?
22 Can you give us some names?
23 A. Barbara Martin.
24 Q. Is she still with the company?
25 A. Yes.

Page 372

1 Q. Did she have any DEA training
2 on suspicious order monitoring?
3 MR. HILL: Object to the form.
4 Foundation.
5 THE WITNESS: I don't know her
6 background.
7 QUESTIONS BY MR. SHKOLNIK:
8 Q. Was there a ceiling threshold
9 that you were looking at at that time?
10 A. This is prior to our ceiling
11 and creation of RX integrity.
12 (Walgreens-Mills Exhibit 26
13 marked for identification.)
14 QUESTIONS BY MR. SHKOLNIK:
15 Q. Exhibit 26. I'm going to show
16 you what's been marked as Exhibit 25 -- 26,
17 I'm sorry. This is an e-mail dated
18 September 21, 2017.
19 MR. HILL: Can you just hang on
20 one second? You gave us two different
21 ones.
22 MR. CIACCIO: Oh, let me see.
23 MR. HILL: Which one is it? Is
24 it the one that says "thank you, Mike"
25 at the top?

Page 373

1 MR. CIACCIO: No.
2 MR. SHKOLNIK: Thank you, be
3 well.
4 MR. CIACCIO: Thank you, be
5 well.
6 THE WITNESS: Sorry.
7 QUESTIONS BY MR. SHKOLNIK:
8 Q. This is an override request
9 from Store Number 10695. It appears to be
10 related to alprazolam and Vicodin. And the
11 response at the bottom of the page is, "We
12 are unable to submit a request online for an
13 override on these two medications because a
14 request for the same medications have been
15 submitted within the last seven days. I hope
16 you will review and consider our request."
17 And up at the top it seems to
18 be an e-mail from you that says, "Hello.
19 I've placed an order for both items below.
20 Please allow one to two business days to
21 receive."
22 Under what basis would you have
23 approved this override, other than -- I mean,
24 on what basis? It came in at 8:04, and it
25 looks like it was turned around -- I'm sorry,

Page 374

1 came in at 7:47 -- it doesn't make sense.
2     MR. CIACCIO: It's p.m.
3 QUESTIONS BY MR. SHKOLNIK:
4     Q.    p.m. It came in at 8:04 p.m.,
5 and it appears to be approved at 7:47 a.m.
6 the next day.
7     A.    What was your question?
8     Q.    On what basis was this
9 approved? There's nothing here.
10     MR. HILL: Object to the form.
11     THE WITNESS: It clearly states
12 we have currently have 11
13 prescriptions out of stock, meaning
14 they have zero in hand, and they have
15 11 patients waiting for this
16 medication to be filled, and they
17 always used extra care when dispensing
18 common medications, ensured no
19 prescription was dispensed early, and
20 we routinely check prescribers if
21 there's any duplication in therapy.
22 That, to me, is sufficient information
23 to go ahead and approve this override
24 form -- or this request for
25 alprazolam.

Page 375

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    The third one in seven days?
3     A.    Where does it say the third one
4 in seven days?
5     Q.    I'm sorry, my mistake.
6     "We're unable to submit a
7 request online for an override of these two
8 medications because a request for the same
9 medications have been submitted within the
10 last seven days."
11     So simply telling you that they
12 do a good job was enough for you to say, "All
13 right, I'm going to approve another one for
14 the same two medications"?
15     A.    This is not --
16     MR. HILL: Object to the form.
17     THE WITNESS: This is not
18 limited to what I only reviewed. I
19 would have reviewed the store's
20 dispensing and ordering history as
21 well to make that determination as
22 well.
23     (Walgreens-Mills Exhibit 27
24 marked for identification.)
25

Page 376

1 QUESTIONS BY MR. SHKOLNIK:
2     Q.    I'm handing you what's been
3 marked as Exhibit 27. It's an override -- it
4 appears to be an override request, if I'm not
5 mistaken. And we'll start at the bottom of
6 the second page.
7     "Are you looking for a quantity
8 by store or just an overall company increase
9 by number of units?
10     "Quantity by item by store
11 would be ideal."
12     So this is an e-mail from
13 AmerisourceBergen to Denman, Polster, a
14 couple other people and it's saying, "To
15 John's point, even if you apply the standard
16 factor by item by store, that would not
17 require significant special calculation or
18 estimates but would give us specificity we
19 need to show DEA if they ask for
20 justification, which is always done by item
21 by store." We.
22     Go up the chain. "All, please
23 read the chain. Putting in a safety stock
24 for HCP is the plan."
25     What is HCP?

Page 377

1     A.    Sorry, I'm starting from the
2 beginning because I have no basis of this
3 e-mail.
4     Q.    Okay. Let's start at the
5 beginning. That's fine.
6     You know what, I'm going to
7 withdraw it. We can skip this.
8     A.    Okay.
9     (Walgreens-Mills Exhibit 28
10 marked for identification.)
11 QUESTIONS BY MR. SHKOLNIK:
12     Q.    The next one is Exhibit 28.
13     I'm going to show you Exhibit
14 Number 28. This is something called GFD
15 audit for Store 2865, Modesto, California.
16     You want to take a moment to
17 take a look at this.
18     Can I ask you a question now?
19 Have you had a chance to look at it?
20     A.    Yeah.
21     Q.    If we start at the top, we have
22 Mr. Murray writing an e-mail to Tasha and
23 you're copied on it as well. And it says,
24 "Tasha and Sanjay, Cardinal continues to push
25 back on the store. Between the four stores

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1  in a .25 mile radius, they have dispensed
2  over a half a million hydrocodone 10/325s
3  since August 15, 2012, in 13 weeks."
4          Does that seem to be a little
5  out of the norm, half a million pills in 13
6  weeks from these four stores?
7          MR. HILL: Object to the form.
8          THE WITNESS: I don't know
9      where these stores are located within
10     a hospital network or, you know, pain
11     clinics or et cetera. I don't know.
12     I don't know.
13 QUESTIONS BY MR. SHKOLNIK:
14     Q.   We talked about Modesto,
15 California, before in another exhibit where
16 you had a map and you told -- I'm sorry,
17 someone said, "Well, why don't you just send
18 the prescriptions to the other stores in the
19 radius," and as I understand it, the .25 mile
20 radius is 2865, 5498, 2842 and 4331. This is
21 the area with over a half a million pills in
22 13 weeks, and that Cardinal was pushing back.
23         To your knowledge, did anyone
24 ever report these stores to the DEA as to
25 what was going on during that time frame?

Page 379

1      A.   Not to my knowledge.
2      Q.   "On top of that, 2865 is
3  intra-storing product from other stores in
4  the area on a weekly basis."
5      That's inappropriate, correct?
6          MR. HILL: Object to form.
7          THE WITNESS: I don't know.
8  QUESTIONS BY MR. SHKOLNIK:
9      Q.   Do you condone that?
10         MR. HILL: Same objection.
11         THE WITNESS: I don't want to
12     speculate what was happening at these
13     stores at that time.
14 QUESTIONS BY MR. SHKOLNIK:
15     Q.   Well, the speculation is that
16 they were -- it's not speculation to say
17 for -- these pills were distributing half a
18 million pills in 13 weeks. That's -- that's
19 a staggering number, is it not?
20         MR. HILL: Object to the form.
21         THE WITNESS: I don't know how
22     this data was presented or provided or
23     pulled. Not that I don't trust Denny,
24     but I don't know who provided that
25     data to him.

Page 380

1  QUESTIONS BY MR. SHKOLNIK:
2      Q.   Well, we know they were
3  intra-storing on a weekly basis. "We also
4  know," next line, "Cardinal has identified
5  orders for these stores as suspicious
6  order -- SOMs," suspicious orders, "on a
7  daily basis."
8          That's a flag, is it not?
9          MR. HILL: Object to the form.
10         THE WITNESS: According to
11     Cardinal, they have deemed that as a
12     flag.
13 QUESTIONS BY MR. SHKOLNIK:
14     Q.   Okay. So we have very high
15 numbers. We have intra-storing. We now have
16 a distributor that supplies your pharmacies
17 on a daily basis issuing SOMs for these
18 stores.
19         Do you think maybe someone
20 should have said, "DEA, we got a problem
21 here"?
22         MR. HILL: Object to the form.
23         THE WITNESS: I don't know.
24 QUESTIONS BY MR. SHKOLNIK:
25     Q.   "LP" --

Page 381

1          Who is LP?
2      A.   Loss prevention.
3      Q.   -- "has been informed of the
4  situation as there are large negative
5  inventory adjustments."
6          So that means there's a whole
7  bunch of pills just kind of disappearing from
8  the store, correct?
9          MR. HILL: Object to the form.
10         THE WITNESS: No, that's not at
11     all what that means.
12 QUESTIONS BY MR. SHKOLNIK:
13     Q.   They were having a problem with
14 expiring pills sitting on the shelf too long
15 and having to send them back to the
16 warehouse?
17     A.   There's multiple reasons why
18 you would need to make an inventory
19 adjustment.
20     Q.   Not a store that's running out
21 and taking pills from other stores. I mean,
22 the negative adjustment here is that pills
23 are disappearing, is it not, a fact? Is it
24 not a fact?
25         MR. HILL: Object to the form.

Page 382

1      THE WITNESS: No, that is not a
2   fact. There's multiple reasons why
3   there could be a negative adjustment
4   to the inventory.
5   QUESTIONS BY MR. SHKOLNIK:
6      Q.   Well, one of them could be the
7   fact that there's pilfering going on; pills
8   are disappearing in this high volume store.
9   That's one possibility.
10     A.   That's one opinion, yes.
11     Q.   And so that's November 2012,
12  just before you started in integrity.  And
13  then he says, "I'm at a loss for the next
14  steps." I'm at a loss.  "I know this is a
15  busy store, but the hydrocodone volume
16  presents a, quote, opportunity for further
17  investigation."
18     Well, would you agree with me,
19  sir, at the -- there's a possibility that
20  something should have been reported to the
21  DEA by your company --
22     MR. HILL:  Object to the form.
23  Foundation.
24  QUESTIONS BY MR. SHKOLNIK:
25     Q.   -- in 2012?

Page 383

1      A.   I can't speculate.  That was
2   not my -- my job at that point.
3      (Walgreens-Mills Exhibit 29
4   marked for identification.)
5   QUESTIONS BY MR. SHKOLNIK:
6      Q.   I'm going to mark the next
7   exhibit.
8      I'm going to show you
9   Exhibit 29 an e-mail chain from March
10  of 2016.  The top it's you're sending the
11  e-mail to Patricia Daugherty regarding a
12  prescriber issue, C. Morgan, McMinnville,
13  M-c-M-i-n-n-v-i-l-l-e.
14     If we go to the last page of
15  this and it's the e-mail from RXM 07075.
16  That would be a store, am I correct?
17     A.   Yes, that would be a store.
18     Q.   And he's saying -- or she's
19  saying it's an issue regarding a prescriber.
20  If we go to the last line, "I believe we are
21  far" past -- last paragraph, I'm sorry.
22     "I believe we are far past any
23  reasonable concerns with this office and
24  believe that we as WBA" --
25     What's WBA?

Page 384

1      A.   Walgreens Boots Alliance.
2      Q.   -- "needs to take steps to
3   insulate ourselves from the practice. We've
4   been told repeatedly to follow GFD practices
5   and just rely on that, but I firmly believe
6   this practice is a danger to the community
7   and needs to be blocked across the board from
8   any WBA pharmacy.  I fear some of these will
9   be filled in those eight counties that do not
10  understand the situation with this
11  prescriber."
12     And as I see it, you have an
13  e-mail -- there's an e-mail from integrity
14  and it's signed by Patty.  I'm assuming
15  that's Patty Daugherty responding to this
16  person.
17     "If you're not already aware,
18  our pharmacists need to follow GFD and still
19  take it script it {sic} script.  However, if
20  they're not following each script, they have
21  a right to refuse.  They just cannot make a
22  blanket statement to refuse and we cannot
23  block him yet.  We can probably add a comment
24  like 'follow GFD' in his prescriber record."
25     And then it goes on to say that

Page 385

1   Patty is writing to you to put in a comment
2   in his prescriber records as follow GFD.
3      Now, correct me if I am wrong,
4   the pharmacy is required to follow GFD even
5   if you don't put that in the prescriber's
6   folder, correct?
7      A.   Correct.
8      Q.   Why would you ever suggest it's
9   a good practice to put follow GFD when one of
10  your pharmacists has already prescribed -- I
11  mean, who has already recommended that he
12  should not be allowed to process scripts
13  through you?
14     MR. HILL:  Object to the form.
15     THE WITNESS:  I'm not a
16  pharmacist.  I don't know.  This was
17  Patty's decision.
18  QUESTIONS BY MR. SHKOLNIK:
19     Q.   Let's go to -- let's go to the
20  page number at 647.  So it's the second page
21  of the e-mail.
22     Let's talk about Dr. Charles
23  Dwight Morgan.  "Number one, he was paid a
24  visit by the DEA a few months ago."
25     That's a significant fact, is

Page 386

1 it not?
2    A.    It's a fact.
3    Q.    As part of your GFD, correct?
4    A.    It's a fact, yes.
5    Q.    "McMinnville Drug Center was
6 just audited and understood it was primarily
7 due to his prescriptions."
8         So that means your facility was
9 audited because of his prescriptions,
10 correct?
11        MR. HILL: Object to the form.
12        THE WITNESS: No, that's not
13 what it says.
14 QUESTIONS BY MR. SHKOLNIK:
15    Q.    What does it say?
16    A.    McMinnville Drug Center was
17 audited --
18    Q.    Oh, it's another local
19 pharmacy.
20    A.    That's -- I think that's his
21 clinic.
22    Q.    Oh.
23    A.    That's his last name.
24    Q.    Okay.  Well, number three, "no
25 pharmacy," that's capital, "no pharmacy in

Page 387

1 the county, Freds, Walmart, Sullivans,
2 Kroger, Webb's" -- Walmart wouldn't do it --
3 wouldn't fill -- "would not accept new
4 patients from his office due to allocation
5 concerns.  McMinnville Drug Center and Rite
6 Aid have given their patients a month to find
7 new pharmacies and will no longer fill any
8 prescriptions from him."
9         Number 5, he has started
10 including diagnosis codes on his scripts, but
11 they are often odd.  While his practice is
12 listed with the DEA as family practice,
13 obstetrics, he has started putting cancer as
14 the diagnosis in many of his patients."
15        Now, with that fact pattern, do
16 you think it was appropriate to simply put
17 "follow GFD" in his folder?
18        MR. HILL: Object to the form.
19        THE WITNESS: I'm only
20 following the guidance of my superior.
21 QUESTIONS BY MR. SHKOLNIK:
22    Q.    Tell me something.  If I
23 gave -- if I came to you and said, "I have a
24 doctor in Cleveland, and I want to find out
25 his prescribing history," is that something

Page 388

1 you in integrity could do in your computer
2 system?
3    A.    Yes.
4    Q.    We'd find notes like this if
5 there were any notes or comments and -- about
6 everything about that -- that prescriber
7 through Walgreens?
8    A.    If said comments would exist,
9 we could provide those comments.
10    Q.    Would you also have this
11 prescriber's prescription history in general,
12 not just through Walgreens, in that folder?
13    A.    What do you mean?
14    Q.    Did you have access to doctors'
15 prescribing records that weren't filled in
16 Walgreens?
17    A.    No.
18    Q.    So --
19    A.    Like are you referring to
20 different chains like Rite Aid, Walmart, CVS?
21    Q.    Yes.
22    A.    No.
23        (Walgreens-Mills Exhibit 30
24    marked for identification.)
25

Page 389

1 QUESTIONS BY MR. SHKOLNIK:
2    Q.    I'm just going to go -- the
3 last exhibit is 30, P-WAG-1114.  This is an
4 e-mail from Store 06243 to RX integrity.
5 It's a policy system.  The bottom of the
6 page, if we could go down there.
7         "We have a patient who
8 regularly receives C-II opiates from us who
9 was recently arrested on drug trafficking
10 charges according to the local news outlet.
11 What steps are we allowed to take at this
12 point if he presents with another
13 prescription?  Do we notify the physician of
14 the situation?  Can we refuse the GFD policy?
15 If the prescription meets GFD standards, are
16 we expected to continue dispensing?"
17        And there is an e-mail from
18 Patty to you, "I'll call them, but they can
19 notify the prescribed and should discuss with
20 the prescriber first before just refusing.
21 They may want to refuse after discussing, but
22 give the patient advanced notice before the
23 next fill so patient can find another
24 pharmacy."
25        Is this a policy at Walgreens

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1 in the integrity department, if you have
2 someone who has been arrested for drug
3 trafficking, obviously it relates to his
4 opioids, to give them a call and say, "Why
5 don't you go find another pharmacy so you can
6 fill your prescriptions there?"
7        Is that a standard practice at
8 Walgreens?
9        MR. HILL:  Object to form.
10 QUESTIONS BY MR. SHKOLNIK:
11    Q.    In 2016?
12        MR. HILL:  Object to the form.
13 Assumes facts.
14        THE WITNESS:  I don't know.
15 QUESTIONS BY MR. SHKOLNIK:
16    Q.    Would you condone this, sir?
17    A.    I can't speculate.  I'm not a
18 pharmacist.  I don't know the situation.
19    Q.    How about just generally
20 speaking, not as a pharmacist, do you think
21 it's appropriate to call up that patient and
22 go say, "find another pharmacist," rather
23 than report it or suggest maybe there could
24 be something wrong with the filling of the
25 prescription?

Page 391

1    A.    I don't know.
2        MR. SHKOLNIK:  Okay.  I have no
3 further questions.  Thank you for your
4 time.
5        MR. HILL:  I've got some
6 questions.
7        CROSS-EXAMINATION
8 QUESTIONS BY MR. HILL:
9    Q.    This is Hamilton Hill on behalf
10 of Walgreens.
11        Mr. Mills, Mr. Shkolnik just
12 asked you some questions about Exhibit 29,
13 which is this e-mail that's Bates labeled,
14 the last four digits are 646 to 648.
15        Do you recall that?
16    A.    Yes.
17    Q.    And do you recall that he said
18 that the only thing that you-all did at
19 Walgreens was put GFD in the script -- or in
20 the prescriber record.
21        Do you remember that?
22    A.    Yes.
23    Q.    If you'll come down to the
24 bottom of the first page of Exhibit 29, do
25 you see this response from Patty where she

Page 392

1 says in the last sentence, "We will send his
2 info over to our CMS office for review,
3 though."
4        Do you see that?
5    A.    I do.
6    Q.    What's the CMS office?
7    A.    That is our Walgreens internal
8 chief medical officer who would review the
9 prescribing practices of a certain
10 prescriber.
11    Q.    Is that part of your policy to
12 run those sorts of things by the CMS office?
13    A.    If there are concerns about
14 prescribing habits, there are certain -- our
15 team or the manager specifically may vet that
16 through the CMS office for review to make a
17 determination if we should continue filling
18 scripts from him.
19    Q.    If you could turn with me to
20 Exhibit 24, which is the exhibit he asked you
21 about a few minutes ago.  Once you get it,
22 find it.
23    A.    Okay.
24    Q.    Do you recall being asked about
25 Exhibit Number 24, this e-mail from

Page 393

1 August 2012, when you were in inventory, not
2 RX integrity?
3    A.    Yes, I do.
4    Q.    You recall that he asked you
5 what you did to approve this, and you said
6 there would have been some analysis and
7 review.
8        Do you recall that?
9    A.    Yes, I do.
10    Q.    He asked you about Satinder
11 Sandhu.
12        Do you remember that, Sandhu?
13    A.    Yes, I do remember -- recall.
14    Q.    And I'm sorry, this is actually
15 Exhibit Number 25.  I apologize for that.
16 He's the one with Mr. Sandhu on it.
17    A.    Okay.
18    Q.    If you come down, he asked you
19 who he was.
20        Do you remember?
21    A.    Yes.
22    Q.    If you come down about halfway
23 down the first page, it says, "Pharmacy
24 supervisor, Satinder Sandhu."
25        Do you see that?

Page 394

1    A.    Yes.
2    Q.    What is a pharmacy supervisor?
3    A.    The direct manager over the
4 store, pharmacy manager, direct supervisor.
5    Q.    So he supervises the pharmacy
6 staff?
7    A.    Yes.
8    Q.    And Mr. Shkolnik asked you a
9 few questions about some of the -- he read
10 some of the language on the second page of
11 Exhibit Number 25, but one thing he didn't
12 read was he didn't read that last bit that
13 says, "Pharmacy staff is following GFD
14 policy."
15        Do you see that, sir?
16    A.    I do see that.
17    Q.    What do you understand when you
18 see -- that to mean when you see a pharmacy
19 supervisor note that in the request back in
20 2012?
21    A.    That the pharmacy supervisor
22 has visited the store, has acknowledged the
23 store's following the correct policies and
24 procedures in place around good faith
25 dispensing.

Page 395

1    Q.    I would like to ask you about
2 Exhibit Number 28, which was an exhibit
3 Mr. Shkolnik just asked you about a few
4 moments ago.
5        Do you recall being asked about
6 Exhibit 28, which relates to some pharmacies
7 in Modesto, California?
8    A.    Yes.
9    Q.    Do you remember that he asked a
10 few questions like to your knowledge, did
11 anyone ever report these stores to the DEA as
12 to what was going on during that time frame,
13 and he said something like you should have
14 reported it to the DEA about this store.
15        Do you recall those questions?
16    A.    Yes.
17    Q.    Why don't we take a look at the
18 second page which he did not ask you about,
19 of this three-page e-mail.
20        At the bottom of -- actually,
21 in the middle, there's a section called,
22 "GFD-PDMP."
23        Do you see that?
24    A.    I do see that.
25    Q.    What's PDMP?

Page 396

1    A.    Prescription dispensing
2 monitoring program.
3    Q.    And if you notice the last
4 sentence it says, "The PDMP reports are often
5 included with refusal-to-fill faxes to the
6 DEA."
7        Do you see that?
8    A.    Yes, I do.
9    Q.    What are refusal-to-fill faxes
10 to the DEA?
11    A.    Those are prescriptions that
12 the store or the pharmacy manager has deemed
13 inappropriate and is refusing to fill based
14 on our good faith dispensing policy and
15 according to this e-mail, they are faxing
16 alongside of the refusal of the prescription
17 a copy of the patient's PDMP log to the DEA.
18    Q.    So when these stores are
19 refusing to fill certain prescriptions, they
20 are notifying the DEA of that, correct?
21    A.    Yes, they are notifying the
22 DEA.
23    Q.    And if you take a look at the
24 bottom of the page, which, again is, the page
25 that Mr. Shkolnik didn't ask you to read, it

Page 397

1 says, "GFD notification of the DEA."
2        Do you see that?
3    A.    Yes, I do.
4    Q.    Did he direct you to this
5 section when he was asking all those
6 questions about why didn't Walgreens talk to
7 the DEA about these stores?
8        Did he direct your attention to
9 that?
10    A.    I don't think so.
11    Q.    It says, "The store is
12 maintaining a log of all scripts sent to the
13 DEA, and they do have scripts they've sent in
14 as well as an explanation of why it was sent.
15 The store has three California file folders
16 full of scripts since our GFD policy was
17 updated.  The store sent enough reports that
18 the DEA actually came in to interview the
19 prescription manager."
20        Do you see that?
21    A.    Yes, I do.
22    Q.    Did Mr. Shkolnik let you know
23 that, in fact, the DEA had actually come in
24 and interviewed the prescription manager of
25 these stores?

Page 398

1    A.    No, he did not.
2    Q.    He also was asking you about
3  the number of pills that were coming out of
4  these various stores.
5        Do you remember that?  He said
6  "isn't that a lot of hydrocodone pills."
7        Do you recall those questions?
8    A.    Yes, I do.
9    Q.    If you turn to the second page
10 again, another section he didn't read, it
11 says -- the section at the top says "GFD
12 prescriber."
13       What does that mean?
14       Why would someone organize this
15 e-mail like that, if you know?
16   A.    I don't know why someone would
17 organize this.  I assume it's good faith
18 dispensing around the prescriber.
19   Q.    And if you come down to the
20 last sentence of that analysis, it says, "I
21 would like to add that this location is
22 within five miles of two hospitals, multiple
23 surgery centers, at least five large pain
24 clinics, and they are also used by the local
25 hospice since they compound pain medication

Page 399

1  and carry liquid morphine."
2        Do you see that?
3    A.    Yes, I do see that.
4    Q.    Given your experience, can you
5  see any reason why two hospitals, multiple
6  surgery centers, large pain clinics and a
7  hospice might need a lot of powerful pain
8  medicine?
9    A.    Yes.  They are seeing --
10 they're seeing a lot of patients who need
11 urgent care and need these legitimate
12 medications because they're in severe pain.
13   Q.    This morning Mr. Shkolnik asked
14 you a bunch of questions about what you knew
15 before you joined the RX integrity team in
16 2012.
17       Do you recall that general line
18 of questions?
19   A.    Yeah.
20   Q.    As you sit here today, do you
21 know all of the things that Walgreens did
22 regarding suspicious order monitoring and
23 ceiling limits and due diligence during the
24 time frame before you joined the RX integrity
25 group at the end of 2012?

Page 400

1    A.    No.
2    Q.    Mr. Shkolnik asked you a bunch
3  of questions about whether you were told by
4  others at Walgreens about diversion.
5        Do you remember some of those
6  questions this morning about diversion?
7    A.    Yes.
8    Q.    Do you have an understanding of
9  what diversion means?
10   A.    Yes.
11   Q.    What's your understanding?
12   A.    Not only does it mean pills
13 diverted from the store unlawfully through
14 employee pilfering, but it also means
15 diverting of controlled substance to illicit
16 uses.
17   Q.    And did you know that before
18 you arrived here today?
19   A.    Yes.
20   Q.    Now, earlier today, this
21 afternoon, I believe, Mr. Shkolnik asked you
22 about Exhibit Number 15, which was an exhibit
23 dated -- it was a set of e-mails from
24 January 3rd and January 4, 2013, between you
25 and Ms. Polster.

Page 401

1        Do you recall being asked about
2  Exhibit 15?
3    A.    Yes.
4    Q.    And Mr. Shkolnik was asking
5  about the fact that in this January 4 e-mail
6  you mentioned that some orders had been
7  shipped before you had a chance to evaluate
8  on the dashboard.
9        Do you remember that?
10   A.    Yes, I do.
11   Q.    Do you remember a few times he
12 said, "Hey, didn't you know by January 2013
13 the DEA and Walgreens had entered into a
14 settlement with Walgreens paying
15 $80 million"?
16       Do you recall that?
17   A.    I do recall him saying that.
18   Q.    Were you personally involved in
19 any of those discussions?
20   A.    No.
21   Q.    Were you aware that actually
22 the DEA settlement came about five or six
23 months after Exhibit 15 when Mr. Shkolnik was
24 representing that it actually had occurred
25 before the e-mails in January -- in

Page 402

1  Exhibit 15?
2      A.   No.
3          MR. HILL:  And, in fact, I
4  would like to take this opportunity to
5  object to Exhibit 6, which is this
6  large compilation exhibit.  You guys
7  have given us one that doesn't have
8  the signature pages or the dates on in
9  which we produced on October 26th,
10  about two weeks ago.  So this was an
11  incomplete document that we've now
12  come to realize -- if I can finish.
13          MR. SHKOLNIK:  Go ahead.
14          MR. HILL:  We'd ask that going
15  forward you actually use the exhibit
16  that has the signature pages, so
17  there's no more confusion on the
18  dates.
19          MR. SHKOLNIK:  There's no more
20  confusion.
21          MR. HILL:  Well, if you weren't
22  confused, why were you
23  misrepresenting?
24          MR. SHKOLNIK:  Why didn't you
25  object when it was used?

Page 403

1          MR. HILL:  I didn't know you
2  were going to misrepresent the date.
3          MR. SHKOLNIK:  Why wouldn't you
4  object when it was used?
5          MR. HILL:  Because I didn't
6  know you were going to misrepresent
7  the date.
8          MR. SHKOLNIK:  Because you want
9  to have a speech?
10          MR. HILL:  No, because you said
11  I couldn't.  I would have tried to
12  help, but you said I couldn't.
13          MR. SHKOLNIK:  No, you were
14  allowed to object any time you wanted.
15  You did a good job all day, especially
16  when you coached the witness.
17          MR. HILL:  Please, sir.  You
18  know -- you've said you're only
19  allowed to object to the form.
20          MR. SHKOLNIK:  Well, we're
21  having a conversation.
22  QUESTIONS BY MR. HILL:
23      Q.   Now, he asked you a bunch of
24  questions this afternoon about the law and
25  did certain things comply with the law.

Page 404

1          Are you a lawyer, sir?
2      A.   No.
3      Q.   Do you have legal training?
4      A.   No.
5      Q.   Are you in charge during your
6  job at Walgreens of determining the law or
7  sorting through the many different things the
8  DEA has said over the years or the
9  regulations as part of your job?
10      A.   No.
11      Q.   I want to ask you to look at
12  Exhibit 22 for a moment, sir.
13      A.   It seems to be the only one not
14  in order.  I have it.
15      Q.   Okay.  If you recall, this is
16  an e-mail relating to these -- some stores in
17  Modesto, California, that Mr. Shkolnik asked
18  you about earlier today.
19          Do you recall being asked about
20  Exhibit 22?
21      A.   Yes, I do.
22      Q.   And Mr. Shkolnik said "you may
23  have had a bad doctor in that area passing
24  pills."
25          Do you remember something like

Page 405

1  that?
2      A.   Yes, I do.
3      Q.   If you could turn with me to
4  the second page of Exhibit 22, which I don't
5  believe he showed you this part.  If you come
6  down a little bit from the top, it says,
7  "Store 5498 is a 24-hour pharmacy and in
8  close proximity to one trauma center, one
9  city hospital as well as two pain clinics and
10  serves two hospices."
11          Do you see that, sir?
12      A.   I do see that.
13      Q.   What's a hospice?
14      A.   That's an end-of-life care
15  facility.
16      Q.   A facility where people who are
17  terminally ill and are going to pass away go?
18      A.   Yes.
19      Q.   Why would someone in hospice
20  need powerful pain medicine?
21      A.   To keep them comfortable in
22  their remaining time.
23      Q.   It also says, "This pharmacy is
24  near a trauma center."
25          What's a trauma center?

Page 406

1   A.   A center that performs
2   surgeries; so, you know, car accidents,
3   gunshots, severe -- severe trauma would --
4   would constitute that.
5   Q.   Would people who are suffering
6   severe trauma have the need for powerful pain
7   medication?
8   A.   Yes, they -- they may need a
9   powerful pain medication to get them through
10  the surgery.
11  Q.   And a hospital, are there
12  people at hospitals in your experience that
13  could use powerful pain medication?
14  A.   Yes.
15      MR. HILL:  Okay.  I don't have
16  any other questions, sir.
17      REDIRECT EXAMINATION
18  QUESTIONS BY MR. SHKOLNIK:
19  Q.   Just one quick question.
20      Was that Walgreens supplying
21  that hospital, that trauma center?
22      MR. HILL:  Object to the form.
23      THE WITNESS:  It says they are
24  close proximity to the trauma center,
25  hospital, two pain clinics.

Page 407

1   QUESTIONS BY MR. SHKOLNIK:
2   Q.   I get it.
3       Was that Walgreens supplying
4   the trauma center?
5   A.   I don't know that to be true.
6   Q.   Was that Walgreens supplying
7   the hospice?
8   A.   I don't know.  It's just the
9   closest pharmacy to those locations.
10  Q.   The fact that it's near a
11  hospital does not excuse a pharmacy from
12  inappropriate distribution; is that a fair
13  statement?
14  A.   We would need to look at the
15  data to see where the prescriptions were
16  coming from in that store.
17  Q.   If the hospital had a pain
18  management doctor that was inappropriately
19  prescribing prescriptions, the fact that he
20  was at a -- at or near a hospital would not
21  be an excuse for prescriptions being filled
22  at Walgreens, is it?
23  A.   All prescriptions are verified
24  with GFD prior to fill.
25  Q.   My question is:  The mere fact

Page 408

1   that it's near a hospital, it's near a
2   hospice, it's near a medical center, it's
3   near a trauma center, is not an excuse for
4   inappropriately filling any prescription;
5   fair statement?
6   A.   I don't know how to answer
7   that.
8   Q.   It's very simple.  It's not an
9   excuse, is it?
10      MR. HILL:  Object to the form.
11      THE WITNESS:  These are
12  patients that need these medications,
13  right?  So they're --
14  QUESTIONS BY MR. SHKOLNIK:
15  Q.   We don't know that.  You don't
16  know that just because they're near a
17  hospital.
18  A.   Because they're in hospice?
19  Q.   No.  No.  Because they're near
20  a hospital?
21  A.   They're also near hospice.  We
22  don't know that the hospital prescriptions
23  are the only driving factor here.  We know
24  that they're located next to a trauma center,
25  a hospice, a hospital.  There are pain

Page 409

1   clinics.  They're around or in the vicinity
2   of all of these locations.  You just can't
3   say blankelty it's the hospital, and the
4   hospital has a bad prescriber, so we should
5   just refuse.
6   Q.   Okay.  I didn't suggest that.
7       The mere fact that you're near
8   a hospital does not mean that the
9   prescriptions you're filling are appropriate?
10      MR. HILL:  Object to the form.
11      THE WITNESS:  I don't know that
12  to be true.
13  QUESTIONS BY MR. SHKOLNIK:
14  Q.   And you don't know whether or
15  not your -- well, let me withdraw that.
16      When a patient is in a hospice,
17  in the hospice, is the local Walgreens store
18  the supplier to the hospital's hospice for
19  that inpatient that's living in there?
20  A.   Yes, we can be.
21  Q.   Do you know if the one counsel
22  just pointed to was one of those?
23  A.   I don't know what -- I don't
24  have enough data in front of me to make that
25  determination.

Page 410

1    Q.    So when you asked you the
2  questions that, well, it happens to be a near
3  hospital, a trauma center or a hospice, you
4  have no idea if that store was supplying that
5  center for those drugs?
6    A.    With the data in front of me, I
7  cannot confirm that.
8        MR. SHKOLNIK:  Thank you.
9      RECROSS-EXAMINATION
10  QUESTIONS BY MR. HILL:
11    Q.    And just a quick follow-up.
12        When Mr. Shkolnik was claiming
13  that there were bad doctors just pushing
14  pills, did you see anything in that document
15  that he showed you that would support that?
16    A.    No.
17        MR. HILL:  Thank you.  No
18  further questions.
19        VIDEOGRAPHER:  We're going off
20  the record at 6:06 p.m.
21  (Deposition concluded at 6:06 p.m.)
22        - - - - - - -
23
24
25

Page 412

1    INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8        After doing so, please sign the
9  errata sheet and date it.  You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13        It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25

Page 411

1      CERTIFICATE
2
3        I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
5  of the examination, Steven Mills was duly
   sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7        I DO FURTHER CERTIFY that the
8  foregoing is a verbatim transcript of the
   testimony as taken stenographically by and
9  before me at the time, place and on the date
   hereinbefore set forth, to the best of my
10  ability.

11        I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
12  nor counsel of any of the parties to this
   action, and that I am neither a relative nor
13  employee of such attorney or counsel, and
   that I am not financially interested in the
   action.
14
15
16
17  _____
   CARRIE A. CAMPBELL,
18  NCRA Registered Diplomate Reporter
   Certified Realtime Reporter
19  California Certified Shorthand
   Notary Public
   Dated:  November 12, 2018
20
21
22
23
24
25

Page 413

1    ACKNOWLEDGMENT OF DEPONENT
2
3
4      I,_____, do
   hereby certify that I have read the foregoing
5  pages and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9
10
11
12  _____
   Steven Mills          DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
25

Page 414

```
1        _ _ _ _ _ _ _
              ERRATA
2        _ _ _ _ _ _ _
3   PAGE  LINE  CHANGE/REASON
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25
```

Page 415

```
1        _ _ _ _ _ _ _
           LAWYER'S NOTES
2        _ _ _ _ _ _ _
3   PAGE  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25
```