```
 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                     EASTERN DIVISION

 3   IN RE:  NATIONAL        :  MDL No. 2804

     PRESCRIPTION OPIATE     :

 4   LITIGATION              :  Case No. 17-md-2804

                            :

 5   APPLIES TO ALL CASES    :  Hon. Dan A. Polster

                            :

 6                          :

 7

 8                   HIGHLY CONFIDENTIAL

 9       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                    - - - -

12                 DECEMBER 20, 2018

13                    - - - -

14    VIDEOTAPED DEPOSITION OF JOSEPH EDWARD MILLWARD,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on

20   Thursday, December 20, 2018, commencing at 9:07 a.m.

21                    - - - -

22             GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

23                 deps@golkow.com

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

| Page 2 |
| --- |

```
 1              A P P E A R A N C E S
 2  On behalf of Plaintiffs
 3     WAGSTAFF & CARTMELL, LLP
       BY:  TYLER W. HUDSON, ESQUIRE
 4          ERIC D. BARTON, ESQUIRE
       4740 Grand Avenue, Suite 300
 5     Kansas City, Missouri  64112
       816.701.1100
 6     thudson@wcllp.com
       ebarton@wcllp.com
 7
 8  On behalf of Defendant AmerisourceBergen Drug
    Corporation
 9
       REED SMITH, LLP
10     BY:  LOUIS W. SCHACK, ESQUIRE
       Three Logan Square
11     1717 Arch Street, Suite 3100
       Philadelphia, Pennsylvania  19103
12     215.851.8280
       lschack@reedsmith.com
13
14  On behalf of Defendant Cardinal Health, Inc.
15     PIETRAGALLO GORDON ALFANO BOSICK &
       RASPANTI, LLP
16     BY:  JOHN A. SCHWAB, ESQUIRE
            ADAM J. TRAGONE, ESQUIRE
17     One Oxford Centre, 38th Floor
       301 Grant Street
18     Pittsburgh, Pennsylvania  15219
       412.263.2000
19     jas@pietragallo.com
       ajt@piegragallo.com
20
21  On behalf of Defendants Endo Pharmaceuticals, Endo
    Health Solutions and Par Pharmaceuticals
22     (By phone/Livestream)
       ARNOLD & PORTER KAYE SCHOLER LLP
23     BY:  ERIC SHAPLAND, ESQUIRE
       777 South Figueroa Street
24     Los Angeles, California  90017-5844
       213.242.4000
25     eshapland@arnoldporter.com
```

| Page 3 |
| --- |

```
 1          A P P E A R A N C E S (Continued)
 2  On behalf of Defendant HBC Service Company
 3     MARCUS & SHAPIRA, LLP
       BY:  JOSHUA KOBRIN, ESQUIRE
 4          ROBERT BARNES, ESQUIRE
       One Oxford Centre, 35th Floor
 5     Pittsburgh, Pennsylvania  15219
       412.471.3490
 6     jkobrin@marcus-shapira.com
       rbarnes@marcus-shapira.com
 7
 8  On behalf of Defendant McKesson Corporation
 9     COVINGTON & BURLING, LLP
       BY:  AMBER CHARLES, ESQUIRE
10     One CityCenter
       850 Tenth Street, NW
11     Washington, DC  20001-4956
       202.662.5807
12     acharles@cov.com
13
    On behalf of Defendant Walmart
14
       (By phone/Livestream)
15     JONES DAY
       BY:  PATRICIA OCHMAN, ESQUIRE
16     North Point
       901 Lakeside Avenue
17     Cleveland, Ohio  44114-1190
       216.586.3939
18     pochman@jonesday.com
19
    Also present
20
       Chris Ratano, videographer
21
22
23
24
25
```

| Page 4 |
| --- |

```
 1                    * I N D E X *
 2  JOSEPH E. MILLWARD              PAGE
 3   EXAMINATION BY MR. HUDSON      9, 269, 276
     EXAMINATION BY MR. KOBRIN       257, 275
 4
 5   * INDEX OF HBC-MILLWARD EXHIBITS *
 6  NO.        DESCRIPTION          PAGE
    Exhibit 1  Giant Eagle Retail Operations -    45
 7             Pharmacy Operations 11/13/14
               org chart
 8             HBC_MDL00002216
 9  Exhibit 2  CFR Part 1301.74 from DEA website   72
               P1.47 - P1.47.2
10
    Exhibit 3  DEA Dear Registrant 6/12/12,       107
11             12/27/07, 2/7/07, 9/27/06 letters
               ABDCMDL00269683 - 00269694
12
    Exhibit 4  HBC Service Company's Responses to  127
13             Plaintiffs' (First) Set of Combined
               Discovery Requests
14             P-HBC-0011 - 0011.20
15  Exhibit 5  Giant Eagle Inventory Control -     127
               Suspicious Order Policies with
16             various effective dates
               HBC_MDL00078638 - 00078639
17             HBC_MDL00078636 - 00078637
               HBC_MDL00045916 - 00078918
18             HBC_MDL00051908
               HBC_MDL00043414
19             HBC_MDL00010092 - 00010093
20  Exhibit 6  DEA Hydrocodone Drug Fact Sheet     153
               P-GEN-0086 - 0086.2
21
    Exhibit 7  2006 - 2014 cumulative totals of    157
22             hydrocodone dosage units shipped
               to Cuyahoga and Summit Counties, Ohio
23             P-HBC-0017
24  Exhibit 8  Data of shipments from HBC into     157
               retail pharmacies in Summit County
25             HBC_MDL00002099
```

| Page 5 |
| --- |

```
 1   * INDEX OF HBC-MILLWARD EXHIBITS (Continued) *
 2  NO.        DESCRIPTION          PAGE
    Exhibit 9  Data of shipments from HBC into     157
 3             retail pharmacies in Cuyahoga County
               HBC-MDL00002100
 4
    Exhibit 10  20131030_Daily_HBC_Controls        177
 5              HBC_MDL00002348
    Exhibit 11  20131129_Daily_HBC_Controls        177
 6              HBC_MDL00002646
 7
    Exhibit 12  20131229_Daily_HBC_Controls        177
 8              HBC_MDL00002246
 9  Exhibit 13  20140130_Daily_HBC_Controls        177
                HBC_MDL00002459
10
    Exhibit 14  20140227_Daily_HBC_Controls        177
11              HBC_MDL00002837
    Exhibit 15  20140330_Daily_HBC_Controls        177
12              HBC_MDL00002336
13
    Exhibit 16  20140429_Daily_HBC_Controls        177
14              HBC_MDL00002627
15  Exhibit 17  20140530_Daily_HBC_Controls        177
                HBC_MDL00002244
16
    Exhibit 18  20140629_Daily_HBC_Controls        177
17              HBC_MDL00002437
18  Exhibit 19  20140730_Daily_HBC_Controls        177
                HBC_MDL00002843
19
    Exhibit 20  20140828_Daily_HBC_Controls        177
20              HBC_MDL00002332
21  Exhibit 21  20140929_Daily_HBC_Controls        177
                HBC_MDL00002700
22
    Exhibit 22  Email chain, 11/25/13, from T.     181
23              Roahrig to J. Millward, subject: FW:
                Daily HBC Suspicious Purchasing
24              Report
                HBC_MDL00094599 - 00094600
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1    * INDEX OF HBC-MILLWARD EXHIBITS (Continued) *
2   NO.         DESCRIPTION              PAGE
    Exhibit 23  Email chain, 1/10/14, from T.        181
3              Roahrig to J. Millward, subject: RE:
               Daily HBC Suspicious Purchasing
4              Report - 01/09/14
               HBC_MDL00039223
5
    Exhibit 24  Email chain, 8/23/14, from J. Cornwell to  192
6              P. Raub, et al., subject:
               Order_item_Blocking_5-Dec_13.docx,
7              SuspiciousReporting.sql
               HBC_MDL00086642 - 00086644
8
    Exhibit 25  Email chain, 8/20/15, from G.        212
9              Carlson to J. Jenson, et al., subject
               FW: Thrifty White Notes, attaching
10             Thrifty White Notes
               HBC_MDL00069566 - 00069571
11
    Exhibit 26  Email, 11/13/15, from G. Chunderlik  218
12             to J. Millward, subject: Central
               Signer Procedures, attaching CSOS_
13             Central Signer SOPs.ppt
               HBC_MDL00004646
14
    Exhibit 27  Email, 11/13/15, from J. Millward    221
15             to R. McClune, subject: Notes for
               Purdue Order Monitoring System.docx,
16             attaching notes from Purdue SOM call
               HBC_MDL00028405 - 00028407
17
    Exhibit 28  Email, 11/16/15, from J. Millward    222
18             to P. Raub, et al., subject: SOM
               and Controlled drug monitoring,
19             attaching 2013
               HBC_MDL00004996 - 00004998
20
    Exhibit 29  Email  chain, 12/15/15, from G.      228
21             Chunderlik to J. Millward, subject:
22             FW: DEA Questionnaire, attaching
               Amneal DEA Questionnaire.doc
               HBC_MDL00029194 - 00029198
23
24
25

Page 7

1    * INDEX OF HBC-MILLWARD EXHIBITS (Continued) *
2   NO.         DESCRIPTION              PAGE
    Exhibit 30  Email, 12/2/15, from J. Millward     230
3              to G. Chunderlik, et al., subject:
               Order Monitoring System Policy and
4              Procedures.docx, attaching subject
               document
5              HBC_MDL00028717 - 00028721
6   Exhibit 31  Email, 12/3/15, from J. Millward     230
               to G. Chunderlik, et al., subject:
7              Order Monitoring System Policy and
               Procedures.docx, attaching subject
8              document
               HBC_MDL00056199 - 00056203
9
    Exhibit 32  Email chain, 11/16/15, from J.       269
10             Millward to J. Lazzaro, subject:
               RE: Access to Data Warehouse
11             HBC_MDL00092010 - 00092011
12
13             ----
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1            P R O C E E D I N G S
2               - - - -
3       THE VIDEOGRAPHER:  We are now on the
4   record.  My name is Chris Ratano.  I'm the
5   videographer for Golkow Litigation Services.
6   Today's date is December 20, 2018, and the time is
7   approximately 9:07.
8       This video deposition is being held in
9   Pittsburgh, PA at Marcus & Shapira, LLP, One
10  Oxford Centre, 35th Floor, in the matter of
11  National Prescription Opiate Litigation,
12  MDL No. 2804, Case No. 17-md-2804, United States
13  District Court, Northern District of Ohio, Eastern
14  Division.
15      The deponent today is Joseph Millward.
16      Will counsel please identify themselves for
17  the record.
18      MR. HUDSON:  Ty Hudson of Wagstaff &
19  Cartmell for plaintiffs.
20      MR. BARTON:  Eric Barton, Wagstaff &
21  Cartmell, for the plaintiffs.
22      MR. SCHACK:  Lou Schack from Reed Smith
23  for AmerisourceBergen.
24      MR. SCHWAB:  Tom Schwab from
25  Pietragallo.  I represent Cardinal Health.

Page 9

1       MS. CHARLES:  Amber Charles from
2   Covington & Burling representing McKesson
3   Corporation.
4       MR. BARNES:  Robert Barnes, Marcus &
5   Shapira, HBC.
6       MR. KOBRIN:  Joshua Kobrin from Marcus &
7   Shapira.  I also represent HBC.
8       THE VIDEOGRAPHER:  The court reporter
9   today is Ann Medis, and she will now please swear
10  in the witness.
11          JOSEPH E. MILLWARD,
12      having been first duly sworn, was examined
13          and testified as follows:
14             EXAMINATION
15  BY MR. HUDSON:
16      Q.  Good morning, sir.  Could you please
17  state your name for the record.
18      A.  Joseph Edward Millward.
19      Q.  And, Mr. Millward, my name is Ty Hudson,
20  and I represent several of the plaintiffs in this
21  matter.
22      Where do you currently reside?
23      A.  Erie, Pennsylvania.
24      Q.  And you are a former employee of Giant
25  Eagle?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1   A.   I am.
2   Q.   And Giant Eagle owns HBC Service
3 Company; is that right?
4   A.   Correct.
5   Q.   And are you represented by counsel here
6 today?
7   A.   I am.
8   Q.   And are Mr. Barnes and Josh your
9 attorneys?
10   A.   Yes, they are.
11       MR. HUDSON:  And, Josh, I apologize for
12 mispronouncing your last name.
13 BY MR. HUDSON:
14   Q.   And are they paying for your services
15 here today or is HBC?
16   A.   HBC.
17   Q.   Have you had your deposition taken
18 before?
19   A.   Yes.
20   Q.   How many times?
21   A.   Once.
22   Q.   And what was the subject matter of the
23 litigation?
24   A.   It was an employment matter.
25   Q.   Were you a party to the matter?

Page 11

1   A.   Yes.
2   Q.   Personally, or was Giant Eagle a party
3 to the matter?
4   A.   Giant Eagle was a party.
5   Q.   So you weren't personally named in the
6 lawsuit?
7   A.   Oh, correct; correct.  I'm sorry.
8   Q.   No problem.  I just want to make sure
9 we're on the same page.
10       Well, for this deposition, let's just make
11 sure that we've got the ground rules.  I know
12 you've gone through this once before, but just to
13 be sure.
14       I'm going to be asking questions.  You're
15 going to be providing answers.  I would ask,
16 unless your counsel instructs you not to answer,
17 that you answer my questions.
18       Is that fair?
19   A.   Understood.
20   Q.   Second, you are under oath as if we were
21 in a courtroom in front of a judge and a jury.
22       Do you understand that?
23   A.   I do.
24   Q.   And if you answer my question, I'm going
25 to assume that you understand it.  A different way

Page 12

1 to say that is:  If you don't understand my
2 question, will you just let me know so I can
3 rephrase it?
4   A.   Absolutely.
5   Q.   And you're doing a good job of this, but
6 the court reporter needs to take down audible
7 answers.
8       So you know that; right?
9   A.   I understand.
10   Q.   And, lastly, if you need to take a break
11 at any time, just let me know, and we'll go off
12 the record.  All I would ask is that you answer
13 any pending questions.
14       Is that fair?
15   A.   Understood.
16   Q.   You graduated from the University of
17 Pennsylvania School of Pharmacy; is that right?
18   A.   University of Pittsburgh.
19   Q.   University of Pittsburgh -- I'm sorry --
20   A.   Yeah.
21   Q.   -- School of Pharmacy?  And that was in
22 1995?
23   A.   That is correct.
24   Q.   Any postgraduate work?
25   A.   No.

Page 13

1   Q.   What did you do after you graduated from
2 pharmacy school?
3   A.   I worked for a company called Option
4 Care, which was a home infusion pharmacy, in
5 Johnstown, Pennsylvania.
6   Q.   What does home infusion pharmacy mean?
7   A.   So at the pharmacy we would do home
8 intravenous therapy.  So facilitating earlier
9 discharges out of the hospital for patients to
10 finish their IV antibiotic, IV chemotherapy, total
11 parenteral nutrition, pain management, hydration,
12 all intravenous, working with nurses employed or
13 nursing agencies.
14   Q.   And how long were you with that company?
15   A.   From '95 to 1997.
16   Q.   And what was your role?
17   A.   I was the pharmacist and then pharmacy
18 manager.
19   Q.   Did you deal with controlled substances
20 in that role?
21   A.   Yes, we did.
22   Q.   Did you have any training or
23 experience -- did you obtain any training in that
24 role with complying with the Controlled Substances
25 Act?

Page 14

1    A.   The training was through pharmacy school
2  and our law classes to prepare us for meeting the
3  regulatory requirements.
4    Q.   In part of your schooling, did you cover
5  the Controlled Substances Act?
6    A.   We certainly did.
7    Q.   Did you cover the Controlled Substances
8  Act provisions that relate to manufacturers,
9  distributors, or dispensers?
10   A.   We covered the Controlled Substances Act
11 in its full scope as part of it.
12   Q.   Was the focus on the obligations of
13 pharmacists?
14   A.   You're going way back.  So I would say
15 it covered the Act focused with pharmacy's role,
16 certainly.
17   Q.   Did you take any business classes in
18 pharmacy school that focused on the requirements
19 of manufacturers or distributors under the
20 Controlled Substances Act?
21       MR. KOBRIN:  Object to form.
22       THE WITNESS:  No.
23 BY MR. HUDSON:
24   Q.   In 1997, you left that company; right?
25   A.   Correct.

Page 15

1    Q.   What did you do next?
2    A.   I married a girl from Erie and relocated
3  to Erie, Pennsylvania, Fairview actually, and
4  started working as a pharmacy manager at a
5  Rite-Aid pharmacy.
6    Q.   And that was a -- that was a Rite-Aid
7  pharmacy in Erie, Pennsylvania?
8    A.   Union City was the actual town, just a
9  little town outside of Erie.
10   Q.   And how long did you work at that
11 pharmacy?
12   A.   Until about 1999.  And then I was
13 transferred into a Rite-Aid store in Erie.
14   Q.   And then how long did you stay at that
15 store?
16   A.   Until 2001, approximately September.
17   Q.   So from 1997 to 1999, was your role as a
18 pharmacist at a particular pharmacy?
19   A.   Correct.
20   Q.   And then from 1999 to 2001, was your
21 role, again, as a pharmacist at a particular
22 pharmacy?
23   A.   It was.
24   Q.   And then in 2001, what was your new
25 role?

Page 16

1    A.   I was promoted to pharmacy district
2  manager.
3    Q.   And how long did you remain in that
4  role?
5    A.   Until approximately September 2006.
6    Q.   And what happened in September 2006?
7    A.   I was promoted to district manager.
8    Q.   And how long did you stay in the role as
9  district manager?
10   A.   Until I left Rite-Aid, December of 2007.
11   Q.   So if we go back to the 2001 to 2006
12 time period, describe for me what your role was as
13 a pharmacy district manager for Rite-Aid.
14   A.   So as a pharmacy district manager for
15 Rite-Aid, I had responsibility for the pharmacy
16 P & L, pharmacy operations of the 24 to 26
17 Rite-Aid locations that were in my district,
18 involving training, making sure that they were
19 executing to company standards and adhering to
20 policies and procedures.
21   Q.   In your role as a pharmacy district
22 manager, did you have any responsibility for
23 designing or creating policies or procedures?
24   A.   No.
25   Q.   Did you have -- in your role as pharmacy

Page 17

1  district manager, did you play any role in
2  adhering to the requirements of the suspicious
3  order monitoring requirements of the Controlled
4  Substances Act?
5        MR. KOBRIN:  Object to form.
6        THE WITNESS:  The -- from the suspicious
7  order monitoring, no.  That would have been
8  handled at the distribution level, not the retail
9  level.
10 BY MR. HUDSON:
11   Q.   In your role as a pharmacy district
12 manager at Rite-Aid, did you have any knowledge of
13 the requirements of the suspicious order
14 monitoring system, any of those requirements under
15 the Controlled Substances Act?
16       MR. KOBRIN:  Object to form.
17       THE WITNESS:  Can you be more specific,
18 please?
19 BY MR. HUDSON:
20   Q.   Sure.  In your role as a pharmacy
21 district manager, did you understand that the
22 Controlled Substances Act included specific
23 requirements for manufacturers and distributors to
24 monitor suspicious orders of controlled
25 substances?

Page 18

1    MR. KOBRIN: Object to form.
2    THE WITNESS: That was covered in
3 pharmacy school in the -- in the law class, as
4 stated previously.
5    In the day-to-day operation, the role of the
6 pharmacy district manager was execution of the --
7 making sure the individual pharmacies were
8 compliant with the rules and regulations under the
9 Controlled Substances Act, as well as the state
10 boards of pharmacy.
11 BY MR. HUDSON:
12    Q.  In your role though as the pharmacy
13 district manager, did you gain any knowledge about
14 the requirements for distributors to monitor
15 suspicious orders under the Controlled Substances
16 Act?
17    MR. KOBRIN: Object to form.
18    THE WITNESS: As a pharmacy district
19 manager, no. That was not in play.
20 BY MR. HUDSON:
21    Q.  And did you gain any knowledge as a
22 district manager?
23    A.  No.
24    Q.  So is it fair to say that when you left
25 Rite-Aid in 200- -- December of 2007, any

Page 19

1 knowledge that you had about the requirements for
2 distributors in terms of monitoring suspicious
3 orders under the Controlled Substances Act was
4 acquired while in pharmacy school or law classes?
5    MR. KOBRIN: Object to form.
6    THE WITNESS: Correct. As it was not
7 part of the job requirement, did not deal with
8 that aspect.
9 BY MR. HUDSON:
10    Q.  Let's talk then more specifically about
11 what knowledge you acquired in pharmacy school and
12 law classes about suspicious order monitoring
13 system requirements.
14    Can you be more specific about the knowledge
15 that you gained?
16    MR. KOBRIN: Object to form.
17    THE WITNESS: We would have covered or
18 we did cover the Controlled Substances Act as part
19 of the curriculum.
20 BY MR. HUDSON:
21    Q.  Can you recall any specific classes that
22 you took that did a deeper dive specific to the
23 requirements of distributors under the Controlled
24 Substances Act to monitor suspicious orders?
25    MR. KOBRIN: Object to form.

Page 20

1    THE WITNESS: There were no specific
2 classes to that curriculum, to that part, unique
3 to that.
4 BY MR. HUDSON:
5    Q.  As you sit here today, can you
6 describe -- and I know it's difficult because it's
7 been a number of years.
8    But can you describe what you understood from
9 pharmacy school and your law classes about the
10 requirements of distributors to monitor suspicious
11 orders under the Controlled Substances Act?
12    MR. KOBRIN: Are you asking what he
13 understood --
14    THE WITNESS: 23 years ago?
15    MR. KOBRIN: -- during that time or
16 today?
17    MR. HUDSON: Right.
18 BY MR. HUDSON:
19    Q.  As you exited pharmacy school, do you
20 have any recollection of what you understood in
21 terms of the requirements of a distributor to
22 monitor suspicious orders under the Controlled
23 Substances Act?
24    MR. KOBRIN: Object to form.
25    THE WITNESS: I don't have specific

Page 21

1 recollection of that from 24 years ago.
2 BY MR. HUDSON:
3    Q.  I understand.
4    And to the best of your recollection, do you
5 have any memory of taking any classes that went
6 into any of the specifics of what was required of
7 distributors to monitor suspicious orders of
8 controlled substances?
9    MR. KOBRIN: Object to form.
10    THE WITNESS: There were no specific
11 classes distributor-focused.
12 BY MR. HUDSON:
13    Q.  Then in December of 2007, did you leave
14 Rite-Aid to join Giant Eagle?
15    A.  I did.
16    Q.  And at Giant Eagle, what role did you
17 assume?
18    A.  Pharmacy district leader.
19    Q.  And at that time, was Giant Eagle a
20 regional supermarket chain?
21    A.  Yes.
22    Q.  And just describe, if you could, what
23 your role was as a pharmacy district leader.
24    A.  The role was parallel to the role at
25 Rite-Aid in that, again, responsible for the

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 pharmacy profit and loss; for the execution of
2 initiatives; making sure the pharmacies were
3 compliant through audit checks of whether it was
4 state board or DEA; responsible for the
5 recruiting, on-boarding and training plans for
6 pharmacists and supporting them in what other
7 issues that they needed.
8     Q.   And you remained in your role as a
9 pharmacy district leader for about three years, a
10 little less than three years?
11    A.   A little less, correct.
12    Q.   December of 2007 to October of 2010?
13    A.   Correct.
14    Q.   Does that sound right?
15    A.   That is correct.
16    Q.   What district did you cover?
17    A.   My district was Youngstown to -- in
18 Ohio.  So I had stores in Youngstown, Austintown,
19 north to as far west as Madison, Ohio, east
20 through Erie, and across Interstate 80 to DuBois
21 would probably be the -- DuBois, Pennsylvania --
22 the furthest east.
23    Q.   Did you cover all of the pharmacies that
24 were located in Ohio?
25    A.   No; just that subset.

Page 23

1     Q.   What other districts were located in
2 Ohio at that time, if you can recall, or how many
3 other pharmacy district leaders were there that
4 covered stores in Ohio at that time?
5     A.   Sure.  There were three other pharmacy
6 district leaders in Ohio and three other in
7 Pennsylvania.
8     Q.   So seven total pharmacy district leaders
9 at that time?
10    A.   Correct.
11    Q.   And did that change between when you
12 started in 2007 and then shifted roles towards the
13 end of 2010?
14    A.   I believe seven was maintained.
15    Q.   And how many pharmacists reported to you
16 in your district?
17    A.   I don't remember the exact number.
18    Q.   Any ballpark?
19    A.   Approximately 24 stores.  But the exact
20 number of pharmacists, I don't remember.
21    Q.   Is there sort of an average or what's
22 typical of how many pharmacists were in each
23 store?
24    A.   So part of Rite-Aid, the stores that I
25 had had between two pharmacists to four full-time

Page 24

1 pharmacists.  So counting part-timers, it may be
2 closer to -- it works out -- let me do the math
3 real quick.  It's early.  Maybe 90.
4     Q.   90 to a hundred?
5     A.   Yeah.  Yeah.  Ballpark it.
6     Q.   Sure.  At the time you were a pharmacy
7 district leader, to whom at Giant Eagle did you
8 report?
9     A.   I reported to Anthony Mollica.
10    Q.   What was his title?
11    A.   He was the vice president of pharmacy
12 operations, I believe, although his role -- his
13 title then may have been different.  It may have
14 changed.
15    Q.   And was that true for the three, little
16 less than three years that you were pharmacy
17 district leader the entire time that you reported
18 to Mr. Mollica?
19    A.   I did.
20    Q.   Did he at some point leave Giant Aid --
21 I mean Giant Eagle?  Combining Rite-Aid...
22    A.   Yes; yes, he did.
23    Q.   And do you know when that occurred?
24    A.   I don't know the exact day or exact day
25 or month.  In ballpark, it was maybe '14-ish, '13,

Page 25

1 '14.  I don't recall off the tiptop of my head.
2     Q.   Sure.  Do you recall who replaced him?
3     A.   Ultimately, it was Greg Carlson, was
4 named as the vice president of pharmacy
5 operations.
6     Q.   And to the best of your recollection,
7 that was in 2014?
8     A.   Yeah.  Actually, 2014 sounds about
9 right.
10    Q.   At the time that you were a pharmacy
11 district leader, did you have any involvement with
12 designing or creating any policies or procedures
13 to comply with the Controlled Substances Act?
14    A.   I did not have any role in creating
15 policies.
16    Q.   At the time you were a pharmacy district
17 leader, did you gain any familiarity with the
18 requirements of the Controlled Substances Act that
19 applied to distributors of opioids?
20        MR. KOBRIN:  Object to form.
21        THE WITNESS:  As a pharmacy district
22 leader, no, I did not deal with that aspect.
23 BY MR. HUDSON:
24    Q.   At the time you were a pharmacy district
25 leader, did you have any knowledge of whether

Page 26

1 Giant Eagle or HBC had a suspicious order
2 monitoring program?
3     MR. KOBRIN:  Object to form.
4 BY MR. HUDSON:
5     Q.  Or system.
6     MR. KOBRIN:  Same objection.
7     THE WITNESS:  Yeah.  I don't recall --
8 BY MR. HUDSON:
9     Q.  I mean, to your --
10    A.  -- policies.  I mean, I didn't -- yeah.
11 I don't recall the policies that were in place for
12 suspicious order monitoring for HBC.
13 BY MR. HUDSON:
14    Q.  To the best of your recollection, is it
15 fair to say that Giant Eagle and HBC did not have
16 a manual or a book where you could go and see what
17 suspicious order monitoring system existed for the
18 company?
19    MR. KOBRIN:  Object to form.
20    THE WITNESS:  I can't speak to that as I
21 was not in that role.
22 BY MR. HUDSON:
23    Q.  At the time that you were a pharmacy
24 district leader, did you know that the Controlled
25 Substances Act required a registrant who was

Page 27

1 distributing controlled substances to design and
2 operate a suspicious order monitoring program?
3     MR. KOBRIN:  Object to form.
4     THE WITNESS:  As we stated earlier.
5 BY MR. HUDSON:
6     Q.  So you knew that that requirement
7 existed --
8     A.  For all distributors.
9     Q.  Right.  And, again, up through the point
10 in time that you were a pharmacy district leader
11 at Giant Eagle, any knowledge that you had of that
12 was derived from your time in pharmacy school and
13 law classes; correct?
14    MR. KOBRIN:  Object to form.
15    THE WITNESS:  I'd say that's fair.
16 BY MR. HUDSON:
17    Q.  At the time that you were a pharmacy
18 district leader, did you understand that Giant
19 Eagle had a separate company called HBC Service
20 Company?
21    MR. KOBRIN:  Object to form.
22    THE WITNESS:  We knew -- yes.  I know of
23 H- -- yeah, absolutely.  HBC was the generic
24 warehouse.  Whether it was a separate company or
25 not is -- a separate entity, is that what you're

Page 28

1 referring to?
2 BY MR. HUDSON:
3     Q.  Yes, yeah.  At the time that --
4     A.  Okay.
5     Q.  At the time you were a pharmacy district
6 leader, what was your understanding of HBC or HBC
7 Service Company?
8     A.  Sure.  That was our -- that HBC Service
9 was the generic distribution center.  So it was an
10 in-house distribution facility.
11    Q.  When you say "generic," what do you mean
12 by that?
13    A.  The drug mix that we would see or that
14 was carried by that facility was focused on
15 generic legend drugs, and I believe -- yeah,
16 generic legend drugs --
17    Q.  So generic --
18    A.  -- to the best of my knowledge.
19    Q.  Sure.
20    A.  So from lisinopril to metformin.
21    Q.  You mean generic drugs as opposed to
22 brand drugs?
23    A.  Correct.
24    Q.  And that HBC distribution facility, do
25 you know when it began operations?

Page 29

1     A.  It was before I started with the
2 company.  So it was already up and running by the
3 time I transitioned over.
4     Q.  At the time that you were a pharmacy
5 district leader, did you learn that that facility
6 had obtained a license to distribute certain
7 controlled substances?
8     MR. KOBRIN:  Object to form.
9     THE WITNESS:  We knew -- I knew that the
10 pharmacy or that distribution center was able to
11 distribute Schedules IIIs, IVs, and Vs, but no
12 Schedule II controlled substances, based on the
13 ordering system and what the stores received.
14 BY MR. HUDSON:
15    Q.  And at the time that you were a pharmacy
16 district leader, did you make distinctions between
17 Schedule II and Schedule III controlled
18 substances?
19    A.  How do you mean?
20    Q.  Well, I mean, you've alluded that there
21 were different ordering systems; right?
22    A.  Sure.
23    Q.  So did you understand that the
24 Schedule II controlled substances were being
25 shipped in from McKesson or Anda?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    A.  Absolutely.
2    Q.  And --
3    A.  Via the 222 form, triplicate form.
4    Q.  And what is the 222 form?
5    A.  That's the DEA's form to order
6  Schedule II controlled substances.
7    Q.  And at the time you were a pharmacy
8  district leader, did you understand that in 2009,
9  HBC started to act as a distributor for
10  Schedule III controlled substances?
11    A.  In 2009, I was with Rite-Aid.  So, no, I
12  did not.
13    Q.  Right.  Did you learn at some point in
14  your role as a pharmacy district leader, though,
15  that HBC had begun to distribute Schedule III
16  controlled substances?
17    A.  When I on-boarded with Giant Eagle, so
18  in December, and then through my training in the
19  subsequent -- following January, yes, I knew that
20  Schedule IIIs, IVs, and Vs could come from HBC.
21    Q.  At the time you were a pharmacy district
22  leader, did you ever visit the HBC warehouse?
23    A.  Actually, can I -- I apologize.  Can I
24  go back to that?
25    Q.  Sure.

Page 31

1    A.  You said 2009.  So, yes, I was already
2  with Giant Eagle.  I apologize.
3    Q.  That's okay.
4    A.  Yes.  I knew that we did receive
5  Schedule IIIs, IVs, and Vs then.
6    Q.  Just so we clean up the record --
7    A.  Sure.
8    Q.  -- between December of 2007 and 2010,
9  when you were a pharmacy district leader, there
10  came a time in 2007 when you learned that HBC was
11  beginning to act as a distributor for Schedule III
12  controlled substances?
13       MR. KOBRIN:  Object to form.
14  You said 2007.
15  BY MR. HUDSON:
16    Q.  I'm saying 2009 --
17    A.  2009.
18    Q.  -- you learned --
19    A.  Correct.
20    Q.  -- that HBC became a distributor for
21  controlled substances.
22    I'm not sure I cleaned up the record, but I
23  think we're on the same page.
24    At the time you were a pharmacy district
25  leader, did you ever visit the HBC warehouse?

Page 32

1    A.  No.
2    Q.  So in October of 2010, you were promoted
3  to senior manager, pharmacy quality and
4  compliance?
5    A.  That's correct.
6    Q.  And did you remain in that role until
7  March of 2016?
8    A.  That is correct.
9    Q.  Why did you leave Giant Eagle in March
10  of 2016?
11    A.  So Giant Eagle, as part of a cost
12  reduction, was reorganizing their corporate
13  offices.  And I was offered a severance,
14  essentially.
15    Now, I had been commuting from Erie to
16  Pittsburgh four days a week, so 260 miles a day
17  the round trip.  And it was an -- and had been on
18  the road, as we discussed, since 2001 as pharmacy
19  district leader and the roles.  And it was an
20  opportunity to go from 260 miles a day to 18.
21  And, actually, I couldn't be happier for it.
22    Q.  What have you done since leaving Giant
23  Eagle?
24    A.  So I am a pharmacy manager again at a
25  Rite-Aid location in Erie.

Page 33

1    Q.  Is it one of the locations that you were
2  the manager at back in the '90s?
3    A.  No.
4    Q.  Different location?
5    A.  Yeah, different locations.
6    Q.  But you've got no -- you're just located
7  in a single store now?
8    A.  Correct.  I'm a pharmacy manager again.
9    Q.  Is it a similar role to the role that
10  you had in the two different Rite-Aid stores --
11    A.  It is.
12    Q.  -- from '97 to '99 --
13    A.  It is.
14    Q.  -- and then '99 to 2001?
15    A.  That is -- that is correct.
16    Q.  If you could, just describe what -- what
17  was the -- was your severance package, I think is
18  how you described it, was that an opportunity that
19  was offered to employees -- all executives at
20  Giant Eagle?
21    A.  I can't speak for other executives.
22    Q.  Did somebody from Giant Eagle
23  specifically approach you to --
24    A.  Yeah.  My supervisor did, yes.
25    Q.  And who was your supervisor?

Page 34

1    A.   Then, as stated before, Greg Carlson.
2    Q.   And did Mr. Carlson describe this buyout
3  as an opportunity unique to you?
4        MR. KOBRIN:  Object to form.
5        THE WITNESS:  We didn't discuss any
6  offers to anybody else.  So to my knowledge, it
7  was unique to me.
8  BY MR. HUDSON:
9    Q.   As far as you're aware at this time in
10  March of 2016, there were not any other executives
11  who left Giant Eagle with a similar exit package?
12       MR. KOBRIN:  Object to form.
13       THE WITNESS:  To that point, no.  But
14  there were others that followed.
15  BY MR. HUDSON:
16    Q.  Was there any connection between this
17  offer to you in March of 2016 and the opening of
18  the new Giant Eagle Rx distribution center?
19    A.   I don't believe that they were
20  connected, to my understanding.
21    Q.   Is it your understanding, though, that
22  Giant Eagle did open a new distribution center --
23    A.   Oh, yes.
24    Q.   -- in February of 2016?
25    A.   Um-hum.

Page 35

1    Q.   And one of your roles, when you were
2  still at Giant Eagle in 2015 and early 2016, was
3  to help take steps to prepare for the opening of
4  that; correct?
5    A.   Correct.
6        MR. KOBRIN:  Object to form.
7  BY MR. HUDSON:
8    Q.   Prior to leaving Giant Eagle in March of
9  2016, were Mr. Carlson or any other executives in
10  leadership ever critical of you in your role as
11  senior manager, pharmacy quality compliance?
12       MR. KOBRIN:  Object to form.
13       THE WITNESS:  Can you be more specific?
14  BY MR. HUDSON:
15    Q.   Prior to leaving Giant Eagle in March of
16  2016, did Mr. Carlson or any other of the
17  executives express to you criticism of the job
18  that you -- the compliance role that you were
19  doing?
20       MR. KOBRIN:  Object to form.
21       THE WITNESS:  We had discussions as to
22  what we could do differently.
23  BY MR. HUDSON:
24    Q.   When did those discussions occur?
25    A.   Not as a performance management piece,

Page 36

1  that I recall.
2        When?  I don't remember dates.
3    Q.   Did you have a formal review process?
4    A.   Yes.  The company did.
5    Q.   Did that occur with Mr. Carlson?
6    A.   As a supervisor, that would have been
7  his responsibility.
8    Q.   And did you meet with him one-on-one, in
9  person?
10    A.   Yes.
11    Q.   How often did that occur?
12    A.   We had meetings in his office on a
13  regular basis.  But as far as a performance
14  management, that was an annual review process.
15    Q.   Were there written reviews that were
16  created in connection with the annual review
17  process?
18    A.   I believe so.
19    Q.   And those would exist from 2008
20  through -- well, those would exist from, I guess,
21  2011 to 2016?
22       MR. KOBRIN:  Object to form.
23       THE WITNESS:  Correct.
24  BY MR. HUDSON:
25    Q.   And during that time period from 2011 to

Page 37

1  2016, do you ever recall obtaining a review in
2  which your performance was criticized?
3        MR. KOBRIN:  Object to form.
4        THE WITNESS:  In the annual reviews, no.
5  BY MR. HUDSON:
6    Q.   How about in your informal --
7    A.   I mean --
8    Q.   -- meetings with Mr. Carlson?
9    A.   We would have discussions on timelines,
10  certainly.
11    Q.   How would you describe your relationship
12  with Mr. Carlson?
13    A.   Professional.
14    Q.   Did you see eye to eye on how to run the
15  compliance program at Giant Eagle?
16       MR. KOBRIN:  Object to form.
17       THE WITNESS:  I don't believe we had
18  disagreements as to how it should go.
19  BY MR. HUDSON:
20    Q.   Did Mr. Carlson -- you indicated
21  timelines.  Was Mr. Carlson critical of you or the
22  compliance department in terms of implementing
23  policies or procedures?
24       MR. KOBRIN:  Object to form.
25       THE WITNESS:  Well, one is simply a -- I

Page 38

1 might not have been the fastest to respond to
2 emails, so the inbox would grow.
3     And then there's some timeline discussion
4 around some accreditations, whether it was for
5 specialty pharmacy or VAWD.
6 BY MR. HUDSON:
7     Q.  You said specialty pharmacy.  And what
8 was the other?  Was it an acronym?
9     A.  Yes.  VAWD.  Gosh.  VAWD -- Wholesale
10 Distributor -- Verified -- Verified Accredited
11 Wholesale Distributor.
12     I don't remember the acronym.
13     Q.  That's close enough.
14     A.  Since then, I...
15     Q.  Okay.  Anything else you can think
16 about -- I mean that you can think of, as you sit
17 here today, that Mr. Carlson was critical of you
18 or the compliance department about?
19     MR. KOBRIN:  Object to form.
20     THE WITNESS:  From me, it was difficult
21 to get into an early meeting since I had a
22 two-hour commute in from Erie, and the weather is
23 notoriously sketchy this time of year.  So perhaps
24 punctuality or being available during those times.
25

Page 39

1 BY MR. HUDSON:
2     Q.  So you were -- were you commuting both
3 ways every day?
4     A.  Um-hum, yes.
5     Q.  Two hours there and two hours back?
6     A.  Correct.
7     Q.  Other than punctuality, anything else
8 you can recall that Mr. Carlson was critical of
9 you or the compliance department about?
10     MR. KOBRIN:  Object to form.  Asked and
11 answered.
12     THE WITNESS:  Nothing that pops in.
13 BY MR. HUDSON:
14     Q.  I want to focus then on your position as
15 the senior manager of compliance.
16     Were you the company's top compliance
17 officer?
18     MR. KOBRIN:  Object to form.
19     THE WITNESS:  No.  For the company, no.
20 BY MR. HUDSON:
21     Q.  Who was the top compliance officer?
22     MR. KOBRIN:  Object to form.
23     Are you talking about when he started or --
24     THE WITNESS:  Yeah.  What timeframe?
25

Page 40

1 BY MR. HUDSON:
2     Q.  In October of 2010, when you assumed the
3 role of senior manager of compliance.
4     A.  Good gosh.  Perhaps -- so the top
5 corporate compliance officer, the only name I can
6 think of --
7     MR. KOBRIN:  Don't speculate.
8     THE WITNESS:  Yeah.  I don't remember
9 the exact name of the person who was in -- or if
10 that was his role, his title.
11 BY MR. HUDSON:
12     Q.  Can you recall the name of anyone who
13 was more senior to you in terms of a compliance
14 role at Giant Eagle?
15     A.  On the legal side, in the legal
16 department, Rick Russell was the head of the
17 department, as the attorney.
18     Who else was in there?  From HIPAA
19 compliance, it fell under Robbi Robinson.
20     I don't remember on top who was -- for the
21 whole company piece back then.
22     Q.  When you assumed the role of senior
23 manager, did you have two different
24 responsibilities, one being pharmacy quality and
25 the other being compliance?

Page 41

1     A.  Correct.
2     Q.  And did you have two separate teams for
3 those two separate roles?
4     A.  I had two people that reported to me,
5 one for each.
6     Q.  And then did they have a team underneath
7 them?
8     A.  No.
9     Q.  Did they have anyone underneath them?
10     A.  Nobody else reported to them.
11     Q.  From October of 2010 to March of 2016,
12 were you the head compliance manager at Giant
13 Eagle focused on designing and operating policies
14 to comply with the Controlled Substance Act?
15     MR. KOBRIN:  Object to form.
16     THE WITNESS:  For the -- the initial
17 focus was on the retail pharmacies.
18 BY MR. HUDSON:
19     Q.  In your role though from October of 2010
20 to March of 2016, just describe for me or list for
21 me every person who would be involved in
22 designing or operating a system to comply with the
23 Controlled Substances Act.
24     MR. KOBRIN:  Object to form.
25     Within his group or the entire company?

Page 42

1    MR. HUDSON:  At Giant Eagle.
2    THE WITNESS:  Oh, good heavens.
3    MR. KOBRIN:  To the extent you can.
4    THE WITNESS:  What's that?
5    MR. KOBRIN:  To the extent you can.
6    THE WITNESS:  Yeah.  On the -- well, it
7  would involve the pharmacy IT group which, when I
8  started, would have fallen under Joe Mishanski,
9  and under him Shawn Voyten.  Let's see.  And then
10  their admin for that piece.
11  BY MR. HUDSON:
12    Q.  So Shawn Voyten.  And who was the other
13  person?  I'm sorry.
14    A.  The head of the pharmacy information
15  technology piece at the time was Joe Mishanski.
16    Q.  And where were -- where were the --
17  where was the pharmacy IT group physically
18  located?
19    A.  It was located in -- it was at the
20  corporate campus in a couple different buildings.
21    For policies and procedures with regard to
22  controlled substances, again, I was involved in
23  that, in creating policies along with George
24  Chunderlik.
25    In our policies and procedures group, where

Page 43

1  we dealt with more than just controlled substances
2  but pharmacy quality policies as well, that
3  also -- that group involved Adrienne Anthony,
4  which I don't know her married name now.  So she
5  was also my other person that reported to me on
6  the pharmacy quality side.
7    Steve Zubrow, which was Marcus & Shapira
8  counsel.  Jane Barnes, who was internal risk
9  compliance for Giant Eagle, then later Mary
10  Gibson.  And Rick Springer was part of that as
11  well.  He provided the -- essentially, the
12  training modules, would create the training
13  modules.
14    Q.  Tell me Rick's last name again.
15    A.  Springer.
16    Q.  Springer.  And training modules for
17  what?
18    A.  So computer-based training modules for
19  the pharmacists and pharmacy technicians to do in
20  the stores.
21    Q.  Jane Barnes and Mary Gibson, those were
22  attorneys at Giant Eagle?
23    A.  Correct.  They were both internal
24  counsel.
25    Q.  Anyone else?

Page 44

1    A.  In that room or that was in that
2  procedure meeting?
3    We tried to pull stakeholders in from the
4  other operational groups.  So we may at times have
5  had one of the pharmacy project managers in there.
6  So that would have been Dominic Bertucci.
7    Let me think who else would have been
8  involved in policies and procedures with regard to
9  controlled substances.
10    In those monthly meetings, we would discuss
11  all types of policies that involved pharmacy.
12    MR. KOBRIN:  I don't want you to get
13  into too much detail.
14    THE WITNESS:  Okay.
15    MR. KOBRIN:  You've already identified
16  that counsel were in those meetings and involved
17  in those meetings.  So just be aware or cognizant
18  that you're not sharing privileged information.
19  BY MR. HUDSON:
20    Q.  Did those monthly meetings occur during
21  the entire time that you were the senior manager
22  of compliance?
23    A.  Shortly after starting there.  Starting
24  in that role I should say.  Qualify that.
25    Q.  So when you initially started in the

Page 45

1  role of senior manager of compliance, you didn't
2  have monthly meetings, but at some point shortly
3  thereafter you began to; is that fair?
4    A.  Yeah.  I can't say what they did before.
5  The role was newly created.  When I came, it
6  was -- I promoted into a newly created role.
7    (HBC-Millward Exhibit 1 was marked.)
8  BY MR. HUDSON:
9    Q.  Mr. Millward, I'm just going to hand you
10  what we've marked as Exhibit 1.  And Exhibit 1,
11  we've put an identifier on the top right that's
12  P-HBC 6016.
13    And this appears to be an organizational
14  chart that was created on or around November 13th
15  of 2014.  Do you see that?
16    A.  Yes.  I see that on the page.
17    Q.  And here, as you've testified to, this
18  shows you as the senior manager, pharmacy quality
19  and compliance.  And then it shows you reporting
20  up to Greg Carlson.  Do you see that?
21    A.  That's correct.
22    Q.  And then, as you testified, underneath
23  you, you've got --
24    A.  I forgot about Alicia.
25    Q.  -- a coordinator of pharmacy compliance;

1  right?
2      A.  Correct.
3      Q.  And then you've got a manager of
4  compliance.  And that's Mr. Chunderlik?
5      A.  Correct.
6      Q.  And then you've got a manager of
7  quality.  And that's Adrienne Anthony?
8      A.  Correct.
9      Q.  Did this basic structure exist the
10 entire time that you were the senior manager of
11 pharmacy quality and compliance?
12     A.  With the exception -- well, George and
13 Adrienne reported in to me shortly after going
14 into the role.  And I apologize.  I forgot about
15 Alicia.  She was Anthony's admin until he left.
16 And then she moved under my side, under my org
17 chart.
18     Q.  But, otherwise, this is the structure of
19 the group during the entire time that you were the
20 senior manager of pharmacy quality and compliance
21 basic group?
22     A.  Under me, correct.  There may have been
23 some shifts under the other personnel.
24     Q.  Before assuming the role as Giant
25 Eagle's head of -- or Giant Eagle's role as senior

1  manager of compliance, did you have any prior work
2  experience in a compliance role?
3      MR. KOBRIN:  Object to form.  Asked and
4  answered.
5      THE WITNESS:  No specific education or
6  training beyond that.
7  BY MR. HUDSON:
8      Q.  At the time that you assumed your
9  compliance role at Giant Eagle, did you obtain any
10 training to prepare you for your new role in
11 compliance?
12     MR. KOBRIN:  Object to form.
13     THE WITNESS:  There were no classes or
14 anything more than continuing education programs
15 as part of maintaining a valid and active pharmacy
16 license in the State of Pennsylvania.
17 BY MR. HUDSON:
18     Q.  And you testified that your position was
19 a newly created position; correct?
20     A.  That is correct.
21     Q.  At the time that you assumed the role of
22 senior manager of compliance, were you tasked with
23 monitoring the company's policies and procedures
24 that were in place as it relates to the Controlled
25 Substances Act?

1      MR. KOBRIN:  Object to form.
2      THE WITNESS:  Can you repeat the
3  question, please?
4  BY MR. HUDSON:
5      Q.  Sure.  At the time you assumed your
6  compliance role at Giant Eagle, were you tasked
7  with monitoring the company's policies and
8  procedures that related to the Controlled
9  Substances Act?
10     MR. KOBRIN:  Same objection.
11     THE WITNESS:  I was responsible for
12 reviewing the policies and procedures for all
13 legal compliance beyond just the CSA, to include
14 state board of pharmacy, that the pharmacies were
15 up to date and our policies were in line and
16 complying.
17 BY MR. HUDSON:
18     Q.  Could you estimate, during the time that
19 you were the senior manager of compliance at Giant
20 Eagle, approximately what percentage of your time
21 related to compliance with the Controlled
22 Substances Act?
23     A.  I couldn't give a percent specific.
24     Q.  Even a ballpark?
25     A.  I don't think it would be an accurate

1  number to say a definitive number.
2      Q.  Do you feel like it was a big part of
3  your role, a small part of your role?  Anything
4  you could say to describe what compliance with the
5  Controlled Substances Act --
6      MR. KOBRIN:  Object to form.  He's
7  already said it would be inaccurate to assess his
8  percentage.
9      THE WITNESS:  There's no way to
10 accurately say.  The needs of the day and the
11 issues or legislative changes would kind of
12 dictate the -- and the company initiatives would
13 kind of dictate the direction and energy spent.
14     So to give an accurate time over the -- or an
15 accurate percentage, I'm not able to box it in
16 that way.
17 BY MR. HUDSON:
18     Q.  Between 2011 and 2016, do you have a
19 recollection of any legislative changes or company
20 initiative changes that occurred as they relate to
21 the Controlled Substances Act?
22     A.  Sure, there were.
23     MR. KOBRIN:  Object to form.
24     THE WITNESS:  There were a number of
25 changes.  The rescheduling of hydrocodone from a

Page 50

1 Schedule III to a Schedule II, that was when?
2 October of '14-ish. I apologize. I don't
3 remember the exact date that that occurred.
4    Ohio made changes to their OARRS, for
5 example, to where -- I believe it was unscheduled
6 at the time, but Tramadol had to be reported in
7 before it was -- before it became a Schedule --
8 controlled substance. So just two examples.
9 BY MR. HUDSON:
10    Q. Any other examples you can think of?
11    A. There were tech certification
12 requirements from West Virginia. Sudafed
13 requirement changes for reporting, rolling out the
14 meth check, for example, for pseudoephedrine in
15 the various states and the keeping up with those
16 requirements.
17    But I don't think I can list them all sitting
18 here almost three years from then.
19    Q. Sure. No, I understand. I'm just
20 trying to get an understanding --
21    A. Sure.
22    Q. -- of what some of those would be.
23    How about in terms of company initiatives,
24 were there ever changes in company initiatives --
25    MR. KOBRIN: Object to form.

Page 51

1 BY MR. HUDSON:
2    Q. -- that caused you in your role in
3 compliance to take action?
4    MR. KOBRIN: Object to form.
5    THE WITNESS: Seeking certifications or
6 accreditations for ACC -- ACHC. I'm sorry. I
7 think that's the American -- or the Accreditation
8 Council for Healthcare, ballpark. URAC
9 accreditation. DMEPOS accreditation.
10    I don't know what URAC stands for. I can't
11 remember. And DMEPOS, Durable Medical Equipment
12 Point of -- no, no -- Prosthetics, Orthotics, I'll
13 say Supplies. I don't remember.
14    So that was through NABP, so the National
15 Association of Boards of Pharmacy for that
16 particular accreditation.
17    And then VAWD accreditation, Verified
18 Accredited Wholesale Distributor.
19 BY MR. HUDSON:
20    Q. Any other company initiatives you can
21 think of that impacted your compliance role?
22    A. Opening a specialty pharmacy. Having a
23 call center pharmacy that had no product and only
24 did off-site processing, prescription processing.
25    And then the opening of the what is GERX

Page 52

1 towards the end. Opening stores in Ohio -- or I'm
2 sorry. Licensure issues.
3    Q. When you say "GERX," is that how you
4 refer to the -- is that the Giant Eagle Rx
5 distribution center?
6    A. I believe that's what they refer to it
7 now.
8    Q. Okay.
9    A. At the time it was the pharmacy
10 distribution inside of what I believe was FFM, so
11 Fresh Foods something. It's AFE. It's an acronym
12 for everything.
13    Q. Explain that to me, if you could.
14    It was a distribution facility within Fresh
15 Foods?
16    MR. KOBRIN: Object to form.
17    Is that a question?
18    THE WITNESS: Yeah. Can you please --
19 what do you -- can you ask that again?
20 BY MR. HUDSON:
21    Q. When GERX first opened, how would you
22 describe that?
23    A. It was a -- dedicated pharmacy
24 distribution centers within the structure of an
25 existing Giant Eagle distribution center, next to

Page 53

1 a Giant Eagle central fill pharmacy. That was one
2 of the other initiatives.
3    Q. And how did the structure of the GERX
4 then change over time?
5    MR. KOBRIN: Object to form.
6    THE WITNESS: We'll GERX was -- we'll
7 call it GERX, because I didn't know it as GERX
8 then, in that timeframe. But we'll refer to it
9 from this point on.
10 BY MR. HUDSON:
11    Q. Okay.
12    A. It opened a month before I left, I
13 believe as we previously said, and initially, I
14 think, only distributing -- distributing
15 noncontrols first, I believe.
16    Q. After you left Giant Eagle, have you
17 maintained any knowledge base or do you know
18 anything about how the facility has operated since
19 you left?
20    A. No, no.
21    MR. KOBRIN: Do you want to take a
22 break? Are you doing all right?
23    THE WITNESS: I'm okay.
24    MR. KOBRIN: Ten minutes or so. Is that
25 all right with you, Ty?

Page 54

1    MR. HUDSON:  Sure.
2  BY MR. HUDSON:
3    Q.  I want to just talk about a compliance
4  program now.  Do you agree that a company handling
5  prescription drugs should have an effective
6  compliance program?
7    MR. KOBRIN:  Object to form.
8    THE WITNESS:  The regulations state that
9  in there.  But under the CSA, it's spelled out
10  within the Controlled Substances Act as the
11  requirements for a distributor.
12  BY MR. HUDSON:
13    Q.  I guess my question though is just more
14  general.
15    Do you agree that a company handling
16  prescription drugs needs an effective compliance
17  program?
18    MR. KOBRIN:  Object to form.
19    THE WITNESS:  I believe the company
20  handling prescription drugs has an obligation to
21  be compliant with the rules and regulations set
22  forth.
23  BY MR. HUDSON:
24    Q.  Do you agree that the purpose of a
25  compliance program in a company is to have

Page 55

1  policies and procedures that prevent the
2  organization and employees from breaking laws and
3  regulations?
4    MR. KOBRIN:  Object to form.
5    THE WITNESS:  Policies and procedures
6  are put in place to ensure that all agents of the
7  organization are compliant with laws, rules, and
8  regulations.
9  BY MR. HUDSON:
10    Q.  Do you agree that an effective
11  compliance program should include establishing
12  procedures for documenting actions in writing to
13  show compliance with laws and regulations?
14    MR. KOBRIN:  Object to form.
15    THE WITNESS:  Restate the question.
16  BY MR. HUDSON:
17    Q.  Do you agree that an effective
18  compliance program should include establishing
19  procedures for documenting actions in writing to
20  be able to show compliance with the law?
21    MR. KOBRIN:  Object to form.
22    THE WITNESS:  I believe that if it is
23  required by law to retain those documents, then
24  the program should be designed to retain the
25  documents as legally required.

Page 56

1  BY MR. HUDSON:
2    Q.  And if there isn't a legal requirement
3  to retain documents, then from a compliance
4  perspective, what would you do?
5    MR. KOBRIN:  Object to form.
6    THE WITNESS:  There's many aspects of
7  pharmacy that do have specific -- or that -- laws
8  that require documents to be retained for
9  prescribed amount of times -- or lengths of time.
10  Sorry.
11    And the compliance program must make sure
12  that those legal requirements are met.
13  BY MR. HUDSON:
14    Q.  Do you agree it's easier to show
15  compliance with laws and regulations if a company
16  documents its actions in writing?
17    MR. KOBRIN:  Object to form.
18    Easier to show to who?
19    MR. HUDSON:  Just "Objection.  Form"
20  please.
21    THE WITNESS:  Yeah.  Can you be more --
22  BY MR. HUDSON:
23    Q.  Do you agree --
24    A.  Can you restate that, please?
25    Q.  Sure.  Do you agree it is easier to show

Page 57

1  compliance with laws and regulations if a company
2  documents its actions in writing?
3    MR. KOBRIN:  Object to form.
4    THE WITNESS:  Where they're required to
5  retain those documents, then yes.
6  BY MR. HUDSON:
7    Q.  I'm just saying, in general, do you
8  agree that a company is going to have an easier
9  time showing it complied with the law if it
10  documents in writing the actions that it took?
11    MR. KOBRIN:  Object to form.
12    THE WITNESS:  To document or to show
13  compliance to whom?
14  BY MR. HUDSON:
15    Q.  To anyone.
16    A.  Again, I believe the compliance program
17  should be designed that it meets the requirements
18  for documentation.
19    Q.  From a corporate perspective, in your
20  view as a nonlawyer, are there strategic reasons
21  to not retain documents and put them -- and put in
22  writing the actions that are being taken by the
23  company?
24    MR. KOBRIN:  Object to form.
25    THE WITNESS:  I don't think there's

Page 58

1 any -- again, I'm not sure I follow where you're
2 leading there.
3 BY MR. HUDSON:
4     Q.  I'm just saying:  You were the senior
5 manager of compliance at Giant Eagle for about six
6 years; right?  Five years?
7     A.  Yeah; correct, correct.
8     Q.  And what I'm saying is:  During that
9 time, would you agree that from a compliance
10 perspective, it's going to be easier for Giant
11 Eagle to show it complied with the law if Giant
12 Eagle put the actions that it took in writing?
13         MR. KOBRIN:  Object to form.
14         THE WITNESS:  And that was through our
15 policies and procedures.
16 BY MR. HUDSON:
17     Q.  Right.  I guess what I'm trying to get
18 at is just, "yes" or "no," do you agree with the
19 idea that it's easier for Giant Eagle to show it
20 complied with the law if it puts in writing the
21 actions that it's taking?
22         MR. KOBRIN:  Object to form.
23         THE WITNESS:  And that would be correct,
24 why I would say yes, through the policies and
25 procedures.

Page 59

1 BY MR. HUDSON:
2     Q.  So in your time as the senior manager of
3 compliance, was one of the -- was one of the roles
4 that you undertook to make sure that there were
5 policies or procedures in place so that important
6 actions being taken at Giant Eagle were documented
7 in writing?
8         MR. KOBRIN:  Object to form.
9         THE WITNESS:  I don't recall doing any
10 policies and procedures beyond -- for document
11 retention.  That would have been through the
12 corporate policy or through the -- yeah.  Those
13 would have been above my area.  That would have
14 encompassed all of the corporation, not just
15 exclusive to pharmacy.
16     Pharmacy would be required per the various
17 document retention requirements for the boards of
18 pharmacy, for example.
19         MR. KOBRIN:  It's been about ten
20 minutes.  Do you want to take a break now?
21         THE WITNESS:  Yeah.  Let's take a break.
22         THE VIDEOGRAPHER:  10:13.  We're off the
23 video record.
24         (Recess from 10:13 a.m. to 10:30 a.m.)
25         THE VIDEOGRAPHER:  10:30.  We're on the

Page 60

1 video record.
2 BY MR. HUDSON:
3     Q.  Before the break we were talking about
4 compliance.  HBC did not have its own compliance
5 group; correct?
6         MR. KOBRIN:  Object to form.
7         THE WITNESS:  That I'm aware of at the
8 time specific, no.
9 BY MR. HUDSON:
10     Q.  In other words, between 2009 and 2016,
11 to the best of your knowledge, HBC did not have a
12 compliance department.
13     A.  To my knowledge, it did not have its own
14 dedicated compliance department.
15     Q.  But HBC did rely on the Giant Eagle
16 compliance department; right?
17     A.  The pharmacy --
18         MR. KOBRIN:  Object to form.
19         THE WITNESS:  The pharmacy merchandising
20 group that oversaw HBC.  And then as we went
21 through the certifications, my compliance group.
22 BY MR. HUDSON:
23     Q.  And what is the pharmacy merchandising
24 group?  Is that the procurement group?
25     A.  Under an older version of the the org

Page 61

1 chart, correct.
2     Q.  And if you could, between 2009 and 2016,
3 just describe for me what you recall about how --
4 what the makeup was of the pharmacy merchandising
5 group.
6         MR. KOBRIN:  Object to form.
7         THE WITNESS:  Let's see.  When I
8 started, the -- 2009.  Sorry.
9 BY MR. HUDSON:
10     Q.  Just what you recall.  Who was --
11     A.  Right.
12     Q.  Who was the head of it and --
13     A.  So the --
14     Q.  -- and how did it operate?
15     A.  I'm sorry.  The vice president of
16 pharmacy at the time was Randy Heiser.  And then
17 Greg Carlson oversaw the merchandising group.
18     Q.  So Randy Heiser was the -- say it
19 again -- the vice president of --
20     A.  Pharmacy.
21     Q.  -- pharmacy.
22     A.  Greg ran the merchandising group.  I
23 don't remember what his title was at the time.
24 And Anthony was the operations.
25     Q.  So would it be fair to say that the

Page 62

1 executive most responsible for HBC at that time
2 would have been Randy Heiser?
3     MR. KOBRIN: Object to form.
4     THE WITNESS: As the pharmacy
5 distribution, following with all of pharmacy,
6 rolling into Randy as the top of the pharmacy org
7 chart.
8 BY MR. HUDSON:
9     Q. And then you worked with Mr. Heiser,
10 Mr. Carlson, and Anthony to -- from a compliance
11 perspective?
12     A. Under Anthony, correct. And then later,
13 of course, under Greg as his role changed.
14     Q. But did Mr. Heiser, Mr. Carlson and
15 Anthony look to you and your compliance group to
16 establish policies and procedures for HBC?
17     MR. KOBRIN: Object to form.
18     THE WITNESS: Policies and procedures
19 for all of pharmacy, our controlled substance
20 handling guidelines. So it was as a pharmacist
21 knowing the laws and understanding the impact of
22 compliance in creating those policies and
23 procedures.
24     So to answer your question simply, yes, as
25 far as all pharmacy policies and procedures.

Page 63

1 BY MR. HUDSON:
2     Q. So yes, Mr. Heiser, Mr. Carlson and
3 Anthony were looking to you and the Giant Eagle
4 compliance group to establish policies and
5 procedures for HBC?
6     MR. KOBRIN: Object to form.
7     THE WITNESS: For all of pharmacy, the
8 pharmacy group, as needed, as needed.
9 BY MR. HUDSON:
10     Q. And would that include HBC?
11     A. It came to, yes.
12     Q. At what point in time did it come to
13 be -- did HBC become part of pharmacy?
14     MR. KOBRIN: Object to form.
15     THE WITNESS: HBC was part of pharmacy
16 when it opened, but I was not involved -- I was
17 not in the compliance role at the time for those
18 policy and procedure creation.
19     But as questions would arise, my group was
20 the one that would research and advise.
21 BY MR. HUDSON:
22     Q. So the HBC warehouse opened in late
23 2009; right?
24     MR. KOBRIN: Object to form.
25     THE WITNESS: I don't know the

Page 64

1 early/late piece, but 2009.
2 BY MR. HUDSON:
3     Q. The HBC warehouse opened in 2009; fair?
4     MR. KOBRIN: Object to form. Misstates
5 the record.
6 BY MR. HUDSON:
7     Q. I'm sorry. Josh makes a good point.
8     A. Yes.
9     Q. The HBC warehouse started distributing
10 controlled substances in 2009; correct?
11     A. As far as I'm aware.
12     Q. And then in October of 2010, you assumed
13 the role of senior manager of compliance at Giant
14 Eagle; correct?
15     A. That is correct. Or quality and
16 compliance, but correct.
17     Q. Right. But specific to the compliance
18 role --
19     A. Sure.
20     Q. -- was one of your responsibilities when
21 you assumed that role to evaluate the policies and
22 procedures that existed at HBC?
23     A. As they came up. So HBC's policies and
24 procedures and then subsequently GERX were
25 reviewed when the accreditations became necessary.

Page 65

1     But were -- part of the controlled substance
2 dispensing and controlled substance handling
3 guidelines were actually done through retail as
4 far as one of the levels of controls that were
5 created for the stores, which HBC is the only --
6 the stores are the only -- HBC only distributed to
7 Giant Eagle, to ourselves.
8     Q. My question though is just at the time
9 that you became the senior manager of compliance
10 at Giant Eagle in October of 2010, were you
11 informed that you were responsible for monitoring
12 the policies and procedures that existed at HBC?
13     MR. KOBRIN: Object to form.
14     THE WITNESS: Specific to HBC, those
15 stayed under Greg. They did not fall under the
16 pharmacy compliance piece, which was more
17 operationally focused.
18 BY MR. HUDSON:
19     Q. At some point in time, did you assume
20 the role of becoming responsible for monitoring
21 the policies and procedures at HBC?
22     MR. KOBRIN: Object to form.
23     THE WITNESS: The monitoring of policies
24 and procedures at HBC?
25     When those -- I had involvement in creating

Page 66

1 policies and procedures that were necessary to
2 meet -- as part of our group, to meet the
3 requirements under VAWD accreditation, as an
4 example.
5 BY MR. HUDSON:
6     Q.   I guess what I'm trying to understand
7 is -- and let's zero it in more specifically --
8     A.   Sure.
9     Q.   -- to HBC policies and procedures
10 related to the Controlled Substances Act.
11     A.   Okay.
12     Q.   So at the time that you became the
13 senior manager of compliance, who within the
14 organization was responsible for the policies and
15 procedures at HBC to comply with the Controlled
16 Substances Act?
17     A.   So those would have been created prior
18 to my -- or that role, my role being created and
19 going into that role.  And those would have fallen
20 under Greg, Randy at the time until his departure,
21 and the leadership team at HBC.
22     Q.   So Greg, Randy and Anthony.
23     At the time that you became the senior
24 manager of compliance, to the best of your
25 recollection, the primary responsibility for the

Page 67

1 policies and procedures at HBC to comply with the
2 Controlled Substances Act continued to be the
3 responsibility of Greg, Randy and Anthony?
4     A.   Anthony was operations.
5     Q.   So just Greg and Randy?
6     A.   I would say those two initially.
7     Q.   And were Greg and Randy responsible for
8 the policies and procedures at HBC to comply with
9 the Controlled Substances Act throughout the time
10 that you were the senior manager of compliance?
11     A.   No.  Randy was -- Randy was -- Randy
12 left the company at that point.
13     Q.   Was it Greg or Randy though?  In other
14 words, was it always --
15     A.   Initially, yeah.  Greg always.  And then
16 Randy's replacement, it would have fallen under
17 him.
18     Q.   And who was that?
19     A.   Brett Merrell.  I think of the shoes.
20     Q.   At any time that you were the senior
21 manager of compliance, did you have responsibility
22 for HBC policies and procedures to comply with the
23 Controlled Substances Act?
24     A.   It evolved later on.  Not initially in
25 my role.  From that perspective, I was used as a

Page 68

1 subject matter expert if there were questions that
2 came up.
3     Q.   At some point in time, in your role as
4 senior manager of compliance at Giant Eagle, did
5 you assume responsibility for the policies and
6 procedures at HBC to comply with the Controlled
7 Substances Act?
8     A.   So you're asking if HBC -- can you
9 rephrase?  Let me let you rephrase that question
10 one more time.
11     Q.   At some point in time, did you learn
12 that you, as the senior manager of compliance at
13 Giant Eagle, were responsible for the policies and
14 procedures at HBC to comply with the Controlled
15 Substances Act?
16         MR. KOBRIN:  Object to form.
17         THE WITNESS:  I was responsible for
18 creating the policies and -- well, reviewing and
19 creating policies/procedures specifically that was
20 required for the VAWD certification, and then to
21 do a review and creation of policies for GERX.
22 BY MR. HUDSON:
23     Q.   Have you heard the acronym SOMS,
24 suspicious order monitoring system?
25     A.   I have.

Page 69

1     Q.   Are you familiar with SOMS, that
2 acronym?
3     A.   I am.
4         MR. KOBRIN:  Object to form.
5 BY MR. HUDSON:
6     Q.   At some point, as the senior manager of
7 compliance at Giant Eagle, were you responsible
8 for the policies and procedures at HBC to comply
9 with the SOMS requirements of the Controlled
10 Substances Act?
11         MR. KOBRIN:  Object to form.
12         THE WITNESS:  Again, as I had said
13 before, I helped or our group reviewed the
14 policies and procedures required for -- that were
15 in place previously and were needed for our --
16 were triggered by the VAWD certification, to
17 review the suspicious order monitoring system as a
18 function of the overall controls that were in
19 place at store level, corporate level,
20 distribution center level.
21 BY MR. HUDSON:
22     Q.   At any time that you were the senior
23 manager of compliance at Giant Eagle, were you
24 ever told that you or your group were responsible
25 for the HBC policies and procedures to comply with

Page 70

1 the SOMS requirements of the Controlled Substances
2 Act?
3        MR. KOBRIN:  Object to form.  Asked and
4 answered.
5 BY MR. HUDSON:
6    Q.  You can answer.
7    A.  Was I told by anybody, Greg, Anthony or
8 otherwise, that my group was responsible for
9 those?
10     In the rewriting or review of those for VAWD
11 certification is when we became very involved
12 specific to the individual there that we had
13 procedures at retail level in place already.
14    Q.  What about at the distributor level?
15        MR. KOBRIN:  Object to form.
16        THE WITNESS:  As I said, when we review
17 for the VAWD certification, to review all their
18 policies and procedures that were in place, to
19 reformat them for VAWD certification.
20 BY MR. HUDSON:
21    Q.  When did this VAWD certification review
22 occur?
23    A.  Good grief.  VAWD -- well, the VAWD
24 certification itself, the actual granting of the
25 certification occurred after I was gone from the

Page 71

1 company.
2     But initially it would have been, if I had to
3 ballpark it, '14, '15-ish, and that's a guess.
4    Q.  Let me just ask you the broad question.
5 What is VAWD certification?
6    A.  VAWD, and I apologize for not
7 remembering the entire acronym, but essentially,
8 it's a distributor certification that some states
9 require in order to distribute into those states
10 and a set of standards for not just controlled
11 substances, but temperature controls, physical
12 plant, HR.
13    Q.  Why was there a VAWD review, VAWD
14 certification review occurring in 2014 or 2015?
15    A.  So we could -- as we understood at the
16 time, in order to distribute to the store that was
17 opening in Indiana.  Indiana required VAWD
18 certification in order to distribute.  That was
19 our understanding.  As well as the -- which would
20 have been one store -- as well as the two stores
21 that were in Maryland.
22    Q.  So prior to you and your group's
23 involvement in the VAWD certification review in
24 2014 or 2015, did you have any involvement with
25 the HBC policies and procedures to meet the SOMS

Page 72

1 requirements of the Controlled Substances Act?
2        MR. KOBRIN:  Object to form.
3        THE WITNESS:  So specific procedures for
4 HBC as to what was in their policies and
5 procedures, we were the -- my group were the SMEs
6 to answer any kind of questions that came up or as
7 regulations changed.
8 BY MR. HUDSON:
9    Q.  What does SME mean?  I apologize.
10    A.  Subject matter expert.
11    Q.  Subject matter expert.
12    A.  Sorry.  So while not doing specific
13 policies and procedures, certainly guiding,
14 providing guidance for the facility whenever there
15 was a necessary legislative change.  So the
16 rescheduling of hydrocodone-containing products --
17 again, I misspoke just referring only to
18 hydrocodone earlier -- but hydrocodone-containing
19 products, so the acetaminophen combos essentially
20 as an example, and then the subsequent scheduling
21 of Tramadol.  So that necessitated the change.
22        (HBC-Millward Exhibit 2 was marked.)
23 BY MR. HUDSON:
24    Q.  Let me hand you what we've marked as
25 Exhibit 2.  And Exhibit 2 --

Page 73

1        MR. HUDSON:  Our internal sticker is
2 P-GEN-10.
3 BY MR. HUDSON:
4    Q.  And this is a CFR that we pulled from
5 the Department of Justice DEA website on diversion
6 control division.
7     Do you see there at the top Part 1301,
8 Registration of Manufacturers, Distributors and
9 Dispensers of Controlled Substances?
10        MR. KOBRIN:  I just want to object on
11 the record real quick.  This is only a small
12 section of what's a larger set of regulations, and
13 they are all interconnected and cross-reference
14 each other.
15     You can answer.
16        THE WITNESS:  That's exactly what it
17 says at the top.
18 BY MR. HUDSON:
19    Q.  So my focus is really on 1301.74(b).  Do
20 you see that there?
21    A.  Yes.
22    Q.  "The registrant shall design and operate
23 a system to disclose to the registrant suspicious
24 orders of controlled substances.  The registrant
25 shall inform the field division office of the

Page 74

1  Administration in his area of suspicious orders
2  when discovered by the registrant.  Suspicious
3  orders include orders of unusual size, orders
4  deviating substantially from a normal pattern, and
5  orders of unusual frequency."
6      Do you see that?
7      A.  I do see that.
8      Q.  And what I've done is I just created a
9  little bit of a demonstrative here.  I just want
10 to know if you agree with this.  That in terms of
11 complying with -- this is -- this provision that
12 we're talking about is the suspicious order
13 monitoring system or the SOMS obligation of the
14 Controlled Substances Act; correct?
15     MR. KOBRIN:  Object to form.
16 Misrepresents both the regulation and the record.
17 BY MR. HUDSON:
18     Q.  You can answer.
19     A.  I'm sorry.  Can you say that again?
20     Q.  Sure.  Do you agree that this section
21 that we've been looking at of 1301.74(b) is the
22 suspicious order monitoring system requirement of
23 the Controlled Substances Act?
24     MR. KOBRIN:  Object to form.  Same
25 objection.

Page 75

1      THE WITNESS:  1301.74(b) is part of a
2  whole list of security and control requirements.
3  So it's one of the many listed ones in the other
4  parts of the regulation that distributors are
5  required to follow, dispensers.
6  BY MR. HUDSON:
7      Q.  And can we agree though that this
8  section (b) is the suspicious order monitoring
9  system requirement?
10     MR. KOBRIN:  Object to form.
11 Misrepresents the regulation.
12     THE WITNESS:  Section (b) is the system
13 to disclose suspicious orders of controlled
14 substances, as it states.
15 BY MR. HUDSON:
16     Q.  And can we refer to this as SOMS today?
17     MR. KOBRIN:  Object to form.
18 BY MR. HUDSON:
19     Q.  In other words, if we talk about the
20 requirements of this particular regulation, will
21 you understand that to mean the SOMS requirements?
22     MR. KOBRIN:  So any time after this
23 point, when you refer to SOMS, you're establishing
24 you are only referring to Section 1301.74(b)?
25

Page 76

1      MR. HUDSON:  Correct.
2      MR. KOBRIN:  That's all you're going to
3  be referring to when you refer to SOMS?
4      MR. HUDSON:  Correct.
5      MR. KOBRIN:  I just want you to make
6  sure that you're clear with the witness on that
7  because I don't know that --
8      MR. HUDSON:  That's why I asked the
9  question.
10     MR. KOBRIN:  I don't want him to get
11 confused.
12     MR. HUDSON:  I appreciate it.  Thank
13 you.
14 BY MR. HUDSON:
15     Q.  Mr. Millward, from here forth, if we
16 refer to the SOMS requirement, will you understand
17 that I'm referring to the requirements of
18 Section 1301.74(b)?
19     A.  I understand what you're saying, as the
20 regulation is read.
21     Q.  Do you agree that, in fact, there are
22 federal regulations that do require distributors
23 to have a suspicious order monitoring system in
24 place?
25     MR. KOBRIN:  Object to form.

Page 77

1      THE WITNESS:  A system to disclose
2  suspicious orders, is that what you're referring
3  there?
4  BY MR. HUDSON:
5      Q.  Yes.
6      A.  Then in that case, that is correct.
7      Q.  If you look here on what we've got up
8  here on the screen, do you agree that HBC Service
9  Company had an obligation to design a system to
10 disclose to HBC suspicious orders of controlled
11 substances?
12     MR. KOBRIN:  So the record establishes
13 that we're looking at a demonstrative that's not
14 been entered as an exhibit that summarizes the
15 subsection?
16     MR. HUDSON:  Correct.
17     THE WITNESS:  That's what you want him
18 to look at, not the reg. itself?
19     MR. HUDSON:  Correct.
20     THE WITNESS:  The display does show,
21 correct, that -- it says that HBC shall
22 essentially -- not essentially -- but they'll
23 operate a system to disclose suspicious orders of
24 controlled substance and copies and pastes the
25 list from the regs.

Page 78

BY MR. HUDSON:

Q. So you agree that what we've got displayed on the screen is consistent with the wording and the obligation that's set forth in the regulation itself?

MR. KOBRIN: Object to form.

THE WITNESS: Worded slightly different, but correct.

BY MR. HUDSON:

Q. In substance, what's on the screen accurately displays what the regulation requires; is that fair?

MR. KOBRIN: Object to form.

THE WITNESS: Well, not the regulation in the entirety. I mean, there's the other security pieces that go along with having that total scope of control. But for the subsection (b), it lists the examples that are listed on the regulation for unusual size, pattern and frequency.

BY MR. HUDSON:

Q. So can we agree that between 2009 and 2016, HBC had an obligation to design a system to disclose to HBC suspicious orders of controlled substances?

Page 79

A. I believe --

MR. KOBRIN: Object to form.

THE WITNESS: -- the Controlled Substances Act prescribes that for distributors.

BY MR. HUDSON:

Q. And can we agree that HBC under the Controlled Substances Act had an obligation to operate a system to disclose to HBC suspicious orders of controlled substances?

MR. KOBRIN: Object to form.

THE WITNESS: As a part of the other security requirements set forth in the other subsections of the regulation, that is correct.

BY MR. HUDSON:

Q. And can we agree that under the Controlled Substances Act, suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern and orders of unusual frequency?

MR. KOBRIN: Object to form.

THE WITNESS: That correctly stated the reg.

BY MR. HUDSON:

Q. Can we agree that HBC had an obligation to inform the field division office of the

Page 80

Administration in its area of suspicious orders when discovered by HBC?

MR. KOBRIN: Object to form.

THE WITNESS: As also stated in the regulation.

BY MR. HUDSON:

Q. So the answer is "yes"?

A. Correct.

Q. Now, at HBC between 2009 and 2016, who had responsibility for designing a system to disclose to HBC suspicious orders of controlled substances?

MR. KOBRIN: Object to form.

THE WITNESS: Restate the timeframe.

BY MR. HUDSON:

Q. 2009 to 2016.

A. The specific person tasked with designing the suspicious order piece? That's a good question who the individual was.

MR. KOBRIN: He supposes that it was -- you're saying designing --

MR. HUDSON: Just let him answer the question, please.

MR. KOBRIN: I would just like to clarify.

Page 81

MR. HUDSON: No. I don't need a clarification. I've been patient. You can say, "Objection. Form." There's a pending question. I'd like him to answer it.

MR. KOBRIN: I just want to object that it's not clear whether you're saying designing between 2009 and 2016 or earlier.

MR. HUDSON: You can say, "Objection. Form." That's fine.

MR. KOBRIN: I'd like to get it in the record. That's all. I don't think I'm interfering with your deposition.

MR. HUDSON: You are interfering with my deposition because you're trying to clarify my question. You can say, "Objection. Form." Then I'll clarify my question if I think the form is wrong.

MR. KOBRIN: He's struggling to give you an answer. He's clearly confused by your question.

MR. HUDSON: Do you want to coach anymore?

MR. KOBRIN: I don't think I'm coaching at all.

MR. HUDSON: Do you want to answer for

Page 82

1 him? "Objection. Form" please.
2       THE WITNESS: Go ahead and restate your
3 question.
4       MR. HUDSON: Can you read it back?
5       (The record was read back.)
6       MR. KOBRIN: Same objection.
7       THE WITNESS: 2009, I can't speak as to
8 who would have designed the process. I wasn't
9 involved. I was in the field and not at the
10 corporate office at that time.
11 BY MR. HUDSON:
12     Q. How about in 2010?
13     A. It was already in place or what was
14 there was already in place.
15     Q. How about 2011?
16     A. Same answer.
17     Q. How about 2012?
18     A. The same system would have been in
19 place. We were starting to look at -- well,
20 between 2011 and '12, my group did an overview of
21 controlled substance handling from cradle to grave
22 store level.
23     Q. How about 2013?
24     A. 2013, we started looking at drug
25 movement.

Page 83

1     Q. What's that mean?
2     A. So that would be -- looking at drug
3 movement would be how -- what products and types
4 of products are coming in and being dispensed via
5 prescriptions to the end user patient.
6     Q. Was that at the pharmacy store level
7 that you did the review of drug movement?
8     A. Looking at ordering patterns and
9 dispensing patterns, so store level.
10    Q. And who did that?
11    A. That was part of my group with IT's --
12 my group did not have the IT expertise. So we
13 relied on the pharmacy IT group to give us an
14 assist with creation and generation of reports for
15 us to utilize.
16    Q. Was that Kayla?
17    A. She would have been one of them, yeah,
18 absolutely. Kayla Voelker is who you're referring
19 to; is that correct?
20    Q. Yeah.
21    A. Okay.
22    Q. Other than Kayla Voelker, anyone else
23 involved?
24       MR. KOBRIN: Object to form.
25       THE WITNESS: So Shawn Boyton would have

Page 84

1 helped until his departure.
2 BY MR. HUDSON:
3     Q. Anyone else?
4     A. I don't remember when Joe Mishanski
5 left, but that was again, as previously stated,
6 the pharmacy IT group.
7     Q. Anyone else you can recall that was
8 involved in the drug movement project or
9 initiative?
10       MR. KOBRIN: Object to form.
11       THE WITNESS: My group, but we've stated
12 that.
13 BY MR. HUDSON:
14     Q. And that would be you?
15     A. George.
16     Q. And George Chunderlik. Anyone else?
17     A. And we may have had Adrienne. I don't
18 want to take a guess. But definitely George,
19 definitely the IT. And our admins would have been
20 involved.
21     Q. In 2013 in connection with the efforts
22 to review drug movement, were there any changes to
23 HBC's policies and procedures?
24     A. I wasn't involved in their policy and
25 procedure, as stated before. So I don't know if

Page 85

1 they changed anything from HR policies to
2 controlled substance policies, outside of the
3 changes we previously discussed.
4     Q. How about 2014?
5     A. Okay. Go ahead.
6     Q. Who was responsible for HBC's policies
7 and procedures and requirements under the
8 Controlled Substances Act as it related to the
9 distribution of prescription drugs?
10       MR. KOBRIN: Object to form.
11       THE WITNESS: The supervisor group or
12 the org chart for HBC from the person who ran it
13 day to day up through Greg's -- through the
14 merchandising group, still had the responsibility
15 for the operational procedures for that with my
16 input where asked and where necessary.
17 BY MR. HUDSON:
18     Q. So if we go back to the original
19 question I was focused on though, between 2009 and
20 2016, who was responsible for designing the system
21 to disclose to HBC suspicious orders of controlled
22 substances?
23       MR. KOBRIN: Object to form. Asked and
24 answered.
25       THE WITNESS: As far as a "You've been

Page 86

1 designated to be that person," I believe that fell
2 under that group. And then I gave significant
3 input as far as helping educate as to what
4 opportunities we have.
5      We have controls at all levels and how we can
6 evolve and continue to improve as information
7 comes in from our partners, whether the DEA or
8 boards of pharmacy.
9 BY MR. HUDSON:
10     Q. Is it fair to say then between 2009 and
11 2016, it was Randy or Greg who was always the one
12 who was responsible for the design of the system
13 to disclose to HBC suspicious orders of controlled
14 substances?
15     MR. KOBRIN: Object to form.
16     THE WITNESS: So for -- well, Randy
17 again, he left. And the time when he departed I
18 don't recall specifically. I apologize.
19     The design of the policies and procedures,
20 again, fell or would be under that org chart. I
21 certainly helped and my group helped review and
22 shape and gave significant input as far as changes
23 in -- based off of our meetings that we've had
24 with the DEA, through their pharmacy diversion
25 awareness conferences and the distributor

Page 87

1 conferences that I attended, one of the HBC people
2 attended, helped shape our understanding to
3 continue to evolve our controls for our self
4 distribution system.
5     MR. HUDSON: I move to strike the answer
6 as nonresponsive.
7 BY MR. HUDSON:
8     Q. If we get back to HBC's design of a
9 system to disclose to HBC suspicious orders of
10 controlled substances, do you agree that if HBC is
11 taking actions to comply with the law, that those
12 actions should be documented in writing?
13     MR. KOBRIN: Object to form.
14     THE WITNESS: We're required by law.
15 BY MR. HUDSON:
16     Q. Is the answer "yes"?
17     A. They would be required to document as
18 required by law or company policy.
19     Q. So it's your understanding of the
20 Controlled Substances Act that in terms of putting
21 a policy in place to monitor suspicious orders, if
22 HBC is taking actions to comply with that law,
23 those actions should be documented in writing?
24     MR. KOBRIN: Object to form. Misstates
25 the record.

Page 88

1     THE WITNESS: I would say that every
2 time where there is a requirement by law to retain
3 documentation, that HBC has an obligation to be
4 compliant with that law.
5 BY MR. HUDSON:
6     Q. Right. And in terms of specifically
7 taking actions to comply with the SOMS
8 requirements of the Controlled Substances Act, do
9 you agree that if HBC is taking actions to comply
10 with that law, those actions should be documented
11 in writing?
12     A. As policies and procedures, if that's
13 what you're referring to, policies and procedures
14 are created as needed, as required, retained per
15 company requirements and the law to be compliant.
16     Q. My question is more general than that.
17     As the senior manager of compliance at Giant
18 Eagle, one of your roles was to put in place
19 policies and procedures that comply with the law;
20 right?
21     A. Correct.
22     Q. Would you agree with me that if HBC
23 needed to take actions to comply with the law,
24 that those actions should be documented in
25 writing?

Page 89

1     MR. KOBRIN: Object to form.
2     THE WITNESS: I don't necessarily agree
3 with that, no. If it's not required to be
4 documented, is there a -- they should document --
5 actually, if they have an obligation to document,
6 we're required to document.
7 BY MR. HUDSON:
8     Q. Do you think it's a good practice from a
9 compliance perspective to put in writing actions
10 that are being taken at HBC to show compliance
11 with the law?
12     MR. KOBRIN: Object to form. Asked and
13 answered.
14     THE WITNESS: Again, those are the
15 policies and procedures.
16 BY MR. HUDSON:
17     Q. In your mind, if there isn't an
18 obligation under the law to specifically document
19 something, from a compliance perspective, it would
20 be your view that it's not necessary to put it in
21 writing and document it?
22     MR. KOBRIN: Object to form. Misstates
23 testimony.
24     THE WITNESS: The policies and
25 procedures were created to help, whether it's HBC,

Page 90

1 the corporation or the pharmacy operational group
2 be compliant with the law, rules, regulations,
3 federal, state and local.
4 BY MR. HUDSON:
5 Q. I guess what I'm asking --
6 A. That's why we put them in writing.
7 Q. And I guess what I'm asking is: Do you
8 agree that it is important to create policies and
9 procedures to document in writing actions that are
10 being taken by HBC that are required by law?
11 A. I believe it's important to have
12 policies and procedures that dictate the
13 requirements for compliance.
14 Q. And if particular laws require actions
15 by HBC to comply with the law, do you think it's
16 prudent to put policies and procedures in place to
17 make sure that the actions that are being taken by
18 HBC are documented in writing --
19 MR. KOBRIN: Object to form.
20 BY MR. HUDSON:
21 Q. -- so that the company can show what it
22 did to comply with the law?
23 MR. KOBRIN: Object to form.
24 THE WITNESS: Correct. Where they're
25 required to report, for example, that's

Page 91

1 documentation. So they would be required to
2 retain that; correct.
3 BY MR. HUDSON:
4 Q. My question though is more basic. Just
5 in general --
6 A. I apologize. I'm getting a grasp.
7 Q. That's okay. If HBC has a requirement
8 under the law to take certain actions to comply
9 with the law, do you agree that HBC should have
10 policies and procedures in place to make sure that
11 the actions that are being taken are documented in
12 writing?
13 MR. KOBRIN: Object to form. Asked and
14 answered. He's answered this very specific
15 question about two minutes ago.
16 THE WITNESS: And they're documented
17 through the policies and procedures that
18 require -- that guide HBC or pharmacy in general
19 to be compliant, documented in the policies and
20 the procedures.
21 BY MR. HUDSON:
22 Q. Right. And you keep saying that they're
23 documented in policies and procedures.
24 My question goes towards what policies and
25 procedures should be created by compliance? In

Page 92

1 other words, one of your responsibilities for
2 compliance was to actually be the group that
3 creates policies and procedures; right? Do you
4 agree with that?
5 A. I agree.
6 Q. And then put policies and procedures in
7 place so that everyone in the company is complying
8 with the law; right?
9 MR. KOBRIN: Object to form.
10 THE WITNESS: Correct. The policies and
11 procedures are to facilitate, educate and keep the
12 company compliant.
13 BY MR. HUDSON:
14 Q. So my question is: If in order to
15 comply with the law HBC needs to take certain
16 actions --
17 A. Correct.
18 Q. -- is it going to do things --
19 A. Correct.
20 Q. -- do you agree with me that HBC should
21 put policies and procedures in place to make sure
22 that the actions that are taken are actually
23 documented in writing so that HBC can show it
24 complied with the law?
25 MR. KOBRIN: Object to form. Asked and

Page 93

1 answered.
2 BY MR. HUDSON:
3 Q. Do you agree with that?
4 MR. KOBRIN: Object to form.
5 THE WITNESS: Only if required by law to
6 retain that documentation, to create and retain
7 that documentation to -- what you're asking is to
8 demonstrate compliance. Am I interpreting your
9 question correctly?
10 BY MR. HUDSON:
11 Q. What I'm getting at is if actions are
12 necessary to comply with the law, from a
13 compliance perspective, why wouldn't you document
14 in writing what the company is doing?
15 MR. KOBRIN: Object to form.
16 THE WITNESS: If you're not required to
17 document, why would you document.
18 BY MR. HUDSON:
19 Q. Would that be from your point of view,
20 the Giant Eagle view or the HBC view of
21 compliance?
22 MR. KOBRIN: Object to form. Misstates
23 testimony.
24 THE WITNESS: Requiring -- if the law
25 prescribes that documentation must be retained,

Page 94

1 created and retained to show compliance, then the
2 organization has to be -- in order to be compliant
3 with that law has to create and retain that
4 information.
5 BY MR. HUDSON:
6    Q.  And my point is if part of the
7 requirements of the law are to take actions, do
8 things -- so let's say, for example, under the
9 suspicious order monitoring system, if you have an
10 order that gets flagged because you believe that
11 it might be at risk for diversion, then would you
12 agree with me that there's an obligation to go and
13 investigate or due diligence look at that order?
14       MR. KOBRIN:  Object to form.
15       THE WITNESS:  That's a different
16 question than you asked before.  Previous question
17 was just on creating and retaining documents.  Now
18 your question now was an obligation to do due
19 diligence on an investigation?  So change -- am I
20 interpreting your question correctly?
21 BY MR. HUDSON:
22    Q.  My questions before related to taking
23 actions.  All of my questions that I asked were if
24 the law requires you to take certain actions,
25 should those be documented in writing.

Page 95

1    Now I'm asking more specifically.  So let's
2 talk about the Controlled Substances Act and, in
3 particular, suspicious orders.
4    Can we agree that a distributor, one of its
5 obligations is if an order is flagged as being
6 suspicious, then the distributor is to go and
7 investigate or do due diligence on that order to
8 try to figure out whether it's at risk for
9 diversion?
10       MR. KOBRIN:  Object to form.
11       THE WITNESS:  So the reg. reads -- let
12 me read that again -- the registrant shall inform
13 the field division office in his area of
14 suspicious orders when discovered by the
15 registrant.  Then it goes on to say unusual size,
16 frequency and pattern.
17    So does that answer your question?
18 BY MR. HUDSON:
19    Q.  Not really.  Let me try again.
20    A.  Sorry.
21    Q.  Do you agree that under the Controlled
22 Substances Act, a distributor who flags a shipment
23 as being suspicious or at risk for diversion has
24 an obligation to go and conduct an investigation
25 or do due diligence?

Page 96

1       MR. KOBRIN:  Object to form.  Compound.
2       THE WITNESS:  How do you know an
3 order -- let me rephrase.
4    There should be a system in place to identify
5 orders that are suspicious.  You have to find out
6 why they are, what are the criteria.  As part of
7 the bigger picture of the controls of this reg.
8 and from the diversion conferences and
9 interactions with the DEA, the biggest safety
10 control is knowing your customer.
11    In this case, Giant Eagle is wholly the only
12 customer to itself and its distribution.
13       MR. HUDSON:  I'll move to strike the
14 answer as nonresponsive and come back to my
15 question.
16 BY MR. HUDSON:
17    Q.  Do you agree under the Controlled
18 Substances Act, if a distributor flags a shipment
19 as being suspicious for diversion, that that
20 distributor has an obligation to go and
21 investigate that shipment?
22       MR. KOBRIN:  Object to form.
23       THE WITNESS:  Whether an individual
24 order or a bad prescription, pharmacists or the
25 organization has to understand why it's

Page 97

1 suspicious.
2 BY MR. HUDSON:
3    Q.  If a distributor flags an order as being
4 suspicious, do you agree that that distributor has
5 an obligation to go and conduct due diligence to
6 try to figure out whether it's a legitimate order
7 or an order at risk of diversion?
8       MR. KOBRIN:  Object to form.
9 BY MR. HUDSON:
10    Q.  "Yes" or "no."  Do you agree with that?
11    A.  Yes.
12    Q.  So investigation is a requirement.
13 Investigation of shipments that are flagged as
14 being suspicious or at risk of not being
15 legitimate, we can agree an obligation is to go
16 and investigate that shipment; is that fair?
17       MR. KOBRIN:  Object to form.
18       THE WITNESS:  You need to make -- the
19 investigation you need to -- whether you say
20 obligation or not, the organization needs to
21 determine is it a suspicious order and the reason
22 why.
23 BY MR. HUDSON:
24    Q.  Right.  And so it needs to go and
25 investigate or conduct due diligence to figure out

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 whether that order is legitimate or whether it's
2 not; is that fair?
3     A.  Correct.
4         MR. KOBRIN:  Object to form.
5 BY MR. HUDSON:
6     Q.  So can we agree that under the
7 Controlled Substances Act, HBC as a distributor
8 has an obligation to investigate shipments that
9 are flagged as being suspicious for diversion?
10        MR. KOBRIN:  Object to form.
11     Make sure you give me a chance to object.
12        THE WITNESS:  I apologize.
13     I don't believe that the obligation to
14 investigate or those words are used in the
15 Controlled Substances Act under that -- under
16 1301.74(b) specifically.  Well, let's see.
17 BY MR. HUDSON:
18     Q.  Mr. Millward, putting aside the
19 regulation itself, just in general, the Controlled
20 Substances Act, one of the things you did when you
21 were the senior manager of compliance at Giant
22 Eagle is you wrote, actually wrote policies for
23 HBC and Giant Eagle on how to comply with the
24 suspicious order monitoring requirements of the
25 Controlled Substances Act; right?

Page 99

1     A.  As a portion or a part of the overall
2 controlled substance handling.
3     Q.  Right.  So you have familiarity with
4 this regulation and this framework of regulations
5 that are in place; right?
6     A.  Correct.
7     Q.  And you understand that it's a closed
8 system where anyone handling controlled substances
9 needs to be registered?
10     A.  From manufacturers, distributors,
11 pharmacies.
12     Q.  Right.  And you understand that the
13 point of that regulatory framework is to make sure
14 that prescription drugs and controlled substances
15 are not diverted for illegal purposes; right?
16        MR. KOBRIN:  Object to form.
17        THE WITNESS:  Correct.  The framework is
18 in place to prevent diversion; right.
19 BY MR. HUDSON:
20     Q.  In other words, the framework is in
21 place to create a system where legitimate
22 prescriptions are being filled that are medically
23 necessary; right?
24        MR. KOBRIN:  Object to form.
25        THE WITNESS:  Correct, access to

Page 100

1 medications for people who have a need; correct.
2 BY MR. HUDSON:
3     Q.  And so as part of that process,
4 distributors have certain obligations to take
5 actions to make sure that the drugs that they're
6 shipping are not being diverted for illegal
7 purposes.  Can we agree with that?
8        MR. KOBRIN:  Object to form.
9        THE WITNESS:  Correct.
10 BY MR. HUDSON:
11     Q.  And so when a distributor like HBC
12 identifies an order as being suspicious or has the
13 potential of diversion, can we agree that HBC has
14 an obligation to go and investigate that order to
15 determine whether it's legitimate or not?
16        MR. KOBRIN:  Object to form.
17        THE WITNESS:  When there is a flag, it
18 gets investigated.
19 BY MR. HUDSON:
20     Q.  And so can we agree that any order that
21 gets flagged by HBC, then the law says go and
22 investigate and figure out whether it's legitimate
23 or not?
24        MR. KOBRIN:  Object to form.  Misstates
25 the regulations.

Page 101

1        THE WITNESS:  I don't believe the law
2 says that, but that's what occurs.
3 BY MR. HUDSON:
4     Q.  In the regulatory framework though,
5 that's the expectation?
6        MR. KOBRIN:  Object to form.
7 BY MR. HUDSON:
8     Q.  When a distributor flags an order as
9 being suspicious of diversion, then the
10 distributor has an obligation to go and figure out
11 whether it's a legitimate order or not?
12        MR. KOBRIN:  Object to form.  Is that a
13 question?
14 BY MR. HUDSON:
15     Q.  Do you agree with that?
16     A.  The DEA allows the distributors to
17 determine or to set forth their procedures to meet
18 the requirements.
19     Q.  And in terms of HBC's procedures, would
20 you agree that going and investigating orders that
21 got flagged was something that HBC was required to
22 do under its policies and procedures?
23        MR. KOBRIN:  Object to form.
24        THE WITNESS:  Under policies and
25 procedures, investigating the flagged orders,

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 absolutely.
2 BY MR. HUDSON:
3    Q.  Each and every one, each and every
4 flagged order or flagged shipment should be
5 investigated under HBC's policies and procedures;
6 correct?
7    A.  Each should have to have a level of
8 review, absolutely.
9    Q.  And if HBC does not review or
10 investigate orders that are flagged, would you
11 agree that that would be a violation of HBC's
12 policies and procedures?
13    A.  If HBC was not -- if policies were not
14 being followed, then that would be outside of the
15 policy, I guess.
16    Q.  Right.  And you'd agree that one of the
17 HBC policies or procedures was that if an order
18 gets flagged, it needs to be reviewed or
19 investigated?
20    A.  I don't have the policy offhand, but I
21 believe that that's reasonable.  I don't remember
22 the policy off the top of my head.  Actually, I
23 take that back.  If an order is flagged, it would
24 be -- it would be reviewed, investigated to some
25 degree.

Page 103

1    Q.  And if an order was flagged for some
2 reason, but it wasn't investigated or reviewed,
3 you would agree that would be a violation of HBC's
4 policies and procedures; correct?
5       MR. KOBRIN:  Object to form.
6       THE WITNESS:  If HBC or personnel didn't
7 follow the policies that were set forth, then they
8 would be in violation of the policy.
9 BY MR. HUDSON:
10    Q.  And because there was a specific policy
11 that each order flagged should be reviewed or
12 investigated, you would agree that if a particular
13 order or shipment was not reviewed or
14 investigated, that would be a violation of HBC's
15 policies and procedures; correct?
16       MR. KOBRIN:  Object to form.  Asked and
17 answered.
18       THE WITNESS:  If they didn't follow --
19 if personnel or at any level didn't follow the
20 policies, then I agree it would be a violation of
21 that policy.
22 BY MR. HUDSON:
23    Q.  And in the particular case of reviewing
24 or investigating orders that are flagged, if
25 personnel didn't review or investigate orders that

Page 104

1 were flagged, you would agree that that would be a
2 violation of HBC's policies and procedures;
3 correct?
4       MR. KOBRIN:  Object to form.  Same
5 objection.
6       THE WITNESS:  I believe I answered that
7 already.
8 BY MR. HUDSON:
9    Q.  It's just a "yes" or "no" question.  In
10 other words, if HBC has a policy that orders that
11 are flagged should be reviewed or investigated,
12 you'd agree with me that if flagged orders are not
13 reviewed or investigated, that would be a
14 violation of HBC's policies or procedures;
15 correct?
16       MR. KOBRIN:  Object to form.  He doesn't
17 have to answer "yes" or "no."  I don't want you
18 instructing him he has to answer "yes" or "no."
19 BY MR. HUDSON:
20    Q.  You can answer.
21    A.  I believe I have.  If policies were --
22 not following a policy would be a violation of
23 that individual policy, regardless of what -- if
24 it's controlled substance, if it's human
25 resources, if it's time and attendance, it's all

Page 105

1 the same.
2    Q.  Correct.  And you've also agreed with me
3 that there was a policy and procedure in place to
4 review or investigate orders that are flagged as
5 suspicious; correct?
6    A.  We had a procedure to do so.
7    Q.  My specific question is:  If HBC flagged
8 an order as being suspicious, then you would agree
9 with me that if it was not investigated or
10 reviewed, that would be a violation of HBC's
11 policies or procedures?
12       MR. KOBRIN:  Object to form.
13       THE WITNESS:  Any policy that's not
14 followed, if it spells forth an action to take and
15 that action isn't taken, then it would be a
16 violation of the policy.
17 BY MR. HUDSON:
18    Q.  Can you answer my specific question
19 about reviewing or investigating flagged orders?
20    A.  Whether the policy is flagged orders or
21 it's anything else, it all follows the exact same
22 process.
23    Q.  Can you answer the specific question?
24 In other words, can you tell me if an order was
25 flagged as being suspicious and HBC did not review

Page 106

1 or investigate that order, would that or would
2 that not be a violation of HBC policies and
3 procedures?
4      MR. KOBRIN: Object to form. This has
5 been asked and answered. This whole line of
6 questioning is getting argumentative.
7      THE WITNESS: Again, if the procedure or
8 the procedure requires the investigation of a
9 flagged order, just as any other policy, and the
10 policy is not followed, then your answer -- then
11 there would be a violation of policy regardless of
12 the policy.
13      MR. KOBRIN: Do you want to take a
14 break? It's been about an hour.
15      THE WITNESS: Yeah, please.
16      MR. HUDSON: Let's go off the record.
17      THE VIDEOGRAPHER: 11:32. We're off the
18 video record.
19      (Recess from 11:32 a.m. to 11:55 a.m.)
20      THE VIDEOGRAPHER: 11:55. We are on the
21 video record.
22 BY MR. HUDSON:
23      Q. Sir, I'm going to hand you what we've
24 marked as Exhibit 3.
25      MR. HUDSON: This has got an internal

Page 107

1 number P-GEN-3.
2 BY MR. HUDSON:
3      Q. My question is: Do you recognize this
4 set of documents?
5      (HBC-Millward Exhibit 3 was marked.)
6      THE WITNESS: Give me a second to
7 review, please.
8      (Witness reviewed the exhibit.)
9      THE WITNESS: Appears to be a Dear
10 Registrant letter; correct?
11 BY MR. HUDSON:
12      Q. Correct. Are you familiar with Dear
13 Registrant letters?
14      A. I knew the DEA sends them out. And we
15 have how many years worth here?
16      Q. I believe these are a set of Dear
17 Registrant letters from 2006, 2007 and 2012
18 relating to distributing controlled substances or
19 manufacturing controlled substances.
20      A. Okay.
21      Q. My question is just: Do you recognize
22 any of these letters?
23      A. Not from 2006 or 2007 as I was not in
24 the role at that time. And I can't remember if I
25 saw specifically this one during my time in 2012.

Page 108

1      Q. Do you know whether anyone at Giant
2 Eagle or HBC received the first letter from 2012?
3      A. Honestly, I can't speak to anybody
4 else's history or recollection.
5      Q. Given that the letter indicates it was
6 sent to every entity in the United States who is
7 registered with the DEA to manufacture or
8 distribute controlled substances, do you believe
9 that someone at Giant Eagle or HBC received this
10 letter from the DEA in 2012?
11      MR. KOBRIN: Object to form. I wouldn't
12 speculate as to your beliefs.
13      THE WITNESS: State the question again.
14 I'm sorry.
15 BY MR. HUDSON:
16      Q. Given that the DEA in this letter states
17 in the beginning that it's being sent to every
18 entity in the United States who is registered with
19 the DEA to manufacture or distribute controlled
20 substances, do you believe that this letter was
21 sent to HBC?
22      MR. KOBRIN: Same objection.
23      THE WITNESS: As a registrant with the
24 DEA and the DEA, as they state, sent it to all
25 registrants, then while I can't say that it

Page 109

1 physically made it -- I can't say that it
2 physically made it to HBC as I wasn't there to
3 receive the letter personally. I can't speak to
4 that.
5      But if every registrant in the country who,
6 as it says, manufactures or distributes controlled
7 substances, it reasons to believe that every
8 registrant received one.
9 BY MR. HUDSON:
10      Q. And in 2012, HBC was a registrant to
11 distribute controlled substances; correct?
12      A. Correct.
13      Q. And in your role as senior manager of
14 compliance, do you have any knowledge about who at
15 HBC would have been receiving this letter from the
16 DEA?
17      A. The personnel at HBC.
18      Q. Who in particular do you think that
19 would be at HBC, if you know?
20      A. In 2012?
21      Q. Um-hum.
22      A. 2012, I don't remember. Actually, I
23 don't remember who the -- over the general manager
24 or whatever that role -- who was in that role
25 specifically, and I don't want to guess as to

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 their name.
2    Q. Well -- go ahead.
3    A. No, no. By all means, go ahead.
4    Q. Is this the type of communication from
5 the DEA that you in your role as senior manager of
6 compliance would have received a copy of?
7    A. I don't -- I don't -- I don't recall
8 receiving a copy of it. Could possibly.
9    Q. In terms of the practices at Giant Eagle
10 or HBC, would it have been your expectation that a
11 letter like this from the DEA would make its way
12 to you as the senior manager of compliance?
13    A. I would hope so.
14    Q. And were there policies or practices in
15 place that would ensure that a letter like this
16 from the DEA would make its way to you or others
17 in the compliance group?
18    A. I'm not aware of a specific policy
19 regarding that.
20    Q. For this type of Dear Registrant letter
21 from the DEA, within Giant Eagle or HBC who would
22 you expect to receive a copy of a letter like
23 this?
24    A. Well, it was sent to the registrant. So
25 it would have been sent to HBC, assuming as a

Page 111

1 registrant and the DEA is following through, that
2 it would have been received by the personnel that
3 were there.
4    The supervisor, whose name I don't recall
5 specifically 2012, and I apologize, would have
6 physically received the letter. My hopes would
7 have been that it would have made it into the
8 corporate office.
9    Q. So you mean it would be physically sent
10 to the HBC warehouse --
11    MR. KOBRIN: Object to form.
12 BY MR. HUDSON:
13    Q. -- would be your expectation as the
14 registrant?
15    A. Well, according to what it says from the
16 DEA on the first paragraph, which you read, the
17 letter would have been sent to the registrant, and
18 that registrant would have been HBC.
19    Q. Would it be Walter Durr? Was he the
20 supervisor of the HBC facility?
21    MR. KOBRIN: Object to form.
22    THE WITNESS: No. Walter Durr -- that's
23 his last name -- 2012, I don't think it was him.
24 If I think of the other guy back then...
25

Page 112

1 BY MR. HUDSON:
2    Q. Did you then in your role, your
3 compliance role receive any materials, attend any
4 seminars in connection -- that were being held by
5 the DEA to familiarize yourselves with the
6 requirements of the Controlled Substances Act?
7    MR. KOBRIN: Object to form.
8    THE WITNESS: As stated in a previous
9 answer, I did attend the pharmacy diversion
10 awareness conferences as well as a distributor
11 version of the same. That was with Matt Rogos.
12 That actually might have been who was in there in
13 2012 for HBC.
14 BY MR. HUDSON:
15    Q. You attended a pharmacy diversion
16 awareness seminar?
17    A. A PDAC, yes, as they refer to it.
18    Q. What is the acronym?
19    A. PDAC.
20    Q. PDAC?
21    A. Pharmacy diversion awareness conference.
22    Q. And was that in Washington, DC?
23    A. The pharmacy diversion awareness
24 conferences were -- well, the last one was in
25 Pittsburgh. It was downtown. I don't remember

Page 113

1 the hotel. It's right by the hockey there.
2    The one before, the first one I went to, I
3 don't remember where that one was offhand. I
4 don't remember. But the diversion or the
5 distributor one was in DC.
6    Q. When was that?
7    A. I don't remember the date offhand.
8    Q. Any ballpark?
9    A. I'd have to look at the -- at my
10 communication that had it.
11    Q. So in terms of seminars that you
12 attended, just to make sure we've got a complete
13 list, are there two?
14    A. Three total.
15    Q. Three total?
16    A. Two PDACs and one distributor.
17    Q. Two PDACs, one distributor?
18    A. That's correct.
19    Q. And do you know any of the dates of any
20 of those three seminars?
21    A. The last one in Pittsburgh, I think I --
22 I'd have to look at the calendar, but it was
23 December. Year? I don't remember the year.
24 December 10 stands out. I think it was
25 December 10 and 11, whatever was the Wednesday --

Page 114

1 I think there was a Wednesday, Thursday, if I
2 recall.
3     That one just stands out because I met my
4 father here. That's why. He came in for it, too.
5 That's why it's unique.
6     Q. But no recollection of the year?
7     A. Not off -- I'd have to look again at --
8 I have access to my old calendar.
9     Q. As a result of any of the seminars that
10 you attended, did you propose new policies or
11 procedures at Giant Eagle or HBC?
12     A. So from both or we'll say the two PDACs
13 and the distributor, the information that was
14 there, I shared the slides and presentation with
15 the operational group. And taking the information
16 and education as provided by the representatives
17 of the DEA, looked to continue to involve or
18 evolve our existing control procedures, pharmacy,
19 distribution, corporate, to ensure compliance;
20 kind of that whole spectrum of control that we put
21 in at all levels.
22     Q. As a result of attending any of these
23 seminars, the three seminars that you've
24 referenced, did you or anyone at Giant Eagle or
25 HBC implement new policies or procedures?

Page 115

1     A. When we learned new or information from
2 the DEA, interpretation as to the information
3 presented, that all goes into shaping and evolving
4 our practices.
5     Q. As a result of attending any of the
6 three seminars that you've referenced, are there
7 any specific policies or procedures that you or
8 anyone at Giant Eagle or HBC enacted that you
9 recall as you sit here today?
10     MR. KOBRIN: Object to form.
11     THE WITNESS: There were policies and
12 procedural adjustments, sure.
13 BY MR. HUDSON:
14     Q. And what were those?
15     A. Specifically?
16     Q. Yes.
17     A. We continued to evolve our control with
18 the monitoring and distribution and dispensing of
19 controlled substances.
20     Q. Anything more specific you can say?
21     A. As far as taking information that was
22 presented to change how we handle the receipts,
23 the monitoring of movement and the continued
24 vigilance for preventing diversion through the
25 supply chain of -- the internal supply chain to

Page 116

1 the end user patient.
2     Q. As a result of attending these seminars,
3 did you learn information that you then
4 incorporated in any policies or procedures related
5 to monitoring of orders of controlled substances
6 to prevent diversion?
7     MR. KOBRIN: Object to form.
8     THE WITNESS: To continue to improve our
9 overall controls and with regards to all the
10 regulations and order monitoring.
11 BY MR. HUDSON:
12     Q. What did you do to improve them?
13     A. Specifically?
14     Q. Yeah. Specifically what did you do to
15 improve them?
16     A. We reviewed the suspicious order
17 monitoring, having the ability -- again,
18 reiterating the responsibility of the distributor
19 to be able to identify suspicious orders of
20 controlled substances and see what other
21 opportunities we had to evolve our existing
22 controls to be even better.
23     Q. Well, was HBC monitoring shipments to
24 identify suspicious orders of controlled
25 substances?

Page 117

1     MR. KOBRIN: Object to form.
2     THE WITNESS: I believe that we were
3 compliant.
4 BY MR. HUDSON:
5     Q. My question though is: During the
6 entire time that you were in the role of senior
7 manager of compliance at HBC, was HBC monitoring
8 shipments of controlled substances to identify
9 suspicious orders?
10     MR. KOBRIN: Object to form. Misstates
11 the record.
12     THE WITNESS: So I wasn't the manager of
13 compliance for HBC. Can I correct that? It was
14 for Giant Eagle, for the pharmacy, quality and
15 compliance.
16     And were orders -- we looked at -- since we
17 had -- our system was a complete system of having
18 the benefit of only having our pharmacies to
19 dispense. We knew every -- monitor the
20 prescription movement, being able to look at
21 dispensing patterns, prescribing patterns to
22 prevent suspicious orders from being created; so
23 watched it from the ground up as part of that
24 system of overall control.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 118

BY MR. HUDSON:

Q. During the entire time that you were in your role as senior manager of compliance at Giant Eagle, was HBC systematically monitoring shipments of controlled substances to identify suspicious orders?

A. There was a system in place to identify, yeah. I would say yes. We monitored our -- or had procedures in place overall to watch controlled substance movement to identify where suspicious orders may be created and ideally to prevent them from ever occurring.

Q. Did you have policies or procedures to document what you were doing at HBC to monitor those shipments?

MR. KOBRIN: Object to form.

THE WITNESS: As we said earlier on the policies and the procedures, those were reviewed later or those -- I'm sorry -- those were -- step back. Repeat the question more one time. I'll take a second.

BY MR. HUDSON:

Q. Did you have policies or procedures to document what you were doing at HBC to monitor shipments of controlled substances?

Page 119

MR. KOBRIN: Object to form. It's a little bit confusing. I don't want to interfere with your question.

BY MR. HUDSON:

Q. Let me try again.

Did you have policies or procedures to document in writing what actions HBC was taking to monitor shipments of controlled substances?

MR. KOBRIN: Object to form.

THE WITNESS: I believe we talked about this before the break, but the policies to create documents, retain documents would be as required and spelled out by -- any documentation that was required by law would have been created and retained.

BY MR. HUDSON:

Q. To your knowledge, did you have policies or procedures to document in writing what actions HBC was taking to monitor shipments of controlled substances?

MR. KOBRIN: Object to form. Asked and answered.

THE WITNESS: Where required.

BY MR. HUDSON:

Q. Did you say, "Where required"?

Page 120

A. By law, sure.

Q. From a compliance perspective, what was required by law?

MR. KOBRIN: You've shown him a section of the regs. I just want to object to that question. Are you asking him from his memory to tell you what was required under the Controlled Substances Act and all the other regulations?

BY MR. HUDSON:

Q. I'm saying as the senior manager of compliance at Giant Eagle, what was required by law?

A. It was required to notify the DEA if an order was deemed -- if an order was deemed suspicious and stopped from shipment, notify the DEA.

Q. And how many times did that happen while you were at Giant Eagle?

A. I believe twice we stopped shipments.

Q. And both times did you notify the DEA?

A. Yes.

Q. In your mind, were there any other requirements?

MR. KOBRIN: Object to form.

THE WITNESS: Any other requirements?

Page 121

BY MR. HUDSON:

Q. To monitor --

A. Or document?

Q. -- shipments of controlled substances to determine whether or not they were suspicious.

MR. KOBRIN: Object to form.

THE WITNESS: Any other requirements beyond what is in the reg. I guess is my question.

BY MR. HUDSON:

Q. You can put the reg. aside. I'm just asking you as a former senior manager of compliance at Giant Eagle, how did this system work?

MR. KOBRIN: Objection.

BY MR. HUDSON:

Q. What review in your mind -- what was HBC required to do?

MR. KOBRIN: Object to form.

THE WITNESS: They're required to follow the reg. and the list of regs. beyond which cover physical controls as well beyond the others that are there and whenever -- and have a system in place, though the DEA does not define the system or what that system is, to be able to identify suspicious orders and report accordingly.

Page 122

1  BY MR. HUDSON:
2     Q.  And when you assumed your role at HBC,
3  what did that system look like?  How did it work?
4        MR. KOBRIN:  Object to form.
5        THE WITNESS:  It was a whole company
6  system that involved procedures at the pharmacy,
7  at the distribution center, at corporate to be
8  able to know the -- again, we had the benefit of
9  Giant Eagle pharmacies were only or HBC only
10  distributed to Giant Eagle pharmacies both
11  controls and noncontrols, along with merchandise
12  as well out of that distribution center, but had
13  access to every prescription that was dispensed.
14     So part of that control is knowing your
15  customer, and we knew our customers, our
16  pharmacies, better than anybody else possibly
17  could.  And so had complete visibility and access
18  into the movement.
19     If it starts with the prescription and the
20  order and pharmacies by law and practice only
21  dispense orders pursuant to a prescription, they
22  can only order to cover those products, and that's
23  one of the multiple levels of controls that are
24  there.
25     So if know your customer as being the

Page 123

1  umbrella for which diversion is prevented and
2  knowing where those prescriptions are going, you
3  have a deeper ability to prevent even a suspicious
4  order from being created.  The fact that we found
5  two, I think, is a testament that the system
6  worked, our system was in place and working.
7  BY MR. HUDSON:
8     Q.  The fact that you found two suspicious
9  orders in the six years that HBC was a distributor
10  of opioids?
11     A.  It probably started after '13, and it
12  was a two schedule -- or the same drug, but they
13  were Schedule IIIs.
14     Q.  What do you mean it probably started
15  after 2013?  You mean your monitoring?
16     A.  No.  I mean we involved the -- we always
17  would look at -- there was always a process in
18  place to review movement of product since it's
19  ourself distributing to self, to monitor it along
20  the entire way to meet that requirement as an
21  overall system of control.
22     Q.  So your testimony is that HBC and Giant
23  Eagle collectively had a whole company system; is
24  that right?
25     A.  Corporate level, pharmacy level,

Page 124

1  distributor level.
2     Q.  So you've got the pharmacies involved.
3  The warehouse, the HBC warehouse is involved.  And
4  corporate is involved in the system?
5     A.  I believe that's fair to say.
6     Q.  Where do I go at HBC or Giant Eagle to
7  figure out who had what role and how the system
8  worked in 2009 through 2014?
9        MR. KOBRIN:  Object to form.
10        THE WITNESS:  It involves the entire --
11  it involved the group.  So from the group that
12  oversaw HBC to the compliance group to the PDLs
13  and making sure stores were complying or doing
14  their role, as the role I was in previously, to
15  the pharmacy IT group in providing the data as
16  stated previously.
17  BY MR. HUDSON:
18     Q.  Is there a manual or a book or something
19  I can go to to see how this system was designed to
20  operate?
21        MR. KOBRIN:  Object to form.
22        THE WITNESS:  I don't know if there was
23  a book form, but it would be contained in the
24  policies and the procedures at the different
25  levels.

Page 125

1  BY MR. HUDSON:
2     Q.  So it's your testimony that we will be
3  able to find policies and procedures at the
4  pharmacy level, the warehouse level and the
5  corporate level that would specifically relate to
6  monitoring shipments from HBC to Giant Eagle
7  pharmacies to determine whether or not they're
8  suspicious?
9        MR. KOBRIN:  Object to form.
10        THE WITNESS:  Well, I know we talked
11  about the policies earlier in the conversation.
12  And as far as where the policies for the
13  distribution center, when I got involved with the
14  distribution center would have been through the
15  VAWD process and then subsequently GERX.  But
16  sharing info with the group from the conferences.
17  BY MR. HUDSON:
18     Q.  I agree.  I mean, HBC -- I'll represent
19  to you that the company has answered questions
20  that we've asked them about written policies.  And
21  you definitely were involved.  There were written
22  policies in place in 2015 and later; right?  Do
23  you agree with that?
24        MR. KOBRIN:  Object to form.
25        THE WITNESS:  I agree that's when I had

Page 126

1 some input on that.
2 BY MR. HUDSON:
3    Q.  So in 2015 and later, we can point to
4 written policies that existed at HBC and Giant
5 Eagle to look at the specific processes put in
6 place to monitor suspicious orders of controlled
7 substances; right?
8    MR. KOBRIN:  Object to form.
9    THE WITNESS:  As part of the review and
10 creation of policy or -- I should say revising of
11 policies and formatting for VAWD certification.
12 BY MR. HUDSON:
13    Q.  Right.  One of the things you did was
14 put in place written policies; right?
15    A.  Correct.  Well, guide and create them
16 with the group, not just me exclusively, our
17 policy group.
18    Q.  Prior to 2015 though, there were no
19 specific written policies that existed at HBC or
20 Giant Eagle directly related to monitoring
21 shipments of controlled substances from HBC to
22 Giant Eagle; correct?
23    MR. KOBRIN:  Object to form.  Misstates
24 the record.
25    THE WITNESS:  I don't believe -- I don't

Page 127

1 agree with that characterization.
2 BY MR. HUDSON:
3    Q.  You're aware of written policies that
4 existed?  Are you aware of written policies that
5 existed prior to 2015?
6    A.  Do I recall them now?  Do I recall the
7 specific policies previously?  Not off the top of
8 my head.
9    Q.  Do you have any reason to believe as you
10 sit here today that there were written policies
11 that existed prior to April 9, 2015 at HBC to
12 monitor shipments from HBC to Giant Eagle?
13    A.  Do I believe -- restate it one more
14 time.
15    Q.  Do you have any reason to believe that
16 written policies existed at Giant Eagle or HBC
17 prior to April 9, 2015 that were in place to
18 identify, investigate or report suspicious orders
19 from HBC to Giant Eagle pharmacies?
20    MR. KOBRIN:  Object to form.
21    THE WITNESS:  Again, I don't recall
22 specific policies.
23    (HBC-Millward Exhibits 4 - 5 were marked.)
24 BY MR. HUDSON:
25    Q.  I'll hand you then what I've marked as

Page 128

1 Exhibits 4 and 5.
2    (Witness reviewed the exhibit.)
3 BY MR. HUDSON:
4    Q.  In particular, I'll represent to you
5 that Exhibit 4 is a discovery request -- I'm
6 sorry -- a discovery response that HBC provided to
7 plaintiffs' set of combined discovery requests.
8 So these are basically questions that HBC
9 answered.
10    And in particular, I'm focused on the second
11 question, which is on page 8, which says, "Please
12 produce each of your suspicious order monitoring
13 system policies and procedures since January 1,
14 2006 and identify the Bates-stamp range for each.
15 Please identify the effective dates each was in
16 force and effect."
17    Do you see that?
18    A.  Hold on.  Where were you on page 8
19 again?  I'm sorry.
20    Q.  Under number two, the question.  If you
21 look up there on the board, he's got it set up for
22 you.
23    A.  Okay.  Sorry.
24    Q.  So you've got that question in mind?  If
25 we move to page 9, the next page, and zero in on

Page 129

1 the bottom half of that, there's a list of Bates
2 numbers there.  And above it, it says, "HBC also
3 responds it's produced written SOMS policies in
4 response to Request No. 25 in Plaintiffs' First
5 Set of Requests for Production of Documents to HBC
6 Service Company that are located at..."  And then
7 you see underneath there's a list of
8 policies and procedures.
9    And so if you go back to the question, you
10 see the question was, state policies and
11 procedures since January 1, 2006 and please
12 identify the effective dates each was in force and
13 effect.
14    Then we've got a list of documents by Bates
15 range in response to that.  Do you see that?
16    A.  I do see where you're reading.
17    Q.  What I've done is I've gone and taken
18 each one of those Bates range responses and put
19 those documents together and put it into one
20 document.  And that's Exhibit 5.
21    So you've got here the questions and answer
22 about policies and procedures and the effective
23 dates, and then we've got the documents
24 themselves.
25    Do you see there under these, the first one

Page 130

1 HBC_MDL00078638 through 8639, and then next to it,
2 it says, HBC policy effective 4/9/2015 to
3 2/26/2016?
4     A.  I see that.
5     Q.  And then if we go to Exhibit 5 and we
6 zoom in on the top of that, do you see there
7 revision date 4/9/2015?
8     A.  Yes, I do.
9     Q.  Now, are you aware as you sit here today
10 of any written policies, written SOMS policies
11 that were in force and effect prior to April 9,
12 2015?
13     A.  According to the document, April 1,
14 2014 -- I'm sorry -- is the effective date as
15 written on here.
16     Q.  So this document that's been provided to
17 us as a written SOMS policy we've got here, the
18 effective date is from 4/9/2015 to 2/26/2016.  You
19 agree with that; right?
20     A.  State that timeframe again, please.
21     Q.  4/9/2015 to 2/26/2016.
22     A.  This would be the revision date;
23 correct.
24     Q.  If you look at the next policy, which is
25 Bates ending 4386, you can see there that it

Page 131

1 has -- we've got a new revision date of 2/26/2016.
2 He's got it pulled up there for you.
3     And that's consistent with the answer that's
4 provided by the company about the effective date
5 of HBC written policies; right?
6     A.  I don't -- well -- I don't know how the
7 company testified.
8     Q.  Well, it's not testimony.  I mean
9 testified through these written responses.  It's
10 right there on the page.  You see that; right?
11     A.  Yes.
12     Q.  Now, you've pointed out that this first
13 policy that's been identified here says that it
14 had a created date of actually 8/1/2014 just right
15 back on the front page, right there.
16     A.  Yes.  I see that.
17     Q.  Now, there isn't any document listed
18 here that actually establishes that there was a
19 policy that was in place and effective during that
20 time.
21     Are you aware of a prior version of this
22 document that was created on August 1, 2014?
23     A.  Since this is a revision of the
24 August 14th document --
25     Q.  I think you meant August 1, 2014.

Page 132

1     A.  I'm sorry.  I apologize.  -- August 1,
2 2014 document, that there was a document from that
3 date.
4     Q.  And I'll represent to you that I have
5 looked high and low in the files produced in this
6 case, and I can't find it.  And I'll also
7 represent to you that in the responses to our
8 questions, HBC hasn't identified a Bates range for
9 that document.
10     As you sit here today, do you believe that
11 there is a more -- an older version of this policy
12 that existed and was created on August 1, 2014?
13     A.  Do I believe that there was a version
14 from August 1, 2014?
15     Q.  Yes.
16     A.  I would say that we had a policy.  But I
17 don't have access to be able to even say.
18     Q.  If a policy existed and was created on
19 August 1, 2014, would it have been Giant Eagle or
20 HBC's practice to maintain that policy, keep the
21 actual physical copy of the written policy?
22     MR. KOBRIN:  Object to form.
23     THE WITNESS:  Or electronic version.
24 BY MR. HUDSON:
25     Q.  So if a policy was created on August 1,

Page 133

1 2014, do you expect that HBC or Giant Eagle would
2 still have an electronic or paper copy of it
3 today?
4     A.  I can't answer that as I'm not there
5 anymore to know.
6     Q.  I'm just saying in your role in
7 compliance, knowing what you know about the
8 practices at the company, would you expect that if
9 a policy was created on August 1, 2014, it would
10 still exist in electronic or paper form?
11     MR. KOBRIN:  Object to form.  Don't
12 speculate about policies you don't know about.
13     THE WITNESS:  I don't know that.
14     MR. HUDSON:  Don't coach the witness.
15     THE WITNESS:  I don't know if it was
16 retained.  I don't know that anymore.
17 BY MR. HUDSON:
18     Q.  My question was a little bit different.
19     A.  Since leaving the company.
20     Q.  My question is:  If this indicates that
21 there was a policy created date of August 1, 2014
22 and a policy was created at that time, based upon
23 what you know about the practices of HBC or Giant
24 Eagle, do you believe that that policy would still
25 exist in electronic or written form?

Page 134

1    MR. KOBRIN: Object to form.
2    THE WITNESS: If it was required to be
3 retained from the company's own document retention
4 policy. But I can't -- I can't speak to where
5 that would be or if it was retained.
6 BY MR. HUDSON:
7    Q. Do you believe that you worked on
8 creating a policy in or around I guess it would be
9 July or early August of 2014?
10    MR. KOBRIN: Object to form.
11    THE WITNESS: I don't remember the
12 dates, and I'm not going to speculate.
13 BY MR. HUDSON:
14    Q. As you sit here today, do you have any
15 recollection of anyone at Giant Eagle or HBC
16 taking any efforts in July of 2014 to create
17 written suspicious order policies?
18    A. Again, I can't say who or when would
19 have created it or when it was created.
20 Obviously, prior to August.
21    Q. At any point in time, were you aware of
22 you or anyone else at Giant Eagle becoming
23 concerned that you didn't have written policies in
24 place?
25    MR. KOBRIN: Object to form.

Page 135

1    THE WITNESS: So following our -- I
2 don't remember the year that we went to the
3 diversion conference, as we talked earlier, that
4 we saw an opportunity to evolve our overall
5 practices with regard to controlled substances at
6 all levels.
7 BY MR. HUDSON:
8    Q. And as part of that evolution, did you
9 become concerned that you did not have written
10 policies in place?
11    A. Did I become concerned that we did not
12 have written policies in place following the
13 visit?
14    I think it was an opportunity I would say --
15 actually, I will say an opportunity to continue to
16 improve operational procedures, be it policy or
17 procedure.
18    Q. I will mark this an exhibit if we need
19 to, but I will represent to you that in response
20 to another one of the discovery questions that we
21 asked -- we asked, "Please identify the date and
22 location of each DEA or Ohio Board of Pharmacy
23 meeting, training, information or education
24 system."
25    Then in response, HBC said, "HBC further

Page 136

1 states that former Giant Eagle employees Joseph
2 Millward and Anthony Mollica attended a DEA
3 session in Washington, DC in 2013."
4    A. I was there in 2013 and Anthony -- or
5 I'm sorry -- Matt Rogos.
6    Q. Was Anthony Mollica there as well, do
7 you think, to the best of your recollection?
8    A. No. Anthony wasn't there.
9    MR. KOBRIN: We had to amend that to
10 reflect Matt. I apologize for that.
11    THE WITNESS: It should -- it should say
12 Matt.
13 BY MR. HUDSON:
14    Q. Do you have any more specific
15 recollection of when that session occurred in
16 2013, in other words, beginning, end, fall,
17 spring?
18    A. It wasn't the summer because it was
19 cooler, but I don't remember spring, fall. It
20 wasn't winter either.
21    Q. And was this -- the seminar that you
22 attended in Washington, DC, was that the seminar
23 specific to diversion at the distributor level?
24    A. It was specific -- the DEA's target
25 audience was the distributors across the country.

Page 137

1    Q. And it's your testimony that as a result
2 of attending that conference in 2013, that led to
3 the creation of some written policies; is that
4 fair?
5    MR. KOBRIN: Object to form. Misstates
6 the record.
7    THE WITNESS: The education received
8 through the DEA's conference, distributor
9 conference, was shared with all levels within the
10 pharmacy group, and, of course, Matt being there
11 from HBC, and led to reevaluate and continue to
12 evolve our practices.
13 BY MR. HUDSON:
14    Q. And then as a result of that, one of the
15 things that occurred is the creation of this
16 inventory control suspicious order policy, right,
17 we've marked as Exhibit 5, the first policy?
18    MR. KOBRIN: Object to form.
19    THE WITNESS: The information gained at
20 the diversion or at the DEA's distributor
21 conference I would say certainly helped shape our
22 evolving processes.
23 BY MR. HUDSON:
24    Q. Can we agree that the created date even
25 of this first policy is August 1, 2014?

Page 138

1    A.  I agree that that's what it says.
2    Q.  And as you sit here today, you're not
3  were aware of any policy, written policy that was
4  created prior to August 1, 2014; correct?
5       MR. KOBRIN:  Object to form.
6       THE WITNESS:  That would be housed at
7  HBC at the time.
8  BY MR. HUDSON:
9    Q.  Housed at HBC or Giant Eagle?  I ask
10 because this particular policy has Giant Eagle at
11 the top.
12   A.  If the policy was at HBC, it resided at
13 HBC for that.
14   Q.  As you sit here today -- I'm sorry.
15   You'll see each one of these written policies
16 that's been identified as a SOMS policy has Giant
17 Eagle at the top.
18   A.  Correct.
19   Q.  And you testified previously that HBC
20 did not have a compliance division or department;
21 correct?  They relied on Giant Eagle.
22   A.  Correct.
23   Q.  Are you aware of any written policies
24 that existed at HBC and were created by HBC?
25      MR. KOBRIN:  Object to form.

Page 139

1  BY MR. HUDSON:
2    Q.  Relating to SOMS specifically.
3       MR. KOBRIN:  Object to form.
4       THE WITNESS:  As I sit here today years
5  removed, I can't recall a specific document that
6  they may have had.
7       MR. HUDSON:  Let's take a break.
8       MR. KOBRIN:  We actually have lunch here
9  if you want to take lunch.
10      THE VIDEOGRAPHER:  12:45.  We're off the
11 video record.
12      (Recess from 12:45 p.m. to 1:38 p.m.)
13      THE VIDEOGRAPHER:  1:38.  We're on the
14 video record.
15 BY MR. HUDSON:
16   Q.  Mr. Millward, are you aware that this
17 litigation is about the opioid crisis?
18      MR. KOBRIN:  Object to form.
19      THE WITNESS:  As it's been explained to
20 me, yes.
21 BY MR. HUDSON:
22   Q.  Do you believe that there is an opioid
23 problem in the United States?
24      MR. KOBRIN:  Object to form.
25      THE WITNESS:  Define opioid problem.

Page 140

1  BY MR. HUDSON:
2    Q.  Do you believe there's an opioid crisis
3  in the United States?
4       MR. KOBRIN:  Object to form.
5       THE WITNESS:  I believe that people
6  misuse illicit drugs or really anything,
7  unfortunately.
8  BY MR. HUDSON:
9    Q.  Do you believe though that there's an
10 opioid crisis in our country?
11      MR. KOBRIN:  Object to form.
12      THE WITNESS:  People misuse opiates.  I
13 believe they do.
14 BY MR. HUDSON:
15   Q.  And do you think that the misuse of
16 opiates has led to a crisis in our country?
17      MR. KOBRIN:  Object to form.
18      THE WITNESS:  I believe people make
19 choices that they end up dying.  It's unfortunate.
20 BY MR. HUDSON:
21   Q.  Do you believe that drug manufacturers,
22 distributors or dispensers have any responsibility
23 for creating problems with opioids in our country?
24      MR. KOBRIN:  Object to form.
25      THE WITNESS:  I can speak for -- well, I

Page 141

1  believe that the stakeholders have a -- that those
2  medications like other dangerous prescription or
3  any prescription drug must be used appropriately
4  in order to be used safely.
5  BY MR. HUDSON:
6    Q.  So your view is that drugs must be used
7  appropriately in order to be used safely?
8    A.  Prescriptions dispensed, those
9  medications have a very legitimate use as defined
10 by the or as the DEA states in their scheduling as
11 well as the prescription piece, and when used for
12 a legitimate patient have a very legitimate use,
13 to prevent or to treat pain.
14   Q.  Do you have opinions though on whether
15 or not opioids are being misused in our country?
16   A.  Do I have opinions that they are?
17   Q.  Yes.
18      MR. KOBRIN:  Object to form.
19      THE WITNESS:  People abuse opiates.
20 BY MR. HUDSON:
21   Q.  Do you believe that the manufacturers,
22 distributors or dispensers of opioids in our
23 country have any responsibility for causing the
24 opioid crisis?
25      MR. KOBRIN:  Object to form.

Page 142

1   MR. SHAPLAND:  Object to form.
2   THE WITNESS:  Responsibility for causing
3  that?  I can't speak to the manufacturers.  I can
4  only speak to Giant Eagle.  And the responsibility
5  is to ensure medications, regardless of the
6  medication, are dispensed pursuant to a legitimate
7  prescription for a legitimate medical use for an
8  end user patient.
9  BY MR. HUDSON:
10   Q.  And do you believe that Giant Eagle or
11  HBC has caused or contributed to the diversion of
12  any prescription drugs?
13   MR. KOBRIN:  Object to form.  I just
14  want to get it on the record that I think this is
15  exceeding the discovery ruling on questioning or
16  the discovery on the cause of the, quote-unquote,
17  opioid crisis.  I think that was excluded pursuant
18  to one of the special master's orders.
19  BY MR. HUDSON:
20   Q.  Do you agree that opioids have the
21  potential to be diverted for illegal purposes?
22   MR. KOBRIN:  Object to form.
23   THE WITNESS:  As part of the DEA's
24  classification of controlled substances, that's
25  one of the criteria.  Legitimate medical use is

Page 143

1  part, and the other is likelihood of diversion or
2  misuse.
3  BY MR. HUDSON:
4   Q.  Do you believe that opioids though have
5  the potential for diversion?
6   MR. KOBRIN:  Object to form.
7   THE WITNESS:  As the DEA classifies
8  that, correct.
9  BY MR. HUDSON:
10   Q.  And to you, what does diversion mean?
11   A.  Diversion can be outright theft or that
12  end user patient not using the medication as
13  required or as prescribed or -- once that
14  medication leaves the realm of Giant Eagle's
15  control or the pharmacy's control in general and
16  that patient uses it outside as prescribed.
17   Q.  Anything else in terms of diversion?
18   A.  Not off the top of my head.
19   Q.  Is that something that you did in your
20  role, your compliance role at Giant Eagle, is
21  tried to analyze and anticipate ways that
22  controlled substances could be diverted?
23   MR. KOBRIN:  Object to form.
24   THE WITNESS:  The role to create
25  policies and procedures to monitor or to prevent

Page 144

1  those opportunities from occurring.
2  BY MR. HUDSON:
3   Q.  You wanted to create policies and
4  procedures to prevent diversion; right?
5   A.  Within Giant Eagle.
6   Q.  So in order to try to prevent diversion,
7  did you analyze ways that prescription drugs or
8  controlled substances could be diverted?
9   MR. KOBRIN:  Object to form.
10   THE WITNESS:  So looked at a way that --
11  as I mentioned earlier, having a cradle to grave
12  integrated approach to the handling of controlled
13  substances at all three levels, so store,
14  distribution and corporate, to look for or to
15  mitigate opportunities for theft within those --
16  within the realm of our control.
17  BY MR. HUDSON:
18   Q.  So we talked about theft.  But you'd
19  agree that your controls at store, corporate and
20  at the warehouse would not be able to prevent end
21  user patients who obtain a prescription from using
22  the medication for purposes different than which
23  it was prescribed; right?
24   MR. KOBRIN:  Object to form.
25   THE WITNESS:  Can you rephrase that?

Page 145

1  BY MR. HUDSON:
2   Q.  Sure.  You listed two potential ways
3  prescription drugs or controlled substances are
4  diverted.  One was theft and secondly was the end
5  user patient not using the medication as
6  prescribed; right?
7   A.  Correct.
8   Q.  So the second one, the end user patient
9  not using the medication as prescribed, I think as
10  you described it, it was after they leave the
11  pharmacy they choose to use that medication in a
12  way differently than it was prescribed for; right?
13   A.  Correct.
14   Q.  Are there any Giant Eagle or HBC store,
15  warehouse or corporate policies or procedures you
16  could point to that would address an end user
17  patient not using medication as prescribed?
18   MR. KOBRIN:  Object to form.
19   THE WITNESS:  Once the medication is
20  dispensed pursuant to a legitimate prescription
21  and leaves the pharmacy, it's outside of the realm
22  of Giant Eagle's control.
23  BY MR. HUDSON:
24   Q.  So is it fair to say that an end user
25  patient not using medication as prescribed is not

Page 146

1 something that Giant Eagle has an ability to
2 prevent happening as a result of its policies and
3 procedures?
4         MR. KOBRIN:  Object to form.
5         THE WITNESS:  From my experience as a
6 pharmacist and as -- on the district level, you
7 have -- you're not able to control what choices
8 that patient makes after dispensing a legitimate
9 prescription.
10 BY MR. HUDSON:
11     Q.  And so is it fair to say that in your
12 view, Giant Eagle did not have any policies or
13 procedures that were in place to prevent that type
14 of diversion?
15         MR. KOBRIN:  Object to form.
16         THE WITNESS:  I don't believe there's
17 even a way any company could create policies and
18 procedures to do that.
19 BY MR. HUDSON:
20     Q.  So the other type of diversion that you
21 mentioned is theft; right?
22     A.  Um-hum.
23     Q.  And there are store, warehouse and
24 corporate policies aimed at preventing theft;
25 right?

Page 147

1         MR. KOBRIN:  Object to form.
2         THE WITNESS:  Correct.
3 BY MR. HUDSON:
4     Q.  Are there any other types of diversion
5 that you were concerned about from the standpoint
6 of compliance?
7         MR. KOBRIN:  Object to form.  Asked and
8 answered.
9         THE WITNESS:  Any other than those two?
10 BY MR. HUDSON:
11     Q.  Yes.
12     A.  I believe I said, off the top of my
13 head -- I answered no, that I can think of right
14 now.
15     Q.  Well, the SOMS, that particular -- that
16 suspicious order monitoring system is a process
17 that's put in place to try to prevent diversion;
18 right?
19     A.  Correct.  That's part of it.
20     Q.  Do you have any knowledge of the type of
21 diversion that it's trying to prevent?
22         MR. KOBRIN:  Object to form.
23         THE WITNESS:  Yes.  I'll refer back to
24 that.  So the overall security requirements are
25 designed to create ways that that product, as you

Page 148

1 said, has that closed system in the handoffs
2 between registrants down to end user patient, to
3 make sure that they're accounted for, that the
4 orders are legitimate and any suspicious orders or
5 prescriptions -- well, I'll say orders and leave
6 it there -- as the DEA requires, identify -- to be
7 able to identify suspicious orders of unusual
8 size, frequency or pattern.
9 BY MR. HUDSON:
10     Q.  Why though are orders of unusual size
11 suspicious?
12         MR. KOBRIN:  Object to form.
13 BY MR. HUDSON:
14     Q.  What makes an order of unusual size
15 suspicious from the standpoint of diversion?
16         MR. KOBRIN:  Object to form.  No
17 foundation.
18         THE WITNESS:  Are you asking me to
19 speculate?
20 BY MR. HUDSON:
21     Q.  No.  I'm asking you as the senior
22 manager of compliance for Giant Eagle between 2010
23 and 2016, what was your understanding of why an
24 order of unusual size would make it suspicious?
25         MR. KOBRIN:  Object to form.

Page 149

1         THE WITNESS:  An unusual -- an order of
2 unusual size in and of itself, essentially, that
3 would deviate from a pattern.  If you know your
4 customer and the pattern at which they order and
5 there's a deviation to that, then -- it in itself,
6 the size in itself doesn't mean that the order is
7 suspicious, but it's a criteria to review.
8 BY MR. HUDSON:
9     Q.  So in your mind, an order of unusual
10 size doesn't necessarily mean that it's a
11 suspicious order?
12         MR. KOBRIN:  Object to form.
13         THE WITNESS:  Not in of itself.
14 BY MR. HUDSON:
15     Q.  So there could be orders of unusual size
16 that go from HBC to Giant Eagle retail pharmacies,
17 and it would be your view that those would not be
18 suspicious and would not need to be reviewed?
19     A.  Say that one more time, make sure I
20 understand.
21     Q.  There could be orders of unusual size
22 that go from HBC to Giant Eagle retail pharmacies,
23 and it would be your view that those would not be
24 suspicious and would not need to be reviewed?
25         MR. KOBRIN:  Object to form.

Page 150

1    THE WITNESS: Yes. That would be
2 possible.
3 BY MR. HUDSON:
4    Q. And would you also agree that there
5 could be orders deviating substantially from a
6 normal pattern that go from HBC to Giant Eagle
7 retail pharmacies, and it would be your view that
8 those would not be suspicious and would not need
9 to be reviewed?
10    MR. KOBRIN: Object to form.
11    THE WITNESS: Two different things.
12 There would have to be an understanding as to the
13 pattern or the reason for the pattern, but it
14 doesn't mean that they're suspicious.
15 BY MR. HUDSON:
16    Q. So it's possible that there could be
17 orders deviating substantially from a normal
18 pattern that go from HBC to Giant Eagle
19 pharmacies, and those would not be suspicious and
20 would not need to be reviewed; correct?
21    MR. KOBRIN: Object to form.
22    THE WITNESS: Orders of interest to
23 review before they're determined to be suspicious
24 or not.
25

Page 151

1 BY MR. HUDSON:
2    Q. But it's your view, just so we're clear,
3 it's your view that there could be orders
4 deviating substantially from a normal pattern that
5 go from HBC to Giant Eagle retail pharmacies, and
6 those would not be suspicious and would not need
7 to be reviewed?
8    MR. KOBRIN: Object to form.
9    THE WITNESS: Orders of interest to be
10 reviewed before determined if they were
11 suspicious.
12 BY MR. HUDSON:
13    Q. So does every single order or every
14 single shipment that deviated substantially from a
15 normal pattern, does that need to be reviewed?
16    MR. KOBRIN: Object to form.
17    THE WITNESS: Are you asking future
18 tense as "does" or past tense?
19 BY MR. HUDSON:
20    Q. I'm asking between 2009 and 2014 when
21 HBC was shipping hydrocodone combination products,
22 would you agree with me that any order that
23 deviated substantially from the normal pattern
24 would need to be reviewed?
25    MR. KOBRIN: Object to form.

Page 152

1    THE WITNESS: Would have to be reviewed?
2 At least I would say flagged as an order of
3 interest and reviewed before any determination of
4 the suspicion.
5 BY MR. HUDSON:
6    Q. So in your mind, it's not suspicious
7 that the order deviated substantially from a
8 normal pattern. In and of itself, that doesn't
9 make it suspicious in your mind?
10    MR. KOBRIN: Object to form.
11    THE WITNESS: Not inclusive.
12 BY MR. HUDSON:
13    Q. And would that be true as well for
14 orders of unusual frequency, that those wouldn't
15 necessarily be suspicious orders in and of
16 themselves?
17    MR. KOBRIN: Object to form.
18    THE WITNESS: In and of itself; correct.
19 BY MR. HUDSON:
20    Q. Do you agree that HBC needed to have
21 some sort of a system that would flag any orders
22 of unusual size, orders deviating substantially
23 from a normal pattern and orders of unusual
24 frequency?
25    MR. KOBRIN: Object to form.

Page 153

1    THE WITNESS: I believe that was asked
2 before. But yes, because that would be compliant
3 with the reg.
4 BY MR. HUDSON:
5    Q. Are you aware that HBC was a distributor
6 of hydrocodone combination products?
7    A. As they were Schedule IIIs.
8    Q. Are you familiar with hydrocodone
9 combination products?
10    A. I am.
11    Q. And you're familiar with hydrocodone?
12    A. As a pharmacist.
13    (HBC-Millward Exhibit 6 was marked.)
14 BY MR. HUDSON:
15    Q. Let me hand you what I've marked as
16 Exhibit 6 here.
17    MR. HUDSON: Exhibit 6, P-GEN-86 is the
18 internal reference number.
19    MR. KOBRIN: Is there a date on this
20 document?
21    MR. HUDSON: I don't know. I do know on
22 the second page, it says, "Hydrocodone is a
23 Schedule II narcotic that is marketed in
24 multi-ingredient Schedule III products." So it
25 was before October 2014.

Page 154

1 BY MR. HUDSON:
2    Q. Have you had a chance to review the DEA
3 Drug Fact Sheet?
4    A. Finishing up, but yes.
5      MR. KOBRIN: Do you know where you got
6 this?
7      MR. HUDSON: I think from the Drug
8 Enforcement Administration.
9      MR. KOBRIN: Is it still up on their
10 website?
11      MR. HUDSON: I don't know that.
12      THE WITNESS: Okay.
13 BY MR. HUDSON:
14    Q. Do you see there under the Overview, it
15 says, "Hydrocodone is the most frequently
16 prescribed opioid in the United States and is
17 associated with more drug abuse and diversion than
18 any other elicit or illicit opioid"?
19    A. I do see that sentence.
20    Q. Do you have any reason to disagree with
21 that sentence?
22    A. No. I don't have any data to dispute
23 the DEA's statement.
24    Q. Then if you go down to the bottom, do
25 you see it says, "There are numerous brand and

Page 155

1 generic hydrocodone products marketed in the
2 United States. All are combination products. The
3 most frequently prescribed combination is
4 hydrocodone and acetaminophen."
5    And then it's got examples of Vicodin and
6 Lortab, Lorcet, and then other examples of
7 combination products include those containing
8 aspirin, which, again, is Lortab ASA, ibuprofen
9 and then antihistamines.
10    And those are drugs you're familiar with;
11 correct?
12    A. Correct.
13    Q. Those were drugs that HBC acted as a
14 distributor of; correct?
15    A. The hydrocodone-containing products?
16    Q. Yeah, hydrocodone combination products.
17    A. Combination products?
18    Q. Yes.
19    A. I'm sorry. Thank you. Yes.
20    Q. Do you have any sense of the volume of
21 hydrocodone combination products that HBC acted as
22 a distributor of?
23    A. I do not.
24    Q. Let me -- I'm going to avoid marking
25 these, but I'm going to hand you what I'll

Page 156

1 represent to you is a printout of a spreadsheet
2 that was provided to us, and I believe in the top
3 right it says P-HBC-6011.
4    And, again, I'll represent to you that I took
5 the spreadsheet that was transactional data of HBC
6 and just sorted it by order of date.
7    A. Okay. I see that on the third column
8 from the right.
9    Q. Right. So you see there and then under
10 the drug name, you see hydro, hydro, hydro, all
11 the way down. And then it's got the buyer's
12 number, the buyer's address, the buyer's city, the
13 buyer's state.
14    What you have before you are all transactions
15 or shipments that were sent by HBC to retail
16 pharmacies in Summit County. And you can probably
17 recognize that from the names of the cities.
18    A. I'll be honest. I'm not familiar with
19 the county designations for Ohio as a geography
20 thing.
21    Q. And then also, one of the requirements
22 under the Controlled Substances Act is to report
23 data to the DEA's ARCOS unit; correct?
24    A. Correct.
25    Q. And that was also something that HBC did

Page 157

1 during the time it was a distributor; correct?
2    A. I believe so. Did not oversee that.
3    (HBC-Millward Exhibit 7 was marked.)
4 BY MR. HUDSON:
5    Q. Let me hand you what I've marked as
6 Exhibit 7.
7      MR. KOBRIN: Are we going to make this
8 as an exhibit? We'd like to mark it as an
9 exhibit.
10      MR. HUDSON: Do you want to mark it?
11      MR. KOBRIN: Yeah. I think it makes
12 sense.
13    (HBC-Millward Exhibit 8 was marked.)
14      MR. HUDSON: That's fine. So we'll mark
15 that as Exhibit 8. I apologize. I don't have
16 copies because I was not going to mark it.
17      MR. BARTON: So HBC-6011 is Exhibit 8.
18    (HBC-Millward Exhibit 9 was marked.)
19 BY MR. HUDSON:
20    Q. What I'll do is I'll go ahead and
21 mark -- I'll go ahead and mark as 9 what I'm
22 handing you here, which is the data into Cuyahoga,
23 the data of shipments from HBC into retail
24 pharmacies in Cuyahoga.
25      MR. KOBRIN: That is 9?

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    MR. HUDSON: That is 9.
2 BY MR. HUDSON:
3    Q.  So if we go back to Exhibit 7 -- I think
4 it's going to be easier just to work with the
5 cumulative numbers there -- and turn to the second
6 page of Exhibit 7, then you see there in 2006,
7 2007, 2008 and then most of 2009, do you see there
8 that McKesson was acting as the distributor?
9    MR. KOBRIN: What page are you on?
10    MR. HUDSON: Page 2.
11 BY MR. HUDSON:
12    Q.  Was acting as the distributor.
13    MS. CHARLES: Object to form.
14    THE WITNESS: There in 2006, 2007, 2008
15 and 2009?
16 BY MR. HUDSON:
17    Q.  Right.  Do you see for HBC Service
18 Company, there's zero?
19    A.  Until 2009.
20    Q.  Right.  And then if you look at 2009,
21 2010, 2011, 2012, 2013 and 2014, I'll represent to
22 you that those are the totals that our experts put
23 together of the dosage units shipped from HBC to
24 Giant Eagle pharmacies in Cuyahoga.  And you see
25 there at the top for Cuyahoga, the total is

Page 159

1 10,103,720 dosage units?
2    A.  I see that highlighted.
3    Q.  And then if we go to two pages back,
4 we've got the same data here.  For HBC Service
5 Company, you can see there from 2009 to 2014,
6 you've got the totals there.  And then at the top,
7 we've got the total into Summit County of
8 8,892,360 dosage units.
9    A.  That is what that paper shows.
10    Q.  So combined between Summit and Cuyahoga
11 counties, there's more than 18 million dosage
12 units of hydrocodone combination products that
13 were shipped from HBC into Giant Eagle retail
14 pharmacies in Summit or Cuyahoga County.
15    A.  Okay.
16    Q.  Do you see that?
17    MR. KOBRIN: Object to form.
18 BY MR. HUDSON:
19    Q.  And do you know as you sit here
20 approximately how many retail pharmacies Giant
21 Eagle has in Cuyahoga or Summit County?
22    MR. KOBRIN: At this time?
23    MR. HUDSON: No, back between 2009 and
24 2014.
25    MR. KOBRIN: Object to form.

Page 160

1    THE WITNESS: I don't recall the number
2 of stores.
3 BY MR. HUDSON:
4    Q.  Does around 40 seem in the ballpark, at
5 least based on your experience from acting as a
6 pharmacy district leader in that area?
7    MR. KOBRIN: Object to form.
8    THE WITNESS: Again, I don't remember
9 the number.
10 BY MR. HUDSON:
11    Q.  In terms of a suspicious order
12 monitoring system, do you agree that between 2009
13 and 2014 when HBC acted as a distributor of these
14 hydrocodone combination products, that HBC had an
15 obligation to have a system in place to monitor
16 orders and try to detect suspicious orders?
17    MR. KOBRIN: Object to form.
18    THE WITNESS: As asked before and
19 answered before, all registrants -- all
20 distributors have that responsibility under the
21 code.
22 BY MR. HUDSON:
23    Q.  So if you could, now that we've got some
24 idea of the volume of shipments into Cuyahoga and
25 Summit County, describe for me, if you could, how

Page 161

1 HBC -- how HBC's system operated to flag
2 potentially suspicious orders.
3    MR. KOBRIN: Object to form.
4    THE WITNESS: As we talked about
5 earlier, HBC distributed only to Giant Eagle
6 pharmacies as part of our integrated levels of
7 control at the store level, corporate level and
8 distributor level to monitor movement of all
9 medications through the supply chain and to the
10 end user patient or the, reverse, distributor.
11 BY MR. HUDSON:
12    Q.  So let's break that down then.  So can
13 we agree that the pharmacy merchandising group or
14 the procurement group is a group within Giant
15 Eagle that was responsible for buying prescription
16 drugs; right?
17    MR. KOBRIN: Object to form.
18    THE WITNESS: They had and negotiated
19 the contracts with the manufacturers to bring
20 product into HBC of all kinds.
21 BY MR. HUDSON:
22    Q.  So they're buying.  I'm just trying to
23 make an easy way to understand this process.
24 We've got the procurement group of Giant Eagle,
25 and they're out buying these hydrocodone

Page 162

1 combination products from different manufacturers;
2 right?
3     A.   Until it was rescheduled as a Schedule
4 II.
5     Q.   Right.  Correct.  For purposes of all
6 these questions, I'm talking about the timeframe
7 between 2009 and October of 2014 when HBC was
8 acting as a licensed distributor of hydrocodone
9 combination products.  Okay?
10    A.   Okay.
11    Q.   So at the time, the way the process
12 would work is that the procurement group would go
13 and buy the hydrocodone combination products from
14 various manufacturers of those drugs; right?
15        MR. KOBRIN:  Object to form.
16        THE WITNESS:  I can't speak until
17 I got in the role in 2010 and then into 2011.  But
18 that was my understanding, that they would
19 negotiate those contracts and order product as
20 needed, controlled and noncontrolled.
21 BY MR. HUDSON:
22    Q.   And so then that product would then be
23 shipped into the HBC warehouse; right?
24    A.   Correct.
25    Q.   And that's the big warehouse that's in

Page 163

1 Washington, Pennsylvania?
2     A.   That's where it was located; correct.
3     Q.   So then at that point, it would be put
4 into the warehouse.  And then as orders were
5 needed, there would be totes that would be filled,
6 and then those orders would be shipped to the
7 different retail pharmacies in different places;
8 right?
9         MR. KOBRIN:  Object to form.
10        THE WITNESS:  Correct.  That's how the
11 distribution center would fulfill orders, my
12 understanding.
13 BY MR. HUDSON:
14    Q.   And then in the retail pharmacies, then
15 the pharmacist would fill prescriptions, and the
16 patients would obviously have their prescription
17 drugs; right?
18        MR. KOBRIN:  Object to form.
19        THE WITNESS:  The pharmacies would
20 receive the orders, whether it was from McKesson,
21 HBC, Anda, wherever, and then use that inventory
22 to fill legitimate prescriptions from prescribers.
23 BY MR. HUDSON:
24    Q.   Well, how did they know that -- is it
25 your testimony today that each and every

Page 164

1 prescription that was filled for the 18 million
2 dosage units of hydrocodone combination products
3 that were shipped to retail pharmacies were
4 legitimate?
5         MR. KOBRIN:  Object to form.
6         THE WITNESS:  Each individual pharmacist
7 has a corresponding obligation with that of the
8 prescriber to ensure the legitimacy of that
9 prescription before it can be filled.
10 BY MR. HUDSON:
11    Q.   So today you're confident testifying
12 under oath that the 18 million dosage units of
13 hydrocodone that were shipped into Cuyahoga and
14 Summit County, all of those were dispensed by
15 pharmacists to patients with legitimate
16 prescriptions?
17        MR. KOBRIN:  Object to form.
18 Misrepresents testimony.
19        THE WITNESS:  Again, I have not reviewed
20 all prescriptions for the State of Ohio or those
21 counties in question, but each pharmacist,
22 pursuant to CSA, has a corresponding
23 responsibility with that of the prescriber to
24 ensure that the prescription meets the criteria
25 for being legitimate, it's for legitimate medical

Page 165

1 use, that there's a bona fide relationship between
2 the patient and the prescriber, and that the
3 prescriber is acting in the normal course of his
4 professional practice.
5 BY MR. HUDSON:
6     Q.   And, sir, are you confident testifying
7 here today that all of the 18 million dosage units
8 of hydrocodone combination products that were
9 shipped into Giant Eagle retail pharmacies in
10 Cuyahoga and Summit counties were, in fact,
11 dispensed to legitimate patients?
12        MR. KOBRIN:  Object to form.  Misstates
13 the testimony.
14        THE WITNESS:  Restate that.
15 BY MR. HUDSON:
16    Q.   Are you confident in testifying here
17 today that all of the 18 million dosage units of
18 hydrocodone combination products that were shipped
19 into Giant Eagle retail pharmacies in Cuyahoga and
20 Summit counties were, in fact, dispensed to
21 legitimate patients?
22        MR. KOBRIN:  Object to form.
23        THE WITNESS:  The medications
24 that -- I'm sorry -- the dosage units that were
25 dispensed to or on -- subsequent to a

Page 166

1 prescription, I believe, while I can't -- I have
2 not reviewed each individual prescription for its
3 own individual merit, I trust that our pharmacists
4 following their requirement and their training
5 followed the law in dispensing prescriptions to
6 legitimate or legitimate prescriptions to
7 legitimate patients.
8 BY MR. HUDSON:
9    Q.   You're confident that Giant Eagle had
10 written policies in place that made sure that
11 there was no diversion of any of the 18 million
12 dosage units of hydrocodone combination products
13 that were shipped into Giant Eagle retail
14 pharmacies in Cuyahoga and Summit counties?
15    MR. KOBRIN:  Object to form.
16    THE WITNESS:  Can I have you repeat that
17 one more time, please?
18 BY MR. HUDSON:
19    Q.   Sure.  You're confident that Giant Eagle
20 had written policies in place that made sure there
21 was no diversion of any of the 18 million dosage
22 units of hydrocodone combination products that
23 were shipped into Giant Eagle retail pharmacies in
24 Cuyahoga and Summit counties?
25    MR. KOBRIN:  Same objection.

Page 167

1    THE WITNESS:  Giant Eagle had policies
2 and procedures in place to prevent the opportunity
3 for diversion.  It also had loss prevention and
4 procedures to detect if there were variances and
5 then to investigate and, in the case of Ohio
6 stores, work with the Ohio Board of Pharmacy to
7 investigate and have them prosecute.
8 BY MR. HUDSON:
9    Q.   Well, we know, sir, earlier from today
10 that there were no written policies in place
11 before at least August 1, 2014; right?
12    MR. KOBRIN:  Object to form.
13 Misrepresents testimony.
14    THE WITNESS:  So the document you have I
15 believe -- what was the number?
16 BY MR. HUDSON:
17    Q.   Exhibit 5.
18    A.   So that's for HBC.  We had policies and
19 procedures in place at retail that were the
20 controlled substances dispensing guidelines that
21 were created to instruct, guide our pharmacy teams
22 in, again, their corresponding responsibility to
23 the security of the department as to who has
24 access, how to receive orders, in determining that
25 a prescription is legitimate before dispensing it.

Page 168

1    And then ultimately, in the last statement on
2 the controlled substances dispensing guidelines, a
3 pledge to the pharmacist that if they determine a
4 prescription was not legitimate or a doctor
5 couldn't justify its use and they chose not to
6 fill it, the company would support them.
7    Q.   But before we talked about the types of
8 diversion, and you said theft; right?
9    A.   Correct.
10    Q.   So you've got written policies in place
11 at the retail pharmacy level to prevent theft;
12 correct?
13    A.   Correct.
14    Q.   Explain to me in the overall suspicious
15 order monitoring system how what happens at the
16 retail operations or what happens at corporate has
17 an impact on a suspicious order monitoring system
18 at the HBC warehouse.
19    A.   Again, it goes down to the levels, the
20 integrated levels of control, that we spoke about,
21 over.
22    Q.   Specifically, what is the integration
23 though?
24    A.   The store level responsibilities to
25 prevent the opportunity for theft and diversion or

Page 169

1 theft at the store level.  On the handling of the
2 medication, pharmacies, for example, are required
3 to do a physical inventory every month.  And
4 that's a standard of practice across retail, or at
5 least in my experience through Rite-Aid and Giant
6 Eagle, as an example of one of those control
7 mechanisms.
8    Q.   You keep using the word "integrated,"
9 integrated system.  How is that policy in place at
10 a retail pharmacy to prevent theft, how is that
11 integrated into what HBC is doing at their
12 warehouse?
13    MR. KOBRIN:  Object to form.
14    THE WITNESS:  Having control of the
15 product the entire -- so Giant Eagle has control
16 of that product the entire way from when it comes
17 into the distribution center to when it goes to
18 the end user patient, and those policies and
19 dispensing procedures and pharmacy laws, rules and
20 regulations all play roles into ensuring that --
21 play a role that the medications are dispensed
22 appropriately for legitimate prescriptions, and
23 have procedures in place that if there is a
24 discrepancy that's found, that it is investigated
25 and reported as appropriate, as required.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 BY MR. HUDSON:
2     Q.   Let me ask you this: How many shipments
3 to retail pharmacies, Giant Eagle retail
4 pharmacies, did Giant Eagle retail pharmacies
5 report to the DEA as being suspicious?
6       MR. KOBRIN: Object to form.
7       THE WITNESS: Timeframe, please.
8 BY MR. HUDSON:
9     Q.   Ever.
10     A.   I can't speak for anything beyond or
11 prior to my time.
12     Q.   2009 to 2016 then. Are you aware of any
13 Giant Eagle retail pharmacy that ever reported to
14 the DEA a suspicious order of controlled
15 substances?
16     A.   A Giant Eagle pharmacy?
17     Q.   Yes.
18     A.   Reporting a suspicious order?
19     Q.   Correct.
20     A.   Suspicious prescription? Because the
21 pharmacy would see the prescription.
22     Q.   A suspicious order. If it's an
23 integrated system, are you saying that the retail
24 pharmacies are playing some role in trying to
25 identify orders of unusual size?

Page 171

1     A.   The system is designed to prevent orders
2 of unusual size or to identify and call them out.
3     Q.   Right. So is it your testimony that
4 Giant Eagle retail pharmacies, as part of their
5 integrated system, actually played a role and
6 tried to identify orders of unusual size?
7     A.   I believe there were two orders that
8 were identified and reported.
9     Q.   And those were of buprenorphine?
10     A.   Buprenorphine, yes. You can say
11 Subutex, which is the brand name of the single
12 entity.
13     Q.   Neither one of those were hydrocodone
14 combination products; right?
15     A.   That is correct.
16     Q.   Both of those were orders that were
17 detected at HBC or were those detected by retail
18 pharmacies?
19     A.   They were detected --
20       MR. KOBRIN: Object to form.
21       THE WITNESS: They were detected
22 corporately.
23 BY MR. HUDSON:
24     Q.   And when you say corporately, what do
25 you mean?

Page 172

1     A.   In the office we created a reporting
2 system to see if there were -- among the other
3 tools that we had and the other policies and
4 procedures in place, a tool to assist us in
5 looking at, as I stated earlier, looking at
6 monitoring drug movement throughout the
7 organization.
8     Q.   And was that the threshold reports?
9     A.   Threshold was a tool that assisted in
10 the process.
11     Q.   When was this process put in place?
12     A.   Specific date I don't recall. You may
13 have to refresh me. But I would say somewhere
14 2013-ish.
15     Q.   Who put the process or practice in
16 place?
17       MR. KOBRIN: Object to form.
18       THE WITNESS: It was a team approach.
19 BY MR. HUDSON:
20     Q.   Was this the project with Kayla Voelker?
21     A.   Correct.
22     Q.   And she then created the daily
23 suspicious reports?
24     A.   Well, the white board planning would
25 have been involving more Shawn Boyton. Kayla was

Page 173

1 the execution piece for generating the reports.
2     Q.   And were you also involved?
3     A.   Yes.
4     Q.   So did you and Shawn Boyton -- you then
5 white boarded a process or a practice to follow to
6 flag suspicious orders?
7       MR. KOBRIN: Object to form.
8       THE WITNESS: Shawn was more well versed
9 in the systems, the inventory systems piece beyond
10 me. That was outside of my expertise. The
11 nitty-gritty of it I should say.
12 BY MR. HUDSON:
13     Q.   Describe for me how the process or
14 practice worked.
15       MR. KOBRIN: Object to form. No
16 foundation.
17       THE WITNESS: Once the report was
18 generated you mean?
19 BY MR. HUDSON:
20     Q.   In general -- sorry. I didn't mean to
21 interrupt you. I'll start over.
22       At some point in 2013, you and Shawn Boyton
23 sat down and white boarded out a process for
24 monitoring shipments of prescription drugs; right?
25       MR. KOBRIN: Object to form.

Page 174

1 THE WITNESS: Looking at overall
2 movement.
3 BY MR. HUDSON:
4 Q. And that was something that you did at
5 the Giant Eagle corporate offices; right?
6 A. Correct.
7 Q. What particular inventory systems were
8 you looking at to evaluate the overall movement?
9 A. The names of the systems, so PDX, which
10 was the dispensing system. I don't know the name
11 of the system used on the HBC side. That's not my
12 area of expertise. I don't know the system.
13 Q. So PDX is at Giant Eagle?
14 A. PDX is a third-party product. It's a
15 company that Giant Eagle -- it's a dispensing
16 system, essentially, with an inventory component.
17 And that's the name, the company's name, PDX.
18 Q. When you and Shawn Boyton sat down, was
19 there anyone else in the room?
20 A. I don't recall.
21 Q. Other than you, Shawn Boyton and Kayla
22 Voelker, was there anyone else involved in either
23 designing or creating this new process?
24 MR. KOBRIN: Object to form.
25 THE WITNESS: George as the compliance

Page 175

1 manager would have had involvement. Other people
2 in the room, I can't speculate, or people that we
3 consulted or bounced off or sought input from, I
4 can't accurately tell you who they were and when.
5 BY MR. HUDSON:
6 Q. Was anyone taking notes?
7 A. Not that I recall.
8 Q. Was there an agenda put together before
9 the meeting?
10 A. No.
11 Q. Were there any like written deliverables
12 from this meeting to memorialize what was being
13 done and why?
14 MR. KOBRIN: Object to form.
15 THE WITNESS: Not that I'm aware of.
16 Some of it was kind of ad hoc, spur of the moment.
17 BY MR. HUDSON:
18 Q. What caused this ad hoc or
19 spur-of-the-moment meeting to occur?
20 A. Part of a continued evolution of our
21 current practices and how can we go from good to
22 better, go to best.
23 Q. Was this after you had attended the DEA
24 meeting in Washington, DC?
25 A. Where it falls in, I'll be honest, I

Page 176

1 don't remember the date of it. I apologize for
2 that. I'm sorry.
3 Q. Who from the group was tasked with
4 figuring out the process to put in place?
5 MR. KOBRIN: Object to form.
6 THE WITNESS: I can't say there was a
7 specific "You are a hundred percent in charge."
8 It was discussions and sharing opinions and vision
9 and say what can we do, and Shawn being able to
10 brainstorm on his end and taking input from George
11 and anybody else who we may have talked to.
12 BY MR. HUDSON:
13 Q. As a result of that meeting, what
14 happened? What did you put in place or what did
15 you do?
16 MR. KOBRIN: Object to form.
17 THE WITNESS: It eventually led to the
18 creation of what unfortunately I believe is the or
19 referred to as the Voelker report only because
20 Kayla is nice. But that's what it...
21 BY MR. HUDSON:
22 Q. What is the Voelker report then?
23 A. A report that measured the movement of
24 product and to compare it to some baseline.
25 Q. Did anything else occur as a result of

Page 177

1 that meeting?
2 MR. KOBRIN: Object to form.
3 THE WITNESS: I don't want to speculate
4 on the meeting. I don't remember specifically
5 what else came beyond that.
6 BY MR. HUDSON:
7 Q. The main takeaway though from that
8 meeting was the creation of the Voelker report or
9 threshold reports or whatever --
10 A. However you want to call it.
11 Q. -- label we want to put on it?
12 I'm going to hand you a number of these.
13 MR. HUDSON: In fact, let's just go off
14 the record for a minute. I'll get myself
15 organized and then start and do it quicker.
16 THE VIDEOGRAPHER: 2:31. We're off the
17 video record.
18 (Recess from 2:31 p.m. to 2:57 p.m.)
19 THE VIDEOGRAPHER: 2:57. We are on the
20 video record.
21 (HBC-Millward Exhibits 10 - 21 was marked.)
22 BY MR. HUDSON:
23 Q. Before the break we were talking about I
24 think what you described as the Voelker report.
25 I'm going to hand you what I've marked as

Page 178

1 Exhibits 10 through 21. And take a minute to look
2 at those.
3 　　　MR. HUDSON: Their internal reference
4 number is P-HBC-1052 through 1063.
5 　　　MR. KOBRIN: We're marking them in
6 order? Are they all in the same order?
7 　　　MR. HUDSON: Yep.
8 BY MR. HUDSON:
9 　　Q. I'll represent to you that in HBC's
10 production, we found about 1200 different daily
11 reports. So what I've done is picked the last day
12 of each month between October of 2013, which was
13 the first month I could find one in the
14 production, and September of 2014.
15 　　If you look also on the first page of the
16 first exhibit, you can see there the placeholder
17 indicates that it's a document title Microsoft XML
18 Workbook. Then it's got a title, a number and
19 then _Daily_HBC_Controls.
20 　　A. I see that.
21 　　Q. Are you familiar with these Excel
22 workbook spreadsheets?
23 　　A. Yes.
24 　　Q. And do you know when you began creating
25 these daily reports?

Page 179

1 　　A. I have no idea.
2 　　　MR. KOBRIN: Object to form.
3 　　　THE WITNESS: I don't recall the
4 specific date that they began.
5 BY MR. HUDSON:
6 　　Q. Any reason to believe it wasn't October
7 of 2013?
8 　　A. Again, I don't know the date it started,
9 the exact date, but somewhere.
10 　　Q. I've represented to you the earliest
11 ones I could find is October 2013.
12 　　My question is just: Is there any reason
13 that you have to believe that these reports were
14 being created before October of 2013?
15 　　A. I don't have, based on the refresh, have
16 any documentation to say that they were created
17 before.
18 　　Q. So who created -- by the way, is that an
19 SQL? Have you heard that phrase before?
20 　　　MR. KOBRIN: Object to form.
21 　　　THE WITNESS: I've heard it. I'm not an
22 Excel person, to tell you the truth. So I
23 couldn't create it.
24 BY MR. HUDSON:
25 　　Q. Just tell me what you know about how

Page 180

1 this daily control report worked. What would
2 happen?
3 　　　MR. KOBRIN: Object to form.
4 　　　THE WITNESS: It is a report that would
5 be the -- it was a daily report and reviewing or
6 identifying stores that had been shipped
7 quantities to -- based on our first pass at what
8 a, as they call them, fresh quantity, again our
9 first pass at what that would be, how their
10 accumulation for the calendar month would be.
11 BY MR. HUDSON:
12 　　Q. Would these be generated each day?
13 　　A. Correct.
14 　　Q. Then who received them?
15 　　A. I don't have the email list. I received
16 them. There were a number of people that received
17 them.
18 　　Q. You received the report each day or you
19 received an email or how -- in what form did you
20 receive a report?
21 　　　MR. KOBRIN: Object to form.
22 　　　THE WITNESS: The report came via email,
23 but I cannot recall generated directly from the
24 system or forwarded over after it was -- if it was
25 run, if it was an automatic distribution.

Page 181

1 　　　(HBC-Millward Exhibit 22 was marked.)
2 BY MR. HUDSON:
3 　　Q. Let me hand you what I'm marking as
4 Exhibit 22.
5 　　　MR. HUDSON: And Exhibit 22 has been --
6 our internal number is 1094, P-HBC-1094.
7 BY MR. HUDSON:
8 　　Q. On Exhibit 22, if you turn to the second
9 page, there's an email from Kayla Voelker to a
10 distribution list including you. It says Daily
11 HBC Suspicious Purchasing Report - 11/13/13.
12 　　A. I see that.
13 　　Q. Is that the email that you received?
14 　　A. Yes. I would have received this email.
15 　　Q. When you said you received the report or
16 an email, is this what you were talking about, is
17 you would receive an email like this?
18 　　A. I received this, yeah. I received this
19 email. Can you rephrase it? Yeah, this is an
20 email I received.
21 　　　(HBC-Millward Exhibit 23 was marked.)
22 BY MR. HUDSON:
23 　　Q. Let me just give you what I marked as
24 Exhibit 23 as well. It may help.
25 　　A. There we go.

Page 182

1    Q.  Again, if you look at Exhibit 23, at the
2  bottom email, again, this is another email from
3  Ms. Voelker to it looks like the same distribution
4  list.  Do you see that?
5    A.  I see that.
6    Q.  Do you know whether this was an
7  automated email that was sent or whether she
8  reviewed the report and then manually sent it out?
9        MR. KOBRIN:  Object to form.
10        THE WITNESS:  It appears that Kayla
11  generated the report on a daily basis and then
12  distributed it.
13  BY MR. HUDSON:
14    Q.  Manually though?
15    A.  That's -- I can't say how or what
16  Kayla -- it appears that way.
17    Q.  What if there was a given day that there
18  were no shipments that exceeded the purchasing
19  thresholds, would an email still be sent?
20    A.  No.
21    Q.  To the best of your knowledge, do you
22  believe it was a manual process where she would
23  review the report and then choose to then email
24  the distribution list if there were pharmacies
25  that had purchases exceeding the thresholds?

Page 183

1        MR. KOBRIN:  Objection.  Object to form.
2  Asked and answered.  Calls for speculation.
3        THE WITNESS:  Repeat the question,
4  please.
5  BY MR. HUDSON:
6    Q.  Do you believe that the way that the
7  process worked was that Ms. Voelker would review
8  the report each morning and then turn around and
9  each morning that there is a pharmacy that is
10  exceeding the purchasing thresholds, that she
11  would send an email to the group letting them
12  know?
13        MR. KOBRIN:  Same objection.
14  BY MR. HUDSON:
15    Q.  As opposed to it being like an automated
16  process where it automatically happened.
17        MR. KOBRIN:  Same objection.
18        THE WITNESS:  I believe she ran the
19  report on a daily basis and then would forward it
20  out.
21  BY MR. HUDSON:
22    Q.  If we could, on Exhibit 23 is one of the
23  reports that she sent out to the group; right?
24  She indicated there was one pharmacy exceeding the
25  purchase threshold.  Then you wrote back and said

Page 184

1  to Todd -- is it Roahrig -- you wrote to Todd,
2  "Store A is flagged as having hit their threshold
3  for total hydrocodone products.  Can you please
4  check to see if this is an anomaly or if the order
5  should be considered suspicious."
6        MR. KOBRIN:  Object to form.
7  BY MR. HUDSON:
8    Q.  Do you see that?
9    A.  I see my response.
10    Q.  And then he wrote back and said it's
11  actually for a generic and the quantity would be
12  about 17 bottles.
13        And then he said, Renee replied that she had
14  a ton of scripts for this and a lot of owes due to
15  cough/cold season and this is a particular choice
16  of syrup for a prescription there, I believe.  I
17  don't have details, but assuming eight ounces is a
18  typical RF, that's only 34 scripts, so not
19  probably unusual at their volume.
20        Do you see that?
21        MR. KOBRIN:  Object to form.
22  Misrepresents the exhibit.
23        THE WITNESS:  I see Todd's response.
24  BY MR. HUDSON:
25    Q.  So is this the type of review that would

Page 185

1  be done to try to determine whether or not an
2  order was suspicious?
3    A.  So as we spoke earlier -- and this is
4  actually, I think, a good example of the different
5  levels that we go to to ensure our controlled
6  substance integrity, that whenever there is an
7  order of interest or a flag, that it gets
8  investigated.
9        In this case, the pharmacy district leader,
10  Todd Roarhrig, reached out to the pharmacist -- I
11  can't remember Renee -- pharmacy manager, staff
12  pharmacist, to understand why is there -- to
13  understand the purchasing or the orders that the
14  system generated for the store for that, and her
15  response saying that in cough and cold season,
16  seeing an increase in prescriptions from
17  prescribers as the hydrocodone or Hycodan, which
18  is hydrocodone and homatropine, is a cough syrup.
19    Q.  But this is a hydrocodone combination
20  product; correct?
21    A.  Correct, hydrocodone and homatropine.
22    Q.  And this is to store number 8; right?
23    A.  That is correct.
24    Q.  And you're asking your pharmacy district
25  manager is this an anomaly or should the order be

Page 186

1  considered suspicious; right?
2      A.  That's what I asked.
3          MR. KOBRIN:  Object to form.
4  BY MR. HUDSON:
5      Q.  He writes back, after contacting the
6  pharmacist, and says that it's cough season.  It's
7  really not that much.
8      So in your mind, have you been provided with
9  a legitimate or an explanation that in your mind
10 makes it clear that this is a legitimate shipment
11 that should not be deemed suspicious?
12         MR. KOBRIN:  Object to form.
13         THE WITNESS:  Renee's response that
14 there's -- they're receiving an increase
15 particularly from or for the cough and cold season
16 for a cough syrup and the timing coincides with
17 cough and cold, I believe is a realistic view of
18 dispensing any prescription for legitimate medical
19 use.
20 BY MR. HUDSON:
21     Q.  Would there be anywhere we could go to
22 look at a log or records of reviews like this that
23 were conducted to see whether, in fact, each
24 shipment that exceeded this threshold was, in
25 fact, reviewed?

Page 187

1          MR. KOBRIN:  Object to form.
2          THE WITNESS:  We talked earlier about
3  the retention of documents, and if not legally
4  required to have it, I can't say that those
5  documents may be retained for a period of time,
6  don't exist.  I don't have any access to that.
7  BY MR. HUDSON:
8      Q.  Would you expect there to be an email
9  from Ms. Voelker to this distribution list that
10 exists for each day that there was a pharmacy that
11 exceeds the purchasing threshold?
12     A.  I believe that Kayla would forward the
13 flagged stores as the report generated them, as
14 she ran the report.
15     Q.  In a situation here like store 8 where
16 it's being flagged, is there any effort by anyone
17 with HBC to try to figure out whether or not this
18 was an anomaly or, in fact, it was just flu
19 season?
20         MR. KOBRIN:  Object to form.
21         THE WITNESS:  Part of the whole
22 distribution control of the medication process
23 that we talked earlier, everything being
24 integrated, this was yet one of those other checks
25 to vet out an order again.

Page 188

1  BY MR. HUDSON:
2      Q.  Sure.  Let's look then, if we could --
3  let's just go through Exhibits 10 through 21 and
4  see how many times store 8 comes up as exceeding
5  the threshold for hydrocodone combination
6  products.
7      So the first one is October from 2013.  Do
8  you see on the bottom store 8 --
9      A.  I do.
10     Q.  -- is on the list for exceeding the
11 threshold.  If we go to the next one from November
12 of 2013, do you see two-thirds of the way down
13 store 8 is again on the list for exceeding the
14 threshold?
15     A.  I see that there, yes.
16     Q.  If we go to the next one in December of
17 2013, we've again got store 8, more than double
18 exceeding the threshold.
19     If we go to the next one from January of
20 2014, we've again got store 8 exceeding the
21 threshold for hydrocodone combination products.
22     If we go to the next one in February, they're
23 actually not on the list, right, in February of
24 2014?  Store 8 wasn't on the list in February.
25 But we would agree that would still be cough

Page 189

1  season; right?
2          MR. KOBRIN:  Can I get a standing
3  objection on these to the extent they have
4  transactional data and threshold limits for stores
5  that are outside of Cuyahoga and Summit counties,
6  the jurisdictions in question in this litigation?
7          MR. HUDSON:  Sure.  My questions are
8  going to just in general the SOMS system and its
9  ability to operate.
10 BY MR. HUDSON:
11     Q.  So if we go then to March of 2014 --
12     A.  Which number?
13     Q.  Number 15.  -- do you see store 8 is
14 back on our list as exceeding the threshold?
15 Third from the bottom.  It's actually the other
16 one for hydrocodone combination products.
17     If we go to April of 2014 and again we go
18 look for store 8, about right in the middle
19 they're on the list again, close to double the
20 threshold for hydrocodone combination products.
21     If we look at May of 2014, again we've got
22 store 8 on the list, close to double again.
23     If we go to June of 2014, again we've got
24 store 8 exceeding the threshold for hydrocodone
25 combination products.

Page 190

1  July of 2014, we've again got store 8. In
2  August of 2014, we've again got store 8 exceeding
3  the threshold for hydrocodone combination
4  products; right?
5      A.  I see that.
6      Q.  Then we go to September of 2014, and
7  again the third one down is store 8 exceeding the
8  threshold.
9      So at least some of those months were
10 certainly not flu season where there were coughs
11 that were occurring; right?
12     In other words, it wasn't a season where you
13 would expect to have an abnormally large number of
14 people who needed cough syrup; is that fair?
15         MR. KOBRIN:  Object to form.
16         THE WITNESS:  According to history of
17 the CDC, the months that comprise traditional flu
18 season, is that what you're asking me to comment
19 on?
20 BY MR. HUDSON:
21     Q.  I'm asking you to comment on whether or
22 not you agree that the monitoring system that was
23 in place, the explanation that was provided for
24 exceeding the threshold on this one month would
25 not be an explanation that would work for all the

Page 191

1  other months that we've gone through where the
2  threshold was exceeded; right?
3          MR. KOBRIN:  Object to form.
4          THE WITNESS:  So reviewing the
5  documents, the threshold for the store was, I
6  believe, based on an average chain movement, store
7  8 being one of the highest volume stores in the
8  chain and the thresholds not being tailored, not
9  yet sophisticated enough to be tailored to
10 individual stores at that time.
11     So it doesn't seem unreasonable that a
12 high -- one of the highest volume stores in the
13 company would have some of the highest volume
14 ordering to fulfill the higher volume legitimate
15 prescriptions.
16 BY MR. HUDSON:
17     Q.  Do you agree that the system that you
18 put in place left big gaping holes in your logic?
19         MR. KOBRIN:  Object to form.
20         THE WITNESS:  I would disagree with that
21 statement.
22 BY MR. HUDSON:
23     Q.  Do you know James Cornwell?
24     A.  I do.
25     Q.  Who is James Cornwell?

Page 192

1      A.  Jim Cornwell is a pharmacist and is part
2  of the pharmacy IT group.
3      Q.  Do you believe him to be a knowledgeable
4  person about pharmacy policies and practices?
5      A.  I believe Jim to be knowledgeable and a
6  good bagpipe player.
7          (HBC-Millward Exhibit 24 was marked.)
8  BY MR. HUDSON:
9      Q.  Let me hand you what I've marked as
10 Exhibit 24.
11         MR. HUDSON:  Exhibit 24 is internal
12 number is 1027.
13 BY MR. HUDSON:
14     Q.  This is an email from James Cornwell to
15 Philip Raub and Dominic Bertucci on August 23,
16 2016. It's got a couple of attachments here.
17     Now, by this time, sir, you've left Giant
18 Eagle; correct?
19     A.  That is correct.
20     Q.  And this is Mr. Cornwell writing to
21 Mr. Raub and Mr. Bertucci. He's talking about
22 this suspicious reporting that was put in place by
23 yourself and Mr. Boyton and Ms. Voelker; right?
24     A.  I'm sorry.  Say that again.
25     Q.  This is an email in which he's writing

Page 193

1  about the system that we've been talking about
2  that was created by yourself, Mr. Boyton and
3  Ms. Voelker; right?
4      A.  According to the text in the email, he's
5  reviewing the SQL. I do see the SQL was written
6  by Kayla.
7      Q.  And that's consistent with what we've
8  talked about with the process that you put in
9  place; right?
10         MR. KOBRIN:  Object to form.  Assumes
11 facts not in evidence.
12         THE WITNESS:  Let me review this.
13         MR. KOBRIN:  It looks to me like we're
14 missing a part of the exhibit.  Is that accurate?
15         MR. HUDSON:  I did my best to put
16 together what we had.
17         MR. KOBRIN:  It appears that
18 HBC_MDL00086642 is a cover sheet to another
19 attachment in this email.  We don't have the cover
20 sheet.  It looks like there's two attachments
21 based on the email.  I also object that he's never
22 received or seen this email.
23 BY MR. HUDSON:
24     Q.  Have you had a chance to review it,
25 Mr. Millward?

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    A.  Finishing up.  Go ahead.  Ask your
2  question again.  I'm sorry.
3    Q.  Back to Mr. Cornwell's email, do you
4  agree that he's referring to the system that we've
5  been talking about that was put in place by
6  yourself, Mr. Boyton and Ms. Voelker?
7      MR. KOBRIN:  Object to form.
8      THE WITNESS:  While I haven't had a
9  chance to talk to -- obviously, this was, as
10  stated, created after I was with Rite-Aid again or
11  not with Giant Eagle.  It appears he's reviewing
12  or he does again say that he's reviewing or does
13  see the SQL as written by Kayla looking at
14  utilizing a monthly average looking back at the
15  last 12 months that had each item ordered based on
16  it GPI(10).
17  BY MR. HUDSON:
18    Q.  That is how your system and the process
19  that you described worked; correct?
20      MR. KOBRIN:  Object to form.
21      THE WITNESS:  As previously stated, I
22  didn't know that nitty-gritty SQL piece to be able
23  to say that, but...
24  BY MR. HUDSON:
25    Q.  I'm focused on the requirements for

Page 195

1  utilizing a monthly average looking back at the
2  last 12 months that had each item ordered based on
3  the GPI.  Is that how your process worked?
4      MR. KOBRIN:  Object to form.  You keep
5  referring to it as his process.  I believe that
6  misrepresents the evidence.
7      THE WITNESS:  Do I believe it represents
8  what was created as far as generated the previous
9  reports?
10  BY MR. HUDSON:
11    Q.  Yes.
12    A.  It appears to be.
13    Q.  Then he goes on and writes, "This value
14  was a monthly accumulation that reset the first of
15  each month which mirrored McKesson's system, but
16  left big holes in our logic.  If the item showed
17  on the report, George evaluated it.  If it was
18  determined it should be blocked, the blocking form
19  was filled out.  This form expired at the end of
20  reach month, again a problem.  I have attached the
21  SQL and the documentation on the blocking form.
22  That form was my main focus on this project."
23    Did I read that right?
24    A.  You read the email correctly.
25    Q.  Do you disagree with Mr. Cornwell that

Page 196

1  there were problems with the process that you and
2  Ms. Voelker and Mr. Boyton put in place?
3      MR. KOBRIN:  Object to form.
4      THE WITNESS:  I have no basis to judge
5  because I don't know to which -- what he
6  interprets -- I have no basis which to judge
7  because I don't know his interpretation.
8  BY MR. HUDSON:
9    Q.  Beyond what you read in his email right
10  here?
11    A.  Beyond this.
12    Q.  But you can read his words here in terms
13  of his analysis of the system; right?
14    A.  I see the email that he wrote and his
15  opinions.
16    Q.  Is there anything factually that you
17  think is inaccurate about the email that he wrote?
18      MR. KOBRIN:  Object to form.
19      THE WITNESS:  I have no basis to dispute
20  what he was reviewing at the time or to his
21  thought process in determining if there were
22  holes.
23  BY MR. HUDSON:
24    Q.  Well, the system that we're talking
25  about, this monitoring process, is something you

Page 197

1  were involved with from at least October of 2013
2  into 2014; is that fair?
3    A.  Correct.
4    Q.  You know how the process worked; right?
5    A.  High level.
6    Q.  You know how Mr. Cornwell is describing
7  it here; right?
8      MR. KOBRIN:  Object to form.
9  BY MR. HUDSON:
10    Q.  And that's what he's doing in this
11  email, is describing the suspicious reporting and
12  blocking process; right?
13      MR. KOBRIN:  Object to form.
14      THE WITNESS:  As presented, I see the
15  email you presented me.
16  BY MR. HUDSON:
17    Q.  Is there anything factually in
18  Mr. Cornwell's email that you believe is
19  inaccurate or incomplete?
20      MR. KOBRIN:  Object to form.  No
21  foundation.
22      THE WITNESS:  Again, I don't -- wasn't
23  there at the time of this project referenced in
24  the last sentence to have any reason to believe up
25  until the time I left it was the -- that there

Page 198

1 were any issues beyond.
2 BY MR. HUDSON:
3    Q.  Put to one side whatever project he's
4 working on.  That part of the email I don't care
5 about.
6    What I'm focused on is:  Can we agree that in
7 his email, he describes the process that was in
8 place at HBC for monitoring shipments?
9        MR. KOBRIN:  Object to form.  He's
10 already said he knew only at a high level.
11       THE WITNESS:  Again, I don't know how
12 the programming worked other than the views of how
13 products came in.  The actual SQL coding and the
14 nuts and bolts of how purchases are pulled or how
15 any of that other data is cobbled together and put
16 into the spreadsheet -- I know that Kayla put it
17 into the spreadsheet and it had an output that you
18 provided examples of.
19 BY MR. HUDSON:
20    Q.  So you have no idea what the threshold
21 was that was put in place at the company?
22    A.  Threshold was based on, as I said, a
23 factor of the company's average movement.
24    Q.  So if it exceeded the monthly average,
25 looking back at the last 12 months, then it

Page 199

1 exceeded the threshold, or was it three times the
2 average?
3        MR. KOBRIN:  Object to form.
4        THE WITNESS:  If the threshold or when
5 the threshold is created, if three times is a
6 baseline, again, it's a company average and not
7 tailored to an individual's location.
8 BY MR. HUDSON:
9    Q.  Is it your understanding that the value
10 was a monthly accumulation that reset the first of
11 each month?
12    A.  That is correct.
13       MR. KOBRIN:  Object to form.
14 BY MR. HUDSON:
15    Q.  Do you agree that if an item showed on
16 the report, then George evaluated it?
17    A.  I can't answer that, what George did as
18 of August 2016, because I wasn't there.
19    Q.  Sir, he's talking about -- do you see
20 the attachments?  He's talking about the process
21 that Kayla put in place back in 2013; right?
22       MR. KOBRIN:  Object to form.  It appears
23 to me that you're referring to the very document
24 that we're missing here because it's not --
25       MR. HUDSON:  Look at page 2.  Look at

Page 200

1 page 2 at the bottom left.  Do you see December 5,
2 2013?
3        MR. KOBRIN:  You told him to ignore that
4 last sentence related to the blocking form.  The
5 other document that he's talking about is the
6 suspicion reporting attachment which is not
7 attached.  You've only got a cover sheet.
8 Standing objection.
9 BY MR. HUDSON:
10    Q.  Do you agree he's describing the process
11 that was in place in 2013?
12    A.  Yeah, I agree.
13    Q.  And do you agree that that's how the
14 process worked, if an item showed on the report,
15 that George within your group evaluated it?
16       MR. KOBRIN:  Object to form.  Asked and
17 answered.
18       THE WITNESS:  Going back to your
19 previous Exhibit 23, the distribution list is on
20 there as to who received the report.
21 BY MR. HUDSON:
22    Q.  Is it your testimony --
23    A.  George is one of those names on that
24 list along with me.
25    Q.  Was anyone other than George Chunderlik

Page 201

1 tasked with evaluating pharmacies that showed up
2 on the report?
3        MR. KOBRIN:  Time period?
4        THE WITNESS:  Yeah, specify your time
5 period, please.
6 BY MR. HUDSON:
7    Q.  During any time that this process was in
8 place.
9    A.  So the exhibit is an example of where I
10 forwarded out or I reached out to the PDL to look
11 into store 8.
12    Q.  We've got you and George Chunderlik.  Is
13 there anyone else who was involved in the process
14 of evaluating pharmacies who popped up on this
15 report?
16    A.  The pharmacy district leaders as they
17 were identified for their individual stores, phone
18 calls to individual pharmacies, store visits by
19 the PDL, by me.
20    Q.  Those were people -- what I'm talking
21 about is taking pharmacies that pop up on this
22 list, the nuts and bolts of how that worked
23 between October of 2013 and whenever that process
24 ended.
25    When a pharmacy popped up on that list, who

Page 202

1  were the people at Giant Eagle or HBC who went and
2  investigated?
3      MR. KOBRIN:  Object to form.
4  BY MR. HUDSON:
5      Q.  You said you, and we've seen that in the
6  emails.  Then you said George Chunderlik; right?
7      A.  Um-hum.
8      Q.  Anyone else?
9      A.  And I've said the pharmacy district
10 leaders that were overseeing those individual
11 districts.  So in the exhibit, Todd Roarhrig as
12 you've identified.
13     Q.  But you reached out to him though;
14 right?
15     A.  Correct.
16     Q.  So the pharmacy district leaders were
17 not on the distribution list that was being
18 generated at corporate; correct?
19     A.  That is correct, but that wasn't your
20 question.
21     Q.  My question is -- I'm saying once this
22 report is generated, who is it within Giant Eagle
23 or HBC that's tasked with going and investigating
24 the specific pharmacies that are on that list?
25     So far you've listed yourself and George

Page 203

1  Chunderlik.  Is there anyone else who was
2  involved?  I understand that as part of that
3  investigation, you or George may be calling other
4  people in the organization.  I'm trying to get an
5  understanding of the investigation, how that
6  occurred and who was involved, of the specific
7  pharmacies that popped up on the list.
8      MR. KOBRIN:  Object to form.
9      THE WITNESS:  The pharmacies that popped
10 up on the list would be -- I would reach out to
11 the pharmacy district leader that had that store
12 say, I need you to investigate this.  I need you
13 to check and see, as an example, if it's an
14 anomaly or if there's something more.
15 BY MR. HUDSON:
16     Q.  Did anyone other than you and George
17 Chunderlik take on that role?
18     MR. KOBRIN:  Do you mean among
19 recipients of the email, Ty, or do you mean -- I'm
20 confused.
21     THE WITNESS:  Was anybody else --
22 rephrase your question.  I'm not going to assume
23 your question.
24 BY MR. HUDSON:
25     Q.  At corporate you created a system where

Page 204

1  there would be a daily threshold report that was
2  generated; correct?
3      A.  As established.
4      Q.  And you've indicated that Kayla would
5  review that every day, and then Kayla would send
6  an email out to the group of people.  We've seen
7  two of those that I think are Exhibits 22 and 23;
8  right?
9      A.  That is correct.
10     Q.  So my question is:  Then at that step in
11 the process, was it you or George Chunderlik that
12 would then go and investigate the pharmacies that
13 were popping up on the list?
14     MR. KOBRIN:  Object to form.
15     THE WITNESS:  We would leverage the
16 pharmacy district leader to go into his or her
17 store to investigate and to find out what's going
18 on.  We've also gone to -- I've done site visits
19 as well in conjunction with the PDL.
20 BY MR. HUDSON:
21     Q.  Other than yourself and Mr. Chunderlik,
22 was there anyone else who was involved in
23 contacting the PDLs or others in the organization
24 to try to investigate those pharmacies that popped
25 up on the threshold list?

Page 205

1      A.  Anybody who received the report could
2  reach out.  Nothing precluded those individuals
3  from doing so.
4      Q.  Was there a process in place?  How did
5  you decide who did what?
6      A.  The process would be either George or I
7  would reach out to that pharmacy district leader
8  to contact, contact either by phone, email or
9  physical on-site visit.
10     Q.  Then as a result of that review or
11 investigation, if there was reason to believe that
12 the order was not legitimate, then you would
13 report that to the DEA and stop the shipment?
14     A.  So based on their -- so the PDL is --
15 the report triggers the PDL's review of the store.
16 Report is forwarded down.  Ultimately, they're the
17 one going in and having that discussion.
18     And then if the movement is deemed as -- so
19 if the movement is deemed as suspicious in the
20 case of a store where we had a change in
21 prescribing pattern, then shipments to the store
22 would be deemed suspicious, stopped and reported
23 to the DEA.
24     Q.  In your time at Giant Eagle, there were
25 only two times that reports were made to the DEA;

Page 206

1 correct?
2     A.  That's correct.
3     Q.  So in your time at Giant Eagle, you're
4 aware of only two suspicious orders that existed
5 of shipments from HBC to Giant Eagle; correct?
6     A.  There were two occasions when the
7 movement, in this case not theft, but an unusual
8 prescribing pattern of buprenorphine products were
9 flagged or stopped, reported.  The store was --
10 shipments to the store for that chemical were
11 halted and the -- which then the team interviewed,
12 retrained on the controlled substance dispensing
13 guidelines, the guidelines in the pharmacist
14 manual from the DEA, as far as understanding and
15 catching red flags, dispensing red flags, in this
16 case, prescriptions from a set of -- subset of
17 prescribers.
18     Q.  I guess what I was getting at is all
19 suspicious orders from Giant Eagle -- I'm sorry --
20 from HBC to Giant Eagle were reported to the DEA;
21 correct?
22     MR. KOBRIN:  Object to form.
23     THE WITNESS:  The two suspicious orders
24 identified were reported to the DEA.
25

Page 207

1 BY MR. HUDSON:
2     Q.  And to your knowledge, at least while
3 you were the senior manager of compliance at Giant
4 Eagle, you are not aware of any other suspicious
5 orders of controlled substances that were shipped
6 from HBC to Giant Eagle and not reported to the
7 DEA; correct?
8     A.  The two orders that were determined or
9 the movement that was determined to be suspicious
10 were reported.
11     Q.  I appreciate that.  You've said that a
12 couple of times.  My question is a little bit
13 different.
14     My question is:  During the time that you
15 were the senior manager of compliance at Giant
16 Eagle, you are not aware of any suspicious orders
17 from HBC to Giant Eagle retail pharmacies that
18 were not reported to the DEA; correct?
19     A.  No orders deemed suspicious -- it's a
20 double negative now.  All orders identified as
21 suspicious were reported.
22     Q.  If we could go back to page 2 of
23 Mr. Cornwell's email, it's the attachment, which
24 is Exhibit 24, you see at the top it says
25 Suspicious Drug Monitor Blocking, and then at the

Page 208

1 bottom you see it's dated December 5, 2013.
2     A.  Yes.  I see that on that document.
3     Q.  And at least Mr. Cornwell's email -- let
4 me put that differently.
5     This is one of the items that's attached to
6 or the document that's attached to Mr. Cornwell's
7 email; correct?
8     MR. KOBRIN:  Object to form.  He didn't
9 receive this email.
10     MR. HUDSON:  I understand.
11     THE WITNESS:  I didn't receive it from
12 Jim, the attachments.
13 BY MR. HUDSON:
14     Q.  I understand.  But have you in your time
15 at Giant Eagle received emails with attachments
16 before?
17     A.  I have.
18     Q.  Can you take the second page and compare
19 it to the description on the attachment?  Do you
20 see that it's referring to a suspicious -- excuse
21 me -- an order item blocking and then it says 5
22 December 13.  Then if you look on the second page
23 of the document at the bottom, it's also dated
24 December 5, 2013.
25     A.  I see that.

Page 209

1     Q.  Now, my question -- because you were in
2 compliance at this time, in December of 2013;
3 correct?
4     A.  Correct.
5     Q.  Was this suspicious drug monitor
6 blocking document ever implemented as a policy, if
7 you know?
8     A.  So this document, as I read it, talks
9 about the technical system changes that need to be
10 made as far as the inventory system.  Things that
11 are referenced in there were more IS or IT
12 related, and reviewing this, it appears to be an
13 internal IT or pharmacy IT how-to.
14     Q.  Do you know if you've ever seen this
15 document?
16     A.  I can't recall seeing it.  It appears to
17 be an IT-specific document.
18     Q.  Do you know whether this policy was ever
19 implemented?
20     MR. KOBRIN:  Object to form.  He already
21 said he hasn't seen it.
22     THE WITNESS:  I don't necessarily agree
23 with the characterization as a policy for this.
24 Based on reading it as presented here, it looks
25 more like a how-to job aid.  But that's only my

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 interpretation of having seen this document
2 presented today.
3 BY MR. HUDSON:
4    Q.  Do you know whether or not HBC or Giant
5 Eagle took any of the actions that are set out in
6 this document?
7    A.  So two orders we had -- again, the two
8 orders are two orders that were deemed or the two
9 situations where there was suspicious movement and
10 reported.  How the nuts and bolts of how they
11 stopped the order, I wasn't necessarily privy to.
12 As far as the system changes that had to go and
13 the files which were created, I don't -- that
14 was -- I asked them to stop based off.  They did
15 their job.
16    Q.  You believe that HBC had the capability
17 to stop the shipment of orders?
18    A.  Again, as part of the integrated piece,
19 okay, that the ordering system as part of our
20 overall system of monitoring and following drug
21 movement from purchasing to end user dispensing,
22 the ability to block would be through pharmacy IS
23 to facilitate that.  They had systems access.
24    Q.  As you sit here today, the two shipments
25 that you reported to the DEA, you know that those

Page 211

1 shipments were stopped?
2    A.  Yes.
3       MR. KOBRIN:  Object to form.
4 BY MR. HUDSON:
5    Q.  So during your time at Giant Eagle, to
6 the best of your recollection, you believe that
7 HBC or Giant Eagle had the capability to stop
8 shipments?
9       MR. KOBRIN:  Object to form.
10       THE WITNESS:  And did stop shipments on
11 two occasions and reported as required.
12 BY MR. HUDSON:
13    Q.  And do you agree if those shipments were
14 not stopped, that that would be a violation of the
15 Act?
16       MR. KOBRIN:  Object to form.
17       THE WITNESS:  That's speculation.
18       MR. KOBRIN:  Calls for a legal
19 conclusion.
20 BY MR. HUDSON:
21    Q.  Let me shift gears and just talk, if I
22 could, about efforts that were undertaken in 2015.
23 At some point, did you begin to try to analyze
24 putting controls in place for the new distribution
25 facility that was going to open, the Giant Eagle

Page 212

1 RX distribution center?
2       MR. KOBRIN:  Object to form.  Vague.
3       THE WITNESS:  Can you be more specific,
4 please, or restate the question?
5 BY MR. HUDSON:
6    Q.  At a certain point, did you become
7 involved with taking steps to make sure that the
8 new Giant Eagle RX distribution center was
9 complying with the Controlled Substances Act?
10    A.  As part of the VAWD certification
11 process, policies and procedures were reviewed.
12 And because it was a new distribution center with
13 a new physical layout and the business plan called
14 for a vault, policies and procedures had to be
15 created for the facility.
16    Q.  And you were involved in that process;
17 right?
18    A.  Yes.
19    Q.  Let me hand you what I marked as
20 Exhibit 25.
21       (HBC-Millward Exhibit 25 was marked.)
22       MR. HUDSON:  Exhibit 25, the internal
23 number is 1005.
24 BY MR. HUDSON:
25    Q.  I'm going to focus mainly on this first

Page 213

1 page.  You see the bottom email is an email from
2 you to a distribution list with the subject matter
3 Thrifty White Notes.
4    A.  I'm just reviewing the whole document if
5 you can afford me a second.  Go ahead.  Ask.
6    Q.  Do you see there the second email is an
7 email from you to a distribution list, dated
8 August 20, 2015, with the subject Thrifty White
9 Notes?
10    A.  Yes, I see that.
11    Q.  And did you take notes during a visit to
12 Thrifty White?
13    A.  Yes.
14    Q.  And what is Thrifty White?
15    A.  Thrifty White is a pharmacy, regional
16 pharmacy chain in northern states, north central.
17    Q.  Why did you visit Thrifty White?
18       MR. KOBRIN:  Object to form.  Assumes
19 facts not in evidence.
20       THE WITNESS:  Thrifty White was one of
21 the share group partners and had invited -- had
22 implemented, either implemented already or were in
23 the process of implementing a -- they did self
24 distribute, but implementing a vault to house
25 Schedule IIs that they would be able to self

Page 214

1 distribute.
2 BY MR. HUDSON:
3   Q.  And did you personally visit Thrifty
4 White?
5   A.  I did.
6   Q.  And who else visited Thrifty White?
7   A.  Bob McClune, Phil Raub.  I'm trying to
8 remember if Walt was there.  I apologize.  I don't
9 remember if he was there or not.
10   Q.  Down below in this email, these are your
11 notes from that visit?
12   A.  Yes.
13   Q.  Your number one note is, "Keep engaged
14 with the DEA through all steps of the process."
15   A.  Yes.
16   Q.  Was that something new that you learned
17 during that visit to Thrifty White or something
18 that you already knew?
19   A.  As it says, keep engaged.  So we had
20 a -- Giant Eagle had what I believe a very
21 positive relationship with the DEA agents out of
22 the resident office, and the goal to keep
23 engagement with them all the way through the
24 process for their advice and suggestions, guidance
25 as to entering into the Schedule II as they would

Page 215

1 be responsible for the site reviews.
2   Q.  Number two, "It is critical to have a
3 robust suspicious order monitoring program."  You
4 put in quotes, Relying on the thresholds is not
5 good enough for the DEA, end quotes.  "How would
6 you identify a store that has an unusually large
7 order that does not push it over the threshold?
8 They have a process to review the orders before
9 they're filled by the DC."
10   Does that mean distribution center?
11     MR. KOBRIN:  Object to form.
12     THE WITNESS:  I believe so.
13 BY MR. HUDSON:
14   Q.  At this time, HBC did not have a process
15 to review orders before they were filled by the
16 distribution center; correct?
17   A.  HBC had a process to disclose to the
18 registrants suspicious orders of controlled
19 substances.
20   Q.  Did HBC have a process to review orders
21 before they are filled by the distribution center?
22   A.  Again, HBC had a -- as part of the
23 integrated approach that we had at all levels of
24 the store, the pharmacy and corporate and HBC, to
25 disclose suspicious orders or movement.

Page 216

1   Q.  So did HBC have a process to review the
2 orders before they are filled by the distribution
3 center?
4     MR. KOBRIN:  Object to form.  Asked and
5 answered.
6     MR. HUDSON:  Then I'll move to strike
7 his two previous answers as nonresponsive.
8 BY MR. HUDSON:
9   Q.  My question is very simple.  Did HBC
10 have a process to review orders before they were
11 filled by the distribution center?
12     MR. KOBRIN:  Object to form.
13     THE WITNESS:  Giant Eagle had a system
14 to disclose suspicious orders and to review
15 purchases.
16 BY MR. HUDSON:
17   Q.  Before they were filled by the
18 distribution center or after?
19   A.  As they were --
20     MR. KOBRIN:  Object to form.
21     THE WITNESS:  For which schedules?
22 BY MR. HUDSON:
23   Q.  That's the regulation itself.  My
24 question is about HBC.
25   Did HBC have a process to review orders

Page 217

1 before they were filled by the distribution
2 center?
3     MR. KOBRIN:  Object to form.
4     THE WITNESS:  Giant Eagle as part of the
5 overall levels of controls at the store, at the
6 distribution center, even to the team members
7 picking the orders, to be able to see or to
8 identify flags to be investigated.
9 BY MR. HUDSON:
10   Q.  So the review for flags would happen
11 before the orders were filled by the distribution
12 center?
13     MR. KOBRIN:  Object to form.
14     THE WITNESS:  Which orders?
15 BY MR. HUDSON:
16   Q.  Orders of controlled substances.
17   A.  Again, part of the process would be the
18 orders would come in.  We talked previously that
19 when they would flag to be determined if they
20 were -- if the order pattern was out of line for
21 the store or the threshold, I'll put it that way,
22 flag on the threshold report that the PDLs would
23 be directed to investigate.
24   With CSOS, the controlled substance ordering
25 system, the orders were reviewed before they were

Page 218

1 sent for filling.
2    Q.   And when did CSOS come into effect?
3    A.   That's a good question.  I don't
4 remember the date.
5    Q.   Is it C-S-O-S?
6    A.   Yeah.
7    Q.   That came into effect after
8 October 2014; right?  Or was it some point in
9 2015?
10    A.   I don't remember the date.  I'd have to
11 be refreshed.
12        (HBC-Millward Exhibit 26 was marked.)
13 BY MR. HUDSON:
14    Q.   I'll hand you, sir, what I'm marking as
15 Exhibit 26.  Is this the CSOS program that you're
16 referring to?
17    A.   Sorry.  I'm taking a second to review
18 it.  It appears to be the CSOS, CSOS walk through
19 and trouble-shooting document.
20    Q.   And this is coming online in late 2015;
21 right?
22        MR. KOBRIN:  Object to form.
23        THE WITNESS:  Either late 2015 or
24 early -- the date on the email is November of '15.
25 So it certainly would not have been before that.

Page 219

1 So late to early.
2 BY MR. HUDSON:
3    Q.   Going back though to -- if we could go
4 back to Exhibit 25, prior to the CSOS system, my
5 question is:  Did HBC have a process to review
6 orders before they were filled by the distribution
7 center?
8        MR. KOBRIN:  Object to form.
9        THE WITNESS:  I don't believe it was
10 required.
11 BY MR. HUDSON:
12    Q.   My question is:  Did the HBC facility
13 have a process to review orders before they were
14 filled by the distribution center?
15        MR. KOBRIN:  Object to form.
16        THE WITNESS:  Did the company review
17 orders?  Again, integrated.  I don't think there
18 was an obligation to other than to have a system
19 to disclose suspicious orders.
20 BY MR. HUDSON:
21    Q.   So since --
22    A.   That could be -- I don't want to
23 speculate.
24    Q.   In your mind, if it wasn't required,
25 then did Giant Eagle or HBC not have a process to

Page 220

1 review orders before they were filled by the
2 distribution center?
3        MR. KOBRIN:  Object to form.  Asked and
4 answered numerous times.
5        THE WITNESS:  As we discussed earlier on
6 the threshold reports, on the two occasions where
7 an order was deemed suspicious or movement was
8 suspicious, orders were stopped and withheld from
9 the store.
10 BY MR. HUDSON:
11    Q.   So on those two occasions, there was a
12 review that occurred; right?  We've looked at
13 that.  Your testimony is it was stopped.  The
14 order was stopped before it was filled at the
15 distribution center?
16        MR. KOBRIN:  Object to form.
17 Misrepresents the evidence.
18        THE WITNESS:  The orders for
19 buprenorphine for those stores were blocked.
20 BY MR. HUDSON:
21    Q.   Before they were filled at the
22 distribution center?
23    A.   Correct.  If they were blocked, they
24 could not have been filled.
25        MR. KOBRIN:  Do you want to take a

Page 221

1 break?
2        THE WITNESS:  Yeah.  We can take a
3 break.
4        MR. KOBRIN:  Time to take a break?
5        MR. HUDSON:  Yeah.  Can we make it short
6 though?  Let's go off the record.
7        THE VIDEOGRAPHER:  4:06.  We're off the
8 video record.
9        (Recess from 4:06 p.m. to 4:21 p.m.)
10        THE VIDEOGRAPHER:  4:21.  We're on the
11 video record.
12        (HBC-Millward Exhibit 27 was marked.)
13 BY MR. HUDSON:
14    Q.   Mr. Millward, before the break, we were
15 talking about notes from a visit that you made to
16 Thrifty White.  I want to now shift gears and hand
17 you a new exhibit.  I believe this talks about
18 this conversation that you had with Purdue.
19    I handed you what's been marked as
20 Exhibit 27, which has an internal reference number
21 of 6014.
22    Do you see on the front it's an email from
23 you to George Chunderlik and Adam Zakin with a
24 copy to Robert McClune?
25    A.   I see that.

Page 222

1     Q.   Then there's an attachment, Notes for
2   Purdue Order Monitoring System.
3     A.   Docx, yeah.
4     Q.   If we look on the next page, are those
5   your notes?
6     A.   These, as I'm reviewing them, having not
7   seen them for a while, a long time, appear to
8   be -- are they Giselle's notes?
9     Q.   Go back to the front.  It says,
10  "Attached are the notes from the Purdue SOM call."
11    A.   And the document Notes for the Purdue
12  Order Monitoring System as the attachment?
13          (HBC-Millward Exhibit 28 was marked.)
14  BY MR. HUDSON:
15    Q.   Let me give you one more here.  I'm
16  going to mark as Exhibit 28 -- it's actually three
17  separate documents, but I'm going to combine them
18  to mark it as one exhibit because they're
19  consecutively Bates numbered, and I believe
20  they're the two attachments to the email.  I'm
21  going to hand these to you.  That's been marked as
22  Exhibit 28.
23          (Witness reviewed the exhibit.)
24  BY MR. HUDSON:
25    Q.   You'll see there that the email from you

Page 223

1   in Exhibit 28 has got two attachments, and the two
2   documents behind them are the next two
3   Bates-labeled documents in the production.  So
4   I'll give you a chance to take a look at those.
5     A.   Okay.
6     Q.   Have you had a chance to review
7   Exhibits 27 and 28?
8     A.   I have.
9     Q.   Does that refresh your recollection
10  about discussions you were having with Purdue
11  about their suspicious order monitoring system?
12    A.   To circle back, if I may, to the
13  previous question about -- sorry -- Exhibit 27 --
14    Q.   Yes.
15    A.   -- I do believe that these are the notes
16  from Purdue because as they -- as it references,
17  Kate can help with training -- that would be seven
18  lines essentially from the bottom -- as a Purdue
19  employee.  So I believe that was Purdue's
20  information to us ahead of the conference call.
21    Q.   So then let's start, if we could, with
22  Exhibit 27 and look at those notes for the Purdue
23  order monitoring system call.  Do you see that at
24  the top it says that?
25    A.   I do.

Page 224

1     Q.   It says look at percentage of controlled
2   substances of total; right?
3     A.   That's what it says; correct.
4     Q.   Percentage of cash?
5     A.   Yes.
6     Q.   Percentage of target chemical of total
7   and of controls, and then percentage of cash,
8   percentage of high value GPIs, and then percentage
9   of cash, and percentage of opiate, benzo --
10    A.   Potentiator.
11    Q.   -- co-administration.  So those
12  were -- were those red flags to look at when
13  monitoring orders?
14          MR. KOBRIN:  Object to form.
15          THE WITNESS:  So this is a very good
16  example of reaching out to partners in industry to
17  continue to evolve Giant Eagle's processes.  In
18  this case, these were things suggested that Purdue
19  looks at and recommendations and suggestions for
20  ways to parse data further beyond what we may have
21  been using at that particular time.
22  BY MR. HUDSON:
23    Q.   So at this particular point in time, in
24  November of 2015, those were not indicators or
25  items that you were looking at, correct, at Giant

Page 225

1   Eagle or HBC?
2          MR. KOBRIN:  Object to form.
3          THE WITNESS:  Restate it.  I'm sorry.  I
4   was reading the attachment.
5   BY MR. HUDSON:
6     Q.   Up on the screen there, what we read
7   off, percentage of controlled substances, percent
8   of cash, percentage of targeted chemical, that
9   list is not something that HBC was looking at at
10  the time, as of November of 2015; correct?
11    A.   Those were suggestions from Purdue as to
12  things that they recommend looking at.
13    Q.   And as far as you were aware at the
14  time, that would be an upgrade to your system at
15  HBC because that wasn't something that you were
16  currently looking at; correct?
17    A.   Again, reaching out to partners in the
18  industry to develop what should be best practices
19  and to continue to evolve the processes, continued
20  evolution of the controls.
21    Q.   And at least from Purdue's point of
22  view, what they're reflecting here is looking at
23  those items was something that they recommend that
24  you do; right?
25    A.   Based on her communication, sending that

Page 226

1  over and talking and discussing it on the
2  conference call, those are things that Purdue had
3  as a recommendation.
4      Q.  If we go to Exhibit 28, this is an email
5  from you to a distribution list, and again, it's
6  talking about -- you're providing a recap, right,
7  of your call with Purdue?
8      You wrote, "On Friday, George and I
9  participated in a conference call with Purdue
10  Pharma, maker of top shelf controlled substances
11  such as Oxycontin and Hysingla ER, to discuss
12  their SOM process.  In addition to thresholds,
13  they purchase IMS data and look at the percentages
14  of their meds as part of all Rxs filled and the
15  percentage that were filled as cash as opposed to
16  third parties."
17      Then you wrote, "Kayla had created a similar
18  report a couple of years ago.  I would like to
19  incorporate something similar into our SOM and
20  controlled substances monitoring processes.  I've
21  attached two similar spreadsheets.  You can change
22  the quarter from Q1 to Q2 to see the data.
23  Unfortunately, that is the limit of the data
24  incorporated into the workbook.  I think something
25  like that would fit well into a BI tool."  Right?

Page 227

1      MR. KOBRIN:  Object to form.
2  BY MR. HUDSON:
3      Q.  Or fit well within a BI tool; correct?
4      A.  That's what it says.
5      Q.  And those comments you made back in
6  November of '15, do those accurately reflect that
7  call that occurred with Purdue Pharma?
8      A.  I believe if you go down the next
9  section in that exhibit, where it continues on the
10  breakdown description, those are -- those are my
11  thoughts or incorporating -- looking to
12  incorporate some of the suggestions or
13  recommendations from an industry partner.
14      Q.  And your email reflects that those were
15  not things that you were currently doing at HBC;
16  correct?
17      MR. KOBRIN:  Object to form.
18      THE WITNESS:  At the time of the email,
19  that would be correct.
20  BY MR. HUDSON:
21      Q.  Prior to leaving HBC in March of 2016,
22  do you know if any of those processes were
23  incorporated?
24      A.  Leaving Giant Eagle?
25      Q.  Giant Eagle.  I'm sorry.

Page 228

1      A.  That's okay.  That's fine.  I don't -- I
2  don't recall if they had been put into production
3  or not.
4      (HBC-Millward Exhibit 29 was marked.)
5  BY MR. HUDSON:
6      Q.  I'm going to move to a different topic
7  here and hand you what I'm going to mark as
8  Exhibit 29.
9      From time to time, were you asked by
10  manufacturers to fill out questionnaires relating
11  to your programs, your suspicious order monitoring
12  programs?
13      A.  So the email chain appears to initiate
14  from one of the manufacturers, Amneal, with a
15  questionnaire that was sent to Giant Eagle RX
16  distribution center.
17      Q.  And it looks like Mr. Chunderlik filled
18  out the questionnaire, but he wanted you to take a
19  look at it before he sent it back; right?
20      A.  His email to me reads, "Erin Hart asked
21  me to fill out this Amneal DEA questionnaire.  I
22  filled it out.  However, I want you to review also
23  before I send it back to Erin."
24      Q.  And do you recall whether you did, in
25  fact, review the questionnaire?

Page 229

1      A.  While I don't recall specifically
2  reading it at that time, I would have responded to
3  George.
4      Q.  If you look at question No. 15 of this
5  questionnaire, they're asking you to describe your
6  suspicious order monitoring system.  Do you see
7  that?
8      A.  I see the question.
9      Q.  And do you see the second sentence, "The
10  order monitoring system (OMS) uses algorithms to
11  identify controlled substance orders that requires
12  investigation and documentation before releasing
13  the order for distribution.  The OMS generates
14  flags based on monthly thresholds and
15  characteristics specific to:  Pharmacy location,
16  chemical, generic product indicater (GPI),
17  National Drug Code (NDC) and week of the month."
18      Did I read that correctly?
19      A.  You read it correctly.
20      Q.  Was that a truthful description of the
21  SOM program that existed at the time in December
22  of 2015?
23      MR. KOBRIN:  Object to form.
24      THE WITNESS:  I believe that was
25  accurate at the time it was written.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

BY MR. HUDSON:

Q. So in December of 2015, to the best of your recollection, HBC had an order monitoring system that used algorithms to identify controlled substance orders that required investigation and documentation before releasing the order for distribution?

MR. KOBRIN: Object to form.

THE WITNESS: Well, this is for Giant Eagle RX distribution center.

BY MR. HUDSON:

Q. So it's your belief that that was a system that was going to be in place at Giant Eagle RX distribution center?

MR. KOBRIN: Object to form.

THE WITNESS: Yeah, I believe that to be accurate.

(HBC-Millward Exhibits 30 - 31 were marked.)

BY MR. HUDSON:

Q. I want to switch topics again and talk just briefly about your efforts to create written policies. I'm going to hand you two exhibits. Mark these as Exhibit 30 and 31.

MR. HUDSON: The internal numbers are 5029 and 5030.

Page 231

THE WITNESS: Thank you.

(Witness reviewed the exhibit.)

BY MR. HUDSON:

Q. Can you just tell me the two exhibit numbers of the two documents?

A. 30 and 31.

Q. Thank you. Are Exhibits 30 and 31 two emails attaching different drafts of some procedures that you were -- policies and procedures that you were putting together for the new distribution facility?

A. May I just have a second to review through, please?

Q. Of course.

A. Thank you. Okay. They do appear to be drafts.

Q. Does this indicate that you were the one at this time, in December of 2015, who was actually drafting the SOM policies and procedures?

MR. KOBRIN: Object to form. Misrepresents the exhibit.

THE WITNESS: So the exhibit is a draft of the inventory control or it falls under order monitoring policy, order monitoring system, and I'm looking at document No. 30, and lays out

Page 232

the -- my thoughts as to and subsequently with George's input of how it would flow.

BY MR. HUDSON:

Q. Right. And your email in Exhibit 31 that starts out Team, it says, "Team, attached is the latest draft of the SOM procedure for the Giant Eagle order monitoring system policy"; right?

A. Correct. That's what it says.

Q. Was that the SOMS policies and procedures for the new Giant Eagle RX distribution center?

A. So this was the latest draft of those procedures seeking input from the other stakeholders. The first was to Adam Zakin and George Chunderlik, and then the second was expanding it out to seek feedback from Bob McClune, Greg Carlson, Jason Mullen, Christy Hart, Rick Shaheen, Jess Boyd, Justin Daugherty and Nick Garrett.

Q. I guess what I'm asking is: Were you the primary drafter, initial drafter of these policies?

A. I believe George and I worked collaboratively, but my type.

Page 233

Q. During your time as the senior manager of compliance at Giant Eagle, were you the one that was most knowledgeable about these types of policies and procedures for SOMS?

MR. KOBRIN: Object to form.

THE WITNESS: I'm sorry. Restate your question, please.

MR. HUDSON: Would you mind just reading it back.

(The record was read back.)

THE WITNESS: Yeah, I was knowledgeable on the subject.

BY MR. HUDSON:

Q. Were you the one -- at Giant Eagle, in your mind, were you the one who was most knowledgeable about the subject matter?

A. I can't speak for the knowledge of others, but I was the one that was the point person responsible for investigating and understanding the requirements as in the reg. and then working with the other stakeholders for their areas of expertise.

Q. Were you and George the two that were primarily responsible for the policies and procedures, in other words, designing them and

Page 234

1 then implementing them?
2    MR. KOBRIN: Object to form. These
3 particular policies or policies and procedures
4 generally?
5    MR. HUDSON: The SOMS policies and
6 procedures.
7    THE WITNESS: With regard to this, we
8 would put it together to be reviewed by the group
9 and the other stakeholders, so Bob McClune in
10 purchasing, the central signers, loss prevention
11 all have their feedback that goes into it, their
12 view of it and their point of view which is very
13 critical to make sure that the policy is -- once
14 it goes into final form and into production is
15 actionable and meets their areas which are
16 somewhat different than mine.
17    Q. But I guess what I'm trying to get at
18 just to make sure that I've covered the waterfront
19 here, in your time as senior manager of compliance
20 at Giant Eagle, are you aware of anyone other than
21 you and George who would have drafted or created
22 SOMS policies or procedures?
23    A. The timeframe you said is all of my time
24 at Giant Eagle in that role?
25    Q. Right, as the senior manager of

Page 235

1 compliance.
2    A. I believe we talked about earlier this
3 morning that the policies or the procedures were
4 in place for HBC before I got there, before I
5 moved into the role when the distribution center
6 opened, and then as in the role and as we did the
7 revisions with regard to VAWD as the example, then
8 there was an increase and got more involved in
9 that process and with the overall looking at the
10 total movement of controlled substances and within
11 our lockdown realm of control.
12    Q. I appreciate that answer. I want to
13 make sure though the record is clear.
14    During your time as senior manager of
15 compliance at Giant Eagle, are you aware of any
16 anyone other than you or George who would have
17 drafted or created SOMS policies or procedures?
18    MR. KOBRIN: Object to form. Asked and
19 answered.
20    THE WITNESS: In my time before we were
21 involved -- other people who would be involved
22 with distribution policies and procedures would
23 have been distribution and the merchandising
24 group, as I stated earlier.
25

Page 236

1 BY MR. HUDSON:
2    Q. I appreciate that. I'm trying to get a
3 direct answer to the question that I asked.
4    Other than you or George, during your time as
5 the senior manager of compliance at Giant Eagle,
6 are you aware of anyone else who drafted or
7 created a SOMS policies or procedures?
8    MR. KOBRIN: Object to form. Asked and
9 answered. He made reference to other people who
10 worked on the policies.
11    MR. HUDSON: If you want to coach him,
12 that's my point, that those are other policies.
13 My question is about SOMS policies and procedures.
14 BY MR. HUDSON:
15    Q. In your time as senior manager of
16 compliance at Giant Eagle, are you aware of anyone
17 other than you or George who drafted or created
18 policies or procedures for SOMS?
19    MR. KOBRIN: Ty, I'm not coaching him,
20 but I think there's a miscommunication of what you
21 mean by SOMS.
22    THE WITNESS: All our policies and
23 procedures, whether regardless, focused on --
24 again, I can't speak to the policies and
25 procedures that were in place when HBC was created

Page 237

1 before I came into the role.
2    Policies and procedures afterwards could be
3 drafted or I would draft or George would draft
4 collaboratively, and then those policies and
5 procedures would be reviewed, as I had spoken
6 earlier, through our policies and procedures
7 committee.
8 BY MR. HUDSON:
9    Q. You have in front of you Exhibits I
10 think they're 30 and 31; right?
11    A. Yes.
12    Q. You, yourself, have identified those as
13 SOMS policies and procedures; right?
14    A. Well, order monitoring system, yes.
15    Q. In your second email, you said, team,
16 here's my SOM; right?
17    A. Yes.
18    Q. SOM means suspicious order monitoring;
19 right? And in that you're drafting policies and
20 procedures; right?
21    A. For GERX.
22    Q. Right. So my question is: Other than
23 you or George, during your time as the senior
24 manager of compliance at Giant Eagle, are you
25 aware of anyone else in the company who drafted

Page 238

1 any policies and procedures like Exhibits 30 or
2 31?
3        MR. KOBRIN:  Object to form.  Asked and
4 answered.
5        THE WITNESS:  For this date, this is an
6 evolution of our order monitoring program as part
7 of our complete overview of or our control of
8 controlled substances movement throughout the
9 organization.
10 BY MR. HUDSON:
11    Q.  Sir, are you able to answer the
12 question?
13        MR. KOBRIN:  Objection.  Argumentative.
14        THE WITNESS:  People who may have
15 created policies at the time, and I think they
16 were earlier exhibits, were people that were
17 involved at the distribution center or through --
18 again before the DC became or before we got
19 involved in the policies.  I think this is
20 actually pretty good.  I'm glad that we're seeing
21 it again, but anyway...
22 BY MR. HUDSON:
23    Q.  Other than you or George though, give me
24 a list of the people at Giant Eagle who were
25 involved with creating SOM policies and

Page 239

1 procedures.
2        MR. KOBRIN:  Object to form.
3 BY MR. HUDSON:
4    Q.  Is there anyone other than you or
5 George?
6        MR. KOBRIN:  Object to form.  Asked and
7 answered.  We can go around this a lot, Ty.  I
8 might be able to help clarify what's going on, but
9 I know you don't want me to interject and help out
10 with the deposition in any way.  But I think
11 there's a miscommunication here, and I think
12 you're seeking something that's ill defined.
13 BY MR. HUDSON:
14    Q.  Is there anything more that you can say
15 about that?
16    A.  I think I've said it.
17    Q.  -- if we go back to Exhibit 5, which is
18 the internal No. 12, did you or George draft these
19 policies?
20        After the first two, I think you were gone
21 from the company.  So my question would really be
22 just about the first two.
23    A.  I see what you're saying.
24    Q.  So for the first two policies.
25    A.  They would have been George and I with

Page 240

1 Matt Rogos as the policy owner.
2    Q.  In the process of drafting these two
3 policies, are you aware of anyone else who was
4 involved other than you and George and Matt Rogos?
5    A.  Our policy procedure group.
6    Q.  And who from that group was involved?
7    A.  Well, the list that I gave, the example
8 I gave earlier this morning when we talked about
9 it.  Again, I'll go through.  So me, George, I
10 mentioned Rick Springer, Steve Zubrow, Mary
11 Gibson, Jane Barnes, so those three internal or
12 external and internal counsel respectively.
13 Adrienne Anthony.  Matt would have been part or a
14 representative from the DC would have been part --
15 for to review as well.  But that was the -- I said
16 Rick Springer.
17        That was our policy and procedure committee
18 that would review all the policies before they
19 would ever go to production that I was involved
20 with.
21    Q.  Were you ever aware of an initiative
22 within Giant Eagle of evaluating whether pain
23 management was a potential corporate business
24 opportunity?
25    A.  What's the timeframe that you're

Page 241

1 referring to?
2    Q.  November of 2010.
3    A.  Yes.
4    Q.  And describe for me what you know about
5 that.
6    A.  I wasn't directly involved.  As I --
7 there was a trip to -- I apologize -- I believe it
8 was Oregon, I don't remember, to investigate a
9 pain management pharmacy.  That business idea was
10 killed and never explored beyond that initial
11 visit.
12    Q.  You mean the idea was killed and never
13 went beyond the initial visit to a pain clinic in
14 Oregon?
15    A.  Being a dispensing pharmacy for a pain
16 clinic was not a business we had any interest in
17 beyond that initial visit.  So that idea, that
18 business model never left the initial stages that
19 I'm aware of and never went to execution.
20    Q.  But you think that that initiative was
21 focused on looking at a pain management clinic in
22 Oregon?
23    A.  I believe that's where it was.  I may be
24 wrong.  I deserve the right to be wrong on that.
25 Okay?  I apologize.

Page 242

1  Q.  That's fair.
2  A.  I wasn't involved in it.  I didn't make
3  the trip.  But feedback from I believe it was
4  Anthony, who was on that trip, said that that is
5  not a business Giant Eagle ever wants to be
6  involved in.
7  Q.  Why not?
8  A.  Why?  We do not want to be involved in
9  having a pain clinic pharmacy because of the --
10  I'm not able to attest to what his thought process
11  was.  That's how he relayed it to me.  That is not
12  something we're interested in.
13  Q.  Did you have any understanding of why
14  not?
15  MR. KOBRIN:  Object to form.  Asked and
16  answered.
17  THE WITNESS:  From my opinion on the
18  surface, not a business I want to be in.
19  BY MR. HUDSON:
20  Q.  Because it's not profitable or why not?
21  MR. KOBRIN:  Object to form.
22  THE WITNESS:  I don't think that's -- I
23  don't want to be involved in a pain clinic
24  pharmacy.  It's not necessarily -- it's not
25  something that we had any interest in.

Page 243

1  BY MR. HUDSON:
2  Q.  Is that type of business at higher risk
3  for diversion?
4  MR. KOBRIN:  Object to form.
5  THE WITNESS:  Well, not being in that
6  business, I can't say, because I don't -- I don't
7  know necessarily.  Okay?  But that type of
8  business certainly has -- requires or garners a
9  significant amount of, let's say, review from the
10  DEA.  And I didn't believe in it, don't believe
11  that was the right thing for any of our business.
12  BY MR. HUDSON:
13  Q.  Do you know whether or not Giant Eagle
14  retail pharmacies were filling prescriptions that
15  were being written at pain management clinics?
16  A.  Giant Eagle pharmacies were filling
17  prescriptions brought by patients that were -- the
18  pharmacists were required to do their due
19  diligence to determine is that a legitimate
20  prescription for a legitimate medical use from a
21  physician acting in their course of practice.
22  So I believe whether it's from a dentist, as
23  long as the pharmacist made their -- exercised
24  their corresponding responsibility to determine
25  that prescription was legitimate, I believe the

Page 244

1  prescription was -- that they acted in the course
2  of their professional practice as the pharmacist
3  in determining that.
4  Q.  But as a pharmacist, how do you know if
5  the prescription is coming from a legitimate
6  doctor or an illegitimate doctor?
7  MR. KOBRIN:  Object to form.
8  THE WITNESS:  That's a very interesting
9  question.  You have to do your due diligence and
10  make your individual determination based on the
11  prescription, the prescribing pattern of the
12  physician, the patient, to determine is this a --
13  is it being used for legitimate use.  It could be
14  talking to the patient, saying, why are you using
15  this.
16  In our controlled substance dispensing
17  guidelines, it's called out for the pharmacists
18  are empowered to call the doctor to get the
19  diagnoses, to get -- as far as even getting
20  progress notes.  We coach them to say -- the
21  burden of proving that it's a legitimate
22  prescription falls onto the prescriber before they
23  fill that -- before they make that fill or do not
24  fill determination.  That's how our pharmacists
25  were trained and coached.

Page 245

1  BY MR. HUDSON:
2  Q.  Were those some of the procedures that
3  you were working on putting together in 2015?
4  A.  2013.  Actually, even before that.  I'm
5  sorry.  It was shortly after.  The controlled
6  substance dispensing guidelines came out -- I
7  forget the month, but I want to say somewhere
8  2011-ish.
9  Q.  In 2011?
10  A.  For the controlled substance dispensing
11  guidelines?  I have to look at the document to see
12  to refresh my timeline.  But as I -- I referenced
13  those earlier.  That's the other reason why, to
14  answer your question, the pharmacists had to make
15  that individual determination.  And they knew that
16  the company, if they chose not to fill that
17  prescription because they did their due diligence,
18  the company would support that decision.
19  Q.  As you sit here today, are you aware of
20  any pharmacists who did not fill prescriptions?
21  A.  Sure.
22  Q.  How many?
23  A.  I can't give you a number.
24  Q.  Is there some way within Giant Eagle
25  that that was tracked?

Page 246

1    A.  No.
2    Q.  Going back to the idea of pain
3  management as a corporate business opportunity,
4  were you aware of any efforts in the Cleveland
5  market to advance that corporate initiative?
6    A.  No.
7    Q.  Are you aware of any conversations with
8  the Cleveland Clinic?
9    MR. KOBRIN:  Object to form.  Asked and
10  answered.
11    THE WITNESS:  I do not recall any
12  conversations or being part of conversations with
13  regard to the question.
14    MR. HUDSON:  Let's take a short break.
15    THE VIDEOGRAPHER:  5:08.  We're off the
16  video record.
17    (Recess from 5:08 p.m. to 5:31 p.m.)
18    THE VIDEOGRAPHER:  5:31.  We're on the
19  video record.
20  BY MR. HUDSON:
21    Q.  Mr. Millward, we talked today about HBC,
22  and I believe we agreed that HBC acted as a
23  distributor of hydrocodone combination products
24  from November of 2009 to October of 2014.
25    Do you agree with that?

Page 247

1    A.  I agree.
2    Q.  And I think we established that HBC
3  shipped more than 18 million dosage units of
4  hydrocodone combination products to Cuyahoga and
5  Summit counties; right?  That's the transaction
6  data that we looked earlier.
7    A.  Without a way to independently verify
8  those numbers or I don't have a way to verify
9  those numbers or the amount of prescriptions that
10  they were pursuant to.
11    Q.  But you would agree that the data that
12  we looked at, at least from the ARCOS data, as
13  presented to you, the documents that were created
14  show more than 18 million dosage units shipped
15  into Cuyahoga and Summit counties; right?
16    MR. KOBRIN:  Object to form.
17    THE WITNESS:  Again, I can say the
18  documents you presented, those were the numbers
19  that were on it.
20  BY MR. HUDSON:
21    Q.  Now, during this time -- so these
22  questions relate to the time period of
23  November 2009 to October of 2014 -- do you agree
24  that HBC had no computerized system with an
25  algorithm to monitor orders?

Page 248

1    MR. KOBRIN:  Can you repeat the
2  timeframe?
3    MR. HUDSON:  All of these questions will
4  be from November 2006 to October of 2014.
5    THE WITNESS:  Can you repeat it again
6  now that I'm prepared?
7  BY MR. HUDSON:
8    Q.  Sure.  HBC did not have a computer
9  system with an algorithm to monitor orders, to
10  flag orders that were suspicious?
11    MR. KOBRIN:  Object to form.
12    THE WITNESS:  And a computer algorithm
13  isn't required under the Act.
14  BY MR. HUDSON:
15    Q.  You'd agree that HBC did not have any
16  process for tracking in writing orders that were
17  flagged for review?
18    MR. KOBRIN:  Object to form.
19  Misrepresents the evidence and the record.
20    THE WITNESS:  We discussed earlier about
21  retaining documents that were legally required and
22  to retain those as required.
23  BY MR. HUDSON:
24    Q.  As you sit here today, you can't tell me
25  though between November of 2009 and October 2014,

Page 249

1  how many orders of hydrocodone combination
2  products HBC flagged as being orders of interest;
3  right?
4    MR. KOBRIN:  Object to form.
5    THE WITNESS:  I don't have that data or
6  recollection.
7  BY MR. HUDSON:
8    Q.  And HBC didn't track that; right?
9    A.  Again, I don't have that recollection.
10    Q.  In other words, to your knowledge,
11  there's nowhere we can go to try to determine how
12  many orders HBC flagged as being orders of
13  interest for potential diversion; is that fair?
14    MR. KOBRIN:  Object to form.
15  Misrepresents the record.
16    THE WITNESS:  I don't have -- again, I
17  don't have recollection of orders that were
18  flagged.  And any documents would be retained as
19  required by law.
20  BY MR. HUDSON:
21    Q.  And there's -- HBC had no standardized
22  process for documenting whether it was doing a
23  review or an investigation; correct?
24    MR. KOBRIN:  Object to form.
25    THE WITNESS:  So you asked, if I'm

Page 250

1 understanding you correctly, did not have a
2 procedure for documenting? Did I interpret that
3 correctly?
4 BY MR. HUDSON:
5     Q. For documenting reviews or
6 investigations; correct.
7     A. Or a requirement to do so?
8     Q. Right. But my question is just you
9 agree with me HBC had no standardized process for
10 documenting in writing reviews or investigations
11 that it was doing of orders; correct?
12     A. I don't agree with the phrasing of the
13 question.
14     Q. As you sit here today, is there anywhere
15 I can look to determine which shipments or orders
16 HBC reviewed or investigated to try to determine
17 whether they were at risk for diversion?
18     A. I'm not aware of or have knowledge of
19 orders that were flagged. And again,
20 documentation would only be required -- or
21 document retention, the company would have
22 followed what those rules were, the laws.
23     Q. You agree that HBC during this time
24 period had no standardized process for tracking
25 the progress of reviews or investigations;

Page 251

1 correct?
2     A. Again, I disagree with the form of the
3 question. But again -- actually repeat it one
4 more time.
5     Q. You agree HBC had no standardized
6 process for tracking the progress of its reviews
7 or investigations?
8     MR. KOBRIN: Object to form.
9 Misrepresents the record.
10     THE WITNESS: Again, I don't agree with
11 the form of the question, nor was there a
12 requirement to create documentation.
13 BY MR. HUDSON:
14     Q. But you would agree with me that there's
15 nowhere within Giant Eagle or HBC where we could
16 go to and look in a repository or a file and be
17 able to determine what was happening on any review
18 or investigation of any order that was flagged for
19 being suspicious of diversion; is that fair?
20     MR. KOBRIN: Object to form.
21 Misrepresents the record.
22     THE WITNESS: I'm not aware of any
23 orders for hydrocodone-containing products that
24 were flagged, and I'm not again aware of any
25 documentation or repository thereof for any

Page 252

1 investigation as it's not required.
2 BY MR. HUDSON:
3     Q. Since you are aware of no orders of
4 hydrocodone combination products that were worthy
5 of being flagged, you agree then there's no review
6 or investigation notes that we can look at to
7 determine what HBC did to evaluate whether or not
8 any of their hydrocodone combination product
9 shipments were at risk for diversion?
10     MR. KOBRIN: Object to form. It
11 misrepresents the record.
12     THE WITNESS: Can you restate that again
13 a little differently?
14 BY MR. HUDSON:
15     Q. Sure.
16     A. I just want to make sure I understand
17 you thoroughly.
18     Q. As you sit here today, are you aware of
19 any reviews or investigations that were done by
20 HBC of any orders of hydrocodone combination
21 products?
22     A. So as we looked at the -- we talked
23 previously and discussed at store 8 inquiring,
24 sending it to the pharmacy district manager to
25 investigate. So I apologize for not fully

Page 253

1 understanding the force of your question.
2     Q. Other than that one, are there any other
3 investigations you're aware of or reviews that
4 occurred?
5     A. The orders that came up on the flag
6 reports would all have been reviewed.
7     Q. Each and every one of them?
8     A. To determine whether there was any
9 diversion or activity.
10     Q. So Exhibits 10 through 21 that we looked
11 at earlier, those reports, it's your testimony
12 that each and every one of the orders that were
13 listed on those reports were reviewed or
14 investigated for risk of diversion?
15     A. Well, I can't recall every individual
16 case and I can speak to store 8 as it's been
17 refreshed. That information would belong to the
18 pharmacy district manager, pushed to them, to take
19 a look at. And that was before we had other
20 systems to be able to look into movement
21 centrally.
22     Q. I don't understand. What does that
23 mean? You have those Exhibits 10 through 21. We
24 talked about them earlier today. They're these
25 reports. What did it mean they were pushed to the

Page 254

1 pharmacy district managers to take a look at?
2     A.   That's what the -- when you see the
3 store 8, Todd the store flagged, I believe.
4     Q.   Are you saying you or George contacted
5 the pharmacy district managers?
6     A.   To have them take a look at it, one of
7 us, anybody on that distribution list would have
8 been able to as well.  But to send it to them to
9 say you have a store that's on the report, take a
10 look, tell me.
11     Q.   Is there any reason why any of those
12 reviews or investigations, why there wasn't a
13 process put in place to track what was being done?
14         MR. KOBRIN:  Object to form.  Asked and
15 answered.
16         THE WITNESS:  You're asking if there was
17 a procedure for recording those investigations?
18 BY MR. HUDSON:
19     Q.   My question is:  Is there any reason
20 why -- so now I'm asking about the reason -- is
21 there any reason why you did not put a process in
22 place to document in writing the reviews or
23 investigations that were occurring?
24         MR. KOBRIN:  Object to form.  Asked and
25 answered.

Page 255

1         THE WITNESS:  Not a requirement.
2 BY MR. HUDSON:
3     Q.   Would you agree that it would be easier
4 for us to today to try to figure out what HBC did
5 if HBC would have documented in writing the
6 reviews and investigations that occurred?
7         MR. KOBRIN:  Object to form, as you
8 repeatedly asked and repeatedly answered for a
9 long period this morning.  I want that on the
10 record.
11         THE WITNESS:  You're asking an "if"
12 question for me to speculate as to how you would
13 be able to see that.  I don't believe I can answer
14 that.
15 BY MR. HUDSON:
16     Q.   I'm asking:  Would you agree as we sit
17 here today and we're trying to figure out what
18 reviews or investigations occurred, other than
19 store 8 -- is there any other investigation you
20 can tell me about that occurred between November
21 of 2009 and October of 2014 of hydrocodone
22 combination products?
23         MR. KOBRIN:  Object to form.
24         THE WITNESS:  So 2009 to October '10 I
25 wasn't in the role.  Beyond to where after 2013

Page 256

1 when, as we've established, the report was
2 created, then those reports and movements would
3 have been pushed.  The only one we have
4 documentation of, store 8, and it's been three,
5 five years.
6 BY MR. HUDSON:
7     Q.   Right.  That's all I'm getting at.  If
8 we had documented each review or investigation and
9 put those into writing, wouldn't that be easier
10 for us today to be trying to figure out what HBC
11 did between 2009 and 2014?
12         MR. KOBRIN:  Object to form.
13         THE WITNESS:  As a speculation and
14 crystal ball looking into the magic 8 ball of
15 would this be easier, that's an interesting
16 question.
17 BY MR. HUDSON:
18     Q.   Do you want to answer it?
19         MR. KOBRIN:  Object to form.
20         THE WITNESS:  It's hard to say.  I don't
21 have a good -- I'm not going to speculate.
22 BY MR. HUDSON:
23     Q.   We do agree though that HBC never
24 blocked a single shipment of hydrocodone
25 combination products during the time that it was a

Page 257

1 distributor of those products; correct?
2     A.   Again, I can't speak to what happened
3 before I was in the role, understanding -- with
4 that qualifier.
5     Q.   At least while you were there though,
6 you agree there was never a shipment of
7 hydrocodone combination products that were blocked
8 from shipment at HBC; correct?
9     A.   I'm not aware of any shipment that was
10 blocked.
11     Q.   You agree that during the time you were
12 the senior manager of compliance, there was never
13 a shipment of hydrocodone combination products
14 where you notified the DEA that they were a
15 suspicious order; right?
16     A.   Again, I'm not aware that there was a
17 flag that was deemed to be suspicious.
18         MR. HUDSON:  I don't have any further
19 questions.
20         EXAMINATION
21 BY MR. KOBRIN:
22     Q.   Mr. Millward, you were asked earlier
23 today about stopping shipments on orders of
24 interest while they were being investigated.
25     Do you recall that line of questioning?

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    A. I do.
2    Q. Tell me, are there different means
3 through which Giant Eagle or HBC investigates an
4 order of interest?
5    A. Yes. We talked at length about the
6 threshold or the Voelker report, so to speak, but
7 there were other systems in place. Giant Eagle
8 invested in two tools from a company by the name
9 of Supply Logics.
10    Supply Logics had two products, Pinpoint
11 Monitor and Pinpoint Audit, one looking at
12 pharmacy purchasing patterns, the other looking at
13 pharmacy dispensing patterns.
14    Giant Eagle also invested in a dedicated
15 person to review those or to have access and
16 review those tools to look for any -- really as a
17 redundant mechanism to look for any kind of
18 movement of controlled substances that could
19 potentially be a flag for investigation.
20    Q. Just to clarify the record, are there
21 situations where through this investigation you
22 could stop an order of interest before it shipped?
23    A. That is correct. If a report was
24 generated or a flag was generated, we had the
25 potential to stop the orders for that store until

Page 259

1 an investigation could be fully fleshed out.
2    Q. That was if a flag was generated by the
3 person you had hired to do investigation --
4    A. Correct.
5    Q. -- with this Supply Logic program?
6    A. Correct. His name was Jason Mullen.
7    Q. And he could do these investigations and
8 he could stop the shipment when that store made an
9 order if he found there was a reason to
10 investigate that store; is that correct?
11    A. That is correct.
12    Q. Now, were there other situations in
13 which you could not necessarily stop a shipment
14 even after you identified an order of interest?
15    A. So the Kayla report was a report that
16 came out the next day after a store had received
17 the order, and that's where that store had already
18 received it. So it afforded the opportunity to
19 investigate at that point and stop future orders
20 it determined to be suspicious and then
21 subsequently reported as required.
22    Q. Did you ever do that, stop future
23 orders?
24    A. We did.
25    Q. And was there anything else you could do

Page 260

1 even if the order had been started to be filled at
2 the warehouse or even filled at the warehouse and
3 shipped? Had you lost control of the order?
4    A. Because, as stated earlier, Giant Eagle
5 distributed to itself, we were our customer, we
6 knew everything about the characteristics of our
7 store and had control of and control of the
8 product from where it entered into the DC till it
9 left in a prescription for an end user patient.
10    If something needed to be quarantined and
11 removed from dispensing stock, we had the ability
12 to have our stores pull that aside, if necessary,
13 to prevent it from being dispensed.
14    Q. You talked about a visit to Purdue that
15 you made in order to see their practices. Why did
16 Giant Eagle visit Purdue?
17    A. It was a conference call. It was a
18 conference call that we had. And I believe Purdue
19 reached out to us through the purchasing group,
20 put in contact with me for George and I to have a
21 conference call, again, along the lines of the
22 Thrifty White, for example.
23    It was just another example of reaching out
24 to determine what are some other things other
25 organizations -- now Purdue being very different

Page 261

1 from us as only a manufacturer and then a
2 distributor to distributors, not dispensing.
3    It was essentially used as intel or insight
4 as to what other organizations are doing so we can
5 continue, as I had spoken repeatedly, improve and
6 evolve and tighten our practices.
7    Q. You said Purdue was very different from
8 you. Can you elaborate on that?
9    A. Purdue is a maker of brand -- well, most
10 known for Oxycontin. We mentioned earlier
11 Hysingla, which was in an email. And they are a
12 manufacturer that has a worldwide presence.
13    Q. They are not, as Giant Eagle is, a
14 regional or, rather, as HBC is a regional
15 distributor to captive pharmacy purchasers?
16    A. No. They are not a regional distributor
17 for captive pharmacies.
18    Q. Or a captive orderer, rather.
19    A. Exactly. The companies are very
20 different.
21    Q. You also mentioned one of the things
22 that you found interesting at Purdue was that they
23 were tracking the percentage of cash purchases.
24 Do you recall that?
25    A. I do.

Page 262

1    Q.   And opposing counsel asked about whether
2  you knew or whether that was something that Giant
3  Eagle did not do.  Do you recall that?
4    A.   I do.
5    Q.   To clarify the record at all, was there
6  any point at which Giant Eagle was able to do that
7  kind of tracking and that kind of investigation?
8    A.   So as I had mentioned, Jason Mullen and
9  the Supply Logics tool, the Supply Logics and I
10  believe -- one that was involved in the dispensing
11  patterns, Jason, his job was to go in and
12  investigate, to parse the data, and had the
13  ability to break it down via what the industry and
14  the DEA have defined as red flags to determine,
15  and one of those being percentage of cash
16  prescriptions for target chemical entities like
17  the oxycodone or hydrocodone and
18  hydrocodone-containing products, which by this
19  time rescheduled.
20    So yes, he absolutely had the ability to
21  review that data and to present to us information.
22    Q.   And he would preemptively review that
23  data, or would he be responding to orders?  What
24  was Jason Mullen doing?
25    A.   The great thing about having the tool

Page 263

1  and having somebody dedicated to use it is they
2  could go on and they could dive into the data and
3  search for movement issues unprompted, so not
4  necessarily directed by intel from a store or a
5  movement pattern of an individual product.
6    And he could find -- he could look into that
7  and get as granular as creating geographical maps
8  of the patients and the doctors to help better
9  understand where those prescriptions were coming
10  from.
11    Q.   Did this help you to preempt potential
12  orders of interest?
13    A.   This did.  It did help us prevent and
14  stop orders for stores, again, with buprenorphine.
15    Q.   You mentioned that you attended a DEA
16  conference in 2013.  Do you recall that?
17    A.   I do.
18    Q.   At that conference, do you recall any
19  discussions at all about having written policies
20  in regard to suspicious order monitoring?
21    A.   I do not.
22    Q.   Do you recall there being any discussion
23  at all about requirements to maintain documents of
24  investigations pursuant to your policies?
25    A.   I do not.

Page 264

1    Q.   Opposing counsel just asked you several
2  questions about if you had retained such documents
3  or if you had had some kind of a retention policy
4  and a recording policy that recorded every single
5  investigation you conducted, it would make things
6  easier for him.  Do you recall that?
7    A.   I do recall that.
8    Q.   We do, however, have the reports that
9  you referred to as the Voelker reports that are
10  daily reports, and those show every single order
11  that was flagged.  Is that accurate?
12    A.   That's correct.
13    Q.   By the Voelker system, not by the other
14  controls that we have in place, but by the Voelker
15  system, does that show everything that was
16  flagged?
17    A.   Correct, based on the thresholds.
18    Q.   And there were over a thousand reports
19  produced from that system; is that correct?
20    A.   To be honest, I don't know an
21  accumulated number.
22    Q.   Well, those came out daily from the
23  period which it started until the end of your
24  tenure at Giant Eagle; correct?
25        MR. HUDSON:  Object to form.

Page 265

1  BY MR. KOBRIN:
2    Q.   Did those come out daily starting in
3  2014 until the end of your tenure at Giant Eagle?
4    A.   I believe so.
5    Q.   On those reports, it specified the
6  particular orders and the particular stores and
7  the particular product being ordered; correct?
8    A.   The particular product order with regard
9  to accumulated quantity to threshold; correct.
10    Q.   You talked about the fact that you would
11  review each of those, whether it was by you
12  reviewing it or by you pushing it to a PDL to
13  investigate the order; is that correct?
14    A.   That's correct.
15    Q.   Was an explanation for one particular
16  order ever relied upon to excuse other orders from
17  the same pharmacy?
18        MR. HUDSON:  Object to the form.
19        MR. KOBRIN:  What's your objection?
20        MR. HUDSON:  To the form.
21        MR. KOBRIN:  What's the --
22        MR. HUDSON:  You want me to explain?
23        MR. KOBRIN:  Yeah.
24        MR. HUDSON:  It's vague.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 266

BY MR. KOBRIN:

Q.  Counsel showed you some orders from store 8, and we looked at a particular order that you had a PDL investigate.  Do you remember that?

A.  I do.

Q.  And in that case, you had him investigate one order.  And he came back with an explanation after his investigation.  Do you remember that?

A.  I do.

Q.  Would you have relied on that investigation of store 8 for that particular order and that particular month for those other orders that were flagged in the Voelker system?

MR. HUDSON:  Object to form.

THE WITNESS:  No.  I would not have relied on one explanation in one month to account for every subsequent month.

BY MR. KOBRIN:

Q.  Would you have reviewed the other orders that triggered or appear in the threshold report?

A.  Yes, we would have.

Q.  The document showing that you investigated the store 8 order where you sent the message to the PDL and he explained why the order

Page 267

that had flagged was not suspicious, would similar records be created in your email from when you requested that people investigate orders?

A.  If the communication was via email or via phone call to have them do it, do the investigation.

Q.  So you would have a record, a paper record of email and the threshold reports that you received via email daily; is that accurate?

A.  I don't believe there was a requirement to retain.

Q.  But did you do that anyway?

MR. HUDSON:  Object to form.

BY MR. KOBRIN:

Q.  Did you have documentation in your emails and in threshold reports?  Whether they were retained or not, were these things documented via email and the threshold reports?

MR. HUDSON:  Object to the form.

THE WITNESS:  As the PDLs would respond via email, they would have been in my email.

BY MR. KOBRIN:

Q.  Was this required pursuant to any DEA regulation that you're aware of?

A.  No.

Page 268

Q.  Was there any requirement that you create any kind of record?  Strike.

Was there any requirement under any DEA regulation that you create or maintain such records?

A.  There was no requirement.

Q.  Finally, do you believe at all times that Giant Eagle was in compliance with the security requirements, including the subpart relating to SOM?  And when I say Giant Eagle, I mean Giant Eagle and HBC.

A.  I believe Giant Eagle was fully compliant for the handling and the movement of controlled substances within the organization as evidenced by what we discussed earlier, the various levels of control at all levels, and that understanding evolved over the course of time.

Q.  Do you believe these levels of controls over controlled substances would prevent suspicious orders?

A.  I believe the controls that we had in place from the store level -- remember an order is generated subsequent to prescription dispensing -- that the controls that we had around our pharmacy teams and as I discussed about their doing their

Page 269

professional obligation with regard to determining a prescription is legitimate before filling it or declining to fill, that that movement generates the orders.

So if there is -- if you eliminate the -- if you eliminate the bad movement by doing your due diligence under the corresponding responsibility as prescribed in the regs., that no suspicious order should be generated.

Q.  Thank you very much, Mr. Millward.

MR. KOBRIN:  Pass the witnesses.

RE-EXAMINATION

BY MR. HUDSON:

Q.  Mr. Millward, Mr. Mullen, he joined -- Jason Mullen, you talked about him.  And he's a capable investigator; right?

A.  Jason had a -- he had an inquisitive nature and had an ability with the systems.

(HBC-Millward Exhibit 32 was marked.)

BY MR. HUDSON:

Q.  I'm going to hand you what's marked as Exhibit 32, and I'm really just focused on the last email of that.

MR. HUDSON:  This internal number is 1125.

Page 270

BY MR. HUDSON:

Q. The bottom one is an email from you. In that you say, "Our new LP pharmacy analyst, Jason Mullen, will be analyzing controlled substance movement data as part of his new role"; right?

A. That is correct.

Q. That's in November of 2015; right?

A. Yes.

Q. At that time, HBC was no longer even a distributor of hydrocodone combination products; right?

A. At that time; correct. It was after it was rescheduled.

Q. So to your knowledge, Mr. Mullen never used Supply Logic to track any of the movement of hydrocodone combination products that were distributed by HBC; correct?

A. That's correct. He wasn't in the role at that time, to my knowledge.

Q. You just testified in response to questions from HBC's counsel that in your view, Giant Eagle and HBC were fully compliant with the Controlled Substances Act including the SOMS requirements; right?

A. By SOMS requirement, 1301.74(b)?

Page 271

Q. Right.

A. That they have a system designed -- design and operate a system to disclose to the registrant suspicious orders?

Q. Right.

A. Yes.

Q. We've seen the Voelker report right, these reports, and I think you testified that there were 1100 orders that were flagged as being above your threshold.

A. I testified I don't know the number.

Q. I think actually HBC's counsel was asking you questions, and I think you answered yes, there were 1100 that were flagged.

MR. KOBRIN: Object.

BY MR. HUDSON:

Q. Does that refresh your recollection?

MR. KOBRIN: Object to form. Misrepresents the record.

THE WITNESS: Again, I don't believe I testified to the exact number of reports, but reports were printed daily for a period of time.

BY MR. HUDSON:

Q. I think you said from October of 2013 until the end of your tenure; right?

Page 272

A. Correct.

Q. Now, you've now had a chance to answer questions from counsel, and so far, what we've been able to identify is documentation of one investigation of one hydrocodone combination product; correct?

A. Well, we've talked also about buprenorphine as well.

Q. Right. But in terms of hydrocodone combination products, we've seen documentation to prove that there was one investigation?

A. As presented, that is the email chain from that.

Q. So there was -- there were over a thousand shipments that under your system were flagged as a potential suspicion of diversion. But today we've established that at least one of them was investigated?

MR. KOBRIN: Object to form.

THE WITNESS: Let me change that. They were flagged as orders of interest or stores of interest and were investigated. There was not -- it's premature to say they were suspicious in your question.

Page 273

BY MR. HUDSON:

Q. Weren't they flagged as being orders of interest because they were of an unusual size because they were beyond the thresholds that you set?

MR. KOBRIN: Object to form.

THE WITNESS: And as discussed as well, though threshold was -- when we -- threshold was just an average of the or a multiple, whatever it happened to be, of a chain movement, overall movement.

BY MR. HUDSON:

Q. Right. But you had 1100 shipments of unusual size that were above the thresholds that HBC set, and today we've been able to show an investigation -- documentation of an investigation of one of those that was a hydrocodone combination product; right?

MR. KOBRIN: Object to form.

THE WITNESS: We've entered or we have one email that was presented.

BY MR. HUDSON:

Q. Is there anything else as you sit here today that you can point to as documentation to show a review or an investigation of those orders

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  of interest of unusual size?

2      A.  As I sit here today, as you said, I am

3  two years removed from the organization and do not

4  have any access or even recollection of what -- or

5  requirement to even say for the company to save

6  those documentation, if any existed.

7      Q.  Today you can't say whether you or

8  Mr. Chunderlik -- you can't tell us anything more

9  specific about the details of any review or any

10  investigation that was conducted by you or

11  Mr. Chunderlik between 2009 and 2014 that we

12  haven't already talked about; correct?

13          MR. KOBRIN:  Object to form.

14  Misrepresents his testimony.

15          THE WITNESS:  George would have to speak

16  for him understandably and respectfully, but I'm

17  not able to -- other than the buprenorphine issues

18  that we talked about, which were two other

19  examples in Pennsylvania stores on the Schedule

20  III -- I believe it's Schedule III -- on the

21  Subutex where we did have investigations.

22  BY MR. HUDSON:

23      Q.  But you can't speak to -- other than

24  store number 8, which we talked about that email,

25  you can't speak to any reviews or investigations

Page 275

1  that were done of any of the hydrocodone

2  combination products that were above the

3  thresholds; correct?

4      A.  Having been removed from the company or

5  this amount of time, in a timeframe perspective, I

6  don't have any exact recollection of others.

7      Q.  I don't have any further questions.

8              RE-EXAMINATION

9  BY MR. KOBRIN:

10      Q.  One quick question.  Counsel asked you

11  for specific recollections of investigations, and

12  then refreshed you with only one piece of evidence

13  regarding the investigation; is that correct?

14      A.  Correct.

15      Q.  We did, however, look at numerous other

16  reports from the Voelker report; correct?

17      A.  Correct.

18      Q.  I know you don't have any specific

19  recollection of these flagged orders from several

20  years ago, but as a general matter, do you recall

21  that when you would get the Voelker report, you

22  would have someone review the orders that flagged

23  in order to confirm that they were or were not

24  suspicious?

25      A.  Correct.  We'd send it out to have the

Page 276

1  PDLs reach out to the stores to justify the move

2  or to investigate it.

3      Q.  And you would do that each time the

4  order flagged.  You wouldn't rely on a prior

5  explanation for the prior month; is that correct?

6      A.  Well, the way the report was cumulative,

7  so once a store flagged for that month, it would

8  be on each subsequent day.  So an explanation on

9  the 20th still holds true for the 21st, for

10  example.

11      Q.  But if another order flagged --

12      A.  For another store, then, yes, that would

13  be -- that would be the next or that would be the

14  direction for the PDL of whatever store to do

15  their investigation.

16      Q.  And you recall doing that each time the

17  orders came in on the investigation report?

18      A.  The PDLs would be directed to find out

19  what's going on at the store, to reach to the

20  store, whether by phone, email or on-site visit,

21  to do so.

22      Q.  Thank you, Mr. Millward.

23          MR. HUDSON:  Just one last question.

24          RE-EXAMINATION (Continued)

25

Page 277

1  BY MR. HUDSON:

2      Q.  Just to be clear, there were over a

3  thousand of those reports.  And it's your

4  testimony that you or Mr. Chunderlik led the

5  review or investigation of each and every one of

6  those.

7      But today when I've asked you to recall any

8  of the details from any of them, other than the

9  one that we've talked about, you're not able to

10  speak to any of them?

11          MR. KOBRIN:  Object to form.

12  BY MR. HUDSON:

13      Q.  Is that correct, sir?

14          MR. KOBRIN:  Object to form.  Are you

15  talking only about hydrocodone combination

16  products?  Because he has mentioned a few other

17  ones that he recalls.

18  BY MR. HUDSON:

19      Q.  As to hydrocodone combination products,

20  you cannot recall the specifics of any particular

21  review or investigation that occurred during the

22  time that those threshold reports were generated;

23  correct?

24          MR. KOBRIN:  Object to form.

25          THE WITNESS:  Correct.  I don't recall

Page 278

1   what the responses were from a PDM or a PDL on an
2   individual email beyond what was refreshed by the
3   document.
4   BY MR. HUDSON:
5       Q.  Sir, isn't that important -- isn't that
6   why it's very important as a compliance person to
7   put things in writing?
8       MR. KOBRIN:  Object to form.  Asked and
9   answered.  There's no evidence they weren't put in
10  writing.
11      MR. HUDSON:  Do you want to testify for
12  him?  Let me start that over.
13  BY MR. HUDSON:
14      Q.  Isn't the lack of a recollection of
15  reviews or investigations that were done, isn't
16  that exactly why from a compliance perspective you
17  should put things in writing?
18      A.  I don't think it -- it wasn't required
19  to have or retain those documents or
20  communications.  And that's where I stand.  That's
21  where it is.
22      Q.  No further questions.  Thank you.
23      THE VIDEOGRAPHER:  6:14.  We're off the
24  video record.  This concludes the video deposition
25  of Joseph Millward.

Page 279

1       (Whereupon, at 6:14 p.m., the taking of
2   the instant deposition ceased.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 280

1   COMMONWEALTH OF PENNSYLVANIA )
2   COUNTY OF ALLEGHENY      )   SS:
3       C E R T I F I C A T E
4       I, Ann Medis, Registered Professional
5   Reporter, Certified Livenote Reporter and Notary
6   Public within and for the Commonwealth of
7   Pennsylvania, do hereby certify:
8       That JOSEPH E. MILLWARD, the witness
9   whose deposition is hereinbefore set forth, was
10  duly sworn by me and that such deposition is a
11  true record of the testimony given by such
12  witness.
13      I further certify the inspection,
14  reading and signing of said deposition were not
15  waived by counsel for the respective parties and
16  by the witness.
17      I further certify that I am not related
18  to any of the parties to this action by blood or
19  marriage and that I am in no way interested in the
20  outcome of this matter.
21      IN WITNESS WHEREOF, I have hereunto set
22  my hand this 27th day of December, 2018.
23
        _____
24              Notary Public
25

Page 281

1   COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
    COUNTY OF ALLEGHENY      ) S H E E T
2
3       I, JOSEPH E. MILLWARD, have read the
    foregoing pages of my deposition given on
4   December 20, 2018, and wish to make the following,
    if any, amendments, additions, deletions or
5   corrections:
6
    Page  Line   Change and reason for change:
7
8   ____ ____  _____
9   ____ ____  _____
10  ____ ____  _____
11  ____ ____  _____
12  ____ ____  _____
13  ____ ____  _____
14  ____ ____  _____
15  ____ ____  _____
16  ____ ____  _____
17  ____ ____  _____
18  ____ ____  _____
19  In all other respects, the transcript is true and
    correct.
20
21      _____
22          JOSEPH E. MILLWARD
23  _____ day of _____, 2018.
24  _____
            Notary Public
25