```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4                        -  -  -
 5
      IN RE:  NATIONAL        :   HON. DAN A.
 6    PRESCRIPTION OPIATE      :   POLSTER
      LITIGATION               :
 7                             :
      APPLIES TO ALL CASES     :   NO.
 8                             :   1:17-MD-2804
                               :
 9
              - HIGHLY CONFIDENTIAL -
10
      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                        -  -  -
12
                   January 16, 2019
13
                        -  -  -
14
15            Videotaped deposition of
      KEVIN MITCHELL, taken pursuant to notice,
16    was held at the Doubletree Resort by
      Hilton, 2400 Willow Street Pike,
17    Lancaster, Pennsylvania, beginning at
      9:34 a.m., on the above date, before
18    Michelle L. Gray, a Registered
      Professional Reporter, Certified
19    Shorthand Reporter, Certified Realtime
      Reporter, and Notary Public.
20
                        -  -  -
21
22          GOLKOW LITIGATION SERVICES
          877.370.3377 ph| 917.591.5672
23              deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: W. SCOTT SIMMER, ESQ.
600 New Hampshire Avenue, NW
The Watergate, Suite 10-A
Washington, D.C. 20037
(202) 333-4562
Ssimmer@baronbudd.com
Representing the Plaintiffs

MORGAN LEWIS & BOCKIUS, LLP
BY: ELISA P. McENROE, ESQ.
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-4824
Elisa.mcenroe@morganlewis.com
     - and -
MORGAN LEWIS & BOCKIUS
BY: KELLY A. MOORE, ESQ.
BY: MATTHEW R. LADD, ESQ.
101 Park Avenue
New York, New York 10178
(212) 309-6734
kelly.moore@morganlewis.com
matthew.ladd@morganlewis.com
Representing the Defendant, Rite Aid of
Maryland and the Witness

Page 3

TELEPHONIC APPEARANCES:

BARON & BUDD, P.C.
BY: WILLIAM G. POWERS, ESQ.
600 New Hampshire Avenue, NW
The Watergate, Suite 10-A
Washington, D.C. 20037
(202) 333-4562
Wpowers@baronbudd.com

     - and -

BARON & BUDD, P.C.
BY: NOAH M. RICH, ESQ.
600 New Hampshire Avenue, NW
The Watergate, Suite 10-A
Washington, D.C. 20037
(202) 333-4562
Nrich@baronbudd.com
Representing the Plaintiffs

JONES DAY
BY: MIRIAM LIABO, ESQ.
77 West Wacker
Chicago, Illinois 60601
(312) 269-4166
Mliabo@jonesday.com
Representing the Defendant, Walmart

COVINGTON & BURLING, LLP
BY: LAUREN C. DORRIS, ESQ.
850 10th Street, NW
Washington, D.C. 20001
(202) 662-6000
ldorris@cov.com
Representing the Defendant, McKesson
Corporation

Page 4

TELEPHONIC APPEARANCES: (Cont'd.)

ARNOLD PORTER KAYE SCHOLER, LLP
BY: DAVID HIBEY, ESQ.
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-6992
David.hibey@arnoldporter.com
Representing the Defendants, Endo Health
Solutions Endo Pharmaceuticals, Inc.; Par
Pharmaceutical Companies, Inc. f/k/a Par
Pharmaceutical Holdings, Inc.

JACKSON KELLY, PLLC
BY: ANGELA L. FREEL, ESQ.
221 NW Fifth Street
Evansville, Indiana 47708
(812) 422-9444
alfreel@jacksonkelly.com
Representing the Defendant,
AmerisourceBergen Drug Corporation

ALSO PRESENT:

Gretchen Kearney - Paralegal
(Baron Budd)
Emma Kaboli, Paralegal
(Baron Budd - via telephone)

VIDEO TECHNICIAN:
Ray Moore

LITIGATION TECHNICIAN:
Mike Kutys

Page 5

- - -
I N D E X
- - -

Testimony of:

KEVIN MITCHELL

By Mr. Simmer    12, 340, 343
By Ms. McEnroe    323, 341

- - -

E X H I B I T S

- - -

NO.        DESCRIPTION          PAGE
Rite Aid
Mitchell-1   LinkedIn          20
           Profile, Kevin
           Mitchell

Rite Aid
Mitchell-2   E-mail Thread     89
           1/28/08
           Subject,
           Information Needed
           Rite_Aid_OMDL_0016954
Rite Aid
Mitchell-3   Justice News     116
           Rite Aid Corporation
           And Subsidiaries Agree
           To Pay $5 Million
           1/12/09

- - -
E X H I B I T S  (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Rite Aid
Mitchell-4   Settlement and          124
             Release Agreement
             1/9/09

Rite Aid
Mitchell-5   Memorandum of          127
             Agreement
             1/12/09

Rite Aid
Mitchell-6   E-mail Thread          138
             8/4/08
             Subject, Generic
             Vicodin Replenishment
             Rite_Aid_OMDL_0027316-23

Rite Aid
Mitchell-7   DC Self Assessment     177
             Program
             Rite_Aid_OMDL_0020535

Rite Aid
Mitchell-8   E-mail Thread          217
             10/10/07
             Subject, Control
             Cage Procedures
             Rite_Aid_OMDL_0016204-05

Rite Aid
Mitchell-9   Controlled Drug        221
             Above Average
             Order Monitoring Program
             Rite_Aid_OMDL_0016253-55

- - -
E X H I B I T S  (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Rite Aid
Mitchell-15  Cegedim Web Printout  296
             Suspicious Order
             Monitoring Programs

Rite Aid
Mitchell-16  E-mail, 6/3/11        304
             Subject, SOM
             Rite_Aid_OMDL_0050634

Rite Aid
Mitchell-17  E-mail Thread         311
             11/16/10
             Subject, PSE in
             California
             Rite_Aid_OMDL_0050632

Rite Aid
Mitchell-18  E-mail Thread         315
             12/3/10
             Subject, Threshold
             Cutbacks
             Rite_Aid_OMDL_0046564-65

Rite Aid
Mitchell-19  E-mail Thread         332
             9/22/05
             Subject, DEA Audit
             Perryman Distribution
             Center
             Rite_Aid_OMDL_0047171-72

Rite Aid
Mitchell-20  E-mail Thread         338
             9/30/09
             Subject, DEA Audit
             Rite_Aid_OMDL_0046772-73

- - -
E X H I B I T S  (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE

Rite Aid
Mitchell-10  Drug Diversion        235
             Training
             Rite_Aid_OMDL_0016230-31

Rite Aid
Mitchell-11  E-mail, 5/3/11        242
             Subject, Above
             Threshold
             Rite_Aid_OMDL_0013106-07

Rite Aid
Mitchell-12  Regulatory            264
             Guidelines Policy
             VI Excessive Order
             Monitoring
             Rite_Aid_OMDL_0020703
             Rite_Aid_OMDL_0020727

Rite Aid
Mitchell-13  E-mail Thread         288
             7/31/09
             Subject, Register Now
             for the 7th Annual
             Controlled Substances
             Conference
             Rite_Aid_OMDL_0020388-90

Rite Aid
Mitchell-14  E-mail Thread         294
             4/11/11
             Subject, Suspicious
             Order Monitoring
             Rite_Aid_OMDL_0050628-30

- - -
P R E V I O U S L Y   M A R K E D
E X H I B I T S
- - -

NO.          DESCRIPTION

Rite Aid
Chapman-1    E-mail Thread
             11/9/09
             Subject, Week of 11/9
             Rite_Aid_OMDL_0020412

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 10 |
| --- | --- |

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

|  | Page 11 |
| --- | --- |

1    THE VIDEOGRAPHER:  We are
2  now on the record.  My name is Ray
3  Moore.  I'm a videographer for
4  Golkow Litigation Services.
5    Today's date is January 16,
6  2019, and the time is 9:34 a.m.
7    This video deposition is
8  being held in Lancaster,
9  Pennsylvania, in the matter In Re
10  National Prescription Opiate
11  Litigation for the United States
12  District Court for the Northern
13  District of Ohio, Eastern
14  Division, MDL No. 2804.
15    The deponent is Kevin
16  Mitchell.
17    Counsel will be noted on the
18  stenographic record.
19    The court reporter is
20  Michelle Gray and will now swear
21  in the witness.
22    - - -
23    ... KEVIN MITCHELL, having
24  been first duly sworn, was

|  | Page 12 |
| --- | --- |

1  examined and testified as follows:
2    - - -
3    EXAMINATION
4    - - -
5  BY MR. SIMMER:
6    Q.   Good morning, Mr. Mitchell.
7  My name is Scott Simmer.  I'm here -- I'm
8  here to ask you some questions on behalf
9  of the plaintiffs in this matter.  Let me
10  go over some of the ground rules before
11  we get started.  First of all, I'm going
12  to be asking you a series of questions
13  that you will answer.  The court reporter
14  is taking down a verbatim transcript of
15  everything that we both say.  So it's
16  important that we don't talk over each
17  other.
18    Do you understand?
19    A.   Yes, sir.
20    Q.   And that you have to answer
21  verbally.  You can't answer just by
22  nodding your head.  She cannot take that
23  down on her transcript.
24    Do you understand?

|  | Page 13 |
| --- | --- |

1    A.   Yes, sir.
2    Q.   You need to answer fully and
3  accurately and verbally as I say.
4    Do you understand?
5    A.   Yes, sir.
6    Q.   If you don't understand a
7  question that I've asked, ask me to
8  rephrase.  I will be glad to do that.
9    Do you understand that?
10    A.   Yes, I do.
11    Q.   And when I say you must
12  answer truthfully, you understand that
13  there are penalties for failing to answer
14  a question truthfully, correct?
15    A.   Yes.
16    MS. McENROE:  Objection to
17  form.
18  BY MR. SIMMER:
19    Q.   And that's called perjury.
20    Do you understand that?
21    MS. McENROE:  Objection to
22  form.
23    You may answer.
24    THE WITNESS:  Yes, sir.

Page 14

BY MR. SIMMER:

Q. You can request a break at any time. I just ask if there's a question pending, you answer the question before you take a break. Is that fair?

A. Yes, sir.

Q. From time to time, counsel sitting next to you will be lodging objections. Unless they tell you not to answer, you must still answer the question.

Do you understand?

A. Yes, I do.

Q. Is there any reason why you cannot testify truthfully and accurately today?

A. No, sir.

Q. Are you taking any medication that would interfere with your ability to answer these questions truthfully?

A. No, sir.

Q. What's your understanding of why you are here today?

Page 15

A. My understanding is the role that I had while I was at Rite Aid is why I'm here.

Q. Have you reviewed any of the pleadings in this case?

A. No, sir.

Q. Did you meet with attorneys representing the company in preparation for your deposition?

A. Yes.

Q. Who did you meet with?

A. With Elisa, Matt, and Kelly.

Q. And when did you meet with them?

A. Yesterday.

Q. Any other occasions beyond yesterday?

A. Maybe a month and a half, two months ago.

Q. And how long did you meet with them each time?

A. Back, October, November approximately five hours. And yesterday from 9:30 until about 5:30 yesterday

Page 16

evening.

Q. Are you being compensated for your time to testify today?

A. No, sir.

Q. Did you retain Morgan Lewis to be your counsel in this deposition?

A. Yes.

Q. Did you sign a retainer agreement retaining them to represent you today?

A. I have not.

Q. Did you get some kind of a letter from them that you countersigned of any kind where you agreed to have them represent you today?

A. I have not signed, no.

Q. Are you paying them to be your counsel today?

A. No, sir.

Q. Is it your understanding that they are representing you or are they representing Rite Aid?

A. They're rep --

MS. McENROE: Objection to

Page 17

form.

Go ahead.

THE WITNESS: Representing Rite Aid.

BY MR. SIMMER:

Q. Have you been involved in litigation before of any kind?

A. I have not.

Q. What about as a party in, say, a bankruptcy?

A. No, sir.

Q. Any criminal proceedings?

A. No, sir.

Highly Confidential - Subject to Further Confidentiality Review



Page 18

Page 19

Page 20

1    A.    Nothing.
2    Q.    -- of any kind?
3    A.    No, sir.
4    Q.    Again, you are going to have
5  to let me finish my questions before --
6  before you start answering.
7         Do you have any hardcopy
8  files of any kind?
9    A.    No, sir.
10    Q.    Your understanding, the
11  company provided certain documents that
12  were from your e-mail folders and other
13  folders from your time during your
14  employment with the company?
15    A.    Yes, sir.
16    Q.    Did you give any direction
17  to the Rite Aid's counsel about where to
18  get your materials?
19    A.    No, sir.
20         (Document marked for
21         identification as Exhibit Rite Aid
22         Mitchell-1.)
23  BY MR. SIMMER:
24    Q.    The court reporter has

Page 21

1  handed you what we've marked as Mitchell
2  Exhibit Number 1.  If you can take a look
3  at that for a moment.  I'll ask you some
4  questions.
5         Are you done reviewing
6  the --
7    A.    Yes, sir.
8    Q.    -- document?
9         Again, you -- you let me
10  finish my question before you start to
11  answer.
12         This appears to be your
13  LinkedIn page, correct?
14    A.    Yes, sir.
15    Q.    And did you put the content
16  in here that describes what your
17  employment history has been?
18    A.    Yes, sir.
19    Q.    Does it appear to be
20  accurate?
21    A.    Yes, sir.
22    Q.    One area it does not cover
23  is your education background.  Could you
24  tell us what your education background is

6    Q.    Have you been a witness in
7  any kind of litigation before?
8    A.    No, sir.
9    Q.    Ever testified in a
10  deposition?
11    A.    No, sir.
12    Q.    In advance of today's
13  deposition, did the company ask for you
14  to provide it copies of any documents
15  that you still had from your Rite Aid
16  employment?
17    A.    No, sir.
18    Q.    Do you still have any
19  documents from your time as an employee
20  of Rite Aid?
21    A.    I do not.
22    Q.    Not a computer of any kind?
23    A.    No, sir.
24    Q.    Hard drive --

Page 22

1 starting with high school?
2     A.    George Washington High
3 School, 1983 graduate.
4     Q.    What town is that?
5     A.    Danville, Virginia.  Then I
6 attended Danville Community College,
7 1983, 1984, also in Danville, Virginia.



22     A.    I joined the United States
23 Marine Corps.
24     Q.    How long were you in the

Page 23

1 Marine Corps?
2     A.    Just shy of seven years,
3 sir.
4     Q.    And what was the highest
5 rank that you achieved?
6     A.    Sergeant.
7     Q.    And what were your
8 specializations in the Marine Corps?
9     A.    I worked in the -- I was an
10 0151 which was an administrative clerk
11 and I -- at Camp Lejeune I was the
12 administrative chief, so I was in charge
13 of any and all admin duties as required
14 by the 10th Marine Regimental
15 Headquarters.
16         Then I moved -- my last role
17 was inspector/instructor staff, I&I duty,
18 in Allentown, Pennsylvania, where I was
19 responsible for training reservists.
20     Q.    You received an honorable
21 discharge?
22     A.    Yes, sir.
23     Q.    What's your first employment
24 after you left the Marine Corps?

Page 24

1     A.    I worked as a temp for
2 Manpower for just several months before I
3 started with Frito Lay.
4     Q.    So on your LinkedIn page
5 that's Exhibit 1, it references that you
6 were senior office manager at PepsiCo.
7 Is that related to Frito Lay?
8     A.    Frito Lay is owned by
9 PepsiCo, yes, sir.
10     Q.    And what were your
11 responsibilities?
12     A.    Started as the warehouse
13 manager in Easton, Pennsylvania.  Got
14 promoted, moved to Williamsport,
15 Pennsylvania.  Was the operations
16 manager.  Had both packaging and
17 production.  And then I moved into a
18 senior operations manager role also in
19 Williamsport in charge of the
20 distribution warehousing.  And then I
21 relocated to York, Pennsylvania in 1999,
22 also as a senior operations manager over
23 transportation.
24     Q.    And your last date of

Page 25

1 employment at Frito Lay was what?
2     A.    I think it was June of
3 2000 -- 2000.
4     Q.    And why did you leave that
5 position?
6     A.    I was terminated.
7     Q.    For what reason?
8     A.    I was moving into a role
9 other than the one that I was in, and
10 word got out that I was moving before
11 that actually happened.  And so they
12 terminated me because word got out,
13 although it didn't get out by me.
14     Q.    I'm not sure I entirely
15 follow.  Word got out that you were
16 moving from one position to another, and
17 they fired you for that?
18     A.    Correct.  I was told not to
19 say anything.  I did not say anything.
20 Someone else -- it got out, and I got
21 accused of saying it, so they let me go.
22     Q.    And what was your next
23 position after leaving Frito Lay?
24     A.    I went to work at Rite Aid

Highly Confidential – Subject to Further Confidentiality Review

Page 26

1 in September of 2000 as pharmacy support
2 manager.
3　　Q.　Was there a period of time
4 where you were out of work between the
5 Frito Lay job and Rite Aid?
6　　A.　Yes, sir.
7　　Q.　How many months?
8　　A.　From June to September.  So
9 three months.
10　　Q.　And what were your
11 responsibilities as pharmacy support
12 manager?
13　　A.　To provide liaison between
14 the pharmacy distribution centers and
15 regulatory agencies, such as DEA, FDA,
16 cigarette, tobacco, auditors from
17 different states, and process
18 improvement.
19　　Q.　Did you actually manage some
20 employees in that position?
21　　A.　I did not.
22　　Q.　How did you receive training
23 to -- for your new job?
24　　MS. McENROE:  Objection to

Page 27

1　　form.
2　　MR. SIMMER:  Strike that.
3 BY MR. SIMMER:
4　　Q.　Did you receive any training
5 for your new job?
6　　A.　Yes, I did.
7　　Q.　What kind of training did
8 you receive?
9　　A.　The former deputy director
10 of DEA, Ron Buzzeo, who owned his own
11 company, Buzzeo PDMA, actually came to
12 the Perryman, Maryland distribution
13 center and performed audits, training me
14 to do the same.
15　　Q.　So were you working out of
16 the Perryman facility at that time?
17　　A.　No, sir.
18　　Q.　Where were you working out
19 of?
20　　A.　Rite Aid headquarters.
21　　Q.　And where were they?
22　　A.　Camp Hill, Pennsylvania.
23　　Q.　Did you receive any written
24 materials as part of this training?

Page 28

1　　A.　I don't recall.
2　　Q.　So he trained you how to
3 perform a distribution center audit; is
4 that correct?
5　　A.　A DEA audit, in particular.
6　　Q.　Okay.  And what is it --
7 what were you trained to do in a DEA
8 audit?
9　　MS. McENROE:  Objection to
10 form.  Calls for a narrative.  You
11 may answer.
12　　THE WITNESS:  Ron had a
13 checklist basically that was --
14 that he had put together based on
15 the Code of Federal Regulations,
16 what's required by DEA.  And that
17 was the document that we used to
18 audit the pharmacy control drug
19 cage and the pharmacy department.
20 BY MR. SIMMER:
21　　Q.　So when I asked you about
22 written materials, wouldn't that
23 checklist be one of the written materials
24 that would have been used in your

Page 29

1 training?
2　　A.　That would be correct.
3　　Q.　So when I asked you did you
4 receive any written materials, the answer
5 would have been yes, correct?
6　　MS. McENROE:  Objection to
7 form.
8　　THE WITNESS:  Correct.
9 BY MR. SIMMER:
10　　Q.　Do you want to then change
11 your earlier answer?
12　　A.　Yes, sir.
13　　Q.　Who is your supervisor at
14 this time?
15　　A.　Neil Meischeid.
16　　Q.　Can you spell his last name,
17 please?
18　　A.　M-E-I-S-C-H-E-I-D.
19　　Q.　First name?
20　　A.　Neil, N-E-I-L.
21　　Q.　And who are you working for
22 at this time?
23　　A.　Rite Aid Headquarters
24 Corporation.

Page 30

1    Q.   What name is actually on
2  your paycheck that you receive?
3    A.   Rite Aid Headquarters
4  Corporation.
5    Q.   You didn't work for Rite Aid
6  of Maryland; is that correct?
7    A.   Correct, sir.
8    Q.   And Mr. Meischeid also
9  worked for Rite Aid Corporation
10 Headquarters, right?
11   A.   Correct, sir.
12   Q.   How long were you a pharmacy
13 support manager?
14   A.   I believe it was two and a
15 half years.
16   Q.   That would be from 2000 to
17 2002 or '3?
18   A.   2003, yes, sir.
19   Q.   And what was your next
20 position?
21   A.   Senior manager of regulatory
22 compliance.
23   Q.   Were you performing
24 different duties than you had as a

Page 31

1  pharmacist support manager?
2    A.   No, sir.
3    Q.   So the only change is the
4  title?
5    A.   Yes, sir.
6    Q.   When did you receive -- is
7  this a promotion by the way?
8    A.   Yes, sir.
9    Q.   When did you receive this
10 promotion?
11   A.   2003.
12   Q.   Okay.  And what were your
13 responsibilities as senior manager of
14 regulatory compliance?
15   A.   The same as pharmacy support
16 manager.  Liaison with the DEA and Rite
17 Aid pharmacy distribution centers.
18   Q.   So that means that you had
19 direct contact with the DEA?
20   A.   At times, yes, sir.
21   Q.   And who at the DEA did you
22 have contact with?
23   A.   Patricia Good, Mark
24 Caverley.  They're the ones that I

Page 32

1  remember.
2    Q.   How do you spell Ms. Good's
3  last name?
4    A.   G-O-O-D.
5    Q.   And Mr. Caverley's last
6  name?
7    A.   C-A-V-E-R-L-E-Y.
8    Q.   And when you say you had
9  contact with them, what did you actually
10 do?
11   A.   I don't recall.
12   Q.   Was that face-to-face
13 contact?
14   A.   Phone contact.
15   Q.   How often did you have this
16 phone contact with these individuals?
17   A.   Rarely.
18   Q.   You said that you also had
19 contact with Rite Aid pharmacy
20 distribution centers; is that correct?
21   A.   Yes, sir.
22   Q.   What kind of contact was
23 this?
24   A.   I perform mock audits at

Page 33

1  their locations.
2    Q.   And how often did you
3  perform these mock audits?
4    A.   I would say an average of
5  one to two times annually.
6    Q.   And what did you do when you
7  performed one of these mock audits?
8    A.   I basically would go in
9  unannounced and ensure compliance with
10 the Code of Federal Regulations.
11   Q.   And how did you do that?
12   A.   With the checklist that was
13 provided from Mr. Buzzeo.
14   Q.   Do you know how Mr. Buzzeo
15 developed that checklist?
16   A.   I do not know.
17   Q.   And that checklist that you
18 used, is that something that the company
19 had in its possession?
20   A.   Yes, sir.
21   Q.   Is that something that
22 others in the company also used as well,
23 besides yourself?
24   A.   At times, yes, sir.

Page 34

1  Q. How long was Mr. Buzzeo's
2  checklist used by the company?
3  A. Prior to my arrival, I would
4  say up to a year after I started, and
5  then I'd changed the checklist. I
6  updated it as new jurisdiction -- new
7  legislation was passed to ensure we were
8  current with current regulations.
9  Q. So the answer to my question
10 is that Mr. Buzzeo's checklist was used
11 for a period of time and then you changed
12 it; is that right?
13 A. That's correct, sir.
14 Q. When do you recall first
15 changing Mr. Buzzeo's checklist?
16 A. Early 2000s.
17 Q. You said as new legislation
18 was passed you changed the checklist to
19 ensure you were up-to-date with
20 current regulations, correct?
21 A. Yes, sir.
22 Q. Where did you get the
23 information that you were using to base
24 your decision to make these changes?

Page 35

1  A. From the Code of Federal
2  Regulations.
3  Q. Did you receive any legal
4  training in order to read these
5  regulations to make these changes?
6  A. No, sir.
7  Q. Did you consult with any
8  other sources other than the regulations
9  themselves in order to make these
10 changes?
11 A. At times, Ron Buzzeo used to
12 also offer conferences where he would
13 provide counsel, document -- or counsel
14 or suggestions as to how we remained
15 compliant. So I may have taken a
16 suggestion from one of the conferences
17 and implemented it into our checklist.
18 Q. How often did you attend
19 these conferences?
20 A. During my tenure I probably
21 attended five or six conferences. So
22 every couple of years.
23 Q. You went every couple of
24 years?

Page 36

1  A. Yes, sir.
2  Q. And did he give written
3  materials to -- strike that.
4  Did the -- at the
5  conference, did you receive written
6  materials?
7  A. At times, yes. And at times
8  they would send via e-mail.
9  Q. And were those materials
10 then distributed to others in the
11 organization?
12 A. At times, yes.
13 Q. When was the first
14 conference that you attended?
15 A. I don't recall.
16 Q. What was the next position
17 that you held at Rite Aid?
18 A. Director of regulatory
19 compliance.
20 Q. And when did you receive
21 that title?
22 A. Two and a half years
23 afterwards, so 2005, 2006.
24 Q. What were your

Page 37

1  responsibilities?
2  A. The same.
3  Q. Just a different title?
4  A. Yes, sir.
5  Q. This is a promotion?
6  A. Yes, sir.
7  Q. And who did you report to in
8  this position?
9  A. Started with Robbie Roberson
10 who is the vice president of logistics.
11 And then in 2007 I reported to Rick
12 Chapman who is also the vice president of
13 logistics.
14 Q. So Mr. Roberson, can you
15 spell his last name, please?
16 A. R-O-B-E-R-S-O-N.
17 Q. So in this position as
18 director of regulatory compliance, as you
19 saw changes in the federal regulations,
20 again you would make changes in the
21 checklist that you would use to perform
22 your mock audits; is that correct?
23 A. If deemed appropriate, yes,
24 sir.

Page 38

1   Q.   Did you ever provide copies
2 of your checklists to the company's legal
3 counsel?
4        MS. McENROE:  Objection to
5        form.  And I caution the witness
6        to be careful about not stepping
7        onto privileged issues and any
8        substance that you may have
9        discussed with counsel.
10       THE WITNESS:  I -- I
11       honestly do not recall.
12 BY MR. SIMMER:
13   Q.   Do you know whether Rite
14 Aid's legal counsel ever reviewed your
15 checklist?
16   A.   I do not.  I do not know.
17   Q.   In your position as director
18 of regulatory compliance, did you ever
19 have any interaction with the company's
20 legal counsel?
21   A.   I have had interaction, yes.
22   Q.   About what should go into
23 your mock audits?
24   A.   No, sir.

Page 39

1   Q.   Did you have any interaction
2 with the company's compliance people?
3   A.   Yes, sir.
4   Q.   About the mock audits?
5   A.   Define compliance people, if
6 you would, please, sir.
7   Q.   Well, did the company have a
8 compliance function?
9        MS. McENROE:  Objection to
10       form.
11       THE WITNESS:  They had
12       several.  They have an internal
13       assurance department, and we also
14       had a privacy officer that was
15       part of the government affairs
16       department.  And I've had
17       interaction with each.
18 BY MR. SIMMER:
19   Q.   Did the work you did as
20 director of regulatory compliance overlap
21 with any of the company's compliance
22 personnel?
23       MS. McENROE:  Objection.
24 BY MR. SIMMER:

Page 40

1   Q.   What they were doing?
2        MS. McENROE:  Objection to
3        form.
4        THE WITNESS:  Yes.
5 BY MR. SIMMER:
6   Q.   Which one of the compliance
7 functions did you overlap with?
8   A.   Internal assurance.
9   Q.   And so did you collaborate
10 with internal assurance on the mock
11 audits and the checklists that you were
12 describing?
13   A.   On or about 2009, yes.
14   Q.   And who did you interact
15 with in 2009?
16   A.   There were various people.
17 Steven Sheinfeld, Ashley Kido, Bryan
18 Strahan, Curt Saleme.
19   Q.   Can you spell
20 Mr. Sheinfeld's last name?
21   A.   S-H-E-I-N-F-I-E-L-D (sic).
22   Q.   And Ms. -- I guess Ashley,
23 what was her last name?
24   A.   It was Kido when I left.

Page 41

1 K-I-D-O.
2   Q.   Mr. Strahan, how do you
3 spell his last name?
4   A.   S-T-R-A-H-A-N.
5   Q.   And Mr. Strapell, how do you
6 spell his last name?
7   A.   Mr. who?
8   Q.   You said Curt.  I didn't get
9 his last name.
10   A.   Saleme.
11   Q.   Saleme.  I'm sorry.  How do
12 you spell his last name?
13   A.   S-A-L-E-M-E.
14   Q.   And where were these -- what
15 department were these people employed in?
16   A.   Internal assurance.
17   Q.   And is that part of the
18 corporate headquarters in Camp Hill?
19   A.   Yes, sir.
20   Q.   And so the work that you did
21 on these mock audits, is that something
22 that you interacted with these people in
23 internal assurance on?
24   A.   On or around 2009, yes, sir.

Page 42

1    Q.   What happened in 2009 that
2  you had interaction with these
3  individuals?
4    A.   We collectively developed a
5  compliance -- a CSA team. I don't recall
6  what CSA stands for. But it was a
7  collaboration between the supply chain
8  department and the internal assurance
9  department to perform audits at the 12
10 distribution centers that Rite Aid had.
11   Q.   CSA, is that Controlled
12 Substances Act?
13   A.   CSA would stand for that,
14 yes, sir.
15   Q.   So what you were looking at
16 is controlled substances; is that
17 correct?
18       MS. McENROE:  Objection to
19       form.
20       THE WITNESS:  Yes, sir.
21 BY MR. SIMMER:
22   Q.   Do you know what prompted
23 the CSA team to be created?
24   A.   It was an idea that I

Page 43

1  actually had that we could collaborate
2  with the internal assurance group. There
3  were audits conducted by them that we
4  felt, as the supply chain team, that were
5  a little inaccurate and felt that this
6  was an opportunity to collaborate and
7  utilize experts in the field within the
8  Rite Aid distribution network to conduct
9  audits at the distribution centers to
10 again ensure that we continued to stay
11 prepared for any and all audits.
12   Q.   When you say you were
13 utilizing experts in the field.  Are
14 these external experts?
15   A.   No, sir.
16   Q.   So these were internal
17 personnel?
18   A.   Rite Aid personnel, yes,
19 sir.
20   Q.   And what kind of expertise
21 are you talking about that they had?
22   A.   So DEA coordinators from
23 each of the buildings where appropriate.
24 So they could come into another pharmacy

Page 44

1  distribution center and do -- conduct an
2  audit and actually feel comfortable that
3  they knew what they were looking for.
4  And basically every facet of the
5  operation.  So again, as an example, the
6  transportation managers from one location
7  may go to a different location to conduct
8  an audit on transportation.
9    Q.   So I take it that these DEA
10 coordinators would not audit the
11 distribution centers where they worked?
12   A.   That's correct.
13   Q.   So they would go to a
14 different distribution center and conduct
15 the audit you're talking about?
16   A.   That's correct.
17   Q.   The CSA team that you're --
18 you've just mentioned, was there any
19 written product they created?
20   A.   Yes, sir.
21   Q.   What was this product
22 called?
23   A.   There was a training that
24 was conducted, and then there was

Page 45

1  checklists that were created as well.
2    Q.   So the training that was
3  conducted, I take it there were
4  written -- written materials for that?
5    A.   Yes, sir.
6    Q.   What were those materials
7  called or what -- what were they?
8        MS. McENROE:  Objection to
9        form.
10       THE WITNESS:  I don't recall
11       the proper name for them, but...
12 BY MR. SIMMER:
13   Q.   And you say there were
14 checklists created as well?
15   A.   Yes, sir.
16   Q.   And what were -- what were
17 those checklists called?
18   A.   I don't recall the proper
19 name.
20   Q.   Do you know where these --
21 either the training materials or the
22 checklists, where they were housed at
23 Rite Aid?
24   A.   The training material would

Page 46

1 be housed by the internal assurance
2 group. I probably had a copy of it
3 myself.
4         The checklist was created by
5 multiple people within the headquarters
6 operation. We consolidated everything to
7 Steve Sheinfeld in internal assurance.
8 Bryan Strahan built the portfolio, the --
9 the scorecard, if you will, that we used
10 to conduct audits.
11     Q.   So you called it a checklist
12 a moment ago. Now, you are calling it a
13 scorecard or a portfolio. Which is it?
14     A.   It -- it's a checklist that
15 at the conclusion of the audit provides a
16 score.
17     Q.   So is it right that
18 Steven -- or Steve Sheinfeld was the
19 person who headed this effort?
20     A.   I would say jointly. He --
21 he headed it for the CSA team.
22     Q.   Along with you?
23     A.   Yes, sir.
24     Q.   So did this fall in your

Page 47

1 actual job responsibilities, the work you
2 were doing with the CSA team?
3     A.   Written responsibilities,
4 no, sir.
5     Q.   So describe for us actually
6 what the CSA team did.
7         MS. McENROE:  Objection to
8 form.
9         THE WITNESS:  We -- the CSA
10 team would actually go out to each
11 Rite Aid distribution center.
12         We created two teams. There
13 was a red team. There was a blue
14 team. And each team was
15 designated six Rite Aid DCs to
16 audit throughout the course of the
17 year.
18         So each month there would be
19 a rotating basis where the red
20 team would audit January, March,
21 May, et cetera.
22         Blue team would be
23 alternating months. And they
24 would go -- conduct a full

Page 48

1         wall-to-wall audit at each
2         distribution center.
3 BY MR. SIMMER:
4     Q.   Did you have any external
5 experts that you -- the company worked
6 with on any of these mock audit
7 activities that you've been describing?
8     A.   As far as the CSA, no. We
9 did work with outside -- outside
10 counsel -- not counsel. Outside support
11 during an VAWD accreditation at some
12 point during the 2000s.
13     Q.   Who was that?
14     A.   I think her name was
15 Samantha Falter. She worked with Ron
16 Buzzeo group.
17     Q.   Spell her last name?
18     A.   F-A-L-T-E-R.
19     Q.   She was part of Buzzeo,
20 correct?
21     A.   Yes, sir.
22     Q.   And what did she do to help
23 you in your -- your audit activities?
24     A.   It wasn't audit activity,

Page 49

1 sir. It was actually just creating a
2 standard operating procedure for VAWD
3 accreditation.
4     Q.   What is VAWD accreditation?
5     A.   I don't recall what VAWD
6 stands for. However, it was an
7 accreditation that the State of Indiana
8 required for legend drugs.
9     Q.   So you created some standard
10 operating procedures; is that correct?
11     A.   Yes, sir.
12     Q.   And what were those called?
13     A.   Did I create them? Let me
14 back up if I could please.
15         There were procedures in
16 place when I started. They were
17 regulatory guidelines.
18     Q.   And were those SOPs?
19     A.   In an essence, yes, sir.
20     Q.   Were they written down?
21     A.   Yes, sir.
22     Q.   And what were they called?
23     A.   Regulatory guidelines is
24 what I recall.

Page 50

1    Q.   And did those change over
2  time?
3    A.   Yes, sir.
4    Q.   Who was responsible for --
5  for updating those regulatory guidelines?
6    A.   That would be me.
7    Q.   Throughout your time period,
8  that was your responsibility?
9    A.   Yes, sir.
10    Q.   And Ms. Falter helped you
11  review those procedures?
12    A.   No, sir.
13    Q.   I'm sorry, I thought you
14  said she helped you with the
15  accreditation that you were receiving.
16    A.   That was VAWD accreditation,
17  not regulatory guidelines.  That was
18  totally separate procedures.
19    Q.   And what did she actually
20  do?
21    A.   She drafted SOPs to be
22  compliant with the VAWD accreditation
23  needs.
24    Q.   And this is accreditation

Page 51

1  for the State of Indiana?
2    A.   Yes, sir.
3    Q.   Was it only for your
4  distribution center in Indiana?
5    A.   And Perryman, Maryland.
6    Q.   And why did you need that
7  for Perryman, Maryland, since it's not
8  located in Indiana?
9    A.   Perryman distributed to
10  Indiana.
11    Q.   And where else did Perryman
12  distribute?
13    A.   I don't recall every state.
14    Q.   And what kind of changes
15  resulted as a part of the accreditation
16  procedure that you were going through the
17  VAWD accreditation?
18    A.   I don't recall any changes
19  that -- that took place.
20    Q.   So it's unclear to me what
21  exactly she did then when she came and
22  helped you with this accreditation?
23    A.   She just simply drafted a
24  different set of SOPs that VAWD required

Page 52

1  for accreditation.  And I guess it had
2  something to do with their licensure, or
3  us being able to renew our licensure with
4  Indiana.
5    I believe it was more of a
6  formatting issue than -- than anything.
7    Q.   So the SOPs covered
8  formatting only?
9    MS. McENROE:  Objection to
10  form.
11    THE WITNESS:  I don't recall
12  specifically.
13  BY MR. SIMMER:
14    Q.   You don't recall
15  specifically what the SOPs covered?
16    A.   Those SOPs, no, sir.
17    Q.   What type frame was it that
18  she -- you were going through this VAWD
19  accreditation?
20    A.   I don't recall.
21    Q.   Okay.  What was your next
22  job at Rite Aid?
23    A.   Senior director of
24  regulatory compliance.

Page 53

1    Q.   And when did you receive
2  that job promotion?
3    A.   December 2010.
4    Q.   And I called that a
5  promotion.  I assumed it was a promotion.
6    A.   Yes, sir.
7    Q.   Did your duties change?
8    A.   I assumed responsibility
9  over pharmacy returns as well as my
10  current responsibilities.
11    Q.   Had someone else been doing
12  that to that point?
13    A.   Yes, sir.
14    Q.   So was this taking on
15  additional responsibilities for you?
16    A.   Yes, sir.
17    Q.   Did you have people
18  reporting to you in this position?
19    A.   Yes, sir.
20    Q.   How many people?
21    A.   Three.
22    Q.   Who were they?
23    A.   Kevin Peterson.  I don't
24  remember the -- the last name, Dawn.  I

Page 54

1 honestly do not recollect her last name.
2 And the third person I can't -- Rich
3 Handy was the third person.
4     Q.   Rich Handy?
5     A.   Yes, sir.
6     Q.   Okay.  And were you still
7 working out of Camp Hill at this time?
8     A.   Yes, sir.
9     Q.   And who was your supervisor?
10     A.   Rick Chapman.
11     Q.   Do you know who
12 Mr. Chapman's supervisor was?
13     A.   Wilson Lester.
14     Q.   And in turn who is
15 Mr. Lester's supervisor?
16     A.   It changed so frequently,
17 I -- I don't recall.
18     Q.   So what department were --
19 was this function that you were
20 performing housed in at the time?
21     A.   Supply chain in Camp Hill,
22 Pennsylvania.
23     Q.   And you had responsibility
24 for all the distribution centers that the

Page 55

1 company owned throughout the country?
2     A.   Not direct responsibility,
3 but I -- my job was to basically work
4 with them and help prepare them for any
5 regulatory audits that may occur.
6     Q.   Were there any distribution
7 centers that you were not responsible
8 for?
9     A.   No, sir.
10     Q.   And in turn those
11 distribution centers distributed
12 pharmaceuticals to all of the Rite
13 Aid-owned pharmacies around the United
14 States, correct?
15     A.   Yes --
16     MS. McENROE:  Objection to
17 form.
18     THE WITNESS:  Yes, sir.
19 BY MR. SIMMER:
20     Q.   And again at this time you
21 were working for the parent company at --
22 in Camp Hill, correct?
23     A.   Yes, sir.  That's the only
24 company I worked for during my tenure

Page 56

1 with Rite Aid.
2     Q.   What was your next job at
3 Rite Aid?
4     A.   That was the last job at
5 Rite Aid.
6     Q.   When did you leave your
7 employment?
8     A.   January 2012.



Page 57

5     MR. SIMMER:  It's a
6 completely improper objection.
7     MS. McENROE:  Okay.  We can
8 call Special Master Cohen if you'd
9 like.
10 BY MR. SIMMER:
11     Q.   How did -- how did --
12     MR. SIMMER:  You can.
13     MS. McENROE:  Yeah, we can
14 go off the record and call the
15 special master.
16 BY MR. SIMMER:
17     Q.   How did these personal --
18     MS. McENROE:  We're going to
19 stop the deposition and call the special
20 master.
21     THE VIDEOGRAPHER:  The time
22 is now 10:14 a.m.  We're going off
23 the record.
24     (Whereupon, a discussion was

Page 58

1   held off the record.)
2       THE VIDEOGRAPHER:  The time
3   is now 10:17 a.m.  We are back on
4   the record.
5   BY MR. SIMMER:
6       Q.   I'm going to withdraw the
7   last question.  Was there anything about
8   the job itself that you felt that you
9   could no longer perform?
10      A.   No, sir.
11      Q.   And when you left your
12  employment at Rite Aid, what did you do
13  next?
14      A.   My next position was general
15  manager at CEVA Logistics.
16      Q.   Was there a gap in
17  employment between the job you had at
18  Rite Aid and the job that you had at CEVA
19  Logistics?
20      A.   Yes, sir.
21      Q.   How long?
22      A.   Just shy of four months.
23      Q.   What were you doing at CEVA
24  Logistics?

Page 59

1       A.   And general manager of a
2   third-party logistics firm, supporting
3   the startup of a Microsoft business.
4       Q.   And where was that job?
5       A.   In Carlisle, Pennsylvania.
6       Q.   And you left that job after
7   six months, you say?
8       A.   Thereabouts, yes, sir.
9       Q.   Why did you leave that job?
10      A.   I resigned to assume a
11  position with Crescent Park.
12      Q.   Crescent Park is the name of
13  the company?
14      A.   Yes, sir.
15      Q.   And what were you doing
16  there?
17      A.   General manager as well.
18      Q.   In Mechanicsburg,
19  Pennsylvania, correct?
20      A.   Yes, sir.
21      Q.   How long did you hold that
22  position?
23      A.   Until the end of May, June
24  of 2013.

Page 60



15      Q.   And what was your next
16  position after that?
17      A.   General manager with my
18  current employer, 48forty Solutions.  And
19  just to clarify, they've had -- that's
20  the third name since I've worked there.
21  It started out as IFCO Systems, then
22  became CHEP Recycled, and now 48forty
23  Solutions.
24      Q.   What were your

Page 61

1   responsibilities there?
2       A.   Oversight over a pallet
3   recycling manufacturing company, and I'm
4   in charge of both purchasing recycled
5   pallets and the sale of recycled pallets
6   to retailers throughout the country.
7       Q.   So your responsibility as
8   general manager is for the entire
9   company?
10      A.   For the entire --
11  Pennsylvania, for Biglerville,
12  Pennsylvania.
13      Q.   But the pallets themselves
14  are being sold to retailers throughout
15  the United States?
16      A.   Yes.
17      Q.   And your responsibility is
18  only for Pennsylvania?
19      A.   Pennsylvania, Maryland.  We
20  can ship anywhere in the U.S.

Page 62



15    MR. SIMMER:  Can we go off
16  the record for a minute.
17    THE VIDEOGRAPHER:  The time
18  now is 10:22 a.m.  We are going
19  off the record.
20    (Short break.)
21    THE VIDEOGRAPHER:  The time
22  is now 10:42 a.m.  We are back on
23  the record.
24  BY MR. SIMMER:

Page 63

Page 64

4    Before our break, you
5  mentioned that there was a corporate
6  assurance department; is that right?
7    A.   Internal assurance
8  department, yes, sir, at the corporate
9  office.
10    Q.   That was its formal title
11  was the, internal assurance department?
12    A.   Internal assurance or
13  internal audit.  Either one.  I'm not --
14  I'm not sure.
15    Q.   And while it -- while you
16  worked at Rite Aid, was that its name
17  throughout that time period?
18    A.   As far as I recall, yes,
19  sir.
20    Q.   What were the specific
21  functions as you know it for the internal
22  assurance department?
23    MS. McENROE:  Objection to
24  form.

Page 65

1    THE WITNESS:  To conduct
2  independent audits of the
3  distribution centers.  I know, as
4  it relates to the supply chain
5  group, that's what they did.
6    As far as their other jobs,
7  I have no idea.
8  BY MR. SIMMER:
9    Q.   It sounds like that those
10  functions overlapped with what you were
11  doing, correct?
12    A.   They could, yes.
13    Q.   Had the responsibilities of
14  the internal assurance department changed
15  over time while you worked at the
16  company?
17    MS. McENROE:  Objection to
18  form.
19    THE WITNESS:  I don't recall
20  them being involved with the
21  distribution centers until later
22  in the 2000s, 2007, 2008 time
23  frame.
24  BY MR. SIMMER:

Page 66

1    Q.   So after that time period,
2 they were responsible for audits of
3 distribution centers, correct?
4        MS. McENROE:  Objection to
5    form.
6        THE WITNESS:  They could
7    have been all along.  That's just
8    what I remember.
9 BY MR. SIMMER:
10    Q.   Did they have responsibility
11 for all of the Rite Aid entities?
12        MS. McENROE:  Objection to
13    form.
14 BY MR. SIMMER:
15    Q.   Strike that.  Let me
16 rephrase.
17        Did the corporate assurance
18 department or the internal assurance
19 department have responsibility for all of
20 the Rite Aid distribution centers
21 following that time period?
22        MS. McENROE:  Objection to
23    form.
24        THE WITNESS:  I do not know.

Page 67

1 BY MR. SIMMER:
2    Q.   Did they have any
3 responsibility for suspicious order
4 monitoring?
5        MS. McENROE:  Objection to
6    form.
7        THE WITNESS:  I do not know.
8 BY MR. SIMMER:
9    Q.   Who would we need to talk to
10 that would clarify what their
11 responsibilities were?
12    A.   One of the associates in
13 internal assurance.
14    Q.   Where was the internal
15 assurance department housed within the
16 company structure?
17    A.   At headquarters, the Annex
18 building in Camp Hill, Pennsylvania.
19    Q.   I'm talking about the org
20 chart.  What department were they part
21 of?
22    A.   That, I do not know.
23    Q.   Do you know who the head of
24 the internal assurance department was?

Page 68

1    A.   Tony Bellezza.
2    Q.   Can you spell his last name,
3 please?
4    A.   I will attempt.
5 B-E-L-L-E-Z-Z-A.
6    Q.   Is he still working for the
7 company as far as you know?
8    A.   I do not know.
9    Q.   And did he hold that title
10 or was he -- strike that.
11        Was he head of the internal
12 assurance department throughout the time
13 period that you worked at the company?
14    A.   As far as I can recall, yes.
15    Q.   Did he hold that position
16 when you left the company?
17    A.   Yes.
18    Q.   Help us understand.  It
19 looks like they overlap with you pretty
20 substantially.  It seems like it would be
21 a confusing structure.  Were they -- was
22 that function completely separate from
23 yours or are you basically working doing
24 the same responsibilities?

Page 69

1        MS. McENROE:  Objection to
2    form.
3        THE WITNESS:  Completely
4    different functions.
5 BY MR. SIMMER:
6    Q.   Based on your work as senior
7 director, supply chain regulatory
8 compliance, is it fair to say that you're
9 familiar with the term "diversion" in the
10 context of controlled substances?
11    A.   Yes, sir.
12    Q.   What does diversion mean in
13 your own words?
14    A.   Diverting from a normal
15 course of action.
16    Q.   And based on your knowledge
17 and experience, you'd agree with me Rite
18 Aid had an obligation to prevent
19 diversion?
20        MS. McENROE:  Objection to
21    form.
22        THE WITNESS:  Yes, sir.
23 BY MR. SIMMER:
24    Q.   As senior director of supply

Page 70

1 chain regulatory compliance, you
2 understand that the DEA required that
3 Rite Aid prevent diversion?
4        MS. McENROE:  Objection to
5 form.
6        THE WITNESS:  Yes, sir.
7 BY MR. SIMMER:
8    Q.   And based on your work and
9 experience, you are familiar with the
10 concept of a "suspicious order" in the
11 context of controlled substances?
12        MS. McENROE:  Objection to
13 form.
14        THE WITNESS:  Yes, sir.
15 BY MR. SIMMER:
16    Q.   And what does it mean?
17    A.   Suspicious would be
18 anything, just that, suspicious.
19    Q.   Can you clarify what you
20 mean by a suspicious order?
21    A.   Anything abnormal.
22    Q.   Where did you gain your
23 understanding about what a suspicious
24 order was?

Page 71

1    A.   Through training with Ron
2 Buzzeo.
3    Q.   Would that be only at the
4 conferences that you attended?
5    A.   It really started when Ron
6 came to train me two months into my
7 employment.
8    Q.   Back in 2000?
9    A.   Yes, sir.
10    Q.   How extensive was that
11 training with Mr. Buzzeo?
12    A.   I like to think it was
13 pretty extensive.  We spent three or
14 four days together going through his
15 checklist, not just auditing, but
16 explaining really what the spirit of the
17 regulations mean, and then how to ensure
18 that, you know, as a registrant that they
19 were doing the things needed to do to be
20 compliant with all the rules and
21 regulations set forth.
22    Q.   So let me clarify this.  You
23 received three or four days of training
24 in 2000 when you first began working for

Page 72

1 Rite Aid, correct?
2    A.   That's correct, sir.
3    Q.   Did you have any additional
4 training with Mr. Buzzeo up until those
5 conferences you talked about, that you
6 attended later?
7    A.   Yes.
8    Q.   And what kind of training
9 did you receive from Mr. Buzzeo in that
10 interval in between?
11    A.   Just the exact same things.
12    Q.   He came back?
13    A.   Yes, sir.
14    Q.   And trained you
15 additionally?
16    A.   We worked together
17 additionally, yeah.  So I can give you an
18 example.  When I first got there, in --
19 well, 2000 -- in November 2000 Ron and I
20 performed the training.  He performed the
21 training with me.  The results were what
22 they were.
23        And I invited him to come
24 back in six months and do a re-audit and,

Page 73

1 you know, give us a chance to treat
2 our -- address any deficiencies so that
3 six months from now when you come back,
4 you should see a different story.
5        So four months after the
6 fact I called Ron and invited him back
7 and told him we were ready.
8        Ron came back a week or two
9 after our phone call and conducted
10 another audit.  He conducted the audit
11 with me there, again asking questions,
12 trying to continue to learn and found no
13 deficiencies.
14    Q.   So what was he auditing when
15 he came back the second time?
16    A.   Could you rephrase?  I'm
17 sorry.
18    Q.   You said he conducted a
19 re-audit.  What was he actually auditing?
20    A.   The control drug cage and
21 all the processes, the SOPs, biennial
22 inventories, you name at --
23    Q.   At Perryman?
24    A.   -- accountability -- yes,

Page 74

1  sir, at Perryman.
2      Q.   Okay.  So when he first
3  trained you in 2000, he actually
4  conducted an audit of Perryman at that
5  time?
6      A.   Yes, sir.
7      Q.   I take it that that wasn't a
8  positive audit?
9      A.   That would be correct, sir.
10     Q.   What were the deficiencies
11 that you recall he noted in -- in 2000?
12     A.   I -- I don't recall
13 individual.
14     Q.   Was there a written report
15 that he prepared?
16     A.   Yes, sir.
17     Q.   And is that something that
18 the company retained in its records as
19 far as you know?
20     A.   I would assume but I do not
21 know for sure.
22     Q.   When he came back, I guess
23 was it four months or six months later?
24     A.   Four months.

Page 75

1      Q.   Did he prepare a report at
2  that time?
3      A.   Yes, sir.
4      Q.   And again, that was only of
5  the Perryman facility, correct?
6      A.   That's correct.
7      Q.   And specifically in regard
8  to controlled substances, correct?
9      A.   That's correct.
10     Q.   And he found, you said no
11 deficiencies, correct?
12     A.   Correct.
13     Q.   Do you know what he actually
14 did in conducting that audit?
15          MS. McENROE:  Objection to
16     form.
17          THE WITNESS:  He basically
18     did the exact same thing the DEA
19     audits -- or DEA agents did later
20     in my tenure.  Did a very
21     comprehensive audit of the entire
22     control drug cage, security,
23     records, et cetera.
24 BY MR. SIMMER:

Page 76

1      Q.   Did he conduct any audits
2  of -- at other distribution centers?
3          MS. McENROE:  Objection to
4     form.
5          THE WITNESS:  I don't know
6     for sure if he himself did.  I
7     know his company did.
8  BY MR. SIMMER:
9      Q.   So it's your belief that --
10 that others with Buzzeo conducted audits
11 at the distribution centers?
12          MS. McENROE:  Objection to
13     form.
14          THE WITNESS:  I believe that
15     would be correct.
16 BY MR. SIMMER:
17     Q.   Do you know when they did
18 this?
19     A.   That I do not know.
20     Q.   Do you know who it was at
21 Buzzeo that did these audits of the other
22 distribution centers?
23     A.   I recall one name, Ron
24 Garribato.

Page 77

1      Q.   You better spell that name.
2      A.   G-A-R-R-I-B-A-T-O.
3      Q.   And do you know what his
4  title was at Buzzeo?
5      A.   I do not.
6      Q.   Do you know when he did
7  this?
8      A.   I can recall early 2000s.
9      Q.   And which distribution
10 center did he audit?
11     A.   Woodland, California.
12     Q.   Why was that one audited?
13     A.   It was just, again, a mock
14 audit.
15     Q.   And throughout the time
16 period when you worked at the company,
17 you undertook these same kind of mock
18 audits, correct?
19     A.   Yes, sir.
20     Q.   And you did essentially the
21 same kind of -- of procedures as
22 Mr. Buzzeo had trained you, correct?
23     A.   That's correct.
24     Q.   Did you actually write up

Page 78

1 reports after you did each of these mock
2 audits?
3     A.   I honestly do not recall.
4     Q.   Did you put anything in
5 writing when you -- after you conducted a
6 mock audit at a distribution center?
7     A.   I may have given the
8 checklist to them that I had used during
9 my time there.  It's just been so many
10 years ago, I just honestly don't remember
11 all the details.
12     Q.   So how long was the
13 checklist that you used?
14     A.   I don't recall how many
15 pages.
16     Q.   Was there a scoring system
17 of any kind in the checklist?
18     A.   Initially, no.
19     Q.   There was later a scoring
20 system of some kind used?
21     A.   The -- the certified
22 self-assessment that we were talking
23 about earlier with internal assurance,
24 that did have a scoring system with it.

Page 79

1     Q.   And when did you put in
2 place that scoring system?
3     A.   Say approximately 2009.
4     Q.   Was that in conjunction with
5 the -- the changes that you talked about
6 earlier with the controlled substances
7 team?
8         MS. McENROE:  Objection to
9     form.
10         THE WITNESS:  Would --
11         MR. SIMMER:  Strike that.
12 BY MR. SIMMER:
13     Q.   Was that in conjunction with
14 the changes you'd talked about earlier
15 with the CSA team?
16     A.   Yes, sir.
17     Q.   That you put the scoring
18 system into place as part of the changes
19 that the CSA team had implemented,
20 correct?
21     A.   That's correct.
22     Q.   Based on your work as senior
23 director supply chain regulatory
24 compliance, you'd agree that Rite Aid had

Page 80

1 an obligation to report any suspicious
2 orders to the DEA, right?
3         MS. McENROE:  Objection to
4     form.
5         THE WITNESS:  Yes, sir.
6 BY MR. SIMMER:
7     Q.   And did that, in fact,
8 happen, that the company reported any
9 suspicious orders to the DEA while you
10 were the senior director supply chain
11 regulatory compliance?
12         MS. McENROE:  Objection to
13     form.
14         THE WITNESS:  I'm not aware
15     of any suspicious orders during my
16     tenure.
17 BY MR. SIMMER:
18     Q.   That wasn't my question.
19 Were there any reports to the DEA?
20     A.   Not that I'm aware of.
21     Q.   Based on your work as senior
22 director supply chain regulatory
23 compliance, you'd agree that Rite Aid had
24 an obligation not to ship any suspicious

Page 81

1 orders, right?
2         MS. McENROE:  Objection to
3     form.
4         THE WITNESS:  Yes, sir.
5 BY MR. SIMMER:
6     Q.   Are you aware of any
7 instance when the company refused to ship
8 what it felt was a suspicious order?
9         MS. McENROE:  Objection to
10     form.
11         THE WITNESS:  I'm not aware,
12     no, sir.
13 BY MR. SIMMER:
14     Q.   So that never happened as
15 far as you know?
16     A.   As far as I know.
17     Q.   Based on your work as senior
18 director supply chain regulatory
19 compliance, do you know what the DEA red
20 flags for diversion are?
21         MS. McENROE:  Objection to
22     form.
23         THE WITNESS:  Could you ask
24     the question a different way

Page 82

1  please?
2  BY MR. SIMMER:
3      Q.   Do you know what the term --
4  are you familiar with the term "red flags
5  of diversion"?
6      A.   I am not.
7      Q.   Never heard of that before?
8      A.   I have not.
9      Q.   You never heard the DEA's
10 red flags for potential diversion?
11         MS. McENROE:  Objection to
12     form.  Asked and answered.
13         THE WITNESS:  I have not.
14 BY MR. SIMMER:
15     Q.   So I take it that you in
16 your position as senior director supply
17 chain regulatory compliance did nothing
18 to monitor any of the DEA red flags for
19 diversion, correct?
20         MS. McENROE:  Objection to
21     form.
22         THE WITNESS:  That's
23     inaccurate.
24 BY MR. SIMMER:

Page 83

1      Q.   How is it inaccurate?
2      A.   We had policies and
3  procedures in place that -- for excessive
4  order monitoring.
5      Q.   Okay.  I asked you a moment
6  ago if you were familiar with the DEA red
7  flags for diversion and you said you were
8  not, correct?
9      A.   I have not heard the term
10 "red flag," that's correct.
11     Q.   So I then asked you if you
12 had undertaken any monitoring of the red
13 flags for diversion.  And you said that
14 you feel like you had.
15     A.   Monitoring to diversion,
16 yes.  Monitoring red flags, I would have
17 to say no.  Again, I'm not familiar --
18 I'm sorry, not familiar -- not familiar
19 with the term.
20     Q.   So the answer to my
21 question, did you do any monitoring of
22 the red flags of diversion, the answer
23 would be no; isn't that right?
24         MS. McENROE:  Objection to

Page 84

1  form.  Misstates testimony.
2         THE WITNESS:  I would say
3      "red flag" being the keyword,
4      again not familiar with the term.
5      So I would say no.
6  BY MR. SIMMER:
7      Q.   During your time as senior
8  director supply chain regulatory
9  compliance, Rite Aid distributed
10 controlled substances, correct?
11     A.   Yes, sir.
12     Q.   And it distributed these
13 controlled substances only to Rite Aid
14 stores, correct?
15     A.   That is correct.
16     Q.   During your time as a Rite
17 Aid employee, did it have a suspicious
18 order monitoring program?
19     A.   Yes, sir.
20     Q.   Can you describe what that
21 program was?
22     A.   It was to -- I don't recall
23 the exact verbiage.  But it was basically
24 to identify anything that seemed

Page 85

1  suspicious, out of the ordinary.  And if
2  a suspicious order was detected, the
3  registrant would then call the government
4  affairs department at the corporate
5  headquarters in which they would report
6  directly to DEA.
7      Q.   Let's clarify what you mean
8  by -- who is the registrant in -- in what
9  you just described?
10     A.   So Rite Aid of Maryland in
11 Perryman's case.
12     Q.   And if Rite Aid of Maryland
13 became aware of a suspicious order, they
14 would call government affairs at -- at
15 corporate headquarters and they would
16 report directly to the DEA, correct?
17     A.   Correct.
18     Q.   Did that ever happen to your
19 knowledge?
20     A.   Not that I'm aware of.
21     Q.   Explain what you mean by any
22 suspicious order as being out of the
23 ordinary, what did you mean by that term?
24     A.   Suspicious to me means

Page 86

1 anything that's -- that is outside of a
2 normal pattern.
3      Q.   And how would you determine
4 that an order was out of the ordinary
5 pattern?
6           MS. McENROE:  Objection to
7      form.
8           THE WITNESS:  It could be
9      the size of the order.  It could
10     be the frequency of the order.
11     That to me would get my attention.
12 BY MR. SIMMER:
13     Q.   And what would be a size of
14 an order that you would have deemed to
15 have been suspicious?
16          MS. McENROE:  Objection to
17     form.
18          THE WITNESS:  I don't
19     personally know.  I didn't work at
20     the distribution center.
21 BY MR. SIMMER:
22     Q.   But it was your
23 responsibility to identify suspicious
24 orders, correct?

Page 87

1           MS. McENROE:  Objection to
2      form.
3           THE WITNESS:  It was the
4      distribution center's
5      responsibility to identify
6      suspicious orders.
7 BY MR. SIMMER:
8      Q.   What was your role in
9 identifying suspicious orders?
10     A.   Again, I didn't work at the
11 distribution center.  So I would not have
12 had visibility over suspicious orders, or
13 any orders for that matter.
14          My role would have been to
15 have had a policy or procedure in place.
16     Q.   And what did the policy and
17 procedure say was a suspicious order?
18     A.   I don't recall the verbiage.
19     Q.   What about the frequency of
20 an order would make it suspicious?
21          MS. McENROE:  Objection to
22     form.
23          THE WITNESS:  If I were at a
24     DC and if I were seeing an order

Page 88

1 every day in large quantities for
2      the same item, again, that
3      would -- that would get my
4      attention.
5 BY MR. SIMMER:
6      Q.   Did that ever happen?
7      A.   Not that I recall.
8      Q.   So during the time that you
9 worked for the company, you have no
10 recollection of anytime there have been
11 an order that was identified as being
12 suspicious because it was too frequent,
13 right?
14     A.   I do not.
15     Q.   At any time while you worked
16 for the company as the director of supply
17 chain regulatory compliance, were there
18 any orders that were deemed to have been
19 suspicious that were reported to the DEA
20 or to government affairs?
21          MS. McENROE:  Objection to
22     form.
23          THE WITNESS:  Not that I'm
24     aware of.

Page 89

1 BY MR. SIMMER:
2      Q.   And I'm right that the
3 system that Rite Aid used was a
4 threshold-based system?
5           MS. McENROE:  Objection to
6      form.
7           THE WITNESS:  Yes, sir.
8 BY MR. SIMMER:
9      Q.   And it measured the volume
10 of the shipments only, correct?
11          MS. McENROE:  Objection to
12     form.
13          THE WITNESS:  As far as I
14     know, yes, sir.
15          (Document marked for
16     identification as Exhibit Rite Aid
17     Mitchell-2.)
18 BY MR. SIMMER:
19     Q.   I'll hand you what we've
20 marked as Mitchell Exhibit Number 2.
21     A.   Thank you.
22     Q.   I'll identify it for the
23 record as an e-mail from you dated
24 January 28, 2008, to a group of

Page 90

1 individuals. Bates number
2 Rite_Aid_OMDL_0016954.
3        Take a moment to review that
4 if you could, please.
5        A.   Yes, sir.  Okay.
6        Q.   Do you see it's an e-mail
7 from you to a group of individuals?
8        A.   Yes, sir.
9        Q.   Do you know who the
10 addressees are that you were sending this
11 e-mail to?
12       A.   Yes, sir, I do.
13       Q.   And what functions were
14 they?
15       A.   They were both the pharmacy
16 department managers and DEA coordinators
17 of the Rite Aid DCs.
18       Q.   So all of the Rite Aid
19 distribution centers that you're sending
20 this to?
21       MS. McENROE:  Objection to
22 form.
23       THE WITNESS:  The Rite Aid
24 distribution centers that

Page 91

1        distribute pharmaceuticals.
2 BY MR. SIMMER:
3        Q.   Okay.  And did these
4 individuals work for the corporate Rite
5 Aid or do they work for a different Rite
6 Aid?
7        MS. McENROE:  Objection to
8 form.
9        THE WITNESS:  They each
10       worked for their own specific Rite
11       Aid distribution center.  And they
12       all had different entities.  So I
13       don't know each particular
14       entity's name.
15 BY MR. SIMMER:
16       Q.   Were all of the distribution
17 centers subject to the same policies and
18 procedures?
19       A.   Yes.
20       Q.   So all the distribution
21 centers would have the same policies and
22 procedures about regulatory compliance,
23 correct?
24       A.   Yes, sir.

Page 92

1        Q.   They had the same policies
2 and procedures regarding how to
3 distribute controlled substances,
4 correct?
5        A.   That's correct.
6        Q.   They had the same policies
7 and procedures regarding how to comply
8 with the C.F.R. provisions regarding
9 controlled substances, correct?
10       A.   Yes, sir.
11       Q.   And they had the same
12 policies and procedures regarding
13 thresholds for controlled substances,
14 correct?
15       A.   If I can clarify the e-mail.
16 This was during a time where Rite Aid had
17 just acquired the Brooks Eckerd
18 distribution centers, which is why I'm
19 probably asking these questions, because
20 during this time we were also
21 transitioning those distribution centers
22 to do exactly what you just mentioned,
23 fall under one umbrella, have one set of
24 policies and procedures that were Rite

Page 93

1 Aid-specific and not Brooks Eckerd
2 specific.
3        Q.   What about this e-mail tells
4 you that it fell into that transition
5 period from Brooks Eckerd to Rite Aid?
6        A.   I'm just looking at the date
7 and why I would have asked that question.
8        Q.   So is there a specific time
9 period when this transition -- transition
10 was happening where they were not part of
11 the Rite Aid corporate policies and
12 procedures?
13       MS. McENROE:  Objection to
14       form.
15       THE WITNESS:  There was a
16       time, yes, sir.
17 BY MR. SIMMER:
18       Q.   When was that?
19       A.   Approximately 2007, 2008.
20       Q.   So at that point in time
21 there would have been different policies
22 and procedures for these legacy
23 distribution centers that Rite Aid
24 purchased in that Brooks Eckerd

Page 94

transaction?

    A.    Until the --

        MS. McENROE:  Objection to
    form.

        THE WITNESS:  Sorry.

        Until the transaction was
    final, that would be true.

BY MR. SIMMER:

    Q.    When was the transaction
final?

    A.    I -- I do not recall.

    Q.    So after the transaction was
final, would it have been true that there
were different procedures for the
Perryman distribution center as opposed
to the Liverpool distribution center?

        MS. McENROE:  Objection to
    form.

        THE WITNESS:  There were
    corporate policies.  There was a
    blue book binder which was a set
    of guidelines, regulatory
    guidelines.  And then each
    distribution center had their own

Page 95

    policies and procedures.  But they
    were all -- they were all
    basically the same, if you will.

BY MR. SIMMER:

    Q.    So this blue book binder
what's its official title?

    A.    I don't recall the name of
the binder itself.

    Q.    But it was a blue cover of
some kind?

    A.    Yes, sir.  It was a thick
blue binder that every distribution
center had.

    Q.    And it was the same blue
book binder for every one of these
distribution centers?

    A.    Yes, sir.

    Q.    Even though they were
separate corporate entities, they all
worked off the same blue book?

    A.    Yes, sir.

    Q.    Who prepared the items that
went into that blue book?

    A.    It was prepared when I

Page 96

started.  So I don't recall.

    Q.    Did you update that blue
book from time to time yourself?

    A.    I did not, no.

    Q.    Who had responsibility for
updating that blue book?

        MS. McENROE:  Objection to
    form.

        THE WITNESS:  I don't
    recall.

BY MR. SIMMER:

    Q.    What kinds of materials were
included in that blue book?

    A.    Guidelines.  So for
inventory control, for transportation,
for controlled substances, et cetera,
really every facet of the distribution
operation.

    Q.    Did you consult that blue
book yourself from time to time?

    A.    Yes, sir.

    Q.    And were there changes to
the blue book from time to time?

    A.    I don't recall.

Page 97

    Q.    Can you look at the first
paragraph of your e-mail where you say,
"First of all, I want to ensure that you
have in place an excessive order
monitoring process for your respective
DC."

        Do you see where you say
that?

    A.    Yes, sir.

    Q.    So what is it you're trying
to say here, if you recall?

    A.    I am trying to check and
ensure there's an excessive order
monitoring process for each of the
pharmacy DCs.

    Q.    Is that because of the fact
that you had some legacy Brooks Eckerd
distribution centers that you were --
that might not have had an excessive
order monitoring process in place?

        MS. McENROE:  Objection to
    form.

        THE WITNESS:  I was -- I
    wouldn't have known if they had

Page 98

1 one. But that's why I was
2 checking, just to ensure.
3 BY MR. SIMMER:
4 Q. At this point in time, all
5 the legacy Rite Aid distribution centers,
6 would it be correct that they all had an
7 excessive order monitoring process in
8 place?
9 A. Absolutely, yes, sir.
10 Q. And that would have been
11 something that would have been described
12 in the blue book that you just testified
13 about a moment ago?
14 MS. McENROE: Objection to
15 form.
16 THE WITNESS: I believe it
17 was in the blue book, yes, sir.
18 BY MR. SIMMER:
19 Q. "You go on to say, the
20 quantity should be as follows: Bottles
21 of 100 tablets or liquid containers,
22 maximum of 50 units per order. Bottles
23 of 500 tablets, maximum of ten per order.
24 Bottles of 1,000 tablets, maximum of five

Page 99

1 per order."
2 Do you see what I see?
3 A. Yes.
4 Q. Did I read that correctly?
5 A. Yes, sir.
6 Q. Who established this
7 standard?
8 A. Our government affairs
9 department.
10 Q. Do you know how they
11 determined that this would be the
12 standard?
13 A. I believe it was looking
14 back at the past ██████ of history at
15 each specific store.
16 Q. And this was a standard that
17 was applied to all of the Rite Aid
18 stores, right?
19 A. Yes, sir.
20 Q. It was uniform for every
21 one?
22 A. Yes, sir.
23 Q. Right below that, do you see
24 where you say, "Please identify any and

Page 100

1 all stores that have attempted to order
2 in excess of these quantities. I need
3 the store number, item number and
4 description, and date of order. We are
5 going to run reports for those stores on
6 those items in question to check for
7 'need.'"
8 Do you see that?
9 A. Yes, sir.
10 Q. What are you asking for
11 there?
12 A. We had an excessive order
13 monitoring log that the DCs would use.
14 And they should be able to capture any
15 store that had ordered more than these
16 numbers that were listed in the paragraph
17 above.
18 If they had, I wanted those
19 numbers reported back to me so that I
20 could provide those to government
21 affairs, have them rerun those numbers
22 again to check to see if these quantities
23 were even needed at these stores.
24 So we could potentially

Page 101

1 adjust the monitoring program, or the
2 threshold limits that were in place.
3 Q. When you say "need" in that
4 paragraph, what is it that you mean by
5 that term?
6 A. For my vantage point, it
7 would be for -- for scripts, so for
8 script count.
9 Q. So based on how you're using
10 the term there, would it be fair to say
11 that there were Rite Aid pharmacies that
12 may have been ordering controlled
13 substances that they didn't in fact need?
14 MS. McENROE: Objection to
15 form.
16 THE WITNESS: There were
17 Rite Aid pharmacies that at times
18 would order what would be deemed
19 excessive. And through our
20 excessive order monitoring
21 program, the distribution centers
22 would in turn call those stores to
23 validate whether or not there was
24 a legitimate need or not.

Page 102

1    Oftentimes, more often than
2  not, the stores actually had a
3  keying error.  So if they had
4  ordered 53, they really only
5  wanted five or they only wanted
6  three.  And then that order would
7  get cut back at the distribution
8  center before being shipped.  And
9  they kept a log annotating those
10 notes.
11 BY MR. SIMMER:
12   Q.   The next paragraph you say,
13 "Also, some of you had stores that have
14 been given exceptions for certain items,
15 please provide the store number and item
16 numbers as well.  We want to reevaluate
17 the need."
18    What are you saying there?
19   A.   That there are large stores
20 that may have higher volume that may have
21 a true business need for higher than our
22 threshold limits, in which again Janet
23 Hart in our government affairs department
24 would run reports to justify whether or

Page 103

1  not those numbers were still, in fact,
2  accurate, whether they needed to be
3  increased or decreased.  And we have done
4  both over my tenure.  We have not just
5  increased the amount we ship, we've
6  actually decreased.
7    Q.   When you say, "We want to
8  reevaluate the need," is that something
9  you were actually doing?
10   A.   I was spearheading the
11 effort in relation to the DCs.  I'm not
12 the one that actually did the background
13 work.  But again, knowing the
14 responsibility of the DCs for excessive
15 order monitoring and suspicious order
16 monitoring, I want to make sure that
17 we're doing our due diligence to ensure
18 compliance.
19   Q.   So when you're spearheading
20 the effort, you, in fact, were not doing
21 this evaluation yourself, correct?
22   A.   That's correct.
23   Q.   That's something government
24 relations was doing, right?

Page 104

1    A.   Yes, sir.
2    Q.   And that's Janet Hart's --
3    A.   Yes, sir.
4    Q.   -- function?
5    A.   Yes, sir.
6    MS. McENROE:  Just let him
7  finish his questions.
8  BY MR. SIMMER:
9    Q.   I know you're real anxious
10 to answer these great questions, but you
11 have to let me finish.
12    So you, in fact, had nothing
13 to do with the actual evaluation; is that
14 right?
15   A.   That's correct, sir.
16   Q.   You also testified that --
17 however, that you wanted to make sure
18 that "we're doing our due diligence to
19 ensure compliance"; is that right?
20   A.   Yes, sir.
21   Q.   And what is it you, in fact,
22 were doing to ensure compliance?
23   A.   That we had SOPs and
24 processes in place to identify anything

Page 105

1  that we deemed excessive or suspicious.
2    Q.   The next paragraph of your
3  e-mail you say, "We will be re-evaluating
4  our current threshold.  Once the run" --
5  strike that.
6    "Once we run the reports and
7  review, we will send to your DC printer
8  for you to file with your controlled drug
9  paperwork."
10    Do you see that?
11   A.   Yes, sir.
12   Q.   So what are you describing
13 here?
14   A.   So again, the threshold is
15 listed above.  So given that we have now
16 acquired additional distribution centers
17 and want to ensure full compliance
18 throughout our organization, we want to
19 rerun the reports for the information
20 that they would have in turn provided to
21 me, I would have provided to Janet, to
22 again check the true business need for
23 these specific items.
24    And then we would send the

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 results of that to their DC printer, to
2 file with their controlled drug
3 paperwork.
4         So the -- the reasoning for
5 that is if DEA were to ever come in and
6 question why you shipped X number of
7 bottles to this specific store, we have
8 justification, we have a record to
9 explain why we do what we do.
10     Q.   So it sounds like two things
11 happened.  The first thing with the
12 results of what you were asking for was
13 information that you provided to
14 government relations, correct?
15     A.   Yes, sir.
16     Q.   And do you know what
17 government relations then did with the
18 information you provided in 2008 that
19 we're talking about here?
20     A.   They would have sent
21 whatever information was found to the DCs
22 with guidance as to whether or not the
23 threshold was adjusted or not.  And what
24 stores would be on that exception list.

Page 107

1     Q.   Okay.  I want to clarify
2 your answer.  You -- you said they would
3 have sent.  Did they, in fact, do that,
4 do you know that?
5     A.   I don't recall.
6     Q.   So you're just speculating?
7         MS. McENROE:  Objection to
8 form.
9         THE WITNESS:  It's -- it's
10 been 11 years.  I just don't
11 recall.
12 BY MR. SIMMER:
13     Q.   But sitting here today, you
14 can't testify whether, in fact,
15 government relations ever did anything
16 with this information; is that fair?
17         MS. McENROE:  Objection to
18 form.
19         THE WITNESS:  Based on my
20 experience, I would -- I would say
21 they did.  But however I can't be
22 100 percent sure because it's been
23 11 years ago.  I just don't
24 remember.

Page 108

1 BY MR. SIMMER:
2     Q.   You just don't know, right?
3     A.   I just don't know.
4     Q.   Okay.  The second thing that
5 you describe here is that the
6 distribution centers were to take this
7 paperwork and put it into their records
8 so that if the DEA ever came and did an
9 audit, they would have information in
10 their records to reflect what had
11 happened about the shipments beyond the
12 threshold; is that fair?
13     A.   Yes, sir.
14     Q.   And where in their records
15 would the distribution centers store
16 these reports?
17     A.   I don't recall where they
18 stored them.
19     Q.   Was this a one-time only
20 event that's going on here?
21     A.   No, sir.  We -- during my
22 tenure we reviewed the threshold several
23 times.
24     Q.   So when you say you reviewed

Page 109

1 it, you just pulled a record to show
2 which shipments were over the threshold,
3 right?
4         MS. McENROE:  Objection to
5 form.
6         THE WITNESS:  Early on there
7 was a threshold in place when I
8 first started.  And I know that
9 we, in time, over time, continued
10 to reevaluate that.  Again, just
11 to check for the validity and the
12 true business need.
13 BY MR. SIMMER:
14     Q.   So when you say threshold,
15 is that what's described in the second
16 paragraph of this e-mail you're sending?
17     A.   Yes, sir.
18     Q.   Did that -- do those
19 threshold numbers change while you worked
20 at Rite Aid?
21     A.   I believe they did, yes,
22 sir.
23     Q.   And how did they change over
24 time?

Page 110

1    A.   That I do not recall.  I
2  don't recall whether they went up or
3  down.  But I do know they were different
4  during my tenure.
5    Q.   And whose responsibility was
6  it to make these changes to the threshold
7  numbers we're looking at here?
8    A.   Worked collectively with
9  government affairs.
10    MS. McENROE:  Scott --
11  BY MR. SIMMER:
12    Q.   So you had a responsibility
13  for that as well as government affairs,
14  right?
15    A.   I had a responsibility to
16  communicate it to the distribution
17  centers.  Government affairs made the
18  determination this is the threshold.
19    Q.   And what's your
20  understanding how it is that the
21  government affairs came up with any
22  changes they made to these numbers?
23    MS. McENROE:  Objection to
24  form.

Page 111

1    THE WITNESS:  By rerunning
2    reports based on average sales,
3    average dispensing.
4  BY MR. SIMMER:
5    Q.   So the numbers basically
6  just were to reflect the averages across
7  all Rite Aid pharmacies; is that correct?
8    MS. McENROE:  Objection to
9    form.
10    THE WITNESS:  That I can't
11    answer.
12  BY MR. SIMMER:
13    Q.   Okay.  I'm just trying to
14  understand how it is that -- that
15  government affairs established what the
16  thresholds would be.
17    MS. McENROE:  Is that a
18    question?
19  BY MR. SIMMER:
20    Q.   Do you know?
21    A.   I -- with all due respect,
22  that would be a question best asked for
23  them.  I don't recall.
24    MS. McENROE:  Scott, if we

Page 112

1  get a good chance to take a quick
2  comfort break, that would be
3  appreciated on this side.
4    MR. SIMMER:  Can we just go
5  a little bit further?
6    MS. McENROE:  Yeah.  Finish
7  your line of questioning, that
8  would be fine.
9  BY MR. SIMMER:
10    Q.   Do you know whether there
11  were pharmacies that were identified as
12  part of this process that were ordering
13  controlled substances that they didn't
14  actually need?
15    MS. McENROE:  Objection to
16  form.
17    THE WITNESS:  I do not
18  recall.
19  BY MR. SIMMER:
20    Q.   Who would we need to speak
21  to to find out the answer to that
22  question?
23    A.   I would -- I would recommend
24  Janet Hart, sir.

Page 113

1    Q.   Because ultimately it was
2  their responsibility to determine which
3  pharmacies were making orders they didn't
4  actually need; is that right?
5    MS. McENROE:  Objection --
6    objection to form.
7    THE WITNESS:  To identify?
8  BY MR. SIMMER:
9    Q.   Pharmacies that were
10  ordering controlled substances they
11  didn't actually need?
12    MS. McENROE:  Objection to
13  form.
14    THE WITNESS:  They -- yes.
15  BY MR. SIMMER:
16    Q.   So if it were true that a
17  pharmacy was ordering controlled
18  substances they didn't actually need,
19  that's something that Rite Aid should
20  have been reporting to the DEA; isn't
21  that fair?
22    MS. McENROE:  Objection to
23  form.
24    THE WITNESS:  I really don't

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 know.
2 BY MR. SIMMER:
3    Q.   Is it correct that as
4 director of supply chain regulatory
5 compliance, it would have been your
6 responsibility to ensure that the company
7 had implemented a suspicious order
8 monitoring system to ensure that only
9 orders sent to pharmacies where there had
10 been a legitimate need?
11        MS. McENROE:  Objection to
12    form.
13        THE WITNESS:  Yes.
14 BY MR. SIMMER:
15    Q.   If you had been aware that
16 there were orders sent to Rite Aid
17 pharmacies where there was no legitimate
18 need, this is something you would flag as
19 being suspicious, right?
20        MS. McENROE:  Objection to
21    form.
22        THE WITNESS:  If I were made
23    aware of it, yes, sir.
24 BY MR. SIMMER:

Page 115

1    Q.   And how would you, in fact,
2 flag that as being a suspicious order?
3    A.   Again, I didn't have
4 visibility over orders, so I wouldn't
5 have known unless someone had -- would
6 have called me and told me.
7    Q.   And the folks that had that
8 responsibility, and that information,
9 that's government relations, right?
10    A.   It would have been the
11 pharmacy DCs would have identified
12 anything suspicious, in turn would have
13 called government affairs, correct.
14    Q.   And again I think you -- you
15 testified about that -- this a moment
16 ago, Rite Aid would have notified the DEA
17 of any suspicious orders, right?
18        MS. McENROE:  Objection to
19    form.
20        THE WITNESS:  Yes.
21 BY MR. SIMMER:
22    Q.   And Rite Aid would not have
23 shipped any orders that were deemed to be
24 suspicious, right?

Page 116

1        MS. McENROE:  Objection to
2    form.
3        THE WITNESS:  Yes.
4        MR. SIMMER:  We can go off
5    the record.
6        THE VIDEOGRAPHER:  The time
7    is now 11:25 a.m.  We're going off
8    the record.
9        (Short break.)
10        THE VIDEOGRAPHER:  The time
11    is now 11:42 a.m.  We are back on
12    the record.
13        (Document marked for
14    identification as Exhibit Rite Aid
15    Mitchell-3.)
16 BY MR. SIMMER:
17    Q.   Sir, we're going to -- I
18 hand you what we marked as Mitchell
19 Exhibit 3.  I'll identify it for the
20 record as a press release issued by the
21 Department of Justice on January 12th,
22 2009.  It is a two-page document.  We
23 printed the exhibit front and back.  So
24 just take a moment to look at that.

Page 117

1    A.   Okay.
2    Q.   Do you see where the
3 headline to this press release, it says,
4 "Rite Aid Corporation and subsidiaries
5 agree to pay $5 million in civil
6 penalties to resolve violations in eight
7 states of the Controlled Substances Act"?
8    A.   Yes, sir.
9    Q.   And this would have occurred
10 during the time that you were working for
11 the company; is that correct?
12    A.   Yes, sir.
13    Q.   Do you recall this
14 settlement?
15    A.   I do not.
16    Q.   Do you recall whether this
17 settlement had any impact on your work as
18 the director of supply chain regulatory
19 compliance?
20        MS. McENROE:  Objection to
21    form.
22        THE WITNESS:  No, sir.
23    After reading this, it's pretty
24    clear it was 100 percent related

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    to the Rite Aid stores.
2  BY MR. SIMMER:
3      Q.   Okay.  Look at the first
4  bullet in the middle of the page, on Page
5  1.  Do you see where it says, "At
6  pharmacies in Kentucky and New York, Rite
7  Aid knowingly filled prescriptions for
8  controlled substances that were not
9  issued for a legitimate medical purpose
10  pursuant to a valid physician-patient
11  relationship"?
12      A.   Yes, sir.
13      Q.   So would you agree with me
14  that when it says that it had no
15  legitimate medical purpose, those are
16  prescriptions for which there was no
17  legitimate need?
18        MS. McENROE:  Objection to
19      form.
20        THE WITNESS:  No.  I
21      wouldn't necessarily say that.
22  BY MR. SIMMER:
23      Q.   And why wouldn't you?
24      A.   They may be needed for

Page 119

1  another patient, but maybe not in the
2  example that they're giving.
3      Q.   But with regard to those
4  specific prescriptions, when it says here
5  that there was no legitimate medical
6  purpose, wouldn't it be true that there
7  was no need to even have those
8  prescriptions issued in the first place?
9        MS. McENROE:  Objection to
10      form.
11        THE WITNESS:  No.  Again, I
12      would disagree.
13  BY MR. SIMMER:
14      Q.   And again, what is your
15  disagreement with that?
16      A.   I don't know how dispensing
17  a script has anything to do with on-hand
18  inventory at store level.
19      Q.   Nothing at all?
20      A.   Right.
21      Q.   So when a pharmacy actually
22  has inventory, isn't that inventory being
23  used to fill prescriptions?
24        MS. McENROE:  Objection to

Page 120

1    form.
2        THE WITNESS:  Yes.  Yes, it
3      would be.
4  BY MR. SIMMER:
5      Q.   And the orders that the
6  pharmacy makes of controlled substances,
7  those would be to fill prescriptions,
8  right?
9      A.   That would be correct.
10      Q.   And with regard to these
11  specific pharmacies, when they say there
12  was no legitimate medical purpose, that's
13  coming out of their inventory of the
14  shipments they had gotten from the
15  Perryman facility, right?
16        MS. McENROE:  Objection to
17      form.
18        THE WITNESS:  Yeah, it could
19      be, certainly, or it could have
20      come from McKesson.
21  BY MR. SIMMER:
22      Q.   In either event, those
23  shipments were sent to a Rite Aid
24  pharmacy, right?

Page 121

1        MS. McENROE:  Objection to
2      form.
3        THE WITNESS:  Correct.
4  BY MR. SIMMER:
5      Q.   And you're disputing the
6  fact that when it says no legitimate
7  medical purpose, whether that is coming
8  out of the inventory for which there is
9  no legitimate need as well, right?
10        MS. McENROE:  Objection to
11      form.
12        THE WITNESS:  I wouldn't
13      have any insight as to what
14      inventory -- what inventory
15      balances a store would be required
16      to have.  So I guess the point
17      that I was trying to make is that
18      I don't think it's out of the
19      ordinary for a store to have, for
20      example, ten bottles of a
21      particular drug if there are going
22      to be scripts sold for that drug.
23        I would have absolutely no
24      way of knowing the

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 doctor-physician-pharmacy-patient
2 relationship.  I mean, what
3 happens at the store level, I have
4 no knowledge or observation of.
5 BY MR. SIMMER:
6     Q.   So when a store, and in this
7 example these stores in Kentucky and New
8 York, issued prescriptions for which
9 there was no legitimate medical purpose,
10 would you agree with me that they would
11 need to replenish their stock with
12 additional controlled substances?
13        MS. McENROE:  Objection to
14    form.
15        THE WITNESS:  Replenishment
16    is based on sales, so yes.
17 BY MR. SIMMER:
18     Q.   And so in that instance, if
19 those sales were reflective of those
20 prescriptions for which there was no
21 legitimate medical purpose, correct?
22        MS. McENROE:  Objection to
23    form.
24        THE WITNESS:  That's --

Page 123

1    that's what it says.  Again, I
2    have no knowledge of that
3    whatsoever.
4 BY MR. SIMMER:
5     Q.   Following the $5 million in
6 fines that Rite Aid paid here, can you
7 tell us what changes the company made to
8 its suspicious order monitoring system to
9 ensure that orders were being shipped
10 based on legitimate medical purpose?
11        MS. McENROE:  Objection to
12    form.
13        THE WITNESS:  Again, this
14    is -- this entire document is
15    relating to the stores.  Never
16    once does it talk about a
17    distribution center.  And I am
18    confident that the programs we had
19    in place, based on DEA audits,
20    specifically Perryman in 2005 and
21    in 2009, we had glowing results.
22 BY MR. SIMMER:
23     Q.   That wasn't what my question
24 was.

Page 124

1        Can you tell us what changes
2 the company made to its suspicious order
3 monitoring system to ensure that orders
4 were being shipped based on legitimate
5 medical purpose?
6        MS. McENROE:  Objection to
7    form, including asked and
8    answered.
9        THE WITNESS:  I am not aware
10    of any changes.
11        (Document marked for
12    identification as Exhibit Rite Aid
13    Mitchell-4.)
14 BY MR. SIMMER:
15     Q.   I'll hand you what we've
16 marked as Mitchell Exhibit Number 4.
17        I'll identify it for the
18 record.  It is a settlement agreement and
19 release.  We've obtained this off -- it's
20 a public document.  We obtained it off
21 the internet.
22        If you'd like to review the
23 entire document, that's fine.  But I'm
24 just going to ask you a few general

Page 125

1 questions about it.
2     A.   Okay.
3     Q.   Do you recall ever having
4 seen this document before?
5     A.   No, sir.
6     Q.   Is it fair to say that this
7 settlement agreement and release, so far
8 as you know, did not result in any
9 changes in how you conducted your work as
10 director of supply chain regulatory
11 compliance at Rite Aid?
12        MS. McENROE:  Objection to
13    form.
14        THE WITNESS:  That is
15    correct.
16 BY MR. SIMMER:
17     Q.   Okay.  I'll direct your
18 attention to one specific paragraph,
19 Paragraph 10 on Page 11.
20        Do you see where it says,
21 "Rite Aid represents that it has taken
22 good faith actions to detect and prevent
23 diversion, including without limitation,
24 agreeing to implement the policies and

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 procedures that are the subject of a
2 memorandum of agreement between Rite Aid
3 and the Drug Enforcement Administration,
4 dated January 12, 2009, and attached
5 hereto as Appendix B."
6        Do you see that?
7     A.   Yes.
8     Q.   Did you undertake any
9 changes in your work as Rite Aid's
10 director of supply chain regulatory
11 compliance as part of these good faith
12 actions that the company agreed to
13 undertake?
14        MS. McENROE:  Objection to
15     form.
16        THE WITNESS:  Is there a
17     copy of the MOU that they are
18     referring, or memorandum of
19     agreement?
20 BY MR. SIMMER:
21     Q.   Well, we'll get to that in a
22 moment.  I just recall -- I'm asking
23 whether you -- whether you recall
24 undertaking any good faith actions at all

Page 127

1 as a result of this settlement?
2        MS. McENROE:  Objection to
3     form.
4        THE WITNESS:  I do not
5     recall.
6        (Document marked for
7     identification as Exhibit Rite Aid
8     Mitchell-5.)
9 BY MR. SIMMER:
10     Q.   Just to be clear for the
11 record.  Do you recall any discussions at
12 all about this $5 million settlement
13 while you were working with Rite Aid?
14        MS. McENROE:  Objection to
15     form.
16        THE WITNESS:  I do not
17     recall.
18 BY MR. SIMMER:
19     Q.   I'll hand you what we've
20 marked as Mitchell Exhibit Number 5.
21        I'll identify it for the
22 record as a document entitled memorandum
23 of agreement.  And again, it's a document
24 we obtained from the internet.  Multi

Page 128

1 pages.
2        I think it's the memorandum
3 of agreement that was being discussed in
4 the prior exhibit.  Take a moment to look
5 at that.
6        By all means, look at the
7 entire document if you need to.  But I
8 just have a few specific questions
9 relatively straightforward.
10        Just the first paragraph.  I
11 can point to you a couple passages, and
12 if you need to look at the rest of the
13 document, do so.
14        First paragraph, do you see
15 that it says, "This is administrative
16 memorandum of agreement entered into on
17 this 12th day of January, 2009, by and
18 between the United States Department of
19 Justice, Drug Enforcement Administration,
20 hereinafter DEA, and Rite Aid
21 Corporation"?
22        Do you see that?
23     A.   Yes, sir.
24     Q.   And that Rite Aid

Page 129

1 Corporation, that's the entity that you
2 work for, correct?
3        MS. McENROE:  Objection to
4     form.
5        THE WITNESS:  Yes, sir.
6 BY MR. SIMMER:
7     Q.   You see at the end of that
8 paragraph it says, "A list of Rite Aid
9 subsidiaries is attached hereto as
10 Exhibit A"?
11        I'm sorry, Appendix A?
12     A.   Yes, sir.
13     Q.   Can I direct you to
14 Appendix A at the back, it's Page 9.
15        And this is a list of all
16 the Rite Aid subsidiaries, correct?
17     A.   Yes, sir.
18     Q.   And they were a party to --
19 as far as the way this is referencing,
20 they were a party to the settlement as
21 well, correct?
22     A.   Apparently so, yes, sir.
23     Q.   And in the case of the
24 Perryman facility, is that what's

Page 130

1 indicated, Rite Aid of Maryland Inc.?
2 MS. McENROE: Objection to
3 form.
4 THE WITNESS: Yes, sir.
5 BY MR. SIMMER:
6 Q. Can I take you back to
7 Page 3 of this exhibit. At the last
8 sentence of the first paragraph on that
9 page, do you see where it says, "Rite Aid
10 acknowledges and agrees that the
11 obligations undertaken in this
12 subparagraph do not fulfill the totality
13 of its obligations under the CSA"?
14 A. Yes, sir.
15 Q. So you agree with me that --
16 that the compliance that the company had
17 entered into wasn't all its obligations
18 were under the Controlled Substances Act,
19 right?
20 A. Yes, sir.
21 Q. And in the next paragraph,
22 you see where it says, "Rite Aid shall
23 monitor compliance at all Rite Aid
24 locations in properly maintaining records

Page 131

1 in accordance with the CSA. Within one
2 year of the effective date of this
3 agreement, Rite Aid loss prevention
4 managers will conduct a separate audit of
5 all Rite Aid pharmacies for compliance in
6 all material respects with all applicable
7 DEA regulatory requirements, including
8 regulatory" -- or "including
9 recordkeeping, reporting and security."
10 Do you see that?
11 A. Yes, sir.
12 Q. Did you have any role and
13 responsibility with regard to those
14 audits of the -- of the Rite Aid
15 pharmacies?
16 A. No, sir.
17 Q. Were you aware that -- that
18 as part of this settlement, there were
19 allegations that there were prescriptions
20 issued for which there was no legitimate
21 medical need?
22 MS. McENROE: Objection to
23 form. Asked and answered.
24 THE WITNESS: No, sir.

Page 132

1 BY MR. SIMMER:
2 Q. Had you known that, would it
3 have -- have prompted you to make any
4 changes to Rite Aid's suspicious order
5 monitoring program?
6 MS. McENROE: Objection to
7 form. Calls for speculation.
8 THE WITNESS: I don't think
9 so.
10 BY MR. SIMMER:
11 Q. Because in your -- your
12 view, what happened at the pharmacies was
13 irrelevant to what was happening at the
14 distribution center level?
15 MS. McENROE: Objection to
16 form.
17 THE WITNESS: I felt
18 comfortable that the distribution
19 centers had good policies and
20 procedures and measures already in
21 place to prevent the DCs from --
22 from shipping to stores.
23 BY MR. SIMMER:
24 Q. So as far as you know, were

Page 133

1 the distribution centers -- centers
2 actually monitoring whether there was
3 legitimate medical need for the
4 prescriptions that they were filling?
5 MS. McENROE: Objection to
6 form.
7 THE WITNESS: The
8 distribution center would have
9 absolutely no idea about a
10 legitimate medical need.
11 They would be able to look
12 at -- you know, first of all our
13 distribution centers, they
14 distributed Schedules III through
15 V. So Schedule IIs were not
16 distributed at the DC.
17 And again, there was a
18 monitoring program in place to
19 look for anything out of the norm;
20 excessive, suspicious, et cetera.
21 BY MR. SIMMER:
22 Q. But the fact that in this
23 settlement agreement, the -- the company
24 admitted that there were prescriptions

Page 134

1 that were filled at pharmacies where
2 there was no legitimate medical need,
3 that had no bearing on what you were
4 doing in your job; is that right?
5     MS. McENROE:  Objection to
6 form.
7     THE WITNESS:  That would be
8 correct.  This is 100 percent
9 related to deficiencies at the
10 pharmacies.  It's not the pharmacy
11 distribution centers.
12 BY MR. SIMMER:
13     Q.   So -- so when a --
14     MS. McENROE:  Hold on.  Did
15 you have something more to say?
16 BY MR. SIMMER:
17     Q.   Yeah, were you --
18     A.   Again, I was just going to
19 kind of go back to, we had had -- we have
20 had multiple DEA audits, where again DEA
21 has come in, they -- they've looked at
22 the entire gamut of the operation.  They
23 have continually praised the distribution
24 center on its compliance programs, on the

Page 135

1 effectiveness on the programs.
2     And again, with DEA being
3 kind of my scorecard as to how I rate my
4 ability to help the DCs become compliant,
5 if the DC -- if the DEA is telling me
6 that your program is awesome, then I have
7 no -- no really valid business reason to
8 want to change that.
9 BY MR. SIMMER:
10     Q.   Point well taken.
11     So what you're testifying,
12 as I understand it, the fact that the
13 company had admitted in this settlement
14 agreement that there were prescriptions
15 filled where there was no legitimate
16 medical need was irrelevant to what
17 the -- the company was doing in
18 suspicious order monitoring, correct?
19     MS. McENROE:  Objection to
20 form.
21     THE WITNESS:  I'm saying I
22 had no oversight or knowledge of
23 it.
24 BY MR. SIMMER:

Page 136

1     Q.   And I'm trying to
2 understand.  As you -- in your
3 responsibilities as the director of
4 supply chain regulatory compliance at
5 this time, what you're -- you're
6 testifying that the fact that there were
7 prescriptions filled where there was no
8 legitimate medical need, you felt that
9 they had nothing to do with the company's
10 obligation to have a suspicious order
11 monitoring program that was in operation
12 at the time, right?
13     MS. McENROE:  Objection to
14 form.
15     THE WITNESS:  No, that's not
16 what I said.
17     I said that my
18 responsibility was oversight over
19 the distribution centers.
20     I was not aware of any of
21 this when it happened.  Therefore,
22 if I'm not aware of it, I
23 wouldn't, or couldn't have made
24 changes to the program at the DCs.

Page 137

1 BY MR. SIMMER:
2     Q.   Do you have an understanding
3 of who in the company would have had an
4 obligation to tell you about this
5 settlement agreement and how it might
6 impact what the company was doing about
7 its suspicious order monitoring program?
8     MS. McENROE:  Objection to
9 form.
10     THE WITNESS:  I could assume
11 that multiple people could have,
12 or should have notified the supply
13 chain department.
14 BY MR. SIMMER:
15     Q.   And who were those
16 individuals you believe that could have
17 or should have notified the supply chain
18 department?
19     A.   Whoever was involved in
20 making the settlement.  So I'm -- I would
21 assume the Rite Aid legal team, or
22 government affairs or pharmacy
23 operations.
24     Q.   And your best recollection

Page 138

1 is none of those individuals, none of
2 those departments, ever notified you of
3 any changes that should be made to Rite
4 Aid's suspicious order monitoring
5 program, right?
6          MS. McENROE:  Objection to
7 form.
8          THE WITNESS:  I am not
9 aware, no.
10          (Document marked for
11          identification as Exhibit Rite Aid
12          Mitchell-6.)
13 BY MR. SIMMER:
14     Q.   I'll hand you what we've
15 marked as Mitchell Exhibit Number 6.
16          Take a moment to review
17 that.  While you're doing that let me
18 identify it for the record as an e-mail
19 chain.  First Bates number is
20 Rite_Aid_OMDL_0027317 through --
21          MS. McENROE:  316, I think.
22          MR. SIMMER:  What did I say?
23 Oh, I'm sorry, 316, thank you
24          through 0027323.

Page 139

1 BY MR. SIMMER:
2     Q.   It's a multi-page exhibit.
3 I can direct your attention to specific
4 pages I'm going to ask you questions
5 about.
6     A.   Okay.
7     Q.   I'd like to have -- direct
8 your attention to two pages in this
9 Exhibit, 317 and 318, if I could.
10     A.   Okay.
11     Q.   Do you recall having seen
12 this document before?
13     A.   I have, yes, sir.
14     Q.   When is the last time that
15 you saw this document?
16     A.   Yesterday.
17     Q.   What's your understanding is
18 going on here that you've become involved
19 in this communication?
20          MS. McENROE:  Objection to
21 form.
22          THE WITNESS:  It appears
23 that a store is looking to
24 increase their threshold on

Page 140

1 hydrocodone.
2 BY MR. SIMMER:
3     Q.   And am I right that it is
4 Store 2389?
5     A.   Yes, sir.
6     Q.   Do you know where that store
7 is located?
8     A.   I do not.
9     Q.   We looked it up.  I think --
10 and see if you agree on it.  Canton,
11 Ohio?
12     A.   I have no idea.
13     Q.   Okay.  Can I direct your
14 attention to the e-mail that begins at
15 the bottom of Page 7317.  It's from Pam
16 Mueller to Charles Miller copying a group
17 of individuals including yourself.
18          Do you see that?
19     A.   Yes, sir.
20     Q.   Let me just read some of
21 that e-mail and ask you a few questions
22 about it.
23          In the body of the e-mail,
24 Ms. Mueller, on July 23, 2008, says,

Page 141

1 "Charlie, conclusion of our conversation
2 with Jack Phillipson and Charlotte
3 Winder.  Jack is going to send a request
4 to have Store Number 2389 minimum
5 increased on this item to Janet Hart and
6 Kevin Mitchell."
7          Do you see that?
8     A.   Yes, sir.
9     Q.   And that would be you,
10 right?
11     A.   Yes, sir.
12     Q.   And Ms. Hart, right?
13     A.   Yes, sir.
14     Q.   "Charlotte Winder is sending
15 an e-mail to Pam Hammaker to approve the
16 last credit from 7/29" -- that's
17 July 29th -- "and all other credits have
18 been issued."
19          Do you see that?
20     A.   Yes, sir.
21     Q.   Do you know what she's
22 saying there?
23     A.   I have no idea.
24     Q.   She goes on to say, "The

Page 142

1  process for quantity limits on controls
2  is: 500 tablets, limit to ten bottles;
3  1,000 tablets, limit to five bottles."
4        Do you see that?
5        A.  Yes, sir.
6        Q.  And that's the threshold
7  that we were talking about earlier,
8  correct?
9        A.  Yes, sir.
10       Q.  And then she has a question
11  for you.  That's what I want to ask you
12  about.  And I think that's you in the
13  middle of this page here, or middle of
14  this e-mail?
15       A.  Yes, sir.
16       Q.  "Kevin, do you know if there
17  is documentation on this somewhere that
18  the stores would have received so that
19  they are aware of the limitations and
20  know how to get resolved?  This store
21  does not seem to be aware of these
22  limitations."
23       Now, what's the answer to
24  that?  Is there documentation that the

Page 143

1  stores had about this threshold?
2        A.  Absolutely not.
3        Q.  And why not?
4        A.  Quite frankly, I wouldn't
5  want the stores to know about a
6  threshold.  That's our job as the
7  registrant to monitor.
8        Q.  Okay.  And if in fact they
9  knew what the thresholds were, how would
10  that change things?
11       MS. McENROE:  Objection to
12       form.
13       THE WITNESS:  It wouldn't in
14       my mind, because, again, we would
15       have to do the due diligence with
16       Janet running reports to validate
17       that our thresholds were
18       legitimate.
19  BY MR. SIMMER:
20       Q.  She goes on to say in this
21  next paragraph, "If the stores need these
22  limits lifted for any reason, they are to
23  have someone send an e-mail to Janet Hart
24  slash Kevin Mitchell with an

Page 144

1  explanation."
2        Do you see that?
3        A.  Yes, sir.
4        Q.  Is that an accurate
5  description of the process in terms of if
6  they -- if the order was over the
7  threshold, they were to get in touch with
8  you and Ms. Hart?
9        MS. McENROE:  Objection to
10       form.
11       THE WITNESS:  Typically what
12       would happen if a store was
13       ordering a certain number of units
14       and they weren't getting them,
15       they would typically make some
16       sort of noise, whether it was
17       calling pharmacy replenishment or
18       Janet to find out what could be
19       done to increase their limits.
20       What happened in those
21       conversations, I honestly could
22       not tell you.  But if for any
23       reason -- according to this last
24       line, if a store needs limits

Page 145

1       increased they would send an
2       e-mail to Janet.  I was typically
3       copied on there, so that I would
4       know what the distribution centers
5       were allowed to do or not.
6  BY MR. SIMMER:
7        Q.  So you were copied on it.
8  It's not that you were an actual
9  decisionmaker on that?
10       A.  Correct.  I was not driving
11  the change one way or the other.
12       Q.  So when you say that the
13  pharmacies would make some sort of noise.
14  What is it that you mean by some sort of
15  noise?
16       A.  Contacting either the
17  pharmacy replenishment team or Janet,
18  whoever they have a relationship with
19  that they would be able to get action.
20       Q.  Well, Ms. Mueller actually
21  is part of replenishment, right?
22       A.  That's correct.
23       Q.  So when she describes this,
24  she's describing a different process than

Page 146

1 you just described, right?
2     MS. McENROE: Objection to
3 form.
4     THE WITNESS: In that Pam
5 has no -- she has no jurisdiction
6 or no ability to increase
7 thresholds.
8     Her job is strictly to
9 replenish the stores' inventory.
10 BY MR. SIMMER:
11    Q. So if a store needed more
12 than it was allowed under the threshold
13 and they contacted replenishment, she
14 couldn't do anything about that, right?
15    A. That's correct. She should
16 not be able to do anything about that.
17    Q. And that the only area that
18 could make that -- or to approve that,
19 would be Janet Hart's government
20 relations department, right?
21    A. Yes, sir.
22    Q. And again, the term "need"
23 is used in that sentence. That's the
24 same thing that you had in that prior

Page 147

1 e-mail that we looked at earlier. Is
2 that a different usage of the term "need"
3 than what you had in your e-mail? Is it
4 the same understanding?
5     MS. McENROE: Objection to
6 form.
7 BY MR. SIMMER:
8    Q. I'll withdraw the question.
9 It's not a good question. Let's do that
10 again.
11     When she says "need" here,
12 do you have any reason to believe that
13 that's different than how you used it in
14 the earlier e-mail?
15     MS. McENROE: Objection to
16 form.
17     THE WITNESS: I don't think
18 it would be any different than how
19 I used it.
20 BY MR. SIMMER:
21    Q. Okay. And when she says
22 that they are to contact you and Janet
23 Hart with an explanation, do you know
24 what the explanation was supposed to be

Page 148

1 in order to get this increase?
2    A. I do not. Janet would have
3 to -- again, she would have to run
4 reports to validate historical sales
5 and -- you know, again, if there was
6 other information or other detail that
7 had to be provided, that would come from
8 Janet.
9    Q. Do you have an understanding
10 what type of explanations would have been
11 the kinds that would have been used to
12 justify an increase?
13    A. I do not.
14    Q. You've never seen any kind
15 of criteria or anything else that
16 described, you know, what would be a
17 valid explanation?
18     MS. McENROE: Objection.
19     THE WITNESS: I don't
20 recall.
21 BY MR. SIMMER:
22    Q. Were there -- did the
23 company have any standard operating
24 procedures in place about what would be a

Page 149

1 valid explanation for a threshold
2 increase?
3    A. I don't recall.
4    Q. Look at your e-mail, which
5 is the next one in the string, again
6 dated July 31, 2008.
7     A few minutes later, the
8 prior e-mail was at 9:24 a.m., and your
9 e-mail is at 9:28 a.m.
10     Do you see that?
11    A. Yes, sir.
12    Q. And let me read into the
13 record what -- in the body of your
14 e-mail.
15     "There are limits on all
16 controlled drugs. As I discussed with
17 Jerry on Tuesday, if a store has a
18 legitimate need and we can show where
19 their dispensed usage supports their
20 ordering, we can raise the limits."
21     Let me just stop there.
22     You say that, "As I
23 discussed with Jerry." Do you who -- do
24 you know who that is?

Page 150

1   A.   Jerry Paul.  Yes, sir.
2   Q.   And who is that?
3   A.   He is the -- when I was
4 there he was the senior director of
5 replenishment.
6   Q.   And where you say "if a
7 store has a legitimate need," tell us
8 what you meant by "legitimate need".
9   A.   Sales to support the orders.
10   Q.   So --
11   A.   If -- sorry.  So if their
12 inventory levels had gotten below a
13 certain point that, you know,
14 auto-replenishment would raise them back
15 to the levels that they're -- that they
16 should be at.
17     And as I understand that
18 program gets adjusted every ▮▮▮▮▮
▮ ▮ the auto-replenishment system.
20   Q.   And how is it adjusted every
21 ▮▮▮▮▮
22   A.   Based on sales.
23   Q.   So when you're talking about
24 legitimate need, it's simply there are

Page 151

1 sales to justify getting more than the
2 threshold would allow, right?
3     MS. McENROE:  Objection to
4   form.
5     THE WITNESS:  That's
6   correct.
7 BY MR. SIMMER:
8   Q.   And to be legitimate, simply
9 they had to have sales that would require
10 that they get additional controlled
11 substances beyond the threshold, right?
12     MS. McENROE:  Objection to
13   form.
14     THE WITNESS:  Above the
15   threshold, they would -- again,
16   Janet would have to determine that
17   there was a legitimate business
18   need for that to happen.
19   Otherwise, regardless of what's
20   ordered, that order is going to
21   get cut back.
22 BY MR. SIMMER:
23   Q.   Did the standard operating
24 procedures discuss what a legitimate

Page 152

1 business need was?
2   A.   I don't recall.
3   Q.   Did you have any idea how
4 Janet would undertake a determination of
5 what a legitimate business need was?
6   A.   I do not know.
7   Q.   So how is a legitimate need
8 different than simply a need?
9     MS. McENROE:  Objection to
10   form.
11     THE WITNESS:  There would
12   have to be a legitimate script
13   written by a doctor.
14 BY MR. SIMMER:
15   Q.   So do you mean the -- the
16 term "need" to be different than
17 legitimate need?
18   A.   In -- in my opinion, I think
19 legitimate is the right word because I
20 think we all know that there are some
21 doctors that don't necessarily write
22 scripts that are legitimate.
23   Q.   Would there be instances
24 as -- as a store had an illegitimate

Page 153

1 need, for example?
2   A.   I'm not aware of any.
3   Q.   For example, if the
4 prescription was for not a medically
5 appropriate purpose, would that be an
6 illegitimate need driving that particular
7 threshold increase?
8     MS. McENROE:  Objection to
9   form.
10     THE WITNESS:  Not for me to
11   determine.
12 BY MR. SIMMER:
13   Q.   But that is your language,
14 talking about legitimate need, right?
15     MS. McENROE:  Objection to
16   form.
17     THE WITNESS:  That's
18   correct.  I meant something
19   different by it than it's being
20   interpreted.
21 BY MR. SIMMER:
22   Q.   I'm just asking what you
23 meant by it.  I -- it's your
24 interpretation I care about, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1   A.   Well -- valid sales.
2   That's --
3   Q.   Okay.
4   A.   That's it.  Yes, sir.
5   Q.   So my question is, was the
6   concern here that there could be
7   illegitimate prescriptions and that would
8   mean that they shouldn't get that
9   threshold increase?
10      MS. McENROE:  Objection to
11      form.
12      THE WITNESS:  I would have
13      no way of knowing if it was
14      illegitimate or legitimate, the
15      script.
16  BY MR. SIMMER:
17      Q.   Am I right that the only way
18  to determine whether it was legitimate or
19  illegitimate was to actually get the
20  prescribing data?
21      MS. McENROE:  Objection to
22      form.
23      THE WITNESS:  I -- I really
24      don't have the knowledge to answer

Page 155

1      that.
2   BY MR. SIMMER:
3      Q.   You go on to say that "we
4   can show where their dispensed usage
5   supports their ordering."  What did you
6   mean by that?
7      A.   So that their sales would
8   mirror or come close to mirroring their
9   ordering patterns.
10     Q.   Simply looking for sales,
11  that would reflect their ordering
12  patterns, right?
13     A.   Yes, sir.
14     Q.   And so what's going on in
15  their sales, you have no way of knowing
16  whether those are -- are legitimate
17  prescriptions at all, would you?
18     MS. McENROE:  Objection to
19     form.
20     THE WITNESS:  That would be
21     correct.
22  BY MR. SIMMER:
23     Q.   So if there were
24  illegitimate prescriptions for example,

Page 156

1   your system wouldn't have any way to
2   detect that; isn't that fair?
3      MS. McENROE:  Objection to
4      form.
5      THE WITNESS:  That -- I
6      would think that would be correct.
7   BY MR. SIMMER:
8      Q.   So under your system, you're
9   simply looking at what the demand was,
10  right?
11     MS. McENROE:  Objection to
12     form.
13     THE WITNESS:  Yes, sir.
14  BY MR. SIMMER:
15     Q.   So if they had -- they had
16  demand or business that would increase
17  the sales, then you would be -- the --
18  the system would allow them to have a
19  threshold increase, right?
20     MS. McENROE:  Objection to
21     form.
22     THE WITNESS:  Again, that --
23     that would have to come from
24     Janet.

Page 157

1   BY MR. SIMMER:
2      Q.   But that's how the system
3   worked, right?
4      MS. McENROE:  Objection to
5      form.
6      THE WITNESS:  Janet would
7      have to tell you exactly how the
8      system worked, because honestly I
9      didn't do the legwork to make
10     those determinations.
11  BY MR. SIMMER:
12     Q.   Let's read on, the next
13  sentence where you say, "Janet's group is
14  running the reports for this store today
15  and we should be able to determine
16  whether or not their orders should be
17  increased past the current threshold,"
18  right?
19     A.   Yes, sir.
20     Q.   And that's what we were just
21  talking about, that Janet's group is the
22  one that actually ran the reports to
23  determine whether there was legitimate
24  need in order to increase the threshold,

Page 158

1 right?
2     A.   Yes, sir.
3     Q.   Have you seen those reports
4 before?
5     A.   I may have in time.  But
6 I -- I don't recall.
7     Q.   Do you have an understanding
8 what those reports included?
9     A.   I do not.
10    Q.   Did it simply include
11 whether there was a legitimate business
12 need, as you described it?
13        MS. McENROE:  Objection to
14    form.
15        THE WITNESS:  I do not know,
16    because I don't recall seeing
17    them.
18 BY MR. SIMMER:
19    Q.   Additional sales for
20 example, is that what it -- what it
21 required?
22        MS. McENROE:  Objection to
23    form.
24        THE WITNESS:  As I said, I

Page 159

1    don't recall.
2 BY MR. SIMMER:
3    Q.   Okay.  Look at the next
4 e-mail on the chain here, from Ms. Hart
5 that same day at 10:29 a.m.  Do you see
6 where I am?
7    A.   Yes, sir.
8    Q.   And you see where you're --
9 or this e-mail was sent to you from
10 Ms. Hart?
11    A.   Yes -- yes, sir.
12    Q.   And she's -- you see where
13 she says, "To all, from the distribution
14 side, it's extremely important to have a
15 series of checks and balances in place to
16 identify 'excessive orders' and/or
17 'suspicious orders.'"
18        Let me just stop right
19 there.  Is there a difference between an
20 excessive order and a suspicious order?
21        MS. McENROE:  Objection to
22    form.
23        THE WITNESS:  In my opinion,
24    yes.

Page 160

1 BY MR. SIMMER:
2    Q.   How do they differ?
3    A.   Excessive is just that, it's
4 excessive to the point that it's more
5 than -- more than historically the store
6 would order.
7        Suspicious would be
8 something out of the ordinary, not just
9 from a number, but maybe from a number
10 and a frequency.
11    Q.   Let me ask you.  So are all
12 excessive orders suspicious?
13        MS. McENROE:  Objection to
14    form.
15        THE WITNESS:  I do not think
16    so, no.
17 BY MR. SIMMER:
18    Q.   Are all excessive orders
19 potentially suspicious?
20        MS. McENROE:  Objection to
21    form.
22        THE WITNESS:  In my opinion,
23    no.
24 BY MR. SIMMER:

Page 161

1    Q.   Are all suspicious orders
2 potentially excessive?
3        MS. McENROE:  Objection to
4    form.
5        THE WITNESS:  I -- no.
6 BY MR. SIMMER:
7    Q.   Based on your work as senior
8 director supply chain regulatory
9 compliance, do you have any idea what the
10 correlation is between an excessive order
11 and a suspicious order?
12        MS. McENROE:  Objection to
13    form.
14        THE WITNESS:  I want to make
15    sure I understand your question.
16    So are you asking do I understand
17    the difference between the two?
18 BY MR. SIMMER:
19    Q.   I asked whether there is a
20 correlation between them.
21        MS. McENROE:  Objection to
22    form.
23        THE WITNESS:  There -- there
24    could be.

Page 162

BY MR. SIMMER:

Q. I'm not asking whether it could be.

So your system is identifying excessive orders, right?

A. It would --

MS. McENROE: Objection to form.

THE WITNESS: Our system would identify both.

BY MR. SIMMER:

Q. Okay. So if I -- if your system is identifying excessive orders beyond the threshold, right?

A. Yes, sir.

Q. I'm asking do you have any -- any idea how -- what the frequency is where that excessive order actually turned out to be a suspicious order?

MS. McENROE: Objection to form.

THE WITNESS: I don't recall any suspicious orders during my tenure with Rite Aid.

Page 163

BY MR. SIMMER:

Q. So the fact that you were identifying excessive orders has no correlation at all to there being any suspicious orders, right?

MS. McENROE: Objection to form.

THE WITNESS: I would agree.

BY MR. SIMMER:

Q. Because your system didn't identify any suspicious orders, right?

MS. McENROE: Objection to form.

THE WITNESS: Not that I recall.

BY MR. SIMMER:

Q. And what is your understanding how why identifying orders over 5,000 units per month would identify suspicious orders?

MS. McENROE: Objection to form.

THE WITNESS: Could you ask that again, please?

Page 164

BY MR. SIMMER:

Q. Sure.

Based on your experience as senior director supply chain regulatory compliance, do you have any understanding how identifying orders over 5,000 units per month would identify suspicious orders?

MS. McENROE: Objection to form.

THE WITNESS: I do not.

BY MR. SIMMER:

Q. Based on your experience as senior director of supply chain regulatory compliance, do you know what happened if Rite Aid identified an order as being excessive?

A. Yes, I do.

Q. What happened?

A. So, there was a policy in place, Rite Aid would actually contact -- the Rite Aid distribution center would contact the store and ask the store, hey, we got an order for 53 units, did you

Page 165

mean to order 53 units. Depending on what they said, again typically, I think we talked about this earlier, they would say, "No, I'm sorry, the order, it should be five," or, "It should be three."

They would make a note of that on a log. And then cut that order back to whatever the true amount was that was -- that should have been ordered.

Q. In the example, if -- if the order was being filled in the middle of the night, what would the overnight shift do at Perryman if an order came in that was over the threshold?

A. I think -- well, they did a couple things. First of all, you can't contact the store in the middle of the night. So sometimes I'm sure nothing was done. It may have just automatically been cut back. And then I'm sure there were probably times where they may have left a note for somebody on the dayshift that, hey, this happened at nightshift. If that order had not shipped already for

Page 166

1 the dayshift to contact somebody from the
2 store.
3         Again, all of that would be
4 my -- just my opinion based on -- I
5 wouldn't know when the order -- when it
6 left the building. But again, if it was
7 still in the building, they would have
8 the ability to call. Otherwise they
9 would just automatically cut it down to
10 the threshold before shipping.
11     Q.   So in the example where they
12 were cutting it back like that, they
13 would cut it back to simply the threshold
14 and then somebody else would follow up
15 later; is that right?
16     A.   That could happen, yes.
17     Q.   Or -- or it could also
18 happen that nobody ever called the
19 pharmacy to check about why the order
20 exceeded the threshold, right?
21     A.   That could be true as well.
22     Q.   So is it the case that the
23 part that was actually shipped was deemed
24 to have not been excessive, right?

Page 167

1         MS. McENROE: Objection to
2     form.
3         THE WITNESS: Based on the
4     thresholds, that would be correct.
5 BY MR. SIMMER:
6     Q.   Let me read on in Ms. Hart's
7 e-mail and ask you a few questions about
8 it.
9         In that first paragraph,
10 the -- the last sentence, do you see
11 where she says, "You may have read
12 articles about enormous fines certain
13 wholesalers have paid for shipping
14 excessive/suspicious orders."
15         Do you see that?
16     A.   Yes, sir.
17     Q.   Is that something you all
18 were talking about, about what was going
19 on in the industry with these -- these
20 enormous fines?
21         MS. McENROE: Objection to
22     form.
23         THE WITNESS: I don't
24     recall.

Page 168

1 BY MR. SIMMER:
2     Q.   So this isn't something you
3 recall having spoken about, that we need
4 to -- to make sure we have a series of
5 checks and balances in place to avoid
6 these kinds of enormous fines?
7     A.   I mean obviously I've known
8 about suspicious order monitoring and
9 excessive order monitoring my entire
10 tenure. So that's always been a goal of
11 ours, to make sure that we are compliant
12 and that we are doing things by the
13 letter of the law.
14     Q.   Look at the second
15 paragraph. Do you see where she says --
16 I'll read it into the record. "If there
17 is a store that exceeds the criteria that
18 the DC has established as 'excessive
19 order' for any controlled substance,
20 please forward to me immediately and I
21 can quickly" -- strike that -- "and I can
22 review quickly and authorize."
23         Do you see that?
24     A.   Yes, sir.

Page 169

1     Q.   Is that the process that
2 she's describing that you're familiar
3 with from your time working at the
4 company?
5     A.   Yes, sir.
6     Q.   So that if there was an
7 excessive order that came in for a
8 controlled substance, those went to
9 Janet's department for review and
10 approval?
11         MS. McENROE: Objection to
12     form.
13         THE WITNESS: Yes, sir.
14 BY MR. SIMMER:
15     Q.   And you see where she goes
16 on in the next sentence, "There is a
17 system in place to authorize the
18 increased threshold and to review the
19 authorization every six months for
20 compliance and continued usage."
21         Do you see that?
22     A.   Yes, sir.
23     Q.   So this was only reviewed
24 every six months; is that right?

Page 170

1    A.   I believe that to be true.
2    Q.   Let me read in the next
3 paragraph where she says, "The threshold
4 for Rite Aid Number 2389, based on
5 replenishment data, usage, and
6 verification of prescription dispensing
7 for hydrocodone 5/500 milligrams Number
8 500 may be increased to 20 bottles per
9 week."
10        Let me just stop there.
11        Can you just break down what
12 she said there?
13    A.   That based on the
14 replenishment data, usage and
15 verification of prescription dispensing,
16 hydrocodone has now been increased to 20
17 bottles per week.  So that now means the
18 distribution center can ship 20 bottles
19 per week.
20    Q.   So she's -- if I have it
21 right, she's approved the shipment over
22 the threshold, right?
23    A.   Yes, sir.
24    Q.   And what she's describing in

Page 171

1 that sentence is what she's reviewed in
2 order to make that decision to increase
3 the threshold, right?
4        MS. McENROE:  Objection to
5    form.
6        THE WITNESS:  That's how I
7    understand it, yes, sir.
8 BY MR. SIMMER:
9    Q.   So what she says she's done
10 is reviewed the replenishment data,
11 right?
12    A.   Yes, sir.
13    Q.   And what is the
14 replenishment data?
15    A.   I don't -- I don't know.
16 I'm assuming that's based off sales.
17    Q.   And where she says usage, do
18 you know what that would be?
19    A.   Again, the dispensing.
20    Q.   And verification of
21 prescription dispensing, do you see that
22 as well?
23    A.   Yes, sir.
24    Q.   Is that different than

Page 172

1 usage?
2        MS. McENROE:  Objection to
3    form.
4        THE WITNESS:  Usage is
5    probably not -- not the best word
6    to use.
7        I would have probably just
8    left it at replenishment data and
9    verification of prescription
10    dispensing.
11 BY MR. SIMMER:
12    Q.   So she seems to be
13 describing the fact that in order to make
14 this threshold increase determination,
15 she's looked at dispensing data, right?
16    A.   That's how I read it, that's
17 correct.
18    Q.   Let me read on.  She goes on
19 to say, "If their usage continues to
20 increase Rite Aid can raise the threshold
21 accordingly."
22        Do you see that?
23    A.   Yes, sir.
24    Q.   Again, that's consistent

Page 173

1 with your understanding of the process
2 that the company had in place, right?
3    A.   That's correct.
4    Q.   So just generally speaking,
5 what she's describing in this e-mail
6 appears to be the company's excessive
7 order monitoring program, right?
8        MS. McENROE:  Objection to
9    form.
10        THE WITNESS:  It's the
11    company threshold.
12 BY MR. SIMMER:
13    Q.   So the company had
14 thresholds in place?
15    A.   Yes.
16    Q.   If the pharmacy wanted more
17 than was allowed by the threshold, they
18 could request an increase, that went to
19 Janet Hart's department, government
20 relations.  They would do a review and
21 make a -- determine whether they can get
22 more than the thresholds allowed, right?
23        MS. McENROE:  Objection to
24    form.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    THE WITNESS:  Yes, that's
2  correct.
3  BY MR. SIMMER:
4    Q.   Is there anything else about
5  the suspicious order monitoring program
6  or excessive order monitoring program
7  that you understood happened beyond what
8  she's described here?
9    MS. McENROE:  Objection to
10  form.
11    THE WITNESS:  Not that I
12  recall.
13  BY MR. SIMMER:
14    Q.   So does the company use the
15  terms "excessive order monitoring
16  program" and "suspicious order monitoring
17  programs" to mean the same thing?
18    MS. McENROE:  Objection to
19  form.
20    THE WITNESS:  No, sir.
21  BY MR. SIMMER:
22    Q.   How are they different?
23    A.   Again, excessive, I think we
24  just talked about this a few moments ago.

Page 175

1  Excessive is just that, it's excessive
2  based on a normal pattern of ordering.
3  Suspicious would be something that's way
4  out of the ordinary.
5    Q.   So the excessive order
6  monitoring program really doesn't
7  identify suspicious orders at all, does
8  it?
9    MS. McENROE:  Objection to
10  form.
11    THE WITNESS:  It -- it
12  could.
13  BY MR. SIMMER:
14    Q.   But is that what its aim is,
15  is to identify suspicious orders?
16    MS. McENROE:  Objection to
17  form.
18    THE WITNESS:  I think our --
19  our responsibility is to remain
20  open-minded every day about
21  looking for suspicious and/or
22  excessive orders.
23  BY MR. SIMMER:
24    Q.   That wasn't my question.

Page 176

1  I'm asking whether the excessive order
2  monitoring program actually identifies
3  suspicious orders.  That -- was that its
4  aim?
5    MS. McENROE:  Objection to
6  form.
7    THE WITNESS:  No, it was
8  not.
9    MR. SIMMER:  Can we take our
10  lunch break?
11    THE VIDEOGRAPHER:  The time
12  is now 12:32 p.m.  We're going off
13  the record.
14    (Lunch break.)
15    THE VIDEOGRAPHER:  The time
16  is now 1:24 p.m.  We are back on
17  the record.
18  BY MR. SIMMER:
19    Q.   Sir, this morning you
20  discussed the fact that you and a group
21  of other individuals at internal
22  assurance in 2009 started what I think
23  you called a -- a CSA team, correct?
24    MS. McENROE:  Objection to

Page 177

1  form.
2    THE WITNESS:  Yes, sir.
3  BY MR. SIMMER:
4    Q.   And I think you said that
5  you developed a checklist of some kind
6  that you went out and used then to
7  conduct audits of the distribution
8  centers; is that correct?
9    A.   The teams conducted the
10  audits, correct, yes, sir.
11    Q.   Okay.  I'll hand you what
12  I'll identify for the record in a moment.
13  Just have you look at it.
14    (Document marked for
15  identification as Exhibit Rite Aid
16  Mitchell-7.)
17  BY MR. SIMMER:
18    Q.   This came out of the file,
19  your custodial file materials that the
20  company produced to us that was in one of
21  the documents that -- that they
22  identified as coming from your files.
23    I'll identify it for the
24  record as Rite_Aid_OMDL_0020535.

Page 178

1    It was produced natively,
2 which means, sir, that it was produced
3 electronically, so that all of the pages
4 in here have the same Bates number at the
5 bottom, because it was a spreadsheet.
6    If you just there's only one
7 area that I want to specifically ask you
8 about, but by all means look at the
9 entire document.  I'll direct your
10 attention to one page in specific in a
11 minute after you -- after you had a
12 chance to look at it.
13    A.   Okay.
14    Q.   Can you tell us what this
15 document is?
16    A.   This is the checklist that
17 the self-assessment teams used in
18 conducting audits at distribution
19 centers.
20    Q.   Is this the one that the CSA
21 team developed or is this something
22 different?
23    A.   This is the one that was
24 developed by the CSA team.

Page 179

1    Q.   And the purpose of this was
2 to audit the distribution centers for how
3 they were handling controlled substances,
4 correct?
5    MS. McENROE:  Objection to
6    form.
7    THE WITNESS:  Not just
8    controlled substances, but every
9    facet of the operation itself, to
10    include human resources,
11    transportation, et cetera.
12 BY MR. SIMMER:
13    Q.   Okay.  On the second page of
14 the exhibit, you see on the heading it
15 says "Rite Aid Corporation DC
16 Self-Assessment Program, Regulatory
17 Checklist Summary of Results"?
18    A.   Yes, sir.
19    Q.   And then there's a scoring
20 of some kind that is produced on that
21 page, right?
22    A.   Yes, sir.
23    Q.   Is that the scoring that I
24 asked you about that you said was put in

Page 180

1 place at some point in time?
2    A.   Yes, sir.
3    Q.   And am I right -- I think
4 from your testimony this morning, you
5 said that the scoring system was put in
6 place by your CSA team?
7    A.   By internal assurance, yes.
8    Q.   Oh, internal assurance put
9 the scoring system in place?
10    A.   Correct.
11    Q.   Okay.  Could I direct your
12 attention to the first page of this
13 spreadsheet.  And it's very small print.
14 I think we'll have --
15    MS. KEARNEY:  I'm going to
16    print out a copy.
17    MR. SIMMER:  He doesn't have
18    a copy of it?  Got it.
19 BY MR. SIMMER:
20    Q.   Well, on the first page of
21 this spreadsheet, and it has a grayscale
22 box at the top.
23    A.   Yes, sir.
24    Q.   Do you see where it says

Page 181

1 "Rite Aid Corporation DC Self-Assessment
2 Program regulatory checklist,
3 regulatory/inspector site visits, revised
4 August 2, 2010"?
5    Do you see that?
6    A.   Yes, sir.
7    Q.   And over on the right-hand
8 side, there's a fill-in place for
9 distribution center.  It says Perryman.
10 And am I right that that's an indication
11 of which distribution center was being
12 reviewed in this particular form, as you
13 see it?
14    A.   Yes, sir.  That's correct.
15    Q.   And it says that it's
16 completed by Mike Hertzke.
17    Do you know who that is?
18    A.   Yes, I do.
19    Q.   Who is that?
20    A.   Mike was the receiving
21 manager in Lancaster, California.
22    Q.   And did he work in the
23 insurance department that you talked
24 about earlier?

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    MS. McENROE:  Objection to
2  form.
3    THE WITNESS:  No, he did
4  not.
5  BY MR. SIMMER:
6    Q.   So what job did he hold?
7    A.   Receiving manager in
8  Lancaster, California.
9    Q.   So I think you talked about
10  this morning that in terms of how these
11  audits actually took place, you would not
12  audit your own distribution center, that
13  people were brought in from other
14  distribution centers to conduct the
15  audit; is that right?
16    A.   That's correct.
17    Q.   And is that what's going on
18  here, Mike was the one who did this audit
19  for Perryman?
20    A.   For the regulatory section,
21  it looks that way, yes, sir.
22    Q.   Okay.  And then it also says
23  a date, March 23rd, 2011.
24    Do you see that?

Page 183

1    A.   Yes, sir.
2    Q.   Do you have any
3  understanding of what that date is
4  showing?
5    A.   The date that the audit was
6  conducted by Mike at Perryman.  Yes, sir.
7    Q.   And then it lists two people
8  under sources below that.
9    Do you see that?
10    A.   I do.
11    Q.   And it says Norman Dunkinson
12  and Howard Johnson.  What is that
13  indicating?
14    A.   Norman is the -- or was the
15  general manager.  I don't know who Howard
16  Johnson is.
17    Q.   Is that some indication that
18  these are the two individuals from
19  Perryman that worked on the audit with
20  Mr. Hertzke?
21    A.   It looks as if they were
22  sources, so if he had questions, they
23  would be people he would ask questions
24  to.  But they were -- again, I don't know

Page 184

1  Howard, but Norman was the GM in
2  Perryman.
3    Q.   Let's just go back a minute.
4  You said there was this CSA team.  Where
5  did you get that title, CSA team, if you
6  know?
7    A.   It was certified
8  self-assessment, and it was developed by
9  the internal assurance group.  And I
10  think earlier when we talked about this
11  this morning, we thought Controlled
12  Substance Act came out, but it was
13  actually a certified self-assessment.
14    Q.   So as you said a moment ago,
15  it's not just about how they were
16  handling controlled substances, it's all
17  aspects of the work the distribution
18  centers were conducting, right?
19    A.   That's correct, sir.
20    Q.   So what specifically in this
21  certified self-assessment had to do with
22  controlled substances?
23    A.   The checklist that's here.
24    Q.   Okay.  Let me direct your

Page 185

1  attention to one item specifically.  And
2  I can't -- can we -- oh, yeah, it's -- in
3  the upper right-hand corner there are
4  little numbers.  Do you see where it says
5  A.08.02?
6    A.   Yes, sir.
7    Q.   And I think that's how each
8  page of the spreadsheet seems to be
9  organized in this document.  Would you
10  agree with me on that?
11    A.   Yes, sir.
12    Q.   Okay.  I want to direct your
13  attention to Line 48 of the document,
14  it's very small print.  So it might be
15  most helpful for the videographer to blow
16  up that red text there.  And then we
17  can -- and maybe your eyesight is better
18  than mine.  But I think I'm going to wait
19  for him to pull it up on the screen so I
20  can see it.
21    Are you with me, on Line 48?
22    A.   I am.  Yes, sir.
23    MS. McENROE:  Can you read
24  it?

Page 186

BY MR. SIMMER:

Q.   Your eyes are better than mine.

A.   Well, it's only because I have help.

MS. McENROE:  The witness is holding up his reading glasses.

BY MR. SIMMER:

Q.   Let me read what it says in Line 48 and ask you a few questions about it, if I could.

A.   Yes.

Q.   Do you see where it says, "Does the registrant review the 24-hour logs sent by the cross-dock DCs on a regular (sic) basis and report violations to the director of regulatory compliance and to the DEA?"

Do you see that?

A.   Yes, sir.

Q.   She corrected me.

MR. SIMMER:  What did I say?

MS. KEARNEY:  You said regular basis.

Page 187

BY MR. SIMMER:

Q.   I said regular basis.  I meant -- excuse me.  It should say "daily basis."

With that correction, did I read it otherwise correctly?

A.   Yes, sir, you did.

Q.   Okay.  What is this talking about here?

A.   There is a -- prior to -- prior to me starting with Rite Aid, there was a memorandum of understanding put in place with government affairs, specifically Jim Krahulec and DEA.

So that MOU, as I remember, basically stated that Rite Aid distribution centers that used to hold a DEA registration could give up those registrations in lieu of the MOU, meaning they would now become a freight forwarding facility.

And what DEA agreed to do is give Rite Aid permission to ship all pharmaceuticals -- all pharmaceuticals,

Page 188

to include controlled substances, into a cross-dock freight forwarding DC, put in a caged area.  Had very specific security guidelines that had to be followed, et cetera.

And those drugs had 24 hours to leave the facility and be delivered to a store.

Q.   There's a lot in that answer that I don't understand.  So you're going to have to go back and help me.

A.   Okay.

Q.   So what is the individual's name at the DEA?  You said Jim?

A.   Jim Krahulec was actually the vice president of government affairs for Rite Aid Corporation.

Q.   Okay.  And how do you spell his last name?

A.   K-R-A-H-U-L-E-C.

Q.   And do you know when this MOU was entered into with the DEA?

A.   I believe it was 1999.

Q.   So a year prior to your

Page 189

joining the company?

A.   Yes, sir.

Q.   And do you know what the subject of the MOU was that the company entered into with the DEA?

A.   I believe it was called cross-dock facilities.

Q.   And what is a cross-dock facility?

A.   It basically -- again, it allowed Rite Aid of West Virginia or Poca, West Virginia; Pontiac, Michigan; Rome, New York, as a few examples, back in the day, prior to my arrival distributed pharmaceuticals.

They gave up their license with DEA to no longer distribute, but to now become a cross-dock facility, so that Perryman or Woodland, California could distribute all pharmaceuticals into those locations with the understanding they could only stay 24 hours or less and had to be under security the entire time.

Q.   So again, I'm just trying to

Page 190

1 get the terminology. A cross-dock
2 facility is a what? What is that?
3     A.   It's basically a freight
4 forwarding facility. Or, if you use
5 FedEx or UPS, it's like a hub.
6     Q.   And this line 48 talks about
7 a 24-hour log. What is that?
8     A.   That's the 24-hour rule that
9 Rite Aid entered into with DEA.
10     So we logged time that the
11 product arrived at the facility and time
12 that the last shipment left the facility
13 to ensure that we were meeting the spirit
14 of the MOU.
15     THE COURT REPORTER:  Spirit
16   of the what?
17     THE WITNESS:  Memorandum of
18   understanding. I'm sorry.
19 BY MR. SIMMER:
20     Q.   And so this checklist
21 included -- this is one of the criteria
22 that distribution centers were evaluated
23 on, right?
24     A.   That's correct. Being that

Page 191

1 Perryman is the registrant, it's
2 imperative that the DCs that fall under
3 the MOU are compliant. Because at the
4 end of the day Perryman would be the one
5 that would have to answer to DEA.
6     Q.   Okay. So anything in this
7 particular item on the checklist have to
8 do with the suspicious order monitoring
9 program?
10     MS. McENROE:  Objection to
11   form.
12     THE WITNESS:  This one would
13   not, no, sir.
14 BY MR. SIMMER:
15     Q.   Did it have anything to do
16 with the excessive order monitoring
17 program?
18     A.   This would not, no, sir.
19     Q.   Is there any item on this
20 checklist that you could identify that
21 had to do with the suspicious order
22 monitoring program?
23     MS. McENROE:  Objection to
24   form.

Page 192

1     THE WITNESS:  If I could
2   just have a moment to review the
3   checklists.
4     To answer your question, I
5   see in Question Number 15 on
6   A.08.02 does not specifically
7   mention a suspicious order
8   monitoring. But it does mention
9   the excessive order monitoring
10   procedure.
11     MR. SIMMER:  Can we pull
12   that up on the screen?
13 BY MR. SIMMER:
14     Q.   So one of the criteria they
15 were looking for on Line 15 says, "Is
16 there a written excessive order
17 monitoring procedure?"
18     That -- that's one of the
19 items that you and the CSA team put in
20 this -- this checklist, right?
21     A.   Correct.
22     Q.   And this doesn't say
23 suspicious order monitoring, it says
24 excessive order monitoring, right?

Page 193

1     MS. McENROE:  Objection to
2   form.
3     THE WITNESS:  Yes, sir.
4 BY MR. SIMMER:
5     Q.   And then Line 16, do you see
6 where it says, "Is an ARCOS file kept
7 capturing all RC 80, 87 and 007
8 adjustments to C3A controlled drugs?"
9     Do you see that?
10     A.   Yes, sir.
11     Q.   And what is that in
12 reference to?
13     A.   Any adjustments that would
14 be made to a controlled substance order.
15     Q.   What is an example of some
16 adjustments that would be identified
17 here?
18     A.   So for example cutting an
19 order back could be a reason code used
20 for an adjustment.
21     Q.   Okay. And look at Line 17.
22 Do you see where it says, "If a threshold
23 is ever adjusted, is documentation
24 available to support the change?"

Page 194

1    Do you see that?
2    A.   Yes, sir, I do.
3    Q.   And what would that include?
4    A.   The documents that Janet
5  Hart would have provided to the DCs any
6  time a change would be made to the
7  current threshold.
8    Q.   And that's something I think
9  we talked about earlier, looking at some
10 other exhibits, what the government
11 relations people would do, creating
12 paperwork to explain the -- any
13 adjustment, or any adjustments over the
14 threshold, right?
15   A.   Yes, sir.
16   Q.   Okay.  Look at Line 18 if
17 you would.  "Verify that the controlled
18 drug procedure is known and available."
19   What is that in reference
20 to?
21   A.   That's in reference to
22 making sure that the controlled drug
23 procedure is available and that people
24 understand what the controlled drug

Page 195

1  procedure entails.
2    Q.   What is that procedure?
3    A.   I want to make sure I
4  understand your question.
5    Q.   The reference is a
6  controlled drug procedure.  I'm just
7  trying to understand, what -- what are we
8  talking about?
9    A.   The procedure on how to
10 handle controlled substances within the
11 Perryman -- within any pharmaceutical
12 distribution center.
13   Q.   Is that in reference to the
14 threshold?
15   MS. McENROE:  Objection to
16   form.
17   THE WITNESS:  It would
18   include the threshold, or it would
19   include, I'm sorry, the excessive
20   order monitoring and suspicious
21   order monitoring.
22 BY MR. SIMMER:
23   Q.   So in -- in Column C, right
24 after that, it has ADM-10.  Do you know

Page 196

1  what that's in reference to?
2    A.   If I'm not mistaken -- I
3  know early on we spoke about a blue
4  binder, a blue distribution binder.
5  ADM-10, as I recall, was the procedure.
6    Q.   Could I direct your
7  attention to two pages later at A.08.04.
8  And I think the numbering starts over
9  again, so I think it's a little
10 confusing.
11   Here we go.  So look at the
12 bottom of the page, line -- Lines 13 and
13 14 if you would.  13 and 14, there we go.
14   Do you see under Line 13
15 where it says, "Are the appropriate
16 inventory controls in place to detect and
17 document any theft, counterfeiting or
18 diversion of drugs or devices?"
19   Do you see that?
20   A.   Yes, sir.
21   Q.   Do you know what was done to
22 actually audit for that particular item?
23   A.   I do not recall.
24   Q.   So when it says controls in

Page 197

1  place, what are -- what are the types of
2  controls in place that that's in
3  reference to?
4    A.   If -- you know, again, I
5  would just want to preface that I don't
6  remember exactly what the audit team
7  would have done.  But I would -- I would
8  be looking for inventory adjustments
9  along with potentially a 106 if there
10 were true theft identified in this.
11   Q.   When it says in reference to
12 diversion though, it -- what type of
13 diversion are we looking for there?
14   MS. McENROE:  Objection to
15   form.
16   THE WITNESS:  I would say
17   we're looking for any kind of
18   diversion, anything that's again
19   out of the norm.
20 BY MR. SIMMER:
21   Q.   Not just theft from the
22 distribution center, but any kind of
23 diversion diverting a drug to an
24 inappropriate use, right?

Page 198

1    MS. McENROE: Objection to
2    form.
3    THE WITNESS: Or -- that
4    could be true.  It could be in a
5    different department it shouldn't
6    be in.  It could be just as simple
7    as that.  Just a lack of control.
8    BY MR. SIMMER:
9    Q.   Do you know how the -- the
10   audit team reviewed this particular audit
11   finding or element to make a decision
12   whether the -- the distribution center
13   was in compliance or not?
14   MS. McENROE: Objection to
15   form.
16   THE WITNESS: I would assume
17   that they did a controlled drug
18   accountability on the items to
19   ensure that those numbers
20   balanced, which would show proper
21   control over receipts, sales, the
22   whole gamut.
23   BY MR. SIMMER:
24   Q.   Is that actually looking

Page 199

1    then at shipments to, you know, that --
2    that Perryman was making to determine
3    whether there was any diversion --
4    evidence of diversion there?
5    A.   Yes --
6    MS. McENROE: Objection to
7    form.
8    THE WITNESS: Yes, sir.  It
9    would -- it would look at a couple
10   things.  So it would look at your
11   on-hand inventory at the
12   distribution center.  It would
13   look at your inbound receipts
14   coming from the manufacturers
15   and/or McKesson in this case.
16   And it would also look at
17   our outbound shipments.
18   So once you do the math, you
19   know, add your inbound to your
20   existing minus your sales, you
21   should have an on-hand inventory.
22   And if that on-hand
23   inventory is truly what the system
24   says it is, then we show that

Page 200

1    we've got proper controls and
2    there's been no diversion.
3    BY MR. SIMMER:
4    Q.   So in that particular
5    example, we're just counting numbers,
6    we're not actually digging into the
7    orders themselves to determine whether
8    there was any inappropriate order
9    included, right?
10   MS. McENROE: Objection to
11   form.
12   THE WITNESS: That would
13   have done prior to any shipments
14   being made.
15   BY MR. SIMMER:
16   Q.   By whom?
17   A.   By the pharmacy department.
18   Q.   But not -- at -- out of the
19   Perryman center, they would not -- or
20   distribution center.  They would not be
21   looking at whether the orders themselves
22   were appropriate, right?
23   MS. McENROE: Objection to
24   form.

Page 201

1    THE WITNESS: The Perryman
2    facility, those folks would be
3    looking.
4    The -- the CSA audit team,
5    if -- if that's what you're
6    asking, they would not know that.
7    BY MR. SIMMER:
8    Q.   So what did the Perryman
9    facility folks do to determine whether
10   the orders were appropriate?
11   MS. McENROE: Objection to
12   form.
13   THE WITNESS: There -- in
14   the excessive order monitoring
15   program, they -- they have a
16   checklist internally that they
17   would use to identify what -- what
18   was quantities and what -- what
19   was the NDC of the items coming
20   in.  They would then review that.
21   And there were things even less
22   than the threshold that could look
23   excessive to them.  So if -- you
24   know, if my store typically orders

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 two of something each week, which
2 is well below the threshold, if
3 they all of a sudden order seven,
4 because you have the same people
5 picking orders day in and day out,
6 that looks excessive.
7 BY MR. SIMMER:
8 Q. So you're just looking at
9 excessive orders, not suspicious orders?
10 A. Well --
11 MS. McENROE: Did you finish
12 your answer?
13 THE WITNESS: Yes and no.
14 There -- there -- I want
15 to -- I want to kind of correct
16 what I said earlier today too, if
17 I -- if I may.
18 BY MR. SIMMER:
19 Q. No, there's not a question
20 pending on that, so --
21 A. Okay. So I'll move on.
22 Could you please repeat your
23 question again.
24 Q. So my question is, this

Page 203

1 process you've talked about, where the
2 Perryman folks would have looked at this,
3 they are identifying excessive orders,
4 not suspicious orders, right?
5 MS. McENROE: Objection to
6 form.
7 THE WITNESS: Excessive
8 orders could turn into suspicious
9 orders.
10 BY MR. SIMMER:
11 Q. But they are only really
12 looking at the total number of count of
13 orders relative to a prior period, right?
14 MS. McENROE: Objection to
15 form.
16 THE WITNESS: It's probably
17 better that one of them answer
18 that than me.
19 My understanding is that
20 they are looking at anything that
21 just looks abnormal. Again, it
22 could be small in size, it could
23 be large in size.
24 They would then question it.

Page 204

1 So again, if one store always
2 orders two of a specific item, and
3 all of the sudden they're ordering
4 anything greater than that, they
5 would then -- that would be kind
6 of an eye opener to them.
7 They would then in turn call
8 the store, verify if you really
9 truly needed that seven or if that
10 order should be cut back to two.
11 And they have logs that they keep
12 in the control drug cage that
13 annotate every -- every call they
14 made, who they spoke to, what the
15 outcome of the call was, and if
16 that order was in turn reduced or
17 not.
18 BY MR. SIMMER:
19 Q. And you had nothing to do
20 with that process that you've described,
21 right?
22 MS. McENROE: Objection to
23 form.
24 THE WITNESS: That's

Page 205

1 correct. I worked at the
2 corporate headquarters. I did not
3 work at the DC.
4 BY MR. SIMMER:
5 Q. So when you talked about
6 your understanding, you're just
7 speculating, aren't you?
8 MS. McENROE: Objection.
9 BY MR. SIMMER:
10 Q. What they actually did,
11 right?
12 MS. McENROE: Objection to
13 form.
14 THE WITNESS: No. During
15 audits, I've actually seen it
16 happen. I've witnessed it.
17 BY MR. SIMMER:
18 Q. Tell us when -- what times
19 you recall having witnessed that
20 occurring.
21 A. I can't give you specific
22 timelines, but during my 11 and a half
23 years of employment there.
24 Q. But you can't tell us

Page 206

1 specifically what happened?
2　　　　MS. McENROE:  Objection to
3　　form.  Asked and answered.
4　　　　THE WITNESS:  No.  That's
5　　19 years ago to seven years ago, I
6　　don't recall a specific date.
7 BY MR. SIMMER:
8　　Q.　So did you actually
9 participate ever on any of these calls
10 that the distribution center made to a
11 pharmacy to call -- to question whether
12 the order was suspicious or not?
13　　A.　Did I participate?  No, I
14 did not.
15　　Q.　So in the Perryman center --
16 let me have -- see if I get this right.
17 It was the order picker that would flag
18 whether it was a potentially suspicious
19 order; is that right?
20　　　　MS. McENROE:  Objection to
21　　form.
22　　　　THE WITNESS:  That is
23　　correct.
24 BY MR. SIMMER:

Page 207

1　　Q.　And that is what your
2 understanding is?
3　　A.　That is correct.
4　　Q.　And the order picker would
5 use what criteria to decide whether an
6 order was suspicious or not?
7　　　　MS. McENROE:  Objection to
8　　form.
9　　　　THE WITNESS:  They --
10　　experience from daily picking the
11　　same stores' orders over and over.
12　　They would be able to
13　　identify something that looked
14　　excessive and/or suspicious.
15 BY MR. SIMMER:
16　　Q.　And that's subjective,
17 right?
18　　　　MS. McENROE:  Objection to
19　　form.
20　　　　THE WITNESS:  It could be.
21　　But again, based on their
22　　experience, they felt that it
23　　looked outside of the norm.
24 BY MR. SIMMER:

Page 208

1　　Q.　So were there any objective
2 criteria used by the order picker in
3 order to determine whether an order was
4 suspicious or not?
5　　　　MS. McENROE:  Objection to
6　　form.
7　　　　THE WITNESS:  Correct.
8 BY MR. SIMMER:
9　　Q.　I didn't ask a yes-or-no
10 question.  I said were there any
11 objective criteria used by the order
12 picker to determine whether it was
13 suspicious or not?
14　　　　MS. McENROE:  Objection to
15　　form.
16　　　　THE WITNESS:  Again, their
17　　experience.
18 BY MR. SIMMER:
19　　Q.　Were there any SOPs in place
20 that the company used to determine
21 whether an order was suspicious or not?
22　　　　MS. McENROE:  Objection to
23　　form.
24　　　　THE WITNESS:  The company

Page 209

1　　did have SOPs for suspicious order
2　　monitoring.
3 BY MR. SIMMER:
4　　Q.　And what were the criteria
5 used to determine whether an order was
6 suspicious or not from those SOPs?
7　　A.　I don't recall.
8　　Q.　But I think what you're
9 talking about, isn't it, that the pickers
10 would use their experience, right?
11　　A.　They would.
12　　Q.　Is it your testimony that
13 the order pickers were trained to
14 identify what they believe to be
15 suspicious orders?
16　　A.　Yes.
17　　Q.　Who did that training?
18　　A.　The pharmacy department team
19 at the DCs.
20　　Q.　And did they have training
21 materials they used for that training to
22 train the order pickers to determine what
23 was suspicious?
24　　A.　They had training materials

Page 210

1 and signoffs from each associate that was
2 trained.
3    Q.   And what were the training
4 materials they used for this training?
5       MS. McENROE:  Objection to
6    form.
7       THE WITNESS:  That, I cannot
8    answer.  I don't know.
9 BY MR. SIMMER:
10   Q.   Who prepared the training
11 materials?
12   A.   The DC.
13   Q.   You had nothing to do with
14 it?
15   A.   I did not.
16   Q.   Okay.  Were these pickers
17 evaluated on how accurate they were in
18 determining whether orders were
19 suspicious or not?
20       MS. McENROE:  Objection to
21    form.
22       THE WITNESS:  That, I do not
23    know.
24 BY MR. SIMMER:

Page 211

1    Q.   Do you know whether they
2 received any kind of bonuses or -- in
3 their -- in their evaluations related to
4 their accuracy of identifying suspicious
5 orders?
6       MS. McENROE:  Objection to
7    form.
8       THE WITNESS:  That, I do not
9    know.
10 BY MR. SIMMER:
11   Q.   Do you know whether any
12 order pickers were ever fired for not
13 adequately identifying suspicious orders?
14       MS. McENROE:  Objection to
15    form.
16       THE WITNESS:  I do not know.
17 BY MR. SIMMER:
18   Q.   Do you know if any part of
19 their evaluation whatsoever evaluated the
20 accuracy of their picking suspicious
21 orders?
22       MS. McENROE:  Objection to
23    form.
24       THE WITNESS:  I do not know.

Page 212

1 BY MR. SIMMER:
2    Q.   Did anybody ever audit the
3 accuracy of their picking suspicious
4 orders?
5       MS. McENROE:  Objection to
6    form.
7       THE WITNESS:  I do not know.
8 BY MR. SIMMER:
9    Q.   Yet, this is one of the
10 things that you and the CSA team did, is
11 put together that checklist?  You didn't
12 put anything in your checklist that
13 mandated that the Perryman center and the
14 Woodland center was to be audited for the
15 accuracy of the pickers in identifying
16 suspicious orders; isn't that right?
17       MS. McENROE:  Objection to
18    form.
19       THE WITNESS:  We
20    identified -- what we required was
21    that there be an excessive order
22    and/or suspicious order monitoring
23    program and that it was being
24    used.

Page 213

1       And based on the results and
2    the documents from the DCs, it was
3    being used.  It was being used
4    very effectively.  And DEA as well
5    commented on just how good and
6    solid that program was.
7       MR. SIMMER:  Move to strike
8    everything after "monitoring
9    program and that it was being
10    used."  Everything after that is
11    nonresponsive to the question.
12       MS. McENROE:  For the
13    purposes of the record, Rite Aid
14    disagrees.  And we can fight it
15    out at the time of the trial.  But
16    that you don't like the witness's
17    answer is not a basis to move to
18    strike.
19       MR. SIMMER:  You know what?
20    I can make any objection I want
21    just like you can.
22       MS. McENROE:  And I can --
23       MR. SIMMER:  And you can
24    take it to the judge if you'd

Page 214

1  like.
2      MS. McENROE:  Yep.  I can
3  preserve it for the record.  I
4  said at the time of trial we can
5  deal with it.
6      MR. SIMMER:  That's fine.
7  BY MR. SIMMER:
8      Q.   Sir, is there anywhere in
9  this document that you and the CSA team
10  created the use of the word "suspicious"
11  anywhere?
12      MS. McENROE:  Objection to
13  form.
14      THE WITNESS:  I did not see
15  that in the document, no.
16  BY MR. SIMMER:
17      Q.   And in fact, the -- on the
18  items that we just looked at, the four,
19  five, six items that we looked at, they
20  talk about excessive orders, don't they?
21      A.   Yes, they did.
22      Q.   They don't talk about
23  suspicious orders, do they, anywhere in
24  this document?

Page 215

1      A.   Specifically, I did not see
2  it, no.
3      Q.   So when you talked about in
4  your answer previously that you would --
5  they were looking for excessive and/or
6  suspicious orders, it's just excessive
7  orders, isn't it?
8      MS. McENROE:  Objection to
9  form.
10      THE WITNESS:  It depends on
11  how you interpret it.  But as it's
12  written, yes.
13  BY MR. SIMMER:
14      Q.   Well, the words are the
15  words used in the document that you and
16  the CSA team created, right?
17      MS. McENROE:  Objection to
18  form.
19      THE WITNESS:  That's
20  correct.
21  BY MR. SIMMER:
22      Q.   So if you wanted to evaluate
23  these two distribution centers for
24  whether they had a suspicious order

Page 216

1  monitoring program in place, you would
2  have put that in these criteria for the
3  audit, wouldn't you?
4      MS. McENROE:  Objection to
5  form.
6      THE WITNESS:  I would
7  assume, yes.
8  BY MR. SIMMER:
9      Q.   But you didn't.  You only
10  talk about excessive orders in this
11  document; isn't that right?
12      MS. McENROE:  Objection to
13  form.
14      THE WITNESS:  For this
15  specific document, yes.
16  BY MR. SIMMER:
17      Q.   Well, did it ever change
18  during the time that you worked at the
19  company, that actually was one of the
20  criteria that was looked at, is whether
21  they had -- they were actually doing
22  suspicious order monitoring?
23      MS. McENROE:  Objection to
24  form.

Page 217

1      THE WITNESS:  That may not
2  have been part of this specific
3  program, but it was part of my
4  self-assessment, or my audits that
5  I conducted independently of the
6  CSA team.
7  BY MR. SIMMER:
8      Q.   And you put that in writing
9  someplace?
10      A.   Oh, there's certainly
11  checklists out there, yes.
12      Q.   And that referred to
13  suspicious order monitoring program,
14  right?
15      A.   Yes, yes.
16      Q.   And where would we find that
17  document?
18      A.   It -- it should be in my
19  documents that I had when I was with the
20  company.
21      (Document marked for
22  identification as Exhibit Rite Aid
23  Mitchell-8.)
24  BY MR. SIMMER:

Page 218

1 Q. I'm going to hand you what
2 we marked as Exhibit 8. I'll identify it
3 for the record as an e-mail chain. It's
4 a two-page document, and it's Bates range
5 Rite_Aid_OMDL_0016204 to 0016205.
6 Could I direct your
7 attention to the last e-mail on this
8 string. It's to Robert Hensley from you
9 dated October 10th, 2007.
10 Do you see where I'm
11 looking?
12 A. Sorry. I don't have that.
13 Q. Last e-mail on the string.
14 Not the first e-mail. Not -- the top of
15 the page here, Robert Hensley. Do you
16 see that? First page. Do you see that?
17 A. Oh right. Yes.
18 Q. Okay. And do you see the
19 date on there, October 10, 2007?
20 A. Yes, sir.
21 Q. And you see the subject
22 line, control cage procedures, do you see
23 that?
24 A. Yes, sir.

Page 219

1 Q. And then below that there's
2 a list of attachments to this. Do you
3 see that?
4 A. Yes, sir.
5 Q. And just generally as you
6 look at that list, any idea what that
7 list is that you're including in your
8 e-mail to Mr. Hensley?
9 A. It looks like documents that
10 Perryman had put in place. And again,
11 this goes back during around the time
12 that Rite Aid acquired the Brooks Eckerd
13 DCs, and Bob Hensley was with the
14 Charlotte, North Carolina, distribution
15 center.
16 MS. McENROE: And for the
17 record, Exhibit 8 is just the
18 e-mail chain without exhibits?
19 MR. SIMMER: That's right.
20 MS. McENROE: Yes.
21 BY MR. SIMMER:
22 Q. All right. So how is it
23 relevant that this happened during the
24 time period between the Brooks Eckerd

Page 220

1 acquisition?
2 A. Again, it kind of goes back
3 to what we were talking about earlier
4 today with -- with trying to normalize
5 all pharmacy distribution centers to make
6 sure that there was consistency in
7 policies, procedures and just how they
8 operated business.
9 Q. And who is Mr. Hensley?
10 A. Bob was the pharmacy manager
11 in Charlotte.
12 Q. And is he someone that came
13 over with the Brooks Eckerd acquisition?
14 A. Yes, sir, he is.
15 Q. And so are you sending
16 him -- as I understand it then, you are
17 sending him this information to inform
18 him of the procedures that Rite Aid had
19 in place that would impact him?
20 A. These were recommendations
21 or procedures that he should put in place
22 for Charlotte to ensure that there was
23 consistency in our administration of
24 policy.

Page 221

1 Q. So he was a pharmacy manager
2 in Charlotte. Is that a distribution
3 center?
4 A. It was.
5 Q. Okay. So that was his
6 title, pharmacy manager at the Charlotte
7 distribution center?
8 A. Pharmacy department manager,
9 yes, sir.
10 Q. Okay.
11 (Document marked for
12 identification as Exhibit Rite Aid
13 Mitchell-9.)
14 BY MR. SIMMER:
15 Q. I'll hand you what we've
16 marked as Mitchell Exhibit 9. And what
17 we did, just to make this a cleaner
18 record, we just took two of the exhibits
19 here and what we're going to show you and
20 not every one of them, these procedures
21 that were attached to your e-mail. This
22 one is entitled, as you see, Control Drug
23 Above Average Order Monitoring Program.
24 Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    A.   I do.
2    Q.   I'll identify it for the
3  record as Rite_Aid_OMDL_0016253 through
4  0016255.
5         Take a moment to look at
6  that if you would.
7    A.   Yes, sir.  Okay.
8    Q.   Are you familiar with this
9  document?
10    A.   I -- I have seen it, yes,
11  sir.
12    Q.   Okay.  And this one does not
13  talk about excessive order monitoring
14  program, it calls it an above average
15  order monitoring program.  Is there a
16  difference?
17    A.   I think they were understood
18  to be one and the same.
19    Q.   Who created this document,
20  if you know, or this -- this program?
21         MS. McENROE:  Objection to
22    form.
23         THE WITNESS:  The document
24  I -- I don't know.  The program

Page 223

1    was in place when I started with
2    Rite Aid.
3  BY MR. SIMMER:
4    Q.   Did this program change
5  while you were at Rite Aid?
6    A.   I -- I don't think the
7  program changed.  The -- the only thing
8  that could have potentially changed would
9  have been the -- the thresholds.
10    Q.   Do you see under this, "The
11  person who picks a controlled drug order
12  is responsible for alerting the
13  supervisor on duty of unusually high
14  order quantities."
15         Do you see that?
16    A.   Yes, sir.
17    Q.   And I understand that what
18  this is, is basically a description of
19  what's in this above average order
20  monitoring program, correct?
21         MS. McENROE:  Objection to
22    form.
23         THE WITNESS:  Yes, sir.
24  BY MR. SIMMER:

Page 224

1    Q.   Okay.  Now just to clarify
2  for the record.  Was there another
3  program in place to identify suspicious
4  orders?
5         MS. McENROE:  Objection to
6    form.
7         THE WITNESS:  I don't
8    recall.
9  BY MR. SIMMER:
10    Q.   So in terms of what we're
11  talking about here, this just identifies
12  an unusually high order; is that right?
13         MS. McENROE:  Objection to
14    form.
15         THE WITNESS:  That's
16    correct.
17  BY MR. SIMMER:
18    Q.   So when we talked earlier,
19  you said that the -- those who
20  were doing the order picks, they would
21  use their judgment to identify if there
22  was a suspicious order, there wasn't a
23  program in place, except for this program
24  identifying unusually high orders, am I

Page 225

1  right?
2         MS. McENROE:  Objection to
3    form.
4         THE WITNESS:  I would
5    disagree with that.  Because if --
6    if that were true, then the
7    excessive order monitoring logs
8    that they did have would have only
9    been based off thresholds, they
10    wouldn't be based off just -- you
11    know, they -- they would have --
12    they'd have other information
13    other than anything that was
14    higher.
15         Because the document is
16    talking about if Pick-to-Light
17    indicates quantities greater than
18    50 or 10 or 5, that the picks
19    automatically stopped.  Because
20    of, as we were talking about
21    earlier with using their judgment,
22    there were oftentimes that the
23    pick was stopped if they
24    identified 7 that just didn't seem

Page 226

1 right.
2 BY MR. SIMMER:
3    Q.  But the program itself --
4 we're looking at this document.  The
5 program itself only asked those doing the
6 picking to identify unusually high
7 orders, right?
8        MS. McENROE:  Objection to
9      form.
10        THE WITNESS:  That's what
11      this document says.
12 BY MR. SIMMER:
13    Q.  And I asked you a moment
14 ago, and I just want to reiterate.  There
15 was no written policy for anything to
16 identify suspicious orders, was there?
17        MS. McENROE:  Objection.
18        THE WITNESS:  There were
19      plenty of other written policies
20      that superseded or in conjunction
21      with this.  So there are other
22      policies within Rite Aid that do
23      address suspicious orders.
24 BY MR. SIMMER:

Page 227

1    Q.  A moment ago I asked you
2 this question:  "Now just to clarify for
3 the record, was there another program in
4 place to identify suspicious orders?"
5      Your answer, "I don't
6 recall."
7      Which is it?  Was there
8 other programs to identify suspicious
9 orders or not?
10        MS. McENROE:  Objection to
11      form.
12 BY MR. SIMMER:
13    Q.  Because your -- your answer
14 you just gave contradicts that.
15    A.  My -- the answer I just gave
16 was talking about a policy.
17      So was there a process?
18 Again, the excessive order monitoring,
19 above average monitoring, suspicious
20 order monitoring, you know, in my mind
21 that's how you -- that's how you would
22 identify any of these.
23    Q.  But there was no written
24 policy, am I right, to identify

Page 228

1 suspicious orders?
2        MS. McENROE:  Objection to
3      form.
4        THE WITNESS:  There is a
5      written policy.
6      This is a training document.
7 BY MR. SIMMER:
8    Q.  Was there any written
9 training document, whatever you want to
10 call it, to identify suspicious orders?
11        MS. McENROE:  Objection to
12      form.
13        THE WITNESS:  That I do not
14      recall.
15 BY MR. SIMMER:
16    Q.  Look at the -- I'll direct
17 your attention to the second paragraph,
18 please.
19



Page 229

2      I just want to understand
3 what that second sentence actually means.
4      Do you see where -- what I'm
5 talking about?

8        MS. McENROE:  Objection to
9      form.
10 BY MR. SIMMER:
11    Q.  Can you tell me what that
12 means?
13    A.  I see -- I see the sentence,
14 but I did not create this document so I
15 don't necessarily know what the intent
16 is.
17    Q.  Who would we have to talk to
18 in order to understand the intent of
19 this?
20    A.  If -- if I'm not mistaken, I
21 think Marian Wood would have created
22 these documents.
23    Q.  And what department she --
24 did she work?

Page 230

1    A.  She was the pharmacy
2 department manager and DEA coordinator
3 over -- over my tenure.  She held several
4 different roles.
5    Q.  So you sent this information
6 on to Mr. Hensley, right?
7    A.  I forwarded the e-mails,
8 correct.
9    Q.  And did you explain to him
10 what this particular sentence meant?
11    A.  That I do not recall.
12    Q.  But sitting here today, your
13 testimony is that you didn't even know
14 what that sentence means, right?
15    A.  I don't typically read the
16 training documents that the DCs used
17 internally.  That's not something I ever
18 got involved with.
19    Q.  So you just sent these
20 materials on, you didn't -- you don't
21 even remember having read them?
22    MS. McENROE:  Objection to
23    form.
24    THE WITNESS:  I don't

Page 231

1   recall.
2 BY MR. SIMMER:
3    Q.  Look at the second page if
4 you would.  Just directing your attention
5 to the top there.
6    With the exceptions of Store
7 Number 777.  What is Store Number 777?
8    A.  They were a -- if my memory
9 serves correctly, they were an internet
10 company that Rite Aid acquired prior to
11 my tenure.
12    Q.  DrugStore.com?
13    A.  DrugStore.com, correct.
14    Q.  And why do they have an
15 exception?
16    A.  They have a lot more volume
17 than a standalone store.
18    Q.  So do the -- the thresholds
19 just not apply to them?
20    MS. McENROE:  Objection to
21    form.
22    THE WITNESS:  Thresholds
23    were done the same for them as
24    they were for every other store,

Page 232

1 was my understanding.
2 BY MR. SIMMER:
3    Q.  So it goes on to say, "They
4 have been preapproved for 75 for a tab
5 count of 100 and 500, and 25 for a tab
6 count of 1,000."
7    So that's a much larger
8 threshold than any other approved
9 threshold for any other pharmacy that
10 Rite Aid owned, correct?
11    A.  Correct.
12    Q.  Do you know how this
13 threshold was arrived at for
14 DrugStore.com?
15    A.  I do not.  That would be a
16 question for Janet Hart.
17    Q.  In -- in the audit
18 procedures that we looked at for your CSA
19 team that you developed, was there any
20 kind of audit undertaken to audit the
21 prescriptions that came in through
22 DrugStore.com?
23    MS. McENROE:  Objection to
24    form.

Page 233

1    THE WITNESS:  Not that I'm
2    aware of, no.
3 BY MR. SIMMER:
4    Q.  So the Woodland and Perryman
5 distribution centers were simply not
6 audited for what was going on at -- at
7 DrugStore.com, right?
8    MS. McENROE:  Objection to
9    form.
10    THE WITNESS:  DrugStore.com
11    would have been no more than just
12    another store in Perryman's
13    distribution network.
14 BY MR. SIMMER:
15    Q.  But it got no special
16 attention on your audit checklist that we
17 just talked about?
18    A.  It would be treated like any
19 other store, correct.
20    Q.  Can I direct your attention
21 to the third page.  Do you see where it
22 says, "I have read and understand the
23 above order monitoring program"?
24    A.  I do.

Page 234

1  Q.  And then there's an
2  expectation that a person would print
3  their name, sign it, and date it, right?
4  A.  That's correct.
5  Q.  And this would be an
6  obligation for everybody who was an order
7  picker at either Perryman or Woodland,
8  right?
9       MS. McENROE:  Objection to
10  form.
11       THE WITNESS:  This is
12  specific to Perryman, and it's an
13  internal training.  So I would say
14  for Perryman for sure.
15  BY MR. SIMMER:
16  Q.  And where are these forms
17  housed?  Where are they retained after
18  someone signs them?
19       MS. McENROE:  Objection to
20  form.
21       THE WITNESS:  Again,
22  question for the pharmacy
23  department manager there.  This
24  wasn't something that I had

Page 235

1  oversight over.
2  BY MR. SIMMER:
3  Q.  And you think that is Marian
4  Wood is the person we would have to talk
5  to about that?
6  A.  That would be a good
7  resource, correct.
8  Q.  And so when the person is --
9  signs this and says they understand that,
10  that includes that second sentence in the
11  second paragraph that you don't
12  understand what it means, right?
13       MS. McENROE:  Objection to
14  form.
15       THE WITNESS:  Correct.
16       (Document marked for
17  identification as Exhibit Rite Aid
18  Mitchell-10.)
19  BY MR. SIMMER:
20  Q.  I'll hand you what we've
21  marked as Mitchell Exhibit 10.
22       MS. McENROE:  Is it just one
23  page or is it two?  They're not
24  stapled, but these two are

Page 236

1  together?  I just want to make
2  sure I'm clear on it.
3       MS. KEARNEY:  Do you want a
4  stapler?
5       MS. McENROE:  Sure.
6  BY MR. SIMMER:
7  Q.  I'll identify for the record
8  a document entitled "Drug Diversion
9  Training."  Bates range
10  Rite_Aid_OMDL_0016230 to 16231.  Take a
11  moment to review that.
12  A.  Okay.
13  Q.  Have you seen this document
14  before?
15  A.  I have.
16  Q.  And did you have a hand in
17  preparing this document?
18  A.  I did not.
19  Q.  Do you know who prepared it?
20  A.  Again, I would think Marian
21  Wood.
22  Q.  And why do you think that?
23  A.  Because she was the pharmacy
24  department manager and at one time the

Page 237

1  DEA coordinator and prepared all the
2  training there internally for Perryman
3  specific to controlled substances.
4  Q.  Okay.  And what's your
5  understanding of what this document's
6  purpose was?
7  A.  To make associates aware
8  that have any contact in the controlled
9  substance cage with what DEA's
10  expectations are as far as reporting
11  diversion if they see it, and of course
12  the accountability that goes along with
13  it.
14  Q.  As it's used here, what kind
15  of diversion are we talking about?
16       MS. McENROE:  Objection to
17  form.
18       THE WITNESS:  Again, any
19  diversion, whether that include
20  theft or inadvertently moving
21  product from a location to a
22  location that it shouldn't belong
23  to.  Anything should be reported
24  that's diverting it out of its

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    normal intended chain.
2  BY MR. SIMMER:
3      Q.   Look at the second
4  paragraph.  And there's -- it's in
5  quotes.  The fact that it's in quotes, do
6  you have any idea why it's in quotes?
7      A.   The entire second paragraph?
8      Q.   Not the entire thing.  But I
9  think the first three sentences are -- is
10 quoted here.
11     A.   Well, I think it's important
12 that the associates know that, you know,
13 controlled substances being put in the
14 wrong hands are not a good thing for the
15 public.
16     Q.   I'm sorry, that wasn't a
17 great question.  I'm just trying to
18 understand the importance of it having
19 quotes around it.
20         Do you have any idea about
21 why it's quoted?
22     A.   No, I do not.  No.
23     Q.   Okay.
24     A.   Sorry.

Page 239

1      Q.   Let me direct your attention
2  to the first sentence.  "Reports of drug
3  diversion by fellow employees are not
4  only a necessary part of an overall
5  employee security program but also serve
6  the public interest at large."
7          So what's being talked about
8  there is drug diversion by fellow
9  employees.
10         Am I right what they are
11 talking about is people who were working
12 in the distribution center itself, they
13 are involved in drug diversion, right?
14         MS. McENROE:  Objection to
15     form.
16         THE WITNESS:  That's not how
17     I read this.
18 BY MR. SIMMER:
19     Q.   How do you read that then?
20     A.   I read this as -- I
21 interpreted this more as drug diversion
22 within the four walls of the controlled
23 substance cage.
24     Q.   I think we're in agreement

Page 240

1  then.  This is actually someone who's
2  stealing from Rite Aid, right?
3          MS. McENROE:  Objection to
4      form.
5          THE WITNESS:  I would agree.
6  BY MR. SIMMER:
7      Q.   Okay.  Let's look at the
8  second sentence.  "It is, therefore, the
9  position of the DEA that an employee who
10 has knowledge of drug diversion from
11 their employer by a fellow employee has
12 an obligation to report such information
13 to a responsible security official."
14         Do you see that?
15     A.   Yes, sir.
16     Q.   And it says it's the
17 position of the DEA.
18         Do you see that?
19     A.   I do.
20     Q.   Do you have any
21 understanding where this came from when
22 it says it's the position of the DEA?
23     A.   I do not.
24     Q.   Okay.  And what they're

Page 241

1  talking about is diversion from their
2  employer.  I think you would agree with
3  me that's theft from -- from Rite Aid by
4  someone who is working in the
5  distribution center, right?
6          MS. McENROE:  Objection to
7      form.
8          THE WITNESS:  I would agree.
9  BY MR. SIMMER:
10     Q.   Okay.  And reading on, it
11 says, "The employer shall treat such
12 information as confidential and treat" --
13 "and shall take all reasonable steps to
14 protect the confidentiality of the
15 information and the identity of the
16 employee furnishing information."
17         Do you see that?
18     A.   Yes, sir.
19     Q.   So what this is talking
20 about on drug diversion training is
21 simply making those individuals aware
22 that if you're stealing from your
23 employer, that could be deemed to be drug
24 diversion, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    A.   That is correct.
2    Q.   And if you just look -- take
3  a look at the second page of this
4  exhibit.  There's a place -- and it's
5  identical verbiage, it appears to be.
6  But there's a place to date and put your
7  name and then a signature.
8    A.   Yes, sir.
9    Q.   And what's the intent here,
10 if you know?
11   A.   It appears to be a training
12 document that, again, Marian would have
13 used to train the pharmacy associates
14 that work in the controlled drug cage.
15   Q.   And getting the people to
16 date and put their name and signature on
17 it, what does that accomplish?
18   A.   It's acknowledging that she
19 has spent the time with them to educate
20 them on the expectations.
21   Q.   And do you know where these
22 forms are actually kept for each
23 individual employee?
24   A.   I do not, sir.

Page 243

1        (Document marked for
2        identification as Exhibit Rite Aid
3        Mitchell-11.)
4  BY MR. SIMMER:
5    Q.   I'll hand you what we've
6  marked as Exhibit 11.  I'll identify it
7  for the record as an e-mail with an
8  attachment that was, I guess produced
9  natively.  I'll identify it for the
10 record Rite_Aid_OMDL_0013106 through
11 0013107.
12        And then there was a
13 spreadsheet attached that has the same
14 Bates number, 13107.  Take a moment and
15 look at that.
16        So there's a cover e-mail
17 from you to Marian Wood.  Excuse me.
18 Strike that.
19        There's a cover e-mail from
20 Marian Wood to you.
21        Do you see that?
22   A.   Yes, sir.
23   Q.   And the date is May 3rd,
24 2011.

Page 244

1        Do you see that?
2    A.   Yes, sir.
3    Q.   And the subject line is
4  "Threshold Log."
5        Do you see that?
6    A.   Yes, I do.
7    Q.   What is a threshold log?
8    A.   It's the log that they keep
9  in Perryman that identifies any excessive
10 orders and/or suspicious orders.
11   Q.   And I think you talked about
12 this earlier, but let's clarify.  So I
13 think you said as the order picker
14 identified an order that was over the
15 threshold, they would log it, right?
16   A.   That would be correct.
17   Q.   And so then, somebody,
18 generally, not every instance you said,
19 but generally someone would call the
20 pharmacy and find out what was the
21 explanation for the order being above the
22 threshold, right?
23   A.   Correct.
24   Q.   And in those instances where

Page 245

1  they did not call the pharmacy, why was
2  that?
3    A.   That, I can't answer, other
4  than if the store was closed.  Again, I
5  think we talked about during -- during
6  night shift.  Pharmacies typically close
7  at 9:00 p.m., so if nightshift is picking
8  at 1:00 a.m., there's nobody to call.
9    Q.   Okay.  Can I direct your
10 attention to the first page of the
11 threshold log?
12        And -- and I think you said
13 before too, this information is actually
14 retained by the distribution center so
15 that when the FDA -- excuse me, strike
16 that.  When the DEA came in, they would
17 be able to produce this log and show the
18 DEA what had been done with any orders
19 that were over the threshold, right?
20        MS. McENROE:  Objection to
21   form.
22        THE WITNESS:  Any excessive
23   orders, yes, sir.
24 BY MR. SIMMER:

Page 246

1  Q.  Simply those -- those are
2  the orders that are over the threshold,
3  right?
4      MS. McENROE:  Objection to
5  form.
6      THE WITNESS:  And including
7  any order.  It doesn't have to be
8  a threshold order.  Excessive
9  could be less than the threshold.
10 BY MR. SIMMER:
11  Q.  Okay.  Just what they deem
12 to be excessive for whatever reason?
13  A.  Correct.
14  Q.  What are some of the reasons
15 beyond being over the threshold that
16 would be an excessive order?
17  A.  Mis-keying an order, would
18 be one that comes to my mind pretty
19 quickly.
20  Q.  So just going across the top
21 of that first page.  It has a date, that
22 would be the date that the order came in
23 in the first place; is that right?
24  A.  Yes, sir.

Page 247

1  Q.  And then there's a store.
2  That's the Rite Aid pharmacy.
3  A.  Correct.
4  Q.  And then each pharmacy has
5  its own number, right?
6  A.  Yes, sir.
7  Q.  And the item number.  What
8  is that?
9  A.  The item number for the
10 particular SKU or medication that was
11 ordered.
12  Q.  Now, the first page doesn't
13 have this, but later pages have a
14 description column.  Is there any reason
15 that your -- you can help us with that
16 the first page does not have that
17 description on it?
18  A.  Because specifically I don't
19 know what Item 89283 is.  So if you have
20 a description then it makes it much
21 easier for folks to understand what it is
22 that was ordered.
23  Q.  Okay.  So what does that
24 numbering convention mean to the -- to

Page 248

1  the distribution center?
2      MS. McENROE:  Objection to
3  form.
4      THE WITNESS:  The item
5  number itself, sir?
6  BY MR. SIMMER:
7  Q.  Yes.
8  A.  It's -- it's the product.
9  So I would have to look it up in the
10 system to see what 89283 even was.
11  Q.  So that would reflect what,
12 a product and a package size and a
13 dosage?
14  A.  Yes, sir.
15  Q.  The quantity ordered,
16 that -- do I have it right that that's
17 the amount that the retail pharmacy
18 actually ordered?
19  A.  Correct.
20  Q.  The allowable quantity.
21 What is that column?
22  A.  That is the -- and that's
23 probably a bad choice of words, the
24 allowable quantity rather than shipped

Page 249

1  quantity.  But that's what the order was
2  cut back to prior to shipping.
3  Q.  If it was indeed cut back?
4  A.  Correct.
5  Q.  Because some of these show
6  an exception was made, right?
7  A.  There could be.
8  Q.  Okay.  And then the last
9  column, it says reason.  Do you see that?
10  A.  Yes, sir.
11  Q.  Let me just look at a few of
12 these.  On this first page a number of
13 them just say system.  Any idea what that
14 is?
15  A.  I don't know for sure.
16 My -- my assumption would be
17 auto-replenishment.
18  Q.  Okay.  Let me pick a few
19 more of these and see if you can help us
20 understand what they are.
21      Look at Page 7 if you would
22 please.  That's -- same Bates number,
23 so --
24  A.  Yes, sir.

Page 250

1  Q.   Just look at that first line
2  on there.  You see that the date was
3  January 3, 2011?
4  A.   Yes, sir.
5  Q.   And the Store Number 4309,
6  do you see that?
7  A.   Yes, sir.
8  Q.   And then there is an item
9  number, and the description is CA3
10 hydrocodone AP 7.5, 750 milligrams,
11 tab 500.  Do you see that?
12 A.   Yes, sir.
13 Q.   And the amount ordered -- or
14 quantity ordered was   And then there
15 was an allowable quantity of .
16      And do you see that the
17 reason, pharmacy manager Hiren usually
18 needs more than ordered?
19 A.   Yes, sir.
20 Q.   What is the reason -- help
21 us to understand what that means.
22 A.   He's basically telling the
23 distribution center that the reason that
24 he's ordering more is that he needs more.

Page 251

1  Q.   Look at the third item on
2  here, Diazepam 20-milligram rectal gel 2
3  kit.  Do you see that?
4  A.   Yes, sir.
5  Q.   Quantity ordered, .  Do
6  you see that?
7  A.   Mm-hmm.
8  Q.   And the allowable quantity
9  was ?
10 A.   Yes, sir.
11 Q.   And it says, "SW PIC Grey,
12 wanted them all, appeared excessive?"
13      What's being said there?
14 A.   The pharmacy spoke with
15 Pharmacist-in-Charge Grey.  And whoever
16 Grey is again communicated to them that
17 they needed them all.
18 Q.   So when they say they wanted
19 them all, basically they have
20 prescriptions -- prescription demand
21 business, if you will, to justify this
22 entire order; is that correct?
23 A.   Correct.  So although the
24 distribution center -- although it was

Page 252

1  less than the threshold, the distribution
2  center still identified that as excessive
3  based on their normal orders.
4  Q.   Look at the next page if you
5  would.  I just am picking a few of things
6  to understand what's being said.
7       So the fifth item on here,
8  this is from January 21, 2011.
9  Pharmacy 4964.  Item Number 49061.
10 Plan B One-step 1.5 tab one count.  Do
11 you see that?
12 A.   Yes, sir.
13 Q.   And the order was for .
14 Do you see that?
15 A.   I do.
16 Q.   And the -- the shipped
17 amount was .  Do you see that?
18 A.   I do.
19 Q.   And then it says over in the
20 explanation, "auto-replenishment."
21 A.   Yes, sir.
22 Q.   So what is that indicating?
23 A.   That auto-replenishment is
24 the one that generated the suggested

Page 253

1  order for .  And again, if I'm not
2  mistaken, this is a -- I don't even think
3  this is a controlled substance.  I think
4  this is a pseudoephedrine drug.  And we
5  had also got permission from DEA to store
6  in the controlled drug cage just because
7  of all the diversion with pseudoephedrine
8  products.
9       So again, I think it's just
10 showing the due diligence that the DC has
11 of -- of making sure that those
12 particular items are also controlled, not
13 as a controlled substance, but they have
14 more security around them.  And that we
15 would only ship -- we had a threshold for
16 pseudoephedrine items of  units per --
17 per shipment.
18 Q.   Okay.  Look later on that
19 same page.  I think this -- the seventh
20 item from the bottom.  I'll read across.
21 January 26, 2011.  Pharmacy 4667.  Do you
22 see the same line?
23 A.   Yes, sir.
24 Q.   It was for Item 49019.

Page 254

1  Q-TAPP elixir, 118 milliliters.
2       Do you see that?  That
3  indicates it's a liquid, right?
4       A.   Yes, sir.
5       Q.   When it's measured in
6  milliliters, right?
7       A.   Yes.  Mm-hmm.
8       Q.   Okay.  It says it was an
9  account -- or amount ordered, ▇.  Do you
10  see that?
11       A.   I do.
12       Q.   And the amount shipped was
13  ▇?
14       A.   Mm-hmm.
15       Q.   And over in the explanation
16  column, "Called store at 1435.  No
17  answer.  Appeared excessive."
18       What is being said there?
19       A.   That they tried to reach out
20  to the store to identify whether or not
21  they truly needed ▇.  And again, if they
22  didn't talk to anyone and the order had
23  to ship, and it's still within the
24  threshold, because that -- that item

Page 255

1  would have been ▇ as the max, although
2  it appeared excessive it still was within
3  the threshold, so it looks like they
4  shipped ▇.
5       Q.   So in that instance they
6  didn't even speak to anybody at the
7  pharmacy at all, did they?
8       A.   It appears that way,
9  correct.
10       Q.   They shipped it anyway,
11  right?
12       A.   Correct.
13       Q.   Look at the fourth from the
14  bottom.  January 26, 2011.  Store 11577.
15  Item 87445.  Do you see that?
16       A.   Yes, sir.
17       Q.   And C3A.  What is a C3A?
18       A.   C -- the A is how an ARCOS
19  reportable item is classified on these
20  documents.
21       Q.   And that would be a
22  controlled substances?
23       A.   Yeah -- oh yes, sir.
24       Q.   When it says Hydromet

Page 256

1  syringe, does S-Y-R mean syringe?
2       A.   I believe it's syrup.
3       Q.   Syrup, okay.
4  5 milligrams/5 milliliters, 160 -- excuse
5  me, 16-ounce; is that right?
6       A.   Mm-hmm, yes, sir.
7       Q.   And it says the ordered
8  amount was ▇.  Do you see that?
9       A.   Yes, sir.
10       Q.   And the shipped amount was
11  ▇?
12       And then over the -- or the
13  explanation, SW tech Marianne.  And I'll
14  let you tell us what else is being said
15  there.
16       A.   "Spoke with the pharmacy
17  tech Marianne," and she wanted -- again
18  she basically communicated back to the DC
19  that she wanted them all.
20       Q.   So -- and there are a number
21  of instances.  I can go through more of
22  them to show that.  But what -- when this
23  conversation happened, the person, either
24  the pharmacist or whoever was spoken to

Page 257

1  says, "I want them all."
2       Is that a sufficient
3  explanation in order to ship what could
4  have been an excessive order?
5       MS. McENROE:  Objection to
6  form.
7       THE WITNESS:  They -- in my
8  opinion, they would have known
9  what they needed to fulfil -- fill
10  scripts.  Again, I wouldn't have
11  known that.
12       If I'm the one -- if I'm the
13  person I guess in Perryman
14  speaking with Marianne, again
15  she's going to know whether she
16  needs these items to fill scripts
17  or not.
18       So being that it's within
19  the threshold and she is the one
20  running the store or working at
21  the store, then I -- I would --
22  yeah.  I would make the same
23  determination that it's okay to
24  ship.

Page 258

BY MR. SIMMER:

Q. Because the person at the pharmacy said I want them all, that's all that's required, right?

MS. McENROE: Objection to form.

THE WITNESS: Based off what you and I both see as the reasoning, yes.

BY MR. SIMMER:

Q. Again, what they are looking for is need. I think you've talked about that earlier. If there appears to be a business need, that's sufficient in terms of -- of shipping this order, even though it's over whatever excessive order log that's on here, right?

MS. McENROE: Objection to form.

THE WITNESS: Well, it's -- it's still within the threshold, but again, based on their normal ordering, whoever identified this did identify it as excessive.

Page 259

BY MR. SIMMER:

Q. But when they spoke to the person at the pharmacy, said I need them all, right?

A. That's correct.

Q. And that's sufficient in order to -- to ship this order, right?

MS. McENROE: Objection to form. Asked and answered.

THE WITNESS: It -- it would be, yes.

BY MR. SIMMER:

Q. Nothing further required than saying I want them all, right?

A. That would be correct.

MR. SIMMER: Can we take a short break?

THE VIDEOGRAPHER: The time is now 2:38 p.m. We're going off the record.

(Short break.)

THE VIDEOGRAPHER: The time is now 2:59 p.m. We are back on the record.

Page 260

BY MR. SIMMER:

Q. Sir, just a couple more questions about that last exhibit that we were looking at a moment ago.

MS. McENROE: That's Exhibit 11?

MR. SIMMER: Exhibit 11, yes.

BY MR. SIMMER:

Q. This was a record that was created reflecting the fact that all of these shipments had been shipped, right?

MS. McENROE: Objection to form.

THE WITNESS: Yes, sir.

BY MR. SIMMER:

Q. And you got these reports monthly; is that correct?

A. I honestly do not recall how frequently I got them.

Q. But you received them yourself, right?

A. I did.

Q. Did you look at them when

Page 261

you received them?

A. Yes, I did.

Q. Did you ever see any order that was flagged as being a suspicious order and that was not shipped at all and then reported to the DEA?

MS. McENROE: Objection to form.

THE WITNESS: I do not recall ever seeing that.

BY MR. SIMMER:

Q. Do you recall ever, as a part of this threshold log process, the identification of any order that was reported to the DEA?

MS. McENROE: Objection to form.

THE WITNESS: I do not.

BY MR. SIMMER:

Q. And just to clarify too, what we're seeing in terms of the records -- we went through several of them here -- that's the entire record to reflect what happened in terms of due

Page 262

1 diligence for these orders that were
2 potentially excessive, right?
3         MS. McENROE:  Objection to
4     form.
5         THE WITNESS:  I -- I would
6     assume so.
7 BY MR. SIMMER:
8     Q.   Okay.  So you assume so.
9 You're saying that you don't know?  Is
10 that what you're saying?
11     A.   Again, I don't -- I never
12 worked at the distribution center, so I
13 am assuming this is all they did prior to
14 shipping the drugs.
15     Q.   I'm just trying to clarify.
16 Is there any other due diligence record
17 that was created about these orders other
18 than these lines that are reflected on
19 this threshold log?
20         MS. McENROE:  Objection to
21     form.  Asked and answered.
22         THE WITNESS:  Not that I'm
23     aware of.
24 BY MR. SIMMER:

Page 263

1     Q.   Sir, you testified earlier
2 that the DEA had commented on just how
3 good and solid your program was, right?
4     A.   Yes, sir.
5     Q.   When did they tell you that?
6     A.   2005, 2009.  And that would
7 be the Baltimore office that came in to
8 do an inspection of Perryman.
9     Q.   And who was that?
10     A.   I do not recall their names.
11     Q.   Was it included in the
12 report in writing?
13         MS. McENROE:  Objection to
14     form.
15         THE WITNESS:  The DEA did
16     not issue a report because there
17     were no findings.  They did a
18     recap with the entire pharmacy
19     staff, the general manager of the
20     building, and myself complimenting
21     on us -- complimenting us and
22     telling us -- quite frankly, their
23     exact words were, you should be
24     the gold standard for other

Page 264

1 wholesale distributors to follow.
2 BY MR. SIMMER:
3     Q.   So -- but there's no written
4 report to reflect those statements,
5 right?
6     A.   That's correct.  They only
7 issue a report if there's a finding.
8         (Document marked for
9         identification as Exhibit Rite Aid
10         Mitchell-12.)
11 BY MR. SIMMER:
12     Q.   I'm going to hand you
13 something that we pulled out of your
14 custodial file.  It's an excerpt of a
15 much longer document.  And we just pulled
16 two pages.  I want to ask you about it.
17 And I'll set it up in terms of, it's a --
18 it's a document, I think it's about 100
19 pages long, that we found in your
20 materials.  I'll identify these two pages
21 as excerpts from that.
22         First page is
23 Rite_Aid_OMDL_0020703, and the second
24 page is 0020727.

Page 265

1         You mentioned something
2 earlier that you called the blue book?
3     A.   Yes, sir.
4     Q.   Which I think was a binder
5 of the standard operating procedures the
6 company had?
7         MS. McENROE:  Objection to
8     form.
9         THE WITNESS:  Yes, sir.
10 BY MR. SIMMER:
11     Q.   The first page here on this
12 document where it says Distribution
13 Center Customer Support Center
14 Prescription Drug SOPs Regulatory
15 Guidelines, would that be what you're
16 calling the blue book?
17     A.   No, sir.
18     Q.   It's different?
19     A.   Correct.
20     Q.   Okay.  What is -- what is
21 this one called?
22     A.   Customer Support Center
23 Prescription Drug SOPs.
24     Q.   Does -- it doesn't have a

Page 266

1 shorthand name like --
2 　　A.　No, it doesn't.
3 　　Q.　-- the blue -- okay.
4 　　A.　I'm not being sarcastic.  It
5 was -- that's just what it's called.
6 　　Q.　Okay.  And sometimes the
7 questions yield what was an obvious
8 answer and I apologize for that.
9 　　　　And the blue book did not
10 include SOPs?
11 　　MS. McENROE:  Objection to
12 　　form.
13 　　THE WITNESS:  Disagree.  The
14 blue book was SOPs.
15 BY MR. SIMMER:
16 　　Q.　So this one is a different
17 group of SOPs?
18 　　A.　This is.
19 　　Q.　Okay.  And -- and tell us
20 what the difference between the blue book
21 and this one would be?
22 　　A.　The -- the blue book was in
23 place when I first started with the
24 company.  And if I'm not mistaken, it

Page 267

1 originated maybe like in 1993.
2 　　　　This was more specific, and
3 I think more detailed than the blue book,
4 so this is what I had the pharmacy DCs
5 use to monitor their day-to-day
6 activities, again to ensure compliance
7 with DEA regulations.
8 　　Q.　Was this on top of the blue
9 book or did it replace the blue book?
10 　　A.　It was on top of it.
11 　　Q.　So everyone working in
12 distribution centers worked off of this
13 set of guidelines as well?
14 　　A.　For the prescription drugs,
15 correct.  Yes, sir.
16 　　Q.　Okay.  Just looking at the
17 first page, it's a summary of sort of the
18 legal terrain of the DEA regulations,
19 right?
20 　　MS. McENROE:  Objection to
21 　　form.
22 BY MR. SIMMER:
23 　　Q.　And it says, the second
24 paragraph, and I'll just read it aloud

Page 268

1 and we can blow that up and put it on --
2 on the screen.
3 　　　　Do you see where it says,
4 "Therefore, the following DEA regulatory
5 guidelines were prepared in response to a
6 need for a single source of current
7 information for Rite Aid regarding Drug
8 Enforcement Administration (DEA) policies
9 and the requirements of the comprehensive
10 Drug Abuse Prevention Act, Public Law
11 91-5132, otherwise known as the
12 Controlled Substances Act of 1970 or the
13 CSA and the implementing regulations."
14 　　　　Do you see that?
15 　　A.　Yes, sir.
16 　　Q.　Do you know who prepared
17 this document for the company?
18 　　A.　I'm pretty sure it was Ron
19 Buzzeo's group.
20 　　Q.　It wasn't prepared by
21 anybody at Rite Aid?
22 　　A.　No, sir.
23 　　Q.　And why are you saying
24 you're pretty sure it was Ron Buzzeo's

Page 269

1 group?
2 　　A.　That's what I recall.
3 　　Q.　Did you have a hand in
4 commissioning them to prepare this?
5 　　A.　That I do not recall.
6 　　Q.　Did the company have a
7 contract or series of contracts with
8 Buzzeo -- Buzzeo's group to do this kind
9 of work for it?
10 　　A.　Again, a better question
11 probably for the government affairs
12 department.  They are the ones that
13 typically generated the discussions with
14 Ron about auditing and what they would
15 like for him to do.
16 　　Q.　Do you have an idea when
17 this set of guidelines was put in place?
18 　　A.　Early in my tenure.  But I
19 don't remember the exact year.
20 　　Q.　Look at the last paragraph
21 on this page, if you would.  Do you see
22 where it says, "Rite Aid is responsible
23 for ensuring compliance with DEA
24 regulatory requirements, and that

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1  responsibility for compliance cannot be
2  abdicated or transferred to anyone else"?
3      A.   Yes.
4      Q.   And that was a true
5  statement the entire time you worked at
6  Rite Aid, wasn't it?
7      A.   Yes, sir.
8      Q.   Reading on.  Do you see
9  where it says, "The legislative and
10 social intent of regulating controlled
11 substances and products that contain
12 List I chemicals is consistent with the
13 mission of Rite Aid in serving the public
14 good."
15      Do you see that?
16      A.   Yes, sir.
17      Q.   And that sentence was a true
18 statement through the entire time you
19 worked at Rite Aid as well, right?
20      A.   Yes, sir.
21      Q.   Let's look at the last
22 sentence.  "To achieve these important
23 goals, Rite Aid supports the proper and
24 appropriate use of controlled substances

Page 271

1  and products that contain List I
2  chemicals for legitimate use and seeks to
3  eliminate any and all diversion of
4  controlled substances and products that
5  contain List I chemicals."
6      Do you see that?
7      A.   Yes, sir, I do.
8      Q.   Did I read that accurately?
9      A.   Yes, sir.
10     Q.   And that was a true
11 statement the entire time you worked at
12 Rite Aid as well, right?
13     A.   Yes, sir.
14     Q.   Could I direct your
15 attention to the next page please.
16     Do you see the heading where
17 it says, "DEA regulatory guidelines," and
18 it has Roman numeral VI, excessive order
19 monitoring?
20     A.   Yes, sir.
21     Q.   And what is your
22 understanding, if you could, I mean if
23 you need to refer to it or read it, by
24 all means do, but what's being referred

Page 272

1  to here as excessive order monitoring?
2      MS. McENROE:  Objection to
3  form.
4      THE WITNESS:  Well again,
5  and this is what I am going to
6  say earlier, that excessive order
7  monitoring is to provide
8  monitoring for all controlled
9  substances as well as List I
10 chemicals, as you could tell with
11 the document that was provided in
12 the last attachment.  And to
13 detect excessive orders and/or
14 suspicious orders.
15 BY MR. SIMMER:
16     Q.   But insofar as the heading
17 here it just says excessive orders,
18 right?
19     A.   The Title VI, correct.
20 Mm-hmm.
21     Q.   Okay.  But it's your
22 testimony now that it also is endeavored
23 to identify suspicious orders.
24      Is that what you're

Page 273

1  testifying?
2      A.   Yes, sir.
3      Q.   Okay.  Let's look at the
4  procedures that are outlined below there.
5  Do you see paragraph Number 1?
6      A.   Yes, sir.
7      Q.   Let me read this into the
8  record.  Do you see where it says, "All
9  orders containing controlled substances
10 are reviewed and verified for order
11 quantity and size to not exceed the
12 determined order history threshold.  Any
13 order exceeding the threshold is
14 immediately forwarded to the department
15 manager for further investigation."
16      Do you see that?
17     A.   Yes, sir.
18     Q.   So this first paragraph is
19 simply identifying any -- anything over
20 the threshold, right, that's what's being
21 described here?
22      MS. McENROE:  Objection to
23 form.
24      THE WITNESS:  I think that

Page 274

1 could be interpreted a couple
2 different ways.
3          It says the order history
4 threshold. I don't know that that
5 necessarily means the threshold
6 for specific items as much as it
7 means that as well as the order
8 history itself.
9 BY MR. SIMMER:
10    Q.    So you're saying that in
11 terms of that particular pharmacy's order
12 history, not the -- not the overall
13 threshold that is applicable to -- across
14 all Rite Aid pharmacies, but that
15 particular pharmacy's order history,
16 that's what's being talked about here?
17    A.    I interpret this as both.
18 That's correct.
19    Q.    And what it says here is any
20 order exceeding that threshold, that
21 order history you're talking about, must
22 be immediately forwarded to the
23 department manager for further
24 investigation, right?

Page 275

1    A.    Yes, sir.
2    Q.    And what department manager
3 are we referring this to?
4    A.    This would be the local
5 distribution center pharmacy manager.
6    Q.    Okay. So the procedure that
7 is outlined here, this is the pickers
8 that were identifying these potentially
9 excessive prescriptions, right?
10    A.    Yes, sir.
11    Q.    Excuse me. Excessive
12 orders?
13    A.    Yes.
14    Q.    Okay. Look at Paragraph 2.
15 "Suspicious orders include orders of
16 unusual size, orders deviating
17 substantially from a normal pattern, and
18 orders of an unusual frequency."
19          Do you see that?
20    A.    Yes, sir.
21    Q.    Now, this says suspicious
22 orders, right?
23    A.    Yes, sir.
24    Q.    So, as it's used here, is a

Page 276

1 suspicious order the same as an excessive
2 order?
3    A.    No, sir.
4    Q.    And so how are we to
5 distinguish between an excessive order
6 and a suspicious order?
7    A.    Again, I think excessive is
8 just that. Excessive is out of the
9 normal. It could be a higher quantity
10 than their -- they typically order.
11          I think suspicious, again,
12 could include the unusual size, orders
13 deviating from the days or number of
14 times per week that an order was placed,
15 which is kind of covered in the unusual
16 frequency.
17    Q.    Okay. Now, let me just
18 clarify one item. In paragraph Number 1,
19 we looked at a number what deemed to be
20 excessive orders on that threshold log,
21 right?
22    A.    That's correct.
23    Q.    And those were ones that
24 were either over the standard generic

Page 277

1 threshold that the company applied to
2 every drug or were unusual as to the
3 ordering history for that pharmacy,
4 right?
5    A.    That's correct.
6    Q.    And here with regard to
7 Paragraph 2, was there any separate
8 report or way of tracking suspicious
9 orders that the company identified?
10          MS. McENROE: Objection to
11    form.
12          THE WITNESS: I'm not aware
13    of any suspicious orders that were
14    ever identified. But if I were
15    the one at the distribution
16    center, I would put that on the
17    excessive log and then contact
18    government affairs as the policy
19    states to do.
20 BY MR. SIMMER:
21    Q.    But you don't know of any
22 time that there were ever any suspicious
23 orders identified by the distribution
24 center and in turn reported to government

Page 278

1 affairs; isn't that right?

2 　　　MS. McENROE:  Objection to

3 　form.

4 　　　THE WITNESS:  That's

5 correct.

6 　　　MS. McENROE:  Asked and

7 　answered.

8 BY MR. SIMMER:

9 　　Q.　Look at Paragraph 3.  Do you

10 see where it says, "A review is performed

11 to determine the legitimacy of the order.

12 Appropriate documentation of the review

13 is maintained on file."

14 　　　Do you see that?

15 　　A.　Yes, sir.

16 　　Q.　So who does this review to

17 determine if the legitimacy of the order?

18 　　A.　Government affairs and Janet

19 Hart's group.

20 　　Q.　And what is your

21 understanding is meant by legitimacy of

22 the order?

23 　　A.　Again, whether or not it

24 was -- it was justified.  Whether there

Page 279

1 are actual scripts to support that amount

2 of distribution of a particular product.

3 　　Q.　So the legitimacy -- if --

4 if the investigation was -- strike that.

5 　　　If the government affairs

6 was investigating this and found that the

7 order was illegitimate, would there be a

8 record of that someplace?

9 　　A.　That I do not know.

10 　　Q.　Do you know of any time that

11 the government affairs ever deemed an

12 order to be illegitimate?

13 　　A.　Not that I'm aware of.

14 　　Q.　When it says appropriate

15 documentation of the review is maintained

16 on file, do you know where that's

17 maintained?

18 　　A.　The distribution center

19 would have it on file in case DEA wanted

20 to see supporting documentation.  But

21 I -- again, the DC would have to answer

22 where they kept them.  I'm not aware.

23 　　Q.　Is anything other than the

24 threshold log that we looked at a moment

Page 280

1 ago in terms of records that you're aware

2 of that the DC would have kept?

3 　　　MS. McENROE:  Objection to

4 　form.

5 　　　THE WITNESS:  The only other

6 　thing would be whatever documents

7 　Janet Hart would have provided in

8 　her research.

9 BY MR. SIMMER:

10 　　Q.　Okay.  That's not DC, but

11 that's government affairs, right?

12 　　A.　Government affairs would

13 have done the work.  The DC would have

14 kept the finished product, the document

15 to support whether or not the threshold

16 was adjusted up or down or whether she

17 gave permission to ship more than the

18 standard company threshold.

19 　　Q.　So it's your belief that if

20 the DC was the one that would retained

21 the records, including the records that

22 were created by government affairs,

23 right?

24 　　A.　Absolutely, yes, sir.

Page 281

1 　　Q.　Look at Number 4.  "Any

2 order which is determined to be

3 suspicious will be immediately reported

4 to the corporate office who will notify

5 the local DEA field division office of

6 the" -- excuse me -- "DEA field division

7 office of the administration."

8 　　　Do you see that?

9 　　A.　Yes, sir.

10 　　Q.　I stumbled over that.  But

11 you understand what that's saying here,

12 right?

13 　　A.　Absolutely.

14 　　Q.　Why don't you tell us.

15 　　A.　So if any order was deemed

16 to be suspicious, that person should

17 immediately report it to Janet Hart,

18 government affairs.  She in turn would

19 report that directly to the field

20 diversion office of DEA.

21 　　Q.　And would you have been

22 copied on any of those kinds of notices

23 that would have been sent to Janet Hart

24 during your time working at the company?

Page 282

```
1        MS. McENROE:  Objection.
2        THE WITNESS:  I'm not
3    aware -- I'm not aware of any
4    notice that was ever sent to
5    Janet, so I don't know.
6  BY MR. SIMMER:
7        Q.   So, so far as you know,
8  there was no such notice ever sent to her
9  of any suspicious order, right?
10       A.   Not that I'm aware.
11       Q.   Nor in turn that she
12 reported to the DEA as well, right?
13       A.   Not that I'm aware.
14       Q.   Paragraph Number 5, "If a
15 suspicious order is reported to
16 corporate, the corporate government
17 affairs will determine whether to 'ship'
18 or 'do not ship.'"
19       Do you see that?
20       A.   Yes, sir.
21       Q.   Are you aware of any
22 instance when corporate government
23 affairs determined do not ship?
24       A.   I am not aware.
```

Page 283

```
1        Q.   In fact, you are not aware
2  of any suspicious orders even being
3  reported to corporate government affairs,
4  right?
5        MS. McENROE:  Objection to
6    form.  Asked and answered.
7        THE WITNESS:  That is
8    correct.
9  BY MR. SIMMER:
10       Q.   Paragraph Number 6, "All
11 discussions, investigations and reports
12 will be maintained in the file designated
13 'suspicious orders.'"
14       Do you see that?
15       A.   Yes, sir.
16       Q.   Do you know if there was
17 indeed a file designated "suspicious
18 orders" that the company maintained?
19       A.   I do not recall.
20       Q.   You don't recall or you
21 don't believe there was one?
22       MS. McENROE:  Objection to
23    form.
24       THE WITNESS:  I don't
```

Page 284

```
1    recall.
2  BY MR. SIMMER:
3        Q.   Because there were no
4  suspicious ever -- orders ever reported,
5  is it the fact that they simply had none
6  to put in that file?
7        MS. McENROE:  Objection to
8    form.
9        THE WITNESS:  I don't
10   recall.
11 BY MR. SIMMER:
12       Q.   You just don't know one way
13 or the other?
14       MS. McENROE:  Objection to
15   form.
16       THE WITNESS:  Again, it's
17   been a long time ago.  I don't
18   recall.
19 BY MR. SIMMER:
20       Q.   But I think it is your
21 testimony -- I've asked you several
22 times, just to confirm -- you don't know
23 of any suspicious orders that were ever
24 reported at all, right?
```

Page 285

```
1        MS. McENROE:  Objection to
2    form.
3        THE WITNESS:  That is
4    correct.
5  BY MR. SIMMER:
6        Q.   Besides the work that you've
7  talked about so far today that the
8  company did with Buzzeo, did the company
9  consult with any other third-party
10 companies about its suspicious order
11 monitoring program?
12       A.   I'm unaware if they did.
13       Q.   Buzzeo would be the one that
14 you're aware of that the company worked
15 with on a regular basis, right?
16       MS. McENROE:  Objection to
17   form.
18       THE WITNESS:  From a
19   distribution center standpoint, he
20   is the only one that I can recall
21   working with.  What they did on
22   the stores and on the retail side,
23   I have no -- no knowledge of that.
24 BY MR. SIMMER:
```

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  Q.   And how frequently did
2  Buzzeo work with the distribution centers
3  in this consulting capacity?
4      A.   As far as conducting audits,
5  probably just the first year or so.
6  Maybe year or two years of my employment.
7          Afterwards, we used him
8  very, very rarely to write SOPs and to
9  assist with the VAWD SOPs that were
10 written, I believe in 2007.  But as far
11 as coming and conducting audits, it was,
12 you know, probably nothing after 2002.
13     Q.   So Buzzeo never came back
14 after 2002 that you recall to audit the
15 company's suspicious order monitoring
16 program, right?
17     A.   Not that I recall, correct.
18     Q.   Okay.  And you do recall
19 that they actually assisted in writing
20 SOPs, right?
21     A.   Yes, that is correct.
22     Q.   And that's with regard to
23 the Indiana VAWD procedure that you
24 talked about earlier, right?

Page 287

1      A.   Those, and these SOPs as
2  well.
3      Q.   And these are separate --
4          MS. McENROE:  For the
5      record, the witness is gesturing
6      towards Exhibit 12.  Just want to
7      make sure that was clear.
8          THE WITNESS:  Sorry.
9  BY MR. SIMMER:
10     Q.   Yes, and you were -- you
11 were pointing to the prior exhibit, those
12 SOPs that we just talked about a moment
13 ago?
14     A.   Yes, sir.
15     Q.   Okay.  And those were two
16 separate things that Buzzeo did?
17     A.   Yes, sir.
18     Q.   One, they worked with the
19 certification that the company was
20 seeking to get with Indiana, right?
21     A.   Correct.
22     Q.   And that's the VAWD?
23     A.   Yes, sir.
24     Q.   We don't know what that

Page 288

1  acronym stands for; is that right?
2      A.   That's correct.
3      Q.   And then the second thing
4  they did was to help prepare SOPs that we
5  just looked at, the excerpts that we just
6  went over, right?
7      A.   That's correct.
8      Q.   Is there anything else that
9  Buzzeo did to assist the company in
10 looking at a suspicious order monitoring
11 program?
12     A.   Not that I recall.
13         (Document marked for
14         identification as Exhibit Rite Aid
15         Mitchell-13.)
16 BY MR. SIMMER:
17     Q.   I'll hand you what we marked
18 as Mitchell Exhibit Number 13.  I'll
19 identify it for the record while you're
20 looking at it as an e-mail string, two
21 pages, first page of which is
22 Rite_Aid_OMDL_0020388 to 0020389.
23         Have you seen this e-mail
24 before?

Page 289

1      A.   Yes, sir.
2      Q.   When did you look at it
3  last?
4      A.   I believe I saw this
5  yesterday.
6      Q.   Can I direct your attention
7  to, I guess the e-mail that starts the
8  string that's dated July 27, 2009, from
9  Cegedim Dendrite Compliance Solutions?
10     A.   That's right.
11     Q.   Am I right that Cegedim
12 Dendrite Compliance Solutions is the same
13 as Buzzeo?
14     A.   That's correct.
15     Q.   And this is an invitation,
16 as I understand it, to the Seventh Annual
17 Controlled Substances Conference?
18     A.   Yes, sir.
19     Q.   Is that a conference that
20 you've attended before?
21     A.   I've attended some of his
22 conferences in the past.  That is
23 correct.
24     Q.   Before this particular

Page 290

1  invite right here?
2      A.   Yes, sir.
3      Q.   And your e-mail right above
4  that from you to Rick Chapman, do you see
5  where -- this is July 27, 2009.  Do you
6  see where you say, "Rick, would you
7  approve me attending this conference?  If
8  so I would like to offer to the DEA
9  coordinators and the remaining Rx
10  buildings as well.  Please let me know
11  your thoughts.  Thanks Kevin."
12      A.   Yes, sir.
13      Q.   And you're just simply
14  asking permission to attend, right?
15      A.   Correct.
16      Q.   And you had to do that every
17  time if you wanted to attend?  You
18  couldn't just go on your own; is that
19  right?
20      A.   Correct.
21      Q.   And what was your intention,
22  why you felt it was necessary to go to
23  this conference?
24      MS. McENROE:  Objection to

Page 291

1      form to further my knowledge and
2      to coordinate the knowledge DEA
3      coordinators in the buildings.
4  BY MR. SIMMER:
5      Q.   Can I direct your attention
6  to the second page here.  I just want to
7  ask you a few questions.  Do you see
8  where it says "Register Now" and there's
9  something that -- a little picture that
10  apparently didn't get transferred in the
11  document we were given.  But it talks
12  about the conference that was going to be
13  on November 4th through 6, 2009, in the
14  Crystal Gateway Marriott in Arlington,
15  Virginia.
16      Do you see that?
17      A.   Yes, sir.
18      Q.   And then there's a paragraph
19  down below there about the things that
20  were going to be discussed at this
21  conference.
22      Do you see that?
23      A.   Yes, sir.
24      Q.   Are these the typical areas

Page 292

1  that the Buzzeo conferences included?
2      MS. McENROE:  Objection to
3      form.
4  BY MR. SIMMER:
5      Q.   As you understand it?
6      A.   They changed from conference
7  to conference.  But any update on DEA
8  regulations or expectations, they
9  typically covered current events.
10      Q.   Would you be the only person
11  from the company that would have
12  regularly attended these conferences?
13      MS. McENROE:  Objection to
14      form.
15      THE WITNESS:  Not
16      necessarily.
17  BY MR. SIMMER:
18      Q.   Who else at the company
19  would have attended these conferences
20  besides yourself?
21      A.   Janet Hart has attended.  I
22  think Andy Palmer has attended, DEA
23  pharmacy.  Again, this is distribution
24  I'm speaking of.  Pharmacy department

Page 293

1  managers have attended.  DEA coordinators
2  have attended.
3      Q.   And did the company try to
4  always have somebody at these
5  conferences?
6      MS. McENROE:  Objection to
7      form.
8      THE WITNESS:  No, sir.
9  BY MR. SIMMER:
10      Q.   So were there times when no
11  one attended?
12      A.   That would be correct, sir.
13      Q.   And why would no one attend
14  a conference if it was something that
15  conveyed this kind of current information
16  to you?
17      MS. McENROE:  Objection to
18      form.
19      THE WITNESS:  That, I can't
20      answer.
21  BY MR. SIMMER:
22      Q.   Were there instances where
23  you asked permission to attend that you
24  were not given permission to attend?

Page 294

1    A.   Not that I recall.
2    Q.   So every time you asked, you
3 were generally given permission to
4 attend?
5    A.   I believe that to be true.
6    Q.   Do you know whether you
7 attended this particular one in
8 November 2009?
9    A.   I believe I did.
10    (Document marked for
11    identification as Exhibit Rite Aid
12    Mitchell-14.)
13 BY MR. SIMMER:
14    Q.   I'll hand you what we've
15 marked as Mitchell Exhibit 14.
16    I'll identify it for the
17 record as an e-mail string, two pages --
18 actually strike that.  Three pages.  The
19 first of which is Rite_Aid_OMDL_0050628
20 through 50630.
21    Take a moment to review
22 that.
23    A.   Okay.
24    Q.   Let me just ask you first

Page 295

1 about the e-mail on the first page that
2 starts the string from Kimberly Birklin.
3 Who is that?
4    A.   Kim was the DEA coordinator
5 in Liverpool, New York.
6    Q.   And do you know what her
7 responsibilities were as DEA coordinator?
8    A.   To basically ensure
9 compliance with all DEA regulations for
10 the Liverpool DC.
11    Q.   Okay.  And so her e-mail to
12 you dated April 11, 2011.  Do you see
13 where she says under the subject,
14 suspicious order monitoring, do you see
15 that?
16    A.   Yes, sir.
17    Q.   And in the body of the
18 e-mail, she says, "Kevin, just reviewing
19 SOM procedures for our building.  Do you
20 know if we are moving in this direction
21 for our order management system?"
22    And then there's a link to a
23 Cegedim page attached to this.
24    A.   Yes, sir.

Page 296

1    Q.   Do you remember having seen
2 this -- this e-mail string before?
3    A.   Yes, sir, I have.
4    Q.   When did you last see it?
5    A.   I believe yesterday.
6    Q.   Okay.  Directing your
7 attention to the second page.  It's --
8 it's cut off, but we went back and I
9 think have identified the actual page
10 here.
11    Can I show that to you?
12    A.   Yes, sir.
13    (Document marked for
14    identification as Exhibit Rite Aid
15    Mitchell-15.)
16 BY MR. SIMMER:
17    Q.   We just wanted to make sure,
18 as we say it, we're on the same page,
19 that -- because part of it was cut off,
20 we just want to make sure that we could
21 show you the entire page, rather than a
22 cutoff page.
23    MS. McENROE:  And Scott,
24    could you mark that as Exhibit 15?

Page 297

1    MR. SIMMER:  I will mark
2    that, I'm sorry.
3    MS. McENROE:  Yes --
4    THE WITNESS:  Mine is marked
5    as Exhibit 15.
6 BY MR. SIMMER:
7    Q.   And I'm sorry, that's
8 exhibit?
9    A.   15.
10    Q.   15.
11    A.   Yes, sir.
12    Q.   I'll identify it for the
13 record as a page off the Cegedim website
14 that -- that was the identical link as
15 was in Ms. Birklin's e-mail to -- to the
16 witness.  And it's entitled Suspicious
17 Order Monitoring Programs.
18    If you'd just compare at
19 least what you can see of the two, it is
20 identical content?
21    So when -- under -- you see
22 in the middle of this, this particular
23 exhibit, it says, "Confidence in
24 compliance."

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1   Do you see that?

2   A.   Yes, sir.

3   Q.   And you see where it says,

4  "Establish a statistically defensible

5  order pending system"?

6   Do you see that?

7   A.   Yes, sir.

8   Q.   Do you know what that's in

9  reference to?

10   A.   I do not recall.

11   Q.   Okay.  Under operational

12  effectiveness, where you see where it

13  says, "Improve detection of suspicious

14  orders, quick clearance of legitimate

15  ones."

16   Do you see that?

17   A.   Yes, sir.

18   Q.   Do you have any idea what

19  that's in reference to?

20   A.   I mean it appears to me that

21  Ron is trying to sell a service to

22  wholesale distributors.

23   Q.   Okay.  And use those same

24  kind of language that we've talked about

Page 299

1  earlier in terms of identifying

2  legitimate orders, right?

3   A.   Yes, sir.

4   Q.   Okay.  And the third one

5  under strong defensibility.  Do you see

6  where I'm talking?

7   A.   Yes, I do.

8   Q.   You see where it says, "Make

9  decisions built on statistics and math,

10  not best guesses."

11   Do you see that?

12   A.   Yes, sir.

13   Q.   Okay.  Do you know whether

14  the company engaged with Mr. Buzzeo or

15  Cegedim or -- or any of those folks

16  working with them for these services?

17   MS. McENROE:  Objection to

18   form.

19   THE WITNESS:  If so, I'm

20   unaware.

21  BY MR. SIMMER:

22   Q.   Okay.  Do you know, in

23  response are you -- I'm sorry.

24   You send this on to Janet

Page 300

1  Hart, right, what -- what Ms. Birklin had

2  sent you?

3   A.   Yes.

4   Q.   You see in your e-mail dated

5  April 11, 2011, where you say, "We never

6  put anything in writing for this.  Can

7  we?"

8   What it is -- what is it

9  you're asking Ms. Hart?

10   A.   So there's -- there is a

11  little background to this.  So as with

12  any conference that Ron held, and I think

13  we all, everybody in this room knows

14  this, when -- when DEA issues guidance,

15  they are very vague in what they are --

16  what they are putting in writing.

17   So with suspicious order

18  monitoring and -- and with Ron's

19  conferences, DEA was represented there

20  and they talked about suspicious order

21  monitoring as one of the topics.  And

22  they talked about how, you know, what was

23  good in the past is not necessarily going

24  to be good going forward.  There's just

Page 301

1  so much scrutiny on that particular

2  subject that things are going to get much

3  tougher.

4   So if you don't have a good

5  program in place, it may be in your best

6  interest to solicit Ron's services and

7  have them come into your DC and formulate

8  a program for you.

9   We actually had several

10  meetings internally with myself, with

11  loss prevention, with government affairs,

12  to test our program and make sure that

13  the algorithm's in place and the -- that

14  the program was working as it was

15  intended.

16   So that's where -- that's

17  the pieces that are missing, as far as we

18  never put anything in writing for this.

19   Q.   So let me ask you a little

20  bit further about that.  You say you had

21  meetings internally.  You met with loss

22  prevention.  Who in loss prevention?

23   A.   I believe Andy Palmer.

24   Q.   Who in government affairs?

Page 302

1    A.   Janet Hart.
2    Q.   And you say that you tested
3  your program.  How did you test your
4  program?
5    A.   Actually pharmacy operations
6  was also part of that, Maggie Perritt,
7  and Maggie is the one who tested the
8  algorithm to make sure that, from an
9  ordering standpoint, everything was
10 working as it was designated to work.
11   Q.   And you are referencing an
12 algorithm.  Whatever -- what is the
13 algorithm you're referencing?
14   A.   That -- that is beyond my
15 intellectual ability -- I don't know.
16   Q.   Who is it that we would talk
17 to about that algorithm?
18   A.   Maggie Perritt.
19   Q.   How do you spell her last
20 name?
21   A.   P-E-R-R-I-T-T.
22   Q.   And what department did she
23 work?
24   A.   Pharmacy operations.

Page 303

1    Q.   Where was that housed?
2    A.   Camp Hill.
3    Q.   So there was an actual
4  algorithm that was put into the computer
5  to identify suspicious orders, is that
6  what you're testifying?
7    A.   I'm not sure what it
8  identified.  But it was part of the
9  excessive order and suspicious order
10 monitoring program.
11   Q.   And you -- your testimony is
12 that she undertook a test of some kind to
13 see that it was working properly?
14   A.   That is correct.
15   Q.   And do you know what she
16 actually did?
17   A.   We asked her to put it in
18 writing so that the DCs again would have
19 that as supporting evidence that we have
20 a program in place that was tested.
21   Q.   And you asked her to put
22 what in writing?
23   A.   The results of her findings.
24   Q.   Did she ever do that?

Page 304

1    A.   Not that I'm aware of.
2         (Document marked for
3    identification as Exhibit Rite Aid
4    Mitchell-16.)
5  BY MR. SIMMER:
6    Q.   I'll hand you what we've
7  marked as Mitchell Exhibit Number 16.
8         Identify it for the record
9  as a one-page e-mail with the Bates
10 Number Rite_Aid_OMDL_0050634.
11        And it's an e-mail from you
12 dated June 3, 2011, to Janet Hart and
13 the -- you see in the body of the e-mail
14 where you say, "We need to get the
15 explanation on suspicious order
16 monitoring in writing.  Thought Maggie
17 was going to put something in writing.
18 Did you ever get anything?"
19        Is that what you were just
20 talking about?
21   A.   Yes, sir.
22   Q.   That Ms. Perritt was
23 supposed to put the results of her test
24 in writing and she never did?

Page 305

1    A.   That's correct.
2    Q.   Do you have any idea why she
3  never put it in writing?
4    A.   I do not.  She left the
5  company.  And I'm not -- I mean I can't
6  recollect when, but that may have been
7  part of it.
8    Q.   It may have been part of
9  what?
10   A.   Why she didn't do it.
11   Q.   That she left before she got
12 it completed, is that what you're
13 testifying?
14   A.   It's possible.  I don't
15 recall.
16   Q.   Had she left at the time you
17 sent this e-mail?
18   A.   I don't recall.
19   Q.   I'll hand you what we've
20 previously marked as Chapman Exhibit 1.
21        MS. McENROE:  So you're just
22 leaving it that way?
23        MR. SIMMER:  Yeah, we're not
24 going to re-mark it.

Page 306

BY MR. SIMMER:

Q.   I'll identify it for the record as a one-page e-mail, Bates Number Rite_Aid_OMDL_0020412.

Okay.  This is two e-mails. I want to look at the -- the earlier e-mail.  Do you see the e-mail address where it says ███████@riteaid.com?

A.   Yes, sir.

Q.   Is that you?

A.   Yes.

Q.   We've never seen that e-mail used anywhere else in any of your documents.  Is there some reason why it's different here that you're aware of?

A.   There were two separate systems at Rite Aid.  They had a system called SYSM which was S-Y-S-M, that was an internal Rite Aid communication only. And being that I worked in distribution, that's what the D-I-S stands for and then initials.

So if you were in pharmacy it would have been PMP or PMD.  Loss

Page 307

prevention would have been LPN, et cetera.

Q.   So this is a different kind of communication system other than e-mails?

A.   That's correct.

Q.   And why was this system used?

A.   Internal communication for Rite Aid.

Q.   Why not use regular e-mail system?

MS. McENROE:  Objection to form.

THE WITNESS:  No idea.  It was in place when I started.  They did do away with it at some point, probably after I left.

BY MR. SIMMER:

Q.   So this is an e-mail on November 7th, 2009.

Do you see that?

A.   Yes, sir.

Q.   So as of 2009, SYSM was

Page 308

still in place, right?

A.   Apparently so, yes, sir.

Q.   So how did you know to use SYSM sometimes and use the regular e-mail system other times?

MS. McENROE:  Objection to form.

THE WITNESS:  There was no rhyme or reason why you would use either one.  It just -- I don't know.

BY MR. SIMMER:

Q.   Okay.  I'll direct your attention to your e-mail -- or I guess -- I guess you don't call this e-mail.  What is it then?

A.   SYSM.

Q.   SYSM.  Okay.  In your SYSM on this date, do you see where you says the first paragraph is talking about someone who died.  And the second paragraph, you say, "Kim Birklin's room last week at the conference was supposed to be either direct billed or put on

Page 309

someone from LVP's card, but it wasn't."

I don't need to read the whole paragraph.  But what's going on in that paragraph, if you could explain it to us?

A.   Kim's expenses weren't paid for, so I ended up paying for it myself.

Q.   Okay.  And what conference are we talking about?

A.   This would be Ron's conference.

Q.   Okay.  And that's a conference that was the 2009 conference, the one we looked at earlier where you were asking permission to attend?

A.   Yes, sir.

Q.   Okay.  Do you see the last -- or excuse me, second-to-the-last paragraph, where you say, "Good conference.  We have one takeaway that we need to better address, suspicious order monitoring."

Do you recall why you said this to your boss, Mr. Chapman?

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    A.   Absolutely.  As I just
2  talked about a couple minutes ago,
3  when -- when DEA spoke at the conference,
4  they talked about all the standards were
5  going to be much more stringent, much
6  tougher.  And of course, me being as
7  diligent as I was about making sure that
8  the DCs were compliant, I took that as,
9  you know, maybe our program is not good
10 enough, maybe we need to test it to make
11 sure.
12       So all of the things that we
13 just talked about, about, you know,
14 having the follow-up meetings with Maggie
15 and Andy and Janet to test the program
16 and make sure it worked as it was
17 designed to work, we're kind of -- but
18 that was after this particular e-mail
19 obviously.
20       But I wanted to make sure
21 that Rick was aware that DEA's stance was
22 going to be very aggressive in monitoring
23 suspicious orders.
24    Q.   And you're saying that

Page 311

1  because that's what you heard at the
2  Buzzeo conference, right?
3     A.   Yes, sir.
4       (Document marked for
5       identification as Exhibit Rite Aid
6       Mitchell-17.)
7  BY MR. SIMMER:
8     Q.   I'll hand you what we marked
9  as Mitchell Exhibit 17.  I'll identify it
10 for the record as an e-mail string with
11 Bates -- one-page e-mail string with
12 Bates ending OMDL_0050632.
13    A.   Okay.
14    Q.   Could I direct your
15 attention to, I guess, the second --
16 third e-mail on the string.  It's from
17 you to Janet Hart dated November 16,
18 2010.
19       Do you see where I am?
20    A.   Yes, sir.
21    Q.   In the body of the e-mail,
22 do you see where you say, "When I get
23 back to the office next week, we need to
24 talk about suspicious order monitoring.

Page 312

1  At Buzzeo's conference last week and what
2  we have in place probably isn't
3  sufficient anymore.  I'll give you a
4  shout so we can 'brainstorm.'"
5       Do you remember this?
6     A.   Yes, sir.
7     Q.   Have you seen this e-mail
8  before?
9     A.   Yes, sir.
10    Q.   Did you see it yesterday?
11    A.   I did.
12    Q.   Okay.  And when you say that
13 they -- your suspicious order monitoring
14 program probably isn't sufficient
15 anymore, that's because what you've just
16 seen at the Buzzeo conference is
17 something that has alerted to you that
18 there have been some changes, you think,
19 right?
20       MS. McENROE:  Objection to
21    form.
22       THE WITNESS:  It's been
23    alerted that they are going to
24    take a very stringent approach.

Page 313

1       So, again, being that we haven't
2       been inspected by DEA in a couple
3       years, I wanted to make sure that
4       what we had was sufficient.  I was
5       questioning whether or not it was,
6       so -- which is what prompted this
7       e-mail.
8  BY MR. SIMMER:
9     Q.   And she responds to you
10 later that same day saying, "Sounds
11 good."
12    A.   Correct.
13    Q.   Did you ever have this
14 conversation with Janet Hart?
15    A.   Yes, sir.  We had -- these
16 are the meetings that I've been
17 referencing.
18    Q.   Okay.  So when you talked
19 about actually doing this algorithm test,
20 that's what -- what series of meetings
21 followed this communication to Ms. Hart,
22 right?
23    A.   That is correct, sir.
24    Q.   And this is where you also

Page 314

1  said you involved some others in the
2  company to undertake that review as well,
3  right?
4      A.   That is correct.
5      Q.   Did you ever bring any
6  Buzzeo or any third-party vendors to look
7  at the Rite Aid suspicious order
8  monitoring program to do an audit of any
9  kind?
10         MS. McENROE:  Objection to
11     form.
12         THE WITNESS:  Ron had done
13     audits in the past.  I did not
14     bring anybody on after 2009 to
15     conduct audits on the program.
16 BY MR. SIMMER:
17     Q.   I think you said that the
18 last audit he had done was in 2002,
19 right?
20     A.   That's correct.
21     Q.   He hadn't done any since
22 then, right?
23     A.   Not that I recall no.
24     Q.   And as far as you know,

Page 315

1  nobody else, Mr. Buzzeo or anybody else,
2  had come in and done an audit of the
3  company's suspicious order monitoring
4  program since 2002, right?
5          MS. McENROE:  Objection to
6      form.
7          THE WITNESS:  Other than
8      DEA.
9  BY MR. SIMMER:
10     Q.   Other than what you talked
11 about earlier, right?
12     A.   Yes, sir.
13     Q.   Okay.  And which there was
14 no written record though, right?
15         MS. McENROE:  Objection to
16     form.
17         THE WITNESS:  That is
18     correct, sir.
19     (Document marked for
20     identification as Exhibit Rite Aid
21     Mitchell-18.)
22 BY MR. SIMMER:
23     Q.   I'll hand you what we marked
24 as Mitchell Exhibit Number 18.

Page 316

1      A.   Thank you.
2      Q.   I'll identify it for the
3  record as Rite_Aid_OMDL_0046564.  And
4  then there's a native attachment that is
5  Bates-numbered 046565.
6          Your e-mail to a group of
7  individuals, dated November 29, 2010, do
8  you see that?
9      A.   Yes, sir, I do.
10     Q.   And do you see where you
11 say, "Can you please capture all orders
12 for the month of November that stores
13 ordered more than the allowed amount?
14 Please e-mail to me no later than close
15 of business Friday, December 3, 2010."
16         Do you see that?
17     A.   Yes, sir.
18     Q.   What prompted you to request
19 this information?
20     A.   That, I honestly do not
21 recall.
22     Q.   And who are the individuals
23 that you're requesting this information
24 from?

Page 317

1      A.   They are the DEA
2  coordinators at the pharmacy DCs.
3      Q.   So that would be Marian
4  Wood.  And then the second name is?
5      A.   Jennifer Wyatt.  And she was
6  in Tuscaloosa, Alabama.
7      Q.   Barbara Lucero?
8      A.   Barbara Lucero was in
9  Woodland, California.  And Kimberly
10 Birklin was in Liverpool, New York.
11     Q.   Okay.  And then the e-mail
12 right above it from Ms. Wood dated
13 December 3rd, 2010, she says, "As
14 requested.  FYI, it seems there was a
15 recall which caused many RxPs" --
16     A.   Pharmacists.
17     Q.   -- "to order more
18 hydrocodone.  In addition, there was a
19 manufacturer out, which caused higher
20 than normal orders."
21         Do you see that?
22     A.   I do.
23     Q.   Do you have any recollection
24 of what she's referencing here?

Page 318

1    A.   I've seen the e-mails over
2  the last day, but I don't recollect it as
3  something that I remember.
4    Q.   If you look at her
5  attachment, this is like the threshold
6  log that we looked at before, I believe,
7  right?
8    A.   Yes, sir.
9    Q.   So this is for the month of
10 November, as I take it, right?
11   A.   That's what I had asked for.
12 So I would assume so.
13   Q.   So -- there isn't an actual
14 product description here.  It's just the
15 item number.  But we can tell what some
16 of the reasons were.  Do you see, for
17 example, the second item on this list --
18 this is Store 10526, Item 602732.
19 Ordered amount, 66.  Order shipped, 24.
20   A.   Yes, sir.
21   Q.   Do you see, "Reason:  Not
22 called"?
23   A.   Mm-hmm.  I do.
24   Q.   So whenever I see not called

Page 319

1  on here, that means nobody ever called
2  the pharmacy, right?
3    A.   That would be my assumption
4  as well.
5    Q.   And we may have talked about
6  this.  But I'm not exactly sure what your
7  answer was.  When it says not called,
8  that just simply reflects no one ever
9  called the pharmacy?
10       MS. McENROE:  Objection to
11 form.
12       THE WITNESS:  That would be
13 correct.
14 BY MR. SIMMER:
15   Q.   Okay.  So without going into
16 each of these items -- so the subject
17 line to your e-mail, the one that you
18 sent on November 29th, it says "Threshold
19 Cutbacks"?
20   A.   Yes, sir.
21   Q.   What's a threshold cutback?
22   A.   We would be reviewing the
23 thresholds again and potentially cutting
24 them back.  So we would be shipping

Page 320

1  smaller sizes.
2    Q.   And, again, you don't have
3  any recollection of what prompted this
4  review of these thresholds to determine
5  whether they should be cut back?
6    A.   I do not.  I'm sorry.
7    Q.   And so the table she's
8  giving us is every instance during the
9  month of November where there was a
10 threshold -- or an order that had been
11 cut back?
12   A.   That's correct.
13   Q.   Can I direct your attention
14 to the fourth item from the bottom.  It's
15 got a little green box over the store
16 number.
17       Do you see that?
18   A.   Yes, sir.
19   Q.   2389.  Do you see that?
20   A.   I do.
21   Q.   And that one over in the
22 reason says, "Exception, allowed up to
23 15."  So this is an exception made over
24 the threshold, right?

Page 321

1    A.   Correct.
2    Q.   Any other reason given other
3  than just that an exception was given for
4  that pharmacy?
5    A.   There were numerous stores
6  within the Rite Aid network that had
7  exceptions based on volume.
8    Q.   But the only reason that
9  it's documented here is simply that there
10 was an exception made, right?
11   A.   That's what I see as well.
12   Q.   Okay.
13       MR. SIMMER:  Can we go off
14 the record.
15       THE VIDEOGRAPHER:  The time
16 is now 3:51 p.m.  We're going off
17 the record.
18       (Short break.)
19       THE VIDEOGRAPHER:  The time
20 is now 4:07 p.m.
21       We are back on the record.
22       MR. SIMMER:  I have no
23 further questions of the witness
24 at this time.  I would, however,

Page 322

1 reserve any kind of further
2 questioning, assuming you do some
3 cross.
4 But in addition, we reserve
5 the right to come back and conduct
6 further examination given the
7 lateness of the production last
8 night. We have some additional
9 documents that we haven't had a
10 chance to incorporate in today's
11 examination. Anything in there
12 that we may request to come back
13 in a limited additional
14 examination.
15 MS. McENROE: Is that the 17
16 pages from last night or are you
17 talking about something else?
18 MR. SIMMER: I don't know
19 how many pages there are -- I
20 don't know how many pages were
21 produced, but there were some
22 additional pages that we got last
23 night.
24 MS. McENROE: Understood.

Page 323

1 We -- we have a different view of
2 it, but we can deal with that if
3 it becomes an issue.
4 I have a couple follow-up
5 questions for the witness. Is it
6 okay if I do it sitting here, or
7 do you want me to switch?
8 I'm happy to do it from
9 here.
10 MR. SIMMER: If you just
11 want to do it from there, that's
12 great.
13 MS. McENROE: Okay, great.
14 - - -
15 EXAMINATION
16 - - -
17 BY MS. McENROE:
18 Q. Hi, Mr. Mitchell. I'm Elisa
19 McEnroe. I represent Rite Aid and I'm
20 here on your behalf today as well. You
21 understand that?
22 A. Yes, I do.
23 Q. I have just a couple
24 questions for you. And we appreciate you

Page 324

1 being here.
2 When did you cease your
3 employment with Rite Aid?
4 A. January 2012.
5 Q. That was a number of years
6 ago, correct?
7 A. Seven years ago last Friday,
8 correct.
9 Q. And throughout the
10 discussion today there have been some
11 references to the concept of an excessive
12 order monitoring program and discussion
13 of a suspicious order monitoring program.
14 Do you, generally speaking, recall those
15 discussions?
16 A. Yes, I do.
17 Q. I'd like to direct your
18 attention to Exhibit 12 please.
19 A. Okay.
20 Q. And in particular the second
21 page of it, which I understand, and
22 counsel represented, and I agree, that
23 this is just a couple pages out of a much
24 larger document.

Page 325

1 So the second page has the
2 Bates Rite_Aid_OMDL_0020727. Are you on
3 the same page as I am?
4 A. Yes, I am.
5 Q. And what is the header of
6 this document?
7 A. DEA regulatory guideline.
8 Q. What's the title under that?
9 A. Title VI, Excessive Order
10 Monitoring.
11 Q. For the record, could you
12 please read the purpose section that's
13 right under that?
14 A. "To provide for monitoring
15 of all controlled substances orders as to
16 detect suspicious orders."
17 Q. Is that your understanding
18 of what the purpose was of this
19 particular guideline?
20 MR. SIMMER: Objection to
21 form.
22 BY MS. McENROE:
23 Q. You may answer.
24 A. Yes.

Page 326

1   Q.   Could you explain for me,
2   just to make sure the record is clear,
3   the relationship, if any, between
4   excessive order monitoring and suspicious
5   order monitoring?
6   A.   Excess --
7        MR. SIMMER: Objection to
8   form.  Asked and answered.
9   BY MS. McENROE:
10  Q.   You may answer.
11  A.   Okay.  I'm sorry.  Excessive
12  is anything out of the norm with size.
13  Where suspicious order monitoring,
14  suspicious was anything that, regardless
15  of size, frequency of the order, and an
16  order pattern that would be different
17  from a normal distribution.
18  Q.   Looking at this DEA
19  regulatory guideline, it's titled
20  Excessive Order Monitoring and it has
21  that purpose.
22       Do you understand there's
23  some relationship between excessive order
24  monitoring and looking for suspicious

Page 327

1   orders or potentially suspicious orders?
2        MR. SIMMER: Objection to
3   form.
4   BY MS. McENROE:
5   Q.   You may answer.
6   A.   Yes, I do.
7   Q.   Can you explain that to me
8   please.
9        MR. SIMMER: Same objection.
10  BY MS. McENROE:
11  Q.   You may answer.
12  A.   Okay.  Excessive orders at
13  times could potentially point out a
14  suspicious order.
15       Again, during my time with
16  Rite Aid, I'm not aware of any suspicious
17  orders that were identified.
18  Q.   Can you keep Exhibit 12 out,
19  but also at the same time take out
20  Exhibit 7 please.
21       You'll recall this is a
22  document you went over with counsel
23  earlier.  And I'm not going to try and
24  take very much time with it.  But it is a

Page 328

1   copy of a Rite Aid Corporation DC
2   self-assessment program regulatory
3   checklist.
4        Do you see that?
5   A.   Yes.
6   Q.   Okay.  I'd like to direct
7   your attention, and I know we had a
8   little bit of trouble with which page is
9   which.  But I'm going to go with the
10  numbers at the bottom that say like 2 of
11  16, 3 of 16.  Do you see that?
12  A.   Yes.
13  Q.   Could you please flip to 3
14  of 16?
15       And at the top of that
16  document, do you see that, in the upper
17  right-hand corner, it says A --
18       MR. SIMMER: Just a second,
19  Elisa.  Where are you?
20       MS. McENROE: Oh, I'm just
21  trying to --
22       MR. SIMMER: No, but these
23  numbers you're referring to are
24  not on -- on the exhibits we're

Page 329

1   looking at.  So I don't know what
2   we're --
3        MS. McENROE: Oh, you know
4   what, mine is printed out
5   differently than yours.  So maybe
6   I can try and identify the page
7   differently, if that makes sense.
8        The -- the page I was trying
9   to get to has A.08.02 at the top.
10       MR. SIMMER: Okay.  Thank
11  you.
12       MS. McENROE: Great.  Do you
13  have -- do you have it?
14       MR. SIMMER: Mm-hmm.
15  BY MS. McENROE:
16  Q.   Okay.  And are you there, do
17  you have it?
18  A.   Yes, I am.
19  Q.   Okay.
20       MS. McENROE: And we are all
21  literally on the same page I hope.
22  BY MS. McENROE:
23  Q.   Okay.  So looking at Item 13
24  there, I think this is something we

Page 330

1  discussed earlier. Could you read that
2  for me, what the question is?
3      A.  "Verify that the excessive
4  order monitoring policy is known and
5  available."
6      Q.  And is that referring to the
7  page we were looking at in Exhibit 12 a
8  moment -- a moment ago?
9          MR. SIMMER:  Objection to
10  form.
11  BY MS. McENROE:
12      Q.  You may answer.
13      A.  Yes, it is.
14      Q.  And so earlier counsel was
15  asking you about where the words
16  suspicious order monitoring was in
17  Exhibit 7.  But looking at this, it's
18  referring to Exhibit 12, which in its
19  purpose says it's to detect suspicious
20  orders; is that right?
21          MR. SIMMER:  Objection,
22  form.
23          Are you testifying for the
24  witness?

Page 331

1          MS. McENROE:  I'm not, I'm
2  asking him a question.
3          MR. SIMMER:  A leading
4  question of your own witness?
5          MS. McENROE:  Your objection
6  is noted for the record.
7          Your objection is noted for
8  the record.  Thank you.
9  BY MS. McENROE:
10      Q.  You may answer.
11          MR. SIMMER:  Objection to
12  form.
13          THE WITNESS:  That's
14  correct.
15  BY MS. McENROE:
16      Q.  So we were just looking at
17  13.  Now take a look at Item 15.  Do you
18  see that?
19      A.  Yes.
20      Q.  And it says, "Is there a
21  written excessive order monitoring
22  procedure?"
23          Did you see that?
24      A.  Yes.

Page 332

1      Q.  And is that referring to the
2  same thing as in Exhibit 12?
3          MR. SIMMER:  Objection to
4  form.  Leading.
5  BY MS. McENROE:
6      Q.  You may answer.
7      A.  It is.
8      Q.  Okay.  You can set those two
9  aside.
10          MS. McENROE:  Can I get two
11  exhibit stickers.
12          (Document marked for
13  identification as Exhibit Rite Aid
14  Mitchell-19.)
15  BY MS. McENROE:
16      Q.  So the copying is not so
17  great.  It's a little bit dark.  But I'm
18  handing you what I marked as Exhibit 19.
19          Do you remember a line of
20  questioning earlier where counsel was
21  asking you about DEA audits at the
22  Perryman facility?
23          MR. SIMMER:  Objection to
24  form.  Misstates prior testimony.

Page 333

1  BY MS. McENROE:
2      Q.  Do you remember at all today
3  discussing DEA auditing at the Perryman
4  facility?
5          MR. SIMMER:  Objection to
6  form.
7  BY MS. McENROE:
8      Q.  You may answer.
9      A.  Yes, I do.
10      Q.  Do you remember a question
11  about whether there was any written
12  record of those audits?
13      A.  Yes, I do.
14      Q.  Do you remember what you
15  testified?
16          MR. SIMMER:  Objection to
17  form.  The record speaks for
18  itself.
19  BY MS. McENROE:
20      Q.  You may answer.
21          MR. SIMMER:  Testimony
22  speaks for itself.
23  BY MS. McENROE:
24      Q.  You still may answer.

Page 334

1    A.   The DEA does not provide
2  documentation unless there are findings.
3    Q.   What is this Exhibit 19 that
4  I just handed you?
5    A.   This is a summary that I put
6  together from the DEA visit in Perryman
7  in 2005 to the senior vice president of
8  supply chain, my boss at the time, Robbie
9  Roberson and Tim Peifley, who was the
10  general manager in Perryman that just
11  basically memorializes the outcome and
12  the findings -- or the lack of findings,
13  therefore, and -- with the DEA audit in
14  Perryman.
15       MR. SIMMER:  Just one
16    minute.  Which part of this
17    exhibit were you referencing?
18    There was a question just about
19    what does it say.  And then you
20    start talking about something in
21    this exhibit.  I have no idea
22    where he's -- where he's
23    referencing.
24       MS. McENROE:  So I asked the

Page 335

1  question, and he answered it.  I
2  was asking him what the document
3  is.  And he just described it to
4  me.  So I'm going to ask some more
5  follow-up questions, and if you
6  have questions after, you're
7  welcome to ask.
8       MR. SIMMER:  Okay.  I tell
9    you what.  Move to strike.
10    Nonresponsive.  The question is,
11    "What does the exhibit say?"  And
12    then he answered something
13    completely different.  Move to
14    strike.  Nonresponsive.
15       MS. McENROE:  All right.
16    Well, I disagree with your motion,
17    but we can deal with that at a
18    later date.
19  BY MS. McENROE:
20    Q.   So, Mr. Mitchell, looking at
21  the first e-mail in this chain, it's an
22  e-mail from you to Wilson Lester copying
23  Robbie Roberson and Tim Peifley; is that
24  right?

Page 336

1    A.   Yes.
2    Q.   And you testified earlier
3  about Wilson Lester.  Who is Robbie
4  Roberson?
5    A.   He was vice president of
6  logistics and my direct boss at the time.
7    Q.   Who is Tim Peifley?
8    A.   General manager of Perryman
9  distribution center.
10    Q.   And Peifley is
11  P-E-I-F-L-E-Y; is that right?
12    A.   Correct.
13    Q.   In the e-mail can you read
14  the first sentence after Wilson?
15    A.   "Wilson, the investigators
16  from the DEA office in Baltimore have
17  departed from Perryman with very positive
18  comments regarding our pharmacy
19  operation."
20    Q.   Do you mind going on to read
21  the next sentence?
22    A.   The audit was conducted for
23  Monday, September 19th, through
24  Wednesday, September 21st.  They were

Page 337

1  very impressed with the level of detail
2  and ownership that the staff in Perryman
3  has with controlled substances.
4    Q.   Then you list a number of
5  things.  And then you have a sentence
6  that starts with, "The closing comments."
7  Can you read that?
8    A.   "The closing comments
9  mention specifically that they have no
10  words of advice for the staff for
11  improvement.  It was a flawless audit."
12    Q.   Do you recall if this is
13  consistent with your memory of this 2005
14  DEA audit of the Perryman facility?
15       MR. SIMMER:  Objection to
16    form.
17       THE WITNESS:  Yes.
18  BY MS. McENROE:
19    Q.   Would you have expected, in
20  your experience, to have gotten a written
21  confirmation from DEA of their outcome of
22  this audit?
23       MR. SIMMER:  Objection to
24    form.  Leading.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    THE WITNESS:  No, I would
2  not.
3    (Document marked for
4  identification as Exhibit Rite Aid
5  Mitchell-20.)
6  BY MS. McENROE:
7    Q.   I'm going to hand you what
8  I'm marking Exhibit Number 20.
9    Do you recognize this
10 document?
11   A.   Yes.
12   Q.   What is it?
13   A.   It's a memorialization from
14 Tim Peifley to me and Tim's boss, Robert
15 Shovel, of the outcome of the 2009 DEA
16 audit in Perryman.
17   Q.   And there's a lot written
18 here.  You can take some time and review
19 it if you'd like.  And I'll direct your
20 attention to the end of the e-mail once
21 you've had a chance to take a look at it.
22   A.   Okay.
23   Q.   Could you read the last
24 bullet point in Tim Peifley's e-mail that

Page 339

1  starts at the top of the second page of
2  this exhibit?
3    MR. SIMMER:  Objection to
4  form.
5  BY MS. McENROE:
6    Q.   You can read it.
7    A.   "There will be no official
8  report as a result of this visit.  There
9  will be no memorandums of understanding
10 as a result of the audit.  He stated,
11 'Everything we saw meets the requirements
12 of what we came to see.  I'm happy, very
13 happy.'"
14   Q.   And can you read the
15 sentence after that?
16   A.   "Thanks to everyone who made
17 this an exceptionally successful audit of
18 an immensely critical part of our
19 operation and the supply chain's overall
20 mission as well."
21   Q.   Those portions that you just
22 read out loud, are those consistent with
23 your recall of the audit in 2009 of the
24 Perryman facility?

Page 340

1    A.   Yes, they are.
2    MS. McENROE:  I have nothing
3  further.
4    - - -
5    EXAMINATION
6    - - -
7  BY MR. SIMMER:
8    Q.   Sir, could you look back at
9  your e-mail summary in Exhibit 19 that
10 you were just asked some questions about?
11   And so this is
12 September 2005, correct?
13   A.   Yes, sir.
14   Q.   Is there anywhere in your
15 summary that you put together here a
16 reference to the fact that the DEA had
17 actually audited the suspicious order
18 monitoring program?
19   A.   I did not, no.
20   Q.   Is there anywhere in your
21 summary that the DEA audited the
22 excessive order monitoring program?
23   A.   I did -- no, sir, there is
24 not.

Page 341

1    Q.   Look at Exhibit 20.  Now,
2  you didn't create this record.
3  Mr. Peifley did, right?
4    A.   Yes, sir.
5    Q.   So these are his words, not
6  yours, right?
7    A.   That's correct, sir.
8    Q.   And in his summary, did he
9  summarize anywhere that the DEA audited
10 the Rite Aid excessive order monitoring
11 program?
12   A.   No, sir.
13   Q.   In his words anywhere, did
14 he say that the DEA audited the Rite Aid
15 suspicious order monitoring program?
16   A.   No, sir.
17   MR. SIMMER:  No further
18 questions.
19   MS. McENROE:  I just have a
20 quick follow-up.
21   - - -
22   EXAMINATION
23   - - -
24 BY MS. McENROE:

Page 342

1  Q.  Looking at both Exhibits 19
2  and 20, do you have a recall of an
3  understanding of whether the DEA actually
4  would have audited, looked at, the
5  excessive or suspicious order monitoring
6  policies as part of these audits?
7      MR. SIMMER:  Objection to
8      form.  Document speaks for itself.
9  BY MS. McENROE:
10     Q.  You may answer.
11     A.  I can only speak to the
12 audit in 2005 because I was physically
13 there during that audit.  It was a very
14 comprehensive audit and, yes, they did
15 review the excessive order monitoring
16 program as well as the documents that the
17 DC was utilizing upon calling stores.
18     2009, I have no recollection
19 of that at all.
20     Q.  Do you believe -- do you
21 have any reason to believe that they did
22 not audit the excessive or suspicious
23 order monitoring programs in 2009?
24     MR. SIMMER:  Objection as to

Page 343

1  form.
2      THE WITNESS:  I have no
3      reason to believe, but again, I
4      have no knowledge that they did or
5      they didn't.
6      MS. McENROE:  Thank you.  No
7      further questions.
8          - - -
9      EXAMINATION
10         - - -
11 BY MR. SIMMER:
12     Q.  Just a couple follow-ups.
13 You said -- you just answered that you
14 believe they did in 2005.  13 years ago,
15 that's your recollection that they did,
16 right?
17     A.  Yes, sir.
18     Q.  And the records that they
19 would have reviewed, those would have
20 been those excessive order logs we looked
21 at, right?
22     A.  Yes, sir.
23     Q.  There's nothing else in the
24 distribution center logs that they could

Page 344

1  have reviewed in order to evaluate the
2  excessive order monitoring program,
3  right?
4      MS. McENROE:  Objection to
5      form.
6      THE WITNESS:  I recall them
7      looking at all of our SOPs as well
8      as the log that was presented
9      today as we were talking about,
10     you know, what the DCs do.
11 BY MR. SIMMER:
12     Q.  And as you've testified
13 multiple times today, at no time had
14 there been ever a report of any
15 suspicious orders of any kind, right?
16     MS. McENROE:  Objection to
17     form.
18     THE WITNESS:  That's
19     correct.  As far as I know, that's
20     correct.
21 BY MR. SIMMER:
22     Q.  So those logs only reflect
23 some suspicious orders -- excuse me --
24 strike that.

Page 345

1      Those logs reflect a series
2  of potentially excessive orders where a
3  call was made to the pharmacy, and some
4  of which were increased over the
5  threshold, others were not, right?
6      MS. McENROE:  Objection to
7      form.
8      THE WITNESS:  I don't recall
9      any being increased.  But yes, the
10     document is what you are
11     referencing.
12 BY MR. SIMMER:
13     Q.  Well, we looked at some of
14 the examples in the one log we looked at
15 where the pharmacist said, "I need the
16 entire shipment," right?
17     A.  That's correct.
18     Q.  And so that was approved in
19 those instances, right?
20     MS. McENROE:  Objection to
21     form.
22     THE WITNESS:  It was not
23     above the threshold.
24 BY MR. SIMMER:

Page 346

1    Q.   And in some of those
2  examples they were, right?
3       MS. McENROE:  Objection to
4  form.
5       THE WITNESS:  There was one,
6  if -- if it's the one that you had
7  highlighted that I recall, maybe
8  fourth from the bottom, that was
9  already an exception.
10      So that was -- that was a
11  little bit different than the rest
12  of these.
13 BY MR. SIMMER:
14   Q.   But the point here is that
15 the only thing the DEA actually looked at
16 were those records, right?
17      MS. McENROE:  Objection to
18 form.
19      THE WITNESS:  That would be
20 correct.
21      MR. SIMMER:  Yeah, nothing
22 further.
23      MS. McENROE:  I have nothing
24 further.  Thank you so much,

Page 347

1  Mr. Mitchell.
2       MR. SIMMER:  Thank you.
3       THE VIDEOGRAPHER:  The time
4  is now 4:26 p.m.  This concludes
5  today's deposition.  We're going
6  off the record.
7       (Excused.)
8       (Deposition concluded at
9  approximately 4:26 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 348

1
2            CERTIFICATE
3
4
5       I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
       It was requested before
8  completion of the deposition that the
   witness, KEVIN MITCHELL, have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12
   _____
13 MICHELLE L. GRAY,
   A Registered Professional
   Reporter, Certified Shorthand
14 Reporter, Certified Realtime
   Reporter and Notary Public
15 Dated:  January 21, 2019
16
17
18      (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 349

1      INSTRUCTIONS TO WITNESS
2
3       Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8       After doing so, please sign
9  the errata sheet and date it.
10      You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14      It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 350

1      - - - - - -
        E R R A T A
2      - - - - - -
3
4  PAGE  LINE  CHANGE
5  _____  _____ _____
6    REASON: _____
7    _____  _____ _____
8    REASON: _____
9    _____  _____ _____
10    REASON: _____
11    _____  _____ _____
12    REASON: _____
13    _____  _____ _____
14    REASON: _____
15    _____  _____ _____
16    REASON: _____
17    _____  _____ _____
18    REASON: _____
19    _____  _____ _____
20    REASON: _____
21    _____  _____ _____
22    REASON: _____
23  _____  _____ _____
24    REASON: _____

Page 352

1        LAWYER'S NOTES
2  PAGE  LINE
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____

Page 351

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4       I,_____, do
5  hereby certify that I have read the
6  foregoing pages, 1 - 352, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  KEVIN MITCHELL            DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20_____.
21  My commission expires:_____
22
    _____
23  Notary Public
24