Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3
      ***************************
 4
      IN RE:  NATIONAL          MDL No. 2804
 5    PRESCRIPTION OPIATE
      LITIGATION                Case No.
 6                              1:17-MD-2804
      ***************************
 7
      THIS DOCUMENT RELATES TO   Hon. Dan A. Polster
 8    ALL CASES
 9    ***************************
10
11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
13       VIDEOTAPED DEPOSITION OF THOMAS S. MOFFATT
14
15            Tuesday, January 15th, 2019
16                   8:04 a.m.
17
18       Held At:
19              Omni Hotel
20              One West Exchange Street
21              Providence, Rhode Island
22
23    REPORTED BY:
24    Maureen O'Connor Pollard, RMR, CLR, CSR
```

Page 2

```
 1  APPEARANCES:
 2
    FOR THE PLAINTIFFS:
 3
        MICHAEL E. ELSNER, ESQ.
 4      KAITLYN EEKHOFF
           MOTLEY RICE LLC
 5         28 Bridgeside Boulevard
           Mt. Pleasant, South Carolina 29464
 6         843-216-9250
           melsner@motleyrice.com
 7
             -and-
 8
        JAMES A. DeROCHE, ESQ., of Counsel
 9      WEISMAN, KENNEDY & BERRIS CO., LPA
           101 W. Prospect Avenue
10         Cleveland, Ohio 44115
           800-747-9330
11         lderoche@garson.com
12
13  FOR McKESSON CORPORATION:
14      KEVIN M. KELLY, ESQ.
           COVINGTON & BURLING LLP
15         One CityCenter
           850 Tenth Street, NW
16         Washington, DC 20001-4956
           202-662-5518
17         kkelly@cov.com
18
19  FOR CARDINAL HEALTH, INC.:
20      CHRISTOPHER N. DAWSON, ESQ.
           WHELAN, CORRENTE, FLANDERS, KINDER
21         & SIKET LLP
           100 Westminster Street, Suite 710
22         Providence, Rhode Island 02903
           401-270-4500
23         cdawson@whelancorrente.com
24
```

Page 4

```
 1  APPEARANCES (Continued):
 2
    FOR WEST VIRGINIA BOARD OF PHARMACY:
 3
        HARRISON CYRUS, ESQ. (Remotely)
 4      BAILEY & WYANT PLLC
           500 Virginia Street East
 5         Charleston, West Virginia 25301
           304-345-4222
 6         hcyrus@baileywyant.com
 7
 8  VIDEOGRAPHER:  Robert Sweig
 9  TRIAL TECH:  Gina Veldman
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1  APPEARANCES (Continued):
 2
    FOR AMERISOURCEBERGEN DRUG CORPORATION:
 3
        JAMES A. PETKUN, ESQ. (Remotely)
 4      REED SMITH LLP
           Three Logan Square
 5         1717 Arch Street, Suite 3100
           Philadelphia, Pennsylvania 19103
 6         215-851-8100
           jpetkun@reedsmith.com
 7
 8
    FOR WALMART:
 9
        JOANNE CACERES, ESQ. (Remotely)
10      JONES DAY
           77 West Wacker
11         Chicago, Illinois 60601
           312-782-3939
12         jcaceres@jonesday.com
13
14  FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.
    and THE DEPONENT:
15
        ERIC R. DELINSKY, ESQ.
16      ZUCKERMAN SPAEDER LLP
           1800 M Street NW, Suite 1000
17         Washington, DC 20036-5807
           202-778-1800
18         edelinsky@zuckerman.com
19
20  FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
    SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
21  INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
        DOUGLAS L. SHIVELY, ESQ. (Remotely)
22      BAKER HOSTETLER
           127 Public Square
23         Cleveland, Ohio 44114
           216-861-6486
24         dshively@bakerlaw.com
```

Page 5

```
 1                  INDEX
 2  EXAMINATION                      PAGE
 3  THOMAS S. MOFFATT
 4   BY MR. ELSNER                    8
 5
 6
 7        E X H I B I T S
 8  NO.     DESCRIPTION            PAGE
 9  CVS-Moffatt-1  9/27/06 letter fro DEA,
                   Bates CVS-MDLT1-000010552
10                 through 555................  40
11  CVS-Moffatt-2  12/27/07 letter from DEA,
                   Bates CVS-MDLT1-000013535
12                 and 3536...................  53
13  CVS-Moffatt-3  9/14/18 letter...............  74
14  CVS-Moffatt-4  Document titled CVS Health
                   At a Glance.................  77
15
    CVS-Moffatt-5  Map, Red Lion Data..........  78
16
    CVS-Moffatt-6  Drug Fact Sheet,
17                 Hydrocodone, Bates
                   CVS-MDLT1-000055614 and
18                 55615......................  93
19  CVS-Moffatt-7  11/25/13 e-mail, Bates
                   CVS-MDLT1-000076135..........  96
20
    CVS-Moffatt-8  5/15/14 e-mail, Bates
21                 CVS-MDLT1-000022230 and
                   2231.......................  101
22
    CVS-Moffatt-9  Letter from DEA to CVS
23                 Indiana, Bates
                   CVD-MDLT1-000008014 and
24                 8015.......................  122
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

CVS-Moffatt-10   E-mail chain with
           attachments, Bates
           CVS-MDLT1-00006693 through
           955........................ 132
CVS-Moffatt-11   Document title CVS Health
           Trade Association and
           Coalition Participation...... 140
CVS-Moffatt-12   E-mail chain, Bates
           CVS-MDLT1-000103475 and 476.. 146
CVS-Moffatt-13   Declaration of Joseph
           Rannazzisi................... 158
CVS-Moffatt-14   Settlement Agreement, Bates
           CVS-MDLT1-000060796 through
           804.......................... 175
CVS-Moffatt-15   In the Matter of Cardinal
           Health, Government's
           Prehearing Statement, Bates
           CAH_MDL_PRIORPROD_DEA12_
           00000001 through 54.......... 185
CVS-Moffatt-16   Settlement Agreement, Bates
           CVS-MDLT1-000060805 through
           811.......................... 200
CVS-Moffatt-17   Settlement Agreement, Bates
           CVS-MDLT1-000060812 and 821.. 205
CVS-Moffatt-18   Settlement Agreement, Bates
           CVS-MDLT1-000060822 through
           829.......................... 208
CVS-Moffatt-19   Settlement Agreement, Bates
           CVS-MDLT1-000060847 through
           855.......................... 218
CVS-Moffatt-20   Settlement Agreement, Bates
           CVS-MDLT1-000060856 through
           871.......................... 223
CVS-Moffatt-21   Stipulated Agreement, Bates
           CVS-MDLT1-000060915 through
           921.......................... 237

Page 7

CVS-Moffatt-22   Settlement Agreement, Bates
           CVS-MDLT1-000060839 through
           846.......................... 242
CVS-Moffatt-23   Settlement Agreement, Bates
           CVS-MDLT1-000060830 through
           838.......................... 252
CVS-Moffatt-24   Settlement Agreement, Bates
           CVS-MDLT1-000060872 through
           906.......................... 254
CVS-Moffatt-25   Stipulated Agreement, Bates
           CVS-MDLT1-000060907 through
           914.......................... 260
CVS-Moffatt-26   Chart titled CVS
           Settlements.................. 262
CVS-Moffatt-27   CVS Caremark Corporation
           January 8-9, 2014 Board of
           Directors Meeting minutes,
           Bates CVS-MDLT1-000055303
           through 5352................. 266

Page 8

PROCEEDINGS

THE VIDEOGRAPHER:  We are now on the
record.  My name is Robert Sweig, and I'm a
videographer for Golkow Litigation Services.
     Today's date is January 15, 2019, and
the time is 8:04 a.m.
     This video deposition is being held in
Providence, Rhode Island in the matter of In Re:
National Prescription Opiate Litigation pending
before the United States District Court for the
Northern District of Ohio, Eastern Division.
     The deponent is Thomas Moffatt.
     Counsel appearances will be as noted
on the stenographic record.
     Our court reporter is Maureen Pollard,
who will now swear in our witness.

     THOMAS S. MOFFATT,
having been duly sworn, was examined and
testified as follows:
     EXAMINATION
BY MR. ELSNER:
     Q.   Good morning.

Page 9

     A.   Good morning.
     Q.   My name is Michael Elsner, I'm from
the law firm of Motley Rice, and I represent the
plaintiffs in these actions.
     Can you please state your name?
     A.   Thomas S. Moffatt, M-O-F-F-A-T-T.
     Q.   And what is your date of birth?
     A.   January 26, 1964.
     Q.   And where do you live, sir?
     A.   Kingston, Rhode Island.
     Q.   And you graduated from college with a
degree in history, is that right?
     A.   Yes.
     Q.   Did you take any pharmaceutical
courses in college?
     A.   No.
     Q.   Did you take any courses that related
to pharmacy distribution or regulations of
pharmacies?
     A.   No.
     Q.   What about courses in controlled
substances or other narcotics?
     A.   No.
     Q.   You then took a few years off and you

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  went to law school, is that right?
2      A.  I took a few years off, then I went to
3  law school.
4      Q.  What did you do in that intervening
5  period?
6      A.  I worked, principally I worked at
7  Brother Industries in Nagoya, Japan as an
8  English consultant, and then I came back and
9  worked as a paralegal for a year in a personal
10  injury firm.
11      Q.  What was the name of the firm?
12      A.  Law offices of S. George Bromberg.
13      Q.  And where was that?
14      A.  Cambridge, Massachusetts.
15      Q.  And then you attended Northeastern
16  University School of Law, is that right?
17      A.  Correct.
18      Q.  Did you graduate from law school?
19      A.  Yes.
20      Q.  And did you take the Bar exam when you
21  graduated?
22      A.  Yes.
23      Q.  Are you a licensed attorney today?
24      A.  Yes.

Page 11

1      Q.  What states are you licensed to
2  practice?
3      A.  I'm licensed in Massachusetts, and
4  then I'm registered as an out-of-state in-house
5  counsel in Rhode Island.
6      Q.  In law school did you take any courses
7  in pharmaceutical law or regulations of
8  pharmacies?
9      A.  No.
10      Q.  After law school you went to work for
11  Mintz Levin, is that right?
12      A.  Correct.
13      Q.  And what was your area of practice
14  when you worked there?
15      A.  I was a corporate attorney.
16      Q.  Okay.  What years were you there?
17      A.  I was there from 1993, the fall of '93
18  through August -- or July of '97.
19      Q.  What type of work did you do as a
20  corporate attorney for Mintz Levin?
21      A.  A wide variety of corporate matters,
22  transactions, securities, general corporate law.
23      Q.  Did you deal with any DEA regulations
24  while working at Mintz Levin?

Page 12

1      A.  No.
2      Q.  Was CVS a client of Mintz Levin while
3  you were there?
4      A.  Yes.
5      Q.  Did you work on that -- for CVS while
6  at Mintz Levin?
7      A.  No.
8      Q.  What type of work did Mintz Levin do
9  for CVS, just generally?  I don't need the
10  specifics.
11      A.  Generally real estate matters.
12      Q.  Is that related to the purchase of
13  various pharmacies, or could you be a little bit
14  more specific without revealing a privilege?
15      A.  It was more general real estate
16  matters than acquisitions, as far as I recall.
17      Q.  But you didn't --
18      A.  I didn't work on any of them, so...
19      Q.  Okay.  And then you came to work for
20  CVS, is that right?
21      A.  Yes.
22      Q.  And what year was that?
23      A.  That was August of 1997.
24      Q.  Okay.  What were you hired to do for

Page 13

1  CVS?
2      A.  I was a corporate lawyer.
3      Q.  For CVS Health, or what was the name
4  of the entity that hired you?
5      A.  CVS Pharmacy, Inc., a Rhode Island
6  corporation.
7      Q.  And where were you based?
8      A.  In Woonsocket, Rhode Island.
9      Q.  Is that where you're based today?
10      A.  Yes.
11      Q.  How is it that you came to be hired by
12  CVS?
13      A.  A long story, but essentially it was
14  the lead real estate partner at Mintz, Levin
15  talking to the general counsel at CVS and the
16  general counsel saying, we're looking for a
17  corporate guy, do you know anybody, and the real
18  estate partner said -- came to me and said, you
19  know, don't take this the wrong way but CVS is
20  looking for a guy like you, and I said, don't
21  take this the wrong way but sign me up, and so I
22  went for an interview, and the rest is history.
23      Q.  Okay.  Do you recall what the name of
24  your position was when you started at CVS?

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    A.   Legal counsel.

2    Q.   And how long did you serve in that

3  role?

4    A.   Probably three years or so.

5    Q.   Okay.  Could you give me a sort of

6  snapshot of your work history with CVS from 1997

7  until today and the various positions that

8  you've held for CVS Pharmacy?

9    A.   That's a pretty long snapshot.  So

10  I've always been a corporate lawyer, general

11  corporate law.  I do a wide variety of corporate

12  matters for CVS, always have.  For many years I

13  was the only corporate lawyer at CVS.  And so I

14  was legal counsel first, then senior legal

15  counsel, then assistant general counsel, vice

16  president and assistant general counsel.

17    Q.   If I could just interrupt you real

18  quickly?

19    A.   Sure.

20    Q.   Can you give me some sense of the

21  years when you became senior legal counsel and

22  then vice president and assistant --

23    A.   Senior legal counsel was probably

24  around 2000, somewhere in that time frame.

Page 15

1  Assistant general counsel would have been around

2  2005 or so.  Then I was vice president 2007 or

3  '8, something like that, and for a brief period

4  of time I served as the corporate secretary of

5  the public company.  I've been assistant

6  secretary of the public company for several

7  years now.  So I've held a variety of titles.

8  My employer has always been CVS Pharmacy, Inc.,

9  and then I have various titles with other

10  entities.

11    Q.   You said that you were a corporate

12  secretary for the public company.  Is the public

13  company CVS Pharmacy, Inc.?

14    A.   No.

15    Q.   What is the public company?

16    A.   CVS Health Corporation is the current

17  name.

18    Q.   And in what position did you serve?

19  You said secretary?

20    A.   I was vice president and corporate

21  secretary from 2011 through the end of 2013, and

22  I've been assistant secretary from 2013 to the

23  present, vice president and assistant secretary.

24    Q.   Why were you asked, if you know, to

Page 16

1  hold that position?

2        MR. DELINSKY:  I would just like to

3  object on privilege grounds.

4        Mr. Moffatt, if you can answer without

5  disclosing an attorney/client confidence, you

6  can answer.  Otherwise I instruct you not to

7  answer.

8    A.   I don't know why.

9  BY MR. ELSNER:

10    Q.   Was it a result of pending litigation?

11    A.   I can say that it was not a result of

12  litigation.

13    Q.   Who asked you to serve in that role?

14    A.   It would have been Doug Sgarro who was

15  the executive vice president and chief legal

16  officer.  The corporate secretary retired from

17  the company, and I became -- I was, you know,

18  kind of his second-in-command, so when he

19  retired I moved up.

20    Q.   You also served as the treasurer and

21  secretary of CVS Indianapolis which is the

22  distribution center for CVS in Indiana, is that

23  right?

24    A.   I don't recall serving as treasurer.

Page 17

1  I believe I was secretary.

2    Q.   All right.  And was that from 2006 to

3  2011?

4    A.   That sounds about right.  We have many

5  entities, and keeping track of my specific title

6  with each entity is difficult.

7    Q.   How many entities do you serve as an

8  officer of for CVS?

9    A.   I don't know exactly, but hundreds.

10    Q.   Why?

11    A.   Mostly for administrative convenience.

12    Q.   Administrative convenience to whom?

13    A.   To the organization.

14    Q.   What organization are you referring to

15  when you say that?

16    A.   So there are 800-plus entities in the

17  CVS family of entities, and in order to provide

18  services to those entities I need to be able to

19  sign documents and so forth for the various

20  entities.

21    Q.   So it's a convenience -- is it a

22  convenience to CVS Health, or is it a

23  convenience to the entities themselves?

24    A.   It's to the entities themselves,

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 because they all -- many of them need licenses,
2 leases, that sort of thing, so it's in order for
3 them to operate properly.
4     Q.  When did the Indianapolis distribution
5 center for CVS start operations?
6     A.  I don't know exactly.  We acquired it
7 in the Revco acquisition, which was just before
8 I joined the company, so in 1997.  I'm not sure
9 when it was first built or anything.
10     Q.  But then you joined as a secretary of
11 CVS Indiana in 2006, is that right?
12     A.  I believe the entity was formed
13 shortly before then, so when the entity was
14 formed I was either secretary or assistant
15 secretary.
16     Q.  Who asked you to play that role?
17     A.  It would have been my immediate
18 superior, Zenon Lankowsky.
19     Q.  How large is the legal department at
20 CVS?
21         MR. DELINSKY:  Object to form.
22     A.  I don't know exactly, depends on who
23 you count, but in terms of lawyers
24 post-acquisition it's over 100 lawyers, and then

Page 19

1 there's paralegals and support staff and clerks
2 and so forth, so it's several hundred people.
3 BY MR. ELSNER:
4     Q.  Okay.  In 2012 you became the
5 president of CVS Indiana, is that right?
6     A.  Yes.
7     Q.  Why was that?
8     A.  It was in connection with the
9 retirement of Mr. Lankowsky.
10     Q.  He was the previous president?
11     A.  Yes.
12     Q.  And have you served as president of
13 CVS Indiana since 2014?
14     A.  I believe so.  Since before that, I
15 think you said it was 2012.
16     Q.  That's right.  I just said dates of
17 through 2014, so I was curious whether you
18 continued to perform that role.
19     A.  Past that, yes.
20     Q.  And you're the president today?
21     A.  Yes.
22     Q.  All right.  Can you explain to me what
23 your duties and responsibilities are as
24 president of CVS Indiana?

Page 20

1     A.  It's principally an administrative
2 function, so CVS Indiana needs a wide variety of
3 licenses and other documents that need to be
4 signed, and I sign documents on behalf of that
5 entity and the other entities.
6     Q.  Are there board meetings for CVS
7 Indiana?
8     A.  Yes.
9     Q.  Do you attend those?
10     A.  Yes.
11     Q.  How often are those held?
12     A.  Annually.
13     Q.  Where are they held?
14     A.  At CVS headquarters.
15     Q.  Who attends the board meetings
16 generally?
17     A.  Actually let me take a step back.  I
18 was mistaken there.  For CVS Indiana it's an LLC
19 that doesn't have a board, so we don't really
20 have board meetings.  We have, you know -- the
21 member would meet of CVS Indiana, and the member
22 is a sole member, so I sign -- typically we do
23 actions by written consent of the member, and I
24 execute those.

Page 21

1     Q.  So there are no annual or quarterly
2 meetings of CVS Indiana?
3     A.  It doesn't --
4         MR. DELINSKY:  Object to form.
5     A.  It doesn't have a board, so it doesn't
6 have board meetings.
7 BY MR. ELSNER:
8     Q.  But you said that the member signs the
9 documents, and it's all by consent, and you are
10 the member, is that right?
11     A.  Well, there's -- a corporation is the
12 member.  CVS Pharmacy, Inc. is the member.
13     Q.  Okay.  Are there minutes of those
14 meetings?
15     A.  There would either be minutes, or
16 there would be a consent.
17     Q.  Do you recall meetings in which there
18 were minutes taken for CVS Indiana?
19     A.  I don't recall all the meetings that I
20 took part in.
21     Q.  And have you been to the facility at
22 CVS Indiana?
23     A.  No, I have not.
24     Q.  Do you interact with the management

Page 22

1 and staff of CVS Indiana?

2    A.   No, not on a regular basis.

3    Q.   Do they keep you apprised of the

4 activities of CVS Indiana?

5    A.   There are others at CVS that are

6 responsible for operations of the distribution

7 centers.  They would keep them apprised.  They

8 wouldn't keep me apprised.

9    Q.   They don't keep you apprised as

10 president?

11    A.   They keep the people that need to be

12 apprised.

13    Q.   And generally what are those offices

14 within CVS headquarters that apprised?

15    A.   It would be the logistics department

16 is generally responsible for distribution center

17 operations and transportation.

18    Q.   You're also the president of CVS Rx

19 Services, Inc., is that right?

20    A.   That's correct.

21    Q.   And when have you served in that role?

22    A.   I believe since 2012, same time as

23 Indiana.

24    Q.   Were you formerly a secretary or

Page 23

1 treasurer of CVS Rx Services, Inc.?

2    A.   I don't recall my exact titles, but in

3 all likelihood I would have been secretary

4 before I became president.

5    Q.   What does CVS Rx Services do?

6    A.   It was originally formed as the

7 employer of our pharmacists in the various

8 stores.

9    Q.   When?

10    A.   When was it formed?  I don't know

11 exactly.  Probably around the late '90s, 1998,

12 '99, something like that, I believe.

13    Q.   Okay.  So are all pharmacists of CVS

14 and CVS pharmacies employees of CVS Rx Services?

15    A.   There are others that are responsible

16 for keeping track of who is employed by who, but

17 my understanding is yes.

18    Q.   Okay.  And what about the pharmacy

19 itself, is the pharmacy itself organized under

20 CVS Rx Services, or is it just the pharmacists?

21       MR. DELINSKY:  Object to form.

22    A.   Generally speaking, the pharmacies

23 would be in different store operating entities.

24 BY MR. ELSNER:

Page 24

1    Q.   We received a response to a request,

2 and the response stated that CVS Rx Services

3 distributed hydrocodone combination products

4 into track 1 jurisdictions between April 15,

5 2014 and September 30, 2014, and then it refers

6 to something called the Chemung distribution

7 period.  Do you know what that is, the Chemung

8 distribution period?

9    A.   I know that we have a distribution

10 center in Chemung, New York.

11    Q.   And is that distribution center

12 organized under CVS Rx Services?

13       MR. DELINSKY:  Object to form.

14    A.   Chemung is operated by CVS Rx

15 Services, Inc.

16 BY MR. ELSNER:

17    Q.   Okay.  And do you know why CVS was

18 distributing hydrocodone products into Summit

19 counties and Cuyahoga counties in Ohio between

20 April 15th, 2014 and September 30th, 2014?

21       MR. DELINSKY:  Object to form.

22    A.   I don't know.  I don't know that

23 that's the case.  I know that others at CVS

24 would have been responsible for which

Page 25

1 distribution centers would distribute into which

2 stores.

3 BY MR. ELSNER:

4    Q.   So as president of CVS Rx Services,

5 what are your roles and responsibilities?

6    A.   Again, it's principally administrative

7 to sign various licenses and documents that CVS

8 Rx Services needs to sign.

9    Q.   Have you ever been to the Chemung

10 distribution center?

11    A.   No, I have not.

12    Q.   The whole period of time when you've

13 been operating as the president of CVS Indiana

14 and the president of CVS Rx Services, you always

15 worked out of the office in Rhode Island for

16 CVS, is that right?

17    A.   That's correct, I've only worked out

18 of the Woonsocket office.

19    Q.   Okay.  Are there board meetings or

20 minutes of meetings related to CVS Rx Services?

21    A.   Yes.

22    Q.   And how often do you meet?

23    A.   It would be annually.

24    Q.   And where are those meetings held?

Page 26

1    A.  At Woonsocket.

2    Q.  Do you receive any compensation from

3  CVS Indiana or CVS Rx Services for your role as

4  president of those entities?

5    A.  Unfortunately, no.

6    Q.  So all of your payment is from CVS

7  Health?

8    A.  It's from CVS Pharmacy is my employer,

9  and it's as a corporate attorney.

10    Q.  Can you explain to me the relationship

11  between CVS Pharmacy, CVS Health, and CVS

12  Indiana, and CVS Rx Services?

13    MR. DELINSKY:  Object to form.

14    A.  That's a very broad question.  CVS

15  Health Corporation is the public company.  It's

16  a holding company.  It's formed in Delaware and

17  doesn't have any employees.  CVS Pharmacy is our

18  main operating company.  It's a Rhode Island

19  corporation.  It employs me.  It employs a

20  number of people.  And then CVS Pharmacy is the

21  parent company to Rx Services and CVS Indiana

22  and a large number of other entities.

23  BY MR. ELSNER:

24    Q.  Does CVS Indiana and CVS Rx Services

Page 27

1  pay any fees to CVS Pharmacy as the operating

2  company for legal advice or for advice on their

3  suspicious order monitoring program or anything

4  like that?

5    MR. DELINSKY:  Object to form.

6    A.  Others at CVS would be responsible for

7  how intercompany charges work.  I'm not sure

8  exactly what charges might be paid between the

9  entities.

10  BY MR. ELSNER:

11    Q.  But you're the president of those

12  entities, so in your role as president of those

13  entities, what is your understanding?  Are there

14  contracts between the subsidiary companies and

15  CVS Pharmacy?

16    MR. DELINSKY:  Object to form.

17    A.  There are contracts between CVS

18  Pharmacy and the store entities.  There are also

19  contracts with non-store entities.  There's an

20  agency agreement where CVS Pharmacy provides

21  various services to the subsidiaries.  It also

22  provides a number of services simply because

23  it's the parent company of the various entities,

24  and can provide services to its subsidiaries.

Page 28

1  BY MR. ELSNER:

2    Q.  I want to make sure I understood

3  clearly what you were talking about, because you

4  talked about store entities.  When you referred

5  to store entities, does that include

6  distribution centers, or are you speaking about

7  the pharmacies themselves?

8    A.  I'm talking about entities that

9  operate stores.  Distribution center entities

10  would be different, and I can't recall, it was a

11  long time ago that we did the agency agreements.

12  I don't recall what the -- I don't know what the

13  current state of those are, but many years ago

14  we did agency agreements with at least some of

15  the distribution center entities, but I can't

16  remember if Rx Services has one or if Indiana

17  has one.

18    Q.  When is the last time you think you've

19  looked at those, if ever?

20    A.  I have looked at them, but I haven't

21  looked at them in many years, probably when we

22  were doing restructuring in the mid 2000s.

23    Q.  So they're not reviewed annually?

24    A.  They're not.

Page 29

1    Q.  I think you also said that you have

2  responsibility at CVS for licensing issues.

3  Does that include DEA licenses?

4    MR. DELINSKY:  Object to form.

5    A.  So I said that I sign documents

6  related to licensing, so it would -- well, I

7  also have people that work for me that are

8  responsible for signing DEA documents, but I

9  have signed DEA documents in the past.

10  BY MR. ELSNER:

11    Q.  Are you the head of the licensing

12  division for CVS?

13    MR. DELINSKY:  Object to form.

14    A.  We don't have a licensing division, so

15  licensing is one of our functions in the legal

16  department, and the licensing -- the head of

17  licensing is a licensing director, and she

18  reports to me.

19  BY MR. ELSNER:

20    Q.  Okay.  And how many people are under

21  her?

22    A.  30 plus.

23    Q.  And who is that licensing director?

24    A.  Her name is Linda Cimbron.

Page 30

1  Q. So I'm just taking a look at your
2  LinkedIn page, and it's written here, it says --
3  it describes you as the vice president,
4  assistant secretary and assistant general
5  counsel for CVS Health Corporation. And that's
6  your current role, is that right?
7  A. That's my role with CVS Health
8  Corporation, yes.
9  Q. And then it says under here, it says
10  Licensing, and it says "Oversees the licensing
11  department which obtains and maintains all
12  licenses for the company's 10,000-plus
13  facilities, over 150,000 licenses," is that
14  correct?
15  A. That's correct. As I said, Linda
16  Cimbron, licensing director, reports to me. So
17  I oversee the licensing function.
18  Q. So you oversee the licensing
19  department?
20  A. Yes.
21  Q. And then it says "Interacts with
22  government officials including DEA, state boards
23  of pharmacy, and alcohol boards." Is that
24  accurate?

Page 31

1  A. It was more accurate a couple years
2  ago when that was written. Now we have a board
3  of pharmacy practice that does a lot more of the
4  interaction with the boards of pharmacy. We
5  also have an attorney that works on government
6  investigations, including DEA. So, you know,
7  it's not as accurate today as it was several
8  years ago.
9  Q. When was this written?
10  A. I don't remember. A couple years ago,
11  I think. I might have updated numbers, but I
12  haven't changed a lot of it.
13  Q. Every CVS distribution center,
14  including CVS Indiana, holds a DEA license, is
15  that right?
16  A. I don't recall if they all have --
17  take a step back. We used to have distribution
18  centers that had full registrations, and then we
19  had other facilities that did what was called
20  cross-talking, so they wouldn't necessarily have
21  drugs in the facility. I don't recall what the
22  current structure of the distribution centers
23  is, so I don't know if every one of them has.
24  Q. Okay. But in order to distribute a

Page 32

1  controlled substance, you need a DEA license to
2  do so, is that right?
3      MR. DELINSKY: Object to form.
4  A. Yes, I believe that's right.
5  BY MR. ELSNER:
6  Q. And CVS Indiana had a DEA license to
7  distribute controlled substances, is that right?
8  A. It definitely had a DEA registration,
9  yes.
10  Q. And is the same true for the CVS
11  facility, the distribution center in Chemung,
12  New York?
13  A. Yes.
14  Q. What about CVS Pharmacy, does CVS
15  Pharmacy have its own DEA license?
16      MR. DELINSKY: Object to form.
17  A. So the DEA registrations are by
18  facility, so there are facilities that CVS
19  Pharmacy, Inc. operates that have DEA
20  registrations, there are actually many.
21  BY MR. ELSNER:
22  Q. And is it CVS Pharmacy which holds
23  those licenses, or it's the entities themselves?
24  A. The entities them -- the entities that

Page 33

1  operate the facilities would hold the licenses,
2  so in some instances that is CVS Pharmacy, in
3  some instances it's another entity like CVS
4  Indiana or CVS Rx Services.
5  Q. What is your understanding of why the
6  DEA requires distributors and dispensers of
7  controlled substances to have a DEA
8  registration?
9      MR. DELINSKY: Object to form.
10  A. I haven't really thought of it. It's
11  been a requirement under their regulations, but
12  you'd have to ask somebody at the DEA why they
13  regulate the way they regulate.
14  BY MR. ELSNER:
15  Q. Well, you're in charge of the whole
16  licensing department, everyone reports to you,
17  so I wanted to understand from you what you
18  believe the reason is that the DEA has a
19  registration requirement for distributing and
20  dispensing controlled substances.
21      MR. DELINSKY: Object to form.
22  A. Again, you'd have to ask somebody at
23  the DEA why they have regulations. I'm not
24  sure. I know that they need to -- we have

Highly Confidential - Subject to Further Confidentiality Review

---

Page 34

1 separate registrations for every facility so
2 they want the facilities that have controlled
3 substances to be registered in some way.
4 BY MR. ELSNER:
5   Q.  Why?
6   A.  So I don't know.
7   Q.  Are you familiar with the Controlled
8 Substances Act?
9   A.  Generally, yes.
10  Q.  What is your understanding of the
11 Controlled Substances Act?
12      MR. DELINSKY:  And, Mr. Moffatt, if
13 you can answer that question without it
14 disclosing attorney/client confidences you may
15 answer.  If you can't, I instruct you not to
16 answer.
17 BY MR. ELSNER:
18  Q.  Sir, you're a lawyer.  You understand
19 attorney/client confidences and privileges?
20      MR. DELINSKY:  Object to form.
21  A.  Generally speaking, yes.
22 BY MR. ELSNER:
23  Q.  So throughout this whole deposition,
24 I'm not trying to elicit a single response that

---

Page 35

1 discloses any kind of attorney/client privilege,
2 so there's no need for a continued objection to
3 that.  When I ask you a question, I want you to
4 assume that I'm not asking you to divulge any
5 attorney/client privilege.  Do you understand
6 that?
7   A.  I understand you saying that, but it's
8 difficult given my role -- my principal role
9 being an attorney and interacting with other
10 attorneys all day every day, it's hard to
11 separate, you know, what I know based on
12 discussions with the people that have expertise
13 in the Controlled Substances Act as opposed to
14 me.  I'm a corporate lawyer, so general
15 corporate law I know.
16  Q.  That's fine.  What is your
17 understanding of the Controlled Substances Act?
18      MR. DELINSKY:  Same objection and
19 instruction.
20  A.  I don't have a specific understanding
21 of the Controlled Substances Act.  I know it's a
22 law that's out there.
23 BY MR. ELSNER:
24  Q.  Have you ever read it?

---

Page 36

1   A.  No, I have not read the act in its
2 entirety.
3   Q.  Do you understand that controlled
4 substances are highly addictive?
5      MR. DELINSKY:  Object to form.
6   A.  I don't know.  No, I don't know that
7 controlled substances are -- I think there are
8 other people at CVS that will respond -- that
9 are focused on that sort of thing.
10 BY MR. ELSNER:
11  Q.  So as the president of CVS Indiana and
12 as the president of CVS Rx Services, you do not
13 know that controlled substances can be highly
14 addictive?
15      MR. DELINSKY:  Object to form.
16  A.  Others at CVS are responsible for
17 operations and so forth, and I have no view on
18 that.
19 BY MR. ELSNER:
20  Q.  I'm not asking whether anybody else
21 knows they're highly addictive.  I'm just asking
22 you, are controlled substances highly addictive?
23      MR. DELINSKY:  Object to form.
24 BY MR. ELSNER:

---

Page 37

1   Q.  Yes, no, or I don't know.
2   A.  Other people at CVS know.  I don't
3 have an opinion on that.
4   Q.  You don't know?
5      MR. DELINSKY:  Object to form.
6   A.  Other people at CVS know.  I don't
7 have an opinion.
8 BY MR. ELSNER:
9   Q.  You don't have an opinion one way or
10 the other?
11      MR. DELINSKY:  Object to form.  Asked
12 and answered.
13  A.  Other people at CVS know about that.
14 It's not my role, and I don't have an opinion.
15 BY MR. ELSNER:
16  Q.  Do you believe that there's a risk
17 that controlled substances like an opioid may be
18 diverted?
19      MR. DELINSKY:  Object to form.
20  A.  Other people at CVS are responsible
21 for operations and so forth.  I don't have an
22 opinion on that.
23 BY MR. ELSNER:
24  Q.  Has CVS ever distributed a Schedule II

---

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 drug, to your knowledge?
2      A.   To my knowledge, no.
3      Q.   Why not?
4           MR. DELINSKY:  Same instruction with
5 regard to the attorney/client privilege, to the
6 extent that your knowledge is based on
7 attorney/client communications.
8      A.   Other people at CVS made that
9 decision.  You know, I've been there since '97.
10 The company has been around longer than that.
11 It was before I got there.
12 BY MR. ELSNER:
13     Q.   So you don't know?
14     A.   Other people at CVS would have been
15 responsible for that.
16     Q.   Who?
17     A.   I'm not sure.
18     Q.   Are you sure someone is responsible
19 for that?
20     A.   Other people at CVS are responsible
21 for all the operations, compliance, logistics.
22 We have huge departments that are responsible
23 for those things.  I'm not responsible for those
24 things.

Page 39

1      Q.   CVS has distributed Schedule III drugs
2 to CVS pharmacies, is that right?
3           MR. DELINSKY:  Object to form.
4      A.   My understanding is that our
5 registrations are for Schedules III through V,
6 so yes.
7 BY MR. ELSNER:
8      Q.   And CVS Indiana and CVS Rx Services
9 through the CVS Chemung distribution center
10 distributed Schedule III drugs, is that correct?
11          MR. DELINSKY:  Object to form.
12     A.   Other people at CVS were responsible
13 for the actual operations, but my understanding
14 is we had the registrations for Schedules III
15 through V, and that's what was distributed by
16 those distribution centers.
17 BY MR. ELSNER:
18     Q.   And that they distributed those drugs
19 into Cuyahoga and Summit Counties, is that
20 right?
21          MR. DELINSKY:  Object to form.
22     A.   I don't have any specific knowledge of
23 where the distribution centers distributed.
24 BY MR. ELSNER:

Page 40

1      Q.   The Indiana distribution center for
2 CVS was distributing hydrocodone products until
3 hydrocodone was rescheduled as a Schedule II
4 drug in October of 2014, is that right?
5           MR. DELINSKY:  Object to form.  Same
6 objection as to attorney/client privilege.
7      A.   Other people at CVS were responsible
8 for what was distributed where.  I don't have
9 any knowledge of my own on that subject.
10 BY MR. ELSNER:
11     Q.   So as the president of CVS Indiana,
12 you don't know whether CVS Indiana was
13 distributing hydrocodone products until they
14 were rescheduled?
15          MR. DELINSKY:  Object to form.
16     A.   Others at CVS were responsible for
17 that.  I don't have any knowledge of my own.
18 BY MR. ELSNER:
19     Q.   I've marked this document as the first
20 exhibit.  This is Motley Rice 5.
21          (Whereupon, CVS-Moffatt-1 was marked
22          for identification.)
23 BY MR. ELSNER:
24     Q.   Sir, this is a letter from the US

Page 41

1 Department of Justice, the Drug Enforcement
2 Administration, signed from Joseph Rannazzisi
3 who is the deputy assistant administrator for
4 the Office of Diversion Control for the DEA, and
5 the letter was sent to CVS Indiana, LLC, dated
6 September 27, 2006.
7           Do you see that, sir?
8      A.   Yes.
9      Q.   Have you ever seen this letter before?
10          MR. DELINSKY:  I'd just like to assert
11 an objection.
12          Mr. Elsner, I assume you do not mean
13 in the course of preparing for the deposition.
14 BY MR. ELSNER:
15     Q.   I haven't asked whether you've seen it
16 in the course of preparing for the deposition.
17          Have you ever seen it before?
18     A.   I have seen it in the course of
19 preparing for the deposition, never before that.
20     Q.   Never before that.
21     A.   No.
22     Q.   So as the president of CVS Indiana, no
23 one ever shared this letter with you?
24          MR. DELINSKY:  Object to form.

Page 42

1    A.  Not that I recall.  I don't recall
2 seeing it before preparing for the deposition.
3 BY MR. ELSNER:
4    Q.  And as the person responsible for
5 licensing for CVS, you've never seen this
6 document before?
7        MR. DELINSKY:  Object to form.
8    A.  I don't recall seeing it before
9 preparing for the deposition.
10 BY MR. ELSNER:
11    Q.  Okay.  In the second sentence of the
12 letter it says "The purpose of this letter is to
13 reiterate the responsibilities of controlled
14 substance distributors in view of the
15 prescription drug abuse problem our nation
16 currently faces."
17        Did I read that correctly?
18    A.  Yes.
19    Q.  Were you aware that there is -- that
20 there was and is a prescription drug abuse
21 problem that the United States nation faces as
22 of September 27, 2006?
23        MR. DELINSKY:  Object to form.
24    A.  I'm aware that that's what this

Page 43

1 sentence says.  I don't know anything about what
2 Mr. Rannazzisi was saying, the context of how
3 this was prepared or why it was prepared, so I
4 don't know where -- how he came to this
5 conclusion.
6 BY MR. ELSNER:
7    Q.  So do you believe that there was a
8 drug abuse problem that the United States nation
9 faces as of 2006?
10        MR. DELINSKY:  Object to form.
11        Mr. Moffatt, to the extent that that
12 question calls for attorney/client privileged
13 information, I instruct you not to answer
14 insofar as it would require the disclosure of
15 that information.
16    A.  So could you repeat the question?
17        MR. ELSNER:  Can you read it back,
18 please?
19        (Whereupon, the reporter read back the
20 pending question.)
21        MR. DELINSKY:  Same objections and
22 instruction.
23    A.  I don't know.  I don't know anything
24 about the background of this, so I don't know

Page 44

1 that I can agree or disagree.  I don't have any
2 information of my own that would allow me to
3 form an opinion as to whether this is accurate.
4 BY MR. ELSNER:
5    Q.  Well, independent of the document, did
6 you believe in 2006 that there was a drug abuse
7 problem in the United States?
8        MR. DELINSKY:  Object to form.  Same
9 privilege, objection, and instruction.
10    A.  I don't have -- I'm a corporate
11 lawyer.  I don't have information of my own that
12 would allow me to form an opinion on that.
13 BY MR. ELSNER:
14    Q.  And nobody brought to your attention
15 the issue that the DEA felt there was a drug
16 abuse problem in the United States and felt so
17 strongly about it that it sent a letter to every
18 single distribution center in the United States
19 distributing controlled substances?
20        MR. DELINSKY:  Object to the form of
21 the question.
22        Mr. Moffatt, again, to the extent that
23 that question calls for the disclosure of
24 attorney/client information, I instruct you not

Page 45

1 to answer on privilege grounds.
2    A.  I don't know anything about who this
3 was sent to in addition.  I know it was sent to
4 CVS Indiana.  I don't know anything about who it
5 was sent to, anything about the background of
6 the letter, so...
7 BY MR. ELSNER:
8    Q.  No copy of this letter was in the
9 licensing department?
10        MR. DELINSKY:  Object to form.
11    A.  Not to my knowledge, but I really
12 don't know.
13 BY MR. ELSNER:
14    Q.  If you turn to the end of the third
15 paragraph on the first page, it reads in the
16 last two lines "Congress has expressly declared
17 that the illegal distribution of controlled
18 substances has a substantial and detrimental
19 effect on the health and general welfare of the
20 American people."
21        Did I read that correctly?
22    A.  Yes.
23    Q.  Were you aware that Congress had made
24 that declaration?

Page 46

1  A.  I've never seen this before preparing
2  for the deposition, so I was not aware of that.
3     Q.  Independent of the document, were you
4  aware that Congress had expressly declared that
5  the illegal distribution of controlled
6  substances has a substantial and detrimental
7  effect on the health and general welfare of the
8  American people?
9        MR. DELINSKY:  Object to form.
10  Objection insofar as it calls for the disclosure
11  of privileged information.  To the extent it
12  does, I instruct you that you do not answer.
13     A.  I had no information about this --
14  Congress declares things, hundreds of things
15  every day, I'm sure, but I had no knowledge of
16  this.
17  BY MR. ELSNER:
18     Q.  Well, they do, but this specifically
19  relates to the licensing and the distribution of
20  controlled substances which is a department that
21  you oversaw at CVS, so were you aware that
22  Congress had made that declaration?
23        MR. DELINSKY:  Object to form.  Same
24  objection and instruction as to privilege.

Page 47

1     A.  This refers to illegal distribution of
2  controlled substances.  That could be something
3  completely outside of what I do.
4  BY MR. ELSNER:
5     Q.  Well, you understand that the
6  distribution center could distribute a drug
7  illegally, correct?
8        MR. DELINSKY:  Object to form.
9     A.  I believe that's true, but they could
10  also be talking about cocaine being imported
11  into the United States or something like that.
12  Illegal distribution of --
13  BY MR. ELSNER:
14     Q.  This deals with the distribution and
15  dispensing of controlled substances under the
16  Controlled Substances Act, which doesn't include
17  the distribution of cocaine and heroin.  Those
18  aren't drugs which can be prescribed and
19  distributed in the United States.  They're
20  Schedule I drugs, so what we're talking about
21  here are controlled substances like opioids,
22  hydrocodone, OxyContin.  Were you aware that
23  Congress had declared that with respect to these
24  types of controlled substances?

Page 48

1        MR. DELINSKY:  Object to the form of
2  the question.
3     A.  I don't know what Congress was talking
4  about.  This letter is from the DEA and, you
5  know, at the beginning they're talking about
6  controlled substance distributors, but I don't
7  know what Congress was talking about when they
8  made this declaration.
9  BY MR. ELSNER:
10     Q.  And you've never read the Controlled
11  Substances Act?
12        MR. DELINSKY:  Objection to form.
13  Asked and answered.
14     A.  I have not read -- sat down and read
15  it in its entirety.
16  BY MR. ELSNER:
17     Q.  On the second page in the second
18  paragraph at the last sentence, or second to
19  last sentence, it reads, Nonetheless, given the
20  extent of the prescription drug abuse in the
21  United States, along with the dangerous and
22  potentially lethal consequences of such abuse,
23  even just one distributor that uses its DEA
24  registration to facilitate diversion can cause

Page 49

1  enormous harm.
2        Are you aware of that?
3        MR. DELINSKY:  Object to form.
4     A.  You read the sentence accurately.  I
5  think you might have stuck a second extra "the"
6  in there.  But that's the extent of what I know
7  about it, what you just read.
8  BY MR. ELSNER:
9     Q.  Okay.  You did not know that the DEA
10  felt that a distribution center, that if even
11  one distribution center -- strike that.  Let me
12  start over.
13        You were not aware that if even one
14  distribution center uses its DEA registration to
15  facilitate diversion that it could cause
16  enormous harm in the United States?
17        MR. DELINSKY:  Object to form.
18     A.  I agree that you're reading that
19  sentence correctly.  I would also look up to the
20  first sentence in that paragraph which says that
21  the "DEA recognizes...the overwhelming majority
22  of registered distributors act lawfully and take
23  appropriate measures to prevent diversion," and
24  I would believe our distribution centers would

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 be among the ones referenced in the first
2 sentence.
3 BY MR. ELSNER:
4    Q.  What is your basis for making that
5 statement?  What did you know about how the
6 distribution center in Indiana was conducting
7 its operations for controlled substances?
8    A.  Others at CVS were responsible for
9 operations of the facility and for compliance,
10 and they would be responsible for those things.
11    Q.  So you don't have personal knowledge
12 of that?  That would be other people that have
13 that knowledge?
14    A.  I was not involved in operations.  I'm
15 a lawyer.
16    Q.  Okay.  Do you agree with the statement
17 here that if even one distributor uses its DEA
18 registration to facilitate diversion it could
19 cause enormous harm?
20        MR. DELINSKY:  Object to form.
21    A.  I have no basis for coming to that
22 conclusion.
23 BY MR. ELSNER:
24    Q.  In the middle of Page 2, it begins the

Page 51

1 sentence "The DEA regulations."  Do you see
2 where I'm at just before the indentation?
3    A.  Yes.
4    Q.  It reads "The DEA regulations require
5 all distributors to report suspicious orders of
6 controlled substances.  Specifically, the
7 regulations state in 21 CFR 1301.74(b):
8        "The registrant shall design and
9 operate a system to disclose to the registrant
10 suspicious orders of controlled substances."
11        Were you aware of that responsibility?
12        MR. DELINSKY:  Object to the form of
13 the question.  Further object to the extent it
14 calls for the disclosure of attorney/client
15 communications.  If that's the case, I instruct
16 you not to answer, Mr. Moffatt.
17    A.  I was not aware of -- before I read
18 this letter in preparation for the deposition, I
19 was not aware of this.
20 BY MR. ELSNER:
21    Q.  Did you understand that the DEA had
22 defined suspicious orders to include orders of
23 unusual size, orders deviating substantially
24 from a normal pattern, and orders of unusual

Page 52

1 frequency?
2        MR. DELINSKY:  Object to the form of
3 the question.  Same objection and instruction as
4 to privilege.
5    A.  Others at CVS would have been
6 responsible for complying with the DEA
7 regulations related to distribution.
8 BY MR. ELSNER:
9    Q.  Did CVS have an electronic system in
10 place in 2006 when it received this letter to
11 measure whether specific orders it was receiving
12 from its pharmacies for hydrocodone were of
13 unusual size, frequency?
14        MR. DELINSKY:  Object -- excuse me --
15 object to the form of the question.  Same
16 objection as to privilege, and same instruction.
17    A.  Others at CVS would have been
18 responsible for such a system.
19 BY MR. ELSNER:
20    Q.  Are you aware that CVS did not have a
21 system in place to electronically measure these
22 types of orders in 2006?
23        MR. DELINSKY:  Object to the form of
24 the question.

Page 53

1    A.  Others at CVS would have been
2 responsible for that.  I'm not -- I have no
3 basis to know whether or not we had a system.
4 BY MR. ELSNER:
5    Q.  Well, as the head of licensing for
6 CVS, does it concern you that when you received
7 this letter from the DEA in 2006 that you didn't
8 actually have an electronic system in place to
9 measure for the elements that it was requiring
10 you to measure for?
11        MR. DELINSKY:  Object to the form of
12 the question.
13    A.  Others at CVS would have been
14 responsible for that.
15 BY MR. ELSNER:
16    Q.  And you have no personal knowledge?
17    A.  I have no personal knowledge.  Others
18 at CVS would have been responsible for that.
19        MR. ELSNER:  Mark this next document
20 as Moffatt Exhibit 2, this is MR 7.
21        (Whereupon, CVS-Moffatt-2 was marked
22        for identification.)
23 BY MR. ELSNER:
24    Q.  Mr. Moffatt, this is another letter

Page 54

1 from Mr. Joseph Rannazzisi which was sent to all
2 the distribution centers in the United States.
3 The date was December 27, 2007.
4        Have you ever seen this letter before
5 preparing for this deposition?
6     A.  I don't recall if I've seen this
7 before.  I didn't see it before preparing for
8 the deposition.  I don't recall if I saw it in
9 connection with preparing.
10     Q.  Let me just break that down.
11        Before your deposition prep with
12 counsel, had you ever seen this letter before?
13     A.  I don't think so.
14     Q.  Okay.  The first line of the letter
15 says that "This letter is being sent to every
16 entity in the United States registered with the
17 Drug Enforcement" Agency "to manufacture or
18 distribute controlled substances."
19        Did I read that correctly?
20     A.  It's Drug Enforcement Administration.
21 You said agency.
22     Q.  I'm sorry.
23     A.  But otherwise, yes.
24     Q.  Okay.  And as the head of licensing

Page 55

1 for CVS, you do not recall ever receiving this
2 document before?
3        MR. DELINSKY:  Object to form.
4     A.  I've seen many, many documents.  I
5 don't specifically recall seeing this one.  It's
6 over ten years ago.
7 BY MR. ELSNER:
8     Q.  This, in the second paragraph in the
9 second sentence, it cites a code section, and
10 then it says "specifically requires that a
11 registrant 'design and operate a system to
12 disclose to the registrant suspicious orders of
13 controlled substances.'"
14        Did CVS in Indiana have a system in
15 place as of December 27, 2007 to electronically
16 monitor for suspicious orders of controlled
17 substances?
18        MR. DELINSKY:  Object to form.
19     A.  Others at CVS would have been
20 responsible for such a system.  I believe this
21 is the same code section as the previous
22 letter --
23 BY MR. ELSNER:
24     Q.  That's right.

Page 56

1     A.  -- from the previous year.
2     Q.  It's the Controlled Substances Act,
3 that's right.
4        Does it concern you that CVS didn't
5 have a system in place to electronically monitor
6 for suspicious orders of controlled substances
7 as of December 27, 2007?
8        MR. DELINSKY:  Object to the form of
9 the question.
10     A.  Others at CVS would have been
11 responsible for such a system.
12 BY MR. ELSNER:
13     Q.  Do you understand that a violation of
14 the Controlled Substances Act could result in a
15 distribution center losing its license to
16 distribute controlled substances?
17     A.  I'm generally aware of, you know, the
18 implications of violations, but I have no
19 specific knowledge.  It's not my area of
20 expertise.  I'm a corporate lawyer.
21     Q.  But you understand that CVS and other
22 pharmacies from time to time have had their
23 licenses suspended, correct?
24        MR. DELINSKY:  Object to the form of

Page 57

1 the question.
2        Mr. Moffatt, further object on
3 privilege grounds.  To the extent that you
4 possess any responsive information that you
5 obtained in the context of attorney/client
6 communications, I instruct you not to disclose
7 that information.
8     A.  Information that it would have
9 received regarding other pharmacies or CVS would
10 have been through attorney communications.
11 BY MR. ELSNER:
12     Q.  Well, you've signed settlements with
13 the DEA in which you entered a settlement with
14 them to avoid the suspension of your
15 registration for a pharmacy, correct?
16        MR. DELINSKY:  Object to the form of
17 the question.
18     A.  I have signed settlements for various
19 entities, other attorneys work on those
20 settlements and they come to me at the end when
21 they're ready to be signed.  I don't know the
22 background as to why things were signed or
23 whether they were signed to avoid a suspension
24 or anything like that.  I've signed documents,

Page 58

1  but I don't know the full circumstances. You'd
2  have to give me the actual settlement that
3  you're talking about.
4  BY MR. ELSNER:
5      Q.  Well, I'm just talking generally.
6          You understand the DEA has the
7  authority and the ability to suspend or remove a
8  license for a distributor to distribute a
9  controlled substance, you understand that,
10 right?
11         MR. DELINSKY:  Object to form.  Same
12 objection and same instruction as to privilege
13 in addition.
14     A.  I'm aware based on attorney
15 communications.
16 BY MR. ELSNER:
17     Q.  What was your understanding of why a
18 license was required at all to distribute
19 controlled substances?
20         MR. DELINSKY:  Object to form.  Same
21 objection and instruction to the extent the
22 question also implicates attorney/client
23 communications.
24     A.  As we discussed earlier, the DEA set

Page 59

1  up the regulatory regime.  I don't have
2  information as to why it was set up the way it
3  was set up.
4  BY MR. ELSNER:
5      Q.  So you were just signing paper and
6  moving paper, right?  You don't understand what
7  the basis or need is for the license, why it's
8  required and what could result if you don't
9  fulfill your responsibilities?
10         MR. DELINSKY:  Object to form.  Same
11 objection and same instruction as to privilege
12 to the extent it pertains.
13     A.  What I know about it is based on
14 attorney communications.
15 BY MR. ELSNER:
16     Q.  I'm not talking about a specific
17 instance.  I'm talking generally.
18         You're the head of the licensing
19 department, you oversee them, and you have no
20 understanding of what the purpose of the license
21 is for the controlled substance or what could
22 result if you don't fulfill the requirements of
23 the Controlled Substances Act, is that right?
24         MR. DELINSKY:  Object to the form of

Page 60

1  the question.  Further object on privilege
2  grounds.
3          To the extent this calls for
4  attorney/client communications, I'd instruct you
5  not to answer, Mr. Moffatt.
6          And I'd just state for the record that
7  the attorney/client privilege applies to -- not
8  only to information exchanged in connection with
9  specific instances, but also to general
10 information exchanged for the purpose of
11 obtaining legal advice.
12     A.  So other people at CVS are responsible
13 for operations and compliance, and they
14 understand the implications of, you know, the
15 need for licenses and for violations.
16 BY MR. ELSNER:
17     Q.  I'm not asking you what anyone else
18 understands about the licensing requirements.
19 I'm just asking you, because you're the head of
20 the licensing department, you oversee it, and
21 you have no understanding of the reason for the
22 license or the consequences of not fulfilling
23 your obligations under the controlled substances
24 and its implications for your ability to lose

Page 61

1  the license, is that right?
2          MR. DELINSKY:  Object to form.  Same
3  objection as to privilege.  Same instruction as
4  to privilege.
5      A.  That's not right.  I have information,
6  but all my information would have been received
7  in the context of attorney information being
8  passed to me from other areas of the legal
9  department.
10 BY MR. ELSNER:
11     Q.  That simply can't be true.  I'm not
12 asking you about a particular instance or
13 investigation.  I'm asking you generally as the
14 head of the licensing department, do you have an
15 understanding of what the licensing requirements
16 were for distributing controlled substances?
17         MR. DELINSKY:  Object to the form of
18 the question.
19         I instruct the witness not to answer
20 based on his prior two answers.
21     A.  Again, my information was based on
22 information I received from other attorneys.
23 BY MR. ELSNER:
24     Q.  The next sentence in that same

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 paragraph reads "The regulation clearly
2 indicates that it is the sole responsibility of
3 the registrant to design and operate such a
4 system."
5      Did you understand that it was the
6 sole responsibility for CVS Indiana to design
7 and operate a system to prevent diversion of
8 controlled substances?
9      MR. DELINSKY:  Object to the form of
10 the question.
11      Same objection, same instruction,
12 Mr. Moffatt.
13      A.  You read the sentence as it's written
14 here.  I have no basis to agree or disagree with
15 the conclusion that it clearly indicates -- what
16 it says it indicates.
17 BY MR. ELSNER:
18      Q.  Did you know that as the president of
19 CVS Indiana that it was CVS Indiana's sole
20 responsibility to design such a system?
21      MR. DELINSKY:  Object to form.  Asked
22 and answered.
23      A.  As I said, that's what the sentence
24 says, but I don't have any basis to agree or

Page 63

1 disagree that it's its sole responsibility.
2 BY MR. ELSNER:
3      Q.  And you never saw this in 2007?
4      MR. DELINSKY:  Object to form.  Asked
5 and answered.
6      A.  I don't recall seeing it.  I see many,
7 many documents.
8 BY MR. ELSNER:
9      Q.  Do you believe there's an opioid
10 crisis in the United States?
11      MR. DELINSKY:  Object to form.
12      A.  I don't have any basis to characterize
13 anything as a crisis.  I'm a corporate lawyer.
14 BY MR. ELSNER:
15      Q.  What's your understanding?
16      MR. DELINSKY:  Object to form.
17 Further object to the extent that that question
18 calls for the disclosure of attorney/client
19 privilege information.
20      A.  I don't have any personal information.
21 I've gathered information on -- you know, based
22 on my services as an attorney for the company.
23 BY MR. ELSNER:
24      Q.  So you have no understanding at all

Page 64

1 whether there's an opioid crisis or not in the
2 United States?
3      MR. DELINSKY:  Object to the form of
4 the question.  Asked and answered.
5      A.  The information that I've received
6 would have been in the context of being a
7 corporate attorney.
8 BY MR. ELSNER:
9      Q.  So I want to drill down on this a
10 little bit.
11      If someone told you that there was an
12 opioid crisis in the United States, and you're
13 an employee of CVS, you would consider that a
14 privileged communication?
15      A.  It would depend on the context.  I
16 don't think anybody would come out of the blue
17 and just walk up to me and say that.
18      Q.  So you've never heard -- have you ever
19 heard that there's an opioid crisis in the
20 United States?
21      MR. DELINSKY:  Object to the form.
22 Asked and answered.  I instruct the witness not
23 to answer further.
24 BY MR. ELSNER:

Page 65

1      Q.  Are you going to answer the question?
2      A.  I was instructed not to answer.  No.
3      MR. DELINSKY:  I'd just like to make
4 clear for the record the objection is on -- the
5 instruction was based on privilege.
6 BY MR. ELSNER:
7      Q.  I'm going to show you Motley Rice 4.
8      MR. DELINSKY:  Before you show the
9 witness the exhibit, let's break.  I think we've
10 been going about an hour.
11      MR. ELSNER:  Okay.  Happy to.
12      THE VIDEOGRAPHER:  We're going off the
13 record at 9:05 a.m.
14      (Whereupon, a recess was taken.)
15      THE VIDEOGRAPHER:  We're back on the
16 record at 9:18 a.m.
17 BY MR. ELSNER:
18      Q.  Mr. Moffatt, have you read any
19 newspaper articles, magazine articles about the
20 opioid crisis in the United States?
21      A.  I'm sure I have.  I don't recall any
22 specifics.
23      Q.  What generally do you recall?
24      MR. DELINSKY:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1   A.  Just general news stories.
2  BY MR. ELSNER:
3   Q.  What sources of news?
4       MR. DELINSKY:  Object to form.
5   A.  So like 60 Minutes, that sort of
6  thing.
7  BY MR. ELSNER:
8   Q.  Have you watched the 60 Minutes
9  episodes?
10   A.  No, I have not.
11   Q.  Have you read newspaper articles about
12  the 60 minutes episodes?
13       MR. DELINSKY:  Object to form.
14  BY MR. ELSNER:
15   Q.  Dealing with the opioid crisis?
16       MR. DELINSKY:  Object to form.
17   A.  Not that I recall, no.
18  BY MR. ELSNER:
19   Q.  Do you get a newspaper at your house?
20   A.  No, I don't.
21   Q.  Do you get a newspaper at work?
22   A.  No, I don't.
23   Q.  Do you watch the news in the evening?
24   A.  No, I don't.

Page 67

1   Q.  Have you read any books about the
2  opioid crisis in the United States?
3   A.  No.
4   Q.  Not a single one?
5       MR. DELINSKY:  Object to form.
6   A.  Not that I recall, no.  I don't read
7  many books.  I'm, you know, at work most of the
8  time.
9  BY MR. ELSNER:
10   Q.  Have you read any congressional
11  testimony about the opioid crisis in the States?
12       MR. DELINSKY:  Object to form.
13  Further object on privilege grounds to the
14  extent that --
15       MR. ELSNER:  It can't be privilege
16  whether he read congressional testimony.  It
17  just can't be privileged if he read
18  congressional testimony.
19       MR. DELINSKY:  Mr. Elsner, you're not
20  the arbiter of what privilege is or isn't, so if
21  I could finish my objection.  It very well could
22  be.
23       To the extent that you reviewed
24  testimony in the context of attorney/client

Page 68

1  work, I instruct you to confer with me privately
2  about that before answering.
3       MR. ELSNER:  I think that's an
4  improper instruction.
5  BY MR. ELSNER:
6   Q.  Sir, have you read any congressional
7  testimony about the opioid crisis?
8   A.  If I have, it would have been in the
9  context of attorney/client communications.
10   Q.  Well, you can answer yes or no, and
11  then we can go to the next part.
12       Have you read such testimony?
13   A.  I don't recall reading such testimony,
14  but if I have, it would have been in the context
15  of attorney/client communication.
16   Q.  Okay.  So if I understand it, you've
17  read no books, don't recall any newspaper
18  articles, have watched no news programs at all
19  about the opioid crisis in the United States?
20       MR. DELINSKY:  Object to form.
21   A.  I've seen information, but it would
22  largely be in connection with my role as a
23  corporate attorney.
24  BY MR. ELSNER:

Page 69

1   Q.  Have you attended any CLE programs
2  related to the DEA regulations?
3   A.  I have attended CLE programs.  I don't
4  recall specific topics.
5   Q.  Have you -- are they in the field of
6  DEA regulations?
7       MR. DELINSKY:  Object to form.  Asked
8  and answered.
9   A.  I have attended many over the years.
10  We have a CLE requirement for Rhode Island, but
11  I don't recall specific topics and specific
12  years that I would have.
13  BY MR. ELSNER:
14   Q.  You don't -- do you select CLE
15  programs in your field of practice?
16   A.  Typically they're in my field of
17  practice, but there are also CLE presentations
18  at work, there are ones that are online, so it
19  varies.
20   Q.  Tell me about the ones that CVS shows
21  at work.  What type of CLE programs does CVS
22  have internally?
23       MR. DELINSKY:  Object to form.
24   A.  They have a wide variety of programs.

Page 70

1 Law firms come in and present on various topics.
2 BY MR. ELSNER:
3    Q.  What law firms?
4    A.  A wide variety of law firms.
5    Q.  Give me some names.
6    A.  I don't -- I'm not involved in setting
7 them up.  There are others in the department
8 that set up the programs and say, there's a CLE
9 on attorney/client privilege, or something like
10 that, and whatever firm they set it up with.
11 But, yeah, it varies.
12    Q.  Has there been a CLE on the
13 distribution or dispensing of opioids?
14    A.  I don't recall.
15    Q.  Has there been a CLE on the dispensing
16 or distribution of controlled substances?
17    A.  Are you talking about at CVS or --
18    Q.  At CVS.
19    A.  I don't recall.
20    Q.  Who at CVS would set those up?
21    A.  One of the other attorneys has an
22 administrative assistant that -- or a paralegal
23 that works with the firms to set up programs.
24    Q.  Who is the attorney that selects what

Page 71

1 CLE programs will be shown at CVS?
2       MR. DELINSKY:  Object to form.
3    A.  It varies.  Different attorneys would
4 set them up.
5 BY MR. ELSNER:
6    Q.  Well, give me a couple names.
7       MR. DELINSKY:  Object to form.
8    A.  Typically it's -- it would be one of
9 the senior vice presidents in the legal
10 department, so Betsy Ferguson or Colleen
11 McIntosh would be two of the attorneys that
12 might have -- you know, firms would come to them
13 and say, we have a program on attorney/client
14 privilege, do you want us to do it at CVS.
15 BY MR. ELSNER:
16    Q.  Have you attended any DEA
17 presentations?
18       MR. DELINSKY:  Object to form.
19    A.  Others at CVS have.  I have not
20 personally.
21 BY MR. ELSNER:
22    Q.  Have you ever seen any slides or
23 PowerPoint presentations prepared by the DEA?
24    A.  Other than in the context of

Page 72

1 attorney/client information that I would have
2 received, no.
3    Q.  Well, let's break it down.
4       Have you ever seen such DEA
5 presentations?  Just yes or no.
6    A.  I don't recall seeing any DEA
7 presentations.
8    Q.  Have you ever spoke with Joseph
9 Rannazzisi?
10    A.  Not that I know of, no.
11    Q.  Have you spoken with anyone at the DEA
12 about any of its investigations of CVS?
13       MR. DELINSKY:  Object to form.
14    A.  I've spoken to people at the DEA.  I
15 don't believe I've ever spoken to them in the
16 context of an investigation.
17 BY MR. ELSNER:
18    Q.  In what context?
19    A.  Related to registrations.
20    Q.  Registrations of what?
21    A.  Either pharmacies or distribution
22 centers, in the context of acquisitions where
23 we're acquiring a large number of stores or
24 distribution centers and how we go about making

Page 73

1 the transition from the prior owner to CVS,
2 that's typically where I would interact with
3 people at the DEA.
4    Q.  Who specifically, or what division of
5 the DEA would you interact with?
6    A.  It would vary, but I believe they're
7 typically in the Office of Diversion Control.
8    Q.  Do you know who?
9    A.  It would have varied over the years.
10 I've been doing it for 21 years, so different
11 people at different times.  I don't recall
12 anybody's name.
13    Q.  What about in the 2010 through 2012
14 period?
15       MR. DELINSKY:  Objection.  Asked and
16 answered.
17    A.  Well, we did acquisitions in that time
18 period, so I probably would have talked to them
19 sometime in that time period.
20 BY MR. ELSNER:
21    Q.  Do you know any names?
22    A.  I don't recall.  It's a long time ago.
23    Q.  I'm going to mark this next letter as
24 Exhibit 3.

Page 74

1      (Whereupon, CVS-Moffatt-3 was marked
2      for identification.)
3   BY MR. ELSNER:
4      Q.   This is a letter from counsel to
5   plaintiffs in this litigation, and it's a list
6   of CVS custodians, and it says in the second
7   sentence that this "list identifies individuals
8   who we believe, based on our good-faith
9   investigation to date, are most likely to have
10  non-cumulative discoverable information relating
11  to the claims against the CVS defendants in the
12  Track One cases."
13     Do you see that?
14     A.   Yes.
15     Q.   Okay.  And if you turn to the second
16  page under the fifteenth person, your name
17  appears there.
18     Do you see that?
19     A.   Yes.
20     Q.   What is your understanding of the
21  discoverable information that you have to offer
22  in this litigation?
23     MR. DELINSKY:  Object to form.
24     And I'd state on the record that you

Page 75

1   left out the first sentence of the letter which
2   indicates that the list includes individuals
3   proposed by plaintiffs, and Mr. Moffatt's name
4   was proposed by the plaintiffs.
5      MR. ELSNER:  Okay.
6      MR. DELINSKY:  He was not identified
7   as a custodian by defense counsel who would have
8   relevant information.
9      MR. ELSNER:  Okay.
10  BY MR. ELSNER:
11     Q.   Do you have relevant information
12  concerning the claims and defenses in this
13  action?
14     MR. DELINSKY:  Object to form.
15     And to the extent that calls on you to
16  provide attorney/client legal analysis, I
17  instruct you not to answer.
18     A.   I wouldn't be the one making that
19  decision.
20  BY MR. ELSNER:
21     Q.   Would you agree that CVS is among the
22  largest of the chain pharmacies in the United
23  States?
24     MR. DELINSKY:  Object to form.

Page 76

1      A.   Yes, we are.
2   BY MR. ELSNER:
3      Q.   And you're the largest by store number
4   with more than 9,800 CVS pharmacies?
5      MR. DELINSKY:  Object to form.
6      A.   We're close to Walgreen's, so I'm not
7   exactly sure what Walgreen's store count is
8   these days.  We are among the largest.
9   BY MR. ELSNER:
10     Q.   Among the top two?
11     MR. DELINSKY:  Object to form.
12     A.   As far as I know, yes.
13  BY MR. ELSNER:
14     Q.   Do you know how many pharmacies CVS
15  currently operates today in the United States?
16     MR. DELINSKY:  Object to form.
17     A.   Approximately 9,900.
18  BY MR. ELSNER:
19     Q.   And you're also the largest by the
20  number of pharmacists, right?  There are over
21  20,000 pharmacists for CVS?
22     MR. DELINSKY:  Object to form.
23     A.   I'm not familiar with the count of
24  pharmacists at, say, Walgreen's.

Page 77

1      MR. ELSNER:  I'll mark this next
2   document as Exhibit 4.
3      (Whereupon, CVS-Moffatt-4 was marked
4      for identification.)
5   BY MR. ELSNER:
6      Q.   This is Motley Rice 206.  This is from
7   CVS's website.
8      Would you agree with me that CVS is
9   one of the largest pharmacists by prescriptions,
10  handling over 2.5 billion prescriptions, is that
11  right?
12     MR. DELINSKY:  Object to form.
13     A.   So it says here "2.5 billion
14  prescriptions managed or filled."  That doesn't
15  mean we filled them necessarily.  But I know
16  that we are one of the bigger pharmacies and,
17  therefore, fill more prescriptions than most
18  other pharmacies.
19  BY MR. ELSNER:
20     Q.   And would you agree that CVS is one of
21  the largest pharmacies by revenue?
22     MR. DELINSKY:  Object to form.
23     A.   To my knowledge, yes.
24  BY MR. ELSNER:

Page 78

1  Q. And would it be accurate to say that
2  that revenue is close to $60 billion in 2017?
3      MR. DELINSKY: Object to form.
4      A. I don't have the figures at hand, but
5  -- so I don't really know off the top of my
6  head. There are many people that work on the
7  financials for the company.
8  BY MR. ELSNER:
9      Q. Does that sound about right?
10     A. I really couldn't say.
11         (Whereupon, CVS-Moffatt-5 was marked
12         for identification.)
13  BY MR. ELSNER:
14     Q. Are we on Exhibit 5?
15     A. Yes.
16     Q. This is a map of the 9,800 pharmacies
17  that CVS has in the United States. Does it
18  appear accurate in terms of the majority of your
19  pharmacies on the East Coast, the midwest, and
20  in California?
21     MR. DELINSKY: Object to form.
22     A. So I'm not familiar with Red Lion,
23  where this came from, but it appears generally
24  accurate. I mean, I don't know that you'd call

Page 79

1  Texas midwest, there's a number of stores in
2  Texas, Arizona, so this looks generally like the
3  store map picture.
4  BY MR. ELSNER:
5      Q. And by midwest, I was referring to
6  sort of the Ohio area. And CVS has about 329
7  pharmacies in Ohio, is that right?
8      MR. DELINSKY: Object to form.
9      A. I don't recall the specifics of state
10  by state store count, but that sounds generally
11  accurate.
12  BY MR. ELSNER:
13     Q. If you look back at Exhibit 4 on the
14  third page, it has a drop-down on the website,
15  facts by state, and for Ohio the drop-down says
16  329 pharmacies. Does that sound about accurate?
17     MR. DELINSKY: Object to form.
18     A. I don't know when this was prepared,
19  so, you know, it could have changed a little
20  bit. But, you know, at the time that the
21  information was loaded it was accurate, but, you
22  know, we opened new stores, we closed stores.
23  BY MR. ELSNER:
24     Q. Sure.

Page 80

1      A. Pretty consistently.
2      Q. It's generally accurate?
3      A. Yes.
4      Q. And what is CVS's market share in the
5  country?
6      MR. DELINSKY: Object to form.
7      Mr. Moffatt, to the extent that that
8  calls for information you've obtained in
9  attorney/client context, I instruct you not to
10  answer.
11     A. Well, it would depend on what product
12  you're talking about and so forth. There are
13  other people at CVS that would be more attuned
14  to what market share we have.
15  BY MR. ELSNER:
16     Q. I'm just describing the number of
17  pharmacies across the country. Would you say
18  that you have about 14 percent of the total
19  market share?
20     MR. DELINSKY: Object to form. Same
21  objection and instruction as to privilege.
22     A. I don't know what the market share is.
23  And again, it depends on what you're looking at,
24  whose statistics you're looking at. Others at

Page 81

1  CVS, you know, have responsibility -- well, they
2  would know more about market share than a
3  corporate attorney.
4  BY MR. ELSNER:
5      Q. What about in Ohio, do you know what
6  the market share is that CVS has in Ohio?
7      A. Others at CVS would know that
8  information. I don't.
9      Q. There are roughly 70 CVS stores in
10  Summit County and Cuyahoga County. Does that
11  sound accurate to you?
12     A. I have no basis for knowing how many
13  stores are in specific counties.
14     Q. Are you aware that the Summit and
15  Cuyahoga Counties are -- sorry, strike that.
16     Are you aware that CVS stores in
17  Summit and Cuyahoga County were provided
18  controlled substances from the Indiana
19  distribution center?
20     MR. DELINSKY: Object to form.
21     A. Others at CVS would be responsible for
22  which distribution centers distribute to which
23  stores. I'm not responsible for that, and I
24  don't have any information of my own.

Page 82

BY MR. ELSNER:
 Q.  So as the president of CVS Indiana, you don't know what states that distribution center distributes controlled substances to, is that right?
     MR. DELINSKY:  Object to form.
 A.  Others at CVS would be responsible for that information.  It's -- in connection with my licensing responsibility, I know that it has licenses in a number of states.
BY MR. ELSNER:
 Q.  Have you read the complaint in this case?
     MR. DELINSKY:  Object to form.
 A.  In connection with preparing for this, I probably was given it at some point.  I don't recall seeing it.
BY MR. ELSNER:
 Q.  Well, did you read it?
     MR. DELINSKY:  Object to form.  Asked and answered.
 A.  Again, in connection with preparing -- either preparing for the case, or I think I might have provided a declaration or an

Page 83

affidavit, so I may have read it back then, but I don't recall specifics about the complaint.
BY MR. ELSNER:
 Q.  But you did provide a declaration.  In preparing the declaration, did you read the complaint?
     MR. DELINSKY:  Object to form.  Asked and answered.
 A.  I believe it would have been given to me by counsel.  I don't recall.  I signed a number of declarations, but typically I would be given the documents that I need in order to provide the declaration.
BY MR. ELSNER:
 Q.  Did you write the declaration?
     MR. DELINSKY:  Object to form.
     To the extent that calls for the disclosure of attorney/client communications, I instruct you not to answer.
 A.  It would have been purely attorney/client communications.
BY MR. ELSNER:
 Q.  What did you read to prepare your declaration?  Did you read the declaration?

Page 84

 A.  Of course, I read the declaration.
 Q.  What else did you read?
 A.  I don't recall specifics.  I'd have to see the declaration and then, you know, it would -- I'm not sure that I recall exactly what I read.
 Q.  Do you understand that the allegations in this case is that there is an opioid crisis in Summit and Cuyahoga Counties?
     MR. DELINSKY:  Object to form.
 A.  I don't have any basis for that understanding.
BY MR. ELSNER:
 Q.  To prepare for the deposition, did you read any -- to prepare for the deposition, did you read any other depositions that have been taken in this case?
 A.  I did not.
 Q.  Did you read that, not just CVS depositions, any other depositions from Purdue, Cardinal, any other depositions?
 A.  I don't recall reading any other depositions in this case.
 Q.  Have you been provided any?

Page 85

 A.  I don't believe so, no.
 Q.  What did you do to prepare for your deposition?
 A.  Principally I met with our attorneys and --
 Q.  For how long?
 A.  -- both in-house counsel and out.
 Q.  For how long did you meet, and over how many days?
 A.  I don't really recall.  We met a couple of different times because my deposition was originally scheduled earlier, so -- and I don't recall, I didn't keep track of how long meetings were or anything like that.
 Q.  Did you review documents?
 A.  I reviewed a handful of documents, yes.
 Q.  What documents did you review?
     MR. DELINSKY:  I instruct you not to answer that, and caution you to the extent you even recall an attorney/client -- attorney/client privilege and attorney work product grounds.
     Mr. Elsner, if you would like to ask

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 about particular documents, we'll take those
2 questions as they come.  But to the extent your
3 question asks for a selection of documents
4 that's selected by counsel, I instruct the
5 witness not to answer.
6         MR. ELSNER:  I don't think that's an
7 appropriate objection, but I think it's one we
8 need to resolve with the court.
9 BY MR. ELSNER:
10     Q.  Did you discuss your deposition with
11 anyone other than counsel?
12     A.  No.
13     Q.  Did you discuss your deposition with
14 any other employees at CVS other than attorneys?
15     A.  Other than attorneys, no.  I let my
16 boss know that I was going to be here today.
17     Q.  What role, if any, did you play with
18 respect to the suspicious order monitoring
19 system at CVS?
20         MR. DELINSKY:  Object to form.
21     A.  Others at CVS were responsible for the
22 systems.  I didn't have any role in that.  I'm
23 an attorney.
24 BY MR. ELSNER:

Page 87

1     Q.  At one point in time CVS had hired the
2 Buzzeo Group to help it develop an algorithm for
3 suspicious order monitoring system.  Are you
4 familiar with the Buzzeo Group?
5     A.  I am familiar with Ron Buzzeo.  Many,
6 many years ago I communicated with him, but it's
7 been quite a long time since I did any of that.
8     Q.  What was the base -- what were you
9 communicating with him about?
10         MR. DELINSKY:  And I object to the
11 extent that question calls for privileged
12 information.  To the extent it does, I instruct
13 the witness not to answer.  If you're not sure
14 and you want to discuss it, we can discuss it.
15     A.  I don't recall specifically what I
16 might have talked to him about, but it would
17 have been because I'm an attorney and he was a
18 consultant.
19 BY MR. ELSNER:
20     Q.  Did you negotiate the contract between
21 CVS and the Buzzeo Group?
22         MR. DELINSKY:  Object to form.
23     A.  I don't recall any -- I don't even
24 know if there was a contract.  I don't recall if

Page 88

1 I was involved in the negotiation of it.
2 BY MR. ELSNER:
3     Q.  Did it relate to the development of a
4 suspicious order monitoring system at CVS, your
5 conversations with Ron Buzzeo?
6         MR. DELINSKY:  Object to form.
7     A.  I don't recall what I would have
8 talked to Mr. Buzzeo about.
9 BY MR. ELSNER:
10     Q.  The Buzzeo Group's contract with CVS
11 or the consulting services it offered to CVS
12 were terminated in late 2012 or early 2013.  Do
13 you know why?
14         MR. DELINSKY:  Object to the form of
15 the question.
16         To the extent you're able to answer
17 for the moment, let's keep it to a yes or no
18 question.  We'll take each question here in
19 turn.
20     A.  Well, I don't know anything about
21 the -- I don't know that there was a contract or
22 when it was terminated if it was terminated,
23 that sort of thing.  I don't recall anything
24 about the contract.

Page 89

1 BY MR. ELSNER:
2     Q.  You said you knew Ron Buzzeo, I may
3 misquote you, it's not my intention, but from
4 way back.  What period of time did you first
5 meet Ron Buzzeo?
6         MR. DELINSKY:  Object to form.
7     A.  It would have been sometime shortly
8 after I got to CVS, so late 1990s, early 2000s.
9 BY MR. ELSNER:
10     Q.  And was your meeting with him in
11 relationship to him serving as a consultant to
12 CVS?
13         MR. DELINSKY:  Object to form.
14     A.  As I recall, yes.  And I don't know
15 that I ever met him, I think I talked to him on
16 the phone.
17 BY MR. ELSNER:
18     Q.  Okay.  And what's your best
19 recollection of that discussion?  And how many
20 times did you talk to him on the phone?
21         MR. DELINSKY:  Object to form.
22     A.  It was 20 years ago.  I really don't
23 know.
24 BY MR. ELSNER:

Page 90

1    Q.  Were you aware that CVS had hired the
2  Analysis Group to consult on its suspicious
3  order monitoring system?
4    A.  Others at CVS would have been
5  responsible for that.  I had no involvement in
6  it.
7    Q.  Were you involved at all in
8  negotiating or drafting the contract between CVS
9  and the Analysis Group?
10   A.  Others at CVS would have been
11  responsible for that.  I don't believe I had any
12  role.
13   Q.  Did anyone bring to your attention as
14  the president of CVS Indiana that there were
15  certain staffing issues in the monitoring of
16  suspicious orders of controlled substances at
17  CVS Indiana in 2012 and 2013?
18       MR. DELINSKY:  Object to form.
19   A.  Others at CVS were responsible for
20  operating the facility and for staffing, so I
21  was not involved in that.  I was just a
22  corporate attorney.
23  BY MR. ELSNER:
24   Q.  Were you aware as the president of CVS

Page 91

1  in Indiana that CVS Indiana was reviewing all
2  orders for controlled substances to determine
3  whether there was a suspicion of diversion?
4       MR. DELINSKY:  Object to form.
5    A.  Others at CVS were responsible for
6  operations, and I was not involved in that.
7  BY MR. ELSNER:
8    Q.  So as the president of CVS Indiana, no
9  operational issues were brought to your
10  attention, is that right?
11       MR. DELINSKY:  Object to the form of
12  the question.
13   A.  Others at CVS were responsible for
14  operations.  I was not involved in operations.
15  I'm not an operator.
16  BY MR. ELSNER:
17   Q.  Did you have any conversations with
18  Mark Nicastro who was an employee of CVS
19  Indiana?
20   A.  Not that I recall, no.
21   Q.  Do you recall any conversations with
22  any employees of CVS Indiana distribution center
23  while you served as president of CVS Indiana?
24       MR. DELINSKY:  Object to form.

Page 92

1    A.  Any communications I would have had
2  would have been in my role as an attorney.  I
3  don't recall specifics.
4  BY MR. ELSNER:
5    Q.  Let's break it down.
6       Do you recall any conversations?  And
7  we can deal with the privilege issue separately.
8    A.  I believe I have talked to people at
9  the distribution center in my role as an
10  attorney.
11   Q.  What people -- without disclosing the
12  conversation, what people at the CVS Indiana
13  distribution center did you communicate with?
14   A.  I don't recall.  It was many years ago
15  that we're talking about.  We're talking about,
16  you know, pre-2014, so I don't really know.
17   Q.  Did you ever speak with Gary Millikan?
18   A.  I don't recall.  I know the name, and
19  I probably have talked to Gary in the past,
20  either on conference calls or directly, I can't
21  recall.  But it would have been, again, in my
22  role as an attorney.
23   Q.  Aaron Burtner, did you ever have any
24  conversations with Aaron Burtner?

Page 93

1    A.  I'm not familiar with that name.
2       MR. ELSNER:  Mark this as Exhibit 6.
3       (Whereupon, CVS-Moffatt-6 was marked
4       for identification.)
5  BY MR. ELSNER:
6    Q.  Mr. Moffatt, this is the DEA's Drug
7  Fact Sheet for hydrocodone.  Hydrocodone was one
8  of the drugs that the Indiana distribution
9  center distributed to CVS stores in Summit and
10  Cuyahoga County.
11       Are you familiar with the fact that
12  CVS distributed hydrocodone?
13       MR. DELINSKY:  Object to form.
14   A.  Others were responsible for what
15  distribution centers distributed what drugs, and
16  I'm not familiar with it.
17  BY MR. ELSNER:
18   Q.  Okay.  This says, if you read it in
19  the Overview with me here, that "Hydrocodone is
20  the most frequently prescribed opioid in the
21  United States and is associated with more drug
22  abuse and diversion than any other...illicit
23  opioid."
24       Were you aware of that?

Page 94

1    MR. DELINSKY: Object to form.
2    A. Well, it says "licit or illicit."
3 BY MR. ELSNER:
4    Q. Licit or illicit, that's right.
5    A. I'm not familiar with this document at
6 all, so I was not familiar until reading it just
7 now.
8    Q. Are you aware that hydrocodone is the
9 most frequently prescribed opioid in the United
10 States?
11    A. That's what it says here. I'm not
12 familiar with what drugs are prescribed. Others
13 at CVS would be more knowledgeable about that.
14    Q. Did you know in certain years the
15 dispensing of hydrocodone was more than double
16 that of Lipitor in the United States?
17    MR. DELINSKY: Object to form.
18    A. Others at CVS are knowledgeable about
19 the prescribing of drugs. That's not in my
20 area.
21 BY MR. ELSNER:
22    Q. As the president of CVS Indiana, do
23 you know whether hydrocodone was the highest
24 drug distributed from CVS Indiana?

Page 95

1    MR. DELINSKY: Object to form.
2    A. Others at CVS would know about what
3 drugs were distributed from what distribution
4 centers. It's not in my area.
5 BY MR. ELSNER:
6    Q. Were you aware that hydrocodone was
7 the subject of more drug abuse and diversion
8 than any other licit or illicit opioid?
9    MR. DELINSKY: Object to form.
10    A. Others at CVS were responsible for
11 that sort of thing. It's not in my area.
12 BY MR. ELSNER:
13    Q. Did it concern you as the president of
14 CVS Indiana that you were distributing
15 hydrocodone and that it was the subject of such
16 abuse?
17    MR. DELINSKY: Object to form.
18    A. Others at CVS were responsible for
19 this, and I don't have any basis for what you're
20 saying in your question.
21 BY MR. ELSNER:
22    Q. So it didn't concern you one way or
23 the other?
24    MR. DELINSKY: Object to form.

Page 96

1    A. Others at CVS would be responsible for
2 those areas.
3 BY MR. ELSNER:
4    Q. And it didn't concern you?
5    MR. DELINSKY: Object to form.
6    A. Others at CVS were responsible for
7 that.
8 BY MR. ELSNER:
9    Q. Well, they may have been, but did it
10 concern you?
11    MR. DELINSKY: Object to form.
12    A. Others at CVS were responsible, so I
13 was not involved in that, and so it was not --
14 it would not have been one of my concerns.
15    MR. ELSNER: I'm going to mark this
16 next document as Exhibit 7.
17    (Whereupon, CVS-Moffatt-7 was marked
18    for identification.)
19 BY MR. ELSNER:
20    Q. Mr. Moffatt, this is an e-mail from
21 Dan Gillen, who is with the DEA, and it's an
22 e-mail he sent to Mark Nicastro on November 25,
23 2013, and it's in the context of the DEA's audit
24 and investigation of CVS Indiana at the time you

Page 97

1 were the president of CVS Indiana.
2    Were you aware that the DEA was
3 conducting an audit of CVS Indiana in 2013?
4    MR. DELINSKY: Object to form.
5    A. Others at CVS would have been
6 responsible for DEA investigations. I was not
7 involved in the investigation. To the extent I
8 knew anything, it would have been through
9 attorney communications.
10 BY MR. ELSNER:
11    Q. Well, as the president of CVS Indiana,
12 were you made aware of the audit in that
13 capacity?
14    MR. DELINSKY: Object to form.
15    A. Any communications would have been
16 because I'm a lawyer, not because I'm president
17 of CVS Indiana.
18 BY MR. ELSNER:
19    Q. So there would have been no alerts to
20 you as president of CVS Indiana if the DEA was
21 conducting an audit?
22    MR. DELINSKY: Object to form.
23    A. Others at CVS would have been
24 responsible for the audit and for the

Page 98

1  investigation, so I was not informed other than
2  in my capacity as a lawyer.
3  BY MR. ELSNER:
4      Q.  There were no meetings of CVS Indiana
5  or discussions in CVS Indiana about this audit
6  that you participated -- sorry, strike that
7  question.
8          Were there any meetings among members
9  of CVS Indiana concerning the DEA audit?
10         MR. DELINSKY:  Object to form.
11     A.  I would not have been involved in the
12 investigation or in any meetings.  Meetings
13 would have taken place between other counsel and
14 individuals at the distribution center who are
15 CVS Indiana employees, and so CVS Indiana
16 employees would have been involved, but I was
17 not involved.
18 BY MR. ELSNER:
19     Q.  Okay.  This e-mail concerns two
20 different stores.  It concerns one store --
21 these are both stores in Indiana, and it says in
22 the first paragraph that "CVS Store 06880
23 ordered 1,888,600 dosage units of hydrocodone
24 between January 1, 2012 and October 2013.  Of

Page 99

1  which 1,766,000 tablets of hydrocodone were
2  shipped from your facility."  That's the CVS
3  distribution center in Indiana.  And that the
4  pharmacy is located in a town in Indiana with
5  approximately 18,000 people.
6          Were you aware of that?
7          MR. DELINSKY:  Object to form.
8      A.  I can see that that's what the e-mail
9  says.  Others would have been involved in the
10 investigation and the audit.  I was not
11 involved.
12 BY MR. ELSNER:
13     Q.  Were you aware that the DEA was
14 concerned about large shipments of hydrocodone
15 into towns with very small populations?
16         MR. DELINSKY:  Object to form.
17     A.  To the extent I was aware of that, it
18 would have been in connection with my role as an
19 attorney, so through attorney communications.
20 BY MR. ELSNER:
21     Q.  You were not made aware of this as the
22 president of CVS Indiana?
23     A.  I would have been made aware of it in
24 my role as an attorney.

Page 100

1      Q.  You would have been made aware of it,
2  or you were made aware of it?
3          MR. DELINSKY:  Object to form.
4      A.  To the extent -- yeah, to the extent I
5  was made aware of it, it would have been because
6  I'm an attorney.
7  BY MR. ELSNER:
8      Q.  Were you aware that one of the
9  concerns that the DEA had were -- strike that.
10         Would you agree that shipping roughly
11 2 million dosage units of hydrocodone to a town
12 for a -- to a CVS Pharmacy in a town of
13 18,000 people is potential evidence of
14 diversion?
15         MR. DELINSKY:  Object to form.
16     A.  I don't know anything about this
17 particular store.  I'd need to know a lot more
18 about the context, what the volume of the store
19 is.  There can be very large stores in towns
20 that have small populations, if it's on a major
21 thoroughfare, so I don't know anything about
22 this particular store.  We have many stores.
23 BY MR. ELSNER:
24     Q.  Did CVS ever conduct an investigation

Page 101

1  of this particular store to determine why it was
2  receiving roughly 2 million units of
3  hydrocodone?
4          MR. DELINSKY:  Object to the form of
5  the question.  Further object to the extent that
6  that question calls on you to provide
7  information you learned in the course of
8  attorney/client privilege.
9      A.  Any information about what I would
10 have learned about this would have been in my
11 role as an attorney.
12         MR. ELSNER:  Why don't we take a quick
13 break.  Go off the record for a minute.
14         THE VIDEOGRAPHER:  We're going off the
15 record at 9:58 a.m.
16         (Whereupon, a recess was taken.)
17         THE VIDEOGRAPHER:  We're back on the
18 record at 10:10 a.m.
19 BY MR. ELSNER:
20     Q.  Mr. Moffatt, I'm going to show you
21 Exhibit 8.
22         (Whereupon, CVS-Moffatt-8 was marked
23         for identification.)
24 BY MR. ELSNER:

Page 102

1    Q.   This is an e-mail from Mark Nicastro
2  to William Jusko.
3         Do you know who Mark Nicastro is?
4    A.   I know that he's at the Indiana
5  distribution center based on prior questions.
6    Q.   But you otherwise didn't know he was
7  the director of the CVS distribution center in
8  Indiana?
9    A.   I'm familiar with the name.  I'm not
10 familiar with what roles he's played.
11   Q.   This e-mail relates to a meeting at
12 the conclusion of the DEA audit that began in
13 2013, and this -- the subject of this is the
14 "DEA closing audit."  Do you see that in the
15 subject line?
16   A.   Yes, yes, I see that.
17   Q.   Okay.  And then it reads in the first
18 sentence "DEA investigators Dan Gillen and
19 Andrew Ratcliffe set up our closing meeting for
20 today with Betsy Ferguson.  Betsy was here as
21 well as Pam Hinkle."
22        Did I read that correctly?
23   A.   Yes, you did.
24   Q.   Have you ever met Dan Gillen?

Page 103

1    A.   I have not.
2    Q.   Do you understand that he was a DEA
3  investigator?  Did you know that before seeing
4  this document?
5         MR. DELINSKY:  Object to form.
6    A.   I believe he's -- the prior e-mail,
7  but I'm not familiar with Mr. Gillen.
8  BY MR. ELSNER:
9    Q.   So before today you didn't know the
10 name?
11   A.   No.  Others at CVS would have been
12 involved in government investigations and so
13 forth.
14   Q.   Do you know that -- if you see under
15 "Number 5" there, which is in the sort of middle
16 of the page, the very first line says "Failure
17 to maintain an SOM program."
18        Were you aware that the DEA believed
19 that CVS did not have a suspicious order
20 monitoring program?
21        MR. DELINSKY:  Object to form.
22   A.   Others at CVS were responsible for
23 operations and compliance.
24 BY MR. ELSNER:

Page 104

1    Q.   So you were aware or not aware?
2    A.   Others at CVS were responsible for it.
3    Q.   Yeah, but were you aware?
4    A.   Until I read this document -- others
5  at CVS would have been involved in this.  I was
6  not involved.
7    Q.   So you were not involved, which means
8  you were not aware, is that right?
9         MR. DELINSKY:  Object to form.  Asked
10 and answered.
11   A.   To the extent I was aware of any of
12 this, it would have been in my role as an
13 attorney.
14 BY MR. ELSNER:
15   Q.   Well, as president of CVS Indiana, no
16 one brought it to your attention that the DEA
17 believed that CVS in Indiana failed to maintain
18 a suspicious monitoring program, is that right?
19        MR. DELINSKY:  Object to form.
20 Objection, asked and answered.
21   A.   Others at CVS would have been
22 responsible for this sort of thing.  And to the
23 extent I was aware of it, it would have been in
24 my role as an attorney.

Page 105

1  BY MR. ELSNER:
2    Q.   My question is simply whether you were
3  aware, yes or no.
4         MR. DELINSKY:  Object.
5  BY MR. ELSNER:
6    Q.   Others may be aware, but I'm asking
7  whether you were aware.
8         MR. DELINSKY:  Object to form.  Asked
9  and answered.
10   A.   Others would have been aware.  To the
11 extent I was aware, it would have been in my
12 role as an attorney.  I don't have a specific
13 recollection of this.
14 BY MR. ELSNER:
15   Q.   As the head of the licensing division
16 for CVS, were you aware that the DEA believed
17 that CVS did not have a suspicious order
18 monitoring program in 2014?
19        MR. DELINSKY:  Object to form.
20   A.   Others at CVS would have been
21 responsible for that sort of thing.  Again, we
22 didn't have a division, a department, or
23 subdepartment for licensing, but others would
24 have been responsible for that.

Page 106

BY MR. ELSNER:

1 Q. But as the head of that division, you
2 were not aware of that, is that right?
3 MR. DELINSKY: Object to form.
4 A. To the extent I was aware of it, it
5 would have been in my role as an attorney.
6 BY MR. ELSNER:
7 Q. As the president of CVS Indiana, you
8 were required to sign certain documents
9 concerning licenses for CVS Indiana, is that
10 right?
11 MR. DELINSKY: Object to form.
12 A. So others typically sign -- it depends
13 on the time frame. But others typically sign
14 documents related to licensing, so my licensing
15 director or the licensing managers. It's been
16 delegated.
17 BY MR. ELSNER:
18 Q. What documents did you have to execute
19 as the president of CVS Indiana, if any?
20 A. I don't recall specifics. I sign
21 hundreds of documents.
22 Q. Well, as the president of CVS Indiana,
23 did you ever verify whether there was a system

Page 107

1 in place at CVS Indiana to monitor for
2 suspicious activities dealing with the
3 distribution of controlled substances?
4 MR. DELINSKY: Object to form.
5 A. Others at CVS were responsible for
6 operations and compliance.
7 BY MR. ELSNER:
8 Q. And you don't know one way or another
9 whether they complied or didn't comply, is that
10 right?
11 MR. DELINSKY: Object to form.
12 A. Others at CVS were responsible for
13 that.
14 BY MR. ELSNER:
15 Q. And you didn't make a point to find
16 out one way or the other as the president of CVS
17 Indiana, is that right?
18 MR. DELINSKY: Object to form.
19 A. Others were responsible for it.
20 BY MR. ELSNER:
21 Q. And so you didn't do anything, is that
22 right?
23 MR. DELINSKY: Object to form.
24 A. Others were responsible.

Page 108

1 BY MR. ELSNER:
2 Q. So it was not your role, is that
3 right?
4 MR. DELINSKY: Object to form.
5 A. Others were responsible for that, that
6 type of activity.
7 BY MR. ELSNER:
8 Q. What did you do as the president of
9 CVS Indiana?
10 MR. DELINSKY: Object to form. Asked
11 and answered.
12 A. My role was largely administrative.
13 BY MR. ELSNER:
14 Q. And to do what?
15 A. Sign documents.
16 Q. What documents?
17 MR. DELINSKY: Objection. Asked and
18 answered.
19 A. I signed many, many documents for a
20 number of our entities. I don't recall
21 specifics as to what I signed for a specific
22 entity.
23 BY MR. ELSNER:
24 Q. Well, you knew you were being deposed

Page 109

1 today, and you knew you were being deposed with
2 your role with respect to being the president of
3 CVS Indiana which is a defendant in this action,
4 right?
5 A. Yes.
6 Q. Did you take any steps to look through
7 the documents or the things you executed as the
8 president of CVS Indiana in the relevant time
9 period to prepare for today's deposition?
10 MR. DELINSKY: Object to form.
11 A. I don't know what documents I signed
12 on behalf of CVS Indiana.
13 BY MR. ELSNER:
14 Q. And to come here today for your
15 deposition you didn't make any effort to
16 determine that, is that right?
17 MR. DELINSKY: Object to form.
18 A. I wasn't involved in the collection of
19 documents or anything like that, so I did not
20 myself go looking through files.
21 BY MR. ELSNER:
22 Q. You, to prepare for today's
23 deposition, you didn't go back and look at the
24 documents you executed in the relevant time

Page 110

1 period related to this lawsuit while you served
2 as the president of CVS Indiana, is that right?
3        MR. DELINSKY:  Object to form.
4 Further object to the insinuation that a fact
5 witness has a duty to review his old files in
6 preparation for a deposition.  There's no such
7 duty.
8        MR. ELSNER:  Objection.  You can
9 object on form or privilege.  You can't give
10 speaking objections, you know that.
11    A.  So I signed thousands of documents
12 during the time period we're talking about.  I
13 did not go back to try to find what specific
14 documents I signed for any specific entity.
15 BY MR. ELSNER:
16    Q.  Did you understand that this testimony
17 today and this lawsuit is important?
18        MR. DELINSKY:  Object to form.
19    A.  I understand it's important.  I don't
20 know the relevance of me going back to look at
21 files from many, many years ago to try to find
22 documents that I don't even know if they exist.
23 BY MR. ELSNER:
24    Q.  One of your roles as president of CVS

Page 111

1 Indiana was to make sure that the distribution
2 center maintained its license with the DEA, its
3 registration to distribute controlled
4 substances, right?
5        MR. DELINSKY:  Object to form.
6    A.  Could you repeat that?
7        MR. ELSNER:  Could you read it back?
8        (Whereupon, the reporter read back the
9 pending question.)
10        MR. DELINSKY:  Object to form.
11    A.  So a number of people were responsible
12 for maintaining the licenses of the facility.  I
13 don't think it was my role.  It was certainly
14 not my role individually.
15 BY MR. ELSNER:
16    Q.  Well, you were the president.  There's
17 no one higher than you at CVS Indiana, right?
18        MR. DELINSKY:  Object to form.
19 Misstates testimony.
20    A.  My role as president was
21 administrative.  There were other people that
22 were operating the facility.
23 BY MR. ELSNER:
24    Q.  Did you think it was important for CVS

Page 112

1 Indiana to maintain its license as the president
2 of that entity?
3        MR. DELINSKY:  Object to form.
4    A.  Others are responsible for operations.
5 It's important for each of our facilities to be
6 properly licensed.
7 BY MR. ELSNER:
8    Q.  Did you think it was important that
9 each facility is properly licensed, including
10 CVS Indiana as its president?
11        MR. DELINSKY:  Object to form.
12    A.  So other people are involved in the
13 operations of all the facilities.  They have
14 responsibility, and I believe that it's
15 important that we maintain proper licenses.
16 BY MR. ELSNER:
17    Q.  What steps did you take, if any, to
18 ensure that CVS Indiana was taking the
19 appropriate steps to maintain its license?
20        MR. DELINSKY:  Object to form.
21    A.  I don't recall anything specific with
22 regard to CVS Indiana.
23 BY MR. ELSNER:
24    Q.  If you look back at the exhibit we

Page 113

1 were just looking at, we were discussing under
2 Number 5 "Failure to maintain an SOM program."
3 It then reads that "Dan Gillen recited the exact
4 same thing he has been saying since day one.
5 They see a lot of pills going through CVS in
6 small towns and it has to be excessive, yet he
7 has never seen a report cross his desk from CVS
8 about a suspicious order in the three years he
9 has been here."
10        Were you aware that CVS Indiana had
11 never distributed, or never sent the DEA a
12 suspicious order report related to its
13 distribution of controlled substances?
14        MR. DELINSKY:  Object to form.
15    A.  Others at CVS would be responsible for
16 that.  I was not aware.
17 BY MR. ELSNER:
18    Q.  Then it reads "Betsy did the talking
19 and was very professional and friendly."  And
20 then it says "Dan finally pushed Betsy's button
21 and the gloves came off."
22        Who is Betsy Ferguson?
23    A.  Betsy is a senior vice president and
24 deputy general counsel at CVS.

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    Q.  What does it mean that the "gloves
2  came off"?
3        A.  I have no context for this.  I was not
4  at the meeting.  I don't know.
5        Q.  If you go down to the next paragraph,
6  the one beginning "Betsy made it very clear," do
7  you see where I'm at?  "Betsy made it very clear
8  that a letter of Admonishment is one thing."
9        A.  I see that.
10       Q.  Okay.  It says "Betsy made it very
11  clear that a letter of Admonishment is one
12  thing.  Anything other than that and she wanted
13  an opportunity to do a presentation to his boss"
14  -- Dan Gillen's boss -- "and her boss about what
15  we do with SOM."
16            Do you see that?
17       A.  I see that sentence.
18       Q.  Okay.  And then after that it says
19  "Anything more than a letter and we would meet
20  in DC in the courts just like Walgreen's did."
21            Do you see that?
22       A.  I see that sentence, yes.
23       Q.  Were you aware that Betsy Ferguson was
24  threatening the DEA that if they sent anything

Page 115

1  other than an admonishment letter that they
2  would see the DEA in court just like Walgreen's
3  did?
4        MR. DELINSKY:  Object to form.
5        A.  I have no context for any of this.  I
6  wasn't at the meeting.
7  BY MR. ELSNER:
8        Q.  Did you know --
9        A.  I don't know anything about it.
10       Q.  Did you know that Betsy Ferguson was
11  threatening the DEA agent that if he did
12  anything other than send a letter of
13  admonishment that she'd request a meeting with
14  his boss?
15        MR. DELINSKY:  Object to form.
16  Further object to the extent that this question
17  calls for you to disclose attorney/client
18  communications.  If it does, I instruct you not
19  to answer.
20       A.  I don't know anything about this
21  meeting.  That's your characterization based on
22  a third party's write-up of this.  I don't have
23  any basis to say that Betsy did anything
24  threatening.

Page 116

1  BY MR. ELSNER:
2        Q.  Were you aware that Walgreen's had
3  sued the DEA?
4        MR. DELINSKY:  Object to form.
5  Objection to the extent it calls for
6  attorney/client privileged information.  To the
7  extent it does, I instruct you not to answer.
8        MR. ELSNER:  It can't be
9  attorney/client privilege if he's aware that
10  Walgreen's brought an action against the DEA.
11  That can't disclose a privilege.
12       A.  To the extent I'm aware of it, it was
13  through attorney communications.
14  BY MR. ELSNER:
15       Q.  Are you aware that Walgreen's brought
16  an action against the DEA?  Do you know what
17  Betsy Ferguson is referring to here?
18       A.  This is a long time ago.  It's Betsy's
19  area, it's not mine, and to the extent I was
20  aware of it, it was through communications that
21  she would have sent to me as an attorney.
22       Q.  It read that "Apparently Walgreen's
23  took action against the DEA for not properly
24  administering their own SOM regulations."

Page 117

1            Were you aware that Walgreen's had
2  taken that action?
3        MR. DELINSKY:  Object to form.
4  Objection, asked and answered.
5        A.  Again, it's Mr. Nicastro's
6  characterization.  I don't know, and it's not my
7  area, so I don't recall anything specific about
8  the Walgreen's matter.
9  BY MR. ELSNER:
10       Q.  It then reads that -- and this is
11  Betsy Ferguson again -- "She was very pointed
12  about why the DCs" -- 'the distribution
13  centers -- "shouldn't see many suspicious orders
14  because of all the preemptive work that is done
15  at the pharmacy, pharmacy ops, interviewing
16  doctors, etcetera."
17            Is it CVS's position that the
18  pharmacies at CVS were doing such extraordinary
19  work that it wouldn't result in any suspicious
20  orders?
21        MR. DELINSKY:  Object to form.
22       A.  This is again Mr. Nicastro's
23  characterization of a meeting that I wasn't at,
24  and I'm not able to form an opinion about it.

Page 118

BY MR. ELSNER:

Q. Well, as the president of CVS in Indiana, would you agree that you wouldn't see suspicious orders because of all the preemptive work undertaken at the pharmacies?

MR. DELINSKY: Object to form.

A. Any information I would have about this sort of thing would have come to me as a result of my being an attorney, not as my -- as a result of me being president. I am aware that we take a lot of measures at the store. I don't know anything about how it would impact suspicious orders.

BY MR. ELSNER:

Q. Does it concern you as the president of CVS in Indiana that there were no suspicious orders reported to the DEA concerning distribution of controlled substances from the Indiana distribution center?

MR. DELINSKY: Object to form.

A. It's not my area, so I don't know what reports may have been issued. This particular e-mail talks about it not coming across his desk. It could have been submitted somewhere

Page 119

else for all I know. But it's not my area. Other people at CVS are responsible for this activity.

BY MR. ELSNER:

Q. So it didn't concern you as the president of CVS in Indiana that they had never reported a suspicious order to the DEA?

MR. DELINSKY: Object to form.

A. Others at CVS were responsible for operations and compliance.

BY MR. ELSNER:

Q. And so it didn't matter to you?

MR. DELINSKY: Object to the form.

A. Others at CVS were responsible for that activity.

BY MR. ELSNER:

Q. I know. But did it matter to you or not?

MR. DELINSKY: Object to form.

A. Others at CVS were responsible.

BY MR. ELSNER:

Q. Did it matter to you?

MR. DELINSKY: Object to form.

BY MR. ELSNER:

Page 120

Q. I'm asking you a different question than what you're answering, and I'm entitled to an answer to the question I asked.

A. I -- my --

Q. You can give your colloquy, but you've got to end it with yes, it did, or no, it didn't.

MR. DELINSKY: Object to form.

Mr. Moffatt, you answer the questions as you see proper.

A. My answer is that others were responsible for that activity.

BY MR. ELSNER:

Q. And so how did you feel about it?

MR. DELINSKY: Object to form.

A. I don't have an answer beyond the other people's being responsible.

BY MR. ELSNER:

Q. So you had no feeling one way or the other?

MR. DELINSKY: Object to form.

A. Other people were responsible.

MR. ELSNER: I think that this is totally improper coaching of a witness. I'm

Page 121

entitled to answers to these questions, and he's been coached to repeat the same phrase back to me and not answer any of the questions that I'm asking him. I think it's totally improper, and it's obstructive.

MR. DELINSKY: Your questions are completely and totally improper. We've spent the last hour on documents that Mr. Moffatt has testified plainly that he has never seen before concerning events that he has testified he is not familiar with. You've continued to ask question after question on these topics. That is what's improper about this line of questions.

MR. ELSNER: It's not improper because he's the president of the entity, and I'm entitled to ask him whether he's been made aware of these activities, and if he has a view about them. It's totally proper.

MR. DELINSKY: But his role as president of the entity is an administrative role only. All operations are led and managed by other persons, as he has testified. It is improper.

MR. ELSNER: Mark this next document

Page 122

1  as Exhibit 9.
2        (Whereupon, CVS-Moffatt-9 was marked
3        for identification.)
4  BY MR. ELSNER:
5        Q.  Mr. Moffatt, prior to receiving this
6  letter from the DEA, which is the final closing
7  letter of the DEA audit of the Indianapolis
8  distribution center of which you were the
9  president of, was there any discussion with you
10  about the potential that the DEA may suspend the
11  license to distribute controlled substances at
12  CVS Indiana?
13        MR. DELINSKY:  Object to form.
14        A.  Others were responsible for operating
15  the facility.  And to the extent I was made
16  aware of anything, it would have been in my role
17  as an attorney, not as president.
18  BY MR. ELSNER:
19        Q.  Were you aware, sir, that the DEA had
20  determined that CVS failed to design and
21  maintain a system to detect suspicious and
22  report suspicious orders for Schedule III
23  through V controlled substances?
24        MR. DELINSKY:  Object to form.

Page 123

1        A.  I'm reading this now for the first
2  time.  That appears to be the allegation in
3  paragraph number 1.
4  BY MR. ELSNER:
5        Q.  Okay.  And so as president of CVS in
6  Indiana, you never saw this letter, nor did you
7  know about this finding, is that right?
8        MR. DELINSKY:  Object to form.
9        A.  The letter is addressed to Betsy
10  Ferguson, and so I was not -- to the extent I
11  was made aware of it, it was because I'm an
12  attorney, not because I'm president.
13  BY MR. ELSNER:
14        Q.  Well, it's addressed to CVS Indiana,
15  care of Betsy Ferguson, correct?
16        A.  Yeah, and it says "Dear Ms. Ferguson"
17  as well.
18        Q.  But it's to CVS Indiana, right?
19        A.  The first line is "CVS Indiana."
20        Q.  Were you made aware -- so you were not
21  made aware of the letter with respect to your
22  role overseeing the licensing component of CVS's
23  business, is that right?
24        MR. DELINSKY:  Object to form.

Page 124

1        A.  To the extent I was made aware of it,
2  it would have been in my role as an attorney.
3  BY MR. ELSNER:
4        Q.  I'd like to understand a little bit
5  about the process of purchasing controlled
6  substances at CVS.
7        CVS pharmacies fill prescriptions for
8  opioids, including OxyContin, oxycodone,
9  hydrocodone combination products, is that right?
10        MR. DELINSKY:  Object to form.
11        A.  Others at CVS are responsible for
12  pharmacy purchasing.  I'm not involved in that
13  process.
14  BY MR. ELSNER:
15        Q.  Do you know that that's what they
16  dispense?
17        MR. DELINSKY:  Object to form.
18        A.  Others at CVS are responsible for
19  that, and I'm aware we dispense thousands of
20  drugs.
21  BY MR. ELSNER:
22        Q.  Right.  Including opioids, right?
23        MR. DELINSKY:  Object to form.
24        A.  Others are more knowledgeable about

Page 125

1  this, but generally speaking, I'm aware that
2  opioids are among the drugs that we dispense.
3  BY MR. ELSNER:
4        Q.  Do all CVS pharmacies dispense
5  opioids, or only certain ones?
6        MR. DELINSKY:  Object to form.
7        A.  We have a handful of stores that don't
8  have pharmacies at all.  I believe that the ones
9  that have pharmacies -- I don't know -- I don't
10  have particular information about what
11  prescriptions are filled at what pharmacies, so
12  others in pharmacy operations would have
13  information about that.
14  BY MR. ELSNER:
15        Q.  You're the president of various
16  pharmacy entities, is that right?
17        A.  Yes, that's correct.
18        Q.  And so for those pharmacies, are you
19  aware whether they dispense opioids?
20        MR. DELINSKY:  Object to form.
21        A.  Others in pharmacy operations are more
22  versed in what stores fill what prescriptions.
23  To the extent anybody gives me information, it's
24  in my role as an attorney as opposed to in my

Page 126

1 role as president of one of the store
2 subsidiaries.
3 BY MR. ELSNER:
4     Q.  Is the fact that a CVS dispenses an
5 opioid a privilege issue?  Are you asserting
6 privilege over whether you dispense opioids or
7 not?
8         MR. DELINSKY:  Object to form.
9         You don't need to -- that question
10 should be directed to --
11 BY MR. ELSNER:
12     Q.  You're the president of certain CVS
13 pharmacies.  Do all those pharmacies dispense
14 opioids?  Yes or no.
15         MR. DELINSKY:  He's already answered
16 the question, Mike.  Asked and answered.
17     A.  People in pharmacy operations know
18 better than I do which pharmacies dispense which
19 drugs.  That's not part of my role as a
20 corporate attorney.
21 BY MR. ELSNER:
22     Q.  I know.  But I can't find the most
23 knowledgeable person on every single thing at
24 CVS to answer questions or this discovery period

Page 127

1 would last for decades.  So I'm asking you, do
2 you know whether the pharmacies of which you are
3 the president of, do they dispense opioids?
4 Yes, no, I don't know.
5         MR. DELINSKY:  Object to form.  It's
6 already been asked and it's already been
7 answered.
8         MR. ELSNER:  No.  He's just said that
9 other people know more.  But I didn't get the
10 answer.
11         MR. DELINSKY:  He said right at the
12 beginning that he's not sure what pharmacies
13 dispense what pharmaceuticals.  He said it,
14 Mike.  It's in the transcript.
15 BY MR. ELSNER:
16     Q.  I'd like to have an answer, please.
17     A.  I'm not sure what pharmacies dispense
18 what drugs.  That's -- other people at CVS
19 handle that.
20     Q.  Did CVS ever purchase Schedule II
21 drugs like OxyContin or oxycodone directly from
22 manufacturers of those products?
23         MR. DELINSKY:  Object to form.
24     A.  Others at CVS are responsible for

Page 128

1 pharmacy purchasing.  To the extent we carried
2 any Schedule IIs, those would have come from,
3 from my understanding, wholesalers.
4 BY MR. ELSNER:
5     Q.  Wholesalers?
6     A.  Not from our distribution centers.
7     Q.  Correct.
8         But would CVS ever purchase those
9 products directly from the manufacturer as
10 opposed to a wholesaler like Cardinal or
11 McKesson?
12         MR. DELINSKY:  Object to form.
13     A.  Others at CVS are responsible we
14 pharmacy purchasing.  I have no knowledge of
15 which drugs are purchased from where.
16 BY MR. ELSNER:
17     Q.  Have you ever been involved in
18 discussions with Purdue or any other
19 manufacturer of opioids concerning contracts to
20 purchase those drugs?
21         MR. DELINSKY:  Object to form.
22     A.  I have not.
23 BY MR. ELSNER:
24     Q.  Do you generally know whether CVS has

Page 129

1 ever purchased Schedule II drugs directly from a
2 manufacturer of those drugs or not?
3     A.  Other people at CVS would be
4 responsible for pharmacy purchasing.  I don't
5 have any knowledge about that.
6     Q.  The Schedule II drugs that CVS
7 purchased from wholesalers like Cardinal, would
8 CVS receive any type of incentive program or
9 rebate program from those wholesalers?
10         MR. DAWSON:  Object to form.
11         MR. DELINSKY:  Object to form.
12     A.  Others at CVS were responsible for
13 pharmacy purchasing, so I'm not knowledgeable
14 about that.
15 BY MR. ELSNER:
16     Q.  Have you been involved at all in any
17 of the contract negotiations or discussions with
18 Cardinal concerning agreements to purchase
19 controlled substances from them?
20         MR. DAWSON:  Object to the form.
21     A.  Others at CVS were responsible for
22 that.
23 BY MR. ELSNER:
24     Q.  So you've never had a role with

Page 130

1 respect to that?
2     A.  I don't recall ever having a role with
3 that.
4     Q.  With respect to the hydrocodone
5 products that were distributed by CVS Indiana,
6 did CVS Indiana purchase those drugs from a
7 wholesaler?  Did it purchase hydrocodone from a
8 wholesaler or from the manufacturer of those
9 drugs?
10     MR. DELINSKY:  Object to form.
11     A.  I'm not involved at all in pharmacy
12 purchasing, so I don't know whether they came
13 from a wholesaler or from manufacturers.
14 BY MR. ELSNER:
15     Q.  When a pharmacy would select a
16 particular -- order a particular drug like
17 hydrocodone or a Schedule II drug, would the
18 pharmacy sell -- pharmacist select where that
19 drug would be purchased from, or delivered from,
20 or was that an automatic process?
21     MR. DELINSKY:  Object to form.
22     A.  Others are involved in pharmacy
23 purchasing and ordering.  The others, the people
24 that are responsible for ordering, would know

Page 131

1 that.  I don't know that.
2 BY MR. ELSNER:
3     Q.  You don't know that?  Okay.
4         Would you agree with me that CVS,
5 given its size and market share, has a great
6 deal of data concerning the distribution and
7 dispensing of hydrocodone combination products?
8     MR. DELINSKY:  Object to form.
9     A.  Others at CVS are responsible for
10 whatever data we manage.
11 BY MR. ELSNER:
12     Q.  Do you know how that data is used, if
13 at all, in conducting analysis of controlled
14 substances to prevent diversion?
15     MR. DELINSKY:  Object to form.
16     A.  Others in various departments would
17 have knowledge about that.  I'm not involved in
18 information management or how information is
19 used.
20 BY MR. ELSNER:
21     Q.  So you have no information about that?
22     A.  Others at CVS would have information.
23 I am not involved in that process.
24     Q.  There came a time in which hydrocodone

Page 132

1 was rescheduled from a Schedule III narcotic to
2 a Schedule II narcotic.  Are you aware of that?
3     MR. DELINSKY:  Object to form.
4     A.  I'm aware of it through, you know, my
5 role as an attorney.
6     MR. ELSNER:  I'm going to mark this
7 next document as Exhibit 10.
8         (Whereupon, CVS-Moffatt-10 was marked
9         for identification.)
10 BY MR. ELSNER:
11     Q.  This is Motley Rice 213.  This is an
12 e-mail to a large group of people.
13         And on the third page which bears the
14 Bates number 66941, it says "CVS Caremark Daily
15 News Report."  And this one is dated August 22,
16 2014.
17         Do you see that?
18     A.  Yes, I see that.
19     Q.  Are you aware of these daily news
20 reports at CVS?  Do you receive them?
21     A.  Yes.
22     Q.  Okay.  Are they sent to all employees
23 at CVS or just management, do you know?
24     A.  I believe they're sent to everyone

Page 133

1 that has a mailbox.  Not every employee at CVS
2 has a mailbox.
3     Q.  So anyone that has an e-mail address,
4 is that right, a CVS mailbox address?
5     A.  I'm not involved in the distribution,
6 so I'm not 100 percent sure, but it would be,
7 you know -- it would certainly be restricted to
8 people that have CVS e-mail addresses.
9     Q.  Okay.  And how often does this come
10 out?  Is it weekly, daily?
11     A.  I'm not involved in the production of
12 it.  It says "Daily News Report."
13     Q.  But you do receive them, is that
14 right?
15     MR. DELINSKY:  Object to form.
16     A.  I do receive the -- I think it's
17 called something different now.  The company is
18 called something different now.  So it's -- but,
19 yeah, I've seen reports like this.
20 BY MR. ELSNER:
21     Q.  Okay.  If I could ask you to turn to
22 CVS-66952.  And there's a reporting on the
23 bottom, there's an article from the AP dated
24 August 21, 2014, and it says "New Restrictions

Page 134

1   on Hydrocodone to Take Effect."
2       Do you see that?
3       A.  Yes.
4       Q.  Okay.  And then the first paragraph,
5   it says "The federal government is finalizing
6   new restrictions on hundreds of medicines
7   containing hydrocodone, the highly addictive
8   painkiller that has grown into the most widely
9   prescribed drug in the United States."
10      Do you see that?
11      A.  Yes.
12      Q.  Is this the type of information that
13  would be shared with the employees at CVS, these
14  news articles, on a routine basis?
15      MR. DELINSKY:  Object to form.
16      A.  I'm not involved in the production of
17  this.  I don't know how it's put together.  I
18  don't know what information finds its way into
19  this.
20  BY MR. ELSNER:
21      Q.  It says in the third paragraph there
22  that, and this is a quote from the DEA chief,
23  Michelle -- is it Leonhart?  Do you know the
24  name?

Page 135

1       A.  I don't know the name.
2       Q.  It says "Today's action recognizes
3   that these products are some of the most
4   addictive and potentially dangerous prescription
5   medications available."
6       Do you agree with that statement?
7       MR. DELINSKY:  Object to form.
8       A.  I agree that you read it.  I have no
9   basis for agreeing or disagreeing with
10  Michelle's statement.
11  BY MR. ELSNER:
12      Q.  The head of the DEA, right?
13      A.  DEA chief.  That's the way it's
14  characterized by the AP.  I don't recognize the
15  name.
16      Q.  At the time CVS was distributing from
17  its distribution centers hydrocodone, is that
18  right?
19      MR. DELINSKY:  Object to form.
20      A.  Others at CVS were responsible for
21  which drugs were shipped from which facility, so
22  I'm not -- I'm not aware of what was being
23  shipped from where at this time.
24  BY MR. ELSNER:

Page 136

1       Q.  Were you aware that the federal
2   government was in the process of trying to
3   reschedule hydrocodone from a Schedule III to a
4   Schedule II drug in 2013 and '14?
5       MR. DELINSKY:  Object to form.  Asked
6   and answered.
7       A.  Others at CVS would have been
8   responsible for keeping track of that sort of
9   information.  As a corporate lawyer, I wasn't
10  involved in it.
11  BY MR. ELSNER:
12      Q.  Were you aware that the State of New
13  York had rescheduled hydrocodone from a Schedule
14  III to a Schedule II within the state in August
15  of 2012?
16      MR. DELINSKY:  Object to form.
17      A.  Others at CVS would have been
18  responsible for which drug is coming from where,
19  so I was not involved in that process.
20  BY MR. ELSNER:
21      Q.  Generally when a state creates a
22  stricter requirement, either for the
23  distribution of a controlled substance or on
24  some other basis, was it CVS's policy to follow

Page 137

1   that stricter requirement within those states?
2       MR. DELINSKY:  Object to form.
3       A.  Others at CVS would have been
4   responsible for how we complied with various
5   regulations.  I'm not aware of how we addressed
6   the New York regulation that you just spoke of.
7   BY MR. ELSNER:
8       Q.  But do you understand that these
9   various regulations are minimum standards, and
10  that CVS could always do more than the minimum
11  standard if it chose to?
12      MR. DELINSKY:  Object to form.
13      A.  Again, others at CVS are responsible
14  for compliance and so forth, so they would be
15  making that decision.
16  BY MR. ELSNER:
17      Q.  But they may be, but from your
18  perspective as the president of all sorts of
19  pharmacies, the president of distribution
20  centers, did you understand that when the
21  federal government created regulations that
22  those were minimum standards that CVS could do
23  more?
24      MR. DELINSKY:  Object to the form of

Page 138

1 the question.
2     A.   Others at CVS are responsible -- were
3 involved in that analysis.  It's not part of my
4 role.
5 BY MR. ELSNER:
6     Q.   Did you understand that CVS didn't --
7 wasn't required to distribute hydrocodone by the
8 government, right?
9         MR. DELINSKY:  Object to form.
10    A.   Others are responsible for which drugs
11 are distributed.  I'm not aware of the
12 government requiring us to do anything.  Pay
13 taxes, but other than that...
14 BY MR. ELSNER:
15    Q.   Right.  So there's no -- so CVS could
16 make a choice.  They could choose to distribute
17 hydrocodone or not, right?
18        MR. DELINSKY:  Object to form.
19    A.   Others are responsible for deciding
20 what drugs we distribute.
21 BY MR. ELSNER:
22    Q.   Well, CVS had a decision to make
23 whether to sell cigarettes or not, right?
24        MR. DELINSKY:  Object to form.

Page 139

1     A.   That's correct.
2 BY MR. ELSNER:
3     Q.   And CVS decided, I think wisely, not
4 to do so, and they made that decision, and the
5 same could have been chosen for hydrocodone,
6 right?
7         MR. DELINSKY:  Object to form.
8     A.   I suppose that's true.  But tobacco
9 has no therapeutic value, unlike prescription
10 drugs.
11 BY MR. ELSNER:
12    Q.   I agree.
13    A.   So there's a very big difference
14 between deciding not to sell tobacco and
15 deciding not to sell a medication that many
16 people need.
17    Q.   Understood, and I agree with that
18 statement.
19         But you would agree with me that
20 there's no requirement for CVS to distribute
21 hydrocodone?
22        MR. DELINSKY:  Object to form.  Asked
23 and answered.
24    A.   Again, other people make the decision

Page 140

1 of what drugs to sell.  But I know that many
2 people need them, and I can't imagine a pharmacy
3 deciding not to sell a drug that's needed.
4 BY MR. ELSNER:
5     Q.   Under any circumstances?
6     A.   It's not my decision.
7     Q.   CVS was a member of the National
8 Association of Chain Drugstores, correct?
9     A.   Yes, and we still are.  It's not was,
10 is.
11    Q.   Is.  That's fair.
12         And that CVS contributes millions of
13 dollars to the NACDS, isn't that right?
14        MR. DELINSKY:  Object to form.
15    A.   I don't -- I'm not involved in what --
16 I don't know that we would contribute.  I'm not
17 familiar with NAC -- our involvement with NACDS.
18 I know we're a member.
19        MR. ELSNER:  I'm going to mark this
20 next exhibit, which is Exhibit 11.
21        (Whereupon, CVS-Moffatt-11 was marked
22        for identification.)
23 BY MR. ELSNER:
24    Q.   This is also from CVS Health's

Page 141

1 website.  And it's Motley Rice 207.
2         And there's a section on the website
3 with Trade Association and Coalition
4 Participation.
5         Do you see that?
6     A.   Yes.
7     Q.   Okay.  If you turn to the next page,
8 there's a listing here among the trade
9 associations as the National Association of
10 Chain Drugstores.
11         Do you see that?
12    A.   Yes.
13    Q.   Okay.  And on the top, this is a list
14 of contributions/dues to the trade associations
15 and coalitions.  That's what the banner reads on
16 the top of the page, is that right?
17    A.   Yes.
18    Q.   Okay.  And next to the National
19 Association of Chain Drugstores, the
20 contribution from January, 2017 to March, 2018
21 was a little over $1.5 million, right?
22    A.   Yes.
23    Q.   Okay.  And then if you go to the next
24 page, 2016, for National Association of Chain

Page 142

1 Drugstores the amount was over $1.4 million in
2 dues and contributions, is that right?
3 　　A.　The way it's characterized is
4 contributions/dues.　In some cases it's
5 contributions.　In other cases it's dues.
6 　　Q.　But regardless, the number in 2016 for
7 the National Association of Chain Drugstores was
8 $1.4 million, is that right?
9 　　A.　That -- yes, that's what this says.
10 　　Q.　And for 2015, that amount was also
11 about a little over $1.4 million.
12 　　　　MR. DELINSKY:　I'm sorry.　What year,
13 Mike?
14 　　　　MR. ELSNER:　2015 on the next page.
15 　　A.　Again, that's what this says, yes.
16 BY MR. ELSNER:
17 　　Q.　On the next page, in 2014 that amount
18 was $1.2 million?
19 　　A.　That's what this says, yes.
20 　　Q.　So you'd agree with me that CVS Health
21 was contributing dues and other contributions to
22 the National Association of Chain Drugstores at
23 least during this period of time over a million
24 dollars a year, is that right?

Page 143

1 　　　　MR. DELINSKY:　Object to form.
2 　　A.　During the time frame that we were
3 just reading, yes.　It looks like it was lower
4 in the prior years.
5 BY MR. ELSNER:
6 　　Q.　Yes, that's true.　That's correct.
7 　　　　In 2013, that amount was half a
8 million dollars, is that right?
9 　　A.　Let's see.
10 　　Q.　That's Page 6.
11 　　A.　Yes.　526,000.
12 　　Q.　In 2012 it was 421,000, is that right?
13 　　A.　Yes.
14 　　Q.　Okay.　Do you know why the amount
15 doubled in 2013 and '14, around the same time
16 that hydrocodone was being rescheduled by the
17 United States Government?
18 　　A.　I have no involvement in how dues are
19 paid for these organizations, so others at CVS
20 would be knowledgeable about that.
21 　　Q.　Are you aware that various executives
22 of CVS have served as directors of the National
23 Association of Chain Drugstores?
24 　　　　MR. DELINSKY:　Object to form.

Page 144

1 　　A.　Yes, I am aware of that.
2 BY MR. ELSNER:
3 　　Q.　Do you know that Larry Merlo served as
4 the president and -- who is the president and
5 chief executive officer of CVS Health, he served
6 as the director of the National Association of
7 Chain Drugstores in 2015?
8 　　　　MR. DELINSKY:　Object to form.
9 　　A.　Larry Merlo is his name.　I'm not
10 familiar with what specific role he played at
11 NACDS.
12 BY MR. ELSNER:
13 　　Q.　Okay.　But you were generally aware
14 that there were directors of CVS or executives
15 at CVS that served in leadership positions with
16 the National Association of Chain Drugstores?
17 　　A.　Yes, I was aware of that.
18 　　Q.　Okay.　Do you know who in particular?
19 　　A.　Mr. Merlo, as you said.　I believe
20 John Roberts might have been another.
21 　　Q.　Okay.
22 　　A.　Again, I'm not really involved in our
23 relationship with NACDS.
24 　　Q.　What about -- is it Kevin Hourican?

Page 145

1 　　A.　Hourican.　I know Kevin.　I'm not
2 familiar with any role he might play at NACDS.
3 　　Q.　And he was the executive vice
4 president of CVS Health and the president of CVS
5 Pharmacy at one point in time, is that right?
6 　　A.　That's his current title.
7 　　Q.　Current title?
8 　　A.　Yeah, in 2018 he became that.
9 　　Q.　He became that.
10 　　　　What about the Healthcare Distribution
11 Management Association, were you aware that CVS
12 was a member of that trade association?
13 　　　　MR. DELINSKY:　Object to form.
14 　　A.　I'm not familiar with that trade
15 association.　I'm not involved in which
16 associations we participate in.
17 BY MR. ELSNER:
18 　　Q.　Were you aware that the National
19 Association of Chain Drug Stores had opposed the
20 rescheduling of hydrocodone?
21 　　A.　I'm not -- others at CVS were involved
22 with NACDS.　We're not -- obviously we're not
23 the only participant in that organization, so
24 I'm not familiar with NACDS's activities.

Page 146

1    Q.  Did you know that NACDS was opposing
2  the rescheduling of hydrocodone combination
3  products?
4        MR. DELINSKY:  Object to form.
5    A.  Others at CVS were involved with
6  NACDS.  I was not familiar with our relationship
7  and what their activities might have been.
8        (Whereupon, CVS-Moffatt-12 was marked
9        for identification.)
10  BY MR. ELSNER:
11    Q.  I'm going to mark this as Exhibit 12.
12  This is CVS-103475.
13        And on the bottom there's an e-mail
14  from Kevin Nicholson.
15        Do you see that?
16    A.  Yes.
17    Q.  Okay.  And he has an e-mail address
18  with the suffix NACDS.org.
19        Do you see that?
20    A.  Yes.
21    Q.  And the date of this is Wednesday,
22  November 13, 2013.
23        Do you see that?
24    A.  Yes.

Page 147

1    Q.  And he writes in the second paragraph
2  "Please see the attached letter from Pharmacy
3  Associations to HHS opposing FDA's
4  recommendation to reschedule combination
5  hydrocodone products."
6        Do you see that?
7    A.  Yes.
8    Q.  And so NACDS was opposing the
9  rescheduling of hydrocodone products, correct?
10        MR. DELINSKY:  Object to form.
11    A.  I don't know anything about the
12  preparation of this or anything about NACDS's
13  position.  I don't see the letter.  So I don't
14  really have --
15  BY MR. ELSNER:
16    Q.  But that's what it says, right, that
17  they were going to oppose FDA's recommendation
18  to reschedule combination hydrocodone products?
19        MR. DELINSKY:  Object to form.
20    A.  From -- it says from various --
21  "from pharmacy associations to HHS" and NACDS
22  signed the letter along with -- I don't know
23  what all these letters stand for.
24  BY MR. ELSNER:

Page 148

1    Q.  Okay.  If you see above, and the
2  letter was opposing the rescheduling of
3  combination hydrocodone products, right?
4        MR. DELINSKY:  Object to form.
5    A.  Could you --
6  BY MR. ELSNER:
7    Q.  Yeah, I just -- you said that NACDS
8  signed the letter along with these other trade
9  associations, and the letter was, as referred to
10  by Kevin Nicholson here, was opposing FDA's
11  recommendation to reschedule combination
12  hydrocodone products.  That's what it says?
13    A.  Yeah, I see where Nicholson says that,
14  yes.
15    Q.  And then above that there's an e-mail
16  from Michael Ayotte.
17        Do you see that?
18    A.  Ayotte.
19    Q.  Ayotte.  Who is that?
20    A.  He's a member of our government
21  affairs department.
22    Q.  And is he an employee of CVS Caremark?
23    A.  He's an employee of CVS Pharmacy.
24    Q.  CVS Pharmacy.

Page 149

1        Okay.  And he is sending this e-mail
2  to Marissa -- these two names there.  Do you
3  know who those people are?
4    A.  Marissa Schlaifer was his boss in
5  government affairs.  Papatya Tankut is -- she
6  was in pharmacy operations, I believe.  I'm not
7  really sure.  I know the name, and I know her.
8    Q.  And Michael Ayotte is asking, "do we
9  still support this move?"  That's what he wrote,
10  correct?
11    A.  That's what it says, yes.
12    Q.  Okay.  And the response from Marissa
13  Schlaifer was "We are fine with this position
14  although we won't be stating that as publicly,"
15  correct?
16        MR. DELINSKY:  Object to the form of
17  the question.
18    A.  That's what --
19        MR. DELINSKY:  Hold on one second.  I
20  further object to the selection of this exhibit
21  to the exclusion of other materials as
22  misleading.
23        MR. ELSNER:  Objection.  You can ask
24  questions when you get a chance.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

BY MR. ELSNER:

1    Q.   Is that what the e-mail says?

2    A.   I don't know anything about the
context of how -- what was being commented on
here.  That is what the e-mail says, if you just
read it.  But again, this -- I'm sure there's
more information out there.

3    Q.   So CVS opposed the rescheduling of
hydrocodone combination products but was not
doing so publicly, correct?

4    A.   I was not --

5         MR. DELINSKY:  Excuse me.  I object to
the form of the question.  That's inaccurate, to
put it mildly.

6    A.   So this says NACDS signed the letter.
We're one member of I don't know how many
members of NACDS.  It's not -- CVS was not
itself making -- saying anything about the
letter.

BY MR. ELSNER:

7    Q.   Except that they were fine with that
position, right?

8         MR. DELINSKY:  Object to the form of
the question.

Page 151

BY MR. ELSNER:

1    Q.   That's what's written in the e-mail,
right?

2    A.   That's what's written in the e-mail.
I don't know about the context or what else we
were saying or what else we were doing.

3    Q.   Did CVS support the rescheduling of
hydrocodone or not?

4    A.   Others at CVS would be responsible for
that.

5    Q.   Do you know the profit margin on the
dispensing of hydrocodone products?

6    A.   Others at CVS are involved in the
financials.  That's not my area.

7    Q.   Are you aware of the profit margin on
distributing hydrocodone combination products at
CVS?

8         MR. DELINSKY:  Object to the form.

9    A.   Others at CVS are responsible for all
financial information.

BY MR. ELSNER:

10   Q.   Are you aware that as a member of the
National Association of Chain Drug Stores that
CVS participated in an amicus brief in the

Page 152

Masters case?

1         MR. DELINSKY:  Object to the form of
the question.

2    A.   Others at CVS are involved with any
involvement we have with NACDS.  I'm not
familiar with the Masters case or any amicus
brief.

BY MR. ELSNER:

3    Q.   Have you ever read the Southwood
decision or the Masters decision?

4    A.   Others at CVS would be -- would follow
that sort of thing more closely.  It's possible,
but I don't recall.

5    Q.   Did you know that CVS through these
trade associations participated in an amicus
brief in the Masters case?

6         MR. DELINSKY:  Object to the form of
the question.

7    A.   Others at CVS were involved with
NACDS, so they would be informed about that.

BY MR. ELSNER:

8    Q.   Who at CVS would have made the
decision to participate or not in that amicus
brief?

Page 153

1    A.   I am not sure.  I don't know.

2    Q.   Would it have been a decision in the
legal department, or would it have been a
decision in the regulatory affairs department?

3         MR. DELINSKY:  Object to form.

4    A.   Generally speaking, legal matters are
legal -- the legal department decisions
ultimately.

BY MR. ELSNER:

5    Q.   And who in the legal department would
have made that decision?

6         MR. DELINSKY:  Object to form.  Asked
and answered.

7    A.   Others in the legal department.  I'm
not really sure.  It would depend on the type of
matter, and I'm not familiar with the Masters
case.  I don't know.

BY MR. ELSNER:

8    Q.   Okay.  Well, the Masters decision
involved a suspicious order monitoring program
and whether it met the requirements of the
Controlled Substances Act.  So assuming that to
be the case, who within the legal department
would have made the decision to participate or

Page 154

1 not in the Masters amicus brief filed by the
2 National Association of Chain Drugstores?
3    A.  I'm not sure.  It would probably be --
4 I don't know.  I don't know enough about the
5 matter.
6    Q.  Have you ever attended any CLE
7 programs at CVS or anywhere else that discussed
8 the Masters decision?
9    A.  I don't recall any CLEs that discussed
10 it, but we do a lot of them.
11       MR. ELSNER:  Why don't we take a quick
12 break.
13       THE VIDEOGRAPHER:  We're going off the
14 record at 11:05 a.m.
15       (Whereupon, a recess was taken.)
16       THE VIDEOGRAPHER:  We're back on the
17 record at 11:17 a.m.
18 BY MR. ELSNER:
19    Q.  Mr. Moffatt, you are aware that there
20 have been instances in which the DEA has issued
21 suspension orders to CVS pharmacies, correct?
22    A.  I am aware of that.
23    Q.  Okay.  And you understand that when a
24 pharmacy or a distribution center is not

Page 155

1 adhering to the requirements of the Controlled
2 Substances Act that there's a danger that that
3 facility or pharmacy could lose its DEA license
4 or registration, correct?
5       MR. DELINSKY:  Object to form.
6    A.  I'm aware that that has happened, you
7 know.  It's not my area, other people handle
8 that sort of thing.
9 BY MR. ELSNER:
10    Q.  But you're aware that the DEA has that
11 authority, right?
12    A.  I'm generally aware.
13    Q.  Okay.  And are you aware of any other
14 actions that the DEA could take against a
15 pharmacy or distribution center other than
16 issuing a suspension order?
17    A.  It's not my area.  I don't handle the
18 government investigation type things, but I'm
19 aware that there are other penalties and fines
20 and letters and so forth.
21    Q.  And there are actions that could be
22 brought by the DEA against those pharmacies to
23 remove those registrations and licenses, is that
24 right?

Page 156

1       MR. DELINSKY:  Object to form.
2    A.  Again, not my area, but I'm generally
3 aware that that's possible, yes.
4 BY MR. ELSNER:
5    Q.  Okay.  And you're aware, are you not,
6 that the DEA issued an immediate suspension
7 order for two CVS pharmacies in Florida because
8 they posed an imminent danger to public health
9 or safety, correct?
10       MR. DELINSKY:  Object to form.
11    A.  I am aware of the action in Florida.
12 I don't know about the characterization as to
13 the reason that you stated.
14 BY MR. ELSNER:
15    Q.  Okay.  You know that the DEA suspended
16 two CVS pharmacies from distributing controlled
17 substances in Florida, is that right?
18       MR. DELINSKY:  Object to form.
19    A.  I am aware of that situation, yes.
20 BY MR. ELSNER:
21    Q.  And those pharmacies were the Holiday
22 CVS, LLC pharmacies, numbers 5195 and 219, is
23 that right?
24    A.  Those store numbers sound familiar.

Page 157

1 We have a lot of stores.  Holiday CVS operates
2 all or virtually all the stores in Florida.
3    Q.  And you're the president of Holiday
4 CVS, or were, is that right?
5    A.  I am currently, since the same time
6 frame as Indiana and Rx Services, early 2011.
7    Q.  In what year did you become the
8 president of Holiday CVS?
9    A.  I think it would have been the
10 beginning of 2012.
11    Q.  Okay.  And prior to that were you a
12 secretary of Holiday CVS?
13    A.  Yes.
14    Q.  Starting in 2006, or was it before?
15    A.  Again, I don't know specific titles
16 for specific entities back at that time frame.
17 I might have been assistant secretary and then
18 secretary.  But probably secretary at that
19 point.
20    Q.  Okay.  And are you the president of
21 Holiday CVS today?
22    A.  Yes.
23       MR. ELSNER:  I'm going to mark this as
24 Exhibit 13.

Page 158

1    (Whereupon, CVS-Moffatt-13 was marked
2    for identification.)
3 BY MR. ELSNER:
4    Q.  And this is a declaration of Joseph
5 Rannazzisi.  And we've seen that name before.
6 He was with the DEA at this time, is that right?
7    A.  Yes, that's what it says in the first
8 couple paragraphs here.
9    Q.  All right.  He's the deputy assistant
10 administrator for the DEA's Office of Diversion
11 Control at this time in 2012, is that right?
12    MR. DELINSKY:  Object to form.
13    A.  That's what the Paragraph 1 says, yes.
14 BY MR. ELSNER:
15    Q.  All right.  The caption here is for an
16 action that was filed in the U.S. District Court
17 for the District of Columbia, Holiday CVS versus
18 Eric Holder.
19    Do you see that?
20    A.  Yes, I see the caption.
21    Q.  And are you aware this action was
22 taken in the district court in DC?
23    A.  Others in the legal department would
24 have been involved in this.  I'm not familiar

Page 159

1 with this particular action.  So I see that, you
2 know, it's Holiday CVS, Eric Holder was attorney
3 general, but I don't know anything about, you
4 know, this matter.
5    Q.  So as the president of Holiday CVS,
6 you didn't know that this action was pending in
7 federal court in DC?
8    MR. DELINSKY:  Object to form.
9    A.  To the extent I knew anything about
10 it, it would have been in my role as an
11 attorney, so...
12 BY MR. ELSNER:
13    Q.  Before we get to what you know, did
14 you know that it existed or not, the filing was
15 made?
16    MR. DELINSKY:  Objection.  Asked and
17 answered.
18    A.  I would need to know more about the
19 case.  Just reading the caption.
20 BY MR. ELSNER:
21    Q.  Fair enough.
22    A.  I'm not a litigator.  I'm a corporate
23 guy, so I would need to know more about where
24 this fits into the whole picture.

Page 160

1    Q.  Okay.  Let's go through it a little
2 bit.
3    If you turn to Paragraph 3 of the
4 declaration, which is on Page 2, in the second
5 sentence it reads "I participated in the
6 decision-making process that led to the issuance
7 of an Immediate Suspension Order against Holiday
8 CVS, CVS Pharmacy 219 and CVS Pharmacy 5195 on
9 February 2, 2012."  Is that right?
10    A.  Yes, that's what this says.
11    Q.  Okay.  And this was filed in 2012, and
12 so at this time you were the president of
13 Holiday CVS?
14    A.  I believe so, yes.
15    Q.  Okay.  If you turn to Page 9 of the
16 declaration, which is Paragraph 24, there's a
17 heading "CVS 219 and CVS 5195."  And if it's
18 easier to use the screen, that's available for
19 you, or the paper, whatever you'd prefer.
20    It says in Paragraph 24 that CVS 219
21 was located at 3798 Orlando Drive in Sanford,
22 Florida, and is registered with the DEA as a
23 chain pharmacy in Schedules II, III, IV and V
24 controlled substances under a DEA registration

Page 161

1 number.  And then in Paragraph 25 it says CVS
2 5195 was located at 4639 West 1st Street in
3 Sanford, Florida.
4    Do you see that?
5    A.  Yeah, well, it says "located at," not
6 "was."  They still are.  Yeah.
7    Q.  I wasn't sure about store 5195.  Are
8 you?  Is it still located at that address?
9    A.  I'm not sure.  I don't know the
10 particulars for all of this.
11    Q.  That's why I said "was" because I
12 don't know if today it's located at the same
13 address.  Do you know?
14    A.  I don't know.  I don't know the
15 particulars.  I just know that the store still
16 exists.
17    Q.  Were you aware that these were the two
18 stores that were the subject of the DEA
19 suspension in 2012?
20    MR. DELINSKY:  Object to form.
21 Objection, asked and answered.
22    A.  I am aware of that because, you know,
23 I was informed based on my role as an attorney.
24 BY MR. ELSNER:

Page 162

1    Q.  Okay.  And these two stores were
2  Holiday CVS stores, correct?
3    A.  That's correct.
4    Q.  Okay.  It says in the next section,
5  "Notice to CVS of Diversion Problems."  In
6  Paragraph 26 it says that "On December 8, 2010,
7  DEA hosted a meeting with CVS at the DEA West
8  Palm Beach Resident Office."  And then it lists
9  a group of people who were in attendance.
10      Were you aware that CVS held a
11  meeting -- I'm sorry, that the DEA held a
12  meeting with CVS long before the suspension
13  order was issued in December of 2010 to warn
14  them of problems of diversion from their
15  pharmacies?
16      MR. DELINSKY:  Object to form.
17    A.  I'm not at all familiar with this
18  document, so I don't know the context of how
19  this was put together.  I wasn't involved in the
20  meeting certainly, so I don't really know
21  anything about what was said or anything at the
22  meeting.
23      MR. DELINSKY:  Mike, just hold on.
24  Did you say you were not, wasn't involved in the

Page 163

1  meeting?
2      THE WITNESS:  Exactly.  I was -- no,
3  I'm not on the list here.
4      MR. DELINSKY:  Okay.
5      THE WITNESS:  So, no, I was not
6  involved, and I wouldn't have been.  It's not my
7  area.
8  BY MR. ELSNER:
9    Q.  In Paragraph 27 it says that John
10  Gilbert, Counsel for CVS/Caremark, made a brief
11  statement.  "Mr. Gilbert stated," this is a
12  quote from Mr. Rannazzisi's affidavit, "that CVS
13  was aware of the pill mill and/or pain clinic
14  situation and the diversion of controlled
15  substances, primarily oxycodone, in Florida."
16      What was CVS aware of the pain mill
17  and pain clinic situation in Florida at this
18  time?
19      MR. DELINSKY:  Object to form.
20    A.  I don't know anything about this
21  meeting, or if this is an accurate
22  characterization of what he said.  I don't know
23  Mr. Gilbert.  Again, it's not my area.
24  BY MR. ELSNER:

Page 164

1    Q.  You don't know Mr. Gilbert, counsel
2  for CVS/Caremark?
3    A.  That's not a real entity name, but
4  just as a corporate lawyer, that bugs me a
5  little bit.  But I know Mr. Gilbert.  I know the
6  name.  But again, I think he's a litigator.  And
7  I'm not a litigator, I'm a corporate person, so
8  I've seen the name, but I've never interacted
9  with him.
10    Q.  Is he in-house at CVS, or is he
11  outside counsel?
12    A.  He's outside counsel.
13    Q.  Do you know what firm he's with?
14    A.  I don't.  I didn't have direct
15  involvement with him.
16    Q.  And as the president of Holiday CVS,
17  no one informed you of the pill mill and/or pain
18  clinic situation in Florida?
19      MR. DELINSKY:  Object to form.
20    A.  Others at CVS would have been
21  responsible for that sort of thing.  Nobody
22  informed me of anything as president.  Again, as
23  a lawyer for the company I may have been
24  informed, but not as president.

Page 165

1  BY MR. ELSNER:
2    Q.  If you turn to Paragraph 29 on
3  Page 11, it reads "CVS 219's and CVS 5195's
4  District Supervisor, Jennifer Lalani,
5  acknowledged that she was aware of an increase
6  in the number of oxycodone prescriptions that
7  have been presented to CVS, especially in the
8  Orlando, Florida area."  She then says that
9  she -- Mr. Rannazzisi says that "Ms. Lalani also
10  made reference to an October '10 letter sent to
11  the pharmacies from the Hillsborough County
12  Sheriff David Gee.  In that letter, Sheriff Gee
13  made a plea to area pharmacies to work with law
14  enforcement and closely scrutinize the
15  prescriptions they receive in order to deal with
16  the prescription drug epidemic in Florida."
17      Were you aware that CVS pharmacies
18  that you were president of received a letter
19  from the sheriff in Hillsborough County?
20      MR. DELINSKY:  Object to form.
21    A.  Others at CVS would have been
22  responsible for operations and compliance, and
23  they would have been informed of this.  I would
24  not have been informed of this.

Page 166

BY MR. ELSNER:

Q. And you were not?

A. Others at CVS that were responsible for this sort of thing were aware.

Q. But you were not?

A. Others were.

Q. Others were, but you were not, right?

A. I may have been informed of something in my capacity as an attorney. I don't recall.

Q. If you turn to Page 32, it reads "Mrs. Lalani" -- sorry, I'll let you get there. Not Page 32, sorry, Page 12, Paragraph 32. My apologies.

It reads "Ms. Lalani confirmed that CVS 219 was located in Sanford, Florida and was under her supervision. Ms. Lalani agreed that the volume of oxycodone purchased by this pharmacy was extremely high; Ms. Lalani was unable to explain why the volume was so high."

Were you aware that the two pharmacies -- that CVS 219 that you were the president of had a high volume of oxycodone purchased by this pharmacy?

MR. DELINSKY: Object to form.

Page 167

A. Others at CVS would have been responsible for operations and compliance, and they would have been involved in this. I wasn't informed as president. As an attorney I may have been informed of things, but I don't recall seeing this.

BY MR. ELSNER:

Q. It then reads in Paragraph 33 that on August 12, 2011 that the DEA hosted a second meeting with CVS at the DEA Weston Resident Office, and that in attendance at the meeting were DEA representatives and 24 supervisors and managers from various South Florida CVS pharmacies.

Were you aware that the DEA hosted a second meeting solely as president of CVS Holiday Inn August 12, 2011?

A. Others at CVS would have been involved in this -- this situation, but I don't recall being involved in it.

Q. As president of CVS Holiday, you were not informed, correct?

MR. DELINSKY: Object to form.

A. Others would have been involved in

Page 168

this type of meeting. You know, as an attorney I may have been informed about it, but not as president.

BY MR. ELSNER:

Q. Were you aware that the DEA conducted an investigation of these two pharmacies, CVS pharmacies in Florida, and interviewed employees as part of its investigation?

A. Others would have been involved directly in that situation. I was not involved in that.

Q. If you turn to Page 15 of the affidavit, Paragraph 41, it says the "DEA personnel interviewed employees from both CVS 219 and CVS 5195." And it says that "The Pharmacist in Charge at CVS 219...stated that the majority of the diagnosis codes listed by the prescribing practitioners on the oxycodone prescriptions were the same, and that customers requested certain brands of oxycodone, referring to them as 'Ms' or 'blues.'"

Were you aware of that?

A. I was not. The others were involved in this situation. I was not directly involved.

Page 169

And I don't know if that's Ms. or Ms. But in any event, other attorneys would have been involved in this type of situation.

BY MR. ELSNER:

Q. Have you heard of oxycodone being referred to as Ms?

A. No. I just didn't see a period, that's why I said Ms as opposed to Ms. I am not aware of them being referred to by either name.

Q. Under paragraph B it reads "One of the pharmacists at CVS 219...stated that many of the patients receiving oxycodone prescriptions received the same cocktail of prescriptions, including oxycodone 30 milligrams, oxycodone 15 milligrams, alprazolam 2 milligrams."

Were you aware that individuals coming to CVS 219 were -- held prescriptions for a cocktail of drugs?

MR. DELINSKY: Object to form.

A. I was not involved in any of this. I wasn't there. I don't know that that's her characterization of the group of prescriptions or if it's the -- Mr. Rannazzisi. But, you know, you've read that correctly.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

BY MR. ELSNER:

Q. Well, it states here that Susan Masso, who is one of the pharmacists at CVS, "stated that many of the patients."

Do you see that there?

MR. DELINSKY: Object to form.

A. I do see that, and I see the word "cocktail" in quotes, and I don't know if that means that's a quote from her or if that's his characterization of the group of prescriptions.

BY MR. ELSNER:

Q. Well, regardless, she said patients were coming in with prescriptions for multiple different drugs that are listed there, oxycodone 30 milligrams and 15 milligrams and the others, correct?

A. Again, I was not involved in this, others were. That is what this paragraph says.

Q. Okay. And in paragraph C it reads that "The Pharmacist in Charge at CVS 5195, Jessica Merrill, stated that she set a daily limit of how many oxycodone 30-milligram prescriptions the pharmacy would fill each day. The limit was set based upon the amount of

Page 171

oxycodone the pharmacy had on-hand each day. PIC Merrill" stated "that the reason she set this daily limit was to ensure that the pharmacy had enough oxycodone 30 milligrams to fill the prescriptions for 'real pain patients.'"

Were you aware of that?

MR. DELINSKY: Object to form.

A. I was not involved in this. Other attorneys were. I was not at the interview or anything like that, so this is the first I'm reading of it.

BY MR. ELSNER:

Q. Well, as an executive at CVS, would it concern you that a CVS Pharmacy was dispensing drugs to patients that were not in real pain, oxycodone in particular?

MR. DELINSKY: Object to form.

A. I was not involved in this at all, and I don't know anything about how this was being characterized, so I don't have a view on that.

BY MR. ELSNER:

Q. Well, do you have any reason to believe it's being mischaracterized by Joseph Rannazzisi?

Page 172

A. I have no reason to believe either way whether it is correct or incorrect. I wasn't --

Q. You're not suggesting that he lied under oath?

A. No. I'm saying I -- you know, I wasn't there, I don't know -- I wasn't at any of these interviews, don't know anything about it.

Q. Well, does it concern you as an executive at CVS that pharmacists were saving aside oxycodone in the height of the opioid epidemic for, I quote, real pain patients?

MR. DELINSKY: Object to form. Objection, asked and answered.

A. You know, I'm not involved in this area, and I don't have a view on it.

BY MR. ELSNER:

Q. I know, but you've been at CVS a really long time. Does it concern you, this paragraph? Does it concern you if it's true?

MR. DELINSKY: Object to form. Objection, asked and answered.

A. CVS is -- we aim to comply with laws, and so I -- you know, generally speaking that's how we operate, so I would be concerned if we

Page 173

were not, but I have no information to lead me to believe one way or another.

BY MR. ELSNER:

Q. But this would indicate that, in fact, in this instance CVS was not complying with federal regulations, that they were, in fact, selling drugs, oxycodone in particular, to patients that they knew were not in real pain, correct?

MR. DELINSKY: Object to form.

A. I wasn't involved in the interviews. I don't know anything about the interviews, so I can't really form on opinion on that.

BY MR. ELSNER:

Q. If you turn to Page 57 -- sorry, Page 24, Paragraph 57. There's a heading just above that paragraph that says the "DEA Issues Immediate Suspension Orders for CVS 219 and CVS 5195," correct?

A. Just above that paragraph, yes, I see that.

Q. And then it says that "Through my training and experience" -- and this is Joseph Rannazzisi's declaration again -- "as both a law

Page 174

1 enforcement officer and as a licensed
2 pharmacist, I believe that CVS 219's and CVS
3 5195's DEA registration to handle and distribute
4 any type of controlled substance poses an
5 imminent danger to the public health and
6 safety."
7        Did I read that correctly?
8    A.  Yes, you read it correctly.
9    Q.  Were you aware as president of Holiday
10 CVS at this time that the DEA had determined
11 that a suspension order should be issued because
12 these two CVS stores posed an imminent danger to
13 public health and safety?
14        MR. DELINSKY:  Object to form.
15    A.  I was not involved in this whole
16 situation, and we're kind of picking and
17 choosing paragraphs in a very long document, so
18 that is what it says here.
19 BY MR. ELSNER:
20    Q.  And you were not made aware of that as
21 the president of Holiday CVS, the president of
22 these two stores?
23        MR. DELINSKY:  Object to form.
24    A.  I was made aware of it because I'm an

Page 175

1 attorney in the legal department, but not due to
2 my role as president of Holiday.
3        MR. ELSNER:  Okay.  I'm going to mark
4 this next document as the next exhibit, which is
5 MR 68, and it's Exhibit 14 to the deposition.
6        (Whereupon, CVS-Moffatt-14 was marked
7        for identification.)
8 BY MR. ELSNER:
9    Q.  This is CVS-60796 through 60804.  This
10 is a settlement agreement, is it not, between
11 CVS Health and the -- and its subsidiaries and
12 the DEA related to the DEA's investigation of
13 stores 219 and 5195 in Sanford, Florida,
14 correct?
15    A.  Yes, that appears to be correct.
16    Q.  And it was the DEA's position, the US
17 government's position that CVS had failed in its
18 responsibilities under the Controlled Substances
19 Act, correct?
20        MR. DELINSKY:  Object to form.
21    A.  I was not involved in this settlement
22 agreement, so I mean, I'd have to go through the
23 whole thing to agree with your characterization
24 of what's in here.

Page 176

1 BY MR. ELSNER:
2    Q.  Well, if we turn to Page 3 of the
3 settlement agreement, under paragraph I, it
4 reads the "DEA revoked the registrations issued
5 to CVS stores 219 and 5195 in an order published
6 on October 12, 2012" in the Federal Register.
7 The "DEA revoked the registrations of the DEA
8 stores...based, among other things, on their
9 failure to fulfill their corresponding
10 responsibilities under 21 CFR 1306.04," which is
11 the Controlled Substances Act.
12        Are you aware of that?
13    A.  I was not involved in putting this
14 together or anything like that.  I was generally
15 aware of the actions taken against the two
16 stores.
17    Q.  Okay.  And were you aware in
18 Paragraph 12 that CVS -- on Page 3, that "CVS
19 acknowledges that certain CVS/pharmacy retail
20 stores did dispense certain controlled
21 substances in a manner not fully consistent with
22 their compliance obligations under the CSA and
23 its implementing regulations"?
24    A.  I see that.  It's paragraph K.

Page 177

1    Q.  Yes.
2    A.  Yes.
3    Q.  So, in fact, CVS agreed, did it not,
4 that there were certain violations of the
5 Controlled Substances Act in these two stores in
6 Florida?
7        MR. DELINSKY:  Object to form.
8    A.  It says CVS acknowledges that certain
9 stores dispensed controlled substances in a
10 manner not fully consistent with their
11 compliance obligations under the CSA and its
12 implementing regulations.
13 BY MR. ELSNER:
14    Q.  Right.
15    A.  That's what it says, yes.
16    Q.  And if we turn to Page 4, it says,
17 small Roman Numeral iii in the middle of the
18 page, these are the determinations or findings
19 by the DEA, it says "Dispensing, on or before
20 the Effective Date of this Agreement, by the
21 Florida CVS/pharmacy retail store of controlled
22 substances to individuals CVS knew or should
23 have known were diverting controlled
24 substances."

Page 178

1   Were you aware that that was the
2  determination by the DEA?
3      A.  Again, I was not involved in this
4  settlement agreement at all.  You're reading the
5  paragraph correctly.
6      Q.  Okay.  And also that the DEA
7  determined that there was dispensing "by any
8  Florida CVS/pharmacy retail store of controlled
9  substances pursuant to prescriptions issued by
10 physicians who did not have current, valid DEA
11 registrations."
12     Were you aware that that was a
13 component of the DEA's determinations in its
14 investigation of these two CVS stores?
15     MR. DELINSKY:  I object to the form of
16 the question.  These paragraphs define the
17 covered conduct for the scope of the release.
18     MR. ELSNER:  Okay.  Well, the reason
19 they're getting a release on that conduct is
20 because it was the finding of the DEA, and it
21 didn't want subject him to another fine and a
22 continued investigation.
23     MR. DELINSKY:  Well, but this section
24 does not set forth the basis of the fines.  It

Page 179

1  sets forth the basis for the release.  So
2  there's an apples and oranges problem here.
3      MR. ELSNER:  I don't think there is.
4  BY MR. ELSNER:
5      Q.  But generally were you aware that the
6  DEA had determined that these two CVS stores had
7  dispensed and/or filled prescriptions for
8  physicians that didn't have valid DEA licenses?
9      MR. DELINSKY:  Object to form.
10     A.  I was not involved in this in any way.
11 There were other attorneys involved.  So I don't
12 know that that was a finding --
13 BY MR. ELSNER:
14     Q.  Were you --
15     A.  -- for any Florida CVS/pharmacy retail
16 store, so I don't know if it's talking about
17 these two particular stores or what.
18     Q.  If you turn to Page 6 of the
19 settlement agreement, in Paragraph 3, CVS agreed
20 to pay the DEA $22 million in settlement of this
21 investigation of diversion of controlled
22 substances, correct?
23     A.  Yes, that's what Paragraph 3 says.
24     Q.  Were you aware that CVS agreed to pay

Page 180

1  $22 million in settlement of this investigation?
2      A.  Yes, I was aware of that.
3      Q.  And who paid the fine?  Was it CVS
4  Holiday, was it CVS Pharmacy?
5      A.  I don't know.  I wasn't involved in
6  the payment process.
7      Q.  Well, you're the president of CVS
8  Holiday at this time.  Do you know whether CVS
9  Holiday paid the fine?
10     MR. DELINSKY:  Object to the form of
11 the question.
12     A.  I'm not involved in the payment
13 process.  The movement of money between the
14 various subsidiaries, I'm not involved in that
15 at all, so I don't know which entity would have
16 been involved in the payment.
17 BY MR. ELSNER:
18     Q.  Who would know?
19     A.  I'm not sure.  Someone in our finance
20 group, I would think.
21     Q.  There's no one in the legal department
22 that would know who is responsible for paying
23 the fine?
24     MR. DELINSKY:  Object to form.

Page 181

1      A.  I would think the attorneys that were
2  involved in the negotiation of the settlement
3  would have told -- or would have been involved
4  in telling the finance department, this is the
5  settlement.  I think it's signed by CVS
6  Pharmacy, Inc., or maybe that's just -- yeah, on
7  behalf of CVS Pharmacy, Inc.  So I'm not sure if
8  it came from CVS Pharmacy, Inc. or if it came
9  from Holiday.
10     Q.  Would you review financial statements
11 from the various entities that you were
12 president of, including CVS Holiday?
13     MR. DELINSKY:  Object to form.
14     A.  No.  We don't have separate financial
15 statements for the operating subsidiaries.
16 BY MR. ELSNER:
17     Q.  Okay.  So there's no financial
18 statements with respect to the distribution
19 centers or for these entities like CVS Holiday,
20 is that right?
21     A.  There are -- there is financial
22 information that is kept.  We don't -- we don't
23 produce or file the financial statements for the
24 underlying entities.  The ones that we file are

Page 182

1 just for the public company.
2     Q.  I understand there's public filing
3 obligations.  But as the president of CVS
4 Holiday, would you review the financial
5 information from the CVS pharmacies that were
6 part of that group?
7         MR. DELINSKY:  Object to form.
8     A.  Others at CVS in financial reporting
9 group would be responsible for entity level
10 financial information, and they would review.
11 Our tax department would also be involved in
12 that.
13 BY MR. ELSNER:
14     Q.  But as the president of the --
15     A.  I did not.
16     Q.  You did not.  Okay.
17         And this agreement, this settlement
18 agreement with the DEA was signed by Elizabeth
19 Ferguson, the senior vice president, assistant
20 general counsel for CVS Pharmacy on December 18,
21 2014, is that right?
22     A.  That's what Page 9 says, yes.
23     Q.  Do you know whether CVS ever issued
24 any warning or instruction or guidance to the

Page 183

1 Indianapolis distribution center that you were
2 the president of concerning the investigation of
3 pharmacies in Florida?
4         MR. DELINSKY:  Object to form.
5     A.  Others that are involved in operations
6 would have been, you know, involved in that sort
7 of communication.  I was not.
8 BY MR. ELSNER:
9     Q.  Do you know one way or the other
10 whether that took place?
11         MR. DELINSKY:  Object to form.  Asked
12 and answered.
13     A.  Others at CVS would be involved in
14 that.  I don't know one way or another.
15 BY MR. ELSNER:
16     Q.  I mean, they might be involved that it
17 took place, but I'm asking --
18     A.  Yes.
19     Q.  -- do you know that it took place or
20 not?
21         MR. DELINSKY:  Objection to form.
22 Asked and answered.
23     A.  I don't -- others at CVS were
24 responsible, so I wouldn't be involved in that

Page 184

1 whole process.
2 BY MR. ELSNER:
3     Q.  So you don't know one way or another.
4 It's possible that no information was sent,
5 right?
6     A.  It -- either would be possible, but I
7 wouldn't have knowledge to know one way or the
8 other.
9     Q.  Cardinal is one of the distributors of
10 oxycodone and other controlled substances to
11 store 219 in Florida, is that right?
12     A.  I'm not involved in the where drugs
13 come from process, so I can't say one way or
14 another.  I know Cardinal was one of our primary
15 wholesalers.
16     Q.  Okay.  And do you know whether
17 Cardinal was one of the primary wholesalers for
18 your pharmacies that you were president of in
19 Florida pharmacy 219?
20         MR. DELINSKY:  Object to form.
21     A.  I'm not involved in the process, so I
22 don't know which wholesalers would supply which
23 stores.
24         MR. ELSNER:  I'm going to mark this

Page 185

1 next document as Exhibit 15.
2         (Whereupon, CVS-Moffatt-15 was marked
3         for identification.)
4 BY MR. ELSNER:
5     Q.  This is the Government's Prehearing
6 Statement in a matter related to Cardinal Health
7 at the Drug Enforcement Administration.
8         Were you aware that the government had
9 taken and prepared a statement regarding
10 Cardinal's activities with respect to store 219
11 in Florida?
12         MR. DAWSON:  Object to the form.
13     A.  I was generally aware that there were
14 actions taken against Cardinal and others in
15 Florida.
16 BY MR. ELSNER:
17     Q.  What were --
18     A.  Walgreen's, for example.
19     Q.  What do you know about what actions
20 were taken against Cardinal in Florida?
21     A.  It wasn't my area of focus, so I
22 don't -- I wasn't following it.  It was more,
23 you know, Betsy Ferguson and her group that
24 would have been involved in the matter.  I was

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 just generally aware based on my role as an
2 attorney.
3      Q.  If you turn to Page 17 of this
4 document.  And this is the government's brief in
5 the Cardinal matter, just to give you a frame of
6 reference.  And it lists in the second full
7 paragraph toward the bottom of the page, it
8 reads "CVS 219 and 5195."  Do you see where we
9 are?
10     A.  Yes.
11     Q.  It reads "CVS 219 and 5195, two of
12 Respondent's" -- that's Cardinal's -- "top four
13 retail pharmacy customers, are located in
14 Sanford, Florida."
15         And you're aware that those two
16 pharmacies are in Sanford, Florida, is that
17 right?
18         MR. DELINSKY:  Object to form.
19     A.  Yes, I'm aware that 219 and 5195 are
20 in Sanford.
21 BY MR. ELSNER:
22     Q.  And you're the president of Holiday
23 CVS, as we established, and the president of
24 these two stores, is that right?

Page 187

1         MR. DELINSKY:  Object to form.
2     A.  I'm president of the entity, yes.
3 BY MR. ELSNER:
4     Q.  Okay.  And have you ever visited those
5 stores?
6     A.  I have not.
7     Q.  It reads that "During" -- hold on one
8 second.  It reads that Cardinal supplied, it
9 says Respondent, but during 2019, Respondent, or
10 Cardinal supplied 6 of the 16 pharmacies with
11 DEA registrations located within the city limits
12 of Sanford, Florida with approximately over 3
13 million dosage units of oxycodone.
14         Did I read that correctly?
15     A.  Yes, you did.
16     Q.  Okay.  And that according to the 2010
17 US Census Bureau fact sheets, Sanford, Florida
18 had a population of only 53,570 people, is that
19 right?
20         MR. DAWSON:  Object to the form.
21     A.  That's what the sentence says, yes.
22 BY MR. ELSNER:
23     Q.  And it says that "Based on these
24 numbers, Respondent's, or Cardinal's,

Page 188

1 "distribution of oxycodone could supply every
2 resident of Sanford, Florida with approximately
3 58.6 dosage units of oxycodone," is that
4 correct?
5         MR. DAWSON:  Object to the form.
6     A.  That's what this sentence says.
7 BY MR. ELSNER:
8     Q.  And if you go down to the next
9 paragraph, in the second sentence it reads "Of
10 this volume, Respondent," Cardinal, "shipped
11 3,012,500 dosage units (96 percent) to the two
12 CVS stores named in the ISO," CVS stores 219 and
13 5195.
14         Were you aware of that?
15     A.  This is the first time I'm reading
16 this document.
17     Q.  Okay.
18     A.  So first time I've seen this sentence.
19     Q.  It goes on to say that "This volume
20 dwarfs the...volume purchased by other chain
21 drugstores in Sanford, such as Walgreen's."
22         Were you aware that there was a
23 comparison done by the government of the CVS
24 stores' purchases of oxycodone to other

Page 189

1 similarly situated pharmacies in the same
2 geographic area?
3         MR. DELINSKY:  Object to the form.
4         MR. DAWSON:  Object to the form.  And
5 object to the form of the prior question as
6 well.
7     A.  I wasn't involved in this at all, so
8 I'm not aware of any of these, any of this
9 information.
10 BY MR. ELSNER:
11     Q.  Does it concern you as the president
12 of CVS Holiday that there were over 3 million
13 dosage units supplied to your two CVS stores in
14 Sanford, Florida, accounting -- or a city that
15 had a population of 53,000 people?
16         MR. DAWSON:  Object to the form.
17     A.  There are others that are involved in
18 the operations of the store and compliance, so
19 that would be their responsibility.  I was not
20 involved in how many dosage units -- I don't
21 even know what a dosage unit is, but how many
22 units went to particular stores.
23 BY MR. ELSNER:
24     Q.  And we earlier discussed that the DEA

Page 190

1  had expressed concern about the CVS distribution
2  center in Indiana that you're also president of,
3  that that distribution center was supplying very
4  high doses of hydrocodone products to CVS stores
5  in towns with small populations, is that right?
6        MR. DELINSKY: Object to form.
7     A.  I recall seeing that in the earlier
8  document, but again, I don't know anything about
9  the stores that are involved, anything about
10 their volumes in general, or anything like that.
11 BY MR. ELSNER:
12    Q.  If you go down on Page 18 to the first
13 full paragraph that starts "Publix Pharmacy."
14 Do you see where I'm at?
15    A.  Yes.
16    Q.  It says this Publix Pharmacy, located
17 in Sanford, Florida, is about two miles from
18 CVS -- it says "of" -- from CVS 5195 store, and
19 that that Publix Pharmacy purchased only
20 25,700 units of oxycodone.  But the CVS store
21 5195, which is two miles away, purchased
22 1.2 million dosage units of oxycodone.
23       Can you explain to me why that would
24 be the case?

Page 191

1        MR. DAWSON: Object to the form.
2        MR. DELINSKY: Object to the form.
3     A.  Others at CVS were responsible for
4  operations and so forth, but different stores
5  have different volumes of all drugs, so I don't
6  know enough about the -- this particular CVS.  I
7  don't know anything about Publix.
8  BY MR. ELSNER:
9     Q.  That seems wildly disproportionate,
10 doesn't it?
11       MR. DAWSON: Object to the form.
12    A.  I don't know anything about either the
13 CVS or the Publix.  Two miles is a very long
14 distance.  You know, as people know from looking
15 around, CVS can have stores much closer than two
16 miles apart.  So it can be a big difference even
17 being two miles apart.  There's a could be a
18 difference in a store located within a grocery
19 store, which a Publix would be, as opposed to a
20 stand-alone CVS store.
21 BY MR. ELSNER:
22    Q.  Well, the DEA thought it was
23 concerning, didn't it?
24       MR. DELINSKY: Object to form.

Page 192

1     A.  I have no basis to determine what the
2  DEA thought about something.
3  BY MR. ELSNER:
4     Q.  Well, that's what this brief says,
5  right?
6        MR. DELINSKY: Object to form.
7        MR. DAWSON: Object to form.
8     A.  I don't know.  It's a very long brief.
9  I don't know what it says.
10 BY MR. ELSNER:
11    Q.  If you turn to Page 25, there's a
12 paragraph -- there's a section heading "CVS
13 219."
14       Do you see where I'm at?
15    A.  Yes.
16    Q.  It says that apparently there was an
17 investigator for the government who was prepared
18 to testify related to an investigation of CVS
19 219, and according to her analysis "between" --
20 and this is in the third line -- "between
21 January 1, 2010 and October 18, 2011, 42 percent
22 of the 30-milligram oxycodone prescriptions at
23 CVS 219 were paid for in cash, using no
24 insurance to pay for the medication."

Page 193

1        Did I read that correctly?
2     A.  Yes, that's what that --
3     Q.  Are you aware that payments of cash
4  for opioids could be a red flag or an indicator
5  of diversion?
6        MR. DELINSKY: Object to form.
7     A.  Others at CVS are responsible for that
8  sort of information.  As a corporate lawyer I
9  was not involved in that sort of information.
10 BY MR. ELSNER:
11    Q.  Do you know otherwise just generally
12 that payments in cash for an opioid could be a
13 red flag for diversion of that opioid?
14       MR. DELINSKY: Object to form.
15    A.  Any information I would have gotten
16 about that would have been through an attorney
17 communication, but from one of the attorneys
18 that works on this sort of matter.
19 BY MR. ELSNER:
20    Q.  And you believe that if a CVS employee
21 told you that payments were being made in cash
22 and that was a red flag under their standards
23 that that would invoke a privilege?
24       MR. DELINSKY: Object to form.

Page 194

1    A.  What I said was other attorneys at CVS
2  handled this sort of matter and I may have
3  learned something through talking to other
4  attorneys about -- well, not about a Cardinal
5  matter necessarily, I don't know --
6  BY MR. ELSNER:
7    Q.  Well, this is talking about a CVS
8  store 219, so it is a CVS matter.  It's also a
9  Cardinal matter, but it's a CVS matter in the
10  sense this is a CVS Pharmacy and in that CVS
11  Pharmacy they were dispensing oxycodone
12  30-milligram tablets.  42 percent of the people
13  who got those were paying cash for those with no
14  insurance.  And you were not aware of that, is
15  that your testimony?
16    MR. DELINSKY:  I object to the form of
17  the question.
18    And, Mr. Elsner, you just -- I ask
19  that you not interrupt the witness before he's
20  fully completed his answers.  It's happened a
21  handful of times in the last hour or so.
22    A.  So others at CVS would have been
23  involved in this sort of matter.  I was not.
24  BY MR. ELSNER:

Page 195

1    Q.  It says in the next sentence that at
2  this particular location, this is CVS 219 of
3  which you were the president of the entity
4  controlling that, that the pharmacy charged $239
5  for a prescription of 30-milligram strength
6  oxycodone.
7    Did I read that correctly?
8    A.  Well, a prescription of 180.  You
9  skipped the 180 part.
10    Q.  Okay.
11    A.  But that's what that says, yes, in
12  terms of the price.
13    Q.  And do you know whether that would be
14  a trigger for -- or a red flag for diversion for
15  an opioid, to have a customer pay almost $240 to
16  fill a prescription in cash?
17    MR. DELINSKY:  Object to form.
18    A.  This is not my area.  I'm not aware of
19  what's considered a red flag and what isn't.
20  BY MR. ELSNER:
21    Q.  The government writes that based on
22  data provided by IMS that the average for the
23  payments of prescription in cash is about
24  6.9 percent at the end of that paragraph, but

Page 196

1  the CVS store 219, that 42 percent of their
2  customers were paying in cash.  Can you explain
3  the anomaly?
4    MR. DELINSKY:  Object to form.
5    MR. DAWSON:  Object to form.
6    A.  Others at CVS would be responsible for
7  information about these stores, and I don't know
8  enough about the stores in question or, you
9  know, this is -- you're talking about one
10  particular store in Florida versus -- I don't
11  know what the 6.9 percent refers to, different
12  years, so I don't know that it's apples to
13  apples.
14  BY MR. ELSNER:
15    Q.  Did you know that Cardinal had asked
16  CVS for information concerning the sales of
17  oxycodone 30-milligram tablets from store 219?
18    MR. DAWSON:  Object to the form.
19    A.  I would not be involved in that sort
20  of communication, so others at CVS would have
21  been involved in that.
22  BY MR. ELSNER:
23    Q.  So you never became aware of that?
24    A.  Others at CVS would have been

Page 197

1  involved, assuming it happened.  I don't know.
2    Q.  Did you know that Cardinal had
3  requested patient information for store 219
4  related to the sales and the dispensing of these
5  drugs and that CVS refused to provide that
6  information to Cardinal?
7    MR. DAWSON:  Object to the form.
8    A.  Again, this is not my area.  I would
9  not be involved in any such communications.
10  BY MR. ELSNER:
11    Q.  Well, Cardinal was requesting the
12  information so that it could conduct its own due
13  diligence of the sales it was making to CVS
14  pharmacies, including that pharmacy 219, and CVS
15  was refusing to provide that data to Cardinal to
16  conduct that investigation.  Can you explain
17  why?
18    MR. DAWSON:  Object to the form.
19    A.  This is not my area.  I'm not involved
20  in that sort of communications back and forth,
21  so I don't have any basis for responding to
22  that.
23  BY MR. ELSNER:
24    Q.  Were you aware that there was an

Page 198

1 agreement between CVS and Cardinal that CVS
2 would not provide this kind of data to Cardinal?
3        MR. DAWSON: Object to the form.
4     A.  I was not involved in this in any way,
5 so I wouldn't -- I don't know one way or
6 another.  I have no basis to opine on that.
7 BY MR. ELSNER:
8     Q.  Were you aware that a CVS employee
9 from store 219 informed CVS corporate who
10 informed Cardinal that the reason that there was
11 an oxycodone spike was because there was an
12 increased number of patients from pain clinics?
13        MR. DAWSON: Object to the form.
14     A.  I wasn't involved in this process.
15 Others at CVS were involved, so I wouldn't be
16 involved in that sort of communication.
17 BY MR. ELSNER:
18     Q.  Cardinal had also asked for a dosage
19 utilization report from CVS related to store
20 219, and CVS refused to provide that report.
21 Can you explain why?
22        MR. DAWSON: Object to the form.
23     A.  Others would have been involved in
24 that sort of communication, and I have no basis

Page 199

1 to opine either way.
2 BY MR. ELSNER:
3     Q.  Cardinal's general practice when it
4 found anomalies like this, in investigations
5 like this, and suspicion of diversion was to
6 actually do a site visit to the pharmacy, do an
7 inspection and interview people and understand
8 why it was that they were purchasing such large
9 amounts of opioids, but they didn't do a site
10 visit to CVS stores.  As the president of CVS
11 Holiday, do you know why CVS wouldn't -- did CVS
12 have a policy not to permit them to conduct such
13 an investigation?
14        MR. DAWSON: Object to the form.
15     A.  I was not involved in that whole
16 process, so I have no basis to give a view on
17 that.
18 BY MR. ELSNER:
19     Q.  Did any -- do you have any
20 understanding why CVS would prevent that?
21        MR. DAWSON: Object to the form.
22     A.  I had no involvement in the process.
23 Others at CVS would have been involved in that.
24        MR. DELINSKY: Excuse me, court

Page 200

1 reporter, I'm sorry I forgot your name.  Are you
2 picking up on --
3        THE REPORTER: Yes.
4        MR. DELINSKY: -- the objections to
5 forms?  Thank you.
6        MR. ELSNER: I'm going to mark this
7 next exhibit, which is Exhibit 16.  This is MR
8 70.
9        (Whereupon, CVS-Moffatt-16 was marked
10        for identification.)
11 BY MR. ELSNER:
12     Q.  Were you aware the DEA was conducting
13 an investigation of CVS pharmacies in Maryland?
14     A.  Others were handling this more
15 directly.  I was generally aware based on my
16 role as an attorney.
17     Q.  The investigation concerned potential
18 violations of the Controlled Substances Act, and
19 in particular it related to CVS's obligations
20 with respect to corresponding responsibility
21 between the pharmacist and the physician.  Were
22 you aware of that?
23        MR. DELINSKY: Object to form.
24     A.  Others were handling this more

Page 201

1 directly.  I was generally aware of that based
2 on my role as an attorney.
3 BY MR. ELSNER:
4     Q.  If you turn to -- what I've placed
5 before you is actually a settlement agreement
6 which was entered into by CVS Pharmacy, Inc.
7 with the DEA related to the DEA's investigation
8 in Maryland, is that right?
9     A.  Yes, that's what this appears to be.
10     Q.  Okay.  And if you turn to Page 2 of
11 the settlement agreement under paragraph F, it
12 reads that "The United States contends that CVS
13 failed to fulfill its corresponding
14 responsibilities under 21 CFR 1306.04," which is
15 the Controlled Substances Act, and "is subject
16 to civil penalties."
17        Did I read that correctly?
18     A.  You did read that correctly.
19     Q.  Okay.  And in paragraph E it states
20 that "CVS acknowledges that it has a
21 corresponding responsibility to dispense only
22 those prescriptions that have been issued for a
23 legitimate medical purpose by an individual
24 practitioner acting in the usual course of

Page 202

1 professional practice and that knowingly filling
2 a prescription not in the usual course of
3 professional treatment or in legitimate and
4 authorized research subjects CVS to penalties
5 under the CSA," or the Controlled Substances
6 Act, correct?
7     A.  Yes, you read that correctly.
8     Q.  Were you aware that CVS acknowledged
9 in paragraph G that certain CVS Pharmacy retail
10 stores in Maryland did dispense certain
11 controlled substances in a manner not fully
12 consistent with their compliance obligations
13 under the CSA?
14     A.  You read that portion of the paragraph
15 G correctly as well.
16     Q.  Were you aware that CVS had made that
17 acknowledgment in the settlement agreement?
18     A.  I was not involved in putting this
19 settlement agreement together, and so I wouldn't
20 have been involved in the wording here.
21     Q.  If you turn to Page 3, it states --
22 Page 3, Paragraph 3 at the very bottom, it
23 states that CVS will pay the United States a sum
24 of $8 million in settlement, is that correct?

Page 203

1     A.  Yes, that's what Paragraph 3 says.
2     Q.  Were you aware that CVS had entered
3 into a settlement with the DEA related to
4 violations of corresponding responsibilities of
5 its CVS pharmacies in Maryland for an amount of
6 $8 million?
7     MR. DELINSKY:  Object to form.
8     A.  I wasn't involved in the whole
9 process, but that appears to be what this says.
10 It also says that it was done to avoid the
11 delay, expense, and inconvenience and
12 uncertainty of litigation.  So it's not
13 necessarily, you know, an admission, but...
14 BY MR. ELSNER:
15     Q.  The DEA had reached certain findings,
16 and you could have fought those findings in
17 court, but rather than doing that you entered
18 into a settlement in the amount of $8 million,
19 is that right?
20     MR. DELINSKY:  Object to form.
21     A.  Again, there's another attorney, or
22 other attorneys would have been responsible for
23 making that sort of decision, and the reasons
24 behind it.  I'm not involved in that process.

Page 204

1 BY MR. ELSNER:
2     Q.  Okay.  But CVS agreed to it and they
3 signed -- Betsy Ferguson on behalf of CVS
4 Pharmacy, Inc. executed the settlement agreement
5 in February of 2016, correct?
6     A.  Yes.
7     MR. DELINSKY:  Could we take a quick
8 five minutes?
9     MR. ELSNER:  Sure.  Absolutely.
10     THE VIDEOGRAPHER:  We're going off the
11 record at 12:16 p.m.
12     (Whereupon, a recess was taken.)
13     THE VIDEOGRAPHER:  We're back on the
14 record at 12:24 p.m.
15 BY MR. ELSNER:
16     Q.  Mr. Moffatt, were you a secretary or
17 president of any of the pharmacies in Maryland
18 that were subject of the DEA investigation and
19 CVS settlement with the DEA?
20     MR. DELINSKY:  Object to form.
21     A.  I was president of the entity that
22 operated those pharmacies, yes.
23 BY MR. ELSNER:
24     Q.  Were you aware that the DEA also

Page 205

1 conducted an investigation of certain CVS
2 pharmacies in Alabama?
3     MR. DELINSKY:  Object to form.
4     A.  Others at CVS are responsible for all
5 of those sort of matters, so I don't recall
6 specifically information about Alabama.
7 BY MR. ELSNER:
8     Q.  Let me show you Moffatt Exhibit 17,
9 which is a settlement agreement between CVS and
10 the DEA related to entities in Alabama.
11     (Whereupon, CVS-Moffatt-17 was marked
12     for identification.)
13 BY MR. ELSNER:
14     Q.  If I could -- the DEA was
15 investigating certain pharmacies in Alabama,
16 particularly in Calera, Alabama, for certain
17 recordkeeping and reporting violations of
18 controlled substances, regulations in place to
19 guard against theft and diversion.  This is
20 paragraph F on Page 2.  Do you see where I'm at?
21     A.  Yes.
22     MR. DELINSKY:  Objection.
23     A.  I see paragraph F.
24 BY MR. ELSNER:

Page 206

1  Q.  And then in paragraph G on Page 2 that
2  as a result of the DEA's investigation and its
3  inspection of this CVS store in Calera, Alabama,
4  that the United States contends that on or
5  before the effective date of the agreement CVS
6  Calera violated the CSA, the Controlled
7  Substances Act, and then it lists three
8  violations that the DEA believed exists, is that
9  correct?
10      MR. DELINSKY:  Object to form.
11      A.  I was not involved in the preparation
12  of this, but that is what Paragraph G says.
13  BY MR. ELSNER:
14      Q.  On Page 3 of the agreement under
15  "Terms and Conditions," CVS agreed to pay a
16  $1 million sum in settlement of this contention
17  and these alleged violations, is that right?
18      MR. DELINSKY:  Object to form.
19      A.  I wasn't involved in this settlement
20  or anything, but it appears that that's what
21  Paragraph 1 on Page 3 says.
22  BY MR. ELSNER:
23      Q.  Okay.  And on Page 8 of the agreement,
24  CVS Pharmacy, Inc. agreed to the settlement

Page 207

1  terms in July of 2018, is that right?
2      A.  What page were you on?
3      Q.  Page 8, the very last page of the
4  agreement.
5      A.  Yes, yes, signed in July.
6      Q.  Signed by Betsy Ferguson again, is
7  that right?
8      A.  And John Gilbert, our outside
9  attorney.
10      Q.  Okay.
11      A.  Who is at Hyman, Phelps.
12      Q.  Another question.
13          Were you the president or secretary or
14  treasurer or officer of this Alabama CVS store?
15      MR. DELINSKY:  Object to form.
16      A.  I believe I was president of the
17  entity that operated the Alabama CVS pharmacies.
18  BY MR. ELSNER:
19      Q.  And what entity is that?
20      A.  CVS Alabama, LLC, I believe.
21      Q.  What was the entity in Maryland that
22  you were the president of that was related to
23  the CVS stores under investigation there by the
24  DEA?

Page 208

1      A.  That would have been, I believe, CVS
2  Maryland, LLC.
3      Q.  Okay.  Do you have a list of all of
4  the entities that you serve as president or
5  secretary of?
6      A.  I could generate one.  I don't have
7  one with me or anything like that.
8      Q.  It's not in your backpack?
9      A.  No.
10      Q.  But you could provide that?
11      MR. DELINSKY:  Object to form.
12      A.  We could create a list if one was
13  needed, yeah.
14  BY MR. ELSNER:
15      Q.  Okay.  The DEA also conducted an
16  investigation of CVS stores in Oklahoma, is that
17  right?
18      A.  Other people would have been involved
19  in particular investigations.  I believe there
20  was one in Oklahoma, yes.
21      Q.  I'm going to show you Exhibit 18.
22      (Whereupon, CVS-Moffatt-18 was marked
23      for identification.)
24  BY MR. ELSNER:

Page 209

1      Q.  This is Motley Rice 224.  This is a
2  settlement agreement between CVS and the DEA
3  related to a DEA investigation, is that right?
4      A.  Yes, that's what it appears to say.
5      Q.  And in fact, this particular
6  settlement agreement, you actually signed and
7  executed the settlement.  Your signature -- is
8  that your signature on Page 7?
9      A.  Yes, my signature and initials at the
10  top of Page 7.
11      Q.  I'm going to have you turn to Page 829
12  of the document, which is -- sorry.  We've
13  already done that.  Hold on one second.  If we
14  turn to -- sorry, hold on one second.  Turn to
15  Page 2, Paragraph 11 at the bottom of Page 2.
16  This is MR 224.  Page 2, 60823, Paragraph 11.
17      A.  Yes, I see it.
18      Q.  And it says that the US -- "United
19  States alleges that the following conduct by
20  CVS/pharmacy retail stores in Oklahoma and
21  elsewhere for the relevant time period under
22  circumstances that violate the CSA and the
23  regulations promulgated thereunder," and then it
24  has a list of various things that the CVS

Page 210

1  pharmacies in Oklahoma on the top of Page 3,
2  Roman Numeral little i, "filling prescriptions
3  for certain prescribers whose DEA registration
4  numbers were not current or valid."  That was
5  one of the DEA's determinations, is that right?
6        MR. DELINSKY:  Object to form.
7     A.  That's one of the allegations.
8  BY MR. ELSNER:
9     Q.  Allegations which the DEA determined
10 that violate the CSA, is that right?
11       MR. DELINSKY:  Object to form.
12    A.  It says that the United States alleges
13 this conduct under circumstances that violate
14 the CSA, that's their characterization of the
15 conduct.
16 BY MR. ELSNER:
17    Q.  Okay.  And under little Roman Numeral
18 ii, it included "entering and maintaining
19 invalid DEA registration numbers on CVS
20 dispensing records for certain prescriptions,"
21 is that right?
22    A.  That's allegation in Romanette ii,
23 yes.
24    Q.  And allegation under Roman Numeral

Page 211

1  iii, "entering and maintaining CVS dispensing
2  records including prescription vial labels that
3  identify a non-prescribing provider as the
4  prescribing provider for certain prescriptions."
5  Was that another allegation?
6     A.  That is the third allegation here.
7     Q.  Okay.  And in settlement of these
8  allegations, CVS agreed to pay $11 million to
9  the United States Government, is that right?
10    A.  At Paragraph 15 it says $11 million.
11 Again, I was not involved in the preparation of
12 this or any -- didn't take any part in this
13 settlement, so I'm not familiar with all the
14 circumstances described in here.
15    Q.  Well, this --
16    A.  I signed it, but others would have
17 been involved in the entire matter and, you
18 know, would have brought this to me at the end.
19    Q.  Okay.  What was brought to you at the
20 end, and what did you consider when deciding to
21 execute this settlement agreement?
22       MR. DELINSKY:  I object to the form of
23 the question.  I also object to the question to
24 the extent it calls for attorney/client

Page 212

1  information, privileged information and/or work
2  product.
3        To the extent answering would require
4  you to disclose that information, I instruct you
5  not to -- to say so and not to disclose the
6  information.
7     A.  It would have been brought to me by
8  the attorney that was working on this, and our
9  communication as to what was in the document
10 would have been all privileged.
11 BY MR. ELSNER:
12    Q.  What were the findings -- or what were
13 the facts that the DEA presented to CVS to
14 inform CVS that its stores in Oklahoma had these
15 recordkeeping violations?
16    A.  I had no involvement in the
17 particulars here.  Other attorneys and other
18 individuals were involved.  So I -- to the
19 extent I learned of any of that, it would have
20 been through our attorney and would have been
21 privileged.
22    Q.  Well, I don't -- I take issue with
23 that.  What I'm asking you is not whether CVS
24 determined those allegations would be true or

Page 213

1  false or whether it was a good settlement or a
2  bad settlement, I'm not asking you anything
3  about that.
4        What I'm asking you is, what facts did
5  the DEA present to CVS to indicate that there
6  had been violations of the Controlled Substances
7  Act at its CVS stores in Oklahoma?
8        MR. DELINSKY:  Let's take this
9  step-by-step in light of the privilege issues.
10 Perhaps we could start by establishing whether
11 Mr. Moffatt recalls any of the facts.  If he
12 doesn't recall, there's no privilege concern.
13 If he recalls, we can figure out how to go from
14 there in light of the privilege.
15 BY MR. ELSNER:
16    Q.  Well, were you -- go ahead, why don't
17 you answer the question.
18    A.  I don't recall specifics as to the
19 conduct in this matter.
20    Q.  Okay.  Before signing this agreement,
21 did you read it?
22    A.  Yes, I did.
23    Q.  Did you seek to determine what the
24 basis was for the DEA's allegations in

Page 214

1 Paragraph 11?
2     MR. DELINSKY: Object to form.
3    A. The other attorney or attorneys that
4 were involved in the settlement, we would have
5 had a discussion about it. I don't recall any
6 particulars about it.
7 BY MR. ELSNER:
8    Q. Did they present to you -- and I just
9 don't know, in the general practice, does the
10 DEA provide you with a letter or a document
11 explaining what the allegations are?
12    A. I'm not involved in the whole process,
13 so I'm not sure what was provided in this
14 instance.
15    Q. Did you review anything before you
16 executed this document other than the settlement
17 agreement itself?
18     MR. DELINSKY: Object to form.
19 BY MR. ELSNER:
20    Q. Just yes or no.
21    A. I don't -- I mean this was when, 2013?
22 I don't recall what I would have reviewed or
23 what discussions I would have had with the
24 attorney that was involved in the matter.

Page 215

1    Q. Okay. You signed this as president of
2 Oklahoma CVS Pharmacy, is that right?
3    A. Yes.
4    Q. And so you were the president of the
5 entity which controlled the CVS pharmacies that
6 were the subject of this investigation in
7 Oklahoma, is that right?
8    A. On that date I was, yes.
9    Q. Okay. And prior to this date, did you
10 serve as a treasurer or secretary of that
11 entity?
12     MR. DELINSKY: Object to form.
13    A. I probably -- so the time period
14 that's referred to below here in Paragraph 9,
15 for example, talks about 2005 to 2011, during
16 that time frame I would have been secretary
17 probably.
18 BY MR. ELSNER:
19    Q. Okay. And as a matter of general
20 practice, regardless of this particular
21 circumstances, what type of information would
22 you review before you'd execute a settlement
23 agreement like this?
24     MR. DELINSKY: Object to form.

Page 216

1    A. So generally speaking, I would talk to
2 the attorney that was involved in the matter and
3 they would tell me what was involved, and I
4 would read it.
5 BY MR. ELSNER:
6    Q. Okay. You wouldn't do your own
7 independent investigation of the alleged facts
8 by the DEA?
9     MR. DELINSKY: Object to form.
10    A. I would not. We had other people that
11 were responsible for both handling the matter
12 and, you know, store operations and so forth, so
13 I wouldn't do my own investigation.
14 BY MR. ELSNER:
15    Q. And would you review any of the
16 letters or documentation provided by the DEA to
17 CVS related to those investigations before you
18 executed the document?
19     MR. DELINSKY: Object to form.
20    A. Not that I recall. Not typically.
21 Typically it would be more a conversation with
22 the attorney. I'm sure on some occasions I
23 would have some of the background, either -- you
24 know, sometimes I would be involved -- like in

Page 217

1 this case I would be in providing a declaration
2 earlier in the matter, so I might have been
3 involved then. For the signing of this
4 particular settlement agreement, I think it
5 would have just been a conversation with the
6 attorneys.
7    Q. Was this approved by anyone at CVS
8 Pharmacy?
9    A. It was signed by Josh Flum, who was
10 senior vice president. I think at the time he
11 was pharmacy operations. But again, it would be
12 one attorney or group of attorneys. I'm not
13 sure who handled it. They would have been
14 handing the matter and would have brought it to
15 both me and Josh to sign.
16    Q. And who would those attorneys be at
17 CVS?
18    A. It varies, but Betsy Ferguson was head
19 of the area, so it would be her and other
20 attorneys in her group.
21    Q. But in settlement of the Oklahoma
22 investigation, CVS agreed to pay $11 million,
23 and you executed that settlement agreement on
24 behalf of Oklahoma CVS, is that right?

Page 218

1    MR. DELINSKY:  Object to form.
2    A.  That's correct.  That's what
3 Paragraph 15 says.
4 BY MR. ELSNER:
5    Q.  There was also an investigation by the
6 DEA of CVS stores in Rhode Island, is that
7 right?
8    MR. DELINSKY:  Object to form.
9    A.  Others are involved in the various
10 investigations.  I'm generally aware that there
11 was one in Rhode Island.
12 BY MR. ELSNER:
13    Q.  Okay.  This is MR 225.  This is
14 Exhibit 19, Mr. Moffatt.
15    (Whereupon, CVS-Moffatt-19 was marked
16    for identification.)
17 BY MR. ELSNER:
18    Q.  If you turn to Page 3 of 7 of the
19 settlement agreement, paragraph I, it states,
20 does it not, that "Between October 18, 2013 and
21 March 2, 2015, the DEA Providence Resident
22 Office conducted an investigation into CVS'
23 dispensing of prescriptions from Rhode Island
24 CVS/pharmacy retail stores."  Is that right?

Page 219

1    A.  Yes, that's what paragraph I says.
2    Q.  Did you have a role with respect to
3 CVS stores and pharmacies -- were you president
4 or secretary or treasurer of that entity?
5    MR. DELINSKY:  Object to form.
6    A.  I would have been president of the
7 Rhode Island entity, yes.
8 BY MR. ELSNER:
9    Q.  And what is that entity called?
10    A.  I have to look it up, but something
11 along the lines of Rhode Island CVS Pharmacy,
12 LLC.
13    Q.  Do you know the name sitting here
14 today?
15    A.  I don't.  We have separate store
16 entities in each state, sometimes multiple, so I
17 don't know exactly the name of the entity.
18 Sometimes it's just Rhode Island CVS, sometimes
19 it's CVS Rhode Island, it varies a little bit.
20    Q.  In paragraph J it states that "The
21 United States contends that it has certain civil
22 and administrative claims under the Act," this
23 is the Controlled Substances Act, and "it's
24 implementing regulations based on CVS' conduct

Page 220

1 in Rhode Island CVS/pharmacy retail stores
2 between the 3rd of March, 2010 and the date of
3 this agreement," and then it goes on to list
4 certain conduct which includes "Filling
5 prescriptions with invalid prescriber DEA
6 numbers, or under circumstances where the
7 pharmacist filling the prescription knew or had
8 reason to know that the prescription in question
9 was invalid or unauthorized."
10    Did I read that correctly?
11    A.  That's what Paragraph 1 says.
12    Q.  In Paragraph 2 for "Filling
13 prescriptions for Schedule III controlled
14 substances written by psychiatric nurse
15 practitioners who were not authorized under
16 state law or by the terms of their DEA
17 registration to issue such prescriptions," is
18 that right?
19    A.  That's what Paragraph 2 says.
20    Q.  Okay.  And third that "Entering,
21 creating, or maintaining CVS dispensing records,
22 including prescription vial labels, in which the
23 DEA registration numbers of non-prescribing
24 practitioners, including non-prescribing

Page 221

1 practitioners who were not really authorized to
2 prescribe the substances dispensed, were
3 substituted for the DEA registration numbers of
4 prescribing practitioners, in violation of the
5 Controlled Substances Act," is that right?
6    A.  That's what Paragraph 3 says, yes.
7    Q.  Were you aware that the DEA had made
8 such contentions with respect to CVS stores in
9 Rhode Island based on your role as the president
10 of the CVS entity in Rhode Island covering those
11 stores?
12    MR. DELINSKY:  Object to form.
13    A.  No.  Others at CVS would have been
14 responsible for this sort of investigation, and
15 for the settlement, so I was not involved in
16 preparing this document or in the investigation.
17 BY MR. ELSNER:
18    Q.  Okay.  And CVS agreed to pay in
19 settlement of these claims $450,000 to the
20 United States Government, is that right?
21    A.  That's what Paragraph 1 on Page 4
22 says.
23    Q.  Were you aware of that as the
24 president of the CVS Rhode Island entity

Page 222

1 concerning these stores?
2      MR. DELINSKY:  Object to form.
3      A.  I was not involved in preparing any of
4 this or in the amount that was agreed upon.  To
5 the extent I knew about it, it was because of my
6 role as an attorney as opposed to because I'm
7 president of the store entity.
8 BY MR. ELSNER:
9      Q.  They wouldn't have informed you as
10 president of the store entity that a settlement
11 had been reached?
12      MR. DELINSKY:  Object to form.
13      A.  They informed me because I'm an
14 attorney.  I'm also president of the entity.  I
15 don't know if they would have informed somebody
16 else if somebody else was the president, but
17 they did inform me.
18 BY MR. ELSNER:
19      Q.  Okay.  And Betsy Ferguson executed
20 this document on August 5, 2015, Page 7 of 7?
21      A.  Yes, she did.  August 5th.
22      Q.  Were you aware that the DEA had
23 conducted investigations of CVS pharmacies in
24 California, in Nassau and Suffolk County, New

Page 223

1 York, and also in -- related to the theft of
2 controlled substances and the failure to report
3 those thefts to the DEA promptly?
4      MR. DELINSKY:  Object to form.
5      A.  Others at CVS are involved in all of
6 the government investigations, so I may have
7 heard of those matters through my role as an
8 attorney, but other people were primarily
9 responsible for that sort of investigation and
10 the circumstances behind them.
11 BY MR. ELSNER:
12      Q.  Okay.  This is Motley Rice 226, which
13 is Exhibit 20 to your deposition.
14      (Whereupon, CVS-Moffatt-20 was marked
15      for identification.)
16 BY MR. ELSNER:
17      Q.  This is the settlement agreement
18 between CVS and the DEA related to its
19 investigation in California.
20      If you turn to paragraph F, which is
21 on Page 2 of the agreement, describes that the
22 DEA Sacramento field office, and U.S. Attorney's
23 Office for the Eastern District of California
24 conducted an investigation with respect to

Page 224

1 CVS/pharmacy retail stores and their compliance
2 with the Controlled Substances Act, it reads
3 "specifically investigating the recordkeeping,
4 reporting, procedures to guard against theft and
5 diversion, and certain dispensing practices
6 of...CVS Pharmacy Retail Stores in the Eastern
7 District of California."  Is that right?
8      MR. DELINSKY:  Object to form.
9      A.  I was not involved in preparing this,
10 but that appears to summarize paragraph F.
11 BY MR. ELSNER:
12      Q.  Okay.  Were you aware that the DEA was
13 concerned with thefts of controlled substances
14 across the country?
15      A.  Others at CVS are responsible for both
16 the investigation and for operations and
17 compliance with what would be involved in this
18 sort of activity.  I was not.
19      Q.  If you turn to paragraph J, which is
20 on Page 3, it reads that "CVS acknowledges that,
21 during the period" -- do you see where I'm at at
22 the bottom of Page 3, paragraph J?
23      A.  Yes.
24      Q.  "CVS acknowledges that, during the

Page 225

1 period from April 30, 2011 through April 30,
2 2013, certain Eastern District of California CVS
3 Pharmacy Retail Stores failed to fulfill certain
4 recordkeeping obligations under the CSA in a
5 manner fully consistent with CVS's compliance
6 obligations."
7      Did I read that correctly?
8      MR. DELINSKY:  Object to form.
9      A.  You did read that sentence correctly,
10 but the next sentence starts with
11 "Notwithstanding," so I take it that's going to
12 say something different.
13 BY MR. ELSNER:
14      Q.  It might.
15      But were you aware that CVS
16 acknowledged during this period that those
17 recordkeeping violations existed?
18      MR. DELINSKY:  Object to form.
19      A.  It appears that we acknowledged it,
20 but we contend that a failure to fulfill those
21 recordkeeping obligations did not arise or did
22 not cause the diversion of controlled
23 substances.
24 BY MR. ELSNER:

Page 226

1    Q.  Why did CVS admit that there were
2  recordkeeping violations, but contend that those
3  did not arise from or cause the diversion of
4  controlled substances?
5       MR. DELINSKY:  Object to the form of
6  the question to the extent that would require --
7  if you know the answer, if you possess
8  responsive information, to the extent it would
9  call you to divulge attorney/client privilege
10  information or work product, and I ask that you
11  not answer and instruct you accordingly.
12    A.  So I wasn't involved in the
13  investigation.  I don't know any particulars as
14  to why we would do that.  I could speculate, but
15  would not be advised to do so, I'm sure.
16  BY MR. ELSNER:
17    Q.  So the reason you read that sentence
18  was not because you had any personal information
19  about it?
20    A.  No, I just think it presents a fuller
21  picture.  And it also says the United States
22  does not contend to the contrary, so the United
23  States --
24    Q.  Did CVS --

Page 227

1    A.  -- wasn't forcing the issue either.
2    Q.  Well, CVS did acknowledge that there
3  were recordkeeping violations related to thefts
4  of controlled substances in its California
5  stores, is that right?
6       MR. DELINSKY:  Object to form.
7    A.  I don't think it says anything related
8  to thefts.  It says "failed to fulfill certain
9  recordkeeping obligations."  I know that that
10  can sometimes be timing, you filed it a day
11  late, you gave the information but because it's
12  not filed within a certain time frame, I could
13  see where that might be something that they
14  would say, yet technically it's a recordkeeping
15  violation, but it's -- you know, it wouldn't
16  rise to the level of causing a diversion of
17  controlled substances.
18  BY MR. ELSNER:
19    Q.  If you look just above on Page 3 under
20  the various bullets, it states that "The United
21  States also contends that various EDCA CVS
22  Pharmacy Retail Stores failed to provide
23  effective controls and procedures to guard
24  against theft and diversion of controlled

Page 228

1  substances."
2       Did I read that correctly?
3    A.  That is the contention that's there,
4  yes.
5    Q.  So it relates to thefts of controlled
6  substances and the reporting obligations
7  consistent with that, is that right?
8       MR. DELINSKY:  Object to form.
9    A.  Again, I'm not involved in the
10  preparation of this, you know, some of the
11  things above that -- what you just read, failed
12  to record the amount or the date or to do order
13  forms, that sort of thing, and then it says
14  "United States also contends."  So what's in
15  paragraph J, I don't know that we're agreeing
16  that we -- that we notified -- I kind of got
17  lost there.
18       Our recordkeeping obligations, our
19  failure to fulfill recordkeeping obligations did
20  not arise from or cause diversion of controlled
21  substances.
22  BY MR. ELSNER:
23    Q.  CVS agreed to pay a $5 million fine in
24  resolution of this investigation by the DEA, is

Page 229

1  that right?
2    A.  That's what Paragraph 1 says on
3  Page 4.
4    Q.  And did you have a role as either
5  president or secretary or treasurer for the --
6       MR. DELINSKY:  I apologize.  I just
7  want to object to the form of the prior
8  question.
9  BY MR. ELSNER:
10    Q.  Did have you a role as either
11  president, secretary, or treasurer of any of the
12  CVS stores in the Eastern District of California
13  which were the subject of this settlement?
14       MR. DELINSKY:  Object to form.
15    A.  So not with respect to the store, with
16  respect to the entities I would have a role.
17  Depends on the time frame and what entity we're
18  talking about, but I would have had an officer
19  role with the store entities.  I was not
20  involved in the investigation or the settlement
21  or anything like that.
22  BY MR. ELSNER:
23    Q.  Were you the president of the
24  California entity?

Page 230

1    A.   What time frame are we talking about?
2    Q.   Well, I think we can talk about two
3  time frames.  The agreement was executed in June
4  of 2017.
5    A.   So today I am president of -- we have
6  multiple store entities in California, and I'm
7  president of both of those.  It looks like the
8  entire time frame because it talks about on
9  Page 2 early 2012, so that would be when I
10  became president when my predecessor retired.
11    Q.   So as of May, 2012 through 2000 --
12  well, through today, you've served as the
13  president of the California entities over these
14  pharmacies, is that right?
15    A.   That's correct.
16    Q.   Okay.  And were you made aware as
17  president of the CVS entities in California, of
18  these CVS pharmacies, that a settlement had been
19  reached with the DEA?
20    MR. DELINSKY:  Object to form.
21    A.   Others at CVS were responsible for
22  operations and compliance and the people that --
23  they were informed, and I as an attorney would
24  be aware of it, but not -- I wasn't informed of

Page 231

1  something because I was president.
2  BY MR. ELSNER:
3    Q.   Do you know how many thefts occurred
4  at CVS Pharmacy stores in California of
5  controlled substances prior to and during this
6  period?
7    A.   Others are responsible for that sort
8  of information.  I don't have that information.
9    Q.   Do you know whether CVS had an issue
10  with respect to thefts of opioids, hydrocodone
11  products from its pharmacies across the country?
12    MR. DELINSKY:  Object to form.
13    A.   Others would be responsible for that
14  sort of information.  We have a loss prevention
15  area that would be involved in that, but it's
16  not my area.
17  BY MR. ELSNER:
18    Q.   So you have no idea whether there's
19  been an issue of thefts from CVS pharmacies for
20  controlled substances?
21    MR. DELINSKY:  Object to form.
22    A.   Except as being informed as an
23  attorney, I would not.
24  BY MR. ELSNER:

Page 232

1    Q.   Well, if a theft occurs in a CVS store
2  and they make you aware of that, there's nothing
3  privileged about that theft, is there?
4    MR. DELINSKY:  Let's leave the dispute
5  over what's privileged and not between you,
6  Mr. Elsner, and me as counsel for the witness
7  and then the company.  It's not appropriate to
8  ask the witness to opine on what is privileged
9  or what is not.
10    What he's testified is that to the
11  extent he received information on the subject it
12  was in the context of attorney/client
13  communication.
14    MR. ELSNER:  Just because an attorney
15  learns a fact from a client doesn't make that
16  fact become privileged.
17    MR. DELINSKY:  But you haven't asked
18  him about a particular fact.  You asked him
19  about information or --
20  BY MR. ELSNER:
21    Q.   Were you aware that there were thefts
22  that occurred in California CVS stores at the
23  time in which you served as the president of the
24  entity over those stores in California?

Page 233

1    A.   I was not informed of individual
2  thefts at any California stores.
3    Q.   Were you informed of any individual
4  thefts of opioids or other controlled substances
5  at any CVS stores across the country?
6    MR. DELINSKY:  Object to form.
7    A.   To the extent I learned of any
8  information about thefts, it would have been in
9  the context of attorney/client information.
10  BY MR. ELSNER:
11    Q.   That doesn't answer my question.  I
12  don't think my question invokes a privilege.
13    My question is, were you informed of
14  any thefts from CVS stores across the country
15  while you've been working at CVS?  Just yes or
16  no.
17    A.   It's not a yes or no question.
18    Q.   Well, it's either yes, no, or I don't
19  know.
20    A.   Others at CVS were involved in
21  individual matters.  To the extent I've received
22  information about thefts, it would have been in
23  the context of an attorney/client communication.
24    MR. ELSNER:  I think we should take a

Page 234

1 break and talk to the witness. I don't see how
2 that invokes a privilege. The question is, is
3 he aware of a theft at a CVS store. It doesn't
4 matter whether a CVS employee told him of that.
5 It doesn't become privileged just because there
6 was a theft, and I also don't understand what
7 the privilege would be.
8 MR. DELINSKY: If there is -- what the
9 witness is saying clearly is he may have learned
10 information. You haven't cleared up -- you
11 haven't asked about what specifically -- whether
12 he specifically recalls any specific instances.
13 MR. ELSNER: I don't have to ask that.
14 MR. DELINSKY: Because other attorneys
15 provide -- may have provided that information,
16 okay, that would by definition be an
17 attorney/client communication subject to the
18 privilege.
19 If you have a specific instance about
20 what you want to inquire, were you aware of a
21 theft on this date or that date, you can ask the
22 question and we can see where it goes. But
23 you're asking very broad and general questions.
24 MR. ELSNER: I don't think it was that

Page 235

1 broad. I asked him whether he was aware of a
2 specific instance of a theft at a CVS store.
3 MR. DELINSKY: You can answer the
4 question.
5 BY MR. ELSNER:
6 Q. Yes or no.
7 A. I wouldn't be informed of a specific
8 theft at a specific store.
9 Q. Were you aware that -- strike that.
10 Were you aware that in 2011 CVS had 12
11 robberies in the Boston area of OxyContin?
12 A. I don't recall being informed of that.
13 It's not my area, so it would have been reported
14 to other people, it wouldn't be reported to me
15 necessarily.
16 Q. Did you know that over the next
17 11 months, so after the first six months, so
18 between -- the first six months would be January
19 through June of 2011, there had been 12
20 robberies in the Boston area. Did you know that
21 over the next 11 months that CVS had 96
22 robberies of its stores in the Boston area, and
23 that 78 of those 96 robberies targeted
24 OxyContin?

Page 236

1 MR. DELINSKY: Object to form.
2 A. Others at CVS would have been given
3 that information. It wasn't my area.
4 BY MR. ELSNER:
5 Q. Did you know that CVS had a
6 conversation with Purdue in a meeting with
7 Purdue to discuss those thefts?
8 A. Others at CVS would have participated
9 in such a meeting. I was not involved in that.
10 Q. So you did not -- you're not aware of
11 that?
12 A. I'm not aware of that.
13 Q. Are you aware that CVS asked Purdue to
14 indemnify them in any lawsuits related to an
15 opioid case?
16 MR. DELINSKY: Object to form.
17 A. I'm not at all involved in the
18 relationship between CVS and Purdue, so I
19 wouldn't be the person that would be acting on
20 that.
21 BY MR. ELSNER:
22 Q. Prior exhibit, the California
23 settlement agreement lists as Attachment A CVS
24 stores in the Eastern District of California

Page 237

1 that were covered by the settlement agreement.
2 Do you know which of these stores experienced
3 thefts of controlled substances?
4 MR. DELINSKY: Object to form.
5 A. I don't know specifically. Others at
6 CVS would be informed of thefts at particular
7 stores. It would not -- I would not be
8 informed.
9 BY MR. ELSNER:
10 Q. Were you aware that CVS had also
11 investigated -- sorry, that the DEA investigated
12 CVS stores in Texas concerning thefts of
13 controlled substances in Texas?
14 A. I was -- I'm not involved in any of
15 these matters, so I don't recall specifics about
16 Texas, no.
17 (Whereupon, CVS-Moffatt-21 was marked
18 for identification.)
19 BY MR. ELSNER:
20 Q. This is Exhibit 21, which is the
21 settlement agreement between CVS and the DEA,
22 and this is dated December of 2015. If you look
23 at Paragraph 7.
24 A. Paragraph 1 is wrong. I can't help

Page 238

1 it.
2        What is it?  Which paragraph?
3    Q.  Paragraph 7.
4    A.  7, okay.  Okay.
5    Q.  Sorry, what was wrong about
6 Paragraph 1?
7    A.  "CVS is incorporated in Delaware."
8 It's incorporated in Rhode Island.  So it's
9 referring to CVS Pharmacy, Inc.
10    Q.  It's fair to say CVS's corporate
11 structure is pretty complicated, is that right?
12        MR. DELINSKY:  Object to form.
13    A.  It's -- we have a lot of entities,
14 yes, I'd agree with that.
15 BY MR. ELSNER:
16    Q.  How many entities?
17    A.  Right now?  Roughly a thousand.
18    Q.  And how many of those entities do you
19 serve as a president or officer of?
20    A.  I'd have to generate a report.  I'm
21 not sure.
22    Q.  What's your best estimate?
23        MR. DELINSKY:  Objection.  Asked and
24 answered.

Page 239

1    A.  Hundreds of those, not all of them,
2 but a large number of them.
3 BY MR. ELSNER:
4    Q.  Did it -- let's go back to the
5 document.
6        Paragraph 7 of the settlement
7 agreement.  It reads "The United States contends
8 that it has certain civil claims against CVS for
9 engaging in the following conduct from
10 January 1, 2013 through October 23, 2014."  And
11 it then states that "On October 15, 2014, DEA
12 issued a Notice of Inspection to CVS Pharmacy
13 5667," which is in Houston, Texas, "after that
14 pharmacy had reported a theft of over 40,000
15 dosage units of controlled substances by two
16 former employees."
17        Were you aware that there was a 40,000
18 dosage unit theft of controlled substances from
19 the CVS store in Houston, Texas?
20        MR. DELINSKY:  Object to form.
21    A.  I'm not responsible for this sort of
22 investigation or activity, so I was not
23 informed.  Others at CVS that would be
24 responsible for this would have been informed.

Page 240

1 BY MR. ELSNER:
2    Q.  Did you serve as an officer of any of
3 the CVS -- of this CVS Pharmacy in Houston,
4 Texas in 2013 and '14?
5    A.  During the time frame, I believe so,
6 yes.
7    Q.  Okay.  Do you know the name of that
8 entity?
9    A.  The Texas stores are actually operated
10 by CVS Pharmacy, Inc.
11        MR. DELINSKY:  Would that change your
12 answer as to whether or not you were an officer?
13    A.  So I am an officer of CVS Pharmacy,
14 Inc., vice president and secretary.
15        MR. ELSNER:  Asked and answered, Eric.
16        MR. DELINSKY:  I was trying to clear
17 it up for myself.
18 BY MR. ELSNER:
19    Q.  There were also a listing of
20 recordkeeping -- allegations of recordkeeping
21 violations with respect to that theft, is that
22 right, under 1, 2, and 3, beneath it?
23    A.  Yes.
24    Q.  Okay.  And as a result of this

Page 241

1 investigation, CVS agreed to pay a settlement in
2 the amount of $345,000 in Paragraph 13 on
3 Page 4, is that right?
4        MR. DELINSKY:  Object to form.
5    A.  Paragraph 13 on Page 4 refers to a sum
6 of $345,000.
7 BY MR. ELSNER:
8    Q.  Were you made aware of that as the
9 president of CVS Texas entity?
10        MR. DELINSKY:  Object to form.
11 BY MR. ELSNER:
12    Q.  I'm sorry, as the president of CVS
13 Pharmacy?
14        MR. DELINSKY:  Object to form.
15 BY MR. ELSNER:
16    Q.  Were you made aware of the amount of
17 the settlement?
18    A.  I was vice president and secretary of
19 CVS Pharmacy.  I -- others would be responsible
20 for this settlement.  To the extent I learned
21 about it, it would have been as an attorney.
22    Q.  If I could show you the next exhibit.
23        There was also an investigation of CVS
24 in Nassau and Suffolk County, New York on Long

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 Island between 2013 and 2015 concerning thefts
2 of controlled substances and reporting
3 violations. Were you aware of that?
4    A. Yes, I was aware of that.
5    Q. This is Exhibit 22.
6       (Whereupon, CVS-Moffatt-22 was marked
7       for identification.)
8 BY MR. ELSNER:
9    Q. This is Motley Rice 242.
10       Can you tell me what it is you
11 remember about this?
12    A. I remember we settled it fairly
13 recently, although the conduct, as you said, was
14 from several years back, and I recall, I think,
15 I signed -- yeah, I signed this one.
16    Q. You executed this on behalf of what
17 entity?
18    A. CVS Pharmacy, Inc.
19    Q. And that was the company controlling
20 the CVS Pharmacy, the subject of this
21 investigation pharmacies, is that right?
22    A. Actually, no. So it appears from
23 here, it says A, settlement, "CVS Pharmacy, Inc.
24 is a Rhode Island corporation with its corporate

Page 243

1 headquarters in Woonsocket, Rhode Island. CVS
2 directly or indirectly operates CVS retail
3 pharmacies in Nassau and Suffolk Counties."
4       So the entity that actually operates
5 stores in New York is called CVS Albany, LLC.
6 CVS Pharmacy, Inc. is its parent.
7    Q. Are you an officer of CVS Albany?
8    A. Yes.
9    Q. President?
10    A. I am president of CVS Albany.
11    Q. And was that true for the time period
12 concerning this investigation, which is between
13 February of 2013 and January of 2015?
14    A. Yes.
15    Q. And the investigation here concerned
16 the failure to promptly report a theft of a
17 controlled substance from these stores, is that
18 right?
19       MR. DELINSKY: Object to form.
20    A. Another attorney would have been
21 involved in the whole matter. So, you know, I
22 was brought in at the end, as I discussed
23 earlier, you know, so, you know, I was consulted
24 at the end when it needed to be signed. But I

Page 244

1 didn't have -- I wasn't directly involved in
2 this, so I don't recall the particulars. Well,
3 I didn't know the particulars.
4 BY MR. ELSNER:
5    Q. Well, CVS agreed to pay in settlement
6 of this matter $1.5 million, is that right,
7 Page 2?
8    A. Yeah, Page 2, Paragraph 1.
9    Q. Is that correct?
10    A. That is correct.
11    Q. Okay. And you signed this settlement
12 agreement?
13    A. Yes.
14    Q. Other than the settlement agreement
15 itself, did you review any documents before you
16 executed this agreement?
17    A. Another attorney would have been
18 responsible for the entire matter. I don't
19 recall if I reviewed any documents. I had a
20 discussion certainly with the attorney when I
21 was asked to sign it.
22    Q. Who was the attorney?
23    A. I believe it was Mark Vernazza.
24    Q. And he's employed by CVS, is that

Page 245

1 right?
2    A. Yes, CVS Pharmacy.
3    Q. CVS Pharmacy, Inc.
4       Did Mark show you any documents before
5 you executed the agreement?
6       MR. DELINSKY: Objection. Asked and
7 answered.
8    A. I don't recall if he showed me
9 anything.
10 BY MR. ELSNER:
11    Q. Did Mark share with you what the DEA
12 had found concerning the thefts and the
13 reporting from these CVS Pharmacy stores?
14       MR. DELINSKY: Object to form. And I
15 instruct the witness not to answer on the
16 grounds that that would involve attorney/client
17 privileged information.
18       MR. ELSNER: So what I've asked him is
19 I've asked him whether he, Mark Vernazza, shared
20 with the witness what the DEA had found
21 concerning thefts in the reporting violations,
22 and you're asserting privilege over the DEA's
23 findings and facts, is that my understanding?
24       MR. DELINSKY: I'm asserting privilege

Page 246

1 as a result of the following circumstances.
2 Mr. Moffatt has testified that he doesn't recall
3 reviewing any documents in connection with his
4 signing the settlement agreement, so by
5 definition the only way that information could
6 have been conveyed to Mr. Moffatt would have
7 been through an attorney reflecting that
8 attorney's mental impressions upon hearing or
9 reading, depending on the facts, what the DEA
10 told him. So on that basis I am asserting
11 privilege.
12      I think the manner in which to proceed
13 here would be for you to ask Mr. Moffatt if he
14 obtained any information from the attorney that
15 was separate from or in addition to the
16 information already contained in the settlement
17 agreement so we at least can see if there's even
18 a dispute.
19 BY MR. ELSNER:
20    Q.  Did you obtain any information
21 regarding the allegations here by the DEA above
22 and beyond what's written in the settlement
23 agreement?
24    A.  I don't recall getting any other

Page 247

1 information.
2    Q.  Did you ask for any?
3    A.  I don't recall what we specifically
4 discussed.
5    Q.  This was just in June of last year,
6 it's not a particularly old event, and you said
7 you did have a recollection of it.  So did
8 you -- did you personally discuss any of these
9 matters with anyone at the DEA?
10    A.  No.  Mark or someone on Betsy's team
11 would be responsible for this sort of matter.
12    Q.  Did the DEA provide CVS with any
13 document describing its findings that you're
14 aware of?
15      MR. DELINSKY:  Object to form.
16      You may answer.
17    A.  I wouldn't have been involved, so I
18 don't know what the DEA would have provided.
19 BY MR. ELSNER:
20    Q.  Did you ask Mr. Vernazza if there were
21 any documents provided by the DEA?
22    A.  I did not ask him if there were
23 documents provided, not that I recall.
24    Q.  Did you -- did Mr. Vernazza, yes or

Page 248

1 no, tell you what the DEA findings were with
2 respect to these CVS stores in Long Island?
3      MR. DELINSKY:  Objection.  Asked and
4 answered.
5    A.  In connection with signing this we had
6 discussions, but I don't recall specifically
7 what he told me about the contentions or, you
8 know, any conclusions.
9 BY MR. ELSNER:
10    Q.  I'm just trying to understand, before
11 you would execute these agreements, did you just
12 rely on the lawyers at CVS who were involved in
13 this process and simply sign it, or did you do
14 any of your own independent analysis in
15 consideration before executing them?
16      MR. DELINSKY:  Object to form.
17    A.  I would have a discussion about the
18 attorneys involved, but I didn't do an
19 independent investigation.
20 BY MR. ELSNER:
21    Q.  How many discussions?
22    A.  It would depend on the case and the
23 circumstances.  I don't -- we probably only had
24 one or two discussions about this matter.

Page 249

1 BY MR. ELSNER:
2    Q.  How long did they last?
3    A.  I don't recall.
4    Q.  An hour, half a day?
5    A.  I don't recall.
6    Q.  Did you ever, with respect to any of
7 these investigations by the DEA, ever have a
8 meeting with anyone at the DEA concerning them?
9    A.  Others at CVS have meetings with the
10 DEA all the time.  I am not involved in those
11 meetings.
12    Q.  Did you review any memos or documents
13 concerning those meetings with the DEA?
14    A.  Not that I recall.
15    Q.  Do you know whether there's a process
16 within CVS that when the DEA begins an
17 investigation that there are certain documents
18 that are generated at CVS that outline the
19 conduct by the DEA and what their investigation
20 is?
21      MR. DELINSKY:  Object to form.
22    A.  I'm not involved in that process.
23 There are others that are involved in the
24 process, and I'm not -- I don't know what's

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1 involved.
2 BY MR. ELSNER:
3     Q.  Have you ever seen any such documents
4 related to investigation by the DEA?
5         MR. DELINSKY:  Object to form.
6     A.  I may have in connection with
7 discussions with other lawyers, but nothing
8 specific comes to mind.
9         MR. DELINSKY:  I'd just like to put on
10 the record that Special Master Cohen has
11 addressed the subject of settlement agreements
12 on the dispensing side in Discovery Ruling No.
13 8, and he limited discovery as to the settlement
14 agreements -- to the settlement agreements and
15 the settlement agreements only, and to nothing
16 else about the settlement agreements.  These
17 questions are going further than that which is
18 allowed by Discovery Ruling 8, and I object to
19 them on that ground.
20 BY MR. ELSNER:
21     Q.  Are you aware that there was a DEA
22 investigation of CVS in Connecticut?
23     A.  I don't -- I wouldn't have been
24 involved in that.  Others would have handled it.

Page 251

1 I don't specifically recall Connecticut.
2         MR. DELINSKY:  And, Mike, you'd
3 previously indicated that you hoped to finish by
4 1:00 or earlier.  It's now 1:20.  Could you give
5 us a sense of where you are?  We've been going
6 an hour.  I'm just trying to --
7         MR. ELSNER:  There are three
8 additional settlements I want to address and ask
9 some wrap-up questions.  So I'm happy to take a
10 break now if you want to do that, if you want to
11 take a break and go to lunch, we could do that.
12 But it took a little longer than I anticipated,
13 so...
14         MR. DELINSKY:  Can you give us an
15 estimate?  If it's a half hour, it's one thing.
16 If it's another hour, that's another.
17         MR. ELSNER:  Why don't we go off the
18 record and discuss it.
19         THE VIDEOGRAPHER:  We're going off the
20 record at 1:21 p.m.
21         (Whereupon, a recess was taken.)
22         THE VIDEOGRAPHER:  We're back on the
23 record at 1:31 p.m.
24 BY MR. ELSNER:

Page 252

1     Q.  Mr. Moffatt, before we broke I had
2 shared with you Exhibit 23, which is the
3 settlement agreement between CVS and the DEA
4 concerning the DEA's investigation of CVS stores
5 in Connecticut, is that right?
6         (Whereupon, CVS-Moffatt-23 was marked
7         for identification.)
8         MR. DELINSKY:  Object to form.
9     A.  Yeah, it appears to be stores in these
10 two cities, Southington and New Britain.
11 BY MR. ELSNER:
12     Q.  And the DEA had determined that the
13 Southington store on at least 2,886 occasions
14 that CVS failed to keep paper Schedule III
15 through Schedule V prescriptions, and invoices
16 on 31 occasions with respect to the Southington
17 store and with respect to the New Britain store.
18 In Paragraph 3 the US determined that on 4,936
19 instances CVS failed to keep paper Schedule III
20 through V prescriptions in a readily retrievable
21 manner from other prescriptions in the pharmacy.
22 Is that right?
23         MR. DELINSKY:  Object to form.
24     A.  I wasn't involved in this

Page 253

1 investigation at all, but that appears to be a
2 summary of that paragraph.
3 BY MR. ELSNER:
4     Q.  And CVS entered a settlement with the
5 DEA and agreed to pay $600,000 in settlement, is
6 that right?
7     A.  That's in Section III, Paragraph 1.
8 Again, I wasn't involved in this.
9     Q.  Were you aware that CVS agreed to
10 settle these -- this investigation with the DEA
11 in that amount of $600,000?
12     A.  I have no specific recollection of
13 this matter.  To the extent I learned anything
14 about it, it would have been through discussions
15 between attorneys.
16     Q.  And the settlement agreement was
17 executed on behalf of Connecticut CVS Pharmacy,
18 LLC by Betsy Ferguson, the president and deputy
19 general counsel for CVS Health Corporation, is
20 that right?
21     A.  That's what her signature block says,
22 yes.
23         MR. DELINSKY:  I believe it says
24 senior vice president.

Page 254

1    MR. ELSNER:  Senior vice president.
2    A.  Yes.
3  BY MR. ELSNER:
4    Q.  And did you have a role with respect
5  to Connecticut CVS Pharmacy, LLC?
6    A.  Yes.  I'm president of that entity.
7    Q.  And were you through the period of
8  time of this investigation?
9    A.  It says that it began January, 2016,
10  so yes.
11    Q.  Okay.  Are you currently the
12  president?
13    A.  Yes.
14    Q.  Were you aware that there was an
15  investigation by the DEA of CVS stores in
16  Massachusetts?
17    A.  I'm not specifically involved in any
18  of these, so I don't recall that one in
19  particular.
20    Q.  Okay.  Here's Exhibit 24.
21    (Whereupon, CVS-Moffatt-24 was marked
22    for identification.)
23  BY MR. ELSNER:
24    Q.  Which is Motley Rice 243.  This was an

Page 255

1  investigation, as described in paragraph E on
2  the first page, where the government had found
3  that CVS had filled 523 forged prescriptions for
4  controlled substances.
5    Were you aware that the DEA
6  investigated CVS pharmacies in Massachusetts for
7  filling forged prescriptions?
8    A.  I wasn't responsible for this sort of
9  matter.  I think I was generally aware that it
10  occurred based on discussions with other
11  attorneys.
12    Q.  Okay.  Attached to the settlement
13  agreement is an exhibit which is described as
14  Attachment A, and it purports to be a list of
15  the forged prescriptions that were filled at CVS
16  pharmacies in Massachusetts.  Were you aware of
17  that?
18    MR. DELINSKY:  Object to form.
19    A.  I was not involved in this matter at
20  all, so I was not -- like I said, I may have
21  been generally aware of the situation, but the
22  specifics that are in Attachment A, I was not
23  aware of.
24  BY MR. ELSNER:

Page 256

1    Q.  Okay.  If you look through Attachment
2  A, it includes drugs such as oxycodone,
3  hydrocodone, acetaminophen, and other opioids
4  and controlled substances, is that correct?
5    A.  Those drugs appear to be listed here.
6  I'm not sure of their characterization.
7    Q.  Do you know whether they're opioids or
8  not?
9    MR. DELINSKY:  Object to form.
10    A.  I'm aware that oxycodone and
11  hydrocodone are two opioids.
12  BY MR. ELSNER:
13    Q.  Okay.  And that these forged
14  prescriptions were filled in the height of the
15  opioid epidemic.  And does that concern you?
16    MR. DELINSKY:  Object to form.
17    A.  I was not involved in this particular
18  matter.  The appropriate people were involved.
19  I can tell you based on -- earlier we talked
20  about 2.5 billion prescriptions manager filled,
21  523 forgeries doesn't give me a great deal of
22  concern.
23  BY MR. ELSNER:
24    Q.  Not even if they are for oxycodone and

Page 257

1  hydrocodone products, given their addictive
2  nature in the height of the opioid epidemic?
3    MR. DELINSKY:  Object to form.
4    A.  CVS always tries to comply with all
5  regulations, and I think we do a very good job
6  of doing that.  As I said, given the volume,
7  it's unfortunate that 523 got through, but, you
8  know, given the size of our operation it doesn't
9  give me great concern.
10  BY MR. ELSNER:
11    Q.  Why is it unfortunate?  What did you
12  mean by that?
13    A.  We like to be 100 percent, you know.
14  But it's unfortunate because we, you know, we
15  try to comply with all regulations, and if
16  forged prescriptions got through, that's not --
17  according to the DEA that's not compliant, so we
18  prefer to get it 100 percent right.
19    Q.  As a result of that, CVS agreed to a
20  settlement of $3.5 million, right?
21    A.  I have to look it up.
22    Q.  The terms of the agreement on Page 2.
23    A.  It says 3.5 million.
24    Q.  It's not sort of an oopsie, right?

Page 258

1   $3.5 million is a significant settlement amount,
2   correct?
3        MR. DELINSKY:  Object to form.
4        A.   Other people handle these matters.  I
5   don't know what the exposure was, what -- you
6   know, what went into the decision to settle --
7   settle the matter and the amount that it was
8   settled for.  That's not my area.
9   BY MR. ELSNER:
10       Q.   Do you understand that there's a lot
11  of people overdosing on these products, these
12  opioids, across the United States?  Are you
13  aware of that?
14       MR. DELINSKY:  Object to form.
15       A.   I am aware of that situation, yes.
16  BY MR. ELSNER:
17       Q.   Okay.  And this is evidence of
18  diversion of these products, correct?
19       MR. DELINSKY:  Object to form.
20       A.   So this is evidence that -- well, it
21  says that 523 forged prescriptions, at least
22  allegedly forged prescriptions were filled at
23  our stores.
24  BY MR. ELSNER:

Page 259

1        Q.   Okay.  For opioid products?
2        A.   It says 523 forged opioid
3   prescriptions.  But again, you know, other
4   people were responsible for handling this
5   matter, and for operations of the stores.
6        Q.   Did you serve a role as an officer of
7   any of the CVS pharmacies, the subject of this
8   investigation in Massachusetts?
9        MR. DELINSKY:  Object to form.
10       A.   So the CVS pharmacies in Massachusetts
11  are operated by CVS Pharmacy, Inc., so I'm vice
12  president, secretary, assistant general counsel
13  of CVS Pharmacy, Inc.
14  BY MR. ELSNER:
15       Q.   There was also an investigation, I
16  believe, of CVS stores in Massachusetts
17  regarding the prescription monitoring program.
18  Are you aware of that?
19       A.   That's not my area.  I'm not sure.
20       Q.   Did you know that CVS pharmacies in
21  Massachusetts didn't have access to the internet
22  so they couldn't operate the prescription
23  monitoring program?
24       MR. DELINSKY:  Object to form.

Page 260

1        A.   Others in CVS would be responsible for
2   what access the stores had.  I have no knowledge
3   about that.
4   BY MR. ELSNER:
5        Q.   Were you aware that there was a second
6   investigation by the DEA into CVS's operations
7   in Texas concerning filling prescriptions for a
8   physician that was not properly licensed?
9   Exhibit 25.
10       (Whereupon, CVS-Moffatt-25 was marked
11       for identification.)
12       A.   It's Paragraph 7 you're talking about?
13  BY MR. ELSNER:
14       Q.   Yes.
15       A.   I see what Paragraph 7 says, yes.
16       Q.   Okay.  So the DEA was investigating
17  CVS pharmacies in Texas for filling
18  prescriptions for a Dr. Pedro Garcia, and it was
19  discovered that he didn't have a valid license
20  to prescribe those substances, correct?
21       MR. DELINSKY:  Object to form.
22       A.   It says that his Texas Department of
23  Public Safety controlled substances registration
24  was expired.

Page 261

1   BY MR. ELSNER:
2        Q.   And CVS filled 153 of those
3   prescriptions?
4        A.   That's what Paragraph 7 indicates.
5        Q.   And as a result CVS entered into a
6   settlement with the DEA in Paragraph 13 on
7   Page 4 and agreed to pay $1,912,500 to the DEA,
8   is that right?
9        MR. DELINSKY:  Object to form.
10       A.   That's what Paragraph 13 says.  Again,
11  I had no involvement in the settlement or the
12  underlying matter.
13  BY MR. ELSNER:
14       Q.   And it was executed by Betsy Ferguson
15  on behalf of CVS in August of 2014, is that
16  right, Page 7?
17       A.   Yes.  CVS, in this case CVS Pharmacy,
18  Inc., yes.
19       Q.   And did you play a role with respect
20  to being an officer of the CVS entity in Texas
21  responsible for this CVS store?
22       A.   So that's CVS Pharmacy, Inc., again
23  vice president, secretary, assistant general
24  counsel.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1     Q. I've done a -- I've put together --
2 I'll show you the next exhibit, which is sort of
3 a summary of the CVS settlements that we've been
4 talking about. This is Exhibit 26.
5       (Whereupon, CVS-Moffatt-26 was marked
6         for identification.)
7 BY MR. ELSNER:
8     Q. And would you agree with me that CVS
9 had entered settlements with the DEA related to
10 its handling of controlled substances of
11 $55 million between March of 2013 and July of
12 2018?
13     A. That appears to be the -- well, you
14 said June of 2018?
15     Q. July is the third entry.
16     A. July 24th, I got it. I'll take your
17 word for it that that's what that adds up to.
18     Q. Does that surprise you?
19       MR. DELINSKY: Object to form.
20 BY MR. ELSNER:
21     Q. The amount of the fines paid?
22     A. I know that we've had -- as I've said
23 multiple times, I'm not the person involved in
24 any of these investigations or settlements or

Page 263

1 anything like that. I know that we are, you
2 know, very heavily regulated. And, you know,
3 the fact is we're one of the biggest pharmacies,
4 as we discussed at the beginning of this
5 deposition, given our volume and the scope of
6 our operations, this doesn't cause me concern.
7     Q. Not even given that these all related
8 to the dispensing of controlled substances in
9 the height of the opioid epidemic in the United
10 States?
11       MR. DELINSKY: Object to form.
12     A. No. They -- as I said, other people
13 were involved in these matters. They all have
14 different facts and circumstances. The DEA can
15 be very, you know -- they have a lot of
16 authority, and settlements in this amount don't
17 concern me.
18 BY MR. ELSNER:
19     Q. And in each instance you were an
20 officer of the entity responsible for this
21 allegation from the DEA for each one of these
22 fines, is that right?
23     A. That's correct. I was an officer of
24 some kind.

Page 264

1     Q. Have I left any out? Has CVS, to your
2 knowledge, been a party to any other settlements
3 with the DEA concerning controlled substances
4 than the ones that I've listed here?
5       MR. DELINSKY: Object to form.
6     A. It's not my area, so I don't keep
7 track of that sort of thing. I don't -- I'm not
8 sure.
9 BY MR. ELSNER:
10     Q. Okay. Are you aware of any other
11 settlements that CVS has entered with any state
12 AG's office or any state-related fines or
13 allegations concerning either its distribution
14 or its sales of controlled substances?
15     A. It's not my area, and I don't keep
16 track of such things, so I don't -- I'm not
17 aware of anything.
18     Q. You're not aware of any?
19     A. Not that I can recall, no.
20     Q. Did you have -- did you play any role
21 with respect to the drafting of any contracts
22 related to compensation, bonuses to be paid to
23 pharmacists?
24     A. No, I had no involvement in that at

Page 265

1 all.
2     Q. Were you aware that pharmacists
3 received as a component of their bonus a bonus
4 for filling prescriptions at a particular rate
5 prior to 2012?
6     A. There are other attorneys that are
7 involved with employment, and I had no
8 involvement in that, so no.
9     Q. Did you know that CVS changed its
10 policy in 2012 to exclude opioids from its bonus
11 structure for pharmacists? Did you play any
12 role with respect to that decision?
13     A. That would not be within my
14 responsibilities, so I was not involved in that
15 decision.
16       MR. ELSNER: Can we go off the record
17 for one minute?
18     A. Of course.
19       THE VIDEOGRAPHER: We're going off the
20 record at 1:49 p.m.
21       (Whereupon, a recess was taken)
22       THE VIDEOGRAPHER: We're back on the
23 record at 1:52 p.m.
24 BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    Q.  Mr. Moffatt, I want to show you
2  Exhibit 27.  These are some board minutes of the
3  CVS Caremark Corporation.  This is MR 266 from
4  January 8th through 9, 2014.
5        (Whereupon, CVS-Moffatt-27 was marked
6        for identification.)
7  BY MR. ELSNER:
8    Q.  I'm going to direct your attention to
9  Page 5 of the minutes which bears the Bates
10  number 55307.
11    A.  Okay.  I'm on Page 5.
12    Q.  Okay.  And sort of the last five lines
13  from the bottom, there's a statement here.  It
14  says "a risk assessment of the Corporation's
15  incentive compensation programs."
16        Were you aware that there was a risk
17  assessment performed of CVS's incentive
18  compensation programs?
19    A.  Yes, I'm aware of that.  There's a
20  risk assessment conducted every year.
21    Q.  Okay.  Who conducts the assessment?
22    A.  I believe the compensation consultant
23  is involved in that.  I don't have any
24  involvement with the -- this is the chairman of

Page 267

1  the management planning and development
2  committee is making that -- this report, and I
3  don't have involvement with that committee at
4  all.
5    Q.  Okay.  Does this relate in any way to
6  incentive programs for pharmacy managers or
7  pharmacists?
8    A.  It's an overall risk assessment of the
9  entire compensation program.
10    Q.  Okay.
11    A.  Whether we're incenting the right --
12  our incentive programs are doing what they aim
13  to do.
14    Q.  Okay.  And was there a particular risk
15  assessment performed concerning the incentive
16  compensation program related to pharmacists'
17  bonus structure for filling prescriptions
18  including opioids?
19        MR. DELINSKY:  Object to form.
20    A.  I don't have any knowledge of the
21  particulars of what went into the risk
22  assessment in this particular year.
23  BY MR. ELSNER:
24    Q.  Okay.  But the assessment included all

Page 268

1  employees, including pharmacists, is that right?
2    A.  I don't know how granular it gets.  I
3  think it's an overall view of the compensation
4  program, so I don't have any involvement in it,
5  so I can't really speak to it.
6    Q.  The compensation consultant, is that
7  an entity outside of CVS or in CVS?
8    A.  Outside of CVS.
9    Q.  Who is it?
10    A.  It has changed over the years.
11  Currently it's a company called Execuity.  I
12  believe it was Execuity at this time, but again
13  I'm not the person involved with this.
14    Q.  Do you know what it was in 2012?
15    A.  I don't know.
16        MR. ELSNER:  I don't think I have any
17  further questions at this time.  I do think,
18  though, that there were certain questions that I
19  believe should have been answered and were not
20  on the basis of a privilege, and I'm going to
21  reserve the rest of my time in the event that we
22  decide to raise that issue with the court.
23        MR. DELINSKY:  Okay.
24        MR. ELSNER:  Do you have any

Page 269

1  questions?
2        MR. DELINSKY:  Nothing further.
3        MR. DAWSON:  No questions.
4        THE VIDEOGRAPHER:  This concludes the
5  videotaped deposition of Thomas Moffatt.  The
6  time is 1:56 p.m., and we are now off the
7  record.
8        (Whereupon, the deposition was
9        concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 270

1  STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

2

3      I, MAUREEN O'CONNOR POLLARD, RMR, CLR,

4  and Commissioner in the State of Rhode Island

5  and Providence Plantations, do certify that on

6  the 15th day of January, 2019, at 8:04 o'clock,

7  the person above-named was duly sworn to testify

8  to the truth of their knowledge, and examined,

9  and such examination reduced to typewriting

10  under my direction, and is a true record of the

11  testimony given by the witness.

12      I further certify that I am neither

13  attorney, related or employed by any of the

14  parties to this action, and that I am not a

15  relative or employee of any attorney employed by

16  the parties hereto, or financially interested in

17  the action.

18      In witness whereof, I have hereunto

19  set my hand this 17th day of January, 2019.

20

21  _____

22  COMMISSIONER

23  My Commission Expires April 30, 2020

24

Page 271

1          INSTRUCTIONS TO WITNESS

2

3          Please read your deposition over

4  carefully and make any necessary corrections.

5  You should state the reason in the appropriate

6  space on the errata sheet for any corrections

7  that are made.

8          After doing so, please sign the

9  errata sheet and date it.  It will be attached

10  to your deposition.

11          It is imperative that you return

12  the original errata sheet to the deposing

13  attorney within thirty (30) days of receipt of

14  the deposition transcript by you.  If you fail

15  to do so, the deposition transcript may be

16  deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

Page 272

1      - - - - - -

          E R R A T A

2      - - - - - -

3  PAGE  LINE  CHANGE

4  ____  ____  _____

5     REASON: _____

6  ____  ____  _____

7     REASON: _____

8  ____  ____  _____

9     REASON: _____

10  ____  ____  _____

11     REASON: _____

12  ____  ____  _____

13     REASON: _____

14  ____  ____  _____

15     REASON: _____

16  ____  ____  _____

17     REASON: _____

18  ____  ____  _____

19     REASON: _____

20  ____  ____  _____

21     REASON: _____

22  ____  ____  _____

23     REASON: _____

24  ____  ____  _____

Page 273

1      ACKNOWLEDGMENT OF DEPONENT

2

3      I, _____, do
   Hereby certify that I have read the foregoing

4  pages, and that the same is a correct
   transcription of the answers given by me to the

5  questions therein propounded, except for the
   corrections or changes in form or substance, if

6  any, noted in the attached Errata Sheet.

7

8  _____

   THOMAS S. MOFFATT          DATE

9

10

11

12

13

14

15  Subscribed and sworn
   To before me this

16  _____ day of _____, 20____.

17  My commission expires: _____

18

   _____

19  Notary Public

20

21

22

23

24

Page 274

```
 1        LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```