```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3   IN RE:  NATIONAL        :  MDL No. 2804

     PRESCRIPTION OPIATE     :

 4   LITIGATION              :  Case No. 17-md-2804

                             :

 5   APPLIES TO ALL CASES    :  Hon. Dan A. Polster

                             :

 6                           :

 7

 8                   HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                      - - - -

12                   JANUARY 4, 2019

13                      - - - -

14       VIDEOTAPED DEPOSITION OF ANTHONY MOLLICA,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Friday,

20   January 4, 2019, commencing at 8:06 a.m.

21                      - - - -

22             GOLKOW LITIGATION SERVICES

           877.370.3377 phone | 917.591.5672 fax

23                   deps@golkow.com

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1   A P P E A R A N C E S
2   On behalf of Plaintiffs
3   WAGSTAFF & CARTMELL, LLP
    BY: TYLER W. HUDSON, ESQUIRE
4   AND ERIC D. BARTON, ESQUIRE
    4740 Grand Avenue, Suite 300
5   Kansas City, Missouri 64112
    816.701.1100
6   thudson@wcllp.com
    ebarton@wcllp.com
7
8   On behalf of Defendant AmerisourceBergen Drug
    Corporation
9
    (By Phone/Livestream)
10  JACKSON KELLY PLLC
    BY: SANDRA K. ZERRUSEN, ESQUIRE
11  50 South Main Street, Suite 201
    Akron, Ohio 44308
12  330.252.9060
    skzerrusen@jacksonkelly.com
13
14  On behalf of Defendant Cardinal Health, Inc.
15  PIETRAGALLO GORDON ALFANO BOSICK &
    RASPANTI, LLP
16  BY: JENNIFER BOURIAT, ESQUIRE
    One Oxford Centre, 38th Floor
17  301 Grant Street
    Pittsburgh, Pennsylvania 15219
18  412.263.2000
    jhb@pietragallo.com
19
20  On behalf of Defendants CVS Indiana and CVS Rx
    Services
21
    (By Phone/Livestream)
22  ZUCKERMAN SPAEDER, LLP
    BY: KYLE A. CRAWFORD, ESQUIRE
23  1800 M Street, NW, Suite 1000
    Washington, DC 20036-5807
24  202.778.1825
    kcrawford@zuckerman.com
25

Page 3

1   A P P E A R A N C E S (Continued)
2   On behalf of Defendants Endo Pharmaceuticals, Endo
    Health Solutions and Par Pharmaceuticals
3
    (By Phone/Livestream)
4   ARNOLD & PORTER KAYE SCHOLER LLP
    BY: DAVID KOUBA, ESQUIRE
5   601 Massachusetts Avenue, NW
    Washington, DC 20001-37453
6   202.942.5743
    david.kouba@arnoldporter.com
7
8   On behalf of Defendant HBC Service Company
9   MARCUS & SHAPIRA, LLP
    BY: JOSHUA KOBRIN, ESQUIRE
10  AND ROBERT M. BARNES, ESQUIRE
    One Oxford Centre, 35th Floor
11  Pittsburgh, Pennsylvania 15219
    412.471.3490
12  jkobrin@marcus-shapira.com
    rbarnes@marcus-shapira.com
13
14  On behalf of Defendant McKesson Corporation
15  COVINGTON & BURLING, LLP
    BY: RAJ PAUL, ESQUIRE
16  One CityCenter
    850 Tenth Street, NW
17  Washington, DC 20001-4956
    202.662.5807
18  rpaul@cov.com
19
20  On behalf of Defendant Walmart
21  (By Phone/Livestream)
    JONES DAY
    BY: CHRISTOPHER MARKHAM, ESQUIRE
22  100 High Street
    21st Floor
23  Boston, MA 02110-1781
    617.960.3939
24  cmarkham@jonesday.com
25

Page 4

1   A P P E A R A N C E S (Continued)
2   Also present
3       Chris Ritona, videographer
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1   * I N D E X *
2   ANTHONY MOLLICA                    PAGE
3   EXAMINATION BY MR. HUDSON        8, 232
    EXAMINATION BY MR. BARTON            168
4   EXAMINATION BY MR. BARNES       207, 242
    EXAMINATION BY MR. KOBRIN            229
5
6   * INDEX OF HBC-MOLLICA EXHIBITS *
7   NO.        DESCRIPTION           PAGE
    Exhibit 1  HBC Service Company's Responses to    53
8      Plaintiffs' (First) Set of Combined
       Discovery Requests
9
    Exhibit 2  Giant Eagle Inventory Control -       54
10     Suspicious Order Policies with
       various effective dates
11     HBC_MDL00078638 - 00078639
       HBC_MDL00004386 - 00004387
12     HBC_MDL00045916 - 00078918
       HBC_MDL00051908
13     HBC_MDL00043414
       HBC_MDL00010092 - 00010093
14
    Exhibit 3  Letter, 10/18/13, from OARRS to       83
15     HBC, re: Instructions for Reporting
       Wholesale Transactions to OARRS
16     HBC_MDL00081290 - 00081293
17  Exhibit 4  Email chain, 1/6/14, from J.          85
       Cornwell to S. Valetta, et al.,
18     subject: RE: Ohio State Board of
       Pharmacy - Nov. 2013 - Change to
19     OARRS Report - "80 MED" threshold
       scoring system
20     HBC_MDL00137199 - 00137202
21  Exhibit 5  Ohio State Board of Pharmacy          89
       Meeting Minutes December 5-7, 2011
22
    Exhibit 6  Ohio State Board of Pharmacy          95
23     Meeting Minutes November 2-4, 2009
24  Exhibit 7  Ohio State Board of Pharmacy          95
       Meeting Minutes January 4-6, 2010
25

Page 6

1      * INDEX OF HBC-MOLLICA EXHIBITS (Continued) *
2  NO.          DESCRIPTION            PAGE
   Exhibit 8  Email chain, 10/24/17, from M.    107
3            Niskach to G. Chunderlik, subject:
             RE: Control Limits
4            HBC_MDL00009648 - 00009649
5  Exhibit 9  Email, 5/1/12, from A. Mollica    119
             to G. Chunderlik, subject: FW:
6            2012 Anda Supply Chain Symposium
             HBC_MDL00064379 - 00064441
7
   Exhibit 10  Email, 11/11/13, from G. Carlson   129
8             to M. Bianco, subject: Fw: Controlled
              Substance Suspicious Monitoring,
9             attaching invite_4469.ics
              HBC_MDL00136771 - 00136772
10
   Exhibit 11  Email chain, 1/22/14, from J.      138
11            Millward to G. Carlson, et al.,
              subject: FW: Wholesale Distributor
12            Questionnaire, attaching Wholesale
              Distributor Questionnaire
13            HBC_MDL00135570 - 00135574
14 Exhibit 12  Email chain, 1/10/14, from T.      157
              Roahrig to J. Millward, subject: RE:
15            Daily HBC Suspicious Purchasing
              Report - 01/09/14
16            HBC_MDL00039223
17 Exhibit 13  Ohio Administrative Code           190
              Section 4729-9-05 Security
18            requirements
19 Exhibit 14  Ohio Administrative Code Section   190
              Section 4729-9-11 Security and
20            control of dangerous drugs
21                      - - - -
22
23
24
25

Page 7

1              P R O C E E D I N G S
2                    - - - -
3        THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Chris Ritona.  I'm the
5  videographer for Golkow Litigation Services.
6  Today's date is January 4, 2019, and the time is
7  approximately 8:06 a.m.
8       This video deposition is being held in
9  Pittsburgh, PA at Marcus & Shapira, LLP, One
10 Oxford Centre, 35th Floor, in the matter of
11 National Prescription Opiate Litigation,
12 MDL No. 2804, Case No. 17-md-2804, United States
13 District Court, Northern District of Ohio, Eastern
14 Division.
15      The deponent today is Anthony Mollica.  The
16 court reporter today is Ann Medis.
17      Will all counsel please identify themselves
18 for the record.
19       MR. HUDSON:  Ty Hudson of Wagstaff &
20 Cartmell for plaintiffs.
21       MR. BARTON:  Eric Barton, Wagstaff &
22 Cartmell, for plaintiffs.
23       MR. PAUL:  Raj Paul, Covington &
24 Burling, on behalf of McKesson.
25       MS. BOURIAT:  Jennifer Bouriat from

Page 8

1  Pietragallo on behalf of Cardinal.
2        MR. BARNES:  Robert Barnes on behalf of
3  HBC, Marcus & Shapira.
4        MR. KOBRIN:  Josh Kobrin, Marcus &
5  Shapira, on behalf of HBC Services Company.
6        THE VIDEOGRAPHER:  Ann, will you please
7  swear in the witness.
8             ANTHONY MOLLICA,
9    having been first duly sworn, was examined
10          and testified as follows:
11        THE VIDEOGRAPHER:  You may proceed.
12             EXAMINATION
13 BY MR. HUDSON:
14    Q.  Good morning, Mr. Mollica.  My name is
15 Ty Hudson and I represent several of the
16 plaintiffs in this case.
17     Could you state your name for the record,
18 please.
19    A.  Anthony Mollica.
20    Q.  And what is your current address?
21    A.  9640 Portofino Drive, Brentwood,
22 Tennessee 37027.
23    Q.  And you are a former employee of Giant
24 Eagle?
25    A.  That's right.

Page 9

1    Q.  Giant Eagle owned HBC Service Company;
2  is that right?
3    A.  Correct.
4    Q.  And are you aware that HBC Service
5  Company is a defendant in this case?
6    A.  I am.
7    Q.  Are you represented by counsel here
8  today?
9    A.  I am.
10   Q.  And who is your attorney?
11   A.  They're in the room, Marcus & Shapira.
12   Q.  And are you paying for their services or
13 is HBC?
14   A.  I don't know who's paying for the
15 services.  Not me.
16   Q.  Have you had your deposition taken
17 before?
18   A.  No.
19   Q.  Let's just make sure then we understand
20 how this process works before we get going.  I'm
21 going to be asking you some questions, and then I
22 would ask that you provide answers unless your
23 counsel instructs you not to answer.  Sometimes
24 they may object for the record, but unless you're
25 instructed not to answer, you agree to answer my

Page 10

1 questions?
2　A.　Okay.
3　Q.　Second, do you understand that you are
4 under oath as if we were in a courtroom before a
5 judge and a jury?
6　A.　I do.
7　Q.　And is it fair that if you answer my
8 question, I'm going to assume that you understand
9 it. And the flip side of that is if you don't
10 understand my question, will you let me know so I
11 can clarify or rephrase it?
12　A.　Yes.
13　Q.　And then lastly, if you need to take a
14 break at any time, just let me know. We can go
15 off the record. All I would ask is if there's a
16 pending question you answer it. Is that fair?
17　A.　Sure.
18　Q.　What did you do to prepare for your
19 deposition today?
20　A.　I came in, had some just general
21 procedural conversations about today yesterday
22 with my counsel.
23　Q.　How long did those conversations last?
24　A.　Four hours.
25　Q.　Did you review any documents during the

Page 11

1 conversations?
2　A.　A brief familiarity with, you know, the
3 types of documents that we'll be discussing today.
4　Q.　And did those documents refresh your
5 recollection?
6　A.　That's hard to say.
7　　　MR. KOBRIN: I want to just quickly --
8 don't talk about anything that we discussed. All
9 of that is privileged. In general, if you can
10 answer his question "yes" or "no," that's fine.
11　　　THE WITNESS: There are some documents
12 that triggered memory, some of them. Most I've
13 never seen before.
14 BY MR. HUDSON:
15　Q.　And do you understand that this
16 litigation relates to the opioid crisis?
17　A.　That's my understanding.
18　Q.　Is that a phrase that you've heard
19 before, the opioid crisis?
20　A.　I've heard that phrase before on like TV
21 and that type of thing.
22　Q.　How about in connection with your roles
23 or your role at Giant Eagle?
24　A.　No. I never heard that as a phrase when
25 I was at Giant Eagle.

Page 12

1　Q.　How about the Controlled Substances Act,
2 was that something in your role at Giant Eagle
3 that you focused on?
4　A.　As a pharmacist I'm familiar with the
5 Controlled Substances Act as it pertains to the
6 practice of retail pharmacy.
7　Q.　How about more specifically at Giant
8 Eagle, was that something that you were involved
9 with, is compliance with the Controlled Substances
10 Act, you personally?
11　A.　In the scope of what I oversaw at Giant
12 Eagle, compliance with the Controlled Substances
13 Act, yes.
14　Q.　Let's, if we could, start with your
15 education. Could you just -- did you graduate
16 from the University of Pittsburgh with a Bachelor
17 of Science in Pharmacy?
18　A.　Yes.
19　Q.　And was that in 1995?
20　A.　Yes.
21　Q.　Any postgraduate work?
22　A.　Yes. I have a -- received an MBA from
23 the University of Waynesburg -- at that time it
24 was called Waynesburg College -- in 2003.
25　Q.　And what did you do between the time

Page 13

1 that you graduated from -- was it pharmacy school?
2　A.　That's correct.
3　Q.　-- between graduation from pharmacy
4 school and then starting your MBA?
5　A.　What did I do specifically with Giant
6 Eagle or in general?
7　Q.　No, in general.
8　A.　I was a licensed pharmacist retail. I
9 moved up into regional supervisory positions and
10 eventually into -- I oversaw pharmacy operations,
11 retail operations for Giant Eagle; went on into
12 the specialty pharmacy markets for a company
13 called Omnicare CVS. And most recently, I'm
14 president of healthcare services for an
15 organization called Brookdale Senior Living.
16　Q.　Let's break that down, if we could. So
17 you graduated from pharmacy school in 1995;
18 correct?
19　A.　Correct.
20　Q.　And then did you do your MBA while you
21 were still working, or did you go back to school
22 full time?
23　A.　No. I did it while I was working. It
24 was a part-time program.
25　Q.　If you could, after you graduated from

Page 14

1 pharmacy school in 1995, what was the first job
2 that you had?
3    A.  A staff pharmacist for Giant Eagle.
4    Q.  And where were you located?
5    A.  I believe my first -- I floated to many
6 locations.  But I believe my first permanent like
7 one store role was in Waterworks in Pittsburgh.
8    Q.  And how long did you remain in that
9 role?
10    A.  As a staff pharmacist, I want to say
11 maybe a year and a half to two years.  It's hard
12 to -- that's 25 years ago.  One or two years.
13    Q.  And then at some point, did you get
14 promoted?
15    A.  I became a pharmacy manager, which is
16 more supervisory, over a single pharmacy.
17    Q.  And that was sometime in the 1997, 1998
18 timeframe?
19    A.  That's correct, right.
20    Q.  How long did you remain in that role?
21    A.  I remained in that role I'd say maybe a
22 year and a half.  It could be two years.  I'm
23 trying to remember those specifics dates.
24    Q.  Sure.  No, I understand.  And then at
25 that point, what did you do after you were a

Page 15

1 pharmacy manager?
2    A.  I left Giant Eagle for a staffing
3 company called MedTech and then eventually for a
4 few months in one of the sites that they assigned
5 me to as a -- MedTech was a staffing company.  So
6 they would send you in and fill in for pharmacists
7 where they had needs.
8    One of the companies they had me fill in for
9 offered me a position there.  And then I stayed
10 there for probably about -- I'd say about maybe
11 four or five months.  Then I came back to Giant
12 Eagle.
13    Q.  And was that in 200- -- when was that?
14    A.  I'm trying to think.  I was there maybe
15 2000 to 2001.  I think that's about right.  Then I
16 came back to Giant Eagle in 2001.
17    Q.  And then when you came back to Giant
18 Eagle, what was your role?
19    A.  I was a floating pharmacist because at
20 that time, I had gone back to get my MBA and I
21 needed flexibility in the schedule.  So they used
22 me as full time but as a fill-in pharmacist when
23 pharmacists were on vacation.  I had multiple site
24 roles at that time.
25    Q.  And how long did you stay in that role

Page 16

1 as a floating pharmacist?
2    A.  Until -- I want to say until 2003.  2003
3 I believe is when.  Then I was promoted to a
4 pharmacy -- at that time they called it pharmacy
5 specialist, basically a regional supervisor.
6    Q.  Is that different than a pharmacy
7 district leader?
8    A.  Same.  It's just vernacular difference
9 at the time.
10    Q.  And then you were in the role as a
11 specialty pharmacist from 2003 to 2006?
12    A.  Yeah, that sounds right.
13    Q.  Then in March of 2006, were you promoted
14 to the VP of pharmacy operations?
15    A.  No.  I was in that role for I want to
16 say maybe a year.  Then I went to Rite-Aid.  I
17 spent maybe I think 90 days at Target.  Target at
18 that time was opening up in the Pittsburgh market,
19 and they were looking to bring folks into -- groom
20 into their supervisory roles.
21    At the same time I got an offer from Rite-Aid
22 to be a -- same position for Rite-Aid, pharmacy
23 supervisory.  I went there for 18 months.  Then I
24 came back to Giant Eagle in 2006, I think spring
25 of 2006.

Page 17

1    Q.  And when you came back to Giant Eagle,
2 were you then the VP of pharmacy operations?
3    A.  No, no.  I came back in the same
4 position I left in, as a pharmacy supervisor.
5    Q.  And why did you come back?
6    A.  Giant Eagle was expanding its markets
7 into the Cleveland area through an acquisition.
8 They said that they needed help, stronger -- they
9 needed some strong leadership in terms of
10 assimilating a new -- a market like that.  And it
11 sounded like a good opportunity for advancement to
12 come back.
13    Q.  How long did you remain in the role as a
14 pharmacy supervisor for Giant Eagle in the
15 Cleveland market?
16    A.  About eight months.  And then I was
17 promoted to director of operations.
18    Q.  And at that time, were you living in
19 Cleveland?
20    A.  No, no.  I lived in Pittsburgh.  I just
21 commuted.
22    Q.  How long did you remain director of
23 pharmacy operations?
24    A.  Well, my -- I was -- my position as
25 director of pharmacy operations -- I had title

Page 18

1 changes up to VP of operations.  So until I left,
2 basically the same role, but as the Giant Eagle
3 continued to grow, they just retitled the position
4 senior director of operations and then eventually
5 vice-president of operations.  But the basics of
6 the role were the same.
7    Q.  And was that from March of 2006 --
8 excuse me -- February of 2006 to March of 2014?
9    A.  No, no.  Like I say, I became director
10 of operations I want to say very early on in 2007.
11 And then the gyrations of my role, the titles
12 changed, but the same basic position through March
13 of 2014.
14    Q.  And if you could, when you became the
15 director of pharmacy operations in 2007, could you
16 just describe the organizational structure of
17 Giant Eagle?
18    A.  Sure.  Giant Eagle -- well, the grocery
19 part of Giant Eagle, I'm not as familiar with
20 their distribution centers and wholesale grocery
21 piece.  I can talk -- speak more intelligently
22 about the grocery piece that I report into.  Is
23 that what you're asking here?
24    Q.  You mean the pharmacy piece?
25    A.  Giant Eagle has a lot of -- Giant Eagle

Page 19

1 ran distribution warehouses and lots of different
2 businesses.  They had a real estate organization,
3 gas stations, lots of stuff.  I'm familiar with
4 the basic structure of the grocery store chain of
5 which the pharmacy was part of.
6    Inside that structure was a basic structure
7 where there was a merchandising vertical and then
8 operations vertical.  Merchandising included
9 things like sales drivers, marketing,
10 distribution, et cetera.
11    Operations was what happened inside of the
12 store.  So inside of that structure pharmacy at
13 the time that I became director of operations, at
14 that specific time, because it changed later,
15 pharmacy was part of the merchandising part of
16 Giant Eagle in terms of the grocery store section.
17    Inside of that structure, inside of pharmacy
18 you had -- pharmacy I think was the only unique
19 one in which the operations of pharmacy reported
20 into the merchandising structure of pharmacy at
21 that time versus the overall company operation
22 structure.  So I reported into a gentleman named
23 Randy Heiser who was VP of pharmacy.
24    Q.  And who did Mr. Heiser report to?
25    A.  I believe he reported to John Tedesco.

Page 20

1 I don't recall what his title was at that time.  I
2 don't recall what John's title was.  I'm sure you
3 have that somewhere.
4    Q.  So was there a CEO of Giant Eagle?
5    A.  At that time David Shapira was the CEO.
6    Q.  Was that the highest officer in the
7 company?
8    A.  Yes.
9    Q.  Just walk me through, if you could, the
10 structure from yourself to Mr. Heiser up through
11 to the CEO.
12    A.  At that time what I believe, as I
13 recall -- I mean, I know who I reported to, was
14 Randy, but Randy reported to John Tedesco.  John
15 Tedesco either reported to David directly or he
16 may have reported to John Lucot who was the chief
17 operating officer.  I believe he reported to John
18 Lucot though.
19    Q.  And as the director of pharmacy, what
20 were your roles and responsibilities?
21    A.  Retail store operations.  I would say
22 from the third line of the P & L down.  It would
23 be cost controls, labor, hiring and firing, making
24 sure that you were following the regulatory
25 practices for the pharmacy and dispensing, those

Page 21

1 type of things, doing our quality inspections,
2 accuracy of the prescriptions, basic P & L
3 responsibilities.
4    Operations then drive sales, meaning the
5 marketing, and the sales tactics and things like
6 that were part of the merchandising part of the
7 pharmacy department, but I ran what happens inside
8 the stores.
9    Q.  And who reported to you as the director
10 of pharmacy?
11    A.  The pharmacy, regional pharmacy
12 supervisors reported to me.  And then eventually
13 as things progressed inside of the organization,
14 we added some quality managers for prescription
15 accuracy.  So that reported to me.  I'm trying to
16 think.
17    We had some trainers, technician training
18 program, that type of thing, that reported into my
19 org chart.  That's basically my org chart, was as
20 the operations lead.
21    Q.  At some point, did Joe Millward join as
22 the senior manager of compliance in pharmacy
23 quality?
24    A.  Yeah.  Joe Millward was our quality
25 person that I referred to.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    Q.   And did he report to you?
2    A.   He reported to me.
3    Q.   And his role as senior manager -- am I
4  correct he was senior manager of compliance and
5  pharmacy quality?
6    A.   When we hired Joe, originally it was for
7  quality.  And then the regulatory pieces started
8  to fall under the quality bucket, too.  And his
9  role expanded in the time he was there.  So it was
10 constantly evolving.  There's a lot of hats you
11 wear in a company the size of Giant Eagle.  So he
12 had a lot of different roles in terms of how he
13 added value to the organization.
14      And then Joe supported regulatory, not just
15 for the retail operations piece, but also for the
16 merchandising part of the organization, which
17 included, like I said, the sales designs, the
18 distribution centers and that type of thing.
19   Q.   Do you have a recollection about at what
20 point Mr. Millward's position expanded from just
21 quality to quality and compliance?
22   A.   No, no, no.  I don't have recollection
23 of an exact day or something like that or when.
24 It was more evolving.
25   Q.   How about what year?

Page 23

1    A.   I'd say within his first year as things
2  started to evolve.
3    Q.   Would that be like 2010, 2011?
4    A.   I don't recall when he was -- I'm trying
5  to think when he was brought on, because he was a
6  supervisor for us, pharmacy supervisor, before he
7  moved into that role.  I don't recall the dates
8  when he was brought into that role.
9    Q.   Did you know Mr. Millward prior to him
10 joining Giant Eagle?
11   A.   Yes.
12   Q.   How did you know him?
13   A.   We went to college together.  We had --
14 he also worked at Rite-Aid.  He worked for
15 Rite-Aid when I was there, but we were in
16 different divisions.  He was part of Rite-Aid.
17   Q.   Was he a friend of yours in pharmacy
18 school?
19   A.   Yes.
20   Q.   Did you recruit him over to Giant Eagle?
21   A.   I recruited him into Giant Eagle as a
22 pharmacy supervisor.
23   Q.   Who made the decision to promote
24 Mr. Millward up to his position in quality and
25 then compliance?

Page 24

1       MR. KOBRIN:  Object to form.
2       THE WITNESS:  We had a -- we had a CQI
3  committee, which was represented by multiple parts
4  of the organization that interviewed Joe and made
5  the recommendation for the role.
6  BY MR. HUDSON:
7    Q.   What does CQI stand for?
8    A.   Quality control initiative.
9    Q.   And who was on that committee?
10   A.   It was a combination of operators,
11 merchandisers, legal, both internal and external
12 counsel.
13   Q.   Do you recall approximately how many
14 people were on that committee?
15   A.   No.  More than five, but I can't recall
16 the exact number.
17   Q.   Am I correct that compliance within the
18 pharmacy portion of Giant Eagle fell under your
19 role as director of pharmacy?
20      MR. KOBRIN:  Object to form.
21      THE WITNESS:  The compliance --
22 compliance person who was running regulatory,
23 which is Joe, reported to me, but he had dotted
24 line responsibilities to parts of the business
25 that included retail operations, which I oversaw,

Page 25

1  but also parts of the business that I didn't
2  touch.
3  BY MR. HUDSON:
4    Q.   My question though was in terms of the
5  regulatory department for pharmacy operations,
6  where did that fall within the organization?  Who
7  was responsible for that?
8       MR. KOBRIN:  Object to form.
9       THE WITNESS:  I was responsible for the
10 pieces of regulatory that pertained to retail
11 pharmacy.
12 BY MR. HUDSON:
13   Q.   How about the pieces that related to
14 distributors or HBC?
15   A.   Yeah.  That fell to other parts of the
16 org charts.  That was Randy Heiser, Brett Merrell,
17 Greg Carlson.  I didn't have any oversight over
18 any distribution areas.
19   Q.   Randy Heiser, Brett Carlson?
20   A.   Brett Merrell, Greg Carlson.  There
21 could be supervisors at the warehouses.  I wasn't
22 familiar with that part of the business.
23   Q.   Did you ever visit the HBC warehouse?
24   A.   I believe I did a generalized tour of
25 the overall warehouse one time, which I'm trying

Page 26

1 to remember. There was a cage. They showed me
2 that, hey, you know, that's the HBC cage. But
3 I've never had a tour of the specific HBC
4 warehouses that pertained to pharmacy or for
5 pharmacy reasons.
6     Q.   Do I understand you correctly then that
7 Mr. Millward, when he became the senior manager of
8 compliance, for lack of a better phrase, wore two
9 hats. In other words, one hat was dealing with
10 compliance issues relating to the retail
11 pharmacies and then another hat would be relating
12 to other compliance issues relating to other parts
13 of the business?
14     A.   That's correct.
15        MR. KOBRIN: Object to form.
16        THE WITNESS: That's correct. In a
17 matrix organization, you can support multiple
18 areas. He reported to me more of an
19 organizational design. Someone has to do
20 performance appraisals and that type of thing. He
21 sat on my org chart, but he touched multiple areas
22 of the pharmacy, not just retail operations.
23 BY MR. HUDSON:
24     Q.   And was one of the areas that he touched
25 or was responsible for was compliance as it

Page 27

1 relates to HBC acting as a distributor of
2 controlled substances?
3        MR. KOBRIN: Object to form.
4        THE WITNESS: I can't say that for sure.
5 Greg Carlson, to my knowledge, was in charge of
6 the warehouse. But utilizing Joe as a resource
7 for things absolutely occurred, but to what
8 extent, I'm not -- I wasn't in that piece of the
9 business.
10 BY MR. HUDSON:
11     Q.   Is it fair to say that the piece of the
12 business that you were responsible for was related
13 to retail pharmacies?
14     A.   That's all my responsibility was. My
15 responsibility started at the front door of the
16 pharmacy and ended at the counter.
17     Q.   And did that remain true from 2007 until
18 you left Giant Eagle?
19     A.   Yes.
20     Q.   Were you aware at some point that HBC
21 became a licensed distributor of controlled
22 substances?
23     A.   Yes.
24     Q.   Were you aware of which types of
25 controlled substances or schedule drugs HBC was

Page 28

1 acting as a distributor for?
2     A.   General awareness. I wasn't intimate
3 with the specific formularies of the warehouse,
4 but general awareness, yes.
5     Q.   And what was your general understanding?
6     A.   That they had an assortment of Schedules
7 III through V in addition to -- but the majority
8 of what they had there was nonscheduled drugs.
9     Q.   And what was your understanding of who
10 acted as the distributor for Schedule II drugs?
11     A.   McKesson.
12     Q.   Did you have any interaction with
13 McKesson in your role?
14     A.   Business interactions were more I was
15 part of Giant Eagle. So I'd see McKesson maybe
16 for dinner once a year at NACDS and sit in maybe
17 when they gave an annual report of the
18 relationship of the business, but I didn't have
19 direct business relationships with McKesson.
20     Q.   Do you have any knowledge of McKesson's
21 controls or procedures as it relates to complying
22 with the Controlled Substances Act?
23     A.   No, no. I'm not in that part of the
24 business.
25     Q.   How about for HBC, do you have any

Page 29

1 knowledge about policies or procedures that HBC
2 had in place to comply with the Controlled
3 Substances Act?
4     A.   No.
5     Q.   In your role from 2007 to 2014, was
6 there any coordination between retail pharmacies
7 and the distribution side in terms of coordinating
8 on putting in place controls or policies or
9 procedures to comply with the Controlled
10 Substances Act?
11     A.   Coordination, I think that would be a
12 fair way to describe it. If there were
13 downstream -- if there were actions that needed to
14 take place or follow-ups at a store level, that's
15 where it touched my level. So if there was a
16 request for more information and there needed to
17 be an operational intervention to comply with
18 those requests, that's where it touched my area.
19     Q.   At the retail pharmacy level, were there
20 any policies or procedures in place that were
21 specifically designed to monitor suspicious orders
22 of controlled substances?
23        MR. KOBRIN: Object to form.
24        THE WITNESS: The policies inside of the
25 pharmacy were more about how do you check in an

Page 30

1 order, how do you maintain proper inventory
2 controls of controlled substances and how to
3 dispense them in a legal and appropriate manner.
4 BY MR. HUDSON:
5     Q.  Are you aware of any policies or
6 procedures that existed at the retail pharmacy
7 level that were aimed at monitoring suspicious
8 orders of controlled substances?
9         MR. KOBRIN:  Object to form.
10        THE WITNESS:  Repeat your question, the
11 second part of that.  I apologize.  I want to make
12 sure I'm understanding.
13        MR. BARTON:  Would you mind just reading
14 back that question.
15        (The record was read back.)
16        THE WITNESS:  You're asking about orders
17 of substances.  Any monitoring systems would be
18 outside of the actual purview of the pharmacy.
19 Those systems would sit outside.  The systems we
20 had in pharmacy were more about on-shelf accuracy
21 and dispensing accuracy and the correlation
22 between the two of them.
23 BY MR. HUDSON:
24     Q.  How about at the retail pharmacy level,
25 what policies or procedures existed between 2007

Page 31

1 and 2014 aimed at preventing the diversion of
2 controlled substances?
3         MR. KOBRIN:  Object to form.
4         THE WITNESS:  We had lots of training in
5 policies around the Controlled Substances Act and
6 what DEA regulations were in terms of dispensing
7 and maintaining inventory and pharmacist
8 corresponding responsibility in terms of
9 dispensing, training, those types of things.
10 BY MR. HUDSON:
11     Q.  Who within Giant Eagle was responsible
12 for the training?
13     A.  Well, first of all, which part of the
14 training, if you don't mind being more specific?
15     Q.  Training to comply with the Controlled
16 Substances Act.
17     A.  Well, pharmacists actually take a board
18 to certify that they're aware.  They take -- a
19 legal piece of their board actually qualifies them
20 for that.
21     We had technician training programs.  We had
22 documents, manuals, lots of reference materials on
23 site, links to regs.  Then we would do refresher
24 reviews for pharmacists at annualized meetings
25 regarding our policies when it comes to controlled

Page 32

1 substances.
2     Q.  Who within the Giant Eagle organization
3 though was -- was there someone who was
4 responsible for overseeing the training of
5 pharmacists to make sure they were complying with
6 the Controlled Substances Act?
7         MR. KOBRIN:  Object to form.  During
8 what period?
9         MR. HUDSON:  2007 to 2014.
10        THE WITNESS:  There's not a requirement
11 to do controlled substance training inside a
12 pharmacy.  We did generalized training of which
13 controlled substances would in cases be parts of
14 that, CBTs, things like that.
15     Pharmacy managers are actually responsible
16 for the practice of what goes on inside of the
17 site and making sure that everyone in it is
18 following the rules and regs.
19 BY MR. HUDSON:
20     Q.  Other than the pharmacy managers, is
21 there anyone else within the Giant Eagle
22 organization who was responsible for training on
23 compliance with the requirements of the Controlled
24 Substances Act from 2007 to 2014?
25        MR. KOBRIN:  Object to form.

Page 33

1         THE WITNESS:  As I stated, we've done --
2 we had multiple reference materials to aid in that
3 training.  We would do annual refreshers on
4 multiple different topics of which that was one of
5 them.
6     Joe Millward and his team would do trainings
7 and just general -- we did quarterly audits that
8 were very, very specific to practices, including
9 controlled substances.  And those materials on
10 those audits were always made available even
11 before the audits for the pharmacy so they could
12 educate themselves on the pharmacy.
13 BY MR. HUDSON:
14     Q.  My questions are focused not on the
15 content that was provided to train the
16 pharmacists, but just on who particularly was
17 involved in doing that.
18     So far you've said the pharmacy managers were
19 involved in some of the training, and then you
20 indicated in your last answer that Joe Millward
21 and his team were involved.
22     A.  Sure.  There could be multiple folks who
23 could train.  Technician trainers could talk about
24 those areas.
25     What I'm referring to is more of the practice

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 that goes on inside of the store, who is allowed
2 to approach the safe, who is allowed to count
3 controls, who is allowed to check inventory. It
4 was more operational, retail operation practice
5 around controlled substances.
6 Q. Was there anyone within Giant Eagle that
7 was focused specifically on training pharmacists
8 to avoid diversion of controlled substance?
9 A. No.
10 MR. KOBRIN: Object to form.
11 THE WITNESS: Not a specific titled
12 person whose job is to do that. That comes with a
13 pharmacy license.
14 BY MR. HUDSON:
15 Q. Are you aware of any policies or
16 procedures that existed within Giant Eagle from
17 2007 to 2014 that were aimed at pharmacists to
18 avoid the diversion of controlled substances?
19 A. We had controlled substance policies
20 that were distributed in every pharmacy with
21 procedures and regulatory requirements, and those
22 were audited.
23 Q. In general terms, what were those
24 policies, specifically policies that were aimed at
25 avoiding diversion?

Page 35

1 MR. KOBRIN: Object to form.
2 THE WITNESS: Once again, how to receive
3 an order, how to store documents properly, how to
4 dispense an order, what the requirements were in
5 terms of what was needed from a prescription, what
6 the pharmacist's role was, you know, giving them
7 reference materials to cite back to the Controlled
8 Substances Act and the DEA regs, those types of
9 things.
10 BY MR. HUDSON:
11 Q. Was there any log or report that was
12 kept by Giant Eagle to indicate when pharmacists
13 had flagged or denied prescriptions to patients?
14 MR. KOBRIN: Object to form.
15 THE WITNESS: We had monthly audits of
16 controlled substances, but reports where
17 pharmacists had to make medical decisions as to
18 whether to dispense, I'm not aware of any reports
19 that were specific to that.
20 Pharmacists could make notes on patient
21 profiles if they felt there was diversion issues
22 and flag things in the system.
23 BY MR. HUDSON:
24 Q. And how would that be flagged in the
25 system?

Page 36

1 A. Multiple ways. Pharmacists could make
2 notes at a patient record level. You could make
3 notes on a physical prescription, those types of
4 things.
5 Q. Explain to me how that would work where
6 a pharmacist would make notes on a patient record.
7 A. Depending on the operating system. We
8 had a couple different ones at the time. You
9 could make patient notes on a record. So if you
10 pulled Bob Smith up, every time you pulled Bob
11 Smith up, you could see requires a live call to
12 the doctor or verification or do not fill.
13 Like I said, that's part of the pharmacy
14 practices, which is owned by the individual
15 pharmacist under their licensing rights.
16 Q. So between 2007 and 2014, if I wanted to
17 try to figure out how many times a Giant Eagle
18 retail pharmacist had flagged a patient for
19 suspicion of diversion, how would I go about doing
20 that?
21 MR. KOBRIN: Object to form.
22 THE WITNESS: I don't know that you
23 could. I wouldn't be familiar enough with the
24 system to be able to say there's a specific way.
25

Page 37

1 BY MR. HUDSON:
2 Q. If I want to look back at the records
3 from Giant Eagle between 2007 and 2014 and try to
4 determine what actions Giant Eagle took at the
5 retail pharmacy level to avoid diversion of
6 controlled substance, where would I look?
7 A. We had a control box that had all the
8 records of dispensing. We had records of monthly
9 audits. And you would just look at our shelves,
10 and you'll see the reference materials and
11 policies and procedures around dispensing
12 practices for controlled substances.
13 Q. But in terms of -- is there anything
14 more specific that would exist to document actions
15 taken to address the potential for diversion of
16 controlled substances?
17 MR. KOBRIN: Object to form.
18 THE WITNESS: I'm not aware of any
19 requirement to keep a log of actions on controlled
20 substances. We complied with the letter of the
21 law on all of our document retention.
22 BY MR. HUDSON:
23 Q. How do you know that to be true?
24 A. We would audit --
25 MR. KOBRIN: Object to form. How does

Page 38

1  he know what to be true?
2  BY MR. HUDSON:
3      Q.  Did you have any involvement in the
4  formation of HBC as a separate company?
5      A.  No.
6      Q.  Did you have any involvement in the
7  decision for HBC to become a licensed distributor
8  of controlled substances?
9      A.  No.
10     Q.  Do you know who was involved in that
11 decision making?
12     A.  My assumption is Randy Heiser.
13     MR. KOBRIN:  Don't assume.  If you
14 can --
15     THE WITNESS:  I don't know who in the
16 organization made the decision.  I just know where
17 it reported to.  That's all.  I wasn't in that
18 part of the business.
19 BY MR. HUDSON:
20     Q.  Do you have any education specifically
21 on compliance, in other words, complying with laws
22 related to the Controlled Substances Act?
23     MR. KOBRIN:  Object to form.
24     THE WITNESS:  I'm familiar with the
25 Controlled Substances Act as it pertains to the

Page 39

1  practice of retail pharmacy.
2  BY MR. HUDSON:
3      Q.  How about the Controlled Substances Act
4  as it relates to manufacturers or distributors of
5  controlled substances?
6      A.  No, no, I'm not familiar with those
7  regs.
8      Q.  Any knowledge of the distributor
9  requirements under the Controlled Substances Act?
10     MR. KOBRIN:  Object to form.
11     THE WITNESS:  No.
12 BY MR. HUDSON:
13     Q.  Ever been in any meetings where there
14 was ever any discussion about actions being taken
15 by HBC to meet the distributor requirements of the
16 Controlled Substances Act?
17     MR. KOBRIN:  Object to form.
18     THE WITNESS:  No, not specific to HBC.
19 I was in generalized meetings just about overall
20 company quality practices and things like that, of
21 which, you know, I can't -- I wouldn't be able to
22 say that I've never heard an HBC question being
23 asked or a comment being made, but I've never been
24 in a meeting specifically to design a warehouse
25 function.  I was in retail.

Page 40

1  BY MR. HUDSON:
2      Q.  Did you have an understanding that
3  distributors had an obligation to design a system
4  to disclose to the distributor suspicious orders
5  of controlled substances?
6      MR. KOBRIN:  Object to form.  Assumes
7  facts not in evidence.
8      THE WITNESS:  I'm aware that
9  organizations and distributors have controls in
10 place and we have to trust those controls.  But
11 the specifics of those I'm not familiar with.
12 BY MR. HUDSON:
13     Q.  Do you know whether or not distributors
14 had an obligation to design a system to monitor
15 for suspicious orders of controlled substances?
16     MR. KOBRIN:  Object to form.
17     THE WITNESS:  I'm not aware of specific
18 requirements when it comes to that area.  I wasn't
19 in that part of the business.
20 BY MR. HUDSON:
21     Q.  From 2007 to 2014, do you know who
22 within the Giant Eagle organization would have
23 been responsible for creating policies or
24 procedures to comply with the Controlled
25 Substances Act requirements as they relate to

Page 41

1  monitoring suspicious orders of controlled
2  substances?
3      A.  I know that Greg Carlson oversaw the
4  area.  Who under Greg was specifically responsible
5  for those, once again, I wasn't in that part of
6  the business.
7      Q.  Other than Mr. Millward, are you aware
8  of anyone prior to him who had a role focused
9  specifically on compliance?
10     MR. KOBRIN:  Object to form.
11     THE WITNESS:  Joe's role wasn't
12 specifically on compliance.  He was regulatory.
13 Quality was -- my interactions with Joe were much
14 more about the quality of the practice of pharmacy
15 and error rates.  That's why he was on my org
16 chart.
17     There was a gentleman named Don Casar who
18 preceded him in that role who had very similar
19 responsibilities.  But in terms of what they
20 touched, that could be depending on the time and
21 what was going on in that business.
22 BY MR. HUDSON:
23     Q.  You said Don Casar?
24     A.  Yes.
25     Q.  Spell that last name if you could.

---

Page 42

1    A.  Don't quote me on this, but I think it's
2  C-A-S-A-R.  There might be a silent E in there
3  somewhere, but I'm not...
4    Q.  And what was Mr. Casar's job title?
5    A.  He was -- I actually don't remember the
6  title, but it was similar to Joe's.  It would have
7  been a quality lead, manager of quality, senior
8  manager of quality, something like that.
9    Q.  Do you know if he had any
10  responsibilities for compliance?
11    A.  I honestly can't recall if he touched
12  compliance specifically at the time.  I honestly
13  can't remember.
14    Q.  Is it your understanding that
15  Mr. Millward's role when he became the senior
16  manager of pharmacy quality and compliance, that
17  that was a new role that was created for him or
18  was he taking over for Mr. Casar?
19    A.  He was replacing Mr. Caser.
20    Q.  Did Mr. Casar leave the company?
21    A.  No, no.  He went back to being a retail
22  pharmacist in one of our locations.
23    Q.  So if we wanted to try to figure out
24  what policies, procedures or actions HBC took to
25  comply with or address the distributor

---

Page 43

1  requirements of the Controlled Substances Act,
2  other than Mr. Carlson, is there anyone else you
3  would identify that we should speak to?
4    MR. KOBRIN:  Object to form.
5    THE WITNESS:  He reported to two
6  different gentlemen in my tenure at, you know,
7  Giant Eagle, Randy Heiser and Brett Merrell.  But
8  in terms of the specific folks on that part of the
9  organizational chart, I couldn't -- I couldn't
10  tell you.  I don't even know the name of the folks
11  who actually worked at the warehouse.
12  BY MR. HUDSON:
13    Q.  And you indicated he reported to two
14  different gentlemen, Randy Heiser and Brett
15  Merrell.  Were those at different points in time?
16    A.  At different points in time, yes.
17    Q.  Do you have a recollection of when that
18  changed from Mr. Heiser to Mr. Merrell?
19    A.  Yes.  Give me a moment to think this
20  out.  I'd say around either 2011 or 2012 Randy
21  Heiser left the organization, and he was replaced
22  with Brett Merrell.  That's when the change -- at
23  that time also my organizational structure
24  actually changed over to the traditional Giant
25  Eagle structure, which I reported into the

---

Page 44

1  operating wing of the company, which was Gene
2  Tommasi.
3    Q.  And to the best of your recollection,
4  that was in the 2012 timeframe?
5    A.  I want to say '11, '12, right in that --
6  right in that era.
7    Q.  Other than Mr. Heiser and Mr. Merrell,
8  anyone else that you would identify as being an
9  individual who would have knowledge about HBC's
10  actions as a distributor to meet the requirements
11  of the Controlled Substances Act?
12    MR. KOBRIN:  Object to form.
13    THE WITNESS:  Joe Millward would have
14  had some kind of interaction with that as he
15  touched those areas as it pertained to whatever it
16  is that Greg or someone in that part of the org
17  chart needed to be interested in.
18  BY MR. HUDSON:
19    Q.  How about George Chunderlik?
20    A.  George was part of Joe Millward's org
21  chart.  Yeah, I would include that with Joe.
22    Q.  Anyone else besides Mr. Millward and
23  Mr. Chunderlik that you would include within Joe's
24  team?
25    A.  Not that I can think of.  Not to say

---

Page 45

1  there weren't others.  I'm just not aware of them.
2    Q.  Do you have any specific knowledge of
3  actions taken by Mr. Millward or Mr. Chunderlik as
4  it relates to HBC and the actions taken to meet
5  the distributor requirements for the Controlled
6  Substances Act?
7    MR. KOBRIN:  Object to form.
8    THE WITNESS:  I'm not familiar with the
9  requirements of the distributor side.  My
10  connection to that was when there was a request or
11  an action needed at the retail level, like I say,
12  whether a request for information, et cetera.
13  BY MR. HUDSON:
14    Q.  Were there any weekly, monthly or
15  quarterly meetings between retail operations and
16  distribution to discuss efforts to avoid
17  diversion?
18    A.  No, no.  We had quarterly meetings about
19  quality, but they were retail based.  They were
20  more about the practice of pharmacy, not
21  warehouse.
22    Q.  Was there any integration between the
23  retail pharmacy side and the HBC distribution side
24  in terms of collaborating to avoid diversion?
25    MR. KOBRIN:  Object to form.

---

Page 46

1    THE WITNESS: Like I said, our
2  collaboration was more of what do we need
3  downstream at the retail level. Request for
4  information, if there was a question as to an
5  order or some action that needs to take place
6  physically in a pharmacy, my part of the org chart
7  job was to get that information to comply with it.
8  BY MR. HUDSON:
9    Q.  Would you say that was more of an ad hoc
10 type of a process or was it more systematic?
11   MR. KOBRIN: Object to form.
12   THE WITNESS: I don't think it was
13 either. It was if there was a request for
14 information, we were part of the same company, we
15 made sure we did things in an integrated way, in
16 that perspective.
17 BY MR. HUDSON:
18   Q.  Between 2007 and 2014, approximately how
19 many times were there requests by the HBC
20 distributor side for information from the retail
21 pharmacy side?
22   MR. KOBRIN: Object to form.
23   THE WITNESS: I have no idea how many
24 times, but requests -- I wouldn't even say
25 requests from the distributor side. If there was

Page 47

1  a question that Joe was asking based on an order
2  that was received or something like that, I'm
3  talking in those types of terms. It was not a
4  distributor operations type of, you know,
5  relationship in that. In a different aspect.
6  BY MR. HUDSON:
7    Q.  I guess that's what I'm trying to get
8  at. Was there any formal integration in terms of
9  written policies, procedures or practices where
10 the distributor side and the retail pharmacy side
11 were systematically coordinating?
12   A.  Oh, no, no, only in terms of how do you
13 receive an order, how do you put it on the shelf,
14 those types of things, how do you place an order,
15 those types of coordinations.
16   Q.  But in terms of preventing diversion,
17 was it more of just a process where if Joe or
18 others had questions, then they would just pick up
19 the phone and call the retail pharmacy?
20   MR. KOBRIN: Object to form.
21   THE WITNESS: I think both. It could
22 be -- it was a combination of things. It could be
23 an email sent requesting information. It could be
24 a request to fill out a form. It could be in a
25 lot of different forms.

Page 48

1  BY MR. HUDSON:
2    Q.  Was there any formal process in place to
3  try to document the actions that were being taken?
4    MR. KOBRIN: Object to form.
5    THE WITNESS: I'm not aware of any
6  requirement to document an interaction of that
7  nature.
8  BY MR. HUDSON:
9    Q.  I understand. Put to one side whether
10 there was a requirement or not.
11   My question is: To your knowledge, was there
12 any practice in place of documenting times where
13 there was coordination between the distributor
14 side and the retail pharmacy side in terms of
15 efforts to avoid diversion?
16   MR. KOBRIN: Object to form.
17   THE WITNESS: Not to my knowledge.
18 BY MR. HUDSON:
19   Q.  Would there be any way for me to look at
20 a log or a report to try to determine how many
21 times between 2009 and 2014 there were actions
22 taken by Mr. Millward or others to try to
23 investigate or due diligence on suspicious orders?
24   MR. KOBRIN: Object to form.
25   THE WITNESS: I'm not aware if there's

Page 49

1  one or not. There's no requirement to have
2  documentation like that in the practice of retail
3  pharmacy that I'm aware of.
4  BY MR. HUDSON:
5    Q.  Again, putting to one side the
6  requirements. To the best of your knowledge as
7  you sit here today, is there a log or report that
8  we could look to to determine when actions were
9  taken by Mr. Millward or others to try to avoid
10 diversion?
11   MR. KOBRIN: Object to form. Asked and
12 answered.
13   You can answer.
14   THE WITNESS: I'm not aware of a form,
15 if it exists or not.
16 BY MR. HUDSON:
17   Q.  In your training as a pharmacist, did
18 you have any training specific to opioids?
19   A.  Not specific. Our training was more
20 about the Pharmacy Act. It was legal in general
21 of which controlled substances were part.
22   Q.  Do you have any knowledge, either
23 specific knowledge or training, on diversion of
24 controlled substances?
25   MR. KOBRIN: Object to form.

Page 50

1    THE WITNESS: My knowledge is what the
2  legal requirements are to run a practice of a
3  pharmacy.
4  BY MR. HUDSON:
5    Q. And it focused specifically on retail
6  pharmacies?
7    A. Well, that was my focus. You can do a
8  lot of different things with a pharmacy degree.
9    Q. Did you have any knowledge, for example,
10 of opioids that were most likely to be abused or
11 diverted?
12   A. No, not specific to opioids diversion.
13   Q. Any meetings or communications that you
14 recall between 2009 and 2014 in which there was
15 discussion of diversion of hydrocodone or any
16 other opioids?
17   A. Yes.
18     MR. KOBRIN: Object to form.
19 BY MR. HUDSON:
20   Q. Describe for me what you recall.
21   A. As it relates to dispensing practices
22 and what happens inside of a pharmacy as to
23 whether it's associated with diversion or
24 practices in terms of how to store and dispense
25 and maintain logs that are part of the legal

Page 51

1  requirement.
2    Q. Any meetings or communications you were
3  involved in that were focused specifically at the
4  distributor level?
5      MR. KOBRIN: Object to form.
6      THE WITNESS: No.
7  BY MR. HUDSON:
8    Q. What is your understanding of how the
9  process worked for distributing controlled
10 substances from HBC to the specific retail
11 pharmacies? How did that work?
12   A. We'd place an order, an electronic order
13 for controlled substances. There was no CIIs
14 there during my time. So there was no
15 additional -- and how those orders got parsed were
16 outside of the pharmacy. That was more of an IT
17 thing.
18   Q. Do you have an understanding like
19 physically what would happen? In other words, a
20 pharmacist at a retail pharmacy would type an
21 order in. And then how would that work in terms
22 of what would happen at the warehouse and then how
23 would the controlled substances or other
24 prescription drugs then eventually get back to the
25 pharmacy and eventually be dispensed?

Page 52

1      MR. KOBRIN: Object to form.
2      THE WITNESS: My knowledge of what goes
3  on is at the retail pharmacy level. How they
4  place an order, yes, I'm aware of that. They can
5  do that in an electronic way. A pharmacist
6  oversees it before they send it. And then we
7  receive the order the next morning, check it in.
8  The check-in procedure is part of what we operate,
9  what we owned.
10 BY MR. HUDSON:
11   Q. Who would you receive the order from?
12   A. It would get delivered on a McKesson
13 truck.
14   Q. Do you know what would happen between
15 the time the order was entered and then McKesson
16 would deliver the order to the retail pharmacy?
17     MR. KOBRIN: Object to form.
18     THE WITNESS: No. I'm not familiar with
19 that area.
20 BY MR. HUDSON:
21   Q. Did that process ever change between
22 2007 and 2014, to your knowledge?
23     MR. KOBRIN: Object to form.
24     THE WITNESS: Not to my knowledge. I'm
25 not familiar with that part of the business.

Page 53

1      MR. HUDSON: We've been going about an
2  hour. Let's take a quick break.
3      THE VIDEOGRAPHER: 8:58 we're off the
4  video record.
5      (Recess from 8:58 a.m. to 9:19 a.m.)
6      THE VIDEOGRAPHER: 9:19 we're on the
7  video record.
8      (HBC-Mollica Exhibit 1 was marked.)
9  BY MR. HUDSON:
10   Q. Mr. Mollica, I'm going to hand you what
11 we've marked as Exhibit 1, and I'll represent to
12 you that Exhibit 1 is entitled HBC Service
13 Company's Responses to Plaintiffs' (First) Set of
14 Combined Discovery Requests.
15   Do you see that at the top?
16   A. Yes.
17   Q. I'm going to focus specifically on
18 page 8, No. 2. It says, "Please produce each of
19 your suspicious order monitoring system (SOMS)
20 policies and procedures since January 1, 2006 and
21 identify the Bates-stamp range for each. Please
22 identify the effective dates each was in force and
23 effect."
24   Do you see that?
25   A. Yes.

Page 54

1  (HBC-Mollica Exhibit 2 was marked.)
2  BY MR. HUDSON:
3     Q.  Then we turn to the next page.  On page
4  9 then there's some Bates labels there.
5     I'll hand you what I've marked as Exhibit 2,
6  and I'll represent to you that Exhibit 2 is a
7  compilation document that we put together of the
8  Bates labels that are listed here on Exhibit 1 on
9  page 9.
10    So these are the policies and procedures that
11 have been identified.  Do you see that?
12    A.  Sorry.  I'm not sure of the Bates label.
13    Q.  No problem.  Bates labels on the bottom
14 right-hand corner of the document is just an
15 identifying number.  So if you see the identifying
16 number there matches up with the ending 38 and 39
17 on the bottom right.  38 and 39.  If you keep
18 going back through, the next one is 86 and 87 and
19 so on and so forth.
20    My question is just simply for Exhibit 2, are
21 any of those written policies, do they look
22 familiar to you?
23    A.  No.  I'm not familiar.  I've not seen
24 these policies.
25    Q.  Do you have any knowledge about any of

Page 55

1  these policies?
2     A.  You said the ones on -- I'm sorry -- 86
3  as well you're asking?
4     Q.  Yeah.  I'm actually focused mainly on
5  the first one, which is on Bates ending 38 and 39.
6     A.  I mean, it sounds reasonable, but I'm
7  not familiar with these directly.  I've never seen
8  these before.
9     Q.  Other than today, have you ever read
10 these policies?
11    A.  Not to my knowledge, no.
12    Q.  Do you know if anyone at the retail
13 pharmacy level would have been provided with these
14 policies?
15    MR. KOBRIN:  Object to form.
16    THE WITNESS:  I'm not aware of a
17 situation where a retail pharmacist would be in a
18 warehouse procedure manual.
19 BY MR. HUDSON:
20    Q.  If you look at the dates of each of
21 these policies, and to speed it up, I'll represent
22 to you that the effective date of the first policy
23 is 8/1/14.  Do you see that?
24    A.  Okay.  I see it.
25    Q.  And then as you go back, the dates get

Page 56

1  later in time.
2     A.  Okay.
3     Q.  Can we agree that by 8/1/14, you had
4  left Giant Eagle?
5     A.  Yes.
6     Q.  Are you aware of any policies or
7  procedures that existed during the time you were
8  at Giant Eagle specifically from 2009 to 2014
9  relating to a suspicious order monitoring system?
10    MR. KOBRIN:  Object to form.  Do you
11 mean written policies or procedures or generally?
12    MR. HUDSON:  Either.
13    THE WITNESS:  I'm familiar with many --
14 suspicious monitoring to me could encompass a wide
15 range of everything that happens from the time you
16 distribute all the way to dispensing.  So, yes,
17 I'm aware of many policies in terms of how we
18 control diversion and suspicious monitoring.
19    My definition of suspicious monitoring would
20 include things like training the pharmacist,
21 making sure that we have policies and procedures
22 in place for how we place orders, keeping proper
23 inventory and virtual inventory practices and
24 doing proper follow-ups, auditing, maintaining our
25 control boxes, that type of thing.

Page 57

1  BY MR. HUDSON:
2     Q.  So the first request is please produce
3  each of your suspicious order monitoring system
4  policies and procedures since January 1, 2006 and
5  identify the Bates-stamp range for each.
6     Did I read that right?
7     A.  I'm sorry.  Where are you at again?
8  BY MR. HUDSON:
9     Q.  Back to the second question.  It
10 actually has a highlight.
11    A.  Thank you.  I'm sorry.  What's your
12 question again?
13    Q.  For that question specifically.
14    A.  What is your question?  I'm not sure
15 what you're asking me.
16    Q.  Are you saying that other than what's
17 listed in Exhibit 2, you believe there's other
18 written policies and procedures since January 1,
19 2006 that would be responsive to that question or
20 that request?
21    MR. KOBRIN:  Object to form.  Misstates
22 his testimony.
23    THE WITNESS:  I don't even understand
24 what number two is asking for.  What I can say is
25 we have plenty of policies and procedures that I'm

Page 58

1 aware of in terms of preventing diversion.
2 BY MR. HUDSON:
3    Q.  You've said that a couple of times now.
4 Can you be more specific on what those written
5 policies were?
6        MR. KOBRIN:  Object to form.  Misstates
7 his testimony.  And I'd ask for clarification on
8 this, Ty.  I don't want you misleading the
9 witness.  He never said anything about written
10 policies either in his testimony and you never
11 said it in your prior question that prompted that
12 testimony.
13       MR. HUDSON:  "Objection.  Form."
14       MR. KOBRIN:  No.  I think when you're
15 misleading him, I don't want to just say
16 "Objection.  Form" because I don't want any
17 testimony that's going to misrepresent the record.
18       MR. HUDSON:  Well, it's stepping beyond
19 what's proper.  You'll get a chance to ask
20 redirect, Josh, if you want.
21       MR. KOBRIN:  I don't agree.  I think
22 it's proper in that circumstance.  I've held back.
23 But I don't want him to be confused by your
24 question.
25       MR. HUDSON:  I'm sure you'll get a

Page 59

1 chance to ask him questions, and you can clarify
2 at that time if you think there's something that's
3 misleading.
4 BY MR. HUDSON:
5    Q.  You testified, sir, that it's your
6 belief that there were policies relating to the
7 monitoring of suspicious orders.  Did I get that
8 right?
9    A.  No.  What I'm saying is --
10       MR. KOBRIN:  Object to form.
11       THE WITNESS:  -- I'm aware of policies
12 that are designed to prevent diversion, and there
13 are many of them that we had in terms of the
14 practice of pharmacy.
15 BY MR. HUDSON:
16    Q.  And were those written policies?
17    A.  We had written procedures when it came
18 to controlled substances, what our stances were.
19 We had many nonwritten reinforcements that
20 pharmacists were in a position to make good
21 decisions in terms of dispensing practices and we
22 would honor those decisions.
23    We had written policies in terms of who
24 handled controlled substances and training
25 procedures for technicians and documentation

Page 60

1 requirements being held based on legal
2 requirements, et cetera.
3    Q.  Let's just, if we could, make a list of
4 these policies.  So the first that I heard was
5 good decisions on dispensing.
6    A.  We supported pharmacists' right to make
7 professional judgments as to what was proper and
8 improper in terms of dispensing, made sure the
9 pharmacists knew that they had the right, final
10 right of decision making when it came to
11 dispensing.
12    We had our controlled substance procedures
13 that we made sure was distributed.  We had audit
14 procedures that were done quarterly and documented
15 in accordance with what our procedures and
16 policies were at the time.  We had practices in
17 terms of document retention and what needed to be
18 done in terms of proper ordering, training,
19 training on -- we had manuals and references
20 regarding not only the DEA, but Pharmacy Act and
21 fraud, waste and abuse policies, CBTs, annual
22 meetings with a lot of discussions of what the
23 obligation of pharmacists were and helped in any
24 way.
25    We've had DEA inspections which were never --

Page 61

1 never got any feedback that we weren't doing
2 anything other than what was required from us from
3 a legal perspective.
4    Q.  So I just want to make sure I've got an
5 exhaustive list.  One was good decisions on
6 dispensing.  Then you said you gave pharmacists or
7 professionals the ability to make professional
8 judgments on dispensing controlled substances?
9    A.  Yeah, supported by the Pharmacy Act,
10 yes.
11    Q.  And then the second one was controlled
12 substance procedures?
13    A.  Again, Giant Eagle had a controlled
14 substance policy that's part of the control box,
15 and the company made sure that we communicated
16 what those procedures are to the pharmacy.
17    Q.  And what were those policies?
18    A.  I can't recite them.  It was part of the
19 control box.
20    Q.  When you say control box, what do you
21 mean by that?
22    A.  There was a physical box in every
23 pharmacy that was a single place to look for
24 procedures, documents, records, that type of
25 thing.  We called it the control box.

Page 62

1     Q. It was a control box for Schedule II
2 controlled substances?
3     A. Yes. It had other information in there.
4 It was all controls, but Schedule II was part of
5 that.
6     Q. Do you know if the control box -- if
7 Schedule III controlled substances would be
8 contained in the control box?
9     A. Well, just general --
10     MR. KOBRIN: Object to form.
11     THE WITNESS: Not to my knowledge. I
12 don't think there's specific -- like DEA manuals
13 aren't specific just to that. They're all
14 inclusive of the thing.
15 BY MR. HUDSON:
16     Q. So all controlled substances would be in
17 the control box?
18     MR. KOBRIN: Object to form.
19     THE WITNESS: Information regarding,
20 yeah.
21 BY MR. HUDSON:
22     Q. Information regarding controlled
23 substances. So it's not like a physical box that
24 you put certain controlled substances into?
25     A. Oh, no, no. I'm talking about

Page 63

1 documentation here. No. Controlled substances,
2 Schedule IIs, were kept in lock and key, in safes.
3 III through Vs would be distributed in the
4 pharmacy in a proper fashion in accordance with
5 the law.
6     Q. The control box then would be a box that
7 would have policies or procedures in it?
8     A. Policies, procedures, the records in
9 terms of ordering and dispensing, all the
10 reference materials, fraud, waste and abuse, the
11 technician certifications, those types of things.
12     Q. And would there be a control box that
13 would be contained at each Giant Eagle retail
14 pharmacy?
15     A. Yes.
16     Q. And would the control box contain the
17 same basic set of -- would you call them policies
18 or procedures or how would you describe them?
19     A. Both.
20     Q. Would there be things beyond just
21 policies and procedures in the control box?
22     A. I don't recall exactly what was in each
23 tab of the box, but things like the order records.
24 If you had CIIs, those order records would be
25 maintained, or dispensing logs associated with it.

Page 64

1     At one time I want to say that there was
2 records of the actual audits we would do monthly,
3 but that moved over to an electronic format, and I
4 can't recall if that was part of the box after
5 that.
6     Q. The third thing I had was audit
7 procedures. So if you could, just describe for me
8 what the audit procedures were.
9     A. First of all, the state and local
10 authorities would do audits at will. In terms of
11 ours, we did quarterly audits that were all
12 inclusive of operational practice. That included
13 making sure that the box was in order and the
14 things that needed to be there were in there.
15     Every month we would audit every controlled
16 substance. Annually we would do a hand count of
17 every controlled substance in the pharmacy. We
18 would do routine audits, virtual inventory logs,
19 lots of stuff like that.
20     Q. So for those audits of controlled
21 substances, would you do a physical count of each
22 prescription --
23     MR. KOBRIN: Object to form.
24 BY MR. HUDSON:
25     Q. -- or each bottle? Describe for me what

Page 65

1 that procedure looked like.
2     MR. KOBRIN: Object to form.
3     THE WITNESS: Which procedure?
4 BY MR. HUDSON:
5     Q. The audit procedure.
6     A. Which one?
7     Q. For reviewing inventory.
8     A. Every month there was a requirement to
9 hand count every CII narcotic, record that against
10 what was dispensed.
11     Q. Was the process the same for Schedule II
12 controlled substances versus Schedule III
13 controlled substances?
14     A. Schedule IIIs through Vs, there was -- I
15 believe the state requires it every two years. We
16 did it annually.
17     Q. So was the monthly audit procedure
18 focused exclusively on the Schedule II controlled
19 substances?
20     A. That particular procedure was about
21 control IIs, yes.
22     Q. So there was not a monthly audit
23 procedure that applied to Schedule III controlled
24 substances?
25     MR. KOBRIN: Object to form.

Page 66

1    THE WITNESS: First of all, there was a
2 daily audit of all controls. We had a virtual
3 log. Every pharmacist got the chance to see the
4 virtual inventory dispensings and what was being
5 ordered on a nightly basis.
6    Records were printed every night in terms of
7 what was dispensed on the controlled substance.
8 I'm speaking specifically to a required audit
9 which was a monthly procedure, not day in/day out
10 operating procedures.
11    There was daily monitoring of who could touch
12 the safe, who could count. If anything, I think
13 we always erred on the side do more rather than
14 less when it came to procedures with controlled
15 substances.
16 BY MR. HUDSON:
17    Q. Were Schedule IIIs though in the vault?
18    A. I don't recall Schedule IIIs being in
19 the vault. Actually, Vicodin or hydrocodone
20 products, at one time I believe we made -- we
21 treated them with the same control II substance
22 policy. I don't recall the dates around that, but
23 I do recall moving the hydrocodone combination
24 products into the safe or at least a portion of
25 those. I don't recall the specifics of that.

Page 67

1    MR. KOBRIN: When you say vault, do you
2 mean the safe at the pharmacy, Ty?
3    MR. HUDSON: Yes.
4    THE WITNESS: That's what I'm assuming
5 you mean.
6 BY MR. HUDSON:
7    Q. Do you know anything more specific about
8 when the hydrocodone products were in part treated
9 as Schedule IIs timeframe?
10    A. I wasn't in that field anymore when that
11 happened. That happened after I not just left
12 Giant Eagle, but I was out of that type of
13 industry.
14    Q. So that was after you had left Giant
15 Eagle?
16    A. Oh, yeah, yeah. It wasn't during my
17 time there. But once again, we empowered the
18 pharmacists to put whatever process that they
19 wanted based on their situations. If the
20 pharmacists wanted to keep something in the safe,
21 they did.
22    Q. Are you aware of any pharmacists who
23 themselves diverted prescription drugs?
24    A. For personal use, yes, I'm aware of
25 those types of situations.

Page 68

1    Q. How about for reselling?
2    A. Not to my knowledge for reselling.
3    MR. KOBRIN: Object to form.
4    THE WITNESS: I don't know what, you
5 know -- I wouldn't be able to say.
6 BY MR. HUDSON:
7    Q. Approximately how many times did
8 pharmacists divert prescription drugs for their
9 own personal use?
10    MR. KOBRIN: Object to form.
11    THE WITNESS: It was rare. I couldn't
12 tell you how many times. It was rare, but it
13 happens in pharmacy.
14 BY MR. HUDSON:
15    Q. Anything more specific you can say? In
16 other words, any instances that you specifically
17 recall?
18    A. We caught these things because we had
19 good controls in place.
20    Q. You caught them before they happened or
21 you caught them after they happened?
22    MR. KOBRIN: Object to form.
23    THE WITNESS: I don't know that you can
24 catch something before it happens. But when
25 something would pop up on a report or something

Page 69

1 would be out of whack in terms of -- the ordering
2 system would show that, you know, you have an
3 order and no dispensing.
4    Whether it was on a routine audit of the
5 shelf, whether it was someone self reporting that
6 someone is violating a policy into a store, we
7 would do investigations of anything that had --
8 that looked unusual to see if it was diversion.
9 BY MR. HUDSON:
10    Q. How many investigations would you say
11 Giant Eagle conducted between 2007 and 2014 to
12 investigate potential personal diversion by
13 pharmacists?
14    MR. KOBRIN: Object to form.
15    THE WITNESS: I couldn't say. Not a
16 lot, but when needed. If there was a trigger, we
17 investigated. That I can say every time. But the
18 number, I wouldn't be able to tell you that.
19 BY MR. HUDSON:
20    Q. Do you know if it's more or less than a
21 hundred?
22    MR. KOBRIN: Object to form.
23    THE WITNESS: I honestly couldn't tell
24 you that.
25 BY MR. HUDSON:

Page 70

1    Q.   Any ballpark range you can give?  In
2  other words, I'm trying to get an understanding.
3  Between 2007 and 2014, could you say more or less
4  than a thousand times it happened, 10,000?  Is
5  there some outer range?
6       MR. KOBRIN:  Object to form.  He said it
7  was rare.
8       THE WITNESS:  I was just going to say
9  the same thing.  It was infrequent.  An exact
10  number I couldn't tell you.  The range would be a
11  very small range.
12  BY MR. HUDSON:
13    Q.   Do you have some sense of the total
14  dosage units of, for example, hydrocodone
15  combination products that Giant Eagle dispensed in
16  any given year?
17       MR. KOBRIN:  Object to form.
18       THE WITNESS:  No, I don't.  I didn't
19  track specific hydrocodone only.  There was
20  reporting in terms of controlled substance overall
21  usage, but I couldn't -- I couldn't be specific
22  about the number.
23  BY MR. HUDSON:
24    Q.   Could you be just general?  In other
25  words, would you say it's hundreds of millions of

Page 71

1  dosage units or tens of millions dosage units
2  nationwide through all the Giant Eagle stores?
3       MR. KOBRIN:  Object to form.
4       THE WITNESS:  No.  I know that our
5  overall controlled substances dispensing was a
6  very minor portion of our overall dispensing.
7  BY MR. HUDSON:
8    Q.   In terms of volume or profits?
9    A.   Volume.  I have no idea what the
10  relationship to profit is on those.  We didn't
11  track it that way.
12    Q.   Did you ever have any responsibilities
13  where you were responsible for looking on the
14  revenue side of how prescriptions of controlled
15  substances impact the overall revenue of the
16  pharmacies?
17       MR. KOBRIN:  Object to form.
18       THE WITNESS:  Giant Eagle didn't have a
19  requirement to track controlled substance revenue,
20  no.
21  BY MR. HUDSON:
22    Q.   Prescriptions in general?
23    A.   I'm in the pharmacy business, so yes.
24  Part of that is making sure that we dispense and
25  we're a profitable company, but never something

Page 72

1  specific to a controlled substance.
2    Q.   Were prescription drugs -- would you
3  describe them as one of the more profitable
4  portions of the Giant Eagle business or less
5  profitable?  How would you describe that?
6       MR. KOBRIN:  Object to form.  No
7  foundation.
8       THE WITNESS:  I couldn't describe them
9  in any way.  Every drug has its own cost and sales
10  base.  We never tracked it down to that level.
11  BY MR. HUDSON:
12    Q.   Within Giant Eagle were there ever any
13  efforts to try to increase the number of
14  prescriptions being written at Giant Eagle retail
15  pharmacies?
16    A.   Being written, no.
17    Q.   Being filled.  I'm sorry.
18    A.   When you're in a retail model, what you
19  try to do, you try to capture more lives into your
20  business model with marketing, et cetera, but
21  nothing ever specific to -- we didn't create
22  lives.  We don't write the prescriptions.
23  Obtaining more market share obviously is a goal of
24  any business.
25    Q.   Were there ever efforts to try to

Page 73

1  increase the number of prescriptions being filled
2  at Giant Eagle retail pharmacies?
3    A.   We had efforts to draw more customers
4  into our stores to get their prescription needs
5  filled.
6    Q.   What about any efforts by Giant Eagle to
7  form relationships with pain management clinics or
8  other organizations that were writing
9  prescriptions for controlled substances?
10    A.   No.
11       MR. KOBRIN:  Object to form.
12       THE WITNESS:  No.  We never targeted any
13  particular segment of writing or pharmaceutical
14  practice.
15  BY MR. HUDSON:
16    Q.   You never heard of or are aware of any
17  efforts by Giant Eagle to either try to form
18  relationships with places like the Cleveland
19  Clinic or other places where prescriptions are
20  being dispensed -- I'm sorry -- prescriptions are
21  being written?
22    A.   Having relationships with -- good
23  relationships with any kind of medical practice,
24  but not -- I'm not aware of for a specific -- to a
25  particular entity or anything like that, no.

Page 74

1 Communities all have their own, you know, sources
2 of which medical practices will write and I'm sure
3 there's local relationships just because you do so
4 much business with them when they call. They have
5 relationships that way, but not formal
6 relationships with particular areas that write
7 prescriptions, not that I can recall, nothing like
8 that.
9     Q.  Describe for me what you mean by
10 relationships that exist over time.
11     A.  Sure. When you're in a pharmacy, you
12 could get the same doctors' offices call 20 times
13 with calling in prescriptions. You get to know
14 who those folks are and their voices, that type of
15 thing. But not formal business relationships.
16     Q.  Was there any effort by Giant Eagle
17 to try to track the volumes of prescriptions being
18 written by different entities that were, for lack
19 of a better phrase, repeat players?
20     A.  Oh, no, no, that I'm aware of.
21         MR. KOBRIN:  Object to form. Wait until
22 he finishes asking his question. Then answer.
23 BY MR. HUDSON:
24     Q.  If we go back to the list just of
25 policies or procedures that we were talking about,

Page 75

1 we talked now about audit procedures; right?
2     A.  Yeah.
3     Q.  And just so the record is clear, am I
4 correct that the monthly audit procedure that you
5 described did not relate to Schedule III
6 controlled substances?
7     A.  No. I talked --
8         MR. KOBRIN:  Object to form.
9         THE WITNESS:  I talked about many
10 procedures inclusive of a monthly physical count
11 of Schedule IIs. There were daily audits,
12 minute-by-minute audits of these. Every time you
13 dispense one, you're basically checking it out
14 versus -- you have an opportunity to check it
15 against the virtual inventory.
16     In my definition, you would have audits of
17 these every time you touched them. But the
18 monthly audit you're referring to is specific
19 about a requirement to hand count.
20 BY MR. HUDSON:
21     Q.  That's what I'm focused on, is the
22 monthly audit procedure that you talked about.
23 That did not apply to Schedule IIs, correct,
24 Schedule IIIs; correct?
25     A.  There wasn't a monthly requirement to

Page 76

1 hand count Schedule IIIs, but every time you
2 dispense, you have to make sure that the virtual
3 inventory matched what was on the shelf.
4     Q.  Well, sir, if every time you dispensed
5 you had to make sure that the virtual inventory
6 matched what was the shelf, why would you bother
7 with doing a monthly?
8     A.  Because it's a required procedure.
9     Q.  In your mind, was it necessary?
10     A.  It's a required procedure, so that makes
11 it necessary.
12     Q.  Other than what you talked about, just
13 the process of there being logs that tracked
14 Schedule IIIs when they were being dispensed, any
15 specific audit procedures that related to those?
16         MR. KOBRIN:  Object to form.
17         THE WITNESS:  Every time you pull one of
18 them off the shelf, you have an opportunity to
19 check it against a virtual inventory balance. So
20 every time you touch them, you got the opportunity
21 to do that.
22 BY MR. HUDSON:
23     Q.  What do you mean by virtual inventory
24 balance?  The inventory in the warehouse, the
25 inventory in the pharmacy?

Page 77

1     A.  My answers will always be about what
2 happens inside the pharmacy. When you start a
3 prescription and you select a prescription in the
4 operating system, it gives you -- it will say the
5 inventory should have X.
6     When you pull it out, every time you touch
7 it, you'll be able to see what you have on the
8 shelf versus what it says you should have on the
9 shelf. So you do that every time you touch it.
10     Q.  And that would be a control focused on
11 avoiding theft? In other words, is that the point
12 of having that inventory control in place?
13         MR. KOBRIN:  Object to form.
14         THE WITNESS:  Well, not specific to
15 theft. It's about the best pharmacy practices we
16 could put into place. We had a wide range of
17 controls. Although I can't speak specific to what
18 happens before it gets to the pharmacy, we did
19 have an integrated system of making sure that we
20 had many, many checkpoints -- we were all the same
21 company -- to make sure that a controlled
22 substance from start to finish was being handled
23 in the most appropriate way to prevent diversion.
24 BY MR. HUDSON:
25     Q.  What specifically then occurred at the

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  warehouse?

2      A.  I can't speak to what specifically
3  occurred at the warehouse.

4      Q.  So in terms of integration, it wasn't so
5  integrated that you understood what was going on
6  at the warehouse; right?

7          MR. KOBRIN:  Object to form.

8          THE WITNESS:  It was integrated in the
9  way that we had coordination meaning that if there
10 was a question that the warehouse had, all they
11 had to do was pick up a phone and call us.

12     The products that were shipped from the
13 warehouse sat on our shelves.  So we had chain of
14 custody the entire way through within the same
15 organization.

16     We had multiple steps of policies and
17 procedures including training, how to accept
18 medications, how to dispense them, virtual
19 inventories, monthly audits, daily dispensing
20 records and logs, audits at the checkpoints when
21 you fill the prescription, quarterly audits that
22 the supervisors did, random checks, physical
23 inventories that we had in place, DEA and state
24 audits.

25     We had multiple, multiple integrated

Page 79

1  checkpoints.

2  BY MR. HUDSON:

3      Q.  You keep talking about integrated, but
4  all of those things are things that you've
5  testified happened at the retail pharmacy level;
6  correct?

7          MR. KOBRIN:  Object to form.

8          THE WITNESS:  What I'm saying is if you
9  ask me specific questions of policies and
10 procedures for the warehouse, I didn't touch that
11 part of the business, but that doesn't mean it's
12 not integrated in the way that we as one company
13 are just basically -- that we're distributing to
14 ourselves.  So by definition, to me that's
15 integrated to begin with.

16 BY MR. HUDSON:

17     Q.  But my point is not only did you not
18 touch the policies and procedures at the
19 warehouse, but as you sit here today, you don't
20 even know what they were; right?

21         MR. KOBRIN:  Object to form.

22         THE WITNESS:  What I don't know is what
23 the specific legal requirements are for warehouse
24 distribution.  What I do know is when the
25 organization had policies and procedures in terms

Page 80

1  of what needed to happen and how it impacted the
2  part of the business, yes, we were integrated in
3  that way.

4  BY MR. HUDSON:

5      Q.  What were the policies and procedures
6  then at the warehouse?

7          MR. KOBRIN:  Object to form.  Asked and
8  answered.

9          THE WITNESS:  I can't tell you what
10 policies and procedures at the warehouse
11 specifically are.

12 BY MR. HUDSON:

13     Q.  What did the warehouse do to monitor
14 orders to determine orders of unusual size?

15         MR. KOBRIN:  Object to form.  Asked and
16 answered.

17         THE WITNESS:  I know the warehouse
18 had -- they would have a report that if they had
19 questions as to why an order was placed, they
20 could pick up the phone and call, and we would be
21 required to give a response that was satisfactory
22 to satisfy the inquiry.

23 BY MR. HUDSON:

24     Q.  And how many times did that happen?

25     A.  When needed.

Page 81

1      Q.  How many times was it needed?

2          MR. KOBRIN:  Object to form.

3          THE WITNESS:  When needed.  I don't
4  track how many times I picked up the phone and
5  called somebody.

6  BY MR. HUDSON:

7      Q.  Is there any documentation though that I
8  can look to from the warehouse level that would
9  tell me the number of calls that were made from
10 the warehouse to any retail pharmacy during any
11 time period?

12         MR. KOBRIN:  Object to form.

13         THE WITNESS:  I don't know of any legal
14 requirement to keep a log of those types of
15 things.  It would be silly when you're the same
16 company.  We were distributing to ourselves.  So
17 the drugs were going to known pharmacies sitting
18 on shelves.

19     If there was a question or something, you had
20 to look no further than the shelf of the pharmacy.

21 BY MR. HUDSON:

22     Q.  For example, a phoney prescription, I
23 mean phoney prescriptions, how do you avoid that
24 happening?

25         MR. KOBRIN:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 THE WITNESS: The pharmacist
2 scrutinized. There's plenty of -- they're trained
3 to understand what legal requirements are for a
4 prescription, is the doctor's signature familiar,
5 did they put their DEA number on it. They would
6 call and verify with physicians if there was any
7 question.
8 There was records of what the patient
9 dispensing was. The states had systems in place.
10 I can't remember the names of these systems. Ohio
11 and Pennsylvania had systems in place that were
12 able to track dispensing even outside of the
13 pharmacy that would send flags.
14 BY MR. HUDSON:
15 Q. Is that the OARRS system?
16 A. Yes. Thank you. The OARRS system is an
17 example of that. Even our operating system would
18 flag if something was being filled at a high
19 frequency, not to mention insurance companies
20 themselves. The payers would actually block,
21 those types of things, if a prescription was
22 filled too soon.
23 Q. Where could I go, for example, within
24 the company to look at any documentation to try to
25 figure out what actions were taken to comply, for

Page 83

1 example, with OARRS?
2 MR. KOBRIN: Object to form.
3 THE WITNESS: I'm not familiar with
4 where specifically you would look for that.
5 BY MR. HUDSON:
6 Q. Well, how do they figure out whether you
7 were complying with OARRS or not?
8 MR. KOBRIN: Object to form.
9 THE WITNESS: I think the states have
10 auditing agencies to make sure we were complying.
11 I can't speak to the specifics of how OARRS
12 worked, but I know they track our compliance
13 electronically.
14 BY MR. HUDSON:
15 Q. Tell me, if you could, what you know
16 about OARRS.
17 MR. KOBRIN: Object to form.
18 THE WITNESS: Just general that the
19 state tracks a log of dispensing of controlled
20 substances and extracts that information in some
21 kind of IT, electronic way, from pharmacies.
22 MR. HUDSON: Let's pull up 1187.
23 (HBC-Mollica Exhibit 3 was marked.)
24 BY MR. HUDSON:
25 Q. I hand you what I've marked as

Page 84

1 Exhibit 3.
2 MR. KOBRIN: Do you have a copy for us
3 or should we share?
4 MR. HUDSON: Yeah. You can just look up
5 there.
6 MR. KOBRIN: Okay. I want to be sure we
7 have the whole document.
8 BY MR. HUDSON:
9 Q. Mr. Mollica, if you look here at what
10 we've marked as Exhibit 3, is this an example or a
11 description, I guess, of the OARRS requirement
12 that was enacted into law in Ohio?
13 A. I'm seeing this document for the first
14 time. So I -- it looks to be an example of that.
15 I'm not familiar with this particular document.
16 Q. Are you familiar with OARRS at all?
17 A. Yeah. I'm familiar with what OARRS are.
18 The specific -- the detailed requirements I'm not
19 that intimate with.
20 Q. What generally is OARRS?
21 MR. KOBRIN: Object to form. Asked and
22 answered.
23 THE WITNESS: It's a database of
24 collecting dispensing across pharmacies for the
25 state.

Page 85

1 BY MR. HUDSON:
2 Q. And that became a requirement under Ohio
3 law?
4 MR. KOBRIN: Object to form.
5 THE WITNESS: That's my understanding,
6 yes.
7 (HBC-Mollica Exhibit 4 was marked.)
8 BY MR. HUDSON:
9 Q. If we look to -- I'm going to hand you,
10 again, my copy -- I apologize, I don't have extra
11 copies -- of what I've marked as Exhibit 4. And
12 this has an internal number of 1186.
13 If you could, just ignore the highlighting on
14 that copy. We'll get that switched out. My focus
15 is on the bottom half.
16 Who is James Cornwell?
17 A. He was an employee at Giant Eagle. He
18 had -- he worked in an IT style function.
19 Q. And do you see here he's written an
20 email on January 3, 2014?
21 A. Yes.
22 Q. And the subject line is Ohio State Board
23 Of Pharmacy - November 2013 - Change to OARRS
24 Report - "80 MED" threshold scoring system.
25 Do you see that?

Page 86

1    A.  I do.
2    Q.  And then within his email, he said,
3  "Concerning the warehouse side of the reporting, I
4  did some digging and I found we're in compliances
5  in ARCOS.  They require CII, CIII and selected
6  CIVs.  However, we're not in compliance with
7  OARRS."
8    Do you see that?
9    A.  I see that.
10    MR. KOBRIN:  Can he read the whole
11  email?  Do you mind, Ty?
12    MR. HUDSON:  Sure.  Take your time.
13    (Witness reviewed the exhibit.)
14    THE WITNESS:  Okay.  I've read it.
15  BY MR. HUDSON:
16    Q.  My question is just on this specific
17  email.  Would you agree that in this email,
18  Mr. Cornwell is indicating that the organization
19  was not in compliance with OARRS?
20    A.  No.  I would say, having read the
21  document, that he's saying there's a question on
22  one particular product in terms of the OARRS
23  report for compliance.
24    Q.  But would you agree at least in one
25  respect, he's saying that the organization is not

Page 87

1  in compliance with OARRS?
2    A.  I can acknowledge that he says in this
3  email -- he makes a statement, but I don't know
4  that it's a factual statement or not.  That's his
5  statement.
6    Q.  But this is at least one example of a
7  Giant Eagle employee indicating that the
8  organization was not in compliance with OARRS, at
9  least in one respect; is that fair?
10    A.  I think there's a question on it, and he
11  wouldn't be in a position to really know that or
12  not, being an IT person.
13    Q.  So in your view, he's asking a question
14  in this email?
15    A.  Yeah.
16    MR. KOBRIN:  Object to form.
17    THE WITNESS:  I think he's phrasing a
18  question.
19  BY MR. HUDSON:
20    Q.  When he wrote, "However, we are not in
21  compliance with OARRS," you interpret that as him
22  asking a question?
23    A.  I'm interpreting it as I don't know if
24  he can say that as a factual statement or not.  I
25  don't know what Jim Cornwell's actual knowledge of

Page 88

1  what the requirement is.
2    Q.  In the next paragraph, he says, "I feel
3  that we need to make adjustments and supply an
4  additional report"; right?
5    A.  But that's actually what my point is.
6  He said I feel we need to.  I don't know that
7  that's based on fact or not.
8    Q.  He does there recommend a specific
9  course of action, right, to supply an additional
10  report?
11    A.  That's what I see.
12    Q.  Do you know whether or not Giant Eagle
13  ever supplied an additional report?
14    A.  I don't know.  I wasn't part of this
15  email chain in that particular situation.
16    Q.  Do you know if any actions were taken by
17  Giant Eagle to attempt to address these new OARRS
18  changes?
19    MR. KOBRIN:  Object to form.
20    THE WITNESS:  I don't know the specifics
21  of this particular piece, but my knowledge of
22  Giant Eagle is whatever is required was going to
23  be done.
24  BY MR. HUDSON:
25    Q.  And would that be true of the entire

Page 89

1  company in all respects?
2    MR. KOBRIN:  Object to form.
3    THE WITNESS:  That's my belief.
4  BY MR. HUDSON:
5    Q.  So during the entire time at the
6  company, you can't think of one time where there
7  weren't actions taken to comply with the law?
8    MR. KOBRIN:  Object to form.
9    THE WITNESS:  Not to my knowledge, no.
10  I don't recall ever a time that we didn't comply
11  with the law.
12  BY MR. HUDSON:
13    Q.  So there were never pharmacists who ever
14  took actions that didn't comply with the law?
15    MR. KOBRIN:  Object to form.
16    THE WITNESS:  Now that I understand your
17  question, has an individual broken a law before?
18  I can't speak to the specifics of that, but I know
19  the company stance is we follow all procedures.  I
20  feel confident that that's how we do things.
21    (HBC-Mollica Exhibit 5 was marked.)
22  BY MR. HUDSON:
23    Q.  Let me hand you what I've marked as
24  Exhibit 5.
25    MR. HUDSON:  This one I do have copies

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 of.
2 BY MR. HUDSON:
3 Q. Mr. Mollica, my questions are going to
4 be focused on pages 4, 5, 6 and 7 of this
5 document.
6 A. Are these numbers or numbered?
7 Q. No, I'm sorry, I don't believe the pages
8 are numbered.
9 A. You said 4?
10 Q. Yeah, where it says Settlement Agreement
11 with the State Board of Pharmacy. Then underneath
12 that, Giant Eagle #4098.
13 Do you agree or do you see at the front that
14 these are minutes of the December 5 through 7,
15 2011 meeting of the Ohio State Board of Pharmacy?
16 A. Yes.
17 Q. And Giant Eagle operated retail
18 pharmacies in Ohio; correct?
19 A. Yes.
20 Q. And do you know Kelly Chappell?
21 A. I'm familiar who she is.
22 Q. Who is Kelly Chappell?
23 A. A pharmacist.
24 Q. And was she a pharmacist at a Giant
25 Eagle pharmacy in Ohio?

Page 91

1 A. Yes.
2 Q. And do you see on the seventh page of
3 this document -- I apologize it's two sided -- do
4 you see the signature of Kelly Chappell there
5 dated 11/11/2011?
6 A. I don't see a signature, no. I'm sorry.
7 Q. No problem.
8 A. I see a line where it has her name on
9 it, yes.
10 Q. You see the S?
11 A. Yes. Thank you.
12 Q. So it's an electronic signature.
13 A. Understood.
14 MR. KOBRIN: Ty, do you know if it's
15 related to the jurisdictional question?
16 MR. HUDSON: I don't.
17 BY MR. HUDSON:
18 Q. If you could, just take a moment to look
19 at the section of these minutes that start
20 Settlement Agreement with the State Board of
21 Pharmacy, Docket Number D-110714-197, that page
22 through the page which Ms. Chappell has signed.
23 MR. KOBRIN: I have a standing objection
24 to this because I think this incident and
25 everything related to it occurred outside of the

Page 92

1 City of Cleveland, County of Summit, County of
2 Cuyahoga and any other jurisdiction relevant to
3 this Track One case. I'm not sure how this is
4 relevant.
5 (Witness reviewed the exhibit.)
6 THE WITNESS: I've read it.
7 BY MR. HUDSON:
8 Q. Mr. Mollica, have you had a chance to
9 review the settlement agreement between Giant
10 Eagle and the State Board of Pharmacy?
11 A. The four pages that start on page 4 and
12 end with Kelly Chappell's signature, yes.
13 Q. Yes. If you see on the first page
14 there, I guess a third of the way down on page 4,
15 it starts out R2012-102 Settlement Agreement with
16 the State Board of Pharmacy.
17 A. Yes.
18 Q. And before coming here today, were you
19 aware that Giant Eagle pharmacy entered into a
20 settlement agreement with the State Board of
21 Pharmacy in Ohio?
22 A. Yes.
23 MR. KOBRIN: Objection.
24 BY MR. HUDSON:
25 Q. You were aware of this particular

Page 93

1 agreement?
2 A. I don't know the details of the
3 agreement, but I'm aware there was a situation in
4 that particular location and that we complied with
5 whatever the state board pieces were.
6 MR. KOBRIN: Ty, do you consent to our
7 standing objection on this being outside the
8 jurisdiction?
9 MR. HUDSON: Yes.
10 BY MR. HUDSON:
11 Q. Mr. Mollica, you've testified to your
12 knowledge, Giant Eagle always complied with the
13 law; right?
14 A. That's correct.
15 Q. But this would be an example where the
16 State of Ohio Board of Pharmacy charged Giant
17 Eagle with not complying with the law; correct?
18 MR. KOBRIN: Object to form.
19 THE WITNESS: That's actually not how
20 I'm reading it, no.
21 BY MR. HUDSON:
22 Q. You don't read this as the State of Ohio
23 accusing Giant Eagle Pharmacy of not complying
24 with the law?
25 MR. KOBRIN: Object to form.

Page 94

1    THE WITNESS:  Could you direct me to a
2  particular passage where it says that Giant Eagle
3  was compliant with the law?
4  BY MR. HUDSON:
5    Q.  Was not compliant with the law?
6    A.  Could you direct me to a part there?
7    Q.  I'll just walk you through.  We'll go
8  through numbers two, three.
9    Number two says, "Giant Eagle Pharmacy #4098
10  did from May 1, 2009 through January 21, 2011 fail
11  to provide effective and approved controls and
12  procedures to deter and detect theft and diversion
13  of dangerous drugs, to wit:  The following
14  controlled substances and dangerous drugs where
15  stolen from the pharmacy, yet internal control
16  procedures failed to deter or detect the theft.
17  The drugs were stolen by an inadequately
18  supervised technician who admitted to a board
19  agent that the drugs were diverted to her addicted
20  husband and also sold to another individual."
21    A.  I see that line, but I don't see a
22  reference that it's not complying with the law.
23  It sounds like a criticism of the internal
24  control.
25    Q.  Who has the responsibility to create

Page 95

1  internal controls?
2    MR. KOBRIN:  Object to form.
3    THE WITNESS:  Everyone including the
4  pharmacist, the company, everybody.
5  BY MR. HUDSON:
6    Q.  Who is the named party in this action
7  that's brought by the Ohio State Board of
8  Pharmacy?
9    MR. KOBRIN:  Object to form.
10    THE WITNESS:  I don't know how to read
11  the legal document.  Are you referring to Giant
12  Eagle 4098?
13  BY MR. HUDSON:
14    Q.  Yeah.  The legal entity is Giant Eagle;
15  right?
16    A.  Yeah.
17    MR. KOBRIN:  Object to form.
18    (HBC-Mollica Exhibits 6 - 7 were marked.)
19  BY MR. HUDSON:
20    Q.  As an example, I'll show you.  Let me
21  mark a couple more.  We can look at those and
22  compare those.  I hand you what I've marked
23  Exhibit 6.  We'll mark this one as Exhibit 7.
24    If we take a look here, Exhibit 5 are minutes
25  of the December 5 through 7, 2011 meeting of the

Page 96

1  Ohio State Board of Pharmacy.  Do you see that?
2  That's the one we've been talking about.
3    A.  Yes.
4    Q.  And if you look there, the named entity
5  in the action by the Ohio State Board of Pharmacy
6  is Giant Eagle; right?
7    A.  Right.  Okay.
8    Q.  Now, if we look at Exhibits 6 and 7,
9  those are minutes of the November 2 through 4,
10  2009 Ohio State Board of Pharmacy and then minutes
11  of the January 4 through 6, 2010 Ohio State Board
12  of Pharmacy; right.  Do you see that?
13    A.  Yes.
14    Q.  So if you look at these two -- and,
15  again, I apologize these aren't numbered -- but if
16  you look at these two and you go back one, two,
17  three, four, five, six, the seventh full page.
18    MR. KOBRIN:  This is Exhibit 6?
19    MR. HUDSON:  This is 7.
20  BY MR. HUDSON:
21    Q.  Sixth page back and actually onto the
22  next, seventh page, right, do you see that?
23    A.  Yes.
24    Q.  Do you see there Justin Allan Bracken?
25    MR. KOBRIN:  Which one?

Page 97

1    THE WITNESS:  Would you turn yours so I
2  can make sure?
3  BY MR. HUDSON:
4    Q.  Sure.  Exhibit 6.
5    A.  No.  I got that.  The page you're on.
6    Q.  It's just the back, I think, of page 6 I
7  believe.
8    MR. KOBRIN:  Six of six?
9    MR. HUDSON:  Yep, and seven, the back
10  page of it.
11    THE WITNESS:  These are single pages.
12    MR. HUDSON:  That's why.  It's probably
13  14.
14  BY MR. HUDSON:
15    Q.  If you could just in Exhibit 6, the
16  pharmacist is Justin Allan Bracken and in Exhibit
17  7, the pharmacist is Myra Joy Hindes.  It should
18  be page 12.
19    So in Exhibit 6 you see the pharmacist is the
20  named party Justin Allan Bracken?
21    A.  Yes.
22    MR. KOBRIN:  Is this a Giant Eagle case?
23    MR. HUDSON:  Yes.
24  BY MR. HUDSON:
25    Q.  And then if we look at Exhibit 7, we go

Page 98

1   back, I believe, the 13th page.
2        MR. KOBRIN:  Do you know if these fall
3   within the jurisdiction?
4        MR. HUDSON:  I don't, but I'll give you
5   a standing objection.
6        MR. KOBRIN:  This one is in West
7   Virginia?
8        MR. HUDSON:  She's a pharmacist in West
9   Virginia.
10       THE WITNESS:  Can we have a standing
11  objection to the reference pages on Exhibit 7,
12  outside the jurisdiction in this case, and also a
13  standing objection as to Mollica 6 which I believe
14  is also outside the jurisdictions in this Track
15  One litigation, in Track One of this litigation.
16  So both of these incidents are unrelated to Track
17  One.
18  BY MR. HUDSON:
19       Q.  Mr. Mollica, do you see there on
20  Exhibit 7 that the pharmacist is the person named?
21       A.  Yes.
22       Q.  And I'll represent to you in both of
23  these cases, they relate to incidents that
24  occurred at Giant Eagle pharmacies.  Okay?
25       A.  Okay.

Page 99

1        Q.  If we go back to Exhibit 5, you agree
2   that particular set of instances, the Ohio State
3   Board of Pharmacy was charging Giant Eagle with
4   having insufficient internal controls; correct?
5        A.  Yeah.  My original question was I just
6   didn't know how to read the document.
7        Q.  Right.  But you agree though now
8   understanding how to read the document this is an
9   example of the Ohio State Board of Pharmacy
10  accusing Giant Eagle of not complying with the
11  law; correct?
12       MR. KOBRIN:  Object to form.
13       THE WITNESS:  I just don't agree with
14  that statement.  There's a -- there's a question
15  about were the practices effective enough, but it
16  doesn't state anything about not following the
17  law.
18  BY MR. HUDSON:
19       Q.  The State of Ohio Board of Pharmacy
20  accused Giant Eagle of not having internal control
21  procedures to deter or detect the theft of these
22  controlled substances; right?
23       MR. KOBRIN:  Object to form.
24       THE WITNESS:  As I'm reading it, it's
25  stating that the controls that we have in place

Page 100

1   weren't effective in this case.
2   BY MR. HUDSON:
3        Q.  Right.  And as a result, they've brought
4   an action against Giant Eagle.
5        A.  Yes.
6        MR. KOBRIN:  Object to form.
7   BY MR. HUDSON:
8        Q.  They didn't bring this action against
9   the individual pharmacist.  They brought it
10  against Giant Eagle.
11       MR. KOBRIN:  Object to form.
12       THE WITNESS:  As I'm reading this, that
13  would be my understanding.  I'm not that familiar
14  with legal documents like this.
15  BY MR. HUDSON:
16       Q.  Sure.  If we go to the third paragraph,
17  it says, "Giant Eagle Pharmacy #4098 did from
18  May 1, 2009 through January 21, 2011 fail to
19  provide effective and approved controls and
20  procedures to deter and detect theft and diversion
21  of dangerous drugs, to wit:  The following
22  controlled substances and dangerous drugs were
23  stolen from the pharmacy, yet internal control
24  procedures failed to deter or detect the theft.
25  The drugs were stolen by an inadequately

Page 101

1   supervised technician who admitted to a Board
2   agent that the drugs were diverted to her addicted
3   husband and also sold to another individual."
4        Do you see that?
5        A.  I see that.
6        Q.  And then down below, it's got a list of
7   drugs.  Do you see there a series of hydrocodone
8   combination products?
9        A.  Yes.
10       Q.  Of different strengths; correct?
11       A.  Yes.
12       Q.  Then underneath that, it says, "Such
13  conduct is in violation of Rule 4729-9-05 of the
14  Ohio Administrative Code."
15       A.  Yes.
16       Q.  And this document shows Giant Eagle
17  entering into a settlement of these accusations;
18  correct?
19       MR. KOBRIN:  Object to form.
20       THE WITNESS:  That's how I would
21  interpret it with the couple paragraphs I read.
22  BY MR. HUDSON:
23       Q.  Sure.  If Giant Eagle had the internal
24  control procedures in place like you talked about
25  that were tracking specifically each order as it

Page 102

1 was being filled, why then was Ohio charging them
2 with having inadequate internal controls?
3         MR. KOBRIN:  Object to form.  You're
4 asking him not only to understand what someone
5 else did, but what another state entity did?
6         THE WITNESS:  I can't speak to what
7 Ohio's position was on it.  We had controls in
8 place.  It looks like in this particular
9 situation, an employee who understood our
10 procedures was violating those procedures.
11 BY MR. HUDSON:
12     Q.   Right.  In a couple of other instances,
13 the State of Ohio actually sued or brought
14 charges, I should say, or brought actions against
15 those two specific pharmacists; right?
16     A.   I don't know.  I honestly don't know.
17     Q.   Well, that's Exhibits 6 and 7 that we
18 looked at; right?
19     A.   You asked me to look at a name on
20 Exhibit 7.
21     Q.   Let's just take a quick look then, if we
22 could, at Exhibit 6 and go back to that section in
23 the action against Justin Allan Bracken.
24         MR. KOBRIN:  You're consenting to our
25 standing objection on 6 and 7, Ty?

Page 103

1         MR. HUDSON:  Yes.
2 BY MR. HUDSON:
3     Q.   If you look there, and we go back to --
4 the action against Justin Allan Bracken, if you go
5 back to the fourth page of this particular action,
6 look at paragraph 8.
7     So in this particular case, this is Ohio
8 making allegations specifically against Justin
9 Allan Bracken.  Do you see that?
10     A.   Yes.
11     Q.   "That he did from April 30, 2007 to
12 May 20, 2009 with purpose to divert, knowingly
13 obtain or exert control over dangerous drugs, the
14 property of Giant Eagle Pharmacy #4152 beyond the
15 express or implied consent of the owner, to wit:
16 Justin Allan Bracken possessed a stock container
17 of" -- do you know how to pronounce that drug?
18     A.   Temazepam.
19     Q.   -- "temazepam, 15-milligram, from his
20 employer.  Audit figures indicate shortages of the
21 same drug Justin Allan Bracken possessed."
22     Do you see that?
23     A.   Yes.
24     Q.   If we look in Exhibit 6, this would be
25 an example where the audit figures actually caught

Page 104

1 Justin Allan Bracken taking possession of these
2 controlled substances; is that fair?
3         MR. KOBRIN:  Object to form.
4         THE WITNESS:  You can imply that from
5 here.  I don't know the exact circumstances of how
6 he was caught.
7 BY MR. HUDSON:
8     Q.   It says audit figures indicate shortages
9 of the same drugs Justin Allan Bracken possessed;
10 right?
11     A.   Sure.  I guess I'm just saying I don't
12 know if that's how he was caught.
13     Q.   If we go back to Exhibit 5, the action
14 against Giant Eagle, in that particular situation,
15 the State of Ohio Board of Pharmacy is actually
16 bringing the action against Giant Eagle because
17 its internal controls failed to detect these
18 actions being taken; right?
19         MR. KOBRIN:  Object to form.
20 Misrepresents the exhibit.
21         THE WITNESS:  I disagree.  Internal
22 controls would have caught a shortage if someone
23 was manipulating internal controls.  That's my
24 feeling on what was going on here.
25

Page 105

1 BY MR. HUDSON:
2     Q.   Your feeling would be that if somebody
3 was manipulating the drugs, the internal controls
4 would catch them each and every time?
5         MR. KOBRIN:  Object to form.
6         THE WITNESS:  No.  I'm saying if someone
7 was manipulating the internal control, the person,
8 in this case, a pharmacist who we put in charge of
9 keeping the standard of our internal control, was
10 manipulating that control in this particular
11 situation, they would -- it created, it looks
12 like, a diversion.
13     But that's not to imply that there wasn't
14 internal controls that wouldn't have caught it if
15 someone is manipulating those internal controls.
16 BY MR. HUDSON:
17     Q.   Do you know why Giant Eagle agreed to
18 settle these accusations by the State of Ohio
19 Board of Pharmacy?
20         MR. KOBRIN:  Object to form.
21         THE WITNESS:  No.  I don't know the
22 specifics on why.
23 BY MR. HUDSON:
24     Q.   Do you have any more knowledge about
25 whether Giant Eagle took any additional actions

Page 106

1 after the settlement to address the accusations by
2 Ohio that the internal controls were inadequate?
3 　　MR. KOBRIN: Object to form. It
4 misrepresents the evidence.
5 　　THE WITNESS: I know that as a result of
6 any incident, and especially ones like this, that
7 Giant Eagle took many actions to continually try
8 to improve and build new mousetraps when it comes
9 to internal controls and how we measure them.
10 BY MR. HUDSON:
11 　Q. Anything more specific you can say about
12 specific actions or steps Giant Eagle took after
13 the settlement with the Ohio Board of Pharmacy in
14 2011?
15 　A. Sure. I mean, I can't say that they're
16 specific to this particular situation, but from
17 2011 moving forward, there were things like moving
18 to more virtual inventory and moving away from
19 paper to electronics. There was a company called
20 Supply Logics that Giant Eagle engaged to bring
21 more visibility to this. You could see if an
22 associate was manipulating an internal control or
23 changing an inventory figure to read more
24 favorably on a report. Heightened awareness in
25 terms of physical audits that we would do, more

Page 107

1 training.
2 　We always tried to use situations where bad
3 players is an opportunity to reevaluate and come
4 up with new procedures to stay ahead of it.
5 　Q. In your mind, did the procedures at
6 Giant Eagle become better at detecting diversion
7 over time?
8 　A. I would like to think they became
9 better. That was always the goal, was to make it
10 better and better. You don't know what you don't
11 know. But when you see a weakness in an area or
12 if someone can exploit it, you work to try to stop
13 someone from being able to exploit it.
14 　　(HBC-Mollica Exhibit 8 was marked.)
15 BY MR. HUDSON:
16 　Q. Let me hand you what I marked as
17 Exhibit 8. For the record, Exhibit 8, the
18 internal number is P-HBC-1331.
19 　Mr. Mollica, these emails were obviously
20 written after you left the company, so you haven't
21 probably seen them before would be my guess.
22 　A. Years after I left the company it looks
23 like.
24 　Q. And my focus is on the middle email from
25 Mr. Chunderlik to others, and the topic is Control

Page 108

1 Limits. And you can see down below in the email
2 the question is asked: "Have we ever considered
3 limits on control/narcs like Rite-Aid does?"
4 　Then in response, Mr. Chunderlik wrote, "Hi,
5 Matt. When we initially developed the Controlled
6 Drug Dispensing Guideline, we tried to avoid
7 putting limits on the controls to allow the
8 pharmacists the ability to exercise their
9 professional responsibilities. This was back when
10 Anthony Mollica was here and at his direction.
11 That was three or four years ago...may be
12 something that we have to revisit."
13 　Is Mr. Chunderlik in his email accurate about
14 how the controlled drug dispensing guidelines
15 worked at the time that you were responsible for
16 those?
17 　A. I have no idea. I don't recall a
18 conversation with George from -- at that time it
19 would have been six to ten years ago. I don't. I
20 don't know if he was accurate or not.
21 　Q. Were there ever instances where Giant
22 Eagle put limits or controls that prevented
23 pharmacists from dispensing certain quantities of
24 controlled substances?
25 　　MR. KOBRIN: Object to form.

Page 109

1 　　THE WITNESS: I'm not aware of a limit
2 or control other than they're required by law to
3 follow the safety and dispensing requirements of
4 the drug and to question anything that doesn't
5 make sense to them with the physician and then
6 document it.
7 　We give pharmacists the ability to make those
8 decisions. We would never put a guideline as to
9 what they should or should not dispense. It's
10 their license and the practice of pharmacy that
11 guides that. We reinforce that at every
12 opportunity we have with pharmacists.
13 BY MR. HUDSON:
14 　Q. At the time that you were with Rite-Aid,
15 do you know whether Rite-Aid had controls or
16 limits?
17 　A. I actually --
18 　　MR. KOBRIN: Object to form. Just be
19 careful. I don't know how much we want to get
20 into your experience at Rite-Aid or any company
21 information with regard to Rite-Aid. So if you
22 think you're getting into anything that is
23 confidential or anything related to Rite-Aid, if
24 you can let us know before you testify to that
25 information.

Page 110

1  THE WITNESS: In my time as a pharmacy
2  supervisor with Rite-Aid, I'm not familiar with
3  any limit on a dispensing practice.
4  BY MR. HUDSON:
5  Q. Was there any reason why there couldn't
6  be limits on dispensing certain quantities of
7  controlled substances?
8  A. That's hard to say because not every
9  patient is the same. You could have a controlled
10  substance that's dispensed for someone who came
11  from the dentist, and you can have controlled
12  substances dispensed to someone who is, you know,
13  chronically ill with cancer. Their dispensing
14  guidelines are completely different.
15  Because there's so much circumstantial and
16  relevant decisions have to be made to a specific
17  patient, I don't know how you can do that
18  effectively. How do you have a scarlet line as to
19  what a patient needs? The doctor is really
20  involved with that.
21  The pharmacist's role is to make sure that
22  those physicians are operating within the guidance
23  of what we believe their practice should be and
24  that it's not violating a safety requirement in
25  terms of what the dispensing doses should be from

Page 111

1  the manufacturer. I just don't know how you would
2  do that.
3  Q. How would you exercise professional
4  responsibilities? What criteria would a
5  pharmacist apply to determine whether or not a
6  quantity of controlled substances is too much to
7  be dispensed?
8  MR. KOBRIN: Object to form.
9  THE WITNESS: I can give you examples
10  from my experiences, you know. A combination drug
11  with hydrocodone and Tylenol in it, you would have
12  to make sure -- there's guidelines from the
13  manufacturer in terms of what normal dispensing
14  is. There's also limits of which the amount of
15  Tylenol would exceed a safe dose. And if there
16  were things outside those limits, you would call
17  and verify with the physician the accuracy of that
18  and make professional judgment decisions as to
19  whether or not they make sense.
20  BY MR. HUDSON:
21  Q. How would you apply the dispensing
22  guidelines set by the manufacturer? In other
23  words, how would you go and apply that to a
24  particular patient who brings in a prescription?
25  A. Well, I mean, as an example, if a dosing

Page 112

1  guideline for a drug says, you know, up to four
2  times a day and the doctor was writing ten times a
3  day, you would question that and document that, or
4  with the physician sometimes say, no, I'm not
5  filling this. I feel it's not safe.
6  Q. Would there be any way to figure out how
7  many times that type of professional judgment or
8  responsibility was exercised by Giant Eagle retail
9  pharmacists?
10  MR. KOBRIN: Object to form. Asked and
11  answered.
12  THE WITNESS: There's no way to do that.
13  That's why you have pharmacists there. They're
14  the ones that safeguard the practice and
15  dispensing for the health and safety of the
16  patient. And that's not exclusive to controlled
17  drugs. That's any drug.
18  BY MR. HUDSON:
19  Q. Anything though more you could say on
20  how there would be a criteria or a methodology
21  that pharmacists could apply to make sure that
22  there's consistency across Giant Eagle retail
23  pharmacies to make sure that prescriptions are
24  being dispensed for legitimate purposes?
25  MR. KOBRIN: Object to form.

Page 113

1  THE WITNESS: Well, prescriptions -- the
2  one consistent thing across all Giant Eagle
3  pharmacies is they all start with written
4  prescription from a doctor. In following the
5  state guidelines in terms of dispensing, making
6  sure that reference materials including
7  side-effect materials and all the references were
8  available to the pharmacist, educating them on
9  what their role is in terms of corresponding
10  responsibility to dispense and making sure that
11  they knew that we would always back the
12  professional judgment from a pharmacist.
13  BY MR. HUDSON:
14  Q. Giant Eagle would always back the
15  professional judgment of the pharmacist?
16  A. Giant Eagle wouldn't -- didn't --
17  wouldn't intercede on a clinical decision from a
18  pharmacist. It's not the place of a company to do
19  that. It's your license that determines that.
20  Q. I guess I'm trying to focus on like
21  concrete criteria. You said if you have a written
22  prescription from a doctor. That would be an
23  instance where you could look and see is there a
24  prescription written from a doctor. If the answer
25  is yes, then you would dispense that.

Page 114

1 In other words, are there criteria or a
2 process across Giant Eagle retail pharmacies that
3 pharmacists would be applying to try to figure out
4 whether to dispense or not dispense?
5 MR. KOBRIN: Object to form.
6 THE WITNESS: What you're describing is
7 the pharmacy degree and the state Board of
8 Pharmacy license. That's the criteria. Every
9 patient has a -- they're snowflakes. They're
10 not -- there's no way to standardize what you
11 dispense on every single situation. No one -- no
12 two people have the same issue that creates a need
13 for a pharmaceutical intervention.
14 BY MR. HUDSON:
15 Q. Anything more specific than though what
16 pharmacists learn in pharmacy school to obtain a
17 license that you can say in terms of a criteria
18 that --
19 MR. KOBRIN: Object to form.
20 THE WITNESS: What I'm talking about is
21 clinical.
22 MR. KOBRIN: Object to form.
23 THE WITNESS: Clinical training is what
24 pharmacists get, and they use that clinical
25 training to make evaluations as to whether or not

Page 115

1 something meets those guidelines.
2 BY MR. HUDSON:
3 Q. Let me ask it this way: Do you believe
4 that we have a problem with diversion of opioids
5 in our country?
6 A. Our country has a problem with opioids?
7 Q. Yes.
8 A. I think opioids can create harm in the
9 country if they're used illicitly, yes.
10 Q. But my question specifically is: Do you
11 believe that we have a problem with diversion of
12 opioids in our country?
13 A. I believe that there are folks who will
14 use these types of products illicitly, yes.
15 Q. My question is broader than that.
16 Do you believe we have a problem with
17 diversion of opioids in our country?
18 A. I don't know if diversion is the opioid
19 problem versus illicit use of it. My feeling is
20 the problem the country has is illicit use of
21 these products. If diversion is a part of
22 illicit, then I believe it's an illicit use of
23 these things.
24 Q. That's what I'm trying to figure out.
25 Everybody who is a pharmacist had go to pharmacy

Page 116

1 school; right?
2 A. Yes.
3 Q. They had to take the oath and get a
4 license to obtain the ability to dispense drugs;
5 right?
6 A. Yes.
7 Q. The government, I think it's widely
8 known, has said that we have a problem with
9 diversion of opioids in our country.
10 My question is: How can that occur if
11 pharmacists are always following what they learned
12 in pharmacy school and what they had to do in
13 order to get a license given that type of
14 professional judgment?
15 MR. KOBRIN: Object to form.
16 THE WITNESS: So you don't think that
17 someone could steal something out of someone's
18 medicine cabinet or take something out of
19 someone's bag or those types of things? That's
20 why when you're saying diversion, I'm saying
21 illicit. If someone is obtaining these things in
22 an improper way, yes, I believe it can cause harm.
23 BY MR. HUDSON:
24 Q. So in your mind though, at Giant Eagle
25 or other retail pharmacies across the United

Page 117

1 States, there's no issue, that you're aware of, of
2 there being any lack of controls that would lead
3 to any issues with diversion of any kind?
4 MR. KOBRIN: Object to form.
5 THE WITNESS: That's not how I would say
6 it. I believe that, yes, you will have human
7 beings that will do bad things, whether they're
8 pharmacists or not, and those types of things
9 happen and you have controls in place to minimize
10 those to the best of your extent. You have an
11 obligation to continue to try to evolve those
12 practices, which is what I think we did.
13 BY MR. HUDSON:
14 Q. And would you agree --
15 A. But I also believe that those things are
16 done illicitly. That's what my definition is.
17 Q. But would you also agree that a company
18 that is complying with the law should put in
19 writing their actions that they're taking so that
20 they can show that they were taking actions?
21 MR. KOBRIN: Object to form.
22 THE WITNESS: I think if a company is
23 complying with the law, then they're going to
24 document and retain whatever documentation is
25 required by law.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

BY MR. HUDSON:

Q. And if there is a lack of documentation as a licensed pharmacist, would that be of concern to you?

MR. KOBRIN: Object to form.

THE WITNESS: If they were not following the guidelines set forth by the law in terms of document retention and requirements, yes. But, like I said, our obligation is to follow the law.

BY MR. HUDSON:

Q. Right. For example, if the DEA conducted an audit or if the State of Ohio came in and conducted an audit, would you agree that they're going to ask you for documentation to show that you complied with the law?

MR. KOBRIN: Object to form.

THE WITNESS: I don't know. I'd have to have a specific case of what they would ask for. But what they ask for, in my experience, are things required to be retained and documented by law. I can't speak to what the theoretical question would be.

BY MR. HUDSON:

Q. Like, for example, a suspicious order monitoring system, let's just say that's a

Page 119

requirement of the law. Part of that involves monitoring suspicious orders of controlled substances.

Would you agree then that in order to show that you complied with the law, it would be helpful to show that there was actually monitoring occurring?

MR. KOBRIN: Object to form. Assumes facts not in evidence; compound.

THE WITNESS: I believe that the obligation in terms of pharmacy practice is to comply with all documentation requirements that are set forth by law. Following the law is what I agree with.

MR. HUDSON: Let's take another short break.

THE VIDEOGRAPHER: 10:36 we're off the video record.

(Recess from 10:36 a.m. to 10:58 a.m.)

THE VIDEOGRAPHER: 10:58 we're on the video record.

(HBC-Mollica Exhibit 9 was marked.)

BY MR. HUDSON:

Q. Mr. Mollica, I'm going to hand you what I've marked as Exhibit 9. And the internal number

Page 120

for Exhibit 9 is P-HBC-6008.

It's a multi-page document. It looks like an email, it appears to me, that you forwarded along to George Chunderlik in or around May 1, 2012 with several attachments. And I will tell you my focus is going to be on the second attachment, which starts on the page that has the Bates ending 4409. It goes through, I believe, 4431.

(Witness reviewed the exhibit.)

BY MR. HUDSON:

Q. Have you had a chance to look at, at least, the email? We can walk through the attachments. The email in particular, do you recall forwarding these presentations to Mr. Chunderlik in May of 2012?

A. No. I don't recall actually forwarding them, but I see that from the document.

Q. Do you know how you came to be in possession of these presentations?

A. No. My guess is if my name is associated on some kind of register, if they look up Giant Eagle, they see, you know, pharmacy operations. They probably sent it to us.

If I would see something -- like I'm trying to think what would I do today if I got this email

Page 121

and I was at Giant Eagle. I'd probably do the same thing. If I see something has to do with, you know, symposium on anything like that, George's position was to keep in contact, you know, with the regs and things like that, and I would just forward it on to the folks it's relevant to.

Q. Do you know whether or not you looked at these presentations before you forwarded them along?

A. I can't say for sure, but I can't imagine I would because it's really not relevant to what I did and what my role was in Giant Eagle.

Q. If we go back to the second presentation, which is the one that starts on Bates 4409, if you would, just flip through and take a look at the presentation.

A. Okay.

Q. So if we just look at the beginning of this presentation, this relates to -- do you see the beginning relates to manufacturer and distributor obligations to address suspicious order monitoring?

A. Sure.

MR. KOBRIN: Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 BY MR. HUDSON:
2    Q.  And then I think you've testified today
3 that that's not really something that you had a
4 role in or that wasn't your part of the business.
5        MR. KOBRIN:  Object to form.
6        THE WITNESS:  In terms of the details of
7 what that needs to look like and how it's applied
8 specific to the warehouses and suspicious
9 monitoring would be, you know, as it coordinates
10 with what the warehouse procedures are and how it
11 impacts the stores.
12 BY MR. HUDSON:
13    Q.  So if we move back then to Bates 4418,
14 this particular presentation then shifts and talks
15 about pharmacies.
16    A.  Okay.
17    Q.  The regulations that apply to
18 pharmacies.  Are those regulations that are cited
19 and then described on Bates ending 4418 and 4419,
20 are those regulations that you're familiar with?
21        MR. KOBRIN:  Object to form.
22        THE WITNESS:  I'm not familiar with this
23 deck.  I mean, I wouldn't know these regulations
24 just by CFR 1306.  I don't know what that
25 particularly means.

Page 123

1 BY MR. HUDSON:
2    Q.  On 4419, for example, that relates to
3 pharmacies, do you believe that to be an accurate
4 description?
5    A.  It appears to be accurate.
6    Q.  Then if we go back, the next slide talks
7 about no parties to the transaction, and then the
8 next slide is use of state PMP.
9        What is PMP?
10    A.  I believe PMP is kind of like OARRS, the
11 monitoring systems.
12    Q.  Do you know what that acronym stands
13 for?
14    A.  I probably did at one time.  I can't
15 recall.  I know what it's referring to.  If I'm
16 accurate, it's referring to the state, like the
17 example of OARRS.  I just can't remember what the
18 acronym stands for.
19    Q.  If we go to the next page, 4422, it says
20 Pharmacy Checks on Prescribers.  Did you have any
21 written policies on pharmacy checks on
22 prescribers?
23    A.  We had dispensing guideline policies,
24 not -- I don't know if it's specific to policies
25 to checks on prescribers, but it's outlined pretty

Page 124

1 clearly in the Pharmacy Act what the pharmacist's
2 obligation is there, which is a referencable
3 material in the pharmacies.
4    Q.  Did you have any written policies on
5 checking with a pharmacy system whether the
6 pharmacy system -- I guess I should just ask:  Did
7 Giant Eagle's pharmacy system allow for DEA
8 expiration dates and schedules?
9        MR. KOBRIN:  Object to form.
10        THE WITNESS:  I'm not sure what
11 you're -- I don't understand your question.
12 BY MR. HUDSON:
13    Q.  It says here, the second question, "Does
14 pharmacy system allow for DEA expiration dates and
15 schedules?"
16        Do you know whether or not the Giant Eagle
17 pharmacy system allowed for DEA expiration dates
18 and schedules?
19    A.  I don't even know what that -- our
20 pharmacy system tracked to make sure that we had
21 prescriber DEAs and we had -- and I don't remember
22 the vendor, but we had a system that checked and
23 made sure that the records are updated and
24 accurate and that you didn't have an expired
25 license physician in the system.

Page 125

1    Q.  If we turn to the next page --
2    A.  I think that's what that's asking.
3 That's just a weird way of asking.
4    Q.  Sure.  One of the things asked is:  Does
5 pharmacy fill all prescriptions written by doctor?
6 Do you see that?
7        MR. KOBRIN:  Object to form.
8        THE WITNESS:  I see that question, yes.
9 BY MR. HUDSON:
10    Q.  Did Giant Eagle keep any documentation
11 where we could determine whether or not there were
12 ever instances where Giant Eagle pharmacists did
13 not fill all prescriptions written by a doctor?
14        MR. KOBRIN:  Object to form.  Asked and
15 answered.
16        THE WITNESS:  Giant Eagle kept records
17 of all filled prescriptions.  There's no
18 regulatory requirement to track what you didn't
19 fill.
20 BY MR. HUDSON:
21    Q.  If we look at the next page, Pharmacy
22 Policies, "Does pharmacy have written controlled
23 substance policies?"
24        Did Giant Eagle have specific written
25 controlled substance policies?

Page 126

1    A.  Yes.
2    Q.  Those are the ones you've already
3 described?
4    A.  Yes.
5    Q.  The last question asked, "Who from
6 distributor reviews the pharmacy activities?"
7    Do you know what that means?
8        MR. KOBRIN:  Object to form.
9        THE WITNESS:  This is a deck written by
10 it looks like a drug distributor.  I don't know
11 what specifically they're asking on this.
12 BY MR. HUDSON:
13    Q.  That's all my question is.  Do you know
14 what that question is asking?
15    A.  I don't know what the context of what
16 the question is asking.
17    Q.  Do you know whether anyone at HBC
18 reviewed the pharmacy activities that were
19 occurring at Giant Eagle pharmacies?
20        MR. KOBRIN:  Object to form.
21        THE WITNESS:  There were -- I don't know
22 of someone from HBC specifically whose job it is
23 to review that, but we were integrated in terms of
24 the same company.  So those records are available
25 to anyone within pharmacy.

Page 127

1 BY MR. HUDSON:
2    Q.  I'm saying:  Was there any procedures or
3 practice in place where somebody from HBC was
4 reviewing the Giant Eagle retail pharmacy
5 activities?
6        MR. KOBRIN:  Object to form.
7        THE WITNESS:  HBC had practices.  My
8 answer is, you know, if you're asking me the
9 specifics of how they're built and what the
10 requirements are, that I'm not familiar with
11 because it's not in my purview.  But yes.
12    Are there procedures that they monitored
13 activities as related to pharmacy?  Sure.  There's
14 been a lot of involvement and questions and
15 verifications, you know, between the stores and
16 what gets distributed from the warehouses.
17 BY MR. HUDSON:
18    Q.  This is asking, though, did somebody at
19 HBC to your knowledge review the pharmacy
20 activities at Giant Eagle retail pharmacies?
21        MR. KOBRIN:  Object to form.
22        THE WITNESS:  I'm saying someone in
23 pharmacy did.  Now, whether they were specific to
24 the warehouse or not -- everyone had -- it's the
25 same company.

Page 128

1 BY MR. HUDSON:
2    Q.  Right.  You've testified previously that
3 if there were questions, they would call the Giant
4 Eagle retail pharmacy.  My question is different.
5    Did anyone at HBC actually review the
6 activities that were occurring at the Giant Eagle
7 retail pharmacies, in other words, review the
8 prescriptions, do you know?
9        MR. KOBRIN:  Object to form.  Asked and
10 answered; compound.
11        THE WITNESS:  I don't -- the specifics
12 of what you're asking I just couldn't answer.  I
13 can't answer if they did or didn't.  What I'm
14 saying is there was access to prescription
15 records, dispensing records for folks who would
16 have been in charge of the pharmacy part of the
17 warehouse.
18 BY MR. HUDSON:
19    Q.  Well, to your knowledge, did HBC keep
20 due diligence files?
21        MR. KOBRIN:  Object to form.
22        THE WITNESS:  I would like to believe if
23 there was a requirement to keep files, they did.
24 BY MR. HUDSON:
25    Q.  Do you know as you sit here today one

Page 129

1 way or the other whether HBC kept due diligence
2 files or not?
3        MR. KOBRIN:  Object to form.
4        THE WITNESS:  I didn't run the practices
5 of the warehouse, so I just couldn't answer from
6 firsthand experience.  I don't know what that
7 looked like.
8 BY MR. HUDSON:
9    Q.  Are you familiar at all with the
10 National Association of Drug Diversion
11 Investigators?
12    A.  No.  I've never actually even heard of
13 that before.
14    Q.  Me either.  Let me hand you what I
15 marked as Exhibit 10.
16        (HBC-Mollica Exhibit 10 was marked.)
17        (Witness reviewed the exhibit.)
18 BY MR. HUDSON:
19    Q.  Have you had a chance to look at
20 Exhibit 10?
21    A.  I'm sorry.  I thought Exhibit 10 was
22 just the first page.  I apologize.
23    Q.  I think it is.  I think the rest of it
24 is just a restatement of the same thing, but I
25 could be wrong.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1   A.  Okay.
2   Q.  So if we focus on the first page of
3  Exhibit 10, it looks like this is an email invite
4  to a discussion that's going to occur at the
5  Century Three.  I assume that's the room.
6   A.  That's a meeting room.
7   Q.  Meeting room.  Okay.  This is from James
8  Cornwell to yourself and Mr. Chunderlik,
9  Mr. Hughes, Mr. Millward, Mr. Voyten and
10  Mr. Carlson.  Do you see that?
11   A.  Yes.
12   Q.  And this is November of 2013?
13   A.  That's what it looks like, yes.
14   Q.  And the topics are discussion of the
15  process developed for identifying pharmacies
16  ordering excessive controlled substances, and then
17  number two, discussion of the monitoring and steps
18  to be taken when a pharmacy appears on the above
19  list.
20   A.  That's what it says.
21   Q.  Do you know whether or not you attended
22  a meeting in November of 2013 on this topic?
23   A.  I honestly don't.  I would assume yes.
24  I just don't remember that particular meeting.
25   Q.  Do you know whether or not there was a

Page 131

1  process developed in or around November of 2013
2  for identifying pharmacies ordering excessive
3  controlled substances?
4   A.  I can't speak to the dates.  I don't
5  recall like based on a meeting or in what month,
6  but there were processes that identified
7  pharmacies that would trigger an interest to go
8  look and verify.
9   If there was a question about an order, yes,
10  there were processes in place to go look and see.
11  That's where retail operations were involved.  Our
12  supervisors would go in, ask the questions,
13  verify, and then respond back to the person asking
14  the question.
15   Q.  And when was that procedure or process
16  put into place, if you know?
17   A.  I don't know a definitive date.  I just
18  know that that was common procedure.
19   Q.  And when you say common, why do you use
20  that term?
21   A.  Well, you know, you put systems in place
22  that are meant to trigger questions.  You don't
23  want systems in place that trigger no questions.
24  So if it's not common, then you don't have good
25  measures in place.  So what they do is they

Page 132

1  trigger things that you want to go and find out
2  more about.
3   They don't necessarily mean there's a
4  wrongdoing.  But the system works when you have
5  reasons to go look and see and verify, and that's
6  what these systems were about.
7   It's very difficult to have from an ordering
8  standpoint something suspicious when you're only
9  distributing to your own pharmacies because the
10  product is sitting on the shelf.  You can just
11  pick up the phone and ask questions.
12   Q.  It's your opinion as you sit here today
13  that it's difficult for a retail distributor to
14  have suspicious orders if they're shipping to
15  their own pharmacies.  Do I understand that right?
16   MR. KOBRIN:  Object to form.
17   THE WITNESS:  No.  That's not what I'm
18  saying.
19   MR. KOBRIN:  Don't speculate.
20   THE WITNESS:  I'm just saying it would
21  be difficult for Giant Eagle to have suspicious
22  orders because we were basically a closed system.
23  BY MR. HUDSON:
24   Q.  Is Giant Eagle the only closed system?
25   A.  I don't know what other people do.  I

Page 133

1  just know what we were doing.  The warehouse, to
2  my knowledge, did not distribute outside of Giant
3  Eagle.
4   Q.  And do you know whether or not that's
5  true of, for example, Walgreens or CVS or any
6  other controlled substance dispensers?
7   MR. KOBRIN:  Object to form.
8   THE WITNESS:  I don't know what their
9  business practices are.
10  BY MR. HUDSON:
11   Q.  Was there anything unique at Giant Eagle
12  that caused there to be a lower probability of
13  diversion beyond just this closed system?
14   MR. KOBRIN:  Object to form.
15   THE WITNESS:  We had -- not only did we
16  have a closed system, but when you're ordering
17  from yourself, intimate knowledge of not only the
18  practices of who we were distributing to, but also
19  the people in those locations and all of our audit
20  procedures, all of our policies and procedures and
21  the educations and reeducations and just the
22  constant communication between the teams to make
23  sure we're doing things to the best of our
24  ability.
25

Page 134

BY MR. HUDSON:

1 Q. That would be true though of Rite-Aid or
2 Walgreens or anyone who is both a distributor and
3 a retail pharmacy; right?
4 MR. KOBRIN: Object to form. He's
5 already testified he's not sure of what their
6 procedures were.
7 THE WITNESS: I can't speak to what the
8 procedures are at companies I don't have oversight
9 over.
10 BY MR. HUDSON:
11 Q. Right. I'm not getting to what their
12 procedures were. What I'm getting at is anyone,
13 any retail pharmacy that dispensed controlled
14 substances like Walgreens or CVS, if they acted as
15 a distributor, then all of those companies would
16 be in the same situation; right?
17 MR. KOBRIN: Object to form.
18 THE WITNESS: I don't know what the
19 business relationships between and what the
20 emphasis were of those organizations.
21 BY MR. HUDSON:
22 Q. Right. I'm just saying I'm asking you
23 to assume that Walgreens and CVS and others acted
24 both as a distributor and a retail pharmacy.

Page 135

1 A. You're asking me to assume, and I'm
2 saying I won't assume, I can't assume things that
3 I don't have knowledge about.
4 Q. Right. I'm saying just assume that
5 could be the case. So you don't need to have
6 knowledge of it.
7 I'm saying assuming that to be true, is there
8 something unique about Giant Eagle? Did it have
9 better policies, procedures or practices than
10 others, or do you have any knowledge of what was
11 happening in the industry?
12 MR. KOBRIN: Object to form.
13 THE WITNESS: What's happening in the
14 industry is a different question than do I have
15 knowledge of what the procedures were specific to
16 these types of interactions at another company.
17 I know that Giant Eagle and our part in this
18 was to make sure we were doing things above and
19 beyond what was required at all times and that we,
20 you know, felt very good that we had not only a
21 system of checks and balances but also continuous
22 improvement.
23 BY MR. HUDSON:
24 Q. But how do you point to results or
25 actions to do that? Would you agree we'd go look

Page 136

1 at the documentation to see what occurred?
2 MR. KOBRIN: Object to form.
3 THE WITNESS: I agree that we do self
4 inspections and continuous improvement and
5 monitoring and communications between departments
6 and making sure that it's top of mind and made
7 sure it was top of mind of our associates.
8 BY MR. HUDSON:
9 Q. And I trust that you believe that. But
10 how do I go verify that? So what steps do I take
11 to actually verify that the actions are consistent
12 with your statements?
13 MR. KOBRIN: Object to form.
14 THE WITNESS: Every legal required
15 action is being done. That's for the DEA and
16 state boards, you know, to testify -- I mean, to
17 my knowledge, DEA never had any problems with our
18 procedures or anything that they notified us that
19 they needed to change.
20 BY MR. HUDSON:
21 Q. Well, how many suspicious orders did you
22 report to the DEA?
23 MR. KOBRIN: Object to form.
24 THE WITNESS: If there was a suspicious
25 order that needed to be reported to the DEA, we

Page 137

1 would. But I don't see how you would have a
2 suspicious order in our system because the
3 products are all still within the company.
4 BY MR. HUDSON:
5 Q. Well, do you know how many suspicious
6 orders Walmart or CVS or Walgreens reported?
7 A. I have no idea.
8 MR. KOBRIN: Object to form.
9 BY MR. HUDSON:
10 Q. So how would you have any sense to know
11 whether -- in other words, how would you have any
12 perspective to know what a suspicious order would
13 be or not be?
14 MR. KOBRIN: Object to form.
15 THE WITNESS: My job isn't to have
16 perspective of -- I don't use other organizations
17 as benchmarks on what is right and wrong. The law
18 is the law, and we complied to it. I don't care
19 what Walgreens, you know, procedures are, what
20 they consider good or any other. What I do know
21 is our emphasis was making sure we did everything
22 to the best that we could.
23 BY MR. HUDSON:
24 Q. And I appreciate that. You said that
25 several times. What I'm trying to figure out is

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 how do we go and verify that that's, in fact,
2 true?
3        MR. KOBRIN:  Object to form.
4        THE WITNESS:  I don't know how you do
5 that.  Our procedures were consistent with the
6 law.
7        (HBC-Mollica Exhibit 11 was marked.)
8 BY MR. HUDSON:
9    Q.  I'm handing you what I'm marking as
10 Exhibit 11.  Exhibit 11 is an email from
11 Mr. Millward to Mr. Carlson, Mr. Chunderlik
12 Mr. Voyten with a cc to you and Mr. Bianco.  And
13 it's sent January 22, 2014.
14    It says, Shawn and Greg, are we reporting PSE
15 (a listed chemical) sales from HBC to the stores
16 monthly?  I assume it is through ARCOS to comply
17 with 21 USC 830(b).  Are the records being
18 retained for two years?  We need to lock down an
19 SOM SOP ASAP.
20    Do you see that?
21    A.  Yes.
22    Q.  Do you know what he meant by:  We need
23 to lock down an SOM SOP ASAP?
24        MR. KOBRIN:  Object to form.
25        THE WITNESS:  I don't know what he means

Page 139

1 by that.  Sudafed is an over-the-counter
2 medication.
3 BY MR. HUDSON:
4    Q.  If you look down under I of this
5 questionnaire, do you see there it says SOM and
6 Anti-diversion Program?
7    A.  Yes.
8    Q.  There it says, "The company has a
9 suspicious order monitoring program which complies
10 with 21 CFR 1301.74(b) for controlled substances?"
11    A.  Yes.
12    Q.  And it's "yes" or "no"; right?
13    A.  Um-hum.
14    Q.  Do you think SOM then -- seeing this
15 below, this questionnaire, do you think in the
16 sentence above when he said SOM, that means
17 suspicious order monitoring?
18    A.  Yes.  I would also assume that SOP means
19 maybe standard operating -- oh, I see what it says
20 here, summary of program.
21    Q.  And that's the fourth question.  Please
22 provide a copy of your Suspicious Order Monitoring
23 Program SOP or Summary of Program; right?
24    A.  That's what it says, yes.
25    Q.  And Mr. Millward is writing to a

Page 140

1 distribution list:  We need to lock down SOM SOP
2 ASAP; right?
3    A.  That's what he says, yes.
4    Q.  If we go back to Exhibit 2, there you
5 see the effective date of that first policy is
6 8/1/14 in Exhibit 2?
7    A.  Yes.
8    Q.  Is there any relationship between this
9 email written by Mr. Millward in January of 2014
10 saying we need to lock down an SOM SOP ASAP and
11 then a written policy being created around August
12 of 2014?
13        MR. KOBRIN:  Object to form.  That
14 misrepresents the evidence.
15        THE WITNESS:  What I can tell you is in
16 my general knowledge of this.  I don't know the
17 specifics of what Joe is asking on a distribution
18 requirement here, but that particular drug he's
19 referring to is an over-the-counter nonnarcotic.
20    I don't remember the dates, but there were
21 changes in how they needed to be distributed and
22 dispensed from a pharmacy.  That probably made it
23 under a purview of a new -- of a regulation that
24 might have been written before it.
25

Page 141

1 BY MR. HUDSON:
2    Q.  Well, here you can see on the first page
3 of his question he's talking about question one in
4 this questionnaire, "Company has a suspicious
5 order monitoring program which complies with 21
6 CFR 1301.74(b) for controlled substances"; right?
7    A.  Yes.
8    Q.  Do you think there's any relationship
9 between that and Mr. Millward's statement above
10 that we need to lock down an SOM SOP ASAP?
11    A.  I honestly don't know.  These things are
12 not in my daily practice.  I don't -- I'm not
13 familiar with these codes.
14    Q.  Do you know why you were copied on this
15 email?
16    A.  No, but I can guess, you know.  Because
17 it was a common practice that people would copy
18 the operators.  It's more of an FYI so if
19 something were to change.  If he's talking about a
20 procedure here that needs to be changed, you can
21 almost assume that there's going to be an
22 operating step that needs to happen to make sure
23 that procedure happens.  I think it's more of a
24 heads up type of thing.
25    Q.  Well, do you know as you sit here today

Page 142

1 looking at these documents whether or not Giant
2 Eagle had a written suspicious order monitoring
3 policy in place at this time in January of 2014?
4 A. For the Sudafed drug that he's talking
5 about there?
6 Q. No, just in general, suspicious order
7 monitoring program as a whole, in other words,
8 written policies?
9 A. We had written policies. My definition
10 of suspicious monitoring though is inclusive of
11 everything within the practices and for the
12 pharmacy. So my answer would be yes.
13 Q. This question says, "Company has a
14 suspicious order monitoring program which complies
15 with 21 CFR 1301.74(b)"; right?
16 A. I don't know what that's referring to.
17 I'm sorry. I'm just not familiar with this thing.
18 Q. So today everything you've testified
19 about, any written policies or procedures that
20 existed at Giant Eagle, you don't know one way or
21 the other whether or not those are suspicious
22 order monitoring programs that would add to
23 compliance with 21 CFR 1301.74(b)?
24 MR. KOBRIN: Object to form. Misstates
25 the testimony and the evidence.

Page 143

1 THE WITNESS: What I'm saying is I'm not
2 familiar with what -- if you said it earlier, I
3 apologize. I don't know what 21 CFR 1301.74(b)
4 is. I don't know what it's referring to.
5 BY MR. HUDSON:
6 Q. If you go back to the prior exhibit, the
7 exhibit you just had?
8 A. This thing from Anda?
9 Q. You got it exactly. And you go back to
10 Bates 4413, if you compare Exhibit 9, which is
11 this Anda description; right? And see it makes
12 reference to 1301.74(b)? And then we compare that
13 to Exhibit 11, and they're also talking about a
14 suspicious order monitoring program which complies
15 with 21 CFR 1301.74(b); right?
16 MR. KOBRIN: Object to form. I just
17 want to clarify for the record that this is not an
18 Anda presentation. Some other third party
19 presented it at the Anda conference that the
20 witness has said he doesn't know anything about.
21 BY MR. HUDSON:
22 Q. It's actually a presentation by Mike
23 Mapes, chief compliance officer of Assured RX
24 Services, and Robert DelVecchio, chief executive
25 officer of Assured RX Services.

Page 144

1 If you go back and you compare these two, it
2 seems like in the industry there's a fair amount
3 of talk of putting a suspicious order monitoring
4 program in place; right?
5 MR. KOBRIN: Object to form.
6 THE WITNESS: I still want to point out
7 though on this form, it says other security
8 controls for nonpractitioners. I'm saying it's
9 because I was on the practitioner side of how
10 these things relate, that's why I'm not as
11 familiar with these as someone who would be
12 connected.
13 BY MR. HUDSON:
14 Q. No. I appreciate that. I guess that's
15 what I'm trying to get at. You've testified today
16 about policies or procedures that you were aware
17 of that existed at the retail pharmacy level;
18 right?
19 A. Right.
20 Q. So what I'm focused in on is policies or
21 procedures that existed at the nonpractitioner
22 level, meaning the manufacturer or distributor
23 level.
24 So my question is: Can you say as you sit
25 here today whether or not Mr. Millward's email

Page 145

1 here in January of 2014 that you're copied on is
2 indicating that Giant Eagle needed to create a
3 suspicious order monitoring program to comply with
4 1301.74?
5 MR. KOBRIN: Object to form.
6 THE WITNESS: No, I can't say that.
7 What he says here is as it relates to an
8 over-the-counter drug, he has a question regarding
9 to that referenced section.
10 BY MR. HUDSON:
11 Q. He says in his email, "We need lock down
12 an SOM SOP ASAP"; right?
13 A. Yeah, specific to Sudafed,
14 over-the-counter drug.
15 Q. Well, how do you know that, that it's
16 specific to Sudafed?
17 A. Because he says we are reporting PSE,
18 which is Sudafed (a listed chemical) sales from
19 HPC to the stores monthly before he makes that
20 statement.
21 Q. But down below can we agree the
22 questionnaire is asking more broadly about --
23 number four says, "Please provide a copy of your
24 suspicious order monitoring program SOP or Summary
25 of Program."

Page 146

1  A. I don't know what this document is.
2 What are these questions? This SOM and
3 anti-diversion program piece, I just don't know
4 what this is.
5  Q. That's what I'm getting at, is whether
6 you're able to say as you sit here today whether
7 or not Giant Eagle had written policies that were
8 specifically aimed at meeting these requirements
9 of 1301.74(b).
10  MR. KOBRIN: Object to form.
11  THE WITNESS: When you asked me -- to me
12 you're asking about a difference between a policy
13 that's of a distributor versus the pharmacy, and
14 I'm saying that it's the same company distributing
15 to itself. So by definition, any and all of our
16 suspicious -- whether diversion related measures
17 that we had in place are going to be part of the
18 suspicious monitoring system, to my opinion.
19 BY MR. HUDSON:
20  Q. Is there anything as you sit here today,
21 any manual or anything in writing?
22  A. Everything that we have, our dispensing
23 procedures, our documentation tracking, our
24 requirements in training that we do with
25 technicians, all our procedures are going to be

Page 147

1 part of that.
2  Q. Those are all geared towards identifying
3 unusually large orders of controlled substances?
4  A. That's not what it's asking on here.
5 It's asking about if there's suspicious
6 order monitoring.
7  Q. What is a suspicious order?
8  MR. KOBRIN: Object to form.
9  THE WITNESS: I don't have a definition
10 of suspicious order. If there are orders that
11 require, you know, a go look-see or further
12 information, we were going to go look and see.
13 BY MR. HUDSON:
14  Q. Well, what does the regulation say about
15 a suspicious order?
16  MR. KOBRIN: Object to form. If you
17 want to show him the regulation, but I don't think
18 he should be expected to know that or should
19 testify to it. I'm going to say don't answer
20 that.
21  MR. HUDSON: Are you instructing him not
22 to answer?
23  MR. KOBRIN: I think you should clarify
24 or tell him what you're doing. I mean, you're
25 asking him to tell you about legal regulations

Page 148

1 without showing him anything.
2 BY MR. HUDSON:
3  Q. Sir, you've testified that in your view,
4 Giant Eagle had policies and procedures in place
5 to identify suspicious orders; correct?
6  A. Yeah, that's correct.
7  Q. So what is a suspicious order?
8  MR. KOBRIN: Object to form.
9  THE WITNESS: I would like to see a
10 definition of what the regulation or --
11 BY MR. HUDSON:
12  Q. Sir, how can you testify that Giant
13 Eagle had policies and procedures in place to
14 identify suspicious orders if you don't even know
15 what a suspicious order was?
16  MR. KOBRIN: Are you asking from a legal
17 perspective, Ty, or are you asking him --
18  MR. HUDSON: No. I'm asking him as the
19 VP of pharmacy operations.
20  THE WITNESS: Because in our system, the
21 products that we were distributing are sitting on
22 the shelves. So if there's procedures in place to
23 appropriately dispense those medications, in my
24 opinion, by definition you were monitoring
25 suspicious orders.

Page 149

1 BY MR. HUDSON:
2  Q. But suspicious orders -- let's just
3 look, if we can, since you want to look at the
4 regulation -- if we go back to Exhibit 9 and the
5 Bates ending 4413, if we focus in on the section
6 (b) in particular and the last sentence.
7  So can we agree that for these purposes as
8 we've talked about, the registrant in this case
9 would be HBC, the distributor?
10  A. I honestly don't know if the registrant
11 would be the distributor or the pharmacy. I don't
12 know what -- I'd have to see it in more context.
13  Q. The regulation says right here,
14 "Suspicious orders include orders of unusual size,
15 orders deviating substantially from a normal
16 pattern and orders of unusual frequency."
17  So how would a Giant Eagle retail pharmacy be
18 able to identify a suspicious order at HBC of
19 unusual size?
20  A. Well, if our -- if our order was greater
21 than dispensing, it would trigger an alert. You
22 could see it when you place the order. And there
23 were reports that HBC ran. Like I said, my
24 answers are -- I don't know what algorithms or
25 what they ran, but if something was a question

Page 150

1 that needed to be followed up with, we had those
2 triggers in place and we'd go and investigate why.
3    Q.  Who had those triggers in place?
4    A.  There were programs that were run to see
5 ordering versus dispensing.  There were programs
6 that were run just to show what was being
7 distributed to the pharmacies in terms of
8 quantity.
9    But I don't know what the triggers were that
10 would put something on a list to go and
11 investigate.  But if there was something on a
12 list, we would investigate.
13    Q.  Before though I asked you what policies
14 or procedures or practices existed at HBC to
15 identify suspicious orders, and you testified that
16 you weren't aware of what those were because it
17 wasn't your side of the business; right?
18    MR. KOBRIN:  Object to form.
19    THE WITNESS:  No.  What I'm saying is I
20 don't know what the formula for how they do it is.
21 I'm just not in that kind of thing dealt with the
22 warehouse piece.  But do they have procedures in
23 place to say something needs to be inquired on?
24 Yes.  Those things I'm aware they're in place, but
25 what drives them and how they're formulated, I

Page 151

1 don't --
2 BY MR. HUDSON:
3    Q.  Sure when did they get put in place?
4    A.  I'm not familiar with specific dates.
5 Like I said, it evolved over time.
6    Q.  Who put it in place?
7    MR. KOBRIN:  Object to form.
8    THE WITNESS:  The company, you know,
9 everyone.  It depended on which policy or
10 procedure you're talking about.
11 BY MR. HUDSON:
12    Q.  This policy or procedures that you've
13 identified of HBC identifying orders.
14    A.  You're asking me what human being
15 decided to put that particular policy?  I have no
16 idea.  A group of folks I'm sure.
17    Q.  Is there anything more specific you can
18 say about it?
19    A.  Well, I mean, first of all, what came
20 from the warehouses were Schedule III through Vs,
21 and so as time went on, you know, and things
22 progressed in terms of strengthening the amount of
23 due diligence procedures that we had, they evolved
24 over time.
25    That's why I can't be specific which date.

Page 152

1 It wasn't a seminal date that policies were here
2 and they weren't before that date.  They evolved
3 over time.
4    Q.  Well, at least in terms of written
5 policies, can we agree that you didn't have any in
6 place while you were at the company?
7    A.  No.
8    MR. KOBRIN:  Object to form.
9    THE WITNESS:  I can't agree to that.
10 BY MR. HUDSON:
11    Q.  Your testimony is HBC had written
12 policies in place during the time you were at
13 Giant Eagle that were specifically designed to
14 identify suspicious orders?
15    MR. KOBRIN:  Object to form.
16    THE WITNESS:  I can't speak to the
17 specifics of the HBC policies.  Giant Eagle had
18 policies in place that was designed to monitor
19 suspicious orders.
20 BY MR. HUDSON:
21    Q.  That's what I'm getting at, is the
22 difference between policies and procedures being
23 in place at retail pharmacies and policies and
24 procedures being in place at HBC as a distributor.
25    In your mind, is there a difference between

Page 153

1 those two?
2    A.  I think there's a difference when it
3 comes to the actual operation of a distribution
4 center versus the operation, but when you ask
5 about policies about monitoring, they're not
6 specific to one thing or another.  It's inclusive.
7 And that's the reason why I'm answering the way I
8 did.
9    I don't know that there's a policy that's
10 specific to this or is specific to that.  When
11 you're asking me questions and I'm saying I'm
12 unaware, I'm referring to the actual operating
13 day-in-and-day-out procedures of how you handle at
14 a warehouse.  That's what I don't have intimate
15 knowledge on.
16    Q.  I guess what I'm trying to figure out
17 is, in your mind, the relationship between things
18 that were happening at retail pharmacies, that
19 were occurring at Giant Eagle and HBC's efforts at
20 the warehouse.  I thought I understood this
21 morning you were saying you had knowledge of what
22 was happening at the pharmacies; you didn't have
23 knowledge of what was happening at the warehouse.
24    MR. KOBRIN:  Object to form.
25    THE WITNESS:  In terms of how to run a

Page 154

1 warehouse, not in terms of how to have a good
2 quality control program in place.
3 BY MR. HUDSON:
4    Q.   So are you aware then of the HBC written
5 policies and procedures that existed?
6    A.   I'm not aware of specific to HBC
7 policies.  Our policies were umbrella policies for
8 the organization.
9    Q.   What's that mean, umbrella policies?
10    A.   Same company distributing to itself and
11 dispensing to patients.  If you're going to
12 control those practices, I don't know that it
13 would be exclusive to one entity of the company
14 versus another.
15    Q.   Well, did Giant Eagle retail policies
16 and procedures -- were those carried out at HBC at
17 the HBC warehouse?
18    A.   Which ones?
19    Q.   Any of them.
20    A.   Were retail policies carried out for
21 retail?
22    Q.   Correct.  What does umbrella mean?
23    A.   Having -- making sure that prescriptions
24 weren't dispensed unless they were legally
25 required by a medical physician.  That's not

Page 155

1 specific to a particular place.  Ordering products
2 were triggered by what you dispense, making sure
3 that that's happening, making sure what -- you
4 asked me the question.  Making sure that what you
5 ordered and what you received matched what you
6 were dispensing, that wasn't exclusive to the
7 warehouse or a pharmacy, those types of things.
8    Q.   But those are all actions that are
9 occurring at the dispenser, at the retail
10 pharmacy; correct?
11    MR. KOBRIN:  Object to form.
12 BY MR. HUDSON:
13    Q.   There's no way for the HBC warehouse to
14 put practices in place to try to figure out
15 whether or not the prescription that's being
16 presented at the retail pharmacy is legitimate or
17 not; right?
18    A.   No.
19    MR. KOBRIN:  Object to form.
20    THE WITNESS:  That's not true.  If the
21 warehouse had a question about a large order, for
22 example, they would ask questions and we would
23 satisfy those questions in order to feel good
24 about the distribution.
25

Page 156

1 BY MR. HUDSON:
2    Q.   That's my question.  So in your mind,
3 there were, in fact, policies that existed where
4 the warehouse would ask about large orders?
5    A.   Yes.  But your question, at least as I
6 understood it, was were they specific to the
7 warehouse.  So when I hear that, what I'm
8 interpreting is operating procedures at the
9 warehouse, not -- it's just misinterpretation of
10 what you're asking.  That's all.
11    Q.   I'm just trying to get your best
12 testimony as to what you believe the policies and
13 procedures were that existed at the HBC warehouse
14 and then when they came into existence and who was
15 involved.
16    A.   There were procedures, for example, that
17 if there was a large quantity.  I don't know, like
18 I said, what formulated or what constituted large,
19 that kind of detail.  But if there was a quantity
20 that was questionable, yes, there were procedures
21 in terms of what you did for follow-up and what
22 kind of documentation was required in order to
23 feel good about the order.
24    Q.   Those were in writing while you were at
25 the company?

Page 157

1    MR. KOBRIN:  Object to form.
2    THE WITNESS:  Yeah.  We had standard
3 operating procedures in terms of what needed to
4 happen.  I can't -- I don't remember the specifics
5 of what was in writing versus what was trained and
6 taught.  But I would argue that, yes, there were
7 policies in writing there.
8 BY MR. HUDSON:
9    Q.   You believe though, just so I make
10 sure --
11    A.   I mean, I haven't been in Giant Eagle in
12 five years.  I don't remember the specifics of
13 what they look like.  But yes.
14    (HBC-Mollica Exhibit 12 was marked.)
15 BY MR. HUDSON:
16    Q.   I'll hand you what I marked as Exhibit
17 12.  Exhibit 12 is a one-page email chain.  The
18 internal number is 1001.  You see at the bottom,
19 there's Kayla Voelker sending an email to
20 yourself, Mr. Hughes, Mr. Carlson, Mr. Voyten,
21 herself, Mr. Millward, Mr. Cornwell and
22 Mr. Chunderlik.
23    A.   Yes.
24    Q.   And that's in January of 2014?
25    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  Q. Who was Kayla Voelker?

2  A. She was in admin. She also had some
3  analytics skills. She was in admin doing some
4  analytics things, too.

5  Q. And when you say admin, what do you
6  mean? Administrative assistant?

7  A. Yes.

8  Q. And who was she administrative assistant
9  to?

10  A. Different people at different times.
11  She worked more connected to IT. Usually the
12  folks that she reported and worked with were IT.

13  Q. Do you know whether she had training in
14  IT?

15  A. I don't think she was IT. She did some
16  analytics. That's why she was related to IT. She
17  wasn't part of IT. She reported in to admin.

18  Q. Mr. Voyten, for example, what was his
19  position?

20  A. He worked with information systems, too,
21  which I call it generically IT, but it could be
22  information systems, IS.

23  Q. So would Ms. Voelker, her position, be
24  in admin to someone like Mr. Voyten?

25  A. Like him. She reported to -- at one

Page 159

1  time she reported to a gentleman named Joe
2  Mashanski who was Shawn's boss, to give you
3  context.

4  Q. That's what I was trying to figure out.
5  That's helpful. Thank you.

6  Do you know why she was sending this email?

7  A. Let me read this real quick. She was
8  probably responding to -- one of her duties was to
9  look to see if -- any of these reports that were
10  in place, to look if order quantities were outside
11  of a range, and if they were, to make sure that it
12  was being communicated to the folks who needed to
13  respond.

14  Q. Is that something that you knew at the
15  time that you were at the company, in other words,
16  from 2007 to 2014, that that was her
17  responsibility?

18  A. Yes. It wouldn't have been that whole
19  time. Kayla, she came in as an admin and then her
20  kind of skills and responsibilities changed. But
21  I wouldn't say from 2007. But, yes, during that
22  time, yes, in that time.

23  Q. And how did you come to learn that she
24  had that role?

25  A. I worked for the company.

Page 160

1  Q. Sure. I'm trying to get a sense of just
2  how involved you were with HBC suspicious
3  monitoring, because this morning it seemed like
4  you were saying you weren't part of that business
5  and now we've got an email that you're copied on.

6  So my question is: Is this something that
7  you were focused on or you were copied on because
8  you were in a position that you were getting
9  copied on things?

10  MR. KOBRIN: Object to form.

11  THE WITNESS: I think it's a combination
12  in a position that I was getting copied on. But
13  if you read this, if she's saying that there's a
14  pharmacy that needs something done and a
15  go-look-see, that's part of operations.

16  Like I said, I don't run -- just because I
17  don't run the warehouse doesn't mean I don't have
18  a link to it in terms of how we coordinate things.
19  I don't run the warehouse. I don't know what the
20  details of operating procedures for warehouse
21  procedures are. But for diversion procedures that
22  transcend the company, yes.

23  BY MR. HUDSON:

24  Q. How many emails like this from Kayla did
25  you receive?

Page 161

1  MR. KOBRIN: Object to form.

2  THE WITNESS: I couldn't say. I don't
3  know.

4  BY MR. HUDSON:

5  Q. Do you know more or less than ten or a
6  hundred, a thousand, any outer limit?

7  MR. KOBRIN: Object to form.

8  THE WITNESS: I don't know how many
9  emails from Kayla I received like this.

10  BY MR. HUDSON:

11  Q. Do you know what was done other than
12  what's in this email? Because I don't think you
13  were copied on the upper emails. Do you know what
14  was done to address this issue?

15  MR. KOBRIN: Object to form. This issue
16  being the bottom email?

17  MR. HUDSON: Yes.

18  THE WITNESS: I mean, I don't know the
19  specifics of this. Todd is a regional supervisor
20  who reported to me. Probably why I was copied on
21  the first email. This was his store. And it
22  looks like there's a request to go and just verify
23  quantity to make sure that it was accurate and
24  needed versus something that could have been a
25  diversion. Just reading this, it looks like

Page 162

1 that's what they did.
2 BY MR. HUDSON:
3    Q.  Do you have any knowledge about what
4 these types of investigations -- like, for
5 example, was one of Todd's responsibilities in
6 reporting to you to log and describe to you what
7 investigations he was involved in to try to figure
8 out whether or not prescriptions were legitimate?
9       MR. KOBRIN:  Object to form.
10      THE WITNESS:  No.  There wasn't a
11 requirement to log, you know, these types of
12 discussions.  What his responsibilities were to me
13 is that if there was a request from the
14 organization in our integrated diversion
15 practices, prevention practices to go and do an
16 action, that the action actually took place.
17      For example, if one of the folks copied on
18 that or connected to that first email did not get
19 a response, they would call and say, hey, Anthony,
20 we need Todd to go do a response.
21 BY MR. HUDSON:
22    Q.  Right.  And I guess I'm trying to get a
23 sense of just during your time with the company,
24 so between November of 2009 when HBC started
25 acting as a distributor for Schedule III

Page 163

1 controlled substances and March of 2014 when you
2 left, do you have any sense of how many of these
3 types of emails or investigations occurred?
4       MR. KOBRIN:  Object to form.
5       THE WITNESS:  You're calling them
6 investigations.  These are inquiries.  If
7 something comes up on a report, it is an
8 opportunity to verify.  So, yeah, they happen.
9       In terms of the quantity, I don't know.  It
10 wasn't -- it wasn't a -- it wasn't something that
11 was overly burdensome from an operational.  So my
12 guess is it was very rare.  But when they
13 happened, you took care of them.
14 BY MR. HUDSON:
15    Q.  Did you, yourself, ever review the
16 daily -- you know the daily threshold monitoring
17 reports?  You indicated Ms. Voelker, one of her
18 jobs was to review those; right?
19    A.  I don't know the specifics of how she
20 got that, but only because of where she reported
21 to, if someone would have seen something that
22 flagged, she's in admin, she's going to go and
23 communicate, hey, we need a look-see.  Yeah, so
24 that's -- I'm not sure if there's anything more
25 you need there or not.

Page 164

1    Q.  Was there a process in place?  In other
2 words, was Ms. Voelker creating a daily report do
3 you know?
4    A.  I don't know who was creating it.  It
5 was somewhere in IT.  It happened electronically.
6 I mean, it's not -- it wasn't a report that you
7 created from the pharmacy.  But there was a report
8 that would show quantities and whatever the
9 formula for a trigger of a go look-see, if
10 something was on it, we would make sure that the
11 field representatives went and did that and just
12 verified that the request for whatever quantity
13 was legitimate and not triggered by something that
14 was a diversion-related activity.
15    Q.  And how do you know that that occurred,
16 that due diligence or look-see, whatever you're
17 calling it, how do you know that that occurred?
18    A.  There was a -- you would have to
19 satisfy -- it was more of a closed system.  If
20 there was an inquiry, there were like three or
21 four questions that had to be answered.  If they
22 didn't get those answers, they would notify me
23 that those answers weren't received.  And I would
24 press on someone like Todd to make sure that go
25 look-see happened.

Page 165

1    Q.  How many times did you have to press on
2 people to have a go look-see occur?
3    A.  Not often.
4       MR. KOBRIN:  Object to form.
5       THE WITNESS:  Not often because we made
6 it very clear that if you're in this role, you're
7 going to take these things serious.  If I had a
8 situation where I had to force folks to do -- to
9 follow procedures like this, they wouldn't be in
10 the roles very long.
11 BY MR. HUDSON:
12    Q.  I guess what I'm trying to get at, as
13 you sit here today, is there any way to quantity
14 the magnitude of orders that got flagged,
15 investigations that occurred, go-look-sees that
16 occurred, just to quantify the amount of activity
17 that was happening?
18      MR. KOBRIN:  Object to form.
19      THE WITNESS:  Not that I could say.
20 There's no requirement to have a log of those
21 types of things.  So I couldn't tell you how often
22 they happened.  Remember, these were -- these
23 types of monitoring systems, they were ours to
24 develop, and they changed over time.
25      You know, the scrutiny of them could change

Page 166

1 over time. The amplification of how something
2 qualifies to get on the list, they could change.
3 So it was an evolving process.
4 BY MR. HUDSON:
5    Q. How would I then figure out how the
6 process evolved? Would I look at the
7 documentation or I got to talk to each individual
8 witness? How do I figure out how it evolved and
9 when it evolved and who was involved?
10    MR. KOBRIN: Object to form. You're
11 asking him how you should figure it out or how
12 somebody in --
13    MR. HUDSON: Anyone figure it out.
14    THE WITNESS: I don't know why someone
15 needs to figure it out. Our systems were
16 monitored by the DEA and met federal and legal
17 requirements. There was no requirement to retain
18 documentation of what those things looked like.
19 BY MR. HUDSON:
20    Q. That was true for every distributor in
21 the country; right?
22    MR. KOBRIN: Object to form.
23    THE WITNESS: I don't know, like I said,
24 what the details of other distributors are.
25

Page 167

1 BY MR. HUDSON:
2    Q. You don't know whether or not other
3 distributors were also governed by the DEA?
4    MR. KOBRIN: Object to form.
5    THE WITNESS: I know they're governed by
6 the DEA. I don't know what their -- you asked me
7 if it was true that they were following those
8 regulations. I don't know.
9 BY MR. HUDSON:
10    Q. What I'm getting at is there's
11 regulations that applied, right, across to all
12 distributors and to all dispensers?
13    A. I think so, yeah. I believe that's
14 true.
15    Q. So what I'm trying to get at is, is
16 there something unique about Giant Eagle that
17 gives you this heightened comfort that there was
18 no diversion of drugs that were coming from Giant
19 Eagle?
20    MR. KOBRIN: Object to form.
21    THE WITNESS: I had comfort that we were
22 following procedures and the law. It didn't have
23 to be unique to give me comfort. It just had to
24 be effective and meet the standards.
25

Page 168

1 BY MR. HUDSON:
2    Q. How do we measure the effectiveness?
3 How do we figure that out?
4    MR. KOBRIN: Object to form.
5    THE WITNESS: Our operating procedures
6 and our policies and making sure they got met,
7 that was the daily job.
8    MR. KOBRIN: Let's take a break.
9    THE VIDEOGRAPHER: 11:54 we're off the
10 video record.
11    (Recess from 11:54 a.m. to 12:36 p.m.)
12    THE VIDEOGRAPHER: 12:36 we're on the
13 video record.
14       EXAMINATION
15 BY MR. BARTON:
16    Q. Mr. Mollica, we met at the beginning of
17 the deposition. My name is Eric Barton here with
18 Mr. Hudson representing the plaintiffs. I just
19 have some follow-up questions for you on a few of
20 the topics that have already been touched on this
21 morning, if that's all right.
22    I understand from your testimony at the
23 beginning of the deposition about your work
24 history that you were in -- I think you just
25 described it as a leadership role in the Cleveland

Page 169

1 area for about eight months before you became the
2 director of operations, pharmacy operations for
3 Giant Eagle; is that right?
4    A. Yes. The titles changed. It used to be
5 called pharmacy specialist. Now it's called
6 pharmacy district leader. That was the role.
7    Q. That was going to be my first question,
8 what was your title, but it was either pharmacy
9 specialist or pharmacy district leader?
10    A. Yeah. I can't remember because they
11 changed it somewhere in that era.
12    Q. And this was, I think, in about 2006,
13 about then?
14    A. That's correct.
15    Q. In that role, whatever your title, in
16 that role do I understand correctly that you would
17 have had some supervisory responsibility for some
18 number of stores in your geographic area, which
19 was the Cleveland area at that time?
20    A. That's right.
21    Q. Can you just give us a little more
22 detail about what your area or territory was at
23 that period of time in the Cleveland area for
24 those eight months that you held that position?
25    A. Yeah, but please understand they changed

Page 170

1 my territory so many different times. I've had so
2 many different ones. I may not be a hundred
3 percent accurate.
4     But it's my recollection the ones in that
5 particular area were on the west side, like in the
6 suburban areas. I didn't have like inner city
7 ones. But the ones that were west of Cleveland
8 and maybe southwest.
9     Q. How many stores in that role, and I
10 understand that may have varied, too --
11    A. Right.
12    Q. -- with what you said, but approximately
13 how many stores would you have had supervisory
14 responsibility for?
15    A. It would have been some number between
16 20 and 30. They changed the size of the
17 territories over time, too. It's in that range
18 somewhere. At that particular time, too, even
19 though it was, quote-unquote, on paper for eight
20 months, there was a big acquisition going on at
21 that time, and I was helping with the acquisition.
22    So I was -- they had interim leaders
23 overseeing my, quote-unquote, stores while I was
24 working on the acquisition piece, too.
25    Q. Given the number of stores and where you

Page 171

1 were, do you believe that you did have supervisory
2 responsibility during that period of time in the
3 position of pharmacy specialist or pharmacy
4 district leader for Giant Eagle retail pharmacies
5 in Cuyahoga or Summit counties?
6     MR. BARNES: Object to form. Can you
7 define what you mean by supervisory?
8     MR. BARTON: Whatever he would say his
9 roles were as pharmacy specialist or pharmacy
10 district leader.
11    THE WITNESS: I honestly don't know the
12 counties. If you show me a map, I'd probably be
13 able to -- I don't know which counties. I'm from
14 Pennsylvania originally, not Ohio. So I'm not
15 sure what the county names are. If you had store
16 specific -- I didn't have any of the ones that
17 were like in Cleveland proper, if that's what
18 you're asking, at that time.
19    It's my recollection that I had -- at one
20 time I had stores that were east of Cleveland and
21 more like going into Youngstown. But at that
22 time, it's my recollection it was the ones that
23 were kind of further out there in the west. I
24 didn't have the city stores.
25    Is that what those counties correspond to?

Page 172

1 BY MR. BARTON:
2    Q. That's fine.
3    A. In south, like Medina area, like going
4 into Akron, you know, the ones that are kind of on
5 the outskirts. I didn't have the...
6 BY MR. BARTON:
7    Q. Let me ask a general question about the
8 Giant Eagle retail pharmacies that we're talking
9 about here.
10    Is it accurate for us to understand that
11 these retail pharmacies were always connected to
12 or are a part of Giant Eagle supermarket grocery
13 stores?
14    A. Yes. Over the years, not in that
15 particular area, over the years there were onesie
16 twosie things where a Giant Eagle would be in an
17 independently-owned grocery store that Giant Eagle
18 distributed groceries to, but they were always
19 Giant Eagle pharmacies.
20    There were none in -- I don't think there
21 were any -- after the acquisition in Cleveland,
22 there were two stores -- I don't even remember the
23 names of them -- that we had Giant Eagle
24 pharmacies in. I think there were two of them in
25 the Cleveland market that we ran Giant Eagle

Page 173

1 pharmacies inside of the other grocery -- the
2 independent grocery store banner. But then they
3 were closed in some short time afterwards. But
4 for the most part, yes.
5    Q. That's helpful. So there were rare
6 examples, if I understand correctly, there were a
7 couple of rare examples that didn't last where a
8 Giant Eagle pharmacy that you or Giant Eagle
9 operations people had responsibility for the
10 operations of those pharmacies, but a couple of
11 them may have been physically located for a time
12 in a different grocery store, not a Giant Eagle
13 grocery store?
14    A. Correct. I do want to note as my
15 recollection, too, after the acquisition, my
16 territory at least for a couple of months -- I
17 don't remember the exact dates -- were just to
18 help the pharmacies that we just acquired. Some
19 of those may have been in those counties. But,
20 like I said, I'm not sure what the county borders
21 are for those.
22    MR. BARNES: Eric, when you say
23 different, you mean did they run the Giant Eagle
24 banner that they were independent or did they run
25 some other banner?

Page 174

1    MR. BARTON: Yeah. Let me ask that
2 question just to flesh it out. I realize we're
3 talking about exceptions, but we might as well
4 understand all the alternatives here.
5 BY MR. BARTON:
6    Q. In the instances where Giant Eagle owned
7 and operated or purchased and operated a pharmacy
8 within a grocery store that had a different
9 banner, a different brand, not Giant Eagle as the
10 supermarket or grocery store --
11    MR. BARNES: If that occurred.
12 BY MR. BARTON:
13    Q. In those instances and if that occurred,
14 did the pharmacy inside that grocery store have
15 kind of clear Giant Eagle signage, branding?
16    A. Yes, yes. They were branded, licensed.
17 Even the uniforms were the same. The bottle
18 labels had Giant Eagle Pharmacy on them.
19    Q. Operationally within the Giant Eagle
20 pharmacy operations group, operationally did those
21 pharmacies operate any differently than a Giant
22 Eagle pharmacy inside a Giant Eagle grocery store?
23    A. The more accurate way to say it is they
24 didn't operate different than any other Giant
25 Eagle that was an independently-owned Giant Eagle,

Page 175

1 meaning the way you handled the money. Because
2 the dollars were separate, there was a different
3 procedure for that.
4    There are some Giant Eagle grocery stores
5 that are independently owned. It was the same
6 procedure as would be in an independently-owned
7 Giant Eagle.
8    Q. Thank you. One of the things just for
9 us to be clear about, within all of the Giant
10 Eagle grocery stores that someone may come upon in
11 any of the states in which you operate or
12 operated, some of those Giant Eagle grocery stores
13 are independently owned and operated, but just
14 licensed or franchised or whatever the term would
15 be from Giant Eagle while others are company-owned
16 grocery stores; is that right?
17    A. Correct.
18    Q. Is there any way for somebody driving by
19 on the street to tell which kind they're looking
20 at?
21    A. No. It shouldn't be any different from
22 the viewpoint of a customer.
23    Q. When you just referenced the difference
24 in operations, I think the example of what you
25 referred to is just the handling of the money.

Page 176

1    A. Right, the books.
2    Q. The handling of the money would differ
3 between an independently-owned grocery store
4 licensed by Giant Eagle or a Giant Eagle
5 company-owned store; correct?
6    A. That's right.
7    Q. And, therefore, you said that the Giant
8 Eagle pharmacies inside independently-owned stores
9 might operate a little differently than Giant
10 Eagle pharmacies inside company-owned stores from
11 the standpoint of how the money is handled or
12 where it goes?
13    A. Yeah, the financial reporting pieces
14 only. Everything else was the same.
15    Q. Everything else being the same and
16 specifically since in this case we're talking a
17 lot about the security and policies for handling
18 of controlled substances; correct?
19    A. It would have been the same.
20    Q. So it doesn't matter where the store is.
21 That aspect of the operations would be the same
22 for Giant Eagle pharmacies everywhere you go?
23    A. Correct.
24    Q. Quickly, some of this is just basic
25 background, but just to kind of establish a few

Page 177

1 things, did Giant Eagle operate any pharmacies not
2 within grocery stores or supermarkets? In other
3 words, did they have any just standalone
4 exclusively pharmacy locations?
5    A. The only one that you could even, you
6 know, question if it was, if you consider a
7 grocery store, was Giant Eagle Express. It was
8 more of a C store, convenience store format. It
9 was not a traditional C store, but it had some
10 extended grocery, but it was a different format
11 than a traditional grocery store. And there was a
12 pharmacy in that. But once again, the procedures
13 would have been identical.
14    Q. That example, was that just a one store
15 example?
16    A. Yes.
17    Q. Or is that a one concept?
18    A. There may be more now, but at the time I
19 was there, there was only one.
20    Q. You answered the question already.
21 Operationally, even in that instance from the
22 standpoint of security and control and controlled
23 substances for sure, that pharmacy would operate
24 the same way?
25    A. Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1   Q.   And likewise, from the merchandising
2   side or the supply side of where each of these
3   Giant Eagle pharmacies would be getting its drugs,
4   its product, would those channels be the same
5   regardless of which kind of setting we're talking
6   about?
7       A.   The channels were the same, but, as I
8   recall, depending on the locations from warehouses
9   and things like that, the frequency of
10  distribution may have been different in certain
11  markets.  But where the drugs came from and things
12  like that were relatively the same.
13      McKesson will be able to answer better, but I
14  think, for example, in the Columbus market, the
15  distribution center from McKesson was different
16  than the one that supplied Western Pennsylvania.
17  I just think the differences were more logistical,
18  not so much procedural.
19      Q.   All of these Giant Eagle retail
20  pharmacies regardless of where they were, did they
21  all serve the general public?
22      A.   Yes.
23      Q.   So none of them were specialized only
24  servicing some exclusive group of people; correct?
25      A.   There was a pilot for two different

Page 179

1   types of businesses.  One was a compounding
2   pharmacy that was located in Pittsburgh.  It was a
3   closed door.  It wasn't open to the public.  So I
4   would consider that more of a specialty type of
5   pharmacy.
6       Then there was an acquisition of another
7   closed door pharmacy that was specific to
8   hepatitis C patients that was in Cleveland.
9       Q.   So other than those two examples you can
10  think of, ordinarily every other Giant Eagle
11  retail pharmacy served the general public;
12  correct?
13      A.   Correct.
14      Q.   So for a pharmacy that serves the
15  general public, does that pharmacy -- does it
16  matter to that pharmacy where its customer lives?
17      A.   I'm not sure.  Will you rephrase that?
18  I'm not sure what your question is.
19      Q.   I'm just getting at --
20      A.   Would we only take customers from a
21  certain area?
22      Q.   A certain county, a certain city.
23      A.   No.  It was general public.
24      Q.   So Giant Eagle pharmacies that are
25  located in Summit or Cuyahoga counties in the

Page 180

1   Cleveland metro area, not all of their customers
2   necessarily have to live within those counties;
3   correct?
4       A.   No, no.  The restrictions to pharmacy
5   filling are more about where the physician's
6   license originates, not so much where the patient
7   does.  However, I will say if you had -- if you
8   were a pharmacist and you were getting out of town
9   or a frequency of other than the normal kind of
10  course of business, those would be flags you would
11  question and verify with doctors and want to take
12  additional steps if you thought that there was
13  something that didn't make sense.
14      Q.   So that would be an example of where if
15  you have a bunch of customers coming in from some
16  far away place, that would seem a little odd to
17  the pharmacists; correct?
18      A.   I would think it would, yes.
19      Q.   But within a metro area where there are
20  a number of counties that all kind of would be
21  considered part of the broader metro area, that
22  isn't likely to trigger a flag in the eyes of the
23  pharmacist; fair?
24      A.   No, not if someone was from a general
25  radius of a store, no, I can't imagine that would.

Page 181

1       Q.   And just as Giant Eagle pharmacies in
2   Summit or Cuyahoga counties might have customers
3   from adjoining counties that come in to use that
4   pharmacy for some reason, the same could be true
5   that residents of Cuyahoga and Summit counties
6   might for whatever reason visit and regularly use
7   a Giant Eagle pharmacy that's located outside of
8   one of those counties; correct?
9       MR. BARNES:  Object to form to the
10  extent it's asking to speculate.
11      THE WITNESS:  Yeah, I was just going to
12  have to clarify.  I'm not sure which one Summit
13  County is.  Cuyahoga I'm pretty sure is where
14  Cleveland is located.  Which one is Summit County?
15  BY MR. BARTON:
16      Q.   I believe a map would show -- I'm not
17  from there either, but I believe a map would show
18  Summit is directly south of Cuyahoga County.
19      A.   Because you were saying in the vicinity.
20  Again, your question was?
21      Q.   My question is that people who live in
22  Summit or Cuyahoga County might go to a Giant
23  Eagle store in an adjoining county?
24      A.   It's possible, sure.
25      Q.   And that might normally happen?

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1   A.  Yes.
2   Q.  But there's no restriction
3  geographically on where people need to go for
4  their pharmacies to pick up their drugs; correct?
5   A.  That's correct.  Well, that's not
6  entirely -- controlled substances have a
7  restriction in terms of how often they can
8  transfer.  IIIs through Vs are only allowed to be
9  transferred legally one time.  IIs obviously are
10  single fill only.  So they wouldn't be able to go
11  from pharmacy to pharmacy with refills.
12   But in terms of bringing in a new
13  prescription though, there's not a restriction in
14  terms of what pharmacy they can enter.
15   Q.  I'm glad you brought that up.  So what
16  you're referring there by transfer, you're
17  referring to a situation where one pharmacy has a
18  prescription for a customer and transfers that
19  prescription at the customer's request to a
20  different pharmacy?
21   A.  Correct.
22   Q.  So what you're saying is there's
23  regulations that say for controlled substances,
24  there are limits on how frequently a pharmacy can
25  transfer prescriptions of controlled substances

Page 183

1  for a particular customer?
2   A.  It's a limit.  It's once for III through
3  Vs.
4   Q.  And transfers of prescriptions, that
5  usually happens at the customer's request; is that
6  right?
7   A.  That would be the only request that we
8  would ever have for a transfer.
9   Q.  For example, if someone goes on a
10  vacation and they run out of their prescription in
11  a far away place and they need it filled, there's
12  a mechanism by which that customer can call their
13  pharmacy back where they live, the one they
14  usually use, that has their prescription and that
15  pharmacy, if the right things happen, that
16  pharmacy can transfer that prescription to a far
17  away pharmacy even in a different state, and that
18  remote pharmacy can fill the prescription;
19  correct?
20   A.  That's correct.  There's a procedure in
21  place for pharmacists to do transfers that have to
22  be met, but yes.
23   Q.  Or if a customer of one pharmacy moves
24  and wants to just move to a different pharmacy
25  across town but is in the middle of a

Page 184

1  prescription, they can have the prescription
2  transferred from one pharmacy to another one
3  across town; correct?
4   A.  They could go downtown to get dinner and
5  decide to pick up the prescription downtown and
6  transfer it.  But with controls, it's only once.
7   Q.  But my earlier set of questions was
8  really just simply confirming that it doesn't
9  matter in what county someone lives.  Whether they
10  have prescriptions for controlled substances or
11  noncontrolled, it doesn't matter what county they
12  live in in terms of what county of a pharmacy they
13  choose to go to have the prescription filled in
14  the first instance; correct?
15   A.  The law as I understand it has
16  restriction on the doctor has to be from that
17  state and there's no law that says that you can't
18  go 50 miles away from where you live to get it
19  filled.
20   However, if you had an out-of-town
21  prescription, first time fill, the customer coming
22  in for controlled substances, most pharmacists
23  would at least ask some clarifying questions, want
24  more documentation from the prescriber, which is a
25  very common practice to call and verify.

Page 185

1   Q.  Let me ask you about that.  That sounds
2  to me, from what you described, like one of those
3  issues of kind of independent pharmacists'
4  judgment that you talked about or you mentioned
5  that Giant Eagle supports; is that right?
6   A.  That's right.
7   Q.  Are there written policies or procedures
8  at the pharmacy level that specifically address
9  that point?
10   A.  There's best practices that we will put
11  in place, and I can't remember the specifics, but
12  we would -- I believe they were in our dispensing
13  guidelines, too, but we had -- we did live
14  re-attestations to that, even role playing at
15  annual meetings where we bring pharmacists in.
16  And then, of course, the Pharmacy Act, we made
17  sure that every pharmacist understood the
18  corresponding responsibility piece, which that's
19  inclusive of.
20   Q.  That's an issue of best practices and
21  you do some training of pharmacists about
22  recognizing, things like that, red flags being
23  raised; correct?
24   A.  Correct.
25   Q.  Is there any state or federal law that

Page 186

1  specifically requires Giant Eagle or any other
2  retail pharmacy to go through some specific
3  process when someone brings a controlled substance
4  prescription written in one county and takes it to
5  a pharmacy 50 miles away or two counties away to
6  have it filled?
7      MR. BARNES:  Object to form.  Asking him
8  for a legal conclusion and/or to interpret laws.
9      THE WITNESS:  I'm not familiar with any
10 law that requires that type of procedure.
11 BY MR. BARTON:
12     Q.  But you and you believe Giant Eagle
13 during the time you were there considered that to
14 be one of those issues of best practices of
15 looking for red flags, things that don't quite
16 make sense in the normal day to day, and following
17 up about it; correct?
18     A.  The DEA puts language in their regs that
19 say things like takes steps to ensure, and they're
20 very vague about those, even when you ask
21 specifically how would you define "take steps to
22 ensure."
23     So they leave it in a lot of cases to
24 pharmacies to interpret and come up with what you
25 consider a good operating standard, and that's how

Page 187

1  we would manage it.
2      Q.  In terms of tracking how well
3  pharmacists or how consistently Giant Eagle
4  pharmacists were doing that, was there any for you
5  as director and vice-president of operations in
6  pharmacy to assess the compliance of Giant Eagle
7  pharmacists with that kind of a best practices
8  standard for the company as a whole?
9      A.  Sure.  An example is like we're doing
10 right now.  A lot of it was if you had, you know,
11 an order that seemed high, going and talking to
12 the pharmacist, getting that point of view, doing,
13 like I said, our monthly audits and reviews,
14 making sure that on-hand quantities and things
15 like that aren't altered.
16     But a lot of it is boots on the ground.  Even
17 while you see in emails a request for Todd in the
18 last document that you gave me to go and do a
19 look-see, that's what those steps are designed to
20 do.
21     Q.  I think my question was just whether --
22 let's move on just in terms of your role.  We
23 started by talking about when you were a pharmacy
24 district leader or pharmacy specialist in the
25 Cleveland area.  You were promoted to director of

Page 188

1  pharmacy operations for the company; right?
2      A.  That's correct.
3      Q.  And with that promotion did you have a
4  responsibility for pharmacy operations for the
5  entire company?
6      A.  For the operations piece, yes.
7      Q.  How many states at that time did Giant
8  Eagle have pharmacies in?
9      A.  Four.  There were two pharmacies in
10 Maryland, two in West Virginia, but predominantly
11 Pennsylvania and Ohio.
12     Q.  And the same was true once your title
13 became vice-president of pharmacy operations?
14 That is, you had responsibility for the operations
15 in retail pharmacies in every state in which Giant
16 Eagle operated pharmacies; correct?
17     A.  Yes.
18     Q.  So company-wide all the pharmacies.  And
19 you understood that each state does have its own
20 set of regulations for licensing both pharmacists
21 and pharmacies?
22     A.  Yes.
23     Q.  And I think you said one of your roles
24 as director of operations and later vice-president
25 of operations for the company was making sure that

Page 189

1  company pharmacies were following the regulatory
2  requirements for the pharmacy; correct?
3      A.  Correct.
4      Q.  And so while there were others below you
5  who also had those responsibilities at the
6  pharmacy and district levels, you kind of had the
7  ultimate responsibility for that kind of
8  compliance, if you will, pharmacy compliance,
9  regulatory compliance for the company as a whole;
10 correct?
11     A.  Yeah, making sure that we were following
12 state laws we were operating in.
13     Q.  You did understand that each state does
14 have its own regulatory body like state Boards of
15 Pharmacy; correct?
16     A.  Correct.
17     Q.  Its own sets of regulations.  In the
18 realm of security and control of controlled
19 substances, were you aware of any state law
20 differences from one state to another in that area
21 of how pharmacies were required to operate?
22     A.  Not anything that comes to mind that
23 would have been different, not even in a
24 noncontrolled area.  Different states have
25 different requirements for like document retention

Page 190

1 and things like that, you know, requirements for
2 everything from where if you had a central
3 dispensing area, are they licensed in your state
4 versus not needed to be, those types of things,
5 what the interval of licensure updates and things
6 like that are. But most of it is the same from
7 state to state.
8    Q.  I'm going to mark a couple of things as
9 exhibits. I'm going to hand you 13 and 14 here.
10    (HBC-Mollica Exhibits 13 - 14 were marked.)
11       (Witness reviewed the exhibit.)
12 BY MR. BARTON:
13    Q.  Mr. Mollica, I've handed you two
14 documents, Exhibits 13 and 14. Do you see that?
15    A.  Yes.
16    Q.  And I'll just represent to you that
17 Exhibit 13 is a printout of the Ohio
18 Administrative Code Section 4729-9-05, and this is
19 the version that was in effect in 2009 through its
20 next amendment, which I believe was in 2011 or
21 '12, although it wasn't a major amendment.
22    But this is during the time that you were in
23 the position of director of operations, pharmacy
24 operations for Giant Eagle; correct?
25    A.  Yes.

Page 191

1    Q.  And then Exhibit 14 is, likewise, a
2 printout of the Ohio Administrative Code, and it's
3 Section 4729-9-11, also the version in effect in
4 2009 through at least 2011 until it was next
5 amended. Do you see that?
6    A.  Yes.
7    Q.  So these two documents are part of the
8 pharmacy regulations applicable to pharmacies in
9 the state of Ohio. Do you agree with that?
10    A.  Yeah. That's what it appears to be,
11 yes.
12    Q.  And these are administered by in Ohio I
13 think the Ohio State Board of Pharmacy; correct?
14    A.  Yeah. It would be the Ohio state board.
15    Q.  These particular ones, looking at
16 Exhibit 13, which is Section 4729-9-05, that's
17 security requirements for dangerous drugs. Do you
18 agree with that?
19       MR. BARNES: Are you reading that from
20 somewhere?
21       MR. BARTON: No. I'm just
22 characterizing it.
23 BY MR. BARTON:
24    Q.  The title is Security Requirements.
25 That's the title of this particular regulation?

Page 192

1    A.  Yeah.
2    Q.  And it's within the chapter applicable
3 to dangerous drugs, do you see there up above?
4 That's what this purports to be addressing; do you
5 agree?
6    A.  I mean, I agree that 4729-9-05 is
7 security requirements.
8    Q.  And so in subsection (A) -- I'm not
9 going to read all of these, but we're just seeing
10 what these are. In subsection (A), the very first
11 sentence says, "All registrants shall provide
12 effective and approved controls and procedures to
13 deter and detect theft and diversion of dangerous
14 drugs."
15    Did I read that correctly?
16    A.  Yes.
17    Q.  All registrants, using that word in
18 these regulations, would you assume that that
19 refers in this instance to pharmacies if this is
20 regulating pharmacies?
21       MR. BARNES: Object to form. Don't
22 speculate.
23       THE WITNESS: I'm not even sure what
24 you're asking me. I can verify that's what it
25 says on the piece of paper the way you read it.

Page 193

1 BY MR. BARTON:
2    Q.  Well, do you believe that in the State
3 of Ohio, all pharmacies were required to have
4 effective and approved controls and procedures to
5 deter and detect theft and diversion of dangerous
6 drugs?
7    A.  Sure.
8    Q.  And in subsection (B), it says that,
9 "Substantial compliance with the standards set
10 forth in 4729-9-11 of the Administrative Code may
11 be deemed sufficient by the State Board of
12 Pharmacy after evaluation of the overall security
13 system and needs of the applicant or registrant."
14    Did I read that correctly?
15    A.  Yes.
16    Q.  So that's Exhibit 14, is the section
17 that's referenced there. Do you see that?
18 Exhibit 14 is 4729-9-11.
19    A.  Yes.
20    Q.  I want you to -- in the second sentence
21 of subsection (B) back on Exhibit 13, it says, "In
22 evaluating the overall security system of a
23 registrant or applicant, the State Board of
24 Pharmacy may consider any of the following factors
25 as they deem relevant for strict compliance with

Page 194

1  security requirements."
2      Do you see that?
3      A.  Yes.
4      Q.  First of all, strict compliance with
5  security requirements, do you believe that that is
6  what Ohio, the State of Ohio expected for its
7  retail pharmacies?
8          MR. BARNES:  Object to form.
9          THE WITNESS:  I don't know what -- what
10  it says here is that they considered the following
11  as they deem relevant.  So how they deemed these
12  relevant, I can't speak for how the Board would in
13  those particular situations.
14  BY MR. BARTON:
15      Q.  Do you believe that Giant Eagle -- in
16  the position of director and vice-president of
17  pharmacy operations, did you try to achieve strict
18  compliance of security requirements?
19      A.  Our goal is to achieve compliance with
20  any regulation and legal requirement.
21      Q.  But not necessarily strict compliance?
22          MR. BARNES:  Object to form.
23          THE WITNESS:  I don't know what the
24  definition of strict is.  We followed -- we
25  followed what was required.

Page 195

1  BY MR. BARTON:
2      Q.  So one of the factors that the state
3  Board of Pharmacy may deem relevant is down in
4  Section 14 at the bottom of the page on
5  Exhibit 13.  It's "Adequacy of the registrant's or
6  applicant's system for monitoring the receipt,
7  manufacture, distribution and disposition of
8  dangerous drugs in its operation."
9      Do you see that?
10      A.  Yes.
11      Q.  So do you believe the State of Ohio
12  expected pharmacies to have a system for
13  monitoring the receipt of dangerous drugs?
14          MR. BARNES:  Object to form.  Lack of
15  relevance.
16          THE WITNESS:  It says -- it states here
17  that one of the requirements that they may deem
18  relevant is adequacy of the registrant's or
19  applicant's system for monitoring the receipt.
20  BY MR. BARTON:
21      Q.  And if the registrant in the State of
22  Ohio was a registrant or applicant that
23  distributed dangerous drugs, likewise, you believe
24  the State of Ohio expected them to have a system
25  for monitoring the distribution of the dangerous

Page 196

1  drugs in its operation; correct?
2          MR. BARNES:  Object to form.  Misstates
3  the very document you're showing him.
4          THE WITNESS:  What I see here is there's
5  14 examples of what they may deem relevant.
6  BY MR. BARTON:
7      Q.  Did you deem it relevant as director and
8  VP, vice-president of operations for Giant Eagle,
9  pharmacy operations, did you deem it relevant for
10  Giant Eagle to have a system for monitoring the
11  receipt or distribution of dangerous drugs in its
12  operation?
13      A.  I believe that's what we were doing.
14      Q.  So you did deem it relevant?
15      A.  Yes.
16      Q.  In fact, that would have been
17  particularly important to you in your position for
18  overseeing pharmacy operations for all of the
19  retail pharmacies in the company; correct?
20      A.  Yes.
21      Q.  If you turn the page to subsection (D),
22  that says, "Any registrant or applicant" -- sorry.
23  I'll let you get there.  I'm on the second page
24  toward the top.
25      It says, "Any registrant or applicant

Page 197

1  desiring to determine whether a proposed security
2  system substantially complies with or is the
3  structural equivalent of the requirements set
4  forth in Rule 4729-9-11 of the Administrative Code
5  may submit any plans, blueprints, sketches or
6  other materials regarding the proposed security
7  system to the State Board of Pharmacy."
8      Do you see that?
9      A.  Yes.
10      Q.  Do you know whether you ever did that or
11  anyone else from Giant Eagle ever submitted any
12  proposed plans for a security system to the State
13  of Ohio?
14      A.  In Ohio not only did you have to give
15  the blueprint, but they did a physical inspection
16  of the security systems.
17      Q.  And that was part of opening a new
18  pharmacy, for example?
19      A.  Yes.  And they did routine inspections
20  after they were open as well.
21      Q.  Did that include submitting policies and
22  procedures to Ohio, or are you interpreting that
23  as just referring to the physical structure
24  itself?
25      A.  That's what I do believe they are

Page 198

1 referring to here. That was the requirement.
2 They have -- in other parts of the Ohio Boards,
3 there are requirements for what you have to do in
4 order to open a pharmacy, and this piece is
5 included in there.
6    Q.   Do you recall ever submitting any
7 changes to any plans or security procedures to the
8 State of Ohio when there were any changes to those
9 that you may have made as a company?
10    A.   As it pertained to what they're
11 referring to here, physical changes to the
12 pharmacy in terms of the storage of controlled
13 substances, if we made physical changes to a cage
14 or something along those lines, you would submit
15 any changes.
16    Not even referring to controlled substances,
17 but if you made a physical change to a pharmacy at
18 any time other than, you know, where you put the
19 filing cabinet, physical changes, you would have
20 to submit them to the state.
21    Q.   And would that also apply to any just
22 changes in policies, procedures or operations?
23    A.   No.  The state to my knowledge doesn't
24 require you to -- your internal policies and
25 procedures, to submit to them.

Page 199

1    Q.   Go back to -- let's go back to
2 Exhibit 5, which was the Ohio State Board of
3 Pharmacy proceedings against one particular
4 pharmacy in Ohio.
5       MR. BARNES:  This is the one that's
6 outside Case Track One jurisdiction?
7       MR. BARTON:  It's Exhibit 5, P-GEN-111.
8       THE WITNESS:  I have it here.
9       MR. BARNES:  I think we have a
10 continuing objection that this does not relate to
11 Case Track One jurisdiction.
12       MR. BARTON:  The continuing objection is
13 fine.
14 BY MR. BARTON:
15    Q.   So this a Giant Eagle #4098 in Chardon,
16 Ohio; correct?
17    A.   Correct.
18    Q.   And do you know where Chardon is?
19    A.   Yeah.  I think it's -- jeez, now I can't
20 remember.  It's a suburb of the Cleveland area.  I
21 can't recall if it's on the east or the west side.
22    Q.   I'll represent to you I believe it's on
23 the east side.
24    A.   I was just going to say my gut is
25 telling me east side.

Page 200

1    Q.   Do you know what county it's in?
2    A.   No, no.
3    Q.   Do you recall there being a Geauga
4 County?  I don't know if I say it right.
5    A.   No.  I know that there's -- I know
6 there's a part of Ohio called Geauga, but I don't
7 know if it's a county or town.
8    Q.   Well, I'll represent that Chardon is in
9 that county, whether I pronounce it correctly or
10 not, and that county borders Cuyahoga County.
11 It's adjacent to Cuyahoga County to the east.
12 It's the county directly east and adjacent to
13 Cuyahoga County.
14    A.   That makes sense.
15    Q.   Do you have any reason to disagree with
16 that?
17    A.   No.
18    Q.   The map will be what the map is.
19    A.   The map is what the map is.
20    Q.   There was some discussion of this, but I
21 just want to make it clear.  You understand --
22 one, this did happen during the time you were
23 director of pharmacy operations for the company;
24 correct?
25    A.   Yes.

Page 201

1    Q.   And you do understand that this
2 settlement agreement began and, in fact, it
3 recites that the state Board of Pharmacy was
4 charging that pharmacy with violating the
5 regulations that we just looked at.  Do you
6 understand that?
7    A.   No.  Could you refer to that section
8 again?
9    Q.   Yeah.  If you look on the second page of
10 the part we're talking about, after the settlement
11 agreement, but the next page.
12    A.   The next page after this one, that one?
13    Q.   Yeah.  That's the one.
14    If you look at the second whereas clause,
15 first of all, it says, whereas, on or about
16 July 14, 2011, pursuant to Chapter 119 of the Ohio
17 Revised Code, that Giant Eagle store was notified
18 of the allegations or charges against it, its
19 right to hearing, its rights in such hearing and
20 its right to submit contentions in writing.
21 Further, a hearing was scheduled and continued by
22 the Board, and the July 14, 2011 notice of
23 opportunity for hearing contains the following
24 allegations or charges.
25    Do you see that?

Page 202

1  A.  Yes.
2  Q.  Number two is one of -- you understand
3  that number two then below is one of the
4  allegations or charges that was made by the state
5  Board of Pharmacy against this store?
6  A.  Yes.
7  Q.  And that is that Giant Eagle Pharmacy
8  #4098 did from May 1, 2009 through January 21,
9  2011 fail to provide effective and approved
10  controls and procedures to deter and detect theft
11  and diversion of dangerous drugs, to wit:  The
12  following controlled substances and dangerous
13  drugs where stolen from the pharmacy, yet internal
14  control procedures failed to deter or detect the
15  theft; correct?
16  A.  Yes.  That's what it says.
17  Q.  Then number three also describes the
18  same.  When it carries onto the next page, it
19  actually specifically lists the drugs that were
20  admitted by a technician to a Board agent that
21  that list of drugs were diverted to her addicted
22  husband and also sold to someone else; right?  Do
23  you understand that?
24  A.  Correct.
25  Q.  That are those are the facts being

Page 203

1  alleged.  And it lists the drugs.  It then follows
2  by saying, such conduct is in violation of
3  4729-9-05 of the Ohio Administrative Code, which
4  is what we just looked at in Exhibit 13?
5  A.  It says that after -- it says
6  allegations or charges.
7  Q.  Right.  Your point is this is an
8  allegation or a charge; correct?
9  A.  Correct.
10  Q.  By the State Board of Pharmacy against
11  this specific pharmacy, not just the technician,
12  but against the pharmacy for internal controls not
13  preventing or deferring this from happening;
14  correct?
15  A.  Yes, for this instance, yes.
16  Q.  Then it says in the next sentence below,
17  Giant Eagle #4098 neither admits nor denies the
18  allegations in that notice of opportunity for
19  hearing letter dated July 14, 2011; correct?
20  A.  Yes.
21  Q.  That speaks for itself.  It neither
22  admitted or denied those allegations; correct?
23  A.  Yeah.  It basically says nothing.  It
24  says neither, nor.  So, yes.
25  Q.  Were you a part of the decision of how

Page 204

1  to respond to that notice of opportunity in the
2  hearing letter dated July 14, 2011?
3  A.  Most of that would have been done by
4  counsel and working directly with the folks who
5  were touching that.  Mine is more indirect.  The
6  pharmacy district leader and the folks who run
7  that particular pharmacy would probably be more
8  intimate with, you know, the details of that.
9  I'm aware of the incident, but the details in
10  terms of how the response, I wouldn't have been as
11  integral as others would be.
12  Q.  One of the things that Giant Eagle 4098
13  agreed to do is listed in paragraph (A) here.
14  Giant Eagle #4098 agrees to adopt and implement
15  the policies as submitted to the Ohio State Board
16  of Pharmacy in its letter dated September 27,
17  2011.  Do you see that?
18  A.  Yes.
19  Q.  And do you recall being a part of
20  reviewing or assisting in the preparation of that
21  letter to the Ohio State Board of Pharmacy?
22  A.  I don't recall specifically, but my
23  feeling is, yes, I would have reviewed that
24  letter.
25  Q.  As you sit here, do you know what

Page 205

1  policies that pharmacy agreed to adopt and
2  implement as part of the settlement agreement?
3  A.  I don't recall that specifically.  If
4  you let me look at them, I could try to
5  refamiliarize myself.  That was eight years ago.
6  I don't remember specific to that incident.
7  Q.  Would you agree that it's reasonable to
8  infer from Giant Eagle's #4098's agreement to
9  adopt and implement policies as part of this
10  settlement that those policies that it agreed to
11  adopt and implement would have been reasonable
12  policies?
13  MR. BARNES:  Object.
14  THE WITNESS:  If you could show me the
15  policies that they're referring to, I could answer
16  that more properly.
17  BY MR. BARTON:
18  Q.  I'm asking a simpler question, which is:
19  Would you agree that what happened here is this
20  store wrote a letter to the State Board of
21  Pharmacy, and it agreed to adopt and implement
22  policies that were outlined in that letter?  Do
23  you agree with that?
24  A.  Yes.
25  Q.  That was part of the settlement of this

Page 206

1 whole thing; right?
2    A.  Yeah.  It states here that there were --
3 agreed to implement policies specific to the
4 incident that were included in this document or
5 along with this.  I guess I'd have to familiarize
6 myself to be specific.
7    Q.  It doesn't actually say agrees to adopt
8 and implement policies specific to this incident,
9 but the letters --
10    A.  Do you not agree that they're specific
11 to this incident?
12    Q.  No.  I'm saying that we don't have the
13 letter, the September 27, 2011 letter.  We'd like
14 to see it.  We don't have that.
15    A.  I don't have it either.
16    Q.  But I'm just asking you -- I'm just
17 asking you:  Do you believe that Giant Eagle #4098
18 as part of the settlement of this proposed to
19 adopt and implement reasonable procedures?
20    MR. BARNES:  Object to form.  Asking you
21 to speculate.
22    THE WITNESS:  What I believe is that
23 Giant Eagle 4098 agreed to adopt and implement
24 policies that were specific to this incident as
25 related to this particular Board inquiry.

Page 207

1 BY MR. BARTON:
2    Q.  And do you believe the policies that it
3 proposed would have been reasonable policies?
4    MR. BARNES:  Object to form.
5    THE WITNESS:  I would think that makes
6 sense, yes, reasonable.
7 BY MR. BARTON:
8    Q.  And you would also agree that those
9 reasonable policies had not yet been adopted or
10 implemented by that store?  Do you agree with
11 that?
12    MR. BARNES:  Object to form.
13    THE WITNESS:  No.  I can't say that
14 that's true.  I don't know what the lag time
15 between the incident occurred here and when this
16 document was written to say when those policies
17 were put into effect.  They could have been done
18 the next hour after we found out.  There's no way
19 of knowing that from this document.
20    MR. BARTON:  I don't think I have any
21 further questions.
22    EXAMINATION
23 BY MR. BARNES:
24    Q.  I have a few follow-up questions.  You
25 were asked a few questions about Exhibit 5,

Page 208

1 Mr. Mollica.  This is the Geauga County incident
2 back in 2011?
3    A.  Yes.
4    Q.  You weren't asked questions about the --
5 there was a thousand dollar monetary penalty.  Do
6 you see that?
7    A.  I see that, yes.
8    Q.  And do you see the drugs up above,
9 hydrocodone with APAP?
10    A.  Yes.
11    Q.  What is that?
12    A.  Those are combination products of --
13 APAP is a chemical abbreviation for Tylenol, what
14 you know as Tylenol, acetaminophen.
15    Q.  And were these schedule IIIs or IIs at
16 the time of this incident?
17    A.  Every one of these would have been
18 Schedule III.  Not every one.  I'm sorry.
19 Carisoprodol I don't believe was a Schedule III.
20 I think that was a IV.  And I honestly don't
21 remember what Suboxone was.  That wasn't during my
22 time behind the pharmacy counter.
23    Q.  Under the DEA scheduling regulations,
24 IIIs, IVs and Vs are considered less dangerous
25 than IIs; is that right?

Page 209

1    A.  Yes.
2    Q.  The thousand dollar fine that was paid,
3 this store agreed to pay this thousand dollar fine
4 related to this incident; is that right?
5    A.  Yes.  That's it says, yes.
6    Q.  Does theft happen from time to time
7 chain-wide?  Given the fact that you employ
8 humans, do humans from the time steal?
9    A.  Yes, they do.  And the problem with
10 associates is they are more familiar with how to
11 get around the controls that you put in place.
12 So, yes, there are occasions when they will steal.
13    Q.  There was a reference to this diversion.
14 This was by somebody who diverted to her addicted
15 husband and apparently he then sold the stolen
16 drugs to another individual.
17    Do you recall being asked about that?
18    A.  I honestly don't recall the details of
19 that theft.  I'm aware of the theft at Chardon,
20 and there was follow-ups, but the details -- I
21 just don't recall what the thief did with the
22 medication after she stole it.
23    Q.  Right.  And I'm not necessarily asking.
24 I'm just saying that you were asked some questions
25 a few minutes ago about what this says here at the

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 top.
2    It says drugs were stolen by an inadequately
3 supervised technician who admitted to a Board
4 agent the drugs were diverted to her addicted
5 husband and also sold to another individual.
6    I take it you have no idea what her addicted
7 husband did with these drugs?
8    A.  No, no.
9    Q.  In your experience, are pharmacists
10 supposed to follow people out of the store and all
11 the way home and monitor every pill that they take
12 and where they put it or who they sell it to on
13 the street corner or otherwise?
14    A.  No.  Our chain of custody is at the
15 counter.
16    Q.  Are pharmacists responsible for the
17 criminal acts of third parties?
18    A.  No.
19    Q.  This was directed to one pharmacy
20 outside of Case Track One jurisdiction.  How many
21 pharmacies were in the chain at the time?
22    A.  Over 200.  I want to say 212, but once
23 again, acquisitions happen in a fluid manner.  So
24 I don't know the exact number at this particular
25 time, but I would venture to say over 200.

Page 211

1    Q.  And when an employee violates Giant
2 Eagle's rules like this, are they disciplined or
3 fired?
4    A.  They're terminated immediately and where
5 it's appropriate, we report to the state Board.
6    Q.  In any organization that you've ever
7 been in, do they have a 100 percent record of
8 employees not stealing?
9    A.  Not the ones I've ever worked at, no.
10    Q.  In your experience, are internal
11 controls sometimes overridden by dishonest
12 employees?
13    A.  I've had situations where employees have
14 overridden internal controls, yes, to steal from
15 an organization, whether it's money, drugs, other
16 things, supplies.
17    Q.  So despite the company's best efforts to
18 put in controls, sometimes people commit criminal
19 acts?
20    A.  You're always trying to build a better
21 mousetrap because of those things.
22    Q.  Now, other than this thousand dollar
23 fine paid in connection with this incident, are
24 you aware of the Ohio State Board of Pharmacy
25 doing anything else with respect to this incident

Page 212

1 other than what's revealed in this document?
2    A.  No, not to my -- not to my recollection.
3 I honestly can't remember if they did follow-up
4 inspections or things like that.  They may have.
5 I just don't recall.
6    Q.  And this was specifically directed at
7 one store, not the entire chain or the
8 corporation; is that correct?
9    A.  That's correct.
10    Q.  You said something about the DEA and the
11 Ohio State Board coming into these pharmacies for
12 spot audits, things of that nature.
13    A.  Correct.
14    Q.  Did the Ohio State Board of Pharmacy as
15 a result of this incident do anything with respect
16 to this store's ability to continue to fill
17 prescriptions?
18    A.  No.  Are you referring to any kind of
19 sanction?
20    Q.  Yes.
21    A.  No.
22    Q.  You talked a lot about the integrated
23 system of controls that Giant Eagle had, and I
24 don't want repeat all of that.  But I just want to
25 make sure for completeness of the record.

Page 213

1    Did Giant Eagle at all times hire licensed
2 and trained pharmacists?
3    A.  Yes.
4    Q.  Did they train those pharmacists with
5 respect to diversion?
6    A.  Pharmacists are trained, are aware of
7 the laws regarding diversion as part of licensure.
8 But then, yes, we had training for pharmacists and
9 reference material type of tools within the
10 pharmacy for them to reacquaint themselves with
11 those things at any time.
12    Q.  If a pharmacist doesn't follow Giant
13 Eagle policies and procedures or the law, what
14 happens?
15    A.  If a pharmacist doesn't follow the law,
16 they're terminated, many times reported to the
17 Board if we believe that whatever the termination
18 was a risk to public health.
19    Q.  And you talked earlier today about the
20 professional discretion and judgment that
21 pharmacists use.
22    Is that a line of control in your mind in
23 terms of avoiding diversion?  Is that the first
24 line of defense, that a pharmacist, licensed
25 pharmacist must review the prescription before

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 it's filled?
2    A.  Yes.  That's why pharmacies require
3 licensed pharmacists.  That's one of the reasons.
4    Q.  And pharmacies are assisted by
5 technicians in the pharmacy; is that right?
6    A.  Yes.
7    Q.  Are they trained and supervised by the
8 pharmacists themselves?
9    A.  They're trained both by the pharmacist,
10 but there's a formal technician training program
11 as well, a Giant Eagle certification program.
12    Q.  And the policies, some of the policies
13 that you referenced earlier today, do they include
14 the DEA pharmacist manual?
15    A.  Yes.
16    Q.  Are those in all of the pharmacies?
17    A.  Yes.
18    Q.  Do they include the Giant Eagle
19 Controlled Substance Dispensing Guidelines?
20    A.  Yes.
21    Q.  Are the pharmacists trained on those
22 dispensing guidelines?
23    A.  Yes.
24    Q.  Is that training monitored in some way?
25 In other words, can a pharmacist just skip that

Page 215

1 training in some way?
2    A.  I can't imagine you could pass the state
3 Board exam if you skip it.
4    Q.  Does Giant Eagle make sure that the
5 pharmacists when they're hired, they actually
6 review these guidelines and are trained on them?
7    A.  Yes.  There's also computer-based
8 monitoring that had attestations.
9    Q.  In these so-called PMPs, like the OARRS
10 system, are those in all of the Giant Eagle
11 stores?
12    A.  To my knowledge, yes.
13    Q.  And are pharmacists --
14    A.  I can't recall what the State of West
15 Virginia was with that.  I can't remember if they
16 had electronic or some other system, but whatever
17 West Virginia had, we were complying with that
18 one.  I don't want to say it was exactly like
19 OARRS.  Each state has a right to be a little
20 different there.
21    Q.  Are those a resource tool for the
22 pharmacists to determine the legitimacy of
23 prescriptions?
24    A.  Yes.
25    Q.  You were asked a lot of questions today

Page 216

1 about so-called suspicious orders.  But you talked
2 about how Giant Eagle was self distributing.
3    A.  Yes.
4    Q.  In your understanding of Giant Eagle's
5 integrated system, should there ever be a
6 suspicious order?
7    A.  That's what I was trying to say.  I
8 don't know by definition how you could have a
9 suspicious order when the drugs are moving from
10 the warehouse to a shelf that's also owned and
11 operated by Giant Eagle.
12    That's why we have our -- our internal
13 mechanisms could always -- you never have an
14 opportunity where you can't check chain the
15 custody in our system because it's a closed system
16 to ourselves.
17    Q.  Did Giant Eagle Pharmacies report their
18 transactions to the DEA?
19    A.  Which transactions?
20    Q.  Filling prescriptions.
21    A.  Yes.
22    Q.  Did the DEA ever raise any questions
23 with any of the Giant Eagle stores at any time?
24    A.  I'm sure -- that's a little too vague.
25 I'm sure they've had questions over time.  If

Page 217

1 you're saying specific to suspicious drug
2 monitoring, not to my knowledge.
3    Q.  You talked about the extensive of record
4 keeping at the stores.  I don't want to belabor
5 that point.  But with respect to the physical
6 security of controlled substances, are they
7 monitored from the moment they come in to the
8 moment that they go out?
9    A.  Yes.
10    Q.  Are they kept in locked cabinets or
11 vaults as necessary?
12    A.  Which controlled substances?
13    Q.  I'm talking about -- let's talk about
14 opioids.
15    A.  Opioids are kept in a locked cabinet.
16    Q.  And who has the keys to that?
17    A.  Only the pharmacist.
18    Q.  And who can dispense opioids?
19    A.  Only the pharmacist.
20    Q.  Incoming orders, are they checked in and
21 monitored closely and added to inventory?
22    A.  Orders are -- for controls you're
23 referring to?  They're checked in in sealed
24 containers for which you have to sign that you're
25 the one opening the container.  They're checked

Page 218

1 into inventory, and then they're matched to the
2 dispensing records.
3    Q. Are there regular and perpetual
4 inventories of controlled substances including
5 opioids?
6    A. Yes.
7    Q. And you mentioned the monthly so-called
8 narc audits.
9    A. Yes.
10    Q. Is that where you actually physically
11 recount controlled substances including opioids?
12    A. Yes.
13    Q. And there's an annual inventory; is that
14 right?
15    A. That's correct.
16    Q. Do the pharmacists double count
17 controlled substance prescriptions?
18    A. Yes. That's a policy of Giant Eagle.
19    Q. Do they back count them?
20    A. I do not know that means, back count.
21    Q. Well, making sure that the amount left
22 in the bottle is what the inventory system says
23 should be there.
24    A. That's correct.
25    Q. Did the Board of Pharmacy come in and do

Page 219

1 audits from time to time?
2    A. Yes.
3    Q. The pharmacy district leaders, did they
4 oversee stores in their area and do quarterly
5 internal audits?
6    A. Yes.
7    Q. Including compliance audits?
8    A. Yes.
9    Q. Did they supervise the training of
10 pharmacists?
11    A. Yes.
12    Q. Did they work with law enforcement and
13 the Board of Pharmacy to deter diversion?
14    A. Yes.
15    Q. And criminal acts. Was there red flag
16 awareness training for the pharmacists?
17    A. Be more specific. I'm not sure...
18    Q. Well, in the dispensing guidelines, the
19 red flags to look for to see if a prescription is
20 legitimate.
21    A. Oh, yes, yes.
22    Q. Did Giant Eagle have a loss prevention
23 department?
24    A. Yes.
25    Q. With experienced diversion

Page 220

1 investigators?
2    A. Yes.
3    Q. Did they spend a lot of time in the
4 pharmacies?
5    A. Yes.
6    Q. Do they work with the local police and
7 the Boards of Pharmacy and the DEA?
8    A. Yes.
9    Q. Did the pharmacists take any steps
10 individually to flag scripts that they thought
11 might be illegitimate?
12    A. Yes.
13    Q. Can you give us some examples?
14    A. If prescriptions didn't look like --
15 once again, you get intimate with your community,
16 so you recognize physicians' signatures when they
17 don't look right, if they're missing pieces of
18 documentation, when there's obvious errors.
19    You would be very surprised at some of the
20 whacky stuff that you see when the public tries to
21 divert, spelling things wrong, not using the right
22 Latin codes, missing numbers, unusual quantities
23 or frequency, dates that look altered, those types
24 of things, photocopies. There's all kinds of
25 things that you can pick up on.

Page 221

1    Q. And are Giant Eagle pharmacists trained
2 to look for that kind of --
3    A. They're trained not just by the
4 organization, but just in their general practice,
5 too. You need to be in a pharmacy to know that
6 Dr. Smith always writes controls on a blue pad and
7 this one is yellow. You can't train that. But
8 pharmacists do those things as part of local
9 awareness as well as the tools that we provide
10 from the company.
11    Q. Are there security cameras in all of the
12 pharmacies?
13    A. I actually don't know. Yes, there are
14 security cameras. Not for my entire run at Giant
15 Eagle, but when I left, I'm pretty sure every one
16 of them had security cameras.
17    Q. Are you aware of so-called BOLO notices,
18 Be On The Lookout notices exchanged between the
19 pharmacists?
20    A. Oh, they do that. Yeah. They do that a
21 lot on their own. It's a very tight network.
22    Q. You mentioned daily counts of drugs.
23 Did that include hydrocodone combination products
24 when HBC distributed it when it was a Schedule
25 III?

Page 222

1   A.   Daily counts?
2   Q.   Yes.
3   A.   Of which ones?
4   Q.   Of the HCPs.
5   A.   The combination products?
6   Q.   Yes.
7   A.   I don't know that daily counts were
8   required in terms of physical counts.  I don't
9   recall.  But you had a virtual inventory that
10  every time you pulled the drug off the shelf, you
11  had to verify.  It that constitutes a physical
12  count, I don't know.
13  Q.   I want to direct your attention back to
14  Exhibit 13.  This is the Ohio Administrative Code,
15  but its looks awfully similar to the DEA
16  regulation.  I want to direct your attention to
17  (A), "All registrants shall provide effective and
18  approved controls and procedures to deter theft
19  and diversion..."
20  Do you know if that's almost identical to the
21  DEA regulation on the same topic?
22  A.   Likely to be, yes.
23  Q.   All these factors that you go through, I
24  want to go through some of these factors to
25  determine whether you meet the security

Page 223

1   requirement.
2   The type of activity conducted, HBC to your
3   knowledge was a Schedule III, IV, V warehouse that
4   never distributed controlled substance level IIs.
5   Did you know that?
6   A.   Yes.  And noncontrols as well.
7   Q.   And noncontrols.
8   A.   That was the majority of what they
9   distributed.
10  Q.   And did it do branded and unbranded
11  generics, or did it just do a piece of the IIIs,
12  IVs, Vs?
13  A.   It was just the generic portions of it.
14  It was more meant as a generic warehouse, not --
15  Q.   So would you say with respect to factor
16  (B)(3) that the quantity of dangerous drugs
17  handled, considering the fact that they were IIs
18  when handled by HBC and the fact that they were
19  only doing some of the generics, would you say
20  that would be high or a low quantity of dangerous
21  drugs being handled by HBCs?
22  MR. HUDSON:  Object to the form.
23  THE WITNESS:  I would say it would be
24  low, a low quantity as compared to the overall
25  ordering of a pharmacy.  Even when pharmacies

Page 224

1   would get their totes, you know, filled with
2   drugs, the HBC ones were a different color.  You
3   might see one tote from HBC and 20, you know, from
4   the general -- from McKesson or whomever we were
5   ordering from.
6   BY MR. BARNES:
7   Q.   So is it fair statement that between
8   2009 and 2014, the vast majority of opioid
9   products going into the Giant Eagle pharmacies
10  were coming from McKesson?
11  A.   I don't -- I don't recall what the
12  specific formulary for the controls that were at
13  the HBC warehouse were, but my assertion is the
14  minority of them came from the HBC warehouse.
15  Q.   Well, you know most opioids are
16  Schedule IIs and always have been Schedule IIs;
17  correct?
18  A.   In my definition, when you say opioid,
19  I'm including combination drugs.  We got zero
20  Schedule IIs from the warehouse.
21  Q.   And were opioids small or a large
22  percentage of what the warehouse was doing,
23  sending to the pharmacies?
24  A.   The HBC warehouse?
25  Q.   Yes.

Page 225

1   A.   It was a small percentage.  Like I say,
2   I can't recall the exact NDCs that were in the
3   warehouse, but even in our overall dispensing,
4   it's a small number, small percentage.
5   Q.   This Exhibit 13, number (B)(4) talks
6   about location of the premises.  Were all these
7   Giant Eagle pharmacies inside Giant Eagle grocery
8   stores?
9   A.   Yes, with the exception of the examples
10  that I spoke to the gentleman about earlier.
11  There was two independently-owned grocery stores
12  in the Cleveland market that we had Giant Eagle
13  pharmacies in.
14  Q.   Those were transitioned then to Giant
15  Eagle stores?
16  A.   They were just -- no.  They never
17  transitioned to Giant Eagle stores.  We just took
18  the pharmacies out.
19  Q.   But being inside of a grocery store, is
20  that a level of control that you consider as part
21  of the security analysis?
22  A.   Not only were they delivered to a store,
23  but they were in cases where the pharmacy -- if
24  there was a situation where the pharmacy wasn't
25  open, they had to be delivered to a locked cage

Page 226

1  within the store.
2      Q.  Factor (B)(6) six talks about types of
3  vaults and safes and other secure enclosures.
4      Did the pharmacies at least to your knowledge
5  keep any controlled substances in locked secure
6  locations?
7      A.  Every drug in the pharmacy is in a
8  locked location in the pharmacy, and that's the
9  reason why the state Boards have you send in
10 diagrams of physical barriers so every drug is
11 protected that way.  It doesn't matter if it's
12 controlled or not.  Narcotics inside of that
13 locked pharmacy are in a locked safe or locked
14 cabinet.
15     Q.  Did the Ohio State Board of Pharmacy
16 audit every store at least once per year?
17     A.  I don't know what their frequency was.
18 That sounds reasonable.  If you would ask me how
19 often I think, I would say once a year.
20     Q.  Did anybody from the Ohio State Board of
21 Pharmacy ever come to Giant Eagle to your
22 knowledge and say, hey, you're not meeting those
23 requirements?
24     A.  No.  In fact, we actually had a member
25 of the state Board who worked for us.

Page 227

1      Q.  And then you were asked questions about
2  this No. 14, adequacy of the registrant's or
3  applicant's system for monitoring receipt,
4  manufacture, distribution and disposition of
5  dangerous drugs in its operation.
6      The Schedule III, IV, Vs being handled by the
7  Giant Eagle pharmacies, were they subject to this
8  integrated system of controls you've testified to
9  repeatedly throughout your deposition?
10     MR. HUDSON:  Objection.  Misstates his
11 testimony.
12     THE WITNESS:  All controls were treated
13 within those same guidelines.  Schedule IIs had
14 additional steps that you had to take.
15 BY MR. BARNES:
16     Q.  Well, Giant Eagle wasn't manufacturing
17 any of these products; correct?
18     A.  Oh, no, no.
19     Q.  And all of these products were FDA
20 approved legal products being handled --
21     A.  Yes.
22     Q.  -- by the pharmacies?  And the
23 pharmacies were just dispensing pursuant to
24 prescriptions issued by licensed doctors; is that
25 correct?

Page 228

1      A.  Correct.
2      Q.  So regardless of what anybody wants to
3  call the orders that were sent out by the
4  pharmacies, can you tell us what happened to any
5  orders, suspicious or not suspicious, funny or not
6  funny or strange or unusual?  What happened to any
7  of those drugs after they arrived at the Giant
8  Eagle pharmacies?  Where did they go?
9      A.  You mean after they left the pharmacy?
10     Q.  No, when they arrived at the pharmacy no
11 matter how they got --
12     A.  They went right into the shelf and to
13 the pharmacy.
14     Q.  But how did they leave the store?
15     A.  Only if there was a legal prescription,
16 to our knowledge, a legal prescription written for
17 the product.
18     Q.  You were asked a few questions about
19 whether Giant Eagle was unique in any way.  Do you
20 recall those questions?
21     A.  Yes.
22     Q.  You were asked specifically what about
23 Rite-Aid, what about these other companies.
24     These other companies, are they different in
25 size from Giant Eagle?

Page 229

1      A.  Yes.  Every -- the reason why it's hard
2  to answer a question about how unique Giant Eagle
3  is because every company is unique.  I don't know
4  of another chain that's exactly our size with
5  exactly the same amount of stores with the same
6  exact procedures and distribution and dispensing
7  practices.  So every company is going to be
8  different from that perspective.
9      Q.  As being smaller, does that equate in
10 any way to being able to maintain firmer controls?
11 In other words, having 200 stores as compared to
12 10,000 stores, is it in your experience easier to
13 maintain control over 200 stores than it is
14 10,000?
15     MR. HUDSON:  Object to the form.
16     THE WITNESS:  Scale and scope, you know,
17 you would think has something to do with it.  Once
18 again, I can't -- I can't speak to what other
19 organizations do to maintain that type of scale
20 and scope.  But I did feel that the size Giant
21 Eagle was made it so that we could do that very
22 effectively.
23         EXAMINATION
24 BY MR. KOBRIN:
25     Q.  If you look at Exhibit 4 real quick.

Page 230

1    A.  Exhibit 4?
2    Q.  It should be an email.  This is the
3  email that you took a little bit of time to look
4  over earlier.  And you can look it over again
5  right now if you want to take the time again.
6    But do you recall plaintiffs' counsel asking
7  you questions about this email?
8    A.  I'm sorry.  Give me one moment to
9  refamiliarize.
10    Q.  No problem.
11    A.  Oh, yes, yes.
12    Q.  Looking at this email now, can you tell
13  what product Mr. Cornwell was concerned about here
14  with regard to OARRS?
15    A.  It looks like they're talking about
16  Tramadol.
17    Q.  Is Tramadol a Schedule II narcotic?
18    A.  No.
19    Q.  Is Tramadol a Schedule III narcotic?
20    A.  I don't know if it is now.  To my
21  knowledge, it was Schedule IV at least at that
22  time.
23    Q.  Is Tramadol an opioid?
24    A.  No.
25    Q.  Look at Exhibit 12.  It's also an email.

Page 231

1    A.  Yes.
2    Q.  Do you recall plaintiffs' counsel asked
3  you about due diligence that Mr. Millward would
4  request sometimes after receiving these HBC
5  purchasing reports?
6    A.  Yes.
7    Q.  You at one point said you didn't have to
8  do a lot of follow-ups with the PDL when the PDLs
9  were responding to these requests because they did
10  the investigations or due diligence that was
11  requested by Mr. Millward; is that right?
12    A.  Yes.
13    Q.  Sitting here today, do you actually have
14  a sense of how often Joe Millward or others made
15  requests for investigations in response to these
16  purchasing reports?
17    MR. HUDSON:  Object to the form.
18    THE WITNESS:  I don't have a sense of
19  how often Joe Millward would have made this
20  request to the PDLs.  When I stated that -- I
21  believe I stated that it was rare that I was
22  involved in having to do an intervention to get
23  them to do it.
24    But in terms of the frequency, I don't know.
25  He would have gone directly to the PDLs in most

Page 232

1  cases because they're the ones who touch the
2  stores directly.
3  BY MR. KOBRIN:
4    Q.  So you don't have a sense one way or the
5  other whether it was very frequent or very rare?
6    A.  No.  My sense is it would have been when
7  needed.  Whatever that -- how that was determined
8  would have been the answer.
9    MR. KOBRIN:  That's all I have.  Pass
10  the witness.
11    RE-EXAMINATION
12  BY MR. HUDSON:
13    Q.  Mr. Mollica, counsel for HBC has asked
14  you a number of questions about training and
15  policies that existed at the time you were there.
16    All of those questions related to training
17  and policies that existed at the retail
18  pharmacies; right?
19    A.  I mean, I interpreted it as just
20  training and policies as related to diversion,
21  maybe not specific to retail.
22    Q.  Well, you would agree with me that HBC
23  has a warehouse; right?
24    A.  Yes.
25    Q.  It's a big warehouse?

Page 233

1    A.  Yes.
2    Q.  And that's in Washington, Pennsylvania;
3  right?
4    A.  Yes.
5    Q.  Is where it was.
6    A.  Or at least when I was there.
7    Q.  Right, when you were there.  And it had
8  a whole bunch of employees that worked in that
9  warehouse; right?
10    A.  Sure.
11    Q.  And HBC was a licensed distributor where
12  it had a license from the DEA to act as a
13  distributor of controlled substances; right?
14    A.  Sure.
15    Q.  And as part of that license, you agree
16  that HBC had certain obligations to comply with
17  the legal requirements for distributors; right?
18    A.  Sure, yeah.
19    Q.  Now, of all the questions that were
20  asked of you by HBC's counsel, point me to
21  specific training or policies that would have
22  occurred at that HBC warehouse and would have
23  involved monitoring of orders that were coming
24  specifically from that HBC warehouse.
25    A.  I'm familiar with they had a report that

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1  they would work through Joe to identify when
2  orders were in excess of whatever algorithm they
3  came out to. I mean, when you say point to it,
4  I'm not sure what you're asking me to do.
5      Q. That process you just described, when
6  did it get implemented?
7      A. I don't know the specific dates. I
8  would say in '13 maybe, sometime in '13.
9      Q. How many orders did it flag as being
10 beyond the threshold requirements?
11     A. I think that's what the question that
12 was just being asked was. Daily I know they came
13 up with a report and they tracked it through the
14 month. So as you would get closer to the end of
15 the month, you would expect that orders would get
16 larger and larger obviously as you go through the
17 month.
18     When a particular threshold was triggered for
19 go look and see, Joe would work through the PDLs.
20 I can't speak to the frequency of how often Joe
21 did that specifically with the PDLs. Sometimes I
22 was copied on some of those, sometimes not, but I
23 don't know the exact direct that he had with them.
24     Q. Right. HBC went out of its way to
25 create these daily reports; right?

Page 235

1      A. I don't know if they went out of their
2  way, but they had daily reports.
3      Q. And they kept those reports, right, and
4  we have them?
5      A. I don't know if they -- I don't know
6  what the document retention policies were for
7  those reports.
8      Q. Have you ever seen them?
9      A. I've seen examples of them before. I
10 think there was actually one exhibit. Was it
11 Exhibit 12? No. I thought I saw it earlier on
12 one of the exhibits you gave me.
13     Q. Other than one or two emails we've
14 talked about today though, are you aware of any of
15 the specifics of any follow-up that Joe Millward
16 on anyone on his team did to try to determine
17 whether or not orders that had been flagged were,
18 in fact, legitimate?
19     A. Specific -- in general, there were a
20 couple of different things. Sometimes it was as
21 simple as sending a PDM or a PDL, whatever we're
22 calling them, to a store to go ask questions that
23 are relevant to why orders would be high.
24     If there was a threshold, even if -- a
25 threshold from any kind of ordering, there was a

Page 236

1  series of questions that you would ask to satisfy,
2  you know, the legitimacy of the order. But the
3  specific -- I mean, I can't recall what the
4  specific questions were.
5      Q. Do you have any idea of how many times
6  that happened, that there were orders flagged and
7  those series of questions were sent to pharmacies?
8      MR. KOBRIN: Object to form. Asked and
9  answered.
10     THE WITNESS: I don't know how often he
11 went directly to -- whether it was directly to the
12 stores or directly to the PDLs.
13 BY MR. HUDSON:
14     Q. Can you point to any efforts that
15 occurred by HBC that avoided diversion of opioids?
16     A. I think Exhibit 12 would be, but, yes, I
17 think I said that when -- if they saw -- if they
18 saw an order that was outside of whatever,
19 whatever mechanism they used to determine this is
20 an order that we need to get more information
21 from, they would trigger an event through
22 operations to go see.
23     Q. How many orders were blocked by HBC?
24     A. I don't know.
25     Q. How many orders were reported to the DEA

Page 237

1  by HBC?
2      A. I wouldn't know how many orders were
3  reported.
4      Q. How many times did HBC conduct due
5  diligence or investigations or follow-up on orders
6  that were above the threshold limits?
7      A. You asked me that a million times. I
8  don't know how often Joe or anyone from the
9  warehouse would have gone directly to the stores
10 to do that. It's just not a -- you're asking me
11 questions about how often day in/day out
12 operations happened. I just don't recall that
13 this far out.
14     Q. If we turn then from the HBC side that
15 we've been talking about and focus on the 200 or
16 so retail pharmacies, you talked about training
17 and policies that were in place.
18     Are there any records that you can point to
19 that would demonstrate that pharmacists, in fact,
20 refused to fill prescriptions?
21     A. No, no, no. I mean, I've stated that a
22 couple times. There's no requirement, no
23 regulatory or legal requirement to retain
24 documentation like that.
25     Q. Do we have any idea how many times that

Page 238

1  training actually resulted in action that
2  prevented or stopped the diversion of opioids?
3      MR. KOBRIN:  Were you interrupted there?
4      THE WITNESS:  I was just going to say,
5  and actually my answer to this current question
6  would be the same as what I was going to say, the
7  reason why I can't point to those things is
8  because this is literally day in/day out every
9  single day at a pharmacy.
10      Every single day you're making those
11  judgements literally on every single prescription.
12  No, there's not a way to do that.  That's what the
13  pharmacists are there for.
14  BY MR. HUDSON:
15      Q.  You're making judgments every day;
16  right?
17      A.  Yes.
18      Q.  But do you have any sense of how many
19  times that resulted in a pharmacist actually --
20      A.  I can tell you --
21      Q.  Hold on.  Let me if I could just ask my
22  question this time.  -- how many times that
23  resulted in a pharmacist actually refusing to fill
24  a prescription?
25      A.  I couldn't tell you how often a

Page 239

1  pharmacist refused to fill a prescription because
2  it's not a legal or regulatory requirement to
3  track that.
4      I can tell you from my personal experience
5  being behind a pharmacy counter, it could have
6  been daily that those things happened.  It could
7  be three times in an hour.  It could be one time
8  in a week.
9      Q.  Is there any way though across the 200
10  Giant Eagle retail pharmacies to be able to
11  determine how many times that happened?
12      A.  I don't know if there's a mechanism to
13  do that, but it's not a requirement to do that.
14      Q.  Is there any reason why that couldn't
15  have been noted in the systems?
16      A.  I don't know of any reason why we should
17  that I'm aware of in terms of a requirement.
18      Q.  Any technical requirement or anything
19  that would have just prevented creating a log of
20  prescriptions that were refused to be filled so
21  that it could be populated over time in order to
22  improve the efforts to reduce diversion?
23      MR. KOBRIN:  Object to form.
24      THE WITNESS:  No.  I don't know how or
25  why that would improve diversion tracking when you

Page 240

1  say no.  And some of those things would be HIPAA
2  related.  No, I don't know of any reason or
3  requirement to do anything like that.
4  BY MR. HUDSON:
5      Q.  Well, you agree that logging
6  prescriptions that were not filled because there
7  was suspicion of diversion, keeping track of those
8  would allow a retail pharmacy to then have a list
9  that could then be referenced for the future if
10  there were other suspicions; right?
11      MR. KOBRIN:  Object to form.
12      THE WITNESS:  We have a list and
13  documents that you can track to see if diversion
14  happened.  It's the prescriptions we filled.
15  BY MR. HUDSON:
16      Q.  You can tell from the prescriptions that
17  you filled how you avoided diversion?
18      A.  If the prescriptions we filled are legal
19  and written by physicians, then by definition,
20  that's how you prevent diversion.
21      Q.  How many did not get filled because you
22  avoided the diversion from occurring because you
23  blocked it as being suspicious?
24      MR. KOBRIN:  Object to form.  Asked and
25  answered.

Page 241

1      THE WITNESS:  I don't know.
2      MR. KOBRIN:  He talked about what was
3  done and the policies behind it and the reasons
4  behind it.
5  BY MR. HUDSON:
6      Q.  And I just want to make sure the record
7  is clear.  This is my only chance to talk to you.
8      There's no reason though why Giant Eagle
9  retail pharmacies nationwide couldn't have kept
10  some sort of record of suspicious or questionable
11  prescriptions that ended up not being filled, is
12  there?
13      MR. KOBRIN:  Are you asking if they
14  should have kept a record of the actual
15  prescriptions themselves?
16  BY MR. HUDSON:
17      Q.  Do you understand the question?
18      A.  You're asking me is there anything that
19  prohibited us from maintaining records of
20  prescriptions we did not fill?
21      Q.  Right.  In other words, if somebody came
22  in and handed you a prescription and you as a
23  licensed pharmacist applying your medical judgment
24  said, you know what, this doesn't seem right, I'm
25  not going to fill this prescription, is there any

Page 242

1 reason why you can't write that down, take notes
2 on that, put it into a computer and then as an
3 organization log that to try to identify
4 suspicious or questionable opioid orders that are
5 being rejected?
6        MR. KOBRIN:  Object to form.
7        THE WITNESS:  For what reason?  There's
8 no requirement to do that, so it would have never
9 come up.
10        MR. HUDSON:  I don't have any further
11 questions.
12        RE-EXAMINATION
13 BY MR. BARNES:
14    Q.  I just have one follow-up question.  The
15 formula type program that went into effect in
16 2013, in your view, was that an additional system
17 of controls on top of controls that were already
18 in existence?
19    A.  Yeah.  We're always checking in orders
20 and maintaining inventory requirements.  Like I
21 said, systems evolve in time, and that was an
22 example of one that evolved.
23        MR. BARNES:  Thank you.
24        THE WITNESS:  Thank you.
25        THE VIDEOGRAPHER:  2:01 p.m. we are off

Page 243

1 the video record.  This concludes the video
2 deposition.
3        (Whereupon, at 2:01 p.m., the taking of
4 the instant deposition ceased.)

Page 244

1 COMMONWEALTH OF PENNSYLVANIA )
2 COUNTY OF ALLEGHENY        )   SS:
3        C E R T I F I C A T E
4    I, Ann Medis, Registered Professional
5 Reporter, Certified Livenote Reporter and Notary
6 Public within and for the Commonwealth of
7 Pennsylvania, do hereby certify:
8    That ANTHONY MOLLICA, the witness whose
9 deposition is hereinbefore set forth, was duly
10 sworn by me and that such deposition is a true
11 record of the testimony given by such witness.
12    I further certify the inspection,
13 reading and signing of said deposition were not
14 waived by counsel for the respective parties and
15 by the witness.
16    I further certify that I am not related
17 to any of the parties to this action by blood or
18 marriage and that I am in no way interested in the
19 outcome of this matter.
20    IN WITNESS WHEREOF, I have hereunto set
21 my hand this 8th day of January, 2019.
22
        _____
23        Notary Public
24
25

Page 245

1 COMMONWEALTH OF PENNSYLVANIA )  E R R A T A
  COUNTY OF ALLEGHENY        )  S H E E T
2
3    I, ANTHONY MOLLICA, have read the foregoing
  pages of my deposition given on January 4, 2019,
4 and wish to make the following, if any,
  amendments, additions, deletions or corrections:
5
6 Page Line  Change and reason for change:
7 ____ ____  _____
8 ____ ____  _____
9 ____ ____  _____
10 ____ ____  _____
11 ____ ____  _____
12 ____ ____  _____
13 ____ ____  _____
14 ____ ____  _____
15 ____ ____  _____
16 ____ ____  _____
17 ____ ____  _____
18
19 In all other respects, the transcript is true and
   correct.
20
21        _____
          ANTHONY MOLLICA
22
23 _____ day of _____, 2019.
24 _____
          Notary Public
25