1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF OHIO

3                EASTERN DIVISION

4

5    ---------------------------x

6    IN RE: NATIONAL PRESCRIPTION    ) Case No.

7    OPIATE LITIGATION               ) 1:17-MD-2804

8    APPLIES TO ALL CASES            ) Hon. Dan A. Polster

9    ---------------------------x

10        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11              CONFIDENTIALITY REVIEW

12

     VIDEOTAPED DEPOSITION OF HENRY JOHN MORTELLITI, III

13

                 WASHINGTON, D.C.

14

            WEDNESDAY, JANUARY 23, 2019

15

                   8:05 A.M.

16

17

18

19

20

21

22

23

24   Reported by: Leslie A. Todd

Page 2

1    Deposition of HENRY JOHN MORTELLITI, III, held
2    at the law offices of:
3
4
5           ZUCKERMAN SPAEDER, LLP
6           1800 M Street, N.W.
7           Suite 1000
8           Washington, D.C. 20036
9           (202) 778-1801
10
11
12
13    Pursuant to notice, before Leslie Anne Todd,
14   Court Reporter and Notary Public in and for the
15   District of Columbia, who officiated in
16   administering the oath to the witness.
17
18
19
20
21
22
23
24

Page 3

1           A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS:
3      ERIC KENNEDY, ESQUIRE
4      WILLIAM BAKER, ESQUIRE
5      BRIAN ROOF, ESQUIRE
6      JAMES A. DeROCHE, ESQUIRE
7      WEISMAN, KENNEDY & BERRIS, CO., L.P.A.
8      101 West Prospect Avenue, Suite 1600
9      Cleveland, Ohio 44115
10     (216) 781-1111
11
12   ON BEHALF OF CVS HEALTH AND THE WITNESS:
13     GRAEME W. BUSH, ESQUIRE
14     ZUCKERMAN SPAEDER, LLP
15     1800 M Street NW, Suite 1000
16     Washington, D.C. 20036-5807
17     (202) 778-1801
18
19   ON BEHALF OF CARDINAL HEALTH:
20     KATELYN ADAMS, ESQUIRE
21     WILLIAMS & CONNOLLY LLP
22     725 Twelfth Street, N.W.
23     Washington, D.C. 20005
24     (202) 434-5107

Page 4

1    APPEARANCES (Continued):
2
3    ON BEHALF OF McKESSON CORPORATION:
4      GABRIEL FULMER, ESQUIRE
5      COVINGTON & BURLING LLP
6      One City Center
7      850 Tenth Street, N.W.
8      Washington, D.C. 20001-4956
9      (202) 662-5261
10
11   ON BEHALF OF ENDO PHARMACEUTICALS AND PAR:
12     WREDE SMITH, ESQUIRE
13     ARNOLD & PORTER KAYE SCHOLER LLP
14     601 Massachusetts Avenue, N.W.
15     Washington, D.C. 20001-3743
16     (202) 942-5435
17
18   ON BEHALF OF WALMART:
19     CHRISTINE D. PROROK, ESQUIRE (Telephonically)
20     JONES DAY
21     77 West Wacker Drive
22     Chicago, Illinois 60601-1692
23     (312) 782-3939
24

Page 5

1    APPEARANCES (Continued):
2
3    ON BEHALF OF AMERISOURCEBERGEN:
4      M. JANE BRANNON, ESQUIRE (Telephonically)
5      JACKSON KELLY, PLLC
6      175 East Main Street
7      Lexington, Kentucky 40507
8      (859) 288-2805
9
10   ON BEHALF OF CARDINAL HEALTH:
11     CHRISTOPHER N. DAWSON, ESQUIRE
12       (Telephonically)
13     WHELAN, CORRENTE, FLANDERS, KINDER & SIKET LLP
14     100 Westminster Street, Suite 710
15     Providence, Rhode Island 02903
16     (401) 270-4500
17
18   ALSO PRESENT:
19     STEPHANIE HACKMAN (Paralegal)
20     ZACH HONE (Trial technician)
21     DANIEL HOLMSTOCK (Videographer)
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 6

CONTENTS

1

2  EXAMINATION OF HENRY JOHN MORTELLITI, III    PAGE

3    By Mr. Kennedy                13

4    By Mr. Baker              190, 377

5    By Mr. Bush               374

6        E X H I B I T S

7      (Attached to transcript)

8  CVS-MORTELLITI DEPOSITION EXHIBITS        PAGE

9  No. 2    Title 21 Code of Federal Regulations,

10       Part 1301 - Registration of

11       Manufacturers, Distributors and

12       Dispensers of Controlled Substances   28

13 No. 9    E-mail re DEA SOP 8-25-10.doc (with

14       attachment), Bates CVS-MDLT1-

15       0000088956 to 0000089025        100

16 No. 16   Business Idea Description, Submit to

17       IS-Business-Idea mailbox, Bates

18       CVS-MDLT1-000034175 to 000034176   129

19 No. 17   E-mail string re SOM Modifications,

20       Bates CVS-MDLT1-000024523 to

21       000024524               173

22 No. 18A  E-mail re Logistics Business Support

23       Requests - 2011-04-28, Bates

24       CVS-MDLT1-000029864 to 000029866   177

Page 7

1        E X H I B I T S (Continued)

2      (Attached to transcript)

3  CVS-MORTELLITI DEPOSITION EXHIBITS        PAGE

4  No. 22   CVS Pharmacy, Logistics, 2011

5       Initiatives, January 28, 2011,

6       Bates CVS-MDLT1-000018910 to

7       000018945               170

8  No. 23   E-mail string re New BSR - Control

9       Drug IRR Changes, Bates CVS-MDLT1-

10       000034168 to 000034171       141

11 No. 24   E-mail string re A new fax has

12       arrived from 4078585031 (Part 1 of

13       1) on Channel 3, Bates CVS-MDLT1-

14       000075542 to 000075547       152

15 No. 28   Conference Call invite, Bates

16       CVS-MDLT1-000024539 to 000024552   101

17 No. 48   CVS Controlled Drug Manual:

18       Suspicious Order Monitoring

19       Procedure               104

20 No. 49   E-mail string re November 10, 2009,

21       Bates CVS-MDLT1-000087889 to

22       000087890               111

23

24

Page 8

1        E X H I B I T S (Continued)

2      (Attached to transcript)

3  CVS-MORTELLITI DEPOSITION EXHIBITS        PAGE

4  No. 111  E-mail re Agenda/Updates for

5       Monday's staff meeting, Bates

6       CVS-MDLT1-000103859 and 000103867   167

7  No. 126  Item Review Report, Bates

8       CVS-MDLT1-000100763 to 000100768   156

9  No. 130  E-mail string re SOM Project Plan,

10       Bates CVS-MDLT1-000114320 to

11       000114328               68

12 No. 132  Chart entitled VIPER x PDMR, Bates

13       CVS-MDLT1-000068377 to 000068381   77

14 No. 135  E-mail string re DEA day 3, Bates

15       CVS-MDLT1-000010223 to 000010224   58

16 No. 139  Item Review Report, Bates

17       CVS-MDLT1-000100775 to 000100850   38

18 No. 142  CVS Caremark, Year-End Review -

19       2012 (Finalized)            74

20 No. 143  E-mail string re Prepared at the

21       Request of Legal Counsel - Subject to

22       Attorney Client Privilege, Bates

23       CVS-MDLT1-000117715 to 000117718   358

24

Page 9

1        E X H I B I T S (Continued)

2      (Attached to transcript)

3  CVS-MORTELLITI DEPOSITION EXHIBITS        PAGE

4  No. 209  E-mail re SOM - Reporting, Bates

5       CVS-MDLT1-000033126 to 000033154   247

6  No. 506  E-mail string re IRR/SOM Retunement

7       BSR_LOG_61148, Bates CVS-MDLT1-

8       000057759               244

9  No. 521  E-mail string re Control Drug IRR

10       important info, Bates CVS-MDLT1-

11       000100370 to 000100373       335

12 No. 562  Portion of rough transcript (not

13       attached hereto)            190

14 No. 562  June IRR Report (not attached hereto) 253

15 No. 562A July IRR Report (not attached hereto) 257

16 No. 606  DEA, FDA, OSHA Regulatory Update,

17       Bates CVS-MDLT1-000061121 to

18       000061123               228

19 No. 607  SOM Program, Bates CVS-MDLT1-

20       000002186               229

21 No. 610  E-mail string re The CVS Retunement,

22       Bates CVS-MDLT1-000061141 and

23       000114642 to 000114652       258

24

Page 10

```
1         E X H I B I T S (Continued)
2          (Attached to transcript)
3   CVS-MORTELLITI DEPOSITION EXHIBITS        PAGE
4   No. 611  E-mail string re SOM Report
5       Attorney Client Privilege, Bates
6          CVS-MDLT1-000109623 to 000109625    268
7   No. 612  E-mail re SOM Update, Bates
8          CVS-MDLT1-000088734        284
9   No. 614  E-mail string re Adjustment to the
10          CVS SOM, Bates CVS-MDLT1-000110439
11         to 000110441             292
12  No. 615  E-mail re Control Drug IRR UPdate,
13         Bates CVS-MDLT1-000034183     295
14  No. 623  E-mail string re IRR Narratives,
15         Bates CVS-MDLT1-000112597 to
16          000112600              309
17  No. 624  E-mail re IRR Narratives, Bates
18          CVS-MDLT1-000109849 and 000109843
19         to 000109849             309
20  No. 625  E-mail re Control Drug Suspicious
21          Order Monitoring.doc (with
22          attachment), Bates CVS-MDLT1-
23          000057736 to 000057738 and
24          000083969 to 000083971      309
```

Page 11

```
1         E X H I B I T S (Continued)
2          (Attached to transcript)
3   CVS-MORTELLITI DEPOSITION EXHIBITS        PAGE
4   No. 634  List I Chemicals (PSE, EPH) and
5       Control Drug Policy & Procedure,
6          CVS-MDLT1-000009812 to 000009815    344
7   No. 641  E-mail string re Attorney/Client
8       Privileged Information, Bates
9          CVS-MDLT1-000083855 to 000083856    353
10  No. 690  ARCOS Reporting, Bates CVS-MDLT1-
11          000019007              339
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 12

```
1           P R O C E E D I N G S
2           --------------------
3         THE VIDEOGRAPHER:  We are now on the
4   record.  My name is Daniel Holmstock.  I am the
5   videographer for Golkow Litigation Services.
6   Today's date is January 23rd, 2019.  The time is
7   8:05 a.m.
8         This deposition is being held at the law
9   offices of Zuckerman Spaeder LLP, 1800 M Street,
10  Northwest, Suite 1000, in Washington, D.C., in the
11  matter of In Re:  National Prescription Opiate
12  Litigation, pending before the United States
13  District Court for the Northern District of Ohio,
14  Eastern Division.
15         The deponent is Mr. John H. Mortelliti.
16         Counsel for appearances will be noted on
17  the stenographic record.
18         The court reporter is Leslie Todd, who
19  will now administer the oath.
20         HENRY JOHN MORTELLITI, III,
21          and having been first duly sworn,
22        was examined and testified as follows:
23          DIRECT EXAMINATION
24  BY MR. KENNEDY:
```

Page 13

```
1      Q    All right, sir, my name is Eric Kennedy,
2   and I represent the plaintiffs in this case.
3         Do you understand that?
4      A    Yes.
5      Q    Could you please state your full name
6   for the record.
7      A    It's Henry John Mortelliti, III.
8      Q    And what is your professional address?
9      A    One Berry Drive, Lumberton, New Jersey.
10     Q    And who is your current employer?
11     A    CVS Health.
12     Q    And what is the relationship of CVS
13  Health to CVS Pharmacy?
14     A    CVS Health had different businesses.
15  There's the pharmacy stores, Caremark, Omnicare.
16  There -- there's different branches.  And now
17  Aetna.
18     Q    So CVS Pharmacy would be a subsidiary of
19  CVS Health?
20     A    It's one of the branches, yes.
21     Q    What is your position?
22     A    Director of Asset Protection Supply
23  Chain.
24     Q    And how long have you held that
```

Page 14

1 position?

2     A    Since 2010.

3     Q    Tell me about the duties and
4 responsibilities of your position.

5     A    In my role, I oversee company loss from
6 the supply chain point of view.  I oversee store
7 shortages.  I also review government regulatory
8 visits.  I have asset protection managers that
9 report to me.  They're in each of the facilities.
10 And we oversee the audits as well as just the --
11 the entire supply chain to ensure the stores are
12 getting the product they need, no thefts in the
13 buildings, and overall safety of the employees.

14     Q    When did you take that position?

15     A    As director, it was summer of 2010.

16     Q    And can you tell when you began the
17 position in the summer of 2010, what
18 responsibility did you have or relationship did
19 you have with controlled substances?

20     A    We would oversee the auditing of the
21 pharmacy area, and my -- my role was to ensure
22 that all our managers were following the
23 guidelines of basically auditing the building,
24 from pick, pack to ship.

Page 15

1     Q    And when you say pick, pack and ship,
2 was that in relation to a particular distribution
3 center?

4     A    It was the -- the DCs I covered at the
5 time.

6     Q    Okay.  And what were those DCs?

7     A    2010, off the top of my head, it was
8 either going to be the Mid-Atlantic or -- or the
9 Southeast.  I -- I don't recall.

10     Q    Prior to 2010 when you took that
11 position, what was your -- your job at CVS, if
12 any?

13     A    I was the loss prevention manager of the
14 Lumberton distribution center.  I started in
15 Lumberton in January of 1999 as a supervisor for
16 loss prevention.

17     Q    And what were your duties and
18 responsibilities starting in January of '99?

19     A    I would audit different departments for
20 CVS policy and procedure compliance.  I also
21 oversaw the in-house safety program, as well as
22 store shortage research.

23     Q    And did you hold that position then from
24 1999 to 2010?

Page 16

1     A    I was promoted to the manager of
2 Lumberton, and I'm going to say that may have been
3 the end of '99, early 2000.  And I held that
4 position till I was director.

5     Q    Now, CVS distributed -- distributes
6 hydrocodone products to CVS stores.  You're aware
7 of that?

8     A    Yes.

9     Q    When did you first learn that CVS was a
10 distributor of hydrocodone products to CVS
11 pharmacies?

12     A    When I was a supervisor.

13     Q    And so that would have been in 1999?

14     A    Yes.

15     Q    What were your duties and
16 responsibilities in 1999 as it related to the
17 CVS distribution of -- of hydrocodones to CVS
18 pharmacies?

19     A    We would just oversee the actual
20 shipments, ensure there were no store shortages,
21 and we shipped what we say we picked.

22     Q    In 1999, what were your duties and
23 responsibilities in relation to suspicious order
24 monitoring of -- of hydrocodone products?

Page 17

1     A    I wasn't involved with it in 1999.

2     Q    When was your first involvement with
3 suspicious order monitoring of -- of hydrocodones?

4     A    It -- it was a while ago.  I'm going to
5 say somewhere around 2008, 2009.

6     Q    And you understand that hydrocodone is a
7 controlled substance?

8     A    Yes.

9     Q    You've known that since 1999?

10     A    Yes.

11     Q    You understand that it is a narcotic?

12     A    Yes.

13     Q    You understand that it is not just any
14 narcotic, but it is a narcotic that became a -- a
15 focus of what has been described as an opioid
16 crisis in this country.  Do you understand that?

17     A    I know there's a lot of talk about the
18 opioid situation.

19     Q    And you understand the role of
20 hydrocodone in that opioid -- what you call a
21 situation?

22     A    Yes.

23     Q    And we'll get into more detail, but
24 just -- just to start, you understand that -- that

Page 18

1 CVS had certain responsibilities with respect to
2 suspicious order monitoring as it relates to
3 hydrocodones.
4    A    I knew that I was given a responsibility
5 to oversee a process during a certain time period.
6 As for the overall expectation, I just -- I just
7 followed the process when it came to me.
8    Q    And that would have been in '08 and '09?
9    A    Somewhere in there, yes.
10   Q    In '08 or '09 when you first became
11 involved with suspicious order monitoring at CVS,
12 what was your official title at that point?
13   A    I was a loss prevention manager.
14   Q    At Lumberton?
15   A    Yes.
16   Q    Did you have any duties and
17 responsibilities beyond Lumberton in '08 and '09?
18   A    I -- I -- when -- okay.  I -- I believe
19 I had the Mid-Atlantic during this time period.
20   Q    And so that would have involved what
21 distribution centers?
22   A    The alignments changed almost every
23 year, so I'm not 100 percent sure, but it would
24 have been Fredericksburg, Lumberton, North

Page 19

1 Augusta, and that may have been it at the time.
2    Q    Who was your immediate supervisor in
3 '08, '09, when you took on this responsibility
4 with respect to the suspicious order monitoring?
5    A    Frank Devlin.
6    Q    What responsibilities were you given
7 then in '08, '09, with respect to suspicious order
8 monitoring?
9    A    There was -- there was a green -- we
10 called it a green bar, but it was actually the
11 IRR.  So I was reviewing the I -- the IRR for the
12 network.
13   Q    Prior to be given this responsibility to
14 review these IRRs -- and we'll talk about that in
15 detail -- prior to being given that
16 responsibility, explain to us what your experience
17 was with suspicious order monitoring of controlled
18 substances.
19   A    With -- prior to that my responsibility
20 was to ensure the overall accuracy for the
21 distribution centers.
22   Q    When you say "accuracy" -- oh, I'm
23 sorry, did you finish?
24   A    Yes.

Page 20

1    Q    When you say "accuracy," specifically
2 what are you referring to?
3    A    That we shipped exactly what was
4 ordered.
5    Q    Okay.  And that would have been your
6 only experience that might relate to suspicious
7 order monitoring prior to being given this job,
8 correct?
9    A    Aside from doing controlled drug
10 in-house audits, yes.
11   Q    And the controlled in-house audits would
12 be -- basically that's an inventory process; is
13 that true?
14   A    Yes.
15   Q    When you were given this -- this
16 responsibility of beginning to review these IRR
17 reports in relation to controlled substances, tell
18 me about the training and the education that you
19 were provided by CVS.
20   A    During -- during that time period, I was
21 working with Pam Hinkle.  She was -- she was --
22 she had the experience with pharmacy.  As for the
23 actual training itself, I -- I just don't recall
24 how -- how that -- all that went down.

Page 21

1    Q    Now, she had experience dealing at the
2 pharmacy level, correct?
3    A    Warehouse.
4    Q    Warehouse.
5    A    Right.
6    Q    All right.  What materials were you
7 provided to -- to prepare you for your job in
8 reviewing IRRs?
9    A    I -- I don't -- I don't remember.
10   Q    Were you provided with a copy or did
11 anybody explain to you the Controlled Substances
12 Act before you took on this responsibility?
13   A    I -- I don't remember.
14   Q    Did anybody explain to you or show you a
15 copy of the federal regulations as it related to
16 the duties and responsibilities of a distributor
17 of -- of opioids?
18   A    I don't remember.
19   Q    Did anybody provide you with -- with any
20 of the DEA letters that had been sent to
21 distributors in '06, '07, and a second letter in
22 '07, so that you could have a better understanding
23 of your responsibilities?
24   A    I don't remember.

Page 22

1    Q   Did anybody sit down and explain to you
2 what the overarching responsibilities were of a
3 distributor with respect to the distribution of
4 opioids in 2008 when you began this role?
5    A   I don't remember.
6    Q   And if anybody would have given you that
7 responsibility or provided you with that material,
8 you say it would have been Pam Hinkle?
9    A   It would either have been Pam Hinkle,
10 Frank Devlin, possibly someone in corporate. I --
11 I don't recall the actual transition time period.
12    Q   Tell me, what was Mr. Devlin's
13 experience in relation to suspicious order
14 monitoring of controlled substances when you began
15 your role in 2008?
16    A   I don't -- I don't know what his
17 experience was.
18    Q   Now, you said you began to review this
19 IRR report. That probably would have been 2009,
20 correct?
21    A   Somewhere in that time period.
22    Q   Tell the jury what an IRR report is.
23    A   It's an inventory review report.
24    Q   Did Mr. Devlin sit down and explain to

Page 23

1 you what an inventory review report was?
2    A   I don't remember.
3    Q   Did Pam Hinkle explain to you what an
4 inventory review report was?
5    A   I don't remember the transition period
6 at that time.
7    Q   Do you know -- do you have any memory
8 who sat you down and said, This is an inventory
9 review report?
10    A   I -- the only thing I recall was when I
11 was getting it, Frank filled me in and told me it
12 was coming. I -- I don't remember who from
13 corporate reviewed it with me. I just don't
14 recall.
15    Q   When you say "corporate," what are you
16 referring to?
17    A   Someone from Rhode Island.
18    Q   And who would they be employed by?
19    A   CVS.
20    Q   Did anybody explain to you the
21 importance and the significance of this report as
22 it related to CVS's responsibility to monitor
23 suspicious orders of narcotics?
24    A   Yeah, I -- I'm -- I don't recall how it

Page 24

1 was explained, but being a narcotic itself and the
2 understanding of the report, I realized that it
3 was very important.
4    Q   Did anybody explain to you what was
5 going on in the country with respect to
6 hydrocodones in this crisis and the role CVS was
7 to play in somehow combatting that crisis?
8    A   During that time, again, I -- I don't
9 recall the exact transition of -- of taking that
10 over. My -- my job was this is the procedure and
11 this is what the expectation is, and that's how I
12 performed it.
13    Q   All right. When you say you were told,
14 This is the procedure and these are the
15 expectations, tell me what was explained to you
16 about the procedure and what were you told about
17 the expectations.
18    A   The importance of the IR -- the IRR,
19 when -- when I was reviewing the IRR.
20    Q   Who explained to you the importance of
21 the IRR?
22    A   Again, I -- I just don't remember.
23    Q   And what was the expectation that was
24 communicated to you?

Page 25

1    A   Well, the expectation was to look for
2 orders of interest.
3    Q   When you were provided with -- or had
4 taken this job in 2008 and '09, what was your
5 understanding of CVS's responsibility or duty with
6 respect to suspicious order monitoring?
7    A   Not to release any order that we deemed
8 an order of interest.
9    Q   And what that means is not to ship any
10 order of a narcotic that you deemed to be an order
11 of interest?
12    A   Right.
13    Q   Until you had completed some sort of
14 review or investigation of that order, true?
15    A   Right.
16    Q   Were you sent to any DEA seminars before
17 you began your -- your job in 2008 or 2009 as it
18 related to suspicious order monitoring?
19    A   I don't remember the dates, but I -- I
20 attended some NADDI, N-A-D-D-I, seminars.
21    Q   Would that have been before you took on
22 your responsibility?
23    A   I -- I don't remember.
24    Q   Let's go to January of 2006. CVS was

Page 26

1  distributing hydrocodone products to its -- its
2  stores, its pharmacies in 2006, correct?
3      A   Yes.
4      Q   You were at a DC at that point in time.
5      A   Yes.
6      Q   So you were aware of that at the DC.
7      A   Yes.
8      Q   And in 2006, given your responsibilities
9  at the distribution center, were you aware of the
10 fact in 2006 that CVS had certain responsibilities
11 in relation to its distribution of hydrocodone
12 narcotics?
13     A   We -- we looked at the control cage as
14 high responsibility, which is why we did the
15 audits, the random audits and random inventories.
16     Q   So you knew and you understood that CVS
17 in 2006 did have a responsibility in relation to
18 the distribution of controlled substances.  You
19 understood that?
20     A   I understood that it was my position and
21 my job to ensure that we did what we could to make
22 sure the stores got exactly what they ordered, and
23 nothing was missing or diverted.
24     Q   Okay.  So you basically in 2006, you --

Page 27

1  in your position you were monitoring for theft,
2  correct?
3      A   We -- we were monitoring for -- for
4  accuracy as well.
5      Q   All right.  What did you understand in
6  2006 to be CVS's duties and responsibilities with
7  respect to suspicious order monitoring?
8      A   Again, I -- I really didn't have the
9  thought process along those lines.  It was my job
10 to ensure that we could account for every bottle
11 of every controlled drug.
12     Q   Did you have any understanding of the
13 responsibilities -- CVS's responsibility at the --
14 at the distribution center in relation to
15 monitoring each and every order as to whether or
16 not it was suspicious?
17     A   At that time period, I -- nothing
18 outside of my role.
19     Q   Who had the role in 2006 at the
20 distribution center to -- to monitor suspicious
21 orders?
22     A   I don't know.
23     Q   Did anybody, to your knowledge?
24     A   I -- I have no idea.

Page 28

1          (Exhibit No. 2 was premarked for
2      identification.)
3  BY MR. KENNEDY:
4      Q   I'm going to show you what has been
5  marked as Exhibit 2, if we could.
6          MR. BUSH:  Is this the one for the
7  witness?
8          MR. KENNEDY:  Yes.
9  BY MR. KENNEDY:
10     Q   Exhibit 2, do you see Title 21, Code of
11 Federal Regulations?  Do you see that up at the
12 top?
13     A   Yes.
14     Q   And then underneath that, 1301.74, if
15 you look down to (b), we're going to read through
16 (b).
17         Now, (b) states that:  "The registrant
18 shall design and operate a system to disclose to
19 the registrant suspicious orders of controlled
20 substances."
21         Do you see that?
22     A   I do.
23     Q   That first sentence of this
24 regulation -- and I'll tell you this regulation is

Page 29

1  from 1971.  Okay?
2          Were you aware of this regulation from
3  1971 in your role at the distribution center in
4  2006?
5      A   In 2006, I -- I -- I may or may not have
6  seen this.  I don't remember.
7      Q   But it indicates that the registrant --
8  and CVS you understand would be a registrant that
9  would be subject to this regulation.  You knew
10 that, did you not?
11     A   Again, in 2006, my -- my position at
12 that time wasn't -- wasn't that deep into where --
13 where it went in 2008 and so forth, but I just
14 knew that my -- my job in the distribution center
15 was to ensure that we can account for the
16 inventory and the accuracy of the shipments.
17     Q   Well, let me ask you this:  In 2006,
18 what you have come to know about this regulation,
19 can we agree that this regulation that CVS shall
20 design and operate a system to disclose to the
21 registrant suspicious orders of controlled
22 substances, that regulation applied to CVS, did it
23 not, in 2006?
24     A   I -- again, I -- that was above my pay

Page 30

1  grade at that time. I didn't have anything to do
2  with this during that -- during that time period.
3      Q   Well, let me ask you, did you ultimately
4  become a manager of the DC?
5      A   I did.
6      Q   And would you have had overall authority
7  over that distribution center?
8      A   I had overall authority to audit and
9  investigate our inventory and our shipments.
10     Q   Who was senior to you at -- at the
11 distribution center?
12     A   Nobody at the distribution center.
13     Q   All right. And so -- and tell me then,
14 in 2006 at your distribution center where nobody
15 was senior to you, tell me in 2006 whether or not,
16 according to this regulation, CVS had designed and
17 was operating a system to disclose to the
18 registrant suspicious orders of controlled
19 substances.
20     A   Let me -- I'll back that up. When I say
21 no one was over me in the distribution center, our
22 department was paid out of finance. We were like
23 a third party in the DCs. So the DCs would have a
24 distribution center director, ops manager,

Page 31

1  pharmacy manager.
2          MR. KENNEDY: All right, I'll move to
3  strike.
4  BY MR. KENNEDY:
5      Q   If you would just answer my question, if
6  you would, sir.
7          MR. BUSH: Objection. He gave -- he
8  clarified an answer. That's perfectly
9  appropriate.
10         MR. KENNEDY: Fine.
11 BY MR. KENNEDY:
12     Q   If you could answer my question, please.
13     A   Repeat the question.
14     Q   In 2006, tell me, according to this
15 regulation, at the DC where you were the manager,
16 tell me about the system that was designed and
17 operated to disclose to the registrant, CVS,
18 suspicious orders of controlled substances.
19     A   I wasn't involved with and I don't know
20 who did it.
21     Q   With -- as the manager, tell me about
22 the system that was in existence, if any, in 2006
23 that -- that fulfilled the obligation of this
24 regulation that says: "Shall design and operate a

Page 32

1  system to disclose to the registrant suspicious
2  orders of controlled substances."
3      A   If there was a process in place, it
4  would have went through the pharmacy manager to
5  hold the orders. I -- I don't know. I just -- I
6  wasn't involved in this at all at that time.
7      Q   So as the manager of the DC, you don't
8  know of a process that was in place.
9      A   I don't know of a process or who was
10 responsible for it, no.
11     Q   Was anybody responsible for it?
12     A   I don't know.
13     Q   Were you at the DC every day --
14     A   Yes.
15     Q   -- as part of your job?
16     A   Yes.
17     Q   How many years were -- were you at that
18 DC?
19     A   From January '99.
20     Q   Until 2008?
21     A   Actually, I'm still hubbed there.
22     Q   All right. And you were the manager of
23 that DC for how many years?
24     A   The loss prevention manager for five,

Page 33

1  six -- six years, seven years.
2          And when we say "manager of the DC," I
3  was the loss prevention manager. I wasn't the DC
4  ops manager or -- or pharmacy manager, production
5  manager. We -- again, we reported to a different
6  entity so we could be a neutral part of the audit.
7          MR. KENNEDY: Okay. I'll move to
8  strike.
9  BY MR. KENNEDY:
10     Q   At corporate headquarters in this period
11 of time from 2006 to 2009, who at corporate
12 headquarters -- let's go to CVS Pharmacy -- who at
13 CVS Pharmacy was responsible for suspicious order
14 monitoring?
15     A   From 2006 till 2009, I -- I don't know.
16     Q   And you understand the regulation that
17 we just read through, that came into existence in
18 1971. You understand that?
19     A   Okay.
20     Q   So the period we're talking about in
21 2006 is some 35 years after that regulation came
22 into place. Do you understand that?
23     A   Mm-hmm.
24     Q   Let's -- let's move to 2009, if we

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 could.
2 　　　Well, let me ask you this before we move
3 to 2009. In 2006, did anybody show you the letter
4 that was received by CVS from the DEA outlining
5 the duties and responsibilities of a distributor
6 in relation to suspicious order monitoring? Did
7 anybody show you that letter in '06?
8 　　A　I don't recall.
9 　　Q　In 2007, the DEA sent two letters to
10 distributors, again outlining the duties and
11 responsibilities of a distributor in relation to
12 controlled substances in the distribution. Did
13 anybody show you those letters in 2007?
14 　　A　I don't remember.
15 　　Q　Did they show those letters in 2008?
16 　　A　I don't remember.
17 　　Q　Were you shown those letters in 2009
18 when you took on this new position to review
19 the -- the controlled substance reports?
20 　　　MR. BUSH: Objection.
21 　　　THE WITNESS: I don't remember.
22 BY MR. KENNEDY:
23 　　Q　Now, our records indicate that -- that
24 this IRR report was not really delivered to -- to

Page 35

1 CVS until late 2008, December of 2008.
2 　　　Would you disagree with the timing of
3 that?
4 　　　MR. BUSH: Objection.
5 　　　You can go ahead and answer.
6 　　　THE WITNESS: Okay. I -- I can't agree
7 or disagree. I -- I don't know.
8 BY MR. KENNEDY:
9 　　Q　If that's true, then you wouldn't begin
10 to review the IRR narcotic reports until 2009. Is
11 that consistent with your memory, 2009 is when you
12 began to review?
13 　　A　I -- I don't recall the exact year.
14 　　Q　Now, the IRR report that you were
15 reviewing, did that cover all controlled
16 substances being sold by CVS pharmacies?
17 　　A　I -- I believe it did, but I don't
18 remember.
19 　　Q　Well, were you doing it just for your
20 distribution center or just for a particular
21 region of distribution centers, or were you
22 reviewing --
23 　　A　Oh.
24 　　Q　-- the report for the entire country?

Page 36

1 　　A　Okay. No, I was doing it for the
2 country.
3 　　Q　All right. And were you also reviewing
4 the PSE orders?
5 　　A　Yes.
6 　　Q　So you were reviewing both reports.
7 　　A　Yes.
8 　　Q　At that point in time when you began
9 to -- to review this -- and I apologize if I've
10 asked you -- but we've come to this time frame of
11 the beginning of '09, at that point in time did
12 anybody sit you down and show you the Controlled
13 Substances Act or the regulation with respect to
14 suspicious orders that we looked at or any of the
15 DEA letters that had been sent out in '06 and '07?
16 　　　MR. BUSH: Objection.
17 　　　THE WITNESS: I don't -- I don't
18 remember any exact letters during that process.
19 BY MR. KENNEDY:
20 　　Q　Tell me about the IRR report.
21 Specifically what did it contain? What was the
22 information in the report when you began to look
23 at it in '09?
24 　　A　And again going off memory, there was an

Page 37

1 algorithm that would flag particular orders by
2 drug, and when an item would flag, we would view
3 it as an item of interest, an order of interest.
4 　　Q　And then you would do a review.
5 　　A　Do a review.
6 　　Q　Would you stop the order of interest at
7 the distribution center from being shipped prior
8 to your review?
9 　　A　Yes.
10 　　Q　So basically the algorithm would --
11 would create a score for each order, correct?
12 　　A　Yes.
13 　　Q　And if the score was above a certain
14 level, that would trigger a review, it would flag
15 the order for a review.
16 　　A　Mm-hmm.
17 　　Q　Was that the process?
18 　　A　Yes.
19 　　Q　And just looking at the controlled
20 substance IRR report, can we agree that daily
21 there would be hundreds of orders flagged
22 nationally for your review?
23 　　A　For the controlled substance?
24 　　Q　Yes.

Page 38

1   A   Definitely not daily.  I -- I don't -- I
2 don't recall hundreds flagging either.
3   Q   Well, did the number of orders that were
4 flagged, did that change over time or did it
5 become greater in '09 and then greater in '10?
6   A   If there was -- just -- just the system
7 in general, it was steady.  If there was something
8 that would come up that would cause more -- more
9 items to generate when the IRR -- that would cause
10 the IRR to expand.
11      And when we're talking controls, cough
12 syrup is a good example, cough and cold season,
13 prometh would cause the IRR to grow because cough
14 syrup had codeine in it.  So there were situations
15 where the IRR would -- would be larger during
16 certain periods of time.
17      (Exhibit No. 139 was premarked for
18      identification.)
19 BY MR. KENNEDY:
20   Q   Let me show you Exhibit 139.
21   A   Okay.
22   Q   Is that a typical IRR?  Is that what
23 that report is?
24   A   This is an IRR.  I don't know if it's a

Page 39

1 typical one.  This one seems pretty thick.
2   Q   Well, this is 75 pages, isn't it?  Look
3 at the Bates 775 to 850.  This is a 75-page IRR.
4   A   Okay.
5   Q   And you understand that this is for one
6 day for one distribution center.  Correct?
7   A   I'm looking at it, and it does appear to
8 be that, yes.
9   Q   How many distribution centers were there
10 in '09?
11   A   Maybe nine, ten, eleven.  Somewhere in
12 there.
13   Q   And about how -- take a look at -- pull
14 out any individual page and tell me how many
15 flagged orders of a controlled substance there are
16 on each page.
17   A   Well, I'm looking at the date, and again
18 it's November 30th.  You're in flu season, you're
19 in cough and cold season.  I don't know how many
20 of these were driven by codeine cough syrups.
21   Q   Sir, I asked you how many per page.
22 That was my question.
23   A   How many per page, it looks like five.
24   Q   And we've got 75 pages, 5 times 75 is

Page 40

1 close to 500, close to 400 -- 400, right?
2   A   Yeah, 375 -- 150, 3 -- yep, 375.
3   Q   And this is for one of ten distribution
4 centers, and you were looking at IRRs for the
5 entire country, all distribution centers, true?
6   A   True.
7   Q   In addition to an IRR -- and this is a
8 daily report, right?
9   A   Yes.
10   Q   And in addition to this daily report
11 that you were looking at beginning in '09, you
12 were also looking at the PSE report, true?
13   A   Yes.
14   Q   And the PSE report, would that be again
15 hundreds of -- of orders that you would also have
16 been looking at in addition to the hundreds of
17 orders of controlled substances?
18   A   I don't remember that many on a typical
19 IRR.
20   Q   This period of time, '09 and into '10
21 when you were looking at the IRR, were you the
22 only person nationally looking at the IRR every
23 single day for CVS?
24   A   For a period of time I was.

Page 41

1   Q   What period of time?
2   A   I -- I don't know the exact dates, but I
3 do know there was a period into 2010.
4   Q   Were you the only person looking at it?
5   A   Yes.
6   Q   During this period of '09 and '10, in
7 addition to this controlled substances IRR, in
8 addition to the PSE review report, tell -- PSE,
9 tell the jury what that is.
10   A   Oh, it's the pseudoephedrine or
11 ephedrine, Bronkaid.
12   Q   Like controlled substances, those are
13 dangerous drugs that needed to be monitored by
14 CVS, true?
15   A   Yes.
16   Q   In addition to your responsibilities in
17 '09 and 2010 to review these IRRs daily, what were
18 your other job responsibilities?
19   A   Just to oversee my -- my area.
20   Q   The same job responsibilities that you
21 had had since 1999?
22   A   No, at this point we added an extra head
23 in Lumberton.  So there was a manager and
24 supervisor on each shift to pick up the slack in

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  Lumberton.
2      Q   When was that person added?
3      A   I don't recall the exact date.
4      Q   2008, '07, '06, '05?  Give me the year.
5      A   I -- I would be guessing.  Maybe 2007,
6  2008.
7      Q   So you had a set of responsibilities at
8  your distribution center and for that region in
9  '07 and '08, and then this was added to your
10 responsibilities, this reviewing the PSE, daily
11 IRR and the controlled substances IRR, true?
12     A   Yes.
13     Q   You also had some responsibilities
14 during this period with the development of a
15 suspicious order monitoring policy, did you not?
16     A   I was asked for my opinions.  There were
17 policies being sent to me for feedback.  As for
18 actually writing, I don't recall actually writing
19 any policies.
20     Q   When you were reviewing the -- the IRR
21 controlled substances report in '09 and 2010,
22 could you tell the jury about the written policies
23 and procedures that were in place at CVS to guide
24 you in your responsibility.

Page 43

1      MR. BUSH:  Objection.
2      You can answer.
3      THE WITNESS:  I -- I don't know.  I
4  don't recall again the policies.  I had a process
5  in place, and I followed the process.
6  BY MR. KENNEDY:
7      Q   No, I'm asking about what were the
8  written policies and procedures provided you by
9  CVS to guide you in your responsibility to review
10 the IRR.
11     A   I don't recall.
12     Q   Were there any?
13     A   I don't remember.
14     Q   How many -- how much time have you spent
15 preparing for this deposition today, this
16 testimony?
17     A   Oh, gosh.  A couple of days, off and on.
18     Q   During that preparation time, did
19 anybody ever show you any written policies and
20 procedures that were in place and utilized by you
21 in 2009 and 2010 to review this IRR report?
22     MR. BUSH:  Objection.
23     THE WITNESS:  I was -- I was shown
24 policies and procedures.  Which ones were -- were

Page 44

1  reviewed with me at that time period, I don't
2  recall.
3  BY MR. KENNEDY:
4      Q   Vernazza -- Mr. Vernazza, do you know
5  who that is?
6      A   Yes.
7      Q   He indicated that he spoke with you or
8  met with you on four occasions to talk about
9  policies and procedures.
10     Do you remember that?
11     A   We had calls, yes.
12     Q   Did he inform you of any policies and
13 procedures that were in place in 2009 and 2010
14 with respect to what you were doing for CVS?
15     MR. BUSH:  Objection.
16     If that answer -- if that question calls
17 for any privileged communications with
18 Mr. Vernazza, then I instruct you not to answer.
19 You can answer with respect to the meetings or
20 calls that you had with Mr. Vernazza relating to
21 his testimony for CVS as a CVS representative, if
22 you can distinguish between the two.
23     THE WITNESS:  I -- I don't recall what
24 was privileged and what was on the record.

Page 45

1  BY MR. KENNEDY:
2      Q   Well, let me ask you, when you spoke
3  with him, did you say or did you tell him, Hey, I
4  was -- I was looking at these IRRs in 2009 and
5  '10, and these were the policies that -- that were
6  provided to me to tell me what to do?  Did you
7  tell him that?
8      MR. BUSH:  Objection.  Same objection on
9  privilege grounds.
10     THE WITNESS:  Yeah, I -- I -- I told him
11 the same thing I just told you, I don't recall
12 going off a particular policy.  I went off of the
13 process.
14 BY MR. KENNEDY:
15     Q   Well, did he tell you, Hey, we've been
16 looking and searching the documents at CVS, and we
17 found these policies that -- that were probably
18 guiding you in your job to review the IRR?  Did he
19 say that to you?
20     MR. BUSH:  Objection.  Privileged.
21     You can answer to the extent you had the
22 conversation with him about his testimony as a
23 corporate representative.
24     THE WITNESS:  Yeah.  Again, I don't

Page 46

1 remember what -- what we spoke about when -- in --
2 in what kind of platform.
3 BY MR. KENNEDY:
4     Q    Let me -- let me kind of wrap it up.
5 When you were given this responsibility by CVS on
6 top of your other duties in 2009, do you have any
7 memory of, number one, any policies and procedures
8 to guide you or any specific training that you
9 were provided in order for you to carry out
10 this -- this new job?
11         MR. BUSH:  Objection.  Compound.
12 BY MR. KENNEDY:
13     Q    Any memory.
14         MR. BUSH:  Objection.
15         THE WITNESS:  I -- I just don't remember
16 the details, and I don't want to -- I don't want
17 to assume that I remember under oath.  I just -- I
18 don't remember the details.
19 BY MR. KENNEDY:
20     Q    What is clear, though, from your memory
21 is that prior to 2009, prior to being given this
22 job that you told us was very important, you had
23 no prior experience reviewing suspicious order
24 monitorings pursuant to any type report.

Page 47

1         MR. BUSH:  Objection.
2 BY MR. KENNEDY:
3     Q    Would that be true?
4         MR. BUSH:  Objection.
5         THE WITNESS:  Not in the process of what
6 I was doing after I started it.
7 BY MR. KENNEDY:
8     Q    Correct.  You had never seen an IRR
9 report prior to this, correct?
10     A    No.
11     Q    You had never seen a suspicious order
12 monitoring report prior to this, correct?
13     A    I don't recall.
14     Q    Who made the determination as to
15 specifically what you were to do with your review
16 of this IRR?  Who decided?
17     A    Frank Devlin was the person who assigned
18 it to me.
19     Q    And did he sit you down and say
20 specifically, This is what you are to do with
21 respect to each IRR?
22     A    I don't remember if I worked with Frank,
23 if I worked with Pam or if I worked with the
24 third-party consultants.  I just don't recall.  At

Page 48

1 one point or another I worked with all of them.
2     Q    And you don't know whether Mr. Devlin
3 had any experience with a -- an inventory report
4 for controlled substances, do you?
5     A    I have no idea, no.
6     Q    Did you create a daily report when you
7 began this process in 2009, a daily report as to
8 your activities as it related to your review of
9 the IRR?
10     A    If I remember correctly, I did not use a
11 daily report when I first started.  I actually
12 notated my information on the IRRs.
13     Q    Were you required to keep notations?
14     A    For -- for -- yes, for three years.
15     Q    You were required -- in 2009 when you
16 were given this, you were told to provide
17 documentation of -- of any of your reviews?
18     A    No, I just knew that anything that had
19 to do with pharmacy, we held for three years.
20     Q    And you were -- were you told you needed
21 to document every review?
22     A    I -- I don't recall if I was told or
23 not, but I -- I did put the notes on each review.
24     Q    The report would -- would flag what

Page 49

1 might -- clearly might be hundreds of orders a
2 day.  Correct?
3     A    Sometimes it may only be five pages
4 total.  It wasn't always a hundred -- hundred
5 pages.
6     Q    All right.  But there were days when
7 there was a hundred pages and there were hundreds
8 of orders, right?
9     A    Yes.
10     Q    And in addition to that, you also had to
11 look at the PSE flagged orders, correct?
12     A    Yes.
13     Q    And you had to review it every single
14 day, true?
15     A    Yes.
16     Q    So you had to review it on the days when
17 there was 15 pages and you had to review it on the
18 days there were 50 pages, correct?
19     A    Yes.
20     Q    And you had to review it on the days
21 when there was a `hundred pages, true?
22     A    Yes.
23     Q    And you understood that -- I think you
24 told us you at least understood this was very

Page 50

1  important, true?
2      A   Yes.
3      Q   When you would see a flagged order on a
4  day when there were hundreds, tell us what you
5  would do.
6      A   I would go through and review whether or
7  not there was a pattern of a particular drug that
8  may be flagging that were wide.  And when they're
9  as thick as this, I usually -- I usually find
10  that -- that the root cause would be, and I used
11  the prometh as an example, cough and cold season
12  could make this report go from five pages to a
13  book this thick.  So when those items flagged
14  validated cough and cold season, you validated
15  that's happening everywhere in the network.
16          And then I would go through and review
17  for all the other controlled drugs with an
18  emphasis on the drugs that I would review first,
19  being street drugs -- drugs that had street value,
20  I would go through and do those first, and then do
21  the rest of them.
22      Q   All right.  Number one, you said you
23  would look at all of these orders, even on the
24  days where there were hundreds, and you would look

Page 51

1  for a pattern, correct?
2      A   Yes.
3      Q   In trying to identify a pattern, were
4  you looking within the four corners of the IRR
5  report?
6      A   I don't -- I don't know what you mean.
7      Q   Were you looking at materials other than
8  the report itself when you were identifying
9  patterns, the first thing you said you were doing?
10      A   Oh, I would use other resources.  If I
11  saw cough and cold, I would work with my field
12  partners to ensure that we do have a cough and
13  cold season in effect.
14      Q   So that's the pattern for cough and
15  cold.
16      A   Well, I'm using that as one example
17  because I remember that standing out in the fourth
18  quarter, which -- which is right around this --
19  this IRR that you gave me earlier.
20      Q   You have a flag on hydrocodone, which
21  you will see flagging of hydrocodones there.
22      A   Mm-hmm.
23      Q   Tell me what would you look at to
24  determine whether or not there was a pattern in

Page 52

1  relation to hydrocodone in 2009 and '10 when you
2  were reviewing the IRR.
3      A   I wouldn't use a pattern for
4  hydrocodone.  Hydrocodone, street drugs are --
5  they're -- they're not seasonal, so I would
6  automatically freeze these.
7      Q   Okay.  So, first of all, when you talk
8  about pattern, you're looking for seasonal
9  patterns, true?
10      A   I'm looking for drugs that have seasonal
11  patterns.
12      Q   Okay.  So hydrocodones, you would not be
13  looking for patterns, true?
14      A   No patterns for hydrocodone.
15      Q   Okay.  Tell me then when a hydrocodone
16  flags -- and "flagging" means it's potentially
17  suspicious, true?
18      A   Well, it's of interest.
19      Q   Of interest.  Well, and that's -- that's
20  potentially suspicious, that's of interest, same
21  thing?
22      A   Well, it becomes suspicious when we
23  don't root cause it.
24      Q   I said potentially suspicious.  Whatever

Page 53

1  is flagged is potentially suspicious, true?
2      A   If it's -- I -- I mean, everything on
3  this report is potentially suspicious.
4      Q   All right.  But when you say an "order
5  of interest," you -- what you mean is you're
6  interested in reviewing it because it might be
7  subject to diversion.
8      A   Correct.
9      Q   And diversion is what you're trying to
10  prevent, true?
11      A   Yes.
12      Q   And diversion is the -- is the movement
13  of narcotics from legitimate channels into
14  illegitimate channels.
15      A   Yes.
16      Q   And these illegitimate channels, you
17  understood at that point in time that's what was
18  killing a lot of Americans was illegitimate
19  channels of hydrocodones and other controlled
20  substances.
21      MR. BUSH:  Objection.
22      THE WITNESS:  I really didn't even look
23  at it that broadly.  I looked it as my job to make
24  sure every single drug in this report was

Page 54

1 legitimate, no matter what the drug was. If it
2 wasn't legitimate, I wasn't going to let it go.
3 BY MR. KENNEDY:
4    Q    Okay. Let's go back to hydros then.
5 You're not looking for patterns when you looked at
6 the IRR in 2009 for hydrocodones. What do you do
7 with the hydrocodones that are flagged as of
8 interest or potentially suspicious?
9    A    Freeze the orders within the
10 distribution centers. I would contact the field
11 VIPER analyst in those areas. I would also
12 contact the regional loss prevention managers for
13 them to do an investigation.
14    Q    And you did that in 2009 up to October
15 of 2010 for every flagged hydrocodone order. Is
16 that your testimony?
17    A    Yes.
18    Q    How long would these orders remain
19 freezed?
20    A    Until they were cleared by the field.
21    Q    How long would that take?
22    A    For the most part, a lot of the stores
23 were within range. Sometimes the same day,
24 sometimes two days because they wanted to do more

Page 55

1 investigation.
2    Q    And so it's -- it's your testimony that
3 for every hydrocodone order that was flagged in
4 the country, every day you would contact the field
5 VIPER analyst for them to do an investigation and
6 the regional loss prevention manager to do an
7 investigation. Is that your testimony?
8    A    There could be times where one of those
9 guys weren't available, but one of them would be
10 involved.
11    Q    So if we were to take the testimony
12 of -- of those two folks, they would tell us that
13 every single day they were investigating
14 hydrocodone orders sent to them by you in 2009.
15 That's what they'll say?
16    A    I'm not sure if it would be every day,
17 but they would definitely tell you that I was
18 having them running around a lot. They were --
19 they were very vocal.
20    Q    Hydrocodone orders were flagged every
21 single day in the country, were they not, every
22 day?
23        MR. BUSH: Objection.
24        THE WITNESS: I don't recall every day.

Page 56

1 I don't know.
2 BY MR. KENNEDY:
3    Q    For the, what is it, 5- to 7,000 CVS
4 stores and pharmacies in 2009?
5    A    Yeah, I -- I'm assuming that many, yes.
6    Q    And it would be your testimony that you
7 were contacting distribution centers to stop
8 hydrocodone orders every single day?
9        MR. BUSH: Objection.
10        THE WITNESS: I would contact them if it
11 was flagged.
12 BY MR. KENNEDY:
13    Q    And there was flagged hydrocodones every
14 day if you look at the IRRs, correct?
15        MR. BUSH: Objection.
16        THE WITNESS: I don't recall every day.
17 BY MR. KENNEDY:
18    Q    But these field VIPER analysts and
19 regional loss prevention managers should be
20 telling us that you were contacting them just
21 about every day to begin reviews and
22 investigations of hydrocodones. That should be
23 their testimony, correct?
24    A    If it was in their area, yes.

Page 57

1    Q    And in 2009, tell me who -- give me the
2 names of the different field VIPER analysts that
3 you would have been contacting every day about
4 hydrocodone flagged orders.
5        MR. BUSH: Objection.
6        THE WITNESS: Matt Listowsky.
7 BY MR. KENNEDY:
8    Q    And where -- where was he located?
9    A    I believe he was in the Northeast.
10        Dennis Wilkinson.
11    Q    And where was he located?
12    A    He was in the Midwest. There was a
13 Southeast gentleman, he had a British accent, I
14 cannot think of his name. We've had a lot of
15 turnover since then. I -- I don't remember.
16    Q    So according to your testimony, then in
17 2009 into 2010, you would have been contacting DCs
18 across the country to stop hydrocodone orders.
19    A    Yes.
20    Q    And that would be -- given what we know,
21 that would be -- you would be contacting DCs daily
22 in this country to stop hydrocodone orders because
23 they had been flagged, true?
24        MR. BUSH: Objection.

Page 58

1    THE WITNESS:  If they were flagged, I
2 would contact them.
3 BY MR. KENNEDY:
4    Q   And say, Stop the orders.
5    A   Freeze the order, yes.
6    Q   And who would you contact at the DCs?
7    A   I would contact the loss prevention
8 manager and the pharmacy manager.
9    Q   Of the DCs?
10    A   Yes.
11    Q   How would you contact them?
12    A   Phone calls.
13    MR. KENNEDY:  Give me Exhibit 135.
14    (Exhibit No. 135 was premarked for
15    identification.)
16 BY MR. KENNEDY:
17    Q   Exhibit 135, look at the front page of
18 that.  Do you see it's an e-mail from Terrence
19 Dugger?  Do you see Terrence Dugger?
20    A   Yes.
21    Q   That he's sending an e-mail.  Do you
22 know who Terrence Dugger is?
23    A   Yes.  He was the loss prevention manager
24 in Indianapolis at the time.

Page 59

1    Q   In Indianap-- -- and that's a
2 distribution center, true?
3    A   Yes.
4    Q   And this is dated August 26, 2010.  Do
5 you see that?
6    A   Yes.
7    Q   He's sending this e-mail to Frank
8 Devlin.  And was he your boss?
9    A   Frank Devlin is, yes.
10    Q   And a copy of this to Sean Humphries?
11 Who is Sean Humphries?
12    A   He was my counterpart who oversaw
13 Indianapolis at the time.
14    Q   All right.  It says:  "Subject "DEA
15 Day 3."  Do you see that?
16    A   Yes.
17    Q   And this is an e-mail -- we'll go
18 through it -- this is an e-mail about a DEA
19 inspection that was going on, and Terrence Dugger
20 is reporting this to -- to your boss.  Do you see
21 that?
22    MR. BUSH:  Objection.
23    THE WITNESS:  Yes.
24 BY MR. KENNEDY:

Page 60

1    Q   Look at bullet point -- the last bullet
2 point on page 10223.  Do you see that, it starts
3 with "I shared"?
4    A   Oh, yes.
5    Q   It starts with "I shared," that bottom
6 bullet point, and it states:  "I" -- and I think
7 that that's Terrence Dugger from the distribution
8 center.  "I shared with her" -- and that would be
9 the DEA inspector -- "I shared with her the
10 suspicious order monitoring report IRR, and she
11 asked how often I received it.  I told her daily
12 and weekly, but I have not received the file in a
13 few months as the report was being tweaked.  I
14 told her that it was monitored corporately by John
15 Mortelliti.  She asked what happens when he calls
16 regarding information on the report.  I told her
17 that I have never received a call regarding
18 information from the report."
19    Never received a call from you.  Is that
20 consistent with your memory?
21    A   I do remember terminating Terrence for
22 his performance.  But, no, this does not sound
23 familiar with my memory at all.
24    Q   Didn't you just tell us that you were

Page 61

1 going through these IRRs, these hundreds of IRRs
2 every day, and then if a hydrocodone was flagged,
3 you were calling the DC to stop the order daily?
4    A   Could I take a minute to read this?
5    Q   Absolutely.
6    But, sir, please answer my question.
7 Didn't you just tell us that you reviewed the IRR
8 daily, and when hydrocodones were flagged, you
9 would call the DC that very day to stop the order?
10    A   Yes.
11    Q   And now we have a gentleman who says he
12 hasn't -- you never called him.  Is that what he
13 says?
14    A   I'm -- I'm going to read this.  I don't
15 know the context of the e-mail yet.
16    Q   All right.
17    A   (Peruses document.)
18    Q   Have you read it?
19    A   I did.
20    Q   All right.  Let's go to the second page
21 of that.
22    A   Okay.
23    Q   Now that you got a chance to read it,
24 and start with the sentence "She," and "she" would

Page 62

1  be the DEA?
2      MR. BUSH: Objection.
3  BY MR. KENNEDY:
4      Q  Do you agree that "she" is making
5  reference to the DEA investigator on the second
6  page?
7      A  Okay.
8      MR. BUSH: Objection.
9  BY MR. KENNEDY:
10     Q  The sentence that starts with "She
11  asked," now that you got a chance to read it -- so
12  let me ask you, "She asked what happens when he
13  calls regarding information on a report. I told
14  her that I never received a call regarding
15  information from the report."
16     Did I read that right, now that you've
17  had a chance to review this?
18     A  Yeah, it's in here.
19     Q  Let me ask you, the IRR report itself --
20     A  Mm-hmm.
21     Q  -- you've reviewed tens of thousands of
22  these, have you not?
23     A  Tens of thousands reports or --
24     Q  Items on those reports.

Page 63

1      A  I -- I reviewed them all during that
2  time period.
3      Q  All right. Tell me what conclusions
4  from the IRR report itself can you draw as to
5  whether or not an order is suspicious?
6      A  We're talking about hydro?
7      Q  Let's look at hydro.
8      From the report itself, what conclusions
9  can you draw, if any, from the information
10  contained in the report?
11     A  Okay. Well, as for the report itself,
12  this -- this looks like the time period where data
13  was lost for three months. We had a time period
14  where historical data fell off --
15     Q  I don't want to talk about that. We
16  will talk about that in detail.
17     I just want to -- in a general sense,
18  when you would look at an IRR report --
19     A  Mm-hmm.
20     Q  -- you would have the score that would
21  be above a certain level so it would flag,
22  correct?
23     A  Yes.
24     Q  Generally, what other information on

Page 64

1  that report, just the report itself, allowed you
2  to or assist you in making the determination as to
3  whether or not this order of interest is indeed
4  suspicious?
5      A  For hydro, I -- I went after all the
6  hydro. I went after all the cocktail drugs,
7  street drugs. I worked with DEA Agent Donna
8  Walker. She gave me a list of drugs to look out
9  for for this particular program, and I posted it
10  on my wall. It's still hanging there today. And
11  I reviewed every single one of those drugs and
12  viewed them all as suspicious if they were on this
13  report.
14     MR. KENNEDY: Okay. I'm going to move
15  to strike.
16  BY MR. KENNEDY:
17     Q  You've got to listen carefully.
18     MR. BUSH: Objection.
19     MR. KENNEDY: He is not even close.
20  BY MR. KENNEDY:
21     Q  Listen very carefully --
22     MR. BUSH: That's not true. He answered
23  your question. I'm sorry you don't like the
24  answer. You can move to strike. It's not -- the

Page 65

1  judge will decide.
2      MR. KENNEDY: The judge will decide.
3  BY MR. KENNEDY:
4      Q  But my question is real simple. From
5  the IRR report itself --
6      A  Mm-hmm.
7      Q  -- tell me what information -- other
8  than the score, what information is there on that
9  report that would assist you -- if any, would
10  assist you in determining whether or not that
11  order was suspicious?
12     A  If it flagged, it would be an item of
13  interest.
14     Q  Correct. And we agree that there is no
15  other information that you would be able to
16  utilize on that report itself that would assist
17  you in your review and investigation of that
18  order. True?
19     A  For hydrocodone, I would err on the side
20  of caution. I also erred on the side of caution
21  for the street drugs.
22     MR. KENNEDY: Okay. I'm going to move
23  to strike.
24  BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Q   Listen very carefully.  What information
2  is there on the IRR, other than the score, that
3  you used and assisted you in determining whether
4  or not the order was suspicious?
5        MR. BUSH:  Objection.
6        THE WITNESS:  I -- for -- depending on
7  the drug, like in the e-mail you just gave me, it
8  appears Tussionex.
9  BY MR. KENNEDY:
10   Q   We're talking about hydrocodone.
11   A   For hydrocodone, if it's on there,
12 I'm -- I'm reviewing it as suspicious or --
13   Q   All right.  And what information in your
14 review -- what information on the IRR itself, if
15 any, would assist you in that review?
16   A   Nothing.  The fact that it's there.
17   Q   That's all I want.  Thank you.
18       When you would send or contact the field
19 VIPER analysts -- let's start with the field
20 analysts -- with a flagged potentially suspicious
21 order of hydrocodone, tell me specifically what
22 the field VIPER analysts would do in their review
23 of that order.
24       MR. BUSH:  Objection.

Page 67

1        THE WITNESS:  The VIPER analysts were
2  the subject matter experts for exceptions.  So
3  they would take that information.  How they went
4  through their different reporting -- exception
5  reporting, I wasn't there for it.  I know they
6  used specific software reporting to -- to actually
7  review what I would send them, but as for step by
8  step, I'm not sure.
9  BY MR. KENNEDY:
10   Q   You say that they used software in order
11 to evaluate an order of hydrocodone.  Is that your
12 testimony?
13   A   They used exception reporting and
14 whatever else they did.  I -- again, they were the
15 subject matter experts on -- on investigating.
16   Q   When you said they used exception
17 reporting, what is that?
18   A   We had a program VIPER in the field at
19 the time.
20   Q   And what else other than VIPER would
21 they use?
22   A   I don't know offhand.
23   Q   And we're talking about the time frame
24 of 2009 and 2010, correct?

Page 68

1    A   Yeah, I don't know.
2    Q   Have you ever heard of the term
3  "MicroStrategy"?
4    A   Yes.
5    Q   And can we agree that MicroStrategy was
6  not available in 2009 and 2010 to the VIPER
7  analysts?
8    A   I don't --
9        MR. BUSH:  Objection.
10       THE WITNESS:  I don't know.
11       MR. KENNEDY:  Exhibit 130.
12       (Exhibit No. 130 was premarked for
13       identification.)
14       MR. BUSH:  You're welcome to look at
15 those.  That's an extra copy.
16 BY MR. KENNEDY:
17   Q   Do you see the cover page, the first
18 page, 114320, is an e-mail from Aaron Burtner to
19 Steve Molina?  Do you see that?
20   A   Yes.
21   Q   And the date of that is 7/11/2012?
22   A   Yes.
23   Q   "Attachments:  Project plan," correct?
24   A   Yes.

Page 69

1    Q   Who is Aaron Burtner?
2    A   Aaron was -- I believe his title was the
3  manager for the -- the analysts.  I don't know his
4  exact title, but he was brought into the SOM
5  project.
6    Q   To the suspicious order monitoring
7  project?
8    A   Yes.
9    Q   A competent guy?
10   A   Yes.
11   Q   He would have been knowledgeable about
12 the suspicious order monitoring process by 2012?
13   A   I -- I believe he would be.
14   Q   Go to page 114322, if you would, of this
15 exhibit.
16       This is a list of projects, correct?
17 This says "Project Plan."  Is that what the --
18 that's what we just read on the first page?
19   A   Yes.
20   Q   Look at number 17.  17, does it say --
21 again, we are in July of 2012, and they're
22 outlining projects.  It says:  "Obtain
23 MicroStrategy / VIPER reports for Paul Lawson and
24 Aaron Burtner."

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1      Do you see that?
2      A   I do.
3      Q   And the start date of that was
4  February 28, 2012.  That's the start of obtaining
5  the reports.  Do you see that?
6      A   Yes.
7      Q   That looks like it was finished -- you
8  got those reports for them in March of 2012,
9  right?
10         MR. BUSH:  Objection.
11 BY MR. KENNEDY:
12     Q   Is that what it says?
13         MR. BUSH:  Objection.
14         THE WITNESS:  End -- end date.  Yes.
15 BY MR. KENNEDY:
16     Q   And this was your project, this was --
17 you were the task owner of that?
18         MR. BUSH:  Objection.
19 BY MR. KENNEDY:
20     Q   Is that true?
21     A   I'm on -- I'm on here.  I -- I don't
22 recall back to 2012.
23     Q   All right.  But you were the task -- at
24 least you owned that task, true?

Page 71

1          MR. BUSH:  Objection.
2          THE WITNESS:  You know, I'm -- I'm on
3  here.
4  BY MR. KENNEDY:
5      Q   Let's go down to line 21.  This is
6  project 21.  Do you see this?
7      A   I do.
8      Q   It says -- 21 says, "Begin."  Do you see
9  the first word says, "Begin"?
10     A   Yes.
11     Q   It doesn't say "already doing," correct?
12     A   Yes.
13     Q   It says:  "Begin reviewing irregular
14 store orders utilizing MicroStrategy."
15         Does it say that?
16     A   Yes.
17     Q   And the start of that project would have
18 been 2/29/12, right?
19         MR. BUSH:  Objection.
20 BY MR. KENNEDY:
21     Q   Correct?
22         MR. BUSH:  Objection.
23         THE WITNESS:  I think I know what this
24 was.

Page 72

1  BY MR. KENNEDY:
2      Q   Is that what it says?
3      A   Yes.
4      Q   And they accomplished that, the
5  beginning of using MicroStrategy for irregular
6  orders, on 3/15/12, do you not?
7          MR. BUSH:  Objection.
8          THE WITNESS:  They had -- they had this
9  different information.  This is the information
10 that the field was using, and they were bringing
11 it in-house to the supply chain analysts.  That --
12 that's what -- that's what this is.
13 BY MR. KENNEDY:
14     Q   "Data being used to determine irregular
15 orders," is that what it says, 2012?
16     A   That -- that's what it says.
17     Q   And when you say "in-house," it had been
18 in-house outside the distribution center since
19 March of 2011, had it not?
20         MR. BUSH:  Objection.
21 BY MR. KENNEDY:
22     Q   You centralized in March of 2011, did
23 you not?
24     A   Well, all --

Page 73

1          MR. BUSH:  Objection.
2          THE WITNESS:  All this was was bringing
3  the reporting that the field was investigating
4  with, bringing it to the -- to the people who were
5  actually flagging orders of interest.
6  BY MR. KENNEDY:
7      Q   These were the people that were actually
8  doing the reviews beginning in March of 2011,
9  true?
10         MR. BUSH:  Objection.
11         THE WITNESS:  Yes.
12 BY MR. KENNEDY:
13     Q   And is it your testimony that this
14 MicroStrategy existed prior to 2012?
15         MR. BUSH:  Objection.
16         THE WITNESS:  I don't recall.
17 BY MR. KENNEDY:
18     Q   This would seem to indicate that they
19 didn't start applying it to irregular orders until
20 2012, right?
21         MR. BUSH:  Objection.
22         THE WITNESS:  No.  The field was using
23 their -- their information to do the
24 investigation.  The goal here was to see the same

Page 74

1  thing the field was using so these guys were
2  knowledgeable on the actual investigation that the
3  field subject matter experts were -- were using.
4  BY MR. KENNEDY:
5      Q   Sir, is it your testimony that
6  MicroStrategy existed and was being utilized by
7  CVS prior to 2012?
8      A   I don't recall MicroStrategy.  I recall
9  VIPER.
10         (Exhibit No. 142 was premarked for
11         identification.)
12  BY MR. KENNEDY:
13     Q   All right.  We'll look at VIPER.
14         Let me show you Exhibit 142.  Is that
15  your name up on the front page?
16     A   Yes.
17     Q   Henry Mortelliti, correct?
18     A   Yes.
19     Q   Go to page 6 of 9, if you would, please.
20  This is kind of a progress report, is it not?
21         MR. BUSH:  Objection.
22         THE WITNESS:  It's a year-end.
23  BY MR. KENNEDY:
24     Q   For 2012?

Page 75

1      A   Yes.
2      Q   Looking at page 6 of 9, go over on the
3  right-hand column.  A couple of paragraphs down,
4  does it say "April 2"?  Do you see that, April 2?
5      A   Okay.
6      Q   "April 2:  Meet deadline for
7  understanding how to leverage WMS reporting,
8  MicroStrategy and VIPER."
9          MR. BUSH:  Objection.  I think you
10  misspoke, Eric.  It's met, not meet.  Small point,
11  but you didn't read it quite right.
12  BY MR. KENNEDY:
13     Q   Next sentence:  "Begin immediate use of
14  queries to analyze control drug and PSE order
15  data."  Do you see that?
16     A   I do.
17     Q   Do you have any evidence -- any memory,
18  any evidence that MicroStrategy existed and was
19  being utilized prior to 2012?
20     A   I -- I don't know.  I don't know if the
21  field was using it.  This -- this information
22  again was taken -- what we received on the IRR and
23  actually reviewing other -- other data, and a lot
24  of this information I got from the DEA Agent Donna

Page 76

1  Walker on what we should be looking for.
2      Q   I'm talking about 2009 right now up to
3  October of '10.  That's what I'm talking about
4  with respect to the use of MicroStrategy.
5          Do you have any memory or any evidence
6  that you can point us to that would -- that would
7  indicate that MicroStrategy was in existence and
8  being utilized in 2009 up to October of '10?
9      A   I just don't recall using it.
10     Q   All right.  Now, you indicated that
11  these -- these folks in 2009 and '10, the field
12  VIPER analysts and the regional LP manager, that
13  they were utilizing VIPER to evaluate potentially
14  suspicious orders that you would refer to them,
15  true?
16     A   Yes.
17     Q   Let's -- let's look at VIPER.
18         MR. BUSH:  Is now a good time for a
19  break?  We've been going --
20         MR. KENNEDY:  Sure.
21         MR. BUSH:  -- for an hour and a half.
22         MR. KENNEDY:  Yeah.
23         THE VIDEOGRAPHER:  The time is 9:27 a.m.
24  We're going off the record.

Page 77

1          (Recess.)
2          THE VIDEOGRAPHER:  The time is 9:42 a.m.
3  We're back on the record.
4  BY MR. KENNEDY:
5      Q   Now, Mr. Mortelliti, you -- you
6  indicated that when you would refer a suspicious
7  or potentially suspicious order of hydrocodone to
8  the VIPER analysts and the LP prevention manager,
9  that they would have available to them what was
10  known as the VIPER report, true?
11     A   Yes.
12     Q   And that's -- they would have had that
13  available to them in '09 and 2010; is that your
14  testimony?
15     A   Yes.
16         (Exhibit No. 132 was premarked for
17         identification.)
18  BY MR. KENNEDY:
19     Q   I want to look at Exhibit 132 if we
20  could.
21         Is that a VIPER report, sir?
22     A   I --
23         MR. BUSH:  Take your time to look
24  through it.

Page 78

BY MR. KENNEDY:

Q   And more specifically, a VIPER PDMR report.

A   (Peruses document.)  It looks like one of the reports.

Q   And this is a report that would be -- it was generated every three months; is that true?

A   I --

MR. BUSH:  Objection.

THE WITNESS:  I didn't know it to be generated every three months.

BY MR. KENNEDY:

Q   Do you have any -- any knowledge, background, anything you've looked at that would allow you to disagree with the fact that this was created every three months, these were three-month reports?

MR. BUSH:  Objection.

THE WITNESS:  Are you -- I know that they had reports that were -- that were realtime where they could actually review dispensing versus billings.

BY MR. KENNEDY:

Q   What were those reports called?

Page 79

A   I -- I don't recall.

Q   Were those available in 2009?

A   Yes.

Q   The realtime reports?

A   Yes.

Q   Who else would know about that other than -- than you that these realtime reports existed in 2009?

Let's start with the people we've already -- already testified about that.  Who -- who else would know that these realtime VIPER reports existed in 2009, other than what you're saying here?

MR. BUSH:  Objection.  I don't know really what you meant by "the people we've already testified about."

BY MR. KENNEDY:

Q   Who else in the company at CVS would testify that the realtime VIPER reports existed in 2009, other than you?

A   The field loss prevention.

Q   They would all know that?

A   If they were -- if they were around in 2009.

Page 80

Q   They would know that?

A   Yeah, now the PDMR?

Q   Yes.

A   I could be mistaken here, but I believe this is just one of -- of the many reports -- VIPER was a program.  So there were several reports -- from the way I -- I recall it, there were several different reports they could have pulled -- exception reports they could have pulled out of VIPER.

Q   And we're going to look at those.

A   Okay.

Q   This is the first one we're going to look at, VIPER PDMR.  All right?

A   Okay.

Q   Let's go back first to -- let's go back to the federal regulation, Exhibit 2, which you should have in front of you.

We looked at that previously, correct?

A   Yes.

Q   And this is from 1971.  Do you understand that?

A   Yes.

Q   By 2009, were you familiar with this,

Page 81

this regulation when you sat in this position?

MR. BUSH:  Objection.

THE WITNESS:  I don't recall reading this particular document.

BY MR. KENNEDY:

Q   Well, the federal registration -- or, excuse me, the Federal Regulation states:  "The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant."

And CVS was a registrant, correct?

A   Yes.

Q   And then it states:  "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."

Were you aware of -- of that statement in the Federal Registry?

A   I knew our -- our process would flag this.  As for it being in the -- in the regulation, I just -- I don't recall.

Page 82

1    Q   Looking back to the VIPER report,
2  Exhibit 132, that -- that would have been
3  available to these folks that were reviewing the
4  IRR, is there anything on this report -- take a
5  look at it -- that would allow the VIPER analysts
6  or the LP prevention manager, is there anything on
7  this report that would allow them to evaluate
8  whether a specific order was unusually high?
9    A   I don't want to speak on -- on behalf of
10 the field investigations.  I mean, I -- I could
11 look at it --
12   Q   Absolutely.
13   A   -- from where I'm sitting, but I'm
14 not -- I'm not -- I don't know this report like
15 they would.
16   Q   Take a look at it.  Anything on there
17 that would allow you or anybody else to evaluate
18 whether a specific order for hydrocodone was
19 unusually high?
20       MR. BUSH:  Objection.
21       THE WITNESS:  (Peruses document.)  I see
22 it has a -- it's got a flag on it.  I -- I don't
23 know what the codes mean.  I also see that it
24 takes what the warehouse shipped, the outside

Page 83

1  vendor shipments, and how many items were
2  dispensed.
3        It's got a variance percentage.  Again,
4  I don't know if that is a -- a field flag.  I
5  don't know the volume of -- of the stores.  I
6  don't know what their shelf quantity is.  And
7  again, the VIPER analysts and the loss prevention
8  regional manager, they would understand what this
9  information means for them for this particular
10 store, because the numbers, they're -- they're
11 different depending on the volume.
12 BY MR. KENNEDY:
13   Q   Would the answer to my question be "no"?
14       MR. BUSH:  Now, I will object.  That is
15 not -- he answered the question.  I'm sorry you
16 don't like the answer, but he answered it.
17 BY MR. KENNEDY:
18   Q   Would the answer to my question be "no"?
19       MR. BUSH:  Objection.
20       THE WITNESS:  What was your question
21 again?
22 BY MR. KENNEDY:
23   Q   Sir, that's the problem, isn't it, that
24 we're having here communicating; you're not

Page 84

1  answering my questions.
2        MR. BUSH:  Objection.  He is answering
3  the question.
4  BY MR. KENNEDY:
5    Q   You don't even remember my question
6  because you're not even making an attempt to
7  answer my questions.
8        MR. BUSH:  No --
9  BY MR. KENNEDY:
10   Q   And I'm going to ask you the question
11 again, and I want you to listen very carefully to
12 my question.
13       And it relates to a -- you were sending
14 to the VIPER analysts specific orders, correct?
15   A   Mm-hmm.
16   Q   Single specific orders for hydrocodone
17 that you wanted them to investigate, correct?
18   A   Yes.
19   Q   And you told us that they utilized this
20 VIPER report, correct?
21   A   They utilized VIPER --
22       MR. BUSH:  Objection.
23       THE WITNESS:  I didn't say which report
24 or --

Page 85

1  BY MR. KENNEDY:
2    Q   We're just going to go through all
3  three.  All right?
4    A   Okay.
5    Q   So we can try to narrow it down.  They
6  used the VIPER reports you told us, true?
7        MR. BUSH:  Objection.
8  BY MR. KENNEDY:
9    Q   True?
10       MR. BUSH:  Misstates his answers.
11 BY MR. KENNEDY:
12   Q   Is that true?
13   A   Yes.
14   Q   And we also just went through the
15 federal regulation, that by this point in time
16 is -- 40 years old, and the regulation
17 indicated that you've got to look at orders,
18 individual orders, and determine whether they are
19 unusually high.
20       Do you remember just reading that
21 regulation?
22   A   Yes.
23   Q   And I want to know on this VIPER report,
24 from your standpoint, with all your background and

Page 86

1 experience, what your job was, from this VIPER
2 report, is there anything on here that would have
3 allowed the -- the analyst to evaluate whether a
4 single specific order was unusually high?
5    A   I -- I did answer that question. I
6 can't answer that. I'm not --
7    Q   That's all I want. If you can't answer,
8 that's fine.
9    A   I said that earlier.
10    Q   Can you answer that question?
11    A   I cannot answer that question.
12    Q   All right. Is there anything on this
13 report that would have allowed the VIPER analyst
14 or the LP manager to review and evaluate a
15 specific order as to whether or not it was
16 unusually frequent as required by the law?
17    A   I don't know.
18    Q   Is there anything on this report that
19 would allow the VIPER analyst or the LP prevention
20 manager, anything on this report allow them to
21 evaluate an individual order as to whether or not
22 it was of an unusual pattern?
23       MR. BUSH: Objection.
24       THE WITNESS: I don't know how they used

Page 87

1 it.
2 BY MR. KENNEDY:
3    Q   So let me understand this.
4       What was your job in '09? Tell me your
5 job title again.
6    A   Loss prevention manager.
7    Q   And what was your responsibility with
8 respect to suspicious order monitoring in '09?
9    A   To flag suspicious orders that came
10 through the distribution center, get that
11 information out to my field partners, freeze the
12 orders. If they were of interest, wait for them
13 to report back to me their findings or to release
14 the order.
15    Q   And what was your responsibility --
16 we've seen it on e-mails -- your responsibility
17 with respect to drafting, implementing and
18 creating a suspicious order monitoring policy in
19 '09 and '10?
20       MR. BUSH: Objection. Asked and
21 answered.
22       THE WITNESS: I didn't fully draft
23 policies. Several were floated my way for -- for
24 input.

Page 88

1       MR. KENNEDY: Give me 131 and 133.
2 BY MR. KENNEDY:
3    Q   Let me shortcut this. I'm going to show
4 you -- if I were to show you two more VIPER
5 reports and ask you whether or not these VIPER
6 reports provided any information as to whether or
7 not a specific order was unusual in size,
8 frequency or pattern, would your answer be the
9 same, that you -- you cannot tell?
10    A   It would be.
11       MR. BUSH: Objection.
12 BY MR. KENNEDY:
13    Q   The LP analysts -- excuse me, the VIPER
14 analysts and the LP prevention manager who you
15 would refer investigation to, who did they work
16 for? Who was their employer, what company?
17    A   The VIPER analysts in the field reported
18 to, it would be, the loss prevention area
19 directors.
20    Q   And who would they be?
21    A   In 2009?
22    Q   Yes.
23    A   Chris Knight, Gary Loreck, David Henry,
24 Jim Berry, Tim Curry, and I believe Paul Lehman

Page 89

1 were the area directors. There could be a couple
2 that I missed by a couple of years. We had some
3 turnover.
4    Q   What policies -- written policies and
5 procedures were in place in 2009 and 2010 telling
6 the -- the VIPER analysts and the LP prevention
7 manager what they were to do with respect to
8 investigating suspicious orders?
9    A   I don't know.
10    Q   Who trained the VIPER analysts and the
11 LP prevention manager with respect to their
12 responsibilities to investigate suspicious orders?
13    A   They -- they had their own field
14 training. I don't know who the trainers were.
15 But -- no, I don't know.
16    Q   What audit policy was in place to -- to
17 audit and monitor what the VIPER analysts and the
18 LP prevention manager were doing with respect to
19 their investigation of suspicious orders?
20    A   I don't know what their -- what their
21 process looked like.
22    Q   And in '09 and 2010, what -- what audit
23 procedure was in place to -- to audit what you
24 were doing with respect to the IRR reports?

Page 90

1    A   I -- I don't recall if -- I don't recall
2  an audit.
3    Q   Do you remember an audit ever being done
4  to monitor your performance with respect to what
5  you were doing with the IRRs?
6    A   We had meetings with outside counsel,
7  Terry Woodworth.
8    Q   In 2009?
9    A   I -- I don't remember the dates.
10   Q   I'm talking about a formal audit of what
11 you were doing with respect to IRRs, was that ever
12 done in 2009 and '10?
13   A   I don't recall the dates.  I did have a
14 sit-down with our corporate attorneys at one
15 point, and again, I don't recall the dates.  I
16 know Terry Woodworth was our -- our -- gosh, I
17 don't know, DEA consultant maybe, pharmacy
18 consultant.  I'm not sure.  But they reviewed my
19 work.  But as for something written down, I -- I
20 don't recall seeing anything like that.
21   Q   The VIPER analysts and the LP prevention
22 manager, would they be required to create records
23 of any investigation that they performed in
24 relation to hydrocodones?

Page 91

1    A   I don't know.
2    Q   You don't know?
3    A   No.
4    Q   Can we agree that any investigation or
5  review that they did in 2009, '10, should be part
6  of an IRR recap report?
7       MR. BUSH:  Objection.
8       THE WITNESS:  When I was doing the
9  reports, I would write down on the IRR itself
10 time, date, who I spoke to, when they called me
11 back, and when the order was released, who I froze
12 the order with.
13      MR. KENNEDY:  I'm going to move to
14 strike.
15 BY MR. KENNEDY:
16   Q   Listen to my question, please.
17      I asked you, and I'll ask you again, can
18 we agree that any review or investigation that a
19 VIPER analyst or an LP prevention manager did with
20 respect to a potentially suspicious hydrocodone
21 order would be recorded in the IRR recap report?
22      MR. BUSH:  Objection.  And his answer
23 before was perfectly responsive to that question.
24      THE WITNESS:  Yeah, my answer is the

Page 92

1  same.  I wrote down the information, and they got
2  back to me on the report.
3  BY MR. KENNEDY:
4    Q   Oh, so you would record not just what
5  you did, you would record what they told you they
6  did?
7    A   Not what they did, no, I didn't record
8  that.  I record when they told me it was okay to
9  release the order.
10   Q   So you did not record anywhere what the
11 VIPER analyst or LP prevention manager did to
12 review an order, correct?
13   A   Not -- not all the steps.  No.
14   Q   And so my question again for the third
15 time, and listen very carefully, what they did do,
16 whatever review or investigation the VIPER analyst
17 did or the LP prevention manager did with respect
18 to a hydrocodone order should be recorded in the
19 IRR recap report.
20      MR. BUSH:  Objection.
21 BY MR. KENNEDY:
22   Q   True?
23      MR. BUSH:  Objection.
24      THE WITNESS:  I don't know if it should

Page 93

1  be recorded there.  They may have it on file for
2  themselves.  They didn't report to me.
3  BY MR. KENNEDY:
4    Q   All right.  But it should be recorded
5  either by them in their own recordkeeping,
6  correct?
7    A   I don't know.
8       MR. BUSH:  Objection.
9  BY MR. KENNEDY:
10   Q   Or it should be on the IRR recap report,
11 correct?
12      MR. BUSH:  Objection.
13      THE WITNESS:  I only wrote what they
14 told me:  To release -- to release the orders.
15 BY MR. KENNEDY:
16   Q   We talked about VIPER.  Specifically,
17 can you name for us any other reports other than
18 VIPER that would have been utilized in 2009 and
19 '10 by the VIPER analyst or the LP prevention
20 manager in reviewing a hydrocodone suspicious
21 order?
22   A   I don't remember the reports.
23   Q   And with respect to hydrocodone, would I
24 be correct that you reviewed no reports, you just

Page 94

1 simply referred it to the LP prevention manager or
2 the VIPER analyst?
3      MR. BUSH: Objection.
4      THE WITNESS: Aside from the store order
5 history of hydrocodone, which I had historical
6 data on, the store reports themselves I didn't
7 have access to. So...
8 BY MR. KENNEDY:
9      Q   And the historical data, you're talking
10 about what was in the IRR?
11      A   Yes.
12      Q   So in your position then from '09 to
13 '10, with respect to hydrocodones, you did nothing
14 more than take a flagged hydrocodone order and
15 refer it elsewhere to be reviewed, correct?
16      MR. BUSH: Objection.
17 BY MR. KENNEDY:
18      Q   That is all you did with hydrocodones
19 that were flagging as potentially suspicious?
20      MR. BUSH: Objection. Misstates the
21 record.
22      THE WITNESS: If there were also other
23 drugs that were flagged for that store, especially
24 if it was a cocktail, I would pass on that

Page 95

1 information as well.
2 BY MR. KENNEDY:
3      Q   But you did no review -- let's be just
4 very clear. You did no review and investigation
5 yourself on flagged orders of hydrocodone,
6 correct?
7      A   That -- that was out of my area. No.
8 It was the field's responsibility.
9      Q   So you didn't do an investigation,
10 correct?
11      A   For all the stores in the country?
12      Q   Correct, for hydrocodones.
13      A   No, the field did their -- their stores,
14 their own stores.
15      Q   You know of no policies and procedures
16 in place that in any way guided you as to your
17 responsibilities in '09 and '10, correct?
18      MR. BUSH: Objection.
19      THE WITNESS: I don't recall any
20 specific policy and procedure. I read tons of
21 documents year end and year out.
22 BY MR. KENNEDY:
23      Q   As you sit here today, you can't
24 identify any single policy and procedure that

Page 96

1 existed in '09 and '10 to guide you in your job,
2 true?
3      MR. BUSH: Objection.
4 BY MR. KENNEDY:
5      Q   Is that true?
6      A   I don't recall any procedure.
7      Q   You don't recall a single formal audit
8 of you with respect to your duties and
9 responsibilities and how you were carrying out
10 your job in '09 and '10; is that correct?
11      A   Formal audits with our corporate
12 attorney and Terry Woodworth, they reviewed my --
13 my information. I didn't get any recommended
14 changes or anything.
15      Q   And can you tell me, sir, how many
16 suspicious orders of controlled substances were
17 reported to the DEA in '09 and '10 while you were
18 monitoring the IRR? How many?
19      A   I don't recall. Frank Devlin and Pam
20 Hinkle were the only two that were permitted to
21 speak with DEA.
22      Q   But you certainly would be aware of it,
23 right?
24      A   I -- I did my -- my job. I did follow

Page 97

1 the procedure, the process. If something was
2 investigated, if we held an audit -- an order, I
3 reported that up to them, they would follow up on
4 their end, and then I moved on to the next phase.
5 Everyone had their -- their position with the --
6 with the SOM project.
7      Q   Did you review suspicious orders in '09
8 and '10, and -- and take a look at the cash
9 percentages of purchases at particular pharmacies?
10 Did you do that?
11      MR. BUSH: Objection.
12      THE WITNESS: '09 and '10? I don't
13 recall.
14 BY MR. KENNEDY:
15      Q   Who is Cricket Osment?
16      A   She was a VIPER analyst at the time.
17      Q   She's one of the people that you would
18 refer hydrocodone orders to to investigate?
19      A   She would have been, yes.
20      Q   What would happen when you were sick or
21 went on vacation in '09 and 2010, who would take
22 your job over?
23      A   Well, I had perfect attendance, but if I
24 had vacation, I would have Pam Hinkle take over

Page 98

1 the process.

2 Q Let's move into the fall -- the fall of

3 2010. There were -- things changed in the fall of

4 2010, did they not?

5 A Yeah -- yes.

6 Q The fall of -- of 2010, the first

7 written suspicious order monitoring policy came

8 into place, did it not?

9 MR. BUSH: Objection.

10 THE WITNESS: I don't recall dates.

11 There were several documents.

12 BY MR. KENNEDY:

13 Q One second.

14 You don't recall that in October of --

15 of 2010, you stopped being the single person in

16 the country responsible for looking at all IRRs?

17 A There was a --

18 MR. BUSH: Objection.

19 THE WITNESS: -- a brief time where we

20 were looking to remove it from my plate.

21 BY MR. KENNEDY:

22 Q Does that sound about right, October of

23 2010, it got removed from your plate?

24 MR. BUSH: Objection.

Page 99

1 THE WITNESS: I don't recall the exact

2 time.

3 BY MR. KENNEDY:

4 Q Well, it went from your plate to the

5 plate of each of the 11 DCs, correct?

6 MR. BUSH: Objection.

7 THE WITNESS: That was the goal. I -- I

8 don't recall -- I don't recall that actually

9 happening, though.

10 BY MR. KENNEDY:

11 Q All right. Let me ask you this: Didn't

12 you represent to the DEA in August of -- of 2010

13 that that's exactly what was going to happen

14 within the next 30 days? Wasn't that the express

15 representation to the DEA?

16 MR. BUSH: Objection.

17 THE WITNESS: I did present to DEA Agent

18 Donna Walker -- whew -- I don't recall the slides

19 off the top of my head, but I talked -- if -- if

20 I'm not mistaken, I believe there was -- there was

21 what we were doing and -- and what the plan may

22 have been or what we were doing because of -- or

23 what we planned on doing, but we didn't. I don't

24 remember how that went down. But I can tell you

Page 100

1 if Donna Walker -- Walker was in my building, she

2 was going to -- she was going to know the truth.

3 So...

4 BY MR. KENNEDY:

5 Q Are you saying Donna Walker?

6 A Donna Walker, yes.

7 Q Okay. All right.

8 Why didn't it go out to the distribution

9 centers in October of 2010? That was your -- your

10 written policy and procedure that was to be

11 implemented in October of 2010, to take your job

12 and send it to the distribution centers so that

13 they each could look at their own IRR. Why did

14 that not happen?

15 MR. BUSH: Objection.

16 THE WITNESS: The IRR you provided in

17 November is showing that that's the time period

18 that we had lost historical data. So I was the

19 only one that had that historical data in previous

20 IRRs. I can't remember all the details, but I

21 couldn't turn over the program at the time because

22 no one else would be able to do it correctly.

23 (Exhibit No. 9 was premarked for

24 identification.)

Page 101

1 MR. KENNEDY: All right.

2 Exhibit 9.

3 (Exhibit No. 28 was premarked for

4 identification.)

5 BY MR. KENNEDY:

6 Q Well, let me show you this first. Let

7 me show you Exhibit 28. Where's 28? Let's start

8 with 28.

9 MR. KENNEDY: That's mine.

10 BY MR. KENNEDY:

11 Q And maybe this is what really never

12 occurred. This is talking about the controlled

13 drug IRR implementation, and we're in late

14 September of 2010.

15 Do you see that?

16 A (Peruses document.) Okay.

17 Q Withdraw the question.

18 MR. KENNEDY: If we could go off the

19 record for a second.

20 THE VIDEOGRAPHER: The time is

21 10:12 a.m. We're going off the record.

22 (A discussion was held off the record.)

23 THE VIDEOGRAPHER: The time is

24 10:13 a.m. We're back on the record.

Page 102

BY MR. KENNEDY:

1 Q   The document I've shown you, Exhibit 28,
2 could you -- this is just some e-mails going
3 around to the -- to the distribution centers to
4 talk about the implementation of the new
5 suspicious order monitoring program, correct?
6 A   It's not new.  This was in preparation
7 to roll this out to the DCs.
8 Q   Correct.  But they're going to be shown
9 the first written suspicious order monitoring
10 policy, true?
11 A   I don't recall.  There were -- there
12 were other people involved in writing the policy
13 itself.  I only had information on -- or only
14 provided information or recommendations.
15 Q   Let me show you Exhibit 9, if we could.
16 A   Okay.
17 MR. KENNEDY:  This is the original.  You
18 probably want that.
19 BY MR. KENNEDY:
20 Q   Exhibit 9.  Do you see this is an e-mail
21 from Amy Propatier, correct?
22 A   Yes.
23 Q   Who is she?

Page 103

1 A   I don't know her -- her exact title, but
2 I believe she was in charge of posting SOPs and
3 policies for compliance.  I -- I'm not 100 percent
4 sure.
5 Q   And the subject is "DEA SOP," and is the
6 date 8/25/10?
7 A   Yes.
8 Q   And is the date of the document 8/25/10?
9 A   It says "Effective December 1st, 2007."
10 Q   And does it state:  "Can you please
11 post?  We added the suspicious order monitoring"?
12 Do you see that?
13 A   Yes.
14 Q   And attached to that would be the
15 standard operating procedures for controlled
16 drugs, true?
17 A   Yes.
18 Q   You've seen this before?
19 A   I'm sure it's -- it's floated by my
20 desk.
21 Q   And the -- the latest date on it is
22 8/25/10, true?
23 A   That's the date that's on here.
24 Q   And you understand that this is the

Page 104

1 first written suspicious order monitoring policy
2 at CVS ever?
3 MR. BUSH:  Objection.
4 THE WITNESS:  I don't recall that.
5 MR. KENNEDY:  Give me 48.
6 BY MR. KENNEDY:
7 Q   Sir, you were involved in the process of
8 developing the suspicious order monitoring policy,
9 were you not?
10 A   They would ask me for my feedback.
11 Q   Correct, so you knew the process was
12 going on.
13 A   I knew they were updating the SOP.
14 There were several drafts that crossed my desk.
15 Q   All right.  Let's take a look at that.
16 (Exhibit No. 48 was premarked for
17 identification.)
18 BY MR. KENNEDY:
19 Q   Let me show you Exhibit 48.
20 Now, put this in context.  The first
21 letter comes from the DEA to all distributors in
22 2006 outlining the responsibilities of a
23 distributor with respect to controlled substances.
24 2006, that's the first letter from the DEA,

Page 105

1 correct?
2 MR. BUSH:  Objection.
3 THE WITNESS:  Again, if you say it is.
4 I -- I don't -- I don't remember.
5 BY MR. KENNEDY:
6 Q   Looking at this chart, do you -- do you
7 recall, sir, that -- so you get the first DEA
8 letter in '06, and then about a year and a half
9 later on 12/1/07, CVS for the first time creates
10 standard operating procedures for controlled
11 substances.
12 Do you remember that in '07, sir?
13 MR. BUSH:  Objection.
14 THE WITNESS:  I do not.
15 BY MR. KENNEDY:
16 Q   Do you remember in that first version of
17 the standard operating procedures with respect to
18 suspicious order monitoring, it's stated "being
19 developed and written."
20 You remember that, don't you?
21 MR. BUSH:  Objection.
22 THE WITNESS:  I do not.
23 BY MR. KENNEDY:
24 Q   You told us there were various

Page 106

1  revisions. The second revision of the standard
2  operating procedures at CVS, that suspicious order
3  monitoring section again stated "being developed
4  and written." Do you remember that when it came
5  across your desk?
6          MR. BUSH: Objection.
7          THE WITNESS: I do not.
8  BY MR. KENNEDY:
9      Q   The third version of the standard
10 operating procedures at CVS were put into effect
11 in 1/28/10. When that came across your desk, do
12 you remember for suspicious order monitoring it
13 again stated "being developed and written"? Do
14 you recall that?
15         MR. BUSH: Objection.
16         THE WITNESS: I don't.
17 BY MR. KENNEDY:
18     Q   And at this point in time, you're the
19 one reviewing the IRR reports to monitor
20 suspicious orders, correct?
21     A   Yes.
22     Q   And you don't remember that being stated
23 in the -- in the written policies, "being
24 developed and written"?

Page 107

1          MR. BUSH: Objection.
2          THE WITNESS: There were policies out
3  there that were constantly being updated. I -- I
4  don't recall nothing being out there, but I don't
5  recall -- I don't recall three years of being
6  developed.
7  BY MR. KENNEDY:
8      Q   Well, let's look to April 30, 2010.
9          The standard operating procedures are
10 again revised for controlled substances, and in
11 the section for suspicious order monitoring, it
12 again states "being developed and written."
13         When that came across your desk, do you
14 remember that?
15         MR. BUSH: Objection.
16         THE WITNESS: I don't even know who this
17 would have came from.
18 BY MR. KENNEDY:
19     Q   Sir, this period that I'm talking about,
20 this -- this '07 to '10, this three-year period,
21 you -- you realize we've gone through that CVS
22 would have gotten two more letters from the DEA
23 outlining their responsibilities with respect to
24 controlled substances.

Page 108

1          Do you realize that?
2          MR. BUSH: Objection.
3  BY MR. KENNEDY:
4      Q   Two more letters --
5          MR. BUSH: Objection.
6  BY MR. KENNEDY:
7      Q   -- during this period.
8          MR. BUSH: Objection.
9          THE WITNESS: During our DEA audit in
10 Lumberton particularly, Donna Walker walked our
11 process. She reviewed what we had. She got the
12 information from our pharmacy manager. She was
13 pleased with what we had. I don't recall what we
14 had. I don't recall what we -- what the pharmacy
15 manager gave her. I showed her our SOM program.
16 She was -- she was pleased with that. Donna
17 Walker came in early 2005, '06 maybe, and did a
18 nine-month audit in our building.
19 BY MR. KENNEDY:
20     Q   I'm not talking about '05 and '06. I'm
21 talking about a period of time after that. I'm
22 talking about a period of time where the DEA has
23 sent CVS three separate letters outlining their
24 duties and responsibilities with suspicious order

Page 109

1  monitoring. And during that period, your SOPs
2  with respect to suspicious order monitoring on
3  four different occasions stated "being developed
4  and written."
5          And you saw that every single time it
6  came across your desk, did you not, sir?
7          MR. BUSH: Objection.
8          THE WITNESS: I don't recall that.
9  BY MR. KENNEDY:
10     Q   And you knew, sir, all this interaction
11 with the DEA, you knew that the lack of any, any
12 written suspicious order monitoring policies, you
13 knew and you understood that that was a big issue
14 with the DEA, did you not, sir?
15         MR. BUSH: Objection.
16 BY MR. KENNEDY:
17     Q   Did you not understand that?
18         MR. BUSH: Objection.
19         THE WITNESS: I was very proud of where
20 we were with the DEA. She walked the process.
21 BY MR. KENNEDY:
22     Q   Did you understand that your failure --
23 CVS's failure to have any written policies in four
24 versions, you knew and you understood that that

Highly Confidential - Subject to Further Confidentiality Review

---

Page 110

1 was a big issue with the DEA, sir, did you not?
2     A    No.
3         MR. BUSH:  Objection.
4         THE WITNESS:  No, I -- I -- we were
5 audited, our policies were audited.  She saw our
6 SOM.
7 BY MR. KENNEDY:
8     Q    Your policies were audited for the first
9 time in August 25th of 2010, sir.  Do you remember
10 that?
11    A    Not --
12        MR. BUSH:  Objection.
13        THE WITNESS:  -- off the top of my head,
14 no.
15 BY MR. KENNEDY:
16    Q    And do you remember within 48 hours, you
17 put together written policies for the very first
18 time in the history of CVS, sir, in August of
19 2010, for the very first here?
20        MR. BUSH:  Objection.
21        THE WITNESS:  I don't recall that.
22 BY MR. KENNEDY:
23    Q    And you were highly concerned, sir,
24 because you knew this was a big issue with the

---

Page 111

1 DEA, the lack of policies, did you not, sir?
2         MR. BUSH:  Objection.
3         THE WITNESS:  I don't recall that.
4         (Exhibit No. 49 was marked for
5         identification.)
6 BY MR. KENNEDY:
7     Q    Let's look at Exhibit 49.
8         MR. BUSH:  You got another one of those?
9 Thanks.
10 BY MR. KENNEDY:
11    Q    Start with the bottom e-mail.
12        Let me ask you, before we -- we read
13 through this, who is Christopher Knight?
14    A    He was the field area director for, I
15 guess, the Mid-Atlantic area.
16    Q    Would that be a position higher on the
17 chain than you?
18    A    He would be a peer.  His -- his folks
19 are the VIPER analysts and the regional managers
20 that I would work with.
21    Q    And he is sending you an e-mail on
22 November 4, 2009, true?
23    A    Yes.
24    Q    And does he state:  "The meeting portion

---

Page 112

1 I would like you to see for technology is from
2 9:00-11:30, and then have lunch with us.  You can
3 present anything you would like before lunch, and
4 then you are free to go at any time you would
5 like."
6         Does he state that to you?
7     A    Yes.
8     Q    And then up above, you e-mailed back on
9 11/5/09.  Do you state:  "Sounds good.  I am
10 trying to get through rough draft SOM" -- that's
11 suspicious order monitoring -- "SOP" -- standard
12 operating procedures, which is what we've been
13 talking about -- "to you prior to the meeting.
14 This is a big issue with CVS and the DEA."
15        Do you state that?
16    A    Yes.
17    Q    And did you believe it at the time?
18    A    This wasn't about the overall SOP.  This
19 is kind of taken out of context.
20        I wrote on there that I would speak on
21 this a bit with help from Chuck and Ken, who were
22 the LP regional managers, who actually supported
23 me and trying to train me on the -- the software.
24 The goal was to get the information that they had

---

Page 113

1 eventually into the analysts' hands.  I wanted to
2 have an SOP when this all transferred over to
3 Knoxville for the analysts to do what Chuck and
4 Ken were doing and the rest of their team.
5         So this is taken out of context.  This
6 isn't about -- this right here, this is strictly
7 how loss prevention -- we were going to set up an
8 SOP for loss prevention to bring in their
9 information in-house to supply chain.
10    Q    Sir, when you talk about bringing it
11 in-house, this e-mail is dated 11/5/09, right?
12    A    Yeah.
13    Q    It doesn't come in-house for another two
14 years until March of 2011, sir.  This e-mail has
15 got nothing to do with that.
16    A    Oh, it has everything to do with that.
17 I wanted to get this off my plate as quickly as I
18 could, and the easiest way for me to do that was
19 to get a team in-house to understand what the
20 field was doing.
21    Q    And it was a big issue to you, CVS and
22 the DEA, right?
23    A    SOM?  Absolutely.
24    Q    And at this point in time, sir, there

---

Page 114

1 was no written suspicious order monitoring policy
2 at CVS.
3     A   That --
4     Q   Isn't that true?
5     A   That is not what I said at all.  This
6 has nothing --
7     Q   That's not what I'm asking.  Listen to
8 what I'm asking you, sir.
9     A   I --
10     Q   At the point in time of this e-mail,
11 there was no written suspicious order monitoring
12 policy at CVS.  Is that true?
13     A   I don't know.
14         (To videographer):  Stop touching it?  I
15 got it.
16     Q   But you received every single draft of
17 the SOP in 12/1/07, 12/11/09, 1/28/10, 4/30/10,
18 and then finally in August of 2010.  You received
19 every draft and the finality of every single one
20 of them, did you not?
21         MR. BUSH:  Objection.
22         THE WITNESS:  I don't know.
23 BY MR. KENNEDY:
24     Q   And, sir, when it came across your desk,

Page 115

1 every single draft with respect to suspicious
2 order monitoring said "being developed and
3 written," did it not, sir?  Every one.
4         MR. BUSH:  Objection.
5         THE WITNESS:  I don't know.
6         MR. KENNEDY:  Give me 9, please.
7         I'm sorry, give me 28.
8         Where's 9?  Okay.
9 BY MR. KENNEDY:
10     Q   Let's go back to 9, if we could.
11     A   To 9.
12     Q   9 is the 8/25/10 standard operating
13 procedures.
14         Is this the -- I think we identified it
15 before, this is the 8/25/10 standard operating
16 procedure, true?
17     A   That's -- yes.
18     Q   And if you go to page 96, that is the
19 beginning of the suspicious order monitoring
20 section, is it not?
21     A   I got 9 -- oh, 86 or 96?
22     Q   96.  Is that the beginning of the
23 section?
24     A   That's 7.  Yes.

Page 116

1     Q   The next page is the second page of the
2 suspicious order monitoring section.  All right?
3     A   Okay.
4     Q   And you just -- what I'm telling you,
5 this is the first time in its history that CVS has
6 got a suspicious order monitoring policy in
7 writing.  You don't remember whether that's true
8 or not?  This is 8/25/2010.
9     A   I -- I don't recall the SOPs.  I just
10 recall the process that we had in place.
11     Q   All right.  Look at 4.
12     A   Okay.
13     Q   4 says:  "Item Review Report.  Currently
14 the item review report (IRR) for control drugs is
15 being reviewed at a central location in New
16 Jersey."
17         That would have been you, right?
18     A   Yes.
19     Q   Then it states:  "During the month of
20 September 2010, the report will be transitioned to
21 each pharmacy DC and the following procedures will
22 occur."
23         Correct?  Do you see that?
24     A   I do.

Page 117

1     Q   You're telling us, though, that that
2 never happened.  Would that be accurate?
3     A   I don't recall this actually being
4 totally turned over to them.  I don't recall not
5 doing it.  Or overseeing it.
6     Q   All right.  So from your memory, it
7 never went to the individual DCs, but, instead, in
8 March then it was centralized in Knoxville.  Is
9 that your memory?
10         MR. BUSH:  Objection.
11         THE WITNESS:  Yeah, I believe -- I
12 believe that's how it happened.
13 BY MR. KENNEDY:
14     Q   All right.  That takes a whole section
15 of questioning away.
16         MR. BUSH:  Whatever works.
17 BY MR. KENNEDY:
18     Q   And you indicated that that did not
19 happen because of an issue that was discovered
20 with respect to active ingredient, true?
21     A   I don't remember that being the active
22 ingredient time period.  I -- it could have been.
23 I -- I believe it had something to do with
24 historical data.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    Q   Well, let me ask you then, so that the
2  reason that it never went to the -- to the
3  distribution centers, as indicated, was something
4  to do with historical data.  Is that your -- your
5  memory?
6    A   I believe so.
7    Q   Did you notify the DEA and say, Look it,
8  the plan we put into place to begin in September
9  of 2010, and what you presented to them, did you
10  notify them to say, That's not what we're going to
11  do?
12       MR. BUSH:  Objection.
13       THE WITNESS:  When -- when I reviewed it
14  with Donna Walker, I told her current plans,
15  future plans, but as for me contacting DEA outside
16  that audit, aside from understanding knowledge of
17  street drugs, I wasn't contacting the DEA.  It was
18  all Pam Hinkle and Frank Devlin.
19  BY MR. KENNEDY:
20    Q   So the answer was you did not.
21    A   I did not.
22    Q   So you didn't call them up and say, Hey,
23  our plan was to send this out to the DCs like we
24  had indicated, but we've got a change of plans?

Page 119

1  Did you call them and -- did you call them and
2  tell them that?
3    A   No, I did not.
4    Q   Do you know of anybody that called them
5  and told them that?
6    A   I don't know.  Again, only Pam or Frank
7  would have done that.
8    Q   So you don't know whether they -- they
9  would have called and said, We have an issue or
10  problem with historical data for controlled
11  substances, so we're not going forward with what
12  we represented.  You don't know if they did that.
13    A   I don't know if they called.
14    Q   The suspicious order monitoring policy,
15  the one that comes into play in August of 2010,
16  and even before that when you were involved, can
17  we agree that the -- this -- the IRR report was
18  kind of the base of that suspicious order
19  monitoring program?  It was the base, it's where
20  things started.
21    A   From -- from my perspective?
22    Q   Correct.
23    A   Yes.
24    Q   And, frankly, if you look at the written

Page 120

1  suspicious order monitoring policy that comes into
2  play in August of 2010, the IRR report is --
3  again, it's the base, it's the foundation of the
4  monitoring program, correct?
5       MR. BUSH:  Objection.
6       THE WITNESS:  The SO -- the SOP itself,
7  I -- I -- I hear what you're saying, but it didn't
8  impact on how I followed the process that I was
9  doing.
10  BY MR. KENNEDY:
11    Q   But you were aware this SOP was sent to
12  you, you were the one that was going to implement
13  it, and because of the historical data problem,
14  you decided not to.  You're certainly familiar
15  with it, aren't you?
16       MR. BUSH:  Objection.
17       THE WITNESS:  A particular draft, I
18  don't even know if this -- this actually got --
19  got to -- if it was actually posted.
20  BY MR. KENNEDY:
21    Q   It said:  "Can you please post?  We
22  added the suspicious order monitoring."
23       You don't know whether that was posted?
24    A   No.  It's only sent to one person, and

Page 121

1  she was a supervisor.  She wasn't even anybody who
2  would -- I mean, I don't know why it was sent to
3  her.
4    Q   Let me ask you this:  As -- as you sit
5  here today, do you know and understand that --
6  that CVS had written suspicious order monitoring
7  policies in their standard operating procedures?
8  Do you know that or you -- you don't even know
9  that?
10       MR. BUSH:  This is untethered to time?
11       MR. KENNEDY:  Yeah, at any time.
12  BY MR. KENNEDY:
13    Q   I mean, are you aware that they actually
14  created a written suspicious order monitoring
15  policy at CVS?
16    A   I know I was asked questions on -- on
17  feedback when they were revising.  As for writing
18  it itself, I -- I can't tell you when that
19  started, if -- what it was originally.
20       My process was the process.  What people
21  were writing in that SOP, whether it be real or a
22  draft or a final version, I only had input.
23    Q   Well, let me ask you this:  When you --
24  when you were involved with looking at the IRR,

Page 122

1 the IRR was the foundation of the entire
2 monitoring program for controlled substances, was
3 it not?
4        MR. BUSH:  Objection.
5        THE WITNESS:  From my position.
6 BY MR. KENNEDY:
7    Q    Absolutely.  It's -- that's where it
8 started.  It got flagged, and it got stopped, and
9 it got reviewed.  Correct?
10       MR. BUSH:  Objection.
11       THE WITNESS:  Yes.
12 BY MR. KENNEDY:
13    Q    It all started with the IRR report, did
14 it not?
15       MR. BUSH:  Objection.
16       THE WITNESS:  From my position.  I don't
17 know what the field had in place.
18 BY MR. KENNEDY:
19    Q    I'm not talking about the field.  From
20 your position, that's where it started.
21    A    From my position.
22    Q    And the program that you were going to
23 implement in the distribution centers, that all
24 started with the IRR, correct?

Page 123

1        MR. BUSH:  Objection.
2 BY MR. KENNEDY:
3    Q    Hydrocodone would get flagged in a
4 report, and then the review would begin, true?
5        MR. BUSH:  Objection.
6        THE WITNESS:  That would take place.
7 BY MR. KENNEDY:
8    Q    If it didn't get flagged, then it didn't
9 get reviewed, true?
10    A    If it didn't get flagged, I wouldn't
11 have that information.
12    Q    And neither would anybody looking at the
13 IRR report that was involved with your suspicious
14 order monitoring, true?
15    A    If it wasn't flagged.
16    Q    So the report was the foundation, it was
17 the primary tool that you folks were using to
18 monitor suspicious orders, was it not?
19    A    Yes, from my position, you
20    Q    And from the position that anybody that
21 utilized the IRR after you, sir, correct?
22    A    I can't speak after me.  I don't even
23 know how they use it today.
24    Q    You -- as you sit here today, you

Page 124

1 have -- so you stopped reviewing the IRR when?
2    A    When it went to Knoxville, I kept my
3 finger on it.  I would still review it every now
4 and then.  I worked with the team they had in
5 Knoxville.  I don't recall what exact month that
6 was, but that's when I was transitioning out.  I
7 spent several weeks in Knoxville ensuring that
8 they understood the process the way I did.  And --
9 aside from again occasional picking it up, say,
10 Hey, would you find out about this or would you
11 find out about that, it would just look like --
12 just to test it, I -- I was trying to get out of
13 that.
14    Q    Look at page 97, the Bates of Exhibit 9.
15 This is the first written suspicious order
16 monitoring policy.  Look at page 97.
17    A    Okay.
18    Q    Look at the top where it says "Items
19 Reviewed."  That's referencing the IRR report, is
20 it not?
21    A    Yes.
22    Q    The second sentence states:  "These
23 thresholds are the primary tool to prevent stores
24 from purchasing excessive or potentially

Page 125

1 suspicious control drug orders."
2        Do you disagree with that?
3    A    From -- from the supply chain, no, the
4 I -- the IRR was definitely the prime tool.
5    Q    It says -- it says "the primary tool,"
6 does it not?
7    A    (Reading to himself.)  Well, no, it says
8 "these thresholds are the primary tool."  I'm
9 assuming they're talking about NovaStar and -- for
10 the field reports, exception reports.
11    Q    And the IRR report.
12    A    Right.
13    Q    And you know that -- that this statement
14 about them being the primary tool to prevent the
15 purchase of excessive and potentially suspicious
16 orders, you know that statement is in CVS's
17 standard operating procedures in 2010, 2011, 2012,
18 right on through.  Did you know that?
19    A    No.
20       MR. BUSH:  Objection.
21 BY MR. KENNEDY:
22    Q    Do you disagree with that statement?
23       MR. BUSH:  The question is just whether
24 do you know it's in the other SOPs.

Page 126

1　　　THE WITNESS: I -- I don't know. I --
2 off the top of my head, do I know that they're
3 written exactly the same? If you're telling me
4 you looked at them, I don't have any reason not to
5 believe you.
6 BY MR. KENNEDY:
7　　Q　Right. And you wouldn't disagree with
8 the statement that -- that the IRR is the primary
9 tool for the prevention of -- of diversion.
10　　　MR. BUSH: Objection.
11　　　THE WITNESS: From -- from our process
12 in the DCs, it is our primary tool.
13 BY MR. KENNEDY:
14　　Q　So the fall of 2011, at that point in
15 time you're the only one reviewing the IRR at CVS
16 in the fall of -- of 2010, correct?
17　　A　Yes.
18　　Q　No one more involved at CVS in the IRRs
19 than you. Would that be true?
20　　A　November 2011?
21　　Q　No, no, I'm talking about the fall of
22 2010 --
23　　A　Oh, fall of --
24　　Q　-- when you were going to turn this over

Page 127

1 to the DCs and you decided not to, at that point
2 in time, leading up to then, you were the only
3 person at CVS that was reviewing IRRs leading up
4 to that period.
5　　A　I'm not 100 percent sure on the month
6 when they hired an analyst for Knoxville. I
7 believe his name was Cain. That's when the
8 process went to there. So if it was before Cain,
9 then, yes, it was me.
10　　Q　Well, that's March of 2011. I'm talking
11 about --
12　　　MR. BUSH: Objection.
13 BY MR. KENNEDY:
14　　Q　-- September or October of 2010, so try
15 to stay focused on that time frame.
16　　　In that time frame you had a new SOM
17 program in place, you were going to turn it over
18 to the DCs, but you decided not to because of a
19 problem with historical data, correct?
20　　A　Yes.
21　　　MR. BUSH: Objection.
22 BY MR. KENNEDY:
23　　Q　And at that point in time you had
24 basically been the only one that had been

Page 128

1 reviewing IRRs at CVS, correct?
2　　　MR. BUSH: Objection.
3　　　THE WITNESS: Yes.
4 BY MR. KENNEDY:
5　　Q　And can we agree that there would have
6 been no one more knowledgeable at CVS about the
7 IRRs than you when we're talking about the fall of
8 2010?
9　　A　Pam Hinkle would have had equal
10 knowledge.
11　　Q　Was she reviewing IRRs daily like you
12 were?
13　　A　No.
14　　Q　Now, this problem that you discovered,
15 this issue, that was discovered in September,
16 October of 2010. Do you remember that?
17　　　MR. BUSH: Which issue?
18 BY MR. KENNEDY:
19　　Q　Is that correct?
20　　　MR. BUSH: Objection.
21 BY MR. KENNEDY:
22　　Q　We're talking about the issue with
23 historical data. You understand.
24　　A　Yeah. It was -- I believe that was the

Page 129

1 timeline.
2　　　MR. KENNEDY: Exhibit 16, please.
3　　　(Exhibit No. 16 was premarked for
4　　　identification.)
5 BY MR. KENNEDY:
6　　Q　Let's take a look at that. Do you
7 remember this problem with historical data related
8 to active ingredient?
9　　A　I don't remember it being active
10 ingredient. Let me see.
11　　Q　Let's look at 16. This document is from
12 10/8/2010. All right? Is it titled on the first
13 page "Business Idea Description"? Do you see
14 that?
15　　A　I do.
16　　Q　And it says: "Submit to
17 IS-Business-Idea mailbox." What is IS?
18　　A　They are the group in corporate that can
19 write a query for your programs.
20　　Q　And this is requested for on behalf of
21 John Mortelliti. Is that you?
22　　A　Yes.
23　　Q　And your department at that point in
24 time was loss prevention, true?

Page 130

1  A   Yes.

2  Q   And the title is "Control Drug IRR
3 Update." True?

4  A   Yes.

5  Q   And that is what we've been talking
6 about, the IRR report that's kind of foundational
7 to your monitoring program, true?

8  A   Yes.

9  Q   When was the last time you reviewed this
10 document?

11  A   I don't -- I don't know.  I --

12  Q   It says:  "Summary Description and
13 Objectives:  DEA expects CVS to prevent suspicious
14 orders from being filled out of our DCs."

15      Did I read that right?

16  A   You did.

17  Q   And that would be true, that's what the
18 DEA expects, does it not?

19  A   Yep.

20  Q   Next sentence:  "The current IRR does
21 not provide the proper information to meet the
22 DEA's needs."

23      Did I read that right?

24  A   You read it correctly.

Page 131

1  Q   Next sentence, does it state:  "We need
2 control drugs to be monitored by 'active
3 ingredient.'  Currently the control drugs are
4 monitored by item.  The IRR loses all order
5 history when the info on the item changes causing
6 CVS to be noncompliant with DEA expectations."

7      Did I read that correct?

8  A   You read it correctly.

9  Q   Were those your words, sir?  Were those
10 your words?

11  A   That's what I put in here.

12  Q   Now --

13  A   But --

14  Q   No, I just asked you if those were your
15 words, and we'll go into detail.

16  A   Okay.

17  Q   Let me ask you first, sir, you weren't
18 in -- in the habit of writing and creating and
19 filling in documents on things you didn't believe,
20 stuff you thought was untrue?  Was that your habit
21 and your practice at CVS back in 2010 or 2009 or
22 '08, was that ever your practice to -- to write
23 things and document things that you believed were
24 not true?  Was that your practice, sir?

Page 132

1  A   I can -- I could tell you that this
2 document --

3  Q   First answer my question as to whether
4 or not it was your practice to create or fill in
5 documents, make memos that you believed were
6 untrue.  Was that your practice while you were at
7 CVS from when you began all the way up here to
8 2010?  Was that your practice?

9      MR. BUSH:  And I object to you
10 interrupting the witness.  He was in the middle of
11 his answer.

12      Go ahead.  You can answer.

13      THE WITNESS:  I worded it this way so I
14 could get this pushed through quickly.

15      MR. KENNEDY:  I'm going to -- go ahead,
16 but I'm going to move to strike.  Go ahead.

17      MR. BUSH:  Finish your answer.

18      THE WITNESS:  This -- this had nothing
19 to do with the DEA needs.  We had a process in
20 place.  If we went by ingredient, it would have
21 made it a lot easier, a lot quicker, and
22 unfortunately, CVS has a -- history of if you
23 don't put something on the fast path action, it
24 could take forever to get done.

Page 133

1      So I did word it this way to try to get
2 this pushed through quicker so the reports could
3 be easier.  We wanted to move this over to the
4 Knoxville team, and it would be a lot easier for
5 them to digest the information if it was by
6 ingredient.

7      MR. KENNEDY:  All right.  I'm going to
8 move to strike.

9      Could you please read back my question.

10 BY MR. KENNEDY:

11  Q   Sir, I want you to listen to the
12 question and -- and answer it the best you can.

13      MR. BUSH:  Well, wait a minute, she's
14 going --

15      MR. KENNEDY:  She's going to read you
16 the question back so --

17      MR. BUSH:  Let her read it back.

18      THE WITNESS:  Okay.

19      MR. KENNEDY:  -- you can hopefully
20 answer it.

21      (Whereupon, the requested record
22      was read.)

23      THE WITNESS:  Not a standard practice.

24 BY MR. KENNEDY:

Page 134

1   Q   And let me ask you, sir, when -- did you
2   change this document or redo this document and --
3   and correct it at any point in time?
4   A   No.
5   Q   And the -- the purpose of -- of this
6   document was to go to whom?
7   A   I believe -- I'm not sure who was head
8   of it at the time.  It may have been Gary
9   Misiaszek.  I'm not sure.  Whoever received the --
10  the IS request.
11  Q   And when this says "Target start," it
12  says -- did you put in there "ASAP"?
13  A   Yes.
14  Q   So you wanted this done as soon as
15  possible.
16  A   I did.
17  Q   And under "Business drivers," do you
18  state:  "We can be fined and/or penalized by the
19  DEA due to the current environment"?  Did you
20  state that?
21  A   I did.
22  Q   Let me ask you, sir, if -- if CVS was
23  noncompliant here in October of '08 because the
24  drugs were being monitored by active ingredient,

Page 135

1   if you were noncompliant on this date, can we
2   agree that you and CVS would have been
3   noncompliant all the way back from the beginning
4   with your IRR in '09 when you started reviewing?
5        MR. BUSH:  Objection.
6   BY MR. KENNEDY:
7   Q   Can we agree?
8        MR. BUSH:  Objection.
9        THE WITNESS:  No, we were compliant.  I
10  worded this to get it pushed through the system.
11  BY MR. KENNEDY:
12  Q   Sir, the IRR with the way it was
13  structured, monitoring by active ingredient, that
14  was true from the very beginning.  True?
15       MR. BUSH:  Objection.  Misstates the
16  document and the testimony.
17  BY MR. KENNEDY:
18  Q   Is that true?
19       MR. BUSH:  Objection.
20  BY MR. KENNEDY:
21  Q   Excuse me.  Let me restate that.
22       The monitoring of controlled substances
23  was not being monitored by active ingredient since
24  the beginning of the IRR's creation in '09,

Page 136

1   correct?
2   A   No.
3   Q   So -- you're saying that originally when
4   it came into play in '09 when you started
5   reviewing it, originally it was monitored by
6   active ingredient.  Is that your testimony?
7   A   It was by the drug active ingredient.
8   It was broken out by the particular drug.
9   Q   And that's the way it was when you
10  started in '09.
11  A   Yes.
12  Q   And when did it change so that it was
13  not monitored by active ingredient, as stated here
14  in October of 2010?  When did it change?
15       MR. BUSH:  Objection.
16       THE WITNESS:  It was always monitored by
17  the active -- the ingredient.
18  BY MR. KENNEDY:
19  Q   Do you state here this -- right here:
20  "We need control drugs to be monitored by active
21  ingredient"?  Is that your statement?
22  A   I wanted it broken down by the -- the
23  active ingredient in all the drugs into one -- one
24  component of the IRR.

Page 137

1   Q   Okay.  So my question is simple.  The
2   way it was monitoring with respect to active
3   ingredient here in -- in October of 2010 was the
4   same way it was being monitored in '09 when it
5   started.  True?
6   A   The same results, just a different
7   format.
8   Q   My answer -- the answer to my question
9   is "yes," correct?  The same way it was being
10  monitored here in October of 2010, the same way it
11  was being monitored from the beginning in '09,
12  true?
13  A   I believe --
14  Q   The report --
15  A   Yes.
16  Q   -- it hadn't been changed --
17  A   Yes.
18  Q   -- between '09 and 2010, correct?
19  A   Yes.
20  Q   And so my question is real simple.
21  If -- if the report in 2010 is such that it causes
22  CVS to be noncompliant with DEA expectation, if
23  that's true in October of 2010, then that would be
24  true back in '09 when you started, because there

---

Page 138

1 was no change in this IRR report during that
2 period, true?
3     MR. BUSH:  Objection.
4     THE WITNESS:  This is not true.  I
5 worded it this way, I -- hindsight 20/20, I
6 shouldn't have.  But I worded it this way to get
7 this pushed through so we could get a different
8 format as quickly as possible.  I wanted to get
9 this information turned over to the new team in
10 Knoxville under a new format.
11 BY MR. KENNEDY:
12     Q    And, sir, at the time that you put this
13 report together and used these words:  "Currently
14 the control drugs are monitored by item.  The IRR
15 loses all order history when the info on the item
16 causing -- changes causing CVS to be noncompliant
17 with DEA expectations," when you wrote those
18 words, you had known about this problem already
19 for several weeks, had you not?
20     A    I don't recall that.  As soon as I had
21 the problem, I reported it.  This is two different
22 issues on here.
23     Q    Sir, the report had been designed to
24 provide historical data, hadn't it, the IRR?

---

Page 139

1 That's how it was designed.
2     A    Yes.  But there was a time where the
3 historical data fell off.
4     Q    And that's what we're talking about
5 right here.
6     A    Well, no, this is two things.  The data
7 fell off, but we also wanted to change it from
8 item to total active ingredient into one -- into
9 one -- in one line.  So, instead of saying a 5325
10 Percocet flag and a 5325 generic flag, the active
11 ingredient in those two items would flag in one --
12 one line instead of two lines.
13     Q    So you had two problems then that caused
14 to you state that:  "The IRR loses all order
15 history when the info on the item changes causing
16 CVS to be noncompliant with DEA expectations."
17 You had two reasons to state that is what you're
18 telling me.  Two reasons.
19     MR. BUSH:  Objection.
20     THE WITNESS:  I listed two.  As for the
21 compliance, CVS was in compliance.
22 BY MR. KENNEDY:
23     Q    All right.  And -- and again, my point
24 is you had known about this for two weeks, so you

---

Page 140

1 had an opportunity to digest this information and
2 try to understand its significance before you
3 filled out this report, right?  You had two weeks
4 to think about this.
5     MR. BUSH:  Objection.
6     THE WITNESS:  I don't understand what
7 you wanted me -- where you're going with that.
8 BY MR. KENNEDY:
9     Q    My point is this wasn't a spur of the
10 moment filling out of a report because you
11 discovered a problem in the morning and didn't
12 give it much thought, and then you wrote this
13 report.  You thought about this for two weeks, and
14 you digested the problem, you investigated the
15 problem before you wrote these words "noncompliant
16 with DEA expectations," right?  You had two weeks.
17     MR. BUSH:  Objection.
18     THE WITNESS:  If I remember correctly, I
19 made several phone calls to try to get the process
20 changed.  I was told I had to fill out this
21 report, work with other departments -- I believe
22 John Andrade was still around then -- to see if
23 they can figure out the -- the history of the data
24 or see if that was something we could do in-house

---

Page 141

1 with the actual -- active ingredient.  And once
2 none of that worked, then I filled out this
3 report.
4     (Exhibit No. 23 was premarked for
5      identification.)
6 BY MR. KENNEDY:
7     Q    Let's go to -- take a look at
8 Exhibit 23, so we can start to understand when
9 this problem began.
10     If you go to page 170, that's the
11 beginning of the chain chronologically.  And this
12 is an e-mail from you on October 5, 2010, correct?
13     A    Mm-hmm.
14     Q    And it's to a whole lot of different
15 people.
16     A    Yes.
17     Q    "Subject:  Control Drug IRR Important
18 Info."  Is that the subject matter?
19     A    Yes.
20     Q    "Importance:  High."
21     A    Yes.
22     Q    And you state:  "The issue with the
23 hydro items" -- and that's hydrocodone, a
24 controlled substance, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1   A   Yes.

2   Q   "The issue with the hydro items last

3   month" --

4        So now you're referring back to

5   September, an issue, correct, back to September?

6   A   Yes.

7   Q   So, "The issue with the hydro items last

8   month appears to be happening again this month

9   with several items.  This includes all drugs that

10  end with 'pam,' many and items."  There's some

11  redactions by CVS.

12       Then you state:  "I verified the entire

13  network" --

14       When you say "entire network," you're

15  talking about the entire country, true?

16  A   Correct.

17  Q   And you say:  "I verified the entire

18  network this morning, and there were no control

19  drug suspicious orders."  Is that what you stated?

20  A   Yes.

21  Q   You've got 5,000 to 7,000 pharmacies at

22  this point in time, and your report shows no

23  controlled drug suspicious orders.

24       MR. BUSH:  Objection.

Page 143

1   BY MR. KENNEDY:

2   Q   Is that -- is that alarming to you, sir?

3        MR. BUSH:  Objection.

4        THE WITNESS:  All 5,000 weren't on

5   October 5th.  Earlier in the month, the -- the IRR

6   ran fairly clean.  Usually as the month went on,

7   that's when the orders would -- would start to

8   potentially get into a zone where that they could

9   start flagging.

10  BY MR. KENNEDY:

11  Q   My question is real simple, sir.  Was

12  that alarming to you that when you looked at an

13  IRR report, you saw not one single controlled drug

14  suspicious order for the entire country?  Was that

15  alarming to you, sir?

16       MR. BUSH:  Objection.

17       THE WITNESS:  It wasn't the entire -- it

18  wasn't every single store.  It was only the stores

19  that ordered on that particular day.

20  BY MR. KENNEDY:

21  Q   Exactly, sir.  Was that alarming to you

22  that across this country on this date not one

23  controlled drug suspicious order?  Did that alarm

24  you?

Page 144

1   A   No.

2   Q   No.  Important enough for you to send an

3   e-mail to all of these people to tell them,

4   though, right?

5   A   I wanted --

6        MR. BUSH:  Objection.

7        THE WITNESS:  -- to get the data fixed.

8   BY MR. KENNEDY:

9   Q   And that -- the fact that not one

10  controlled drug suspicious order was on that

11  report was important enough for you to tell all

12  these people, right?

13       MR. BUSH:  Objection.

14  BY MR. KENNEDY:

15  Q   Is that right?

16  A   That was just letting them know the

17  findings today.

18  Q   Exactly.  And you put "Importance:

19  High."  Right?

20  A   To let them know that although we don't

21  have the data, I did verify that the job was still

22  done.

23  Q   Now, let's go up to your next e-mail,

24  same day, John Mortelliti.  And then you send it

Page 145

1   to Gary, whose name I can't pronounce.  Who was

2   that?

3   A   Gary Misiaszek.  He -- I believe he was

4   the head of IS at the time.

5   Q   Okay.  And that's the person that could

6   help you fix this?

7   A   Yes.

8   Q   Okay.  Again, high -- the importance is

9   high, right?

10  A   Yep.

11  Q   And you state:  "Gary, it looks as

12  though the same issue we had with the hydro items

13  is now happening to several items.  The report is

14  about a half-inch thick."

15       That's not a little report, is it?

16  A   Nope.

17  Q   You said beginning -- you got a

18  half-inch report, and only about five total items

19  have historical data.  Five on a half-inch thick

20  report.  Did that alarm you?

21  A   It caused a lot of work for me.  I had

22  to go back and review previous IRRs and fill in

23  the blanks.

24  Q   I didn't ask you what you had to do.  I

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 know what you did. We'll talk about that. But
2 the fact that you got a report a half-inch thick,
3 and you only have historical data for five, did
4 that alarm you, sir?
5     A    What alarmed me was it wasn't printing
6 on that report. I had historical data for
7 everything.
8     Q    And, sir, this is what prompted you to
9 fill out the report indicating that CVS was
10 noncompliant with DEA expectations. This is what
11 prompted that report, sir; isn't it true?
12         MR. BUSH:  Objection.
13         THE WITNESS:  The lost data was one of
14 the reasons.
15 BY MR. KENNEDY:
16     Q    Go to page 69, the previous page, we
17 continue along with the e-mail chain. Go up to
18 your next e-mail, which is October 6th, 2010, the
19 next day, and it's to Gary again, and now this is
20 to your boss, Frank Devlin, true?
21     A    Yep.
22     Q    And it says "Importance: High," does it
23 not?
24     A    Yes.

Page 147

1     Q    And then you state:  "All but one item
2 in the network" --
3         The network is the entire country, is it
4 not, sir?
5     A    Yes.
6     Q    And you say:  "All but one item in the
7 network are missing three to four items of LAG
8 info on today's report."
9         The LAG is in relation to historical
10 data, is it not, sir?
11     A    Yes.
12     Q    And now you've got a report, one item
13 nationally -- only one item nationally; is that
14 right?
15         MR. BUSH:  Objection.
16 BY MR. KENNEDY:
17     Q    Is that what it says?
18         MR. BUSH:  Objection.  I don't
19 understand the question.
20 BY MR. KENNEDY:
21     Q    All but one item.  Is that what it says,
22 sir?  I'm just asking you about the first
23 sentence.
24     A    Yes.

Page 148

1     Q    And so the jury understands, three to
2 four items of LAG are missing.  There's only six
3 total items of LAG of historical data, correct?
4     A    Yes.
5     Q    Only six LAGs.
6     A    Yeah.
7         MR. BUSH:  Objection.
8 BY MR. KENNEDY:
9     Q    And on this report every single -- every
10 single item is missing three to four except for
11 one.  Were you alarmed by that?
12         MR. BUSH:  Objection.
13         THE WITNESS:  I was alarmed about how
14 much work needed to be done to get the data.
15 BY MR. KENNEDY:
16     Q    Well, you were alarmed enough to fill
17 out a report to say, "CVS is noncompliant with DEA
18 expectations at this point."  True, sir?
19         MR. BUSH:  Objection.
20 BY MR. KENNEDY:
21     Q    What's based upon what we're reading
22 here, correct?
23         MR. BUSH:  Objection.
24         THE WITNESS:  That's -- that's -- yes, I

Page 149

1 wrote it like that, like I said, because I had to
2 go back to all previous reports and manually fill
3 in all the data to do the IRR.
4 BY MR. KENNEDY:
5     Q    Well, sir, look, I -- I know you look at
6 this and say, This is going to cause me a lot of
7 work, but weren't you also concerned with the
8 people in the United States of America who were in
9 the midst of an opioid crisis?  Weren't you also
10 concerned about them?
11         MR. BUSH:  Objection.
12         THE WITNESS:  This had nothing to do
13 with losing drugs.  I -- I did not allow one drug
14 to slip through the IRR during this process.  I
15 worked several more hours on the IRR, which is why
16 I wrote it the way -- the way I wrote it.  But I
17 didn't release anything because of the work.
18 BY MR. KENNEDY:
19     Q    Let's continue to the next sentence.
20 "Something else changed or just about every
21 company we deal with has changed the description
22 of their drugs.  Whatever you can do to help
23 expedite this process would be greatly
24 appreciated."

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 You wanted this done fast, sir, did you
2 not?
3 A I wanted it done immediately.
4 Q Because you knew that if the DEA came
5 in, they would know, they would understand, and
6 they would discover that you were noncompliant
7 with their expectations as it -- as it relates to
8 monitoring suspicious orders, sir. That's why you
9 wanted it done fast.
10 MR. BUSH: Objection.
11 THE WITNESS: No, I don't believe that.
12 BY MR. KENNEDY:
13 Q Okay. You next state: "I am now
14 reviewing the network Control Drug IRR on common
15 sense as opposed to IRR historical data. I know,
16 that is scary. Be nice."
17 Explain to us, sir --
18 A I was --
19 Q -- tell us your common sense --
20 MR. BUSH: Wait, wait. Let him answer.
21 BY MR. KENNEDY:
22 Q Tell us your common sense approach that
23 you were utilizing.
24 A I was trying to basically poke fun at

Page 151

1 myself to get friendly with Gary Misiaszek, hoping
2 he would push my -- my request through so I could
3 get all the data put back onto the IRR and ease
4 some of the workload I had.
5 Q What was your common sense approach?
6 A There was no common sense approach. I
7 was trying to be funny with him, trying to be
8 friendly. I manually took all the historical data
9 from previous IRRs and filled in the blanks for
10 all the historical data.
11 Q You were trying to do what a computer
12 and six algorithms were doing, right?
13 A No, I was copying, and I had people
14 helping me.
15 Q And what you were trying to do was fill
16 in historical data and do what a computer and six
17 algorithms were doing.
18 A By filling in the historical data?
19 Q Yes.
20 A I guess the printer would have printed
21 it.
22 Q And then what would you do with it when
23 you got it?
24 A Review it.

Page 152

1 Q And what would you do, sir, when you
2 would review it? What algorithms or mathematical
3 formulas were you applying that the algorithm had
4 previously been providing?
5 MR. BUSH: Objection.
6 THE WITNESS: Oh, okay. Actually -- I
7 took the data from previous LAGs, filled it in,
8 and erred on the side of caution. If -- if they
9 were over the trend, I just automatically
10 forwarded them out for investigation. I froze
11 them.
12 BY MR. KENNEDY:
13 Q The trending, before you did this with
14 common sense, was being done by the algorithms,
15 correct?
16 MR. BUSH: Objection.
17 THE WITNESS: But I -- I had that
18 information. It was printed on previous IRRs.
19 Yes.
20 (Exhibit No. 24 was premarked for
21 identification.)
22 BY MR. KENNEDY:
23 Q Let's go to Exhibit 24.
24 Start this one at the top. This is an

Page 153

1 e-mail from you dated 10/12/2010, so this is about
2 a week later. And you are -- you are sending this
3 to Jason Todd. Who is Jason Todd?
4 A He is --
5 MR. BUSH: It's Todd Janson, I think it
6 is.
7 THE WITNESS: Yeah.
8 BY MR. KENNEDY:
9 Q I'm sorry. Todd Janson.
10 A He's the loss prevention manager in
11 distribution.
12 Q Superior to you in the chain?
13 A He reported to me.
14 Q Okay. And you state: "Todd, I sent you
15 an e-mail about two weeks ago explaining why I am
16 handling the Control Drug IRR for the time being."
17 So we're back to late September.
18 A Mm-hmm.
19 Q You discover the problem, correct?
20 A Yes.
21 Q "You may want to forward it to Dean."
22 Then, "Dean, there is a rewrite we are
23 trying to get approved for the control drug IRR.
24 The current report shows control drugs by item

Page 154

1 instead of active ingredient (such as PSE). We
2 thought this would be a great idea at the time,
3 but what we found was that the system cannot match
4 historical data to an item if the manufacturer
5 changes the name of the item (Todd can forward you
6 the e-mail). Example: Hydro 5 mg can be changed
7 to hydro mg 5. Same item, just put the 5 in front
8 of the mg. The system cannot match this item
9 because of the change, and therefore loses
10 historical data."
11        Sir, was that simple of a change that
12 would cause you to lose historical data, right?
13     A   Yes.
14     Q   "This is why you are seeing zero for
15 historic ordering (usually in LAG 3-6). Long
16 story short, we are having controlled drugs listed
17 by active ingredient (like PSE). Until then I
18 will be doing the control drug IRR for the network
19 so there won't be as much confusion trying to
20 decipher the report in its current form."
21        And that's what you did, you took it
22 over.
23     A   Correct.
24     Q   Now, this IRR form and program, it

Page 155

1 involved algorithms, correct?
2     A   Yes.
3     Q   And CVS had paid a firm called Buzzeo to
4 develop this IRR report?
5     A   I know Buzzeo was involved. I wasn't
6 part of that in the beginning.
7     Q   All right. But you knew and you
8 understand your deals with Buzzeo, they had
9 background expertise and experience in creating
10 these -- these algorithms to monitor suspicious
11 orders, true?
12     A   Yes.
13     Q   And CVS did not have that experience,
14 which is why they sent it out to Buzzeo to develop
15 this algorithm and IRR report. True?
16        MR. BUSH: Objection.
17        THE WITNESS: I can't answer on behalf
18 of CVS.
19 BY MR. KENNEDY:
20     Q   Well, Buzzeo, in creating this IRR
21 report that you were reviewing, and it's now the
22 fall of 2010, they created it using historical
23 ordering data for controlled substances, true?
24        MR. BUSH: Objection.

Page 156

1        THE WITNESS: I didn't question how
2 Buzzeo had the information.
3 BY MR. KENNEDY:
4     Q   Well, you knew they were using
5 historical data for hydrocodones to create these
6 algorithms and spit out the score with respect to
7 each order, right?
8        MR. BUSH: Objection.
9 BY MR. KENNEDY:
10     Q   You knew that.
11     A   I knew the IRR printed the historical
12 data. However, they worked the algorithm to
13 gather the formulas for this. I had no
14 involvement.
15     Q   I know, but you -- you had a basic
16 understanding that the algorithm and the score of
17 each order involves historical ordering data,
18 right?
19        MR. BUSH: Objection.
20        THE WITNESS: The results were
21 historical, yes.
22        (Exhibit No. 126 was premarked for
23        identification.)
24 BY MR. KENNEDY:

Page 157

1     Q   All right. I'm going to -- let me give
2 you Exhibit 126, which is an IRR, all right?
3        These are reports you looked at daily
4 for almost two years. True?
5     A   Yes.
6        MR. BUSH: Object.
7 BY MR. KENNEDY:
8     Q   And go to -- go to page 765, if you
9 would.
10     A   Okay.
11        MR. BUSH: Hold on a second. Eric, just
12 hold on a second, I think I'm missing a page.
13        MR. KENNEDY: 765?
14        MR. BUSH: Sorry. Let me -- one of mine
15 is missing. Sorry, you got the one that's --
16 that's short-sheeted.
17 BY MR. KENNEDY:
18     Q   Go to page 765. 765 gives you kind of a
19 summary of the -- of the evaluation of each
20 individual order, true?
21        MR. BUSH: Objection.
22        THE WITNESS: How this algorithm --
23 BY MR. KENNEDY:
24     Q   Sir, I've asked you a very simple

Page 158

1 question.
2 Does this give you a basic summary of
3 the different scores that are assigned to each
4 individual order?
5 A Yes.
6 Q And you -- look down on the bottom
7 sheet, the score .65. Do you see that?
8 A I do.
9 Q And that is the final score that every
10 single order is given, true?
11 MR. BUSH: Objection.
12 THE WITNESS: For the flag, yes.
13 BY MR. KENNEDY:
14 Q Yes. And, sir, you worked a lot with
15 the scoring system to refine it to make sure that
16 it wasn't flagging false positives, did you not?
17 You did a lot of work on this in 2009, did you
18 not?
19 A I believe that was the time period.
20 Q Let's look at the -- the different then
21 parameters or tests that are being run on each
22 order by the algorithm. All right?
23 A Okay.
24 Q First, at the top, do you see

Page 159

1 "Description"?
2 A Mm-hmm.
3 Q Look at the first box. The computer
4 algorithm on the first test on an order gives the
5 number of standard deviations the current monthly
6 total lies from the six-month average. Right?
7 A Yes.
8 Q And if the algorithm doesn't have all
9 six months of data, then whatever it spits out
10 with respect to test number 1 is going to be
11 inaccurate. True?
12 MR. BUSH: Objection.
13 BY MR. KENNEDY:
14 Q It's basing it on a six-month average,
15 and it doesn't have six months' worth of
16 historical data, true?
17 A Yes.
18 MR. BUSH: Objection.
19 BY MR. KENNEDY:
20 Q So whatever it spits out with respect to
21 test number 1 on this algorithm, that's going to
22 be inaccurate.
23 MR. BUSH: Objection.
24 BY MR. KENNEDY:

Page 160

1 Q Correct?
2 A You're talking about the missing
3 historical data?
4 Q Yes, sir.
5 A Yes, it would be.
6 Q Let's go down to test number 2 run on
7 each order of a controlled substance. Test
8 number 2 of this computer algorithm says "Gives
9 the number of standard deviations the current
10 monthly total lies from the projected monthly
11 total based on historic ordering behavior."
12 And if you're missing four of six months
13 of historical data, whatever test number 2 spits
14 out, that's going to be inaccurate, true?
15 MR. BUSH: Objection.
16 THE WITNESS: It -- it will cause a lot
17 more flags.
18 BY MR. KENNEDY:
19 Q It's going to be inaccurate, true?
20 MR. BUSH: Objection.
21 THE WITNESS: Yes.
22 BY MR. KENNEDY:
23 Q Let's go down to number 4. Test
24 number 4 of each order: "Indicator: Detects for

Page 161

1 an increasing trend in ordering behavior." If it
2 doesn't have four out of six months for the
3 historical data, it cannot evaluate trends, true?
4 A It would -- it was -- the missing data
5 was coming up as zeros.
6 Q Correct.
7 A Right.
8 Q So it's not going to be able to
9 accurately evaluate with this algorithm or this
10 test trending, true?
11 A It would flag a lot more.
12 Q Yeah, it's not going to be accurate.
13 A No.
14 Q The next test: "Indicator: Determines
15 if the GNC has been ordered for two or more months
16 prior to the current ordering date." If it's got
17 zeroes in LAG 1 and 2 and 3 and 4, it's not going
18 to be able to accurately make that determination,
19 correct?
20 A No.
21 Q The next test that it's going to run,
22 this algorithm computer and the IRR determines if
23 the amount ordered for the GNC is less than or
24 equal to the six-month maximum. Well, if it's

Page 162

1  missing data, historical data in this six-month
2  period, it's not going to be accurate when running
3  that test either, is it?
4     A   No.
5     Q   Sir, look at a couple of pages beyond
6  that, 768.
7        If you go down to number 3 where it says
8  "Hydrocodone," "Store 3 -- 03362," do you see that
9  on the left?
10    A   I do.
11    Q   That 03362 identifies a specific store,
12  does it not?
13    A   Yes.
14    Q   And then it's -- they're talking about
15  750 milligram hydrocodone, right?
16    A   I believe they're talking about 0.5 and
17  the 750, if I'm not mistaken, is the actual
18  acetaminophen.
19    Q   All right.  And then with respect to the
20  hydrocodone product for that store, look down to
21  the LAG line.  It's a couple of lines down to the
22  right, the order where it says LAG 1, 2, 3, 4, 5,
23  6, 7.  Do you see that?
24    A   Yes.

Page 163

1     Q   Now, LAG 1, that's the previous one
2  month of orders, true?
3     A   Yes.
4     Q   LAG 2 would be the second month back,
5  LAG 3, third, correct?
6     A   Mm-hmm.
7     Q   Fourth, fifth, sixth, and there are
8  zeroes --
9     A   Correct.
10    Q   -- for month 3, 4, 5 and 6, and this was
11 the problem that you were talking about, true?
12    A   Yes.
13       MR. BUSH:  Eric, is now another good
14 time for a break?
15       MR. KENNEDY:  Sure.  Yeah, great.
16       THE VIDEOGRAPHER:  The time is 11:16
17 a.m.  We're going off the record.
18       (Recess.)
19       THE VIDEOGRAPHER:  The time is
20 11:31 a.m.  We're back on the record.
21 BY MR. KENNEDY:
22    Q   Mr. Mortelliti, we were -- we've been
23 talking about the -- the IRR report and the
24 absence of historical data, and we were talking

Page 164

1  about this -- this period of October of 2010, and
2  you indicated that you took over the review of the
3  IRR reports because of the missing historical
4  data, correct?
5        MR. BUSH:  Objection.
6        THE WITNESS:  Yes.
7  BY MR. KENNEDY:
8     Q   And you indicated that you would go back
9  and you would fill in the historical data in -- in
10 the LAGs, correct?
11    A   Yes.
12    Q   Where would you get that historical
13 data?
14    A   I kept copies of all the previous IRRs.
15    Q   So you would have to go back and find
16 IRRs for the same store that didn't have missing
17 data.  Is that right?
18    A   Find IRRs for the same stores that
19 didn't have missing data?  When the -- when the
20 data was missing, it actually flagged more items.
21 So I would have to go back and pull up the last
22 LAG with all the information on there.  So when
23 these reports are printed realtime, the
24 information's there.  The stores are in numerical

Page 165

1  order and they're by date.  If a store orders and
2  delivers on a Monday, I know to look under
3  Mondays.  So I would pull that information and
4  then fill it in.
5        MR. KENNEDY:  All right, and I'm going
6  to move to strike the answer.
7  BY MR. KENNEDY:
8     Q   Let me ask you very simply:  When you
9  were filling in the historical data, you would
10 have to go back and look for the same store that
11 didn't have missing data for those months,
12 correct?
13    A   I don't understand what you're saying,
14 look for the same store that didn't have missing
15 data.
16    Q   Let me -- you were filling in the
17 historical data that is missing for a specific
18 store when you reviewed the IRRs starting in
19 October of 2010, correct?
20    A   Correct.
21    Q   And to fill that data in, you would have
22 to look back at prior IRR reports for the same
23 store.
24    A   Yes.

Page 166

1 Q And you would have to look for IRR
2 reports for that store that did not have missing
3 data for specific months, correct?
4 A Yes.
5 Q And if the store -- the previous IRR
6 that you were looking at was more than six months
7 old, it wouldn't have the data that you were
8 looking for, correct?
9 A I don't know what you're asking. I was
10 able to gather all the data I needed for this.
11 Q Do you agree with my statement that if
12 the previous IRR for the same store was more than
13 six months old, it would not have any of the data
14 that you were looking at to fill in for the
15 current IRR for that store. True?
16 A Because it didn't have -- no, that's not
17 true.
18 Q All right. When you got the historical
19 data, you weren't doing algorithms, were you?
20 A No.
21 Q That was for the computer.
22 A Yes.
23 Q So you discover the problem, I think we
24 can agree, in late September of 2010. True?

Page 167

1 A Yes.
2 Q You sent out a variety of different
3 e-mails indicating high, this is important, ASAP.
4 You wanted to address this, true?
5 A Yes.
6 (Exhibit No. 111 was premarked for
7 identification.)
8 BY MR. KENNEDY:
9 Q Let's look at Exhibit 111, please.
10 Sir, when you -- let me -- let me go
11 back a second. When you would go back and try to
12 fill in the missing historical data, you would
13 have to find the same store, correct?
14 A Yes.
15 Q And not only would you have to find the
16 same store, but you would also have to -- to find
17 that that store, that same store flagged for that
18 same drug in order to fill it in, correct?
19 A Yes.
20 Q Okay. Let's -- let's move forward then.
21 I think about -- this would be three
22 months after you discovered the -- no, this is a
23 month after you discovered the problem. This is
24 from Christopher Tulley. It's an e-mail dated

Page 168

1 10/29/10. Do you see that?
2 A I do.
3 Q And this is dealing with updates for key
4 initiatives, true?
5 A Yes.
6 Q If you'll look at the same -- the next
7 page, "Logistics Core Team Update." Have you ever
8 seen these before?
9 A I did these after Frank left.
10 Q Okay. And this is dated November 1,
11 2010.
12 A Okay.
13 Q Correct?
14 A Yes.
15 Q All right. "Pharmacy Compliance." It
16 states: "Controlled" -- what's -- what's
17 "compliance" mean? That -- that's referencing the
18 DEA, is it not?
19 A Frank wrote this. I don't want to put
20 words in his mouth.
21 Q When you would use it, "compliance"
22 would mean DEA compliance, true?
23 MR. BUSH: Objection.
24 THE WITNESS: I would specifically write

Page 169

1 what government regulatory agency when I would
2 fill in these, but I never saw these when Frank
3 did them.
4 BY MR. KENNEDY:
5 Q All right. Does it state, bullet
6 point 3: "Control drug suspicious order
7 monitoring is being reworked to identify active
8 ingredients versus product name"? Does it state
9 that?
10 A Yes.
11 Q "This will prevent stores from spreading
12 orders over multiple products and also address
13 name change issue." True?
14 A That's what he wrote.
15 Q So this is more than a month after you
16 have discovered the problem, and the change hasn't
17 yet been done. True?
18 MR. BUSH: Objection.
19 THE WITNESS: Yes.
20 BY MR. KENNEDY:
21 Q And this is the condition and the issue
22 with the IRR that -- that you had described a
23 month earlier as making CVS noncompliant with DEA
24 expectations. Same issue, true?

Page 170

1    MR. BUSH: Objection.
2    THE WITNESS: We were compliant, and
3 they knew we were compliant, so they didn't push
4 it through as quickly as I would have liked to see
5 it go through.
6 BY MR. KENNEDY:
7    Q   Well, let me ask you, you wrote
8 "noncompliant with DEA expectations." Did
9 somebody send you an e-mail, a memo saying you
10 were wrong when you made that statement?
11    A   No.
12    Q   And you wanted it done ASAP, and it's
13 now a month and it's not done, right?
14    A   Yes.
15    (Exhibit No. 22 was premarked for
16    identification.)
17 BY MR. KENNEDY:
18    Q   Let's go to Exhibit 22. 22.
19    Now, this is titled "CVS Logistics." Do
20 you see that?
21    A   I do.
22    Q   Have you seen reports such as this in
23 the past?
24    A   No, not the full report.

Page 171

1    Q   Does this say "2011 Initiatives"?
2    A   It does.
3    Q   Dated January 28, 2011.
4    A   Yes.
5    Q   Go to page 944.
6    Look down to bullet point -- 1, 2, 3,
7 4 -- 5, if you would.
8    A   Okay.
9    Q   Does this state: "Control Drug IRR
10 rewrite to include active ingredients instead of
11 item descriptions. Working with Gary M., Ellen
12 D., and third-party counsel," parentheses, "DEA."
13    Does it state that?
14    A   Yes.
15    Q   So this is now four months after you
16 have discovered the problem, and it's -- it's
17 still not done. Right?
18    MR. BUSH: Objection.
19    THE WITNESS: I'm not sure how long the
20 data was missing. The actual change to ingredient
21 wasn't done yet.
22 BY MR. KENNEDY:
23    Q   Wasn't done. And that's what you were
24 telling everybody you wanted done ASAP, but

Page 172

1 nobody's listening.
2    MR. BUSH: Objection.
3 BY MR. KENNEDY:
4    Q   Right?
5    MR. BUSH: Objection.
6    THE WITNESS: I did want it done.
7 BY MR. KENNEDY:
8    Q   And you want it done ASAP, sir, because
9 you knew it made CVS noncompliant with DEA
10 expectations. That's why you wanted it done ASAP.
11    MR. BUSH: Objection.
12 BY MR. KENNEDY:
13    Q   True?
14    A   Not at all. We were compliant. It
15 would have made my job quicker and easier by
16 ingredient.
17    MR. KENNEDY: Let's go to Exhibit 32111.
18    Q   What's retunement with respect to the
19 IRR? Tell us about.
20    A   Well, I guess it depends on the context.
21 There was -- we had several false positives early
22 on in the process, and we worked with our field
23 partners to gather information on what was causing
24 the false positives, and what we found -- and

Page 173

1 again, I'm -- vaguely, this is a long time ago to
2 try to remember all the details, but I believe
3 lower volume stores were flagging very easily for
4 certain -- for certain reasons, and we wanted to
5 work with the group to try to get an understanding
6 on whether or not we could adjust those stores
7 to -- to account for some of the false positives.
8    Q   The DEA wasn't going to have -- have
9 problems with you overflagging, were they?
10 That's not -- the DEA wouldn't have a problem if
11 you were overflagging potentially suspicious
12 orders, right?
13    MR. BUSH: Objection.
14    THE WITNESS: Well, even after
15 retunement we overflagged.
16 BY MR. KENNEDY:
17    Q   And that's not my question. Could you
18 answer my question, please?
19    A   Sure. No, they wouldn't.
20    (Exhibit No. 17 was premarked for
21    identification.)
22 BY MR. KENNEDY:
23    Q   All right. Let me -- take a look at
24 Exhibit 17, if you would.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  And the first e-mail in -- from a time
2  standpoint, go down to the second e-mail from John
3  Andrade, you're copied on it, it's from March 21,
4  2011.
5  And who is John Andrade?
6  A  John Andrade, he -- I guess he oversaw
7  the -- the IS team at the time. I don't recall
8  his exact title.
9  Q  And the IT folks, those are the people
10 that you sent the request to change the IRR to
11 where you wrote "noncompliant with DEA
12 expectations," right? That's the same department?
13 A  Yes.
14 Q  Okay. He writes on March 21, and you're
15 copied, Subject: Suspicious Order Monitoring
16 modifications, and he is writing to your boss, it
17 looks like, says: "Frank, there are three
18 requests in the queue related to DEA."
19 So he's relating this to the DEA. Do
20 you see that?
21 A  Mm-hmm. Yes.
22 Q  One: "Indy DEA changes." Two, "SOM
23 'Retunement.'"
24 Do you see that?

Page 175

1  A  I do.
2  Q  And that SOM retunement, he's referring
3  back to this problem with historical data and
4  active ingredient, is he not --
5  MR. BUSH: Object.
6  BY MR. KENNEDY:
7  Q  -- that you asked him to change six
8  months earlier, right?
9  MR. BUSH: Objection.
10 THE WITNESS: The retunement was to
11 review the false positives.
12 BY MR. KENNEDY:
13 Q  Well, let's go up to the -- DEA wouldn't
14 have a problem with that, I think you already told
15 us.
16 So let's go to the next e-mail and look
17 at that, and this is from Frank Devlin back, and
18 you're copied, sent 3/21/2011. "John, all three
19 are critical."
20 So that's your boss saying these changes
21 are critical to the IRR, correct?
22 And then he states: "All three are
23 critical and could cause a problem if we don't
24 complete. In order of priority:" One, "We have

Page 176

1  committed to the government to have the fix in
2  Indy by April." Two, "Suspicious Order Monitoring
3  for controls."
4  Did I read that right?
5  A  Yes.
6  Q  And as you told us earlier, this -- this
7  retunement in relation to overflagging, flagging
8  false positives, that's not something that was
9  going to create a problem for you with the DEA,
10 sir, was it?
11 A  Not with the DEA.
12 Q  He's talking about the problem with the
13 suspicious order monitoring IRR that you
14 identified six months earlier, is he not?
15 MR. BUSH: Objection.
16 THE WITNESS: I don't know what he's
17 referring to. I don't recall. He sent this to
18 John Andrade, right? Yes. I -- I don't know what
19 his conversations with John Andrade were about.
20 BY MR. KENNEDY:
21 Q  Sir, if he's talking about this -- a
22 change in the IRR because it could create a
23 problem, and it's -- it's still not done, nobody
24 is listening to you that this needs to be done as

Page 177

1  soon as possible, are they?
2  MR. BUSH: Objection.
3  THE WITNESS: They realize we were
4  compliant, so it did fall to the back burner.
5  (Exhibit No. 18A was premarked for
6  identification.)
7  BY MR. KENNEDY:
8  BY MR. KENNEDY:
9  Q  All right. Well, let's look. They
10 realized you're compliant. Let's see what they
11 realized. Let's go to Exhibit 18A.
12 It's now April 29th of 2011, and that's
13 about eight months after you identified this
14 problem with the IRR, correct?
15 A  There was no problem with the IRR. I
16 wanted it changed to active ingredient instead of
17 by drug.
18 Q  And it's been eight months since you
19 wanted to have that done ASAP, true?
20 A  Yes.
21 Q  And now Gary, who you have identified
22 as -- he's somebody who's involved in IT, he makes
23 IT type changes, right?
24 A  Yes.

Page 178

1    Q   He's sending an e-mail out, and your
2  boss, Frank Devlin, is included in -- in who he's
3  sending this to, right?
4    A   Yes.
5    Q   And that's April 29th, 2011, true?
6    A   Yes.
7    Q   And "Attachments" is the "2011-04-28
8  Logistics Business Support Requests," true?
9    A   Yes.
10   Q   And it says: "Good afternoon, All:
11 Attached you'll find the most current listing of
12 IT Business Support Request in the CVS IT
13 Logistics Team work queue."
14     True?
15   A   Yes.
16   Q   And that's the listing of things that
17 got to be done.  Yes?
18     MR. BUSH:  Objection.
19     THE WITNESS:  It's a listing of things
20 that we want to get done.
21 BY MR. KENNEDY:
22   Q   Right.  And that's when you sent your
23 request eight months earlier to have a change done
24 with respect to active ingredient, historical

Page 179

1  data, because, at least in your words, on that day
2  you were noncompliant, right?
3    A   We were compliant, but I did write it
4  up that way to try to get it pushed through
5  quicker.
6    Q   Well, let's look at eight months later
7  and see what Frank Devlin, your boss, says.
8      Go to the next page, please, where we
9  have a -- a longer chart, if you would.
10     There is a column that says "Tasks."  Do
11 you see that column?
12   A   Yes.
13   Q   And the task that they're addressing is
14 "Revisions to IRR/SOM System."  True?
15   A   Yes.
16   Q   And then two over, it says "Business
17 Lead," Frank Devlin, and that would mean Frank
18 Devlin, your boss, is now responsible for this --
19 this revision.  It's his task.
20     MR. BUSH:  Objection.
21 BY MR. KENNEDY:
22   Q   Right?
23     MR. BUSH:  Objection.
24 BY MR. KENNEDY:

Page 180

1    Q   Or is it your task?
2    A   I mean --
3      MR. BUSH:  Objection.
4      THE WITNESS:  I don't recall now who --
5  BY MR. KENNEDY:
6    Q   Well, the next column over -- and again,
7  this is April 29 of 2011, eight months after you
8  filled out the original form, and under
9  "Description / Objectives," does it say, April of
10 2011, "DEA expects CVS to prevent suspicious
11 orders from being filled out of our DCs.  The
12 current IRR does not provide the proper
13 information to meet the DEA's needs.  We need
14 control drugs to be monitored by 'active
15 ingredient.'  Currently the control drugs are
16 monitored by item.  The IRR loses all order
17 history when the info on the item changes causing
18 CVS to be noncompliant with DEA expectations."
19     Is that the statement still eight months
20 later, sir?  In April of 2011, is that the
21 statement?
22     MR. BUSH:  Objection.
23     THE WITNESS:  That's --
24 BY MR. KENNEDY:

Page 181

1    Q   Did I read that right?
2    A   That's the statement.
3      MR. BUSH:  Did he -- did he read it
4  right?  That's what he asked.
5      THE WITNESS:  Yes.
6  BY MR. KENNEDY:
7    Q   "Priority," next column, it says,
8  "High."  You agree with that, don't you?
9    A   Because of the additional work, yes.
10   Q   And you said ASAP eight months earlier,
11 did you not?
12   A   I did.
13   Q   Where -- does it say here,
14 "Objectives" -- does it say we need to do this
15 ASAP because it's too much work for
16 Mr. Mortelliti?  Does it say that anywhere?
17   A   No, I wouldn't have got that through if
18 I worded it like that.
19   Q   Right.  Well, again, you weren't --
20 again, it wasn't your policy, wasn't your practice
21 to write things down that you -- that you believed
22 were untrue, was it, sir?
23   A   I wouldn't be here 25 years if I did.
24   Q   All right.  And it indicates "As of

Page 182

1  Date," 4/29/11 -- so this is the status as of that
2  date, is it not?
3      A   According to this paper.
4      Q   And it says "Start." Do you see
5  "Start" -- the "Start" column?
6      A   Yes.
7      Q   It says: "Start, 2/11/2011." You
8  discovered this problem in 2010, five months
9  before that, did you not?
10     A   I don't know if this is the same
11 problem. I don't know if they're referring to
12 strictly the active ingredient or if we were still
13 losing historical data. I -- I didn't write this
14 piece.
15     Q   This is -- these are the same words
16 that you wrote eight months earlier. Almost
17 identical, right, to what you wrote eight months
18 earlier?
19     A   Yeah, but I didn't put it in this form.
20 I --
21     Q   No, Frank Devlin now put it in this
22 form, and he put it in this form, sir, and he
23 states the same thing that you stated eight months
24 earlier: "CVS is noncompliant with DEA

Page 183

1  expectations." Isn't -- he says the same thing
2  eight months after you said it, does he?
3          MR. BUSH: Objection.
4          THE WITNESS: He says it, but he knew we
5  were compliant.
6  BY MR. KENNEDY:
7      Q   Was -- was your boss, Frank Devlin, was
8  he in the habit also of -- of writing things down
9  in formalized documents and forms that he believed
10 weren't true?
11         That wasn't his habit, was it?
12         MR. BUSH: Objection.
13         THE WITNESS: No. But in -- in our
14 company, we've -- did word things to get things
15 accomplished. Didn't happen often, but this is
16 one case where we really wanted to save manhours
17 and get the active ingredient.
18 BY MR. KENNEDY:
19     Q   Sir, let me -- let me ask you, it's 2011
20 when this is being written.
21     A   Mm-hmm.
22     Q   Was it a matter of manhours or was it a
23 matter of doing what was right for this country in
24 the midst of an opioid crisis? Which one was it?

Page 184

1      A   If --
2          MR. BUSH: Objection.
3          THE WITNESS: If this was a noncompliant
4  issue and harming the public, this would have been
5  done instantly. They knew we were compliant,
6  which is why it dragged out as long as it did.
7  BY MR. KENNEDY:
8      Q   And you knew and understand by 2011, did
9  you not, because you were getting communications
10 from a variety of sources that were letting you
11 know that clearly by 2011, that prescription
12 opioids were killing more people in America than
13 cocaine and heroin combined? Were you aware of
14 that?
15     A   I don't recall dates, what years we
16 started hearing about the opioid crisis. I
17 strictly knew my job was to prevent every single
18 pill leaving our distribution centers from
19 diversion.
20     Q   And you were good at your job, weren't
21 you?
22     A   I felt I was.
23     Q   And, sir, you were conscientious at your
24 job, were you not?

Page 185

1      A   I felt I was.
2      Q   And that's why you wanted to do the
3  right thing, didn't you?
4      A   I did the right thing.
5      Q   Yeah, and doing the right thing in
6  October of 2010 was saying, We need to make this
7  change ASAP because we are noncompliant with DEA
8  expectations. That's what you did in 2010.
9          MR. BUSH: Objection.
10 BY MR. KENNEDY:
11     Q   True, sir?
12     A   We were compliant. I wanted to make it
13 easier.
14     Q   Let's look at here on this same -- look
15 at that last column where it says "Finish." Do
16 you see that?
17     A   Yes.
18     Q   Expected finish, 12/31/2011, is that
19 when this was finally done, sir, more than a year
20 after you requested it?
21     A   I have --
22     Q   12/31/2011 was when they finally made
23 the change to become DEA compliant.
24         MR. BUSH: Objection.

Page 186

1    THE WITNESS: I don't have a
2 recollection of that.
3 BY MR. KENNEDY:
4    Q   Do you have anything, anything that
5 would indicate that up until 12/31/2011, you all
6 by yourself were trying to piece together the
7 historical data to review IRRs?
8    MR. BUSH: Objection.
9 BY MR. KENNEDY:
10   Q   Any -- any evidence of that, sir?
11   MR. BUSH: Objection.
12   THE WITNESS: I -- I don't -- I don't
13 recall whether or not this was completed by then.
14 I don't recall if this was the time period
15 Knoxville already had the program based there, and
16 I was supporting the program. This was definitely
17 toward, if not already, the end of my 100 percent
18 hands on. I don't recall if it was completed or
19 not.
20    I don't know what this form is. I'm not
21 sure if it's accurate. I don't know. I don't
22 feel like I waited a year, but I -- I don't know.
23 BY MR. KENNEDY:
24   Q   Sir, if this IRR change did not occur

Page 187

1 until the end of 2011, that would be almost six
2 years from the first DEA letter to distributors
3 outlining their responsibilities, wouldn't it be?
4 Almost six years if that letter came in '06.
5    MR. BUSH: Objection.
6    THE WITNESS: Six years.
7 BY MR. KENNEDY:
8    Q   And if two more DEA letters came to CVS
9 in '07, and it took you till 2011 to make changes
10 to the IRR, that would be five years from the
11 second and the third description and outline by
12 the DEA as to what CVS's responsibilities were,
13 true?
14    MR. BUSH: Objection.
15 BY MR. KENNEDY:
16   Q   Five years.
17   A   If anything, those five years we were
18 overflagging. That -- that's what the changes
19 were. It wasn't not doing the process.
20   Q   Well, what it was, for at least a year
21 and a half, was you using your common sense to
22 retrieve historical data and attempt to do what a
23 computer algorithm -- six computer algorithms were
24 doing. That's what it was.

Page 188

1    A   That's not correct.
2    MR. BUSH: Objection.
3    Make sure you give me a two-beat
4 pause so I can get the objection in. It's getting
5 in a little bit after you.
6    THE WITNESS: Sorry.
7 BY MR. KENNEDY:
8    Q   Sir, I'm going to go back for a second.
9    Let's go back to 2009 and into 2010,
10 when you were the only one at CVS that was looking
11 at the IRR. All right? Go back to that time
12 period.
13   A   Okay.
14   Q   You indicated, and correct me if I'm
15 wrong, that you -- when you would see a flag, a
16 potentially suspicious order of hydrocodone, that
17 you would make a phone call and refer those to the
18 VIPER analysts and to the LP --
19   A   Regional manager.
20   Q   -- regional manager. That's what you
21 would do?
22   A   Yes.
23   Q   Correct?
24    And did you do that with a hundred

Page 189

1 percent of the flagged hydrocone -- hydrocodone
2 orders in the IRR?
3    A   Oh, as -- as far as my knowledge,
4 yes.
5    Q   And where would that be recorded? Your
6 referral of those hydrocodone suspicious orders to
7 the VIPER analysts and the LP regional manager,
8 where would that be recorded?
9    A   On the actual IRR itself.
10   Q   That you wrote.
11   A   Yes.
12   Q   Would it be recorded anywhere else?
13   A   Not to my knowledge.
14   Q   Would it be recorded in the IRR recap
15 report?
16   A   I don't believe we had that early on.
17 I'm not sure.
18    MR. KENNEDY: Let's take a quick
19 break -- I'm going to check with these folks, take
20 a quick break just to see -- I might be done.
21    THE VIDEOGRAPHER: It's 12:00 p.m. We
22 are going off the record.
23    (Lunch recess.)
24    THE VIDEOGRAPHER: The time is 12:53

Page 190

1  p.m., and we're back on the record.
2       DIRECT EXAMINATION
3  BY MR. BAKER:
4    Q   My name is William Baker.  I'm going to
5  follow up with some questions that Mr. Kennedy
6  asked you this morning, and then I may have some
7  other questions.
8       Fair enough?
9    A   Yes.
10      (Exhibit No. 562 was premarked for
11      identification.)
12  BY MR. BAKER:
13    Q   So could you pull up Exhibit 562,
14  please.
15      MR. BUSH:  Tell us what it is so we can
16  find it.
17      MR. BAKER:  This is a recap of his
18  testimony from a specific page this morning.  So
19  there is no paper copy.
20      MR. BUSH:  Oh, I'm sorry.
21  BY MR. BAKER:
22    Q   Okay.  This is going to be marked as
23  Exhibit 562.  This is a portion of your testimony
24  that was given this morning when Mr. Kennedy was

Page 191

1  asking you questions.  I'll give you a chance to
2  look at that, and follow along with me.
3       The question is:  "Listen very
4  carefully.  What information is there on the IRR
5  other than the score that you used and assisted
6  you in determining whether or not the order was
7  suspicious?"
8       And you said:  "I -- for -- depending on
9  the drug, like in the e-mail you just gave me it,
10  it appears Tussionex."
11      "Q.  We're talking about hydrocodone.
12      "A.  For hydrocodone, if it's on there
13  I'm reviewing it as suspicious.
14      "Q.  All right.  And what information --
15  in your review, what information on the IRR
16  itself, if any, would assist you in that review?
17      "A.  Nothing.  The fact that it's
18  there."
19      My question to you, sir, is that an
20  accurate recap of your testimony that you're
21  looking at on the board there?
22    A   Yes.
23    Q   Okay.  So let me revisit that last
24  question.

Page 192

1       It says:  "All right.  What
2  information -- in your review, what information on
3  the IRR itself, if any, would assist you in that
4  review?
5       "A.  Nothing.  The fact that it's
6  there."
7       So the fact that it's there, you're
8  reviewing it as a suspicious order, correct?
9    A   I am -- I mean, obviously when I say,
10  "The fact that it's there," I'm looking at all the
11  information, the trend.  You're looking at the six
12  months of LAG, you're reviewing the trend, and
13  you're understanding why it's flagged.
14      I thought he was referencing other
15  information above and beyond, but as I'm reading
16  it --
17    Q   As you're reading it, it says what it
18  says, right?
19    A   Yeah, it says what it says.
20    Q   So you're reviewing it as suspicious
21  because it's hydrocodone and appears on the IRR,
22  correct?
23    A   It's -- it's --
24      MR. BUSH:  Objection.

Page 193

1  BY MR. BAKER:
2    Q   Correct.
3    A   It's an order of interest.
4    Q   Read those words:  "I'm reviewing it as
5  suspicious."  That's your testimony, correct?
6    A   I would like to -- to say that I used
7  the word "suspicious" early on all the time
8  throughout the process of learning it.  As we
9  transformed more into the process itself, they
10  weren't suspicious until the investigations come
11  back and we say, We can't find a root cause.  At
12  that point they're suspicious.
13    Q   The fact that it's hydrocodone, though,
14  that's what leads you to refer it out for
15  investigation; is that correct?
16    A   Yes.
17    Q   If it wasn't hydrocodone, it doesn't go
18  out for investigation automatically, right?
19    A   Not true.
20    Q   But it -- well, were you -- were you
21  sending other orders that showed up on that IRR
22  other than hydrocodone out for -- for automatic
23  investigation?
24    A   Yes.

Page 194

1  Q   Okay.  What drugs did that pertain to?
2  A   Anything --
3  Q   Just the name of the drug.
4  A   Anything like alprazolam.  It's -- the
5  DEA agent gave me a chart that I have hanging in
6  my office till this day that I use those drugs for
7  street value, those automatically went out.
8  Q   You're talking about the cocktail drugs?
9  A   Yes.
10  Q   And the cocktail drugs, would those --
11  would be those that are generally -- when you're
12  talking about a cocktail, that's mixed with
13  another drug, correct?
14  A   Mixed with hydro usually, yes.
15  Q   Okay.  So if you say alprazolam, you're
16  thinking that needs to be investigated because
17  that's commonly mixed with hydrocodone, correct?
18  A   Yes.
19  Q   Okay.  In the context of diversion,
20  meaning illegal use, correct?
21  A   Yes.
22  Q   Okay.  So when you look at a IRR and it
23  shows you hydrocodone, and you refer it out,
24  you're referring it out to what you call VIPER,

Page 195

1  VIPER analysts or VIPER field investigators?  What
2  are they called?
3  A   VIPER analysts.
4  Q   Okay.  You said something about field.
5  Who -- are they in the field?  Are they in a car
6  driving around?  What field are they in?
7  A   They're -- they're in the cars driving
8  around.  They're -- I call the field the stores.
9  Q   Okay.  So you referred it out to a VIPER
10  field analyst; is that what you're talking about?
11  A   Yes.
12  Q   Okay.  And the VIPER field analyst
13  actually drives to the store where the order was
14  generated; is that right?
15      MR. BUSH:  Objection.
16      THE WITNESS:  I'm not sure if they
17  always drove to the store, but they had the
18  exception reporting to start reviewing what I
19  asked.
20  BY MR. BAKER:
21  Q   Okay.  And there's some document
22  certainly that you have that says exactly what
23  these people did, right?
24      There's some policy, some procedure,

Page 196

1  some written document that you had at that time
2  that said what these people did in the field to
3  investigate these orders that you referred to them
4  that were hydrocodone orders that showed up on the
5  IRR, right?
6      MR. BUSH:  Objection.
7      THE WITNESS:  I don't recall that.
8  BY MR. BAKER:
9  Q   Okay.  Well, what procedure are they
10  supposed to follow if there's no written document?
11  How did they know what procedure to follow?
12  A   Their -- their jobs are to investigate.
13  They are the subject matter experts in the stores.
14  They understand the transactions.  They understand
15  the billings, the receipts.  I only understand the
16  supply chain piece.
17  Q   Okay.  Your brain is in their brain to
18  understand what they understand; is that what
19  you're saying?
20      MR. BUSH:  What?
21  BY MR. BAKER:
22  Q   Are you saying that your brain
23  understands what their brain understands?
24      You're calling them experts.  You don't

Page 197

1  know that these people are experts.  Nobody has --
2  has certified them as an expert in any way, shape
3  or form.  Has anybody?
4      MR. BUSH:  Objection.
5  BY MR. BAKER:
6  Q   No, really tell me, what -- what
7  organization certified these VIPER people that
8  you're talking about in the field as experts?
9  Tell me the name of the organization that
10  certified them as an expert.
11      MR. BUSH:  Objection.
12  BY MR. BAKER:
13  Q   Go ahead.
14  A   They needed VIPER certifications.
15  Q   VIPER certification from whom?
16  A   Whoever their trainer was.  I don't
17  know.  I didn't have it.
18  Q   From CVS?
19  A   I'm not sure.
20  Q   Who -- who invented the word "VIPER"?
21  Where did that come from?
22  A   I don't know.
23  Q   What's that even mean?  I'm thinking of
24  a viper snake, something -- what are you thinking

Page 198

1  of?  What is a VIPER?
2      A   No idea.
3      Q   And how do you know that they're even
4  certified?  How do you know that?
5      A   I --
6          MR. BUSH:  Objection.
7          THE WITNESS:  I recall they going --
8  them -- the field guys going to training for
9  VIPER.
10  BY MR. BAKER:
11      Q   To where?
12      A   Wherever they were having it.
13      Q   And -- and where is this place that
14  they're having it?  I'd like to know.  I would
15  like to go ask these people where they went -- I'd
16  like to know.  I'd like to know exactly where this
17  training takes place, and you're one that's the
18  manager.  Tell me.
19          MR. BUSH:  Objection.
20          THE WITNESS:  I'm not their manager.
21  BY MR. BAKER:
22      Q   Okay.  Well, these are the people to
23  whom you are deferring investigation.  You say
24  they're experts.  Tell me where they could become

Page 199

1  an expert.
2          MR. BUSH:  Objection.
3          THE WITNESS:  They're in their roles
4  because they're supposed to understand the
5  policies and process.  I don't train them.  I just
6  know they're in their roles to do that.
7  BY MR. BAKER:
8      Q   I'm asking you what policies and
9  process.  What policies and process do they follow
10  to do this investigation?
11      A   I don't know.
12      Q   Are there any policies and processes
13  that were in existence at CVS at that time that
14  determined what a VIPER field analyst would do for
15  an investigation of an order of hydrocodone that
16  you referred to them that came off the IRR form
17  that you were looking at?
18          MR. BUSH:  I object.
19          THE WITNESS:  I don't know.
20  BY MR. BAKER:
21      Q   Okay.  Well, if you don't know, then how
22  do you know that they're following some procedure?
23  How do you even know that?
24          MR. BUSH:  Objection.

Page 200

1          THE WITNESS:  That's their position.
2  That's what they're supposed to do.
3  BY MR. BAKER:
4      Q   The truth is you don't know what they
5  were doing, am I correct?  That's the absolute
6  bottom line truth is you don't know what they were
7  doing to investigate these orders, correct?
8          MR. BUSH:  Objection.
9  BY MR. BAKER:
10      Q   Correct?
11          MR. BUSH:  Objection.
12          THE WITNESS:  I don't know the steps
13  they were doing.  I know they were investigating.
14  BY MR. BAKER:
15      Q   Okay.  The steps that they are doing is
16  called an investigation.  So if you don't know the
17  steps that they were doing, you don't know what,
18  if anything, they were doing to investigate,
19  correct?
20          MR. BUSH:  Objection.  Argumentative.
21  BY MR. BAKER:
22      Q   Correct?
23          MR. BUSH:  Objection.
24  BY MR. BAKER:

Page 201

1      Q   Right?
2          MR. BUSH:  Objection.
3          THE WITNESS:  I don't know their job
4  like they do.
5  BY MR. BAKER:
6      Q   Okay.  Let me see if you can answer this
7  question.
8          First of all, you don't know the steps
9  that they were or weren't taking, correct?  Yes or
10  no?
11      A   I can't speak for all of them.
12      Q   I know you can't, but my question is,
13  you don't know the steps that they were taking,
14  yes or no?
15      A   No.
16      Q   Okay.  Therefore you don't know what
17  they did to investigate, yes or no?
18          MR. BUSH:  Objection.
19          THE WITNESS:  I don't know what they
20  did, all the steps they took.
21  BY MR. BAKER:
22      Q   You don't know any step that they took,
23  correct?
24          MR. BUSH:  Objection.

Page 202

1    THE WITNESS: It --
2 BY MR. BAKER:
3    Q   Correct?
4       MR. BUSH: Objection.
5 BY MR. BAKER:
6    Q   Sir?
7    A   I guess it depends on the situation.
8 There may be sometimes they told me.
9    Q   Okay. Let me explain to you, I just
10 asked you what steps they took. You said, I don't
11 know what steps they took. Am I correct?
12   A   You said that as just a broad statement.
13   Q   Right. But you never went with them to
14 investigate anything, did you?
15   A   No.
16   Q   Okay. So the fact that it's
17 hydrocodone, the reason that you are referring
18 those out is because you know that to have been a
19 highly addictive drug that was highly looked at by
20 the DEA for the purposes of diversion, correct?
21      MR. BUSH: Objection.
22 BY MR. BAKER:
23   Q   Right?
24      MR. BUSH: Objection.

Page 203

1    THE WITNESS: That's one of the few that
2 the DEA agent told me about, yes.
3 BY MR. BAKER:
4    Q   Okay. Let's pull up the drug fact
5 sheets. That would be Exhibit 2.
6       MR. BAKER: Do you have those? I'd say
7 they're on what's her name's. Get them off of --
8 oh, they're right here too. Okay, I got you.
9 BY MR. BAKER:
10   Q   We'll call this Exhibit 2. Here you go,
11 sir.
12      MR. BUSH: Which one are you using?
13      MR. BAKER: This is going to be the same
14 as 502. Okay. So we'll put it underneath the
15 ELMO.
16      MR. BUSH: So what are we calling this,
17 Exhibit 2?
18      MR. BAKER: Exhibit 2.
19 BY MR. BAKER:
20   Q   Okay. Do you see this DEA drug fact
21 sheet?
22   A   I do.
23   Q   Okay. Under "Hydrocodone," it says:
24 "Hydrocodone is most -- is the most frequently

Page 204

1 prescribed opioid in the United States and is
2 associated with more drug abuse and diversion than
3 any other illicit -- or illicit opioid." Is that
4 correct?
5    A   That's what it says.
6    Q   Okay. And that's the reason why you
7 were referring every single hydrocodone order that
8 appeared on the IRR out for investigation for that
9 very reason, correct?
10      MR. BUSH: Objection.
11      THE WITNESS: I -- I knew it had a high
12 street value, according to the DEA agent I spoke
13 with, and I continuously flagged the hydrocodone.
14 BY MR. BAKER:
15   Q   Okay. But you knew it was the most
16 frequently prescribed opioid in the United States
17 and was associated with more drug abuse and
18 diversion than any other illicit or illicit
19 opioid, correct? You knew that.
20      MR. BUSH: Objection.
21      THE WITNESS: During that time I don't
22 know if I knew that.
23 BY MR. BAKER:
24   Q   Well, you know it now, right?

Page 205

1       MR. BUSH: Objection.
2 BY MR. BAKER:
3    Q   You're looking at the DEA drug fact
4 sheet, right?
5       MR. BUSH: Objection.
6 BY MR. BAKER:
7    Q   Right?
8    A   I'm looking at it.
9    Q   You don't have any reason to disagree
10 with that, do you?
11      MR. BUSH: Objection.
12      THE WITNESS: I don't.
13 BY MR. BAKER:
14   Q   Okay. In terms of what you were looking
15 at, you were looking at Class III drugs at the
16 time, correct, which was -- included hydrocodone
17 and hydrocodone combination products, correct?
18      MR. BUSH: Objection.
19      THE WITNESS: Yes.
20 BY MR. BAKER:
21   Q   Okay. And you were not looking at any
22 Class II drugs that were sold by CVS pharmacies
23 nationwide, correct?
24   A   Our --

Page 206

1    MR. BUSH: Objection.
2    THE WITNESS: -- distribution centers
3 didn't have Class II.
4 BY MR. BAKER:
5    Q   Okay. The distribution centers didn't
6 distribute Class II drugs to CVS pharmacies at the
7 time you worked there in suspicious order
8 monitoring capacity, correct?
9    A   I -- I don't recall Class II during that
10 time.
11   Q   I haven't seen any evidence of it.
12      I just am asking you, is -- is that what
13 your recall is.
14   A   Yeah, I don't recall Class II.
15   Q   All right. So CVS never monitored
16 anything in reference to Class II drugs that were
17 sold by its own pharmacies to your knowledge; is
18 that correct?
19      MR. BUSH: Objection. You're talking
20 about SOM monitoring or some other kind of
21 monitoring?
22      MR. BAKER: I'm asking him the question.
23      THE WITNESS: I --
24      MR. BUSH: Objection.

Page 207

1    THE WITNESS: I wasn't involved with the
2 what the stores were doing.
3 BY MR. BAKER:
4    Q   Insofar as suspicious order monitoring,
5 you -- you never did any suspicious order
6 monitoring on any Class II drugs that were sold by
7 CVS pharmacies nationwide, correct?
8    A   I wasn't involved in any store
9 monitoring.
10   Q   Okay. Listen to my question.
11      You did not monitor anything about
12 Class II drugs in the context of suspicious order
13 monitoring with CVS, did you?
14   A   To my knowledge, we didn't have Class II
15 in the DCs.
16   Q   Okay. So does that mean you did not
17 monitor them?
18   A   If we didn't have them, I didn't monitor
19 them.
20   Q   Okay. Very good.
21      Okay. Class IIs included a drug named
22 oxycodone. Are you familiar with that drug?
23      See that up on the screen?
24   A   Okay.

Page 208

1    Q   Okay. Are you familiar with the name of
2 that drug, oxycodone?
3    A   Yes.
4    Q   All right. "Oxycodone," according to
5 this document, "is a semisynthetic narcotic
6 analgesic and historically has been a popular drug
7 of abuse among the narcotic-abusing population."
8      Is that what the document says?
9    A   Yes.
10   Q   The document also says that: "The
11 street names of this are Hillbilly Heroin, Kicker,
12 OC, ox, oxy, perc and Roxy.
13   A   That's what it says.
14   Q   It says: "Oxycodone is marketed alone
15 as OxyContin in 10, 20, 40 and 80 milligram
16 controlled release tablets and other immediate
17 release capsules like 5-milligram oxy IR. It is
18 also marketed in combination with products --
19 combination products with aspirin, such as
20 Percodan, or acetaminophen, such as Roxicet."
21 Correct?
22   A   That's what it says.
23   Q   Okay. It talks about the methods of
24 abuse, that "oxycodone is abused orally or

Page 209

1 intravenously. The tablets are crushed and
2 sniffed or dissolved in water and injected.
3 Others heat a tablet that has been placed on foil
4 and inhale the vapors."
5      Is that what that document?
6    A   That's what it says.
7    Q   It says: "Effects on the mind:
8 Euphoria and feelings of relaxation are the most
9 common effects of oxycodone on the brain, which
10 explains its high potential for abuse." Correct?
11   A   That's what it says.
12   Q   Now, that's the drug that's sold in the
13 pharmacies around the nation by CVS that are not
14 monitored through the distribution centers because
15 the distribution centers don't distribute those
16 drugs to the CVS pharmacies, correct?
17      MR. BUSH: Objection.
18 BY MR. BAKER:
19   Q   Correct, to your knowledge?
20      MR. BUSH: Objection.
21      THE WITNESS: To my knowledge, no.
22 BY MR. BAKER:
23   Q   Okay. Every one of these oxycodone-
24 related products, OxyContin and the other related

Page 210

1 drugs that I talked about on that drug fact sheet,
2 are purchased by CVS pharmacies from outside
3 vendors, correct?
4    A   I don't know about the stores.
5    Q   Okay.  Well, if they don't get them from
6 the distribution centers, they have to get them
7 from somewhere, right?
8       MR. BUSH:  Objection?
9       THE WITNESS:  Yes.
10 BY MR. BAKER:
11    Q   Okay.  And if they don't get them from
12 the CVS distribution centers, they have to get
13 them from somewhere other than CVS, correct?
14    A   Yes.
15       MR. BUSH:  Objection.
16 BY MR. BAKER:
17    Q   That means an outside vendor, correct?
18    A   Yes.
19    Q   Such as McKesson and Cardinal, correct?
20    A   Yes.
21    Q   And you know who McKesson and Cardinal
22 are, right?
23    A   I do.
24    Q   Okay.  McKesson and Cardinal were also

Page 211

1 supplementing the Class IIIs, the hydrocodone
2 combination products that were carried by the CVS
3 pharmacies during the time that you had been
4 employed there, correct?
5       MR. BUSH:  Objection.
6       THE WITNESS:  I don't know what deals
7 the stores had or what contracts they had with the
8 vendors.  I know those vendors supplied.
9 BY MR. BAKER:
10    Q   Okay.  "Those vendors," meaning outside
11 vendors, helped supply CVS pharmacies with the
12 hydrocodone combination products that they sold at
13 those CVS pharmacies, correct?  You know that,
14 right?
15    A   Yes.
16    Q   And none of the monitoring that you did
17 through the suspicious order monitoring system
18 monitored the quantity of those outside vendors'
19 sales to those pharmacies, correct?
20       MR. BUSH:  Objection.
21       THE WITNESS:  That wasn't on the SOM.
22 BY MR. BAKER:
23    Q   Okay.  So is the answer "correct"?
24    A   Yes.

Page 212

1    Q   Okay.  In terms of suspicious order
2 monitoring, however much was sold by outside
3 vendors to those pharmacies, that's something that
4 CVS did not monitor as far as you know; is that
5 correct?
6       MR. BUSH:  Objection.
7       THE WITNESS:  I don't know that because
8 that information is on the field's programs.
9 BY MR. BAKER:
10    Q   Yeah, but you did not monitor that in
11 the suspicious order monitoring system, correct?
12       MR. BUSH:  Objection.
13       THE WITNESS:  I did not monitor it.
14 BY MR. BAKER:
15    Q   Okay.  And you're unaware of anybody
16 else monitoring it within the suspicious order
17 monitoring system, correct?
18       MR. BUSH:  Objection.
19       THE WITNESS:  I wouldn't know of anybody
20 else in the field monitoring.
21 BY MR. BAKER:
22    Q   All right.  Insofar as the IRR, this was
23 a daily report, correct?
24    A   Yes.

Page 213

1    Q   All right.  And what time would you get
2 that report in the morning?
3    A   I would start about 5:00 a.m.
4    Q   And what time would you finish your
5 review of that report?
6    A   It all depended on the report itself.  I
7 usually was able to get done between -- I don't
8 recall.  I'm -- I'm going to say roughly maybe
9 7:30, 8:00 a.m.
10    Q   Okay.  And what time did you start, did
11 you say?
12    A   About five -- 5:00, 5:30 a.m.
13    Q   Let's say you started at 5:00 a.m., and
14 you finished at 7:30 a.m., the review of the IRR
15 report, correct?
16    A   Yes.
17    Q   Okay.  The review of the IRR report
18 means that you're reading what's on the IRR
19 report.  That's the review, correct?
20    A   Yes.
21    Q   Okay.  And the review is just simply you
22 take a document, you put it down on the desk in
23 front of you, you read it, page 1, page 2, page 3,
24 et cetera, until two and a half hours later, in

Page 214

1　that example you're done, correct?
2　　A　No, not -- it's not like that at all.
3　　Q　Okay.  Reviewing it with what, your
4　eyes?
5　　A　Yes.
6　　Q　Okay.  Reviewing it with whatever else?
7　What else are you reviewing it with other than
8　your eyes?
9　　A　Not going through page 1 and one page at
10　a time to review it the way -- the way you
11　described it.
12　　Q　Do you not review every page?
13　　A　I do.
14　　Q　Okay.  So what else are you using to
15　review this document other than your eyeballs?
16　　A　I didn't know you were referencing my
17　eyeballs.  I thought you asked me if I reviewed
18　this page, then this page, then this page.
19　　Q　What did you -- what tool did you use to
20　review that document for two and a half hours?
21　　A　I -- I reviewed the document as the
22　document.
23　　Q　Okay.  So you used your eyes and your
24　hands, right?

Page 215

1　　A　Sure.
2　　Q　Okay.  So using those two tools, it took
3　you two and a half hours to review the IRR on some
4　days, right?
5　　A　Correct.
6　　Q　And on those days, how many items were
7　on the IRR?
8　　　　MR. BUSH:  Objection.
9　BY MR. BAKER:
10　　Q　If it took you two and a half hours to
11　review an IRR, I'd like to know how many -- how
12　many items are on the IRR that takes two and a
13　half hours to review?
14　　A　Every day was different.  I gave you a
15　rough estimate.
16　　Q　I'm asking on the two-and-a-half-hour
17　day, how many would be on there approximately?
18　　A　Two-and-a-half-hour day would probably
19　look a little bit like the one you gave me
20　earlier.
21　　Q　All right.  Which would be the one that
22　had about how many items on it?
23　　A　I believe he said 350.
24　　Q　350?

Page 216

1　　A　Yes.
2　　Q　Was the IRR sometimes thicker than that?
3　　A　It -- it depends on the time of year the
4　reason why it was going up.  This IRR looks to be
5　cough and cold season.  If we had -- you saw the
6　Tussionex up there earlier.  If it was a heavy
7　cough and cold time period, the IRR would be
8　thicker.
9　　Q　Okay.  In terms of non-cough and cold
10　time frames, there are -- there are IRRs that you
11　reviewed that had 3- to 400 items on them that
12　were outside of the cough and cold season,
13　correct?
14　　A　I don't recall that.
15　　Q　Okay.  How many IRRs did you review per
16　week?
17　　A　Five.
18　　Q　Okay.  What was the average number of
19　hydrocodone and hydrocodone combination products
20　on the IRR per day at the beginning of the month?
21　　A　I -- so we're going back like ten years.
22　I -- I don't remember.
23　　Q　How many hours did you prepare for this
24　deposition?

Page 217

1　　A　I had a couple of conference calls
2　and --
3　　Q　Are you going to tell me you didn't
4　expect that question to be asked?
5　　　　MR. BUSH:  Objection.
6　BY MR. BAKER:
7　　Q　Did you not expect that question to be
8　asked, how many -- how many hydrocodone
9　combination products appeared on the IRR daily?
10　Seriously you did not anticipate that question?
11　　　　MR. BUSH:  Objection.
12　　　　THE WITNESS:  If that question was
13　asked, I gave him the same answer I just gave you.
14　BY MR. BAKER:
15　　Q　Okay.  Which is "I don't know," "I don't
16　recall"?
17　　A　I don't recall.
18　　Q　Okay.  How about the middle of the
19　month, how many hydrocodone combination product
20　orders appeared in the middle of the month on the
21　IRR back in 2009, 2010?
22　　A　I don't recall.
23　　Q　How many hydrocodone combination
24　products appeared on the IRR sheet during the

Page 218

1 third week of the month that you were reviewing?

2    A   I don't know.

3    Q   How many on the fourth week of the

4 month?

5    A   I don't recall.

6    Q   Did more appear on the fourth week of

7 the month than on the first week of the month?

8    A   I believe the IRR was thicker by the end

9 of the month.

10    Q   Okay.  How many did you refer out to

11 these VIPER field analysts to do their supposed

12 investigations per month?

13    A   I --

14       MR. BUSH:  Objection.

15       THE WITNESS:  I don't know per month,

16 but there was a lot of false positives, which led

17 me to have meetings with them to get a better

18 understanding of what they were finding.

19 BY MR. BAKER:

20    Q   Okay.  Let's talk about that.

21       I thought you said that if

22 hydrocodone -- which means a hydrocodone

23 combination product in this context, correct?

24    A   Yes.

Page 219

1    Q   And that if it appeared on the IRR, it

2 was reviewed as suspicious, understanding that you

3 just tried to correct that testimony to mean that

4 it appeared as potentially suspicious, correct?

5       MR. BUSH:  Objection.

6       THE WITNESS:  Anything that came on the

7 IRR was an interest, an item of interest.  It

8 would be sent out to the field --

9 BY MR. BAKER:

10    Q   I'm sorry.  I'm talking about

11 hydrocodone combination products.  I'm not talking

12 about anything on the IRR, okay?  My focus today

13 is HCPs, hydrocodone combination products.

14    A   Okay.

15    Q   So when I ask you this question, I want

16 you to -- to understand that's my focus.  Fair

17 enough?

18    A   Fair.

19    Q   Okay.  Any hydrocodone combination

20 product that appeared on that IRR is something

21 that you deemed worthy of referring out for

22 further investigation because it was potentially

23 suspicious just because it appeared on the IRR,

24 correct?

Page 220

1    A   Hydrocodone was an item of interest, so

2 I did refer that out.

3    Q   Okay.  Every single one of them on the

4 IRR you referred out for further investigation,

5 correct?

6    A   Yes.

7    Q   Okay.  Where is the paperwork and what

8 do we call the paperwork that proves you did

9 exactly that, that you referred every single one

10 of the hydrocodone combination product orders that

11 appeared on the IRR out for further investigation?

12 What's the name of the document?  Where is it so I

13 can go get it?

14       MR. BUSH:  Objection.  Counsel, you know

15 that the production of documents in this case has

16 covered all of the documents that are available,

17 and they may not be available.  So...

18       MR. BAKER:  I'm going to ask counsel to

19 just object to form and to not give speaking

20 objections.

21 BY MR. BAKER:

22    Q   Where is the documents?

23    A   The documents are gone.

24    Q   The documents are gone.  Okay.  Who

Page 221

1 destroyed those documents?

2    A   I'm guessing when they hit their

3 three-year expiration date.

4    Q   Who destroyed those documents, CVS?

5       MR. BUSH:  Objection.  Let him finish

6 his answer, please, Bill.

7       THE WITNESS:  Don't know.

8 BY MR. BAKER:

9    Q   Okay.  CVS played a role in destroying

10 those documents, correct?

11       MR. BUSH:  Objection.

12       THE WITNESS:  When they hit their

13 three-year expiration date.

14 BY MR. BAKER:

15    Q   Okay.  So if we were to ask you for --

16 for paper proof of any document that proves that

17 you referred an order off the IRR to a VIPER field

18 analyst, your answer is that there is no such

19 paper because it's been destroyed; is that correct

20 or not?

21    A   I could not find any.  Believe me, I

22 tried.

23    Q   Okay.  So you actually went back and

24 tried to find documentation to support this

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  testimony that you're giving today to the effect
2  that -- that you did refer all of these potential
3  suspicious orders of hydrocodone combination
4  product that appeared on the IRR out to -- for
5  further investigation through a field VIPER
6  analyst; is that correct?
7       MR. BUSH: Objection.
8  BY MR. BAKER:
9    Q  Yes or no?
10      MR. BUSH: Objection.
11 BY MR. BAKER:
12   Q  You actually went back and tried to do
13 that, didn't you?
14      MR. BUSH: Objection. It's not what his
15 testimony was.
16      THE WITNESS: I tried to find documents
17 that were still in the DC.
18 BY MR. BAKER:
19   Q  Okay. And you couldn't find one single
20 document to that effect, could you?
21      MR. BUSH: Objection.
22      THE WITNESS: No.
23      MR. BAKER: Okay.
24 BY MR. BAKER:

Page 223

1    Q  So we're just having to deal with one
2  person, meaning you, and your sworn-under-oath
3  testimony to believe that as of this minute;
4  because there's no other document that supports it
5  that you can bring to the table or that we can ask
6  you to get because it doesn't exist, correct?
7       MR. BUSH: Objection.
8       THE WITNESS: I am not lying.
9  BY MR. BAKER:
10   Q  Correct? Is that correct?
11   A  Yes, you should believe me, absolutely.
12   Q  Okay. What I'm saying is that's the
13 only thing we have to go on is the words out of
14 your mouth. There's no document that exists to
15 support it, because you've looked for it and you
16 cannot find it, correct?
17   A  None that I'm aware of, correct.
18   Q  Okay. Insofar as these people that
19 you're -- what do you call them, VIPER analysts,
20 VIPER field people, VIPER investigators? What's
21 the name of it?
22   A  The VIPER analysts --
23   Q  Yes.
24   A  -- and the regional loss prevention

Page 224

1  manager.
2    Q  Okay. What's the name of this
3  investigator? Is it VIPER analyst, regional loss
4  prevention manager? That's what I should use from
5  now on, right?
6    A  They're two people.
7    Q  But you used field -- which one is the
8  field?
9    A  They both report to the field.
10   Q  Okay. When they supposedly, allegedly
11 did this supposed further investigation in the
12 field, were their notes kept of that?
13      MR. BUSH: Objection.
14      THE WITNESS: I wrote down the date, the
15 time I spoke to them, who I froze the order with.
16 I kept it frozen until they called me back to say
17 release it or they were still investigating.
18 BY MR. BAKER:
19   Q  And then you would make a note as to
20 what their investigation was or just that it
21 needed to be released?
22   A  If they gave me the details, if it
23 was -- I mean, for the most part, I -- gosh, I'm
24 trying to remember.

Page 225

1    Q  You just can't remember?
2       MR. BUSH: Let him finish the answer,
3  please, Bill.
4       THE WITNESS: I don't know what they
5  told me --
6  BY MR. BAKER:
7    Q  I know you don't, but I'm just asking
8  you, you never went in the field to investigate
9  this with these people, right?
10   A  No. I held meetings with them to try to
11 get an understanding of how they reviewed their
12 reports.
13   Q  Right. What I'm asking is, did these
14 people, the VIPER person in the field, or whatever
15 you want to call them that you supposedly sent
16 these orders to, did that VIPER person get out a
17 piece of paper and a pencil or a pen and write
18 notes down that were kept in some sort of
19 documentary form?
20      MR. BUSH: Objection.
21      THE WITNESS: I don't know.
22 BY MR. BAKER:
23   Q  Okay. Did this VIPER field
24 investigator, whatever you want to call him, in

Page 226

1 the field, did they have a computer that they
2 typed notes into?
3          MR. BUSH:  Objection.
4 BY MR. BAKER:
5     Q   In terms of what they were doing to
6 investigate in the field?
7          MR. BUSH:  Objection.
8          THE WITNESS:  They have a computer.
9 BY MR. BAKER:
10    Q   Did they write notes in that computer
11 showing the results of their investigation and the
12 extent of their investigation on each and every
13 one of the HCP orders that appeared on the IRR?
14          MR. BUSH:  Objection.
15          THE WITNESS:  I don't know what they
16 did.
17 BY MR. BAKER:
18    Q   Did you go look for that?  When you were
19 trying to come here to have your deposition today,
20 did you look for that type of documentation?
21    A   No.
22    Q   Did you think that type of documentation
23 might support the truth or lack of truth of the
24 testimony that you're giving here today?

Page 227

1          MR. BUSH:  Objection.
2          THE WITNESS:  I didn't think about it.
3 BY MR. BAKER:
4     Q   Okay.  Is that document -- has that
5 documentation -- assuming it even exists, has that
6 been kept anywhere by CVS that you're aware of?
7     A   I don't know where the field keeps their
8 stuff.
9     Q   Okay.  In other words, did -- did the
10 field VIPERs send their notes somewhere to be kept
11 in some sort of manner to where if somebody wanted
12 to go back and look at it and audit it to see what
13 they did or didn't do, somebody could actually go
14 do that?
15    A   I don't know.
16    Q   Okay.  But you're telling me that's not
17 something that you did before you came here today
18 is go back and look for the field VIPER analyst
19 notes, correct?
20    A   No, I didn't.
21    Q   Pull Exhibit 6, please.  606, please.
22          MS. HACKMAN:  Give me the reference,
23 please.
24          MR. BAKER:  Yes, I'm sorry.  606,

Page 228

1 please.
2          (Exhibit No. 606 was premarked for
3          identification.)
4          MR. BAKER:  Let me go off the record for
5 a minute.
6          THE VIDEOGRAPHER:  The time is 1:24 p.m.
7 We're going off the record.
8          (A discussion was held off the record.)
9          THE VIDEOGRAPHER:  The time is 1:24 p.m.
10 We're back on the record.
11 BY MR. BAKER:
12    Q   Do you recognize the document before
13 you?
14    A   I do not.
15    Q   All right.  Go to page 2 of that
16 document.  This is called a DEA Regulatory Update
17 for CVS Logistics.
18          This says that -- look at that second
19 bullet point:  "Failure to comply with DEA
20 regulations not only creates exposure for
21 logistics but CVS as a corporation."  Correct?
22    A   That's what it says.
23    Q   You understand that in the context of
24 your job as a suspicious order monitor, that if

Page 229

1 there's -- if somebody is able to expose the fact
2 that you failure -- failed to comply with DEA
3 regulations, it not only creates exposure for
4 logistics but for CVS as a corporation, correct?
5 You know that.
6          MR. BUSH:  Objection.
7          THE WITNESS:  So -- so -- what are you
8 asking me?
9 BY MR. BAKER:
10    Q   You understand that if somebody is able
11 to show with evidence that you failed to comply
12 with DEA regulations concerning suspicious order
13 monitoring, that that not only creates exposure
14 for logistics, the logistics department at CVS,
15 but it creates exposure for CVS as a corporation.
16 You know that, don't you?
17          MR. BUSH:  Objection.
18          THE WITNESS:  I -- I don't know this
19 document.  I don't know where it came from, who
20 wrote it, the context they wrote it in.  I don't
21 want to comment on somebody's bullets here that
22 I'm not aware of.
23          MR. BAKER:  Go to Exhibit 607, please.
24          (Exhibit No. 607 was premarked for

Page 230

1    identification.)
2    BY MR. BAKER:
3        Q   This is called "Know Your Customer."
4            MR. BUSH:  Do you want him to have the
5    one with the highlighting on it?
6            MR. BAKER:  Yeah, he can have that.
7            MR. BUSH:  Okay.
8    BY MR. BAKER:
9        Q   Okay.  First of all, before you look at
10   that doc, could you look at me?
11       A   Mm-hmm.
12       Q   Tell me what your definition of "know
13   your customer" is, before you look at that
14   document.
15       A   "Know your customer," it's understanding
16   their needs, their medical needs, their
17   prescriptions, and I guess, you know, if you're a
18   pharmacist, you're ensuring that they're not
19   mixing prescriptions that could be unhealthy, if
20   they have different doctors.  So I'm giving you
21   just off the top of my head a rough.
22       Q   Okay.  In the context of suspicious
23   order monitoring, what does "know your customer"
24   mean to you as a suspicious order monitor?

Page 231

1        A   "Know my customer" would mean to --
2        Q   Mean to what?
3        A   When reviewing, I guess, the IRR,
4    looking at the different items that are flagging
5    and get an understanding why those items are
6    flagging.
7        Q   Okay.  Look at the definition before
8    you.  And this is the DEA definition.
9            It says:  "First, you must know and
10   understand DEA's 'Know Your Customer' policy
11   because this is the foundation to designing the
12   SOM program."
13           Do you see that?
14       A   Yes.
15       Q   Did you know that the concept of "Know
16   Your Customer," that that policy is the foundation
17   to designing the SOM program?  Did you know that
18   before reading this document today?
19           MR. BUSH:  Objection.
20           THE WITNESS:  I -- I don't recall if
21   someone actually brought that to my attention.
22   I -- I don't know.
23   BY MR. BAKER:
24       Q   Okay.  So the answer is, no, you don't

Page 232

1    know?
2        A   I don't recall.
3        Q   Okay.  So if you don't recall, then you
4    don't know, because you can't know something that
5    you don't recall, right?
6            MR. BUSH:  Objection.
7    BY MR. BAKER:
8        Q   Every time you say, "I don't recall,"
9    that means you don't know.  Do you get that?
10           MR. BUSH:  Objection.  That's
11   argumentative.
12   BY MR. BAKER:
13       Q   Listen -- listen to me.  If you say you
14   don't recall, how in the world are you going to
15   say you know or don't know, because if you don't
16   recall, you can't know, right?
17           MR. BUSH:  Objection.
18           THE WITNESS:  When I was doing this, I
19   don't recall if I knew this then.
20   BY MR. BAKER:
21       Q   Yeah.  But what I'm trying to say is, as
22   we sit here right now, you can't tell me that you
23   ever saw the "Know Your Customer" policy and read
24   it when you were doing suspicious order monitoring

Page 233

1    for CVS, correct?  You can't tell me that you did
2    or didn't, correct?
3        A   I read a lot of policies.  I cannot
4    specifically say I read this piece of paper you
5    have in front of me.
6        Q   Okay.  Let me tell you what the policy
7    states.  Read it.
8            It says:  "It is fundamental for sound
9    operations that handlers take reasonable measures
10   to identify their customers, understand the normal
11   and expected transactions typically conducted by
12   those customers, and, consequently, identify
13   that -- identify those transactions conducted by
14   their customers that are suspicious in nature."
15           Do you see that?
16       A   I do.
17       Q   Okay.  Is that what guided you in your
18   job as a suspicious order monitor or not?
19           MR. BUSH:  Objection.
20   BY MR. BAKER:
21       Q   That concept?
22       A   My -- no.  My job was to ensure that
23   every single drug that I released was not
24   diverted.

Page 234

1   Q   Let's talk for a minute about IRR
2 recaps.
3   A   Okay.
4   Q   When did CVS start using IRR recaps?
5   A   I don't know how long they used them
6 before I started using them. I don't know.
7   Q   When did you first start using IRR
8 recaps?
9   A   Roughly 2008.
10   Q   2008. Okay. So if you had -- the
11 purpose of an IRR recap is to show which orders on
12 the IRR were actually referred out for
13 investigation; is that correct?
14   A   Well, orders -- orders would flag for
15 the items of interest. Again, you know, I use the
16 cough and cold season. There are high orders, we
17 know why they're flagging. But, yes, all orders
18 that flag on the IRR are orders of interest. It
19 doesn't necessarily mean that they're all
20 suspicious.
21   Q   All right. Listen to my question. And
22 please listen to the question, okay? And I'm not
23 asking you about cough and cold season, and you
24 seem to want to throw the cough and cold season

Page 235

1 into every single answer. So let me explain, I am
2 not asking you about cough and cold season. I'm
3 not asking you about syrup. Okay?
4   A   Okay.
5       MR. BUSH: Object to the speeches. Let
6 him answer the question.
7 BY MR. BAKER:
8   Q   All right. So when you -- when you
9 answer a question, there is no reason to throw
10 cough and cold and syrup in there, okay?
11       MR. BUSH: There may very well be --
12       MR. BAKER: No, there's not.
13       MR. BUSH: -- a reason to throw that in
14 there.
15       MR. BAKER: There's not --
16       MR. BUSH: So he's going to answer the
17 question the way he wants to answer it, and he's
18 going to be responsive. Quit giving him lectures
19 and testifying.
20       MR. BAKER: No, I'm not. It's just he
21 keeps trying to throw some rehearsed line in there
22 about cough and cold season.
23 BY MR. BAKER:
24   Q   I'm going to tell you in advance, cough

Page 236

1 and cold is going to have zero to do with my
2 question and zero in the context of how you should
3 answer, okay?
4       MR. BUSH: You should answer the
5 question the way you think you should answer it.
6 BY MR. BAKER:
7   Q   Are you ready?
8       MR. BUSH: Do you understand --
9 BY MR. BAKER:
10   Q   Are you ready?
11       MR. BUSH: I'm instructing my client, my
12 witness how to answer your questions. He's not to
13 listen to your instructions on this. All right.
14 Do you understand that?
15       MR. BAKER: No, I don't understand that.
16       MR. BUSH: Well, then you obviously --
17       MR. BAKER: I'm going to ask a
18 legitimate question.
19       MR. BUSH: -- don't understand English
20 apparently.
21       MR. BAKER: I do understand English. He
22 doesn't.
23 BY MR. BAKER:
24   Q   Okay. Are you --

Page 237

1       MR. BUSH: No, he understands perfectly.
2 BY MR. BAKER:
3   Q   Are you ready? Are you ready?
4   A   Sure.
5   Q   Okay. So here's the question.
6   A   Mm-hmm.
7   Q   When did you start using the IRR recap?
8 I think the answer that you gave was in 2008, am I
9 correct?
10   A   Right around that time period.
11   Q   Okay. And the IRR recap is a monthly
12 recap of orders that were on the IRR report that
13 were referred out for further investigation,
14 correct?
15   A   Yes.
16   Q   Okay.
17   A   For hydrocodone.
18   Q   And that would include items that
19 appeared on the IRR -- the daily IRR that were
20 referred out for further investigation by the
21 VIPER analysts that you're talking about in 2008,
22 2009, 2010, correct?
23   A   VIPER analysts and/or the loss
24 prevention regional manager.

Page 238

1  Q   Okay.  So if we could get ahold of CVS
2  providing us the IRR recaps for those years, that
3  would show us to some extent which orders were on
4  the IRR that you reviewed in 2009 and 2010 that
5  you then referred out for further investigation to
6  field VIPER analysts, correct or incorrect?
7  A   You're asking me if you have an IRR from
8  that time period, it would have my information
9  that I wrote down for items going up for review?
10  Q   What I'm asking is this question -- I'm
11  glad you asked for clarification, so I'm going to
12  repeat the question and get it as clear as I can,
13  okay?
14  A   Okay.
15  Q   All right.  So if we could get ahold
16  from CVS of IRR recaps for the months -- 12 months
17  of 2008, 12 months of 2009, and the 12 months of
18  2010, those recaps should show us which orders and
19  the number of orders that you referred out of the
20  IRR sheet itself for further investigation in the
21  field, correct?
22  A   If there was a recap.  I wrote my
23  information directly on the IRR.
24  Q   Okay.  But the recap is a recap of those

Page 239

1  that were referred out, correct?
2       MR. BUSH:  Objection.
3  BY MR. BAKER:
4  Q   That's what it is.  That's what the
5  recap is, right?
6       MR. BUSH:  Objection.
7       THE WITNESS:  I -- I don't know what --
8  what recap you're referring to.
9  BY MR. BAKER:
10  Q   The IRR monthly recap.
11       MR. BUSH:  Objection.
12       THE WITNESS:  I don't know what you're
13  referring to.
14  BY MR. BAKER:
15  Q   You've never seen an IRR monthly recap?
16  A   I very well may have.  I don't recall it
17  right now.  If you have one --
18  Q   You just told me that you started using
19  it in 2008.  You just testified to that.
20  A   No.  The IRR I was using in 2008.
21  Q   When did you start using the IRR recap
22  tool?
23  A   I don't recall the IRR recap tool.
24  Q   You never used the IRR recap tool?

Page 240

1  A   I don't know anything about an IRR recap
2  tool.
3  Q   Okay.  So you never used the IRR recap.
4  You never have seen the IRR recap, correct?
5       MR. BUSH:  Objection.  That's not his
6  testimony.
7       THE WITNESS:  If you have one, I could
8  tell you if I've seen one.
9  BY MR. BAKER:
10  Q   Okay.  We might look at one a little
11  later.  Okay?
12  A   Perfect.
13  Q   To what point in 2010 were you referring
14  every single hydrocodone item out for further
15  review?
16  A   Hydrocodone was always reviewed.
17  Q   Okay.  I'm talking about when you --
18  when it appeared on the IRR sheet, the daily
19  sheet, if it appeared, say, in September of 2010
20  on the sheet, it would also show that you referred
21  it out for further investigation, correct?
22  A   I -- I would have wrote it on the IRR,
23  yes.
24  Q   Okay.  And if the IRR recap is a tool

Page 241

1  that CVS uses to show those orders of interest,
2  those potential suspicious -- suspicious orders on
3  the IRR that were referred out for further
4  investigation, if that's the tool they used to
5  show that, then it should appear on the IRR recap,
6  all those hydrocodone combination product orders
7  that you referred off the IRR for further
8  investigation in the field, correct?
9       MR. BUSH:  Objection.
10       THE WITNESS:  Again, I don't know what
11  this IRR recap is, what it has on it.  I -- I
12  don't recall this.
13  BY MR. BAKER:
14  Q   Okay.  When you referred them out, did
15  you make some sort of entry in your computer to
16  the effect that they were referred out?
17       MR. BUSH:  Objection.
18       THE WITNESS:  No.  I handwrote my notes
19  on the IRR sheet next to the drug that was
20  referred out with the time, date, and the people I
21  spoke to.
22  BY MR. BAKER:
23  Q   Okay.  So if we have an IRR, say, from
24  September of 2010, it should have your handwritten

Page 242

1  notes on it for those that you referred out,
2  correct?
3      MR. BUSH:  Objection.
4      THE WITNESS:  I don't recall if I was
5  still doing it September 2010, but if I was, it
6  would have my notes.
7  BY MR. BAKER:
8      Q    Okay.  Would there be any reason for you
9  to have not done it in September -- I'm just using
10  that month arbitrarily -- would there have been
11  any reason for you to not write your notes on the
12  IRR, This is being referred out in September 2010,
13  if that was your practice?
14      A    No.  If I referred it out, I wrote who I
15  spoke to --
16      Q    Let's -- go ahead.  You would write it
17  out on the IRR form, correct?
18      A    The date and the time, yes.
19      Q    Okay.  And that would be in your cursive
20  handwritten way, right?
21      A    Yes.
22      Q    Okay.  Would you initial it too to know
23  who -- so we could know who wrote that?
24      A    Usually.

Page 243

1      Q    Okay.  And let's pick another random
2  month, let's say July.  Let's go earlier in the
3  year.  Suppose we had an IRR for July of 2010.
4  Was the same process in place, to the best of your
5  recollection, that if you referred them out, that
6  it would be written on the IRR?
7      MR. BUSH:  Objection.
8      THE WITNESS:  If -- I'm trying to
9  remember back to July 2010.  There was a time
10  period where we had a team put together in
11  Knoxville.  I wasn't doing the I- -- the IRRs at
12  that time.  If we had people in Knoxville doing
13  it, then you won't have anything with my writing
14  on it.
15  BY MR. BAKER:
16      Q    If the evidence shows that the program
17  was referred to Knoxville in March of 2011, if
18  that's what the evidence shows, then logically if
19  I could show you a document that says it was -- it
20  was being referred there in March of 2011, then
21  using your logic, it would have been done in
22  Lumberton up to that point, correct?
23      MR. BUSH:  Objection.
24      THE WITNESS:  If those dates are

Page 244

1  correct, yes.
2  BY MR. BAKER:
3      Q    Okay.  And Lumberton is Lumberton, New
4  Jersey, which was your office, correct?
5      A    Yes.
6      Q    Okay.  Which means that the IRRs would
7  have been reviewed by you up to the point that it
8  was referred out -- the whole program was referred
9  out to Knoxville, correct?
10      A    Yes.
11      Q    Okay.  Give me just a second to look for
12  the Knoxville document.
13      MR. BAKER:  Let's go off record.  We can
14  use some of my time.  I don't want any argument
15  about that.
16      THE VIDEOGRAPHER:  The time is 1:38 p.m.
17  We're going off the record.
18      (Recess.)
19      (Exhibit No. 506 was marked for
20      identification.)
21      THE VIDEOGRAPHER:  The time is 1:40 p.m.
22  We're back on the record.
23  BY MR. BAKER:
24      Q    I'm under the ELMO.

Page 245

1      I'd like you to look at what's been
2  marked as Exhibit 506.  This is an e-mail that's
3  dated March 14, 2011.
4      Do you see that?
5      A    Yes.
6      Q    From John Mortelliti, that's you, right?
7      A    Yes.
8      Q    Let me underline that, John Mortelliti.
9  You wrote this e-mail, according to what this
10  e-mail indicates, correct?
11      A    Yes.
12      Q    Okay.  And you send it to Ellen
13  Demetrius.  Who was she in the context of
14  employment with CVS?
15      A    At the time I believe she was overseeing
16  the different reports for the supply chain.
17      Q    Okay.  And you also send it to Pam
18  Hinkle.  Who was she in the context of CVS at this
19  time, 3/14/11?
20      A    Pam Hinkle oversaw the program in the
21  Knoxville DC.
22      Q    Okay.  So this says:  "The IRR process
23  has been shifted to our Knoxville DC with the LP
24  analyst position."  Correct?

Page 246

1    A    Yes.
2    Q    And that would be shifted to Pam Hinkle,
3  correct?
4    A    Yes.
5    Q    So up until that time, it was in
6  Lumberton in your hands, correct?
7        MR. BUSH:  Objection.
8        THE WITNESS:  I -- I don't recall when
9  it was shifted over there.  I don't know.
10 BY MR. BAKER:
11   Q    Well, according to this document, it was
12 shifted at this point, am I correct?
13       MR. BUSH:  Objection.  Misstates the
14 document.
15       THE WITNESS:  Yeah, it just says that
16 it's no longer in -- in Lumberton.
17 BY MR. BAKER:
18   Q    Okay.  And you don't know exactly when
19 it was shifted to Knoxville, even though this
20 document says:  "The IRR process has been shifted
21 to our Knoxville DC with the LP analyst position,"
22 and it's dated 3/14/11, correct?
23       MR. BUSH:  Objection.
24       THE WITNESS:  Yeah, I don't recall.

Page 247

1  BY MR. BAKER:
2    Q    Okay.  But we know for sure from your
3  testimony that at least throughout 2010, it was in
4  Lumberton, correct?
5    A    Yes, for some parts of 2010.
6    Q    Okay.
7        MR. BAKER:  Let's go off the record for
8  just a second. I'll use my time.  I don't care.
9        THE VIDEOGRAPHER:  The time is 1:42 p.m.
10 We're going off the record.
11       MR. BAKER:  Pull up Exhibit 209, please.
12       (Exhibit No. 209 was premarked for
13       identification.)
14       THE VIDEOGRAPHER:  The time is 1:43 p.m.
15 We're back on the record.
16 BY MR. BAKER:
17   Q    You have in front of you Exhibit 209,
18 correct?  Sir?
19   A    Yes.
20   Q    Okay.  This is an e-mail dated
21 3/30/2011.  The front of it is from Gary Misiaszek
22 to Robert Williamson at Dendrite.  That was the
23 consultant, CCS Dendrite, correct?
24   A    Yes.

Page 248

1    Q    Okay.  And a copy of it going to Ellen
2  Demetrius, Frank Devlin, Pam Hinkle.  And it says:
3  "SOM Reporting."  "Good afternoon, Bob.  I hope
4  things are going well for you.  We have started
5  work on the SOM reporting for Rx controlled drugs
6  and a few questions have come up that we could use
7  your guidance on."
8        And then it goes through a list of all
9  those questions, correct?
10   A    Yes.
11   Q    Okay.  Now, turn to the next page.  Do
12 you see at the top of that page, you see the date,
13 9/4/2009?  Do you see that?
14   A    I do.
15   Q    Okay.  This would have been when you
16 were in charge of reviewing the IRRs, correct?
17   A    In that time period, yes.
18   Q    Lumberton, correct?  In Lumberton, New
19 Jersey, correct?
20   A    I believe so, yes.
21   Q    All right.  By yourself, correct?
22   A    Yes.
23   Q    Okay.  Go to the next page, please.
24   A    Okay.

Page 249

1    Q    Okay.  Do you see where it says
2  "hydrocodone"?  About a third of the way down the
3  page, it has "hydrocodone."  Do you see that?
4    A    Yes.
5    Q    Okay.
6        MR. BAKER:  Go ahead and put a yellow
7  mark through that, please.  Okay.
8        MR. BUSH:  Not you.
9        THE WITNESS:  No.
10 BY MR. BAKER:
11   Q    Can you tell me where on this form any
12 notations are made that you referred this out to
13 anybody for investigation, whether it be a field
14 VIPER analyst or any other name of any other
15 person that you want to say may have investigated
16 this order?
17       MR. BUSH:  Objection.
18 BY MR. BAKER:
19   Q    Where does it show?
20       MR. BUSH:  Objection.
21       THE WITNESS:  Since I wasn't in the
22 original e-mail, I'm going to think that this was
23 meant for Pam Hinkle in Knoxville.  It wasn't even
24 sent to me.

Page 250

BY MR. BAKER:

Q   Okay.  How do you know that they're not reviewing an order that you had reviewed as opposed to an order that's independent of that?

A   I would think I would be on this e-mail.

Q   Okay.  Well, go to the next page, where you see any mention of a hydrocodone combination product anywhere in here.

Go to page 33134 at the bottom.  33134.  Now look at the top of there, it says "hydrocodone."  Do you see that?

A   I do.

Q   Okay.  Do you see any notations on there that this was referred out for further investigation, yes or no?

A   I don't want to speak on behalf of this report if I didn't do it.  I don't see anything on here, but I'm not sure I was doing it during this time period.

Q   All right.  Go to 33137.

Look at the bottom where it says "hydrocodone."

A   Okay.

Q   Do you see any notations of that being

Page 251

referred out for investigation?

A   No.

Q   Go to 33138.  Do you see where it says "hydrocodone" at -- towards the bottom?

A   I do.

Q   Do you see that referred out to anybody for investigation?

A   No.

Q   All right.  Look at the next one right below it, "hydrocodone."  Do you see that being referred out for investigation?

A   No.

Q   Go to 33144.

This again is that same document dated 9/4/2009, correct?

A   Yes.

Q   Okay.  Do you see that hydrocodone order being referred out for investigation?

A   No.

Q   Okay.  Go to the next page, 33146.

This is the same date, 9 -- 9 of 2009, correct?  It's the same IRR.

A   Okay.

Q   And do you see that hydrocodone order

Page 252

being referred out for investigation?

A   No.

Q   All right.  Go to 33147.  Do you see the hydrocodone order up there on the IRR?

A   Yes.

Q   Do you see that being referred out for investigation?

A   Not on this copy, no.

Q   Go to 33151.

Do you see the hydrocodone orders on there being referred out for investigation?

A   No.

Q   Okay.  Go to 33154.

Do you see the hydrocodone order on there being referred out for investigation?

A   No.

MR. BAKER:  Let's go off record for a second.  Use my time.

THE VIDEOGRAPHER:  The time is 1:48 p.m. We're going off the record.

(Pause.)

MR. BAKER:  This will be Exhibit 562.

THE VIDEOGRAPHER:  Back on the record. The time is 1:49 p.m.  We're back on the record.

Page 253

(Exhibit No. 562 was premarked for identification.)

BY MR. BAKER:

Q   Okay.  You have in front of you on the screen there Exhibit 562, which is Bates No. 88412.  Do you see that?

A   I do.

Q   Okay.  This is an item review report, or IRR, dated 7 -- July 7 of 2010, correct?

A   Yes.

Q   Okay.  Go to the next page, please.

MR. BAKER:  All right.  Go to the next page.  Keep going.  Keep going.  Keep going.

BY MR. BAKER:

Q   Do you see any hydrocodone orders on there yet?

A   Are these electronic copies?

Q   I'm asking you what it is.

A   It doesn't look like the green bar that I use.

Q   Okay.  What is this?

A   That looks like an electronic copy.  The green bars are, I guess, about 18 inches long. They have lines in them, different colors that

Page 254

1  actually breaks up the different rows to make them
2  easy to review.
3      Q   Okay.
4      A   We received electronic copy and we also
5  received the hard copies.
6      Q   Okay.
7      A   Hard copies printed off the green bar
8  machine at each facility, and I used the actual
9  green bar.  I didn't use the electronic copies.
10     Q   Okay.  So, in other words, if CVS has
11  this electronic copy, then CVS also has the green
12  bar copy that they could give to you and me,
13  correct?
14         MR. BUSH:  Objection.
15  BY MR. BAKER:
16     Q   Is that right?
17     A   The green bars were the ones that we
18  kept in storage for three years.
19     Q   Okay.  So -- but if CVS gave me in the
20  context or gave the plaintiffs' attorneys in this
21  case a copy of the electronic version, then there
22  should also be a copy of the green bar version,
23  correct?
24         MR. BUSH:  Objection.

Page 255

1  BY MR. BAKER:
2      Q   Correct?
3      A   Yes.
4          MR. BUSH:  Objection.
5  BY MR. BAKER:
6      Q   Okay.  And if we don't have the green
7  bar version, then that means that CVS destroyed
8  it, correct?
9          MR. BUSH:  Objection.
10         THE WITNESS:  After the three years.
11  Yes.
12  BY MR. BAKER:
13     Q   That CVS would have destroyed it,
14  correct?
15     A   Yes.
16     Q   Okay.  So you can't tell off of here how
17  many hydrocodone combination product orders were
18  made, can you?
19     A   I could --
20     Q   Off of 562.
21         MR. BUSH:  Look at the electronic --
22  BY MR. BAKER:
23     Q   If we go through the electronic copy.
24  Keep paging through it.

Page 256

1      A   What would you like to know on here?
2      Q   Is there any way you could tell whether
3  or not any of those products are hydrocodone
4  combination products?  Is there?
5      A   That was just the scoring.  I didn't see
6  any.
7      Q   Okay.  So we don't know from looking at
8  this how many of these were hydrocodone
9  combination products, correct?
10     A   Not -- none populated.  They only show
11  on the scoring page.
12     Q   Okay.  So, in other words, we'd have to
13  have the green bar, that -- that other type of
14  printout that we were looking at, correct?
15     A   The green bar would be the one that I
16  had my notes on.
17     Q   Okay.  And again, if the green bar
18  doesn't exist, it's only because CVS got rid of
19  it, right?
20     A   After three years, yes.
21         MR. BAKER:  The next line of questioning
22  is probably going to take me about an hour.  So I
23  think this would be a good point to break.
24         THE VIDEOGRAPHER:  The time is 1:53 p.m.

Page 257

1  We're going off the record.
2      (Recess.)
3         THE VIDEOGRAPHER:  The time is 2:05
4  p.m., and we're back on the record.
5         MR. BAKER:  For record purposes, five --
6  Exhibit 562 is going to be the September IRR that
7  we were just reviewing, and the July IRR that we
8  were reviewing is going to be 562-A.  I believe
9  they were mistakenly both marked as 562, but one
10  will be 562, one will be 562-A.
11     (Exhibit No. 562-A was marked for
12     identification.)
13         MR. BUSH:  When we were going through
14  those, I didn't notice, but we went through
15  both -- both those dates?
16         MR. BAKER:  We did go through both those
17  dates.
18         MR. BUSH:  Okay.
19         MR. BAKER:  Okay?
20         MR. BUSH:  Yeah.
21  BY MR. BAKER:
22     Q   All right.  So is it true that before
23  CCS, which is C-E-G-E-D-I-M -- do you say Cegedim?
24  Is that --

Page 258

1  A  Yeah.

2  Q  Okay.  I'm going to call them CCS.

3  A  That's fine.

4  Q  The Buzzeo company, you know them,
5  right?

6  A  Yes.

7  Q  Okay.  So before the Cegedim Buzzeo
8  company was hired to write the SOM software, there
9  was no software program that was based upon an
10  algorithm to flag orders to appear on an IRR at
11  CVS in the SOM department, correct?

12  A  I -- I don't know either way.  I was
13  just given a job to do.  When that came up, the
14  process was there.

15  Q  Okay.  In any event, you're unaware of
16  any that preceded that particular program,
17  correct?

18  A  Yeah, I don't know.

19  Q  Okay.  Let me show you Exhibit 10 --
20  610.

21      (Exhibit No. 610 was premarked for
22      identification.)

23  BY MR. BAKER:

24  Q  All right.  Exhibit 610, I'm sorry.

Page 259

1      All right.  This is the retunement
2  document.  You see it on the next page beyond the
3  e-mail, do you see that?

4      MR. BUSH:  Hold on a second, Bill.  We
5  got a little numbering problem here.  So this --

6      MR. BAKER:  This is No. 610.

7      MR. BUSH:  And you have 10 on this.

8      MR. BAKER:  Right, it's 610.

9      MR. BUSH:  You don't mind if I correct
10  it then?

11      MR. BAKER:  Not at all.

12      MR. BUSH:  All right.  There we go.

13  BY MR. BAKER:

14  Q  All right.  So this is Exhibit No. 610,
15  and you see the second page of that is called the
16  Retunement, correct?  At the top.

17  A  Second page at the top.

18  Q  Right -- right here, sir.  Right there.

19  A  Yes.

20  Q  Retunement.  Okay.

21      All right.  So go back to the first
22  page.

23  A  Okay.

24  Q  All right.  This is an e-mail from John

Page 260

1  Mortelliti, that's you, to Frank Devlin, correct?

2  A  Yes.

3  Q  It's called "The CVS Retunement," and
4  you just put, "Thankfully," correct?

5  A  Yes.

6  Q  All right.  And below that, earlier in
7  the day it says:  "John, Gary and Ellen, attached
8  is the CVS Retunement document."  Correct?

9  A  Yes.

10  Q  "It contains a revised algorithm and
11  additional required information for the suspicious
12  order monitoring system."  Correct?

13  A  Yes.

14  Q  Okay.  So the retunement document,
15  according to this e-mail, was delivered to CVS
16  February 9, 2011, by Robert Williamson of CCS to
17  John Mortelliti, which is you, Gary Misiaszek, and
18  Ellen Demetrius, all employees of CVS, correct?

19  A  Yes.

20  Q  All right.  Now, go to the -- go to the
21  first page of the retunement document itself.  Do
22  you see all those items highlighted up on the
23  screen there?

24  A  Okay.

Page 261

1  Q  Okay.  It says:  "The primary
2  requirement" -- talking about of a distributor of
3  hydrocodone combination products and other
4  narcotics that are classified as controlled
5  substances is under 21 CFR 1301.74(b).  Correct?

6  A  Yes.

7  Q  Okay.  And you've seen that on the board
8  here earlier in other exhibits, correct?

9      Let's just read it.  It says:  "The
10  registrant shall design and operate a system to
11  disclose to the registrant suspicious orders of
12  controlled substances.  The registrant shall
13  inform the field division office of the
14  administration in his area of suspicious orders
15  when discovered by the registrant.  Suspicious
16  orders include orders of unusual size, orders
17  deviating substantially from a normal pattern, and
18  orders of unusual frequency."  Correct?

19  A  That's what it says, yes.

20  Q  Okay.  And that's the -- that's the Code
21  of Federal Regulation that guided you in your job
22  as a suspicious order monitoring employee of CVS,
23  correct?

24      MR. BUSH:  Objection.

Page 262

1 THE WITNESS: I -- I didn't focus on any
2 particular code. I know the process was -- was
3 designed to -- to handle a desired function.
4 That's what I did.
5 Can I sit here and say I read this and
6 said our program is -- I didn't build the program.
7 People above me took this information to build the
8 program. I just handled the process.
9 BY MR. BAKER: Q. Okay. So, in other words, are you
10 telling me you either do -- you either did or
11 didn't review 21 CFR 1301.74, but you don't
12 remember one way or the other; is that correct?
13 A. Oh, I'm not saying I didn't read it.
14 I'm just saying that my -- my job wasn't to ensure
15 we had the process for any particular reg. That's
16 with Frank or -- and whoever else he worked with
17 in corporate with this company. My job was to
18 understand and review IRR.
19 Q. Okay. Were you ever involved with
20 anything dealing with this company insofar as
21 the -- the computer software program and its
22 development and implementation through CVS's SOM
23 program?
24

Page 263

1 A. Not originally, no.
2 Q. Okay. How about non-originally?
3 A. Later in time?
4 Q. Yes, sir.
5 A. Later in time, once we started getting
6 the false positives, we did do some investigation
7 in that and work with this company.
8 Q. Okay.
9 A. At least I -- I think it was this
10 company.
11 Q. Okay. So let's go through the history
12 here of the retunement. It says: "In December
13 2008, CCS delivered an initial SOM model to CVS,
14 which CVS integrated into their order management
15 process." Correct?
16 A. I don't know what the context of this
17 is. Is there a document that came with this?
18 MR. BUSH: Well, I think he's asking
19 whether it says that.
20 THE WITNESS: Oh, okay.
21 BY MR. BAKER:
22 Q. Is that what it says?
23 A. Oh, that's what I'm reading, yes.
24 Q. Okay. Look at the one in front of you,

Page 264

1 I'm showing you the retunement document. This is
2 giving a historical analysis of what was delivered
3 and when it was delivered.
4 A. Oh, okay.
5 Q. So do you have any reason to disagree
6 with the -- statement that: "In December of
7 2008, CCS delivered an initial SOM model to CVS,
8 which CVS integrated into their order management
9 process"?
10 Do you have any reason to disagree with
11 that?
12 A. I feel like we were doing this prior to
13 2000 -- December 2008. I'm not sure if these
14 dates are correct.
15 Q. Okay. Well, if the date is on the
16 document of the company that built the system, do
17 you have any reason to disagree with that?
18 MR. BUSH: Well, he just said he did.
19 Asked and answered.
20 THE WITNESS: I -- I don't feel like
21 these dates are correct.
22 BY MR. BAKER:
23 Q. Okay. And then it says: "In July 2009,
24 CVS staff advised that the current SOM model was

Page 265

1 pending a large number of orders that were not
2 suspicious on their face and cleared by CVS
3 staff." Correct?
4 A. That's what it says, yes.
5 Q. Okay. "Not suspicious on their face."
6 What -- what does "not suspicious on their face"
7 mean?
8 A. I have no idea. You would probably have
9 to talk to the author of this.
10 Q. Okay. "And cleared by CVS staff." What
11 does that mean, to be cleared by CVS staff?
12 A. I'm not -- if you reference -- if
13 they're referencing what I would clear, it would
14 be my work that I was doing with the analysts and
15 the regional manager for the stores, but I don't
16 know -- I don't know what they're referring to was
17 cleared by CVS staff.
18 Q. Okay. And then it says here: "This can
19 occur infrequently" -- what does the word
20 "infrequently" mean to you?
21 A. Not often.
22 Q. Okay. "-- with the model, especially
23 during the initial implementation period when the
24 model uses data from a fixed, unchanging period of

Page 266

1  time prior to the model's initial deployment."
2  Correct, that's what it says.
3     A   That's what it says.
4     Q   All right.  "In light of CVS's perceived
5  number of false positives" -- now let me ask you
6  about the word "perceived."  What does the word
7  "perceived" mean to you?
8     A   In this context --
9     Q   Just the word "perceived," what does
10 that mean?
11    A   The way it's seen.
12    Q   The way it's seen.  Okay.  It doesn't
13 mean something is actually true; it just means
14 that it seems to you or to whoever is perceiving
15 it that it's true to them, correct?
16       MR. BUSH:  Objection.
17 BY MR. BAKER:
18    Q   Right?
19       MR. BUSH:  Objection.
20       THE WITNESS:  I can't comment for the
21 people who wrote this.
22 BY MR. BAKER:
23    Q   Okay.  And then it says:  "In light of
24 CVS's perceived numbers of false positives, CCS

Page 267

1  statisticians made a revision to the CVS model
2  through adjustment to the algorithm coefficients."
3       Let me stop you right there.  Do you
4  know what an algorithm coefficient is?
5     A   No.
6     Q   Do you know what an algorithm is?
7     A   I vaguely know what an algorithm is.
8     Q   What is vaguely the definition of an
9  "algorithm"?
10    A   It's -- it's the formula that they use
11 to come up with the sum they're -- they're looking
12 for.  I --
13    Q   Okay.  It says:  "The revised model was
14 delivered to CVS on August 27, 2009."  Correct?
15    A   That's what it says.
16    Q   Okay.  Now look at me, if you would.
17 Would that be consistent with when the revised
18 coefficient model was delivered?
19    A   The revised coefficient model -- what?
20    Q   It says that the revised -- no, now go
21 back.  It says here on the prior page, it says:
22 "CCS statisticians made a revision to the CVS
23 model through an adjustment to the algorithm
24 coefficients."

Page 268

1       Do you see that?
2     A   Yep.
3     Q   And it says:  "The revised model was
4  delivered to CVS on August 27, 2009."  Correct?
5     A   That's what it says.
6     Q   All right.  Would that be consistent
7  with when the revised coefficients were delivered
8  into the model such that it was delivered by CCS
9  to CVS August 27, 2009, according to this
10 document?
11    A   I don't know.
12    Q   Okay.  Let's go to Exhibit 11.
13       (Exhibit No. 611 was marked for
14       identification.)
15       MR. BAKER:  Oh, 611.  Geez.
16       MR. BUSH:  Has that got the right number
17 on it?
18       THE WITNESS:  Yep.
19       MR. BAKER:  Okay.  Pull that one up, if
20 you would.
21 BY MR. BAKER:
22    Q   This is an e-mail that's dated at the
23 bottom, August 27, 2009.  Do you see that, from
24 Frank Devlin to Ellen Demetrius?

Page 269

1       It says:  "Here is the revised formula
2  change for the SOM controlled drug report."
3     A   Yes.
4     Q   Now, you remember that prior document I
5  just showed you said that it was delivered in
6  August of 2009, the revised coefficients.  Do you
7  remember that?
8     A   Yes.
9     Q   Okay.  Turn to the next page.
10    A   Okay.
11    Q   And this says "CVS SOM Revised
12 Coefficients," correct?
13    A   Yes.
14    Q   Okay.  Does this appear to be what --
15 what they're talking about, that the CVS SOM
16 revised coefficients were delivered in August --
17 on August 27, 2009, and that these are -- this is
18 a summary of the CVS SOM revised coefficients?  Is
19 that what it appears to be?
20    A   I --
21    Q   I can go through it if you're not sure.
22 If you're not sure, just tell me.
23    A   Yeah, I -- I just hate to comment on it
24 because I -- I just don't recall this.

Page 270

1    Q    That's fine.
2        Okay.  You see about midway down the
3    page, it says "In July of 2009"?  You see that?
4    A    Yes.
5    Q    "In July 2009, CVS staff advised CCS
6    that the current SOM model was pending a large
7    number of orders that were being cleared by CVS
8    staff and determined not to be suspicious on their
9    face."  Do you remember that?
10   A    I remember reading that.
11   Q    Okay.  Go down to the next paragraph.
12   It says: "CVS requested that the model's
13   sensitivity be adjusted."  Do you see that?
14   A    I do.
15   Q    All right.  Look at me, if you would.
16   Do you know what that means, "sensitivity" in the
17   context of an SOM software model?
18   A    (Reading to himself.)
19       In the context it's written here, I'm
20   going to assume that it's about the number of
21   false flags.
22   Q    When you make something less sensitive
23   in this context of an SOM model, you're making it
24   so that it's not going to flag as many orders as

Page 271

1    it was previously flagging, correct?
2        MR. BUSH:  Objection.
3        THE WITNESS:  The -- the way I'm reading
4    it, it's trying to eliminate the false positives.
5    BY MR. BAKER:
6    Q    The false positives that were perceived
7    by CVS, correct?
8        MR. BUSH:  Objection.
9        THE WITNESS:  The false positives that I
10   reviewed had root cause and background when I
11   reviewed it with the field.
12   BY MR. BAKER:
13   Q    I understand that was the perception,
14   but that's what the document says, that it was
15   perceived by CVS, correct?  Isn't that what the
16   document said?  I'm not asking you anything --
17   isn't that what the document said, that it was
18   perceived?
19   A    That's what someone wrote here.
20   Q    Okay.  All right.  So then it goes -- go
21   to the next page.  It says: "Model summary with
22   revised coefficients."  It says: "Given the
23   variables previously defined in the 12/24/2008 SOM
24   document" -- now remember the 12/24/2008 document,

Page 272

1    remember that in the prior document I showed you
2    that it was delivered in December of 2008?  Do you
3    remember that?
4    A    I -- I remember that document, yes.
5    Q    Okay.  Then it says: "The SOM model for
6    CVS remains the following formula," and it gives
7    that formula:  S equals E to the A power over
8    1 plus E to the A power.
9        Do you see that?
10   A    I do.
11   Q    Okay.  Do you know what S equals E to
12   the A power over 1 plus E to the A power even
13   means?
14   A    I do not.
15   Q    Okay.  Then at the bottom, it says:  The
16   values B0, B1, B2, B6 are the model coefficients."
17   Do you see that?
18   A    I do.
19   Q    Okay.  And then it gives a table with
20   the model coefficients.  For B0, it's minus
21   3.4214.  Do you see that?
22       B1, it gives a .7294.  Do you see that?
23   A    I do.
24   Q    Okay.  Now go back to the prior

Page 273

1    document.  The prior Exhibit No. 6 -- No. 610.
2        All right.  Go to the last page of that
3    document.  Do you see the coefficients table
4    there?
5    A    (The witness nodded.)
6    Q    Those are different coefficients than
7    what appear on the other table, correct?
8    A    Yes.
9    Q    Okay.
10       MR. BAKER:  Is there any way you can put
11   the two side by side, the coefficients tables?
12   BY MR. BAKER:
13   Q    What's on the left is the coefficient
14   tables that are in the retunement document,
15   correct?  Right?
16   A    Yes.
17       MR. BUSH:  On the left of the
18   retunement; is that right?
19       MR. BAKER:  The left is the retunement.
20   BY MR. BAKER:
21   Q    Retunement model coefficients minus
22   5.9745.  Do you see that?  Right?
23   A    Yes.
24   Q    Okay.  Now look at me.  The history,

Page 274

1 December of 2008, the initial model delivered,
2 right, according to the document?
3    A    According to what's in front of me.
4    Q    Okay.  And then over there to the right
5 on the screen, those are the revised coefficients,
6 correct?
7    A    Yes.
8    Q    Okay.  Where it starts at B0 minus
9 3.4214, and then it gives a whole list of numbers
10 right below it, right?
11    A    Yes.
12    Q    And those are the ones that were
13 delivered in 2009 with the revised coefficients,
14 correct?
15        MR. BUSH:  Objection.
16 BY MR. BAKER:
17    Q    That's what it says on the document,
18 correct?
19    A    That's -- that's what the document says,
20 but again, I -- I didn't create this document.
21 There's verbiage in here, "face value."  Like
22 there's things in here that to me just doesn't
23 make sense.
24    Q    Okay.  Well, let me just -- I'm just

Page 275

1 focusing on the coefficients, okay?
2    A    Okay.
3    Q    The coefficients on the right of that
4 screen at the bottom, it says B0 equals minus
5 3.4214, those are the ones that were delivered in
6 2009 that was an amendment to the initial
7 coefficients that were delivered in December of
8 2008, correct?
9        MR. BUSH:  Objection.
10 BY MR. BAKER:
11    Q    That's what it says, "revised
12 coefficients."  Right?
13    A    That's what I'm reading.
14    Q    Okay.  The ones on the left-hand side of
15 the screen are the ones that appear in the retuned
16 document that was delivered in 2011, correct?
17 February 2011, right?
18        Attached to the CVS retunement document,
19 the e-mail February 9, remember?  Look, February 9
20 e-mail, retunement.  Do you see it?
21    A    I do.
22    Q    Okay.  The retunement document is
23 attached to it, correct?
24    A    Yes.

Page 276

1    Q    Okay.  And if you go to the last page of
2 that retunement document, it tells you the
3 coefficients in that SOM algorithm program, does
4 it not?
5    A    It does.
6    Q    Okay.  And those coefficients are
7 different than the ones that were in the revised
8 coefficients, correct?
9    A    They are.
10    Q    Okay.  So you're -- have you read this
11 document before today at any time that you recall?
12        MR. BUSH:  Which document?  You had two
13 up there.
14 BY MR. BAKER:
15    Q    Okay.  Did you read the retunement
16 document or the revised coefficients document at
17 any time before today?
18    A    If I got the e-mail, I -- I would have
19 read it.  Would I have understood these formulas
20 and coefficients?  No.
21    Q    Okay.  Fair enough.
22        So let me make sure I understand.
23        You didn't understand what the
24 coefficients were and how they played into the

Page 277

1 algorithm formula, correct?
2    A    I do -- I don't understand how they come
3 up with the algorithm, period.
4    Q    Okay.  Fair enough.
5        So let's take a look at the algorithm.
6 If we go to Exhibit 610.  This is the retunement
7 document.  Do you see it?
8    A    Okay.
9    Q    All right.  Go to page 114645 of that
10 document.
11    A    645.
12    Q    It's about the fifth page.  All right?
13        Now, these are formulas that are set
14 forth by this company that describes their
15 algorithm, correct?
16    A    Yes.
17    Q    All right.  Do you understand those
18 formulas on that page?
19    A    No.
20    Q    Okay.  Go to the next page.  These are
21 additional formulas that this company is
22 describing as built into the algorithm system,
23 correct?
24    A    I'm assuming, yes.

Page 278

1    Q   Do you understand those formulas?
2    A   No.
3    Q   Go to the next page. These are
4 additional formulas that are implemented into the
5 algorithm system that became the software that was
6 used by CVS in their SOM system, correct?
7       MR. BUSH: Objection.
8       THE WITNESS: I don't know that.
9 BY MR. BAKER:
10   Q   Okay. Do you know what these formulas
11 mean?
12   A   I don't.
13   Q   Go to the next page. Do you see those
14 formulas?
15   A   Yes.
16   Q   Are those also formulas that are being
17 described by this company as input into their
18 algorithm system?
19   A   I --
20       MR. BUSH: Objection.
21       THE WITNESS: I don't know what these
22 formulas are for.
23 BY MR. BAKER:
24   Q   But you don't even know what they mean,

Page 279

1 do you?
2    A   No.
3    Q   Okay. Go to the next page. Now, you
4 remember there was a lot of discussion about
5 active ingredient in your testimony with
6 Mr. Kennedy earlier today?
7    A   Yes.
8    Q   Remember that?
9       And you remember that it was on a -- on
10 a list of things that needed to be accomplished.
11 Do you remember that?
12   A   Yes.
13   Q   Okay. So with this new program, do you
14 see here, it says: "An important feature of this
15 SOM model that is now being recommended to CVS is
16 that it is now based on the monthly totals, i.e.
17 sums, of the controlled substances as measured in
18 milligram amounts of active ingredient."
19       Do you see that?
20   A   I do.
21   Q   Okay. Was that something that you were
22 attempting to have fixed at the time this model
23 was being developed and retuned?
24   A   I don't remember the timeline for that.

Page 280

1 I just recall wanting to go from the actual
2 individual prescription drug to the total quantity
3 of the strength -- or total quantity of the active
4 ingredient.
5    Q   Okay. Look at the last sentence of that
6 paragraph. It says: "These cumulative quantities
7 are then evaluated for suspicion based upon the
8 monthly totals of each item for the previous
9 12 months in the CVS database."
10       Is that correct?
11   A   That's what it says. I -- I'm not
12 saying -- (reading to himself).
13   Q   You're not saying what?
14   A   I -- I'm not saying that I -- I fully
15 agree with the formulas, understand the formulas,
16 but that's what it says.
17   Q   The truth is you don't even know what
18 these formulas are, right?
19   A   I don't know how these formulas work.
20   Q   Okay. And if you look at document
21 610 -- go back to document 610. And go to the
22 fourth page at 114644.
23       MR. BUSH: 610 or 611?
24       MR. BAKER: 610.

Page 281

1       MR. BUSH: I thought that's what we were
2 in.
3       MR. BAKER: Yeah, go to 610.
4       MR. BUSH: Okay.
5       MR. BAKER: Go to the fourth page.
6       MR. BUSH: Fourth page.
7 BY MR. BAKER:
8    Q   And this is the retunement document,
9 correct? This is the one that was delivered
10 February 9 of 2011, correct? Right?
11   A   I --
12   Q   Well, look at it.
13   A   I'm looking at it. I can't -- I
14 can't --
15   Q   Well, look at the front page. You've
16 been through this.
17   A   That's what it says. I'm not just
18 saying -- I don't know.
19   Q   Well, just assume -- if you assume the
20 document is true, that it speaks the truth, the
21 document itself, the e-mail February 9, 2011, then
22 this retunement document was delivered to CVS
23 February 9, 2011.
24   A   Yes.

Page 282

1　Q　Correct?
2　A　Yes.
3　Q　Okay. So then you go to the retunement
4　document on page 4. Do you see it?
5　A　I see the page.
6　Q　It says -- that page right there
7　(indicating). It's page 4 of the document,
8　114664. Do you see it?
9　A　Got it. Yes.
10　Q　Okay. It's underlined. It says: "The
11　model has been designed so that any order with a
12　score of .15 or higher is identified as
13　suspicious, pended, and should be investigated
14　further."
15　　　Do you see that?
16　A　I do.
17　Q　Okay. So look at me, if you would.
18　　　The pended orders that you were looking
19　at under the algorithm system, they were being
20　pended at a score higher than .15 when you used
21　it, right?
22　　　MR. BUSH: Objection.
23　BY MR. BAKER:
24　Q　Right?

Page 283

1　A　I -- I don't recall.
2　Q　Did you have something to do with
3　changing the scoring system and tweaking it up
4　from .15 to .65 to make it less sensitive? Did
5　you have something to do with that?
6　　　MR. BUSH: Objection.
7　BY MR. BAKER:
8　Q　Yes or no?
9　　　MR. BUSH: Objection.
10　　　THE WITNESS: I -- I did review those --
11　those false positives, yes.
12　BY MR. BAKER:
13　Q　Okay. Listen to my question.
14　A　Mm-hmm.
15　Q　And you keep wanting to throw "false
16　positives" in your answer. I understand that's
17　what you want to do. I'm not asking about false
18　positives.
19　　　My question is simply this: Did you
20　have something directly to do with tweaking the
21　algorithm score flagging system to where it would
22　no longer flag at .15, but it would instead flag
23　only at .65 or above? Yes or no, did you have
24　something to do with that?

Page 284

1　A　I did the testing.
2　Q　Okay. And this was you tweaking a
3　program that you had no idea what the algorithm
4　actually meant, correct?
5　A　We had conversations with the people who
6　built the algorithm, and they assured us that we
7　were within line.
8　Q　If you will look at document No. 13,
9　please. Six -- hold on. 612. I'm sorry.
10　　　(Exhibit No. 612 was premarked for
11　　　identification.)
12　BY MR. BAKER:
13　Q　Now, this is -- on the front here, it
14　says this is June 30, 2010. And it says: "Bob, I
15　will be reviewing the data for the next few weeks
16　and testing some of the pending items with field
17　loss prevention. I am going to focus on the .15
18　score for starters." Correct?
19　A　Yes.
20　Q　"Once I" -- that's you, correct?
21　A　Mm-hmm. Yes.
22　Q　-- "determine an acceptable score, I
23　will get in touch with you and Jonathan, if
24　necessary, for feedback." Do you see that?

Page 285

1　A　I do.
2　Q　Okay. So you were determining what
3　score you wanted to raise this algorithm up to for
4　the purpose of flagging an order for further
5　investigation. Correct?
6　A　It's out of context. No.
7　Q　Well, what does the word "I" mean?
8　A　Oh, I see what I wrote. I --
9　Q　"Once I determine."
10　　　MR. BUSH: Please let him finish his
11　answer. Both of you let --
12　BY MR. BAKER:
13　Q　Go ahead, what does the word "I" mean?
14　A　I see what I wrote. There were
15　meetings, there were conversations that took place
16　that aren't on this e-mail.
17　Q　You know, here's --
18　A　They assured us that --
19　Q　Here's the --
20　A　-- this was going to be acceptable.
21　They would never let me do this if it wasn't
22　acceptable.
23　Q　That's what you're saying.
24　A　That's what they said.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1      MR. BUSH:  That's what he is testifying.
2  BY MR. BAKER:
3      Q   So let's just go --
4      MR. BUSH:  By the way, this document
5  appears to be all out of order.
6      MR. BAKER:  Well, you know what, it's my
7  exhibit, so I put it out there like I want to,
8  okay?
9  BY MR. BAKER:
10     Q   So go to the second --
11     MR. BUSH:  All right.  So, for the
12 record, this document is not a document that was
13 produced by CVS in the form in which you're using
14 it, okay?
15     MR. BAKER:  It was produced exactly in
16 the form that I'm using it.
17     MR. BUSH:  Apparently not.  It's not
18 even consecutive Bates numbers.
19     MR. BAKER:  Okay.  Well, so what?
20 BY MR. BAKER:
21     Q   All right.  Are you ready?  Let's move
22 forward.
23     All right.  So go to CVS 88524, the
24 second to last page.  Do you see that?

Page 287

1      A   I do.
2      Q   All right.  This is kind of the
3  beginning of this string, June 30, 2010.  Do you
4  see that at the bottom?
5      A   Yes.
6      Q   "Bob, I will be reviewing the data for
7  the next few weeks and testing some of the pending
8  items with field loss prevention.  I am going to
9  focus on the .15 score for starters.  Once I
10 determine an acceptable score, I will get in touch
11 with you and Jonathan, if necessary, for
12 feedback."
13     Do you see that?
14     A   Yes.
15     Q   Okay.  What you were fixing to do --
16 what you were intending to do, I should say, with
17 this algorithm was you wanted to tweak it up,
18 right?
19     A   I wanted to eliminate false positives.
20     Q   Listen to my question.  You wanted to
21 tweak --
22     A   I answered your question.
23     Q   -- tweak, T-W-E-A-K, it up.
24     A   Eliminate.

Page 288

1      MR. BUSH:  Don't raise your voice with
2  the witness.  He's answered your question.
3      MR. BAKER:  No, no, he reformulates the
4  question every time he gives an answer, and I'm
5  going to ask --
6      MR. BUSH:  If you asked a better
7  question, he wouldn't have to formulate.
8  BY MR. BAKER:
9      Q   All right.  Here's the question:  What's
10 the word "tweak" mean?
11     A   In this context?
12     Q   Yes.
13     A   To eliminate false positives.
14     Q   Okay.  What does it mean generally that
15 you're doing?  Are you going up or down with the
16 score when you're tweaking it?
17     A   To eliminate false positives, it will be
18 going up.
19     Q   Okay.  Which makes the system less
20 sensitive.
21     A   For false positives.
22     Q   False positives in your eyes, in CVS's
23 eyes, correct?
24     MR. BUSH:  Objection.

Page 289

1  BY MR. BAKER:
2      Q   That you perceived, correct?
3      A   No.  No.  Investigated.
4      Q   Okay.  That you perceived according to
5  the document that you just looked at.
6      A   I didn't write that.  I don't know who
7  wrote that.
8      Q   Because you were getting thick IRR
9  reports and you were sick of looking at thick IRR
10 reports, weren't you?
11     A   No.
12     MR. BUSH:  Objection.
13 BY MR. BAKER:
14     Q   You were looking at them all by yourself
15 every day, they were thick, and you wanted to get
16 them thinner, didn't you?
17     A   No.
18     Q   Okay.  We'll go through that in just a
19 minute.
20     A   Okay.
21     Q   So it says -- it says -- in response
22 he says:  "Good afternoon, John."  And this is to
23 you.
24     A   Yes.

Page 290

1    Q   He says: "Thought I would just touch
2  base with you here and see if you had a chance to
3  orient to that date.  We would like to reengage on
4  the retunement."
5        Do you see that?
6    A   I do.
7    Q   He's trying to get you to engage and to
8  hire him to do a retunement, instead of doing all
9  this stuff that you're fixing to do, right?
10       MR. BUSH:  Objection.
11       THE WITNESS:  I don't know that.
12 BY MR. BAKER:
13   Q   Okay.  Isn't that the context of what
14 it's written in?
15       MR. BUSH:  Objection.
16       THE WITNESS:  He would've had to go
17 through Frank for that.
18 BY MR. BAKER:
19   Q   Okay.  So then keep going forward.  And
20 it says here on July 26, 2010, it says -- up at
21 the top, it says: ".65 is where we are now.  .7
22 looks a bit more realistic, but I still want to
23 view data."
24       Do you see that?  That's from you.

Page 291

1    A   I do.
2    Q   Okay.  So what you did was you increased
3  the score up to .65 in the algorithm, did you not?
4    A   There were --
5        MR. BUSH:  Objection.
6        THE WITNESS:  -- a lot of conversations
7  and discussions along the way.
8  BY MR. BAKER:
9    Q   Listen to my question.
10       You personally increased that score from
11 .15 to .65, did you not?
12       MR. BUSH:  Objection.
13       THE WITNESS:  No.  I -- I had the
14 support and backing from CVS.
15 BY MR. BAKER:
16   Q   Okay.  So CVS --
17   A   And this company.
18   Q   CVS supported that, and you're saying
19 this company that CVS hired supported that.  Is
20 that what you're saying?
21   A   Yes.
22   Q   Okay.  So between CVS and the company
23 they hired, their minds together is the -- is the
24 cause of this thing getting tweaked up from .15

Page 292

1  to .65; is that right?
2        MR. BUSH:  Objection.
3        THE WITNESS:  Their minds together was
4  getting an understanding on why we kept having
5  investigations that were unnecessary and causing
6  our field guys to review cases day in and day out
7  that were --
8  BY MR. BAKER:
9    Q   Go to exhibit --
10       MR. BUSH:  Wait a second.
11 BY MR. BAKER:
12   Q   Go ahead.
13   A   That were as simple as a low volume
14 store ordering 30 additional pills in a month's
15 time.  This is the kind of things that were
16 setting off the IRR.
17       (Exhibit No. 614 was premarked for
18       identification.)
19 BY MR. BAKER:
20   Q   Let's go to Exhibit No. 614, please.
21   A   Okay.
22   Q   Now, if you go to this document, you see
23 here we're on March 10, 2010.
24   A   Okay.

Page 293

1    Q   All right.  It looks like you in that
2  second e-mail down, March -- excuse me, March 9 of
3  2010, do you see that second e-mail down?
4    A   Yes.
5    Q   It says: "I did.  I believe we need to
6  continue to tweak the formula up.  I am still
7  seeing small quantities hitting the report that
8  may be due to a new patient needing a specific
9  drug.  The orders aren't heavy in most cases."
10       Do you see that?
11   A   I do.
12   Q   Okay.  "Tweak," that's the word you
13 used, correct?
14   A   And I also used the reasoning for
15 tweaking it.  One new patient ordering one
16 additional drug was causing a false positive flag.
17   Q   Well, if you tweak it, it's going to
18 cause all the orders that are run through the
19 system to be scored at a much higher score than
20 .15 if you tweak it up to .65, not just the ones
21 in small quantities, correct?
22   A   This was the conversations and the
23 conference calls that we were having with these
24 companies.  We were worried about the low volume

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 stores.

2    Q  Okay.  Listen to my question.

3    A  No, I'm not -- I don't agree with that.

4    Q  No, you're not answering.

5    A  I don't agree with that.

6    Q  Okay.  Listen to me.  If you raise the

7 score from .15 to .65, you're making the algorithm

8 program less sensitive, correct?

9    A  I don't know.  I am telling you --

10    Q  Okay.  You don't know the answer to that

11 question?

12    A  I don't know if that answer is going to

13 make it less sensitive for higher volume stores.

14 I don't recall the conversations, but that was the

15 conversations and why we had it.

16    Q  Okay.  Look at the e-mail above that

17 from Antony Santhoshraj.  Do you see him?

18    A  I do.

19    Q  Okay.  Who is he?

20    A  I don't remember.

21    Q  It says: "John, I have run today with

22 scores .15, .17, .19, .21, .23, .25, .27 and .29."

23      Do you see that?

24    A  I do.

Page 295

1    Q  Okay.  You're okaying that, are you not?

2    A  Am I okaying him to run this score?

3    Q  Yes.

4    A  No, he --

5      MR. BUSH:  Objection.

6 BY MR. BAKER:

7    Q  Go ahead.

8    A  He told me he was running that.

9    Q  Okay.  This is something that you wanted

10 to happen.

11    A  I -- I definitely wanted to eliminate

12 false positives.

13    Q  Okay.  Because you said you believed you

14 need to continue to tweak the formula up in the

15 e-mail right below that, right?  And that's what

16 he's doing, he's tweaking it up.  You're

17 encouraging it, are you not?

18    A  Yeah, I did ask him to.

19      (Exhibit No. 615 was premarked for

20      identification.)

21 BY MR. BAKER:

22    Q  Okay.  Let me show you No. 615.

23      This is a memorandum to Frank Devlin

24 from John Mortelliti, August 13, 2010.  Do you see

Page 296

1 that?

2    A  I do.

3    Q  Okay.  That first bullet says: "Control

4 drug IRR score .15 has been tested by John

5 Mortelliti, Lumberton Distribution Center,"

6 correct?

7    A  Yes.

8    Q  Okay.  The third bullet down says: "The

9 IRR was eventually adjusted to .65."  Do you see

10 that?

11    A  I do.  But in that first bullet it also

12 says that it was tested with three of the -- the

13 field partners.  It wasn't just me testing it.

14    Q  Field partners are CVS employees,

15 correct?

16    A  They are.

17    Q  But you're marshalling this whole thing

18 about tweaking the program to get the -- the

19 system scoring to where it flags at .65 and not

20 .15, correct?

21    A  Based on the results of their

22 investigations, that's why they were part of it.

23    Q  Okay.  But you're the one that's

24 marshalling this whole thing to happen, right?

Page 297

1      MR. BUSH:  Objection.

2      THE WITNESS:  I'm trying to avoid the

3 boy who cried wolf with the field, they were

4 chasing one bottle of pills.

5 BY MR. BAKER:

6    Q  Yeah, they were chasing one bottle of

7 pills.

8      Well, let me explain what I'm trying to

9 get across to you.  When you raised that score

10 from .15 to .65, it affects the analysis of every

11 single order that runs through that system, not

12 just the ones that have small volume.  Correct or

13 incorrect?

14    A  It made it more accurate to items of

15 interest is what it did.  It eliminated all the

16 fluff that these guys were chasing day in and day

17 out, and finding out that one extra order of 30

18 extra pills because they have a new cancer patient

19 in a store was flagging these items.

20      These guys were running all over for me.

21 We were going to get to a point where they

22 weren't going -- they were going to just -- who

23 knows.  I don't want to get to a point where

24 they're not trusting what we're trying to tell

Page 298

1 them.
2    Q   Okay.  Listen to my question.
3    A   Go ahead.
4    Q   Every single order was run through the
5 system at .65 from that point forward, correct?
6    A   If that was the date that it started,
7 yes.
8    Q   Okay.  That includes every single order
9 from a -- from a pharmacy to a distribution center
10 in the CVS SOM system.  Every single one, correct?
11    A   I am not the person who put the
12 algorithm together.  I don't know if this impacted
13 lower volume stores more than larger volume
14 stores.  I'm not going to -- I'm not going to
15 answer that.  I don't know.
16    Q   Listen to my question.  Every single
17 order from a CVS pharmacy to a CVS distribution
18 center was run through the suspicious order
19 monitoring algorithm system every single night,
20 correct?
21    A   Yes.
22    Q   Okay.  That included small volume
23 orders, medium volume orders and large volume
24 orders, correct?

Page 299

1    A   Yes.
2    Q   Okay.  So the small volume orders, the
3 medium volume orders and the large volume orders
4 were all scored against this algorithm system that
5 flagged at .65, correct?
6    A   Yes.
7    Q   Okay.  And before you tweaked it up, the
8 small volume orders, the medium volume orders and
9 the high volume orders were all run through the
10 system and scored to flag at .15, correct?
11    A   Is there anything in here that says that
12 the .65 impacted the large --
13    Q   Listen to my question.  You're not
14 answering my question.
15    A   I don't know.
16    Q   Okay.  You don't know that answer.
17    A   It went through this.  Do I know if it
18 made a difference?  I don't recall it making a
19 difference.  I don't know.
20    Q   You don't know.
21    A   No.
22    Q   Okay.  Your concern was that you had a
23 thick IRR coming across your desk, and you wanted
24 to make it thinner so that you wouldn't have to

Page 300

1 investigate as many orders, correct?
2       MR. BUSH:  Objection.
3       THE WITNESS:  I wanted to eliminate the
4 field running around investigating false
5 positives.
6       (Exhibit No. 613 was premarked for
7       identification.)
8    Q   Go to Exhibit 13 -- 613.
9       MR. BAKER:  Pull up Exhibit 613.
10 BY MR. BAKER:
11    Q   Do you see at the top there, it says:
12 "The report is still large even for the most
13 aggressive formula attached."  Do you see that?
14    A   I do.
15    Q   That's you, that's -- you're writing
16 that, correct?
17       MR. BUSH:  Can we look at the whole
18 document together?
19       MR. BUSH:  Yes, we can absolutely look
20 at the full document.
21       Go ahead and open the full document.
22 BY MR. BAKER:
23    Q   This is the document where just below
24 it, it says:  "The report is run with .15, .16,

Page 301

1 .17, .18, .19.  We can run for alternate too, like
2 .17, .19, .21 and so on."  Correct?
3    A   Yes.
4    Q   Okay.  Go just above that on the same
5 document, same Bates, and it says:  "The report is
6 still large even for the most aggressive formula
7 attached."  Correct?
8    A   Yes.
9    Q   That was your concern, sir, is that the
10 report was -- the IRR was coming out too large for
11 your liking, for your taste, correct?
12    A   Not in the least.
13    Q   Okay.  Let's go to document No. 14 --
14 614.
15       (Exhibit No. 614 was premarked for
16       identification.)
17       MR. BUSH:  Do you not have the hard
18 copies of these?
19       MR. BAKER:  I've already given them to
20 you.
21       MR. BUSH:  Oh, I'm sorry.
22 BY MR. BAKER:
23    Q   Do you see here?
24    A   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    Q   This is where that same time frame that
2 he's talking about -- you're talking about
3 tweaking the formula up.  Do you see that?
4    A   Yeah, right -- right above where I gave
5 him the example of one new patient, and this is
6 what's causing the false positives.
7    Q   Yeah, and that's your perception.
8    A   No, that was proven.
9    Q   Okay.  And you have copies of all the
10 IRRs that you can show us from 2010 where you can
11 give it to us so we can see which one of these you
12 flagged and sent out to VIPER analysts, correct?
13   A   I do not.
14   Q   Okay.  Because you -- you, along with
15 other people in CVS, destroyed those documents,
16 correct?
17       MR. BUSH:  Objection.
18       THE WITNESS:  We have a set timeline to
19 hold documents.  We only have so much space.  Once
20 those three years are done, we start old out,
21 first out.
22 BY MR. BAKER:
23   Q   And you don't store them on a computer
24 database somewhere as opposed to the paper copy?

Page 303

1 You don't -- you don't store them on a computer
2 database, the green -- the green bar copies?
3    A   No.
4    Q   Come on.  Aren't -- aren't they
5 generated off of a computer?
6       MR. BUSH:  Objection.
7 BY MR. BAKER:
8    Q   Aren't these generated off a SOM system
9 that's computer-based?
10   A   Those -- those reports printed on a
11 green bar piece of paper, a stack of papers, that
12 I would receive every day.  You had the electronic
13 copy.  You saw what it was like in the electronic
14 copy.
15   Q   I had both the electronic copy and the
16 green bar copy to the extent that they were
17 produced to me by CVS.  To the extent they weren't
18 and existed but were destroyed, I don't.  Do you
19 understand that?
20   A   I do understand that.
21   Q   Okay.  So what I'm trying to explain to
22 you is -- is -- do you understand my question,
23 that the green bar copy is also computer-
24 generated, right?

Page 304

1    A   Of course.
2    Q   Okay.  And so if it's computer-
3 generated, why isn't it on some hard drive or some
4 storage somewhere on a computer as opposed to in a
5 warehouse, a paper copy that you destroyed?
6       MR. BUSH:  Objection.
7 BY MR. BAKER:
8    Q   Why isn't it on a computer?
9       MR. BUSH:  Objection.
10      THE WITNESS:  You would have to ask
11 someone from corporate why they don't store the
12 computer stuff.  I only do the files.
13 BY MR. BAKER:
14   Q   So this -- this notion that you had
15 one order -- like orders that were too small that
16 you thought were causing a nuisance, we'd only be
17 able to look at that if we had the green bar,
18 correct?
19   A   Yes, you --
20      MR. BUSH:  Objection.
21      THE WITNESS:  Yes, you would.
22 BY MR. BAKER:
23   Q   Okay.  And so we simply have to trust
24 your word, and not the green bar copy of the IRR,

Page 305

1 to validate what you're saying, correct?
2    A   No.
3       MR. BUSH:  Objection.
4 BY MR. BAKER:
5    Q   Okay.  Well, what other document is
6 there?
7    A   Others -- other people that were part of
8 reviewing these cases, part of reviewing what we
9 brought to the table.  There were conference
10 calls.  You have the list of the field personnel
11 that were involved with this.
12   Q   Sir, I think what I asked you is, what
13 other document exists to support your notion that
14 these nuisances were causing you to have too thick
15 of a report?
16      MR. BUSH:  Objection.
17      THE WITNESS:  I --
18 BY MR. BAKER:
19   Q   What document?
20   A   I don't keep my taxes ten years.
21   Q   Okay.  I didn't ask you --
22   A   I don't -- I don't have -- the company
23 says three years, I rotate it out.  That's all my
24 room has -- has room for.  I don't keep it past

Page 306

1 the company required timeline.

2   Q   Okay.  My question is, what document is
3 possessed by you or anybody else at CVS that you
4 know of that supports your notion that these
5 nuisances were causing your need to increase the
6 algorithm score?  What document?

7   A   They weren't nuisances.  They were solid
8 examples of how one additional customer was
9 causing a false positive.  I don't have a
10 document.  I said it over and over again, we kept
11 it for three years.  That was the company's
12 requirements.  I don't -- we don't have a
13 warehouse that we pay square footage on to store
14 ten years of data.

15   Q   It's on a computer.

16   A   Well, ask them why they didn't have it
17 on their computer.  I don't have that computer.

18   Q   I have.  Do you know why it's not there?

19   A   No.  How would I know?

20   Q   Okay.  There you go.  We don't know why
21 it's not there.  The only -- the only entity that
22 had possession of these documents was CVS,
23 correct?

24   A   I -- I don't even know that.

Page 307

1   Q   Okay.  Well, the only person that had
2 possession of what was on that green bar was --
3 was CVS through its computer system, its SOM
4 system, right?

5       MR. BUSH:  Objection.

6       THE WITNESS:  I -- the -- the green
7 bar -- you -- you showed me a digital copy -- copy
8 earlier.

9 BY MR. BAKER:

10   Q   Yeah, that gave us select ones.  We want
11 all of the ones from 2009 and 2010, if you can
12 tell us where they are.  I'd like to see every
13 single IRR from 2008, 2009, 2010.  Where are they?

14       MR. BUSH:  Mr. Baker --

15 BY MR. BAKER:

16   Q   Where are they?

17       MR. BUSH:  Mr. Baker, you can deal with
18 the counsel for CVS about production of documents.
19 This witness is not the one who was involved in
20 the production.

21       MR. BAKER:  He was the one that was
22 writing on the IRR.

23 BY MR. BAKER:

24   Q   So my question was to you --

Page 308

1       MR. BUSH:  He is not the one who was
2 involved in the production of documents.  That's
3 what you're asking.

4 BY MR. BAKER:

5   Q   Where are the IRRs that you reviewed and
6 you wrote on from 2008, 2009, 2010?  Where are
7 they?

8       MR. BUSH:  Objection.  Asked and
9 answered.

10       THE WITNESS:  I have nothing from three
11 years back.  And so we're 2019, so from this date
12 three years back, I won't have anything.

13 BY MR. BAKER:

14   Q   They were destroyed.

15   A   Yes.

16   Q   By CVS.

17   A   Yes.

18   Q   Was there ever an alternative formula
19 that you used to determine the existence of a
20 suspicious order other than the formula of a
21 flagging score that came under the algorithm
22 system that flagged at .65?

23       MR. BUSH:  Objection.

24       THE WITNESS:  I don't know of any other

Page 309

1 formula.  I don't recall.

2 BY MR. BAKER:

3   Q   Okay.

4       MR. BAKER:  Pull Exhibit No. 23, 24 --
5 623 and 624 and 625.

6       (Exhibit Nos. 623, 624, and 625
7       were premarked for
8       identification.)

9 BY MR. BAKER:

10   Q   On the screen in front of you is --

11       MR. BUSH:  Which one is this?

12       MR. BAKER:  6 -- 623.

13       MR. BUSH:  Okay.

14 BY MR. BAKER:

15   Q   On the screen in front of you is a
16 e-mail from Pam Hinkle to Frank Devlin, 1/27/2011.
17 And it says attached is "Reviewing Suspicious
18 Orders on the Control IRR Report."  And it says:
19 "Frank, this is the drafts Stephen sent to John to
20 review."

21       Do you see that?

22   A   I do.

23   Q   Okay.  And then you see what's attached
24 to it is something called "Components of the

Page 310

1 Control IRR Report."
2 Do you see that?
3 A Yes.
4 Q All right. And look at the highlighted
5 portion. It says: "The month-to-date order
6 quantity states the amount of the item in question
7 ordered during the current month. LAG 1 is the
8 amount ordered during the month before, LAG 2 is
9 the amount ordered two months before, and LAG 3 is
10 the amount ordered three months before."
11 Do you see that?
12 A I do.
13 Q It says: "Process of identifying
14 suspicious orders. In order to determine which
15 items on the control IRR report are suspicious,
16 the order quantity field is observed by the DC IRR
17 analyst for a quantity ordered of ten or more.
18 The month-to-date field is then observed and
19 compared to LAGs 1, 2 and 3. If the month-to-date
20 quantity is at least three times greater than the
21 quantities in LAGs 1, 2 or 3, then that item is
22 labeled as being suspicious."
23 Do you see that?
24 A I do.

Page 311

1 Q Is that what you were doing to shortcut
2 this thing?
3 A No. In fact, that is not true.
4 Q Okay. Go to Exhibit No. 24 -- 624.
5 This is an e-mail dated 1/27/11 from
6 Stephen Cain. Who is Stephen Cain?
7 A He was the analyst that was in Knoxville
8 doing the IRRs at the time.
9 Q And this is to John Mortelliti. That's
10 you.
11 A Yes.
12 Q Copy to Pam Hinkle. She was in
13 Knoxville, correct?
14 A Yes.
15 Q And the subject on 1/27/2011 is "IRR
16 Narratives." Do you see that?
17 A I do.
18 Q Okay. It says: "Please find the IRR
19 narratives attached. Let me know if you would
20 like for me to change anything or include any
21 additional information."
22 Do you see that?
23 A I do.
24 Q All right. Now, again, you don't deny

Page 312

1 that you got this e-mail and you don't deny that
2 you got the attachment, do you?
3 A No.
4 Q Okay. Go to the next page. Or,
5 actually, go to the attachment.
6 The attachment is "Components of the IRR
7 Report." Do you see that?
8 A I do.
9 Q It says: "The Control IRR Report is a
10 list of controlled substances which are labeled as
11 being suspicious."
12 Do you see that?
13 A I do.
14 Q All right. Go to the next page,
15 "Process of identifying suspicious orders." Do
16 you see that?
17 A Yes.
18 Q And it says: "The DC IRR analyst
19 observes order quantity field for a quantity
20 ordered of ten or more."
21 Let me stop you there. What does "ten
22 or more" mean? Ten or more bottles? Ten or more
23 what?
24 A I don't -- I don't remember.

Page 313

1 Q And it says: "The month-to-date field
2 is then observed and compared to LAGs 1 through 6.
3 If the month-to-date quantity is at least three
4 times greater than the quantities in LAGs 1
5 through 6, then that item is labeled as being
6 suspicious."
7 That's what the document says, correct?
8 A This -- this has to be a draft.
9 Q Okay. This is in January of 2011.
10 You're saying it's a draft?
11 A I'm -- I'm saying I would not have --
12 there's got to be something else to this. I
13 wouldn't have -- I wouldn't have accepted this.
14 Q Okay. Go to Exhibit 625, please.
15 All right. Exhibit 625, if you note,
16 the Bates at the bottom is 57736, the Bates at the
17 bottom of the next page is 57737, the bottom of
18 the next page is 57738.
19 Do you see that?
20 A Yes.
21 Q Okay. This is in May of 2011, from
22 Frank Devlin to Judith Hughes. Do you see that?
23 A Yeah.
24 Q And it says: "Control drug suspicious

Page 314

1 order monitoring."
2     Now, nowhere on that e-mail does this
3 say that this is a draft, does it?
4     A  I -- I didn't send this e-mail.  I don't
5 know what the context was.  I don't know if there
6 was attachments.  What this was between Frank and
7 Judy.  I'm not answering for Frank.
8     Q  You understand these are sequentially
9 numbered documents produced by CVS in accordance
10 with the Bates system.  You understand that,
11 right?
12    A  I do.
13    Q  Okay.  And what I'm asking you is, on
14 that front page you don't see the word "Draft"
15 anywhere on there, do you?
16    A  It doesn't mean it's not a draft.
17    Q  But you don't see it anywhere on there,
18 do you?
19    A  No, but it doesn't mean it's not one.
20    Q  Okay.  I hear your argument, but listen
21 to the question.  Is the word "D-R-A-F-T" on that
22 front page, yes or no?  Yes or no?
23    A  No.
24    Q  Okay.  That's the kind of answer I'm

Page 315

1 looking for, just a yes or no if it calls for yes
2 or no.
3     A  Well, the context is misleading.
4     Q  So then on the next page, "Components of
5 the Control IRR Report."  Do you see that?
6     A  I do.
7     Q  All right.  It says: "The month-to-date
8 order quantity states the amount of the item in
9 question ordered during the current month.  LAG 1
10 is the amount ordered the month before, LAG 2 is
11 the amount ordered two months before, and LAG 3 is
12 the amount ordered three months before."
13        That's what the document says, right?
14    A  That's what it says.
15    Q  All right.  "Process of identifying
16 suspicious orders.  In order to determine which
17 items on the Control IRR Report are suspicious,
18 the order quantity field is observed by the DC IRR
19 analyst for a quantity ordered of ten or more.
20 The month-to-date field is then observed and
21 compared to LAGs 1, 2 and 3.  If the month-to-date
22 quantity is at least three times greater than the
23 quantities in LAGs 1, 2 or 3, then that item is
24 labeled as being suspicious."

Page 316

1     Correct?
2     A  I -- listen --
3        MR. BUSH:  The question is, is that what
4 it says?
5 BY MR. BAKER:
6     Q  Is that what the document says?
7        MR. BUSH:  That's all he's asking.
8        THE WITNESS:  Okay.  Yes.
9 BY MR. BAKER:
10    Q  Okay.  All right.  Now, go to the next
11 set of documents, and these are the manner in
12 which they were provided to me.
13        MR. BUSH:  What's the next set of
14 documents?
15        MR. BAKER:  Okay.  The next set of
16 documents are the last couple of pages to that.
17 But they're not consecutively -- well, yeah, they
18 are consecutively numbered.
19        MR. BUSH:  So starting with 3969?
20 BY MR. BAKER:
21    Q  83969, do you see that?
22    A  Yes.
23    Q  Okay.  And this says: "Components of
24 the control IRR report.  Month" -- about the

Page 317

1 second to last bullet down in that first set
2 there, it says: "Month-to-date order quantity,
3 LAGs 1, 2, 3, 4, 5, 6."  Do you see that?
4     A  Yep.
5     Q  All right.  Go to the next page.  It
6 says: "Suspicious order process.  DC IRR analyst
7 will review IRR for quantity that is flagged as
8 potentially suspicious.  The month-to-date field
9 is then observed and compared to LAGs 1-6.  If a
10 month-to-date quantity is out of line compared to
11 the store LAG as well as the ordering patterns of
12 the network, the order will be labeled as
13 suspicious."  Correct?
14    A  That's what it says.
15    Q  What does the term "out of line" mean,
16 or do you even know when it's used in the context
17 of this?
18    A  I had -- I don't know.  I didn't write
19 this.
20    Q  Okay.  So you're telling me there
21 weren't shortcuts like that taken, even though
22 they're -- they're written down and passed back
23 and forth between the people within CVS involved
24 in the SOM program?

Page 318

1    A  I can --
2      MR. BUSH:  Objection.
3  BY MR. BAKER:
4    Q  Yes or no?
5    A  I can tell you when I did it, absolutely
6  not.
7    Q  Okay.
8      MR. BUSH:  I would just note for the
9  record too -- I mean, Bill, I think you actually
10  referred to this, but at least the last three
11  pages of this document don't seem to be
12  consecutively numbered.
13      MR. BAKER:  Correct, as comparing the
14  two.
15      MR. BUSH:  Yeah.
16      MR. BAKER:  As comparing the two.
17      MR. BUSH:  So this is not a document
18  produced.
19      MR. BAKER:  Well, the first part of it
20  is up until the time we --
21      MR. BUSH:  Yep, yep, I agree with that.
22  I agree with that.  But the last part isn't.
23      MR. BAKER:  We're going to take a short
24  break.

Page 319

1      MR. BUSH:  Okay.
2      THE VIDEOGRAPHER:  The time is 2:57 p.m.
3  We're going off the record.
4     (Recess.)
5      THE VIDEOGRAPHER:  The time is 3:13 p.m.
6  We're back on the record.
7  BY MR. BAKER:
8    Q  Mr. Mortelliti, do you remember those
9  e-mails that were going back and forth in 2010
10  where you were tweaking the score up from .15
11  to .65?  Do you remember that?
12    A  From what -- what you showed me today.
13    Q  Okay.  And of course, the -- that's when
14  you were operating under the 2009 revised
15  coefficients program, correct?
16    A  According to the paper.  I -- I don't
17  know anything about at the time whether -- what I
18  was operating under.
19    Q  And it was in 2011 that the program was
20  delivered that was the retunement, correct?
21    A  Okay.
22    Q  Right?  At least according to the
23  documents.
24    A  According to the documents.

Page 320

1    Q  Okay.  So basically what you did was you
2  raised the score from .15 to .65 during a period
3  of time prior to the retunement, correct?
4    A  We --
5      MR. BUSH:  Objection.
6      THE WITNESS:  -- tested it.
7      MR. BUSH:  Go ahead.  I'm sorry.
8  BY MR. BAKER:
9    Q  Your lawyer can't answer for you, but --
10  but y'all seem to come out with that exact word at
11  the same time.  How did that happen?
12      MR. BUSH:  What?
13  BY MR. BAKER:
14    Q  How did that happen, "we tested it,"
15  both y'all came out with the same word at the same
16  time?
17    A  He objected.
18      MR. BUSH:  Objection -- I said,
19  "Objection."
20      MR. BAKER:  Okay.
21      MR. BUSH:  What are you talking about?
22      MR. BAKER:  So -- it sounded like that.
23  All right?  So I apologize.
24  BY MR. BAKER:

Page 321

1    Q  Let me -- let me ask you something.
2  When you -- when you increased the flagging score
3  from .15 to .65, that was the period of time prior
4  to the retunement being delivered to CVS, correct?
5    A  We tested it prior to any changes taking
6  place.
7    Q  Okay.  You actually raised it to .65
8  before the retunement, correct?
9    A  I don't recall that.
10    Q  Well, it was in 2010 that you were doing
11  it, and you remember the gentleman that you were
12  consulting with at CCS said, I would suggest a
13  retunement.  Do you remember that?
14    A  Yes.
15    Q  Okay.  So when you were doing --
16      MR. BUSH:  Sorry.  Sorry, can I
17  interrupt for a second?  I lost the feed.
18      MR. BAKER:  Okay.
19      MR. BUSH:  Can I get my feed back?  What
20  do I need to do to do that?  Sorry.
21      THE VIDEOGRAPHER:  The time is 3:15 p.m.
22  We're going off the record.
23     (Pause.)
24      MR. BAKER:  The time is 3:19 p.m.  We're

Page 322

1 back on the record.
2 BY MR. BAKER:
3    Q   Okay. Is your testimony that you don't
4 know if you increased the score -- the flagging
5 score from .15 -- from .15 to .65 before the
6 retunement was delivered? Is that your testimony?
7    A   I -- I don't recall. I remember
8 testing.
9    Q   Okay. All right.
10      MR. BAKER: So pull up Exhibit 562-A.
11 BY MR. BAKER:
12    Q   Okay. What is the flagging score on
13 this particular document? Where is it? Do you
14 know?
15      Look at it. What does it say? .65 --
16    A   65.
17    Q   -- right?
18    A   Yes.
19    Q   Okay. So this document -- go to the
20 front page of it, this document is dated 7/7/2010,
21 correct?
22    A   Yes.
23    Q   Okay. So this is what you were using in
24 July of 2010 was a .65 score, correct?

Page 323

1    A   Yes.
2    Q   Okay. And you continued to use that all
3 the way through the time that you had the
4 retunement done, correct?
5      MR. BUSH: Objection.
6 BY MR. BAKER:
7    Q   Do you need time to think about that?
8    A   No. I'm trying to put it all together.
9 It's nine years ago.
10    Q   Okay. Look at me. I think I can help
11 you.
12    A   Go ahead.
13    Q   Okay. Historically, remember the
14 initial program was delivered in December 2008,
15 right?
16      MR. BUSH: Objection.
17 BY MR. BAKER:
18    Q   According to the retunement document,
19 right?
20    A   I didn't agree with the dates that you
21 had.
22    Q   I know that, but according to the
23 retunement document, it says it was delivered in
24 December 2008, the initial SOM computer program

Page 324

1 from CCS, correct?
2    A   That's what it says.
3    Q   Okay. And then it says that in February
4 of 2009, there was revised coefficients delivered.
5 Remember?
6    A   That's what it said.
7    Q   Okay. And those coefficients were
8 different than the later coefficients that were
9 implemented. Remember?
10    A   Yes.
11    Q   Okay. And so what you were doing is you
12 were retuning -- or, actually, you were tweaking
13 the program that was delivered in 2009 when you
14 tweaked it up from .15 to .65, correct?
15      MR. BUSH: Objection.
16      THE WITNESS: I was involved with the
17 testing of that.
18      THE REPORTER: I'm sorry, can you --
19      THE WITNESS: Oh, I was involved with
20 the testing.
21 BY MR. BAKER:
22    Q   The tweaking -- you remember the word
23 "tweak"?
24    A   I do remember that.

Page 325

1    Q   You were involved with the tweaking,
2 correct?
3    A   I used that term, yes.
4    Q   Okay. And so then at the time you were
5 tweaking in 2010, that's when CCS through those
6 e-mails was recommending a retunement. Do you
7 remember that?
8    A   I do.
9    Q   Okay. So what you were tweaking was the
10 2009 coefficient program, correct?
11      MR. BUSH: Objection.
12 BY MR. BAKER:
13    Q   Correct?
14      MR. BUSH: Objection.
15 BY MR. BAKER:
16    Q   That was the most recent one onboard in
17 2010 was the one that was delivered in 2009 with
18 the revised coefficients, correct?
19      MR. BUSH: Objection.
20      THE WITNESS: According to these papers,
21 but I don't agree with these dates.
22 BY MR. BAKER:
23    Q   I know you don't, but that's what the
24 papers say you were doing, right?

Page 326

1  A  That's what the paper said, but I don't
2  agree with that.
3  Q  Okay.  So then in 2011, there's a
4  brand-new program delivered called a "retuned
5  program," correct?  That's what the documents say.
6  A  Okay.
7  Q  Right?
8  A  That's what it says.
9  Q  Okay.  And that retuned program had
10  brand-new coefficients, correct?
11     MR. BUSH:  Objection.
12  BY MR. BAKER:
13  Q  You saw them on the board, remember?
14  A  Yes.
15  Q  Okay.  Different than the coefficients
16  that were existent in 2009 that you tweaked in
17  2010, right?
18     MR. BUSH:  Objection.
19  BY MR. BAKER:
20  Q  Right?
21     MR. BUSH:  Objection.
22     THE WITNESS:  Well, I would have to --
23  BY MR. BAKER:
24  Q  I showed you the coefficients right to

Page 327

1  left up on the page.  Do you remember?
2  A  I would like to -- like, yes, you showed
3  me those dates, yes.
4  Q  But you saw the coefficients right up on
5  the screen, they were different, remember?
6  A  Yes, they were different.
7  Q  Okay.  So then in the -- in the
8  retunement, do you remember where it said that the
9  program was designed to pend an order at .15?  Do
10  you remember that?
11  A  That's what it says.
12  Q  And the retuned program delivered in
13  2011, the program was designed to pend an order at
14  .15, according to that document from CCS, the
15  company that wrote the algorithm-based program,
16  correct?
17  A  Yes.
18  Q  Okay.  In spite of that, CVS still
19  raised the score from .15 to .65 to pend an order
20  from that point forward, correct?
21  A  We gave them the results of what we had
22  in investigations, and it was agreed upon, even
23  with this company, that it was acceptable to start
24  raising it.

Page 328

1  Q  Sir, I showed you documents where y'all
2  went back and forth in 2010 about that, correct?
3  A  It doesn't mean we didn't have
4  conference calls.
5  Q  Okay.  You don't --
6  A  I --
7  Q  Can you point to one document in 2011
8  after the time that the program -- the retuned
9  program was delivered that says you had
10  conferences and did some testing with CCS to raise
11  the program to .65?  Do you have any documents to
12  that effect?
13     MR. BUSH:  Objection.
14     THE WITNESS:  So you're saying these
15  four documents that you presented today was the
16  only thing that went into retuning this?
17  That's -- that's what you're referring to?  That's
18  what you're trying to say?
19  BY MR. BAKER:
20  Q  Listen to my question.
21  A  I heard what you said.  I'm repeating it
22  to make sure I understood that you're saying --
23  Q  My question is this --
24  A  -- that you think these four documents

Page 329

1  that you just showed me are the only documents
2  that took place for us to tweak a number,
3  quote/unquote, as important as this.  You think
4  this is the only thing that happened?
5  Q  Let me explain to you, I have to rely
6  upon what CVS produces to me.
7  A  There's phone conversations, there's
8  conference calls.  CVS is not going to allow me at
9  my level to change an IRR.  I test it, I report
10  the results.  They take the results.  The company
11  that wrote the results, they review the results.
12  They saw the false positives.  I know you don't
13  like that word.  There were a ton of them.
14  Q  Listen --
15  A  They realized that there was an issue
16  with the original algorithm.
17  Q  The original algorithm that was
18  delivered in 2008 that was --
19  A  I don't know about the dates.
20  Q  -- that was retuned in 2011 is what
21  you're saying.
22  A  I don't know about -- I don't know about
23  those dates.  I really don't.
24  Q  Okay.  Now, after 2011, do you have any

Page 330

1 documented conversation that you can show me in
2 any document between you and CCS regarding raising
3 the score from .15 to .65, yes or no?
4     A   I had nothing from 2008.  Nothing.
5 2009, two --
6     Q   Well, I just showed you the e-mails.  Is
7 there anything else?
8     A   They didn't get this from me.
9     Q   Okay.  Whose -- who raised the score
10 within CVS?  Was it the CVS IT department that did
11 it?
12     A   All the information was reported.  Frank
13 Devlin had the ultimate say because he was my
14 superior.
15     Q   Okay.  So it was Frank Devlin.  Is that
16 right?
17     A   He would have to bless it.  Frank would
18 have to bless it to the next level.  I don't know
19 who Frank worked with.  I do know that this
20 company was part of the -- part of the
21 understanding.  There were several conference
22 calls.  We even had our field guys, the analysts
23 and the regional manager, involved with this to
24 explain their investigations.

Page 331

1     Q   Go to Exhibit 9, please.
2         MR. BUSH:  Is that one you've already
3 given us?
4         MR. BAKER:  Yes.
5 BY MR. BAKER:
6     Q   Go to the first page of the SOM SOP.
7 The SOP dated 8/25/10.  Do you see that?
8     A   I'm looking for 9 again.
9     Q   Well, look at it on the board, if you
10 would.
11     A   Okay.
12     Q   Okay.  That's the SO -- SOP that has the
13 SOM inserted into it on 8/25/10.  Do you remember
14 that?
15         MR. BUSH:  So it's this one.
16         THE WITNESS:  I'm not --
17         MR. BAKER:  I'm going -- go back to
18 page 1.  He doesn't remember.
19         THE WITNESS:  That's -- no, I --
20 BY MR. BAKER:
21     Q   Go back to page 1.
22         MR. BUSH:  You're showing him one page
23 of a document that he doesn't have in front of
24 him, Bill.  He needs to know what the document is.

Page 332

1 Just relax.
2 BY MR. BAKER:
3     Q   Amy -- Amy Propatier, DEA SOP 8/25/10.
4 Do you see that?
5     A   Thank you.  Yes.
6     Q   Okay.  This is when Amy Propatier
7 inserted the SOM into the SOP, correct?
8     A   According to this document.
9     Q   Correct.  Okay.  Now go to the first
10 page of the document.
11     A   Okay.
12     Q   All right.  Do you see down where it
13 says "CVS is responsible."  Do you see that?
14     A   I do.
15     Q   Okay.  It says: "CVS is responsible for
16 ensuring compliance with the DEA regulatory
17 requirements, and that responsibility cannot be
18 abdicated or transferred to anyone else."
19         Isn't that what that says?
20     A   That's what it says.
21     Q   Okay.  So CVS -- look at me.
22     A   Hold on.  I want to read the rest of
23 that.
24     Q   -- according to CVS's own policies, is

Page 333

1 "responsible for DEA regulatory compliance, and it
2 cannot be abdicated or transferred to anyone
3 else," correct?
4     A   That's what it says.
5     Q   Okay.  Including CCS or anyone else
6 outside of CVS, correct?  That's what the document
7 says, right?
8         MR. BUSH:  Objection.
9 BY MR. BAKER:
10     Q   Isn't that what it says?
11     A   I'm not sure that's what it meant.
12     Q   Well, it -- it has a facial meaning.
13 There's no -- there's nothing that's confusing
14 about that statement, is there?
15         MR. BUSH:  Objection.
16 BY MR. BAKER:
17     Q   Read it.
18     A   I'll read it again.
19     Q   Read it out loud for us, please, that
20 first sentence.
21     A   Okay.
22     Q   "CVS is responsible" --
23     A   -- "for ensuring compliance" --
24     Q   No, start out with "CVS is responsible,"

Page 334

1 please.
2　　A　No problem.
3　　　"CVS is responsible for ensuring
4 compliance with DEA regulatory requirements, and
5 that responsibility cannot be abdicated or
6 transferred to anyone else."
7　　Q　Correct.
8　　　Okay.　Now, did you ever have any other
9 shortcut formula you used -- you remember when I
10 asked you about those shortcut formulas, the three
11 times LAG?　Do you remember those -- those
12 documents?
13　　A　I remember you referencing that, but I
14 never had a shortcut formula.
15　　Q　Never?
16　　A　Never.
17　　Q　Never ever used one at any time for any
18 reason whatsoever.
19　　A　I never shortcutted anything having to
20 do with hydrocodone.
21　　Q　Okay.　Go to 521, please.　This will be
22 imaged under the screen.
23　　　MR. BUSH:　This is not one we have in
24 hard copy?

Page 335

1　　　MR. BAKER:　We do.
2　　　MR. BUSH:　Thank you.
3　　　(Exhibit No. 521 was premarked for
4　　　identification.)
5 BY MR. BAKER:
6　　Q　This is an e-mail --
7　　　MR. BUSH:　Okay, here.
8 BY MR. BAKER:
9　　Q　-- from John Mortelliti dated October 5,
10 2010.　Do you see that?
11　　A　I do.
12　　Q　Okay.　And you're sending it to a whole
13 bunch of people.　Who are those people?　What's --
14 what's their context of why you would be sending
15 it to them?
16　　A　They are the loss prevention managers in
17 our pharmacy DCs.
18　　Q　Okay.　And it says:　"Regarding
19 Controlled Drug IRR Important Info, Part 2.
20 Importance:　High."　Right?
21　　A　Yes.
22　　Q　Okay.　And it says:　"Team:　I will
23 verify the controlled drug IRR daily for the
24 network, except for Thursday, I have jury duty.　I

Page 336

1 will forward all suspicious orders to everyone on
2 this e-mail until we get an update in the system."
3　　　Now, let me ask you something, what's
4 "an update in the system" mean?
5　　A　This is the time when the historical
6 data was gone and I had to do the historical data.
7　　Q　Uh-huh.　And it says:　"This is
8 controlled drugs only.　I will need each of you to
9 complete your IRR on Thursday because I will not
10 have access to the report.　A rule to use, if
11 there are four months of LAG, usually LAG 3-6,
12 then the item is not suspicious."　Correct?
13　　A　That's what it says.
14　　Q　That's a shortcut, is it not?
15　　　MR. BUSH:　Objection.
16　　　THE WITNESS:　Let me read for a second
17 here so I can grab the context.　(Peruses
18 document.)
19　　　Okay.　There was -- there was more
20 involved with this.　This -- this was letting them
21 know that information is missing, and because that
22 information is missing, they were going to have
23 several flags.
24　　　I don't -- I don't know -- it says

Page 337

1 Part 2.　Do we have Part 1?
2 BY MR. BAKER:
3　　Q　Well, you can look at it below.　You see
4 the Part 1 is:　"Team:　The issue with the hydro
5 items last month appears to be happening again
6 this month with several items.　This includes all
7 drugs that end with pam, carisoprodol, many
8 codones" --
9　　　That would include hydrocodone, correct?
10　　A　Yes.
11　　Q　Okay.　"-- and andro items."
12　　　Do you see that?
13　　A　Yes.
14　　Q　"I verified the entire network this
15 morning, and there are no control drug suspicious
16 orders."
17　　　Do you see that?
18　　A　I do.
19　　Q　Okay.　But then you go up and tell
20 everybody you have jury duty and that a rule to
21 use is if there are four months of LAG, then the
22 item is not suspicious.　The label has been
23 changed and the system believes the item is new,
24 so there is no formulated historical data.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    Do you see that?
2    A    Yeah, but the context is so different.
3    Q    Yeah.  Well, the context is this a
4  shortcut, is it not?
5    A    No, it isn't.
6    Q    It's overriding the system that flags
7  the order by using a shortcut.
8         MR. BUSH:  Objection.
9  BY MR. BAKER:
10    Q    Is it not?
11         MR. BUSH:  Objection.
12         THE WITNESS:  These folks knew what I
13  was referring to.
14         MR. BAKER:  I'm going to strike the
15  answer, "these folks knew."
16  BY MR. BAKER:
17    Q    You don't know what they know.  You're
18  not in their head.
19    A    Oh, I knew.
20    Q    Let me see if I can ask the question,
21  and give the answer without trying to tell me what
22  other folks knew.
23    A    Well, I -- I told them about it.
24    Q    Okay.  Listen to my question.

Page 339

1    A    Sure.
2    Q    This is a shortcut.
3    A    No.
4    Q    It speaks for itself.
5    A    It does.
6    Q    It sure does.
7         All right.  Do you know what ARCOS data
8  is?
9    A    I do not handle ARCOS.
10    Q    Okay.  Do you know what it is?
11    A    I -- it's not part of anything I do.  Do
12  I know that we have ARCOS reports?  Yes.
13    Q    Okay.  Let me show you Exhibit 690.
14         (Exhibit No. 690 was premarked for
15         identification.)
16         MR. BUSH:  Six-nine-oh?
17         MR. BAKER:  Yes, sir.
18  BY MR. BAKER:
19    Q    Okay.  ARCOS reporting.  Now, this is --
20  this is within the SOP of -- this is a page out of
21  the SOP of CVS.  Do you remember reading this or
22  not?
23    A    I read a lot of documents.  This
24  particular page right now, I could tell you I may

Page 340

1  or may not have read it.
2    Q    Okay.  It says:  "ARCOS is the automated
3  system developed by the DEA to track distributors'
4  acquisition and distribution transactions and
5  inventories of certain controlled substances."
6         Do you see that?
7    A    I do.
8    Q    It says:  "Federal regs require
9  distribution centers to report all transactions
10  involving the acquisition or distribution of
11  ARCOS-designated controlled substances.
12  Transaction reports must provide data on each
13  acquisition to inventory and each reduction of
14  inventory.  ARCOS transaction reports must be
15  submitted quarterly so as to be received by the
16  DEA not later than the 15th day of the month.
17  ARCOS reports must list the actual date the
18  controlled substance is received or distributed
19  from the DC."
20         Do you see that?
21    A    I do.
22    Q    Okay.  Now, part of your job as a
23  suspicious order monitor in loss prevention was to
24  make sure that pills aren't lost in the context of

Page 341

1  when they are first delivered into the
2  distribution center and the time that they are
3  delivered to the pharmacy, correct?
4    A    Yes.
5    Q    Okay.  Those are transactions when they
6  were received into the distribution center from
7  whoever CVS purchases those pills from until the
8  time that they get in the control cage at the DC,
9  correct?
10    A    Yes.
11    Q    Okay.  And who -- who was -- who was CVS
12  purchasing the hydrocodone combination products
13  from during the time that you were involved
14  between 2008, 2009, and 2010?
15    A    Which suppliers?
16    Q    Yes, who were they?
17    A    Oh, I -- I don't know.  Maybe I
18  misunderstood your question.
19         My -- my job and responsibility was to
20  investigate any inaccuracy that we had in
21  inventory, whether it be overage or shortages.
22    Q    Okay.  So the inventory comes in from --
23  from vendors who sell the pills to CVS, correct?
24    A    Yes.

Page 342

1    Q   Okay.  And those pills are stored in
2  control cages at the CVS pharmacy -- or narcotics
3  licensed distribution centers, correct?
4    A   Yes.
5    Q   And not all distribution centers are
6  narcotics licensed, correct?
7    A   Correct.
8    Q   Okay.  So what happens then, there's a
9  transaction, a transaction record kept of when
10  those pills come into the distribution center, and
11  then a separate transaction record related to each
12  pill as to when it goes out to a pharmacy,
13  correct?
14    A   Yes.
15    Q   And those numbers should be equal.  That
16  means the amount purchased and recorded in should
17  equal the amount that is distributed as it relates
18  to those same pills and sent to a pharmacy,
19  correct?
20    A   Yes.
21    Q   Okay.  And if they're not equal, what
22  would be the reasons for that?
23    A   We've had vendor shortages.  Temporarily
24  items are miscounted during a daily cycle count.

Page 343

1    Q   Anything else?
2    A   Not off the top of my head.
3    Q   Could the pills have -- have been stolen
4  or gone missing?
5    A   From our distribution center?
6    Q   Yes.
7    A   The entire area is CCTV'd.  So -- but we
8  do validate all that.
9    Q   Do you know whether or not CVS has ever
10  had thousands of pills that have gone missing?
11    A   From our DCs?
12    Q   From between the DCs and the pharmacies
13  during the process.
14        MR. BUSH:  Objection.
15  BY MR. BAKER:
16    Q   During the process of deliveries between
17  the DCs and the pharmacies.
18    A   Thousands of pills.
19    Q   Do you know?
20    A   I do not -- not offhand, I do not.
21    Q   Okay.  In the context of your ARCOS
22  reporting, do you include any items that were
23  purchased from outside vendors --
24    A   In the --

Page 344

1    Q   -- that go directly to the pharmacies?
2        MR. BUSH:  From the outside vendor, you
3  mean?
4        MR. BAKER:  Yes.
5        MR. BUSH:  Objection.
6        THE WITNESS:  I -- I don't -- I'm not
7  involved in that at all.
8  BY MR. BAKER:
9    Q   You don't know.
10    A   I don't know.
11    Q   Okay.  Let me ask you about thresholds.
12  Give me your definition of a "threshold."
13    A   A "threshold" would be a point in where
14  we should be taking a look at something.
15    Q   Okay.  Is the threshold the -- the basis
16  for the program of suspicious order monitoring?
17    A   The --
18        MR. BUSH:  Objection.
19        THE WITNESS:  The term is used a lot.
20        (Exhibit No. 634 was premarked for
21        identification.)
22  BY MR. BAKER:
23    Q   Okay.  Go to Exhibit 634, please.
24        Now, in 2012, were you still in

Page 345

1  logistics?
2    A   I was in logistics, yes.
3    Q   Okay.  I want you to look at this
4  document on page 1.  This is called a "Logistics
5  IRR Analyst Suspicious Order Monitoring Program."
6        This is a policy and procedure at CVS,
7  is it not?
8    A   Yes.
9    Q   Okay.  So this governs what that person
10  should be doing, the logistics IRR analyst, as of
11  effective date June 28, 2011, correct?  Upper
12  left-hand corner.
13    A   Yeah, I --
14    Q   Is that right?
15        MR. BUSH:  Objection.
16        THE WITNESS:  I -- I don't know if
17  this --
18  BY MR. BAKER:
19    Q   This?
20    A   This SOP -- hold on.  Let me read the
21  thresholds here.
22    Q   Okay.  Let me -- let me just -- just
23  look at me, if you would.
24    A   Sure.

Page 346

1  Q  All right.  These SOPs, standard
2  operating procedures, are generated as rules by
3  which people are to operate within CVS, correct?
4       MR. BUSH:  Objection.
5  BY MR. BAKER:
6    Q  Is that right?
7       MR. BUSH:  Objection.
8       THE WITNESS:  The SOPs are out there to
9  document the process or should be in line with the
10  process, I guess.  I don't know.  All I know is I
11  had a process.  I wasn't involved in writing these
12  SOPs.
13  BY MR. BAKER:
14    Q  Okay.  Look at me, if you would.
15       Did you ever allow an order to go to a
16  pharmacy from the DC that exceeded the threshold?
17    A  That exceeded the threshold, if it was
18  approved by the investigation.
19    Q  Okay.  What is a threshold?
20    A  Well, in that context, it's what would
21  flag on the IRR.
22    Q  Okay.  And what would flag -- why would
23  an item flag on the IRR?
24    A  It was a different trend in the order --

Page 347

1  ordering for that item.
2    Q  Was it based on quantity?
3    A  Quantity -- yeah, quantity pretty much.
4  Frequency.
5    Q  Unusual pattern?
6    A  Unusual patterns.
7    Q  Would it have anything to do with ratios
8  of control to non-controlled substances that would
9  be purchased by the pharmacy, or do you know?
10    A  I don't know that.
11    Q  Okay.  Would it have anything to do with
12  unusual pattern as to why it would flag on the
13  computer system or not?
14    A  I do believe that pattern -- unusual
15  pattern, order pattern would flag it.
16    Q  Okay.  So what would be an unusual
17  pattern?  Give me an example of that.
18    A  What would be -- I'm sorry, an
19  unusual --
20    Q  Give me an example of an unusual
21  pattern.
22    A  If a store ordered a quantity of a
23  hundred, zero, zero, zero, and then all of a
24  sudden come up with 400, that's an unusual

Page 348

1  pattern.
2    Q  So even small orders can be considered
3  an unusual pattern, correct?
4    A  Oh, we -- yes.
5    Q  Okay.  So small orders should be
6  investigated the same way that large orders should
7  be investigated, right?
8    A  And -- and we did.
9    Q  Okay.  It says:  "Thresholds" -- under
10  here, do you see where it says:  "Thresholds.  CVS
11  has established thresholds that restrict the
12  amount of controlled drugs" --
13       Do you see that?
14    A  Yes.
15    Q  -- "that can be ordered by each store
16  within a specific time frame.  These thresholds
17  and subsequent analysis of irregular activity are
18  the primary tools to stop suspicious orders of
19  controlled drugs."
20       Do you see that?
21    A  I do.
22    Q  It says:  "Stores may not order more
23  than the threshold amount, and the DC may not ship
24  amounts that exceeds -- that exceed these

Page 349

1  thresholds."  Correct?
2    A  That's what it says.
3    Q  That's the rule that governed as of
4  June 28, 2011, right?
5       MR. BUSH:  Objection.
6       THE WITNESS:  I -- I feel as though
7  that's being taken out of context.  The unusual
8  pattern, for example, I just gave you, if that
9  store's inventory was not to exceed 600, they
10  would have been under inventory.  However, it
11  flagged because of an unusual pattern.
12  BY MR. BAKER:
13    Q  Does this document say that stores may
14  not order more than the threshold amount, and that
15  the distribution center may not ship amounts that
16  exceed these thresholds?  Is that what the
17  document says?
18    A  Yeah, but you related that document to
19  irregular orders.  There's a difference between
20  what the IRR does and what the thresholds in the
21  stores are.
22    Q  Okay.  Listen to my question.  Does this
23  document say that stores may not order more than
24  the threshold amount, and that the distribution

Page 350

1  center may not ship amounts that exceed these
2  thresholds?  Is that what this document says?
3      A    That's what it says.
4      Q    So if anybody at CVS shipped greater
5  than the threshold amount to the distribution
6  center -- from the distribution center to a CVS
7  pharmacy, then that violated this rule, correct?
8      A    In the context you're saying, it's --
9  no.  The stores had a threshold.  It would
10  populate on their system, and they would have to
11  go through a process -- I don't know what it is --
12  to get more ordered.  The IRR flagged the unusual
13  patterns, additional orders.
14      I -- I'll give you an example.  We had a
15  pharmacy buy scripts from a downtown pharmacist.
16  We bought them out.  I saw the information
17  populate on here.  They increased the store's
18  threshold because that store was going to take all
19  those customers on, but it still flags on my IRR.
20  The investigation is done, I get the information.
21  Yeah, go ahead and release it.  This is why, this
22  is what we have.
23      So the threshold of the store, yeah.  Do
24  we ship past the store's thresholds as far as my

Page 351

1  knowledge?  No, I don't think we can.  I think
2  there's something in place that stops that.
3      Q    And if -- if CVS ships in excess of the
4  threshold, then that violates this policy,
5  correct?
6      MR. BUSH:  Objection.
7  BY MR. BAKER:
8      Q    I mean it's black and white.
9      A    It is, but I -- I didn't write it.  I
10  had one job to do, and -- did I go through and
11  digest every single sentence in here?  I did the
12  best I could to make sure nothing was diverted.
13      Q    Okay.
14      A    If I did my job, I'm sure everything in
15  here wouldn't be an issue.
16      Q    Listen to my question.  Listen to my
17  question.
18      A    Go ahead.
19      Q    If CVS shipped an order from a DC to a
20  CVS store in excess of the threshold, then it
21  violates the standards set forth in this SOP,
22  which says stores may not order more than
23  threshold amount, and the DC may not ship amounts
24  that exceed these thresholds.  Correct?

Page 352

1      A    That's what it says.
2      Q    Thank you.
3      And the ARCOS data would show how much
4  was being shipped from the DC to each store,
5  correct?
6      MR. BUSH:  Objection.
7      THE WITNESS:  I mean, does it go to each
8  store?  I don't know.  I don't deal -- I don't
9  work with ARCOS.
10      MR. BAKER:  Give me just one second.
11      I may be done.  Give me a second to
12  review my notes.  We'll take a short break, okay?
13      THE WITNESS:  Okay.
14      THE VIDEOGRAPHER:  The time is 3:46 p.m.
15  We're going off the record.
16      (Pause.)
17      THE VIDEOGRAPHER:  The time is 3:47 p.m.
18  We're back upon the record.
19  BY MR. BAKER:
20      Q    All right.  This program, the suspicious
21  order monitoring program that -- that you ran out
22  of Lumberton, New Jersey, up until the time that
23  it was transferred to Nashville, that was a
24  nationwide program for CVS; is that correct?

Page 353

1      A    Yes.
2      Q    Okay.  And so the volume of what would
3  be shipped overnight is what would be run through
4  the suspicious order monitoring computer system
5  and would either flag or not flag on the IRR,
6  correct?
7      A    The -- yeah, the orders would be ran
8  through the system.
9      (Exhibit No. 641 was premarked for
10      identification.)
11  BY MR. BAKER:
12      Q    Okay.  Let me show you Exhibit 641.
13      Before you read that --
14      A    Okay.
15      Q    -- are you aware of the volume of
16  prescription drug orders that pass through the --
17  the system each night, the CVS system?
18      A    No.
19      Q    Okay.  You're -- you were still employed
20  by CVS in 2012, correct?
21      A    Yes.
22      Q    Okay.  And what was your involvement
23  with suspicious order monitoring at that point?
24      A    I turned it over to -- to the -- the

Page 354

1 team in Knoxville.
2    Q    Were you still involved with -- with
3 receiving and making sure that the items that were
4 received, including narcotic drugs, were stored
5 properly in the controlled drug cage?
6    A    Yes.
7    Q    And were you still responsible for
8 making sure that those received in the controlled
9 drug cage were properly counted, and that when
10 they were distributed to the stores and supplied
11 to the stores that they were properly counted that
12 way out as well?
13    A    We have an audit program in place that
14 actually validates and scans the controlled drugs.
15    Q    Okay. Look at this exhibit in front of
16 you. It's an e-mail dated July 10, 2012, from
17 John Andrade to Pam Hinkle.
18        Do you know who John Andrade is?
19    A    Yes.
20    Q    Who is that?
21    A    I believe he over- -- he oversaw the --
22 the IT or IS department.
23    Q    Okay. And the context of this on the
24 front page, it says: "There are 18 CVS

Page 355

1 distribution centers. 11 are DCA licensed to ship
2 controlled substance II through V. CVS does not
3 ship Schedule II products." Is that correct?
4    A    That's correct.
5    Q    "And stores place orders using CVS's
6 homegrown system called AIM." Is that right?
7    A    I do recall AIM.
8    Q    Okay. And that's the system through
9 which an order is placed from a pharmacy to the
10 distribution center, correct?
11    A    I -- I can't say yes or no. I don't
12 know if there's any way to validate that from --
13 from where we are. I -- we had AIM. I don't know
14 if pharmacy -- what the extent of it was within
15 pharmacy. That I don't know.
16    Q    Okay. Well -- all right. So it says
17 "Volume of orders" on the second page. It says
18 "Rx controls."
19    A    I'm sorry. Where are you?
20    Q    "Volume of orders," do you see it?
21    A    Okay.
22    Q    Okay. "Volume of orders, Rx controls."
23    A    Yes.
24    Q    "Schedules III through V," correct?

Page 356

1    A    Yes.
2    Q    All right. So that's controlled drugs,
3 controlled substances Schedule III through V.
4 Schedule III includes hydrocodone combination
5 products, correct?
6    A    Yes.
7    Q    And PSE, that's pseudoephedrine, which
8 is a chemical -- which is a controlled chemical,
9 correct?
10    A    It's a chemical. I don't know if it's
11 listed as controlled. We treat it as one.
12    Q    Okay. I mean that's part of what pops
13 on the IRR is the PSEs, correct?
14    A    Yes.
15    Q    Okay. So it says: "The controls III
16 through Vs and the PSE comprises 30,000 to 40,000
17 line items." Correct?
18    A    That's what it says.
19    Q    This is talking about nightly, because
20 if you look in the next bullet, it says: "Front
21 store, Rx, promo, et cetera, total approximately
22 to 6 to 8 million records nightly." Correct?
23    A    That's what it says, yes.
24    Q    And of those 6 to 8 million records

Page 357

1 nightly, 30- to 40,000 line items of them are
2 going to be between the Rx controls, substances
3 III through V and the PSE, correct?
4    A    Yes.
5    Q    Okay. So -- so these are high volume
6 numbers, are they not?
7        MR. BUSH: Objection.
8        THE WITNESS: I mean with the same 30-
9 to 40,000 lines, that doesn't necessarily mean --
10 I mean, CVS is a high volume drug -- drugstore
11 company. That 30- to 40,000 doesn't mean that all
12 of these are going to hit the IRR.
13 BY MR. BAKER:
14    Q    I asked you earlier if something flagged
15 on the IRR and it was a hydrocodone combination
16 product, whether you would then, because it was a
17 hydrocodone combination product, flag it to be
18 subject to investigation. Correct?
19    A    It -- yes.
20    Q    Okay. And do you know what the minimum
21 amount of investigation was that you felt
22 appropriate for that to be done?
23    A    I -- I sent all of it, which again led
24 to -- well, the field wanting to understand why

Page 358

1 such small volumes were -- were flagging.
2    Q   Okay.
3    A   But I sent it all.
4    Q   Were you involved with setting the
5 standard of what an investigation should entail as
6 late as mid-2012?
7    A   At the DC level?
8    Q   At any level.
9    A   I don't recall specifically doing that.
10   (Exhibit No. 143 was premarked for
11   identification.)
12 BY MR. BAKER:
13   Q   Okay.  Let me show you what's marked as
14 Exhibit 143.
15   A   Okay.
16   Q   Now, this is an e-mail from you dated
17 May 3, 2012.  Do you see right here, it says from
18 John Mortelliti?
19   A   Yes.
20   Q   Thursday, May 3, 2012.  Do you see that?
21   A   I do.
22   Q   Okay.  And you're sending this to Aaron
23 Burtner, Frank Devlin, Pamela Hinkle and Paul
24 Lawson, correct?

Page 359

1    A   Yes.
2    Q   Burtner and Lawson were loss prevention
3 analysts, correct?
4    A   Yes.  Burtner was the manager, I
5 believe.
6    Q   Okay.  And -- and Devlin was the loss
7 prevention manager within the department of
8 logistics, correct?
9    A   He was the senior director.
10   Q   Okay.  And Pamela Hinkle, what was she?
11   A   I think her title -- and I don't know
12 for sure -- compliance manager.
13   Q   Okay.  But you were telling them what an
14 absolute minimum investigation must have, correct?
15   A   Let me read this real quick.  (Peruses
16 document.)
17       This is -- this is when I transitioned
18 out, and I wanted this group to start getting a
19 better understanding of the data that the field
20 would have.
21       I'm assuming by this time they had VIPER
22 at their fingertips, so they were able to pull
23 the -- well, yeah.  So they would have had it,
24 because they were able to pull out cash sales,

Page 360

1 dispense dosage.
2       This is the information that we -- we
3 always relied on the field, and it would give them
4 a jumping start when they called in for the field
5 to do the investigations in the stores.
6    Q   Okay.  So the process was that if a
7 hydrocodone combination product showed up on the
8 IRR daily, that it would be flagged for automatic
9 review, correct?
10   A   Yes.
11   Q   All right.  And sent for automatic
12 further due diligence or further investigation,
13 correct?
14   A   Yes.
15   Q   Okay.  So it wasn't like a choice where
16 you can have hydrocodone show up on the IRR and
17 decide, Well, we're not going to flag that one and
18 send it for investigation.  Every single one of
19 them needed to be sent for investigation; is that
20 right?
21   A   Yes.
22   Q   Okay.  And if they weren't, that would
23 violate the policies and procedures of CVS that
24 you knew them to be, correct?

Page 361

1       MR. BUSH:  Objection.
2       THE WITNESS:  Oh, we had -- we had a
3 process in place that we would -- we would call
4 these in and have them investigated.  If you're
5 asking -- well, no, go ahead.
6 BY MR. BAKER:
7    Q   Well, let me -- just look at me, if you
8 would.  Let's just talk for a second and not look
9 at a document.  All right.
10      So -- so when you were involved with
11 reviewing the IRR by yourself --
12   A   Yes.
13   Q   -- if an HCP, a hydrocodone combination
14 product, showed up on that daily IRR, bam, that
15 thing got flagged to be sent out to be
16 investigated, correct?
17   A   All the items, yes.
18   Q   Every single one of them.  Because as we
19 pulled up your testimony, do you remember --
20   A   Mm-hmm.
21   Q   -- we showed that every one of those was
22 considered worthy of further due diligence,
23 correct?
24   A   Yes.  I used the Donna Walker

Page 362

1 spreadsheet.
2    Q   Right.
3    A   -- that you gave me, yes.
4    Q   And you're not supposed to take a
5 shortcut and decide you're not going to
6 investigate it.  You investigate every single HCP
7 ordered on that IRR.  That's -- that was the
8 standard you were following, correct?
9       MR. BUSH:  Objection.
10      THE WITNESS:  That's what I did.
11 BY MR. BAKER:
12   Q   Okay.  And when you were giving
13 instructions in 2012 to these people in -- that
14 were doing loss prevention analysis, you were
15 telling them exactly how it needed to be done, the
16 absolute minimum that needed to be done for that
17 type of investigation, right?
18      MR. BUSH:  Objection.
19 BY MR. BAKER:
20   Q   Right?
21   A   This -- this wasn't part of the
22 investigation.  This was the data that they were
23 supposed to have prepared for when they forwarded
24 it on for an -- an order that flagged.

Page 363

1    Q   Okay.  Well, let's take a look, okay?
2 Go down to the context of the e-mail if you want
3 to take it in sequence.
4    A   Okay.
5    Q   All right.  So if you go right below
6 that, it shows that Aaron Burtner is telling you,
7 John Mortelliti -- now, let me ask you, was --
8 were you Aaron Burtner's boss at some point?
9    A   No.
10   Q   Okay.  Why was Aaron Burtner
11 communicating with you, to your knowledge?
12   A   Because I trained him prior to him
13 taking over Knoxville.
14   Q   Okay.  When you trained Aaron Burtner,
15 did you train him to do just like you did, to the
16 extent that if an IRR flagged a -- a hydrocodone
17 combination product on the -- on the daily IRR,
18 that that is to go to further due diligence
19 automatically because it is an HCP?
20   A   I trained him on how I did it.  I don't
21 know -- this was no longer under me at this time.
22   Q   Okay.  But did you train him that that's
23 the way that you did it?
24   A   Yes.

Page 364

1    Q   Okay.  And you felt that to be necessary
2 in order to fully investigate things relative to
3 what was required under the Controlled Substances
4 Act, correct?
5    A   Prior to having all this other
6 information, I didn't take a chance.  I erred on
7 the side of caution.
8    Q   Okay.  And -- and so if you see the
9 context of this, it's April 20, 2012, and you see
10 flagged on the IRR there were hydrocodone
11 combination products.  For instance, the first one
12 is hydrocodone combination product 5 milligrams of
13 hydrocodone to 500 milligrams of the combination
14 product, correct?
15   A   Yes.
16   Q   And that's typically acetaminophen,
17 correct?
18   A   Yes.
19   Q   All right.  The second one is
20 hydrocodone, 7.5 milligrams to 750 milligrams of
21 acetaminophen, correct?
22   A   Yes.
23   Q   All right.  So those are examples of --
24 of two that flagged that should be investigated by

Page 365

1 the way that things should be done at CVS if they
2 popped on the IRR as a hydrocodone combination
3 product, correct?
4    A   If -- when I was doing it, yes.  I --
5 when I turned it over to Knoxville, I did my
6 training, I was done.  I don't know if they had
7 anything else in place.
8    Q   Okay.  But that's what you trained Aaron
9 Burtner to do, right?
10   A   I trained him on how I did it.
11   Q   And you trained him to investigate every
12 hydrocodone combination product that showed up on
13 the daily IRR, correct?
14      MR. BUSH:  Objection.
15 BY MR. BAKER:
16   Q   I mean you showed him that's how you did
17 it.
18   A   I told him that's how I did it, yes.
19   Q   Okay.  And you were hoping that's how he
20 would do it too, to carry forward with the way you
21 did it, right?
22      MR. BUSH:  Objection.
23      THE WITNESS:  At this point, Pam took it
24 over.  There's a lot more information here.  I

Page 366

1 don't know if that made a difference or not. So
2 I -- I can't comment on why he did it or didn't do
3 it. I was -- they tried to keep pulling me into
4 this, but I really wasn't hands on at this point
5 when it got to this level.
6 BY MR. BAKER:
7    Q   Well, let me ask you something. We went
8 through earlier that when a HCP or hydrocodone
9 combination product popped on the IRR, it was
10 flagged on the IRR by the computer, that the only
11 reason you knew it was suspicious or potentially
12 suspicious is because it was there. Do you
13 remember that?
14    A   I do remember saying that.
15    Q   Okay. Because there's nothing that you
16 can look to on the IRR itself that tells you
17 anything more than that it's just there. Right?
18       MR. BUSH:  Objection.
19       THE WITNESS:  The rest of the IRR, you
20 can look at the patterns by month of the orders.
21 You can look to see if anything else flagged for
22 the cocktails for that store for the month. So
23 you're able to paint a picture of what's actually
24 going on, volume of the store, things like that,

Page 367

1 but when it came to the hydrocodone, I still erred
2 on the side of caution and sent those out.
3 BY MR. BAKER:
4    Q   Because they needed further due
5 diligence done to comply with the DEA requirements
6 of suspicious order monitoring, right?
7       MR. BUSH:  Objection.
8 BY MR. BAKER:
9    Q   Is that right?
10      MR. BUSH:  Objection.
11      THE WITNESS:  I don't know if that was a
12 DEA requirement that every single one get followed
13 up on. I erred on the side of caution when I did
14 this during the time I did it.
15 BY MR. BAKER:
16   Q   Okay. Because you were trying to comply
17 with the context of what the DEA required under
18 suspicious order monitoring, correct?
19      MR. BUSH:  Objection.
20      THE WITNESS:  I always looked at it as
21 I'm trying to ensure that to the best of my
22 ability that no bottles were diverted.
23 BY MR. BAKER:
24   Q   Okay. And if they weren't investigated,

Page 368

1 then you were taking a chance that there was going
2 to be diversion with respect to that order,
3 correct?
4       MR. BUSH:  Objection.
5       THE WITNESS:  Was I taking a chance?
6 BY MR. BAKER:
7    Q   If you didn't have it investigated.
8    A   I never thought of it. I -- I --
9    Q   You never thought of it? I mean that's
10 the whole reason why you're doing it.
11      MR. BUSH:  Let him finish. He hadn't
12 finished his answer.
13      THE WITNESS:  I never thought of not
14 getting something investigated. I mean I held the
15 order. The store, if they wanted it, an
16 investigation takes place. I never thought, Well,
17 what if they don't get back to me?
18 BY MR. BAKER:
19   Q   Right.
20   A   If you don't get back to me, you're
21 still not getting it.
22   Q   In other words, investigation required
23 at a minimum that you do some additional due
24 diligence of a HCP or hydrocodone combination

Page 369

1 product that showed up on the IRR, correct?
2    A   Yes.
3    Q   Okay. So what you did was you wrote an
4 e-mail to Aaron Burtner and Paul Lawson, and
5 others within CVS, May 3, 2012, that said: "Team:
6 Please see below. This is the absolute minimum an
7 investigation must have."
8       Tell us what you said that absolute
9 minimum investigation must include.
10   A   All right. Let me see here. All
11 investigations must --
12   Q   Begin with "Each store."
13   A   "Each store must be broken down by drug
14 data. If the investigation needs to move forward,
15 you will need to include items such as, but not
16 limited to, doctor names, multiple store
17 locations, et cetera."
18   Q   What's the "et cetera"?
19   A   Well, I'm going to assume at the time
20 when I wrote this, it was the -- the examples that
21 Burtner has on the bottom.
22   Q   Okay. So you asked him to do what --
23 you asked Mr. Burtner to do what?
24   A   To take into consideration of the

Highly Confidential - Subject to Further Confidentiality Review

---

Page 370

1 information that he had at his fingertips once he
2 received the field software.
3    Q  Okay.  And you said:  "Aaron, please
4 create" -- go ahead.
5    A  Okay.  "Aaron, please create an
6 investigation work instruction to include the
7 steps taken to successfully complete an
8 investigation.  Please try to get the draft to the
9 team, including Frank, by next Wednesday."
10    Q  Okay.  And that would be the
11 investigation that would be required on every
12 hydrocodone combination product order that
13 appeared on the IRR daily, correct?
14    A  Yes.  For his -- for his team.
15    Q  All right.  So with respect to when you
16 turned the program over to Pam Hinkle, you don't
17 really know, correct?
18    A  Pam -- Pam had it by now.  I was still
19 supporting it.  The reason why I know Pam had it
20 is because I wrote on this e-mail:  "All
21 investigations must go through Pam.  If she has
22 any questions, she can contact me for review."
23      So Pam had it at this point.
24    Q  Okay.  You would be really disappointed

---

Page 371

1 if you had a team that only -- or you were
2 managing a team of people who were only sending,
3 say, two to three to four to five out of a hundred
4 that popped on the IRR as hydrocodone combination
5 products for further investigation.  That would
6 disappoint you, wouldn't it?
7      MR. BUSH:  Objection.
8      THE WITNESS:  It -- it would depend on
9 the information that they had.  I didn't have the
10 information that this group had.  I didn't review
11 it like they had.  I -- I didn't see it.
12 BY MR. BAKER:
13    Q  Well, the IRR we know doesn't tell you
14 what a due diligence further investigation would
15 tell you, correct?
16    A  And that is the reason why I forwarded
17 all that information.
18    Q  And that's the reason why you
19 forwarded --
20    A  I forwarded --
21    Q  -- all hydrocodone combination product
22 that appeared -- all hydrocodone combination
23 products that appeared on the IRR as a flagged
24 item on the IRR for further due diligence

---

Page 372

1 investigation, correct?
2    A  Yes, because I didn't have this
3 information, this software that they had at this
4 time.  I don't know what they did after they had
5 this or what this actually told.
6    Q  Or if the software did what you would
7 consider a due diligence investigation consistent
8 with what you thought to be due diligence,
9 correct?
10      MR. BUSH:  Objection.
11      THE WITNESS:  Again, I -- I can't
12 comment on it because I -- I wasn't there for that
13 part.
14      MR. BAKER:  All right.  That's all I
15 have.  Thank you very much.
16      THE WITNESS:  Okay.
17      MR. BUSH:  I want a minute with the
18 witness, and I may have a question.
19      MR. BAKER:  Okay.
20      THE VIDEOGRAPHER:  The time is 4:05 p.m.
21 We're going off the record.
22      MR. BAKER:  Oh, yes.  Let's go back on.
23 I have to put 613 in because it wasn't actually
24 entered.  We're just going to enter 613.  We

---

Page 373

1 already discussed 613.  It's going to be entered
2 as an exhibit.
3      THE VIDEOGRAPHER:  Now off the record?
4      MR. BUSH:  Yes.
5      THE VIDEOGRAPHER:  The time is 4:05 p.m.
6 We're going off the record.
7      (Recess.)
8      MR. BAKER:  Let me put this on the
9 record.
10      MR. BUSH:  I'm leaving the room.  You
11 can put it on the record.
12      MR. BAKER:  Okay.  I'm going to put on
13 the record here that I asked counsel to not confer
14 with the witness while he's on the stand
15 testifying during the deposition between the time
16 that I just ended my cross-examination and he's
17 going to start his direct.  He wouldn't agree with
18 me that he would fail to do that.  He simply said
19 he was going to do what he wanted to do.
20      It is not within the rules of ethics or
21 within the rules of procedure allowable to do
22 that, and I object to that being done today and in
23 every other deposition that we take in this case
24 and during the trial of this case.

---

Page 374

1      MR. SMITH: You mischaracterized what he
2   said. He didn't say he was going to do what he
3   wanted to do. He said he was going to do what he
4   was going to do.
5      MR. BAKER: Okay. He said he was -- go
6   ahead.
7      He said he was going to do what he is
8   going to do. So I misstated that precise word,
9   but I think that accurately portrayed it. So go
10  ahead. So they're back in the room, and I trusted
11  that did not take place.
12     THE VIDEOGRAPHER: The time is 4:08 p.m.
13  We're back on the record.
14        CROSS-EXAMINATION
15  BY MR. BUSH:
16     Q   Mr. Mortelliti, you recall that you were
17  asked some questions about what you called the
18  green bar?
19     A   Yes.
20     Q   And Mr. Baker put up on the screen what
21  I think he called an electronic version of the IRR
22  reports.
23     A   It was the electronic version, yes.
24     Q   All right. And you did not take notes

Page 375

1   on any electronic version of an IRR, did you?
2      A   No. Only green bar.
3      Q   And the electric -- green bar copies of
4   the reports were available in some circumstances
5   in places other than Lumberton, right?
6      A   Yes.
7      Q   And so if there were copies of green bar
8   reports from say Indy or Knoxville, they wouldn't
9   have your handwritten comments on the report that
10  reflected whatever review you had done of any of
11  the items on the report, right?
12     MR. BAKER: Object to form.
13     THE WITNESS: Correct.
14  BY MR. BUSH:
15     Q   And where would you have to go to find a
16  copy of an IRR that had your handwritten comments
17  on it?
18     A   I kept the six months plus current in my
19  office. After the eighth month, they would go
20  into archives.
21     Q   All right. And do you -- I think you
22  did testify a bit about looking for IRRs. Do you
23  recall that subject general -- generally?
24     A   Yes.

Page 376

1      Q   And was the IRRs -- or were the IRRs
2   that you were looking for the ones that had your
3   handwritten notes on it?
4      A   Yes.
5      Q   And was the search that you conducted in
6   Lumberton?
7      A   Yes.
8      Q   And is where -- is that where those
9   copies were archived?
10     A   Yes.
11     Q   And -- and I think you also testified
12  about the three-year document retention policy
13  at -- that was in place at Lumberton?
14     A   Yes.
15     Q   And did you come to understand what had
16  happened to the copies of the IRR reports that had
17  your notes on them?
18     A   Yes.
19     Q   And what -- what had happened?
20     A   They got cleaned up by month. All this
21  out by month until all -- all the years were gone.
22     Q   All right. And -- and was that done in
23  accordance with the three-year document retention
24  policy that you testified about?

Page 377

1      A   Yes.
2      MR. BUSH: All right. I have nothing
3   further.
4        RECROSS-EXAMINATION
5   BY MR. BAKER:
6      Q   Where does the three-year document
7   retention policy originate?
8      A   I don't know. I -- I -- for compliance,
9   I know OSHA has expectations of two years. I
10  don't know where it originated.
11     Q   Well, we've seen e-mails that go way far
12  beyond three years that -- that were saved in the
13  computer systems at CVS, right?
14     A   Yeah, that -- yeah, not -- that wasn't
15  my computer. That --
16     Q   Yeah, I understand. And that's the --
17  the computer system at CVS is able to store that
18  data, which allowed it to be pulled when we
19  requested it in this case, correct?
20     A   Yes.
21     Q   Okay. And that computer system at CVS
22  also has a computer copy of the green bar,
23  correct?
24     MR. BUSH: Objection.

Page 378

1  BY MR. BAKER:
2    Q   Right?
3        MR. BUSH:  Objection.
4        THE WITNESS:  Yes.
5  BY MR. BAKER:
6    Q   Okay.  And so if somebody destroyed the
7  green bar off the computer system, that would be
8  something in addition to the paper copy that was
9  destroyed, correct?
10       MR. BUSH:  Objection.
11 BY MR. BAKER:
12   Q   Correct?
13       MR. BUSH:  Objection.
14       THE WITNESS:  It -- you're asking me if
15 someone intentionally destroyed?
16 BY MR. BAKER:
17   Q   If somebody was to have erased the CVS
18 green bars off the computer system, that would be
19 a separate task aside from destroying the paper
20 copies, correct?
21   A   Yeah, I had no control over the green
22 bars.  How long they stay, when they drop off,
23 I -- I don't know anything about the electronic
24 copies.

Page 379

1    Q   I think you said one of the reasons the
2  documents were destroyed is because of room in
3  warehouses.  Do you remember that?
4    A   Talking about the paper documents.
5    Q   Right.  But a computer can store things
6  on a system that doesn't take up a lot of room,
7  correct?
8    A   Yes.
9    Q   Okay.  So why was the computer copy
10 destroyed?  Tell me.
11       MR. BUSH:  Objection.
12       THE WITNESS:  I never had a computer
13 copy of that.
14 BY MR. BAKER:
15   Q   I -- well, it comes to you from a
16 computer, correct?  The IRR is printed off a
17 computer.
18   A   Yeah, not my computer.
19   Q   Right.  But it -- it pops up on a
20 computer system, and then somebody hits "print,"
21 and you go get the paper copy from that room,
22 correct?
23       MR. BUSH:  Objection.
24 BY MR. BAKER:

Page 380

1    Q   Right?
2    A   Actually, it was an auto-print to a
3  specific job that's put into the system.
4    Q   Right.
5    A   So it comes from corporate auto-printed.
6  I would get that green bar first thing.
7    Q   Right.  But the green bar is kept on a
8  computer, not on a piece of paper.  The piece of
9  paper is printed off the computer, correct?
10       MR. BUSH:  Objection.
11       THE WITNESS:  How long that data is on
12 there, I don't know.
13 BY MR. BAKER:
14   Q   No, just listen to my question.  The
15 green bar is created on a computer, correct?
16       MR. BUSH:  Objection.
17       THE WITNESS:  Yes.
18 BY MR. BAKER:
19   Q   Okay.  And then somebody prints it onto
20 a printer, right?
21   A   Well, it's automatic.
22   Q   Right.  But when it's printed onto a
23 printer, it -- the whole set of data that you
24 print onto the printer still stays -- lives on

Page 381

1  that computer, correct?
2    A   I don't know anything about the
3  corporate computers.
4    Q   Oh, come on.
5    A   I don't.
6    Q   When you -- when you open up and type a
7  Word document in Word -- Microsoft Word and you
8  save it, you can print it, and the paper copy
9  prints out on a printer, right?
10   A   Yes.
11   Q   Okay.  And you have a choice to either
12 save or destroy that document that you print,
13 correct?
14   A   I do.
15   Q   Okay.  But the electronic copy of that
16 document lives on that hard drive of that
17 computer, correct?
18       MR. BUSH:  Objection.
19 BY MR. BAKER:
20   Q   Right?
21       I mean, everyday common sense, what's
22 the answer to that question?
23       MR. BUSH:  Objection.
24       THE WITNESS:  It -- yeah, it's

Page 382

1 somewhere.
2 BY MR. BAKER:
3    Q  Right. It's on the hard drive of that
4 computer, right? So if you wanted to go back and
5 reprint it, you could by going into the hard
6 drive, correct?
7    A  No, I couldn't. I would have to send a
8 request to some of the people you saw earlier.
9    Q  Oh, come on.
10    A  That's exactly how it was done.
11    Q  Do you own a laptop?
12    A  I do, but this green bar --
13    Q  Do you --
14    A  -- did not come from a laptop.
15    Q  Do you understand that when you create a
16 document that you're saving it on your computer in
17 the hard drive of the computer? Do you even
18 understand that?
19    A  I never had that on my -- it's on the
20 internet. It's not on my laptop.
21    Q  Okay. I'm not talking about the green
22 bar. I'm just using common sense.
23    A  Oh, I'm trying to work with you with
24 common sense --

Page 383

1    Q  Okay. If I was --
2    A  -- but you're trying to tell me
3 something that doesn't exist.
4    Q  If you open up your laptop and type
5 something, and then you hit "Save," it saves onto
6 the computer hard drive, correct?
7    A  What's that have to do with the green
8 bar?
9    Q  I'm going to explain that to you.
10    A  Okay.
11    Q  But it saves on the computer hard drive,
12 right?
13    A  Sure. In that scenario, yes.
14    Q  Okay. And so this system, this computer
15 system through which the IRR green bar document is
16 created, that's a computer-generated document as a
17 result of an order or a set of nightly orders from
18 the pharmacies to the distribution centers going
19 through the SOM computer algorithm process,
20 correct?
21      MR. BUSH: Objection.
22      THE WITNESS: It goes through some
23 warehouse management system computerized.
24 BY MR. BAKER:

Page 384

1    Q  Right. Okay. And when it does, it then
2 lives on the computer until it is -- until it is
3 printed onto a physical piece of paper, correct?
4      MR. BUSH: Objection.
5 BY MR. BAKER:
6    Q  Right?
7      MR. BUSH: Objection.
8      THE WITNESS: I don't know how long it
9 lives on the computer.
10 BY MR. BAKER:
11    Q  I'm not asking you how long. It's on
12 the computer and then you can print it, right?
13    A  No. No.
14    Q  Come on.
15    A  It's automatically sent to a green bar
16 machine that prints it out.
17    Q  Yeah, there's data --
18    A  There's no --
19    Q  The data --
20      MR. BUSH: Hold on. Let him finish.
21      THE WITNESS: Let me explain. There's
22 no pulling up a computer, hit "Print" now, "Save."
23 There's none of that.
24 BY MR. BAKER:

Page 385

1    Q  I understand. If --
2    A  For whatever reason, if the thing jams
3 up, I don't know, something I get --
4    Q  Where is the server?
5      MR. BUSH: Hold on. Let him finish his
6 answer, please.
7 BY MR. BAKER:
8    Q  Go ahead.
9    A  You've got to ask them to resend the
10 print jobs. They have print jobs. I think that
11 was B106R or something, so you would have to
12 request that. You would have to request that for
13 DEA if they did an audit.
14    Q  Okay. Where is the data that exists for
15 what is put onto that green bar? Where -- where
16 does it live?
17    A  I -- I don't know. Corporate. That's
18 the only thing, corporate.
19    Q  And that would be in Woonsocket, Rhode
20 Island?
21    A  I -- I'm assuming that.
22    Q  Okay. On a computer system there?
23    A  On some warehouse management system.
24    Q  Okay. Did you check that before you

Page 386

1 came to your deposition?
2    A   No.  Why would I?
3    Q   Okay.  For the same reason that you went
4 and hunted for the paper copies.
5    A   The paper copies had my information on
6 it.  I would have loved to have been able to
7 present that.
8    Q   Correct.  But the -- the number that
9 appeared on the IRR, that would be on the
10 documents that are inside the computer system in
11 Woonsocket, Rhode Island, not the paper copy.
12       MR. BUSH:  What number?
13 BY MR. BAKER:
14    Q   The number of hydrocodone combination
15 products that popped on the IRR daily would exist
16 on that green bar that's inside the computer
17 system in Woonsocket, correct?
18       MR. BUSH:  Objection.
19       THE WITNESS:  It would look like what
20 you sent me.
21 BY MR. BAKER:
22    Q   Sir, would that be correct?
23    A   It would look like what you put on the
24 board earlier.

Page 387

1    Q   Okay.  But it could be converted to the
2 green bar, correct?
3       MR. BUSH:  Objection.
4 BY MR. BAKER:
5    Q   That data could be converted to the
6 green bar.
7       MR. BUSH:  Objection.
8 BY MR. BAKER:
9    Q   Is that right?
10    A   I -- I don't know how that works.  I
11 never thought about it.
12    Q   Okay.  If anybody destroyed those green
13 bars, it was CVS, right?
14    A   After the three years, yes.
15       MR. BAKER:  That's all I have.  Thank
16 you.
17       MR. BUSH:  All right.  Thank you.
18       THE VIDEOGRAPHER:  The time is 4:19 p.m.
19 January 23rd, 2019.  Going off the record,
20 completing the videotaped deposition.
21       (Whereupon, the deposition of
22       HENRY JOHN MORTELLITI, III was concluded
23       at 4:19 p.m.)
24

Page 388

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2    The undersigned Certified Shorthand Reporter
3 does hereby certify:
4    That the foregoing proceeding was taken before
5 me at the time and place therein set forth, at which
6 time the witness was duly sworn; That the testimony
7 of the witness and all objections made at the time
8 of the examination were recorded stenographically by
9 me and were thereafter transcribed, said transcript
10 being a true and correct copy of my shorthand notes
11 thereof; That the dismantling of the original
12 transcript will void the reporter's certificate.
13    In witness thereof, I have subscribed my name
14 this date:  January 26, 2019.
15
16       _____
17       LESLIE A. TODD, CSR, RPR
18       Certificate No. 5129
19 (The foregoing certification of
20 this transcript does not apply to any
21 reproduction of the same by any means,
22 unless under the direct control and/or
23 supervision of the certifying reporter.)
24

Page 389

1       INSTRUCTIONS TO WITNESS
2    Please read your deposition over carefully and
3 make any necessary corrections. You should state the
4 reason in the appropriate space on the errata sheet
5 for any corrections that are made.
6 After doing so, please sign the errata sheet
7 and date it.
8    You are signing same subject to the changes you
9 have noted on the errata sheet, which will be
10 attached to your deposition.  It is imperative that
11 you return the original errata sheet to the deposing
12 attorney within thirty (30) days of receipt of the
13 deposition transcript by you. If you fail to do so,
14 the deposition transcript may be deemed to be
15 accurate and may be used in court.
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1         ------
2         E R R A T A
3         ------
4  PAGE LINE CHANGE
5  ____ ____ _____
6  REASON: _____
7  ____ ____ _____
8  REASON: _____
9  ____ ____ _____
10 REASON: _____
11 ____ ____ _____
12 REASON: _____
13 ____ ____ _____
14 REASON: _____
15 ____ ____ _____
16 REASON: _____
17 ____ ____ _____
18 REASON: _____
19 ____ ____ _____
20 REASON: _____
21 ____ ____ _____
22 REASON: _____
23 ____ ____ _____
24 REASON: _____

Page 391

1         ACKNOWLEDGMENT OF DEPONENT
2
3      I,_____, do hereby
4  certify that I have read the foregoing pages, and
5  that the same is a correct transcription of the
6  answers given by me to the questions therein
7  propounded, except for the corrections or changes in
8  form or substance, if any, noted in the attached
9  Errata Sheet.
10
11 _____
12 HENRY JOHN MORTELLITI, III          DATE
13
14
15 Subscribed and sworn to
16 before me this
17 _____day of_____,20___.
18 My commission expires:_____
19 _____
20 Notary Public
21
22
23
24