Highly Confidential - Subject to Further Confidentiality Review

1               IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF OHIO

3                        EASTERN DIVISION

4

5       ---------------------------x

6       IN RE: NATIONAL PRESCRIPTION ) MDL No. 2804

7       LITIGATION                   ) Case No. 17-md-2804

8       This document relates to:    ) Hon. Dan A. Polster

9       All Cases                    )

10      ---------------------------x

11          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12                 CONFIDENTIALITY REVIEW

13          VIDEOTAPED DEPOSITION OF BRIAN MUNROE

14                    WASHINGTON, D.C.

15                 TUESDAY, MARCH 19, 2019

16                      9:14 A.M.

17

18

19

20

21

22

23

24      Reported by: Leslie A. Todd

Page 2

1     Deposition of BRIAN MUNROE, held at the offices

2  of:

3

4

5                ARNOLD & PORTER KAYE SCHOLER, LLP

6                601 Massachusetts Avenue, N.W.

7                Washington, D.C. 20001

8                (202) 942-5000

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 3

1            A P P E A R A N C E S

2

3   ON BEHALF OF THE MDL PLAINTIFFS:

4       PARVIN AMINOLROAYA, ESQUIRE

5       SEEGER WEISS, LLP

6       77 Water Street, 8th Floor

7       New York, New York 10005

8       (212) 584-0700

9

10  ON BEHALF OF THE TENNESSEE PLAINTIFFS:

11      TRICIA HERZFELD, ESQUIRE

12      BRANSTETTER, STRANCH & JENNINGS, PLLC

13      223 Rosa L. Parks Avenue, Suite 200

14      Nashville, Tennessee 37203

15      (615) 254-8801

16

17  ON BEHALF OF ENDO PHARMACEUTICALS and PAR:

18      JOSHUA M. DAVIS, ESQUIRE

19      WREDE SMITH, ESQUIRE

20      ARNOLD & PORTER KAYE SCHOLER, LLP

21      601 Massachusetts Avenue, N.W.

22      Washington, D.C. 20001

23      (202) 942-5000

24

Page 4

1   APPEARANCES (Continued):

2       JOBINA JONES-McDONNELL, ESQUIRE

3       ENDO PHARMACEUTICALS

4

5   ON BEHALF OF THE WITNESS:

6       WALTER W. COHEN, ESQUIRE

7       OBERMAYER REBMANN MAXWELL & HIPPEL LLP

8       200 Locust Street, Suite 400

9       Harrisburg, Pennsylvania 17101-1508

10      (717) 234-9730

11

12  ON BEHALF OF WALMART:

13      SHIRLETHIA V. FRANKLIN, ESQUIRE

14      JONES DAY

15      51 Louisiana Avenue, N.W.

16      Washington, D.C. 20001-2113

17      (202) 879-3939

18

19  ON BEHALF OF PURDUE PHARMA:

20      NICHOLAS A. NOVY, ESQUIRE

21      DECHERT, LLP

22      Cira Centre, 2929 Arch Street

23      Philadelphia, Pennsylvania 19104-2808

24      (215) 994-4000

Page 5

1   APPEARANCES (Continued):

2

3   ON BEHALF OF ADAM KASAAB:

4       J. MICHAEL CONNOLLY, ESQUIRE

5       CONSOVOY McCARTHY, PLLC

6       3033 Wilson Boulevard

7       Suite 700

8       Arlington, Virginia 22201

9       (703) 243-9423

10

11  ON BEHALF OF McKESSON CORPORATION:

12      GABRIEL FULMER, ESQUIRE

13      COVINGTON & BURLING LLP

14      One CityCenter

15      850 Tenth Street, NW

16      Washington, DC 20001-4956

17      (202) 662-5769

18

19  ON BEHALF OF WEST VIRGINIA BOARD OF PHARMACY:

20      HARRISON CYRUS, ESQUIRE (Remote Streaming)

21      BAILEY & WYANT, PLLC

22      500 Virginia Street East, Suite 600

23      Charleston, West Virginia 25301

24      (304) 345-4222

Page 6

```
1   APPEARANCES (Continued):
2
3       SARAH MILLER BENOIT, ESQUIRE
4        (Remote Streaming)
5       ULMER & BERNE, LLP
6       65 East State Street
7       Suite 1100
8       Columbus, Ohio 43215-4213
9       (614) 229-0000
10
11  ON BEHALF OF AMERISOURCEBERGEN:
12      M. PATRICK YINGLING, ESQUIRE
13       (Remote streaming)
14      REED SMITH LLP
15      10 South Wacker Drive, 40th Floor
16      Chicago, Illinois 60606-7507
17      (312) 207-2834
18
19  ALSO PRESENT:
20      ERICA KUBLY, Seeger Weiss, Law Clerk
21      SCOTT SIEGEL, Seeger Weiss, Paralegal Manager
22      JEFF SAYRES, Trial Consultant
23      DANIEL HOLMSTOCK, Videographer
24
```

Page 7

```
1           C O N T E N T S
2   EXAMINATION OF BRIAN MUNROE          PAGE
3       By Ms. Aminolroaya          15, 425
4       By Ms. Herzfeld             303
5       By Mr. Davis                419
6
7
8
9           E X H I B I T S
10          (Attached to transcript)
11  ENDO-MUNROE DEPOSITION EXHIBITS       PAGE
12  No. 1    (Exhibit number not used.)
13  No. 2    Subpoena to Testify at a Deposition
14          in a Civil Action          22
15  No. 3    LinkedIn profile of Brian Munroe,
16          E1900.1 to E1900.3          52
17  No. 4    E-mail re No Subject EML, Bates
18          ENDO-OPIOID_MDL-02210739 to
19          02210763                84
20  No. 5    (Exhibit number not used.)
21  No. 6    Document entitled "3 Waves of the
22          Rise in Opioid Overdose Deaths,"
23          E1901.1                 108
24
```

Page 8

```
1           E X H I B I T S (Continued)
2           (Attached to transcript)
3   ENDO-MUNROE DEPOSITION EXHIBITS       PAGE
4   No. 7    E-mail string re Urge Your Member of
5           Congress to Join the Bipartisan
6           Congressional Caucus on Drug Policy,
7           Bates PPLPC018000141199 to
8           18000141201             118
9   No. 8    E-mail re Note the Bold at end,
10          Bates PPLPC019000154246 to
11          19000154249             121
12  No. 9    E-mail re Invoice from Consultant
13          Munroe, Bates PPLPC023000118882    123
14  No. 10   (Exhibit number not used.)
15  No. 11   E-mail string re Slides, Bates
16          ENDO-OPIOID_MDL-02212973 to
17          02213004                131
18  No. 12   E-mail string re Percocet, Bates
19          ENDO-OPIOID_MDL-06146694 to
20          06146695, with attachment   152
21  No. 13   E-mail re Dec. 20th Meeting
22          Follow-Up, Bates ENDO-OR-CID-
23          00707260 to 00707267        160
24
```

Page 9

```
1           E X H I B I T S (Continued)
2           (Attached to transcript)
3   ENDO-MUNROE DEPOSITION EXHIBITS       PAGE
4   No. 14   Demonstrative created at
5           deposition              165
6   No. 15   E-mail string re Percocet, Bates
7           ENDO-OPIOID_MDL-06146694 to 06146696,
8           with attachment             167
9   No. 16   AMDG Interagency Guideline on
10          Opioid Dosing for Chronic Non-
11          Cancer Pain; an educational pilot
12          to improve care and safety with
13          opioid treatment, E1957.1 to
14          E1957.14                173
15  No. 17   E-mail string re Washington state
16          Opioid prescribing guidelines,
17          Bates EPI001775348 to 001775349    176
18  No. 18   E-mail string re POPAN activities
19          in the past months, Bates
20          ENDO-OPIOID_MDL-02210853 to
21          02210855                178
22  No. 19   E-mail re Washington Draft Opioid
23          Guidelines, Bates PPLP004301238 to
24          004301239               178
```

Page 10

1          E X H I B I T S (Continued)
2            (Attached to transcript)
3   ENDO-MUNROE DEPOSITION EXHIBITS          PAGE
4   No. 20   E-mail string re Washington State
5      Opioid Dosing Guidelines, Bates
6      PPLP004024280 to 004024281          185
7   No. 21   Compilation of documents, E0287.1
8      to E0287.35                191
9   No. 22   (Exhibit number not used.)
10  No. 23   Document entitled: "Responsible
11     Opioid Prescribing, a Physician's
12     Guide," Bates END000051370 to
13     00051443                188
14  No. 24   (Exhibit number not used.)
15  No. 25   E-mail re Opana ER - doses >30mg?
16     Bates ENDO-OPIOID_MDL01902659 to
17     01902662                206
18  No. 26   E-mail string re FDA Response to
19     PROP Petition, Bates ENDO-OPIOID_
20     MDL-01448657 to 01448675          213
21  No. 27   E-mail re FDA petition regarding
22     opioid labeling, Bates
23     END000403619 to 00403646          216
24

Page 11

1          E X H I B I T S (Continued)
2            (Attached to transcript)
3   ENDO-MUNROE DEPOSITION EXHIBITS          PAGE
4   No. 28   E-mail string re PCF REMS Task
5      Force - I need your input ASAP,
6      Bates ENDO-OPIOID_MDL-03902804
7      to 03902806                222
8   No. 29   E-mail string re REMS Letter,
9      Bates ENDO-OPIOID_MDL-02485618
10     to 02485622                229
11  No. 30   E-mail string re Meeting today at
12     NOON - Draft PCF response regarding
13     REMS, Bates EPI001789493 to
14     001789494                232
15  No. 31   E-mail re [blank], Bates
16     ENDO-OPIOID_MDL-01134277 to
17     01134291                236
18  No. 32   E-mail re FDA Docket, Bates
19     ENDO-OPIOID_MDL-02293305 to
20     02293319                239
21  No. 33   E-mail re Friday's schedule,
22     Bates ENDO-OPIOID_MDL-02297404
23     to 02297405, with attachment          249
24

Page 12

1          E X H I B I T S (Continued)
2            (Attached to transcript)
3   ENDO-MUNROE DEPOSITION EXHIBITS          PAGE
4   No. 34   E-mail re PCF REMS Task Force
5      Recommendation and process,
6      Bates END00077888 to 0077921          249
7   No. 35   E-mail string re Opana Rebate,
8      Bates EPI001080837 to 001080838          252
9   No. 36   E-mail string re EPPC Update -
10     Senator Casey -- Prescription
11     Drug Abuse Meeting, Bates
12     EPI002377845 to 002377847          259
13  No. 37   E-mail re Military/Veterans and
14     Pain Media Briefing this Tuesday
15     10-30, Bates ENDO-OPIOID_MDL-
16     02807915 to 02807922          269
17  No. 38   American Pain Foundation Invoice,
18     dated November 2, 2007, to
19     Endo Pharmaceuticals, Bates
20     CHI_000430399 to 0004303404          271
21  No. 39   E-mail re APF Briefing, Bates
22     ENDO-OPIOID_MDL-02807881 to
23     02807908                277
24

Page 13

1          E X H I B I T S (Continued)
2            (Attached to transcript)
3   ENDO-MUNROE DEPOSITION EXHIBITS          PAGE
4   No. 40   E-mail re Endo meeting with the
5      DEA, Bates EPI001179443 to
6      001179451, with attachment          286
7   No. 41   Letter to Robert Barto from
8      Parinda Jani (FDA), Bates
9      EPI001313856 to 001313859          290
10  No. 42   E-mail string re DEA Letter,
11     Bates ENDO-CHI_LIT-00096310 to
12     00096312                296
13  No. 43   (Exhibit number not used.)
14  No. 44   E-mail string re Response from DEA
15     Bates EPI001504213 to 001504221          299
16  No. 45   E-mail string re TN Opana ER,
17     Bates ENDO-OPIOID_MDL-02667004
18     to 02667005                337
19  No. 46   E-mail string re Submitted for
20     your review - Final Draft Rx Drug
21     Abuse Plan - please provide comments
22     Bates ENDO-OPIOID_MDL-02801542 to
23     02801547, with attachment          348
24  No. 47   (Exhibit was clawed back)          365

Page 14

1    E X H I B I T S (Continued)

2       (Attached to transcript)

3  ENDO-MUNROE DEPOSITION EXHIBITS         PAGE

4  No. 48   (Exhibit was clawed back)      371

5  No. 49   (Exhibit was clawed back)      373

6  No. 50   (Exhibit was clawed back)      381

7  No. 51   E-mail re Draft Rx Drug Abuse

8          Deck for 6/5/12                 385

9  No. 52   E-mail re Draft 2012 GA Strategic

10         Plan, Bates ENDO-OPIOID_MDL-

11         06213500 to 06213540            395

12 No. 53   E-mail string re External: HR

13         659 Opioid Addiction Advisory

14         Committee Meeting 06-26-14,

15         Bates ENDO-OPIOID_MDL-02795421

16         to 02795422, with attachment    408

17 No. 54   E-mail string re Top 10 States --

18         Opana Sales, Bates ENDO-OPIOID_MDL-

19         02791740 to 02791742, with

20         attachment                      411

21 No. 55   E-mail string re Oxymorphone HCL

22         ER Geographical Insights, Bates

23         EPI001106854 to 001106856, with

24         attachment                      415

---

Page 15

1       P R O C E E D I N G S

2       -------------------

3       THE VIDEOGRAPHER:  We are now on the

4  record.  My name is Daniel Holmstock.  I am the

5  videographer for Golkow Litigation Services.

6  Today's date is March 19th, 2019, and the time on

7  the video screen is 9:14 a.m.

8       This video deposition is being held at

9  the law offices of Arnold & Porter Kaye Scholer

10 LLP, at 601 Massachusetts Avenue, Northwest, in

11 Washington, D.C., in the matter of In Re: National

12 Prescription Opiate Litigation pending before the

13 United States District Court for the Northern

14 District of Ohio, Eastern Division, MDL No. 2804.

15      Our deponent today is Mr. Brian Munroe.

16      Counsel for appearances will be noted on

17 the stenographic record.

18      The court reporter is Leslie A. Todd,

19 who will now administer the oath.

20           BRIAN MUNROE,

21    and having been first duly sworn,

22    was examined and testified as follows:

23 EXAMINATION BY COUNSEL FOR THE MDL PLAINTIFFS

24 BY MS. AMINOLROAYA:

---

Page 16

1    Q   Good morning, Mr. Munroe.

2    A   Good morning.

3    Q   Have you ever been deposed before?

4       MR. DAVIS:  I just want to put a

5  statement on the record before we get going.

6  It's -- we went on the record at 9:15.  Mr. Munroe

7  was in the chair at 9:00.  MDL plaintiffs' counsel

8  wasn't even in the building until 9:07.  I think

9  it's extremely inconsiderate to all of us here in

10 the room, and especially Mr. Munroe, given how

11 long these depositions have been going.  I just

12 want that on the record.

13      MS. AMINOLROAYA:  Sure.  And I

14 apologize.  As I mentioned before we went on the

15 record, I have a foot injury that has impeded my

16 ability to walk, and so I was slow getting

17 together this morning.  I think we've been on time

18 before -- we've been at the deposition before the

19 start time.  I apologize for that.  It's

20 unexpected.

21 BY MS. AMINOLROAYA:

22   Q   Mr. Munroe, have you ever been deposed

23 before?

24   A   No.

---

Page 17

1    Q   So I'll just go over a few ground rules

2  with you.  Your counsel may have gone over them

3  with you before, but just so that we're on the

4  same page, there's a couple of things that will be

5  helpful if we both keep in mind throughout the

6  day.

7       So if you don't understand a question,

8  please tell me.  Otherwise -- or you can ask me to

9  rephrase it.  Otherwise, the record will reflect

10 that you understood the question.

11      Does that sound fair?

12      You need to --

13      MR. DAVIS:  You've got to say yes or no.

14      MS. AMINOLROAYA:  Yes.

15      MR. DAVIS:  You've got to be verbal.

16      THE WITNESS:  Yes.

17 BY MS. AMINOLROAYA:

18   Q   Another -- another ground rule that

19 I'll -- I'll let you know is that we need to

20 answer with verbal -- verbal responses.  The court

21 reporter can only take down a "yes" or a verbal

22 response, so nods of the head or shakes can't be

23 recorded.

24      Another thing that may happen throughout

---

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 the day is in the course of normal conversation,
2 it's normal for you to anticipate my question, but
3 again for purposes of having a clear record, let
4 me finish the question, and then you can provide
5 your answer so that we have a clean record.
6         We can take a break whenever you need.
7 If you need a break at any time, that's completely
8 fine.  I would just ask that if I've asked a
9 question, you answer that question before we take
10 a break.
11        Does that sound fair?
12    A   Yes.
13    Q   All right.  Do you understand these
14 instructions?
15    A   Yes.
16    Q   Okay.  And -- and as a reminder, you are
17 under oath as if you were in a court of law before
18 a judge, Judge Polster in Ohio.  So you must
19 answer fully and include all relevant information
20 in your answer.
21        And if you don't know or can't recall,
22 just say so.  We're not looking for any guesses,
23 but we are entitled to your best recollection.
24        Do you understand that?

Page 19

1    A   Yes.
2    Q   Thank you.
3        And is there anything we should know
4 that would prevent you from testifying truthfully
5 and to the best of your ability today?
6    A   No.
7    Q   Okay.  Thank you.
8        What did you do to prepare for your
9 deposition today?
10    A   I met with my legal team.
11    Q   Okay.  And whose your legal team?
12    A   They're seated to the left of me,
13 representatives from Arnold & Porter, Endo, and
14 Walter Cohen from Obermayer.
15    Q   And what's the second firm's name?
16    A   Obermayer.
17    Q   Obermayer.  And does Obermayer represent
18 you personally?
19    A   Yes.
20    Q   And when did you retain Obermayer?
21    A   In preparation for the deposition.
22    Q   Okay.  And do you remember -- do you
23 recall what date that was?
24    A   I don't recall.

Page 20

1    Q   Was it in 2019?
2    A   It was in 2019.
3    Q   Tell me the name of your lawyer at
4 Obermayer.
5    A   Walter Cohen.
6        (Counsel conferring.)
7 BY MS. AMINOLROAYA:
8    Q   And how long did you spend preparing for
9 your deposition?
10    A   Approximately a dozen hours.
11    Q   And was that in one day or multiple
12 days?
13    A   Multiple days.
14    Q   How many days did you spend preparing?
15    A   I prepared on four separate days for
16 several hours each day.
17    Q   All right.  And did you speak with
18 anyone to -- besides your lawyers, to prepare for
19 this deposition?
20    A   No.
21    Q   Did you reach out to any employees at --
22 at Endo?
23    A   No.  The only people that I spoke to
24 about the deposition were family and close friends

Page 21

1 telling them that I was going to go through this
2 process, but I discussed none of the content or
3 substance.
4    Q   Okay.  For example, you told your wife
5 maybe that you were going to a deposition today.
6    A   Yes.
7    Q   Okay.  And did you review any documents
8 in the course of your preparation for the
9 deposition?
10    A   I did.
11    Q   All right.  Did you bring them with you
12 today?
13    A   I did not.
14    Q   Okay.  And do you know what documents
15 you reviewed in preparation for your deposition?
16        MR. DAVIS:  Objection.  Form.
17        I'm going to instruct you, Brian, not to
18 divulge the content of any of the documents that
19 you reviewed during the course of your preparation
20 with us.
21 BY MS. AMINOLROAYA:
22    Q   Did you ask to review any documents in
23 particular in the course -- I'm not asking for the
24 content of them yet.  I'm asking if you asked to

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  review any particular documents in preparation for
2  your deposition.
3      A   I don't recall.
4          (Munroe Exhibit No. 2 was marked
5          for identification.)
6  BY MS. AMINOLROAYA:
7      Q   So I'm going to hand you what's been
8  marked -- we used Exhibit 1 for another document,
9  so we'll start with Exhibit 2, a subpoena to
10 testify at a deposition.
11         MS. AMINOLROAYA:  And do we have copies
12 for counsel?
13 BY MS. AMINOLROAYA:
14     Q   Have you seen this document?
15     A   Yes, I believe -- I didn't study it, but
16 I believe that I did see the subpoena for me to
17 appear to testify.
18     Q   Okay.  And when did you see a copy of
19 this?
20     A   During my preparation.
21     Q   All right.  And did you take a look at
22 page 9 of the subpoena, "Requests for Production
23 by Brian Munroe"?
24     A   Let me look at that.

Page 23

1      Q   Sure.
2      A   (Peruses document.)  Yes, I did look at
3  this.
4      Q   All right.  And so there are ten
5  requests per the production of documents.  Did you
6  search for documents to respond to these requests?
7      A   I did.
8      Q   Where did you search?
9      A   I searched my wife's e-mail account, and
10 I searched my personal laptop, which were the only
11 areas that I thought there might be documents
12 relevant to these requests, knowing that the
13 company would have documents from my time when I
14 was an employee at Endo.
15     Q   Okay.  But you understood that you also
16 needed to search -- separately search --
17     A   I did.
18     Q   -- these other sources.
19         And did you find any documents that were
20 responsive to these requests?
21     A   I found one document on my personal
22 laptop that was a public document.
23     Q   And what was -- what was the document
24 about?

Page 24

1      A   The document was the notice of a hearing
2  of the Energy and Commerce Committee on the
3  subject of opioids.
4      Q   And do you recall the date of that
5  document?
6      A   I don't.
7      Q   And where did you find the document?
8      A   On my laptop.
9      Q   Did you use your laptop for work as
10 well?
11     A   No.  I used it briefly as a consultant
12 in between jobs.  My -- end of my time as an
13 employee at Endo and before I started my current
14 position, I was a consultant and I used my laptop
15 for my consulting business.  So that's why I
16 searched my laptop to see if there were any
17 relevant documents.
18     Q   And when did you -- since when have you
19 had this laptop?
20     A   I believe that I purchased the laptop at
21 the end of my time at Endo, knowing that I was
22 going to transition out of the company, but I
23 don't recall the exact date.
24     Q   Okay.  And did you have a laptop prior

Page 25

1  to this -- this laptop?
2      A   No.
3      Q   Did you have a desktop that you used
4  before you purchased this laptop at home?
5      A   We had a family desktop.
6      Q   And did you ever use that family desktop
7  for work?
8      A   I might have occasionally used it for
9  work when I didn't have my laptop from work.  If I
10 was doing something on the weekends, I might have
11 used the family desktop.  But I don't -- it would
12 have been very infrequent.
13     Q   And did you search the family desktop
14 for documents that would be responsive to these
15 requests?
16     A   I did.
17     Q   And did you find any documents?
18     A   I did not.
19     Q   And what's the name of your consulting
20 firm?
21     A   I was just an individual consultant.  It
22 didn't have a name.
23     Q   Okay.  And during -- when did you become
24 an individual consultant?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    A    At the conclusion of my employment with
2  Endo in March of 2019.
3    Q    And did you ever work as an individual
4  consultant prior to that?
5    A    I was a consultant at a consulting firm
6  prior to my employment at Endo.
7    Q    And what year was that -- or what years
8  did that cover?
9    A    I don't recall.
10    Q    Would that be Capitol Hill Consulting?
11    A    That would be Capitol Hill Consulting
12  Group.
13    Q    Do you recall that you worked at Capitol
14  Hill Consulting Group in 2007?
15    A    I don't recall the dates.
16    Q    Was it prior to your time at Endo?
17    A    It -- it was.
18    Q    And after leaving WellPoint?
19    A    Yes.
20    Q    Did you ever use your phone for work
21  purposes, your personal phone?
22    A    While I was an employee at Endo?
23    Q    Yes, mm-hmm.
24    A    I did not have a personal phone.  It was

Page 27

1  my work phone.  And I would use my e-mail account
2  on my phone for work purposes, absolutely.
3    Q    And would you ever send text messages
4  related to work on that phone?
5    A    I don't recall sending text messages
6  related to work.
7  ███    ██ ████████████████████████████████
8  ███  ████████████████████████████████
9  ███  ████████████████
10    Q    And would you use this e-mail address
11  for work?
12    A    No.
13    Q    Did you ever use it for your -- related
14  to your work at Endo?
15    A    I don't recall ever using it for
16  work-related purposes at Endo.
17    Q    Are you aware that we located some
18  e-mails that were sent -- that were sent from this
19  e-mail account to -- to parties who are employed
20  by other defendants in the litigation?
21    A    I am aware of -- of those e-mails, and
22  those e-mails were employment opportunities for
23  me, so I considered that non-work related and
24  personal in nature.

Page 28

1    Q    All right.  Switching gears a little
2  bit, tell us about your education.
3    A    I have a B.A. degree from the University
4  of California.
5    Q    Which school?
6    A    The University of California at Santa
7  Barbara.
8    Q    And what is your degree in?
9    A    History.
10    Q    Do you have a graduate degree?
11    A    I don't.
12    Q    Okay.  And what year did you obtain
13  your -- your Bachelor's?
14    A    1983.
15    Q    And after you graduated, what did you
16  do?
17    A    After I graduated, in the summer of 1983
18  I worked at the University.
19    Q    And what kind of work did you do at the
20  University?
21    A    I worked at a place called the Alumni
22  Vacation Center.
23    Q    All right.  And how long did you do
24  that?

Page 29

1    A    For three months.
2    Q    Do you have a CV, Mr. Munroe?
3    A    I do.
4    Q    Did you bring one with you?
5    A    I did not.
6    Q    Okay.  And you were there for three
7  months, and what did you do after that?
8    A    I recall that I went to work at the
9  Democratic National Committee.
10    Q    And is this still 1983?
11    A    This would still be 1983.
12    Q    And what did you do at the Democratic
13  National Committee?
14    A    I worked in the mailroom.
15    Q    How long were you there?
16    A    I don't recall.
17    Q    All right.  And do you recall what your
18  next position was after working in the mailroom at
19  the Democratic National Committee?
20    A    Yes.  I worked on the finance staff.
21    Q    And until when was that?
22    A    I don't recall.
23    Q    Did you remain at the Democratic
24  National Committee for any -- in any other

Page 30

1 positions?
2    A   I don't recall.
3    Q   And do you recall where you went after
4 the Democratic National Committee?
5    A   Yes. Occidental.
6    Q   And what did you do on the financial
7 staff at the Democratic National Committee?
8    A   We organized fundraisers and organized
9 the collection of funds to support the activities
10 at the DNC.
11    Q   And who did you work with in this -- in
12 this role?
13    A   Don Sweitzer.
14    Q   And who -- who is he?
15    A   At that time he was the head of the
16 finance group at the DNC.
17    Q   Did you work with anyone else?
18    A   Yes.
19    Q   Who else?
20    A   I don't recall.
21    Q   Okay. And then you went to Occidental.
22 What is Occidental?
23    A   It's a large oil and chemical company.
24    Q   And what did you do there?

Page 31

1    A   I was responsible for state government
2 relations at Occidental Chemical Company.
3    Q   Is that the same thing as lobbying?
4    MR. DAVIS: Objection to form.
5    You can answer.
6    THE WITNESS: No.
7 BY MS. AMINOLROAYA:
8    Q   Okay. What did you do in your role in
9 the state government relations at Occidental?
10    A   It was a job where I monitored
11 legislative and regulatory activity, participated
12 in trade association meetings and wrote reports.
13    Q   And until when were you there?
14    A   I don't recall.
15    Q   All right. What did you do after
16 leaving Occidental?
17    A   I went to work for Hoffmann-La Roche.
18    Q   What was your role at Hoffmann-La Roche?
19    A   I was a lobbyist at Hoffmann-La Roche.
20    Q   And what did you do in your role as a
21 lobbyist for Hoffmann-La Roche?
22    A   I worked on projects in the southeastern
23 United States and in Congress, and I worked on
24 projects at the intersection where an issue was a

Page 32

1 benefit to society or a benefit to public health
2 and a benefit to Hoffmann-La Roche.
3    Q   Can you give me an example of an issue
4 that fit the description you just provided?
5    A   No, I don't recall my work in any detail
6 that long ago.
7    Q   Do you recall what year you were at
8 Hoffmann-La Roche?
9    A   No, I don't recall.
10    Q   And did you work on issues that involved
11 pharmaceutical drugs at Hoffmann-La Roche?
12    A   Yes.
13    Q   Do you recall which drugs?
14    A   No, I don't recall.
15    Q   Do you recall working on Accutane while
16 you were at Hoffmann-La Roche?
17    MR. DAVIS: Objection to form.
18    THE WITNESS: I don't recall.
19 BY MS. AMINOLROAYA:
20    Q   Or the drug -- the generic was called
21 isotretinoin. Do you recall that?
22    A   No, I don't recall.
23    Q   Did you work on any medical devices at
24 Hoffmann-La Roche?

Page 33

1    A   I don't recall the specific issues I
2 worked on that many years ago.
3    Q   Okay. And after leaving
4 Hoffmann-La Roche where did you go?
5    A   I went to SmithKline Beecham.
6    Q   And what did you do at SmithKline
7 Beecham?
8    A   I was the head of state government
9 affairs.
10    Q   And what did -- what did that involve?
11    A   It involved creating a department,
12 lobbying and public policy development
13 specifically to address issues at the state level
14 for SmithKline Beecham. And it was a startup
15 role, so I was tasked with creating a department
16 that would develop and implement public policy
17 work for the company.
18    Q   And what is public policy work?
19    A   It involves developing public policy
20 positions for the company that would benefit the
21 public health or benefits to society -- determine
22 which issues benefit society and make an important
23 contribution to society, and also benefit
24 SmithKline Beecham.

Page 34

1  Q   And who determines whether the public
2  policy that you're describing here benefits
3  society?
4     A   Lawmakers.
5     Q   And would you suggest public policies
6  that you believed would fit this description to
7  lawmakers?
8     A   Yes.
9     Q   And earlier it seemed like you made a
10 distinction between government affairs and
11 lobbying.  What is the distinction you were
12 making?
13    MR. DAVIS:  Objection to form.
14    THE WITNESS:  I was making the
15 distinction about the specific job I had at
16 Occidental where I -- I did not meet with
17 lawmakers directly.  I did the research, I
18 monitored, I wrote reports, I met with company
19 officials, but was not meeting directly with
20 elected officials.
21 BY MS. AMINOLROAYA:
22    Q   Thank you.
23       And at SmithKline Beecham, you were
24 lobbying politicians?

Page 35

1     MR. DAVIS:  Objection to form.
2     THE WITNESS:  At the beginning of my job
3  at SmithKline Beecham and through the early parts
4  of my job at SmithKline Beecham, I was lobbying
5  elected officials, but as the department grew, I
6  built a team that would do much of that work.
7  BY MS. AMINOLROAYA:
8     Q   And by lobbying, what do you mean by
9  lobbying?
10    A   Lobbying for me was determining and
11 finding issues that would benefit the public and
12 provide a societal benefit, particularly in the
13 area of public health, and then determining which
14 of those issues would benefit SmithKline Beecham,
15 and when those issues intersected, those were
16 issues that -- that we would actually approach
17 elected officials and have conversations with them
18 about.
19    Q   And who determined whether an issue
20 benefitted the public health?
21    A   Lawmakers.
22    Q   And would -- again, would you suggest a
23 public health issue to a lawmaker that you
24 believed would benefit the public health?

Page 36

1     MR. DAVIS:  Objection to form.
2     THE WITNESS:  Yes.
3  BY MS. AMINOLROAYA:
4     Q   And you would try in your lobbying
5  efforts -- or what were your lobbying efforts when
6  you were suggesting a public health issue or a
7  public policy, excuse me, that would benefit the
8  public health, what were you doing to lobby the
9  politician?
10    MR. DAVIS:  Objection to form.
11    THE WITNESS:  We would provide them with
12 facts and data.
13 BY MS. AMINOLROAYA:
14    Q   Would you do anything else?
15    A   I don't know.
16    Q   Why don't you know?
17    MR. DAVIS:  Objection to form.
18    THE WITNESS:  That's just an open-ended
19 question.  I can't think of all of the things that
20 we might have done to lobby any particular issue.
21    Our principal activity was to provide
22 elected officials and appointed officials with
23 facts and data to support our position that what
24 we were advocating was a benefit to society,

Page 37

1  particularly in the area of public health, and to
2  put forward positions that would protect the
3  interests of patients.  So -- so the principal
4  thing we did was provide them with facts and data
5  to support a position that would protect the
6  interests of patients, public health, and -- and
7  identify the benefits to society.
8     I might also bring in experts from the
9  company, subject matter experts on particular
10 topics.  That would be another activity that --
11 that I would do.  But I can't think now of all of
12 the things I've done throughout my career, and
13 it's -- it's a pretty open-ended question.
14 BY MS. AMINOLROAYA:
15    Q   Thank you.
16       Would you hire -- would your efforts --
17 your lobbying efforts that you just described,
18 would it -- do those involve hiring outside
19 lobbying firms?
20    A   Yes.
21    Q   And did you ever hire outside lobbying
22 firms at Smithfield as part of your lobbying
23 work?
24    MR. DAVIS:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    THE WITNESS: Do you mean SmithKline
2 Beecham?
3 BY MS. AMINOLROAYA:
4    Q   I'm sorry. Yes, SmithKline Beecham.
5    A   Yes, we did hire outside consultant
6 lobbyists.
7    Q   And SmithKline Beecham, is that where
8 you met Burt Rosen?
9    MR. DAVIS: Objection to form.
10 Foundation.
11    THE WITNESS: It is.
12 BY MS. AMINOLROAYA:
13    Q   When did you meet Mr. Rosen?
14    A   I don't recall.
15    Q   Do you recall, was Mr. Rosen an -- an
16 employee at SmithKline Beecham?
17    A   He was.
18    Q   And was he in your department?
19    A   Yes, he was.
20    Q   And what was his role there?
21    A   He was the head of government affairs.
22    Q   Did you bring him on?
23    MR. DAVIS: Objection to form.
24    MR. NOVY: Objection to form.

Page 39

1    THE WITNESS: No.
2 BY MS. AMINOLROAYA:
3    Q   I believe you stated that you created
4 the government affairs department at SmithKline
5 Beecham; is that correct?
6    A   No, that's incorrect.
7    Q   I believe you testified that you were
8 the head of state government affairs?
9    A   That's correct.
10    Q   And so was Mr. Rosen the head of -- how
11 did state -- strike that.
12    How did state government affairs fit
13 with the government affairs department?
14    MR. DAVIS: Objection to form.
15    THE WITNESS: The state government
16 affairs department was a part of the government
17 affairs department.
18 BY MS. AMINOLROAYA:
19    Q   So did you work for Mr. Rosen then?
20    A   I did.
21    Q   Did you -- when you started at
22 Smithfield -- excuse me -- SmithKline Beecham, was
23 Mr. Rosen your boss?
24    A   Yes.

Page 40

1    Q   And did you know Mr. Rosen prior to
2 starting at SmithKline Beecham?
3    A   No.
4    Q   Was Mr. Rosen a friend?
5    MR. NOVY: Objection to form.
6    MR. DAVIS: Objection to form.
7    THE WITNESS: Mr. Rosen is a friend.
8 BY MS. AMINOLROAYA:
9    Q   Did that friendship develop when you
10 were at SmithKline Beecham?
11    MR. NOVY: Objection to form.
12    THE WITNESS: No.
13    MR. DAVIS: Objection to form.
14 BY MS. AMINOLROAYA:
15    Q   When did that friendship develop?
16    A   After my employment with SmithKline
17 Beecham.
18    Q   And do you get together socially with
19 Mr. Rosen?
20    MR. NOVY: Objection to form.
21    MR. DAVIS: Objection to form.
22    THE WITNESS: I do.
23 BY MS. AMINOLROAYA:
24    Q   And that continues through today?

Page 41

1    MR. DAVIS: Objection to form.
2    MR. NOVY: Objection to form.
3    THE WITNESS: Yes.
4 BY MS. AMINOLROAYA:
5    Q   Earlier you mentioned that you would
6 hire outside lobbyists in addition -- in addition
7 to the work that was being done in the government
8 affairs department at SmithKline Beecham.
9    Why would you hire outside lobbyists in
10 addition to the work that was being done?
11    MR. DAVIS: Objection to form.
12 BY MS. AMINOLROAYA:
13    Q   By government affairs.
14    A   We would hire consultant lobbyists for
15 their expertise in either policy areas or
16 consultants for their expertise in a state
17 capital's government processes.
18    Q   And did lobbyists ever draft bills for
19 SmithKline Beecham?
20    MR. DAVIS: Objection to form.
21    THE WITNESS: I don't recall.
22 BY MS. AMINOLROAYA:
23    Q   And -- and what do you mean by your
24 explanation that -- that you hired lobbyists for

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 their expertise in government state capital
2 processes?
3    A   Well, each state capital, as you might
4 know, is different from every other state capital
5 and state government.  So each one is unique in
6 their processes.  In the way legislation travels
7 through the government process, the way laws are
8 created, the way state agencies will implement
9 programs, each state government and each state
10 capital has unique government processes.
11       And I believe at our zenith, we had five
12 to seven employee lobbyists throughout the United
13 States, but we did not have an expert on the
14 government process in each and every state.  So it
15 was necessary oftentimes to have a consultant who
16 understood the government processes in each of the
17 state capitals and state governments.
18    Q   And could they assist with communicating
19 with politicians in state government?
20       MR. DAVIS:  Objection to form.
21       THE WITNESS:  Yes.
22 BY MS. AMINOLROAYA:
23    Q   And is that one way that you used
24 lobbyists during your time at SmithKline Beecham

Page 43

1 to help you communicate with a politician?
2       MR. DAVIS:  Objection to form.
3       THE WITNESS:  Yes.
4 BY MS. AMINOLROAYA:
5    Q   And would you use lobbyists to help you
6 set up a meeting with a politician?
7       MR. DAVIS:  Objection to form.
8       THE WITNESS:  Yes.
9 BY MS. AMINOLROAYA:
10    Q   And if you wanted, for example, to
11 discuss a -- a potential bill with a politician,
12 would you ask the lobbyists to help you set up a
13 meeting?
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  Yes.
16 BY MS. AMINOLROAYA:
17    Q   Would lobbyists ever help you with
18 the -- the scope of the work that the lobbyists
19 did for you at SmithKline Beecham, did it ever
20 involve bundling contributions for politicians?
21       MR. DAVIS:  Objection to form and
22 foundation.
23       THE WITNESS:  I don't recall.
24 BY MS. AMINOLROAYA:

Page 44

1    Q   Did lobbyists ever help -- help
2 politicians that you were seeking to obtain a
3 meeting with hold fundraising events?
4    A   I don't recall.
5       MR. DAVIS:  Objection to form.
6 BY MS. AMINOLROAYA:
7    Q   Did the lobbyists that you hired while
8 you were at SmithKline Beecham ever help with any
9 kind of fundraising for a politician that you were
10 seeking to have a meeting with?
11       MR. DAVIS:  Objection to form.
12       THE WITNESS:  I don't recall.
13 BY MS. AMINOLROAYA:
14    Q   And when you were using lobbyists to
15 communicate with politicians, were the politicians
16 aware that the lobbyists were there on your
17 behalf?
18       MR. DAVIS:  Objection to form.
19       Are you talking about during his time at
20 SmithKline Beecham or --
21       MS. AMINOLROAYA:  Yes.
22       THE WITNESS:  I would think so in almost
23 every event, although I cannot speak for the
24 lawmakers themselves.  You'd have to ask them.

Page 45

1 BY MS. AMINOLROAYA:
2    Q   And just switching gears for a moment,
3 did you speak with Mr. Rosen about your deposition
4 today?
5    A   I did not.
6    Q   Are you aware that Mr. Rosen was deposed
7 in this litigation?
8    A   Yes, I was aware.
9    Q   Did you read his deposition transcript?
10   A   I did not.
11   Q   And how did you become aware that
12 Mr. Rosen was deposed?
13       MR. DAVIS:  Objection to form.
14       To the extent you know from some source
15 other than conversations you've had with counsel,
16 you can answer.  If not, I'm going to instruct you
17 not to.
18       THE WITNESS:  I've been instructed by
19 counsel not to answer that question.
20 BY MS. AMINOLROAYA:
21   Q   Okay.  And when did you become aware
22 that Mr. Rosen was deposed in this litigation?
23   A   I've been instructed by counsel not to
24 answer that question.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    MR. DAVIS:  You can answer the -- the
2 time.
3    THE WITNESS:  In the last three weeks.
4 BY MS. AMINOLROAYA:
5    Q   Did you work with Mr. Rosen at any
6 organizations?
7    MR. NOVY:  Objection to form.
8    MR. DAVIS:  Objection to form.
9    THE WITNESS:  I worked with Mr. Rosen on
10 issues where there was an intersection between --
11 where we both supported the same public policy,
12 and that that public policy intersected with a
13 benefit to society, and in particular, a benefit
14 to public health and protecting patient health.
15 BY MS. AMINOLROAYA:
16    Q   And on what issues did you work with
17 Mr. Rosen?
18    MR. NOVY:  Objection to form.
19    MR. DAVIS:  Objection to form.  I think
20 it mischaracterizes his testimony.
21 BY MS. AMINOLROAYA:
22    Q   You testified that you worked with
23 Mr. Rosen on issues where there was an
24 intersection of -- where you both supported the

Page 47

1 same public policy and that public policy
2 inter- -- intersected with a benefit to society.
3    On what issues did you work with
4 Mr. Rosen?
5    A   I don't recall --
6    MR. DAVIS:  Same objection.
7    THE WITNESS:  -- the specific issues.
8 BY MS. AMINOLROAYA:
9    Q   And did you work together in any
10 organizations?
11    MR. DAVIS:  Objection to form.
12    MR. NOVY:  Objection to form.
13    THE WITNESS:  We were both members of
14 the Pain Care Forum, but I don't recall the
15 specific issues that I worked on with Mr. Rosen.
16 BY MS. AMINOLROAYA:
17    Q   And are you both -- are you members of
18 any other organizations that Mr. Rosen is also a
19 member of?
20    MR. NOVY:  Objection to form.
21    MR. DAVIS:  Objection to form.
22    THE WITNESS:  I know of one other
23 organization, although I am not currently active
24 in that organization, and that's the organization

Page 48

1 BCRG, which is the organization of the heads of
2 Washington offices.  Business-Government Relations
3 Council is -- is what I believe it's called.
4 BY MS. AMINOLROAYA:
5    Q   And when did you become a member of
6 BCRG?
7    A   I don't recall.
8    Q   Is it -- was this -- did you become a
9 member prior to beginning your work at Endo?
10    A   I don't recall.
11    Q   And what is the Business-Government
12 Relations Council?
13    A   It's a networking organization for the
14 heads of Washington offices of businesses.
15    Q   What kind of events does the
16 organization hold?
17    MR. DAVIS:  Objection to form,
18 foundation.
19    THE WITNESS:  They hold an annual
20 meeting and luncheons with speakers from
21 Washington, D.C.
22 BY MS. AMINOLROAYA:
23    Q   Are these events open to the public?
24    A   I don't believe they are.

Page 49

1    Q   When was the last time you attended an
2 event put on by this organization?
3    A   I don't recall the specifics, but it's
4 been over a year.
5    Q   Did this networking organization focus
6 on any particular issues?
7    A   No.
8    Q   Are there any other organizations that
9 both you and Mr. Rosen belong to?
10    A   Not that I recall.
11    Q   And what did you do after leaving
12 SmithKline Beecham?
13    A   After leaving SmithKline Beecham, I went
14 to work at Millennium Pharmaceuticals.
15    Q   And what did you do at Millennium?
16    A   I was the head of government affairs.
17    Q   What did you do in that role?
18    A   Government affairs.
19    Q   Can you describe what that -- what that
20 means?
21    A   I developed public policy positions for
22 the company, and then lobbied elected and
23 appointed officials on issues that would benefit
24 society, benefit the public health, and also

Page 50

1 benefit Millennium Pharmaceuticals.
2     Q    And who determined if these public
3 policy decisions -- excuse me -- if these public
4 policy positions benefitted society or the public
5 health?
6         MR. DAVIS:  Objection to form.
7         THE WITNESS:  Government officials.
8 BY MS. AMINOLROAYA:
9     Q    And would government officials approach
10 you with public policies?
11        MR. DAVIS:  Objection to form.
12        Again, is this during his time at
13 Millennium?
14 BY MS. AMINOLROAYA:
15    Q    During your time at Millennium, yes.
16    A    I don't recall.
17    Q    Would -- would you approach government
18 officials with public policy-- public policies
19 that you wanted them to support?
20        MR. DAVIS:  Objection to form.  Same
21 timing question.
22 BY MS. AMINOLROAYA:
23    Q    We're still talking about Millennium.
24    A    Yes.

Page 51

1     Q    So when you were approaching them with
2 public policies, it was because you or your
3 employer had determined that this is something
4 that they wanted the politician to support,
5 correct?
6         MR. DAVIS:  Objection to form.
7         THE WITNESS:  We approached government
8 officials during my time at Millennium when we
9 identified an issue that would benefit the public,
10 particularly in the area of public health, and
11 would be a direct benefit to patients and patient
12 health, and a benefit to Millennium.
13 BY MS. AMINOLROAYA:
14    Q    Did your work at Millennium involve
15 opioids?
16    A    No.
17    Q    Did it involve other drugs?
18    A    It did.
19    Q    Any pain medication?
20    A    No.
21    Q    And what did you do after leaving
22 Millennium?
23    A    I went to work for WellPoint.
24    Q    And what did you do at WellPoint?

Page 52

1     A    I was the head of the Washington office.
2     Q    And by Washington office, do you mean a
3 government relations office?
4     A    Yes.
5     Q    And what did you do as the head of
6 government relations for WellPoint?
7     A    I was the lead federal lobbyist.
8     Q    And was this in 2006?
9     A    I don't recall.
10        (Munroe Exhibit No. 3 was marked
11        for identification.)
12 BY MS. AMINOLROAYA:
13    Q    I'm handing you what's been marked as
14 Exhibit 3.
15        Do you recognize this as your LinkedIn
16 profile?
17    A    Yes, I do.
18    Q    And do you see on page 2 of the document
19 you've listed your Millennium Pharmaceuticals
20 position, vice president of government affairs.
21 You were there through 2006, according to this?
22    A    Yes, that's what this says.
23    Q    Okay.  Is that correct?
24    A    I don't recall the exact dates.

Page 53

1     Q    Any reason to believe this is not
2 correct?
3     A    There would be no reason to believe it's
4 not correct.
5     Q    Thank you.
6         All right.  And after leaving
7 Millennium, you went to WellPoint, as you just
8 mentioned, and were you there until November 2006?
9     A    That's what this says.
10    Q    Okay.  And what did you do after you
11 left WellPoint?
12    A    After I left WellPoint, I came to work
13 for Endo.
14    Q    Did you do anything between Endo and
15 WellPoint?
16    A    At the conclusion of WellPoint, for a
17 short period I worked at the Capitol Hill
18 Consulting Group.
19    Q    Is there any reason that's not on your
20 LinkedIn profile?
21    A    Yes.
22    Q    What is that?
23    A    There are lots of smaller, lesser jobs
24 that are not on my LinkedIn profile.  I put my

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 primary jobs on my LinkedIn profile.
2    Q   And what did you do at Capitol Hill
3 Consulting?
4    A   I was responsible for lobbying for their
5 healthcare clients.
6    Q   Did that include opioid manufacturers?
7    A   Yes.
8    Q   And which opioid manufacturers did that
9 include?
10    A   Purdue.
11    Q   Do you recall how long you worked for
12 Purdue?
13       MR. NOVY:  Objection.
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  I have never worked for
16 Purdue.
17 BY MS. AMINOLROAYA:
18    Q   Do you recall how long you were
19 responsible for lobbying for Purdue?
20       MR. NOVY:  Objection to form.
21       MR. DAVIS:  Objection to form.
22       THE WITNESS:  I never actually lobbied
23 for Purdue.  Purdue was one of the healthcare
24 clients that Capitol Hill Consulting Group had,

Page 55

1 but they did not require my services during the
2 time that I was a consultant lobbyist.  So I never
3 actually lobbied on behalf of Purdue Pharma.
4 BY MS. AMINOLROAYA:
5    Q   Did you do any other work for -- besides
6 lobbying while you were at Capitol Hill
7 Consulting?
8    A   No.
9    Q   Did you do any work at all while you
10 were at Capitol Hill Consulting for their Purdue
11 client?
12       MR. NOVY:  Objection.
13       MR. DAVIS:  Objection to form.
14       THE WITNESS:  I don't recall doing any
15 work for Purdue during my time as a consultant
16 there.
17 BY MS. AMINOLROAYA:
18    Q   And after Capitol Hill Consulting, did
19 you go to Endo?
20    A   Yes.
21    Q   What did you do at Endo?
22    A   At Endo, I started up the government
23 relations department.
24    Q   What did Endo's government relations

Page 56

1 department do?
2       MR. DAVIS:  Objection to form.
3       THE WITNESS:  Our department at Endo
4 Pharmaceuticals, government affairs would develop
5 public policy positions based on what was -- based
6 on those public policy issues that were good for
7 society, beneficial to public health, and
8 beneficial to the patient that intersected with
9 public policy issues that were beneficial to the
10 company, and at that intersection, we would
11 develop projects on the legis- -- on legislative
12 and regulatory issues to work on that would
13 benefit the patient and society.
14 BY MS. AMINOLROAYA:
15    Q   And who determined whether a public
16 policy position was good for society?
17    A   Well, ultimately, the elected and
18 appointed officials that we were speaking to, they
19 would have to make that determination based on the
20 facts and data.
21    Q   And initially, Endo's government affairs
22 department made that determination, correct?
23       MR. DAVIS:  Objection to form.
24       THE WITNESS:  No.  We identified issues

Page 57

1 which we believed were beneficial to society, the
2 public health, and beneficial to patient care that
3 intersected with issues that were also beneficial
4 to Endo, and it was those issues that we would
5 bring before lawmakers, and it was the lawmakers,
6 the elected officials, the appointed officials,
7 that would make the determination.
8 BY MS. AMINOLROAYA:
9    Q   And issues that were beneficial to Endo
10 were issues that would -- issues that were good
11 for Endo's business, correct?
12       MR. DAVIS:  Objection to form.
13       THE WITNESS:  The issues that I worked
14 on at Endo, and I can only speak in my capacity as
15 the head of government affairs, were issues that
16 were beneficial to society, beneficial to the
17 public health, those issues that benefitted the
18 patients directly, and where those issues
19 intersected with issues that were beneficial to
20 Endo, those were issues that we worked on.
21 BY MS. AMINOLROAYA:
22    Q   And the issues that you were
23 identifying, public health issues -- strike that.
24       The public policies that you just

Page 58

1 described, these were public policies that would
2 have a return on investment for Endo?
3     MR. DAVIS: Objection to form.
4     THE WITNESS: The issues that I worked
5 on in my capacity as the head of government
6 affairs were those issues that we identified would
7 have a benefit to society, the public health, and
8 benefits often directly to patients, and a benefit
9 to Endo.
10 BY MS. AMINOLROAYA:
11     Q  And the benefit to Endo, would that be
12 a -- in the way of product successes?
13     A  I can only speak to the issues that --
14 that I was involved with at my -- while I was
15 employed by Endo.
16     Q  Sure.
17     A  And those issues were issues that had a
18 benefit to society, the public health, often
19 directly to patient health, and a benefit to Endo.
20     Q  And my question was, the benefit to
21 Endo, does that include product success?
22     A  You'll have to ask Endo. I'm no longer
23 an employee of Endo.
24     Q  All right. If you can take a look at

Page 59

1 Exhibit 3.
2     Page 1 of your LinkedIn profile, it
3 states under "Endo Pharmaceuticals," created from
4 scratch and currently lead an offensive mind, a
5 proactive and high return on investment government
6 relations function focused on commercial/product
7 successes."
8     Did I read that correctly?
9     A  Let me look at this, please.
10     Q  Sure.
11     A  (Peruses document.) Yes.
12     Q  And what did you mean by -- by this
13 statement?
14     A  Which statement?
15     Q  The statement that's highlighted for us
16 that -- that I just read.
17     A  What I have attempted to communicate
18 here and what I know to be true is that I worked
19 on issues that had a benefit to society, a benefit
20 to the public health, and a benefit to patients,
21 and I worked on those issues that intersected with
22 the interests of Endo. And when that intersection
23 came together, those were projects we worked on.
24     Q  You would agree, sir, that there's no

Page 60

1 mention of any benefit to society in this -- in
2 the description of your role at Endo on your
3 LinkedIn profile?
4     MR. DAVIS: Objection to form.
5     THE WITNESS: Perspective employers who
6 might be looking at my LinkedIn profile would
7 know, and I know that they would know, that's --
8 that it is impossible to be successful at what I
9 have made my life's work without demonstrating a
10 benefit to society, a benefit to public health,
11 and a benefit to patients. And so one is unable
12 to be successful in lobbying unless you can
13 demonstrate facts and data to support a benefit to
14 society, a benefit to public health, or a benefit
15 to the patient.
16 BY MS. AMINOLROAYA:
17     Q  But the only thing you felt was
18 important to include or to mention in this first
19 sentence in your role -- describing your role at
20 Endo was that you "created from scratch and
21 currently lead an offensive minded, proactive and
22 high return on investment government relations
23 function focused on commercial/product successes."
24 Correct?

Page 61

1     MR. DAVIS: Objection to form,
2 foundation.
3     THE WITNESS: I do know that the
4 projects that I worked on at Endo had a benefit to
5 society -- we believed that they had a benefit to
6 society, a benefit to the public health, a benefit
7 to patients, and where those ideals intersected
8 with the interests of Endo, that those were
9 projects that I worked on.
10 BY MS. AMINOLROAYA:
11     Q  And I -- but those -- those things are
12 mentioned nowhere on your LinkedIn profile
13 describing your role at Endo, correct?
14     MR. DAVIS: Objection to form.
15     THE WITNESS: My work at Endo, which I
16 can describe was work where we identified a
17 benefit to society, a benefit to the public
18 health, and a benefit often directly to the
19 patient, and it's where those issues intersected
20 with the interests of Endo that I spent my time
21 working.
22 BY MS. AMINOLROAYA:
23     Q  Thank you. My question is more narrow
24 than that.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    My question is, your role at Endo, as
2 it's described on your LinkedIn profile, does not
3 mention a benefit to the public health or a
4 benefit to society, correct?
5    MR. DAVIS: Objection to form.
6    THE WITNESS: People of importance that
7 I cared about looking at my LinkedIn profile, I
8 felt, would know that you cannot be successful at
9 the work you do here in Washington unless you can
10 clearly demonstrate with facts and data that there
11 is a benefit to society, a benefit to public
12 health, and a benefit to the patient, and it's
13 where those principles intersected with my work at
14 Endo that I spent my time.
15 BY MS. AMINOLROAYA:
16    Q   Sir, can you stay with my question? Are
17 those things found anywhere on your LinkedIn
18 profile, just yes or no?
19    MR. DAVIS: Objection to form. Asked
20 and answered several times now.
21    THE WITNESS: I will say that the work I
22 did at Endo was focused on those public policy
23 issues where we believed there was a benefit to
24 society, a benefit to the public health, and often

Page 63

1 a direct benefit to the patient, and it's where
2 those principles intersected with the interests of
3 Endo that I spent my time.
4    MS. AMINOLROAYA: Move to strike your
5 answer.
6 BY MS. AMINOLROAYA:
7    Q   Sir, do you understand you're under oath
8 as if you were in a court of law before Judge
9 Polster?
10    A   Yes.
11    Q   You need to answer my questions.
12    MR. DAVIS: Parvin, he's answered this
13 question I think probably five times now. Just
14 because you don't like his answer doesn't mean
15 he's not answering.
16    MS. AMINOLROAYA: No, he has not
17 answered the question. My question is, is a
18 benefit to public health or a benefit to public
19 society -- society found on the description of his
20 role at Endo in his LinkedIn profile. He's
21 answering another question. This is not a Sunday
22 morning talk show where he can pivot and provide
23 the answer that he wants to provide.
24    MR. DAVIS: Just because you don't like

Page 64

1 his answer doesn't mean he needs to change it.
2 You've asked him the question several times, he's
3 given you the same answer several times. You can
4 keep asking him the question, but the answer I
5 would imagine is not going to change.
6    MS. AMINOLROAYA: We'll get the special
7 master on the phone if this continues. We can
8 take a short break.
9    THE VIDEOGRAPHER: The time is 10:18
10 a m. We're going off the record.
11    (Recess.)
12    THE VIDEOGRAPHER: The time is 10:32
13 a m., and we're back on the record.
14 BY MS. AMINOLROAYA:
15    Q   Welcome back, Mr. Munroe. We took a
16 short break. We're back on the record.
17    Your LinkedIn profile on page 2, if you
18 turn there, at the top of the page 2, it's the
19 last clause after the semicolon. It states:
20 "Lead Endo teams through five Congressional
21 investigations and numerous crises."
22    What were the five Congressional
23 investigations that you led Endo through?
24    A   I don't recall all of them. I do recall

Page 65

1 one of the Congressional investigations was on
2 opioids led by Senator Grassley, and another one
3 was led by Senator McCaskill on opioid SOMs
4 programs. And another was a Congressional
5 investigation that didn't happen because we were
6 able to provide facts and data to have that
7 Congressional investigation not happen. But I
8 don't recall all of them.
9    Q   Okay. Thank you.
10    And as to the last Congressional
11 investigation that you say didn't happen, what was
12 the subject matter of that?
13    A   Mesh products.
14    Q   What was your role in the Congressional
15 investigation led by Senator Grassley?
16    A   I worked with a team of Endo executives
17 to be responsive to Senator Grassley's written
18 questionnaire that he had sent the company, and we
19 responded with documents. And I don't recall
20 the -- the other specific responses that we
21 provided to the committee -- to the chairman and
22 to the committee.
23    Q   Thank you.
24    And was that in approximately 2012?

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    A   It could have been.  I don't recall the
2  date.
3    Q   And the Congressional investigation by
4  Senator McCaskill related to suspicious order
5  monitoring, what was your role in responding to
6  that investigation?
7    A   My role was to organize a team of
8  subject matter experts, outside and inside legal
9  counsel, so that we could be responsive to Senator
10  McCaskill.
11    Q   What year was this?
12    A   I don't recall.
13    Q   And who were the team of experts that
14  you assembled to respond to this investigation?
15    A   It would have been members of our DEA
16  and supply organization at Endo.  I don't remember
17  the names.  It would have been at least one member
18  of my department.  It would have been inside and
19  outside legal counsel.  Again, it's been some
20  time, and I don't remember the names of the people
21  who all were there.
22    Q   Did you hire any lobbying firms to
23  respond to this Congressional investigation?
24    MR. DAVIS:  Objection to form.

Page 67

1    THE WITNESS:  I don't recall hiring a
2  lobbying firm to directly address this issue.  We
3  addressed it mostly with our internal team, inside
4  and outside legal counsel is what I recall.
5  BY MS. AMINOLROAYA:
6    Q   Did you engage a lobbying firm to
7  indirectly address Senator McCaskill's
8  investigation?
9    A   I don't recall.
10    MR. DAVIS:  Objection to form.
11  BY MS. AMINOLROAYA:
12    Q   And for Senator Grassley's
13  investigation, did you hire a lobbying firm to
14  respond to his inquiries?
15    MR. DAVIS:  Objection to form.
16    THE WITNESS:  I believe at that time we
17  had lobbying firms under employment, but I don't
18  recall hiring a lobbying firm to specifically
19  address the issues raised by Senator Grassley.
20  BY MS. AMINOLROAYA:
21    Q   Did any of the lobbying firms that you
22  had under employment do work for you in response
23  to Senator Grassley's investigation?
24    MR. DAVIS:  Objection to form.

Page 68

1    THE WITNESS:  I don't recall them doing
2  any lobbying work on either of -- of those
3  Congressional investigations.  Both of which,
4  interestingly, resulted in no follow-up from the
5  committee.
6    MS. AMINOLROAYA:  Move to strike the
7  second sentence as nonresponsive.
8  BY MS. AMINOLROAYA:
9    Q   And your -- your LinkedIn profile
10  mentions that, on the first page towards the
11  bottom, that you "extended exclusivity for largest
12  products by one year," hyphen, "$900 million
13  impact."
14    Which product does this refer to?
15    A   I'd like to read the document.
16    (Peruses document.)
17    Lidoderm.
18    Q   And --
19    A   Which is a non-opioid product you might
20  know.
21    Q   Thank you.
22    And the last sentence -- or the last
23  bullet, full bullet here states:  "Successfully
24  removed all unapproved products in the category

Page 69

1  from the market creating exclusivity for Endo
2  product, $125 million in annual impact."
3    Which unapproved products are you
4  referring to here?
5    A   I'm referring to two non-opioid
6  products, Adrenalin and HCl.
7    Q   And your profile continues:  "Achieved
8  two of only four technical corrections to
9  Obamacare to exempt two Endo products from
10  Medicaid rebates."
11    Which products are you referring to
12  here?
13    A   I'm trying to remember the names of the
14  products.  I remember the name of one of the
15  products.  They're both non-opioid products.  And
16  the exceptions we gained were for infused -- I'm
17  sorry, instilled and implanted products, and I
18  believe the name of one of the products is
19  Valstar, and I don't recall the name of the other
20  product.
21    Q   Thank you.
22    Then you describe yourself as "battle
23  tested."  Do you see that?
24    A   That's what this says.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  Q  Yes.  What does that mean?
2  A  I think it refers to my lobbying on
3  issues of controversy.
4  Q  And that's followed in the same bullet
5  by: "Lead Endo teams through five Congressional
6  investigations and numerous crises."
7  So were these issues of controversy,
8  these five Congressional investigations for Endo?
9  MR. DAVIS:  Objection to form.
10  THE WITNESS:  They ended up not being
11  controversial, in my opinion, because in each
12  instance, after being completely responsive to
13  Congressional committees in the investigations
14  they were undertaking, there was no follow-up.
15  Which is the equivalent in Congressional terms to
16  being in a situation where there was -- there was
17  nothing for -- no action for them to take.  So
18  they completed their investigation and the
19  investigation was done, and there was no
20  follow-up.  So I would not describe those as
21  controversial.
22  BY MS. AMINOLROAYA:
23  Q  But you do include the term "battle
24  tested" in the same bullet as your description of

Page 71

1  the five Congressional investigations that you led
2  Endo through, correct?
3  A  That's what this says.
4  Q  And you also mention numerous crises
5  that you led Endo through.  Which are those?
6  A  I don't recall.
7  Q  And were you responsible for particular
8  drugs in your role as senior vice president of
9  government affairs at Endo?
10  A  No.
11  Q  Did your work span all of Endo's drugs?
12  MR. DAVIS:  Objection to form.
13  THE WITNESS:  My work spanned not only
14  all of the drugs, but all of the issues that the
15  company felt had a benefit to society, a benefit
16  to public health, a benefit to patients, and a
17  benefit to Endo.  So those might be pharmaceutical
18  product issues, but many other issues as well
19  where we identified a societal benefit.
20  BY MS. AMINOLROAYA:
21  Q  And again, this benefit to society and
22  benefit to public health is mentioned nowhere in
23  the description of your job at Endo on your
24  LinkedIn profile, correct?

Page 72

1  MR. DAVIS:  Objection to form.
2  THE WITNESS:  I -- I would agree that --
3  that while it's not on my LinkedIn profile, it's
4  implicit in the work that I was doing, especially
5  the successful work, that you simply can't be
6  successful at my job without producing the facts
7  and data and convincing lawmakers and appointed
8  officials that there was a clear benefit to
9  society.
10  BY MS. AMINOLROAYA:
11  Q  What did you do when you left Endo?
12  A  I became a consultant for a short
13  period.
14  Q  Did you consult for any opioid
15  companies?
16  A  Yes.
17  Q  Which companies did you consult for?
18  A  Endo.
19  Q  When did you consult for Endo?
20  A  After leaving Endo, I consulted for
21  several months before I began my next full-time
22  employment.
23  Q  And on what issues did you consult for
24  Endo?

Page 73

1  A  My time as a consultant for Endo, I
2  spent most of that time coaching the new head of
3  government affairs, one of my former employees
4  that was left behind in the group, and most of
5  what I did was coach him on his job and monitored
6  legislative and regulatory activities and kind of
7  kept him informed of what I thought he needed to
8  be kept informed about in terms of legislative and
9  regulatory activities.
10  Q  And what is his name?
11  A  James Manser.
12  Q  Did you do any other work in your role
13  as a consultant for Endo?
14  A  No.
15  Q  Did you do any other consulting work for
16  any other companies?
17  A  Yes.
18  Q  For any companies that sell opioids?
19  A  No.
20  Q  For any companies that distribute
21  opioids?
22  A  No.
23  Q  For any other organizations that
24  interact with opioids?

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    MR. DAVIS: Objection to form.
2    THE WITNESS: I did do executive
3 coaching for an employee of a company that has a
4 pipeline product in the addiction recovery space.
5 And that company's pipeline product, which is not
6 yet approved by the FDA, does contain an opioid
7 substance, buprenorphine.
8 BY MS. AMINOLROAYA:
9    Q   Thank you.
10    And now at Bausch Health, do you -- does
11 your work there involve opioids?
12    A   No.
13    Q   And why did you leave Endo?
14    A   I left Endo because Endo was going
15 through a restructuring and made a decision to
16 close the Washington office to reduce operating
17 expense.
18    Q   Did you enter into a separation
19 agreement with Endo?
20    A   I did.
21    Q   Are you testifying today pursuant to
22 your separation agreement?
23    MR. DAVIS: Objection to form.
24    THE WITNESS: I'm here to be responsive

Page 75

1 to the subpoena.
2 BY MS. AMINOLROAYA:
3    Q   Does your separation agreement require
4 you to testify?
5    A   Not explicitly. The separation
6 agreement, as I understand it, requires me to
7 cooperate with the company on reasonable levels of
8 issue -- at a reasonable level of issues,
9 including litigation.
10    Q   Are you being paid for your time today
11 by Endo?
12    A   I am not.
13    Q   Did Endo's government affairs department
14 do lobbying?
15    MR. DAVIS: Objection to form.
16    THE WITNESS: Yes.
17 BY MS. AMINOLROAYA:
18    Q   And what -- what did the lobbying work
19 that Endo's government affairs department did when
20 you were in the department involve?
21    A   So we would identify issues that were
22 beneficial to society, particularly those issues
23 that were of benefit to public health and a
24 benefit to patients, or issues that would protect

Page 76

1 the physicians' prescribing authority to prescribe
2 the right medication to the right patient at the
3 right time to the appropriate patient, we would
4 identify those issues that had this societal
5 benefit, and where they intersected with Endo's
6 interests, we would work on those issues.
7 BY MS. AMINOLROAYA:
8    Q   You would agree that if a physician
9 can't prescribe one of Endo's products, that's --
10 that's not good for Endo's business?
11    MR. DAVIS: Objection to form.
12    THE WITNESS: We believed, and I can
13 only speak in my role in government affairs and
14 the role that I played, that we sought to protect
15 a physician's right to prescribe the right drug,
16 any drug, any company's drug, so long as it was
17 the right drug for that patient's best healthcare
18 needs. And so that was very much a priority to
19 have this patient-centered approach, and to
20 protect a physician's right to -- to make that
21 decision with the patient.
22 BY MS. AMINOLROAYA:
23    Q   And a physician's right to prescribe a
24 drug, it's beneficial for Endo, correct?

Page 77

1    MR. DAVIS: Objection to form.
2    THE WITNESS: We thought the primary
3 benefit -- you're asking about benefit, which I --
4 which I think is important. Our focus was on
5 protecting the physician's right to prescribe the
6 right medication. That was really our focus,
7 and -- and we thought it was important then, and I
8 imagine that it's -- it remains important to the
9 company.
10 BY MS. AMINOLROAYA:
11    Q   So your focus in government affairs was
12 protecting a physician's right to prescribe the
13 right medication; is that correct?
14    A   Well, we identified issues that were --
15 that had a societal benefit, particularly in the
16 area of public health, and would have a,
17 oftentimes, direct benefit on the patient, and
18 where those issues intersected with the interests
19 of Endo, those were the issues that I worked on.
20    Q   And again, if a physician could not
21 prescribe one of Endo's products, you would agree
22 that that would be negative for Endo's business
23 goals?
24    MR. DAVIS: Objection to form,

Page 78

1 foundation.
2      THE WITNESS:  We believed that it was
3 very important for the best interests of the
4 patient to have the physician have the ability to
5 prescribe the right medication for that patient's
6 best healthcare needs.  And that was our focus and
7 that was our priority.
8 BY MS. AMINOLROAYA:
9      Q    Is being profitable a goal that Endo
10 has?
11      A    Yes.  We were a commercial enterprise
12 while I worked there, and I think they're still a
13 commercial enterprise.  So I think while it was
14 important, we did not work on issues that were
15 solely issues driven by Endo's profit.  We worked
16 on issues where Endo's interests were intersecting
17 with those issues that had a benefit to society,
18 public health, and the patient's best healthcare
19 needs and interests.
20      Q    And did Endo's lobbying activities in
21 this department, did it include writing
22 legislation?
23      MR. DAVIS:  Objection to form,
24 foundation.

Page 79

1      THE WITNESS:  Sometimes it did.
2 BY MS. AMINOLROAYA:
3      Q    And did it include providing drafts of
4 legislation to legislative staff?
5      MR. DAVIS:  Objection to form.
6      THE WITNESS:  Yes.
7 BY MS. AMINOLROAYA:
8      Q    Did Endo's lobbying efforts include
9 hosting legislators in meetings?
10      A    I don't know what you mean by the term
11 "hosted."
12      Q    Did Endo either directly -- or strike
13 that.
14      Did Endo ever invite legislators to
15 meetings at places other than legislators'
16 offices?
17      A    I don't recall.
18      Q    Was that something that you've ever done
19 throughout your career?
20      A    I have invited legislators, constituent
21 members of Congress, and state legislators that
22 are constituent members of the -- the state
23 legislatures to our Endo facilities so that they
24 could better understand the technologies and the

Page 80

1 products that -- that serve the important patients
2 needs that my companies have -- have made over the
3 years.
4      Q    And when did you invite legislators to
5 Endo's facilities?
6      A    I don't recall.
7      Q    And did you invite legislators to Endo's
8 facilities to learn about any particular opioid
9 products?
10      A    I don't recall.
11      Q    Any other products?
12      A    We invited legislators, particularly
13 constituent members of Congress and constituent
14 members of the state legislature, to tour
15 facilities at companies that I've worked at over
16 the years to discuss Endo's, or any company that I
17 worked at, products and services so that they
18 could better understand, you know, the
19 technologies and products that were coming forward
20 from the company I was working at, and for which
21 they represented in Congress or the state
22 legislature.
23      Q    Did your work as a lobbyist for Endo
24 include bundling contributions for politicians?

Page 81

1      MR. DAVIS:  Objection to form.
2 Foundation.
3      THE WITNESS:  I don't recall.
4 BY MS. AMINOLROAYA:
5      Q    What does -- what does "bundling
6 contributions" mean?
7      MR. DAVIS:  Objection to form.
8      THE WITNESS:  My understanding is that
9 that's a legal term, and -- and I'm not an FEC
10 lawyer and I don't want to speculate about what
11 the legal definition of that term is.
12 BY MS. AMINOLRAYA:
13      Q    Did your -- did your responsibility as a
14 lobbyist for Endo include finding donors to make
15 contributions to politicians?
16      MR. DAVIS:  Objection to form.
17      THE WITNESS:  I don't recall.
18 BY MS. AMINOLROAYA:
19      Q    Have you ever done this at any of your
20 jobs over the years?
21      A    I don't recall.
22      Q    Did your responsibilities as a lobbyist
23 for Endo include hosting receptions for
24 politicians?

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A   What do you mean by "hosting"?

2    Q   Hosting. Where Endo is the one putting

3 on the event.

4      MR. DAVIS: Objection to form.

5      THE WITNESS: I don't recall.

6 BY MS. AMINOLROAYA:

7    Q   And did your responsibilities as a

8 lobbyist for Endo include lobbying the executive

9 branch?

10    A   They did.

11    Q   And during your time at Endo, which

12 parts of the executive branch did you lobby?

13    A   I don't recall.

14    Q   Did your responsibility as a lobbyist

15 for Endo include lobbying to advocacy groups?

16      MR. DAVIS: Objection to form.

17      THE WITNESS: I would not characterize

18 my work with advocacy groups as lobbying. Where

19 there was an intersection between public policy

20 issues that were a benefit to society,

21 particularly in the areas of public health or a

22 benefit to the patient, and those interests

23 intersected with Endo's, and independent third-

24 party organizations had the same -- had come to

Page 83

1 the same conclusion on those same issues, those

2 were issues that -- that would have brought us

3 into contact.

4 BY MS. AMINOLROAYA:

5    Q   And which independent third-party

6 organizations did you come into contact with

7 during your time at Endo?

8    A   I don't recall each and every one.

9    Q   Do you recall any of them?

10    A   I do recall the American Cancer Society.

11    Q   Do you recall any other third-party

12 organizations that you interacted with during your

13 time at Endo?

14    A   Yes.

15    Q   And which are those?

16    A   The Pain Care Coalition. The American

17 Pain Foundation. The Alliance for Aging Research.

18 Those are the ones that are top of mind.

19    Q   And do you recall that Endo provided

20 financial support to the American Pain Foundation?

21    A   I do recall that.

22    Q   Do you recall that was a subject of

23 Senator Grassley's investigation?

24    A   I do.

Page 84

1      MR. DAVIS: Objection to form.

2 BY MS. AMINOLROAYA:

3    Q   Did your job at Endo include putting

4 together communication strategies for the media?

5      MR. DAVIS: Objection to form.

6      THE WITNESS: That was certainly not a

7 principal part of my job. That was another

8 department. I might have had views about what the

9 company should do infrequently, but that was not

10 my department.

11      MS. AMINOLROAYA: May I have 1785,

12 please.

13      MR. DAVIS: Do you mind not putting the

14 exhibits on the screen until the witness has the

15 document in front of him, please. Thank you.

16      (Munroe Exhibit No. 4 was marked

17      for identification.)

18 BY MS. AMINOLROAYA:

19    Q   I'm handing you Exhibit 4. This is an

20 e-mail from you. And for the record, this is

21 ENDO-OPIOID_MDL-02210739. It's E number 1785.

22 This is an e-mail from you to colleagues at Endo,

23 including Lankau and others, dated January 11,

24 2008.

Page 85

1      And you state: "Attached for your

2 review are materials that I will use at our

3 discussion next week."

4      January 11th, 2008, how long had you

5 been at Endo at this point?

6    A   I don't recall, but it couldn't have

7 been very long.

8    Q   So this -- just to orient us, this is at

9 the beginning of your career at Endo.

10    A   That sounds right.

11    Q   Okay. And you attached here a

12 presentation that starts on page 5. It's entitled

13 "2008 Government Affairs Executive Team."

14      And was this prepared by you?

15    A   I -- I don't recall this document at

16 all. It's 11 years ago, and so I have no memory

17 of this document, whether I created it or not.

18    Q   Okay. Your name is on the first

19 cover -- the cover page of this slide deck,

20 correct?

21    A   Yes. That's what that says.

22    Q   Any reason to believe you didn't create

23 this document?

24    A   Well, the document looks pretty complex,

Page 86

1 and so I think there would be reason to believe
2 that it could have been created by a consultant
3 that I would have hired, and not me.
4      Q    And this was a presentation that you
5 were presenting to the group on this e-mail,
6 correct?
7          If you take a look at page 1, it says:
8 "Attached for your review are materials that I
9 will use in our discussion next week."
10          And the third sentence there says:
11 "Because of our limited time together, I plan on
12 moving through the slides quickly and want to make
13 sure we have enough time to discuss the priority
14 areas you would like to delve into."
15      A    I -- I'd like to read this.  Because
16 it's 11 years old, so I'd like to --
17      Q    Sure.
18      A    -- go through it.  (Peruses document.)
19          I'm sorry, what's the question now?
20      Q    Whether this was a presentation that you
21 were presenting to the group on this e-mail.
22      A    I honestly do not remember this document
23 from 11 years ago.  I don't know whether this
24 slide presentation was ever shown.  I don't know

Page 87

1 whether I gave it.  I don't recall writing it.
2 It's 11 years ago.  A lot has happened in my
3 professional and personal life since then, and I
4 have no recollection of this document whatsoever.
5      Q    Any reason to believe that you did not
6 direct this document to be written?
7          MR. DAVIS:  Objection to form.
8          THE WITNESS:  I think there's no reason
9 to not believe that I sent the document.
10 BY MS. AMINOLROAYA:
11      Q    Any reason to believe that this slide
12 deck was not put together at your direction?
13          MR. DAVIS:  Objection to form.
14          THE WITNESS:  I don't want to speculate
15 about a document that I have no memory of
16 whatsoever on -- as you said, in the early days of
17 my employment in a ten-and-a-half-year career with
18 the company.
19 BY MS. AMINOLROAYA:
20      Q    And so did you have a -- is it typical
21 for you to put your name on a document that you
22 did not direct or that you were not involved with?
23          MR. DAVIS:  Objection to form.
24          THE WITNESS:  I think it's reasonable

Page 88

1 that I was involved with the document and that I
2 sent the document, but I have no memory of the
3 document from 11 years ago.
4 BY MS. AMINOLROAYA:
5      Q    All right.  Let's turn to page 10 of the
6 document.
7          MR. DAVIS:  Take your time if you want
8 to go through it.
9 BY MS. AMINOLROAYA:
10      Q    And you're welcome to look at any page
11 of this document.  I found what's helped us all
12 move along when we look at documents like this is
13 for me to tell you the page I'm going to be asking
14 about.
15      A    I'd like to review the document, because
16 this is 11 years ago.  So I --
17      Q    You'd like to review the entire
18 document?
19      A    Yes, please.
20          MS. AMINOLROAYA:  Okay.  Let's go off
21 the record so --
22          MR. DAVIS:  No.
23          MS. AMINOLROAYA:  -- the witness can
24 review the entire document.

Page 89

1          MR. DAVIS:  He's going to review the
2 document on the record, whether we go off now or
3 not.
4          MS. AMINOLROAYA:  Well, we'll have
5 the -- Court Reporter, would you mark the time.
6          And I can tell you I'm going to ask you
7 about page 10.
8          MR. DAVIS:  The tenth slide or the
9 E number?
10          MS. AMINOLROAYA:  The E number 10.  So
11 1785.10.
12          THE WITNESS:  (Peruses document.)
13 BY MS. AMINOLROAYA:
14      Q    And let me know when you're at page 10,
15 please.
16      A    (Peruses document.)
17      Q    Are you at page 10, Mr. Munroe?
18      A    Not yet.
19      Q    Okay.
20          MR. DAVIS:  Do you see the numbers up on
21 top?
22          THE WITNESS:  Yeah.
23          I haven't looked at the entire document.
24 I just wanted to familiarize myself generally with

Page 90

1  it. So thank you for allowing me to do that.
2       And I've now kind of just -- because I
3  have no memory of this document from 11 years ago,
4  but I have taken just a couple of minutes to
5  familiarize myself. So now I'm turning back to
6  page 10, so I've got page 10 in front of me.
7  BY MS. AMINOLROAYA:
8       Q   Okay. And the cover e-mail here, to
9  orient us, if you turn to page 1, this is being
10 sent to Lankau. Who is Lankau?
11      A   Peter Lankau was the CEO.
12      Q   Thank you.
13          And Caroline Manogue?
14      A   The general counsel.
15      Q   And David Lee?
16      A   Chief scientific officer.
17      Q   Nancy Wysenski?
18      A   I believe that she was the head of
19 commercial.
20      Q   So this e-mail is being sent -- you were
21 sending this e-mail to executives at the company?
22      A   Yes.
23          MR. DAVIS: Objection to form.
24 BY MS. AMINOLROAYA:

Page 91

1       Q   And is the strategy that you're
2  proposing here on page 10 to the executives of the
3  company, the Endo government affairs strategy, is
4  it to focus on those issues that disproportionally
5  impact Endo, place Endo at a competitive advantage
6  or disadvantage, impact the company's bottom line
7  and/or impact our current and/or pipeline
8  products?
9       A   So I don't want to speak specifically to
10 this document because I have no memory of it, but
11 I would point you to slide 8, which says: "The
12 vision of Endo government affairs is to understand
13 and shape the external public policy environment
14 to benefit patients and Endo." Which echoes what
15 I have said this morning.
16          And -- and that strikes a chord with me,
17 because we worked on issues at Endo that were a
18 benefit to society, a benefit to public health,
19 and a benefit to patients, where they intersected
20 with Endo's interests. I would also --
21      Q   Thank you. Mr. -- Mr. Munroe --
22      A   -- point you to another slide, slide 28,
23 where we talk about public policy criteria. And
24 again, I don't want to speak directly to this

Page 92

1  document because I have no memory of it whatsoever
2  from 11 years ago, but I noticed that the very
3  first bullet on this slide is "Focus on the
4  patient: The right thing to do."
5       And so a hallmark of my work at Endo was
6  to work on those issues where there was a benefit
7  to society, a public health benefit, a benefit to
8  the patient. Right there on slide 28, "Focus on
9  the patient: The right thing to do." Those were
10 the issues that I worked on at Endo.
11          MS. AMINOLROAYA: Would the court
12 reporter -- I'm sorry, Leslie, am I remembering
13 that correctly?
14          THE REPORTER: Yes.
15          MS. AMINOLROAYA: Would you mark the
16 record, please. And could you tell me the line --
17 the line number and the time of the witness's last
18 testimony.
19          THE REPORTER: Right now, this last
20 testimony?
21          MS. AMINOLROAYA: Yes.
22          THE REPORTER: I have page 74, line 6.
23 I don't know if that --
24          MS. AMINOLROAYA: Thank you.

Page 93

1          THE REPORTER: -- is the same as yours.
2  And it was at 11:14.
3          MS. AMINOLROAYA: Thank you.
4          MR. DAVIS: And maybe we could mark the
5  time of this little back and forth. It probably
6  took about the same as Mr. Munroe's answer to your
7  question.
8          MS. AMINOLROAYA: Move to strike as
9  nonresponsive. Mr. -- move to strike Mr. Munroe's
10 last answer as nonresponsive.
11 BY MS. AMINOLROAYA:
12      Q   Is page 10 of this document telling your
13 colleagues at Endo that a strategy of Endo's
14 government affairs is to focus on issues that
15 disproportionally impact Endo?
16      A   When I say -- and I want to be
17 completely responsive to your question, when I say
18 we worked on issues that had a benefit to society,
19 public health, and the patient, and Endo, it was
20 on the Endo side of that equation, those were
21 issues that disproportionately impacted Endo, as
22 opposed to those issues which were industrywide
23 issues that an organization like pharma or bio.
24          So we did work on issues that

Page 94

1  disproportionately impacted Endo, but also only in
2  the case where there was a benefit to society,
3  public health, or benefit to the patient.
4      Q    And did Endo's government affairs
5  department have a strategy to place Endo at a
6  competitive -- to focus on issues that placed Endo
7  at a competitive advantage or disadvantage?
8      A    Again, not speaking to this document
9  that I don't recall in any regard, we did work to
10 advance commercial interests where there was a
11 benefit to society, the public health and a
12 benefit to patients.
13     Q    And did Endo's government affairs
14 strategy include work on issues that impacts the
15 company's bottom line?
16     A    We only worked on issues that impacted
17 the company's bottom line when they intersected
18 with benefits to society, the public health, or
19 benefits to patients.
20     Q    And who made that determination whether
21 an issue benefitted society?
22     A    Elected and appointed government
23 officials.
24     Q    So would -- would Endo wait for a

Page 95

1  government official to tell them that an issue
2  benefitted society before it would work on an
3  issue?
4      MR. DAVIS:  Objection to form.
5      THE WITNESS:  We sought to identify
6  those issues for which we believed had a benefit
7  to society, public health, or benefit to the
8  patient, and our ability to successfully work on
9  those projects required us to gather facts and
10 data, and bring them to lawmakers and demonstrate
11 that there was in fact a benefit to society, the
12 public health, or the patient.
13 BY MS. AMINOLROAYA:
14     Q    So it was Endo that was making the
15 judgment whether an issue benefitted society.
16     MR. DAVIS:  Objection to form,
17 mischaracterizes testimony.
18     THE WITNESS:  You'll have to ask Endo.
19 I'm not Endo.
20 BY MS. AMINOLROAYA:
21     Q    Well, was it Endo's government affairs
22 department that was deciding the issues it worked
23 on?
24     A    No.

Page 96

1      Q    Who decided which issues Endo's
2  government affairs department worked on?
3      A    The -- the company's executive team.
4      Q    And who was that?
5      A    It was -- I worked for four different
6  CEOs while I was at the company.
7      Do you know them or would you like me to
8  name them?
9      Q    Why don't you name them.
10     A    Okay.  Peter Lankau, Dave Holveck, Rajiv
11 De Silva, and Paul Campanelli.
12     And I had four supervisors at Endo that
13 also approved all of my work.
14     Q    And who were your supervisors at Endo?
15     A    Carolyn Manogue, Don DeGolyer, Keri
16 Mattox, and Steve Mock.
17     Q    And how did this process work of
18 deciding what issues Endo's government affairs
19 department would work on?
20     A    I would say it was multifactorial.  We
21 would bring for -- each CEO had a slightly
22 different process.  So setting goals and
23 objectives for the company, I would get input from
24 the functional heads of the companies on what they

Page 97

1  felt were priority issues.
2      Government affairs did its own
3  environmental assessment of -- of where there were
4  opportunities to benefit society and Endo.  I had
5  supervisorial input.
6      And we also had a process to develop
7  public policy positions at Endo that involved --
8  on nonmaterial issues to the company, the head of
9  the Washington office, a member of the executive
10 team, and the company's subject matter expert or
11 functional head had to all agree on taking a
12 public policy position.  If it was a material
13 issue, that group had to agree and the CEO had to
14 agree.
15     Q    And for these issues, would you identify
16 them for your supervisors or -- or would they
17 identify all issues for you?
18     MR. DAVIS:  Objection to form.
19     THE WITNESS:  I think it was a -- it was
20 probably a mixture.
21 BY MS. AMINOLROAYA:
22     Q    So in making this decision of whether an
23 issue benefitted society, would that judgment come
24 from both you and the executives or your

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 supervisors?
2          MR. DAVIS:  Objection to form.
3          THE WITNESS:  I would say it's -- it was
4 a -- an agreed-upon decision to move forward on
5 public policy issues that benefitted society, the
6 public health, a benefit to patients where they
7 intersected with Endo.  I would come to an
8 agreement with the executives, both my supervisors
9 and the executive team, and by utilizing our
10 public policy approval process, we would come to
11 an agreement on those priority issues that
12 benefitted society and patients, and then work on
13 them.
14 BY MS. AMINOLROAYA:
15     Q   So it was you and the government affairs
16 department and your supervisors and the CEOs at
17 Endo that were deciding what was beneficial for
18 society --
19          MR. DAVIS:  Object --
20 BY MS. AMINOLROAYA:
21     Q   -- when you were proposing these public
22 policies.
23     A   That's --
24          MR. DAVIS:  Objection to form.

Page 99

1          THE WITNESS:  That's incorrect.
2 BY MS. AMINOLROAYA:
3     Q   If it wasn't you, who -- who was making
4 this judgment?
5     A   It was lawmakers.  Elected and appointed
6 officials would ultimately decide if there was a
7 benefit to society.  And they passed the laws and
8 they're the government.  We weren't the
9 government.  We were advocating for a certain
10 public policy position that we believed would
11 benefit society, public health, or patients.
12     Q   And the issues that you were advocating
13 for were issues that Endo believed would benefit
14 society.  Correct?
15     A   Certainly Endo, but also other important
16 experts, independent third-party organizations.
17 We were in tune with patient advocacy
18 organizations because we wanted to work on
19 projects that were centered on benefits to the
20 patient.
21     Q   And Endo provided financial assistance
22 for a number of third-party patient organizations,
23 correct?
24     A   We did -- we did provide donations to

Page 100

1 independent third-party organizations, but it was
2 disconnected from the work that we've been talking
3 about.  So I wanted to make that clear, a clear
4 delineation that it was not connected to the work
5 that I was doing in -- in lobbying and public
6 policy.
7          MS. AMINOLROAYA:  Move to strike as
8 nonresponsive, everything after the word
9 "organizations."
10 BY MS. AMINOLROAYA:
11     Q   And was one of Endo's government affairs
12 department's goals for 2008, on page 34 of the
13 document, to protect the company from negative
14 government action?
15     A   I've turned to slide 34 in the deck.
16 And I have no memory of this document whatsoever,
17 so I don't want to speculate about what it means.
18 It's an 11-year-old document.
19     Q   On page 34 of this document, is the --
20 the title of this "Endo Government Affairs 2008
21 Goals"?
22     A   That's what that says.
23     Q   Thank you.
24          And does it continue:  "Formal

Page 101

1 execution:  Build a plan based on this
2 presentation and discussion to protect the company
3 from negative government action"?
4     A   That's what that says.
5     Q   Thank you.
6          And does the next page, page 35,
7 continue:  "Value added.  Core capabilities built
8 to realize the value from these activities"?  And
9 is one of the activities on the left side of the
10 page, first circle, "Endo defense against
11 government/risk MGT"?
12     A   I'd just like to look at this document
13 for a little bit because it's an 11-year-old
14 document, and would like to see it because I have
15 no recollection of this document at all.
16     Q   Sure.  And would you just tell me if
17 "Endo defense against government/risk management"
18 is -- is on page 35 of this document entitled
19 "Value added:  Core capabilities to realize the
20 value from these activities"?
21     A   This -- this says those words.
22     Q   Thank you.
23          And does the middle of this page have a
24 circle -- does the middle circle state "Value"?

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    A   It's very interesting that it does, and
2  while I don't remember this document at all, it
3  strikes a chord with me, because we were looking
4  to provide value on issues that were important
5  benefits to society, the public health, and
6  benefits to patients that would really provide
7  value to patients, and also value to Endo.  So
8  that strikes a chord with me.
9    Q   And does it -- does anywhere on this
10 page -- on this page that has a circle with the
11 word "Value" on it, are any of the circles here,
12 do they mention providing value to patients?
13      MR. DAVIS:  Objection to form.
14      THE WITNESS:  I don't want to speak to
15 this document because I have no recollection of
16 this 11-year-old document.
17      What I can tell you about your direct
18 question about value, I do want to answer that
19 question and be responsive.  Which is to say we
20 were looking for issues where there was a value to
21 society, a value to the public health, a value to
22 the patients, and where those issues intersected
23 with a value to Endo.  So that strikes a chord
24 with me.

Page 103

1  BY MS. AMINOLROAYA:
2    Q   What my question was, does page 35 of
3  this document mention patient benefit anywhere on
4  the page?
5    A   I really can't speak to this document.
6  I don't recall anything about this document.  I
7  don't -- it's an 11-year-old document, and I don't
8  want to speculate about an 11-year-old document.
9    Q   Sir, I'm not asking you what you can
10 recall.  I'm asking you if there are any -- if
11 this page 35 of the document that starts with the
12 words "Value added," whether patient benefit is
13 found anywhere on this page.
14    A   I know if I would have spoken about this
15 slide, I would have talked about the value to
16 society, public health, and the value to patients,
17 because that was so core to the work I did.  It
18 was very much the forefront.
19      And I would bring you back to, I believe
20 it was, slide 8, where we said patient focus, you
21 know, had to be our priority.  So if this slide
22 says "Value," I know I would have talked about the
23 value to patients.
24    Q   But that's not found anywhere on this

Page 104

1  slide, correct?
2    A   Well, I don't see it on the slide.  I
3  know it would have been a priority for Endo to put
4  the value to patients and the value to society at
5  the forefront of public policy issues that we were
6  considering.
7    Q   But not important enough to include on
8  this page about "Value added."
9      MR. DAVIS:  Objection to form.
10     THE WITNESS:  I would have made the
11 discussion of value to society and value to
12 patients at the forefront of any presentation that
13 I would have made to the executive committee,
14 because one cannot be successful in my line of
15 work unless you can demonstrate with facts and
16 data the value to society that -- the public
17 policy issues that you're moving forward with.
18 BY MS. AMINOLROAYA:
19    Q   Does page 63 of this document identify
20 potential opportunities for Endo's government
21 affairs department?
22    A   I'm now turning to page 63, just kind of
23 reading along the way.  (Peruses document.)
24      Your question?

Page 105

1    Q   So was one of the potential
2  opportunities that was identified in this 2008
3  document that you sent to your colleagues that:
4  "These factors will assist in identifying and
5  educating champions on issues that Endo wants to
6  proactively pursue as well as conveying opposition
7  to issues Endo does not support"?
8    A   I don't recall anything about this
9  11-year-old document, but what strikes a chord
10 with me is where it says: "Commitment to science-
11 based research to discover novel compounds."  And
12 so that would have -- that would have been
13 something that -- that we would be doing, which is
14 to try and communicate facts and data on issues
15 that had a benefit and value to society, the
16 public health, and a benefit to patients, and at
17 the same time were important to Endo.
18      MS. AMINOLROAYA:  Move to strike as
19 nonresponsive everything after the word
20 "document."
21      And would the court reporter mark the
22 record as well.  Thank you.
23 BY MS. AMINOLROAYA:
24    Q   Did Endo's government affairs strategy

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  include identifying champions on issues that Endo
2  wants to proactively pursue?
3      A   Sometimes, yes.
4      Q   And did Endo's government affairs
5  strategy include the creation of a -- a PAC?
6          MR. DAVIS:  Objection to form,
7  foundation.
8          THE WITNESS:  We did have a PAC at Endo.
9  BY MS. AMINOLROAYA:
10     Q   What is a PAC?
11     A   A PAC is a political action committee.
12     Q   And why did Endo create a PAC?
13     A   Because -- because it is the -- one of
14 the only legal ways in which a corporation can
15 organize employees to make contributions, to give
16 elected officials campaign contributions.
17     Q   And was it because goodwill only goes so
18 far, elected officials must run campaigns like we
19 run our business?
20         MR. DAVIS:  Objection to form.
21         THE WITNESS:  Are you reading that from
22 this document?
23 BY MS. AMINOLROAYA:
24     Q   I'm asking you that question.

Page 107

1      A   Okay.
2      Q   Did Endo create a PAC because goodwill
3  only goes so far, elected officials must run
4  campaigns like Endo runs its business?
5      A   In my time lobbying in Washington, I did
6  feel it was important to have a political action
7  committee.  I felt it was important at Endo and
8  all of the other companies that I worked for.
9      Q   Would you turn to page 40 of the
10 document.
11         And is the third bullet on this page:
12 "Why create a PAC?"  Does it state:  "Goodwill
13 only goes so far, elected officials must run
14 campaigns like we run our business"?
15     A   As I said, I don't recall this 11-year-
16 old document.  But I note that in the fourth
17 bullet I say:  "It's the only legal way Endo can
18 contribute money to worthy candidates," which is a
19 form of the answer that I just gave you.  So that
20 strikes a chord with me.  But I don't remember
21 this document at all.
22     Q   Okay.  And just stick with my question,
23 Mr. Munroe.  Maybe I wasn't clear.
24         Is the third bullet of this -- on this

Page 108

1  page entitled "Why Create a PAC?"  Is it:
2  "Goodwill only goes so far, elected officials must
3  run campaigns like we run our business?"  Is that
4  what the third bullet states?
5      A   That's what that says.
6      Q   Thank you.
7          MS. AMINOLROAYA:  Can I have 1761,
8  please.
9          (Munroe Exhibit No. 6 was marked
10         for identification.)
11 BY MS. AMINOLROAYA:
12     Q   I'm handing you what's been marked as
13 Exhibit 6.  It's entitled "3 Waves of the Rise of
14 Opioid Overdose Deaths."  And the source of this
15 is the National Vital Statistics System Mortality
16 File.
17         Are you familiar with the National Vital
18 Statistics System?
19     A   No.
20     Q   Are you familiar with the -- the opioid
21 overdose problem in the country?
22         MR. DAVIS:  Objection to form.
23         THE WITNESS:  Only what I read about in
24 the press.

Page 109

1  BY MS. AMINOLROAYA:
2      Q   Have you ever visited the CDC's website?
3      A   I have.
4      Q   Have you ever seen any material on the
5  CDC's website reflecting the opioid overdoses in
6  the country?
7      A   I don't recall.
8      Q   Have you ever attended Congressional
9  hearings discussing the opioid epidemic?
10     A   I don't recall.
11     Q   Have you ever attended meetings
12 discussing the opioid epidemic?
13     A   Yes.
14     Q   So this document is entitled "3 Waves of
15 the Rise in Opioid Overdoses."
16         And you started at Endo in 2007; is that
17 correct?
18     A   I don't recall.
19     Q   According to your LinkedIn profile, it
20 states you started at Endo in 2007.  Any reason to
21 believe that's incorrect?
22     A   No.
23     Q   Okay.  So let's take a look at this
24 chart.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    Do you see three lines here -- three
2  colored lines on this chart?
3    A  I do.
4    Q  All right.  And what is Wave 1,
5  according to this chart?
6    A  I have never seen this chart before.  I
7  don't know what the information says, and so I
8  don't really want to talk about a document that
9  I'm unfamiliar with.
10    I'm not an epidemiologist, I'm not a
11  scientist, I'm not a physician, I'm not a
12  statistician, and I don't want to speculate about
13  a document that I'm seeing for the first time that
14  has lines and -- and dates and numbers and what
15  looks like statistical analysis.  So my preference
16  is to just not speculate about the information on
17  this document.
18    Q  Mr. Munroe, do you see the word "Wave 1"
19  in purple on the left-hand side of this document,
20  the lower left side of the document?
21    MR. DAVIS:  Objection to form.
22    THE WITNESS:  That -- that's what it
23  says.
24  BY MS. AMINOLROAYA:

Page 111

1    Q  Okay.  And does it state:  "Rise in
2  prescription opioid overdose deaths"?
3    A  That's what that says.
4    Q  All right.  And does the chart start in
5  1999?
6    A  I don't want to talk about the
7  information on the chart because I'm just
8  unfamiliar with it, and I don't understand it and
9  I don't know what it means, and this is the first
10  time I'm seeing this information.
11    Q  Are you saying you don't want to answer
12  my question, Mr. Munroe?
13    A  I do very much want to say that I'm not
14  a statistician, an epidemiologist, a physician, a
15  scientist, or someone who could interpret this
16  information in a meaningful way.  And I don't want
17  to speculate about a document that I've never seen
18  before.  That -- that would be my preference.
19    Q  Sir, I'm not -- I'm not asking you to
20  speculate.  I'm asking you whether the first year
21  on this chart is 1999.
22    MR. DAVIS:  Objection to form.
23    THE WITNESS:  I don't want to talk about
24  the numbers on the chart.  There's numbers on the

Page 112

1  side, there's numbers on the bottom.  I don't want
2  to speak to a chart that I'm seeing for the first
3  time because I just don't understand it and I
4  haven't had a chance to study it.
5    MS. AMINOLROAYA:  Would the court
6  reporter mark the record.
7  BY MS. AMINOLROAYA:
8    Q  And the first purple -- the first box on
9  the left-hand corner here states:  "Wave 1, rise
10  in opioid -- rise in prescription opioid overdose
11  deaths."  Correct?
12    A  That's what that says.
13    Q  And that covers 1999 to 2005, correct?
14    MR. DAVIS:  Objection to form.
15    THE WITNESS:  I don't want to talk about
16  what -- what that means, because I'm not an
17  epidemiologist, a statistician, a scientist, a
18  physician.  I've not studied this document.  This
19  is the first time I'm seeing this document.  And I
20  don't want to begin to interpret, you know, the
21  relevance of the dates or -- or other information
22  on the chart since this is my first time seeing
23  it, and I haven't studied the document.
24  BY MS. AMINOLROAYA:

Page 113

1    Q  And 2007 is when you began at Endo.  And
2  do you see on the left -- left side of this
3  document, it states:  "Deaths per 100,000
4  population"?
5    A  I disagree with your connecting my
6  employment date at Endo with -- with deaths,
7  and -- and I disagree with that wholeheartedly.
8    I worked on issues at Endo in my role in
9  government affairs where there was an intersection
10  between what we identified as being beneficial to
11  society, the public health or the patient, and the
12  interests of Endo.  So I disagree with your
13  characterization and -- and the connection of my
14  employment date with this chart.
15    Q  Sir, my question was, do you see on the
16  left side of this document, it states:  "One" --
17  it states:  "Deaths per 100,000 population"?
18    A  That's what's written along the side
19  here, yeah.
20    Q  Thank you.
21    And do you see that in 2007, the purple
22  line, which refers to commonly prescribed opioids,
23  natural and semisynthetic opioids, and methadone
24  for 2007 corresponds with four deaths per 100,000

Page 114

1 population?
2     MR. DAVIS: Objection to form.
3     THE WITNESS: I absolutely do not want
4 to draw any conclusions about this document that
5 I'm seeing for the first time. I am neither an
6 epidemiologist, a scientist, a physician, or a
7 statistician.
8     So I don't -- I don't recognize the
9 source of this document. I've not seen this
10 document before, and I don't want to begin to
11 speculate the meaning of this document and the
12 data.
13 BY MS. AMINOLROAYA:
14   Q  Is Opana ER a commonly prescribed
15 semisynthetic opioid?
16     MR. DAVIS: Objection to form.
17     THE WITNESS: I was not in product
18 development, scientific affairs, research and
19 development.
20     In my role in government affairs, I
21 wouldn't have been able to categorize the nature
22 of our -- our products and their chemical makeup.
23 That was just not -- that was beyond the scope of
24 my position at Endo.

Page 115

1 BY MS. AMINOLROAYA:
2   Q  Is Opana ER or was Opana ER a commonly
3 prescribed opioid?
4     MR. DAVIS: Objection to form. He just
5 answered that question.
6     THE WITNESS: I think the word
7 "commonly" is something that -- that I would be
8 unfamiliar with, because you would associate
9 "commonly" with some sort of percentage within the
10 opioid market, and again, that was beyond the
11 scope of my job. So I would not have the
12 information necessary to answer that question
13 adequately.
14 BY MS. AMINOLROAYA:
15   Q  Would you agree that in 2007, the deaths
16 per 100,000 population for commonly prescribed
17 opioids was four?
18     MR. DAVIS: Objection to form.
19     I think Mr. Munroe has been clear that
20 he can't interpret this chart. If you want him to
21 read the words that are on this piece of paper,
22 I -- we can do that, but having him interpret this
23 data is something I think he has told you several
24 times he's unprepared and unable to do.

Page 116

1 BY MS. AMINOLROAYA:
2   Q  Mr. Munroe, are you having difficulty
3 seeing where the purple line is in 2007 on this
4 page?
5   A  I am not having difficulty seeing the
6 purple line.
7   Q  Is the purple line at the number 4?
8     MR. DAVIS: Objection to form.
9     Answer one more time.
10     THE WITNESS: I don't want to answer a
11 question about a document and begin interpreting
12 it, because I'm not an epidemiologist, a
13 scientist, a physician, or a statistician. And I
14 don't want to interpret a document that I'm seeing
15 for the first time in which I don't even recognize
16 the source of the data or the underlying data, and
17 I've not studied this document. And so my
18 preference is not to speculate about the
19 information in the document.
20 BY MS. AMINOLROAYA:
21   Q  Mr. Munroe, earlier you testified that
22 Endo put the patients' interests first, and its
23 public policy -- strike that.
24     Earlier you testified that in selecting

Page 117

1 public policy matters to pursue, Endo put the
2 patients' interests first and the benefits to
3 society first.
4     Do you recall the many times you
5 testified to that?
6     MR. DAVIS: Objection to form.
7     THE WITNESS: I -- I testified that we
8 worked on issues that were benefits to society,
9 public health, and the patients that also
10 benefitted Endo, and where those two sets of
11 principles intersected, those were the issues that
12 we worked on.
13 BY MS. AMINOLROAYA:
14   Q  Do you recall in 2007, prior to
15 beginning at Endo, abuse of OxyContin was -- was
16 well known?
17     MR. DAVIS: Objection to form.
18     MR. NOVY: Objection to form.
19     THE WITNESS: I have never been an
20 employee of Purdue Pharma, and so I have no
21 knowledge of those issues relating to OxyContin.
22 So I can't speak for Purdue.
23 BY MS. AMINOLROAYA:
24   Q  Did you ever do any consulting work for

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 Purdue?
2          MR. DAVIS:  Objection to form.
3          THE WITNESS:  Purdue was a client of the
4 Capitol Hill Consulting Group during the time I
5 was a consultant lobbyist at the Capitol Hill
6 Consulting Group, but I do not recall doing any
7 work for the Purdue account.
8          (Counsel conferring.)
9          (Munroe Exhibit No. 7 was marked
10          for identification.)
11 BY MS. AMINOLROAYA:
12     Q   I'm handing you what's been marked as
13 Exhibit 7 to your deposition.  This is
14 PPLC018000 --
15          MR. DAVIS:  Do you have another one?
16 BY MS. AMINOLROAYA:
17     Q   -- 141199.
18          MR. DAVIS:  Have another one?
19          MS. AMINOLROAYA:  Yes.
20 BY MS. AMINOLROAYA:
21     Q   It's E number 1743.
22          And in May of 2007, is Mr. Rosen of
23 Purdue asking you whether you should visit at the
24 appropriate time with anyone listed?

Page 119

1     A   I don't recall this document at all.
2 It's a 12-year-old e-mail.  I have no idea what
3 this is about.
4     Q   And does this page -- does -- does this
5 e-mail from Mr. Rosen state:  "Let's discuss
6 whether we should visit at the appropriate time
7 with anyone listed.  Thanks for yesterday"?
8     A   That's what this says.
9     Q   All right.  And is -- is your name in
10 the "to" line here?
11     A   Yes.  Two names.
12     Q   And is the date of this e-mail May 11,
13 2007?
14     A   Yes, that's what this says.
15     Q   And does page 3 of this document list
16 current members of the Congressional Caucus on
17 Drug Policy?
18     A   That's what this says.
19     Q   And your -- is your response to
20 Mr. Rosen on page 1 of the document:  "Would it be
21 worth trying to get one of our friends to join
22 this caucus to," quote, "ensure the government's
23 appropriate and measured response based on medical
24 facts and data to the nation's drug policies," end

Page 120

1 quote, question mark, hyphen, "both as a mole and
2 as an insider to make this group doesn't
3 overreach.  Thanks, Brian"?
4     A   That's what that says.
5     Q   Thank you.
6          And does Mr. Rosen respond:  "Like the
7 idea.  Do you suggest anyone"?
8     A   Again, I don't recall this e-mail
9 exchange at all.  The only thing that strikes a
10 chord for me is where it says "facts and data to
11 the nation's drug policies," because that's
12 something that I built a career around, which is
13 providing facts and data to government officials
14 so that we can land on issues that are benefits to
15 society, public health, and a benefit to the
16 patient where they intersect with our -- my own
17 company's goals.
18          So that -- that statement about facts
19 and data and providing facts and data, that
20 strikes a chord with me, but I don't remember this
21 e-mail exchange at all.
22          MS. AMINOLROAYA:  Move to strike
23 everything in his last answer.
24          And would the court reporter please mark

Page 121

1 the record.
2          (Munroe Exhibit No. 8 was marked
3          for identification.)
4 BY MS. AMINOLROAYA:
5     Q   It's Exhibit 8.  E1777 and
6 PPLPC019000154246.
7          And is this an e-mail from Burt Rosen to
8 you and two other individuals at Capitol Hill
9 Consulting Group dated July 20th, 2007?
10     A   That's what this says.
11     Q   All right.  And does Mr. Rosen write to
12 you:  "Can you discreetly check to see if Senate
13 Judiciary is planning any kind of drug abuse
14 hearing on July 31st?"
15     A   That's what this says.
16     Q   And is the -- is there an article
17 included in the body of the e-mail?
18     A   It appears that that's the case,
19 although I have no memory of this e-mail.  Bill
20 Brewster was not only the chairman of the firm,
21 but he was the longtime contract lobbyist for
22 Purdue Pharma.
23          So I was a healthcare practitioner at
24 the firm so I was included on this e-mail, but --

Page 122

1 but Bill was the principal recipient of this
2 e-mail. And I don't recall it in any regard.
3        MS. AMINOLROAYA: Move to strike as
4 nonresponsive.
5 BY MS. AMINOLROAYA:
6     Q   My question was, is there an article
7 included in the body of the e-mail, and is it --
8 is it entitled "Mother to face those she blames.
9 Woman's death tied to OxyContin. Drug exec
10 sentenced today"?
11    A   That's what that says.
12    Q   Thank you.
13       And was Mr. Rosen here asking you and
14 your colleagues at Capitol Hill Consulting Group
15 to see if the Senate Judiciary was planning any
16 kind of drug abuse hearing on July 31st?
17       MR. NOVY: Objection to form.
18       MR. DAVIS: Objection to form.
19       THE WITNESS: Well, that's what this
20 says, and it would not have been unusual for a
21 company lobbyist to make inquiries about what
22 Congressional hearings of various healthcare
23 related committees or other committees of Congress
24 might be holding in the future. That would be a

Page 123

1 very routine kind of request.
2        (Munroe Exhibit No. 9 was marked
3        for identification.)
4 BY MS. AMINOLROAYA:
5     Q   I'm handing you what's been marked as
6 Exhibit 9. PPLPC023000118882. It's also
7 E-numbered 1739.
8       And is the subject of this e-mail
9 "Invoice from Consultant Munroe"?
10    A   I don't recognize this in any regard.
11    Q   Is the subject of this e-mail "Invoice
12 from Consultant Munroe"?
13    A   Yes.
14    Q   Okay. And does Mr. Rosen write to the
15 recipients here: "Brian Munroe is a government
16 affairs consultant. I had the opportunity to hire
17 him as a consultant for a three-month period at
18 $5,000 per month. In this time frame he assisted
19 me in my capacity as the VP Federal Government
20 Affairs."
21       Is that what Mr. Rosen states here?
22    A   Yes.
23    Q   And does he continue: "Together we
24 reviewed an organization that I helped found. The

Page 124

1 group is the Pain Care Forum, which is organized
2 around several pharmaceutical companies, pain
3 advocacy groups, pain groups, healthcare
4 professionals and hospice organizations"?
5     A   That's what this says.
6     Q   And does it continue: "Brian Munroe has
7 had past experience with forming similar
8 coalitions, and he has given me several
9 suggestions for growing the Pain Care Forum and
10 for strengthening its effectiveness"?
11    A   That's what this says. But this e-mail
12 was not to me and I didn't receive it, and I don't
13 recognize it at all.
14    Q   Did you consult for Mr. Rosen in 2007
15 regarding the Pain Care Forum?
16    A   I don't recall doing that.
17    Q   Do you have any reason to believe that
18 Mr. Rosen's e-mail is not accurate?
19    A   I just don't know what this e-mail is
20 about. I don't know whether it was about a
21 prospective consultant opportunity. I don't
22 recall consulting for Burt. So I -- I simply
23 don't recall, and I've never seen this e-mail
24 before in my life.

Page 125

1     Q   Well, the e-mail states, fourth
2 sentence: "And together we reviewed an
3 organization that I helped found."
4       Right? So you would agree that's the
5 past tense?
6     A   I don't want to comment on this e-mail.
7 This e-mail is not any e-mail that I received.
8 I've never seen it before, so I don't want to try
9 and interpret it.
10    Q   You would agree that here Mr. Rosen is
11 stating that you and he reviewed an organization
12 called the Pain Care Forum, and that he provided
13 you with suggestions for growing -- or, rather,
14 that you provided him with grow- -- with
15 suggestions for growing the Pain Care Forum and
16 strengthening its effectiveness?
17    A   You'd have to ask Mr. Rosen.
18    Q   Do you have any reason to believe that
19 Mr. Rosen would write an e-mail that misrepresents
20 work that you've done for him, and submit that
21 e-mail or submit an invoice --
22    A   You would have to ask --
23    Q   -- to the company?
24    A   You would have to ask Mr. Rosen. I

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 don't know what his intentions are.
2    Q   And you know Mr. Rosen fairly well;
3 isn't that correct?
4        MR. DAVIS:  Objection to form.
5        MR. NOVY:  Objection to form.
6        THE WITNESS:  I do know him well.
7 BY MS. AMINOLROAYA:
8    Q   Do you know him to misstate facts?
9        MR. DAVIS:  Objection to form.
10       MR. NOVY:  Objection.
11       THE WITNESS:  I don't want to comment
12 and interpret an e-mail that Burt sent to some
13 other individual that I don't know.  I don't
14 understand the content of this e-mail.  So I don't
15 want to begin to speculate on an interpretation on
16 a 12-year-old e-mail of which I never received.
17 BY MS. AMINOLROAYA:
18   Q   Do you know who Ms. Shaw is?
19   A   Yes.
20   Q   Who is Ms. Shaw?
21   A   Ms. Shaw is Burt's assistant in the
22 Washington office.
23   Q   Thank you.
24       MR. DAVIS:  We're a little bit over an

Page 127

1 hour and a half.  It's after noon.  Do you mind if
2 we take a break here?
3        MS. AMINOLROAYA:  I'm just about to go
4 through another document.  I think we can take a
5 break after that.
6        MR. DAVIS:  How long do you think you're
7 going to have with the document?
8        MS. AMINOLROAYA:  I won't be very long.
9 BY MS. AMINOLROAYA:
10   Q   And you and Mr. Rosen were close,
11 correct?
12       MR. DAVIS:  Objection to form.
13       THE WITNESS:  In what regard?
14 BY MS. AMINOLROAYA:
15   Q   Well, you're friends.
16   A   We are friends.
17   Q   And -- and you have no reason to
18 believe -- do you have no reason -- you have no
19 reason to believe that Mr. Rosen would
20 inaccurately state facts?
21       MR. DAVIS:  Objection to form.
22       THE WITNESS:  I don't want to speculate
23 on a document, on a 12-year-old e-mail, that I've
24 never seen and that I did not receive.

Page 128

1        So, my answer remains the same.  I don't
2 want to speculate on a document that's 12 years
3 old and an e-mail that I've never seen.
4 BY MS. AMINOLROAYA:
5    Q   And my question is not with respect to
6 the document at this time.
7        My question is, do you have any reason
8 to believe that Mr. Rosen would inaccurately state
9 facts?
10       MR. DAVIS:  Objection to form.
11       THE WITNESS:  I have found Mr. Rosen to
12 be a -- a man of high integrity.
13       MS. AMINOLROAYA:  We can take a break.
14       THE VIDEOGRAPHER:  The time is 12:08
15 p.m., and we are going off the record.
16       (Lunch recess.)
17       THE VIDEOGRAPHER:  The time is 12:46
18 p.m., and we're back on the record.
19 BY MS. AMINOLROAYA:
20   Q   Welcome back, Mr. Munroe.  We took a
21 lunch break.  We're back on the record.
22       In 2009, did the FDA announce that it
23 would make a REMS requirement for opioids?
24   A   I don't --

Page 129

1        MR. DAVIS:  Objection to form.
2        THE WITNESS:  -- remember the date.
3 BY MS. AMINOLROAYA:
4    Q   At a certain point during your tenure at
5 Endo, did FDA announce that a REMS would become
6 applicable to opioids?
7        MR. DAVIS:  Objection to form.
8 Foundation.
9        THE WITNESS:  I don't -- I don't recall
10 what FDA was doing ten years ago.
11 BY MS. AMINOLROAYA:
12   Q   Are you familiar with the term "REMS"?
13   A   I am.
14   Q   And what is a REMS?
15   A   REMS stands for Risk Evaluation
16 Mitigation Strategies.
17   Q   And at a certain time during your
18 tenure, did FDA tell your former employer Endo
19 that its opioid Opana ER would become subject to a
20 REMS?
21       MR. DAVIS:  Objection to form.
22       THE WITNESS:  My understanding is that
23 our company's products were going to be subject --
24 opioid products would be subject to REMS.  And I

Page 130

1 was involved in some of those discussions, but it
2 was outside the scope of my -- my principal
3 duties, and it was the job of regulatory affairs
4 to deal with the specifics of the FDA regulatory
5 implementation.
6 BY MS. AMINOLROAYA:
7    Q    And at the time the FDA announced it
8 would implement a REMS for opioids, including
9 Opana ER, were opioids at the center of a major
10 public health crisis?
11       MR. DAVIS:  Objection to form.
12       THE WITNESS:  I don't want to speak for
13 FDA and their motivations in -- in creating the
14 REMS process for opioids.
15 BY MS. AMINOLROAYA:
16    Q    And my question was, when FDA announced
17 it would implement a REMS for opioids, including
18 Opana ER, were opioids at the center of a major
19 public health crisis?
20    A    I don't know.
21       MR. DAVIS:  Objection to form.
22 BY MS. AMINOLROAYA:
23    Q    Were opioid overdoses part of that
24 public health crisis at the time FDA announced it

Page 131

1 would implement a REMS for opioids?
2       MR. DAVIS:  Objection to form.
3       THE WITNESS:  I don't know.  You would
4 have to ask FDA.
5       MS. AMINOLROAYA:  Let me have 1998,
6 please.
7 BY MS. AMINOLROAYA:
8    Q    And would you agree that in 2009
9 prescription opioid and misuse was continuing to
10 grow in the United States?
11       MR. DAVIS:  Objection to form.
12 Foundation.
13       THE WITNESS:  While I would like to
14 answer the question directly, I'm just not in a
15 position to, given the fact that I'm not an
16 epidemiologist, a statistician, a physician, or a
17 scientist that's really studied these issues in
18 any detail.
19       (Munroe Exhibit No. 11 was marked
20       for identification.)
21 BY MS. AMINOLROAYA:
22    Q    I'm handing you what's been marked as
23 Exhibit 11.
24       This is an e-mail from Will Rowe to a

Page 132

1 number of recipients, including you, and you can
2 see your name after Micke Brown's name and before
3 Myra Christopher's, a little further down than
4 halfway in the recipient list.
5       Do you see "Munroe," comma, "Brian"?
6    A    Yeah.  I'm going to just take a moment
7 to find -- I do -- I do see my name on this
8 e-mail.  It looks like it's to 50 or so -- 50, 60,
9 70, 80 -- oh, wow, maybe a hundred people.
10    Q    Thank you, Mr. Munroe.
11       And was this sent to you on March 16th,
12 2009?
13    A    So ten years ago.
14    Q    And you note that the attachment here is
15 slides.
16    A    Let me go back and read this.
17       (Peruses document.)
18    Q    And the document attaches FDA slides at
19 a March 3rd, 2009 meeting.
20    A    I have no recollection of receiving this
21 document that's a ten -- that's from ten years
22 ago.  I do see the slides you're referring to, but
23 I have no memory of this ten-year-old document.
24    Q    Thank you.

Page 133

1       And so on page -- E-numbered page 99 --
2 1999.13, does the bottom slide here state "Scope
3 of the Problem"?
4    A    It does.
5    Q    And you stated before that you had no
6 recollection that you received the document.  Any
7 reason to believe that you did not receive the
8 document?
9    A    Well, since a hundred people received it
10 and it's ten years old, there's every reason to
11 believe that I would not recall receiving it.
12    Q    Oh, no, my question was, is there any
13 reason to believe that you did not receive the
14 document?  Not that -- I'm not asking you about
15 your recollection.  I'm asking you, is there any
16 reason to believe that you did not receive this
17 e-mail and the attachments?
18    A    I allow for the possibility that I
19 received this document by e-mail.
20    Q    But my question was, is there any reason
21 to believe that you didn't receive it?
22       MR. DAVIS:  Objection to form.
23       THE WITNESS:  No.
24 BY MS. AMINOLROAYA:

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 Q Thank you.

2 So page 13 of the document, do you know

3 Bob Rappaport?

4 A I -- I know of him.

5 Q Who's Mr. -- who is Dr. Rappaport?

6 A Well, the slide here says that he's, at

7 the time, the director of the Division of

8 Anesthesia, Analgesia and Rheumatologic --

9 Rheumatology products, the Center for Drug

10 Evaluation and Research at the Food and Drug

11 Administration.

12 Q Thank you.

13 And does the bottom slide state "Scope

14 of the Problem"?

15 A That's what that says.

16 Q Does the first bullet state: "2000,

17 first reports of widespread OxyContin abuse"?

18 A That's what that says.

19 Q Thank you.

20 And does the fourth bullet state: "Risk

21 management plans for most ER opioids"?

22 A That's what that says.

23 Q Do you know what an ER opioid is?

24 A Yes.

Page 135

1 Q What is an ER opioid?

2 A ER stands for extended release.

3 Q Thank you.

4 And is Opana ER an ER opioid?

5 A I believe it to be so.

6 Q Thank you.

7 And does the final bullet on this slide

8 state: "2009, prescription opioid abuse and

9 misuse continues to grow"?

10 A That's what this says.

11 Q Thank you.

12 And turn to page 15, please.

13 E-numbered 15.

14 And does the bottom slide here state:

15 "It's time to take action"?

16 A That's what this says.

17 Q And is the -- does the first bullet

18 under FDA slide stating "It's time to take action"

19 state: "Prescription opioids are at the center of

20 a major public health crisis of addiction, misuse,

21 abuse, overdose, and death"?

22 A That's what that says.

23 Q Thank you.

24 And earlier, Mr. Munroe, you testified

Page 136

1 that Endo's government affairs department put

2 patients' interests first, benefit to society --

3 and the benefit to society first. Do you recall

4 that testimony?

5 MR. DAVIS: Objection to form.

6 THE WITNESS: I was referring to a slide

7 in a slide deck that I didn't remember that said

8 put the patients' interests first, and what I said

9 was that that struck a chord with me. Because we

10 worked on public policy issues in which the

11 benefits to society, the benefits to public

12 health, and the benefits to patients intersected

13 with the interests of Endo. Those were the issues

14 that I worked on.

15 So we can have the court reporter read

16 back exactly what I said, but I was referring to a

17 bullet in the document, "putting patients first."

18 BY MS. AMINOLROAYA:

19 Q But you testified a number of times that

20 Endo's government affairs strategy was to work on

21 issues that intersected with benefits to patients

22 and society, correct?

23 A No question.

24 Q And in 2009, in a document you received,

Page 137

1 FDA told the world that prescription opioids were

2 at the center of a major public health crisis,

3 correct?

4 MR. DAVIS: Objection to form.

5 THE WITNESS: I don't understand the

6 question.

7 BY MS. AMINOLROAYA:

8 Q In 2009, FDA told the industry that

9 prescription opioids were at the center of a major

10 public health crisis of addiction, misuse, opioid

11 abuse, overdose, and death. Correct?

12 MR. DAVIS: Objection to form.

13 THE WITNESS: This slide doesn't say

14 that. So I -- it doesn't say that.

15 BY MS. AMINOLROAYA:

16 Q Does this slide state that -- it's dated

17 March 3rd, 2009, right at the beginning on

18 page 13.

19 Does this slide state: "Prescription

20 opioids" -- if we can go to page 15, please --

21 "Prescription opioids are at the center of a major

22 public health crisis"?

23 A That's what this says.

24 Q Okay. Thank you.

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1      Did Endo -- in light of this, did Endo
2 ever consider stopping its sales of opioids?
3          MR. DAVIS:  Objection to form,
4 foundation.
5          THE WITNESS:  I don't know.
6 BY MS. AMINOLROAYA:
7      Q    You testified earlier that Endo worked
8 on strategies that put patient interests first,
9 correct?
10     A    I testified that our priority was to
11 identify public policy issues where there was a
12 benefit to society, a benefit to the public
13 health, and/or a benefit to patients, and to work
14 on those issues where those principles intersected
15 with the interests of Endo.
16     Q    So you would agree that it's a benefit
17 to society that people don't die from opioid
18 overdoses?
19         MR. DAVIS:  Objection to form.
20         THE WITNESS:  I am -- I would absolutely
21 agree that that would be a benefit to society.
22 That seems to be a common sense position that we
23 don't want people overdosing and dying.
24 BY MS. AMINOLROAYA:

Page 139

1      Q    But you don't know if Endo ever
2 considered stopping sales of its opioids.
3          MR. DAVIS:  Objection to form.
4          THE WITNESS:  I don't know.
5 BY MS. AMINOLROAYA:
6      Q    And prior to 2016, did Endo ever stop
7 marketing its prescription opioids?
8          MR. DAVIS:  Objection to form,
9 foundation.
10         THE WITNESS:  I don't know the date that
11 Endo stopped marketing its opioid products.
12 BY MS. AMINOLROAYA:
13     Q    Did Endo market its opioid products --
14         MR. DAVIS:  Objection to form.
15 BY MS. AMINOLROAYA:
16     Q    -- as a general matter?
17         MR. DAVIS:  Objection to form,
18 foundation.
19         THE WITNESS:  I actually -- as much as I
20 would like to answer that question very directly,
21 I'm just not in a position to, because I was not
22 in the commercial organization, and I don't want
23 to speak to, you know, what we marketed and how we
24 marketed it, because that was just outside the

Page 140

1 scope of my position.
2 BY MS. AMINOLROAYA:
3      Q    And I'm just -- I'm not asking you for
4 specifics or what type of marketing was done.  I'm
5 asking you whether you know if Endo marketed its
6 opioids.
7          MR. DAVIS:  Objection to form,
8 foundation.
9          THE WITNESS:  Yes, you're using the term
10 "opioids," plural.  So I don't know if Endo
11 marketed opioids, plural.  I do not know the
12 answer to that question.
13 BY MS. AMINOLROAYA:
14     Q    Do you know if Endo marketed Opana ER?
15         MR. DAVIS:  Objection to form.
16         THE WITNESS:  My understanding was that
17 they did market Opana ER.
18 BY MS. AMINOLROAYA:
19     Q    And do you know if in light of the
20 public health crisis with prescription opioids,
21 Endo ever considered stopping its marketing prior
22 to 2016?
23         MR. DAVIS:  Objection to form.
24         THE WITNESS:  I don't know.

Page 141

1 BY MS. AMINOLROAYA:
2      Q    Do you know whether -- you testified
3 earlier that Endo supported the American Pain
4 Foundation, correct?
5      A    We gave the American Pain Foundation --
6 Foundation contributions, if that's the answer to
7 your question.
8      Q    And these were financial contributions,
9 correct?
10     A    They were financial contributions.
11     Q    Did Endo ever consider stopping
12 financial support for the American Pain
13 Foundation --
14         MR. DAVIS:  Objection --
15 BY MS. AMINOLROAYA:
16     Q    -- prior to 2012?
17         MR. DAVIS:  Objection to form.
18         THE WITNESS:  I don't know.
19 BY MS. AMINOLROAYA:
20     Q    In light of the public health crisis
21 with prescription opioids, did Endo ever advocate
22 that states adopt prescribing guidelines like the
23 CDC's guidelines?
24         MR. DAVIS:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    THE WITNESS: I don't recall what our --
2 what our activities were in the states. I had
3 somebody who reported me -- to me handle state
4 government affairs, and so I don't want to speak
5 to details that I really don't recall.
6 BY MS. AMINOLROAYA:
7    Q   Do you recall whether Endo ever
8 advocated for federal agencies to adopt opioid
9 prescribing guidelines like the CDC's guidelines?
10    MR. DAVIS: Objection to form.
11    THE WITNESS: No, I don't recall.
12 BY MS. AMINOLROAYA:
13    Q   And so you stated earlier -- you
14 testified earlier that Endo's government affairs
15 strategy was to pursue objectives which
16 intersected with the public health and benefits to
17 society, but when there was a public health crisis
18 and opioids were being abused, misused, people
19 were dying of overdoses, Endo never considered
20 doing any of these things.
21    MR. DAVIS: Objection to form. What
22 things?
23    THE WITNESS: We undertook -- I was
24 aware that we undertook a number of activities

Page 143

1 throughout the company aimed at addressing the
2 misuse and abuse of our products and -- and
3 services. So I was involved in some of those
4 directly in terms of contributions to drugfree.org
5 and the National Association of Drug Diversion
6 Investigators, CADCA, and -- and similar
7 organizations. And I know that there were
8 activities going on throughout the company that I
9 was not directly involved with and can't speak to
10 in detail, but those activities to mitigate the
11 misuse and abuse of Endo products were going on
12 from my very first day with the company.
13    (Counsel conferring.)
14 BY MS. AMINOLROAYA:
15    Q   Mr. Munroe, earlier we talked about the
16 Pain Care Forum. What is the Pain Care Forum?
17    A   The Pain Care Forum, I think, is -- is
18 accurately named in that it was a forum, a place
19 where people could gather, organizations could
20 gather, that were interested in -- in balancing
21 the needs of the pain patient and the interests of
22 the pain patient with the interests of mitigating
23 the misuse and abuse of pain medicines. So it was
24 a -- a collection of organizations that -- that

Page 144

1 got together monthly and would have discussions
2 about topics related to pain.
3    Q   And what types of organizations were
4 members of the Pain Care Forum?
5    A   It was a broad cross-section of
6 companies in the -- in the pain space, both device
7 and -- and drug companies. It was the provider
8 groups, physicians, pharmacists, nurses. It was
9 the pain patient advocacy organizations, like the
10 American Cancer Society, who -- who felt that
11 appropriate pain care treatment was an important
12 goal.
13    Q   And were distributor trade groups a
14 member of the Pain Care Forum?
15    MR. DAVIS: Objection to form,
16 foundation.
17    THE WITNESS: I believe they were.
18 BY MS. AMINOLROAYA:
19    Q   And what was their interest in the Pain
20 Care Forum?
21    A   I can't speak for them. You'd have to
22 ask them.
23    Q   Did you have a role in the Pain Care
24 Forum?

Page 145

1    A   I did have a role in the Pain Care
2 Forum. I was a group that we loosely called the
3 executive committee, which was the individuals
4 represented in Washington offices. The Pain Care
5 Forum was open to anybody anywhere who was
6 interested in the pain agenda, and there was a
7 collection of us that were in Washington that had
8 full-time public policy jobs that acted as a -- a
9 bit of an organizing committee.
10    Q   Who else was an executive committee
11 member of the Pain Care Forum?
12    A   I don't remember all of the individuals,
13 but I remember Rebecca Kirch from the American
14 Cancer Society. Bob Saner who represented the
15 pain physicians. I believe Wade Delk, who
16 represented the pain nurses.
17    Q   What organization was --
18    A   Burt Rosen from pharma -- Purdue Pharma.
19    Q   What organization was Mr. Saner with?
20    A   He represented the pain physicians.
21    Q   And did his organization have a name?
22    A   It did. The Pain Care Coalition.
23    Q   And you said Mr. Rosen was also a member
24 of the executive committee of the Pain Care Forum?

Page 146

1   A   Yes.

2   Q   And he was at Purdue?

3   A   Yes.

4   Q   Any other members on the executive

5 committee?

6   A   I don't recall.

7   Q   When did you join the Pain Care Forum?

8   A   I don't recall.

9   Q   And if someone wanted to join the Pain

10 Care Forum, how would they go about it?

11   A   They would send an e-mail to our

12 moderator, Burt Rosen, who would then circulate

13 the -- the request to the executive committee.

14 And it was a pretty open process. I don't recall

15 ever the executive committee rejecting a request.

16 They might have, but -- but I don't recall an

17 instance in which they did.

18      This is a pretty open organization. It

19 was really an e-mail list, and you could get your

20 name on the e-mail. We had government officials

21 on the e-mail list. There was no security on the

22 e-mail list. E-mails could be forwarded. The

23 monthly conference call line was an open

24 conference call line. We didn't know who was on

Page 147

1 the phone. So it was a fairly open organization,

2 as open as any organization as I've been

3 affiliated with in all of my years in Washington.

4   Q   Did the Pain Care Forum have any members

5 who were -- that did not work in the pain space?

6      MR. DAVIS: Objection to form.

7      THE WITNESS: There were organizations

8 that were on the periphery of the pain space.

9 There were healthcare organizations. For

10 instance, the pharmacists. The pharmacists

11 dispensed all medications, including pain

12 medications, but they were interested in pain

13 policy issues, so they were members of the Pain

14 Care Forum. That's an example of an organization

15 that wasn't strictly a pain organization, but,

16 nonetheless, was -- was on the e-mail list.

17 BY MS. AMINOLROAYA:

18   Q   And did the Pain Care Forum hold

19 meetings?

20   A   Yes. Typic- -- the typical structure

21 was a monthly conference call and a quarterly

22 meeting in which we would seek to have a speaker.

23 Oftentimes the speakers would be government

24 officials.

Page 148

1   Q   And where were the quarterly meetings

2 held?

3   A   I don't recall.

4   Q   And was -- were the meetings of the Pain

5 Care Forum open to the public?

6   A   They were not open to the public per se,

7 except that I'm unaware of any situation where

8 anyone who ever showed up at a Pain Care Forum

9 meeting was ever asked to leave. So in that

10 regard, they were as open an organization as I

11 have ever seen or been affiliated with in all of

12 my years in Washington.

13   Q   Were the meetings of the Pain Care Forum

14 publicized anywhere as far as the details of the

15 meeting date and location?

16      MR. DAVIS: Objection to form.

17      THE WITNESS: They were routinely set on

18 a set schedule so that -- and I don't remember

19 exactly which day of the week, if it was the third

20 Thursday of every month or the second Wednesday of

21 every month.

22      But I say a set schedule because in that

23 regard, while they weren't advertised per se, it

24 was widely known and the e-mails were widely

Page 149

1 distributed, and there was no security on the

2 e-mails which prevented them from being forwarded

3 in such a way as to create the most open meeting

4 and organization that I've ever been involved with

5 in all my years in Washington.

6      MS. AMINOLROAYA: Move to strike as

7 nonresponsive.

8 BY MS. AMINOLROAYA:

9   Q   Were the meetings of the Pain Care Forum

10 publicized anywhere?

11      MR. DAVIS: Objection to form, asked and

12 answered.

13      THE WITNESS: They were publicized in

14 the e-mail that got distributed very widely.

15 BY MS. AMINOLROAYA:

16   Q   And was the e-mail distributed to the

17 public?

18      MR. DAVIS: Objection to form.

19      THE WITNESS: Not to my knowledge.

20 BY MS. AMINOLROAYA:

21   Q   And what was discussed on the monthly

22 conference call of the Pain Care Forum?

23   A   Legislative and regulatory issues

24 related to pain. It was a true public policy

Page 150

1  discussion.
2      Q    And who decided what legislative and
3  regulatory issues would be discussed on these
4  calls?
5      A    That was part of the reason that I
6  described it as such an open organization is that
7  anybody could put any topic on the agenda, and it
8  was automatically accepted.  It was a limitless,
9  completely open agenda in which you simply
10 e-mailed the moderator that you are requesting
11 this item be placed on the agenda, and the agenda
12 would then reflect that item.
13     Q    But members of the public wouldn't know
14 about the meeting, and therefore wouldn't be able
15 to place a topic on the agenda, correct?
16         MR. DAVIS:  Objection to form.
17         THE WITNESS:  I imagine that there are
18 thousands -- not hundreds, but thousands of
19 organizations in Washington, D.C. that are not
20 open to the public and publicize their agendas.
21 The fact that the Pain Care Forum did not do that
22 to me is unremarkable.
23 BY MS. AMINOLROAYA:
24     Q    My question was, would members of the

Page 151

1  public be able to place a topic on the agenda of
2  the Pain Care Forum?
3         MR. DAVIS:  Objection to form.
4         THE WITNESS:  I don't know.
5  BY MS. AMINOLROAYA:
6      Q    You were on the executive committee of
7  the Pain Care Forum, but you don't know whether a
8  member of the public could place a topic on the
9  agenda for the monthly Pain Care Forum conference
10 calls?
11         MR. DAVIS:  Objection to form.
12         THE WITNESS:  I don't know.
13 BY MS. AMINOLROAYA:
14     Q    Did the topics for the monthly
15 conference calls generally revolve around opioids?
16         MR. DAVIS:  Objection to form.
17         THE WITNESS:  I don't recall.
18 BY MS. AMINOLROAYA:
19     Q    Did the Pain Care Forum have a budget?
20     A    I recall in the beginning years of
21 the -- the Pain Care Forum that it did have a
22 small budget to cover the quarterly sandwich
23 luncheons in which we would attempt to get a
24 speaker.  And so there was a small budget created

Page 152

1  to -- to pay for the sandwiches so that no one
2  organization of the Pain Care Forum had to -- to
3  bear the cost of -- of the sandwich lunches.
4      Q    Do you recall now when you joined the
5  Pain Care Forum?
6         MR. DAVIS:  Objection to form.
7         THE WITNESS:  I don't recall.
8         (Munroe Exhibit No. 12 was marked
9          for identification.)
10 BY MS. AMINOLROAYA:
11     Q    I'm handing you what's been marked as
12 Exhibit 12.
13     A    (Peruses document.)
14     Q    And is this an e-mail that you forwarded
15 to yourself on July 1, 2009, "Subject:  Percocet"?
16     A    I see the e-mail header, and it -- and
17 that appears to be the case, although I have no
18 memory of this ten-year-old e-mail.
19     Q    And do you see in the attachments line
20 it states:  "Attachments:  Copy of Pain Care Forum
21 lists"?
22     A    I do see this attachment.
23     Q    And on page 5 of the document, do you
24 see a Pain Care Forum directory?

Page 153

1      A    I do.
2      Q    Last updated June 2009.
3      A    Yes, ten years old.
4      Q    And do you see a number of the Pain Care
5  Forum members listed here?
6      A    I do.
7      Q    So I just want to go over a couple of
8  these with you.
9         Was Mary Bennett of the American Pain
10 Foundation a member of the Pain Care Forum in June
11 of 2009?
12     A    I don't recall.
13     Q    Is that what this document states?
14     A    Yeah, she's listed here on this
15 document.
16     Q    And this document states "Pain Care
17 Forum Directory"?
18     A    That's what that says.
19     Q    All right.  And I just would like to
20 create a chart to help us go along here.
21         So this document states that the
22 American Pain Foundation was a member of the Pain
23 Care Forum in 2009, correct?
24         MR. DAVIS:  Object to the use of any

Page 154

1  sort of made-at-the-time exhibits to be shown to
2  Mr. Munroe.
3      THE WITNESS:  Yeah, I just don't
4  remember this document at all, and so I don't know
5  if it's accurate, inaccurate.  I have no memory of
6  a ten-year-old e-mail with an attachment that I
7  may or may not have opened.  So I don't want to
8  speak to this document.  I'd like to speak to this
9  document if I remembered it, but I -- I just don't
10  recall this e-mail or -- or any of this
11  information.
12  BY MS. AMINOLROAYA:
13      Q    Does this document state that the --
14  Mary Bennett of the American Pain Foundation was
15  on the directory of the Pain Care Forum in June of
16  2009?
17      A    That's what this document does say.
18      Q    Thank you.
19          And have you heard of the American Pain
20  Care Forum -- well, we'll just refer to it as
21  APF -- actually, I'll use the ELMO here.
22          Was Pamela Bennett of Purdue listed as a
23  member of the Pain Care Forum in June of 2009?
24      A    I don't want to commit to who was a

Page 155

1  member in 2009 or not.  My memories of the Pain
2  Care Forum are -- are not so clear as to who was a
3  member when, and so I don't want to commit to
4  that.
5      Q    Mm-hmm.  My question is, is Pamela
6  Bennett of Purdue Pharma listed as a -- in the
7  directory for the Pain Care Forum in June of 2009?
8      A    That's what this document says.
9      Q    Thank you.
10          Is Fritz Bittenbender of Cephalon listed
11  as a member of the Pain Care Forum in June of
12  2009, according to this document?
13      A    That -- that's what this says.
14      Q    Thank you.
15          And if you turn to page 1950.7, in the
16  middle of the page, do you see the -- Anita Ducca
17  of the Healthcare Distribution Management
18  Association --
19      THE VIDEOGRAPHER:  Do you want to go
20  back on the other one?
21      MS. AMINOLROAYA:  No, we can stick with
22  this, yeah.  Thank you.  Appreciate that.
23  BY MS. AMINOLROAYA:
24      Q    On page 1950.7 of the document, do

Page 156

1  you see that Anita Ducca of the Healthcare
2  Distribution Management Association is listed as
3  in the Pain Care Forum directory in June 2009?
4      A    Yes.  That's what's written here.
5      Q    And what is the Healthcare Distribution
6  Management Association?
7      A    That's the association of drug
8  wholesalers.
9      Q    And do you know who the members of the
10  Healthcare Distribution Management Association
11  are?
12      A    I don't.
13      Q    Do you know any of the members?
14      A    I know there's AmerisourceBergen is --
15  is -- I understand them to be one of the members.
16  And Cardinal Health.  And McKesson.  Those are the
17  three that I recall.
18      Q    Cardinal and McKesson.
19          Do you know if there are other members?
20      A    I -- I don't know.
21      Q    Do you see Scott Fishman listed as a
22  member of the Pain Care Forum in June of 2009 on
23  this page?
24      A    I -- I do see his name here.

Page 157

1      Q    And have you heard -- have you heard of
2  the -- we'll use AAPM for the American Academy of
3  Pain Medicine?
4      A    I don't recall.
5      Q    Does this document state that the
6  American Academy of Pain Medicine, Scott Fishman,
7  are on the directory of the Pain Care Forum in
8  June of 2009?
9      A    That's what this says.
10      Q    Thank you.
11          And does the next line there state that
12  Kimberly France of Covidien is on the directory of
13  the Pain Care Forum in June 2009?
14      A    That's -- that's what this says.
15      Q    Okay.  And is Covidien also known as
16  Mallinckrodt?
17      A    I don't know.
18      Q    Do you know -- have you heard of the
19  company Mallinckrodt?
20      A    I have.
21      Q    Do you know if they have a relationship
22  with Covidien?
23      A    I don't know that.
24      MR. DAVIS:  Objection to form.

Page 158

BY MS. AMINOLROAYA:

Q   So we'll list Covidien for now.

If you turn over to page 8, do you see that Brad Gary of Allergan Inc. is listed as a member of the Pain Care Forum in June 2009?

A   That -- that's what this says.

Q   Thank you.

And do you see yourself listed as a member of the Pain Care Forum on page 11 of the document?

A   That's what this says.

Q   Thank you.

So I'm going to add your name here, or, rather, add Endo.

And do you see Susan Nichol of Johnson & Johnson listed as a member of the Pain Care Forum in June -- June 2009?

A   That's what this says.

Q   All right.  So we'll add Johnson & Johnson.

And if you drop down a few, do you see Lisa Robin of the Federation of State Medical Boards listed as a member of the Pain Care Forum?

A   I do see that.

Page 159

Q   Thank you.  I'm just going to add that here, FSMB.

There are a number of other organizations listed here as well.  Correct?

A   It looks to be a hundred or so, but I would -- I haven't counted them, but quite a few.

Q   And these are on a directory of the Pain Care Forum as of June 2009, correct?

A   That's what this says, although I can't testify to the veracity of the document because I just don't remember receiving it, and it's a ten-year-old e-mail.  So...

Q   Any reason to believe that it's not accurate?

A   No.

Q   I'm going to write down Pain Care Forum here.

And so all of these organizations here were members of the Pain Care Forum according to this document, correct?

A   I can't speak for the other organizations and their affiliations with independent third-party organizations.

Q   I'll put the source here.  This is from

Page 160

Brian Munroe deposition.

MR. DAVIS:  I object.  The source of that document is actually you, not Mr. Munroe.

MS. AMINOLROAYA:  Well, Mr. Davis, if you could limit your objections to form consistent with the deposition protocol.  Thank you.

MR. DAVIS:  If you'd just use actual exhibits and not demonstratives that you're creating here in the room that are misleading and contain information about roughly, I don't know, a 20th of the names on the list that you've written down on that chart, that would be helpful as well.

MS. AMINOLROAYA:  As I said, the deposition protocol requires that objections be limited to form.  I'd appreciate it if you'd follow that.

BY MS. AMINOLROAYA:

Q   And other members of the Pain Care Forum joined after June 2009, correct?

A   I don't know.

MS. AMINOLROAYA:  Could we have Exhibit E1952, please.

(Munroe Exhibit No. 13 was marked for identification.)

Page 161

BY MS. AMINOLROAYA:

Q   I hand you Exhibit 13.

And this is an e-mail from you on January 4th, 2012, correct?

A   On January 4th, 2012?

Q   Yes.

A   That's what this says, but I would like to take a minute to read this because I don't recall --

Q   Sure.  And --

A   -- sending this e-mail, so I'd like to just read it.

Q   And I won't ask you about anything before page 11.

A   Okay.  (Peruses document.)

Q   And do you see on page 11, Mr. Munroe, it states "Pain Care Forum Participating Organizations"?

A   That's what this says.

Q   And do you see the American Pain Society on the left-hand side?  Under --

A   Yes.

Q   -- American Pain Foundation.  We'll add that here.  And we'll use APS for American Pain

Page 162

1  Society.
2       And do you see on the right side of the
3  document towards the end, do you see Teva's name?
4    A   That's what this says.
5    Q   I'll add that here.
6       And Endo, Purdue, Cephalon, Johnson &
7  Johnson, Covidien, Allergan, these are companies
8  that sell opioids?
9       MR. DAVIS:  Objection to form.
10      THE WITNESS:  I don't know -- I do know
11  that many of them sell opioids, but I don't know
12  the product lines for all the companies.
13  BY MS. AMINOLROAYA:
14   Q   Do you know whether they sell opioids?
15      MR. DAVIS:  Objection to form.
16      THE WITNESS:  I don't know if they all
17  sell opioids.
18  BY MS. AMINOLROAYA:
19   Q   And you're familiar with Purdue's
20  product OxyContin?
21   A   I am.
22   Q   And that's an opioid?
23   A   Yes.
24   Q   And Cephalon's product Actiq?

Page 163

1    A   What --
2    Q   Are you familiar with Cephalon's product
3  Actiq?
4    A   Only vaguely.
5    Q   Is that an opioid?
6    A   Yes.
7    Q   And Johnson & Johnson's product Nucynta,
8  are you familiar with that product?
9    A   I'm really not familiar with that
10  product.
11   Q   Are you familiar with Duragesic?
12   A   I've heard of that product before, but
13  I'm not familiar with it.
14   Q   Is that an opioid?
15   A   I don't know.
16   Q   Are you familiar with Covidien's sale of
17  generic opioids?
18   A   I was -- I was not familiar until you
19  just said it.
20   Q   Okay.  Are you familiar with Allergan's
21  sale of Kadian?
22   A   No.
23   Q   And it's the APF, and is that a patient
24  advocacy group?

Page 164

1    A   It is a defunct advocacy.
2    Q   Was it a patient advocacy group?
3       MR. DAVIS:  Objection to form.
4       THE WITNESS:  When?
5  BY MS. AMINOLROAYA:
6    Q   In 2009.
7    A   I don't know the dates, but I -- I do
8  remember them as a patient advocacy organization.
9    Q   Okay.  Patient advocacy organization,
10  I'll write that here.
11      THE VIDEOGRAPHER:  You want to go back
12  to the ELMO on the screen?
13      MS. AMINOLROAYA:  Sure.
14  BY MS. AMINOLROAYA:
15   Q   And the APS, is that a medical society?
16      MR. DAVIS:  Objection to form.
17      THE WITNESS:  The APS?
18  BY MS. AMINOLROAYA:
19   Q   The American Pain Society.
20   A   I don't recall what APS was.
21   Q   How about the AAPM?
22   A   I don't recall.
23   Q   And the FSMB, do you know what that
24  organization is?

Page 165

1    A   I do know that organization -- I --
2  I know a little bit about them in that they
3  represented the state medical boards.
4    Q   Are they a trade group?
5    A   I would characterize them more as a
6  professional society.
7    Q   Okay.  So I'm going to write "and
8  professional society."
9       And AmerisourceBergen, Cardinal,
10  McKesson, are these distributors of opioids?
11      MR. DAVIS:  Objection to form.
12      THE WITNESS:  My understanding is that
13  they distribute all products, all pharmaceutical
14  products.
15  BY MS. AMINOLROAYA:
16   Q   Do they distribute opioids as well?
17   A   You would have to ask them.
18   Q   All right.  We'll mark this as
19  Exhibit 14.
20      (Munroe Exhibit No. 14 was marked
21      for identification.)
22      MR. DAVIS:  I'm going to object to this
23  demonstrative that was made here in the day in a
24  terribly misleading way as being introduced as an

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  exhibit.
2        MS. AMINOLROAYA:  I'll remind you,
3  Mr. Davis, to keep your objections to form.  Thank
4  you.
5        Can I have 1448, please.
6  BY MS. AMINOLROAYA:
7    Q   Did the Pain Care Forum develop plans
8  for how professional, medical and advocacy groups
9  should operate?
10       MR. DAVIS:  Objection to form.
11       THE WITNESS:  The Pain Care Forum was a
12 place where people could have discussions, raise
13 ideas, talk to each other about pain policy
14 matters, and if they so desired, work together on
15 issues that they believed where there was a shared
16 interest.  We called it a coalition of the
17 willing.  The Pain Care Forum itself did not take
18 public policy positions --
19 BY MS. AMINOLROAYA:
20   Q   Did it develop --
21   A   -- that I'm aware of.
22   Q   Did it develop strategies for patient
23 advocacy groups?
24       MR. DAVIS:  Objection to form.

Page 167

1        THE WITNESS:  I don't know.
2        (Munroe Exhibit No. 15 was marked
3        for identification.)
4  BY MS. AMINOLROAYA:
5    Q   I'm handing you Exhibit 15.
6        This is E1448, ENDO-OPIOID_MDL-06146694.
7        And this is an e-mail -- the -- the
8  bottom string on the first page is an e-mail from
9  you to Kevin Wiggins and others on July 1st, 2009.
10       And if you take a look --
11   A   This is -- so this is a ten-year-old
12 e-mail.
13   Q   That's correct.  If you take a look at
14 the e-mail, it says:  "Kevin, thanks for your
15 message."
16       And then if you drop down to the second
17 paragraph, it says:  "Forgive me if I am stating
18 the obvious, but I think that we need to undertake
19 the following initiatives with a number of the key
20 groups that belong to the Pain Care Forum, which I
21 will identify later in the memo.  Our plan should
22 include, among other things, the following," and
23 the fourth bullet here states:  "We should develop
24 specific suggested strategies for each of the

Page 168

1  groups.  The two that come to mind are a letter-
2  writing campaign into the FDA, and the circulation
3  of an electronic petition," parentheses, "the
4  American Pain Foundation garnered 4,000 on its
5  REMS position in 48 hours," closed parentheses.
6        Did I read that correctly?
7    A   You know, I don't recall anything about
8  this ten-year-old e-mail, but the one part of it
9  that strikes a chord with me is -- is something
10 that we would have done, which is, we need to
11 provide key groups with the full-blown scientific
12 rationale for our position.
13       It was often the case that we would need
14 to provide facts and data to independent third-
15 party organizations on issues where our position
16 seeking benefits to society, public health and
17 patient benefit would coincide with our own at
18 Endo.
19       So that one sentence kind of strikes a
20 chord with me, but the rest of this, I -- I don't
21 remember the contents of a ten-year-old e-mail.
22       MS. AMINOLROAYA:  Move to --
23       MR. DAVIS:  Just so the record is
24 clear --

Page 169

1        MS. AMINOLROAYA:  Move to strike the
2  answer as nonresponsive.
3        MR. DAVIS:  -- this is the exact same
4  document as Exhibit 12, just for the record.
5        THE REPORTER:  I'm sorry, you need to
6  repeat that because --
7        MR. DAVIS:  Just saying this is the
8  exact same document as Exhibit 12, just so the
9  record is clear.
10       MS. AMINOLROAYA:  Thanks for that
11 clarification.
12 BY MS. AMINOLROAYA:
13   Q   My question was, Mr. Munroe, whether I
14 read correctly the language that's highlighted
15 here, and you provided an answer to something
16 else.
17       But my question was whether I -- I read
18 these highlighted statements correctly?
19       MR. DAVIS:  Objection to everything
20 before the actual question.
21       THE WITNESS:  Yeah, if you could just
22 restate the question for me, I'd appreciate it.
23       MS. AMINOLROAYA:  And I'll ask the court
24 reporter to mark the record as well, mark

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 Mr. Munroe's testimony prior to his last
2 statement.
3 BY MS. AMINOLROAYA:
4    Q   Does this -- this e-mail from you to
5 Kevin Wiggins on July 1st, 2009, states: "Kevin,
6 thank you -- thanks for your message." And the
7 last sentence of the second paragraph states:
8 "Forgive me if I am stating the obvious, but I
9 think that we will need to undertake the following
10 initiatives with a number of the key groups that
11 belong to the Pain Care Forum, which I will
12 identify later in the memo. Our plan should
13 include, among other things, the following..."
14    Did I read that correctly up to now?
15    A   You actually added another word.
16 Between the words "we" and "need," you added the
17 word "will."
18    Q   Okay. We'll try it again.
19    It states here: "Forgive me if I am
20 stating the obvious, but I think that we need to
21 undertake the following initiatives with a number
22 of the key groups that belong to the Pain Care
23 Forum, which I will identify later in the memo.
24 Our plan should include, among other things, the

Page 171

1 following..."
2    Did I read that correctly?
3    A   That's -- that's what this says.
4    Q   And if we drop down to the fourth bullet
5 here, does it state: "We should develop specific
6 suggested strategies for each of the groups. The
7 two that come to mind are a letter-writing
8 campaign into the FDA, and the circulation of an
9 electronic petition," parentheses, "the American
10 Pain Foundation garnered 4,000 on its REMS
11 position in 48 hours," close parentheses.
12    Did I read that correctly?
13    A   You -- you did read that one correctly.
14    Q   Okay. You can set that aside.
15    MS. AMINOLROAYA: May I have 1957.
16 BY MS. AMINOLROAYA:
17    Q   Do you recall your involvement,
18 Mr. Munroe, in an effort to oppose the State of
19 Washington's opioid prescribing guidelines?
20    MR. DAVIS: Objection to form.
21    THE WITNESS: I remember that being an
22 issue while I was at the company, but I don't
23 recall the details.
24    (Witness and counsel conferring.)

Page 172

1    MR. DAVIS: Yeah, actually can we take a
2 quick break? Mr. Munroe just asked.
3    THE WITNESS: I need to take a
4 five-minute --
5    MR. DAVIS: It's been an hour.
6    THE WITNESS: -- bio break.
7    THE VIDEOGRAPHER: The time is --
8    MS. AMINOLROAYA: That's fine.
9    THE VIDEOGRAPHER: The time is 1:48 p.m.
10 We're going off the record.
11    (Recess.)
12    THE VIDEOGRAPHER: The time is 2:01 p.m.
13 and we're back on the record.
14 BY MS. AMINOLROAYA:
15    Q   Good afternoon, Mr. Munroe. We took a
16 break. We're back on the record.
17    And we left off with a discussion of the
18 State of Washington's opioid prescribing
19 guidelines, and you said you recall that.
20    A   I -- I do recall the issue. I don't
21 recall the details. I had two individuals over my
22 course of time at Endo that ran my state
23 government relations department that would have
24 been more familiar with the details, and it was

Page 173

1 really so long ago. I do recall that it was
2 during the time when I first joined the company or
3 thereabouts that there was an issue in Washington.
4    Q   Yes, that's -- that's a -- in terms of
5 timing, that's an accurate recollection.
6    (Munroe Exhibit No. 16 was marked
7    for identification.)
8 BY MS. AMINOLROAYA:
9    Q   I'm handing you what's been marked as
10 Exhibit 16. These are the Interagency Guidelines
11 on Opioid Dosing for Chronic Non-Cancer Pain, and
12 these are from the Agency Medical Directors' Group
13 for the State of Washington, and the date on this
14 is March 2007.
15    And if you take a look at page 2 of the
16 document, this will help orient us with some of
17 the details on the reasons for the guidelines. So
18 if you look at the last paragraph here on the --
19 the left side of the page, on E-numbered
20 page 1957.2, and for the record this is E1957, it
21 states: "Recent studies indicate an -- an
22 increase in accidental deaths associated with the
23 use of prescription opioids. At the same time
24 there has been a dramatic increase in the average

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 daily morphine equivalent dose, MED, of the most
2 potent Schedule II long-acting opioids."
3       Did I read that correctly?
4   A   Where are we at, which page?
5   Q   We're on page 2, 1957.2.
6   A   Okay.  Could you read that again,
7 please?
8   Q   It says: "Recent studies indicate an
9 increase in accidental deaths associated with the
10 use of prescription opioids since 1999.  At the
11 same time there has been a dramatic increase in
12 the average daily morphine equivalent dose of the
13 most potent Schedule II long-acting opioids."
14       Do you see that?
15   A   You -- you read that correctly.
16   Q   Thank you.
17       And was Opana ER a Schedule II long-
18 acting opioid?
19   A   It -- it -- it is.
20   Q   Thank you.
21       And the following sentence goes on to
22 describe the problem that the State of Washington
23 was dealing with.  It says: "The overall number
24 of opioid-related deaths more than doubled between

Page 175

1 1995 and 2004, and prescription opioid-related
2 deaths now exceed non-prescription opioid-related
3 deaths."
4       Did I read that correctly?
5   A   That's what this says.
6   Q   Thank you.
7       And you'll see on the right side of the
8 page, it tells us the purpose of the guidelines.
9 It says: "The purpose of Part II of the guideline
10 is to assist primary care providers in treating
11 patients whose morphine equivalent dose, MED,
12 already exceeds 120 milligrams per day."
13       Do you see that?
14   A   Well, you skipped over Part I, and then
15 you went to Part II, and you did read the Part II
16 correctly.
17   Q   Thank you.
18       And members of the Pain Care Forum
19 opposed Washington State's opioid prescribing
20 guidelines, these guidelines, correct?
21       MR. DAVIS:  Objection to form.
22       THE WITNESS:  I am not --
23       MS. AMINOLROAYA:  (Inaudible.)
24       THE WITNESS:  I know that there were

Page 176

1 issues raised about these guidelines and the
2 issue, but I don't remember the details and I
3 don't remember which members of the Pain Care
4 Forum objected to them and on what basis.  I just
5 don't recall.
6       This document is from 2007, so that
7 would make it 12 years old.
8 BY MS. AMINOLROAYA:
9   Q   In fact, you took the lead, Mr. Munroe,
10 in opposing the State of Washington's opioid
11 prescribing guidelines, correct?
12       MR. DAVIS:  Objection to form.
13       THE WITNESS:  I don't recall really the
14 Washington State issue in any detail.  It was so
15 long ago, and it would have been at the very
16 beginning of my tenure at Endo.  So I -- I just
17 don't recall the details.
18       (Munroe Exhibit No. 17 was marked
19       for identification.)
20 BY MS. AMINOLROAYA:
21   Q   I'm handing you what's been marked as
22 Exhibit 17.  This is EPI001775348, E-numbered
23 E1763.
24       And this is an e-mail -- the bottom

Page 177

1 string here is an e-mail from you to a David
2 Kerr and a number of other individuals dated
3 January 16th, 2008, correct?
4   A   That's what this indicates, although I
5 have no memory of this 11-year-old e-mail.
6   Q   And the subject here is: "Washington
7 State Opioid Prescribing Guidelines."  And you
8 write to this group, and is Dave Kerr one of your
9 former colleagues at Endo?
10   A   He -- he -- he is a former colleague.
11 He was a former colleague, yeah.
12   Q   Do you recognize these as your -- your
13 former colleagues at Endo, these names on the --
14 the "to" line here?
15   A   Largely.
16   Q   And you write to them:  "Dear all:  I
17 have been asked to lead the effort in the state of
18 Washington to develop a political plan in response
19 to the state's drafting of opioid prescribing
20 guidelines."  Correct?
21   A   That's what this says.
22   Q   And in fact, you developed an aggressive
23 plan to oppose the State of Washington's
24 guidelines, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    A    I don't recall any of the details of
2  what actually happened in Washington.  This would
3  have been several months after my first joining
4  the company.  So despite the accuracy of that
5  first statement, I don't recall any of the details
6  of what went on in Washington.
7         And this is, yes, 11 years old.
8    Q    And you developed a plan to form a
9  ground coalition to respond to the Washington
10 State guidelines.
11        MR. DAVIS:  Objection to form.
12        (Munroe Exhibit No. 18 was marked
13        for identification.)
14        MS. AMINOLROAYA:  Exhibit 18.
15        MR. DAVIS:  Do you have others?
16        MS. AMINOLROAYA:  I'm sorry.
17        MR. DAVIS:  Do you have others?
18        MS. AMINOLROAYA:  Yes.
19        MR. DAVIS:  May I have them?
20        MS. AMINOLROAYA:  Do I have other copies
21 of that?  I'm not sure.  17 and --
22        And we'll go ahead and mark No. 19 --
23 Exhibit 19 as well.
24        (Munroe Exhibit No. 19 was marked

Page 179

1        for identification.)
2  BY MS. AMINOLROAYA:
3    Q    For the record, Exhibit 18 is
4  ENDO-OPIOID_MDL-02210853, and it's E-numbered
5  E1765.
6         And Exhibit 19 is E1764, PPLP04301238.
7         And on Exhibit 18, Mr. Rowe writes to
8  Micke Brown -- and is that Mr. Rowe -- William
9  Rowe of the American Pain Foundation?  In the
10 third e-mail from the bottom.  Do you see the
11 e-mail string there from Will Rowe?
12   A    I -- I don't -- I don't recognize this
13 11-year-old e-mail string, but -- but that is who
14 is -- you're referring to is on this -- this
15 e-mail header.
16 BY MS. AMINOLROAYA:
17   Q    And Mr. Rowe was with the American Pain
18 Foundation at this time on February 11th, 2008?
19   A    I don't know the exact dates that he was
20 the head of the American Pain Foundation, but that
21 sounds right.
22   Q    All right.  And he writes here to Micke
23 Brown, Scott Fishman and to you, correct?
24   A    That's what that e-mail header

Page 180

1  indicates.
2    Q    Mm-hmm.  Who is -- do you know who Micke
3  Brown is?
4    A    The name is familiar, but -- but I --
5  I -- I don't recall what organization she's with.
6    Q    And Scott Fishman, do you know who Scott
7  Fishman is?
8    A    I know that he was a leading pain
9  physician.
10   Q    And someone that Endo made payments to?
11   A    I wouldn't know about the payments to
12 Scott Fishman.
13   Q    Okay.  We'll take a look at those
14 shortly.
15        And -- and Mr. Rowe copies you as well,
16 correct?
17   A    Yes.
18   Q    And Mr. Rowe writes here:  "First item
19 on the call agenda is an update from those on the
20 ground.  Brian and I will propose adding
21 Purdue/Endo to the on-the-ground coalition, and
22 having that group hire and direct a lobbyist to
23 develop a plan to stop the train.
24        "We have, we believe, sufficient

Page 181

1  ammunition with all of the position papers coming
2  out against the guideline to attract key political
3  attention to halt the progress on the guideline.
4  We also have to" -- "we also" -- excuse me -- "we
5  hope also to have consensus on an alternative
6  guideline, like getting Wash State Medical Board
7  approval of the model guideline."
8         Do you see that?
9    A    You know, I don't recognize this e-mail
10 or these documents, but what does strike a chord
11 to me is at the beginning part of the e-mail where
12 Dionetta Hudzinski writes about the very involved
13 work of the patient advocacy community and the
14 patient groups in Washington, and goes into an
15 incredible level of detail about the work that
16 they're doing.
17        And what you've just read says "propose
18 adding Purdue/Endo to the on-the-ground
19 coalition."  So it would be adding Purdue/Endo to
20 what is already a very involved, detailed, ongoing
21 list of activities by the American Pain
22 Foundation, the American Pain Society, the
23 American Cancer Society, jointly with the Alliance
24 of State Pain Initiatives, the American Academy of

Highly Confidential – Subject to Further Confidentiality Review

Page 182

1　Pain Management, the Washington chapter of the
2　Academy of Pain Management, Western Pain Society
3　and the Washington-Alaska Pain Initiative.
4　　　　So while I'm not familiar with the
5　details of this, that does strike a chord in me
6　that there was a very involved effort in -- in
7　Washington, and that someone might propose to add
8　other members of the Pain Care Forum to this
9　effort.
10　　Q　Did you hear my question, Mr. Munroe?
11　　　　MR. DAVIS:  Objection to form.
12　　　　THE WITNESS:  Yes.
13　BY MS. AMINOLROAYA:
14　　Q　Okay.  My question was whether you saw
15　the language that I read on the document.
16　　A　Could -- could you ask the question
17　again, please?
18　　Q　Yes.  I read language here, and I said,
19　Do you see that?  And you responded with something
20　totally different.
21　　A　Yeah, I -- I don't know if you
22　accurately read that statement or not.  You would
23　have to read it again.
24　　　　MS. AMINOLROAYA:  Okay.  Let -- let's

Page 183

1　take a break.
2　　　　THE VIDEOGRAPHER:  Okay.  The time is
3　2:16 p.m. and we're going off the record.
4　　　　(Recess.)
5　　　　THE VIDEOGRAPHER:  The time is 2:28 p.m.
6　and we're back on the record.
7　BY MS. AMINOLROAYA:
8　　Q　So, Mr. Munroe, you've had a chance to
9　look at Exhibits 18 and 19, correct?
10　　A　Yes.
11　　Q　Do these documents -- you'd agree that
12　Purdue and Endo became involved in an effort to
13　oppose the Washington State guidelines?
14　　　　MR. DAVIS:  Objection to form.
15　　　　THE WITNESS:  These are 11-year-old
16　e-mails, and I'm not sure whatever came of our
17　efforts.  I -- I do not recall the details.
18　　　　I know in this e-mail, Exhibit 19, we
19　talk of -- of potential actions that we would
20　take.  That's what the e-mail says.  I don't
21　remember what happened or whether we did take
22　actions or not.  But the e-mail talks about
23　potential actions.
24　BY MS. AMINOLROAYA:

Page 184

1　　Q　And did those potential actions include
2　putting a field general on the ground?
3　　A　Well, the e-mail says that:  "It strikes
4　me that we have a couple of options, and I'm open
5　to more."
6　　　　So it was very kind of open-ended.
7　　　　And it says:  "One of the companies with
8　a presence on the ground could step forward and
9　volunteer their company or contract lobbyist to
10　take the lead.  We don't have anybody, but perhaps
11　someone does."
12　　　　So that to me is an open-ended,
13　suggestive potential route that the company might
14　take, and it would be the kind of suggestion that
15　would be familiar to me.  But I can tell you in
16　the State of Washington, which happened at the
17　outset of my tenure with Endo, I don't know and I
18　don't remember what we actually did.
19　　Q　Do you recall that the Pain Care Forum
20　came up with a strategy to respond to the
21　Washington State guidelines?
22　　A　I recall that the Pain Care Forum had
23　lots of discussions about the issue.  But I -- and
24　the Pain Care Forum didn't, you know, take public

Page 185

1　policy positions itself.  Members of the Pain Care
2　Forum took public policy positions.  I don't know
3　what came of those discussions at -- at forum
4　meetings.
5　　Q　And do you recall whether the Pain Care
6　Forum or its members came up with a strategy to
7　promote Scott Fishman's responsible opioid
8　prescribing?
9　　A　I don't recall.
10　　　　MR. DAVIS:  Objection to form.
11　BY MS. AMINOLROAYA:
12　　Q　Do you recall whether you provided
13　talking points to different groups to advance an
14　opposition to the Washington State guidelines?
15　　　　MR. DAVIS:  Objection to form.
16　　　　THE WITNESS:  I don't recall any of the
17　detail of what actually happened in the state of
18　Washington.
19　　　　(Counsel conferring.)
20　　　　MR. DAVIS:  And just for the record, for
21　the next set of stickers, it's Munroe with a U,
22　not an O.
23　　　　(Munroe Exhibit No. 20 was marked
24　　　　for identification.)

Page 186

BY MS. AMINOLROAYA:

Q    I'm handing you what's been marked as Exhibit 20.

This is an e-mail.  The second e-mail here is from Will Rowe dated January 24th, 2008.

A    So this would be an 11-year-old e-mail.

Q    That -- Mr. Munroe, that -- I did not ask a question.  You need to wait for a question.

This is an e-mail from Will Rowe dated January 24th, 2008, to you and a number of other recipients.  Do you see that?

A    You read that correctly.

Q    And is the subject here "Washington State Opioid Dosing Guideline"?

A    You read that correctly.

Q    And does this document discuss a strategy of this group to promote the FSMB model guidelines to the Washington State Medical Board?

MR. DAVIS:  Objection to form.

THE WITNESS:  I -- I don't recall this e-mail.  It's an 11-year-old e-mail, and I don't recall seeing it, and so I couldn't tell you what it says.

BY MS. AMINOLROAYA:

Page 187

Q    Does Mr. Rowe start out by thanking the recipients of this e-mail for participating on a call about the Washington State Opioid Dosing Guidelines?

A    Is that a question?

Q    Yes.

A    What is the question?

Q    Does Mr. Rowe start out by thanking the recipients of this e-mail for participating on a call about the Washington State Opioid Dosing Guidelines?

A    Well, that's not what this says.

Q    What does this say?

A    It says:  "Dear all:  Thank you -- thank you all for participating on the call today on this important issue."

Q    And does the e-mail also state that:  "This group came to consensus on a strategy to promote the FSMB guideline to the Washington State Medical Board"?

A    I don't know what this -- this says because I'm -- I'm unfamiliar with this document.

Q    All right.  Why don't you --

A    I don't recall.

Page 188

Q    -- take a look at the third paragraph here.

A    I just don't recall the substance of this discussion that's ongoing, that's written by somebody else.

Q    Does the document state that there was a consensus on a strategy to promote the FSMB guidelines to the Washington State Medical Board?

A    It actually uses the term "FSMB model guideline."

Q    Thank you.

And are these the same model guidelines that Endo sponsored?

MR. DAVIS:  Objection to form, foundation.

THE WITNESS:  I don't know.  I'm not a guidelines expert or a physician, and -- and I just -- it's out of my scope of position within the company.

MS. AMINOLROAYA:  423.

(Munroe Exhibit No. 23 was marked for identification.)

BY MS. AMINOLROAYA:

Q    I'm handing you Exhibit 23, Responsible

Page 189

Opioid Prescribing, A Physicians Guide.  It's Bates number END00051370, E-numbered E423.

Do you recognize this --

A    I don't --

Q    -- document?

A    I don't recognize it.

Q    Have you heard of Responsible Opioid Prescribing by Scott Fishman before?

A    It does ring a bell, but not in any detail.

Q    And is this a book that Endo sponsored?

MR. DAVIS:  Objection to form.

THE WITNESS:  I don't recall.

BY MS. AMINOLROAYA:

Q    And the -- Exhibit 20 discusses a consensus strategy to promote excerpts of Dr. Scott Fishman's book, correct?

A    You -- you read that correctly on E1852.2.

Q    And this is the same book that Endo provided financial support for, correct?

MR. DAVIS:  Objection to form.

THE WITNESS:  You know, I -- I don't recall, but I -- I'm seeing on page 3, it says:

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  "This book is sponsored by a consortium of
2  organizations," and it has a list of, I don't
3  know, 20 or so organizations, and our -- our
4  company is on that list.  I have no reason to
5  believe that we didn't sponsor it, but I just
6  don't recall.
7  BY MS. AMINOLROAYA:
8      Q   And Endo didn't only sponsor this
9  particular book of the Federation of State Medical
10  Boards, it provided further support for the
11  Federation of State Medical Boards, correct?
12         MR. DAVIS:  Objection to form.
13         THE WITNESS:  I actually don't know and
14  don't remember.
15  BY MS. AMINOLROAYA:
16      Q   Do you recall your earlier testimony
17  that you were involved in leading the company and
18  its response to Congressional investigations?
19         MR. DAVIS:  Objection to form.
20         THE WITNESS:  I do recall the
21  conversation that you and I had earlier today on
22  that topic.
23  BY MS. AMINOLROAYA:
24      Q   And that included Senator Grassley's

Page 191

1  investigation, correct?
2      A   Correct.
3         (Munroe Exhibit No. 21 was marked
4         for identification.)
5  BY MS. AMINOLROAYA:
6      Q   This is 21.
7         And the page we've marked Exhibit 21,
8  this is E287.1.  It's Bates-numbered
9  ENDO-OR-CID-00754369 for the record.  And this is
10  a compilation of a few documents produced to us by
11  Endo, including Senator Grassley's letter to Endo
12  dated May 8th, 2012, that starts on 287.12.
13         Do you see that letter addressed to
14  David Holveck?
15      A   I do.
16      Q   President and CEO of Endo?
17      A   Yes, I do.
18      Q   And on the second page of Senator
19  Grassley's letter, he wrote that:  "There is
20  growing evidence that pharmaceutical companies
21  that manufacture and market opioids may be
22  responsible, at least in part, for this epidemic
23  by promoting misleading information about the
24  drug's safety and effectiveness."

Page 192

1      Do you see that?
2      A   You read that correctly.
3      Q   And Senator Grassley continued by
4  mentioning recent investigator reporting which
5  showed extensive ties between companies that
6  manufacture and market opioids and nonprofit
7  organizations, such as the American Pain
8  Foundation, the American Pain Society, and other
9  groups, the Federation of State Medical Boards.
10         Do you see that?
11      A   You -- you also read that correctly.
12      Q   And Endo is one of these pharmaceutical
13  companies that received a letter from Senator
14  Grassley as part of his investigation of this
15  matter.  Correct?
16         MR. DAVIS:  Objection to form.
17         THE WITNESS:  What I remember about this
18  letter -- and it's been some years and we had
19  subsequent Congressional investigations, so I
20  don't remember all the details -- but what I do
21  remember about this Congressional investigation is
22  at the conclusion, after giving them thousands and
23  thousands of documents, the committee ended its
24  investigation with no follow-up and no action

Page 193

1  taken.  And we took that as -- as positive news.
2  I do remember that at the time.
3         MS. AMINOLROAYA:  Move to strike as
4  nonresponsive.
5  BY MS. AMINOLROAYA:
6      Q   My question was whether Endo was one of
7  the pharmaceutical companies that received a
8  letter from Senator Grassley as part of an
9  investigation into growing evidence that
10  pharmaceutical companies that manufacture opioids
11  may be responsible for the opioid epidemic by
12  promoting misleading information about opioid
13  safety and efficacy.
14         MR. DAVIS:  Objection to form.
15         THE WITNESS:  We did receive a letter,
16  as I stated previously, and I -- I see that you --
17  you've correctly identified David Holveck as the
18  recipient of a letter from the Committee on
19  Finance and Senator Grassley.
20  BY MS. AMINOLROAYA:
21      Q   And Endo provided financial support to a
22  number of pain groups and other nonprofit
23  organizations.  Correct?
24      A   We did provide support to independent

Page 194

1 third-party organizations, but it was not
2 connected in any way to our advocacy efforts on
3 Capitol Hill or in state capitals. We sought to
4 undertake government affairs projects where there
5 was an intersection between the benefits to
6 society, public health, and the benefits to
7 patients, and where those interests intersected
8 with our own, we undertook lobbying activity.
9     MS. AMINOLROAYA: Move to strike as
10 nonresponsive.
11 BY MS. AMINOLROAYA:
12    Q   Did Endo provide financial support to
13 pain groups and other nonprofit organizations?
14    A   I am aware that we did.
15    Q   And did Endo respond to Senator
16 Grassley's letter with information as to the
17 financial support it provided to third-party
18 organizations?
19    A   I believe that that was part of our
20 response.
21    Q   And if you turn to page 32 of the
22 document, do you see Endo's financial support for
23 the Federation of State Medical Boards?
24    A   I do see that listed here.

Page 195

1    Q   And what is the total amount listed here
2 of funds provided by Endo to the Federation of
3 State Medical Boards?
4    A   For what time period?
5    Q   The total here.
6    A   $369,025.
7    Q   And on page 12 of the document --
8 rather, page 13 --
9    A   Over a ten-year period.
10    Q   And on page 13 of the document, this is
11 one of the organizations that the letter describes
12 as having extensive ties with manufacturers.
13 Correct?
14    MR. DAVIS: Objection to form.
15    THE WITNESS: I'm sorry, where are you
16 referring to?
17 BY MS. AMINOLROAYA:
18    Q   Page 13, middle of the page.
19    A   That's what Senator Grassley's staff are
20 saying in the letter.
21    Q   And the Federation of State Medical
22 Boards model policy is singled out here in the
23 following paragraph.
24    MR. DAVIS: Objection to form.

Page 196

1    THE WITNESS: Yeah, I -- I believe that
2 you read that correctly.
3 BY MS. AMINOLROAYA:
4    Q   And it's being singled out because of
5 criticism that it failed to point out the lack of
6 science supporting the use of opioids for chronic
7 non-cancer pain.
8    MR. DAVIS: Objection to form.
9    THE WITNESS: That is the -- the charge
10 that Senator Grassley appears to be making in this
11 letter.
12 BY MS. AMINOLROAYA:
13    Q   And how many books, according to this
14 letter, were -- of the model policy were
15 distributed?
16    A   This letter indicates that there were
17 160,000 copies, but I can't, you know, provide any
18 veracity to that because I just don't know.
19    Q   Any reason to dispute this number?
20    A   Well, it's a seven-year-old document
21 created by Congressional staff who probably picked
22 up that number from somewhere, but I don't know
23 where. And so I -- I can't speak to that issue
24 because I -- I don't work at the Federation of

Page 197

1 State Medical Boards and don't know how many
2 copies of their book they distributed.
3    Q   And this is the book that was identified
4 as part of the consensus strategy that Endo and
5 others came up with to oppose the Washington State
6 medical guidelines, correct?
7    MR. DAVIS: Objection to form.
8    THE WITNESS: Well, on -- on -- I can
9 speak to that on two -- on two levels. The first
10 is that I don't recall the details of Washington,
11 as I've said before, of what actually happened
12 there. And -- and so -- and what the Federation
13 did with their book, I can't speak for the
14 Federation.
15 BY MS. AMINOLROAYA:
16    Q   Now, Exhibit 20 states, you would agree,
17 that there was a strategy to promote the FSMB
18 model guidelines in response to the Washington
19 State Opioid Dosing Guidelines.
20    A   This looks to be an 11-year-old e-mail
21 that I previously said that I did not recall in
22 which -- which you are correct that when you use
23 the term there was a consensus strategy on the
24 call that's being referenced here, but just

Page 198

1 because there was a consensus strategy, in my work
2 throughout my tenure at Endo, didn't mean that
3 anything ever came of it or that any actions were
4 ever taken, and I don't recall that they were.
5    Q    Senator Grassley's letter states that
6 160,000 of these books were distributed.  Correct?
7    A    You -- you read the letter correctly.
8    Q    And Endo opposed the guidelines because
9 they put a limitation on dosing of opioids,
10 correct?
11        MR. DAVIS:  Objection to form,
12 foundation.
13        THE WITNESS:  Which -- which guidelines?
14 BY MS. AMINOLROAYA:
15    Q    The Washington State guidelines.
16        MR. DAVIS:  Same objection.
17        THE WITNESS:  I don't -- I don't recall
18 the details of the public policy issues we were
19 working on or even if we took any action in the
20 state of Washington.  I do remember, as I've
21 stated previously, that there were lots of
22 discussions about Washington, and that there was
23 an issue in Washington.  But I don't recall any
24 level of detail about what we did or if we did

Page 199

1 anything in the state of Washington.
2 BY MS. AMINOLROAYA:
3    Q    And the -- the fact is, Mr. Endo --
4 Mr. Munroe, excuse me, that limitations on doses
5 of opioids is -- is bad for Endo's business.
6        MR. DAVIS:  Objection to form.
7        THE WITNESS:  What we cared about in my
8 tenure at Endo was the idea that it was important
9 that the physician prescribe the right medication
10 to the right patient at the right time.
11 BY MS. AMINOLROAYA:
12    Q    And Endo didn't only oppose the
13 Washington State's -- or Washington State's
14 efforts to put a limitation on -- on dosing of
15 opioids, it opposed the issue when it came up
16 later, right?
17        MR. DAVIS:  Objection to form,
18 foundation.
19        THE WITNESS:  Are you saying generically
20 we opposed guidelines?
21 BY MS. AMINOLROAYA:
22    Q    I'm asking if you opposed limitations on
23 dosing of opioids.
24        MR. DAVIS:  Objection to form.

Page 200

1        THE WITNESS:  What we cared about was
2 the physician's prerogative to prescribe the right
3 medicine to the appropriate patient at the
4 appropriate time.  And -- and that was the basis
5 for our public policy positions on these issues.
6 BY MS. AMINOLROAYA:
7    Q    And Endo opposed dosing limits on
8 opioids.  Correct?
9        MR. DAVIS:  Objection to form.
10        THE WITNESS:  I don't recall us ever
11 taking a position where we did not put the ideal
12 of having the physician have the right to
13 prescribe the right medicine to the appropriate
14 patient at the right time, and that was the
15 centerpiece of these issues for us.  That was the
16 basis for our public policy positions.
17 BY MS. AMINOLROAYA:
18    Q    And the CDC came out with guidelines in
19 2016 which proposed limitations on opioid dosing,
20 correct?
21        MR. DAVIS:  Objection to form,
22 foundation.
23        THE WITNESS:  I don't -- I don't know
24 the timeline.  I don't recall the timeline.  But

Page 201

1 the CDC did come out with draft guidelines, and we
2 objected vehemently to the process that they used
3 to develop the guidelines.
4        And so we believed that a good process
5 would result in good guidelines that allowed the
6 physician to prescribe the right medicine to the
7 appropriate patient at the right time, and that --
8 that we objected to the process that the CDC had
9 embarked upon in developing their guidelines.  And
10 so did many, many organizations throughout
11 Washington, including government agencies.
12 BY MS. AMINOLROAYA:
13    Q    Did Endo ever support guidelines that
14 tried to educate doctors on safe limits for dosing
15 opioids?
16    A    You would have to ask Neil Shusterman,
17 who was our chief medical officer, and he was in
18 charge of guidelines and those kinds of medical
19 scientific issues.  That was beyond the scope of
20 my position at Endo.
21    Q    And did Endo ever pursue a public policy
22 or advocacy that involved opioid guidelines that
23 set limits on dosing?
24        MR. DAVIS:  Objection to form.

Page 202

1    THE WITNESS:  I recall that the basis
2  for our work on guidelines issues in Washington,
3  D.C., was based on two principles.  One, that with
4  regard to the CDC guidelines, good process would
5  produce good guidelines.  And the process they
6  created was, you know, just terrible, and so we
7  objected to that process.  We also on the
8  proactive side supported a physician's right to
9  prescribe the right medicine to the appropriate
10  patient at the right time.
11    So those were the two kind of
12  foundational public policy positions that I recall
13  us taking on these issues in Washington, D.C.,
14  during my time as an employee at Endo.
15    MS. AMINOLROAYA:  Move to strike the
16  entire answer as nonresponsive.
17  BY MS. AMINOLROAYA:
18    Q   Mr. Munroe, my question again is simply,
19  did Endo ever pursue a public policy or advocacy
20  that involved opioid guidelines that set limits on
21  dosing?
22    MR. DAVIS:  Objection to form.
23    THE WITNESS:  I don't recall.
24  BY MS. AMINOLROAYA:

Page 203

1    Q   And do you not recall because Endo never
2  did that?
3    MR. DAVIS:  Objection to form.
4    THE WITNESS:  Those guideline issues, I
5  was aware that there were discussions in the
6  company about that.  And I may have been involved
7  in those discussions.  But I don't recall the
8  specifics, and as I said, our chief medical
9  officer, Dr. Neil Shusterman, would have been the
10  employee at Endo who would have had the expertise
11  to hold forth on that subject.
12  BY MS. AMINOLROAYA:
13    Q   You were aware, Mr. Munroe, that
14  limitations on opioid dosing would have had very
15  negative consequences for Endo's Opana ER drug?
16    MR. DAVIS:  Objection to form,
17  foundation.
18    THE WITNESS:  Pardon me.  What's the
19  question?
20  BY MS. AMINOLROAYA:
21    Q   The question is whether you were aware
22  that limitations on dosing of opioids would have
23  had negative financial consequences for Endo's
24  Opana ER drug.

Page 204

1    MR. DAVIS:  Objection to form.
2    THE WITNESS:  Dosing of opioids?  If --
3  if dosing of opioids would have been determined by
4  the physician, we would have been okay with it.
5  BY MS. AMINOLROAYA:
6    Q   My question --
7    MS. AMINOLROAYA:  Move to strike as
8  nonresponsive.
9  BY MS. AMINOLROAYA:
10    Q   My question is whether you were aware
11  that limitations on doses of opioids that could be
12  provided to a patient would have had negative
13  consequences for Endo's Opana ER drug.
14    MR. DAVIS:  Objection to form.
15    THE WITNESS:  I think it would have been
16  a negative consequence on the -- on the patient
17  that's being prescribed the medicine.  I think the
18  consequence that we were focused on was the
19  consequence to the patient.
20  BY MS. AMINOLROAYA:
21    Q   And are you aware that high doses of
22  opioids are associated with increased risks?
23    MR. DAVIS:  Objection to form.
24    THE WITNESS:  I'm not a medical doctor,

Page 205

1  and that's outside the scope of my position, so I
2  don't know.
3  BY MS. AMINOLROAYA:
4    Q   So you advocate about opioids for -- for
5  ten years at Endo, and you're not familiar with
6  the risks and benefits of the drugs that you
7  advocate for?
8    MR. DAVIS:  Objection to form,
9  mischaracterizes testimony.
10    THE WITNESS:  I am -- I am not medically
11  trained.  I'm not a physician, I'm not a
12  scientist, I'm not a sales representative that was
13  medically trained, formally trained on the
14  product.
15  BY MS. AMINOLROAYA:
16    Q   Sir, your testimony earlier was that
17  your job was to provide facts and data to
18  legislators and politicians, correct?
19    A   Yes.
20    Q   But you're not familiar with the facts
21  and the data that show that higher doses of
22  opioids are associated with increased risks.
23    MR. DAVIS:  Objection to form,
24  mischaracterizes testimony.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 THE WITNESS: I would answer that on a
2 couple of fronts. One, I worked on many, many
3 issues. I worked on tax issues, I worked on
4 compounding issues, I worked on various cancer
5 issues. So I worked on lots of issues, so I
6 couldn't be an expert on -- on everything. So we
7 would coordinate the company's public policy
8 positions, including the use of subject matter
9 experts, which I would bring with me to testify on
10 scientific and technical issues, such as Dr. Neil
11 Shusterman, who was our chief medical officer.
12 MS. AMINOLROAYA: I'm marking -- let's
13 see.
14 (Munroe Exhibit No. 25 was marked
15 for identification.)
16 BY MS. AMINOLROAYA:
17 Q I'm handing you 1573, which is
18 Exhibit 25. This is ENDO-OPIOID_MDL-01902659.
19 It's E-numbered E1573.
20 And the last page of the document, Keri
21 Mattox is writing to John Harlow in March -- on
22 March 15th, 2016.
23 Do you see that?
24 A I do.

Page 207

1 Q And it's regarding Opana ER doses. And
2 Keri, in investor relations, writes to John and
3 copies Brian Lortie and you.
4 A I see that.
5 Q In an inquiry about the CDC's guidelines
6 and their impact.
7 A I do see that.
8 Q And is Ms. -- is Mattox -- Keri Mattox,
9 is that a female?
10 A Yes.
11 Q And was she one of the boss -- your
12 bosses that you mentioned earlier?
13 A Yes.
14 Q So Ms. Mattox in investor relations was
15 your supervisor?
16 MR. DAVIS: Objection to form.
17 THE WITNESS: Correct. She was the head
18 of corporate affairs, which included
19 communications, government affairs, investor
20 relations. A number of groups.
21 BY MS. AMINOLROAYA:
22 Q And here she's writing about the impact
23 of the CDC's guidelines to start low and go slow
24 on Opana ER. Correct?

Page 208

1 A I'm --
2 MR. DAVIS: Objection to form.
3 THE WITNESS: I'm trying to read that.
4 BY MS. AMINOLROAYA:
5 Q And that's on the last page of the
6 document --
7 A Oh, the last page.
8 Q -- page 4. If you flip over to the very
9 -- it starts at the very end of page 3 and goes to
10 page 4.
11 A Okay. (Peruses document.)
12 Yes, I -- I see where she says that.
13 Q Mm-hmm. And the CDC guidelines were
14 suggesting a limit of 90 MMEs per day of opioids,
15 correct?
16 A I -- I don't know what the -- the
17 guidelines scientific measures were and are. I'm
18 just not familiar.
19 Q And those guidelines -- the -- the
20 limitations on dosing that the guidelines were
21 suggesting were predicted by Endo to have a
22 significant impact on Opana ER.
23 MR. DAVIS: Objection to form.
24 THE WITNESS: I can only talk about my

Page 209

1 work, and my work on the CDC guidelines was that
2 we objected to the process that the CDC used to
3 get to the guidelines that they presented in draft
4 form. And so we believe that good guideline -- a
5 good process would produce good guidelines. So I
6 can only talk about my work.
7 I will note that this document is
8 possibly after the guidelines had been finalized.
9 Is that true? If the guidelines had been
10 finalized -- is this an after-the-finalization,
11 simple report of what happened? If that's simply
12 what it is, it is what it is.
13 I ask the question because I don't
14 recognize this document.
15 BY MS. AMINOLROAYA:
16 Q Well, let's take a look at what the
17 impact of the guidelines would be on Endo's --
18 Endo's sales.
19 And page 1 -- on page 1 here, would you
20 agree that your boss, Ms. Mattox, is writing to
21 you and others, and she states that the guidelines
22 would -- well, let's turn to page 2 of the
23 document.
24 Mr. Harlow writes here in the last chain

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1  on page 2 that: "The guidelines will impact the
2  20, 30, and 40 milligram dosages of Opana ER."
3      Bottom of page 2.
4      MR. DAVIS: Objection to form.
5      THE WITNESS: Well, I can read the
6  document here, as -- as you stated. I think the
7  impact will vary, and we won't need to monitor
8  this closely.
9  BY MS. AMINOLROAYA:
10     Q   And he -- he states that the guidelines
11 could impact the 20, 30, and 40 milligram doses of
12 Opana ER, correct?
13     A   You read that correctly.
14     Q   And this will translate into a
15 substantial loss of revenue for Opana ER.
16     MR. DAVIS: Objection to form.
17     THE WITNESS: Yeah, I -- I think it --
18 there was a certain amount of measured
19 speculation, and -- and I think executives at the
20 company were -- were acting in good faith, trying
21 to understand how this would impact our product
22 line.
23 BY MS. AMINOLROAYA:
24     Q   Well, if you go to page 1 of the

Page 211

1  document, you see some pretty specific numbers,
2  right? It's not speculation. You have
3  percentages and totals.
4      So if you look at the second bullet:
5  "These guidelines could potentially affect Endo's
6  opioid product portfolio." And then it provides a
7  total of 636 million, or 14 percent, of 2016
8  revenue guidance.
9      Was this why Endo was opposing dosing
10 limitations on opioids?
11     MR. DAVIS: Objection to form.
12     THE WITNESS: I'm unaware of opposition
13 to dosing limits on opioids. I am aware that we
14 opposed the development of -- of guidelines at the
15 CDC because of the -- the bad process they were
16 using, and that we believed that a good process
17 would produce good guidelines.
18 BY MS. AMINOLROAYA:
19     Q   But again, Endo never supported dosing
20 guidelines for opioids.
21     A   I don't know. You'd have to ask Neil
22 Shusterman that question.
23     Q   Nothing that you recall working on.
24     A   I don't recall.

Page 212

1      Q   Thank you.
2      And Endo also -- strike that.
3      The Pain Care Forum also opposed dosing
4  guidelines or dosing limitations when it came to
5  the label of -- of opioid drugs.
6      MR. DAVIS: Objection to form.
7  Foundation.
8      THE WITNESS: Well, the Pain Care Forum
9  didn't take positions. The Pain Care Forum was a
10 forum in which organizations could get together on
11 a monthly basis to have discussions about pain
12 public policy issues.
13 BY MS. AMINOLROAYA:
14     Q   But the Pain Care Forum came up with a
15 plan to respond to the PROP petition.
16     MR. DAVIS: Objection to form,
17 foundation.
18     THE WITNESS: Is there -- is there a
19 question?
20 BY MS. AMINOLROAYA:
21     Q   Yes. Did the Pain Care Forum come up
22 with a plan to respond to the PROP petition?
23     A   I don't recall.
24     Q   Are you familiar with the PROP petition?

Page 213

1      A   Vaguely.
2      (Munroe Exhibit No. 26 was marked
3      for identification.)
4  BY MS. AMINOLROAYA:
5      Q   Marked Exhibit 26. It's E1931,
6  ENDO-OPIOID_MDL-01448657.
7      And this PROP, Physicians -- does PROP
8  stand for Physicians for Responsible Opioid
9  Prescribing?
10     A   Yes.
11     Q   And do you recall that they submitted a
12 Citizens Petition to the FDA requesting a change
13 to the labels of opioids?
14     A   As I said before, I vaguely remember
15 this, but -- I don't remember the details in
16 specific. I remember that it -- was an issue,
17 but --
18     Q   And is this a letter from Mr. Byrne to
19 you and your colleagues at Endo regarding the PROP
20 petition in September 11th of 2013?
21     A   That's what this e-mail header says. I
22 don't recall this document in particular.
23     Q   Was the PROP petition seeking to have --
24 to -- or requesting that the FDA take three

Page 214

1 actions: One, strike the term "moderate" from the
2 indication of opioid analgesics for non-cancer
3 pain?
4     A   You'll have to ask them. I don't know
5 what's in this petition.
6     Q   Do you have any reason to believe that
7 Mr. Byrne's description here is not accurate?
8     A   I would have no reason to believe
9 it's -- it's -- it's not accurate.
10     Q   And was the PROP petition also seeking
11 to have the FDA change the label of opioids to add
12 a maximum daily dose equivalent to 100 milligrams
13 of morphine for non-cancer pain?
14     A   You -- you did read that correctly.
15     Q   Thank you.
16         And finally, was the PROP petition
17 seeking a change to the label that would add a
18 maximum duration of 90 days for continuous daily
19 use for non-cancer pain?
20     A   This didn't say anything about labeling
21 that I'm aware of. Unless you can point that part
22 out to me.
23     Q   Sure. So the first description here
24 talks about striking the term "moderate" from the

Page 215

1 indication of opioid analgesics.
2     A   Okay.
3     Q   And so is the third relief -- or the
4 third request that PROP makes here of FDA that it
5 add a maximum duration of 90 days for continuous
6 daily use of opioids for non-cancer pain?
7     A   You also read that correctly.
8     Q   And did the Pain Care Forum come up with
9 a plan for its members to respond to the PROP
10 petition?
11         MR. DAVIS: Objection to form.
12         THE WITNESS: I don't recall. The only
13 thing I recall about the PROP Citizens Petition is
14 I do remember that the FDA refuted the PROP
15 Citizens Petition chapter and verse with facts and
16 data that were extremely impressive.
17 BY MS. AMINOLROAYA:
18     Q   But that -- that was after the Pain Care
19 Forum instructed its members to engage in a -- a
20 letter-writing campaign to the FDA.
21     A   I don't --
22         MR. DAVIS: Objection to form.
23         THE WITNESS: I don't recall the
24 activities of the Pain Care Forum at that time.

Page 216

1         MS. AMINOLROAYA: Can we have 1926.
2         (Munroe Exhibit No. 27 was marked
3         for identification.)
4 BY MS. AMINOLROAYA:
5     Q   I'm handing you Exhibit 27. This is
6 E-numbered 1926. END00403619.
7         And is this an e-mail from Bob Twillman
8 to members of the Pain Care Forum on August 22nd,
9 2012?
10     A   That's what this says.
11     Q   And does Mr. Twillman send documents to
12 the PCF members to review so they can formulate
13 responses to the FDA petition -- the PROP petition
14 asking for a label change?
15         MR. DAVIS: Objection to form.
16         THE WITNESS: I'm looking to see if I
17 received this e-mail. I did. Okay. I don't
18 recall this e-mail at all and don't know the
19 subject matter.
20         I'm sorry. I was trying to see if I --
21 if I received this e-mail. I am on this list of
22 what looks like a hundred people who received this
23 seven-year-old e-mail.
24         So I apologize, what's -- what's the

Page 217

1 question?
2 BY MS. AMINOLROAYA:
3     Q   Did Mr. -- was Mr. Twillman here sending
4 documents to PCF members to review so they could
5 respond to the PROP petition?
6         MR. DAVIS: Objection to form.
7         THE WITNESS: Well, it actually says:
8 "I'm attaching documents for Pain Care Forum
9 members to review in formulating their own
10 responses to the FDA."
11 BY MS. AMINOLROAYA:
12     Q   Mm-hmm.
13     A   So that's a -- that's a quote from this
14 document.
15     Q   Mr. Twillman was -- was circulating
16 documents to help shape the response that FDA
17 would hear.
18         MR. DAVIS: Objection to form.
19         THE WITNESS: What I remember about this
20 issue is that the FDA responded to the PROP
21 Citizens Petition with withering criticism and
22 facts and data that were overwhelming and
23 impressive in refuting the majority of claims that
24 PROP was making in their Citizens Petition. I do

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 have a recollection of that.
2 BY MS. AMINOLROAYA:
3   Q   And the documents that Mr. Twillman was
4 sending to the membership of the Pain Care Forum
5 here are of the American Academy of Pain
6 Management, some other groups, and the American
7 Academy of Pain Medicine.  Correct?
8   A   It -- it looks like you read that
9 correctly.
10   Q   And the American Academy of Pain
11 Medicine and the American Academy of Pain
12 Management, those are groups that Endo provided
13 financial support to, right?
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  I actually don't recall
16 who we gave money to at what level.  We did
17 support independent third-party organizations
18 while I was at Endo with financial support.
19 BY MS. AMINOLROAYA:
20   Q   And if you turn back to Exhibit 21,
21 page 26, do you see that in 2012, Endo paid the
22 American Academy of Pain Medicine $135,000?
23   A   Yes.  And I have no recollection of
24 being involved with that donation.  It says "pain

Page 219

1 education," and so I have no recollection of being
2 involved or knowing about that.
3   Q   And in total, between 1999 and 2012,
4 Endo had given the American Academy of Pain
5 Medicine over $1.3 million, correct?
6   A   Is that an 11-year period?  12-year --
7 no, 13-year period.
8   Q   Is that correct, Mr. Munroe?
9   A   I -- I wouldn't know about the donations
10 or -- to the American Academy of Pain Medicine for
11 pain education.  That's not something I would have
12 been involved with.
13   Q   This is a submission to a response to
14 Senator Grassley, correct?
15   A   Yes.
16   Q   And the submission states that Endo
17 provided over a million dollars, over $1.3 million
18 to the AAPM.
19   A   It appears that you're reading that
20 correctly.
21   Q   And after the Pain Care Forum encourages
22 its membership to engage in a letter-writing
23 campaign to the FDA opposing the PROP petition,
24 the FDA doesn't adopt dosing limitations that were

Page 220

1 sought by the PROP petition, correct?
2       MR. DAVIS:  Objection to form.
3       THE WITNESS:  I believe FDA to be
4 totally independent and an organization of our
5 government that bases its decisions on a
6 collection of the data, and, in their view,
7 what's -- what's best for American citizens.  So
8 that's my fundamental belief having worked with
9 the FDA for decades.
10 BY MS. AMINOLROAYA:
11   Q   Mm-hmm.  You've stated, Mr. Munroe, that
12 the Pain Care Forum was capable of influencing the
13 FDA; isn't that right?
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  I don't recall saying
16 that.
17       And as I have said previously, the Pain
18 Care Forum did not take public policy positions.
19 Members would take positions.  And through a free
20 association of interaction, groups were free to
21 join together to support or oppose legislative or
22 regulatory public policy issues.
23       MS. AMINOLROAYA:  Move to strike
24 everything after "I don't recall saying that."

Page 221

1   1447.
2 BY MS. AMINOLROAYA:
3   Q   And the Pain Care Forum came up with a
4 plan to influence the FDA's opioid REMS.  Do you
5 recall that?
6       MR. DAVIS:  Objection to form.
7 Foundation.
8       THE WITNESS:  The Pain Care Forum itself
9 didn't take public policy positions.  It was a
10 collection of organizations that would meet
11 monthly for -- for networking purposes and for
12 sharing information on public policy issues that
13 could impact the pain community.
14 BY MS. AMINOLROAYA:
15   Q   Did the PCF have a REMS task force?
16   A   I know that the creation of an opioid
17 REMS, classwide REMS was the subject of an agen-
18 -- of agenda items at the Pain Care Forum.  I am
19 aware of that, but I don't recall what the details
20 were.  And my responsibilities at Endo were not --
21 did not include regulatory affairs, so that's
22 something that Bob Barto and Tara Chapman would
23 have taken the lead on.
24   Q   But you were involved with the PCF REMS

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 task force, right?
2          MR. DAVIS:  Objection to form.
3          THE WITNESS:  I don't recall being
4 involved.  I might have seen or communicated about
5 the issues, but it would have been at the very
6 beginning of that topic being raised.  I very
7 quickly would have moved my work -- any work that
8 I might have done over to Bob Barto and Tara
9 Chapman in our regulatory affairs because that was
10 really their profession and their scope of
11 responsibility.
12 BY MS. AMINOLROAYA:
13    Q    All right.  Well, let's mark
14 ENDO-OPIOID_MDL-03902804 as Exhibit 28.  It's
15 E1447.
16          (Munroe Exhibit No. 28 was marked
17           for identification.)
18 BY MS. AMINOLROAYA:
19    Q    And do you see here at the bottom e-mail
20 you're reporting to Bob Barto and Demir Bingol?
21 On December 11th, you're writing an e-mail to
22 them?
23    A    Yeah, this looks like it's an 11-year-
24 old e-mail, and I don't recall it in the least.

Page 223

1    Q    I asked if you saw that this reflects an
2 e-mail that you sent to Bob Barto and Demir Bingol
3 and others on December 11th.
4    A    You've -- you've read that correctly.
5    Q    And is that what this reflects?
6          MR. DAVIS:  Objection to form.
7 BY MS. AMINOLROAYA:
8    Q    What this e-mail reflects.
9          MR. DAVIS:  Objection to form.
10          THE WITNESS:  Does the e-mail reflect
11 what?
12 BY MS. AMINOLROAYA:
13    Q    That you sent -- you're sending an
14 e-mail here to Barto and Bingol.
15          MR. DAVIS:  Objection to form.
16          THE WITNESS:  I don't know what this is.
17 This is an 11-year-old e-mail chain of some kind.
18 I'd have to read through it.
19          Would you like me to read through it?
20 BY MS. AMINOLROAYA:
21    Q    You're welcome to read the document.
22          Tell us who Mr. Bingol and Barto are.
23    A    They were coll- -- former colleagues of
24 mine at Endo.

Page 224

1    Q    And what did they do at Endo?
2    A    Bob was in charge of -- of the
3 regulatory affairs department, and Demir was in
4 our commercial organization.
5    Q    And did you send them an e-mail on
6 December 11th regarding the PCF REMS task force?
7    A    That's what this says at the top.
8    Q    And does this e-mail refresh your
9 recollection as to whether the PCF voted?
10    A    No, it does not.  And I don't know what
11 this is about.  This is an 11-year-old e-mail, and
12 I have no recollection of this e-mail chain.
13          Again, I'll volunteer to -- to read
14 through it if you'd like.
15    Q    Sure.  Well, let's take a look at the
16 top of page 2.
17          And does Bob write to you here stating
18 that:  "There is going to be a classwide REMS.  We
19 need to participate in the development
20 discussions"?
21    A    Well, actually, the -- the first e-mail
22 appears to be from Will Rowe to about 30 people.
23    Q    And my question is about the e-mail at
24 the top of page 2.

Page 225

1    A    Oh, okay.  From Bob.
2    Q    Yes, mm-hmm.
3    A    And -- and your question about this
4 e-mail from Bob to me is?
5    Q    Yes.  Whether Endo -- the question is,
6 what was Bob's view as to whether Endo should be
7 participating in these discuss- -- in discussions
8 regarding the REMS?
9    A    Well, it says here that he does not
10 object to Endo being a signatory.
11    Q    Mm-hmm.  And that's in response to
12 Mr. Rowe's e-mail, which you pointed out, which
13 references the Pain Care Forum's continued work on
14 REMS.
15    A    Yeah, I don't recall what that work
16 might have been, but I -- I do recall that REMS
17 was an issue.  And as you can see from this e-mail
18 chain, I very quickly was attempting to -- to turn
19 this over to the people that had responsibility
20 for regulatory affairs in our company.
21    Q    Mm-hmm.  But you had a -- you took a
22 turn at a draft letter that was being sent to
23 members of the Pain Care Forum.
24    A    What are you referring to?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    Q   If you take a look at the second e-mail
2  from the top on page 2, you reference Job 1.  What
3  was Job 1?
4    A   I don't remember this e-mail.  So I
5  don't know what it was.
6    Q   Was Job 1 your work with the APF to
7  redraft the proposed PCF letter on opioid REMS?
8    A   That -- that's what this says, but I
9  have no memory of this -- what is it? -- 11-year-
10  old e-mail.
11       I do recall on this subject that -- of
12  wanting to transfer responsibility of the issue to
13  Bob Barto, because this was his principal job with
14  the company.
15       MR. DAVIS:  Is now a good time for a
16  break?  It's been over an hour or so.
17       MS. AMINOLROAYA:  I've got a few more in
18  this area, but we can take a break now.
19       THE VIDEOGRAPHER:  The time is 3:35 p.m.
20  We're going off the record.
21       (Recess.)
22       THE VIDEOGRAPHER:  The time is 3:51 p.m.
23  and we're back on the record.
24  BY MS. AMINOLROAYA:

Page 227

1    Q   Welcome back, Mr. Barto.  We took a
2  break, and we're back on the record.
3    A   Mr. Munroe.
4    Q   I'm sorry.
5    A   Yeah, it's okay.
6    Q   Barto -- Munroe.  Thank you.  It's late
7  in the afternoon.  I may confuse things.  I
8  appreciate the reminder.
9       Do you recall if the Pain Care Forum
10  also lobbied the FDA Commissioner concerning the
11  REMS?
12    A   The Pain Care Forum didn't take
13  positions that I'm aware of.  The Pain Care Forum
14  was a -- an opportunity for organizations that --
15  in the pain community and in the healthcare
16  community in Washington to get together on a
17  monthly basis.
18       There were times when members of the
19  Pain Care Forum would take a public policy
20  position and invite others to join them.  But
21  those are the only efforts that I'm aware of are
22  efforts in which the Pain Care Forum members would
23  get together on a particular issue.  I'm unaware
24  of anything that any particular coalition of

Page 228

1  members of the Pain Care Forum did with respect to
2  the FDA Commissioner.
3       MS. AMINOLROAYA:  Our next exhibit,
4  1750, please.
5  BY MS. AMINOLROAYA:
6    Q   Do you recall whether Endo signed on to
7  a -- a letter to the FDA Commissioner along with
8  other manufacturers of opioids and -- and pain
9  advocacy and professional groups?
10    A   On what topic?
11    Q   On the topic of the REMS.
12    A   I -- I don't recall.  I know that there
13  were interactions between members of the Pain Care
14  Forum and the FDA, and that they would evolve into
15  the industrywide working group, which was a group
16  that FDA requested that industry form, but the
17  details of that work were done by Bob Barto, who
18  was head of regulatory affairs at Endo.
19    Q   So would it surprise you if you were
20  involved in this process?
21       MR. DAVIS:  Objection to form.
22       THE WITNESS:  I might have been involved
23  at the very early stages of discussions involving
24  opioid REMS, but I don't recall specifics.

Page 229

1       (Munroe Exhibit No. 29 was marked
2       for identification.)
3  BY MS. AMINOLROAYA:
4    Q   I'm handing you what's been marked as
5  Exhibit 29.  It's ENDO-OPIOID_MDL-01485618, and
6  it's E-numbered E1750.
7       And the bottom e-mail on the first page,
8  do you see where Mr. Rowe says:  "We decided to
9  send our REMS letter to the new leadership at the
10  FDA who assumed office today"?  And this is dated
11  January 20th, 2009.
12    A   I do see that.
13    Q   And did Endo sign on to this letter?
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  I actually don't remember.
16  I'm now looking at the letter, and it does show
17  Endo Pharmaceuticals as signatory on the letter.
18  BY MS. AMINOLROAYA:
19    Q   And did Endo sign this letter with other
20  manufacturers?
21    A   Actually, with the Alliance of State
22  Pain Initiatives, the American Academy of Pain
23  Management, the American Academy of Pain Medicine,
24  the American Cancer Society, the American Chronic

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  Pain Association, the American Pain Foundation,
2  the American Pain Society, the American Pharmacist
3  Association, the American Society of Pain
4  Educators, the American Society of Pain Management
5  Nursing, Center for Practical Bioethics, National
6  Hospice and Palliative Care Organization, National
7  Pain Foundation, Pain and Policy Study Group,
8  and -- and -- and some companies.
9      Q   And the American Pain Foundation,
10 American Pain Society, as we've seen in -- in
11 Endo's response to Senator Grassley's letter, are
12 organizations that Endo provided financial support
13 to, correct?
14     MR. DAVIS:  Objection to form.
15     THE WITNESS:  That's what those
16 documents from Senator Grassley -- the response to
17 Senator Grassley showed.
18 BY MS. AMINOLROAYA:
19     Q   Thank you.
20     And Endo, along with these other
21 organizations, were writing to tell the Acting
22 Commissioner on his first day on the job, Frank
23 Torti, Dr. Torti, about its concerns over the
24 REMS.

Page 231

1      MR. DAVIS:  Objection to form.
2      THE WITNESS:  I don't recall this
3  ten-year-old e-mail which was sent to all these
4  folks or the attachment.
5  BY MS. AMINOLROAYA:
6      Q   Endo was trying to get a seat at the
7  table --
8      MR. DAVIS:  Objection to form.
9  BY MS. AMINOLROAYA:
10     Q   -- in the discussion of the REMS.
11     A   The principal decision maker on REMS at
12 the company while I was there was Bob Barto, who
13 ran our regulatory affairs department, so you'd
14 have to ask him.
15 BY MS. AMINOLROAYA:
16     Q   Well, you seem to be following this very
17 closely.
18     If you look at the top of -- of
19 Exhibit 29, you tell Mr. Barto that you'll follow
20 up with steps as they are formulated by the Pain
21 Care Forum.
22     MR. DAVIS:  Objection to form.
23     THE WITNESS:  That's what that says.
24 You read that correctly.  But it's a ten-year-old

Page 232

1  e-mail, and I have no recollection of what the
2  back and forth was or -- or, actually, even what
3  happened.
4  BY MS. AMINOLROAYA:
5      Q   Okay.  Well, we'll take a look at some
6  of that right now.
7      A   Okay.
8      Q   And do you recall if the Pain Care Forum
9  drafted a letter that contained a consensus
10 statement of the PCF members regarding REMS?
11     A   I don't recall.
12     Q   I'm marking as Exhibit 30 EPI001789493,
13 and this is E1749.
14     (Munroe Exhibit No. 30 was marked
15     for identification.)
16 BY MS. AMINOLROAYA:
17     Q   And in the middle e-mail here, are you
18 telling Mr. Barto -- or are you sending Mr. Barto
19 a draft of a -- a Pain Care Forum draft consensus
20 letter regarding opioid -- an opioid classwide
21 REMS proposal?
22     A   I don't know what this says.  I'm
23 looking at this 11-year-old e-mail, and I have no
24 recollection of -- of sending this e-mail.  So,

Page 233

1  I'm sorry, I just don't remember.
2      Q   Well, we're looking at this e-mail today
3  because Endo didn't provide these documents to the
4  FDA or to the public when they authored them, when
5  you authored them, when other members of Endo or
6  employees of Endo authored them 10 or 11 years
7  ago, so I'm not sure what the significance of the
8  date that you keep referencing is.  If you have a
9  reason to believe that this e-mail is not
10 something you received, let me know, please.
11     And so does this e-mail reflect that you
12 sent Mr. Barto a copy of a draft consensus letter
13 from the Pain Care Forum regarding an opioid
14 classwide REMS proposal?
15     MR. DAVIS:  Objection to everything
16 before the actual question.
17     THE WITNESS:  I -- I actually don't
18 recall what this 11-year-old e-mail is about.
19 BY MS. AMINOLROAYA:
20     Q   Well, if you take a look at the first
21 e-mail here from Will Rowe, he states:  "Attached
22 is the beginning of a draft of a possible
23 collaborative communication to the FDA regarding
24 the development of a classwide REMS for opioid

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 medicines."

2 And do you see you're on the chain

3 below, and it appears that you're sending this to

4 your colleagues at Endo.

5 A  You -- you read that correctly.

6 Q  Well, I'm asking if that's what you see

7 in the e-mail here.

8 A  And I'm responding that what you just

9 read, you read from the e-mail, and you did read

10 it correctly. I don't recall what was in the

11 e-mail because it's 11 years old, and I don't know

12 whether I got a million e-mails while I was at

13 Endo or two million, but I got a lot of them, and

14 I don't remember this 11-year-old e-mail. But you

15 did read it correctly what you did read.

16 Q  And did you ever suggest that a

17 product-specific REMS might be a way for Endo to

18 gain a competitive advantage over Purdue?

19 MR. DAVIS:  Objection to form.

20 THE WITNESS:  I -- I don't recall that

21 subject.

22 BY MS. AMINOLROAYA:

23 Q  Endo didn't support a product-specific

24 REMS, though, correct?

Page 235

1 MR. DAVIS:  Objection to form.

2 Foundation.

3 THE WITNESS:  I was not in the detailed

4 work on the REMS topic. That was really the --

5 the purview of Bob Barto, who was the head of our

6 regulatory affairs department, and he would

7 have -- be able to answer these questions in a lot

8 more detailed fashion.

9 Q  And the PCF came up with recommendations

10 for its membership on what -- on what members

11 could support as far as the REMS was concerned.

12 Do you recall that?

13 A  I --

14 MR. DAVIS:  Objection to form.

15 THE WITNESS:  I do recall that there

16 were discussions at the Pain Care Forum, but I

17 don't recall what those discussions led to.

18 I know that one of the original -- what

19 it -- what it led to was the industrywide working

20 group on REMS.

21 BY MS. AMINOLROAYA:

22 Q  And there was also a task force at the

23 PCF related to REMS, right?

24 A  As I've said, I know that the REMS issue

Page 236

1 was an agenda item at the Pain Care Forum, and

2 there were discussions, but I don't recall the

3 details of what they were.

4 (Munroe Exhibit No. 31 was marked

5 for identification.)

6 BY MS. AMINOLROAYA:

7 Q  I've just handed you Exhibit 31. This

8 is ENDO-OPIOID_MDL-1134277, and its E number is

9 881.

10 And did you provide an update to your

11 colleagues at Endo on March 17th on the Pain Care

12 Forum's consensus recommendations for the REMS?

13 Turn to page 2.

14 A  Well, what I'm looking at, I -- I don't

15 recall this document. It's a ten-year-old draft

16 document stamped "Draft." I do see that it says

17 "Endo REMS strategy discussion."

18 Q  And do the meeting minutes of -- of this

19 March 17th, 2009 meeting reflect that you and

20 Mr. Barto provided an update on the Pain Care

21 Forum at the meeting?

22 A  I don't recall the details of this

23 document whatsoever. So I've --

24 Q  Do you have any reason to dispute that

Page 237

1 you attended a meeting at Endo and provided an

2 update on the Pain Care Forum?

3 A  That would have been -- that would have

4 been something that I could have done, although I

5 just don't recollect what happened ten years ago,

6 and the fact that this is a draft document leads

7 me to -- to question it, but -- so I just don't

8 know.

9 Q  Well, according to this draft document,

10 were the Pain Care Forum's consensus

11 recommendations -- were there seven

12 recommendations that are listed here?

13 A  That's what this draft ten-year-old

14 document says.

15 Q  And one -- was one of the

16 recommendations that a REMS should not interfere

17 with the physician's ability to treat patients?

18 A  You read that correctly.

19 Q  And was another recommendation that a

20 patient registry should not be part of the REMS?

21 A  You paraphrased that correctly.

22 Q  Any reason to believe that this -- this

23 document is not accurate?

24 A  Well, it's stamped "Draft," which I

Page 238

1 think makes it subject to question.
2    Q   Okay.  Well, we'll look at some more
3 documents that provide some support for what we've
4 just seen here.
5        MS. AMINOLROAYA:  E1632.
6 BY MS. AMINOLROAYA:
7    Q   And it was the Pain Care Forum's view
8 that it was really critical to the future of
9 its -- of its members that the -- that the
10 membership make submissions to the FDA or provide
11 feedback to the FDA on the REMS.
12        MR. DAVIS:  Objection to form.
13        THE WITNESS:  What's the question?
14 BY MS. AMINOLROAYA:
15    Q   That it -- was it the Pain Care Forum's
16 view that it was critical to the future of its
17 membership that the membership make submissions to
18 the FDA on the REMS issue?
19        MR. DAVIS:  Objection to form.
20        THE WITNESS:  The Pain Care Forum didn't
21 take public policy positions, as I've described
22 previously.  It was a forum for individual member
23 organizations to get together once a month and
24 meet and have discussions about pain topics.

Page 239

1 BY MS. AMINOLROAYA:
2    Q   Did they prepare recommendations for
3 their membership to submit to the FDA?
4    A   Who is "they"?
5    Q   The Pain Care Forum.
6    A   The Pain Care Forum is made up of
7 members.  They didn't take public policy positions
8 as a whole, that I'm aware of.
9    Q   Did they tell their membership what to
10 say to the FDA?
11        MR. DAVIS:  Objection to form.
12        THE WITNESS:  Did who tell?
13 BY MS. AMINOLROAYA:
14    Q   Did the Pain Care Forum tell their
15 members what to say to the FDA about the REMS?
16    A   Well, the Pain Care Forum didn't take
17 positions on issues, so they couldn't have --
18 very well have told the membership what their
19 positions were because they didn't take positions
20 to my knowledge.
21    Q   We're marking Exhibit 32.  It's
22 ENDO-OPIOID_MDL-02293305.  It's E-numbered E1632.
23        (Munroe Exhibit No. 32 was marked
24        for identification.)

Page 240

1 BY MS. AMINOLROAYA:
2    Q   Is this an e-mail from Will Rowe to
3 you and other members of the Pain Care Forum on
4 May 2nd, 2010?
5    A   Yes, it looks like a nine-year-old
6 e-mail to about, I don't know, a hundred people.
7    Q   And that's about the size of the Pain
8 Care Forum, or is it larger?
9    A   That would have been a rough estimate
10 that I would make.
11    Q   Okay.  So it's not surprising that Will
12 Rowe is sending an e-mail to about a hundred
13 people if he's e-mailing the Pain Care Forum,
14 right?
15    A   Right.
16    Q   And what is Mr. Rowe attaching here?
17    A   I don't recall this nine-year-old
18 document that was sent to a hundred people, but it
19 looks like -- I don't know what this is.
20        I do know that in the first sentence, he
21 says: "I want to alert members of the Pain Care
22 Forum and the REMS task force about another
23 opportunity to voice opinions about the REMS
24 process in addition to the open FDA docket on

Page 241

1 REMS."
2        So, he's inviting members of the Pain
3 Care Forum to voice their opinions.
4    Q   Right.  And he's not inviting them to
5 free form their opinions.  He's attaching
6 recommendations provided by the Pain Care Forum.
7    A   You will have to ask Mr. Rowe what his
8 intentions and motivations are.  I can't speak for
9 him.
10    Q   Well, let's -- let's take a look at
11 page 4 of the document.  What is the title of this
12 document that's been attached here?
13    A   Would you like me to read it?
14    Q   Sure.
15    A   "Recommendations to be considered in
16 preparing a submission to the FDA REMS open
17 docket, Docket No. FDA-2009-N-0143."
18    Q   And at this time was FDA accepting
19 responses on a docket in -- as to what a REMS
20 should look like?
21    A   I -- I actually --
22        MR. DAVIS:  Objection to form.
23        THE WITNESS:  I actually don't know.
24 Bob Barto, our head of regulatory affairs, would

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 be in a position to answer your question, though,
2 probably, because this was his area of
3 responsibility for the company.
4 BY MS. AMINOLROAYA:
5    Q  We definitely heard that from other Endo
6 employees that nothing was their responsibility.
7       So looking at the bottom of page 1,
8 isn't Mr. Rowe here attaching a menu of
9 recommended comments that the membership can use
10 in providing -- in making their response to FDA
11 about the opioid REMS?
12       MR. DAVIS:  Objection to the unnecessary
13 colloquy before the actual question.
14       THE WITNESS:  You read most of that
15 sentence correctly.
16 BY MS. AMINOLROAYA:
17    Q  Would you agree that these are
18 recommendations the Pain Care Forum has provided
19 as to what the members --
20    A  I don't know what these documents are.
21       MR. DAVIS:  Let her finish the question.
22 BY MS. AMINOLROAYA:
23    Q  Do you dispute that these are
24 recommendations that the Pain Care Forum is

Page 243

1 providing to its membership on what it should say
2 to FDA about the opioid REMS?
3       MR. DAVIS:  Objection to form.
4       THE WITNESS:  I have no recollection of
5 this nine-year-old e-mail sent to a hundred
6 people.
7 BY MS. AMINOLROAYA:
8    Q  Do you agree that Mr. Rowe says here:
9 "I have attached a copy of the menu of recommended
10 comments which was previously shared with our
11 membership for use in preparing your comments"?
12    A  Where are you reading from, please?
13    Q  At the very bottom of the page, the last
14 full paragraph.
15    A  And could you state the question again,
16 please?
17    Q  Yes.  Is Mr. Rowe telling the PCF
18 membership here that he's attaching -- attaching a
19 menu of recommended comments that can be used to
20 prepare their submissions to FDA on the opioid
21 REMS?
22    A  You read that correctly.
23    Q  Do you see Mr. Rowe's comment at the
24 bottom here, "If we're not at the table, we're on

Page 244

1 the menu"?
2    A  Yes.
3    Q  Is that a reference to the future of
4 opioid drugs?
5       MR. DAVIS:  Objection to form.
6       THE WITNESS:  You would have to ask
7 Mr. Rowe.
8 BY MS. AMINOLROAYA:
9    Q  And do you see the names of -- of Pain
10 Care Forum members at different manufacturers who
11 sell opioids on this e-mail?
12    A  I actually -- I actually don't recognize
13 a lot of these names.  It's -- this is, what, a
14 nine-year-old e-mail?  Yeah, I -- I recognize some
15 of the names but not all of the names.
16    Q  Do you see Burt Rosen's name on the
17 e-mail?
18    A  Well, let me see.  I'll have to look
19 through it.
20    Q  It's next to yours, if you have spotted
21 your name.
22    A  I haven't spotted my name.  Let me see
23 here.
24       I can tell you it's in the third line

Page 245

1 from the top.
2    A  Third line.  That's helpful.  Thank you.
3 I do see Burt Rosen's name.
4    Q  And was Mr. Rosen at Purdue, which sells
5 OxyContin?
6       MR. NOVY:  Objection to form.
7       THE WITNESS:  I'm not an employee at
8 Purdue, so I don't -- I don't know about the dates
9 of when he joined Purdue.  So I don't want to
10 speak to those issues.
11 BY MS. AMINOLROAYA:
12    Q  You're not aware that Purdue has sold
13 OxyContin?
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  I -- I am aware that that
16 is a Purdue product.
17 BY MS. AMINOLROAYA:
18    Q  Thank you.
19       And how about Susan Nichol, do you know
20 who she is?
21    A  No, that name doesn't -- I don't recall
22 knowing that name.
23    Q  And how about Kimberly France at
24 Covidien, is that a familiar name?

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    A    No, that's not a familiar name.

2    Q    Do you know if Covidien sells opioids?

3    A    You told me earlier in the deposition

4  that they did.

5    Q    Independent of that, do you know whether

6  they sell opioids?

7    A    No.

8       MS. AMINOLROAYA:  1752.

9  BY MS. AMINOLROAYA:

10   Q    And Endo believed that it had defeated

11 certain of the FDA's proposed measures for REMS.

12 Do you recall that?

13      MR. DAVIS:  Objection to form.

14      THE WITNESS:  I was not involved in the

15 FDA REMS discussions in a detailed and substantive

16 way.  You would have to ask Bob Barto, who was our

17 head of regulatory affairs, who was very involved.

18 BY MS. AMINOLROAYA:

19   Q    Do you recall having discussions about

20 the scope of the FDA REMS with your colleagues?

21   A    I -- I recall having discussions on the

22 topic of FDA REMS, but I don't recall any of the

23 details because it was outside the scope of my

24 responsibilities at Endo.

Page 247

1    Q    And what do you recall about your

2  discussions on the topic of the FDA REMS?

3    A    I only recall that -- that we had

4  discussions.  I recall discussions involving the

5  importance of physician education and

6  appropriate opioid prescribing.  But that's the

7  only thing I recall about this topic.

8    Q    Do you recall telling your colleagues

9  that you were able to influence the position that

10 FDA took on the REMS?

11   A    I don't recall that.

12      (Munroe Exhibit No. 33 was marked

13        for identification.)

14 BY MS. AMINOLROAYA:

15   Q    I'm handing you what's been marked as

16 Exhibit 33.  It's ENDO-OPIOID_MDL-02297404.  It's

17 number -- E-numbered 1752.

18      And is this an e-mail from Elizabeth

19 Bush to you on October 31, 2011 -- I'm sorry,

20 yeah, October 31, 2011?

21   A    It looks to be.  I have no recollection

22 of it, but it looks to be.

23   Q    And was defeating certain aspects of the

24 REMS a high priority issue for Endo?

Page 248

1       MR. DAVIS:  Objection to form.

2       THE WITNESS:  I think the opioid REMS

3  process was an important matter of public policy

4  for the company.

5  BY MS. AMINOLROAYA:

6    Q    And was defeating certain aspects of the

7  REMS a high priority issue for Endo?

8    A    You --

9       MR. DAVIS:  Objection to form.

10      THE WITNESS:  You would have to ask Bob

11 Barto, who was our head of regulatory affairs, and

12 whose job it was to involve himself in -- in those

13 kind of issues.

14 BY MS. AMINOLROAYA:

15   Q    And is attached to this e-mail, is there

16 a slide deck entitled "Political Action Committees

17 (Endo PAC), Government Affairs and Public Policy

18 Activities"?

19   A    That -- that's what this looks to be.  I

20 don't recall this document, but that's what the

21 title page looks like.

22   Q    And is one of the high priority issues

23 that's mentioned on page 4 of the document "Risk

24 Evaluation and Mitigation Strategies (REMS):

Page 249

1  Defeated Patient Registry"?

2    A    You read that correctly.

3    Q    Was this a high priority issue for Endo,

4  defeating the patient registry component of the

5  REMS?

6       MR. DAVIS:  Objection to form.

7       THE WITNESS:  I just don't recall.

8  BY MS. AMINOLROAYA:

9    Q    And do you know why this issue is

10 included in -- in a slide deck regarding political

11 action committees and government affairs and

12 public policy activities?

13      MR. DAVIS:  Objection to form.

14      THE WITNESS:  No, I don't.

15      MS. AMINOLROAYA:  I'm marking as

16 Exhibit 34 END00077888.  It's E-numbered 1450.

17      (Munroe Exhibit No. 34 was marked

18        for identification.)

19 BY MS. AMINOLROAYA:

20   Q    And is this an e-mail from you to Bob

21 Barto on April 28th, 2009?

22   A    It -- it appears to be that.

23   Q    And did the Pain Care Forum have a

24 strategy to influence the direction of the REMS?

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1     MR. DAVIS:  Objection to form.
2     THE WITNESS:  Well, the Pain Care Forum
3  would create task forces on public policy issues
4  in which individual members of the Pain Care Forum
5  were free to join or not join.
6     And so this is referring to a task force
7  on REMS that the Pain Care Forum created, although
8  this is a ten-year-old e-mail that went to, again,
9  about a hundred people, and my action item was to
10  forward it to Bob Barto, who I've said repeatedly
11  it was his job to manage this issue.
12  BY MS. AMINOLROAYA:
13     Q   Were you aware that the Pain Care Forum
14  drafted recommendations on the REMS?
15     A   I don't -- I don't recall anything about
16  draft recommendations on REMS.
17     Q   If you turn to page 3 of the document,
18  is Mr. Rowe there thanking participants of the
19  Pain Care Forum for participating in the REMS
20  recommendation process?
21     MR. DAVIS:  Objection to form.
22     THE WITNESS:  It appears that he is
23  thanking them.
24  BY MS. AMINOLROAYA:

Page 251

1     Q   And did you keep -- did you keep
2  yourself informed as to the efforts to influence
3  the REMS?
4     MR. DAVIS:  Objection to form.
5     THE WITNESS:  I don't recall.
6  BY MS. AMINOLROAYA:
7     Q   And do you recall there being a
8  sustained effort with the Pain Care Forum to
9  defeat the FDA's suggested patient registry
10  component of the REMS?
11     A   No.
12     Q   Do you recall that this would have had
13  greatly reduced Endo's market -- or strike that.
14     Do you recall that a patient registry in
15  the REMS would have greatly reduced Endo's market?
16     MR. DAVIS:  Objection to form.
17     THE WITNESS:  I -- I don't recall this
18  subject.
19  BY MS. AMINOLROAYA:
20     Q   And do you recall that the REMS was
21  passed without a patient registry or the REMS was
22  implemented or finalized without a patient
23  registry?
24     A   I don't remember the details of what

Page 252

1  ended up in the final REMS.
2     Q   And do you recall that you -- you
3  believed that the physician -- physician training
4  component of the REMS would fail?
5     MR. DAVIS:  Objection to form.
6     THE WITNESS:  I don't recall the details
7  of -- of the REMS issue.  Bob Barto would have
8  been, you know, the lead at our company on these
9  issues.  I undoubtedly had views, but it would
10  have been Bob's job to -- to manage this issue.
11     MS. AMINOLROAYA:  I'm marking as
12  Exhibit 35 EPI001080837.
13     (Munroe Exhibit No. 35 was marked
14     for identification.)
15  BY MS. AMINOLROAYA:
16     Q   Is this an e-mail from you to Timothy
17  Byrne on April 26, 2012?
18     A   That's -- that looks right.
19     Q   And who is Mr. Byrne?
20     A   He was the head of Public Policy at
21  Endo.
22     Q   And was he someone in your department or
23  in a different department?
24     A   He was in -- my department.  He

Page 253

1  reported to me.
2     Q   Do you recall that 2012 was the year
3  that the opioid classwide REMS was implemented by
4  FDA?
5     A   I don't recall that.
6     Q   I'll represent to you that -- that that
7  was the year when FDA implemented the opioid
8  classwide REMS.
9     And do you see your statement there:  "I
10  think we heavily influenced the REMS process again
11  for a sustained effort with the Pain Care Forum"?
12     Did I read that correctly?
13     A   You did.
14     Q   And so at this time you had been keeping
15  yourself informed as to what was going on at the
16  Pain Care Forum with respect to the REMS.
17     MR. DAVIS:  Objection to form.
18     THE WITNESS:  Yeah, I don't recall
19  writing this e-mail.  When was this?  This is only
20  seven years old, but I still don't recall.  But --
21  but it does describe my thinking at the time.
22  BY MS. AMINOLROAYA:
23     Q   So you -- your thinking at the time was
24  that you heavily influenced the REMS process

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 through a sustained effort with the Pain Care
2 Forum?
3        MR. DAVIS: Objection to form.
4        THE WITNESS: I'm unclear about what I
5 mean by the term "we."
6 BY MS. AMINOLROAYA:
7    Q    Other than the "we," was your thinking
8 at the time that the REMS process was heavily
9 influenced through a sustained effort with the
10 Pain Care Forum?
11        MR. DAVIS: Objection to form.
12        THE WITNESS: That -- that's what those
13 words say.
14 BY MS. AMINOLROAYA:
15    Q    And this was your thinking in 2012.
16        MR. DAVIS: Objection to form.
17        THE WITNESS: I don't remember this
18 e-mail, but what I said was: "I think we heavily
19 influenced the REMS process." And I don't know
20 who to attribute "we" to because I don't remember
21 the details of this e-mail.
22 BY MS. AMINOLROAYA:
23    Q    Regardless of who the "we" is here --
24    A    Right.

Page 255

1    Q    -- you'd agree that you were saying that
2 that influence occurred through a sustained effort
3 with the Pain Care Forum.
4        MR. DAVIS: Objection to form.
5        THE WITNESS: You read that correctly.
6 BY MS. AMINOLROAYA:
7    Q    Any reason to believe that's not what
8 you wrote in this e-mail?
9    A    I just don't recall the specifics of
10 this e-mail.
11    Q    And we did just look at a process over
12 the past few exhibits of recommendations that were
13 issued by the Pain Care Forum and interactions
14 that Endo had with the Pain Care Forum.
15    A    I do recall the discussions that we had
16 in the company at the time that this was an
17 important public policy matter. But it was really
18 driven by Bob Barto, who was head of our
19 regulatory affairs.
20    Q    Well, you seem to be fairly close to the
21 issue in this e-mail. You say "I think."
22        MR. DAVIS: Objection to form.
23        THE WITNESS: Yeah, I do say "I think."
24 BY MS. AMINOLROAYA:

Page 256

1    Q    And these efforts through the Pain Care
2 Forum resulted in the classwide REMS not having an
3 Accutane-like patient registry. Correct?
4        MR. DAVIS: Objection to form.
5        THE WITNESS: I think the FDA made their
6 own independent judgment of -- of what was the
7 best way to conduct physician training, and they
8 came out with a program. And I think they
9 received input from a lot of stakeholders.
10 BY MS. AMINOLROAYA:
11    Q    But in this e-mail you're saying that
12 you influenced the REMS. You're not referring to
13 an independent process undertaken by the FDA;
14 you're referring to influence by the Pain Care
15 Forum.
16        MR. DAVIS: Objection to form.
17        THE WITNESS: I'm questioning who I am
18 attributing the influence from, because I don't
19 recall who I'm referring to with the term "we."
20 BY MS. AMINOLROAYA:
21    Q    Understood. Regardless of who the "we"
22 is here, the influence occurred through the Pain
23 Care Forum, according to your writing in this
24 e-mail.

Page 257

1    A    I -- I disagree with that
2 characterization.
3    Q    And a patient registry, according to
4 you -- your comments here, would have increased
5 your costs and greatly reduced your market by
6 80 percent.
7        MR. DAVIS: Objection to form.
8        THE WITNESS: That's what this says.
9 BY MS. AMINOLROAYA:
10    Q    So a patient registry would not have
11 been good for Endo's business.
12        MR. DAVIS: Objection to form.
13        THE WITNESS: The details of the REMS
14 issue, I cannot recall. They were really the
15 purview of Bob Barto, who was the head of
16 regulatory affairs at Endo. So I'm reluctant to
17 get into details about the REMS policy issues
18 because I just wasn't that involved.
19 BY MS. AMINOLROAYA:
20    Q    But here you don't mention Mr. Barto at
21 all. You don't say, We should talk to Mr. Barto
22 to find out what the effect of a patient registry
23 would have had. You affirmatively state that: "A
24 patient registry would have increased our costs

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1 greatly and reduced our market by 80 percent."
2       MR. DAVIS: Objection to form.
3       THE WITNESS: I can't speak to this
4 e-mail -- this back and forth e-mail with one of
5 my subordinates on a seven-year-old e-mail that I
6 have no recollection about.
7       I can tell you that on detailed REMS
8 policy issues, those decisions and actions that
9 the company took were driven by Bob Barto.
10      MS. AMINOLROAYA: Move to strike as
11 nonresponsive.
12 BY MS. AMINOLROAYA:
13      Q   And as part of your work on the REMS,
14 you also talked a senator out of a potential
15 amendment that would have also implemented REMS
16 requirements.
17      MR. DAVIS: Objection to form.
18      THE WITNESS: I have no recollection of
19 that activity.
20 BY MS. AMINOLROAYA:
21      Q   You state here towards the end of the
22 paragraph: "As part of the Casey amendment on
23 PDUFA, we talked Casey out of making new onerous
24 REMS requirements (their first idea!)."

Page 259

1       Did you write that in this e-mail?
2       A   I did.
3       Q   Who is Senator Casey?
4       A   Senator Casey was the senior senator
5 from our home state of Pennsylvania.
6       Q   Is Senator Casey a senator who you
7 lobbied?
8       A   Yes.
9       Q   And you lobbied him out of an amendment
10 that would have proposed more onerous REMS
11 requirements, right?
12      MR. DAVIS: Objection to form.
13      THE WITNESS: I actually don't recall
14 that lobbying effort, although it is described
15 here.
16 BY MS. AMINOLROAYA:
17      Q   You actually wrote about this lobbying
18 on more than one occasion.
19      (Munroe Exhibit No. 36 was marked
20      for identification.)
21 BY MS. AMINOLROAYA:
22      Q   I'm handing you Exhibit 36. This is
23 EPI002377845. E-numbered 1968.
24      And is the middle e-mail here an e-mail

Page 260

1 from you to David Holveck and colleagues, dated
2 April 17, 2012?
3       A   Yes, I'm seeing that.
4       Q   And is -- is the e-mail regarding an
5 EPPC Update, Senator Casey, prescription drug
6 abuse meeting?
7       A   I don't recall this specific lobbying
8 effort, and I'm not surprised in that I lobbied
9 many, many issues over a long career at Endo, and
10 I would involve, as I described previously,
11 subject matter experts.
12      So, as you can see from this e-mail,
13 that again I don't remember any of the details of
14 this project, but I brought Tara Chapman with me
15 from our regulatory affairs department because, as
16 I've stated several times, the regulatory affairs
17 group was -- was principally responsible for
18 managing the REMS issue.
19      So it doesn't surprise me that, one, I
20 don't remember a particular lobbying issue because
21 I lobbied on many issues, and it doesn't surprise
22 me that Tara Chapman was with me, who would have
23 presented our case to Senator Casey.
24      Q   I withdraw the question.

Page 261

1       My question is, is the e-mail regarding
2 an EPPC update, Senator Casey, prescription drug
3 abuse meeting?
4       A   Yes.
5       Q   Thank you.
6       And what is the EPPC?
7       A   Endo -- actually -- Endo Public Policy
8 Committee or Executive Public Policy Committee.
9 One of those two.
10      Q   And who maintained a relationship with
11 Senator Casey? Was it you?
12      MR. DAVIS: Objection to form.
13      THE WITNESS: It was me, and it was our
14 contract lobbying firms.
15 BY MS. AMINOLROAYA:
16      Q   And who are your contract lobbying
17 firms?
18      A   Over -- they were different firms at
19 different times while I was at Endo, but they
20 included Venable, the Capitol Hill Consulting
21 Group, Foley & Lardner, and the Gibson Group.
22      Q   And what did these lobbying groups do
23 for Endo?
24      A   They helped arrange meetings with

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1 members of Congress and staff for Endo government
2 affairs, principally.
3      Q    And would they have helped you arrange a
4 meeting with Senator Casey, or would you have done
5 that directly?
6           MR. DAVIS:  Objection to form.
7           THE WITNESS:  I don't recall.
8 BY MS. AMINOLROAYA:
9      Q    And did you have a close relationship
10 with Senator Casey?
11          MR. DAVIS:  Objection to form.
12          THE WITNESS:  Not particularly.
13 BY MS. AMINOLROAYA:
14     Q    If you take a look at this e-mail, the
15 second sentence here, you write to your
16 colleagues -- well, before we read the e-mail, who
17 is Mr. Holveck?
18     A    Dave Holveck was the CEO of Endo.
19     Q    And Caroline Manogue, is she your
20 supervisor?
21     A    She was at one point my supervisor and
22 the general counsel.
23     Q    And Brian Lortie?
24     A    The head of commercial for branded

Page 263

1 pharma.
2      Q    So you're writing to senior Endo
3 employees --
4           MR. DAVIS:  Objection to form.
5 BY MS. AMINOLROAYA:
6      Q    -- here?
7      A    Yes.
8      Q    And the second sentence here, you write:
9 "Because of our close relationship with this
10 office, we are on the inside of this process and
11 are considered key advisors on this project."
12          Does this refresh your recollection as
13 to whether you had a close relationship with
14 Senator Casey?
15     A    Not particularly.  There's nothing like
16 time to give one perspective and to understand,
17 you know, what is a real close relationship and
18 what isn't.  So I'm answering truthfully now in
19 what I believe to be the case in my tenure at Endo
20 that we did have a relationship with the office,
21 but I would not characterize it as particularly
22 close, despite what's -- what's written here in
23 the document.
24     Q    And you would agree, in this e-mail you

Page 264

1 characterized it as close?
2      A    Yes, you're reading that correctly.
3      Q    And this is not -- and this is an e-mail
4 you wrote.
5      A    Yes.
6      Q    And one of the things that you were
7 meeting with Senator Casey about was that you did
8 not need additional REMS.
9      A    I don't remember the details of what we
10 were lobbying in this issue.  And as you can see,
11 with Tara Chapman being with me, I would have let
12 her handle the details, the substance.
13     Q    But you refer to this -- just a week
14 later, you tell Mr. Byrne in your -- in your
15 department that you talked Senator Casey out of
16 making the new onerous REMS requirement.
17     A    In what document do I say that?
18     Q    Take a look at -- we just marked it,
19 it's E1753.
20     A    Yeah, I just don't recall lobbying this
21 issue with Senator Casey.
22     Q    Would you have written something that
23 was not accurate in an e-mail?
24          MR. DAVIS:  Objection to form.

Page 265

1           THE WITNESS:  I don't know.  I would --
2 I would certainly hope to not ever put anything
3 inaccurate in an e-mail or any communication that
4 I made during my tenure at Endo.  But I can't
5 commit that I ever said anything that was -- that
6 was inaccurate.
7 BY MS. AMINOLROAYA:
8      Q    But no reason to believe this is
9 inaccurate.
10     A    No reason to believe.
11     Q    Yeah, thank you.
12          And the eventual REMS that was
13 implemented in 2012 by FDA, you believed this
14 would fail.
15          MR. DAVIS:  Objection to form.
16          THE WITNESS:  I believed that the
17 voluntary nature of the physician education
18 program was problematic.
19 BY MS. AMINOLROAYA:
20     Q    And did Endo do anything to require a
21 mandatory physician training?
22          MR. DAVIS:  Objection to form.
23          THE WITNESS:  We talked about supporting
24 an effort on Capitol Hill that would tie the DEA

Highly Confidential – Subject to Further Confidentiality Review

Page 266

1 licensing registration process to certifying
2 physicians for opioid prescribing, and we thought
3 that this mandatory requirement was a thoughtful,
4 efficient way to move forward.
5      If there were other efforts at physician
6 training -- if there were other efforts at the
7 company involving physician training for opioids,
8 they would have been in the department of Neil
9 Shusterman. So I think the company was -- was
10 focused on appropriate physician education and
11 training and it was a priority, but it was not my
12 department.
13 BY MS. AMINOLROAYA:
14     Q   That wasn't something mandatory --
15 physician training was not something that you
16 pursued as part of your responsibilities at Endo.
17      MR. DAVIS: Objection to form.
18      THE WITNESS: Well, I pursued it
19 inasmuch as I did have conversations on Capitol
20 Hill that I recall about the need for a DEA --
21 tying the physician training to a DEA licensing
22 registration process. I do recall that, because I
23 thought that would be an important way to ensure
24 physician training. Such a training would be

Page 267

1 mandatory. And I just -- so -- so that's one
2 example.
3 BY MS. AMINOLROAYA:
4     Q   But you -- it wasn't something that you
5 talked Senator Casey into.
6      MR. DAVIS: Objection to form.
7      THE WITNESS: Yeah, I don't recall if I
8 had this conversation with Senator Casey or his
9 staff.
10      MS. AMINOLROAYA: I'm not sure how long
11 we're going -- we've been going. I'm at a
12 stopping point, but I can move on.
13      MR. DAVIS: No, why don't -- why don't
14 we take a quick break and then finish up after
15 that.
16      THE VIDEOGRAPHER: The time is 4:51 p.m.
17 and we're going off the record.
18      (Recess.)
19      THE VIDEOGRAPHER: The time is 5:13 p.m.
20 and we're back on the record.
21 BY MS. AMINOLROAYA:
22     Q   Welcome back, Mr. Barto. This is the
23 last stretch.
24     A   Mr. Munroe.

Page 268

1     Q   Mr. Munroe. I'm sorry. I don't know
2 why I keep doing that. Welcome back, Mr. Munroe.
3 It's a sign that it's 5:12 and we've been going
4 for six hours.
5      Did -- do you -- did Endo, as part of
6 its government affairs and public policy work,
7 support certain pain measures with respect to
8 veterans?
9      MR. DAVIS: Objection to form.
10      THE WITNESS: I recall that we lobbied
11 one issue on -- on a veterans piece of legislation
12 while I was at Endo.
13 BY MS. AMINOLROAYA:
14     Q   And what was that?
15     A   I don't remember the details of -- but I
16 remember the arguments we were making, which is we
17 wanted to preserve the right of veterans being
18 treated for pain, for physicians to be able to
19 prescribe the right medicines for the appropriate
20 patients at the right time for veterans, and that
21 there was legislation that was introduced and
22 moving forward that would have prevented that. So
23 we worked with the Veterans' Affairs Committee in
24 the House to assure that veterans received

Page 269

1 appropriate pain care treatment.
2     Q   And did you support the Veterans Pain
3 Care Act of 2007?
4     A   I don't know if we supported the overall
5 act. I know that we were involved with the issue
6 as I previously described.
7      MS. AMINOLROAYA: 1747.
8      I'm marking Exhibit 37, which is
9 ENDO-OPIOID_MDL-02807915. It's E1747.
10      (Munroe Exhibit No. 37 was marked
11      for identification.)
12 BY MS. AMINOLROAYA:
13     Q   And is this an e-mail from Burt Rosen to
14 Brian -- to you on October 28, 2007?
15     A   It does appear to be that.
16     Q   And is he forwarding on an e-mail from
17 Tamara Sloan-Anderson?
18     A   Yes. Yeah, he is actually forwarding an
19 e-mail from Pamela Bennett.
20     Q   Yes, thank you.
21      And who's Pamela Bennett?
22     A   Pamela Bennett is a Purdue employee.
23     Q   And what would be a -- does this e-mail
24 refresh your recollection about the law, the

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 Veteran Pain Care Act of 2007?
2    A  It -- it does not. That's a 12-year --
3 this is a 12-year-old e-mail. No.
4    Q  All right. Well --
5    A  I have no recollection of this 12-year-
6 old piece of legislation.
7    Q  The third paragraph from the top here
8 describes what the bill would do. It states that:
9 "It would require the Veterans Administration to
10 establish a pain care initiative at every VA
11 healthcare facility with each utilizing a
12 professionally recognized pain assessment tool or
13 process to ensure that every patient with chronic
14 or acute pain is diagnosed and treated properly."
15     Does that refresh your recollection
16 about Endo's work on this bill?
17    A  No, it doesn't. And -- and I don't
18 believe that -- that we worked on this bill in any
19 substantive way, but I -- I just don't recall.
20    Q  And aside from the -- the law, do you
21 recall that Endo -- Endo's lobbying firm -- Endo,
22 along with its lobbying firm, sponsored veteran
23 events with the American Pain Foundation to
24 promote the use of opioids for chronic pain?

Page 271

1    A  I --
2     MR. DAVIS: Objection to form.
3     THE WITNESS: I actually don't recall
4 that.
5 BY MS. AMINOLROAYA:
6    Q  If you look at page 3 of the document --
7    A  Mm-hmm.
8    Q  -- do you see an invitation to an event,
9 "Freedom From Pain, It's Your Right"?
10    A  I do.
11    Q  And the event was dated October 30th,
12 2007.
13    A  That's correct.
14    Q  And on the next to last page of the
15 document, there's a fact sheet.
16     Do you recall Endo's sponsoring of this
17 event at the American Pain Foundation and the fact
18 sheet?
19    A  I don't.
20     MS. AMINOLROAYA: Get 1987, please.
21     THE WITNESS: This is -- yeah, this is a
22 12-year-old event. I would have no recollection
23 of this.
24     (Munroe Exhibit No. 38 was marked

Page 272

1     for identification.)
2 BY MS. AMINOLROAYA:
3    Q  I'm handing you Exhibit 38. This is
4 CHI000430399.
5     And is this an invoice from the American
6 Pain Foundation dated November 2nd, 2007?
7    A  I'm just reading this --
8    Q  Sure.
9    A  -- document. (Peruses document.)
10 Yeah, I don't recognize this, and I
11 don't recall ever seeing it.
12    Q  If you turn --
13    A  I'm not sure what it is.
14    Q  Okay. If you turn to page 2 of the
15 document -- well, we can start on page 1 actually.
16     Who is William Newbould?
17    A  William Newbould was the head of
18 Communications, I recall, when I first joined the
19 company.
20    Q  And did he -- do you know if he
21 interacted with the American Pain Foundation?
22    A  I don't know if he did or not.
23    Q  And the American Pain Foundation sends
24 this invoice to Endo and thanks them for the

Page 273

1 opportunity to work with Endo in Hyde Park
2 Communications.
3     What is Hyde Park Communications?
4    A  Hyde Park Communications was a boutique
5 consulting communications company. I don't know
6 if they're still in business or not.
7    Q  And the -- the invoice references work
8 on the important issue of pain with populations of
9 military and veterans. Correct?
10    A  You've read that correctly, yes.
11    Q  And is the American Pain Foundation here
12 sending Endo an invoice for $32,000?
13     MR. DAVIS: Objection to form.
14     THE WITNESS: You know, I -- I just
15 don't know about this. I don't know what this is.
16 This is a document that I don't recall ever
17 seeing. And it's a 12-year-old document I don't
18 recall ever seeing.
19 BY MS. AMINOLROAYA:
20    Q  And if you turn to the back here, do you
21 see the back of the document has been signed by
22 someone at Endo?
23    A  Yes, I was actually trying to decipher
24 that signature.

Page 274

1    Q    Mm-hmm.
2    A    Have you been successful in doing that
3 yet?
4    Q    I have not, no.
5    A    Yeah, it's very difficult to make out.
6    Q    But in fact, this is someone for Endo
7 signing on the -- the last page of the document.
8         MR. DAVIS:  Objection to form.
9         THE WITNESS:  I don't know.  I don't
10 know what that signature is.
11 BY MS. AMINOLROAYA:
12    Q    Do you see the words "Authorized
13 signature, Endo Pharmaceuticals" there?
14    A    I do.
15    Q    And is there a signature above that?
16    A    There's some squiggly lines, but it
17 doesn't look very legible.
18    Q    And there's also a signature for the
19 American Pain Foundation?
20    A    Yeah, I see that.
21    Q    And -- and we see a signature there as
22 well.
23    A    Yes.
24    Q    And the payment to Endo includes -- or

Page 275

1 the payment to the American Pain Foundation on
2 page 2, in the middle of the page, you see
3 includes for a -- if we scroll down a little bit
4 more on the screen -- includes fact sheet
5 development.
6    A    Yes, I -- I would say that you read that
7 correctly.
8    Q    And if we turn back to the previous
9 exhibit.  Do you see a fact sheet on the next to
10 last page of the document?
11    A    E1747.6?
12    Q    Yeah -- yes.
13    A    I do see this page.
14    Q    And do you see that this is -- has --
15 it's called a fact sheet on the upper left hand of
16 the page?
17    A    It does say that.
18    Q    And this is -- according to the invoice
19 from the American Pain Foundation, this was
20 something that Endo's support to APF would
21 include.
22         MR. DAVIS:  Objection to form.
23 BY MS. AMINOLROAYA:
24    Q    If we look back at the invoice.

Page 276

1    A    I'm not sure --
2         MR. DAVIS:  Objection to form.
3         THE WITNESS:  -- if it's -- if it's
4 connected to this invoice or not.  If you're
5 speaking about Exhibit 38, I wouldn't have any
6 recollection of if -- if they're connected or not.
7 BY MS. AMINOLROAYA:
8    Q    But you would agree that the American
9 Pain Foundation's budget includes a request for
10 support for fact sheet development.
11    A    You did read that correctly from
12 their -- from Exhibit 38.
13    Q    And it's -- the budget is for an
14 October 30th, 2007 military event.
15    A    That was also read correctly.
16    Q    And -- and the invitation attached here
17 is also for an event to be held on October 30th.
18    A    Let me look at the invitation because I
19 don't recall this 2017 document -- 2007 document,
20 pardon me, a 12-year-old document.
21    Q    If you look at page 3 of the document,
22 you see about the middle of the page, it says
23 "Tuesday, October 30th"?
24    A    Yes.  It does say that.

Page 277

1    Q    And the following page or two pages over
2 is the fact sheet.
3    A    Yeah, I -- I just can't speak to these
4 documents because I have no recollection of -- of
5 this event or -- or the documents you're speaking
6 of.
7    Q    And you started at Endo in 2007?
8    A    I don't remember my exact start date.
9 Sounds right.
10         MS. AMINOLROAYA:  Do we have 1754?
11         I'm marking as Exhibit 9 ENDO-OPIOID --
12 I'm sorry, Exhibit 39, ENDO-OPIOID_MDL-02807881.
13 It's E1754.
14         (Munroe Exhibit No. 39 was marked
15         for identification.)
16 BY MS. AMINOLROAYA:
17    Q    Do you see the first page here, Shanna
18 Duncan of Hyde Park Communications sends you an
19 e-mail on October 24, 2007, regarding an APF
20 briefing?  Do you see that in Exhibit 39?
21    A    Yes, I do see this e-mail from Shanna
22 Duncan.
23    Q    And if you turn over to the next page,
24 do you see a memorandum from Brian Munroe -- so

Page 278

1 this is page 2 of Exhibit 39 -- Peter Lankau
2 regarding "Freedom From Pain, It's Your Right,
3 Veterans Pain Event"?
4    A   I do see it.
5    Q   And who is Peter Lankau?
6    A   Peter Lankau was the CEO for the first,
7 I believe, four months of my tenure at Endo, so
8 this would have been right when I joined the
9 company.
10   Q   So you're writing to the CEO about an
11 event, a veterans pain event here?
12   A   (No response.)
13   Q   And did you tell Mr. Lankau in this
14 memorandum that: "Endo is supporting a panel
15 discussion hosted by the American Pain Foundation
16 focusing on the special importance of pain
17 management to veterans"?
18   A   You read that correctly.
19   Q   And is that what you wrote in this
20 memorandum?
21   A   I don't have any recollection of
22 something that happened on my first days with the
23 company.
24   Q   Do you have any reason to believe you

Page 279

1 didn't write this?
2    A   No.
3    Q   And if you turn back to Exhibit 21. And
4 turn to page 24. We can find the last payment in
5 2007 to the American Pain Foundation.
6        And just to orient us with the document,
7 this is again Endo's response to Senator
8 Grassley's inquiry regarding Endo's support of --
9 of pain groups, and do you see a contribution
10 there for $32,000 in 2007 to the American Pain
11 Foundation?
12   A   I do.
13   Q   And is that the same amount that the
14 American Pain Foundation requested in its invoice
15 to Endo in October of 2007 for --
16   A   It's --
17   Q   -- a military veteran event?
18   A   It is the same amount that's in
19 Exhibit 38, of which I -- I don't recall ever
20 knowing about or seeing.
21   Q   But this is the same event that you're
22 writing to Mr. Lankau about in Exhibit 39,
23 correct?
24   A   I don't know. It was just too long ago

Page 280

1 to tie it all together. I just don't recall.
2    Q   Well, let's look at page 3 of
3 Exhibit 39.
4    A   Okay.
5    Q   And do you see -- I think you might be
6 on page 5.
7    A   Oh, yeah, page 3. I'm sorry.
8    Q   And do you see at the top, it says
9 "Agenda: Freedom From Pain, It's Your Right,
10 October 30th, 2007"?
11   A   Yeah, I -- I do see the page you're
12 referring to.
13   Q   And if you turn over to the next page,
14 "Lunch with panelists APF and veterans at this
15 event," do you see your name listed along with
16 other employees, Brian Munroe, third from the
17 bottom?
18   A   I do.
19   Q   So let's turn back to -- to the
20 invitation to the event.
21   A   And that's exhibit --
22   Q   Mr. Davis has it in his hand right now.
23   A   Okay.
24   Q   And this fact sheet was included in the

Page 281

1 budget -- in the APF invoice that we looked at,
2 correct?
3        MR. DAVIS: Objection to form.
4        THE WITNESS: I don't want to speak to
5 that invoice because I don't recall ever seeing
6 it.
7 BY MS. AMINOLROAYA:
8    Q   And we looked at Endo's response to the
9 Senate Finance Committee and saw that Endo
10 acknowledged a payment to the American Pain
11 Foundation for the same amount, $32,000, correct?
12   A   We -- we did look at that.
13   Q   Mm-hmm. And let's look at two
14 statements on this fact sheet. If you turn to the
15 second to last page of the document, do you see on
16 the right-hand side of the document, it
17 discusses -- it says: "Military Culture: A
18 Barrier to Effective Pain Management"? Do you see
19 that section?
20   A   No, I don't.
21   Q   Our -- our trial tech has highlighted it
22 for us, if that's helpful.
23   A   Oh, it's over here. Okay.
24   Q   And the second full paragraph there

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  before the bullets talks about: "A number of
2  concerns and misconceptions that stand in the way
3  of optimal pain management. These may include
4  fears about," and then dropping to the fourth
5  bullet there it says, "becoming drugged up or
6  addicted to pain medications if they are
7  prescribed."
8       Is this a statement that was included in
9  a fact sheet drafted by the American Pain
10 Foundation?
11     A  You would have to ask them.
12        MR. DAVIS: Objection to form.
13        THE WITNESS: They -- they drafted this
14 and published it. So I would prefer --
15 BY MS. AMINOLROAYA:
16     Q  Any reason to believe that they didn't
17 draft this?
18        MR. DAVIS: Objection to form.
19        THE WITNESS: No. I'm saying that you
20 would have to ask them about this document. This
21 wasn't an Endo document. This was an American
22 Pain Foundation document, as I understand it.
23 BY MS. AMINOLROAYA:
24     Q  Yes, found in Endo's business records.

Page 283

1  And this fact sheet was in the invoice of -- of
2  items that APF was preparing for this veterans
3  event that we just looked at, correct?
4      A  I don't know --
5         MR. DAVIS: Objection to form and
6  everything before the actual question.
7         THE WITNESS: I don't know about the
8  invoice.
9  BY MS. AMINOLROAYA:
10     Q  And separately we looked at Endo's
11 submission to the Senate Finance Committee, which
12 showed a $32,000 payment to the APF, correct?
13     A  Yes.
14     Q  So as a statement on this page, on this
15 fact sheet created by the APF that: "A number of
16 concerns and misconceptions stand in the way of
17 optimal pain management. These may include fears
18 about becoming drugged up or addicted to pain
19 medications if they are prescribed."
20     A  You would have to --
21        MR. DAVIS: Objection to form.
22        THE WITNESS: -- ask the American Pain
23 Foundation.
24 BY MS. AMINOLROAYA:

Page 284

1      Q  Do you dispute that those words appear
2  on this page?
3      A  I don't dispute that.
4      Q  And on the last page of the document, in
5  the column entitled, "Tolerance, Physical
6  Dependence and Addiction, What's the Difference?"
7  If you go to the paragraph --
8      A  I see that.
9      Q  -- the second paragraph in the
10 "Addiction" section, do you see that it states:
11 "Unless someone has a past or current history of
12 substance abuse, the chance of addiction is very
13 low when these medications are prescribed by a
14 doctor and taken as directed"?
15     A  That's what that says.
16     Q  The Endo Senate Finance Committee
17 response indicates that Endo provided funding for
18 this to the American Pain Foundation in 2007.
19        MR. DAVIS: Objection to form.
20        THE WITNESS: The response to the Senate
21 Finance Committee categorizes a wide range of
22 contributions that we made to independent third-
23 party organizations.
24 BY MS. AMINOLROAYA:

Page 285

1      Q  And we see a payment for $32,000, the
2  same amount of the APF invoice in 2007, correct?
3      A  I can't speak to the APF invoice because
4  I just have no recollection of being involved with
5  that invoice or seeing it.
6      Q  And my question was, was the amount of
7  the invoice the same amount that Endo reported to
8  Senator Grassley?
9      A  On one line item, it was.
10     Q  Thank you.
11        All right. We're switching gears here.
12 Do you recall that in 2011, Endo had a problem
13 with respect to DEA quotas for oxymorphone?
14        MR. DAVIS: Objection to form.
15        THE WITNESS: I recall that we had a
16 particular challenge around the DEA quota for
17 oxymorphone related to the launch of Opana ER ADF
18 in which we believed there was a potential to
19 mitigate abuse and misuse of the product.
20 BY MS. AMINOLROAYA:
21     Q  Thank you.
22        And did you enlist the help of lobbyists
23 and the American Pain Foundation to help lobby the
24 DEA for an increased quote of oxymorphone?

Page 286

1    MR. DAVIS:  Objection to form.
2    THE WITNESS:  I don't recall all of the
3 specific steps that I would have taken.
4    (Munroe Exhibit No. 40 was marked
5 for identification.)
6 BY MS. AMINOLROAYA:
7    Q    We've marked Exhibit 40.  This is
8 EPI001179443, and it's E-numbered 1905.
9    And is this an e-mail from you to
10 yourself, blind carbon copying a number of
11 individuals on October 7, 2011?
12    A    It -- it does appear to be that.
13    Q    And are you blind carbon copying
14 individuals with e-mail addresses at the Senate
15 and the House?
16    A    The House, the Senate, and the
17 Administration.
18    Q    Thank you.
19    As well as individuals at Capitol Hill
20 Consulting Group?
21    A    Yes.  Capitol Hill Consulting Group,
22 Venable, the Gibson Group, and Alston & Bird.
23    Q    And what were you telling them in this
24 e-mail?

Page 287

1    A    I'm just reading the e-mail for a
2 moment.  (Peruses document.)
3    We had enlisted members of Congress and
4 the Administration in an effort to increase
5 oxymorphone quota so that we could launch Opana ER
6 ADF at risk, and destroy the product if the FDA
7 didn't approve it, but if the FDA did approve it,
8 it would put us in a position to -- to launch the
9 product in -- and in that event, we assured the
10 DEA we would seek to withdraw the original
11 formulation from the distribution stream.  And so
12 we did this because we believed the new
13 formulation had the potential to mitigate misuse
14 and abuse of the product.
15    Q    And did you communicate your request for
16 additional quota for oxymorphone to the DEA?
17    A    We did.  And I did that with colleagues
18 at Endo who were responsible for -- for dealing
19 with the DEA.
20    Q    And did Endo tell the DEA that Endo's
21 reformulated Opana ER was designed to be crush-
22 resistant?
23    MR. DAVIS:  Objection to form.
24    THE WITNESS:  I don't recall what we

Page 288

1 said exactly at the DEA meeting.  I know the --
2 the intent was to communicate what we believed was
3 the potential for the product to mitigate misuse
4 and abuse of the original formulation.
5 BY MS. AMINOLROAYA:
6    Q    And if you look at the second to last
7 sentence in your e-mail here, are you telling the
8 recipients of this e-mail that you -- that: "The
9 new quota would be designated exclusively for the
10 new product designed to be crush-resistant"?
11    A    Those are the words I used.
12    Q    And this is what you told the DEA?
13    MR. DAVIS:  Objection to form.
14    THE WITNESS:  I don't remember what we
15 told the DEA.  And most of the talking at the DEA
16 meeting was done by our DEA representative, our --
17 the person who handled our DEA matters.
18 BY MS. AMINOLROAYA:
19    Q    Okay.  Turn, please, with me one page
20 over.  And do you see this is a letter to DEA
21 Administrator, Michele M. Leonhart?
22    A    I do.
23    Q    And you see this is a letter that's
24 signed by Brian Lortie on the second page.

Page 289

1    But at the -- at the end of the first
2 paragraph, do you see that Mr. Lortie is telling
3 the DEA Administrator here that the -- the
4 reformulated Opana ER is designed to be
5 crush-resistant?
6    A    I'm trying to find that in the letter.
7 It's right here.  Okay.
8    Q    It's right before the sentence -- the
9 last sentence in the first paragraph.
10    A    He does write that.
11    Q    And you echo this in your comments to
12 the recipients of the e-mail, correct?
13    MR. DAVIS:  Objection to form.
14 BY MS. AMINOLROAYA:
15    Q    You echo this statement that Endo told
16 the DEA that Opana ER was designed to be
17 crush-resistant --
18    MR. DAVIS:  Objection to form.
19 BY MS. AMINOLROAYA:
20    Q    -- in your e-mail to the recipients in
21 the bcc row.
22    A    My comment about crush-resistant was
23 related to designating the approval of new quota
24 for the ADF formulation.

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    Q   And do you know at this time whether
2    Endo had received approval for Opana ER as an ADF
3    formulation?
4    A   No, we had not.
5        MR. DAVIS:  Objection to form.
6        MS. AMINOLROAYA:  1921.
7        (Munroe Exhibit No. 41 was marked
8        for identification.)
9    BY MS. AMINOLROAYA:
10   Q   I'm handing you Exhibit 41, which is
11   EPI001313856.  It's E-numbered 1921.
12       And if you look at the last page of this
13   document, to orient us, the date is January 4th,
14   2011.  And this is from Parinda Jani at FDA to
15   Mr. Barto.  This is approximately ten months
16   before you send Exhibit 40 to various recipients
17   of House and Senate.
18       And let's take a look at page 2 of the
19   document.
20       Actually, sorry, before you do that, or
21   review that, let's look at the beginning of the
22   document to orient -- orient us.  So this is a
23   letter to Mr. Barto.  FDA is telling Mr. Barto
24   that it's looked at Endo's new drug application

Page 291

1    for Revopan, oxymorphone hydrochloride, extended
2    release.
3        Do you know Revopan to refer to Opana ER
4    reformulated?
5    A   I didn't --
6        MR. DAVIS:  Objection to form.
7        THE WITNESS:  I did not know that.
8    BY MS. AMINOLROAYA:
9    Q   Okay.  I'll represent to you that we've
10   seen that in -- in the Endo documents.
11       And if we take a look at the
12   recommendations here of FDA, the last bullet, this
13   has the recommendations of the controlled
14   substance staff at FDA, and do you see there that
15   FDA tells Endo that:  "The product label should
16   not include language asserting that Revopan or
17   Opana ER reformulated provides resistance to
18   crushing because it may provide a false sense of
19   security since the products may be chewed and
20   ground for subsequent abuse"?
21   A   I'm not a formulation scientist, and
22   I've never seen this document before.  So I really
23   can't speak to it.
24   Q   Were you aware that in beginning of

Page 292

1    2011, FDA told Endo that it should not -- the
2    product label for Opana ER should not state that
3    the drug provides resistance to crushing?
4        MR. DAVIS:  Objection to form.
5        THE WITNESS:  I was not privy to ongoing
6    conversations between the FDA and the company, at
7    any company I've worked for.  My role in
8    government affairs was to represent the company's
9    interests before elected and appointed officials.
10   BY MS. AMINOLROAYA:
11   Q   So no one told you about this letter
12   from FDA?
13       MR. DAVIS:  Objection to form.
14       THE WITNESS:  I don't recall ever seeing
15   this letter.
16   BY MS. AMINOLROAYA:
17   Q   No one told you that FDA told Endo that
18   its request for Opana ER to be approved as an
19   abuse-deterrent formulation had been denied?
20       MR. DAVIS:  Objection to form,
21   mischaracterizes the document.
22       THE WITNESS:  I had many, many
23   conversations with Endo executives about Opana ER,
24   the details of which totally escape me.  I have no

Page 293

1    recollection of the details of those
2    conversations.  I can tell you that I am not a
3    formulation scientist --
4    BY MS. AMINOLROAYA:
5    Q   Mm-hmm.
6    A   -- or an FDA expert, and that I've
7    never -- I don't recall ever seeing this document.
8    Q   So when you were speaking to senators,
9    the DEA, you -- regarding the new formulation that
10   Endo was coming up -- the new Opana ER formulation
11   that Endo was seeking to launch, did you inform
12   yourself about the drug from anyone at the
13   company?
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  It wasn't necessary for me
16   to do that because I had subject matter experts
17   with me.
18   BY MS. AMINOLROAYA:
19   Q   And your subject matter experts were
20   telling DEA, even after FDA told the company that
21   it should not say that the drug is resistant to
22   crushing, your subject matter experts were telling
23   members of Congress, DEA officials, that the drug
24   was designed to be crush-resistant.

Page 294

1    MR. DAVIS:  Objection to form.
2  BY MS. AMINOLROAYA:
3    Q   Is that correct?
4    A   You'll have to ask them.
5    Q   Well, we just looked at a document from
6  Mr. Lortie where he tells the DEA Administrator
7  that the drug is designed to be crush-resistant,
8  correct?
9    MR. DAVIS:  Objection to form.
10   THE WITNESS:  Again, questions about
11 what -- what Brian Lortie wrote or -- or what he
12 said or what he knew, I would implore you to ask
13 him.
14 BY MS. AMINOLROAYA:
15   Q   Now, you echoed this description of
16 Opana ER reformulated in your e-mail to senators.
17   MR. DAVIS:  Objection to form.
18   THE WITNESS:  What was the question?
19 BY MS. AMINOLROAYA:
20   Q   I said, did you echo the description of
21 Opana ER reformulated as designed to be crush-
22 resistant in your e-mail?
23   A   We believed Opana ER ADF had the
24 potential to mitigate misuse and abuse, which is

Page 295

1  why we were bringing the product forward.
2    MS. AMINOLROAYA:  Move to strike as
3  nonresponsive.
4  BY MS. AMINOLROAYA:
5    Q   Did you echo the description of Opana ER
6  reformulated as designed to be crush-resistant in
7  your e-mail to members of the Senate, House and
8  the Executive Branch?
9    MR. DAVIS:  Objection to form.
10   THE WITNESS:  We believed that Opana ER
11 ADF had the potential to mitigate misuse and
12 abuse, which was why we were bringing that product
13 forward.
14 BY MS. AMINOLROAYA:
15   Q   Stick with my question, Mr. Munroe.
16   MS. AMINOLROAYA:  And I'm going to move
17 to strike your last answer as nonresponsive.
18 BY MS. AMINOLROAYA:
19   Q   Did you tell members of government that
20 Opana ER was designed -- Opana ER reformulated was
21 designed to be crush-resistant?
22   MR. DAVIS:  Objection to form.
23   THE WITNESS:  Our view of Opana ER was
24 that it had the potential to mitigate misuse and

Page 296

1  abuse, which is why I was working with members of
2  Congress and the Administration, and -- and
3  petitioning the DEA for additional quota.
4    MS. AMINOLROAYA:  Withdraw the last
5  question.
6    (Munroe Exhibit No. 42 was marked
7    for identification.)
8  BY MS. AMINOLROAYA:
9    Q   We're handing you Exhibit 42.  This is
10 ENDO-CHI-LIT00096310.  It's E1771.
11   And is this a letter from Will Rowe to
12 the American Pain Foundation?  If you turn to the
13 second and third page of the document.
14   A   (Peruses document.)  I don't recall this
15 letter from eight years ago, but I have just read
16 it.
17   Q   Thank you.
18   And does -- is the American Pain
19 Foundation the same group that Endo provided
20 millions of dollars in financial support to?
21   MR. DAVIS:  Objection to form.
22   THE WITNESS:  You'll have to ask the
23 American Pain Foundation about their finances.
24 BY MS. AMINOLROAYA:

Page 297

1    Q   And is that what you told Senator
2  Grassley in your -- Endo's response to his
3  investigation?
4    A   We were very comprehensive in our
5  response to Senator Grassley, and we individually
6  made notation of contributions that we made to
7  independent third-party organizations.  Those are
8  details that we've talked about during this
9  testimony.
10   Q   Yeah, so if that document reflects that
11 Endo provided millions of dollars to the APF, you
12 wouldn't dispute that.
13   A   I don't know the amounts that are in
14 that document.
15   Q   Let's take a look at 287.
16   A   You'd have to get a calculator out.
17   Q   You provided it in a total format, so we
18 actually don't need a calculator.  We just need to
19 look at E287.
20   A   Do you --
21   Q   It's Exhibit 21, if I'm recalling
22 correctly.
23   And if you look at page 25 of the
24 document, do you see that total payments that Endo

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  told Senator Grassley it provided to the American
2  Pain Foundation was $5,941,671.40?
3      A   I'm just looking -- yes, over a 13-year
4  period.
5      Q   Thank you.
6          And turning back to our last exhibit,
7  42.
8      A   Yes.
9      Q   Does Mr. Rowe at the American Pain
10 Foundation write to the DEA, again DEA
11 Administrator Leonhart on October 6, 2011?
12     A   I don't recall this letter, but it -- it
13 appears that that's the case.
14     Q   And is Mr. Rowe lobbying the DEA here,
15 in the last paragraph, does he write:  "Our strong
16 endorsement of these products leads us to support
17 a timely approval of Endo's pharmaceutical
18 application for additional oxymorphone quota to
19 speed the manufacture and delivery of the new
20 tamper-resistant Opana ER"?
21     A   You've read that correctly.
22     Q   And is this ten months after FDA tells
23 Endo that it should not be making this claim about
24 Opana ER reformulated?

Page 299

1          MR. DAVIS:  Objection to form.
2          THE WITNESS:  I don't want to agree with
3  that characterization because I was not involved
4  with the back and forth conversations between the
5  company and FDA, and I'm also not a -- a
6  formulation scientist.
7  BY MS. AMINOLROAYA:
8      Q   But you did tell members of Congress and
9  the Senate, you did describe Opana ER reformulated
10 as designed to be crush-resistant.
11     A   When it --
12         MR. DAVIS:  Objection to form.
13         THE WITNESS:  When it comes to Opana ER,
14 we believed that Opana ER ADF had the potential to
15 mitigate misuse and abuse, which is why we were
16 choosing to bring it forward.
17         MS. AMINOLROAYA:  Withdrawn.
18 BY MS. AMINOLROAYA:
19     Q   Mr. Munroe, if you're not going to
20 answer my question, I'm going to withdraw the
21 question and your testimony is meaningless.
22         (Munroe Exhibit No. 44 was marked
23          for identification.)
24 BY MS. AMINOLROAYA:

Page 300

1      Q   Exhibit 44, EPI001504213, and it's
2  E-numbered 1782.
3          And this an e-mail from you to your
4  colleagues at Endo on December 15th, 2011?
5      A   It appears to be that.
6      Q   And are you attaching a letter from the
7  DEA here?
8      A   I would just like a moment to read the
9  e-mail since it's eight years old.
10         (Peruses document.)
11     Q   And do you know if this message to DEA
12 that Opana ER reformulated was crush-resistant,
13 was that delivered to DEA?
14     A   I recall the interaction with the late
15 John Dingell.  And I -- I recall a meeting with --
16 with Congressman Dingell and talking to him about
17 this issue, but I don't recollect the letter that
18 Congressman Dingell wrote to the DEA.  I do
19 remember in the meeting him committing to writing
20 a letter to the DEA, but I don't recall what was
21 in that letter.
22         This appears to be a response to
23 Congressman Dingell from the FDA, which I have no
24 recollection of -- of reviewing.  But it does say

Page 301

1  that in the -- in the cover e-mail that this was
2  from Congressman Dingell's staff to me forwarding
3  on the letter they received to the FDA -- from the
4  FDA.
5      Q   And in the response to Congressman
6  Dingell's letter on page 4 of the document, did
7  DEA commend Endo for formulating a crush-resistant
8  tablet?
9          MR. DAVIS:  Objection to form.
10         THE WITNESS:  I have no recollection of
11 what's in this letter.  Would you like me to read
12 the letter?
13 BY MS. AMINOLROAYA:
14     Q   No, just if we can highlight the
15 language here, we'll -- it says:  "While DEA
16 commends Endo for formulating a crush-resistant
17 tablet, the drug is abused by oral means.  In
18 other words, the new formulation will prevent
19 insufflation and injection, but it will do nothing
20 to present -- to prevent oral abuse."
21         So did DEA understand somehow that
22 Opana ER was crush-resistant?
23     A   You would have to --
24         MR. DAVIS:  Objection to form.

Page 302

1    THE WITNESS: -- ask the DEA.
2  BY MS. AMINOLROAYA:
3    Q    And this is despite that FDA had told
4  the company months earlier not to market the drug
5  as crush-resistant.
6    MR. DAVIS:  Objection to form.
7  Mischaracterization of the record.
8    THE WITNESS:  That is a total
9  mischaracterization.  These are DEA's words.
10  BY MS. AMINOLROAYA:
11    Q    And somehow Congressman Dingell
12  communicated to DEA that Opana ER, and Mr. Rowe as
13  well, was crush-resistant when FDA had conveyed to
14  Endo that those words were not to be used in the
15  description of Opana ER.
16    MR. DAVIS:  Objection.
17  Mischaracterization of the documents.
18    THE WITNESS:  We believed that Opana ER
19  had the potential to mitigate misuse and abuse,
20  which is why we went forward with our effort to
21  increase oxymorphone quota so that we could
22  transition the product once it was approved by the
23  FDA or destroy the product if it was not approved
24  by the FDA.

Page 303

1    MS. AMINOLROAYA:  Withdraw the question.
2    I have no further questions at this
3  time.
4    THE VIDEOGRAPHER:  Should we go off the
5  record?
6    MR. DAVIS:  Yeah, we can go off.
7    THE VIDEOGRAPHER:  The time is 6:06 p.m.
8  We're going off the record.
9    (Recess.)
10    THE VIDEOGRAPHER:  The time is 6:20 p.m.
11  and we're back on the record.
12    EXAMINATION BY COUNSEL FOR THE
13      TENNESSEE PLAINTIFFS
14  BY MS. HERZFELD:
15    Q    Okay, Mr. Munroe, my name is Tricia
16  Herzfeld.  I'm an attorney representing the
17  plaintiffs in the Tennessee state litigation.
18    Are you familiar with the Tennessee
19  state litigation?
20    A    I'm not.
21    Q    Okay.
22    MS. HERZFELD:  And I'm going to go ahead
23  and put on the record our usual objections.  We
24  don't believe that the defendants have complied

Page 304

1  with document production, the MDL deposition
2  protocol or the protocol that's at issue in the
3  Stalbus or Dunaway matters.
4    MR. DAVIS:  Yeah, same response that we
5  have on the record for all of these, that we
6  disagree.  We believe we've complied with document
7  production requirements and the MDL deposition
8  protocol.
9    MS. HERZFELD:  Okay.  Great.
10  BY MS. HERZFELD:
11    Q    Mr. Munroe, you have two sets of
12  attorneys here today; is that correct?
13    A    No.
14    Q    Okay.  So who is your attorney?
15    A    I'm represented by Arnold & Porter.
16  They're joined by the -- the legal team at Endo
17  and Walter Cohen at Obermayer.
18    Q    Okay.  So what about my question if you
19  have two sets of attorneys was incorrect?
20    A    Oh, I was referring to also the -- the
21  Endo legal team.
22    Q    Okay.  So you have Endo in-house
23  counsel.  Is that correct?
24    A    Yeah, I don't -- I don't know if there

Page 305

1  is a direct representation there.  So -- so maybe
2  it is two.
3    Q    Okay.  And have you signed a
4  representation agreement with Arnold & Porter?
5    A    I have.
6    Q    Okay.  And are you paying Arnold &
7  Porter?
8    A    No.
9    Q    Okay.  And what was the name of your
10  other attorney?
11    A    Walter Cohen.
12    Q    Walter Cohen.  And do you have a
13  representation agreement with Mr. Cohen?
14    A    I do.
15    Q    Okay.  And are you paying Mr. Cohen?
16    A    No.
17    Q    Okay.  Who is paying Mr. Cohen, if you
18  know?
19    A    Endo.
20    Q    Okay.  And when was Mr. Cohen hired, to
21  your knowledge?
22    A    Both firms have been hired in the last
23  few weeks.
24    Q    Okay.  And did you ask for separate

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1 counsel or was it offered to you?
2 MR. DAVIS: Objection to form to the
3 extent that it requires you to divulge
4 conversations you've had with legal counsel.
5 THE WITNESS: I've been advised by my
6 attorney not to answer that question.
7 BY MS. HERZFELD:
8 Q And that's how you took his -- his
9 advice there? He said answer it if you can answer
10 it.
11 So my question is, without divulging
12 attorney-client information, can you answer the
13 question?
14 A No.
15 Q Okay. And so you're relying on the
16 advice of your attorney and refusing to answer the
17 question in this deposition?
18 A Correct.
19 Q Okay. Very good.
20 Okay. And have you taken any medication
21 today that could impact your memory?
22 A No.
23 Q Okay. Have you had any sort of physical
24 injury or physical impairment that could affect

Page 307

1 your memory?
2 MR. DAVIS: I'll just object. These are
3 all preliminary questions that were covered by the
4 MDL plaintiffs counsel. I think our agreement is
5 to non-duplicative questioning. So if we could
6 get to the Tennessee-specific non-duplicative
7 questioning sooner rather than later, I think we'd
8 all appreciate it.
9 BY MS. HERZFELD:
10 Q If you could answer my question, please,
11 sir.
12 A No.

Page 308

8 MR. DAVIS: Again, objection to form.
9 And, Brian --
10 This is a question that is designed
11 purely to harass the witness.
12 If you want to ask him some substantive
13 questions about events in Tennessee that were not
14 covered by the MDL plaintiffs, you're free to do
15 so. We welcome your participation in that. But
16 if you're going to ask questions that are solely
17 designed to harass Mr. Munroe, we're just going to
18 stop.
19 MS. HERZFELD: Okay. And if you could
20 just take down the time right now, Ms. Court
21 Reporter, please.
22 I'm not going to have my two hours of
23 time taken up by your speaking objections.
24 MR. DAVIS: Well, we're not going to

Page 309

1 waste Mr. Munroe's time with questions that are
2 designed to solely harass him. If you have
3 Tennessee-specific questions, we welcome them.
4 Please go ahead. Otherwise, we'll take
5 Mr. Munroe, and we can stop this now.
6 MS. HERZFELD: I will ask my questions.
7 I'll ask my question. You're not going to tell me
8 what questions I can ask and what questions I
9 cannot.
10 MR. DAVIS: Well, you may be -- you may
11 be asking questions of an empty chair if they're
12 not Tennessee specific and they're not unique.
13 MS. HERZFELD: Okay. Great.
14 BY MS. HERZFELD:
15 Q In any event, Mr. Munroe, do you have
16 some problems with your memory?
17 MR. DAVIS: Objection to form.
18 THE WITNESS: I don't.
19 BY MS. HERZFELD:
20 Q Okay. So do you know about the illegal
21 drug market for Opana?
22 MR. DAVIS: Objection to form.
23 THE WITNESS: I'm not an expert in the
24 illegal drug market for Opana.

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1  BY MS. HERZFELD:
2      Q   I didn't ask you if you were an expert
3  in the illegal drug market for Opana.  I asked you
4  if you were aware of the illegal drug market for
5  Opana.
6          Are you aware of the illegal drug market
7  for Opana?
8      A   I am aware that all opioids carry a risk
9  of misuse and abuse.
10     Q   Okay.  But my question was, are you
11 aware of the illegal drug market for Opana?
12         MR. DAVIS:  Objection to form.
13         THE WITNESS:  I am aware of the risks
14 that all opioids carry for misuse and abuse.
15         MS. HERZFELD:  And that was
16 nonresponsive to my question.
17 BY MS. HERZFELD:
18     Q   Do you know that Opana is sold on the
19 street in the black market?
20         MR. DAVIS:  Objection to form.
21         THE WITNESS:  I do understand that all
22 opioids carry a risk of misuse and abuse.
23 BY MS. HERZFELD:
24     Q   Okay.  So you've now given me the same

Page 311

1  answer three different times and none of them have
2  answered my question.
3          Are you aware that Opana is sold on the
4  black market?
5          MR. DAVIS:  Objection to form, and asked
6  and answered.
7          THE WITNESS:  I am aware that all
8  opioids carry a risk of misuse and abuse.
9  BY MS. HERZFELD:
10     Q   Are you aware that any opioids are sold
11 on the black market?
12         MR. DAVIS:  Objection to form.
13 Foundation.
14         THE WITNESS:  I am aware that all
15 opioids carry a risk of misuse and abuse.
16         MS. HERZFELD:  Okay.  We're going to
17 stop right now.  Is he going to answer the
18 questions today or is he going to continue just
19 saying the same thing over and over again?
20         MR. DAVIS:  He's going to answer your
21 questions.  Just because you don't like his answer
22 doesn't mean he's not answering them.  And
23 frankly, you could lay maybe just a touch of
24 foundation for any of these questions.

Page 312

1          MS. HERZFELD:  And your speaking
2  objections are completely inappropriate.
3          MR. DAVIS:  You just asked me a
4  question.
5          MS. HERZFELD:  Under the MDL protocol,
6  you are allowed to object to the form, and that is
7  it.
8          MR. DAVIS:  I'm -- you asked me a direct
9  question, and I'm answering it.
10         MS. HERZFELD:  I'm going to make my
11 record right now.  If we don't get answers from
12 this witness today, we will be going straight to
13 the judge to be asking to re-depose him.
14         Now, I at this point have agreed --
15         MR. DAVIS:  If you want --
16         MS. HERZFELD:  -- to do two hours of
17 questioning in order to see if we can keep the
18 burden of this witness to a minimum.  However, if
19 we're going to sit here for two hours, and he
20 can't answer a basic question, we're just going to
21 go to the judge.
22         MR. DAVIS:  You're not asking him
23 questions for Tennessee.  You're not asking
24 questions for which you've laid a foundation.

Page 313

1  You've only -- you've asked him again --
2          MS. HERZFELD:  Will you please mark this
3  down for my time.
4          MR. DAVIS:  -- by asking questions to
5  purely harass him.
6          MS. HERZFELD:  I would like to reclaim
7  my time at the end.
8          MR. DAVIS:  And, frankly, if you want to
9  take this record to a state court judge in
10 Northern Virginia, we can do that, but we --
11         MS. HERZFELD:  No, I'll take --
12         MR. DAVIS:  -- we welcome -- we welcome
13 your participation with respect to questions
14 related to Tennessee.
15         MS. HERZFELD:  Okay.  I want to go --
16         MR. DAVIS:  I'm happy to have the
17 witness answer that.
18         MS. HERZFELD:  I want to reclaim my time
19 from this ridiculous speaking objection, please.
20 BY MS. HERZFELD:
21     Q   Now, you're aware that Opana is sold on
22 the black market; is that correct?
23         MR. DAVIS:  Objection to form,
24 foundation.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1        MS. HERZFELD: No speaking objections.
2  Object to form is what the MDL protocol says.
3  Object to form.
4        MR. DAVIS: That's an objection to form.
5  Foundation is an objection to the form of the
6  question.
7        MS. HERZFELD: No, it's not.
8        THE WITNESS: I don't want to speak to
9  issues that I'm not informed about, and the black
10 market for prescription drugs is not an issue that
11 I'm informed about.
12 BY MS. HERZFELD:
13    Q   Okay. So you are unaware that opioid
14 medication is sold illegally in the black market.
15       MR. DAVIS: Objection to form.
16       THE WITNESS: I don't know what the
17 black market means.
18       I do -- I would tell you that I realize
19 fully that all opioid products carry a risk of
20 misuse and abuse. So I'm -- I'm clear on that
21 point.
22 BY MS. HERZFELD:
23    Q   Okay. So you're aware that people
24 inject Opana ER, are you not?

Page 315

1        MR. DAVIS: Objection to form.
2        THE WITNESS: I am aware that Opana ER
3  has been abused.
4  BY MS. HERZFELD:
5     Q   Okay. And when you say you're aware
6  that Opana ER has been abused, in which ways do
7  you know it has been abused?
8     A   It has been abused by snorting and
9  injecting.
10    Q   Okay. And what about taking it orally?
11    A   I don't know about that abuse.
12    Q   Okay. So you've never heard of someone
13 taking orally an Opana -- an Opana pill without a
14 prescription?
15       MR. DAVIS: Objection to form.
16       THE WITNESS: I -- I don't recall
17 knowing about that form of abuse.
18 BY MS. HERZFELD:
19    Q   Okay. But you did know about snorting
20 and intravenous injection; is that correct?
21    A   Yes.
22    Q   Okay. And so if someone is injecting
23 Opana into their veins, is that typically the way
24 that it has been prescribed for them to take, to

Page 316

1  your knowledge?
2        MR. DAVIS: Objection to form.
3        THE WITNESS: I am not a physician or a
4  medical expert, and I'm uncomfortable speaking
5  about issues and which is the appropriate way to
6  take Opana ER.
7  BY MS. HERZFELD:
8     Q   Okay. But certain --
9     A   My understanding is the appropriate way
10 to take it would be to swallow it.
11    Q   Okay. And so to inject it would
12 indicate that someone is abusing Opana ER; is that
13 correct?
14       MR. DAVIS: Objection to form.
15       THE WITNESS: I am not a physician or a
16 scientist or an abuse expert. So my
17 understanding, which is really almost a layman's
18 understanding, of how the product should be
19 appropriately administered is orally.
20 BY MS. HERZFELD:
21    Q   Okay. Have you ever heard of anyone
22 being arrested for selling Opana ER without a
23 prescription?
24       MR. DAVIS: Objection to form.

Page 317

1        THE WITNESS: I don't recall being aware
2  of that.
3  BY MS. HERZFELD:
4     Q   Okay. And have you heard of any law
5  enforcement actions for anyone selling opioid
6  medication without a prescription?
7     A   I've read about stories in the
8  newspaper.
9     Q   Okay. So you are aware that opioid
10 medication can be sold illegally on the street; is
11 that right?
12       MR. DAVIS: Objection to form.
13       THE WITNESS: I -- I have read press
14 reports about that that would make me aware.
15 BY MS. HERZFELD:
16    Q   Okay. And you are aware that there was
17 a problem with Opana ER injection in Tennessee; is
18 that correct?
19    A   It is correct.
20    Q   Okay. And when did you first become
21 aware of that?
22    A   I don't know the dates.
23    Q   Okay. And what is it that you -- what
24 is it that you recall about the IV injection

Page 318

1  problem with Opana in Tennessee?
2      A    The details are fuzzy because it was
3  sometime ago, but I -- I remember that it being
4  localized in a -- in a particular locality of
5  Tennessee. I do remember that.
6      Q    Do you know what a pill mill is?
7      A    I've read press reports of -- of what a
8  pill mill is.
9      Q    Okay. And what is your understanding of
10 what is a pill mill?
11     A    My understanding of a pill mill is a
12 place where there's inappropriate prescribing or
13 dispensing of pain medications.
14     Q    Okay. And when you say "inappropriate,"
15 what do you mean?
16     A    Not according to good medical practice.
17     Q    Okay. Is your understanding that it's a
18 place where people can get medication without a
19 legitimate medical need?
20         MR. DAVIS: Objection to form.
21         THE WITNESS: I don't really know.
22 BY MS. HERZFELD:
23     Q    Do you know what "diversion" means in
24 regards to opioids?

Page 319

1      A    I think I do.
2      Q    Okay. And what is your definition of
3  "diversion"?
4      A    My definition of "diversion" would be
5  when an opioid product leaves the legitimate
6  manufacturing distribution, dispensing,
7  prescribing, lawful way in which pain patients,
8  including terminally ill patients, cancer
9  patients, end-of-life patients, or chronically ill
10 pain patients, would lawfully get the -- get a
11 prescription of pain medication.
12     Q    Okay. Okay. And then those pills that
13 were diverted that you just described, your
14 understanding is they would enter then the illegal
15 market for pain medication; is that correct?
16     A    I wouldn't characterize it that, because
17 I -- I'm just not close to that situation. I
18 would say that if it left -- if a product left the
19 legitimate, lawful manufacturing, distribution,
20 dispensing, prescribing, lawful way in which a
21 pain medication was appropriately prescribed for a
22 patient who needed it, that that would constitute
23 diversion.
24     Q    Okay. And diversion would be unlawful;

Page 320

1  is that correct?
2          MR. DAVIS: Objection to form.
3          THE WITNESS: I don't want to speak to
4  all of the laws that control all of the
5  manufacture, distribution, dispensing and
6  prescribing of opioid medications because I'm not
7  an expert in that area.
8  BY MS. HERZFELD:
9      Q    Okay. But you would agree that at least
10 some of that would be unlawful; is that correct?
11     A    I think that's fair to say.
12     Q    Okay. Okay. And so at some point you
13 knew that there was a problem in Tennessee with
14 the abuse and misuse of Opana, you said before; is
15 that correct?
16     A    Yes.
17     Q    Okay. And that problem was so bad at
18 one point that Endo considered halting shipments
19 of Opana to Tennessee; is that correct?
20         MR. DAVIS: Objection to form.
21         THE WITNESS: I think our response to
22 Tennessee -- my understanding of the company's
23 response to Tennessee is that we undertook a
24 number of steps to mitigate the abuse and misuse

Page 321

1  of our product.
2          MS. HERZFELD: Okay. I'm going to move
3  to strike that answer as nonresponsive.
4  BY MS. HERZFELD:
5      Q    My question was, and the problem with
6  abuse and misuse of Opana in Tennessee was so bad
7  that at some point Endo considered halting
8  shipments of Opana to Tennessee; is that correct?
9          MR. DAVIS: Objection to form.
10         THE WITNESS: I think that's a
11 mischaracterization. I think that there were
12 certainly discussions. But your characterization
13 that there was consideration is -- is a
14 characterization that -- that -- that I don't
15 recall.
16 BY MS. HERZFELD:
17     Q    Okay. So you recall discussions of
18 halting shipments of Opana to Tennessee. Is that
19 an accurate statement of your testimony?
20     A    Yes.
21     Q    Okay. But it was not considered as an
22 option?
23     A    I don't know -- I don't recall if it was
24 considered or not.

Page 322

1     Q  Okay.  But you recall those discussions?
2     A  Yes.
3     Q  Okay.  And do you recall discussions of
4 halting shipments of Opana to any other
5 localities?
6     A  I don't recall.
7     Q  Okay.  And Endo did not stop shipping to
8 Tennessee; is that correct?
9     MR. DAVIS:  Objection to form.
10     THE WITNESS:  I'm not in charge of our
11 supply/distribution system.  You'd have to ask our
12 supply people.
13 BY MS. HERZFELD:
14     Q  Okay.  But did you ever hear of -- of
15 Endo making the decision to halt shipments of
16 Opana to Tennessee?
17     A  I did not hear that we had halted it.
18     Q  Have you ever lobbied Tennessee
19 legislators relating to opioids?
20     MR. DAVIS:  Objection to form.
21     THE WITNESS:  I don't recall lobbying
22 Tennessee legislators.  There might have been
23 somebody in my department who would have lobbied
24 Tennessee legislators.

Page 323

1 BY MS. HERZFELD:
2     Q  Do you recall Endo engaging any lobbying
3 activities with Marsha Blackburn regarding
4 opioids?
5     A  I don't recall, although we might have.
6     Q  Okay.
7     A  As a member of the Energy and Commerce
8 Committee, she would have been somebody that we
9 might have gone and seen.
10     I thought you were referring to
11 Tennessee legislators --
12     Q  Oh, no, we'll get to that.
13     A  -- in Tennessee.
14     Q  No, no, we'll get to that.
15     A  Okay.
16     Q  Okay.  And what about Bob Corker, do you
17 have any recollection of any lobbying efforts to
18 Senator Bob Corker from Tennessee on behalf of
19 Endo for opioids?
20     A  I don't recollect them, but we may
21 have -- you know, I saw many members of Congress
22 in my time serving with Endo, many members of the
23 United States Senate and their staffs.  So we may
24 have, but I -- I don't recall it.

Page 324

1     Q  Okay.  Do you have any specific memories
2 of lobbying efforts towards Senator Lamar
3 Alexander from Tennessee regarding Endo and
4 opioids?
5     A  I certainly remember going in to see the
6 Alexander staff on issues, because at one point he
7 chaired an important committee, or was the ranking
8 member on an important committee, but I don't
9 recall what those lobbying issues were.
10     Q  Do you recall if they had anything to do
11 with Endo's opioids?
12     A  I don't recall.
13     Q  Okay.  So I want to make sure I
14 understood your testimony from earlier.
15     You had said that your role at
16 government affairs was to represent the company's
17 interests before elected and appointed officials.
18 Do you recall that testimony?
19     A  What I recall representing was that --
20 that I represented the company's interests where
21 they intersected with benefits to society, public
22 health, and a benefit to patients.
23     Q  Oh, yes, I remember that.  You said it
24 like 20 times.

Page 325

1     But do you recall the testimony about
2 the company's interests before -- you said your
3 role at government affairs was to represent the
4 company's interests before elected and appointed
5 officials.  Is that an accurate statement?
6     MR. DAVIS:  Objection to everything
7 before the question, and objection to the question
8 as purely duplicative of the testimony he gave for
9 seven hours prior to this questioning.
10     THE WITNESS:  I did represent the
11 company's interests where they intersected with
12 benefits to society, public health, and benefits
13 to patients.
14 BY MS. HERZFELD:
15     Q  Okay.  But my question was, is it an
16 accurate statement that your role at government
17 affairs was to represent the company's interests
18 before elected and appointed officials?  It's a
19 very simple question.
20     MR. DAVIS:  Objection to form, and it's
21 one that he answered many times on --
22     THE WITNESS:  I -- I disagree with your
23 characterization because you're leaving out the
24 part about benefits to society, public health, and

Highly Confidential – Subject to Further Confidentiality Review

Page 326

1 benefits to patients.
2 BY MS. HERZFELD:
3     Q   Okay, sir, it --
4     A   So I disagree with your characterization
5 of my role at Endo.
6     Q   Okay.  I wrote it down as a quote, but
7 that's fine if you don't want to agree with me on
8 that.
9         You had said that you brought in subject
10 matter experts when there were particular
11 questions that you weren't the subject matter
12 expert in when you were dealing with various
13 legislators or the Executive Branch.
14        Did I understand that correctly?
15    A   I -- I --
16        MR. DAVIS:  Objection to form.  This is
17 purely duplicative.  If we could get to the
18 Tennessee-specific questioning, I think we all in
19 the room would appreciate it.
20 BY MS. HERZFELD:
21    Q   Can you answer my question, please.
22    A   I -- I often used subject matter
23 experts.
24    Q   And so when you were using those subject

Page 327

1 matter experts, would they meet with the -- the
2 various legislators on their own or would you be
3 present at that time?
4     A   In almost --
5         MR. DAVIS:  Objection to form.
6         THE WITNESS:  In almost every case, I
7 would be with them.
8 BY MS. HERZFELD:
9     Q   Okay.
10    A   But perhaps not exclusively.
11    Q   Okay.  Throughout your tenure at Endo,
12 how often was the abuse of Opana in Tennessee
13 discussed?
14        MR. DAVIS:  Objection to form,
15 foundation.
16        THE WITNESS:  I have no idea.
17 BY MS. HERZFELD:
18    Q   Okay.  You said that you knew about the
19 problem on -- with Opana injection in Tennessee;
20 is that right?
21    A   Mm-hmm.
22    Q   Is that a "yes"?
23    A   Yes.
24    Q   I know you were drinking water, so I

Page 328

1 didn't mean to ask a question when you had water
2 in your mouth.
3         And other than the issue with Opana
4 injection in Tennessee, do you recall other
5 conversations about abuse of Opana or other
6 opioids that were produced by Endo in Tennessee?
7         MR. DAVIS:  Objection to form.
8         THE WITNESS:  That were produced by Endo
9 in Tennessee?
10 BY MS. HERZFELD:
11    Q   That were manufactured by Endo being
12 abused in Tennessee.
13    A   Oh, being abused in Tennessee.
14        MR. DAVIS:  Objection to form.
15        THE WITNESS:  There may have been
16 conversations.  I don't recall.
17 BY MS. HERZFELD:
18    Q   Have you heard that Appalachia has been
19 hit pretty hard by the opioid abuse epidemic?
20        MR. DAVIS:  Objection to form.
21        THE WITNESS:  I have.  I have read the
22 press reports.
23 BY MS. HERZFELD:
24    Q   Okay.  And when did you first get that

Page 329

1 knowledge?
2     A   I don't recall.
3     Q   And do you consider Tennessee to be part
4 of Appalachia?
5     A   It's certainly a part of Tennessee.
6     Q   Okay.  Were you ever present when anyone
7 at Endo discussed ways to address the abuse issues
8 of opioids in Tennessee?
9         MR. DAVIS:  Objection to form.
10        THE WITNESS:  I was -- I do recall
11 conversations involving such abuse in Tennessee.
12 I don't recall the details of those conversations,
13 but -- but I do recall that the company discussed
14 the issue and that there was a -- kind of a
15 multilayered, multifactorial kind of approach that
16 the company was going to undertake to -- to
17 mitigate the abuse and misuse of the product in
18 Tennessee.
19 BY MS. HERZFELD:
20    Q   Okay.  And what was that multilayered,
21 multifactorial approach to mitigate the abuse and
22 misuse of the product in Tennessee?
23    A   I don't know the details of that.  I
24 would point you to our pharmacovigilance and

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 medical affairs staff, in particular, Dr. Neil
2 Shusterman, who led the company -- as I
3 understand, led the company's efforts in that
4 regard.
5     Q   Okay. Do you know if any actual steps
6 were taken as part of that multilayered,
7 multifaceted approach to stopping the abuse and
8 misuse of Opana in Tennessee?
9     A   I only know of one effort that I was
10 involved with, and it was a -- a donation to
11 drugfree.org and Drug-Free Kids that was meant to
12 prevent prescription drug abuse, particularly in
13 Tennessee, and it was a sizeable donation. I
14 don't remember the exact amount.
15     Q   Okay. And how did those donations come
16 about?
17     MR. DAVIS: Objection to form.
18     THE WITNESS: I don't understand the
19 question.
20 BY MS. HERZFELD:
21     Q   Sure. Whose idea was it to donate money
22 to those two organizations?
23     A   I -- I don't recall. I think that there
24 were discussions going on at the company about

Page 331

1 what could be done, and I was involved in those
2 discussions. And subsequently, the company took
3 this kind of multilayered, multifactorial approach
4 and -- and took the actions they took.
5     Q   Okay. And so you know that there were
6 donations made to drugfree.org and Drug-Free Kids.
7     A   Yeah, it's the same organization.
8 They -- it's kind of drugfree.org/Drug-Free Kids.
9     Q   Okay. And what year was that donation?
10     A   I don't recall.
11     Q   Do you recall if it was in the last five
12 years?
13     A   I would say it was in the last five
14 years.
15     Q   Okay. And when you say "a sizable
16 donation," do you mean hundreds of dollars or
17 hundreds of thousands of dollars or millions of
18 dollars?
19     A   I --
20     MR. DAVIS: Objection to form.
21     THE WITNESS: I just don't recall.
22 BY MS. HERZFELD:
23     Q   Okay. And where could I find
24 information about that donation?

Page 332

1     A   I would ask James Manser.
2     Q   And how was that organization,
3 drugfree.org and Drug-Free Kids, how was that
4 chosen?
5     A   I don't recall.
6     Q   Okay. Do you know what connection, if
7 any, drugfree.org and Drug-Free Kids has to
8 Tennessee?
9     A   No.
10     Q   Do you know what about that donation
11 would have been expected to impact Tennessee?
12     MR. DAVIS: Objection to form.
13     THE WITNESS: Well, you would have to
14 ask them.
15 BY MS. HERZFELD:
16     Q   "Them" being who?
17     A   Drugfree.org.
18     Q   Okay. And who made the decision to --
19 to choose drugfree.org/Drug-Free Kids?
20     MR. DAVIS: Objection to form.
21     THE WITNESS: I have answered that
22 question already, and I don't recall the exact
23 process and the individuals who made that
24 decision.

Page 333

1 BY MS. HERZFELD:
2     Q   Okay. And what was your role in that
3 process?
4     A   I knew of the drugfree.org organization
5 through their participation in the Pain Care Forum
6 as one of the preeminent drug prevention
7 organizations in the United States, and one of the
8 most revered and blue chip organizations dealing
9 with the prevention of drug abuse in America.
10     MS. HERZFELD: I'm going to move to
11 strike that answer.
12 BY MS. HERZFELD:
13     Q   My question was, what was your role in
14 the process of making that donation to pain
15 care -- or to drugfree.org/Drug-Free Kids? What
16 was your role in --
17     MR. DAVIS: Objection to form.
18     THE WITNESS: I can't recall what
19 process we used as a company and my role in it.
20 BY MS. HERZFELD:
21     Q   Okay. Did you attend meetings where it
22 was discussed?
23     A   I do remember there were discussions
24 that took place, and I would have been in some of

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1 those meetings.
2    Q   Okay.  Was it your project to -- to
3 facilitate that donation?  Were you in charge of
4 it?
5    A   I led a team at one point in 2016.  We
6 had an ongoing effort throughout the country and
7 in Tennessee to mitigate the abuse and misuse of
8 our products.  I was designated to coordinate an
9 internal team of executives in 2016, I believe,
10 that would develop additional measures to mitigate
11 the misuse and abuse of prescription drugs and our
12 products.
13    Q   Okay.  And so when that donation was
14 made to drugfree.org/Drug-Free Kids, was that a
15 donation made on behalf of Endo or by another
16 organization that you were involved with?
17    A   It was -- it was made by Endo.
18    Q   Okay.  And when that donation was made
19 to -- to drugfree.org/Drug-Free Kids, was that
20 made -- was that donation made as a part of a
21 national effort on -- on opioid abuse or was it
22 specific to Tennessee?
23        MR. DAVIS:  Objection to form.
24        THE WITNESS:  We -- my understanding and

Page 335

1 my recollection is that we had programs that were
2 meant to mitigate the misuse and abuse of opioid
3 products nationally and in Tennessee.
4 BY MS. HERZFELD:
5    Q   Okay.
6    A   We had both.
7    Q   And so I guess what I'm asking is, when
8 that donation was made to drugfree.org on -- by
9 Endo, was that a part of a national program,
10 national including Tennessee?
11        MR. DAVIS:  Objection to form.
12        THE WITNESS:  I don't recall the
13 specifics.
14 BY MS. HERZFELD:
15    Q   Okay.  Was the donation made to
16 drugfree.org specifically only for Tennessee?
17    A   I don't recall.
18    Q   Okay.  Okay.  And you also had talked
19 about the multilayered, multifaceted approach that
20 Endo had taken in response to the opioid issues in
21 Tennessee.
22        So other than this donation to
23 drugfree.org, what other steps are you aware of
24 that Endo took to curb the abuse of opioids in

Page 336

1 Tennessee?
2    A   I have previously pointed you to
3 Dr. Neil Shusterman, who would have that
4 information.  I -- I'm unaware of the very
5 specific, detailed steps the company took in
6 Tennessee, but Neil would know, Dr. Shusterman
7 would know.
8    Q   Okay.  So we've exhausted your personal
9 knowledge on that issue; is that correct?
10    A   I don't know whether we have or not.
11    Q   Well, I guess that's my question.
12        So you're -- you're directing me to Dr.
13 Shusterman to ask for information that you don't
14 have.
15    A   He would best know.
16    Q   I understand that, but I want to make
17 sure I understand everything that you know.
18        And so you've told me about this
19 donation to drugfree.org.
20        What, if anything, else do you know
21 personally?
22    A   I don't recall --
23        MR. DAVIS:  Objection to form.
24        THE WITNESS:  -- anything else.

Page 337

1 BY MS. HERZFELD:
2    Q   Okay.  Thank you very much for that.
3        Okay.  I am going to hand you what we
4 will mark as Munroe Exhibit 45.
5        (Munroe Exhibit No. 45 was marked
6        for identification.)
7        MS. HERZFELD:  There's for you.  And I
8 think that's for everybody else if anybody wants
9 them.
10        Okay.  For those on the phone, and for
11 the record, this document is marked ENDO-OPIOID_
12 MDL02667004 and 7005.  It's a two-page document.
13 BY MS. HERZFELD:
14    Q   Mr. Munroe, do you see that this is an
15 e-mail that was sent from Brian Lortie to you on
16 November 13th, 2014?
17    A   I do.
18    Q   Okay.  And Brian Lortie was someone that
19 you worked with at Endo; is that correct?
20    A   Correct.
21    Q   Okay.  Okay.  And Brian Lortie was the
22 president of Endo --
23        MR. DAVIS:  Objection to form.
24 BY MS. HERZFELD:

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    Q    -- Branded Pharmaceuticals, yes?
2    A    Branded Pharmaceuticals.
3    Q    Okay.  And so he sends -- this is an
4  e-mail forwarding an e-mail from him to Jason
5  Reckner, and then Jason to Brian Lortie, and then
6  Brian Lortie to you; is that right?
7    A    Correct.
8    Q    Okay.  And so looking from the bottom
9  up, the e-mail from Brian Lortie to Jason Reckner
10 says: "Jason, just making sure that you will take
11 the lead on the Tennessee Opana actions from
12 yesterday's review."
13        Did I read that correctly?
14   A    Yes.
15   Q    Then it says: "Tennessee distribution
16 flash Rx's in specific area.  What if we closed
17 off distribution there?"  Question.  "Impact on
18 sales," question mark.  "What did Purdue do and
19 how?"  Question mark.  "Brian Munroe can provide
20 assistance on this one through his contacts,"
21 period.
22        Did I read that correctly?
23   A    Yes.
24   Q    Okay.  And so were you involved in this

Page 339

1  review where they were discussing the Tennessee
2  Opana actions?
3    A    I don't recall if I was involved.  I
4  don't think I was.
5    Q    Okay.  And do you know what they're
6  referring to when they talk about Tennessee
7  distribution or prescriptions in specific areas?
8    A    No, I don't.
9    Q    Okay.  So the next line, when they say,
10 "What if we closed off distribution there?" is
11 your understanding that's when it was discussed
12 whether they would stop -- whether Endo would stop
13 distributing Opana in Tennessee?
14       MR. DAVIS:  Objection to form.
15       THE WITNESS:  Discussions did take place
16 at the company, and I think that's what this
17 refers to.
18 BY MS. HERZFELD:
19   Q    Okay.  And when those discussions took
20 place, was there also a discussion of the impact
21 of closing off distribution in Tennessee on sales
22 to Endo?
23   A    Not that I'm aware of.
24   Q    Okay.  But it says that in this e-mail,

Page 340

1  does it not?
2        MR. DAVIS:  Objection to form.
3        THE WITNESS:  There's a question in the
4  e-mail.
5  BY MS. HERZFELD:
6    Q    And what does the question say, if you
7  could read it for me?
8    A    "Impact on sales," question mark.
9    Q    Okay.  And then it says: "What did
10 Purdue do and how?"  Do you know what that means?
11       MR. NOVY:  Object to form.
12       THE WITNESS:  I think it's referring to
13 did they cut off distribution to Tennessee.
14 BY MS. HERZFELD:
15   Q    Okay.  And had you ever heard about
16 Purdue considering cutting off distribution of
17 OxyContin to Tennessee?
18       MR. NOVY:  Objection.
19       THE WITNESS:  No.
20 BY MS. HERZFELD:
21   Q    Okay.  And then it says: "Brian Munroe
22 can provide assistance on this one through his
23 contacts," and the e-mail is then forwarded to
24 you.

Page 341

1        Did you follow up with your contacts at
2  Purdue on -- to get that information in response
3  to this e-mail?
4        MR. NOVY:  Objection to form.
5        MR. DAVIS:  Objection to form.
6        THE WITNESS:  I did.
7  BY MS. HERZFELD:
8    Q    Okay.  And what did you find out?
9    A    I found out that they had not
10 discontinued distribution of their product, and I
11 relayed that back to the commercial business.  I'm
12 not sure whether I spoke to Jason or to Brian.
13   Q    Okay.  And who did you speak with to
14 find out whether Purdue had discontinued
15 distribution of its product in Tennessee?
16   A    I just called my counterpart in the
17 Washington office.
18   Q    Okay.  And who was your counterpart in
19 the Washington office?
20   A    Burt Rosen.
21   Q    Okay.  And what was the conversation
22 with Mr. Rosen, to the best of your ability?
23       MR. NOVY:  Object to form.
24       THE WITNESS:  I just asked him if he

Page 342

1  had -- had Purdue cut off distribution.
2  BY MS. HERZFELD:
3     Q   Okay.  And how did he respond?
4        MR. NOVY: Object to form.
5        THE WITNESS: He said no.
6  BY MS. HERZFELD:
7     Q   Okay.  And was there any other
8  conversation on that -- was it a telephone call?
9     A   I don't recall if it was in person or on
10 the phone.
11    Q   Okay.  Was that the substance of the
12 conversation?
13    A   It was.
14    Q   Okay.  And did Mr. Rosen ask why you
15 were asking about Tennessee?
16       MR. NOVY: Object to form.  Foundation.
17       THE WITNESS: I don't recall.
18 BY MS. HERZFELD:
19    Q   Did you ever have any other
20 conversations with Mr. Rosen about an opioid issue
21 in Tennessee?
22       MR. DAVIS: Objection to form.
23       MR. NOVY: Objection.
24       THE WITNESS: Not that I recall.

Page 343

1  BY MS. HERZFELD:
2     Q   Okay.  Do you recall having
3  conversations with anybody else about opioids in
4  Tennessee?
5        MR. DAVIS: Objection to form.
6        THE WITNESS: I might have, but I don't
7  recall.
8  BY MS. HERZFELD:
9     Q   Okay.  If you might have, do you know
10 who you might have had a conversation with?
11       MR. DAVIS: Objection to form.
12       THE WITNESS: No.
13 BY MS. HERZFELD:
14    Q   You've known Mr. Rosen for a while,
15 according to your testimony from this morning; is
16 that correct?
17    A   Yes.
18       MR. NOVY: Object to form.
19 BY MS. HERZFELD:
20    Q   Okay.  And do you know if Mr. Rosen was
21 aware of the opioid abuse problems in Tennessee?
22       MR. NOVY: Object to form and
23 foundation.
24       MR. DAVIS: Objection to form.

Page 344

1        THE WITNESS: You would have to ask
2  Mr. Rosen.
3  BY MS. HERZFELD:
4     Q   But my question is, do you know if he
5  knows?
6        MR. DAVIS: Objection to form.
7        THE WITNESS: I don't know what he
8  knows.
9  BY MS. HERZFELD:
10    Q   Okay.  Have you ever had any other
11 discussions with Mr. Rosen about opioids in
12 Tennessee?
13       MR. DAVIS: Objection to form.
14       MR. NOVY: Objection.
15       THE WITNESS: Not that I recall.
16 BY MS. HERZFELD:
17    Q   Okay.  And when you responded to either
18 Mr. Reckner or Mr. Lortie about Purdue not cutting
19 off distribution of OxyContin in Tennessee, how,
20 if at all, did they respond?
21    A   I think they said -- and I don't
22 remember who it was specifically, if it was Jason
23 or Brian or my boss or somebody from corporate,
24 but they said, "Thank you."

Page 345

1     Q   Okay.  And was there any further
2  conversation that you were aware of regarding
3  getting information about whether Purdue was
4  cutting off distribution of OxyContin in
5  Tennessee?
6        MR. NOVY: Objection to form.
7        MR. DAVIS: Objection to form.
8        THE WITNESS: I believe that ended it.
9  BY MS. HERZFELD:
10    Q   Okay.  And what other discussions, if
11 any, did you have with anyone at Endo about
12 halting distribution of Opana in Tennessee?
13       MR. DAVIS: Objection to form.
14       THE WITNESS: I don't remember all the
15 conversations I had about Tennessee --
16 BY MS. HERZFELD:
17    Q   Okay.
18    A   -- while I was an employee at Endo.
19    Q   Would you say you had more than the
20 conversation we just discussed?
21       MR. DAVIS: Objection to form.
22       THE WITNESS: There were discussions
23 about the misuse and abuse of opioids in Tennessee
24 while I was an employee at Endo, and I was a party

Highly Confidential - Subject to Further Confidentiality Review

---

Page 346

1 to some of those discussions. But I don't recall
2 the details, I don't recall how many discussions
3 we had, who was in the room, when they took place.
4 I just knew that about issues that were going on
5 in Tennessee, and there were discussions that
6 happened, but beyond that, I wasn't terribly
7 involved.
8 BY MS. HERZFELD:
9    Q   Okay. Did you provide any input about
10 whether Endo would cut off distribution of Opana
11 to Tennessee?
12       MR. DAVIS: Objection to form.
13       THE WITNESS: I don't recall providing
14 any input.
15 BY MS. HERZFELD:
16    Q   Okay. And who would make the decision?
17 Who is the person at Endo that would make the
18 decision of whether a drug was going to be cut off
19 from distribution to a particular state?
20       MR. DAVIS: Objection to form.
21       THE WITNESS: I don't now --
22       MR. DAVIS: Foundation.
23       THE WITNESS: I don't know how the
24 company's decision-making would work on -- on

---

Page 347

1 something that significant.
2       MS. HERZFELD: Okay.
3       MR. DAVIS: Brian, it's 7:00. Do you
4 want to take a quick break?
5       THE WITNESS: Yeah, please.
6       MS. HERZFELD: I -- I'm not quite
7 finished with my question.
8       MR. DAVIS: Mr. Cohen has to leave.
9       THE WITNESS: I'm just going to say
10 goodbye.
11       MS. HERZFELD: Okay. But I'm not -- I'm
12 not finished with my question. I'd like to finish
13 my question.
14       THE WITNESS: Okay.
15       MR. DAVIS: One more question.
16       MS. HERZFELD: I'd like to finish my
17 question. I wasn't finished.
18       THE WITNESS: Okay.
19 BY MS. HERZFELD:
20    Q   When you say "significant," you think
21 that's a significant decision to cut off
22 distribution to a particular region of Opana?
23       MR. DAVIS: Objection to form.
24       THE WITNESS: I -- I do believe it would

---

Page 348

1 be significant because of the impact it would have
2 on appropriate medication for appropriate
3 patients. So for me, I think of terminally
4 patients, patients with end-of-life issues,
5 terminally ill cancer patients, patients in
6 debilitating chronic pain. And so I think that's
7 why I use the term "significant."
8       MS. HERZFELD: Okay. We can take a
9 break.
10       THE WITNESS: Thank you.
11       THE VIDEOGRAPHER: The time is 7:01 p.m.
12 We're going off the record.
13       (Recess.)
14       THE VIDEOGRAPHER: The time is 7:08 p.m.
15 We're back on the record.
16 BY MS. HERZFELD:
17    Q   Okay, Mr. Munroe, we're back after a
18 short break.
19       I'm going to hand you the next exhibit,
20 which we will mark as Munroe Exhibit 46. It's
21 ENDO-OPIOID_MDL-02801542 and 43, 44, and a
22 smattering of attachments that end in 62.
23       (Munroe Exhibit No. 46 was marked
24       for identification.)

---

Page 349

1 BY MS. HERZFELD:
2    Q   Okay. If you could take a look at this
3 for me very quickly, sir.
4    A   (Peruses document.)
5    Q   Does this appear to be an e-mail that
6 was sent from you to Scott Andrew on April the
7 14th, 2016?
8    A   Andrew Scott.
9    Q   Oh, I'm sorry, yes, sir. Andrew Scott.
10 And who is Andrew Scott?
11    A   He was my employee in the Washington
12 office.
13    Q   Okay. And it looks like you are
14 forwarding an e-mail that you previously sent to
15 Brian Lortie, Paul Campanelli, Keri Mattox, and
16 then copying a bunch of other folks on April the
17 4th; is that right?
18    A   That would be correct, yes.
19    Q   Okay. And there you're talking about
20 the final draft of the Prescription Drug Abuse
21 Plan; is that correct?
22    A   Yes.
23    Q   Okay.
24    A   This would have been the -- the effort

---

Page 350

1 that I previously described in my testimony.
2    Q   Okay.  The efforts to --
3    A   Coordinate.
4    Q   -- curb opioid abuse.  Yes, okay.
5        And so did you develop this plan?
6    A   You know, I would -- it was a team
7 effort, and I would say that I -- more or less
8 coordinated the plan.
9    Q   Okay.  And on --
10   A   Because we had sub- -- subject matter
11 experts contributing to different parts of the
12 plan.
13   Q   Okay.  And before you were coordinating
14 these efforts in 2016, what program did Endo have
15 in place to identify signs of abuse and diversion
16 that sales representatives might observe in the
17 field?
18       MR. DAVIS:  Objection to form.
19       THE WITNESS:  That was a program that
20 was run -- I don't know if it was run.  It was --
21 it was coordinated by Endo legal, and at the time
22 the legal lead for that was Jenn Dubas.
23 BY MS. HERZFELD:
24   Q   Okay.

Page 351

1    A   So you should ask her about that
2 program.  I'm not familiar with the details of
3 that program.
4    Q   Do you know when that program was in
5 place?
6    A   No.
7    Q   Do you know if it was in place at the
8 time that you developed this Prescription Drug
9 Abuse Plan that's referenced in this e-mail?
10       MR. DAVIS:  Objection to form.
11       THE WITNESS:  I believe that a form of
12 the plan was in place, but I don't want to speak
13 to the details because I'm just not aware of the
14 details of the plan.
15 BY MS. HERZFELD:
16   Q   Okay.  Are you aware --
17   A   The effort.
18   Q   Are you aware of Endo creating a program
19 to identify signs of abuse and diversion through
20 its sales representatives as part of the
21 settlement agreement with the New York Attorney
22 General in March of 2016?
23       MR. DAVIS:  Objection to form.
24       THE WITNESS:  I am aware of -- of that

Page 352

1 effort, but at a level of detail that's
2 commensurate with what you just said and not much
3 else.
4 BY MS. HERZFELD:
5    Q   Okay.  And so was your understanding
6 that the program, whatever it is that existed, if
7 any, needed to be revamped, and that's why you had
8 this Prescription Drug Abuse Plan in 2016?
9        MR. DAVIS:  Objection to form.
10       THE WITNESS:  That is not my
11 recollection.
12 BY MS. HERZFELD:
13   Q   Okay.  So what is your understanding as
14 to why this Prescription Drug Abuse Plan that
15 you're referring here in your April 4th, 2016
16 e-mail was necessary?
17       MR. DAVIS:  Objection to form.
18       THE WITNESS:  We had ongoing
19 prescription efforts to mitigate the abuse and
20 misuse of opioids from the time I joined Endo.  I
21 would characterize this effort in 2016 as a
22 continuation of -- of those ongoing efforts that
23 the company had undertaken since my first day I
24 became aware of them as an employee.

Page 353

1        So I wouldn't characterize this Rx drug
2 abuse plan as anything else other than our
3 continued efforts to mitigate the abuse and misuse
4 of opioid products.
5 BY MS. HERZFELD:
6    Q   Okay.  And were those efforts successful
7 in Tennessee?
8        MR. DAVIS:  Objection to form.
9 BY MS. HERZFELD:
10   Q   To mitigate the abuse and misuse of
11 Opana --
12       MR. DAVIS:  Objection to form.
13 BY MS. HERZFELD:
14   Q   -- in Tennessee?
15   A   I don't know.
16   Q   Okay.  You can set that aside for me,
17 please.
18       Are you familiar at all with Purdue's
19 abuse, detection and deterrent plan?
20       MR. NOVY:  Objection to form.
21       MR. DAVIS:  Objection to form.
22       THE WITNESS:  No.
23 BY MS. HERZFELD:
24   Q   Okay.  Have you ever discussed with

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1  Mr. Rosen Purdue's efforts to curb the opioid
2  abuse problem?
3       MR. NOVY:  Form and foundation.
4       THE WITNESS:  Not that I recall.
5  BY MS. HERZFELD:
6    Q   Okay.  And before that e-mail we were
7  just looking at, the April 2016 e-mail with the
8  drug abuse -- Prescription Drug Abuse Plan, before
9  that time were you involved at all in creating
10 abuse prevention plans for Endo?
11      MR. DAVIS:  Objection to form.
12      THE WITNESS:  I don't recall if I was --
13 I don't recall whether I was involved or not.  I
14 certainly undertook efforts in government affairs
15 to launch initiatives aimed at mitigating the
16 abuse and misuse of opioids, including making
17 donations to the National Association of Drug
18 Diversion Investigators and other organizations
19 that would hopefully do something to mitigate the
20 abuse and misuse of opioids.
21      MS. HERZFELD:  Okay.  And I'm going to
22 move to strike everything after "I don't recall
23 whether I was involved or not."
24 BY MS. HERZFELD:

Page 355

1    Q   Sir, do you know what neonatal
2  abstinence syndrome is?
3    A   No.
4    Q   Have you ever heard of the term
5  "neonatal abstinence syndrome"?
6       MR. DAVIS:  Objection to form.
7       THE WITNESS:  I don't recall hearing
8  that term before.
9  BY MS. HERZFELD:
10   Q   Okay.  Have you heard about babies being
11 born dependent on opioids?
12      MR. DAVIS:  Objection to form.
13      THE WITNESS:  I -- I don't recall
14 knowing about that.
15 BY MS. HERZFELD:
16   Q   Sir, do you know that I represent the
17 babies of Tennessee that have been born dependent
18 on opioids?
19      MR. DAVIS:  Objection to form.
20      THE WITNESS:  I did not know that.
21 BY MS. HERZFELD:
22   Q   If we could go back to Exhibit, I
23 think, 45.  Is that the 2014 e-mail?
24      MR. DAVIS:  Which one?

Page 356

1       MS. HERZFELD:  2014, Exhibit 45.
2       MR. DAVIS:  Is that -- that looks like a
3  43.  I --
4       MS. HERZFELD:  Let me -- oops, that's
5  45.
6       MR. DAVIS:  Is this -- this is the one
7  you want (indicating), right?
8       MS. HERZFELD:  Yes.
9  BY MS. HERZFELD:
10   Q   Okay.  So if you could take a look for
11 me at Exhibit 45 again, sir.  So when we discussed
12 that exhibit, that was when there was at least a
13 discussion of halting distribution of Opana to
14 Tennessee, as you testified earlier, correct?
15   A   I remember that the company did have
16 discussions about that, yes.
17   Q   Okay.  And in fact, Endo did not halt
18 distribution of Opana to Tennessee after that time
19 to your knowledge; is that right?
20      MR. DAVIS:  Objection to form.
21      THE WITNESS:  To my knowledge, that's
22 correct.
23 BY MS. HERZFELD:
24   Q   Okay.  Do you know how many babies were

Page 357

1  born dependent on opioids in Tennessee in 2015,
2  the year after Endo discussed halting the sales of
3  Opana to Tennessee?
4       MR. DAVIS:  Objection to form.
5       THE WITNESS:  I don't know.
6  BY MS. HERZFELD:
7    Q   Has anybody ever told you that it's
8  1,049 babies were born dependent on opioids in
9  Tennessee the following year?
10      MR. DAVIS:  Objection to form and
11 foundation.
12      THE WITNESS:  No, no one has told me
13 that.
14 BY MS. HERZFELD:
15   Q   Okay.  Has anyone told you that in 2016,
16 when Endo did not stop the distribution of Opana
17 to Tennessee, an additional 1,071 babies were born
18 dependent on opioids in Tennessee?
19      MR. DAVIS:  Objection to form,
20 foundation.
21      THE WITNESS:  No.
22 BY MS. HERZFELD:
23   Q   Okay.  So in 2015, 2016 and 2017 --
24 actually, strike that.

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    So Opana was removed from the market in
2  2017; is that correct?
3    MR. DAVIS:  Objection to form.
4    THE WITNESS:  Could you repeat the
5  question, please?
6  BY MS. HERZFELD:
7    Q    Yes.  Opana -- reformulated Opana ER was
8  removed from the market in 2017; is that correct?
9    A    I -- I don't know the exact date.
10    Q    Okay.  But it was removed from the
11  market, yes?
12    MR. DAVIS:  Objection to form.
13    THE WITNESS:  It was removed from the
14  market.
15  BY MS. HERZFELD:
16    Q    Okay.  And it wasn't removed from the
17  market last month, right?
18    MR. DAVIS:  Objection to form.
19    THE WITNESS:  It was not removed from
20  the market last month.  It was removed while I was
21  an employee at Endo.
22  BY MS. HERZFELD:
23    Q    Okay.  And you left your employment with
24  Endo when?

Page 359

1    A    In March of 2018.
2    Q    Okay.  So you are aware of how many
3  babies were born dependent on opioids in the state
4  of Tennessee while Endo chose not to remove Opana
5  from the market after considering it --
6    MR. DAVIS:  Objection --
7  BY MS. HERZFELD:
8    Q    -- in Tennessee?
9    MR. DAVIS:  Objection to form.
10    THE WITNESS:  I -- I do not know.
11  BY MS. HERZFELD:
12    Q    Okay.  If I told you it was 3,210 babies
13  that were born dependent on opioids during that
14  three-year period, is that a number you've heard
15  before?
16    MR. DAVIS:  Objection to form,
17  foundation.
18    THE WITNESS:  It's not a number I've
19  heard before.
20  BY MS. HERZFELD:
21    Q    Okay.  What about 4,340 people who have
22  died of opioid overdose deaths in Tennessee from
23  the time that, according to that e-mail, Endo
24  first considered not shipping Opana to Tennessee?

Page 360

1    MR. DAVIS:  Objection to form and
2  foundation.
3  BY MS. HERZFELD:
4    Q    Have you heard that?
5    A    Well, I disagree with your
6  characterization as consider.  I know that there
7  were discussions, but as I previously indicated, I
8  do disagree with your characterization.
9    Q    That it was considered because it was
10  only discussed.
11    A    Correct.
12    Q    Okay.  And what is it that you see is
13  the difference between "considered" and
14  "discussed"?
15    MR. DAVIS:  Objection to form.
16    THE WITNESS:  I think it's the -- the
17  Webster's dictionary for those two words, and --
18  BY MS. HERZFELD:
19    Q    Okay.
20    A    -- would use that as a reference
21  document.
22    Q    Great.
23    Okay.  And when dealing with opioid
24  products, you would agree that Endo should balance

Page 361

1  the benefits and the risks in the use of opioids;
2  is that correct?
3    MR. DAVIS:  Objection to form.
4  Foundation.
5    THE WITNESS:  When -- when I was an
6  employee at Endo, we sought to protect a
7  physician's ability to write prescriptions for
8  patients who needed them, and also undertake
9  efforts to mitigate the misuse and abuse of our
10  products.
11  BY MS. HERZFELD:
12    Q    Okay.
13    A    So those were dual goals that we had.
14    Q    Okay.  So I'm going to back up.
15    You'd agree with me that while you
16  believe there are benefits of opioids, there are
17  also risks to opioid use; is that correct?
18    A    As I've stated throughout the -- the
19  course of my testimony today, there are -- I
20  understand that there are risks associated with
21  the misuse and abuse of all opioids.
22    Q    Okay.  And so when you talked earlier
23  about identifying the benefit of opioids to
24  society, do you also think that it's important to

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  identify the risks of opioids to society?
2       MR. DAVIS:  Objection to form.
3  Mischaracterizes testimony.
4       THE WITNESS:  Yeah, I mean, I -- I don't
5  think I can be more clear on this point.
6       We believed in the appropriate use of
7  our products to treat serious pain conditions,
8  including conditions of terminal illness, end of
9  life, cancer, and the -- and the chronically ill.
10  We also believed in undertaking efforts to
11  mitigate the misuse and abuse of our product.
12       So instead of agreeing or disagreeing
13  with your statement, I'm choosing to put this in
14  my own words and tell you exactly how I understood
15  the company's mission while I was an employee at
16  Endo.
17       MS. HERZFELD:  Okay.  So I'm going to
18  move to strike that answer as nonresponsive.
19  BY MS. HERZFELD:
20    Q   My question is, I think you had talked
21  before about the importance of identifying the
22  benefit to society, the benefit to public health
23  and the benefit to the patient.
24       Am I paraphrasing your -- your previous

Page 363

1  testimony correctly?
2       MR. DAVIS:  Objection to form.  It's out
3  of -- out of context, that characterization.
4       THE WITNESS:  It is out of context.
5       When I referred to benefits to society,
6  benefits to public health, and benefits to the
7  patient, I -- I was referring to our public policy
8  initiatives on Capitol Hill, and where those three
9  principles intersected with benefits to Endo, we
10  would undertake a project.
11  BY MS. HERZFELD:
12    Q   Okay.  And so when you were dealing with
13  those public policy initiatives on Capitol Hill,
14  did you also think that it was important to
15  identify the potential risks of Endo's opioid
16  products?
17       MR. DAVIS:  Objection to form.
18       THE WITNESS:  My job, and I can only
19  speak to my role --
20  BY MS. HERZFELD:
21    Q   Sure.
22    A   -- and I can't -- I can't speak to
23  the -- the many roles at Endo where people might
24  have been involved in the business of identifying

Page 364

1  the risks of products -- my role at Endo were to
2  identify public policy issues where there was a
3  benefit to society, public health, a benefit to
4  the patient, and a benefit to Endo, and where
5  that intersection took place is where I spent my
6  time.
7    Q   Okay.  So identifying the risks of
8  opioids was not within your role at Endo.
9       MR. DAVIS:  Objection to form.
10  BY MS. HERZFELD:
11    Q   Did I understand your testimony
12  correctly?
13    A   I don't agree with that
14  characterization.  I am stating very clearly what
15  my role at Endo was.  I don't want to state what
16  it wasn't.  Because I know what it was.  It wasn't
17  a lot of things.
18    Q   Okay.  So whose job was it to identify
19  the risks to society, the risks to public health
20  and the risks to the patient to -- whose role was
21  it to identify and communicate that information to
22  lawmakers?
23       MR. DAVIS:  Objection to form.
24  Foundation.

Page 365

1       THE WITNESS:  Yeah, I don't understand
2  the question.
3  BY MS. HERZFELD:
4    Q   Okay.  During your tenure at Endo when
5  you were lobbying various lawmakers, did you ever
6  discuss with them the risks to society, the risks
7  to public health or the risks to patients of Endo
8  products?
9    A   We had conversations that acknowledged
10  the risks of all opioids for misuse and abuse.  So
11  I would say the answer to that question is yes.
12    Q   Okay.  Thank you.
13       And did Endo create any documents that
14  you saw that identified the risks to society, the
15  risks to public health or the risks to the
16  patients of Endo's opioid products?
17       MR. DAVIS:  Objection to form.
18       THE WITNESS:  I -- I don't recall such
19  documents.
20  BY MS. HERZFELD:
21    Q   Okay.  I'm going to hand you what we're
22  going to mark as Munroe Exhibit 47.
23       (Munroe Exhibit No. 47 was marked
24       for identification.)

Page 366

1    MS. HERZFELD: Could the witness see
2  that exhibit?
3    MR. DAVIS: I'm going to claw this
4  document back as protected attorney work product
5  given the involvement of legal counsel in
6  preparation for the Opana ER AdCom.
7    MS. HERZFELD: Who is the legal counsel
8  on the e-mail?
9    MR. DAVIS: There's no legal counsel on
10 the -- the e-mail.
11   MS. HERZFELD: So you're clawing it back
12 and there's no legal counsel?
13   MR. DAVIS: I'm not going to debate the
14 work-product doctrine with you right now, but
15 we're clawing it back.
16   MS. HERZFELD: Okay. Well, I'm
17 reserving my right to ask questions about this
18 document because I don't understand how it is that
19 you're declaring it work product if there's no
20 attorney on this e-mail.
21   MR. DAVIS: Again, I'm not going to
22 explain the work-product doctrine to you right
23 now, but we're clawing it back.
24   MS. HERZFELD: Pardon me?

Page 367

1    MR. DAVIS: I said I'm not going to
2  explain the work-product doctrine to you right
3  now, but we're clawing the document back.
4    MS. HERZFELD: Pardon me. Okay.
5  Well, we're going to object to that, and
6  specifically reserve the ability to question on
7  that, we -- question on this specific issue. This
8  e-mail very clearly has to do with Tennessee.
9  There's no attorney on it. You haven't indicated
10 that it was done at the direction of an attorney.
11   So I don't understand exactly what the
12 work-product privilege claimed here is, but we're
13 specifically reserving our right to -- to question
14 about this.
15   MR. DAVIS: Again, I'm not going to
16 discuss the work-product doctrine with you on the
17 record right now. We're clawing it back.
18   MS. HERZFELD: Okay, we'll talk about it
19 during the break. Okay?
20 BY MS. HERZFELD:
21   Q   Do you recall ever talking about the
22 opioid problem in Tennessee and discussing it as
23 it's a story about Tennessee, not a story about
24 Opana?

Page 368

1    MR. DAVIS: Objection to form.
2    THE WITNESS: I -- I don't recall.
3  BY MS. HERZFELD:
4    Q   Do you -- were you involved at all in
5  trying to figure out why it is that Tennessee had
6  such an abuse problem with Opana?
7    MR. DAVIS: Objection to form,
8  foundation.
9    THE WITNESS: I was not involved. That
10 would have been our pharmacovigilance and our
11 medical affairs department. The principal
12 individual at Endo would have been Dr. Neil
13 Shusterman, and he would have information about
14 that.
15 BY MS. HERZFELD:
16   Q   Okay. Do you recall ever encouraging
17 your colleagues to make the Opana abuse problem an
18 issue about Tennessee and not about Opana?
19   MR. DAVIS: Objection to form,
20 foundation.
21   THE WITNESS: I -- I just don't recall.
22 BY MS. HERZFELD:
23   Q   Okay. Is there something specific about
24 Tennessee that you think made it more ripe for

Page 369

1  abuse of Opana?
2    MR. DAVIS: Objection to form and
3  foundation.
4    THE WITNESS: I'm not an expert on drug
5  abuse, so I can't tell you why what was happening
6  in Tennessee was happening.
7  BY MS. HERZFELD:
8    Q   Did you ever hear any theories floated
9  as to why Tennessee seemed to have such an
10 Opana --
11   A   There were --
12   Q   -- injection problem?
13   MR. DAVIS: Let her finish the question.
14   THE WITNESS: Well -- yeah. I'm sorry.
15 Could you repeat the question, please?
16 BY MS. HERZFELD:
17   Q   Sure. Did you ever have any theories
18 floated as to why Tennessee had such an Opana
19 injection problem?
20   MR. DAVIS: Objection to form,
21 foundation.
22   THE WITNESS: Well, there were
23 discussions certainly at the company that I was
24 involved with about the abuse of Opana ER in

Highly Confidential – Subject to Further Confidentiality Review

Page 370

1 Tennessee.  So those discussions did happen, and I
2 was in the room for some of them.  But I can't for
3 the world recall what those discussions were in
4 any substantive way.
5 BY MS. HERZFELD:
6    Q    Okay.  And so you don't know that
7 anybody hypothesized why Tennessee had such a
8 problem with Opana?
9         MR. DAVIS:  Objection to form.
10        THE WITNESS:  I can't recall.
11 BY MS. HERZFELD:
12    Q    Have you heard during your time at Endo
13 that higher prescription rates per capita can
14 correlate to higher abuse rates of opioids?
15        MR. DAVIS:  Objection to form,
16 foundation.
17        THE WITNESS:  I -- I'm not an expert on
18 drug abuse rates or -- or that kind of
19 information, so that's not something that comes to
20 mind.
21 BY MS. HERZFELD:
22    Q    I understand you're not an expert, but
23 you were present when your subject matter experts
24 would have conversations with various elected

Page 371

1 officials or government officials or others.
2         So have you ever heard that a higher
3 prescription per capita rate of opioids can be
4 linked to a higher abuse rate?
5    A    I don't recall such conversations.
6    Q    Okay.  Or hearing that information?
7    A    I don't recall hearing that information.
8    Q    Okay.  Okay.  I'm going to hand you what
9 we'll mark as Munroe Exhibit 48.
10        (Munroe Exhibit No. 48 was marked
11        for identification.)
12 BY MS. HERZFELD:
13    Q    Okay.  What I've handed you we've marked
14 as Exhibit 48 is ENDO-OPIOID_MDL-02805111 through
15 113.
16        Sir, do you recognize this as an e-mail
17 from you to Matthew Davis?
18    A    I do.
19    Q    And who is Matthew Davis?
20    A    He was the head of R&D.
21    Q    Okay.  And this e-mail is dated
22 February 23rd, 2017; is that correct?
23    A    Yes.
24    Q    Okay.  And in this e-mail Matthew Davis

Page 372

1 writes about Endo being asked, "Why now?"
2         Do you see that?
3    A    Yes.  I -- I want to familiarize myself
4 with this e-mail, so I'm going to take a moment to
5 read it.
6    Q    Sure, sir.
7    A    (Peruses document.)
8         MR. DAVIS:  I claw this one back too.
9 Same principle.  This is covered by the
10 work-product doctrine.  It's work performed at the
11 direction of legal counsel.  Specifically Jenn
12 Dubas is referenced in the e-mail chain and copied
13 in the earlier chain.
14        MS. HERZFELD:  Okay.  We're going to
15 object to you clawing this back, and reserve our
16 right to question on this document.
17        MR. DAVIS:  Would -- would you just hang
18 on to them.  I don't want them on the record.
19 BY MS. HERZFELD:
20    Q    Do you know when Endo first observed a
21 problem with injection of Opana in Tennessee?
22        MR. DAVIS:  Objection to form.
23        THE WITNESS:  I don't.
24 BY MS. HERZFELD:

Page 373

1    Q    When were you first aware of it?
2    A    I don't know.
3    Q    Okay.  I'm going to hand you what we're
4 going to mark as Munroe Exhibit 49.  We can see if
5 this one does not get clawed back.
6         (Munroe Exhibit No. 49 was marked
7         for identification.)
8 BY MS. HERZFELD:
9    Q    For the record, it's ENDO-OPIOID_MDL-
10 04060965 through 68.
11    A    (Peruses document.)
12    Q    Sir, do you recognize this as an e-mail
13 sent from you to Stephen Mock on February 22nd,
14 2017?
15        MR. DAVIS:  Hang on, Brian.
16        (Counsel conferring.)
17        MR. DAVIS:  Can we go off the record for
18 a second, please?
19        THE VIDEOGRAPHER:  Is that okay,
20 Counsel?
21        The time is 7:37 p.m.  We're going off
22 the record.
23        (Pause in the proceedings.)
24        THE VIDEOGRAPHER:  The time is 7:41 p.m.

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1  We're back on the record.
2  BY MS. HERZFELD:
3     Q   Okay.  I just handed you a document
4  which your counsel has just removed from you.
5     MR. DAVIS:  Yeah, well, again, similar
6  to the last two documents we've clawed back, these
7  are documents that were prepared at the direction
8  of counsel in preparation for the Opana ER AdComs.
9  So we're calling them back as protected by the
10  work-product doctrine.
11     MS. HERZFELD:  Okay.  And is there an
12  attorney identified anywhere in this e-mail?
13     MR. DAVIS:  Again, I'm not going to
14  debate the work-product doctrine with you.  I
15  think you, like everyone in the room, understands
16  that an attorney not need be present on a
17  communication for the document to be protected by
18  the work-product doctrine.
19     MS. HERZFELD:  I understand that, but my
20  question is, is there anybody on this e-mail
21  that's an attorney?  I don't -- I'm just asking
22  that.  Do you know?
23     MR. DAVIS:  Can I see the e-mail?
24     Do you have Exhibit 49?

Page 375

1     Is it 49 we're talking about now?  Do I
2  have the right one in front of me?
3     MS. HERZFELD:  49.
4     You can follow up in a communication
5  after the deposition to let me know if there's an
6  attorney copied on this e-mail or any of the
7  others you've clawed back.
8  BY MS. HERZFELD:
9     Q   Okay.  I'm going to preserve our right
10  to question you on that e-mail as well, which has
11  been marked as Exhibit 49, subject to where we end
12  up on this work-product argument.
13     Sir, there was a time that Endo
14  discussed paying for addiction treatment services;
15  is that correct?
16     MR. DAVIS:  Objection to form.
17     THE WITNESS:  Yes.
18  BY MS. HERZFELD:
19     Q   Okay.  And the decision was ultimately
20  made that Endo should not pay for opioid addiction
21  treatment services; is that right?
22     MR. DAVIS:  Objection to form.
23     THE WITNESS:  Yes.
24  BY MS. HERZFELD:

Page 376

1     Q   Okay.  And were you involved at all in
2  that discussion?
3     A   Yes.
4     Q   Okay.  And what was your opinion in that
5  discussion?
6     MR. DAVIS:  Objection to form.
7     THE WITNESS:  I really didn't have an
8  opinion.  I -- I was -- I was learning about these
9  issues and wasn't familiar then or now with
10  addiction treatment.
11  BY MS. HERZFELD:
12     Q   And do you know if addiction treatment
13  services were ever funded by Endo in the state of
14  Tennessee?
15     MR. DAVIS:  Objection to form.
16     THE WITNESS:  I am unaware.
17  BY MS. HERZFELD:
18     Q   And when you were involved in those
19  discussions about addiction treatment services
20  being provided by Endo, do you recall saying that
21  if you provided addiction services treatments
22  to -- to people who needed them for opioid abuse
23  issues, that that could be deemed an admission of
24  guilt by Endo of some wrongdoing?

Page 377

1     MR. DAVIS:  Objection to form,
2  foundation.
3     THE WITNESS:  I don't recall any
4  conversations involving that.
5  BY MS. HERZFELD:
6     Q   Okay.  What about an e-mail?
7     A   I don't recall any e-mail in that
8  regard.
9     Q   Okay.  Do you think if Endo had provided
10  addiction treatment services for people addicted
11  to opioids that that would've reflected poorly on
12  Endo?
13     MR. DAVIS:  Objection to form.
14     THE WITNESS:  I -- it was not my job at
15  Endo to determine what would reflect poorly on
16  Endo or what would reflect well on Endo.  I might
17  have had views while I was an employee.  I might
18  have even shared those views.  But I can't tell
19  you what they were.
20  BY MS. HERZFELD:
21     Q   You don't remember?
22     A   I don't recall the specifics of why we
23  made a decision not to fund addiction treatment
24  services.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    Q   Do you recall generally?
2    A   I think generally, we thought we had
3  better ideas, and the company had a -- had a
4  history of undertaking initiatives to mitigate the
5  misuse and abuse of its products.
6        The conversations that I -- the ongoing
7  conversations I had throughout my tenure as an
8  employee, I recall that there were many
9  conversations and many ideas that came forward,
10  and in a general way, a decision not to proceed
11  down one path was arrived at by finding a better
12  path.
13    Q   Okay.  But ultimately, none of those
14  undertakings or initiatives that were discussed by
15  Endo ended up curbing the opioid abuse rates in
16  Tennessee; is that right?
17        MR. DAVIS:  Objection to form.
18        THE WITNESS:  I -- I'm not aware of the
19  opioid abuse rates in Tennessee.
20  BY MS. HERZFELD:
21    Q   Okay.  Did you hear of the opioid
22  injection -- Opana injection -- strike that.
23        Did you ever hear that the Opana
24  injection issue in Tennessee ever got solved?

Page 379

1        MR. DAVIS:  Objection to form.
2        THE WITNESS:  I -- I did not hear what
3  the situation was after I left as an employee.
4  BY MS. HERZFELD:
5    Q   What about when you were a consultant?
6    A   No, I -- I never -- I never really -- by
7  that time the company had -- had stopped marketing
8  its opioid products, and they weren't much of a
9  government relations priority.
10    Q   Okay.  And you didn't do any follow-up
11  to see how the folks in Tennessee were doing once
12  Opana was pulled from the market.
13        MR. DAVIS:  Objection to form.
14        THE WITNESS:  It wasn't -- my job at --
15  at Endo as head of government affairs was to
16  communicate the company's positions to elected and
17  appointed officials on those issues that we
18  identified were -- had a benefit to society,
19  public health, or benefit to patients, and also a
20  benefit to Endo.  So that's where I spent my time.
21  BY MS. HERZFELD:
22    Q   And when they didn't have benefits, like
23  people injecting Endo's drug Opana into their
24  veins and then overdosing in Tennessee, did your

Page 380

1  office do anything to follow up on that
2  non-benefit of an Endo opioid product?
3        MR. DAVIS:  Objection to form.
4        THE WITNESS:  I -- I don't want to
5  characterize all of the work that I didn't do.  I
6  feel more comfortable characterizing the work that
7  I did do.  And that work was at the intersection
8  of public policy issues that had a benefit to
9  society, public health, or the patient, which also
10  had a benefit to Endo.
11  BY MS. HERZFELD:
12    Q   And did those intersection of public
13  policy issues when you're talking about the
14  benefit to society, public health or the patient,
15  the people that were abusing Opana by injecting it
16  into their veins and then overdosing, did -- was
17  that something you would consider a benefit of
18  Opana?
19    A   Well, I would say --
20        MR. DAVIS:  Objection to form.
21        THE WITNESS:  -- this:  That there
22  certainly was not a benefit to Endo, and that we
23  were very concerned about mitigating the abuse and
24  misuse of opioids throughout the United States,

Page 381

1  including Tennessee.
2        (Munroe Exhibit No. 50 was marked
3         for identification.)
4  BY MS. HERZFELD:
5    Q   Great.  I'm going to hand you what we've
6  marked as Munroe Exhibit 50.
7        Take a look at that, please.
8    A   (Peruses document.)
9        MR. DAVIS:  Claw this back.  These are
10  draft slides prepared for the Opana ER AdCom that
11  were prepared at the direction and with the -- the
12  guidance of legal counsel at the company.
13        MS. HERZFELD:  Okay.  We're going to
14  object to your clawback on this document.  So
15  you're aware, it was not clawed back in a previous
16  deposition.  Okay?
17        I'm reserving my right to ask a
18  multitude of questions about this document.
19  BY MS. HERZFELD:
20    Q   Sir, do you ever recall saying that the
21  opioid abuse problem was a perception and not a
22  reality?
23        MR. DAVIS:  If you're going to ask him
24  questions that are based upon the substance of a

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1  document that we've just clawed back, I'm going to
2  ask -- instruct Mr. Munroe not to answer.
3        MS. HERZFELD:  I'm just asking if he
4  recalls saying it.
5        THE WITNESS:  On the advice --
6        MR. DAVIS:  Do you recall saying --
7        THE WITNESS:  On the advice of counsel,
8  I'm choosing not to answer that question.
9  BY MS. HERZFELD:
10       Q    Okay.  Do you believe that there is an
11  opioid drug abuse problem in this country?
12       A    I do.
13       Q    Okay.  And do you believe that that's a
14  legitimate problem?
15       A    What do you mean by "legitimate"?
16       Q    Do you believe it's a problem that's
17  created by the media or do you believe that there
18  is actually a drug abuse problem?
19       MR. DAVIS:  Objection to form.
20       THE WITNESS:  I think -- I was aware
21  during my entire employment at Endo, and I am
22  aware today, of the risk from misuse and abuse of
23  all opioids.
24  BY MS. HERZFELD:

Page 383

1        Q    Have you ever known anyone that's been
2  addicted to opioids, sir?
3        MR. DAVIS:  Objection to form.
4        THE WITNESS:  I don't recall that I do.
5  BY MS. HERZFELD:
6        Q    Have you ever met someone who has abused
7  opioids?
8        MR. DAVIS:  Objection to form.
9        THE WITNESS:  I don't recall that I
10  do -- that I have.
11  BY MS. HERZFELD:
12       Q    Okay.  Do you -- have you ever visited
13  with someone who considers themselves to be in
14  recovery from an abuse to opioids?
15       MR. DAVIS:  Objection to form.
16       THE WITNESS:  I don't recall that I
17  have.
18  BY MS. HERZFELD:
19       Q    Have you ever been to Tennessee, sir?
20       A    Yes, I have.
21       Q    Okay.  Where have you been?
22       A    Recently with my family, we went to
23  Pigeon Forge, Tennessee, to the Great Smoky
24  Mountain National Park and Dollywood.

Page 384

1        Q    I hope you enjoyed Dollywood.
2        A    Yes.  Thank you.
3        Q    Are you aware that that region of
4  Tennessee has been particularly hard hit by the
5  opioid abuse epidemic?
6        MR. DAVIS:  Objection to form.
7        THE WITNESS:  I -- I am aware that --
8  that Appalachia has been hit and that -- I'm not a
9  geography expert, but that that part of Tennessee
10  is -- is known to be part of Appalachia.
11  BY MS. HERZFELD:
12       Q    Okay.  And other than that trip with
13  your family to Pigeon Forge, have you been to
14  Tennessee for any other reason professionally?
15       A    I might have been to Tennessee to the
16  state capital early in my career, because I did a
17  lot of work in state government affairs, but it
18  would have been so long ago that I don't recall
19  the details.
20       Q    Okay.  And have you been to any other
21  city in Tennessee other than Nashville or --
22       A    Not that I recall.
23       Q    Have you ever spoken with any law
24  enforcement in Tennessee?

Page 385

1        A    Not that I recall.
2        Q    Okay.  I'm going to hand you what we're
3  marking as Munroe Exhibit 51.
4        (Munroe Exhibit No. 51 was marked
5         for identification.)
6  BY MS. HERZFELD:
7        Q    Sir, do you recognize this as an e-mail
8  with an attached PowerPoint that was sent from
9  your e-mail account on May 30th, 2012, to the
10  people listed in the "to" line?
11       A    Yes, I do.
12       Q    Okay.  And the attachment is
13  "Prescription Drug Abuse Deck, 6/5/2012"; is that
14  right?
15       A    You -- you read that correctly.
16       Q    Okay.  And did you create this document?
17       MR. DAVIS:  Objection to form.
18       THE WITNESS:  I don't recall.  I don't
19  recall this document.  It was seven years ago?
20  Yeah.  I don't recall this document.
21  BY MS. HERZFELD:
22       Q    Okay.  If you will look with me on that
23  first page, the orange one.  Do you see it?
24       A    This one (indicating)?

Page 386

1   Q   Yes, sir.
2   A   Yeah.
3   Q   It says: "Prescription drug abuse,
4 legislative and regulatory issues."  Do you see
5 where I'm at?
6   A   I do see that.
7   Q   And then it says: "Brian Munroe,
8 June 5th, 2012"; is that right?
9   A   Yes.
10   Q   Okay.  So did you give a presentation
11 with this slide deck?
12   A   I don't recall if I did or not.  I --
13 I'm looking at the cover e-mail.  It says:
14 "Thanks, Team, for helping put this together."  So
15 a number of people would have had input on putting
16 it together, and --
17   Q   It's your name on the front; is that
18 right, sir?
19   A   It is.
20   Q   Okay.  And so looking for me on page 2
21 of this, the title is "Is Prescription Drug Abuse
22 Really a Problem?"
23       Do you see the question there?
24   A   You did read that correctly.

Page 387

1   Q   Okay.  And then the answer, it says,
2 "A," could you read that for me, please.
3   A   It says: "It is for Endo.  Did you see
4 the letter from Senators Baucus and Grassley?"
5   Q   Okay.  And then on slide 3.  So page 3
6 of the slide, it's double-sided there for you.
7       The question is, "Why?"  And then the
8 answer, if you could read that for me, please.
9   A   "Because the media and the government
10 say so frequently."
11   Q   Okay.  So here, are you contending that
12 the prescription drug abuse in this country in
13 2012 was only a problem because the media and the
14 government said it was?
15   A   I have testified that the opioid abuse
16 issue in America is a real problem.
17   Q   I understand that, sir.  But my question
18 is, why in this slide we're talking about whether
19 drug abuse really is a problem, and because the
20 media and government say so.  I'm trying to
21 understand the purpose of these slides.
22   A   Well --
23       MR. DAVIS:  Objection to form.
24       THE WITNESS:  -- I can't speak directly

Page 388

1 to the slides because I don't have any
2 recollection of this slide deck from seven years
3 ago in which I may have had a role in -- in
4 developing or not.  I -- I have no recollection,
5 although the cover e-mail says, "Thanks, Team."
6 So it could have been outside consultants.  It
7 could have been members of my staff.
8       I will say that in my role as head of
9 government affairs, where I was directly involved,
10 it mattered hugely what the government was saying.
11 So that's something that would have -- that --
12 that strikes a chord with me.  While I don't
13 remember the specifics of the document, it strikes
14 a chord that I would be interested in what the
15 government's position was on all public policy
16 issues.
17 BY MS. HERZFELD:
18   Q   Okay.  And if you could turn with me to
19 slide 5.
20       Slide 5 says "Perception is Reality,"
21 quote from Lee Atwater there.
22       Do you know why this quote was selected
23 for this slide?
24   A   I don't.

Page 389

1   Q   Do you know what was meant by it?
2   A   I have no recollection of this slide
3 whatsoever.
4   Q   Okay.  And then the next line is:
5 "There is no reality, only perception."  That's a
6 quote from Dr. Phil.  Do you see that?
7   A   I do.
8   Q   Okay.  Did you select that quote?
9   A   I have no recollection of this slide
10 whatsoever.
11   Q   Was it Endo's position in 2012 that
12 prescription drug abuse was not in fact a reality?
13       MR. DAVIS:  Objection to form.
14       THE WITNESS:  It was our -- it was --
15 it's my understanding of the company's position on
16 all these issues related to prescription drug
17 abuse, from the moment I became an employee at
18 Endo, that we were aware of the risk of misuse and
19 abuse of all opioids and -- and came to understand
20 that there was in fact a serious prescription drug
21 abuse problem in America.
22 BY MS. HERZFELD:
23   Q   Okay.  If you could switch with me to
24 slide 12, please.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 390

1  Slide 12 says: "Big Problem = Effective
2  Solutions Take Time and Policymakers Don't Have
3  Time."
4  Did I read that correctly?
5  A  Yes.
6  Q  Okay.  Did you author this slide?
7  A  I have no recollection of this slide
8  whatsoever.
9  Q  Do you know what was meant by this
10 slide?
11 A  I -- I don't want to speculate about
12 what it might mean because I just have no
13 recollection of seeing this -- this draft.
14 Q  Okay.  If you'll switch with me to
15 slide 13.
16 And then slide 13, what is the title
17 there?
18 A  "Threats to good public policy."
19 Q  Okay.  And it identifies two threats on
20 this slide; is that right?
21 A  I'm not sure whether it's two or three.
22 There's kind of three little sections here, and I
23 have no recollection of this slide whatsoever.
24 Q  Okay.  So could you read to me the first

---

Page 391

1  one, please.
2  A  "Bipartisan alarm about perceived
3  crisis."
4  Q  And "crisis" is in quotes, right?
5  A  Yes.
6  Q  Okay.  And do you know why this language
7  was included?
8  A  No.
9  Q  Okay.  And Endo -- did Endo not believe
10 that there was an opioid crisis in 2012?
11 MR. DAVIS:  Objection to form.
12 THE WITNESS:  I don't want to speak to
13 the dates.  I can say that Endo and everybody that
14 I worked with at Endo believed that there was a
15 genuine prescription drug abuse issue in America.
16 BY MS. HERZFELD:
17 Q  Okay.  And when did you come to that
18 understanding?
19 A  I don't recall the date.
20 Q  Okay.  And at some point in your career
21 you didn't have that information, and then at some
22 point you did come to that understanding that
23 there was a real opioid crisis in America; is that
24 right?

---

Page 392

1  MR. DAVIS:  Objection to form.
2  THE WITNESS:  I -- I don't recall the
3  date and whether it was from my time at the
4  beginning of Endo or when I came to that
5  realization.
6  BY MS. HERZFELD:
7  Q  Okay.  And do you recall why you came to
8  that realization?
9  A  I don't recall.
10 Q  Do you recall if there was specific
11 facts or a specific event that kind of clued you
12 in to the fact that there was an opioid abuse
13 problem in this country?
14 A  Well, I know that my meetings at the
15 Pain Care Forum were a great educational avenue
16 for me because the Pain Care Forum had drug abuse
17 experts, addiction experts, people that would
18 provide information about prescription drug abuse.
19 And so that would have been one source of -- of
20 the information beyond, you know, just reading in
21 the press about the -- the genuine issue our
22 company -- our country faced.
23 Q  Okay.  Let's go back to the "Threats to
24 good public policy."  The second one says, quote,

---

Page 393

1  "Fix it now," end quote, "syndrome."
2  Do you know what that is?
3  A  I don't know what that is.
4  Q  Do you know why it was included in this
5  slide?
6  A  No.
7  Q  Okay.  And then the last one, it
8  concludes:  "Need for a strong defense to prevent
9  harmful policy actions."
10 Did I read that correctly?
11 A  You did.
12 Q  Do you know what that means?
13 A  I don't know what it means.
14 Q  Do you know why it was included in this?
15 A  I don't.  I -- I do know that we sought
16 to protect physicians' ability to write
17 prescriptions for appropriate medications for
18 appropriate patients, and that those patient
19 concerns and patient benefits were a big part of
20 our public policy initiatives.
21 Q  Okay.  Is Endo suggesting with this
22 statement that it must defend itself against
23 government action to stop the opioid crisis?
24 MR. DAVIS:  Objection to form.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1    THE WITNESS:  I don't think so.  I think
2 what we were trying to do was identify issues that
3 had a benefit to society, public health, or the
4 patient, and work on public policy issues where
5 there was an intersection between those three
6 principles and benefits to the company.
7 BY MS. HERZFELD:
8    Q   So while you were doing that, who was
9 working on protecting individuals who were getting
10 addicted to Endo's opioids?
11    MR. DAVIS:  Objection to form,
12 foundation.
13    THE WITNESS:  I don't know.
14 BY MS. HERZFELD:
15    Q   Okay.  Do you know if Endo had
16 identified the opioid crisis as being legitimate
17 prior to 2012 when these slides were created?
18    MR. DAVIS:  Objection to form,
19 foundation.
20    THE WITNESS:  I -- I don't know the
21 dates.
22 BY MS. HERZFELD:
23    Q   I'm going to hand you what we will mark
24 as Munroe 52.

Page 395

1    (Munroe Exhibit No. 52 was marked
2    for identification.)
3 BY MS. HERZFELD:
4    Q   Okay.  Do you recognize this as an
5 e-mail sent from Timothy Byrne to you and Greg
6 Thomas?
7    A   Actually, it's sent to Caroline Manogue.
8    Q   You are correct.  Copying you and Greg
9 Thomas; is that right?
10    A   That's right.
11    Q   Okay.  And it's attaching the 2012
12 strategic plan; is that correct?
13    A   That's what this e-mail indicates.
14    Q   Okay.  And so looking at the attachment,
15 the draft of "Endo Government Affairs 2012
16 Strategic Plan," if you will switch with me to the
17 page marked 18, by y'all's page numbers, not the
18 Bates.  It would be Bates number MDL-06213518.
19    The top of it says "2012 Objectives by
20 Department," page 18.  Do you see where I'm at,
21 sir?
22    A   I think so.  Is this page 18?  Is
23 that -- do I have that right?
24    MR. DAVIS:  Yeah, that's right.

Page 396

1    THE WITNESS:  Okay, yeah.
2 BY MS. HERZFELD:
3    Q   Okay.  And if you'll look down with me,
4 it says "External Affairs."  This is the topic; is
5 that correct?
6    A   It -- it appears to be the topic.
7    Q   Okay.  And going down to "State
8 Priorities," do you see where I'm at?
9    A   Yes.
10    Q   Okay.  And it says "TRF," and then a
11 bunch of states.  What does TRF stand for?
12    A   Tamper-resistant formulation.
13    Q   Okay.  And Tennessee is listed among
14 several other states there; is that correct?
15    A   It is.
16    Q   Okay.  Now, if you could switch with me
17 to the page marked 33, Bates 06213533.
18    The top says:  "Candie Phipps, 2012
19 Southwest Regional and Tennessee Action Plan."
20    Do you see where I'm at?
21    A   I do.
22    Q   Okay.  And so looking at that, it says:
23 "New Opana ER formulation.  With the expected
24 launch of Opana ER, Endo's state government

Page 397

1 affairs will provide support to the Southwest
2 region and Tennessee through various efforts."
3    Did I read that correctly?
4    A   You did.
5    Q   Okay.  And then number 1 states:
6 "Implement protections at the state level to
7 prevent the inappropriate substitution of generic
8 products for Opana ER tamper-resistant formulation
9 prescriptions."
10    Did I say -- say that correctly?
11    A   Yes.
12    Q   Okay.  And then, "Introduce and pass TRF
13 legislation in Louisiana and Tennessee."  Is that
14 right?
15    A   That's what this says.
16    Q   Okay.  And do you know if legislation
17 for tamper-resistant formulas was ever introduced
18 in Tennessee?
19    A   I -- I don't recall.
20    Q   Okay.  Do you recall any proposed
21 legislation in Tennessee to have Opana ER
22 reformulated put on a tamper-resistant list?
23    A   I don't recall.
24    Q   Would you have been involved in that, in

---

Page 398

1 those efforts?
2    A   I would not have been directly involved
3 in those efforts.  That would have -- that was a
4 department that reported to Greg Thomas, and then
5 he had people underneath him and they had
6 consultants working for them.  So it would have
7 been several steps removed from me.
8    Q   Okay.  So that wouldn't have been
9 something that was within your purview.
10      MR. DAVIS:  Objection to form.
11      THE WITNESS:  Well, it was -- it was
12 happening within my department, but not something
13 that I did on a day-to-day basis.
14 BY MS. HERZFELD:
15    Q   Okay.  Have you ever heard of Opana ER
16 getting put on a list of tamper-resistant
17 formulas?
18    A   What I recall --
19      MR. DAVIS:  Objection to form.
20      THE WITNESS:  -- is our public policy
21 position that we believed that if there were
22 generic versions of Opana ER ADF on the market at
23 the same time as Opana ER ADF, that it would
24 undermine the potential success at mitigating

---

Page 399

1 misuse and abuse of Opana ER ADF.  So we undertook
2 efforts to educate lawmakers in that regard.
3      Now, as to the specific state
4 activities, I don't recall.
5 BY MS. HERZFELD:
6    Q   Okay.  But Opana ER reformulated never
7 actually got the abuse-deterrent labeling from the
8 FDA; is that right?
9      MR. DAVIS:  Objection to form.
10      THE WITNESS:  I don't want to speak to
11 the label, but if you do have questions about the
12 label, Bob Barto was our head of regulatory
13 affairs, and he would be able to address those
14 issues for you.
15 BY MS. HERZFELD:
16    Q   Okay.  And I understand you don't want
17 to speak to it, but my question is, do you know if
18 Opana ER reformulated ever received abuse-
19 deterrent labeling?
20      MR. DAVIS:  Objection to form.
21      THE WITNESS:  I really don't want to
22 talk about the label because that's just not
23 something that I have a -- a comfort level with in
24 terms of my area of expertise.

---

Page 400

1 BY MS. HERZFELD:
2    Q   I understand that, sir, but my question
3 is do you have knowledge.  That's -- that's my
4 question.  So you're here today --
5    A   I don't recall knowledge --
6    Q   -- because I'm allowed to ask you --
7      MR. DAVIS:  Let her finish the question.
8 BY MS. HERZFELD:
9    Q   I'm sorry.  You don't have any
10 knowledge, is that what you said?  I didn't hear
11 you.
12      MR. DAVIS:  Ask him the question again,
13 please.
14      MS. HERZFELD:  Sure.
15 BY MS. HERZFELD:
16    Q   I'm asking if you have any knowledge if
17 Opana ER reformulated received abuse-deterrent
18 labeling?
19      MR. DAVIS:  Objection to form.
20      You can answer that.
21      THE WITNESS:  I don't recall any level
22 of knowledge about the answer to that question.
23 BY MS. HERZFELD:
24    Q   Okay.  And do you know if you ever had

---

Page 401

1 knowledge of the answer to that question, or you
2 just don't remember today?
3      MR. DAVIS:  Objection to form.
4      THE WITNESS:  I can't say.  I just don't
5 know.
6 BY MS. HERZFELD:
7    Q   Okay.  Okay.  What would be considered a
8 threat -- a state legislative opportunity that
9 would be a threat to Endo in regard to opioids?
10      MR. DAVIS:  Objection to form,
11 foundation.
12      THE WITNESS:  A threat might be an
13 impediment to a physician's ability to write an
14 appropriate prescription medicine for an
15 appropriate patient for an appropriate disease
16 state.
17      One of our public policy goals was to
18 facilitate patient access to appropriate pain care
19 medications that were deemed appropriate by
20 physicians.
21 BY MS. HERZFELD:
22    Q   Okay.  And physicians can work at pill
23 mills; is that right?
24      MR. DAVIS:  Objection to form.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1 Foundation.
2        THE WITNESS:  I don't know about --
3 anything about physicians working at pill mills,
4 actually.
5 BY MS. HERZFELD:
6    Q   Okay.  We talked before about pill
7 mills.  I believe you talked about knowing that
8 it's a place where people would go to get an
9 illegitimate prescription; is that right?
10    A   I don't recall what our conversation
11 was.
12    Q   Oh, okay.  Okay then.
13        Do you recall what, if any, groups
14 specific in Tennessee you worked with --
15        MR. DAVIS:  Objection.
16 BY MS. HERZFELD:
17    Q   -- for your lobbying efforts at Endo?
18        MR. DAVIS:  Objection to form.
19        THE WITNESS:  No, I don't recall.
20 BY MS. HERZFELD:
21    Q   Okay.  Did you have a contract lobbyist
22 in Tennessee?
23    A   I believe at one point the company did
24 have a contract lobbyist.  That would have been a

Page 403

1 contract lobbyist that worked for Candie Phipps.
2    Q   Okay.  And why did the company have a
3 contract lobbyist in Tennessee?
4    A   It would have been to pursue public
5 policy issues where we believed there was a
6 benefit to society, public health, or a benefit to
7 appropriate patient care and a benefit directly to
8 the patient, and also an intersection with what
9 was beneficial to Endo.
10    Q   Okay.  And who on the lobbying staff's
11 job would it have been to protect the interests of
12 those who were being addicted to Opana in
13 Tennessee?
14        MR. DAVIS:  Objection to form.
15        THE WITNESS:  Our job in -- in
16 government affairs was to work on -- on those
17 issues where there was a benefit to society,
18 public health, or a benefit to the patient, and
19 where there was an intersection of those
20 principles with benefits to Endo.
21        What we didn't work on -- I don't want
22 to speak to what we didn't work on, because what
23 we didn't work on was -- was, frankly, infinite
24 where there were a lot of things we didn't do.  I

Page 404

1 feel totally comfortable describing what we did
2 do, and -- and those were efforts that I was proud
3 of.
4 BY MS. HERZFELD:
5    Q   Okay.  And my question is, who, if
6 anyone, in government affairs was responsible for
7 looking out for the people who were getting
8 addicted to Endo's product in Tennessee?
9        MR. DAVIS:  Objection to form,
10 foundation.
11        THE WITNESS:  We worked on -- I can tell
12 you what we did work on.  I can't speak to the
13 issues of what we didn't do, but I can speak to
14 the issues of what we did do.  And what we did do
15 was work on public policy issues where there was a
16 benefit to society, public health, benefit to
17 patients, and where those ideals intersected with
18 the interests of Endo.
19        MS. HERZFELD:  I'm going to move to
20 strike the answer there.
21 BY MS. HERZFELD:
22    Q   My question is, was there anyone on the
23 staff of government affairs whose responsibility
24 it was to look out for the people who were getting

Page 405

1 addicted to Opana in Tennessee?
2        MR. DAVIS:  Objection.
3 BY MS. HERZFELD:
4    Q   It's a simple question.  Was there
5 somebody or was there not?
6        MR. DAVIS:  Objection to form,
7 foundation.
8        THE WITNESS:  I believe strongly that
9 the work we did which was directly related to
10 public policy issues where there was a benefit to
11 society, public health or a benefit to patients,
12 and where those ideals intersected with benefits
13 to Endo, that we would engage in public policy
14 activities.  I don't want to describe the infinite
15 number of things we didn't do.  I would rather be
16 forthcoming and tell you what we did do.
17 BY MS. HERZFELD:
18    Q   Okay.  And so you've told me what you
19 did do, and you've said you don't want to talk
20 about what you didn't do.
21        So was there someone in charge of
22 addiction stuff in Tennessee or was there not?
23        MR. DAVIS:  Objection to form.  Asked
24 and answered.

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1    THE WITNESS: I think --
2    MS. HERZFELD: He hasn't answered it.
3    THE WITNESS: -- I've answered this
4  question, you know, many times.
5  BY MS. HERZFELD:
6    Q   You talked about what you did do, and
7  you talked about what you didn't do. And my
8  question is simple: Was there somebody assigned
9  to look out for those interests in Tennessee?
10   MR. DAVIS: Objection to form, asked and
11 answered.
12   THE WITNESS: I can tell you that we did
13 work on public policy issues --
14 BY MS. HERZFELD:
15   Q   Okay. I'm going to back up.
16   A   -- where there was a --
17   MR. DAVIS: Let him finish his answer.
18   THE WITNESS: -- benefit to society,
19 public health, and a benefit to patients -- and/or
20 a benefit to patients.
21 BY MS. HERZFELD:
22   Q   Okay. How about --
23   A   And where those principles intersected
24 with the interests of Endo.

Page 407

1    MS. HERZFELD: Okay. I'm going to move
2  to strike that as nonresponsive.
3  BY MS. HERZFELD:
4    Q   What was the name of the person who was
5  in charge in government affairs of looking out for
6  people who were addicted to Endo's products?
7    MR. DAVIS: Objection to form,
8  foundation.
9    THE WITNESS: Yeah, I --
10 BY MS. HERZFELD:
11   Q   Do you have a name?
12   A   I don't remember all the names of the
13 employees in my department over the years.
14   Q   Okay.
15   A   I can't recite them, you know, off the
16 cuff.
17   Q   Okay. And would there have been a title
18 of a person whose job would have included that?
19   MR. DAVIS: Objection to form.
20 Foundation.
21   THE WITNESS: I can tell you that the
22 people that did work for me in state government
23 affairs in particular would have worked on public
24 policy issues where there was a benefit to

Page 408

1  society, public health, and a benefit to patients,
2  and where those principles intersected with
3  interests of Endo. I can tell you that. That
4  happened in both state government affairs and in
5  federal government affairs.
6    MS. HERZFELD: I'm going to move to
7  strike that answer as nonresponsive.
8  BY MS. HERZFELD:
9    Q   I'm going to hand you what we're marking
10 as Munroe Exhibit 53.
11   (Munroe Exhibit No. 53 was marked
12   for identification.)
13 BY MS. HERZFELD:
14   Q   Okay. This is ENDO-OPIOID_MDL-02795421
15 and 22, with -- the attachment is 95460 through
16 66. We didn't print out all of attachments, just
17 the one that was relevant to Tennessee.
18   Sir, do you recognize this as an e-mail
19 sent from you to James Manser?
20   A   I do.
21   Q   Okay. And that's dated June 26, 2014;
22 is that correct?
23   A   Yes.
24   Q   Okay. And it's forwarding an e-mail

Page 409

1  from Alan Must to you, copying Burt Rosen, about
2  materials distributed for the meetings in
3  Pennsylvania that day. Is that right?
4    A   That's what this says.
5    Q   And do you know --
6    A   You read that correctly.
7    Q   And it says in the subject, "HR659,
8  Opioid Addiction Advisory Committee Meeting,
9  6-26-14."
10   Did I read that correctly?
11   A   That sounds right.
12   Q   Okay. So if you'll switch with me to
13 the attachment that says "Joint State Government
14 Commission, dated June 4th, 2014." Do you see
15 where I'm at?
16   A   I do.
17   Q   Okay. And then it says, title:
18 "Prescription for Success: Statewide Strategies
19 to Prevent and Treat the Prescription Drug Abuse
20 Epidemic in Tennessee."
21   Did I read that correctly?
22   A   You did.
23   Q   Okay. And do you know who created this
24 document?

Highly Confidential – Subject to Further Confidentiality Review

Page 410

1    A   I don't.

2    Q   Do you know where it came from?

3    A   This document does not look familiar to

4  me, and as -- as the -- the cover e-mail

5  indicates, this is something that I sent along FYI

6  to the person who handled state government

7  relations.  And specifically Pennsylvania, that

8  would be James Manser.  So I just forwarded this

9  along.

10   Q   Okay.  And if you just flip through --

11   A   I'm not even sure I read it at the time,

12  but I don't recall ever seeing it.

13   Q   Okay.  If you'll just flip through it --

14  I don't need you to read every page, but if you'll

15  just kind of generally flip through it for me.  It

16  talks very specifically about different things

17  that can be done on -- to combat opioid abuse in

18  Tennessee.

19       Do you know if Endo did any of the

20  things that are recommended in this document?

21       MR. DAVIS:  If you're going to ask him

22  that question, he's going to do a lot more than

23  just flip through the document.

24       THE WITNESS:  Well -- well, first of

Page 411

1  all, I don't recognize the document.

2  BY MS. HERZFELD:

3    Q   Okay.

4    A   So I don't know -- I -- on both fronts,

5  I don't recognize the document, and I don't know

6  all of the things that Endo did or does to

7  mitigate the misuse and abuse of opioids.

8    Q   Okay.

9    A   So I wouldn't be able to crosswalk an

10  answer for you --

11   Q   Okay.

12   A   -- because I don't -- I'm not familiar

13  with this document, and I'm not familiar with

14  everything that Endo has done to mitigate the

15  misuse and abuse of opioids.

16   Q   Okay.  Very good.  Thank you, sir.  You

17  can put that aside.

18       Okay.  And I think I just have a couple

19  more questions for you.

20       I'll mark this as Munroe Exhibit 54.

21       (Munroe Exhibit No. 54 was marked

22       for identification.)

23  BY MS. HERZFELD:

24   Q   This is ENDO-OPIOID_MDL-02791740

Page 412

1  through 42 with an attachment -- two attachments.

2       Sir, do you recognize this as an e-mail

3  sent from Greg Thomas to you and Timothy Byrne?

4    A   I do.

5    Q   Okay.  And looking down at the e-mail

6  that was forwarded to you, does this indicate

7  that, based on prescription volume for those past

8  13 weeks leading up to November 13th, 2012, that

9  Tennessee was number two in the market for

10  Opana ER?

11   A   Yeah, I'm -- I'm really unfamiliar with

12  this data.

13   Q   Sure.  Well, let's just read the e-mail

14  that is being forwarded to you.

15   A   Okay.

16   Q   So it says:  "Tim and Brian, per our

17  brief discussion on researching the state

18  substitution laws, please see e-mail below

19  regarding the top ten states for Opana.  Look

20  forward to discussing moving ahead on this

21  project.  Greg."

22       Did I read that correctly?

23   A   You did.

24   Q   Do you know what the project is he's

Page 413

1  referring to?

2    A   I don't.

3    Q   Okay.  Do you know if you were working

4  on state substitution laws in some states?

5    A   That -- that sounds familiar, but I -- I

6  don't recall the details of it.

7    Q   And when I say "state substitution

8  laws," what do you -- what do you take that to

9  mean?

10   A   We believed that having generic versions

11  of Opana ER on the market at the same time that

12  the new formulation was on the market would

13  undermine the ability of Opana ER new formulation

14  to reach its full potential in the mitigation of

15  misuse and abuse.

16   Q   Okay.  And that mitigation, the intended

17  mitigation of Opana ER reformulated didn't work so

18  well in Tennessee because they continued injecting

19  Opana ER; is that right?

20       MR. DAVIS:  Objection to form.

21       THE WITNESS:  I --

22       MR. DAVIS:  Foundation.

23       THE WITNESS:  I don't want to speak to

24  the particular drug abuse issues in Tennessee

Highly Confidential – Subject to Further Confidentiality Review

Page 414

1 because I'm just not knowledgeable about them. I
2 did become aware of them when there were
3 discussions that happened at the company.
4 BY MS. HERZFELD:
5    Q   Okay.
6    A   And I -- I did read about them in the
7 press.
8    Q   Okay.
9    A   So I have a -- high level of
10 familiarity with them, but I don't know about
11 the -- the Tennessee prescription drug abuse
12 problems in particular, so I would like to limit
13 my remarks.
14       But I would refer you to Dr. Neil
15 Shusterman, our chief medical officer at the time,
16 who is very expert in these issues and could
17 probably answer your questions.
18    Q   Okay. And looking down at the e-mail
19 that was forwarded to you, it says: "Hi, Greg, I
20 have attached a spreadsheet containing IMS Xponent
21 level data for the current 13-week period as of
22 10/26/12."
23       Did I read that correctly?
24    A   I'm just paying attention to this for

Page 415

1 the first time in my recollection, so I -- like I
2 said, I don't recall this at all. But, yeah, I
3 think you read that correctly.
4    Q   Okay. And my question is very simple.
5 So Rowan D'Annibale, in Rowan's e-mail to Greg
6 Thomas, identifies Tennessee as one of the top ten
7 states for Opana ER, according to this e-mail; is
8 that right?
9    A   That's what this e-mail indicates, I
10 believe.
11    Q   Okay. Thank you, sir.
12       Okay, this is my last one. We will mark
13 this as Munroe Exhibit 55.
14       (Munroe Exhibit No. 55 was marked
15       for identification.)
16 BY MS. HERZFELD:
17    Q   It's EPI001106854 through 856 with an
18 attached PowerPoint.
19       Sir, do you recognize this as an e-mail
20 sent from Greg Thomas to Timothy Byrne and you,
21 copying a bunch of people?
22    A   Yes, I do.
23    Q   And the date on this e-mail is
24 November 13th, 2012; is that correct?

Page 416

1    A   That's what this says.
2    Q   Okay. And then Greg is passing along
3 information to you and Timothy as an FYI; is that
4 right?
5    A   That's what this says.
6    Q   Okay. Do you recall reading this
7 e-mail?
8    A   I don't.
9    Q   Okay. If you'll go down with me to the
10 e-mail from Annnibale -- or Rowan D'Annibale,
11 which is being forwarded then on from Greg to you,
12 it talks about "Key Insights."
13       Do you see where I'm at?
14    A   I do.
15    Q   Okay. And so see where it says
16 "oxymorphone HCl"?
17    A   I do.
18    Q   Could you read that for me, please.
19    A   "Oxymorphone HCl ER and contributes 40
20 percent of the TRx volume in the current 13 weeks.
21 The Midwest has also seen the most significant
22 decline in Opana ER volume since the
23 reformulation."
24    Q   Okay. Then the next one, "Oxymorphone

Page 417

1 HCl."
2    A   "ER is geographically concentrated with
3 40 percent of TRx volume coming from four
4 districts - Tennessee, Western PA, Kentucky, Ohio,
5 West Virginia. More than 22 percent of TRx volume
6 is from four Tennessee footprints - East
7 Knoxville, North Knoxville, East Nashville and
8 West Nashville."
9    Q   Okay, you can stop right there.
10       Do you know of any specific action that
11 Endo took in response to getting these numbers
12 about the concentration of oxymorphone HCl ER in
13 those districts?
14       MR. DAVIS: Objection to form.
15       THE WITNESS: I'm just looking at this
16 document for the first time.
17 BY MS. HERZFELD:
18    Q   Sure.
19    A   (Peruses document.)
20    Q   My question is pretty simple. Do you
21 know of any activities that Endo took specifically
22 in response to this information about the
23 geographic concentration of prescription volumes
24 in these four footprints for oxymorphone HCl ER?

Page 418

1    MR. DAVIS:  Objection to form.
2    THE WITNESS:  I just don't recall seeing
3  this document, so I'm just taking a quick look at
4  it.
5  BY MS. HERZFELD:
6    Q   You can take a look at it, that's fine.
7    A   (Peruses document.)  No.
8    MS. HERZFELD:  Okay.  I don't have any
9  further questions for you, Mr. Munroe.
10   THE WITNESS:  Thank you.
11   MS. HERZFELD:  Thank you very much.
12   THE WITNESS:  Thank you.
13   MS. HERZFELD:  We're standing on our
14  reservation on those various documents that
15  counsel clawed back.  So we'll be suspending the
16  deposition at this time pursuant to further
17  litigation on those issues and others.
18   MR. DAVIS:  Let's go off.
19   THE VIDEOGRAPHER:  The time is 8:33 p.m.
20  We're going off the record.
21   (Recess.)
22   THE VIDEOGRAPHER:  The time is 8:43 p.m.
23  We're back on the record.
24   EXAMINATION BY COUNSEL FOR ENDO

Page 419

1    PHARMACEUTICALS AND PAR
2  BY MR. DAVIS:
3    Q   Mr. Munroe, I just have a couple of
4  questions for you that I want to clarify, if I
5  may.
6    Do you recall questioning from the MDL
7  plaintiffs regarding the Pain Care Forum?
8    A   I do.
9    Q   Do you recall discussion with the MDL
10  plaintiffs regarding the membership of the Pain
11  Care Forum?
12   A   I do.
13   Q   Do you recall being shown lists of the
14  members of the Pain Care Forum?
15   A   I do.
16   Q   And are those lists the lists that are
17  attached to Exhibits 12 and 13?
18   A   Let me take a quick look.
19      That's 13.  Yes.
20   Q   And did counsel for the MDL plaintiffs
21  ask you about all of the members of the Pain Care
22  Forum?
23   A   No.
24   Q   Did -- you can see here, this document

Page 420

1  that -- it's Exhibit 14 that the MDL plaintiffs
2  created during that questioning.  Do you recall
3  this?
4    A   Yes.  And that's a very circumscribed
5  limited view of the Pain Care Forum.
6    Q   Do you recall being asked questions
7  about patient advocacy organizations and
8  professional societies who were members of the
9  Pain Care Forum?
10   A   I -- I remember -- yes, I do remember
11  that question.
12   Q   Were there other patient advocacy
13  organizations or professional societies who were
14  members of the Pain Care Forum?
15   A   There certainly were, a number of them.
16   Q   So let's say there's other -- other
17  organizations.
18   MS. AMINOLROAYA:  Objection.
19  BY MR. DAVIS:
20   Q   Do you recall whether --
21   MS. AMINOLROAYA:  Objection.  Please do
22  not mark my exhibit.
23  BY MR. DAVIS:
24   Q   Do you recall whether --

Page 421

1    MS. AMINOLROAYA:  Objection.
2  BY MR. DAVIS:
3    Q   -- whether any of those other
4  organizations related to nursing?
5    A   Yes.  Pain nursing in particular.
6    Q   Okay.  How about cancer treatment?
7    MS. AMINOLROAYA:  Objection.  This is
8  plaintiffs' exhibit and -- excuse me.  We need to
9  go off the record.  This is my exhibit, and if you
10  want to mark up this exhibit, you can, but you
11  need to do it on another copy.
12   MR. DAVIS:  Well, we've already started.
13  This is an exhibit that you created.  I'm just
14  making it actually complete.
15  BY MR. DAVIS:
16   Q   Mr. Munroe, do you recall --
17   MS. AMINOLROAYA:  No.  Objection.
18   MR. DAVIS:  You've got an objection on
19  the record.
20   MS. AMINOLROAYA:  I object.  You are --
21  you are altering my exhibit.
22   MR. DAVIS:  Parvin, you got your -- you
23  got your objection on the record.
24  BY MR. DAVIS:

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1    Q   Mr. Munroe, do you recall any patient
2  advocacy organizations related to cancer
3  treatment?
4    A   Yes.  In particular, the American Cancer
5  Society, the renowned American Cancer Society.
6    Q   How about patient advocacy organizations
7  or professional societies related to hospice care?
8    A   Yes.  The Hospice and Palliative Care
9  both were members of the Pain Care Forum.
10   Q   How about pain advocacy organizations or
11 professional societies related to drug abuse
12 monitoring?
13   A   Yes.  They --
14       MS. AMINOLROAYA:  Objection to the
15 alteration of the exhibit.
16       THE WITNESS:  They were also members of
17 the Pain Care Forum.  It was a very broad
18 coalition.
19 BY MR. DAVIS:
20   Q   How about third-party organizations
21 related to drug abuse prevention?
22   A   Yes, they were also members of the Pain
23 Care Forum.
24   Q   Do you recall counsel for the MDL

Page 423

1  plaintiffs asking you about companies who were
2  members of the Pain Care Forum?
3    A   I do.
4    Q   Are these all of the companies that were
5  members of the Pain Care Forum?
6    A   No, I don't think so.
7    Q   Can you think of any other companies who
8  were members of the Pain Care Forum?
9    A   Well, one of the big companies that was
10 a very active member was Boston Scientific, makers
11 of medical devices.  They were not an opioid
12 company.  But there were other companies that were
13 non-opioid companies that were members of the Pain
14 Care Forum.
15   Q   Okay.  Do you recall any patient
16 advocacy or professional societies related to
17 pharmacists --
18   A   I do --
19   Q   -- that were members of the Pain Care
20 Forum?
21   A   I do, and they were members.
22   Q   Okay.  Do you recall, Mr. Munroe, you --
23 were you a member of the executive committee of
24 the Pain Care Forum?

Page 424

1    A   Yes.
2    Q   As a member of the executive committee
3  of the Pain Care Forum, do you recall excluding
4  any organization or company from membership?
5    A   I don't recall excluding any
6  organization.
7    Q   So not exclusive.
8        Mr. Munroe, do you recall whether the
9  Pain Care Forum ever took any policy positions?
10   A   I don't recall them ever taking a policy
11 position.
12   Q   Mr. Munroe, can you tell me anything
13 about the agenda of the Pain Care Forum?
14   A   Well, it is --
15       MS. AMINOLROAYA:  Object to form.
16       THE WITNESS:  -- a completely open
17 agenda, and -- and if you just e-mailed the
18 moderator the topic that you wanted to -- to place
19 on the agenda, it went on the agenda.
20       MR. DAVIS:  Great.  Thank you,
21 Mr. Munroe.
22       THE WITNESS:  You're welcome.
23       THE VIDEOGRAPHER:  Off the record.
24       MS. AMINOLROAYA:  Off the record.

Page 425

1        THE VIDEOGRAPHER:  Okay.  The time is
2  8:49 p.m.  We're going off the record.
3        (Recess.)
4        THE VIDEOGRAPHER:  Okay.  The time is
5  5:30 -- sorry, 8:56 p.m.  We're back on the
6  record.
7        MS. AMINOLROAYA:  I want to reiterate a
8  standing objection to the defacing of Exhibit 14.
9  We are at Arnold & Porter's offices in Washington,
10 D.C.  Mr. Davis could have easily made a copy of
11 the exhibit and marked that one, and instead chose
12 to deface and -- and extricably alter Exhibit 14.
13 And we reserve all rights with respect to that.
14       FURTHER EXAMINATION BY COUNSEL
15          FOR THE MDL PLAINTIFFS
16 BY MS. AMINOLROAYA:
17   Q   Mr. Munroe, do you recall testifying
18 that you could not recall excluding any
19 organization from the Pain Care Forum?
20   A   I --
21       MR. DAVIS:  Objection to form.
22       THE WITNESS:  I -- I do recall
23 testifying to that, that I didn't recall.
24 BY MS. AMINOLROAYA:

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1    Q   If someone wanted to join the Pain Care
2  Forum, would there be any way for a person to
3  Google the Pain Care Forum and find them?
4    A   I don't know.  I've never tried to
5  Google the Pain Care Forum.
6    Q   Could they look them up in the
7  phonebook?
8        MR. DAVIS:  Objection to form.
9        THE WITNESS:  They might have been able
10  to Google them.  I don't know.
11  BY MS. AMINOLROAYA:
12    Q   Does the Pain Care --
13    A   I'm not sure I know of anybody who uses
14  a phonebook anymore.
15    Q   Could they be looked up on
16  whitepages.com or the businesswhitepages.com?
17    A   I don't know.  You'd have to try
18  yourself.  I've never done that.
19    Q   All right.  So could someone find out
20  from public sources on the internet about the Pain
21  Care Forum and how to join them?
22    A   I don't know.  I've never done a -- a
23  search on the internet for the Pain Care Forum.
24    Q   And did the Pain Care Forum post their

Page 427

1  meeting information publicly anywhere?
2        MR. DAVIS:  Objection to form.
3        THE WITNESS:  Not to my knowledge.
4  BY MS. AMINOLROAYA:
5    Q   Did they post their agendas in a public
6  space for the world to see?
7        MR. DAVIS:  Objection to form.
8        THE WITNESS:  No, they did not.
9  BY MS. AMINOLROAYA:
10    Q   Did they publicize their events in any
11  other way?
12        MR. DAVIS:  Objection to form.
13        THE WITNESS:  I'm unaware of any other
14  notices for meetings of the Pain Care Forum other
15  than those that -- that came from the e-mail
16  distribution.
17  BY MS. AMINOLROAYA:
18    Q   Thank you.
19        And did Will Rowe have a leadership
20  position at the Pain Care Forum?
21        MR. DAVIS:  Objection to form.
22        THE WITNESS:  I don't know.
23        MR. DAVIS:  Foundation.
24  BY MS. AMINOLROAYA:

Page 428

1    Q   Was Will Rowe a member of the Pain Care
2  Forum?
3    A   The American Pain Foundation was a
4  member, and -- and Will was -- was an active
5  member.
6    Q   And was the American Pain Foundation an
7  organization that Endo gave millions of dollars
8  to?
9        MR. DAVIS:  Objection to form.
10        THE WITNESS:  I don't recall the exact
11  amount of money that we gave to the American Pain
12  Foundation.
13  BY MS. AMINOLROAYA:
14    Q   But you would agree that the -- Endo's
15  response to the Senate Finance Committee correctly
16  discloses the amount of money or some of the money
17  that Endo gave to the American Pain Foundation?
18    A   I could say that -- that we made every
19  attempt to -- to make that an accurate document
20  for Senator Grassley.
21    Q   Were many e-mails sent to Pain Care
22  Forum's membership by Mr. Rowe?
23        MR. DAVIS:  Objection to form.
24        THE WITNESS:  You would have to ask him.

Page 429

1  BY MS. AMINOLROAYA:
2    Q   Did we look at a number of e-mails today
3  that came from Mr. Rowe to the Pain Care Forum?
4        MR. DAVIS:  Objection to form.
5        THE WITNESS:  We did look at some.
6        MS. AMINOLROAYA:  Those are all the
7  questions I have.
8        THE WITNESS:  Thank you.
9        MR. DAVIS:  We're good to go.
10        THE VIDEOGRAPHER:  Okay.  The time is
11  8:59 p.m., March 19th, 2019.  Going off the
12  record, concluding the videotaped deposition.
13        (Whereupon, the deposition of
14        BRIAN MUNROE was concluded at
15        8:59 p.m.)
16
17
18
19
20
21
22
23
24

Highly Confidential – Subject to Further Confidentiality Review

| Page 430 |
|---|

1     CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2     The undersigned Certified Shorthand Reporter

3  does hereby certify:

4     That the foregoing proceeding was taken before

5  me at the time and place therein set forth, at

6  which time the witness was duly sworn; That the

7  testimony of the witness and all objections made

8  at the time of the examination were recorded

9  stenographically by me and were thereafter

10  transcribed, said transcript being a true and

11  correct copy of my shorthand notes thereof; That

12  the dismantling of the original transcript will

13  void the reporter's certificate.

14     In witness thereof, I have subscribed my name

15  this date:  March 22, 2019.

16

17     _____

18     LESLIE A. TODD, CSR, RPR

19     Certificate No. 5129

20  (The foregoing certification of

21  this transcript does not apply to any

22  reproduction of the same by any means,

23  unless under the direct control and/or

24  supervision of the certifying reporter.)

| Page 431 |
|---|

1     INSTRUCTIONS TO WITNESS

2    Please read your deposition over carefully and

3  make any necessary corrections. You should state

4  the reason in the appropriate space on the errata

5  sheet for any corrections that are made.

6  After doing so, please sign the errata sheet

7  and date it.

8    You are signing same subject to the changes

9  you have noted on the errata sheet, which will be

10  attached to your deposition.  It is imperative

11  that you return the original errata sheet to the

12  deposing attorney within thirty (30) days of

13  receipt of the deposition transcript by you. If

14  you fail to do so, the deposition transcript may

15  be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24

| Page 432 |
|---|

1     - - - - - -

2     E R R A T A

3     - - - - - -

4  PAGE LINE CHANGE

5  ____ ____ _____

6  REASON: _____

7  ____ ____ _____

8  REASON: _____

9  ____ ____ _____

10  REASON: _____

11  ____ ____ _____

12  REASON: _____

13  ____ ____ _____

14  REASON: _____

15  ____ ____ _____

16  REASON: _____

17  ____ ____ _____

18  REASON: _____

19  ____ ____ _____

20  REASON: _____

21  ____ ____ _____

22  REASON: _____

23  ____ ____ _____

24  REASON: _____

| Page 433 |
|---|

1     ACKNOWLEDGMENT OF DEPONENT

2    I,_____, do hereby

3  certify that I have read the foregoing pages, and

4  that the same is a correct transcription of the

5  answers given by me to the questions therein

6  propounded, except for the corrections or changes

7  in form or substance, if any, noted in the

8  attached Errata Sheet.

9

10  _____

11  BRIAN MUNROE       DATE

12

13

14  Subscribed and sworn to

15  before me this

16  _____day of_____,20___.

17  My commission expires:_____

18  _____

19  Notary Public

20

21

22

23

24