```
 1              IN THE UNITED STATES DISTRICT COURT

                FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3

     ------------------------    )

 4   IN RE: NATIONAL             ) MDL No. 2804

     PRESCRIPTION OPIATE         )

 5   LITIGATION                  ) Case No.

     ------------------------    ) 1:17-MD-2804

 6                               )

     THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster

 7   ALL CASES                   )

     ------------------------    )

 8

 9                 HIGHLY CONFIDENTIAL

10       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12              VIDEOTAPED DEPOSITION OF

13                   MARK NICASTRO

14                 December 6, 2018

15

16                Indianapolis, Indiana

17

18

19

20

21

22            GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

23                 deps@golkow.com

24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1

2

3    The videotaped deposition of MARK NICASTRO,

4  called by the Plaintiffs for examination, taken

5  pursuant to the Federal Rules of Civil Procedure of

6  the United States District Courts pertaining to the

7  taking of depositions, taken before CORINNE T.

8  MARUT, C.S.R. No. 84-1968, Registered Professional

9  Reporter and a Certified Shorthand Reporter of the

10  State of Illinois, 251 East Ohio Street,

11  Indianapolis, Indiana on December 6, 2018,

12  commencing at 9:04 a.m.

13

14

15

16

17

18

19

20

21

22

23

24

Page 3

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3    MOTLEY RICE LLC
      28 Bridgeside Boulevard
4    Mt. Pleasant, South Carolina  29464
      843-216-9250
5    BY:  MICHAEL E. ELSNER, ESQ.
         melsner@motleyrice.com
6       AMANDA UNTERREINER, ESQ.
         aunterreiner@motleyrice.com
7            (via livestream/teleconference)
8
9    WEISMAN KENNEDY & BERRIS CO LPA
      101 West Prospect Avenue
10    1600 Midland Building
      Cleveland, Ohio  44115
11    216-781-1111
      BY:  JAMES A. DeROCHE, ESQ.
12       Of Counsel
         jderoche@weismanlaw.com
13       AMY KENNEDY, ESQ.
         akennedy@weismanlaw.com
14            (via livestream/teleconference)
         DANIEL GOETZ, ESQ.
15         dgoetz@weismanlaw.com
              (via livestream/teleconference)
16
17    GARSON JOHNSON LLC
      101 West Prospect Avenue
18    Midland Building, Suite 1610
      Cleveland, Ohio  44115
19    800-747-9330
      BY:  PATTI CARDINAL, ESQ.
20       pcardinal@garson.com
              (via livestream/teleconference)
21
22
23
24

Page 4

1  APPEARANCES (Continued):
2    LEVIN PAPANTONIO THOMAS MITCHELL
      RAFFERTY & PROCTOR P.A.
3    316 South Baylen Street, Suite 600
      Pensacola, Florida  32502
4    205-396-3982
      BY:  WILLIAM BAKER, ESQ.
5       wcb850@gmail.com
              (via livestream/teleconference)
6
7  ON BEHALF OF CVS INDIANA, LLC,
    CVS RX SERVICES, INC. and THE DEPONENT:
8
      ZUCKERMAN SPAEDER LLP
9       1800 M Street, NW
      Suite 1000
10     Washington, DC  20036-5807
      202-778-1800
11     BY:  PAUL B. HYNES, JR., ESQ.
         phynes@zuckerman.com
12
13  ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
    ENDO PHARMACEUTICALS, INC.,
14  PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
    COMPANIES, INC. (f/k/a Par Pharmaceutical
15  Holdings, Inc.):
16     ARNOLD & PORTER KAYE SCHOLER LLP
      70 West Madison Street, Suite 4200
17     Chicago, Illinois  60602-4231
      312-583-2435
18     BY:  MICHAEL BULLERMAN, ESQ.
         Michael.Bullerman@arnoldporter.com
19            (via livestream/teleconference)
20
21
22
23
24

Page 5

1  APPEARANCES (Continued):
2  ON BEHALF OF McKESSON CORPORATION:
3    COVINGTON & BURLING LLP
      1999 Avenue of the Stars
4    Los Angeles, California  90067
      424-332-4780
5    BY:  MICHAEL LANOSA, ESQ.
         mlanosa@cov.com
6            (via livestream/teleconference)
7
8  ON BEHALF OF CARDINAL HEALTH, INC.:
9    WILLIAMS & CONNOLLY LLP
      725 Twelfth Street, N.W.
10    Washington, DC  20005
      202-434-5013
11    BY:  JOSEPH S. BUSHUR, ESQ.
         jbushur@wc.com
12
13  ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
    AMERISOURCEBERGEN CORPORATION:
14
      REED SMITH LLP
15     Three Logan Square
      1717 Arch Street, Suite 3100
16     Philadelphia, Pennsylvania  19103
      BY:  ABIGAIL M. PIERCE, ESQ.
17       abigail.pierce@reedsmith.com
              (via livestream/teleconference)
18
19  ON BEHALF OF WALMART:
20    JONES DAY
      325 John H. McConnell Boulevard
21    Suite 600
      Columbus, Ohio  43215
22    614-469-3939
      BY:  EDWARD M. CARTER, ESQ.
23       emcarter@jonesday.com
              (via livestream/teleconference)
24

## Page 6

```
 1   APPEARANCES (Continued):
 2   ON BEHALF OF RITE AID:
 3       MORGAN, LEWIS & BOCKIUS LLP
         101 Park Avenue
 4       New York, New York  10178-0060
         212-309-6000
 5   BY:  MATTHEW R. LADD, ESQ.
             matthew.ladd@morganlewis.com
 6           (via teleconference)
 7
 8   ON BEHALF OF HBC COMPANY:
 9       MARCUS & SHAPIRA LLP
         One Oxford Centre, 35th Floor
10       Pittsburgh, Pennsylvania  15219
         412-338-4383
11   BY:  JAMES F. ROSENBERG, ESQ.
             rosenberg@marcus-shapira.com
12           (via livestream/teleconference)
13
14   ON BEHALF OF MALLINCKRODT PHARMACEUTICALS:
15       ROPES & GRAY, LLP
         Prudential Tower
16       800 Boylston Street
         Boston, Massachusetts  02199-3600
17       617-951-7000
     BY:  SEAN B. KENNEDY, ESQ.
18           Sean.Kennedy@ropesgray.com
             (via livestream/teleconference)
19
20
21
22
23
24
```

## Page 7

```
 1   APPEARANCES (Continued):
 2   ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC.:
 3       CLARK MICHIE LLP
         220 Alexander Street
 4       Princeton, New Jersey  08540
         609-423-2142
 5   BY:  BRUCE CLARK, ESQ.
             bruce.clark@clarkmichie.com
 6           (via livestream/teleconference)
 7
 8
     ALSO PRESENT:
 9
         MEGAN NEUBERT, Paralegal,
10       Motley Rice LLC
11       KAITLIN EEKHOFF, Research Assistant,
         Motley Rice LLC
12
         STEPHANIE HACKMAN, Paralegal,
13       Levin Papantonio Thomas Mitchell
         Rafferty & Proctor P.A.
14           (via teleconference)
15
         GINA VELDMAN, Trial Technician
16
17
18
19
     VIDEOTAPED BY:  MICHAEL NEWELL
20
21
     REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
22
23
24
```

## Page 8

```
 1               I N D E X
 2   MARK NICASTRO              EXAMINATION
 3       BY MR. ELSNER.................  15
         BY MR. DeROCHE...............  289
 4
 5
 6              E X H I B I T S
 7   CVS-NICASTRO DEPOSITION EXHIBIT       MARKED FOR ID
 8   CVS-       PowerPoint, Prescription Drug    26
     Nicastro-  Abuse; CVS-MDLT1-15502
 9   001
10   CVS-       document, "Track One CVS Store   35
     Nicastro-  Information";
11   002        CVS-MDLT1-000007362 - 000007364
12   CVS-       9/27/06 letter to CVS Indiana,   38
     Nicastro-  LLC from DEA;
13   003        CVS-MDLT1-000010552 - 000010555
14   CVS-       2/7/07 letter from DEA;          42
     Nicastro-  CVS-MDLT1-000091513 - 000091516
15   004
16   CVS-       12/27/07 letter from DEA;        43
     Nicastro-  CVS-MDLT1-000013535 - 000013536
17   005
18   CVS-       CVS Distribution Centers         45
     Nicastro-  Controlled Drug-DEA Standard
19   006        Operating Procedures Manual;
                CVS-MDLT1-000066576 - 000066641
20
     CVS-       12/11/09 e-mail string with      51
21   Nicastro-  attachment;
     007        CVS-MDLT1-000081281 -
22              000081346
23
24
```

## Page 9

```
 1              E X H I B I T S
 2   CVS-NICASTRO DEPOSITION EXHIBIT       MARKED FOR ID
 3   CVS-       8/24/10 e-mail string;           56
     Nicastro-  CVS-MDLT1-000076281
 4   008
 5   CVS-       8/24/10 e-mail string;           58
     Nicastro-  CVS-MDLT1-000076282
 6   009
 7   CVS-       9/2/10 e-mail with attachment;   61
     Nicastro-  CVS-MDLT1-000076283 - 000076285
 8   010
 9   CVS-       5/19/09 e-mail string;           62
     Nicastro-  CVS-MDLT1-000034234 - 000034235
10   011
11   CVS-       CVS Controlled Drug-DEA          66
     Nicastro-  Standard Operating Procedures
12   012        Manual; CVS-MDLT1-000088957 -
                000089025
13
     CVS-       8/26/10 e-mail;                  70
14   Nicastro-  CVS-MDLT1-000088956
     013
15
     CVS-       9/1/10 e-mail string with        71
16   Nicastro-  attachment;
     014        CVS-MDLT1-000075299 - 000075312
17
     CVS-       1/5/11 e-mail string with        94
18   Nicastro-  attachment;
     015        CVS-MDLT1-000076236 - 000076238
19
     CVS-       2/4/11 e-mail with attachment;   97
20   Nicastro-  CVS-MDLT1-000076353 - 000076389
     016
21
     CVS-       10/7/10 e-mail string;          106
22   Nicastro-  CVS-MDLT1-000034172 - 000034177
     017
23
24
```

## Page 10

```
 1           E X H I B I T S
 2  CVS-NICASTRO DEPOSITION EXHIBIT     MARKED FOR ID
 3  CVS-      10/12/10 e-mail;          109
    Nicastro-  CVS-MDLT1-000104883
 4  018
 5  CVS-      organizational chart;     115
    Nicastro-  CVS-MDLT1-000030733
 6  019
 7  CVS-      4/15/11 e-mail with       117
    Nicastro-  attachment;
 8  020       CVS-MDLT1-000076286 - 000076352
 9  CVS-      11/27/12 e-mail with      131
    Nicastro-  attachment;
10  021       CVS-MDLT1-000029867 - 000029870
11  CVS-      11/27/12 e-mail string;   138
    Nicastro-  CVS-MDLT1-000106664 - 000106673
12  022
13  CVS-      5/20/13 e-mail string;    143
    Nicastro-  CVS-MDLT1-000057783 - 000057784
14  023
15  CVS-      7/17/13 e-mail string;    145
    Nicastro-  CVS-MDLT1-000076114 and
16  024       000076115
17  CVS-      7/16/13 e-mail string;    151
    Nicastro-  CVS-MDLT1-000028615 - 000028617
18  025
19  CVS-      8/18/13 e-mail;           152
    Nicastro-  CVS-MDLT1-000012363
20  026
21  CVS-      9/27/13 e-mail string;    156
    Nicastro-  CVS-MDLT1-000017250
22  027
23
24
```

## Page 11

```
 1           E X H I B I T S
 2  CVS-NICASTRO DEPOSITION EXHIBIT     MARKED FOR ID
 3  CVS-      10/3/13 e-mail string with  158
    Nicastro-  attachments;
 4  028       CVS-MDLT1-000022055 - 000022061
 5  CVS-      11/13/13 e-mail string;   160
    Nicastro-  CVS-MDLT1-000017255 - 000017258
 6  029
 7  CVS-      3/14/14 e-mail string;    165
    Nicastro-  CVS-MDLT1-000017246
 8  030
 9  CVS-      3/20/14 e-mail string with  169
    Nicastro-  attachment;
10  031       CVS-MDLT1-000076146 - 000076148
11  CVS-      8/5/13 Notice of Inspection of  176
    Nicastro-  Controlled Premises;
12  032       CVS-MDLT1-000010522 - 000010523
13  CVS-      Handwritten notes;        177
    Nicastro-  CVS-MDLT1-000010525 - 000010529
14  033
15  CVS-      8/7/13 e-mail;            179
    Nicastro-  CVS-MDLT1-000061606 - 000061607
16  034
17  CVS-      Document, "DEA Visit 8/5 - 8/8  180
    Nicastro-  2013"; CVS-MDLT1-000008389 -
18  035       000008395
19  CVS-      11/15/13 e-mail string;   190
    Nicastro-  CVS-MDLT1-000022277
20  036
21  CVS-      11/15/13 e-mail string;   193
    Nicastro-  CVS-MDLT1-000111940 - 000111941
22  037
23
24
```

## Page 12

```
 1           E X H I B I T S
 2  CVS-NICASTRO DEPOSITION EXHIBIT     MARKED FOR ID
 3  CVS-      11/19/13 e-mail with      195
    Nicastro-  attachment;
 4  038       CVS-MDLT1-000076142 - 000076145
 5  CVS-      11/20/13 e-mail;          196
    Nicastro-  CVS-MDLT1-000058093
 6  039
 7  CVS-      11/21/13 e-mail with      198
    Nicastro-  attachment;
 8  040       CVS-MDLT1-000076136 - 000076141
 9  CVS-      11/21/13 e-mail;          201
    Nicastro-  CVS-MDLT1-000076127
10  041
11  CVS-      11/21/13 e-mail with      203
    Nicastro-  attachments;
12  042       CVS-MDLT1-000000409 - 000000420
13  CVS-      11/25/13 e-mail string;   206
    Nicastro-  CVS-MDLT1-000000421 - 000000422
14  043
15  CVS-      11/25/13 e-mail;          211
    Nicastro-  CVS-MDLT1-000076135
16  044
17  CVS-      Graph, "Annual CVS Hydrocodone  219
    Nicastro-  Purchase Benchmarks - Dosage
18  045       Units (2006 - 2014)"; no Bates
              numbers
19
20  CVS-      5/15/14 e-mail;           227
    Nicastro-  CVS-MDLT1-000022230 - 000022231
    046
21
    CVS-      3/5/14 e-mail string with  242
22  Nicastro-  attachment; and
    047       CVS-MDLT1-000076100 - 000076107
23
24
```

## Page 13

```
 1           E X H I B I T S
 2  CVS-NICASTRO DEPOSITION EXHIBIT     MARKED FOR ID
 3  CVS-      1/20/14 e-mail string;    253
    Nicastro-  CVS-MDLT1-000076153 - 000076154
 4  048
 5  CVS-      Declaration of Joseph     258
    Nicastro-  Rannazzisi
 6  049
 7  CVS-      Settlement Agreement;     271
    Nicastro-  CVS-MDLT1-000060796 - 000060804
 8  050
 9  CVS-      8/26/14 e-mail string;    279
    Nicastro-  CVS-MDLT1-000003065 - 000003066
10  051
11  CVS-      8/22/14 e-mail string;    280
    Nicastro-  CVS-MDLT1-000000437 - 000000438
12  052
13  CVS-      12/31/15 letter from U.S. DOJ  287
    Nicastro-  DEA to CVS Indiana;
14  053       CVS-MDLT1-000008014 - 000008015
15  CVS-      8/9/13 e-mail string;     321
    Nicastro-  CVS-MDLT1-000000397
16  216
17  CVS-      8/6/13 e-mail string;     317
    Nicastro-  CVS-MDLT1-000003026 - 000003032
18  232
19
20
21
22
23
24
```

Page 14

1    THE VIDEOGRAPHER:  We are now on the record.
2  My name is Michael Newell.  I'm a videographer for
3  Golkow Litigation Services.
4        Today's date is December 6, 2018.  The
5  time is 9:04 a.m.
6        This deposition is being held in
7  Indianapolis, Indiana, in the matter of National
8  Prescription Opiate Litigation.
9        The deponent today is Mark Nicastro.
10       Will counsel please identify themselves.
11    MR. ELSNER:  My name is Michael Elsner from
12  the law firm of Motley Rice on behalf of
13  Plaintiffs, and with me today from my office is
14  Kaitlyn Eekhoff and Megan Neubert.
15    MR. DeROCHE:  James DeRoche, of counsel,
16  Weisman Kennedy & Berris, for the Plaintiffs.
17    MR. BUSHUR:  Joseph Bushur of
18  Williams & Connolly on behalf of Cardinal Health.
19    MR. HYNES:  Paul Hynes of Zuckerman Spaeder on
20  behalf of CVS Indiana, LLC, CVS RX Services, Inc.
21  and the witness, Mark Nicastro.
22    THE REPORTER:  Counsel on the phone.
23    MR. BULLERMAN:  This is Michael Bullerman of
24  Arnold & Porter on behalf of the Endo and Par

Page 15

1  Defendants.
2    MR. LADD:  This is Matthew Ladd from Morgan
3  Lewis on behalf of Defendant Rite Aid.
4    MR. LANOSA:  This is Michael Lanosa from
5  Covington & Burling on behalf of McKesson.
6    MS. PIERCE:  This is Abigail Pierce from Reed
7  Smith on behalf of AmerisourceBergen Drug
8  Corporation.
9    MR. CARTER:  Ed Carter from Jones Day on
10  behalf of Wal-Mart.
11    THE VIDEOGRAPHER:  The Court Reporter today is
12  Corinne Marut and will now swear in the witness.
13        (WHEREUPON, the witness was duly
14        sworn.)
15        MARK NICASTRO,
16  called as a witness herein, having been first duly
17  sworn, was examined and testified as follows:
18        EXAMINATION
19  BY MR. ELSNER:
20    Q.   Good morning.
21    A.   Good morning.
22    Q.   My name is Michael Elsner and I
23  represent the Plaintiffs.
24        Could you tell us your name, sir.

Page 16

1    A.   It's Mark Nicastro.
2    Q.   And where do you live?
3    A.   I live in Carmel, Indiana.
4    Q.   And how old are you?
5    A.   53.
6    Q.   And I saw that you graduated from
7  Bowling Green University, is that right?
8    A.   I did.
9    Q.   And did you graduate with a degree?
10    A.   I did.
11    Q.   What was your degree in?
12    A.   General business.  BSBA in general
13  business.
14    Q.   In what year was that?
15    A.   1987.
16    Q.   Okay.  And before working for CVS you
17  were working with Best Buy, is that right?
18    A.   That's correct.
19    Q.   And what were you doing for Best Buy?
20    A.   I was an operations manager for a
21  distribution center.
22    Q.   For how long did you do that?
23    A.   Approximately three years.
24    Q.   And what years were those?

Page 17

1    A.   1995 to 1998.
2    Q.   After leaving Best Buy where did you go
3  to work after that?
4    A.   For CVS.
5    Q.   When you say "CVS," who hired you
6  exactly?
7    A.   The person that hired me or the company?
8    Q.   The company.
9    A.   I believe it was CVS Pharmacy.
10    Q.   Okay.
11    A.   Because I went to work in Somerset,
12  Pennsylvania.
13    Q.   Okay.  And what did you do in Somerset,
14  Pennsylvania?
15    A.   I was the director of operations for
16  that DC.
17    Q.   And by "DC" you mean distribution
18  center?
19    A.   Distribution center.
20    Q.   Okay.  And how long did you -- were you
21  in Somerset, Pennsylvania?
22    A.   Almost ten years to the date.
23    Q.   Okay.  And what were the dates?
24    A.   August '98 to around August of --

Page 18

1 probably about September of 2008.

2 Q. September of 2008?

3 A. Yes. Ten years.

4 Q. Okay. And what were your

5 responsibilities in Somerset, Pennsylvania?

6 A. Oversee the operation for distributing

7 products to CVS stores.

8 Q. And what were -- what was the geographic

9 region of that distribution center in Somerset,

10 Pennsylvania?

11 A. We covered West Virginia, New York,

12 Pennsylvania, Ohio, a little bit of Maryland.

13 Q. And did there come a time when you moved

14 to Indianapolis?

15 A. Yes.

16 Q. And when was that?

17 A. That was in 2008.

18 Q. And what job did you take in

19 Indianapolis?

20 A. Director of operations.

21 Q. Okay. And were you hired by

22 CVS Pharmacy at the time in 2008?

23 A. To me it was all the same, just moving

24 from CVS to CVS, but I know the title of our

Page 19

1 building is different. It's CVS Indiana, LLC.

2 Q. Okay. But you viewed it all as CVS?

3 A. Yes.

4 Q. And in 2008 what was your position?

5 A. Director of operations.

6 Q. Director of operations. Okay. And

7 that's for the distribution center in Indiana?

8 A. Yes.

9 Q. For CVS?

10 A. Yes.

11 Q. And what was the geographical territory

12 of that operation center in Indiana?

13 A. We had a little bit of Ohio, but most

14 states went out west and north. So, we had Indiana

15 of course, Illinois, Missouri, Kansas, Montana,

16 North Dakota, Minnesota, Wisconsin.

17 Q. A large number?

18 A. Yeah.

19 Q. And in this case we're particularly

20 interested in Summit County and Cuyahoga County.

21 Were those -- were those CVS stores in those

22 locations, what distribution center provided

23 hydrocodone products and other products to those

24 stores?

Page 20

1 A. They would have been serviced through

2 the Somerset distribution center; but the

3 hydrocodone, the pharmacy products were distributed

4 through Indianapolis and cross-docked to Somerset,

5 and then Somerset delivered to those stores the

6 pharmacy product.

7 Q. Okay. And did Somerset, Pennsylvania

8 ever distribute hydrocodone products?

9 A. The products would have come from

10 Indianapolis to Somerset and then -- so, yes, the

11 control drugs would have been part of that pharmacy

12 delivery.

13 Q. Okay. And did you have access to the

14 Internet at the facility in Somerset, Pennsylvania,

15 and, if so, in what year?

16 A. Yes.

17 Q. Do you remember when?

18 A. The -- the Internet?

19 Q. Yes.

20 A. Have access to the Internet?

21 Q. At work.

22 A. I believe the entire time.

23 Q. The entire time?

24 A. Yeah.

Page 21

1 Q. From 1998 till 2008?

2 A. Yes.

3 Q. Okay. As the director of the

4 Indianapolis distribution center, who do you report

5 to?

6 A. I report to -- currently I report to Jim

7 Hall. He is a regional director.

8 Q. For CVS?

9 A. Yes.

10 Q. CVS Pharmacy?

11 A. I believe.

12 Q. When you first joined the Somerset,

13 Pennsylvania distribution center, were you given

14 any training on the distribution of controlled

15 substances in 1998?

16 A. No.

17 Q. When is the first year that you recall

18 being given training on the distribution of

19 controlled substances?

20 A. Our process in Somerset was much

21 different than Indianapolis because we did not

22 carry any control drugs or any pharmacy products

23 within the -- within the distribution center.

24 So, the only access or training that I

Page 22

1 needed around pharmaceuticals is how we handled it
2 once it came into the building.
3    Q.   But my question was slightly different,
4 which is:  In what year do you first recall
5 receiving training on the distribution of
6 controlled substances at CVS?
7    A.   It would depend on what kind of training
8 we are talking about.
9    Q.   Any training.
10    A.   When I came on site, I would have been
11 brought up to speed very quickly on how we handle
12 the drugs as they come through the building.  They
13 are a special color tote.  We kept them in a
14 secured area and then we distribute, loaded them up
15 with the stores.  So, that -- that process and
16 understanding the importance of it would have been
17 immediate.
18    Q.   Immediate.  And at what point in time do
19 you first recall receiving any kind of training in
20 the distribution of controlled substances as it
21 relates to monitoring for suspicious activities and
22 those types of programs?
23    A.   I would not have had any of that until I
24 moved to Indianapolis.

Page 23

1    Q.   And that was in 2008, is that right?
2    A.   Correct.
3    Q.   Did you receive that training in 2008?
4    A.   I had a team that managed that process,
5 my operations manager, pharmacy manager, pharmacy
6 supervisor.  So, they were -- they managed that
7 process.  I just oversaw that part of the
8 operation.  But I would have -- so I don't recall
9 exactly when I became familiar with that or
10 received any type of training, but it would have
11 been shortly after I arrived.
12    Q.   When did the Indianapolis distribution
13 center open, to your knowledge?
14    A.   I don't know.
15    Q.   When you joined in 2008, who was
16 responsible for the pharmacy-related aspects of the
17 business in Indianapolis?
18    A.   Gary Millikan was my operations manager,
19 and he oversaw the pharmacy.
20    Q.   How many people did Gary Millikan have
21 under him that reported to him?
22    A.   I -- I don't remember.
23    Q.   I saw some statistics that the
24 distribution center in Indiana in 2013 had about

Page 24

1 $109 million worth of pharmacy inventory.  Does
2 that sound about right to you?
3    A.   I don't know the exact number, but
4 roughly.
5    Q.   Okay.  And also in 2013 I saw some
6 statistics that the CVS distribution center in
7 Indiana had shipped about 85 million pieces of
8 pharmaceutical products.
9         Does that number sound about right to
10 you?
11    A.   I -- I'm not -- I don't recall in 2013.
12 It's been a long time ago.
13    Q.   Does that sound about right in terms of
14 the volume that the Indiana distribution center
15 would distribute?
16    A.   I -- I don't remember.  I'm sorry.
17    Q.   Do you believe there is an opioid crisis
18 in the United States?
19    MR. HYNES:  Objection to form.
20 BY THE WITNESS:
21    A.   I believe there is issues with opioids.
22 I see the news and I read the paper and a lot of
23 discussion about it in the political stage, too.
24 So, I -- I understand there is issues with opioids.

Page 25

1 BY MR. ELSNER:
2    Q.   Okay.  And you follow those issues?
3    A.   Not closely.  Just what I see on TV and
4 in the paper.
5    Q.   What is your understanding of the opioid
6 crisis in the United States?
7    MR. HYNES:  Objection to form.
8 BY THE WITNESS:
9    A.   There is -- there is some addiction
10 issues with opioids.
11 BY MR. ELSNER:
12    Q.   And did anyone ever tell you from
13 CVS Pharmacy or in CVS that there is an opioid
14 crisis in the United States?
15    A.   Not in that manner.
16    Q.   Were you aware that the Center for
17 Disease Control and Prevention had declared
18 prescription drug abuse to be an epidemic?
19    MR. HYNES:  Objection.  Time frame.
20    MR. ELSNER:  2010.
21 BY THE WITNESS:
22    A.   No.
23 BY MR. ELSNER:
24    Q.   Did you know as early as 2007 that

Page 26

1 approximately 27,000 unintentional overdose deaths
2 occurred in the United States, which is one in
3 every 19 minutes?
4     MR. HYNES: Objection; form.
5 BY THE WITNESS:
6     A. No.
7 BY MR. ELSNER:
8     Q. Were you aware that every component of
9 the distribution chain, it had been determined, had
10 been breached as a result of the opioid crisis?
11     MR. HYNES: Objection; form.
12     MR. ELSNER: Why don't we show the PowerPoint.
13 First exhibit is CVS-MDLT1-15502. We will mark
14 this as Exhibit 1.
15     (WHEREUPON, a certain document was
16     marked as CVS-Nicastro-001:
17     PowerPoint, Prescription Drug
18     Abuse; CVS-MDLT1-15502.)
19     MR. HYNES: Did you say this has a Bates
20 number on it?
21     MR. ELSNER: It does. Can we see a copy of
22 the Bates number?
23     MR. HYNES: Could I have this copy? Thank
24 you. But I appreciate this is easier to read.

Page 27

1     MR. ELSNER: Right. And in color.
2 BY MR. ELSNER:
3     Q. I'm going to ask you to turn to -- first
4 of all, this is a -- this is a PowerPoint
5 presentation which was provided to CVS by McKesson.
6     Have you ever seen this PowerPoint
7 presentation before?
8     A. I have not.
9     Q. Okay. No one at CVS shared this with
10 you?
11     A. No.
12     Q. Okay. On the third page of the
13 PowerPoint, it reads that every component of the
14 distribution chain has been breached by the opioid
15 epidemic. Were you aware of that?
16     A. No.
17     Q. No one at CVS told you that information?
18     A. No.
19     MR. HYNES: Objection to form.
20 BY MR. ELSNER:
21     Q. On the following page, which is page 4
22 of the PowerPoint, 15505, it reads, "Prescription
23 drugs cause more deaths than heroin and cocaine
24 combined."

Page 28

1     Were you aware of that?
2     MR. HYNES: Objection to form.
3 BY THE WITNESS:
4     A. No.
5 BY MR. ELSNER:
6     Q. On the sixth page of the PowerPoint,
7 there is a chart. It's 15507. Were you aware that
8 the rate of opioid deaths has generally risen with
9 the rate of opioid sales?
10     MR. HYNES: Objection to form.
11 BY THE WITNESS:
12     A. No.
13 BY MR. ELSNER:
14     Q. Would you agree with me that the
15 oversupply of opioids leads to diversion?
16     MR. HYNES: Objection to form.
17 BY THE WITNESS:
18     A. Could you repeat that.
19 BY MR. ELSNER:
20     Q. Sure. Would you agree with me that the
21 oversupply of opioids may lead to diversion?
22     MR. HYNES: Objection to form.
23 BY THE WITNESS:
24     A. The oversupply. I don't really

Page 29

1 understand the -- are you asking me a specific
2 question like was I oversupplying drugs to areas
3 or --
4 BY MR. ELSNER:
5     Q. No, I'm asking you whether you
6 understood that if there was an oversupply of
7 opioid drugs that there was a risk that those drugs
8 might be diverted?
9     MR. HYNES: Objection. Time frame. Now or?
10 BY MR. ELSNER:
11     Q. At any time.
12     A. As long as we had -- as long as there
13 are controls in place to manage those drugs,
14 whatever they are, I don't think it would be a
15 higher risk for diversion.
16     Q. So, even if those numbers were 10,000
17 pills into a community of a size of 12,000 people,
18 you wouldn't see that as a risk of diversion so
19 long as there were some controls in the
20 distribution center?
21     MR. HYNES: Objection to form.
22 BY THE WITNESS:
23     A. As long as there were controls
24 throughout the supply chain network and at the --

Page 30

1  at the pharmacy level, at the store level.
2      I -- I deal with very large numbers
3  every day. So, we store a lot of inventory. We
4  move a lot of inventory. But it's still every
5  piece is managed and controlled. So, I think as
6  long as you have the proper controls in place, it
7  should prevent diversion.
8  BY MR. ELSNER:
9      Q.  Regardless of volume?
10      MR. HYNES: Objection to form.
11  BY THE WITNESS:
12      A.  Regardless of volume.
13  BY MR. ELSNER:
14      Q.  I ask you to turn to the tenth page of
15  this PowerPoint, which bears the Bates No. 15511.
16  And this is a chart of the states with the highest
17  pharmacy dispensing in 2012. And if you see that
18  under "Hydrocodone" that Ohio is the seventh
19  largest state for the dispensing of hydrocodone.
20  Were you aware of that?
21      MR. HYNES: Objection to form.
22  BY THE WITNESS:
23      A.  I was not aware of that.
24  BY MR. ELSNER:

Page 31

1      Q.  Okay. What other states on this chart
2  were also serviced by your distribution center in
3  the hydrocodone?
4      A.  For hydrocodone?
5      Q.  Yes.
6      A.  Michigan, Illinois and Indiana.
7      Q.  And Ohio?
8      A.  And I believe Ohio.
9      Q.  Okay. So, were you aware that four of
10  the top ten states for the dispensing of
11  hydrocodone were supplied that hydrocodone by CVS?
12      MR. HYNES: Objection to form.
13  BY THE WITNESS:
14      A.  I was not.
15  BY MR. ELSNER:
16      Q.  Okay. Were you aware that the CVS
17  Indiana distribution center was the largest
18  distributor of hydrocodone in Ohio?
19      MR. HYNES: Objection to form.
20  BY MR. ELSNER:
21      Q.  From 2006 through 2014, distributing
22  nearly 287 million dosage units.
23      MR. HYNES: Objection to form.
24  BY THE WITNESS:

Page 32

1      A.  I was not aware of that.
2  BY MR. ELSNER:
3      Q.  You were not aware that CVS was the
4  largest distributor of hydrocodone in the entire
5  state of Ohio?
6      MR. HYNES: Objection to form.
7  BY THE WITNESS:
8      A.  No.
9  BY MR. ELSNER:
10      Q.  The Indiana distribution center provided
11  controlled substances to all CVS stores in Summit
12  and Cuyahoga County, Ohio, is that correct?
13      A.  Correct.
14      Q.  And do you know from what period of time
15  that distribution took place?
16      A.  I -- I don't know the beginning dates.
17  No, I don't.
18      Q.  Okay. But the Indianapolis distribution
19  center was distributing hydrocodone combination
20  products to CVS stores in Summit County and
21  Cuyahoga County in 2008 when you arrived, is that
22  right?
23      A.  Yes.
24      Q.  And they did so through 2014, is that

Page 33

1  right, for hydrocodone combination products?
2      A.  I -- I'm not sure of the date, but we
3  did move that operation where Somerset was serviced
4  from another facility, and that's when we no longer
5  serviced that area. So, if it was -- if we have
6  numbers that are 2014, then, yes, it would be 2014.
7      Q.  So, from -- do you know prior to 2008
8  who was providing opioid products, distributing
9  opioid products to CVS stores in Summit County and
10  Cuyahoga County, Ohio?
11      MR. HYNES: Objection to form.
12  BY MR. ELSNER:
13      Q.  You can answer if you know.
14      A.  Okay. Yes, the Indianapolis
15  distribution center. Was there a begin date? I
16  know the time that I was in Somerset, from '98 to
17  2008, Indianapolis was providing us with the
18  pharmacy which we were delivering to Ohio.
19      Q.  Okay. So, if I understand that
20  correctly, from 1998 to 2008, when you were in
21  Somerset, Pennsylvania, the Indianapolis
22  distribution center would ship the controlled
23  substances for distribution in Ohio to Somerset,
24  Pennsylvania, is that right?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    A.   That's correct.

2    Q.   And then in Somerset, Pennsylvania, you

3  would then ship those products to the stores in

4  Ohio, is that right?

5    A.   Correct.

6    Q.   And did that change when you moved to

7  Indianapolis in 2008 or is that -- or did that

8  process continue where the Indianapolis

9  distribution center would send it to Somerset and

10 then Somerset would ship it to the stores?

11   A.   That process remained in place.

12   Q.   Remained in place.  Did it remain in

13 place for controlled substances and hydrocodone

14 products through 2014 before hydrocodone was

15 rescheduled?

16   MR. HYNES:  Hydrocodone combination products?

17   MR. ELSNER:  Yes.

18 BY THE WITNESS:

19   A.   No.  I believe -- I believe we ended the

20 Somerset, delivering to Somerset before we

21 eliminated hydrocodone from our inventory.  And I'm

22 just thinking here.  I think it was around 2012

23 that we stopped shipping to Somerset.

24 BY MR. ELSNER:

Page 35

1    Q.   Okay.  And so from 2012 on, you would --

2  you would ship it from Indianapolis directly to the

3  stores in Ohio?

4    MR. HYNES:  Objection.

5  BY THE WITNESS:

6    A.   Only to the stores that the Indianapolis

7  DC was servicing, and we were not servicing

8  Cleveland or Akron area.

9  BY MR. ELSNER:

10   Q.   In 2000 -- in what year?

11   A.   I'm not sure of the year, but when --

12 Somerset continued to deliver to those areas, but

13 they were getting their -- their controlled

14 products from another distribution center.

15   Q.   I'm going to mark this as Exhibit 2,

16 which is a list of stores that had been produced to

17 us by CVS.

18        (WHEREUPON, a certain document was

19        marked as CVS-Nicastro-002:

20        Document, "Track One CVS Store

21        Information"; CVS-MDLT1-000007362 -

22        000007364.)

23 BY MR. ELSNER:

24   Q.   I want to ask whether you recognize

Page 36

1  these as CVS stores that were provided hydrocodone

2  combination products in Summit County and Cuyahoga

3  County from the Indiana distribution center.

4    A.   I couldn't confirm each store number and

5  date, but we did deliver to this area.  So, if

6  these are CVS stores, then, yes, we would have

7  delivered to these stores.

8    Q.   Okay.  Were you aware that the

9  Controlled Substances Act had been in place since

10 1970?

11   A.   Yes.

12   Q.   Okay.  And are you aware that the

13 Controlled Substances Act schedules various drugs

14 based on their potential for abuse and whether the

15 drug has an accepted medical use?

16   A.   I'm vaguely aware of the -- I know the

17 schedules, but I am not an expert on it and I

18 couldn't tell you what a Controlled II, III, IV, V,

19 why they are in those classes based on those

20 parameters.

21   Q.   But you know those schedules exist, is

22 that right?

23   A.   Yes.

24   Q.   And you know that drugs that are a

Page 37

1  Schedule II and Schedule III pose a high risk of

2  addiction and diversion, is that right?

3    MR. HYNES:  Objection to form.

4  BY THE WITNESS:

5    A.   I know we are required -- well, we don't

6  carry C-IIs because there is a lot more regulatory

7  control over it than C-III through V.

8  BY MR. ELSNER:

9    Q.   When you say there is a lot more

10 regulatory control, did someone tell you that

11 that's the reason that you don't -- that CVS does

12 not distribute Schedule II drugs?

13   A.   No.  But the facility that I'm in used

14 to be the Hooks headquarters, and I was told back

15 in the day when Hooks had that, you know,

16 distributed drugs, they did C-IIs and they had --

17 it was a safe, a vault.  So, the C-IIs had to be

18 stored in a vault and all that kind of thing.

19        So, but that's -- that's my knowledge of

20 it.  I don't know the regulations to control -- to

21 handle C-IIs.  I just know we don't.

22   Q.   In 2006 the deputy assistant

23 administrator for the U.S. Drug Enforcement Agency,

24 Joseph Rannazzisi, sent to CVS in Indiana a letter

Page 38

1 which I'm going to mark as Exhibit 3 and ask if
2 you've ever seen this before.
3          (WHEREUPON, a certain document was
4          marked as CVS-Nicastro-003:
5          9/27/06 letter to CVS Indiana, LLC
6          from DEA; CVS-MDLT1-000010552 -
7          000010555.)
8 BY MR. ELSNER:
9     Q.   This is 10552.  This is a letter from
10 the U.S. Department of Justice, the Drug
11 Enforcement Administration, dated September 27,
12 2006, and this addressed CVS Indiana on Empire
13 Drive.  Is that the Indiana distribution center?
14     A.   Yes.
15     Q.   And the letter states in the second line
16 that "The purpose of this letter is to reiterate
17 the responsibilities of controlled substance
18 distributors in view of the prescription drug abuse
19 problem our nation currently faces."
20          Do you see that?
21     A.   I do.
22     Q.   Have you seen this letter before?
23     A.   I have not, no.  But I did not go to
24 Indianapolis until late 2008.

Page 39

1     Q.   Okay.
2     A.   So...
3     Q.   And when you arrived at Indianapolis,
4 was there a file there that contained these types
5 of letters from the DEA?
6     A.   I'm not aware of it.
7     Q.   Is today the first time you've ever seen
8 this letter?
9     A.   Yes.
10     Q.   I want to ask you to turn to the second
11 page of the letter.  In the second paragraph,
12 second-to-last sentence, it reads, "Nonetheless,
13 given the extent of prescription drug abuse in the
14 United States, along with the dangerous and
15 potentially lethal consequences of such abuse, even
16 just one distributor that uses its DEA registration
17 to facilitate diversion can cause enormous harm."
18          Were you aware of that?
19 MR. HYNES:  Objection to form.  Go ahead,
20 Mark.
21 BY THE WITNESS:
22     A.   No, I was not aware of that.
23 BY MR. ELSNER:
24     Q.   Okay.  A little further down in the same

Page 40

1 letter, two paragraphs down, it reads, "The DEA
2 regulations require all distributors to report
3 suspicious orders of controlled substances.
4 Specifically, the regulations state that the
5 registrant shall design and operate a system to
6 disclose to the registrant suspicious orders of
7 controlled substances.  The registrant shall inform
8 the Field Division Office of the Administration in
9 his area of suspicious orders when discovered by
10 the registrant.  And suspicious orders include
11 orders of unusual size, orders deviating
12 substantially from a normal pattern and orders of
13 unusual frequency."
14          Were you aware of that?
15     A.   I'm aware of this -- of this regulation.
16     Q.   When did you become aware of that
17 regulation?
18     A.   Not until I came to the Indianapolis
19 distribution center.
20     Q.   In 2008?
21     A.   Yes.
22     Q.   Okay.  How did you become aware?
23     A.   From my team, learning it from my team.
24     Q.   Who specifically did you learn that from

Page 41

1 on your team in 2008?
2     A.   I don't know.  I would -- I would be
3 speculating, but I would have to assume it was my
4 operations manager, Gary Millikan.  He was -- he
5 was over the pharmacy.
6     Q.   Was it a formal training process?
7     A.   No.
8     Q.   It was more ad hoc?
9     A.   Yes.
10 MR. HYNES:  Can we go off the record for a
11 second.  This is not updating.
12 MR. ELSNER:  Can we go off the record.
13 THE VIDEOGRAPHER:  Going off the record at
14 9:35.
15          (WHEREUPON, a recess was had
16          from 9:35 to 9:37 a.m.)
17 THE VIDEOGRAPHER:  We are back on the record
18 at 10:30 -- I'm sorry -- 9:37.
19 BY MR. ELSNER:
20     Q.   Mr. Rannazzisi wrote a second letter on
21 February 7, 2007, which was also sent to all the
22 distribution centers across the United States, and
23 that letter bears the Bates range CVS-MDLT1-91513.
24 This is Exhibit 4.

Page 42

1    (WHEREUPON, a certain document was
2        marked as CVS-Nicastro-004:
3        2/7/07 letter from DEA;
4        CVS-MDLT1-000091513 - 000091516.)
5 BY MR. ELSNER:
6    Q.   If you look at the very first paragraph
7 of this letter, the opening line, it reads that
8 "This letter is being sent to every commercial
9 entity in the United States registered with the
10 Drug Enforcement Agency to distribute controlled
11 substances.  The purpose of this letter is to
12 reiterate the responsibilities of controlled
13 substance distributors in view of the prescription
14 drug abuse problem our nation currently faces."
15        Were you aware that this letter had been
16 sent to all the distribution centers in the
17 United States?
18    A.   Could I have a second to read it?
19    Q.   Sure.
20    A.   Okay.
21    MR. HYNES:  Do you want to repeat the
22 question.
23 BY MR. ELSNER:
24    Q.   I'm just asking if you're aware that

Page 43

1 this letter was sent to all the distribution
2 centers in the U.S.?
3    A.   I don't recall this letter.
4    Q.   You've never seen it before?
5    A.   No.
6        (WHEREUPON, a certain document was
7        marked as CVS-Nicastro-005:
8        12/27/07 letter from DEA;
9        CVS-MDLT1-000013535 - 000013536.)
10 BY MR. ELSNER:
11    Q.   Okay.  I'm going to mark as Exhibit 5 a
12 third letter that was sent by Mr. Rannazzisi.  The
13 Bates number is 13535.  It's dated December 27,
14 2007.  And the opening line reads, "This letter is
15 being sent to every entity in the United States
16 registered with the Drug Enforcement Agency to
17 manufacture or distribute controlled substances."
18        Were you aware of this letter and have
19 you ever seen it before?
20    MR. HYNES:  Object to form, compound.  You may
21 answer.
22 BY THE WITNESS:
23    A.   I don't recall seeing this letter.
24 BY MR. ELSNER:

Page 44

1    Q.   Okay.  So, in 2008 what -- at what point
2 in the year did you arrive at Indianapolis?
3    A.   It was a transition.  I would have been
4 fully in the role around September 2008.
5    Q.   If you look at the third paragraph of
6 the December 27, 2007 letter, it reads, "The
7 regulation also requires that the registrant inform
8 the local DEA Division Office of suspicious orders
9 when discovered by the registrant."  And it says,
10 "Filing a monthly report of completed transactions
11 (excessive purchase report or high unit purchases)
12 does not meet the regulatory requirement to report
13 suspicious orders."
14        When you joined the Indianapolis
15 distribution center in 2008, do you know whether
16 the center was sending these excessive purchase
17 reports or high unit purchase reports to the DEA?
18    A.   I do not.
19    Q.   Had the CVS distribution center in
20 Indiana when you arrived in 2008 ever reported a
21 suspicious order for a controlled substance to the
22 DEA?
23    A.   I don't know.  I don't know what
24 happened before I got there.

Page 45

1    Q.   When you arrived, did you ever ask
2 whether that had taken place?
3    A.   I did not.
4    Q.   Exhibit 6 I will place before you.
5        (WHEREUPON, a certain document was
6        marked as CVS-Nicastro-006:  CVS
7        Distribution Centers Controlled
8        Drug-DEA Standard Operating
9        Procedures Manual;
10        CVS-MDLT1-000066576 - 000066641.)
11 BY MR. ELSNER:
12    Q.   This is 66576.  This is the Distribution
13 Center's Controlled Drug - DEA Standard Operating
14 Procedures Manual dated December 1, 2007.
15    MR. HYNES:  Where is that date?
16    MR. ELSNER:  It's in the metadata.
17    MR. HYNES:  Okay.
18 BY MR. ELSNER:
19    Q.   Is this the first final copy of the
20 standard operating procedures for controlled drugs
21 for CVS distribution centers?
22    A.   I -- I don't know.  I really wasn't
23 involved with this piece of the business until I
24 arrived in Indianapolis.

Page 46

1    Q.   Okay.  So you don't recall having looked
2  at this in Somerset, Pennsylvania in 2000 -- in
3  December of 2007?
4      MR. HYNES:  I'm going to object because the
5  date is not on the agreement, but you may answer
6  the question.
7  BY THE WITNESS:
8      A.   I do not, no.
9  BY MR. ELSNER:
10     Q.   The second page of the document in the
11 second paragraph -- actually, let's look at the
12 last paragraph of the second page, 66577.
13        It reads, "Each CVS distribution center
14 handling controlled substances will designate a
15 specific staff member to implement the following
16 standard operating procedures."
17        When you arrived at CVS in Indiana, was
18 there a specific staff member who was designated to
19 implement the standard operating procedures for
20 controlled drugs?
21     A.   Yes.
22     Q.   Who was that?
23     A.   Gary Millikan.
24     Q.   And if you turn to page I-2, which is

Page 47

1  66581, paragraph 13(a) in the middle, it says, "DC
2  DEA Compliance Coordinator," and it reads, "means
3  the individual designated as responsible for
4  assuring compliance with applicable CSA
5  requirements at each CVS distribution center."
6         Was there a DC DEA compliance
7  coordinator in Indianapolis distribution center
8  when you arrived in 2008?
9      A.   I don't recall using this specific
10 title.  Yeah, I don't recall that specific title.
11     Q.   And if I ask you to turn to VIII-6,
12 there is a section on "Suspicious Order
13 Monitoring."
14     MR. HYNES:  What's the Bates number?
15     MR. ELSNER:  66614.
16     MR. HYNES:  Thank you.
17 BY MR. ELSNER:
18     Q.   Under section D, "Suspicious Order
19 Monitoring," 1(b), do you know what a suspicious
20 order monitoring system is?
21     A.   Yes.
22     Q.   What is it?
23     A.   It's a process for us to monitor
24 suspicious orders or orders of intent or --

Page 48

1      Q.   And what's the purpose of the process?
2      A.   To identify orders that we need to do
3  further research on to determine if it truly is
4  suspicious or not.
5      Q.   And suspicious of what?
6      A.   Suspicious of -- well, kind of the three
7  things, unusual size, frequency and pattern, to try
8  to identify if there is anything suspicious about
9  the order I guess that we shouldn't be shipping
10 this product to a particular store for one of those
11 reasons.  It's unusually large, the pattern,
12 frequency.
13     Q.   And what was the purpose behind that?
14 Why were you looking for orders of unusual size,
15 unusual frequency?
16     A.   To -- to basically prevent product from
17 going to a store that they don't need or don't, you
18 know -- don't need.  Sending too much of one item
19 to a store that they don't require.
20     Q.   Was it put in place to -- was it that?
21 Was it for supply reasons, to make sure that the
22 store wasn't oversupplied or undersupplied with the
23 controlled substances?
24     A.   It's part of knowing our customer.  So,

Page 49

1  knowing the store's ordering habits and just making
2  sure that too much inventory is not going into a
3  particular store if it's not what they normally
4  order.
5      Q.   Why?
6      MR. HYNES:  Objection; asked and answered.  Go
7  ahead.
8  BY THE WITNESS:
9      A.   It's required by the DEA.
10 BY MR. ELSNER:
11     Q.   If you look in 1(b) under the
12 "Suspicious Order Monitoring," it says, "These
13 parameters documented in the standard operating
14 procedure, 'Order Quantity Parameters for
15 Controlled Drugs,' is being developed and written."
16        Do you see that?
17     A.   I do.
18     Q.   Were you aware that there was not a
19 written policy for the suspicious order monitoring
20 program in 2007?
21     MR. HYNES:  Objection to form.
22 BY THE WITNESS:
23     A.   We may not have had a documented SOP,
24 but we did have a procedure that we followed with

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 our warehouse associates that worked within the
2 control cage to monitor orders as they were
3 producing them.
4 BY MR. ELSNER:
5    Q.   That's not the question I asked.  I
6 asked were you aware that there was not a written
7 policy in the standard operating procedure for an
8 SOM program, a suspicious order monitoring program?
9        MR. HYNES:  Objection; asked and answered.
10 BY THE WITNESS:
11    A.   I don't.  I mean, looking at this
12 document, it would appear that we did not.  But at
13 this point, I was not aware we didn't have a
14 policy.
15 BY MR. ELSNER:
16    Q.   When you arrived --
17    A.   SOP.  I'm sorry.  Written SOP.
18    Q.   When you arrived in 2008 at the CVS
19 distribution center in Indiana, were you aware that
20 there was not a written policy for a suspicious
21 order monitoring program at that time?
22    A.   No.
23    Q.   Did you review the suspicious order
24 monitoring procedures when you arrived at CVS

Page 51

1 Indiana?
2        MR. HYNES:  Objection; form.
3 BY THE WITNESS:
4    A.   It wouldn't have been the first thing I
5 did.  I can't recall the date that I became aware
6 of our SOM program, but I'm sure it wasn't the
7 first thing I did when I arrived.
8        (WHEREUPON, a certain document was
9        marked as CVS-Nicastro-007:
10        12/11/09 e-mail string with
11        attachment; CVS-MDLT1-000081281 -
12        000081346.)
13 BY MR. ELSNER:
14    Q.   I'm going to mark as Nicastro 7 an
15 e-mail from Dean Vanelli.  Actually, I'm going to
16 refer to the e-mail below that from Amy Propatier
17 to a large number of people where you are cc'd; and
18 the date of this e-mail is December 11, 2009, and
19 it attaches the Controlled Drug - DEA Standard
20 Operating Procedure Manual dated December 11 --
21 well, the effective date was -- sorry -- dated
22 December 11, 2009.
23        Do you see that, sir?
24    A.   I do.

Page 52

1    Q.   Okay.  This is the standard operating
2 procedure manual for controlled substances
3 effective December of 2009.  At this time you were
4 the director of the distribution center in Indiana,
5 is that right?
6    A.   Correct.
7    Q.   And you see on CVS 81281 this e-mail
8 from Amy Propatier and you are one of the people
9 cc'd on the e-mail, is that correct?
10    A.   Yes.
11    Q.   Okay.  And the -- the e-mail states,
12 "Attached is the DEA RX SOP."
13        What do you understand the DEA RX SOP to
14 be?
15    A.   This is the standard operating procedure
16 we were to follow regarding pharmacy.
17    Q.   Okay.  And if you look at the second
18 paragraph of the manual itself, the very first
19 page, second paragraph.
20    A.   I'm probably going to get these all
21 screwed up.  Is that okay?
22    Q.   We will sort them out.
23        In the second paragraph it reads,
24 "Therefore, the following standard operating

Page 53

1 procedures were prepared in response to a need for
2 a single source of current information for CVS
3 regarding DEA policies and the requirements of the
4 Comprehensive Drug Abuse Prevention Act, otherwise
5 known as the Controlled Substances Act."
6        Did you understand that that was the
7 purpose of the standard operating procedure manual
8 for controlled drugs?
9    A.   That's what's stated, so I would -- I
10 would believe so.
11    Q.   Okay.  And you received this manual?
12    A.   I -- my name is on it, so I imagine I
13 did.  But I --
14    Q.   Did you read it?
15    A.   I -- I can't say for sure.  It's nine
16 years ago.  But I -- if I got it, I probably did.
17    Q.   Okay.  And if you'd turn to Section
18 VIII-6, the page on the bottom, which is 81321 of
19 the document.  Are you with me?
20    A.   Okay.
21    Q.   It says under Section D "Suspicious
22 Order Monitoring," is that right?
23    A.   Yes.
24    Q.   And, again, under 1(b) on the following

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  page, it reads, "The parameters are documented in
2  SOP 'Order Quantity Parameters for Controlled
3  Drugs' being developed and written."
4        Were you aware that the standard
5  operating procedure for suspicious order monitoring
6  was not contained in the standard operating
7  procedures manual for controlled drugs in
8  December of 2009?
9        MR. HYNES: Objection to form. Go ahead.
10 BY THE WITNESS:
11    A.  If I can have just a second to read the
12 first paragraph.
13 BY MR. ELSNER:
14    Q.  Sure.
15    A.  Okay. Obviously, this process has
16 evolved over time. So, I wanted to kind of make
17 sure I'm in the right time frame.
18        When I read this about "screened and
19 reviewed by the host system," I believe that is
20 talking about a system that was a new systemic or
21 software program that was being put in place; and I
22 believe that's why this was still being developed
23 because the process was going to be evolving.
24        But I didn't write it, so I can't say

Page 55

1  for sure that's what it was. But looking at this
2  nine years later, I believe that's what was
3  happening and why we didn't have it included in the
4  SOP at that point.
5    Q.  Okay. But my question was were you
6  aware that it wasn't included in the SOP, the
7  standard written policy for standard -- for the
8  suspicious order monitoring program in December of
9  2009?
10       MR. HYNES: Objection to form.
11 BY THE WITNESS:
12    A.  In reading this, I am now aware that
13 it's not in here.
14 BY MR. ELSNER:
15    Q.  Were you aware at the time?
16    A.  It's hard for me to say. I mean, we
17 would have got this -- this SOP and gone through
18 it, and I'm sure there would have been some
19 discussion saying here's what's happening with the
20 SOP for the SOM piece; but I don't recall what that
21 conversation was at that point.
22    Q.  Were you involved in those discussions
23 in 2009?
24    A.  In the development of the SOP?

Page 56

1    Q.  Yes.
2    A.  No.
3    Q.  And the SOM?
4    A.  No, no.
5    Q.  The DEA began an audit of the Indiana
6  distribution center in August of 2010. Do you
7  recall that?
8    A.  Yes.
9    Q.  And were you there when the DEA came in
10 on August 24, 2010?
11    A.  I was.
12    Q.  And did you meet with the DEA during
13 those -- during that audit?
14    A.  I did.
15    Q.  Okay. I'll mark this as Nicastro
16 Exhibit 8.
17        (WHEREUPON, a certain document was
18        marked as CVS-Nicastro-008:
19        8/24/10 e-mail string;
20        CVS-MDLT1-000076281.)
21 BY MR. ELSNER:
22    Q.  It's 76281. And there is -- there is an
23 e-mail that you sent to Ben Cote at 5:30 on
24 August 24, 2010, and it reads, "They came in around

Page 57

1  1:30 and left around 4," and the re line is the DEA
2  audit of Indy, and that they were going to come
3  back tomorrow.
4        My question is: When they arrived for
5  the audit, what action did you take when they
6  arrived?
7    A.  My -- well, typically when we have a DEA
8  audit, they arrive unannounced. We find out
9  they're here, and then we assemble the team that
10 needs to meet with them and we sit down with them
11 and do an opening meeting.
12    Q.  And do you make a phone call to
13 CVS Pharmacy to inform them that an audit has begun
14 at the Indianapolis distribution center?
15       MR. HYNES: Objection to form. Go ahead.
16 BY THE WITNESS:
17    A.  Not typically. We would start the --
18 start the audit and, you know, find out why they
19 are there, are we doing the audit or do they just
20 have a question about something. But we would
21 report that they were there and how it went.
22       MR. ELSNER: I will mark this as Exhibit 9.
23        (WHEREUPON, a certain document was
24        marked as CVS-Nicastro-009:

Page 58

1      8/24/10 e-mail string;
2      CVS-MDLT1-000076282.)
3   BY MR. ELSNER:
4      Q.   This is 76282.  If you look at the
5   e-mail on the bottom, this is an e-mail from Frank
6   Devlin sent Tuesday, August 24 at 1:56 p.m., and he
7   cc's you to the e-mail.  Is that right?
8      A.   Yes.
9      Q.   And he writes, "John, just wanted to let
10  you know the DEA showed up in Indy today for a full
11  audit."
12      Is that right?
13      A.   That's correct.
14      Q.   Okay.  And the time of this is 1:56.
15  And who is Frank Devlin?
16      A.   Frank Devlin was the loss prevention
17  director.
18      Q.   For CVS?
19      A.   Yes.
20      Q.   In Indianapolis?
21      A.   No.  For logistics for all DCs.
22      Q.   And where was he located?
23      A.   Rhode Island.
24      Q.   In Rhode Island?

Page 59

1      A.   Corporate.
2      Q.   So, within 26 minutes of the audit
3   beginning, Frank Devlin is sending you an e-mail
4   concerning or cc'ing you on an e-mail concerning
5   the audit, is that right?
6      A.   Yes.
7      Q.   Do you know how he was made aware that
8   the audit began?
9      A.   I don't know who called him.  I
10  wouldn't.  And the e-mail he is sending it to is
11  the person who is going to need to pull computer
12  information for the audit.
13      Q.   Okay.  So, fair to say that when a DEA
14  audit begins, that the wheels get put into motion
15  to be able to prepare yourself to collect the
16  information that the DEA needs and provide it to
17  the DEA, is that right?
18      A.   Yes.
19      Q.   And that includes not only your own
20  distribution center, but it also includes
21  CVS Pharmacy in Rhode Island and other parts of the
22  country, is that right?
23      A.   Well, there is always information they
24  are requiring.  One is a list of our corporate

Page 60

1   executives.  We don't have that on site.  So, there
2   is several things we need to go to our corporate
3   office in order to get information prepared for
4   them.
5      Q.   So, it's important to notify the
6   corporate office immediately of when a DEA audit
7   starts so you can prepare the materials to give to
8   the DEA, is that right?
9      MR. HYNES:  Objection; form.
10  BY THE WITNESS:
11      A.   Yeah, we want to be expeditious with our
12  information.
13  BY MR. ELSNER:
14      Q.   Among -- let me --
15      Do you recall that among the items that
16  were requested by the DEA in the audit was a copy
17  of the suspicious order monitoring program for the
18  standard operating procedures manual?
19      MR. HYNES:  Objection to form.
20  BY THE WITNESS:
21      A.   It's a pretty typical thing they ask
22  for.  So, I don't know if it was on the 2010
23  request, but it typically is something that we have
24  talked about in the past several years.

Page 61

1      (WHEREUPON, a certain document was
2      marked as CVS-Nicastro-010:  9/2/10
3      e-mail with attachment;
4      CVS-MDLT1-000076283 - 000076285.)
5   BY MR. ELSNER:
6      Q.   This is 76283.  It's an e-mail from
7   Terrence Dugger to you dated September 2, 2010, and
8   it attaches a memo related to the DEA's visit
9   August 24 through August 27, 2010.  Is that right?
10      A.   Correct.
11      Q.   Who is Terrence Dugger?
12      A.   Terrence Dugger was the loss prevention
13  manager at Indianapolis.
14      Q.   And so he worked for you?
15      A.   No.  He worked for Frank Devlin.  The
16  loss prevention managers don't report to the
17  operations.
18      Q.   But he worked in the Indianapolis
19  facility, is that right?
20      A.   Yes.
21      Q.   Do you see in the requested items on
22  76284 that among the requested items was the SOM
23  SOP on the second page.
24      Do you see that?

Page 62

1    A.   Yes.
2    Q.   Okay.  And these were the items that
3  were requested by the DEA in the audit in August of
4  2010, is that right?
5    A.   Yes.
6    MR. ELSNER:  Why don't we take a quick break
7  if we could.
8    MR. HYNES:  Okay.
9    THE VIDEOGRAPHER:  Going off the record at
10  10:06.
11    (WHEREUPON, a recess was had
12    from 10:06 to 10:19 a.m.)
13    THE VIDEOGRAPHER:  We are back on the record
14  at 10:19.
15    (WHEREUPON, a certain document was
16    marked as CVS-Nicastro-011:
17    5/19/09 e-mail string;
18    CVS-MDLT1-000034234 - 000034235.)
19  BY MR. ELSNER:
20    Q.   Mr. Nicastro, I'm going to show you what
21  we've marked as Exhibit 11.  Just have it nearby.
22  We may refer back to it.
23    This is -- Exhibit 11 is 34234 and on
24  the bottom, there is an e-mail from Amy Propatier

Page 63

1  dated April 3, 2009 and you're cc'd on the e-mail.
2    Do you see that?
3    A.   Yes.
4    Q.   And the re line or the subject line
5  reads, "Updated DEA SOP."
6    Do you see that?
7    A.   Yes.
8    Q.   Okay.  And she -- she writes, "Good
9  morning.  Attached is the DEA SOP which was
10  implemented in December of 2007.  We've made some
11  recent updates to the SOP," she says, and then she
12  describes record retention update and then she
13  says, "Also, the SOM section is still not included
14  in the SOP."
15    That's the suspicious order monitoring
16  section, is that right?
17    A.   Correct.
18    Q.   And she says, "In the event of an audit
19  and the question comes up, please direct them to
20  corporate (Frank or myself) for the explanation of
21  the program.  Please review with your teams and
22  forward to anyone I may have missed."
23    Do you see that?
24    A.   I do.

Page 64

1    Q.   Okay.  And so when the DEA began its
2  audit in August of 2010, did you follow the advice
3  given by Amy Propatier and refer them to CVS
4  corporate?
5    MR. ELSNER:  Objection; form.
6  BY THE WITNESS:
7    A.   I -- I don't recall.  I don't remember
8  referring them to the corporate office.
9  BY MR. ELSNER:
10    Q.   But the SOP at this point in time did
11  not contain a written policy for suspicious order
12  monitoring, correct?
13    MR. HYNES:  Objection to form.
14  BY THE WITNESS:
15    A.   Correct.
16  BY MR. ELSNER:
17    Q.   Okay.  And you did not refer them to CVS
18  corporate or you did refer them to CVS corporate?
19    MR. HYNES:  Objection; asked and answered.
20  BY THE WITNESS:
21    A.   I'm not sure.  I don't remember if we
22  did or we didn't.  I'm sure we would have had to
23  respond to them about our SOM SOP.  I just don't
24  remember if that's the avenue we took or if we

Page 65

1  handled it ourselves.
2  BY MR. ELSNER:
3    Q.   Were you concerned when the DEA began
4  its audit in August of 2010 that there was not a
5  written policy in place for your suspicious order
6  monitoring program and that the DEA had
7  specifically requested a copy of it?
8    MR. HYNES:  Objection to form.
9  BY THE WITNESS:
10    A.   No.  We had an SOM process in place and
11  was very comfortable with the process we were
12  following.  If they were looking for an SOP that
13  hadn't been developed, then we would have to deal
14  with that.
15  BY MR. ELSNER:
16    Q.   Well, did you inform CVS Pharmacy that
17  the request for a written SOM had been made?
18    MR. HYNES:  Objection.  CVS Pharmacy, Inc., is
19  that what you're referring to when you say that?
20    MR. ELSNER:  Yes.
21    MR. HYNES:  Just wanted to clarify.
22  BY THE WITNESS:
23    A.   Okay, because I've always considered
24  myself CVS.  So, to me CVS Pharmacy is corporate.

Page 66

1 But okay.
2     I'm sorry. Can you ask the question
3 again?
4 BY MR. ELSNER:
5     Q. Well, let me show you Exhibit 12. I
6 will strike that question.
7         (WHEREUPON, a certain document was
8         marked as CVS-Nicastro-012: CVS
9         Controlled Drug-DEA Standard
10        Operating Procedures Manual;
11        CVS-MDLT1-000088957 - 000089025.)
12 BY MR. ELSNER:
13    Q. Exhibit 12 is a standard -- the DEA
14 standard operating procedures for controlled drugs,
15 and the revision date on this document is
16 August 25, 2010, the day after the DEA audit began
17 in Indianapolis, is that right?
18    A. Yes.
19    Q. Okay. And, so, these new SOP procedures
20 were prepared within 24 hours of the DEA visit to
21 the Indianapolis distribution center, is that
22 right?
23    MR. HYNES: Objection to form.
24 BY THE WITNESS:

Page 67

1     A. I don't know that. I find that highly
2 unlikely.
3 BY MR. ELSNER:
4     Q. Well, the date is August 25, 2010,
5 right?
6     A. Yes.
7     Q. And the audit began on August 24, 2010,
8 is that right?
9     A. Correct. I just -- I don't --
10    Q. I'd ask you to turn to the index, which
11 is the third page of the document, 88959. Under
12 Section VIII-D. Do you see where I'm at? It reads
13 "Suspicious Order Monitoring."
14    MR. HYNES: This one right here.
15 BY THE WITNESS:
16    A. Oh, okay. I'm sorry. VIII-D.
17 BY MR. ELSNER:
18    Q. Okay. And the page reference is VIII-5,
19 is that right, for the suspicious order monitoring
20 component of the standard operating procedure, is
21 that right?
22    A. Yes.
23    Q. So, if we turn to VIII-5, which is
24 88995. Are you there?

Page 68

1     A. Yes.
2     Q. It doesn't contain the "Suspicious Order
3 Monitoring" section, does it?
4     A. Does not.
5     Q. So, that's contained on VIII-6, is that
6 right, at the bottom?
7     A. Yes.
8     Q. And this manual for the very first time
9 contains a written policy for the suspicious
10 monitoring program in the standard operating
11 procedure, is that right?
12    MR. HYNES: Objection to form.
13 BY THE WITNESS:
14    A. Yes.
15 BY MR. ELSNER:
16    Q. Okay. And if you look, it's basically
17 contained on two and a half pages. It runs from
18 VIII-6 through VIII-8. Is that right?
19    A. Looks like it continues to VIII-9.
20    Q. Well, see, that's the interesting thing
21 because what happens is it's actually inserted in
22 here twice if you look. You see the title
23 "Prevention and Monitoring of Controlled Drug
24 Suspicious Orders" on 88996 and it lists 1 through

Page 69

1 7, and then that section is cut-and-pasted a second
2 time in the same manual.
3     MR. HYNES: Objection to form, misstates the
4 document.
5 BY MR. ELSNER:
6     Q. On VIII-8 through VIII-11.
7     A. Okay.
8     Q. It's fair to say that this was thrown
9 together fairly hastily?
10    MR. HYNES: Objection to form.
11 BY THE WITNESS:
12    A. I didn't produce the document. I didn't
13 create the document. I couldn't tell you what
14 their motivation was.
15 BY MR. ELSNER:
16    Q. But you're the director of the
17 distribution center in Indiana, right?
18    A. Correct.
19    Q. And the buck stops with you, there is no
20 one higher than you when it comes to the policies
21 and procedures in Indiana, is that right?
22    A. Correct.
23    Q. Okay. So, you don't know sitting here
24 whether in fact when this operating procedure

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  was -- came into existence, is that right?
2      A.   I do not.
3      Q.   Okay.  When did you receive this
4  document?
5      A.   I -- I don't -- I don't know.  Yeah, I
6  don't know what date I received it.  I would have
7  to assume it was fairly soon after the revision
8  date.
9      Q.   I will mark for you Exhibit 13, which is
10  88956.
11          (WHEREUPON, a certain document was
12          marked as CVS-Nicastro-013:
13          8/26/10 e-mail;
14          CVS-MDLT1-000088956.)
15  BY MR. ELSNER:
16      Q.   This is from Amy Propatier to Annette
17  Lamourex dated, and it says "DEA SOP 8-25-10," is
18  that right, in the subject line and in the
19  attachment, is that right?
20      A.   Yes.
21      Q.   And it said, "Can you please post?  We
22  added the Suspicious Order Monitoring."
23          What does it mean to post?
24      A.   Since she was sending it to Annette, I'm

Page 71

1  assuming that they were putting it online, putting
2  it on our Share post or Share whatever it's called.
3      Q.   When something like that happens, are
4  you given an alert to that effect or does that just
5  take place without your knowledge?
6      A.   That would take place without my
7  knowledge.  I would expect that we would all get an
8  e-mail at some point saying this has now been
9  posted or get a copy of it at some point.
10      Q.   This next document is Nicastro 14.
11          (WHEREUPON, a certain document was
12          marked as CVS-Nicastro-014:  9/1/10
13          e-mail string with attachment;
14          CVS-MDLT1-000075299 - 000075312.)
15  BY MR. ELSNER:
16      Q.   This is CVS 75299.  If you see on the
17  bottom, this is an e-mail from John Mortelliti to
18  Terrence Dugger and the subject reads, "DEA
19  Speaking Points.  Importance:  High."
20          Is that right?
21      A.   Correct.
22      Q.   And Mr. Dugger worked at the
23  Indianapolis distribution center, is that right?
24      A.   He did.

Page 72

1      Q.   And he was involved in the DEA audit in
2  Indianapolis?
3      A.   Yes.
4      Q.   And he prepared this memo that we looked
5  at in Exhibit 10 that described a summary of their
6  visit, is that right?
7      A.   Yes.
8      Q.   And it reads, "Terrence, this is for the
9  DEA.  The corrections listed below have been
10  updated.  It's okay to review this with the
11  agents."
12          And then above that, in another e-mail
13  from Mr. Mortelliti, September 1, 2010, he writes
14  to a team, and that team, there is a cc to Denise
15  Byers.  Who is she?
16      A.   Denise Byers -- the second e-mail?
17      Q.   Yes.
18      A.   Denise Byers is my current loss
19  prevention manager, but she worked in -- well, I
20  can't say for sure.  I think she worked in
21  Lumberton in 2010.
22      Q.   And attached to this e-mail is a
23  PowerPoint which reads on the very first page
24  "Suspicious Order Monitoring for PSE and Control

Page 73

1  Drugs, Summary of Key Concepts and Procedures,"
2  dated August 27, 2010.
3          Do you see that?
4      A.   Yes.
5      Q.   Now, this was a PowerPoint put together
6  to be shared with the DEA, is that right?
7      MR. HYNES:  Objection; calls for speculation.
8  BY THE WITNESS:
9      A.   Updated version.  It's okay to share
10  this document.  So, yes.
11  BY MR. ELSNER:
12      Q.   Okay.  And during -- and this is in the
13  middle of the DEA's audit of the Indianapolis
14  distribution center, correct?
15      A.   Correct.
16      Q.   The -- I will ask you to turn inside the
17  document itself to page 75301, which is the second
18  page of the -- of the PowerPoint presentation.
19          In the very last bullet it says, "The DC
20  RX and Loss Prevention have been tasked with review
21  and investigation of potential suspicious orders
22  from the DC to the stores."
23          Do you see that?
24      A.   I do.

**Page 74**

1 Q. Okay. At this point in time, in
2 September of 2010, this review process was not
3 taking place in Indianapolis, was it?
4 MR. HYNES: Objection to form.
5 BY THE WITNESS:
6 A. The review process we had previous to
7 this was monitored by our warehouse associates that
8 picked the controlled drugs until this inventory
9 review report was developed.
10 BY MR. ELSNER:
11 Q. But this process didn't go into place
12 until after this program, is that right? At this
13 point in time these -- this review is being done in
14 New Jersey, is that right?
15 MR. HYNES: Objection to form.
16 BY THE WITNESS:
17 A. I'm unclear on the dates that that was
18 occurring, but there was a timeline where it was
19 being done in New Jersey and then distributed out
20 to the DCs and then future processes I am sure we
21 will get into later where it was more centralized.
22 So, I'm just not sure what the dates were that it
23 moved back into the DCs from the Lumberton
24 facility.

**Page 75**

1 BY MR. ELSNER:
2 Q. Was this PowerPoint presentation shared
3 with the DEA during their audit in Indianapolis in
4 2010?
5 A. I don't recall covering this with them.
6 I know we talked about a couple other things that
7 seemed to be more -- more important, more pertinent
8 I guess to the audit and the questions that they
9 had. I don't recall covering this with them.
10 Q. Do you know whether you provided --
11 well, I'll strike that.
12 If you look at the -- the cover e-mail
13 to the -- to this.
14 A. Sorry. Exhibit 14?
15 Q. Yes. To the PowerPoint.
16 Mr. Mortelliti attaching the PowerPoint
17 says, "These are the final approved speaking points
18 for the DEA agents if they come to one of your
19 facilities and question suspicious monitoring.
20 It's okay to share this document. Please be sure
21 your team understands it before presenting it so it
22 doesn't look like a prop instead of a tool."
23 Were you aware of this e-mail in 2010?
24 A. No.

**Page 76**

1 Q. But these were new policies put in place
2 at this time in September of 2010, is that right?
3 MR. HYNES: Objection to form.
4 BY THE WITNESS:
5 A. I'm not on this e-mail. So, I am --
6 yeah, I'm not included on this e-mail, so I don't
7 know what his -- what his motivation was.
8 BY MR. ELSNER:
9 Q. Did you review this PowerPoint
10 presentation when you received it from
11 Mr. Mortelliti?
12 MR. HYNES: Objection.
13 BY MR. ELSNER:
14 Q. Sorry. When Terrence Dugger received it
15 from Mr. Mortelliti.
16 A. I don't recall this document.
17 Q. So, Mr. Dugger didn't share this
18 document with you as the head of the distribution
19 center in Indiana during the DEA audit, is that
20 right?
21 MR. HYNES: Objection; form.
22 BY THE WITNESS:
23 A. I just don't recall. I just -- I don't
24 remember.

**Page 77**

1 BY MR. ELSNER:
2 Q. Mr. Mortelliti was concerned, was he
3 not, that if you were communicating with the DEA
4 regarding this new standard operating procedure
5 manual discussion on suspicious order monitoring
6 that everyone be familiar with the contents of the
7 document so that it appear that those operations
8 were in place, is that right?
9 MR. HYNES: Objection to form.
10 BY THE WITNESS:
11 A. I -- I don't know what his motivation
12 was. Again, I wasn't part of this trail or this
13 e-mail. So, I -- I don't know. I don't know what
14 he was intending to say. The folks on the e-mail
15 are all loss prevention folks. So, I don't know
16 what his -- what he was trying to convey.
17 BY MR. ELSNER:
18 Q. But he writes that "Before presenting
19 this to the DEA, I need you to understand it so
20 that it looks like a prop instead of a tool."
21 Is that right?
22 A. So, it doesn't look like a prop instead
23 of a tool. He does write that, but I --
24 Q. Meaning that he wants this to appear to

Page 78

1 the DEA like it's actually something that's being
2 used in practice like a tool and not as a pretend
3 prop, is that right?
4     MR. HYNES: Objection; calls for speculation.
5 BY THE WITNESS:
6     A. Yes, I -- I don't know what -- what he
7 was trying to convey here. He didn't -- he didn't
8 send it to me. We didn't have a conversation about
9 this. So, I -- it would just be conjecture or
10 speculation of what he was writing.
11 BY MR. ELSNER:
12     Q. And as the head of the distribution
13 center for Indiana, you were not aware that these
14 new procedures had been put in place overnight, is
15 that right?
16     MR. HYNES: Objection to form.
17 BY THE WITNESS:
18     A. Correct. I do not recall putting
19 something in place right as the DEA audit was being
20 conducted.
21 BY MR. ELSNER:
22     Q. When you met with the DEA, did you
23 inform them that the standard operating procedure
24 had been put in place the day after the audit of

Page 79

1 the Indianapolis distribution center began?
2     MR. HYNES: Objection to form.
3 BY THE WITNESS:
4     A. I -- I don't -- again, I don't recall
5 having -- even discussing this with the DEA, having
6 a broad discussion about this -- about the SOM.
7 I'm sure if we shared this with them, they would
8 have seen the date says August 27.
9 BY MR. ELSNER:
10     Q. Did you share it with them?
11     A. I don't recall.
12     Q. If we look at the presentation again.
13     MR. HYNES: Exhibit 14?
14     MR. ELSNER: Yes.
15 BY MR. ELSNER:
16     Q. At 75309. It says, "FAQ. Why is the DC
17 responsible to review suspicious orders?"
18     It reads, "The DC as a separate DEA
19 registrant is responsible for products shipped from
20 that facility. DEA regulations require all
21 distributors to report suspicious orders."
22     Did you understand that the distribution
23 center that you managed had its own DEA
24 registration?

Page 80

1     A. Yes.
2     Q. And did you understand that as the
3 district -- as the manager of the distribution
4 center in Indiana that your facility was
5 responsible for informing the DEA of suspicious
6 orders?
7     A. Yes.
8     Q. Okay. At this point in time, had the
9 distribution center in Indianapolis ever reported a
10 suspicious order to the DEA?
11     A. Not to my knowledge. Not that I recall.
12     Q. This function of reviewing these
13 suspicious orders at this point in time was not
14 being performed in the distribution center in
15 Indianapolis, is that right?
16     MR. HYNES: Objection to form.
17 BY THE WITNESS:
18     A. I'm not sure of the time frame.
19 BY MR. ELSNER:
20     Q. In August of 2010.
21     A. I'm not sure of that time frame when it
22 moved from Lumberton to the loss prevention
23 managers and the pharmacy managers, but that
24 process did move into the DCs for the pharmacy

Page 81

1 manager and the LP manager to review.
2     Q. If we go back to Exhibit 12 and we look
3 at 88997.
4     MR. HYNES: Michael, is the number 88997?
5     MR. ELSNER: Yes.
6 BY MR. ELSNER:
7     Q. It's actually, yeah, 88997. Under
8 Section 4, "Item Review Report."
9     A. Sorry. I don't see that. 8895.
10     MR. HYNES: 88997. VIII-7.
11 BY THE WITNESS:
12     A. 88997. Okay.
13 BY MR. ELSNER:
14     Q. It reads, "Currently the Item Review
15 Report for controlled drugs is being reviewed at a
16 central location in New Jersey. During the month
17 of September 2010 the report will be transitioned
18 to each pharmacy DC and the following procedures
19 will occur."
20     This is from the 8-25-2010 manual, is
21 that right?
22     A. Okay. Yes.
23     Q. So, does that refresh your recollection
24 at the time of the DEA audit this function was

Page 82

1 actually being performed in New Jersey and not at
2 the distribution center in Indianapolis?
3    A.   That would be correct.
4    Q.   Okay.  And, so, the presentation that
5 was approved to be given to the DEA which stated
6 that that process was taking place at each of the
7 distribution centers was incorrect, is that right?
8    MR. HYNES:  Objection to form.  Let me see
9 that document again.  What page was that on?
10    MR. ELSNER:  75301.
11    MR. HYNES:  No.  75309.
12    MR. ELSNER:  It's actually 75306.
13 BY MR. ELSNER:
14    Q.   Do you see the first bullet under
15 "Responsibilities" it reads, "The DC RX - Review
16 Report (IRR) Daily and determine whether variances
17 are within acceptable ranges."
18       Do you see that?
19    A.   I do.
20    Q.   But that function wasn't taking place at
21 the Indianapolis distribution center at this time.
22 It was taking place at a centralized location in
23 New Jersey.  Is that right?
24    MR. HYNES:  Objection to form.

Page 83

1 BY THE WITNESS:
2    A.   Based on the dates on the other
3 document, I would -- I would say yes, but that's
4 the only recollection I have as far as the date
5 that actually moved is what was on that document.
6 So...
7 BY MR. ELSNER:
8    Q.   But the -- as the director of the
9 Indianapolis distribution center at this time in
10 2010, this review process wasn't taking place in
11 your facility, was it?
12    MR. HYNES:  Objection; asked and answered.
13 BY MR. ELSNER:
14    Q.   Or do you not know?
15    A.   Well, I know it was moving from
16 New Jersey into the facilities.  I just wasn't
17 aware -- I'm just unsure what the date was that
18 that actually happened.
19    Q.   Okay.  But based on these two documents,
20 this approved DEA presentation was incorrect, is
21 that right?
22    MR. HYNES:  Objection to form; calls for
23 speculation.
24 BY THE WITNESS:

Page 84

1    A.   I'm sorry.  I'm not seeing in here where
2 it says it has been moved to the DCs.
3 BY MR. ELSNER:
4    Q.   No, that's in the manual that we looked
5 at where we just read.  The date of that is
6 August 25, 2010 where it said that this IRR review
7 is being conducted at a central location in
8 New Jersey.
9       And this document two days or a few days
10 later, September 1st, 2010, says that this review,
11 this IRR review, is being conducted at the DC Rxs.
12 Is that right?
13    A.   What page?  What slide is that?
14    Q.   75306, the first bullet.
15    A.   It says DC Rx.
16    Q.   That's the distribution center, is that
17 right?
18    A.   Yeah.  Yeah.  I'm kind of speculating
19 here.  I mean, Lumberton is a distribution center
20 too.  So, I -- I'm not sure if it's referring to as
21 the DC Rx, but it -- it may be referring to the
22 actual DC it's coming out of.
23    Q.   But was this function being performed at
24 your DC in Indiana in 2010, if you know?

Page 85

1    MR. HYNES:  Objection; asked and answered.
2 BY THE WITNESS:
3    A.   Yeah, I -- I don't know if it was being
4 performed in August of 2010.  I know it came to us
5 at one point.  I just don't know the actual date.
6 So...
7       I don't know if we were doing it
8 August 25, 2010.
9 BY MR. ELSNER:
10    Q.   Can you explain to me -- do you know
11 what the -- what was -- what the process was that
12 was being reviewed in New Jersey related to the
13 IRRs as reflected in this manual in August of 2010?
14    MR. HYNES:  Objection to form.  Go ahead.
15 BY THE WITNESS:
16    A.   I couldn't explain it, no.  It's -- that
17 process was being conducted.  I was not familiar
18 with the actual day-to-day process or what they
19 were actually reviewing.
20 BY MR. ELSNER:
21    Q.   Okay.  And did -- when the -- explain to
22 me what would happen if there was a potentially
23 suspicious order at your facility in 2010.  Would
24 you be alerted of that from CVS Pharmacy either

Page 86

1 from New Jersey or Rhode Island?
2    A.   I wouldn't be alerted directly, but our
3 pharmacy team would be alerted to hold that order
4 until it was cleared or had time to be reviewed and
5 a determination was made whether it was suspicious
6 or not. But that would have gone directly to
7 the -- to my pharmacy department.
8    Q.   And was your pharmacy department
9 conducting its own investigation of those
10 suspicious orders at that time or was that all
11 being handled in a centralized location in
12 New Jersey?
13    A.   They could. It was -- it was being
14 handled in New Jersey, but we could also -- we also
15 had our own process which we could initiate an
16 investigation and forward it on to Lumberton for
17 them to review.
18    Q.   And is that based on an electronic
19 review of records, the system that you had in place
20 in New Jersey in -- I'm sorry -- in Indianapolis in
21 2010?
22    A.   Prior to the IRR that Lumberton was
23 reviewing, no. It was a manual process.
24    Q.   So, when is the first electronic process

Page 87

1 that began for the review of suspicious --
2 potentially suspicious orders in the Indianapolis
3 distribution center?
4    MR. HYNES: Objection to form. Go ahead.
5 BY THE WITNESS:
6    A.   I believe it was with this -- when that
7 IRR, the IRR report moved from Lumberton into the
8 facilities is when we had the first documents or
9 generated documents.
10 BY MR. ELSNER:
11    Q.   Okay. So, prior to that time, all of
12 that review and analysis being conducted outside of
13 the Indianapolis distribution center, is that
14 right?
15    MR. HYNES: Objection to form.
16 BY THE WITNESS:
17    A.   Correct.
18 BY MR. ELSNER:
19    Q.   And, so, when you would be alerted from
20 New Jersey to hold a particular order, explain to
21 me what that process would entail.
22    MR. HYNES: Objection to form.
23 BY MR. ELSNER:
24    Q.   Did it involve anything other than

Page 88

1 holding the order until it was determined that the
2 order should be canceled or released?
3    MR. HYNES: Same objection.
4 BY THE WITNESS:
5    A.   I'm not clear on exactly what we did at
6 that time, but the procedure at that time would
7 have been to hold that order until we were given
8 clearance to either ship it or not.
9 BY MR. ELSNER:
10    Q.   And that would be the sole function that
11 the Indianapolis distribution center and the
12 pharmacy department would play at that time?
13    A.   Other than identifying orders that we
14 saw from the orders that were placed from our
15 stores from our associates to -- to escalate an
16 issue.
17    Q.   So, leaving aside the manual process of
18 reviewing potential orders to see if there was
19 something suspicious, there was no electronic
20 process taking place at the Indianapolis
21 distribution center until that process moved to
22 Indianapolis sometime after 2010, is that right?
23    A.   Correct.
24    Q.   That manual process that you were

Page 89

1 describing, what is the volume of controlled
2 substances that was being moved in and out of your
3 distribution center around that time, 2010 through
4 2014?
5    MR. HYNES: Objection to form. Go ahead.
6 BY THE WITNESS:
7    A.   We've had a myriad of store realignments
8 and activities, so I don't have an exact number of
9 stores that we were servicing at that time. I
10 would say it was a little over 1,000 stores.
11 BY MR. ELSNER:
12    Q.   A little over 1,000 stores. And, so, we
13 are talking pretty high volumes of controlled
14 substances moving in and out of your facility, is
15 that right?
16    A.   Not -- not necessarily. The controlled
17 substance volume in our building accounts for about
18 1% of our total volume. It's a -- it's a small
19 amount compared to the rest of the pharmacy and the
20 rest of the building.
21    Q.   But it was -- it was over a million
22 dosage units per year, is that right?
23    MR. HYNES: Objection to form.
24 BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    A.   I don't recall the number that we were
2  shipping per year at that point, but our -- on any
3  given week in our facility we'll ship -- and at
4  that time frame roughly, we were shipping 6 to
5  7 million pieces a week in total.
6    Q.   And so the process that was in place for
7  these 6 to 7 million pieces was all manual at that
8  time before 2010, is that right?
9    MR. HYNES:  Objection.  I think it misstates
10 what he said.
11 BY THE WITNESS:
12   A.   Yeah, the 6 to 7 million pieces per week
13 was everything we shipped, that's cotton balls,
14 toothpaste, toilet paper, liquor, cigarettes, all
15 the things we shipped out of that building.  But of
16 those numbers, the control items represented about
17 1% of that total.
18 BY MR. ELSNER:
19   Q.   But it was tens of millions of dosage
20 units of controlled substances being shipped from
21 2006 through '14, is that right?
22   MR. HYNES:  Objection; asked and answered.
23 BY THE WITNESS:
24   A.   Yeah, I'm not aware of the exact number,

Page 91

1  but we have shipped a lot of pharmaceuticals over
2  the years.
3    Q.   Well, there were over 287 million dosage
4  units of hydrocodone products shipped from your
5  facility into Ohio alone from 2006 through 2014.
6  So, we're talking about hundreds of millions of
7  hydrocodone products, is that right, combination
8  products?
9    MR. HYNES:  Objection to form.
10 BY THE WITNESS:
11   A.   I don't have the -- I don't have the
12 number in front of me, but we've moved a lot of
13 pharmaceuticals.
14 BY MR. ELSNER:
15   Q.   Well, does that sound right or does that
16 surprise you?
17   MR. HYNES:  Objection to form.
18 BY THE WITNESS:
19   A.   What's the time frame?
20 BY MR. ELSNER:
21   Q.   From 2006 through 2014.
22   A.   So, eight years.
23   Q.   This is just into Ohio.
24   A.   Yeah, I -- I don't know.  I mean,

Page 92

1  it's --
2    Q.   Do you have any idea what the range is
3  of the controlled substances that you were
4  distributing for hydrocodone combination products
5  by year from 2016 (sic) to 2014?
6    A.   The range?
7    Q.   The rough -- rough range of the numbers
8  of pills that you were distributing.
9    A.   I do not, no.
10   Q.   Is that not an important fact for you to
11 know as the head of the distribution center in
12 Indiana, the numbers of controlled substances that
13 you were distributing?
14   MR. HYNES:  Objection to form.
15 BY THE WITNESS:
16   A.   Not really, no.  As long as we were
17 following -- following our policies and procedures
18 and following the reasons that we would be shipping
19 that product, that's what would be important.
20 BY MR. ELSNER:
21   Q.   If I could ask you to go back to the
22 August 25, 2010 manual.
23   MR. HYNES:  Exhibit 12.
24 BY MR. ELSNER:

Page 93

1    Q.   At 88997.  In the second paragraph it
2  says, "Each day, the DC Pharmacy Supervisor shall
3  review the daily IRR report.  This report is the
4  analysis of all Control Drugs orders from the
5  stores within the prior 24 hours."
6    At this point in time, was this process
7  taking place at your facility in Indianapolis?
8    MR. HYNES:  Objection; asked and answered.
9  BY THE WITNESS:
10   A.   What time frame?
11 BY MR. ELSNER:
12   Q.   The date of the policy is August 25,
13 2010.
14   MR. HYNES:  Same objection.
15 BY THE WITNESS:
16   A.   I -- I don't believe so.  I believe this
17 process was still in Lumberton and -- well, reading
18 the first paragraph, September 2010 it was
19 transitioning into the DCs.  So, I would say we're
20 close, but I -- I don't know if it was happening
21 that exact August 25.
22 BY MR. ELSNER:
23   Q.   So, it was not happening yet but was
24 intended to happen, is that right?

Page 94

1    A.   That's the way I read this, yes.

2    Q.   Okay.  Following the DEA visits to the
3   Indianapolis distribution center...

4    MR. ELSNER:  Why don't we go off the record
5   for a couple minutes.

6    THE VIDEOGRAPHER:  We are going off the record
7   at 11:01.

8    (WHEREUPON, a recess was had
9        from 11:01 to 11:13 a.m.)

10   THE VIDEOGRAPHER:  We're back on the record at
11  11:13.

12  BY MR. ELSNER:

13   Q.   Mr. Nicastro, I'm going to show you what
14  I've marked as Exhibit 15.

15   MR. ELSNER:  Can I have that?  Sorry.  I gave
16  you my version.

17   (WHEREUPON, a certain document was
18       marked as CVS-Nicastro-015:  1/5/11
19       e-mail string with attachment;
20       CVS-MDLT1-000076236 - 000076238.)

21  BY MR. ELSNER:

22   Q.   And following the DEA's visit in
23  August and September of 2010 there -- the
24  investigation closed, and a letter was drafted to

Page 95

1   the DEA which is a response I think to the DEA's
2   letter.

3    And if you look at the bottom e-mail
4   from Frank Devlin, he sends to you, forwards to you
5   a copy of this DEA response letter and he writes,
6   "Here is the response being sent to the DEA today
7   regarding our Letter of Admonition.  Please do not
8   forward."

9    Why is he asking you not to forward this
10  letter?

11   MR. HYNES:  Objection to form.

12  BY THE WITNESS:

13   A.   I -- I don't know.

14  BY MR. ELSNER:

15   Q.   But you did forward it to Gary Millikan?

16   A.   Yes.

17   Q.   And then you asked him not to forward
18  it?

19   A.   Right.

20   Q.   Why did you do that?

21   A.   It's a controlled document so we
22  wouldn't want this flying all over everywhere.  But
23  I would pass it on to Gary because Gary was our --
24  basically our DEA compliance person.  He was our

Page 96

1   face to the DEA.  So, I would want him to have a
2   copy of the letter.

3    Q.   And was there a process at the
4   distribution center in Indiana for you to do a kind
5   of post hoc review on DEA visits?

6    A.   Yes.

7    Q.   And would it include reviewing these
8   types of letters and the letters from the DEA?

9    A.   No.  Our review would be more of how did
10  the audit go, how did the -- how did everything go
11  throughout the visit, our accounts, did we answer
12  the questions they were asking, did we make any --
13  did we have to make any modifications to our
14  operation as a result of their findings.  So, we
15  would do a postmortem review, and we do that of
16  any -- any audit agency that comes in.

17   Q.   Who would have been involved in that
18  postmortem review in 2010 and '11?

19   A.   Gary Millikan, Gary Lamberth is my
20  pharmacy manager, the pharmacy supervisor.

21   Q.   Anyone else?

22   A.   Loss prevention manager.

23   Q.   In Indianapolis?

24   A.   In Indianapolis, yeah.

Page 97

1    Q.   Anyone else?

2    A.   Not that I recall.  That would be the
3   normal group.

4    Q.   I want to show you what we've marked as
5   Exhibit 16.

6    (WHEREUPON, a certain document was
7        marked as CVS-Nicastro-016:  2/4/11
8        e-mail with attachment;
9        CVS-MDLT1-000076353 - 000076389.)

10  BY MR. ELSNER:

11   Q.   These are "Logistics Initiatives" for
12  2011.  The document is 76353.  It's an e-mail from
13  Dean Vanelli, and I believe that you're included on
14  the e-mail.

15   A.   Yes.

16   Q.   And I'd ask that you turn to page -- to
17  page 35 of the attachment.  The attachment is
18  "Logistics 2011 Initiatives."  And this is 76388.

19   A.   A lot of initiatives.

20   Q.   A lot of issues.  76388.  And the date
21  of this is January 28, 2011.  And this particular
22  page, 35, relates to loss prevention; and about
23  halfway down the page there is a bullet that
24  says, "Establish Knoxville as a Central Location

Page 98

1  for all DEA IRR activity."
2      Is that right?
3      A.  Correct.
4      Q.   When -- did in fact the process for the
5  IRR review move from New Jersey to Knoxville and,
6  if so, when?
7      A.   My recollection is it moved from
8  Lumberton into the facilities, each individual
9  facility, and then moved from the facilities into
10 Knoxville as a central location.
11     Q.   So, explain that to me.  What was the
12 role of Knoxville in that -- as a central location
13 for all DEA IRR activity?
14     MR. HYNES:  Objection to form.
15 BY THE WITNESS:
16     A.   I wasn't involved with the Knoxville
17 operation at all.  I can only speak to after the
18 process in Knoxville was then moved to
19 Indianapolis.  So, I can't speak to what they were
20 doing or how they were doing it.  But I'm aware
21 that the Knoxville facility was a central location
22 reviewing all IRR activity for all distribution
23 centers.
24 BY MR. ELSNER:

Page 99

1      Q.   Okay.  So, are you telling me that the
2  review of the IRR activity forms moved from
3  Lumberton, New Jersey to each of the individual
4  distribution centers and that Knoxville served as a
5  centralized location to ultimately review all of
6  the distribution centers' IRR review?
7      A.   It was --
8      MR. HYNES:  Objection.
9      THE WITNESS:  Sorry.
10 BY THE WITNESS:
11     A.   It was three -- it was separate.  It was
12 Lumberton and then to the DCs and then from the DCs
13 back to a central location in Knoxville.
14 BY MR. ELSNER:
15     Q.   Okay.  What is your understanding of the
16 role that the central location in Knoxville was
17 performing?  I know you don't know the particulars
18 of every single thing they did, but what's your
19 understanding of what they were supposed to be
20 doing?
21     A.   They were reviewing the IRR for any
22 suspicious orders.  Instead of suspicious, say
23 orders of interest that would need to -- need
24 further investigation.  And then they would notify

Page 100

1  the home DC, wherever that store was processed
2  from, and notify them not to ship until the review
3  was completed.
4      Q.   Okay.  So, they were essentially
5  performing the same function that was being
6  performed previously in Lumberton, New Jersey, is
7  that right?
8      A.   I don't know.  I don't know the process
9  in Lumberton exactly how they were doing it.  I
10 really have no idea how they were doing the process
11 there.
12     Q.   But your understanding as the director
13 of the Indianapolis distribution center is that
14 whatever the exact format of that function that was
15 being done in New Jersey was moved then to
16 Knoxville?
17     MR. HYNES:  Objection to form.
18 BY MR. ELSNER:
19     Q.   At a subsequent point, is that right?
20     A.   Well, my understanding of it is it moved
21 from Lumberton to the each DC and was being
22 performed within the DCs and then the process was
23 moved from the DC to the Knoxville facility.
24     So, if there were -- if there was an

Page 101

1  evolution of the process between that and what
2  exactly Knoxville had at that point, I -- I can't
3  speak to it.
4      Q.   Okay.  When did the process move from
5  Lumberton, New Jersey to the individual
6  Indianapolis distribution center?
7      A.   I don't know the date specifically.  I
8  don't recall the date specifically.  I know we have
9  looked at some documents with some different dates
10 on it.  But other than that document, I don't
11 recall the date it came to Indy.
12     Q.   Based on this, do you have any sense of
13 whether it had been moved to the distribution
14 center in Indiana at this point in time or you do
15 not know?
16     MR. HYNES:  Objection; asked and answered.
17 BY THE WITNESS:
18     A.   Which process?  The --
19 BY MR. ELSNER:
20     Q.   The individual IRR review.
21     A.   I --
22     MR. HYNES:  Objection to form.  Go ahead.
23 BY THE WITNESS:
24     A.   Yeah, I'm not -- I'm not sure.  I'm not

Page 102

1 sure of the dates. So...
2 BY MR. ELSNER:
3    Q. This -- these 2011 initiatives also
4 included something called "Control drug IRR rewrite
5 to include active ingredients instead of item
6 description. Working with Gary M, Ellen D and
7 third party counsel."
8    Are you familiar with the issue that
9 arose in the review of the IRR reports based on
10 item description instead of active ingredient?
11    A. I am not. No.
12    Q. Have you ever reviewed an IRR form? Do
13 you know how to do that review?
14    A. No, I don't.
15    Q. You've never trained on that at all?
16    A. No.
17    Q. Has that process been explained to you
18 by Terrence Dugger or anyone else in the
19 Indianapolis distribution center?
20    A. At a very high level, but I couldn't
21 speak to it and to any specifics around it.
22    Q. No one brought to your attention that in
23 reviewing the IRR reports that that review couldn't
24 be done effectively by item description?

Page 103

1    MR. HYNES: Objection; asked and answered. Go
2 ahead.
3 BY THE WITNESS:
4    A. Yeah, I -- I -- no, I don't recall that.
5 BY MR. ELSNER:
6    Q. So, what was happening in the IRR report
7 was that by listing it by item description, when a
8 drug manufacturer would change the description of
9 the drug, the history of that drug and your
10 distribution of that drug would fall out of the IRR
11 report. So, a movement was put underway to do it
12 by active ingredient instead of by drug item or
13 drug name.
14    But as the head of the distribution
15 center in Indianapolis, no one brought that to your
16 attention as a potential issue in the review of the
17 IRR reports?
18    MR. HYNES: Objection to form including asked
19 and answered.
20 BY THE WITNESS:
21    A. No.
22 BY MR. ELSNER:
23    Q. Would you agree with me that that's a
24 pretty significant issue, if you couldn't review

Page 104

1 the historical distribution of hydrocodone
2 combination products in order to conduct your due
3 diligence review and review for suspicious orders?
4    MR. HYNES: Objection to form.
5 BY THE WITNESS:
6    A. I believe we need all the tools
7 necessary to do a proper, proper evaluation.
8 BY MR. ELSNER:
9    Q. And would you agree that that would be
10 an important tool?
11    MR. HYNES: Objection to form.
12 BY MR. ELSNER:
13    Q. To know the drug history ordering
14 record?
15    MR. HYNES: Objection to form.
16 BY THE WITNESS:
17    A. As -- I would agree that any information
18 that we could get to do our job effectively would
19 be -- would be important.
20 BY MR. ELSNER:
21    Q. Well, I'm sure. But I'm asking
22 specifically about the drug history review.
23    You understand that reviewing the amount
24 of a particular drug being shipped to a particular

Page 105

1 pharmacy over time is an important factor in
2 determining whether an order is potentially
3 suspicious. Do you know that?
4    A. Yes.
5    Q. Okay. So, you would agree that being
6 able to review that drug history record would be an
7 important component of conducting your due
8 diligence and review for suspicious orders,
9 correct?
10    MR. HYNES: Objection to form.
11 BY THE WITNESS:
12    A. Yes.
13 BY MR. ELSNER:
14    Q. Okay. But nobody saw fit to bring that
15 to your attention?
16    MR. HYNES: Objection; asked and answered.
17 BY THE WITNESS:
18    A. No. Again, I had a team that I relied
19 on to -- that's why I had a pharmacy manager and I
20 had Gary as our DEA point of contact and
21 compliance. That's why we have a corporate team of
22 corporate regulatory and pharmacy operations to
23 make sure that we're getting the proper tools to do
24 what we need to do.

Page 106

BY MR. ELSNER:

Q. Were you aware that because of this IRR review problem that -- actually, why don't we just show the document. It's easier.

MR. ELSNER: This is Exhibit 17.

(WHEREUPON, a certain document was marked as CVS-Nicastro-017: 10/7/10 e-mail string; CVS-MDLT1-000034172 - 000034177.)

BY MR. ELSNER:

Q. I want to direct your attention to the middle e-mail from John Mortelliti to Gary Misiasek. Who is Gary Misiasek?

A. He works in our corporate office. He does IT type things. Pulls data.

Q. And the subject line is "Control drug IRR important info," and the importance is listed as high. Is that right?

A. Correct.

Q. And this is October 6, 2010, is that right?

A. Yes.

Q. It reads that, in the second sentence, "Something else changed or just about

Page 107

every company we deal with has changed the description of their drugs. Whatever you can do to help expedite this process would be greatly appreciated. I am now reviewing the network Control Drug IRR on common sense as opposed to IRR Historical Data. I know, that is scary."

Would you agree that a review of the IRR report based on common sense as opposed to historical data posed a risk that a controlled substance could be shipped when it should not have been?

MR. HYNES: Objection to form.

BY THE WITNESS:

A. I had no -- no information regarding these e-mails. I'm not on these e-mails. I don't know what they were trying to get accomplished. Yeah, I don't feel comfortable commenting on something I had nothing to do with.

BY MR. ELSNER:

Q. Well, based on your understanding as the head of the Indianapolis distribution center, would you agree that a review that's just based simply on common sense and not a review based on historical data is a potentially frightening situation?

Page 108

MR. HYNES: Objection to form.

BY THE WITNESS:

A. I was not aware this was an issue. So, I wouldn't -- I wouldn't want to guess what John Mortelliti is sharing with Gary or Frank. I'm not even -- I just -- I don't know what this is about. First time I have seen it. I don't know what they're -- what they're -- what the communication was before that and after that. And so I -- I don't know.

BY MR. ELSNER:

Q. But would you agree with the principle, irrespective of the document, as the head of the distribution center for CVS in Indianapolis that a review based on common sense instead of accurate historical data would pose a risk and be potentially a frightening situation?

MR. HYNES: Objection to form.

BY THE WITNESS:

A. I would need more specific information. John again is out of New Jersey and if these dates are accurate where the process moved to the DCs in September, were all reports affected, were they just his reports affected, I don't have the -- I

Page 109

don't have the history. So, I'm -- I'm just not comfortable commenting on that.

BY MR. ELSNER:

Q. And no one brought that to your attention, the fact of this IRR data situation?

A. No, no.

Q. This is Exhibit 18.

(WHEREUPON, a certain document was marked as CVS-Nicastro-018: 10/12/10 e-mail; CVS-MDLT1-000104883.)

BY MR. ELSNER:

Q. It's CVS 104883. This is an e-mail dated October 12, 2010, and the subject is the October 12, 2010 control drug IRR.

And Mr. Mortelliti writes that "I have sent several control drug flagged items out this morning. If your DC had a suspicious order, you would have received an e-mail from me by now. I would like to remind everyone that due to the amount of suspicious orders flagged, I do not have the time to follow up on each item I send out. It is the DC's responsibility to monitor the suspicious order process until the flagged item is

Page 110

1 declared not suspicious or there is an
2 investigation. Either way, you should have results
3 attached to your files as per your policy."
4 Does this refresh your recollection as
5 to what was being performed by the distribution
6 centers in October of 2010?
7 MR. HYNES: Objection to form.
8 BY THE WITNESS:
9 A. This e-mail appears to be -- some of the
10 names I don't recognize, but appears to be mainly
11 loss prevention folks. Loss prevention does not
12 report to me. And I'm not on these e-mails. So,
13 I'm -- I don't -- I don't recall what -- what this
14 is about.
15 BY MR. ELSNER:
16 Q. Okay. So, Terrence Dugger was in the
17 Indianapolis distribution center at this time, is
18 that right?
19 A. Correct.
20 Q. And he received the e-mail?
21 A. Yes.
22 Q. And, so, it would have been his
23 responsibility in the Indianapolis DC, distribution
24 center, to monitor for this suspicious order

Page 111

1 process, is that right?
2 MR. HYNES: Objection to form.
3 BY THE WITNESS:
4 A. Him and my pharmacy manager.
5 BY MR. ELSNER:
6 Q. Gary Lamberth, is that right?
7 A. Yes.
8 Q. And the two of them did not bring to
9 your attention the problem that existed with the
10 drug IRR, is that right?
11 A. They did not.
12 Q. Do you know what process they were
13 performing in October of 2010, Terrence Dugger and
14 Gary Lamberth, related to potentially suspicious
15 orders at the Indianapolis distribution center?
16 A. My recollection is Gary would get the
17 report and review it for anything that was out of
18 the parameters and he would -- if there was
19 anything that flagged on the report, then he would
20 give it to Terrence and Terrence would take it from
21 there and escalate it to a Viper analyst or with
22 Frank or kind of take it from there once we've
23 identified something.
24 Q. When you say "take it from there," can

Page 112

1 you describe for me what work Terrence Dugger
2 actually did with respect to a potentially
3 suspicious order?
4 A. I don't know the detail. I know in some
5 of our SOPs we had Viper analysts. Those were
6 people that were in the field, but I don't know --
7 I don't know who they are. I don't know what their
8 role exactly was. But Terrence would have elevated
9 it I believe towards the Viper analysts or towards
10 Frank Devlin, his boss, his superior.
11 Q. But you don't know what Terrence Dugger
12 would actually do with the particular order
13 himself, is that right?
14 A. I don't, no.
15 Q. You understand that under the Controlled
16 Substances Act that the distribution center itself
17 had a responsibility to monitor and review these
18 orders and report suspicious orders, is that right?
19 MR. HYNES: Objection; calls for a legal
20 conclusion. Go ahead.
21 BY THE WITNESS:
22 A. Yes.
23 BY MR. ELSNER:
24 Q. And you as the head of the distribution

Page 113

1 center were ultimately responsible for making sure
2 that those suspicious orders are reported, is that
3 right?
4 A. Correct.
5 Q. But you're not familiar with what the
6 process was that was taking place by Terrence
7 Dugger in your facility in 2010, is that right?
8 A. That's correct.
9 Q. And, so, you were relying on
10 CVS Pharmacy and others and you yourself were not
11 overseeing this process, is that right?
12 MR. HYNES: Objection. Objection to form.
13 BY THE WITNESS:
14 A. It was an over -- I was overseeing it.
15 So, as I was overseeing the entire operation. So,
16 this is -- this is why I had experts that were
17 working on that process, and my job was to make
18 sure that they were -- had the resources they need
19 and they were performing the -- performing what
20 they needed to perform.
21 But for me to get into the weeds with it
22 and understand every single piece of it, that
23 really wasn't my role.
24 BY MR. ELSNER:

Page 114

1  Q.  But you didn't even know what he was
2  actually doing, Terrence Dugger?
3  A.  No, I knew at a high level what the --
4  that they were reviewing these reports and they
5  were escalating those stores if there was an issue.
6  But I didn't get into it any further than that.
7  Q.  And you never asked him to explain that
8  process to you?
9  A.  I -- no.
10  Q.  Were you aware that at this time in 2010
11  that there were so many suspicious orders flagged
12  that Mr. Mortelliti didn't have time to follow up
13  on each one and was relying on each of the DCs to
14  monitor for that suspicious activity at this time?
15  A.  No.
16  MR. ELSNER:  Go off the record for one quick
17  minute.
18  MR. HYNES:  Sure.  That's fine.
19  THE VIDEOGRAPHER:  We are going off the record
20  at 11:37.
21      (WHEREUPON, a recess was had
22      from 11:37 to 11:40 a.m.)
23  THE VIDEOGRAPHER:  We are back on the record
24  at 11:40.

Page 115

1      (WHEREUPON, a certain document was
2      marked as CVS-Nicastro-019:
3      Organizational chart;
4      CVS-MDLT1-000030733.)
5  BY MR. ELSNER:
6  Q.  Mr. Nicastro, I've shown you CVS 30733,
7  and this is a -- it's kind of an operational work
8  chart work flow, and we'll get you the date when we
9  can.  It lists you at the top, director, Mark
10  Nicastro, is that right?
11  A.  That's correct.
12  Q.  All these various people under you
13  report to you, is that right?
14  A.  Yes.
15  Q.  And included among there is LP manager
16  Terrence Dugger, is that right?
17  A.  That's why it's a dotted line.  He does
18  not report.  They don't have the loss prevention
19  team report to the operations manager or to the
20  facility at all, so they have that outside loyalty.
21  Q.  What does that mean?
22  A.  Well, the -- if he reported to me and I
23  hired him and I had responsibility to fire him,
24  would he be comfortable investigating me.  They are

Page 116

1  kind of the checks and balances for the facility
2  for any -- they are loss prevention.  So, theft,
3  you know, asset protection, all that good stuff, in
4  the building.
5  Q.  And the date of this document is
6  September 23, 2010?
7  A.  2010.
8  Q.  2010.  And, so, if there were issues
9  that developed in the -- with respect to loss
10  prevention in the Indianapolis distribution center,
11  would Terrence Dugger bring those to your
12  attention?
13  A.  If it was regarding the operation, yes.
14  Q.  Okay.  And, so, in that sense he did
15  report to you in the sense that you're in control
16  of the entire distribution center, is that right?
17  A.  He would -- he would bring things
18  forward that, you know, that I needed to be aware
19  of.
20  Q.  I will show you the next document, which
21  is CVS-MDLT1-76286 through 76352.
22  MR. HYNES:  This is 20.
23  MR. ELSNER:  This is 20.
24      (WHEREUPON, a certain document was

Page 117

1      marked as CVS-Nicastro-020:
2      4/15/11 e-mail with attachment;
3      CVS-MDLT1-000076286 - 000076352.)
4  BY MR. ELSNER:
5  Q.  And this is an e-mail from Terrence
6  Dugger to a group of people, including yourself,
7  dated April 15, 2011 and the subject is "PSE or
8  Controls" and the importance is high.  Do you see
9  that?
10  A.  Yes.
11  Q.  And he attaches the DEA SOP for
12  March 11, 2011.  Is that right?
13  A.  Correct.
14  Q.  And he writes, "If there's a shortage
15  (or you think there is a shortage) regarding PSE
16  and control items, Loss Prevention must be
17  notified.  This is not optional."
18      Is that what he writes?
19  A.  That's what he writes.
20  Q.  Do you know why he was writing this and
21  attaching this manual to this group of people in
22  April of 2011?
23  MR. HYNES:  Objection to form.
24  BY THE WITNESS:

Page 118

1    A.   I don't know.  The folks on here are
2  almost every supervisor and manager in the
3  building.  So, I'm not sure why he's writing these
4  comments based on his audience.
5  BY MR. ELSNER:
6    Q.   Was there a situation in the
7  Indianapolis distribution center regarding a
8  shortage of any control items that you're aware of
9  in 2011 or '12?
10   A.   Not that I can speak to specifically.
11   Q.   Do you recall one ever being brought to
12  your attention, a theft or a loss, at the CVS
13  Indiana distribution center?
14   A.   We've had -- we've had shortages and
15  overages and losses and trans of losses.  We have
16  had a range of opportunities come up over the
17  years.
18   Q.   Is this an example of one of those
19  things that Terrence Dugger would bring to your
20  attention?
21   A.   If we had a shortage that wasn't -- that
22  he wasn't being notified of, he would -- I'm sure
23  he would tell me that he wanted to be aware of it.
24   Q.   And if I could have you turn to

Page 119

1  page VIII-7, 76326, of the DEA standard operating
2  procedures for CVS dated March 11, 2011.  This is
3  76326.  Under Item 4, "Item Review Report."  It
4  reads, "Currently the Item Review Report for
5  control drugs is being reviewed at a central
6  location in Knoxville, Tennessee."
7       Do you see that?
8    A.   Yes.
9    Q.   Okay.  And then it says, "Each day the
10  network DC analyst shall review the daily item
11  review report (IRR report)."
12       Is this function being handled in
13  Knoxville, Tennessee at this point in time as the
14  manual states in March of 2011?
15   A.   I don't know the specific date, but the
16  assumption would be it is at this point.
17   Q.   Okay.  And, so, at this point in time
18  was the Indianapolis distribution center conducting
19  its own review of IRR reports or was this being
20  conducted in Knoxville, Tennessee or both?
21   A.   The IRR report would have been reviewed
22  only in Knoxville and then we still would have had
23  our process in place with the associates checking
24  orders.  But the actual IRR report would have been

Page 120

1  done in Knoxville.
2    Q.   Okay.
3    A.   Centralized.
4    Q.   When you are referring to this process
5  in place for our own people checking orders, that's
6  a manual process and review, it's not an electronic
7  process?
8    A.   It is.
9    Q.   Is that right?
10   A.   Yes.
11   Q.   Do you have another name for that
12  process?
13   A.   Not really, no.
14   Q.   Is there -- is there a formal manual
15  that describes the process?
16   A.   We -- we didn't have a formal document
17  describing that process.
18   Q.   Okay.  Was there specific training that
19  was done for people on how they were going to
20  conduct that process?
21   A.   The training was done for the associates
22  that worked in the control cage and they were --
23  they were trained on what to look for when they
24  were picking the orders.

Page 121

1    Q.   What were they told to look for?
2    A.   Orders of unusual size was the -- would
3  have been the main character, unusual size,
4  pattern, frequency.  But they would have mainly
5  been looking for unusual size.
6    Q.   Was that training formalized in a
7  formalized training program?
8    MR. HYNES:  Objection to form.
9  BY THE WITNESS:
10   A.   No.  No, it would have been -- it would
11  have been conducted just for the folks that work
12  within the control cages, which is a very small
13  group of people.
14  BY MR. ELSNER:
15   Q.   So, kind of on an ad hoc oral basis, is
16  that right?
17   MR. HYNES:  Objection to form.
18  BY THE WITNESS:
19   A.   As they were -- as they moved into that,
20  if they were -- if they moved into that department,
21  that's when they would have been trained.
22  BY MR. ELSNER:
23   Q.   And they would have been told that by
24  the other people working in that department?

Page 122

1    A.   They would have told that by the
2  pharmacy manager or supervisor about the process.
3    Q.   Okay.  But there is no formalized
4  training for it?
5    A.   No.
6    Q.   And no written policy?
7    MR. HYNES:  Objection; asked and answered.
8  BY THE WITNESS:
9    A.   No.
10  BY MR. ELSNER:
11    Q.   If we go down to "Escalation Review"
12  under No. 5.  Actually, I'm sorry.  Could we go
13  back up to the second sentence of 4.  It
14  reads, "Each day, the Network DC Analyst."
15      The network DC analyst, that's a
16  position that's held in Knoxville, Tennessee at
17  this time, is that right?
18    A.   That's correct.
19    Q.   There wasn't such a person in
20  Indianapolis, right?
21    A.   No.
22    Q.   Okay.  And if we go down a little bit
23  further under "Escalation of Review," No. 5, it
24  reads, "The Network DC Analyst shall verify

Page 123

1  specific ordered items and notify the Field Viper
2  Analyst and the DC's Loss Prevention Manager by
3  e-mail or fax of any orders that appear to be
4  excessive or potentially suspicious as soon as
5  possible."
6      The network DC analyst, this function
7  was performed in Knoxville and there would simply
8  be, in the last sentence, a record of such notice
9  shall be maintained at the DC, is that right?
10    MR. HYNES:  Objection to form.
11  BY THE WITNESS:
12    A.   Correct.
13  BY MR. ELSNER:
14    Q.   And who would maintain the notices of --
15  of an escalated review in the Indianapolis
16  distribution center?
17    A.   It would have been one of two positions.
18  It would have either been the loss prevention
19  manager or the pharmacy manager.
20    Q.   Okay.  And in the event there was an
21  escalated review, would there be a notification
22  given to the DEA of that or no?
23    A.   Not for an escalation for review.  The
24  only time the DEA would be notified is if the order

Page 124

1  was actually -- was -- if it was stopped.
2    Q.   If it was stopped?
3    A.   Yeah.
4    Q.   And would you be notified if there was
5  an escalated review?
6    A.   An escalated review, no.  No.
7    Q.   At what point in time, if ever, would
8  you be notified of a potentially suspicious
9  transaction?
10    A.   If the order had been stopped and we
11  needed to contact the DEA with a letter that we had
12  a suspicious order that we stopped.  That's when I
13  would have been notified.
14    Q.   And as of March 2011 had that ever
15  happened while you were the head of the
16  Indianapolis distribution center?
17    A.   I don't recall receiving that
18  notification.
19    Q.   And you never notified the DEA of any
20  potentially suspicious orders as of March 2011, is
21  that right?
22    A.   Yeah, to the best of my recollection,
23  no.
24    Q.   Okay.  In the discovery in this case,

Page 125

1  CVS has informed us that you developed, managed,
2  administered the monitoring program for orders of
3  hydrocodone combination products that were received
4  from CVS stores in Summit County and Cuyahoga
5  County during the period of 2011 through 2014?
6    MR. HYNES:  Objection.
7  BY MR. ELSNER:
8    Q.   Were you aware of that?
9    A.   I did not develop the program.
10    Q.   In fairness, the question reads that
11  either developed, managed and administered the
12  process.  So, did you perform any of those roles
13  from 2011 through 2014 for the suspicious order
14  monitoring progress?
15    A.   Yes.
16    Q.   Can you explain to me what role you
17  played?
18    A.   I had -- yes.  So, 2012 is when the
19  process -- let me back up.
20      In 2012 an LP specialist Aaron Burtner
21  began supporting the Knoxville process.  The
22  process that was currently being done in Knoxville,
23  Aaron was recruited to help support him in that
24  role, monitoring orders.

Page 126

1   Q.  And at that point in time was Aaron
2 Burtner working at the Indianapolis distribution
3 center?
4   A.  He was working out of the Indianapolis
5 distribution center, and at this point I have no --
6 no responsibility for it.  This is still being
7 managed by -- he still works for loss prevention.
8 All the -- the idea to have him be part of that
9 team has all been done outside of my realm.
10      So, he's helping with the function.  My
11 role was to get him a desk and an office to sit in.
12 So...
13   Q.  Do you know why he was selected to
14 assist the and support the Knoxville, Tennessee
15 office?
16   A.  I believe it was -- it was to just have
17 a -- have more support for that role.  The -- and
18 this is just based on conversations I had with
19 folks.  But it was the understanding that person
20 doing the role may not be with us much longer.  So,
21 they were planning for kind of a succession plan,
22 and they tagged Aaron as the guy.
23   Q.  Who was the person performing that role
24 in Knoxville in 2011 and '12?

Page 127

1   A.  I don't know his name.  I think it was
2 Paul.  I'm sure it's in the record somewhere.  But
3 I'm -- I never met him.  I don't know his whole
4 name.
5   Q.  You never had any interaction with him?
6   A.  No, no.
7   Q.  Okay.  And, so, in essence your
8 understanding is is that loss prevention was
9 grooming Aaron Burtner to take over the role that
10 was being performed by Paul in the Knoxville
11 distribution center, is that right?
12   A.  Yes.
13   Q.  Okay.  And, in fact, did Aaron Burtner
14 take over that role?
15   A.  He did.
16   Q.  In what year was that?
17   A.  2012, late -- late 2012.  I'm not sure
18 of the date, but it was late 2012.
19   Q.  And when he took over that role, did
20 those functions move from Knoxville to
21 Indianapolis?
22   MR. HYNES:  Objection to form.
23 BY THE WITNESS:
24   A.  Once he took over -- once the other

Page 128

1 gentleman was no longer with CVS, yes, he took over
2 the full functions.
3 BY MR. ELSNER:
4   Q.  Okay.  So, in late 2012, the operation
5 of the IRR review process that was taking place in
6 Knoxville was moved from Knoxville to the
7 Indianapolis distribution center, is that right?
8   A.  Correct.
9   Q.  And Aaron Burtner then was the new head
10 of the suspicious order monitoring program, is that
11 right?
12   A.  Correct.
13   Q.  And, so, did you have any role in either
14 developing or managing or administering the
15 suspicious order monitoring process in 2011?
16   A.  No.
17   Q.  Okay.  What about 2012?
18   A.  Yes.  The latter part of 2012, I got
19 involved.
20   Q.  Okay.  And were you supervising Aaron
21 Burtner?
22   A.  Not -- not until I got involved.  He was
23 still under the loss prevention umbrella until --
24 until we decided to grow the team and I got

Page 129

1 involved.
2   Q.  Okay.  And was that in the fall of 2012?
3   A.  Yes.
4   Q.  Who asked you to get involved?
5   A.  Ron Link.
6   Q.  And what did Mr. Link ask you to do?
7   A.  He asked me to make sure that Aaron had
8 the resources he needed in order to complete the
9 job.
10   Q.  And what resources were needed?
11   A.  I sat down with Aaron, and we developed
12 a plan of what kind of support did he need; and
13 based off that, we added to his department.  I
14 got -- I found him an office in our building that
15 he could use for just this process and where he
16 could add -- had more space, and he could -- we
17 could add to the team as necessary.
18   Q.  And did you hire anyone in the fall of
19 2012 to assist Aaron Burtner with that role?
20   A.  Yes.  We hired Kelly Baker in I believe
21 it was December of 2012, maybe November.  I think
22 it was December.
23   Q.  Anyone else?
24   A.  We used Shauna Helfrich as a part-time

Page 130

1 position. I don't believe that started until early
2 2013.
3      Q.   The -- did you perform any other role
4 with respect to the suspicious order monitoring
5 process other than assisting Aaron Burtner in
6 finding space in the Indianapolis distribution
7 center and in assisting him in hiring other
8 employees?
9      A.   Not at that time.
10     Q.   Did there come a time when you did
11 become more involved in that process?
12     A.   Yes.
13     Q.   When was that?
14     A.   I'm not sure of the date, but as we grew
15 the team and Shauna moved into a full-time role
16 with Kelly and Aaron, basically my role was check
17 in with them each day, see how it's going, what's
18 happening, what's going on, and make sure they have
19 what they needed.
20          My role grew 2013. I'm not sure of the
21 dates of when -- once Aaron left the company, then
22 I was active in trying to find his replacement; and
23 as we were growing the operation into -- well,
24 redeveloping some new processes, I was again just

Page 131

1 trying to find the space that we would need for
2 them and trying to hire them some good candidates
3 to replace Aaron.
4      Q.   At this point in time when you started
5 to become more involved in the process, had you
6 received any additional training from CVS on the
7 suspicious order monitoring program and its
8 processes?
9      A.   No.
10     MR. ELSNER:  I'd like to mark the next
11 document as Exhibit 21.
12          (WHEREUPON, a certain document was
13          marked as CVS-Nicastro-021:
14          11/27/12 e-mail with attachment;
15          CVS-MDLT1-000029867 - 000029870.)
16 BY MR. ELSNER:
17     Q.   This is 29867. It's an e-mail from
18 Craig Schiavo. Who is Craig Schiavo?
19     A.   I don't know his -- well, his title is
20 compliance manager, but I know him as someone that
21 we used for support out of our corporate office.
22     Q.   All right. And this e-mail was sent to
23 you, is that right?
24     A.   To me and others, yes.

Page 132

1      Q.   Yes. Including Aaron Burtner?
2      A.   Yes.
3      Q.   Okay. And the date was November 27,
4 2012. And the attachment is the "SOM System End
5 State Solution," is that right?
6      A.   Yes.
7      Q.   And then he writes, "I tried to put down
8 some process requirements we should think about
9 when enhancing our SOM system/processes that we may
10 be able to use as a guide for this morning's
11 meeting."
12          Is that right?
13     A.   Correct.
14     Q.   And then he attaches a document, which
15 is the SOM End State Enhancement Solution. And
16 under "Actions to be Taken to Enhance CVS Process,"
17 it reads, "Current algorithm/enhancements to
18 algorithm/create new algorithm," under 1(a),
19 "Review our contracts with Buzzeo."
20          Who is Buzzeo?
21     A.   Buzzeo created the system that we were
22 currently using at this time in 2012.
23     Q.   And then under that, under "i" it reads,
24 "Were they fired?"

Page 133

1          Was Buzzeo fired?
2      A.   I don't know. I had no contact with
3 Buzzeo. I knew them as the name of the -- of the
4 builder of the system, but I had no contact with
5 them or -- and I don't know where -- where we were
6 with them at that point.
7      Q.   Were you on this conference call to
8 discuss these issues?
9      A.   My name is on there, so I would assume
10 that -- I did sit in on some calls when they were
11 talking about the enhancement solutions, but it was
12 more directed at the folks that were actually using
13 the system and had day-to-day knowledge of it.
14     Q.   Okay. Underneath "Were they fired?" it
15 says, "Do we want to hold another call before
16 making a decision to move on?"
17          I assume move on from Buzzeo to someone
18 else. Were you involved in the discussions about
19 whether they were going to hire someone other than
20 Buzzeo to create or enhance the algorithm that was
21 being used by CVS?
22     MR. HYNES:  Objection to form.
23 BY THE WITNESS:
24     A.   No.

Page 134

BY MR. ELSNER:

Q.   This is a pretty long list of action items to be handled for the SOM program as of November 2012, correct?

MR. HYNES:  Objection to form.

BY THE WITNESS:

A.   There are several pages, yes.

BY MR. ELSNER:

Q.   Okay.  There is a review of an AGI proposal under 1(b).  Were you involved in interactions with the Analysis Group?

A.   No.  No.

Q.   You didn't participate in any of those discussions and what they were intending to do?

A.   No.  I had -- I had no input into the actual development of the new program or...

Q.   Do you know who they are, the Analysis Group?

A.   The Analysis Group from CVS or the Analysis Group from?

Q.   This refers to, in 1(b), "Review AGI Proposal."  And then underneath it, it lists, "Need to ensure the system requirements are clearly outlined.  The system/algorithm will need to be

Page 135

flexible in order to make the flagging of orders more or less sensitive.  We need to understand what criteria the algorithm looks at to ensure it complies with DEA regulations by monitoring each store's orders of unusual size, orders deviating substantially from a normal pattern and orders of unusual frequency."

This appears to be a proposal by another vendor to create this process, is that right?

A.   Yeah, that's what it looks like to me.

Q.   Okay.  And were you involved in the discussions about whether to hire that Analysis Group, this outside third consultant group, to perform this function?

A.   No.

Q.   Did you know that they hired another group other than Buzzeo to perform this function?

A.   Yes.

Q.   And did you know that to be the Analysis Group?

A.   No.  I don't -- to this day, I don't know who the actual company is that is running our SOM process.  But I know we stepped away from Buzzeo.

Page 136

Q.   Do you know why?

A.   I do not.

Q.   On the last page of the document, 29870, it says, "Testing of the New System Before 'Go Live.'"

The under A it reads, "Run the test information to see the new metrics:  i.  How many orders will be flagged for review, a day/a week/a month?  Do we have the proper resources to handle?"

Were you involved in the discussion of the hiring needs for the review of those suspicious orders?

MR. HYNES:  Objection.  Time frame.

BY MR. ELSNER:

Q.   At the time of the document in 2012.

A.   This would have been very early on in the process.  At the point that I was -- we were discussing additional resources or a new SOM manager to replace Aaron would have been the summer of 2013, probably -- I believe he left June, July 2013.  I believe.

Q.   Okay.  But between receiving this memo in November of 2012 and when Aaron Burtner left in the summer of 2013, did you have any involvement

Page 137

with respect to the suspicious order monitoring process?

A.   Supporting the local SOM process, Aaron, Kelly, Shauna, yes.  But the review and the development of the new program, no.

Q.   During that period of time did Aaron Burtner or anyone else in the SOM team in Indianapolis bring to your attention any potentially suspicious orders from any of the CVS pharmacies that you distributed to?

A.   That Indianapolis distributed to or to any of the DCs they were referring to?

Q.   That Indianapolis did.

A.   I don't recall any -- any orders being deemed suspicious for or being stopped for the Indianapolis DC.

Q.   This process of review that Aaron Burtner was conducting in the Indianapolis distribution center was not just of Indianapolis' distribution.  It included other distribution centers for CVS, is that right?

A.   That's correct.

Q.   Did it include all of them across the country?

Page 138

1    A.   Yes.
2    Q.   Okay.  And the people who were doing
3  that function in November of 2012 were Aaron
4  Burtner and Kelly Baker and then part time is this
5  other woman, what was her name, Shauna, Pamela?
6    A.   Shauna Helfrich.
7    Q.   Shauna Helfrich.  And that was the team,
8  is that right?
9    A.   Yes.
10   MR. ELSNER:  This is Exhibit 22.
11       (WHEREUPON, a certain document was
12       marked as CVS-Nicastro-022:
13       11/27/12 e-mail string;
14       CVS-MDLT1-000106664 - 000106673.)
15 BY MR. ELSNER:
16   Q.   This is 106664.  It's an e-mail from
17 Aaron Burtner to you, is that right?
18   A.   Yes.
19   Q.   And the date is November 27, 2012, and
20 the subject is the "AGI proposal."  And the
21 attachment is the "CVS SOM Proposal" dated
22 October 11, 2012, is that right?
23   A.   Correct.
24   Q.   Now, this is the proposal that the

Page 139

1  Analysis Group prepared for CVS to consider hiring
2  it to create an SOM program, is that right?
3    MR. HYNES:  Objection to form.
4  BY MR. ELSNER:
5    Q.   Is that right?
6    A.   I -- I believe so.
7    Q.   And Mr. Burtner forwarded this document
8  to you?
9    MR. HYNES:  Take your time to look at it.
10 BY MR. ELSNER:
11   Q.   I'm sorry.  I didn't hear if you gave a
12 verbal yes.
13   A.   Oh, I -- well, can I take a look at it
14 real quick?
15   Q.   Yes, of course.  No problem.
16   A.   I don't recall the actual document, but
17 if -- if Aaron had, you know -- has a document that
18 says he forwarded it to me, then yes, he would have
19 forwarded it to me.
20   Q.   Do you recall reviewing it and
21 participating in this discussion?
22   A.   I do not.  This would have been pretty
23 specific to the -- for the folks that are -- are
24 doing the day-to-day guidance or managing of the

Page 140

1  process, this would mean a lot more to them than to
2  me and I knew I wasn't going to be the final
3  decision maker on this -- on this process.  So,
4  this would have been more of an FYI to me.
5    Q.   And is that how you treated this
6  function with respect to the review of the SOM
7  program and the Analysis Group's work, as more of a
8  just generally know that it's going on without
9  participating actively in the process?
10   A.   Yes.
11   MR. HYNES:  Objection to form.
12 BY THE WITNESS:
13   A.   Yes.
14 BY MR. ELSNER:
15   Q.   So, as the head of the distribution
16 center for Indianapolis, you didn't think that it
17 was an important role of your function to
18 participate directly in the SOM program and the
19 hiring of outside consultants, is that right?
20   MR. HYNES:  Can I clarify something?  Are you
21 talking about the redesign or the operation of the
22 system existing at the time?
23   MR. ELSNER:  I'm talking about this proposal
24 from the Analysis Group and the review that was

Page 141

1  going on in October.
2    MR. HYNES:  But the review of this proposal,
3  not the review of orders?  I'm just confused by the
4  question.
5    MR. ELSNER:  No.  The proposal.
6    MR. HYNES:  Okay.
7  BY THE WITNESS:
8    A.   So, the review of the proposal -- can
9  you say it again?
10   MR. ELSNER:  Could you repeat my question?
11   MR. HYNES:  I'm sorry.  I was confused.
12       (WHEREUPON, the record was read
13       by the reporter as requested as
14       follows:  Q.  So, as the head of
15       the distribution center for
16       Indianapolis, you didn't think that
17       it was an important role of your
18       function to participate directly in
19       the SOM program and the hiring of
20       outside consultants, is that
21       right?)
22 BY THE WITNESS:
23   A.   That would be correct.
24 BY MR. ELSNER:

Page 142

1  Q. There was a point in time where you were
2  asked to write an article on the SOM program for a
3  publication, Logistics Insider. Do you recall
4  that?
5  A. I know what the Logistics Insider is. I
6  wrote a couple articles for it, but...
7  Q. Did you write an article on the SOM
8  program?
9  A. I don't remember if I did or -- what was
10  the time frame?
11  Q. This is in 2013. May of 2013.
12  A. And who asked me to write the --
13  Q. We will get the document. I'm not quite
14  sure. I believe you forwarded the request to Aaron
15  Burtner, and he replied that he was going to work
16  on something.
17  A. Okay. That would make sense. The
18  Logistics Insider is just a -- it was a kind of a
19  newsletter that came out once a month and just kind
20  of highlighted topics from all the DCs, might be
21  pictures of an employee welfare event, might be
22  something is happening in this building or that
23  building or, you know, or something along those
24  lines.

Page 143

1  So, if she asked me to do an SOM
2  article, I would have certainly asked Aaron to go
3  ahead and provide some notes for it.
4  Q. Is this for CVS only?
5  A. Yeah, it's just for CVS -- I'm sorry.
6  CVS and our -- just the DCs.
7  Q. Okay.
8  (WHEREUPON, a certain document was
9  marked as CVS-Nicastro-023:
10  5/20/13 e-mail string;
11  CVS-MDLT1-000057783 - 000057784.)
12  BY MR. ELSNER:
13  Q. This is a copy of that e-mail exchange,
14  57783. It was Jennifer DiSumma?
15  A. DiSumma, okay, yep.
16  Q. Who is she?
17  A. She works in corporate in the logistics
18  department. I don't know her exact title. But she
19  was in charge of the newsletter, and each month she
20  would send something out to different folks about
21  would you like to write an article for the
22  newsletter.
23  Q. Did you write one, do you know?
24  A. I --

Page 144

1  Q. On this topic.
2  A. I doubt it. I'm pretty sure if I asked
3  Aaron to do it and he said "No problem," he did it.
4  MR. ELSNER: Why don't we take a break and go
5  off the record. That makes sense.
6  MR. HYNES: Okay.
7  THE VIDEOGRAPHER: We are going off the record
8  at 12:15.
9  (WHEREUPON, a recess was had
10  from 12:15 to 12:59 p.m.)
11  THE VIDEOGRAPHER: We're back on the record at
12  12:59.
13  BY MR. ELSNER:
14  Q. Mr. Nicastro, when Aaron Burtner left in
15  June of 2013, that started to create a series of
16  issues with respect to staffing, is that right?
17  MR. HYNES: Objection to form.
18  BY THE WITNESS:
19  A. We were -- we were down a manager, yes.
20  BY MR. ELSNER:
21  Q. And when he left in June of 2013, did
22  you ask Kelly Baker to assume Aaron Burtner's
23  responsibilities as the SOM manager?
24  A. Yes.

Page 145

1  Q. To do so until a replacement could be
2  found?
3  A. Yes.
4  Q. Okay. And did Kelly Baker fill that
5  role?
6  A. He did.
7  Q. Okay. I'm going to mark this next
8  document as the next exhibit.
9  (WHEREUPON, a certain document was
10  marked as CVS-Nicastro-024:
11  7/17/13 e-mail string;
12  CVS-MDLT1-000076114 and 000076115.)
13  BY MR. ELSNER:
14  Q. This is 76114, document begins with
15  that.
16  (Clarification requested by the
17  reporter.)
18  MR. ELSNER: Sorry. 24.
19  BY MR. ELSNER:
20  Q. This is Exhibit 24. And I want you to
21  look on the second page of this document, which was
22  76115. At the top there is an e-mail that's sent
23  to -- from Kelly Baker dated July 9, 2013, and at
24  this point in time he was acting as the SOM manager

Page 146

1 in Indianapolis, is that right?
2    A.   Yes.
3    Q.   Okay.  And he sends this e-mail and he
4 writes, "Craig, not really pertaining to your
5 question, but I did want to highlight to the group
6 that you note that I do NOT," and "not" is in all
7 caps, "have a backup.  Even our hourly assistant
8 has limited access."
9        Who is the hourly assistant he is
10 referring to?
11   A.   Shauna Helfrich.
12   Q.   "If something happens to me via an act
13 of nature or illness, the current daily SOM process
14 would come to a complete halt."
15       Is that right?
16   A.   That's what he wrote.
17   MR. HYNES:  Objection to form.
18 BY MR. ELSNER:
19   Q.   Okay.  And were you aware of that?
20   MR. HYNES:  Objection to form.
21 BY THE WITNESS:
22   A.   Yes.  He forwarded that to me, you know,
23 through the series of e-mails, but I also knew that
24 we had limited resources should he get run over by

Page 147

1 a bus or something should happen to him.
2 BY MR. ELSNER:
3    Q.   Okay.  So, at this point in time
4 overseeing the IRR reports and the SOM process for
5 the entire country was Kelly Baker and an hourly
6 assistant who was working part time, is that right?
7    MR. HYNES:  Objection to form.
8 BY THE WITNESS:
9    A.   No, at this point Shauna is full time
10 supporting -- supporting him.
11 BY MR. ELSNER:
12   Q.   Okay.  So, it's Kelly Baker and Shauna,
13 is that right?
14   A.   Yes.  And then I also had Gary Millikan
15 filling in on a part-time role.  So, Gary Millikan
16 at this point has retired.
17   Q.   Yes.
18   A.   And is still working for us part time
19 doing different projects, and so I asked him to get
20 involved with this process.  He was the perfect
21 person.
22   Q.   And when did you ask him to get
23 involved?
24   A.   Somewhere -- somewhere in this window of

Page 148

1 time, once Aaron left.  I'm not exactly sure what
2 the date was that I asked him to get involved.
3    Q.   And this e-mail is forwarded to you from
4 Kelly Baker on the 17th of July, a little over a
5 week later, and he writes, "Mark, I didn't include
6 you on this original because of your full mailbox,"
7 and then he talks about BVR orders being flagged
8 based on volume, ratio or both.
9        And then he writes, "Really just a CYA
10 for me.  I'm pretty sure Aaron mentioned this to
11 the SOM development team, but I don't want them to
12 use me as a sacrificial lamb when or if it hits the
13 fan because something slipped through."
14       Is that what he wrote?
15   A.   That's what he wrote.
16   Q.   Were you aware that Kelly Baker was
17 really worried about something slipping through in
18 terms of order of controlled substance --
19   MR. HYNES:  Objection to form.
20 BY MR. ELSNER:
21   Q.   -- in July of 2013?
22   MR. HYNES:  Objection to form.
23 BY THE WITNESS:
24   A.   Kelly -- yes, Kelly was concerned about

Page 149

1 a lot of things, but he was very analytical and saw
2 things in strictly black and white and so he
3 brought -- brought his concerns to my attention,
4 which he would do on a regular basis.
5    Q.   Okay.  And you would agree that adequate
6 staffing is a very important issue for any due
7 diligence program for controlled substances, right?
8    MR. HYNES:  Objection to form.
9 BY THE WITNESS:
10   A.   Yes.
11 BY MR. ELSNER:
12   Q.   Okay.  And the other thing that Kelly
13 Baker states in this e-mail exchange to Craig
14 Schiavo, which was forwarded to you, which is the
15 second e-mail, on July 11 he sent it to Craig
16 Schiavo and then it was forwarded to you, in the
17 second sentence it reads, "The data snapshot" --
18 this is one of the concerns he has -- "is a
19 three-month window that is very old.  Any analysis
20 that I may make from the data is, for the most
21 part, irrelevant and pointless."
22       Is that what he wrote?
23   A.   That's what he wrote.
24   Q.   And you became aware of that, is that

Page 150

1  right?
2      A.  Yes.  When he forwarded the e-mail to
3  me.
4      Q.  And was this an issue that concerned
5  you?
6      A.  Yes.  The -- Kelly certainly was
7  escalating it to the right people.  They were part
8  of the development of the -- of the enhanced
9  processes and he wanted to make sure that, you
10  know, his concerns were being heard and Craig was
11  definitely the right person for him to escalate
12  that to.
13     Q.  Right.  He says, "The big issue," in the
14  last sentence of that e-mail, "is of false
15  negatives and the risks associated with something
16  slipping by."
17         What he means is something -- a
18  controlled substance being shipped that shouldn't
19  be, correct?
20     MR. HYNES:  Object to the form.
21  BY THE WITNESS:
22     A.  I'm -- I'm not sure what he's referring
23  to as "false negatives."  Yeah, I would -- I would
24  need to understand what he mean by a false

Page 151

1  negative.
2  BY MR. ELSNER:
3      Q.  Do you not know what a false negative is
4  in an IRR search?
5      A.  No, I do not.
6      Q.  Okay.  And while Kelly Baker was
7  concerned that he didn't have any sufficient
8  backup, at the same time you were being asked by
9  Dean Vanelli to provide more resources to the SOM
10  program and review in Rhode Island, is that right?
11     MR. HYNES:  Objection to form.
12  BY THE WITNESS:
13     A.  I'm sorry.  I didn't catch the end of
14  the sentence.  The -- could you repeat that?
15  BY MR. ELSNER:
16     Q.  I'll strike the question.  We'll redo
17  it.
18         This is Exhibit 25.
19         (WHEREUPON, a certain document was
20         marked as CVS-Nicastro-025:
21         7/16/13 e-mail string;
22         CVS-MDLT1-000028615 - 000028617.)
23  BY MR. ELSNER:
24     Q.  This is an e-mail that's sent to you on

Page 152

1  July 16, 2013, the day before you received this
2  e-mail from Kelly Baker, and it's from Dean
3  Vanelli; and he's asking you, at the same time that
4  Kelly Baker is worried about having enough
5  resources, he's asking you if there are additional
6  trained resources that could be thrown at the SOM
7  work so that Kelly could support some other
8  testing.  Is that right?
9      A.  Yes.
10     Q.  And did you have such resources?
11     A.  No, not at this time.  Gary Millikan was
12  coming on board and training, but I had concerns
13  that Aaron would not have time to be able to do
14  training -- not training.  But testing on the new
15  system and be able to key our functions going.
16     Q.  I'm going to show you what we've marked
17  as Exhibit 26.
18         (WHEREUPON, a certain document was
19         marked as CVS-Nicastro-026:
20         8/18/13 e-mail;
21         CVS-MDLT1-000012363.)
22  BY MR. ELSNER:
23     Q.  This is an e-mail that you wrote in
24  August of 2013.  It's CVS 12363.  And the re line

Page 153

1  is "SOM update" and you sent this to Ronald Link
2  and William Jusko, is that right?
3      A.  Correct.
4      Q.  And who are those people?
5      A.  Ronald Link was the executive VP for
6  logistics and William Jusko was my immediate boss.
7      Q.  In the middle of the e-mail there, there
8  is a mention, the paragraph beginning "Tom Bourke."
9  There was a discussion of "moving this process,
10  because it usually" -- "because we usually don't
11  get tipped off that the DEA are coming and they
12  never take a day off during the audit.  We may get
13  tipped off that they are coming, but DEA audits
14  typically take a day off to allow the DC to get the
15  paperwork together before they come back."
16         And then you write, "I understand his
17  trepidation given our vulnerability of not having
18  an SOM manager."
19         Is that what you wrote?
20     A.  I did.
21     Q.  And you were concerned that if the DEA
22  came and conducted an audit that you wouldn't
23  actually have an SOM manager in place, is that
24  right?

Page 154

1    MR. HYNES: Object to the form.
2  BY THE WITNESS:
3    A.   At this -- at this time, yes.
4  BY MR. ELSNER:
5    Q.   Okay.  And because of that, you were
6  suggesting that CVS should hire this candidate to
7  be a new or future SOM manager.  Is that right?
8    A.   Yes.
9    Q.   Okay.  And you were suggesting that that
10 function should stay in Indianapolis, right?
11   A.   I was.
12   Q.   And were you aware that there were
13 others within CVS that were suggesting that that
14 function be removed from Indianapolis and
15 put in a different location?
16   A.   Yes.
17   MR. HYNES: Objection to the form.
18 BY THE WITNESS:
19   A.   Yes.
20 BY MR. ELSNER:
21   Q.   Why did -- what is your understanding as
22 to why people wanted to move that function out of
23 Indianapolis?
24   A.   There was a much larger support function

Page 155

1  or support group from the corporate office than
2  there would be from my facility.  My facility would
3  have been kind of standalone SOM team, kind of like
4  what I had currently.
5    But any support that we would receive if
6  we were trying to get more information about a
7  store or the location, population, all that kind of
8  thing, we'd get on the phone and we called folks up
9  at our corporate office and regulatory and pharmacy
10 ops and all those folks would get involved.
11   It made total sense to move this process
12 to corporate where they're all right there and they
13 can all communicate together and have a really
14 tight relationship with all those folks.
15   Q.   But at the time you wanted it to stay in
16 Indianapolis, correct?
17   A.   I did.  I -- one, the candidate that we
18 had found was amazing.  Her background was
19 fantastic.  Her experience with the DEA was
20 fantastic.  So, we were really excited to get her
21 on board and we were actually in that process, and
22 we were very close to making her an offer.
23   Q.   And did you make her an offer?
24   A.   No.  We were very close to that, but the

Page 156

1  decision was ultimately made to move the process to
2  corporate so then she was interviewed by the team
3  at corporate and they wanted her, you know, for the
4  role but she wasn't willing to relocate to Rhode
5  Island.
6    MR. ELSNER: This is Exhibit 27.
7        (WHEREUPON, a certain document was
8         marked as CVS-Nicastro-027:
9         9/27/13 e-mail string;
10        CVS-MDLT1-000017250.)
11 BY MR. ELSNER:
12   Q.   This is an e-mail that you wrote to Dean
13 Vanelli on September 27, 2013.  Bates number is
14 17250.  And the subject is "SOM."
15       In the second line you say, "We were
16 talking about the Kelly and Shauna and he told me
17 Kelly had a phone interview.  No surprise.
18 However, Shauna has been offered a position with a
19 law firm she used to work for for more money.  I'll
20 talk to her today but we could be in trouble,
21 fast."
22       Is that what you wrote?
23   A.   That's what I wrote.
24   Q.   Okay.  And you were concerned that the

Page 157

1  staff that you had were not being hired and that
2  Shauna was going to take another position, is that
3  right?
4    MR. HYNES: Objection to form.
5  BY THE WITNESS:
6    A.   The concern was once they understood we
7  were not going to keep the process there, as is
8  natural reactions like what am I going to do, I'm
9  going to be out of a job, so they were, you know,
10 covering their, you know, covering their future
11 plans and seeing where else they could go.
12 BY MR. ELSNER:
13   Q.   And, in fact, Kelly Baker did leave, is
14 that right?
15   A.   He did leave.
16   Q.   And Shauna left, is that right?
17   A.   No.  Shauna stayed.
18   Q.   She stayed.  Okay.
19   A.   She is still with me.
20   Q.   Why did Aaron Burtner leave in June of
21 2013?
22   A.   I don't know the reason, but he left for
23 a position with Amazon out in Seattle.  I believe
24 Frank Devlin had some input in that because Frank

Page 158

1  Devlin had left for Amazon and he called Aaron to
2  come out and work with him.
3      Q.   And when did Frank Devlin leave?
4      A.   I don't know.  I don't know the dates
5  around that.  It was --
6      Q.   Do you have a rough estimate?
7      A.   Before Aaron, but really I don't know.
8      Q.   Do you know, was it shortly before Aaron
9  in 2013 or was it earlier than that?
10     A.   I don't know.  I'm not sure.
11     Q.   Next document I'm going to show you is
12  CVS 22055 through 61, and it's Exhibit 28.
13              (WHEREUPON, a certain document was
14              marked as CVS-Nicastro-028:
15              10/3/13 e-mail string with
16              attachments; CVS-MDLT1-000022055 -
17              000022061.)
18  BY MR. ELSNER:
19     Q.   These are job descriptions for the
20  suspicious order monitoring manager position and
21  analyst position, October 3, 2013.
22          Do you see that?
23     A.   I do.
24     Q.   Okay.  And, so, there were currently

Page 159

1  three positions that were being open.  There was
2  a -- open manager for suspicious order monitoring,
3  there was a suspicious order monitoring analyst 2
4  and a suspicious order monitoring analyst 3.  Is
5  that right?
6      A.   I see suspicious order monitoring 1,
7  suspicious order monitoring analyst 2 and a
8  suspicious order monitoring manager.
9      Q.   Right.  And if you look, in each of the
10  reporting requirements, you are listed in the
11  hierarchy with job description, is that right?  If
12  you look at page 22057.  Is that right?
13     A.   I am listed, yes.
14     Q.   Okay.  And for the suspicious order
15  monitoring analyst 2, you're listed as well on
16  22059?
17     A.   Yes.
18     Q.   And also for the SOM manager, which is
19  22061.
20     A.   Yes.
21     Q.   Is that right?
22     A.   Um-hmm.  Yes.
23     Q.   Okay.  And, so, all three of these
24  people were to be reporting to you, is that right?

Page 160

1      A.   At this date of October 2013, the
2  decision had been made for this process to leave
3  Indy, so I don't know why my name is on here
4  because I -- once it was leaving Indianapolis, I
5  was no longer to have a role with SOM.  So...
6      Q.   But they listed you as the supervisor
7  nevertheless, is that right?
8      A.   They did.
9      MR. HYNES:  Objection to form.
10  BY MR. ELSNER:
11     Q.   The --
12     MR. ELSNER:  Mark this next document as
13  Exhibit 29.
14              (WHEREUPON, a certain document was
15              marked as CVS-Nicastro-029:
16              11/13/13 e-mail string;
17              CVS-MDLT1-000017255 - 000017258.)
18  BY MR. ELSNER:
19     Q.   This is 17255.  It's a collection of
20  e-mails.  The top e-mail is sent from you dated
21  November 13, 2013.  But if we go to the last page,
22  there's -- there's a request in July by Shauna
23  Helfrich for access to a particular database.
24          Do you see that?  It's 17257,

Page 161

1  second-to-last page.  It says "Master Request."
2      A.   Yes.
3      Q.   Okay.  And there is an e-mail that's
4  sent that you're cc'd from William Klenotic.
5  Who is that?
6      A.   William Klenotic is my systems
7  administrator.
8      Q.   Sorry for the mispronunciation.
9          And he writes that "Shauna Helfrich has
10  been looking for this access for months.  Upon
11  review it looks like someone rejected the request?"
12          Now, this is -- he writes this in
13  November.  The original request was in July, is
14  that right?
15     A.   7/29.
16     Q.   2013, right, July?
17     A.   Yes.
18     Q.   Okay.  And Pamela Hinkle responds.  Who
19  is Pamela Hinkle?
20     A.   She -- her -- she is -- she was LP
21  manager in Knoxville, but she -- I'm not exactly
22  sure what her title is today.  But she was involved
23  with the SOM process.
24     Q.   Okay.  And then she responds that the

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 program that she wanted access to is no longer
2 functional and that that program had been replaced
3 by the Viper program. Is that right?
4    A.  Yes.
5    Q.  Okay. And there are a series of e-mails
6 that take place. And finally on the front page, in
7 November of 2013, you write, "She needs this access
8 immediately. The work she is doing is a critical
9 compliance component that cannot be delayed."
10      Is that what you wrote --
11    A.  Yes.
12    Q.  -- November 13, 2013?
13    A.  Yes.
14    Q.  Okay. And then they describe that
15 they're putting a program together to give her
16 access finally on November 13.
17      So, isn't it true that there were
18 difficulties in your staff having access to the
19 right databases and information during this period
20 of time?
21    MR. HYNES: Objection to form.
22 BY THE WITNESS:
23    A.  She was having issues getting access and
24 it was because of her title and then also because

Page 163

1 it would appear we were asking for the wrong
2 program because that program had been deleted and
3 we moved on to a different -- a different program.
4 And so it was -- it didn't get through. So...
5 BY MR. ELSNER:
6    Q.  So, from July until November of 2013 she
7 didn't have access to the program that she needed
8 to perform her work, right?
9    MR. HYNES: Objection to form.
10 BY THE WITNESS:
11    A.  Kelly Baker still had his access.
12 BY MR. ELSNER:
13    Q.  But there was Kelly Baker and her at
14 this point in time, is that right?
15    A.  Yes, but Kelly could run all the reports
16 and he did. He ran all the reports so she could do
17 her analysis.
18    Q.  Okay. But why didn't she go to Kelly
19 Baker and ask for access to the correct program?
20    MR. HYNES: Objection; calls for speculation.
21 BY THE WITNESS:
22    A.  Yeah, Bill Klenotic would be the -- our
23 point of contact in our building to request to --
24 call my IT request. That would be his role to go

Page 164

1 ahead and try and get that access for her, for
2 anybody in the building.
3 BY MR. ELSNER:
4    Q.  And -- but it took from July to
5 November to get access to a program which you
6 described as necessary for a critical compliance
7 component, is that right?
8    A.  Yeah, I, you know -- we're a large
9 company and when you want to get something
10 expedited, you -- you tell them the sky is falling
11 and you need this right away.
12      So, it was my way of just putting an
13 exclamation point on it like this needs to happen
14 now. So...
15    Q.  But it's true that at that point in time
16 there were only two people performing this SOM
17 function, is that right?
18    MR. HYNES: Objection to form.
19 BY THE WITNESS:
20    A.  Yeah, at this time Gary Millikan would
21 have been involved on a part-time basis and then we
22 also would have had pharma compliance on site and
23 assisting with that, with the program, which was a
24 decision made.

Page 165

1      Since we lost our SOM manager, we wanted
2 to have a level of expertise on site just to help
3 guide and make sure they had more expertise than I
4 did, and we wanted to make sure that they felt that
5 we were still completing the work satisfactorily.
6 BY MR. ELSNER:
7    Q.  I show you this next document which is
8 Exhibit 30.
9      (WHEREUPON, a certain document was
10      marked as CVS-Nicastro-030:
11      3/14/14 e-mail string;
12      CVS-MDLT1-000017246.)
13 BY MR. ELSNER:
14    Q.  It's 17246. And the date at the bottom
15 e-mail is March 14, 2014 and it reads, "Good
16 morning. With the deployment of the SOM last
17 Friday (Indy DC only)."
18      So, at this point in time, March 14 --
19 it was basically in March of 2014 that the SOM was
20 deployed first in Indianapolis, the new program, is
21 that right?
22    A.  The new program, yes.
23    Q.  Okay. And it was deployed in
24 Indianapolis before it was deployed in the rest of

Page 166

1 the country, is that right?

2    A.   I -- I don't remember.  It was -- it was

3 a rollout and several DCs went on at a time.  I

4 don't remember if we were first or not.

5    Q.   And this is the -- this is the new

6 program that was put in place by the Analysis

7 Group, is that right?

8    A.   Correct.

9    Q.   Okay.  And did you have any role in

10 putting this program in place in the Indianapolis

11 distribution center in late 2013 through March of

12 2014?

13    A.   Putting this new program in place?

14    Q.   Yes.

15    A.   No.

16    Q.   Okay.  So, did you have any role with

17 the SOM program in 2014 for CVS?

18    A.   Only until all DCs had migrated off of

19 the current -- the Buzzeo system I guess, the

20 current system and migrated to the new system.

21 Once all those DCs had migrated to the new system,

22 then we were essentially finished with the process.

23    Q.   Okay.  This says this is being deployed

24 in March of 2014 or the week before that.  So, did

Page 167

1 you -- did you have any role with the SOM program

2 following this date in March of 2014?

3    MR. HYNES:  Objection; asked and answered.

4 BY THE WITNESS:

5    A.   If -- if we -- if all DCs had migrated

6 by March 14, then, yes, I was done.

7 BY MR. ELSNER:

8    Q.   Because Indiana was still responsible

9 for monitoring all of the distribution centers

10 around the country until each one were fully

11 operational, is that right?

12    A.   That is correct.

13    Q.   Okay.  And that process took through

14 most of 2014, is that right?

15    A.   I don't remember the dates or when

16 the -- when the stores -- when the DCs converted

17 over.  I -- yeah, I don't recall.

18    Q.   William Klenotic had written in response

19 to this e-mail, "It's an awesome process...NOT."

20        And he sent this e-mail to you, correct?

21    A.   Um-hmm.

22    Q.   Why did he -- what did he mean by "It's

23 an awesome process...NOT"?

24    A.   Bill was sarcastic.  You have to kind of

Page 168

1 know him to understand his range of e-mails.

2        But what he was referring to, the

3 process that his -- so he's responsible for the

4 data room, and without getting into the weeds on

5 this whole thing, but it created more work for the

6 data room.

7        So, we would get our orders at night,

8 the entire order at one time; and once the new SOM

9 process went in place, we would only get the

10 non-SOM orders first, and then we would get the SOM

11 orders later in the night once the SOM processes

12 had a chance to run.  So, it created more work for

13 his team.

14    Q.   And were any changes made to the process

15 in response to his e-mail to you in March of 2014?

16    A.   No.  No, that's the way the process

17 runs, and that's what we work with.

18    Q.   In 2014 through this period before the

19 new SOM is fully operational, what staff did you

20 have on hand to handle the IRR reviews?

21    A.   For what time frame?

22    Q.   Through 2014 before the process was --

23 the new process went into effect in the whole

24 country.

Page 169

1    MR. HYNES:  Beginning?

2 BY THE WITNESS:

3    A.   Beginning of 2014 and forward?

4 BY MR. ELSNER:

5    Q.   Yes.

6    A.   Shauna Helfrich, Gary Millikan, and at

7 the beginning of 2014 we would have had pharma

8 compliance also on site.

9    Q.   Is that a particular individual or a

10 group of people?

11    A.   It was a group.  Typically one -- one of

12 three people that came.  But it was a team.  They

13 would come one at a time, but there was a few

14 different guys that would come in.

15    MR. ELSNER:  This is Exhibit 31.

16    MR. HYNES:  Is this all supposed to be one?

17    MR. ELSNER:  Yes.  It's CVS-MDLT1-76146

18 through 147.

19        (WHEREUPON, a certain document was

20        marked as CVS-Nicastro-031:

21        3/20/14 e-mail string with

22        attachment; CVS-MDLT1-000076146 -

23        000076148.)

24 BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    Q.   And this is an e-mail that you sent on
2  March 20, 2014 to Shauna Helfrich, and you are
3  forwarding to her a list by store number and who is
4  servicing those particular facilities and they
5  provide it to you in an Excel spreadsheet.
6        Do you see that?
7        So, if you look at 76147, in the bottom
8  e-mail, you send an e-mail to Alisa Tomasetti.
9        Do you see that?
10   A.   Yes.
11   Q.   Okay.  And you write, "As the SOM
12 process transitions to corporate and the DCs move
13 to the corporate analysis, my SOM analyst is having
14 a hard time deciphering whether she needs to do any
15 follow-up on a store because she doesn't have easy
16 access to a list of stores and their respective
17 distribution center."
18       Is that right?
19   A.   Correct.
20   Q.   So, then someone sends to you for her to
21 use a list of all the stores and who is servicing
22 those stores, is that right?
23       And it's a very large --
24       (Clarification requested by the

Page 171

1        reporter.)
2  BY MR. ELSNER:
3    Q.   Is that right?
4    A.   Yes.  Yes.
5    Q.   And it's a very, very large Excel
6  spreadsheet, so I didn't include the whole thing,
7  but what I did do is I sorted it by all of the
8  stores in Ohio.  And if you see in the first
9  attachment, 76148, it lists a store number, a
10 street, and city, the state and then the servicing
11 distribution center.
12       Do you see that?
13   A.   Yes.
14       MR. HYNES:  I'm going to object to the exhibit
15 itself if that's okay.
16       MR. ELSNER:  Okay.  If you go to the next
17 page, Gina.
18       That looks different.
19 BY MR. ELSNER:
20   Q.   I'm looking at this page here that lists
21 the stores.  The question I have is it was my
22 understanding that the Indiana distribution center
23 was servicing all of the stores in Ohio, but there
24 are a number of different states listed here as the

Page 172

1  distribution center for these Ohio stores and I'd
2  like to ask why that is.
3        MR. HYNES:  My objection is because the data
4  has been sorted or altered from its form.
5        MR. ELSNER:  I understand.
6        MR. HYNES:  I wanted to make that clear.  Go
7  ahead.
8        THE WITNESS:  Okay.
9  BY THE WITNESS:
10   A.   So, Ohio is covered by four different
11 distribution centers.
12 BY MR. ELSNER:
13   Q.   Now, this is in 2014.  Is that true as
14 today?
15   A.   Yeah, I couldn't speak specifically to
16 2014.  I know today we have four different
17 distribution centers in that area and -- yeah, it
18 wouldn't have been much different in 2014.  It
19 might have been three.
20       But our Knoxville facility covers
21 southern Ohio like Cincinnati and southern Ohio.
22 Somerset covered Cuyahoga County, Summit County,
23 Ohio, Youngstown, that area.  The Novi, Detroit or
24 the Novi, Michigan facility, which is DT, services

Page 173

1  Toledo and comes down into Columbus.  And then we
2  had the Dayton, Dayton area and Bellevue and Sidney
3  and areas like that.
4    Q.   Now, does this refer specifically to
5  controlled substances or are these all products?
6    A.   These would be all products.
7    Q.   Including controlled substances?
8    A.   Yes.  Yes.
9    Q.   Okay.  So, the -- so, for a CVS store in
10 Akron, Ohio in Summit County, is it possible that
11 they were being distributed controlled substances
12 from a distribution center other than the Indiana
13 distribution center?
14       MR. HYNES:  Objection.  Time frame.
15 BY MR. ELSNER:
16   Q.   In 2014 and before.
17   A.   Well, if this is the list that was
18 generated, so YK stands for our Chemung, New York
19 facility.  So, at this point Chemung, New York
20 would have been servicing Somerset and Somerset was
21 servicing the Cleveland, Akron area.
22   Q.   So, the data that we're looking for out
23 of the Indianapolis distribution center for the
24 distribution of controlled substances into CVS

Page 174

1 stores may not contain all the orders for those
2 controlled substances between -- from 2014 and
3 before, is that right?
4     MR. HYNES: Objection to form.
5 BY THE WITNESS:
6     A.   There was a point when Chemung started
7 processing the controls and the pharmacy for
8 Somerset. I'm not -- I'm not sure what the date
9 is. But it would have been somewhere in that
10 2012 -- '11, '12, '13 time frame.
11     So, if you were looking for records for
12 those stores at that period, that would have been
13 distributed through our Chemung, New York facility
14 for that market.
15 BY MR. ELSNER:
16     Q.   Okay. If you go back to the spreadsheet
17 page just before the one we were looking at, I'll
18 represent to you that I sorted the servicing
19 distribution center by the location of Indiana.
20     Do you see that?
21     A.   The short page? Yeah.
22     Q.   Yeah, the short page.
23     A.   Yes.
24     Q.   And then I also narrowed it to CVS

Page 175

1 stores in California. Was the Indianapolis
2 distribution center providing services to CVS
3 stores in California?
4     MR. HYNES: Same objection to the exhibit.
5 You may answer, Mark.
6 BY THE WITNESS:
7     A.   No, and that's -- this looks odd because
8 we -- we have a distribution center in La Habra,
9 California. I don't know why we would be listed as
10 a servicing DC for a La Habra California store. To
11 my knowledge we don't service stores in California
12 out of our building.
13 BY MR. ELSNER:
14     Q.   That's what my understanding was. So,
15 this Excel spreadsheet that was put together for
16 Shauna to use to conduct her SOM process was
17 incorrect, is that right?
18     MR. HYNES: Objection to the form.
19 BY THE WITNESS:
20     A.   For these stores, it is.
21 BY MR. ELSNER:
22     Q.   And perhaps others?
23     MR. HYNES: Same objection.
24 BY THE WITNESS:

Page 176

1     A.   For these stores I know we did not
2 service those stores in 2014.
3 BY MR. ELSNER:
4     Q.   In 2013 the DEA began an audit of the
5 Indiana distribution center, is that right?
6     A.   Correct.
7     MR. ELSNER: I'm going to mark this document
8 as the next exhibit. It's Exhibit 32. It's
9 CVS 10522.
10     (WHEREUPON, a certain document was
11     marked as CVS-Nicastro-032: 8/5/13
12     Notice of Inspection of Controlled
13     Premises; CVS-MDLT1-000010522 -
14     000010523.)
15 BY MR. ELSNER:
16     Q.   Do you recognize this document?
17     A.   Yes.
18     Q.   What is it?
19     A.   It's the form that the DEA gives us to
20 acknowledge that they're here and they're preparing
21 to do an audit.
22     Q.   And the date is August 5, 2013, is that
23 right?
24     A.   Yes.

Page 177

1     Q.   And were you present when the DEA began
2 this audit on August 5, 2013?
3     A.   Yes.
4     Q.   I have some handwritten notes that were
5 produced to us.
6     MR. ELSNER: This is Exhibit 33.
7     (WHEREUPON, a certain document was
8     marked as CVS-Nicastro-033:
9     Handwritten notes;
10     CVS-MDLT1-000010525 - 000010529.)
11 BY MR. ELSNER:
12     Q.   It's 10525. In the beginning says,
13 "DEA Visit." I wanted to know: Do you recognize
14 the handwriting in these notes?
15     A.   It's not mine because you can read it.
16 Unless there is a name, I don't know who wrote
17 these notes.
18     Q.   They're not yours?
19     A.   Okay.
20     Q.   They're not yours, right?
21     A.   Oh, no, they are not mine, no.
22     Q.   And did you take notes at these
23 meetings?
24     A.   I would. If there was something -- I'd

Page 178

1 have a little notepad and if they had some comments
2 or questions I wanted to make, I'd take some notes,
3 yeah.
4    Q.   Do you recall taking notes during this
5 meeting?
6    A.   I don't recall.  Typically during our
7 audits, LP would do a really nice job of
8 note-taking and day by day by day.  So, usually
9 would leave it to them.
10    Q.   On the last page of the document, 10529,
11 there are copies of business cards and they include
12 a card for Daniel Gillen.
13       Do you see that?
14    A.   Yes.
15    Q.   Is it customary for the DEA agents to
16 give you copies of their business cards when they
17 begin their audits?
18    A.   Yes.
19    Q.   Who is Daniel Gillen?
20    A.   He was the group supervisor.  Andrew and
21 Michael reported to Dan, the way I understood the
22 relationship.
23       MR. ELSNER:  This next document is Exhibit 34.
24       (WHEREUPON, a certain document was

Page 179

1       marked as CVS-Nicastro-034:  8/7/13
2       e-mail; CVS-MDLT1-000061606 -
3       000061607.)
4 BY MR. ELSNER:
5    Q.   This is an e-mail from Pamela Hinkle to
6 Joseph Scholl.  Who is Pamela Hinkle?
7    A.   Pamela Hinkle is -- she works out of the
8 Knoxville DC.  She is in the LP world, loss
9 prevention world.  But she is heavily involved with
10 DEA compliance.
11    Q.   And she lists here the items that the
12 DEA requested during their audit, is that right?
13       MR. HYNES:  Object.  I think it's Joe Scholl
14 writing the e-mail.
15 BY MR. ELSNER:
16    Q.   Oh, sorry.  I'm sorry.  He describes.
17 Who is Joseph Scholl?
18    A.   Joseph Scholl would have been my loss
19 prevention manager at this time.
20    Q.   Okay.  And he was based in Indianapolis,
21 is that right?
22    A.   Yes.
23    Q.   Okay.  And this is an example of some of
24 the note-taking that the loss prevention would

Page 180

1 perform during a DEA audit, is that right?
2    A.   Correct.
3    Q.   Okay.  And he includes in the list of
4 the requested items that the DEA is concerned about
5 is a copy of your SOM SOP, is that right?
6    A.   Yes.
7    Q.   I'm going to show you Exhibit 33.
8       MR. HYNES:  35.  This was 34.
9       THE WITNESS:  33 was the handwritten.
10       MR. ELSNER:  Sorry.  35.
11       MR. HYNES:  I would have made that mistake a
12 few times if I was taking the deposition.
13       MR. ELSNER:  Just put 35.  We will go from
14 there.
15       (WHEREUPON, a certain document was
16       marked as CVS-Nicastro-035:
17       Document, "DEA Visit 8/5 - 8/8
18       2013"; CVS-MDLT1-000008389 -
19       000008395.)
20 BY MR. ELSNER:
21    Q.   These are notes of the DEA's visit to
22 the Indianapolis distribution center from August 5
23 through the 8th of 2013, is that right?
24    A.   That's correct.

Page 181

1    Q.   This is 8389.
2       And I want you to turn to 8393, on
3 day 3, which is Thursday, August 8, 2013.
4       Do you see that?
5    A.   Yes.
6    Q.   Okay.  And then if we go to the
7 following page, 8394, there are some notes that you
8 explained the SOM process and provided the DEA with
9 the SOP, is that right?
10    A.   Yes.
11    Q.   Did you do that?
12    A.   I did.
13    Q.   Okay.  And the DEA had specifically
14 questioned whether your SOM process had stopped any
15 orders, is that right, which is the third bullet?
16       MR. HYNES:  Objection to form.
17 BY THE WITNESS:
18    A.   Yes.
19 BY MR. ELSNER:
20    Q.   Okay.
21    A.   This is a -- this is my loss prevention
22 manager's observation of the meeting.  So, I don't
23 know if it's word for word, but it's -- it's his
24 recollection of the meeting.  So...

Page 182

1    Q.   Well, is that recollection correct?  Did
2  the DEA question whether there was an SOM process
3  that had stopped orders?
4    A.   Yes.
5    Q.   Okay.  And he writes your response.  And
6  he puts it in quotes.  "No, the process has
7  identified several orders that required additional
8  research and upon validating them, they were
9  released and sent."
10        Is that correct?
11    A.   That is what it says, but that would not
12  be correct.  "Several orders" should say "several
13  hundred orders" or maybe "several thousand orders."
14    Q.   Is there a record of those orders?
15    A.   Yes.  There is -- well, there's records
16  of the orders that were -- that required additional
17  research.  So, I'm saying there were several
18  hundred or several thousand orders that required
19  additional research, which is what the SOM team
20  would do.  I'm not saying there were several
21  hundred or several thousand orders stopped.
22    Q.   I understand.
23    A.   Okay.
24    Q.   And where is a record of those orders

Page 183

1  being identified for review kept?
2    A.   We had the records in boxes and boxes
3  and boxes of reports of the work that the SOM team
4  did every day.
5    Q.   And were you familiar with these orders
6  that had been identified for additional research?
7    A.   No.  That was -- that's what the SOM
8  team did every day is review orders to see if there
9  was a reason for them to be stopped.
10    Q.   And -- but were those review orders
11  brought to your attention as the director of the
12  distribution facility in Indianapolis?
13    A.   No.  No.
14    Q.   But it's you that is describing the
15  process to the DEA, is that right?
16    A.   I am, yes.
17    Q.   And the -- the next bullet says, "The
18  DEA questioned that no stopped orders have been
19  communicated to them and wanted to know if the
20  process had ever stopped any orders."
21        Is that right?
22    A.   That's correct.
23    Q.   Okay.  And your response in this note
24  says, "Director Nicastro said there have been two

Page 184

1  orders that were stopped, but none in Indiana."
2        Is that right?
3    A.   Yes.
4    Q.   "He further stated that he considers
5  what they said about no orders being stopped as a
6  compliment that the current SOM process is working
7  as designed."
8        Is that what you told them?
9    A.   That's -- yes, I did.
10    Q.   Where were the two orders stopped that
11  you refer to in your discussion with the DEA?
12    A.   I -- the two that I was referring to, I
13  don't remember what -- what states those would have
14  been stopped in.
15    Q.   Do you know why they were stopped?
16    A.   I -- I don't have the specifics on why
17  we stopped those orders.
18    Q.   If we go a few bullets down from there,
19  there is a -- there is a note there that said that
20  "DEA stated statistics like Indiana leads the
21  nation in pharmacy armed robberies and that several
22  CVS stores have been among those robbed.  They
23  questioned what CVS is doing or can do to prevent
24  pharmacy robberies.  They questioned maybe some of

Page 185

1  our stores are carrying too much hydrocodone, which
2  is a major target for robberies."
3        Were you aware that hydrocodone products
4  were a major target for robberies at CVS stores?
5    MR. HYNES:  Object to the form.
6  BY THE WITNESS:
7    A.   No.  I knew our stores, we were having
8  high robbery rates in the State of Indiana.  I know
9  we put timed safes into most, if not all, of our
10  stores and that has reduced the number of
11  robberies.  But I don't -- I don't know the -- it's
12  not my realm to be part of the field operations and
13  how they...
14  BY MR. ELSNER:
15    Q.   Were you aware that these robberies
16  related to hydrocodone products?
17    MR. HYNES:  Objection to form.
18  BY THE WITNESS:
19    A.   I don't know what was taken during these
20  robberies.
21  BY MR. ELSNER:
22    Q.   Did you know that the target of the
23  robberies that the DEA is talking about here was
24  the robberies related to hydrocodone?  Were you as

Page 186

1  the director of the Indianapolis distribution
2  center aware that CVS stores had been targeted for
3  robberies for hydrocodone?
4      MR. HYNES:  Objection to form.
5  BY THE WITNESS:
6      A.   No.  I was aware that we had robberies
7  and that drugs had been taken during some of those
8  robberies.  But I was not aware of what drugs they
9  were targeting or what exactly they were getting
10 away with.
11 BY MR. ELSNER:
12     Q.   It then says that "CVS continues to pump
13 hydro into these stores, some of which have been
14 robbed repeatedly."
15         Is that what the DEA said?
16     A.   According to Joe Scholl, yes.  I mean,
17 using that -- using those words, "pumped in," I
18 would say he was probably taking that word for word
19 from the DEA.
20     Q.   From the DEA.  And you were there.  Do
21 you remember that?
22     A.   I remember us having this conversation.
23     Q.   Do you remember that the DEA was
24 concerned that even though there was a robbery that

Page 187

1  took place, that CVS was continuing to pump
2  hydrocodone products into those same stores that
3  had been robbed?
4      A.   We had a -- we had a lengthy discussion
5  about stores and robberies, and I remember
6  questions about how would those orders hit our SOM,
7  if we were replenishing the hydrocodone that was
8  lost.  But we -- we had a conversation about it.
9      Q.   And in the next bullet underneath, it
10 kind of relays your response which confirms that.
11 It says that "Director Nicastro stated that when a
12 store placed an order to replenish controlled
13 substances after a robbery, the order would flag as
14 irregular and be researched.  And once the research
15 revealed it as a legitimate order to replenish a
16 store after a robbery, it would be released and
17 sent."
18         Is that what you told him?
19     A.   That's correct.
20     Q.   So, CVS' role after a robbery before
21 replenishing a store was to confirm that a robbery
22 took place, is that right?
23     MR. HYNES:  Objection to form.
24 BY THE WITNESS:

Page 188

1      A.   Yeah, I -- can you ask that again?
2  BY MR. ELSNER:
3      Q.   So, according to this, what you told the
4  DEA was that after a robbery took place, the
5  research you would do is to confirm whether in fact
6  it really was a robbery, right?
7      MR. HYNES:  Objection to form.
8  BY THE WITNESS:
9      A.   I didn't do that research to find out if
10 it was a robbery.  I don't know --
11 BY MR. ELSNER:
12     Q.   That's the process, right?
13     MR. HYNES:  Objection to form.
14 BY THE WITNESS:
15     A.   If we had an order from a store that was
16 unusually large, like in this case where maybe all
17 their hydro was --
18     Q.   Was stolen?
19     A.   -- was gone and we are now replacing a
20 large amount, that would flag on our system and
21 that is part of our research, calling the store,
22 contacting the field and then we would find out
23 this store was robbed and that order is okay to
24 send or it's -- we get the details.

Page 189

1      Q.   Right.
2      A.   Before --
3      Q.   I'm sorry.  Go ahead.
4      A.   Before we would release that order to
5  that store.
6      Q.   And as long as you confirmed that there
7  was a robbery, then the store would be replenished,
8  is that right?
9      MR. HYNES:  Objection to form.
10 BY THE WITNESS:
11     A.   There were more questions around that,
12 but that would be one of the reasons why we would
13 replenish that store.
14 BY MR. ELSNER:
15     Q.   Was there ever a situation where after a
16 robbery you decided to lower the threshold amount
17 that you would ship to those particular stores that
18 were being robbed for hydrocodone?
19     MR. HYNES:  Objection to form.
20 BY THE WITNESS:
21     A.   I don't know that answer.  We would --
22 we wouldn't be making that decision in the SOM team
23 that because that store was robbed we're just not
24 going to ship them as much product anymore.  That

Page 190

1 wouldn't be a decision that we'd be making as the
2 SOM team.
3 BY MR. ELSNER:
4    Q.   Did you ever make a recommendation like
5 that to anyone at CVS?
6    A.   No.
7    Q.   But that was the concern of the DEA,
8 right, that they were concerned that you were
9 continuing to pump hydrocodone into stores that had
10 already been robbed, is that right?
11   A.   Yes, yes.
12   Q.   Okay.
13       MR. ELSNER:  This is CVS 36.  CVS-MDLT1-22277.
14       (WHEREUPON, a certain document was
15            marked as CVS-Nicastro-036:
16            11/15/13 e-mail string;
17            CVS-MDLT1-000022277.)
18 BY MR. ELSNER:
19   Q.   This is November 14, 2013.  You're
20 writing an e-mail in the bottom to Dan Gillen from
21 the DEA, is that right?
22   A.   Yes.
23   Q.   And you are requesting a time frame for
24 a closing meeting for their audit.  Is that right?

Page 191

1    A.   Yes.
2    Q.   Okay.  And then you write, "Regarding
3 our call today, I'm disappointed to hear you do not
4 believe we have a suspicious order monitoring
5 program in place, but I can assure you that we do."
6       What specifically did Agent Dillon --
7 Gillen tell you about his belief that there was no
8 suspicious order monitoring program in place at
9 CVS?
10   A.   Regardless what we showed Mr. Gillen and
11 documents that we produced and the SOPs and records
12 or examples of how we go through the process, he
13 was adamant that we don't have an SOM process.
14       So, we went to great lengths to show him
15 how robust our system was, but he was -- he wasn't
16 buying it.  He wasn't interested.
17   Q.   He didn't believe that you had a program
18 in place?
19   A.   Right.
20   Q.   Correct?
21   A.   Right.
22   Q.   Okay.  And did you relay those concerns
23 to CVS --
24   A.   Yes.

Page 192

1    Q.   -- in Rhode Island?
2    A.   Yes.
3    Q.   Who did you call and tell?
4    A.   As we were going through this process,
5 because it was so unique that a process, usually
6 they come in, they do their audit, they're in,
7 they're out, we close the audit and away we go.
8       The fact that they were delaying the
9 audit without giving us any indication until now
10 why they weren't closing the audit, it was a -- it
11 was a cast of many that were involved with the
12 process trying to find out what's happening, what's
13 going on, what's their concerns, how can we appease
14 them, what's the, you know, what's the -- what's
15 the issue at hand and how do we rectify it so we
16 can move forward.
17   Q.   And Agent Gillen then asks you on
18 November 15 for a list of any suspicious order
19 notifications to any and all DEA offices over the
20 last three years, is that right, for controlled
21 substances?
22   A.   Yes.
23   Q.   And did you -- did you respond to him?
24   A.   I believe we did, yes.

Page 193

1    Q.   Let me -- actually, let me ask one quick
2 question about this.
3       MR. ELSNER:  I will mark this as Exhibit 37.
4       (WHEREUPON, a certain document was
5            marked as CVS-Nicastro-037:
6            11/15/13 e-mail string;
7            CVS-MDLT1-000111940 - 000111941.)
8 BY MR. ELSNER:
9    Q.   It's 111940.  You forwarded this e-mail
10 that Mr. Gillen sent to you requesting the
11 shipments for the past three years to Betsy
12 Ferguson, Pamela Hinkle, Dean Vanelli, the re line
13 being "Closing audit."
14       Do you see that?
15   A.   Yes.
16   Q.   Okay.  In this e-mail were you relaying
17 to these individuals the content of the phone call
18 that you had with Agent Gillen and his request for
19 these shipments?
20       MR. HYNES:  I'm going to object on privilege
21 and direct the witness not to answer.
22       MR. ELSNER:  Without asking -- without him
23 revealing precisely what he asked for, I think I'm
24 entitled to know what the general subject matter of

Page 194

1 the inquiry was.
2 MR. HYNES: It shows he forwarded the e-mail
3 from Gillen, right?
4 MR. ELSNER: Yes.
5 MR. HYNES: I mean, if that's your question, I
6 think the answer is yes. As to what he said to
7 counsel, he is not going to discuss that.
8 BY MR. ELSNER:
9 Q. Well, I want to know, I want to know in
10 this e-mail, were you asking for legal advice from
11 counsel with respect to this request or were you
12 describing the conference call you had with Agent
13 Gillen and the collection of these documents
14 related to the shipments over the last three years?
15 MR. HYNES: We are -- objection stands. We
16 are not going to discuss what he said to counsel in
17 this e-mail.
18 MR. ELSNER: I think I am entitled to know
19 whether he was asking for legal advice, not asking
20 what the advice, what the advice was he was
21 requesting or if he was describing the factual
22 content of the call he had with them.
23 MR. HYNES: I think even describing the
24 factual content of the call to them could be a

Page 195

1 request for legal advice.
2 MR. ELSNER: I'm going to mark this next
3 document as Nicastro 38.
4 (WHEREUPON, a certain document was
5 marked as CVS-Nicastro-038:
6 11/19/13 e-mail with attachment;
7 CVS-MDLT1-000076142 - 000076145.)
8 BY MR. ELSNER:
9 Q. This is a -- this is 76142. It's
10 Exhibit 38.
11 You then begin working on a draft letter
12 in response to Agent Gillen by CVS, is that right?
13 A. Yes.
14 Q. Okay. And you're sharing this with
15 Pamela Hinkle, is that right?
16 A. Yes.
17 Q. And why were you sharing it with
18 Ms. Hinkle?
19 A. She had -- she was very involved in DEA
20 compliance for the entire network, and so I was
21 sharing it with her to see if everything looked
22 good.
23 Q. And you were also looking for --
24 MR. ELSNER: Can I get the next exhibit?

Page 196

1 BY MR. ELSNER:
2 Q. And did she give you edits and comments
3 to your letter?
4 A. I don't remember if she did
5 specifically.
6 Q. The following day, this is November 19
7 in the afternoon, of 2013, is that right, the
8 e-mail?
9 A. Are we still on this one?
10 Q. Yeah, Exhibit 38.
11 A. November 19? Is that --
12 Q. Right.
13 A. Yes.
14 Q. That's the date. Okay.
15 And the next day, we will mark as
16 Exhibit 39, you sent an e-mail to Dean Vanelli.
17 This is 58093.
18 (WHEREUPON, a certain document was
19 marked as CVS-Nicastro-039:
20 11/20/13 e-mail;
21 CVS-MDLT1-000058093.)
22 BY MR. ELSNER:
23 Q. At 7:27 p.m. Is that right?
24 A. Yes.

Page 197

1 Q. And the re line is "SOM SOP," correct?
2 And this is one of the items that the
3 DEA had requested in their audit, right?
4 A. Correct.
5 Q. Okay. And you write, "For the life of
6 me, I can't find the SOP for SOM. Can you send me
7 an electronic copy, please. I've been on the
8 logistics website, looked through hundreds of
9 e-mails, nothing. I'm surprised it isn't on our
10 website."
11 So, is it true that even with all the
12 problems you had with the written version of the
13 SOM policy and the standard operating procedure
14 years before, that in November of 2013, when
15 you're drafting this letter, you cannot locate an
16 electronic version of the SOM, is that right?
17 MR. HYNES: Objection to form. Go ahead.
18 BY THE WITNESS:
19 A. I couldn't find it. That doesn't mean
20 someone who is more computer savvy could find it.
21 We have many locations to look for SOPs and
22 different documents, and I went into -- all the
23 sites are kind of broke down, LP, regulatory, HR.
24 I went into a couple. I couldn't find it.

Page 198

1     I remember this and Dean produced it for
2  me.  I had a hard copy.  I just didn't have an
3  electronic copy that I could attach to the e-mail.
4  BY MR. ELSNER:
5     Q.  But you were the director of the
6  Indianapolis distribution center, right?
7     A.  I am, yes.
8     Q.  And you couldn't find an electronic
9  version when you were looking, is that right?
10    A.  I could not find it.
11    Q.  Okay.
12    MR. ELSNER:  Let me mark the next document as
13 the next exhibit.
14 BY THE WITNESS:
15    A.  But I did have a hard copy of it.
16 BY MR. ELSNER:
17    Q.  Right.  I'm going to show you that,
18 which is Exhibit 39 -- or 40.
19       (WHEREUPON, a certain document was
20          marked as CVS-Nicastro-040:
21          11/21/13 e-mail with attachment;
22          CVS-MDLT1-000076136 - 000076141.)
23 BY MR. ELSNER:
24    Q.  This is an e-mail from Pamela Hinkle

Page 199

1  dated November 21, 2013, and the subject is
2  "SOM process - 5 07 13," SOM -- and the attachment
3  is the "SOM Process."
4     Do you see that?
5     A.  Yes.
6     Q.  Okay.  And she attaches to you a
7  document which says, "Suspicious order monitoring
8  process," is that right?
9     A.  Yes.
10    Q.  Dated 5/17/2013?
11    A.  Um-hmm.
12    Q.  And she writes, "I don't know if this is
13 the final versions.  I'm going to keep looking."
14       Who is Pamela Hinkle at this time?  What
15 position did she hold at CVS?
16    A.  I'm not sure what her title was at this
17 point, but she was very involved with DEA
18 compliance, DEA relationships with all the
19 facilities.
20    Q.  But at this point in time she's not sure
21 whether this is the final version of the SOM or
22 not, correct?
23    MR. HYNES:  Objection to form.
24 BY THE WITNESS:

Page 200

1     A.  That's what she's saying.
2  BY MR. ELSNER:
3     Q.  And that's what you were trying to
4  confirm before sending it to the DEA, right?
5     A.  Yes.
6     Q.  So, at this point in time, you and Pam
7  Hinkle are not sure what the final version of the
8  SOM policy is under the standard operating
9  procedure.
10    MR. HYNES:  Objection to form, misstates the
11 testimony.
12 BY MR. ELSNER:
13    Q.  Is that right?
14    A.  We wanted to make sure we had the right,
15 the latest revision.
16    Q.  Exactly.
17    A.  We wouldn't want to send them one that
18 was, you know -- had been recently revised and
19 we're sending them an old copy.  We wanted to make
20 sure we're -- we're good.
21    Q.  Right.  At that point in time she wasn't
22 sure whether this was the final version or not,
23 correct?
24    A.  Correct.

Page 201

1     MR. HYNES:  Objection; asked and answered.
2  BY MR. ELSNER:
3     Q.  This is --
4     MR. ELSNER:  Actually, this may be a good time
5  for a break.
6     MR. HYNES:  Okay.
7     MR. ELSNER:  Why don't we take a quick break.
8     THE VIDEOGRAPHER:  We are going off the record
9  at 2:07.
10       (WHEREUPON, a recess was had
11          from 2:07 to 2:20 p.m.)
12    THE VIDEOGRAPHER:  We're back on the record at
13 2:20.
14 BY MR. ELSNER:
15    Q.  I'm going to show you Exhibit 41.
16       (WHEREUPON, a certain document was
17          marked as CVS-Nicastro-041:
18          11/21/13 e-mail;
19          CVS-MDLT1-000076127.)
20 BY MR. ELSNER:
21    Q.  This is an e-mail that you write at
22 10:40 a.m. to Pamela Hinkle related to the DEA
23 letter, and you write, "Final version I promise."
24       I guess she had read a few of your

Page 202

1 drafts, is that right?
2     A.   Yes.
3     Q.   And then you write, "I wish I had more
4 stop orders that went back further."
5         And here you're referring to stop orders
6 of controlled substances that were reported to the
7 DEA in addition to the ones you had on your list
8 that you were going to send them, correct?
9     A.   No.  What I meant with this is, this was
10 a monumental effort that we were going through with
11 the DEA and what would have made this effort go
12 away is if I would have just simply produced here's
13 a whole bunch of stores that we stopped.
14        And, so, if it was that simple and we
15 had all these extra stores we stopped, you know,
16 possibly Mr. Gillen would have been satisfied and I
17 could move on with my other work.
18    Q.   Because he would have -- because he
19 would have expected a large retail chain like CVS'
20 size to have stopped and reported more orders than
21 were stopped and reported, correct?
22        MR. HYNES:  Objection to form, calls for
23 speculation.  Go ahead.
24 BY THE WITNESS:

Page 203

1     A.   That's -- that was what Mr. Gillen
2 suggested many times.
3 BY MR. ELSNER:
4     Q.   And you believe that if you had more
5 stopped orders to show him, then he would have been
6 satisfied that you had a suspicious order
7 monitoring system in place that was robust,
8 correct?
9         MR. HYNES:  Objection to form.
10 BY THE WITNESS:
11    A.   To satisfy him.
12 BY MR. ELSNER:
13    Q.   I'm going to show you Exhibit 42.
14        (WHEREUPON, a certain document was
15         marked as CVS-Nicastro-042:
16         11/21/13 e-mail with attachments;
17         CVS-MDLT1-000000409 - 000000420.)
18 BY MR. ELSNER:
19    Q.   And this is a copy of the final letter
20 that you e-mailed to Agent Gillen with a cover
21 e-mail.
22        Do you see that?
23    A.   Yes.
24    Q.   And this is November 21, 2013, right?

Page 204

1     A.   Correct.
2     Q.   And you write, "Hello Dan.  I apologize
3 for all the attachments, but the information I've
4 included provides a clear strategy on how we manage
5 suspicious orders," and then it provides a list of
6 the various things that you were going to provide
7 him, correct?
8     A.   Yes.
9     Q.   And if you switch to the letter on the
10 second page, which is at 410, in the second
11 paragraph, you write, "In our" -- to Mr. Gillen,
12 "In our conversation on November 14," this is the
13 third sentence of the second paragraph, "you had
14 concerns about our SOM process, specifically
15 stating that you were going to report to your
16 program manager in Chicago that we have no
17 reporting structure in place."
18        Is that what you wrote?
19    A.   That's -- that's what I wrote because
20 that's what he said.
21    Q.   Because that's what he said in your
22 conference call on November 14 to you, correct?
23    A.   In our -- yes, yes.  I was thinking we
24 had that conversation during the audit, the

Page 205

1 meeting.
2         Can I verify that date real quick
3 from --
4     Q.   Well, whether it was on the 13th or the
5 14th, in the letter that's the conversation you are
6 referring to, right, is that call you had with him
7 where he expressed concern that you didn't have a
8 suspicious order monitoring program in place,
9 correct?
10    A.   Yes.
11    Q.   There was only that one call or were
12 there other calls like that between you and him
13 during this time period?
14    A.   We had many calls.  I couldn't tell you
15 what exactly was on each phone call.  But -- but we
16 did -- we had this conversation.
17    Q.   You had this conversation.  Okay.
18        How many calls did you have with Agent
19 Gillen before you sent this letter concerning the
20 SOM program and his -- and the DEA's concern about
21 CVS' SOM program?
22    A.   The only conversations I would have had
23 with him from the time of our audit would have been
24 from the time of our audit until this

Page 206

1 November 14th. I hadn't -- I hadn't met Mr. Gillen
2 before he came in for our audit in August.
3      Q.   And if you turn to the attachment, among
4 the attachments to the letter is a list of the stop
5 orders and the reports to the DEA. This is on 417,
6 correct?
7      A.   Yes.
8      Q.   Okay. And this is what you sent to
9 Agent Gillen in response to his request for a list
10 of all of the stop orders that CVS had made and
11 reports that it had made to the DEA, correct?
12      MR. HYNES: Objection to form.
13 BY THE WITNESS:
14      A.   That's correct.
15 BY MR. ELSNER:
16      Q.   Okay. And it lists seven suspicious
17 orders that were stopped, right?
18      A.   Yes, there are seven orders on this
19 document.
20      Q.   The following day, Agent Gillen writes a
21 letter to you. This is Exhibit 43.
22           (WHEREUPON, a certain document was
23           marked as CVS-Nicastro-043:
24           11/25/13 e-mail string;

Page 207

1           CVS-MDLT1-000000421 - 000000422.)
2 BY MR. ELSNER:
3      Q.   And he -- he sends an e-mail to you and
4 he thanks you for your responses.
5      Actually, let me have you turn to
6 page 422. The e-mail is on the very bottom of 421.
7 It's an e-mail he sends November 22, 2013.
8      MR. HYNES: Starts at the bottom.
9      MR. ELSNER: Starts at the bottom of the first
10 page.
11      MR. HYNES: And goes over.
12      THE WITNESS: Okay.
13 BY MR. ELSNER:
14      Q.   And then it says --
15      MR. ELSNER: It's actually a little bit lower,
16 Gina. It's at the bottom of that. Am I right
17 about that? On 421.
18      MR. HYNES: We got it. We're good.
19 BY MR. ELSNER:
20      Q.   And then on the 422 he asks, "We were
21 under the impression that sales of controlled
22 substances from your DC location in Indianapolis
23 were for approximately six states in the region but
24 you provided a list of four pharmacies that CVS had

Page 208

1 stopped shipments to in 2012 and 2013 for
2 California, Texas and Hawaii. Could you please
3 confirm that these shipments originated from your
4 CVS DC location. Also by 'stopped' does that mean
5 that no further orders were filled at these
6 pharmacies for controlled substances? Appreciate
7 the clarification."
8      Did I read that right?
9      A.   You did.
10      Q.   Okay. And that's what Agent Gillen
11 wrote to you after he received your letter,
12 correct?
13      A.   Correct.
14      Q.   And then you responded to that on
15 November 25, which is on page 421, and you write to
16 him in the second line, "No, those shipments did
17 not originate from the Indianapolis distribution
18 center." And then you write, "Our SOM algorithms
19 are the same algorithms for all the distributions
20 in the CVS chain."
21      Is that what you wrote?
22      A.   It is.
23      Q.   Okay. And, so, this attachment that we
24 were looking at of these seven stopped orders are

Page 209

1 seven stopped orders not from the Indianapolis
2 distribution center, correct?
3      A.   Correct.
4      Q.   These were all of the stopped orders for
5 all CVS distribution centers across the entire
6 country, right?
7      MR. HYNES: Objection to form.
8 BY THE WITNESS:
9      A.   Yes.
10 BY MR. ELSNER:
11      Q.   Okay. And you understood that it was
12 CVS' obligation to have a system in place to report
13 any and all suspicious orders to the DEA, is that
14 right?
15      A.   Yes.
16      Q.   And you had that responsibility at least
17 in 2006 when you received the Rannazzisi letter,
18 when CVS did?
19      A.   I don't recall receiving that letter.
20      Q.   But do you understand that CVS had that
21 responsibility from at least that point in time?
22      MR. HYNES: Objection to form.
23 BY THE WITNESS:
24      A.   No. I was not -- I was not aware of

Page 210

1  that -- that letter or that responsibility or that
2  specific responsibility in 2006.
3  BY MR. ELSNER:
4      Q.  Okay.  But you understand that his
5  letter is derived from the Controlled Substances
6  Act, correct?
7      A.  Yes.
8      MR. HYNES:  Objection to form.
9  BY MR. ELSNER:
10     Q.  And that was put in place in 1970,
11 correct?
12     A.  Yes.
13     Q.  Okay.
14     A.  But our DC in Somerset was not
15 distributing controlled substances from our
16 facility.
17     Q.  Okay.  But CVS was otherwise doing it,
18 just not out of Somerset, Pennsylvania, right?
19     A.  They were doing it out of other
20 facilities.
21     Q.  Right.  And the Indiana distribution
22 center is responsible for distributing controlled
23 substances into Summit County and Cuyahoga County
24 in Ohio, correct?

Page 211

1      MR. HYNES:  Objection.  Time frame.
2  BY MR. ELSNER:
3      Q.  From 2008 through 2014?
4      MR. HYNES:  Objection; asked and answered.
5  BY THE WITNESS:
6      A.  I'm not sure if it's -- it's whatever --
7  we -- Indianapolis did it from the date until
8  Chemung, New York took over pharmacy
9  responsibilities for Somerset.  So, that was, as I
10 mentioned, somewhere 2011, '12, '13, somewhere in
11 that time frame.  I just don't have the date in my
12 head.
13 BY MR. ELSNER:
14     Q.  But there were no suspicious orders
15 reported for sales of hydrocodone or other
16 controlled substances into stores in Ohio, is that
17 right?
18     MR. HYNES:  Objection to form.
19 BY THE WITNESS:
20     A.  That -- yes.
21     MR. ELSNER:  Let's see Exhibit 44.
22         (WHEREUPON, a certain document was
23         marked as CVS-Nicastro-044:
24         11/25/13 e-mail;

Page 212

1         CVS-MDLT1-000076135.)
2  BY MR. ELSNER:
3      Q.  This is Exhibit 44.  Agent Gillen writes
4  you in the afternoon of November 25, 2013 and he
5  writes, "Mark.  CVS Store No. 6880 ordered
6  1,888,600 dosage units of hydrocodone between
7  January 1st, 2012 through October 13" -- "through
8  October of 2013."
9         Correct?
10     A.  That's what he writes, yes.
11     Q.  "Of which 1,766,000 tablets of
12 hydrocodone were shipped from your facility.  This
13 pharmacy is located in" -- is it Vincennes?  Is
14 that how you pronounce it?
15     A.  Vincennes.
16     Q.  -- "Vincennes, Indiana with a population
17 of approximately 18,000 people."
18        Is that what he wrote?
19     A.  That's what he wrote.
20     Q.  He also identified a store in Columbus,
21 Indiana that had ordered a total of 2,012,400
22 tablets, of which your facility provided 1,756,300
23 tablets from January 1st, 2012 through October 13,
24 2013.  The population of Columbus, Indiana is

Page 213

1  approximately 45,000 people.  Is that what he
2  writes?
3      A.  Yes.  That's what he writes.
4      Q.  Okay.  And so you understood at least at
5  this point in time that the DEA was concerned about
6  large shipments of hydrocodone products to CVS
7  pharmacies through your center, is that right?
8      MR. HYNES:  Objection to form.
9  BY THE WITNESS:
10     A.  Correct.  He was stating that here, that
11 he wanted -- he was looking -- I believe he was
12 looking for more information.  Yeah, he was looking
13 for if we -- if we took into account population.
14 BY MR. ELSNER:
15     Q.  And did you have access to data that
16 would identify for you the amount of tablets which
17 were being shipped to those specific pharmacies in
18 these cities in Indiana?
19     A.  I did not have it personally for myself
20 to review.
21     Q.  Who in CVS had access to that data?
22     A.  I don't know.  I believe it would have
23 been our corporate, a position in our corporate
24 office.

Page 214

1    Q.   So, but as the head of the distribution
2  center for Indianapolis which provided these
3  shipments, did you know that this volume of
4  hydrocodone products and tablets were being shipped
5  to these CVS stores in Indiana?
6       MR. HYNES:  I'm going to object on the basis
7  of Discovery Ruling 3.  You may answer.
8  BY THE WITNESS:
9       A.   I am not aware, I was not aware of the
10  specific number of pills that are being distributed
11  to a store.
12  BY MR. ELSNER:
13       Q.   Okay.  When you read this e-mail from
14  Agent Gillen, did these numbers concern you as the
15  head of the distribution center for CVS in
16  Indianapolis?
17       A.   I shared this information with our
18  corporate team for them to do some analysis and
19  hopefully provide some more information as to why
20  those numbers would look like they do.
21       Q.   But were you concerned as the head of
22  the distribution center for CVS in Indianapolis at
23  the volume of hydrocodone products that were being
24  shipped to these two CVS stores in Indiana?

Page 215

1       MR. HYNES:  Same objection.  Go ahead.
2  BY THE WITNESS:
3       A.   It would be my responsibility to make
4  sure that I escalated this to the proper folks so
5  that they would be able to do more digging, more
6  due diligence to understand that these are
7  acceptable levels, if they're high or if they're --
8  you know, or if that's -- or if they're correct.
9  BY MR. ELSNER:
10       Q.   I understand that you asked others to
11  look into it, but I'm asking whether you personally
12  had a concern at the volume of these hydrocodone
13  pills that were being shipped into these stores in
14  Indiana when you learned of this by this e-mail by
15  Agent Gillen.
16       MR. HYNES:  Same objection.
17  BY THE WITNESS:
18       A.   If the DEA has a concern, then I would
19  have a concern.  So, if they're asking a question,
20  then I am going to follow up and find out, you
21  know, is their concern valid or is it our normal
22  practice, are these stores high volume, why are the
23  reasons that these dosage amounts are being shipped
24  into those stores.

Page 216

1  BY MR. ELSNER:
2       Q.   And you understand that the concern that
3  the DEA had was that it's possible that these pills
4  are being diverted, is that right?
5       MR. HYNES:  Objection; calls for speculation.
6  Go ahead.
7  BY THE WITNESS:
8       A.   Yeah, I believe DEA's concern over all
9  this is diversion.  They are not concerned about
10  someone just getting their prescription filled.
11  They are more worried about, you know, folks that
12  aren't getting their prescriptions filled legally
13  or that folks are getting the prescriptions and
14  selling them to other folks.  So...
15  BY MR. ELSNER:
16       Q.   And they were particularly worried
17  during this period in the height of the opioid
18  epidemic, correct?
19       MR. HYNES:  Objection to form.
20  BY THE WITNESS:
21       A.   I would -- my speculation is I would
22  expect that they are -- they'll always be concerned
23  about diversion and not necessarily just during
24  this time period.

Page 217

1  BY MR. ELSNER:
2       Q.   The e-mail indicates that, for instance,
3  with the first CVS store that 1. -- basically
4  1.7 million tablets of hydrocodone were shipped
5  from your facility, meaning the Indianapolis
6  distribution center, of the 1.8 million total
7  tablets that that CVS store received.
8       Did you understand that CVS stores at
9  this period of time could order tablets from --
10  from someone other than a CVS distributor?
11       MR. HYNES:  I'm going to object based on the
12  geographic scope of Discovery Ruling 3.  You may
13  answer.
14  BY THE WITNESS:
15       A.   I understand that stores have the
16  ability to order drugs from outside vendors.
17  BY MR. ELSNER:
18       Q.   And you understand -- did you understand
19  that at this point in time in 2013 CVS didn't have
20  a system in place to track purchases made by those
21  CVS stores from other vendors meaning vendors other
22  than the CVS distribution centers?
23       MR. HYNES:  Objection to form.
24  BY THE WITNESS:

Page 218

1  A.  My only understanding of that is I knew
2 that our new system was going to be able to capture
3 OV and that the outside vendors were also required
4 to carry or to have an SOM process in place so that
5 they could know their customer as well.
6 BY MR. ELSNER:
7  Q.  Were you aware that CVS had the -- I'm
8 sorry.  Let me strike that and start over.
9       Were you aware that CVS Indiana
10 distribution center had shipped over 21 million
11 dosage units of hydrocodone combination products to
12 CVS stores in Summit County from 2006 to 2014?
13  MR. HYNES:  Objection to form.
14 BY THE WITNESS:
15  A.  No, I'm not aware of the numbers.
16 BY MR. ELSNER:
17  Q.  Were you aware that CVS Indiana shipped
18 nearly 35 million dosage units of hydrocodone
19 combination products to CVS stores in Cuyahoga
20 County from 2006 through 2014?
21  MR. HYNES:  Objection; form.
22 BY THE WITNESS:
23  A.  No.
24 BY MR. ELSNER:

Page 219

1  Q.  I want to show you a chart we put
2 together.  This is Exhibit 45.
3       (WHEREUPON, a certain document was
4        marked as CVS-Nicastro-045:  Graph,
5        "Annual CVS Hydrocodone Purchase
6        Benchmarks - Dosage Units (2006 -
7        2014)"; no Bates numbers.)
8 BY MR. ELSNER:
9  Q.  This chart depicts in yellow the average
10 hydrocodone purchases -- sorry -- the average
11 hydrocodone purchases by year.
12  MR. HYNES:  Combination.
13 BY MR. ELSNER:
14  Q.  Of combination products by year from
15 2006 through 2014, which is the orange lines.  Do
16 you see those?
17  MR. HYNES:  Hold on one second.  I'm just
18 going to object because we don't have the data
19 underlying this.  I will make a standing objection
20 to this exhibit.  But you're saying beyond that you
21 are saying the orange is hydrocodone combination
22 products.
23  MR. ELSNER:  This is the average hydrocodone
24 combination products.

Page 220

1  MR. HYNES:  The orange.
2  MR. ELSNER:  The orange.  Sold annually by
3 pharmacies in Ohio from 2006 through 2014.
4 BY MR. ELSNER:
5  Q.  Did you know that these were the average
6 purchases of hydrocodone combination products by
7 all pharmacies in Ohio during this period of time?
8  MR. HYNES:  Same objection to the exhibit.  Go
9 ahead.
10 BY THE WITNESS:
11  A.  No.
12 BY MR. ELSNER:
13  Q.  The red line, the first of the red
14 lines, depicts the number of hydrocodone products
15 that were purchased from the Indiana distribution
16 center that you directed by year from 2006 through
17 2014.
18       If you look, the very first year in
19 2006, the CVS on Brook Park Road had purchased
20 349,200 dosage units of hydrocodone combination
21 products from your distribution center.
22       Did you know the difference between the
23 Brook Park Road purchases of hydrocodone
24 combination products from CVS Indiana in 2006

Page 221

1 compared to the average in Ohio?
2  MR. HYNES:  Objection to the form.
3 BY THE WITNESS:
4  A.  I did not have personal knowledge, no.
5 BY MR. ELSNER:
6  Q.  Does this surprise you when you look at
7 the range difference between what the average was
8 for a pharmacy in Ohio versus what the CVS Pharmacy
9 in Brook Park Road was ordering?
10  A.  I have no information about these
11 stores.  I don't know what kind of volume stores
12 they are.  I don't know who these other -- these
13 averages over here represent, what companies those
14 represent.  I don't know the number of
15 prescriptions these stores move.  I don't know if
16 it's next to a hospital.  I don't have any data to
17 suggest if these are excessive or not.
18  Q.  If you look at 2012, for instance, the
19 average purchases of hydrocodone combination
20 products from all pharmacies in Ohio in 2012 was
21 98,370 dosage units.
22       Do you see that, in 2012, the orange
23 line?
24  A.  Yes.

Page 222

1    Q.   And do you see that the CVS Brook Park
2  Road pharmacy had purchased from your distribution
3  center nearly over four times that amount, 473,380
4  dosage units of hydrocodone combination products?
5       Do you see that?
6    A.   I do.
7    Q.   Does it surprise you that one of your
8  CVS stores that you were distributing to was
9  purchasing nearly four times the average of other
10 pharmacies in Ohio?
11      MR. HYNES:  Objection to form.
12 BY THE WITNESS:
13   A.   I would have to go with my last answer.
14 Without having statistics for those stores, their
15 location.  You know, the Ohio average, just my
16 curiosity, that Ohio average includes CVS as their
17 average?
18 BY MR. ELSNER:
19   Q.   Yes, it does.
20   A.   But I -- you know, I don't have any data
21 to suggest that's excessive or not.
22   Q.   Was there ever an internal investigation
23 at CVS that you're aware of related to the large
24 purchases of these hydrocodone combination products

Page 223

1  by the CVS store in Brook Park Road and the CVS
2  road on East Market Street depicted in this
3  exhibit?
4    A.   I am not aware of that.
5    Q.   It's true, is it not, that the CVS
6  distribution center in Indiana never notified the
7  DEA or stopped any orders to these two CVS stores
8  on Brook Park Road or in East Market Street during
9  this period, is that right?
10      MR. HYNES:  Objection; calls for speculation.
11 BY THE WITNESS:
12   A.   I'm -- I -- without reviewing the data,
13 I couldn't tell you if we reviewed this store or --
14 yeah, I wouldn't know if we restored this store or
15 not.
16 BY MR. ELSNER:
17   Q.   My question was whether you ever
18 notified the DEA and stopped any orders to these
19 two CVS stores.
20      MR. HYNES:  Same objection.
21 BY THE WITNESS:
22   A.   Not to my recollection.
23 BY MR. ELSNER:
24   Q.   And it's not included in the chart that

Page 224

1  you provided to Agent Gillen when he asked,
2  correct?
3    A.   Correct.
4    Q.   Did you ever visit any of these CVS
5  stores, the Brook Park Road store or the East
6  Market Street store?
7    A.   I did not personally visit these stores.
8    Q.   Did anyone in the Indianapolis
9  distribution center, to your knowledge, visit these
10 stores?
11   A.   Not that I'm aware of.  If they had
12 received a visit from the field, field loss
13 prevention or pharmacy ops, that would have been
14 outside my jurisdiction.
15   Q.   Who would have conducted that
16 investigation if it had been done?
17   A.   I don't know.  It would have been -- I
18 don't know.  Regional -- the field LP would have
19 been involved with that.  Who specifically, I don't
20 know who the -- who the field LP rep is for that
21 area or director.
22   Q.   And is that someone employed by
23 CVS Pharmacy?
24   A.   It would be, yes.

Page 225

1    Q.   Did you ever provide a response either
2  by phone or in writing to Agent Gillen related to
3  his concern about these two CVS stores in Indiana
4  that he inquired about?
5       MR. HYNES:  That's Exhibit 44?
6       MR. ELSNER:  Yes.
7  BY THE WITNESS:
8    A.   I -- I don't know.  I don't remember the
9  response, but I -- yeah, I'm not sure.
10 BY MR. ELSNER:
11   Q.   Do you know whether following Agent
12 Gillen's e-mail concerning the large volume orders
13 for these particular stores, whether CVS conducted
14 an investigation of other stores that were
15 receiving large shipments of hydrocodone
16 combination products?
17   A.   That would have been outside of my realm
18 of responsibility.
19   Q.   Well, Agent Gillen wrote this letter to
20 you, correct, this e-mail to you?
21   A.   Yes.
22   Q.   Okay.  And he expressed his concern.
23 So, did you ever ask anyone in CVS Pharmacy whether
24 they would conduct an investigation like that to

Page 226

1 determine whether there were other stores like
2 these that were of concern?
3     MR. HYNES: Objection to form.
4 BY THE WITNESS:
5     A. I don't remember what I did with that,
6 but I am pretty confident I would have forwarded
7 that to the folks at corporate to determine what,
8 you know, at least formulate a response for Dan
9 and to be able to answer his question. But they
10 would have done the research and the investigation
11 for those stores.
12 BY MR. ELSNER:
13     Q. Did you -- I'm sorry.
14     A. Go ahead. I'm sorry.
15     Q. Did you yourself inquire whether an
16 investigation had been done and to determine
17 whether an investigation had been done?
18     A. I don't believe so, but had I forwarded
19 that information to the group, I would think we
20 would have had more conversations around those
21 stores.
22     Q. Did you have conference calls concerning
23 those stores?
24     A. I don't remember them if we did.

Page 227

1     Q. Did you visit those two stores in
2 Indiana after you got this e-mail from Agent
3 Gillen?
4     A. I did not.
5     Q. Did you ask anyone on your -- on your
6 team in the distribution center in Indiana to
7 conduct a visit?
8     A. No, I did not.
9     MR. ELSNER: I'm going to mark this next
10 document as Exhibit 46.
11         (WHEREUPON, a certain document was
12         marked as CVS-Nicastro-046:
13         5/15/14 e-mail; CVS-MDLT1-000022230
14         - 000022231.)
15 BY MR. ELSNER:
16     Q. It's CVS 22230. This is an e-mail that
17 you sent to William Jusko dated May 15, 2014,
18 correct?
19     A. Yes.
20     Q. And you write, "DEA investigators Dan
21 Gillen and Andrew Ratcliffe set up our closing
22 meeting for today with Betsy Ferguson," and you
23 write, "Betsy was here as well as Pam Hinkle."
24 Correct?

Page 228

1     A. Correct.
2     Q. And, so, this is a report to him on the
3 closing meeting with the DEA concerning their 2013
4 audit, correct?
5     A. Yes.
6     Q. Okay. And there were four infractions
7 that you discussed in the beginning of your e-mail
8 and then you get to No. 5, which is in all caps,
9 correct?
10     A. Correct.
11     Q. And No. 5 related to the DEA's concern
12 and finding that there's a failure to maintain a
13 SOM program at CVS, correct?
14     A. That is correct.
15     Q. Okay. And you write that "Dan Gillen
16 recited the exact same thing he's been saying since
17 day one. They see a lot of pills going through CVS
18 in small towns and it has to be excessive, yet he
19 has never seen a report cross his desk from CVS
20 about a suspicious order in the three years that he
21 has been here."
22         Is that what he said during the closing
23 meeting?
24     A. That's what he said.

Page 229

1     Q. Okay. And then you write, "Betsy did
2 the talking and was very professional and
3 friendly."
4         This is Betsy Ferguson, correct?
5     A. Yes.
6     Q. And she's a lawyer with CVS, right?
7     A. Yes.
8     Q. And she wrote -- and you wrote, "Dan
9 finally pushed Betsy's button and the gloves came
10 off."
11         Is that what you wrote?
12     A. I did write that.
13     Q. And that refers to Dan Gillen pushing
14 Betsy Ferguson's buttons, is that right?
15     A. Yes. I was trying to describe to my
16 boss the mood of the meeting.
17     Q. And what was it that Dan said that
18 pushed Betsy's button?
19     A. I -- I don't remember.
20     Q. Okay. If you see in the next paragraph,
21 it reads, "Betsy made it very clear that a letter
22 of admonishment is one thing. But anything other
23 than that and she wanted an opportunity to do a
24 presentation to his boss," meaning Dan Gillen's

Page 230

1  boss, right?
2      A.  Yes.
3      Q.  "And her boss about what we do with
4  SOM."
5          So, she was basically in the meeting
6  threatening Dan Gillen that if it was anything more
7  than a letter of admonishment, then she wanted a
8  meeting with his boss, right?
9      MR. HYNES:  Objection to form.
10 BY THE WITNESS:
11     A.  It wasn't so much a threat.  I mean, it
12 was still a very professional meeting.  But she was
13 just stating our stance on, you know, what we felt
14 about SOM and knowing the history with -- knowing a
15 lot more about these processes than I do, she was
16 stating some history and what we would expect if we
17 were to move forward with anything more than a
18 letter of admonishment.
19 BY MR. ELSNER:
20     Q.  So, Betsy Ferguson in the legal
21 department knew more about the SOM program than you
22 did as the director of the Indianapolis
23 distribution center.  Is that what you said?
24     A.  No, that's not what I said.  What I'm

Page 231

1  saying is she -- you know, when you start talking
2  about courts and districts and what's happened with
3  other companies, I don't have any legal knowledge
4  to what all that means.  That's her job.
5          So, she was explaining based off history
6  that this is some of the expectations we would
7  have.
8      Q.  Okay.  And in addition to if there is
9  anything more than a letter of admonishment meeting
10 with his boss, she wrote or she said, as you wrote,
11 that "Anything more than that and we'll meet in DC
12 courts just like Walgreens did."
13         Is that what she said?
14     A.  Yes.
15     Q.  So, if you -- if you do anything more
16 than a letter of admonishment, then she threatened
17 that she was going to set up a meeting with Dan
18 Gillen's boss and anything more than that, she was
19 going to take the DEA to court on behalf of CVS
20 like Walgreens did, correct?
21     MR. HYNES:  Objection to form.
22 BY THE WITNESS:
23     A.  Yes, I believe that's what she was
24 suggesting.

Page 232

1  BY MR. ELSNER:
2      Q.  And then she writes, "She was very
3  pointed about why" -- then she says.  I'm sorry.
4  "She was very pointed about why the DCs shouldn't
5  see many suspicious orders because all of the
6  preemptive work that's done at the pharmacy,
7  pharmacy ops, interviewing doctors, et cetera."
8          Is that what she said?
9      A.  She did.
10     Q.  Okay.  And then in the last sentence or
11 the -- I think it's the last.  It's the
12 second-to-last sentence.
13         You wrote, "Dan talked specifically
14 about a store in Columbus, Indiana and she finished
15 his sentences with the doctors that were
16 interviewed, the patients were all local, the
17 clinics were legitimate and the patients were
18 legitimately in pain."
19         Is that what she said?
20     A.  Where is that?
21     MR. HYNES:  You skipped some sentences.
22 BY MR. ELSNER:
23     Q.  It's the second-to-last sentence of the
24 first paragraph.

Page 233

1      A.  Okay.  All right.
2      MR. HYNES:  Sorry about that.
3      MR. ELSNER:  No problem.
4  BY MR. ELSNER:
5      Q.  Do you see where I'm at?
6      A.  Okay.  Got it.  Okay.  Yes.  She did
7  state that.
8      Q.  How did Betsy Ferguson determine that
9  the patients who received hydrocodone pills from
10 the CVS store in Columbus, Indiana were
11 legitimately in pain?
12     MR. HYNES:  Objection; calls for speculation.
13 Go ahead.
14 BY THE WITNESS:
15     A.  That -- her statement suggests to me
16 that we did an investigation into this store and
17 determined this information.
18 BY MR. ELSNER:
19     Q.  But how would she determine that the
20 patients were legitimately in pain?  Did she
21 interview the patients?
22     MR. HYNES:  Same objection.
23 BY THE WITNESS:
24     A.  I -- yeah, I don't know how she came up

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 with that.
2 BY MR. ELSNER:
3    Q.   Is there any way to do it other than to
4 interview the patient?
5    MR. HYNES:  Same objection.
6 BY MR. ELSNER:
7    Q.   She didn't really know the patients were
8 in pain or not, right?
9    MR. HYNES:  Same objection.
10 BY THE WITNESS:
11    A.   I don't know what she knew.  I don't
12 know about what -- what came of the investigation
13 or how deep the investigation went.  So, I couldn't
14 speak to where she had her knowledge from or how
15 she gained her knowledge.
16 BY MR. ELSNER:
17    Q.   She then says that she would have
18 prescribed Tylenol but the doctor prescribed
19 hydrocodone and that was the issue?
20    A.   She said perhaps she would have
21 prescribed Tylenol where a doctor is prescribing
22 hydrocodone.
23    Q.   But, in fact, the pharmacist has a
24 corresponding responsibility to the physician to

Page 235

1 ensure that the medicine prescribed is for a
2 legitimate medical need, right?
3    MR. HYNES:  Objection to form.  Go ahead.
4 BY THE WITNESS:
5    A.   Yeah, I really can't speak to what the
6 stores, you know, what the procedures are in the
7 stores and what a pharmacist does and doesn't do
8 and the data that they have to determine, you know,
9 bad scripts or bad doctors or bad patients.  I
10 don't have that information provided to me.
11 BY MR. ELSNER:
12    Q.   But Betsy Ferguson said that the reason
13 that there were so few suspicious orders was
14 because the pharmacy operations were so strong,
15 right?
16    A.   She does state that.
17    Q.   But you --
18    A.   I just -- I'm sorry.  I can't speak to
19 the pharmacy operations and what all they have in
20 place.
21       I know when we were going through this
22 process and were talking about this process, there
23 were a lot of people that could get involved very
24 quickly from regional managers to pharmacy

Page 236

1 supervisors, loss prevention, you know, a lot of
2 field effort.
3       And as we went through this process with
4 the DEA, I learned that there was a lot of activity
5 in the field, a lot more than I was aware of as far
6 as their due diligence and what they were doing.
7    Q.   But you as the director for the
8 distribution center in Indianapolis were unaware of
9 the procedures in place at the pharmacies to
10 prevent diversion.  Is that what you're saying?
11    A.   Yes.
12    Q.   That wasn't part of the training that
13 you underwent with CVS?
14    A.   The training that I underwent?
15    Q.   You didn't receive any training from CVS
16 on pharmacist's responsibilities to prevent
17 diversion?
18    A.   Only at a very high level, that they
19 have programs in place.  But no, I would not have
20 been trained on their procedures.
21    Q.   Do you agree that pharmacists have a
22 responsibility prior to dispensing any controlled
23 substance like an opioid to determine whether the
24 prescription's been issued for a legitimate medical

Page 237

1 purpose?
2    MR. HYNES:  Objection; calls for a legal
3 conclusion.
4 BY THE WITNESS:
5    A.   I understand that there are steps and
6 processes they have in place to determine if
7 prescriptions are valid.
8 BY MR. ELSNER:
9    Q.   And you understand that if a -- that if
10 a pharmacist thinks that a prescription should be
11 given only for Tylenol but the prescription is
12 actually written for hydrocodone, that that
13 pharmacist is not fulfilling its medical
14 responsibility, correct?
15    MR. HYNES:  Objection to form.  Go ahead.
16 BY THE WITNESS:
17    A.   I'm not sure what you're asking me.
18 BY MR. ELSNER:
19    Q.   Well, Betsy Ferguson says, "Look, I
20 might have just prescribed Tylenol but that doctor
21 prescribed hydrocodone."
22       Hydrocodone is a Schedule II --
23 Schedule III narcotic at this point in time,
24 correct?

Page 238

1　　A.　Correct.

2　　Q.　And it was later rescheduled --

3　　MR. HYNES:　Combination.

4　BY MR. ELSNER:

5　　Q.　Combination.　And it was later

6　rescheduled to Schedule II, correct?

7　　A.　Yes.

8　　Q.　Okay.　And part of the reason for that,

9　it's highly addictive.　Would you agree with that?

10　　A.　I don't know the -- I'm not a chemist.

11　I'm not a biologist.　I'm not a pharmacist.　I

12　can't speak to the addictive qualities or -- of the

13　drugs, but...

14　　　　So, would I agree with her or not?　I

15　can't -- I can't agree that it's a highly addictive

16　drug.　I've taken it once for a medical procedure.

17　My wife has taken it for multiple procedures and we

18　didn't become addicted.　That's all I can tell you

19　about hydrocodone.

20　　Q.　But your procedure manual at CVS lists

21　it as -- at the time as a Schedule III drug,

22　correct?

23　　A.　Yes.

24　　Q.　Okay.　And certain procedures were put

Page 239

1　in place to prevent that drug from being diverted,

2　correct?

3　　A.　Yes.

4　　Q.　Okay.　And, so, what Betsy Ferguson is

5　saying here is that she might just prescribe

6　Tylenol, Tylenol is not a Schedule II or III

7　narcotic, correct?

8　　A.　Correct.

9　　Q.　But this physician happened to prescribe

10　a Schedule III narcotic, hydrocodone combination

11　product.　But this statement is not true, is it?

12　　　　If pharmacists has a corresponding

13　responsibility meaning that if the pharmacist

14　believes that the prescription being provided for

15　that patient is not for legitimate medical need, it

16　should not be filled.　Do you understand that?

17　　MR. HYNES:　Objection to form.　There is

18　multiple questions in there.　Go ahead.

19　BY THE WITNESS:

20　　A.　I'm not a pharmacist, so I don't feel

21　qualified to answer the questions for what a

22　pharmacist's responsibilities are.

23　BY MR. ELSNER:

24　　Q.　So, you don't know one way or the other

Page 240

1　whether the statement that Betsy Ferguson made to

2　the DEA here concerning Tylenol and hydrocodone is

3　correct or not?

4　　A.　I think it's -- she is suggesting an

5　opinion, you know, where during a conversation

6　where she says, "I might have given a patient

7　Tylenol where the doctor prescribed hydrocodone."

8　It's just part of a conversation.

9　　Q.　Was -- Ms. Ferguson says that the

10　doctors were all interviewed and the clinics were

11　legitimate.

12　　　　Did CVS actually go and interview every

13　single doctor that prescribed a hydrocodone product

14　through the -- this particular CVS store in

15　Indiana?

16　　A.　I don't have any knowledge of what the

17　investigative process was for that location.

18　　Q.　But that's what you wrote, right?

19　　MR. HYNES:　Objection; form.

20　BY THE WITNESS:

21　　A.　Yeah, I wrote --

22　BY MR. ELSNER:

23　　Q.　That's what Betty (sic) Ferguson said

24　that she did, right?

Page 241

1　　A.　Yes.　I wrote what Betsy discussed with

2　Dan.　But I don't know the details of what we did

3　and how we did it.

4　　Q.　Was that investigation done before the

5　DEA audit began or after it began?

6　　MR. HYNES:　Objection to form, misstates the

7　record.

8　BY THE WITNESS:

9　　A.　I wouldn't know.　I don't know.

10　BY MR. ELSNER:

11　　Q.　Do you know whether an investigation was

12　actually done at all?

13　　A.　I don't.　I don't know the -- I don't

14　know any facts of any investigation for the store.

15　　Q.　But you understand that the

16　responsibility lies with the distribution center in

17　Indianapolis concerning the pills that you

18　distributed, correct?

19　　MR. HYNES:　Objection to form.

20　BY THE WITNESS:

21　　A.　I understand we have a suspicious order

22　monitoring process and we're required to know our

23　customer.

24　BY MR. ELSNER:

Page 242

1    Q.   And you're required to stop orders that
2  are suspicious and report them to the DEA, correct?
3    A.   Yes.
4    Q.   This is Exhibit 47.  I'm going to come
5  back to this other exhibit, so you can kind of
6  leave it close.
7    MR. HYNES:  46.
8    MR. ELSNER:  Is it 46 or 47?
9    MR. HYNES:  No, you're going to come back to
10  46.
11    MR. ELSNER:  I'm going to come back to 46,
12  yes.
13        (WHEREUPON, a certain document was
14        marked as CVS-Nicastro-047: 3/5/14
15        e-mail string with attachment; and
16        CVS-MDLT1-000076100 - 000076107.)
17  BY MR. ELSNER:
18    Q.   47 is -- is an e-mail from William Jusko
19  to you dated March 5, 2014, and it appears to be an
20  end of the year review.  Is that what this is?
21    A.   Yes.
22    Q.   Okay.  And it has a section on goals and
23  progress and results, and on page 4 of 7, which is
24  76104, it lists "Manager's Progress and Results."

Page 243

1      Do you see that?
2    A.   The right side of the page.
3    Q.   Yes.  I think so.  It starts on the
4  bottom and then --
5    A.   Oh, okay.  "Manager's comments on CVS
6  values"?
7    Q.   This is on page 4 of 7.
8    A.   Starts with "LMS review resulted."
9    Q.   Yes.
10    MR. HYNES:  Right-hand column.
11  BY MR. ELSNER:
12    Q.   In the right-hand column.
13    A.   Yes.
14    Q.   I just want to understand first.  Is
15  this you writing in the right-hand column?
16    A.   It is.
17    Q.   It is.  Okay.  And this is your
18  evaluation of -- for yourself or for Mr. Jusko?
19    A.   This is me telling Mr. Jusko about my
20  year.
21    Q.   Okay.  And you reported -- did you
22  report to him at this point in time?
23    A.   I did.
24    Q.   Okay.  And do you do these every year?

Page 244

1    A.   Yes, twice a year.
2    Q.   Twice a year.  So, and this is in March,
3  and you write that the "SOM became quite an
4  interesting project.  I took on the managerial
5  responsibility just as the spotlight was turned on
6  the State of Indiana by the DEA."
7      Correct?
8    A.   I did write that, yes.
9    Q.   So, what does that mean you took on the
10  managerial responsibility?
11    A.   Well, if this process, before it came
12  to -- well, it was in Knoxville and it came to
13  Indianapolis, and at this time when we lost our SOM
14  manager and we were looking for another SOM
15  manager, then made the decision to move the process
16  to corporate, and then the DEA came in and had a
17  lot of questions obviously about our DEA -- our
18  suspicious order monitoring.
19      So, that's -- yeah, it took on a lot
20  of -- a lot of responsibility and I was making sure
21  that Kelly and Shauna and Gary and the DEA
22  compliance team were all aligned and make sure we
23  were all, you know, doing what we need to do.
24    Q.   Did you review and were you managing

Page 245

1  their review of the suspicious order process?
2    A.   No, I was not.  No.  I didn't actually
3  take on the role of suspicious order manager.  What
4  I was stating to him is this is a role no other
5  director had.
6    Q.   In the whole country, right?
7    A.   Yeah, in the other distribution centers.
8  This is not a function they had to do.  So I'm just
9  trying to highlight to him that I took on a lot of
10  responsibility unique to anywhere else and I'm
11  trying to toot my horn.
12    Q.   And you wrote that "the DEA has grave
13  concerns about the dispensing habits of our
14  pharmacies and is trying to pin that on the DC
15  distribution habits."  Correct?
16    A.   Yes.
17    Q.   So, what you were writing in your review
18  was not that the -- that there were concerns at the
19  distribution center, but there were actually
20  problems at the pharmacy level.  Is that what you
21  were writing?
22    A.   Well, I wrote that because I felt
23  confident in the processes that we had, starting
24  with our pickers, which that process never changed

Page 246

1  and is still in place today.  I was confident in
2  the job that the SOM team was doing even through
3  the changes, the multiple changes that we had with
4  staffing and the changes that were coming into play
5  in 2014.
6       So, I felt good about what we were doing
7  and, you know, if there were issues at the
8  pharmacies, you know, Mr. Gillen, every time we --
9  not every time, but when we talked, he was all
10  about, "Do you know about this store in Anderson,
11  Indiana?  Do you know about this store in Columbus,
12  Indiana?  Do you know about this store?"  So, you
13  know, it was all about what's happening at the
14  store level.
15      But I still maintain and I still share
16  my confidence that we were doing everything we
17  could to mitigate any issues coming out of the
18  distribution center for our control drugs.  That's
19  the point I was making there.
20      Q.   But you believed that the DEA's concern
21  was about the dispensing habit of the pharmacies,
22  that's what you wrote, correct?
23      A.   Yes.
24      MR. HYNES:  Object.

Page 247

1  BY MR. ELSNER:
2       Q.   And that you were -- and that the DEA
3  was trying to pin those failures on the
4  distribution center, is that right?
5       A.   Yes.  My opinion of that was they were
6  concerned about diversion and the, you know -- so,
7  clearly that is the distribution center's
8  responsibility, and they were coming after us for
9  what they felt were issues with the pharmacies.
10      Q.   And then you write that "The second half
11  of the year was dominated with my involvement in
12  securing more space for SOM, hiring a new staff,
13  then ultimately planning for transition of the
14  process to corporate while my staff quit and trying
15  to keep the DEA at bay."
16      Is that what you wrote?
17      A.   It is.
18      Q.   And then you wrote, "In my tenure, we've
19  stopped shipments to more CVS pharmacies than all
20  the previous years of the program."  Is that what
21  you wrote?
22      A.   I did.
23      Q.   What shipments did you stop during your
24  tenure to CVS pharmacies?

Page 248

1       A.   If we went back to the exhibit that had
2  the stores that were listed.
3       Q.   The one that you sent to Agent Gillen?
4       A.   Yes.
5       Q.   The seven stores?
6       A.   Yes.  I believe the majority of those
7  stores were stopped while that process was in
8  Indianapolis.
9       Q.   In 2013?
10      A.   The period of 2012 and 2013.
11      Q.   2012 and '13?
12      A.   Yes.
13      Q.   So, all of those stop orders occurred
14  while the Indianapolis distribution center was
15  charged with reviewing the SOM program and the IRR
16  reports, correct?
17      A.   I believe that -- I don't know if they
18  all were stopped during my time, but I believe I
19  was stating that most of them were stopped during
20  my time.
21      Q.   Okay.
22      A.   More so than before we took it over.
23      Q.   And how many were stopped before you
24  took over?

Page 249

1       MR. HYNES:  Objection; calls for speculation.
2  BY THE WITNESS:
3       A.   I'm not sure.
4  BY MR. ELSNER:
5       Q.   Well, how did you compare what you
6  stopped versus what had been stopped before?
7       A.   We would need to take a look at that, go
8  back and take a look at the list.
9       Q.   Okay.
10      A.   I don't know if the dates were on there.
11      Q.   Let's do that.
12      A.   There we go.  Thank you.
13      Q.   So, it appears the first one was
14  February 29, 2012 and the last one was October 7,
15  2013.  Is that right?
16      A.   So, the -- the first stop would not have
17  been done on my watch, if I'm getting the dates
18  right.
19      Q.   Okay.
20      A.   But the November 2012 and the
21  October 2013s would have been stopped while that
22  process was in Indianapolis.
23      Q.   Okay.  So, what you -- so, from
24  November -- well, from November of 2012 through

Page 250

1 October of 2013, you made six stop orders, correct?
2    A.   Yes.
3    Q.   And that was more than any other CVS
4 distribution center had stopped orders previously
5 at CVS, correct?
6    A.   Well, I don't have any data that would
7 tell me what orders were stopped with suspicious
8 order monitoring before Knoxville, what
9 Mr. Mortelliti did at Lumberton, the process before
10 that, the -- frankly, even what was happening in
11 Knoxville.
12       I know from that one until this period,
13 those were the ones I was familiar with.  If there
14 were any that were stopped previous to that time, I
15 wouldn't have the specifics on that.
16    Q.   And what you were writing here is that
17 you were trying to keep the DEA at bay while your
18 staff quit, meaning that you had insufficient staff
19 at the time that you were trying to fill at the
20 same time that the DEA was conducting its audit and
21 investigation?
22    A.   No.  I didn't have insufficient staff.
23 It was just the staff was volatile.  Kelly was
24 looking to leave.  The SOM manager had quit.  We

Page 251

1 were ready to replace him, and then we decided to
2 move the process.  So, there was just volatility.
3       They had -- they had plenty of resources
4 to complete the job each and every day.
5    Q.   You wrote that the -- that "the DEA had
6 grave concerns about the dispensing habits of our
7 pharmacies and is trying to pin that on the
8 distribution habits."
9       But Betsy Ferguson had told the DEA that
10 the strength of the SOM program was because the
11 pharmacies had strong controls in place.  So, she
12 is saying one thing and you're saying the opposite
13 thing.
14    MR. HYNES:  Objection to form.
15 BY MR. ELSNER:
16    Q.   Are you aware of what dispensing habits
17 of the pharmacies were at this point in time when
18 you wrote this review?
19    MR. HYNES:  Objection; calls for speculation.
20 BY THE WITNESS:
21    A.   I did not.
22 BY MR. ELSNER:
23    Q.   You wrote that the -- "I've also
24 represented the SOM program with the Florida DEA

Page 252

1 explaining our program."
2       Is that right?
3    A.   Yes.
4    Q.   When did that start?
5    A.   Well, it was a phone call.  So, there
6 was an audit in one of our Florida DCs and they had
7 asked questions about the SOM.  And so they were
8 referred to me to have a call with them and kind of
9 explaining what our process was since we were doing
10 it out of Indianapolis.  So...
11    Q.   Do you recall when that was?
12    A.   Because I listed it here in my 2013
13 review, I'm going to say 2013, but I don't have a
14 specific date.
15    Q.   Okay.  I'll share a document with you
16 that may help clarify the date.  Who asked you to
17 get involved in this?
18    MR. HYNES:  Objection.  The Florida thing?
19    MR. ELSNER:  The Florida issue.
20 BY THE WITNESS:
21    A.   I don't remember.  It would have been
22 someone outside my facility, but I don't remember
23 who asked me to make that call or sit in on that
24 call.

Page 253

1 BY MR. ELSNER:
2    Q.   I'm going to show you Nicastro
3 Exhibit 48.
4       (WHEREUPON, a certain document was
5       marked as CVS-Nicastro-048:
6       1/20/14 e-mail string;
7       CVS-MDLT1-000076153 - 000076154.)
8 BY MR. ELSNER:
9    Q.   This is 76153.  At the bottom you say,
10 "Hi Kathy, I'm drafting a letter to the DEA that
11 covers your distribution center."
12       Do you see that?
13    A.   Yes.
14    Q.   Who is Kathy Kearney?
15    A.   She was the pharmacy manager at our
16 Patterson, California distribution center.
17    Q.   And you ask her if you can send the name
18 of the DEA contact you were having correspondence
19 with and the address and you ask him for the
20 license of the store.
21       Now, this was a store in Florida, is
22 that right?  If you look at the e-mail above her
23 response.
24    A.   If it's a store in Florida, I was

Page 254

1  talking to the wrong person. She would be dealing
2  with the stores in California or Hawaii.
3      Q.   Okay. So, did you have any interaction
4  with the DEA related to activities in California?
5      A.   We drafted a letter and sent it to them
6  regarding a store that we had stopped for
7  suspicious order, and I believe it's on that list
8  that we had the seven stores. I believe that was
9  one of them.
10     MR. ELSNER: Could we pull that up, Gina.
11 BY MR. ELSNER:
12     Q.   So, these stop orders from November of
13 2012, there are apparently three in November 21,
14 2012. These were all stop orders initiated by the
15 CVS distribution center in Indianapolis?
16     A.   Okay. So, I'm -- I'm confused then. I
17 don't know why I was contacting Kathy about this
18 store.
19     Q.   Right above, it lists -- she writes you
20 back.
21         Let me ask, though, while we are on this
22 store list.
23         Did you notify the DEA with respect to
24 these stop orders on this chart that you sent to

Page 255

1  Agent Gillen?
2      A.   We would have initiated the letter out
3  of our facility to -- to these orders that we
4  stopped.
5      Q.   Okay.
6      A.   And then we also would have sent one to
7  Mr. Gillen in Indiana.
8      Q.   Do you know the reason that these stop
9  orders were in effect for these locations in
10 California in November of 2012?
11     MR. HYNES: Objection to form. Go ahead.
12 BY THE WITNESS:
13     A.   I don't remember.
14 BY MR. ELSNER:
15     Q.   What about the ones in Hawaii on -- in
16 early October 2013?
17     MR. HYNES: Same objection.
18 BY THE WITNESS:
19     A.   I don't remember.
20 BY MR. ELSNER:
21     Q.   Okay. If we could go back to 76153, the
22 re line of the e-mail that you send to Kathy is
23 "Store 3937 SOM."
24         Do you see that?

Page 256

1      A.   Yes.
2      Q.   And then she responds to your e-mail and
3  she gives you the address for the DEA contact in
4  California, correct? And then she gives you the
5  DEA license number that you had asked for for store
6  3937, which is in Florida, correct?
7      A.   Oh. I guess so. I don't recall. So, I
8  don't --
9      Q.   Did you write a letter for CVS
10 concerning an investigation they were doing of the
11 store in Florida?
12     MR. HYNES: Objection to form.
13 BY THE WITNESS:
14     A.   I -- I don't remember.
15 BY MR. ELSNER:
16     Q.   What's your best recollection of what
17 you were asked to do in interacting with the DEA
18 related to stores in Florida, independent of the
19 document?
20     A.   Well, it was a phone call with two DEA
21 agents.
22     Q.   Let me stop you. Did they initiate the
23 call to you or did you call them?
24     A.   They had asked questions about the SOM,

Page 257

1  so the call was set up for me to be able to speak
2  with them. There were several people on the call.
3  I don't recall who all was on the call. But they
4  called in and they asked me questions about our SOM
5  program and --
6      Q.   For all the people in CVS to answer
7  questions about the SOM program and interact with
8  the DEA on this issue, CVS selected you to do that
9  phone call, is that right?
10     A.   For this one instance, and it was
11 because the process was in our facility.
12     Q.   And what process were they concerned
13 about?
14     A.   They just had questions about what do we
15 do around SOM. So, I explained the process to
16 them. It was a very short call. I explained the
17 process to them. They were satisfied. And that
18 was the end of the call. That was the last time I
19 spoke with them.
20     Q.   And in your e-mail to Kathy you say that
21 you are "drafting a letter to the DEA that covers
22 your distribution center."
23         Was that letter related to the same
24 phone call?

Page 258

1    A.  No.  There were no issues.  There was
2  no -- during that call there were no issues with a
3  specific store.  They simply had some questions
4  about our SOM program, and so I took them through
5  the process and explained what we do, answered a
6  couple of their questions and we were done.
7       So, there was no specific store that we
8  were talking about.
9       MR. ELSNER:  Why don't we take a quick break.
10      THE VIDEOGRAPHER:  We are going off the record
11  at 3:25.
12          (WHEREUPON, a recess was had
13           from 3:25 to 3:38 p.m.)
14      THE VIDEOGRAPHER:  We are back on the record
15  at 3:38.
16  BY MR. ELSNER:
17      Q.  Mr. Nicastro, I want to give you what we
18  have marked as Exhibit 49.
19          (WHEREUPON, a certain document was
20           marked as CVS-Nicastro-049:
21           Declaration of Joseph Rannazzisi.)
22  BY MR. ELSNER:
23      Q.  And at the time that Betsy Ferguson in
24  2014 in the meeting with Agent Gillen was

Page 259

1  discussing and touting the work of the pharmacies
2  in preventing controlled substances being diverted
3  as a reason that your SOM program was so strong,
4  were you aware that Florida pharmacies, CVS
5  pharmacies, were under investigation by the DEA?
6      A.  For the time frame of 2014?
7      Q.  And earlier period of time.
8      MR. HYNES:  Objection.  What time frame are we
9  talking about?
10  BY MR. ELSNER:
11      Q.  I believe that it concerned conduct in
12  2010 and through '12 and into 2014 and '15.
13      MR. HYNES:  I'm going to object to the form,
14  but go ahead.
15  BY THE WITNESS:
16      A.  I'm aware that there were some issues
17  with a couple stores in Florida at an earlier
18  point.  I don't have the details and I don't have
19  any special knowledge of it.
20  BY MR. ELSNER:
21      Q.  So, what I have put before you is a
22  declaration signed by Joseph Rannazzisi of the DEA.
23       Do you see that?
24      A.  I do.

Page 260

1      Q.  Okay.  And this was filed in a legal
2  proceeding related to CVS -- the DEA's efforts to
3  administratively suspend the operations of two CVS
4  pharmacies in Florida.  Did you know that?
5      A.  I was aware that there was an issue with
6  a couple stores, but I didn't know the rest of the
7  details.
8      Q.  Did you know that the DEA had issued an
9  immediate suspension order to two CVS pharmacies in
10  Florida because they posed an imminent threat or
11  danger to the public health and safety?
12      MR. HYNES:  Objection to the form.
13  BY THE WITNESS:
14      A.  No.
15  BY MR. ELSNER:
16      Q.  I want you to turn to page -- to
17  paragraph 26 of this declaration.
18       Actually, let's start on page 2,
19  paragraph 3, the second sentence.  Mr. Rannazzisi
20  writes, "I participated in the decision-making
21  process that led to the issuance of an Immediate
22  Suspension Orders against Holiday CVS, LLC,
23  Pharmacy 219, and CVS Pharmacy 5195 on February 2,
24  2012."

Page 261

1       Were you aware of that?
2      A.  Not specifically of the store numbers on
3  the dates.
4      Q.  Were you aware that two stores, two CVS
5  stores had been issued a suspension order in
6  Florida in 2012?
7      A.  I was aware there was an issue.  But the
8  details, the suspension orders and all the legalese
9  of it, I was not aware.
10      Q.  If you turn to page 9, paragraph 26 of
11  the declaration, Mr. Rannazzisi writes, "On
12  December 8, 2010, DEA hosted a meeting with CVS at
13  the DEA West Palm Beach Resident Office," and then
14  it lists the various people that were in attendance.
15       Were you aware that the DEA had had a
16  meeting with CVS concerning two of its stores in
17  Florida to warn them about what was occurring in
18  those stores?
19      A.  No.
20      Q.  If you turn to page 29.  I'm sorry.
21  Paragraph 29, page 11.  It reads, "CVS 219 and CVS
22  5195 district supervisor Jennifer Lalani
23  acknowledged that she was aware of an increase in
24  the number of oxycodone prescriptions that had been

Page 262

1 presented to CVS pharmacies especially in the
2 Orlando, Florida area."
3          And she also made reference to the fact
4 that CVS and other pharmacies had received a
5 warning letter from the sheriff in Hillsborough
6 County, Florida asking them to work closely with
7 law enforcement to deal with the prescription drug
8 epidemic in Florida.
9          Were you aware that CVS stores in
10 Florida had received a warning from the sheriff's
11 department in 2010 to work with them to avoid
12 diversion of opioid products?
13      A.   No.
14      Q.   So, there wasn't any internal
15 communication at CVS that came to you that would
16 indicate that the -- that at least pharmacies in
17 the Florida area were under investigation and that
18 the police had sent letters to the pharmacies to
19 warn them about diversion?
20      MR. HYNES:  Objection to form.
21 BY THE WITNESS:
22      A.   No, and I -- at this point I am not part
23 or have any responsibility for the SOM, centralized
24 SOM process.  It's not in Indianapolis at this

Page 263

1 time.  So...
2 BY MR. ELSNER:
3      Q.   But this affidavit was signed in 2012,
4 right?
5      A.   Early, February 2012.
6      Q.   February 2012.
7      A.   And the process didn't come into
8 Indianapolis until late 2012 or summer 2012, when
9 Aaron Burtner originally took it over.
10      Q.   Okay.  Were you aware that this
11 investigation was taking place when you started the
12 SOM process in Indianapolis?
13      A.   No.  The -- the only thing I was aware
14 of was that there was a problem with those two
15 stores, but I believe I was informed about it after
16 the -- it was all done and whatever the final
17 outcome was is when I became aware of it.
18      Q.   If you turn to page 12, paragraph 33, it
19 says that "On August 12, 2011 DEA hosted a second
20 meeting with CVS," and it lists the various
21 representatives in attendance and 24 supervisors,
22 managers, from various south Florida CVS
23 pharmacies.
24          Were you aware that the DEA had a second

Page 264

1 follow-up meeting in Florida in 2011 to warn
2 against the risks of diversion?
3      MR. HYNES:  Objection to form.
4 BY THE WITNESS:
5      A.   No.
6 BY MR. ELSNER:
7      Q.   Okay.  I'm going to ask you to turn to
8 page 15.  In this component of the affidavit,
9 Mr. Rannazzisi describes the investigation that he
10 conducted and in paragraph 41(a), it states that,
11 at the beginning, that "The pharmacist in charge
12 stated, for the CVS store 219, stated that the
13 majority of the diagnosis codes listed by the
14 prescribing practitioners on the oxycodone
15 prescriptions were the same, and that certain
16 customers had requested certain brands of oxycodone
17 referring to them as 'Ms' or 'blues.'"
18          Were you aware that the -- that there
19 was an issue in pharmacies in Florida of patients
20 coming in with prescriptions like this and
21 referring to these types of drugs in this manner?
22      A.   No.
23      MR. HYNES:  Objection; form.
24 BY MR. ELSNER:

Page 265

1      Q.   In paragraph B it states, "Susan Masso
2 stated to the DEA related to store 219 that many of
3 the patients receiving oxycodone prescriptions
4 received the same 'cocktail,'" in quotes, "of
5 prescriptions," and then he lists the various drugs
6 that make up the component of those cocktail drugs.
7          Were you aware that there was a concern
8 in pharmacies, CVS pharmacies in Florida and
9 perhaps elsewhere, about cocktail prescription
10 drugs?
11      A.   Specifically relating to this?  No.
12      Q.   Were you aware of it generally?
13      A.   That there's the opportunity for
14 cocktails to be made from different drugs?
15      Q.   That different drugs would be prescribed
16 in combination with one another and they were
17 referred to generally as cocktail drugs when they
18 were prescribed together?
19      A.   I'm familiar with the term "cocktails"
20 with control drugs.
21      Q.   What is your understanding of that?
22      A.   That certain control drugs when mixed
23 together are much stronger or can have different
24 varied effects on people if they take them in

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1 certain quantities.
2    Q.  Do you know what drugs form that risk?
3    A.  I do not. I know hydrocodone is part of
4 it, but I don't know the other drugs.
5    Q.  Do you know whether that was part of the
6 suspicious order monitoring process to detect
7 whether a prescription contained of hydrocodone in
8 combination with another drug?
9    MR. HYNES: Objection. Time period.
10    MR. ELSNER: At any time.
11 BY THE WITNESS:
12    A.  I know that the team, the SOM team, did
13 review for to see if the dispensing of drugs to
14 certain patients could be, you know, be considered
15 a cocktail.
16 BY MR. ELSNER:
17    Q.  In -- at what point in time?
18    A.  Just during the time frame that it was
19 in -- Indianapolis. That's the only time I would
20 know just because working with the team, they were
21 talking about cocktails and how they could look at
22 the reports and see what the different drugs are
23 being used.
24    Q.  In 2012?

Page 267

1    A.  I remember it more when the team was
2 assembled and that would have been more closer to
3 2013 after Kelly is on board, Shauna is up there
4 full time. So, I remember learning more about that
5 in 2013.
6    Q.  Okay. In paragraph C, "The pharmacist
7 in charge, Jessica Merrill for CVS 5195, she said
8 that she set a daily limit of how many oxycodone
9 30 milligram prescriptions the pharmacy would fill
10 each day. The limit was set based upon the amount
11 of oxycodone the pharmacy had on hand each day.
12 She said that the reason she set this daily limit
13 was to ensure that the pharmacy had enough
14 oxycodone 30 milligram to fill prescriptions for
15 'real pain patients.'"
16     Were you aware that there were concerns
17 in the pharmacies that people were receiving
18 oxycodone drugs that did not have valid
19 prescriptions?
20    A.  No.
21    Q.  Were you aware that there were
22 pharmacists that were holding aside certain
23 oxycodone drugs to make sure they could fill the
24 prescriptions for patients, as she says, in real

Page 268

1 pain?
2    A.  No.
3    Q.  That means as opposed to those who don't
4 have real pain, right?
5    A.  It's the first time I have seen this
6 document. I have no knowledge of this whole
7 process or the specifics of this case.
8    Q.  Does this surprise you?
9    MR. HYNES: Objection to form.
10 BY THE WITNESS:
11    A.  The expectation is the pharmacists do
12 their job. If this indicates the pharmacists were
13 not doing their job but -- again, I don't know what
14 a pharmacist's role is and what -- how they manage
15 their day-to-day process, how they manage their --
16 what their expectations are. So, I really can't
17 comment.
18 BY MR. ELSNER:
19    Q.  Well, if someone had brought to your
20 attention as the director of the distribution
21 center in Indiana that there was a pharmacist in
22 Summit County that was holding back certain
23 prescriptions of hydrocodone, holding some back for
24 the real pain patients so they wouldn't sell out,

Page 269

1 would that trigger an investigation on your part?
2    MR. HYNES: Objection; hypothetical. Go
3 ahead.
4 BY THE WITNESS:
5    A.  Hypothetically speaking, I would say
6 yes, we would want to investigate that and see
7 what's going on, if it was accurate or not.
8 BY MR. ELSNER:
9    Q.  But at the time that this investigation
10 took place, you were not aware that this
11 investigation and these findings by the DEA had
12 occurred in Florida. Is that right?
13    A.  No.
14    Q.  I will ask you to turn to the following
15 page on 16 paragraph E. Near the end of the
16 paragraph, the sentence beginning, "PT Morrell went
17 on to say." Do you see where I'm at?
18    A.  Yes.
19    Q.  "PT Morrell went on to say" -- that's
20 the -- a pharmacy technician in store 5195 -- "that
21 the daily limit for oxycodone 30 milligram
22 prescriptions was usually reached between 10 a.m.
23 and 12 p.m. each day, but sometimes that daily
24 limit was reached within 30 minutes of the pharmacy

Page 270

1 opening."
2      Were you aware of that?
3      A.   I was not.
4      Q.   If you could turn to page 24, paragraph
5 57.  This is a -- this is a summary of
6 Mr. Rannazzisi's affidavit, and he concludes in
7 paragraph 57, "Through my training and experience
8 as both a law enforcement officer and as a licensed
9 pharmacist, I believe that the CVS 219 and CVS
10 5195's DEA registrations to handle and distribute
11 any type of controlled substance poses an imminent
12 danger to the public health and safety."
13      Did you know that the DEA held these
14 views of certain CVS pharmacists -- pharmacies in
15 Florida?
16      A.   No, I didn't.
17      Q.   Were you aware that CVS entered into a
18 settlement agreement with the DEA concerning the
19 conduct of these two stores in Florida?
20      A.   I'm not aware of the details of the
21 settlement, but I know we did some type of
22 settlement.
23      MR. ELSNER:  Okay.  This is Exhibit 50.
24      (WHEREUPON, a certain document was

Page 271

1      marked as CVS-Nicastro-050:
2      Settlement Agreement;
3      CVS-MDLT1-000060796 - 000060804.)
4 BY MR. ELSNER:
5      Q.   This is a copy of the settlement
6 agreement.
7      If you turn to page 3 of the agreement,
8 in paragraph I, it says, "The DEA revoked the
9 registrations issued to CVS stores 219 and 595 in
10 an order published on October 12, 2012 and it did
11 so, among other reasons, on their failure to
12 fulfill their corresponding responsibilities."
13      And then if you look down at the two
14 paragraphs later under K, it says, "CVS
15 acknowledged that certain CVS Pharmacy retail
16 stores did dispense certain controlled substances
17 in a manner not fully consistent with their
18 compliance obligations under the Controlled
19 Substances Act and its implementing regulations."
20      Were you aware that CVS had acknowledged
21 that their stores did not dispense controlled
22 substances in a manner consistent with the
23 Controlled Substances Act?
24      MR. HYNES:  Objection to form.

Page 272

1 BY THE WITNESS:
2      A.   No, I wasn't.
3 BY MR. ELSNER:
4      Q.   If you go to page 4 of the agreement
5 under (ii) -- sorry.  Actually, (iii).
6      Were you aware that the DEA had alleged
7 that in (iii) that there was -- that dispensing
8 of -- by any Florida CVS Pharmacy retail store of
9 controlled substances to individuals CVS knew or
10 should have known were diverting controlled
11 substances, did you know that the DEA reached that
12 conclusion?
13      A.   No.
14      MR. HYNES:  Objection to form.
15      THE WITNESS:  I'm sorry.
16 BY THE WITNESS:
17      A.   No.
18 BY MR. ELSNER:
19      Q.   Did you know that the DEA had reached
20 the conclusion that there was dispensing by Florida
21 CVS Pharmacy stores of controlled substances
22 pursuant to prescriptions issued to physicians who
23 did not have current valid DEA registrations?
24      MR. HYNES:  Objection to form.

Page 273

1 BY THE WITNESS:
2      A.   No.
3 BY MR. ELSNER:
4      Q.   You understand that issuing --
5 dispensing a controlled substance to a person who
6 presents a prescription from a physician who
7 doesn't have a DEA, valid DEA registration violates
8 the Controlled Substances Act?  Do you know that?
9      MR. HYNES:  Objection; calls for a legal
10 opinion.  Go ahead.
11 BY THE WITNESS:
12      A.   Yeah, I don't know all the details of
13 what the requirements are to dispense a
14 prescription.
15 BY MR. ELSNER:
16      Q.   If you go to page 5, there is a section
17 of the Florida distribution centers.  Do you know
18 that the DEA in (viii) found that there was a
19 failure by Florida distribution centers to timely
20 detect and report suspicious orders of controlled
21 substances?  Were you aware of that?
22      A.   No.
23      Q.   Were you aware that CVS on page 6,
24 paragraph 3, agreed to pay the sum of $22 million

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  as a fine for these violations of the Controlled
2  Substances Act?
3      A.  I knew we paid a fine.  I didn't know
4  the amount.
5      Q.  Was that information shared with you by
6  CVS?
7      A.  Yes.
8      Q.  How did you learn that information?
9      A.  It would have been a conference call
10  talking about stuff, and I mean it could have
11  been -- it wasn't a call specifically about this.
12  It was a call to discuss whatever we were
13  discussing, and I remember this coming up on a call
14  that we were -- we were -- just paid a fine for
15  drug issues in Florida.
16      Q.  And did you receive any information at
17  the CVS distribution center in Indiana concerning
18  warnings or lessons from the Florida fine and the
19  findings of the DEA there?
20      MR. HYNES:  Objection to form.
21  BY THE WITNESS:
22      A.  I don't -- I don't know if we received
23  something.
24  BY MR. ELSNER:

Page 275

1      Q.  I want to ask a question.  In conducting
2  due diligence reviews for the distribution of
3  controlled substances, would you agree that the
4  distributor should be aware of the geographic area
5  in which the opioids were being shipped?
6      MR. HYNES:  Objection to form.
7  BY THE WITNESS:
8      A.  Would I -- I'm sorry.  Can you repeat
9  that?
10  BY MR. ELSNER:
11      Q.  Would you agree that the distributor
12  should be aware of the geographic area in which the
13  controlled substances were being shipped?
14      MR. HYNES:  Same objection.
15  BY THE WITNESS:
16      A.  Yes.
17  BY MR. ELSNER:
18      Q.  Okay.  As part of the due diligence,
19  right?
20      A.  Right.
21      Q.  You wanted to know what the stores were
22  like in the areas in which they operate, correct?
23      A.  Correct.
24      Q.  Okay.  And in doing that due diligence

Page 276

1  review, would you and others at CVS rely on media
2  reports concerning the activities in those
3  particular geographic areas?
4      A.  As part of the SOM process, I know the
5  process that we were conducting in our building, we
6  weren't relying on media reports of areas; and any
7  information that we were requesting along that --
8  that type of information, we would have requested
9  from our corporate team.
10      Q.  And do you know what the corporate team
11  was collecting about the geographic area in which a
12  particular CVS store sat?
13      MR. HYNES:  Objection to form.
14  BY THE WITNESS:
15      A.  Yeah, I can't speak to the specifics,
16  but I do know when we would request information, we
17  could get quite a bit of information.  So...
18  BY MR. ELSNER:
19      Q.  What kind of information was being
20  requested?
21      A.  The population, the -- we had the
22  information on distance traveled.  We had
23  information on the top patients, information on
24  the -- top patients that are getting controlled

Page 277

1  substances, the top doctors that were prescribing.
2      But when we get into like the statistics
3  of an area, the size of the stores as far as their
4  sales volume, are people coming in from further
5  distances, we would get that information from --
6  from corporate.  They could -- they could produce a
7  lot of statistics that we didn't have right at our
8  hands.
9      Q.  And that was in 2013 and '14, is that
10  the period you're talking about?
11      A.  2000 -- it would have been for the
12  period that we had the process in Indianapolis.
13  That would have been 2012, '13, early '14.
14      Q.  But it was transitioning at the end of
15  2013, is that right?
16      A.  Yes.
17      Q.  In Exhibit 46 --
18      MR. HYNES:  Give us a second, please.
19  BY MR. ELSNER:
20      Q.  -- which is the e-mail that you sent to
21  Bill Jusko concerning the DEA closing audit, 22230.
22      MR. HYNES:  We're ready.
23  BY MR. ELSNER:
24      Q.  At the bottom of the first page of your

Page 278

1 e-mail, in the second sentence of the last
2 paragraph, it reads, "Dan asked, what are you going
3 to do when hydrocodone goes to a class 2 drug. She
4 said," and this is Betsy Ferguson I believe, "that
5 we will not distribute it from the distribution
6 centers. It will be ordered through Cardinal or
7 McKesson and we are counting down the days."
8        Is that what she said?
9    A.   Yes.
10    Q.   And what did she mean by "we are
11 counting down the days"?
12    MR. HYNES:  Objection to form, calls for
13 speculation. Go ahead.
14 BY THE WITNESS:
15    A.   She was probably suggesting just like I
16 felt when it went away and it was good to go away.
17 We're glad that it went to a control II and --
18 yeah, we're glad it went to a C-II, and it was just
19 less aggravation for at least for my team and my
20 distribution center.
21 BY MR. ELSNER:
22    Q.   Because it was difficult and frustrating
23 to work through those programs, correct?
24    MR. HYNES:  Objection to form.

Page 279

1 BY THE WITNESS:
2    A.   Not necessarily the programs. I mean,
3 the programs are the programs. And I think they
4 were effective. But it's just the extra stress and
5 disruption that comes with distributing those
6 drugs, just as I would suspect if we had C-IIs in
7 our building and had vaults and all the extra
8 regulations that go along with that.
9        All the -- all the discussion around
10 hydrocodone, I think it was a good move for it to
11 move to C-II.
12 BY MR. ELSNER:
13    Q.   And you would have supported that
14 rescheduling program, right?
15    A.   Yes.
16    Q.   And this is an e-mail from Pam Hinkle.
17        (WHEREUPON, a certain document was
18        marked as CVS-Nicastro-051:
19        8/26/14 e-mail string;
20        CVS-MDLT1-000003065 - 000003066.)
21 BY MR. ELSNER:
22    Q.   This is 3065. And someone is forwarding
23 to Pam Hinkle the press release about the
24 rescheduling of hydrocodone combination products

Page 280

1 from Schedule III to Schedule II, and Pam Hinkle
2 writes, "Thank you. I was aware and can't wait to
3 be out of the hydro business. I appreciate you
4 looking out for me."
5        Did Pam Hinkle express to you that she
6 was excited that CVS would no longer be
7 distributing hydro combination products?
8    A.   She did not.
9    Q.   Were you aware that she held those
10 views?
11    A.   No.
12    Q.   But I think you testified that you held
13 those views, is that right?
14    A.   I did. I think most people were. I was
15 also happy when we got rid of cigarettes.
16    Q.   So was I.
17        (WHEREUPON, a certain document was
18        marked as CVS-Nicastro-052:
19        8/22/14 e-mail string;
20        CVS-MDLT1-000000437 - 000000438.)
21 BY MR. ELSNER:
22    Q.   This bears the Bates No. 437 and this is
23 an e-mail that Gary Millikan forwards to you and
24 that you respond to.

Page 281

1        He writes, "It could be big!  Would
2 remove all from Indy if passed."
3        And you reply, "Yep. We think we will
4 be out of it by the end of the year."
5        Is that right?
6    A.   That's what I said, yes.
7    Q.   Okay. Did you ever express your
8 frustration to anyone at CVS Pharmacy about
9 distributing hydrocodone prior to the rescheduling?
10    MR. HYNES:  Objection to form, misstates the
11 testimony. Go ahead.
12 BY THE WITNESS:
13    A.   No.
14 BY MR. ELSNER:
15    Q.   Do you realize that CVS didn't have to
16 distribute hydrocodone at all, correct?
17    A.   Yes, I know we have an option of
18 everything we distribute. So...
19    Q.   So, and they always had the option.
20 They were never required to distribute hydrocodone,
21 right?
22    A.   Correct.
23    Q.   But it was generally felt within the
24 company, at least the people that you interacted

Page 282

1  with, that the company should not be distributing
2  hydrocodone, right?
3      MR. HYNES:  Objection to form.
4  BY THE WITNESS:
5      A.   We never had that conversation where,
6  you know, we shouldn't be doing this.  It was --
7  yeah, we didn't really have discussions around it,
8  before it was going away, that it was a bad thing
9  to have in the buildings.
10 BY MR. ELSNER:
11     Q.   And you were excited that it was going
12 away, is that right?
13     A.   Yeah, one less thing that I had to -- to
14 pay attention to.  So, yes.
15     Q.   Okay.  Prior to the rescheduling of
16 hydrocodone by the Federal Government, the State of
17 New York rescheduled hydrocodone, is that right?
18     MR. HYNES:  Objection to form and based on
19 Discovery Ruling 3.  Go ahead.
20 BY THE WITNESS:
21     A.   I'm not aware of that.  I didn't know
22 they did it before the Federal Government.
23 BY MR. ELSNER:
24     Q.   Well, New York is in -- is New York in

Page 283

1  the region for the Indianapolis distribution center
2  for the distribution of hydrocodone or not?
3      A.   No.  Well, what time frame are we
4  talking about?
5      Q.   In 2012.
6      A.   Okay.  I apologize.  Indianapolis would
7  have been servicing a portion of New York at that
8  time.
9          Well, let me take that back.
10         Yeah, I believe -- if we were still
11 servicing Somerset, kind of qualify it with that,
12 because our Chemung facility was coming up, I'm not
13 sure of the dates, I believe that was 2010, 2011
14 when that facility was built and came online, but
15 I'm not sure when they took over all the New York
16 stores.
17         So, potentially we could have been
18 servicing New York in 2012 out of Indianapolis.
19     Q.   When New York rescheduled hydrocodone in
20 August of -- it was August 27, 2012, did the CVS
21 distribution center in Indianapolis stop
22 distributing hydrocodone in New York as a result of
23 that rescheduling?
24     MR. HYNES:  Objection based on Discovery

Page 284

1  Ruling 3.  Go ahead.
2  BY THE WITNESS:
3      A.   We absolutely would have if that was the
4  ruling.  If that was the time it went into place,
5  we would not have shipped into New York out of
6  Indianapolis.
7  BY MR. ELSNER:
8      Q.   But you continued to ship to Ohio and
9  other states after hydrocodone had been rescheduled
10 in New York in August of 2012, right?
11     A.   We would have, yes.
12     Q.   Did CVS have a procedure in place to
13 follow the strictest policy or rules for a
14 particular state out of the distribution center if
15 one state enacted a stricter rule than another or
16 did the distribution center handle the different
17 state rules as each applied to those states?
18     MR. HYNES:  Objection to form.
19 BY THE WITNESS:
20     A.   We are very consistent with going to the
21 toughest rule that there is.  So, if a certain
22 state requires -- if a certain state has a certain
23 requirement, California is a good example, but then
24 we follow the strictest rule so that if we were

Page 285

1  going into that state for some reason, we'd be
2  meeting the requirements.
3  BY MR. ELSNER:
4      Q.   And you understand that all of these
5  rules are minimum standards.  You could always do
6  more than the minimum standard or the minimum rule
7  for your own procedures and policies, correct?
8      A.   Yes.
9      MR. HYNES:  Objection to form.
10 BY THE WITNESS:
11     A.   Yes.
12 BY MR. ELSNER:
13     Q.   Okay.  And even though New York had
14 rescheduled hydrocodone combination projects --
15 products to a Schedule II in August of 2012, CVS
16 nevertheless continued to distribute hydrocodone
17 combination products in states that had not
18 rescheduled that drug to Schedule II like Ohio,
19 correct?
20     A.   That would not be my decision to make.
21     Q.   But that's what happened, right?
22     A.   We continued to ship from Indianapolis,
23 yes.
24     Q.   The -- if we go back to Exhibit 46, the

Page 286

1  very last -- if we go to the second, sort of the
2  last phrase there starting with "Dan said."
3       And when Agent Gillen heard that CVS was
4  no longer going to distribute hydrocodone, he said
5  that the DEA's main concern with the SOM was
6  hydrocodone.  Is that right?
7       A.   Yes.
8       Q.   Okay.  And then you wrote, "He didn't
9  come right out and say it, but it was picked up by
10 everyone in the room that he was establishing a
11 reason not to escalate this," DEA investigation,
12 "past a letter of admonishment based on that
13 rescheduling."  Correct?
14      MR. HYNES:  Objection to form.  I don't think
15 that's exactly what it says.  You may answer.
16 BY THE WITNESS:
17      A.   Yeah, it was my opinion that he was --
18 because hydrocodone is going to be going to a
19 Schedule II, that there would be no reason to do
20 anything more than a letter of admonishment.  That
21 hadn't been determined at that point.
22 BY MR. ELSNER:
23      Q.   On the following page, you write in the
24 very last sentence, "I'm pretty sure this is a

Page 287

1  feeling out meeting to see if we were prepared to
2  defend ourselves and Betsy made that crystal
3  clear."
4       Is that right?
5       A.   Correct.
6       Q.   Meaning that she told Agent Gillen that
7  if he proceeds past a letter of admonishment that
8  she was going to request a meeting with his boss
9  and CVS would fight the DEA in court like Walgreens
10 did, correct?
11      MR. HYNES:  Objection to form.
12 BY THE WITNESS:
13      A.   Yeah, this was -- this was my opinion,
14 that -- because the reason for the meeting, it was
15 still to meet with his boss to discuss what they
16 wanted to do, and in my opinion there was really no
17 reason that we had the meeting that week other than
18 maybe for some feeling out of what was -- what
19 would be our position.
20 BY MR. ELSNER:
21      Q.   I'm going to show you Exhibit 53.
22      (WHEREUPON, a certain document was
23       marked as CVS-Nicastro-053:
24       12/31/15 letter from U.S. DOJ DEA

Page 288

1       to CVS Indiana; CVS-MDLT1-000008014
2       - 000008015.)
3  BY MR. ELSNER:
4       Q.   This is a letter from Daniel Gillen from
5  the DEA, is that right?
6       A.   Yes.
7       Q.   The signature line?
8       A.   Yes.
9       Q.   And the date of this letter is
10 December 31, 2015, correct?  It's next to his
11 signature.
12      A.   Oh.  Yes.
13      Q.   And this is after the hydrocodone
14 products had been rescheduled, correct?
15      A.   Correct.
16      Q.   So, the DEA left this investigation open
17 from July of 2013 until this final letter in
18 December of 2015, is that right?
19      MR. HYNES:  Objection to form.
20 BY THE WITNESS:
21      A.   That's correct.
22 BY MR. ELSNER:
23      Q.   And Agent Gillen found and the DEA found
24 that as a result of the investigation that there

Page 289

1  was a violation of the Controlled Substances Act.
2       Do you see that at the end of the first
3  paragraph?
4       A.   Yes.
5       Q.   Okay.  And you're aware, are you not,
6  that he found and the DEA determined that there was
7  a "Failure to design and maintain a system to
8  detect suspicious and report suspicious orders for
9  Schedule III to V controlled substances" as
10 required under the Controlled Substances Act,
11 correct?
12      A.   Correct.
13      Q.   And -- okay.
14      MR. ELSNER:  At this time I'm going to go off
15 the record.
16      THE VIDEOGRAPHER:  We are going off the record
17 at 4:17.
18      (WHEREUPON, a recess was had
19       from 4:17 to 4:22 p.m.)
20      THE VIDEOGRAPHER:  We're back on the record at
21 4:22.
22           EXAMINATION
23 BY MR. DeROCHE:
24      Q.   Good afternoon, Mr. Nicastro.  My name

Page 290

1 is Jim DeRoche. I just have a few follow-up
2 questions for you based on earlier testimony.
3        First of all, when you started with CVS,
4 you were in Somerset, Pennsylvania?
5    A.   Correct.
6    Q.   Is that correct? What is that facility?
7    A.   It's a distribution center for CVS.
8 It's a smaller than Indianapolis.
9    Q.   What did it distribute?
10    A.   It distribute front store product
11 basically. So, any product, almost any product you
12 see in a CVS store.
13    Q.   So, the front of store products included
14 things like ephedrine and pseudoephedrine, is that
15 correct?
16    A.   Pseudo -- what time frame are we talking
17 about?
18    Q.   The time frame when you were working
19 there.
20    MR. HYNES: I'm objecting based on Discovery
21 Ruling 2.
22 BY MR. DeROCHE:
23    Q.   You can answer.
24    A.   I -- I don't remember if that was an

Page 291

1 item that we carried or an item that was delivered
2 to us from Indianapolis.
3        So, Indianapolis delivered our pharmacy
4 product each day, but they also delivered what we
5 call centrally warehoused items, and that's about
6 10,000 items that they carry that we don't carry.
7 And they would deliver those.
8        And I -- I don't remember if the
9 pseudoephedrine was part of our inventory or part
10 of Indianapolis' inventory.
11    Q.   Well, I guess --
12    A.   Before it was regulated I think is what
13 we are talking about?
14    Q.   Well, when you were there was it
15 regulated? Were there any regulated products that
16 you distributed out of Somerset?
17    A.   No.
18    Q.   So, you had no suspicious order
19 monitoring process at all for any either controlled
20 substances or listed chemicals?
21    A.   No.
22    Q.   And then when you went to
23 Indianapolis -- first of all, who did you succeed
24 in Indianapolis as the director?

Page 292

1    A.   Dana Lilly was the former director
2 before me.
3    Q.   I'm sorry. That was Dana?
4    A.   Dana.
5    Q.   Okay. And did you sit down and meet
6 with Dana when you did the transition where you
7 took over?
8    A.   Yes.
9    Q.   Did you have an understanding from
10 discussions with Dana what the suspicious order
11 monitoring process was at Indianapolis at the time
12 you took over?
13    A.   We did not discuss that during our
14 transition.
15    Q.   So, you didn't find that to be an
16 important subject that you needed to get informed
17 about from your predecessor?
18    MR. HYNES: Objection to form.
19 BY THE WITNESS:
20    A.   It -- he would have needed to have
21 informed me about it because I was not aware of the
22 program or had any experience with that program.
23 BY MR. DeROCHE:
24    Q.   When you were taking over, you

Page 293

1 understood you were taking over a facility that was
2 federally licensed, correct?
3    A.   Yes.
4    Q.   And you understand what a license is,
5 right?
6    A.   I do.
7    Q.   You have a driver's license, right?
8    A.   Correct.
9    Q.   You have to -- you understand you have
10 to meet certain requirements in order to keep your
11 license, correct?
12    A.   Yes.
13    Q.   Just like a driver's license, the DEA
14 license is the same thing, right?
15    A.   Correct.
16    Q.   Okay. And the requirements included the
17 design and operation of a system that was intended
18 to disclose suspicious orders to the DC, correct?
19    MR. HYNES: Objection to form.
20 BY THE WITNESS:
21    A.   That's correct.
22 BY MR. DeROCHE:
23    Q.   And that requirement was in place when
24 you took over at Indianapolis, right?

Page 294

1    A.   Yes.
2    Q.   And that is, in fact, one of the primary
3  requirements for the Indianapolis DC to keep its
4  DEA license, correct?
5    MR. HYNES:  Objection to form.
6  BY THE WITNESS:
7    A.   There were many -- there are many
8  requirements for us to keep our -- keep our
9  license.
10 BY MR. DeROCHE:
11   Q.   That was an important requirement, was
12 it not?
13   MR. HYNES:  Objection to form.
14 BY THE WITNESS:
15   A.   It's important as there were many
16 important requirements.
17 BY MR. DeROCHE:
18   Q.   But it wasn't important enough for you
19 to have discussions about it with your predecessor
20 when you took over?
21   MR. HYNES:  Objection to form, asked and
22 answered.
23 BY MR. DeROCHE:
24   Q.   Is that what you're telling the jury?

Page 295

1    A.   The -- if Dana didn't discuss it with
2  me, then we did not discuss it.
3    Q.   You didn't bring it up because you
4  didn't even know about it, right?
5    MR. HYNES:  Objection to form.
6  BY THE WITNESS:
7    A.   I did not have any -- any knowledge of
8  the program because I did not need it while I was
9  in Somerset.
10 BY MR. DeROCHE:
11   Q.   Okay.  When you took over in 2008, my
12 understanding is there was no process at corporate
13 or anywhere else where there was an item review
14 report that was generated by a computer, is that
15 correct?
16   A.   That is correct.
17   Q.   In 2008 if I understand your testimony,
18 your suspicious order monitoring process was
19 relying on these pickers and packers that worked at
20 the warehouse?
21   A.   Correct.
22   Q.   Is that correct?
23        And these pickers and packers, on a
24 nightly basis, because this was an overnight

Page 296

1  process for you, right?
2    A.   It was a daylight process, day shift
3  process.
4    Q.   You didn't get orders overnight and have
5  to fill them overnight?
6    A.   No.  No, we only filled control drugs on
7  one shift in an eight-hour period.
8    Q.   Okay.  And that was during the day?
9    A.   Yes.
10   Q.   And you were fulfilling orders from a
11 thousand-odd stores in the Indianapolis
12 distribution center, right?
13   A.   Per week, yes.
14   Q.   Per week.  Well, every day, right?
15   MR. HYNES:  Objection.
16 BY THE WITNESS:
17   A.   No, it was a thousand stores -- a little
18 over a thousand stores in total.
19 BY MR. DeROCHE:
20   Q.   In total that you were servicing?
21   A.   Correct.
22   Q.   Right.  And how many folks worked in the
23 control cage at the distribution center in
24 Indianapolis?

Page 297

1    A.   Approximately eight.
2    Q.   And so you had eight of these pickers
3  and packers at any one time, is that correct?
4    A.   Yes.
5    Q.   Did they all work every day or were
6  there three or four and you spread out the shifts?
7    A.   No.  We only ran that department on one
8  shift, day shift, and those eight folks were our
9  controlled substance pickers and packers and
10 checkers.
11   Q.   Okay.  And in 2008 when you came in, how
12 long had those folks been working for CVS that were
13 working in that position?
14   MR. HYNES:  Objection to form.
15 BY THE WITNESS:
16   A.   I can't tell you the -- all their
17 seniority dates at that point.  What I can tell you
18 is most of those folks were more tenured
19 associates.  And even today I still have one -- two
20 associates in that department that are still there
21 today from when I came in in 2008.
22 BY MR. DeROCHE:
23   Q.   And, so, the process that they followed
24 when they were picking these controlled substances

Page 298

1  that you were then going to ship to Somerset, what
2  was the actual process that they followed?
3      Why don't you explain that to me. I'm
4  talking about 2008.
5      A.  They would -- they would go through and
6  pick the orders and they would review the orders
7  for anything of unusual size.
8      These were our experts. They were in
9  the cage every single day. They picked these
10  orders every single day. And they are going to be
11  the best -- have the most knowledge as to whether
12  an order seems unusual size or pattern.
13     Q.  For a particular store, in other words,
14  they had to have a knowledge of what the store had
15  ordered in the past for these thousand stores?
16     A.  They had a general knowledge of how many
17  bottles they would pick for any particular store.
18     Q.  I mean, you have a wide range of
19  controlled substances that would go to your stores,
20  wouldn't you?
21     A.  It's a small number of items that we
22  have in our control cage.
23     Q.  I'm not talking about the items. I'm
24  talking about the range of the number of orders

Page 299

1  that you receive from the stores. You have some
2  high-volume stores, correct?
3      A.  Yes.
4      Q.  You have some medium-volume stores I
5  assume, correct?
6      A.  Um-hmm, yes.
7      Q.  Yes. You have some low-volume stores,
8  right?
9      A.  Yes.
10     Q.  And they have their own particular
11  pattern, is that right?
12     MR. HYNES: Object to form.
13  BY MR. DeROCHE:
14     Q.  Of ordering?
15     A.  Yes.
16     Q.  And you're relying on pickers and
17  packers in 2008 to have a memory of what each of
18  these thousand stores that you're servicing may or
19  may not order on a regular basis. Is that what
20  you're saying?
21     A.  Yes.
22     Q.  Did they have any work tools of any
23  sort, any kind of computer technology that assisted
24  them in generating these hunches with respect to

Page 300

1  suspicious orders?
2      MR. HYNES: Objection to form.
3  BY THE WITNESS:
4      A.  Not at that time.
5  BY MR. DeROCHE:
6      Q.  Did they have any in 2009?
7      MR. HYNES: Objection. Same objection.
8  BY THE WITNESS:
9      A.  No.
10  BY MR. DeROCHE:
11     Q.  What did they have access to in terms of
12  information that would help them be efficient
13  spotters of suspicious orders as required by the
14  DEA?
15     MR. HYNES: Objection to form.
16  BY MR. DeROCHE:
17     Q.  What did they have?
18     A.  Their knowledge. We relied on them to
19  use their experience to flag anything that looked
20  suspicious to them, and they would -- they would
21  escalate those to their pharmacy supervisor or
22  manager, and they would take it from there.
23     Q.  So, they didn't have any access, for
24  instance, to dispensing data?

Page 301

1      A.  No.
2      Q.  Didn't have access to any kind of order
3  history that they could call up and refer to?
4      A.  No.
5      Q.  They didn't have any access to
6  prescribing data, for example?
7      A.  No.
8      Q.  They didn't have access to any
9  indication of the geographic location of the folks
10  who were receiving the drugs at the end of the day,
11  patient data?
12     A.  They would have -- they wouldn't have
13  patient data. They would have an idea of where
14  the -- where the stores are based on who they were
15  picking them for, if it was for Somerset or for
16  Novi or for Indianapolis.
17     Q.  Well, there's a store in the middle of
18  Akron, Ohio, for example, that you're servicing,
19  right, and you are saying a picker and packer is
20  going to know virtually nothing about what's going
21  on at the store and you're going to rely on them to
22  be the one to flag a suspicious order if one's
23  placed?
24     MR. HYNES: Objection.

Page 302

BY MR. DeROCHE:

2  Q.  Is that what you're saying?

3  MR. HYNES:  Misstates testimony.

4  BY THE WITNESS:

5  A.  I'm saying that we relied on them to

6  look for any -- anything that stood out to them

7  about that order.

8  BY MR. DeROCHE:

9  Q.  Did you ever try to find out if that

10  reliance was justified?

11  MR. HYNES:  Objection to form.

12  BY THE WITNESS:

13  A.  Can you ask that question again?

14  BY MR. DeROCHE:

15  Q.  You relied on them to do this process

16  that your DEA license depends on.  I'm asking you

17  did you ever do anything to determine if that

18  reliance was reasonable, anything at all?

19  MR. HYNES:  Objection; form.

20  BY THE WITNESS:

21  A.  Well, they turned in orders on a regular

22  basis to our team to at least contact the store and

23  see if there was a fat fingering, something along

24  those lines.

Page 303

1  BY MR. DeROCHE:

2  Q.  Do you have any specific knowledge of

3  any specific instance where a picker and packer

4  elevated an order for review other than a fat

5  finger situation where the size was out of line

6  with reasonableness?

7  MR. HYNES:  Objection to form.

8  BY THE WITNESS:

9  A.  I don't have specific information

10  regarding what stores or how many stores were

11  flagged.

12  BY MR. DeROCHE:

13  Q.  Can you recall whether or not that ever

14  happened?

15  MR. HYNES:  Objection to form.

16  BY THE WITNESS:

17  A.  I do know that they stopped -- they

18  flagged orders.

19  BY MR. DeROCHE:

20  Q.  I know they flagged orders, but we're

21  talking about an order where you say a reasonable

22  order would be 30, there is a fat finger situation

23  where someone orders 300.  Is that what you're

24  talking about what they elevated?

Page 304

1  A.  Typically that would be an easy one to

2  elevate if an order looked unusually large.  That

3  was probably the easiest order they could flag.

4  Q.  I know they looked at size, and that

5  would be an easy order to flag.  I'm asking you did

6  they ever look at frequency of orders, pattern of

7  ordering and elevate any of those that you're aware

8  of, any specific instance where you recall that

9  happening?

10  MR. HYNES:  Objection; form.

11  BY THE WITNESS:

12  A.  Not that I'm aware of.

13  BY MR. DeROCHE:

14  Q.  All right.  And you know based on the

15  letters that Mr. Elsner went through with you from

16  the DEA that unusual pattern was one of the

17  requirements for your DC to look for, right?

18  A.  It's one of the requirements for

19  suspicious order monitoring.

20  Q.  One of the requirements for you to keep

21  your license from the DEA?

22  MR. HYNES:  Objection to form.

23  BY MR. DeROCHE:

24  Q.  To distribute controlled substances.

Page 305

1  That was a requirement you had, right?

2  A.  The requirement was for us to have a

3  suspicious order monitoring process in place.

4  Q.  Right.  Including looking for unusual

5  patterns of ordering, right?

6  A.  Correct.

7  Q.  And you had pickers and packers as your

8  only SOM, suspicious order monitoring, individuals

9  who had zero tools that would allow them to monitor

10  anybody for a particular pattern of ordering?

11  MR. HYNES:  Objection.

12  BY MR. DeROCHE:

13  Q.  Isn't that true?

14  MR. HYNES:  Objection; misstates his

15  testimony.

16  BY MR. DeROCHE:

17  Q.  You can answer, sir.

18  A.  Our -- if patterns or frequencies were

19  to change, that would have been flagged with our --

20  our stores order once a week with the exception of

21  a handful of stores that order twice a week.  So,

22  any orders that were coming in off schedule or not

23  on their normal, normal day, normal schedule, would

24  be an order of interest for us.

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1  Q.  So, you're saying that the Brook Park
2  Road CVS in Cuyahoga County, Ohio ordered
3  controlled substances once a week?
4      MR. HYNES:  Objection; misstates his
5  testimony.
6  BY MR. DeROCHE:
7      Q.  Is that what you're saying?
8      A.  I don't know how often they ordered.
9      Q.  But you said our stores ordered once a
10 week, sir.
11     MR. HYNES:  He said some stores don't.
12 BY THE WITNESS:
13     A.  We have some stores that order once a
14 week and we have some stores that ordered twice a
15 week.
16 BY MR. DeROCHE:
17     Q.  You want to tell me the -- the Brook
18 Park Ohio CVS in Cuyahoga County, Ohio ordered no
19 more than twice a week from your DC?
20     MR. HYNES:  Objection; asked and answered.
21 BY THE WITNESS:
22     A.  I have no idea what their ordering
23 frequency was.
24 BY MR. DeROCHE:

Page 307

1      Q.  So, if the ARCOS data that you folks
2  submitted to the DEA as you're required to do
3  showed they were ordering way more than that, you
4  couldn't disagree with that, could you?
5      MR. HYNES:  Objection.  I don't understand the
6  question.
7  BY THE WITNESS:
8      A.  Yeah, if there's documentation to show
9  that we were shipping to that store more often than
10 once or twice a week, then that's what we were
11 doing.
12 BY MR. DeROCHE:
13     Q.  Do you know if the, for instance, Brook
14 Park Road CVS in Cuyahoga County, Ohio was ever
15 flagged by a picker and packer for unusual ordering
16 in 2008 or 2009?
17     A.  I do not know what stores were flagged
18 during that time frame.
19     Q.  You don't recall that ever happening as
20 far as you remember?
21     MR. HYNES:  Objection; asked and answered.
22 BY THE WITNESS:
23     A.  I know we flagged stores.  I don't know
24 the specific store numbers that we flagged.

Page 308

1  BY MR. DeROCHE:
2      Q.  Were the pickers and packers provided
3  any kind of training, specific training, as to
4  suspicious order monitoring and how to flag orders?
5      MR. HYNES:  Objection; asked and answered --
6  BY MR. DeROCHE:
7      Q.  That you can recall.
8      MR. HYNES:  -- by Mr. Elsner.  Go ahead.
9  BY THE WITNESS:
10     A.  We -- they were trained when they went
11 into the department by the pharmacy supervisor or
12 manager as to what to look for and then with the
13 other experienced pickers in that area.
14     So, if we had a new person go in, they
15 would, you know, learn from their -- from the --
16 what we showed them from the pharmacy supervisor or
17 manager and then from the rest of the team that was
18 in there.
19     Again, it was a very small team of, you
20 know, tenured folks that knew the process.
21 BY MR. DeROCHE:
22     Q.  Was there any kind of quality control
23 that was undertaken with respect specifically to
24 the suspicious order monitoring activities of the

Page 309

1  pickers and packers?
2      MR. HYNES:  Objection; asked and answered by
3  Mr. Elsner.  This whole line of questioning is in
4  violation of the deposition protocol which
5  prohibits cumulative questioning by Plaintiffs'
6  counsel.
7      MR. DeROCHE:  Right.  And it wasn't asking
8  about quality control.  So, let the record
9  reflect --
10     MR. HYNES:  All of this was discussed before.
11     MR. DeROCHE:  Right.  It wasn't.  So you can
12 note your objection and then we will move on.
13     MR. HYNES:  Violates the deposition protocol.
14 BY MR. DeROCHE:
15     Q.  Was there any quality control with
16 respect to the pickers and packers suspicious order
17 monitoring activities?
18     MR. HYNES:  Same objections.
19     MR. DeROCHE:  Noted.
20 BY THE WITNESS:
21     A.  I'm not sure what you're -- by "quality
22 control" what do you mean?
23 BY MR. DeROCHE:
24     Q.  You don't know what quality control

Page 310

1 means?
2     A.   I know what quality control is, but I
3 don't know how you're referencing that.
4     Q.   Okay.  Let's use your definition.  Why
5 don't you define quality control and then tell me
6 what you did with respect to the pickers and
7 packers to make sure they were doing their job with
8 respect to monitoring suspicious orders.
9     MR. HYNES:  I'm going to object and ask that
10 counsel be a little more respectful of the witness.
11 BY MR. DeROCHE:
12    Q.   Go ahead.  You can answer, sir.
13    A.   The -- well, we -- for our -- for every
14 order that's picked with our control -- in our
15 control cage, every item is rescanned and
16 reverified for 100% accuracy to make sure that we
17 are shipping what we were expecting to ship.
18 That's a form of quality control.  We do audits on
19 our totes.  We do audits on entire stores.  To me
20 that's what quality control is.
21        We also audit our processes across the
22 building.  So, if we expect a chaser or a stalker
23 or a loader to do certain functions, we audit them
24 to make sure that they're doing those functions.

Page 311

1 That's quality control to me.
2        We would do the same things with the
3 pickers in the control cage.  We would make sure if
4 we had pickers that were not bringing any orders
5 forward, we would remind them of the program and
6 have you not seen any orders, we would do training
7 with the folks.
8        The supervisors specifically would meet
9 with the team on a daily basis and talk about the
10 volume that we had for the day, what our -- what
11 our schedule was for the remainder of the day, any
12 other pertinent facts they needed to hear about the
13 building at that point, what their schedule was
14 going to be.  They were working eight hours, nine
15 hours or whatever the case is.  And then they would
16 review the SOM process.
17        We didn't do that every day, but it was
18 certainly something that was talked about.
19    Q.   Okay.  And who talked about it?  Who was
20 the person actually doing that?
21    A.   It would be --
22    MR. HYNES:  Objecting to this line of
23 questioning.
24 BY MR. DeROCHE:

Page 312

1     Q.   Go ahead.
2     MR. HYNES:  But go ahead.
3 BY THE WITNESS:
4     A.   It would be the pharmacy supervisor or
5 the pharmacy manager that would go back and talk to
6 the folks.
7 BY MR. DeROCHE:
8     Q.   Were there any reports of this quality
9 control with respect to the SOM process that was
10 ever generated that you saw?
11    MR. HYNES:  Same objection and objection to
12 form.
13 BY MR. DeROCHE:
14    Q.   Go ahead.
15    A.   I don't recall seeing a report, a
16 quality report like that.
17    Q.   Now, with respect to the pickers and
18 packers doing this suspicious order monitoring,
19 you're aware that the DEA requirement was that
20 there be -- that the DC that you ran, licensee,
21 design and operate a system that was intended to
22 expose suspicious orders, right?
23    MR. HYNES:  Objection to form.
24 BY THE WITNESS:

Page 313

1     A.   Yes.
2 BY MR. DeROCHE:
3     Q.   Who designed this system where you'd
4 have pickers and packers using a hunch to maybe
5 flag an order every once in a while?
6     MR. HYNES:  Objection; misstates testimony.
7 BY MR. DeROCHE:
8     Q.   Who designed that?
9     MR. HYNES:  Misstates the testimony about the
10 system.
11 BY THE WITNESS:
12    A.   That was in place long before I arrived
13 in Indianapolis.  So I don't know who put that in
14 place.
15 BY MR. DeROCHE:
16    Q.   Was there a conscious design that you're
17 aware of where somebody said, hey, I think we ought
18 to do suspicious order monitoring by having the
19 pickers and packers do whatever they do?
20    MR. HYNES:  Objection; asked and answered.
21 BY THE WITNESS:
22    A.   I don't know who came up with the plan
23 or when it was put in place.
24 BY MR. DeROCHE:

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    Q.   Well, do you know if anybody came up
2  with the plan or did it just happen by osmosis?
3       MR. HYNES:  Objection; asked and answered.
4  Improper question.  He answered this twice.  He
5  doesn't know.
6  BY THE WITNESS:
7    A.   I don't know.
8  BY MR. DeROCHE:
9    Q.   When the new SOM system was rolled out I
10 think you said in 2014, is that right?
11      MR. HYNES:  Objection.  More cumulative
12 questioning in violation of the deposition
13 protocol.  Go ahead.
14      MR. DeROCHE:  Note a continuing objection so
15 we don't have to go through this nonsense every ten
16 seconds.
17 BY MR. DeROCHE:
18   Q.   You know what I am talking about when it
19 was rolled out?
20   A.   Are we talking about the current program
21 that we are using?
22   Q.   Correct.
23   A.   What's the question?
24   Q.   It was rolled out to Indianapolis first,

Page 315

1  right?
2    A.   Yes.
3    Q.   Do you know why it was chosen, why
4  Indianapolis was chosen?
5       MR. HYNES:  Objection; cumulative questioning.
6  BY THE WITNESS:
7    A.   I don't know.
8  BY MR. DeROCHE:
9    Q.   Did you ever ask anybody?
10      MR. HYNES:  Objection; asked and answered,
11 cumulative questioning.  Go ahead.
12 BY THE WITNESS:
13   A.   No.  We were given a schedule of the DCs
14 that were going to roll out, and it was what it
15 was.
16 BY MR. DeROCHE:
17   Q.   Did anybody at CVS ever tell you that
18 Indianapolis was chosen because your DC serviced
19 markets with known prescription drug concerns?
20      MR. HYNES:  Objection; asked and answered.
21 BY MR. DeROCHE:
22   Q.   You can answer, sir.
23      MR. HYNES:  If you are reading from a
24 document, you should show the witness the document.

Page 316

1  BY MR. DeROCHE:
2    Q.   Did anybody ever tell you that?
3    A.   No.
4    Q.   Did you know that your DC serviced
5  markets with known prescription drug concerns?
6       MR. HYNES:  Repeat the question.
7  BY MR. DeROCHE:
8    Q.   Did you know that your DC serviced
9  markets with known prescription drug concerns?
10      MR. HYNES:  Objection to form.
11 BY MR. DeROCHE:
12   Q.   You can answer.
13   A.   Yes.
14   Q.   Which markets had the known prescription
15 drug concerns that you were aware of?
16   A.   Well, one that I was aware of for sure
17 was Indiana because Mr. Gillen -- Mr. Gillen was
18 sharing that information with me.
19   Q.   Do you know if Ohio had a known
20 prescription drug concern as well?
21      MR. HYNES:  Objection; vague.
22 BY THE WITNESS:
23   A.   In reviewing the documents that Ohio -- that
24 we talked about earlier that showed Ohio on that

Page 317

1  list for hydrocodone, top ten.
2  BY MR. DeROCHE:
3    Q.   So, you were aware of that?
4    A.   I was aware of it when we looked at it
5  earlier today.
6    Q.   Were you aware of it in 2010?
7    A.   I -- I don't know.
8    Q.   Let's look at 232.
9            (WHEREUPON, a certain document was
10           marked as CVS-Nicastro-232:  8/6/13
11           e-mail string; CVS-MDLT1-000003026
12           - 000003032.)
13 BY MR. DeROCHE:
14   Q.   Sir, showing you what we marked as
15 Nicastro CVS Exhibit 232.
16       Do you see in the second e-mail down,
17 there was an e-mail from Mr. Vanelli to a number of
18 folks, I believe, including you, dated August 6,
19 2013.
20       Do you see that, sir?
21   A.   Yes.
22   Q.   And I believe that it was circulating to
23 you something called a DC Huddle Guide, starting on
24 the third page.  And this is Bates Nos. 3026

Page 318

1 inclusive of 3032.
2 　　A.　Okay.
3 　　Q.　Are you familiar with this document,
4 sir?
5 　　A.　I'm sorry?
6 　　Q.　Are you familiar with this document?
7 　　A.　Vaguely.
8 　　Q.　It was sent to you in 2013, is that
9 correct?
10 　　A.　Yep.
11 　　Q.　Yes?
12 　　A.　Yes.
13 　　Q.　And you were instructed to go over it
14 with your associates who were involved in picking
15 controlled substances, correct?
16 　　MR. HYNES:　Objection.
17 BY THE WITNESS:
18 　　A.　Yes.
19 BY MR. DeROCHE:
20 　　Q.　Prior to August 6, 2013, had you ever
21 seen anything similar to this DC Huddle Guide that
22 you received in 2013, any document?
23 　　A.　I -- I don't know.
24 　　Q.　You don't recall ever seeing anything

Page 319

1 prior to this time?
2 　　MR. HYNES:　Objection; misstates the
3 testimony.
4 BY MR. DeROCHE:
5 　　Q.　You can answer.
6 　　A.　I don't recall.
7 　　Q.　Did you ever go over this document with
8 the folks that worked at your DC?
9 　　A.　I -- I don't recall.　I'm pretty sure I
10 would have.
11 　　Q.　Okay.　Something that you thought would
12 have found important at the time?
13 　　A.　Yes.
14 　　Q.　Has to do with suspicious order
15 monitoring by those folks, correct?
16 　　A.　Yes.
17 　　Q.　So, you would have found it important to
18 go over it with them --
19 　　A.　Yes.
20 　　Q.　-- carefully?
21 　　A.　My -- my pharmacy manager would have
22 gone over it with his team, yes.
23 　　Q.　Well, you would have gone over it with
24 him too, correct?

Page 320

1 　　MR. HYNES:　Objection; misstates his
2 testimony.
3 BY THE WITNESS:
4 　　A.　Not necessarily.　I had full faith and
5 confidence in my pharmacy manager, and I'm sure if
6 we -- if I requested him to go over this
7 information, he would have.　It's a little vague.
8 It's five years ago.　So...
9 　　Q.　Sure.
10 　　A.　But I'm sure if this was, you know, get
11 this done, do it, importance high, we would have
12 done it.
13 　　Q.　So, you would have found it to be
14 strange if you only had spent 15 minutes going over
15 this document --
16 　　MR. HYNES:　Objection.
17 BY MR. DeROCHE:
18 　　Q.　-- with your associates?
19 　　A.　We would have spent --
20 　　MR. HYNES:　Misstates his testimony.
21 BY THE WITNESS:
22 　　A.　-- the proper amount of time to go over
23 this document, and I think it would be difficult to
24 go over in 15 minutes.

Page 321

1 　　MR. DeROCHE:　Let's go to 216.
2 　　　　(WHEREUPON, a certain document was
3 　　　　marked as CVS-Nicastro-216:　8/9/13
4 　　　　e-mail string;
5 　　　　CVS-MDLT1-000000397.)
6 BY MR. DeROCHE:
7 　　Q.　Sir, showing you what we have now marked
8 as Nicastro CVS Exhibit 216.
9 　　　　Do you see the second e-mail down,
10 August 9, 2013?
11 　　A.　Um-hmm.
12 　　Q.　It's an e-mail from you, correct?
13 　　A.　Yes.
14 　　Q.　Who are the folks that are listed on the
15 "To" line of this e-mail?
16 　　A.　None of these folks are in my pharmacy
17 department.　These are supervisors of the front
18 store, inventory control, transportation
19 supervisor, shipping supervisor.　They would just
20 need to have a broad knowledge of the SOM because
21 it doesn't really impact them.
22 　　Q.　So, none of these folks had anything to
23 do with controlled substances at all?
24 　　A.　No.　None of them work in the pharmacy

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  department or in the control cage.
2      Q.   Do you know what the SOM training was
3  that you were providing for them for about 15
4  minutes on August 9, 2013?
5      A.   I don't recall specifically what it was.
6      Q.   Three days after you received the
7  huddle?
8      A.   Yeah, I would assume that it was this --
9  this update.  And it was probably to go over this
10 in general, give them a copy of it so they
11 understood what the expectations are for the folks
12 that are back in the pharmacy.
13     Q.   The person who was running the pharmacy
14 department isn't listed on here as a recipient of
15 this e-mail?
16     A.   No.
17     Q.   That's all I have for that one.
18         Earlier Mr. Elsner asked you about the
19 store that was located on Brook Park Road in
20 Cuyahoga County and questions generally about the
21 volume of controlled substances that were
22 distributed there?
23     MR. HYNES:  Objection to the cumulative
24 questioning.

Page 323

1  BY MR. DeROCHE:
2      Q.   Do you recall that testimony?
3      A.   I recall that.
4      Q.   And I believe your testimony was that
5  you really couldn't give a reaction to what he was
6  showing you because you had no data, for instance,
7  didn't know if it was near a hospital, things of
8  that nature, right?
9      MR. HYNES:  Same objection.
10 BY MR. DeROCHE:
11     Q.   Is that correct?
12     A.   Correct.
13     Q.   You would agree that in 2008 and 2009
14 your pickers and packers didn't have that kind of
15 data either, did they?
16     MR. HYNES:  Same objection.
17 BY THE WITNESS:
18     A.   They would have been looking at it based
19 on volume for that store.
20 BY MR. DeROCHE:
21     Q.   So, they didn't have the data that you
22 mentioned, whether it was near a hospital and
23 things of that nature?
24     MR. HYNES:  Same objection.

Page 324

1  BY MR. DeROCHE:
2      Q.   Didn't have that available to them, in
3  other words?
4      MR. HYNES:  Same objection.
5  BY THE WITNESS:
6      A.   No, they would not know if there was a
7  hospital next door to a store.
8  BY MR. DeROCHE:
9      Q.   You mentioned that you think that the
10 Indianapolis DC may have stopped distributing
11 controlled substances to Ohio -- to Cuyahoga County
12 and Summit County, rather, in 2013?
13     MR. HYNES:  Same objection.
14 BY THE WITNESS:
15     A.   I'm not sure of the date.  When the
16 Chemung, New York facility came online, and there
17 was a period there where they didn't take the
18 volume and then when they did, we would have
19 stopped servicing the area.  I'm not sure of the
20 dates.
21 BY MR. DeROCHE:
22     Q.   So, it could have been '14, you don't
23 recall?
24     A.   It wouldn't have been '14.  It was

Page 325

1  earlier on.  I think it was either '11, '12, or
2  '13.
3          '14 -- I think it was sooner in the time
4  that I went to Indianapolis that we lost Somerset
5  than later.
6      Q.   So, if the ARCOS data shows that your DC
7  distributed a million doses of hydrocodone
8  combination products to Cuyahoga County in 2014,
9  you wouldn't be able to explain why that was?
10     MR. HYNES:  Same objection.
11 BY THE WITNESS:
12     A.   If there is data showing it was 2014,
13 then, yes, we were still shipping to Cuyahoga
14 County.  So, it must have been 2014, then, that the
15 Chemung DC took over.
16 BY MR. DeROCHE:
17     Q.   While you were running the SOM program
18 in Indianapolis, did you have -- did the folks who
19 were working for you have access to outside vendor
20 orders?
21     A.   I -- I don't believe so.
22     Q.   So, they wouldn't have had access to,
23 for instance, the volume of Schedule II hydrocodone
24 products that were being shipped to any particular

**Page 326**

1 store?

2    A.   Yeah, I -- I don't believe they had that

3 access.

4    MR. DeROCHE:  Give me a moment to review my

5 notes. I think I may be done.

6    THE VIDEOGRAPHER:  Do you want to go off the

7 record?

8    MR. DeROCHE:  Let's go off the record, yeah.

9 Sorry.

10    THE VIDEOGRAPHER:  We're going off the record

11 at 4:56.

12      (WHEREUPON, a recess was had

13       from 4:56 to 4:59 p.m.)

14    THE VIDEOGRAPHER:  We're back on the record at

15 4:59.

16    MR. DeROCHE:  Mr. Nicastro, I have nothing

17 further. Thank you for your time.

18    THE WITNESS:  Thanks.

19    MR. DeROCHE:  Off the record.

20    THE VIDEOGRAPHER:  Going off the record at

21 4:59.

22      (WHEREUPON, the following

23       proceedings were had off the video

24       record:)

**Page 327**

1    THE REPORTER:  Signature? Do you read and

2 sign?

3    MR. HYNES:  Yes.

4      (Time Noted:  4:59 p.m.)

5      FURTHER DEPONENT SAITH NAUGHT.

**Page 328**

1

2    I, CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify:

3    That previous to the commencement of the examination of the witness, the witness was duly

4 sworn to testify the whole truth concerning the matters herein;

5    That the foregoing deposition transcript was reported stenographically by me, was thereafter

6 reduced to typewriting under my personal direction and constitutes a true record of the testimony

7 given and the proceedings had;

   That the said deposition was taken

8 before me at the time and place specified;

   That the reading and signing by the

9 witness of the deposition transcript was agreed upon as stated herein;

10    That I am not a relative or employee or attorney or counsel, nor a relative or employee of

11 such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in

12 the outcome of this action.

13

14    _____
   CORINNE T. MARUT, Certified Reporter

15

16    (The foregoing certification of this transcript does not apply to any

16 reproduction of the same by any means, unless under

17 the direct control and/or supervision of the certifying reporter.)

**Page 329**

1      INSTRUCTIONS TO WITNESS

2

3    Please read your deposition over

4 carefully and make any necessary corrections. You

5 should state the reason in the appropriate space on

6 the errata sheet for any corrections that are made.

7    After doing so, please sign the errata

8 sheet and date it.

9    You are signing same subject to the

10 changes you have noted on the errata sheet, which

11 will be attached to your deposition.

12    It is imperative that you return the

13 original errata sheet to the deposing attorney

14 within thirty (30) days of receipt of the

15 deposition transcript by you. If you fail to do

16 so, the deposition transcript may be deemed to be

17 accurate and may be used in court.

Page 330

```
 1         - - - - - -
               E R R A T A
 2         - - - - - -

 3

 4  PAGE  LINE  CHANGE

 5  _____  _____  _____

 6         REASON:  _____

 7  _____  _____  _____

 8         REASON:  _____

 9  _____  _____  _____

10         REASON:  _____

11  _____  _____  _____

12         REASON:  _____

13  _____  _____  _____

14         REASON:  _____

15  _____  _____  _____

16         REASON:  _____

17  _____  _____  _____

18         REASON:  _____

19  _____  _____  _____

20         REASON:  _____

21  _____  _____  _____

22         REASON:  _____

23  _____  _____  _____

24         REASON:  _____
```

Page 332

```
 1         LAWYER'S NOTES
 2  PAGE  LINE
 3  _____  _____  _____
 4  _____  _____  _____
 5  _____  _____  _____
 6  _____  _____  _____
 7  _____  _____  _____
 8  _____  _____  _____
 9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
```

Page 331

```
 1       IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF OHIO
                 EASTERN DIVISION
 3
 4  ------------------------  )
     IN RE: NATIONAL          ) MDL No. 2804
 5  PRESCRIPTION OPIATE       )
     LITIGATION               ) Case No.
 6  ------------------------  ) 1:17-MD-2804
                              )
 7  THIS DOCUMENT RELATES TO  ) Hon. Dan A. Polster
     ALL CASES                )
 8  ------------------------  )
 9
           ACKNOWLEDGMENT
10
         I, MARK NICASTRO, the undersigned,
11  being first duly sworn, on oath say that
     the testimony given at my deposition at the time
12  and place aforesaid is the truth, the whole truth,
     and nothing but the truth, and that I have read the
13  foregoing transcript consisting of Pages 1 to 331
     inclusive, and do subscribe and make oath that the
14  same is a true, correct, and complete transcript of
     my deposition so given as aforesaid, and includes
15  changes, if any, so made by me.
16
17

18  _____
         MARK NICASTRO
19
20  SUBSCRIBED AND SWORN TO before me
21  this    day of    , A.D. 20 .
22  _____
23  Notary Public
24
```