Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

                         -  -  -
 3

    IN RE:  NATIONAL            : HON. DAN A. POLSTER
 4  POLSTER
    PRESCRIPTION OPIATE         :
 5  LITIGATION                  :
                                :
 6  APPLIES TO ALL CASES        : NO.
                                : 1:17-MD-2804
 7

                 - HIGHLY CONFIDENTIAL -
 8       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
                         -  -  -
 9               JANUARY 17, 2019
                         -  -  -
10                     VOLUME II
11               Videotaped sworn continued
12          deposition of TRACEY L. NORTON, taken
13          pursuant to notice, was held at BEST
14          WESTERN LEHIGH VALLEY HOTEL & CONFERENCE
15          CENTER, 300 Gateway Drive, Bethlehem,
16          Pennsylvania, beginning at 8:38 a.m., on
17          the above date, before Margaret M.
18          Reihl, a Registered Professional
19          Reporter, Certified Shorthand Reporter,
20          Certified Realtime Reporter, and Notary
21          Public.
22
                         -  -  -
23

                 GOLKOW LITIGATION SERVICES
24          877.370.3377 ph | 917.591.5672 fax
```

| | |
|---|---|
| **Page 549** | **Page 551** |

Page 549

1  A P P E A R A N C E S:
2
    SEEGER WEISS LLP
3  BY:  DAVID BUCHANAN, ESQUIRE
       ELINA RAKHLIN, ESQUIRE
4      SCOTT SIEGEL, PARALEGAL
    55 Challenger Road
5  Ridgefield Park, New Jersey  07660
    (212) 584-7732
6  erakhlin@seegerweiss.com
    Representing the Plaintiffs
7
8  MORGAN & MORGAN
    BY:  JAMES YOUNG, ESQUIRE
9      RAYMOND TAMAYO, ESQUIRE (telephonic)
       TERESA DuBUISSON-MAI, ESQUIRE (telephonic)
10     RENEE COOK, ESQUIRE (telephonic)
       SHAWKURA SHAW, ESQUIRE (telephonic)
11     JENNIFER WILLIAMS, ESQUIRE (telephonic)
    76 Laura Street, Suite 1100
12  Jacksonville, Florida  32202
    (904) 398-2722
13  jyoung@forthepeople.com
    Representing the Plaintiffs
14
15  MCCARTER & ENGLISH
    BY:  AMY M. VANNI, ESQUIRE
16  1600 Market Street
    Suite 3900
17  Philadelphia, Pennsylvania  19103
    (215) 979-3848
18  avanni@mccarter.com
    - AND -
19  BY:  HAYLEY J. REESE, ESQUIRE
    405 N. King Street, 8th Floor
20  Wilmington, Delaware  19801
    (302) 984-6308
21  hreese@mccarter.com
    Representing the Defendant Endo and
22  the witness
23
24

Page 550

1  A P P E A R A N C E S: (cont'd)
2
    KIRKLAND & ELLIS LLP
3  BY:  JENNIFER G. LEVY, ESQUIRE
    655 Fifteenth Street, N.W.
4  Washington, D.C.  20005
    (202) 879-5211
5  jennifer.levy@kirkland.com
    Representing the Defendant Allergan
6
7
    REED SMITH LLP
8  BY:  LOUIS W. SCHACK, ESQUIRE
    Three Logan Square
9  1717 Arch Street, Suite 3100
    Philadelphia, Pennsylvania  19103
10  (215) 851-8280
    lschack@reedsmith.com
11  Representing the Defendant AmerisourceBergen
12
    FOLEY & LARDNER LLP
13  BY:  KATY E. KOSKI, ESQUIRE
    111 Huntington Avenue
14  Boston, Massachusetts  02199-7610
    (617) 342-4000
15  kkoski@foley.com
    Representing the Defendant Anda
16
17  MORGAN LEWIS & BOCKIUS LLP
    BY:  MARTHA A. LEIBELL, ESQUIRE
18  200 South Biscayne Boulevard
    Suite 5300
19  Miami, Florida  33131-2339
    (305) 415-3387
20  martha.leibell@morganlewis.com
    Representing the Defendant Teva
21
22
23
24

Page 551

1  A P P E A R A N C E S:  (cont'd)
2
3  BARNES & THORNBURG
    BY:  WILLIAM J. LEEDER, III, ESQUIRE
4  171 Monroe Avenue N.W.
    Suite 1000
5  Grand Rapids, Michigan  49503-2694
    bleeder@btlaw.com
6  Representing the Defendant H.D. Smith
7
    ALSO PRESENT:
8
9  Sandra Di Iorio, Litigation Counsel
    Endo
10
    Phillip Todd, Videographer
11
    Bradley Smith, Trial Technician
12
13       – – –
14
15
16
17
18
19
20
21
22
23
24

Page 552

1  TELEPHONIC APPEARANCES:
2  JONES DAY
    BY:  KASEY M. HEMPHILL, ESQUIRE
3  555 South Flower Street
    Fiftieth Floor
4  Los Angeles, California  90071-2300
    (213) 243-2356
5  Representing the Defendant Walmart
6
    TUCKER ELLIS LLP
7  BY:  RACHEL N. BYRNES, ESQUIRE
    950 Main Avenue, Suite 1100
8  Cleveland, Ohio 44113
    (216) 696-3950
9  rachel.byrnes@tuckerellis.com
    Representing the Defendants
10  Janssen and J&J
11
    ARNOLD & PORTER KAYE SCHOLER LLP
12  BY:  DAVID D. FAUVRE, ESQUIRE
    601 Massachusetts Ave, NW
13  Washington, DC 20001-3743
    (202) 942-5000
14  david.fauvre@arnoldporter.com
    Representing the Defendants, Endo
15  Health Solutions; Endo
    Pharmaceuticals, Inc.; Par
16  Pharmaceutical Companies, Inc. f/k/a
    Par Pharmaceutical Holdings, Inc.
17
18
19
20
21
22
23
24

Page 553

I N D E X

| WITNESS | PAGE |
|---|---|
| TRACEY L. NORTON | |
| By Ms. Vanni | 555 |
| By Ms. Koski | 592 |
| By Mr. Buchanan | 643 |

– – –

E X H I B I T S (cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Par-Norton-31 | Title 21-Food and Drugs excerpted pages no Bates | 594 |
| Par-Norton-32 | E-mail dated 7/17/07 Subject, Re: DEA Contact History [ALLERGAN_MDL_03952959 to 2960] | 622 |
| Par-Norton-33 | E-mail dated 8/22/07, Subject, DEA Meeting Logistics - 8/23 [Anda_Opioids_MDL_0000152278] | 624 |
| Par-Norton-34 | E-mail dated 7/31/07, Subject, DEA Teleconference re: CS Distribution/Anda [Anda_Opioids_MDL_0000275627] | 632 |
| Par-Norton-35 | Charts, produced natively [PAR_OPIOID_MDL_0001596805] | 655 |

Page 554

E X H I B I T S (cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Par-Norton-36 | E-mail string, top one dated 5/7/13, Subject, Re: API quota of OXYCODONE HYDROCHLORIDE ER Tablets for 2013 [PAR_OPIOID_MDL_0000368385 to 8392] | 668 |
| Par-Norton-37 | E-mail dated 2/25/14, Subject, charter with attachment [PAR_OPIOID_MDL_0001642692 to 2695] | 672 |
| Par-Norton-38 | E-mail string, top one dated 1/11/08, Subject FW: DEA Notice with attachments [ENDO-OPIOID_MDL-04881787 to 1788] | 682 |
| Par-Norton-39 | E-mail dated 5/21/14 Subject, New Educational Video for Pharmacists Addresses Prescription Drug Abuse - MarketWatch with attachment [ENDO-OPIOID_MDL-02794965 to 4967] | 710 |
| Par-Norton-40 | Thumb Drive | 712 |
| Par-Norton-41 | 2009 QT Mapics Direct Sales Data [Par_Opioid_MDL_0001596813_HC] | 745 |

Page 555

1    THE VIDEOGRAPHER:  We're now on
2 the record.  My name is Phillip Todd,
3 I'm a videographer for Golkow Litigation
4 Services.  Today's date is January 17,
5 2019.  The time is 8:38 a.m.
6    This video deposition is being
7 held in Bethlehem, PA in the matter of
8 National Prescription Opiate Litigation
9 for the United States District Court,
10 Northern District of Ohio, Eastern
11 Division.  The deponent is Tracey
12 Norton.  Counsel will be noted on the
13 stenographic record.
14    The court reporter is Peg Reihl
15 and will now swear in the witness.
16    ... TRACEY L. NORTON, having been
17 duly sworn as a witness, was examined
18 and testified further as follows:
19 BY MS. VANNI:
20    Q.    Good morning, Tracey.
21    A.    Good morning.
22    Q.    Can you please introduce yourself
23 to the jury.
24    A.    Yes, my name is Tracey Norton.

Page 556

1    Q.    We've seen some documents over
2 the course of the last couple of days where you
3 were referred to as Tracey Hernandez.
4    Is that a previous name you used
5 to use?
6    A.    Yes, it is.
7    Q.    What is your educational
8 background?
9    A.    I have a Bachelor's in business
10 from Muhlenberg University and a Master's in
11 pharmaceutical policy from the University of
12 Florida.
13    Q.    And when did you earn your
14 Master's?
15    A.    In -- my Master's was 2010.
16    Q.    How long did it take you to earn
17 your Master's?
18    A.    Two years.
19    Q.    And can you give us a sense of
20 what your Master's involves.
21    A.    Yes.  It covered all different
22 types of regulations that apply to the
23 pharmaceutical industry, so FDA regulations,
24 drug approval, DEA regulations, state

Page 557

1 regulations, basically the gamut of regulations
2 that apply to the industry.
3     Q.    And why did you get your
4 Master's?
5     A.    It was an area that I wanted to
6 pursue and make sure that I had a thorough
7 understanding, even beyond DEA compliance.
8     Q.    When did you first begin working
9 at Qualitest?
10     A.    In August of 2011.
11     Q.    And when did you leave Qualitest?
12     A.    In December of 2014.
13     Q.    So you were there about three
14 years and a couple of months?
15     A.    Yes, three years and four months.
16     Q.    What was Qualitest's customer
17 base?
18     A.    Primarily wholesalers and chains.
19     Q.    And when you say "chains," what
20 are you referring to?
21     A.    Chain drug stores.
22     Q.    When you joined Qualitest, what
23 was your position?
24     A.    The director of DEA compliance.

Page 558

1     Q.    And during your time at
2 Qualitest, did your position change?
3     A.    No.
4     Q.    As director of DEA compliance,
5 can you explain to us a little bit of what you
6 were responsible for on a day-to-day basis?
7     A.    Absolutely.  I was responsible
8 for -- excuse me -- quota, recordkeeping, such
9 as dealing with DEA 222 forms, import and export
10 documentation, also end of year reporting, ARCOS
11 reporting, SOMS and training for employees.
12     Q.    Did anyone report to you?
13     A.    Yes.  Ultimately, I had eight
14 people that reported to me.  When I first
15 started there was one.
16     Q.    And just, generally speaking,
17 what were the functions of those people who
18 reported to you?
19     A.    So I had a person for each --
20 each manufacturing and distribution facility,
21 and they were responsible for the overall
22 compliance of that facility, all of the
23 activities that I mentioned, the day-to-day
24 records and things like that.

Page 559

1     And then I also had a SOMS team
2 of SOMS manager and two associates.
3     Q.    So SOMS was handled separately?
4     A.    Yes, separate from the
5 manufacturing and distribution.
6     Q.    I want to talk to you about some
7 of the components of DEA compliance program at
8 Qualitest based on what you just told us that
9 you handled on a day-to-day basis.
10     A.    Sure.
11     Q.    I believe one thing you just
12 mentioned was quota, so I want to talk to you
13 first a little about quota, okay?
14     A.    Mm-hmm, yes.
15     Q.    Before I do that, I want to ask
16 you whether you recall being shown a
17 demonstrative that plaintiff's counsel put
18 together yesterday, it's Exhibit 4.  I think you
19 have it in front of you.
20     A.    Yes, I do.
21     Q.    It's called "Par Total Pills
22 Shipped 2008 - 2015."
23     A.    Yes.
24     Q.    Do you remember that?

Page 560

1     A.    Yes, I do.
2     Q.    Counsel represented to you
3 yesterday that the information in this
4 demonstrative was based on information that Endo
5 had pointed him to.
6     Do you recall that?
7     A.    I do.
8     Q.    Have you ever seen any of the
9 underlying data referenced in this
10 demonstrative?
11     A.    No, I have not.
12     Q.    Do you know what the data
13 represents?
14     A.    No.
15     Q.    Do you know if the data reflects
16 sales?
17     A.    I'm not sure.
18     Q.    You mentioned yesterday that it
19 could reflect more than sales.
20     Do you have a recollection of
21 that?
22     A.    Yes, yes, it could actually also
23 reflect transfers, when DEA refers to a sale
24 that can also be a transfer or a movement of

Page 561

1 product from your facility to somewhere else.
2          MR. BUCHANAN:  Move to strike,
3     called for speculation.  The witness'
4     answer was speculation.
5 BY MS. VANNI:
6     Q.    Are you familiar with quota --
7     A.    Yes.
8     Q.    -- and how quota is handled?
9     A.    Yes, I am.
10    Q.    Do you know if this demonstrative
11 is accurate?
12    A.    No, I do not.
13    Q.    Counsel also referred to
14 Qualitest as pumping pills out.
15         Do you recall that?
16    A.    I do.
17    Q.    Can you describe for the jury
18 what quota is?
19    A.    Yes.  So quota is a requirement
20 by DEA, it's basically a permission to purchase
21 a certain -- in Qualitest's case, it was a
22 permission to purchase a certain quantity of raw
23 material for each controlled substance family.
24 DEA regulates that amount every year, there's a

Page 562

1 new quota assigned, and it's based on several --
2 several different things that DEA considers,
3 information that the company provides as well as
4 information that DEA obtains elsewhere.
5     Q.    Like what?
6     A.    It's based on sales data that the
7 company provides.  It's also based on
8 destruction data of material that's on hand.
9 It's based on prescriptions written, DEA does
10 review the IMS data that talks about
11 prescriptions and, you know -- so they're
12 looking for the medical need for the product.
13         It's also -- they also confer
14 with FDA on it as well, and it could also be for
15 commercial distribution, but the quota is also
16 used for research activities as well, validation
17 activities of validating new processes and
18 things like that.
19    Q.    As part of your responsibilities
20 as DEA compliance manager, did you manage quota?
21    A.    Yes.
22    Q.    And what would that require you
23 to do?
24    A.    We would interact with a lot of

Page 563

1 different departments at Qualitest to find out
2 what the needs of the department were.  So if
3 there were any research projects that were going
4 on, if there were any transfers or validations
5 that were going on.
6          So, for example, if product was
7 being made in one piece of equipment and needed
8 to be transferred to a different piece of
9 equipment, you would have to make three
10 validation batches, that was an FDA requirement,
11 so we would need to get quota for that as well.
12         We would also have information on
13 destructions and information on sales, and we
14 would be submitting all of that information to
15 DEA and also answering any follow-up questions
16 that they had on those quotas.
17    Q.    How often would you have to apply
18 for quota?
19    A.    You would apply in April of the
20 prior year for the current year.  That was your
21 initial submission, and then throughout the
22 year, as things changed, you would submit
23 additional quota requests if sales increased.
24 You could also surrender quota if you weren't

Page 564

1 using it.
2     Q.    Could it be carried over?
3     A.    No, it could not.  It was
4 basically for that one year, and anything that
5 was not used in the permission by December 31st
6 was forfeited.
7     Q.    Approximately how much of your
8 time was spent managing quota?
9     A.    Probably about 40%.
10    Q.    And as part of your
11 responsibilities in managing quota, would you
12 communicate with the DEA?
13    A.    Yes, on a regular basis, mostly
14 with DEA headquarters.
15    Q.    Based on your experience and
16 knowledge of how quota works, could Qualitest
17 just be pumping pills out, as counsel suggested?
18    A.    No.
19         MR. BUCHANAN:  Objection to form.
20 BY MS. VANNI:
21    Q.    Why is that?
22    A.    DEA basically regulates how much
23 we can make, and, again, it's based on a number
24 of factors, one of which is medical need.

Highly Confidential - Subject to Further Confidentiality Review

Page 565

1    Q.    You also mentioned, I believe you
2  said recordkeeping or end of year recordkeeping
3  reporting.
4        Can you tell the jury what that
5  is?
6    A.    Yes.  So every transfer that we
7  have of a Schedule I or II drug, which is what
8  oxycodone or hydrocodone was, every movement
9  that we make of those drugs is visible to DEA.
10  There's a form called a DEA 222 form, which is a
11  three-part form issued by DEA.  The purchaser
12  receives a copy, the supplier receives a copy,
13  and DEA gets a copy.  So they're aware of every
14  movement and every customer purchase of Schedule
15  I or Schedule II drugs.  So that's the 222s.
16        Then we also did ARCOS reporting,
17  which is a quarterly report, could also be
18  monthly, depending on how the company wants to
19  submit it, but it's a quarterly report that sums
20  up all sales, all purchases.  And by "sales," I
21  mean movement as well as actual sales.  All
22  purchases, all transfers that we would make
23  within the company or externally, all of that is
24  recorded and submitted to DEA on a regular

Page 566

1  basis.  So, again, they have additional
2  information about your movements.
3        And then at the end of the year,
4  we also did an end of year report, and that was
5  a full accountability of everything on site
6  of -- a large part of that is your end of year
7  inventory, and you count everything on site, and
8  then you reconcile to the prior year's
9  inventory, and that gets submitted to DEA as
10  well.
11        MR. BUCHANAN:  Move to strike the
12     narratives, and, frankly, they should
13     proceed in a question, answer not with
14     narratives.
15  BY MS. VANNI:
16    Q.    And why is end of year reporting
17  important?
18    A.    It's important because it's a
19  total reconciliation and it shows that you are
20  able to account for all of your product.  There
21  is some loss that's allowed by DEA, because they
22  expect that you're going to have some
23  manufacturing loss due to the processes, but
24  there's an unspoken percentage that DEA will

Page 567

1  investigate and you'll have to explain if you
2  can't account for everything.
3    Q.    If you're not able to reconcile
4  your numbers, what do you have to do?
5        MR. BUCHANAN:  Objection to form,
6     calls for narrative.
7        THE WITNESS:  You would have to
8     report it to DEA if you can't reconcile,
9     and there could be a violation.
10  BY MS. VANNI:
11    Q.    You were asked some questions
12  yesterday about the SOMS program at Qualitest.
13        Do you recall that?
14    A.    Yes.
15    Q.    First of all, can you define what
16  SOMS is?
17    A.    Suspicious order monitoring
18  system.
19    Q.    And why is -- is a SOMS program
20  important, in your view?
21    A.    It is, yes.
22    Q.    And why?
23    A.    Because we need to make sure that
24  we're shipping product to customers that are

Page 568

1  legitimate and that have legitimate use of the
2  product.
3    Q.    You were asked some questions
4  yesterday about a DEA meeting that Qualitest had
5  in March of 2013.
6        Do you recall those?
7    A.    I do.
8    Q.    And I believe that counsel made
9  some reference to Qualitest being called to or
10  summoned to the DEA in DC, and I think you
11  referred to it as a different kind of meeting.
12        Can you describe the meeting that
13  Qualitest had with DEA in March of 2013?
14    A.    Yes.
15        MR. BUCHANAN:  Objection,
16     misstates the record.
17        THE WITNESS:  DEA had a
18     distributor initiative that was ongoing
19     for several years, and it was their
20     intent to meet with all distributors,
21     all distributor registrants and to share
22     information, and it was really a meeting
23     where they were talking to industry
24     about some possible things that they

Page 569

1 could look at to improve their SOMS
2 program, as well as getting information
3 from industry as to what tools might be
4 out there, what they were doing that
5 could also be of value. Really looking
6 to partner to -- to help make the SOMS
7 programs the best it could be.
8 MR. BUCHANAN: Objection, move to
9 strike, lack of foundation.
10 BY MS. VANNI:
11 Q. Did you personally attend the
12 meeting?
13 A. I did.
14 Q. Did you interact with DEA at the
15 meeting?
16 A. I did, yes.
17 Q. Counsel showed you a variety of
18 documents yesterday to establish that you knew
19 about certain factors that went into having an
20 effective SOMS program.
21 Before you met with the DEA in
22 March of 2013, do you remember that line of
23 questioning?
24 A. Yes, I do.

Page 570

1 Q. In fact, I believe counsel's
2 question was something to the effect of you knew
3 what was important before the DEA meeting in
4 2013, right?
5 MR. BUCHANAN: Objection to form.
6 THE WITNESS: Yes.
7 BY MS. VANNI:
8 Q. Do you recall that?
9 A. I do.
10 Q. In fact, that's true, right?
11 A. It is very true.
12 Q. Is there any dispute about that?
13 A. No, not at all.
14 Q. Do you have an understanding, as
15 you sit here today, why Qualitest hired you in
16 2011?
17 A. I do.
18 Q. What is that?
19 A. Qualitest hired me to come in and
20 make improvements to the DEA program that they
21 wanted to have, and that includes all of the
22 recordkeeping quotas, SOMS, make improvements
23 across the board.
24 MR. BUCHANAN: Objection. Move

Page 571

1 to strike, absence of foundation.
2 BY MS. VANNI:
3 Q. And when you started at
4 Qualitest, were there some areas of improvement
5 that you wanted to address with respect to the
6 SOMS program?
7 A. Yes, there were.
8 Q. Okay. And what were some of
9 those areas?
10 A. I had heard at DEA conferences
11 that there were things that DEA thought that
12 industry could do to improve SOMS programs, such
13 as a customer questionnaire, a customer on-site
14 visits, putting boots on the ground, to visit
15 your customers, SOPs, chargeback data. Those
16 were all things that had come up at DEA
17 conferences in the past and that DEA was
18 suggesting could be helpful.
19 Q. Were they required by regulation?
20 A. They were not.
21 MR. BUCHANAN: Objection to form,
22 foundation.
23 BY MS. VANNI:
24 Q. Are you familiar with the

Page 572

1 regulation?
2 A. I am, yes.
3 Q. I want to show you what plaintiff
4 used yesterday, I believe it was Exhibit 17. I
5 think you have it in front of you.
6 If you could go to I believe it's
7 page 574.24.
8 A. Yes.
9 Q. Under "Potential Failure
10 Mode/Effect."
11 Do you see where I am?
12 A. I do.
13 Q. It says, "Our current Suspicious
14 Order Monitoring Program (SOMS) was built in
15 pieces and only applies to the retail side of
16 the business."
17 A. Yes.
18 Q. "DEA requires it to apply to all
19 customers. In addition, the current system has
20 had two issues in the past year that resulted in
21 controlled product being released that should
22 not have been. The system needs to be revamped,
23 all customers added, IMS data and chargeback
24 data incorporated and eventually a contracted

Page 573

1 customer assessment firm hired or an on-site
2 SOMS specific individual to perform these
3 assessments."
4 Do you know who wrote this?
5 A. I did.
6 Q. Yesterday counsel had suggested
7 to you that this document was written in
8 January 2013 because it was attached to an
9 e-mail from that date.
10 Do you recall that?
11 A. Yes, I do.
12 Q. When was this document written?
13 A. This document was a living
14 document that was written from -- started at the
15 time when -- at the time that I was hired and as
16 I reviewed different areas, I added to the
17 document, on an ongoing basis.
18 Q. And what was the purpose of you
19 doing that?
20 A. To document things that I wanted
21 to improve at the company and to basically make
22 sure that we addressed all of them.
23 Q. Your comments with respect to the
24 current suspicious order monitoring program that

Page 574

1 I just read, were they -- was that based on
2 observations that you made?
3 A. It was.
4 Q. Can you estimate for us when you
5 started looking at the SOMS program at
6 Qualitest?
7 A. Basically --
8 MR. BUCHANAN: Calls for
9 speculation.
10 THE WITNESS: -- when I started.
11 BY MS. VANNI:
12 Q. And I think we've established
13 that you started in 2011. Do you remember the
14 month?
15 A. August of 2011, yes.
16 Q. Tracey, did you wait until the
17 DEA meeting in March 2013 to start looking at
18 the SOMS program?
19 A. Absolutely not.
20 Q. If you started looking at the
21 SOMS program around the time you were first
22 hired at Qualitest, can you explain to the jury
23 why all of the changes that you wanted to make
24 were not implemented before March 2013?

Page 575

1 A. Yes.
2 MR. BUCHANAN: Objection,
3 foundation.
4 THE WITNESS: Creating a SOMS
5 program is an extremely involved
6 process, especially if you want to do it
7 right, and our -- we had to evaluate the
8 electronic systems that were available
9 to us, our own internal system to see if
10 it was capable of handling and our IT
11 structure to see if they could build --
12 we could build our own system in-house
13 versus outsource it. We had to hire
14 people to manage the program on a
15 regular basis. We had to write SOPs.
16 We had to educate internal people on
17 what the program was about and how to
18 use it. And we had to make sure that we
19 had the capability to visit customers.
20 We had to review chargeback data. There
21 were a lot of different things that went
22 into developing an enhancement of that
23 program.
24

Page 576

1 BY MS. VANNI:
2 Q. You mentioned needing to hire
3 people?
4 A. Yes.
5 Q. Were you involved in the hiring
6 process?
7 A. I was.
8 Q. Can you describe a little bit for
9 us why that would take time?
10 A. It took a long time because of
11 the facility being in Huntsville, for one. It
12 was not -- not really in the pharmaceutical
13 belt, so it was a little bit difficult to find
14 someone who had applicable experience and then,
15 also, we wanted to -- I wanted to make sure that
16 we found the right person. I think it's a very
17 important role. So it definitely took a long
18 time to get the right person in and to write the
19 job descriptions as well.
20 Q. With respect to the DEA meeting
21 that you were questioned about yesterday, you
22 made a comment or provided testimony that
23 counsel moved to strike that the SOMS -- that
24 the DEA did not find Qualitest SOMS program

Highly Confidential - Subject to Further Confidentiality Review

Page 577

1 inadequate.

2     Do you recall that?

3     A.   I do, yes.

4     Q.   Do you want to say something now

5 about the DEA's findings with respect to

6 Qualitest's SOMS programs, based on your

7 presence at that meeting?

8     A.   Yes, yes, I do.

9     MR. BUCHANAN: Objection, calls

10 for speculation. Lack of foundation.

11     THE WITNESS: The SOMS program --

12 the SOMS programs was not in violation

13 of the DEA regulations. If it was in

14 violation of the DEA regulations, we

15 would have gotten a fine and/or a letter

16 of admonition, and that was not the

17 case.

18     Again, this was a meeting of

19 exchanging ideas and information.

20 BY MS. VANNI:

21     Q.   Following the meeting with DEA,

22 did you continue to try to enhance the SOMS

23 programs at Qualitest?

24     A.   Yes, we continued on the path

Page 578

1 that we had been on and incorporated several of

2 the things -- actually all of the things that

3 DEA had suggested.

4     Q.   Can you give us a sense of some

5 of the things that you implemented following

6 that meeting?

7     A.   Yes, we implemented -- we

8 continued to complete our SOPs, writing SOPs.

9 We educated employees, the sales team, our

10 employees that we hired on the system and how to

11 work the system, how to run it, and, also, we

12 even did training for warehouse people, which

13 was above and beyond and was really something

14 that we thought would be helpful to have another

15 set of eyes on orders that were going out. We

16 did implement the customer visits. We

17 contracted with a company to do some of those

18 visits, as well as our SOMS manager also did

19 some. And we contracted with an IT company to

20 implement the statistical analysis system,

21 electronic system.

22     Q.   Did you make any hires following

23 the meeting?

24     A.   We did. We hired the SOM

Page 579

1 manager. We also hired two associates to work

2 for him to review orders on a daily basis.

3     Q.   Did you take any actions in

4 trying to elicit information from customers?

5     A.   We did. We also submitted a --

6 created a customer questionnaire, which we had

7 started previously, but it was an ongoing

8 activity, and we added some additional questions

9 to it and sent that out as well.

10     Q.   And what type of information did

11 you ask for in those questionnaires?

12     A.   We asked for information about

13 our customers, licensing, which we already knew

14 that they had valid licenses, but we wanted more

15 detail so that we could actually go online. We

16 wanted information about their state licenses so

17 we could check their regulatory history online.

18     We also wanted names of owners or

19 people that worked at the facility, information

20 about the customer's SOM program, what they were

21 doing. Information about the expected

22 purchases, products, the product mix that they

23 were -- would be purchasing from us. Yeah,

24 that's pretty much a lot of information.

Page 580

1     Q.   Yesterday you were shown

2 Plaintiffs' Exhibit Number 5. You should have

3 it in front of you. I can direct your attention

4 to the second page of that document on Qualitest

5 letterhead dated October 18, 2013?

6     A.   Yes.

7     Q.   Turn the back page of it, 594.4,

8 is that your signature?

9     A.   Yes, it is.

10     Q.   Did you send this letter?

11     A.   I did.

12     Q.   What is -- what was the purpose

13 in you sending this letter?

14     A.   The purpose of the letter was to

15 notify our customers that we were going to be

16 asking for additional information from them in

17 the form of a questionnaire, that we were

18 concerned we would be looking at orders in

19 different ways than we had in the past and --

20     Q.   Different how?

21     A.   Different through the new

22 electronic system, so those -- the information

23 that the new electronic system would give us

24 would be additional information. We may be

Page 581

1 coming back to the customers to ask questions,
2 and so it was really just notifying them that,
3 you know, they might get calls from us that they
4 did have to fill out this questionnaire,
5 basically putting them on alert to this change.
6     Q.    If the customers did not fill out
7 questionnaires, would you take any steps or
8 actions or would anybody in your department?
9     A.    Yes, we would follow up with them
10 at first to give them an opportunity.  If it
11 didn't -- hadn't been sent to the correct
12 person, we wanted to make sure that it
13 absolutely did get to the right person.  If they
14 didn't fill it out after that, then we would
15 take action against them as far as not servicing
16 them.
17     Q.    If I could direct your attention
18 to the third paragraph, it's the second sentence
19 begins, "Qualitest is enhancing its due
20 diligence efforts when fulfilling orders to
21 provide greater assurance that our products are
22 purchased by appropriate patients for prescribed
23 uses."
24     Did I read that correctly?

Page 582

1     A.    Yes, you did.
2     Q.    What did you mean by that
3 statement?
4     A.    We wanted to make sure that we
5 were doing everything we could, meeting the
6 regulation, which is what we were doing
7 previously, but we also wanted to make sure that
8 we were building in some of the things that I
9 knew had been suggestions and feedback from DEA
10 in the past to make sure that we were doing
11 whatever we could to prevent our product from
12 getting into illegitimate hands.
13     Q.    And I think we established you're
14 familiar with the DEA regulations?
15     A.    Yes.
16     Q.    The things that you were able to
17 implement during your time at Qualitest with
18 respect to the SOMS program, were they required
19 under the regulation?
20     MR. BUCHANAN:  Objection to the
21     form, foundation.
22     THE WITNESS:  No, they were not
23     required.
24 BY MS. VANNI:

Page 583

1     Q.    I believe you mentioned customer
2 visits as well?
3     A.    Yes.
4     Q.    Were you able to implement
5 customer visits after the DEA meeting?
6     A.    We were, yes.
7     Q.    And why did you want to do that?
8     A.    It was one of the suggestions
9 that DEA had had, and I had seen it being
10 suggested by DEA previously as well.
11     Q.    With respect to Qualitest SOMS
12 program, if an order of interest was flagged,
13 what would happen?
14     MR. BUCHANAN:  Objection as to
15     time.
16     THE WITNESS:  There would be an
17     investigation into that order.  We would
18     look at the customer's history, purchase
19     history.  We would go back to the
20     questionnaire and look at the
21     information that had been submitted.  We
22     would do additional research into the
23     information on the questionnaire to make
24     sure nothing had changed.  We would also

Page 584

1     get the customer's feedback on, you
2     know, why there was an increase.  If
3     that did not sound justified, we would
4     not ship the order and notify DEA.
5     If other information was
6     available that made us feel that the
7     customer needed an additional visit, we
8     would revisit the customer.  Ultimately,
9     we would either discontinue the order
10     and notify DEA.  We would let the order
11     go through if everything was okay, or in
12     some cases, we would discontinue the
13     customer.
14 BY MS. VANNI:
15     Q.    If you didn't hear back from the
16 customer, receive information that you needed,
17 what would happen?
18     A.    We would follow up, try to get
19 that information.  If we still did not get the
20 information, we would --
21     MR. BUCHANAN:  Excuse me.  Same
22     objection as to time.
23     THE WITNESS:  -- we would
24     eventually cut off the customer.

Highly Confidential - Subject to Further Confidentiality Review

Page 585

BY MS. VANNI:

Q. And what time frame are we talking about here with respect to your description of the SOMS program, as you just provided it?

A. As far as when did the customer visits start?

Q. No, in terms of the questions that I was just asking you generally in terms of the SOMS program, how it operated, what time frame are you referring to?

A. So the time frame of an order pending versus the investigation and all the happenings, so it --

Q. My question was a little bit different.

What years are we talking about that the SOMS program operated like this?

A. Basically 2013, 2014.

Q. You also when you were describing your overall DEA compliance responsibilities at Qualitest, you had mentioned training?

A. Yes.

Q. What do you mean by "training"?

Page 586

A. We did a lot of training for employees, a lot of different types of training.

So the main one was the general overview, which covered I called it soup to nuts on the DEA regulations, all of the recordkeeping, the requirements, storage requirements, the general overview of quota, the need for the suspicious order monitoring. It covered everything.

MR. BUCHANAN: Objection to form as to time again. I'm sorry it's belated, but if you want to correct it to clarify, I just wanted to give you notice.

BY MS. VANNI:

Q. When would you have implemented training?

A. Basically when I started.

Q. So we're talking like the 2011 time frame?

A. Correct.

Q. And would the training be provided at different points in time?

A. It would, yes. It was provided

Page 587

on an ongoing basis across the employee.

Q. Would you personally provide the training, or would people on your team do it?

A. At first I was the main one providing the training. Certain specific training others gave, so, for example, our SOM manager gave specific SOMS training.

Q. What kind of -- what's your understanding of what training Mr. Brantley would provide?

A. Basically, why we needed the SOMS program.

MR. BUCHANAN: Objection to form, foundation.

THE WITNESS: What types of things we would look for and why it was important, things that we would document.

BY MS. VANNI:

Q. Prior to someone on your team giving training to someone in the company, would you have a discussion with them?

A. We were discussing things with employees all the time, so it was really an

Page 588

ongoing education process, so we would train and talk to all employees, all levels.

Q. Finally, you were asked some questions yesterday about some industry groups that you belong to, specifically the anti-diversion working group and the New Jersey Pharmaceutical Industry Group.

Do you remember that?

A. I do, yes.

Q. Can you describe for the jury what the anti-diversion working group is?

A. Yes, the anti-diversion working group was put together -- it consisted of manufacturers and distributors, it was a group that met maybe four times total. It --

Q. What was the purpose of the group?

A. The purpose of the group was to collaborate, to see if there was a way that we could impact abuse and diversion in a positive way, to help to prevent it, and we came up with the red flags video.

Q. What is the red flags video?

A. It's a video that's directed to

Page 589

1 pharmacies and pharmacists, and it basically
2 talks about things that they should look for in
3 patients or individuals that are seeking to
4 divert the product.
5    Q.    What is the -- what was the
6 purpose of that?
7    A.    The purpose was to make sure that
8 pharmacists were aware of things to look for to
9 help to prevent diversion. We were concerned
10 about it and wanted to try to do whatever we
11 could.
12    Q.    Do you know if the DEA was aware
13 of this group?
14    A.    The DEA was aware of the group.
15 DEA was actually -- I believe they were sent --
16 also sent a copy of the video.
17        MR. BUCHANAN: Objection move to
18    strike, foundation.
19 BY MS. VANNI:
20    Q.    You also were asked about your
21 time at -- involved in the New Jersey
22 Pharmaceutical Industry Group?
23    A.    Yes.
24    Q.    Do you recall that?

Page 590

1    A.    Mm-hmm.
2    Q.    What is that?
3    A.    It's a working group of peers,
4 others in the companies that handled DEA
5 compliance, and the group gets together maybe
6 once or twice a year, and the purpose is to
7 share learnings of DEA regulations and to get
8 industry to do benchmarking.
9    Q.    What is benchmarking?
10    A.    Basically to see what other
11 companies are doing in some areas so --
12    Q.    Why is that important?
13    A.    It's important because it helps
14 to -- helps to keep you abreast of what's new
15 and what's developing. It also helps to know
16 what's going on in other companies, because
17 sometimes you might want to implement something
18 internally and you're asked, you know, by others
19 in your company, well, what are other companies
20 doing? So to have that background and that
21 knowledge, to a certain extent, obviously, there
22 are, you know, pretty big confidentiality issues
23 when you're dealing with people who are our
24 competitors, so there's not a lot of detail

Page 591

1 shared, but there is some detail shared.
2    Q.    And why did you decide to join
3 these groups?
4    A.    The group actually started, the
5 New Jersey working group actually started
6 through a request from the local DEA, and DEA
7 was looking to have a good working relationship
8 with industry and to make sure that we,
9 together, could do, you know, everything that we
10 could from a prevention of abuse and diversion.
11        MS. VANNI: At this point I don't
12    have any further questions for you. I
13    might have some follow-up after.
14        THE WITNESS: Okay.
15        MS. VANNI: Thank you. Pass the
16    witness.
17        MR. BUCHANAN: You can go off the
18    record. Thank you.
19        THE VIDEOGRAPHER: The time is
20    now 9:13. We are off the record.
21        (Brief recess.)
22        THE VIDEOGRAPHER: 9:15, back on
23    the record.
24 BY MS. KOSKI:

Page 592

1    Q.    Good morning, I introduced myself
2 earlier on the record, but my name is Katie
3 Koski, and I represent Anda, Inc.
4        Over the course of your
5 deposition you've been asked a lot of questions
6 or we've heard a lot of answers about a couple
7 of different concepts that I want to discuss
8 with you this morning, concepts such as ordering
9 limits or thresholds.
10        Are you familiar with that
11 concept?
12    A.    Yes.
13    Q.    And customer dispensing data or
14 dispensed data.
15        Do you recall talking about that?
16    A.    I do.
17    Q.    And we've heard reference to
18 customer questionnaires, do you recall that?
19    A.    Yes.
20    Q.    And there have been references to
21 electronic order monitoring or electronic order
22 systems?
23    A.    Yes.
24    Q.    And I'd like to ask some

Page 593

1 questions about those concepts.
2         So you've worked in DEA
3 compliance for about 25 years; is that right?
4    A.    Yes.
5    Q.    And you understand when I refer
6 to DEA compliance that I mean working with a
7 company's obligations under the Federal
8 Controlled Substances Act, right?
9    A.    I do.
10    Q.    And you're familiar with that
11 statute?
12    A.    Yes, I am.
13    Q.    So if I referred to 21 USC
14 Section 801, you understand what that is; is
15 that right?
16    A.    I understand the 21 USC, yes.
17    Q.    Okay.  And is it fair to say
18 throughout the course of your career, you had
19 occasion to review the statute?
20    A.    I have.
21    Q.    Okay.  And you're familiar with
22 Section 823 of the Act, right?
23    A.    I'm not sure exactly what 823 is
24 but...

Page 594

1         (Document marked for
2         identification as Par-Norton Deposition
3         Exhibit No. 31.)
4 BY MS. KOSKI:
5    Q.    Okay.  I'm going to hand you what
6 we've then marked as Exhibit 31.
7         MR. BUCHANAN:  You said 31?
8         MS. KOSKI:  Yes.
9 BY MS. KOSKI:
10    Q.    And you recognize the document
11 that I handed you as Section 823 of the
12 Controlled Substances Act?
13    A.    Yes, I do.
14         MR. BUCHANAN:  Counsel, I just
15     wanted to note a preliminary objection.
16     I trust this is going to be fact
17     testimony.  It doesn't sound like it to
18     me at this point, but I just wanted to
19     give you notice that this does not seem
20     to be related to the witness' experience
21     or at least my examination of the
22     witness, so I don't feel constrained by
23     whatever time you use if I need more
24     time.

Page 595

1         MS. KOSKI:  We'll agree to
2     disagree on that.
3         MR. BUCHANAN:  That's fine.
4 BY MS. KOSKI:
5    Q.    Ms. Norton, you're familiar with
6 the statute?
7    A.    Yes.
8    Q.    Having taken a look at it just
9 now, Exhibit 31, does that refresh your
10 recollection as to the statute?
11    A.    Yes, I just wasn't sure offhand
12 what 823 was.
13    Q.    And yesterday during the course
14 of your examination, you referred on several
15 occasions to statutes of regulations that govern
16 DEA compliance, the role that you served?
17    A.    Yes.
18    Q.    Okay.  And if you refer to
19 Section 823, you see that that governs the
20 registration of pharmaceutical manufacturers and
21 distributors, right?
22    A.    Yes, it does.
23    Q.    And we talked at length yesterday
24 that you worked primarily for pharmaceutical

Page 596

1 manufacturers and then later in your career for
2 a distributor; is that right?
3    A.    Yes, that's correct.
4    Q.    Okay.  And for both manufacturers
5 and distributors, Section 823 provides that the
6 Attorney General shall register an applicant to
7 manufacture or distribute controlled substances
8 if he determines such registration is consistent
9 with the public interest.
10         Do you see that?
11    A.    Yes, I do.
12    Q.    And Section 823 in front of you
13 also provides that "In determining the public
14 interest, the following factors shall be
15 considered," and then it lists several, which
16 includes maintenance of effective controls
17 against diversion of particular controlled
18 substances into other than legitimate medical,
19 scientific and industrial channels.
20         You see that, right?
21    A.    Yes, I do.
22    Q.    In fact, that's the only section
23 of the Controlled Substances Act that addresses
24 maintenance of effective controls against

Page 597

1 diversion, right?
2         MR. BUCHANAN:  Objection to the
3     form, leading, and, frankly, you should
4     do this with experts.  This is also
5     beyond yesterday.  This is not fact
6     testimony, counsel.  Put it in a legal
7     brief, get an expert, do something, but
8     this is not appropriate redirect
9     examination.
10        MS. KOSKI:  You may object as to
11    form, if you want a standing objection
12    other than your speech that you just
13    gave, you can have it.
14        MR. BUCHANAN:  No, I think you
15    should know the basis of the objection.
16    This is beyond -- this is expert.
17        MS. KOSKI:  I don't need -- I
18    don't need to know the basis of the
19    objection.  You can object as to form.
20 BY MS. KOSKI:
21    Q.    And I'll repeat my question.
22          This is the only section of the
23 Controlled Substances Act that addresses
24 maintenance of effective controls against

Page 598

1 diversion, right?
2         MR. BUCHANAN:  It's leading.
3         THE WITNESS:  I think overall the
4     regulations as a whole address in
5     different ways those controls.  It does
6     reference that specific wording here.
7 BY MS. KOSKI:
8     Q.    Okay.  And in the Controlled --
9 the Federal Controlled Substances Act, the
10 statute, there's no mention of suspicious order;
11 is that fair?
12        MR. BUCHANAN:  Objection to form
13    and the leading, counsel.  It's a new
14    area.  It should be direct examination.
15        MS. KOSKI:  I'm sorry.  You can
16    object as to form, and you can preserve
17    your record as to form.
18        MR. BUCHANAN:  You're leading a
19    witness on expert territory, counsel.
20    It's highly improper.
21        MS. KOSKI:  It's a form
22    objection.  You can object as to form.
23        MR. BUCHANAN:  I'll just tell
24    you, counsel, it's not appropriate

Page 599

1     redirect.
2 BY MS. KOSKI:
3     Q.    The Act doesn't mention --
4 doesn't include the phrase suspicious order,
5 right?
6         MR. BUCHANAN:  That is leading.
7         THE WITNESS:  The CFR
8     mentions suspicious order.
9 BY MS. KOSKI:
10    Q.    I'm talking about the statute in
11 front of you, the Controlled Substances Act.
12        MR. BUCHANAN:  That's leading.
13        THE WITNESS:  It does not say it
14    here, no.
15 BY MS. KOSKI:
16    Q.    And you know that there is no
17 reference in the Controlled Substances Act to a
18 "suspicious order monitoring system," correct?
19        MR. BUCHANAN:  Objection to the
20    leading, counsel.
21        THE WITNESS:  Not to a system.
22 BY MS. KOSKI:
23    Q.    Okay.  And there's no language in
24 the section of the Controlled Substances Act

Page 600

1 that you have in front of you that says to "know
2 your customer," right?
3         MR. BUCHANAN:  Objection to the
4     leading, counsel.
5         THE WITNESS:  No, there is not.
6 BY MS. KOSKI:
7     Q.    And there's no section in the
8 Controlled Substances Act in front of you that
9 refers to dispense data or dispensing data,
10 right?
11    A.    There is not.
12        MR. BUCHANAN:  Objection to the
13    leading, counsel.
14 BY MS. KOSKI:
15    Q.    And there's no mention of
16 customer questionnaire in the Act either, right?
17    A.    There is not.
18        MR. BUCHANAN:  Objection to the
19    leading.
20        You just have to give me a moment
21    to get my objections in.  Apparently,
22    there are going to be quite a few.
23        THE WITNESS:  I'm sorry.
24        MR. BUCHANAN:  Thank you.

Page 601

BY MS. KOSKI:

Q. And the Act does not refer to internet pharmacies, right?

MR. BUCHANAN: Objection to the leading.

THE WITNESS: It does not.

BY MS. KOSKI:

Q. And there's no provision of the Act that states that distributors may not fill orders that are identified by them as potentially "suspicious orders"?

MR. BUCHANAN: Objection to the leading, counsel.

BY MS. KOSKI:

Q. There's nothing in the Act in front of you that says that?

MR. BUCHANAN: Objection to the leading. Those words, is that what you're saying?

MS. KOSKI: Yes.

MR. BUCHANAN: Leading.

BY MS. KOSKI:

Q. You can answer.

A. The CFR --

Page 602

Q. Referring to the Controlled Substances Act in front of you. We'll talk about the CFR after that.

A. No.

Q. Okay. And the Act doesn't have any provision that requires distributors to create an ordering system that allows a customer to submit suspicious orders so that the distributor can then report those orders to the DEA, right? That's not in the language of the statute?

MR. BUCHANAN: I'll object to the leading.

THE WITNESS: No.

MR. BUCHANAN: I'm also going to object to the examination, counsel.

Did you serve a separate notice for this examination? This goes well beyond the direct examination.

MS. KOSKI: It doesn't.

MR. BUCHANAN: It does. Did you serve a separate notice?

MS. KOSKI: If references all of the concepts that you discussed.

Page 603

MR. BUCHANAN: Did you serve a notice on this?

MS. KOSKI: You can object as to form.

MR. BUCHANAN: No, no, no, no. I'm objecting because you don't have the right to do this.

If you want to do this with this witness, you need to serve a notice; otherwise, you're limited to the examination that I conducted.

MS. KOSKI: And this is clearly visible --

MR. BUCHANAN: This is not.

MS. KOSKI: Well, we can --

MR. BUCHANAN: You're using her as an expert.

MS. KOSKI: This is within the scope.

MR. BUCHANAN: Tender her as a 26(a)(1) expert if you want to.

MS. KOSKI: I'm sorry, I'm not using her as an expert.

MR. BUCHANAN: Then we'll take

Page 604

the full examination.

MS. KOSKI: I'm using -- this is within the scope of your examination yesterday.

MR. BUCHANAN: It's absolutely not. Does everybody here consent to this? Because if you do, it's going well beyond the time. We're going to kick open the door and we're going to go all morning.

MS. KOSKI: I object to that. It's within the scope.

MR. BUCHANAN: That's all right, we'll sit here.

BY MS. KOSKI:

Q. And you've heard reference throughout your deposition -- I think you actually referred to the term registrants, right?

A. Yes.

Q. Okay. And registrants are -- the term registrant is because of Section 823 that talks about the registration, right?

MR. BUCHANAN: Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 605

1 foundation and the leading.
2          THE WITNESS: The registration.
3 BY MS. KOSKI:
4      Q.    Okay. And when you referred to
5 the term yesterday throughout your deposition as
6 registrant, that was someone who was registered
7 to either manufacture or distribute controlled
8 substances pursuant to the Controlled Substances
9 Act; is that correct?
10          MR. BUCHANAN: Objection to form,
11      leading.
12          THE WITNESS: There are other
13      types of registration as well.
14 BY MS. KOSKI:
15      Q.    And you referred during your
16 testimony yesterday to the DEA regulations that
17 relate to the distribution and manufacture of
18 controlled substances, right?
19      A.    Yes.
20      Q.    And I believe you referred to
21 that -- the CFR, I think you referenced that, is
22 that the Code of Federal Regulations?
23      A.    Yes, it is.
24      Q.    And is that what you were

Page 606

1 referring to when you said the DEA regulations
2 that you used in your work as a compliance
3 director?
4      A.    Yes.
5      Q.    Okay. And I believe you said the
6 regulations are -- that's what you worked with
7 more than the statute itself; is that right?
8          MR. BUCHANAN: Objection to form
9      and the leading.
10          THE WITNESS: Yes.
11 BY MS. KOSKI:
12      Q.    Is that a fair summary of your
13 testimony yesterday that the regulations are
14 something you used as part of your roles and
15 responsibilities as a director of compliance?
16          MR. BUCHANAN: Objection,
17      overbroad.
18          THE WITNESS: Yes.
19 BY MS. KOSKI:
20      Q.    And you know that those
21 regulations don't refer to "know your customer,"
22 right?
23          MR. BUCHANAN: Objection to form
24      and the leading.

Page 607

1          THE WITNESS: Yes.
2 BY MS. KOSKI:
3      Q.    And they don't make any mention
4 of dispensing data?
5          MR. BUCHANAN: Objection to form,
6      leading.
7          THE WITNESS: They do not.
8 BY MS. KOSKI:
9      Q.    And they don't refer to customer
10 questionnaires in the regulations, right?
11          MR. BUCHANAN: Objection to form,
12      leading.
13          THE WITNESS: They do not.
14 BY MS. KOSKI:
15      Q.    And one of the other things that
16 you mentioned yesterday throughout your
17 testimony is guidance from DEA.
18          Do you recall that testimony?
19      A.    I do.
20      Q.    Okay. And as someone with your
21 background in DEA compliance, you're familiar
22 with the concept of guidance from the agency
23 that regulates your business, right?
24      A.    Yes.

Page 608

1      Q.    Okay. And guidance sort of
2 generally refers to the way the DEA as an agency
3 itself or as individual employees of the DEA
4 communicate with you as an industry participant;
5 is that a fair summary?
6          MR. BUCHANAN: Objection to form.
7          THE WITNESS: Yes.
8 BY MS. KOSKI:
9      Q.    And as you talked about yesterday
10 and I think earlier this morning as well, it may
11 come in the form of a presentation given by
12 representatives of the agency, right?
13          MR. BUCHANAN: Objection to form.
14          THE WITNESS: Yes, that's
15      correct.
16 BY MS. KOSKI:
17      Q.    Okay. And you've attended those
18 types of presentations by DEA representatives?
19      A.    I have.
20      Q.    Okay. Could DEA guidance also
21 come in the form of conversations between
22 representatives of the industry and members of
23 DEA?
24          MR. BUCHANAN: Objection,

Highly Confidential - Subject to Further Confidentiality Review

Page 609

1  foundation.
2        THE WITNESS: Yes, it could.
3  BY MS. KOSKI:
4        Q.  In your experience, has that
5  actually happened?
6        A.  Yes, it has.
7        Q.  And you talked a lot about that
8  yesterday in the context of your many years in
9  the industry; is that fair?
10        MR. BUCHANAN:  Objection,
11   overbroad.
12        THE WITNESS:  Yes.
13  BY MS. KOSKI:
14        Q.  Mr. Buchanan asked you about
15  conversations you had with DEA agents?
16        A.  Yes.
17        Q.  And it may come in the form of
18  written statements sent to one or more industry
19  participant as well, guidance from the DEA that
20  is?
21        MR. BUCHANAN:  Objection, form.
22        THE WITNESS:  Yes.
23  BY MS. KOSKI:
24        Q.  And there's a -- is there a

Page 610

1  difference, in your mind, between the Controlled
2  Substances Act that we marked as Exhibit 31 and
3  the guidance in the form of conversations or
4  presentations from DEA agents?
5        MR. BUCHANAN:  Objection to form.
6        THE WITNESS:  Yes, there is.
7  BY MS. KOSKI:
8        Q.  Now, yesterday during the course
9  of your testimony, you heard reference to things
10  like notice of violation or I believe there was
11  a reference to being summoned to the DEA and
12  things like that.
13        Do you recall that testimony?
14        A.  I do.
15        Q.  Okay.  So I'd like to talk to you
16  a little bit about your understanding of how DEA
17  interacts with members of the industry.
18        And so, for example, on one side
19  of the house, DEA has some sort of, for lack of
20  a better word, law enforcement responsibilities.
21        Are you familiar with take?
22        MR. BUCHANAN:  Objection to form.
23        THE WITNESS:  Yes, I am.
24        MR. BUCHANAN:  I'll renew my

Page 611

1  continuing objection as to the scope of
2  this examination.
3  BY MS. KOSKI:
4        Q.  And by law enforcement, DEA acts
5  as a sort of a police; is that fair?
6        MR. BUCHANAN:  Objection to form
7  and the leading.
8        THE WITNESS:  Yes, there are
9  agents.
10  BY MS. KOSKI:
11        Q.  Okay.  And they might investigate
12  criminal activity, for example?
13        A.  Yes.
14        Q.  And they may refer cases to the
15  Department of Justice for prosecution if they
16  have reason to believe there's criminal activity
17  happening within the industry.
18        Are you familiar with that?
19        A.  Yes.
20        Q.  And now based on your testimony
21  yesterday, your experience, is it fair to say,
22  was more on the DEA's administrative or civil
23  side of their responsibilities; is that fair?
24        A.  The meetings with DEA?

Page 612

1        Q.  Right.
2        A.  Yeah.
3        Q.  Those weren't criminal in nature
4  that you're aware of?
5        MR. BUCHANAN:  Objection to form.
6        THE WITNESS:  No, they were not.
7  BY MS. KOSKI:
8        Q.  Okay.  And over the course of
9  your testimony yesterday, I believe we saw some
10  documents in reference to some meetings that
11  would have been on behalf of DEA as the agency.
12        Do you recall that?
13        A.  I'm sorry?
14        Q.  For example, we saw a letter
15  issued a dear registrant letter I believe that
16  you testified about yesterday.
17        Do you recall that testimony?
18        A.  I do.
19        Q.  Okay.  And is it your
20  understanding that was a communication sent on
21  behalf of the agency itself?
22        A.  Yes.
23        Q.  But you've also -- you also
24  testified yesterday, in your experience, and

Page 613

1 correct me if I'm wrong with this, that you've
2 engaged at a more sort of one-on-one level with
3 representatives of the agency in the course of
4 your business, right?
5          MR. BUCHANAN:  Objection to the
6     leading.
7          THE WITNESS:  Yes.
8 BY MS. KOSKI:
9     Q.     And on the administrative power
10 side, which you testified being more familiar
11 with, you're aware that DEA can take different
12 actions against industry participants; is that
13 right?
14          MR. BUCHANAN:  Objection to the
15     form.
16          THE WITNESS:  Yes.
17 BY MS. KOSKI:
18     Q.     And you reference in some of your
19 documents you referred to violations, I think
20 you talked earlier about fines, possible
21 administrative fines, right?
22     A.     Yes.
23     Q.     Okay.  And as part of that,
24 you're familiar that DEA can get a search

Page 614

1 warrant; is that right?
2     A.     Yes.
3     Q.     And they can compel a company to
4 send individuals to appear before DEA and to
5 testify under oath.
6          Are you familiar with that?
7     A.     Yes.
8     Q.     And they can institute a formal
9 proceeding like an enforcement action, right?
10 Are you familiar with that?
11          MR. BUCHANAN:  Objection to form.
12     This is so beyond the scope and so the
13     subject for somebody who you're going to
14     designate as an expert.  You shouldn't
15     be doing this in fact testimony,
16     counsel.
17 BY MS. KOSKI:
18     Q.     You're familiar with the roles
19 and responsibilities of DEA over the course of
20 your 25 years in the industry, right?
21     A.     Yes.
22     Q.     And there's also something called
23 an order to show cause.
24          Are you familiar with that

Page 615

1 language from the DEA?
2          MR. BUCHANAN:  Same objection.
3          THE WITNESS:  Vaguely, yes.
4 BY MS. KOSKI:
5     Q.     All right.  So with all this sort
6 of in mind, I'd like to refer you to Exhibit 2,
7 which I believe you have in front of you and
8 which counsel marked yesterday.  And just for
9 purposes of folks in the room, Exhibit 2 was an
10 e-mail cover with a copy of Ms. Hernandez, then
11 Hernandez, sorry, resume and then also a summary
12 of suspicious order monitoring experience.
13          Do you recall this testimony
14 about this document?
15     A.     I do.
16     Q.     Okay.  And as I understand it,
17 you prepared Exhibit 2, I believe you testified
18 yesterday, in connection with applying for a
19 job; is that right?
20     A.     Yes.
21     Q.     Okay.  And the date at least on
22 the cover e-mail is October 2014.
23          Do you see that?
24     A.     Yes.

Page 616

1     Q.     Is that around or about the time
2 that you prepared the summary of suspicious
3 order monitoring?
4     A.     Yes, it is.
5     Q.     Okay.  And so when you prepared
6 this, this was about -- sorry, strike that.
7          And on the second page of the
8 document, you see there's a reference to Watson.
9          Do you see that?
10     A.     Yes.
11     Q.     And that's Watson Laboratories,
12 Inc.; is that right?
13     A.     Yes.
14     Q.     And you were employed by Watson
15 Laboratories, Inc., right?
16     A.     I was.
17     Q.     Okay.  And that's reflected in
18 Exhibit 1, your resume, if you need to look at
19 it.
20     A.     Yes.
21     Q.     And I believe on your resume it
22 indicates you worked at Watson from 2002 to
23 2009; is that right?
24     A.     Yes.

Page 617

1 Q. And so this document, Exhibit 2,
2 was prepared five years after you left Watson
3 Laboratories; is that right?
4 A. Yes, that's correct.
5 Q. And I think you testified
6 yesterday that you draft -- in the course of
7 drafting this document, you were trying to make
8 yourself look good to a potential employer; is
9 that fair?
10 MR. BUCHANAN: Objection to form.
11 THE WITNESS: That was what was
12 requested of me.
13 BY MS. KOSKI:
14 Q. And that's what you said
15 yesterday, right?
16 MR. BUCHANAN: Objection to form.
17 THE WITNESS: Yes.
18 BY MS. KOSKI:
19 Q. All right. And I want to just
20 look at some of the -- and I'm focused again on
21 the Watson section and some of the things that
22 you wrote.
23 And you wrote that while you were
24 employed by Watson, you did not support Anda

Page 618

1 from a DEA perspective.
2 Do you see that?
3 A. Yes, that's correct.
4 Q. And that's an accurate statement,
5 right?
6 A. It is.
7 Q. Okay. You never worked for Anda,
8 Inc., right?
9 A. I did not.
10 Q. And you didn't work day to day in
11 Anda's compliance department, right?
12 A. I did not.
13 Q. And you weren't responsible for
14 oversight or for the actions of Anda's
15 compliance department, right?
16 A. I was not.
17 Q. I believe you testified yesterday
18 that -- and as I think you reference here, Anda
19 had its own compliance department when it was
20 acquired by Watson, right?
21 A. Yes.
22 Q. And in Exhibit 2 you describe a
23 meeting between Anda and DEA, right?
24 A. Yes.

Page 619

1 Q. Okay. And do you recall that the
2 meeting was in the summer of 2007? Does that
3 sound about right?
4 A. I don't recall when the meeting
5 was.
6 Q. Fair to say that it was sometime
7 during your employment at Watson?
8 A. Yes.
9 Q. And you wrote here that "Anda was
10 summoned to DEA."
11 Do you see that, and you spent
12 some time on that with counsel yesterday?
13 A. Yes.
14 Q. Okay. And we just went through
15 some of the ways in which the DEA exercises its
16 criminal and administrative powers, right? Do
17 you recall that; we just went through that?
18 A. I do.
19 Q. And you're familiar with that
20 from your experience, right?
21 A. Yes.
22 Q. And you'll agree with me that DEA
23 didn't issue any kind of a subpoena or some
24 legal process to bring Anda in to appear, right?

Page 620

1 MR. BUCHANAN: Leading.
2 THE WITNESS: They did not.
3 MR. BUCHANAN: Objection to form.
4 BY MS. KOSKI:
5 Q. Did DEA issue a warrant to Anda,
6 search warrant?
7 A. They did not.
8 Q. Okay. And you'll agree, won't
9 you, that DEA didn't issue any kind of formal
10 process like we talked about as it relates to
11 Anda, right?
12 MR. BUCHANAN: Objection, form,
13 leading.
14 THE WITNESS: No, they did not.
15 BY MS. KOSKI:
16 Q. And, of course, I'm focused on
17 the time period that you were at Watson and this
18 time period where you were dealing with this
19 meeting with Anda.
20 A. Understood.
21 Q. Okay. And so to the extent here
22 in your job application papers where you refer
23 to summoned, you didn't mean to say that DEA
24 issued a summons to Anda, right?

Page 621

1    A.    I did not, no.
2    Q.    And as we said, Exhibit 2, that
3 was in 2014, right?
4    A.    Yes.
5    Q.    So I want to refer you now --
6         MR. BUCHANAN:  I'm sorry,
7    counsel, just so the record is clear,
8    your last question was 2014, you're just
9    referring to the date that this was
10   prepared.
11 BY MS. KOSKI:
12   Q.    I'm sorry, yes.  The year of
13 Exhibit 2 was 2014?
14   A.    Yes.
15   Q.    All right.  And I'd like to
16 focus, if we could, on the time period of the
17 actual meeting that you referenced in Exhibit 2
18 and talked a little bit about yesterday.
19        Now, you recall that the -- you
20 said that you weren't summoned in the formal
21 sense, but that you -- do you recall that you
22 received a phone call, you, Ms. Hernandez, at
23 Watson as it related to this Anda issue with
24 DEA?

Page 622

1    A.    Yes, I did.
2    Q.    Sorry about that.  My piles
3 are -- here you go.
4         (Document marked for
5    identification as Par-Norton Deposition
6    Exhibit No. 32.)
7 BY MS. KOSKI:
8    Q.    Handing you what we marked as
9 Exhibit 32.  And for the record, this is a
10 document with a Bates number
11 ALLERGAN_MDL_03952959.
12        And if you look on the second
13 page of this document, this an e-mail -- just
14 for the record, this is an e-mail that you wrote
15 in July of 2007.
16        Do you see that?
17   A.    Yes.
18   Q.    Okay.  And on the second page, in
19 the first full paragraph, do you see there that
20 it says Mr. Mapes.
21        Do you know who Mr. Mapes is?
22   A.    Yes, he was at DEA headquarters.
23   Q.    And you see the reference
24 there -- and he worked at DEA, right?

Page 623

1    A.    Yes.
2    Q.    And is it fair to say he's the
3 person with whom you were communicating about
4 this issue?
5    A.    Yes.
6    Q.    Do you see there's a reference it
7 says, "Mr. Mapes also offered to meet with us to
8 discuss the issue and internet pharmacies in
9 general in more detail."
10        Do you see the reference to that?
11   A.    Yes, I do.
12   Q.    And does this refresh your
13 recollection about the circumstances under which
14 Anda was meeting with DEA in 2007?
15   A.    Yes.
16   Q.    So, in other words, in your
17 Exhibit -- in Exhibit 2 where you referenced
18 Anda being summoned in, that was written in
19 2014, right?
20   A.    Yes.
21   Q.    But at the time of your
22 conversations in 2007 with Mr. Mapes, you make a
23 reference here that you were -- that Mr. Mapes
24 offered to meet with Anda, right?

Page 624

1         MR. BUCHANAN:  Objection,
2    misstates the document, form.
3         THE WITNESS:  That is what it
4    states later in the document, yes.
5 BY MS. KOSKI:
6    Q.    And does that refresh your
7 recollection about what was happening in 2007?
8         MR. BUCHANAN:  Objection to form.
9         THE WITNESS:  Yes.
10 BY MS. KOSKI:
11   Q.    And did Anda accept Mr. Mapes'
12 invitation to meet?
13   A.    Yes.
14   Q.    Now, do you recall when after
15 Mr. Mapes contacted you you went in to meet with
16 him?
17   A.    I do not.
18   Q.    Was it immediate?
19   A.    I'm assuming it was close to the
20 date, but I don't know exactly when.
21        (Document marked for
22    identification as Par-Norton Deposition
23    Exhibit No. 33.)
24 BY MS. KOSKI:

Highly Confidential - Subject to Further Confidentiality Review

Page 625

1    Q.   Handing you what we've marked as
2  Exhibit 33.  For the record, Exhibit 33 is Bates
3  number Anda_Opioids_MDL_0000152278.
4         MR. BUCHANAN:  I only have one
5  page.
6         MS. KOSKI:  It's just a one-page
7  document.
8         MR. BUCHANAN:  Oh, I'm sorry.  I
9  thought you were holding two, and it's
10  Exhibit Number 33.
11        MS. KOSKI:  Thirty-three, yes.
12  BY MS. KOSKI:
13    Q.    And you see this is an e-mail
14  dated August 22nd, 2007?
15    A.    Yes.
16    Q.    Okay.  And on the first line it
17  says "Hello All, tomorrow's (8/23) meeting with
18  the DEA."
19        Do you see that?
20    A.    Yes, I do.
21    Q.    Okay.  So is it fair to say the
22  meeting was on August 23rd?
23    A.    Yes.
24    Q.    About a month after the phone

Page 626

1  call referenced in the prior exhibit?
2    A.    Yes.
3    Q.    And do you recall that the
4  meeting was scheduled for about a two-hour time
5  period with DEA?
6    A.    I'm not sure.
7    Q.    Do you recall it being a full day
8  meeting?
9    A.    No, it was not.
10    Q.    And if you look at what we marked
11  as Exhibit 33, you'll see again the first line,
12  the meeting is scheduled from 12:00 to 2:00 p.m.
13        Do you see that?
14    A.    Yes.
15    Q.    Is that consistent with your
16  memory of the meeting?
17    A.    Yes.
18    Q.    Now, referring back to Exhibit 2,
19  you wrote that DEA asked for the meeting because
20  of Anda's, and I think I'm quoting you here,
21  "lack of a robust SOM program."
22        Do you recall that from the
23  document --
24    A.    Yes.

Page 627

1    Q.   -- and your testimony yesterday?
2         Okay.  Now, you had, as indicated
3  in Exhibit 32, several calls with Mr. Mapes
4  before the August 23rd meeting.
5         Do you recall that?
6         MR. BUCHANAN:  Objection to form
7     and the leading.
8         THE WITNESS:  I do not.
9  BY MS. KOSKI:
10    Q.    Okay.  If you look at Exhibit 32,
11  you can see there's references to a number of
12  phone calls if you read through the e-mail?
13    A.    Yes.
14    Q.    Okay.  Does that refresh your
15  recollection that you had several phone calls
16  with Mr. Mapes before the August 23rd meeting?
17        MR. BUCHANAN:  Objection to the
18     form and the leading.
19        THE WITNESS:  Yes.
20  BY MS. KOSKI:
21    Q.    And the exhibit -- sorry -- 32 is
22  a rather lengthy e-mail, Exhibit 32.
23        Is it fair to characterize that
24  as your notes from those phone calls, or how

Page 628

1  would you characterize what's in that e-mail?
2    A.    That is documentation of the
3  phone calls.
4    Q.    Okay.  And, again, focusing on --
5  I think now we're on the -- if you look at the
6  bottom of Exhibit 32, you'll see the paragraph
7  starts on July 16, 2007.
8         Do you see that?
9    A.    Yes.
10    Q.    It says "I received a telephone
11  call from Michael Mapes, DEA HQ."
12        Do you see that?
13    A.    Yes.
14        MR. BUCHANAN:  I don't, actually.
15     Can you just highlight on Bates 60?
16        MS. KOSKI:  On page 59 and it's
17     below the sort of the page break line,
18     the first page of the e-mail.
19        Do you see that, Exhibit 32?
20        MR. BUCHANAN:  Can you see it?
21     Thank you.  I got it.  Thank you.
22  BY MS. KOSKI:
23    Q.    Do you see that reference to
24  Mr. Mapes?

Highly Confidential - Subject to Further Confidentiality Review

Page 629

1  A.   Yes.
2  Q.   And so, according to this note,
3 you, Ms. Hernandez received a call from
4 Mr. Mapes, right?
5  A.   Yes.
6  Q.   Okay.  I believe you testified
7 yesterday that part of the reason you were
8 involved was because you knew the people at DEA
9 that were involved?
10  A.   Yes.
11  Q.   Okay.  And, in fact, this
12 document indicates that the initial contact came
13 directly to you; is that right?
14  A.   Yes, it did.
15  Q.   And if you look at the next
16 paragraph, there's a reference there that
17 Mr. Mapes told you DEA had seen "a steady
18 increase in Anda sales of hydrocodone," right?
19 That's at the bottom of the page going over to
20 the next page.
21  A.   Yes.
22  Q.   And then you note, we don't need
23 to read through it all, but you note a number of
24 other things that you talked about with

Page 630

1 Mr. Mapes during that initial call, right?
2  A.   Yes.
3  Q.   And then the bottom paragraph --
4 oh, I'm sorry, in that same -- sorry, the top
5 paragraph, you indicate that Mr. Mapes asked
6 about the effectiveness of Anda's suspicious
7 order monitoring program or system, excuse me.
8  Do you see that, the top of the
9 page marked 60?
10  A.   No, I'm sorry, I don't see where.
11  Q.   The paragraph that bleeds over
12 from the first to the second page, and you'll
13 see he says, "He also asked about the
14 effectiveness of Anda's suspicious order
15 monitoring system; quoting orders of 279,000
16 hydrocodone dosage units sold to a single
17 customer in a 30 day period and another for
18 174,000."
19  Do you see that?
20  A.   Yes, I see that.
21  Q.   And so did you understand this is
22 in reference to two specific orders that Anda
23 had filled?
24  MR. BUCHANAN:  Objection to the

Page 631

1 leading.
2  THE WITNESS:  I did not have any
3 knowledge of Anda orders at the time.  I
4 was just documenting what was told to me
5 by Mr. Mapes.
6 BY MS. KOSKI:
7  Q.   Okay.  That's because Anda had a
8 compliance department, right?
9  MR. BUCHANAN:  Objection to form.
10  THE WITNESS:  Yes.
11 BY MS. KOSKI:
12  Q.   And you didn't work in it?
13  A.   Correct.
14  Q.   Okay.  And then if you see in the
15 last paragraph where you say this commitment was
16 conveyed to Mr. Mapes by telephone on 7/16/2007.
17  Do you see that?
18  A.   Yes.
19  Q.   So you called Mr. Mapes back
20 after you spoke with some of the folks at Anda,
21 right?
22  A.   Yes.
23  Q.   And that's referenced in this
24 document, right?

Page 632

1  A.   Mm-hmm, yes.
2  (Document marked for
3  identification as Par-Norton Deposition
4  Exhibit No. 34.)
5 BY MS. KOSKI:
6  Q.   Handing you what we marked as
7 Exhibit 34.
8  MS. KOSKI:  Counsel.  And for the
9  record, Exhibit 34 is Bates
10  Anda_Opioids_MDL_0000275627.
11 BY MS. KOSKI:
12  Q.   Do you see that?
13  A.   Yes.
14  Q.   Okay.  And what's this document?
15  A.   It's an internal e-mail from
16 myself to Diane Miranda and Al Paonessa.
17  Q.   With a CC to Michael Cochrane and
18 Patrick Cochrane?
19  A.   Yes.
20  Q.   And what's the date on it?
21  A.   July 31st, 2007.
22  Q.   Okay.  And the subject is "DEA
23 Teleconference re: CS Distribution/Anda."
24  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 633

1    A.    Yes.

2    Q.    Okay.  And is it -- and the first
3 reference there is "today we finally got to have
4 our teleconference with DEA."

5         Do you see that?

6    A.    Yes.

7    Q.    So the today referenced there
8 would be the date of the e-mail; is that fair?

9    A.    Yes.

10   Q.    Okay.  So this is, in fact, a
11 third call you had with DEA relating to the Anda
12 issues?

13   A.    It is another call, yes.

14   Q.    Okay.  And you made notes of that
15 call as well, right?

16   A.    Yes.

17   Q.    And that's reflected in what we
18 just marked as Exhibit 34?

19   A.    Yes.

20   Q.    And these notes were made the
21 same day as the phone call, right?

22   A.    Yes.

23   Q.    Fair to say it would have been
24 fresh in your memory at the time that you wrote

Page 634

1 the e-mail?

2    A.    Yes.

3    Q.    And as reflected in this e-mail,
4 you discussed Anda's decision to establish new
5 limits on customers who purchase controlled
6 substances from Anda, right, beginning of the
7 second paragraph.  You need reference?

8    A.    Yes, it talks about limits.

9    Q.    Right, and that's Anda's decision
10 to establish the new limits, right?

11        MR. BUCHANAN:  Objection to form.

12 BY MS. KOSKI:

13   Q.    We're talking about Anda here?

14   A.    Yes.

15   Q.    And the new limit was 5,000
16 dosage units per drug family.

17        Do you see that?

18   A.    For hydrocodone products, yes.

19   Q.    And other controlled substances
20 with a high diversion potential.

21        Do you see that?

22   A.    Yes.

23   Q.    Okay.  And yesterday you referred
24 to and you were talking about your -- this

Page 635

1 interaction you indicated that after or during
2 your discussions with DEA, Anda made some
3 changes to its SOMS program, right?

4    A.    Yes.

5    Q.    Okay.  And I think you referred
6 to a limit, but I don't know that you put a
7 number on it.

8    A.    Yes.

9    Q.    Okay.  Does this refresh your
10 recollection about the number?

11   A.    It does.

12   Q.    Okay.  And you also discuss other
13 things or you reflect your discussion with
14 Mr. Mapes about other things as well here in
15 Exhibit 34, and you discussed two customers in
16 particular who had -- whose legitimate needs
17 dictate quantities greater than 5,000 a month.

18        Do you see that?

19   A.    Yes, I do.

20   Q.    And that's a reflection of the
21 discussion that Anda had with Mr. Mapes on
22 July 31st of 2007?

23   A.    Yes.

24   Q.    And then you say here, "His exact

Page 636

1 words were that '5,000 dosage units is not a
2 hard limit, but a start' and that as long as we
3 are making the effort to know the customer's
4 business he is fine with that."

5        Do you see that reference?

6    A.    I do.

7    Q.    And that's reflecting your
8 conversation at the time with Mr. Mapes, right?

9    A.    Yes.

10   Q.    And if you refer back to I
11 believe it's Exhibit 32 or in your first call,
12 you indicate that Mr. Mapes had expressly
13 referred to some specific large orders as the
14 reason -- one of the reasons, at least, for the
15 phone call that he made to you, right?

16   A.    Yes.

17   Q.    And so here on July 31st, you're
18 discussing -- you reflect -- you're reflecting
19 your discussion with Mr. Mapes where you talked
20 about that, the large order situation, fair?

21        MR. BUCHANAN:  Object to the
22   leading.

23        THE WITNESS:  Without knowing the
24   customers, I'm not sure if that's the

Highly Confidential - Subject to Further Confidentiality Review

Page 637

1  same, but there is -- there are comments
2  here, yes.
3  BY MS. KOSKI:
4      Q.    And the idea being that for some
5  specific customers, dispensing more than the
6  5,000 per month that was recommended by DEA
7  could be appropriate, right?
8          MR. BUCHANAN:  Objection to the
9      form.
10         THE WITNESS:  Yes.
11 BY MS. KOSKI:
12     Q.    And that's reflected in your
13 notes that you wrote at the time, right?
14         MR. BUCHANAN:  Objection to the
15     form.
16         THE WITNESS:  Yes, that's based
17     on the comments from DEA.
18 BY MS. KOSKI:
19     Q.    If you look back to 32, and this
20 was the e-mail we were just looking at that
21 referred to the initial phone call you received
22 from Mr. Mapes, right?
23     A.    Yes.
24     Q.    And if you see on the second page

Page 638

1  of the document, there's a reference in your
2  notes about what -- that Mr. Mapes, I believe is
3  the he, referenced recent regulatory actions DEA
4  has taken against, and he names some entities,
5  not Anda, right?
6      A.    Yes.
7      Q.    Okay.  And you recorded that in
8  these notes from your conversation with him at
9  the time?
10     A.    I did.
11     Q.    Now, when we talked earlier about
12 DEA has different mechanisms of communicating
13 with the industry, DEA has different formal
14 processes they could take, did you understand
15 that was what Mr. Mapes was referencing here in
16 this document?
17         MR. BUCHANAN:  Objection to the
18     form.  Which document are you
19     referencing, counsel?
20         MS. KOSKI:  Exhibit 32 that you
21     have in your hand.
22         MR. BUCHANAN:  Objection to form,
23     vague.
24         THE WITNESS:  Are you referring

Page 639

1  to the actions taken against Southwood,
2  Bellco, Richie, those companies?
3  BY MS. KOSKI:
4      Q.    Right, right.
5      A.    Yes.
6      Q.    So you refer -- you refer here
7  your notes to recent regulatory actions DEA has
8  taken, right?
9      A.    Yes.
10     Q.    And we talked earlier this
11 morning about some of the types of regulatory
12 actions that DEA is empowered to take, right?
13     A.    Yes.
14     Q.    And did you understand that's
15 what Mr. Mapes was referring to with respect to
16 these other companies?
17         MR. BUCHANAN:  Objection to form.
18         THE WITNESS:  Yes.
19 BY MS. KOSKI:
20     Q.    Now, DEA never instituted any
21 formal action against Anda while you worked at
22 Anda, right?
23         MR. BUCHANAN:  Objection to form.
24         MS. KOSKI:  Excuse me.  Strike

Page 640

1      that.
2  BY MS. KOSKI:
3      Q.    DEA never instituted any formal
4  action against Anda while you worked at Watson,
5  right?
6      A.    Not that I'm aware of.
7      Q.    Instead, you -- this experience
8  that you had with Mr. Mapes was a series of
9  telephone calls and an agreed meeting; is that
10 fair?
11     A.    Yes.
12     Q.    And I believe you discussed
13 yesterday and maybe earlier this morning the
14 distributor initiative that you believe this
15 related to?
16         MR. BUCHANAN:  Objection to form
17     and the leading.
18         THE WITNESS:  Yes.
19 BY MS. KOSKI:
20     Q.    And, in fact, during your
21 conversations, you had an exchange of
22 information with Mr. Mapes; is that fair?
23     A.    Yes.
24     Q.    And when we talked earlier about

Page 641

1  guidance received from DEA, would this fall into
2  what you've referred to over the course of the
3  couple days as guidance?
4      A.   Yes.
5      Q.   And, in fact, outside of this
6  narrow context with Anda, you've had other
7  occasions to have conversations with DEA, right?
8      A.   Yes.
9      Q.   And then just looking back at
10 Exhibit 2 quickly, which is your employment
11 application, for lack of a better word, do you
12 have that Exhibit 2, the e-mail with your
13 resume?  Of course, it's at the bottom of the
14 pile.  It's at the bottom of the pile.
15     A.   Yes.
16     Q.   And do you see in there that you
17 wrote that the meeting was for cause?
18     A.   Yes.
19     Q.   And when we talked about DEA has
20 formal actions, we talked at one point about
21 orders to show cause.  That's one of the formal
22 processes, right?
23     A.   It is, yes.
24     Q.   And an order to show cause is

Page 642

1  something that actually compels the registrant
2  to appear before DEA, right?
3      A.   Yes.
4      Q.   Okay.  And you didn't mean to
5  suggest in Exhibit 2, in your employment
6  application documents, that DEA issued an order
7  to show cause to Anda, right?
8      A.   They did not.
9      Q.   In fact, they didn't do that,
10 right?
11     A.   Correct.
12     Q.   And as long as you worked at
13 Watson, you weren't aware of any occasion in
14 which DEA issued Anda an order to show cause,
15 right?
16     A.   I'm not aware of any.
17         MR. BUCHANAN:  Objection to the
18     leading, move to strike.
19 BY MS. KOSKI:
20     Q.   And, again, as we've gone through
21 your contemporaneous notes from August of 2007,
22 when the meeting happened, the meeting was a
23 result of some exchanges between Anda and DEA
24 and an invitation from you, right?

Page 643

1          MR. BUCHANAN:  Objection to form,
2      misstates the evidence.
3          THE WITNESS:  Yes.
4          MS. KOSKI:  That's all I have.
5      Thank you.
6          THE WITNESS:  Thank you.
7          MR. BUCHANAN:  Do any other
8      defense counsel have questions?  We can
9      close the record -- close it on that.  I
10     have follow-up questions.  Go off the
11     record for a few minutes.
12         THE VIDEOGRAPHER:  The time is
13     9:57.  Off the record.
14         (Brief recess.)
15         THE VIDEOGRAPHER:  The time is
16     10:24 a.m.  This begins DVD Number 2.
17     We are back on the record.
18 BY MR. BUCHANAN:
19     Q.   Ms. Norton, I have a few
20 questions in follow-up to the questions asked by
21 Endo's counsel, Qualitest's counsel as well as
22 Anda counsel.
23     A.   Yes.
24     Q.   Before I do that, though, can we

Page 644

1  agree that you and I hadn't met before today?
2      A.   We met yesterday.
3      Q.   That's fair.  Before your
4  deposition began, we can agree on that?
5      A.   Yes.
6      Q.   Thank you.  Obviously, you told
7  us that you had an opportunity to meet with
8  counsel for Endo, I think, before your testimony
9  yesterday, correct?
10     A.   Yes.
11     Q.   Three days?
12     A.   Yes.
13     Q.   Multiple hours each time?
14     A.   Yes.
15     Q.   Did you have an opportunity to
16 meet with Anda's counsel before you answered
17 questions today?
18     A.   Briefly by phone.
19     Q.   And in that regard, did you
20 review or discuss documents to refresh your
21 recollection?
22     A.   Yes.
23     Q.   Okay.  And what were they?
24         MS. KOSKI:  Objection.

Page 645

1       MS. LEIBELL:  Objection.
2   BY MR. BUCHANAN:
3       Q.    Did they refresh your
4   recollection?
5       A.    Yes.
6       Q.    What were they?
7       A.    The Mike Mapes' phone call,
8   documentation of the first phone call.
9       Q.    Okay.  So you worked through that
10  document?
11      A.    The first one, yes.
12      Q.    Before you came in today?
13      A.    Yes.
14      Q.    Did you do that again before you
15  testified this morning?
16      A.    No.
17      Q.    Okay.  Any other documents that
18  refreshed your recollection?
19      A.    No.
20      Q.    Okay.  I'd like now to start, and
21  we'll get to the Anda portion of this.  I'd like
22  to start with your testimony relating to your
23  time at Qualitest.
24          You joined in 2011, you left in

Page 646

1   2014, right?
2       A.    Yes.
3       Q.    You were asked some general
4   questions, I think open-ended questions about
5   describe your SOM process.
6           Do you recall those questions on
7   examination by Endo counsel?
8       A.    Yes.
9       Q.    Okay.  And you gave a list of
10  things that were done.  You would look at order
11  of interests.  You would look at the customer's
12  specific history, look at the customer
13  questionnaire.  You would get customer feedback.
14  You would go and visit customers.  You would do
15  that whole process.
16          Do you recall that?
17      A.    Yes.
18      Q.    That process was implemented, if
19  I understand your testimony correctly, in 2013?
20      A.    Over time.
21      Q.    The process you described with
22  those items that I just listed, that was the
23  process in place as of 2013, correct?
24      A.    It was, yes.

Page 647

1       Q.    Also incorporated at some point
2   in time after 2013, consideration of IMS data,
3   correct?
4       A.    I don't know the exact date as to
5   when it was implemented.  That was before -- I
6   don't know exact date, but 2013, yes.
7       Q.    Yeah, we looked at documents in
8   early 2013 where you said we need to start
9   incorporating IMS data.
10          Do you recall that?
11      A.    Yes.
12      Q.    So you hadn't been doing it prior
13  to 2013, correct?
14          MS. VANNI:  Object to form.
15          THE WITNESS:  We had IMS data.
16      This was different data.
17  BY MR. BUCHANAN:
18      Q.    Yeah, I'm referring to IMS data
19  so that you could evaluate your customer
20  thresholds or customer levels to see whether
21  they were buying above or below national
22  averages for classes of trade?
23      A.    Yes, correct.
24      Q.    You were not doing that prior to

Page 648

1   2013, correct?
2       A.    No.
3       Q.    I'm correct?
4       A.    Yes, you are correct.
5       Q.    Thank you.  We talked yesterday
6   about the incorporation of chargeback data into
7   the process and looked at some correspondence
8   where Mr. Brantley was using chargeback data in
9   connection with his correspondence with your
10  direct customers to talk about issues with
11  customers of customers.
12          Do you recall that?
13      A.    Yes, I do.
14      Q.    Use of chargeback data was not
15  being done prior to 2013, correct?
16      A.    Correct.
17      Q.    And we looked at documents
18  yesterday where, in your own words, you said you
19  needed to revamp the SOM process in 2013,
20  correct?
21      A.    Yes.
22      Q.    And we further looked at
23  documents yesterday where you were told in 2013
24  that your current SOM program systems and

Highly Confidential - Subject to Further Confidentiality Review

Page 649

1 procedures do not meet the regulatory
2 requirements.
3        Do you recall that?
4        MS. VANNI: Object to form.
5        THE WITNESS: I'm not sure what
6    document it was.
7 BY MR. BUCHANAN:
8    Q.    E-15, I'm sorry, Exhibit 15, it's
9 E1052. Can we go to 1052.1. I don't have the
10 exhibits to give you. There's a stack right
11 there.
12        All right. Let's -- we see this
13 correspondence between yourself and Ms. Connell,
14 your boss at the same time?
15    A.    Yes, correct.
16    Q.    Okay. It says, "Jill, I added
17 the action items and the estimated completion.
18 If Judy can put them in the Gantt chart it would
19 be a big help. Again, the dates are estimates
20 since input is needed from other departments to
21 confirm."
22        This is an e-mail from yourself
23 to your boss in 2013, again before you sat down
24 with DEA, correct?

Page 650

1    A.    Correct.
2    Q.    Some consultants had come in and
3 looked at your systems, spent a couple days on
4 site looking at things, correct?
5    A.    Yes.
6    Q.    All right. Could we go to .3.
7        And the consultants concluded,
8 can we highlight that paragraph, there you go.
9 "The consultants concluded that our current SOM
10 program, systems and procedures" -- could you
11 read the rest?
12    A.    "Do not meet the regulatory
13 requirements."
14    Q.    Thank you.
15        In fact, this was before the DEA
16 had to tell you that, right?
17        MS. VANNI: Object to form.
18        THE WITNESS: This was the
19    consultant's opinion that was given
20    before we met with DEA, yes.
21 BY MR. BUCHANAN:
22    Q.    Fair enough. Could you look at
23 Exhibit 16, ma'am.
24        And we don't have to just look at

Page 651

1 the consultant opinion, we can look at yours as
2 of the same time. Exhibit 16, could we please
3 go to E.1071.
4        And here we have, ma'am, a
5 presentation you put together for Ms. Connell
6 around the same period of time, February 2013.
7        Do you see that?
8    A.    Yes.
9    Q.    I'm on the cover letter right
10 now.
11    A.    Yes.
12    Q.    Okay. And you were putting
13 together action items and things that needed to
14 be done and to address various compliance issues
15 you were having at that time, correct?
16        MS. VANNI: Object to form.
17        THE WITNESS: Improvements that
18    we wanted to make, not compliance
19    issues.
20 BY MR. BUCHANAN:
21    Q.    Let's go to 1071.8.
22        We can agree at this point in
23 time, ma'am, with regard to your SOM program,
24 you identified it as inadequate, correct?

Page 652

1    A.    That is what I wrote, yes.
2    Q.    Right. Inadequate as in not
3 adequate, correct?
4        MS. VANNI: Object to form.
5        THE WITNESS: Inadequate as in
6    not meeting the -- my goals, not meeting
7    my goals for the program.
8 BY MR. BUCHANAN:
9    Q.    And what you wrote here was
10 "Inadequate SOMS," correct?
11    A.    That is what's written.
12    Q.    And what you wrote in other
13 documents and one of which was shown to you this
14 morning by defense counsel was that you had a 25
15 risk assessment to your SOM program at the same
16 point in time, correct?
17        MS. VANNI: Object to form.
18        THE WITNESS: Yes, based on
19    improvements I wanted to make.
20        MR. BUCHANAN: And move to strike
21    the nonresponsive portion.
22 BY MR. BUCHANAN:
23    Q.    And the weakness, you have many
24 weaknesses that are listed here with regard to

Page 653

1  SOMS, you note inadequate SOMS, correct?
2        MS. VANNI:  Object to colloquy.
3        THE WITNESS:  That is what it
4  says.
5  BY MR. BUCHANAN:
6     Q.   With regard to resources, you say
7  "Limited Resources," correct?
8     A.   Yes, we were waiting to hire
9  additional people.
10    Q.   Okay.  Well, to be clear, I think
11 in talking about your DEA compliance group on
12 direct examination with defense counsel, you
13 said that when you got to the company -- how
14 many people were in DEA compliance?
15    A.   One.
16    Q.   One, okay.
17        And pause on that for a moment.
18 Can you pull up Exhibit 4, and for the video --
19 excuse me for the display screens, it's E1157.1.
20        As of 2011 -- was your testimony
21 yesterday that 70% of the company's business was
22 controlled substances, ma'am?
23    A.   I said approximately.  I didn't
24 know exact.

Page 654

1     Q.   Okay.  As of 2011 we see -- what
2  is that, over 2 billion controlled substances?
3     A.   Again, I can't speak to the
4  detail of this document.  I don't know what went
5  into it.
6     Q.   Okay.  We could agree the company
7  made a lot of controlled substances, right?
8        MS. VANNI:  Object to form.
9        THE WITNESS:  They were in the
10 controlled substance business.
11 BY MR. BUCHANAN:
12    Q.   Right, and as a company in the
13 controlled substance business, they had one
14 person in DEA compliance; is that right?
15        MS. VANNI:  Object to form.
16        THE WITNESS:  At the time, yes.
17 BY MR. BUCHANAN:
18    Q.   When you were hired as of 2011.
19        MR. BUCHANAN:  Can you take that
20        down.  Can you blow out 2008 through
21        2011 with the legend on the left with
22        drugs and years.
23 BY MR. BUCHANAN:
24    Q.   And so for 2011, when you joined,

Page 655

1  and for the years prior, we could agree the
2  company was making billions and billions and
3  billions of controlled substances that were
4  entering the market, correct?
5        MS. VANNI:  Object to the form.
6        THE WITNESS:  Again, I can't
7  speak to the data or to things that
8  happened before I arrived.
9        MR. BUCHANAN:  Okay.  I mean,
10 this is a bit of a challenge because
11 defense counsel has pointed us to what
12 I'm now going to mark as Exhibit 35.
13        Is that correct, 35 is next in
14 order?
15        (Document marked for
16 identification as Par-Norton Deposition
17 Exhibit No. 35.)
18 BY MR. BUCHANAN:
19    Q.   Passing you, ma'am, Exhibit 35.
20 There you go.  And I'll represent to you, ma'am,
21 that the summary table that was presented to you
22 was derived from these spreadsheets that defense
23 counsel provided to us.
24        I guess what I'd like to -- what

Page 656

1  I'd like to understand, ma'am, is in 2008 how
2  many hydrocodone APAP did Qualitest ship?
3     A.   Again, I don't know where this
4  data came from.  I don't know how it was pulled
5  for research, and I wasn't here in 2008 to speak
6  to it.
7     Q.   I take it you're familiar with
8  this type of form, correct?
9     A.   I am not familiar with this type
10 of form.
11    Q.   Okay.  As the head of DEA
12 compliance, did you review data on the quantity
13 of pills the company was shipping?
14    A.   We had to do reports that gave
15 accountability of what we were shipping, yes.
16    Q.   Did you get them in a more user
17 friendly form than this?
18        MS. VANNI:  Object to form.
19        THE WITNESS:  Yes.
20 BY MR. BUCHANAN:
21    Q.   You did?
22    A.   Well, some of it, sometimes.
23    Q.   You could get your data and
24 systems team to identify for you the quantity of

Highly Confidential - Subject to Further Confidentiality Review

Page 657

1 shipped material?
2     A.   Not all. Different things were
3 in different systems.
4     Q.   If you wanted to get the quantity
5 of sales to customers could you get that, ma'am?
6     A.   Depends on what is called sales.
7 So are -- if we're referring to direct shipment
8 to customer, we could get some information, yes,
9 more information after SAP was implemented, but
10 not at first.
11     Q.   I assume the company kept track
12 of the drugs that it was selling to its
13 customers?
14     A.   Yes.
15     Q.   Okay. Company had systems to do
16 that?
17     A.   Systems and electronic -- some
18 electronic, some manual.
19     Q.   And we've had computers for a
20 long time, right?
21     A.   Yes, we have.
22     Q.   Okay. So as of matter of
23 processing large volumes of orders, the company
24 had a computer system, correct?

Page 658

1     A.   For some things, yes.
2     Q.   For keeping track of shipments to
3 customers, correct?
4     A.   Parts of that data, yes.
5     Q.   And keeping track of orders to
6 customers, correct?
7     A.   Parts of that data, yes.
8     Q.   Right. Well, just if you could,
9 ma'am, just look through this and please tell us
10 the volume of hydrocodone APAP product that was
11 shipped in your first year, 2011?
12     MR. BUCHANAN: I'm sorry, please
13     take that document down.
14     MS. VANNI: Counsel, if you
15     wouldn't mind, could you read the Bates
16     number in. I saw it and now it sort of
17     disappeared, and I don't know where it
18     went.
19     MR. BUCHANAN: You know what, I
20     gave you a copy. I'll give you another
21     one to take home. My paralegal does
22     have an extra copy. I wasn't sure
23     whether this was an appropriate one for
24     broader distribution, so I'm giving it

Page 659

1 with the witness.
2     MS. VANNI: I appreciate that
3     because it is marked highly
4     confidential.
5     MR. BUCHANAN: It's from the
6     witness' time at the company, so I
7     believe it's an appropriate use, but I'm
8     being sensitive to whatever concerns you
9     may have on its distribution. You can
10     address that with your co-counsel --
11     co-defense counsel at a later point in
12     time. I am not burning it into the
13     video feed.
14 BY MR. BUCHANAN:
15     Q.   Looking through it, ma'am, could
16 you please, what I've identified as Exhibit --
17 was that 38 -- 35, could you tell us, please,
18 the shipments for hydrocodone products in 2011?
19     A.   I'm sorry, I can't read it. It's
20 very small.
21     Q.   I'll give you some time to see if
22 you can sum that up or give us a number.
23     A.   I don't see a total. I see line
24 items.

Page 660

1     Q.   How about for oxycodone shipments
2 in 2011, ma'am?
3     A.   I don't see totals on here. I
4 just see line items, individual line items.
5     Q.   Would my question be easier to
6 answer if I said orders?
7     A.   No, it would not.
8     Q.   How about orders of hydrocodone,
9 orders of oxycodone, the quantities that you
10 received in 2011?
11     A.   No. I mean, this is -- these are
12 individual customer orders, by the looks of it.
13 I don't know when they occurred, since I can't
14 see the dates.
15     Q.   I just need the totals, ma'am.
16     A.   I can't. There's no -- I don't
17 know where the totals are in here.
18     Q.   There was some question about the
19 providence of the exhibit that we prepared and
20 showed to you and you had questions about where
21 things came from. I provided that to you.
22     So my question now is can you
23 give us the shipments of hydrocodone and
24 oxycodone for the years that we're talking

Page 661

about?

A. I cannot. What you provided me is a report that I can't read that I would need a considerable amount of time to go through in order to pull information out of, and I don't even know if it contains transfers or just financial transactions or what it contains, so I can't on the spot give you that information.

Q. All great questions of the data.

MR. BUCHANAN: Counsel, we'll take your stipulations as to all those numbers if you'll provide them kindly. Do you have them?

MS. VANNI: Do I have what? Do I have the --

MR. BUCHANAN: The information in the numbers the witness is asking for, because this is where you pointed us -- I mean, I'm not comfortable with the witness questioning the providence of the data you've shown -- told us to go to look at, so I'll take your representations and stipulations as to what it is.

Page 662

MS. VANNI: I can't stipulate to anything. This was a document that I'm seeing for the first time today that you've presented to me in an illegible form. I don't know if this was prepared for purposes of litigation. I don't know what this document is. I apologize, but I can't stipulate to anything because I don't even know what it is. I can't even read it.

MR. BUCHANAN: All good points you're raising, and I don't think it's any different in reverse on this side of the base, certainly, because we don't have the resources to confirm any of that information, but this is the spreadsheet you called to our attention as 33C in your rog responses.

Okay. I'll move on at this point.

BY MR. BUCHANAN:

Q. Ma'am, we were looking at 1071.8. We can agree, even though we can't pin down the actual numbers of pills, that the company was

Page 663

making a lot of hydrocodone and a lot of oxycodone in 2011 when you got to the company, right?

MS. VANNI: Object to form.

THE WITNESS: The company was making hydrocodone and oxycodone. I don't want to define a lot. I don't know what we're comparing it to. It's been...

BY MR. BUCHANAN:

Q. Okay. Well, I'll ask you to stay with me on this, and I'll ask you to assume that the company was making billions of pills of oxycodone or hydrocodone per year. Is that a lot to you?

MS. VANNI: Object to form.

THE WITNESS: That's opinion.

BY MR. BUCHANAN:

Q. Okay. You gave opinions throughout the day.

A. I have nothing to compare it to. I can't comment on what "a lot" is.

Q. You don't have an opinion as to whether billions of hydrocodone pills, hundreds

Page 664

of millions of oxycodone pills is a lot?

A. No, I don't.

MS. VANNI: Objection, asked and answered and argumentative.

BY MR. BUCHANAN:

Q. As the head of DEA compliance who was the person in charge of ensuring the adequacy of the company's SOMS system --

A. Yes.

Q. -- you don't have an opinion as to whether the company was making a lot --

MS. VANNI: Objection.

BY MR. BUCHANAN:

Q. -- of oxycodone or hydrocodone?

A. No, I don't have comparisons to other companies. I don't have -- no, I don't have an opinion.

Q. Okay. Let's come back now to weaknesses of the company as of this 2013 document. You had weaknesses related to DEA security and controls, right?

A. Things I wanted to improve upon, yes.

Q. What you wrote was weaknesses?

Highly Confidential - Subject to Further Confidentiality Review

Page 665

1    A.    That's what the document says.
2    Q.    Right, and you wrote "Weaknesses,
3  DEA related Security and Controls," item one,
4  correct?
5    A.    Yes.
6    Q.    In this company where 70% of its
7  business was controlled substances, correct?
8        MS. VANNI:  Object to form.
9        THE WITNESS:  Yes.
10 BY MR. BUCHANAN:
11   Q.    You had weaknesses regarding
12 "Lack of Data Visibility, Processes & Systems,"
13 correct?
14   A.    Again, things I wanted to
15 improve.
16   Q.    You had weaknesses in terms of
17 limited resources, one head count for DEA
18 compliance during the time -- at the time you
19 started with the company, correct?
20   A.    Because functions were being
21 handled by other groups as well.
22   Q.    Not because.  You had limited
23 resources and that was a weakness as of 2013,
24 not even 2011, correct?

Page 666

1    A.    I had limited people --
2        MS. VANNI:  Object to form.
3        THE WITNESS:  -- in my
4    department.  That doesn't mean that
5    regulations were not being followed.
6  BY MR. BUCHANAN:
7    Q.    Just stay with my question,
8  ma'am.
9        What you wrote was that you had
10 limited resources, and that was a weakness,
11 agreed?
12   A.    That's what's written.
13   Q.    Thank you.  Another weakness was
14 a "Lack of Training & Compliance first culture."
15       Did I read that correctly?
16   A.    You did.
17   Q.    You had the weakness of
18 "Inadequate SOMS" that we've talked about,
19 correct?
20   A.    That's what it says.
21   Q.    And you had "Day-to-day
22 challenges and the depth of compliance
23 activities are not visible to the organization,"
24 correct?

Page 667

1    A.    Yes, that's what the document
2  reads.
3    Q.    Okay.  And so then you talked
4  about this meeting you had with DEA in March of
5  2013, and you characterized it for us yesterday,
6  perhaps recharacterized it today, but fair to
7  say throughout the rest of 2013, the company got
8  about trying to implement and strengthen its
9  SOMS process, fair?
10       MS. VANNI:  Object to the
11   colloquy.  Object to form.
12       THE WITNESS:  We continued with
13   our planned improvements.
14 BY MR. BUCHANAN:
15   Q.    Okay.  And you also discussed
16 with defense counsel on direct examination the
17 quota process.
18       Do you recall that?
19   A.    I do.
20   Q.    The inner relation with the DEA
21 going back and forth from time to time, and you
22 said that was an important part of your
23 responsibilities?
24   A.    Yes, it is -- was.

Page 668

1        MR. BUCHANAN:  Could I have 1068,
2    please.  I need a copy for the witness.
3    Could you take it down until I have
4    copies for the witness, please.
5    Counsel.
6        (Document marked for
7    identification as  Par-Norton Deposition
8    Exhibit No. 36.)
9  BY MR. BUCHANAN:
10   Q.    We're marking this, ma'am, as
11 Exhibit 39 (sic) to your deposition.
12   A.    Okay.
13   Q.    It's an e-mail from -- e-mail
14 exchange between you and a few other folks at
15 Qualitest, Sanjay Patel, yourself as the latest
16 in time e-mail at the top, but there's an
17 exchange going on regarding a quota request.
18 You can go bottom up, but I suggest you can
19 probably get all the information you need on the
20 first page if you start at the bottom of the
21 first.  We're at 1068.1, and you received an
22 e-mail from Fang Zhou?
23   A.    Fang Zhou.
24   Q.    Zhou.  "Hi, Tracey.  Please find

Highly Confidential - Subject to Further Confidentiality Review

Page 669

1  the information below to apply the quote of
2  oxycodone hydrochloride for 2013. Would you
3  apply quota for 115 kg oxycodone hydrocodone
4  ASAP?"
5       Did I read that correctly?
6       A.   Yes, you did.
7       Q.   And then it's got a list of the
8  various units and strengths.
9       Do you see that?
10      A.   Yes.
11      Q.   Okay. And is this generally the
12 process, people throughout the organization with
13 various needs, whether it was research, whether
14 it was testing, whether it was sales for
15 production, would come to you and give you
16 numbers to apply to quota or to seek quota from
17 DEA if you needed more?
18      MS. VANNI:  Objection to form.
19      THE WITNESS:  For sales that was
20      not the process. We would look at our
21      sales using IMS data, and we would -- we
22      would submit quota using that
23      information. This is for research, and
24      in the research case, they will tell us

Page 670

1       how much we need -- how much they need,
2       and it's our job to push back on that
3       quantity and to determine if that
4       actually is definitively needed.
5  BY MR. BUCHANAN:
6       Q.   Okay. And so this is all
7  happening in mid-2013 a few months after your --
8  May 2013, a few months after your meeting with
9  DEA, correct?
10      A.   Yes.
11      Q.   Two months exactly.
12      And your response is you forward
13 this to Mr. Patel is FYI, I guess you are
14 forwarding the thread to him for consideration?
15      A.   Yes.
16      Q.   FYI, for your information, is
17 that what that means?
18      A.   Yes, uh-huh.
19      Q.   "Not sure asking for this in" --
20 what did you write?
21      A.   "Not sure asking for this in our
22 current SOMS environment is the best idea.
23 Thoughts?"
24      Q.   Okay. Let's pause on that. So

Page 671

1  not sure asking for this in our current SOMS
2  environment, and your current SOMS environment
3  in early 2013, two months after you met with the
4  DEA, was a SOMS environment that you
5  characterized as weak and inadequate, right?
6       MS. VANNI:  Object to form.
7       THE WITNESS:  In that prior
8       document, that's how it was
9       characterized.
10 BY MR. BUCHANAN:
11      Q.   That's right.
12      And what you noted here is you
13 were, I guess, seeking input from your
14 colleague, Mr. Patel, was not sure asking for
15 this, and "this" would be a quota increase,
16 right?
17      A.   Yes.
18      Q.   "Not sure asking for this in the
19 company's current SOMS environment is the best
20 idea."
21      Did I read that correctly?
22      A.   Yes, you did.
23      Q.   Thank you. You can set that
24 aside.

Page 672

1       You talked about some of the SOMS
2  processes the company engaged in in this 2013
3  and later period, consideration of information
4  and how that worked.
5       You also formed a SOMS advisory
6  board, right?
7       A.   Yes, we did.
8       Q.   Okay.
9       MR. BUCHANAN:  Could I have 1148.
10      This will be Exhibit 43. Can we go off
11      the record.
12      THE VIDEOGRAPHER:  The time is
13      10:48. Off the record.
14      (Document marked for
15      identification as Par-Norton Deposition
16      Exhibit No. 37.)
17      THE VIDEOGRAPHER:  The time is
18      10:50 a.m. We are back on the record.
19 BY MR. BUCHANAN:
20      Q.   Passing you, ma'am, what we just
21 marked as Exhibit 37 to your record. Our
22 internal number is E1148. It's an exchange
23 between you and Mr. Brantley in 2014, early
24 2014.

Page 673

1      Do you see that?
2      A.    Yes.
3      Q.    Okay.  And he's passing on the
4  charter for the advisory board of Qualitest
5  Pharmaceuticals suspicious order monitoring
6  program.
7      Do you see that?
8      A.    Yes.
9      Q.    And you told us about some of
10  these DEA interactions, where the DEA didn't
11  want the sales team making calls on whether
12  orders were suspicious and customers were
13  suspicious, right?
14      A.    Correct.
15      Q.    Okay.  You implemented this
16  particular protocol in early 2014?
17      A.    This charter, yes, when it was
18  finalized.
19      Q.    And so what we see here is
20  there's the SOM team, which Mr. Brantley was a
21  part of, correct?
22      A.    Yes.
23      Q.    There was an advisory board,
24  correct?

Page 674

1      A.    Yes.
2      Q.    And you were a component of the
3  advisory board?
4      A.    I believe so.  I don't know where
5  the numbers are listed, but I believe yes.
6      Q.    It's on 1148.2, "Membership."
7      A.    Yes.
8      Q.    Okay.  "The advisory board shall
9  consist of the Director of DEA compliance."
10      That was you, right?
11      A.    Yes.
12      Q.    "Vice President Legal," who was
13  that?
14      A.    Margaret Richardson.
15      Q.    Okay.  And the Deputy Compliance
16  Officer for generics, right?
17      A.    Yes.
18      Q.    And who was that?
19      A.    Sandra Parker.
20      Q.    Okay.  And so the advisory board
21  would consider information given to it by the
22  SOM team, correct?
23      A.    Correct.
24      Q.    And you guys would make calls on

Page 675

1  various things or recommendations?
2      A.    Yes, that's correct.
3      Q.    Okay.  And am I correct, though,
4  that with regard to certain customers, customers
5  that bought a lot of your product, that was not
6  a decision made by the advisory board, right?
7      MS. VANNI:  Object to form.
8      THE WITNESS:  No, that's not
9  correct.
10  BY MR. BUCHANAN:
11      Q.    For tier 1 customers, ma'am, tier
12  1 customers, decisions as to whether stop
13  selling to them or reducing quota, those went to
14  your chief operating officer, right?
15      A.    Where are you seeing this?  Oh, I
16  see, okay, yes.
17      Q.    I'm looking -- general advisory
18  board responsibilities.
19      Do you see that?
20      A.    I do.
21      Q.    Towards the bottom, "The general
22  responsibilities and duties of the Advisory
23  Board include: Review recommendations from the
24  SOM team regarding corrective actions concerning

Page 676

1  tier 1 customers who are not in compliance with
2  Qualitest SOM policies."
3      Did I read that correctly?
4      A.    You did.
5      Q.    "A tier 1 customer is a customer
6  with a minimum of ten million dollars in overall
7  sales and/or 750,000 dosage units of Controlled
8  Substance or List 1 chemical purchases
9  annually."
10      Did I read that correctly?
11      A.    You did.
12      Q.    And it says in the next sentence
13  who would be responsible with regard to "final
14  authority in determining Controlled Substance
15  discontinuance to a tier 1 customer," correct?
16      A.    Yes.
17      Q.    And the person who had that
18  responsibility was not the DEA compliance
19  officer, correct?
20      A.    No.
21      MS. VANNI:  Object to form.
22      THE WITNESS:  The DEA compliance
23  officer reviewed with the rest of the
24  team members the advisory board and then

Highly Confidential - Subject to Further Confidentiality Review

Page 677

1 the recommendation would be sent to the
2 quality chief operating officer.
3 BY MR. BUCHANAN:
4    Q.    Right.  The chief operating
5 officer, correct?
6    A.    Yes.
7    Q.    And who was that at this point in
8 time?
9    A.    I think it was Don Degoyla at
10 that time.
11    Q.    Chief operating officer is a
12 business guy, right?
13        MS. VANNI:  Object to form.
14        THE WITNESS:  Yes.
15 BY MR. BUCHANAN:
16    Q.    Okay.  And so the business guy
17 who was above you in the org chart had the final
18 authority for determining whether or not you
19 were going to discontinue sales to your really
20 big customers, right?
21        MS. VANNI:  Object to form.
22        THE WITNESS:  He had the final
23    say once all information was provided to
24    him, and, obviously, he would want to

Page 678

1    comply with the DEA regulation as the
2    chief operating officer.
3 BY MR. BUCHANAN:
4    Q.    Oh, you certainly go beyond my
5 question.
6        My question to you was who had
7 the final authority in terms of discontinuing
8 controlled substance sales to your big
9 customers?
10        MS. VANNI:  Object to colloquy.
11        THE WITNESS:  He did.
12 BY MR. BUCHANAN:
13    Q.    He did, the chief operating
14 officer, the business guy?
15        MS. VANNI:  Objection.
16        THE WITNESS:  Because there
17    was -- would be a business --
18 BY MR. BUCHANAN:
19    Q.    Is that a yes answer, ma'am?  I
20 need a yes answer.
21    A.    Yes, it is, yes.
22    Q.    Thank you.
23        You spent some time with defense
24 counsel on Exhibit 5, our internal number is 594

Page 679

1 on this one.
2        Do you have Exhibit 5 before you?
3        We can work with the screen.
4 Here you go.
5        Exhibit 5 is that letter that you
6 sent out to your customers in 2013.
7        Do you recall that?
8    A.    I do.
9    Q.    And I think you called out the
10 questionnaire in the back and a portion of the
11 description of some of the changes you were
12 making.
13        Do you recall that?
14    A.    I do.
15    Q.    Okay.  But what you noted in the
16 paragraph before that, this is 594.3, it's
17 beginning "when our products."
18        "When our products leave the
19 legitimate channels they have been manufactured
20 to support, heart-wrenching consequences often
21 occur."
22        Do you see that?
23    A.    Yes, we've read it several times.
24    Q.    "As responsible corporate

Page 680

1 citizens -- individuals, parents, friends,
2 caregivers, relatives and acquaintances -- we
3 need to do as much as we can to prevent drug
4 abuse and diversion in our communities."
5        Did I read that correctly?
6    A.    Yes.
7    Q.    "Each company and individual in
8 the supply chain has that responsibility."
9        Did I read that correctly?
10    A.    Yes.
11    Q.    "To put adequate controls in
12 place to discourage and prevent the diversion of
13 prescription products for uses other than those
14 for which they were originally intended."
15        Did I read that correctly?
16    A.    Yes, you did.
17        MS. VANNI:  Just note my
18 objection, just beyond the scope.  I
19 know I used this document on direct, but
20 I didn't refer her to that paragraph or
21 ask her any questions about that part --
22        MR. BUCHANAN:  I understand your
23 objection.  I don't know how video will
24 get cut at some point in time.

Page 681

1	MS. VANNI: Just preserving my
2	objection.
3	MR. BUCHANAN: Fair enough.
4	BY MR. BUCHANAN:
5	Q.	Let's look at -- well, withdrawn.
6	In examination I think both with
7	Endo counsel and Anda counsel, you were asked
8	about compliance with the reg, whether acts were
9	in compliance or not with the reg regarding
10	suspicious orders, and I think you were even
11	shown the statute.
12	Do you recall that?
13	A.	Yes.
14	Q.	Okay. We looked yesterday, just
15	in passing, at a letter that you received from
16	DEA in 2007, you, obviously at a former company
17	at that point in time, from Mr. Rannazzisi.
18	Do you recall that?
19	A.	I do.
20	Q.	And you remember receiving that
21	letter?
22	A.	I remember seeing the letter,
23	yes.
24	Q.	Okay.

Page 682

1	MR. BUCHANAN: Let's look at
2	Exhibit -- internal Exhibit Number 640.
3	(Document marked for
4	identification as Par-Norton Deposition
5	Exhibit No. 38.)
6	BY MR. BUCHANAN:
7	Q.	Passing you what we're marking as
8	Exhibit 38.
9	MR. BUCHANAN: Copy for defense
10	counsel, please.
11	BY MR. BUCHANAN:
12	Q.	And this is some internal
13	correspondence with Endo from before your time
14	there, attaching a letter that had been received
15	from a Mr. Rannazzisi, "Dear Registrant."
16	Do you see that?
17	A.	Yes.
18	MS. VANNI: I just want to note
19	my objection to use of this document as
20	it predates her employment with the
21	company, and it's an Endo document, so
22	it doesn't even apply to her employment
23	since she wasn't an Endo employee.
24	BY MR. BUCHANAN:

Page 683

1	Q.	Is this the same letter ma'am
2	that we saw in the PowerPoint yesterday that you
3	had referenced from your time at the company?
4	A.	I believe it's the same letter.
5	Q.	And so this is December 27, 2007,
6	several years before you joined the company,
7	correct?
8	A.	Yes.
9	Q.	And you acknowledge being aware
10	or at least having received it during your time
11	at a prior employer, correct?
12	A.	I had seen it, yes.
13	Q.	Okay. And this went to
14	manufacturers and distributors, right?
15	A.	Yes.
16	Q.	"The purpose of this letter is to
17	reiterate the responsibilities of controlled
18	substance manufacturers and distributors to
19	inform DEA of suspicious orders in accordance
20	with 21 CFR 1301.74(b)."
21	Do you see that?
22	A.	Yes I do.
23	Q.	I'd like to focus on the next
24	paragraph. It says, "In addition to, and not in

Page 684

1	lieu of, the general requirement under 21 USC
2	823, that manufacturers and distributors
3	maintain effective controls against diversion,"
4	and then the sentence continues.
5	This letter is telling
6	registrants that in addition to obligation, the
7	statutory obligation to maintain effective
8	controls against diversion, there are some other
9	things we want to highlight to you about
10	suspicious order monitoring practices, fair?
11	MS. VANNI: Object to form.
12	THE WITNESS: It refers back to
13	the regulation, the CFR, yes.
14	BY MR. BUCHANAN:
15	Q.	Is that a yes to my question?
16	MS. VANNI: Object to form.
17	THE WITNESS: No, I'm not sure.
18	BY MR. BUCHANAN:
19	Q.	Okay. Well, you said, I think,
20	in the examination with defense counsel that you
21	took your communications from DEA as guidance,
22	correct?
23	A.	I did.
24	Q.	Oral communications as guidance,

Page 685

1 correct?

2     A.    Yes.

3     Q.    I think you were even told that
4 DEA presentations were guidance as to
5 compliance, correct?

6         MS. VANNI:  Object to form.

7         THE WITNESS:  All instructions
8     from DEA are -- have meaning to me, and
9     I take them seriously, yes.

10 BY MR. BUCHANAN:

11    Q.    Well, in fact, they told you when
12 you sat down with them and we looked at it
13 yesterday in the minutes of the meeting with the
14 DEA in 2013 that all that information I just
15 discussed, presentations, letters, statements
16 and communications with the DEA, that was all
17 guidance for you to incorporate as part of your
18 compliance program, correct?

19        MS. VANNI:  Object to form.

20        THE WITNESS:  They were
21    suggestions for things that industry
22    could use, yes.

23 BY MR. BUCHANAN:

24    Q.    We're circle back on the minutes

Page 686

1 in a moment.

2         What this letter is -- and so
3 this would be guidance to you, this letter,
4 correct?

5     A.    Yes.

6     Q.    As to what the DEA was expecting
7 of you as a registrant, correct?

8     A.    Yes.

9     Q.    Okay.  And so it says "In
10 addition to, and not in lieu of."

11        Do you have an understanding what
12 that means?

13    A.    I do.

14    Q.    And what does it mean?

15    A.    It means instead of versus, yeah,
16 this end instead -- you can't substitute one for
17 the other.

18    Q.    That's right.  I mean, you have
19 an obligation, obviously, to do suspicious order
20 monitoring, and you have an obligation to
21 maintain effective controls against diversion,
22 correct?

23    A.    Absolutely and we were.

24        MS. KOSKI:  Object.

Page 687

1         MS. VANNI:  Object to form.

2         MR. BUCHANAN:  Ma'am, move to
3 strike the nonresponsive portion.  I'm
4 not asking whether and you were.  You
5 keep inserting that at the end.  I'm
6 supposing that maybe that's guidance.
7 Let's stay with my questions, okay.

8         MS. VANNI:  Object to the
9     colloquy, and I just want to note that
10    you are at 35 minutes for Endo.

11        MR. BUCHANAN:  I'm at 35 minutes
12    of an hour and 20 minutes.

13 BY MR. BUCHANAN:

14    Q.    In addition to, you understand to
15 mean in addition to the statutory requirements,
16 correct?

17        MS. VANNI:  Counsel, I'm sorry.
18    Just for -- I'm sorry.  I didn't mean to
19    interrupt you.  Just for clarification,
20    is it your position that you're entitled
21    to use the full direct, not minute for
22    minute as used by the defendants on
23    direct?

24        MR. BUCHANAN:  I am entitled to

Page 688

1 use minute for minute of the redirect
2 examination conducted by you or your
3 direct examination used by you.

4         MS. VANNI:  That would be 35
5     minutes for Endo.

6         MR. BUCHANAN:  No, I mean "you"
7     as defendants.

8         MS. VANNI:  Okay.  We object to
9     that position, but -- so just note our
10    objection.

11        MR. BUCHANAN:  That hasn't been
12    my understanding, but I've been doing
13    issues that concern Anda as part of
14    this.  I'm not sequencing specifically
15    between Anda and Endo.

16 BY MR. BUCHANAN:

17    Q.    This Rannazzisi letter that was
18 received in 2007 by registrants, and we saw it
19 copied in your PowerPoint, reflects that the
20 requirements under the CFR are in addition to
21 and not in lieu of those in the statute,
22 correct?

23    A.    That's what it says.

24    Q.    Thank you.

Highly Confidential - Subject to Further Confidentiality Review

Page 689

1         And let's look at that with
2 regard to -- so a manufacturer or a distributor
3 has an obligation to maintain effective controls
4 against diversion, right?
5     A.    Yes, as identified in the
6 regulation.
7     Q.    Statutory -- I'm sorry.  As
8 identified in the statute?
9     A.    Yes.
10     Q.    Okay.  Has an obligation to
11 maintain effective controls against diversion,
12 that's the statutory obligation, correct?
13     A.    Yes.
14     Q.    And Mr. Rannazzisi is saying you
15 have a separate obligation with regard to the
16 CFR, the regulation, with regard to suspicious
17 order monitoring and reporting, correct?
18         MS. KOSKI:  Object to form.
19         MS. VANNI:  Object to form.
20         THE WITNESS:  Yes.
21 BY MR. BUCHANAN:
22     Q.    Okay.  And so in this letter -- I
23 mean, you'd agree this is important guidance
24 from DEA, correct?

Page 690

1         MS. VANNI:  Object to form.
2         THE WITNESS:  It's guidance.
3     It's not anything that wasn't well known
4     at the time.
5 BY MR. BUCHANAN:
6     Q.    Okay.  Well, let's see what was,
7 again, then well known at the time before you
8 got this letter.
9         "The regulation specifically
10 states that suspicious orders include orders of
11 unusual size, orders deviating from a normal
12 pattern and orders of an unusual frequency."
13         Would you agree that's what he
14 wrote?
15     A.    That's what it says, yes.
16     Q.    Can you go to third paragraph,
17 please.  It continue, "The size of order alone,
18 whether or not it deviates from a normal
19 pattern, is enough to trigger the registrant's
20 responsibility to report the order as
21 suspicious."
22         Do you see that?  It's the --
23 sorry, fourth paragraph.
24         Do you see that, ma'am?

Page 691

1     A.    Yes.
2     Q.    Okay.  "The determination of
3 whether an order is suspicious depends not only
4 on the ordering patterns of the particular
5 customer, but also on the patterns of the
6 registrant's customer base and the patterns
7 throughout the relevant segment of the regulated
8 industry."
9         Did I read that correctly?
10     A.    Yes.
11     Q.    Okay.  So what this is saying is,
12 one, your system has got to look at patterns,
13 right?
14         MS. VANNI:  Object to form.
15 BY MR. BUCHANAN:
16     Q.    Isn't that what he wrote?
17     A.    It says if you're looking at
18 patterns, the size of the order alone is
19 different than -- basically that they're not --
20 you can't base a decision on one versus the
21 other.
22     Q.    Let's look at what's written by
23 the DEA to registrants.
24         "The determination of whether an

Page 692

1 order is suspicious depends not only on the
2 ordering patterns of the particular customer,
3 but also on the patterns of the registrant's
4 customer base and the patterns throughout the
5 relevant segment of the regulated industry."
6         Did I read that correctly?
7     A.    You read it correctly.
8     Q.    Okay.  And as of the time you got
9 to Qualitest, was the Qualitest suspicious order
10 monitoring system looking at class of trade as
11 separate thresholds?
12     A.    Again, I can't comment on what
13 the system was --
14         MS. VANNI:  Objection.
15         THE WITNESS:  -- before I got
16     there.
17         MS. VANNI:  Beyond the scope.
18 BY MR. BUCHANAN:
19     Q.    At the time you got there.  At
20 the time you got there, ma'am, was it looking at
21 relevant classes of trade?
22         MS. VANNI:  Objection, asked and
23     answered.
24         THE WITNESS:  I don't know what

Page 693

1    OMS was doing.
2  BY MR. BUCHANAN:
3      Q.   Okay.  The next page it says,
4  "Registrants that rely on rigid formulas to
5  define whether an order is suspicious may be
6  failing to detect suspicious orders."
7          Did I read that correctly?
8      A.   You did.
9      Q.   "For example, a system that
10 identifies orders as suspicious only if the
11 total amount of a controlled substance order
12 during one month exceeds the amount ordered the
13 previous month by a certain percentage or more
14 is" -- what did Mr. Rannazzisi say?
15     A.   "Is insufficient."
16     Q.   "Is insufficient."  So you had
17 that knowledge as of 2007, right?
18         MS. VANNI:  Object to form.
19         THE WITNESS:  In other words,
20     don't rely on pattern.
21 BY MR. BUCHANAN:
22     Q.   It says something that is looking
23 at whether or not it just exceeds a
24 predetermined percentage from a prior month is

Page 694

1  insufficient, correct?
2      A.   Which is the frequency of the
3  order.  That's what it says, yes.
4      Q.   "A system that identifies orders
5  as suspicious only if the total amount of a
6  controlled substance ordered during one month
7  exceeds the amount ordered the previous month by
8  a certain percentage or more is insufficient."
9          Those are the words, right?
10         MS. VANNI:  Object to form.
11         THE WITNESS:  That's what it
12     says, yes.
13 BY MR. BUCHANAN:
14     Q.   Okay.  "This system fails to
15 identify orders placed by a pharmacy if the
16 pharmacy placed unusually large orders from the
17 beginning of its relationship with the
18 distributor."
19         Do you agree with that, ma'am?
20     A.   That's what it says.
21     Q.   Okay.  And you agree?
22         MS. LEIBELL:  Object to form.
23         THE WITNESS:  No.
24 BY MR. BUCHANAN:

Page 695

1      Q.   Nonetheless, you had this
2  guidance from the DEA as of the end of 2007, and
3  I think you even said this was known before,
4  right?
5          MS. KOSKI:  Object to form.
6          MS. VANNI:  Object to form.
7          THE WITNESS:  The letter was out
8      there.
9  BY MR. BUCHANAN:
10     Q.   And, "Also, this system would not
11 identify orders as suspicious if the order were
12 solely for one highly abused controlled
13 substance if the orders never grew
14 substantially."
15         Did I read that correctly?
16     A.   You did.
17     Q.   "Nevertheless, ordering one
18 highly abused controlled substance and little or
19 nothing else deviates from the normal pattern of
20 what pharmacies generally order."
21         Did I read that correctly?
22     A.   You did.
23     Q.   This is that product mix issue
24 that the DEA discussed with you later in time,

Page 696

1  correct?
2          MS. KOSKI:  Object to form.
3          MS. VANNI:  Object to form.
4          THE WITNESS:  I can't -- can't
5      connect the two.
6  BY MR. BUCHANAN:
7      Q.   Okay.  Well, let's talk about it.
8  "Ordering one highly abused controlled substance
9  and little or nothing else deviates from the
10 normal pattern of what pharmacies generally
11 order."
12         Did I read that correctly?
13     A.   He's making a statement about
14 pharmacies.  I mean, I think you're reading more
15 into what he's saying than is there but...
16     Q.   You told us, ma'am, that these
17 are important guidances, and this is what you
18 governed your actions by, right?
19         MS. KOSKI:  Object to form.
20         MS. VANNI:  Object to form.
21         THE WITNESS:  They are things
22     that I take into consideration, yes.
23 BY MR. BUCHANAN:
24     Q.   Well, if the DEA is telling you

Highly Confidential - Subject to Further Confidentiality Review

Page 697

1  this is what you need to do to comply, then this
2  is what you need to do to comply, right?
3          MS. KOSKI: Object to form.
4          THE WITNESS: And we did.
5  BY MR. BUCHANAN:
6      Q.   Okay. And so Qualitest was
7  considering the relative percentages of
8  controlled substances versus noncontrolled
9  substances of its customers prior to 2013,
10 ma'am?
11     A.   I don't know, again, what OMS was
12 doing.
13     Q.   Okay. You're not aware that
14 Qualitest was doing that, correct?
15         MS. VANNI: Object to form.
16         THE WITNESS: I don't know. I
17     can't comment.
18 BY MR. BUCHANAN:
19     Q.   Okay. You have no information to
20 share with us as to whether Qualitest was doing
21 that, correct?
22         MS. VANNI: Object to form.
23         THE WITNESS: Do not, no.
24 BY MR. BUCHANAN:

Page 698

1      Q.   Okay. Paragraph beginning
2  "lastly."
3          Lastly, registrants that
4  routinely report suspicious orders, yet fill
5  these orders without first determining that the
6  order is not being diverted into other than
7  legitimate medical scientific and industrial
8  channels may be failing to maintain effective
9  controls against diversion.
10         Did I read that correctly?
11     A.   Yes, you did.
12     Q.   And you have that knowledge and
13 understanding as of 2007 at the latest, ma'am?
14         MS. VANNI: Object to form.
15         THE WITNESS: That's what he's
16     saying in 2007, yes.
17 BY MR. BUCHANAN:
18     Q.   And he is the DEA at this point?
19     A.   Yes.
20     Q.   Okay. And this is a DEA
21 communication to all registrants, correct?
22         MS. KOSKI: Object to form.
23         THE WITNESS: It is a
24     communication to some registrants, yes.

Page 699

1          MR. BUCHANAN: Okay.
2          THE WITNESS: Manufacturers and
3      distributors.
4  BY MR. BUCHANAN:
5      Q.   Fair enough, to manufacturers and
6  distributors. Okay.
7          All right. So every year that
8  Qualitest or any of the entities you were with
9  filed a application with the DEA to get
10 permission to manufacture, to distribute, to
11 sell controlled substances, you were agreeing to
12 play within that framework, right?
13         MS. KOSKI: Object to form.
14         MS. VANNI: Objection.
15         THE WITNESS: We were agreeing to
16     abide by the DEA regulations.
17 BY MR. BUCHANAN:
18     Q.   You were agreeing to maintain
19 effective controls against diversion, one,
20 correct?
21         MS. VANNI: Objection.
22         THE WITNESS: Which we did, yes.
23     All of the recordkeeping and
24     accountability and storage requirements

Page 700

1  were met.
2          MR. BUCHANAN: Move to strike.
3      You did it again. Let's stay with my
4      question.
5          MS. KOSKI: Objection.
6  BY MR. BUCHANAN:
7      Q.   When you apply for a
8  registration, you are agreeing to maintain
9  effective controls against diversion, correct?
10     A.   Yes, and we did.
11         MR. BUCHANAN: Move to strike.
12 BY MR. BUCHANAN:
13     Q.   Are you having a hard time just
14 staying with my focus?
15         MS. VANNI: Object to colloquy.
16 BY MR. BUCHANAN:
17     Q.   Are you having a hard time with
18 that?
19     A.   No.
20     Q.   Okay. When you file an
21 application with the DEA to be a registrant as
22 either a manufacturer or a distributor, you are
23 agreeing that you will maintain effective
24 controls to prevent diversion, yes or no?

Page 701

1    A.   Yes.
2        MS. VANNI: Objection, asked and
3   answered.
4 BY MR. BUCHANAN:
5    Q.   When you make an application to
6 be a registrant, you are agreeing that you will
7 comply with the regulations concerning
8 suspicious order monitoring, yes or no?
9        MS. KOSKI: Objection to form.
10       MS. VANNI: Objection, asked and
11 answered.
12      THE WITNESS: Yes.
13 BY MR. BUCHANAN:
14    Q.   You agree not just the first
15 time, you agree every time you do that; yes or
16 no?
17        MS. VANNI: Objection.
18      THE WITNESS: Yes.
19 BY MR. BUCHANAN:
20    Q.   And so if you're agreeing to do
21 that, it's not unreasonable for the DEA to
22 believe that you're doing that, correct?
23        MS. VANNI: Objection.
24      THE WITNESS: Yes, and to

Page 702

1 inspect, to confirm.
2 BY MR. BUCHANAN:
3    Q.   You saw the interaction with the
4 DEA yesterday, where you were told that you had
5 the public trust in your hands.
6      Do you recall hearing that from
7 the DEA in 2013?
8    A.   Yes.
9        MS. VANNI: Objection.
10 BY MR. BUCHANAN:
11    Q.   You had that understanding as a
12 DEA compliance officer, correct?
13    A.   Yes.
14    Q.   That not just -- the obligation
15 wasn't just to make the pills and put them out
16 there, but to maintain effective controls
17 against diversion when you were doing that.
18      You understood that, correct?
19        MS. VANNI: Object to form.
20      THE WITNESS: Yes.
21 BY MR. BUCHANAN:
22    Q.   And to maintain appropriate --
23 withdrawn.
24      And to maintain a suspicious

Page 703

1 order monitoring program to detect suspicious
2 orders, correct?
3        MS. KOSKI: Objection.
4        MS. VANNI: Objection, asked and
5 answered.
6      THE WITNESS: As done, yes.
7      MR. BUCHANAN: Move to strike.
8 BY MR. BUCHANAN:
9    Q.   And you also had the obligation,
10 and you agreed every time you renewed, that you
11 were maintaining a suspicious order monitoring
12 program compliant with the DEA guidance,
13 correct?
14        MS. KOSKI: Object to form.
15        MS. VANNI: Objection.
16      THE WITNESS: Yes.
17 BY MR. BUCHANAN:
18    Q.   And if you weren't doing so, and
19 if you weren't doing so, that would be a very
20 serious breach of not only the promise you made
21 as part of your registration but also the public
22 trust, yes or no?
23        MS. KOSKI: Objection.
24        MS. VANNI: Objection.

Page 704

1      THE WITNESS: That would be not
2   complying with the regulation.
3 BY MR. BUCHANAN:
4    Q.   And a breach of the public trust;
5 do you agree with that?
6        MS. VANNI: Objection.
7      THE WITNESS: It's not up to me
8   to define what's a breach of the public
9   trust.
10 BY MR. BUCHANAN:
11    Q.   You understand that you can't
12 do -- you being Qualitest, a manufacturer and
13 distributor of controlled substances during the
14 time you were there or with any of the
15 manufacturers and distributors that you worked
16 with, you can't do what you do without the
17 permission slip that's obtained following the
18 promise you make to do those things, right?
19        MS. VANNI: Object to form.
20      THE WITNESS: Following the grant
21   of the license by DEA.
22 BY MR. BUCHANAN:
23    Q.   And the promise that the
24 registrant will maintain effective controls

Page 705

1 against diversion and a suspicious order
2 monitoring program to detect suspicious orders;
3 you would agree, correct?
4          MS. VANNI: Object to form.
5          THE WITNESS: We have to comply
6 with the regulations.
7          MS. VANNI: My real time is down.
8 Could we go off the record.
9          THE VIDEOGRAPHER: The time is
10 now 11:15 a.m. We are off the record.
11          (Pause.)
12          THE VIDEOGRAPHER: The time is
13 11:18. We are back on the record.
14 BY MR. BUCHANAN:
15     Q.    Ma'am, you have 640.1 before you.
16 Let me just see the exhibit number, though.
17 Internal Number 640.1, 38 for the deposition.
18          MR. BUCHANAN: Could we pull up
19     that one.
20          MS. VANNI: Could I have a copy?
21          MR. BUCHANAN: You have it. It's
22     already been marked.
23 BY MR. BUCHANAN:
24     Q.    So on Exhibit 38 on the first

Page 706

1 page, ma'am, I understand you were not at
2 Qualitest at this point in time.
3          Did you have familiarity with the
4 HDMA?
5     A.    Not at this time, no.
6     Q.    When did you get involved with
7 HDMA?
8     A.    When I worked for HD Smith.
9     Q.    Okay. So at a late -- roughly
10 ten years later, I guess?
11     A.    Yes.
12     Q.    Or eight years later, whatever it
13 is.
14          This e-mail notes that the HDMA,
15 that's from Brian Munroe to a distribution list
16 of people that probably included some and didn't
17 include others from your time at Endo and
18 Qualitest, he was the vice president of
19 government affairs.
20          Did you have any opportunity to
21 deal with him during your time at Qualitest?
22     A.    I did.
23     Q.    Okay. I understood he had
24 relations and interactions with HDMA on various

Page 707

1 issues?
2          MS. VANNI: Object to form.
3          THE WITNESS: I don't know.
4 BY MR. BUCHANAN:
5     Q.    What he notes in this e-mail, can
6 we have it on the screen here, "The HDMA is
7 objecting to the attached DEA notice and is
8 presenting to the Pain Care Forum tomorrow."
9          Did I read that correctly?
10     A.    You did.
11     Q.    The attached notice is the notice
12 we were looking at from Mr. Rannazzisi and the
13 DEA in 2007, correct?
14     A.    Yes.
15     Q.    Okay. Did you know that that was
16 one of the things HDMA was doing with regard to
17 the guidances industry was receiving concerning
18 suspicious order monitoring and anti-diversion
19 efforts?
20     A.    No, I wasn't --
21          MS. VANNI: Object to form.
22          MR. LEEDER: Object to form.
23          THE WITNESS: -- involved and
24     didn't have knowledge of that.

Page 708

1 BY MR. BUCHANAN:
2     Q.    Did you know industry was
3 objecting --
4     A.    No.
5          MS. VANNI: Object to form.
6 BY MR. BUCHANAN:
7     Q.    -- to the DEA's requirements?
8     A.    No, I did not.
9     Q.    Okay. "This is worth looking at
10 as it represents the continuing 'creep' of the
11 DEA into activities that contribute to the
12 overall chilling effect of prescribing pain
13 medications."
14          Did I read that correctly?
15     A.    You did.
16     Q.    Okay. And were you involved at
17 all with HDMA in trying to combat DEA
18 regulations?
19     A.    No.
20          MS. VANNI: Object to form.
21 BY MR. BUCHANAN:
22     Q.    Okay. Or guidances?
23     A.    No.
24     Q.    Okay. Were you a part of Watson

Page 709

1 or Anda's efforts with the HDMA at this point in
2 time?
3      A.   No.
4           MS. KOSKI:  Object to form.
5           MS. LEIBELL:  Object to form.
6 BY MR. BUCHANAN:
7      Q.   Okay.  Did you tell your peers at
8 Watson or Anda at that point in time we've got
9 to resist this obligation for our companies?
10     A.   No.
11          MS. LEIBELL:  Object to form.
12          MS. KOSKI:  Object to form.
13 BY MR. BUCHANAN:
14     Q.   Did you know that others were
15 doing that?
16     A.   I did not.
17     Q.   Okay.  You talked about other
18 industry organizations in your direct
19 examination with Endo counsel.  I think you
20 mentioned the Anti-Diversion Industry Working
21 Group, a red flags video.
22          Do you recall that?
23     A.   I do.
24     Q.   Pass you what we're marking as

Page 710

1 Exhibit -- it's internal number 1080 for the
2 deposition -- 39.
3          (Document marked for
4          identification as Par-Norton Deposition
5          Exhibit No. 39.)
6 BY MR. BUCHANAN:
7      Q.   Passing you Exhibit 39 to your
8 deposition.  There you go.  This is a press
9 release that issued around the time the red flag
10 video was released; is that right?
11     A.   Yes.
12     Q.   And we looked at a document
13 yesterday concerning the anti-diversion working
14 group, where there was a reference to maybe we
15 should do something like this.
16          Do you recall that?
17     A.   I'm sorry?
18     Q.   I said we looked at a -- I think
19 it was a meeting of -- your minutes having
20 attended an anti-diversion working group meeting
21 where, among other things, one thing that was
22 discussed was the development of this video?
23     A.   Yes.
24     Q.   Okay.  So that occurs and the

Page 711

1 video issues, right?
2      A.   Yes.
3      Q.   Were you a part of the review
4 process for the red flag video, ma'am?
5      A.   I was.
6      Q.   I see Qualitest was also
7 involved?
8      A.   Yes, when I worked for Qualitest.
9      Q.   Okay.  And that was --
10     A.   That's me.
11     Q.   You're actually referenced on the
12 press release announcing the red flag video?
13     A.   Yes.
14     Q.   And so you endorsed its content?
15          MS. VANNI:  Object to form.
16          THE WITNESS:  I did.
17 BY MR. BUCHANAN:
18     Q.   You reviewed its contents?
19     A.   Yes.
20     Q.   Okay.  And then you sent it
21 around to others in the company as a -- to show
22 them, frankly, what the anti-diversion working
23 group had done?
24     A.   Yes.

Page 712

1          MR. BUCHANAN:  Do we have a copy
2     of the video I can give to counsel?  I
3     need a copy of the video, though, just
4     for the record.
5          (Thumb drive marked for
6          identification as Par-Norton Deposition
7          Exhibit No. 40.)
8          MR. BUCHANAN:  All right.  I'm
9     just marking as Exhibit 40 a thumb drive
10    which has a copy of the video.  I'd like
11    you to watch with me now as we pull it
12    up on the screen.
13          Can you pull the red flag video
14    up on the screen.  Can you go to the
15    start of it first, and let's just get it
16    rolling for a moment.  Can you
17    transcribe what's played.
18          (Video played as follows:
19          "I'm Carmen Collazo, executive
20    director for the examination" --
21          MR. BUCHANAN:  Let's pause.  We
22    don't have enough volume.
23          THE VIDEOGRAPHER:  The time is
24    11:24.  Off the record.

Highly Confidential - Subject to Further Confidentiality Review

Page 713

1    (Brief recess.)
2    THE VIDEOGRAPHER:  The time is
3    11:30.  We are back on the record.
4  BY MR. BUCHANAN:
5    Q.    Ma'am, you were telling us
6  yesterday about your involvement with the
7  anti-diversion working group.  You also just
8  discussed with us your involvement with the
9  preparation of the red flag video both
10 individually and on behalf of Qualitest.
11    Do you recall that testimony?
12    A.    I do.
13    Q.    Okay.  I'd like to just put it on
14 the screen and just confirm that we're talking
15 about the same thing, okay?
16    A.    Yes.
17    MR. BUCHANAN:  Can you queue it
18    up please and pause for a second.
19 BY MR. BUCHANAN:
20    Q.    This is NABP red flag video.  You
21 saw the title flash on the screen, ma'am?
22    A.    I did.
23    Q.    Okay.  And you recognize this
24 individual?

Page 714

1    A.    Yes.
2    Q.    And who is he?
3    A.    Carmen Collazo, the head of the
4  National Association of Boards of Pharmacy.
5    Q.    Could we go to -- we don't have
6  the time to listen to all 12 minutes.  We're
7  going to hit a few places.  But fair to say that
8  what's happening here is the company is
9  presenting -- I'm sorry -- the anti-diversion
10 working group together with the ABMP is
11 presenting situations and scenarios that may
12 occur in pharmacies to sensitize pharmacists and
13 pharmacies to maybe things they can do to help
14 prevent diversion.
15    A.    Yes.
16    Q.    Would that be fair?
17    MS. VANNI:  Object to form.
18    MR. BUCHANAN:  Let's go to 2:21.
19    Okay.  That's actually helpful.  That
20    will refresh the witness' recollection
21    more broadly.
22 BY MR. BUCHANAN:
23    Q.    And one of the things the video
24 did and we see it on the screen right now is

Page 715

1  show actually faces of individuals struggling
2  with opioids, right?
3    MS. BANNI:  Object to form.
4    THE WITNESS:  Yes.
5  BY MR. BUCHANAN:
6    Q.    One of the points being, these
7  are everyday people who are addicted?
8    A.    That's the point --
9    MS. BANNI:  Object to form.
10    THE WITNESS:  -- yes.
11 BY MR. BUCHANAN:
12    Q.    The point of showing faces of all
13 ilks is to say this is a drug abuse issue that
14 is different than drug abuse that people might
15 ordinarily be thinking of, right?
16    MS. KOSKI:  Object to form.
17    MS. BANNI:  Object to form.
18    THE WITNESS:  I'm not sure, but
19    it's meant to show that there are
20    different types of people who face
21    addiction.
22 BY MR. BUCHANAN:
23    Q.    And the jury will have the full
24 video to review and see what was trying to be

Page 716

1  conveyed --
2    A.    Yes.
3    Q.    -- by the anti-diversion working
4  group, together in collaboration with the ABMP,
5  but I would like to focus on some specific
6  language with you now.  Could we go to 2:21.  Is
7  it ready to play?  All right.  Now we'll play
8  some clips and I'll ask you some questions.
9    (Video played as follows:
10    "Opioid abuse is a nationwide
11    epidemic.  Every 19 minutes someone dies
12    from an unintentional drug overdose and
13    when it comes to overdose deaths caused
14    by prescription drugs, nearly three out
15    of four are caused by painkillers.  The
16    number of deaths involving opioids now
17    outnumbers those from cocaine and heroin
18    combined.  Regulations" --)
19    MR. BUCHANAN:  You can press
20    pause.
21 BY MR. BUCHANAN:
22    Q.    You recall that portion of the
23 video, ma'am?
24    A.    I do.

Page 717

1    Q.   You were involved in its
2  preparation?
3    A.   I was involved in -- I didn't --
4  I didn't draft the wording for it, but I was --
5  I reviewed it before, yes.
6    Q.   I think you told us a few minutes
7  ago you reviewed and endorsed it, right?
8    A.   Yes.
9    Q.   Okay.  Content was accurate when
10 written?
11     MS. BANNI:  Object to form.
12     THE WITNESS:  I don't know if you
13   say accurate.  It was -- it sounded --
14   it sounded right when I reviewed it.
15 BY MR. BUCHANAN:
16   Q.   Right, I mean, you were certainly
17 trying to make sure that it was accurate when
18 you were putting it out and distributing it on a
19 website for pharmacies around the country,
20 right?
21     MS. BANNI:  Object to form.
22     THE WITNESS:  We did not put it
23   out and distribute it on a website.
24   That was done by NABP.

Page 718

1  BY MR. BUCHANAN:
2    Q.   Well, the anti-diversion working
3  group issued a press release, right?
4    A.   I believe Mallinckrodt issued a
5  press release and noted everybody on there, yes.
6    Q.   Right.  And you endorsed its
7  content when it was released, correct?
8      MS. BANNI:  Object to form.
9      THE WITNESS:  Yes.
10 BY MR. BUCHANAN:
11   Q.   Even sent it around to your peers
12 in the firms to show it to them, right?
13   A.   Right.  It was something that I
14 was proud that we had -- we had done.
15   Q.   Okay.  Let's go to 4:56, and
16 we're kind of scrubbing through the images.
17 Does that refresh your recollection in terms of
18 its content?
19   A.   Yes.
20   Q.   People walking up to a counter,
21 red flags, cash customers, people walking in in
22 groups?
23   A.   Mm-hmm.
24   Q.   People going from one doctor to

Page 719

1  another doctor, right?
2      MS. BANNI:  Object to form.
3      THE WITNESS:  These were things
4    that we had been told by DEA were
5    issues, yes.
6  BY MR. BUCHANAN:
7    Q.   And we see people on the screen,
8  and these are people that, could we agree, are
9  everyday folks?
10     MS. BANNI:  Object to form.
11     MS. KOSKI:  Object to form.
12     THE WITNESS:  I guess, yeah.
13     MR. BUCHANAN:  Okay.  Let's play
14   from 4:56.
15     (Video played as follows:
16     "For every unintentional overdose
17   death from opioids in 2010, there were
18   733 nonmedical users.  Emergency room
19   visits resulting from pharmaceutical
20   abuse with no other type of drug or
21   alcohol involved almost doubled between
22   2004 and 2010.")
23     MR. BUCHANAN:  Press pause,
24   please.

Page 720

1  BY MR. BUCHANAN:
2    Q.   Big problem, can we agree?
3      MS. BANNI:  Object to form.
4      THE WITNESS:  Big problem, there
5    is an addiction problem in the United
6    States, yes.
7  BY MR. BUCHANAN:
8    Q.   For every opioid death in 2010,
9  there were 733 nonmedical users of those drugs,
10 right?
11   A.   That's what this -- the data
12 showed.  I'm not sure where the data came from,
13 I don't recall, but it was probably from a
14 regulatory agency.
15   Q.   Data you endorsed as accurate at
16 that point in time personally, correct?
17     MS. BANNI:  Object to form.
18     THE WITNESS:  Yes.
19 BY MR. BUCHANAN:
20   Q.   Data you endorsed as accurate on
21 behalf of the anti-diversion working group,
22 correct?
23     MS. BANNI:  Object to form.
24     THE WITNESS:  Yes.

Page 721

BY MR. BUCHANAN:

Q.    We've seen stats on opioid deaths. You're familiar there's stats out there, right?

A.    Yes.

Q.    As of this point in time, you had the knowledge that for every death there were 733 people who were using opioids for nonmedical use, right?

MS. BANNI: Objection, beyond the scope.

THE WITNESS: It's all stats that are out there. We took the stats as they were. I don't know what the details were before into them and how they were obtained, but we assumed they were accurate based on the source.

BY MR. BUCHANAN:

Q.    You certainly were trying to convey accurate information, correct?

A.    Yes, we were.

Q.    And, to the best of your knowledge, ma'am, you did so, correct?

A.    Yes.

Page 722

Q.    Okay. Let's go forward now to 8:25. And we see kind of interspersed with facts these scenarios with individuals approaching a pharmacy counter, fair?

A.    Yes.

Q.    Okay.

MR. BUCHANAN: Could you play 8:25.

(Video played as follows: "America's biggest drug problem isn't on the streets, it's in our medicine cabinets. Seventy percent of Americans are taking at least one prescription drug and more than 50% are on at least two. Among young people who abuse prescription medications, 70% get them from family or friends.")

MR. BUCHANAN: Let's pause.

BY MR. BUCHANAN:

Q.    America's drug problem isn't on the streets, it's in our medicine cabinet.

Did you hear that?

A.    I did.

Q.    True statement when made, right?

Page 723

MS. VANNI: Object to form.

THE WITNESS: It's one of the things that's outlined on DEA's website and why they do their national take back days now, yes.

BY MR. BUCHANAN:

Q.    And the manufacturers who you worked with in the anti-diversion working group endorse that as a true statement of the state of affairs as of 2014 when this video was prepared, correct?

MS. VANNI: Objection.

THE WITNESS: Yes, there's always independent thought and people who will abuse and take things in ways they shouldn't.

BY MR. BUCHANAN:

Q.    America's drug problem isn't on the streets, it's in our medicine cabinets, right?

A.    In that particular case, yes, when we were directing to pharmacies, yes, that is the case.

MR. BUCHANAN: Let's go to nine

Page 724

minutes and three seconds and play that portion.

(Video played as follows: "More Americans abuse prescription drugs than the number of cocaine, hallucinogen, methamphetamine and heroin abusers combined. The pharmacy" --)

MR. BUCHANAN: Let's pause there.

BY MR. BUCHANAN:

Q.    More Americans abuse prescription drugs than cocaine, hallucinogens, methamphetamine and heroin abusers combined.

Did you hear that, ma'am?

A.    I did.

Q.    To your knowledge in 2014, that was a true statement you were making through the anti-diversion working group for this video, correct?

A.    Those were statements that have would come from DEA or CDC or a regulator, so I would assume, yes.

Q.    You certainly wouldn't endorse them as appropriate or true if they weren't

Page 725

1  true, right?
2          MS. VANNI:  Object to form.
3          THE WITNESS:  Yes.
4  BY MR. BUCHANAN:
5      Q.   To the best of your knowledge,
6  ma'am, as a person who was on this committee to
7  review and endorse this video, those were true,
8  right?
9      A.   Those --
10         MS. VANNI:  Object to form.
11         THE WITNESS:  Those were publicly
12     available.
13  BY MR. BUCHANAN:
14     Q.   To the best of your knowledge,
15  they were true?
16     A.   I wasn't in a position to make a
17  determination if they were true.  They were
18  publicly available.  I didn't have access to the
19  data that was used to compile that information,
20  so I can't say they were 100% true.  I can only
21  make a assumption based on the viability of the
22  sources that they came from.
23     Q.   America's drug problem isn't on
24  the streets, it's in our medicine cabinets,

Page 726

1  right?
2      A.   It's in a lot of places, but,
3  yes, that's one of them.
4      Q.   What you put in the video is that
5  it wasn't on the streets, it was in people's
6  medicine cabinets, correct, ma'am?
7          MS. VANNI:  Object to form.
8          THE WITNESS:  Because that's what
9      the video was focused on.
10  BY MR. BUCHANAN:
11     Q.   Is that what you put on the
12  video?  Not because, not why --
13         MS. VANNI:  Let her answer her
14     question -- her answer.
15  BY MR. BUCHANAN:
16     Q.   Not because, not why.  Stay with
17  my questions.
18         What you put in the video, ma'am,
19  was that America's drug problem isn't on the
20  street, it's in our medicine cabinets, correct?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  Yes, the video is
23     directed to its audience.
24         MR. BUCHANAN:  Okay.  Let's go to

Page 727

1  10:31 to 10:46.
2          (Video played as followed:
3          "One in four teens reports having
4      misused a prescription drug at least
5      once.  That translates to 5 million
6      teenagers, a 33% increase over the past
7      five years.")
8          MR. BUCHANAN:  Let's pause.
9  BY MR. BUCHANAN:
10     Q.   33% increase in teen abuse of
11  prescription drugs between 2009 and 2014.
12         You saw that reference, ma'am?
13     A.   Yes, I did.
14     Q.   During the same period of time
15  that Mr. -- after Mr. Rannazzisi and the DEA had
16  sent you a notice saying everybody has got to
17  maintain effective controls against diversion,
18  right?
19     A.   Yes.
20     Q.   And where we've gotten to by 2014
21  is that America's drug problem isn't on the
22  street, it's in medicine cabinets, right?
23         MS. VANNI:  Object to form.
24         THE WITNESS:  That was the --

Page 728

1      those were the statistics that were in
2      the video, yes.
3          MR. BUCHANAN:  Okay.  Well, let's
4      go now to towards the end, 11:41.
5  BY MR. BUCHANAN:
6      Q.   Okay.  And this video was going
7  out to pharmacies, right?
8      A.   That was the focus.
9          MR. BUCHANAN:  Okay.  Could you
10     roll it from here, please.
11         (Video played as follows:
12         "Who is responsible?  Yes, it's
13     the culture.  Yes, it's the doctor or
14     prescriber.  Yes, it's law enforcement.
15     Yes, it's the state boards.  But you,
16     the pharmacist, have a corresponding
17     responsibility.  You play a critical
18     role.")
19         MR. BUCHANAN:  Pause, please.
20  BY MR. BUCHANAN:
21     Q.   Did you hear who was listed as
22  who's responsible?
23     A.   Yes.
24     Q.   Who did the anti-diversion

Highly Confidential - Subject to Further Confidentiality Review

Page 729

1 working group highlight as responsible for this
2 situation, ma'am?
3      A.   Many aspects of the supply
4 change.
5      Q.   I'm sorry.  I didn't hear
6 manufacturers or distributors mentioned, did
7 you?
8           MS. VANNI:  Object to form.
9           THE WITNESS:  No, because we had
10 DEA controls in place.
11 BY MR. BUCHANAN:
12      Q.   In this video in terms of who is
13 responsible for this, the anti-diversion working
14 group, Qualitest, other manufacturers, other
15 distributors point the finger at culture, right?
16           MS. VANNI:  Object to form.
17 BY MR. BUCHANAN:
18      Q.   You saw that?
19      A.   That's what it says, yes.
20      Q.   Pointed the finger at the DEA,
21 right?
22           MS. VANNI:  Objection.
23           THE WITNESS:  Yes.
24 BY MR. BUCHANAN:

Page 730

1      Q.   Pointed the finger at doctors,
2 right?
3      A.   Yes, definitely.
4           MS. VANNI:  Objection.
5 BY MR. BUCHANAN:
6      Q.   And pointed the finger at state
7 boards?
8           MS. VANNI:  Objection.
9           THE WITNESS:  Yes, definitely.
10 BY MR. BUCHANAN:
11      Q.   Okay.  And pointed the finger at
12 pharmacists, right?
13           MS. VANNI:  Objection.
14           THE WITNESS:  Yes, definitely.
15 BY MR. BUCHANAN:
16      Q.   Missed a few big players in the
17 supply chain; we agree?
18           MS. VANNI:  Objection.
19           THE WITNESS:  I would not agree.
20 BY MR. BUCHANAN:
21      Q.   We could agree that manufacturers
22 aren't referenced in terms of their roles in
23 influencing state boards, right?
24           MS. VANNI:  Objection.

Page 731

1           THE WITNESS:  Manufacturers that
2 comply with the regulations are not
3 contributing to the problem.
4 BY MR. BUCHANAN:
5      Q.   Did you see any reference to
6 manufacturers' influence on state boards?
7           MS. VANNI:  Objection.
8           THE WITNESS:  No, I would not
9 think that that would be applicable to
10 this.
11 BY MR. BUCHANAN:
12      Q.   Did you see any reference to
13 distributors' influence on state boards?
14      A.   No.
15      Q.   Did you see any reference to our
16 industry associations that have worked to change
17 the treatment of pain so that these drugs could
18 be prescribed more broadly, did you see any
19 reference to that as a responsibility?
20           MS. VANNI:  Objection.
21           THE WITNESS:  No.
22 BY MR. BUCHANAN:
23      Q.   Did you see any reference to
24 distributors who had no suspicious order

Page 732

1 monitoring programs for years and years and
2 years?
3           MS. VANNI:  Objection.
4           THE WITNESS:  No.
5 BY MR. BUCHANAN:
6      Q.   Did you see any reference to
7 manufacturers who had no such responsibility?
8           MS. VANNI:  Objection.
9           THE WITNESS:  No.
10 BY MR. BUCHANAN:
11      Q.   Did you see any reference to the
12 30 plus million dollars Endo paid to the NIPC to
13 run programs to expand the market for pain?
14           MS. VANNI:  Objection, beyond the
15 scope, argument.
16           THE WITNESS:  No, and I didn't
17 see any reference either to product
18 imported illegally or to any other
19 scenario, independent thought, any other
20 scenario that causes abuse and
21 addiction.  That was not the focus of
22 this video.
23 BY MR. BUCHANAN:
24      Q.   Who is responsible?  You endorsed

Highly Confidential - Subject to Further Confidentiality Review

Page 733

1 this?
2     A.    I did.
3     Q.    We have your letter, ma'am, from
4 October 18, 2013.
5         Do you recall that?
6     A.    I recall the date.  I can't
7 recall what the letter said, but yes.
8     Q.    That's where you told all of your
9 customers that we all have this responsibility,
10 right?
11     A.    Yes.
12         MS. VANNI:  Object to form.
13 BY MR. BUCHANAN:
14     Q.    We all have this responsibility,
15 manufacturers, correct?
16     A.    Yes.
17     Q.    Distributors, correct?
18         MS. VANNI:  Objection.
19         THE WITNESS:  Yes.
20         MS. VANNI:  Objection.
21         THE WITNESS:  And I consider
22     putting that out there to be going above
23     and beyond, and that's, again, something
24     that I have always wanted to do.

Page 734

1         MR. BUCHANAN:  Could we go to the
2     next slide, please, let's finish it.
3         (Video played as follows:
4         "When you are in that moment of
5     truth, will you recognize and act upon
6     the red flag?")
7         MR. BUCHANAN:  Let's pause.
8 BY MR. BUCHANAN:
9     Q.    So we could agree that in terms
10 of who has the responsibility, manufacturers and
11 distributors and others that had no suspicious
12 order monitoring programs or efforts to prevent
13 diversion were not listed, correct?
14         MS. VANNI:  Object to form.
15 BY MR. BUCHANAN:
16     Q.    We can agree on that?
17     A.    We can agree that everyone has a
18 responsibility to abide by the regulations.
19     Q.    Okay.  We can agree that when
20 those that had the responsibility for this
21 situation, who is responsible was the question.
22         Do you recall that?
23         MS. VANNI:  Object to form.
24 BY MR. BUCHANAN:

Page 735

1     Q.    Do you recall that question in
2 the video?
3     A.    In this particular video, yes.
4     Q.    Who is responsible?
5     A.    Yes.
6     Q.    Okay.  We could agree that the
7 Cardinal Healths, the Actavis, the McKessons,
8 the Mallinckrodts, the AmerisourceBergens and
9 the Qualitests, who sponsored the video, are not
10 listed in any way as having responsibility for
11 this, correct?
12         MS. VANNI:  Object to form.
13         THE WITNESS:  We have a
14     responsibility to comply with the
15     regulation.
16 BY MR. BUCHANAN:
17     Q.    Do you have my question, ma'am.
18 When the question was asked in the video --
19     A.    They are not listed in the video.
20     Q.    That's right.  But yet you knew,
21 you knew when you sent your letter in February
22 of 2013 that you had a responsibility as
23 Qualitest, correct?
24         MS. VANNI:  Object to form.

Page 736

1         THE WITNESS:  Of course.  That's
2     why we did comply.
3 BY MR. BUCHANAN:
4     Q.    Distributors had that
5 responsibility, correct?
6     A.    Yes.
7     Q.    And if anyone broke that supply
8 -- that closed system, heart-wrenching
9 consequences could occur, right?
10     A.    That's what my letter said, yes.
11     Q.    Okay.  Now, let's focus on a few
12 other points you did in examination with
13 counsel.
14         MR. BUCHANAN:  What do we have
15     time-wise?
16         THE VIDEOGRAPHER:  Seven minutes.
17     We're at 1:13.  Do you want me to go
18     off?
19         MR. BUCHANAN:  No, no, we're
20     fine.
21 BY MR. BUCHANAN:
22     Q.    Just want to circle back on some
23 of the questions about Anda, specifically this
24 interaction you had with DEA in the summer of

Highly Confidential - Subject to Further Confidentiality Review

Page 737

1  2007.
2       Do you recall that, ma'am?
3       A.   Yes.
4       Q.   Okay.  I think -- I think defense
5  counsel characterized it as an invitation?
6       A.   Yes.
7       Q.   You were invited?
8       A.   Yes.
9       Q.   Didn't they say they wanted to
10  talk to you about serious concerns?
11           MS. KOSKI:  Object to form.
12           THE WITNESS:  DEA did, yes.
13  BY MR. BUCHANAN:
14       Q.   They told you they wanted to talk
15  to you about serious concerns because certainly
16  about certain orders, but also your suspicious
17  order monitoring system, correct?
18           MS. KOSKI:  Object to form.
19           THE WITNESS:  Anda's suspicious
20       order monitoring system.
21  BY MR. BUCHANAN:
22       Q.   Yeah, the year was a little
23  confusing there, but Anda's suspicious order
24  monitoring system, correct?

Page 738

1       A.   Yes.
2       Q.   And you parsed the language
3  closely in some areas with counsel.  I'd like
4  you now to look at Exhibit 32 that was marked in
5  examination.  I don't have the ability to pull
6  it up on the screen for you, ma'am.  It's the
7  e-mail exchange on July 16th, 2007 between
8  yourself and Diane -- Ms. Miranda?
9       A.   Yes.
10       Q.   Okay.  This is an interaction
11  phone call you had with a Mr. Mapes from the
12  DEA.
13       A.   Hold on.  I just have one page.
14       Q.   This is an interaction you had
15  with a Mr. Mapes from the DEA, correct?
16       A.   It is a documented detail of that
17  descript -- that phone call, yes.
18       Q.   You got a phone call, right?
19       A.   Yes.
20       Q.   First call was, hey, does Watson
21  own Anda now, right?
22       A.   Correct.
23       Q.   Okay.  He then indicated he had
24  concerns.

Page 739

1       Did I read that correctly?
2       A.   He did indicate that.
3       Q.   About Anda, that he would like to
4  discuss, okay.
5       You understood he had concerns?
6       A.   That's yes.
7       Q.   Okay.  You started to read I
8  think the first sentence in the bottom of page 1
9  of Exhibit 32, Bates stamp 959.  "Mr. Mapes then
10  went on to say that since then, they have seen a
11  steady increase in Anda's sales of hydrocodone,
12  to the point of these sales being extremely
13  questionable."
14       Do you recall that?
15       A.   These were the -- yes, it's a
16  summary of what he was saying during the call.
17       Q.   And he said that many of the
18  retail pharmacies that you were selling to were
19  feeding the drugs to illegal internet
20  pharmacies, right?
21           MS. KOSKI:  Object to form.
22           THE WITNESS:  That's what he
23       said, yes.
24  BY MR. BUCHANAN:

Page 740

1       Q.   He then said he had questions
2  about the effectiveness of Anda's suspicious
3  order monitoring system, correct?
4       A.   He asked about the effectiveness,
5  which I couldn't really comment on, having not
6  worked there.
7       Q.   Yeah, and that was interesting.
8  I think you were asked a question by defense
9  counsel about did Anda have its own DEA
10  compliance group.
11       Do you recall that?
12       A.   Yes.
13       Q.   When the time came after you
14  were -- I think you said summoned in your
15  characterization of this?
16       A.   I did.
17       Q.   After you were summoned to go and
18  meet with the DEA in Washington, who came with
19  you from DEA compliance at Anda?
20       A.   I believe Michael Cochrane.
21       Q.   CEO?
22       A.   I'm not sure what his title was,
23  but he was the person who at the time I was told
24  handled DEA compliance.

Highly Confidential - Subject to Further Confidentiality Review

Page 741

1    Q.    Okay.  Well, let's look at your
2  writing in Exhibit 2.  Exhibit 2 is your summary
3  of your experience at Ciba-Geigy, Watson,
4  Qualitest, et cetera; do you recall?
5    A.    Yes.
6    Q.    And you note in the middle of the
7  description --
8          MR. BUCHANAN:  Could we pull up
9    1146.2 and go to the Watson entry in the
10   middle of the paragraph.
11 BY MR. BUCHANAN:
12   Q.    It says, "However, Watson
13 purchased Anda and certainly afterward, Anda was
14 summoned to DEA as a result of their lack of a
15 robust SOM program."
16         Did I read that correctly?
17   A.    You did.
18   Q.    "I did not support Anda from a
19 DEA perspective as they had come to Watson with
20 their own DEA person."
21         And it notes, however, you were
22 asked to be their DEA representative for the
23 meeting in HQ.
24         Did I read that correctly?

Page 742

1    A.    Yes.
2    Q.    And what you listed for the
3  people that you went with to that meeting were a
4  representative of the legal department, correct?
5          You can read it in the next
6  sentence.
7    A.    Yes.
8    Q.    What you listed --
9    A.    I don't know who the legal person
10 was.
11   Q.    You went with legal and the
12 individual who at the time was the president of
13 Anda, correct?
14   A.    Yes.
15   Q.    And we talked about the binder
16 you got, and I won't revisit that.
17         But then you note, however --
18 well, actually, we probably should.  "DEA
19 presented and provided a binder as they have
20 done for most companies at this point" in time.
21         Do you see that?
22   A.    Yes.
23   Q.    Okay.  "However, in Anda's case
24 the DEA meeting was" what?

Page 743

1    A.    For cause.
2    Q.    For cause.  It wasn't just a
3  regular distributor meeting that you talked
4  about having -- being aware of that was
5  happening in the industry, correct?
6    A.    Actually, it was a bad choice of
7  words.
8    Q.    You've told us about several
9  words that I think you'd rather recast in your
10 oral testimony, but what you wrote when you were
11 characterizing your experience, on reflection at
12 Watson, was that the DEA meeting was for cause,
13 correct?
14   A.    That's what I wrote, yes.
15   Q.    And that "immediate action was
16 required," that's what you wrote, right?
17   A.    Yes.
18   Q.    "Immediate action required,"
19 correct?
20   A.    That's what I wrote, yes.
21   Q.    Not suggested, right?
22   A.    That's what I wrote, yes.
23   Q.    Not just to go above and beyond,
24 right?

Page 744

1    A.    Yes.
2    Q.    Required?
3    A.    As written.
4    Q.    That's what you wrote?
5    A.    As written, yes.
6    Q.    Okay.  Anda then revamped their
7  program and we conveyed the results to the DEA.
8          Did I read that correctly?
9    A.    You did.
10   Q.    Okay.  Mr. Mapes, you referenced
11 an interaction with him in this 2007 period of
12 time.
13         Is that the same Mr. Mapes that
14 Qualitest brought in to evaluate their program
15 in 2008 that we looked at yesterday?
16   A.    Yes, I believe so.
17   Q.    That identified inadequacies with
18 the SOM program at Qualitest?
19         MS. VANNI:  Object to form, and I
20   think we're at time.
21         THE WITNESS:  Again, I'm not
22   sure.
23 BY MR. BUCHANAN:
24   Q.    What's that?

Highly Confidential - Subject to Further Confidentiality Review

Page 745

1    A.    Again, I'm not sure.
2         MR. BUCHANAN:  Okay.  If that's
3    the case, is that accurate?  Okay.  Let
4    me -- for to correct one thing on the
5    record, counsel, I'm just going to mark
6    this and you can have it.
7         (Document marked for
8    identification as Par-Norton Deposition
9    Exhibit No. 41.)
10        MR. BUCHANAN:  This is Exhibit
11   41.  It's the -- I'm passing it over to
12   the witness.
13        I'll represent to counsel that
14   Exhibit 41 is the remainder of the
15   spreadsheet data that Endo/Qualitest has
16   pointed plaintiffs' counsel to as
17   representative of -- as containing the
18   sales and shipping data of the company's
19   various controlled substances.  That
20   Bates number should correlate with the
21   summary exhibit, which is Exhibit 4, as
22   a data source.
23        Thank you, ma'am.  I'm told I'm
24   out of time.

Page 746

1         THE WITNESS:  Thank you.
2         MR. BUCHANAN:  I appreciate your
3    indulgence.  Off the record.
4         THE VIDEOGRAPHER:  The time is
5    11:56.  Off the record.
6         (Brief recess.)
7         THE VIDEOGRAPHER:  12:06, back on
8    the record.
9         MR. BUCHANAN:  Ms. Norton, I'm
10   advised that I'm out of time.  I have no
11   further questions at this time.
12   Counsel, your witness.
13        MS. VANNI:  I have no questions
14   at this time.  Thank you.
15        THE VIDEOGRAPHER:  The time is
16   now 12:06 p.m.  This concludes today's
17   portion of the deposition of Tracey
18   Norton.  We are now off the record.
19        (Witness excused.)
20            - - -
21
22
23
24

Page 747

1    C E R T I F I C A T I O N
2         I, MARGARET M. REIHL, a
3    Registered Professional Reporter,
4    Certified Realtime Reporter, Certified
5    Shorthand Reporter, Certified LiveNote
6    Reporter and Notary Public, do hereby
7    certify that the foregoing is a true and
8    accurate transcript of the testimony as
9    taken stenographically by and before me
10   at the time, place, and on the date
11   hereinbefore set forth.
12        I DO FURTHER CERTIFY that I
13   am neither a relative nor employee nor
14   attorney nor counsel of any of the
15   parties to this action, and that I am
16   neither a relative nor employee of such
17   attorney or counsel, and that I am not
18   financially interested in the action.
19
20
21   -------------------------------
     Margaret M. Reihl, RPR, CRR, CLR
22   CSR #XI01497  Notary Public
23
24

Page 748

1        - - - - - -
2         E R R A T A
3        - - - - - -
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6    REASON: _____
7    ____  ____  _____
8    REASON: _____
9    ____  ____  _____
10   REASON: _____
11   ____  ____  _____
12   REASON: _____
13   ____  ____  _____
14   REASON: _____
15   ____  ____  _____
16   REASON: _____
17   ____  ____  _____
18   REASON: _____
19   ____  ____  _____
20   REASON: _____
21   ____  ____  _____
22   REASON: _____
23   ____  ____  _____
24   REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

Page 749

ACKNOWLEDGMENT OF DEPONENT

1
2
3        I, TRACEY L. NORTON, do hereby
4    certify that I have read the foregoing
5    pages, and that the same is a correct
6    transcription of the answers given by me
7    to the questions therein propounded,
8    except for the corrections or changes in
9    form or substance, if any, noted in the
10   attached Errata Sheet.
11
12
13

_____
14   TRACEY L. NORTON            DATE
15
     Subscribed and sworn to before me this
16
     _____ day of _____, 2018.
17
     My commission expires:_____
18
19   _____
     Notary Public
20
21
22
23
24