```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                      -  -  -

 5    IN RE: NATIONAL PRESCRIPTION

 6    OPIATE LITIGATION              Case No.

 7                                   1:17-MD-2804

 8    APPLIES TO ALL CASES           Hon. Dan A.

 9                                   Polster

10    Case No. 1:17-MD-2804

11                      -  -  -

12                  January 9, 2019

13      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14             CONFIDENTIALITY REVIEW

15             Videotaped deposition of

16    SOPHIA NOVACK, held at 101 Park Avenue,

17    New York, New York, commencing at 9:37 a.m.,

18    on the above date, before Marie Foley, a

19    Registered Merit Reporter, Certified

20    Realtime Reporter and Notary Public.

21                      -  -  -

22             GOLKOW LITIGATION SERVICES

23        877.370.3377 ph | 917.591.5672 fax

24                  Deps@golkow.com
```

Page 2

1  APPEARANCES:
2
3  BARON & BUDD, P.C.
4  BY: W. SCOTT SIMMER, ESQUIRE
5     WILLIAM G. POWERS, ESQUIRE
6     600 New Hampshire Avenue NW
7     The Watergate, Suite 10-A
8     Washington, DC  20037
9     202.333.4562
10    ssimmer@baronbudd.com
11    Representing the MDL Plaintiffs
12
13
14
15 MORGAN LEWIS & BOCKIUS, LLP
16 BY: JOHN P. LAVELLE, JR., ESQUIRE
17    1701 Market Street
18    Philadelphia, Pennsylvania  19103
19    215.963.5000
20    john.lavelle@morganlewis.com
21       - and -
22
23
24

Page 3

1  APPEARANCES (Cont.):
2
3  MORGAN LEWIS & BOCKIUS, LLP
4  BY: KELLY A. MOORE, ESQUIRE
5     CAROLYN A. SILANE, ESQUIRE
6     101 Park Avenue
7     New York, New York  10178
8     212.309.6000
9     kelly.moore@morganlewis.com
10    Representing Rite Aid and the Witness
11
12
13 FARRELL FRITZ, LLP
14 BY: JAMES M. WICKS, ESQUIRE
15    400 RXR Plaza
16    Uniondale New York  11556
17    516.227.0617
18    jwicks@farrellfritz.com
19    Representing Cardinal Health
20
21
22
23
24

Page 4

1  APPEARANCES VIA TELEPHONE AND STREAMING:
2
3
4  ARNOLD & PORTER KAYE SCHOLER, LLP
5  BY: RYAN Z. WATTS, ESQUIRE
6     601 Massachusetts Avenue NW
7     Washington, DC  20001
8     202.942.5000
9     Ryan.watts@arnoldporter.com
10    Representing Par and Endo
11
12
13 BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
14 BY: LESTER C. HOUTZ, ESQUIRE
15    1801 Wewatta Street
16    Suite 1200
17    Denver, Colorado  80202
18    303.592.3100
19    lester.houtz@bartlit-beck.com
20    Representing Walgreens
21
22
23
24

Page 5

1  APPEARANCES VIA TELEPHONE AND STREAMING
2  (Cont.):
3
4  COVINGTON & BURLING, LLP
5  BY: AMBER CHARLES, ESQUIRE
6     One CityCenter
7     850 Tenth Street NW
8     Washington, DC  20001
9     202.662.6000
10    acharles@cov.com
11    Representing McKesson
12
13
14 JONES DAY
15 BY: SCOTT D. QUELLHORST, ESQUIRE
16    77 West Wacker
17    Chicago, Illinois  60601
18    312.782.3939
19    squellhorst@jonesday.com
20    Representing Walmart
21
22
23
24

| Page 6 | Page 8 |
|---|---|

**Page 6**

1　APPEARANCES VIA TELEPHONE AND STREAMING
2　(Cont.):
3
4　JACKSON KELLY PLLC
5　BY: GRETCHEN M. CALLAS, ESQUIRE
6　　500 Lee Street East
7　　Suite 1600
8　　Charleston West Virginia 25301-2302
9　　304.340.1000
10　　gcallas@jacksonkelly.com
11　　Representing AmerisourceBergen
12
13　BAILEY & WYANT, PLLC
14　BY: JUSTIN C. TAYLOR, ESQUIRE
15　　500 Virginia Street East
16　　Suite 600
17　　Charleston West Virginia 25337
18　　304.345.4222
19　　jtaylor@baileywyant.com
20　　Representing West Virginia Board of
21　　Pharmacy
22
23　ALSO PRESENT:
24　　Ray Moore, videographer, trial tech

**Page 8**

1　　　　　　- - -
2　　　　E X H I B I T S
3　　　　　　- - -
4　　NO.　　　DESCRIPTION　　　PAGE
5　Rite Aid - LinkedIn page for Sophia　　21
6　Novack　　Novack
7　Exhibit 1
8　Rite Aid - Corporate Loss Prevention　　51
9　Novack　　Department chart January
10　Exhibit 2　26, 2011, Bates No.
11　　　　Rite_Aid_OMDL_0044539
12　Rite Aid - Corporate Asset Protection　　61
13　Novack　　Department organization
14　Exhibit 3　chart, Bates No.
15　　　　Rite_Aid_OMDL_0044732 to
16　　　　Rite_Aid_OMDL_0044733
17　Rite Aid - E-mail dated January 25,　　79
18　Novack　　2012, with attachment,
19　Exhibit 4　Bates No.
20　　　　Rite_Aid_OMDL_037355 to
21　　　　Rite_Aid_OMDL_037371
22
23
24

| Page 7 | Page 9 |
|---|---|

**Page 7**

1　　　　　　- - -
2　　　　TRANSCRIPT INDEX
3　　　　　　PAGE
4　APPEARANCES...................... 2 - 6
5　INDEX OF EXHIBITS................ 8 - 11
6　EXAMINATION OF SOPHIA NOVACK:
7　BY: MR. SIMMER.................. 14
8　AFTERNOON SESSION................ 181
9　SIGNATURE PAGE................... 403
10　ERRATA........................... 404
11　REPORTER'S CERTIFICATE........... 405
12
13
14
15　　　　　- - -
16
17
18
19
20
21
22
23
24

**Page 9**

1　　　　　　- - -
2　　　　E X H I B I T S
3　　　　　　- - -
4　　NO.　　　DESCRIPTION　　　PAGE
5　Rite Aid - Email chain ending　　137
6　Novack　　November 10, 2012, with
7　Exhibit 5　attachment, Bates No.
8　　　　Rite_Aid_OMDL_00029787 to
9　　　　Rite_Aid_OMDL_00029954
10　Rite Aid - Email chain ending　　185
11　Novack　　September 16, 2011, Bates
12　Exhibit 6　No. MCK_MDL_00632923 to
13　　　　MCK_MDL_00632925
14　Rite Aid - Pleading in Case No.　　202
15　Novack　　5-14CR096
16　Exhibit 7
17　Rite Aid - Press release dated　　209
18　Novack　　October 20, 2014
19　Exhibit 8
20　Rite Aid - Cleveland.com article　　211
21　Novack　　dated February 13, 2015
22　Exhibit 9
23
24

Page 10

- - -

**E X H I B I T S**

- - -

NO.    DESCRIPTION    PAGE

Rite Aid - Email chain ending    217
Novack    December 19, 2012, Bates
Exhibit 10 No. MCK_MDL_00571625 to
    MCK_MDL_00571628

Rite Aid - Email chain ending    231
Novack    February 21, 2014, Bates
Exhibit 11 No. MCK_MDL_00547503 to
    MCK_MDL_00547510

Rite Aid - Email chain ending October    257
Novack    7, 2017, Bates No.
Exhibit 12 MCK_MDL_00633242

Rite Aid - Email chain ending August    267
Novack    27, 2014, Bates No.
Exhibit 13 MCK_MDL_00627585 to
    MCK_MDL_00627587

Rite Aid - Email chain ending August    286
Novack    27, 2014, Bates No.
Exhibit 14 Rite_Aid_OMDL_0030479 to
    Rite_Aid_OMDL_0030684

---

Page 11

- - -

**E X H I B I T S**

- - -

NO.    DESCRIPTION    PAGE

Rite Aid - Email chain ending August    316
Novack    28, 2014, Bates No.
Exhibit 15 MCK_MDL_00630329 to
    MCK_MDL_00630330

Rite Aid - Email chain ending June    333
Novack    17, 2013, Bates No.
Exhibit 16 Rite_Aid_OMDL_003075 to
    Rite_Aid_OMDL_003077

Rite Aid - Email chain ending October    349
Novack    9, 2013, Bates No.
Exhibit 17 Rite_Aid_OMDL_0050291 to
    Rite_Aid_OMDL_0050306

---

Page 12

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER
  Page   Line
   19    15

REQUEST FOR PRODUCTION OF DOCUMENTS
  Page   Line
   - -none- -

STIPULATIONS
  Page   Line
   - -none- -

QUESTIONS MARKED
  Page   Line
   - -none- -

---

Page 13

- - -
9:37 a.m.
New York, New York
- - -

THE VIDEOGRAPHER:  We are now on
the record.

My name is Ray Moore.  I am a
videographer for Golkow Litigation
Services.

Today's date is January 9th,
2019, and the time is 9:37 a.m.

This video deposition is being
held in New York, New York in the
matter In Re: National Prescription
Opiate Litigation, for the United
States District Court for the Northern
District of Ohio, Eastern Division,
MDL Number 2804.

The deponent is Sophia Novack.

Counsel will be noted on the
stenographic record.

The court reporter is Marie
Foley, and will now swear in the
witness.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

- - -

1  SOPHIA NOVACK, the Witness herein, having
2  been first duly sworn by a Notary
3  Public in and of the State of New
4  York, was examined and testified as
5  follows:
6  EXAMINATION BY
7  MR. SIMMER:
8    Q.   Good morning, ma'am.  My name is
9  Scott Simmer.  I'm here on behalf of the
10 plaintiffs in the -- this litigation from
11 Baron and Budd.
12        Have you been deposed before?
13   A.   No.
14   Q.   Okay.  I expect your counsel or
15 the counsel sitting next to you has talked
16 to you about this as well.  I may go
17 through some of the ground rules.
18        I'm going to be asking you a
19 series of questions.  The court reporter
20 is taking down verbatim what we each say.
21 For that reason, it's important that we do
22 not talk over each other.  She can only
23 take down one speaker at a time.

Page 15

1        Is that fair?
2    A.   Yes.
3    Q.   And, for that reason too, you
4  must answer verbally.  You can't just nod
5  your head.  She can't take down a nod of
6  the head.  So you have to answer verbally.
7        Do you understand?
8    A.   Yes.
9    Q.   You also have to answer fully
10 and accurately and verbally.
11        You understand?
12   A.   Yes.
13   Q.   If you don't understand a
14 question, please say so and I'll try to
15 rephrase it.  Otherwise, I can -- I will
16 assume that you understood what I'm
17 asking.
18        Is that fair?
19   A.   Yes.
20   Q.   You understand that you must
21 answer truthfully, correct?
22   A.   Yes.
23   Q.   You can request a break at any
24 time.  My only request is that if there's

Page 16

1  a question pending, you have to answer it
2  before we take a break.
3        You understand?
4    A.   Yes.
5        MR. LAVELLE:  The witness
6  reserves the right to consult with
7  counsel on issues of privilege.
8  BY MR. SIMMER:
9    Q.   Just as happened just now with
10 Mr. Lavelle, from time to time, the
11 attorneys will lodge objections.  You are
12 still expected to answer unless counsel
13 directs you not to answer.
14        Do you understand?
15   A.   Yes.
16   Q.   And, do you understand these
17 procedures?
18   A.   Yes.
19   Q.   Is there any reason why you
20 cannot testify truthfully and accurately
21 today?
22   A.   No.
23   Q.   You're not taking any medication
24 of any kind that would interfere with your

Page 17

1  ability to answer truthfully?
2    A.   No.
3    Q.   There's counsel sitting next to
4  you.
5        Did you retain this -- Morgan
6  Lewis to defend you in this deposition?
7    A.   Yes.
8    Q.   Are you paying for your counsel
9  today?
10   A.   No.
11   Q.   Who's paying for your counsel
12 today?
13   A.   Rite Aid headquarters.
14   Q.   What's your understanding of why
15 you are here today?
16   A.   Involvement in lit -- opioid
17 litigations.
18   Q.   I can tell right away I'm going
19 to have to ask you to speak up a bit.  I'm
20 a little hard of hearing, so.
21   A.   Okay.
22   Q.   Thank you.
23        Did you meet with attorneys
24 representing the company in preparation

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  for your testimony?
2      A.   Yes.
3      Q.   Who did you meet with?
4      A.   I met with John, Kelly and
5  Carolyn.
6      Q.   And when did you meet with them?
7      A.   The last couple of days.
8      Q.   How long did you meet with them?
9      A.   For couple hours over three
10 days.
11     Q.   Couple?
12     A.   Couple of hours over three days.
13     Q.   Did they show you any documents?
14     A.   Yes.
15     Q.   How many?
16     A.   A binder full.
17     Q.   What kind of documents, just
18 generally?
19     A.   Communications that I've had,
20 training documents that we've done.
21     Q.   I asked you a moment ago, but
22 I'm going to ask you again just to
23 clarify.
24          Have you been involved in

Page 19

1  litigation of any kind before?
2      A.   No.
3      Q.   Not as a party?
4      A.   No.
5      Q.   Not as a witness?
6      A.   No.
7      Q.   Have you ever testified before
8  in a deposition?
9      A.   No.
10     Q.   In preparation for your
11 testimony the counsel got in touch with
12 you, did they ask you to produce to them
13 any documents you had in your possession?
14          MR. LAVELLE:  Objection.
15          Direct the witness not to answer
16 to the extent it will require
17 disclosure of attorney/client
18 communications.
19 BY MR. SIMMER:
20     Q.   Did they ask you to produce
21 documents in your possession?
22          MR. LAVELLE:  Same objection.
23          Direct the witness not to answer
24 to the extent it would require

Page 20

1  disclosure of attorney/client
2  communications.
3  BY MR. SIMMER:
4      Q.   There's nothing privileged about
5  whether -- a yes-or-no question whether
6  you asked -- they asked you to produce
7  documents.
8      A.   No.
9      Q.   Did they ask you to produce any
10 hard copy files you had in your
11 possession?
12          MR. LAVELLE:  Objection.
13          Direct the witness not to answer
14 to the extent it would require
15 disclosure of attorney/client
16 communications.
17     A.   No.
18     Q.   Do you have any hard copy files
19 or electronic files from your time at
20 Rite Aid in your possession?
21     A.   No.
22     Q.   Nothing on a computer or
23 anywhere from your time at Rite Aid?
24     A.   No.

Page 21

1      Q.   No boxes of documents from your
2  time at Rite Aid?
3      A.   No.
4          (Rite Aid - Novack Exhibit 1,
5      LinkedIn page for Sophia Novack, was
6      marked for identification, as of this
7      date.)
8          MR. LAVELLE:  Counsel, what are
9  we labeling this?  Is this Novack 1?
10         MR. SIMMER:  Novack Exhibit 1.
11         MR. LAVELLE:  Thank you.
12 BY MR. SIMMER:
13     Q.   I handed you what we are marking
14 as Novack Exhibit 1, which is your
15 LinkedIn page.
16         Have you seen -- have you
17 prepared that?
18         MR. LAVELLE:  Object to form.
19 BY MR. SIMMER:
20     Q.   Is the information on the
21 LinkedIn page something you prepared?
22     A.   Yes.
23     Q.   When he objects to form, you
24 still have to answer.

Page 22

1    You understand?
2    A.   Yes.
3    Q.   Okay.  So, the information is
4  information that you put on your LinkedIn
5  page, correct?
6    A.   Correct.
7    Q.   Okay.  Let me start with your
8  educational background.
9    It says here that you went to
10  the Arnold Marie Schwartz College of
11  Pharmacy.
12    Do you see that?
13    A.   Yes.
14    Q.   And what was your year of
15  graduation?
16    A.   2005.
17    Q.   Did you have any special area of
18  specialization while you -- when you went
19  to pharmacy school?
20    A.   I achieved the doctorate of
21  pharmacy and also the university honors
22  program.
23    Q.   My question was somewhat
24  different.

Page 23

1    I asked you if you had any area
2  of specialization in your pharmacy degree.
3    MR. LAVELLE:  Object to form.
4    A.   Just pharmacy.
5    Q.   Okay.  And, where did you get
6  your undergraduate degree?
7    A.   Same college, Long Island
8  University.
9    Q.   And you had a pharmacy degree?
10    A.   I graduated with a doctor of
11  pharmacy.  It's one program, one degree.
12    Q.   How many years did you go to
13  school there?
14    A.   Six years.
15    Q.   And, what was your first job
16  post-graduation?
17    A.   Rite Aid Pharmacy as an intern.
18    Q.   When you say an intern, is that
19  a full-time position?
20    A.   It was a part-time position.
21    Q.   Was that a paid position?
22    A.   It was a paid position.
23    Q.   What was the geographic location
24  where you worked?

Page 24

1    A.   Brooklyn, New York.
2    Q.   And, what were your job
3  responsibilities?
4    A.   Counsel patients and dispense
5  medications in the data entry system under
6  the supervision of a pharmacist.
7    Q.   And you worked in an actual
8  pharmacy; is that correct?
9    A.   Correct.
10    Q.   What was the name of the
11  pharmacy where you worked?
12    A.   Rite Aid Pharmacy.
13    Q.   Is there a number for the
14  Rite Aid Pharmacy where you worked?
15    A.   Yes.
16    Q.   That's how they keep track of
17  them is by a four-digit number, correct?
18    A.   It was a four-digit number, yes.
19    Q.   And, what was the number?
20    A.   I don't recall the number
21  exactly.
22    It was the location on Seaview
23  Avenue in Brooklyn, New York.
24    Q.   And, how many years did you work

Page 25

1  there as an intern?
2    A.   I worked there as an intern for
3  a couple months.
4    Q.   And, what was your next
5  position?
6    A.   Pharmacist position.
7    Q.   At the same pharmacy?
8    A.   At a different location in
9  Brooklyn, New York.
10    Q.   And, what was the location for
11  that pharmacy?
12    A.   It was in -- on Pennsylvania
13  Avenue in Brooklyn, New York.
14    Q.   And, what were your
15  responsibilities?
16    A.   Dispense medications to
17  patients, counsel and make sure that they
18  understood what the medications were for.
19    Q.   What hours did you work, if you
20  recall?
21    A.   Usually an eight-hour shift
22  during the week and rotating weekends.
23    Q.   This was a full-time position
24  this time?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    A.    Full-time position.
2    Q.    And, how long did you work in
3 this position in Brooklyn?
4    A.    I was in that position for about
5 a year, and then I became a pharmacy
6 manager.
7    Q.    And a pharmacy manager is of a
8 specific pharmacy; is that correct?
9    A.    Yes.
10    Q.    And, what pharmacy were you the
11 manager for?
12    A.    A pharmacy in Jackson Heights,
13 New York.
14    Q.    What are the responsibilities of
15 a pharmacy manager?
16    A.    Same as the pharmacist, except
17 oversee the operations of the pharmacy
18 along with the personnel.
19    Q.    So, when you say you oversee the
20 operations of the pharmacy, what did you
21 do for that?
22    A.    Insure that we were operating
23 within regulatory compliance, be ready for
24 any type of inspection, and we had direct

Page 27

1 P&L responsibility.
2    Q.    What training did you receive in
3 regulatory compliance in order to fulfill
4 that function?
5    A.    We had training from our
6 pharmacy district manager.  We had various
7 computer-based training, and there were a
8 lot of job aids and help guides that were
9 on our Rite Aid portal for resources.
10    Q.    Did you receive any kind of
11 certification of any kind for your
12 compliance?
13    A.    Did not receive any, no.
14    Q.    Did you take any kind of exams
15 in order to, you know, make sure that you
16 understood the content of the compliance
17 training you received?
18        MR. LAVELLE:  Object to form.
19    A.    There were questions that you
20 had to pass at the end of the e-learnings.
21    Q.    Did you have to answer a certain
22 percentage of the questions correctly
23 before you could continue on?
24    A.    Yes.

Page 28

1    Q.    Do you recall what percentage
2 you had to answer correctly?
3    A.    I don't recall the passing rate.
4    Q.    When you say compliant --
5 "regulatory compliance," what did that
6 entail?
7    A.    Entailed following DEA
8 regulations, recordkeeping, following our
9 dispensing regulations and if we had any
10 inspections that were coming into the
11 door.  Basically making sure that we were
12 following policies and procedures.
13    Q.    You also said as manager you had
14 to be ready for any type of inspection.
15        What kind of inspections were
16 you talking about?
17    A.    From any outside agency or
18 internal agency.  We have our internal
19 audits that come in to do compliance
20 checks too.
21    Q.    What outside agencies are you
22 talking about?
23    A.    Anyone that could regulate us,
24 whether it's a fire inspection, whether

Page 29

1 it's a DEA, whether it's the Board of
2 Pharmacy, whether it's a third-party
3 audit.
4    Q.    And you also said that as a
5 manager of this pharmacy, you had direct
6 P&L responsibility.
7        What is that?
8    A.    The profit and loss statement.
9    Q.    I understand.  But, what does
10 that include?
11    A.    The overall operations of the
12 store from sales to gross profit to what
13 our losses, our expenses are, and at the
14 end of the day, what the bottom line is.
15    Q.    So, am I right you had a
16 responsibility to make sure the pharmacy
17 was profitable?
18        MR. LAVELLE:  Object to form.
19    A.    We had responsibility to make
20 sure that we were operating the store as
21 best as we can.
22    Q.    Just as best you could.  Is that
23 the only expectation the company had?
24        MR. LAVELLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 A. The expectation was to control
2 what we can control.
3 Q. To control what you can control.
4 I don't have any idea what you just said.
5 What does that mean?
6 MR. LAVELLE: Object to form.
7 A. To control our expense lines
8 that we directly have impact over, making
9 sure that we're not over-ordering to
10 create overstock or ultimately damages
11 that will decrease our line, making sure
12 that we're protecting our assets inside
13 the pharmacy, managing our supply,
14 managing our payroll, managing the things
15 that we can control.
16 Q. Did you in turn train the others
17 working in the pharmacy with you?
18 A. Yes.
19 Q. What kind of training did you
20 give them?
21 A. On-the-job training in
22 conjunction with their CBTs and their
23 e-learnings that download throughout the
24 course of their time.

Page 31

1 Q. What is CBT?
2 A. Computer-based training.
3 Q. And e-learnings, what is that?
4 A. It's the same thing. It's all
5 electronic learnings.
6 Q. So, they had computer-based
7 training and e-learnings and you trained
8 them in addition to that.
9 Is that -- do I have it right?
10 MR. LAVELLE: Object to form.
11 A. There are training guides that
12 are available that we go through with them
13 manually that we check off as they, go
14 depending on their job role.
15 Q. How many people did you have
16 that you were supervising as manager of
17 the pharmacy?
18 A. In that particular location, a
19 staff pharmacist and a -- one associate.
20 It was a new store.
21 Q. And the associate, is that a
22 pharmacy tech?
23 A. That was a pharmacy tech.
24 Q. What about the front of the

Page 32

1 store, the non-pharmaceutical items, did
2 you have any responsibility for those?
3 A. No.
4 Q. So your only job was to manage
5 what was back in the pharm -- the
6 prescription pharmacy section of the
7 store, correct?
8 A. Yes.
9 Q. And your P&L responsibilities
10 were only for the prescription drug part
11 of the pharmacy, correct?
12 A. We were tied to the whole store,
13 but my contributions would have been the
14 pharmacy side.
15 Q. Okay. You said you were
16 district manager for this store --
17 MR. SIMMER: Strike that.
18 Q. You were the manager for this
19 store for how long?
20 A. About a year.
21 Q. Until when?
22 A. Until some time the next year,
23 February. I was promoted to a different
24 position.

Page 33

1 Q. February of what year?
2 A. February of 2007.
3 Q. And you were promoted to what
4 position?
5 A. A pharmacy district manager.
6 Q. And, what are the
7 responsibilities a pharmacy district
8 manager?
9 A. To oversee the multi unit
10 pharmacies within that area.
11 Q. Okay. Now, if you could look at
12 Novack Exhibit 1. I think that's what's
13 reflected on your LinkedIn page.
14 Correct?
15 A. Yes.
16 Q. And it says you had that
17 position from February 2007 to August
18 2011.
19 Do I have that right?
20 A. Yes.
21 Q. Okay. And, where were you
22 physically working out of?
23 A. The Queens, Long Island district
24 and then parts of Brooklyn. It was

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 throughout the entire time we had
2 different parts of the metro New York
3 area.
4     Q.   How many pharmacies were you
5 responsible for?
6     A.   It ranged throughout the
7 districts, either from 18 to about 23
8 stores.
9     Q.   When I asked you what your
10 responsibilities were, you said you were
11 to oversee the multi unit pharmacies.
12         What's a multi unit pharmacy?
13     A.   Not just one location.  Like in
14 the pharmacy manager, I was responsible
15 for one location.  As a pharmacy district
16 manager, I was responsible for multiple
17 locations.
18     Q.   So, as a district manager, do
19 you go out and visit the -- each pharmacy
20 to make sure that they're doing what the
21 expect -- the company expects them to do?
22     A.   We go out, yes.
23     Q.   What else do you do in terms of
24 making sure that they're following the

Page 35

1 company's directives?
2     A.   We review with the store teams.
3 We conduct visits to do multiple
4 compliance checks.  We do training and
5 mentorship for our pharmacy managers so
6 that they can operate, help them
7 understand some of the policies and
8 procedures that we have and understand
9 overall pharmacy and providing care for
10 patients.
11     Q.   You said you do multiple
12 compliance checks.
13         What did that entail?
14     A.   We have a quarterly store visit
15 guide that we would do for our pharmacy.
16 We had a DEA checklist that we would do
17 annually for our pharmacies.
18     Q.   A quarterly store visit guide,
19 is that an actual physical manual of some
20 kind?
21     A.   It's a checklist.
22     Q.   A checklist of what items?
23     A.   Multitude of items that go over
24 from service to the business to just

Page 36

1 compliance overall.
2     Q.   You said you also had a DEA
3 checklist.
4         Is that a checklist that the DEA
5 prepared?
6     A.   It's an internal checklist that
7 we prepared as a corporation.
8     Q.   That somehow then reflects DEA
9 regulations?
10     A.   It gives us things that we want
11 to review in the store to make sure that
12 we are compliant with our policies and
13 procedures and regulations.
14     Q.   You also said that you did
15 training and mentorship for your pharmacy
16 managers, correct?
17     A.   Yes.
18     Q.   And, what did that entail?
19     A.   It entailed anything that they
20 needed from completing their job duties as
21 a pharmacy manager, questions about
22 operations, questions related to a policy
23 and procedure, just going through our
24 systems and how to use and operate those.

Page 37

1     Q.   This is in addition to the
2 online training you referred to earlier?
3     A.   Yes.
4     Q.   So, how did you know what you
5 were supposed to be training these people
6 about?  Did you have materials that you
7 were provided for that purpose?
8         MR. LAVELLE:  Object to form.
9     A.   It would be questions that the
10 teams would ask while we're there.  As we
11 do these audits, if there are any
12 deficiencies or any opportunities, we
13 would know that there may be a training
14 gap and we would fill in that information.
15     Q.   So, you simply would respond to
16 the questions that arose during the audit
17 and that's the kind of training you
18 provided?
19         MR. LAVELLE:  Object to form.
20     A.   That's not what I'm saying.
21         I'm saying that we go and
22 reinforce some things that we may identify
23 that are deficiencies to understand if
24 it's just a performance issue or if it's a

Page 38

1 knowledge issue, but we do have structured
2 training guides as we onboard a new
3 pharmacist, and we have different things
4 as programs roll out just to make sure
5 that they understand the different pieces
6 of that program.
7    Q.   So, how long -- you said -- I
8 think it says in here you were a district
9 manager for a little over four years.
10      Is that right?
11    A.   Yes.
12    Q.   Did the DEA audit any of your
13 pharmacies during this time period?
14    A.   No.
15    Q.   Did the company audit any of
16 your pharmacies during this time period?
17    A.   We do internal audits all the
18 time throughout the year.
19    Q.   So you as a district manager did
20 the audit; is that right?
21    A.   I did the audit as a district
22 manager.  There's another department, the
23 Asset Protection Department also does
24 audits.  We have an Internal Assurance

Page 39

1 Department that also comes in and does
2 audits.
3    Q.   Well, let's go through that.
4      So, you said that you did
5 audits, right?
6    A.   That's correct.
7    Q.   During that four-year time
8 period, how many audits of pharmacies did
9 you do?
10    A.   I couldn't give you an exact
11 number.
12    Q.   More than ten?
13    A.   More than ten.
14    Q.   More than 50?
15    A.   I couldn't tell you.
16    Q.   Approximately how many?
17      MR. LAVELLE:  Objection; asked
18   and answered.
19    A.   I don't know if I can give you a
20 concrete number.  It was something that we
21 did routinely.
22    Q.   How many pharmacies did you --
23 were you responsible for?
24    A.   Depends on the time in the

Page 40

1 districts that I had.  So, it ranged from
2 anywhere from 18 up to over in the 20s.
3    Q.   18 to 20, correct?
4    A.   Depending on the district.  So,
5 the districts were 15 stores.  As we
6 restructured, we went to another district.
7 So it can vary in store count.
8    Q.   So, I don't -- I don't quite
9 follow.
10      You said that districts were 15
11 stores, but you were responsible for 18 to
12 20.
13      What's the reason for the
14 variance there?
15      MR. LAVELLE:  Object to form.
16    A.   Depending on the -- over the
17 four years, we covered different
18 districts.  So, my first district was 18
19 stores.  My second district was 20
20 some-odd stores.  My third district was in
21 that range.  So it's anywhere from a range
22 of that district depending on the size.
23    Q.   And, how often were you to audit
24 the pharmacies that you were responsible

Page 41

1 for?
2    A.   We had quarterly audits.
3    Q.   And, tell us everything you did
4 in an audit of a pharmacy.
5      MR. LAVELLE:  Object to form.
6    A.   We would review the questions on
7 the checklist and we'd insure compliance.
8 We rated it depending on whether they were
9 compliant or not.
10    Q.   What are the questions on a
11 checklist?  What's that reference to?
12      MR. LAVELLE:  Object to form.
13    A.   As I mentioned before, it
14 referenced business, service and some
15 compliance and profitability pieces.
16    Q.   Focusing on the compliance part
17 of that, what were the compliance areas
18 that you were to audit of your stores?
19    A.   Overall recordkeeping, making
20 sure that we were processing recalls, they
21 were doing their damages and outdates,
22 making sure that they were completing the
23 transfer paperwork correctly, making sure
24 that our files were filed correctly, et

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 cetera.
2    Q.   Did you audit for suspicious
3 orders, or suspicious prescriptions, I
4 mean?
5        MR. LAVELLE:  Object to form.
6    A.   We audited hard copy
7 prescriptions.  We audited to make sure
8 that we had controls in place where we
9 were locking the safe.  We audited the
10 control box.  We audited the control
11 invoices.  So we audited a lot of
12 different things in relation to ordering.
13    Q.   You said there was another
14 department, the Asset Protection
15 Department, that also did audits.
16        What did that department do?
17        MR. LAVELLE:  Object to form.
18    A.   The Asset Protection Department
19 basically had their audits that were
20 either dictated by the Internal Assurance
21 Department, or they came in to do their
22 checklist that was related to compliance,
23 risk and loss.
24    Q.   You really haven't answered my

Page 43

1 question.
2        I asked what did they actually
3 do in their audit?
4        MR. LAVELLE:  Object to form.
5    A.   So, I couldn't tell you because
6 that wasn't an audit that I did, but I do
7 know that they have a checklist that they
8 reviewed when they were in the store
9 different ones at different times.
10    Q.   You later went to work in asset
11 protection though, right?
12    A.   Correct.
13    Q.   So you don't have any idea what
14 the asset protection audits included?
15        MR. LAVELLE:  Object to form.
16    A.   The Asset Protection Department
17 audits included different ones depending
18 on which one.  It was about protecting
19 their assets, whether it be in the front,
20 cash register, point of sale.  If it's a
21 risk one, it can be different things from
22 checking if the back door is locked.
23    Q.   So, they did -- when asset
24 protection came in and did an audit, they

Page 44

1 didn't do all of these together; they only
2 did one at a time.
3        Is that right?
4    A.   It depended on their audit
5 schedule.
6    Q.   What do you mean by their audit
7 schedule?
8    A.   So, in order to make sure that
9 we are completing all different audits and
10 making sure that we're doing the right
11 audits, it -- they had different audits at
12 different times so that we can get to
13 every store and that we had it on the
14 calendar and that we knew that every store
15 was at least routinely audited.
16    Q.   In advance of asset protection
17 coming in and auditing one of your stores,
18 did you know they were coming?
19    A.   No.
20    Q.   How often did asset protection
21 audit your stores?
22        MR. LAVELLE:  Objection; asked
23    and answered.
24    A.   They do quarterly audits also.

Page 45

1 So --
2    Q.   Of every store?
3    A.   They do quarterly audits for
4 visit guides.  They have different levels
5 for risk.  So, they were always in the
6 stores.
7        Whether they were doing a
8 specific audit at which specific time, I
9 couldn't tell you.
10    Q.   And there was a third department
11 that you said that did audits as well.
12 You called it, I think, the assurance
13 department?
14    A.   The Internal Assurance
15 Department.
16    Q.   And, what were their
17 responsibilities?
18    A.   They -- they went and did a lot
19 of the different audits that the asset
20 protection did, but they were a --
21 basically our internal assurance audit.
22 So separate from the field, they did the
23 same audits, see if we got the same
24 results.

Page 46

1    Q.    So, is Asset Protection
2  considered field?
3    A.    Asset Protection, yes.
4    Q.    And the Internal Assurance
5  Department is not field, right?
6    A.    They work for headquarters.
7    Q.    So, internal assurance is an
8  audit function that is run out of
9  headquarters, right?
10   A.    Yes.
11   Q.    And this Asset Protection is not
12 a headquarters operation?
13   A.    They are field leaders.  They
14 are considered part of the district field
15 team.  They do report up to Asset
16 Protection, that reports up to Internal
17 Assurance, but they're one of our field
18 partners.
19   Q.    I failed to ask you this
20 earlier, I think, that when you became a
21 district manager, where were you working
22 out of?
23   A.    I had initially the Queens, Long
24 Island market, and then I had the Brooklyn

Page 47

1  market after that.
2    Q.    Okay.  But where was your office
3  physically located?
4    A.    We had an office in Flushing and
5  we had an office in Brooklyn on Nostrand
6  Avenue.
7    Q.    Is that where you worked all
8  four years?
9    A.    Most of my work is in the field,
10 meaning we were in stores and sites.
11 We hardly spent time in the office.
12   Q.    Okay.  My question was a little
13 bit different.
14        Did, as district manager, did
15 you always work out of that same district
16 that you described?
17        MR. LAVELLE:  Object to form.
18 BY MR. SIMMER:
19   Q.    In other words, did you get
20 realigned to any other location during
21 that time period?
22        MR. LAVELLE:  Same objection.
23   A.    I've already said we realigned
24 several times with different markets,

Page 48

1  different store count.  I had Queens, Long
2  Island.  Then I had Brooklyn.  So those
3  were realignments.
4    Q.    And, your -- your LinkedIn page
5  says your next position was as director of
6  pharmacy loss prevention.
7        Is that correct?
8    A.    Yes.
9    Q.    And it says you had that
10 position from August 2011 to October 2014,
11 correct?
12   A.    Yes.
13   Q.    Or, so, three years, three
14 months, correct?
15   A.    Yes.
16   Q.    And it says that you were
17 working out of Camp Hill, Pennsylvania?
18   A.    Yes.
19   Q.    That's the company's
20 headquarters, right?
21   A.    Yes.
22   Q.    So that was your physical
23 location where your office was?
24   A.    Yes.

Page 49

1    Q.    What were your responsibilities
2  as director of pharmacy loss prevention?
3    A.    To assist the asset protection
4  district managers in training and learning
5  the systems for field investigations.  We
6  also worked closely with the different
7  departments in the company to insure
8  compliance and different ways to review
9  analytics so that we can improve our
10 tactics against theft and diversion.
11   Q.    So, what is -- what are asset
12 protection district managers doing?
13   A.    They are part of the field team.
14 They are district managers that really
15 help us protect our assets in the field.
16 They do shrink investigations.  They do
17 drug loss investigations.  They do all
18 different types of investigations while
19 they are also helping with maintaining
20 compliance and safety.
21   Q.    Just so we're on the same page,
22 when you say that the -- you were to
23 insure compliance in different ways to
24 review analytics so that you could improve

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  tactics against theft and diversion, what
2  do you mean by "theft"?
3      A.   Stolen goods.
4      Q.   Goods stolen from one of your
5  stores?
6      A.   Yes.  Anything that's stolen
7  from our store is loss, comp loss,
8  anything that at the end of the day we
9  should have had that is no longer there.
10     Q.   And what do you mean by
11 "diversion"?
12     A.   Diversion, anything that is
13 diverted not for its intended use.
14     Q.   Can you give us some examples of
15 what you mean by "diverted not for its
16 intended use"?
17     A.   So, for instance, drugs that are
18 diverted and ultimately end up on the
19 street, something that goes missing or
20 goes lost and it's for illegal use.
21     Q.   So, I take it that the position
22 of director of pharmacy loss prevention
23 was a promotion for you, correct?
24     A.   Yes.

Page 51

1      Q.   Did you have people working
2  under you in that position?
3      A.   Yes.
4      Q.   How many people?
5      A.   Three analysts.
6      Q.   Those are direct reports,
7  correct?
8      A.   Yes.
9      Q.   Did you have dotted line reports
10 to you as well?
11     A.   No.
12         (Rite Aid - Novack Exhibit 2,
13     Corporate Loss Prevention Department
14     chart January 26, 2011, Bates No.
15     Rite_Aid_OMDL_0044539, was marked for
16     identification, as of this date.)
17         MR. LAVELLE:  Counsel, are we
18     finished with Novack 1?
19         (Pause.)
20         MR. SIMMER:  Actually, I'm not
21     done with it yet.  I have a few more
22     questions.  Just hold on to it for a
23     minute.
24         (Pause.)

Page 52

1          MR. SIMMER:  Is there reason why
2      you have to push them to the side,
3      John?
4          MR. LAVELLE:  To avoid
5      confusion.
6  BY MR. SIMMER:
7      Q.   Okay.  I hand you what we marked
8  Novack Exhibit 1, Bates
9  Rite_Aid_OMDL_0044539, identified for the
10 record as an org chart dated January 26,
11 2011, with the, I guess the heading on the
12 document Corporate Loss Prevention
13 Department.
14         MS. MOORE:  Counsel, did you
15     just say Novack 1?
16         MR. SIMMER:  I'm sorry, Novack
17     2.  Thank you.
18 BY MR. SIMMER:
19     Q.   Do you see that?
20     A.   Yes.
21     Q.   Was the department you worked in
22 always, or did -- when you first started
23 working there, was it called Loss
24 Prevention?

Page 53

1      A.   When I started working there, it
2  was already called Asset Protection.
3      Q.   So, when I see an org chart for
4  2011 that shows your name on there, right?
5  Do you see that?
6      A.   Yes.
7      Q.   And Sophia Lai, that is your --
8  before you became Ms. Novack, you were Ms.
9  Lai, correct?
10     A.   That is correct.
11     Q.   That was your maiden name,
12 correct?
13     A.   Yes.
14     Q.   It says that that was called the
15 Corporate Loss Prevention Department.
16         Is that the same, do I have it
17 the same department, essentially, but a
18 different name?
19     A.   Yes.
20     Q.   When did the name change?
21     A.   Before I got there.
22         It looks like this document,
23 they didn't revise it.  I don't know why
24 the date says January 2011.  It looks like

Page 54

1 they just inserted my name instead of
2 updating that org chart.
3      MR. LAVELLE:  Counsel, is there
4 a Bates number for this document?  I
5 don't see it on the copy that's here.
6      MR. SIMMER:  There is on my
7 copy.  I don't know why that one
8 doesn't.
9      I just read it into the record,
10 John.
11      MR. LAVELLE:  Okay.
12 BY MR. SIMMER:
13      Q.   So let me just make sure I
14 understand the structure.
15      Bob Ober --
16      A.   Oberosler.
17      Q.   Oberosler.  Group
18 vice-president, Loss Prevention.
19      That's who you reported to?
20      A.   Yes.
21      Q.   Okay.  And you were -- your
22 position was as a director; is that
23 correct?
24      A.   Yes.

Page 55

1      Q.   And the three individuals you
2 said the analysts working under you,
3 that's reflected on this org chart as
4 well, correct?
5      A.   Yes.
6      Q.   Now, it says -- I pointed also
7 to the date of January 26, 2011.  I think
8 we already discussed the fact that you
9 didn't begin this -- your position until
10 August 2011.
11      A.   Correct.
12      Q.   So, did you start this position
13 before you have it reflected on your
14 LinkedIn page, or is the date wrong on
15 this document?
16      MR. LAVELLE:  Object to form.
17      A.   I started my position August
18 2011.
19      Q.   Okay.
20      A.   I'm not sure why that date says
21 January.
22      Q.   Okay.  I also noted -- noticed
23 that there is another person, Kathy
24 Langley, and she's a senior director.

Page 56

1      Is that right?
2      A.   Yes.
3      Q.   The two of you basically had the
4 same function; is that correct?
5      A.   We had different functions.  She
6 was more of the store analytics, and she
7 had different analysts that reported in to
8 her.
9      Q.   And yours was not a store
10 function, but what kind of function again?
11      A.   Mine is the pharmacy side of the
12 function.
13      Q.   You're going to have to not
14 start answering questions until I finish
15 my --
16      A.   Sorry.
17      Q.   Okay.  Again, you were a
18 pharmacy side, you say?
19      What does that mean?
20      A.   I dealt with the pharmacy
21 transactions.  So, we had different
22 analytic systems.  I was basically
23 responsible for Naviscript, which was any
24 transactions related to a prescription

Page 57

1 function or pharmacy inventory.
2      Q.   Just so we get it clear on the
3 record, I think you said it was
4 Naviscript.
5      Can you spell that, please?
6      A.   N-A-V-I-S-C-R-I-P-T.
7      Q.   And what is that?
8      A.   That's a analytic tool that we
9 have available that we use to identify any
10 issues in the store.  Key performance
11 indicators, pretty much.
12      Q.   Is that a software program?
13      A.   It's a -- it's a dashboard
14 vendor-based created.
15      Q.   What vendor?
16      A.   Naviscript.
17      Q.   And it was used company-wide?
18      A.   Yes.
19      Q.   Is it not just your function in
20 Asset Protection, but the entire company
21 used it for -- for various different
22 purposes?
23      A.   Anyone in the Asset Protection
24 Department had access to Naviscript.

Page 58

1    Q.   No others in the company,
2  correct?
3    A.   Others in the company can get it
4  through us, but they didn't have direct
5  login.
6    Q.   It would be useful for us to the
7  extent you could explain what the
8  structure, who did what in asset
9  protection.
10     Could you go through the org
11  chart and let me just ask you a few
12  questions about what's reflected here and
13  you sort of divide out who's doing what,
14  if you could?
15    A.   Sure.
16    Q.   Would that be fair?
17    A.   Yes.
18     MR. LAVELLE:  Object to form.
19  BY MR. SIMMER:
20    Q.   So, under Mr. Oberosler there is
21  Bill Miller, senior director, LP
22  Technologies.  And he has a group of
23  people under him.
24     What did LP Technologies do?

Page 59

1    A.   He basically coordinated with
2  the supply chain and also any type of
3  equipment, camera systems, locks, alarm
4  systems, that type of technology.
5    Q.   Coordinating the supply chain,
6  do you mean that he actually physically
7  was dealing with the shipments of drugs
8  between your pharmacies, or the asset
9  protection part of that?
10    A.   The --
11     MR. LAVELLE:  Object to form.
12    A.   He was the asset protection part
13  of that.
14    Q.   Okay.  I'm not sure you said
15  this, but what does LP stand for?
16    A.   Loss prevention.
17    Q.   Okay.  Over to the far left,
18  there are four individuals all with the
19  title "director" and different divisions
20  under them, except for Mr. Fallon.
21     So, what are they doing, these
22  directors?
23    A.   They were our field directors.
24  So, our asset protection -- our asset

Page 60

1  protection district managers reported up
2  to these field directors.
3    Q.   The asset protection district
4  managers are not reflected on this org
5  chart.
6     Is that right?
7    A.   Correct.
8    Q.   How many of those were there?
9    A.   I don't know.
10    Q.   So, do I have it right that each
11  division had a number of district managers
12  under it?
13    A.   Yes.
14    Q.   And, so, each of these
15  individuals had a district manager report,
16  a group of them reporting in, correct?
17    A.   Yes.
18    Q.   Okay.  So, Ms. Langley, you said
19  that she was more store-based, correct?
20    A.   She was the front end of the
21  business.
22    Q.   I see.  You're the pharmacy
23  side; she's the front end.  Okay.
24     MR. LAVELLE:  Object to form.

Page 61

1  BY MR. SIMMER:
2    Q.   And, so, the analysts working
3  under her are doing what?
4    A.   They're reviewing the analytics
5  for store-based transactions and reviewing
6  analytics and building analytics on how to
7  reduce loss.
8    Q.   So, in the structure here in
9  Asset Protection, how many of these
10  individuals are pharmacists, if you know?
11    A.   On this org chart here, myself.
12  One.
13    Q.   So, the analysts working under
14  you, were they pharmacists?
15    A.   They were not.
16    Q.   You can put that aside.
17     (Pause.)
18     (Rite Aid - Novack Exhibit 3,
19  Corporate Asset Protection Department
20  organization chart, Bates No.
21  Rite_Aid_OMDL_0044732 to
22  Rite_Aid_OMDL_0044733, was marked for
23  identification, as of this date.)
24

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  BY MR. SIMMER:
2      Q.   I hand you what we've marked as
3  Novack Exhibit 3.  I'll identify it for
4  the record.  It's a two-page exhibit,
5  Rite_Aid_OMDL_0044732 to 0044733.
6          If you could take a moment to
7  look at that.
8          MR. LAVELLE:  Counsel, there's
9  only one page in front of her.
10         MR. SIMMER:  They didn't print
11 the back?
12         If we could go off the record
13 for a minute.
14         MR. LAVELLE:  Yes, of course.
15         THE VIDEOGRAPHER:  The time is
16 now 10:20 a.m.
17         We are going off the record.
18         (Recess taken.)
19         THE VIDEOGRAPHER:  The time is
20 now 10:30 a.m.
21         We are back on the record.
22 BY MR. SIMMER:
23     Q.   Ma'am, we handed you what we've
24 marked as Novack Exhibit 3.  I'll identify

Page 63

1  it for the record as Rite_Aid_OMDL_0044732
2  and 0044733.
3          MR. SIMMER:  The -- this is
4  something, John, we may want to talk
5  about off the record, but some of the
6  exhibits, and I think this is one,
7  they cut off the Bates numbering.  So
8  we can either go back and substitute
9  the ones with the Bates numbers, or we
10 can just have it in the record.
11         How would you like to do that?
12         MR. LAVELLE:  Well, ideally, we
13 would have the Bates numbers on the
14 ones that are going to be bound with
15 the transcript.  So we're --
16         MR. SIMMER:  We'll go ahead and
17 substitute these in, if that meets
18 your permission.
19         MR. LAVELLE:  Yes.
20         MR. SIMMER:  Okay.
21         MR. LAVELLE:  But we would like
22 to note, as you have on the record for
23 this one, what the Bates number is as
24 you're showing it to the witness,

Page 64

1  please.
2          MR. SIMMER:  That's fine.
3  BY MR. SIMMER:
4      Q.   Ma'am, you've had a chance to
5  look at that document?
6      A.   Yes.
7      Q.   This appears to have been
8  three-hole punched.  So some of the
9  printing has got holes in it, but on the
10 first page, it looks like November 2013.
11         Is that right?
12         Do you see where I am up in the
13 upper right-hand corner?
14     A.   Yes.
15     Q.   And the header on this says
16 "Corporate Asset Protection Department."
17         Do you see where I am?
18     A.   Yes.
19     Q.   By the way, on the prior
20 exhibit, it had this too, it has at the
21 top 29 field positions and then some
22 vendor paid positions.
23         Do you see what I'm talking
24 about?  Right under the title of the

Page 65

1  department.
2      A.   Yes.
3      Q.   I guess my -- I just want to
4  have an understanding when it says "field
5  positions" and "vendor paid positions," do
6  you have any under -- any understanding
7  what the difference is between those two?
8      A.   No.
9      Q.   Was your position that you held
10 in Asset Protection a vendor paid
11 position?
12     A.   No.
13     Q.   Do you know what a vendor paid
14 position is?
15     A.   No.
16     Q.   One difference in this is that
17 this is now called the Asset Protection
18 Department.
19         Do you see that?
20     A.   Yes.
21     Q.   Okay.  And I think you already
22 testified about this, but you always only
23 worked in the Asset Protection Department.
24 That's your recollection, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    A.   Yes.
2    Q.   Okay.  Did the structure change
3  other -- I can go through it if you'd
4  like, but did the structure of the
5  department change between the -- that last
6  org chart and this org chart?
7         MR. LAVELLE:  Object to form.
8    A.   The overall structure doesn't
9  seem to have changed except for adding a
10  position in two different spots.
11   Q.   So just an additional position,
12  not in a particular function; is that
13  correct?
14   A.   That is correct.
15   Q.   Okay.  And, again, in this
16  structure, you are the only pharmacist in
17  the entire structure, correct?
18   A.   Yes.
19   Q.   Could I direct your attention to
20  the next page, please?  And this, again,
21  is Asset Protection Division org chart.
22        Do you see that?
23   A.   Yes.
24   Q.   And it says five division

Page 67

1  directors, eight regional directors, and
2  it says January 2014.
3         Do you see that?
4    A.   Yes.
5    Q.   Just generally, what is this
6  structure trying to represent, if you
7  know?
8    A.   This is the different field
9  division leaders that we talked about on
10  the previous org chart, and each division
11  and their direct reports.
12        So, the districts represent an
13  asset protection district manager.  They
14  may have one or multi districts.  And then
15  there's also investigators in each
16  division, and then they've got a regional
17  director too that breaks down some of the
18  responsibilities.
19   Q.   In terms of the hierarchy, which
20  is the more senior position or the -- in
21  the hierarchy, a division director or
22  regional director?
23   A.   A division director.
24   Q.   So the regional directors report

Page 68

1  up to division directors, correct?
2    A.   Yes.
3    Q.   Okay.  You mentioned, too, that
4  each division had investigators as well?
5    A.   Yes.
6    Q.   Just as an example, if you'd
7  look in the upper left Division 1 and it
8  goes over to the right Jason Gonzalez,
9  senior manager of investigations and ORC.
10        What is ORC?
11   A.   Organize -- Organized Retail
12  Crime.
13   Q.   And, so, Mr. Gonzalez is the
14  investigator you described a moment ago?
15   A.   Yes.
16   Q.   What did he do?
17   A.   He did a lot of the organized
18  retail crime, meaning outreach with the
19  local law enforcement departments, about
20  any type of rings that may be going on
21  with theft in stores, and he also handled
22  high-level investigations in the store,
23  and he was also a resource for any of the
24  district managers that needed help with an

Page 69

1  investigation that they were handling
2  locally.
3    Q.   And his -- is he the only
4  investigator assigned to Division 1?
5    A.   All of the regional directors
6  and the district managers are
7  investigators, but he is a senior
8  investigator assigned, yes.
9    Q.   They are invest -- they're
10  trained investigators, you mean?
11   A.   They're trained investigators?
12   Q.   They have law enforcement
13  background?
14   A.   They have Wicklander
15  certification and our internal
16  investigating certifications.
17   Q.   I'm not sure what you said as
18  Wickhand?
19   A.   Wicklander.
20   Q.   What is that?
21   A.   That is an external
22  certification for investigations and
23  interviewing.
24   Q.   Can you spell that, please?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    A.   W-I-C-K-L-A-N-D-E-R.

2    Q.   And, where do you get a

3  Wicklander certification?

4    A.   Through Wicklander.

5    Q.   What is Wicklander?

6    A.   It's a -- it's an organization

7  that conducts training, and they certify

8  that you've completed the training.

9    Q.   Just one question.  I notice

10 that there's a Jonathan Novack, regional

11 director.

12     Is that the person you

13 eventually married?

14   A.   Yes.

15   Q.   Okay.  And, he was a regional

16 director over, I guess, in Division 4.

17     Is that correct?

18   A.   Yes.

19   Q.   Where was he working out of at

20 this time?

21   A.   New York.

22   Q.   Did he always work out of New

23 York?

24   A.   He had some time in Jersey.

Page 71

1    Q.   Okay.  You can set that aside.

2      Go back to your résumé for a

3  moment, if we could.

4      So, the next thing on your

5  résumé is that your next position in

6  October of 2014 became a regional

7  vice-president.

8      What were your responsibilities?

9      MR. LAVELLE:  Object to form.

10   A.   As a regional vice-president, I

11 basically oversaw multiple districts

12 within three different states.

13   Q.   Are you no longer in Asset

14 Protection at this point?

15   A.   No longer in Asset Protection.

16   Q.   And you're a regional

17 vice-president of pharmacy, correct?

18   A.   Yes.

19   Q.   So you didn't have any of the

20 front of the store responsibilities as a

21 regional VP, correct?

22   A.   I had a partner that was

23 responsible for that, a regional

24 vice-president.

Page 72

1    Q.   What were the three states that

2  you were responsible for?

3    A.   I had Georgia, South Carolina,

4  and Tennessee.

5    Q.   And, where were you physically

6  located as -- in this position?

7    A.   In Marietta, Georgia.

8    Q.   So, was the regional

9  vice-president position a promotion for

10 you?

11   A.   Yes.

12   Q.   Did you have direct reports?

13   A.   Yes.

14   Q.   And what direct reports did you

15 have?

16   A.   Pharmacy district managers.

17   Q.   How many?

18   A.   We had -- we realigned.  I think

19 we had 13 direct reports at the time.

20   Q.   And this position as regional

21 vice-president, is that a field-based

22 position?

23   A.   That is a field-base, yes.

24   Q.   And I ask that because you're

Page 73

1  not working out of the corporate office

2  any longer, correct?

3    A.   Correct.

4    Q.   And, what did you actually do as

5  the vice-president -- regional

6  vice-president?

7    A.   We trained and mentored our

8  pharmacy district managers to insure

9  operations in the stores that they

10 oversaw, which ultimately rolled up to our

11 region, over 300 stores at the time.

12   Q.   Did you have P&L responsibility?

13   A.   Yes.

14   Q.   And that would be for the 13

15 districts that were under you?

16   A.   Yes.  It's a region --

17   Q.   And ultimately for the

18 pharmacies that were under them, correct?

19   A.   Yes.

20   Q.   And again, that's only the

21 pharmacy side of those stores, correct?

22   A.   It's one P&L, but I was

23 responsible for the pharmacy

24 contributions.

Page 74

1  Q.  And then your partner was
2  responsible for the -- the rest of the
3  contribution, correct?
4      A.  Yes.
5      Q.  Is there a term for what the
6  rest of that function is called?
7      A.  Just store operations.
8      Q.  Okay.  You had that position for
9  two years and then you became then, in
10  September 2016, a pharmacy district
11  manager.
12         Do you see that?
13     A.  Yes.
14     Q.  And that was in September 2016,
15  correct?
16     A.  Yes.
17     Q.  And you held that position for
18  one year six months, correct?
19     A.  Yes.
20     Q.  And that was in Clifton, New
21  Jersey?
22     A.  Yes.
23     Q.  Is that a promotion for you?
24     A.  No.

Page 75

1      Q.  You stepped down; is that
2  correct?
3      A.  Yes.
4      Q.  Was that a voluntary move on
5  your part?
6      A.  Yes.
7      Q.  Why?
8      A.  Relocated back for family so
9  that I could start a family of my own.
10     Q.  I think we -- you got married at
11  some point along the way; is that correct?
12     A.  I got married when I was in
13  headquarters, and then we had a baby about
14  a year-and-a-half ago.
15     Q.  Okay.  Congratulations.
16     A.  Thank you.
17     Q.  So, in 2016, you made a family
18  decision that you would step down your
19  responsibilities and move back to New
20  Jersey.
21         Is that -- do I have it right?
22     A.  Yes.  We moved back to New York.
23  My responsibility was in New Jersey.
24     Q.  Okay.  And, the pharmacy

Page 76

1  district manager position you took in
2  September 2016, did that have the same
3  duties as when you had been pharmacy
4  district manager back in February 2007 to
5  August 2011?
6      A.  Similar.  The position has
7  evolved a bit, but overall, direct store
8  responsibility for multiple pharmacies,
9  yes.
10     Q.  And, how many pharmacies are you
11  responsible for, or were you responsible
12  for?  Excuse me.
13     A.  In that market, 17.
14     Q.  And the next position you
15  have -- actually, it looks like you left
16  the company in February 2018.
17         Do I have that right?
18     A.  I was actually acquired through
19  an asset purchase through Walgreens
20  acquiring the Rite Aid stores.  So my
21  employment had transitioned over in
22  February.
23     Q.  You were actually acquired; is
24  that right?

Page 77

1      A.  Yes.
2      Q.  It's like a baseball player
3  getting acquired.
4      A.  I feel like I was drafted.
5      Q.  So they acquired the stores that
6  you were managing.
7         Is that right?
8      A.  Yes.
9      Q.  So, did your responsibilities
10  change when you became a Walgreens
11  employee?
12     A.  No.  We're currently still
13  operating under the Rite Aid structure.
14  We haven't converted our stores yet.
15     Q.  And, so, the labels on the
16  stores that you manage are still Rite Aid,
17  correct?
18     A.  Yes.
19     Q.  But you're actually a Walgreens
20  employee?
21     A.  Yes.
22     Q.  So, other than sort of what we
23  just said, what changes have there been in
24  your job function when you became a

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  Walgreens employee in February 2018?
2      A.    There haven't been any changes
3  in function.  We are still operating the
4  same stores with the same systems and the
5  same everything.
6      Q.    Okay.  Have you gone through any
7  kind of retraining or -- when you became a
8  Walgreens employee?
9          MR. LAVELLE:  Object to form.
10     A.    We have not gone through any
11  training until we have a conversion
12  schedule.  So, once we are ready to
13  convert our systems, we will go through
14  that timelines training -- timeline
15  training.
16     Q.    By conversion schedule, you mean
17  actually for these to be physically made
18  into Walgreens drug stores?
19     A.    Yes.
20     Q.    Okay.  Does your husband still
21  work for Rite Aid?
22     A.    No.
23     Q.    Does he work for Walgreens as
24  well?

Page 79

1      A.    No.
2      Q.    Where is he working now?
3      A.    He works at H & M.
4      Q.    How long did he work for
5  Rite Aid?
6      A.    I don't know exactly, but over
7  20-plus years through multiple
8  acquisitions.
9      Q.    Was he always in Asset
10  Protection?
11     A.    For Rite Aid?
12     Q.    Yes, ma'am.
13     A.    I don't know.  When I met him,
14  he was in Asset Protection.  I don't know
15  if he was always with Asset Protection.
16     Q.    Okay.  You can set that aside.
17         (Rite Aid - Novack Exhibit 4,
18     e-mail dated January 25, 2012, with
19     attachment, Bates No.
20     Rite_Aid_OMDL_037355 to
21     Rite_Aid_OMDL_037371, was marked for
22     identification, as of this date.)
23  BY MR. SIMMER:
24     Q.    The court reporter is handing

Page 80

1  you what we marked as Novack Exhibit 8.
2  Again the printing service cut off the
3  Bates numbering, so I'll read it into the
4  record as Rite_Aid_OMDL_037355 through
5  37371.  And we've put it up on the screen
6  too.
7          MR. LAVELLE:  Counsel, you said
8  Exhibit 8, but it's been marked by the
9  court reporter as 4.
10         MR. SIMMER:  I'm sorry.  I said
11  8?  I meant 4.
12         You didn't read my mind, John.
13  Come on.
14         MR. LAVELLE:  I just want to
15  make sure the record is clear.
16  BY MR. SIMMER:
17     Q.    Take a moment and look at that
18  document, if you would.
19         MR. LAVELLE:  I'll just note,
20  while the witness is looking at this
21  document, that it's another one where
22  the Bates number is not on the copy
23  that's in front of her.  So we'll need
24  to substitute, as we discussed

Page 81

1  earlier.
2          MR. SIMMER:  I think I said the
3  same thing.
4          MR. LAVELLE:  Right.
5  BY MR. SIMMER:
6      Q.    On the first page of this
7  document, it's a cover email.  Looks like
8  it's forwarding on one that you see your
9  name on dated January 25th, 2012.
10         Do you see that?  It's from
11  Janet Hart to you and to Tara Guma, Guma
12  (different pronunciation).
13         Do you see that?
14     A.    Yes.
15     Q.    And then the subject line it
16  says "Controlled Substance Purchasing
17  Limits."
18         Do you see that?
19     A.    Yes.
20     Q.    And then attached to it is a --
21  some kind of a presentation.
22         Do you see that?
23     A.    Yes.
24     Q.    Have you seen this before?

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A.   Yes.
2    Q.   Okay.  Tell us what this
3  document is.
4    A.   This was a Power Point that we
5  put together just to go over what the
6  McKesson Controlled Substance Monitoring
7  Program was and detail that, what a
8  threshold increase would entail and what a
9  clinical prot -- a clinic protocol was.
10   Q.   The email is dated January 2012.
11       Do you have any idea when this
12  document was prepared, or the attachment?
13   A.   I don't recall.
14   Q.   How was this document used?
15   A.   In various trainings,
16  presentations.
17   Q.   And this is trainings of whom?
18   A.   Field teams.  So, it could be
19  asset protection district managers, it
20  could be pharmacy district managers, it
21  could be the regional managers that are
22  out there.
23   Q.   It says in the very last page of
24  this document there are no speaker notes

Page 83

1  contained in this presentation.
2        Is that how you recall this
3  document, that it had no speaker notes?
4    A.   I don't re -- I don't remember.
5    Q.   Did you use this presentation in
6  trainings that you gave?
7    A.   Yes.
8    Q.   And this is a Power Point
9  presentation; is that correct?
10   A.   Yes.
11   Q.   You see on the first page of the
12  presentation itself it's "Controlled
13  Substance Purchasing Limits."
14       You see that?
15   A.   Yes.
16   Q.   And, just generally, what is
17  that meant to cover, that subject area
18  here?
19   A.   In this particular presentation,
20  it was to cover the limits that they would
21  approach if they were ordering a
22  controlled substance item through our
23  vendor, McKesson, and also through the DC.
24   Q.   So, it's controlled substance

Page 84

1  ordering not only through McKesson, but
2  also through the distribution center,
3  correct?
4    A.   Yes.
5    Q.   Okay.  I direct your
6  attention -- you don't have page numbers
7  on yours, so I'll have to direct you to
8  the heading.  It's the third page of the
9  presentation.  The heading is "McKesson
10  Thresholds."
11       And for the record, it is Bates
12  ending '37358.
13       Do you see that?
14       MR. LAVELLE:  The witness has it
15  in front of her.
16       MR. SIMMER:  It would be
17  appropriate for the witness to answer
18  the question, not the counsel.
19   A.   Sorry.
20       Yes.
21   Q.   So, this, and if I have it
22  right, is a summary of the -- some of the
23  aspects of McKesson's ordering thresholds,
24  correct?

Page 85

1    A.   Yes.
2    Q.   And that's for controlled
3  substances, correct?
4    A.   Yes.
5    Q.   So, just a question how this is
6  structured, and it -- under the second
7  bullet "Individual Base Code" it has two
8  sub bullets and then one under that:  A
9  store reached their threshold for
10  Diazepam.
11       Do you see that?
12   A.   Yes.
13   Q.   So I have it right that this is
14  simply an example of what's being
15  discussed above that?
16   A.   Yes, this is an example.
17   Q.   And right below that where it
18  says the store would be blocked from
19  ordering any Diazepam containing product
20  for the remainder of the calendar month,
21  so, what that is saying if the store has
22  reached the threshold, they can't order
23  any more that month, correct?
24       MR. LAVELLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    A.   It means that they will not
2 receive any more if they try to order
3 within that month.
4    Q.   A couple bullet -- or a couple
5 points below that it says:  Can reorder
6 the next month or if an increase is
7 approved.
8        Is that right?
9    A.   Yes.
10    Q.   Okay.  So, explain what that is
11 saying.
12    A.   It means once your threshold is
13 met for the month, the next available time
14 that you would be able to get product in
15 your store is the next calendar month, or
16 if there was an increase put in for a
17 threshold, then you would be able to order
18 at that time.
19    Q.   Could you turn back two pages
20 after that?  The heading is "Threshold
21 Accommodations," Bates 37360.
22        Do you see that?
23    A.   Yes.
24    Q.   So, on the first bullet it says:

Page 87

1 Warehouse item out of stock.
2        Do you see that?
3    A.   Yes.
4    Q.   And what is that saying,
5 warehouse item out of stock?
6        MR. LAVELLE:  Object to form.
7    A.   Our controlled substances also
8 are sourced through our distribution
9 centers.  If the distribution center is
10 out of stock on an item.
11    Q.   There right below that it says:
12 McKesson will be advised to adjust the
13 threshold to accommodate our business
14 needs.
15        Do you see that?
16    A.   Yes.
17    Q.   And, so, when it says "business
18 needs," what's that -- what's the meaning
19 of that?
20    A.   It means that the warehouse is
21 out of stock.  Patient needs it.  We can't
22 supply them any.  We need to order through
23 our vendor that has quantities on hand.
24    Q.   Turn to the next page.  The

Page 88

1 heading is "Order Volume."
2        Are you with me?
3    A.   Yes.
4    Q.   This is Bates ending '0037361.
5        You see where it says:  Place
6 smaller more frequent CII orders?
7    A.   Yes.
8    Q.   What does that mean?
9    A.   Our stores don't have auto
10 replenishment on CIIs.  Sometimes they
11 like to do bulk orders.  So we would like
12 them to control their order so they are
13 ordering what is needed for the patient
14 instead of ordering outside of that.
15    Q.   And below that it says:  Avoids
16 problems with the threshold.
17        What does that mean, problems
18 with the threshold?
19    A.   So, they don't traditionally use
20 that medication and they get a new script
21 for it.  So they order a bulk item for
22 three or four months on hand, and that
23 depletes their threshold for the items
24 that they do dispense.  They are not going

Page 89

1 to be able to get product for their
2 regular patients that they serve.
3    Q.   I think our record wasn't real
4 clear.
5        Do you know if they were to
6 order it in bulk --
7    A.   Yes.
8    Q.   -- that would hit their
9 threshold?
10    A.   So, if they ordered something
11 without any type of dispensing history and
12 they just said, you know what, a patient
13 came for it and I'm going to order a big
14 bottle.  It only comes in one size and I'm
15 going to order a thousand, but I'm only
16 going to dispense 30.  Now, that's going
17 to debit against their threshold for that
18 whole active ingredient for anything else
19 that they would have needed to service
20 their regular patient.
21    Q.   The next thing it says:  It
22 reduces risk of
23 diversion/robberies/burglaries.
24        What is meant by that?

Highly Confidential - Subject to Further Confidentiality Review

Page 90



20        MR. LAVELLE:  Object to form.
21        A.    That was our suggestion for our
22    stores so that we can maintain a level
23    inventory.
24        Q.    It's just a suggestion, not a

Page 91

1    policy?
2        A.    Just a suggestion.
3        Q.    And why would a pharmacy not
4    follow that suggestion?
5        A.    A pharmacist, since these are
6    manual orders, sometimes they just want to
7    do their control counts and they want to
8    order for the month all at once.
9        Q.    If you'd look at the next page,
10    that's Bates ending '0037362.  The heading
11    is "Alerts."
12            What's an alert?
13        A.    Notification.
14        Q.    Is that something that's
15    actually triggered in the system?
16        A.    It's something that's triggered
17    on the McKesson side and it's indicated on
18    their invoices.
19        Q.    Do they use that terminology
20    "alert" like that?
21        A.    I'm not sure.
22            That's how we trained our team.
23        Q.    Incidentally, this Power Point
24    presentation is summarizing, as you said,

Page 92

1    and we've been looking at, the McKesson
2    suspicious order monitoring policy, right?
3        A.    This is their program, yes.
4        Q.    How is it you know about the
5    McKesson policy?
6        A.    This isn't their policy.  This
7    is what happens in the operations of our
8    stores.
9            So, as an order comes in, if
10    it's already passed their threshold, it
11    will show up on their invoice to let the
12    teams know that they're not going to be
13    able to receive their supply because we
14    have to make sure we can communicate to
15    the patient that they're not going to get
16    their medication.
17        Q.    Wasn't my question.
18            I wanted to know how is it you
19    know what the McKesson policy is so you
20    can -- it's summarized here.
21            MR. LAVELLE:  Object to form.
22        A.    This procedure has been
23    communicated with -- for -- to us as a
24    company so that we can educate our teams

Page 93

1    on how the systems work.
2        Q.    Communicated by McKesson,
3    correct?
4        A.    This is a training that we've
5    always had.  So how it was initially
6    communicated, not sure, but this is a
7    McKesson --
8        Q.    So this information about the
9    McKesson's procedures was in place at the
10    time you -- you became part of Asset
11    Protection, correct?
12        A.    Correct.
13        Q.    So, you yourself didn't
14    actually, you know, have this training
15    from McKesson; someone else did prior to
16    your time there?
17        A.    This training was given to me by
18    somebody at Rite Aid.
19        Q.    And this Power Point
20    presentation was given to you as well?
21        A.    This Power Point presentation
22    was created after that training.
23        Q.    By you?
24        A.    By me.

Page 94

1    Q.  How did you do it if you didn't
2 attend the training?
3    A.  I did have training.
4      So, there's a policy and
5 procedure in place at Rite Aid. So, from
6 that, this is education to our store teams
7 on what we would see as we're operating
8 our business day in and day out.
9    Q.  Okay. That's where you're
10 losing me.
11      How is it you know what -- if
12 you weren't actually part of the training
13 from McKesson, how is it you know what the
14 McKesson procedures are so that you can
15 convey it in this training slide deck?
16      MR. LAVELLE: Object to form.
17    A.  This is what we see on the
18 Rite Aid side. This is not alluding to
19 what their policies are. This is alluding
20 to the procedures that we get from when we
21 receive our invoices and what our store
22 manager -- our pharmacy managers can
23 identify on their invoices.
24    Q.  Okay. We have a disconnect.

Page 95

1      So, how is it you know what
2 McKesson's procedures are? Is it because
3 you witnessed them?
4      You didn't have any direct
5 interaction with McKesson about this?
6      MR. LAVELLE: Object to form.
7    A.  So, I know this is the process
8 that we follow based off of procedures
9 that we already had instilled in Rite Aid
10 at the time I went into that office. So
11 it's re-communicating that information in
12 the process that we have.
13    Q.  So, let's go back to this slide
14 we were just talking about where it says
15 "Alerts."
16      You see the second bullet:
17 Thresholds can be adjusted for individual
18 base codes.
19      Do you see that?
20    A.  Yes.
21    Q.  What's an individual base code?
22    A.  It's a drug. So, if it's
23 oxycodone, whether it's hydrocodone,
24 whether it's clonazepam, that's an

Page 96

1 individual code.
2    Q.  What -- but, I'm not clarifying this.
3      What is a base code? The term
4 "base," what does that mean?
5      MR. LAVELLE: Object to form.
6    A.  It's the ingredient.
7    Q.  So, oxycodone could have
8 multiple codes, but what is its base code?
9      MR. LAVELLE: Object to form.
10    A.  Oxycodone is the base code.
11    Q.  As I understand it, every drug
12 comes with an NDC, correct?
13    A.  Yes.
14    Q.  The NDC reflects the actual
15 ingredient, but also has package size and
16 strength, correct?
17    A.  Correct.
18    Q.  So, when you're talking about
19 individual base code, does that also
20 reflect package size and strength, or is
21 it just the chemical ingredient?
22      MR. LAVELLE: Object to form.
23    A.  The base code is the chemical
24 ingredient, accounts for all different

Page 97

1 NDCs.
2    Q.  Okay. That's what I'm trying to
3 understand.
4      When you're changing a
5 threshold, let's say I want to change the
6 oxycodone base -- threshold and I want
7 more -- that would include all package
8 sizes, all strengths, right, that base
9 code?
10      MR. LAVELLE: Object to form.
11    A.  That, yes.
12    Q.  So, when I'm communicating to
13 McKesson I want to increase that
14 threshold, how do they convert that into
15 strength and package size as well?
16      MR. LAVELLE: Object to form.
17 BY MR. SIMMER:
18    Q.  Do you see what I'm saying, the
19 problem I'm having with just increasing
20 base code only?
21      MR. LAVELLE: Same objection.
22    A.  The base code is the individual.
23 So, once they've exceeded that threshold,
24 it doesn't matter which NDC you're

Page 98

1    ordering, it debits to the same threshold.
2        Q.   So, if I understand it, Rite Aid
3    had a threshold of 5,000 per month; is
4    that right?  For individual base codes,
5    correct?
6        MR. LAVELLE:  Object to form.
7        A.   Could you repeat that?
8        Q.   Do I have it right that Rite Aid
9    had a threshold of 5,000 units for each
10   base code per month?
11       A.   No, that's not right.
12       Q.   Okay.  What was the threshold?
13       A.   It was 5,000 dosage units per
14   NDC per order.
15       Q.   And a dosage unit, it would be
16   what?
17       A.   The count of tablets, capsules.
18       Q.   Let's go back to it says that to
19   increase the threshold requires a
20   legitimate business reason.
21           Do you see that?
22       A.   On the same page, yes.
23       Q.   And, when you gave this
24   presentation, did you give examples of

Page 99

1    legitimate business reasons?
2        A.   I don't recall what we had gone
3    through, but --
4        Q.   So, that's when -- and, who
5    would actually request this threshold
6    change at Rite Aid?
7        A.   It would have to come from the
8    store and then it goes to the pharmacy
9    district manager, and then if it is a
10   McKesson threshold request, it would come
11   through me.  If it was a supplier chain
12   threshold, it would go through somebody
13   else.
14       Q.   So, it has to have a legitimate
15   business reason at every step along the
16   way, right?
17       A.   Yes.
18       Q.   So, that the store manager would
19   have to -- to request the threshold change
20   and give a legitimate business reason to
21   the district manager.  The district
22   manager would review that and only hand it
23   on to -- to the, who's next in the line?
24       MR. LAVELLE:  Object to form.

Page 100

1        Q.   To you in Asset Protection?
2        MR. LAVELLE:  Same objection.
3        A.   So, it's the pharmacy manager,
4    not the store manager.
5        Q.   I'm sorry.  Pharmacy manager,
6    okay.
7        A.   Would do the request to the
8    pharmacy district manager, and then it
9    would come through me.
10       Q.   Okay.  At each point along the
11   way it has to have a legitimate business
12   reason, right?
13       A.   They have to identify the reason
14   why and, yes, determine that it is
15   legitimate.
16       Q.   And then the -- you as the
17   director of pharmacy loss prevention would
18   in turn go to McKesson and request the
19   threshold change, correct?
20       A.   If it was deemed legitimate,
21   yes.
22       Q.   And you would also have to tell
23   McKesson what the legitimate business
24   reason was, right?

Page 101

1        A.   We would give them the requested
2    increase percentage that we want.
3        Q.   That wasn't my question.
4            Would you have to give them the
5    legitimate business reason for the change?
6        MR. LAVELLE:  Object to form.
7        A.   I don't remember what the
8    criteria was.  I believe that we did give
9    them some information on the percentage
10   increase and the reason behind it.
11       Q.   In the last sub bullet here it
12   says:  Coordinated corporately through LP.
13           That LP is Loss Prevention,
14   correct?
15       A.   Yes.
16       Q.   And you're using the term at
17   Loss Preparation, and we also, I guess --
18   the department had changed to Asset
19   Protection at this point, right?
20       A.   Yes.
21       Q.   Okay.  So, in terms of how the
22   alerts were handled, it would actually go
23   to Asset Protection and not to Loss
24   Prevention, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    A.   Yes.  Same department, just
2  rebranded.
3    Q.   Okay.
4    A.   Same person.
5    Q.   Could you turn two pages back,
6  please, to Bates ending '37364.  The
7  heading on that is "PDM Action for
8  Threshold Increase."
9        And it --
10       MR. LAVELLE:  Counsel, there's
11  more than one document that has that
12  same heading.
13       MR. SIMMER:  I'm sorry.  The
14  subheading right below that is
15  "Include in the communication."
16  BY MR. SIMMER:
17   Q.   Are you with me?
18   A.   Yes.
19   Q.   I know it presents a little
20  additional challenge since we don't have
21  Bates numbering.  So, this is Bates ending
22  '37364.
23       It says:  Include in the
24  communication.

Page 103

1        This is -- and by the way, when
2  it says PDM, what does that abbreviation
3  stand for?
4    A.   Pharmacy district manager.
5    Q.   Okay.  And so, just briefly,
6  what is this slide conveying?
7    A.   This is the information that the
8  pharmacy district manager needs to supply
9  when they are requesting a threshold
10  increase from my department.
11   Q.   And it says you're supposed to
12  include the store number, correct?
13   A.   Yes.
14   Q.   And then the base code.
15       We talked about the base code a
16  moment ago, right?
17   A.   Yes.
18   Q.   And that's talking about the
19  active ingredient again, right?
20   A.   Yes.
21   Q.   The reason for the adjustment,
22  right?
23   A.   Yes.
24   Q.   And then it gives under that an

Page 104

1  example of some of the reasons you could
2  give:  A new pain clinic, et cetera, will
3  be -- will need prescribing MD data for
4  review.
5        Do you see that?
6    A.   Yes.
7    Q.   And that's an example of a
8  reason that could be given for an increase
9  in threshold?
10   A.   That's a example that will also
11  require additional information from the
12  field.
13   Q.   Okay.  That wasn't my question.
14       What it says here, this is a
15  reason that could be given, right?
16       MR. LAVELLE:  Object to form.
17   A.   We identified that as a bullet
18  because you can't just tell us it's a new
19  pain clinic.  If that is the reason, you
20  will have to give us more information.
21   Q.   It doesn't say that though here,
22  right?
23       MR. LAVELLE:  Object to form.
24   A.   That's part of our presentation.

Page 105

1    Q.   You go on then in the
2  presentation to say, okay, if you say it's
3  a new pain clinic, we're going to have
4  more questions for you.
5        Is that how you handled it?
6    A.   Yes.  We want --
7        MR. LAVELLE:  Object to form.
8    A.   We wanted to give them some more
9  information that it's not as simple as
10  there's something new that's causing us to
11  go higher in thresholds.
12   Q.   Okay.  Next bullet below that it
13  says:  Requested adjustment percentage.
14       Do you see that?
15   A.   Yes.
16   Q.   So, what does that mean,
17  requested adjustment percentage?
18   A.   The amount that the field team
19  deems that they feel is necessary to --
20  for that store.
21   Q.   So it's reflected in an actual
22  percentage?
23   A.   Yes.
24   Q.   And it's of their -- the

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 threshold that each store has, they want
2 an adjustment of a specific percentage,
3 correct?
4      A.   Yes.
5      Q.   Okay.  And it says:  Copy RXVP
6 on communication.
7          What is that saying?
8      A.   On that communication that
9 they're sending over to me, they should
10 also copy their regional pharmacy
11 vice-president so that they are aware.
12     Q.   Okay.  Could you turn to the
13 next page, please?  The heading on that is
14 "Clinic Protocol."  Under that is:  Upon a
15 second request for a threshold increase.
16         Do you see that?
17     A.   Yes.
18     Q.   This is Bates ending right --
19 '37365.
20         What is a clinic protocol?
21     A.   A clinic protocol is something
22 we designed for our store teams to go
23 through when they are requesting for a
24 threshold increase that we need some more

Page 107

1 information on.
2      Q.   Is that an actual document or a
3 online procedure they're supposed to
4 follow?
5      A.   It's an actual document.
6      Q.   Where is that housed?
7      A.   We send it out to them
8 individually each time we need a clinic
9 protocol done.
10     Q.   And, what is the document
11 called?
12     A.   Clinic protocol.
13     Q.   And, are these retained by the
14 company?
15     A.   Yes.
16     Q.   And, where are they retained?
17     A.   In the Government Affairs
18 Department.
19     Q.   So, every time a threshold
20 increase is requested, the -- the store --
21 excuse me.  The pharmacy manager, and then
22 in turn the district manager, have to
23 complete the form; is that correct?
24         MR. LAVELLE:  Object to form.

Page 108

1      A.   It is determined based off of
2 the request.
3      Q.   What do you mean by that?
4      A.   So, upon a second request or
5 upon a request that does not seem -- that
6 we need additional information on to
7 determine that there is a legitimate
8 business need or a patient need, we will
9 send out a clinic protocol to that store
10 and that store team.
11     Q.   Okay.  So, the clinic protocol
12 is not something routinely required.  It's
13 only if the Asset Protection people feel
14 it's necessary, correct?
15     A.   Yes.
16     Q.   And, what are the circumstances
17 under which Asset Protection would require
18 the clinic protocol to be completed?
19     A.   We go through a lot of different
20 analytics to review the base business, the
21 reason for the business and to review
22 doctors.  We utilize our KPIs and also IMS
23 data to feed a lot of that information.
24 If it was something simplistic, like we

Page 109

1 purchased a independent pharmacy and their
2 files are coming and we're increasing our
3 overall business by 60 percent, then we
4 can look at our dispensing history.  But
5 if there was no external reason for this
6 increase in demand, then we would do our
7 due diligence.
8      Q.   And that's when you would
9 request the clinic protocol form to be
10 completed?
11     A.   Yes.
12     Q.   And you do the analytics in
13 every instance?
14     A.   For a threshold increase, yes.
15     Q.   You said you review the business
16 business.
17         What is that?
18     A.   We review the business needs.
19     Q.   Business need.  I'm sorry.
20         What is business need?
21     A.   Our patients that come in
22 through our door that have prescriptions
23 for legitimate need, medical need.
24     Q.   So, when you say you review the

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 patients that come through our door to
2 determine if there's a legitimate need,
3 what do you actually do to determine that?
4 A.   You asked what business needs
5 meant.  So that's what I meant by business
6 needs.
7 Q.   Is that something you do in
8 every instance, look at the patient need?
9 MR. LAVELLE:  Object to form.
10 A.   For any threshold increase, we
11 do review the full base business before we
12 recommend or request a threshold increase.
13 Q.   You said you also review the
14 doctors, correct?
15 A.   We review the prescribers that
16 drive some of the -- or their top
17 prescribers in the base code for that
18 store.
19 Q.   And how do you do that?
20 A.   We run our dispensing history.
21 Q.   And then when you say you review
22 them, what do you do?
23 A.   We pull up the information.  We
24 look at what the dosage units are that

Page 111

1 they are dispensing, how many
2 prescriptions, how many patients, are they
3 also dispensing other medications that are
4 non-controlled.  Then we look at their
5 disciplines for our top doctors through
6 IMS, check for their DEA registration,
7 make sure that they have prescribing
8 authority for controlled substances.  We
9 check to make sure that they have an
10 active license.  We check to see what
11 their profession is to make sure that it
12 is within their prescribing rights.
13 Q.   You also said you utilize your
14 KPIs.
15 What is that?
16 A.   In Naviscript we have a lot of
17 key performance indicators that allow us
18 to review the business and if there's any
19 instance of diversion in our stores.  So,
20 before we increase a threshold, we make
21 sure we don't have any indication of an
22 internal issue.
23 Q.   So, this Naviscript third party
24 vendor program, where do they get their

Page 112

1 information?
2 A.   From our dispensing information.
3 We give them a data feed of all of our
4 transactions.
5 Q.   So, a performance indicator is a
6 what?  What is that?
7 MR. LAVELLE:  Object to form.
8 A.   A performance indicator are
9 different metrics that we've identified
10 that, if there was an anomaly, could lead
11 us to suspicious activity.
12 Q.   And what do you mean by metrics
13 that you've identified?  What are they?
14 MR. LAVELLE:  Object to form.
15 A.   There's a lot of different ones
16 that are in the system.  We track cycle
17 countdowns.  We track order adjustments.
18 We track number of manual orders that are
19 placed.  We track dispensing information.
20 We track if anything has been sold and
21 then resold or deleted.  So, a lot of
22 different information that feeds in and we
23 can look at it.
24 Q.   I take it that what you are

Page 113

1 doing in Asset Protection, you're using
2 the dispensing data for that purpose?
3 A.   Yes.  Dispensing data and
4 transaction data from inventory and we're
5 using transaction data from our point of
6 sale system.
7 Q.   You said that you track cycle
8 countdowns.
9 What is that?
10 A.   Any time an on-hand adjustment
11 is down.
12 We actually track all cycle
13 counts, whether it's up or down.
14 Q.   Still don't follow what you mean
15 by an on-hand adjustment.
16 MR. LAVELLE:  Object to form.
17 A.   If our inventory system shows
18 that we should have one cup and I go to
19 the shelf and I don't have one cup, I put
20 zero because I don't physically have it.
21 That's considered an on-hand adjustment.
22 It's a cycle counting down.
23 Q.   What's an order adjustment?
24 A.   We have an auto replenishment

Page 114

1  system that takes our trend and generates
2  an order for our store.  If the store
3  decides that they want to increase or
4  decrease the order, then that would be an
5  adjustment, and we would track that too.
6      Q.   You said you also track the
7  number of manual orders that are placed?
8      A.   Yes.  We can see any type of
9  orders that were placed in through our
10 vendors, and that will also come up in our
11 KPI system.
12     Q.   But what is a manual order
13 adjustment?
14     A.   Somebody that goes in and
15 overrides the order manually,
16 replenishment suggested this and they do
17 more, or they went and placed an order
18 through our vendors.
19     Q.   Okay.  I'm not following you
20 though.
21         So, a manual adjustment, who's
22 doing a manual change here?  Is it the
23 local pharmacist?
24         MR. LAVELLE:  Object to form.

Page 115

1      A.   It's the associate in the store.
2  So the --
3      Q.   The associate and not the
4  pharmacist?
5          MR. LAVELLE:  I think the
6      witness was not finished answering --
7      giving her answer.
8  BY MR. SIMMER:
9      Q.   I apologize.  Go ahead.
10 Complete your answer.
11     A.   The ordering system is
12 accessible by our pharmacy associate, and
13 a pharmacy associate can place an order
14 for medications.
15     Q.   Again, is it pharmacy associate,
16 that's not the pharmacist, right?
17         MR. LAVELLE:  Object to form.
18     A.   It could be the pharmacist,
19 pharmacy manager.  It could be a pharmacy
20 technician.
21     Q.   So you're using the term
22 "pharmacy associate" to include all three?
23     A.   Anyone in that pharmacy.
24     Q.   Okay.  Let's go back and look at

Page 116

1  this document "Clinic Protocol."
2          It says:  Upon a second request
3  for a threshold increase.
4          What's a second request?
5      A.   If there was initial increase
6  and then somebody's asking for a second
7  time of an increase.
8      Q.   The same month, or is it -- is
9  there a certain period of time when you
10 say that's a second request?
11         MR. LAVELLE:  Object to form.
12     A.   It's any time.  If it's a second
13 request, then we will review.
14     Q.   What if the first request and
15 the second request are two years apart,
16 would that still be called a second
17 request?
18     A.   If it was two years apart, we
19 would still review the information in the
20 database to see if they had requested
21 something previously, and then if there
22 was any business needs that require us to
23 do a clinic protocol.
24     Q.   That didn't really answer my

Page 117

1  question.
2          In the example I gave, it was
3  two years apart.
4          Would that still be deemed a
5  second request?
6          MR. LAVELLE:  Object to form.
7      A.   A second request, yes.
8      Q.   So it makes no difference how
9  long apart it is.  If it's a second
10 request for that same base code, you would
11 treat it as a second request, no matter
12 how far apart it was, right?
13         MR. LAVELLE:  Object to form.
14     A.   If there was a increase that was
15 put in and it is more than one time for
16 the same base code and it wasn't an
17 external activity that we had created for
18 that store, we would treat it the same way
19 as a second request.
20     Q.   What's an example of an external
21 activity that was created for that store?
22     A.   An acquisition or filed by, we
23 bought another pharmacy and we're bringing
24 in all those patients.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  Q. Okay. Back to the document.
2      It says that the clinic protocol
3  will be sent to the PDM and LPDM.
4      And LPDM is loss prevention
5  district manager, correct?
6  A. Yes.
7  Q. And then there's information
8  that's requested to be completed on that
9  form. That's what is reflected below,
10  correct?
11  A. Yes.
12  Q. It says: Verify prescriber and
13  credentials.
14      Right?
15  A. Yes.
16  Q. Verify physical location of the
17  clinic/office.
18      Correct?
19  A. Yes.
20  Q. That's the doctor's office
21  that -- that is on the prescription,
22  correct?
23  A. Yes.
24  Q. Review prescribing patterns.

Page 119

1      Is that correct?
2  A. Yes.
3  Q. And that's the -- the doctor's
4  or the clinic's prescribing patterns,
5  correct?
6  A. Yes.
7  Q. Just on that point, what -- what
8  are you looking for in patterns?
9  A. What else are they prescribing
10  with medication? If it's pain, are they
11  also managing their long-acting and
12  short-acting pain? If it's a primary care
13  prescriber, do they have maintenance
14  medications that are being prescribed to
15  their patients? So.
16      , reviewing all different things
17  from that prescriber.
18  Q. Okay. And then the fourth
19  bullet says: Contact local DEA/BOP.
20      That's Board of Pharmacy; is it
21  not?
22      MR. LAVELLE: Object to form.
23  BY MR. SIMMER:
24  Q. You see where it says "BOP."

Page 120

1      Is that Board of Pharmacy?
2  A. Yes.
3  Q. Medical board to inquire about
4  complaints/issues/concerns.
5      What's being conveyed there?
6  A. If we have good contacts with
7  the local law enforcement. Or even if we
8  have good contacts, a lot of times we know
9  our board investigators or board
10  inspectors will ask them if they see any
11  activity with this prescriber or there are
12  any concerns, so they'll reach out.
13  Q. You say a lot of times.
14      This wasn't something that was
15  always required?
16  A. I said a lot of times if we have
17  good relationships with them. If not, we
18  may have to bring that back into our
19  corporate office if they don't have a good
20  relationship with the local board or DEA
21  and somebody in our department could reach
22  out to them.
23  Q. So, who is it that's contacting
24  the DEA, the Board of Pharmacy, or the

Page 121

1  medical board, as you're saying here? Is
2  that supposed to be the PDM and LPDM
3  that's doing that contact?
4  A. Yes. If they have relationships
5  with them, the PDM and the LPDM.
6  Q. If they don't, then it comes
7  back into the corporate office, right?
8  A. Yes.
9  Q. For Asset Protection to do that
10  contact, right?
11  A. Government Affairs. They have a
12  very good relationship with multiple
13  boards.
14  Q. So, in every instance, it is
15  either the PDM, LPDM or government
16  relations that contacts these entities to
17  find out what information they can about
18  this particular prescriber, correct?
19  A. When they're conducting a clinic
20  protocol, yes.
21  Q. Okay. And, so, in every
22  instance, these four things would have to
23  be completed before the threshold increase
24  would be approved, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    A.    In every instance, we would go
2  through this clinic protocol.  If any one
3  of these were not physically able to do,
4  then we would determine that we may not
5  even proceed.  So, for instance, they may
6  not get as far as to contact anyone if
7  they can't even verify a physical
8  location.  So we would stop.
9    Q.    And last thing on this page it
10  says: Deemed clinically appropriate.
11         Do you see that?
12    A.    Yes.
13    Q.    And what does that mean?
14    A.    It means if it's deemed
15  clinically appropriate, then we would
16  proceed with the threshold increase.
17    Q.    So, what kind of analysis is
18  actually done to determine whether the
19  threshold was clinically appropriate?
20         MR. LAVELLE:  Object to form.
21    A.    We do the whole analysis that we
22  had just mentioned before.  Again, we look
23  at our own store and our dispensing
24  history.  We look at how much of

Page 123

1  controlled substances in general that we
2  are dispensing, whether it be for that
3  base code or an overall code.  We look at
4  different flags on whether it is cash,
5  whether these patients are insurance-base.
6  We look at the prescribers that are
7  generating this business for us or
8  prescribing to our patients.  We want to
9  make sure that they have a legitimate
10  professional license to dispense and treat
11  these patients this way.
12         So, there's a lot of different
13  things that we do locally and with
14  coordination with the corporate office to
15  determine that it is clinically
16  appropriate.
17    Q.    That's what I'm having trouble
18  with.  I don't see anything in there
19  that -- that illustrates that you've
20  actually done a clinical analysis.
21         You don't get the medical
22  records for the patient, do you?
23         MR. LAVELLE:  Object to form.
24    A.    We have our prescribing medical

Page 124

1  information from our dispensing system.
2    Q.    So you just have the prescribing
3  history is all, right?
4    A.    Yes.
5         MR. LAVELLE:  Object to form.
6  BY MR. SIMMER:
7    Q.    Is that sufficient to actually
8  determine whether it's clinically
9  appropriate, the prescribing history only?
10         MR. LAVELLE:  Object to form.
11    A.    We also marry that with
12  prescriber information.  So, again, we're
13  looking at if there's a specific
14  prescriber that's generating this
15  information, is that prescriber operating
16  within their profession.  So, how many of
17  our patients are really treatment and care
18  that we can see that there is documented
19  information on diagnosis codes and what we
20  can look at for these patients.
21    Q.    So, if I, Scott Simmer, go to my
22  Rite Aid Pharmacy and hand a prescription
23  to the pharmacist and ask that it be
24  filled and it triggered some threshold

Page 125

1  increase examination like that, how would
2  you determine whether the prescription I
3  had gotten was clinically appropriate?
4         MR. LAVELLE:  Object to form.
5  BY MR. SIMMER:
6    Q.    You didn't look at my medical
7  records, did you?
8         MR. LAVELLE:  Object to form.
9    A.    So, we're not making that
10  determination on whether that patient has
11  specific need.  We're looking to see if we
12  need to increase the amount that's coming
13  through that store.
14         Ultimately, that pharmacist
15  behind that bench is going to make that
16  professional judgment on whether they are
17  going to fill that prescription or not.
18  We give them a lot of guidance and a lot
19  of training on what's deemed medically
20  necessary and make sure that they
21  understand some of the things that they
22  may look at from a red flags perspective,
23  but they make that determination for that
24  patient.  We can look at the store and

Page 126

1  whether we can increase the supply or not.
2      Q.   In this review process, the
3  clinic protocol review process, does
4  anybody pick up the phone and call the
5  doctor and say I'd like to understand why
6  it's clinically appropriate for this
7  patient to have this prescription?  Does
8  that happen?
9          MR. LAVELLE:  Object to form.
10     A.   As a matter of fact, that
11  happens all the time.  Our pharmacists
12  have a protocol to reach out to the
13  doctor, 'cause they are the first line
14  there, and determine what the diagnosis
15  is, and we document that in our dispensing
16  system and on the hard copy prescription.
17         But, outside of that, I've done
18  some of these clinical protocols
19  personally with one of my colleagues, and
20  we've reached out to doctors.  We've
21  had -- we've met with them.  We've made
22  phone calls through them.  So, we've done
23  that.
24     Q.   That's not described in this

Page 127

1  clinic protocol, is it?
2          MR. LAVELLE:  Object to form.
3      A.   This is -- you want to verify
4  them you're at the physical location.
5  They go in and they do that and that's an
6  extra step.
7      Q.   But it's at their discretion
8  whether they take that extra step, right?
9      A.   If there's no information that
10  requires us to do that, then they may not
11  need to.  And most of the times, our
12  pharmacists will know that relationship
13  with that doctor that's there and whether
14  this is somebody that we need to look at
15  or not.  And they will report any
16  suspicious activity through our RX
17  tickets.
18         So we've got a lot of
19  information.  We've done a lot of training
20  out there for our pharmacists to be able
21  to bubble this information up.  If we
22  don't get through a couple of these and
23  say hey, we don't feel good about it, that
24  doesn't happen.

Page 128

1      Q.   But, again, that's at the --
2  your discretion, correct?  Whether you
3  make that actual contact with the doctor,
4  right?
5          MR. LAVELLE:  Object to form.
6      A.   At the end of the day, we follow
7  this clinic protocol.  They do the steps
8  that are in here.
9      Q.   Okay.  I understand.
10         And there's some discretion
11  about how far they go on that about
12  contacting the doctor, right?
13     A.   At minimum, the items that are
14  in here.  Contacting the doctor is not
15  something that's specified in here.  We do
16  it on our end if there is a large concern.
17     Q.   How many times did you contact
18  DEA about, you yourself contacted DEA, an
19  instance like this for one of these clinic
20  protocol reviews?
21     A.   I --
22         MR. LAVELLE:  Object to form.
23     A.   I personally have not.  This is
24  done by my colleague in the Government

Page 129

1  Affairs Department.
2      Q.   How many times in a clinic
3  protocol review that you participated in
4  did someone in Government Affairs contact
5  the DEA?
6      A.   I couldn't give you a specific
7  number.
8      Q.   Ten times?
9      A.   I'm aware that it happened.  I
10  couldn't give you a specific number.
11     Q.   You're aware that it happened,
12  what, one time?
13     A.   More than once.
14     Q.   How many times did the PDM or
15  LPDM contact the DEA about a concern about
16  a -- in this clinic protocol review
17  process?
18         MR. LAVELLE:  Object to form.
19     A.   I wouldn't be able to quantify.
20     Q.   How many times did you contact
21  the doctor?  You just talked about that,
22  you said you actually called the doctor.
23  How many times did you do that?
24         MR. LAVELLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  A.  I've contacted the doctor or I
2  have actually gone to the office with the
3  doctor at least twice.
4  Q.  And, what was the triggering
5  event for those two occasions?
6  A.  We were looking at different
7  analysis, not specifically to a clinic
8  protocol, but we have some processes in
9  place where we will review our top
10 dispensing doctors in our chain that we
11 get from IMS, a database that we run, and
12 we routinely want to see and make sure
13 that we are doing our due diligence.
14 Q.  So, when you said earlier that
15 you actually yourself contacted doctors,
16 it wasn't in conjunction with the clinic
17 protocol review, right?
18 A.  We were doing clinic protocol.
19 However, we were developing this process.
20 This is a very new process as we were
21 training this at this time, because we
22 wanted to have even more controls in
23 place.  So we took the things that we were
24 doing and putting them back into here so

Page 131

1  that our field teams could help us be more
2  eyes and ears out in the field.
3  Q.  So, here in 2012.  Is this a
4  brand new process you're rolling out?  Is
5  that right?
6  A.  This is not a new process.  This
7  is something that we already do.  This is
8  now making sure that we have a cascade of
9  information to our field teams to educate
10 them on the structure that we have and the
11 due diligence that we need to take where
12 it's not just you request something and
13 it's going to happen, 'cause we wanted to
14 make sure that we were -- our field teams
15 understood why these things just don't
16 happen.
17 Q.  So, you just testified "this is
18 a very new process as we were training at
19 this time."  I then went back and asked
20 you if this is a brand new process and you
21 said this is not a new process.  Those
22 look like contradictory answers.
23     Can you clarify?
24     MR. LAVELLE:  Object to form.

Page 132

1  A.  This is not a new process for us
2  in the corporate office.  We were already
3  doing this.  We were reviewing some of
4  this.  We wanted to get this into more
5  hands and educate more of our field teams
6  to understand hey, we're going to need
7  some more help from you and to review some
8  of these clinics because we can't, from
9  the corporate office, get to every single
10 location for every single store that may
11 need something.
12 Q.  Okay.  If you could turn two
13 pages after that, slide with the heading
14 "Rite Aid Distribution Thresholds."
15     Do you see that?
16 A.  Yes.
17 Q.  And it's Bates ending '37367.
18     You see the first bullet where
19 it says:  Similar to McKesson, Rite Aid
20 must have the same types of checks and
21 balances in place to monitor/stop
22 excessive orders of controlled substances.
23     Do you see that?
24 A.  Yes.

Page 133

1  Q.  Was this a change that Rite Aid
2  had to have the same types of checks and
3  balances as McKesson had?
4      MR. LAVELLE:  Object to form.
5  A.  Rite Aid had checks and balances
6  already.  So, we have ways that we monitor
7  any type of excessive orders that are
8  going out there.
9  Q.  So, what you're talking about
10 though is going out and training on the
11 clinic protocol process and getting that
12 information out to the field.
13     Had that actual training and
14 communication to the field been going on
15 prior to what you're doing here?
16     MR. LAVELLE:  Object to form.
17 A.  All that training has been going
18 on.  It's very different when you do it in
19 person and you have that conversation
20 because now it gives them the opportunity
21 to ask questions versus when we do the
22 training, sometimes it's on a
23 computer-based training where we go
24 through this.  It's in a policy and

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 procedure. They know it, but we want to
2 make sure we tie up any loose ends if
3 there's any gaps in understanding.
4     Q.   So you went out into the field
5 and gave this training.
6     Is that right?
7     A.   Yes.
8     Q.   You and other people, your
9 colleagues, did this training, or is it
10 just you?
11     MR. LAVELLE:  Object to form.
12     A.   It was just me if it was in our
13 asset protection trainings in the
14 corporate office when we onboard new
15 district managers because they go through
16 this training every time we get somebody
17 new.  It could have been with multiple
18 colleagues in different presentations
19 together as we go through some road shows
20 so that we can get the whole audience
21 base.  And, ultimately, it could be by
22 myself or with a partner so that everybody
23 gets this education.
24     Q.   What partner?

Page 135

1     A.   The person in -- Janet Hart in
2 Government Affairs is actually usually the
3 person that we work with from a
4 distribution threshold perspective.
5     Q.   And you felt that the in-person
6 training was more effective than the
7 computer-based training; is that right?
8     A.   I think that all forms of
9 training is effective.  Again, this opens
10 up the platform for them to ask questions.
11 Instead of well, you know, I can't get my
12 order or this doesn't happen, that doesn't
13 happen, we can now give them some more
14 whys behind it or some more context for
15 education.
16     Q.   So, the face-to-face training
17 allowed them to ask questions; is that
18 right?
19     A.   Yes.
20     Q.   And that's the only reason why
21 it's being used is simply to allow them to
22 ask questions, right?
23     MR. LAVELLE:  Object to form.
24     A.   We also want to make sure that

Page 136

1 we keep compliance top of mind.
2     Q.   What do you mean by top of mind?
3     A.   When we call out these specific
4 trainings, we're also reenforcing how
5 important this is.  So, it's bringing it
6 back to light so that our teams know this
7 is a big area of focus.  We want to make
8 sure that we are operating within policies
9 and procedures.
10     This is, again, an overview of
11 what happens if you've got any questions,
12 but it also is specific topics on things
13 that we want to make sure that everybody's
14 aware of.
15     MR. SIMMER:  Could we take a
16 break?
17     MR. LAVELLE:  Yes.
18     THE VIDEOGRAPHER:  The time is
19 now 11:39 a.m.
20     We're going off the record.
21     (Recess taken.)
22     THE VIDEOGRAPHER:  The time is
23 now 11:55 a.m.
24     We are back on the record.

Page 137

1     (Rite Aid - Novack Exhibit 5,
2 email chain ending November 10, 2012,
3 with attachment, Bates No.
4 Rite_Aid_OMDL_00029787 to
5 Rite_Aid_OMDL_00029954, was marked for
6 identification, as of this date.)
7 BY MR. SIMMER:
8     Q.   The court reporter is going to
9 hand you what we've marked as Novack
10 Exhibit 5.  It's a massive document.  I'm
11 going to direct your attention to a few
12 pages in it.  You can look at the whole
13 thing.  I think it would save us all some
14 time if I could just have you look at the
15 cover email and then direct your attention
16 to these pages starting -- and, you can
17 see, they don't have Bates numbers on it,
18 but the slides themselves have numbers in
19 the lower right-hand corner.  If I could
20 direct your attention to slide 125 through
21 149, I think it is.
22     MR. LAVELLE:  Counsel, the copy
23 does not have numbers on them.  Not
24 only does it not have Bates numbers,

Page 138

1  it doesn't have slide numbers.
2      MR. SIMMER:  Did they cut that
3  off too?
4      On the Power Point slides
5  themselves there's not?
6      Can we see?
7      THE WITNESS:  (Handing.)
8      MR. SIMMER:  It's not on there
9  either.
10     They successfully ruined this
11 exhibit.
12     MR. LAVELLE:  We'll muddle
13 through.  You just tell us where we
14 need to be and we'll find it.
15     MR. SIMMER:  So, it's going to
16 be about more than halfway through
17 probably, and it's the slide that
18 begins "Controlled Substance
19 Purchasing Limits."
20     We can pull it up on the screen
21 too.
22     If he pulls it up on the screen,
23 you can at least eyeball it.  It has
24 this, the store on it, and that

Page 139

1  (indicating).
2      He's got it on the screen now.
3      MR. WATTS:  If someone would
4  please read the Bates number into the
5  record.
6      MR. SIMMER:  Be glad to.  Trying
7  to get her on the same page.
8      The exhibit itself I'll identify
9  for the record is Novack 5 begins at
10 Rite_Aid _OMDL_00029787 through
11 '29954.
12     (Pause.)
13     MR. SIMMER:  That's it.
14     MR. LAVELLE:  Okay.  Can I put
15 it in front of the witness?
16     MR. SIMMER:  Yes.
17     MR. LAVELLE:  Okay.
18     MR. SIMMER:  Again, I apologize
19 for this printing job.  It's made our
20 jobs a lot more difficult today.
21 BY MR. SIMMER:
22     Q.   So, as I understand this
23 exhibit, ma'am, and you may know this from
24 having seen it before, but there are

Page 140

1  different sections to it, and I'm going to
2  have you look at this whole section on
3  "Controlled Substance Purchasing Limits."
4  And it's roughly what is 24 pages long and
5  it goes up to the next section of
6  "Pharmacy Robberies."  So I'm not going to
7  ask you to look at the "Pharmacy
8  Robberies" section.
9      A.   Okay.
10     Q.   Okay.  So, if you just want to
11 take a moment and look at the cover email
12 and then that section of this exhibit,
13 then we can -- I'll ask you some
14 questions.
15     A.   (Perusing document.)
16     Q.   And while you're doing, that
17 I'll identify for the record, and we're
18 going to swap in again Bates numbered for
19 this.
20         MR. SIMMER:  The passages I'm
21     going to ask her to focus on are
22     '29913 through '29936.
23     A.   (Perusing document.)
24         Okay.

Page 141

1      Q.   I direct your attention to the
2  cover email.  This is Bates '29787 and
3  '29788, and if I -- if you look at this is
4  an email string, the first of which is
5  from Michael KcKinney to you and Janet
6  Hart dated October 13, 2012.
7      Do you see where in the body of
8  the email, and the subject line is "Thank
9  You."
10     Do you see where in the body of
11 the email he says:  Sophia, Janet.  On
12 behalf of region 22 and 25 we would like
13 to thank you for taking time out of your
14 busy schedules to spend time with us.
15     Do you see that?
16         MR. LAVELLE:  Object to form.
17     A.   Yes.
18     Q.   Can you just -- what's your
19 understanding he's responding to here, his
20 purpose for writing this email?
21         MR. LAVELLE:  Object to form.
22     A.   Janet and I attended one of
23 their regional meetings and conducted some
24 training.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  Q. And, so, you'd given them a
2 training and he's thanking you for that,
3 right?
4  A. Yes.
5  Q. Okay. He also goes on in the
6 second paragraph to ask for you to send a
7 copy of the presentation.
8  Do you see that?
9  A. Yes.
10  Q. Okay. And then there's an email
11 right above that from Michael McKinney --
12 actually, no. I'm sorry.
13  This is to Michael McKinney from
14 you dated October 15th, right? Or, if I'm
15 reading this correctly, several days
16 later, you respond to him, correctly --
17 correct?
18  MR. LAVELLE: Object to form.
19  A. Yes.
20  Q. And you see in your email you
21 say: Rob, Garrett, Mike. Thank you for
22 your hospitality and allowing us the time
23 to speak with field members -- or, field
24 leaders. Excuse me. We are in the

Page 143

1 process of compiling the answers to some
2 of the questions and follow-up items we
3 brought back.
4  So, you were compiling answers
5 to questions.
6  Can you tell us what -- what
7 you -- what these questions were?
8  MR. LAVELLE: Object to form.
9  A. I don't recall.
10  Q. Would that be something typical
11 you would have though? When the field
12 team would ask questions, you would
13 actually give them written responses back?
14  A. If it was something that we
15 couldn't answer while we were there, that
16 may not be related to us because we're
17 coming from the corporate office. They
18 may have something about a system that is
19 in another department and they just
20 happened to ask us while we're there
21 because we coordinate with the Pharmacy
22 Operations Department or other
23 departments. We'll take that back, get
24 them an answer, and then respond back.

Page 144

1  Q. Going on then you see where you
2 say: I've attached a copy of the
3 presentation for your reference?
4  A. Yes.
5  Q. Okay. So, that's in response to
6 his request, you're giving him a copy of
7 the presentation itself, right?
8  A. Yes.
9  Q. You go on to say: The videos
10 were too large to send over email so they
11 have been removed from the presentation.
12  So, am I right that there were
13 actual videos included in the
14 presentation?
15  MR. LAVELLE: Object to form.
16  A. Based on this email, yes.
17  Q. Do you know what those videos
18 were?
19  A. I don't recall.
20  Q. Okay. So, then, can I direct
21 your attention to the pages I asked you to
22 look at, the one beginning "Controlled
23 Substance Purchasing Limits"?
24  A. Yes.

Page 145

1  Q. Is this a part of a presentation
2 that you would have given?
3  A. Myself and Janet Hart.
4  Q. So you -- you gave it together;
5 is that right?
6  A. Yes.
7  Q. Did you give this on more than
8 one occasion?
9  A. Yes.
10  Q. Who are the people that you gave
11 this presentation to?
12  A. In this audience, it would have
13 been the field teams that are there,
14 pharmacy district managers, district
15 managers, asset protection district
16 managers. I'm not sure if there were any
17 other disciplines there, but the regional
18 vice presidents and the regional asset
19 protection director would have been there.
20  Q. And you gave this presentation
21 in other situations, right?
22  A. Yes.
23  Q. And, to whom did you give the
24 presentation?

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    A.   Same type of audience, our field
2 team, pharmacy district managers, regional
3 vice presidents, new onboarding or
4 existing asset protection district
5 managers.
6    Q.   And this is information that --
7 is this new information that you're
8 conveying to the -- the folks that are
9 listening?
10   A.   I don't know if there's any new
11 content in here, but a lot of it is
12 repeated from the presentation that we had
13 gone through a little bit earlier.
14   Q.   So, is this something that you
15 did regularly is go out and give this kind
16 of training on this material on controlled
17 substance purchasing limits?
18      MR. LAVELLE:  Object to form.
19   A.   We went out, if there was an
20 opportunity to, for a regional meeting,
21 and we would product -- conduct some sort
22 of training, again to keep a lot of these
23 items top of mind, refresh them, any of
24 the questions they may have.

Page 147

1    Q.   Had the company been doing
2 similar training before you took this
3 position?
4    A.   To my knowledge, yes.
5    Q.   So this isn't something new,
6 this information you're conveying here; is
7 that right?
8      MR. LAVELLE:  Object to form.
9    A.   I don't know if there's any new
10 information in here, specifically that
11 they have not seen in the past or that was
12 new for this particular presentation that
13 I had done, but the context of the
14 information or doing these trainings in
15 the field I've attended when I was out in
16 the field when I was a PDM.
17   Q.   The slides that I directed your
18 attention to, did you prepare those
19 slides?
20   A.   I did.  I think I prepared most
21 of it with input from Janet, the other
22 presenter.
23   Q.   Okay.  And, what did you rely on
24 in order to assemble the content for the

Page 148

1 slides that are reflected here?
2    A.   I don't understand the question.
3    Q.   It wasn't a good question.
4 That's why.
5      I'm just curious to understand
6 in order to -- to decide what information
7 these folks needed to hear, how did you
8 gather the material that you were going to
9 convey to them?
10      MR. LAVELLE:  Object to form.
11   A.   A lot of times we do our
12 trainings based off of hot topics, what's
13 in the news, what are current trends, some
14 things that we want to refresh that we may
15 have some opportunities on and things that
16 we have seen.
17   Q.   Okay.  So, other than that,
18 where did you get the material that's
19 included here?
20   A.   So, going through this
21 information, it looks like a lot of this
22 material was already previously existing.
23 Some of this material are articles that we
24 had pulled off of different websites to

Page 149

1 talk about the local trends or activity
2 that's out there.  Some of this has
3 actually been adopted from a -- a DEA
4 training that we had gone through where
5 the DEA had local trainings for
6 pharmacists in different states that we've
7 attended and they've published their
8 slides that we would utilize too.
9    Q.   One of the things you were
10 conveying here, and it's like the last
11 slide deck we looked at, you're sharing
12 information about McKesson's thresholds,
13 right?
14   A.   I'm sharing our processes in
15 relation to thresholds for controlled
16 substances we're ordering through
17 McKesson.
18   Q.   Well, let me direct your
19 attention to the second page of this
20 section of this exhibit.
21      Do you see where it says
22 "McKesson CSMP"?
23   A.   Yes.
24   Q.   Where did you get the

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  information about the CSMP?  That's the
2  Controlled Substance Monitoring Program
3  that McKesson had.
4      A.   This information is already
5  existing from a previous deck that we've
6  created that has our policies and
7  procedures in place.
8      Q.   So you're describing the
9  McKesson Controlled Substance Monitoring
10  Program, right?
11      A.   We're indicating that there is a
12  Controlled Substance Monitoring Program.
13      Q.   And you're describing how it
14  works, right?
15      A.   We're describing how it impacts
16  us in our stores so they understand what
17  their limits are when they are ordering
18  controls.
19      Q.   Which is how it works, right?
20      A.   How it works from the receiving
21  end at the store customer side.
22      Q.   Look at the next page "McKesson
23  Thresholds."
24          Again, this is, I think we

Page 151

1  looked at this to some extent earlier.
2  Again there's a description of base code
3  and active ingredient and so on.
4          This is that same information we
5  looked at in the prior exhibit, right?
6      MR. LAVELLE:  Object to form.
7      A.   This is the same information
8  that's communicated, yes.
9      Q.   Look at the next page.  It's
10  also entitled "McKesson Thresholds."  This
11  one is, the first bullet below that will
12  help you identify it, is:  Based on the
13  highest month's movement in the last 12
14  months.
15          Do you see that?
16      A.   Yes.
17      Q.   And this is Bates ending '29916.
18          I just want to direct your
19  attention to the last large bullet there.
20  You see where it says:  Threshold limits
21  are based on the date the medication was
22  ordered.
23          What are you conveying there?
24      A.   We're conveying the calendar

Page 152

1  month.
2          So, in this scenario, a
3  threshold is met for a month.  Even if I
4  am not expecting my next order until the
5  next month, if I place that order on the
6  last day of the previous month where my
7  threshold's exceeded, that order will
8  still be omitted.
9      Q.   The next slide is Bates ending
10  '29917 "Threshold Accommodations."  We
11  talked about a similar slide in the last
12  deck.
13          I want to direct your attention
14  to "Warehouse item out of stock."  I think
15  we talked about that in the prior exhibit.
16          Do you see where it says:
17  McKesson will be advised to adjust the
18  threshold to accommodate our business
19  needs.
20          Do you see that?
21      A.   Yes.
22      Q.   That's the similar concept we
23  talked about earlier, right?  Business
24  needs, right?

Page 153

1      A.   When our store is out of stock
2  and the distribution center cannot supply
3  because they're out of stock and we need
4  to get through a different vendor, we
5  haven't traditionally ordered from them,
6  so their thresholds may limit them on
7  getting what they need for their patients.
8  So that's what we're calling out here.
9      Q.   That you have not traditionally
10  ordered from them?
11      MR. LAVELLE:  Object to form.
12      A.   Items that we order from our
13  warehouse, that's our sole -- primary
14  supplier.  If our primary supplier is out
15  of stock, we have to order from McKesson,
16  which is our secondary outside vendor.
17          So, in the situation, if I
18  normally get my supply through the
19  warehouse, I now have to order through a
20  vendor, I may need a temporary adjustment
21  because I haven't traditionally ordered
22  from there.
23      Q.   Look two slides later in this
24  section of the exhibit, Bates ending

Page 154

1  '29919.  "Alerts" is the heading.
2      Do you see that?
3      A.  Yes.
4      Q.  I think this is a similar slide
5  as we talked about earlier, and that
6  alerts is, I think you said earlier, this
7  is a McKesson alert, right?
8      A.  This is an alert how our stores
9  will know that they are approaching their
10 threshold or that they will not be
11 receiving that product, because a lot of
12 times, our stores are waiting for that
13 medication for a patient and they don't
14 know why it's not coming or what's
15 happening, is it just not coming in
16 because somebody didn't order it.  But
17 this will tell them hey, you did order it.
18 It's just not coming because you're at
19 that threshold.
20     Q.  Okay.  So, does the pharmacy
21 then receive a notification when they pass
22 the 75 percent of their threshold for that
23 month?
24     A.  It's printed on their invoices.

Page 155

1      Q.  Okay.  And then you say in the
2  second bullet here:  Thresholds can be
3  adjusted for individual base codes.
4      Do you see that?
5      A.  Yes.
6      Q.  This is a similar concept we
7  talked about in the prior exhibit, right,
8  about how you can adjust for business --
9  individual base codes, right?
10     MR. LAVELLE:  Object to form.
11     A.  This is a threshold that we can
12 adjust for individual base codes, yes.
13     Q.  And you also say below that:
14 Requires legitimate business reasons.
15     That's the same concept we
16 talked about a moment ago, right?
17     A.  The concept is we need to
18 evaluate why we have the need for an
19 increase.
20     Q.  Okay.  And again, it requires
21 the approval from the pharmacy district
22 manager, right?
23     A.  Yes.
24     Q.  And it's coordinated corporately

Page 156

1  through Asset Protection, right?
2      A.  They would have to submit those
3  requests to me, yes.
4      Q.  And the term "corporately" means
5  corporate headquarters, right?
6      A.  Yes.
7      Q.  Okay.  Turn two pages later,
8  Bates ending '29921, if you would.  This
9  is "PDM Action For Threshold Increase."
10     Do you see that?
11     A.  Yes.
12     Q.  And again, PDM is pharmacy
13 district manager, right?
14     A.  Yes.
15     Q.  And it describes how -- what
16 information needs to be conveyed for a
17 threshold increase, right?
18     A.  Yes.
19     Q.  And in the third bullet it says:
20 Reason for the adjustment.
21     And we talked about this a bit
22 ago.  The same examples given here, new
23 pain clinic, et cetera, will need
24 prescribing MD data for review.

Page 157

1      Right?
2      MR. LAVELLE:  Object to form.
3      A.  That tells them that there will
4  be additional action steps, that's the
5  reason.
6      Q.  And again, I think you testified
7  earlier that --
8      MR. LAVELLE:  I think the
9  witness was not finished answering
10 before you interrupted her.
11     MR. SIMMER:  Well, John, I
12 wasn't finished with my question
13 either.  So you're interrupting.
14 Please stop.
15 BY MR. SIMMER:
16     Q.  Were you done with answering the
17 question?
18     A.  I wanted to say that this is an
19 indication that they will need additional
20 action if one of the reasons, for example,
21 is a new clinic type.
22     Q.  And, so, you're just using that
23 as an example of how this process would
24 work, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    A.   Yes.  That it's not automatic
2  just because you give us a reason, you
3  will get a threshold increase.
4    Q.   Could you turn two pages later,
5  please?  The slide entitled "Legitimate
6  Reason"?  And it's Bates ending '29923.
7        Do you see that?
8    A.   Yes.
9    Q.   Can you tell us what the purpose
10 of this slide is?
11   A.   Education to our field team.
12   Q.   It almost looks like it's a --
13 an example of an email, right?  It looks
14 like the body of an email with the subject
15 line "Re oxycodone," doesn't it?
16       MR. LAVELLE:  Object to form.
17   A.   It would appear to be, yes.
18   Q.   Do you know if you took this
19 from an actual email?
20   A.   Yes.
21   Q.   So this was a request for a
22 threshold increase that came in and you
23 used that as a teaching example, right?
24   A.   Yes.  This is an example of

Page 159

1  something that was sent in from a field
2  team requesting a threshold that we wanted
3  to call out.
4    Q.   Was it a good example of a
5  threshold increase?
6    A.   This was not a good example of a
7  threshold increase.
8    Q.   Can you go through all of the
9  things that were wrong with this threshold
10 increase?
11   A.   So, we had just attended a lot
12 of different trainings and we talk about
13 red flags for the area.  So, a couple of
14 flags that we saw when I was reading this
15 particular email talked about other
16 pharmacies are refusing prescriptions for
17 this patient.  So usually indicates hey,
18 why is somebody else turning these
19 patients away?
20       Then other pieces are the
21 doctors and the patients are not from the
22 local geographic area.  They are coming in
23 from out of state, from DC, Maryland and
24 Virginia and we're the only pharmacy that

Page 160

1  seems to be approached by these patients.
2        So, they gave us the different
3  patient -- the prescribers that we're
4  looking at, but those were some of the big
5  ones that immediately said let's take a
6  look at this and let's determine why we're
7  getting this request.
8    Q.   So, in this slide presentation,
9  you used this as an example to show the
10 folks in the field that this is a
11 threshold that would not be approved?
12   A.   This would be a threshold where
13 we would do our due diligence.  This would
14 be we would need to go through a lot of
15 different analytics that we talked about.
16 We would look at our dispensing history.
17 We'd look at these doctors that have
18 already been supplied to us, are they
19 actual prescribers, because ultimately, we
20 want to take a look at the quantities that
21 are being dispensed, how they're
22 dispensing it, and not only is it do we
23 increase this threshold or not, but do we
24 need to do something else from an

Page 161

1  education perspective for that field team,
2  so.
3    Q.   Okay.  Turn to the next page, if
4  you would.  This is Bates ending '29924.
5  And this is also "Threshold Increase."
6        Do you see that?
7    A.   Yes.
8    Q.   This, too, looks like it's taken
9  from an actual threshold increase request,
10 right?
11       MR. LAVELLE:  Object to form.
12       MR. SIMMER:  Can I just ask you
13 what was objectionable about that,
14 John?
15       MR. LAVELLE:  I believe that you
16 were mischaracterizing the -- what the
17 document is.
18       MR. SIMMER:  Okay.
19   A.   I believe this is an email that
20 was received.
21   Q.   So you took this out of an
22 actual threshold increase request, right?
23   A.   Yes.
24   Q.   And, again, it's an example that

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  you wanted to teach the -- those in
2  attendance at this training about how this
3  process worked, right?
4    A.   I wanted to bring awareness to
5  our teams because we have pharmacists that
6  are there taking care of our patients, but
7  they may not be aware of all of the
8  different trends that we are aware of that
9  we hear in the news that we go to DEA
10  conferences about, and this is an example
11  of an education where there's a patient
12  that's requesting all of this medication.
13    Q.   So, what about this particular
14  request were you using as an example in a
15  training to teach the attendees?
16    A.   We were looking at the quantity
17  of the medications and the type of
18  medications that he was receiving, just
19  the sheer number of tablets that he would
20  be taking over a daily basis.  Those would
21  be some things that we wanted to call out,
22  and whether this is the right thing for
23  that patient, because if we're dispensing
24  this type of therapy, as a pharmacist, we

Page 163

1  want to realize is it possible for our
2  patient to be taking this quantity of
3  medication; is it going to increase their
4  outcomes; or is it going to have more
5  risks for their health; and have we really
6  counseled this patient, work with the pain
7  management team to make sure this is the
8  right therapy before we automatically say
9  we need a lot of increases for different
10  bases for the store.
11    Q.   So, if the patient said yes, it
12  is, I need this, you call the doctor and
13  the doctor said yes, this is what I
14  prescribed, what then?
15    A.   So, in this particular scenario,
16  I do recall that we had partnered with our
17  clinical pharmacist and our drug
18  information center just to go through a
19  typical patient, is this possible, is this
20  normal, would this be in therapeutic range
21  for a patient, and review this information
22  because this is not a existing customer
23  that we've been servicing.  We want to
24  make sure that we're providing the right

Page 164

1  treatment and care for this patient as the
2  first time we're encountering this -- this
3  patient, and at the end of the day,
4  whether it was deemed clinically
5  appropriate based off of consulting with
6  our drug information center and some
7  clinical pharmacists.
8    Q.   So, this is an example of the
9  kind of clinical review that you were
10  talking about earlier, by looking at the
11  ordering history, right?
12    A.   This is an example of a
13  patient-related request for a threshold
14  increase and how we reached out to
15  clinical pharmacists and different teams
16  that we have access to to review this
17  information.  Not necessarily dispensing
18  data, but looking for a medical opinion, a
19  clinical professional opinion.
20    Q.   Okay.  That wasn't exactly my
21  question.
22       Is this the kind of clinical
23  review that we were talking about earlier
24  on the earlier exhibit?

Page 165

1    A.   This is --
2       MR. LAVELLE:  Object to form.
3    A.   This is not a clinic protocol.
4  That's a physical site review about
5  prescribers and store.
6       This is a review on therapy and
7  medical need for this patient and really
8  helping that pharmacist review their
9  professional responsibility.
10    Q.   The next slide, if you'd look at
11  that, it's Bates ending '29925 and the
12  heading is "DEA Activity."
13       Do you see that?
14    A.   Yes.
15    Q.   And then it has an example of a
16  breaking news headline "DEA Serves
17  Suspension Order on Walgreen Distribution
18  Center in Jupiter, Florida."
19       Do you see that?
20    A.   Yes.
21    Q.   Why were you giving this
22  information to the attendees at this
23  training session?
24    A.   An education on what is in the

Page 166

1  news, what is happening out there, what
2  are some of the problems that we encounter
3  as we are health care providers taking
4  care of our patients and scenarios where
5  we can learn from if it goes wrong.
6      Q.   Could you turn to this, this
7  several pages back, and this is going
8  to -- the heading of the slide is "Report
9  Suspicious Activity."
10         For the record, it's Bates
11  ending '29934.
12         Do you see right below that it
13  says:  Your pharmacist should report these
14  trends to the PDM.
15         Do you see that?
16     A.   Yes.
17     Q.   And what are you conveying in
18  this slide?
19     A.   So, if they see anything that is
20  a flag, a prescriber that they don't feel
21  comfortable with, somebody that they've
22  already been turning away prescriptions
23  for, a lot of out-of-state activity,
24  anything that they didn't feel comfortable

Page 167

1  and they did not fill that prescription
2  because of professional judgment, report
3  that to our pharmacy district managers so
4  that we can funnel that information up so
5  that we know as a corporation if there's
6  something that we can review and put
7  tighter controls on, or at least be able
8  to take a look and if there's something we
9  can do systemically.
10     Q.   So, if there was a situation
11  which a pharmacist reported a trend like
12  this to the pharmacy district manager, do
13  they then -- are they obligated or
14  directed they're supposed to be
15  communicating that on up to you in Asset
16  Protection?
17         MR. LAVELLE:  Object to form.
18     A.   This is reported to Government
19  Affairs, as listed out here.
20     Q.   You're not included in that
21  chain?
22     A.   They can copy me, but we work in
23  conjunction with the department.  So, if
24  Government Affairs had received this

Page 168

1  information from a PDM, then they -- we
2  would share it if they needed me to review
3  any information.
4      Q.   Okay.  And it says under there
5  the PDM is supposed to do certain things,
6  and it says they're to conduct a store
7  visit, gather information, doctor
8  detailing, report to Government Affairs.
9         Can you just walk through what
10  each of those things is?
11     A.   If our pharmacy district manager
12  gets a question from our pharmacist, they
13  want to go down and do a store visit and
14  at least be able to talk to our associates
15  to understand what their concerns and that
16  part is our information gathering, get all
17  of the information in relation to why they
18  feel that this is suspicious activity,
19  whether they've got specific doctors,
20  specific clinic sites, what are their
21  dispensing trends, get us as much
22  information as possible so that we can
23  send that up to report to Government
24  Affairs and, if possible, if they do know

Page 169

1  where that physician site is, if they can
2  reach out to that doctor.
3         So, doctor detailing is
4  something that we do in the retail world
5  where we go and we let them know hi, you
6  know, I'm Sophia.  I'm the pharmacy
7  district manager up the block.  I just
8  wanted to let you know that if there's
9  anything that you need, just, you know,
10  reach out to us; what are your
11  disciplines; is there anything that you
12  need us to stock.  So that we can at least
13  get into that office, talk to the staff
14  there about our services that we provide
15  that we can take care of patients for, but
16  also to see the operations there and if --
17  have the opportunity to talk to that
18  prescriber so we can get some additional
19  information on the first feel from a
20  boots-on-the-ground perspective so that we
21  can send that to the corporate office.
22     Q.   So, that doctor detailing you
23  just described doesn't sound like actually
24  its intent was to review whether there was

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 any suspicious activity going on in that
2 doctor's office, right?
3     A.   We don't know what we don't
4 know.  So, when you walk into that site,
5 you'll know if it's a legitimate practice
6 or if it's not.
7         I think it's just a baseline of
8 whether we feel that that is the normal
9 doctor that you and I would go to for our
10 annual physical.
11     Q.   That wasn't exactly my question.
12 I didn't ask it well.
13         It sounds like what the doctor
14 detailing is is selling Rite Aid's
15 services and not so much looking for
16 suspicious activity.
17         Am I right?
18         MR. LAVELLE:  Object to form.
19     A.   We call that activity or that
20 thing that we do, to go out there and
21 speak to physicians, doctor detailing
22 because we don't want to go and knock on
23 the door and say hey, I think you've got
24 suspicious patients coming in here and,

Page 171

1 'cause it could be a patient or it could
2 be a prescriber.  We don't know based off
3 of the information that we have.  That's
4 what we're trying to gather.  And the best
5 way is to let them know that we are the
6 local chain here and, you know, here's my
7 contact information so that we can gather
8 some more information or at least develop
9 a relationship where we can ask more
10 questions.
11     Q.   The next bullet says they're
12 supposed to report to Government Affairs.
13         Do you know what information is
14 supposed to be reported to Government
15 Affairs?
16     A.   Anything that they gather.  So,
17 what they --
18     Q.   Anything, good, bad,
19 indifferent?
20     A.   Yes.
21     Q.   Everything gets reported to
22 Government Affairs?
23     A.   If there is a suspicious
24 activity, they do these steps and then

Page 172

1 they send the recap up to Government
2 Affairs.
3     Q.   Even if it's a positive recap,
4 it goes to Government Affairs?
5     A.   If it was a positive recap, it
6 probably wouldn't have been suspicious
7 activity.
8         If there was any indication that
9 there was suspicious activity and they
10 required follow-up, good or bad, the
11 information would come up.
12     Q.   And it says right below that:
13 Death/OD.
14         What is that?
15     A.   If a store team is reported from
16 whatever source, it may be that they are
17 aware of a patient that they had dispensed
18 medications to and it resulted in a death
19 or that patient had overdosed, we want to
20 make sure we're filing a risk management
21 claim.
22     Q.   Okay.  Could I direct your
23 attention to the next slide?  The heading
24 is "Clinic Protocol."  And it's, for the

Page 173

1 record, Bates ending '29935.
2     A.   Okay.
3     Q.   I think this is very similar to
4 what we looked at in the prior exhibit.
5         Am I right?  This is the same
6 clinic protocol process you described in
7 the prior exhibit we looked at a little
8 bit ago?
9         MR. LAVELLE:  Object to form.
10     A.   Generally, yes.  It looks like
11 there may have been some changes or edits
12 to it, but generally it's the same
13 process.
14     Q.   What are the changes?
15     A.   It looks like they called out
16 that we, if possible, take pictures of the
17 office if you're in there or outside.
18     Q.   And it says covertly.
19         Why covertly?
20     A.   When you're on the outside, we
21 just want to take a picture.  If you're
22 inside, it would just be weird if you're
23 taking out your camera or your lens and
24 just snapping away.  So, if possible, we

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  don't want them to go out of their way to
2  do it, but if they can and there's
3  something that they see that seems off,
4  take a picture of it.
5      Q.  Again, I'll just ask you a few
6  questions about the fourth bullet:
7  Contact local DEA/BOP/medical board to
8  inquire about complaints/issues/concerns.
9          I think that's verbatim what we
10 talked about in the prior exhibit, right?
11     A.  Yes.
12     Q.  I just want to make sure, do you
13 know of any instance when there had been a
14 contact to the DEA as a part of a clinic
15 protocol?
16     A.  I do know that there has been
17 contacts with the DEA.
18     Q.  Okay.  And by whom?
19     A.  I know Janet has made calls out
20 to our contacts in different boards or
21 DEAs.
22     Q.  Do you know where the pharmacies
23 were located?
24     A.  Not offhand, no.  I'm not aware.

Page 175

1      Q.  Okay.  Do you know if there were
2  any reports to the DEA for Ohio, Michigan,
3  Illinois, Florida or West Virginia?
4          MR. LAVELLE:  Object to form.
5      A.  I'm not aware of any reports
6  were made.
7      Q.  What about just Ohio itself, do
8  you know of any reports for the clinic
9  protocol in Ohio?
10     A.  It would not have been done by
11 me, so I could not speak to it.  I don't
12 know.
13     Q.  What about Summit County, Ohio,
14 do you know about any reports in Summit
15 County, Ohio?
16         MR. LAVELLE:  Object to form.
17     A.  Again, not something that I
18 would have done.  So I'm not aware if it
19 has or has not been done.
20     Q.  What about Cuyahoga County,
21 Ohio, any reports in this clinic protocol
22 process there?
23         MR. LAVELLE:  Object to form.
24     A.  Not my department.  I don't know

Page 176

1  if something has or has not been done.
2      Q.  Okay.  What about in Cleveland,
3  Ohio, any reports in this clinic protocol
4  process there?  Do you know anything about
5  that?
6          MR. LAVELLE:  Object to form.
7      A.  Not in my department.  I am not
8  aware if anything has or has not been
9  done.
10     Q.  Could you turn to the next page,
11 please?  This, too, is entitled "Clinic
12 Protocol," and it's Bates ending '29936.
13         Are you on the same slide with
14 me?
15     A.  Yes.
16     Q.  And it says:  Deemed clinically
17 appropriate.  And there's some information
18 conveyed there.
19         So, is this a description of the
20 process to -- to determine whether the
21 business is clinically appropriate, right?
22     A.  This is to determine if we were
23 going to increase the threshold.
24     Q.  Okay.  And, the first thing it

Page 177

1  says you're to assess the volume of new
2  business generated.
3          How is that relevant?
4      A.  That's going to determine what
5  the threshold increase request will be.
6      Q.  So, help me understand that.
7          So, if it's a very large
8  threshold increase, that volume of
9  business is a good thing or a bad thing?
10         MR. LAVELLE:  Object to form.
11     A.  It's neither a good or bad
12 thing.  It's what the patients need.
13     Q.  But, again, I'm trying to
14 understand how the volume of new business
15 generated is relevant to determine
16 clinical -- whether it's clinically
17 appropriate to increase the threshold.
18     A.  So, the context is once we have
19 deemed that the threshold increase is
20 clinically appropriate, they need it and
21 we're going to authorize a threshold
22 increase request, we have to assess how
23 much is needed for them to take care of
24 those patients.  So, we don't just open up

Page 178

1  the floors and say you can order as much
2  as you need.  We want to see, well, how
3  many patients would this person see and
4  what would be a reasonable threshold to
5  accommodate these new patients that are
6  coming in.  So that's what we're looking
7  at from a generated perspective because we
8  have to determine what -- what base codes
9  and what threshold increase amount so that
10  we're not just taking everything off the
11  ceilings and saying order what you want
12  and then we'll fix it later.  We want to
13  do it strategically ahead of time.
14      Q.   So, if the pharmacy district
15  manager comes in and says I need, just
16  pick a number, 30 percent increase, what
17  the expectation here is, okay, I need to
18  know how many patients and what their
19  prescribing needs are to understand why
20  you need 30 percent.
21      Is that a fair description of
22  what you just talked about?
23      MR. LAVELLE:  Object to form.
24      A.   Can you repeat that?

Page 179

1      Q.   Probably not.
2      MR. SIMMER:  I think I'll have
3  to have the court reporter read it
4  back.  How is that?
5      (The requested portion of the
6  record was read by the Court Reporter.)
7      MR. LAVELLE:  Same objection.
8      A.   No.  We would have done that
9  clinically appropriate or deemed whatever
10  it is prior to us getting to this phase.
11  So, this phase is once we know that there
12  is a legitimate need, we need to service
13  these patients in this market and we've
14  got to assess a volume.  If we think that
15  this is going to increase our script count
16  by, let's say, five percent, then how much
17  of that would be in this particular
18  control base and how many tablets do we
19  want to add into that threshold.
20      So, the clinically appropriate
21  piece is the first part of it.  This part
22  is really just evaluating the limits that
23  we need to increase.
24      Q.   Okay.  You used a term there I'm

Page 180

1  not sure you've used prior.  You said this
2  particular control base.
3      What is that?
4      A.   Just the base code for that
5  controlled substance item.
6      Q.   Okay.  Direct your attention to
7  the very last page of the entire deck.  I
8  think that should be easy for you to find.
9      A.   Yes.
10      Let me just keep this in order.
11      Q.   Actually, second to last page.
12  Sorry.  Not -- not the ones that I -- of
13  the entire exhibit.  Not -- yes, there you
14  are.
15      A.   Okay.
16      Q.   You see your name there?
17      A.   Yes.
18      Q.   Okay.  And, so, you're directing
19  people if they had questions they could
20  call you.
21      Is that right?
22      A.   Yes.
23      Q.   So, what kind of questions did
24  you get when you made this offer that

Page 181

1  people should call you?
2      A.   I don't recall offhand what type
3  of questions.
4      Q.   Did you get questions?
5      A.   I don't remember.
6      Q.   Okay.
7      A.   From this presentation, I don't
8  remember.
9      MR. SIMMER:  This is a good time
10  for our lunch break, if that's okay.
11      MR. LAVELLE:  Okay.
12      MR. SIMMER:  Go off the record.
13      THE VIDEOGRAPHER:  The time is
14  now 12:38 p.m.
15      We are going off the record.
16      (Luncheon recess taken.)
17      - - -
18    A F T E R N O O N   S E S S I O N
19      - - -
20      THE VIDEOGRAPHER:  The time is
21  now 1:29 p.m.
22      We are back on the record.
23      MR. SIMMER:  So, we'd like to
24  just put on the record that we're

Page 182

1  going to be using a few exhibits that
2  actually came out of the McKesson
3  production, and this is something
4  that's been a regular subject in other
5  depositions.
6       And the protocol we would
7  suggest is this. And this is dealt
8  with in CMO-2 33(h). That to the
9  extent that the deponent authored,
10 prepared or previously reviewed or
11 received the information, it can be
12 used in a deposition even though it
13 came out of another defendant's
14 production.
15      So, our proposal is that for
16 these exhibits, and they're all
17 McKesson exhibits, no other defendant,
18 we'll send them to McKesson's counsel.
19 And those communications or exhibits
20 where Ms. Novack is on the entire
21 email string, we propose to introduce
22 that exhibit into evidence without any
23 changes whatsoever, but some of the
24 exhibits the parties -- the McKesson

Page 183

1  employees then go on and have a
2  back-and-forth interchange in which
3  Ms. Novack was not included. How
4  we've handled that is to simply redact
5  all of that in the spirit of the
6  CMO 33(h).
7       So, if there are any concerns
8  about that, we'd like to go ahead and
9  get that on the record now. If that
10 proposal is acceptable, get that on
11 the record as well.
12      MS. CHARLES: So, this is Amber
13 Charles for McKesson Corporation.
14      I will note that our
15 understanding of the CMO is that for
16 documents where Ms. Novack does not
17 appear, we should have been granted an
18 opportunity several days ago to review
19 those documents and essentially allow
20 their use in an unredacted format.
21 There may well be, I haven't seen the
22 documents, but there well may be an
23 interest of completeness.
24      You know, it is in McKesson's

Page 184

1  interest that the document be
2  introduced, but we are where we are.
3  So I'm happy to take a look at those
4  documents and I will lodge any
5  objections for the record.
6       MR. SIMMER: And for the record,
7  we have just sent you those documents.
8  If you want us to go off the record
9  right now so you can review those
10 documents and you can come back on and
11 make your objections, or we can
12 continue on with the questioning and
13 you can lodge your objection as to
14 each exhibit as it's entered into the
15 examination.
16      MS. CHARLES: Well, I agree with
17 your reading of the CMO as it relates
18 to documents where Ms. Novack is on.
19 So I'm happy for you -- I don't want
20 to hold up everyone's day. So I'm
21 happy for you to proceed.
22      And as for the documents where
23 you've made redactions, I will have to
24 take a look and I'll email your

Page 185

1  colleague back. I think that might be
2  the sufficient way.
3       MR. SIMMER: Okay. Let's
4  proceed that way. And if, for some
5  reason, you have concerns, we can deal
6  with that at the time.
7       MS. CHARLES: Right.
8       (Rite Aid - Novack Exhibit 6,
9  email chain ending September 16, 2011,
10 Bates No. MCK_MDL_00632923 to
11 MCK_MDL_00632925, was marked for
12 identification, as of this date.)
13 BY MR. SIMMER:
14 Q.   The court reporter is handing
15 you what she has marked as Novack
16 Exhibit 6.
17      MR. SIMMER: I'll identify it
18 for the record as MCK_MDL_00632923
19 through '632925. And for the record
20 too, this is an email string. The
21 first in the string, which is on the
22 third page, is an email dated
23 September 12th, 2011 from Jenna
24 Nichols at McKesson to a group of

Page 186

1 individuals, including Ms. Novack, and
2 her maiden name is Lai, and the
3 exhibits, the original email, was sent
4 to her. And then the string then
5 continues on over several days. And
6 then the last one is actually from Ms.
7 Novack dated September 16, 2011. So
8 the entire string includes the
9 witness, even though it's a McKesson
10 document.
11 BY MR. SIMMER:
12 Q. Could I -- ma'am, have you had a
13 chance to just glance at this?
14 A. I'm looking through it now.
15 Q. Pardon?
16 A. I said I'm looking through it
17 now.
18 Q. Okay.
19 A. (Perusing document.)
20 Okay.
21 Q. I direct your attention to the
22 email that began this -- begins this
23 string from Ms. Nichols to you and other
24 individuals. It's the one dated September

Page 187

1 12, 2011 at 9:45 a.m.
2 A. Yes.
3 Q. And you see where she says:
4 Team, Please see the attached daily CSMP
5 report for Rite Aid. Let me know if we
6 need to make any adjustments to the
7 current thresholds.
8 Do you see that?
9 A. Yes.
10 Q. Can you just explain what the
11 process here is that she's talking about
12 here, the daily CSMP report?
13 MS. CHARLES: Objection;
14 foundation.
15 MR. SIMMER: That's an improper
16 objection.
17 MS. CHARLES: I'm sorry. I
18 didn't realize you were asking her a
19 question about McKesson conversations.
20 She is not a McKesson employee.
21 MR. SIMMER: The objection is as
22 to form.
23 MS. CHARLES: Form or
24 foundation.

Page 188

1 Special Master Polster Kelly has
2 ruled in previous depos that he
3 attended we are able to state the
4 basis for our objection.
5 BY MR. SIMMER:
6 Q. You can answer.
7 A. This report is provided to us
8 daily. It's an automatic report that
9 showed what our thresholds were being
10 approached by some stores.
11 Q. So, on the 12th -- is it every
12 day of the month the report comes through?
13 A. I don't recall specifically. I
14 believe it was daily. I forget if it's
15 during the business days or if it's
16 weekends also.
17 Q. And you had begun your job as a
18 director of Pharmacy Loss Prevention the
19 prior month; is that right?
20 A. The end of August.
21 Q. So, how is it that you at
22 Rite Aid were using the CSMP reports?
23 A. We received them and we received
24 them as a daily report. We didn't

Page 189

1 necessarily take any actions with
2 reviewing thresholds or requesting
3 adjustments at that point.
4 Q. I direct your attention to the
5 next email sent at 12:45 p.m.
6 Actually, let me skip that.
7 The email that is sent at 1:51
8 p.m. from Ms. Nichols to you. It's in the
9 middle of the page.
10 Do you see where I'm talking?
11 A. Yes.
12 Q. You see where she says: Hi
13 Sophia. Would you be able to provide more
14 information regarding the oxycodone
15 demands at store 3182, please? Michael
16 Oriente is requesting this information.
17 Do you see that?
18 A. Yes.
19 Q. And, do you know who Michael
20 Oriente is?
21 A. Yes.
22 Q. Who is he?
23 A. He works for McKesson.
24 Q. And the email right above that

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1   is your email to a Mary Menegay.
2       Did I pronounce her name
3   correctly?
4       A.   Yes.
5       Q.   And, who is she?
6       A.   She's the district manager in
7   that location, pharmacy district manager.
8       Q.   And your email is at 2:13 p.m.
9   So just about 20 minutes later.  You say:
10  Hi Mary.  Story 3182 is hitting through
11  oxycodone ordering threshold through
12  McKesson very early in the month.  Please
13  reach out to the store and see why they
14  are placing large orders and if it's
15  needed.
16      Do you see that?
17      MR. LAVELLE:  Object to form.
18      A.   I see that.
19      Q.   Did I read that correctly?
20      A.   Yes.
21      Q.   And, what is it you're
22  requesting Mary do here?
23      A.   I'm requesting for her to take a
24  look and review with the store if this is

Page 191

1   a necessary amount that they're ordering.
2       Q.   So, is this part of that
3   threshold review process that we had some
4   testimony about this morning?
5       A.   So, this is something I looked
6   at in September.  I was very new to the
7   role, so this is probably one of my first
8   instances with reviewing thresholds and I
9   had asked her for some more information,
10  as she was ask -- as we were getting asked
11  from McKesson.
12      Q.   And Mary is the district manager
13  that is in charge of this particular
14  pharmacy 3182, correct?
15      A.   She is a pharmacy district
16  manager.  Based off of the email directing
17  to her, my assumption is she was
18  responsible for that store at the time.
19      Q.   Okay.  And later that day, 4:16
20  p.m., she sends you an email saying:
21  The orders are needed.  There is increased
22  activity from a local pain management
23  doctor.  CX who were previously filling at
24  store 3151 are now coming to 3182.  Can

Page 192

1   the threshold be increased?
2       Do you see that?
3       A.   Yes.
4       Q.   What is CX?
5       A.   Customers.
6       Q.   So, we went through a couple
7   exhibits this morning about the threshold
8   increase process.
9       A.   Yes.
10      Q.   Is that what she's doing here?
11      A.   She's reviewing the information.
12      MS. CHARLES:  Object to form.
13      A.   She's reviewing the information
14  from the store and she's providing that
15  information to me.
16      Q.   And you re -- you see the email
17  at the top of the page at 5:16 p.m. back
18  to her you say:  Yes, but I will need the
19  MD's name, DEA number and practice site.
20  I will also need the percentage increase
21  you would like to request for the store.
22      Did I read that correctly?
23      A.   Yes.
24      Q.   Now, is this the process that

Page 193

1   you were talking about here about getting
2   more information in order to begin your
3   due diligence on the threshold increase?
4       MR. LAVELLE:  Object to form.
5       A.   So, this is information that we
6   were requesting so that I can review.  The
7   information that we are presented in the
8   presentations previously are as we go
9   through more and more of these, we had
10  streamlined and made our review process
11  even more efficient.
12      Q.   So had we begun the protocol,
13  the clinic protocol yet at this point?
14      A.   The clinic protocol document
15  that we had sent out for each PDM to
16  review and do was not typed up into a form
17  for us to put out there at this time.  But
18  we were doing facets of it so that at that
19  point when we were doing the training, we
20  wanted to make it standardized.  Instead
21  of in different places as we were going
22  through these processes, we made sure we
23  had a standardized way to look at these
24  the same way every time even if I was no

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 longer in position.
2 　　Q.　So, in September 2011, you did
3 not actually have this protocol form that
4 you talked about earlier, right?
5 　　A.　Not the form typed out.  In --
6 on the side that we were working on for
7 McKesson.  So, separate from our supply
8 chain and the processes that we were doing
9 through the supply chain, this is
10 McKesson, and for McKesson threshold
11 reviews, we didn't have a specified clinic
12 protocol form, but we were following those
13 processes.
14 　　Q.　When did the clinic protocol
15 form for McKesson get put in place?
16 　　MS. CHARLES:  Objection;
17 foundation.
18 　　THE WITNESS:  Does that mean
19 I --
20 　　MR. LAVELLE:  If you understand
21 the question, you should answer it.
22 　　A.　Can you repeat the question?
23 　　Q.　When did the clinic protocol
24 form for McKesson get put in place?

Page 195

1 　　MS. CHARLES:  Same objection.
2 　　A.　The clinic protocol form, I
3 don't remember exactly when we put it to a
4 piece of paper and started sending it out
5 as a specified detailed checklist for them
6 to do for us.  I can't give you the exact
7 date.
8 　　Q.　But it's correct that it was not
9 in place at this time?
10 　　A.　We didn't have that checklist in
11 a paper form to send out at this time.
12 　　Q.　Could you look at the next in
13 the email string.  Ms. Menegay responds to
14 you the next day at 8:39 a.m.
15 　　Do you see that?
16 　　A.　Yes.
17 　　Q.　And she gives the name of the
18 doctor, Dr. Adolph Harper, Junior.
19 　　Do you see that?
20 　　A.　Yes.
21 　　Q.　██████████████  birth
22 place Memphis, Tennessee, birth county
23 practice 2569 Romig Road, Suite 201,
24 Akron, Ohio, 44320.

Page 196

1 　　Do you see that?
2 　　A.　Yes.
3 　　Q.　And you also see where it has
4 his residence as Copley, Ohio 44320,
5 County Summit.  Professional education
6 school 025010 University of Mississippi
7 School of Medicine, graduated 03/04/76.
8 　　Do you see that?
9 　　A.　Yes.
10 　　Q.　And then also below that it has
11 license and registration information,
12 credential license type, initial licensure
13 date, expiration date status, and it has
14 ██████ doctor of medicine, 02/14/1980,
15 10/01/2012 active, ██████ alternate
16 supervising physician 01/31/2009 inactive.
17 　　Just on that license and
18 registration information, if you could,
19 can you explain what that information is
20 conveying?
21 　　MR. LAVELLE:  Object to form.
22 　　A.　Here it shows that they have an
23 active doctor of medicine to practice
24 license there and an alternate supervising

Page 197

1 physician, that license is inactive 2009.
2 　　Q.　So this shows that the license
3 is inactive, correct?
4 　　A.　It shows that they have an
5 active license doctor of medicine.
6 　　Q.　But the alternate supervising
7 physician part of it is inactive.
8 　　Is that right?
9 　　A.　That may be another license that
10 he has or a certification that he has
11 that's no longer active, but he does have
12 a license to practice medicine.
13 　　Q.　Okay.
14 　　A.　Active.
15 　　Q.　And right below that, Ms.
16 Menegay says:  Please increase 15 percent.
17 　　Do you see that?
18 　　A.　Yes.
19 　　Q.　Has she in her email given any
20 explanation, reason for the increase?
21 　　A.　Her explanation was in the
22 previous email, that we have customers
23 that are coming to this location.
24 　　Q.　Is that a legitimate reason?

Page 198

1    A.   This is the reason that she's
2  giving me that she needed an increase.
3    Q.   But in that slide presentation
4  we looked at this morning, you had two
5  examples of what you -- you were giving to
6  the attendees of reasons that were
7  legitimate.
8        I'm asking is -- is what she's
9  giving here, is that a legitimate reason
10 for a threshold increase of 15 percent?
11       MR. LAVELLE:  Object to form.
12   A.   So, what we talked about this
13 morning, a legitimate reason required a
14 lot of analysis and review on the back
15 end, which does not portray what we were
16 looking at here.  And to refer back to
17 something from 2011, I don't know if at
18 the time we felt that that was legitimate
19 or not.  I would need to see my records
20 and see what else we had done in relation
21 to this review.
22   Q.   So, is it the case that what was
23 a legitimate reason at Rite Aid changed
24 over time?

Page 199

1        MR. LAVELLE:  Object to form.
2    A.   The legitimate reason is based
3  upon the results of our review over a lot
4  of different flags that we look for.  So,
5  it's not just one sentence that she would
6  send up and say I've got customers and
7  that's a legitimate reason.  It's not I've
8  got this particular site that's opening up
9  and I'm getting a lot of business is a
10 legitimate reason.
11       So, for me to determine if,
12 based off of this, I said that this was
13 legitimate or not, I'd have to look at the
14 rest of the context of information that we
15 had looked at that may not be portrayed in
16 this email.
17   Q.   That's not what you just
18 testified.  You said, I'll read it
19 directly out of the transcript:  "And to
20 refer back it something from 2011, I don't
21 know if at the time we felt that was
22 legitimate or not."
23       My question is does what was
24 legitimate or not change over time?

Page 200

1        MR. LAVELLE:  Object to form.
2    A.   Whether it's legitimate or not,
3  again, the term is determined by a lot of
4  different information.  So, the legitimacy
5  doesn't change.  It's what we have looked
6  at.
7        And, in this particular case, I
8  don't have much to look at except for this
9  email.  So I can't answer that question
10 whether I had determined this was
11 legitimate or not based off of that
12 specific email that she had sent me or if
13 I had different conversations with her.
14       So, I'm not too sure if that is
15 what you're asking.
16   Q.   Do you recall this situation?
17   A.   I don't recall the situation
18 specifically, no.
19   Q.   Okay.  Her email right above
20 that at 12:02 later that same day, 12:02
21 p.m., do you see where you say:  Hi Mary.
22 Need DEA number for physician and then
23 I'll be able to send in.  Thanks.  Sophia.
24       Do you see that?

Page 201

1    A.   Yes.
2    Q.   You don't ask her for any kind
3  of reason of any kind, do you, beyond what
4  she already articulated in the prior
5  email, right?
6        MR. LAVELLE:  Object to form.
7    A.   I can't recall if I've asked her
8  outside of an email.
9    Q.   Beyond what's in this email, do
10 you have any recollection of asking Mary
11 for any additional information about Dr.
12 Harper and this particular situation?
13   A.   I don't recall this particular
14 situation or this email.  So I don't
15 recall if I had done something differently
16 outside of this email in relation to
17 asking her.
18   Q.   Let me then point you to the
19 email right above that from you to Jenna
20 Nichols at McKesson, copying Michael
21 Oriente later that day at 3:23 p.m.  So
22 three hours later.
23       You see where you say:  Hi
24 Jenna.  Here's the information requested.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 The PDM would also like to request a 15
2 percent increase for base code oxycodone.
3 Thanks, Sophia.
4        Do you see that?
5    A.  Yes.
6    Q.  So, here you are with the
7 information that Mary's given you going
8 back to McKesson and asking for a 15
9 percent increase, right?
10   A.  Correct.
11   Q.  Are you familiar with Dr.
12 Harper?
13   A.  Not personally.
14      (Rite Aid - Novack Exhibit 7,
15   pleading in Case No. 5-14CR096, was
16   marked for identification, as of this
17   date.)
18 BY MR. SIMMER:
19   Q.  I'll identify for the record
20 that the court reporter has handed you
21 Exhibit 7, Novack 7.  It's a pleading
22 styled United States of America versus
23 Adolph Harper, Junior, et al.  The -- this
24 is Case No. 5-14CR096.  The time stamp is

Page 203

1 March 25th, 2014.  The document is -- it's
2 an indictment and it's 36 pages long.
3        Have you seen this before?
4    A.  No, I have not.
5    Q.  Refresh your recollection about
6 Dr. Harper?
7    A.  I don't recall seeing this.
8    Q.  Let me read you just from the
9 introduction section, paragraph number 1:
10 From on or about September 1, 2009 and
11 continuing through on or about May 18,
12 2012, the defendants, Adolph Harper,
13 Junior, Adria Harper, Patricia Laughman,
14 Tequila Barry, and others, (collectively
15 the Harper Drug Trafficking Organization
16 or "Harper DTO") agreed to illegally
17 distribute hundreds of thousands of doses
18 of prescription painkillers to customers
19 located in the Northern District of Ohio
20 and elsewhere.
21        Do you see that?
22   A.  Yes.
23   Q.  Have you ever heard of this
24 before?

Page 204

1    A.  I don't recall the specific
2 situation.  I may have heard of something
3 about this, but didn't recall the name of
4 the doctor.
5    Q.  I direct your attention to page
6 8, paragraph 21 under the offense.  See
7 where it says:  Beginning at least on or
8 about September 1, 2009 and continuing
9 through on or about May 18, 2012, the
10 exact dates to the grand jury unknown, in
11 the Northern District of Ohio, Eastern
12 Division, Adolph Harper, Junior, Adria
13 Harper, Patricia Laughman and Tequila
14 Barry, the defendants herein, and others
15 known and unknown to the grand jury, did
16 unlawfully, knowingly and intentionally
17 combine, conspire, confederate and agree
18 together and with each other, and with
19 diverse others known and unknown to the
20 grand jury, to knowingly and intentionally
21 distribute and dispense oxycodone,
22 oxymorphone, methadone and amphetamines,
23 Schedule II controlled substances,
24 buprenorphine, hydrocodone, Schedule III

Page 205

1 controlled substances, and alprazolam and
2 zolpidem, Schedule IV controlled
3 substances, outside the usual course of
4 professional practice and not for a
5 legitimate medical purpose, contrary to
6 and in violation of Title 21, U.S. Code
7 Sections 841(a)(1), (b)(1)(C), (b)(1)(E),
8 and (b)(2) and 846.
9        Do you see that?
10      MR. LAVELLE:  Object to form.
11   A.  Yes.
12   Q.  Have you ever heard of this
13 before?
14   A.  These sections?
15   Q.  This description about Dr.
16 Harper and his confederates?
17   A.  No.
18   Q.  I direct your attention to
19 paragraph 25.
20        On the top of page 10:  It is
21 further part of the conspiracy that Adolph
22 Harper, Junior distributed "prescription"
23 to customers who he knew had tested
24 positive for illegal controlled substances

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 during the customer's appointment.
2          Did I read that correctly?
3     A.   Yes.
4     Q.   Did you hear of this before?
5     A.   No.
6     Q.   Paragraph 26:  It was further
7 part of the conspiracy that Adolph Harper,
8 Junior distributed prescriptions -- excuse
9 me.  Quote, prescription, close quote, for
10 controlled substances to customers after
11 he learned that the customer had overdosed
12 on controlled substances.
13          Did you see that?
14    A.   I see that here.
15    Q.   Have you heard of this before?
16    A.   No.
17    Q.   Paragraph 26:  It was further
18 part of the conspiracy that Adolph Harper,
19 Junior continued to distribute
20 "prescriptions" for controlled substances
21 after he learned that some of his
22 customers had died from overdose-related
23 deaths.
24          Do you see that?

Page 207

1     A.   Yes.
2     Q.   And one of the documents we
3 looked at this morning talked about
4 overdoses as one of the things that you
5 were on the lookout for and would make
6 sure would be reported, right, to the --
7 to the DEA?
8          MR. LAVELLE:  Object to form.
9 BY MR. SIMMER:
10    Q.   Remember that?
11    A.   I said if a customer that we had
12 dispensed to overdosed and we were aware
13 of it, then that is our procedure, we
14 should file a net claim.
15    Q.   Look at paragraph 31 at the
16 bottom of the page:  It was further part
17 of the conspiracy that Harper DTO posted
18 in Adolph Harper Junior's "medical" office
19 a list of pharmacies that were likely to
20 fill Adolph Harper, Junior's
21 "prescriptions."
22          Did you see that?
23    A.   Yes.
24    Q.   Have you heard of that before?

Page 208

1     A.   No.
2     Q.   Look at the next paragraph,
3 paragraph 32:  It was further part of the
4 conspiracy that Adria Harper and Tequila
5 Barry completed patient treatment notes
6 for some of Harper DTO's customers before
7 the customers arrived at the office for an
8 appointment.
9          Do you see that?
10    A.   Yes.
11    Q.   Paragraph 33:  It was further
12 part of the conspiracy that members of the
13 Harper DTO wrote the same diagnosis for
14 several of the Harper DTO's customers
15 regardless of the customer's
16 individualized medical needs.
17          Did you see that?
18    A.   I see it here.
19    Q.   Paragraph 34:  It was further
20 part of the conspiracy that Adria Harper,
21 Patricia Laughman and Tequila Barry wrote
22 "prescriptions" for controlled substances
23 in their names and the names of their
24 friends and family members.

Page 209

1          Do you see that?
2          MR. LAVELLE:  Object to form.
3     A.   I see it here.
4     Q.   Have you heard of any of this
5 prior to today?
6     A.   No.
7          (Rite Aid - Novack Exhibit 8,
8     press release dated October 20, 2014,
9     was marked for identification, as of
10    this date.)
11 BY MR. SIMMER:
12    Q.   The court reporter has handed
13 you what she's marked Exhibit 8.  I'll
14 identify it for the record as a press
15 release from the United States Attorney's
16 Office for the Northern District of Ohio
17 dated October 20, 2014, a two-page
18 document.  The headline is "Akron Doctor
19 Pleads Guilty to Illegally Prescribing
20 Painkillers."
21          Do you see that?
22    A.   Yes.
23    Q.   Did you ever hear of Dr. Harper
24 pleading guilty to illegally prescribing

Page 210

1 painkillers?
2        MR. LAVELLE:  Object to form.
3 Objection; asked and answered.
4    A.    Not that I recall.
5    Q.    I direct your attention to the
6 fifth paragraph.
7        Do you see where it says:
8 Together they distributed hundreds of
9 thousands of doses of prescription
10 medications, including OxyContin,
11 Percocet, Roxicet, Opana and others, from
12 Adolph Harper's medical offices in Akron
13 between 2009 and 2012, according to court
14 documents.
15        Do you see that?
16        MR. LAVELLE:  Object to form.
17    A.    I see it here.
18    Q.    Have you ever heard of this
19 before?
20    A.    Aside from the document you just
21 read.
22    Q.    Look at the last paragraph on
23 this page:  Adolph Harper's customers,
24 many of whom were drug addicts exhibiting

Page 211

1 clear signs of drug addiction during their
2 visits to this office, came to his office
3 and received "prescriptions" for addictive
4 prescription medications without being
5 examined by Harper and often without
6 seeing him at all, according to court
7 documents.
8        Do you see that?
9    A.    Yes.
10    Q.    Are you aware at all that Dr.
11 Harper pled guilty and any of this
12 information conveyed I just read?
13        MR. LAVELLE:  Object to form.
14 Objection; asked and answered.
15    A.    Outside of this release, I don't
16 recall anything specific to this doctor.
17        (Rite Aid - Novack Exhibit 9,
18        Cleveland.com article dated February
19        13, 2015, was marked for
20        identification, as of this date.)
21 BY MR. SIMMER:
22    Q.    The court reporter has handed
23 you what she's marked as Novack Exhibit 9.
24 I'll identify it for the record as an

Page 212

1 article in the Cleveland.com dated, it's
2 February 2015 -- February 13, 2015,
3 written by Eric Heisig entitled "Akron
4 Doctor Who Illegally Prescribed
5 Painkillers Sentenced to Ten Years in
6 Prison."
7        Have you ever heard of this
8 doctor getting sentenced to ten years in
9 prison?
10    A.    I don't recall this specific
11 doctor.
12    Q.    Let me direct your attention to
13 the first paragraph:  Akron, Ohio.  A
14 former Akron doctor who doled out hundreds
15 of thousands of prescription painkillers
16 without any medical purpose will spend up
17 to ten years in a federal prison.
18        Do you see that?
19    A.    Yes.
20    Q.    I take it your answer would be
21 the same if I ask again you've never heard
22 of this before, right?
23    A.    I don't recall this.
24        MR. LAVELLE:  Object to form.

Page 213

1 BY MR. SIMMER:
2    Q.    You don't recall whether you --
3    A.    I don't recall this particular
4 doctor situation.  You hear in the media
5 all the time that a doctor is getting
6 arrested and they've been pushing pill
7 mills and -- but I don't recall this
8 specific doctor or if this was one of the
9 ones I've heard.
10    Q.    Let me go back here on
11 Exhibit 6, the email we looked at a moment
12 ago.
13    A.    Yes.
14    Q.    So, this threshold increase is
15 being requested on September 12th, 2011,
16 right?
17    A.    The threshold increase from the
18 field team?
19    Q.    I'm looking at your email, the
20 last one.
21    A.    Okay.
22    Q.    Where you were passing this
23 information on requesting a 15 percent
24 threshold increase, right?

Page 214

1    A.    Yes.

2    Q.    Now, if you would, look at
3    Exhibit 7, the indictment.

4    A.    Yes.

5    Q.    And that first sentence under
6    overview, do you see where it says:  From
7    on or about September 9 --

8         MR. SIMMER:  Strike that.  I'll
9    start again.

10    Q.    From on or about September 1,
11    2009 and continuing through on or about
12    May 18, 2012.

13         So, I guess my question is, and
14    I just want to establish for the record,
15    your request, the one that you passed on
16    to McKesson for a 15 percent threshold
17    increase, you'd agree with me is during
18    the time period of the indictment of Dr.
19    Harper, right?

20         MR. LAVELLE:  Object to form.

21    A.    Based off of this information,
22    the threshold increase for this location
23    was September 2011.

24    Q.    It's within the time period of

Page 215

1    the indictment, right?

2    A.    Yes.

3         MR. LAVELLE:  Object to form.

4    BY MR. SIMMER:

5    Q.    This has some of the redactions
6    I'm talking about.  I'm going to show this
7    to counsel first.  So --

8         MR. POWERS:  And also for the
9    record, counsel for McKesson has
10    e-mailed back saying that they do not
11    object to the use of these documents
12    for this deposition.

13         MR. SIMMER:  So we'll go ahead
14    and proceed unless Rite Aid counsel
15    want to lodge any objection.

16         MR. LAVELLE:  I'd like to see
17    the document before you show it to the
18    witness.

19         MS. CHARLES:  On behalf of
20    McKesson, I'll just note I think it's
21    already clear on the record that the
22    redactions on this document were not
23    as produced by McKesson.  They were
24    added by plaintiff's counsel.

Page 216

1         MR. SIMMER:  That is correct.

2         We can waste a lot of time here.
3    What you're reviewing it for is not
4    the content of the document, it's the
5    redactions.

6         Beyond that, if you have any
7    concerns about that, we're going to go
8    ahead and proceed with our
9    questioning.

10         MR. LAVELLE:  Well, I don't know
11    what you've redacted.  And the copy
12    you've given to me doesn't have a
13    Bates number on it.

14         MR. SIMMER:  I've told you what
15    the issue was, and I'll go ahead and
16    read into the record what the Bates
17    number is.  We'll substitute in Bates
18    numbered documents when we get it, so.

19         MS. CHARLES:  I don't want to
20    hold this up, but if the Bates number
21    was removed, was our confidentiality
22    stamping also removed?

23         MR. SIMMER:  We talked about
24    this this morning, counsel, and we're

Page 217

1    going to substitute back in the ones,
2    but the printing service, for whatever
3    reason, cut all of the Bates numbering
4    off of every exhibit.

5         MS. CHARLES:  So, I'll just have
6    a standing objection to the use of
7    exhibits without our confidentiality
8    stamping, but I understand the excuse.

9         MR. SIMMER:  And Rite Aid's
10    counsel made the same objection early
11    on.

12         Do we have one for the witness
13    too?  I don't think we gave it to her
14    yet.

15         MR. LAVELLE:  You want me to
16    give this to the court reporter?

17         MR. SIMMER:  The court reporter,
18    so she can mark it, please.

19         (Rite Aid - Novack Exhibit 10,
20    email chain ending December 19, 2012,
21    Bates No. MCK_MDL_00571625 to
22    MCK_MDL_00571628, was marked for
23    identification, as of this date.)

24         MR. SIMMER:  I identify it for

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 the record as an email string. The
2 Bates numbering, which unfortunately
3 was cut off, but it's MK --
4 MCK_MDL_00571625 through '1628.
5 BY MR. SIMMER:
6 Q. Take a moment to review that,
7 and let me ask you a few questions about
8 that.
9 A. (Perusing document.)
10 MR. SIMMER: For the record, I'm
11 going to make clear that the exhibit
12 that we have proffered, the only
13 redactions on the document were those
14 that counsel for the plaintiffs did,
15 which included communications in which
16 Ms. Lai, or Ms. Novack, was not party.
17 MR. LAVELLE: So when this was
18 produced by McKesson, the redaction
19 was not on there, correct?
20 MR. SIMMER: That's correct.
21 MR. LAVELLE: Okay. Thanks.
22 THE WITNESS: (Perusing document.)
23 Okay.
24

Page 219

1 BY MR. SIMMER:
2 Q. Okay. I direct your attention
3 to the first email in this string from you
4 dated September 18, 2012 at 11:42 a.m. to
5 Travis House, copying Melissa Evangelista
6 and Michael Oriente.
7 Do you see that?
8 A. Yes.
9 Q. And the subject line is "5277,
10 5284 and 5285."
11 Do you see that?
12 A. Yes.
13 Q. And I believe that's a reference
14 to specific Rite Aid pharmacies, right?
15 A. Yes.
16 Q. In your email, let me read this
17 into the record: Travis, I sent a note
18 last night about 5285's threshold, but
19 could you help me look at 5277 and 5284
20 also? It seems like their thresholds have
21 been adjusted down. Thanks. Sophia.
22 Could you tell us what's -- what
23 your understanding of what was going on
24 here?

Page 220

1 A. The email doesn't give me enough
2 detail on what base code I was looking at.
3 So I couldn't give you more context.
4 Q. You don't recall this situation?
5 A. I don't recall this specific
6 situation.
7 Q. So, am I right though that their
8 thresholds have been adjusted down? Is
9 that what appears to be precipitating your
10 question?
11 MR. LAVELLE: Object to form.
12 A. I don't know what type of
13 thresholds were adjusted down. So usually
14 we would have some indication on what the
15 base code is so I can understand some more
16 context about this email communication.
17 Q. But it was your email.
18 So, you didn't include base
19 codes, right?
20 A. It looks like I did not.
21 Q. Okay.
22 A. So, I don't -- I can't recall
23 what exactly we were talking about except
24 it does look like there was an adjustment

Page 221

1 to the thresholds in the stores on the
2 back end that we were not aware of.
3 Q. So, Travis House responds to you
4 at 1:31 p.m. on December 18th, 2012
5 saying: Sophia. The stores were adjusted
6 down based on a review of the accounts by
7 our regulatory department.
8 Do you see that?
9 A. Yes.
10 Q. What is he saying --
11 MR. LAVELLE: Objection.
12 Q. -- if you understand?
13 MS. CHARLES: Object to the form
14 of the question.
15 MR. SIMMER: I'll withdraw the
16 question.
17 Q. What is your understanding he's
18 saying here?
19 A. That the stores had their
20 thresholds reduced.
21 Q. By McKesson's regulatory
22 department, right?
23 A. Correct.
24 Q. And that's the department that

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 would be responsible for reducing
2 thresholds.
3          Is that your understanding?
4     A.   I don't know how --
5          MS. CHARLES:  Object to the
6 form.
7     A.   I don't know how they normally
8 handle it or who is responsible, but I'm
9 asking their account manager what
10 happened.
11    Q.   Okay.  And you respond, I
12 believe Mr. House is in -- he's in
13 Carollton, Texas, which is Central Time
14 zone.  So you respond a short time later,
15 although it looks to be like 50 minutes
16 later because you're responding Eastern
17 Time, right?
18         Anyway, it's the same day, but
19 it looks to be three minutes earlier.  I
20 don't know how that can be other than a
21 time zone change.
22         You see what I'm saying?
23    A.   Yes.
24    Q.   Okay.  Your email says:  I don't

Page 223

1 understand how that can happen and why
2 this was not communicated.  What was the
3 basis for reducing the thresholds?
4          Do you see that?
5     A.   Yes.
6     Q.   Okay.  You want an explanation
7 for why the thresholds were being reduced,
8 right?
9     A.   Yes.
10    Q.   Okay.  And you see that Mr.
11 House responds 5:17 p.m.:  Sophia.
12 Regulatory performs periodic reviews of
13 all the accounts in their regions.  They
14 base their reviews on purchase histories
15 in order to ensure that buying partners
16 remain constant -- excuse me.  Buying
17 patterns remain constant.  If they see
18 that an account's purchases have
19 decreased, they adjust the thresholds
20 accordingly to better identify anomalies
21 per their SOP.  Since thresholds are blind
22 to the customer, they do not inform them
23 of any reductions.
24         So, is it your understanding, as

Page 224

1 he indicates here, that thresholds are
2 blind to the customer?
3          MR. LAVELLE:  Object to form.
4     A.   I understand that they don't let
5 the stores know what their thresholds are.
6     Q.   But you were requesting that you
7 be informed of that, or that Rite Aid
8 corporate be informed of that nonetheless,
9 right?
10    A.   I was requesting to understand
11 why they were reducing the thresholds, not
12 necessarily what the actual numbers were,
13 but if there was a reduction, what
14 happened so that we can understand why
15 it's impacting our store servicing our
16 patients.
17    Q.   And, what's your understanding
18 of why the thresholds are blind to the
19 customer?
20    A.   It's information that they don't
21 need to know.
22    Q.   If you'd look at the first page
23 of the exhibit, your email dated December
24 19th, the following day, at 10:54 a.m. to

Page 225

1 the same individuals.  Let me read your
2 email into the record:  Please review the
3 purchases.  Based on the dispensing data I
4 pulled for one store they are dispensing
5 and purchasing accordingly.  If this was
6 an auto adjust threshold down and within
7 the next month the stores are at that
8 threshold there should be an auto review
9 to readjust accordingly in order to
10 prevent this issue.  We base this
11 information on thresholds on the report
12 and if we do not know there was a decrease
13 done causing the store to now exceed their
14 threshold it creates a burden for the
15 business.
16         Do you see that?
17    A.   Yes.
18    Q.   What are you saying here?
19         MR. LAVELLE:  Object to form.
20    A.   I'm saying that we need to
21 service our patients.  So if there's an
22 adjustment done that we're not aware of
23 that's now creating a -- a shortage for
24 our customers that we currently serve,

Page 226

1 then that could be a problem. And if we
2 have an algorithm in place where they do
3 do automatic adjustments, then we should
4 have an automatic review to make sure that
5 those adjustments were made correctly.
6    Q.   So, McKesson put in an
7 adjustment downward based on their
8 regulatory review, and you've come back
9 and said then the next month you need to
10 readjust it upward perhaps.
11       Is that right?
12       MR. LAVELLE: Object to form.
13 BY MR. SIMMER:
14    Q.   Or be reevaluated, at a minimum?
15       MR. LAVELLE: Same objection.
16    A.   Saying we need to review the
17 information. So, to make sure that
18 whatever adjustments we do are appropriate
19 for that location.
20    Q.   Because it's a burden for the
21 business, right?
22    A.   Well, that's why I said there
23 isn't enough context for me to understand
24 what thresholds we're talking about. So

Page 227

1 at this point in time, McKesson is our
2 secondary vendor, and our primary vendor
3 or supplier is still our warehouse until
4 we fully converted. So, if we have
5 anomalies that are happening in the
6 warehouse and we're out of stock, so now
7 we've got to supplement with McKesson and
8 we don't traditionally order through them
9 because we have our warehouse supplying,
10 so now I've got to do this because I have
11 a supply issue in one vendor and they
12 didn't know that because they're going off
13 of my purchase history and we weren't
14 communicated that this change is made and
15 we are now out of stock for our patients.
16       So, understanding that changes
17 happen, understanding that there may be
18 dynamics in the operations day-to-day that
19 can cause them to require this is if we do
20 do any type of adjustments, are there
21 anything that we do going back to review
22 are those adjustments appropriate and
23 correct, and if not, do we have a
24 situation where we can review with the

Page 228

1 customer and service the patients.
2    Q.   And everything you just said
3 there is what you describe here as a
4 burden for the business, right?
5    A.   It's burden for the patient.
6 Ultimately --
7    Q.   You don't say burden for the
8 patient. You say burden for the business.
9    A.   Our business is to --
10       MR. LAVELLE: Objection to the
11 form of the question.
12    A.   Our business is to improve
13 patient outcomes as the pharmacist and to
14 make sure that we're providing them
15 treatment of care. So, if we don't have
16 what they need in order to treat their --
17 their problem, then it's going to be a
18 burden.
19    Q.   And in this instance, you're
20 objecting to a change that McKesson's
21 regulatory people had done to reduce the
22 thresholds for these three pharmacies,
23 right?
24       MR. LAVELLE: Object to form.

Page 229

1    A.   I'm questioning the process that
2 they have that we were not aware of, or I
3 was not aware of, and this is coming up as
4 we go into a store that is running into a
5 problem, how did this happen, why did it
6 happen, how do we make sure that we do the
7 right thing for that location.
8       MR. SIMMER: I have another
9 exhibit that's got some redactions on
10 it you should look at. McKesson's
11 counsel, I understand, has no
12 objections to it.
13       Do you want to tell her which
14 one this is? I'll read the exhibit
15 numbers. We're going to be
16 introducing to the witness in a moment
17 another exhibit that's from the
18 McKesson production. It's Bates
19 numbered '547503 through '547510.
20 It's an email string, the last of
21 which is an email -- or, the
22 original -- the first email in this
23 string is from Anthony Dolan to Ms.
24 Novack and a group of others dated

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 December 11, 2013.
2 MS. MOORE: We're marking this
3 one what?
4 MR. SIMMER: I think we're
5 marking this as 11.
6 MR. LAVELLE: We should be at
7 11. Right?
8 And again, the redaction that's
9 on this page was not in the document
10 as it was originally produced by
11 McKesson? Is that correct?
12 MR. SIMMER: That's correct.
13 MR. LAVELLE: Okay.
14 MR. SIMMER: We've only redacted
15 that portion as a communication on
16 which -- or, no Rite Aid employee,
17 including Ms. Novack, was included.
18 MR. LAVELLE: Okay. I just
19 wrote on this one.
20 Do you have a copy that's clean?
21 MR. SIMMER: That's the one for
22 the witness right there.
23 MR. LAVELLE: All right. Just
24 put the stamp on top of what I wrote

Page 231

1 on there.
2 MR. SIMMER: Just swap in the
3 clean one.
4 MR. LAVELLE: Here. Take this
5 one (handing).
6 (Rite Aid - Novack Exhibit 11,
7 email chain ending February 21, 2014,
8 Bates No. MCK_MDL_00547503 to
9 MCK_MDL_00547510, was marked for
10 identification, as of this date.)
11 BY MR. SIMMER:
12 Q. The court reporter has handed
13 you what she's marked as Novack
14 Exhibit 11. I'll identify again for the
15 record as Bates numbered MCK_MDL_00547503
16 through '547510.
17 Just take a moment to review
18 that and I'll ask you some questions.
19 A. (Perusing document.)
20 Okay.
21 Q. I direct your attention to the
22 first email in this string from Anthony
23 Dolan at McKesson dated December 11, 2013
24 at 5:03 p.m. to you, Ernie Richardson and

Page 232

1 Arnaldo la Luz.
2 Who are Ernie Richardson and
3 Arnaldo la Luz?
4 A. They're in our purchasing group.
5 Q. And any idea why he's including
6 them on an email to you? And I guess he's
7 also copying a couple of individuals. Why
8 are they included in this string?
9 MR. LAVELLE: Object to form.
10 A. They are the purchasing group.
11 So they handle the purchases.
12 Q. It's also cc'd Donald Walker and
13 Janet Hart.
14 Who are they?
15 A. Janet is in Government Affairs.
16 I don't remember what Don Walker or his
17 capacity was.
18 Q. I believe he is a McKesson
19 employee.
20 Is that -- do you believe that
21 that's --
22 MS. CHARLES: Object to form.
23 MR. LAVELLE: Object to form.
24 A. I don't know. I don't know.

Page 233

1 Q. Let's look at Mr. Dolan's email
2 to you. He says: Good afternoon, Sophia.
3 As a follow-up to our conversation
4 yesterday, I would like to reach out to
5 the Rite Aid team as it relates to
6 controlled substance monitoring. After a
7 great deal of research on this topic and
8 work by our internal operations team,
9 McKesson has developed a new analytical
10 tool to monitor controlled substance
11 utilization.
12 Do you see that?
13 A. Yes.
14 Q. Do you recall this situation,
15 what's going on here?
16 MS. CHARLES: Object to the
17 form.
18 A. Vaguely.
19 Q. What's your recollection?
20 A. That we were having discussions
21 about going through some stores and the
22 controlled substances.
23 Q. Beyond that, nothing further?
24 A. I don't recall specifically. It

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 looks like they were asking for data, just
2 to review thresholds.
3    Q.  I direct your attention to the
4 second paragraph: I would like to have a
5 meeting with you, Sophia, and Janet and
6 anyone else from your teams to review the
7 current controlled substance utilization
8 process and also share with you how
9 McKesson is now analyzing this data. In
10 anticipation of a meeting after the first
11 of the year that McKesson would like to
12 have with Rite Aid to discuss this topic,
13 can you please provide the following
14 information for the months of September,
15 October, and November regarding total
16 script data for all Rite Aid stores.
17      Do you see that?
18    A.  Yes.
19    Q.  And this is information I
20 understand that McKesson wouldn't have in
21 the ordinary course of business, this data
22 he's requesting?
23      MR. LAVELLE: Object to form.
24    A.  I'm not too sure what

Page 235

1 information they would have had access to.
2    Q.  But, presumably, he wouldn't be
3 asking for data they already have, right?
4      MR. LAVELLE: Object to form.
5    A.  I don't know.
6    Q.  He goes on to say he wants total
7 doses, all non-controlled and controlled
8 substances in doses by stores over this
9 three-month period.
10      Do you see that?
11    A.  Yes.
12    Q.  Do you recall why he's wanting
13 this specific information from Rite Aid at
14 this time?
15      MR. LAVELLE: Object to form.
16      MS. CHARLES: Object to form and
17  foundation.
18    A.  I know one of the things we
19 looked at was in number of doses, how much
20 were we dispensing control versus
21 non-control, as one of the performance
22 indicators we would review internally.
23    Q.  And then there's a list of
24 numbers there, store numbers.

Page 236

1      And, again, that's how Rite Aid
2 identifies stores, by the -- the -- either
3 four- or five-digit number system, right?
4    A.  Yes.
5    Q.  We looked a few of these up, and
6 I'll direct your attention to the second
7 page of the exhibit, par -- store 3157.
8 Is that -- I believe that is a Cleveland,
9 Ohio Rite Aid store.
10      Is that consistent with your
11 recollection?
12      MR. LAVELLE: Object to form.
13    A.  I don't know offhand.
14    Q.  Store 3151, I believe that's an
15 Akron, Ohio Rite Aid store.
16      Is that consistent with your
17 recollection?
18      MR. LAVELLE: Object to form.
19    A.  I don't know all the store
20 numbers and locations.
21    Q.  It would probably be true if I
22 asked you about 3195 right below that,
23 Painesville, Ohio.
24      Is that consistent with your

Page 237

1 recollection?
2      MR. LAVELLE: Object to form.
3    A.  I don't know the store numbers
4 offhand.
5    Q.  Okay. Right below that he -- in
6 the text below the list of pharmacies, the
7 second paragraph: If possible, would
8 Rite Aid also be able to outline to
9 McKesson prior to our meeting the process
10 Rite Aid is currently utilizing to review
11 controlled substance utilization at your
12 pharmacies?
13      Do you see that?
14    A.  Yes.
15    Q.  You recall this -- this inquiry
16 from Mr. Dolan?
17    A.  Vaguely. I re -- I remember the
18 request for information. I don't recall
19 specifically this information.
20    Q.  Do you recall giving him that
21 information about Rite Aid's controlled
22 substance utilization process?
23    A.  I don't recall.
24    Q.  So, in your email to him the

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 next day at 6:24 on December 12th, 2013,
2 you say: Anthony. Could you send me the
3 current thresholds set for these
4 locations? Also criteria used to flag
5 these stores?
6        Do you see that?
7    A.   Yes.
8    Q.   And why are you requesting this
9 information?
10   A.   From our loss prevention
11 background and the interest in analytics,
12 we always want to see if there's more that
13 we can do. So if we could take some
14 information that they're using that
15 they're looking at things differently, we
16 may want to apply the same thing in our
17 side.
18   Q.   Do you recall whether he gave
19 you the thresholds for these locations?
20   A.   I don't recall if he sent it to
21 me.
22   Q.   Do you recall whether he gave
23 you the criteria used to flag these
24 stores?

Page 239

1    A.   I don't recall if he gave it to
2 me or not.
3    Q.   If you'd look at the next email
4 on the string from Mr. Dolan to you, same
5 day at 7:27 a.m., about an hour later:
6 Good morning, Sophia. Can we have a call
7 on Monday to discuss this as a
8 conversation may help answer your
9 questions?
10        Do you see that?
11   A.   Yes.
12   Q.   Do you recall his inquiring
13 about whether you could have a call on the
14 following Monday?
15   A.   I recall based off of this
16 email.
17   Q.   Okay. And you didn't review
18 this email in preparation for your
19 deposition today, did you?
20   A.   No.
21   Q.   Okay. So, the email right above
22 that from Mr. Dolan again to you the
23 following day: Hello Sophia. Just
24 following up on this. If there are times

Page 240

1 later next week that work please let us
2 know and we will get a call scheduled.
3        Do you recall his requesting
4 again to have a conference call with you?
5    A.   As I'm reading it through this
6 email. I don't recall prior to that, but
7 I see it in this email.
8    Q.   And then your email responding
9 on Saturday, December 4th, you say:
10 Anthony. Janet is on vacation and I'm not
11 sure if she is back next week. I am
12 available at 10 a.m. to discuss. You
13 could call me direct at my office
14 717-760-7866.
15        So, am I right then that you're
16 suggesting that you go ahead and have this
17 call just you and the McKesson folks and
18 Janet would not be participating because
19 you thought she might be on vacation? Am
20 I reading that correctly?
21        MR. LAVELLE: Object to form.
22   A.   I'm reading that if he needs to
23 have a conversation, he can call me
24 directly.

Page 241

1    Q.   Okay. And the next email in
2 this string is from Mr. Dolan to you the
3 next month, almost a full month later,
4 Friday, January 10th, 2014, and he adds
5 back in all of the other addressees that
6 had been taken out of your string to this
7 point. He says: Good afternoon Sophia.
8 I wanted to follow up on this request from
9 last month as it relates to discussing
10 controlled substances.
11        I guess my question is, before I
12 read further, do you recall whether you
13 and Mr. Dolan talked between December 14th
14 and January 10th?
15   A.   I don't recall.
16   Q.   He goes on to say: First I
17 wanted to see if you had a chance to pull
18 the information that we requested earlier
19 as we would like to review this
20 information prior to a meeting. Then I
21 would like to see if you can pull your
22 team together on the morning of January
23 23rd so that we can review this data and
24 discuss our partnership as it relates to

Page 242

1 controlled substances?
2      Do you see that?
3   A.   Yes.
4   Q.   Do you recall this inquiry from
5 him asking to have a call to discuss your
6 partnership as it relates to controlled
7 substances?
8   A.   I recall from reading it on this
9 email.  I don't recall if we had a call.
10 I don't recall if -- what next steps we
11 took from it.
12   Q.   So you recall from reading it in
13 the email that he did ask about this?
14   A.   I recall right now where I'm
15 reading through it right now that he's
16 requesting for it.
17   Q.   Okay.  And he calls it a
18 partnership.
19      What is it -- do you have any
20 idea, is that how you all described the
21 relationship you had with McKesson on
22 controlled substances, that it was a
23 partnership?
24   A.   I don't know if this is

Page 243

1 referring to our transition over to
2 McKesson as our sole supplier and that
3 partnership.
4   Q.   Do you know when McKesson became
5 your sole supplier of controlled
6 substances?
7   A.   It was phasing in in 2014.
8   Q.   Do you know if it was a specific
9 date that it started?
10   A.   I don't recall the specific
11 date.  It started in waves.
12   Q.   Were you part of the discussions
13 with McKesson about entering into this
14 relationship where they were the sole
15 source provider of controlled substances?
16   A.   I was not involved in those
17 discussions.  I was involved in reviewing
18 the thresholds for the stores as soon as
19 we were sold -- dispensed through
20 McKesson.
21   Q.   Do you know who at Rite Aid had
22 those discussions with McKesson?
23   A.   I don't know.
24   Q.   Let's look at your email ten

Page 244

1 days later right above that on Monday,
2 January 20th, 2014 to Mr. Dolan and the
3 same copied people:  Hi Anthony.  I should
4 have the information you requested
5 available to you mid to end of next week.
6 Let me know when you would like to
7 schedule a meeting after you receive the
8 data.
9      Do you recall having sent him
10 that email that you're going to provide
11 this data to him the following week?
12   A.   I don't recall sending him the
13 email.
14   Q.   Okay.  Let's look at the next
15 email on this string from Mr. Dolan sent
16 to you that same day three hours later,
17 roughly three hours later:  Thanks for
18 this Sophia.  While I realize that the
19 information is not yet available, Don and
20 I would still like to take some time to
21 meet with you Thursday morning to have a
22 high level conversation on controlled
23 substances.  Please feel free to invite
24 anyone that you wish to the meeting.

Page 245

1 Thank you.  Anthony.
2      Do you recall him asking for a
3 high level conversation on controlled
4 substances?
5   A.   I don't recall his request.
6   Q.   Do you recall having this
7 conversation with -- with these
8 individuals at McKesson about this high
9 level conversation on controlled
10 substances?
11   A.   I recall having conversations
12 with McKesson about controlled substances.
13 I don't recall if it's this specific one.
14   Q.   What do you recall about those
15 conversations with McKesson?
16   A.   That we've had those
17 conversations as we were rolling out our
18 stores for McKesson.  That's why I said I
19 don't know if this was in relation to when
20 we were transitioning over for them to be
21 our supplier and there was a lot of work
22 around establishing the initial thresholds
23 and the information that's needed.
24   Q.   Who did you speak with at

Page 246

1  McKesson about that?
2      A.    Various different people.  I
3  don't even -- I don't remember
4  specifically.
5      Q.    Do you remember anyone that you
6  talked to at McKesson about this?
7      A.    I know as we were going through
8  threshold requests later on, I remember
9  talking to Nate from McKesson.
10     Q.    Nate, what is his last name?
11     A.    Hartle.  H-A-R-T-L-E, I believe.
12     Q.    Do you recall speaking to
13 anybody else at McKesson?
14     A.    I don't recall specifically at
15 this time.
16     Q.    Let's look at your email later
17 that same day:  Anthony.  Based on the
18 calendar available, the only time slot
19 would be Friday, January 24th, between 11
20 and 1 for most of the parties involved.
21        Do you remember sending that
22 email to him?
23     A.    I don't recall sending the
24 email.  I see it here.

Page 247

1      Q.    And then he sends you an email
2  right above that 15 days later, or roughly
3  15 days later on Wednesday, February 5th:
4  Good afternoon Janet, Sophia, and Dan.
5        And, by the way, Dan Miller, who
6  is that?
7      A.    He was our SVP of Pharmacy
8  Operations.
9      Q.    And why would he be included in
10 this conversation, if you know?
11     A.    Because he's operations.
12     Q.    Good afternoon Janet, Sophia and
13 Dan.  I would like to propose to you a
14 meeting on the morning of February 26th
15 with Don Walker and myself to discuss
16 McKesson's Controlled Substance Monitoring
17 Program.  This is actually a follow-up to
18 my earlier message in December as we would
19 like to better understand the controlled
20 substance monitoring process at Rite Aid
21 and also share with you some changes
22 taking place at McKesson regarding
23 controlled substances.
24        Let me just stop there.

Page 248

1        Am I reading this correctly that
2  this conversation and/or meeting that he
3  had been requesting doesn't appear to have
4  happened yet?
5        MR. LAVELLE:  Object to form.
6      A.    I can't answer that because it
7  can be just finding an old email chain and
8  referencing the email there.  Does not
9  necessarily mean that we didn't have any
10 calls or meetings or documents exchanged
11 in between that was not attached to this
12 trail.
13     Q.    But I'm correct, aren't I, that
14 you don't remember having that
15 conversation with them, do you?
16     A.    As I said before, I recall
17 having conversations with McKesson around
18 controlled substances.  If it was related
19 to this specific request or inquiry or
20 process, I don't remember.  I do remember
21 that we have had communications.
22     Q.    So, the answer to my question is
23 "Yes, I don't remember."
24        Right?

Page 249

1        MR. LAVELLE:  Object to form.
2      A.    I'm not sure.
3      Q.    My question for you was:  You
4  don't remember having a conversation with
5  him, do you?
6        MR. LAVELLE:  Object to form.
7      A.    I don't recall -- your question
8  initially was also about did we have any
9  meetings in between these two emails or
10 this email chain.  I don't recall if we
11 did or did not because I recall multiple
12 meetings with McKesson.  I don't remember
13 if it was in relation to something set up
14 specifically on this email conversation or
15 if it was overall controlled substances.
16 So I would be guessing and I wouldn't be
17 giving you accurate information.
18     Q.    Do you -- do you recall any
19 conversations, telephonic, in person, at
20 all, with Mr. Dolan?
21     A.    I don't recall who I spoke to at
22 McKesson.  So I don't know if it was
23 Mr. Dolan or somebody else from McKesson.
24     Q.    Let me read on in his email to

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  you dated February 5th, 2004 -- 14: Also
2  so that we can better prepare for this
3  meeting, could you please provide the
4  following information for the months of
5  September, October and November regarding
6  total script data for all Rite Aid stores.
7      And again what the request is
8  for a non-controlled, controlled
9  substances and a list of the same list of
10 stores that he'd requested earlier.
11     Am I right that this is the same
12 request that he made in the initial email
13 to you back in December?
14     MR. LAVELLE: Object to form.
15     A.  I would have to review the store
16 numbers. I don't know if they're the
17 exact same stores that he's requesting.
18     Q.  Well, let's look at the first
19 five.
20     Are they the same between the
21 two?
22     A.  Yes.
23     Q.  Look at the last five.
24     Are they the same between the

Page 251

1  two?
2      A.  Yes.
3      Q.  You can pick any other sampling
4  that you want.
5      Doesn't this appear to be the
6  same list that he had sent you back in
7  December?
8      MR. LAVELLE: Object to form.
9      Objection; asked and answered.
10     A.  Without comparing the rest of
11 the stores, at least the first five and
12 the last five are the same.
13     Q.  Is there any reason why you
14 haven't provided this data to him already,
15 that you can recall?
16     A.  I can't recall.
17     Q.  Look at the next email on this
18 string from him dated Wednesday, February
19 12th, seven days later: Hello Sophia,
20 Janet, Scott, Ernie and Arnaldo. I just
21 wanted to reach out to you on this request
22 regarding controlled substance purchasing
23 as I want to ensure that the McKesson
24 group has enough time to review this

Page 252

1  information prior to our meeting on
2  February 26th. Please let me know if you
3  have any questions. Anthony.
4      So, it looks like you still
5  haven't provided this data to them because
6  he's asking again, right?
7      MR. LAVELLE: Objection to the
8  form of the question.
9  BY MR. SIMMER:
10     Q.  A week later, right?
11     MR. LAVELLE: Same objection.
12     A.  He's looking for the
13 information. If we didn't send it to him
14 previously, I don't know.
15     Q.  Okay.
16     A.  I don't know if it was sent
17 separately.
18     Q.  Any explanation why you haven't
19 given him the data, we've waited two
20 months for the data?
21     A.  I don't recall the information
22 or what -- what the time frame was that we
23 were sending over.
24     Q.  Okay. And you respond to him

Page 253

1  five days later on February 17th:
2  Anthony. Here is the data for the stores
3  you requested. Please note there is only
4  54 stores. Store 3737 that you requested
5  is a closed store. Let me know if you
6  have any questions.
7      Do you see that?
8      A.  I see it.
9      Q.  And then he responds two days
10 later: Good morning Sophia. While this
11 is a great start and thank you for the
12 information, we do need this information
13 for all Rite Aid stores. Given our new go
14 forward relationship, this information is
15 all the more important to ensure that we
16 set the appropriate levels for all
17 Rite Aid stores.
18     Okay. Let me just start with a
19 couple of specific questions.
20     He refers to a new go forward
21 relationship.
22     Do you know what that is in
23 reference to?
24     A.  I would assume it's our

Highly Confidential – Subject to Further Confidentiality Review

Page 254

1 relationship to use McKesson as our
2 primary supplier.
3    Q.   Any other thing that he could be
4 referring to other than that?
5    A.   Not that I would -- not that I
6 can recall.
7    Q.   When he goes on to talk about
8 that ensuring that we set the appropriate
9 levels for all Rite Aid stores, any idea
10 what he's referring to there?
11    A.   'Cause we are transitioning all
12 of our stores to them, so they will have
13 to review it so they can set the right
14 thresholds for all of our locations.
15    Q.   So, he's coming back to you,
16 isn't he, and saying I don't just need the
17 data for the -- in the list. I need it
18 for every Rite Aid store.
19    Right?
20    A.   Yes.
21    Q.   Okay. And then the -- you
22 respond to him two days later: Anthony.
23 Report is attached.
24    Do you see that?

Page 255

1    A.   Yes.
2    Q.   So, I guess I'm just trying to
3 make sure that did this refresh your
4 recollection of any of the sequence of
5 events in what happened here?
6    A.   I don't understand the question.
7    Q.   Well, you -- when I first
8 started asking you a question about this
9 email string, you didn't recall what was
10 going on here.
11    I'm asking, now that you had
12 gone through these emails, I had asked you
13 questions about that, whether that
14 refreshed your recollection at all.
15    A.   As I've stated when we started,
16 I don't know the exact context of when or
17 what the information was that they're
18 asking for or the time frame. I don't
19 recall if this is when we started
20 discussing the transition to fully service
21 through McKesson and that's why we're
22 reviewing these thresholds.
23    I recall having conversations
24 with them. I don't recall that these were

Page 256

1 specific ones related to this
2 communication.
3    Q.   His email also referenced a
4 meeting to be held on February 26th.
5    Do you know whether that meeting
6 ever happened?
7    A.   I don't recall if that meeting
8 happened or not.
9    Q.   Do you know whether you had a
10 face-to-face meeting or a teleconference
11 or any -- any kind with this group of
12 individuals from McKesson?
13    A.   I recall having meetings. I
14 don't know if it was with this group. I
15 don't know if it was in relation to this
16 topic.
17    Q.   And you said you recall about
18 meetings about controlled substances.
19    What about, you know, what he's
20 talking about here and the McKesson
21 Controlled Substance Monitoring Program
22 and the changes they had made, do you
23 remember them coming to you and talking
24 about that?

Page 257

1    MR. LAVELLE: Object to form.
2    A.   I don't recall specific
3 conversations in relation to anything
4 mentioned in this email.
5    Q.   Do you have any recollection
6 whether -- what the changes were that
7 McKesson made in its Controlled Substance
8 Monitoring Program?
9    MS. CHARLES: Objection;
10 foundation.
11    A.   I don't recall.
12    MR. SIMMER: Can we take a
13 break?
14    MR. LAVELLE: Yes.
15    THE VIDEOGRAPHER: The time is
16 now 2:50 p.m.
17    We're going off the record.
18    (Recess taken.)
19    THE VIDEOGRAPHER: The time is
20 now 3:13 p.m.
21    We are back on the record.
22    (Rite Aid - Novack Exhibit 12,
23 email chain ending October 7, 2017,
24 Bates No. MCK_MDL_00633242, was marked

Page 258

1   for identification, as of this date.)
2   BY MR. SIMMER:
3      Q.   Ma'am, the court reporter has
4   handed you what she's marked as Novack
5   Exhibit 12, which I'll identify for the
6   record as MCK_MDL_00633242.  And it's an
7   email string from a group of individuals
8   and then you're the last recipient of the
9   email string.
10         Do you see that?
11     A.   Yes.
12     Q.   And the email string to you is
13  October 7, 2013.
14         Do you see that?
15     A.   Yes.
16     Q.   And, because of the way this is
17  structured, you would have seen everything
18  down below that as well, right?
19     A.   Yes.
20     Q.   Okay.  Let me start with the
21  first email in the string from Dawn Lynde
22  to Robert Howse, copying Melanie Bernard,
23  subject "Re: Oxycodone 5 milligram usage."
24         Do you see that?

Page 259

1      A.   Yes.  Yes.
2      Q.   Are these individuals that you
3   know?
4      A.   I don't recall the names.
5      Q.   Okay.  Let me just read the
6   context and then we'll get to the email
7   that you're a part of at the end here.
8   Dawn's email says:  Hi, Rob.  I am hoping
9   you can help me.  We have dispensed 1600
10  oxycodone 5 milligram here in the past ten
11  days.  I am wondering if you can find out
12  from corporate how close to my maximum
13  order quantity for the month we actually
14  are.  This trend is something that needs
15  to be kept in check.  Thanks.  Dawn Lynde.
16         Do you see that?
17     A.   Yes.
18     Q.   And is it 3279, is that how
19  you -- was that a store number, or do you
20  know?
21     A.   It looks like it would be a
22  store number.
23     Q.   Okay.  And then Mr. Howse
24  responds by forwarding on to you, copying

Page 260

1   Wayne Cyrway and Melanie Bernard.
2         Who are those individuals?
3      A.   I don't recall who Melanie was.
4         Wayne was the asset protection
5   district manager for that area.
6      Q.   His email, he says:  Hi, Sophia.
7   Can you help me out with this.  See below.
8   This is store 3279 in Brewer, Maine.  Let
9   me know your thoughts.  Thanks, Rob.
10         Do you see that?
11     A.   Yes.
12     Q.   Are you familiar with what's
13  been going on in the opioid epidemic in
14  Maine?
15     A.   Currently or in 2013?
16     Q.   In 2013.
17     A.   I know that we have a lot of
18  robberies or burglaries activities in
19  Maine.
20     Q.   It's one of the hardest hit
21  states in the country; isn't that correct?
22         MR. LAVELLE:  Object to form.
23     A.   At the time, Maine was, when I
24  was in that position, Maine was one of the

Page 261

1   places where we were robbed a lot, but we
2   did have the most stores.
3      Q.   And those robberies were as a
4   result of robberies to seek opioids,
5   right?
6      A.   Controlled drugs.
7      Q.   Controlled substances, right.
8         You respond by forwarding it on
9   to, the email, to Melissa Evangelista.
10         Who is that?
11     A.   She works for McKesson.
12     Q.   And copying Michael Oriente.
13         Who is that?
14     A.   Works for McKesson.
15     Q.   And, do you know what their
16  responsibilities were?
17     A.   I --
18         MS. CHARLES:  Object to form.
19     A.   I know Melissa was our account
20  contact.  If we had anything that we
21  needed, we would go through Melissa.
22         Michael was on the regulatory
23  side of the McKesson account.
24     Q.   In your email:  Melissa.  Hope

Highly Confidential - Subject to Further Confidentiality Review

---

Page 262

1 you have a great weekend. Could you tell
2 me what the oxycodone threshold is for
3 this store?
4         Do you see that?
5     A.   Yes.
6     Q.   Okay. And your email is at
7 12:54 p.m.
8         At the same day, 6:49 p.m.,
9 Michael responds: 11,500.
10        Do you see that?
11    A.   Yes.
12    Q.   Earlier, you testified that
13 there is no reason for stores to know what
14 their threshold is, right?
15        MR. LAVELLE: Object to form.
16    A.   That's the communication that we
17 had received why McKesson does not talk to
18 our stores about their limits.
19    Q.   Is it any different when you're
20 asking for the threshold?
21    A.   I'm not ordering at the store
22 level. So I don't control what goes into
23 that location.
24    Q.   So, when the store came to your

---

Page 263

1 counterparts asking for what their
2 threshold is and the request comes up to
3 you, why are you even getting this
4 information?
5         MR. LAVELLE: Object to form.
6     A.   Based off of this information,
7 it looks like the -- the PDM is asking me
8 for my thoughts. I wanted to understand
9 how much the store is dispensing in
10 general, which would give us some
11 information through history. Because
12 McKesson is our sole supplier for CIIs and
13 this is a CII, they would have our
14 threshold and our limits and they would
15 have all of that data.
16        So, asking them to get a
17 baseline on what we're looking at and
18 where they are in approaching their
19 threshold at this time in the month will
20 allow us to monitor what's going on in
21 this location.
22    Q.   Everything you just said is not
23 in this email though, is it?
24        MR. LAVELLE: Object to form.

---

Page 264

1 BY MR. SIMMER:
2     Q.   There's nothing at all about
3 trying to monitor this pharmacy or
4 anything else, is there, in your -- in
5 what's -- in this email string, is there?
6         MR. LAVELLE: Object to form.
7     A.   The email was a direct question
8 to the -- to the account managers.
9     Q.   And you went ahead and found out
10 the threshold.
11        That's all that happens in this
12 email string, right?
13    A.   I found out the threshold
14 amount, yes.
15    Q.   And because of the request had
16 come up from the pharmacy, you went and
17 asked McKesson what their threshold was.
18 That's all we know from this email string,
19 nothing about monitoring, anything else,
20 is there?
21        MR. LAVELLE: Object to form.
22    A.   This is something that we would
23 look at. We would have to have a point of
24 reference for us to start anything we

---

Page 265

1 wanted to -- to investigate. So, knowing
2 that there is this trend that a store is
3 worried about, we want to know what our
4 upper limit is and make sure that we're
5 reviewing that as time goes on so we have
6 a starting point.
7         MR. SIMMER: Move to strike
8     non-responsive.
9     Q.   The only thing we see in this
10 email string is there was request for a
11 threshold, that you went to McKesson on,
12 nothing else.
13        Isn't that right?
14        MR. LAVELLE: Object to form.
15 BY MR. SIMMER:
16    Q.   In this email?
17        MR. LAVELLE: Object to form.
18    A.   The information here was sent to
19 a PDM. The PDM sent me to review. I
20 asked McKesson for a threshold knowing
21 what I want to do with it.
22    Q.   None of the rest of that's in
23 this email though, is it?
24        MR. LAVELLE: Object to form.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    A.    What else are you asking if is
2  in this email or not?
3    Q.    That you got the threshold that
4  was requested by the store, something that
5  you said the stores don't need to know.
6        MR. LAVELLE:  Object to form.
7    A.    We're not communicating this to
8  the store.
9    Q.    So it's your testimony you
10  didn't in turn communicate this back to
11  the store, right?
12        MR. LAVELLE:  Object to form.
13    A.    I would not have communicated
14  this back to the store.
15        I don't know if I communicated
16  to the district leader, but we get that
17  information so that we have a starting
18  point on what we need to monitor and look
19  at.  This information does not get
20  released back into the store from my
21  office.
22    Q.    You do, though, communicate it
23  back to the district manager.
24        You would agree with that,

Page 267

1  right?
2    A.    Depends on the situation.  I
3  don't know if I have or have not.  But we
4  don't release this information to the
5  store and it's not readily available to
6  stores.
7    Q.    Why do you give it to the
8  district manager if you won't give it to
9  the store?
10    A.    A district manager is not
11  directly involved in that store or
12  involved in their replenishment or their
13  dispensing.  However, a district manager
14  is a field leader and knows our compliance
15  measures and knows what they need to do to
16  monitor that location.  So if they're
17  asking for advice on how to monitor this
18  trend, they have to know a certain limit
19  that they would reach.
20        (Rite Aid - Novack Exhibit 13,
21    email chain ending August 27, 2014,
22    Bates No. MCK_MDL_00627585 to
23    MCK_MDL_00627587, was marked for
24    identification, as of this date.)

Page 268

1  BY MR. SIMMER:
2    Q.    The court reporter has handed
3  you what she's marked as Novack
4  Exhibit 13, which I'll identify for the
5  record as MCK_MDL_00627585 through '587.
6        Take a moment to review that and
7  I'll ask you some questions.
8    A.    (Perusing document.)
9        Okay.
10    Q.    If you look at the first email
11  in this string from you to Michael Oriente
12  and Sarah Medina, copying Melissa
13  Evangelista,
14        I think all three of those
15  individuals are at McKesson.
16        Is that correct?
17    A.    Yes.
18    Q.    The subject line "Threshold
19  increase."  This is dated August 25th,
20  2014.
21        Is this at a time when the sole
22  source for Rite Aid controlled substances
23  CIIs was McKesson?
24    A.    Sole source for CIIs have always

Page 269

1  been McKesson throughout the entire time.
2    Q.    How about all controlled
3  substances?
4    A.    So, for all controlled
5  substances, it depended on the stores.  I
6  don't know if we fully transitioned at
7  this point.  We may be in a wave.
8    Q.    What do you mean by a wave, by
9  the way?
10    A.    We start transitioning a pocket
11  of stores, and we go through, week after
12  week we turn on more stores until we get
13  to the end.
14    Q.    Just so we understand, what's
15  the need to do this in waves?  Why
16  couldn't you just do them all at once?
17    A.    I think it's capacity for the
18  distribution center, making sure if any of
19  our pilot stores had a problem with
20  systems or supply, we would be able to
21  catch it before we implement it to the
22  other locations.
23    Q.    And, how long did that process
24  take to make the transition?

Page 270

1    A.   Several months.

2    Q.   How many waves were there?

3    A.   I don't recall.

4    Q.   Your email you say:  I reviewed
5 the stores below and would like to request
6 the following threshold increases.
7 Thanks.

8         And there's a list of stores
9 down below.

10        Do you recall this situation?

11    A.   I recall sending a few things
12 over.  I don't know if I recall this
13 specific incident, but very similar
14 incidents.

15    Q.   How did you select these
16 pharmacies that you wanted threshold
17 increases on?

18    A.   I don't recall the specific
19 process.  It may have been as we were
20 transitioning over we had some threshold
21 reports or omit reports where the stores
22 were getting their orders cut if they were
23 approaching or meeting their threshold and
24 we were automatically reviewing them to

Page 271

1 make sure, since they're new accounts to
2 supply controlled substances, that they
3 haven't been the supplier for before, that
4 the threshold are set appropriately.

5    Q.   See, if you look at the
6 description here, I believe all of these
7 are CIIIs; are they not?

8    A.   CIIIs, alprazolam CIV.

9    Q.   There's a what?

10    A.   There's a couple of CIVs here
11 with the benzos.  CIIIs with the hydros at
12 the time.

13        It's different classes of
14 controls.

15    Q.   Would these have been drugs that
16 McKesson would have distributed for
17 Rite Aid prior to this changeover you're
18 talking about, or is this -- this category
19 of drugs the ones that are now part of the
20 new business arrangement between McKesson
21 and Rite Aid?

22        MR. LAVELLE:  Object to form.

23    A.   So, prior, McKesson was the sole
24 distributor for our Schedule II controlled

Page 272

1 substances and they were supplying these,
2 but we also had our auto replenishment or
3 our supplier from the warehouse for CIIIs
4 to Vs and any non-controls.  So, in this
5 bucket here, these are mainly things that
6 we would have traditionally replenished
7 from our distribution centers.

8    Q.   I think we're on the same page.

9         And I believe you just
10 testified, but just to clarify, you don't
11 have any specific recollection why you
12 chose these stores for the threshold
13 increases, right?

14    A.   So, one of the things that we
15 were doing during this time as we were
16 switching these pharmacies over for our
17 non- -- for our other controlled
18 substances, they would start reaching a
19 dashboard where we say hey, you know what,
20 they're starting to approach their
21 threshold.  Is it the right amount of
22 time.  Let's take a look to make sure that
23 we're not impacting those patients because
24 there is no other way for them to receive

Page 273

1 this medication at this time.  So we would
2 proactively review since this is the first
3 time that these thresholds are being set
4 for these locations.

5    Q.   I don't think you answered my
6 question.

7         I'm just trying to understand
8 how you chose this list of stores.

9         MR. LAVELLE:  Object to form.

10    A.   It was a list of stores that we
11 would receive where we can receive that
12 they are starting to approach a threshold.

13    Q.   Okay.  And is that because of
14 that daily report that you get from
15 McKesson about where they are with their
16 thresholds that you chose these stores?

17    A.   I believe so.

18    Q.   You say that you reviewed the
19 stores below, in your email.

20         Tell us what you did to review
21 these stores in order to increase their
22 thresholds.

23    A.   So, for any of these, we would
24 review the information that was provided.

Page 274

Appeared I don't know if these were the
initial set thresholds that we were
creating for the waves or if these were
already after the waves were in. But
there would be initial thresholds that
were set. We wanted to review to make
sure that it matches our business
dispensing history because we said we have
the full picture from a dispensing
perspective and we wanted to look at,
based off of the dispensing information,
are these units comparable to what they
would have been dispensing. We wanted to
look at who the prescribers were in these
locations. We wanted to generate some
dispensing history in percentage of
controls versus non-controls.
        So, we were going through a lot
of different key performance indicators to
identify and make sure that these
thresholds were what the stores were
already using today, or that day.
    Q.    A lot of words in your answer.
I asked a very simple question.

Page 275

        What did you do to review these
stores in order to request their threshold
increases? Because your email says I
reviewed the stores below.
    A.    That's exactly what --
        MR. LAVELLE:  Object to form.
BY MR. SIMMER:
    Q.    The answer to your question says
we did this.
    A.    Yes.
    Q.    When you say "I," do you mean
more than just you did this review?
        MR. LAVELLE:  Object to form.
    A.    So, this data has to be
compiled. So, a lot of this information
we brought in additional manpower to
compile this data for us, print it out,
IMS reviews. As that information gets
compiled by different departments and temp
help that we had hired to get this
information out of the system, they create
a file for me so that I could sit down and
review it, and as I would go through it
and make sure that we were looking at the

Page 276

stores dispensing history, we'd look at
the doctor information.  They'd pick up
the top doctor.  They'd utilize IMS which
we had access to at the time so that we
could review whether those prescribers,
what their base of business was outside of
our chain alone, and after we went through
everything, we were comfortable with what
our business base was and what the file
said, I would send this over for approval.
        So, that review was personally
done by me.  If I was not available, then
we had another pharmacy district manager
that would come in and review that same
process which I've trained them to do so.
    Q.    Is there a written record of all
the information that you evaluated in
order to come up with this list of
threshold increases that you are
requesting?
    A.    Yes.  We've got files on every
one of these stores that we had increased
these thresholds for.
    Q.    And, what's the file called?

Page 277

    A.    They were individual files named
after McKesson thresholds for that store,
so.
    Q.    And they would have been created
contemporaneously with this request that
you were making, right?
    A.    Yes.
    Q.    And, what's in that file?  If we
were to request Rite Aid to produce this
file, what would -- what would we request
that they provide to us?
        MR. LAVELLE:  Object to form.
    A.    The file would have our
dispensing information.  It would have our
top doctors.  It would have IMS reports.
It would have their percentage of controls
versus non-controls.
    Q.    And it's -- the actual name of
the file, if I were to say give us the
following files, what's the name of the
file I'll be asking for?
    A.    They're in store order.  It
should be in my archives from my records.
And they would be the store numbers under

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1  my files in Rite Aid, so.
2      Q.   So you kept an archive file by
3  store number and you have all the records
4  of your evaluation of those stores that
5  you prepared, right?
6          MR. LAVELLE:  Object to form.
7      A.   I don't have them, but they are
8  in Rite Aid, so.
9      Q.   Okay.  And, what software
10  program were you working in in order to
11  create those -- those folders you're
12  talking about?
13     A.   We utilized IMS.  We utilized
14  our Naviscript data.  We used our
15  prescriber reports which is generated from
16  our IT department.  So, multitude of
17  different systems, but the main ones were
18  IMS and our Naviscript.
19     Q.   Okay.  I think you -- I thought
20  you said there was one place I could go
21  and get this information.  You've now said
22  that there are multiple places I have to
23  go to to get this information.
24         Which is it?

Page 279

1      A.   I apologize.
2          MR. LAVELLE:  Object to form.
3      A.   I thought you meant where I went
4  to get this information.
5          So, those are the systems I went
6  to to get this information.  This is hard
7  copy reports that were printed and filed
8  in a manila folder in a filing cabinet.
9      Q.   In what kind of folder?
10     A.   In one of your regular file
11  folders filed in a filing cabinet.
12     Q.   And it's by pharmacy number?
13     A.   It's by number.
14     Q.   And those are files, as far as
15  you know, when you last had this position,
16  the company retained, correct?
17     A.   They were all in the cabinet
18  when I left.
19     Q.   And you had one for every
20  pharmacy that Rite Aid owned, right?
21     A.   I had one for every pharmacy
22  that we reviewed these thresholds for.
23     Q.   You didn't review every pharmacy
24  for the threshold request?

Page 280

1      A.   For any of these threshold
2  increases that we requested for.
3      Q.   Only for the ones that you asked
4  an increase from McKesson you created a
5  folder for that pharmacy, right?
6      A.   Yes.
7      Q.   And again, the information we
8  will see in that comes from IMS, Navistar.
9          What else, did you say?
10         MR. LAVELLE:  Object to form.
11     A.   It would come from IMS.  It
12  would come from Naviscript.  It would come
13  from our IT department if we needed any ad
14  hoc reporting.
15     Q.   And you printed all of that data
16  to put into the -- that particular store's
17  folder to document why you were requesting
18  the threshold increase, right?
19     A.   To document the information we
20  reviewed, yes.
21     Q.   Okay.  How long on average did
22  it take for you to conduct a threshold
23  review, like for the ones listed in
24  Exhibit 13, per pharmacy?

Page 281

1      A.   It depends on how much data is
2  available.  So, if it's a large number, if
3  it's a small number, you can see that some
4  of these thresholds are very minimal based
5  off of the volume.  So, it really depended
6  on how much information was generated
7  based off of that store and that base
8  code.  So I don't have a specific --
9      Q.   Let's look at one here for
10  Rite Aid 2375.  That's Erie, Pennsylvania.
11         And you requested a hydrocodone
12  combination increase of 23,500, right?
13         MR. LAVELLE:  Object to form.
14  BY MR. SIMMER:
15     Q.   How long would that evaluation
16  have taken you to conduct?
17     A.   It depends on the information
18  that's available.
19     Q.   Well, what's the average it
20  would have taken for that large a
21  increase?
22         MR. LAVELLE:  Object to form.
23     A.   I haven't timed myself to see
24  how long it takes.  Just gathering the

Page 282

1　data alone will take a good day for my
2　analyst to get all these stores at once.
3　I don't know how much time it specifically
4　takes for one store to gather that
5　information.  And it depends on what we
6　find as we're reviewing it if I needed to
7　take more time to do it.
8　　Q.　Well, I'm just trying to get an
9　understanding.  You have, what?  I don't
10　know how many are on here.  Looks like
11　about 30 pharmacies in this list.
12　　　　Just what would be the
13　approximate amount of time it would take
14　you to get this list together to go to
15　McKesson to request this, or these
16　threshold increases?
17　　　　MR. LAVELLE:  Object to form.
18　　A.　I couldn't quantify.
19　　Q.　Weeks?
20　　A.　Not weeks.
21　　Q.　What, one week, longer?  I'm
22　just trying to get an understanding.
23　　　　MR. LAVELLE:  Object to form.
24　　A.　This was very important to us

Page 283

1　and we did dedicate -- I dedicated a lot
2　of my time for McKesson threshold
3　increases.
4　　　　It was definitely not weeks
5　because we cannot go weeks without a store
6　being able to service their patients.  But
7　I couldn't give you an exact time.
8　　Q.　Okay.  So, you sent this email
9　to these individuals at McKesson on August
10　25th.  Two days later, on August 27th, you
11　sent another email saying:  Have these
12　stores been adjusted?
13　　　　You see that?
14　　A.　I do.
15　　Q.　It doesn't look like a request.
16　You basically are saying you want them
17　adjusted.
18　　　　Isn't that right?
19　　A.　I'm asking if there's an update
20　because if it hasn't, then they would
21　respond no, these have not.
22　　Q.　Okay.  Look at the next email in
23　the string from Sarah Medina to you that
24　same day about an hour later.  Actually,

Page 284

1　she's -- I don't know because of the
2　computer system whether it adjusts for
3　time zone, but roughly an hour later,
4　let's say.
5　　　　She says:  Sophia.  I received
6　word this morning that we have completed
7　the requests that were under 30,000 and
8　are still working on the ones above
9　30,000.  We hope to receive a final update
10　soon.  Thank you for your patience.
11　　　　Do you see that?
12　　A.　Yes.
13　　Q.　Do you recall her sending this
14　email to you saying that they had done the
15　ones under 30,000 only and those had been
16　approved?  Do you remember that?
17　　A.　I see it here.  I don't recall
18　prior to that.
19　　Q.　Okay.  Do you have any
20　recollection why they had a cutoff at
21　30,000?
22　　A.　I don't know what their internal
23　process is.
24　　Q.　You respond just a few minutes

Page 285

1　later:  When will this be resolved?  These
2　stores need product and if we don't get
3　them adjusted they cannot wait until after
4　Labor Day for their next shipment.
5　　　　What are you saying here?
6　　A.　I'm saying that we need to make
7　sure that we can service our patients.
8　　Q.　It's urgent.
9　　　　Is that right?
10　　A.　It is urgent.  They need to tell
11　me one way or another what's happening so
12　that at least we can communicate and help
13　those patients.
14　　Q.　Michael Oriente responds to you
15　short time later:  Sophia.  These
16　adjustments were made.  There are three
17　stores for hydrocodone that I will be
18　reaching out to you later today to
19　discuss.
20　　　　Do you see that?
21　　A.　Yes.
22　　Q.　Did he, in fact, reach out to
23　you?
24　　A.　I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    Q.   Do you have any recollection
2   what it was about those three stores he
3   wanted to talk to you about?
4    A.   I don't recall.
5    Q.   Okay.  So, it looks like other
6   than the three that we don't know how they
7   were resolved, they made all of these
8   adjustments.
9        Is that right?
10       MR. LAVELLE:  Object to form.
11   A.   That's what it would appear to
12  from the email.
13   Q.   And we'll go through some more
14  of these, but just generally, were there
15  any adjustments they refused to make?
16   A.   I don't recall.
17       (Rite Aid - Novack Exhibit 14,
18       email chain ending August 27, 2014,
19       Bates No. Rite_Aid_OMDL_0030479 to
20       Rite_Aid_OMDL_0030684, was marked for
21       identification, as of this date.)
22  BY MR. SIMMER:
23   Q.   The court reporter has handed
24  you what she has marked as Novack

Page 287

1   Exhibit 14, which I'll identify for the
2   record as Rite_Aid_OMDL_0030479 through
3   '30684.
4        Take a moment to review that,
5   let me ask you some questions.
6    A.   (Perusing document.)
7        MR. LAVELLE:  Counsel, there's
8   stuff that appears to be cut off on
9   the right side of this document.
10       Do you have a complete copy of
11  it?
12       MR. SIMMER:  That's how the
13  document was produced to us, counsel.
14       MR. LAVELLE:  Okay.
15       MR. SIMMER:  That one's on you
16  guys.
17       THE WITNESS:  (Perusing document.)
18  Okay.
19  BY MR. SIMMER:
20   Q.   Let me direct your attention to
21  your email on the bottom of the first page
22  dated August 27, 2014 to Sarah Medina
23  copying Michael Oriente, Nathan Hartle,
24  Melissa Evangelista.

Page 288

1        Do you see that?
2    A.   Yes.
3    Q.   And the subject line is
4   "Threshold Increase."
5        Do you see that?
6    A.   Yes.
7    Q.   Does this appear to be another
8   threshold increase request like the one we
9   just looked at?
10   A.   Yes.
11   Q.   A group of pharmacies that
12  you've done evaluation on and you're
13  requesting specific increases of those
14  pharmacies.
15       Is that right?
16   A.   That is correct.
17   Q.   Let me just make sure I
18  understand sort of what the -- we can take
19  an example.  And, I apologize, it was
20  produced to us cut off.
21       But just take, for example, on
22  the second page, the fourth pharmacy from
23  the bottom.  That's Rite Aid 11512 and
24  it's a hydrocodone combination and looks

Page 289

1   like you requested an increase to 33,000.
2        Do you see that?
3    A.   I see 33,000, yes.
4    Q.   Is that -- isn't that reflecting
5   you are requesting an increase to 33,000?
6    A.   Yes.
7    Q.   Okay.  I just want to make sure
8   I understand how these thresholds are
9   being calculated.
10       Is that in dosage units?
11   A.   That is in units.
12       MS. CHARLES:  Objection;
13  foundation.
14  BY MR. SIMMER:
15   Q.   I'm sorry?
16   A.   It is in units.
17   Q.   So it is in dosage units,
18  correct?
19   A.   I do know that they calculate
20  their liquids a little bit differently,
21  but it's in units.
22   Q.   How does this compare to the
23  Rite Aid 5,000 dosage CIII threshold that
24  had been used prior to this?

Page 290

1    MS. CHARLES: Objection to form.
2    A.   This is different.
3    Q.   Thank you for that.
4        How is it different?
5    A.   McKesson goes by base codes. We
6  go by NDCs.
7    Q.   Again, just translate that for a
8  layperson who doesn't understand your
9  lingo.
10        So, how does a base code 5,000
11  threshold that you were using prior to
12  this relate to your NDC threshold you're
13  now using?
14    MR. LAVELLE: Object to form.
15    A.   So, this is for the base code
16  which is, for instance here, hydrocodone,
17  which would include all different NDCs
18  different strengths. Our supply chain is
19  5,000 dosage units based off of an
20  individual NDC.
21    Q.   So, the numbers reflected here
22  would be all NDCs for that particular
23  active ingredient?
24    A.   Yes.

Page 291

1    Q.   So, for example, the very first
2  one, hydrocodone combination increase to
3  20,000.
4        The request there is for all
5  NDCs that include that active ingredient,
6  right?
7    MS. CHARLES: Objection to form.
8    MR. LAVELLE: Same objection.
9    A.   Can you clarify that question?
10    Q.   I'm doing the best I can. A
11  little bit -- you know, I'm looking for
12  help from you.
13    A.   Okay.
14    Q.   So, when you're requesting
15  20,000, what are you requesting?
16    A.   It's encircles all of those NDCs
17  rolling up 20,000. So it's not one NDC
18  20,000, another NDC 20,000. Everything
19  rolling up is 20,000.
20    Q.   So, every hydrocodone
21  combination NDC all added together would
22  be 20,000?
23    A.   Anything that includes
24  hydrocodone as an ingredient, all together

Page 292

1  20,000.
2    Q.   I think we're on the same page,
3  which is really quite remarkable.
4        So, you say here:  I've reviewed
5  the stores below.
6        Did you do anything differently
7  with this group of stores than you did
8  when we looked at the prior exhibit?
9    A.   Same review.
10    Q.   This is two days later than the
11  review you had done for the prior group.
12        When you finish a batch, do you
13  send it off and then start the next one?
14    A.   We review all the files together
15  and then we may send them off as a batch
16  before we start the next one or we may
17  send them up based off of the spreadsheet
18  that we had as we're doing the reviews in
19  totality. So this is just recordkeeping
20  where we are with entering it in that
21  sheet.
22    Q.   I think you raised something I
23  should have gotten a little better
24  understanding on.

Page 293

1        So, when you are establishing
2  what you're going to request for the new
3  threshold, is there a process that
4  internally you as a group sit down and say
5  okay, this is what I propose and the group
6  debates it? Or, how do you arrive at the
7  number that you're going to request?
8    MR. LAVELLE: Object to form.
9    A.   It depends on what type of
10  threshold we are reviewing. For these
11  initial store set, store limit ones that
12  are based off of historical trend and just
13  establishing an account with McKesson,
14  outside of CIIs, because they already had
15  that, but for all of the other scheduled
16  medications, this was reviewing of our
17  data. Very different than if it's a
18  one-off request from the field that's
19  requesting a threshold increase.
20    Q.   Just go through what are some of
21  the differences between this kind of
22  review and the one-off review.
23    A.   So, a one-off review we would
24  include our field team in making sure that

Highly Confidential – Subject to Further Confidentiality Review

Page 294

1 any time they request a -- an increase and
2 they've done their due diligence, gathered
3 information, and it's coming from them for
4 us to review.
5 In this situation, we do it the
6 reverse way. We look at all of the
7 dispensing data. We look at all of our
8 trends. We look at our prescribers and
9 then we determine if these thresholds will
10 meet what our store has traditionally been
11 doing. If there's anything in there that
12 we feel needs additional information, then
13 the reverse would happen. We'd now go out
14 to the field and say can you give us some
15 more information.
16 Q. You keep saying "we did this."
17 Is it just you, or is there a
18 group of people doing this, what you're
19 describing?
20 MR. LAVELLE: Object to form.
21 A. When it comes down to looking
22 into a store and going out and asking the
23 store team, I would usually partner with
24 somebody from Government Affairs just to

Page 295

1 look for it because we house about the
2 same information and we can look at
3 doctors and --
4 Q. We talked about that earlier.
5 A. Yes.
6 MR. LAVELLE: You cut off the
7 witness in the middle of her answer.
8 MR. SIMMER: I apologize.
9 MR. LAVELLE: Please do not do
10 that, counsel.
11 A. So, in those situations, we
12 would -- we would converse and say have we
13 seen anything here; is there anything that
14 we're concerned about; is this normal and
15 customary as we're going through this
16 review or this threshold.
17 We -- I'm thinking about my
18 whole team that had to create all of these
19 documents and these files and put them in
20 front of me and make sure that I had one
21 record after another for me to go through.
22 So, I apologize I'm
23 interchanging my we's and I's. But in
24 this particular case for these thresholds,

Page 296

1 I've sent it over and I've reviewed these
2 thresholds to make sure that we felt
3 comfortable with these based off of our
4 historical dispensing trend.
5 Q. You're the final decider, right?
6 A. For anything that was a base
7 limit threshold, yes, I was a decider.
8 Q. So, there's nobody, you know,
9 else besides you that makes that final
10 decision, right?
11 A. For the initial set, we reviewed
12 data that was provided to us. So McKesson
13 went through all of our history and
14 information. They sent us what their
15 projected thresholds were. We reviewed it
16 to see if there was anything that we
17 needed adjustments on, and if there were
18 any adjustments, then I would review them
19 to send them back up.
20 Q. Take a look at the email that
21 you received from Michael Oriente that
22 same day a couple hours later, it looks
23 like.
24 A. You mean the email from Nate?

Page 297

1 Q. I'm sorry. I take this back.
2 No. To you. The email right
3 above that at the top here on Exhibit 14.
4 A. To me from -- from Nate. You
5 said from Michael Oriente.
6 Q. Because it's --
7 MR. SIMMER: Strike that.
8 Q. It's Nathan Hartle, I guess. I
9 don't know how this came -- this is how it
10 came to us.
11 There is an email from Michael
12 Hartle to you, right? Do you see that?
13 MR. LAVELLE: Object to form.
14 A. I see an email from Nathan.
15 Q. Okay. You see where he says in
16 the body of his email: Hi Sophia. I am
17 not sure if you had a chance to connect
18 with Michael today or not. I have some
19 questions about the requests you have been
20 submitting so maybe we could connect
21 tomorrow or Friday if needed.
22 Do you remember this situation?
23 A. I don't recall this
24 specifically.

Page 298

1    Q.   And, let me go through the
2  questions he has here.
3        The first one:  Question
4  comments.  Could you add a column and
5  provide an explanation for each request?
6  For example, are they part of the original
7  wave research and have gone through your
8  process, are they due to some type of
9  growth, or is there another reason for the
10 request?
11       Do you see that?
12   A.   Yes.
13   Q.   Okay.  Do you recall him asking
14 you for this information?
15   A.   I recall it as I'm reviewing
16 this document.
17   Q.   Okay.  That's confusing.
18       You recall it as you're
19 reviewing the document?  As you review it,
20 it refreshes your recollection of his
21 asking for it?  Is that what you're
22 saying?
23       MR. LAVELLE:  Object to form.
24   A.   I remember that there are

Page 299

1  requests for us to add an indication to
2  why we were increasing a threshold.
3    Q.   Did you, in fact, do that?
4  Provide that information?
5    A.   I don't recall.  I believe so.
6    Q.   Okay.  What types of
7  explanations did you provide?  Because
8  that's not in any document the company
9  provided to us.
10       MR. LAVELLE:  Object to form.
11   A.   The information that's asked
12 here, whether it is a wave research or
13 another reason.
14   Q.   Just clarify what you mean by
15 that.
16       What is wave research?
17   A.   As our stores were rolling out
18 conversion to McKesson, we had the
19 information ahead of time.  We wanted to
20 review the thresholds prior to us rolling
21 out.
22   Q.   Okay.
23   A.   So, hopefully we would be ahead
24 of it.

Page 300

1    Q.   So when he's saying here are
2  they part of the original wave research,
3  do I take it that when the waves were
4  happening, whenever that was, there was
5  research done about each pharmacy at that
6  time and he's inquiring is this part of a
7  wave research?  I'm trying to understand
8  what's -- what's happening here.
9        MR. LAVELLE:  Object to form.
10   A.   I think I'm confused also.
11       So, the wave research is just
12 exactly as it is.  We were researching the
13 waves as they were coming for the
14 individual stores and their thresholds.
15   Q.   So you don't know what he's
16 referring to.
17       Am I right?
18   A.   I can't recall what specifically
19 he's reviewing -- referring to.
20       My understanding from this is
21 he's asking if it was based off of our
22 stores that were rolling in the next waves
23 upcoming and if we can make that
24 indication.

Page 301

1    Q.   Okay.  The second bullet he says
2  under "Wave Research":  Are all of the
3  requests for hydrocodone, aprazolam,
4  car -- how do you pronounce that?
5  Carisoprodol?
6    A.   Mm-hm.
7    Q.   Is that it?
8        Okay.  Part of the initial
9  research process that includes a deep dive
10 and sign off by you?
11       What's he asking for, if you
12 know?
13   A.   So, I go through a request as we
14 are going through this threshold increase
15 or threshold setting.  So he's asking if
16 these items go through that review.
17   Q.   And, do you re -- do you
18 remember responding to him on this?
19   A.   I don't recall if I responded to
20 his email or if we had a call about it.  I
21 don't recall.
22   Q.   So what's the answer to the
23 question he asked you here, if you recall?
24   A.   So, all of the requests that we

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 have sent up are reviewed by me. So that
2 would have been the answer.
3    Q.   So the answer did include a deep
4 dive on sign-off by you?
5    A.   Anything that I was sending over
6 electronically listing with the stores
7 were a review by me.
8    Q.   Okay. So, maybe this is -- a
9 point to sort of clarify the relationship
10 that Rite Aid had with McKesson.
11       It was Rite Aid that established
12 what it thought the appropriate thresholds
13 were for these drugs, not McKesson.
14       Isn't that right?
15       MR. LAVELLE:  Object to form.
16       MS. CHARLES:  Object to form.
17    A.   No.  Rite Aid did not set these
18 thresholds.  So, these thresholds were
19 already set for us.  We had the
20 opportunity to review for any adjustments
21 or misalignments.  So, there may be times
22 where the threshold is right, but due to
23 package sizing, that threshold needs to
24 change because it can't accommodate those

Page 303

1 large bottle sizes for a low limit or
2 threshold.
3    Q.   Well, the instance we're talking
4 about here, did they reject any of the
5 changes you requested?
6    A.   I don't recall if they did or
7 didn't.
8    Q.   Look at the next bullet:
9 Tramadol.  We used the data you supplied
10 to set initial thresholds.  So what is
11 driving the increases in these stores as
12 so soon after the schedule change last
13 week?
14       You see what he's saying?
15    A.   I see it.
16    Q.   So he's saying you're requesting
17 changes a week later on tramadol.
18       What would your answer be to
19 that question?
20       MR. LAVELLE:  Object to form.
21    A.   I don't believe that this
22 relates to my already asking for an
23 increase and asking for another one.
24       So, in this specific question, I

Page 304

1 don't recall the specifics of it.  But
2 looking at this, tramadol was rescheduled,
3 so I don't know if it was in relation to
4 the rescheduling of tramadol that created
5 an issue and we were looking at it, but
6 they indicated that they supplied initial
7 thresholds and it was just from my data.
8       So, we didn't request a
9 threshold increase based off of this
10 conversation.  They just supplied me what
11 they had set it on based off of the data
12 that was sent over to them.  We're asking
13 for some adjustments at this point.
14    Q.   What do you mean by tramadol is
15 rescheduled?
16    A.   It went from a federally
17 non-controlled medication to a controlled
18 medication.  So, I'm assuming this is the
19 time period that it happened, based off of
20 his comment.
21    Q.   So, when he says the schedule
22 change, it appears to be -- to suggest the
23 rescheduling you're talking about.
24       Is that why you're answering the

Page 305

1 way you did?
2    A.   That is my understanding from
3 this particular question, because our
4 replenishment for non-controls does not
5 account for this threshold that would have
6 been created if this was rescheduled
7 through McKesson.
8    Q.   When these drugs were
9 rescheduled, would that -- did all of them
10 happen simultaneously, or did they happen
11 over time by drug?
12       MR. LAVELLE:  Object to form.
13    A.   I don't understand what all are
14 being rescheduled means.
15    Q.   For example, the Schedule IIIs
16 that were rescheduled to be Schedule IIs,
17 did they all happen at the same time?
18    A.   I still don't understand the
19 question.
20       The rescheduling happens on the
21 federal side.
22    Q.   That's what I'm asking.
23       So, as the DEA reschedules
24 Schedule IIIs so that they're Schedule

Page 306

1  IIs, did that all happen at the same time?
2      A.   For a specific medication, it
3  would have happened at the same time.  So,
4  when it was tramadol, tramadol is going to
5  be a scheduled medication.  When they
6  rescheduled hydrocodone, there was all
7  different strengths of hydrocodone that
8  was rescheduled at the same time.
9          I don't know if that's --
10     Q.   Well, I'm asking not just about,
11 you know, isolated tramadol or hydrocodone
12 combination.
13         All those Schedule III drugs
14 when they were rescheduled, did all of
15 them happen at the same time?
16         MR. LAVELLE:  Object to form.
17     A.   I don't understand the question.
18     Q.   There's a disconnect here.  I'm
19 doing the best I can to ask what I thought
20 was a simple question.
21         It was the DEA that decided that
22 these were going to be rescheduled, right?
23         MR. LAVELLE:  Object to form.
24     A.   For the federal scheduling of

Page 307

1  the medications.
2      Q.   Right.
3          They are the ones that decided
4  that, right?
5      A.   It was changed from the federal,
6  yes.
7          So, when a schedule change
8  happened with a medication, tramadol was
9  non-control, we didn't have threshold set
10 for a non-control medication.  So, when
11 tramadol was rescheduled, it now had a
12 base code.  It had a controlled substance
13 limiting threshold, and we had to set
14 those for the first time, whether it be in
15 the supply chain.
16         So it looks like this is during
17 McKesson.
18     Q.   I think I'm starting to
19 understand why we have disconnects.
20         All of these changes the DEA
21 made, the reschedule, you know, scheduling
22 products that were not scheduled at all or
23 controlled before who now are, all those
24 changes, did they happen at the same time

Page 308

1  for all the drugs, or did it phase in by
2  drug?
3          MR. LAVELLE:  Object to form.
4      A.   It was one drug at a time.
5          I still don't understand.
6      Q.   If it was one drug at a time,
7  that's fine.
8          So it was -- we had a date for
9  the change that happened that affected
10 tramadol.  There was another date for
11 hydrocodone combination, another date for
12 another drug.
13         Is that what you're saying?
14     A.   Yeah.
15         MR. LAVELLE:  Object to form.
16     A.   I'm saying that there were
17 specific dates where the rescheduling had
18 to happen.
19     Q.   Okay.
20     A.   Not dictated by any of us here.
21     Q.   Understood.  Okay.
22         And he also says his last
23 bullet:  Other recent changes, i.e.
24 lorazepam amphetamine.  Have you conducted

Page 309

1  the same type of research, analysis and
2  sign off on all of these stores?  Many of
3  them we just changed based on the data you
4  supplied so I would like to understand the
5  need to increase again so soon.
6          What's he asking here, as you
7  understand it?
8      A.   He's asking for additional
9  information on items that we were asking
10 for an increase for.
11     Q.   Looks like you just had an
12 increase a short time earlier, right, for
13 these lorazepam and amphetamine, right?
14     A.   So, it looks like there were
15 thresholds that were reset from data that
16 was sent over.  Not too sure if that was
17 reference to my data or just dispensing
18 data as they were setting the initial
19 thresholds, but it appears that we did
20 need a second increase.
21     Q.   So that would be the original
22 wave research that was done, and now
23 you're asking an additional increase?
24     A.   We are requesting --

Page 310

1    MR. LAVELLE:  Object to form.
2    A.   -- an adjustment to the
3  threshold.
4    Q.   Do you recall why you were
5  making a request so soon after the
6  original wave in research had been done?
7    A.   For lorazepam specifically, I do
8  remember it's based off of our algorithm
9  for replenishment.  And lorazepam comes in
10  large package sizes.  So when we
11  replenish, it gives you the next unit up,
12  which can be a thousand count bottle.  So
13  a low threshold, now I am replenishing at
14  a thousand counts at a time, it's going to
15  increase your threshold quickly.
16    Q.   Okay.  Did you give him answers
17  to these questions?  Do you know?
18    A.   I don't recall.
19    Q.   You seem like a diligent enough
20  employee.
21    You would have responded to
22  requests like this though, right?
23    MR. LAVELLE:  Object to form.
24    A.   I don't remember if we had a

Page 311

1  conference call about it, we had a meeting
2  about it.  I know we talked a lot about
3  this process to make sure that we supplied
4  the information that they need and what we
5  needed to make sure that our patients were
6  getting the medication that they needed.
7    Q.   So if he gives you requests like
8  this in writing, you wouldn't have given
9  him an answer in writing?
10    MR. LAVELLE:  Object to form.
11    A.   I can't tell you what I did or
12  did not do several years ago.
13    I know we would have discussed
14  it and we would have both felt comfortable
15  with the information, whether I was
16  providing over.
17    Q.   You had testified earlier that,
18  I think this morning or maybe earlier this
19  afternoon, that you do recall having
20  conversations with Nathan Hartle.
21    That's who you -- I think you
22  referred to, right?
23    A.   Yes.
24    Q.   And, would that be the context

Page 312

1  of what you're recalling, that you did
2  have the conversation about things like
3  this?
4    MR. LAVELLE:  Object to form.
5    A.   I don't remember the specific
6  conversations we've had, but we did have a
7  lot of conversation over threshold
8  monitoring and reviewing the information
9  and setting the store thresholds.  And as
10  I said, this was a brand new process.
11  We're not going to get it right the first
12  time and there are going to be tweaks that
13  we need to do, whether it be from IT,
14  replenishment, unit doses, things that we
15  didn't encounter or anticipate
16  logistically when we were going into this.
17    Q.   So, if you had done a written
18  response to Mr. Hartle on these requests,
19  that would be in your file, wouldn't it?
20    MR. LAVELLE:  Object to form.
21    A.   If I had a written response, it
22  would be in an email somewhere.
23    Q.   Did you only respond via email?
24    A.   If it was a written response, it

Page 313

1  would be electronic.
2    Q.   So it could be other than via
3  email?
4    A.   If we had a conversation over
5  the phone, if we had a meeting in our
6  office.  I don't recall.  If it was
7  anything different, if it was a written
8  response, it would be electronic through
9  email.
10    Q.   My question was different.
11    I said if you're going to give
12  an electronic response, would it only be
13  via email, or would you have created an
14  electronic response, say, as a Word
15  document or some other vehicle
16  electronically?  That's what I'm trying to
17  understand.
18    MR. LAVELLE:  Object to form.
19    A.   I would have had to still send
20  it over through email.
21    Q.   So, it's your testimony that if
22  you had given a written response, it would
23  have been something you would have sent
24  Mr. Hartle via email and it would be in

Page 314

1  one of your emails, right?
2      MR. LAVELLE:  Object to form.
3      A.   If I responded, it would be in a
4  email.
5      I don't know if I responded via
6  email or not.  Like I said, we could have
7  had a meeting to discuss or we've had some
8  conference calls.  I don't know how I
9  responded.
10     Q.   Did you have face-to-face
11 meetings with Mr. Hartle?
12     A.   I don't recall if we had
13 face-to-face meetings with -- with Mr.
14 Hartle specifically.
15     Q.   Did you have face-to-face
16 meetings with anyone at McKesson around
17 these issues on the transition that was
18 going on?
19     A.   We had meetings and there were
20 McKesson representatives there in our
21 meetings, yes.
22     Q.   Did they come to your offices
23 for those meetings in Camp Hill?
24     A.   We've had some meetings in the

Page 315

1  board room as we were discussing the
2  overall transition in Camp Hill.
3      Q.   So that's the Rite Aid boardroom
4  you're talking about, right?
5      A.   Yes, the conference room.
6      Q.   Did you go down to McKesson's
7  offices for any meetings?
8      A.   Not that I recall.
9      Q.   Would there be meeting notes of
10 any kind that were taken when you met with
11 them?
12     A.   I don't remember.
13     Q.   When you attended meetings with
14 your -- with your colleagues at McKesson,
15 did you take handwritten notes?
16     MS. CHARLES:  Object to form.
17     A.   I would have taken notes if I
18 had anything I needed to document down or
19 write down so that I can follow up on.
20     Q.   And, where did you store your
21 notes?
22     A.   On a legal pad.  I would store
23 it on a legal pad.
24     Q.   And, where did those -- those

Page 316

1  legal pad notes go?
2      A.   I don't always keep my legal
3  pads.  Once I followed up on the
4  information that I needed to, it would be
5  discarded in confidential trash.
6      Q.   What's confidential trash?
7      A.   Just we've got a shredding
8  company.
9      Q.   So you didn't make any effort to
10 try to retain your notes in any way in the
11 files that you left at Rite Aid, at the
12 corporate offices when you changed your
13 position, right?
14     MR. LAVELLE:  Object to form.
15     A.   All of the files in related to
16 the research that we've done for
17 thresholds were maintained and documented
18 and filed by store order.
19     Notepads that I would jot down
20 when I was in meetings was not something
21 that I kept routinely.
22     (Rite Aid - Novack Exhibit 15,
23     email chain ending August 28, 2014,
24     Bates No. MCK_MDL_00630329 to

Page 317

1      MCK_MDL_00630330, was marked for
2      identification, as of this date.)
3  BY MR. SIMMER:
4      Q.   Giving you what the court
5  reporter has marked as Novack Exhibit 15.
6  I'll state for the record that there is a
7  portion of it that is redacted, that
8  that's the part of the email communication
9  that Ms. Novack was not a part of, so we
10 redacted that.  Other than that, the
11 document is as produced, except, again,
12 for the fact that our copy service deleted
13 the footer and Bates number.
14     Take a moment to review that.
15 Let me ask you some questions about it.
16     A.   (Perusing document.)
17     MS. CHARLES:  Could you provide
18 the Bates number?
19     MR. SIMMER:  I'm sorry.
20 MCK_MDL_00630329 to '630330.
21     MS. CHARLES:  Thank you.
22     THE WITNESS:  Okay.
23 BY MR. SIMMER:
24     Q.   Direct your attention to your

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  email dated August 28th, one day later
2  from the email we just looked at, 2014,
3  again to the same group of individuals as
4  the prior email, Sarah Medina, Melissa
5  Evangelista, Nathan Hartle, Michael
6  Oriente.
7         And you have, I think,
8  virtually, or the same statement here:
9  I've reviewed the stores below and would
10 like to request the following threshold
11 increases.
12        You go on to say, it's a little
13 bit different than the prior emails.  You
14 say:  I've only had the opportunity to add
15 the wave data in the first column.
16        Okay.  What are you saying
17 there?
18     A.   I don't remember the context,
19 but looks like I added what waves the
20 stores went for our sole distribution
21 through McKesson.
22     Q.   Well, there is a new column on
23 this table and it says:  National subgroup
24 CD IND Code 2.

Page 319

1         What is that?
2      A.   I don't remember what that
3  means, but based off of the email, it
4  looks like, like for instance, that first
5  store 213 was in wave 16 of conversion to
6  McKesson.  The next store is in wave 17,
7  so on and so forth.
8      Q.   So that's your belief that that
9  column reflects what particular wave that
10 the change had been requested previously,
11 right?
12     A.   The -- no.  That's the wave that
13 the store is converting to McKesson for
14 sole distribution.
15     Q.   I think that was my question.
16 So I think you --
17     A.   Okay.
18     Q.   And again, you did the same kind
19 of research here that you had done in the
20 prior two exhibits we have looked at,
21 right?
22     A.   For these, yes.
23     Q.   This is a different set of
24 pharmacies than what we looked at in the

Page 320

1  prior group, right?
2      A.   Yes.
3      Q.   And, do you know whether
4  McKesson approved this set of changes that
5  you were requesting?
6          MS. CHARLES:  Objection to form.
7      A.   I don't recall, if there isn't
8  more context to this email that tells me
9  if they approved it or not.
10     Q.   So, these are the three emails
11 that we found on this subject.
12        Were there other threshold
13 request changes like this that you recall
14 having done other than these three?
15        MR. LAVELLE:  Object to form.
16     A.   I don't know offhand.
17     Q.   Do you recall how many file
18 folders that you created for these changes
19 that you -- that you say you documented?
20     A.   A lot.
21     Q.   How many days do you recall
22 having worked on this project?
23        MR. LAVELLE:  Object to form.
24     A.   I don't remember days

Page 321

1  specifically, but it was months that we
2  were on this project.
3      Q.   Multiple months?
4      A.   Multiple months.
5      Q.   So, am I right then that there
6  must have been more than three of these?
7      A.   I don't know how many there
8  would have been.
9      Q.   Is it possible there were just
10 three?
11        MR. LAVELLE:  Object to form.
12     A.   I don't know if there was just
13 three.  I don't know if it was just the
14 establishing of the thresholds and it was
15 just these are good to go.  I don't know
16 how we communicated this context.  So I
17 don't know how many.
18        I do know that we have a lot of
19 files that we've created just for review,
20 and some of them may have been just to
21 review, not necessarily to increase, but
22 just to review to make sure that we were
23 comfortable with the initial set.
24     Q.   So there would be a number of

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  these file folders you're talking about
2  where you just did a review and didn't
3  request a threshold increase, right?
4      A.   There would be file folders,
5  yes.
6      Q.   Okay.  So it's not just those
7  ones that you requested a threshold
8  change, but every one you reviewed you
9  created a folder for, right?
10     A.   Ones that I have reviewed there
11 will be a file folder for, or there was a
12 file folder for.
13     Q.   Okay.  You made, in answering
14 the question just now, you made the point
15 of saying ones that you reviewed.
16         Are there ones that others
17 reviewed?
18     A.   You mentioned every single
19 store.  So, I didn't individually review
20 every single store if the initial limit
21 was set and it wasn't one that we wanted
22 to look at for service level reasons.
23     Q.   So, if this process is taking
24 months to conduct this review, the stores

Page 323

1  must have just been screaming bloody
2  murder about, you know, I'm hitting my
3  threshold every month and I'm running out
4  of these drugs, right?
5      MR. LAVELLE:  Object to form.
6      A.   Remember I mentioned that we do
7  these out in waves.  So we're reviewing
8  waves or what's upcoming hopefully ahead
9  of time and we're ahead of it before it
10 happens and then we can catch up on any
11 that whether we didn't -- we missed or
12 whether for our unit size issues or
13 replenishment issues we have to go back
14 and take a look at, so.
15     Q.   Okay.  I think I'm getting a
16 clear understanding now.
17         So that when you're making these
18 changes, these are stores that haven't
19 actually made the change to getting the
20 sole source supply from McKesson?  You're
21 ahead of that change for these stores?
22         Is that right?
23     A.   These are to implement when the
24 stores go sole source supply for the rest

Page 324

1  of the Schedules IIIs to Vs.
2      Q.   So that the change to sole
3  source for these stores has not happened
4  yet?
5      A.   I don't know, based off of the
6  data in this email, whether wave 13, 14,
7  15 has or has not happened.  We tried our
8  best to make sure that we were able to
9  evaluate these so that they were ready for
10 go-live date.
11     Q.   So, because it was important
12 that there wouldn't be any supply issues
13 for those stores when they went on a
14 go-live date, right?
15     A.   It was important that we
16 continued our service for patient care
17 because there will be -- they're only
18 ordering their medications from McKesson.
19     Q.   And again, to the extent you
20 recall, when you made this request, do you
21 know if there were stores that they
22 refused to make the threshold adjustment
23 on that you were requesting?
24     A.   I don't recall if they did or

Page 325

1  did not have any of those situations.
2      Q.   How long did the back and forth
3  go on between yourself and your colleagues
4  at McKesson as to these threshold
5  adjustments we're talking about?
6      MS. CHARLES:  Object to form.
7      A.   For months we had constant
8  communication about this process, which
9  thresholds, reviewing those limits.  So,
10 we were talking about these thresholds all
11 the time.
12     Q.   It wasn't a great question.  Let
13 me try that again.
14         So, when you sent this -- these
15 requests for a re -- for changes, do you
16 recall how long it took to resolve
17 whatever the issues were and get through
18 that particular list?
19     MR. LAVELLE:  Object to form.
20 BY MR. SIMMER:
21     Q.   Was it a period of months?  Was
22 it a period of weeks?
23     MR. LAVELLE:  Object to form.
24     A.   I don't recall specific amount

Page 326

1  of time, but it was not months and it was
2  not weeks.
3      Q.   It was a matter of days then,
4  right?
5      A.   I don't know if it's a couple of
6  days.  I don't know if it's one or two
7  weeks, because we have to continue to
8  follow up, and if there's a reason, we
9  would want to know so that we can discuss.
10     But I don't know.  I couldn't
11 tell you for sure.
12     Q.   When you sent this list to
13 McKesson, do you know whether they did any
14 independent investigation of the -- of
15 these stores to determine whether they
16 agreed with the thresholds that you were
17 requesting?
18         MS. CHARLES:  Objection to
19 foundation.
20     A.   I couldn't speak for them.  I
21 don't know.
22     Q.   You had interactions with, you
23 know, Nathan Hartle and others, you said,
24 at McKesson, right?

Page 327

1      A.   Yes.
2      Q.   Did you get any understanding
3  what they were doing as they evaluated
4  these threshold requests?
5      A.   I don't recall.  I know that I
6  discussed what we were doing on our end at
7  Rite Aid.  I don't recall what their
8  process was on their end.
9      Q.   Mr. Hartle in the email we
10 looked at in the prior exhibit requested
11 certain additional fields of information,
12 right?
13     A.   Yes.
14         MR. LAVELLE:  Object to form.
15 BY MR. SIMMER:
16     Q.   I guess my question is did you
17 reach an understanding that they were
18 looking pharmacy-by-pharmacy to see
19 whether they agreed with the conclusions
20 you had reached about what the appropriate
21 threshold was for these pharmacies?
22         MS. CHARLES:  Objection to
23 foundation.
24         MR. LAVELLE:  Object to form.

Page 328

1      A.   Can you repeat that question?
2      Q.   Did you reach an understanding
3  that McKesson was looking
4  pharmacy-by-pharmacy to see whether they
5  agreed with the conclusions you had
6  reached about what the appropriate
7  threshold would be for these pharmacies?
8         MR. LAVELLE:  Same objection.
9      A.   This email was asking for
10 additional information.  So, if I spoke to
11 him, it was an understanding on what he
12 was asking and what he needed or what
13 information he was requesting.
14     Q.   I wasn't talking about this
15 email.  I said in your conversations with
16 Mr. Hartle, did you reach an understanding
17 whether McKesson was looking
18 pharmacy-by-pharmacy to see whether they
19 agreed with your recommendations about
20 threshold increases?
21         MR. LAVELLE:  Object to form.
22     A.   I don't know what they were
23 doing or what their process was.  It
24 wasn't discussed with me specifically.

Page 329

1      Q.   Okay.
2         MR. LAVELLE:  Counsel, if we're
3  finished with that document, can we
4  take a break?  We've been going for
5  about an hour and 15 minutes.
6         MR. SIMMER:  That's fine.
7         THE VIDEOGRAPHER:  The time is
8  now 4:25 p.m.
9         We're going off the record.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  The time is
12 now 4:42 p.m.
13         We are back on the record.
14 BY MR. SIMMER:
15     Q.   Ma'am, we talked several times
16 today about the 5,000 base code unit
17 threshold that Rite Aid had used with this
18 pharmacy.
19         Is that right?
20         MR. LAVELLE:  Object to form.
21     A.   It's 5,000 dosage unit per NDC
22 per order.
23     Q.   But isn't that what you called
24 the base code?

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    A.   No.
2    Q.   Am I getting this mixed up
3  again?
4       It's McKesson is the base code;
5  for Rite Aid it was NDC, right?
6    A.   Yes.
7    Q.   Okay.  Did you have anything to
8  do with setting that 5,000 limit per NDC?
9    A.   No.
10   Q.   Do you know when that was, that
11 particular policy was set for Rite Aid?
12   A.   I'm not aware when it was set.
13   Q.   But it -- but it was something
14 that was in place when you took your job
15 in Asset Protection?
16   A.   It was already in place, yes.
17   Q.   Do you have any idea how long it
18 had been in place?
19   A.   I'm not sure.
20   Q.   So, that how did this work sort
21 of in the Rite Aid environment, when a
22 pharmacy ordered more than 5,000 of a
23 particular NDC in any given month, would
24 they receive the full 5,000, or was there

Page 331

1  some -- how was that handled?
2       MR. LAVELLE:  Object to form.
3    A.   The stores may not have been
4  able to order the 5,000.  We have a
5  replenishment system that goes through an
6  algorithm.  It takes into account the
7  medication on hand and the movement.  So
8  it didn't allow you to just manually order
9  5,000 units if that's not what you've been
10 dispensing or that's not what your sales
11 show.
12      So, in that scenario, you would
13 not be able to reach that threshold.  The
14 ordering system would tell you you can't
15 order above this because it's already
16 exceeded the max based off of your store
17 algorithm.  If the store orders more than
18 5,000, or for whatever reason the order is
19 over 5,000, then the order would be
20 omitted.  So they would not get anything
21 above that.
22   Q.   They would get the 5,000 though,
23 right?
24   A.   You know, I don't know.

Page 332

1    Q.   So, I'm just trying to
2  understand so that if a store ordered,
3  just give an example, 7500 of that
4  particular NDC, 7500 units, would they get
5  the 5,000 or would they get nothing?
6       MR. LAVELLE:  Object to form.
7    A.   I don't -- I'm not clear.  I
8  know in McKesson, it would -- the whole
9  order would be omitted.
10      From the supply chain, I'm not
11 sure.  I'm not involved in that.
12   Q.   So that McKesson, at least
13 you're sure that they would not do a
14 partial order up to -- or delivery up to
15 the threshold, right?
16   A.   Correct.
17   Q.   Do you know why they did it that
18 way?
19      MS. CHARLES:  Objection;
20 foundation.
21   A.   I'm not sure.
22   Q.   Do you know whether Rite Aid had
23 a similar policy?  Just to be real clear.
24      MR. LAVELLE:  Object to form.

Page 333

1    A.   Rite Aid's policy was somebody
2  will look at the lines that were ordered.
3  If it was over the 5,000, then somebody
4  would come out and pick the lines, and
5  they would have a protocol in place to
6  contact the stores, document that call,
7  that activity in a log.
8    Q.   Okay.  I'm not sure I got a
9  clear answer there.
10      Would they get a partial order
11 shipped to them?
12      MR. LAVELLE:  Object to form.
13 Objection; asked and answered.
14   A.   I don't recall if they partially
15 would fulfill that order.  I don't
16 remember.
17   Q.   Okay.
18      (Rite Aid - Novack Exhibit 16,
19 email chain ending June 17, 2013,
20 Bates No. Rite_Aid_OMDL_003075 to
21 Rite_Aid_OMDL_003077, was marked for
22 identification, as of this date.)
23 BY MR. SIMMER:
24   Q.   The court reporter has handed

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  you what she's marked as Novack Exhibit
2  16, I'll identify for the record as
3  Rite_Aid_OMDL_003075 to '003077.
4        Take a moment to review that, if
5  you would.
6     A.   (Perusing document.)
7        Okay.
8     Q.   The subject line of this string
9  of emails is "5046 Suspicious Order
10 Monitoring Project."
11       Can you tell us what that is?
12    A.   This was a proposal to create a
13 portal application that would help us with
14 suspicious order monitoring being able to
15 excess different KPIs and review
16 cross-function.
17    Q.   Using some of that lingo again.
18       What is a KPI?
19    A.   A key performance indicator.
20    Q.   And, what do you mean by key
21 performance indicator?
22    A.   Some metrics for -- some metrics
23 that we have identified that we wanted to
24 monitor for anomalies.

Page 335

1     Q.   So, an anomaly would be
2  something of concern, correct?
3     A.   An anomaly is something that we
4  want to look at.  Does not mean that it's
5  necessarily a concern.  We just want to
6  understand what happened.
7     Q.   Okay.  So, a key performance
8  indicator looks like a positive thing
9  though.  When I hear that term, it could
10 be a negative thing, depending on what the
11 information is.
12       Right?
13    A.   The information indicates that
14 it's something out of the norm.
15    Q.   Do you know who originated this
16 proposal for suspicious order monitoring
17 project?
18    A.   I know it was in discussion
19 through the supply chain and through Janet
20 Hart's office.
21    Q.   Did you have a role in making
22 this recommendation?
23    A.   Yes.  I was a partner in this
24 one too.

Page 336

1     Q.   You partnered with whom?
2     A.   With Janet Hart on a lot of the
3  specs with the IT person that was creating
4  this document for us.
5     Q.   And, why is it that the three of
6  you had decided that it would be a good
7  idea to have the suspicious order
8  monitoring projects developed?
9     A.   Because we have different
10 channels that we're already doing with
11 suspicious order monitoring.  However,
12 they're housed in different places.  So we
13 were really looking for a one-stop shop,
14 easily accessible, press of a button, so
15 that it's not as manual, it's -- gives us
16 a better edge on identifying something if
17 something is to be out of the norm.
18    Q.   So, the idea was to create a
19 portal, correct?
20    A.   Yes.
21    Q.   Who would have access to that
22 portal?
23    A.   We had determined that the field
24 would have access, meaning pharmacy

Page 337

1  district managers, or asset protection
2  district managers.  We wanted to make sure
3  that Asset Protection had access,
4  Government Affairs would have access and
5  the supply chain.
6     Q.   And, what kind of information or
7  whatever it was would be housed on this
8  portal?
9     A.   We were hoping to get a lot of
10 our information in relation to ordering
11 any type of adjustment that a store does,
12 any type of manual adjustments, any type
13 of external orders, being able to monitor
14 inventory, a lot of the different factors
15 that would impact the store.
16    Q.   So, I'm trying to get a better
17 understanding what actually the idea was
18 for the suspicious order monitoring
19 project.
20       What would be housed on that
21 portal?
22       MR. LAVELLE:  Object to form.
23    A.   So, our thought process was to
24 consolidate everything that we have

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1  currently in our asset protection
2  dashboard that only our asset protection
3  district managers have easy access to.
4  Everybody would have to come through us.
5  And to house items that were housed over
6  in the supply chain so that it can come
7  into one place.  That way we can look at
8  the information.  We can look at it from
9  an analytics perspective.  You know, we're
10  always looking for better ways to increase
11  our controls and improve on what we have.
12     Q.  I direct your attention to,
13  actually, your email which is the second
14  one on the first page of Exhibit 16?
15     A.  Yes.
16     Q.  And it's your email to Robert
17  Oberosler and Janet Hart.
18        Do you see that?
19     A.  Yes.
20     Q.  And you say:  My revisions are
21  in blue for the DC threshold project.
22        So, if I have it right, and I
23  think your exhibit is in color so you
24  should be able to see it as well.  When

Page 339

1  you look back on the next page, you put
2  your changes in that exhibit and they're
3  in blue, correct?
4     A.  Yes.
5     Q.  Are you able to see the blue
6  color for your changes?
7     A.  Yes.
8     Q.  Could I have you, in the middle
9  of the next page there under
10  "Description," could you read those
11  changes in the first sentence that you
12  included that are in the blue type?
13     A.  Yes.
14        Develop effective controls
15  against the diversion of controlled
16  substances and conduct adequate due
17  diligence to ensure that controlled
18  substances distributed from the
19  distribution centers are legitimate
20  business -- are for legitimate business
21  needs.
22     Q.  Now, you chose the word
23  "develop," didn't you?
24     A.  Yes.

Page 340

1     Q.  You didn't choose the word
2  "consolidate."
3        You said "develop," right?
4        MR. LAVELLE:  Object to form.
5     A.  I used the word "develop"
6  because we were developing a brand new
7  portal application.  So that's the term we
8  use as we do any of these specs and we're
9  putting out there because we're developing
10  a new platform that was not currently
11  existing.
12        MR. SIMMER:  Move to strike
13     non-responsive.
14     Q.  I asked you simply it was you
15  chose the word "develop."
16        MR. LAVELLE:  Object to form.
17     Objection; asked and answered.
18     A.  I chose to use the word
19  "develop" because we were developing an
20  access -- a new application, not new
21  controls.
22     Q.  You also chose the word
23  "effective controls," right?
24        MR. LAVELLE:  Object to form.

Page 341

1  BY MR. SIMMER:
2     Q.  The word "effective," that's
3  your word choice, right?
4     A.  Yes.
5     Q.  Okay.  You also say in there
6  "conduct adequate due diligence."
7        Those are your word choices,
8  right?
9     A.  We were already doing our due
10  diligence.  This is how we can tell them
11  this is what this platform is going to
12  portray for us.
13     Q.  You didn't say, and the words
14  you chose were, "already conducting due
15  diligence."  You say here "conduct
16  adequate due diligence."
17        Right?
18        MR. LAVELLE:  Object to form.
19  BY MR. SIMMER:
20     Q.  Those were your words?
21        MR. LAVELLE:  Object to form.
22     A.  We're utilizing this as a
23  description on what this project entails.
24  So, this project is to help us develop a

Page 342

1 new platform and it will have adequate due
2 diligence, not to say that we don't
3 currently have good due diligence or that
4 we don't have effective controls. This is
5 a continuation of what we're already
6 doing.
7     Q. Okay. It's fine to say all this
8 now, but the words you chose are
9 different. The words you chose simply say
10 "conduct adequate due diligence."
11         That's what you said at the
12 time, right?
13         Are you now wanting to add words
14 that you didn't put into the description?
15         MR. LAVELLE: Object to form.
16     A. I'm giving you context to the
17 description because this is a document,
18 but we also have to present this as we are
19 presenting this to get funds to have this
20 application developed.
21     Q. So, this is a description in
22 order to get funds from the company to
23 create the portal, right?
24     A. To create that application, yes.

Page 343

1     Q. Why didn't you say in your
2 description "we would like to collect
3 information that is currently housed in
4 different places into -- and consolidate
5 it in one place"?
6         MR. LAVELLE: Object to form.
7 BY MR. SIMMER:
8     Q. Why didn't you say that?
9         MR. LAVELLE: Same objection.
10     A. We said this because we want to
11 take that information we currently have
12 and also see if we can do more with it.
13 So, we already have controls in place.
14         And, like I said, things change.
15 Everything improves. What type of
16 improvements can we do now with the
17 computer system that we weren't able to do
18 prior to this as a human review?
19     Q. Wouldn't it have been a easier
20 sell for management if you had said we
21 already have controls in place, what we'd
22 like to propose is that we consolidate the
23 information we already have housed in
24 different places?

Page 344

1         MR. LAVELLE: Object to form.
2     A. In order to get funding for a
3 project, we have to put in what is new
4 about it that will help us improve our
5 processes and take it a further step.
6         If we already have something
7 that is existing, which we currently do,
8 then why do we need all this money to
9 create a new platform?
10     Q. How much money were you
11 requesting?
12     A. Any type of IT project was a
13 lot. I don't remember the exact dollar
14 value. It's not something that we could
15 afford personally.
16     Q. You don't think it would have
17 been an easier sell for management, in
18 terms of making this kind of investment,
19 to say, you know, we already have these --
20 these tools in various different places.
21 We'd just like to consolidate them? We're
22 already doing this.
23         Wouldn't that be an easier sell
24 with management?

Page 345

1         MR. LAVELLE: Object to form.
2 Objection; asked and answered.
3     A. We wanted to make sure we
4 showcased what we wanted to do. So, we
5 already have it. We want to make sure
6 that they understand that we want this for
7 a technology perspective so that we can
8 easily access that information if, at any
9 point, we needed it.
10     Q. It doesn't say anywhere in here
11 we already have it, does it?
12         MR. LAVELLE: Object to form.
13 Objection; asked and answered.
14     A. That's why we present these PI
15 projects. So, we create a document and
16 then we go and present this in person and
17 present our case.
18     Q. So you're saying what you would
19 have done is when you would have presented
20 this in person, you would have explained
21 you already have this information in
22 different places, you just want to
23 consolidate it? That's what your
24 testimony is?

Page 346

1        MR. LAVELLE:  Object to form.
2    BY MR. SIMMER:
3        Q.    You'd do it in person, right?
4        MR. LAVELLE:  Same objection.
5        A.    Management is already aware of
6    what we currently have.  We're letting
7    them know what we want to do with this
8    information now.
9        Q.    So, who in management already
10   knew about this?  Who are those
11   individuals?
12       A.    Folks that are operating with
13   this project, anyone that we were
14   presenting this information to that would
15   have a stake in signing off.
16       Q.    Okay.  You're sort of confusing
17   me.
18       You said that you were going to
19   present this to management.  Now you're
20   saying that management happens to be the
21   same people that are working on the
22   project.
23       Which is it?
24       MR. LAVELLE:  Object to form.

Page 347

1        A.    So, we're all in management
2    that's in this project specifically, but
3    we would have to present this to, like,
4    our CFO or our -- for finances, or we'd
5    have to present this to make sure that I
6    copied my supervisor here so that he's
7    aware of what we're trying to do from a
8    department's perspective, and so did Janet
9    and so did other people on this
10   communication chain so they're all aware
11   of what we currently have and they're
12   aware of what we're trying to do from a
13   business case perspective so that we can
14   get this funding.
15       Q.    So when I go take the
16   depositions, or we go take the depositions
17   of these individuals, they're going to say
18   we already knew about all the stuff we
19   had.  We knew it was housed in different
20   places.  Even though the description
21   doesn't say that anywhere, they're going
22   to confirm they agree with you that they
23   knew this stuff was already being done,
24   right?

Page 348

1        MR. LAVELLE:  Object --
2        Q.    That's your testimony?
3        MR. LAVELLE:  -- to the form.
4        A.    I can't tell you what they would
5    say in their deposition.
6        Q.    You just said they already knew
7    about this.
8        MR. LAVELLE:  Object to form.
9    That's not even a question.
10       A.    So, you asked --
11       MR. LAVELLE:  Wait until he asks
12   a question.
13   BY MR. SIMMER:
14       Q.    Did they know about it or not?
15       You just said that they did.
16   Now you're saying you don't know what they
17   know.
18       Which is it?
19       MR. LAVELLE:  Object to form.
20       A.    I said I don't know what they
21   would answer in their deposition or if you
22   were to ask them.
23       Q.    But it's your belief that they
24   would testify they knew about it, right?

Page 349

1        MR. LAVELLE:  Object to form.
2    Objection; asked and answered.
3        A.    I don't know what they would
4    testify.  I don't know what they would say
5    they would answer.  I don't know what they
6    would or would not remember.
7        (Rite Aid - Novack Exhibit 17,
8        email chain ending October 9, 2013,
9        Bates No. Rite_Aid_OMDL_0050291 to
10       Rite_Aid_OMDL_0050306, was marked for
11       identification, as of this date.)
12   BY MR. SIMMER:
13       Q.    The court reporter has handed
14   you what she's marked as Novack
15   Exhibit 17, which I'll identify for the
16   record is Rite_Aid_OMDL_0050291 through
17   '0050306.
18       Please take a moment to review
19   that.
20       A.    (Perusing document.)
21       Okay.
22       Q.    We discussed a moment ago the
23   right -- that Rite Aid started a project
24   in 2013 to develop a suspicious order

Page 350

1  monitoring system, right?
2      MR. LAVELLE:  Objection to the
3  form of the question.
4      A.  I'm sorry.  Could you repeat the
5  question?
6      Q.  You see, when he makes his
7  objections, you lose your train of
8  thought, don't you?  I do the same thing.
9      We discussed a moment ago that
10 Rite Aid started a project in 2013 to
11 develop a suspicious order monitoring
12 project, right?
13     MR. LAVELLE:  Object to form.
14     A.  We had put this together for
15 funding in 2013.
16     Q.  But you started a project that
17 was called the Suspicious Order Monitoring
18 Project, right?
19     A.  Yes.
20     Q.  And you were part of that
21 effort, I think you testified, right?
22     A.  Yes.
23     Q.  And what's attached to
24 Exhibit 17 is that suspicious order

Page 351

1  monitoring proposal or project you were
2  developing with others, right?
3      A.  Yes.
4      Q.  Who all was involved in
5  preparing this document?
6      A.  Myself, Janet Hart, Karyn that's
7  listed on here, I believe Chris Belli was
8  also part of this.
9      Q.  So, if I could direct your
10 attention to the first page of this where
11 it says:  Chair/sponsor Wilson Lester.
12     What does that mean to be a
13 chair sponsor, and what's his role in
14 this?
15     A.  He was the SVP of supply chain.
16 So, this would be his department, or this
17 is his supply chain project.
18     Q.  So, for this to get approved, he
19 had to be the sponsor for it, correct?
20     A.  We needed a sponsor.  We needed
21 a department sponsor.
22     Q.  And the business representative
23 is listed here as Janet Hart.
24     What is her role?

Page 352

1      A.  She's in Government Affairs.
2      Q.  But it says "business
3  representative."
4      What does it mean to be a
5  business representative?
6      A.  We were part of the entity that
7  was requesting this suspicious order
8  monitoring project, and we were basically
9  representing the business on behalf of
10 this project.
11     Q.  You were also listed as a
12 business representative, right?
13     A.  Yes.
14     Q.  Does it require two business
15 representatives to make a proposal like
16 this?
17     A.  The more that you have, the
18 better because you're pulling in expertise
19 from different departments to create
20 something in a document that can go for
21 review.  So, if it houses different
22 departments, then you would have the
23 different department representatives
24 present.

Page 353

1      Q.  It says there's an IS
2  representative.
3      What is IS?
4      A.  That's basically our IT
5  department.
6      Q.  And that's Karyn Kunzig.
7      She's also listed as being the
8  person who prepared it.
9      Is she the person who prepared
10 this document?
11     A.  She would help fill out the
12 forms 'cause, ultimately, she's the one
13 that would have to build the platform.
14     Q.  The structure that this is put
15 into, is this a structure that Rite Aid
16 required for all proposals like this?
17     A.  For project funding, yes.
18     Q.  Okay.  So it's a template you're
19 given and say okay, this is the
20 information that you need to provide so
21 that this will be -- go up through review
22 to get approved, right?
23     A.  Yes.
24     Q.  Anybody else besides the people

Page 354

1 listed here that worked on this or
2 provided input?
3    A.   I don't recall specifically.
4    Q.   What was your specific role in
5 drafting this document?
6    A.   My role was more in relation to
7 the metrics and the trending reports
8 'cause we review those trending reports
9 and we have different ways that we look at
10 it currently in our system.  So we want to
11 take that information and be able to
12 implement it here.
13    Q.   It's correct that you didn't
14 have a portal like this before, did you?
15    A.   This platform was the new portal
16 to create -- to house all this
17 information.  So, we had different
18 processes, but this is going to be a new
19 application.
20    Q.   So this is new, right?
21    A.   The application itself, yes.
22    Q.   That's what I asked.
23       It's new, right?
24    A.   The application, yes.

Page 355

1    Q.   This never went into effect, did
2 it?
3    A.   No, not --
4    Q.   Why not?
5    A.   Not the time that I was there.
6 And based off of the timeline, it
7 coincides with our distribution going to
8 McKesson.  So, we wouldn't have ordering
9 in our -- in our warehouses anymore.
10    Q.   So, if you had not moved
11 distribution over to McKesson, that's when
12 you would have tried to put this portal in
13 place, right?
14       MR. LAVELLE:  Object to form.
15    A.   I don't know since it did
16 happen.  We had a projected timeline and
17 that's the information according to the
18 timeline.
19       However, McKesson came right in,
20 so, and that took the rest of the
21 timeline.
22    Q.   So, the only reason that you
23 know of that it wasn't put in place is
24 that the distribution was switched over to

Page 356

1 McKesson, right?
2    A.   That I'm aware of, yes.
3    Q.   Turn to page 5, please.  So, it
4 has a description here of suspicious order
5 review.
6       Do you see where I am?
7    A.   Yes.
8    Q.   Do you see where it says:
9 Today blanket thresholds are manually
10 enforced at 5,000 dosage units per
11 individual NDC per week per store
12 regardless of dispensing volume or trends.
13 This is a labor intensive process with
14 opportunity for order lines to be missed.
15       So, am I right that this is
16 describing the status quo that you were
17 operating under with your 5,000 unit
18 threshold, right?
19       MR. LAVELLE:  Object to form.
20    A.   This is the current process that
21 we have in place at the time, 5,000 units
22 per NDC.
23    Q.   I think we're saying -- the
24 answer to my question is yes, that's the

Page 357

1 current process you're describing, right?
2       MR. LAVELLE:  Object to form.
3    A.   It's the 5,000 dosage units per
4 NDC.  That's what I'm saying.
5    Q.   So, you do this.  I ask a
6 question and then you change it.  So let
7 me try it again.
8       You're describing what the
9 current system is, right?
10       MR. LAVELLE:  Object to form.
11    A.   The current system is 5,000
12 dosage units.  That's what I'm describing.
13    Q.   Okay.  Did the opioid products
14 distributed by Rite Aid come in different
15 formulations?
16    A.   I'm sorry.  Could you repeat the
17 question?
18    Q.   Did the opioid products
19 distributed by Rite Aid come in different
20 formulations?
21    A.   Yes.
22    Q.   For example, you had a combo
23 products with hydrocodone five-point --
24 or, 7.5 milligrams and others with

Highly Confidential – Subject to Further Confidentiality Review

Page 358

1  hydrocodone 5 milligrams, right?
2      A.   Yes.
3      Q.   Did each formulation have a
4  different NDC?
5      A.   Yes.
6      Q.   So the threshold would be 500 --
7          MR. SIMMER:  Strike that.
8      Q.   So, the threshold would be 5,000
9  dosage units for hydrocodone 7.5
10  milligrams and additional 5,000 dosage
11  units for hydrocodone 5 milligrams, right?
12      A.   For each individual NDC.
13          However, there are algorithms in
14  place that will not allow them to order up
15  to 5,000 dosage units if they have not
16  been using them.
17          MR. SIMMER:  I move to strike
18      everything after "for each individual
19      NDC" as non-responsive.
20      Q.   You say here:  So order lines
21  were missed in the manual process.
22          What do you mean by that?
23          MR. LAVELLE:  Object to form.
24      A.   So, currently at the DC are it's

Page 359

1  manually reviewed by somebody that is
2  picking that item.  So if the item is over
3  that threshold, they would have to
4  manually pull it out.
5          There is an opportunity for
6  human error.  That's what we're saying.
7      Q.   So, is it correct that orders
8  over the threshold were shipped?
9      A.   That's not what I'm saying.  I'm
10  saying that there's potential for human
11  error, and we wanted to minimize that
12  potential.
13      Q.   If they went over the -- it went
14  over the threshold, they'd have to get
15  that order from McKesson, right?
16          MR. LAVELLE:  Object to form.
17          MS. CHARLES:  Form.
18      A.   Could you repeat that question?
19      Q.   I'm just reading back to you
20  essentially what you say here:  In
21  addition, stores which truly need this
22  quantity must order it from McKesson.
23          Right?
24      A.   So, in that case, it's if the

Page 360

1  store truly is dispensing at that volume
2  and we have this blanket threshold across
3  the board, in order to service the
4  remainder of their patients, they would
5  place their order through McKesson.
6      Q.   So I think the answer to my
7  question is yes, if they were going above
8  their threshold, they had to get it from
9  McKesson.
10          Right?
11          MR. LAVELLE:  Object to form.
12      A.   If they needed more than their
13  threshold, then they would order it
14  through McKesson as their source.
15      Q.   I think we're in agreement.  The
16  answer to my question is yes, if they
17  needed it, they would go to McKesson.
18          Right?
19          MR. LAVELLE:  Object to form.
20      A.   I don't think I'm understanding
21  what you're rephrasing.
22      Q.   It's not a trick question.  I
23  asked you if they needed more than they
24  could get through Rite Aid, they would go

Page 361

1  to McKesson.
2          Right?
3          MR. LAVELLE:  Objection; asked
4      and answered.
5      A.   So, in this case, we're talking
6  about a store.  They truly had a
7  dispensing history and they needed it and
8  we had these blanket thresholds, they
9  would have to order it from McKesson, one
10  of the enhancements we were trying to do
11  for our locations.
12      Q.   Just I have to get a clear
13  record here because when I ask you a
14  yes-or-no question and you don't answer it
15  that way, I don't know if you disagree
16  with my question.
17          So, when I asked if they needed
18  more than they could get through Rite Aid,
19  they would go to McKesson, is the answer
20  "yes" or "no" to that question?
21          MR. LAVELLE:  Object to form.
22      Objection; asked and answered.
23          MR. SIMMER:  It is not answered.
24      She didn't answer the question.

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  MR. LAVELLE: Counsel, you don't
2  get to both ask the questions and
3  answer them.
4  MR. SIMMER: I need to get a
5  clear record here.
6  MR. LAVELLE: You already do
7  have a clear record. You're really
8  making it difficult here because you
9  ask every question five times and
10 you're berating the witness.
11  Let's move on.
12 BY MR. SIMMER:
13  Q. So, is the answer to my question
14 "yes" or "no"?
15  So, if they could -- they're up
16 against what they could get from Rite Aid,
17 they would then go to McKesson, right, if
18 they needed more?
19  A. If they truly needed more, based
20 off of the history in dispensing for their
21 patients, then they would order from
22 McKesson.
23  Q. So you are in agreement with my
24 question then if they -- subject to the

Page 363

1  qualification that it has to be truly
2  needed more. Otherwise you agree with me,
3  right?
4  MR. LAVELLE: Object to form.
5  Objection; asked and answered.
6  A. I don't understand your question
7  at this point.
8  Q. What don't you understand?
9  A. I'm stating if the store needed
10 more than their threshold, because their
11 business already dictates that they do,
12 then they would order from McKesson, which
13 is something that that location has to do.
14  Q. Is it true that Rite Aid
15 pharmacies only make legitimate orders?
16  A. Could you repeat that question?
17  Q. Is it true that Rite Aid
18 pharmacies only make legitimate orders?
19  A. Can you -- I don't understand
20 what you mean by legitimate orders.
21  Q. I'm just trying to clarify when
22 you say if they truly need something.
23  Don't they always only order
24 when they truly need something?

Page 364

1  A. So, they truly need it based off
2  of their dispensing. We're calling out
3  that we can't supply more because of their
4  thresholds that are already in place. So,
5  they have been doing this and we want to
6  see if we can make it a little bit easier
7  for our stores, more controls in place so
8  that we can get them to supply through one
9  distribution, instead of at times where we
10 can't get the supply in time for our
11 patients.
12  Q. Okay. I'm just establishing a
13 real simple point.
14  You say that they -- if they ran
15 out of what they could get from Rite Aid
16 and they truly needed it, they could go to
17 McKesson.
18  Right?
19  A. Yes.
20  Q. Isn't every instance when a
21 Rite Aid pharmacy makes an order like that
22 they do truly need it?
23  A. So, I can't tell you what is
24 happening in a store and how those orders

Page 365

1  are placed, whether it's manual or not.
2  So, I can't answer that question.
3  Q. So, is it true then that there
4  are instances when they may not truly need
5  it, but yet they did make an order?
6  MR. LAVELLE: Object to form.
7  A. I don't -- I don't understand
8  the question.
9  Q. I'm trying to understand why you
10 put the qualification of "truly" in there.
11  Is there -- were there instances
12 where you believed that pharmacies were
13 ordering from McKesson and they didn't
14 truly need that additional quantity?
15  MR. LAVELLE: Object to form.
16  A. I believe that there are times
17 where mistakes happen. I believe that
18 there are times where they may figure
19 something or they thought that something
20 was out. I believe there are different
21 times where an order may have been placed
22 that was not necessarily for that
23 business, per se, and that's why we've got
24 these different checks in place.

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    Q.   So, when you say the
2   qualifications "truly," you simply think
3   that's a mistake?
4    A.   No.  I'm saying that stores that
5   currently do supply higher amounts than
6   what our thresholds call for for an
7   individual NDC, they are currently getting
8   supply in two different places.  So, we
9   want to be able to supply in one place for
10  that store that is truly utilizing this
11  medication for their patients.  So we can
12  reduce and minimize the gaps in service
13  and also be able to have more visibility
14  that can control the ordering system, the
15  replenishment system, the algorithms.
16   Q.   Again you put the qualification
17  of "truly utilizing" in your answer.
18       Were there instances where they
19  didn't truly utilize it correctly?
20       MR. LAVELLE:  Object to form.
21  Objection; asked and answered.
22   A.   I don't recall.  I don't know if
23  there were any orders.  We're tell --
24  we're stating here that there are stores

Page 367

1   that are currently being supplied in two
2   different locations and they are utilizing
3   it and it is for patients.  So we want to
4   make sure that we have a system in place
5   where we can monitor these stores and
6   adjust their thresholds outside of just
7   that 5,000 across the board.
8    Q.   And you needed that system in
9   place because you thought there were
10  concerns that they weren't truly using
11  the -- the ordering from McKesson
12  appropriately.
13       Isn't that right?
14       MR. LAVELLE:  Object to form.
15       MS. CHARLES:  Object to form.
16   A.   We have a system in place
17  already.  We wanted a place where it would
18  indicate that anomaly where we can go and
19  produce the records quickly.  We can go in
20  and look at this information quickly
21  rather than waiting for an analyst to
22  review it or a report to pop up later on.
23  We're looking for different ways to make
24  everything more efficient so that we can

Page 368

1   improve our processes and instead of a day
2   later, we can catch it instantaneously,
3   for instance.
4    Q.   You recall the documents we
5   looked at earlier about Dr. Harper?  You
6   remember those -- those exhibits we looked
7   at earlier about Dr. Harper?  Remember how
8   he got sentenced to ten years?
9    A.   Yes.
10       MR. LAVELLE:  Object to form.
11  BY MR. SIMMER:
12   Q.   Was he placing truly needed
13  orders from Rite Aid stores?
14       MR. LAVELLE:  Object to form.
15   A.   He's not placing the orders
16  through Rite Aid stores.
17   Q.   But the one -- the ordering
18  that's being reflected in the threshold
19  increase that you requested from McKesson,
20  that was your request, right?
21   A.   That was my request, yes.
22   Q.   Was that truly needed for that
23  doctor who eventually got ten years in
24  prison?

Page 369

1    A.   That was --
2        MR. LAVELLE:  Object to form.
3        MS. CHARLES:  Object to form.
4    A.   That was identified as needed
5   for that store.  That was a prescriber
6   that was prescribing out of that location.
7        However, for that store at that
8   time, we had deemed that it was needed for
9   an increase for that location.
10       MR. SIMMER:  Move to strike
11  non-responsive.
12   Q.   My question was that volume that
13  you requested the increase from McKesson,
14  was that truly needed?
15       MR. LAVELLE:  Object to form.
16       MS. CHARLES:  Object to form.
17  BY MR. SIMMER:
18   Q.   You requested a 15 percent
19  increase, and the reason for it was
20  because of Dr. Harper.  It was right in
21  that exhibit.
22       Was that truly needed for Dr.
23  Harper's increased utilization?
24       MR. LAVELLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1      MS. CHARLES:  Object to form.
2      A.   That increase was needed for
3  that location.  The information was that
4  one of the prescribers is Dr. Harper.  So,
5  we increased the threshold for that
6  location for that store so that they can
7  service the patients that are coming
8  through.
9      Q.   Ma'am, you're the one that
10 introduced this concept of something being
11 truly needed.
12      In the example we went through
13 earlier today in which numerous patients
14 died of overdoses, was that volume
15 increase that you requested truly needed,
16 yes or no?
17      MR. LAVELLE:  Object to form.
18 Objection; asked and answered.
19      A.   So, that increase was needed for
20 that location and the patients that they
21 were servicing.  Ultimately, those
22 prescriptions were dispensed by a
23 pharmacist for a patient that they deemed
24 had medical need.

Page 371

1      Q.   So you're saying that there was
2  truly needed for that particular pharmacy
3  and those patients, right?
4      MR. LAVELLE:  Object to form.
5      A.   In that situation where we
6  increase the threshold for that store,
7  that store determined that they needed it
8  for those patients.  So, I don't know if
9  it was that doctor's patients or other
10 patients, but it was patients that had a
11 medical need.
12      Q.   And it was truly needed, right?
13      MR. LAVELLE:  Object to form.
14 BY MR. SIMMER:
15      Q.   I'm using the terminology that
16 you established in this protocol, or the
17 project that you came up with that you
18 wanted to be sure that it was truly
19 needed, and I'm trying to use the example
20 of the threshold increase that you made.
21      Was that truly needed, your
22 term?
23      MR. LAVELLE:  Object to form.
24      A.   So, in that situation in that

Page 372

1  location for that store, based off of that
2  time and the information that was
3  provided, it was deemed that the patients
4  needed that medication.  So we increased
5  that threshold by 15 percent.
6      Q.   So, in your answer to the
7  question you use the passive voice.  You
8  say it was deemed that the patients needed
9  that medication.
10      You were the person who made the
11 request.
12      Wasn't it you that deemed that
13 those patients needed that medication and
14 that's why you passed on that 15 percent
15 increase request, because you felt that
16 they -- those patients truly needed that
17 medication?
18      MR. LAVELLE:  Object to form.
19      A.   I felt that the store needed
20 that medication in order to service the
21 patients that they were seeing.
22 Ultimately, the patient that received that
23 prescription was determined to have
24 medical need based off of the pharmacists

Page 373

1  that are dispensing, that's taking care of
2  that patient face-to-face and improving
3  their outcomes.
4      Q.   Look at page 6 of the project
5  document that you and your colleague
6  created.
7      You see where it says "Trending
8  Reports"?
9      A.   Yes.
10      Q.   The first sentence you say:  In
11 addition to monitoring orders daily, the
12 need exists to monitor ordering patterns
13 of a store over time.
14      Do you see that?
15      A.   Yes.
16      Q.   Is it a correct reading of what
17 you're saying there that you were not
18 actually monitoring order patterns of a
19 store over time?
20      A.   No, that's not what we're
21 saying.
22      Q.   You said the need exists, right?
23      A.   The need does exist for us to do
24 that and that's why we want to create more

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1  robust trending reports that are easily
2  accessible.  However, we have these
3  trending reports already on our Naviscript
4  dashboards.
5     Q.   So, the trend report for the
6  store for Dr. Harper that we looked at, if
7  you'd been using that kind of order
8  monitoring pattern, you would have seen
9  that kind of trend that was going on in
10 that store, wouldn't you?
11       MR. LAVELLE:  Object to form.
12    A.   I can't guess to what we would
13 have seen on KPIs that we're trying to
14 house in a different place, and I don't
15 know what type of volume I were doing in
16 that location that would have caused any
17 flags or not on these KPIs.
18    Q.   Did you ever look at Naviscript
19 to determine suspicious orders?
20    A.   Yes.
21    Q.   How often?
22    A.   We have analysts that do order
23 reviews on something we call a trifecta
24 every quarter.

Page 375

1     Q.   Okay.  I'm not sure I
2  understand.
3        What do you call this?  A
4  trifecta?
5     A.   Yeah.  We look at multiple
6  things that we would utilize to determine
7  if there was any suspicious activity that
8  we wanted to be aware of and research.
9  So, we can look at trends where a store is
10 ordering manually overriding their
11 replenishment discussions, also ordering
12 from an outside vendor, and if there are
13 any on-hand adjustments that would
14 indicate that we're trying to get some
15 more medications in the stores that we
16 want to be suspicious about.
17    Q.   So, the proposal you made here,
18 were you suggesting that there needed to
19 be that kind of trend analysis every four
20 months like you're talking about was
21 already being done when you're looking at
22 Navistar [sic]?
23       MR. LAVELLE:  Object to form.
24    A.   So, Naviscript is a quarterly

Page 376

1  review and we review all of the data for
2  the past quarter.  We're looking for
3  something that can be even streamlined for
4  more efficiency so that if something was
5  to happen we can catch the trend even
6  quickly because it's a lot of data that
7  we're reviewing.
8     Q.   I guess I'm asking a slightly
9  different question.
10       You were going to do a -- the
11 proposal you were making was going to
12 monitor orders daily and then also monitor
13 patterns over time.
14       You were going to do simply a
15 quarterly monitoring of that trend; is
16 that right?  For a particular -- is that
17 what you're talking about?  You're going
18 to continue the same kind of quarterly
19 monitoring with this project that you were
20 undertaking?
21    A.   No.
22       MR. LAVELLE:  Object to form.
23    A.   So, this project would give us
24 real-time alerts.  So any time anything

Page 377

1  over here -- two different phases.  So,
2  one part is if there were anything in
3  there that would flag for a corporate
4  review, then that alert would happen right
5  away.
6        If something was -- didn't seem
7  like an anomaly, but over time it adds up
8  to be something that we should be aware
9  of, then it would flag us to look quickly
10 too.
11       So, this was continuous, being
12 more robust in what we already currently
13 had.
14    Q.   Could you turn to page 7?
15       Before I go there, you said that
16 you were doing quarterly reviews through
17 Naviscript, but the orders were being made
18 daily, right?
19    A.   Yes.  The orders are made -- the
20 orders for the warehouses were once a
21 week, if they were a weekly order store.
22    Q.   Turn to page 7.
23       You have a list of assumptions
24 here.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    A.   Yes.

2    Q.   And one of the assumptions, the
3  third bullet is that: McKesson's systems
4  contain sufficient controls to manage the
5  DSD purchases.

6       Do you see that?

7    A.   Yes.

8    Q.   And what is DSD?

9    A.   Vendor purchases.

10   Q.   So, what you're assuming is that
11  McKesson had a system in place to manage
12  that, right?

13   A.   We were assuming that we weren't
14  making any changes to an external system
15  that we didn't own.

16   Q.   So you're assuming that their
17  controls are sufficient, right?

18   A.   We're assuming that their
19  controls are sufficient from their
20  monitoring perspective and we weren't
21  going to make any changes.

22   Q.   What did you mean by
23  "sufficient"?

24   A.   That they have their way of

Page 379

1  monitoring their orders.

2    Q.   Nothing more than that, just
3  that they had their own way of doing
4  things?

5    A.   I don't know what they have or
6  they don't, but in order to be in
7  compliance, we would assume that they had
8  something similar.

9    Q.   So, wouldn't a normal
10  utilization of the word "sufficient" also
11  mean that it's compliant, for example?

12      MR. LAVELLE: Object to form.

13   A.   I can't speak to whether their
14  controls were compliant or not. I --

15   Q.   But you wrote this assumption,
16  right?

17   A.   This is for anything that we
18  provide in our corporation to make sure
19  that we were in compliance and we were
20  operating within controls.

21      MR. SIMMER: Move to strike
22  non-responsive.

23   Q.   My question is you wrote this
24  assumption, and this project assumes that

Page 380

1  McKesson is operating at a level where
2  they had, what you said, sufficient
3  controls, right?

4      MR. LAVELLE: Object to form.
5  Objection; asked and answered.

6    A.   This is assuming Rite Aid had --
7  Walgreen -- sorry. McKesson has their own
8  systems in place.

9    Q.   And, when you say "sufficient,"
10  are you also meaning that they had --
11  they're compliant, right?

12      MR. LAVELLE: Objection to the
13  form. Objection; asked and answered.

14   A.   I cannot speak to their
15  compliance. I'm just -- this is an
16  assumption that we're not doing anything
17  to change McKesson's systems or McKesson's
18  processes. This is for our own processes,
19  our own monitoring. We monitor our vendor
20  orders from a replenishment perspective
21  and what comes in and what goes out, but
22  we were not assuming that we were going to
23  change anything in relation to a vendor
24  'cause we can't.

Page 381

1    Q.   That wasn't my question.

2      So, if it were so that
3  McKesson -- you knew that McKesson had a
4  out-of-control system and was not in
5  compliance with DEA regulations. You
6  would --

7      MS. CHARLES: Object to form.

8      MR. SIMMER: You need to let me
9  finish my question. So why don't you
10  wait.

11  BY MR. SIMMER:

12   Q.   In that situation, you wouldn't
13  be making this recommendation because your
14  assumption was that they had a sufficient
15  control in place, right?

16      MR. LAVELLE: Object to form.

17   A.   I don't understand the question.
18  Could you repeat it?

19   Q.   Well, I'm just -- you used the
20  word "sufficient controls." I don't --
21  I'm not saying you're doing -- trying to
22  change them at all.

23      Base assumption making this
24  proposal was that they have sufficient

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1 in -- controls in place to manage the
2 system, right?
3        MR. LAVELLE:  Object to form.
4 Objection; asked and answered
5 repeatedly.
6    A.  This assumes that they have
7 sufficient controls.  I cannot assume what
8 their compliance is or how they do it on
9 their end.
10   Q.  But that's exactly what you did.
11 I'm trying to -- when you answer these
12 questions and -- all right.
13       MR. SIMMER:  Strike that.
14   Q.  You just said "I cannot assume
15 what their control -- or their compliance
16 is or how they do it on their end."
17       But that's exactly what you did
18 here in bullet number 3.  You say:
19 McKesson's systems contain sufficient
20 controls to manage the DSD purchases.
21       That's an assumption, right?
22       MR. LAVELLE:  Object to form.
23   A.  So, the assumption is that they
24 have sufficient controls to control their

Page 383

1 orders on their end and their own
2 compliance.
3        This is in relation to our
4 supply chain and whether we are compliant
5 with our suspicious order monitoring
6 program and what we're doing in relation
7 to orders that come in and out of our
8 stores and supplying to those locations.
9 So, this is really for our project and
10 what we do on our end.
11       The assumptions there is not to
12 assume -- I cannot speak to what their
13 compliance is.
14   Q.  Let's move on --
15       MR. LAVELLE:  Thank God.
16   Q.  -- and go to page 10, please.
17       So, the template asked you to
18 put benefit estimate.
19       As your understanding, what is
20 meant by "benefit"?
21   A.  So, in our understanding is why
22 do we want to do this?  How is this going
23 to help us?
24   Q.  Is this strictly monetarily?

Page 384

1 Or, what are you looking for when you fill
2 in something like this benefit?
3    A.  It's any type of benefit.  So,
4 in this particular one, we're not going to
5 make any money out of it, but we want to
6 make sure that we avoid any fines.  We
7 want to make sure that we are in
8 compliance with our regulations that we
9 operate under.
10   Q.  So, it says under "Benefit":
11 Avoid DEA fines.
12       Right?
13   A.  Yes.
14   Q.  So, what your team came up with
15 as a benefit that you saw by putting this
16 project in place was to avoid being fined
17 by the DEA, right?
18   A.  It's to operate within
19 compliance.
20   Q.  That's not what you wrote.
21       Your words, not the rest of
22 that.  You say "avoid DEA fines," right?
23       MR. LAVELLE:  Object to form.
24   A.  If we were not in compliance,

Page 385

1 then we ultimately would be fined by the
2 DEA.  So, the ultimate goal here is to
3 make sure that we are compliant in the
4 operations that we're running.
5    Q.  So why didn't you write that
6 down?
7        MR. LAVELLE:  Object to form.
8    A.  It's just a term that we decided
9 to use when we were there.  One implies
10 the other.
11       And, again, we talk about these
12 project initiations and we discuss it in
13 more context when we're presenting this.
14   Q.  So, rather than write down that
15 the ultimate goal was to be more
16 compliant, you chose instead to say "avoid
17 DEA fines."
18       Right?
19   A.  I didn't personally draft this
20 estimate, or these words that were placed
21 in here.  But the words that are printed
22 here are, yes, to avoid DEA fines.
23       However, the context is if we
24 are in compliance, we won't get fined and

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1  that's why we're going to avoid it.
2      Q.   So, look over under
3  "Justification."
4          Did you write that?
5      A.   No.
6      Q.   Somebody else wrote that?
7      A.   Yes.
8      Q.   Who?
9      A.   Janet.
10     Q.   So, the ultimate project as it
11 was being written up, you had the
12 opportunity to review that, right?
13     A.   Correct.
14     Q.   And if you didn't agree with it,
15 you would have changed it, right?
16     A.   You asked for a specific word
17 choice.  So I couldn't tell you why she
18 used that word choice, but I can tell you
19 the context behind ultimately what that
20 meant.
21     Q.   Okay.  But you were one of the
22 reviewers, and if you didn't agree with
23 the word choice, you would have changed
24 it, right?

Page 387

1      A.   Yes.
2      Q.   We saw instances where you did
3  make changes, right?
4      A.   Yes.
5      Q.   Okay.  So, there under the
6  justification, it lists a series of things
7  that were potential justifications.  The
8  first one:  Recent DEA fines for
9  controlled substance distributors.
10         Do you see that?
11     A.   Yes.
12     Q.   And then it lists Walgreens
13 $80,000,000.
14         Do you see that?
15     A.   Yes.
16     Q.   And then McKesson $13,000,000.
17         Do you see that?
18     A.   Yes.
19     Q.   And then it talks about a
20 McDowell County, West Virginia lawsuit.
21         Do you see that?
22     A.   Yes.
23     Q.   And then also it says:  The DEA
24 has stated numerous times controlled

Page 388

1  substance distributors must have a
2  protocol to identify and report suspicious
3  orders based on individual pharmacy volume
4  not generic limits for all registrants.
5          Do you see that?
6      A.   Yes.
7      Q.   Now, this generic limits for all
8  registrants, that's, in fact, the protocol
9  that Rite Aid had been using with its
10 arbitrary 5,000 unit limitation, right?
11         MR. LAVELLE:  Object to form.
12     A.   So, it is my understanding that
13 the DEA does not state in their Code of
14 Federal Regulations that they do not have
15 generic limits for registrants.  It's
16 language about identifying and reporting
17 suspicious orders.  So, we were trying to
18 get ahead of the trend and make sure that
19 we had a way of looking at individual
20 stores, individual thresholds so that we
21 can be ahead of what the trends are out
22 there, knowing that this media has started
23 to strike about the different ways that
24 other organizations were getting fined,

Page 389

1  and it's a great time to say are we doing
2  everything we can to make sure that we are
3  always one step ahead.
4          MR. SIMMER:  Move to strike
5      non-responsive.  That was not my
6      question.
7      Q.   I said that Rite Aid had in
8  place a 5,000 unit threshold for every
9  pharmacy, right?
10     A.   No.  We have a 5,000 threshold
11 for every NDC.
12     Q.   That's what I mean.
13         And that is applied across the
14 board to every pharmacy that Rite Aid
15 owned, right?
16     A.   Yes.
17     Q.   Isn't that the very kind of
18 generic limit that this -- this
19 description here is saying that the DEA
20 says is not appropriate?
21     A.   That's what we are looking at.
22 That's why we did mention in our
23 description we do have blanket generic, or
24 we have blanket NDCs with 5,000 threshold,

Page 390

1  and we want to be able to manipulate that
2  so that it is closer to what the stores
3  are doing.
4      Q.   And you just testified a moment
5  ago that what your goal was to get ahead
6  of the trend.
7          Is that right?
8      A.   Our goal is to make sure that
9  we're operating optimally.  As we hear of
10  different things, we want to learn from
11  them so that we can be better.  So, we
12  have controls that meet the regulations.
13  Do we have controls that can protect us
14  even further, protect our patients even
15  further, our stores, our teams?
16      Q.   So, the McKesson fine was in
17  2008 or so, right?
18      A.   I don't recall which fine it's
19  referring to.
20      Q.   Well, how is it ahead of --
21  getting ahead of trend in 2013, five years
22  later?
23          MR. LAVELLE:  Object to form.
24      A.   So, these are different paces.

Page 391

1  So if that was in 2008, that $13,000,000,
2  we also have a new one that was just
3  recent in the Walgreens settlement.  So,
4  this context is also something that's
5  different.  We know that they've started
6  to talk about these limits and we want to
7  make sure, based off of this information
8  that's coming out and what other retailers
9  are facing, do we have controls to make
10  sure that we can get ahead of it.  So, in
11  2013, I don't know if this statement was
12  valid.
13      Q.   I guess that's my question.
14          You're saying you're getting
15  ahead of trend.  It looks like you're
16  behind the trend here.  It lists all these
17  events that you're talking about have
18  already occurred and the fact that the DEA
19  said numerous times that you have to have
20  more than a generic limit.
21          Isn't, in fact, the case that
22  Rite Aid is behind the trend, not ahead of
23  the trend?
24          MR. LAVELLE:  Object to form.

Page 392

1      A.   No.  Rite Aid is taking the
2  information that we are receiving, looking
3  at all of the different things that are
4  available and taking a look at what we can
5  learn from them so that we can improve,
6  further improve our processes so that we
7  can do better at what we currently do.
8          We are in compliance with what
9  the DEA tells us we need to do in relation
10  to identifying and reporting suspicious
11  orders.  So, can we move it a step
12  further?  And they talk about the things
13  that they've learned in these different
14  news articles that we've read in the media
15  about how they got into the predicament
16  that they're in and how do we adjust to
17  make sure that we're not in the same type
18  of situation.  Do we have those
19  capabilities to do so?
20          So, we were operating in
21  compliance, but as trends change, as
22  things change, we wanted to improve our
23  processes to make sure that we were in the
24  same place.  And this was new, as we were

Page 393

1  discovering it, based off of these fines
2  that were happening.
3      Q.   And the only reason to make this
4  change is because of a trend, right?
5      A.   We're always looking at
6  internally what we can do to improve our
7  processes, so.
8      Q.   Because of the trend.  That's
9  what you keep saying.  It is because of a
10  trend, of things that you saw that were
11  occurring.
12          Right?
13      A.   That's one of the reasons.
14      Q.   Not because it was the right
15  thing to do, but simply because it was the
16  result of the DEA enforcement and some
17  lawsuits, is what it looks like.
18          MR. LAVELLE:  Object to form.
19      A.   A lot of times we don't know
20  what we don't know.  So, as this comes up
21  in the media and we realize that there's
22  some other things that we can look at to
23  improve, then we go back and we say do we
24  have something like this in place, can we

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1  make it more robust, is there something
2  that we can develop.  So, it's always easy
3  to go back and say let's do better and not
4  continue to do just what we're doing.
5      Q.   I think you meant the opposite.
6  It's easy to say that, but it's difficult
7  to do it.
8          Is that what you mean?
9          MR. LAVELLE:  Object to form.
10     A.   I'm not sure what you're
11  referring to.
12     Q.   Well, I'll just read back your
13  response here.  I think you said it wrong.
14  I'll give you a chance to fix this.
15         You say:  It's always easy to go
16  back and say let's do better and not
17  continue to do just what we're doing.
18         I think you meant the opposite
19  of that.  It's more difficult to go and
20  say let's do better rather than keep doing
21  the same thing you're doing.
22         Don't you mean to say that it's
23  easy to keep doing the same thing?
24         MR. LAVELLE:  Object to form.

Page 395

1  BY MR. SIMMER:
2      Q.   But the difficult task is to
3  do -- to change the behavior and do the
4  right thing?
5      A.   You know, the --
6          MR. LAVELLE:  Object to form.
7      A.   The easiest thing is to go and
8  look at what we currently have, right.
9  So, it's a process.  It's hindsight is
10  always 20/20.
11         So, when we have something like
12  this happen, let's take it and let's go
13  back and look and let's see if there's
14  something that we need to do or if there's
15  something that we can improve on
16  processes.
17         So, this was our way of looking
18  at everything that's happening, all of the
19  different reasons why we should review our
20  processes, and let's combine that back and
21  are we doing everything we can.  We have
22  identified that, you know what, we could
23  do better with these order limits and this
24  is what we're trying to do.  We're

Page 396

1  developing a program where we can
2  determine this, it's a lot of massive data
3  and it's a lot of manpower.  How can we
4  make it efficient enough where we can do
5  this quickly?
6      Q.   The proposal you were making,
7  was there going to be some kind of effort
8  to monitor indictments like Dr. Harper's
9  to make sure that wouldn't happen again?
10         MR. LAVELLE:  Object to form.
11     A.   Our process is to monitor any
12  type of suspicious ordering that would
13  relate to theft or diversion in our
14  locations.  So, I don't know what would
15  come of it.  I don't know if any further
16  indictments would happen or that we would
17  have caught it.  I don't know what we
18  don't know.
19     Q.   I don't see anywhere in here an
20  effort in this project that you were
21  outlining in 2013, an effort to identify
22  those situations that were clearly
23  criminal where people were dying.
24         Why wouldn't that be part of

Page 397

1  what you would do as part of the project
2  you were trying to outline?
3          MR. LAVELLE:  Object to form.
4      A.   It's fully part of the project
5  that we're trying to outline.
6          So, we're looking at the
7  indictments.  They're talking about the
8  different increases in amounts that were
9  coming out of the stores, the increases of
10  supply that was going into locations that
11  went unknown.  So we're developing
12  different KPIs that would limit the orders
13  so that we can't suddenly spike in
14  situations like this.  We're looking at
15  different ways where we can flag quickly
16  any order adjustments or any on-hand
17  adjustments or anything that would
18  indicate that we're funneling in all of
19  these prescriptions and there's potential
20  diversion going on.
21         So, we're looking for an easier
22  way to identify that outside of the review
23  that we're already doing.  So, absolutely
24  it's in these documents right here.  It's

Page 398

1  the crux of what we're trying to do.
2      Q.   You're not just doing -- trying
3  to find a more -- an easier way to do
4  that.  You want a more effective way,
5  right?
6          MR. LAVELLE:  Object to form.
7      A.   We're looking for a more
8  efficient way.
9      Q.   So, you don't care whether it's
10  effective.  You just want it to be more
11  efficient, right?
12         MR. LAVELLE:  Object to form.
13     A.   We expect that it will be
14  efficient and effective.  So, we're
15  looking for something that we don't know.
16  We're looking for any type of anomaly that
17  would lead us to believe that we can catch
18  something very quickly.
19     Q.   So, had you already been
20  monitoring indictments as part of the
21  routine work that your folks were doing in
22  monitoring suspicious orders?
23     A.   So, I or my department was not
24  monitoring indictments.  This information

Page 399

1  usually happens through the Government
2  Affairs chain, and then they share it with
3  us.
4      Q.   Yet you were the person that was
5  to sign off on all threshold increases
6  that went -- requests that went to
7  McKesson, right?
8      A.   I signed off on all threshold
9  increases.  The indictments as they
10  happen, we reviewed the data that was
11  coming up with that indictment.  We
12  wouldn't continue to increase thresholds
13  in any stores that had a doctor that was
14  being indicted.
15     Q.   You just said something
16  absolutely contradictory within two
17  questions.
18         You answer "So I or my
19  department was not monitoring
20  indictments."  And now you just said "I
21  did monitor the indictments as they
22  happened."
23         Which is it?
24         MR. LAVELLE:  Object to form.

Page 400

1      A.   I think I was confused on your
2  initial question.
3          So, we weren't the ones that
4  were scouring the Internet to see who was
5  getting indicted or where that information
6  was or what news article was coming
7  through.  As that information is received
8  through one channel of our corporation, if
9  Janet had sent it over or anybody, any
10  party was to send over something about a
11  doctor being indicted, we would look at
12  it, but myself or my department, I was not
13  online looking at this on a daily basis,
14  or I didn't -- it wasn't something that we
15  did.  When we got the information, we
16  would do something with it.
17         MR. SIMMER:  Go off the record.
18         THE VIDEOGRAPHER:  The time is
19  now 5:55 p.m.
20         We're going off the record.
21         (Recess taken.)
22         THE VIDEOGRAPHER:  The time is
23  now 6:04 p.m.
24         We are back on the record.

Page 401

1          MR. SIMMER:  No further
2  questions.
3          I did want to get one thing on
4  the record.  We need to talk about
5  swapping in the exhibits so they have
6  the Bates numbers, and we're going to
7  make sure we get that done.  So I
8  guess we'll work with the court
9  reporter.  Unless there's any
10  questions or any things you want to
11  say on the record about that, that's
12  what we're going to do over the next
13  couple days.
14         MR. LAVELLE:  We have no
15  questions for the witness.
16         The witness reserves the right
17  to read and sign.
18         I would like to put on the
19  record that we are going to need to be
20  involved in the process of confirming
21  that all the documents that are going
22  to be attached to this transcript are,
23  in fact, exact copies of what was used
24  during the testimony today.  We have

| Page 402 |
|---|

1 copies of what was provided to us by
2 counsel, and we will be included in
3 whatever communications there are
4 between plaintiff's counsel and the
5 court reporter to make sure we have a
6 record of the complete documents,
7 including Bates numbers.
8     MS. CHARLES:  McKesson we would
9 appreciate being involved in that as
10 well, as well as for our confidential
11 stamping of the documents.
12     MR. SIMMER:  Of course.
13     MR. LAVELLE:  We agree with
14 that.
15     THE VIDEOGRAPHER:  The time is
16 now 6:05 p.m.
17     This concludes today's
18 deposition.  We are going off the
19 record.
20     (Deposition adjourned at
21 approximately 6:05 p.m.)
22
23
24

| Page 403 |
|---|

1     A C K N O W L E D G M E N T
2
3 STATE OF          )
4                         :ss
5 COUNTY OF          )
6
7     I, SOPHIA NOVACK, hereby certify
8 that I have read the transcript of my
9 testimony taken under oath in my
10 deposition of January 9, 2019; that the
11 transcript is a true and complete record
12 of my testimony, and that the answers on
13 the record as given by me are true and
14 correct.
15
16
17     _____
18             SOPHIA NOVACK
18
19 Signed and subscribed to before me this
20 _____ day of _____, 2019.
21
22 _____
23 Notary Public, State of
24

| Page 404 |
|---|

1     E R R A T A
2 PAGE / LINE / CHANGE  /  REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

| Page 405 |
|---|

1     C E R T I F I C A T E
2 STATE OF NEW YORK
3 COUNTY OF NEW YORK
4
5     I, Marie Foley, RMR, CRR, a
6 Certified Realtime Reporter and Notary
7 Public within and for the State of New
8 York, do hereby certify:
9     THAT SOPHIA NOVACK, the witness
10 whose deposition is hereinbefore set
11 forth, was duly sworn by me and that such
12 deposition is a true record of the
13 testimony given by the witness.
14     I further certify that I am not
15 related to any of the parties to this
16 action by blood or marriage, and that I am
17 in no way interested in the outcome of
18 this matter.
19     IN WITNESS WHEREOF, I have
20 hereunto set my hand this 11th day of
21 January, 2019.
22
23     _____
24         MARIE FOLEY, RMR, CRR

Page 406

1       LAWYER'S NOTES

2   PAGE / LINE

3   ____ ____ _____

4   ____ ____ _____

5   ____ ____ _____

6   ____ ____ _____

7   ____ ____ _____

8   ____ ____ _____

9   ____ ____ _____

10  ____ ____ _____

11  ____ ____ _____

12  ____ ____ _____

13  ____ ____ _____

14  ____ ____ _____

15  ____ ____ _____

16  ____ ____ _____

17  ____ ____ _____

18  ____ ____ _____

19  ____ ____ _____

20  ____ ____ _____

21  ____ ____ _____

22  ____ ____ _____

23  ____ ____ _____

24  ____ ____ _____